# EXHIBIT B – PART 1 OF 3

FILED

| PLAINTIFF(S): THE CITY OF HUNTINGTON | CASE NO.: 17-C-38 |
| DEFENDANT(S): AMERISOURCEBERGER DRUG CORP., CARDINAL HEALTH, INC., MCKESSON CORP. and GREGORY DONALD CHANEY, M.D. | /s/ CHRISTOPHER D. CHILES |

II.    TYPE OF CASE:

| TORTS | | OTHER | | CIVIL |
|---|---|---|---|---|
| ☐ | Asbestos | ☐ | Adoption | ☐ | Appeal from Magistrate Court |
| ☐ | Professional Malpractice | ☐ | Contract | ☐ | Petition for Modification of Magistrate Sentence |
| ☐ | Personal Injury | ☐ | Real Property | ☐ | Miscellaneous Civil |
| ☐ | Product Injury | ☐ | Mental Health | ☐ | Other |
| ☒ | Other Tort | ☐ | Appeal of Administrative Agency | ☐ | |

III.    JURY DEMAND:    ☒ Yes    ☐ No

CASE WILL BE READY FOR TRIAL BY:  January, 2018

IV.    DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS DUE TO A DISABILITY OR AGE?
☐ Yes    ☒ No
☐ Wheelchair accessible hearing room and other facilities
☐ Interpreter or other auxiliary aid for the hearing impaired
☐ Reader or other auxiliary aid for the visually impaired
☐ Spokesperson or other auxiliary aid for the speech impaired
☐ Other: _____

---

| Attorney Name: | Charles R. "Rusty" Webb WVSB No.: 4782 | Representing: |
| Firm: | The Webb Law Centre, PLLC | ☒ Plaintiff    ☐ Defendant |
| Address: | 713 Lee Street, East Charleston, WV  25301 | |
| Telephone: | (304) 344-9322 | |

Dated: January 19, 2017

_Charles R. Webb_
Charles R. "Rusty" Webb (WVSB No.: 4782)

A copy, Teste:

_(signature)_

Circuit Clerk

FILED

IN THE CIRCUIT COURT OF CABELL COUNTY, WEST VIRGINIA

2017 JAN 19 PM 1: 11

THE CITY OF HUNTINGTON,

    Plaintiff,

v.                                                                                    Civil Action No.: 17-C- 38

AMERISOURCEBERGER DRUG CORPORATION,
CARDINAL HEALTH, INC.,                                             /s/ CHRISTOPHER D. CHILES
MCKESSON CORPORATION and
GREGORY DONALD CHANEY, M.D.,

    Defendants.

## COMPLAINT

COMES NOW the Plaintiff, the City of Huntington, West Virginia, by counsel Charles R. "Rusty" Webb of The Webb Law Centre, PLLC and for its Complaint against Defendants, AmerisourceBergen Drug Co. (Amerisource), Cardinal Health Inc. ("Cardinal") McKesson Corporation ("McKesson") and Gregory Donald Chaney, M.D. ("Dr. Chaney") and state as follows:

1.    Plaintiff, the City of Huntington, is a political subdivision of the state of West Virginia.

2.    The City of Huntington has been severely damaged by Defendants' collective actions. The Defendants have illegally and tortiously profited from the prescription drug abuse problems knowingly dumping opioids into the City of Huntington. The devastation caused by these Defendants goes beyond the economic damage; the City of Huntington's families have lost children, parents and grandparents. This epidemic of opioid abuse caused by the Defendants has taken and destroyed the lives of many residents of the City of Huntington.

3.    Upon information and belief, Defendant AmerisourceBergen Drug Corporation ("Amerisource") is a Delaware Corporation that conducts business in West Virginia. Upon

information and belief, Amerisource distributes pharmaceuticals to retail pharmacies, hospitals and county health departments. Upon information and belief, Amerisource is a registrant with the West Virginia Board of Pharmacy and does substantial business in the State of West Virginia wherein it has, during the period relevant herein, distributed pharmaceuticals in the City of Huntington.

4.      Upon information and belief, Cardinal Health Inc. ("Cardinal") is an Ohio Corporation that conducts business in West Virginia. Upon information and belief, Cardinal distributes pharmaceuticals to retail pharmacies, hospitals and county health departments. Upon information and belief, Cardinal is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it has, during the period relevant herein distributed pharmaceuticals in the City of Huntington.

5.      Upon information and belief, McKesson Corporation ("McKesson") is a Delaware Corporation with headquarters in California that conducts business in West Virginia. Upon information and belief, McKesson distributes pharmaceuticals to retail pharmacies, hospitals and county health departments. Upon information and belief, McKesson is a registrant with the West Virginia Board of Pharmacy and does substantial business in the State of West Virginia wherein it has, during the period relevant herein, distributed pharmaceuticals in the City of Huntington.

6.      Upon information and belief, the above named Defendants shipped 423 million pain pills to West Virginia between 2007 and 2012, earning $17,000,000,000 in net income.

7.      Upon information and belief, Dr. Chaney was a licensed physician who had held an active license, No. 16608, to practice medicine in the State of West Virginia which was issued by the Board on July 1, 1991.

8.     Upon information and belief, Dr. Chaney's practice address of record with the Board was in Barboursville, West Virginia.

9.     Upon information and belief, Dr. Chaney was the sole shareholder of Area Health Systems, Inc., d/b/a Tri-State Medical Center.  From January 1, 1996 through January 1, 2016, Area Health Systems, Inc. held a Certificate of Authorization as a Medical Corporation issued by the Board, Registration Number 01213.

10.    Upon information and belief, over the relevant time period, Dr. Chaney wrote prescriptions for medications, including but not limited to schedule II opioids, to Huntington residents.

11.    Through their acts and omissions the Defendants have inserted themselves as an integral part of the epidemic of opioid abuse. As alleged herein, this epidemic consist of medical providers, pharmacies and distributors of controlled substances, each of whom knowingly or while acting grossly negligent prescribe, dispense or distribute prescription medicine for illegitimate medical purposes. Each act alone would be ineffective to divert controlled substances for illegitimate medical purposes.  Equally, each act together causes and contributes to the opioid epidemic.

12.    The actions of Defendants have caused and will continue to cause the City of Huntington to disburse substantial sums of public funds to deal with the significant consequences of the opioid epidemic that was fueled by Defendants' illegal, reckless, and malicious actions in flooding the state with highly addictive prescription medications without regard for the adverse consequences to the City of Huntington or its residents.

13.    The Defendants' actions, motivated by financial gain without regard to the welfare of the City of Huntington and its residents, have caused substantial damages, including, but not

limited to, increased expenses of drug abuse treatment program, prevention and training costs (for law enforcement, hospitals and schools), costs of the drug Naloxone as well as education, training and use, youth development community programs, medical care and hospitalizations, increased costs of law enforcement, increased costs of prosecutions and most significantly increased costs of incarcerations.

14.    This Court has jurisdiction over this case and over Defendants pursuant to the provisions of W.Va. Code § 56-3-33.

15.    Venue is appropriate in Cabell County, West Virginia as the acts and practices of the Defendants at issue herein occurred in and caused damages in the City of Huntington, West Virginia.

## FACTS

16.    In the last six years, drug wholesalers have showered the state of West Virginia with 780 million hydrocodone and oxycodone pills, while 1,728 West Virginians have fatally overdosed on those two painkillers. The unregulated shipments amount to 433 pain pills for every man, woman and child in the state of West Virginia.

17.    In the last 20 years, an opioid epidemic has infected this country, particularly in Huntington, West Virginia. Defendants each played a key role in the creation and continuation of the opioid epidemic resulting momentous damages.

18.    The Defendants each profited while disregarding the impact that their actions had on the people under the influence of these drugs.

19.    Opioids are effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.[1] However, opioids are addictive and subject to abuse,

---

[1] "Originally a term denoting synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics." Stedman's Medical Dictionary, 27nd Edition.

particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should not be used except as a last-resort.

20.   As pharmaceutical wholesalers and a practicing physician, Defendants have known for years that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.

21.   Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, as well as generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin, and thus, they are regulated as controlled substances.[2]

22.   Prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain. Opioids also can create a euphoric high, which can make them addictive. At certain doses, opioids can slow the user's breathing, causing respiratory depression and, possibly, death.

23.   The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors. When turned down by one physician, many of addicts deploy increasingly desperate tactics-including doctor-shopping, use of aliases, and criminal means to satisfy their cravings or turning to heroin as a cheaper alternative to prescription drugs.

24.   Opioid abuse has not displaced heroin, but rather triggered resurgence in its use imposing additional burdens on the City of Huntington and local agencies that address heroin use and addiction.  Huntington, West Virginia experienced 26 heroin overdoses in the span of four

---

[2] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812. Schedule II drugs may not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor.

hours on August 17, 2016. The amount of calls that were received overwhelmed emergency responders. When the first few calls came in, three ambulances were already out dealing with overdoses. For a half-hour span, there were no ambulances available in the county to send. Eight of the victims were revived using the opioid-overdose-reversing drug naloxone and others by a manual resuscitator "a bag valve mask" to stimulate breathing. One victim was given three doses of naloxone.[3]

25.     A recent study by the Centers for Disease Control and Prevention found that hepatitis C cases in the State West Virginia have more than tripled between 2006 and 2012. The recent outbreak of hepatitis C, which can be transmitted by injecting drugs or having unprotected sex, is centered in rural areas among young, white drug users. West Virginia has seen 3,000 drug overdose deaths in the last five years, or an average of 600 a year. In Cabell County alone this year, there were at least 32 overdose deaths and 360 drug overdoses, including heroin and prescription drugs. There have been 406 drug-related arrests in Huntington this year[4].

26.     According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002 to 2004 to 45.2% in 2011 to 2013. Heroin produces a very similar high to prescription opioids, but is often cheaper and easier to obtain. While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin (0.1g), with multiple highs, for the same price.

27.     West Virginia had the highest drug-overdose death rate in the US in 2014, according to a recent CDC report[5]. The state also has one of the highest prescription rates of opioids in the United States[6]. West Virginia ranks in the top 10 for the highest rate of

[3] See http://www.cnn.com/2016/08/ 17/health/west-virginia-city-has-27-heroin-overdoses-in-4-hours/index.html
[4] http://www.dailymail.co.uk/news/article-3128229/West-Virginia-rate-drug-overdose-deaths.html#ixzz4W7qD5w3j
[5] http://www.cdc.gov/drugoverdose/data/statedeaths.html.
[6] http://www.businessinsider.com/these-are-the-states-prescribing-the-most-opioid-painkillers-2016-3.

prescriptions given out for high-dose opioids and extended-release opioids both of which are targets for abusers.

28.    The roots of the opioid epidemic in West Virginia mirror the rest of the United States. However, there are crucial differences. As in the rest of the United States, opioid prescriptions started skyrocketing in the mid-1990s as pharmaceutical companies introduced powerful new painkillers such as MS Contin and Oxycontin to the public. Medical groups began calling pain the "fifth vital sign" that doctors should attend to, according to Dr. Ted Cicero, a professor of psychiatry at Washington University in St. Louis and an opioid-use researcher.

> *"There was a big push saying we had a big problem with the under-treatment of pain*,"
>
> *"Opioid prescriptions skyrocketed from the early '90s until about 2010.*"

The same phenomenon applied in West Virginia but collided with two other factors 1) A disproportionate number of jobs involving manual labor like coal mining, timbering, and manufacturing; and 2) High rates of joblessness.

29.    West Virginia has long been known as "coal country." Mining, timbering, and manufacturing play a huge role in West Virginia's economy[7]. They are all jobs that require heavy manual labor and leave workers prone to injury. Coal mining accounts for more than 18,000 jobs in West Virginia[8]. Although the West Virginia's coal mines have lost more than 7,000 jobs since 2011, the mining industry as a whole has continued to grow in the state, thanks to strong growth in the natural gas and oil industries. According to the US Bureau of Economic Analysis, mining accounted for 18% of the state's overall GDP in 2014[9].

---

[7] http://www.seniorjobbank.org/database/West_Virginia/West_Virginia.html.

[8] http://www.nma.org/pdf/c_employment_state_region_method.pdf.

[9] https://www.afsc.org/sites/afsc.civicactions.net/files/documents/Report-state-working-west-va-2014.pdf.

30.     Mining operations proved to be flash points for opioid abuse when prescription practices liberalized, as workers tried to stave off injuries. John Temple, a professor at West Virginia University and the author of the 2015 book "American Pain", has offered:

> *In a mining camp, there aren't a lot of doctors," he said. "That doctor is going to be more likely to opt for the quick fix and give people pills to fix their pain and get them back into the mine, rather than give them rest or therapy or those things that can actually cure pain.*[10]

31.     Dr. Carl "Rolly" Sullivan, who has run the addiction program at West Virginia University Hospitals since 1985, has noted the link between opioid abuse and the West Virginian economy:

> *West Virginia was ripe for the picking, We had a lot of blue-collar workers who were in farming and timbering and coal mining and things that were likely to produce injuries.*
>
> *There are a lot of dangerous occupations" in Appalachia, he said. "People get prescribed opioids far more frequently" for the injuries associated with them.*[11].

32.     Opioid abuse was further exacerbated by a declining economy and heavy job loss in the state over the last 20 years. As of March 2016, West Virginia has the second-highest unemployment rate in the US, at 6.5%[12].  According to a Bureau of Labor Statistics report last August, West Virginia was the only state to experience a statistically significant decrease in employment over the previous year, losing 19,100 jobs from 2014 to 2015[13].

33.     Though the coal-mining industry has been hit hard jobs in the sector have decreased from 41,000 in 1983 to approximately 18,000 in 2016[14], according to the Mine Safety and Health Administration, other industries were struck as bad or worse. According to The Wall

---

[10] http://www.amazon.com/American-Pain-Unleashed-Americas-Deadliest/dp/1493007386?tag=bisafetynet-20.
[11] http://www.wvgazettemail.com/apps/pbcs.dll/article?AID=/20151017/GZ01/151019539.
[12] http://www.bls.gov/web/laus/laumstrk.htm).
[13] http://blogs.wsj.com/economics/2015/08/21/the-only-state-to-lose-jobs-since-july-last-year-west-virginia/.
[14] https://www.washingtonpost.com/news/wonk/wp/2013/11/04/heres-why-central-appalachias-coal-industry-is-dying/.

Street Journal, jobs in construction and manufacturing have fallen by 23% and 16%, respectively, since the recession[15].

34.    West Virginia was primed by prescriptions from work-related injuries, job loss was the gasoline on the fire. Dr. Richard Vaglienti, the director of the Pain Management Center at West Virginia University and a co-chair of West Virginia's Expert Pain Management panel, stated:

> The parts of the state that were worst hit were the areas in the southern coal fields that had just collapsed. It became a problem there and it spread throughout the state until it was everywhere," "If you look at the areas that are hardest hit, they are usually the areas that have nothing going on economically.

35.    Substance abuse in West Virginia becomes more common as joblessness increases. A lot of citizens will turn to alcohol, tobacco, illegal drugs and get high for recreation until the next job comes along.

36.    Low education levels, high rates of unemployment and job-related injuries are closely linked to abuse of alcohol, illicit drugs and prescription medications[16].

37.    As opioid prescribing rose, prescription opioids became the recreational drug of choice.[17]

38.    The composition of the patients at the West Virginia University addiction program switched from 90% alcoholism in the 1990s to between 90% and 95% prescription painkiller addiction by 2002. Not long after, the state began cracking down on the "pill mills," tightening prescription rules, and launching a prescription drug monitoring program, leading to the arrests of many physicians and pharmacists. But at that point, the opioid epidemic was in full swing.

---

[15] http://blogs.wsj.com/economics/2015/08/21/the-only-state-to-lose-jobs-since-july-last-year-west-virginia/.
[16] Appalachian Regional Commission, 2009 report.
[17] http://www.salon.com/2012/04/11/americas_pill_popping_capital/.

39.    Pharmaceuticals, like opioids, are not sold directly to pharmacies for ultimate dispensing. There is a sophisticated system which distributes the drugs across our nation.

40.    Defendants were each on notice that the controlled substances they distributed or prescribed were the kinds that were susceptible to being diverted for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy and problematic purposes. As entities involved in the distribution and prescribing of dangerous opioid medications, Defendants were engaged in an abnormally and/or inherently dangerous activity and had a duty of care under West Virginia law.

41.    The Defendants Amerisource, Cardinal and McKesson purchased opioids from manufacturers and sold them to pharmacies throughout the City of Huntington.

42.    Upon information and belief, the Defendants Amerisource, Cardinal and McKesson are registered with the West Virginia Board of Pharmacy.

43.    The Defendants Amerisource, Cardinal and McKesson knew or should have known that they were supplying vast amounts of dangerous drugs to small markets that were already facing abuse, diversion, misuse and other problems associated with the opioid epidemic. Though they had a duty to the consuming public, collectively and individually, Defendants Amerisource, Cardinal and McKesson failed to take any action to prevent or reduce the distribution of these drugs.

44.    The Defendants Amerisource, Cardinal and McKesson had the ability to slow down, question, inspect, report or otherwise limit the flow of these drugs into the City of Huntington, but chose not to do so, because they did not want to lose profits.

45.    Individuals in West Virginia cannot obtain opioids without a prescription written by a licensed medical provider.   Dr. Chaney was a licensed medical provider in West Virginia

over the relevant time period. Dr. Chaney provided written opioid prescriptions for patients despite knowing that the opioids were likely to be abused, diverted, or misused. Dr. Chaney knew or should have known his actions resulted in patients obtaining dangerous drugs that they did not need, were likely to be abused, or were likely to be resold on the street.

46.     All Defendants were on notice that West Virginia law required them, inter alia, to provide effective controls and procedures to guard against diversion of controlled substances, pursuant to 15 C.S.R. § 2-4.21 and 2-4.4 and the WV Controlled Substances Act.

47.     The Defendants Amerisource, Cardinal and McKesson, knew, or should have known that West Virginia had an exceedingly high rate of illegal use and diversion of prescription opioids. Numerous publications, news sources and studies highlighted the epidemic rate of opioid abuse and overdose rates in West Virginia.

48.     The Defendants Amerisource, Cardinal and McKesson, like all pharmaceutical wholesalers, were under an obligation to report suspicious orders to the appropriate authorities. Despite having information that suspicious orders were being placed, and despite actually filling these suspicious orders time after time, McKesson did not begin to comply with its regulatory obligations until March 2015. Since that time, McKesson has submitted 4,814 suspicious order reports.

49.     Failing to submit its required suspicious order reports is not a new development for McKesson.  McKesson paid a $13.2 million fine to settle similar claims in 2008 with regard to suspicious orders from internet pharmacies.

50.     The Defendant McKesson settled a similar investigation brought by the Department of Justice in 2015 by paying $150 million and suspending the DEA registrations for three distribution centers.

51.     The Defendants Amerisource and Cardinal similarly delayed compliance with the reporting of suspicious orders. After June 2012, Cardinal finally submitted 2,426 suspicious order reports, though nine months are seemingly missing from their submissions. In 2008 Cardinal paid a $34 million fine for failing to report suspicious orders of hydrocodone. More recently, in 2012 Cardinal's Lakeland, Florida warehouse was suspended by the DEA for two years as a result of shipping suspect orders of opioids.

52.     The Defendants Amerisource, Cardinal and McKesson were also aware that the Healthcare Distribution Management Association ("HDMA"), of which they are members, created "Industry Compliance Guidelines" based upon Drug Enforcement Agency requirements which stressed the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines provided: "At the center of a sophisticated supply chain, Distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers." Indeed, the HDMA advises all distributors to "Know Your Customer."

53.     Between 2007 and 2012 the Defendants Amerisource, Cardinal and McKesson have shipped 423 million doses of highly addictive controlled pain killers into West Virginia, many of which should have been stopped and/or investigated as suspicious orders.

54.     Upon information and belief, the Defendants Amerisource, Cardinal and McKesson failed to undertake any effective affirmative efforts to prevent diversion of its medicines for illegal or abusive purposes.

55.     The Defendants Amerisource, Cardinal and McKesson delivered an excessive and unreasonable number of highly addictive controlled substances in the City of Huntington.

56.     Upon information and belief, the Defendants Amerisource, Cardinal and McKesson did not refuse to ship or supply any controlled substances to any the City of Huntington pharmacy between 2007 and the present.

57.     The Defendants Amerisource, Cardinal and McKesson knew or should have known that they were supplying opioid medications far in excess of the legitimate needs for the City of Huntington.

58.     The Defendants Amerisource, Cardinal and McKesson knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers they supplied to pharmacies and drug stores in the City of Huntington were being diverted to illegal use or abuse.

59.     The Defendants Amerisource, Cardinal and McKesson had a legal duty to ensure they were not filling suspicious orders, as well as to report suspicious orders.

60.     Upon information and belief, the Defendants Amerisource, Cardinal and McKesson made little to no effort to inquire of the pharmacies and drug stores in and adjacent to the City of Huntington to which they shipped substantial amounts of prescription medication, in order to conduct due diligence to ensure the medications they were shipping were not diverted to illegal uses.

61.     The Defendants Amerisource, Cardinal and McKesson paid its sales force employees' and managers' bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to and the City of Huntington.

62.     The Defendants Amerisource, Cardinal and McKesson made substantial profits from the drugs which were sold in the City of Huntington.

63.    The Defendants Amerisource, Cardinal and McKesson undertook intentional distribution of excessive prescription pain killers to a small community which showed a reckless disregard to the safety of the City of Huntington and its residents.

64.    Despite being a licensed physician, Dr. Chaney undertook no efforts to determine whether the volume of prescription pain killers he was prescribing to Huntington residents was excessive and whether any of the prescriptions he wrote should have been refused.

65.    Dr. Chaney knew or should have known that he was prescribing opioid medications far in excess of the legitimate needs for Huntington patients.

66.    Dr. Chaney knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers he wrote in Huntington were being diverted to illegal use or abuse.

67.    Dr. Chaney had a legal duty to ensure he was not prescribing suspicious orders.

68.    Dr. Chaney made substantial profits from the drugs which were sold to Huntington residents.

## COUNT I
## NEGLIGENCE OF DEFENDANTS AMERISOURCEBERGER DRUG CORPORATION, CARDINAL HEALTH, INC. and MCKESSON CORPORATION

69.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 68.

70.    The Defendants Amerisource, Cardinal and McKesson are distributors of controlled substances and must comply with both the laws of West Virginia and with industry customs and standards.

71.    As licensed registrants with the West Virginia Board of Pharmacy, the Defendants Amerisource, Cardinal and McKesson were required to submit suspicious order reports.

72.    The Defendants Amerisource, Cardinal and McKesson failed to submit, or fully disclose suspicious orders.

73.    The Defendants Cardinal and McKesson negligently failed to ensure its conduct conformed to West Virginia law and regulations.

74.    The Defendants Cardinal and McKesson negligently failed to conform their conduct to United States law and regulations.

75.    The Defendants Cardinal and McKesson negligently disregarded the aforementioned factors by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom reasonably can be expected to become addicted or to engage in illicit drug transactions and probable heroin use.

76.    The Defendants Amerisource, Cardinal and McKesson had a duty to the City of Huntington to comply with their obligation to report suspicious orders in the City of Huntington.

77.    The Defendants Amerisource, Cardinal and McKesson breached this duty.  The breach is the proximate cause of damages suffered by Plaintiff.

78.    Industry standards also require the Defendants Amerisource, Cardinal and McKesson to:

> *Know its customers, know its customer base, know the population base served by a particular pharmacy or drug store, know the average prescriptions filled each day, know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases, have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribes.*

79.     The Defendants Amerisource, Cardinal and McKesson negligently failed to ensure its conduct conformed to industry standards.

80.     The aforementioned conduct was a direct breach of the duty Defendants Amerisource, Cardinal and McKesson owed to Plaintiff which was the proximate cause of Plaintiff suffering damages for which it seeks recovery herein.

## COUNT II NEGLIGENCE OF DR. CHANEY

81.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 80.

82.     Data obtained from an agency of the United States government for 2014 revealed that Dr. Chaney prescribed opioids to 58% of the 398 Medicare patients, compared to an average of 25% among all physicians.[18]

83.     Dr. Chaney wrote 1,357 prescriptions (to include refills) for Hydrocodone-Acetaminophen to Medicare patients in 2014. Based on an average of 30 pills per prescription, this equaled 40,700 pills.

84.     Dr. Chaney wrote 124 prescriptions (to include refills) for Oxycodone-Acetaminophen to Medicare patients in 2014. Based on an average of 30 pills per prescription, this equaled 3,720 pills.

85.     Dr. Chaney wrote 117 prescriptions (to include refills) for Tramadol HCL to Medicare patients in 2014. Based on an average of 30 pills per prescription, this equaled 3,510 pills.

86.     Dr. Chaney wrote 107 prescriptions (to include refills) for Oxycodone HCL to Medicare patients in 2014. Based on an average of 130 pills per prescription[19], this would equal 13,910 pills.

---

[18] All Medicare data for Dr. Chaney was located at ProPublica.org.

87.     In January 6, 2015, the Complaint Committee of the West Virginia Board of Medicine (West Virginia Board of Medicine) initiated an investigation of Dr. Chamber for improper prescribing of narcotic pain medication, including narcotics, to a patient who subsequently died.

88.     On or about December 4, 2015, and after vacating his former offices located at 6007 US Rt. 60, East, Dr. Chaney opened a medical office at 702 Central Avenue in Barboursville, West Virginia.

89.     The Office of Health Facility Licensure and Certification, Chronic Pain Management ["OHFLAC/CPM"] conducted a verification survey with respect to Dr. Chaney. This survey included on site review of Dr. Chaney's practice on December 8 and 9, 2015 at the 702 Central Avenue practice location.

90.     On December 29, 2015, the Board received correspondence from OHFLAC/CPM chronicling some observations of Dr. Chaney's practice on December 8-9, 2015. Specifically, and related to the disarray and dangerous procedures employed by Dr. Chaney, the Board was advised:

        a.   On December 8, 2015, an OHFLAC/CPM surveyor observed a woman sitting at the front desk writing out multiple prescription by copying information from prescription bottles onto new prescriptions;

        b.   On December 9, 2015, at 8:50 am, an OHFLAC/CPM surveyor observed an unsecured, unsigned prescription pad lying on top of the desk;

        c.   On December 9, 2015, at 11:05am, an OHFLAC/CPM surveyor observed a patient arrive requesting medication refills. The patient handed prescription bottles to the receptionist, who used them to write new prescriptions. The prescriptions were then taken by the receptionist to Dr. Chaney for signature, and were subsequently provided to the patient;

---

[19] On Dec. 1, 2015, Dr. Chaney wrote a prescription for an employee for 120 30-milligram oxycodone pills without a physical examination.

d.  On December 9, 2015, at 11:20am, an OHFLAC/CPM surveyor observed another patient requesting medication refills. The receptionist could not locate the patient's medical chart, and asked the patient to write down her medications on a piece of paper. The receptionist wrote prescriptions according to the paper filled out by the patient. The receptionist questioned the patient about "the insulin" and the patient told the receptionist that she did not know the name of the insulin, but that it came in an orange pen. The receptionist named off different medications and the patient identified "Novolog" as the insulin she was prescribed. The receptionist wrote the prescription and told the patient that she would have another employee fill in the sliding scale dosages. The receptionist returned and provided the patient with prescriptions. On December 9, 2015, at 11:50am, an OHFLAC/CPM surveyor observed another patient arrive and ask for medication refills. This patient's chart could not be located, and the patient was asked to list medications on a sheet of paper. The receptionist filled out prescriptions according to the list and took them to the back of the office. The receptionist returned with signed prescriptions and provided them to the patient. These prescriptions included a prescription for Norco 1 0mg three times a day.

e.  The receptionist ceased writing prescriptions at 2: 15pm.

f.  On December 9, 2015, an OHFLAC/CPM surveyor observed a tray containing sixteen referrals on a shelf at the receptionist's desk. The office manager stated that the referrals had not been sent due to no facsimile service at the medical office.

g.  OHFLAC/CPM staff interviewed Dr. Chaney on December 9, 2015. Dr. Chaney informed them that fifty percent of the patients who come in to the medical offices just get prescriptions and are never seen by him and not charged for an office visit.

91.  The December 29, 2015 report from OHFLC/CPM also contains additional allegations related to Dr. Chaney's standard of care and improper prescribing.

92.  From December 1, 2015 through January 10, 2016, Dr. Chaney was without a functioning medical practice location.

93.  Dr. Chaney continued to prescribe medication to his patients in December 2015, including after he was without any medical practice location.

94.  As of January 1, 2016, Dr. Chaney's medical corporation is not authorized to engage in the practice of medicine.

95.    It was found that Dr. Chaney was not mentally and/or physically fit to practice medicine with reasonable skill and safety.

96.    The Complaint Committee reviewed the information received from the Evaluating Physician, the Board Investigator, and OHFLAC/CPM and determined that evidence in its possession indicated that Dr. Chaney's continuation in practice or unrestricted practice constituted as an immediate danger to the public.

97.    Thereafter, the Committee determined, based upon the evidence in its possession, to recommend that the full Board impose summary discipline in this matter, pursuant to W. Va. Code §30-3-14(k), because Dr. Chaney's continuation in practice constituted an immediate danger to the public.

98.    The conduct which formed the basis of the Complaint Committee's conclusions are predicated in whole or in part upon the following professional conduct standards:

   a.  W. Va. Code §30-3-14(c)(21) and W. Va. Code R. §1 1-lA-12.1.h., relating to an inability to practice medicine and surgery or podiatry with reasonable skill and safety due to physical or mental impairment, including deterioration through the aging process, loss of motor skill or abuse of drugs or alcohol; and/or

   b.  W. Va. Code §30-3-14(c)(17), W. Va. Code R. §ll-lA-12.1.e and 12.1.j, and W. Va. Code R. §1 1-lA-12.2.d., related to engaging in dishonorable, unethical or unprofessional conduct and/or conduct that has the effect of bringing the medical profession into disrepute; and/or

   c.  W. Va. Code §30-3-14(c)(19) and W. Va. Code R. §ll-lA-12.1.aa, related to gross negligence in the use and control of prescription forms; and/or

   d.  W. Va. Code §30-3-14(c)(16) relating to the delegation of professional responsibilities to a person when the delegating physician knows or has reason to know that the person is not qualified by training, experience or licensure to perform them.

99.    A meeting of the West Virginia Board of Medicine was convened on Monday, January 11, 9:00a.m. At the January 11, 2016, meeting of the full Board, the Complaint

Committee reported that evidence in its possession indicating that Dr. Chaney's continuation in practice or unrestricted practice constituted as an immediate danger to the public.

100.    The Board further determined, with no dissenting votes, that under all of the circumstances and given the cumulative effect of the evidence referenced herein, for Dr. Chaney to continue to hold an active license to practice medicine in the State of West Virginia, constituted as an immediate danger to the health, welfare and safety of the public.

101.    The Board concluded, as a matter of law, that such a danger to the public demands extraordinary measures, and the Board, with a quorum of the Board present and voting, therefore found, with no dissenting votes, that in accordance with its statutory mandate to protect the public interest, the license to practice medicine of Dr. Chaney, license number 16608, was summarily suspended, in accordance with the provisions of W. Va. Code §30-3-14(k) and W. Va. Code R. §11-3-10.16.

102.    As a practicing physician prescribing drugs to Huntington residents, Dr. Chaney owed a duty of care to the residents of Huntington, West Virginia.

103.    Dr. Chaney's negligent acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling an opioid epidemic in West Virginia.

104.    Dr. Chaney's negligent acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

105.    Dr. Chaney's negligent violations of West Virginia law make him liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

106.    Dr. Chaney's negligent acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiff.