## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,
           Plaintiff,

     v.

AMERISOURCEBERGEN DRUG
CORPORATION,[1] CARDINAL HEALTH
INC., MCKESSON CORPORATION, and
GREGORY DONALD CHANEY, M.D.,
          Defendants.

Civil Action No. 3:17-cv-01362
Judge: Robert C. Chambers

## MEMORANDUM IN SUPPORT OF AMERISOURCEBERGEN DRUG
## CORPORATION'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

---

[1] AmerisourceBergen Drug Corporation's name was misspelled by Plaintiff in the caption as AmerisourceBerger Drug Corporation.

I.      INTRODUCTION ......................................................................................................... 1

II.     PLAINTIFF'S ALLEGATIONS ................................................................................... 3

        A.      Opioids Are Prescription Drugs Whose Distribution Is Tightly Controlled
                by Federal and State Law ................................................................................... 3

        B.      The Overprescription of Opioids Has Caused the Opioid Epidemic .................... 4

III.    ARGUMENT ............................................................................................................... 5

        A.      The Complaint Does Not Allege Any Plausible Claim for Relief ........................ 5

                1.      The Complaint Does Not Plausibly Plead Misconduct by ABDC ............ 6

                2.      The Complaint Does Not Plausibly Plead Causation ............................... 8

        B.      The Complaint Does Not Plausibly Plead Proximate Causation .......................... 9

        C.      The Free-Public-Services Doctrine Bars the City's Claims ............................... 14

        D.      The Economic Loss Rule Bars Plaintiff's Claims ............................................. 15

        E.      Count III Should Be Dismissed Because the City Has No Right to Sue
                Under the WVCSA ........................................................................................... 15

        F.      The Alleged Violations of the CSA or the WVCSA Cannot Support
                Plaintiff's Claims for Negligence or Unjust Enrichment .................................. 17

        G.      Count II Should Be Dismissed Because the City Has Not Pled the
                Elements of Unjust Enrichment ....................................................................... 19

IV.     CONCLUSION .......................................................................................................... 20

4822-1629-0116.v1

Defendant AmerisourceBergen Drug Corporation ("ABDC") moves to dismiss the Complaint[2] ("Cp.") pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6).

## I.     INTRODUCTION

The City of Huntington (the "City") seeks to recover from ABDC the "public funds" it has spent to respond to opioid abuse.  ABDC has been and remains committed to the safe and appropriate delivery of legal controlled substances in West Virginia and around the country, and shares the City's concerns with this tragic, pressing, and complex problem.  But ABDC has more than met its legal and regulatory obligations governing the delivery of controlled substances. The City's attempt to blame lawful distributors for the problem is factually unsupported, legally untenable, and fundamentally misguided.  Its own complaint establishes that opioid abuse is primarily driven – as drug abuse has always been – by criminal conduct preying on human frailty. It is not caused by DEA-licensed distributors who supply DEA-licensed pharmacies with FDA-approved prescription products that patients legitimately need to control pain, and who are removed by many layers from those who divert and abuse opioids, including by criminal conduct.

ABDC is a licensed wholesale distributor of legal pharmaceutical drugs.  Cp. ¶¶ 3, 42, 71; Am. Cp. ¶¶3, 44, 73.  It distributes prescription drugs to licensed pharmacies, which dispense them to patients on prescription from licensed physicians.  Cp. ¶¶3, 41, 45, 60; Am. Cp. ¶¶3, 43, 47, 62.  ABDC is not alleged to, and does not, have any role in approving, manufacturing, marketing, prescribing, or dispensing prescription drugs.  The City seeks to recover from ABDC and two other wholesale distributors the increased "public funds" it has spent to perform public

---

[2]      Plaintiff's Complaint was filed on January 19, 2017.  On January 26, 2017, Plaintiff filed an Amended Complaint ("Am. Cp").  The Amended Complaint added two new paragraphs to the Complaint:

> 16.  The Plaintiff affirmatively expresses that the City of Huntington is not seeking any relief in this action for the federal share of funding for the State Medical (sic) Program.

> 17.  Claims for damages for any federal monies expended by the City of Huntington are hereby expressly disavowed.

To date, ABDC has not been served with the Amended Complaint.  ABDC's arguments supporting dismissal of the Complaint apply equally to the Amended Complaint.

duties and services (principally on law enforcement) that it claims relate to the "opioid epidemic." Cp. at ¶¶ 12, 13, 126, 127; Am. Cp. at ¶¶12, 13, 128, 129.  Plaintiff's claims all fail.

**First**, the Complaint does not meet the pleading requirements of *Iqbal/Twombly*.  Its allegations lack factual content and do not plausibly suggest wrongdoing by ABDC, let alone any that caused the opioid epidemic or the City's claimed damages.  The Complaint does not allege any facts demonstrating any deficiency in ABDC's anti-diversion program (which in fact is effective and robust).  Nor does the Complaint allege any facts demonstrating that any pill ABDC distributed was "diverted" to an improper purpose rather than used for legitimate medical purposes, or, indeed, that any pharmacy to which ABDC shipped ever diverted a single pill.

**Second**, the Complaint's allegations establish that ABDC's lawful distribution of prescription products may not be deemed the proximate cause of the City's costs of dealing with crime and other problems allegedly caused by opioid abuse.

**Third**, the "free-public-services" doctrine bars the City from recovering expenditures made to provide public services and to perform its public duties to its citizens.

**Fourth**, the City's claims are barred by the economic loss rule.

**Fifth**, to the extent the City's claims are based on ABDC's alleged noncompliance with the WVCSA or its regulations, no private right of action exists for such claims, nor does the City have authority to enforce them either directly or through a common-law negligence claim.

**Sixth**, the City's unjust enrichment claim fails on its face because the City does not, and cannot, allege that it conferred any benefit on ABDC, which is one of the elements West Virginia law requires for such a claim.[3]

---

[3]   ABDC also contends that, by reason of *res judicata*, the final dismissal with prejudice of the State of West Virginia's lawsuit against ABDC in the Circuit Court of Boone County bars this suit, and any other suit by a West Virginia County, municipality, or other political subdivision seeking the same relief, and will present that argument as, if, and when appropriate.

## II.    PLAINTIFF'S ALLEGATIONS

### A.    Opioids Are Prescription Drugs Whose Distribution Is Tightly Controlled by Federal and State Law

Opioids are FDA-approved prescription drugs that the City acknowledges are "effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care." Cp. at ¶19; Am. Cp. at ¶21.  They are regulated under the Controlled Substances Act, 21 U.S.C. §801 *et seq.* ("CSA") and, in West Virginia, the West Virginia Controlled Substances Act ("WVCSA"), W.Va. Code §60A-1-101, *et seq.*; Cp. ¶21; Am. Cp. ¶23.  Those laws require that opioids be distributed within a closed system in which every participant other than the patient is registered with the federal DEA.  *See*, *e.g.*, 21 U.S.C. §§ 821-830.  The patient may obtain the opioids only through a prescription written for a legitimate medical purpose by a licensed medical practitioner who is registered with the DEA.  21 U.S.C. § 829; Cp. ¶45; Am. Cp. ¶47. To dispense controlled substances, pharmacies must have a valid DEA registration and West Virginia Board of Pharmacy ("BOP") license.  21 U.S.C. § 822(a)(2); W.Va. Code § 60A-3-302. Doctors and pharmacies play the crucial role in the distribution of opioids; both deal directly with patients and may only write and fill prescriptions that, in their professional judgments, are for legitimate medical purposes.  *See* Cp. ¶¶67, 121, 122; Am. Cp. ¶¶69, 105, 123, 124; 21 U.S.C. § 829; W.Va. Code § 60A-3-308.  It is a crime to possess, use, dispense, or sell opioids other than as allowed by the controlled substances laws.  21 U.S.C. §§ 841-863; W.Va. Code § 60A-4-401.

To distribute opioids in West Virginia ABDC must, and did, register with the BOP, which is responsible for regulating transactions in controlled substances in West Virginia.  Cp. ¶¶3, 42, 71; Am. Cp. ¶¶3, 44, 73.  West Virginia law has mandated the creation of a Controlled Substances Monitoring Program Database to help detect and prevent opioid abuse, and requires pharmacies and medical providers to report prescription information to it daily.  W.Va. Code §

60A-9-2; Cp. ¶ 38; Am. Cp. ¶40.  The database is confidential and available only to physicians, pharmacists, and certain state entities including the BOP, but not distributors.  W.Va. Code § 60A-9-5.

### B.      The Overprescription of Opioids Has Caused the Opioid Epidemic

The City seeks to recover its public costs of addressing the "opioid epidemic," that is, the abuse of opioids.  *See, e.g.,* Cp. at ¶¶2, 11, 17; Am. Cp. at ¶¶2, 11, 19.  It blames physicians for that epidemic, alleging that "opioid prescriptions began skyrocketing in the mid-1990s" when the medical community came to believe it "had a big problem with the under-treatment of pain."  Cp. ¶28; Am. Cp. ¶30.  It alleges that a "**dramatic increase in opioid prescriptions** to treat common chronic pain conditions" and conditions for which opioids "should not be used" has "resulted in a population of addicts who seek drugs from doctors" including by "criminal means."  Cp. ¶¶ 19, 23; Am. Cp. ¶¶21, 25.[4]  The Complaint also alleges that the abuse of prescription opioids has "triggered resurgence" in the use of heroin, which has contributed to the costs the City seeks.  Cp. ¶¶23-25; Am. Cp. ¶¶25-27.

The Complaint alleges that ABDC and other distributors caused the opioid epidemic by distributing too many opioids and failing to guard against their "diversion."  *See, e.g.*, Cp. ¶¶53-63; Am. Cp. ¶¶55-65.  It does not allege either the amount of opioids ABDC distributed in the City nor any factual basis for, or explanation of, the assertion that those amounts were "excessive."  *See* Cp. ¶¶ 6, 43, 53, 55, 57, 63, 111, 113; Am. Cp. ¶¶6, 45, 55, 57, 59, 65, 113, 115.  The Complaint does not allege that any pill ABDC delivered to any pharmacy was actually "diverted" or that any pill ABDC delivered to any customer was dispensed other than pursuant to a legitimate medical prescription.  Plaintiff alleges that ABDC failed to comply with regulations that require the identification of and, plaintiff claims, the reporting of suspicious orders.  Cp.

---

[4]        Throughout this brief, emphasis is added unless otherwise noted.

¶¶48, 59, 72; Am. Cp. ¶¶50, 61, 74.  Although the City alleges that ABDC shipped orders it knew were suspicious, it does not identify a single such order nor allege any facts to suggest it was suspicious.  Cp. at ¶¶43, 53, 58; Am. Cp. at ¶¶45, 55, 60.

Three of the Complaint's five counts (which are labeled I, II, III, V, and Y, respectively) are asserted against ABDC.  Count I alleges that ABDC was negligent in failing to report suspicious orders and "to ensure its conduct conformed to industry standards."  Cp. ¶¶72, 79; Am. Cp. ¶¶74, 81.  Count III alleges that ABDC violated unidentified provisions of the WVCSA "by regularly distributing obscene quantities" of controlled substances "to clients who were serving a customer base comprised of individuals who were abusing prescription medications…."  Cp. ¶111, Am. Cp. ¶113.  Count V alleges that ABDC was unjustly enriched by "neglecting its duty of distributing drugs only for proper medical purposes…."  Cp. ¶¶131, 133; Am. Cp. ¶¶133, 135.[5]  None of these claims can survive this motion.

## III.   ARGUMENT

### A.   The Complaint Does Not Allege Any Plausible Claim for Relief

Since *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "courts must now look for 'plausibility' in the complaint"; plaintiff must "set forth the 'grounds' for an 'entitle[ment]' to relief that is more than mere 'labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"  *Employer Teamsters-Local Nos. 175/505 Health and Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 467 (S. D. W. Va. 2013) ("*Employer Teamsters*") (quoting *Twombly*, 550 U.S. at 555); *see also Wright v. Sutton*, Civil Action No. 1:08-1431, 2011 U.S. Dist. LEXIS 34052 (S.D.W. Va. Mar. 29, 2011).  It is not sufficient to allege "a mere 'unadorned, the-defendant-unlawfully-harmed-me accusation,'" *Employer Teamsters*, 969 F. Supp. 2d at 468, nor "[t]hreadbare recitals of the elements of a cause

---

[5]     Counts II and Y are asserted against Dr. Chaney only.  None of the allegations in those counts relates to ABDC, nor is any connection alleged between ABDC and Dr. Chaney.

of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rather, the claim must "contain[ ] '**factual content** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Employer Teamsters*, 969 F. Supp. 2d at 468.  "If … 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – 'that the pleader is entitled to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  The *Iqbal/Twombly* pleading standard applies to complaints that are originally filed in state court and removed to federal court.  *Redd v. McDowell Cty. Bd. of Educ.*, 976 F. Supp. 2d 838, 851 (S. D. W. Va. 2013).

### 1.    The Complaint Does Not Plausibly Plead Misconduct by ABDC

The thrust of plaintiff's claims is that ABDC caused the epidemic of opioid abuse on which the City has expended public funds because it allegedly distributed opioids that others thereafter diverted from legitimate medical uses.  No factual basis is alleged, and certainly no plausible basis, to suggest that ABDC delivered a single pill to any pharmacy in the City that was used for anything other than legitimate medical purposes.  Instead, plaintiff tries to support its claim of diversion by alleging that ABDC (1) distributed an "excessive" number of opioids to pharmacies in the City, and/or (2) distributed opioids to pharmacies without complying with anti-diversion regulations or industry standards.  Neither ground is plausibly alleged.

First, the allegations that ABDC distributed too many pills to pharmacies in the City are entirely conclusory.  *See* Cp. ¶¶2, 12, 16, 43, 55, 57, 63, 111; Am. Cp. ¶¶2, 12, 18, 45, 57, 59, 65, 113 (alleging ABDC "dumped" and "showered" opioids in amounts that were "excessive, "unreasonable," "in excess of legitimate needs," "vast," and "obscene").  Despite its rhetoric, plaintiff does not even allege the number of pills that ABDC distributed into the City.  Although it alleges amounts that all three distributor defendants **collectively** distributed to the entire **state** of West Virginia over a five-year period (Cp. ¶¶6, 53; Am. Cp. ¶¶6, 55), that allegation does not

even permit an inference as to the amounts ABDC distributed into the state, much less the City (or whether and why those amounts were "too much"). Allegations such as these that lump defendants together and do not identify specific conduct for each defendant do not meet the plausibility requirement.[6] Equally fatal to plaintiff's suggestion that ABDC distributed too many opioid pills into the City is its failure to plead any facts that could plausibly support the proposition that diversion may be determined – or has ever before been determined by any court, regulatory agency, or professional medical organization – from the mere number of pills shipped. Plaintiff does not allege how many pills are "too many," how many are "excessive," what number is legitimately needed, or any basis, standard, rule, or methodology of any kind that might be used to support those characterizations.

The Complaint's factual allegations also undercut plaintiff's attempted reliance on numbers, as they admit West Virginia "ranks in the **top 10** for the highest rate of **prescriptions** given out for high-dose opioids and extended-release opioids," and that many West Virginia residents have medical needs for opioids that would lead to a high number of legitimate prescriptions for opioids. *See* Cp. ¶¶27-34; Am. Cp. ¶¶29-36 (alleging that a "disproportionate number of jobs" in West Virginia involve "heavy manual labor and leave workers prone to injury" for which opioids are prescribed "far more frequently"). In sum, plaintiff's allegation that ABDC caused the opioid epidemic by delivering too many opioids into the City is a bare conclusion, devoid of facts, and cannot support any of its claims.

Second, to the extent Count III seeks damages for ABDC's alleged violations of the WVCSA or BOP regulations, or to the extent Counts I and V rely on the alleged violations or industry standards to support the claims of negligence or unjust enrichment, the allegations are

---

[6]     *See, e.g., Jones v. Experian Info. Solutions*, Civil Action No. 14-10218-GAO, 2016 WL 3945094, at \*4 (D. Mass. July 19, 2016); *Gurganus v. Furniss*, Civil Action No. 3:15-cv-03964-M, 2016 WL 3745684, at \*5 (N.D. Tex. July 13, 2016); *Seni v. Peterschmidt*, Civil Action No. 12-cv-00320-REB-CBS, 2013 WL 1191265, at \*3 (D. Colo. Mar. 22, 2013).

-7-

likewise deficient.  Cp. ¶¶76-79, 108-111, 118; Am. Cp. ¶¶78-81, 110-113, 120.  The Complaint does not even identify the provisions of any statute, regulation, or standard it claims ABDC violated, let alone **how** or **when** ABDC supposedly failed to comply with it.  To the extent plaintiff means to refer to anti-diversion regulations, it does not identify a single aspect of ABDC's diversion controls that it claims are inadequate.  Its allegations as to such violations are not only entirely conclusory, they are asserted almost entirely as group pleading  and/or "upon information and belief" without stating any factual basis for the purported belief, neither of which meets the plausibility standard.  *See* Cp. at ¶¶43, 44, 54, 56-60, 63, 72, 108-111, 113; Am. Cp. at ¶¶45, 46, 56, 58-62, 65, 74, 110-113, 115; *see also* n. 6 above.[7]

To the extent plaintiff claims ABDC failed to report suspicious orders, its allegations have no factual substance either.  Here again, it alleges only conclusions:  that ABDC (1) was under an "obligation to report suspicious orders to the appropriate authorities," (2) "delayed compliance with the reporting of suspicious orders," and (3) "failed to submit or fully disclose suspicious orders."  Cp. ¶¶48, 51, 72; Am. Cp. ¶¶50, 53, 74.  These bald conclusions, devoid of a single fact, do not plausibly allege that ABDC violated any reporting requirement.  In sum, the Complaint pleads no facts that plausibly suggest wrongdoing by ABDC.

## 2.    The Complaint Does Not Plausibly Plead Causation

Equally deficient is the City's attempt to plead causation, a required element of all of its claims.  The Complaint includes **no facts** as to how ABDC's alleged distribution of an "excessive" amount of opioid pills or its purported non-compliance with any anti-diversion regulation caused any of the City's alleged harm.  It does not allege, even with a bare conclusion,

---

[7]       *See, e.g., Twombly*, 550 U.S. at 551 (complaint insufficient despite plaintiff's allegation "upon information and belief that [defendants] have entered into a contract, combination or conspiracy to prevent competitive entry…."); *16630 Southfield Ltd. P'ship v. Flagstar Bank*, 727 F.3d 502, 506 (6th Cir. 2013) ( "upon information and belief" claims insufficient where plaintiffs "have merely alleged their 'belief,'" and "[t]hese 'naked assertions devoid of further factual enhancement' contribute nothing to the sufficiency of the complaint"); *Williams v. Calderoni*, No. 11 Civ. 3020(CM), 2012 WL 691832, at *7-8 (S.D.N.Y. Mar. 1, 2012) (same).

that a single pill ABDC distributed to any pharmacy was actually "diverted" as opposed to dispensed for the legitimate medical purposes for which plaintiff acknowledges opioids are "effective treatments." Cp. ¶19; Am. Cp. ¶21. It does not allege what ABDC did that led to the alleged diversion of any pill. It does not identify any pharmacy customer of ABDC that allegedly filled a single prescription that was written for other than a legitimate medical purpose or that otherwise was involved in "diverting" opioids. Where plaintiff has not pled any connection whatsoever between ABDC and any allegedly diverted opioid pill, it has not plausibly pled that ABDC did anything to cause any of the City's alleged costs of addressing opioid abuse.

### B.     The Complaint Does Not Plausibly Plead Proximate Causation

Plaintiff has also failed to plausibly allege that ABDC **proximately** caused its claimed damages. The Complaint's allegations show instead that the opioid epidemic has varied and complex factual causes, and that the City's public expenditures to respond to it resulted from a host of factors (many of them criminal) that are far more immediate and direct than the remote and attenuated connection that ABDC is alleged to have (even if plaintiff's insufficient and conclusory allegations could carry any weight at all). In *Employer Teamsters*, this Court relied on the absence of proximate cause to dismiss a complaint under Rule 12(b)(6) that asserted claims under West Virginia law. 969 F. Supp. 2d at 472-475. It held that a pharmaceutical manufacturer's activities in marketing a blood-thinning drug, Plavix, as a matter of law were too remote from the increased costs the plaintiff third-party payor had reimbursed for the drug to be deemed their proximate cause. *Id.* As this Court explained, the complaint's allegations showed that "[b]etween Defendants' alleged misleading marketing and Plaintiffs' prescription reimbursement lies **a vast array of intervening events**, **including** the '**independent medical judgment' of doctors**" who prescribed the drug. *Id.* at 475. "Without any specific allegations as to who received these misrepresentations, how the misrepresentations influenced doctors, and

why certain patients received Plavix instead of alternative medications, this Court is left without sufficient allegations from which to properly infer that proximate causation is satisfied." *Id*. The Court discussed other cases, including *White v. Wyeth*, 705 S.E.2d 828 (W. Va. 2010), that had "engaged in necessary line-drawing to limit the permissible scope of recovery when an alleged injury involves a potentially complex chain of causation with many intervening events."[8] *Id*. at 472-475.

In cases like this that seek to recover governmental costs of responding to social problems resulting from the misuse of legal products, courts have held that the problems are too complex, and their intervening causes (both legal and illegal) too numerous, to allow the products' manufacturer or distributor to be held liable for the government's costs. One particularly analogous case is *Ashley Cty., Arkansas v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009). There, various Arkansas governmental entities, including counties, sought to hold manufacturers of over-the-counter medications containing pseudoephedrine liable for their costs of addressing the harms from that state's methamphetamine epidemic. The plaintiffs claimed that the manufacturers had marketed and sold their legal products to retailers knowing they were being purchased by third parties to make illegal methamphetamine. The Eighth Circuit affirmed dismissal of the action on the basis that the pseudoephedrine manufacturers' conduct as a matter of law was too far removed from the methamphetamine epidemic to support the government's recovery of its costs from them. *Id*. at 667-673. It relied on the heavily regulated sale of pseudoephedrine, as well as the many intervening causes, including criminal behavior, that lay between the state's costs of addressing the methamphetamine epidemic and the manufacturers' legal sales of pseudoephedrine to retailers. *Id*. at 664.

---

8       Other West Virginia cases have likewise recognized the courts' gatekeeper role in determining that a defendant's role in causing a harm is too remote to be considered its proximate cause. *See, e.g.*, *Webb v. Sessler*, 63 S.E.2d 65, 68-69 (W. Va. 1950); *Jackson v. Putnam Cty. Bd. of Educ.*, 653 S.E. 2d 632, 642 (W. Va. 2007); *Aikens v. Debow*, 541 S.E.2d 576, 582-587 (W. Va. 2000).

-10-

In *City of Philadelphia v. Beretta U.S.A. Corp.*, the Third Circuit likewise relied on the absence of proximate cause to affirm the dismissal of an action seeking to hold gun distributors liable for the city's costs of responding to crime, injuries, and property damage from gun violence. 277 F.3d 415, 426 (3d Cir. 2002). The court noted that gun distributors do not sell directly to purchasers, and that many "links … separate a manufacturer's sale of a gun to a [licensed retailer] and the gun's arrival in the illegal market through a distribution scheme that is not only lawful, but also is prescribed by statute with respect to the manufacturer's conduct." *Id.* at 424. The court also relied on the fact that the city's claimed damages were "speculative as it would be difficult to calculate how many incidents [of gun violence] could have been avoided had the gun manufacturers adopted different policies," and it noted the difficulty of apportioning liability among the various responsible parties, who would include various gun manufacturers, distributors, dealers, re-sellers, "and the shooter." *Id.* at 425-426.

Similar factors here establish that ABDC's conclusorily alleged connection to the City's costs of addressing the "opioid epidemic" is, as a matter of law, too remote and attenuated to support a plausible allegation of proximate cause (as noted above, plaintiff has not plausibly alleged **any** connection between ABDC and any diversion of opioids, nor will it be able to prove any). Like guns and pseudoephedrine, opioids are legal products whose distribution and sale are tightly regulated at every level up to the intended end user—the patient. As the Complaint's allegations show, many factors have intervened between ABDC's legal distribution of opioids to DEA- and BOP-licensed pharmacies and the "opioid epidemic" that the City claims has increased its costs of providing public services. First and foremost among those factors is the gatekeeper role the Complaint acknowledges doctors occupy in the use of opioids: "[i]ndividuals in West Virginia cannot obtain opioids without a prescription written by a licensed medical provider." Cp. ¶45; Am. Cp. ¶47. The Complaint also alleges that widespread opioid addiction and the consequent abuse and ills to which it has responded have resulted from doctors'

-11-

prescribing of opioids for "common" and inappropriate conditions.  Cp. ¶¶23-25, 28-34; Am. Cp. ¶¶25-27, 30-36.  As in *Employer Teamsters*, the central and admitted role of physicians and independent medical judgment in the use of opioids, and, indeed, in causing the opioid epidemic, precludes an inference that ABDC proximately caused the opioid epidemic or the City's costs by supplying opioids to licensed pharmacies to be sold on valid prescription only.  969 F. Supp. 2d at 475.

ABDC's role in the opioid epidemic is even more remote and attenuated in light of the many criminal acts and actors the Complaint identifies as contributing to the opioid epidemic and the City's expenditures, most of which were incurred to address criminal conduct.  Cp. ¶¶13, 126, 127; Am. Cp. ¶¶13, 128, 129 (seeking to recover costs of "law enforcement," "prosecutions," "courts and court personnel," "public defender services," incarcerations," "probation and parole"); Cp. ¶¶23, 24; Am. Cp. ¶¶25, 26 (alleging increased costs from heroin use).  The Complaint alleges that doctors, "pill mills," and "pain clinics" prescribed and/or dispensed opioids illegally, with "no medical evidence supporting the prescription" and/or knowing they were "likely to be abused, diverted, or misused."  Cp. ¶¶38, 45, 64-66, 104, 113; Am. Cp. ¶¶40, 47, 66-68, 106, 115.  It alleges that "many physicians and pharmacists" have been arrested for such illegal conduct.  Cp. ¶38; Am. Cp. ¶40.  It alleges that individuals obtain prescriptions from doctors by "criminal means."  Cp. ¶23; Am. Cp. ¶25.  It is well known, and plaintiff acknowledges, that opioids that are prescribed and dispensed for legitimate medical purposes are diverted to abusers and addicts by illegal sales or other criminal means.  *See, e.g.,* Cp. ¶¶45, 58, 60, 66, 104; Am. Cp. ¶¶47, 60, 62, 68, 106.  The overwhelming prevalence of intentional criminal conduct in supplying opioids to those who wish to abuse them is yet another enormously significant intervening cause of the opioid epidemic and the City's costs of responding to it.

ABDC has no access to the information and the authority necessary to identify and defeat these criminal activities that plague our society. *See* §II(A) above. Only the DEA, the State of West Virginia, the BOP, the WV Board of Medicine, and law enforcement at all levels (including the City) have such access and authority. Their ineffectiveness at defeating the criminal activities that have caused the opioid epidemic may not be ignored or side-stepped, and certainly is not support for a conclusory, inflammatory, accusatory effort to shift the blame for this extraordinarily complex social problem to an entity like ABDC without a single factual allegation that supports it.

Boiled down to their essence, the allegations as to ABDC's conduct are simply that it delivered to duly licensed/registered pharmacies a lawful product that plaintiff admits is effective in easing the suffering of post-surgical, injured, chronically in pain, and dying patients, Cp. ¶19; Am. Cp. ¶21, and then (even though ABDC is not alleged to have had any control over or knowledge of the prescribing, dispensing, or use of opioids), without alleging any factual connection whatsoever, making wholly conclusory allegations that someone or ones thereafter diverted opioids to illegitimate purposes. Thus, ABDC's conduct is remote and attenuated, in contrast with the admittedly criminal conduct of numerous actors who are more closely involved in and have control that ABDC does not have over the conduct that leads to opioid abuse. It would also be exceedingly difficult to apportion to ABDC any share of responsibility for the overdoses, accidents, crimes, and costs that multiple actors, many of them criminal, have clearly, directly, and immediately caused (including by abusing heroin). In sum, although ABDC shares the City's concerns about opioid abuse, ABDC's alleged role is far too remote as a matter of law for ABDC to be deemed the proximate cause of the City's costs. *Employer Teamsters*, 969 F. Supp. 2d at 475; *Ashley*, 552 F.3d at 664; *City of Philadelphia*, 277 F.3d at 426.

-13-

### C.     The Free-Public-Services Doctrine Bars the City's Claims

The City is barred from seeking or recovering its costs incurred in performing its public duties and responsibilities by the "free-public-services" doctrine, which precludes government entities from recovering their expenditures made in doing what it is their public duty to do. *See In re Oil Spill by The Amoco Cadiz*, 954 F.2d 1279, 1310 (7th Cir. 1992) (per curiam). "[T]he government's decision to provide tax-supported services is a legislative policy determination," and "[i]t is not the place of the courts to modify such decisions." *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984). The doctrine has barred claims against a negligent airline for costs expended "to provide public services" in response to a plane crash, *Cty. of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149, 150–51 (2d Cir. 2013), and against gun manufacturers for costs incurred to address gun violence, *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147 (Ill. 2004). West Virginia courts have invoked similar principles to bar claims against inmates to recover "the costs of room and board in the county jail," reasoning that such costs are "a public charge on the county" that cannot "be collected . . . [absent] statutory authority." *State v. St. Clair*, 355 S.E.2d 418, 419-20 (W. Va. 1987). If our government entities may not recover such costs from the criminals who directly cause them, how can they seek them from a far-removed, legitimate, highly regulated business entity?

The City seeks recovery of the "public funds" it has used to provide public services to its citizens. *See* Cp. ¶¶12, 13, 126, 127; Am. Cp. ¶¶12, 13, 128, 129 (seeking expenditures on law enforcement, emergency response, prosecutions, courts, public defenders, jails, public welfare, healthcare, medical services, drug abuse education and treatment). These "public charge[s] on the county," *St. Clair*, 355 S.E.2d at 419-20, represent a legislative policy determination that the courts should not disturb. As the City is not entitled to any of the damages it pleads, its claims against ABDC must be dismissed. *See Air Fla., Inc.*, 750 F.2d at 1080 (affirming dismissal of

-14-

claim seeking expenses of providing emergency services); *Walker Cty. v. Tri-State Crematory*, 643 S.E.2d 324, 329 (Ga. Ct. App. 2007) (same).

### D. The Economic Loss Rule Bars Plaintiff's Claims

The City's claims are also barred by the economic loss rule, which provides:

> An individual who sustains economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages….

Syl. pt. 9, *Aikens*, 541 S.E.2d 576. Without this rule, which requires physical harm or property damage to support tort liability, tort duty would spread a tsunami of economic and social chaos "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id*. at 581 (quoting Justice Cardozo in *Ultramares Corp. v. Touche*, 255 N.Y. 170 (1931)). Because the City asserts only an economic claim for its costs of providing governmental services that it has a duty to provide, the economic loss rule bars this action. *See, e.g., City of Chicago*, 821 N.E.2d at 1143 (dismissing, under economic loss rule, city's costs of responding to gun violence).

### E. Count III Should Be Dismissed Because the City Has No Right to Sue Under the WVCSA[9]

Count III should be dismissed because no private right of action may be implied under the WVCSA. Four factors determine whether a statute provides a private cause of action: (i) whether the plaintiff is part of "the class for whose benefit the statute was enacted"; (ii) the legislature's intent; (iii) whether a cause of action is "consistent with the underlying purposes of the legislative scheme"; and (iv) whether implying a cause of action would intrude into an area

---

[9] To the extent the City purports to seek relief under "United States laws and regulations relating to the distribution of controlled substances," Cp. and Am. Cp. at Prayer Nos. 3(b) and 4(b), its claims must be dismissed because there is no private right to sue under the CSA or its regulations. *See Peckens v. Rite Aid of West Virginia, Inc.*, Civil Action No. 5:11CV70, 2011 WL 2938454, at \*3 (N.D. W. Va. July 19, 2011); *McCallister v. Purdue Pharma, L.P.*, 164 F. Supp. 2d 783, 793 (S.D. W. Va. 2001).

of federal authority. *Hurley v. Allied Chem. Corp.*, 262 S.E.2d 757, 763 (W. Va. 1980). All the *Hurley* factors counsel against implying a private cause of action under the WVCSA.

**First**, the WVCSA and its regulations were not enacted to protect cities from the public costs of responding to prescription-drug diversion but rather, as W. Va. Code § 60A-8-3 provides, "to protect **the health, safety and general welfare of residents** of this state . . . ."

**Second**, the WVCSA's enforcement scheme puts the regulation of controlled substances distribution in West Virginia squarely on the BOP, not private actions for damages. The WVCSA mandates that BOP "shall administer the provisions of this chapter." W. Va. Code § 60A-2-201. It prescribes an enforcement scheme that states that "[c]omplaints arising under any provision of [the Wholesale Drug Distribution Licensing Act]," the WVCSA provision relevant here, "**shall** be handled" pursuant to the procedures set forth in § 60A-8-10. Those procedures authorize the **BOP** to "file a written complaint" charging "a wholesale drug distributorship operation with violations of this article," to hold an "expedited hearing," and to "suspend, restrict or revoke the license" of the registered company. *Id.* § 60A-8-10(a) and (b). The WVCSA provides for judicial relief to enforce its provisions **only** if the BOP requests it: "Upon proper application **by the board**, a court . . . may grant an injunction, restraining order or other order" enforcing the Act. *Id.* § 60A-8-12(a). In furtherance of its authority and obligation to enforce the WVCSA, the BOP has promulgated regulations governing its procedures for adjudicating violations of the WVCSA which, notably, include the effectiveness of distributors' "controls and procedures to guard against theft and diversion of controlled substances." *See, e.g.*, W. Va. Code R. § 15-1-7; *see also* § 15-2-4.2.1. By contrast, nothing in the statute or regulations suggests private actors have or should have any role in enforcing these technical and specialized requirements.

**Third**, for similar reasons, allowing cities to enforce the WVCSA would be inconsistent with the existing legislative scheme. *See Hill v. Stowers*, 680 S.E.2d 66, 74 (W. Va. 2009)

-16-

(where West Virginia Election Code set forth a "process for contesting elections" to be used by the losing candidate, private cause of action would "usurp the legislative scheme"); *see also Gen. Pipeline Constr., Inc. v. Hairston*, 765 S.E.2d 163, 171–72 (W. Va. 2014) (legislature does not intend to create private right of action when it grants a state administrative agency exclusive authority to sue and enforce the statute).

**Fourth**, because the federal CSA comprehensively and closely regulates the distribution of controlled substances throughout the United States and does not provide for a private right of action (*see* n. 9 above), allowing West Virginia counties or cities to bring private actions for money "damages" to enforce controlled substances laws would intrude into (and indeed interfere with) an area of federal authority as well.[10]

In sum, under the Hurley factors, plaintiff has no private right of action to enforce the WVCSA or its regulations.

### F.   The Alleged Violations of the CSA or the WVCSA Cannot Support Plaintiff's Claims for Negligence or Unjust Enrichment

The City's negligence and unjust enrichment claims are based in large part, if not entirely, on alleged violations of the CSA and WVCSA and/or their respective regulations.[11]  Where the City has no right to enforce those statutes or regulations directly, *see* §III(E) & n.11 above, it

---

[10]      There is no merit to the City's assertion of W. Va. Code § 55-7-9 as a basis for establishing what is essentially a private cause of action under the WVCSA.  Cp. ¶115; Am. Cp. ¶117.  That statute provides:  "Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages."  *Cunningham Energy, LLC v. Outman*, No. 2:13-CV-20748, 2013 WL 5274361, at *5 (S.D. W. Va. Sept. 18, 2013), held that §55-7-9 does not create a private right of action for every violation of every statute, and that *Hurley*, not the "extremely broad language" of §55-7-9, determines whether a private right of action exists.  This holding is consistent with *England v. Central Pocahontas Coal Co.*, 104 S.E. 46, 47 (W. Va. 1920), which explained that the statute "was merely enacted to preserve existing causes of action and to prevent defendant from setting up the payment of the statutory penalty in bar thereof."

[11]      *See* Cp. ¶48; Am. Cp. ¶50 (ABDC was "under an obligation to report suspicious orders to the appropriate authorities"); Cp. ¶59; Am. Cp. ¶61 (ABDC "had a legal duty to ensure [it was] not filling suspicious orders, as well as to report suspicious orders").  The latter allegation is incorrect as a matter of law.

should not be allowed to do so through its common-law claims.[12] Further, regulations like those at issue here – which "do not describe **particular acts** that should or should not be done," and "do not provide guidance as to legislative judgment that the failure to engage in **certain conduct** constitutes negligence" – cannot be used as evidence of negligence to support damages in a civil suit because they "do not create standards of care in any more specific sense than the law of negligence in general." *Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1222 (3d Cir. 1989).

The regulations at issue here cannot be deemed to impose standards of care, but only administrative requirements. The directives of the suspicious order regulation are far too vague to support civil liability.[13] It directs distributors to develop a system to detect "suspicious" orders, which are defined to "include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency" (15 W. Va. Code R. § 15-2-4.4), but does not identify any details of such a system or define what constitutes an order of "unusual size," a "normal pattern," or "unusual frequency." *Id.* The DEA has acknowledged the vagueness of and lack of standards in the DEA's suspicious order regulation on which the BOP regulation is

---

[12]     *See Civil Aeronautics Bd. v. Delta Air Lines*, 367 U.S. 316, 328 (1961) (refusing to grant a board "power to do indirectly what it cannot do directly"); *see Blankenship v. Ethicon, Inc.*, 656 S.E.2d 451, 458–59 (W. Va. 2007) (affirming the conclusion that plaintiffs' claims were governed by the Medical Professional Liability Act despite "[t]he fact [that] [the plaintiffs] label [their claims] as 'products' claims"); *see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994) ("We are not prepared to permit plaintiffs to use a common law claim to circumvent the standing requirements of the [applicable statute].").

[13]     WVBOP's suspicious order regulation, which is based almost *verbatim* on the DEA regulation, provides:

The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Office of the Board of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

15 W. Va. Code R. § 15-2-4.4. *Compare* 21 C.F.R. § 1301.74(b) (DEA regulation).

-18-

patterned.[14]  Further, DEA regulations provide that the DEA, after inspecting a distributor's system, may deem "[s]ubstantial compliance" with the suspicious order requirements to be sufficient.  21 C.F.R. § 1301.71(b).  The fact that the BOP and DEA regulations do not establish specific standards, that each distributor's variables are different, and the agency discretion in applying the suspicious order regulations mandate the conclusion that the regulations do not impose a standard of care that could support a negligence claim of civil liability.

Nor may the City impose civil liability on ABDC for the alleged failure to report suspicious orders to "the appropriate authorities."  Cp. ¶48; Am. Cp. ¶50.  Regulatory requirements to report to the government are administrative requirements, not standards of care, and cannot support a negligence claim.  *See Talley v. Danek Med., Inc.,* 179 F.3d 154, 159 (4th Cir. 1999) (violation of statutory requirement that "does not itself articulate a standard of care but rather requires only … a **report** for the administration of a more general underlying standard … is not a breach of a standard of care").[15]  Because the regulations do not establish a standard of care as to any conduct, but are merely administrative requirements, they cannot support the City's common-law claims.

### G.    Count II Should Be Dismissed Because the City Has Not Pled the Elements of Unjust Enrichment

The Complaint does not plead a plausible unjust enrichment claim.  Unjust enrichment reflects the principle "that it would be unjust to allow a person to retain money . . . when in

---

[14]     *See* Food Drug Cosm. L. R. Rep. 400076 (C.C.H.), 2015 WL 7796261 (at pages 28-29, 67) (reporting that DEA has acknowledged that "short of providing arbitrary thresholds to distributors, **it cannot provide more specific suspicious orders guidance** because the variables that indicate a suspicious order differ among distributors and their customers").

[15]     *See also, e.g., Dance v. Town of Southampton*, 95 A.D.2d at 442, 449, 467 N.Y.S. 2d 203, 208 (1983) (driver's failure to report his knee injury to Commission of Motor Vehicles not negligence per se in personal injury action arising from car accident because reporting requirement did not establish duty of care); *Hamilton Cty. Emergency Commc'ns Dist. v. BellSouth Telecommunications, LLC*, 890 F. Supp. 2d 862, 881 (E.D. Tenn. 2012) (telecommunications company's breach of statute requiring it to report amounts billed and collected did not support negligence claim because the "'duty,' however, is an administrative requirement, **not a standard of care**").

equity and justice it should be returned to the payor." *Hill v. Stowers*, 680 S.E.2d 66, 75 (W. Va. 2009) (per curiam).  A plaintiff seeking to recover "on a theory of unjust enrichment must [plead]," among other elements, "a benefit conferred on the defendant **by the plaintiff**." *Johnson v. Ross*, 419 F. App'x 357, 361 (4th Cir. 2011) (applying West Virginia law); *see also Am. Heartland Port, Inc. v. Am. Port Holdings, Inc.*, 53 F. Supp. 3d 871, 879 (N.D. W. Va. 2014) ("In West Virginia, 'restitution damages from a claim of unjust enrichment are measured in terms of the benefit the **plaintiff** conferred to the **defendant**.'")

The Complaint does not allege that the City conferred a benefit on ABDC or made payments to or performed services for it.  It claims instead that ABDC benefited from ABDC's **own** alleged conduct – distributing prescription drugs to pharmacies.  Cp. ¶¶129-133; Am. Cp. ¶¶131-135.  Because the City has not alleged that it conferred on ABDC the "benefits that [ABDC allegedly] received," "there is simply no basis to allow [the City] to pursue a claim against [ABDC] for unjust enrichment." *Hill*, 680 S.E.2d at 75.

## IV.    CONCLUSION

Because the City fails to state a claim against ABDC, the Complaint against ABDC should be dismissed in its entirety.  To the extent the Complaint raises novel issues of West Virginia law as to which the Court determines that it needs guidance, ABDC requests that this Court certify question(s) of law to the Supreme Court of Appeals of West Virginia.  *See* W. Va. Code § 51-1A-3.

4822-1629-0116.v1

Dated: March 2, 2017

Respectfully submitted,

AMERISOURCEBERGEN DRUG CORPORATION

Eric W. Sitarchuk
(*pro hac vice to be submitted)*
eric.sitarchuk@morganlewis.com
Meredith S. Auten
(*pro hac vice to be submitted)*
meredith.auten@morganlewis.com
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

/s/ Alvin L. Emch, Esquire
Alvin L. Emch, Esquire (WVSB # 1125)
aemch@jacksonkelly.com
Adam J. Schwendeman (WVSB # 11989)
aschwendeman@jacksonkelly.com
JACKSON KELLY PLLC
500 Lee Street, East, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000

*Counsel for Defendant AmerisourceBergen
Drug Corporation*

4822-1629-0116.v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

THE CITY OF HUNTINGTON,
           Plaintiff,

     v.

AMERISOURCEBERGEN DRUG
CORPORATION,[1] CARDINAL HEALTH
INC., MCKESSON CORPORATION, and
GREGORY DONALD CHANEY, M.D.,
           Defendants.

Civil Action No. 3:17-cv-01362
Judge: Robert C. Chambers

## CERTIFICATE OF SERVICE

I, Alvin L. Emch, counsel for Defendant AmerisourceBergen Drug Corporation, do

hereby certify that on March 2, 2017, I electronically filed the foregoing Memorandum in

Support of Motion to Dismiss Plaintiff's Amended Complaint ("Memorandum") with the Clerk

of the Court using CM/ECF system, which will send notification of such filing to the following:

> Charles R. "Rusty" Webb
> The Webb Law Centre, PLLC
> 716 Lee Street, East
> Charleston, West Virginia
> rusty@rustywebb.com
>
> Enu Mainigi
> F. Lane Heard, III
> Steven M. Pyser
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C.  20005

---

[1] AmerisourceBergen Drug Corporation's name was misspelled by Plaintiff in the caption as AmerisourceBerger Drug Corporation.

-1-

James R. Wooley
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114-1190

Elizabeth P. Kessler
Jones Day
325 John H. McConnell Blvd.
Columbus, OH 43215

Geoffrey Hobart
Matthew Benov
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001

Jeffrey M. Wakefield
Flaherty Sensabaugh Bonasso PLLC
200 Capitol Street
Charleston, WV  25338-3843

Robert H. Akers
Susan M. Robinson
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
Charleston WV  25301

/s/ Alvin L. Emch
Alvin L. Emch (WVSB # 1125)

4822-1629-0116.v1