IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**THE CITY OF HUNTINGTON,**

    Plaintiff,

v.                                                      Civil Action No. 3:17-cv-01362
                                                             (Judge Chambers)

**AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH
INC., MCKESSON CORPORATION and
GREGORY DONALD CHANEY, M.D.,**

    Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MCKESSON CORPORATION'S MOTION FOR
<u>JUDGMENT ON THE PLEADINGS</u>**

**I. INTRODUCTION**

The distribution of prescription drugs, including controlled substances, into West Virginia and the City of Huntington is undeniably lawful and of vital importance to the health and well-being of their citizens. Prescription drug abuse also undeniably is a problem in West Virginia and the City of Huntington. In this case, Plaintiff, the City of Huntington, [sometimes "City" or "Huntington"] seeks to hold McKesson Corporation ["McKesson"] and two other wholesale drug distributors liable for the effects of prescription drug abuse solely because they lawfully distribute controlled substances to registered pharmacies in the City.[1] Plaintiff, however, lacks any legal basis for finding McKesson liable for the effects of prescription drug abuse in the City of Huntington.

Plaintiff has alleged no legal duty that McKesson owes to it. McKesson owes no duties to the City pursuant to the West Virginia Uniform Controlled Substances Act and its implementing regulations. The alleged distribution of "excessive amounts" of controlled

---

[1] McKesson refers to the three defendant distributors—AmerisourceBergen Drug Corporation ("ABDC"), Cardinal Health, Inc. ("Cardinal"), and itself—as the "Distributor Defendants." Plaintiff's claims against Gregory Donald Chaney, M.D. ("Dr. Chaney") have no relationship to the claims against the Distributor Defendants. Dr. Chaney thus was fraudulently joined. (*See* Notice of Removal at ¶¶ 10-22 (Feb. 23, 2017) [Doc. 1].)

1

substances into Huntington relative to its population does not allege a breach of any legal duty. Plaintiff fails to allege any causal link between McKesson's distribution of controlled substances and Plaintiff's alleged damages and, instead alleges criminal activity by others that break any causal chain. Plaintiff also is not entitled to recover its alleged economic damages for providing public services.

Accordingly, Plaintiff fails to state any claim against McKesson upon which relief can be granted, and the Court should dismiss its Complaint as to McKesson with prejudice. [2]

## II. BACKGROUND

The route of a prescription opioid from manufacture to the hands of a patient involves numerous parties, each with its own legal obligations. (*See* Compl. ¶41 ("There is a sophisticated system which distributes the drugs across our nation.") The manufacturer must be registered with the Drug Enforcement Administration [the "DEA"] and must follow quotas set by the DEA. [3] The prescribing physician must be registered with the DEA and licensed by a State medical board. (*Id.* ¶47.) The prescribing physician cannot write a prescription for other than a medically necessary purpose after examining the patient. [4] The pharmacist, who also must be registered with the DEA and must be licensed by the Board of Pharmacy, has a "corresponding

---

[2] Plaintiff has filed an Amended Complaint. The Amended Complaint was filed before removal of the action to this Court. The Amended Complaint has not been served. The present motion is, therefore, based upon the allegations in the Complaint which McKesson understands are not materially different from the allegations in the Amended Complaint.

[3] Each year, the DEA sets Aggregate Production Quotas ("APQs") for Schedule I and II controlled substances, including oxycodone and hydrocodone, "to provide for the estimated medical, scientific, research, and industrial needs of the United States, for lawful export requirements, and for the establishment and maintenance of reserve stocks." 21 U.S.C. § 826(a). From 1993 to 2015, the DEA authorized a 39-fold increase in the annual oxycodone APQ. John Temple, *DEA Secretly Oks Killer Quantities of Oxy and Morphine* (Oct. 21, 2015), available at <http://www.thedailybeast.com/articles/2015/10/21/dea-secretly-oks-killer-quantities-of-oxy-and-morphine.html> (last visited Feb. 15, 2017). Even though the 2017 APQ for oxycodone was reduced by 25% from 2016, the DEA still is allowing 108,510 kilograms (nearly 120 U.S. tons) to be produced for sale, and even though the 2017 APQ for hydrocodone was reduced by 66% from 2016, the DEA still is allowing 58,410 kilograms (more than 64 U.S. tons) to be produced for sale. DEA, Final Order, *Established Aggregate Production Quotas for Schedule I and II Controlled Substances for 2017*, 81 Fed. Reg. 69079 (Oct. 5, 2016).

[4] Federal regulations require that prescriptions for controlled substances "be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a); *see* W. Va. C.S.R. § 15-2-7.4.1 (same).

responsibility" to not fill a prescription that the pharmacist knows was written for other than a medically necessary purpose. [5] Wholesale distributors, such as McKesson, merely distribute prescription medications from various manufacturers to pharmacies. As a distributor, McKesson has no role in manufacturing or promoting opioids to physicians; it has no role in determining how opioids should be or are prescribed; and it has no role in how pharmacists dispense opioids. [6]

McKesson is registered with DEA and the West Virginia Board of Pharmacy ("WVBOP") to distribute controlled substances in West Virginia. (Compl. ¶ 5; McKesson Ans. ¶ 5.) All McKesson's shipments of controlled substances to West Virginia, including the City of Huntington, were (and are) to pharmacies that also are registered with the DEA and WVBOP to receive controlled substances. (Ans. ¶ 41.) Plaintiff does not allege that McKesson unlawfully shipped controlled substances to unregistered pharmacies in the City of Huntington.

Plaintiff's claims rely on the allegation that in the course of McKesson's lawful distribution of prescription medications to registered pharmacies, McKesson did not "limit the flow of [prescription opioids] into the City of Huntington." (Compl. ¶ 46; *see also id.* ¶¶ 55-65 (alleging that Distributor Defendants "did not refuse to ship or supply" controlled substances to the City of Huntington and violated that alleged duty, which led to the "intentional distribution of

---

[5] Although the primary "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner," DEA regulations place a "corresponding responsibility" on the "pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a); *see* W. Va. C.S.R. § 15-2-7.4.1 (same). DEA thus requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse. *Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed.Reg. 4,729, 4,730 (DEA Feb. 9, 1990). DEA requires that a pharmacist refuse to dispense when a prescription raises suspicion and its propriety cannot be verified. *Id.* No federal or state law, however, imposes a "corresponding responsibility" on distributors.

[6] Plaintiff's Complaint contains extensive allegations about the "opioid epidemic" that purportedly is caused by physicians over-prescribing opioids for chronic pain. (*See* Compl. ¶¶ 19-26.) Over-prescription of opioids is alleged to result in increased heroin use. (*See id.* ¶¶ 25-26.) Because McKesson neither manufactures, promotes, prescribes, nor dispenses opioids, however, these allegations have no relevance to McKesson's wholesale distribution activities. Plaintiff also alleges that criminal conduct relating to opioid addiction subverts this regulated supply chain. (*See* Compl. ¶ 25) ("When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor-shopping, use of aliases, and criminal means to satisfy their cravings...."). Again, McKesson's distribution activities have no connection whatsoever to the alleged criminal conduct of addicts to obtain opioid prescriptions.

excessive prescription pain killers").) Plaintiff, however, neither identifies any specific orders by Huntington pharmacies that McKesson allegedly should have refused to ship nor any Huntington pharmacy that received allegedly suspicious orders. Instead, Plaintiff alleges that the aggregate shipments of controlled substances by the three Distributor Defendants were too large relative to the size of the community. Plaintiff, however, did not and cannot allege facts to support these allegations. No distributor could be aware of the amounts of controlled substances shipped by other distributors, and no particular order from any pharmacy can be identified as suspicious based on community size.

Based on allegations about the volume of prescription opioids that the Distributor Defendants collectively shipped to West Virginia, not the City of Huntington, Plaintiff asserts the following three legal claims against the Distributor Defendants:

> Count I, Negligence of Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc. and McKesson Corporation (Compl. ¶¶ 71-82);
>
> Count III, Defendants Amerisource, Cardinal and McKesson's Violation of West Virginia Uniform Controlled Substances Act (*id.* ¶¶ 109-120); and
>
> Count V, Unjust Enrichment (*id.* ¶¶ 127-135).

Plaintiff specifically alleges damages only in its unjust enrichment count, which alleges that the City has "expended substantial amounts of money annually that it would not have otherwise expended on numerous services through various agencies," and has paid for "costs of prescriptions, health care, and other medically-related costs, rehabilitation, [*et cetera*]."[7] (*Id.* ¶¶ 128-129.) In its Prayer, Plaintiff then seeks temporary and permanent restraining orders to require Defendants to comply with federal and state controlled substances laws, which are enforced by the DEA and the WVBOP, not the City of Huntington. Plaintiff also seeks in its Prayer: "punitive damages" and "attorneys' fees and costs." (*Id.* Prayer.)

---

[7] Plaintiff's alleged damages, as well as other allegations, have been substantially borrowed from the Amended Complaint of the West Virginia Attorney General and two state agencies pageainst McKesson. *See* Am. Compl., *State of W. Va.* ex rel. *Patrick Morrisey v. McKesson Corp.*, Civil Action No. 16-C-1, Boone County, W. Va. Cir. Ct., ¶¶ 436-38.

4

McKesson answered Plaintiff's Complaint, denied Plaintiff's claims, and asserted defenses [Doc. 12].[8]  Because none of Plaintiff's three counts asserted against McKesson states a claim upon which relief can be granted, McKesson now is entitled to a judgment on the pleadings that dismisses Plaintiff's Complaint with prejudice as to it.

## III. ANALYSIS

### A.  The Motion for Judgment on the Pleadings Standard.

The standard for a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is the standard for a motion to dismiss pursuant to Rule 12(b)(6). *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  Under the Rule 12(b)(6) standard, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists when the Court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The Court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).  The Court also must "draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards*, 178 F.3d at 244.  The Court, however, need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... [because courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555); *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979) (courts need not accept conclusory factual allegations devoid of any reference to actual events); *see also*

---

[8] The other two Distributor Defendants moved for Fed. R. Civ. P. 12(b)(6) dismissal [Docs. 13-15].

5

*Lekas v. Briley*, 405 F.3d 602, 613-14 (7th Cir. 2005) (courts are not "required to ignore facts alleged in the complaint that undermine Plaintiff's claim") (citations omitted).

**B.      Plaintiff does not plausibly allege a legal duty that McKesson owes to the City of Huntington.**

Plaintiff's claims against McKesson rely on the allegation that McKesson had a duty to Plaintiff to "limit the flow of [prescription opioids] into the City of Huntington." (Compl. ¶ 46; *see also id.* ¶ 61 (McKesson "had a legal duty to ensure [it was] not filling suspicious orders").) Plaintiff also alleges that McKesson had a "duty to the City of Huntington to comply with [its] obligation to report suspicious orders in the City of Huntington." (*Id.* ¶ 78; *but see id.* ¶ 50 (pharmaceutical wholesalers are "under an obligation to report suspicious orders to the **appropriate authorities**") (emphasis added).) And Plaintiff alleges that McKesson "negligently failed to ensure its conduct conformed to industry standards," which allegedly "was a direct breach of the duty . . . owed to Plaintiff." (*Id.* ¶¶ 81-82.)

As a registered distributor of controlled substances, McKesson may lawfully fill orders from registered pharmacies in West Virginia, including those in the City of Huntington. In order for Plaintiff to state a claim that depends on the unlawfulness of McKesson's conduct as a registered distributor, then, Plaintiff must first plausibly allege that McKesson's conduct violated a legal duty that McKesson owed to the City of Huntington specifically. *See, e.g.*, Syl. Pt. 3, *Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2001) ("In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed **to the plaintiff**.") (emphasis added) (citation omitted). McKesson, however, owes none of the alleged duties to the City.[9]

**1.      The West Virginia Board of Pharmacy, not the City of Huntington, administers the West Virginia Uniform Controlled Substances Act.**

---

[9] The determination that Plaintiff's Complaint fails to allege a legally cognizable duty is properly made by the Court as a matter of law. *See* Syl. Pt. 5, *Aikens*, 541 S.E.2d 576 ("The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.").

6

West Virginia has a comprehensive regulatory scheme for the distribution and dispensing of controlled substances, the West Virginia Uniform Controlled Substances Act (the "WVCSA"), that is administered solely by the West Virginia Board of Pharmacy (the "WVBOP"). *See* W. Va. Code § 60A-2-201(a) (WVBOP "shall administer" provisions of the WVCSA). Under this comprehensive regulatory scheme, whether McKesson meets its duties to the State are determined by WVBOP as conditions for maintaining its registration and avoiding fines. *See* W. Va. Code § 60A-8-7 (distributor licensing requirements); *id.* § 60A-8-14 (disciplinary actions against distributors).[10]

The WVBOP continues to renew McKesson's license and never has taken any action against McKesson. Plaintiff then, has no basis in West Virginia law to seek to enforce the WVCSA against McKesson via civil claims. Furthermore, Plaintiff's claims are identical to and subsumed by the claims against McKesson by the State of West Virginia through its Attorney General, and the West Virginia Department of Military Affairs and Public Safety and the West Virginia Department of Health and Human Resources through their respective Secretaries. (*See generally* Am. Compl., *State of W. Va.* ex rel. *Patrick Morrisey v. McKesson Corp.*, Civil Action No. 16-C-1, Boone County, W.Va. Cir. Ct.). The City alleges that the Distributor Defendants "contributed to the opioid epidemic in the state of West Virginia through reckless disregard to the safety and well-being of the citizens of the City of Huntington." (Compl. ¶ 110 (emphasis added).) Plaintiff also seeks an injunction requiring that McKesson, *inter alia*, report suspicious orders to the "appropriate state and federal authorities," not to the City of Huntington, which has no authority to receive such reports. (*Id.* Prayer.) Plaintiff's own allegations and requested damages acknowledge that its lawsuit duplicates and is subsumed by the State's previously filed lawsuit.

**2. No distributor has a legal duty to the WVBOP, much less to the City of Huntington, to refuse to ship controlled substances.**

---

[10] Similarly, whether McKesson maintains its federal registration is determined solely by the DEA. *See* 21 U.S.C. § 824.

7

While West Virginia's regulations require that McKesson identify suspicious orders,[11] the regulations require only that McKesson report suspicious orders to the WVBOP, not that McKesson refuse to ship any order identified as suspicious.[12] *See* W. Va. C.S.R. § 15-2-4.4. The reporting regulation does not include any interdiction requirement. A duty to suspend shipments also cannot be found in the regulatory requirement that distributors "provide effective controls and procedures to guard against theft and diversion of controlled substances." W. Va. C.S.R. § 15-2-4.2.1. West Virginia C.S.R. § 15-2-4.2.1, limits "effective controls against diversion" to the WVBOP's determination of the adequacy of a registrant's "overall security system" on a registrant-by-registrant basis. *Id.*[13]

The WVBOP's only command to distributors regarding due diligence before shipping controlled substances is to confirm that a receiving pharmacy is registered to possess controlled substances if the distributor is unsure of the pharmacy's registration. W. Va. C.S.R. § 15-2-4.3. Accordingly, nowhere in W. Va. C.S.R. § 15-2-4—or anywhere else in the West Virginia Uniform Controlled Substances Act and its Legislative Rules—can be found a duty that McKesson refuse to ship suspicious orders of controlled substances. Also, no such duty can be found in the federal Controlled Substances Act (the "CSA").[14]

---

[11] The regulation describes suspicious orders as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." Whether an order is "suspicious" is determined on an order-by-order basis, not in the aggregate.

[12] Furthermore, Plaintiff's Complaint lacks any allegation that reporting suspicious orders to the WVBOP would have resulted in any action by the Board against the pharmacies placing the orders.

[13] The two subsections following § 15-2-4.2.1 similarly refer to "[p]hysical security controls" and "security procedures to guard against in-transit losses." *See* W. Va. C.S.R. §§ 15-2-4.2.2, -4.2.3. These regulations nowhere mention a system to interdict suspicious orders.

[14] The federal CSA has a public interest factor of maintaining effective controls against diversion that the DEA considers when registering controlled substance distributors. *See* 21 U.S.C. § 823(b) and (e). As with the WVCSA, the federal CSA's public interest factor of maintaining effective controls against diversion does not require that distributors refuse to ship suspicious orders. The DEA, however, has asserted through adjudications that it may suspend a distributor's registration based on shipping controlled substances that the DEA deems should not have been shipped (typically to Internet pharmacies). These are purely regulatory actions by the DEA based on its own interpretation of the federal CSA and cannot form the basis of a civil duty.

Accordingly, no legal duty to refuse to ship any controlled substances order exists in West Virginia or federal law. Distributors owe no such duty to the WVBOP or DEA. *A fortiori*, McKesson cannot owe a duty not to ship to the City of Huntington.

### 3. So-called industry standards do not impose a legal duty.

Plaintiff alleges that the legal duty to ensure that McKesson does not ship suspicious orders also derives from "[i]ndustry standards." (*See* Compl. ¶ 80.) Plaintiff, however, cannot establish that industry standards create a legally enforceable duty. At most, the referenced "standards" provide suggestions to distributors for complying with federal law as administered by DEA. Industry standards or guidelines have no independent legal force or effect. *See Lehman Bros. Holdings, Inc. v. Laureate Realty Services, Inc.*, No. 1:04-cv-1432-RLY-TAB, 2007 WL 2904591, at *28 (S.D. Ind. Sept. 28, 2007) (unreported) (concluding that Mortgage Bankers Association's Canons of Ethics, as a purported "industry standard," do not "give rise to an independent and enforceable legal duty"); *In re Jones*, Ch. 13 Case No. 09–14499–BFK, 2011 WL 5025329, at *3 (Bankr. E.D. Va. Oct. 21, 2011) (unreported) (concluding that Consumer Data Industry Association's Credit Reporting Resource Guide does not "constitute[] a national, legally enforceable standard for the reporting of debts in a Chapter 13 case").

## C. No reference to volume or population illustrates a breach of any duty.

Plaintiff alleges that "Amerisource, Cardinal and McKesson knew or should have known that they were supplying vast amounts of dangerous drugs to small markets...." (Compl. ¶ 45.) Amerisource, Cardinal and McKesson "undertook intentional distribution of excessive prescription pain killers to a small community...." (*Id.* ¶ 65.) "Amerisource, Cardinal and McKesson delivered an excessive and unreasonable number of highly addictive controlled substances in the City of Huntington." (*Id.* ¶ 57.) These allegations, however, do not effectively allege a breach of any duty.

First, the Defendant Distributors do not act collectively to distribute pharmaceuticals. No distributor knows the amounts of any pharmaceutical distributed by any of its competitors. The allegation of collectively delivering excessive controlled substances has no validity for this

reason alone. It bears noting also that while no distributor is aware of total distribution amounts, the DEA collects this data in its ARCOS database, so the DEA is aware of and can act on aggregate distribution data. Second, suspicious orders are identified on a case-by-case basis, not in the aggregate. The size of a community is neither used to determine whether any particular order from a single pharmacy is suspicious nor could it be used for that purpose. To do so incorrectly assumes that the geographic market for a city's pharmacies is strictly limited to the city's borders. No distributor can make that assumption. Controlled substances monitoring programs use much different measures to identify individual suspicious orders.[15]

In addition to two major conceptual flaws, Plaintiff's allegations of shipping excessive controlled substances relative to a small community do not plausibly allege that McKesson unlawfully distributed any marginal amount of controlled substances. Even under Plaintiff's theory that shipping large amounts of controlled substances indicates unlawfulness, Plaintiff cannot deny that a registered distributor may lawfully distribute some amount of controlled substances to registered pharmacies in the City of Huntington. Plaintiff, however, fails to allege any number of doses that McKesson should have expected it could lawfully ship into Huntington. Plaintiff thus fails to plead any marginal amount of controlled substances that McKesson distributed unlawfully, *i.e.* the amount distributed above an allegedly lawful amount. In other words, Plaintiff alleges that McKesson violated a quota system without plausibly alleging any quota (and without alleging that Plaintiff has the authority to establish quotas). Accordingly, Plaintiff fails to allege that McKesson breached any standard whatsoever.

Plaintiffs' Complaint in this case suffers the same problem as the complaint in *Twombly* that failed to state a claim. In *Twombly*, the plaintiffs pleaded parallel conduct by the defendant telephone companies and then conclusorily claimed that an antitrust conspiracy must exist by virtue of the parallel conduct. *Twombly*, 550 U.S. at 546-57. "Antitrust conspiracy was not

---

[15] Plaintiff's allegations concerning purportedly excessive aggregate shipments simply do not provide a method for identifying any particular order that allegedly should not have been shipped. Plaintiff's allegations are based on aggregate amounts determined *after* the distribution occurred. Plaintiff's allegations provide no basis on which McKesson could prospectively determine that any particular order from any specific pharmacy would be suspicious.

suggested by the facts adduced under either theory of the complaint, which thus fail[ed] to state a valid [antitrust] claim." *Id.* at 547. The same is true in this case. Plaintiff alleges that McKesson and two other distributors collectively distributed large amounts of controlled substances into the City of Huntington relative to the size of the community. Plaintiff, however, fails to plausibly allege that McKesson acted with the other Distributor Defendants to distribute any amount of controlled substances unlawfully.

**D.     Plaintiff does not plausibly allege that McKesson caused its alleged damages.**

Plaintiff fails to allege facts that plausibly suggest that McKesson's distribution of controlled substances into the City of Huntington caused the City to "expend[] substantial amounts of money annually that it would not have otherwise expended on numerous services through various agencies . . . ." (Compl. ¶ 128; *see id.* ¶¶ 129-130 (alleging additional, similar damages); *id.* ¶ 130 ("Plaintiff will continue to incur these increased costs in the future as a result of the Defendants' conduct.").[16])

Plaintiff cannot deny that McKesson is permitted to lawfully distribute some amount of controlled substances into the City of Huntington. For Plaintiff to plausibly allege causation, then, Plaintiff must allege a causal link between: (1) the marginal amount of controlled substances that McKesson allegedly distributed unlawfully; and (2) amounts that the City of Huntington expended related to prescription drug addiction. Nowhere in Plaintiff's Complaint, however, does Plaintiff allege facts that connect McKesson's distribution of controlled substances with Huntington's alleged harms.

General allegations of causation—such as "[t]he aforementioned conduct was a direct breach of the duty Defendants Amerisource, Cardinal and McKesson owed to Plaintiff which was the proximate cause of Plaintiff suffering damages for which it seeks recovery herein" (*Id.* ¶ 82)—do not plead plausible causation. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... [because courts] 'are not

---

[16] Again, Plaintiff's claimed damages are copied from the damages claimed in the State's lawsuit against McKesson.

11

bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *see, e.g.*, *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 426 (3d Cir. 2002) (affirming Rule 12(b) dismissal of negligence and public nuisance claims by City of Philadelphia and civic organizations against gun manufacturers, stating that "[t]he causal connection between the gun manufacturers' conduct and the plaintiffs' injuries is attenuated and weak"); *Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 475 (S.D.W. Va. 2013) (dismissing union funds' unjust enrichment claims against drug manufacturer, because "[b]etween Defendants' alleged misleading marketing and Plaintiffs' prescription reimbursements lies a vast array of intervening events," and Plaintiffs' complaint lacked "sufficient allegations from which to properly infer that proximate causation is satisfied"); *White v. Wyeth*, 705 S.E.2d 828, 837-38 (W. Va. 2010) (finding no causal connection between prescription drug purchases and alleged harm to consumers from deceptive marketing practices "because the consumer cannot and does not decide what product to purchase;" ordering dismissal on remand).

Furthermore, Plaintiff affirmatively alleges intervening criminal activity, which breaks any purported causal chain. Plaintiff specifically pleads that addicts perpetrate crimes to wrongfully obtain opioid prescriptions. (Compl. ¶ 25.) Plaintiff also pleads that diversion occurs because pain clinics "provided highly addictive prescription pain killers to individuals with no medical evidence supporting the prescription," which is unlawful. (*Id.* ¶ 115.) Furthermore, "countless prescriptions that were primarily filled [by pharmacies] to divert the medication to illegal purposes." (*Id.* ¶ 116.) McKesson's alleged statutory violations allegedly "created conditions which contribute to the violation of West Virginia laws **by others**." (*Id.* ¶ 118 (emphasis added).) Most of Plaintiff's alleged damages also result from the criminal activity by third parties. (*See id.* ¶ 128 (alleging increased expenditures for, *inter alia*, "[i]ncreased law enforcement, emergency response teams, prosecutors and prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole").)

"Generally, a willful, malicious, or criminal act breaks the chain of causation." *Yourtree v. Hubbard*, 474 S.E.2d 613, 620 (W. Va. 1996); *see Ashley County, Arkansas v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009) (affirming dismissal of county claims seeking to hold manufacturers of over-the-counter medications containing pseudoephedrine liable for costs incurred by counties in addressing societal effects of methamphetamine epidemic). Rather than plead facts that, if true, would establish causation, the causation-related facts that Plaintiff pleads show that any purported causal chain between McKesson and Plaintiff's alleged damages is broken by criminal conduct.[17]

### E. Plaintiff cannot recover its alleged economic damages from McKesson.

Plaintiff alleges that its damages are increased expenditures for providing public services to address the effects of escalating prescription drug abuse in the City of Huntington. (*See* Compl. ¶¶ 128-30.) In other words, Plaintiff pleads economic loss to its "business" of providing public services. Plaintiff, however, cannot recover such economic loss from McKesson. *See Aikens v. Debow*, 541 S.E.2d 576, Syl. Pt. 9 (W. Va. 2001). Whether characterized as a rule based on a lack of duty, a lack of foreseeability, or a prudential concern for limiting potentially limitless tort suits, the economic loss doctrine states that

> an individual who sustains purely economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor.

*Id.*; *see id.* at 581-592 (examining multiple cases from other jurisdictions).

In this case, Plaintiff pleads no physical harm to them that was directly caused by McKesson's distribution of controlled substances to pharmacies in the City. Indeed, Plaintiff

---

[17] Also, the intervening criminal acts that Plaintiff pleads further establish that McKesson owes no duty to Plaintiff. *See Miller v. Whitworth*, 455 S.E.2d 821, 825 (W. Va. 1995) ("Generally, a person does not have a duty to protect others from the deliberate criminal conduct of third parties.") (quoting 57A Am. Jur.2d *Negligence* § 104 (1989)).

pleads that the harm occurs indirectly after lawful shipments are diverted by others to unlawful purposes. Plaintiff does not and cannot plead any contractual relationship with McKesson. Similarly, Plaintiff does not and cannot plead a special relationship between it and McKesson sufficient to support recovery for its claimed economic losses. Accordingly, Plaintiff seeks economic damages that they cannot recover from McKesson.

Because Plaintiffs' claimed economic damages are amounts they expend for public services, the free public services doctrine provides a complementary reason that they are unable to recover such damages from McKesson. The free public services doctrine precludes claims by governmental agencies, such as Plaintiff, from asserting claims against private persons for public expenditures. *See, e.g.*, *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1143-47 (Ill. 2004); *see also State v. St. Clair*, 355 S.E.2d 418, 419-20 (W. Va. 1987); *Mem. Support AmerisourceBergen Drug Corp.'s Mot'n Dismiss Plf.'s Compl.*, Doc. 11, at 14 (Feb. 1, 2017); *Mem. Support Cardinal Health, Inc.'s Mot'n Dismiss Plf.'s Compl.*, Doc. 13, at 11 (Feb. 1, 2017).

**F.     Plaintiff does not plausibly plead legal claims by threadbare recitals and *ipse dixit* conclusions.**

In its three legal claims against McKesson, Counts I, III, and V, Plaintiff merely cites various statutes and common law theories, and then asserts, *ipse dixit*, that McKesson is liable to it. Again, such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state actionable claims. *Iqbal*, 556 U.S. at 678.

**1.     Count I does not plead a negligence claim against McKesson.**

Count I alleges that McKesson and the other two Distributor Defendants failed to report suspicious orders of controlled substances, which must be reported to DEA and the WVBOP, not to the City of Huntington. (Compl. ¶ 73.) McKesson allegedly has "a duty to the City of Huntington to comply with their obligation to report suspicious orders in the City of Huntington." (*Id.* ¶ 78.) McKesson allegedly breached this duty and the "breach is the proximate cause of damages suffered by Plaintiff." (*Id.* ¶ 79.) McKesson also allegedly "failed to ensure its conduct

14

conformed to industry standards," which allegedly "was a direct breach of the duty [McKesson] owed to Plaintiff which was the proximate cause of Plaintiff suffering damages for which it seeks a recovery herein." (*Id.* ¶¶ 81-82.)

McKesson, however, owes no duty to Plaintiff to report suspicious orders or to comply with industry standards. (*See supra* §§ III(B)(1), (3).) Moreover, no legal duty exists that requires distributors to refuse to ship orders. (*See supra* § III(B)(2).) Plaintiff has not pleaded that McKesson breached any legal duty owed to it. (*See supra* § III(C).) Plaintiff has not pleaded that McKesson caused its alleged damages. (*See supra* § III(D).) And in any event, Plaintiff is not entitled to recover its alleged economic damages for providing public services. (*See supra* § III(E).) Accordingly, Count I in no way pleads negligence by McKesson.

### 2. Count III does not plead violations of the WVCSA or that Plaintiff is entitled to relief as a result of the alleged violations.

Count III alleges that McKesson and the other two Distributor Defendants intentionally violated unspecified provisions of the West Virginia Uniform Controlled Substances Act, W. Va. Code §§ 60A-8-1, *et seq.*, and its regulations. (Compl. ¶¶ 110-113.) These alleged violations of unspecified statutes and regulations allegedly "led to the dispensing of controlled substances for non-legitimate medical purposes and fueling an opioid epidemic in the City of Huntington." (*Id.* ¶ 114.) These alleged statutory violations allegedly "make [McKesson] liable for all the damages which are sustained therefrom" by virtue of W. Va. Code § 55-7-9. (*Id.* ¶ 117.) These alleged statutory violations also allegedly "have proximately caused and substantially contributed to damage suffered by Plaintiff." (*Id.* ¶ 119; *see id.* ¶ 120 (same).)

Again, McKesson owes no duty to Plaintiff to comply with the WVCSA, and no legal duty exists that requires distributors to refuse to ship orders. (*See supra* §§ III(B)(1)-(3).) Plaintiff fails to plead how the WVCSA provides the City with a private right of action that would entitle it to money damages via W. Va. Code § 55-7-9. *See Arbaugh v. Bd. of Educ.*, 591 S.E.2d 235, 238-239 (W. Va. 2003) (four-part *Hurley* test determines if private right of action exists). The WVCSA provides a comprehensive regulatory scheme that the WVBOP exclusively administers

15

for all West Virginians. Nowhere does the WVCSA suggest that it gives rise to a private right of action in Plaintiff. Furthermore, Plaintiff has not plausibly pleaded that any alleged WVCSA violations proximately caused Plaintiff's alleged injuries. *See id.* (violation of statute must be proximate cause of plaintiff's injuries to state § 55-7-9 claim); *supra* § III(D). Accordingly, Count III fails to plead a viable claim against McKesson. *See Arbaugh*, 591 S.E.2d at 239-41 (concluding that child abuse reporting statute provides no private right of action).

### 3. Count V does not plead that McKesson was unjustly enriched.

In West Virginia, unjust enrichment is "an action founded on contract," because it seeks to impose a contract implied in law. *Ringer v. John*, 742 S.E.2d 103, 106 (W. Va. 2013) (*per curiam*) (citation omitted). In its unjust enrichment claim, however, Plaintiff fails to plead how a contract between The City of Huntington and McKesson could be implied by law. Plaintiff's Complaint lacks any allegation that "benefits have been received and retained [by McKesson from the City of Huntington] under such circumstance that it would be inequitable and unconscionable to permit [McKesson] to avoid payment therefor." *Realmark Devs. Inc. v. Ranson,* 542 S.E.2d 880, 884-85 (W. Va. 2000); *see Johnson v. Ross*, 419 F. App'x 357, 361 (4th Cir. 2011) (applying West Virginia law and concluding that plaintiff seeking to recover "on a theory of unjust enrichment must [plead]," *inter alia*, "a benefit conferred on the defendant by the plaintiff"); *Am. Heartland Port, Inc. v. Am. Port Holdings, Inc.*, 53 F. Supp. 3d 871, 879 (N.D. W. Va. 2014) ("In West Virginia, 'restitution damages from a claim of unjust enrichment are measured in terms of the benefit the plaintiff conferred to the defendant.'").

Plaintiff alleges only that it has "expended substantial amounts of money" to address the effects of prescription drug abuse and that Defendants collectively "made large profits." (Compl. ¶¶ 128-131.) Plaintiff nowhere alleges that it paid anything to McKesson in a quasi-contractual relationship, which is required to state an unjust enrichment claim. Instead, Plaintiffs allege that Defendants collectively profited from alleged "wrongdoing," which somehow makes Defendants liable for "the damages and losses of the Plaintiff." (*Id.* ¶¶ 131-35.) An unjust enrichment claim,

however, is not a claim for tort damages. Accordingly, Plaintiffs fail to plausibly plead that they unjustly enriched McKesson so that McKesson should be required to return monies to them.

## IV. CONCLUSION

While the damaging effects of prescription opioid abuse are undeniably great, the City of Huntington has no valid claim that McKesson's lawful distribution of controlled substances to registered pharmacies there creates any civil liability for McKesson. Accordingly, the Court should dismiss the Complaint as to McKesson with prejudice.

**MCKESSON CORPORATION**
**By Counsel**

  /s/Jeffrey M. Wakefield
Jeffrey M. Wakefield (WV Bar #3894)
Flaherty Sensabaugh Bonasso PLLC
P. O. Box 3843
Charleston, WV  25338-3843
304.345.0200
304.345-0260 (fax)
JWakefield@flahertylegal.com
*Counsel for McKesson Corporation*

*and*

Geoffrey Hobart, Esquire (*Pro hac vice* application to be filed)
Matthew Benov, Esquire (*Pro hac vice* application to be filed)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
ghobart@cov.com
mbenov@cov.com
Co- *Counsel for McKesson Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**THE CITY OF HUNTINGTON,**

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　Civil Action No. 3:17-cv-01362
　　　　　　　　　　　　　　　　　　　　　　　(Judge Chambers)

**AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH
INC., MCKESSON CORPORATION and
GREGORY DONALD CHANEY, M.D.,**

    Defendants.

### CERTIFICATE OF SERVICE

    I, Jeffrey M. Wakefield, Esquire, do hereby certify that on the 15th day of March, 2017, I served the foregoing **"DEFENDANT MCKESSON CORPORATION'S MOTION FOR JUDGMENT ON THE PLEADINGS"** upon the parties hereto by depositing a true copy thereof via ECF to the following counsel of record:

Charles R. Webb, Esquire
The Webb Law Centre
716 Lee Street, East
Charleston, WV 25301
*Counsel for Plaintiffs*

A. L. Emch, Esquire
Adam J. Schwendeman, Esquire
Jackson Kelly PLLC
500 Lee Street East, Suite 1600
P. O. Box 553
Charleston, West Virginia 25322

Eric W. Sitarchuk, Esquire
Meridith S. Auten, Esquire
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
*Counsel for AmerisourceBergen Drug Corp.*

Susan M. Robinson, Esquire
Robert H. Akers, Esquire
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
Charleston, WV 25301

Enu Mainigi, Esquire *(Pro Hac Vice)*
F. Lanc Heard, Esquire
Steven M. Pyser, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

James R. Wooley, Esquire *(Pro Hac Vice)*
Jones Day
North Point - 901 Lakeside Avenue
Cleveland, OH 44114

Elizabeth P. Kessler, Esquire *(Pro Hac Vice)*
Jones Day
325 John H. McConnell Blvd.
Columbus, OH 43215
**Counsel for Cardinal Health, Inc.**


   /s/Jeffrey M. Wakefield
Jeffrey M. Wakefield (WV Bar #3894)