# EXHIBIT B

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

MAYOR CHARLES SPARKS, ON BEHALF OF
THE TOWN OF KERMIT,

        Plaintiff,

v.                              Civil Action No.: 17-C-13
                                     Judge: Hon. Miki Thompson

MCKESSON CORPORATION,
AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH 110,
LLC, MIAMI-LUKEN, INC., H.D. SMITH
WHOLESALE DRUG CO., and CAMERON
JUSTICE,
        Defendants.

## COMPLAINT

The Town of Kermit, West Virginia, (hereinafter "Plaintiff" or "Kermit") sues Defendants McKesson Corporation ("McKesson"), AmerisourceBergen Drug Co. ("Amerisource"), Cardinal Health 110, LLC ("Cardinal"), Miami-Luken, Inc. ("Miami-Luken") H.D. Smith Wholesale Drug Co. ("HD Smith), and Cameron Justice, and for causes of action states as follows:

### PARTIES

1.     Plaintiff, Charles Sparks is the duly elected Mayor of the Town of Kermit, which is a political subdivision located within Mingo County in the state of West Virginia. Mayor Sparks brings this action on behalf of the Town of Kermit.

2.     Though small in population, Kermit has been severely damaged by Defendants' collective actions. More specifically, Kermit has suffered substantial actual harm as a result of the conduct of Defendants, motivated by profit and greed, in knowingly flooding Kermit with opioids (schedule II drugs) well beyond what would be necessary to address the pain and other associated reasons that the residents of Kermit might use opioids. The devastation caused by

these Defendants has wrecked the local economy, over-burdened the budget of Kermit, and destroyed the lives of many residents who call Kermit home.

3. The collective actions of Defendants have caused and will continue to cause Kermit to expend substantial sums of public funds to deal with the significant consequences of the opioid epidemic that was fueled by Defendants' illegal, reckless, and malicious actions in flooding the state with highly addictive prescription medications without regard for the adverse consequences to Kermit or its residents.

4. Defendants' actions, motivated by the pursuit of money without regard to the welfare of Kermit and its residents, have caused substantial damages, including but not limited to, increased expenses of drug treatment programs, medical care and hospitalizations, emergency medical transportation, costs of law enforcement response and investigations, costs of prosecutions and incarcerations, and costs of repair for property damage.

## MCKESSON CORPORATION

5. McKesson Corporation is a Delaware Corporation with headquarters in California that conducts business in West Virginia.

6. Among its many business interests, McKesson distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

7. McKesson is the largest pharmaceutical distributor in North America. McKesson delivers approximately one third of all pharmaceuticals used in North America.

8. McKesson is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it distributed pharmaceuticals in Kermit.

## AMERISOURCEBERGEN DRUG CORPORATION

9.      AmerisourceBergen Drug Corporation is a Delaware Corporation that conducts business in West Virginia.

10.     The above named Defendant is referred to throughout this complaint as Amerisource.  Like McKesson, Amerisource distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

11.     Amerisource is the second largest pharmaceutical distributor in North America.

12.     Amerisource is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it distributed pharmaceuticals in Kermit.

## CARDINAL HEALTH 110, LLC.

13.     Cardinal Health 110, LLC is an Ohio company that conducts business in West Virginia.

14.     The above named Defendant is referred to throughout this complaint as Cardinal. Like McKesson and Amerisource, Cardinal distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

15.     Cardinal is the third largest pharmaceutical distributor in North America.

16.     Cardinal is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it distributed pharmaceuticals Kermit.

17.     Collectively, the above named Defendants shipped 423 million pain pills to West Virginia between 2007 and 2012, earning $17,000,000,000 in net income.

## MIAMI-LUKEN, INC.

18.    Defendant Miami-Luken, Inc. is a for profit corporation which is headquartered in Ohio and registered in the state of West Virginia.

## H.D. SMITH WHOLESALE DRUG CO.

19.    H.D. Smith Wholesale Drug Co. is a for profit corporation registered in the state of Delaware and registered in the state of West Virginia.

## CAMERON JUSTICE

20.    Cameron Justice is a resident of West Virginia, who at one time was the owner and operator of a medical clinic (Justice Medical Clinic) in Kermit, West Virginia.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this case and over Defendants pursuant to the provisions of W.Va. Code § 56-3-33.

22.    Venue is appropriate in Mingo County, West Virginia as the acts and practices of the Defendants occurred in and caused damage in Kermit which is located within Mingo County, in this Judicial Circuit.  Additionally, during the relevant time period, Mr. Justice owned and operated a medical clinic in this Judicial Circuit.

## FACTUAL BACKGROUND

23.    Within the last 20 years, a scourge has infected this country, particularly in greater Appalachia and West Virginia.[1]  Mingo County West Virginia, and particularly Kermit, is essentially ground zero for this plague that has destroyed lives and ruined the local economy. The scourge is popularly described as the 'opioid epidemic.'  Defendants herein each played a key part in the creation, proliferation, and continuation of the opioid epidemic and the resulting catastrophic damage.

---

[1] https://www.ncbi.nlm.nih.gov/pubmed/22786464

24.     Defendants each profited while disregarding the impact that their actions had on the people under the spell of these drugs.

25.     Opioids are effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.[2]  However, opioids are addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should not be used except as a last-resort.

26.     In their roles as pharmaceutical wholesalers and as a medical clinic operator, Defendants have known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.

27.     Defendants knew also that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (e.g., hospitals), where the risk of addiction and other adverse outcomes was much less significant. The U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.

28.     Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, as well as generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin, and thus, they are regulated as controlled substances.[3]

---

[2] "Originally a term denoting synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics." Stedman's Medical Dictionary 27th Edition
[3] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812. Schedule II drugs may

29.     Opioids—once a niche drug—are now the most prescribed class of drugs—more than blood pressure, cholesterol, or anxiety drugs.  While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.   Together, opioids generated $8 billion in revenue for drug companies in 2012, a number that is projected to reach $15.3 billion by 2016.

30.     Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain.  Opioids also can create a euphoric high, which can make them addictive.  At certain doses, opioids can slow the user's breathing, causing respiratory depression and, ultimately, death.

31.     The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors.  When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor-shopping, use of aliases, and criminal means—to satisfy their cravings.

32.     Opioid abuse has not displaced heroin, but rather triggered resurgence in its use, imposing additional burdens on Kermit and local agencies that address heroin use and addiction. In 2015, West Virginia had the highest death rate due to drug overdose of 41.5 deaths per 100,000.[4]

33.     According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002 to 2004 to 45.2% in 2011 to 2013.  Heroin produces a very similar high to prescription opioids, but is often cheaper.  While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price. It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person who

---

not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor and filled by

[4] See https://www.cdc.gov/drugoverdose/index.html

started on prescription opioids for a back injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

34.     Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, opined that opioids are more destructive than crack cocaine:

> "[Opioid abuse] is building more slowly, but it's much larger. And the potential[] for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem."[5]

35.     As laid bare in this complaint, Defendants each played a key role in the distribution and prescribing of opioids over the relevant time period.  Simply put, the scheme could not have worked without each Defendant playing their respective part.

36.     Pharmaceuticals, like opioids are not sold directly by manufacturers to pharmacies for ultimate dispensing.  Rather, there is a highly sophisticated system which distributes the drugs across the nation.

37.     Defendants were each on notice that the controlled substances they distributed or prescribed were the kinds that were susceptible to being diverted for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy, or problematic purposes.

38.     As entities involved in the distribution and prescription of dangerous opioid medications, McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice were engaged in an abnormally and/or inherently dangerous activity and, thus, had a heightened duty of care under West Virginia law.

---

[5]  Transcript, *Use and Abuse of Prescription Painkillers*, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript.

39.     McKesson, Amerisource, Cardinal, Miami-Luken, and HD Smith purchased opioids from manufacturers and sold them to pharmacies within Kermit and the surrounding areas.  In order to do so, wholesalers like these Defendants must first register with the West Virginia Board of Pharmacy.

40.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith knew or should have known that they were supplying vast amounts of dangerous drugs to disproportionately small markets that were already facing abuse, diversion, misuse and other problems associated with the opioid epidemic.

41.     Though they had a duty to the consuming public at large as well as Kermit, collectively and individually, McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith failed to take any action to prevent, minimize, or reduce the distribution of these dangerous drugs.

42.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith all had the ability to slow down, question, inspect, report, alert, or otherwise limit the flow of these dangerous drugs into Kermit, but chose not to do so.

43.     Individuals in West Virginia obtain opioids by first obtaining a prescription and then presenting it to a licensed pharmacy or pharmacist.  Cameron Justice, a resident of West Virginia at all times material, operated what was essentially a pill mill operation known as Justice Medical Clinic in Mingo County.  Cameron Justice eventually went to prison as a result of his misdeeds, but through his clinic he prescribed opioids to residents of the surrounding area, including residents of Kermit.

44.     Upon information and belief, Cameron Justice, vis-à-vis his clinic prescribed opioids which were eventually provided to pharmacies by McKesson, Amerisource, Cardinal,

Miami-Luken and HD Smith.   Cameron Justice knew or should have known that he was prescribing vast amounts of dangerous drugs to patients who were likely to abuse, divert, misuse or otherwise contribute to the opioid epidemic.

45.     Though he had a duty to his patients, the public at large, as well as the Town of Kermit, collectively and individually, Cameron Justice failed to take any action to prevent, minimize, or reduce the dispensing of these dangerous drugs.

46.     All Defendants were on notice that West Virginia law required them, inter alia, to provide effective controls and procedures to guard against diversion of controlled substances, pursuant to 15 C.S.R. § 2-4.21 and 2-4.4 and the WV Controlled Substances Act.

47.     The result of Defendants' collective actions has been catastrophic for nearly everyone in Kermit except the Defendants who stood by and watched their profits grow.

### The Role of Wholesalers

48.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith knew, or should have known that West Virginia had an exceedingly high rate of illegal use and diversion of prescription opioids.   Numerous publications, news sources and studies highlighted the epidemic rate of opioid abuse and overdose rates in West Virginia.

49.     According to a study from the Trust for America's Health and the Robert Wood Johnson Foundation that focused on overdose statistics from 2009 to 2013, West Virginia has the highest overdose rate in the country.

50.     McKesson, Amerisource Cardinal, Miami-Luken and HD Smith, like all pharmaceutical wholesalers, were under an obligation to report suspicious orders to the appropriate authorities.

51.     Cameron Justice's clinic prescription rates were so aberrant that they should have triggered suspicious order reports from any pharmacy or distributor who was filling such orders.

52.     Despite having information that suspicious orders were being placed, and despite actually filling these suspicious orders time after time, McKesson did not begin to comply with its regulatory obligations until March 2015, well after the unfortunate opioid train had left the station.  Since that time, McKesson has submitted 4,814 suspicious order reports.

53.     Failing to submit its required suspicious order reports is not a new development for McKesson.  In fact, McKesson paid a $13.2 million fine to settle similar claims in 2008 with regard to suspicious orders from internet pharmacies.

54.     More recently, McKesson settled a similar investigation brought by the Department of Justice in 2015 by paying $150 million and suspending the DEA registrations for three distribution centers.

55.     Amerisource and Cardinal similarly delayed compliance with the reporting of suspicious orders.  After June 2012, Cardinal finally submitted 2,426 suspicious order reports, though nine months are seemingly missing from their submissions.  In 2008 Cardinal paid a $34 million fine for failing to report suspicious orders of hydrocodone.  More recently, in 2012 Cardinal's Lakeland, Florida warehouse was suspended by the DEA for two years as a result of shipping suspect orders of opioids.

56.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith were also aware that the Healthcare Distribution Management Association ("HDMA"), of which they are members, created "Industry Compliance Guidelines" which stressed the critical role of each member of the supply chain in distributing controlled substances.  These industry guidelines provided: "At the center of a sophisticated supply chain, Distributors are uniquely situated to

perform due diligence in order to help support the security of controlled substances they deliver to their customers." Indeed, the HDMA advises all distributors to "Know Your Customer."

57.     Between 2007 and 2012, McKesson, Amerisource and Cardinal have shipped 423 million doses of highly addictive controlled pain killers into West Virginia, many of which should have been stopped and/or investigated as suspicious orders.

58.     Upon information and belief, Miami-Luken and HD Smith similarly shipped excessive numbers of opioids into West Virginia, many of which should have been flagged or stopped and investigated as suspicious orders.   According to litigation brought by the West Virginia Attorney General[6], HD Smith distributed over 12 million doses of hydrocodone and over 3 million doses of oxycodone to West Virginia over the relevant time period.

59.     Upon information and belief, McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith failed to undertake any effective affirmative efforts to prevent diversion of its medicines for illegal or abusive purposes.

60.     When the population of the county is taken into consideration, McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith delivered an excessive and unreasonable number of highly addictive controlled substances in Kermit.

61.     Upon information and belief, McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith did not refuse to ship or supply any controlled substances to any Kermit pharmacy between 2007 and the present.

62.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith knew or should have known that they were supplying opioid medications far in excess of the legitimate needs for Kermit.

---

[6] See *State v. Amerisource et al,* pending in the Circuit Court of Boone County, bearing civil action number 12-C-141

63.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers they supplied to pharmacies and drug stores in Kermit were being diverted to illegal use or abuse.

64.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith had a legal duty to ensure they were not filling suspicious orders, as well as to report suspicious orders.

65.     The sheer volume of highly addictive opioid pain medications McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith shipped to Kermit from 2007 through the present was suspicious on its face.

66.     Upon information and belief, McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith made little to no effort to visit the pharmacies and drug stores in Kermit to which they shipped substantial amounts of prescription medication, in order to conduct due diligence to ensure the medications they were shipping were not diverted to illegal uses.

67.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith paid its sales force employees' and managers' bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Kermit.

68.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith made substantial profits from the drugs which were sold in Kermit.

69.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith knowingly filled suspicious orders in Kermit from 2007 to the present.

70.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith undertook intentional distribution of excessive prescription pain killers to a small community which showed a reckless disregard to the safety of Kermit and its residents.

### The Role of Pill Mills

71.     Cameron Justice was the former owner and president of Justice Medical Clinic who was a necessary participant in the wholesalers' scheme to distribute schedule II opioids with reckless abandon solely for profit and to the detriment of residents of Kermit and Mingo County.

72.     Despite operating his medical clinic, Cameron Justice undertook no efforts to determine whether the volume of pain killers he was prescribing to residents of Kermit was excessive and should not have been sold.  In fact, Cameron Justice knew or should have known that he was prescribing opioid medications far in excess of the legitimate needs for residents of Kermit.

73.     Cameron Justice knew or should have known that there was a high likelihood that a substantial number of the schedule II opioids he was prescribing were being diverted to illegal use or abuse.

74.     Cameron Justice had a legal duty to not prescribe schedule II opioids without a proper medical evaluation.

75.     The sheer volume of highly addictive opioid pain medications Cameron Justice prescribed in Mingo County was suspicious on its face.

76.     Cameron Justice made substantial profits from the drugs which were sold in Kermit and Mingo, County.

77.     Cameron Justice acted in concert with McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith to hide or cover up their misdeeds, negligence or malfeasance in order to

continue making substantial profits from the drugs which were prescribed and sold in Kermit and Mingo, County.

78.     Consistent with the allegation contained herein, Cameron Justice was convicted and sentenced to two and one half years in 2010 for conspiring to misuse a DEA registration number to distribute prescription painkillers and Medicare fraud.

## COUNT I
## NEGLIGENCE OF WHOLESALERS
## MCKESSON, AMERISOURCE, CARDINAL, MIAMI-LUKEN and HD SMITH

79.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 78.

80.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith are distributors of controlled substances and must comply with both the laws of West Virginia and with industry customs and standards.

81.     As licensed registrants with the West Virginia Board of Pharmacy, McKesson, Amerisource and Cardinal were required to submit suspicious order reports.

82.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith failed to submit, or fully disclose suspicious orders.

83.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith negligently failed to ensure its conduct conformed to West Virginia law and regulations.

84.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith negligently failed to conform its conduct conformed to United States law and regulations.

85.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith negligently turned a blind eye to the foregoing factors by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of

whom were addicted and whom reasonably can be expected to become addicted or to engage in illicit drug transactions.

86.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith had a duty to Kermit to comply with their obligation to report suspicious orders in Kermit.

87.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith breached this duty by virtue of the above allegations.  The breach is the proximate cause of damages suffered by Plaintiff.

88.     Industry standards also require McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith to:

- know its customers,

- know its customer base,

- know the population base served by a particular pharmacy or drug store,

- know the average prescriptions filled each day,

- know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases,

- have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and

- know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribes.

89.     McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith negligently failed to ensure its conduct conformed to industry standards.

90.     The aforementioned conduct was a direct breach of the duty Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith owed to Plaintiff which was the proximate cause of Plaintiff suffering damages.

## COUNT II
## DEFENDANTS MCKESSON, AMERISOURCE AND CARDINAL'S
### Violation of W.Va. Code § 60A-8-1 et seq and W.Va. Code § 55-7-9

91.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 78.

92.     Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith intentionally contributed to the prescription drug abuse epidemic in Kermit through repeated intentional violations of various provisions of the West Virginia Uniform Controlled Substances Act and through reckless disregard to the safety and well-being to the citizens of Kermit.

93.     Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith intentionally failed to meet or otherwise misrepresented their compliance with the requirements of W.Va. Code § 60A-8-1 et seq and otherwise intentionally violated the West Virginia Uniform Controlled Substances Act.

94.     Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith intentionally failed to ensure their conduct conformed to industry standards, West Virginia law and other regulations.

95.     Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith intentionally turned a blind eye toward industry standards, West Virginia law, and other regulations by regularly distributing obscenely large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom can reasonably be expected to become addicted or to engage in illicit drug transactions.

96.     Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith's intentional acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in Kermit, West Virginia.

97.     Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith's intentional acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics that did little more than provide prescriptions of highly addictive prescription pain killers to individuals with no medical evidence supporting the prescription.

98.     Defendants' McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith's intentional acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

99.     Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith's intentional violations of West Virginia law make it liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

100.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith's intentional acts and omissions have proximately caused and substantially contributed to damage suffered by Kermit, and created conditions which contribute to the violation of West Virginia laws by others.

101.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith's intentional acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiff and were in violation of the customs, standards and practices within Defendants' own industries.

102.   Upon information and belief, Defendants McKesson, Amerisource, Cardinal, Miami-Luken and HD Smith continue to intentionally violate West Virginia laws and regulations, United States laws and regulations, and Defendants' industry customs, standards and practices which continue to proximately cause substantial damages to Plaintiff.

## COUNT III
## UNJUST ENRICHMENT

103.   Plaintiff incorporates by reference the allegations in paragraphs 1 through 78.

104.   The Defendants acted in concert in undertaking the aforementioned scheme. The actions of the wholesalers would be offset without the complicit actions of the pill mills like those operated by Cameron Justice, who were willing to look the other way and subvert the rules, regulations and professional responsibility in order to profit.

105.   As a result of all Defendants' actions, Plaintiff has expended substantial amounts of money annually that it would not have otherwise expended on numerous services through various agencies, including, but not limited to: Increased law enforcement, prosecutors and prosecutions, courts and court personnel, public welfare and service agencies, healthcare and medical services and drug abuse education and treatment.

106.   Plaintiff has lost revenue and incurred direct and indirect costs from workplace accidents, absenteeism, and decreased productivity from prescription drug abuse.

107.   Plaintiff remains responsible for costs of prescriptions, health care, and other medically-related costs, rehabilitation, and work-related programs, workers' compensation, public insurance, law enforcement, prosecution costs, and court related costs, which costs have substantially increased as a result of the Defendants' acts and omissions.

108.   Plaintiff will continue to incur these increased costs in the future as a result of the Defendants' conduct listed herein.

109.    Collectively, Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice made substantial profits while fueling the prescription drug epidemic in West Virginia and Kermit.

110.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice continue to receive considerable profits from the distribution of controlled substances in Kermit.

111.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice were each unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

112.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice's prescription and sales of prescription medications were increased by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing by the distribution of drugs which were diverted for purposes other than legitimate medical needs.

113.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice's negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing have unjustly enriched the Defendants and are directly related to the damages, losses, and to the detriment of the Plaintiff.

114.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice's negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing entitle Plaintiff to disgorgement of the profits received by Defendants for all sales it made in Kermit from 2007 to present.

115.    Defendants are liable to Plaintiff for all damages incurred as a result of Defendants' negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing contained herein.

## COUNT IV
## NEGLIGENCE OF CAMERON JUSTICE

116.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 78.

117.    As a principle and owner of a medical clinic in Mingo Country, Cameron Justice owed a duty of care to the residents of Kermit and to the town itself.

118.    Cameron Justice's negligent acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a drug abuse epidemic in West Virginia.

119.    Cameron Justice's negligent acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics like Justice Medical Clinic that did little more than provide highly addictive pain killers to individuals with no medical evidence supporting the prescription.

120.    Cameron Justice's negligent violations and those of his medical clinic make him liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

121.    Cameron Justice's negligent acts and omissions have proximately caused and substantially contributed to damage suffered by Plaintiff.

## COUNT V
## CAMERON JUSTICE'S VIOLATION of
## W.Va. Code § 60A-4-401 and W.Va. Code § 55-7-9

122.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 78.

123.    Cameron Justice constructively delivered controlled substances requiring valid prescriptions to persons who received the controlled substances.

124.    Cameron Justice prescribed or caused to be prescribed schedule II drugs intentionally or knowingly outside the usual "course of professional practice or research," thereby not engaging in the authorized activities of a "practitioner," as defined in W.Va. Code, 60A–1–101(v), as amended.

125.    These prescriptions were written for profit and without a legitimate medical need or authorized purpose.

126.    By virtue of Cameron Justice's actions, he constructively delivered controlled substances in violation of W.Va. Code, 60A–4–401(a), as amended, which is part of West Virginia's Uniform Controlled Substances Act.

127.    Defendant Cameron Justice's intentional violations of West Virginia law make him liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

128.    Cameron Justice's intentional acts and omissions have proximately caused and substantially contributed to damage suffered by Kermit, and created conditions which contribute to the violation of West Virginia laws by others.

**COUNT VI**
**CIVIL CONSPIRACY (NEGLIGENCE) AS TO ALL DEFENDANTS**

129.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 78.

130.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice acted in concert in all of the above allegations.

131.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice fraudulently concealed their actions.

132.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice owed a duty to the Plaintiff to not distribute, prescribe or otherwise distribute or provide opioids that they knew or should have known were diverted, abused or misused.

133.    Defendants McKesson, Amerisource, Cardinal, Miami-Luken, HD Smith and Cameron Justice, acting together, breached their duty to Plaintiff, which in turn suffered harm as a result.  The harm suffered by Plaintiff includes the financial burden associated with the opioid epidemic as more fully described above.

## PRAYER

WHEREFORE, Plaintiff prays that the Court grant the following relief:

1.    Order a jury trial on all issues so triable to determine  damages as a result of the Defendants' actions outlined in this Complaint

2.    Enter Judgment in favor of Plaintiff;

3.    Enter a temporary restraining order which:

    a.    Prevents Defendants from continuing to violate West Virginia laws;

    b.    Prevents Defendants from continuing to violate United States laws and regulations relating to the distribution of controlled substances;

    c.    Mandates that Defendants promptly notify the appropriate state and federal authorities of any and all suspicious orders for controlled substances as received from parties who are located in Kermit;

    d.    Mandates Defendants submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendants from distributing any controlled substance in Kermit for any non-legitimate medical purpose;

4.    Enter a permanent restraining order which:

    a.    Prevents Defendants from continuing to violate West Virginia laws;

    b.    Prevents Defendants from continuing to violate United States laws and regulations relating to the distribution of controlled substances;

    c.    Mandates that Defendants promptly notify the appropriate state and federal authorities of any and all suspicious orders for controlled substances as received from parties who are located in Kermit;

    d.    Mandates Defendants submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendants from

distributing any controlled substance in Kermit for any non-legitimate medical purpose; and

e.  Mandates Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions

5.  Order equitable relief, including, but not limited to restitution and disgorgement;

6.  Award punitive damages for Defendants' willful, wanton, malicious, oppressive, and intentional actions as detailed herein;

7.  Award attorneys' fees and costs and

8.  Award such other relief as this Court deems just and fair;

PLAINTIFF SEEKS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

H. Truman Chafin (WV BAR NO. 684)
Letitia N. Chafin (WV BAR NO. 7207)
**THE CHAFIN LAW FIRM, PLLC**
P.O. Box 1799
Williamson, WV 25661
Phone: 304-235-2221
Fax: 304-235-2777
Email: truman@thechafinlawfirm.com
Email: tishchafin@yahoo.com

Mark E. Troy, Esq. (WV BAR NO. 6678)
**Troy Law Firm, PLLC**
222 Capitol Street, Suite 200A
Charleston, WV 25301
Email: mark@troylawwv.com
Phone 304-345-1122

Harry F. Bell, Jr., Esq. (WV BAR NO. 297)
**THE BELL  LAW FIRM PLLC**
P.O. Box 1723
30 Capitol St.
Charleston, WV 25326-1723
Email: hfbel@belllaw.com
Phone: 304-345-1700

John Yanchunis *(Pro Hac Vice to be filed)*
Florida Bar No. 324681

jyanchunis@forthepeople.com
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Phone: (813) 223-5505
Fax: (813)222-4793

James Young *(Pro Hac Vice to be filed)*
Florida Bar No. 567507
jyoung@forthepeople.com
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
Phone: (904) 398-2722
Fax: (904)366-7677

*Attorneys for Plaintiff*