# EXHIBIT C

**IN THE CIRCUIT COURT OF**     **MCDOWELL**     **COUNTY, WEST VIRGINIA**

## CIVIL CASE INFORMATION STATEMENT
### (Civil Cases Other than Domestic Relations)

**I. CASE STYLE:**

Case No. $17 \cdot C \cdot 18$

**Plaintiff(s)**

Judge: Murensky

MAYOR REBA HONAKER, on behalf of

THE CITY OF WELCH

**vs.**

**Defendant(s)**

MCKESSON CORPORATION, ET AL.

| | Days to Answer | Type of Service |
|---|---|---|
| | 30 | VIA U.S. MAIL |

Name
200 WEST WASHINGTON STREET

Street Address
CHARLESTON, WV 25302

City, State, Zip Code

**II. TYPE OF CASE:**

- [✓] General Civil
- [ ] Mass Litigation *[As defined in T.C.R. 26.04(a)]*
  - [ ] Asbestos
  - [ ] FELA Asbestos
  - [ ] Other: _____
- [ ] Habeas Corpus/Other Extraordinary Writ
- [ ] Other: _____

- [ ] Adoption
- [ ] Administrative Agency Appeal
- [ ] Civil Appeal from Magistrate Court
- [ ] Miscellaneous Civil Petition
- [ ] Mental Hygiene
- [ ] Guardianship
- [ ] Medical Malpractice

**III. JURY DEMAND:** [✓] Yes [ ] No   CASE WILL BE READY FOR TRIAL BY (Month/Year): 12 / 2017

| IV. DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS? <br><br> [ ] Yes [✓] No | IF YES, PLEASE SPECIFY: <br> [ ] Wheelchair accessible hearing room and other facilites <br> [ ] Reader or other auxiliary aid for the visually impaired <br> [ ] Interpreter or other auxiliary aid for the deaf and hard of hearing <br> [ ] Spokesperson or other auxiliary aid for the speech impaired <br> [ ] Foreign language interpreter-specify language: _____ <br> [ ] Other: _____ |
|---|---|

Attorney Name: H. TRUMAN CHAFIN

Firm: THE CHAFIN LAW FIRM, PLLC.

Address: POST OFFICE BOX 1799 WILLIAMSON, WV 25661

Telephone: (304) 235-2221

Representing:
- [✓] Plaintiff   [ ] Defendant
- [ ] Cross-Defendant [ ] Cross-Complainant
- [ ] 3rd-Party Plaintiff [ ] 3rd-Party Defendant

[ ] **Proceeding Without an Attorney**

Original and   7   copies of complaint enclosed/attached.

Dated: Feb. / 13 / 2017     Signature: _____

**SCA-C-100: Civil Case Information Statement (Other than Domestic Relations)**     Revision Date: 12/2015

**Plaintiff:** MAYOR REBA HONAKER _____ , *et al*   **Case Number:** _____
**vs.**
**Defendant:** MCKESSON CORPORATION _____ , *et al*

## CIVIL CASE INFORMATION STATEMENT
## DEFENDANT(S) CONTINUATION PAGE

MCKESSON CORPORATION
Defendant's Name
CORP. SERVICE CO. 200 W. WASHINGTON ST.          Days to Answer: ___ 30 ___
Street Address
CHARLESTON, WV 25302                             Type of Service: VIA U.S. MAIL
City, State, Zip Code

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AMERISOURCEBERGEN DRUG CORP.
Defendant's Name
CT CORP. 5400 D BIG TYLER ROAD                   Days to Answer: ___ 30 ___
Street Address
CHARLESTON, WV 25213                             Type of Service: VIA U.S. MAIL
City, State, Zip Code

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CARDINAL HEALTH 110, LLC.
Defendant's Name
CT. CORP. 5400 D BIG TYLER ROAD                  Days to Answer: ___ 30 ___
Street Address
CHARLESTON, WV 25213                             Type of Service: VIA U.S. MAIL
City, State, Zip Code

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MIAMI-LUKEN, INC.
Defendant's Name
                                                 Days to Answer: ___ 30 ___
Street Address
                                                 Type of Service: VIA U.S. MAIL
City, State, Zip Code

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

H.D. SMITH WHOLESALE DRUG CO.
Defendant's Name
                                                 Days to Answer: ___ 30 ___
Street Address
                                                 Type of Service: VIA U.S. MAIL
City, State, Zip Code

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HAROLD ANTHONY COFER, JR, M.D.
Defendant's Name
                                                 Days to Answer: ___ 30 ___
Street Address
                                                 Type of Service: VIA U.S. MAIL
City, State, Zip Code

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Defendant's Name
                                                 Days to Answer: _____
Street Address
                                                 Type of Service: _____
City, State, Zip Code

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SCA-C-100: Civil Case Information Statement-Defendant(s) Continuation Page**      Revision Date: 12/2015

IN THE CIRCUIT COURT OF
MCDOWELL COUNTY, WEST VIRGINIA

MAYOR REBA HONAKER, on behalf of
the CITY OF WELCH,

          Plaintiff,

v.

MCKESSON CORPORATION,
AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH 110,
LLC, MIAMI-LUKEN, INC., and HAROLD
WHOLESALE DRUG CO., and HAROLD
ANTHONY COFER, Jr., M.D.,

          Defendants.

Civil Action No.: *) *)-(-) 8 )*)*

## **COMPLAINT**

Mayor Reba Honaker, on Behalf of the City of Welch, Plaintiff sues Defendants

McKesson Corporation, Amerisource Bergen Drug Corporation, Cardinal Health 110, LLC,

Miami-Luken, Inc., H.D. Smith Wholesale Drug Co., and Harold Anthony Cofer, Jr., M.D. ("Dr.

Cofer"), and for causes of action states as follows:

### I.    **INTRODUCTION**

1.      This matter involves a serious breach of the public trust which has resulted in

drug abuse, misuse and overdose deaths.  Like sharks circling their prey, multi-billion dollar

companies, along with smaller players like local physicians, descended upon Appalachia for the

sole purpose of profiting off of the prescription drug fueled feeding frenzy commonly referred to,

and more fully explained below as, the opioid epidemic.

2.      As distributors of dangerous products like narcotics, these companies bore a

rather significant duty to ensure that the drugs did not end up in the wrong hands.  In exchange

for promising to honor their obligations, each of the defendants was licensed and/or registered by the West Virginia Board of Pharmacy and ultimately received compensation in the form of millions of dollars per year for shipping volumes of drugs well beyond what a reasonable company would expect.

3.     Unfortunately for everyone except Defendants, these dangerous and addictive drugs did end up in the wrong hands. These drugs were diverted, misused, and abused, to the point where citizens of West Virginia, residents of Welch in fact, lost their jobs, health and even their lives. Left in the wake of this malfeasance are small towns and cities like Welch, to clean up the mess and try to restore order while Defendants sit back and count the money they made off of their misdeeds.

4.     When the dangerous and addictive drugs caused harm to the public health of Welch residents in the form of addiction, overdose and death, Defendants were nowhere to be seen, but Welch was there to dispatch emergency services, run drug treatment programs, investigate overdoses, care for the infirm and transport dead bodies.

5.     When the dangerous and addictive drugs caused harm to the public utilities of Welch in the form of litter, clogged water and sewage lines, destruction of public property, the Defendants were nowhere to be seen, but Welch was there enforce codes, clean up streets and neighborhoods, repair water lines and other public property.

6.     When the dangerous and addictive drugs caused increases in crime in Welch, Defendants were nowhere to be found, but Welch was there to dispatch police, prosecute cases, supervise offenders in jail and eventually place them back into society.

7.     This action is therefore brought to recoup the expenses and recover the damages suffered by Welch, and to abate the continuing public nuisance caused in whole or in part, by the actions of Defendants.

## II.     PARTIES

8.     Plaintiff Reba Honaker is the duly elected mayor of the City of Welch, a political subdivision of the state of West Virginia located in McDowell County.  Mayor Honaker brings this action on behalf and for the benefit of the city of Welch pursuant to W.Va Code §8-12-1(3).

9.     The collective actions of Defendants have caused and will continue to cause Welch to expend substantial sums of public funds to deal with the significant consequences of the opioid epidemic that was fueled by Defendants' illegal, reckless, and malicious actions in flooding the state with highly addictive prescription medications without regard for the adverse consequences to Welch or its residents.

a.  MCKESSON CORPORATION

10.     McKesson Corporation (hereinafter "McKesson") is a Delaware Corporation with headquarters in California that conducts business in West Virginia.

11.     Among its many business interests, McKesson distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

12.     McKesson is the largest pharmaceutical distributor in North America.  McKesson delivers approximately one third of all pharmaceuticals used in North America.

13.     McKesson does substantial business in the state of West Virginia wherein it distributed pharmaceuticals to at least 52 of West Virginia's 55 counties, including and significantly, in Welch.

14. From 2007 to 2012, McKesson distributed 46,179,600 doses of Hydrocodone and 54,304,980 doses of Oxycodone for a total of 99,484,580 doses of Hydrocodone and Oxycodone to West Virginia during the six year period. In addition to Oxycodone and Hydrocodone, McKesson distributed high quantities of several other scheduled narcotics to pharmacies throughout the state including formulations of fentanyl and suboxone which have quickly become centerpieces in the opioid epidemic.

b. CARDINAL HEALTH 110 LLC

15. Cardinal Health 110 LLC (hereinafter "Cardinal") is an Ohio Corporation that conducts business in West Virginia.

16. Like McKesson, Cardinal distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

17. Cardinal is the third largest pharmaceutical distributor in North America.

18. Cardinal does substantial business in the state of West Virginia wherein it distributed pharmaceuticals to at least 52 of West Virginia's 55 counties, including and significantly, in Welch.

c. AMERISOURCEBERGEN DRUG CORPORATION

19. AmerisourceBergen Drug Corporation (hereinafter referred to as "ABDC") is a Delaware Corporation that conducts business in West Virginia.

20. Like McKesson, ABDC distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

21. ABDC is the second largest pharmaceutical distributor in North America.

22.     ABDC is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it distributed pharmaceuticals in Welch.

d. MIAMI-LUKEN, INC.

23.     Defendant Miami-Luken, Inc. (hereinafter referred to as "Miami-Luken") is a for profit corporation which is headquartered in Ohio and registered in the state of West Virginia.

24.     Miami-Luken is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it distributed pharmaceuticals in Welch.

e. H.D. SMITH WHOLESALE DRUG CO.

25.     H.D. Smith Wholesale Drug Co. (hereinafter referred to as "H.D. Smith") is a for-profit corporation registered in the state of Delaware and registered to do business in the state of West Virginia.

26.     H.D. Smith is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it distributed pharmaceuticals in Welch.

f. DR. HAROLD ANTHONY COFER, JR.

27.     Dr. Cofer has been licensed to practice in West Virginia since 1981 (medical license number 12594).

28.     Dr. Cofer practiced medicine in neighboring Northfork from 2012 through 2015. Dr. Cofer currently practices in Bluefield, West Virginia (Mercer County).

29.     Over the relevant time period, Dr. Cofer wrote prescriptions for medications, including but not limited to schedule II opioids, to individual patients at his office in Welch.

### III.    JURISDICTION AND VENUE

30.    This Court has jurisdiction over this case and over Defendants pursuant to the provisions of W.Va. Code § 56-3-33.

31.    Venue is appropriate in McDowell County as the acts and practices of the Defendants occurred in and caused the damage in Welch, located within McDowell County. Additionally, during the relevant time period, Dr. Cofer knowingly treated patients and prescribed opioids to residents of Welch and was aware that a great majority of his prescriptions were filled at pharmacies located within Welch.

### IV.    FACTUAL BACKGROUND

32.    Within the last 20 years, a scourge has infected this country, particularly in greater Appalachia and West Virginia.[1]  McDowell County, and specifically Welch, is ground zero for this plague, where it has destroyed lives and ruined local economies.  The scourge is commonly described as the 'opioid epidemic.'  Defendants herein each played a key part in the creation, proliferation, and continuation of the opioid epidemic and the resulting catastrophic damage.

33.    Defendants each profited while disregarding the impact that their actions had on the people under the spell of these drugs and the cities and towns where they lived.

34.    Opioids are effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.[2]  However, opioids are addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should not be used except as a last-resort.

---

[1] https: www.ncbi.nlm.nih.gov pubmed 22786464
[2] "Originally a term denoting synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics." *Stedman's Medical Dictionary* 27th Edition

35.     As pharmaceutical distributors and a practicing physician, Defendants have known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.

36.     Defendants knew also that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (e.g., hospitals), where the risk of addiction and other adverse outcomes was much less significant. The U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.

37.     Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, as well as generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin, and thus, they are regulated as controlled substances.[3]

38.     Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain. Opioids also can create a euphoric high, which can make them addictive. At certain doses, opioids can slow the user's breathing, causing respiratory depression and, ultimately, death.

39.     As laid bare in this Complaint, Defendants each played a key role in the distribution and prescribing of opioids over the relevant time period. Simply put, the scheme could not have worked without each Defendant playing their respective part or at a minimum,

---

[3] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812.

remaining silent about the absurd volume of drugs which they were collectively shipping into or prescribing for Welch.

40.     Opioids—once a niche drug—are now the most prescribed class of drugs—more than blood pressure, cholesterol, or anxiety drugs.  While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.   Together, opioids generated $8 billion in revenue for drug companies in 2012, a number that exceeded $15 billion in 2016.

41.     The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors.  When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor-shopping, use of aliases, and criminal means—to satisfy their cravings.

42.     Opioid abuse has not displaced heroin, but rather triggered resurgence in its use, imposing additional burdens on Welch and local agencies that address heroin use and addiction. Huntington, West Virginia experienced 27 heroin overdoses in the span of four hours on August 15, 2016.[4]

43.     According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002 to 2004 to 45.2% in 2011 to 2013.  Heroin produces a very similar high to prescription opioids, but is often cheaper.  While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price. It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person who started on prescription opioids for a back injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

---

[4] See http://www.cnn.com/2016/08/17/health/west-virginia-city-has-27-heroin-overdoses-in-4-hours/index.html

44.    Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, opines that opioids are more destructive than crack cocaine:

> "[Opioid abuse] is building more slowly, but it's much larger. And the potential[] for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem."[5]

45.    Pharmaceuticals like opioids are not sold directly to physicians or pharmacies for ultimate dispensing. Rather, there is a highly sophisticated system which distributes the drugs across the nation.

46.    Make no mistake; the role of the pharmaceutical distributor is not simply one of freight forwarder or shipper. Each of the Defendant distributors is a member of the trade group Healthcare Distribution Alliance (HDA), formerly known as the Healthcare Distribution Management Association (HDMA). According to the HDA, the leading trade group of distributors, "[h]ealthcare distribution has never been just about delivery. It's about getting the right medicines to the right patients at the right time, safely and efficiently."[6]

47.    In fact, as the dominant players within the healthcare distribution industry, senior executives from each of the Defendant distributors have historically served on the board of the HDA or HDMA. Currently, Cardinal Health's CEO Jon Giacomin serves as the Chairman of HDA and HD Smith's Chairman and CEO Dale Smith serves as the Vice Chairman. ABDC's President Robert Mauch and McKesson's President Mark Walchirk are both on the current executive committee of this powerful trade group.

---

[5] Transcript, Use and Abuse of Prescription Painkillers, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript.
[6] See http://www.hdma.net/about/role-of-distributors

48.     The current website for HDA explains that "[w]hile distributors do not prescribe or dispense drugs directly to patients, they do share a common goal with physicians, manufacturers, pharmacists, law enforcement officials and policymakers: to ensure a safe supply of medicines. Among other safeguards, **distributors are dedicated to keeping prescription painkillers out of the hands of people who may use them for purposes other than those for which they are intended.**"[7] (emphasis added)

49.     According to their website, members of HDA, including the Defendant distributors named herein, are committed to addressing the threat of prescription painkillers ending up in the wrong hands. Their multilayered approach includes the following:

- Our members register with the DEA and follow rigorous statutory and regulatory requirements for the storage, handling and distribution of controlled substances. These sophisticated security systems and processes help safeguard the supply chain.

- Pharmaceutical distributors coordinate with a range of supply chain partners, as well as federal and state regulatory agencies, to help prevent the diversion of prescription drugs.

- We work with supply chain stakeholders, including pharmaceutical manufacturers, hospitals, retail pharmacies and other healthcare providers, to share information and develop strategies to identify and help prevent abuse and diversion.

- We work collaboratively with law enforcement and regulators to combat bad actors who attempt to breach the security of the legitimate supply chain, coordinating with law enforcement and regulators to offer information technology, security and logistics expertise that helps locate and prosecute individuals who attempt to misuse and divert prescription drugs from the legitimate supply chain.

- We take steps to "know our customers," including actively assessing and reviewing purchases from pharmacies and healthcare providers that order controlled substances to monitor and report to the DEA if a customer's controlled substances volume or pattern of ordering might signal inappropriate use of the product. If inappropriate use is suspected, distributors work proactively with DEA, local law enforcement and others to help in the investigation of potential diversion cases.

---

[7] See http://www.hdma.net/issues/prescription-drug-abuse-and-diversion

- We provide the DEA with additional data and reports to aid their efforts to seek out criminal behavior. Distributors communicate about any handling of selected controlled substances to the DEA's reporting system, Automation of Reports and Consolidated Orders System (ARCOS). This system monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to the point of sale at the dispensing/retail level.

50.     Beyond their industry commitments and trade group pledges, as entities involved in the distribution and sale of dangerous opioid medications, Defendant distributors were engaged in an abnormally and/or inherently dangerous activity and, thus, had a heightened duty of care under West Virginia law.

51.     Defendants were on notice that the controlled substances they distributed or prescribed were the kinds that were susceptible to being diverted for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy, or problematic purposes.

52.     Defendant distributors purchased opioids from manufacturers and sold them to pharmacies throughout Welch.

53.     Defendant distributors knew or should have known that they were supplying vast amounts of dangerous drugs to small markets that were already facing abuse, diversion, misuse and other problems associated with the opioid epidemic. Though they had a duty to the consuming public, collectively and individually, Defendant distributors failed to take any action to prevent, minimize, or reduce the distribution of these dangerous drugs.

54.     Individuals in West Virginia cannot obtain opioids without a prescription written by a licensed medical provider. Dr. Cofer was a licensed medical provider in West Virginia over the relevant time period. Dr. Cofer provided written opioid prescriptions for patients despite knowing that the opioids were likely to be abused, diverted, or misused. Dr. Cofer knew or should have known his actions resulted in patients obtaining dangerous drugs that they did not need, were likely to be abused, or were likely to be resold on the street.

55.     Defendants were on notice that West Virginia law required them, inter alia, to provide effective controls and procedures to guard against diversion of controlled substances, pursuant to 15 C.S.R. § 2-4.21 and 2-4.4 and the WV Controlled Substances Act.

56.     The result of Defendants' collective actions has been catastrophic for nearly everyone in Welch except Defendants.

### The Role of the Distributors

57.     McKesson, Cardinal, Miami-Luken, H.D. Smith, and ABDC are all in the business of pharmaceutical distribution. These Defendants, collectively referred to as Defendant Distributors, knew, or should have known that West Virginia had an exceedingly high rate of illegal use, abuse, misuse, and diversion of prescription opioids. Numerous publications, news sources and studies highlighted the epidemic rate of opioid abuse and overdose rates in West Virginia.

58.     According to a study from the Trust for America's Health and the Robert Wood Johnson Foundation that focused on overdose statistics from 2009 to 2013, West Virginia has the highest overdose rate in the country.

59.     The HDA created "Industry Compliance Guidelines" based upon Drug Enforcement Agency requirements which stressed the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines provided: "At the center of a sophisticated supply chain, Distributor are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers." Indeed, the HDMA advises all distributors to "Know Your Customer."

60.     Defendant Distributors have shipped millions of doses of highly addictive controlled pain killers into the tiny city of Welch, many of which should have been stopped and/or investigated as suspicious orders.

61.     Upon information and belief, Defendant Distributors failed to adopt or implement any effective affirmative efforts to prevent diversion of its medicines for illegal or abusive purposes.

62.     When the population of the city is taken into consideration, Defendant Distributors delivered an excessive and unreasonable number of highly addictive controlled substances in Welch.

63.     Defendant Distributors undertook no discernible efforts to determine whether the volume of prescription pain killers it was shipping to Welch was excessive and whether any of the orders it filled qualified as suspicious orders, which should have been refused.

64.     Upon information and belief, Defendant Distributors did not refuse to ship or supply any controlled substances to any Welch pharmacy between 2007 and the present.

65.     Defendant Distributors knew or should have known that they were supplying opioid medications far in excess of the legitimate needs for Welch.

66.     Defendant Distributors knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers they supplied to pharmacies and drug stores in Welch were being diverted to illegal use or abuse.

67.     Defendant Distributors had a legal duty to ensure they were not filling suspicious orders.

68.     The sheer volume of highly addictive opioid pain medications Defendant Distributors shipped to Welch from 2007 through the present was suspicious on its face.

69.     Upon information and belief, Defendant Distributors made little to no effort to visit the pharmacies and drug stores in Welch to which they shipped substantial amounts of prescription medication to do due diligence to ensure the medications they were shipping were not diverted to illegal uses.

70.     Defendant Distributors paid their sales force employees' and managers' bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Welch.

71.     Defendant Distributors made substantial profits from the drugs which were sold in Welch.

72.     Defendant Distributors knowingly filled suspicious orders in Welch from 2007 to the present.

73.     Defendant Distributors' intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Welch and its residents.

74.     According to 2013 estimates, Welch had a population of 2,200.

75.     Defendant Distributors knew or should have known the amount of Oxycodone and Hydrocodone they supplied to Welch and neighboring towns was in excess of any amount reasonable to serve a community as small as Welch.

76.     The claims and allegations contained herein should come as no surprise to the Defendant Distributors.

77.     In 2008, Defendant McKesson paid the Department of Justice $13.25 million for failing to comply with its obligations under the Controlled Substances Act.  Specifically, the government alleged that McKesson failed to report suspicious orders for opioids from internet pharmacies.

78.     On January 17, 2017 the Department of Justice announced it had reached another settlement with McKesson Corporation, this time to pay $150 million to resolve allegations McKesson had violated the Controlled Substances Act by filling millions of orders for drugs, including highly addictive opioids, without sufficient anti-abuse safeguards.

79.     According to the press release, from 2008 until 2013, McKesson supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills, frequently misused products that are part of the current opioid epidemic," the DOJ said in the release.

80.     As part of the nationwide settlement, McKesson agreed to suspend sales of controlled substances from distribution centers in Colorado, Ohio, Michigan and Florida for multiple years, which the DOJ touted as the "most severe sanctions ever" agreed to by a Drug Enforcement Administration registered distributor.

81.     In its own release announcing the deal, McKesson focused on the fact that the allegedly illegal practices took place years in the past, and said the settlement had actually been publicly disclosed in a 2015 U.S. Securities and Exchange Commission filing. The company said it had decided to put aside its disagreements with the DEA and DOJ about its interpretations of the regulations for monitoring of orders, in part to "help stem the opioid epidemic in this country." John H. Hammergren, McKesson's chairman and chief executive officer, said in a statement that pharmaceutical distributors have a key role to play in combating prescription drug abuse, and said his company was taking this task on seriously. Mr. Hammergren specified: "We continue to significantly enhance the procedures and safeguards across our distribution network to help curtail prescription drug diversion while ensuring patient access to needed medications," he said. "We are committed to tackling this multi-faceted problem in collaboration with all

parties in the supply chain that share the responsibility for the distribution of opioid medications."

82. In January 2017, AmerisourceBergen, Cardinal Health, H.D. Smith and Miami-Luken agreed to pay $16 million, $20 million, $3.5 million and $2.5 million respectively to resolve the West Virginia Attorney General's claims relating to their distribution of controlled substances

83. Cardinal Health noted in its press release related to the settlement that "it takes its role as a wholesale distribution company seriously and is working collaboratively with everyone from regulators to physicians to better address the tactics used by those determined to divert prescription drugs for illegitimate use."

## The Role of Dr. Cofer

84. Despite being a licensed physician, Dr. Cofer undertook no efforts to determine whether the volume of prescription pain killers he was prescribing to his patients was excessive and whether any of the prescriptions he wrote should have been refused.

85. Dr. Cofer knew or should have known that he was prescribing opioid medications far in excess of the legitimate needs for Welch residents.

86. Dr. Cofer knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers he wrote for residents of Welch or for patients whose prescriptions were filled within Welch, were being diverted to illegal use or abuse.

87. Dr. Cofer had a legal duty to ensure he was not prescribing suspicious orders.

88. The sheer volume of highly addictive opioid pain medications Dr. Cofer wrote from 2007-present was suspicious on its face.

89.    Dr. Cofer made substantial profits from the drugs which were sold in Welch or to Welch residents.

90.    Specifically, Dr. Cofer was investigated by the Complaint Committee of the West Virginia Board of Medicine for improper prescribing of narcotic pain medication.  In March 2015, the Committee initiated a second investigation of Dr. Cofer based on a report from the West Virginia Controlled Substance Monitoring Program Database Review Committee (CSMP Review Committee).

91.    The CSMP Review Committee notified the West Virginia Board of Medicine that a review done by the chief medical examiner of two drug overdoses could be traced to prescriptions written by Defendant for controlled substances.  The overdoses resulted in the death of two patients.

92.    In addition to the two patients who died, 14 other patients who had been prescribed controlled substances were included in the review by the West Virginia Board of Medicine.

93.    The West Virginia Board of Medicine concluded that Dr. Cofer's medical records did not contain evidence of routine use of controlled substance agreements or routine drug screens prior to 2015.

94.    The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited documentation that drug screens were reviewed and documented in the patient record.

95.    The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited evidence that the Controlled Substance Monitoring Program database was queried in conformity with West Virginia statute (W. Va. Code R. §11-10-1 et. seq.).

Page 17 of 32

96.     On or about February 6, 2016, Dr. Cofer agreed with the stipulated Findings of Fact and Conclusions of Law reached by the West Virginia Board of Medicine.

## V.     CAUSES OF ACTION

### COUNT I
### NEGLIGENCE OF DEFENDANT DISTRIBUTORS

97.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 96.

98.     Defendant Distributors must comply with both the laws of West Virginia and with industry customs and standards.

99.     Industry standards require these Defendants to:

- know its customers,

- know its customer base,

- know the population base served by a particular pharmacy or drug store,

- know the average prescriptions filled each day,

- know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases,

- have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and

- know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribes.

100.    Defendant Distributors negligently failed to ensure its conduct conformed to industry standards.

101.    Defendant Distributors negligently failed to ensure its conduct conformed to West Virginia law and regulations.

102.     Defendant Distributors negligently turned a blind eye to the foregoing factors by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom reasonably can be expected to become addicted or to engage in illicit drug transactions.

103.     Defendant Distributors took no action, or insufficient action to stem the flow of opioids into the hands of abusers, misusers, and diverters in Welch.

104.     The aforementioned conduct was a direct breach of the duty Defendant Distributors owed to Plaintiff which was the proximate cause of Plaintiff suffering damages.

## COUNT II
## NEGLIGENCE OF DR. COFER

105.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 96.

106.     In January 2015, the Complaint Committee of the West Virginia Board of Medicine (West Virginia Board of Medicine) initiated an investigation of Dr. Cofer for improper prescribing of narcotic pain medication.

107.     In March 2015, the West Virginia Board of Medicine initiated a second investigation of Dr. Cofer based on a report from the West Virginia Controlled Substance Monitoring Program Database Review Committee (CSMP Review Committee).

108.     The CSMP Review Committee notified the West Virginia Board of Medicine that a review done by the chief medical examiner of two drug overdoses could be traced to prescriptions written by Dr. Cofer for controlled substances.  The overdoses resulted in the death of two patients.

109.   In addition to the two patients who died, 14 other patients who had been prescribed controlled substances were included in the review by the West Virginia Board of Medicine.

110.   The West Virginia Board of Medicine concluded that Dr. Cofer's medical records did not contain evidence of routine use of controlled substance agreements or routine drug screens prior to 2015.

111.   The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited documentation that drug screens were reviewed and documented in the patient record.

112.   The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited evidence that the Controlled Substance Monitoring Program database was queried in conformity with West Virginia statute (W. VA. Code R. §11-10-1 et. seq.).

113.   On or about February 6, 2016, Dr. Cofer agreed with the stipulated Findings of Fact and Conclusions of Law reached by the West Virginia Board of Medicine.

114.   As a practicing physician treating patients who lived or worked in Welch, Dr. Cofer owed a duty of care to the residents of Welch and to Welch itself.

115.   Dr. Cofer's negligent acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in West Virginia.

116.   Dr. Cofer's negligent acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics that did little more than provide prescriptions of highly addictive prescription pain killers to individuals with no medical evidence supporting the prescription.

117.    Dr. Cofer's negligent acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

118.    Dr. Cofer's negligent violations of West Virginia law make him liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

119.    Dr. Cofer's negligent acts and omissions have proximately caused and substantially contributed to damage suffered by Plaintiff.

## COUNT III
## DEFENDANT DISTRIBUTORS' VIOLATION
### W.Va. Code § 60A-8-1 et seq and W.Va. Code § 55-7-9

120.    Plaintiff incorporates by reference the allegations contained in paragraph 1 through 96.

121.    Defendant Distributors intentionally contributed to the prescription drug abuse epidemic in the state of West Virginia, and specifically in Welch, through repeated intentional violations of various provisions of the West Virginia Uniform Controlled Substances Act as well as through reckless disregard to the safety and well-being to the citizens of West Virginia.

122.    Defendant Distributors intentionally failed to meet or otherwise misrepresented their compliance with the requirements of W.Va. Code § 60A-8-1 et seq and otherwise intentionally violated the West Virginia Uniform Controlled Substances Act.

123.    Defendant Distributors intentionally failed to ensure their conduct conformed to industry standards, West Virginia law and other regulations.

124.    Defendant Distributors intentionally turned a blind eye toward industry standards, West Virginia law, and other regulations by regularly distributing obscenely large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of

Page 21 of 32

whom were addicted and whom can reasonably be expected to become addicted or to engage in illicit drug transactions.

125. Defendant Distributors' intentional acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in West Virginia generally, and specifically in Welch.

126. Defendant Distributors' intentional acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics that did little more than provide prescriptions of highly addictive prescription pain killers to individuals with no medical evidence supporting the prescription.

127. Defendant Distributors' intentional acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes including but not limited to those written by Dr. Cofer.

128. Defendant Distributors' intentional violations of West Virginia law make it liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

129. Defendant Distributors' intentional acts and omissions have proximately caused and substantially contributed to damage suffered by Welch, and created conditions which contribute to the violation of West Virginia laws by others.

130. Defendant Distributors' intentional acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiff and were in violation of the customs, standards and practices within Defendants' own industries.

131. Upon information and belief, Defendant Distributors continue to intentionally violate West Virginia laws and regulations, United States laws and regulations, and Defendant

Distributors' industry customs, standards and practices which continue to proximately cause substantial damages to Plaintiff.

## COUNT IV
## DR. COFER'S VIOLATION
## W.Va. Code § 60A-4-401 and W.Va. Code § 55-7-9

132.   Plaintiff incorporates by reference the allegations contained in paragraph 1 through 96.

133.   Dr. Cofer constructively delivered controlled substances requiring valid prescriptions by the issuance of purported prescriptions on behalf of patients who received the controlled substances from various pharmacists who filled such prescriptions either in Welch, for Welch residents, or otherwise for recipients of said substances whose actions harmed or impacted Plaintiff.

134.   Dr. Cofer issued such prescriptions intentionally or knowingly outside the usual "course of professional practice or research," thereby not engaging in the authorized activities of a "practitioner," as defined in W.Va. Code, 60A–1–101(v), as amended.   Dr. Cofer's prescriptions were issued intentionally or knowingly without a legitimate medical other authorized purpose.

135.   By virtue of Dr. Cofer's actions, he constructively delivered controlled substances in violation of W.Va. Code, 60A–4–401(a), as amended, which is part of West Virginia's Uniform Controlled Substances Act.

136.   Dr. Cofer's intentional violations of West Virginia law make him liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

137. Dr. Cofers' intentional acts and omissions have proximately caused and substantially contributed to damage suffered by Welch, and created conditions which contribute to the violation of West Virginia laws by others.

### COUNT V
### UNJUST ENRICHMENT

138. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 96.

139. As a result of all Defendants' actions, Plaintiff has expended substantial amounts of money annually that it would not have otherwise expended on numerous services, including, but not limited to: law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole, public welfare and service agencies, emergency, healthcare and medical services and drug abuse education and treatment, public utilities, nuisance abatement, code enforcement.

140. Plaintiff has lost tax revenue and incurred direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Defendants' actions.

141. Plaintiff will continue to incur these increased costs, or continue to suffer these losses, in the future as a result of the Defendants' conduct listed herein.

142. Collectively, all Defendants made substantial profits while fueling the prescription drug epidemic in West Virginia and Welch.

143. Defendant Distributors continue to receive considerable profits from the distribution of controlled substances in Welch.

144. Defendants were each unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

145. Defendants' negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing have unjustly enriched the Defendants and are directly related to the damages, losses, and to the detriment of the Plaintiff.

146. Defendants are liable to Plaintiff for all damages incurred as a result of Defendants' negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing contained herein.

147. Defendants' negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing entitle Plaintiff to disgorgement of the profits received by Defendants for all sales it made in Welch or to Welch residents from 2007 to present.

## COUNT VI
## PUBLIC NUISANCE

148. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 96.

149. Defendants, individually and acting through their employees and agents have created and continue to perpetuate and maintain a public nuisance to the citizens of Welch through the massive distribution of millions of doses of highly addictive, commonly abused prescription pain killers.

150. Defendants' failure to put in place effective controls and procedures to guard against theft and diversion of controlled substances, and their failure to adequately design and operate a system to disclose suspicious orders of controlled substances, and by their failure to inform the State of suspicious orders when discovered has created a public nuisance to the citizens of Welch.

151. Defendants knew or should have known its conduct would cause harm or inconvenience to Welch in a multitude of ways.

152.    As a direct and proximate result of the conduct of Defendants, as set forth herein, Defendants have negligently, intentionally, and/or unreasonably interfered with the right of Welch citizens to be free from unwarranted injuries, addictions, diseases and sicknesses, overdoses from prescription pain medication, and ongoing damage, harm, inconvenience and ongoing damage, harm and inconvenience to Welch and its residents who have been exposed to the risk of addiction to prescription drugs, who have become addicted, and/or have suffered other adverse consequences from the use of the addictive prescriptions drugs, and have been adversely affected by the addiction and abuse of others in their communities from highly addictive, prescription pain medication distributed by Defendants.

153.    Defendants' actions have and will continue to cause Welch, its agencies, and citizens to suffer the same fate in the future if Defendants' conduct continues.

154.    As a direct result of Defendants' conduct, as set forth herein, Defendants have negligently, intentionally, recklessly, maliciously, oppressively, and/or unreasonably interfered with the public's right to be free from unwarranted injury, disease or sickness, criminal actions, and have cause ongoing damage, harm and/or inconvenience to the public health, the public safety, and the general welfare of the citizens of Welch.

155.    The health and safety of the citizens of Welch, including those who have used or will use prescription drugs, is a matter of great public interest and of legitimate concern to the county and its citizens.

156.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further occurrence of such harm and inconvenience can be prevented.

157.    Defendants were on notice that an epidemic from prescription drug abuse existed and has existed during all relevant times for this Complaint as the result of:

- A large amount of media coverage of prescription drug abuse and its consequences by both national and local print, television, and radio media;

- Multiple documentary movies depicting the state of prescription drug abuse in West Virginia;

- Publications received from government sources as well as warnings and recommendations contained in trade and professional journals; and

- Changes in law and regulations which were designed specifically to address the growing problem of prescription drug abuse.

- The widespread publicity contained many references and statistics concerning West Virginia's problems from prescription drug abuse, including, but not limited to, suffering the nation's highest per capita death rate from prescription drug overdose.

158.    Notwithstanding the knowledge of this epidemic of prescription drug abuse in West Virginia and specifically in Welch, Defendants persisted in a pattern and practice of distributing controlled substances of kinds which were well-known to be abused and diverted in such quantities and with such frequency, that the Defendants knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes.

159.    As a direct and proximate result of the above-described conduct, Defendants negligently, recklessly, maliciously, oppressively, and/or intentionally, and acting with blind indifference to the facts, created and continue to propagate a public nuisance. More particularly, the public nuisance created by Defendants, injuriously, and in many areas pervasively, affects Welch, and endangers the public health and safety and inconveniences the residents of Welch.

160.    As a direct result of the acts and/or omissions of Defendants in creating, perpetuating, and maintaining the public nuisance hereinabove described, the public nuisance described herein has damaged the health and safety of Welch residents in the past will continue to do so in the future unless the nuisance is abated.

161.     Plaintiffs have sustained economic harm in the expenditure of massive sums of monies and will continue to suffer economic harm in the future unless the above- described public nuisance is abated.

## COUNT VII
## INTENTIONAL ACTS AND OMISSIONS

162.     Plaintiff incorporates by reference all allegations in paragraphs 1 through 96.

163.     Defendants intentionally contributed to the prescription drug abuse epidemic in Welch through repeated intentional violations of variprovisions of the West Virginia Uniform Controlled Substances Act and through reckless disregard to the safety and well-being to the citizens of Welch, to wit:

- Defendants intentionally and improperly dispensed, and continues to dispense prescriptions contrary to W.Va. Code § 60A-3-308;
- Defendants intentionally engaged in prohibited acts, contrary to W.Va. Code §§ 60A-4-401 through 403;
- Defendants intentionally abetted and continue to abet individuals in deceiving and attempting to deceive medical practitioners in order to obtain prescriptions in violation of W.Va. Code § 60A-4-401.
- Defendants intentionally failed to meet the requirements of W.Va. Code § 60A-8-1 et seq.
- Defendants intentionally conspired to violate the WV Uniform Controlled Substances Act.
- Defendants intentionally failed to ensure its conduct conformed to industry standards.
- Defendants intentionally failed to ensure its conduct conformed to West Virginia law and regulations.
- Defendants intentionally turned a blind eye toward the foregoing industry standards by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom can reasonably be expected to become addicted or to engage in illicit drug transactions.

164.     Defendants' intentional acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in Welch.

165.    Defendants' intentional acts and omissions ultimately supplied millions of doses of commonly-abused, highly addictive controlled substances to patients of pill mills and physicians like Dr. Cofer with no legitimate medical evidence supporting the prescription.

166.    Defendants' intentional acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

167.    Defendants' intentional violations of West Virginia law make it liable for all the damages which are sustained therefrom. W. Va. Code § 55-7-9.

168.    Defendants' intentional acts and omissions have proximately cause and substantially contributed to damage suffered by Welch, and created conditions which contribute to the violation of West Virginia laws by others.

169.    Defendants' intentional acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiff and were in violation of the customs, standards and practices within Defendants' own industry.

170.    Upon information and belief, Defendants continue to intentionally violate West Virginia laws and regulations, and Defendant's industry customs, standards and practices which continue to proximately cause substantial damages to Plaintiff.

## VI.    **PRAYER**

WEHREFORE, Plaintiff prays that the Court grant the following relief:

1.    Order a jury trial on all issues so triable to determine  damages as a result of the Defendants' actions outlined in this Complaint

2.    Enter Judgment in favor of Plaintiff;

3.    Enter a temporary restraining order which:

   a.    Prevents Defendants from continuing to violate West Virginia laws;

b.  Prevents Defendants from continuing to violate United States laws and regulations relating to the distribution of controlled substances;

c.  Mandates that Defendants promptly notify the appropriate state and federal authorities of any and all suspicious orders for controlled substances as received from parties who are located in Welch;

d.  Mandates Defendants submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendants from distributing any controlled substance in Welch for any non-legitimate medical purpose;

4.  Enter a permanent restraining order which:

a.  Prevents Defendants from continuing to violate West Virginia laws;

b.  Prevents Defendants from continuing to violate United States laws and regulations relating to the distribution of controlled substances;

c.  Mandates that Defendants promptly notify the appropriate state and federal authorities of any and all suspicious orders for controlled substances as received from parties who are located in Welch;

d.  Mandates Defendants submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendants from distributing any controlled substance in Welch for any non-legitimate medical purpose; and

e.  Mandates Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions

5.  Order equitable relief, including, but not limited to restitution and disgorgement;

6.  Award punitive damages for Defendants' willful, wanton, malicious, oppressive, and intentional actions as detailed herein;

7.  Award attorneys' fees and costs and

8.  Award such other relief as this Court deems just and fair;

PLAINTIFF SEEKS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

H. Truman Chafin (WV BAR NO. 684)
Letitia N. Chafin (WV BAR NO. 7207)
**THE CHAFIN LAW FIRM, PLLC.**
P.O. Box 1799
Williamson, WV 25661
Phone: 304-235-2221
Fax: 304-235-2777
Email: truman@thechafinlawfirm.com
Email: tish@thechafinlawfirm.com

Mark E. Troy, Esq. (WV BAR NO. 6678)
**Troy Law Firm, PLLC**
222 Capitol Street, Suite 200A
Charleston, WV 25301
Email: mark@troylawwv.com
Phone 304-345-1122

Harry F. Bell, Jr., Esq. (WV BAR NO. 297)
**THE BELL LAW FIRM PLLC**
P.O. Box 1723
30 Capitol St.
Charleston, WV 25326-1723
Email: hfbell@belllaw.com
Phone: 304-345-1700

John Yanchunis *(Pro Hac Vice to be filed)*
Florida Bar No. 324681
jyanchunis@forthepeople.com
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
(813) 223-5505

James Young *(Pro Hac Vice to be filed)*
Florida Bar No. 567507
jyoung@forthepeople.com
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904) 398-2722

Page 31 of 32

*Attorneys for Plaintiff*

# IN THE CIRCUIT COURT OF MCDOWELL COUNTY, WEST VIRGINIA

## SUMMONS

**MAYOR REBA HONAKER, on behalf of**
**THE TOWN OF WELCH,**
　　　　**Plaintiffs,**

v.

**Civil Action No. 17-C-** 1 5

**Judge:** Muumky

**MCKESSON CORPORATION,**
**AMERISOURCEBERGEN DRUG**
**CORPORATION, CARDINAL HEALTH 110**
**LLC., MIAMI-LUKEN, INC., H.D. SMITH**
**WHOLESALE DRUG CO., and**
**HAROLD ANTHONY COFFER, JR, M.D.,**

　　　　**Defendants.**


**TO:**　**AMERISOURCEBERGEN DRUG CORPORATION, A Delaware Corporation,**
　　　CT Corporation
　　　5400 D Big Tyler Road
　　　Charleston, WV 25313


## IN THE NAME OF THE STATE OF WEST VIRGINIA,

　　　You are hereby summoned and required to serve upon the following attorneys for Plaintiff, an Answer, including any related counterclaim you may have to the Complaint filed against you in the above-styled civil action, a true copy of which is herewith delivered to you.


Mark E. Troy, Esq.
**Troy Law Firm, PLLC**
222 Capitol Street, Suite 200A
Charleston, WV 25301
Telephone: (304) 345-1122

Harry F. Bell, Jr., Esq.
**The Bell Law Firm, PLLC**
30 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-1700

John Yanchunis & James Young, Esq.
**Morgan & Morgan Complex**
**Litigation Group**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505

Letitia Neese Chafin & H. Truman Chafin
**The Chafin Law Firm, PLLC.**
Post Office Box 1799
Williamson, WV 25661
Telephone: (304) 235-2221

You are required to serve your Answer to the Complaint within **30** days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint, and you will be thereafter barred from asserting in any other action any claim you may have which must be asserted by counterclaim in the above-styled civil action

Date: February 13, 2017          Clerk: _Jeannine Jones_

By: _Melina Slone_
    Dep. Clerk

## IN THE CIRCUIT COURT OF MCDOWELL COUNTY, WEST VIRGINIA

### SUMMONS

**MAYOR REBA HONAKER, on behalf of
THE TOWN OF WELCH,**
      **Plaintiffs,**

v.

Civil Action No. 17-C- / 5
Judge: Mullmky

**MCKESSON CORPORATION,
AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH 110
LLC., MIAMI-LUKEN, INC., H.D. SMITH
WHOLESALE DRUG CO., and
HAROLD ANTHONY COFFER, JR, M.D.,**

      **Defendants.**


**TO:   CARDINAL HEALTH 110, LLC, An Ohio Corporation,**
      CT Corporation
      5400 D Big Tyler Road
      Charleston, WV 25313


### IN THE NAME OF THE STATE OF WEST VIRGINIA,

      You are hereby summoned and required to serve upon the following attorneys for Plaintiff, an Answer, including any related counterclaim you may have to the Complaint filed against you in the above-styled civil action, a true copy of which is herewith delivered to you.


Mark E. Troy, Esq.
**Troy Law Firm, PLLC**
222 Capitol Street, Suite 200A
Charleston, WV 25301
Telephone: (304) 345-1122

Harry F. Bell, Jr., Esq.
**The Bell Law Firm, PLLC**
30 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-1700

John Yanchunis & James Young, Esq.
**Morgan & Morgan Complex
      Litigation Group**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505

Letitia Neese Chafin & H. Truman Chafin
**The Chafin Law Firm, PLLC.**
Post Office Box 1799
Williamson, WV 25661
Telephone: (304) 235-2221

You are required to serve your Answer to the Complaint within **30** days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint, and you will be thereafter barred from asserting in any other action any claim you may have which must be asserted by counterclaim in the above-styled civil action

Date: *February 13, 2017*      Clerk: *Jasmine Spencer*

*By  Meagan Stone*
*Deputy Clerk*

## IN THE CIRCUIT COURT OF MCDOWELL COUNTY, WEST VIRGINIA

### <u>SUMMONS</u>

**MAYOR REBA HONAKER, on behalf of**
**THE TOWN OF WELCH,**
      **Plaintiffs,**

v.

**MCKESSON CORPORATION,**
**AMERISOURCEBERGEN DRUG**
**CORPORATION, CARDINAL HEALTH 110**
**LLC., MIAMI-LUKEN, INC., H.D. SMITH**
**WHOLESALE DRUG CO., and**
**HAROLD ANTHONY COFFER, JR, M.D.,**

      **Defendants.**

Civil Action No. 17-C- 17-C 18

Judge: Murenky


**TO:** **MCKESSON CORPORATION, A Delaware Corporation,**
      Corporation Service Company
      200 West Washington Street
      Charleston, WV 25302


### IN THE NAME OF THE STATE OF WEST VIRGINIA,

      You are hereby summoned and required to serve upon the following attorneys for Plaintiff, an Answer, including any related counterclaim you may have to the Complaint filed against you in the above-styled civil action, a true copy of which is herewith delivered to you.


| | | |
|---|---|---|
| Mark E. Troy, Esq. | Harry F. Bell, Jr., Esq. | John Yanchunis & James Young, Esq. |
| **Troy Law Firm, PLLC** | **The Bell Law Firm, PLLC** | **Morgan & Morgan Complex** |
| 222 Capitol Street, Suite 200A | 30 Capitol Street | **Litigation Group** |
| Charleston, WV 25301 | Charleston, WV 25301 | 201 N. Franklin St., 7th Floor |
| Telephone: (304) 345-1122 | Telephone: (304) 345-1700 | Tampa, FL 33602 |
| | | Telephone: (813) 223-5505 |

Letitia Neese Chafin & H. Truman Chafin
**The Chafin Law Firm, PLLC.**
Post Office Box 1799
Williamson, WV 25661
Telephone: (304) 235-2221

You are required to serve your Answer to the Complaint within **30** days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint, and you will be thereafter barred from asserting in any other action any claim you may have which must be asserted by counterclaim in the above-styled civil action

Date: February 13, 2017    Clerk: _Jasmine Benece_

Necima Stone

By: Deputy Clerk