```
1                    IN THE UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF WEST VIRGINIA
2


3    _____x
     THE CITY OF HUNTINGTON,          :
4                                     :
                    Plaintiff,        :
5    vs.                              :   CIVIL ACTION
                                      :   No. 3:17-01362
6    AMERISOURCEBERGEN DRUG           :
     CORPORATION, et. al.,            :
7                                     :
                    Defendants.       :
8                                     :
                                      :
9    _____x
     CABELL COUNTY COMMISSION,        :
10                                    :
                    Plaintiff,        :
11   vs.                              :   CIVIL ACTION
                                      :   No. 3:17-01665
12   AMERISOURCEBERGEN DRUG           :
     CORPORATION, et. al.,            :
13                                    :
                    Defendants.       :
14                                    :
     _____x
15

16                        STATUS CONFERENCE
                  BEFORE THE HONORABLE DAVID A. FABER,
17                SENIOR UNITED STATES DISTRICT JUDGE,
                            JANUARY 27, 2020
18

19   APPEARANCES:
     For the Plaintiff:       PAUL T. FARRELL, JR., ESQ.
20   Cabell County            Greene Ketchum Farrell Bailey & Tweel
     Commission               P. O. Box 2389
21                            Huntington, WV  25724

22
                              ANTHONY J. MAJESTRO, ESQ.
23                            Powell & Majestro
                              Suite P-1200
24                            405 Capitol Street
                              Charleston, WV  25301
25
```

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

```
 1    APPEARANCES CONTINUED:

 2    For the Plaintiff:      MICHAEL A. WOELFEL, ESQ.
      Cabell County          Woelfel & Woelfel
 3    Commission             801 Eighth Street
                             Huntington, WV  25701
 4

 5
      For the Plaintiff:      ANNE MCGINNESS KEARSE, ESQ.
 6    City of Huntington      Motley Rice LLC
                             28 Bridgeside Blvd.
 7                           Mt. Pleasant, SC  29464

 8
                              CHARLES R. WEBB, ESQ.
 9                           The Webb Law Center
                             716 Lee Street
10                           Charleston, WV  25301

11

12    For the Defendant:      ENU MAINIGI, ESQ.
      Cardinal Health        SUZANNE SALGADO, ESQ.
13                           Williams & Connolly
                             725 Twelfth Street, NW
14                           Washington, DC  20005

15
                              STEVEN R. RUBY, ESQ.
16                           Bailey & Glasser
                             209 Capitol Street
17                           Charleston, WV  25301-1386

18

19    For the Defendant:      MARK H. LYNCH, ESQ.
      McKesson               Covington & Burling
20                           850 10th Street
                             Washington, DC  20001
21

22                            JEFFREY M. WAKEFIELD, ESQ.
                             Flaherty Sensabagh & Bonasso
23                           P. O. Box 3843
                             Charleston, WV  25338-3843
24

25
```

```
1    APPEARANCES CONTINUED:

2    For the Defendant:      ROBERT A. NICHOLAS, ESQ.
     AmerisourceBergen       JOSEPH J. MAHADY, ESQ.
3    Drug Corporation        Reed Smith
                             Three Logan Square, Suite 3100
4                            1717 Arch Street
                             Philadelphia, PA  19103
5

6
                             GRETCHEN M. CALLAS, ESQ.
7                            Jackson Kelly
                             P. O. Box 553
8                            Charleston, WV  25322

9

10

11

12

13

14

15

16

17

18

19

20        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
21

22

23   _____
                CATHERINE SCHUTTE-STANT, RDR, CRR,
24               Federal Official Court Reporter
                300 Virginia Street, East, Room 6009
25                    Charleston, WV 25301
```

STATUS CONFERENCE

```
1              P-R-O-C-E-E-D-I-N-G-S              2:34 p.m.

2              Had before The Honorable David A. Faber, Senior

3    United States District Judge, United States District Court

4    for the Southern District of West Virginia, at Charleston,

5    on January 27, 2020, as follows:

6              THE CLERK:  All rise.  This Court is now in

7    session.  Please be seated and come to order.

8              THE COURT:  Before the Court this afternoon is the

9    case of The City of Huntington and Cabell County Commission

10   against AmerisourceBergen, Cardinal Health, and McKesson

11   Corporation.  There are two consolidated cases:  Civil

12   Action Numbers 3:17-01362 and 3:17-01665.

13       And I'll ask the attorneys to note their appearances on

14   the record, please.

15             MR. FARRELL:  Paul Farrell Jr. on behalf of the

16   plaintiffs.  And the MDL from Cleveland, we say, hello, and

17   we're glad to be back.  Before I let my Brethren and sisters

18   introduce themselves, I do want to note from the Cabell

19   County Commission, we do have with us today Commissioner

20   Kelli Sobonya and County Administrator Beth Thompson.

21             THE COURT:  All right.  Glad to have you.

22             MR. MAJESTRO:  Thank you, Your Honor.  Also glad

23   to be back.  Anthony Majestro on behalf of Cabell County.

24             MS. KEARSE:  Your Honor, Anne Kearse, on behalf of

25   The City of Huntington.  And Mayor Stephen Williams is here
```

STATUS CONFERENCE

1    with us as well.

2             THE COURT:  Thank you.

3             MR. WEBB:  Your Honor, Charles Rusty Webb

4    representing the City of Huntington.

5             MS. Mainigi:  Your Honor, good afternoon.

6    Enu Mainigi from Williams & Connolly on behalf of Cardinal

7    Health.

8             THE COURT:  All right.

9             MR. LYNCH:  Good afternoon, Your Honor.  Mark

10   Lynch from Covington & Burling on behalf of McKesson.

11            MR. NICHOLAS:  Good afternoon, Your Honor.  I'm

12   Robert Nicholas from Reed Smith.  I represent

13   AmerisourceBergen.

14            THE COURT:  All right.

15            MR. MAHADY:  Good afternoon, Your Honor.  Joseph

16   Mahady on behalf AmerisourceBergen.

17            MR. WOELFEL:  Your Honor, Mike Woelfel on behalf

18   of Cabell County Commission.

19            MR. WAKEFIELD:  Good afternoon, Your Honor.

20   Jeffrey Wakefield appearing on behalf of McKesson.

21            MS. CALLAS:  Your Honor, Gretchen Callas with the

22   law firm of Jackson Kelly for AmerisourceBergen.

23            MS. SALGADO:  Suzanne Salgado with Williams &

24   Connolly on behalf of Cardinal Health.

25            MR. RUBY:  And, Your Honor, Steve Ruby with Bailey

1    and Glasser on behalf of Cardinal Health as well.

2              THE COURT:  Is that it?  All right.

3         The Court set this matter today for a status

4    conference, the cases having been sent back from

5    multidistrict litigation.  And I have a number of things on

6    my mind that I'll run through and then I'll hear anything

7    else any of the parties want to offer.

8         The first thing on the plate, is this going to be a

9    bench trial or a jury trial?  And it seems to me that we

10   need to decide that, because it's going to have an obvious

11   impact on other things we need to arrange in order to get

12   this case on track to be tried.

13        Mr. Farrell.

14             MR. FARRELL:  Yes, Your Honor.  As you know, we

15   originally pled a jury trial in our initial pleading.  So my

16   reading of rule 39(a) requires it to be by stipulation.  So

17   we've asked -- the plaintiffs, both The City of Huntington

18   and Cabell County Commission, are willing to stipulate to a

19   bench trial, and we're awaiting to hear from our brothers

20   and sisters from the other side.

21             THE COURT:  Okay.  What say the defendants?

22             MS. MAINIGI:  Your Honor, the defendants are,

23   candidly, still conferring about this issue.  We are hoping

24   to take the opportunity with Your Honor today to understand

25   better what Your Honor was thinking as to how discovery and

STATUS CONFERENCE

1    a trial would be run, and then take that back to our clients

2    and then come back to the Court, if that is possible.

3              THE COURT:  Well, we can pursue these other

4    issues, but it seems to me that a lot of -- a lot of it is

5    going to depend on what the defendants have decided to do,

6    whether to -- whether to waive a jury or not.  It's up to

7    you, of course.  But a bench trial would give me a lot more

8    control over the course of the trial and we could work in

9    some downtime that I wouldn't want to put into the schedule

10   if we had a jury, that would inconvenience the jury.  So

11   that's just my thinking on that.

12             MS. MAINIGI:  Your Honor, what I would say just

13   for our working purposes then today, as we stated in our

14   papers, right now, I think we should plan -- we're certainly

15   open to continuing to think about a bench trial -- but right

16   now, I think we should plan to proceed as if it will be a

17   jury trial.

18             THE COURT:  Okay.  Fair enough.  If it's a jury

19   trial, that certainly is going to make the plaintiffs'

20   proposed schedule unworkable, it seems to me.

21             MR. FARRELL:  Judge, under Rule 39, there is a

22   different course of events.  And so it seems to us, in my

23   experience in this MDL matter, is that if a decision is not

24   imperative, then it is imperative not to make a decision.

25   The old Chinese Proverb.

**8**

1    So what I would suggest is that we set some type of

2    timeframe to hear from the defendants on an ultimate

3    decision.  And a carrot that I will put out is that both the

4    city and the county have conferred and that we -- we are

5    willing to stipulate to the removal of those aspects of the

6    case that give rise to a jury trial, and then it's this

7    Court's decision on whether or not it's a bench trial or

8    not.

9              THE COURT:  Now, what are you talking about there,

10   Mr. Farrell?  I'm not sure I understand what you're --

11             MR. FARRELL:  Well, I have with me here Mr. Tony

12   Majestro, who is the smart one and tells me what I can and

13   can't get away with.  My understanding is that if we

14   stipulate to the removal of punitive damages, then that puts

15   this case squarely in your lap.

16             THE COURT:  Do you agree with that?

17             MR. LYNCH:  Mark Lynch, Your Honor, on behalf of

18   McKesson.  We do not agree with that.  The claims to which a

19   jury trial rights attach, that goes back to the Court of

20   West Minister, in fact.  If we need to brief that, we'd be

21   happy to.

22        And I would say, Your Honor, as Ms. Mainigi said, we

23   are not at this time prepared to waive our right to a jury

24   trial.  Further down the road, as the case takes some shape,

25   after we get discovery -- maybe at the end of discovery, we

STATUS CONFERENCE

1    can see where we stand.

2           THE COURT:  Well, I think we need to know the

3    answer before that, because it's going -- it seems to me

4    that the course of discovery in the case is going to be

5    impacted by what type of a trial it is.

6           MR. LYNCH:  Well, in that case, at this point, as

7    Ms. Mainigi said, we have to assume it's going to be a jury

8    trial.

9           THE COURT:  Okay.  Well, what if I give you a time

10   deadline to change your mind?

11          MS. MAINIGI:  That's fine, Your Honor.

12          MR. LYNCH:  I do think, though, that deadline has

13   to allow for us to see some of the scope of the case through

14   the discovery.

15          THE COURT:  Well --

16          MR. MAJESTRO:  Your Honor, with the concession the

17   plaintiffs are willing to make, we really do believe that

18   there -- you don't get a jury trial with every claim you

19   bring.  We believe we have carved this case down to the

20   point where it's an equitable action seeking abatement to

21   which there is no right to a jury trial.

22      My suggestion is, in addition to going on dealing with

23   the other things we can, is that we brief that issue.

24          THE COURT:  How do you turn your case into a --

25   into an equitable -- your remedy into an equitable remedy

STATUS CONFERENCE

1    that that waives the jury trial?  Is this a damage action?

2    If it's a damage action, it's not an equitable action.

3            MR. MAJESTRO:  It's not an equitable action.  It's

4    action seeking abatement.  And that's what they did in

5    Oklahoma.  That's one of the things we talked about doing in

6    Cleveland, which we never got to that point, but there is

7    case law that would support that those are equitable actions

8    to be tried by the Court.

9            THE COURT:  Was that the theory that the Oklahoma

10   Judge denied -- denied a jury trial?

11           MR. MAJESTRO:  Yes, sir.

12           THE COURT:  What do you say about that, Mr. Lynch?

13           MR. LYNCH:  That was one of the most primary

14   errors made by the judge in the Oklahoma case.  And they've

15   already admitted a list of issues to raise on appeal, and

16   that's up at the top of the list.

17           THE COURT:  So you're saying it's not an equitable

18   remedy; it's a damage action?

19           MR. LYNCH:  It's a tort.  And the existence of the

20   nuisance is something to be found by a jury.  And if Mr.

21   Majestro wants to brief it, we'd be happy to do that.

22           MR. MAJESTRO:  We can get you a brief in a week,

23   Your Honor.

24           THE COURT:  Well, I think I want to see some

25   briefs on that issue.  And my reliable law clerk gave me the

```
 1     nod and the wink that she wants to see what you can put on

 2     paper.

 3          How soon?  A week?

 4               MR. MAJESTRO:  A week, Your Honor.

 5               THE COURT:  How much time -- can you reply in a

 6     week?

 7               MR. LYNCH:  Could we have 10 days?  We have to get

 8     everybody together and agree.  10 days would be fine if we

 9     could have that, Your Honor.

10               THE COURT:  You want 10 days, Mr. Farrell?

11               MR. FARRELL:  Judge, in case I wasn't blunt enough

12     in the position statement that we submitted --

13               THE COURT:  Well, I understand perfectly your

14     argument, that you want this case to move and get to trial,

15     and I understand the reasons.

16               MR. FARRELL:  So I would suggest concomitant

17     briefs at the same time.  We can have ours by the end of the

18     week.  If they need a little extra time to caucus -- but,

19     Judge, we are on the clock.  And I'm trying to do something

20     transformative here.

21               THE COURT:  I'll ask for briefs from both sides in

22     10 days.

23               MR. LYNCH:  Thank you, Your Honor.

24               THE COURT:  On the issue of whether this is an

25     equitable, a case -- suit in equity or an action of law.
```

STATUS CONFERENCE

1          Now, in my conversation with Judge Polster, he led me

2    to believe that this case was almost ready to go to trial;

3    that he had ruled on a lot of the major issues; he had the

4    Daubert hearings, and the only thing left was discovery on

5    what he called local discovery.

6          The parties agree with that?

7              MS. MAINIGI:  Your Honor, we certainly agree local

8    discovery needs to be done.  We may differ, with all due

9    respect to Judge Polster, in terms of the scope of that.

10   The discovery that was done in Cleveland, as Your Honor can

11   imagine, was somewhat one-sided as it applies to this case.

12   So as it relates to the defendants that are here, we were

13   obviously defendants there, we have, you know, essentially

14   the same discovery to offer, the same deponents, with

15   perhaps some slight variation.  So a tremendous amount of

16   discovery was already conducted as it relates to our

17   clients.  However, on the other side, the discovery that was

18   obviously conducted of the plaintiffs was discovery limited

19   to the two counties that were involved in the litigation,

20   Cuyahoga and Summit County.

21         Here, hardly any of that discovery has been done.  And

22   that remains to be done.  And if Your Honor would like

23   specifics, I'm sure some of my colleagues can share the

24   specifics.

25             THE COURT:  Well, you asked for 18 months, and I'm

1    not inclined to give you anything close to 18 months in view

2    of the fact that this case has been pending for three years

3    really.  And I just got it back with instructions to --

4    well, not instructions -- but with an urge to get it moving.

5              MS. MAINIGI:  Your Honor, if I could make a few

6    points in response to that?

7         One, we've hardly gotten any discovery from the

8    plaintiffs.  So there is a tremendous amount of discovery

9    that I think it would be worth highlighting to Your Honor if

10   you have some indulgence of us in terms of listening to

11   that.

12        Second, I'd like Your Honor to consider also the

13   difference between this case and the case that was in --

14   where we picked a jury in Cleveland.  There were multiple

15   other defendants in that case.

16        Here, the three defendants that are sitting here at

17   this table have been artificially severed out.  That does

18   not mean all the other defendants that still exist in the

19   litigation are irrelevant.  And, in fact, discovery from

20   those defendants is very key to this case, because, Your

21   Honor, as pled, the complaint in this case, essentially, a

22   big chunk of the complaint in this case essentially alleges

23   that the cause of this -- or a significant cause of the

24   opioid crisis was the marketing by pharmaceutical companies,

25   of which you don't have any at this table.

1          So I think that there is going to be a tremendous

2     amount of necessary third-party discovery as it relates not

3     just to the pharmaceutical companies, but, also, Your Honor,

4     as it relates to entities such as the Board of Pharmacy and

5     the local West Virginia entities.

6          By contrast, the DEA discovery has certainly been done

7     and completed in significant part.  But there is local

8     discovery that still very much remains.  And then, of

9     course, we've got several issues, as we've highlighted to

10    Your Honor, that need to be briefed even prior to summary

11    judgment briefing which would need to take place.

12          THE COURT:  Well, one of the concerns -- and maybe

13    you're getting to that -- that I have is the nonparty fault.

14    And it seems to me that has got -- the discovery on that has

15    got to be limited, because it could go on forever, if you

16    get to the point where you are going to look at the doctors

17    who prescribed these medications and things like that.

18          So can you give me an idea of where you want to go with

19    that?

20          MS. MAINIGI:  Your Honor, with respect to nonparty

21    fault, I mean, certainly we would have discovery related to

22    the manufacturers, discovery related to the pharmacies.  I

23    think that there would be prescriber discovery that would

24    take place.  And I'll ask any of my colleagues if they have

25    any other specifics to offer, but those -- those, I think,

1    are some of the big categories, Your Honor, that just

2    realistically need to take place.  And Your Honor is

3    absolutely correct, that that is another distinction between

4    here, just given the nature of the nonparty fault statute

5    versus Cleveland.

6        Just as a frame of reference, Your Honor, I believe

7    that -- I may be off slightly in my numbers -- but I believe

8    in Cleveland, the Track 1 plaintiffs produced 99 witnesses

9    for deposition.  They were all Ohio specific witnesses.

10       I'm not suggesting that's how many need to occur here.

11   But that certainly was the magnitude of the county witnesses

12   and other witnesses related to the county that took place

13   with Judge Polster's consent and the Special Master's

14   consent in Cleveland.

15       None of that discovery, obviously, Your Honor, since it

16   was county specific would have applicability here.

17           MR. NICHOLAS:  Your Honor, could I just -- so we

18   don't lose track of one thing -- this is Robert Nicholas for

19   AmerisourceBergen -- and that is, the scope of the discovery

20   that is being pointed out by the plaintiffs in our

21   direction, at least, at the moment.

22       First of all, the plaintiffs are seeking discovery not

23   just pertaining to the State of West Virginia, but also to

24   Kentucky, and Ohio.  They are seeking files, they are

25   seeking data, they are seeking a lot of documentation.

1    That's something that needs to be taken into account.

2         As recently as last Thursday --

3              THE COURT:  Is that relevant?  Do you agree it's

4    relevant?

5              MR. NICHOLAS:  I'm not suggesting it is.  But the

6    plaintiffs have taken the position that it is.  That's a

7    fight.  So right now, that's out there.

8         The other thing -- and I'll just speak for the

9    communications between the plaintiffs' side of things and

10   our -- us, AmerisourceBergen.

11        Last Thursday, we had a call with plaintiffs' counsel,

12   not Mr. Farrell, but his colleagues from a different firm,

13   and they are currently seeking, they want -- and this is not

14   a definitive list on their part, but they are asking for

15   nine depositions.  Almost all of the people that they are

16   seeking depositions of from my clients have not been deposed

17   in this multidistrict litigation, so it's not duplicative,

18   or there is nothing to use from that here.  That's nine.

19        They've identified 41 custodians whose files they would

20   like us to cull through and produce.  We have not completed

21   the process, the negotiation process of search terms to be

22   applied to those custodians.  And so -- well, yes, we would

23   actually like to see some of this discovery narrowing, you

24   know, that is directed towards us.  The reality is that is

25   what we are facing right now.  And I actually wouldn't want

STATUS CONFERENCE

1    the Court to have the impression that this is a one-way --

2    it's just discovery we need from the other side.  They are

3    looking for a lot of discovery from us.  So that has to be

4    taken into account when a schedule is set.

5         Thank you, Your Honor.

6         THE COURT:  You want to respond to that, Mr.

7    Farrell, and, Mr. Majestro?

8         MR. FARRELL:  Yes.  For two years, we have been in

9    the MDL and there is always going to be another reason why a

10   case can't go to trial.  Cuyahoga and Summit County have

11   1.8 million people.  Cabell County has 94,000.  We've

12   already produced a tremendous amount of documents.  We think

13   that your magistrate can handle any discovery issues that

14   remain outstanding.  The fact of the matter is that this

15   case is, if you -- it may take you a little while, but if

16   you follow the docket of this voluminous case, Peter Mougey

17   and Tony Majestro, and myself, we have a data-driven case

18   that is going to demonstrate that there were 10 million

19   pills of opium sold into Cabell County, West Virginia, every

20   year for 10 years.

21        The numbers in this case will be completely driving

22   every other factor.  So we also are alleging joint

23   liability.  So it doesn't matter how many fingers they

24   point.  They can point a thousand fingers.  Under joint

25   liability, if they are held to cause or contribute, they are

1    going to be responsible for it.

2          So all of these things are issues that we've been

3    arguing about and for the past two years.  There is nothing

4    new that's been said today.

5          We just need a trial date.  We need closure.  We need

6    to get to the end of the road.  And the plaintiffs are ready

7    and willing to put their case up.

8          (Pause.)

9               THE COURT:  How much time do you need to complete

10   what we are referring to as the local discovery that you

11   want to get?

12              MR. NICHOLAS:  Your Honor, what I was saying was

13   they are asking for discovery from the individual

14   defendants:  Cardinal, McKesson, and AmerisourceBergen.

15              THE COURT:  I want to get a handle on what -- I

16   understand that, but they are asking for discovery.

17              MR. FARRELL:  Judge, let me see if I can answer

18   your question.  I would think that in the next 30 days that

19   all of the plaintiffs' discovery to the defendants could be

20   over.  The reason I say that is that this case has distilled

21   down into very discrete subparts.  If you read Judge

22   Polster's summary judgment motion, which he granted the

23   plaintiffs' summary judgment on the law of distribution,

24   what we have are elements of our case.

25          We served in discovery back in October, I believe,

1    eleven discovery requests.  If we get the answer to those

2    eleven discovery requests, then we are prepared to go to

3    trial.  Most of that has been completed.  There are some

4    components of those discovery requests that are not.

5              THE COURT:  How does that square with the proposed

6    schedule that you submitted that you -- if I understood

7    correctly, you wanted to do ongoing discovery while you did

8    parts of the trial?

9              MR. FARRELL:  So if this were a law school trial

10   ad class, I would describe it as certain case -- certain

11   aspects of this case are in the can.  We have what -- I

12   believe as I outlined in my letter, we can put on an entire

13   week, starting tomorrow, on ARCOS data, that there is no

14   more discovery that will be done.  We can put on a week's

15   worth of DEA video testimony that will put in elements of

16   the case that no more work needs to be done.

17        We can put in substantial aspects of our liability case

18   against each of The Big 3, and no more discovery needs to be

19   done.

20        The only thing that I need from them is a list of the

21   suspicious orders that they are prepared to stand up in

22   front of you, and a jury, and God, himself, and say these

23   are their orders we reported, and two, the due diligence

24   files.

25        So by way of example, AmerisourceBergen has answered

1  discovery on January 2, 2020.  If they live by that

2  document, they are probably done.

3      Now, are there other aspects of the case that we would

4  like to build and to pursue?  Sure.  But to get a trial date

5  in this case, I'll shut down discovery today.  That's how

6  important it is for us.

7          THE COURT:  You are telling me 30 days, then?

8          MR. FARRELL:  30 days.

9          THE COURT:  Okay.  How much time will you need to

10  finish what you think you need?  And the 18 months is not

11  going to get it.  I mean --

12          MS. MAINIGI:  Your Honor, it's not -- and then

13  I'll let my colleague, Mr. Lynch, jump in -- it is not -- in

14  our mind, it is not finished at discovery; it begins at

15  discovery, unfortunately, because we do not have hardly any

16  of the discovery that we need for the two entities that are

17  suing us.  None of the discovery that we've received from

18  Cabell County and from -- excuse me -- none of the discovery

19  that we've received from Cuyahoga County and Summit, which

20  not only were those 99 depositions, but they produced more

21  than 15 million documents.  Cabell and Huntington, so far,

22  have produced 62,000.

23      So we are not trying to go overboard, Your Honor, but

24  we -- just because Mr. Farrell has decided he's going to

25  prosecute a data-driven case, that does not mean that he is

STATUS CONFERENCE

1    entitled to drive our defense of the case, Your Honor.

2         So I understand Your Honor's position.  And certainly

3    we can do our best to pull back from the estimate that we

4    provided of 18 months, but I don't think that we were making

5    that number up.  We were using as the estimate the one guide

6    that we have, which is the Cleveland matter.

7              MR. LYNCH:  I would add, Your Honor, Mr. Farrell

8    made the point that there are 1.9 million people who live in

9    the two counties in Cleveland, and 94,000 people in Cabell

10   County.  I think I got those numbers, more or less, right.

11        True enough.  Point taken.  But the opioid epidemic was

12   far more severe -- I don't think Mr. Farrell is going to

13   dispute this -- far more severe in Cabell and Huntington

14   than it was in Cuyahoga.

15             MR. FARRELL:  Stipulated.

16             THE COURT:  Yes.  I read dreamland, Mr. Lynch.  I

17   agree with you.

18             MR. LYNCH:  Now, another point here, it is not

19   merely -- not merely a discovery issue, but under the

20   relatively recently enacted statute on apportionment of

21   responsibility, that's going to affect how the trial is

22   conducted.  So there are a lot of entities, both public and

23   private, to share responsibility for the opioid crisis.  We

24   need to build that story.  The fact-finder needs to be able

25   to apportion responsibility.

STATUS CONFERENCE

1          Now, that's going to take some time.  I think 18

2     months, Your Honor, is not a good number to think in terms

3     of discovery, but it's probably a reasonable number to think

4     of in terms of getting the case ready for trial.  I would

5     guess that it's going to take at least six months for Mr.

6     Farrell to produce the documents that we are entitled to.

7     If he can do it sooner, God bless him, and we can move it --

8          THE COURT:  He says he can do it within 30 days,

9     and he's shaking his head he can.

10          MR. LYNCH:  He knows -- he knows that we have a

11     reasonable request for many more documents than he can

12     produce in 30 days.

13          MR. FARRELL:  If I may?

14          THE COURT:  Well, I don't think Mr. Lynch is

15     through yet.

16          MR. FARRELL:  What I'm suggesting is, if that's

17     the issue that is holding this up, then we can get that

18     resolved immediately.

19          MR. LYNCH:  And then after we get the document

20     discovery, we need to take the depositions.  And that, I

21     would hazard a guess, could take six months after we get the

22     documents.  Now, if we speed up the documents, we can speed

23     up the depositions; we can get to depositions sooner.  And

24     then you go, you go into motions, you go into expert

25     discovery, you go into Daubert hearings.  And that's how we

1    got to 18 months, thinking of 18 months to get the case

2    ready for trial.

3              THE COURT:  I thought Judge Polster took care of

4    all the Daubert issues?

5              MR. LYNCH:  I'm glad you raised that because I

6    want to get back to that.  Judge Polster's rulings are not

7    the law of this case.  These are separate cases.  It's a

8    pretty fundamental concept or precept of multidistrict

9    litigation that decisions that a transferee judge makes in

10   bellwether cases do not become the law of the case in the

11   other cases.  They are independent cases.

12       So I think it was a little overoptimism on his part

13   that he told you these cases are all ready to go to trial.

14       And Mr. Farrell -- I was going to get to this anyway,

15   but Mr. Farrell's mission has a list of matters that are

16   covered by law in the case.  We disagree with that

17   profoundly.  That is another issue that we are preparing to

18   brief if we need to.

19       But those rulings of Judge Polster in the bellwether

20   cases are not law of this case.

21             MS. MAINIGI:  Your Honor, may I add just one

22   additional point?

23             THE COURT:  Sure.

24             MS. MAINIGI:  Coming back to Cuyahoga and Summit

25   as somewhat of a frame of reference, the two counties in

1    that matter missed their nine-month deadline for production

2    of documents.

3            THE COURT:  Well, they got thrown out of the case,

4    too, didn't they?

5            MS. MAINIGI:  Cleveland did, Your Honor, but the

6    other counties also missed the nine-month deadline.  You're

7    absolutely right, Your Honor, that Cleveland got thrown out

8    for document deficiency.  But the other counties both missed

9    the nine-month deadline.

10        Mr. Farrell, on January 23rd, 2019, in a discovery

11    teleconference, told Special Master Cohen, our discovery

12    Special Master, that document production here in Cabell and

13    Huntington would be more laborious than Track 1 counties,

14    because Huntington and Cabell are not digitized and

15    automated in terms of the retrieval of information like

16    Cuyahoga and Summit were.

17        Now, I do think --

18            THE COURT:  Well, that's Mr. Farrell's problem,

19    isn't it?

20            MS. MAINIGI:  It is Mr. Farrell's problem, but

21    what we are trying to do, Your Honor, is to be realistic

22    about what happened before.  It is Mr. Farrell's problem.

23    We don't think in any universe Mr. Farrell can actually

24    produce the documents that we are entitled to from the

25    jurisdictions in 30 days.  If he can, then we'll stand

STATUS CONFERENCE

 1    corrected, but we do not think that could possibly be the

 2    case.

 3             THE COURT:  Well, he says he can.  Shouldn't I

 4    give him an opportunity to raise his credibility with the

 5    Court by doing it?

 6             MR. FARRELL:  That was January 23, 2019.  Since

 7    that time, the Commissioner Kelli Sobonya has thrown my

 8    staff out of the county commission building almost on a

 9    weekly basis as we've photocopied, digitized, and gathered

10    every single document in possession of the county

11    commission.  So not only am I prepared to say in 30 days, it

12    could be I could certify it by the end of the week that the

13    documents in our possession have been turned over.

14         Now, to be clear, that doesn't mean those are all the

15    documents that defendants will need.  But from the purpose

16    of the county commission, standing here -- sitting here, and

17    what documents they have, I'm pretty comfortable we can

18    disclose everything.  The city is here as well.  The mayor

19    is here.  He's had people in his office for the past six

20    months, anticipating this day, hoping this day would come.

21    I would say that by the end of the week, they could give you

22    an idea as to whether or not the documents we have have been

23    produced.

24         So, like I said, if this is a document production

25    issue, I can take care of that.

STATUS CONFERENCE

1          What this really is is a delay of justice.

2               MR. NICHOLAS:  Your Honor, just to -- I mean, as

3     of today, the plaintiffs have not agreed on custodians; they

4     haven't agreed on search terms.  And that is the very

5     beginning of the discovery process.  We are not -- we are

6     not looking for delay for the sake of delay.  We are just

7     trying to protect ourselves and make sure that we have the

8     opportunity to obtain the documents that we need to defend

9     ourselves.  But until literally this moment, they have

10    not -- they have not agreed even on which custodians they'll

11    agree to, much less the search terms that apply to those

12    custodians.

13         So to hear the concept that they are going to have all

14    of that done in 30 days, is just -- I mean, that's -- that's

15    very, very tough to think is really possible in any world.

16              MS. KEARSE:  Your Honor, Anne Kearse with the City

17    of Huntington.  And I had the pleasure of actually doing a

18    lot of defense's discovery in Summit and Cuyahoga County.  A

19    lot was learned.  We go a lot faster and we got ahead of the

20    game.  But the search terms -- the search terms have been

21    agreed to.  We also have exchanged custodial documents, and

22    custodians that were asked for were people that were either

23    not under our control.  We have a meet-and-confer on

24    Wednesday and we hope to finalize those.  So we are very,

25    very close to custodians.  Search terms are already agreed

1   to.

2           MR. MAJESTRO:  Your Honor, I think before we get

3   much further on this, this whole idea of some of these legal

4   issues, you know, I think we probably are going to need to

5   brief the -- the binding nature, whether or not Judge

6   Polster's orders are binding.  I would suggest to Your Honor

7   that they are very well reasoned orders, and that even if

8   you aren't bound, which we believe you are, that you would

9   come to the same conclusion and could get there very quickly

10  just by reading them.

11          The second point I want to make is important and on

12  this whole idea of nonparty fault.  You know, one of the

13  things I do when I'm not practicing law is I spend a little

14  time at the legislature.  And I was there in 2015 when that

15  statute was passed.  And one of the things I made sure it

16  had was a retroactivity provision.  And that statute

17  specifically says that it applies to causes of actions

18  accruing on or after the effective date.

19          And so the causes of action we are here on today

20  accrued well before 2015 when that statute went into effect.

21          We believe the 2005 Act applies, which does not allow

22  them to create that mess that they are trying to create with

23  respect to joint and several liability.  They are joint and

24  severally liable, and we believe that -- that all of this

25  other stuff is just another excuse to try to drag this out

1    and overly complicate what is really a simple case.

2              THE COURT:  Well, is that an issue as to which act

3    applies which I'm going to have to decide?

4              MR. LYNCH:  I think that is an issue for Your

5    Honor.  Actually, Mr. Wakefield might address the local

6    statute.

7              MR. WAKEFIELD:  Your Honor, I think it is an issue

8    that is going to have to be addressed.  I mean, there have

9    been a couple different issues that have been raised, for

10   example, Mass Litigation Panel, as to preliminary issues

11   that have to be addressed before the case proceeds; the

12   statute of limitations is an issue, standing on public

13   nuisance claims.  We believe that those issues should be

14   addressed preliminarily by the Court.

15             MR. MAJESTRO:  And again, Your Honor, I think -- I

16   have two points on those, on addressing those issues.  You

17   know, I -- the first time I was before you in a long time is

18   when I argued the motions -- against the motions to dismiss.

19   We went back to federal court.  Judge Polster set this case,

20   Cabell County, as a motion case.  We filed an amended

21   complaint and re-briefed it all.  Those motions were pending

22   before Judge Polster.  When he said, okay, I'm going to rule

23   on those now; they withdrew them.  And so they were so

24   important that they withdraw them.

25             And so Judge Polster said in his order that the

1    transfer court could deal with those issues on summary

2    judgment.  And we believe that is the correct way to handle

3    all of these legal issues.

4        But when you get to them, what you are going to find is

5    that in the past two or three years we've been litigating

6    this case, judges all over the country have been resolving

7    these same issues.  This whole idea of a public right.

8    Fourteen different state courts and federal courts have

9    ruled they are wrong.  The West Virginia courts have twice

10   ruled they are wrong.  The West Virginia Supreme Court has

11   twice, last -- most recently, last spring unanimously

12   decided to grant extraordinary rule on this decision.

13       The other legal issues out there, they are going to

14   re-file all their hundreds and thousands of pages of

15   motions, just like they did in Cleveland.  But we have

16   gotten to the point where we can brief them quickly, and,

17   and if there aren't rulings that you are bound by, there is

18   plenty of guidance that will allow you to quickly decide

19   these legal issues.

20       MR. LYNCH:  Your Honor, the issues that were

21   pending on the motions to dismiss, on Rule 12(b) in the

22   multidistrict case, which were withdrawn, we do not intend

23   to re-file in this case.  Not because it's the law in the

24   case, but we don't intend to do that.

25       We think that most of those issues will be resubmitted

STATUS CONFERENCE

1   in the context of a summary judgment motion on the basis of

2   a full record.

3        There are two threshold issues that we think we can

4   move on for judgment quickly without the need for discovery.

5   First would be on the res judicata defense that we have.

6   Each of the defendants here has a settlement with the state

7   of -- with the State of West Virginia.  And we claim that

8   that settlement is res judicata on the political

9   subdivisions of West Virginia.  We can file a motion for

10  summary judgment on that and it won't require any discovery

11  and we can get that out of the way.

12       We also think we need to file an early motion on the

13  question of the municipality's and county's standing to

14  bring these nuisance cases.

15       Then there is the statute of limitations.  We think

16  there is a very robust record on statute of limitations, but

17  that that record will only get better as we take discovery.

18  So we will probably hold off on statute of limitations.

19       So that's our plan for motions.  Two quick ones.  Other

20  ones wait for summary judgment motions on a full record.

21            MR. MAJESTRO:  Your Honor, I point out that all of

22  those motions were the subject of the motions to dismiss

23  that were withdrawn, including the res judicata motion.

24       I'll also point out that motion was also rejected by

25  the state courts in West Virginia.  And afterwards, the

1    Attorney General himself, his deputy, who is in charge of

2    this case, has publically taken the position they don't have

3    the authority nor did they try to resolve the city's and

4    county's cases.

5        And in terms of discovery on that, if they are going to

6    continue to raise that argument, they need to produce to us

7    the negotiating history of those settlement agreements.

8    They've refused to do it so far.  What little documents we

9    have on that subject show that they asked for those exact

10   releases that they say they got and the Attorney General

11   turned them down.

12       So as a factual matter -- as a legal matter, they are

13   wrong.  As a factual matter, they are wrong.  Again, it

14   is -- these are -- these are issues -- they are, again, they

15   are issues, legal issues that need to be resolved.  We

16   probably would have had a resolution of this issue had they

17   not withdrawn that motion from Judge Polster.  We are

18   willing to brief that argument.  We'd like you to tell them

19   they've got to give us all of the negotiating history

20   between them and the Attorney General's Office.

21           MR. LYNCH:  In fact, there was only one motion

22   before Judge Polster on res judicata and that had been filed

23   by Cardinal.  McKesson and ABDC had not yet filed a motion

24   on that issue.

25       It sounds like -- and each settlement is different in

STATUS CONFERENCE

 1    some particulars.  Now, it sounds like Mr. Majestro is

 2    saying that what I thought was going to be a simple motion

 3    for summary judgment is going to involve some discovery.

 4              MR. MAJESTRO:  We'd like the documents.  That's

 5    all we need.  That doesn't overly complicate things.

 6              MS. MAINIGI:  Your Honor, if I just may add, on

 7    the threshold motions issue, I think you've heard some

 8    discussion on the res judicata.

 9         On the issue of standing, I think that is a very live

10    issue in West Virginia right now.  Our position is

11    plaintiffs have standing to pursue a public nuisance claim

12    if, and only if, they enacted an ordinance of general

13    applicability that defines the nuisance.  Cabell County did

14    that in January 2017.  Our view is they cannot recover for

15    conduct before that date that allegedly created the

16    nuisance.

17         And plaintiffs stood here and told the Court in 2017 at

18    the motion to dismiss hearing that distributors were doing

19    everything right as of that date.  So we really do have a

20    disconnect here, Your Honor, between the public nuisance

21    statute and what it requires and what the plaintiffs have

22    actually -- what the plaintiffs actually have in support.

23    And I do think that is a critical issue that Your Honor

24    needs to rule upon before discovery goes full bore.

25              THE COURT:  Well, you agree with that, don't you,

STATUS CONFERENCE

1    Mr. Majestro?

2            MR. MAJESTRO:  No, Your Honor.  And, again, this

3    standing argument was one of the arguments they raised

4    before you the first time we were here.  We can brief while

5    -- we can walk them through this at the same time --

6            THE COURT:  I was asking you, do you agree it's an

7    issue that needs to be resolved right away?

8            MR. MAJESTRO:  It's -- I don't know if I

9    necessarily agree -- if right away means we should stop and

10   wait for it to be resolved; no, I don't agree.  This is a --

11   this issue, I mean, they raised this -- these issues in

12   state court, and lost those issues.  And, I mean, these

13   are -- they have the right to raise legal issues.  In the

14   end, these are simple issues.  You can resolve them at the

15   same time we are doing whatever discovery we need to do,

16   whatever, at the same time we are going to prepare for

17   trial.

18       And one of the lessons of this MDL is, if you look at

19   all of those numbers of all of the amounts of work that were

20   done in the short period of time it was done, I have never

21   been involved in a case where the parties have shown their

22   ability to accomplish vast amounts of legal work in -- in

23   times that in my other practice it would have been unheard

24   of.  We can get this stuff done.  We can get you these legal

25   issues presented to you in a format you can rule on.  That's

```
 1    what happened in the MDL.  We did all the expert depositions

 2    in a month, more or less.  I mean, those sorts of things,

 3    there are enough bodies in this case to get it done.

 4              MR. NICHOLAS:  Your Honor, just by way of

 5    clarifying the record.  From memory, I can think of at least

 6    two states -- just so we don't sweep all the states under

 7    the same umbrella the way our motions to dismiss this

 8    litigation were granted -- one in Connecticut and one in

 9    North Dakota on standing or private right of action type of

10    issues.

11       I just don't want the record to sound as if no state

12    has done that, because, in fact, at least two -- those are

13    the two at least coming to mind -- have.  And Louisiana and

14    Delaware.

15              (Pause.)

16              THE COURT:  Mr. Ruby, you want to say something?

17              MR. RUBY:  Your Honor, just one point that the

18    Court should be aware of, and to expand on Ms. Mainigi's

19    point that it's a live issue, the issue of standing in West

20    Virginia.  The Mass Litigation Panel, where there is a whole

21    other set, as the Court knows, of state court cases that are

22    pending here in West Virginia, in the last status conference

23    there, Judge Moats, who, of course, is very familiar with

24    the way that West Virginia -- these West Virginia statutes,

25    in particular, interact with complex mass litigation,
```

STATUS CONFERENCE

1    because the Mass Litigation Panel handles those all the

2    time; he sua sponte raised the issue of standing and whether

3    there is a viable claim at all of public nuisance given the

4    way that these nuisance claims were raised and the

5    applicable West Virginia law.

6         So the parties have briefed -- or the plaintiffs in

7    those cases have briefed that, and they are -- there will be

8    a response from the defendants.  But Judge Moats and the

9    panel there thought that that issue of West Virginia law was

10   sufficiently unsettled and sufficiently important that the

11   panel declined to even enter a Case Management Order until

12   the parties could brief that and the panel could make a

13   decision on it.  And the same is true, incidentally, of the

14   question of statute of limitations.

15        And in the same hearing back in December, the panel

16   again sua sponte raised the issue of statute of limitations;

17   required the parties to submit briefing on that, which will

18   be submitted next week.  And the panel took the same

19   position, that those issues are, number one, sufficiently

20   unsettled, and number two, sufficiently important that it

21   would be premature to even enter a Case Management Order

22   before there can be briefing decided.

23             THE COURT:  Okay.  I'm going to take a short

24   break, and we'll be in recess for about five minutes.

25             THE CLERK:  All rise.  This Court stands in

STATUS CONFERENCE

 1    recess.

 2          (A recess was taken from 3:19 p.m. until 3:30 p.m.)

 3          (Proceedings resumed.)

 4          THE CLERK:  All rise.  This Court is in session.

 5    Please be seated and come to order.

 6          THE COURT:  Well, I rarely continue these, but I

 7    think we've done about everything we can do today.  And I'm

 8    a little disappointed we haven't made more progress than we

 9    have.

10          But here's what I propose to do:  We are going to

11    decide the bench trial motion first, because that's going to

12    impact everything else, it seems to me, of what I do here.

13          So I'll receive the cross motions on the bench trial

14    versus the jury trial issue in 10 days.  I don't see any --

15    I haven't heard anything today that should hold up you

16    getting busy with the discovery you need on both sides.

17          The magistrate, I understand, is going to hold a

18    hearing on the pending Motion to Compel right after the

19    conclusion of this hearing.  And he's ready to work with you

20    on discovery and get the discovery moving.

21          So my instruction to you is start that with dispatch on

22    both sides.

23          I would like for you to try to submit a proposed Case

24    Management Order to me within two weeks.  And I realize

25    that's a tall order, but make an effort to do that.  And I'm

STATUS CONFERENCE

1    ready to help you if I can.  But make an effort to submit a

2    Case Management Order in two weeks.

3        I'm going to set another status conference for the

4    first week in March, and we'll see where we are at that

5    point and by then the bench trial versus jury trial issue

6    should be resolved.

7        I intend after that status conference to set a trial

8    date in the case, and it won't be anywhere near the 18

9    months the defendants want.  I'm going to set the case for

10   trial and work backward from that date based on what it

11   appears to me to be a reasonable date.  And I'll look at the

12   status when we have the other conference in March.

13       I think that's about all we can get done today.

14       Does anybody have any problem with that?

15           MR. FARRELL:  Judge, can we have one second to

16   confer?

17           THE COURT:  Yes.

18           MS. MAINIGI:  Your Honor, from the defendants,

19   that's fine with us.

20       (An off-the-record discussion was held between

21   plaintiffs' counsel.)

22       (Pause.)

23           MR. FARRELL:  Judge?

24           THE COURT:  Yes.

25           MR. FARRELL:  What we would ask is that you also

STATUS CONFERENCE

```
 1    allow for us to brief in the absence of punitive damages

 2    whether or not the bench has the ability under Rule 39 to

 3    make a ruling that this is a nonjury trial.

 4              THE COURT:  Well, isn't that encompassed in the

 5    brief you're going to file in 10 days?

 6              MR. FARRELL:  Yes.

 7              MS. MAINIGI:  Yes, Your Honor.

 8              THE COURT:  Yes.

 9              MR. FARRELL:  I'm just trying to narrowly identify

10    that, in the absence of a bench trial -- if this is a jury

11    trial, we have a punitive damage claim.  The question then

12    we are briefing is whether or not, in the absence of a

13    punitive damage claim, whether the bench has the authority

14    to rule this is a -- under your discretion is a bench trial.

15              THE COURT:  Well, that's an issue that you are

16    going to address, isn't it --

17              MS. MAINIGI:  Correct, Your Honor.

18              MR. FARRELL:  Yes.

19              THE COURT:  Okay -- in the briefs I'm going to get

20    in 10 days?

21              MR. FARRELL:  Yes, sir.

22              MS. MAINIGI:  Yes, Your Honor.

23              THE COURT:  All right, anything else?

24         (No response.)

25              THE COURT:  Okay.
```

STATUS CONFERENCE

1              THE CLERK:  All rise.

2              THE COURT:  I look forward to seeing your work.

3              THE CLERK:  This Court stands in recess.

4          (Proceedings concluded at 3:34 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3        I, Catherine Schutte-Stant, Federal Official Realtime

 4   Court Reporter, in and for the United States District Court

 5   for the Southern District of West Virginia, do hereby

 6   certify that, pursuant to Section 753, Title 28, United

 7   States Code, the foregoing is a true and correct transcript

 8   of the stenographically reported proceedings held in the

 9   above-entitled matter and that the transcript page format is

10   in conformance with the regulations of the Judicial

11   Conference of the United States.

12

13          s/Catherine Schutte-Stant, RDR, CRR

14          _____  January 29, 2020

15          Catherine Schutte-Stant, RDR, CRR
            Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```