## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CITY OF HUNTINGTON,
     Plaintiff,
v.
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
     Defendants.

CIVIL ACTION NO. 3:17-01362

_____

CABELL COUNTY COMMISSION,
     Plaintiff,
v.
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
     Defendants.

*Consolidated case:*
CIVIL ACTION NO. 3:17-01665

## PLAINTIFFS CITY OF HUNTINGTON AND CABELL COUNTY COMMISSION'S MOTION TO COMPEL

COME NOW Plaintiffs, CITY OF HUNTINGTON and CABELL COUNTY COMMISSION, and submit this Motion to Compel Discovery against Defendants AmerisourceBergen Drug Corporation ("ABC") and Cardinal Health, Inc. ("CAH") (collectively referred to as "Distributor Defendants") pursuant to Rule 37 of the Federal Rules of Civil Procedure. See also *Handy v. State Farm Mut. Auto. Ins. Co.*, No. 5:15-CV-01950, 2016 WL 146530 (S.D.W. Va. Jan. 12, 2016).

1.     Plaintiffs served *Plaintiffs' First Combined Discovery Requests to Distributors* served on October 22, 2019. The discovery encompassed eleven (11) combined discovery requests essential to this case. (Exhibit A).

2.     Each of the Distributor Defendants provided evasive and/or incomplete responses. (Exhibit B: ABC); (Exhibit C: CAH) (Exhibit D: MCK).[1]

---

[1] Counsel for Plaintiffs and counsel for McKesson recently conducted a meet and confer on deficiencies Plaintiffs contend exist as to McKesson's Responses to Plaintiffs' Combined Discovery Request Nos. 2,

3.     The movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

4.     As an initial matter, each of the discovery responses begins with a preamble of **boilerplate objections** including objections related to **relevance** and Distributor Defendants' assertion that Plaintiffs' requests are **unduly burdensome**.  It is inconceivable that any of these discovery requests are objectionable on the grounds of relevance.  The discovery requests all relate to a subject matter we have litigated for the past two years during which time the parties' discovery work has generated discovery rulings, expert witness reports, *Daubert* rulings and summary judgment orders.  Distributor Defendants' undue burden objection is also not well taken.  We read this to mean "we have relevant information but refuse to disclose because it is too hard."  Plaintiffs ask the Court to strike the boilerplate objections and compel the Distributor Defendants to assert good faith objections to be resolved rather than preserved.

5.     Each of the eleven (11) discovery responses is addressed in turn:

<u>**Combined Request No. 1:**</u> **Please produce all transactional data related to the distribution of prescription opioids arising out of CT2 from January 1, 1996, to the present.**

CAH and MCK have disclosed transactional data, to the extent such exists, for the tri-state area of West Virginia, Ohio and Kentucky.  ABC has yet to fully comply.  Plaintiffs request an order be entered compelling full disclosure of all transactional data no later than March 15, 2020.

<u>**Combined Request No. 2:**</u> **Please identify in chronological order the title of each Suspicious Order Monitoring System (SOMS) policy in force from January 1, 1996, to the present and produce a copy of the same.  After each entry, please identify the Bates range which corresponds to each policy to enable a jury to correlate each policy in your written answer to each document produced.**

---

3, 4, 5, 7, 9, 10, and 11.  Agreement was reached such that McKesson will supplement its responses to the aforementioned requests to address the noted deficiencies beginning next week.

None of the Distributor Defendants have fully complied or certified completion of production.  ABDC referred Plaintiffs to a list of hundreds of documents identified with Bates numbers and Cardinal identified a similar list that includes a Bates range of over 1.2 million pages of documents.[2]

This issue has been problematic for the past two years.  Federal law requires each Distributor Defendant to "design and operate a system to disclose to the registrant suspicious orders of controlled substances."  28 CFR 1301.74(b) [1971].[3]  Plaintiffs have doggedly pursued the Distributor Defendants to create a clear and concise record of its SOMS policy chronology and evolution. In fact, ABC agreed to identify a timeline of its suspicious order monitoring policies and procedures by defining them in sequence. Plaintiffs ask for an order compelling each Distributor Defendant to fully respond to this discovery request, identifying by Bates number which policies were in place and at what time since 1996.

> **Combined Request No. 3**:  **Please identify each suspicious order you reported to any regulatory body, including the DEA and/or the West Virginia Board of Pharmacy, arising out of CT2 and produce all documents related thereto. After each entry, please identify the Bates range which corresponds to each suspicious order to enable a jury to correlate each suspicious order in your written answer to each document produced.**

None of the Distributor Defendants have fully complied or certified completion.  Cardinal has produced a single spreadsheet with information related to orders by its customers in Huntington/Cabell County (CAH_MDL2804_03468434), which are orders placed mostly from

---

[2] On January 27, 2020 an informal discussion was held with Judge Aboulhoson and while Cardinal indicated then that it could not specify the applicable timeframe for each SOMS policy it has failed to provide a verified answer to this discovery request admitting that they do not know when certain SOMS policies were in place.  Cardinal should be made to admit in a verified response that it cannot determine when its SOMS were in place or provide the chronology requested.

[3] See also Opinion and Order Regarding Plaintiffs' Summary Judgment Motions Addressing the Controlled Substances Act, *In re: National Prescription Opiate Litigation*, MDL2804 (Case: 1:17-md-02804-DAP) (Doc #: 2483) (Filed:  08/19/19);

2012 through 2017. ABDC has produced a collection of spreadsheets (ABDCMDL01911435-01911482) that reflect information related to suspicious orders placed by West Virginia customers. However, none of the Defendants have certified that they have completely produced and identified all suspicious order data responsive to this request.

Federal law requires each Distributor Defendant to "inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." 28 CFR 1301.74(b) [1971]. Each of the Distributor Defendants have taken a slightly different position regarding (a) the timing of when an order becomes "suspicious" and (b) the format of each reported order. The standard response is to reference broad ranges of documents and/or unwieldy spreadsheets filled with lines of data. Plaintiffs' request was drafted to elicit a concise and direct response from each Distributor Defendant that identifies each of the orders arising from pharmacies in Huntington/Cabell County that were reported as suspicious along with the Bates reference identifying that order, and the due diligence that accompanied it. Given the finite number of reported suspicious orders, this task should be simple. Plaintiffs respectfully request an order compelling each Defendant to immediately produce and identify by Bates number all suspicious orders responsive to this request or certify that they have already produced the information, identifying all relevant Bates numbers.

> **Combined Request No. 4: Please produce the due diligence file for each of your customers in CT2. Please identify the Bates range which corresponds to each due diligence file to enable a jury to correlate each due diligence file to each of your customers.**

None of the Distributor Defendants have fully complied or certified completion. Federal law requires each Distributor Defendant to block all suspicious orders until its conducts "due diligence" necessary to determine whether an order is likely to be diverted into illegal channels. See fn.1 at p. 15. This is the law of the case. Distributor Defendants have denied this legal duty

exists for more than 15 years in administrative proceedings and courts across the country.  But Judge Polster has clearly ruled against them, and in favor of a clear and consistent interpretation of the law.  Now Distributor Defendants must produce the due diligence file for each order that they identified as potentially suspicious, that they eventually shipped.  The standard response to this discovery request is to amorphously reference a broad range of documents.  We ask that an order be entered which compels each Distributor Defendant to identify the Bates range(s) for each due diligence file for each pharmacy it serviced in Huntington/Cabell County so that Plaintiffs may evaluate the due diligence files related to each Distributor Defendants' customers, and the orders they shipped to those customers.

> **Combined Request No. 5**:  **Please identify each sales representative(s) responsible for the CT2 territory and produce the custodial file for each. Please identify the Bates range which corresponds to each custodial file to enable a jury to correlate each name in your written answer to each custodial file produced.**

Each of the Distributor Defendants have provided the names of sales representatives responsible for the Huntington/Cabell County sales territory.  None have provided the custodial files for those witnesses.  Plaintiffs recently finalized negotiation of search terms to be applied against ABC's relevant custodians, including the relevant sales representatives and ABC has agreed to begin collecting, reviewing and producing documents. We ask that an order be entered which compels each Distributor Defendant to disclose the custodial file of each sales representative along with a reference to correlating Bates stamp ranges to perfect the record and ensure completeness.

> **Combined Request No. 6**:  **Please produce all documents in your possession, custody and/or control related to Safescript Pharmacy #6 (DEA# BS8246349) formerly located at 335 Fourth Avenue in Huntington, Cabell County, West Virginia.**

Cardinal Health and McKesson respond that no such documents exist.  ABC objects to this discovery request on the following grounds:

> ABDC incorporates herein by reference its General Objections, and limits its response to the time period established by Discovery Ruling Nos. 2 and 3. ABDC further objects to this Combined Request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of information or documents relevant to any claim or defense in this action to the extent that it is not limited to ABDC's distribution of Opioids to Cabell County or the City of Huntington.  Subject to and without waiving its objections, ABDC will conduct a reasonable search and produce non-privileged documents responsive to this Combined Request.

ABC has yet to fully comply with this discovery request.  The DEA's ARCOS database (2006-2014) indicates that ABDC sold 1.2 million hydrocodone pills (totaling 6.6 million MMEs) and 2.6 million oxycodone pills (totaling a staggering 91 million MMEs) before getting shut down by the DEA in February 2012.  It is inconceivable this discovery request is *overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of information or documents relevant to any claim or defense in this action*.  Plaintiffs request that the Court enter an order compelling full compliance with this discovery request.  Further, Plaintiffs request that the Court order ABC to identify any alleged privileged documents in a privilege log so that they may be reviewed by the Court during an expedited *in camera* hearing.   Production of all documents referencing this pharmacy is a priority.

**<u>Combined Request No. 10</u>: Please produce all documents related to internal investigations referencing the distribution of prescription opioids in West Virginia.**

ABDC objected to this discovery request as *overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of information or documents relevant to any claim or defense*.  Cardinal Health has stated that it has already produced responsive documents, somewhere in the 1.4 million documents already produced, but only identified one such document by Bates number.   By way of further explanation, McKesson (Fortune rank #7), ABC (Fortune

6

Case 3:17-cv-01362   Document 169   Filed 02/21/20   Page 7 of 18 PageID #: 1511

rank #10) and Cardinal Health (Fortune rank #16) were sued by the WVAG in 2012, sued by WV counties in 2017 and subjected to a Congressional hearing for its WV conduct in 2018.  Against this background, Plaintiffs are entitled to know whether the Distributor Defendants conducted any internal investigation regarding distribution practices within West Virginia.  If not, the answer should be "none."  We ask that an order be entered which compels each Distributor Defendant to clearly and concisely answer this request. We further request that if the Distributor Defendants have indeed already produced responsive documents that they be required to identify to Plaintiffs the Bates number for each document.

> **Combined Request No. 11: Please produce all presentations, including PowerPoints or slide decks, referencing the distribution of prescription opioids in West Virginia.**

Cardinal Health has agreed to conduct a reasonable search in the files of agreed-upon custodians as well as relevant noncustodial sources. Cardinal identified two previously produced documents responsive to this request but has neither provided a date certain by which its search for additional documents will be complete nor certified that the two documents already identified are the only responsive documents within their prior production that is responsive. ABC referenced fourteen (14) documents previously produced; none of which pertain to West Virginia.  These responses are not sufficient.  For instance, it is inconceivable that ABC's response would omit this PowerPoint presentation:

ABDCMDL00269301.  Or this memo which was found buried in ABC's production of some

385,000 documents in CT1:

# memorandum



| | |
|---|---|
| To: | John Parker |
| From: | GMMB |
| Date: | June 19, 2015 |
| RE: | Strategy to Turn the Tide in West Virginia |

Below is a revised strategy for HDMA and its members to turn the tide of imbalanced media coverage and public perception about healthcare distributors' role in painkiller abuse in West Virginia and beyond.

**The Situation**
During the past three years, a state lawsuit against healthcare distributors has put the blame of painkiller abuse squarely on the shoulders of healthcare distributors. It asserts that these companies flooded the state with more than 200 million painkillers over a four- to five-year period which, in turn, fueled the rampant prescription drug abuse problem in the state. Yet, the reality is a far cry from the imbalanced picture painted by reporters, particularly Eric Eyre of The Charleston Gazette.

Healthcare distributors provide a much needed service and fulfill the needs of licensed pharmacies and doctors who provide care for their patients. There are multiple parties responsible for drug diversion and painkiller abuse—pill mills, unsuspecting pharmacists and doctors who comply with patient requests, pharmaceutical companies that heavily market the drugs and the abusers themselves. The state asserts that the distributors should have known that they were sending too many pills into the market. Yet the only party that had the aggregate view of the problem was the DEA. Distributors, like all business competitors, do not share sales data with their competitors.

The fact is that 200 million pills over a four-year period is a significant problem. The story is made worse given the following:
- The distributors do not want to make their sales data public, while Sen. Manchin makes a very public appeal to get this data.
- Attorney General Morrissey has ties to HDMA and has been accused of ignoring this lawsuit and having a conflict of interest in the case.
- Past and future settlements with the U.S. Department of Justice continue to make news.
- While patient access issues can help support the need for distributors, they can also turn against distributors, as these companies must self-monitor and restrict the supply of medicines to protect their ability to continue serving the needs of doctors, pharmacists and their patients.

While the current situation positions HDMA and its members in a negative light, there are several steps you can take to turn the tide. But if action is not taken by HDMA and its members, you risk:
- The credibility and reputation of the industry,
- More litigation across the country,
- Patient access to much needed medicines,
- Possible disruption to the passage of  Senate Bill 483[i] (S. 483) that could make a difference in the problem,
- Additional state or federal regulation that could negatively impact HDMA member companies,
- Potential business and financial losses,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   ABDCMDL00269293

We are deeply concerned that third-party discovery revealed the trade group, Healthcare Distribution Alliance ("HDA"), convened numerous meetings which were attended and chaired by the Distributor Defendants regarding the opioid crisis.  Yet, none of the powerpoints, presentations, slide decks, memoranda or internal communications produced by the Distributor Defendants reflect these conversations.  For instance, the following is a summary of some of the documents Plaintiffs have mined:

On February 16, 2012, the HDA Executive Committee met at The Lodge of Pebble Beach in Pebble Beach, California (HDA_MDL_000020020) wherein the decision was made to retain outside counsel to draft an amicus brief in the *Cardinal Health v. Eric Holder* litigation.  This litigation arises out of the first DEA administrative proceeding against the Big3 which recommended Cardinal Health's license be revoked.  The litigation was eventually settled with Cardinal Health paying an enormous fine.

On April 6, 2012, an HDA Executive Committee Conference call was conducted to "address recent activity with respect to suspicious order monitoring and the role of healthcare distributors. HDMA has testified before Congress and prepared an *amicus curiae* brief for filing with the federal Court of Appeals in the Cardinal v. Holder litigation."  Chairman Moody (Mutual Wholesale Drug Company) and Vice Chairman Neu (ABDC) "expressed concern about the trend of recent developments" and thought it time for the Executive Committee to review recent events and "***plot a course for going forward***." HDA_MDL_000020027 (emphasis added).

On June 10, 2012, the HDMA Executive Committee met at JW Marriott San Antonio Hill Country in San Antonio, Texas (HDA_MDL_000020030) wherein HDMA confirmed it "filed an amicus curiae brief in support of Cardinal Health's position before the Federal Court of Appeals for the District of Colombia Circuit. Cardinal subsequently reached a settlement with DEA and withdrew its appeal. The DEA administrative proceeding was terminated; Cardinal Health agreed to a two-year suspension of its Lakeland facility registration and some enhanced regulatory oversight by DEA."  Mr. Mike Kaufmann (Pharmaceutical Segment, Cardinal Health, Inc,) thanked the Executive Committee members and HDMA for its support during its litigation with DEA.

On September 30, 2012, the HDMA Executive Committee met at The Ritz Carlton Palm Beach in Manalapan, Florida (HDA_MDL_000020036) wherein the recently filed "West Virginia Lawsuit" was discussed.  West Virginia Attorney General Darrell McGraw filed suit against 14 out-of-state drug distributors alleging violations of the State Controlled Substances Act and Consumer Credit and Protection Act for their roles in allegedly supplying controlled substances to state "pill mills." Mr. John Parker (HDMA Vice President, Communications) presented an update on the current state of play regarding how wholesalers are being portrayed in the media and their implications for HDMA members. The GPPC has recommended a strategy of education, advocacy and collaboration. The goal is to find a public relations firm to help execute the strategy. Proposals

from APCO and GMMB will be made to the Board on October 1, 2012. Discussion ensued regarding the scope of a PR program and the possibility of handling some of this work with staff and member assets. No decisions or recommendations were made. PR firm proposals will be considered by the full Board and the Executive Committee and staff will put together a plan including HDMA staff, member, and third-party assets.

Shortly thereafter, the HDMA "approved the selection of APCO Worldwide to partner with HDMA and its member companies on the development of a communications strategy to address the issue of prescription drug abuse and diversion." HDMA_MDL_000217059_R.

On November 16, 2012, an Executive Committee Conference call was conducted (HDA_MDL_000020042) wherein President Gray drew the Executive Board's attention to the November 16, 2012 edition of the WALL STREET JOURNAL, which had a story about DEA bringing actions against FedEx and UPS with respect to controlled substances. He noted that ***DEA's efforts have broadened the initiative and created potential allies for HDMA and its members***. Mr. John Parker (HDMA Vice President, Communications) discussed the Phase I proposal of APCO's COMMUNICATIONS INITIATIVE ON PRESCRIPTION DRUG ABUSE AND DIVERSION including a strategic communications effort to address prescription drug abuse and diversion with a focus on the contributions made by distributors. APCO proposed qualitative and quantitative research designed to arm HDMA with the appropriate resources to identify threats, mitigate risks, educate primary stakeholders and build the foundation for a leadership platform. The research phase would last approximately three months with findings to be shared with the Executive Committee at its next meeting on February 22, 2013.

On December 14, 2012, an Executive Committee Conference call was conducted (HDA_MDL_000020046) to address interest in and need for HDMA participation in established or ad hoc organizations designed to expand and deepen the voice of pharmacy stakeholders in public policy debates.

On February 22, 2013, the HDMA Executive Committee met at The Four Seasons Hotel in Washington, D.C., (HDA_MDL_000020049) wherein the "State of West Virginia Lawsuit" was



discussed. "Former West Virginia Attorney General Darrell McGraw sued 14 out-of-state drug distributors alleging violations of the state Controlled Substances Act and Consumer Credit and Protection Act for their roles in allegedly supplying controlled substances to state "pill mills." With Mr. McGraw's recent defeat in the election of Republican opponent Patrick Morrisey, it is unclear whether or on what schedule these lawsuits will proceed. Mr. Moody reported that recently district attorneys in counties in West Virginia have brought or threatened similar lawsuits on a local basis. Staff was asked to gather additional information about these actions and circulate it to members." Mr. John Parker (HDMA Vice President, Communications) provided a brief background on Phase 1 of the public relations

project and the selection of APCO to be the public relations partner. Mr. Michael Tuffin (Managing Director, Washington, DC, APCO Worldwide) introduced the work to date, which involved mostly research of opinion leaders and views of thought leaders about the problem of controlled substance diversion and abuse and the roles played by doctors, clinics, distributors, manufacturers and government. HDA_MDL_000031703. APCO conducted a series of focus groups and interviews, looking at who opinion leaders blame for drug abuse and diversion and possible solutions. Importantly, the focus group revealed that "***Without access to data, respondents question how distributors can be held responsible***." HDA_MDL_000031775. The Executive Committee voted to approve the continuation of the project - complete Phase I and initiate a Phase II that builds on the stakeholder research findings and key messages. HDA_MDL_000217059_R

On April 25, 2013, the HDMA distributed its *Crisis Playbook: An Interactive Guide to Crisis Communications* (HDA_MDL_000072090) to the Executive Committee and Board of



Directors (including Cardinal Health, McKesson and AmerisourceBergen). HDA_MDL_000217059_R. The 44-page playbook identified the objective of providing clear guidelines for classifying crisis situations, defining roles and responsibilities in a crisis situation, creating an easy-to-use, step-by-step crisis response protocol and having ready-to-use materials on hand for risk situations. The playbook set forth several "Diversion Issues Scenarios" including instructions on how to respond to a DEA registration suspension. In what would prove to be a prophetic reflection of a future propaganda campaign, the playbook rhetorically asks: "***Does this present an opportunity for HDMA to proactively push its message of misdirected DEA enforcement with national media?***" Similar playbook protocols are set forth for diversion lawsuits and a Congressional inquiry. The playbook was approved and authorized by the HDMA Executive Committee which included senior management from Cardinal Health, McKesson and AmerisourceBergen.

On June 2, 2013, the HDMA Executive Committee and Board of Directors met at J.W. Marriott Orlando, Grande Lakes Orlando, FL (HDA_MDL_000020057) wherein APCO presented *HDMA-APCO Stakeholders Research and External Positioning Project*. HDA_MDL_000031691. The study concluded that primary distributors rank very low on the "who's to blame" list for prescription drug diversion and misuse.

On September 29, 2013, the HDMA Executive Committee and Board of Directors met at The Greenbrier in White Sulphur Springs, West Virginia. HDA_MDL_000020063. Mr. Patrick Kelly (HDMA Senior Vice President, Government Affairs) provided an update on legislation being developed in the House by Representatives Tom Marino (R-PA) and Marsha Blackburn (R-TN) which addresses/advances HDMA interests. The legislation would define "imminent danger" and allow a corrective action plan as an intermediate step before a DEA license suspension is considered. HDMA members continue to have difficulty with DEA inspections/audits due, in large

part, to not knowing what is required of the distributor to address "suspicious orders." HDA_MDL_000019851.   In addition, DEA has been referring to the industry compliance guidelines on suspicious orders in certain legal documents, resulting in the implication that it is "an industry standard." Since these guidelines were never intended to constitute a "standard," they have been taken down from the HDMA website. HDA_MDL_000019851.

On February 27, 2014, the HDMA Executive Committee met at The Ritz-Carlton Tysons Corner in McLean, VA, just outside Washington D.C. HDA_MDL_000020063.   The primary purpose of the meeting was the discussion of H.R. 4069, sponsored by Representatives Marino (R-PA) and Blackbum (R-TN) which was introduced as "Ensuring Patient Access and Effective Drug Enforcement Act of 2014." The legislation is designed to clarify existing authorities under the Controlled Substances Act by requiring greater transparency of the enforcement process and developing a forum to bring supply chain stakeholders, law enforcement, patient groups, providers, and regulators together to identify solutions to prescription drug abuse. HDMA is seeking additional sponsors, including interested Democrats in the House and Senate. The legislation addresses distributors' concerns with the lack of clarity in DEA's current enforcement scheme and would put in place the option of a corrective action plan prior to suspension. Such a process is currently available under the Federal Food, Drug, and Cosmetic Act.  Several members highlighted the importance of the legislation and directed staff to identify and engage additional resources to assist. On motion duly made and seconded, the Executive Committee allocated up to $250,000 to be taken from reserves to hire a lobbyist to support H.R. 4069.

On June 1, 2014, the HDMA Executive Committee met at the J.W. Marriott Desert Ridge in Scottsdale, Arizona. HDA_MDL_000020079.   Mr. Kelly provided an overview of HDMA activity regarding drug abuse and diversion, There have been seven Congressional hearings in the past two months focusing on the issue with HDMA President, John Gray, testifying before the House Energy and Commerce Health Subcommittee. HDMA provided support for the Marino/Blackburn legislation. The Marino/Blackbum bill has been reintroduced with two Democratic co-sponsors Representative Welch (D-VT) and Representative Chu (D-CA). Key elements, including provisions regarding corrective action plan and clear definition of tenns, remain in the bill. Provisions requiring drug testing and background checks have been removed. The working group concept has been replaced with a joint report from FDA/CDC on federal efforts to address prescription drug abuse and the potential impact of these efforts on patients and supply chain entities. Congressman Marino has requested a meeting with U.S. Attorney General Eric Holder, which is scheduled for June 9. Representatives from HDMA, NACDS, and the National Community Pharmacists Association (NCP A) will attend. A discussion ensued as to the appropriate representatives from HDMA. The matter will be further discussed with outside counsel, Linden Barber, Esq., who will be accompanying the industry groups.

On September 28, 2014, the HDMA Executive Meeting met at The Montage Laguna Beach in Laguna Beach, California. HDA_MDL_000020084.   Mr. Kelly provided an update on legislative issues. H.R. 4709, the Marino/Blackburn bill, has passed the House. A companion bill, S.B. 2862 is pending in the Senate, and due to time limitations there is a slight chance of consideration and adoption in 2014. The Association continues in its efforts to schedule a meeting with the Assistant Attorney General to discuss drug abuse and diversion matters. Representatives

Blackburn (R-TN) and Marino (R-PA have sent a letter to the Department of Justice seeking an investigation into inflammatory remarks made by DEA Deputy Administrator Rannazzisi. HDMA continues to work cooperatively with the Alliance to Prevent the Abuse of Medicines as well as the Pain Care Forum.

On June 7, 2015, the HDMA Executive Committee met at the JW Marriott San Antonio Hill Country in San Antonio, Texas. HDA_MDL_000020094. Mr. Gray and Mr. John Parker (HDMA Senior Vice President, Communications) provided background on litigation in West Virginia filed in 2012 against 13 distributors, 11 of whom are HDMA members. In essence, the lawsuit alleges that those distributors are improperly supplying controlled substances to West Virginia "pill mills," to the detriment of the state and legitimate patients who need controlled substances. Recent media reports have insinuated that distributors arc responsible for controlled substance problems in West Virginia, including unlawful diversion and increased difficulty in getting controlled substances for legitimate uses. Ms. Janet Goss (GMMB) discussed how HDMA could engage the media to the industry's benefit, including a three-level strategy. Following discussion, there was general agreement that HDMA needs to engage the media. Toward that end, HDMA staff and GMMB will refine Level 1 (taking a strong, visible role in the passage of S. 483; engaging in proactive and reactive media outreach with other stakeholders in West Virginia to offer deep background briefings) and Level 2 (convening a public/private summit to address relevant issues with key stakeholders and reaching out to Sen. Manchin and staff) for further review by legal counsel of affected member companies. There was also genera] agreement that Level 3 {developing an HDMA-led pilot reporting program on drug distribution volume) may not be feasible or desirable.

On February 18, 2016, the HDMA Executive Committee met at The Lodge at Pebble Beach in Pebble Beach, California. HDA_MDL_000020104. HDMA Vice Chairman Jon Giacomin (Cardinal Health, Inc.) chaired the meeting. In attendance was Robert Mauch (President, AmerisourceBergen Drug Corporation) and Mark Walchirk (President, US Pharmaceutical, McKesson Corporation).

The status of the *Masters* litigation as well as a discussion of the draft amicus curiae brief to be possibly filed on behalf of HDMA would be discussed later in the meeting, led by President Gray and HDMA General Counsel Elizabeth Gallenagh.

In January 2016, the West Virginia Attorney General filed suit against McKesson for "failing to identify, detect, report, and help stop the flood of suspicious drug orders." Counsel Frank characterized the series of DEA and state actions as efforts to improperly expand distributors' responsibilities beyond simply reporting suspicious orders to actually preventing the distribution of controlled substances to licensed dispensers. States are bringing these actions for similar reasons but also in an effort to collect monetary damages and penalties. Discussion ensued regarding how distributors can be viewed as part of the "solution" as opposed to being targeted as the "problem." Greater access to ARCOS data and/or legally pem1issible data sharing was briefly discussed. President Gray reported that HDMA will be meeting February 29, 2016, with new DEA Acting Administrator Chuck Rosenberg and Special Agent Louis Milione, Deputy Assistant Administrator for DEA's Office of Diversion Control.

General Counsel Elizabeth Gallenagh drew the Executive Committee's attention to a draft *amicus curiae* brief to be considered in connection with Masters' appeal of the DEA Suspension Order. At its September 27, 2015 meeting, the Executive Committee approved outside counsel preparing a draft brief which raised relevant public policy and legal issues but did not specifically support Masters or criticize DEA. The central theme of the draft brief is that DEA must follow statutory and regulatory requirements regarding the imposition of suspicious order reporting notice-and-comment rulemaking required. The brief also seeks to place the role and capabilities of the distributor in context, noting that distributors neither prescribe, nor dispense controlled substances, and therefore are in no position to adjudicate the legitimacy of an order. Rather, distributors can and do report "suspicious orders" based upon customer order histories. Discussion ensued with all members of the Executive Committee generally supporting filing of the amicus curiae brief. Several members suggested softening the tone and including a statement that HDMA takes no position on the propriety of Masters' actions. Action: On motion duly made and seconded, the Executive Committee unanimously approved filing of an amicus curiae brief subject to final review and approval of the brief. Action: On motion duly made and seconded, the Executive Committee agreed to allow NACDS to join the brief so long as no objectionable substantive changes were made. Note: On February 10, 2016, the U.S. Court of Appeals suspended the briefing schedule in the *Masters* litigation subject to further order. This will permit additional time for HDMA to meet with DEA (February 29, 2016) and review Appellate Masters' brief.

Mr. Patrick Kelly (HDMA Executive Vice President, Government Affairs) provided an update on drug abuse and diversion matters. S. 483 passed the Senate Judiciary Committee with Floor action likely relatively soon. Staff is working with supporters in the House.

On June 12, 2016, the HDMA Executive Committee met at The Broadmoor in Colorado Springs, Colorado. HDA_MDL_000020110. Following a brief introduction by President and CEO John Gray, Ms. Elizabeth Gallenagh (Senior Vice President, Government Affairs and General Counsel) and Mr. John Parker (Senior Vice President, Communications) led a discussion on whether and how HDMA should be prepared to respond to negative media impact and misinformation regarding the role of drug distributors in the abuse of prescription opioids, whether in connection with ongoing West Virginia litigation or possible similar litigation in other states. Following discussion, there was general agreement that HDMA should reconstitute its Working Group to further study this issue and report back to the Executive Committee.

On September 25, 2016, the HDMA Executive Committee met at The Greenbrier in White Sulphur Springs, WV Counsel. HDA_MDL_000020112. Frank also provided a brief update of the *In Re: Masters Pharmaceuticals* matter where HDA has filed an amicus curiae brief challenging DEA's handling of the matter on a procedural basis.

On February 22, 2017, the HDMA Executive Committee met at The Lodge at Pebble Beach Pebble Beach, CA. HDA_MDL_000020118. An update was provided the "highly inflammatory media environment" regarding the role of wholesalers as well as the cases that have been brought in West Virginia. Mr. Robert Schooling (Reservoir Communications Group) discussed a proposal for the development and roll-out of a six-month Communications Program, explaining the role, in appropriate context, of the distributor.

We ask that an order be entered which compels the Distributor Defendants to produce all documents in their possession, custody and/or control which discuss the opioid epidemic in West Virginia. We further request that if the Distributor Defendants have indeed already produced responsive documents that they be required to identify to Plaintiffs the Bates number for each document.

Dated: February 21, 2020

Respectfully submitted,

Plaintiffs,

THE CITY OF HUNTINGTON and
CABELL COUNTY COMMISSION

/s/ *Michael J. Fuller, Jr.*
Michael J. Fuller, Jr. (WV Bar No. 10150)
**McHUGH FULLER LAW GROUP, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
T: 601-261-2220
F: 601-261-2481
mike@mchughfuller.com

Paul T. Farrell, Jr. (WVSB No. 7443)
**FARRELL LAW**
422 Ninth Street, 3rd Floor (25701)
P.O. Box 1180
Huntington, WV  25714-1180
Tel:  304-654-8281
paul@farrell.law

Anne McGinness Kearse (WVSB No. 12547)
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel:  843-216-9000
Fax:  843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

16

Mark Pifko (admitted *pro hac vice*)
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Tel: 818-839-2333
mpifko@baronbudd.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 21, 2020, a copy of the foregoing **PLAINTIFFS' MOTION TO COMPEL** has been filed electronically using the Court's CM/ECF system and will be served *via* the Court's CM/ECF filing system, which will send notification of such filing to the attorneys of record at their e-mail addresses on file with the Court.

*/s/  Michael J. Fuller, Jr..*

Michael J. Fuller, Jr.
