IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                            :
THE CITY OF HUNTINGTON,     :        CIVIL ACTION
                            :        NO. 3:17-cv-01362
         Plaintiff,         :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
         Defendants.        :
                            :
----------------------------x
                            :
CABELL COUNTY COMMISSION,   :        CIVIL ACTION
                            :        NO. 3:17-cv-01665
         Plaintiff,         :
                            :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
         Defendants.        :
                            :
----------------------------x
```

STATUS CONFERENCE

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE

MARCH 5, 2020

1    **APPEARANCES:**

2

3    **For the Plaintiff,**
     **Cabell County Commission:**

4

5    **MR. PAUL T. FARRELL, JR.**
     Greene Ketchum Farrell Bailey & Tweel

6    P.O. Box 2389
     Huntington, WV  25724

7

8    **MR. ANTHONY J. MAJESTRO**
     Powell & Majestro

9    Suite P-1200
     405 Capitol Street

10   Charleston, WV  25301

11

12   **MR. MICHAEL A. WOELFEL**
     Woelfel & Woelfel

13   801 Eighth Street
     Huntington, WV  25701

14

15   **MR. PETER MOUGEY**
     **MR. MIKE PAPANTONIO**

16   Levin Papantonio Thomas Mitchell Rafferty & Proctor
     316 S. Baylen Street

17   Suite 600
     Pensacola, FL  32502

18

19

20   **For the Plaintiff,**
     **City of Huntington:**

21

22   **MS. ANNE MCGINNESS KEARSE**
     **MR. DONALD A. MIGLIORI**

23   Motley Rice
     28 Bridgeside Blvd.

24   Mt. Pleasant, SC  29464

25

1    **APPEARANCES (Continued):**

2

3    **For the Plaintiff,**
     **City of Huntington:**

4

5    **MR. CHARLES R. WEBB**
     The Webb Law Center
6    716 Lee Street
     Charleston, WV  25301
7

8

9    **For the Defendant,**
     **Cardinal Health:**

10

11   **MS. ENU MAINIGI**
     **MS. SUZANNE SALGADO**
12   **MS. JENNIFER WICHT**
     Williams & Connolly
13   725 Twelfth Street, NW
     Washington, DC  20005
14

15   **MR. STEVEN R. RUBY**
     Bailey & Glasser
16   209 Capitol Street
     Charleston, WV  25301-1386
17

18   **MR. MICHAEL W. CAREY**
     Carey Scott Douglas & Kessler
19   707 Virginia Street, East, #901
     Charleston, WV  25301
20

21   **For the Defendant,**
     **McKesson:**

22

23   **MR. MARK H. LYNCH**
     **MS. MEGAN A. CROWLEY**
24   Covington & Burling
     850 10th Street
25   Washington, DC  20001

1    **APPEARANCES (Continued):**

2

3    **For the Defendant,**
     **McKesson:**

4

5    **MR. JEFFREY M. WAKEFIELD**
     Flaherty Sensabaugh & Bonasso

6    P.O. Box 3843
     Charleston, WV  25338-3843

7

8

9    **For the Defendant,**
     **AmerisourceBergen Drug Corporation:**

10

11   **MR. ROBERT A. NICHOLAS**
     **MS. SHANNON E. MCCLURE**

12   **MR. JOSEPH J. MAHADY**
     Reed Smith

13   Three Logan Square
     Suite 3100

14   1717 Arch Street
     Philadelphia, PA  19103

15

16   **MS. GRETCHEN M. CALLAS**
     Jackson Kelly

17   P.O. Box 553
     Charleston, WV  25322

18

19

20

21

22

23   Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

P R O C E E D I N G S

THE COURT:  This is a status conference in the pending cases involving the *City of Huntington and Cabell County Commission* against *McKesson, AmerisourceBergen, and Cardinal Health*.

Please note your appearances.

MR. FARRELL:  Your Honor, Paul Farrell on behalf of Cabell County and the plaintiffs in the MDL.

And I have with me some of my good friends and lawyers that are also involved not only in this litigation but also in the national litigation.

I have Anne Kearse representing the City of Huntington. We have Senator Michael Woelfel and Rusty Webb, Antonio Majestro.

And then I have some out-of-town guests.  I've got Donald Migliori from Motley Rice.  I have Peter Mougey who's the architect and designer of our entire ARCOS platform. He's one of the smart ones that we bring along.

And then it's my honor to introduce my good friend Mike Papantonio from Pensacola, Florida.

THE COURT:  You introduced them as your good friends.  I'm sure they'll remain so throughout the course of this trial, Mr. Farrell.

MR. FARRELL:  It depends on how many times you sanction me, Your Honor.

```
 1              THE COURT:  Well, I don't plan to do that at all
 2    unless you make me.
 3         Okay.  Let's hear from the other side.
 4              MS. MAINIGI:  Good morning, Your Honor.  Enu
 5    Mainigi from Williams & Connolly representing Cardinal
 6    Health.
 7         Also appearing from Williams & Connolly are Jennifer
 8    Wicht and Suzanne Salgado.
 9              THE COURT:  All right.  I thought it might
10    expedite things if I go over my list of things.
11         Do you have something, sir?
12              MR. LYNCH:  I just -- Mark Lynch from Covington &
13    Burling.
14              THE COURT:  Oh, I'm sorry.
15              MS. MAINIGI:  We have some other appearances, Your
16    Honor.
17              THE COURT:  Okay.
18              MR. LYNCH:  Also representing McKesson, Mr.
19    Wakefield and Megan Crowley.
20              MR. WAKEFIELD:  Good morning, Your Honor.
21              THE COURT:  Good morning, Jeff.
22              MS. CROWLEY:  Good morning, Your Honor.
23              THE COURT:  All right.  I'm sorry I interrupted
24    you there.
25              MR. NICHOLAS:  Your Honor, I'm Bob Nicholas for
```

1    AmerisourceBergen.

2        And also representing AmerisourceBergen here in court

3    are Gretchen Callas from Jackson Kelly as well as my

4    partners, Shannon McClure and Joe Mahady.

5            THE COURT:  Thank you, Mr. Nicholas.

6            MR. RUBY:  And, Your Honor, Steve Ruby also for

7    Cardinal Health.

8            MR. CAREY:  And Mike Carey on behalf of Cardinal

9    Health, Your Honor.

10           THE COURT:  Now, did I get everybody?

11       All right.  In order to expedite things, I have -- my

12   law clerk has put together a script for me and I'm going to

13   go through that.  And then if there's anything remaining

14   after we deal with this and if we have any energy left, I'll

15   take up any other matters that you might want to bring up.

16       I understand this is now a bench trial.

17           MR. MAJESTRO:  Yes, sir.

18           MS. MAINIGI:  Yes, Your Honor.

19           THE COURT:  All right.  That will expedite things

20   and I think give us a little flexibility as we move forward,

21   although it means a lot more work for the Court on the back

22   end.  But I think this is the type of case it's probably

23   wise that it is a bench trial.

24       The first issue I have on my plate is the issue of the

25   law of the case.  And the defendants at the January 27th

1    conference took the position that Judge Polster's rulings

2    are not the law of the case.

3        It appears to me that the Fourth Circuit thinks

4    otherwise.  In *Royster* against *Food Lion*, 73 F.3d 528, a

5    1996 case, the Fourth Circuit noted that although the

6    transferor judge has the power to vacate or modify rulings

7    made by the transferee judge, subject to comity and law of

8    the case considerations, doing so in the absence of a

9    significant change of circumstances would frustrate the

10   purposes of centralized pre-trial proceedings.

11       The Court went on to say that if transferor judges were

12   permitted to upset rulings of the transferee judges, the

13   result would be an undermining of the purposes and

14   usefulness of the transfer.

15       And Judge Polster, if I understood correctly, has

16   expressed the opinion that he expects his rulings would

17   survive remand and has indicated as such.

18       And the cite for that is *In Re: National Prescription*

19   *Opiate Litigation*, Number 1:17-MD-2804, Northern District of

20   Ohio, January 3, 2020.

21       And I thought I should get this out of the way up front

22   because a lot of the disputes that appear to be unfolding

23   are because the parties believe they're bound by none of the

24   former rulings of Judge Polster.

25       I'm going to follow Judge Polster's rulings unless

1   changed circumstances warrant their modification, following

2   Fourth Circuit law on this point.

3       And, so, it's imperative that if an issue is brought

4   before the Court that Judge Polster has ruled upon or the

5   argument could be made that he's ruled upon it and it's the

6   law of the case, I don't want to cut off this completely,

7   but I think that the matter should not be brought up unless

8   the parties can in good faith point to a change in

9   circumstances that would warrant me not following Judge

10  Polster's rulings.

11      So as a general proposition, I am of the opinion that

12  Judge Polster's rulings are the law of the case and I intend

13  to follow them unless the parties can persuade me that

14  changed circumstances should indicate otherwise.

15      The next issue I have on the list here is the question

16  of *res judicata*.  The defendants have taken the position

17  that the claims are barred by the State of West Virginia

18  settlement.

19      Plaintiffs have taken the position that they don't

20  agree with that.

21      And if I understood correctly, Mr. Farrell, you or one

22  of the other counsel for plaintiffs indicated that you might

23  need additional discovery on this point.

24          MR. FARRELL:  Well, the short version of it is

25  that we believe that there are communications between the

1    Attorney General's Office and the defendants which highlight

2    and emphasize that the release was not intended to cover the

3    political subdivisions.

4         Those, those documents are in the possession of the

5    Attorney General which are subject to some privilege that he

6    may offer, but they're also in the possession of the

7    defendants.

8         So to the extent that they wish to file a Rule 56, then

9    it's our intention to serve discovery on the three

10   defendants to produce the, their documents and

11   communications with particularity with regard to the

12   settlement and the release.

13             MS. MAINIGI:  Your Honor, I, I think that we have

14   to -- that discovery is pending and we still have to respond

15   to that discovery.  And it may be that we need to ultimately

16   brief that particular issue because we do have final

17   settlement agreements.

18        Have you served discovery requests, Mr. Majestro?

19             MR. MAJESTRO:  No, we have not served it yet.  I

20   think that the --

21             THE COURT:  Well, I'm going to have to get this

22   issue resolved as soon as possible.  It seems to me that

23   issues like this are going to delay the resolution of this

24   matter.  And I feel like I'm under an obligation to move it

25   insofar as it can be done.

1      MR. MAJESTRO:  Your Honor, we have a motion

2  pending in front of Judge Polster.  They withdrew it right

3  before we served the discovery.  So that's procedurally

4  where we are.

5      But the motion was fully briefed in front of Judge

6  Polster, although we had asked in that motion if the Court

7  was going to entertain it that we thought that there was

8  going to be additional discovery that would further support

9  our point.

10      MS. MAINIGI:  And I think, Your Honor, we have

11  made clear from the get-go that we would like to file the

12  motion on *res judicata*.  And I think we, in fact, have

13  offered to have it briefed by March 13th.  We had offered

14  that.  And that offer has been pending for quite a while.

15      THE COURT:  Well, my question is do you need -- do

16  the parties need discovery on this issue before it's in a

17  position for me to rule on it?

18      MS. MAINIGI:  We do not believe we do.

19      THE COURT:  Do you, Mr. Farrell?

20      MR. FARRELL:  You know what.  We're at the stage

21  where this motion has already been decided in State Court.

22  They filed a writ to the West Virginia Supreme Court and it

23  was denied.

24      So we believe the West Virginia Attorney General will

25  submit a declaration that affirms that he not only does not

1    have the authority, but did not intend to release the

2    political subdivisions.

3        So we withdraw any request for discovery and welcome

4    briefing and resolution of the issue.

5              THE COURT:  So the issue is mooted now.  Is that

6    right?

7              MR. FARRELL:  Yes, Your Honor.

8              MS. MAINIGI:  No, Your Honor.  We disagree.  We,

9    we don't think that the issue is mooted.  But --

10             THE COURT:  So there's no need for discovery.

11             MS. MAINIGI:  Correct, Your Honor.

12             MR. FARRELL:  No, Your Honor.

13             THE COURT:  And the parties agree on that.

14             MS. MAINIGI:  Correct, Your Honor.

15             THE COURT:  So you want to -- now, do you need to

16   re-brief the issue and submit it to the Court --

17             MS. MAINIGI:  Yes.

18             THE COURT:  -- in this case?

19             MS. MAINIGI:  Yes, Your Honor.  We intend to file

20   our brief on March 13th if that suits the Court.

21             MR. LYNCH:  And in that regard, Your Honor, while

22   it's the case that Cardinal has filed -- did file a motion

23   for summary judgment in the MDL, ABDC and McKesson have not.

24   So we are going to be briefing it for the first time on the

25   13th.

1      MR. MAJESTRO:  We have no objection if they file a

2 brief on the 13th.

3      THE COURT:  You can file your briefs on the 13th

4 of March?

5      MR. LYNCH:  Yes.

6      THE COURT:  Okay.

7   And how much time do you need to reply?

8      MR. FARRELL:  Well, Mr. Majestro will spend every

9 waking hour to get it done.  And, so, I'm going to say that

10 we can probably have it done in 10 days.  And we welcome the

11 opportunity for all three to file their motions so that you

12 can deny all three at the same time.

13      THE COURT:  Okay.  Can, can all three defendants

14 file their motions and supporting material on the 13th of

15 March?

16      MR. NICHOLAS:  Yes, Your Honor.

17      THE COURT:  And you need 10 days?

18   Can Mr. Majestro do it in seven, Mr. Farrell?

19      MR. MAJESTRO:  You know, Your Honor, I was

20 expecting him to give me three.  So I could do seven.

21      THE COURT:  Okay.  You get seven.

22   And how many do you want to reply?

23      MS. MAINIGI:  Your Honor, could we have seven days

24 for the reply?

25      THE COURT:  Do you have any objection to that, Mr.

1  Farrell?

2          MR. FARRELL:  Yes.  They've got at least

3  exponentially a larger number of lawyers than Mr. Majestro.

4  They should be able to get it done in three days.

5          MS. MAINIGI:  Your Honor, we will get it done in

6  five, but I think there's more than Mr. Majestro.

7          THE COURT:  I'll give you five.

8          MS. MAINIGI:  Thank you, Your Honor.

9          THE COURT:  The 13th, seven, and five.

10          MR. LYNCH:  Your Honor, excuse me.  I didn't know

11  whether you wanted to go through these all at once, but I

12  would like to say a word about the law of the case.  I don't

13  know whether you'd like me to say that now or later.

14          THE COURT:  Well, I sent you a pretty clear signal

15  about how I feel about it, but I don't want to not give you

16  an opportunity to say something.

17          MR. LYNCH:  Let me say this.  The rule you

18  articulated is true with respect to a case that is decided

19  by the MDL judge and transferred back.

20      That rule does not apply to a case that passed through

21  the MDL, was never ruled upon by the MDL judge, and then

22  comes back.

23      Now, I don't know off the top of my head whether

24  *Royster* --

25          THE COURT:  Well, it wouldn't be the law of the

1    case if he hadn't ruled on it, would it?

2            MR. LYNCH:  Well, the point is that the rulings

3    they want to apply are -- were made in the *Cuyahoga* and

4    *Summit* cases.  They were not made in this case.

5        And, therefore, they are not the law of the case.  And

6    I believe -- I, I can't tell you exactly what *Royster* said

7    off the top of my head, but I'd like the opportunity to look

8    at that and, and give you a short brief on this issue.

9            THE COURT:  Well, when do you want to do that?

10            MR. LYNCH:  A week.

11            MR. FARRELL:  Three days.

12            THE COURT:  And you're going to write that one

13   yourself, Mr. Farrell, while Mr. Majestro is busy.  Right?

14            MR. FARRELL:  My response will be very short and

15   sweet.

16            MR. MAJESTRO:  Your Honor, I just want to point

17   out that this is not the only remand case going on.  Judge

18   Breyer in the Northern District of California has also

19   basically sat on the bench.  The very first thing he did is

20   exactly what you did, said we're going to follow the

21   appropriate rulings.  And you're not out on a limb here.  If

22   they want to file a brief, we'll respond.  But we think

23   we've briefed it already and there's substantial law to

24   support it.

25            THE COURT:  Well, I think in fairness we ought to

1    give you a shot at it, --

2              MR. LYNCH:  Thank you very much, Your Honor.

3              THE COURT:  -- although you can tell you're going

4    to be swimming upstream a little bit here.

5         Okay.  The standing issue is next.  And is that --

6    that's pending in the West Virginia mass litigation, is it

7    not?

8              MS. MAINIGI:  Yes, Your Honor, it is.  They've

9    asked for briefing.  But we would -- March 13th is the date

10   that we propose to file our brief on standing as well, Your

11   Honor.

12             THE COURT:  What about the proposition that I

13   should wait and see what the state does on that?

14             MS. MAINIGI:  I think, Your Honor, in order to

15   continue to move this case along, which I recognize is

16   everyone's desire, our proposal would be that we go ahead

17   and file our briefs and get the issue fully briefed.

18             MR. MAJESTRO:  When is the -- what's the briefing

19   schedule in State Court?  I don't have that in front of me.

20             MS. MAINIGI:  The brief was filed February 10th.

21   I don't have the opposition for State Court.

22             MS. CALLAS:  And this is the --

23             THE COURT:  Excuse me, Ms. Callas.

24             MS. CALLAS:  Yes, Your Honor.

25        So what's occurred in the Mass Litigation Panel is the

1    Court asked the plaintiff to submit a brief on the basis of

2    their public nuisance claim.  The plaintiffs have done so.

3        The defendants filed a motion and an accompanying

4    response which the Court permitted.

5        We then had an order issued by the Mass Litigation

6    Panel which came up with its own conclusion on the issue of

7    what ordinance might apply to the public nuisance claim.  We

8    have a hearing next week really to discuss that order.

9        So the Court has not ruled on particular issues raised

10   by the plaintiffs.  And I'm not sure here what particular

11   ordinance these plaintiffs are relying on.  But those issues

12   may be distinct and need to be addressed here separately.

13        MR. FARRELL:  Judge, if I may, with all due

14   respect to my Law Review colleague from West Virginia

15   University, the Mass Litigation Panel, in fact, made a

16   ruling recently and cited a particular statute --

17        THE COURT:  You've gotten on the record you were

18   on Law Review, Mr. Farrell.  That's pretty good.

19        MR. FARRELL:  It's not the first time, Your Honor.

20        So there is a statute the Mass Litigation Panel relied

21   upon in order to find standing for the beginning of, of

22   their bifurcation order.

23        That's not the exclusive standing in this case.  And,

24   in fact, it may not be the standing that ultimately the Mass

25   Litigation Panel decides to proceed.

1    Regardless of what the Mass Litigation Panel does, in

2  this case our standing is rock solid.  Our standing is cited

3  in the first paragraph of our complaint.  The county has a

4  specific statute that allows it to have standing.  The city

5  has a specific statute that allows it to have standing.

6    We've been through all of this for two years.  My

7  recommendation is you let them file whatever they want to

8  file and we'll respond in kind and get it all out of the

9  way.

10    THE COURT:  Well, I think I'll --

11    Ms. Callas, you're not saying I shouldn't accept the

12  briefs on this point at this --

13    MS. CALLAS:  Oh, not at all, Your Honor.  In fact,

14  I think the issues here are unique.

15    My point was simply that we really did not have a full

16  briefing at the Mass Litigation Panel.  I think the issues

17  being considered there are distinct.

18    I don't think these plaintiffs will rely on 16-3-6.  It

19  is an injunction only statute.  And I think they've come up

20  with their own idea, but we should be briefing it here for

21  you.

22    MS. MAINIGI:  Your Honor, we had originally

23  proposed March 13th.  But given the argument of the Mass

24  Litigation Panel that I think is March 13th, what we would

25  propose is given the clear need for us to actually deal with

1  the facts and ordinance in this case, we would propose we

2  file our brief on standing a week from March 13th -- so that

3  would be March 20th I believe -- in order to take into

4  account what happens at the MLP.

5  　　　　　　THE COURT:  All right.  How much time do you need

6  to respond?

7  　　　　　　MR. MAJESTRO:  Seven days is fine.

8  　　　　　　THE COURT:  Seven days?  Okay.

9  　　　　　　MS. MAINIGI:  And five days, Your Honor.

10  　　　　　　THE COURT:  All right, okay.  We'll enter an order

11  setting that as the briefing schedule.

12  　　　Now, what about the statute of limitations?  Do you

13  need additional discovery on that or are we ready to brief

14  that issue?

15  　　　　　　MS. MAINIGI:  I think we also had proposed, Your

16  Honor, that we have that briefed by March 13th.

17  　　　　　　THE COURT:  Okay.

18  　　　Do you agree, Mr. Farrell?

19  　　　　　　MR. FARRELL:  Yes.

20  　　　　　　THE COURT:  You have no additional discovery;

21  right?

22  　　　　　　MR. FARRELL:  None.

23  　　　　　　THE COURT:  Okay.  Now, --

24  　　　　　　MS. MAINIGI:  Your Honor, Mr. Ruby has reminded me

25  that the MLP will be taking up that issue as well.  So

1    perhaps the March 20th date might be better for --

2              THE COURT:  Mr. Ruby.

3              MR. RUBY:  There was briefing, Your Honor, from

4    both sides in the Mass Litigation Panel in the State Court

5    that was requested by the Panel on the statute of

6    limitations issue.

7         Unlike the public nuisance issue, the Mass Litigation

8    Panel hasn't issued any ruling on the statute of limitations

9    issue.  And our expectation is that they will take that up

10   in some form at the status conference that they have

11   scheduled for next Friday the 13th.

12        So it might be helpful, as Ms. Mainigi said, to wait a

13   week after that so we can incorporate what guidance we get

14   from the Mass Litigation Panel and our briefing on the

15   statute of limitations.

16             THE COURT:  Well, that might be helpful to me too.

17   How -- is that going to change the date?  Bump it a week?

18             MS. MAINIGI:  I think March 20th for our brief,

19   Your Honor.

20             MR. FARRELL:  Judge, it sounds like they want to

21   argue and fight with the lawyers in State Court, don't want

22   to fight with us.

23             THE COURT:  Well, I'll, I'll agree to that

24   briefing schedule on that issue.

25             MR. MAJESTRO:  Your Honor, in terms of our

1    response, since we're simultaneously briefing, could we have

2    10 days to respond to that one --

3              THE COURT:  Yes.

4              MR. MAJESTRO:  -- so we can stagger them a little

5    bit?

6              THE COURT:  Yes.

7         And you want to file a reply brief?

8              MS. MAINIGI:  Yes, Your Honor.

9              THE COURT:  Okay.

10        Now, the next one is one that really concerns me.  They

11   all concern me, but this one particularly, the non-party

12   fault liability.  Where are we going with that?

13             MR. MAJESTRO:  Your Honor, I think maybe the way

14   to handle that is -- we don't believe that it applies

15   because it's an abatement action.  The statute -- it doesn't

16   apply based on the effective date of the statute.  We

17   understand they're going to want to brief it.

18        My suggestion on that one is on the 13th we file a

19   motion to strike their non-party fault.  And, so, we can be

20   briefing -- I can be writing that brief while they're

21   writing the other briefs and we can go that way on it.

22             MS. MAINIGI:  That's fine with us, Your Honor.

23             THE COURT:  All right, same briefing schedule on

24   that one.

25        Now, where do we stand on pending discovery?

1    Mr. Farrell, you firmly represented to the Court you

2    could finish within 30 days at the last hearing.  Have you

3    done that?

4        MR. FARRELL:  Pretty darn close.  Mr. Mougey can

5    address the defensive discovery.

6        MR. MOUGEY:  We are really close, Your Honor.

7    We -- I'll give you just a quick run-down of how much we've

8    accomplished.  We've been working on defensive discovery for

9    several months.

10    We've briefed at this point about 1.2 million pages,

11    300,000 docs covering about eight different departments,

12    dozens of custodians.  We are, we are very close.

13    We are -- have finalized the collection.  If there's

14    any odds and ends in collection, we're, we're capturing

15    those now.  But we're literally getting through

16    approximately 14- or 15,000 docs of production a day.  And

17    we've rolled out 15 different production volumes.

18    So we are very close as Mr. Farrell promised the last

19    time we were here.

20        THE COURT:  Does that cover all of the third-party

21    discovery from government agencies?

22        MR. MOUGEY:  It does.  They -- the defendants have

23    issued 20 subpoenas.  And I think it's important to note,

24    Judge, that although we've known we were going to be in this

25    court for quite some time, the subpoenas have all been

1    issued predominantly -- I think almost every one of them

2    within the last two weeks.  It does not include those --

3    that production.

4        But the subpoenas have just come out since I think

5    February 25th.  And I think every one -- every subpoena

6    besides one has come out February 25th thereafter.  So

7    there's some work to do there.

8            MS. KEARSE:  And, Your Honor, the City of

9    Huntington, we're in the same position.  We've -- I think

10   we're down to 5,000 hard copy documents for our final review

11   and produced documents for 30 custodians.  We've produced

12   135,000 documents, 100,000 pages.

13       And we're just very close -- another production is

14   going out today and probably we'll have our final production

15   out next week.

16           THE COURT:  How many government entities are

17   involved here?

18           MR. FARRELL:  Judge, the way it works here is you

19   have the City of Huntington --

20           THE COURT:  Okay.  Go ahead, Mr. Farrell.

21           MR. FARRELL:  So Cabell County itself -- defensive

22   discovery is the Rule 34 and 33 that we as Cabell County

23   Commission have to respond to.  There's an umbrella of what

24   that includes.

25       There's the auditor.  How that's relevant, I have no

1  idea.  There's the county clerk.  How that's relevant, I

2  have no idea.  The circuit clerk, the sheriff, the

3  prosecuting attorney and -- who am I missing?  The janitor.

4  I don't know.

5          THE COURT:  Well, are these all the other

6  governmental entities that are involved or are there other

7  ones?

8      My understanding from the last hearing was that there

9  was a universe of sub departments and things out there that

10  all had to be discovered.

11          MR. FARRELL:  So from the -- so that's, that's a

12  good distinction.  For purposes of our defensive discovery,

13  meaning what we are obligated to turn over under the Rules

14  of Civil Procedure, we are nearly done.

15      The defendants are wanting and have filed subpoenas on

16  other agencies, other state agencies that are not in our

17  domain and control to get documents from them.

18      So they're going to -- they're saying that they've got

19  more they need to do on their end.  But from a defensive

20  discovery standpoint, we've met -- we've substantially met

21  our burden.

22          THE COURT:  Okay.  When are you going to be done?

23  You say "substantially."  When are you going to be done

24  absolutely?

25          MR. MOUGEY:  I think we're almost there, Judge.

1    Our projection is the second week of March.  My guess is

2    that the defendants will find some, some holes here or there

3    that we have to supplement along the way, but I think we're

4    really close, Judge.

5              MS. MAINIGI:  Your Honor, the plaintiffs have

6    self-selected a very narrow piece of the discovery pie to

7    produce.  They have not met their promise that they made to

8    this Court about how long it would take them to produce it.

9    They have pointed out the vast amount of discovery that

10   still needs to be done.

11       I'd like to ask a couple of my colleagues to give you,

12   Your Honor, not chapter and verse but some examples of

13   the -- a high level of the discovery that still needs to be

14   done which is substantial, including a substantial amount of

15   third-party discovery, Your Honor.

16             THE COURT:  Okay.

17             MR. LYNCH:  I too have a colleague, Your Honor,

18   that I would like to have address this issue.

19             THE COURT:  All right.  Identify yourself for the

20   reporter, please.

21             MS. SALGADO:  Sure.  Thank you, Your Honor.

22   Suzanne Salgado for Cardinal Health.

23       I'd just like to address a few of the specifics of the

24   discovery that we've received and not received from Cabell

25   and Huntington.

1    Defendants requested about the same number of
2    custodians from Cabell and Huntington that we received in
3    Track 1 after long negotiations.  We got there from various
4    plaintiffs in the number of, you know, in the 50s, 60s, 100
5    custodians from each of those plaintiffs.  We requested 65
6    each from Cabell and Huntington.  They've produced some
7    documents for 25 custodians.
8    So we are far from complete.  We still have on-going
9    negotiations of what custodians we requested and which ones
10   they'll agree to.
11   There are key custodians that they've not agreed to
12   produce any documents for to date that may require briefing
13   if they continue to maintain their position; for example,
14   City Council members.  They've not agreed to produce any
15   custodial files for those key members of the governing body
16   of those plaintiffs.
17   We're still discussing and negotiating to see what we
18   can get.  And if we come to an impasse, we're going to need
19   to brief those issues before the Court.
20   They've also not told us that they've completed
21   production of any particular custodian.  We've asked for
22   them to represent when they've done so, and they've not done
23   so.
24   There's also issues of whether certain entities are
25   within their possession and control.  They began to produce

1    documents from certain entities and stopped production

2    saying that those entities were not within their control and

3    that we would then have to serve subpoenas.

4        So we're still figuring that out for some key entities,

5    including the Cabell Huntington Health Department which we

6    initially thought would be a party, but they've told us now

7    it's not within their control.

8        So there are key categories of documents that we

9    haven't even begun to receive yet.  And, again, the

10   third-party discovery, as I've said, we've served over 20

11   subpoenas including, you know, a key entity like the

12   Virginia Board of Pharmacy who's recently let us know that

13   while they intend to respond, unfortunately a lot of their

14   documents are in hard copy and it's going to take some time

15   for them to produce those key documents.

16       There's also expansive discovery that's been served on

17   the DEA and DOJ.  And it's not just defendants who have

18   requested this discovery.  It's plaintiffs as well who have

19   requested this discovery.  So there's much left.

20           THE COURT:  How is all this relevant?  I mean, it

21   seems to me like this could be a never-ending quest here

22   that is going to keep us from ever getting to the end of the

23   tunnel.

24           MS. SALGADO:  Understood.  These are key to

25   defendant defenses.  While plaintiffs might not think that

1  these are key to plaintiffs' claims, we are entitled to put

2  on defenses in our case here.

3      And as we've found in Track 1 based on our experience,

4  we found some of the most key documents in the third-party

5  collections.  This sort of information can let us know what

6  other causes may have been.  Those are not documents that

7  are within our custody and control.

8      So we need to know what the government at the county

9  level, at the state level, at the national level, what they

10  were seeing and what they think the causes of this opioid

11  crisis are.

12     Also, you know, the Governor's Council, for example,

13  created a Task Force to figure out the root cause of the

14  opioid crisis.  These are key documents to figure out what

15  the state determined was actually the cause of what's going

16  on here, and we're entitled to these documents.

17         MS. MAINIGI:  Your Honor, if I may just also add

18  the fact that this -- the discovery that we are seeking here

19  is completely consistent with the discovery that was allowed

20  in the MDL.  And it's completely consistent with the

21  discovery that is happening or being completed in New York

22  prior to the New York trial beginning at the end of March.

23     So there, there is nothing here other than different

24  agency names, obviously, but there's nothing that we are

25  seeking in discovery that hasn't been sought in other cases.

1    Obviously, in those other cases we're talking about

2    other plaintiffs.  So the discovery received in those cases

3    does not suffice.  The exception is the DEA where we do have

4    a substantial amount of discovery from the DEA already.  But

5    I think it is the plaintiffs that are seeking additional

6    discovery.

7         THE COURT:  Well, how much, if any, of the

8    discovery you already have is relevant to this case?

9         MS. MAINIGI:  From the DEA, Your Honor?

10        THE COURT:  Well, from anybody.

11        MS. MAINIGI:  Well, I think really from a national

12   level it's primarily the DEA discovery that is relevant.

13   And I think most of it is relevant to this case.

14   It is plaintiffs that are seeking additional discovery

15   from the DEA as I understand it.  Most of the discovery

16   we're seeking, Your Honor, is unique to either West Virginia

17   or Cabell or Huntington.

18        MR. FARRELL:  Judge, if I may, I'm not quite sure

19   if we disagree with anything.  I'm not quite sure I

20   understand what we're talking about.

21   We agree that they are allowed to do as much discovery

22   as they want to do.  They can file third-party subpoenas.

23   Let them do whatever they want.  All I'm suggesting is that

24   we've taken a firm position on what we have to turn over.

25   If they don't like it, they can file motions to compel.

 1      Now, if you'll recall, we have accounted for this with

 2   a bench trial which I think is ultimately where this

 3   argument is leading to.  We've accounted for the fact that

 4   we can start the trial very soon with components of the case

 5   that are in the can, that are not dependent upon any local

 6   evidence or discovery.

 7      And every single issue that they claim has a

 8   requirement of more discovery, we can simply stagger to the

 9   back end of a, of a bifurcated staggered bench trial.

10   That's the beauty of the process that we've identified.

11      We'll be presenting this evidence to you.  All of the

12   standards, all of the *Daubert* motions, you can make -- hold

13   all of these rulings in abeyance because there's no jury.

14      And I'd be remiss to point out that there is on-going

15   settlement negotiations.  And those settlement negotiations

16   are for the entire State of West Virginia and they're

17   dependent upon getting a resolution before we stand up in

18   front of you.

19      So what we're asking for is a bifurcated staggered

20   bench trial to begin no later than June, 2020, and that any

21   issue that they have that they say they need discovery for

22   we simply backload with the presentation and development of

23   the record.

24           MS. CROWLEY:  Your Honor, --

25           THE COURT:  Well, my initial reaction to that was

1   that it might be a little too confusing for the Court, Mr.

2   Farrell, --

3          MR. FARRELL:  I doubt it.

4          THE COURT:  -- to try and keep all this

5   compartmentalized and separated and everything.

6      I'd like to have the discovery done and start the trial

7   and run until it's over.

8          MR. FARRELL:  Let me simply suggest that just like

9   we were here a month ago offering to waive the bench trial,

10   this isn't going to go anywhere until you put us on a clock.

11   If you don't start a clock, this case will never start and

12   this case will never settle.

13          THE COURT:  Well, I totally agree with that.

14          MS. CROWLEY:  Your Honor, Megan Crowley on behalf

15   of McKesson.

16      I just wanted to clarify.  There are 100 custodial

17   files that defendants have requested from plaintiffs which

18   plaintiffs have not produced.  There are 100 outstanding

19   ones.  There are four motions to compel pending, and there

20   are undoubtedly going to be more.

21      So what -- the point of my colleague's discussion of

22   the outstanding discovery is to point out that

23   notwithstanding plaintiffs' representations here, and the

24   representations a month ago at the last status conference,

25   more than a month ago at the last status conference,

1   plaintiffs have not complied with their obligation.

2           MR. FARRELL:  File a motion to compel.

3           MS. MAINIGI:  They're pending.

4           MS. SALGADO:  We can't until -- you know, we've

5   worked in good faith to have regular conferences with

6   plaintiffs and discuss custodians, and we're still working

7   towards that.  And if we get to an impasse on those, we will

8   file motions to compel.

9       But just like my colleague said, unfortunately, you

10  know, from experience we know this, frankly, just takes

11  time.  So I think the point is just it wasn't realistic to

12  get this done in 30 days and we have a lot left for us to

13  get the information we need.

14          THE COURT:  Well, how much time do you think it's

15  going to take?  This -- I can't just leave this open-ended

16  because it will never, it will never end.

17          MS. SALGADO:  Understood.  I think our proposed

18  case management order includes a timeline that we think is

19  appropriate to be able to obtain the discovery we need,

20  recognizing we may be able to do things a little more

21  quickly with a bench trial.

22      But we still think we need sufficient time and, in

23  particular, time to get the documents we need before turning

24  to depositions because what we found in Track 1 is in the

25  MDL, although at first blush it may seem that you can move

1   things along quickly by starting depositions more quickly,

2   what we ended up needing to do was re-depose individuals

3   once additional files were produced.

4       Oftentimes a custodial file was produced, but then

5   files from that person's general office was produced later

6   and we needed to re-depose that person.  So we think enough

7   time needs to be built in to complete all relevant discovery

8   and then turn to depositions.

9           THE COURT:  Are we talking about the non-party

10  fault issue or --

11          MS. SALGADO:  The whole thing, Your Honor, the

12  whole thing.

13          THE COURT:  It overlaps, doesn't it?

14          MS. SALGADO:  It all overlaps.  Unfortunately

15  there is no ability to compartmentalize and segregate this

16  case.  Our defenses are relevant to the entirety of the

17  case.

18      The issue of causation permeates every portion of the

19  case.  And these documents that we seek both from plaintiffs

20  and from third parties are relevant to all of these issues.

21          MR. MOUGEY:  Your Honor, one key point --

22          THE COURT:  Just a minute.

23      Ms. Mainigi, did you want to say something?

24          MS. MAINIGI:  Yes.  I apologize, Your Honor.

25  Thank you.

1          Just to underscore, the issues of the causation and

2    standard of care have shown to be critical issues in all of

3    the cases that are more mature than this one, including the

4    trial that we're about to begin in New York.

5          And, obviously, those components are critical to our

6    ultimate defense in the case, our ultimate presentation of

7    the case.  And the discovery from third parties as well as

8    the Cabell and Huntington entities go straight to the heart

9    of those issues.

10          Thank you, Your Honor.

11          MR. MOUGEY:  Your Honor, if I may just quickly, I

12    think one key point that I just heard that this was the same

13    issues, different departments from CT-1; same issues,

14    different, different names from New York.

15          However, we knew that this case was coming back to West

16    Virginia late last year, the remand, or my memory is early

17    January.  It took almost six weeks to get the subpoenas out

18    the door.

19          So all of this information that's just extremely

20    critical, according to the defendants, they've waited until

21    mid February to ask for it.  Yet, it's all we've done,

22    according to them, from what we did in the other cases.

23          To Mr. Farrell's point about getting things on the

24    clock and get things moving, Your Honor, this -- you can't

25    take six weeks from -- until subpoenas are issued.

1       On the custodial issues, Your Honor, we took 450

2   depositions in CT-1.  There were a handful of depositions

3   that had to be redone.  That was not an overarching issue.

4       The custodial files that need to get done here, I broke

5   out the custodial files:  28,000 individual emails that have

6   already been produced just on behalf of the county; the

7   Circuit Court files, 98,000 docs; EMS run charts, 113,000

8   docs; Sheriff's Office, 25,000 docs; County Clerk files,

9   95,000 docs; individual custodians, as I just mentioned,

10  28,000 docs.

11      They have all the budgets, all the financials, the

12  minutes, the agendas, the vital statistics, the training

13  materials.

14      Your Honor, there's a, there's a wide swath of

15  documents that have been produced.  And I'm confident the

16  defendants will continue to, to point out holes that we can

17  supplement.

18      But we're close, Your Honor.  And what they're talking

19  about are issues that, quite frankly, are by their own

20  making at this point and are third-party discovery.  They

21  should have been teed up six weeks ago.

22          MS. CROWLEY:  Your Honor, just quickly on that one

23  if you don't mind me responding, a large -- a portion of

24  this third-party discovery has been delayed because of

25  plaintiffs' delay in confirming whether the relevant entity

1    is represented by plaintiffs or not.

2        For example, as of February 17th, plaintiffs were still

3    in the process of discussing limited representation of the

4    Cabell County Huntington Health Department, a key entity

5    here, for purposes of document production.  Defendants did

6    not know whether to treat that entity as a party or a

7    non-party for purposes of production until February 19th.

8        So I just want to make sure the record is clear that we

9    have been pushing forward with this discovery.  We have been

10   diligently moving forward issuing subpoenas for this crucial

11   discovery in this case.

12       And, and we agree that we need to be moving forward

13   expeditiously, but there is -- there are key entities here

14   from which we are seeking discovery from which we have been

15   told that large numbers of their documents are in hard copy,

16   and that given restraints and other resource constraints

17   that there will be -- it will take time to get this

18   discovery done.

19            MR. WAKEFIELD:  Yes, Your Honor.  I can speak to

20   that issue as well.

21       I had a telephone conference with Daniel just the other

22   day with the Department of Military Affairs as to this

23   issue.  And they advised that they're not resisting the

24   subpoena, but that it will take time for them and the State

25   Police to respond to the discovery simply because of

1    staffing issues.

2        So it's not a matter of whether people are diligently

3    pursuing it.  It is being diligently pursued.  But we have

4    to recognize that particularly as to some third parties, it

5    will take time to provide responsive information.

6            MS. MAINIGI:  Your Honor, if I may just add, we

7    don't oppose the setting of a trial date.  Let me make that

8    clear and put that on the record.

9        But we think that a trial date needs to be set that is

10   reasonable and consistent with the discovery that needs to

11   be done because as Your Honor is well aware, there are cases

12   being set for trial all over the country.  I think the worst

13   thing would be for us to set a trial date that is too

14   optimistic and then we find out that the promises are not

15   kept.

16           MR. FARRELL:  I'll keep the promises.  You can

17   stop referencing the promises.

18           MS. MAINIGI:  Please don't interrupt.

19           THE COURT:  Mr. Farrell, talk to me.  Okay?

20           MR. FARRELL:  Yes, Your Honor.

21           THE COURT:  I don't want any of this argument

22   about counsel.  We'll get that clear right now.  I'll be

23   happy to hear anything you want to say, but talk to me.

24           MR. FARRELL:  Yes, Your Honor.

25           MS. MAINIGI:  Sorry, Your Honor.

1          With respect to the -- so we've got the, the party

2     discovery, but the third-party discovery is inescapable in

3     terms of sometimes the length that it takes.  I don't think

4     we're looking for an unreasonable amount of time.

5          But I do worry that if we set a trial date that is too

6     optimistic, we will have to be back to Your Honor to explain

7     why that discovery is not done.

8               THE COURT:  Well, I understand that.  The way to

9     do it might be to set a shorter time and then listen to your

10    arguments as to why you couldn't meet it when we get to that

11    point.

12              MS. MAINIGI:  Well, what I worry about, though,

13    Your Honor, is if we don't together come up with a realistic

14    estimate of a trial date, there are trial dates being set

15    all over the country.

16         I think we view this case, obviously, as a critically

17    important case on remand.  And we want to ensure that, that

18    it gets its proper place in the line of cases.

19         If we had to come back to seek a movement of the trial

20    date, I think that upsets the apple cart perhaps with other

21    dates as well.  And it's not that there can't be multiple

22    attorneys trying multiple cases around the country.  There

23    can.  But there are only so many of the same witnesses that

24    exist to bring to trial, Your Honor.

25              THE COURT:  Okay.  That takes me to the issue of

1    an appointment of a Special Master because we're not going

2    to get things moving until there's somebody to deal with

3    discovery disputes and other matters that might come up.

4        And I understand that the candidates here -- I've made

5    up my mind pretty much that the appointment of a Special

6    Master is necessary based upon the workloads of the

7    magistrates in this district and other considerations.

8        And the candidates are the current Special Master in

9    the multi-district litigation or a local Special Master in

10   West Virginia, and a couple of names have been proposed.

11       So let me hear what the parties' positions are on this.

12   And I want to get this moving because we're not going to be

13   able to deal with, with discovery problems until there's

14   somebody to rule on it.

15       Mr. Farrell.

16       MR. FARRELL:  Our frustration remains that we're

17   repeating the same arguments we've heard for the past two

18   years.  Special Master Cohen has heard every single one of

19   these.  He seems like the logical, rational choice so that

20   we don't have to reinvent the wheel.

21       THE COURT:  Okay.

22   Why do you not want Mr. Cohen to do this?

23       MR. LYNCH:  Well, first of all, Your Honor, I

24   think as the previous discussion demonstrated, this case --

25   the discovery in this case is all about West Virginia.  So

1   it makes sense to have somebody from West Virginia handling

2   it.  Mr. Cohen for all his talents and experience doesn't

3   have any experience in West Virginia.

4       Secondly, we do have a problem with Mr. Cohen.  He has

5   participated in confidential settlement discussions as

6   recently as last Friday.  And the procedure in the MDL

7   allowed for free-for-all *ex parte* communications.

8       We hope and we trust that will not be the case in this

9   court.  And it would be inappropriate to appoint a Special

10  Master who has been so deeply involved in *ex parte*

11  communications.

12      So we think, we think one of these West Virginia judges

13  is the right choice.

14          THE COURT:  Well, there's going to be a bit of a

15  learning curve here if I appoint somebody from West

16  Virginia.

17      What's your thought on that?  Well, I think I

18  understand your position.

19          MR. LYNCH:  Yeah.  My, my understanding is that

20  these are experienced judges.  Both of them were on the

21  state, the business court.  Some of our colleagues can

22  perhaps speak to that.

23      But I'm confident that, that a seasoned experienced

24  judge will do a darn good job handling this and the kind of

25  problems they're obviously going to face.

1        THE COURT:  Well, there are two names that have

2   been suggested, Judge Rowe and Judge Wilkes.

3      Do the plaintiffs have any thoughts on either one of

4   those if I decide -- and I'm not saying I've made this

5   decision.  But if I decide to appoint a West Virginia

6   Master, would there be any problem with either Judge Wilkes

7   or Judge Rowe?

8        MR. FARRELL:  We would defer to your wisdom.

9        THE COURT:  Okay.

10        MR. LYNCH:  Thank you.

11        THE COURT:  All right.  Well, I'll decide that as

12   promptly as I possibly can.

13        MR. WAKEFIELD:  Your Honor, if I may.

14        THE COURT:  Yes, Mr. Wakefield.

15        MR. WAKEFIELD:  With the appointment of a Special

16   Master, I think it might be prudent if we would have a

17   requirement for reports every two weeks or so about the

18   status of discovery, how the case is progressing so that the

19   Court is well aware of the efforts of the parties to meet

20   discovery deadlines and whether any trial date can, in fact,

21   realistically be met.

22        THE COURT:  All right.  That's a sound suggestion,

23   Mr. Wakefield.

24      All right.  Here's my proposed schedule.  And I know

25   there will be wailing and gnashing of teeth, but this is

1   what I'd like to do.  This matter needs to be resolved and I

2   feel it's my responsibility to push it.  And I intend to

3   enter an order setting the following deadlines:

4       A written document discovery deadline for completion by

5   April the 30th of this year;

6       Fact witness depositions by June the 15th;

7       Plaintiffs' expert reports by June 22nd;

8       Defendants' expert reports by July 1st;

9       Completion of expert witness depositions by July 31st;

10      Any *Daubert* motions filed by August the 7th;

11      Replies due by August the 19th;

12      Motions *in limine* by August the 7th;

13      Responses by August 14th;

14      And a bench trial of this matter to begin on

15   August 24th, 2020.

16      I intend to allot six weeks to the plaintiffs to

17   present their case-in-chief.

18      After that, I intend to reconvene on November the 2nd

19   to begin the defendant's case-in-chief and give the

20   defendants six weeks.

21      I'm otherwise obligated for the period of October the

22   8th through the 23rd which would give us a nice recess

23   between the plaintiffs' case and the defendants' case.

24      Has Judge Polster held *Daubert* hearings on any of these

25   expert witnesses?

1          MR. MAJESTRO:  Yes, Your Honor.  He's entered

2    extensive rulings.  And a lot of the experts from the

3    plaintiffs' perspective will be the same experts all over

4    again.

5          THE COURT:  Are there any new experts who haven't

6    been *Daubert-ized*?

7          MR. MAJESTRO:  Yes, there are some.

8          THE COURT:  There are some?

9          MR. LYNCH:  There were no hearings, Your Honor.

10   There was briefing, but there were no hearings on *Daubert*.

11         THE COURT:  All right.  But he did make *Daubert*

12   rulings?  Is that right?

13         MS. MAINIGI:  He did on the experts -- on most of

14   the experts, I believe, in that case, Your Honor.

15       Your Honor, may I just raise one point of conflict?

16         THE COURT:  Yes.

17         MS. MAINIGI:  And we hear where Your Honor is on

18   this and understand where you want us to go.

19       I've got a three-week trial on August 10th that is a

20   firm date in California that got set by Judge Gonzalez

21   Rogers in Oakland, California.  Is it possible for this

22   trial date -- the start of the trial date to be pushed back

23   by a couple of weeks since I'm lead trial counsel here?

24         THE COURT:  Well, if I do that, that's going to

25   interrupt the plaintiffs' case because of the two weeks in

1   October that I'm going to be out-of-pocket.

2       And that was probably something you prefer not to have,

3   Mr. Farrell, or does it matter?

4           MR. FARRELL:  No, it does matter, Judge.  Perhaps

5   we could avoid the conflict by moving the trial earlier.

6           THE COURT:  Are you surprised by that position?

7           MS. MAINIGI:  I will -- I'm not surprised, Your

8   Honor.  I will not respond to that position.  But perhaps we

9   can talk to Mr. Farrell off-line to see if there can be any

10  sort of push-back by a week or so to accommodate that.

11          THE COURT:  You're sure your case is going to go

12  and you're sure it's going to take three weeks?

13          MS. MAINIGI:  Yes, Your Honor.

14          THE COURT:  And you're sure you're absolutely

15  necessary to be there?  You prefer the judge in that case to

16  be here?

17          MS. MAINIGI:  I do not.  Let me go on record, Your

18  Honor, saying I absolutely do not.  But she has just changed

19  that trial date where I've been lead counsel for the last

20  five years as a result of the New York trial being set

21  earlier than expected for trial.

22      So I, I think I could get by with a week accommodation,

23  Your Honor, if that's possible and just come straight here.

24          THE COURT:  Mr. Farrell, do you want to give her a

25  week?  Is that -- if I allow six weeks a side and give her a

1    week, then your case is going to be interrupted.  But it's a

2    bench trial and one of the benefits of a bench trial is the

3    flexibility to accommodate things like this.

4            MR. FARRELL:  So we would do five weeks and then

5    we would take a two-week break and then we would get an

6    additional week after that?

7            THE COURT:  Yeah.  I wouldn't want to use this as

8    your trial time.  Maybe you can finish in five weeks.

9            MS. MAINIGI:  Yeah.  I'm not sure, Your Honor,

10   that -- I mean, based on -- I'm sorry.  I didn't mean to

11   interrupt you.  I'm not sure the plaintiffs need six weeks.

12           THE COURT:  Six weeks is just our best estimate of

13   what it might take.

14       What's your estimate, Mr. Farrell?  Can you do it in

15   five weeks?

16           MR. FARRELL:  Yeah, but I'd prefer to take that

17   two-week break to kind of review my notes and then come back

18   and clean up the next week.

19           THE COURT:  Well, if you don't mind splitting your

20   case up, I'm going to give Ms. Mainigi -- I have trouble

21   with your name.

22           MS. MAINIGI:  That's okay, Your Honor.  That's

23   close enough.

24           THE COURT:  -- the extra week and start the trial

25   and, and start the clock on the 31st.

1          MR. FARRELL:  Yes, Your Honor.  August 31st?

2          THE COURT:  Yes.

3          MS. MAINIGI:  Thank you, Your Honor.

4          THE COURT:  Okay.  Now, is there anything else we

5   need to take up today with regard to this matter?

6       Hearing nothing --

7       I'm sorry.  Allison pointed out that I hadn't set a

8   date for oral argument on the pending motions.

9       I think the way to handle that is, is to file the

10  motions according to the schedule I've given you.  And after

11  I review your responses, I'll decide whether I feel oral

12  argument would be helpful to the Court.  And if I do, I will

13  coordinate a hearing date with you on those motions.

14          MS. MAINIGI:  Thank you, Your Honor.

15      Just another question in terms of dates.  Do you want

16  summary judgment the same time as *Daubert*?

17          THE COURT:  Yes.  I think that's -- yeah.  The

18  person who's going to have to do a lot of the work is

19  nodding.  So, yes, that's fine.  The Court will enter an

20  order setting all these time limits and schedules and so

21  forth.

22      Anything else?

23      (No Response)

24          THE COURT:  We got this done in an hour.  I

25  appreciate that.

1          MR. MAJESTRO:  We can move fast when we need to,

2     Your Honor.

3          (Proceedings concluded at 11:00 a.m.)

4                         *  *  *  *  *

5

6

7

8

9

10         I, Lisa A. Cook, Official Reporter of the United

11    States District Court for the Southern District of West

12    Virginia, do hereby certify that the foregoing is a true and

13    correct transcript, to the best of my ability, from the

14    record of proceedings in the above-entitled matter.

15

16

17         s\Lisa A. Cook                    March 6, 2020

18            Reporter                          Date

19

20

21

22

23

24

25