# EXHIBIT A

IN THE CIRCUIT COURT OF BOONE COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA**
*ex rel.* **PATRICK MORRISEY,**
Attorney General, **JOSEPH THORNTON,**
in his capacity as the Secretary of the
**WEST VIRGINIA DEPARTMENT**
**OF MILITARY AFFAIRS AND PUBLIC SAFETY,**
an agency of the State of West Virginia, and
**KAREN BOWLING,** in her capacity as the Secretary
of the **WEST VIRGINIA DEPARTMENT OF**
**HEALTH & HUMAN  RESOURCES**, an agency
of the State of West Virginia,

        Plaintiffs,

v.

                                     Civil Action No.12-C-141
                                     (Hon. William S. Thompson, Judge)

**AMERISOURCEBERGEN DRUG CORP.**, a
Delaware corporation doing business in West Virginia,
**MIAMI-LUKEN, INC.**, an Ohio corporation doing
business in West Virginia, **J.M. SMITH CORP.** d/b/a
**SMITH DRUG CO.**, a South Carolina corporation doing
business in West Virginia, **THE HARVARD DRUG**
**GROUP, LLC,** a Michigan corporation doing business
in West Virginia, **ANDA INC.**, a Florida corporation doing
business in West Virginia, **ASSOCIATED PHARMACIES, INC.**,
an Alabama corporation doing business in West Virginia,
**H.D. SMITH WHOLESALE DRUG CO.**, a Delaware corporation
doing business in West Virginia, **KEYSOURCE MEDICAL INC.**,
an Ohio corporation doing business in West Virginia, **MASTERS**
**PHARMACEUTICALS, INC.**, an Ohio corporation doing business
in West Virginia, **QUEST PHARMACEUTICALS, INC.**,
a Kentucky corporation doing business in West Virginia,
and **TOP RX, INC.**, a Tennessee corporation doing
business in West Virginia,

        Defendants.

## SECOND AMENDED COMPLAINT

## Introduction

For their Second Amended Complaint, the State of West Virginia, at the relation of its duly-elected Attorney General Patrick Morrisey, and two of its agencies, the West Virginia Department of Military Affairs and Public Safety, and the West Virginia Department of Health & Human Resources, state the following:

Pursuant to the Order of this Court and in conformity with Rule 15(b) and (d) of the West Virginia Rules of Civil Procedure, counsel for the Plaintiffs file their Second Amended and Supplemental Complaint on behalf of the State of West Virginia, at the relation of its duly-elected Attorney General Patrick Morrisey and two of its agencies, the West Virginia Department of Military Affairs and Public Safety and the West Virginia Department of Health & Human Resources.  They present the following as supplemented by information contained in the discovery which was previously produced by the named Defendants.  The acts and omissions complained of by the Plaintiffs are more specifically identified hereinafter in paragraphs 14 and 15.

By Order dated December 12, 2014 the Court gave the Plaintiffs 30 days to set forth the wrongful acts of the Defendants.  The Defendants' discovery production as presently exists in its nascent state already exceeds 10,000 pages for these Defendants alone.  In the related case, the number of pages provided for 2 ½ years exceeds 13,000 pages.  Accordingly, counsel for these Plaintiffs through the assistance of an IT expert have produced a database upon which the Plaintiffs rely to support the allegations made hereinafter.  The database has been produced using as its basis the discovery which was produced.  There exists the potential of literally thousands of wrongful acts which will be litigated in this case.  For example, the largest of these Defendants

-2-

Amerisourcebergen Drug Corp. has produced records showing approximately 21,500

transactions involving controlled substances with one pill mill pharmacy which is located in

Boone County. That information covers 468 pages in the records as produced. Another

electronic document submitted by Defendant H.D. Smith Wholesale Drug Co. in discovery

contains 271 pages for distributions to a pill mill pharmacy in Mingo County which reflects

approximately 12,400 transactions.

 As a consequence of the foregoing, Plaintiffs set forth categories of offending acts and

omissions together with specific examples and statistics. This exceeds the threshold of notice

required for a claim  and allows these Defendants who possess their sales data as produced in the

limited initial discovery phase to understand the allegations which are being made against them,

In re: Flood Litigation Coal River Watershed, 222 W.Va. 574, 668 S.E.2d 203 (2008); Highmark

West Virginia, Inc. v. Jamie, 221 W.Va. 487, 665 S.E.2d 509 (2007).

### Description of Action

1. This civil action addresses the epidemic of prescription drug abuse and its costs to the

  State of West Virginia. Prescription drug abuse costs the State of West Virginia hundreds

  of millions of dollars annually. Beyond the actual dollars lost, prescription drug abuse

  devastates West Virginia communities and families and reduces the State's economic

  productivity. The damage done by prescription drug abuse adversely affects West

  Virginia's hospitals, schools, courts, social service agencies, jails and prisons as well as

  diminishing the very quality of life in our cities and towns. Accordingly, the State, at the

  relation of its Attorney General, the West Virginia Department of Military Affairs and

  Public Safety, and the West Virginia Department of Health and Human Resources

(collectively herein referred to as "the State") brings this action against pharmaceutical drug distributors who have contributed substantially to and who have substantially, illicitly and tortiously benefitted financially from the prescription drug abuse problem in West Virginia.

2. The Defendants each distribute prescription drugs closely identified with the prescription drug abuse problem in West Virginia. In recent years, it has been well publicized in the media that West Virginia has been, per capita, one of the "most medicated" states in the Country, with a prescription drug abuse problem of epidemic proportions. Defendants were on notice of the growing West Virginia epidemic of the abuse of those prescription drugs which they supplied and of the quantities and frequency with which those drugs were distributed to entities in West Virginia. For reasons which are more specifically set forth in the following causes of actions these Defendants are answerable in damages to the State of West Virginia and are susceptible to such other relief as is requested.

3. These Defendants are major distributors of controlled substances who have supplied controlled substances to drugstores and pharmacies that then dispense those controlled substances often based upon bogus prescriptions from physicians who are prescribing controlled substances for illegitimate medical purposes. Some pharmacies that order such large quantities of abused controlled substances from Defendants are located in rural or low population areas where the amount of those controlled substances ordered from Defendants is so much greater than a population of that size would warrant that the orders are, at the very least, suspicious. These pharmacies are known as "Pill Mills."

4. Through their acts and omissions Defendants have inserted themselves as an integral part

-4-

of the Pill Mill process.

5.      As hereinafter alleged these Defendants acted negligently, recklessly and in contravention

of West Virginia law.  More particularly, these Defendants have violated West Virginia statutes

and regulations that govern controlled substances and consumer protection.  The Defendants

received substantial revenue from West Virginia entities while engaging in wholesale drug

distribution in West Virginia and in supplying West Virginia Pill Mills.

6.      The problems, damages and losses related to the prescription drug epidemic in West

Virginia include, *inter alia,* the following:

   a.      Costs to the State of as much as $430 million annually in the year 2010 with costs
           projected to be as much as $695 million annually by 2017;

   b.      A per capita death rate from prescription drug overdose which has at times been
           either the highest or the second highest recorded for all states in the United States.
           One West Virginia County, McDowell County, located in Southern West
           Virginia, had a death rate of 34.2 per 100,000 in 2001 and 97.3 in 2008;

   c.      Between 2001 and 2008 West Virginia deaths from overdoses involving
           prescription drugs quadrupled from 5.1 deaths per 100,000 residents to 21.5;

   d.      According to Charleston Area Medical Center approximately twenty (20) percent
           of patients admitted through the hospital's trauma service have an issue with
           narcotic usage which contributes to their injuries.  As such, the demand from the
           growing problem of addiction and management of addicted patients will
           eventually be too great for the available care provided unless the problem is
           addressed.  Many of the addicted patients have no medical insurance coverage;

   e.      West Virginia has been identified as the nation's "most medicated state" based
           upon data gathered for 2009.  Pharmacies in the State filled 18.4 prescriptions per
           capita as compared to the national average of 11.6 per capita;

   f.      One pharmacy located in tiny Kermit, West Virginia (with a population of
           approximately 400 people) in 2006 received 3,194,400 dosage units of
           hydrocodone which ranked 22nd in the nation among pharmacies with respect to
           purchases of hydrocodone dosage and 35th nationally if mail order pharmacies are
           taken into account.  The owner who is a licensed pharmacist has testified that the

5

pharmacy filled one prescription per minute. Pharmacy records reveal that the pharmacy regularly paid suppliers hundreds of thousands of dollars and that virtually 90% of the drugs ordered and received are of the kind associated with the prescription drug epidemic. The pharmacy reported revenue of more than $500,000 per month. Recently, an article described Kermit as "ground zero" in the prescription drug epidemic;

g.  One Pittsburgh area physician who entered a guilty plea to a drug law violation allegedly worked in or owned an operation in Southern West Virginia that a federal investigation disclosed netted him personally as much as $20,000 per day in cash deposits made to his personal bank account. That so-called clinic was closed by the government resulting in seizure of hundreds of thousands of dollars in cash from physicians and others who were associated with the clinic. A pharmacy listed as a "preferred pharmacy" by this Pill Mill was among those that regularly were supplied by the Defendants with prescription drugs known to be abused;

h.  West Virginia Prosecuting Attorneys and Judges lament that as much as 90% of their criminal docket regularly is made up of matters that are either directly or indirectly related to prescription drug abuse. One Prosecutor recently told a Charleston newspaper, "I have sometimes morbidly said I would welcome a cocaine case because at least not as many people are dying from cocaine abuse as they are from prescription drug abuse. I bring this up to point out foremost that we continue to ignore the human cost of substance abuse. Families are destroyed. People die. People can't get jobs and become homeless. They don't send their children to school, which ultimately contributes to truancy, delinquency, another generation of crime and a host of other problems. We're at the top of the nation in births of drug-addicted babies."

i.  According to media reports from 2013, "Thirty-five percent of babies born in the state are born drug-addicted because their mothers are using drugs." It was reported also that West Virginia Senator Ron Stollings of Boone County, a physician, stated that the economic cost of substance abuse is "chewing up tremendous amounts of money."

j.  White House drug czar Gil Kerlowske stated the obvious to West Virginia leaders at an assembly: "The devastation wrought by prescription drug abuse on Appalachian communities is simply heartbreaking . . . . Prescription drug abuse is claiming too many lives, threatening public safety and placing unnecessary obstacles in the way of economic prosperity in Appalachia."

k.  The controlled substances distributed by Defendants without sufficient monitoring of suspicious orders include, but are not limited to, hydrocodone combinations

-6-

(vicodin, lortab, lorcet, vocoprofen, tussenex, tussicaps), codeine combinations
(e.g. empirin with codeine, fiorinal with codeine, tylenol with codeine),
phenobarbital, lorazepam (ativan), triazolam (halcion), chlordiazepoxide
(librium), diazepam (valium), alprazolam (xanax), zolpidem (ambien), zaleplon
(sonata), zopiclone (lunesta), dextropropoxyphene (davron, darvocet), codeine
preparations (Robitussin A-C), amobarbital (amytal), pentobarbital (nembutal),
secobarbital (seconal), morphine (roxanol, duramorph), oxycodone (oxycontin,
tylox, percocet, percodan), hydromorphone (diaudid), oxymorphone (opana,
numorphan, numorphone), meperdine (demerol), phentermine (adipex) and other
generic versions of each of the foregoing.

7.  West Virginia and its agencies seek to protect West Virginia communities by enjoining

    Defendants from distributing controlled substances without sufficient monitoring and

    controls and by requiring notice to the State in order to prevent the creation and operation

    of Pill Mills or distribution to any other suspicious prescription drug retailers. The State

    of West Virginia seeks to recover the damages it has incurred, continues to incur, and will

    incur in the future in addressing and combating the prescription drug abuse epidemic in

    West Virginia and in addressing its effects.

8.  The Defendant drug distributors profit from this epidemic by distributing controlled

    substances in West Virginia in amounts that are in excess of the amount of controlled

    substances legitimately medically required, thereby sourcing drugs ultimately used by

    drug abusers. West Virginia law requires distributors of controlled substances such as

    Defendants to, "provide effective controls and procedures to guard against . . . diversion

    of controlled substances [and] . . . design and operate a system to disclose to the

    registrant suspicious orders of controlled substances. . . . Suspicious orders include orders

    of unusual size, orders deviating substantially from a normal pattern, and orders of

    unusual frequency." 15 *WVCSR* § 2-4.2.1 and 15 *WVCSR* § 2-4.4. By distributing

-7-

excessive amounts of controlled substances, the Defendant drug distributors violate West Virginia law by failing to implement or more particularly to follow and adhere to effective controls to guard against prescription drug diversion and by failing to effectively monitor, enforce and/or disclose suspicious orders they fill.

9.  These Defendants certainly are aware of their legal responsibilities in regard to preventing suspicious orders of abused prescription drugs from flooding susceptible locales. For example, Defendant AmerisourceBergen has acknowledged it is under investigation by the U.S. Attorney for the District of New Jersey for its lack of oversight of painkiller sales. In 2011, Defendant The Harvard Drug Group, LLC, after having its license suspended by the DEA, paid $8 Million to the U.S. Attorney for the Eastern District of Michigan to settle allegations that it did not effectively identify suspicious orders of controlled substances. In 2011, defendant Keysource Medical Inc. forfeited its license to distribute narcotics after an investigation by the DEA revealed Keystone did not exercise due diligence in detecting and reporting suspicious orders of controlled substances. In 2009, Defendant Masters Pharmaceutical, Inc. paid $500,000 to the U.S. Attorney for the Southern District of Ohio to settle, *inter alia*, claims that it failed to report suspicious orders of controlled substances. On March 28, 2007, Defendant Richie Pharmacal, Inc. had its controlled substance registration suspended by the DEA. A DEA spokesman in a press release stated: "Richie Pharmacal, Inc. knew, or should have known, based on the large, frequent quantities, that their customers were diverting hydrocodone into arenas that were not legitimate."

10. The State expressly indicates that it does not seek any relief in this action for the federal

-8-

share of funding for the State Medicaid Program.  Claims of damages for any federal

monies expended are hereby expressly disavowed.

## II.

## Parties

11.    Plaintiff State of West Virginia appears at the relation of its duly elected Attorney

General, Patrick Morrisey.  General Morrisey is authorized by the West Virginia

Constitution, West Virginia common law and by statute to bring this action:

    a.    *West Virginia Code* § 60A-5-501(c) invests the Attorney General with the duty

and the authority to assist in the enforcement of the provisions of the Uniform

Controlled Substances Act and to cooperate with agencies and other governmental

entities, including but not limited to the West Virginia Department of Military

Affairs and Public Safety and the West Virginia Department of Health and Human

Resources, as relates to controlled substances;

    b.    *West Virginia Code* § 46A- 7-101 *et seq*, invests the Attorney General with

authority to sue for violations of the West Virginia Consumer Protection Act, to

recover civil penalties and to seek other remedies for violations of said statute;

and

    c.    Under West Virginia common law, the Attorney General possesses the authority

to enforce all of the applicable laws cited herein, including the consumer

protection laws, substance abuse laws, and laws governing the illicit distribution

of drugs in West Virginia.

12.    Plaintiff Joseph Thornton acting in his capacity as Secretary of the West Virginia

-9-

Department of Military Affairs and Public Safety, an agency of the State of West Virginia established by *W.Va. Code* §5F-1-2. The agency includes, *inter alia*, the West Virginia State Police, National Guard, the Division of Justice and Community Services, the Division of Corrections, the Division of Homeland Security & Emergency Management, the Division of Juvenile Services, the Division of Protective Services, and the Regional Jail and Correctional Facilities Authority. This agency is charged with responsibility for, *inter alia*, enforcing the Uniform Controlled Substance Act, *W.Va. Code* § 60A-5-501 and for housing inmates who have violated said Act and/or committed other crimes related to their violations of the Act.

13. Plaintiff Karen Bowling acting in her capacity as Secretary of the West Virginia Department of Health & Human Resources, an agency of the State of West Virginia established by *W.Va. Code* § 5F-1-2. The agency includes, *inter alia*, the Bureau of Behavioral Health & Health Facilities, the Bureau for Children and Families, the Bureau for Medical Services, and the Bureau for Public Health. This agency is charged with the responsibility for, *inter alia*, providing services related to drug addiction as well as the attendant problems of treatment and family-related issues.

14. At all times pertinent to this Second Amended Complaint each Defendant was doing business in West Virginia as a wholesale drug distributor. The Defendants are:

    a. Amerisourcebergen Drug Corporation, a Delaware corporation;

    b. Miami-Luken, Inc., an Ohio corporation;

    c. J.M. Smith Corporation d/b/a Smith Drug Company, a South Carolina corporation;

-10-

d.     The Harvard Drug Group, LLC, a Michigan corporation;

e.     ANDA Inc., a Florida corporation;

f.     Associated Pharmacies, Inc., an Alabama corporation;

g.     H.D. Smith Wholesale Drug Company, a Delaware corporation;

h.     Keysource Medical Inc., an Ohio corporation;

i.     Masters Pharmaceuticals, Inc., an Ohio corporation;

j.     Quest Pharmaceuticals, Inc., a Kentucky corporation; and

k.     Top RX, Inc., a Tennessee corporation.

Each of these Defendants was

- On notice that an epidemic of prescription drug abuse existed in West Virginia and in the specific areas of this State in which their customers were located.  Further, each of these Defendants was on notice that the controlled substances being distributed were the kind which were being abused;

- On notice that State law required them, *inter alia*, to provide effective controls and procedures to guard against diversion of controlled substances, 15 WVCSR §2-4.21 and 15 WVCSR §2-4-4; and

- On notice that the Healthcare Distribution Management Association ("HDMA") "*Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*" describe the critical role of each member of the supply chain in distributing controlled substances.  These industry guidelines further provide: "At the center of a

-11-

sophisticated supply chain, distributors are uniquely situated to perform

due diligence in order to help support the security of controlled substances

they deliver to their customers." Industry guidelines contain the following

elements:

I.      Know Your Customer Due Diligence

II.     Monitoring for Suspicious Orders

III.    Suspend/Stop an Order of Interest Shipment

IV.     Investigation of Orders of Interest

V.      File Suspicious Order Reports with DEA

VI.     Employees, Training and Standard Operating Procedure (SOP)

VII.    Additional Recommendations

The guidelines' first element of "Know Your Customer" provides that distributors must

gather substantial information on each of its customers, including, *inter alia*, their business

background, customer base, average number of prescriptions filled each day, average number of

controlled substances item prescriptions filled each day, percentage of controlled substance

purchases compared to overall purchases, *etc.* According to the industry guidelines, this

information must be reviewed carefully by the distributor, and the distributor must conduct a

thorough, independent investigation of the customer:

•       Subject to the requirement that it provide notice to the appropriate

        authorities of any suspicious orders for controlled substances and not fill

        the same. Notwithstanding its duties regarding suspicious orders, these

        Defendants regularly filled suspicious orders of West Virginia customers.

-12-

More particularly, they acted either with gross negligence or with a willful blind eye to the facts and circumstances by filling suspicious orders for controlled substances.

- Further, Defendants failed to adhere to industry customs and standards, and violated applicable West Virginia statutes and regulations.

### III.

### Jurisdiction, Venue and Claims

15.    Jurisdiction exists pursuant to the provisions of *West Virginia Code* § 56-3-33, as amended, in that Defendants by and through their authorized agents, servants and employees regularly transacted business in West Virginia, supplied and distributed prescription drugs in West Virginia and further through their acts and omissions tortiously caused injuries in West Virginia by engaging in a persistent course of conduct in West Virginia which violated West Virginia law. These Defendants derived substantial revenue as the result of the prescription drugs which were distributed to West Virginia entities and later consumed by persons then residing in West Virginia. More particularly, the acts and omissions as claimed are described hereinafter.

15 a. **Amerisourcebergen Drug Corp.**

(i)    At all times pertinent hereto this Defendant was a Delaware corporation doing business in the State of West Virginia. As a part of their business practices, Amerisourcebergen Drug Corp. distributed controlled substances to West Virginia customers. This Defendant is one of the largest distributors of prescription drugs

-13-

and is listed as No. 28 in the Forbe's list of Fortune 500 companies.

(ii) Records supplied as discovery by this Defendant reflect that in the five(5) years of records provided, Amerisourcebergen Drug Corp. distributed the following quantities, more or less to West Virginia pharmacies:

- 27,323,920 alprazolam
- 3,577,900 amphetamine
- 9,964,280 Klonopin
- 8,759,410 diazepam
- 60,937,584 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others)
- 1,239,380 opana
- 26,614,000 oxycodone
- 2,792,680 oxycontin

Other controlled substances widely known to be abused were also distributed as well as various quantities of some of the aforementioned substances in liquid form.

The foregoing numbers which are far beyond the number of distributions of controlled substances as would be reasonably distributed to a population of 1.85 million, indicate that for every West Virginian, including children, this Defendant distributed

-14-

thirty-three(33) hydrocodone tablets (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) during the period identified. For oxycodone, oxycontin and opana combined the figure would be 15.56 tablets per person.

(iii)   Amerisourcebergen was a distributor of substantial quantities of controlled substances to Tug Valley Pharmacy in Williamson, West Virginia.  This pill mill pharmacy was located within yards of two notorious pill mill physicians and their operations in the town of Williamson.  Doctors named Diane Shafer, Katherine Hoover, and William Ryckman operated pill mill clinics whose voluminous illegal prescriptions written for non-medical purposes were filled daily by this pharmacy to which Amerisourcebergen was distributing.  This Defendant's records as supplied during discovery indicate that they distributed to Tug Valley Pharmacy a total of 149,300 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) tablets during the calendar year 2009 for an average supply of 12,441 tablets per month.  The operations of Drs. Hoover, Ryckman and Shafer were closed by State and federal law enforcement in 2010 which was followed by criminal prosecutions and asset seizures.

During the same period of 2009 in which this Defendant was distributing hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to Tug Valley, Defendant

Harvard Drug Group, LLC was likewise distributing large quantities of hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to Tug Valley Pharmacy as is set forth more particularly infra.

    (iv)    This Defendant also distributed controlled substances in large quantities to a "drive-in" pill mill pharmacy located in Boone County. According to the discovery there were approximately 21,500 transactions with this pill mill. From the discovery which was provided both by this Defendant and by Defendant J.M. Smith dba Smith Drug Company it is known that on the dates of July 16 and July 17, 2012 Defendant Amerisourcebergen Drug Corp. distributed 8000 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) tablets to this "drive-in" pill mill pharmacy. On these same two dates J.M. Smith distributed 8600 hydrocodone tablets (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to this same pill mill.

            Further, in the months of July, 2012 this Defendant distributed 3800 Oxycodone tablets to this "drive-in" pill mill when J.M. Smith distributed a combined total of 11,800 tablets of oxycodone, oxycotin and opana to the same pharmacy in July.

    (v)    It is the industry standard that the distributor of controlled substances shall "know its customer." Due diligence in this regard is both expected and required to include an awareness of other suppliers of controlled substances to this company's customers. This standard was disregarded

and violated in thousands of transactions by this Defendant.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15.　　b.　　**Miami-Luken, Inc.**

( i).　　At all times pertinent hereto this Defendant was an Ohio corporation doing business in the State of West Virginia.  As a part of their business practices, Miami-Luken, Inc. distributed controlled substances to West Virginia customers.

(ii).　　Examples of the Defendant's acts and omissions as complained of herein are:

(aa).　　Serial and regular distributions of controlled substances to Sav-Rite Pharmacy in Kermit, West Virginia, population 406; this pharmacy and its owner were the subject of a criminal investigation and successful prosecution;

(bb).　　Distributions of controlled substances to Sav-Rite #2 in Crum, WV, population 182; this pharmacy and some of its principals and physicians were the subject of criminal investigations and successful prosecutions;

(cc).　　Distributions to Sav-Rite at times after Sav-Rite had been raided and temporarily closed by Federal and State drug agents.  The Sav-

-17-

Rite entities were closely associated with the Mingo County pill mill clinics and physicians; the owner of Sav-Rite #2 recruited physicians to associate with an on-site "physical therapy" operation named Justice Medical Center which existed to write prescriptions for controlled substances for non-medical purposes which Sav-Rite #2 then filled.

(dd). Distribution to other pill mill pharmacies which occurred as recently as 2014 including, but not necessarily limited to, Trivillian's Pharmacy in Charleston, West Virginia and A+ Care Pharmacy in Barboursville, West Virginia, each of which has been raided by drug agents with attendant prosecutions of the owner and pharmacists in charge. With respect to A+ Care, this Defendant has been reported to have supplied A+ Care "hundreds of thousands of painkillers" between 2012 and June of 2014. With regard to Trivillians, that pharmacy is known to have been regularly filling suspicious prescriptions written for non-medical purposes as received from known pill mills located in Kanawha and Raleigh Counties in West Virginia and in the State of Virginia.

(ee). As supplied by Defendant in their discovery for the years 2007 up to and including 2011, this Defendant distributed among other narcotics and highly abused drugs, the following quantities, more or less, to West Virginia pharmacies;

-18-

- 18,650,400 hydrocodone tablets (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others);

- 8,395,780 alprazalom;

- 2,300,807 diazepam

- 1,642,860 klonopin

- 7,023,800 oxycodone

(ff).    The foregoing distributions were supplied to pharmacies located in communities which were as small as 182 people, in counties identified as high intensity drug trafficking areas, and to a population base which could in no way legitimately consume the volume of drugs which was being distributed.

(gg).    More particularly, the foregoing disparity between population and amount of controlled substances being distributed by this Defendant itself creates a red flag that the orders being filled were suspicious. This is especially so in view of the published statistics about drug abuse in the State of West Virginia.

(hh).    Further, the frequency of orders, the relative numbers of narcotics to non-narcotics which were being supplied, the existence of other distributors who were distributing controlled substances to the same customers, and the reputation of physicians and pharmacies as pill mills provided indicia of suspicious orders which this Defendant either purposely chose to ignore because of the financial

benefits it was reaping or negligently failed to identify.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15.    c.    **J.M. Smith dba Smith Drug Company**

     ( i).    At all times pertinent hereto this Defendant was a Delaware corporation doing business in the State of West Virginia. As a part of their business practices, J.M. Smith dba Smith Drug Company distributed controlled substances to West Virginia customers.

     (ii).    Examples of the Defendant's acts and omissions as complained of herein are:

         (aa).    The records submitted by this Defendant as discovery demonstrate that between late November - early December of 2011 and late July 2013, J.M. Smith distributed to four West Virginia pharmacies a total of:

- 887,200 hydrocodone tablets (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others)
- 360,100 oxycodone tablets
- 362,200 alprazalom tablets

among other controlled substances known to be widely abused. The aforementioned substances were distributed to pharmacies

-20-

located in the communities of Madison, Mullens, Pineville and Hinton which collectively have a population of 7979 people. Of this population, adults over the age of 14 total approximately 6605 according to the census information that is available. Therefore, according to the information contained in Defendant's own records Defendant could have supplied every man, woman and child in the several communities named in excess of 111 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others), in excess of 45 oxycodone and in excess of 45 alprazalom tablets during these 18 months. Among adults, the figures would be more than 134 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others), and more than 54 oxycodone and alprazalom tablets during the same period.

(bb)   Further, according to Defendant's records, there exist periods of time when this Defendant supplied a volume of controlled substances to a single pharmacy in Pineville so that every man, woman and child in the town of Pineville, population 668, could have consumed an oxycodone tablet every 8 hours over a period of months.

(cc)   The controlled substances distributed as herein identified were distributed to pharmacies which are located in designated high intensity drug trafficking areas for which there exist published statistics which document the high per capita death rate from prescription drug overdose, high incidence of drug abuse, and high

volume of criminal prosecutions which were related to prescription drugs in the County have consumed an oxycodone tablet every 8 hours over a period of months. In this regard DEA records indicate that this Defendant distributed 491,300 hydrocodone tablets to Wyoming County pharmacies in the year 2012.

(dd)    Earlier discovery which was supplied in litigation involving the notorious pill mills in Mingo County, West Virginia identify this Defendant Smith Drug Company as being a major supplier of prescription drugs of the kind known to be abused, to wit Klonopin, Hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others), Amphetamine, Alprazalom, Diazepam, Fentanyl, Oxycodone and Xanax, to a pharmacy located in South Willimason, Kentucky on the Mingo County border. That pharmacy was listed as a "preferred pharmacy" by the notorious clinic Mountain Medical Center/Williamson Wellness Center operated by Dr. Katherine Hoover and other physicians and employees who were previously successfully prosecuted by the U.S. Government and/or whose assets have been seized by State and federal law enforcement, including officers of the West Virginia State Police.

(ee)    On the dates of July 16 and 17, 2012 this Defendant distributed 8600 hydrocodone tablets to a "drive in" pharmacy pill mill located in Boone County. On these same two dates another of these Defendants, Amerisourcebergen Drug Corp. distributed 8000

-22-

hydrocodone tablets to this same "drive in" pharmacy.

(ff)    In the month of July 2012 this Defendant also distributed a total of
11,800 tablets of Oxycodone, Oxycotin and Opana combined to the
same "drive in" pill mill pharmacy in Boone County. During that
same month Defendant Amerisourcebergen Drug Corp. distributed
3800 Oxycodone tablets to that pill mill pharmacy.

As the proximate result of the acts and omissions heretofore identified, the State of West
Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and
damages and will continue to incur substantial losses, costs, and damages in the future.

15. d. **Harvard Drug Group, LLC**

(i)     At all times pertinent hereto this Defendant was a Michigan
corporation doing business in the State of West Virginia. As a part
of their business practices, Harvard Drug Group, LLC distributed
controlled substances to West Virginia customers.

(ii)    As set forth previously in this Complaint in 2011, Defendant
Harvard Drug Group, LLC agreed to pay a fine of $8Million to the
federal government for failing to have in place an effective system
designed to identify suspicious orders of controlled substances
which in that instance were primarily for oxycodone as
investigated by the DEA. The DEA identified more than 1000
suspicious orders filled by Harvard for oxycodone between March,
2009 and May, 2010.

(iii)   Records supplied as discovery by this Defendant reflect that
between July 26, 2008 and July 26, 2013 Harvard distributed the

-23-

following quantities, more or less, to West Virginia pharmacies:

- 1,791,340 alpraxalom

- 3,271,000 hydrocodone (generic of Lorcet, Lortab, Vicodin,
  Vicoprofen, among others)

- 624,820 klonopin

among other controlled substances known to be widely abused.
Harvard's records further disclose that Harvard:

(aa)   Distributed enormous amounts of hydrocodone (generic of Lorcet,

Lortab, Vicodin, Vicoprofen, among others) to Hurley Pharmacy

located in Williamson, WV. Hurley is or was at that time

identified as a pill mill pharmacy. For example, Harvard

distributed thirty-three thousand(33,000) hydrocodone tablets to

Hurley Pharmacy in twenty-four(24) transactions between July 30,

2008 and December 22, 2008. That pattern continued as the

records show distribution of three-thousand(3000) hydrocodone

(generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to

Hurley on January 21, 2009, one-thousand(1000) on January 26

and six-thousand(6000) more on February 2, 2009 for a total of ten

-thousand(10,000) pills delivered to Hurley in just thirteen(13)

days. This was shortly followed by a supply of twelve-

thousand(12,000) hydrocodone (generic of Lorcet, Lortab, Vicodin,

Vicoprofen, among others) delivered in three(3) deliveries made on

April 2, 9 and 15, 2009. During this time Defendant

Amerisourcebergen was inundating this same pill mill pharmacy

with hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen,

among others) as alleged previously herein.  Distribution of

hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen,

among others)  to this pharmacy by Harvard continued until May of

2012 according to the records supplied.

(bb)  During the same time period during which Harvard was

distributing large quantities of hydrocodone to Hurley Pharmacy,

the said Defendant was also distributing large quantities of

hydrocodone to Tug Valley Pharmacy, which is another pill mill

pharmacy also located in Williamson, West Virginia approximately

four(4) city blocks from Hurley.  Williamson has a population of

3090.  Williamson and Mingo County are regarded as being at the

epicenter of the prescription drug abuse epidemic in West Virginia

and have been so characterized in the published media.  Within the

town of Williamson operated one of the most notorious pill mills

in the State.  That pill mill which was variously known as

Mountain Medical Care Center or Williamson Wellness Center

was physically located within yards of Tug Valley Pharmacy and

between Tug Valley and Hurley.  Each said pharmacy was listed on

a "preferred list of pharmacies" kept at Mountain

Medical/Williamson Wellness Center.  When the distributions

from Harvard to Hurley and to Tug Valley are compared, this

Defendant distributed nine-thousand (9,000) hydrocodone tablets

(generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to

-25-

a four(4) block area in a town of approximately three-thousand (3,000) people during the thirteen (13) days between July 30, 2008 and August 11, 2008. Thereafter on February 4, 2009 alone, Harvard distributed nine-thousand (9000) hydrocodone tablets to these same two pharmacies.

(cc)     In the period which covers 2009 to 2011 this Defendant distributed high amounts of hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to a pharmacy located in Oceana, West Virginia, population 1351, which is in Wyoming County. In 2010 the number distributed was 47,000. In 2011 the number increased to 58,900. According to published statistics, Wyoming County, like its neighbor McDowell County, has in some years, experienced the highest per capita death rate from prescription drug overdose in West Virginia, perhaps one of the highest rates in America. This Defendant's records reflect that large quantities of alprazalom and diazepam were also being distributed by them to this same pharmacy during the same time period. These drugs were well known to be within that cocktail of drugs which were being abused.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15. e. **Anda, Inc.**

(i)     At all times pertinent hereto, Defendant Anda, Inc. ("Anda") was a foreign

-26-

corporation doing business throughout West Virginia. As part of its business, Anda distributed controlled substances to West Virginians.

(ii).     As background, Anda's partial response to the limited discovery ordered by the court is deficient. Unlike that of many of the other Defendants, Anda's spreadsheet regarding sales of the limited number of controlled substances the court required Defendants to answer does not provide the precise number of dosage units shipped.

(iii)    However, pertinent statistics and examples of Anda's wrongful acts and omissions include but are not limited to:

Distributions of significant shipments of controlled substances, including shipments of oxycodone and hydrocodone, to the following communities in West Virginia: Van (population 211), Hedgesville (population 318), Capon Bridge (population 355), Clay (population 491), Northfork (population 429), Gilbert (population 450), Grantsville (population 561), Masontown (population 546), Man (population 759), Middlebourne (population 815), White Hall (population 648), West Union (population 825), Lumberport (population 876), and War (population 892).

(iv)    The foregoing distributions were supplied to entities with a population base which could legitimately consume the volume of drugs being distributed. Moreover, many of the recipients of controlled substances from Anda are known to be located in areas notorious for prescription drug abuse. DEA records indicate that in the years of 2009 through 2012, Anda distributed 6,348,540 oxycodone tablets to West Virginia pharmacies which includes 2,544,600 to Berkeley County and 1,044,200

-27-

to Morgan County.

(v)    Because of the deficiency in Anda's responses, it is not clear the total quantity of dosage units they report as having been shipped, but it is clear that a pharmacy could order in small quantities (*i.e..*, 1 or 2). Yet, Anda's spreadsheet reveals that it shipped quantities to pharmacies that ordered as many as 168 of oxycodone at a time. (Presumably, each shipment contained 100 dosage units, and so, that would be a total of 16,800 dosage units being sent at a time.) Further, the pharmacy in Raleigh County that ordered 168 shipments at a time did so in back-to-back months in 2007.

(vi)    Distributions of controlled substances, including significant shipments of oxycodone and hydrocodone were made to Trivillian's Pharmacy in Charleston, West Virginia, which was recently raided by federal agents and has resulted in an Information being filed against the principal owner of that pharmacy. Trivillian's is known to be filling suspicious prescriptions for non-medical purposes received from pill mill doctors located in Kanawha and Raleigh Counties and the State of Virginia.

(vii)    DEA records provide that Anda distributed, among other narcotics and highly-abused drugs, the following staggering numbers, more or less, of total dosage units in West Virginia between 2007 and 2012:

12,426,900 of hydrocodone including in excess of 2.2 million to Raleigh County alone; and

6,348,540 of oxycodone.

(viii)    Anda has not complied with the State's discovery requests, which would further reveal the ratios regarding its distribution of controlled substances

vis-a-vis non-controlled substances, or the State's discovery requests regarding its adherence to any sort of policy identifying suspicious orders. Further information on these points will be gleaned during discovery.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15. f.  **Associated Pharmacies, Inc.**

(i)    At all times pertinent hereto, Defendant Associated Pharmacies, Inc. ("Associated") was a foreign corporation doing business throughout West Virginia.  As part of its business, Associated distributed controlled substances to West Virginians.

(ii)   Examples of Associated's wrongful acts and omissions include but are not limited to:

Distributions of significant shipments of controlled substances, including shipments of oxycodone and hydrocodone, to the following communities in West Virginia: Kermit (population 406), Masontown (population 546), Union (population 561), Mill Creek (population 724), Rupert (population 942), and Ronceverte (population 1,765).

(iii)  Serial and regular distributions of controlled substances to Sav-Rite Pharmacy in Kermit, WV; this pharmacy and its owner were the subject of a criminal investigation and successful prosecution.

(iv)   Distributions were supplied to entities with a population base which could in no legitimate way consume the volume of drugs being distributed.

Moreover, many of these recipients are located in areas notorious for prescription drug abuse, such as Mingo County which is regarded as the epicenter of the prescription drug epidemic.

(v)     Associated distributed, among other narcotics and highly-abused drugs, the following staggering numbers, more or less, of total dosage units in West Virginia between 2007 and 2012:

2,668,690 of hydrocodone; and

266,700 of oxycodone.

(vi)    Associated bombarded Greenbrier County (population 34,396) by shipping approximately 1 million units of hydrocodone between 2008 and 2010.

(vii)   Because Associated has not fully complied with the State's discovery requests which would further reveal the ratios regarding its distribution of controlled substances vis-a-vis non-controlled substances or the State's discovery requests regarding its adherence to any sort of policy identifying suspicious orders, further information on these points is needed.  DEA records indicate that Associated distributed 266,700 oxycodone tablets to West Virginia pharmacies during the years 2007 through 2012.  Of that figure, 170,100 dosage units (Sixty-four percent (64%)) went to pharmacies in Greenbrier, population 34,396.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15. g.  **H.D. Smith Wholesale Drug Co.**

   (i)    At all time pertinent hereto this Defendant was a Delaware corporation doing business in the State of West Virginia.  As a part of their business practices, H.D. Smith Wholesale Drug Co. distributed controlled substances to West Virginia customers.

   (ii)   This Defendant made substantial distributions to West Virginia pharmacies of controlled substances widely known to be among those substances which were abused, including Strosnider Drug Store, Inc. dba Sav-Rite Pharmacy of Kermit, Sav-Rite #2 of Crum, Tug Valley Pharmacy of Williamson and Hurley Drug Co. of Williamson.  These pharmacies were among the most notorious of the pill mill pharmacies in Southern West Virginia.

   (aa).  The Sav-Rite entities were owned and/or operated by a Mr. James Wooley who was also the pharmacist-in-charge at the Kermit store. These operations were little more than the dispensing center for the substances which then at the center of illegal drug activity and were known to be highly addictive.  The addictions were often created by the pill mill doctors in Mingo County, namely Donald Kiser, Diane Shafer, Katherine Hoover and William Ryckman.  In fact, Sav-Rite was one of the several pharmacies along with Tug Valley and Hurley which filled hundreds of prescriptions daily which were faxed or hand-delivered to the pharmacies from the pill mill physicians.

   (bb).  Sav-Rite Pharmacy #2 was a sham front for illegal prescriptions.  It

was operated at a location which is next to the Justice Medical Clinic in the area of Crum, West Virginia which is near the border of Mingo and Wayne Counties and about a mile from Strosnider Sav-Rite in Kermit. This sham "pharmacy" was the brainchild of James Wooley who was subsequently prosecuted by the federal government. Mr. Wooley recruited physicians to work at Justice Medical Center, or more accurately stated, to authorize prescriptions under their licensing authority for pain medication which was then filled at Sav-Rite #2 or Sav-Rite in Kermit. At least two physicians were successfully prosecuted for their involvement in this operation. Further, the alleged "head" of Justice Medical Center who was a young man with no experience to justify his stated position went to prison for his role therein. The young man, named Justice, was the son of a woman who was an associate of Mr. Wooley.

(cc). An investigation or inspection of the Sav-Rite entities should have raised red flags about the legitimacy of these operations. As such, this Defendant and any of the other Defendants who are named in this case flagrantly violated the "know your customer" standard of care required for distributors of controlled substances or wilfully turned a blind eye to the obvious fact that there was clearly suspicious orders which they were filling.

(dd). Records supplied as discovery by this Defendant reflect that in the five (5) years provided, H.D. Smith Wholesale Drug Co. distributed

-32-

the following quantities, more or less, to West Virginia

pharmacies:

- 12,448,827 generic hydrocone

- 3,142,900 oxcodone

In addition to the aforementioned controlled substances, this

Defendant distributed 371,320 Oxycontin tablets, 94,400

Opana; 513,876 Alprazalom, as well as other Hydrocodone under

their brand names and controlled substances known to be widely

abused.

(ee). Examples of the Defendant's acts and omissions as complained of

therein:

(i) According to their records of transactions as produced in

discovery, the Defendant in 29 listed transactions

distributed at least 102,000 and as many as 157,400

hydrocodone tablets to Hurley Pharmacy, a pill mill

pharmacy in Williamson, West Virginia, during the month

of January 2008. If Defendant's records presented in

discovery are accurate, such a distribution as this is on its

face both suspicious and represents a gross violation of

Defendant's legal duty not to distribute controlled

substances which are being used for non-legitimate

purposes. During this same month and year this Defendant

-33-

was also distributing large quantities of hydrocodone to Strosnider dba Sav-Rite Pharmacy and to Tug Valley Pharmacy, all pill mills in Mingo County.

(ii)    The Defendant distributed controlled substances to Sav-Rite Pharmacy #2. As stated elsewhere in this Complaint, this alleged pharmacy was a sham which existed purely to fill prescriptions written for non-medical purposes.  The Defendant distributed controlled substances to Sav-Rite Pharmacy #2 on a regular basis between the late Fall of 2008 and March of 2009 which indicate that the Defendant did not "know its customer."

(iii)    The controlled substances distributed to Sav-Rite #2 included both generic and brand named hydrocodone, alprazalom and phentermine.  The latter controlled substance is a stimulant known to be used by those who abuse the drugs Oxycodone and Xanax in order to enhance the effects of those drugs.  The Defendant's records also show the distribution to Sav-Rite of 81,437 of hydrocodone tablets in a period which is less than six (6) months.

(iv)    The Defendant distributed suspiciously large quantities of oxycodone to Westside Pharmacy in Oceana, population 1351, during the years of 2008, 2009 and 2010. Defendant's records reflect approximately 1100 transactions for oxycodone distributions in that period

which would average one transaction a day over the course

of three (3) years.  As stated elsewhere in this Complaint,

this community is in Wyoming County which has

experienced the highest per capita death rate from

prescription drug overdose in West Virgnia.

(v)     This Defendant also distributed enormous amounts of

controlled substances known to be those abused in West

Virginia to Hurley Drug Co. and to Tug Valley Pharmacy,

two pill mill pharmacies located just 4 blocks apart in

Williamson.  These two pill  mills supported the pill mill

physicians at the Mountain Medical/Williamson Wellness

Center which was near these pharmacies and which listed

both Hurley and Tug Valley as pharmacies where their

patients should fill their prescriptions.  These pharmacies

also filled the non-medical prescriptions of Dr. Diane

Shafer, a notorious pill mill physician in Williamson.

(vi)    The records presented in discovery by H.D. Smith for their

distributions to Hurley Pharmacy cover 271 pages and

reflects thousands of suspicious distributions of oxycontin,

hydrocodone (generic of Lorcet, Lortab, Vicodin,

Vicoprofen, among others), oxycodone, alprazalom,

lorazepam, diazepam, and brand name hydrocodone.

(vii)   During the same period of time as the distributions were

made to Hurley Drug, H.D. Smith was distributing the same

mix of drugs to Tug Valley Pharmacy. While not as extensive in number as those distributions to Hurley, those distributions to Tug Valley were suspiciously high when standing alone and more so when considered together with the distributions to Hurley. For example, according to this Defendant's records, on October 18, 2007, H.D. Smith distributed 30,000 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) tablets to Tug Valley Pharmacy. On October 16, 2007 H. D. Smith delivered 5000 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to Hurley Drug. Then on October 18, 2007, H.D. Smith delivered another 4000 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) to Hurley resulting in a total of 39,000 hydrocodone delivered within a two (2) day period to a four (4) block area in a town which had a population of 3090 people.

(v)     The volume of oxycodone and hydrocodone pills distributed to Tug Valley Pharmacy by H.D. Smith in view of the town's population, the close proximity to pill-pushing physicians whose reputations were both well-known and the subject of extensive publicity, the close proximity to another pharmacy, existence of other suppliers of controlled substances to this same pharmacy, all should

-36-

have served to alert a distributor acting with due diligence

that the orders were suspicious in nature.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15. h. **Keysource Medical, Inc.**

    (i)     At all times pertinent hereto, Defendant Keysource Medical Inc. ("Keysource") was a foreign corporation doing business throughout West Virginia. As part of its business, Keysource distributed controlled substances to West Virginians.

    (ii)     By way of example, Keysource's wrongful acts and omissions include, but are not limited to:

Keysource distributed to two pharmacies in Williamson, West Virginia in 2008 and 2009 that were known suppliers of Dr. Katherine Hoover and Dr. Diane Shaffer, both of whom were prosecuted federally for, in essence, being pill mill doctors.

    (iii)     Keysource distributed controlled substances to a pharmacy in Crab Orchard (population 2,678), at an alarming rate since at least 2008 and up until the summer of 2011. This pharmacy in Crab Orchard is known to be a high volume seller of prescription drugs.

    (iv).     On June 9, 2011, the DEA issued a show cause order to Keysource alleging it failed to have an adequate anti-diversion program in conjunction with its sale of controlled substances, including oxycodone. Specifically, Keysource did not monitor or disclose suspicious orders. The

-37-

DEA found the continued registration of DEA constituted an imminent danger to public health and safety. *Keysource Med., Inc. v. Holder*, No. 1:11-cv-393, 2011 WL 3608097, at *4 (S.D. Ohio Aug. 16, 2011). DEA agent, Robert Corso, said the following in a press release: "Prescription drug abuse in Florida, southern Ohio and northern Kentucky has risen to epidemic proportions, and Keysource Medical, should have known based on the large, frequent quantities, that their customers were diverting oxycodone into arenas that were not legitimate. This action is another reminder that the DEA is working hard to hold accountable those companies who choose to operate outside the law."

(v)     Interestingly, some of Keysource's distributions, including those to the pharmacy in Crab Orchard, ceased shortly after the DEA's suspension order was issued in June 2011.  DEA records reflect that Keysource distributed 431,000 hydrocodone dosage units in Mingo County between 2008 to 2010; 319,600 in Raleigh County between 2007 to 2011; DEA records further show that Keysource distributed 677,800 oxycodone in Raleigh County between 2008 and 2010.

(vi)     In conjunction with litigation over an Immediate Suspension Order, the Southern District of Ohio made the following factual findings regarding Keysource:

(a)     KeySource Medical, Inc. ("KMI") is a secondary wholesaler of generic pharmaceutical drugs, including controlled substances that are regulated by the DEA. KMI sells both controlled and non-controlled substances and over-the-counter products to

independent retail pharmacies as well as a mix of small chain, long-term care, hospice, and specialty pharmacies in forty-seven states. (Testimony of Dennis J. Engel (July 5, 2011); Decl. of Dennis J. Engel (Doc. 2–3) 2.) Founded in 1996, KMI has one distribution facility at its Cincinnati, Ohio location. (Id. ¶¶ 2–3.)

(b)    Between2008 and 2011, KMI increased its purchases of hydrocodone and oxycodone, two drugs commonly associated with abuse and diversion. (Wright Testimony; Decl. of Kyle Wright (Doc. 9–3) 10; DX 1007 at 7–8.) According to a database maintained by the DEA,1 KMI doubled the amount of hydrocodone it purchased in 2008 and doubled it again in 2009, when it purchased and distributed 28.6 million units of the drug. (Wright Decl. 11; Def. Ex. 1007 at 7.) KMI also increased its purchases of oxycodone, which more than doubled in 2008 (to 2.4 million dosage units), increased fivefold in 2009 (to 16.2 million dosage units), and tripled in 2010 (to 50.9 million dosage units). (Wright Decl. ¶ 12; Def. Ex. 1007 at 8.) In terms of drug strength, most of KMI's controlled substances sales that were reported to the DEA were of two particular drugs — oxycodone 30 mg and hydrocodone 10 mg — that have a high street value and pose a substantial risk of diversion. (Wright Decl. ¶ 15–17; Def. Ex. 1007 at 10–11.)

( c)    KMI's sales of oxycodone to the state of Florida are particularly significant, for reasons that are explained in the next section.

> Beginning in or around 2009, KMI began distributing
> pharmaceutical drugs to Florida. (Am. Decl. of David Hoffman,
> R.Ph (Doc. 5) 12.) Between January 1, 2009 and May 31, 2011,
> KMI sold 52,880,400 dosage units of oxycodone, a powerful and
> addictive narcotic that is regulated as a schedule II controlled
> substance based on its high potential for abuse and addiction.
> (Wright Testimony; Wright Decl. ¶ 5; Def. Ex. 1007 at 3.) In 2010
> alone, KMI sold 41,502,500 dosage units of oxycodone to
> pharmacies in Florida. (Wright Decl. ¶ 19; Def. Ex. 1007 at 4.)
> Among similarly situated distributors — *i.e.*, those with only one
> distribution facility — KMI was the top supplier of oxycodone to
> Florida in 2010 and the first three months of 2011. (Wright Decl. ¶
> 21–23; Def. Ex. 1007 at 30–33.)
>
> *Keysource Med., Inc. v. Holder*, No. 1:11©CV©393, 2011 WL
> 3608097, at *2-3 (S.D. Ohio Aug. 16, 2011).

(d)    On or about April 5, 2012, Keysource paid $320,000 in fines to
resolve the DEA matter.  Keysource also permanently surrendered
its Ohio license.

(iii)    Keysource's distributions into West Virginia were supplied to entities with
a population base which could in no legitimate way consume the volume
of drugs being distributed.  Moreover, most of the recipients of controlled
substances from Keysource are known to be located in areas notorious for
prescription drug abuse.  DEA records reflect that Keysource distributed,
1,094,900 hydrocodone tablets in West Virginia between 2007 and 2010 -

431,000 of which were to Mingo County pharmacies. Mingo County is considered to be the epicenter of prescription drug abuse.

(iv)    Keysource distributed, among other narcotics and highly-abused drugs, the following staggering numbers, more or less, of total dosage units in West Virginia between 2007 and 2012:

>1,238,700 of hydrocodone; and

>905,100 of oxycodone.

(v)    An undated, internal policy offered by Keysource acknowledges it must "maintain a system to disclose suspicious orders." This policy was not followed by Keysource.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15.  i.  **Masters Pharmaceuticals, Inc.**

(i)    At all times pertinent hereto, Defendant Masters Pharmaceuticals, Inc. ("Masters") was a foreign corporation doing business throughout West Virginia. As part of its business, Masters distributed controlled substances to West Virginians.

(ii)    Examples of Masters's wrongful acts and omissions include but are not limited to:

(a)    Masters produced their responses to the limited discovery allowed by this court with only three categories: "Customer Name, Item Description, Total Quantity Shipped." From this incomplete

information, the State can nevertheless glean from Masters's partial responses that certain pharmacies ordered boxes of narcotics in the following amounts - 658, 508, 480, 476, 439, 394, 386, 359, 312, 301, 290, 288, 248, 247, 246, 221, 220; whereas the other pharmacies ordered shipments of narcotics typically in increments of 4, 3, 2 or 1. With one exception, these shipments in excess of 200 were to McDowell County (the County with the highest overdose rate in the country) or to the Northern Panhandle (which also has a well-documented prescription drug problem). In other words, the foregoing distributions were supplied to entities with a population base which could in no legitimate way consume the volume of drugs being distributed. Moreover, most of these recipients of controlled substances from Masters are known to be located in areas notorious for prescription drug abuse.

(b)   In one instance, a pharmacy in Van, Boone County, West Virginia (population 211) ordered 11,400 pills of oxycodone, hydrocodone, endocet, and morphine over the span of approximately 6 months from December 2011 through May 2012. That's more than 63 pills for each resident per day!

( c)   In another example, Masters received an order from a pharmacy in Crab Orchard (population 2,678) on May 17, 2010. On that day, May 17, 2010, this particular pharmacy ordered every type of hydrocodone available, including dosages in 325 mg, 500 mg, 650 mg, and 750 mg. The total number of dosage units of hydrocodone

ordered that day by the pharmacy in Crab Orchard was 4,000. Masters filled these orders and continued to supply this pharmacy with controlled substances, including hydrocodone through 2010, 2011 and into 2012 up until the time this lawsuit was filed in June 2012.

(d)     Between January 20, 2009 and May 27, 2009, a pharmacy in Raleigh County ordered 34,300 dosage units of oxycodone from Masters. On the first day, January 20, 2009, this pharmacy ordered 60 boxes of 100 dosage units of oxycodone. Three days later, on January 23, 2009, this pharmacy ordered 19 more boxes of 100 dosage units. This pharmacy continually ordered and Masters filled requests for oxycodone.

(e)     In 2009, a pharmacy in Logan County ordered 47,500 dosage units of hydrocodone from Masters. Masters continued to supply this pharmacy with hydrocodone through 2012, prior to the time this lawsuit was filed. By way of example, a 6-day stretch in January 2009 is illustrative. On January 6, 2009, Masters shipped 2,000 dosage units of hydrocodone to this pharmacy. The next day, on January 7, 2009, Masters shipped 1,500 more hydrocodone dosage units to this pharmacy. The following day, January 8, 2008, Masters shipped 2,000 more dosage units of hydrocodone to this pharmacy. On Friday, January 9, 2009, Masters shipped another 2,000 dosage units of hydrocodone to this pharmacy. Following the weekend, Masters sent 2,000 additional dosage units of

hydrocodone to this same pharmacy on January 12, 2009. Between January 6, 2009 and January 12, 2009, Masters sent 9,500 dosage units of hydrocodone to this particular pharmacy in Logan County.

(f)     On July 1, 2009, Masters supplied a pharmacy in Marshall County with 25,000 dosage units of oxycodone. Later that year, Masters shipped another 19,000 dosage units of oxycodone to this same pharmacy in Marshall County on December 8, 2009.

(g)     Between June 21, 2011 and August 23, 2011, Masters distributed 25,000 dosage units of oxycodone to the same pharmacy in Raleigh County. Of this amount, Masters sent 15,000 to the same pharmacy on August 23, 2011.

(h)     On two separate occasions in 2010 and 2011, Masters shipped 20,000 dosage units of hydrocodone per day to a particular pharmacy in Putnam County.

(iii)     Masters distributed, among other narcotics and highly-abused drugs, the following staggering numbers, more or less, of total dosage units in West Virginia between 2007 and 2012:

1,454,040 of hydrocodone; and

859,800 of oxycodone.

(iv)     Masters has not fully complied with the State's discovery requests which would further reveal the ratios regarding its distribution of controlled substances vis-a-vis non-controlled substances, or the State's discovery requests regarding its adherence to any sort of policy identifying suspicious orders. However, DEA records indicate that Masters

-44-

distributed 1,454,040 Oxycodone tablets to West Virginia between years 2007 and 2012.  In the period of 2007 through 2010, 176,700 tablets went to Mingo County pharmacies out of a total of 781,100 for the period.

As the proximate result of the acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15. j. **Quest Pharmaceuticals, Inc.**

(i)    At all times pertinent hereto, this Defendant was a Kentucky corporation doing business in the State of West Virginia.  As part of their business practices, Quest Pharmaceuticals, Inc., distributed controlled substances to West Virginia customers.

(ii)    Examples of the Defendant's acts and omissions as complained of herein are:

(aa)    Distributions of controlled substances to Strosnider Drug Store, Inc., d/b/a SAV-RITE Pharmacy, in Kermit, WV, population 406, and to Tug Valley Pharmacy in Williamson, WV, population: 3,090.  The Strosnider pharmacy and its owner were the subject of a criminal investigation and successful federal prosecution for controlled substance violations. *United States v. James P. Wooley,* Criminal No. 2:12-cr-00007 (USDC SDWV).  The Strosnider and Tug Valley pharmacies were two of the primary suppliers of controlled substances to patients of the notorious pill mills in the area during the time span of 2007 through 2011, that is, the Justice Medical Complex, LLC; Mountain Medical Care Clinic, formerly

known as the Williamson Wellness Center; and Dr. Diane Shafer, M.D. The owner of Justice Medical Complex and physicians associated with that clinic were successfully criminally prosecuted for federal controlled substance violations they committed in connection with that alleged clinic. *United States v. Cameron Justice,* Criminal No. 2:10-cr-00029, and *United States v. Augusto T. Abad, M.D.,* Criminal No. 2:10-cr-00024 (USDC SDWV). Dr. Shafer was successfully criminally prosecuted for controlled substance violations in connection with her practice. *United States v. Diane E. Shafer, M.D.,* Criminal No. 2:12-cr-00085 (USDC SDWV). The office manager and three physicians associated with the Williamson Wellness Center/Mountain Medical Care Clinic were also criminally prosecuted for controlled substance violations committed by them in connection with that clinic. *United States v. Myra C. Miller,* Criminal No. 2:13-cr-00025; *United States v. Donald R. Kiser, D.O.,* Criminal No. 2:07-cr-00074; and *United States v. William F. Ryckman, M.D.,* Criminal No. 2:11-cr-00255 (USDC SDWV). Additionally, numerous assets belonging to these parties, primarily substantial sums of currency and two commercial buildings housing one of the clinics were forfeited by the federal government: *United States v. $599,274.59,* Civil Action No. 2:10-cv-1406 (Diane E. Shafer, M.D.); *United States v. $475,823.75, et al.,* Civil Action No. 2:10-cv-1007 (Myra Miller/William Ryckman, M.D.); *United States v. $88,029.08,* Civil Action No.

-46-

2:10-cv-1087 (Katherine Hoover, M.D); and *United States v. $65,806.86,* Civil Action No. 2:09-cv-00944 (Cameron Justice) (all in the USDC SDWV).

(bb)   As supplied by Defendant in their discovery for the years 2007 up to and including 2012, this Defendant distributed to its West Virginia customers, among other narcotics and highly abused drugs, the following:

- 210,600 Aprazolam; and

- 1,207,853 hydrocodone tablets.  Of this sum, 1,037,242 (86%) were distributed during a three-year period (2007 through 2009) to two pharmacies (Strosnider and Tug Valley) that were directly linked to nearby notorious pill mills identified above, which were located in Mingo County, the epicenter of prescription drug abuse. These orders for hydrocodone were suspicious.

(cc)   The foregoing distributions were supplied to these equally notorious pharmacies located in communities having a population as low as 406 people, in counties designated by federal and state law enforcement as High Intensity Drug Trafficking Areas (HIDTA), and to a population base which in no way could legitimately consume the volume of drugs which was being distributed.

(ff)   More particularly, the foregoing disparity between population and amount of controlled substances being distributed by this

Defendant in itself should have created a red flag that the orders being filled were excessive.

(gg)     Further, the frequency of orders, the relative numbers of narcotics to non-narcotics which were being supplied, the existence of other distributors who were distributing controlled substances to the same customers, and the notorious reputation of physicians, clinics and pharmacies in these communities as "pill mills" provide indicia of suspicious and/or excessive orders which this Defendant either purposely chose to ignore or negligently failed to identify.

As the proximate result of acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

15. k.  **Top Rx, Inc.**

(i)      At all times pertinent hereto this Defendant was a Tennessee corporation doing business in the State of West Virginia. As a part of their business practices, Top Rx, Inc. distributed controlled substances to West Virginia customers.

(ii)     In the years beginning 2007 and ending 2012 the records of the DEA reflect that this Defendant distributed 1,668,290 hydrocodone tablets to pharmacies in West Virginia. The highest totals were distributed to pharmacies which were in counties designated by federal and state authorities as high intensity drug trafficking areas. Those West Virginia Counties to which Top Rx, Inc. distributed

hydrocodone, namely Wayne and McDowell, have a combined population of 62,313 (2013) - 64,594 (2010). For the years stated, the Wayne pharmacy received 435,000 tablets while the McDowell pharmacy, located in the town of War, population 862 in 2010, received 303,170. Taking into account the particular pharmacies, the number of pills distributed, the population base and the history of drug activity and abuse associated with these locations these orders filled by this Defendant are suspicious orders. Further, if the population of War is taken into account the number of hydrocodone tablets per person over the four(4) years identified equals 351.

(iii)   As previously filed with this Court *and hereby corrected to adopt Top Rx, Inc.'s reply* (captioned Top Rx, Inc.'s Reply to Plaintiff's Separate Response) this Defendant supplied one Southern West Virginia physician a total of 53,500 phentermine tablets during a three(3) month period in 2009 (*incorrectly identified in Plaintiffs' filing as hydrocodone*). Phentermine (Adipex) is a Schedule IV substance intended for weight loss which is used by those who abuse hydrocodone and Xanax to enhance the effects of those drugs. In 2011 this Defendant distributed 137,500 phentermine according to their records produced as discovery.

(iv)   As reflected in the five(5) years of transactions which Defendant presented, this Defendant distributed to a single Logan County physician monthly totals of phentermine which *according to the*

*Defendant's reply reached levels as high as 20,000 in a single month.* Logan County is identified as a high intensity drug trafficking area. To reiterate, phentermine is a stimulant which is used by drug abusers or addicts to enhance the effects of Xanax and hydrocodone.

(v)     In addition to the aforementioned, Top Rx, Inc.'s records as produced in discovery reflect distributions of hydrocodone in high volumes on a regular basis which when considering the population served, to pharmacies located in Crab Orchard (Raleigh) in Northfork (McDowell) and in Hinton (Summers), West Virginia. These distributions occurred in the years 2007, 2008 and 2009. The distributions referred to herein are suspicious as contrary to the "know your customer" standard of due diligence which is required.

As the proximate result of acts and omissions heretofore identified, the State of West Virginia and the Plaintiff agencies named herein have incurred substantial losses, costs, and damages and will continue to incur substantial losses, costs, and damages in the future.

16.     Pursuant to *W.Va. Code* § 46A-7-114 venue is proper in that the Defendants committed the acts which are complained of in the preceding paragraph in violation of, *inter alia*, the West Virginia Uniform Controlled Substances Act and the West Virginia Consumer Credit and Protection Act in Boone County West Virginia. Further, the Defendants transacted business in Boone County as well as in other counties within the State of West Virginia.

# Causes of Action

## Count I

### Injunctive Relief for Violations of Responsibilities and Duties Under The West Virginia Uniform Controlled Substances Act

17.     The State hereby incorporates by reference all of the previous allegations of this Amended Complaint.

18.     *West Virginia Code* § 60A-5-501(c) provides: "All prosecuting attorneys and the attorney general, or any of their assistants, shall assist in the enforcement of all provisions of this act and shall cooperate with all agencies charged with the enforcement of the laws of the United States, of this state, and of all other states relating to controlled substances."

19.     *West Virginia Code* § 60A-5-503(a) states that, "The courts of record of this state have and may exercise jurisdiction to restrain or enjoin violations of this act."

20.     Regulations promulgated pursuant to the West Virginia Uniform Controlled Substances Act, *W. Va. Code* § 60A-3-301, provide, *inter alia,* for the following:

- "Every person who manufactures, distributes or dispenses any controlled substance or who proposes to engage in the manufacture, distribution or dispensing of any controlled substance shall obtain annually a controlled substance permit unless exempted by law or pursuant to Section 3.2 of this rule." 15 *W.Va.C.S.R.* § 2-3.1.1.

- "All registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances." 15 *W.Va.C.S.R.* § 2-4.2.1.

- "The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant shall inform the Office of the West Virginia Board of Pharmacy of suspicious orders when discovered by the registrant.  Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."  15 *W.Va.C.S.R.* § 2-4.4.

21.   Defendants have failed to diligently respond to suspicious orders which the Defendants
      have filled. The Defendants therefore have failed to provide effective controls and
      procedures to guard against diversion of controlled substances in contravention of West
      Virginia law.

22.   By failing to do so, Defendants have willfully and repeatedly violated the Uniform
      Controlled Substances Act and corresponding regulations.

23.   The State, by and through, the Attorney General under the authority of *W.Va. Code* §
      60A-5-501(c) and *W. Va. Code* § 60A-5-503(a) seeks to restrain the violations of 15
      *W.Va.C.S.R.* §§ 2-4.2.1, 2-4.4.

24.   The State of West Virginia and its agencies have in the past sustained enormous damages
      as the proximate result of the failure by the Defendants to comply with 15 *W.Va.CSR* §2-
      4.2.1 and 15 *W.Va.CSR* §2-4.4. Unless restrained by injunctive relief the State will
      continue to suffer losses as the proximate result of the failure by the Defendants to
      monitor and to disclose suspicious orders of controlled substances.

25.   The State of West Virginia and its agencies have suffered substantial and irreparable
      harm and will in the future suffer irreparable harm unless the Defendants are restrained by
      an injunction.

26.   A lawsuit for damages for past losses as have been sustained by the State and its agencies
      is inadequate by itself to prevent the future losses that will result from the failures of
      Defendants to comply with West Virginia law as herein alleged..

## Count II

### Damages Resulting From Negligence and Violations of the
### West Virginia Uniform Controlled Substances Act

27.   The State hereby incorporates by reference all of the previous allegations of this

      Amended Complaint.

28.   The epidemic prescription drug abuse is attended and promoted by the repeated violation

      of various provisions of the West Virginia Uniform Controlled Substances Act, to wit;

                 a.     Improper dispensing of prescriptions contrary to
                        *W.Va Code* § 60A-3-308;

                 b.     Engaging in prohibited acts contrary to W.Va *Code*
                        §§ 60A-4-401 through 403;

                 c.     Deceiving and attempting to deceive medical practitioners
                        in order to obtain prescriptions in contravention of *W.Va.*
                        *Code* § 60A-4-410;

                 d.     Disregarding the requirements of the Wholesale Drug
                        Distribution Licensing Act of 1991, *W.Va. Code*
                        §60A-8-1 *et seq,*; and

                 e.     Conspiring to violate the West Virginia Uniform Controlled
                        Substances Act.

29.   The Defendants are distributors of controlled substances and must comply both with the

      laws of the State into which they distribute controlled substances and with industry

      custom and standards.  In the instant case, the standard of conduct for Defendants'

      industry requires that the Defendants know their customers, which includes, *inter alia,* an

      awareness of their customer base (including but not limited to population levels of the

      immediate area), knowledge of the average prescriptions filled each day, the percentage

      of diverted and/or abused controlled substances distributed as compared to overall

      purchases, a description of how the dispenser fulfills its responsibility to ensure that

      prescriptions filled are for legitimate medical purposes, and identification of physicians

      and bogus centers for the alleged treatment of pain that are the dispenser's most frequent

      prescribers.

30.     These Defendants have wilfully turned a blind eye towards the foregoing factors by

        regularly distributing large quantities of commonly-abused controlled substances to

        clients who are serving a customer base comprised of individuals who are themselves

        abusing prescription medications, many of whom are addicted and whom reasonably can

        be expected to become addicted or to engage in illicit drug transactions. The Defendants'

        negligent acts and omissions in violation of West Virginia's drug laws have lead to the

        dispensing of controlled substances for non-legitimate medical purposes of epidemic

        proportions, including the operation of bogus pain clinics that do little more than provide

        prescriptions for addictive controlled substances, thereby creating and continuing

        addictions to prescription medications.

31.     Under West Virginia law a party who violates a statute which violation results in

        damages is liable for such damages as are sustained therefrom. *W.Va. Code* § 55-7-9.

32.     These Defendants have by their acts and omissions proximately caused and substantially

        contributed to damage to the State by violating West Virginia laws, by creating conditions

        which contribute to the violations of West Virginia laws by others, by their negligence

        and by their reckless disregard of the customs, standards and practices within Defendants'

        own industry.

## Count III

### Violation of the West Virginia Consumer Credit and Protection Act (WVCCPA)
### Unfair Methods of Competition or Unfair or Deceptive Acts or Practices

33.     The State and its agencies hereby incorporate by reference all of the previous allegations

        of this Amended Complaint.

34.     West Virginia law as embodied in *W.Va. Code* § 46A-6-104 prohibits the use of unfair

        methods and/or competition or unfair or deceptive acts or practices in any trade or

        commerce.

35.     The Attorney General specifically is charged with the administration of this provision and

        may act *sua sponte* as the agent and legal representative of the State in civil proceedings

        to enforce the statute, *W. Va. Code* § 46A-6-103, §§ 46A-7-102, -108, -110, -111.

36.     Violations of statutes and regulations that are enacted to protect the Public or in the

        exercise of the State's police power constitute unfair or deceptive acts or practices.

37.     Regulations promulgated pursuant to the West Virginia Uniform Controlled Substances

        Act, *W. Va. Code* § 60A-3-301 18 provide, *inter alia,* for the following:

   •        "Every person who manufactures, distributes or dispenses any controlled
            substance or who proposes to engage in the manufacture, distribution or
            dispensing of any controlled substance shall obtain annually a controlled
            substance permit unless exempted by law or pursuant to Section 3.2 of this rule."
            15 *W.Va.C.S.R.* § 2-3.1.1.

   •        "All registrants shall provide effective controls and procedures to guard against
            theft and diversion of controlled substances." 15 *W.Va.C.S.R.* § 2-4.2.1.

   •        "The registrant shall design and operate a system to disclose to the registrant
            suspicious orders of controlled substances. The registrant shall inform the Office
            of the West Virginia Board of Pharmacy of suspicious orders when discovered by
            the registrant. Suspicious orders include orders of unusual size, orders deviating
            substantially from a normal pattern, and orders of unusual frequency." 15
            *W.Va.C.S.R.* § 2-4.4.

38.     Each violation of these mandatory duties in the West Virginia Uniform Controlled

        Substances Act and its corresponding regulations is an unfair or deceptive act or practice

        in the conduct of trade or commerce, as set forth in *W. Va. Code* § 46A-6-104.

39.     Defendants' repeated violations were and are willful, and the State seeks civil penalties

        under *W. Va. Code* § 46A-7-111(2) for each violation.

40.     As a result of the Defendants' actions and omissions the State has sustained damages,

        both past and in the future.

41.     The State seeks all " other appropriate relief" under *W. Va. Code* § 46A-7-108, including

        attorney fees and costs.

## Count IV

### Public Nuisance

42.     The State and its agencies hereby incorporate by reference all of the previous allegations
        of this Amended Complaint.

43.     Defendants, individually and acting through their employees and agents, have created and
        continue to perpetrate and maintain a public nuisance by the massive distribution of
        abused prescription drugs for use by the citizens of West Virginia, and by their failure to
        put in place effective controls and procedures to guard against theft and diversion of
        controlled substances, and their failures to adequately design and operate a system to
        disclose suspicious orders of controlled substances, and by their failures to inform the
        State of suspicious orders when discovered by the registrant ("suspicious orders" include
        orders of unusual size, orders deviating substantially from a normal pattern, and orders of
        unusual frequency). Defendants knew or should have known their conduct would cause
        hurt or inconvenience to the State of West Virginia in a multitude of ways.

44.     As a direct result of the conduct of each of the Defendants as set forth above, Defendants
        have negligently, intentionally and/or unreasonably interfered with the right of West
        Virginians to be free from unwarranted injuries, addictions, diseases and sicknesses and
        have caused ongoing damage, hurt or inconvenience to the State of West Virginia and its
        residents exposed to the risk of addiction to prescription drugs, who have become
        addicted, and/or have suffered other adverse consequences from the use of the addictive
        prescription drugs distributed by Defendants, and countless others who will suffer the
        same fate in the future as Defendants' conduct is continuing.

45.     As a direct result of Defendants' conduct as set forth above, Defendants have negligently,
        intentionally and/or unreasonably interfered with the Public's right to be free from

unwarranted injury, disease or sickness, and have caused ongoing damage, hurt or inconvenience to the public health, the public safety and the general welfare of the citizens of West Virginia.

46.    The health and safety of the citizens of West Virginia, including those who have used or will use prescription drugs, is a matter of great public interest and of legitimate concern to the State and its citizens.

47.    The public nuisance created, perpetuated and maintained by Defendants can be abated and further occurrence of such harm and inconvenience can be prevented.

48.    These Defendants were on notice that an epidemic from prescription drug abuse existed and has existed during times which are relevant to this Amended Complaint. Such notice is the result of

•    A large amount of media coverage of prescription drug abuse and its consequences by both national and local print, television and radio media;

•    Publications received from government sources as well as warnings and recommendations contained in trade and professional journals; and

•    Changes in law and regulations which were designed specifically to address the growing problem of prescription drug abuse.

49.    The widespread publicity contained many references and statistics concerning West Virginia's problems from prescription drug abuse including, but not limited to, suffering the nations' highest per capita death rate from prescription drug overdose.

50.    Notwithstanding the knowledge of this epidemic of prescription drug abuse in West Virginia, the Defendants persisted in a pattern of distributing controlled substances of the kinds which were well-known to be abused and diverted all the while distributing them in geographic areas, and in such quantities and with such frequency, that the Defendants knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes.

51.    As the result of the above-described conduct the Defendants negligently, recklessly
and/or intentionally, and acting with blind indifference to the facts, created and continued
propagate a public nuisance. More particularly, the public nuisance so created,
injuriously, and in many areas pervasively, affects West Virginia communities and the
State, and endangers the public health and safety and inconveniences the citizens of the
State, *inter alia,* in the following ways:

- Areas in certain communities have become congested with persons who gather in large groups outside of "clinics, pharmacies and physician offices" that in fact are component parts of Pill Mills that exist only to prescribe and deliver drugs for illicit, non-medical purposes;

- Crimes and other dangerous activities have increased;

- Hospital services, especially those services provided by emergency rooms, are being consumed by persons with prescription drug abuse issues;

- Law enforcement and prosecutorial resources are being exhausted and consumed by having to address prescription drug abuse issues to the exclusion of other matters;

- Public resources are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources which could be used to benefit the public at large;

- Court dockets are congested by prescription drug-related cases as well as by crimes committed by addicts, thereby diminishing access to our courts by others;

- Jails and prisons suffer from overcrowding.

52.    As a direct result of the acts and omissions of Defendants in creating, perpetuating and
maintaining the public nuisance hereinabove described, the public nuisance described
herein has damaged the health and safety of West Virginia citizens in the past and will
continue to do so in the future unless the nuisance is abated.

53.    The State has sustained economic harm in the expenditure of massive sums of monies
and will in the future continue to suffer economic harm unless the above-described public
nuisance is abated.

## Count V

### Negligence

54. The State realleges and incorporates by reference all preceding paragraphs as though fully set forth herein and further alleges the following.

55. Defendants have a duty to exercise reasonable care in the distribution of controlled substances.

56. Defendants have breached this duty by their conduct alleged above.

57. As a proximate result, Defendants and their agents have caused the State to incur excessive costs related to diagnosis, treatment and cure of addiction or the risk of addiction to such controlled substances, thus the State has borne the massive costs of these illnesses and conditions by having to provide necessary medical care, facilities and services for treatment of citizens of West Virginia who are unable to afford or otherwise obtain such necessary medical care, facilities and services.

58. The Defendants were negligent in failing to monitor and guard against third-party misconduct, *i.e.* the conduct of the Pill Mill physicians and staff as well as corrupt pharmacists and staff and, in fact, by their actions the Defendants participated and enabled such misconduct.

59. Defendants' acts and omissions as aforesaid imposed an unreasonable risk of harm to others separately and/or as combined with the negligent and/or criminal acts of third parties.

60. The Defendants are in a class of a limited number of parties that distribute controlled substances and such activity poses distinctive and significant dangers. The dangers

include diversion of controlled substances for non-legitimate medical purposes and addiction to same by consumers.

61.     The Defendants were negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

62.     Controlled substances are dangerous commodities. The Defendant distributors are required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of controlled substances during distribution. The Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business. The Defendants cannot delegate this duty of care to another.

63.     The distribution of these controlled substances are under the exclusive control and management of the Defendants. The State is without fault and the injuries to the State and its citizens would not have happened in the ordinary course of events had the Defendants used due care commensurate to the dangers involved in the distribution of controlled substances. Hence, the Defendants are negligent.

## Count VI

### Unjust Enrichment

64.     Plaintiffs incorporate by reference all of the previous allegations of this Complaint.

65.     Because of prescription drug abuse the State of West Virginia expends additionally hundreds of millions of dollars annually on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole, public welfare and service agencies, healthcare and medical services and drug abuse education. Further, the State suffers

losses in revenue and incurs costs from workplace accidents and absenteeism resulting from prescription drug abuse.

66. The State of West Virginia remains responsible for costs of prescriptions, health care and other medically-related costs, rehabilitation and work-related programs, workers' compensation, public insurance, law enforcement, prosecution costs, court related costs, public defender services, correctional institutions, probation and parole services, which costs have substantially increased as the result of the Defendants' acts and omissions herein complained of and will in the future continue to increase unless the Defendants' conduct is abated.

67. The Defendants have thus been enriched unjustly by neglecting its duty of distributing drugs only for proper medical purposes which substances are consumed for reasons other than medical.

68. The unjust enrichment of the Defendants is directly related to the damage, loss and detriment to the Plaintiff State of West Virginia and its agencies named herein.

## **PRAYER**

**WHEREFORE**, the State and its agencies pray that the Court grant the following relief:

1. Judgment in favor of the State;

2. Temporary relief, a preliminary injunction and permanent injunction ordering the ordering the Defendants to comply with the West Virginia Uniform Controlled Substances Act, *W. Va. Code* § 60A-3-301 (and regulations promulgated thereto), and *West Virginia Code* § 46A-6-104, and to cease their unlawful conduct, and mandate the Defendants to promptly notify the West Virginia Board of Pharmacy, the Office of the Attorney General, and the Department of Military Affairs and Public Safety of any and all suspicious orders for controlled substances as received from parties who are located in

West Virginia and to submit their system for determining suspicious orders to those West Virginia authorities for prior approval, and to enter temporary and permanent injunctions that mandate Defendants be enjoined from distributing in West Virginia any controlled substances for any non-legitimate medical purpose;

3.   Equitable relief, including but not limited to restitution and disgorgement;

4.   Order a jury trial where so triable to determine such costs, losses and damages as are proved in this action in relation to the several counts of this Second Amended Complaint including, but not limited to:

    a.   Losses sustained as the proximate result of both negligent and conscious violations of the West Virginia Uniform Controlled Substances Act and regulations;

    b.   Damages sustained as the proximate result of nuisances created by the prescription drug abuse epidemic;

    c.   Damages and losses sustained as the proximate result of the Defendants' negligence in marketing, promoting and distribution of controlled substances in West Virginia;

    d.   Disgorgement of unjust enrichment of the Defendants;

    e.   Civil penalties of up to $5000 for each repeated and willful violation of Chapter 46A, under West Virginia Code § 46A-7-111;

    f.   Pre- and post-judgment interest;

    g.   Costs and reasonable attorneys' fees; and

5.   Such other relief, fees and cost as shall be available under the West Virginia Credit and Consumer Protection Act;

6.   Order reimbursement of all litigation costs and enter an award of attorney fees herein;

7.   And grant such other and further relief including but not limited to punitive damages as

shall be deemed appropriate herein.

**Plaintiffs seek a jury trial for all such counts as are so triable**.

**STATE OF WEST VIRGINIA**
*ex rel.* **PATRICK MORRISEY,**
Attorney General, the **WEST VIRGINIA**
**DEPARTMENT OF MILITARY AFFAIRS**
**AND PUBLIC SAFETY,** an agency of the State of
West Virginia, and the **WEST VIRGINIA**
**DEPARTMENT OF HEALTH & HUMAN**
**RESOURCES,** an agency of the State of West
Virginia,

Betty J. Pullin, WV Bar. No. 5580
Assistant Attorney General
**OFFICE OF ATTORNEY GENERAL**
Consumer Protection and Antitrust Division
812 Quarrier Street, 1st Floor
Charleston, WV 25326
Telephone: 304-558-8986
Email: Betty.A.Pullin@wvago.gov

James M. Cagle, WV Bar No. 580
**CAGLE & JACKSON, ATTORNEYS**
P.O. Box 12326
Big Chimney Station
Charleston, WV 25301
Phone: 304-342-3174
Fax: 304-342-0448
Email: caglelaw@aol.com

Rudolph L. DiTrapano      (W.Va. Bar No. 1024)
Sean P. McGinley           (W.Va. Bar No. 5836)
Robert M. Bastress III      (W.Va. Bar No. 9616)
**DiTRAPANO, BARRETT, DiPIERO,**
**McGINLEY & SIMMONS, PLLC**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133 (phone)
(304) 342-4605 (fax)