# EXHIBIT 1

### *PILLAGE: RX drug abuse in W.Va.; Prescription drug abuse takes a deadly toll in W.Va.; Mountain State leads U.S. in rate of overdose deaths*

Charleston Gazette (West Virginia)

January 16, 2011, Sunday

Copyright 2011 Charleston Newspapers

**Section:** NEWS; Pg. P1A

**Length:** 2068 words

**Byline:** Alison Knezevich, Staff writer

## Body

INSIDE: Prevention: Where West Virginia stands 8A

ONLINE: See an audio slideshow on Nick Bills wvgazette.com

This is the first in a four-part series examining prescription drug abuse in West Virginia.

ST. MARYS - By the time he was in his 20s, Nick Bills had gone through so many medical procedures, he swore he could do brain surgery.

When he started abusing prescription drugs, he thought he could handle it.

On a July night in 2009, the 26-year-old pulled his pickup into the parking lot of a St. Marys bar. There, he squeezed the clear gel out of a fentanyl patch, mixed it with water, and injected it into his 6'2" frame.

He died there that night.

In a sense, he didn't die alone. Prescription drug overdoses now kill hundreds of West Virginians every year:

-In 2008, the latest year for which data is available, 390 West Virginians died from accidental overdoses involving prescription drugs, according to the state Health Statistics Center. In 2001, 91 West Virginians died this way.

-West Virginia has the nation's highest rate of drug deaths. Between 2001 and 2008, more than nine out of 10 of those deaths involved prescription drugs.

-Drug overdoses now kill more West Virginians each year than car accidents do. It's the leading cause of accidental deaths in the state.

-Between 2001 and 2008, the statewide death rate of overdoses involving prescription drugs more than quadrupled, from 5.1 deaths per 100,000 residents to 21.5.

Many people still don't realize how dangerous it is to abuse prescription drugs, said the state's chief medical examiner, Dr. James Kaplan.

"They need to know that it is like playing Russian roulette," he said.

'I didn't expect this'

PILLAGE: RX drug abuse in W.Va.; Prescription drug abuse takes a deadly toll in W.Va.; Mountain State leads U.S. in rate of overdose deaths

"This is Nick in a nutshell," said his mother, Vivian, picking up a photo of a family reunion. "Nick and the old men telling stories at the Bills reunion. He was so interested in all their stories."

She always worried about her son. He had abused alcohol for years.

"Every night, I expected a call of some kind, that he was in trouble," she said. "I didn't expect this."

A week before he died, Nick told his mother he wanted to go to rehab. She assumed he wanted help for his alcohol problem. She wishes she had taken him right away.

His problems had started early. When he was about 9, he found a gas can his brother had for the lawn mower. He found a lighter, too. The fire burned 20 percent of his body.

"His personality changed with that extreme pain," his mother said.

She remembers Nick wrapped in gauze at the hospital. He looked like a little mummy.

After the fire, his happy-go-lucky demeanor disappeared. He struggled in school.

Doctors ordered Nick to wear pressure garments - tight, uncomfortable things to stop his scar tissue from puffing up. As a child, he peeled them from his limbs and threw them in the weeds on the way to school. His parents never found them.

He had nightmares of being burned, his mother later learned. Something else haunted him, too: A deep sense of inadequacy.

"Stupid, fat and ugly." That's how he thought of himself.

She was relieved when he found a career he loved after high school. He became a union ironworker.

Around age 20, Nick suffered another accident. One night, as he rode as a passenger with his arm hanging out of the window, the driver whipped past a pole that was close to the roadway. Nick shattered his elbow.

His career as an ironworker ended. He could only lift a few pounds, a gallon of milk at the most. He had to sleep in a recliner. He wore special Velcro shirts to accommodate the metal rods inserted into his injured arm.

Although in great pain, he didn't need all of the drugs doctors prescribed him, said Logan Bloomer, Nick's ex-girlfriend and the mother of his 3-year-old daughter, Addison. He amassed a collection of pain pills that covered the top of the refrigerator at his sister's house, where he was staying.

"[Doctors] just kept giving him more when, to begin with, he wasn't taking a lot," Bloomer said, "so it just kind of backed up."

Friends wanted the pills. He was happy to share. "It made him feel important," said Bloomer, who was no longer dating Nick when he died. "It made him feel needed."

Research shows that nearly two-thirds of West Virginians who misuse pain relievers get them from friends or relatives for free.

As time went on, Nick developed a taste for them himself. He didn't want to give them away.

'A sense of urgency'

Last year, National Drug Control Policy Director Gil Kerlikowske called prescription abuse "our nation's fastest-growing drug problem."

Nationwide, deaths from drug overdoses more than doubled between 1999 and 2007, according to the federal Centers for Disease Control and Prevention, with opiate painkillers fueling the increase. These drugs, which include fentanyl and oxycodone, act on the central nervous system.

PILLAGE: RX drug abuse in W.Va.; Prescription drug abuse takes a deadly toll in W.Va.; Mountain State leads U.S. in rate of overdose deaths

The problem hit West Virginia hard and early, said Dr. Rolly Sullivan, a psychiatry professor and director of addiction services at the West Virginia University School of Medicine.

In the 1990s, "I was so completely overwhelmed with patients hooked on prescription drugs that I thought it was just a completely hopeless case," he said.

During that period, there was a movement to treat pain more aggressively.

OxyContin became available in 1996. The drug was heavily marketed to doctors who were "underprepared to judge the risk of addiction," Sullivan said.

Today, he sees all kinds of people struggling with painkiller addictions. His patients include a lawyer and a woman living in a homeless shelter.

Experts don't know exactly why the problem is so bad here, but they point to several factors.

Prescription drugs are abundant in West Virginia medicine cabinets. Residents of the state filled nearly 19 prescriptions per capita in 2009, the most in the nation, according to the Kaiser Family Foundation. The national average was 12.

Many West Virginians work in industries where they get hurt, like coal mining.

Help for addiction is hard to find, Sullivan said. "There's been pathetically inadequate treatment options," he said. "The state has been really slow to finance any."

Then, there is the lasting misperception that prescription drugs are safer than illegal drugs.

"There's a huge level of ignorance behind this because [people] don't know about the drugs," said Mike O'Neil, pharmacy professor at the University of Charleston and an expert on drug diversion.

People abuse many types of prescription drugs: Painkillers, tranquilizers, stimulants and sedatives.

Opiate painkillers cause so many overdose deaths because of the way the body develops tolerance to them, O'Neil said.

"Over time - and usually fairly quickly - we actually develop tolerance to the sedative effects of these drugs," O'Neil said, "and we develop tolerance to the euphoric or buzz effects."

The body, though, doesn't develop tolerance to opiates' respiratory-depression effects - the way they make the lungs breathe shallower and slower. As an addict takes more opiates to get the same feeling, the drugs can make them stop breathing.

Mixing drugs with each other or with alcohol also can be deadly, he said.

Injecting, snorting or smoking a drug increases the likelihood of addiction, O'Neil said. The drugs reach the brain faster and at higher concentrations because they bypass the digestive system.

"It also overloads other organ systems," he said, "like the heart or respiratory systems."

Some states have made fighting prescription drug overdoses a top priority. In Utah, for instance, legislators in 2007 passed a law creating a program aimed at reducing deaths by prescription drugs by 15 percent.

The state researched overdose deaths to determine which factors made some Utahans more likely to die from prescription drugs. A statewide media campaign educated people on the dangers of prescription drug abuse. Utah also created clinical guidelines for practitioners prescribing opiate pain medications.

In 2008, Utah saw a nearly 13 percent decrease in prescription-drug overdose deaths from the previous year.

PILLAGE: RX drug abuse in W.Va.; Prescription drug abuse takes a deadly toll in W.Va.; Mountain State leads U.S. in rate of overdose deaths

In Ohio, then-Gov. Ted Strickland signed an executive order last year creating a state Prescription Drug Abuse Task Force. In October, the task force released a final report of 20 recommendations related to areas like treatment, law enforcement, and public health.

West Virginia House of Delegates Health and Human Resources Chairman Don Perdue said he wants to see the Mountain State take similar steps.

"Unless we develop a sense of urgency about this problem, we will not do anything that's effective," the Wayne County Democrat said. "It's not penetrating the consciousness of the public in the way that it should."

'He wanted to get better'

Nick Bills' family doesn't know where he got the fentanyl patch that killed him. At the time, he had a prescription only for Vicodin, Bloomer said.

But prescription drugs are easy to find, said Bloomer, who is recovering from painkiller abuse.

When she and Nick abused drugs together, they had a friend with cancer who sold his OxyContin pills and fentanyl, a drug 80 times stronger than morphine. They knew people who worked for a company that collected unused drugs from nursing homes and rehabilitation centers. Instead of disposing of them like they were supposed to, they sold them.

When Nick's arm healed enough for him to work again, he found a new job as a heavy-equipment operator, running cranes and bulldozers.

Bloomer snuck him pills while he was working. At eight months pregnant, she stopped in a gas station daily to buy a piece of pizza. She dug her fingers through the crust, stuffed pills inside and dropped off the pizza at his job site.

One day, the two went driving around. By that time, Bloomer said, they couldn't get high any more. They wanted to not feel sick from withdrawal.

They looked for "old people's cars" like Cadillacs in the driveways, Bloomer said. They stopped at the houses and pretended to be lost. She asked to use the bathroom and scoured the medicine cabinets.

"I can remember going home, and we didn't get anything," she said. "We had to crawl back home, and we were so ashamed. And that's when we would look at each other like, 'This is sad, this is serious.'"

Bills can't imagine her son doing that.

"He would do anything for anyone," Bills said. "Any favor was not asking too much. He just was loveable - that other side, I didn't see."

Nick did his best to hide his addiction, Bloomer said, especially from his family.

"He wanted to get better," she said, "but he was too afraid for people to find out that he was sick."

He had always been a private person.

"Drinking brought him out of that shell," Bloomer said, "and so did pills. I think it was his way of being the person that he wanted to be."

Last month, Bills spent her second Christmas without Nick.

"It's almost harder as time passes on," she said.

The numbness is wearing off.

She thinks of him when she sees birds or stars. He always noticed those things.

PILLAGE: RX drug abuse in W.Va.; Prescription drug abuse takes a deadly toll in W.Va.; Mountain State leads U.S. in rate of overdose deaths

Some days, when she drives over the mountain above her home, she sees brilliant pink and red clouds. Nick loved it there. When she hits a certain point along the road, she feels like she's in the sky.

Most abused

What are the most abused prescription drugs in W.Va.?

1. OxyContin, Percocet

2. Vicodin

3. Xanax

4. Methadone

5. Morphine

Source: W.Va. Prescription Drug Abuse Quitline

Need help?

Need help finding treatment for substance abuse?

-W.Va. Prescription Drug Abuse Quitline:

Call 1-866-WV-QUITT or visit *www.wvrxabuse.org*/

-Federal Substance Abuse and Mental Health Services Administration:

Call 1-800-662-HELP or visit *www.samhsa.gov/treatment*

Coming Monday in The Charleston Gazette: Doctors grapple with treating real pain vs. supplying pill seekers.

This series was conceived and produced as a project for The California Endowment Health Journalism Fellowships, a program of the USC Annenberg School for Communication & Journalism.

kenny kemp | Sunday Gazette-Mail photos

Vivian Bills, who lost her son Nick to a prescription drug overdose in 2009, wipes away tears from the face of Logan Bloomer, Nick Bills' ex-girlfriend. West Virginia has the nation's highest rate of drug overdose deaths, and most involve prescription drugs.

Nick Bills loved history and hearing people tell stories. He was as an ironworker and heavy-equipment operator.

kenny kemp | Sunday Gazette-Mail

Vivian Bills and granddaughter Addison smile at pictures of Bills' son, Nick, who died from a prescription drug overdose in 2009.

Reach Alison Knezevich at *alisonk@wvgazette.com* or 304-348-1240.

**Load-Date:** January 17, 2011

**End of Document**

# EXHIBIT 2

## *PILLAGE: Rx drug abuse in W.Va.; Medical staff grapple with drug epidemic*

Charleston Gazette (West Virginia)

January 17, 2011, Monday

Copyright 2011 Charleston Newspapers

**Section:** NEWS; Pg. P1A

**Length:** 1730 words

## Body

This is the second in a four-part series examining prescription drug abuse in West Virginia.

By Alison Knezevich

Staff writer

HUNTINGTON - In the emergency room at Cabell Huntington Hospital, Dr. Allen Holmes sees patients jump off the bed at the lightest touch to their backs. He hears bizarre excuses.

"My doctor is out of the country for two years," they say. "My dog ate my pain medication."

They check in to the ER for one reason: They want pills.

As head of the hospital's emergency department, Holmes finds himself on the front lines of West Virginia's prescription drug abuse epidemic. In the four years he's been doing this work, he's watched it get worse.

He sees people in their early 20s whose doctors have prescribed them the highest possible doses of narcotic painkillers. He sees old people trying to play the system. He suspects some are addicted, while others want to sell the pills to make ends meet.

Holmes thinks he's too skeptical sometimes.

"And I feel bad about that," he said. "But on the other hand, I feel like I would be contributing to the problem if I leaned too far the other way."

Some West Virginia doctors have been accused of running alleged "pill mills" where people get addictive medications without proper exams.

Well-meaning providers are grappling with a host of challenges in prescribing powerful prescription drugs.

"It's really a complicated issue because we need to have balance," said Dr. Alvin Moss, director of the Center for Health Ethics and Law at West Virginia University and the West Virginia Center for End-of-Life Care.

These medicines help cancer patients suffer less, he said. They help elderly people die with their pain controlled.

The drug abuse epidemic, though, has made some doctors afraid to prescribe them.

"I talk to a lot of doctors now who say, 'I just don't prescribe opioids in my practice," Moss said.

There's no question, though, that West Virginia's consumption of the most abused opiate painkillers has skyrocketed over the past decade.

PILLAGE: Rx drug abuse in W.Va.; Medical staff grapple with drug epidemic

A Gazette review of data from the federal Drug Enforcement Agency, combined with Census figures, shows that from 1999 to 2009, West Virginia's per capita consumption of these drugs has soared:

-Oxycodone: 294 percent increase

-Hydromorphone: 319 percent increase

-Hydrocodone: 296 percent increase

-Fentanyl: 348 percent increase

-Morphine: 199 percent increase

-Methadone: 462 percent increase

Consumption of two opiate drugs - codeine and meperidine - declined by about 50 percent each during the time period. Many hospitals have stopped using those drugs because of side effects, Moss said.

Data for every state could not be obtained from the DEA for this time period. But West Virginia's not the only place with a growing demand for pain medicine.

Nationwide, Americans' use of opiate painkillers - synthetic versions of opium that include OxyContin and Vicodin - has increased at least tenfold in the past 20 years because of a shift toward more aggressive pain treatment, according to the federal Centers for Disease Control and Prevention.

"If only the people that needed pain medication had it available to them, there wouldn't be a [black] market," said state Chief Deputy Attorney General Fran Hughes, whose office sued the makers of OxyContin in 2001 and received a $10 million settlement three years later. "There's obviously a supply that exceeds the legitimate demand."

Evan Jenkins, a Democratic state senator from Cabell County and director of the West Virginia State Medical Association, calls prescription drug abuse "one of our most challenging health and criminal issues."

"If we squeeze this so much and make it too restrictive, we are going to have people suffering unnecessarily," he said. "This is a delicate balance between being able to maintain its availability and its uses in an appropriate manner, and to also go after, strongly, the dark side."

Dr. M. Khalid Hasan, a Beckley psychiatrist and member of the state Board of Medicine, puts it more bluntly.

Some of his colleagues' careless prescription practices frustrate him. "They're writing [prescriptions for] too many damn narcotics."

'The fifth vital sign'

Every room in Holmes' department has the same sign: How do you rate your pain?

Many physicians used to be leery of prescribing narcotic painkillers. Things changed in the 1990s.

Both the American Pain Society and the American Society of Anesthesiologists released guidelines encouraging expanded use of opiates to manage chronic pain.

West Virginia and other states passed laws saying doctors could not be disciplined or criminally punished for treating intractable pain with controlled substances, even if the dosage exceeded the average dosage, as long as they practice within accepted medical guidelines.

The Veterans Health Administration launched a campaign called "Pain is the fifth vital sign." The agency told its doctors to ask patients to describe their pain on a scale from zero to 10. Later, the Joint Commission, which accredits health care organizations, issued guidelines requiring hospitals and nursing homes to regularly measure patients' pain.

PILLAGE: Rx drug abuse in W.Va.; Medical staff grapple with drug epidemic

During the same period, pharmaceutical companies aggressively marketed opiate painkillers such as OxyContin.

In a typical 10-hour shift, Holmes sees about 25 patients. Between two and four are so-called "drug seekers." Some want anti-anxiety medications like Xanax. Most want opiate painkillers.

Many drug seekers say they're allergic to all non-narcotic painkillers, Holmes said. They ask for a specific drug, like Lortab or Vicodin. They exaggerate symptoms of pain. They relax on the bed, chatting on a cell phone, and then writhe when the nurse walks in.

Holmes can't measure his patients' pain with a thermometer or stethoscope.

When someone complains of excruciating abdominal pain, Holmes must rule out any possible emergencies, even if he suspects they're faking. He must order expensive tests. A CT scan costs $5,000. He and his patient could wait hours to get the results.

With doctors stretched thin, some doctors think writing prescriptions is the easy way out, Holmes and others say.

Dr. Carol Foster, a Charleston neurologist specializing in headaches, calls it "express lane" medicine. She practiced in Arizona for 25 years before she returned to her native West Virginia nearly two years ago. She was stunned by the state's prescription drug abuse problem.

"I was so excited about coming home. And within a month of coming home I thought, 'oh my lands, it's a war zone,' " said Foster, who works at Charleston Area Medical Center's Neurological Services. "I don't have any other words than a medical war zone."

She can't believe how many medications some patients take: Painkillers, anti-anxiety medications, sleeping pills, muscle relaxants.

"I can't imagine swallowing that many pills a day," she said.

Pain pills can make headaches worse, she said.

"Giving pain pills to headache patients is like giving Oreos to diabetics," she said. "They feel better for a few minutes and then they get sicker."

Foster works to determine the cause of her patients' headaches. She encourages behavioral changes, like eating a healthy diet and exercising.

"People are just medicating pain without figuring out why" they hurt, Foster said.

Foster works as an on-call neurologist for the emergency room at night. Like Holmes, she sees drug-seekers of all ages.

"The thing that breaks my heart is the grannies," she said.

Some live with grandchildren who abuse or sell their pills, she said.

Many hospitals survey patients and tie some doctors' salaries to "patient satisfaction scores," Holmes said.

"So if I don't prescribe a patient a medication that they want and they were the patient that gets the survey, " he explained, "they're going to say that I'm a terrible doctor, that we're a terrible hospital, that they didn't get good care."

Physicians need to learn more about the nature of addiction, said Dr. Louis Baxter, president of the American Society of Addiction Medicine.

"Pain pills do not cause addiction," Baxter said.

Research shows that many factors can increase risk for addiction, including genetics and a person's family environment.

PILLAGE: Rx drug abuse in W.Va.; Medical staff grapple with drug epidemic

Doctors who prescribe pain medications should pay more attention to patients' predisposition to addiction with substance-abuse screenings, Baxter said. "If physicians start to pay more attention to a person's susceptibility, then right there you can begin to be more careful about to whom you are writing prescriptions."

Drug monitoring program could do more

Both doctors and police in West Virginia say that certain policies have helped cut down on "doctor shopping," where patients visit multiple providers for prescriptions.

The state Board of Pharmacy runs a database where doctors can check where their patients have been filling prescriptions. The system has limitations:

-Doctors don't have to check it before writing prescriptions. About 81 percent of doctors surveyed say they do, but only 18 percent do it every time they write a prescription, according to an article Moss co-authored last year for the West Virginia Medical Journal.

-The system isn't linked to surrounding states' databases, though there is talk of doing so.

-By law, police and the state medical and pharmacy boards can only access data during an open investigation. A new report from the state Legislative Auditor's office recommends that lawmakers change this so that investigators can "red flag" unusual prescription practices and potential doctor shopping.

"People who are bent on abusing drugs are very clever, and as hard as we try, they're going to always find a way to get around the system," said Moss, who is a kidney doctor and palliative care specialist.

He remembers one patient who came in complaining of kidney stones. "She had blood in her urine. I gave her a prescription."

A nurse noticed that the woman didn't have a Band-aid on her finger before she slipped into the restroom for her urine sample. When she emerged, she did.

She had cut her finger to let it bleed it into the cup.

"Somewhere along the line, she learned what she should do," Moss said. "She fooled me."

Coming Sunday in the Gazette-Mail: Why are pill mills so hard to shut down?

Reach Alison Knezevich at

*alisonk@wvgazette.com*

or 304-348-1240.

This series was conceived and produced as a project for The California Endowment Health Journalism Fellowships, a program of the USC Annenberg School for Communication & Journalism.

**Load-Date:** January 18, 2011

---

End of Document

# EXHIBIT 3

## *PILLAGE: Rx drug abuse in W.Va.; 'AN OPEN SECRET' Prescription drug abuse plagues small W.Va. town*

Charleston Gazette (West Virginia)

January 23, 2011, Sunday

Copyright 2011 Charleston Newspapers

**Section:** NEWS; Pg. P1A

**Length:** 1569 words

**Byline:** Alison Knezevich, Staff writer

## Body

WILLIAMSON - It's early morning and the streets are empty. All you can hear is the train that cuts through town.

A few years ago, crowds of people filled the lot outside a clinic on Third Avenue. When they got inside, they paid cash to get prescriptions for painkillers and other drugs, investigators allege.

A couple of blocks away, people lined up before 6 a.m. to visit another clinic's doctor.

The community was frustrated.

"They called it Pilliamson, instead of Williamson," said Mingo County Prosecuting Attorney Michael Sparks. "It was an open secret, you might say."

Federal and state authorities are handling an ongoing investigation of the clinics, but Sparks says prescription drug abuse causes most of the local crimes he prosecutes - robberies, assaults, forgery.

Even though the clinics are now shuttered, substance abuse still plagues the area.

People can still find pills. They can't find treatment for their addiction. A local pastor sees drugs destroy families and kill young people.

"Thankfully, that blight's not there anymore," Sparks said on a recent afternoon, pointing to the nearly empty parking lot that was once filled with drug seekers. "But it's a battle that's far from over."

'Like herding cattle'

People traveled long distances to the Mountain Medical Care Center, formerly known as the Williamson Wellness Center. They paid $450 for the first visit, according to federal court papers.

They had to visit monthly to get their prescriptions renewed - for $150 - and usually didn't see a doctor, investigators allege. Instead, a receptionist asked whether their complaint was the same as before.

Most patients allegedly got prescriptions for painkillers and anti-anxiety pills they abused or sold. The clinic called in the prescriptions to local pharmacies.

Court papers say Mountain Medical, which closed last year, wrote prescriptions for more than 44,000 people. Sometimes the clinic saw 400 patients a day.

Williamson's population is about 3,000.

PILLAGE: Rx drug abuse in W.Va.; 'AN OPEN SECRET' Prescription drug abuse plagues small W.Va. town

One patient described the clinic's practices "as like herding cattle through a process," investigators wrote in court papers.

A few blocks away, outside a now-shuttered house, patients also lined up to visit a smaller clinic operated Dr. Diane Shafer. Court filings allege she accepted cash to write questionable prescriptions. Last year, one of her employees pleaded guilty to giving out prescriptions pre-signed by Shafer in exchange for some of the pills.

In court filings, investigators say that in 2009, Mountain Medical took in more than $4.6 million in cash. They believe Shafer netted more than $1.36 million a year.

Williamson's city budget lost a significant chunk of tax revenue when the clinics closed, Mayor Darrin McCormick said.

Police and prosecutors say it's tougher to investigate prescription drug crimes than those involving illegal substances like cocaine and heroin.

"It's not as black and white," said Sgt. Mike LaFauci of the State Police's drug diversion unit. "If you have crack cocaine in your pocket, you know it's illegal. If you have a Lortab in there, that's a gray area."

It is difficult for police to prove that a doctor is feeding someone's addiction, rather than treating real pain, LaFauci said.

"Pain management is subjective. All that doctors are really required to hear is, 'I have a pain,'" LaFauci said. "When you get into the standard of care, it's a tricky thing for us to prove."

Investigations take years, he said. Patient records are hard to obtain, and once they get them, medical experts must pore over the documents.

Many pill-mill doctors try to escape scrutiny by refusing to take insurance or Medicaid, said Steven Loew, assistant U.S. Attorney. Some require patients to bring X-rays or MRIs, thinking that will thwart prosecution.

"They increase the amount of records that they keep," he said. "They will adapt with their tools, and do everything that they can to fly under the radar screen."

U.S. Attorney Booth Goodwin says prescription drug abuse is one of his office's top concerns. He is focusing on "getting the money" - seizing assets netted from illegal activity.

"Sometimes, people are willing to do the jail time just as long as you don't take the money," he said.

In Williamson, federal prosecutors have seized assets from Shafer, and from Mountain Medical Care Center's Dr. Katherine Hoover, as well as the clinic's office manager.

Between 2002 and 2010, Hoover was the state's No. 1 prescriber of controlled substances.

None of the doctors who worked at the clinics has been charged with any crime.

Hoover now lives in Nassau, the capital of the Bahamas. She says she went there last year because of health problems and because she feared for her safety.

"To the best of my ability, every patient who was treated was treated in good faith for pain," she said in a phone interview.

Hoover said she was trying to help people who were suffering. The state medical board revoked her license last year after she missed a disciplinary hearing related to allegations she asked a 17-year-old female patient to have sex with her teen sons in 1995.

"As a physician, you have a pool of people that are addicts," she said. "I did my very best to sort people out."

Shafer's attorney, Dwane Tinsley, said his client did not want to comment on the case. Her clinic closed in 2009, and she later surrendered her medical license.

"She has not been charged, but she is under investigation," he said.

PILLAGE: Rx drug abuse in W.Va.; 'AN OPEN SECRET' Prescription drug abuse plagues small W.Va. town

Jet-setting for drugs

Police acknowledge that shutting down a suspected pill mill doesn't solve the overall problem.

In the past few years, drug dealers from Detroit have "flooded the market" in West Virginia with pills, said Joe Ciccarelli, FBI supervisory senior resident agent in Charleston.

"A lot of them have shifted into the pill business," he said.

Many people also travel to Florida, where prescription regulations are notoriously lax. They go from doctor to doctor to load up on prescription pills they sell back home, he said. On the street, people typically pay $1 per milligram for most prescription pills.

Sparks, the county prosecutor, knows of Mingo County residents who travel to a particular doctor in Boca Raton, Fla., for pills. They take cheap flights from Huntington to the Sunshine State.

"You can't make this stuff up," Sparks said. "I mean, jet-setting for prescription drugs."

Sparks remembers a case where a woman overdosed after a night of doing drugs with her friends.

They called 911. She died on the way to the hospital that morning.

"Then later that day, [her friends] traveled to Florida to get more oxycodone," he said.

Even when a pill mill shuts down, Ciccarelli said, "We're still going to have addicts living here."

"Treatment has to be part of the equation," he said. "Society has to recognize that it's unacceptable for people to just be medicated into oblivion."

McCormick, the mayor, said rehabilitation options are sorely lacking in the area.

"I would like to see more discussion about treatment," he said. "The problem is addiction."

Throughout West Virginia, services are hard to find outside of major cities, said Laura Lander, clinical director of the West Virginia Prescription Drug Abuse Quitline.

"We actually have people traveling from as far away as Princeton to come up here and receive services" in Morgantown, she said. "In this state, there are not enough services for everyone who needs them. It's hard for people to stay motivated when they're told on the phone that, 'We have a month waiting list or a two-month waiting list.'"

'No one's exempt'

About 30 miles from Williamson, Amy Turner runs the Mingo County STOP Coalition, an anti-drug community group that operates out of the Larry Joe Harless Community Center in Gilbert.

Near the community center, the coalition runs an eight-bed recovery home for women. It's a small place called Crossroads, but Turner says it represents a bit of hope in the community.

"I would like to see the stigma leave," she said.

Addiction has hit people from all walks of life, she said: "It's people way higher up than we would ever know."

On Monday nights at the community center, pastor Anthony Hudgins of Eagle Sanctuary, an interdenominational church in Man, leads support groups for families of drug addicts.

He has seen the pain drugs cause: divorces, overdose deaths, wrecked lives.

"It just affects every age, every status of life," he said. "No one's exempt from this."

PILLAGE: Rx drug abuse in W.Va.; 'AN OPEN SECRET' Prescription drug abuse plagues small W.Va. town

Usually, about 10 or 15 people show up for the support group. He wants to more people to speak up.

"We need more leaders, more government, more members of the community to get involved," he said. "One of the issues I see in our area is people just stick their head in the sand. They feel like if we just don't talk about it, it'll go away. But it doesn't go away."

Coming Monday in The Gazette: The ups and downs of Suboxone treatment for addiction.

Reach Alison Knezevich at *alisonk@wvgazette.com* or 304-348-1240.

This series was conceived and produced as a project for The California Endowment Health Journalism Fellowships, a program of the USC Annenberg School for Communication & Journalism.

chip ellis | Sunday Gazette-Mail photos

Mingo County Prosecuting Attorney Michael Sparks stands where hundreds of people once waited in line to see doctors at the Mountain Medical Clinic, an alleged pill mill that closed last year. Sparks says most crime in the area is caused by drugs.

A few blocks from the Mountain Medical Center, this clinic also allegedly took cash for prescriptions.

**Load-Date:** January 24, 2011

---

**End of Document**

# EXHIBIT 4

### PILLAGE: Rx drug abuse in W.Va.; No magic pill; for addiction; Demand for Suboxone treatment for opiate dependence grows in W.Va.

Charleston Gazette (West Virginia)

January 24, 2011, Monday

Copyright 2011 Charleston Newspapers

**Section:** NEWS; Pg. P1A

**Length:** 1652 words

**Byline:** Alison Knezevich, Staff writer

## Body

INSIDE: Laws could toughen

monitoring of drug prescriptions 3A

This is the final installment of a four-part series examining prescription drug abuse in West Virginia.

The young woman slips the orange tablet into her mouth, chin jutting out as she presses it under her tongue.

Ashley Stamper takes the pill twice a day, morning and night. In 10 to 15 minutes, the little hexagon will dissolve. She won't feel quite right until it kicks in.

Suboxone seeps into her system. Doctors prescribe it to help ease the cravings and kill withdrawal symptoms of opiate addicts who are hooked on painkillers like OxyContin, as well as heroin.

Alcohol remains the main reason people check into rehab, but West Virginians' demand for opiate addiction treatment has skyrocketed.

In 1999, about 5 percent of West Virginians seeking treatment needed help for opiate addiction, according to federal figures. Last year, that proportion was more than 26 percent.

Many are turning to Suboxone, the brand name for a medication whose primary ingredient is the drug buprenorphine.

Experts say the medication must be combined with counseling and other support to really help. Some users are selling it on the streets, which led the state to tighten controls on the drug.

Some people will say Stamper, 25, is just trading one addiction for another. In the past, though, the pull of OxyContin, fentanyl, Lortab and other painkillers was so strong she didn't care whether she lived or died.

"I'm not out there using and searching and partying," Stamper said.

Not just 'a handful of pills'

Stamper started going to the Prestera Addiction Recovery Center in Dunbar in August. On a frosty November morning, she waited with other customers at the CVS pharmacy a few blocks away from the center.

It wasn't yet 8:30 a.m. The six seats in the waiting area were filled. More customers lingered in the vitamin and nail care aisles. By the time they all left, they carried white paper bags with bottles of Suboxone inside.

PILLAGE: Rx drug abuse in W.Va.; No magic pill; for addiction; Demand for Suboxone treatment for opiate dependence grows in W.Va.

In 2008, Prestera - the state's largest mental health provider - and three other providers got a $360,000 grant from the Robert Wood Johnson Foundation to increase access to Suboxone.

Prestera's program now has five doctors and more than 260 patients.

"We're not giving people a handful of pills and a kick in the butt," said Josh Parker, director of Prestera's Suboxone program. "They actually have to get treatment."

Stamper and others in the program attend mandatory one-on-one and group therapy, plus four 12-step meetings weekly.

"I'll be the first to tell you, there is no magic pill for addiction," Parker said. "Trying to battle addiction takes a lot of hard work, a lot of life changes, and a lot of support. And that's what we try to help them develop."

Doctors taper doses to wean patients off Suboxone. Some people get off it in six months, Parker said. Others take nearly two years.

Addicts get "dope sickness" when they quit using opiates. Withdrawal causes diarrhea, muscle cramps, fever, chills and depression.

"You feel like you're dying," said Kim Miller, manager of Women's Addiction Services for Prestera.

The physical symptoms aren't the only hard part of beating an addiction. Many women addicted to painkillers suffered sexual abuse and other trauma, Miller said. That's why therapy and other support are so important.

Stamper says she's "all about staying sober." She enjoys going to therapy, getting things off her chest. She likes listening to other addicts tell their stories at 12-step meetings.

Some people sign up just to get the pills.

"They usually weed themselves out real quickly," Parker said.

Pill counts and drug tests help ensure clients aren't selling their Suboxone or abusing other substances.

Not all opiate addicts need medication, he said.

"Prestera has tried to use it pretty much as your last chance of getting clean," he said.

Stamper tried methadone treatment before. She couldn't function on it. Cigarette burns cover her arms - she used to "nod out" on methadone.

A few weeks before Christmas, Stamper waited with about 20 other Prestera clients in a bare room at the mental health center. At the front of the room, a doctor and nurse sat at a folding table with a stack of files. They called them by name to write their prescriptions.

The crowd had thinned out since the last time Stamper had picked up her prescription two weeks earlier, she said. A lot of people had been kicked out of the program.

"They're really strict," she said. "It's because they want to help everybody."

Doctors diagnosed Stamper with scoliosis at age 6. They put titanium rods in her back at age 12. Afterward, they hooked her up to a morphine pump. She remembers lying there thinking it was the best she'd ever felt.

Doctors prescribed painkillers for Stamper on and off throughout her teens. She thinks she was physically dependent on them by 16.

At 18, she started abusing them, she said. She says she lived in an abusive household with her now ex-husband. Social workers took away their 1-year-old son.

PILLAGE: Rx drug abuse in W.Va.; No magic pill; for addiction; Demand for Suboxone treatment for opiate dependence grows in W.Va.

One night, her friend brought over 45 Lortabs. They sat there and did them all. It was the first time she crushed and snorted a pill.

She could always find pills, she said over breakfast at McDonald's. She spots a few men at the cash register, in neon green shirts.

"I guarantee those miners have them," she said.

She used to send out mass text messages: "Hey, you got any painers?"

At one point, she used three fentanyl patches at a time. She stuck one on her head, another on her heart, and ate the gel from another. Fentanyl is 80 times stronger than morphine, and is prescribed for severe pain.

Took off like a rocket

Federal regulators approved Suboxone, manufactured by the drug maker Reckitt Benckiser, in 2002. Four years later, a federal law made it easier to get treatment.

In West Virginia, "it just took off like a rocket between 2007 and 2009," said Dr. James Becker, medical director for the state's Medicaid program. "Clinics were opening everywhere."

In 2006, West Virginia Medicaid paid about $360,000 for Suboxone claims. Last year, it was more than $4.7 million.

Today, 17 treatment programs and more than 90 private physicians in West Virginia offer the drug, according to the federal Substance Abuse and Mental Health Services Administration.

Unlike methadone, another drug used to treat opiate addicts, Suboxone doesn't have to be taken at a clinic. People can pick it up at a pharmacy just like any other medication.

Prestera developed its own support groups for people taking Suboxone because many traditional groups - which are abstinence based - do not believe in so-called Medication-Assisted Treatment.

Suboxone patients who attended traditional 12-step meetings "felt really unwelcome," Parker said. "And then they would have to try to get a sponsor and build a support system of people who don't trust them, who tell them they're not clean."

Although many recovery groups do not approve of Medication-Assisted Treatment, the medical community mostly does, said Dr. Louis Baxter, president of the American Society of Addiction Medicine.

Still, "We try to stress the point that medication is not used in lieu of the full treatment experience," he said - detoxification, rehabilitation education and follow-up care, including ongoing counseling.

Addiction is like other chronic diseases, Baxter said. If someone has diabetes, their doctor should first encourage behavioral changes like a healthy diet. Some people need medication to stay healthy, he said.

When Suboxone came out, it was touted as a safer, better alternative to methadone. It contains Naloxone, a drug that hospitals use to treat people who have overdosed. If someone injects or snorts it, they'll feel unpleasant withdrawal symptoms.

Buprenorphine also has a "ceiling effect." Taking more of it doesn't increase its effects.

But people still sell it on the streets.

"Among drug addicts, it's seen as the miracle cure," Miller said, explaining that many addicts use the drug to bridge the gap between fixes.

A few years ago, Medicaid officials noticed something. Their data showed that West Virginians were routinely being prescribed 32 mg or more per day. The manufacturer's maximum recommended dose is 24 mg.

PILLAGE: Rx drug abuse in W.Va.; No magic pill; for addiction; Demand for Suboxone treatment for opiate dependence grows in W.Va.

People were diverting the drug. Officials also discovered that some Medicaid patients were traveling out of state to get high doses of Suboxone - paid for by West Virginia Medicaid. They were likely taking a few per day, and then selling the others, said Becker, the program's medical director.

Medicaid cracked down. Starting in August, only doctors enrolled in the Medicaid program could prescribe it to Medicaid patients. Patients now must have prior authorization. Medicaid also limited how much Suboxone it will cover per patient.

Medicaid endorses the use of Suboxone, when used with counseling and other support, Becker said.

"We just see it as a pathway to where [addicts] can recover their lives," Becker said. "Medication's not the ultimate answer."

Stamper says she looks forward to the day she won't need medication. Her main motivation is her son, now 7, and nearly 1-year-old daughter. Both live with family members because of her drug problem.

"I just want to be free of any type of drugs, have my family in my life, and make something of myself," she said. "I wasted a lot of time, and it's hard to fix it all at once."

To learn more about Prestera's program, call Josh Parker at 1-800-642-3434.

Reach Alison Knezevich at *alisonk@wvgazette.com* or 304-348-1240.

This series was conceived and produced as a project for The California Endowment Health Journalism Fellowships, a program of the USC Annenberg School for Communication & Journalism

RIGHT: Suboxone is used to treat people addicted to opiates, like prescription painkillers.

BELOW: Ashley Stamper leaves Prestera in Dunbar after getting her prescription. To participate in Prestera's program, she attends mandatory therapy sessions and 12-step meetings.

lawrence pierce | Gazette photos

**Load-Date:** January 25, 2011

---

**End of Document**

# EXHIBIT 5

# In Brief / PHARMACEUTICALS; McKesson to settle U.S. claims

Los Angeles Times

May 3, 2008 Saturday, Home Edition

Copyright 2008 Los Angeles Times All Rights Reserved

**Section:** BUSINESS; Business Desk; Part C; Pg. 4

**Length:** 80 words

**Byline:** From Times Wire Services

## Body

McKesson Corp., the largest U.S. drug distributor, agreed to pay $13.3 million to settle government claims over the company's distribution of two often-abused prescription drugs.

The agreement with the Drug Enforcement Administration and the Justice Department calls for San Francisco-based McKesson to suspend temporarily the distribution of hydrocodone, a morphine-like drug, and alprazolam, an anti-anxiety drug, from two of the company's 31 distribution centers, the company said.

**Load-Date:** May 3, 2008

End of Document

# EXHIBIT 6

# PHARMACEUTICAL DISTRIBUTOR TO PAY $13 MILLION IN FINES

The Baltimore Sun

May 3, 2008 Saturday, FINAL EDITION

Copyright 2008 The Baltimore Sun Company All Rights Reserved

**Section:** LOCAL; Pg. 3B

**Length:** 198 words

**Byline:** Josh Mitchell

## Body

Prescription drug distributor McKesson Corp. has agreed to pay $13 million in civil fines to settle allegations that it failed to report as suspicious sales of large quantities of drugs, federal prosecutors in Maryland said yesterday.

Under an agreement between the California-based company and U.S. attorney's offices in six states including Maryland, McKesson will also create policies beyond those required by federal regulation to detect and prevent illegal drug diversion.

The Maryland claims, which account for $2 million of the fines, centered on McKesson's dealings with NewCare Pharmacy in East Baltimore and Smeeta Pharmacy in Highland.Prosecutors said McKesson's Landover distribution center sold 3 million units of hydrocodone to NewCare and large quantities of phentermine-based products to Smeeta.

The sales should have been reported to Drug Enforcement Agency officials, said Marcia Murphy, a spokeswoman for Maryland U.S. Attorney Rod J. Rosenstein.

NewCare's owners have been indicted on federal charges of illegally selling more than 9.9 million dosage units of hydrocodone as part of a nationwide Internet operation in 2005 and 2006. Their trial is scheduled to begin May 19.

**Load-Date:** May 4, 2008

---

End of Document

# EXHIBIT 7

Case 3:17-cv-01362 Document 240-1 Filed 03/20/20 Page 27 of 79 PageID #: 3169





THE UNITED STATES ATTORNEY'S OFFICE

COLORADO

ARCHIVE

SEARCH THE ARCHIVE

[ SEARCH ]

Home » News » 2008

# NEWS

October 2, 2008

## CARDINAL HEALTH INC., AGREES TO PAY $34 MILLION TO SETTLE CLAIMS THAT IT FAILED TO REPORT SUSPICIOUS SALES OF WIDELY-ABUSED CONTROLLED SUBSTANCES

WASHINGTON – Cardinal Health Inc., one of the nation's largest distributors of pharmaceutical drugs, has agreed to settle allegations that it violated federal reporting provisions relating to its handling of certain controlled substances regulated by the Drug Enforcement Administration (DEA).  Under the agreement between the company and seven U.S. Attorney's Offices, Cardinal Health agreed to pay $34,000,000 in civil penalties for alleged violations of its obligations under the Controlled Substances Act.

Cardinal Health, which operates 27 DEA-registered distribution facilities, failed to report to DEA suspicious orders of hydrocodone that it then distributed to pharmacies that filled illegitimate prescriptions originating from rogue Internet pharmacy Web sites.  These prescriptions violated applicable Federal and State law because they were not issued for a legitimate medical purpose by physicians acting within the usual course of professional practice.  Cardinal's conduct allowed the "diversion" of millions of dosage units of hydrocodone from legitimate to non-legitimate channels.  DEA regulations require all manufacturers and distributors to report suspicious orders of controlled substances and, more specifically, to "design and operate a system to disclose to the registrant suspicious orders of controlled substances."  Registrants are required to inform DEA of suspicious orders upon discovery.

"Despite DEA's repeated attempts to educate Cardinal Health on diversion awareness and prevention, Cardinal engaged in a pattern of failing to report blatantly suspicious orders for controlled substances filled by its distribution facilities located throughout the United States," said DEA Acting Administrator Michele M. Leonhart.  "Cardinal's negligent conduct contributed to our nation's serious pharmaceutical abuse problem.  This substantial civil penalty underscores DEA's determination to prevent pharmaceutical diversion and protect the public health and safety by continuing to hold companies responsible if they fail to fulfill their obligations under the Controlled Substance Act."

Seven Cardinal Health distribution centers received and filled thousands of suspicious orders placed by pharmacies participating in illicit Internet schemes, but failed to report the orders to DEA.  They did so even after an Aug. 22, 2005, meeting at which DEA officials met with and warned Cardinal officials about excessive sales of their products to pharmacies filling illegal online prescriptions.  The pharmacies filled purported online "prescriptions" for hydrocodone (contained in drugs such as Vicodin), but the prescriptions were issued outside the normal course of professional practice and not for a legitimate medical purpose.  The U.S. Attorneys allege that the orders that Cardinal received from these pharmacies, and others, were unusually large, unusually frequent and/or deviated substantially from the normal pattern.

"The abuse of prescription medications is a significant and growing problem, and there is a widespread misconception that abuse of these substances is somehow safer than the abuse of illegal drugs such as cocaine, meth and heroin," said Associate Deputy Attorney General Stuart Nash.  "Today's settlement makes clear that the Department of Justice is committed to doing its part to curtail illegal access to these dangerous drugs."

Hydrocodone is the generic name of a prescription painkiller that is classified under federal narcotics law as a Schedule III controlled substance.  Nonmedical use of prescription drugs ranks second only to marijuana as the most prevalent category of drug abuse.

Hydrocodone is the most commonly diverted and abused controlled pharmaceutical in the United States.

### Current Site

Department of Justice

     U.S. Attorneys

         District of Colorado

### Archives

Department of Justice

     U.S. Attorneys

         District of Colorado





The Controlled Substances Act is the primary federal law regulating the flow of controlled substances into the marketplace for medical purposes. Among other requirements, the Act requires that distributors register with DEA to sell controlled substances to retail pharmacies and report to DEA suspicious orders of controlled substances. The Act authorizes the imposition of up to a $10,000 civil penalty for each violation of the reporting requirement.

The civil penalty will be collected by the U.S. Attorney's Office in each of the following districts, in the amounts indicated:

```
*Middle District of Florida          $16,000,000
*Southern District of Texas          $  8,000,000
*Western District of Washington      $  3,500,000
*District of New Jersey              $  3,000,000
*Northern District of Georgia        $  1,500,000
*Central District of California      $  1,000,000
*District of Colorado                $  1,000,000
```

This case was investigated by the DEA and handled by attorneys from DEA's Office of Chief Counsel and trial attorneys from the following U.S. Attorneys' Offices: Middle District of Florida, Southern District of Texas, Western District of Washington, District of New Jersey, Northern District of Georgia, Central District of California and District of Colorado. Additional assistance was provided by the Criminal Division's Narcotics and Dangerous Drug Section.

####

USAO ARCHIVE
HOME

**JUSTICE.GOV/USAO**

Accessibility      Justice.gov
FOIA      USA.gov
Privacy Policy
Legal Policies &
Disclaimers

# EXHIBIT 8

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

SHAUN COLLINS, ELIZABETH COLLINS,
DEBORAH DUNCAN, WILLIS DUNCAN,
PAUL HORN, DEWEY MARCUM,
MISTY MARCUM, STEVEN MARCUM,
POLLY WILLIAMS, GEORGE BALL,
KATHY BALL, BRUCE BLANKENSHIP,
TEDDY BLANKENSHIP, ERNEST MEADE,
MARY LOU MEADE, by and through her guardian
and next friend ERNEST MEADE,
JAMES MULLINS,JOYCE MULLINS,
SHARON MULLINS, VERNON MULLINS,
BRENDA PREECE, DENNIS MITCHELL SMITH,
CHARLES EDWARD SPEERS, and LORA SPEERS,

      Plaintiffs,

v.                         Civil Action No. 10 -C-251

TUG VALLEY PHARMACY, LLC,
a West Virginia corporation,

      Defendant.

## COMPLAINT

For his Complaint, Plaintiffs assert the following:

## PRELIMINARY STATEMENT

1.    This litigation will address the practice by certain medical providers of over

prescribing and inappropriately prescribing addictive pain medications to individuals.  This

practice, or more properly malpractice, has been referred to as creating "pill mills" in Southern

West Virginia.  This lawsuit will identify both individuals who are defined by Chapter 55, Article

7B of the West Virginia Code as medical providers and others who have acted in concert with the

medical providers to indiscriminately distribute addictive controlled substances for purposes of personal financial gain in a manner which is contrary to the best and proper interests of patients. The acts and omissions herein complained of have proximately resulted in injuries not only from the failure to properly treat medical conditions, but also in causing debilitating addictions to pain medications among those who saw the providers and filled their prescriptions. This complaint is being filed initially against the pharmacy only while the Plaintiffs await the response from the physicians and other medical providers in conformity with West Virginia Code 55-7B-6.

## JURISDICTION AND VENUE

2.     Jurisdiction is vested in this Circuit Court by the Constitution of West Virginia, Article VIII, Sections 1, 5.

3.     Venue is proper because the acts and omissions complained of herein occurred in Mingo County, West Virginia and the medical providers who were practicing in Williamson, Mingo County, West Virginia at times which are pertinent hereto. Further, the pharmacy which is named as defendant herein is located in Mingo County, West Virginia.

## PARTIES

4.     The Plaintiffs are adult residents and citizens of West Virginia and Kentucky or were so at times relevant hereto.  At times which are pertinent to this cause of action, each of said Plaintiffs visited Mountain Medical Care Center, LLC in Williamson, West Virginia seeking medical attention.

5.     Said Plaintiffs filled prescriptions said to have been written by Drs. Hoover, Teleron and/or Ryckman at Defendant Tug Valley Pharmacy, LLC.

6.      Defendant Tug Valley Pharmacy, LLC is said to be a limited liability corporation organized under the laws of the State of West Virginia.  Its principal office address is 54 W. 2nd Avenue, Williamson, West Virginia.

## STATEMENT OF FACTS

7.      This Defendant, while acting jointly with the employees at the Mountain Medical Care Center, LLC, was engaged in the dispensing of prescriptions for controlled substances with known addictive qualities to individuals who sought medical assistance for injuries and illnesses and to persons who were known to be addicts in flagrant disregard of the consequences of their acts and omissions.  Essentially, Drs. Hoover, Teleron and Ryckman and others acting in concert with them as agents and/or employees of the Mountain Medical Care Center, LLC telephoned and/or faxed prescriptions for controlled substances outside of and in contravention of the proper practice of medicine which prescriptions were regularly and extensively filled by Defendant Tug Valley Pharmacy, LLC, its agents, servants and employees on a regular and continuing basis. These parties acted in negligent and/or reckless disregard of the consequences of the lack of legitimate medical purpose and at least acted in wilful blind disregard of the actual and obvious facts.

8.      Plaintiffs visited the Mountain Medical Care Center, LLC each month at which time they were provided medications following a cursory examination or no examination at all, but were forwarded to the Defendant Pharmacy to pick up their controlled substances.

9.      Defendant Tug Valley Pharmacy, LLC, by and through its principals, its agents, servants and employees, negligently and/or recklessly provided the prescriptions for controlled substances to Plaintiffs.  Said Defendant filled the prescriptions while knowing, or having good

reason to know, that the Plaintiffs were addicted and that the prescriptions were not for any legitimate medical reason and were prescribed by physicians at a center which was widely known in the community as a "pill mill".

10.     The negligent and/or reckless disregard of proper medical or pharmacy protocol is the direct and proximate cause of the Plaintiff's addiction and/or continuation of said addiction thereby resulting in the damages herein complained of.

11.     The acts and omissions of this Defendant were not only negligent, but were willfully and blindly reckless so that punitive damage may likewise be appropriate in this case.

## I.  NEGLIGENCE

12.     The Plaintiffs adopt and reassert by reference the allegations set forth previously in this Complaint, paragraphs 1 though 11 herein.

13.     Defendant Tug Valley Pharmacy, LLC acted negligently in that it, through its principals, agents, servants, and employees acted with wilfully blind indifference to the actual facts and consequences in filling the prescriptions for controlled substances as called in or faxed to them by the physicians and their agents, servants and employees.  Further, Defendant Tug Valley Pharmacy, LLC, by filling literally thousands or hundreds of thousands of prescriptions as were phoned in or faxed to them from medical providers negligently combined to become an integral part of the "pill mill" operations.

15.     As the direct and proximate result of the acts and omissions herein complained of, the Plaintiffs have suffered injuries to their health, emotional well-being, loss of income and income earning ability, both in the past and in the future.  Further medical treatment including,

but not limited to, rehabilitation therapy appears to be necessary as the result of the acts and omissions complained of herein.

## **PRAYER**

WHEREFORE, the Plaintiffs demand judgment from the Defendant in such amounts of compensatory damages as shall be deemed proper under the facts and circumstances of this case as well as their costs.

Plaintiffs demand a trial by jury.

> SHAUN COLLINS, ELIZABETH COLLINS,
> DEBORAH DUNCAN, WILLIS DUNCAN,
> PAUL HORN, DEWEY MARCUM,
> MISTY MARCUM, STEVEN MARCUM,
> POLLY WILLIAMS, GEORGE BALL,
> KATHY BALL, BRUCE BLANKENSHIP,
> TEDDY BLANKENSHIP, ERNEST MEADE,
> MARY LOU MEADE, by and through her guardian
> and next friend ERNEST MEADE,
> JAMES MULLINS, JOYCE MULLINS,
> SHARON MULLINS, VERNON MULLINS,
> BRENDA PREECE, DENNIS MITCHELL SMITH,
> CHARLES EDWARD SPEERS, and LORA SPEERS,

> By Counsel

JAMES M. CAGLE (Bar #580)
1200 Boulevard Tower
1018 Kanawha Boulevard East
Charleston, WV 25301
(304) 342-3174

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

SHAUN COLLINS, ELIZABETH COLLINS,
DEBORAH DUNCAN, WILLIS DUNCAN,
PAUL HORN, DEWEY MARCUM,
MISTY MARCUM, STEVEN MARCUM,
POLLY WILLIAMS, GEORGE BALL,
KATHY BALL, BRUCE BLANKENSHIP,
TEDDY BLANKENSHIP, ERNEST MEADE,
MARY LOU MEADE, by and through her guardian
and next friend ERNEST MEADE,
JAMES MULLINS,JOYCE MULLINS,
SHARON MULLINS, VERNON MULLINS,
BRENDA PREECE, DENNIS MITCHELL SMITH,
CHARLES EDWARD SPEERS, and LORA SPEERS,
            Plaintiffs,

v.                                         Civil Action No. 10-C-251

TUG VALLEY PHARMACY, LLC,
a West Virginia corporation,
            Defendant.

**To the above-named Defendant.**
**IN THE NAME OF THE STATE OF WEST VIRGINIA:**

        You are hereby summoned and required to serve upon **James M. Cagle,** Plaintiffs'

attorney, whose address is **1200 Boulevard Tower, 1018 Kanawha Boulevard, East,**

**Charleston, West Virginia 25301,** an answer, including any related counterclaim or defense you

may have, to the Complaint filed against you in the above-styled civil action, a true copy of

which is herewith delivered to you.  You are required to serve your answer within **30** days after

service of this summons upon you, exclusive of the day of service.  If you fail to do so, thereafter

judgment, upon proper hearing and trial, may be taken against you for the relief demanded in the

Complaint, and you will be thereafter barred from asserting in another action any claim, counter

petition or defense you may have which must be asserted in the above-styled civil action.

Dated: August 24, 2010

_Grant Preece_
_____
Clerk of Court

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

SHAUN COLLINS, ELIZABETH COLLINS,
DEBORAH DUNCAN, WILLIS DUNCAN,
PAUL HORN, DEWEY MARCUM,
MISTY MARCUM, STEVEN MARCUM,
POLLY WILLIAMS, GEORGE BALL,
KATHY BALL, BRUCE BLANKENSHIP,
TEDDY BLANKENSHIP, ERNEST MEADE,
MARY LOU MEADE, by and through her guardian
and next friend ERNEST MEADE,
JAMES MULLINS,JOYCE MULLINS,
SHARON MULLINS, VERNON MULLINS,
BRENDA PREECE, DENNIS MITCHELL SMITH,
CHARLES EDWARD SPEERS, and LORA SPEERS,
          Plaintiffs,

v.                            Civil Action No. 10-C-251

TUG VALLEY PHARMACY, LLC,
a West Virginia corporation,
          Defendant.

**To the above-named Defendant.**
**IN THE NAME OF THE STATE OF WEST VIRGINIA:**

      You are hereby summoned and required to serve upon **James M. Cagle,** Plaintiffs'

attorney, whose address is **1200 Boulevard Tower, 1018 Kanawha Boulevard, East,**

**Charleston, West Virginia 25301,** an answer, including any related counterclaim or defense you

may have, to the Complaint filed against you in the above-styled civil action, a true copy of

which is herewith delivered to you.  You are required to serve your answer within **30** days after

service of this summons upon you, exclusive of the day of service.  If you fail to do so, thereafter

judgment, upon proper hearing and trial, may be taken against you for the relief demanded in the

Complaint, and you will be thereafter barred from asserting in another action any claim, counter

petition or defense you may have which must be asserted in the above-styled civil action.

Dated: August 24, 2010

                                _Grant Preece_
                              _____
                              Clerk of Court

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV  25305



9171 9237 9000 1000 3060 60



**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

Grant Preece, Circuit Clerk
Mingo County Courthouse
P. O. Box 435
Williamson WV  25661-0435

| | |
|---|---|
| ControlNumber: | 299801 |
| Defendant: | Tug Valley Pharmacy, LLC |
| | 8/26/2010 |
| Civil Action: | 10-C-251 |

I am enclosing:

| | | |
|---|---|---|
| ____ summons | ____ affidavit | _1_ summons and complaint |
| ____ notice | ____ answer | ____ summons returned from post office |
| ____ order | ____ cross-claim | ____ summons and amended complaint |
| ____ petition | ____ counterclaim | ____ 3rd party summons and complaint |
| ____ motion | ____ request | ____ no return from post office |
| ____ suggestions | ____ certified return receipt | ____ notice of mechanic's lien |
| _1_ interrogatories | ____ request for production | ____ suggestee execution |
| ____ original | ____ request for admissions | _1_ 1st request to produce |
| ____ subpeona duces tecum | | |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact.  According to law, I have
accepted service of process                in your name and on your behalf.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of
process in your name and on behalf as your attorney-in-fact.  Please address any questions about this document directly
to the court or the plaintiff's attorney, shown in the enclosed paper.  Please do not call the Secretary of State's office.*

Sincerely,

Natalie E. Tennant
Secretary of State

# EXHIBIT 9



# A West Virginia Summit on Prescription Drug Abuse

**Report and Recommendations**










"Through this Summit, I believe that we took a giant step forward in our mission to take on this problem. The prescription drug epidemic is a unique problem and enormous in its reach. The great challenge with prescription drugs is to build bridges between fields that up until now have not known each other very well. We cannot prosecute, treat or legislate our way out of this problem. The only way we are going to get out of the current crisis is to communicate, and we were able to lay that groundwork."

*- R. Booth Goodwin II, U.S. Attorney, Southern District of West Virginia*

"West Virginia has been hit hard by prescription drug abuse, our Nation's fastest growing drug problem. The Obama Administration is mounting an unprecedented effort to address this national public health epidemic, and has requested $9 billion in the 2012 Budget to support early intervention and treatment services. The Administration's efforts to reduce prescription drug abuse focus on prescriber and patient education, prescription drug monitoring programs, proper disposal, and law enforcement. This Summit is an important collaboration among key drivers of change, bringing together law enforcement, prosecutors, treatment, prevention, medical providers, pharmacists, educators, community coalitions, and state legislators to help make communities in West Virginia healthier and safer by reducing prescription drug use and its consequences."

*- Gil Kerlikowske, White House Drug Policy Director*





# A West Virginia Summit on Prescription Drug Abuse

Report and Recommendations

## Table of Contents

The Summit .................................................................................... 4

What We Learned ............................................................................ 5

Developments Since the Summit .................................................... 8

A Call to Action – What We Can Do ............................................... 10

Conclusion ...................................................................................... 12

Special Thanks ............................................................................... 13

Resources and References ............................................................. 14

# The Summit

In West Virginia and across the country, we've experienced alarming increases in prescription drug abuse and the consequences that come with it.  On February 25, 2011, more than 200 people from across the Mountain State convened for a one-day summit on the issue. The event was co-hosted by U.S. Attorney Booth Goodwin and Governor Earl Ray Tomblin, with key participation from the West Virginia Partnership to Promote Community Well-Being, the West Virginia Prevention Resource Center, the West Virginia Division of Justice and Community Services, and the Appalachia High Intensity Drug Trafficking Area (HIDTA). Representatives of state government and the prevention, medical, substance abuse treatment, and law enforcement communities shared their perspectives, current initiatives, and suggestions for additional action steps. U.S. Senator Jay Rockefeller emphasized the need for a generation of efforts including more treatment, more enforcement, more monitoring and more conversations. White House Drug Policy Director Gil Kerlikowske touted the importance of education, treatment and use of the state's prescription drug monitoring program.  Governor Earl Ray Tomblin highlighted the need for a statewide network of stakeholders focused on community-based prevention and communication.



# What We Learned

## The consequences of substance abuse are alarming.

West Virginia has the highest per capita overdose death rate in the nation. Nine of every ten overdose deaths have prescription drugs as a sole or contributing cause of death. And it's not only a public health problem – it is the number one crime problem in the Southern District of West Virginia and a significant financial burden to our state. Substance (including prescription drug) abuse costs West Virginia millions of dollars each year. These costs are shouldered by the criminal justice, health care, education, welfare, and workforce systems.  The financial burden of substance abuse will only continue to increase unless prevention, early intervention, treatment and recovery are adequately addressed.



## Our culture affects our misuse and abuse of prescriptions.

Individual motivations and behaviors leading to the misuse, abuse and diversion of prescription drugs vary greatly. Understanding the cultures of sharing, income seeking, abuse, and addiction are necessary steps in prescription drug abuse prevention, intervention, treatment and recovery.

National Survey of Drug Use and Health data reveal most prescription drug abusers obtain their drugs from family and friends. Changing beliefs and behaviors about prescription drug sharing, therefore, is vital to decreasing prescription drug abuse.  Public awareness about and availability of appropriate prescription drug storage and disposal also needs attention in order to decrease the supply of prescription drugs for potential diversion and abuse.

Social norms and cultures cannot be transformed overnight.  As Senator Rockefeller noted, it takes years, sometimes even a generation, to shift beliefs and behaviors.

## Prescription drug related law enforcement is especially challenging.

Prescription drug cases present many unique challenges for investigators and prosecutors..  For starters, many different prescription drugs are involved — from Oxycontin to Vicodin to Xanax — and others like Opana are emerging as problems.  Several distinct distribution channels also exist. Traditional drug rings move their supply in from places like Detroit, Columbus and Atlanta.  Local pill mills crank out prescriptions by the tens of thousands to anyone with a little cash. Small-time dealers

fly or drive to out-of-state pill mills in places like Florida and return with a bag of pills to sell to their neighbors.  And all too often, drugs are legitimately prescribed, but are later diverted to abusers.

West Virginia is fortunate to have law enforcement resources to address these unique issues.  Nine counties in the Southern District of West Virginia are part of the Appalachia HIDTA, along with designated counties in Kentucky and Tennessee.  The Appalachia HIDTA provides significant resources for enforcement initiatives.   Other law enforcement resources include DEA Diversion Agents, the West Virginia State Police Bureau of Criminal Investigations' drug diversion unit and the multi-jurisdictional drug and violent crime task forces which conduct joint investigations targeting prescription drug diversion and trafficking.  The Diversion Program Office of the U.S. Drug Enforcement Administration provides training and other resources to state and local law enforcement on issues relating to prescription drug diversion and abuse.



### Much work has been done in West Virginia to address substance abuse.

West Virginia has a network of organizations and programs working to address substance abuse.

The West Virginia Bureau for Behavioral Health and Health Facilities (BHHF), the West Virginia Partnership to Promote Community Well-Being, the Controlled Substances Advisory Group, and others are engaged in collaborative partnerships to address issues relating to substance abuse prevention, early intervention, treatment and recovery.  Additionally, local prevention and wellness-oriented coalitions and organizations exist in many of West Virginia's 55 counties.

**SBIRT Program**.  The Bureau for Health and Health Facilities has expanded Screening, Brief Intervention, Referral and Treatment (SBIRT) to 75 sites throughout West Virginia.  Licensed counselors have completed more than 96,000 substance misuse/abuse screens in primary care, behavioral health and school-based sites.

**Substance Abuse Early Intervention Programs (EIP)** in Mercer and Logan counties are the first of their kind in West Virginia. The programs target youth, ages 12 to 17, who are in the onset stages of substance abuse. They are designed to provide increased understanding of substance abuse consequences and coping skills to resist pressures to engage in substance abuse.

**Teen Courts** are established in each region of West Virginia with 14 courts providing a legally binding alternative system of justice that offers young offenders an opportunity to make restitution for their offenses through community service, educational classes, and jury service.

**Juvenile Drug Courts** currently exist in Brooke, Hancock, Cabell, Lincoln, Boone, Logan, Mercer, Monongalia, Putnam, Randolph, Wayne and Wood counties. They divert non-violent youths, ages 10 to 17, who abuse alcohol or drugs from the juvenile court system into an intensive, individualized out-patient treatment process, probation case management, compliance monitoring and parent involvement.

**Prescription Drug Abuse Quit-line (1-866-WV-QUITT)** was developed specifically to assist individuals in determining their personal quitting needs.  Phone educators are highly trained in crisis and addictions.  A supportive staff member provides professional one-on-one support that increases chances of quitting successfully through:  educational information and self-help materials regarding drug treatment and abstinence, assistance to family members or loved ones of abusers, and comprehensive planning sessions and individual phone education with up to four (4) follow-up sessions as needed.

**Substance Abuse Treatment Services.**  The Bureau for Behavioral Health and Health Facilities (BHHF) provides funding to thirteen comprehensive behavioral health centers and other providers statewide supporting the provision of substance abuse intensive out-patient, residential and recovery services in various locations.  Gender-specific residential long-term treatment, transitional living and apartments are also available for women and pregnant women with children.

**West Virginia has a comprehensive social marketing campaign to address our culture of prescription drug sharing.** The **Take Care West Virginia** campaign emphasizes the message that it is dangerous and illegal to share prescription drugs. The campaign includes research-based, professionally-produced public service announcements (PSAs). All television, radio and print PSAs are available to view and download via the multimedia campaign website at www.takecarewv.org. Also available are the following: campaign information designed for placement on prescription bags used by pharmacies; resources for planning community forums; information about proper prescription drug storage and disposal; and a toolkit for coordinating a local prescription drug Take Back Initiative.  The campaign was initially launched in 2010, and continues on a smaller scale through community and other implementation.

**There have been opportunities for proper disposal of prescription drugs.** National and local efforts to collect unused and expired prescription drugs have taken place across the state. Important federal and state regulations, however, must be followed when implementing prescription drug take backs that include controlled substances.

**West Virginia has a Controlled Substances Monitoring Program (WV CSMP).** The West Virginia Board of Pharmacy manages a computerized database of all prescriptions for controlled substances. The database supports access to legitimate medical use of controlled substances by assisting medical professionals and law enforcement identify and deter drug abuse and diversion. However, consistent and thorough usage of the program is vital to its effectiveness.

# Developments Since the Summit

 The United States Attorney's Office (SDWV) has continued aggressive prosecution of people involved in the prescription drug trade by prosecuting more than 60 such drug dealers since the beginning of the year. The US Attorney has also partnered with state and local law enforcement in executing an initiative targeting prescription drug distribution in Mercer, Wyoming and McDowell counties.

 The White House Office of Drug Policy released the Obama Administration's Prescription Drug Abuse Plan, entitled "Epidemic:  Responding to America's Prescription Drug Abuse Crisis."   The Plan details a four-pronged approach to reducing prescription drug abuse: education, monitoring, proper disposal and enforcement.

 The West Virginia Board of Pharmacy has entered into a Memorandum of Understanding (MOU) with the National Association of Boards of Pharmacy (NABP) to participate in the Prescription Monitoring Program (PMP) Interconnect System currently under development.

 A second National Take Back Day was held on April 30, 2011, and featured more than 100 sites throughout West Virginia that accepted expired, unused and unwanted medications. The initiative collected 3,178 pounds of prescription drugs.

 The Governor's Office has entered into a partnership to participate in an Interstate-Opiate Task Force with the States of Kentucky and Ohio.

 The Bureau for Behavioral Health and Health Facilities (BHHF) is adding five new detox beds at Prestera and providing funding support to construct a new 16 bed residential treatment facility for women and children in Raleigh County, West Virginia. In addition, BHHF is funding the construction and operation of a 10-bed treatment facility for women located in McDowell County, West Virginia.

 In June 2011, White House Drug Policy Director Gil Kerlikowske announced the designation of two additional West Virginia counties, Mercer and Putnam, to the Appalachia HIDTA. The Southern District of West Virginia now has a total of eleven counties as part of the Appalachia HIDTA. This designation will enhance coordination among federal, state and local law enforcement and further efforts to reduce drug trafficking in these areas.



# A Call to Action - What We Can Do

## Recommendations for Decreasing Prescription Drug Abuse in West Virginia

To address the complex issue of prescription drug abuse in West Virginia, a comprehensive and on-going approach is needed.  The following recommendations summarize the necessary action steps communicated by those who participated in the Summit.

## EDUCATION

- **Help medical professionals develop a comprehensive approach to effectively treating chronic pain while managing the risk of prescription drug addiction.**

    *ACTION: Communicate to medical professionals the following "best practices" and encourage the development of others:*

    1) For patients requiring chronic therapy with a substance susceptible to abuse, execute a patient contract that requires pill counts, random drug testing, a single, patient-designated pharmacy, and an express duty of the patient to disclose outside medications;

    2) Maintain thorough (well-documented) records of prescribed medications including date, dose, duration, disease and refills;

    3) Query the Controlled Substances Monitoring Program to determine if patient is getting medication(s) from other providers; and

    4) Re-evaluate patient at appropriate intervals, and document responses.

    *ACTION:  Work with academic institutions and licensing boards to ensure basic and continuing education programs include curricula relating to prescription drug abuse.*

- **Collaborate with existing organizations and coalitions focused on substance abuse prevention and intervention, with a focus on reaching elementary school-aged children.**

    *ACTION:  Work through the WV Controlled Substances Advisory Board to carry out five county pilot prescription drug education projects during the fall of 2011.*

- **Engage community anti-drug coalitions, law enforcement agencies and other organizations to expand the use of available public education materials.**

  *ACTION:  Continue statewide and local implementation of the Take Care WV Rx Abuse Prevention Social Marketing Campaign (www.takecarewv.org).*

  *ACTION:  Utilize Community Anti-Drug Coalitions of American (CADCA), Office of National Drug Control Policy (ONDCP) and other existing tool kits and resources to disseminate free awareness materials to communities in West Virginia.*

## MONITORING

- **Promote consistent and thorough usage of the West Virginia Controlled Substances Monitoring Program (WV CSMP).**

  *ACTION:  Educate health care providers on utilization of monitoring program.*

  *ACTION:  Implement systematic usage by prescribers and pharmacists of WV CSMP when prescribing a controlled substance.*

- **Work toward real-time data access for clinicians and capability of sharing West Virginia Controlled Substances Monitoring Program data with other states.**

  *ACTION:  Join the West Virginia Controlled Substance Monitoring Program with the National Association of Boards of Pharmacy (NABP) Prescription Monitoring Program Interconnect System. This will enable participating states to share PMP data and thereby give law enforcement and regulatory agencies a method to identify attempts to illegally divert controlled substances across state lines.*

## DISPOSAL

- **Continue/increase periodic and conveniently located prescription "Take Back" opportunities for unused prescriptions, especially controlled substances.**

  *ACTION:  Provide West Virginians an opportunity to properly dispose of unwanted or expired prescription medications on a quarterly basis. The WV Controlled Substances Advisory Workgroup has developed a toolkit (available at www.takecarewv.org) to assist with the planning of local take back events.   Prevention coalitions throughout the state can assist in organizing these events.*

## ENFORCEMENT

- **Continue to focus efforts of Appalachia HIDTA and other drug and violent crime task forces on illegal prescription drug distribution.**

  *ACTION:  Conduct collaborative law enforcement initiatives targeting prescription drug trafficking in the southern counties of the state.*

- **Provide DEA prescription drug diversion investigation training to state and local law enforcement.**

  *ACTION:  Facilitate a statewide training for law enforcement on prescription drug diversion investigations before the end of 2011.*

## EARLY INTERVENTION/TREATMENT

- **Increase access to effective substance abuse early intervention, treatment and recovery management that is high quality and person-centered.**

  *ACTION:  Expand SBIRT implementation of screening, brief intervention, referral and treatment.*

  *ACTION:  Expand Adult and Juvenile Drug Courts*

### CONCLUSION

Prescription drug abuse is a problem that affects the life of virtually every West Virginian, in every segment of our society.   And just as we are all touched by it, all of us have a role in creating solutions to address the problem, including parents, peers, health care professionals, law enforcement, educators and policymakers.  The efforts of collaboration among the agencies that came together to plan the Summit will continue.  Other federal, state and local entities will be brought to the table as well in an effort to carry out these recommendations.

**SPECIAL THANKS**

*The U.S. Attorney's Office, SDWV, would like to thank the following agencies for
their collaboration and partnership in organizing the Summit and developing this report:*

Office of Senator Jay Rockefeller
Office of Governor Earl Ray Tomblin
U.S. Drug Enforcement Administration
Appalachia HIDTA
West Virginia Division of Justice & Community Services
West Virginia Bureau for Behavioral Health & Health Facilities
West Virginia State Police
West Virginia Partnership to Promote Community Well-Being
West Virginia Prosecuting Attorneys' Institute, WV Drug Endangered Children Program
West Virginia Department of Education
West Virginia Board of Pharmacy
University of Charleston School of Pharmacy
West Virginia Prevention Resource Center
Community Connections
Prestera Center
United Way River Cities, CCSAP



## RESOURCES AND REFERENCES:

Costs of Substance Abuse Reports (www.prevnet.org/)

"Understanding the Cultures of Prescription Drug Abuse, Misuse, Addiction and Diversion" by Dr. Michael O'Neil (www.wvsma.com/shared/content_objects/medical journals//substanceabuse_2010.pdf)

WV Partnership to Promote Community Well-Being & Controlled Substances Advisory Workgroup (www.prevnet.org/wvpartnership/)

WV Coalition Contacts (www.prevnet.org/countypartnerships/default.aspx)

WV Department of Education Office of Healthy Schools Regional Wellness Coordinators (www.wvde.state.wv.us/healthyschools/)

WV Students Against Destructive Decisions (SADD) Coalitions (www.wvsadd.org)

Take Care WV Rx Abuse Prevention Campaign (www.takecarewv.org/)

National Prescription Drug Take Back Initiatives, U.S. Drug Enforcement Administration (www.nationaltakebackday.com/)

WV Controlled Substances Advisory Workgroup Take Back Toolkit (Storage/Disposal page on www.takecarewv.org)

WV Consumer Drug Return Partnership (www.wvrivers.org/WVCDRP/overview.html)

WV Board of Pharmacy (www.wvbop.com/)

 "Checklist to Facilitate Detection and Management of Prescription Drug Seekers and Drug Addicts not in Recovery," by Dr. Michael O'Neil  (www.wvsma.com/shared/content_objects/medical journals//substanceabuse_2010.pdf)

Screening, Brief Intervention, Referral and Treatment (SBIRT) (www.samhsa.gov/prevention/SBIRT/)

Substance Abuse Early Intervention Projects in Logan and Mercer County (www.prevnet.org/earlyintervention/default.aspx)

WV Department of Health and Human Resources Bureau for Behavioral Health and Health Facilities (www.wvdhhr.org/bhhf/)

WV Behavioral Health Providers Association (www.wvbehavioralhealth.org)

Substance Abuse Treatment Facility Locator (www.findtreatment.samhsa.gov)

WV Prescription Drug Abuse Quitline (1-866-WV-QUITT) (www.wvrxabuse.org)

WV Poison Center (www.wvpoisoncenter.org)

Appalachia High Intensity Drug Trafficking Area (AHIDTA) (www.whitehousedrugpolicy.gov/hidta/appalachia.html)

U.S. Drug Enforcement Administration (DEA) (www.justice.gov/dea/)

"Epidemic: Responding to America's Prescription Drug Abuse Crisis" (www.whitehousedrugpolicy.gov/publications/pdf/rx_abuse_plan.pdf)

For more information about prescription drug abuse and ongoing efforts
to implement these recommendations, please contact:

**United States Attorney's Office, SDWV**
**Phone:  304-345-2200**
**Website:  www.justice.gov/usao/wvs/**





# EXHIBIT 10

# IN THE CIRCUIT COURT OF BOONE COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA
ex rel DARRELL V. MCGRAW, JR.
Attorney General,

                    Plaintiff,

v.                                              Civil Action No. _12-C-140_

CARDINAL HEALTH, INC.
an Ohio corporation doing business in
West Virginia,

                    Defendant.

## COMPLAINT

For its complaint the State of West Virginia, by and through its duly-elected Attorney

General Darrell V. McGraw, Jr., states the following:

## I.

## Summary of Action

1.     This civil action addresses the epidemic of prescription drug abuse and its

costs. Prescription drug abuse costs the State of West Virginia hundreds of millions of dollars

annually. Beyond the actual dollars lost, prescription drug abuse devastates families,

communities and reduces the State's economic productivity. Prescription drug abuse adversely

affects West Virginia's hospitals, schools, courts, social service agencies, jails and prisons as

well as diminishing the very quality of life in our cities and towns. Accordingly, the State, by its

Attorney General, brings this action against a party whom the Attorney General has identified as

having substantially contributing to and who have substantially, illicitly and tortiously benefitted

financially from the prescription drug abuse problem in West Virginia.

1

2. The Defendant herein named distributes various prescription drugs which are closely identified with the prescription drug abuse problem in West Virginia. This Defendant was on notice of the growing epidemic from the abuse of those prescription drugs which it supplied and of the quantities and frequency with which those drugs were distributed to entities in West Virginia. For reasons which are more specifically set forth in the following causes of actions this Defendant is answerable in damages to the State of West Virginia and is susceptible to such other relief as is requested.

3. The problems, crimes, damages and losses related to the prescription drug epidemic in West Virginia include, inter alia, the following:

a. Costs to the State of as much as $430 million annually in the year 2010 with costs projected to be as much as $695 million annually by 2017;

b. A per capita death rate from prescription drug overdose which has at times been either the highest or the second highest recorded for all states in the United States. One county, McDowell located in Southern West Virginia, had a death rate of 34.2 per 100,000 in 2001 and 97.3 in 2008;

c. Between 2001 and 2008 West Virginia deaths from overdoses involving prescription drugs quadrupled from 5.1 deaths per 100,000 residents to 21.5;

d. According to Charleston Area Medical Center approximately twenty (20) percent of patients admitted through the hospital's trauma service have an issue with narcotic usage which contributes to their injuries. As such, the demand from the growing problem of addiction and management of addicted patients will eventually be too great for the available care provides unless the problem is addressed. Many of the addicted patients have no

2

medical insurance coverage;

      e.      West Virginia has been identified as the nation's "most medicated state" based upon data gathered for 2009. Pharmacies in the State filled 18.4 prescriptions per capita as compared to the national average of 11.6 per capita;

      f.      One pharmacy which is located in tiny Kermit, West Virginia in 2006 received 3,194,400 dosage units of hydrocodone which ranked 22nd in the nation among pharmacies with respect to purchases of hydrocodone dosage and 35th nationally if you include mail order pharmacies. The owner who is a licensed pharmacists has testified that the pharmacy filled one prescription per minute. Pharmacy records reveal that the pharmacy regularly paid suppliers hundreds of thousands of dollars, that virtually 90% of the drugs ordered and received and are of the kind associated with the prescription drug epidemic. The pharmacy reported revenue of more than $500,000 per month. Recently, an article described Kermit, population 300, as "ground zero" in the prescription drug epidemic;

      g.      One Pittsburgh area physician who has entered a guilty plea to a drug law violation allegedly worked in or owned an operation in Southern West Virginia which a federal investigation disclosed netted him personally as much as $20,000 per day in cash deposits made to his personal bank account. That so-called clinic was closed by the government resulting in seizure of hundreds of thousands of dollars in cash from physicians and others who were associated with the clinic;

      h.      State prosecutors and judges lament that as much as 90% of their case load is regularly made up of matters which are either directly or indirectly related to prescription drug abuse. As one prosecutor recently told a Charleston newspaper " I have

3

sometimes morbidly said I would welcome a cocaine case because at least not as many people are dying from cocaine abuse as they are from prescription drug abuse. I bring this up to point out foremost that we continue to ignore the human cost of substance abuse. Families are destroyed. People die. People can't get jobs and become homeless. They don't send their children to school, which ultimately contributes to truancy, delinquency, another generation of crime and a host of other problems. We're at the top of the nation in births of drug-addicted babies."

## II.

### Parties

4.      The Plaintiff is the State of West Virginia. Darrell V. McGraw, Jr. is the Attorney General of the State of West Virginia. He is authorized both by the West Virginia Constitution and by statute to bring this action. More particularly:

a.      West Virginia Code, Chap. 60A, Art. 5, Sec. 501( c ) invests the Attorney General with the duty and the authority to assist in the enforcement of the provisions of the Uniform Controlled Substances Act and to cooperate with agencies and other governmental entities as relates to controlled substances; and

b.      West Virginia Code, Chap. 46A, Art. 7, Sec, 101 et seq, and Code 47-18-1 et seq invest the Attorney General with the authority to sue for violations of the West Virginia Consumer Protection Act and the West Virginia Antitrust Act, to recover civil penalties and to seek other remedies for violations of said statutes.

4

5.     The Defendant Cardinal Health, Inc. is an Ohio corporation which a: all times pertinent hereto, was conducting business in West Virginia.  This Defendant is a registrant with the West Virginia Board of Pharmacy.

### III.

### Jurisdiction and Venue

6.     Jurisdiction exists pursuant to the provisions of West Virginia Code Chap. 56, Art. 3, Sec. 33, as amended in that Defendant by and through its authorized agents, servants and employees regularly transacted business in West Virginia, supplied and distributed prescription drugs in West Virginia and further through its acts and omissions tortiously caused injuries in West Virginia by engaging in a persistent  course of conduct in West Virginia which violated West Virginia law.  This Defendant derived substantial revenue as the result of the prescription drugs which were distributed to West Virginia entities and later consumed by persons then residing in West Virginia.

7.     Pursuant to W.Va. Code §46A-7-114 and W.Va Code §47-18-15 venue is proper in that the Defendant committed acts in violation of the West Virginia Uniform Controlled Substances Act and the West Virginia Consumer Credit and Protection Act and the West Virginia Antitrust Act in Boone County West Virginia.  Further, the Defendant transacted business in Boone County as well as in other counties within the State of West Virginia.

5

## IV

### DEA's Suspension of Cardinal Health, Inc. As an
### Example of Defendants' Illegal Conduct

8.     In a recent federal district court proceeding in the District of Columbia

regarding the DEA's suspension of Defendant Cardinal's federal controlled substances license,

DEA alleged that Cardinal had not taken adequate safeguards to prevent prescription drugs which

it distributed from being unlawfully diverted.

9.     The DEA further alleged that Cardinal's "staggeringly high" volumes of

pills sent to various dispensers posed "an imminent danger to public health or safety" and thus

the DEA issued an Immediate Suspension Order ("ISO") to Cardinal on February 2, 2012.

a.     During this proceeding, it became apparent that Cardinal had

sent 2,050,000 pills to a store in Florida, where the population of the town was 53,000 (USA

Today).

b.     An average pharmacy in the United States dispenses 69,000

oxycodone pills a year. (USA Today).

10.     Indeed, the DEA explained "Orders Cardinal flagged as suspicious were

overwhelmingly released with little or no explanation why. Even those few orders that Cardinal

refused to fill as suspect it failed to report to DEA, as Lakeland [Cardinal's location] was

required to do. Since it resumed operations in October 2008, Lakeland has not alerted DEA

about a single suspicious order for three of its top four customers, even though two of them have

surrendered their DEA registrations due to committing the very sort of diversion DEA expects

Cardinal and all distributors to police. During the relevant period of time, Cardinal never

6

conducted an in-store audit of either CVS, despite DEA having told Cardinal that it could not fulfill its due diligence obligations simply by relying on CVS's corporate controls.

     11.     Moreover, when Cardinal's investigations did raise red flags, they were frequently ignored. In October 2010, for example, a Cardinal investigator suspected that a pharmacy was illegitimately dispensing oxycodone, and recommended that Cardinal call DEA. Not only did that call never come, Lakeland [Cardinal's location] increased oxycodone volume to this pharmacy in the months after the visit, notwithstanding the investigator's warning that this particular pharmacy posed a "high risk of diversion."

From the bench during a hearing on February 29, 2012, U.S. District Judge Reggie Walton ruled in favor of the DEA, stating, "I think DEA is correct that companies have an obligation to police themselves ... and to be proactive in assessing whether diversion (of controlled substances) is taking place." (Reuters)

     12.     In regard to the District Court's validation of the DEA's Immediate Suspension Order (ISO), Cardinal appealed same. On May 16, 2012 the United States Court of Appeals for the District of Columbia Circuit ruled that the Defendant's (Cardinal Health, Inc) emergency motion for injunction pending appeal be denied, therefore the administrative stay of the DEA's immediate suspension order (ISO) was dissolved.

     13.     Cardinal's actions or inactions in Florida are consistent with Cardinal's conduct in West Virginia.

As a major distributor of controlled substances in West Virginia, Cardinal has supplied controlled substances to rogue drugstores which dispense controlled substances based on bogus

7

prescriptions from unethical physicians who are prescribing controlled substances for illegitimate medical purposes.

"Pill Mills" consist of medical providers, pharmacies and distributors of controlled substances, each of whom must knowingly or while acting grossly negligent prescribe, dispense or distribute prescription medicine for illegitimate medical purposes. Each actor alone would be ineffective to divert controlled substances for illegitimate medical purposes. Conversely, each actor together causes and contributes to the diversion of prescription medicine.

## Causes of Action

### Count I

### Injunctive Relief for Violations of Responsibilities and Duties Under The West Virginia Uniform Controlled Substances Act

14. Plaintiff hereby incorporates by reference all of the previous allegations of this complaint.

15. West Virginia Code §60A-5-501( c ) provides: "All prosecuting attorneys and the **attorney general, or any of their assistants, shall assist in the enforcement of all provisions of this act** and shall cooperate with all agencies charged with the enforcement of the laws of the United States, of this state, and of all other states relating to controlled substances."

16. West Virginia Code § 60A-5-503(a) states that "The courts of record of this state have and may exercise jurisdiction to restrain or enjoin violations of this act."

17. The Uniform Controlled Substances Act, W. Va. Code § 60A-3-301 provides, in relevant part that "The State Board of Pharmacy shall promulgate rules . . . relating

8

to the registration and control of the manufacture **and distribution of controlled substances within this State . . . ."**

      18.    The regulations promulgated pursuant to the above-referenced authority, effective May 1, 2001, provide, <u>inter alia</u>, for the following:

- **"Every person who manufactures, distributes or dispenses any controlled substance or who proposes to engage in the manufacture, distribution or dispensing of any controlled substance shall obtain annually a controlled substance permit unless exempted by law or pursuant to Section 3.2 of this rule." 15 C.S.R. § 2-3.1.1.**

- **"All registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances." 15 C.S.R. § 2-4.2.1.**

- **"The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Office of the West Virginia Board of Pharmacy of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 15 C.S.R. § 2-4.4.**

      19.    Although this Defendant is the single registrant who has actually disclosed two (2) suspicious orders to the West Virginia Board of Pharmacy, (one of which was subsequently shipped) the Defendant has not been consistent in doing so and has failed to diligently respond to the suspicious orders which the Defendant has filled. The Defendant therefore has failed to provide effective controls and procedures to guard against diversion of controlled substances in contravention of West Virginia law.

9

20.    By failing to do so, Defendant has willfully and repeatedly violated the Uniform Controlled Substances Act and corresponding regulations.

21.    The State, by and through, the Attorney General under the authority of W.Va. Code § 60A-5-501( c ) and W. Va. Code § 60A-5-503(a) seeks to restrain the violations of 15 C.S.R. § 2-4.4.

22.    The State of West Virginia has in the past sustained enormous damages as the proximate result of the failure by the Defendant to comply with 15 CSR §2-4.2.1 and 15 CSR §2-4.4.  Unless restrained by injunctive relief the State will continue to suffer losses as the proximate result of the failure by the Defendant to monitor and to disclose suspicious orders of controlled substances.

23.    The State of West Virginia has suffered irreparable harm and will in the future suffer irreparable harm unless the Defendant is restrained by an injunction.

24.    A lawsuit for damages for past losses as sustained by the State is an inadequate remedy to prevent future losses which will result from the failure to comply with West Virginia law.

## Count II

### Damages Resulting From Negligence and Violations of the
### West Virginia Uniform Controlled Substances Act

25.    The Plaintiff hereby incorporates by reference all of the previous allegations of this Complaint.

26.    In addition to regulating the wholesale distribution of controlled substances the West Virginia Uniform Controlled Substances Act authorizes the Board of

10

Pharmacy to administer the provisions of Chapter 60A (the UCSA), §60A-2-201, which this

Plaintiff is required by law to enforce, §60A-5-501( c ).

       27.    The epidemic prescription drug abuse is attended and promoted by the

repeated violation of various provisions of the West Virginia Uniform Controlled Substances

Act, to wit;

       a.    Improper dispensing of prescriptions contrary to
            W.Va Code §60A-3-308;

       b.    Engaging in prohibited acts contrary to W.Va Code
            §§60A-4-401 through 403;

       c.    Deceiving and attempting to deceive medical practitioners
            in order to obtain prescriptions in contravention of W.Va.
            Code §60A-4-410;

       d.    Disregarding the requirements of the Wholesale Drug
            Distribution Licensing Act of 1991, W.Va. Code
            §60A-8-1 et seq,; and

       e.    Conspiring to violate the West Virginia Uniform Controlled
            Substances Act.

       28.    The Defendant as a distributor of controlled substances is expected to

comply both with the laws of the State into which they distribute controlled substances and with

industry custom and standards.  In the instant case the standard of conduct for Defendant's

industry requires that the Defendant know its customers which includes inter alia an awareness of

the customer base, knowledge of the average prescriptions filled each day, the percentage of

controlled substances compared to overall purchases, a description of how the dispenser fulfills

its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and

11

identification of physicians and bogus centers for the alleged treatment of pain that are the dispenser's most frequent prescribers.

29.     This Defendant has wilfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to customers who are serving a customer base comprised of individuals who are themselves abusing prescription medications, many of whom are addicted and all of whom can reasonably be expected to become addicted. The Defendant negligently acted with others to violate West Virginia's drug laws, dispensing controlled substances for illegitimate medical purposes, operating bogus pain clinics which do little more than provide prescriptions for controlled substances and thereby creating and continuing addictions to prescription medications.

30.     Under West Virginia law a party who violates a statute which violation results in damages is liable for such damages as are sustained therefrom, W.Va. Code §55-7-9.

31.     This Defendant has by its acts and omissions proximately caused and substantially contributed to damages to the State of West Virginia by violating West Virginia laws, by creating conditions which contribute to the violations of West Virginia laws by others, by its negligence and by its reckless disregard of the customs, standards and practices within Defendant's own industry.

## Count III

### Violation of the West Virginia Consumer Credit and Protection Act (WVCCPA)
### Unfair Methods of Competition or Unfair or Deceptive Acts or Practices

32.     Plaintiff hereby incorporates by reference all of the previous allegations of this Complaint.

12

33.   West Virginia law as embodied in W.Va. Code §46A-6-104 prohibits the use of unfair methods and/or competition or unfair or deceptive acts or practices in any trade or commerce.

34.   The Attorney General is specifically charged with the administration of this provision and may act *sua sponte* as the agent and legal representative of the State in civil proceedings to enforce the statute, W. Va. Code § 46A-6-103, §§ 46A-7-102, -108, -110, -111.

35.   Violations of statutes and regulations which are enacted to protect the public or in the exercise of the State's police power constitute unfair or deceptive acts or practices.

36.   The Uniform West Virginia Controlled Substances Act, W. Va. Code § 60A-3-301, provides, in relevant part that "The State Board of Pharmacy shall promulgate rules and charge fees relating to the registration and control of the manufacture and distribution of controlled substances within this State . . . ."

37.   The regulations promulgated pursuant to this authority, effective May 1, 2001, provided that:

- **"Every person who manufactures, distributes or dispenses any controlled substance or who proposes to engage in the manufacture, distribution or dispensing of any controlled substance shall obtain annually a controlled substance permit unless exempted by law or pursuant to Section 3.2 of this rule." 15 C.S.R. § 2-3.1.1.**

- **"All registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances." 15 C.S.R. § 2-4.2.1.**

- **"The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Office of the West Virginia Board of Pharmacy of**

13

suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 15 C.S.R. § 2-4.4.

38.     Each violation of these mandatory duties in the West Virginia Uniform Controlled Substances Act and its corresponding regulations is an unfair or deceptive act or practice in the conduct of trade or commerce, as set forth in W. Va. Code § 46A-6-104.

39.     Defendant's repeated violations were and are willful.

40.     As a result of the Defendant's actions and omissions Plaintiff has sustained damages, both past and in the future.

41.     In addition to compensatory damages, Plaintiff seeks all statutory damages available under the WVCCPA, including but not limited to the following:

    a.     Actual damages for past and future violations of the WVCCPA as authorized by W. Va. Code § 46A-5-101(1);

    b.     Statutory damages in the maximum amount authorized by W. Va. Code § 46A-5-101(1) as adjusted for inflation pursuant to W. Va. Code § 46A-5-106;

    c.     Attorney fees and court costs, pursuant to W. Va. Code § 46A-5-104; and

    d.     Penalties for *each* willful violation pursuant to W. Va. Code § 46A-7-111(2).

## Count IV

### Creating A Public Nuisance

42.     Plaintiff hereby incorporates by reference all of the previous allegations of this Complaint.

14

43.     This Defendant was on notice that an epidemic from prescription drug abuse existed and has existed during times which are relevant to this Complaint. Such notice is the result of

- An inordinate amount of media coverage by both national and local print, television and radio media.

- Publications received from government sources as well as warnings and recommendations contained in trade and professional journals.

- Changes in law and regulations which were designed specifically to address the growing problem of prescription drug abuse.

44.     The widespread publicity contained many references and statistics concerning West Virginia's problems from prescription drug abuse including, but not limited to, suffering the nations' highest per capita death rate from prescription drug overdose.

45.     Notwithstanding the knowledge of this epidemic this Defendant persistently engaged in a pattern of distributing controlled substances of the kinds which were well-known to be abused and diverted all the while distributing them in such quantities and with such frequency that the Defendant knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes.

46.     As the result of the above-described conduct this Defendant negligently, recklessly and/or intentionally, and acting with blind indifference to the facts, created and continued a public nuisance. More particularly, the public nuisance so created injuriously affects the communities of West Virginia, endangers the public health and safety and inconveniences the citizens of the State in the following ways:

- Areas in certain communities have become congested with persons who

15

gather in large groups outside of "clinics, pharmacies and physician offices" which are in fact component parts of pill mills which exist only to prescribe and deliver drugs for illicit, non-medical purposes.

- Crimes and other dangerous activities have increased.

- Hospital services, especially those services provided by emergency rooms, are being consumed by persons with prescription drug abuse issues.

- Law enforcement and prosecutorial resources are being exhausted and consumed by having to address prescription drug abuse issues to the exclusion of other matters.

- Public resources are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources which could be used to benefit the public at large.

- Court dockets are congested by drug-related cases as well as by crimes committed by addicts, thereby diminishing access to our courts by others.

- Jails and prisons suffer from overcrowding.

47.     The Defendant's acts and omissions which have caused and contributed to the nuisance described herein has damaged the health and safety of West Virginia citizens in the past and will continue to do so in the future unless the nuisance is abated.

48.     The State of West Virginia has sustained economic harm and will in the future suffer economic harm unless the above-described public nuisance is abated.

## Count V

## Unjust Enrichment

49.     Plaintiff hereby incorporates by reference all of the previous allegations of this Complaint.

50.     Because of prescription drug abuse the State of West Virginia expends additionally hundreds of millions of dollars annually on law enforcement, prosecutors and

16

prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole, public welfare and service agencies, healthcare and medical services and drug abuse education. Further, the State suffers losses in revenue and incurs costs from workplace accidents and absenteeism resulting from prescription drug abuse.

51.     The State of West Virginia remains responsible for costs of prescriptions, health care and other medically-related costs, rehabilitation and work-related programs, workers' compensation, public insurance, law enforcement, prosecution costs, court related costs, public defender services, correctional institutions, probation and parole services, which costs have substantially increased as the result of the Defendant's acts and omissions herein complained of and will in the future continue to increase unless the Defendants's conduct is abated.

52.     The Defendant has thus been enriched unjustly by neglecting its duty of distributing drugs only for proper medical purposes which substances are consumed for reasons which are other than medical.

53.     The unjust enrichment of the Defendant is directly related to the damage, loss and detriment to the Plaintiff State of West Virginia.

## Count VI

### Negligence

54.     The State realleges and incorporates by reference all preceding paragraphs as though fully set forth herein and further alleges the following.

55.     Defendant has a duty to exercise reasonable care in the marketing, promotion and distribution of controlled substances.

56.     Defendant has breached this duty by the conduct alleged above.

17

57. As a proximate result, Defendant and its agents have caused the State to incur excessive prescription costs, health care costs and other medical costs related to diagnosis, treatment and cure of addiction or the risk of addiction to such controlled substances in that many of the citizens of West Virginia are Medicaid or publicly-funded health care recipients, thus the State has borne the massive costs of these illnesses and conditions by having to provide necessary medical care, facilities and services for treatment of citizens of West Virginia who are unable to afford or otherwise obtain such necessary medical care, facilities and services.

58. The Defendant was negligent in failing to guard against third-party misconduct, i.e. the conduct of the so-called "pill mill" physicians and staff as well as and corrupt pharmacists and staff and, in fact, the Defendant participated in such misconduct.

59. Defendant's conduct has imposed an unreasonable risk of harm to others separately and/or as combined with the negligent and/or criminal acts of third parties.

60. The Defendant is in a class of a limited number of parties that distribute controlled substances and such activity poses distinctive and significant dangers. The dangers include diversion of controlled substances for illegitimate medical purposes and addiction to same by consumers.

61. The Defendant is negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

18

62. Controlled substances are dangerous commodities. The Defendant distributor is required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of controlled substances during distribution. The Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business. The Defendant cannot delegate this duty of care to another.

63. The distribution of these controlled substances are under the exclusive control and management of the Defendant. Plaintiff is without fault and the injuries to Plaintiff would not have happened in the ordinary course of events had the Defendant used due care commensurate to the dangers involved in the distribution of controlled substances. Hence, the Defendant is negligent.

## Count VII

## Medical Monitoring

64. Through Defendant's tortious acts, omissions, and conduct as set forth above, users and abusers of prescription drugs have been significantly exposed to the dangers of addiction and misuse. Further, pill mill doctors and pharmacies and other careless professionals have been assisted in their acts or in their carelessness by the availability of such large quantities of abused substances. The increased risk of harm which attends these acts and omissions makes it both reasonable and necessary for the dependent users and abusers to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure. Monitoring, testing and counseling procedures exist for such treatment.

19

65.     Diagnosis and treatment of these conditions is clinically invaluable in that it can prevent or reduce illness, suffering and/or death.

66.     Many individuals who are at risk for addiction and dependency from exposure to overuse of prescription drugs cannot afford appropriate testing and/or therapy

67.     The increased susceptibility to death, injuries and irreparable harm to the health of abusers and dependent users resulting from their exposure to prescription drugs can only be mitigated or addressed by the creation of a Court-supervised fund, financed by the Defendant, that will fund a comprehensive medical monitoring program of:

     a.     Notifying individuals.

     b.     Aiding in diagnosis and treatment.

     c.     Funding studies and research of the short and long term effects and treatment of overuse, misuse and addiction to prescription drugs.

     d.     Accumulating and analyzing relevant medical and demographic information.

     e.     Creating, maintaining and operating a "registry" in which relevant demographic and medical information is gathered, maintained and analyzed; and

     f.     Gathering and forwarding to treating physicians information related to proper diagnosis and treatment.

68.     Prescription drug users in West Virginia have no adequate remedy at law in that monetary damages alone do not compensate for the continuing nature of the harm to them, and a monitoring program which notifies them of the dangers and aids in their treatment can prevent the greater harms which may not occur immediately but which is preventable if proper

research is conducted and the health risk is diagnosed and treated before harm occurs or become worse.

69.     Without a court-approved medical treatment monitoring program, the relevant product users will not receive prompt medical care which could detect and prolong their productive lives, increase prospects for improvement and minimize disability.

### Count VIII

### Antitrust

70.     The State realleges and incorporates by reference all preceding paragraphs as though fully set forth herein and further alleges as follows:

71.     The Attorney General of the State of West Virginia is empowered by law pursuant to West Virginia Code §§47-18-6, 47-18-7 and 47-18-9 to investigate suspected violation of, and to bring actions of behalf of, the State of West Virginia for damages sustained by the State that result from violation of the West Virginia Antitrust Act.

72.     Defendant, as described above, has violated said Act in particular, but without limitation, W.Va Code §47-18-3(b)(1)(B) and W.Va Code §47-18-4, which read in pertinent part:

> b.      Without limiting the effect of subsection (a) of the section, the following shall be deemed to restrain commerce unreasonably and are unlawful:
>
> 1.      A contract, combination or conspiracy between two or more persons:
>
> . . . . .
>
> B.      Fixing, controlling, maintaining, limiting or discontinuing the production, manufacture, mining, sale or supply of any commodity,

21

or the sale or supply of any service, for the purpose or with the effect of fixing, controlling or maintaining the market price, rate or fee of the commodity or service. . . .

W.Va Code §47-18-3(b)(1)(B). §47-18-4.

73.    The Defendant has utilized unfair and deceptive business practices to attempt to obtain dominant market share in the West Virginia market for controlled substances.

74.    The Defendant has conspired with "pill mill" physicians and pharmacies who prescribe and fill these prescription for illegitimate medicine purposes in order to restrain and monopolize trade in West Virginia for the "pill mill" market. This conduct had and has resulted in a restraint of trade or had an anti-competitive effect on trade by seeking to gain advantage over law-abiding, careful wholesale distributors.

75.    Such attempts to provide controlled substances for illegitimate medical purposes, contrary to law, substantially lessened competition, restrained trade or tended to create a monopoly in the illicit pill mill controlled substance scheme in West Virginia.

76.    The combined actions of certain physicians, pharmacies and the Defendant in prescribing, filling and distributing controlled substances for illegitimate medical use, harms and restrains competition. The Defendant unfairly and contrary to law distributed controlled substances which prohibits distributors who distribute controlled substances for legitimate medical purposes from competing in the "pill mill market" which resulted in harm to the citizens of West Virginia and restrained trade.

77.    The combined actions, described above, allocates or divides customers or markets within West Virginia to the Defendant that distributes controlled substances for illegitimate medical purposes, which is in violation of W.Va Code 47-18-3(b)(1)( c ).

22

## Prayer

**WHEREFORE**, the Plaintiff prays that the Court grant the following relief:

1.      Enter temporary and permanent injunction which mandates the Defendant to promptly inform the West Virginia Board of Pharmacy of any all and all suspicious orders for controlled substances as received from parties who are located in West Virginia and to submit their system for determining suspicious orders to West Virginia authorities for prior approval.  Enter temporary and permanent injunction which mandates that Defendant is enjoined from distributing in West Virginia any controlled substances for any illegitimate medical purpose.

2.      Order a jury trial to determine such costs, losses and damages as are proved in this action in relation to the several counts of this Complaint including, but not limited to:

a.      Losses sustained as the proximate result of both negligent and conscious violations of the West Virginia Uniform Controlled Substances Act and regulations;

b.      Damages sustained as the proximate result of nuisances created by the prescription drug abuse epidemic;

c.      Damages and losses sustained as the proximate result of the Defendant's negligence in marketing, promoting and distribution of controlled substances in West Virginia;

d.      Disgorgement of unjust enrichment of the Defendant;

23

e.      Treble damages under the West Virginia Antitrust Act.

3.      Such relief, fees and cost as shall be available under the West

Virginia Credit and Consumer Protection Act.

4.      Order reimbursement of all litigation costs and enter an award of

attorney fees herein.

5.      Order a plan of medical monitoring.

6.      And grant such other and further relief as shall be deemed

appropriate herein.

**Plaintiff seeks a jury trial for all such counts as are so triable.**

State of West Virginia ex rel.
**Darrell V. McGraw, Jr.**
Attorney General

*By Counsel,*

Frances A. Hughes, Esq.
Managing Deputy Attorney General
**OFFICE OF ATTORNEY GENERAL**
Building 1, Room 26-E
Capitol Complex
Charleston, WV 25305
Telephone: 304-558-2021

James M. Cagle, WV Bar No. (580)
Cagle & Jackson, Attorneys
P.O. Box 12326
Big Chimney Station
Charleston, WV 25302

24