# EXHIBIT 21

EDGAR Online

# CARDINAL HEALTH INC

## FORM 10-K
### (Annual Report)

## Filed 08/13/14 for the Period Ending 06/30/14

| | |
|---|---|
| Address | 7000 CARDINAL PLACE |
| | DUBLIN, OH 43017 |
| Telephone | 6147573033 |
| CIK | 0000721371 |
| Symbol | CAH |
| SIC Code | 5122 - Drugs, Drug Proprietaries, and Druggists' Sundries |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 06/30 |



Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2015, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

Table of Contents
Cardinal Health, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

Deferred income tax assets and liabilities in the preceding table, after netting by taxing jurisdiction, are in the following captions in the consolidated balance sheets at June 30:

| (in millions) | 2014 | | 2013 | |
|---|---|---|---|---|
| Current deferred income tax asset (1) | $ | 18 | $ | 15 |
| Noncurrent deferred income tax asset (2) | | 15 | | 17 |
| Current deferred income tax liability (3) | | (918) | | (908) |
| Noncurrent deferred income tax liability (4) | | (324) | | (252) |
| **Net deferred income tax liability** | $ | **(1,209)** | $ | (1,128) |

(1)  Included in prepaid expenses and other in the consolidated balance sheets.
(2)  Included in other assets in the consolidated balance sheets.
(3)  Included in other accrued liabilities in the consolidated balance sheets.
(4)  Included in deferred income taxes and other liabilities in the consolidated balance sheets.

At June 30, 2014 , we had gross federal, state and international loss and credit carryforwards of $210 million , $1.3 billion and $85 million , respectively, the tax effect of which is an aggregate deferred tax asset of $191 million . Substantially all of these carryforwards are available for at least three years. Approximately $92 million of the valuation allowance at June 30, 2014 applies to certain federal, state and international loss carryforwards that, in our opinion, are more likely than not to expire unutilized. However, to the extent that tax benefits related to these carryforwards are realized in the future, the reduction in the valuation allowance would reduce income tax expense.

We had $510 million , $650 million and $654 million of unrecognized tax benefits at June 30, 2014 , 2013 and 2012 , respectively. The June 30, 2014 , 2013 and 2012 balances include $322 million , $371 million and $337 million , respectively, of unrecognized tax benefits that, if recognized, would have an impact on the effective tax rate. The remaining unrecognized tax benefits relate to tax positions for which ultimate deductibility is highly certain but for which there is uncertainty as to the timing of such deductibility. Recognition of these tax benefits would not affect our effective tax rate. We include the full amount of unrecognized tax benefits in deferred income taxes and other liabilities in the consolidated balance sheets. The following table presents a reconciliation of the beginning and ending amounts of unrecognized tax benefits:

| (in millions) | 2014 | | 2013 | | 2012 | |
|---|---|---|---|---|---|---|
| Balance at beginning of fiscal year | $ | 650 | $ | 654 | $ | 747 |
| Additions for tax positions of the current year | | 16 | | 22 | | 16 |
| Additions for tax positions of prior years | | 94 | | 97 | | 68 |
| Reductions for tax positions of prior years | | (40) | | (30) | | (3) |
| Settlements with tax authorities | | (210) | | (93) | | (172) |
| Expiration of the statute of limitations | | — | | — | | (2) |
| **Balance at end of fiscal year** | $ | **510** | $ | 650 | $ | 654 |

It is reasonably possible that there could be a change in the amount of unrecognized tax benefits within the next 12 months due to activities of the U.S. Internal Revenue Service ("IRS") or other taxing authorities, including proposed assessments of additional tax, possible settlement of audit issues, reassessment of existing unrecognized tax benefits or the expiration of applicable statutes of limitations. We estimate that the range of the possible change in unrecognized tax benefits within the next 12 months is a decrease of approximately $25 million to an increase of approximately $10 million , exclusive of penalties and interest.

We recognize accrued interest and penalties related to unrecognized tax benefits in the provision for income taxes. At June 30, 2014 , 2013 and 2012 we had $143 million , $198 million and $209 million , respectively, accrued for the payment of interest and penalties. These balances are gross amounts before any tax benefits and are included in deferred income taxes and other liabilities in the consolidated balance sheets. During fiscal 2014 and 2012 , we recognized $46 million and $28 million of benefit for interest and penalties in income tax expense, respectively. During fiscal 2013 , we recognized $24 million of interest and penalties in income tax expense.

We file income tax returns in the U.S. federal jurisdiction, various U.S. state jurisdictions and various foreign jurisdictions. We are subject to audit by the IRS for fiscal years 2006 through the current fiscal year. We are generally subject to audit by taxing authorities in various U.S. state and foreign jurisdictions for fiscal years 2003 through the current fiscal year.

During fiscal 2014 , the IRS closed audits of fiscal years 2003 through 2005. The IRS is currently conducting audits of fiscal years 2006 through 2010, and our transfer pricing arrangements continue to be under consideration as part of these audits. While the IRS has made and could make proposed adjustments to our transfer pricing arrangements, or other matters, we are defending our reported tax positions, and have accounted for the unrecognized tax benefits associated with our tax positions.

We are a party to a tax matters agreement with CareFusion Corporation ("CareFusion"), under which CareFusion is obligated to indemnify us for certain tax exposures and transaction taxes prior to our fiscal 2010 spin-off of CareFusion. The indemnification receivable was $210 million and $186 million at June 30, 2014 and 2013 , respectively, and is included in other assets in the consolidated balance sheets.

## 9. Commitments, Contingent Liabilities and Litigation

### Commitments

The future minimum rental payments for operating leases having initial or remaining non-cancelable lease terms in excess of one year at June 30, 2014 for fiscal 2015 through 2019 and thereafter are as follows: $97 million , $80 million , $60 million , $45 million , $31 million and $74 million . Rental expense

## Notes to Consolidated Financial Statements (continued)

relating to operating leases was $107 million , $92 million and $86 million in fiscal 2014 , 2013 and 2012 , respectively. Sublease rental income was immaterial for all periods presented.

## Legal Proceedings

We become involved from time to time in disputes, litigation and regulatory matters incidental to our business, including governmental investigations and enforcement actions, personal injury claims, employment matters, commercial disputes, intellectual property matters, government contract compliance matters, disputes regarding environmental clean-up costs, claims in connection with acquisitions and divestitures, and other matters arising out of the normal conduct of our business. We intend to vigorously defend ourselves in such matters.

We may be named from time to time in *qui tam* actions, which are cases initiated by private parties purporting to act on behalf of federal or state governments that allege that false claims have been submitted or have been caused to be submitted for payment by the government. After a private party has filed a *qui tam* action, the government must investigate the private party's claim and determine whether to intervene in the matter. These actions may remain under seal while the government makes this determination.

In addition, we occasionally may suspect that products we manufacture, market or distribute do not meet product specifications, published standards or regulatory requirements. In such circumstances, we investigate and take appropriate corrective action. Such actions can lead to product recalls, costs to repair or replace affected products, temporary interruptions in product sales and action by regulators.

We accrue for contingencies related to disputes, litigation and regulatory matters if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Because these matters are inherently unpredictable and unfavorable developments or resolutions can occur, assessing contingencies is highly subjective and requires judgments about future events. We regularly review contingencies to determine whether our accruals and related disclosures are adequate. The amount of ultimate loss may differ from these estimates.

We are unable to estimate a range of reasonably possible loss for matters described below, since damages or fines have not been specified or the proceedings are at stages where significant uncertainty exists as to legal or factual issues and as to whether such matters will proceed to trial. We do not believe, based on currently available information, that the outcomes of these matters will have a material adverse effect on our financial position, results of operations or cash flows, though the outcome of one or more of these matters could be material to our results of operations for a particular period.

We recognize income from the favorable outcome of litigation when we receive the associated cash or assets.

We recognize estimated loss contingencies for litigation and regulatory matters and income from favorable resolution of litigation in litigation (recoveries)/charges, net in our consolidated statements of earnings.

**Lakeland, Florida Distribution Center DEA Investigation and Related Matters**

In February 2012, the U.S. Drug Enforcement Administration (the "DEA") issued an order to show cause and immediate suspension of our Lakeland, Florida distribution center's registration to distribute controlled substances, asserting that we failed to maintain required controls against the diversion of controlled substances. In May 2012, we entered into a settlement agreement with the DEA that resolved the administrative aspects of the DEA's action, but did not foreclose the possibility of the U.S. Department of Justice (the "DOJ") seeking civil fines for conduct covered by the settlement agreement. In that regard, we are continuing to provide information to and engage in discussions, including preliminary discussions regarding the feasibility of a settlement, with the DEA and the DOJ.

**State of West Virginia vs. Cardinal Health, Inc.**

In June 2012, the West Virginia Attorney General filed, and in January 2014 amended, complaints against 13 pharmaceutical wholesale distributors, including us, in the Circuit Court of Boone County, West Virginia alleging, among other things, that the distributors failed to maintain effective controls to guard against diversion of controlled substances in West Virginia, failed to report suspicious orders of controlled substances in accordance with the West Virginia Uniform Controlled Substances Act and were negligent in distributing controlled substances to pharmacies that serve individuals who abuse controlled substances. In addition to injunctive and other equitable relief, the complaints seek monetary damages and the creation of a court-supervised fund, to be financed by the defendants in these actions, for a medical monitoring program focused on prescription drug abuse.

**Federal False Claims Investigation**

The DOJ has requested information in connection with an investigation of possible violations of the federal False Claims Act with respect to our Medical segment's administration of a prime vendor agreement with the federal government. We are cooperating with the DOJ in this matter.

## Antitrust Litigation Proceeds

We recognized income resulting from settlements of class action antitrust claims in which we were a class member of $24 million and $38 million during fiscal 2014 and 2013 , respectively.

## 10. Guarantees

In the ordinary course of business, we agree to indemnify certain other parties under acquisition and disposition agreements, customer agreements, intellectual property licensing agreements, and other agreements. Such indemnification

Table of Contents

Cardinal Health, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

obligations vary in scope and, when defined, in duration. In many cases, a maximum obligation is not explicitly stated, and therefore the overall maximum amount of the liability under such indemnification obligations cannot be reasonably estimated. Where appropriate, such indemnification obligations are recorded as a liability. Historically, we have not, individually or in the aggregate, made payments under these indemnification obligations in any material amounts. In certain circumstances, we believe that existing insurance arrangements, subject to the general deduction and exclusion provisions, would cover portions of the liability that may arise from these indemnification obligations. In addition, we believe that the likelihood of a material liability being triggered under these indemnification obligations is not significant.

From time to time we enter into agreements that obligate us to make fixed payments upon the occurrence of certain events. Such obligations primarily relate to obligations arising under acquisition transactions, where we have agreed to make payments based upon the achievement of certain financial performance measures by the acquired business. Generally, the obligation is capped at an explicit amount.

## 11. Fair Value Measurements

The following tables present the fair values for those assets measured on a recurring basis at June 30:

| (in millions) | 2014 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Cash equivalents (1) | $    740 | $    — | $    — | $    740 |
| Forward contracts (2) | — | 10 | — | 10 |
| Available-for-sale securities (3) | — | 100 | — | 100 |
| Other investments (4) | 106 | — | | 106 |
| **Total** | $    846 | $    110 | $    — | $    956 |

| (in millions) | 2013 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Cash equivalents (1) | $    348 | $    — | $    — | $    348 |
| Forward contracts (2) | — | 12 | — | 12 |
| Other investments (4) | 89 | — | | 89 |
| **Total** | $    437 | $    12 | $    — | $    449 |

(1)  Cash equivalents are comprised of highly liquid investments purchased with a maturity of three months or less. The carrying value of these cash equivalents approximates fair value due to their short-term maturities.

(2)  The fair value of interest rate swaps, foreign currency contracts and commodity contracts is determined based on the present value of expected future cash flows considering the risks involved, including non-performance risk, and using discount rates appropriate for the respective maturities. Observable level 2 inputs are used to determine the present value of expected future cash flows. The fair value of these derivative contracts, which are subject to master netting arrangements under certain circumstances, is presented on a gross basis in the consolidated balance sheets.

(3)  During fiscal 2014 , we purchased marketable securities, which are classified as available- for-sale and are carried at fair value in the consolidated balance sheets. Observable level 2 inputs such as quoted prices for similar securities, interest rate spreads, yield curves and credit

risk are used to determine the fair value. See Note 6 for additional information regarding available-for-sale securities.

(4)  The other investments balance includes investments in mutual funds, which are used to offset fluctuations in defer red compensation liabilities. These mutual funds primarily invest in the equity securities of companies with large market capitalization and high quality fixed income debt securities. The fair value of these investments is determined using quoted market prices.

## 12. Financial Instruments

We utilize derivative financial instruments to manage exposure to certain risks related to our ongoing operations. The primary risks managed through the use of derivative instruments include interest rate risk, currency exchange risk and commodity price risk. We do not use derivative instruments for trading or speculative purposes. While the majority of our derivative instruments are designated as hedging instruments, we also enter into derivative instruments that are designed to hedge a risk, but are not designated as hedging instruments. These derivative instruments are adjusted to current fair value through earnings at the end of each period.

We are exposed to counterparty credit risk on all of our derivative instruments. Accordingly, we have established and maintain strict counterparty credit guidelines and enter into derivative instruments only with major financial institutions that are investment grade or better. We do not have significant exposure to any one counterparty and we believe the risk of loss is remote. Additionally, we do not require collateral under these agreements.

### Interest Rate Risk Management

We are exposed to the impact of interest rate changes. Our objective is to manage the impact of interest rate changes on cash flows and the market value of our borrowings. We utilize a mix of debt maturities along with both fixed-rate and variable-rate debt to manage changes in interest rates. In addition, we enter into interest rate swaps to further manage our exposure to interest rate variations related to our borrowings and to lower our overall borrowing costs.

### Currency Exchange Risk Management

We conduct business in several major international currencies and are subject to risks associated with changing foreign exchange rates. Our objective is to reduce earnings and cash flow volatility associated with foreign exchange rate changes to allow management to focus its attention on business operations. Accordingly, we enter into various contracts that change in value as foreign exchange rates change to protect the value of existing foreign currency assets and liabilities, commitments and anticipated foreign currency revenue and expenses.

### Commodity Price Risk Management

We are exposed to changes in the price of certain commodities. Our objective is to reduce earnings and cash flow volatility associated with forecasted purchases of these commodities to allow management to focus its attention on business operations.

# EXHIBIT 22

Page 1

Boone County Commission

Audio Transcription

August 21, 2012

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1       (Recording begins)

2               MR. BROWN:  To have Jim Cagle, attorney,

3    on a retainer agreement.  How you doing, Jim?

4               MR. CAGLE:  Okay, fine.  Thank you,

5    Mr. Brown.  Shall I make a presentation, I will do

6    so.

7               MR. BROWN:  Okay.

8               MR. CAGLE:  I am here with Mr. Rudolph

9    DiTrapano --

10              MR. BROWN:  Hi.  Pleased to meet you.

11              MR. CAGLE:  -- who's both well-known and

12   well regarded for good reason.  And the proposal

13   that I want to speak to has to do with the

14   representation of the Boone County Commission in --

15   first, in the investigation of, and thereafter if

16   we find, as we think we will, that there is a good

17   cause of action representing the commission against

18   largely out-of-state corporations, but it may be

19   some locals that are involved in drug trafficking,

20   for want of a better term.

21              What I had discovered in the litigation

22   in which I have been involved is that there are

Page 3

1    basically four players in the -- in this

2    prescription drug epidemic.  There's obviously the

3    individual that uses the drug.  Sometimes there are

4    people who have become addicted after a car wreck

5    or an industrial injury.  Some are just drug

6    seekers.  It takes that component as being one.

7           Thereafter, it takes a corrupt physician

8    who has turned his or her back on the creed that

9    they are supposed to adhere to in the Hippocratic

10   Oath to do no harm to the patient, but rather what

11   they do is simply distribute drugs to anybody that

12   shows up in their office.  So it takes that

13   component of bad doctors.

14           We've also found that it takes

15   pharmacists who are -- have turned a blind eye to

16   their duty.  Contrary to what most of us think,

17   just generally a pharmacist does not have to fill

18   -- in fact, has a duty not to fill -- a

19   prescription that he or she believes is not being

20   issued for a legitimate medical purpose.

21           And what we have found, at least I

22   personally have found and brought lawsuits over it,

Page 4

1    is that you have some pharmacies that just don't

2    care because the money is usually in cash, and

3    there's a lot of it to go around.  And I've found

4    that to be the third component.

5          The component of the problem as I have

6    found it that's really flown under the radar is the

7    out-of-state corporations, which is literally

8    taking millions if not billions in dollars a year

9    from what is this epidemic that we're suffering

10   from, not just nationally but is particularly

11   pernicious in West Virginia, we think, and Eastern

12   Kentucky, as we have unfortunately incurred the

13   highest per-capita death rate of any state in

14   America.  And only one year were we eclipsed barely

15   by New Mexico in that statistic.

16         It's a sad and God awful statistic to

17   address, you know, but it's got to be addressed.

18   Otherwise, there -- what will happen is it'll suck

19   the lifeblood out of our communities and just ruin

20   families, good families, not bad families, good

21   families.  This happens to nice people as it

22   happens to criminals.  It's a God awful epidemic.

Page 5

1        And anyway, the fourth bar of that -- the

2  fourth component of that problem are these out-of-

3  state corporations that we look at.  Some of them

4  are actually on the Fortune 500 list, and including

5  the top 10.

6        Just to give you an anecdote, I sued a

7  pharmacy in Mingo County, in Kermit.  And Kermit,

8  West Virginia, population 300, had a pharmacy that

9  was number 23 in America in oxycodone prescriptions

10  written and filled, number 23.  And that's compared

11  to New York, Chicago, Los Angeles, Atlanta, pick a

12  city.

13        MR. BROWN:  That's a cropland area.

14        MR. CAGLE:  Kermit was number 23.  That's

15  staggering.  When that fellow that was running that

16  -- he's now tried to enter a plea of guilty over

17  here in the U.S. District Court, but he also had

18  his company file bankruptcy.  I looked at the

19  bankruptcy, and he had one company out of Ohio that

20  was still sending in this hydrocodone and Xanax

21  that basically is the cocktail that folks are dying

22  from really.

Page 6

1         And we -- when I found this -- in one

2    month, one month, according to his bankruptcy, this

3    pharmaceutical distributor out of the Columbus

4    area, I believe it was, called Miami-Luken, and I

5    suspect they're in Boone County, I strongly suspect

6    it.  They had been paid or sent an invoice for just

7    under a quarter of a million dollars for a one-

8    month prescription to one little pharmacy in Mingo

9    County, West Virginia.

10        Now, I have a pretty strong feeling that

11   you will find the same in Madison, West Virginia,

12   somewhere that these companies are sucking a

13   quarter of a million dollars a month from these

14   prescriptions, and there will be numerous of these

15   companies.  So I have --

16        MR. HENDRICKS:  Are pharmacists protected

17   if they don't --

18        MR. CAGLE:  Yes, absolutely.

19        MR. HENDRICKS:  By law they're protected?

20        MR. CAGLE:  Absolutely.  A pharmacist can

21   say no.

22        MR. HENDRICKS:  Okay.

Page 7

 1              MR. CAGLE:   And the gentleman we have

 2    that's consulting us, who was actually the head

 3    pharmacist in West Virginia at one point named Sam

 4    Supra (phonetic).   Sam says that he many times said

 5    no, that if somebody shows up at your door and they

 6    have a prescription that doesn't look right, or in

 7    the case of somebody local, you know darned well

 8    that you've got a pill doctor down the street, and

 9    you know what they're up to, your duty, your

10    ethical duty as a pharmacist, is to say, no, I will

11    not fill that prescription.

12              And you are absolutely covered.   It's

13    that you don't have to and you can send them down

14    the road.   And if another pharmacy wants to fill

15    it, that's their business.   But no, they don't have

16    to.

17              MR. HENDRICKS:   Okay.

18              MR. CAGLE:   And that's the thing that I

19    found surprising, even when I first learned that

20    about five or six years ago in some litigation,

21    because the lawyer defending -- it was the

22    insurance lawyer that was defending the pharmacy,

Page 8

1   and that was his motion.  He moved to dismiss

2   saying, well, he had a prescription.  Well, my God,

3   he had a prescription from Don Kaza (phonetic), and

4   everybody knows Don Kaza.  He's still in year six I

5   think in the federal penitentiary in this county.

6   So he --

7           MR. HENDRICKS:  Yeah.

8           MR. CAGLE:  Anyway, so my proposal is set

9   forth in a contingent fee agreement in which we

10  carry the costs in the -- if there is a lawsuit and

11  a recovery, we are -- the two firms are entitled to

12  a third of what is recovered.  If we recover

13  nothing, as the old commercial -- Dan Lyons'

14  (phonetic) commercial goes, we get nothing.

15          So -- but we think there is something to

16  it, and I feel personally strongly about what we

17  are doing.  I've seen friends and relatives that

18  have had this problem, and I have a personal animus

19  about what I'm doing.  And I know Rudy,

20  Mr. DiTrapano, feels the same way.

21          MR. BROWN:  So what do you think?

22          MR. HENDRICKS:  I like him.

Page 9

1          MR. BROWN:  Well --

2          MR. HENDRICKS:  What do you think?

3          MR. CAGLE:  Any questions?

4          MR. GORE:  I've had a -- well, I've had

5    an opportunity to review the contract, and I think

6    it's a standard contingent fee.  It doesn't place

7    the Commission at risk for anything.  Truly the

8    risk is on Mr. Cagle and Mr. DiTrapano and their

9    firms.  But the benefit is if they are able to

10   recover monies ultimately that we can show that

11   we've expended, they're going to get their portion

12   of it.

13          I'll tell you that as far as the pills,

14   you know, I know you all hear this every day.

15   Every time we're over here it seems like we talk

16   about some of that stuff.  And, you know, on the

17   criminal side of things, we're reactive in nature

18   unfortunately.  You know, we don't have the ability

19   to prevent it from coming in.  Occasionally we can

20   catch people bringing it in the county, but

21   normally the time -- most of the time we're

22   reacting to the people who are selling and we're

Page 10

1    going out and trying to make buys.

2              I think the problem has to be attacked on

3    all fronts, and I think this is a way maybe to

4    attack it on the front end.  In other words, you

5    get the people who are dumping this stuff in Boone

6    County and our surrounding counties, they may be a

7    little more skeptical about dumping this stuff in

8    our area.  And, you know, the more you can get

9    away, get that stuff out of our area, hopefully

10   it's going to affect it and ultimately clean up.

11             I saw I think on the news yesterday where

12   multiple facilities, pain clinics, have been shut

13   down in southeastern Ohio.  And the sheriff or the

14   representative of the sheriff was saying as soon as

15   they start shutting these things down, we see our

16   crime decrease.  And we can only hope that that

17   would benefit us if we can somehow get the pills

18   and those other type of rogue facilities out of our

19   area.

20             MR. BROWN:  Yeah.  On both directions,

21   you prevent it, and then it reduces your bills,

22   too.

Page 11

1            MR. GORE:  That's the goal.  And

2   ultimately, too, look at all the money that the

3   County has expended.  And I'm going back to when I

4   came in 2003 and started to see the development of

5   the Day Report, the drug court and all this stuff,

6   and of course, our office, the sheriff's

7   department, all the money -- all the monies that

8   the County expends just to attack the drug problem,

9   it's amazing, and if we can recover some of that,

10  then I think that would be a great thing for the

11  County.

12          And, of course, you know, we talked about

13  some other issues that, you know, we can seek

14  hopefully injunctions.  It's not just about money,

15  but there's also injunctions that we would want to

16  seek to prevent these people from dumping their

17  pills, and also from stopping pharmacists from

18  ignoring the things that Mr. Cagle spoke about.

19          So I think on many fronts it's a good

20  idea.  Certainly if you are willing to consider it,

21  we would recommend giving him an opportunity at

22  least to do the investigation, and he'll advise us

Page 12

1   from there where things stand.

2             MR. HENDRICKS:  I'm for it.

3             MR. CAGLE:  I could add a couple of

4   things if that's what you want, or if you're ready

5   to vote, that's fine.  There are a couple of things

6   I'm happy to add.  We represent Darryl McGraw

7   (phonetic) also in the same firms and suits filed

8   on behalf of the State that were filed in Boone

9   County actually just now.  The defendants have

10  asked -- they have asked for removal to U.S.

11  District Court, and we're fighting that removal

12  now.

13            But in any event, in that suit we have an

14  injunction.  There is a request, and it's -- and it

15  would apply to your situation here, is there is

16  something, a regulation called the cause for a

17  suspicious drug order document, and these companies

18  are not doing it to our Board of Pharmacy.  And

19  that carries certain meaning with a suspicious

20  order.  They're aware if the quantity goes up or

21  seems to be asking for a quantity that's far in

22  excess of the population base that's being served,

Page 13

1    and nobody is doing that.  And we've sought and I

2    think we'll ultimately get a mandatory injunction

3    requiring that, which would help you monitor --

4    help law enforcement monitor what's going on here.

5            And there are two phases to what we're

6    doing.  One is investigation.  Yesterday, I was in

7    War, West Virginia.  God knows if you've ever been

8    to War, I thought the last time I talked about

9    going to war was when I was in the Army, but I --

10           MR. HENDRICKS:  That's God's country.

11           MR. CAGLE:  In any event, I found myself

12   yesterday going from Welch to War, and --

13           MR. HENDRICKS:  That's where Saul is

14   from.

15           MR. CAGLE:  And I will tell you that

16   place is lost.  And we watched drug transactions on

17   the street literally, and spoke to people, locals,

18   that want something done.  We represent McDowell

19   County, and I suspect --

20           MR. HENDRICKS:  I've been there, too.

21           MR. CAGLE:  -- that about the time we get

22   around to your case, we will have filed something

Page 14

1    for McDowell.  And we were doing some

2    investigation.  It's shocking when you get out into

3    areas where there are no police around and people

4    are just literally doing it on the street.

5             Anyway, it's a bad problem and we hope to

6    at least have some impact on it.

7             MR. BROWN:  Okay.  I agree.

8             MR. HENDRICKS:  I move that we allow Jim

9    Cagle to investigate our drug issues in the county,

10   and on a retainer agreement, and then after the

11   investigation, they will further direct us on how

12   we should move forward with this.

13            MR. BROWN:  I'll second.  It's been

14   properly moved, second.  All in favor signify by

15   saying "aye."

16            MR. HENDRICKS:  Aye.

17            MR. BROWN:  Thank you, Mr. Cagle.

18            MR. CAGLE:  Thank you very much.  I

19   appreciate it.  Mr. DiTrapano and I will sign this

20   and just leave it with you.

21            MR. HENDRICKS:  I think it's kind of our

22   duty to do something about all this stuff.  It's

Page 15

1  killing our county.

2          MR. BROWN:  We've got to go in executive

3  session, right?

4          MS. WHITE:  Yeah.  Jim has got one more

5  thing.

6          MR. BROWN:  Okay.  Jim, yeah.

7          MR. GORE:  County Commission received a

8  request from Chief Deputy Chad Barker, and the

9  request is -- it says I am requesting the copy

10  machine at the Boone County Sheriff's office, Sex

11  Crimes and Child Abuse Detachment, be replaced.

12  And he's asking to purchase a Bizhub C35.

13          MR. HENDRICKS:  That's like you got in

14  there.

15          MS. WHITE:  It's like mine.

16          MR. GORE:  Yeah.  It's exactly like

17  Pam's.  That is a color copier that you can fax

18  with it, that you can scan with it, and of course

19  you can copy.

20          MR. HENDRICKS:  Did you purchase that or

21  lease it?

22          MS. WHITE:  We bought ours right out.

Page 16

1            MR. GORE:  Okay.  Yeah.

2            MR. HENDRICKS:  Yeah.  And then pay for

3    copies.

4            MR. GORE:  We will have the option of the

5    buying it out on the lease.

6            MR. HENDRICKS:  You get X amount of

7    copies.

8            MS. WHITE:  No.  We bought it.  It's

9    ours.

10           MR. GORE:  It's ours.

11           MR. HENDRICKS:  Okay.

12           MR. GORE:  So I'd like to get permission

13   to purchase a Bizhub C35 for the sheriff's office.

14           MS. WHITE:  I think that's about a

15   thousand dollars.

16           MR. HENDRICKS:  Who does maintenance?

17       (End of recording)

18

19

20

21

22

8/21/2012                     Boone County Commission                    Audio Transcription

Page 17

1                          CERTIFICATION

2             I, Ilene Watson, do hereby certify

3     that the foregoing is a correct transcript from the

4     electronic sound recording provided for

5     transcription and prepared to the best of my

6     professional skills and ability.

7

8

9

10

11

12

13

14

15

16

17

18

19

20     _____     May 26, 2017

21     Ilene Watson

       AAERT Cert. No. 447

22     Certified Court Transcriptionist