# EXHIBIT 31

**News**Room

9/20/13 Charleston Gazette & Daily Mail (WV) 4A
2013 WLNR 23590200

Charleston Daily Mail (WV)
Copyright © 2013 Charleston Daily Mail

September 20, 2013

Our view Counties should not be suing local businesses Boone
officials have smeared the good reputations of six pharmacies

Dmedit

WEST Virginia suffers the second-highest drug overdose rate in the nation, after New Mexico, according to the Centers for Disease Control and Prevention.

The Mountain State had 4,793 drug overdose deaths from 2001-2012, according to the state Medical Examiner's Office.

The top three drugs involved were alprazolam, diazepam and oxycodone. All are prescription medications. The first two are anti-depressants while the latter is a pain medication.

Abuse of prescription drugs reflects the state's status as the leader in prescriptions per capita, which reflects having the third-highest median age and leading the nation in percentage of people receiving disability checks.

To rein in abuse, the U.S. Attorney's Office has cracked down on doctors who knowingly aid and abet drug abuse.

Such criminal complaints are appropriate.

However, the state Attorney General's Office continues to pursue ill-advised lawsuits filed under former attorney general Darrell McGraw against drug companies, which if successful could make it more difficult for disabled and elderly people to obtain needed medications.

And now Jim Cagle, the outside attorney who is suing on the state's behalf, has convinced both the McDowell County Commission and the Boone County Commission to authorize lawsuits against local pharmacies.

Oh, good grief.

Southern West Virginians have enough of a hard time already keeping a local economy going without county officials trying to shut down the corner drug store.

In Boone's case, the pharmacies smeared were Larry's Drive-in Pharmacy in Madison; Medicine Stop in Uneeda; Meds 2 Go, Meds to Go Express and Alum Creek Pharmacy, all in Alum Creek; and Trivillian's Pharmacy in Kanawha City.

Fortunately, both commissions reconsidered their votes within days and voted to rescind their legal action.

But damage was done to the reputations of these businesses. When presented with a valid prescription for alprazolam, diazepam or oxycodone, just what is a pharmacist supposed to do? Ignore it?

"We had a fact-based case," Cagle told Eric Eyre of the Gazette.

If so, the facts should be presented to a grand jury so that criminal charges can be made.

---- Index References ----

News Subject: (Drug Addiction (1DR84); Legal (1LE33); Health & Family (1HE30); Government Litigation (1GO18))

Industry: (Pharmaceuticals (1PH33); Pharmacy (1PH23); Pharmaceuticals Cost-Benefits (1PH30); Healthcare (1HE06); Pharmaceuticals & Biotechnology (1PH13); Healthcare Services (1HE13); Drugstores (1DR73))

Region: (West Virginia (1WE81); North America (1NO39); U.S. Southeast Region (1SO88); USA (1US73); Americas (1AM92))

Language: EN

Other Indexing: (Eric Eyre; Darrell McGraw; Jim Cagle)

Keywords: (Editorial)

Word Count: 342

End of Document    © 2017 Thomson Reuters. No claim to original U.S. Government Works.



# EXHIBIT 32

**NewsRoom**

9/25/13 Logan Banner (Logan, W.Va.) (Pg. Unavail. Online)
2013 WLNR 24069635

Logan Banner, The (Logan, WV)
Copyright © 2013 The Logan Banner Heartland Publications, LLC. All Rights Reserved.

September 25, 2013

Section: news

Boone Co. drops lawsuit against 6 pharmacies

Staff Report

MADISON – For over a year, two Boone County pharmacies have been under investigation for selling an extremely high volume of narcotics.

A few weeks ago, the Boone County Commission signed a lawsuit with two Charleston law firms against these two pharmacies allowing attorneys to proceed forward with the investigation.

But a change of heart by Commission President Mickey Brown has led to dismissal of the suit, following a meeting of the County Commission last week in Madison.

Although Prosecuting Attorney Keith Randolph clearly disagreed with the Commission decision in the matter, the Prosecutor said he understood the Commission had a right to act as it did.

In presenting a proposal to start the investigation last year, Charleston lawyer Jim Cagle told the Commission that drug-trafficking is an "epidemic" in Southern West Virginia. At the August 21, 2012 Commission meeting in Madison, Cagle spoke on behalf of himself and fellow Charleston attorney Rudy DiTrapano.

Cagle laid out the reasons he and DiTrapano felt a lawsuit and investigation were called for. One of the primary points made by Cagle during his lengthy presentation was that "out-of-state" firms, such as chain pharmacies were more or less a partner in illegal drug trafficking.

Cagle said pharmacists have an absolute right to refuse to fill any prescription that "looks suspicious." He went on, "two components of this illegal drug trade are the users and the physicians who prescribe too many or inappropriate drugs." Cagle described some doctors as operating "pill mills" and said they have to have "cooperating pharmacists" to complete the transaction.

While targeting out-of-state pharmacies may have been a noble goal for the Commission, minds were changed when Commissioners learned that two local pharmacies were being targeted.

Brown, who said he is a friend of both pharmacies involved, also said local physician, Dr. Ron Stollings, had told him a pharmacy has an "absolute duty" to fill any prescription written by a doctor. Stollings, who is also a State Senator, was quoted as saying targeting the locally-owned pharmacies was "a mistake."

Brown appeared to take the matter to heart at last week's meeting. While he said he recognizes "there is a drug problem in Boone County, spurring an increase in crime" Brown said he did not think the two local pharmacies were guilty of inappropriate behavior.

Summing matters up, Brown said he was "misled by the Sheriff, the DEA (Drug Enforcement Agency) and the Prosecutor" regarding the matter. Brown said he could not support continuing legal action against the two pharmacies in question.

Proponents of the lawsuit, including various law enforcement, lawyers and citizens were in attendance attempting to understand the reasoning behind the Commission President's comments.

Randolph said after the meeting, where Commissioners approved withdrawing any lawsuit and investigation on a 2-1 vote, that he did not agree with the decision. "Still, I know they (the Commission) have a tough job to do and I won't criticize them for what they've done."

Randolph did say, however, that he took exception to Brown's characterization that he and the other law enforcement officials had "misled" the Commission. "I don't believe any of us did that," he said.

Brown and Commissioner Eddie Hendricks voted to drop the legal activities while Commissioner Atholl Halstead voted "no."

In the lawsuit that has now been dropped, but was filed on Sept. 3, 2013, the county named Larry's Drive-In Pharmacy, Medicine Stop, Inc., Meds 2 Go, Inc., Meds 2 Go Express Pharmacy, Inc., Alum Creek Pharmacy, and Trivillian's Pharmacy of Kanawha City, Inc. as defendants in the case and accused them of helping to cause and contribute to the prescription drug abuse epidemic in Boone County.

"These defendants have profited substantially from their participation in prescription drug abuse," the suit states, which has cost the county millions of dollars annually and destroys the very quality of life in the community.

These "pill mills," as they've been labeled in the lawsuit, disguise themselves as legitimate pharmacies, but in reality are contributing to the county's prescription drug abuse problem in a big way.

The suit alleges the "pill mill" pharmacy defendants have not acted in accordance with the law and accepted standards of care. They alleged they have failed to establish effective controls and procedures against the diversion of controlled substances; failed to design an effective system to flag suspicious orders; failed to operate a system to flag suspicious orders; and failed to report and inform authorities of suspicious orders.

West Virginia is one of the states with a hotbed of problems related to the illegal distribution of prescription narcotics.

Law enforcement and state and federal prosecutors have gone after users, dealers and over-prescribing doctors in an effort to combat the drug abuse epidemic.

Several of the defendants, however, claim these allegations are not based in fact and that their pharmacies are highly regulated by the West Virginia Board of Pharmacy and the Federal Drug Enforcement Agency (DEA).

Arlie Winters, Compliance Coordinator for the West Virginia Board of Pharmacy, says all pharmacies in the state are inspected every two years.

He confirmed that the state Board of Pharmacy has a very good controlled substance monitoring program with a detailed data base of all controlled substances being prescribed.

"A pharmacy can refuse to fill a prescription, but they must have a valid reason," he said.

Winters says the Board receives and investigates several complaints about pharmacies each year.

"Many are not substantiated and some are," he explained. "Those that are substantiated may face fines, other penalties and even the possible loss of their license in some cases."

Winters said there are 750 to 800 licensed pharmacies in West Virginia.

"West Virginia's pharmacies are very well monitored," he said. "The Board, along with the federal Drug Enforcement Agency, keeps a very close watch on how much controlled substances are going in and out of West Virginia pharmacies."

Winters said the six pharmacies named in the lawsuit were not under investigation or found to be out of compliance at this time.

The lawsuit says the defendants name were "on notice" about the prescription drug epidemic and that prescription they were filling were being diverted to drug dealers, but it doesn't say what agency or individual put the pharmacies "on notice" or how they put them on notice.

They do say that Boone County' law enforcement community and prosecuting attorney's office estimated that most of their caseload is related either directly or indirectly to the prescription drug abuse epidemic and those agencies expend the greatest portion of their budgets to address crimes and investigations that are related to the prescription drug abuse epidemic.

However, the pharmacies claim they are regulated by the West Virginia Board of Pharmacy and the federal Drug Enforcement Agency and are not under any investigations or have never been notified of acting contrary to accepted standard of care by either agency.

"Would it not be fair to say that one of these agencies (the state Board of Pharmacy and the federal DEA) would have investigated us or substantiated some type of wrongdoing prior to this lawsuit being filed?" one pharmacist whose pharmacy is named in the lawsuit said.

One person in the local law enforcement community called this lawsuit "a new strategy in the fight against illegal drug distribution."

"If the community or anyone else thinks we can curb this prescription drug epidemic problem without holding pill mill doctors and pharmacies accountable they are not living in the real world," he said. "We have to go after those in the distribution chain."

However, several doctors and pharmacists say they worry that frivolous lawsuits and over-reaching prosecution will hurt patients with chronic pain and drive up costs for everyone.

"These pharmacies are small local businesses in our communities and there are agencies that highly regulated them," one local doctor said. "Let them do their job and stop these types of frivolous lawsuits that do nothing to address the real issues and problems of prescription drug abuse."

On September 6, 2006, the DEA published in the Federal Register a Policy Statement, Dispensing Controlled Substances for the Treatment of Pain. The purpose of the Policy Statement was to make clear the longstanding requirement under the law that physicians may prescribe controlled substances only for a legitimate medical purpose in the usual course of professional practice.

"In no way should this interfere with the legitimate practice of medicine or cause any physician to be reluctant to provide legitimate pain treatment," the DEA said in the statement.

The DEA goes on to say that the law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription, when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances.

However, the defendants in this civil lawsuit claim they have never been prosecuted or investigated for deliberately ignoring a questionable prescription and follow both state and federal laws regarding the distributing of controlled substances.

It remains unclear at this time if local law enforcement or prosecutors in Boone County will continue with criminal investigations in this matter.

The DEA's Pharmacist's Manual can be found online at http://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/pharm_content.htm

---- Index References ----

Company: WALGREEN CO

News Subject: (Health & Family (1HE30); Social Issues (1SO05); Smuggling & Illegal Trade (1SM35); Drug Addiction (1DR84); Crime (1CR87))

Industry: (Pharmaceuticals Cost-Benefits (1PH30); Pharmacy (1PH23); Pharmaceuticals (1PH33); Healthcare Services (1HE13); Drugstores (1DR73); Healthcare (1HE06); Pharmaceuticals & Biotechnology (1PH13))

Region: (Americas (1AM92); U.S. Southeast Region (1SO88); West Virginia (1WE81); USA (1US73); North America (1NO39))

Language: EN

Other Indexing: (MEDS 2 GO EXPRESS PHARMACY INC; MEDS 2 GO INC) (Eddie Hendricks; Ron Stollings; Keith Randolph; Atholl Halstead; Michael Brown; Rudy DiTrapano; Jim Cagle)

Word Count: 1571

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT 33

Page 1

Kanawha County Council 2-7-13

Video/Audio Transcription

cmv02072013 Audio 24_00 - 48_25

---------------------------------------------------

DIGITAL EVIDENCE GROUP

1730 M Street NW, Suite 812

Washington, DC  20036

(202) 232-0646

2/7/2013                       Kanawha County Council              Video/Audio Transcription

Page 2

1        (Recording begins)

2             PRESIDENT CARPER:  Okay.  The next item

3    on the agenda, and this is going to take, I think,

4    just a little bit of time.  It's the number two

5    discussion item regarding drug distribution

6    litigation.  Who wants to do the presentation on

7    this?

8             Mr. Cagle, how are you this evening?

9             MR. CAGLE:  Thank you very much.

10            PRESIDENT CARPER:  I've known Mr. Cagle

11   for how many years?

12            MR. CAGLE:  Over 30.

13            PRESIDENT CARPER:  He beat me like a drum

14   one time in a murder case, and I --

15            COMMISSIONER SHORES:  Oh, my gosh.

16            PRESIDENT CARPER:  -- I haven't gotten

17   over it.  So what do you want?

18            MR. CAGLE:  Well, I am here --

19            COMMISSIONER HARDY:  Cagle, I remember

20   when you got thrown out of the Raleigh County

21   Courthouse.  You remember that?

22            MR. CAGLE:  Yes, I did.  Yes.

Page 3

1          COMMISSIONER HARDY:  Thought I'd throw

2    that out there.

3        (Laughter)

4          MR. CAGLE:  You sent that client.  You

5    didn't tell me you --

6          COMMISSIONER HARDY:  I sent Cagle a

7    client, and the client called me and said, that's

8    the best lawyer -- I'll just leave out the

9    expletive -- I've ever seen.  He said, he got us

10   both thrown out of the courthouse.

11         COMMISSIONER SHORES:  Oh, my God.  Oh, my

12   God.

13         COMMISSIONER HARDY:  But he liked it.

14         MR. CAGLE:  That's the first case.  And

15   every time I see him, he reminds me of it, too.

16         PRESIDENT CARPER:  Who do you have here

17   with you, Mr. Cagle?

18         MR. CAGLE:  I have esteemed colleagues,

19   Mr. Rudolph DiTrapano.

20         PRESIDENT CARPER:  Mr. DiTrapano, it's an

21   honor to have you here, Rudy.  It really is.

22         COMMISSIONER SHORES:  Rudy, it's good to

Page  4

1    have you here, buddy.

2         PRESIDENT CARPER:  I'm not even going to

3    tell you about the times he's beat me.  Who else

4    you got?

5         MR. CAGLE:  I have P. Rodney Jackson.  I

6    have Timothy DiPiero, I have Sean McGinley, and I

7    have this young man here, Mr. Rob Bastress, a fine

8    young lawyer in the DiTrapano firm.

9         COMMISSIONER SHORES:  That's some group

10   you got here.  That's some group.

11        PRESIDENT CARPER:  I -- excellent

12   lawyers.  I think those of us that practice law --

13   I saw Rodney one time beat the Kanawha County

14   Prosecuting Attorney's office in one of the hardest

15   fought cases.  It was well-thought.  It was back in

16   the days when lawyers actually were civil to each

17   other.  But he actually represented and acquitted

18   his client well, and it was the right jury verdict.

19   I think all jury verdicts are the right verdict.

20        What do you need, Mr. Cagle?

21        MR. CAGLE:  I am here to discuss

22   litigation that we have been involved in, and by

Page 5

1   we, I'm talking about the members of the DiTrapano

2   firm, and Mr. Jackson and I, as partners, by

3   representing, among others, the State of West

4   Virginia, and also the -- two counties within the

5   State of West Virginia, in drug litigation

6   involving primarily out-of-state distributors.

7            PRESIDENT CARPER:  Now, my understanding

8   is that the Attorney General's office has some

9   litigation right now, but that covers the, I guess,

10  PERS, or not PERS, PEIA or whatever.  Am I right on

11  that?

12           MR. CAGLE:  It may or may not cover PEIA,

13  but it's distinct, at least that which they --

14           PRESIDENT CARPER:  It's different from

15  this?

16           MR. CAGLE:  -- seek is distinct from

17  claims that counties may have.

18           PRESIDENT CARPER:  What would -- other

19  counties have already done this?

20           MR. CAGLE:  Yes.  Two --

21           PRESIDENT CARPER:  Who's that?

22           MR. CAGLE:  Well, two others.

Page 6

1          PRESIDENT CARPER:  Who?

2          MR. CAGLE:  Do you mind that I not

3   mention their names, because I've not yet filed the

4   litigation, and I would prefer not to.

5          PRESIDENT CARPER:  We'll respect that.

6   What are you asking us to do, Mr. Cagle?

7          MR. CAGLE:  That litigation is imminent.

8          PRESIDENT CARPER:  What are you asking us

9   to do?

10          MR. CAGLE:  I am asking you to consider

11   becoming involved in litigation on behalf of

12   counties in which we seek recompense for that which

13   has been taken from counties --

14          PRESIDENT CARPER:  In English, money?

15          MR. CAGLE:  -- and their -- and money,

16   yeah.

17          PRESIDENT CARPER:  Okay.

18          MR. CAGLE:  And the -- primarily, we

19   have, through some litigation that I've been

20   involved in, in Mingo County --

21          PRESIDENT CARPER:  Would this have

22   anything to do with our jail bill?

Page 7

1          MR. CAGLE:  It would have everything to

2     do with it.

3          PRESIDENT CARPER:  How in the world would

4     suing some drug company in -- that's headquartered

5     in, what's that place in Ohio?  Dublin or wherever

6     they're at up there, that's one of them, right?

7          MR. CAGLE:  It'd be Dublin.  Other are --

8          PRESIDENT CARPER:  Yeah, I know about

9     them.  But what would that do -- what's that got to

10    do with our jail bill?

11         MR. CAGLE:  Let me give you as pithy an

12    explanation as I can.  I've determined, and I think

13    fairly so, from litigation that there are four

14    components to our drug problem.  One is you have to

15    have a drug seeker.

16         PRESIDENT CARPER:  Where's the

17    prosecutor?

18         Mark?  Listen to this and see if you've

19    got an opinion on this.

20         I think right now, I've seen him bobbing

21    his head up and down.  Go ahead.

22         MR. CAGLE:  One is you have to have a

2/7/2013                          Kanawha County Council                     Video/Audio Transcription

Page 8

1    drug seeker.  We all know those.  We see them at

2    the bar, the court, more than we want to, and in

3    drug courts throughout the state.

4            We -- the second component, of course, is

5    you need a corrupt physician.  And as you know,

6    many have been prosecuted, some of whom I have sued

7    previously.

8            PRESIDENT CARPER:  Pill mills.

9            MR. CAGLE:  Pill mills.

10           PRESIDENT CARPER:  Okay.

11           MR. CAGLE:  The third component, and

12   these also are pill mills, are corrupt pharmacists

13   who choose to turn a blind eye consistent with what

14   their duties are.

15           PRESIDENT CARPER:  Uh-huh.

16           MR. CAGLE:  And there's a fourth

17   component that has heretofore gone under the radar,

18   so to speak, and that is the out-of-state

19   companies, some of whom are Fortune 500 companies,

20   large.  One is a Fortune 5 or 10 company in terms

21   of revenue.  And they have done the same thing that

22   the bad pharmacy has done, and they have the same

Page 9

1    standards that they are governed by as the

2    pharmacies.

3           PRESIDENT CARPER:  And one was fined, I

4    think, $300 million, I think, by the DEA, right?

5           MR. CAGLE:  I don't know what the final

6    number was, but they were --

7           PRESIDENT CARPER:  I think it was 300

8    million.  That number --

9           MR. CAGLE:  It grows out of something --

10          PRESIDENT CARPER:  -- and some change.

11          MR. CAGLE:  It grows out of something

12   that's very common in West Virginia, and that is

13   that you have people lined up, receiving their

14   scrips on a daily basis, or a monthly basis, same

15   people --

16          PRESIDENT CARPER:  What --

17          MR. CAGLE:  -- same scrips, same --

18          PRESIDENT CARPER:  What does that have to

19   do with people in jail?

20          MR. CAGLE:  And -- well, all prosecutors

21   with whom I've discussed this issue, all to a

22   person say to me that anywhere between 70 and 90

Page 10

1    percent of their dockets are related to

2    prescription drug problems, the epidemic that has

3    so ravaged our state.

4              As a consequence, 70 to 90 percent of

5    that which you pay overtime to sheriff's deputies,

6    prosecutors, the costs that you assume and --

7    related to the judicial system, and the jail fees

8    in particular, which I know to be enormous, are

9    related to the prescription drug problem.

10             PRESIDENT CARPER:  So you're going to try

11   to show that illegal, over-prescribing pill mills

12   provide medication to these folks, drugs,

13   oxycodone, and different drugs like that, on a

14   ridiculous amount, and lo and behold, they ended up

15   committing crimes and going to jail, and the

16   taxpayers pay for that.  Is that the sum of it?

17             MR. CAGLE:  That is --

18             PRESIDENT CARPER:  Well, if we agree to

19   hire you, what if you don't win?  How much do we

20   have to pay you?

21             MR. CAGLE:  Nothing.

22             PRESIDENT CARPER:  What if -- and you

Page 11

1    really can't give us an idea how much would be a

2    return, right?

3              MR. CAGLE:  No, I cannot.

4              PRESIDENT CARPER:  How about, if nothing

5    else, a deterrent?

6              MR. CAGLE:  It would be a deterrent, if

7    nothing else.  It is a problem that has to be

8    addressed.  We all see it, but so many people see

9    it, but don't step up to the plate and do anything

10   about it.

11             PRESIDENT CARPER:  We also look, at some

12   point, where they're getting money from the state

13   health insurance plan, from these pill mills, and

14   that's -- I mean, you left out one component is

15   money.  These people want money.  They're not

16   selling these pills for free.  They're making

17   money, millions of dollars.

18             And would you look at our drug plan, too,

19   to see if we've got over-prescribing from these

20   same people?  I'd be stunned if we didn't.

21             MR. CAGLE:  Let me give you one anecdote

22   that I personally experienced, and this involves a

Page 12

1   very small family pharmacy in Kermit, West

2   Virginia, which turned out to be number 23 in the

3   nation in oxycodone prescriptions written, number

4   23.  The town of Kermit has less than a thousand

5   people.

6            In my litigation against that pharmacy, I

7   determined that not only was the pharmacy raking

8   somewhere -- what they're reporting, because it's

9   mostly cash, 10 to $12 million a year, but each of

10  these out-of-state pharmaceutical concerns were

11  making 240 to $400,000 a month in sales to this

12  pharmacy.  It's a shocking --

13           PRESIDENT CARPER:  How many deaths have

14  we had in Kanawha County from oxycodone?  You all

15  know?  Do you all know that?

16           MR. CAGLE:  I do not know that.

17           PRESIDENT CARPER:  It's a shocking

18  number.

19           MR. CAGLE:  We are number one in the

20  nation, West Virginia is, in per capita

21  prescription drug overdoses, with this caveat:  One

22  year New Mexico was slightly ahead.  That's it.

Page 13

1          PRESIDENT CARPER:  Will you all monitor

2      also the Attorney General -- if we hire you, the

3      Attorney General's litigation?  Because I'd hate --

4          MR. CAGLE:  We're in the --

5          PRESIDENT CARPER:  Well, I know.  But do

6      we need to hire someone else at some point to

7      intervene?  Because I'm concerned that we're paying

8      the jail bill.  We've also got people on our health

9      insurance plan, and they'll go cut a deal, get a

10     big settlement, and the state will get it, and the

11     county taxpayers who pay these don't get anything

12     out of that.

13         MR. CAGLE:  Well, that's the reason I'm

14     trying to plug the loophole.  I think counties have

15     claims predicated on the monthly bill you get from

16     the regional jail authority that's entirely ----

17         PRESIDENT CARPER:  And the sheriff's

18     cost, and the city police cost, and all that too.

19     Will you look at that as well?

20         MR. CAGLE:  Yes, sir.

21         PRESIDENT CARPER:  And you also look, if

22     there's a settlement with the attorney generals,

Page 14

1   whether or not the state will just grab the damage

2   and leave us out?  I'm concerned about that.

3          MR. CAGLE:  Well, as counsel, I wouldn't

4   let that happen.

5          PRESIDENT CARPER:  Good.  What's your

6   terms?

7          MR. CAGLE:  The terms is the standard

8   contingent fee agreement.

9          PRESIDENT CARPER:  Well, standard doesn't

10  mean anything.

11         MR. CAGLE:  That means we pay the

12  expenses.

13         PRESIDENT CARPER:  What's standard?  What

14  percentage?

15         MR. CAGLE:  A third.

16         PRESIDENT CARPER:  A third?

17         MR. CAGLE:  Yes, sir.

18     `   PRESIDENT CARPER:  What do you think,

19  Mr. Plants?  You think that could help you any, or

20  is it just wasting and tilting at windmills?

21         MR. PLANTS:  I won't speak to whether

22  it's good or bad (indiscernible - away from

Page 15

1   microphone) a lot more than me.  What I can speak

2   on is that 75 to 85 percent of the people I

3   prosecute are addicted to drugs one way or the

4   other.  We've got the most burglaries, petty

5   larceny, and I deal with (indiscernible) all of

6   them come from people that have and are addicted to

7   drugs.

8           PRESIDENT CARPER:  This county was the

9   first county I think in the nation that did the --

10  you know, our meth ordinance.  And it was an odd

11  way of stopping meth, but what we did, that worked.

12  Frankly, the drug problem is so bad, it is

13  absolutely destroying families.  I think anything

14  we try to do, I can't see any down side to this at

15  all.  I recommend it and I move to approve without

16  even a second thought.

17          COMMISSIONER SHORES:  Second.

18          COMMISSIONER HARDY:  I support.  I just

19  want to understand.

20          PRESIDENT CARPER:  Sure.

21          COMMISSIONER HARDY:  Are we making new

22  law here, Jim?

Page 16

1          MR. CAGLE:  Conceivably.  Conceivably.

2          COMMISSIONER HARDY:  Let me see if I

3    understand --

4          MR. CAGLE:  We're -- you're --

5          COMMISSIONER HARDY:  -- your bones.  I'm

6    trying to just understand the bones of what you're

7    doing.

8          MR. CAGLE:  Absolutely.  Conceivably,

9    we're fighting a battle that others are not

10   fighting.

11         COMMISSIONER HARDY:  Okay.  You're going

12   to file a lawsuit on behalf -- Kanawha County would

13   be one of the named plaintiffs, right?

14         MR. CAGLE:  Yes, sir.

15         COMMISSIONER HARDY:  Where will you be

16   filing it at?

17         MR. CAGLE:  In Kanawha County, West

18   Virginia.

19         COMMISSIONER HARDY:  Okay.  So it'd be --

20   and now, would you anticipate that it'll end up

21   being removed to federal court?

22         MR. CAGLE:  Not in the way we anticipate

Page 17

1    structuring the lawsuit, which would include, I

2    will tell you --

3              COMMISSIONER HARDY:  Okay.

4              MR. CAGLE:  -- local bad guys that are

5    contributing to this problem.

6              COMMISSIONER HARDY:  All right.

7              MR. CAGLE:  So there will not be complete

8    diversity.  In fact, there won't be much diversity

9    at all.

10             COMMISSIONER HARDY:  I have been -- when

11   I read some of these articles in the paper about

12   some of these so-called physicians, it is

13   absolutely unbelievable what I've read.  You know,

14   Dr. Hoover down in I guess Cabell County?

15   Dr. Schaffer?  I don't even need to say anything

16   more about Dr. Schaffer.

17             PRESIDENT CARPER:  He's the one that

18   married the hearing examiner in Kentucky.

19             COMMISSIONER HARDY:  Are there --

20             MR. CAGLE:  I've sued all of them.  Some

21   of them are impending cases.

22             COMMISSIONER HARDY:  Are there doctors

Page 18

1    in --

2            MR. CAGLE:  (Indiscernible) in the

3    Bahamas.

4            COMMISSIONER HARDY:  Are there going to

5    be doctors in Kanahwa County that would be

6    potential defendants?

7            MR. CAGLE:  Probably.  Yes, sir.

8            COMMISSIONER HARDY:  Yeah, I'm not asking

9    you to name them.  I'm just trying to understand

10   what type of lawsuit we're contemplating.

11           MR. CAGLE:  They -- the answer to that is

12   probably, most probably, yes.

13           COMMISSIONER HARDY:  Okay.  And who would

14   be the other named plaintiffs in the case?

15           MR. CAGLE:  There are no other named

16   plaintiffs in this case.  No.  I -- here is the way

17   we have perceived this litigation.

18           COMMISSIONER HARDY:  Okay.

19           MR. CAGLE:  Each county would have a

20   lawsuit in that county.  And they will not -- I

21   don't think they meet the criteria for mass

22   litigation so that they would be combined.  I could

Page 19

1    be proved wrong on that, but I don't think so

2    because there will be distinct defendants and

3    certainly distinct plaintiffs in the case.  And so

4    that -- I think your case could stay right here in

5    this jurisdiction.

6              COMMISSIONER HARDY:  So the case would be

7    potentially Kanawha County versus Physician X, Y,

8    or Z, whoever that --

9              MR. CAGLE:  Yes.

10             COMMISSIONER HARDY:  Are they Kanawha

11   County physicians?

12             MR. CAGLE:  Some may be.  Some may not

13   be.

14             COMMISSIONER HARDY:  But prescribe here?

15             MR. CAGLE:  If discovery indicates that

16   you have people in Kanawha County that are going

17   to, let's pick a county, Boone or Clay, pick it,

18   and to a doctor that's a pill mill, he know he's

19   prescribing meds for people from this area, then I

20   think we have jurisdiction to bring him into the

21   lawsuit.

22             COMMISSIONER HARDY:  Okay.  So it would

Page  20

1    be doctors that prescribe, that prescriptions are

2    being filled in this county?

3              MR. CAGLE:  For illegitimate purposes,

4    yes, to --

5              COMMISSIONER HARDY:  Okay.

6              MR. CAGLE:  -- to people who not only

7    live in this county, but also who commit crimes in

8    this county, you know, if that becomes prevalent.

9    Because what you're dealing with, if we have to

10   house them, and we have to pay a fee to house them

11   in the South Central Regional Jail, then you've got

12   a tab, a claim based on that.  So there are many

13   ways they could come within the umbrella of the

14   litigation we anticipate.

15             COMMISSIONER HARDY:  Okay.  And would the

16   same hold true for pharmacies?

17             MR. CAGLE:  Yes.

18             COMMISSIONER HARDY:  Are there potential

19   pharmacies that are actually in Kanawha County?

20             MR. CAGLE:  Yes.  Yes.

21             COMMISSIONER HARDY:  You don't have to

22   name them because I know you're probably doing

Page 21

1  research and trying to decide.

2        MR. CAGLE:  Yes.

3        COMMISSIONER HARDY:  And then, of course,

4  I take it that the drug companies, some are, or

5  all, or what -- the drug companies that have filled

6  prescriptions that appear to be -- what would be

7  the word -- that shock the conscience, that are so

8  far beyond the norm.  Are you talking probably

9  publicly traded national or international drug

10  companies?

11        MR. CAGLE:  Yes.  At least two of the

12  ones we have identified already are huge

13  international corporations.

14        COMMISSIONER HARDY:  Okay.

15        MR. CAGLE:  Yes, sir.  That do a lot of

16  other things, but among the things they do are

17  distribute prescription medication.

18        COMMISSIONER HARDY:  Of course --

19        MR. CAGLE:  One of whom has actually two

20  operations in West Virginia, at either end of the

21  state, actually.

22        COMMISSIONER HARDY:  Okay.  Has this

Page 22

1   cause of action been tried anywhere else?

2              MR. CAGLE:  No, not to my knowledge.

3              COMMISSIONER HARDY:  Which means it --

4   when it's filed, of course, it could potentially be

5   a case of national import?

6              MR. CAGLE:  Yes.

7              COMMISSIONER HARDY:  I mean, it will be

8   followed, and I'm sure, knowing the drug companies,

9   and knowing how carefully they monitor their

10  litigation and how deep their pocket is, I'm sure

11  it'll be quite a battle.

12             MR. CAGLE:  That's -- just to give you an

13  idea that's apropos of that is the state's

14  litigation is tied up in a removal action that

15  we're winning on, I'm sure because the precedent's

16  on our side.  However, they are now making noise

17  about taking it to the U.S. Supreme Court.  So it's

18  a battle that, it could last a while and is very

19  expensive.

20             COMMISSIONER HARDY:  How will you decide

21  which physicians and/or pharmacies to sue?  I'll

22  leave the drug companies aside.  I'm sure that's --

Page 23

1          MR. CAGLE:   Through discovery.  I would

2     think that -- I would think what we -- those we

3     identify originally won't be the last list of

4     defendants.  I think it'll be amended from time to

5     time.

6          COMMISSIONER HARDY:  Well, and I want to

7     be fair to everybody.  I'm trying to contemplate --

8     let's say that I'm a doctor that's treating pain in

9     this valley, and I read about this suit tomorrow

10    morning, or the potential suit.  I'm going to be

11    nervous about it.

12         Now, hopefully you are going to be able

13    to separate the wheat from the chaff.  In other

14    words, people like Dr. Hoover and Dr. Schaffer, by

15    any stretch of the imagination, they deserve what

16    they got, and deserve more.  I hope that this suit

17    will be able to filter those type of people from

18    legitimate doctors that are trying to offer our

19    aged, arthritic population here pain relief

20    treatment.  I know it's a -- it's not a --

21    sometimes a clear line.

22         MR. CAGLE:  Well, we've been very careful

Page 24

1   with --

2           PRESIDENT CARPER:  I assume you'll start

3   with the ones that have their ticket pulled

4   already.

5           COMMISSIONER HARDY:  That's what I'm

6   trying to ask.  Yeah.

7           PRESIDENT CARPER:  And then you're

8   familiar with Rule 11, aren't you, Mr. Cagle?

9           MR. CAGLE:  Very familiar.

10          PRESIDENT CARPER:  Are you familiar with

11  fraudulent joinder?

12          MR. CAGLE:  I'm very familiar.

13          PRESIDENT CARPER:  And I want to ask you,

14  did I put you up to this?  I wished I had.  You all

15  called me, right?

16          MR. CAGLE:  We called you.

17          PRESIDENT CARPER:  And I've also told

18  you, before you go filing any lawsuits, I want the

19  county solicitor to look at it.

20          COMMISSIONER HARDY:  Well, that's --

21          PRESIDENT CARPER:  Well, yeah.

22          MR. CAGLE:  We won't file anything

2/7/2013                    Kanawha County Council              Video/Audio Transcription

Page 25

1    without --

2            COMMISSIONER HARDY:  Thank you.  Yes.

3            MR. CAGLE:  -- clearing it with you.

4            PRESIDENT CARPER:  So you're not going --

5    you would never sue a little -- a mom and pop

6    pharmacy here that made one transaction just to

7    destroy diversity now, would you?

8            MR. CAGLE:  I wouldn't intend to do that.

9            PRESIDENT CARPER:  Well, you would be the

10   shortest hired lawyer this county's ever seen.  I

11   mean --

12           MR. CAGLE:  I would not do that.

13           PRESIDENT CARPER:  Okay.

14           COMMISSIONER HARDY:  I have -- and I hope

15   you think these questions aren't designed toward

16   that.  I --

17           PRESIDENT CARPER:  I think your questions

18   are excellent.  You know, the only thing, Dave?  I

19   kind of went through a couple of them myself.

20           COMMISSIONER HARDY:  Yeah.  I mean, you

21   don't have --

22           PRESIDENT CARPER:  You're doing fine.

Page 26

1    You hang in there.

2          COMMISSIONER HARDY:  You know how much

3    respect I have for you and Rudy and all the other

4    lawyers here today.  I just want to make sure that

5    we sue the people that have really deviated from

6    what is appropriate pain management, because pain

7    management does have its place.  I think we all

8    know that.

9          MR. CAGLE:  It does.

10         COMMISSIONER HARDY:  There are people

11   that are 75, 80 years old or have had severe

12   injuries that really need the treatment.  What I've

13   read in the newspaper, I'm -- I can't even

14   articulate my thought about Dr. Hoover and

15   Dr. Schaffer and the havoc that they wrecked in

16   many, many lives.  You can't measure what they cost

17   society and --

18         MR. CAGLE:  Yes.

19         COMMISSIONER HARDY:  -- what they cost in

20   human pain.

21         MR. CAGLE:  I assure you that we're not

22   going to do anything without clearing it with you.

2/7/2013                    Kanawha County Council                Video/Audio Transcription

                                                                              Page 27

1    I will assure you that it'll be properly

2    investigated --

3            PRESIDENT CARPER:  Can I ask a question

4    of one of your colleagues, Mr. Cagle?

5            COMMISSIONER HARDY:  Maybe a -- yeah.  I

6    guess what I'm asking is, will you provide us --

7    before you finally file the lawsuit, will you give

8    us a chance to look at your draft complaints?

9            MR. CAGLE:  That's exactly what I would

10   intend to do is --

11           COMMISSIONER HARDY:  Exactly.

12           MR. CAGLE:  -- meet with you --

13           PRESIDENT CARPER:  Mark.  Mark will look

14   it over and get with us.

15           Mr. Dipiero?

16           MR. DIPIERO:  Yes, sir.

17           PRESIDETN CARPER:  I believe, in another

18   life, what did you used to do for a living?

19           MR. DIPIERO:  I was (indiscernible).

20           PRESIDENT CARPER:  Yeah.  And didn't you

21   used to work at the DEA in DEA compliance and

22   things like that?

Page 28

1          MR. DIPIERO:  Yes, sir.

2          PRESIDETN CARPER:  I assume you guys will

3    go find one of these little drugstores that has a

4    shoe box full of violations and notices and over-

5    prescribing and stuff like that, right?

6          MR. DIPIERO:  That will be the first

7    thing I do.

8          PRESIDENT CARPER:  And once you -- and

9    also, to the Board of Medicine, and things like

10   that.  I mean, you don't need dozens and dozens of

11   drugstores, do you?

12         MR. CAGLE:  We don't -- technically, you

13   only need one.

14         PRESIDENT CARPER:  Yeah, I know.

15         MR. CAGLE:  But I --

16         PRESIDENT CARPER:  So you'll pick a good

17   one, right?

18         MR. CAGLE:  There'll be more than one.

19         PRESIDENT CARPER:  And --

20         MR. CAGLE:  And I already know, even from

21   Mingo County litigation, where people of Mingo

22   County come to Charleston, I know the drug stores

Page 29

1    they go to.

2            COMMISSIONER HARDY:  Okay.  So you've

3    got --

4            PRESIDENT CARPER:  Those are excellent --

5            COMMISSIONER HARDY:  Well, this is

6    important.

7            PRESIDENT CARPER:  Yes, uh-huh.

8            COMMISSIONER HARDY:  I mean, you don't

9    want to run your legitimate, excellent physicians

10   that are trying to do this area of practice out,

11   and I don't think you would.  I think you're

12   looking for the kind of people that we've been

13   reading about in the newspapers, which is just

14   unbelievable.

15           MR. CAGLE:  We're talking about pill

16   mills.

17           COMMISSIONER HARDY:  Yes.

18           MR. CAGLE:  I assure you.

19           PRESIDENT CARPER:  Okay.  I got it.

20           MR. CAGLE:  I assure you.

21           PRESIDENT CARPER:  I got it.

22           MR. CAGLE:  I just wanted to --

2/7/2013                    Kanawha County Council              Video/Audio Transcription

Page 30

1           PRESIDENT CARPER:  I assume you'll also

2    probably -- the doctors you'll select will probably

3    be the ones where the good doctors, the 99.9

4    percent of the doctors have complained on them, and

5    probably already showed up and had their peers

6    already -- what's that guy's name down in Dunbar,

7    the one they just got down there that -- you know

8    what I'm talking about?

9           MR. CAGLE:  I'm not sure.

10          PRESIDENT CARPER:  Oh, yeah.  Well I'd

11   put him down on the list.  Okay?

12          COMMISSIONER HARDY:  In Dunbar?

13          PRESIDENT CARPER:  Yeah.  There's one

14   down there.  And then there's one in -- well,

15   there's plenty of them.  Oh yeah, there's plenty of

16   them.

17          COMMISSIONER HARDY:  Okay.  Well, that's

18   -- this is --

19          PRESIDENT CARPER:  Those are important

20   questions, Dave, and this is an important matter.

21   And from me, frankly, where's the Sheriff?  Is he

22   here?

Page 31

1          UNIDENTIFIED SPEAKER:  He's in the

2     hallway.

3          PRESIDENT CARPER:  Okay.  I like the

4     deterrence aspect as much or more, as long as we're

5     deterring such improper conduct, because let's face

6     it, with all due respect to the DEA and the feds

7     and law enforcement, I mean, these pill mills just

8     ran amok, and I just don't think anyone -- you want

9     to hurt them?  Hit them in the pocketbook.

10         MR. CAGLE:  That's our intention.

11         PRESIDENT CARPER:  You -- have you heard

12    what we're going to consider doing here, Sheriff,

13    having some attorneys take a look at hitting the

14    pill mills here for running up our jail bill and

15    having you all run around arresting these people

16    left and right?

17         And I would like to go and -- you know,

18    and your action should also consider the other

19    governmental entities around here, Charleston,

20    South Charleston.  I see Dunbar back there sitting

21    in the back.  How are you doing there, Chief?  Is

22    that --

Page 32

1          UNIDENTIFIED SPEAKER:  (Indiscernible.)

2          PRESIDENT CARPER:  Just fine.  Nice to

3    have you here, Chief.  So you all got a drug

4    problem there in Dunbar?

5          UNIDENTIFIED SPEAKER:  We're totally

6    (indiscernible).

7          PRESIDENT CARPER:  That's right.

8      (Laughter)

9          PRESIDENT CARPER:  Well, I had these same

10   questions, Dave.  And I frankly didn't do as good a

11   job as you did.  But I asked some questions along

12   the same line.  Now come on, we're not going to go

13   down here and, you know, hit some pharmacy that

14   we're -- you know, because of one transaction just

15   to get -- prevent removal, and they've assured me

16   that would never, ever, ever happen.

17          COMMISSIONER HARDY:  After all I've been

18   reading about in the media, have at it.

19          PRESIDENT CARPER:  Yeah.

20          COMMISSIONER HARDY:  I mean, it's just

21   unbelievable.

22          MR. CAGLE:  Well, I'm sure they've

Page 33

1   reached into our community, too.

2            PRESIDENT CARPER:  Well, I recommend it.

3   I think I understand it.  I just --

4            COMMISSIONER HARDY:  I'll call the

5   question.

6            PRESIDENT CARPER:  I want one question.

7   My firm has absolutely no interest in this, and

8   will never have any interest in this, correct?

9            MR. CAGLE:  That is correct.  Yes.

10           PRESIDENT CARPER:  It's no secret that

11  I've sued at least one of these defendants on

12  another matter.  And the reason why I know one of

13  the defendants, I read stuff.  And I saw where the

14  Attorney General's office filed those lawsuits.  I

15  know who they are.  Go get them.

16           All those in favor, say aye.

17      (Chorus of ayes)

18           PRESIDENT CARPER:  Okay.  Mr. DiTrapano,

19  it's an honor to have you here.

20           COMMISSIONER HARDY:  I'll be anxious to

21  see this.

22           PRESIDENT CARPER:  Mr. Jackson,

2/7/2013                    Kanawha County Council                Video/Audio Transcription

Page 34

1    absolutely.  Gentlemen, thank you for coming here.

2              And, Tim, I've got another plan on that

3    other thing.  Call me.  It has nothing to do with

4    this.  Okay?

5              MR. CAGLE:  Shall I sign and leave this

6    for your consideration, the agreement?

7              PRESIDENT CARPER:  If you'll give it to

8    the county solicitor, our rules are he'll approve

9    it.  If he approves it as to form, then we'll sign

10   it and we'll send it to you, Mr. Slotnick over

11   there.

12             COMMISSIONER SHORES:  Thank you.  Thank

13   you very much.  I think drugs just about killed the

14   whole world, I think.  Drugs we just can't continue

15   with, and it's awful.

16             COMMISSIONER HARDY:  Good to see you,

17   Rodney.

18             PRESIDENT CARPER:  Okay.  Thank you.  I

19   suspect, gentlemen, that these two reporters are

20   trailing you out the door, might want to ask you

21   something.  So -- Rodney, it's nice to see you

22   again.

Page 35

1          COMMISSIONER SHORES:  Rodney, good seeing

2     you, Rodney.

3          MR. JACKSON:  Thank you.

4          COMMISSIONER SHORES:  Rodney.  Cagle.

5          PRESIDENT CARPER:  Let me -- have we got

6     all of our elected officials here?  Let me just

7     knock off two little things.

8          COMMISSIONER SHORES:  That's Rodney.

9          PRESIDENT CARPER:  HUD small city block

10    grant.  Cole?

11        (End of requested portion)

12                    *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

2/7/2013                  Kanawha County Council              Video/Audio Transcription

Page 36

```
 1                        CERTIFICATION

 2             I, Ilene Watson, do hereby certify

 3    that the foregoing is a correct transcript from the

 4    electronic sound recording provided for

 5    transcription and prepared to the best of my

 6    professional skills and ability.

 7

 8

 9

10

11    ̲I̲l̲e̲n̲e̲ ̲W̲a̲t̲s̲o̲n̲          May 4, 2017

12    Ilene Watson

13    AAERT Cert. No. 447

14    Certified Court Transcriptionist

15

16

17

18

19

20

21

22
```