# EXHIBIT 36

## IN THE CIRCUIT COURT OF WAYNE COUNTY, WEST VIRGINIA

BOBBY D. STEPHENS, as Administrator
Of the Estate of DEENA STEPHENS,
And BOBBY D. STEPHENS as next friend
and guardian of IZABELLA DEAN,

     Plaintiff,

v.

CIVIL ACTION NO: 13C-131
JUDGE: Young

MITCHELL DEAN
PATRICIA A. DEAN,
WILLIAM HAYNES,
WEST VIRGINIA PAVING, INC.,
A West Virginia corporation,
GEORGE BOYD,
THE MASON AND DIXON LINES, INC.,
a/k/a GREAT AMERICAN LINES, INC.,
a foreign corporation,
ERIC TODD GRANT, P.A.-C.,
PHILLIP FISHER, D.O.,
HUNTINGTON SPINE REHAB & SPINE CENTER,
JIMMY ADAMS, D.O.,
DELANO WEBB, M.D.,
A.ADI, M.D., individually and
d/b/a TOTAL MEDICAL EXPRESS,
TOTAL MEDICAL EXPRESS,
PAUL GLUSMAN, M.D.,
Individually and d/b/a
TOTAL CARE MEDICAL CENTER,
TOTAL CARE MEDICAL CENTER,
ARNOLD H. AARON, D.O.,
IBEM RONALDO BORGES, M.D.,
ARON LOUIS ROTMAN, M.D.,
Individually and d/b/a
PAIN RELIEF CENTER OF ORLANDO,
PAIN RELIEF CENTER OF ORLANDO,
MERCY WELLNESS & RECOVERY CENTER,
VICTOR GEORGESCU, M.D.,
GREATER MEDICAL ADVANCE, INC.,
GEORGE MARSHALL ADKINS,
JARES PHARMACY,
WALGREEN'S PHARMACY,

1

A Florida corporation,
ALLZ WELL PHARMACY, LLC,
A Florida corporation,
CROSS LANES FAMILY PHARMACY, INC.,
A West Virginia Corporation,
WALMART, a Delaware corporation,
ROYAL PHARMACY, INC.,
CARTER'S PHARMACIES &
HOME MEDICAL PRODUCTS,
PAIN CENTER OF BROWARD,
BRISTOL MYERS SQUIBB,
VINTAGE PHARMACEUTICALS,
ACTAVIS, INC. f/k/a WATSON LABS,
MUTUAL PHARMACEUTICALS,
PURDUE PHARMA LP.,
PURDUE PHARMA INC.,
PURDUE FREDRICK CO.,
ABBOTT LABORATORIES,
ABBOTT LABORATORIES, INC.,
MALLINCKRODT,
DURAMED PHARMS BARR, INC.
MIKART, INC.
AMNEAL PHARMACEUTICALS,
HALSEY,
COASTAL PHARMACEUTICALS,
ALVOGEN, INC.
BARR LABORATORIES,
TEVA PHARMACEUTICALS,
WARNER CHILCOTT,
DAVA PHARMACEUTICALS,
SANDOZ,
HIKMA MAPLE,
MYLAN, INC.
ROXANE LABORATORIES, INC.
IVAX SUB, PAR PHARMACEUTICALS, INC.
ABRAXIS BIOSCIENCE
ACTAVIS ELIZABETH,
DURAMED PHARMACEUTICALS,
FERNDALE LABS,
MARTEC
PARENTA PHARMACEUTICALS, INC.
VINTAGE PHARMACEUTICALS
UCB, INC.
DAVA INTERNATIONAL, INC.
APOTEX, INC.
IMPAX LABS

COREPHARMA
ANCHEN PHARMACEUTICALS
ZYDUS PHARMACEUTICALS, USA, INC.
BOCA PHARMACEUTICAL,
AUROBINDO PHARMA USA,
JOHN DOE 1-10 MEDICAL PROVIDERS
JOHN DOE 11-20 PHARMACIES
JOHN DOE 21-30 MANUFACTURERS AD DISTRIBUTORS

Defendants,

## COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW the Plaintiffs, by and through their undersigned attorney and sues the above-named defendants, and alleges as follows:

### GENERAL ALLEGATIONS

1.    At all times material hereto, the Plaintiff, Bobby D. Stephens, as Administrator of the Estate of Deena Stephens, is a resident of 1198 South Jefferson Drive, Huntington, Wayne County, West Virginia 25701.

2.    At all times material hereto, the Plaintiff, Bobby D. Stephens, as next friend and guardian of Izabella Dean, is a resident of 1198 South Jefferson Drive, Huntington, Wayne County, West Virginia 25701.

3.    At all times material hereto, Defendant Mitchell Dean, (hereinafter at times referred to as Defendant "Dean"), is a resident of 712 Thunderbird Drive, Huntington, Cabell County, West Virginia 25704;

4.    At all times material hereto, the Defendant, Patricia A. Dean, is a resident of 445 Augusta Drive, Huntington, Cabell County, West Virginia 25704;

5.    At all times material hereto, the Defendant, William Haynes (hereinafter at times referred to as Defendant "Haynes"), is a resident of 177 Lynwood Circle, Princeton, Mercer County, West Virginia 24740;

6.    At all times material hereto, the Defendant, West Virginia Paving, Inc., (hereinafter at times referred to as Defendant "West Virginia") is a business

authorized to operate in the State of West Virginia with an agent for service of process;

7.  At all times material hereto, the Defendant, George Boyd (hereinafter at times referred to as Defendant "Boyd"), is a resident 2017 Eastwood Avenue, Kingsport, Sullivan County, Tennessee 37664;

8.  At all times material hereto, the Defendant, The Mason and Dixon Lines, Inc., a/k/a Great American Lines, Inc. (hereinafter at times referred to as Defendant "Mason") is a foreign corporation authorized to operate in the State of West Virginia with an agent for service of process;

9.  At all times material hereto, the Defendant, Eric Todd Grant, P.A.-C, is a Physician's Assistant licensed to do business in the State of West Virginia, and conducts business at 2900 1st Avenue, Huntington West Virginia 25704;

10. At all times material hereto, the Defendant, Phillip Fisher, D.O., is a medical provider licensed to do business in the State of West Virginia and conducts business at 3554 US Route 60 East, Barboursville, West Virginia 25504;

11. At all times material hereto, the Defendant, Huntington Spine Rehab & Spine Center, is a business authorized to operate in the State of West Virginia and conducts business at 3554 US Route 60 East, Barboursville, West Virginia 25504;

12. At all times material hereto, the Defendant, Jimmy Adams, D.O., is a medical provider licensed to do business in the State of West Virginia and conducts business at 1400 Hospital Drive, Hurricane, West Virginia 25526;

13. At all times material hereto, the Defendant, Delano Webb, M.D., is a medical provider licensed to do business in the State of West Virginia, and conducts business at 10 6th Avenue West, Suite 300, Huntington, West Virginia 25701;

14. At all times material hereto, the Defendant, A. Adi, M.D., is a medical provider licensed to do business in the State of Florida, and is/was employed by Total Medical Express, Inc., who is a corporation in the State of Florida and has a registered agent, MA Hernandez Tax, Inc., 4540 Southside Boulevard, Suite 303, Jacksonville, Florida 32216;

15. At all times material hereto, the Defendant, Total Medical Express, Inc., is a corporation in the State of Florida and has a registered agent, MA Hernandez Tax, Inc., 4540 Southside Boulevard, Suite 303, Jacksonville, Florida 32216.

16. At all times material hereto, the Defendant, Paul Glusman, M.D., is a medical provider licensed to do business in the State of Florida, and is/was employed by Total Care Medical Center, Inc., who is a corporation in the State of Florida and has a registered agent, Ileana McAuliff, 10000 SW 56th Street, Suite 29, Miami, Florida 33165;

17. At all times material hereto, the Defendant, Total Care Medical Center, Inc., is a corporation in the State of Florida and has a registered agent, Ileana McAuliff, 10000 SW 56th Street, Suite 29, Miami, Florida 33165;

18. At all times material hereto, the Defendant, Arnold H. Aaron, D.O., is a medical provider licensed to do business in the State of Florida, and conducts business at 6201 N. Federal Highway, Boca Raton, Florida 33487;

19. At all times material hereto, the Defendant, Ibem Ronaldo Borges, M.D., is a medical provider licensed to do business in the State of Florida, and conducts business at 1800 West Oakridge Road, Orlando, Florida 32809;

20. At all times material hereto, the Defendant, Aron Louis Rotman, M.D., is a medical provider licensed to do business in the State of Florida, and is/was employed by Pain Relief Center of Orlando, 7209 Curry Road, Suite E, Orlando, Florida 32822;

21. At all times material hereto, the Defendant, Pain Relief Center of Orlando, is a medical provider licensed to do business in the State of Florida and who conducts business at 7209 Curry Road, Suite E, Orlando, Florida 32822;

22. At all times material hereto, the Defendant, Mercy Wellness & Recovery Center, is/was licensed to do business in the State of Florida and conducts business at 2001 NE 48th Street, Fort Lauderdale, Florida 33308;

23. At all times material hereto, the Defendant, Victor Georgescu, M.D., is a medical provider licensed to do business in the State of Ohio, and is/was employed by Greater Medical Advance, who conducted business at their last known address of 8746 Ohio River Road, Wheelerburg, Ohio 45694.

5

24.   At all times material hereto, the Defendant, Jares Pharmacy, is a pharmacy licensed to do business in the State of Florida and conducts business at 9716 N. 56th Street, Temple Terrace, Florida 33617;

25.   At all times material hereto, the Defendant, Walgreen's Pharmacy, Inc., is a corporation in the State of Florida, and whose registered agent is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301;

26.   At all times material hereto, the Defendant, Allz Well Pharmacy, LLC, is a corporation in the State of Florida, and whose registered agent is Wendell T. Locke 821 East Oakland Park Boulevard, Oakland Park, Florida 33334;

27.   At all times material hereto, the Defendant, Cross Lanes Family Pharmacy, Inc. is a West Virginia Corporation and whose registered agent is Brac Brown, Post Office Box 962, Poca, West Virginia, 25159;

28.   At all times material hereto, the Defendant, Walmart, Inc. is a Delaware corporation and whose registered agent is CT Corporation System, 1300 E. 9th Street, Cleveland, Ohio 44114;

29.   At all times material hereto, the Defendant, Royal Pharmacy, Inc., 9961 SW 142nd Ave, Miami, FL 33186 is corporation and whose registered agent is unknown.

30.   At all times material hereto, the Defendant, Carter's Pharmacies is a corporation. whose resident agent for service is 2265 Park St. Jacksonville, FL 32204.

31.   At all times material hereto, the Defendant, Home Medical Products is a corporation whose resident agent for service of process is unknown.

32.   At all times, material hereto, the Defendant, Pain Center of Broward, is licensed to do business in the State of Florida, and conducts business at 5459 North Federal Highway, Fort Lauderdale, Florida 33308;

33.   At all times, material hereto, the Defendant, Bristol Myers Squibb, a division Pharma, is a Delaware corporation, agent of process, The Corporation Trust Co, Corporation Trust Center 1209 Orange St. Wilmington, DE 19801, and is a wholesale distributor of Oxycodone licensed in the State of Florida, whose registered agent for service is The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

34.    At all times, material hereto, the Defendant, Vintage Pharmaceuticals, is a manufacturer or distributor of Oxycodone Alprazolam, and Diazepam licensed in the State of Florida with a principal place of business of 120 Vintage Drive NE, Huntsville, Alabama 35811 and an unknown resident agent of service of process.

35.    At all times, material hereto, the Defendant, Watson Labs, now known as Actavis, Inc., is a wholesale distributor of Oxycodone and Diazepam licensed in the State of Florida with a principal place of business of Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054 and whose registered agent for service is CT Corp., 2 No. Jackson St., Suite 605, Montegomery, AL 36104.

36.    At all times, material hereto, the Defendant, Actavis, Inc., is a manufacturer of Oxycodone and Alprazolam licensed in the State of Florida with a principal place of business of Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054 and an unknown resident agent of service of process.

37.    At all times, material hereto, the Defendant, Mutual Pharmaceuticals, is a wholesale distributor of Oxycodone licensed in the State of Florida with an unknown principal place of business or resident agent of service of process.

38.    At all times, material hereto, the Defendant, Mallinckrodt, is a wholesale distributor of Oxycodone licensed in the State of Florida with a principal place of business of 675 James S. McDonnell Boulevard, Hazelwood, MO 63042 and an unknown resident agent of service of process.

39.    At all times, material hereto, the Defendant, Duramed Pharms Barr, Inc., is a wholesale distributor of Oxycodone licensed in the State of Florida with an unknown principal place of business of resident agent of service of process.

40.    At all times, material hereto, the Defendant, Mikart, Inc., is a manufacturer and/or distributor of Oxycodone licensed in the State of Florida with a principal place of business of 1750 Chattahoochee NW, Atlanta, GA 30318 and an unknown resident agent of service of process.

41.    At all times, material hereto, the Defendant, Amneal Pharmaceuticals, is a wholesale distributor of Oxycodone licensed in the State of Florida with a principal place of business of 440 US Highway 22E, Suite 104, Bridgewater, NJ 08807 and an unknown resident agent of service of process.

42.  At all times, material hereto, the Defendant, Coastal Pharmaceuticals, is a mail-order distributor of Oxycodone licensed in the State of Florida with a principal place of business of 114 Canal Street, Unit #403, Pooler, GA 31322 and an unknown resident agent of service of process.

43.  At all times, material hereto, the Defendant, Alvogen, Inc., is a wholesale distributor of Oxycodone licensed in the State of Florida with a principal place of business of 10B Bloomfield Avenue, Pine Brook, NJ 07058 and an unknown resident agent of service of process.

44.  At all times, material hereto, the Defendant, UCB, Inc., is a wholesale distributor of Lortab licensed in the State of Florida with a principal place of business of 1950 Lake Park Drive, Smyrna, GA 30080 and an unknown resident agent of service of process.

45.  At all times, material hereto, the Defendant, Barr Laboratories, is a wholesale distributor of Diazepam licensed in the State of Florida with a principal place of business of 225 Summit Avenue, Montvale, NJ 07645 and an unknown resident agent of service of process.

46.  At all times, material hereto, the Defendant, Teva Pharmaceuticals, is a wholesale distributor of Diazepam and Alprazolam licensed in the State of Florida with a principal place of business of 5 Basel Street Petach Tikva, 49131 Israel and an unknown resident agent of service of process.

47.  At all times, material hereto, the Defendant, Warner Chilcott, is a wholesale distributor of Diazepam licensed in the State of Florida with a principal place of business of 1 Grand Canal Square Dockland, Dublin 2 Ireland and an unknown resident agent of service of process.

48.  At all times, material hereto, the Defendant, Dava Pharmaceuticals, is a manufacturer and/or wholesale distributor of Diazepam and Alprazolam licensed in the State of Florida with a principal place of business of Parker Plaza, 400 Kelby Street 10th Floor Fort Lee, NJ 07024 and an unknown resident agent of service of process.

49.  At all times, material hereto, the Defendant, Sandoz, is a wholesale distributor of Diazepam and Alprazolam licensed in the State of Florida with a principal place

8

of business of 506 Carnegie Center, Princeton, NJ 08540 and an unknown resident agent of service of process.

50. At all times, material hereto, the Defendant, Mylan, Inc., is a wholesale distributor of Diazepam and Alprazolam licensed in the State of Florida with a principal place of business of 1500 Corporate Drive, Canonsburg, PA 15317 and an unknown resident agent of service of process.

51. At all times, material hereto, the Defendant, Roxane Laboratories, Inc., is a manufacturer and/or distributor of Diazepam and Alprazolem licensed in the State of Florida with a principal place of business of 1809 Wilson Road, Columbus, Ohio and an unknown resident agent of service of process.

52. At all times, material hereto, the Defendant, Ivax Sub, is a wholesale distributor of Diazepam and Alprazolam licensed in the State of Florida with a principal place of business of 4400 Biscayne Boulevard, Miami, Florida 33137 and an unknown resident agent of service of process.

53. At all times, material hereto, the Defendant, Par Pharmaceuticals, Inc. is a wholesale distributor of Diazepam and Alprazolam licensed in the State of Florida with a principal place of business of 300 Tice Boulevard, Woodcliff Lake, NJ and an unknown resident agent of service of process.

54. At all times, material hereto, the Defendant, Abraxis Bioscience, a subsidiary of Celgene Corporation, is a wholesale distributor of Diazepam licensed in the State of West Virginia with a principal place of business of 86 Morris Avenue, Summit NJ 07901 and an unknown resident agent of service of process.

55. At all times, material hereto, the Defendant, Actavis Elizabeth, is a wholesale distributor of Diazepam and Alprazolam licensed in the State of Florida with an unknown principal place of business and an unknown resident agent of service of process.

56. At all times, material hereto, the Defendant, Duramed Pharmaceuticals, is a wholesale distributor of Diazepam licensed in the State of Florida with an unknown principal place of business and an unknown resident agent of service of process.

57.   At all times, material hereto, the Defendant, Ferndale Labs, is a wholesale distributor of Diazepam licensed in the State of Florida with a principal place of business of 780 W. 8 Mile Road, Ferndale, MI and an unknown resident agent of service of process.

58.   At all times, material hereto, the Defendant, Hospira, is a wholesale distributor of Diazepam licensed in the State of Florida with an unknown principal place of business and an unknown resident agent of service of process.

59.   At all times, material hereto, the Defendant, Martec, is a wholesale distributor of Diazepam licensed in the State of Florida with an unknown principal place of business and an unknown resident agent of service of process.

60.   At all times, material hereto, the Defendant, Parenta Pharmaceuticals, Inc., is a wholesale distributor of Diazepam licensed in the State of Florida with a principal place of business of 3 Southern Court, Columbia, SC 29212 and an unknown resident agent of service of process.

61.   At all times, material hereto, the Defendant, Walgreens, Inc., is a distributor of Oxycodone licensed in the State of Florida with a principal place of business of Jupiter Flordia and an unknown resident agent of service of process.

62.   At all times, material hereto, the Defendant, Apotex, Inc., is a wholesale distributor of Alprazolam licensed in the State of Florida with a principal place of business of 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326 and an unknown resident agent of service of process.

63.   At all times, material hereto, the Defendant, Impax Labs, is a manufacturer and/or distributor of Alprazolam licensed in the State of Florida with a principal place of business of 30831 Huntwood Avenue, Hayward, CA 94544 and an unknown resident agent of service of process.

64.   At all times, material hereto, the Defendant, CorePharma, is a wholesale distributor of Alprazolam licensed in the State of Florida with a principal place of business of 215 Wood Avenue, Middlesex, NJ and an unknown resident agent of service of process.

65.   At all times, material hereto, the Defendant, Anchen Pharmaceuticals, owned by CorePharma, is a manufacturer distributor of Alprazolam licensed in the State of

Florida with a principal place of business of 5 Goodyear, Irvine CA 92618 and an unknown resident agent of service of process.

66.   At all times, material hereto, the Defendant, Zydus Pharmaceuticals, is a wholesale distributor of Alprazolam licensed in the State of Florida with a principal place of business of 73 Route 31 N, Pennington, NJ 08534 and an unknown resident agent of service of process.

67.   At all times, material hereto, the Defendant, Boca Pharmacal, is a wholesale distributor of Alprazolam licensed in the State of Florida with a principal place of business of 3550 NW 126th Avenue, Coral Springs, FL 33065 and an unknown resident agent of service of process.

68.   At all times, material hereto, the Defendant, Aurobindo Pharma USA, is a wholesale distributor of Alprazolam licensed in the State of Florida with a principal place of business of Plot #2 Maitri Vihar, Ameerpet, Hyderabad 500 038 Andhra Pradesh India and an unknown resident agent of service of process.

69.   Defendant Purdue Pharma L.P. us a limited partnership with its principal place of business located at One Stamford Forum, Stamford, Connecticut. At all times relevant hereto, Purdue Pharma L.P. was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or distributing OxyContin.

70.   Defendant Purdue Pharma Inc. is a Delaware corporation with its principal place of business located at One Stamford Forum, Stamford, Connecticut. At all times relevant hereto, Purdue Pharma Inc. was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or distributing OxyContin. Purdue Pharma Inc. is the general partner of Purdue Pharma, L.P. and at all relevant times supervised and managed the operations and affairs of its subsidiary and affiliate, Purdue Pharma, L.P.

71.   Defendant Purdue Fredrick Company is a Delaware corporation with its principal place of business located at One Stamford Forum, Stamford, Connecticut. At all times relevant hereto, Purdue Fredrick was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or distributing OxyContin.

11

72.     Defendant Abbott Laboratories is an Illinois corporation with its principal place of business located at Abbott Park, North Chicago, Illinois. At all times relevant hereto, Abbott was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or distributing OxyContin. At all times relevant hereto Abbott Laboratories supervised and managed the operations and affairs of its affiliate and subsidiary, Abbott Laboratories, Inc.

73.     Defendant Abbott Laboratories, Inc., is a Delaware corporation with its principal place of business located at Abbott Park, North Chicago, Illinois. At all times relevant hereto, Abbott was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or distributing OxyContin

## JURISDICTION AND VENUE

74.     Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 73 as if fully rewritten herein.

75.     This Court has jurisdiction to serve process on any out of state Defendants herein, pursuant to WV Long-Arm statute §56-3-33(a) and §56-3-31, which states that jurisdiction, of the Defendants is proper as the Defendants "have certain minimum contacts and the Defendants have purposefully availed themselves of the benefits of the State." The Defendants conduct business, our domiciled, or residence is, in this County and State.

76.     This Court is a proper venue for this action, pursuant to 56-1-1 of W.Va Code which provides that venue is proper in an action involving multiple defendants, where venue is proper as to any one party to the action, and that venue is proper in the county where a defendant resides, has a principal place of business, or where the action giving rise to the claim occurred. The incident occurred in Mercer County and the State of West Virginia; but the defendant Mitchell Dean resides in Wayne County West Virginia.

77.     Jurisdiction is proper in this Court pursuant to W.Va. Statute §56-3-33(a).

78.     The Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) transacted business in Wayne County and throughout the State of West Virginia.

12

79.   Venue is proper pursuant to other state law, because all or part of the Defendants' acts and conduct alleged herein occurred within and predominantly affected Wayne County and the State of West Virginia, and because the Defendants do business in Wayne County and throughout the State of West Virginia.

## GENERAL ALLEGATIONS

80.   The defendants have made misrepresentations and/or omissions regarding the appropriate uses risks and safety of OxyContin, Oxycodone, Diazepam, and Alprazolam over the years.

81.   As a direct and proximate result physicians, pharmacies and patients have been unable to evaluate the relevant risks and useage.

82.   Patients have been and are exposed to the risk of severe and disabling addition, the consequences of addition, including driving to Florida pain clinics to obtain to drug while under the influence of the drug.

83.   OxyContin is an opioid analgesic drug, sold in tablet form, which is a controlled-released oral form of oxycodone hydrochloride.

84.   Oxycodone and oxycodone are morphine-like drugs.

85.   OxyContin is approved for use in the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days.

86.   Defendant Purdue Pharma L.P. developed and patented OxyContin, which was launched in December 1995. OxyContin initially was available in 10mg., 20mg., and 40mg. tablet strengths. In 1997, OxyCotin 80 mg. tablets became available, and in July 2000, 160 mg. tablets became available.

87.   OxyContin and Oxycodone are federally controlled, Schedule II drugs, meaning that: (1) it has a high potential for abuse; (2) it has currently been accepted for medical use in the United States with severe restrictions; and (3) the abuse of the drug may lead to severe psychological or physical dependence.

88.   Because OxyContin and oxycodone are  Schedule II drugs, if a patient receives a prescription, that person must bring the written prescription to a pharmacy. The prescription cannot to called in to the pharmacy by the patient's doctor.

89.   Following the launch of the drug in December 1995, sales quickly skyrocketed, and during the year 2000, just four (4) years from the time of its launch,

OxyContin ranked 36th in sales in the United States of all prescription medications with total sales of $601,128,000 resulting from 3,505,000 prescriptions that year. Total sales of OxyContin have surpassed $1 billion in the United States.

90.   The enormous sales volume of OxyContin, Oxycodone, Diazepam, and Alprazolam are due primarily to Defendants' aggressive marketing strategy to physicians, pharmacists, and patients. That strategy, however, which relied heavily on highly coercive tactics, misrepresented the appropriate uses of the drugs and failed to adequately disclose and discuss the safety issues and possible adverse effects of said drugs use.

91.   The Defendants, drug companies, medical provider, pharmacies, and health care providers have acted in concert by their intentional and repetitive actions to receive monies by the Plaintiff and others similarly situate to obtain millions of dollars

92.   In addition, Defendants and their employees or agents have suggested to pharmacists that they can get in trouble if they do not fill prescriptions, even if they believe someone may be an abuser of the drug.

93.   In addition, Defendants courted physicians and their allegiance to the drug, by paying doctors' transportation and hotel costs to attend weekend meetings to discuss pain management, where Defendants would recruit doctors and pay them fees to speak to other doctors at the more than 7,000 "pain management" seminars that they sponsored around the United States.

94.   At those seminars, Defendants marketed OxyContin as a safe and effective way in which to treat all manner of pain, including minor pain, yet failed to provide adequate information or any mention of the fact that OxyContin was intended to treat only moderate to severe pain and failed to warn of OxyContin's potential for abuse.

95.   Moreover, despite claiming that they did not market OxyContin directly to consumers, Defendants did, in fact, market the drug in that manner. In particular, Defendants financed an Internet site called "Partners Against Pain" which promoted OxyContin to the public.

96. As a result of these aggressive marketing tactics, Defendants achieved their purpose. OxyContin rapidly became one of the most widely used painkillers in the State and throughout the country.

97. As a result of Defendants' inappropriate marketing of OxyContin and oxycodone, the drugs have been inappropriately prescribed and used, unnecessarily putting people at risk of addiction of OxyContin, causing many users of the drug to become addicted to OxyContin and suffering the consequences of addiction.

98. Moreover, Defendants were and are facilitating the inappropriate use of OxyContin by supplying pharmacies in Mexico with OxyContin, because they are aware that members of the public can obtain OxyContin from these pharmacies without a prescription.

99. Upon information and belief, Defendants failed to incorporate into the product formulation any features that would have reduced the risk of bypass, diversion and abuse, all leading to the risk of addiction.

100. Accordingly, as the use of OxyContin, Oxycodone, Diazepam, and Alprazolam mushroomed (particularly because of prescription for inappropriate uses), so too did the numbers of people who were being put at risk of addiction to the drug and/or who were becoming addicted to the drug.

101. OxyContin and oxycodone can be and are abused by crushing and/or dissolving the product, which creates a feeling of euphoria similar to that experienced when taking heroin.

102. Despite their awareness of the abuse of OxyContin and oxycodone by crushing and/or dissolving of the product,

103. Defendants failed to take steps to reformulate OxyContin and oxycodone to prevent the abuse of the drug in this manner

104. Despite their awareness of the rising tide of abuse of these drugs in the above-mentioned ways, Defendants continued to aggressively market these drugs and failed to take appropriate measures to ensure that these drugs were prescribed only in appropriate circumstances.

105. Ultimately, the inappropriate use and abuse of these drugs engendered by Defendants' marketing practices grew to such a level that Federal drug

enforcement officials asked Purdue to limit distribution of OxyContin to doctors who manage pain. This was the first time that the DEA has targeted a specific prescription drug to curb its misuse.

106.     As a result of the excessive and unnecessary prescriptions, the plaintiffs have been damaged.

107.     Walgreens is a corporation that has a shipping center for Oxycodone in Jupiter, Florida.

108.     Walgreens was barred by the DEA from shipping Oxycodone and other controlled drugs from its Jupiter, Florida distribution center.

109.     The pharmaceutical companies, manufactures, drug distributors, drug store chains sell large amounts of highly addicted narcotics including but not limited to OxyContin, Oxycodone, Diazepam, and Alprazolam

110.     These prescription drugs are extremely addictive and the abuse of the prescription of opiod pain relievers account for more deaths than heroin or cocaine combined.

111.     Walgreens and other pharmacies failed to maintain proper controls to ensure that they did not dispense drugs to addicts and drug dealers.

112.     Further addicts and dealers obtain prescriptions from clients known as pill mills where the doctors provide the drugs only after cursory examinations.

113.     Walgreens, Jupiter distribution center was the largest distributor of Oxycodone in Florida. Its market share has increased such that fifty-two (52) Walgreens pharmacies are among the top one hundred (100) Oxycodone purchasers in Florida.

114.     Oxycodone is the most illegally taken prescription pill in the United States with five percent (5%) of Oxycodone being distributed from Florida last year. The vast majority of Oxycodone sold in Florida are acquired from drug addictive patients coming from Appalachian regions of West Virginia and Kentucky.

115.     Oxycodone was first synthesized in Germany to University Frankfort 1916, first clinical use in 1917 and introduced to the US market in 1939. Since then it has became the most used pain killer.

116.     The National Narcotics Control Board estimated that seventy-five.two (75.2) tons or a hundred fifty thousand four hundred (154,400) pounds were manufactured

world wide by 2007. An the United States counted for eighty-two (82%) percent of conception or fifty-one.six (51.6) tons. Such figures only increased over time.

117. Alprazolam is the generic name of Xanex. Alprazolam is used as a sedative, hypnotic, skeletal muscual relaxant, anticonvulsant, and amnestic properties.

118. Alprazolam is the most misused benzodiazepine on the U.S. retail market. With the high degree of risk of dependence.

119. Alprazolam is classified as a schedule IV controlled substance by the DEA.

120. While Alprazolam is used to treat anxiety disorders, panic disorders, and nausea due to chemotherapy it is often taken recreational and abused. Further it is clearly contraindication in those that have alcohol or drug dependence.

121. Alprazolam drug overdoses can cause somnolence (sleepy condition), hypotension (low blood pressure), hypoventilation, impaired motor functions, fainting, coma or death.

122. The mortality levels increased dramatically when used in conjuction when other prescription medication such as Oxycodone.

123. Alprazolam was first released by Upjohn which is now a part of Pfizer. In 1969 application for patent granted in 1976 and relapsed generically was released in 1981.

124. Mitchell Dean had in his possession and or at his residence at the time of the fatal accident prescriptions for Oxycodone, Diazepam, and Alprazolam.

125. Mitchell Dean admitted in his statement in the accident report that he had taken OxyCotin prior to the accident and was under its influence.

## COUNT I

123. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraph's 1 through 125 as if fully rewritten herein.

124. That on June 30, 2011, Plaintiffs, Deena Stephens and Izabella Dean, were passengers in a vehicle operated by Defendant Mitchell Dean.

125. That on June 30, 2011, Defendant Mitchell Dean was operating a 2009 Hyundai Elantra owned by Patricia A. Dean who is vicariously liable for his actions on I-77, in Mercer County, West Virginia in such a grossly negligent manner, and with

reckless disregard for the lives and safety of others so as to collide with Defendant Hayes thereby resulting in the Plaintiff, Deena Stephens' death, and Plaintiff, Izabella Dean, to suffer severe bodily injury.

126. That on the date in question, Defendant Mitchell Dean was under the influence of prescription medication, including but not limited to Oxycontin, and was on his way to obtain additional prescription medications from a Florida pain clinic, which impaired his ability to operate a motor vehicle. That on the date and at the place aforesaid Defendant Mitchell Dean unlawfully, recklessly, wantonly, and willfully caused serious physical harm and bodily injuries including death to the deceased, Deena Stephens and as well as serious physical harm and bodily injuries to Izabella Dean.   As a result of Defendant Dean's actions, he was charged with DUI causing death by reckless disregard and a DUI with unemancipated minor under sixteen (16) years of age.

127. As a direct and proximate result of Defendant Dean's negligence, Plaintiff, Izabella Dean, a minor, suffered severe bodily injury and pain and suffering.

128. As a direct and proximate result of Defendant Dean's negligence, Plaintiff, Izabella Dean, incurred and will continue to incur medical expenses.

129. As a direct and proximate result of Defendant Dean's negligence, Plaintiff, Izabella Dean, has suffered and will continue to suffer general, compensatory and economic damages, and has endured and will continue to endure a reduced quality of life, emotional distress, future medical expenses,

130. As a direct and proximate result of Defendant Dean's negligence, Plaintiff, Izabella Dean, incurred and will continue to incur negligent and/or intentional affliction of emotional distress as a result of her mother's death and loss of consortium.

<u>COUNT II</u>

131.. Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 130 as if fully rewritten herein.

132. That on the date in question, Defendant Haynes was improperly operating a motor vehicle owned by Defendant West Virginia Paving, Inc.

133. The Defendant West Virginia Paving, Inc. was negligent including but not limited to:

a. failure to properly inspect and maintain the vehicle;

b. failure to properly hire train and/or supervise their employees.

c. vicariously liable for the actions of their employees in the scope of their employment

d.   vicariously liable for the actions of their employees in the scope of their employment while said employees are operating a motor vehicle owned or leased by West Virginia Paving, Inc.

e.   improper lighting, failure to warn other drivers, and created a forseeable hazard; and

f.   other acts and omissions to be developed through the discovery process.

134. The Defendant, West Virginia Paving, Inc., is vicariously liable for the actions and negligence of their employees and agents for the unsafe repairs and maintenance and defective condition of the aforementioned vehicle; or in the alternative for the negligent entrustment of the vehicle.

135. The Defendant, West Virginia Paving, Inc., is liable for the failure to warn of the inherently dangerous condition and defective condition of the aforementioned vehicle, other acts and/or omissions to be determined in the scope of discovery

136. As a direct and proximate result of the Defendant's negligence, negligence, actions, and/or inactions that would have been undertaken by a reasonable person in the same or similar context, the Plaintiff, Deena Stephens, suffered extreme pain and suffering and subsequent death and the Plaintiff, Izabella Dean, suffered severe injuries, has suffered a permanent disability, has undergone pain and suffering and mental pain and anguish therefrom, and will suffer such pain and anguish in the future, loss of consortium of her mother, has lost the capacity for the enjoyment of life, incurred and will continue to incur medical expenses in the future, has lost wages in the future, and will continue to suffer such losses.

## COUNT III

137. Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 136 as if fully rewritten herein.

138. That on the date in question, Defendant Boyd was improperly operating a motor vehicle owned by Defendant The Mason and Dixon Lines, Inc.

139. The Defendant, The Mason and Dixon Lines, Inc., was negligent including but not limited to:

   a. failure to properly inspect and maintain the vehicle

   b. failure to properly hire train and/or supervise their employees.

   c. vicariously liable for the actions of their employees in the scope of their employment

   d. vicariously liable for the actions of their employees in the scope of their employment while said employees are operating a motor vehicle owned or leased by The Mason and Dixon Lines, Inc.

   e. other acts and omissions to be developed through the discovery process;

   f. failed to maintain control of said vehicle;

   g. failed to maintain a lookout for hazards in the roadway;

   h. failed to abide by traffic laws and regulations that govern over the road truckers.

140. The Defendant, The Mason and Dixon Lines, Inc., is liable for the actions and negligence of their employees and agents for the as well as their failure to train and supervise their employees and the negligent hiring thereof.

141. As a direct and proximate result of the Defendant's negligent actions, and/or inactions that would have been undertaken by a reasonable person in the same or similar context, the Plaintiff, Deena Stephens, suffered extreme pain and suffering and subsequent death and the Plaintiff, Izabella Dean, suffered severe injuries, has suffered a permanent disability, has undergone pain and suffering and mental pain and anguish therefrom, and will suffer such pain and anguish in the future, loss of consortium of her mother, has lost the capacity for the enjoyment of life, incurred

and will continue to incur medical expenses in the future, has lost wages in the future, and will continue to suffer such losses.

## COUNT IV

142. Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 141as if fully rewritten herein.

143. The Plaintiff, Bobby Stephens, is the duly appointed Administrator of the Estate of Deena Stephens on the 28th day of June, 2011, by the Clerk of the County Commission of Wayne County, a copy of which is attached hereto and incorporated herein by reference.

144. On the 30th day of June, 2011, the Defendants, caused or contributed to the aforementioned wrongful death of Deena Stephens through their negligent acts/omissions/actions when they knew or should have known that their acts/omissions/actions were likely to cause the injuries and/or death described above.

145. The Defendants knew or should have known that their acts/omissions/actions would place Deena Stephens at risk of harm such as injury or death.

146. As a direct and proximate result of the negligence and or acts of the Defendants, in causing or contributing to the death of Deena Stephens, the Plaintiff, Bobby Stephens, as administrator and Izabella Dean, as beneficiary are entitled to recover for having suffered tremendous grief, sorrow, and mental anguish in addition to the following losses:

   (a)   the loss of the society, companionship, comfort, guidance, and advice provided by the decedent;

   (b)   the loss of the future services, protection, care and assistance of the decedent;

   (c)   any other compensation allowed under the West Virginia Wrongful Death Act; and

   (d)   pain and suffering.

147. As a direct and proximate result of the negligence and or acts of the Defendants, in causing or contributing to the death of Deena Stephens, her estate is entitled to recover damages for losses incurred, including, but not limited to:

    (a)    funeral and burial expenses;

    (b)    future loss of income and other financial benefits which would have been realized in the absence of the decedents untimely death;

    (c)    expenses for care, treatment and hospitalization provided to the decedent;

    (d)    the value of the past and future loss of the pleasure and enjoyment of life during what otherwise would have been decedents natural life span;

    (e)    loss of the decedents normal life expectancy; and

    (f)    any other compensation allowed under the West Virginia Wrongful Death Act.

WHEREFORE, the Plaintiff, Bobby Stephens, Administrator of the Estate of Deena Stephens, sues the Defendants, and demands judgment against the Defendants in an amount equal to or in excess of jurisdictional limits, together with costs, prejudgment and post judgment interest and demands trial by jury on all issues so triable as of right by jury.

COUNT V

148.    Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 147as if fully rewritten herein.

149.    Plaintiff, Izabella Dean, by and through her guardian and next of friend, Bobby Stephens, as a result of the Defendants negligence, actions, and inactions suffered the loss of her mother and is entitled to loss of parental consortium against all Defendants for the loss of the mother's services, society, companionship, comfort, guidance, sorrow, love, mental anguish and solace.

150.    Due to the acts and/or omission of the Defendant and as a direct and proximate cause, the Plaintiff, Izabella Dean, suffered the loss of society, companionship, comfort, guidance, services, sorrow, and mental anguish. As the serious emotional distress was reasonable forseeable and the Defendants' negligent conduct caused Deena Stephens to suffer death and Izabella suffered serious emotional distress as a direct result of witnessing her mother, Deena Stephens' death.

## COUNT VI

151. Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 150 as if fully rewritten herein.

152. The Defendant manufacturer of the Products, distributers of the product, pharmacies and health care providers collectively placed the defective and dangerous product and/or drug in the marketplace.

153. That at the time of the incident herein, the product was substantially unchanged in ways intended and/or reasonably foreseeable to the Plaintiffs from the time it was first placed on the market.

154. That the Defendants, impliedly warranted to the users of the their product such as the one the Defendant, Dean was using that said product was merchantable and fit for the particular purpose for which it was being used.

155. That the Plaintiff as a third party beneficiary of said Defendant's relied upon the implied warranty of merchantability and fitness for a particular purpose.

156. That the Defendants, breached said implied warranty, in that, said product was not merchantable and not fit for the particular purpose for which it was used, because said product was inherently dangerous and defective including but not limited to the extreme addictive properties of the drug lack of oversight to the distribution, sale to individuals from pain mills, sale to addicts coming from states 1000+ miles away.

157. That the Defendants were negligent including but not limited to:

    a. failure to insure that the product was distributed properly in accordance with state and federal guidelines

    b. failure to provide adequate warning and insure proper training as to the distribution and administrative uses to prospective purchasers

    c. failure to install applicable safety guidelines as to distribution and use of the drug.

    d. other acts and/or omissions to be determined in the scope of discovery

158. As a direct and proximate result of the Defendants negligence, the Isabella Dean, suffered injuries, has undergone pain and suffering and mental pain and anguish therefrom, and will suffer such pain and anguish in the future, has lost the

capacity for the enjoyment of life, incurred and will continue to incur medical expenses in the future, has lost wages in the future, and will continue to suffer such losses in the future, and suffered and will continue to suffer emotional distress.

## Count VII

159.   Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 158 as if fully rewritten herein.

160.   The Defendants, drug companies, medical providers, pharmacies manufacturers, distributors and health care providers have been unjustly enriched by their intentional and repetitive actions by their receiving monies by the Plaintiff and others similarly situate.

161.   The reprehensibility of the Defendants' drug companies, medical provider, pharmacies, and health care providers conduct is such that it constitutes gross fraud, malice, oppression, and or with wanton, willful or reckless conduct or with a criminal indifference to civil obligations affecting the rights of the Plaintiffs.

162.   The billions of dollars gained by these actions are such that the actions cannot be deterred by individual damages and therefore it is equitable to remove the Defendants' profit to discourage future bad acts.

163.   Such aforementioned actions were committed with malice and a complete disregard to the rights of your Plaintiff that most similarly situated individuals.

164.   As a direct and proximate result of the aforementioned actions and omissions of the defendant the Plaintiff and that most similarly situated individuals has been damaged and the defendant has been unjustly enriched.

165.   The Defendants' actions constitutes reprehensible conduct; and were aware their actions would cause harm similar to that suffered by the Plaintiff that most similarly situated individuals; said actions were concealed from those situate as the Plaintiff; and were without efforts to make amends for said conduct.

166.   The Defendant, actions constitute gross fraud, malice, oppression, wanton, willful, reckless conduct or criminal indifference to civil obligations affecting the rights of others including the Plaintiff.

167.   The Plaintiff was injured as a direct and proximate result of the aforementioned actions of the Defendants.

24

WHEREFORE, the Plaintiff, sues the Defendant for compensatory damages, punitive damages, and unjust enrichment and demands judgment against the Defendant, in an amount equal to or in excess of jurisdictional requirements, together with costs, prejudgment and post-judgment interest and demands trial by jury on all issues so triable as of right by jury.

## COUNT VIII

168.    Plaintiff's re-allege and incorporate by reference the allegations contained in paragraph's 1 through 167 as if fully rewritten herein.

169.    The reprehensibility of the Defendants' drug companies, distributors, manufacturers, medical provider, pharmacies, and health care providers conduct is such that it constitutes gross fraud, malice, oppression, and or with wanton, willful or reckless conduct or with a criminal indifference to civil obligations affecting the rights of the Plaintiffs.

170.    The Defendants, drug companies, medical provider, pharmacies, and health care providers have acted in concert by their intentional and repetitive actions to receive monies by the Plaintiff and others similarly situate to obtain millions of dollars.

171.    Said concert of action or other facts and circumstances from which the unlawful, overt acts were committed by the Defendants, drug companies, medical provider, pharmacies, and health care providers were in furtherance of common design, intention, or purpose of the alleged conspirators

172.    These actions were to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by lawful means.

173.    These wrongful acts were done by the defendants to the injury of the plaintiff.

174.    These actions of the defendants have inducement in malice or ill- will and they are guilty of an unlawful conspiracy and punitive damages.

WHEREFORE, Plaintiffs expressly reserve the right to amend this Complaint as deemed proper by the Court and following disclosures in discovery, the right to add further co-defendants if necessary, and demand judgment as follows, with a trial by a jury of their peers:

A)      For general and compensatory damages against all Defendants in an amount exceeding jurisdictional limits;

B)      For punitive damages in an amount that bear a reasonable relationship to the harm occurred and the reprehensibility of the Defendants' conduct and to remove the Defendants' profit and to discourage future bad acts.  Further the Defendants acted with gross fraud, malice, oppression, and or with wanton, willful or reckless conduct or with a criminal indifference to civil obligations affecting the rights of the Plaintiffs.

C)      For past and current pain and suffering

D)      For future pain and suffering in an amount to be proven at trial;

E)      For past, current and future medical damages;

F)      For damages for emotional distress, and loss of quality of life;

G)      For loss of consortium against all Defendant's for the mothers wrongful death;

H)      For negligent infliction of emotional distress:

I)      For wrongful death damages:

J)      For applicable pre and post judgment interest;

K)      For attorney fees and expenses incurred as a result of this action;

L)      For any and all other relief to which Plaintiff's appear entitled.

BOBBY STEPHENS,

By Counsel,

D. Scott Bellomy, Esq. (#8028)
BELLOMY & TURNER, L.C.
741 Fifth Avenue
Huntington, WV 25701
(304) 697-7200

Donald R. Jarrell, Esq. (#4824)
218 North Court Street
P.O. Box 190
Wayne, WV 25570
(304) 272-6391

Dennis E. Kelley (#10650)
418 8th Street, Suite 101
Post Office Box 1176
Huntington, West Virginia 25701
Telephone: (304) 521-1453

United States of America

State of West Virginia                    County of Wayne, ss:



# Letter of Administration

Estate of DEENA STEPHENS

I, James H Booton, Clerk of the Wayne County Commission, in the State of West Virginia, do hereby certify

that BOBBY D STEPHENS was on the 28th day of June, 2011, appointed  by the Clerk of the  County

Commission of Wayne County as administrator(s) of the Estate of DEENA STEPHENS, duly qualified as

such by taking oath prescribed by law, and by giving approved bond in the sum of  $10,000.00, as required

by law.

NOW THEREFORE, be it known that said appointment is now in full force and effect and that full faith and

credit are due and should be given to all the acts of the said BOBBY D STEPHENS as such administrator(s)

of the Estate of DEENA STEPHENS, as well in all jurisdictions, as elsewhere.

IN WITNESS WHEREOF, I have hereunto set my hand and
affixed the seal of the said County Commission at my office in
said County on the 5th day of July, 2011.

*James H. Booton*

James H Booton
Clerk of the Wayne County Commission

By *Susan A. Dingess*

Susan Dingess
Deputy Clerk

## CERTIFIED MAIL




UNITED STATES POSTAGE
PITNEY BOWES

02 1R              $ 06.27⁰
00020009608    JUL 30  2013
MAILED FROM ZIP CODE 25311

BUSINESS & LICENSING

1610 - 00

# EXHIBIT 37



THE GOVERNOR'S
**Advisory Council**
on Substance Abuse

# Progress & Recommendations Report

## FOR GOVERNOR EARL RAY TOMBLIN






*December 31, 2013*

Substance abuse threatens West Virginia's families, workforce,
and communities, with over 152,000 West Virginian's in need of treatment.

# Progress & Recommendations Report

## FOR GOVERNOR EARL RAY TOMBLIN

## TABLE OF CONTENTS

**Report Goal** — 3

**Introduction** — 3

**Governor's Action** — 4

**Strategic Goals** — 5

**Planning and Action Progress** — 5

**Progress in Addressing West Virginia's Substance Abuse Issues** — 7

**Substance Abuse Strategic Action Plan Progress Update** — 12

**Recommendations of the Governor's Advisory Council on Substance Abuse** — 17

**Next Steps** — 19

**List of Attachments** — 19

A. *Governor's Executive Order* — 20
B. *Governor's Advisory Council on Substance Abuse Member List* — 28
C. *Map of Regional Substance Abuse Task Forces Meetings with Attendance Summary through Rounds 11* — 31
D. *Substance Abuse Task Forces Regional Recommendations dated October 2013* — 35
E. *Drug Take Back Locations* — 44
F. *SB 437 Implementation Updates dated November 2013* — 47
G. *Governor's Advisory Council on Substance Abuse – Member Report Comments* — 54





THE GOVERNOR'S

Progress and Recommendations Report
for Governor Earl Ray Tomblin

December 31, 2013

## REPORT GOAL
To provide the Governor with a progress update and recommendations for practical short-term and long-term solutions that address substance abuse in West Virginia.

## INTRODUCTION

According to the National Institutes of Health, the estimated total overall costs of substance abuse in the United States, including productivity and health- and crime-related costs, exceeds $600 billion annually. Approximately 7.2% of West Virginians over the age of 18 reported having a substance abuse problem in 2010-2011 (National Survey on Drug Use and Health). West Virginia is the 7th most rural state in the United States yet has the nation's highest rate of drug deaths, more than 9 out of 10 coming from prescription drugs, with drug overdoses as the leading cause of death in 2012 among those 45 years of age or younger, killing more West Virginians than car accidents.[1] While West Virginia has decreased the misuse of prescription drugs, the continued use and abuse of other substances including alcohol continue to create societal problems with an increasing cost burden to the State.

### SUBSTANCE ABUSE AFFECTS FAMILIES
Generations of West Virginia children face uncertain futures due to perinatal substance use and lack of family support due to parental use resulting in increased numbers of out of home placements. Neonatal abstinence syndrome (NAS), a postnatal drug withdrawal syndrome that is primarily caused by maternal opioid use, has been on the rise nationwide as well as in West Virginia, and is characterized by an increased incidence of seizures, respiratory symptoms, feeding difficulties, and low birth weight. Current 2013 data collected by individual birthing facilities range from 30-80% exposure rates. The Marshall University Medical Center Department of Obstetrics & Gynecology reported 28 NAS births per 1000 in their facility in 2009 and 80 per 1000 in 2012. In 2012, substance abuse was identified as contributing to abuse in 29.9% of West Virginia Coalition Against Domestic Violence cases.

### SUBSTANCE ABUSE IN THE WORKPLACE
The annual cost of substance abuse to society is estimated to be $510.8 billion dollars. Substance abuse can create or contribute to a variety of problems in the workplace, including injuries and fatalities, decreased worker productivity, and employee absenteeism. The 2011 National Survey on Drug Use and Health (NSDUH) revealed on a national level that 65.9% of those reporting past 30 day illicit drug use were employed full time. This translates to 8.4% of those employed full time using illicit drugs in the past 30 days. The survey results also show that 64.8% of those employed full time reported current alcohol use.

[1] Substance Abuse Prevention and Treatment Block Grant (SABG) and the Community Mental Health Services Block Grant (MHBG) for Fiscal Year 2014. http://www.dhhr.wv.gov/bhhf/resources/Documents/Block%20Grant%20-%20Combined%20SA.MH%20FY14%20Application%20FINAL%209.3.13.pdf



### CURRENT WORKFORCE

In a state with a population of nearly two million people, lack of credentialed individuals and general staff shortage is far-reaching. In West Virginia that shortage includes physicians and nurses, child and adult psychiatrists, clinical psychologists, counselors, social workers and direct care staff. This demonstrates a significant gap between need and availability of qualified professionals. Over 50% (21) of the child psychiatrists in West Virginia practice in two of the State's most populous counties, and rural counties are often left without access to any child psychiatrists.



## GOVERNOR'S ACTION

The Governor's Advisory Council on Substance Abuse (GACSA) and the Regional Task Forces continue to execute the duties outlined in Executive Order No. 5-11 (Attachment A) created on September 6, 2011. The Council includes Cabinet level positions in the Department of Health and Human Resources, Department of Military Affairs and Public Safety, and the Department of Veterans Assistance; persons in leadership positions representing the State Police, Chiefs of Police, Sheriffs, Supreme Court, Schools, WorkForce West Virginia, Behavioral Health and Health Facilities; and experts from the fields of behavioral medicine, substance abuse prevention and treatment, the faith-based community, homelessness, domestic violence prevention, and a range of health professionals, among others. The complete list of the current GACSA membership may be found as Attachment B.



The Executive Order outlined the Council's duties to:
- provide guidance regarding implementation of the Statewide Substance Abuse Strategic Action Plan,
- identify planning opportunities with other interrelated systems to increase both public and private support concerning substance abuse initiatives,
- recommend a list of priorities for the improvement of the substance abuse continuum of care,
- receive input from local communities throughout West Virginia, and
- provide recommendations to the Governor to improve education, data needs, employment opportunities, communication, crime prevention, and other matters related to substance abuse.



Through Executive Order No. 5-11, Governor Tomblin also established six Regional Substance Abuse Task Forces covering West Virginia. The Regional Substance Abuse Task Force meetings are open to the public and have involved West Virginia citizens from a multitude of areas, including local elected officials, service providers, and the general public.

## STRATEGIC GOALS

In accordance with Executive Order No. 5-11, the West Virginia Statewide Substance Abuse Strategic Action Plan continues to be the framework used by each of the Regional Task Forces to discuss and identify priorities within the areas of substance abuse prevention, early intervention, treatment and recovery as these components of the continuum of care relate to data, workforce, access, and resource management.  This Strategic Action Plan was developed by the WV Bureau for Behavioral Health and Health Facilities with stakeholder input. The following are the overarching strategic goals for prevention, early intervention, treatment and recovery:

1. Assessment and Planning:  Implement an integrated approach for the collection, analysis, interpretation and use of data to inform planning, allocation and monitoring of the West Virginia substance abuse service delivery system (data).
2. Capacity:  Promote and maintain a competent and diverse workforce specializing in prevention, early identification, treatment and recovery of substance use disorders and promotion of mental health (workforce).
3. Implementation:  Increase access to effective substance abuse prevention, early identification, treatment and recovery management that is high quality and person-centered (access).
4. Sustainability:  Manage resources effectively by promoting further development of the West Virginia substance abuse service delivery system (resource management).

## PLANNING AND ACTION PROCESS

### GOVERNOR'S REGIONAL SUBSTANCE ABUSE TASK FORCES

Since the issuance of Executive Order No. 5-11 on September 6, 2011, the Governor's Regional Substance Abuse Task Forces have conducted 11 rounds of meetings in each of the six regions of the state (66 total meetings plus one statewide meeting).  A map of meeting locations can be found as Attachment C.

Each Regional Task Force continues to meet quarterly and receive updates from the WVDHHR Bureau for Behavioral Health and Health Facilities (BBHHF), reviews local needs, available data, and regional resources in order to identify service delivery gaps and priorities for addressing substance abuse issues in each area of the state. Previously the task forces collaborated in "action teams" organized around the continuum of care (prevention, early intervention, treatment, and recovery).  During Round 9 meetings, the task force members participated in a "town-hall" discussion in order to share information, experiences, program updates, successes, and challenges.  Rounds 10 and 11 meetings allowed task force members to receive updates and provide input on all four areas of the continuum as well as prioritize regional recommendations.  Staff from the BBHHF served as resources to the task forces to provide updated information regarding the strategic plan, funding opportunities, and program implementation.

To date, cumulative attendance at the Regional Task Forces (RTF) meetings has exceeded 2,750, and average attendance at the meetings held within each of the six regions has ranged between 30 and 54 persons.  Community members across West Virginia, representing law enforcement, corrections, courts, education, faith-based organizations, the medical community, the recovery community, comprehensive behavioral health providers, local community prevention coalitions, state, county, and local officials, and the general public have participated in the regional task force meetings.









In addition to mobilizing local communities to take action to prevent and treat substance abuse, each of the Regional Task Forces has identified priorities for programs and services needed in their respective area of the state that may require state level support and/or funding.

Areas that participants noted as continued unmet needs (both local and "bigger than us") include:

- School system involvement: Participants consistently felt that there is a need for getting schools more involved, including having more school-based counselors, social workers and Prevention Resource Officers (PROs) to address substance abuse issues; improving data collection and dissemination at the county level; WV Secondary School Activities Commission (SSAC) involvement; and better coordination between schools with local substance abuse programs.
- Faith-based involvement: Participants identified the need to better engage the faith-based community in all areas of the continuum.
- Transitional Housing: Participants acknowledged the success of current non-treatment recovery homes and re-entry housing but consistently identified the need for more transitional housing for those coming out of treatment or the correctional system as a cost-effective way to promote and sustain recovery.
- Employment & Workforce: Participants identified the need to work with and educate the business community and to involve it in drug education and employment for individuals post-treatment or after leaving the correctional system (re-entry), including felony forgiveness and alternative sentencing. They also identified the need for funding to hire more drug counselors/clinicians.
- Marketing & Outreach: Participants consistently identified the need for marketing and media campaigns for anti-drug awareness, as well as the need for communication and outreach for the programs and services that are currently available.
- Stigma: The issue of the stigma associated with persons with a history of substance abuse/addiction/mental health remains a problem for future employment/career and other opportunities.
- Transportation: The lack of available transportation was identified as a barrier across all areas.

Each regional task force has also submitted their specific recommendations to the Governor's Advisory Council on Substance Abuse for prioritization statewide – see Attachment D.

### GOVERNOR'S ADVISORY COUNCIL ON SUBSTANCE ABUSE

Since its formation by Executive Order in September 2011, the Governor's Advisory Council on Substance Abuse (GACSA) has met six times in order to assess resources and gaps in service provision, review progress

of the WV State Strategic Action Plan, and Regional Task Force initiatives and recommendations. Many of the GACSA members continue to attend and remain involved with the Regional Task Force meetings in order to hear firsthand the needs and grassroots efforts in their region. The GACSA members have also received updates from the Governor's Office, the BBHHF, and the Board of Pharmacy as well as received presentations on Medicaid Expansion and Implications for Behavioral Health, the Justice Reinvestment Act, and the Governor's Substance Abuse Collaborative.  In addition, via conference call, Dr. Keith Humphreys from Stanford University gave a brief presentation on "Freeing West Virginia from Meth Labs."  During meetings held in July and November 2013, the GACSA members reviewed the status of prior recommendations, as well as developed new recommendations for the coming year.  These recommendations are included at the end of this report.

## PROGRESS IN ADDRESSING WEST VIRGINIA'S SUBSTANCE ABUSE ISSUES

West Virginia has continued to make considerable progress combating substance abuse since September 2011. Implementation of the Senate Bill 437 and the Strategic Action Plan continues. Regions continue to develop new partnerships, and projects have been funded.  New initiatives addressing substance abuse have been developed, and new legislation has been passed.  (Prior year accomplishments can be found online in the GACSA 2012 report: *http://www.wvsubstancefree.org/docs/GACSA-Report-December-2012-FINAL.pdf.*)

### REGIONAL TASK FORCES ACCOMPLISHMENTS
The Substance Abuse Regional Task Forces (RTF) have continued to identify local problems and provide valuable insight into the diverse needs of communities to the GACSA and policymakers.  Participants report improvements in their region as well.  Drug Take Back sites are now located in every region (for a complete list of Drug Take Back sites see Attachment E).  Collaboration and coordination across systems – education, child protective services, law enforcement, corrections, mental health, and treatment – is improving. Prevention coalitions, evidence-based practice (EBP) programs, Screening, Brief Intervention, and Referral to Treatment (SBIRT), and Recovery Coaching are expanding as well.  Participants also report increased community and media awareness.  While progress is being made, RTF participants recommended expansion and consistency (including funding) of these successes to every county in their respective region.

Preceding the first Integrated Behavioral Health Conference hosted by the BBHHF, the GACSA and RTF members came together for a statewide meeting and celebration. On September 16, 2013, at the Charleston Marriott, each region showcased their efforts to date and developed new connections and networks.  Regional presentations included the following:

Region 1 Presentation:  *"Transformations – A Continuum of Change"*
Region 2 Presentation:  *"Putting the Pieces Together"*
Region 3 Presentation:  *"Hope - Tomorrow's Promise"*
Region 4 Presentation:  *"Working Together Toward a Healthier WV"*
Region 5 Presentation:   *"Answer the Call"*
Region 6 Presentation:   *"United Across the Continuum"*

These regional presentations can be viewed online at http://www.wvsubstancefree.org/IBHC-kickoff-event.php. The presentations were followed by a Walk for Wellness and Recovery and a Remembrance Ceremony at the State Capitol.









### LEGISLATIVE ACCOMPLISHMENTS AND UPDATES

Senate Bill 437 was signed into law by Governor Earl Ray Tomblin on March 29, 2012, and continues to be implemented based on established rules. Implementation progress is highlighted below with detailed SB437 implementation updates located in Attachment F.

- Physicians are accessing the Controlled Substance Monitoring Program database at patient intake, before administering, prescribing or distributing prescriptions.
- Rules to regulate Opioid Treatment Programs (OTP) have been finalized and implemented.
- Physicians are receiving required CME education on best prescribing practices.
- Pharmacists have received education on dispensing prescription buprenorphine.
- Education programs have been completed for pharmacies regarding electronically submitting certain information to the Multi State Real Time Tracking System (MSRTTS) administered by the National Association of Drug Diversion Investigators (NADDI).

### SUBSTANCE ABUSE RELATED BILLS PASSED IN 2013

- _Senate Concurrent Resolution 50_ - Requesting Joint Committee on Government and Finance study abuse deterrent formulations for opioid medications.
- _Senate Bill 108_ - Merging under the Office of the West Virginia Chief Medical Examiner, all of the existing Fatality and Mortality Review Teams (including teams which review the deaths involving children, domestic violence, and infants and women who die during pregnancy) into one team and adding a new review category of unintentional pharmaceutical drug overdose fatalities.
- _Senate Bill 265_ - Authorizing DHHR to promulgate legislative rules. The bill includes revisions to the regulation of opioid treatment programs, 69 CSR 7, including but not limited to issues related to increased license fees and inspection costs; required services; counseling; post-admission assessment; unsupervised take-home medications; counseling services and maintenance treatment; collection and testing; and pregnant patients.
- _Senate Bill 371_ - Relating to prison overcrowding. The bill includes, among other things, revisions related to deduction from offender prison sentences for good conduct; pretrial risk assessment; the development of a cognitive behavioral program to address the needs of inmates detained in a regional jail, but committed to the custody of the Commissioner of Corrections; sentencing alternatives, such as weekend jail programs and work programs; home incarceration procedures; adding the BBHHF as a member of the Community Corrections

Subcommittee; adding a person with a background in substance abuse treatment and services as a required member of Community Criminal Justice Boards; standardized risk and needs assessment and day report services; probation and parole eligibility and violations; permitting the Division of Corrections to employ or contract for a director of employment and a director of housing for released inmates; creation of a community supervision committee to share information for coordinated supervision; drug courts; development of qualifications for provider certification to deliver a continuum of care to offenders, fee reimbursement procedures, by the Division of Justice and Community Services, in consultation with the Governor's Advisory Committee on Substance Abuse; and finally, preparation of an annual report prepared by the Division of Justice and Community Services, in consultation with the Governor's Advisory Council on Substance Abuse.

- *House Concurrent Resolution 142* - Urging Congress to swiftly take bipartisan, concrete action to address the growing scourge of prescription drug abuse in West Virginia and other states.
- *House Concurrent Resolution 147* - Improving enforcement of drugged driving offenses.
- *House Bill 2513* - Requesting a study to consider a sentencing revision for DUI with death cases. The purpose of this bill is to improve enforcement of laws against drugged driving. The bill defines "drug" and provides that implied consent applies to testing for controlled substances or drugs upon arrest of a driver in this state. Among other things the bill requires the Bureau for Public Health to prescribe minimum levels of substance or drugs in order to be admissible; authorizes emergency rules; and, requires the Bureau for Public Health to review current methods and standards.

## FUNDING AWARDED

During the 2012 Legislative session, Governor Tomblin allocated $7.5 million for substance use prevention, early intervention, treatment, and recovery ($2.5 million for capital/startup funding, $5.0 million in ongoing funds). Announcements of Funding Availability (AFAs) have been developed and released. To date, funding appropriated by the West Virginia Legislature has been awarded to support the development of high priority services in areas of the state where such services were determined to be limited in availability or non-existent. Three additional Detoxification Stabilization Units (D-CSU), providing 18 new beds, have been awarded to serve the areas in and around Weirton, Lewisburg and Logan, West Virginia with construction underway and opening dates set tentatively for early 2014; one Non-Treatment Recovery Residence has been developed in Wheeling, West Virginia; six Screening, Brief Intervention and Referral to Treatment (SBIRT) sites have been funded across the state in Berkeley Springs, Elkins (2 sites), Logan, Lewisburg and Princeton, West Virginia; Eleven Recovery Coach positions have been added as part of a pilot effort and are currently serving the areas in and around Elkins, Morgantown, and Buckhannon, West Virginia; and one expanded intensive outpatient site was funded in the Elkins area. To further the earlier recommendations made by the GACSA to support expanded substance abuse/co-occurring services access, efforts have been underway within the BBHHF to review existing programs with limited outcomes and replace said programs with best practice and evidence-based models of care. Details of these programs and other initiatives follow.

The northern panhandle's D-CSU, being operated by Healthways, Inc., will be the first of its kind in the Brooke/Hancock counties area and will fill a significant gap that has existed in this region for many years. Also awarded in this region is funding for the YWCA of Wheeling to develop a Recovery Residence for women. This project, which opened its doors April 2013, provides housing for eight women in a safe, structured and substance-free environment while they attend substance use treatment services at a local treatment center while seeking gainful employment and stable, permanent housing.  A redistribution of Federal revenue funds has also made possible the award of three additional recovery residences to Oxford House, Inc.  These new sites will be located in various locations throughout the northern panhandle and will serve to establish a significant recovery housing network in this area.



Appalachian Community Health Center, located in Elkins, West Virginia was awarded funds to expand the agency's capacity to provide Intensive Outpatient Services. This treatment service expansion began its enrollment in June 2013, for adults experiencing substance use issues including those with co-occurring substance use and mental health disorders who are in need of more intensive treatment programming. Appalachian was also awarded a Screening, Brief Intervention, and Referral to Treatment (SBIRT) position with these appropriated funds, as well as one (1) full time Recovery Coach. These programs became operational in August 2013. All the program funding awarded to Appalachian Community Health Center has, for the first time, created a full continuum of care for substance use services within the Elkins area. Other awards in this region include a second SBIRT position to Youth Health Services, as well as the creation of eleven (11) new Recovery Coach positions throughout the region. Valley Healthcare, Inc., of Morgantown, currently has four (4) Recovery Coaches in three of their four county offices. Peer-operated organizations in the region, such as Upshur Cooperative Parish (Hall Neighbor's House and Opportunity House both located in Buckhannon) have hired the remaining positions to work within their recovery service programs. Located in the largest and most rural region of the State, these projects will provide the necessary linkage for the individuals in these communities to readily access the services they need.



One of the three Detoxification Stabilization Units (D-CSU) was awarded to Prestera Center for Mental Health Services, Inc. and will operate in Logan County, West Virginia. This facility will offer services in this community that currently can only be accessed over 50 miles away in Charleston. Prestera Center was also awarded an SBIRT position that will be used to provide early intervention services in identified Logan County schools. In addition to the newly appropriated State funding, other State and Federal revenues were also redistributed in this area for Promotion, Wellness, and Recovery programming, Regional Youth Services, and Recovery Residences. These programs are slated to begin in January 2014. Prestera Center will partner with Logan Mingo Area Mental Health in serving as the region's Youth Service Center, ensuring seamless substance use services for youth ages 12-24. Prestera Center will also operate a 16-bed Promotion, Wellness and Recovery program that will serve as a peer-operated facility, offering 24-hour physical and behavioral health screening and recovery services to other peers in the community. The region will also benefit immensely from an expansion of its Recovery Residence network with the award of four facilities, increasing regional bed capacity by 30 additional beds. Providers include: Prestera Center – to open a new residence in Mason County; Rea of Hope in Charleston; The Healing Place of Huntington – to expand their facility in Cabell County; and Logan-Mingo Area Mental Health – to open a new residence in Mingo County.





Continued efforts for the expansion of statewide substance abuse services access include an additional Detoxification Stabilization Unit (D-CSU) that was awarded to and will be operated by Seneca Health Services, Inc. in Lewisburg, West Virginia. Like the other D-CSUs, this facility will fill a significant gap in the current continuum of substance use treatment services available in Greenbrier County and surrounding areas. Other projects awarded include two SBIRT sites.  Effective August 2013, Seneca Health Services, Inc. has partnered with the Robert C. Byrd Clinic in Lewisburg to provide this service. Southern Highlands Community Health Center operates the second SBIRT project in Welch. Like many of the other regions, the Southern region has been awarded Federal funds, redistributed for the expansion of substance use projects in this area.  FMRS Health Systems, Inc. will partner with two sister comprehensive centers in the region (Seneca Health Services and Southern Highlands) to create the region's Youth Service Center. There has been an increase in available recovery housing in this region with funding for three Recovery Residences.  Providers include Oakhurst Outreach, Inc. – to open a new residence for women in Greenbrier County; Southern West Virginia Fellowship Home in Beckley; and Mercer County Fellowship Home in Bluefield. Both the youth service project and recovery residences will begin providing services in early 2014.

The eastern panhandle also received an award from the appropriated funds for a Screening, Brief Intervention, and Referral to Treatment (SBIRT) position in Berkeley Springs. The Morgan County Partnership also began offering SBIRT services to youth in this area in August 2013, and Shenandoah Community Health has initiated an early intervention, treatment and recovery program for women who are addicted and pregnant to address the need for this critical service. Collectively, program development has increased service capacity within the service continuum in this region.

Efforts to fund additional programming with new or expanded service capacity that supports West Virginia communities statewide will continue.

## NEW PARTNERSHIP INITIATIVES

### Governor's Substance Abuse Collaborative

This Substance Abuse Collaborative is chaired by Secretary Kay Goodwin. Collaborative membership is comprised of various state department leaders, providers, and others, and intersects with the GACSA membership. The Collaborative focuses on issues such as a establishing a one-stop shop in the system of care and the need for and design of a substance abuse/behavioral health hotline.

### WV Interagency Council on Homelessness (WVICH)

Data from the latest West Virginia Coalition to End Homelessness Point in Time Count and Housing Inventory indicates that in 2013, chronic substance abuse among people experiencing homelessness has increased by 40% over the last year among the unsheltered population and by 33% among the sheltered population. On November 21, 2013, Governor Earl Ray Tomblin issued Executive Order No. 9-13 transferring the Interagency Council on Homelessness (WVICH) from the Office of Economic Opportunity to the BBHHF. The WVICH will, in accordance with the Executive Order, serve as a statewide homelessness planning and policy development resource for the Governor and the State of West Virginia. The Council will develop and implement a plan to prevent and end homelessness in the State.  This plan will include evidence-based improvements to programs and policies to ensure services and housing are provided in an efficient, cost effective, and productive manner. The Council will also develop recommendations and strategies, oversee the implementation of the plan to ensure accountability and consistent results, as well as identify and maximize the leveraging of resources to improve the system of services for people who are homeless or at risk of becoming homeless. Substance abuse and homelessness are inextricably intertwined for many individuals - substance use is often both a precipitating factor and a consequence of being homeless. The Council, in close collaboration with the GACSA will consider substance abuse and homelessness in the development of the State Plan to End Homelessness.



## SUBSTANCE ABUSE STRATEGIC ACTION PLAN PROGRESS UPDATE

Through the GACSA and RTF process, the WV Bureau for Behavioral Health and Health Facilities has been able to align needs and work occurring in West Virginia communities. Communication has continued to be strengthened and the GACSA members and RTF participants have been provided quality data to better inform priorities and decision making. In addition, tremendous progress continues to be made pertaining to the Strategic Action Plan. These accomplishments follow.



### SIGNIFICANT ACCOMPLISHMENTS

- Experienced first decrease in Prescription Drug Abuse since 2008, (SB437 passage and Community Based Prevention Services in all 55 Counties are contributing factors).
- Staff continues to provide technical assistance and training on best practice and current trends in substance abuse at national, state and community levels.
- Participated on Substance Abuse Round Tables with Senator Rockefeller and Congressman Rahall.
- Partnered with the Montana State University with financial support from SAMHSA to provide training and support to McDowell and Wyoming Counties to increase positive community norms.
- Facilitated, provided data and content information for 11 rounds of Governor's Regional Task Force and 6 Governor's Advisory Council on Substance Abuse meetings in 6 regions nearing 3,000 participants resulting in recommendations made to the Governor and significant substance abuse-related legislation passed. This is documented at www.wvsubstancefree.org.
- Facilitated 6 Regional Workforce Roundtables to determine current resources and drug-free work culture and provide education to top employers from across West Virginia.



- Partnered with WV Department of Education in the development and implementation of the 2nd round of a single state multi-domain school survey to collect county level data.
- Partnered with West Virginia State Police for Synar and FDA to prevent youth access to tobacco meeting all benchmarks that continue to support federal block grant funds.
- Conducted key informant interviews and surveys to complete assessment on West Virginia Youth Behavioral Health needs to inform the restructuring of adolescent funds to build a quality and coordinated network of youth services statewide.
- Researched Public Inebriate funding and utilized data for determining the restructuring of funds for engagement and wellness centers promoting early assessment and increasing readiness for treatment.

- Aligned West Virginia standards with national standards involving recovery residences to promote consistency and best practice statewide.
- Convened meetings of the West Virginia State Epidemiological Outcomes Workgroup adding 5 additional state agency epidemiologists and completed State, Regional and County Data Profiles.
- Continued partnership with Public Health and the West Virginia Department of Education to support "whole health" wellness initiatives in schools and communities across West Virginia.
- Provided funding for 3 VetCorps members in partnership with Community Anti-Drug Coalitions of America (CADCA) and the Corporation for National and Community Service (CNCS) to engage service members, veterans and families in behavioral health services in 3 identified counties with high numbers of returning veterans.
- Expanded SBIRT services to include face to face and web-based trainings in regional jails, West Virginia schools and hospitals.
- Updated DUI Standards in accordance with current law and converting to a paperless system and working with DMV to create a joint data base for all DUI Safety and Treatment Reporting.
- Partnered with the Office of Maternal Child and Family Health, Benedum Foundation and West Virginia Perinatal Partnership to begin program implementation for the *Moms and Babies Programs* in South Charleston, Lewisburg, Morgantown, Martinsburg and Berkeley Springs with an additional research program at CAMC regarding alcohol exposure on the developing fetus. (Program components include: SBIRT, Physical Screening, Behavioral Health and Health Treatment during pregnancy, Recovery Coach Support and Connections with Home Visiting Programs and follow-up).
- Applied for 3 SAMHSA grant opportunities: SBIRT in Family Planning Clinics, Strategic Prevention Framework-Partnerships for Success and Adolescent Treatment.
- Received the Strategic Prevention Framework Partnerships for Success Funding.
- Expansion of Peer/Recovery Network through training and certification processes including the integration of faith based organizations as recovery support institutions.

### SYSTEM AND INFRASTRUCTURE DEVELOPMENT

Infrastructure development, integrated planning and partnership expansion have been cited as key successes resulting in the BBHHF's ability to: make better data informed decisions for allocation and monitoring of the behavioral health system; improve the quality of service provision by educating providers, key stakeholders and communities; and, incorporate the consumer voice in the planning, implementation and evaluation of services.

Partnership funding was awarded to six regional **prevention** agencies, smaller nonprofit organizations, schools and other state agencies to decrease substance use and promote mental health and wellness, through the building of effective coalitions and implementing evidence based services in 55 counties. Current data-driven prevention priorities include: Stigma Reduction, Prescription Drug Abuse, Under-age Drinking, Physician Engagement, Drug Exposed Pregnancy, Suicide, and Bullying.

In addition to providing prevention/promotion services, the BBHHF provides funding and technical assistance for behavioral health **early intervention**, treatment and peer and recovery support services in West Virginia. Early intervention supported programs include the SBIRT, West Virginia Teen Courts, West Virginia Juvenile Drug Courts and Adolescent Screening, and Consumer and Family Outreach and Engagement Services. Communities have access to Prescription Drug, Problem Gamblers, and Suicide Prevention phone lines that offer education, brief intervention and referral to treatment.



The BBHHF continues to support a continuum of **treatment and recovery** and peer support service opportunities that include: outpatient, intensive support, medication-assisted treatment, out-of-home residential, habilitation, and community support services, including recovery residences. **Priority populations** identified and served include IV drug users, people who are homeless, pregnant women, women with dependent children, transitioning youth and young adults, and military service members, veterans and their families.



The BBHHF partners with the Bureau for Medical Services (BMS) and the Office of Health Facility Licensure and Certification (OHFLAC) in providing oversight for public and private programs that provide medication assisted treatment. In West Virginia, BMS approved State Medicaid reimbursement for Suboxone treatment effective January 2006. Vivitrol, a time released injection of Naltrexone received State Medicaid reimbursement approval in early 2011. In August 2011, the BMS issued a new Subutex/Suboxone/Vivitrol Policy that mandates adequate therapy services, strict documentation requirements, drug screening requirements, and treatment guidelines. Legislation providing increased **coordination and oversight and further regulation of Opioid Treatment Programs** (OTP) became effective October 2013. The State Opioid Treatment Authority is housed within the BBHHF Programs' Substance Abuse Division and will be partnering with OHFLAC and BMS to provide quarterly summaries to the Legislative House Committee on Health and Human Resources regarding oversight and rule implementation.



Telehealth is becoming an integral service modality in coordination with traditional service programming in West Virginia. Web-based resource and service identification as well as trainings, meetings and conferences are all essential due to the rural configuration of the State, and transportation, workforce, and access issues. The BBHHF continues to collaborate with the State Medicaid Authority on receiving approval to expand the use of **telemedicine** based on model policies developed by the American Psychiatric Association. West Virginia providers currently utilize technology based services for aftercare interventions, peer support reminders, Assertive Community Treatment team meetings, psychiatric evaluations (when testifying as expert witnesses for the purpose of commitment hearings), some assessments, and medication assisted treatment groups. Substance abuse program staff have been trained as **national trainers in the implementation and expansion of telehealth practices** and programs and have provided training for behavioral health providers statewide. The BBHHF **website** is currently being improved to better accommodate consumers and families, in



addition to linking communities and providers with services and resources, http://www.dhhr.wv.gov/bhhf. An additional website has been created specifically for the Governor's substance abuse initiatives in partnership with the BBHHF, http://www.wvsubstancefree.org/.

## SIGNIFICANT PARTNERSHIPS

West Virginia's first **Integrated Behavioral Health Conference** was held on September 17-19, 2013, at the Charleston Civic Center. The West Virginia Bureau for Behavioral Health and Health Facilities, a division of DHHR, and 29 partners organized the continuing education conference for members of the behavioral health community across the state and nation. With over 750 individuals from 26 different states, attendees were provided the opportunity to engage with other members of the behavioral health community, create partnerships, and earn Continuing Education Credits (CEUs). Nationally- and locally-recognized presenters explored current trends in integrated health care, clinical supervision, and evidence-based practices to increase engagement and outcomes. Participants had the opportunity to choose from nearly 100 plenary and workshop sessions with topics that included: drug diversion, integration and collaborative care, inclusion, evidence-based programs and practices, stigma reduction and behavioral health awareness and person- and family-centered practices.

The BBHHF partnered with West Virginia University, the State Medical Association and the WV Physicians Health Program by providing funding for **physician education** materials development and implementation of the first Appalachian Addiction & Prescription Drug Abuse Conference held on September 20-21, 2013 at the Embassy Suites in Charleston. Conference topics included best practice for prescribers (understanding SB 437), integrated health and understanding the addicted population.

West Virginia participated in a bipartisan and inter-governmental effort to reduce prison growth and prevent crime using a data-driven "**justice reinvestment**" approach. A comprehensive analysis of the criminal justice system was conducted by the Council of State Governments Justice Center, establishing a working group of legislative leaders from across the political spectrum, top court officials, state agency directors, and criminal justice stakeholders to review trends in the state's criminal justice system and develop policy options. The approach resulted in the passage of SB371, the Governor's Prison Overcrowding bill, during the 2013 Legislative Session. The BBHHF participates at multiple levels within this initiative and has provided technical clinical support, planning and program advisement.

The BBHHF partners with the **West Virginia Governor's Highways Safety Program** on two important initiatives that promote healthy school and campus environments for youth. The **WV Collegiate Initiative to Address High Risk Alcohol Use (WVCIA)** proactively addresses collegiate alcohol, other drug, and associated violence issues through the use of evidence based strategies, in order to promote healthy campus environments through self-regulatory initiatives, information dissemination, public policy influence, cooperation with prevention partners, and technical assistance. Members include representatives of the state's campuses, agencies, and communities who encourage and enhance local, state, regional, and national initiatives through a commitment to shared standards for policy development, educational strategies, enforcement, evaluation, and community collaboration. For more than 27 years, **Students Against Destructive Decisions (SADD)** has been committed to empowering young people to lead education and prevention initiatives within their schools and communities. West Virginia's 150 SADD Chapters highlight prevention of many destructive behaviors and attitudes that are harmful to young people, including underage drinking, substance abuse, impaired driving, teen violence and suicide. West Virginia projects include peer-led classes and theme-focused forums, conferences and the provision of evidenced-based prevention education, leadership training, and legislative advocacy.



West Virginia has taken steps to **integrate behavioral health and primary care.** Ten of the State's 28 Federally Qualified Health Centers (FQHCs) now employ a behavioral health provider. These health centers offer behavioral health services coordinated with medical services. Because these healthcare teams are able to simultaneously treat healthcare and behavioral health issues earlier, better healthcare outcomes can be achieved. Three of the State's largest CBHCs offer coordinated primary health care services in a community mental health setting and share behavioral health staff with rural primary care centers through co-location and integration agreements.



The federally funded West Virginia **Screening, Brief Intervention and Referral to Treatment (SBIRT)** project is an excellent example of integrating behavioral health with other systems. Since 2009, the SBIRT project has: established services in 58 sites; screened over 194,551 individuals, with 31,128 positive screenings; and provided 14,187 brief interventions, 534 brief treatments and 1,036 referrals to treatment. Current venues include primary care, trauma centers, hospital emergency departments, school based health centers, workforce development centers, health departments, colleges/universities, obstetric practices, community behavioral health centers, regional jails and free clinics. More recently, SBIRT training was provided for direct line staff and supervisors at county senior service centers. Furthermore, drug diversion training for nurses, as mandated in Senate Bill 437, includes education on screening, brief intervention and referral to treatment.



### FOCUS ON PRIORITY POPULATIONS

Community program examples of reaching diverse and priority populations include the partnership with the SAMHSA, CADCA and local providers to provide match funding for 3 **VETCORPS** positions, working in coordination with prevention organizations to provide outreach to service members, veterans and their families in Regions 2, 5 & 6. A **health literacy** program was piloted in Region 4 to distribute family health information workbooks to service members, veterans and their families. The BBHHF also provided funding to the Partnership of African American Churches to **increase minority and faith-based representation** in regional planning, training Recovery Coaches, and implementing targeted minority youth programming statewide.



Additionally, the BBHHF continues to participate in a 3-year public/private partnership with the Bureau for Maternal Child and Family Health, WV Community Voices (WV Perinatal Partnership) and the Benedum Foundation to support OBGYN practices/hospitals in providing early intervention and recovery supports to pregnant women **to decrease the incidence of drug exposed babies**. The Substance

Abuse Director works in coordination with the Office of the Governor in partnership with Ohio, Kentucky and Tennessee to expand the capacity and coordination of effort in Appalachian States in addressing prescription drug abuse and strengthening initiatives that provides research and early intervention with substance use in pregnancy. The Substance Abuse Director participates on the WV Perinatal Partnership Substance Use in Pregnancy Committee and also facilitates a work group (Substance Use in Pregnancy), a **Three Branch Initiative** of the Secretary of the West Virginia Department of Health and Human Resources in reducing the incidence of drug addicted infants placed in out-of-home care.

## RECOMMENDATIONS OF THE GOVERNOR'S ADVISORY COUNCIL ON SUBSTANCE ABUSE

During the November 2013 meeting, the Council reviewed updated recommendations from the Regional Task Forces. The Council received a status report on funds awarded for substance abuse services and remaining funding.  Progress reports and information related to other key issues were also presented at the November 2013 Council meeting including:

- Emerging legislative/policy related issues
- Emerging priorities and issues identified by the Regional Task Forces
- Status of SB 437 implementation
- Justice Reinvestment Act
- Appalachian Addictions Conference
- Integrated Behavioral Health Conference
- "Freeing West Virginia from Meth Labs" presentation by Dr. Keith Humphreys from Stanford University, via conference call

Pursuant to the Council's duties as outlined by Executive Order No. 5-11, the Governor's Advisory Council on Substance Abuse reviewed the Regional Task Forces priorities and recommendations submitted for consideration and prioritized recommendations at the state level. The council developed recommendations for public policy action to address substance abuse related issues in West Virginia.

### PROCESS
The GACSA members reviewed Regional Task Force recommendations according to the continuum (prevention, early intervention, treatment, and recovery) and by region. Members also reviewed prior recommendations put forth by the GACSA members during the July 2013 meeting.

- Council members reviewed and discussed all recommendations prior to voting; members discussed each recommendation individually, and by consensus, either kept the recommendation as is, revised recommendation language, or removed the recommendation from voting group.
- Each member had one vote for each area of the continuum – prevention, early intervention, treatment, recovery, and overarching.  Once each recommendation was reviewed and discussed, the members were asked to vote using an anonymous clicker to select their number one priority for each category of recommendations.
- After each set of recommendations in the continuum were voted upon, GACSA members unanimously decided on how many recommendations in each group would be included (based on breakout of votes): *Prevention* – top 2 recommendations, *Early Intervention* – top 3 recommendations, *Treatment* – top 1 recommendation, *Recovery* – top 2 recommendations, *Overarching* – top 5 recommendations.



### RECOMMENDATIONS

Following are the recommendations put forth by the Governor's Advisory Council on Substance Abuse during their November 2013 meeting:

Prevention:

- **Sudafed RX** – pass legislation to require that pseudoephedrine require a prescription from a medical doctor or practitioner
- **Expand Education and Outreach** – Develop marketing campaign/media blitz to promote prevention programs, increased community awareness, changing societal norms that pills "fix" problems

Early Intervention:



- **Expand SBIRT: Train physicians, case workers, social services on SBIRT, expand funding source**, expand SBIRT to **school**-based settings
- **Engage the School System to maintain funding for Prevention Resource Officers (PRO) in schools and/or increase number of school-based counselors, social workers trained in SA**
- **User Fee (beer, liquor, tobacco products)** – pass legislation to add a User Fee to beer, liquor, and tobacco products

Treatment:

- **Develop and expand outpatient and residential treatment options that are adequate and accessible** – for all populations to reduce waiting lists for treatment

Recovery:

- **Whole family programs** – develop non-treatment recovery homes that can serve the entire family
- **Develop system/process for removing barriers to obtaining housing/employment following treatment (Life after recovery)**

Overarching:

- Develop additional **Women, children, and families residential and transitional/non-treatment recovery homes.**
- **Oppose legislation supporting medical marijuana and/or legalization of marijuana utilizing education.**
- **Expand treatment options** – e.g. mobile and crisis units, outpatient, residential
- **Expand Education & Outreach to – Educate parents, legislators, and the community at large regarding "new" drugs, addiction, Rx disposal, healing and stress, underage drinking, other early intervention strategies, etc.**
- **User Fee** – pass legislation to add a User Fee to beer, liquor, and tobacco products



## NEXT STEPS

Per Executive Order No. 5-11, the Governor's Advisory Council will submit this Progress Report and Recommendations to the Office of the Governor no later than December 31, 2013. In early 2014, the Governor's Substance Abuse Regional Task Forces will begin their twelfth round of meetings. The goals of these meetings will be to continue regional projects and expand network connections and increase sectors of people working to address substance abuse issues. The thirteenth round of Regional Task Force meetings is slated for May 2014 and will continue on a quarterly basis. Regional Task Forces updates will be provided to the Governor's Advisory Council on Substance Abuse for review. The Governor's Advisory Council on Substance Abuse plans to meet in early 2014. The WV Bureau for Behavioral Health and Health Facilities will continue to update the Comprehensive Substance Abuse Strategic Action Plan based on current recommendations. A current Plan can be found online at http://www.dhhr.wv.gov/bhhf/sections/programs/ ProgramsPartnerships/AlcoholismandDrugAbuse/Documents/strategicactionplan-info.pdf

## List of Attachments

A.  Governor's Executive Order

B.  Governor's Advisory Council on Substance Abuse Member List

C.  Map of Regional Substance Abuse Task Forces Meetings with Attendance Summary through Rounds 11

D.  Substance Abuse Task Forces Regional Recommendations dated October 2013

E.  Drug Take Back Locations

F.  SB 437 Implementation Updates dated November 2013

G.  Governor's Advisory Council on Substance Abuse – Member Report Comments

# STATE OF WEST VIRGINIA
## EXECUTIVE DEPARTMENT
## AT CHARLESTON
# EXECUTIVE ORDER NO. 5-11
## By the Governor

**WHEREAS,** by 2020, according to the World Health Organization (WHO), behavioral health disorders will surpass all physical diseases as a major cause of disability worldwide; and

**WHEREAS,** every segment of our society is affected by substance abuse and the consequences of substance abuse hamper our ability to create a healthy, educated and globally-competitive workforce that contributes to the economic vitality and community development of our State; and

**WHEREAS,** substance abuse among our citizens demands our care and attention to educate and treat the more than 152,000 West Virginians who are in need of substance abuse treatment services at any given time; and

**WHEREAS,** West Virginia is blessed with a talented workforce, yet substance abuse threatens our national reputation for having one of the lowest turnover and highest productivity rates in the nation; moreover, the impact of worker absenteeism and the costs associated with disqualifications of potential employees failing drug screenings hamper State businesses with increased recruitment costs and stifles economic output in West Virginia; and

**WHEREAS,** evidence of how substance abuse negatively impacts our State is substantiated by deterioration of community and family relations; an increase in crime by both youth and adults; overpopulation of correctional facilities and psychiatric facilities; increased incidents of domestic violence, child neglect and child maltreatment; illicit

drug use by expectant mothers in alarming proportions; significantly increasing health costs; decreased educational opportunities; and higher student drop-out rates; and

**WHEREAS,** behavioral health research has demonstrated that substance abuse prevention works, drug treatment is effective and people do recover from mental and substance use disorders; and

**WHEREAS,** involvement at the local level is critical to formulating policies that address substance abuse regionally and throughout West Virginia and, as a result, the efforts to defeat the crisis of substance abuse in West Virginia demand that the voice and input of local communities be heard and a multi-faceted and collaborative approach be used in order to address the unique problems that each region of this State faces; and

**WHEREAS,** the West Virginia Partnership to Promote Community Well-Being (the "Partnership") was created by Executive Order No. 8-04 to improve and establish priorities for the substance abuse prevention system and, in so doing, created a vision supporting the development of a statewide prevention infrastructure; and

**WHEREAS,** data-driven planning and comprehensive evidence-based strategies must govern and guide efforts that will positively impact the substance abuse issues facing West Virginians; and

**WHEREAS,** a Statewide Substance Abuse Strategic Action Plan was developed to meet the federal block grant requirement for federal substance abuse funding by the Substance Abuse and Mental Health Service Administration, and will be utilized as a framework for discussions on how to combat substance abuse on the local and State level.

**NOW, THEREFORE, I, EARL RAY TOMBLIN**, pursuant to the authority vested in the Governor of West Virginia, do hereby **ORDER** that:

1.     Executive Order No. 8-04 establishing the West Virginia Partnership to Promote Community Well-Being is hereby rescinded and the Partnership is replaced by the Governor's Advisory Council on Substance Abuse (the "Advisory Council").

2.     The Advisory Council shall consist of the following persons set forth in this Executive Order who shall serve at the will and pleasure of the Governor.  The following persons may not designate individuals to serve in their place without the express consent of the Governor.

3.     Members of the Advisory Council shall be persons who have education, experience or special interests regarding substance abuse prevention, early intervention, treatment and recovery, as follows:

      (a)     The Secretary of the West Virginia Department of Health and Human Resources;

      (b)     The Secretary of the West Virginia Department of Military Affairs and Public Safety;

      (c)     The Secretary of the West Virginia Department of Veterans Assistance;

      (d)     The Superintendent of the West Virginia State Police;

      (e)     The President of the West Virginia Chiefs of Police Association;

      (f)     The President of the West Virginia Sheriffs' Association;

      (g)     The Administrative Director for the West Virginia Supreme Court of Appeals;

      (h)     The State Superintendent of Schools;

      (i)     The Executive Director of WorkForce West Virginia;

      (j)     The Commissioner of the Bureau for Behavioral Health and Health Facilities, West Virginia Department of Health and Human Resources;

(k)      Nineteen (19) members who shall serve at the will and pleasure of the Governor and shall be appointed by the Governor, as follows:

(1)      One (1) representative experienced in behavioral medicine and psychiatry;

(2)      One (1) representative experienced in substance abuse prevention;

(3)      One (1) representative from the faith-based community;

(4)      Two (2) representatives from the West Virginia Behavioral Health Providers Association;

(5)      One (1) representative from the West Virginia Association of Alcoholism and Drug Counselors, Inc.;

(6)      One (1) representative from the West Virginia Coalition Against Domestic Violence;

(7)      One (1) representative from the Coalition to End Homelessness, Inc.;

(8)      One (1) representative with experience as a director of an inpatient residential long-term treatment facility;

(9)      One (1) representative with experience as a medical director for a neonatal intensive care unit;

(10)     One (1) representative who is a licensed physician with a specialty in child and adolescent psychiatry;

(11)     One (1) representative with experience in public health;

(12)     One (1) representative with experience as a clinical practitioner in drug diversion;

(13)     One (1) representative from the West Virginia Municipal League;

(14)     One (1) representative of the West Virginia Prosecuting Attorneys Association;

(15)     One (1) citizen member;

(16)     One (1) representative from the West Virginia Board of Medicine;

(17)     One (1) representative from the West Virginia Board of Pharmacy;

(18)     One (1) representative from the West Virginia Board of Dental Examiners; and

(l)     Such additional members as the Governor, at his discretion, may from time to time appoint.

4.     A chairperson of the Advisory Council shall be designated by the Governor.

5.     The Advisory Council shall hold its first meeting within forty-five (45) days of the date of this Order.

6.     The Advisory Council may create sub-committees and shall establish its own by-laws, including rules of procedure for all meetings of the Advisory Council and for any sub-committees created by the Advisory Council, to ensure that all meetings remain accessible to the public and adhere to the State's Open Governmental Proceedings Act.

7.     The Advisory Council shall have the following duties:

(a) Provide guidance regarding the implementation of the approved Statewide Substance Abuse Strategic Action Plan for the improvement of the statewide substance abuse continuum of care;

(b) Identify planning opportunities with other interrelated systems to increase both public and private support concerning substance abuse initiatives;

(c) Recommend a list of priorities for the improvement of the substance abuse continuum of care;

(d) Receive input from local communities throughout West Virginia;

(e) Provide recommendations to the Governor regarding improvements to the following:

(1) Enhancing substance abuse education, including proper prescribing methods in programs of study and continuing education for health care providers, assessment, intervention, prevention and treatment;

(2) Enhancing opportunities to collect and utilize data and facilitating data sharing between entities, including Prescriptions Monitoring Program data to ensure that

the public is made aware of the magnitude of the prescription drug problem, to assist physicians and pharmacists with identifying individuals who obtain prescriptions from multiple providers, and to alert State licensing boards and law enforcement where insufficient prescribing practices are occurring;

(3) Enhancing employment opportunities, training and retention as they relate to substance abuse;

(4) Enhancing communication between federal, State and local partners to align resources;

(5) Enhancing crime prevention and deterrence methods as they relate to substance abuse; and

(6) Any other matters related to substance abuse the Advisory Council may discover.

8. The Advisory Council shall perform such other acts as are necessary and proper to carry out the aforementioned purposes.

9. The Advisory Council shall receive staff support and consultation from the West Virginia Department of Health and Human Resources and shall serve as the substance abuse planning body supporting federal block grant and State substance abuse initiatives.

10. The Advisory Council shall work in coordination with the West Virginia Department of Health and Human Resources to prepare a report of its findings and recommendations to the Governor prior to the first day of each calendar year.

11. In order to assist the Advisory Council, there are also hereby created six (6) Regional Substance Abuse Task Forces whose purpose is to provide the Advisory Council with recommendations for additional support for substance abuse services and programs, realignment or additional funding strategies, advocate for legislative action, and recommend other initiatives to support the overarching goals set forth in the Statewide Substance Abuse Strategic Action Plan.

12.    The Regional Substance Abuse Task Forces shall be established by the Department of Health and Human Resources, and may be reconfigured periodically, in a manner utilizing existing comprehensive behavioral health providers, geographic and socioeconomic boundaries and common interests among all service areas of the State.

13.    The West Virginia Department of Health and Human Resources shall assist with the organization of each Regional Substance Abuse Task Force, arrange for and staff all Task Force meetings and ensure that all information and recommendations generated by each local Task Force is provided to the Advisory Council for consideration and inclusion in the Advisory Council's annual report.

14.    Each Regional Substance Abuse Task Force may be comprised of representatives from local, county and state law enforcement; federal law enforcement; community corrections; courts and prosecutors; education; churches and faith-based organizations; the medical community; the recovery community; comprehensive behavioral health providers; local community prevention coalitions; state, county and local officials; and the public at-large.

15.    The Regional Substance Abuse Task Forces shall hold their initial meetings within forty-five (45) days of the date of this Order.

16.    The Regional Substance Abuse Task Forces shall prepare and submit their first reports to the Advisory Council summarizing regional needs and proposed implementation strategies within ninety (90) days of the date of this Order.

**IN WITNESS WHEREOF,** I have hereunto set my hand and caused the Great Seal of the State of West Virginia to be affixed.



**DONE** at the Capitol, in the City of Charleston, State of West Virginia, this the sixth day of September, in the year of our Lord, Two Thousand Eleven, and in the One Hundred Forty-Ninth year of the State.

_____
**GOVERNOR**

By the Governor

_____
**SECRETARY OF STATE**

**ATTACHMENT B**



# Advisory Council Membership

David Bott
Coalition to End Homelessness
Monongalia County / Region 4
Executive Order No. 5-11: Representative from the
Coalition to End Homelessness, Inc.

Karen Bowling
Cabinet Secretary
WV Department of Health & Human Resources
Kanawha County / Region 5
Executive Order No. 5-11: The Secretary of the West
Virginia Department of Health and Human Resources

Steve Canterbury
Administrative Director
WV Supreme Court of Appeals
Kanawha County / Region 5
Executive Order No. 5-11: The Administrative
Director for the West Virginia Supreme Court of
Appeals

Honorable Chris Chiles
Prosecuting Attorney
Cabell County
Cabell County / Region 5
Executive Order No. 5-11: Representative of the
West Virginia Prosecuting Attorneys Assocation

Mark Drennan
Executive Director
WV Behavioral Health Care Providers
Cabell County / Region 5
Executive Order No. 5-11: Representative from the
West Virginia Behavioral Health Providers
Association

Dr. Alan Ducatman
Chair, Department of Community Medicine
West Virginia University
Monongalia County / Region 4
Executive Order No. 5-11: Additional Member

Dr. Edward Eckley
Member
Board of Dental Examiners
Raleigh County / Region 6
Executive Order No. 5-11: Representative from the
West Virginia Board of Dental Examiners

Dr. Ahmed Faheem
Representative
Comprehensive Behavioral Health Commission
Raleigh County / Region 6
Executive Order No. 5-11: Representative
experienced in behavioral medicine and psychiatry

Russell Fry
Acting Secretary
WorkForce West Virginia
Kanawha County / Region 5
Executive Order No. 5-11: The Executive Director of
Workforce West Virginia

Dr. Brad Hall
Executive Medical Director
WV Medical Professionals Health Program
Harrison County / Region 4
Executive Order No. 5-11: Additional Member

Dr. M. Khalid Hasan
Member, WV Board of Medicine
WVU School of Medicine - Clinical Professor, Dept of
Behavioral Medicine & Psychiatry
Raleigh County / Region 6
Executive Order No. 5-11: Representative from the
West Virginia Board of Medicine

Randy Housh
President
WV Association of Alcoholism & Drug Abuse
Counselors, Inc.
Nicholas County / Region 6
Executive Order No. 5-11: Representative from the
West Virginia Association of Alcoholism and Drug
Counselors, Inc.

Vickie Jones
Commissioner
Bureau for Behavioral Health & Health Facilities -
WVDHHR
Kanawha County / Region 5
Executive Order No. 5-11: The Commissioner of the
Bureau for Behavioral Health and Health Facilities,
WVDHHR

Honorable George Karos
President
WV Board of Pharmacy
Berkeley County / Region 2
Executive Order No. 5-11: Representative from the
West Virginia Board of Pharmacy

Dr. Stefan Maxwell
Medical Director
Neonatal Intensive Care Unit, CAMC
Kanawha County / Region 5
Executive Order No. 5-11: Representative with
experience as a medical director for a neonatal
intensive care unit

Dr. Earnest Miller, Jr.
Representative
Board of Osteopathy
Wood County / Region 3
Executive Order No. 5-11: Additional Member

Rev. James Patterson
Executive Director
Partnership of African-American Churches
Kanawha County / Region 5
Executive Order No. 5-11: Representative from the
faith-based community

James Phares
State Superintendent of Schools
WV State Department of Education
Kanawha County / Region 5
Executive Order No. 5-11: The State Superintendent
of Schools (Designee)

Dr. Jeffrey Priddy
Process Strategies / Prestera
Kanawha County / Region 5
Executive Order No. 5-11: Representative who is a
licensed physcian with a specialty in child and
adolescent psychiatry

William Roper
President
WV Chiefs of Police Association
Jefferson County / Region 2
Executive Order No. 5-11: The President of the West
Virginia Chiefs of Police Association

Sgt. Mike Smith
Bureau of Criminal Investigation - Drug Diversion
Unit
WV State Police
Kanawha County / Region 5
Executive Order No. 5-11: The Superintendent of the
West Virginia State Police

Dr. Carl Rollynn Sullivan
Residency Training Director & Director, Addictions
Programs
WVU School of Medicine - Dept. of Behavioral
Medicine & Psychiatry
Monongalia County / Region 4
Executive Order No. 5-11: Representative with
experience as a clinical practitioner in drug diversion

Russ Taylor
Substance Abuse Program Advisor
HealthWays, Inc. - Dr. Lee Jones Miracles Happen
Center
Ohio County / Region 1
Executive Order No. 5-11: Representative with
experience as a director of an inpatient residential
long-term treatment facility

Tonia Thomas
WV Coalition Against Domestic Violence
Kanawha County / Region 5
Executive Order No. 5-11: Representative from the
West Virginia Coalition Against Domestic Violence

Joe Thornton
Secretary
Department of Military Affairs and Public Safety
Kanawha County / Region 5
Executive Order No. 5-11: The Secretary of the West
Virginia Department of Military Affairs and Public
Safety

Honorable Linda Whalen
Representative
WV Municipal League, Mayor of Bluefield
Mercer County / Region 6
Executive Order No. 5-11: Representative from the
West Virginia Municipal League

Tim White
Cabell County / Region 5
Executive Order No. 5-11: Citizen Member

Mike White
President
WV Sheriff's Association
Hancock County / Region 1
Executive Order No. 5-11: The President of the West
Virginia Sheriff's Association

Karen Yost
Chief Executive Officer
Prestera Center
Cabell County / Region 5
Executive Order No. 5-11: Representative from the
West Virginia Behavioral Health Providers
Association

Cabinet Secretary
Department of Veterans Assistance
Kanawha County / Region 5
Executive Order No. 5-11: The Secretary of the West
Virginia Department of Veterans Assistance

Commissioner
Bureau for Public Health - WVDHHR
Kanawha County / Region 5
Executive Order No. 5-11: Representative with
experience in public health





## Legend


1  Round 1 – September 2011

2  Round 2 – October 2011

3  Round 3 – November 2011

4  Round 4 – January 2012

5  Round 5 – March 2012

6  Round 6 – April 2012


7  Round 7 – August 2012


8  Round 8 – October 2012

9  Round 9 – Jan/Feb 2013

10  Round 10 – May 2013

11  Round 11 – October 2013

## Summary of Substance Abuse Task Forces Meetings

Per Executive Order 5-11, the Governor's Substance Abuse Task Forces are assembled by the Bureau for Behavioral Health and Health Facilities within the West Virginia Department of Health and Human Resources to combat the growing problem of substance abuse and addiction throughout West Virginia.

The Regional Substance Abuse Task Forces are open to the public and are intended to include West Virginia citizens from all walks of life: parents, teachers, service providers, law enforcement, elected officials, and anyone else interested in joining together to combat the problem. Regional Task Forces have been charged with moving from talking about the problem to identifying priorities and developing strategies to address the problem of substance abuse in West Virginia.

To date the total number of participants per round/region is as follows:

| | Round 1 | Round 2 | Round 3 | Round 4 | Round 5 | Round 6 | Round 7 | Round 8 | Round 9 | Round 10 | Round 11 | Totals: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Region 1 | 58 | 60 | 44 | 62 | 62 | 29 | 32 | 30 | 35 | 18 | 20 | 450 |
| Region 2 | 48 | 37 | 13 | 37 | 42 | 32 | 17 | 28 | 34 | 20 | 22 | 330 |
| Region 3 | 50 | 22 | 46 | 39 | 31 | 25 | 32 | 22 | 30 | 33 | 19 | 349 |
| Region 4 | 56 | 49 | 56 | 50 | 51 | 28 | 43 | 43 | 45 | 35 | 67 | 523 |
| Region 5 | 56 | 66 | 71 | 58 | 53 | 29 | 48 | 53 | 77 | 47 | 39 | 597 |
| Region 6 | 65 | 72 | 38 | 80 | 42 | 35 | 46 | 28 | 47 | 24 | 28 | 505 |

*Total Attendees Rounds 1-11*   **2754**

**Substance Abuse Regional Task Forces Meetings**
Rounds 1-11

| Round | Region | Date | Time | Location | Address | City |
|---|---|---|---|---|---|---|
| 1 | 1 | 09/01/11 | | | | Wheeling |
| 1 | 2 | 09/01/11 | | | | Martinsburg |
| 1 | 3 | 09/01/11 | | | | Clarksburg |
| 1 | 4 | 09/01/11 | | | | Parkersburg |
| 1 | 5 | 09/01/11 | | | | Logan |
| 1 | 6 | 09/01/11 | | | | Beckley |
| 2 | 1 | 10/26/11 | 6:00 PM | Weirton Medical Center | 601 Colliers Way | Weirton |
| 2 | 2 | 10/25/11 | 6:00 PM | The Candlewyck Inn | 65 South Mineral Street | Keyser |
| 2 | 3 | 10/24/11 | 9:00 AM | Jackson County DHHR | 2139 Cedar Lakes Road | Ripley |
| 2 | 4 | 10/27/11 | 9:00 AM | Randolph Co. DHHR Office | 1027 N. Randolph Ave. | Elkins |
| 2 | 5 | 11/01/11 | 5:00 PM | Prestera Pinecrest | 5600 US Rt. 60 East | Huntington |
| 2 | 6 | 10/27/11 | 7:00 PM | Mercer County Vocational School | 1397 Stafford Drive | Princeton |
| 3 | 1 | 11/30/11 | 5:30 PM | John Marshall High School Auditorium | 1300 Wheeling Ave | Glen Dale |
| 3 | 2 | 11/28/11 | 2:00 PM | Cacapon Resort State Park | 818 Cacapon Lodge Drive | Berkeley Springs |
| 3 | 3 | 12/01/11 | 5:30 PM | Ritchie County High School Cafeteria | 107 Ritchie County School Road | Ellenboro |
| 3 | 4 | 11/30/11 | 9:00 AM | Ramada Inn | 20 Scott Ave | Morgantown |
| 3 | 5 | 11/28/11 | 2:00 PM | Christ Church United Methodist | 1221 Quarrier Street | Charleston |
| 3 | 6 | 11/29/11 | 7:00 PM | Rahall Technology Center | 804 Industrial Park Drive | Maxwelton |
| 4 | 1 | 01/25/12 | 5:30 PM | Brooke High School - Lecture Room | | Wellsburg |
| 4 | 2 | 01/24/12 | 10:00 AM | WV Schools for the Deaf & Blind - Seaton Hall | 301 East Main Street | Romney |
| 4 | 3 | 01/26/12 | 5:00 PM | Wood County DHHR Office | Corner of 5th and Avery | Parkersburg |
| 4 | 4 | 01/23/12 | 2:00 PM | Days Hotel & Conference Center | 2000 Sutton Lane | Sutton |
| 4 | 5 | 01/25/12 | 2:00 PM | Fountain of Life Worship Center | 301 Daniel Boone Pkwy | Danville |
| 4 | 6 | 01/24/12 | 6:00 PM | Summersville Arena and Conference Center | 3 Armory Way | Summersville |
| 5 | 1 | 03/27/12 | 5:30 PM | Magnolia High School | 601 Maple Ave | New Martinsville |
| 5 | 2 | 03/26/12 | 1:00 PM | Bavarian Inn | 164 Shepherd Grade Rd | Shepherdstown |
| 5 | 3 | 03/19/12 | 5:00 PM | Pleasants County Middle School Library | 510 Riverview Drive | Belmont |
| 5 | 4 | 03/19/12 | 10:00 AM | Bicentennial Inn | 88 E Main St. | Buckhannon |
| 5 | 5 | 03/21/12 | 2:00 PM | Hamlin Community Center | 220-1 Main St | Hamlin |
| 5 | 6 | 03/20/12 | 4:00 PM | Welch Public Library | 90 Howard Street | Welch |

| Round | Region | Date | Time | Location | Address | City | State |
|---|---|---|---|---|---|---|---|
| 6 | 1 | 04/17/12 | 5:30 PM | Northwood Health Systems | 111 19th Street | Wheeling | WV |
| 6 | 2 | 04/19/12 | 3:00 PM | Moorefield Church of the Brethren | Winchester Ave & Clay St | Moorefield | WV |
| 6 | 3 | 04/24/12 | 5:00 PM | Roane County Family Health Care Facility | 146 Williams Drive | Spencer | WV |
| 6 | 4 | 04/23/12 | 10:00 AM | Robert Mollohan Research Center | 1000 Galliher Drive | Fairmont | WV |
| 6 | 5 | 04/18/12 | 2:00 PM | Putnam County Old Courthouse | 3389 Winfield Road | Winfield | WV |
| 6 | 6 | 04/25/12 | 5:30 PM | Lewis Christian Community Center | 469 Central Avenue | Oak Hill | WV |
| 7 | 1 | 08/13/12 | 5:30 PM | Brooke High School - Lecture Room | | Wellsburg | WV |
| 7 | 2 | 08/08/12 | 5:30 PM | Hampshire Co DHHR Office | Rt 50 East | Romney | WV |
| 7 | 3 | 08/14/12 | 5:30 PM | Wood County DHHR Office | Corner of 5th and Avery | Parkersburg | WV |
| 7 | 4 | 08/09/12 | 5:30 PM | Days Hotel & Conference Center | 2000 Sutton Lane | Sutton | WV |
| 7 | 5 | 08/02/12 | 5:30 PM | Christ Church United Methodist | Quarrier & Morris Streets | Charleston | WV |
| 7 | 6 | 08/03/12 | 5:30 PM | Raleigh County Convention Center | 200 Armory Drive | Beckley | WV |
| 8 | 1 | 10/24/12 | 10:30 AM | Northwood Health Systems | 111-19th St | Wheeling | WV |
| 8 | 2 | 10/23/12 | 10:30 AM | South Branch Inn | US 50 | Romney | WV |
| 8 | 3 | 10/24/12 | 4:30 PM | Ritchie County High School | 107 Ritchie County School Road | Ellenboro | WV |
| 8 | 4 | 10/23/12 | 4:30 PM | Valley HealthCare System | 301 Scott Ave | Morgantown | WV |
| 8 | 5 | 10/22/12 | 4:30 PM | Kenova United Methodist Church | 503 15th St | Kenova | WV |
| 8 | 6 | 10/25/12 | 4:30 PM | Princeton Public Library | 920 Mercer Street | Princeton | WV |
| 9 | 1 | 02/25/13 | 5:30 PM | Northwood Health Systems | 111-19th St | Wheeling | WV |
| 9 | 2 | 02/26/13 | 2:00 PM | Cacapon Resort State Park | 818 Cacapon Lodge Drive | Berkeley Springs | WV |
| 9 | 3 | 01/29/13 | 5:30 PM | Wood County DHHR Office | Corner of 5th and Avery | Parkersburg | WV |
| 9 | 4 | 03/01/13 | 2:00 PM | Days Hotel & Conference Center | 2000 Sutton Lane | Sutton | WV |
| 9 | 5 | 01/28/13 | 5:30 PM | Shawnee Regional Golf Course Clubhouse | Route 25 | Dunbar | WV |
| 9 | 6 | 02/21/13 | 5:30 PM | Raleigh County Convention Center | 200 Armory Drive | Beckley | WV |
| 10 | 1 | 05/06/13 | 5:00 PM | Brooke High School | R.D. 3 Box 610 | Wellsburg | WV |
| 10 | 2 | 05/15/13 | 1:00 PM | Potomac State College of WVU - Davis Conf Ce | 101 Fort Ave | Keyser | WV |
| 10 | 3 | 05/07/13 | 5:00 PM | WVU Parkersburg - Main Bldg Multipurpose R | 300 Campus Drive | Parkersburg | WV |
| 10 | 4 | 05/07/13 | 9:30 AM | St. Mary Catholic Church (Peace Hall) | 3334-B University Ave | Star City | WV |
| 10 | 5 | 05/14/13 | 5:00 PM | Christ Church United Methodist | 1221 Quarrier Street | Charleston | WV |
| 10 | 6 | 05/13/13 | 5:00 PM | Hinton Technology Center | 301 Summers Street | Hinton | WV |
| 11 | 1 | 10/21/13 | 5:00 PM | Catholic Charities Center Ballroom | 2000 Main Street, 3rd Fl | Wheeling | WV |
| 11 | 2 | 10/15/13 | 5:00 PM | South Branch Inn | 1500 U.S. 220 | Moorefield | WV |
| 11 | 3 | 10/16/13 | 5:00 PM | Nemesis Shrine Club | 244 Watson Road | Parkersburg | WV |

| Round | Region | Date | Time | Location | Address | City | State |
|---|---|---|---|---|---|---|---|
| 11 | 4 | 10/17/13 | 5:00 PM | Via Veneto | PO Box 208 Rt. 58 | Bridgeport | WV |
| 11 | 5 | 10/22/13 | 5:00 PM | Brickstreet Insurance | 400 Quarrier St. | Charleston | WV |
| 11 | 6 | 10/23/13 | 5:00 PM | Raleigh County Convention Center | 200 Armory Drive | Beckley | WV |

**Governor's Substance Abuse Regional Task Forces**
**Round 11 Regional Recommendations - October 2013**
**REGION 1**

*Following the small group discussion, tables provided their top priorities to bring to vote. Priorities in blue received the highest number of votes; priorities in yellow received the second highest number of votes.*

<u>**Prevention**</u>

- Expand Education & Outreach to - Develop marketing campaign/media blitz to promote prevention programs, increased community awareness, changing societal norms that pills "fix" problems
- Expand Education & Outreach to - Educate parents, legislators, and the community at large regarding "new" drugs, addiction, Rx disposal, healing and stress, underage drinking, other prevention strategies, etc.
- Expand Education & Outreach (all)
- Engage the School System (want counselors in the schools)

<u>**Early Intervention**</u>

- Expand Education & Outreach to - Fund a 1-800 HELPNOW line
- Develop more community activities for kids – family and youth resource centers, after school programs
- Expand Education & Outreach (esp. re: Beer Tax - raise the beer and "Sin" tax to pay for SA services)
- Expand SBIRT (Screening, Brief Intervention & Referral to Treatment)

<u>**Treatment**</u>

- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Mobile crisis units
- Reduce 3-Month Waiting Lists: Develop additional in-patient (Women's Residential Treatment) and outpatient treatment options
- Develop workforce with credentials in SA

<u>**Recovery**</u>

- Develop more transitional/non-treatment recovery homes and programs.
- Develop more transitional/non-treatment recovery homes and programs for - Women and children
- Develop system/process for felony forgiveness and/or expungement
- Education and Outreach - Educate physicians, medical providers, pharmacists, veterinarians, and employers regarding addiction and recovery options, Rx practices, PMP

<u>**Overarching**</u>

- Transportation
- School Based SA Education
- Train Counselors in Schools
- Beer Tax
- Education & Outreach
- Women, children, and families residential and transitional/non-treatment recovery homes.

**Governor's Substance Abuse Regional Task Forces**
**Round 11 Regional Recommendations**
**REGION 2**

*Following the small group discussion, tables provided their top priorities to bring to vote.  Priorities in blue received the highest number of votes; priorities in yellow received the second highest number of votes.*

**Prevention**

- Transportation
- Expand prevention and changing norms
- Develop marketing campaign/media blitz
- Work on the "Why": underlying reasons people use/abuse
- Engage School System: Increase number of school-based counselors, social workers trained in SA
- Develop a program w/ pharmacies in each county (like PEIA diabetes program*), an incentive program (including mobile incineration)
    - * http://www.peia.wv.gov/news/benefit-coordinator-briefing/Pages/Face_to_Face%20Diabetes%20Mgmt%20Program.aspx

**Early Intervention**

- 1800 HELP NOW - make it texting possible (warmline)
- Expand SBIRT (Schools)
- Coordinate more services with Bureau for Children and Families
- Expand SBIRT: Train physicians, case workers, social services on SBIRT
- Expand Education & Outreach: Educate physicians, medical providers, pharmacists, veterinarians, and employers regarding addiction, RX practices, PMP

**Treatment**

- Develop alternative diversion sentencing for drug offenses
- Reduce waiting lists
- Addiction clinics
- Expand option for treatment while incarcerated
- Integrate treatment of SA with MH
- Expand Recovery Coach training and network

**Recovery**

- Develop system process for felony forgiveness
- Re-entry programs with W.R.A.P.
- Expand Recovery Coach training and network
- Develop more Drop-in Centers

**Overarching**

- Transportation
- 1800 HELP NOW
- Raise the beer and "sin" tax to pay for SA services
- Improve transportation in rural areas

**Governor's Substance Abuse Regional Task Forces**
**Round 11 Regional Recommendations**
**REGION 3**

*Following the small group discussion, tables provided their top priorities to bring to vote.  Priorities in blue received the highest number of votes; priorities in yellow received the second highest number of votes.*

<u>**Prevention**</u>
- Prevention Coalitions in each county
- Develop marketing campaign/media blitz to promote prevention programs, increase community awareness, changing societal norms that pills "fix" problems
- Engage the school system – increase # individuals trained in SA, ie PROs, social workers
- Expand education and outreach to all populations

<u>**Early Intervention**</u>
- Expand teen courts and juvenile drug courts
- Coordinate early intervention with CPS
- Enable easier access to schools
- Educate physicians, medical providers, pharmacists, veterans and employers re: addiction, RX practices, PMP
- Expand SBIRT: Train physicians, case workers, social services on SBIRT, expand funding source
- Collaborating, gathering data with community agencies, schools

<u>**Treatment**</u>
- Reduce 3-month waiting lists: develop additional in-patient and outpatient treatment options for non-traditional treatment resources and services
- Integrate treatment of SA with MH
- Market services better
- Reduce waiting list
- Develop workforce with credentials in SA
- Integrated tx of SA with MH and primary care or other non-traditional settings

<u>**Recovery**</u>
- Whole family programs with emphasis on helping support men with children
- Safe havens recovery coaching monitored
- Increase recovery residences
- Engage business community to hire folks in recovery
- Physician driven in hospital to oversee recovery program
- Physician driven recovery program for overdose issues within a hospital savings

<u>**Overarching**</u>
- Equal access to funding to Region 3
- Additional transitional beds for people exiting treatment – men, women, teens, criminal justice population, and military
- Transportation
- 1800 Help Now
- Access to schools
- Insurance gaps

**Governor's Substance Abuse Regional Task Forces**
**Round 11 Regional Recommendations**
**REGION 4**

*Following the small group discussion, tables provided their top priorities to bring to vote.  Priorities in blue received the highest number of votes; priorities in yellow received the second highest number of votes.*

## Prevention

- Engage the School System to - Maintain funding for Prevention Resource Officers (PRO) in schools
- Develop more community activities for kids – family and youth resource centers, after school programs
- Expand Education & Outreach to - Educate parents, legislators, and the community at large regarding "new" drugs, addiction, Rx disposal, healing and stress, underage drinking, other prevention strategies, etc.
- Expand Education & Outreach to - Engage Business community
- Engage the School System to - Increase number of school-based counselors, social workers trained in SA
- Expand Education & Outreach to - Work on the "why": underlying reasons people use/abuse alcohol, tobacco, other drugs
- Expand Education & Outreach to - Educate physicians, medical providers, pharmacists, veterinarians, and employers regarding addiction, Rx practices, PMP
- Engage the School System to - Expand drug/alcohol prevention programming (evidence-based) to younger students
- Improve transportation in rural areas
- Expand Drug Take Back - Develop capacity for mobile incineration

## Early Intervention

- Engage the School System to - Explore truancy diversion as related to SA and handle it more consistently
- Engage the School System to - Maintain funding for Prevention Resource Officers (PRO) in schools
- Expand SBIRT - Train physicians, case workers, social services on SBIRT
- Expand SBIRT - Expand SBIRT to other facilities such as shelters
- Expand SBIRT (particularly in schools)
- Expand Education & Outreach to - Develop marketing campaign/media blitz to promote early intervention programs, increased community awareness, changing societal norms that pills "fix" problems
- Expand Education & Outreach to - Educate parents, legislators, and the community at large regarding "new" drugs, addiction, Rx disposal, healing and stress, underage drinking, other early intervention strategies, etc.
- Overhaul WV Chapter 49
- Raise the beer and "Sin" tax to pay for SA services
- Increase funding for Law Enforcement to - Provide more drug testing, especially for foster parents and school system employees
- Coordinate early intervention efforts with Child Protective Services (CPS)
- Improve access to home visiting programs, e.g. Birth-3, Healthy Start, etc.
- Improve transportation in rural areas
- Increase number of school based counselors  SW etc.
- Collection and release of data

**Treatment**
- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient tx options for - Youth age 17-24 (Non adjudicated juveniles)
- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options (for all populations)
- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Addiction clinics
- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Non-traditional treatment resources and services
- Expand Education & Outreach to - Engage Business community
- Expand Education & Outreach to - Develop marketing campaign/media blitz to promote availability of treatment programs, increased community awareness, removing stigma
- Increase/improve regulations for methadone clinics (medically assisted treatment (MAT) facilities)
- Expand Recovery Coach training and network
- New modalities for treatment and funding for such (telehealth)
- Ensuring that the right bed and facilities are available for SA services particularly kids.
- Improve recruitment and retention of physicians and certified addiction counselors
- Develop alternative sentencing for drug offences

**Recovery**
- Develop more transitional/non-treatment recovery homes and programs for - Whole family programs
- Develop more transitional/non-treatment recovery homes and programs for - Re-entry programs
- Develop more transitional/non-treatment recovery homes and programs for - Women
- Develop better discharge and after-care plans (whole family programs)
- Expand Al-Anon and Alateen
- Develop system/process for felony forgiveness and/or expungement
- Expand Recovery Coach training and network and peer support services
- Develop system/process for regaining eligibility for assistance following treatment
- Education and Outreach - Engage Business community to hire people in recovery
- Education and Outreach - Develop marketing campaign/media blitz to promote availability of recovery programs, increased community awareness, removing stigma
- Education and Outreach - Educate physicians, medical providers, pharmacists, veterinarians, and employers regarding addiction and recovery options, Rx practices, PMP
- Close gaps in insurance coverage (peer support specialists)

**Overarching**
- Inpatient treatment juveniles without court order lasting at least 30 days.
- Expand treatment options
- Marketing campaign/media blitz on prevention and early intervention
- Education of RX providers (all of them)
- Improve Transportation
- Break the Cycle
- PROs
- Expand recovery coach training and network
- Resources for funding for new treatment modalities (telehealth)
- Hubs for treatment
- 1800HELPNOW

**Governor's Substance Abuse Regional Task Forces**
**Round 11 Regional Recommendations**
**REGION 5**

*Following the small group discussion, tables provided their top priorities to bring to vote.  Priorities in blue received the highest number of votes; priorities in yellow received the second highest number of votes.*

<u>**Prevention**</u>

- Engage the School System to - Increase number of school-based counselors, social workers trained in SA
- Expand Education & Outreach to - Develop marketing campaign/media blitz to promote prevention programs, increased community awareness, changing societal norms that pills "fix" problems and educate parents, legislators, and the community at large
- Expand Prevention Coalitions to - Operate in each county to continue funding for the coalitions
- Develop more community activities for kids – family and youth resource centers, after school programs
- Sudafed RX
- Expedition and interstate usage PMP
- Engage the School System (all)
- Expand education and outreach for all populations

<u>**Early Intervention**</u>

- Engage the School System to - Increase number of school-based counselors, social workers trained in SA w/ SBIRT and create funding for SBIRT
- Develop more community activities for kids – family and youth resource centers, after school programs
- Expand Education & Outreach to - Educate parents, legislators, and the community at large regarding "new" drugs, addiction, Rx disposal, healing and stress, underage drinking, other early intervention strategies, etc. and Expand Education & Outreach to - Educate physicians, medical providers, pharmacists, veterinarians, and employers regarding addiction, Rx practices, PMP
- Expand education and outreach (all populations, esp. business and faith based community)
- Raise the beer and "Sin" tax to pay for SA services
- Expand Education & Outreach to - Develop marketing campaign/media blitz to promote early intervention programs, increased community awareness, changing societal norms that pills "fix" problems (MEDIA EXPOSURE)
- Drug Court Expansion
- Funding

<u>**Treatment**</u>

- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Whole family programs with parenting training
- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Women
- More money for residential treatment
- Increase/improve regulations for methadone clinics (medically assisted treatment (MAT) facilities)
- Expand Recovery Coach training and network

**Recovery**

- Develop more transitional/non-treatment recovery homes and programs for - Whole family programs
- Develop more Drop-In Centers - add in rural areas
- Develop more transitional/non-treatment recovery homes and programs for ALL populations
- Develop system/process for felony forgiveness and/or expungement and develop system/process for regaining eligibility for assistance (e.g. HUD, Food Stamps, TANF) following treatment (Life after recovery)
- Transitional housing
- Develop better discharge and after-care plans including engaging business community to hire people in recovery
- Close gaps in insurance coverage and educate physicians, medical providers, pharmacists, veterinarians, and employers regarding addiction and recovery options, Rx practices, PMP

**Overarching**

- SA Counselors and social workers in schools
- Transportation and integrated with recovery coach network
- Recovery Coaches
- Education and Family/Community Activities
- "Sin" Tax
- Transportation in rural areas
- Consistency of funding (sustainability)
- Education and outreach especially faith community

**Governor's Substance Abuse Regional Task Forces**
**Round 11 Regional Recommendations**
**REGION 6**

*Following the small group discussion, tables provided their top priorities to bring to vote.  Priorities in blue received the highest number of votes; priorities in yellow received the second highest number of votes.*

<u>**Prevention**</u>

- Increase funding for Law Enforcement
- Expand prevention coalitions to operate in each county
- Sustainable funding for coalitions to operate substance abuse programs within the work force, school systems, and communities
- Expand Education & Outreach to - Develop marketing campaign/media blitz to promote prevention programs, increased community awareness, changing societal norms that pills "fix" problems
- Engage the School System to - Increase number of school-based counselors, social workers trained in SA
- Expand Drug Take Back - Establish permanent take back sites

<u>**Early Intervention**</u>

- Expand SBIRT
- Raise the beer and "Sin" tax to pay for SA services
- Develop more community activities for kids – family and youth resource centers, after school programs
- Overhaul WV Chapter 49 (Child Welfare Law) (emerging)
- Expand SBIRT - Increase number of medical facilities and hospitals using SBIRT
- Engage the School System to - Increase number of school-based counselors, social workers trained in SA

<u>**Treatment**</u>

- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Youth age 17-24
- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Whole family programs
- Reduce 3-Month Waiting Lists: Develop additional in-patient and outpatient treatment options for - Women
- Expand Recovery Coach training and network
- Develop alternative sentencing for drug offences (including Recovery Coaches)

<u>**Recovery**</u>

- Develop system/process for felony forgiveness and/or expungement and develop system/process for regaining eligibility for assistance (e.g. HUD, Food Stamps, TANF) following treatment
- Education and Outreach - Develop marketing campaign/media blitz to promote availability of recovery programs, increased community awareness, removing stigma
- Develop more transitional/non-treatment recovery homes and programs for - Whole family programs
- Develop more transitional/non-treatment recovery homes and programs for - Women
- Develop more Drop-In Centers
- Develop better discharge and after-care plans

**Overarching**

- Transportation
- Increase school system access and treatment options
- Engage the School System to - Enable collection and release of data related to SA
- Funding to support prevention coalitions ("Sin" tax)
- Engage the School System to - Increase number of school-based counselors, social workers trained in SA
- Engage the School System to - Maintain funding for Prevention Resource Officers (PRO) in schools

ATTACHMENT E

## West Virginia Drug Take-Back Sites

| Region | County | Location | Permanent Lock Boxes |
|--------|--------|----------|----------------------|
| 1 | Hancock | Hancock Sheriff's Department | YES |
| | Hancock | Chester Police Department | YES |
| | Hancock | Weirton Police Department | YES |
| | Brooke | Follansbee Police Department | |
| | Ohio | Elm Grove Pharmacy: Wheeling Police Dept. | NO |
| | | Walmart – Highlands:  Ohio Co. Sheriff's Dept. | NO |
| | | Wheeling PD, and | YES |
| | | Bethlehem PD | YES |
| | | Triadelphia PD | YES |
| | Marshall | Moundsville Police Department | YES |
| | | CVS in Moundsville | NO |
| 2 | Hampshire | Hamp. Co. Sheriff's Dept. Romney Office | YES |
| | | Capon Bridge Town Hall Building | YES |
| | | Hamp. Co. Health Dept. | NO |
| | Mineral | Mineral Co. Detention Center | NO |
| | Grant | Grant County Courthouse or Petersburg Fire Department | NO |
| | Hardy | Moorefield Town Police | YES |
| | | Sheriff's Department | NO |
| | | Wardensville Town Hall Building | YES |
| | Pendleton | Pendleton County Courthouse | NO |
| | | State Police Barracks | NO |
| | Jefferson | Wal Mart Charles Town | No |
| | | Jefferson County Sheriff Department | YES |
| | Berkeley | Spring Mills Wal Mart | NO |

*April 5, 2013*

# West Virginia Drug Take-Back Sites

| | | | |
|---|---|---|---|
| | | Martinsburg Wal Mart | NO |
| | | South Berkeley Fire Department | NO |
| | | Berkeley County Sheriff | YES |
| | Morgan | Rankin's Fitness Ctr. | NO |
| | | Paw Paw town Hall | NO |
| 3 | Pleasants | St. Mary's Police Department | YES |
| | Ritchie | Ritchie Co. Sheriff Office | YES |
| | Tyler | Have box but not set up | YES |
| | Jackson | Jackson Co. Sheriff's Office in Ripley | YES (Has Incinerator) |
| | | Ravenswood Police Department | YES |
| | Wood | Wood Co. Sheriff's Office | YES |
| 4 | Barbour | Maze's Pharmacy Philippi | YES |
| | | Maze's Pharmacy Belington | YES |
| | Harrison | Prescription Shoppe | YES (Will not take narcotics) |
| | | Best Care Pharmacy | YES (Will not take narcotics) |
| | Randolph | Davis Memorial Hospital | YES (Will not take narcotics) |
| | Taylor | Wal-Mart | NO |
| 5 | Putnam | Poca City Police | NO |
| | | Putnam County Sheriff's Dept., Winfield | |
| | | Buffalo | NO |
| | | Eleanor Town Hall | NO |
| | | City of Hurricane, Town Hall | NO |
| | Boone | Courthouse, Madison | NO |
| | | Racine Park | NO |
| | | Douglass Center 10th Avenue | NO |
| | | WV State Police Rt. 60 E | |
| | Mingo | Williamson will be at the State Police Detachment | NO |
| | Lincoln | Harts community Center | NO |
| | | Lincoln County Courthouse | NO |
| | | McCorkle Community Center | NO |
| | | City hall in Gilbert | NO |

*April 5, 2013*

## West Virginia Drug Take-Back Sites

| 6 | McDowell | Kimball Wal-Mart | YES |
|---|---|---|---|
| | Mercer | Bluewell Family Pharmacy | YES |
| | | Community Connections, Inc. | YES |
| | | Princeton State Police | YES |
| | | Senior Centers on 4-26-13 | YES |
| | Monroe | Location not yet determined by 4/26 | YES |
| | Nicholas | Wal-Mart | NO |
| | Pocahontas | Snowshoe Career Center | NO |
| | Raleigh | Raleigh Commission on Aging | NO |
| | Summers | Location not yet determined | YES |
| | Webster | Upperglade at the State Police barracks (pending) | NO |
| | Wyoming | Oceana Magic Mart | NO |
| | | Rite-aid Pineville | NO |
| | | Mullens Rite-aid | NO |

NO Response –Location participating in National Take Back Event

YES Response-Indicates permanent Lock Box

*April 5, 2013*

# SB437 Implementation Update
# November 2013

| TASK | | RESPONSIBLE | | STATUS |
|------|------|------|------|------|
| If Chief Medical Officer determines that drug OD is the cause of death,<br><br>Chief Medical Examiner shall provide notice of the death to the West Virginia Controlled Substances Monitoring Program Database Review Committee | §61-12-10 | Bureau for Public Health<br><br>WV Controlled Substances Monitoring Program Database Review Committee | Regular | Reporting forms, possible rules or policies<br>According to OCME the reporting is not occurring yet, "due to roll out of the new CSMP data base." There is some consideration re use of the actual death records in lieu of a new form capturing the same information.<br>The next CSMP meeting is expected to take place in August.  The mechanism for operationalizing this reporting should be clarified either for that meeting or at that meeting. |
| OHFLAC to develop policies & procedures in conjunction with Board of Pharmacy re physician access to Controlled Substance Monitoring Program database | §16-1-4 | OHFLAC<br><br>Board of Pharmacy | | Physicians must access CSMP database at patient intake, before administering, prescribing or distributing RX Completed.<br>Physicians within an Opioid Treatment Program have had access and have completed these inquiries even prior to SB437. Very few citations result from the non-utilization of the database as required |
| OHFLAC to inspect pain management clinics, issue licenses | §16-5H-3 | OHFLAC | Regular | The rules were passed in during the 2013 Legislative session.  The rules will be filed July 12, 2013. However, the implementation date is unknown due to:<br>1.4. Effective Date. - This rule is effective upon the date specified in an emergency rule promulgated by the Department of Health and Human Resources as being the date funding for implementation of Chronic Pain Management Clinic Licensure will become available pursuant to a duly enacted appropriation bill authorizing the expenditure of funds for that purpose. |
| Draft Rules to Regulate Opioid Treatment Programs | §16-1-4 | DHHR<br><br>BBHHF/ OHFLAC and Medicaid will meet quarterly to develop a combined summary to provide to the Health and Human Services legislative committee. | Regular | Updating opioid treatment center rules<br><br>Rules finalized during 2013 legislative effective October 10, 2013. -No more than 50 clients for each counselor<br>-OTP's must provide counseling on preventing exposure to and transmission of HIV, Hepatitis C |

-OTP's initial post-admission assessment must include (among other things formerly required) a complete physical and psychological exam and history, A TB test, a screening for syphilis, a Hep C test and an HIV test if the patient consents (can't require without consent).

-License fee increases for initial and renewed licenses

-Urine Drug Screens must now be 1) observed with all patients, 2) random for all patients every 30 days

-Exceptions to Federal take-home guidelines (for vacations, hospitalizations, work conflicts and travel hardships) may not exceed 10% of the previous month's average patient population (300 patients, 30 exceptions maximum)

-Maintenance treatment shall be discontinued within 2 continuous years after treatment initiation unless contraindicated in the clinical judgment of the medical director

-New reporting requirements no less than twice annually (State Opioid Treatment Authority is requiring quarterly) that includes: a listing of all patients in treatment for 2 continuous years or longer, count of patients and listing by state of residence along with current dose, number of patients discharged and reason for discharge (completed program, voluntary withdrawal, 4 offense dirty drug screen and administratively discharged with referral to higher level of treatment, or unexplained

-Pregnant women are required to be maintained on the lowest dose possible and may not be discharged for any reason other than client withdrawal AMA (for the safety and health of the developing fetus)

-More stringent requirements for counselors have one of the following, a Bachelor's degree and a social work license or addiction certification, a Master's

| | | | | level degree or a Master's with an addiction certification. Bachelor's level staff must be supervised by a Master's level staff member. All counselors must be actively working toward addiction certification or toward licensure with supervision of an Advanced Alcohol and Drug Counselor (AADC).<br>-New regulations regarding "dirty" Urine Drug Screens that include revocation of all take-home privileges with all bad screens for increasing lengths of time with each successive bad screen, increased counseling requirements with 2nd bad drug screen, counseling of no less than 30 minutes with a licensed or certified counselor and with 4th dirty screen within a six month period (unless pregnant) immediate discharge from the program. |
|---|---|---|---|---|
| Pharmacist may not compound or dispense any RX when he/she has knowledge that the Rx was issued by a practitioner without establishing a valid practitioner-patient relationship. | §30-5-3(g) | | Board of Pharmacy | Education for pharmacists completed |
| Buprenorphine<br>• shall be dispensed only by prescription;<br>• if dispensed, sold or distributed in a pharmacy, may only be by pharmacist or pharm tech;<br>• any purchaser must produce photo ID;<br>• after September 1, 2012, any Rx for buprenorphine and naloxone to treat opioid addiction shall only prescribe or dispense same as sublingual film unless clinically contraindicated | §60A-3-308 | | Board of Pharmacy | Education for pharmacists completed |
| Controlled Substance Prescriptions Database – required information to be filed no more frequently than within 24 hours | §60A-9-3 | Board of Pharmacy | Regular | Rules, policies & education guidelines completed |

| | | | | |
|---|---|---|---|---|
| When medical services provider dispenses controlled substance or whenever Rx is filled by pharmacist, hospital or o/o state pharmacy, they must report information to Board of Pharmacy.<br><br>Reporting required for drug dispensed to patient by practitioner.<br><br>Quantity dispensed may not exceed amount adequate to treat patient for max of 72 hours with no greater than two 72-hour cycles dispensed in any 15-day period. | §60A-9-4 | Board of Pharmacy | Regular | Prescribe by rule form for prescribing Rx completed.<br><br><br>Reporting guidelines, education completed and working now on getting physician dispensers to report into the new system |
| Prior to releasing certain Rx, pharmacist shall verify full legal name, address and birth date of person receiving or acquiring controlled substance through valid government-issued photo ID. Information reported per rule | §60A-9-4a | Board of Pharmacy | Regular | Rule required and completed |
| Controlled Substances Monitoring Database – information open to inspection only by inspectors and agents of Board of Pharmacy, members of WV State Police expressly authorized by WVSP Superintendent to have access; authorized agents of local law-enforcement agencies as members of a federally affiliated drug task force; authorized agents of the federal DEA; authorized agents of Bureau for Medical Services; Office of Chief Medical Examiner; licensing boards of practitioners in this state and other states; prescribing practitioners; pharmacists; persons w/enforceable court order or regulatory agency administrative subpoena.<br><br><br>All law-enforcement personnel w/access shall be granted access in accordance with applicable state laws and Board of Pharmacy rules; shall be certified as a WV law-enforcement officer and shall have successfully completed USDEA Diversion Training and National Association of Drug Diversion Investigation Training. | §60A-9-5 | WV State Police<br><br>Local Law Enforcement Agencies<br><br>Federal DEA<br><br>Bureau for Medical Services<br><br>Office of Chief Medical Examiner<br><br>Boards of<br>• Medicine<br>• Osteopathy<br>• Podiatry<br>• Physician Assistant<br>• Dentistry<br>• Optometry<br>• Pharmacy<br>• Registered Professional Nurses<br>• Licensed Practical Nurses<br><br>Board of Pharmacy | | Agencies must designate persons with access to CSMP database completed and re-credentialing for new CSMP on-going<br><br><br><br>Rules required and completed and have worked with NADDI on trainings and DEA on-going |

| | | | | |
|---|---|---|---|---|
| Board of Pharmacy shall establish an Advisory Committee to develop, implement and recommend parameters to be used in identifying abnormal or unusual usage patterns of patients in this state. | §60A-9-5 | Board of Pharmacy | | Advisory Committee established and working on parameters in upcoming meetings and new CSMP will facilitate. |
| Board of Pharmacy shall review the West Virginia Controlled Substance Monitoring Program database and issue reports that identify abnormal or unusual practices of patients who exceed parameters as determined by the advisory committee. | §60A-9-5 | Board of Pharmacy | Periodic | Advisory Committee established and working on parameters in upcoming meetings and new CSMP will facilitate. |
| The Board shall communicate with prescribers and dispensers to more effectively manage the medications of their patients in the manner recommended by the Advisory Committee. | §60A-9-5 | Board of Pharmacy | | Advisory Committee established and working on parameters in upcoming meetings and new CSMP will facilitate. |
| Advisory Committee<br>• recommend parameters to identify abnormal or unusual usage patterns of controlled substances;<br>• prepare reports;<br>• make recommendations for training, research, etc.;<br>• monitor ability of providers, facilities, pharmacies to meet 24-hour reporting requirement for database;<br>• report on feasibility of real-time reporting;<br>• establish outreach programs with law enforcement. | §60A-9-5 | Board of Pharmacy Advisory Committee<br><br>In conjunction with State Police, local law enforcement agencies, federal DEA | Periodic | Advisory Committee established and working on parameters in upcoming meetings and new CSMP will facilitate. |
| Board of Pharmacy to create the West Virginia Controlled Substances Monitoring Program Database Review Committee | §60A-9-5 | Board of Pharmacy | | Review Committee created |
| West Virginia Controlled Substances Monitoring Program Database Review Committee - authorized to query the database based on parameters established by Advisory Committee | §60A-9-5 | Board of Pharmacy Advisory Committee | | Establish parameters for queries- the new system facilitates searches and the Advisory Committee is working on parameters in upcoming meetings and new CSMP will facilitate. |
| Board of Pharmacy provides administrative support for Advisory Committee and Database Review Committee | §60A-9-5 | Board of Pharmacy | | Provides administrative support |
| WV Controlled Substances Monitoring Program Database Review Committee | §60A-9-5 | WV Controlled Substances Program Database Review | Periodic | Review database prescribing patterns, notices from Chief Medical Examiner. |

| | | | | |
|---|---|---|---|---|
| • makes determinations on specific unusual prescribing or dispensing patterns which Committee has reasonable cause to believe necessitates further action by law enforcement or licensing boards;<br>• reviews notices from Chief Medical Examiner to determine<br>• whether practitioner breached professional or occupational standards<br>• notifies licensing agency or law-enforcement and provides information from database re breach of professional standards or criminal act | | Committee | | Medical Examiner.<br><br>Notify law enforcement or licensing agencies if needed.<br><br>Staff is working with CME on data. Some general data given to Advisory committee at prior meetings. Review Committee will receive info and make recommendations in future meetings as new CSMP system queries are performed |
| Board of Pharmacy shall promulgate rules w/advice and consent of Advisory Committee | §60A-9-5 | Board of Pharmacy | June 1, 2013 | Legislative rules identifying parameters for identifying patterns, etc. have not been completed-the new CSMP being deployed. Rules for various issues in the future as may be identified. |
| All practitioners who prescribe or dispense controlled substances shall have access to WV CSMP Database | §60A-9-5 | Board of Pharmacy | July 1, 2011 | Promulgate rules re access, delegation of access to personnel |
| Board of Pharmacy shall provide annual report on WV CSMP to LOCHHRA w/recommendations | §60A-9-5 | Board of Pharmacy | January 1 of each year | Report completed |
| Any pharmacy, wholesaler, manufacturer or distributor of drug products containing ephedrine, pseudoephedrine, phenylpropanolamine, their salts or optical isomers or salts of optical isomers or other designated precursor, shall obtain a registration annually from the State Board of Pharmacy<br><br>Such entities shall keep complete records of all sales and transactions The records shall be gathered and maintained pursuant to legislative rule promulgated by the Board of Pharmacy. | §60A-10-4 | Board of Pharmacy | Regular | Registration and forms completed<br><br>Rules regarding record keeping completed for NPLEX System is in place |
| Beginning January 1, 2013, a pharmacy or retail establishment shall, before completing a sale under this section, electronically submit the information required by section eight of this article to the Multi-State Real-Time Tracking | §60A-10-5 | Board of Pharmacy | Regular | Rules, education programs completed |

| | | | | |
|---|---|---|---|---|
| System (MSRTTS) administered by the National Association of Drug Diversion Investigators (NADDI) | | | | |
| Various restrictions on sale, advertisement, placement of drug products containing ephedrine, pseudoephedrine or phenylpropanolamine or other designated precursor | §60A-10-5 | Board of Pharmacy | Regular | Rules, education programs completed |
| Board of Pharmacy, upon recommendation of Superintendent of the State Police, shall promulgate emergency and legislative rules to implement updated supplemental list of products containing ephedrine, pseudoephedrine or phenylpropanolamine | §60A-10-7 | Board of Pharmacy, WV State Police | Regular | Rules not completed at this time. Statue now says if product contains any of these then restricted except children's products |
| Pharmacists to report sales of certain drug products and related information to Board of Pharmacy database no more frequently than once a week.<br><br>Beginning January 1, 2013, electronic transmission of information shall be reported to MSRTTS and made in real time at time of transaction. | §60A-10-8 | Pharmacists Board of Pharmacy | January 1, 2013 | Reports, procedures completed and NPLEX implemented |

## Member Report Comments

A nice and coherent report.

As a clinician interested in using medications wisely, I am particularly pleased with the recommendation to make pseudoephedrine type medications available by prescription only (this is not a power thing, off the market altogether is also fine). I hope this sensible and inexpensive recommendation does not again get trumped by economic interests.

Each time we delay doing this it costs - a lot.

*Alan Ducatman*

---

The report looks great – thanks for compiling.

*Tonia Thomas*







# EXHIBIT 38

# *PILLAGE: Rx drug abuse in W.Va.; Clinic balances pain care, abuse dangers; Prescriptions pose 'moral dilemma' for doctors*

Charleston Gazette (West Virginia)

January 17, 2011, Monday

Copyright 2011 Charleston Newspapers

**Section:** NEWS; Pg. P1A

**Length:** 998 words

**Byline:** Alison Knezevich, Staff writer

## Body

CLAY - When Dr. Sarah Chouinard interviews doctors to work in rural clinics, they all want to know the same thing.

Will I have to treat pain patients?

It's always the first question they ask. "Immediately," she said, snapping her fingers.

The doctors don't want to write prescriptions for narcotic painkillers.

"They hate it," she said. "And they hate it because it's a moral dilemma."

How do they know their patients won't sell or abuse those pills?

Chouinard is medical director of Primary Care Systems, a group of community health centers serving Clay County and surrounding areas. In the face of widespread prescription drug abuse, her center is trying new ways to manage patients who take medication for chronic pain.

Primary Care Systems, which is merging with Tri-County Health Clinic, has streamlined the way it cares for these patients. It sets strict rules to weed out those who are abusing or selling their medication. Painkillers are the most abused type of prescription drug in the state.

"West Virginia is one of the worst places for prescription drug abuse, but it's also one of the places that I think has a high rate of legitimate chronic pain," Chouinard said.

Many of her patients work in labor-intensive jobs, she said. Some work in the coal industry. Others trim trees or do mechanical work on heavy machinery.

For many of Chouinard's patients, traveling to a pain specialist isn't an option. Nearly one in four Clay County residents lives in poverty. Its unemployment rate is the highest in the state, nearly 15 percent at last count.

"There are people that have never been to Charleston," which is 45 miles away, Chouinard said.

Prescription drug abuse has caused "a growing fear of primary care providers to even treat chronic pain patients," said Brock Malcolm, chief operating officer of Primary Care Systems.

"We have a mission to try to help the people who aren't being reached. That's what community health centers do," Malcolm said. "There was clearly this population who was not being able to get care because of the stigma of people who abuse the system."

PILLAGE: Rx drug abuse in W.Va.; Clinic balances pain care, abuse dangers; Prescriptions pose 'moral dilemma' for doctors

He remembers doctors arguing about the issue in staff meetings.

"Certain doctors were filled up with pain patients," he said. "If you were willing to do it, [all the patients] would get dumped on you."

To be more efficient, the clinic now makes all chronic pain patients schedule their appointments on one day of the week.

"On that day, we're kind of in the mode," Chouinard said.

Before she even walks into the exam room, she's armed with a Board of Pharmacy report showing which prescriptions her patients have filled, and the results of a urine test and pill count.

Patients sign an 18-point contract. They have to get all medications at a single pharmacy. They must keep their medicine in a secure place, like a locked cabinet or safe. They can't share or sell their pills, and they can't use more medication than the doctor prescribes.

If they break the contract, the clinic will stop prescribing the medication.

Assessing pain is "incredibly time consuming," Chouinard said. Sometimes, the clinic's doctors determine they can treat a patient's pain with alternatives to medicine, like physical therapy.

When Chouinard became medical director in 2005, nearly 300 patients at the Clay site took narcotic pain medication. Today, it's fewer than 50.

One patient is a 47-year-old man who works at a dry cleaners where he does a lot of heavy lifting. He had gone to a pain specialist who said treatment other than pain medicine would not work.

The patient didn't want to give his name because he knows too many people whose homes have been targeted by burglars seeking pain medication.

"One guy left his house and he was gone 30 minutes to the store," the patient said. "And when he got back, they had already broken into the house. It's weird to have someone watching you that close."

He takes Lortab to relieve pain from a bulging disc and spinal stenosis.

When the patient's dentist wrote him a painkiller prescription for an abscessed tooth, he called Chouinard.

"The people that legitimately want and need pain medication are willing to live by that contract," Chouinard said. "Period."

Even with safeguards, some patients still get around the system. A few weeks ago, the staff saw a patient's name in the newspaper. He had been arrested for selling his hydrocodone pills.

Primary Care Systems hopes to strengthen its chronic-pain program, Malcolm said.

"What we want is the reputation in the community to be such that this isn't the place to go if you're trying to abuse the system."

The clinic plans to apply for grant money to keep improving the way it manages the patients, and is searching for a physician to travel to all its sites to treat clients with chronic pain.

That would free up staff to concentrate on patients with other chronic conditions such as diabetes and hypertension, Malcolm said. Eventually, Primary Care hopes to partner with medical schools to train young doctors on treating chronic pain in a primary-care setting.

It's tempting for doctors to stop writing prescriptions for chronic pain, but Primary Care believes that's not the solution, Malcolm said.

PILLAGE: Rx drug abuse in W.Va.; Clinic balances pain care, abuse dangers; Prescriptions pose 'moral dilemma' for doctors

"We knew that just turning people away wasn't going to fix the problem," Malcolm said. "You're just putting your head in the sand at that point."

Without medication, Chouinard's patient who works in the dry cleaners says he wouldn't be able to do his job.

"You would be filling out my disability paperwork," he told Chouinard.

chris dorst | Gazette

Dr. Sarah Chouinard and nurse Christy Yost treat a patient with chronic pain at the Primary Care Systems clinic in Clay.

Reach Alison Knezevich at *alisonk@wvgazette.com*

or 304-348-1240.

This series was conceived and produced as a project for The California Endowment Health Journalism Fellowships, a program of the USC Annenberg School for Communication & Journalism.

chris dorst | Gazette

Dr. Sarah Chouinard and nurse Christy Yost treat a patient with chronic pain at the Primary Care Systems clinic in Clay.

**Load-Date:** January 18, 2011

# EXHIBIT 39

Case 3:17-cv-01362   Document 240-10   Filed 03/20/20   Page 95 of 98 PageID #: 3536

# Wheeling News-Register

Volume CXXII, No. 240 — Wheeling, W.Va. Monday Evening, July 9, 2012 — 24 Pages - 2 Sections — 50 Cents



# Gas Firms Sued

## Local Attorney Says Landowners Getting Shafted

**By CASEY JUNKINS**
**Staff Writer**

ST. CLAIRSVILLE — Rebecca Beach believes Hess Corp. and Mason Dixon Energy are not giving Belmont County landowners a fair deal at $100 per acre for oil and gas rights, so she wants to be able to renegotiate her contract.

Beach, a practicing attorney in Belmont County, filed a lawsuit against both energy companies in the county's Court of Common Pleas on her own behalf for a contract that she and husband, Kevin Beach, signed with Mason Dixon in December 2008. She claims Mason Dixon had no authority to acquire leases in Ohio and knew that the land was worth far more than the amounts the company agreed to pay her and roughly 300 other property owners in 2008.

During an initial hearing in March, Judge Jennifer Sargus recused herself from the matter, citing a conflict of interest because of a personal relationship with the Bench

*Please see Sued, Page 6*

---

# STATES FIGHT DRUG 'TOURISTS'

## W. Va., Ohio Among The Busiest States

**By ANDREW WELSH-HUGGINS**
**AP Legal Affairs Writer**

LEBANON, Ohio — As he sat in the doctor's office, ex-boxer and weightlifter Gerald Dixon explained that years of sports had left him in pain, especially his hands, and he was looking for relief.

After a cursory examination at the clinic in West Palm Beach, Fla., Dixon left with a prescription for 180 doses of OxyContin — and a plan to return to his Ohio home and sell them on the street.

The trips made by Dixon and others like him — authorities dub them "prescription" or "drug" tourists — have complicated the challenges investigators face trying to stem the flow of painkillers, whose prevalence have made drug overdoses the leading cause of accidental death in dozens of states including Ohio, Florida, Kentucky and Utah, surpassing car crashes.

Dixon, 52, a drug dealer for most of his adult life, had recently discovered a new angle on an old profession. By driving to Florida just once a month and acquiring a bagful of pain pills — legally and illegally — he could earn tens of thousands of dollars.

The only thing the medical clinics that Dixon visited in Florida cared about was the money, he said. A diagnosis for severe pain was easy to obtain

*Please see Tourists, Page 6*





Gerald Dixon, 53, serving a four-year sentence for transporting prescription painkillers from Florida back to Ohio for illegal sale, described his drug dealing activities during an interview at the Lebanon Correctional Institution in Lebanon, Ohio.

*AP Photo*

---

# Parents Take On Vaccines

## Seek Exemptions From W.Va. Law

**By LAWRENCE MESSINA**
**Associated Press**

CHARLESTON — West Virginia has some of the strictest limits on exempting children from vaccines required before they can attend school. Some parents are lobbying the Legislature to change that, while public health officials warn that the state already suffers low immunization rates against diseases such as polio, whooping cough and measles.

**■ NO LEEWAY**

While 48 states permit vaccination exemptions on religious grounds, West Virginia and Mississippi do not, according to the U.S. Centers for Disease Control and Prevention.

All states, including West Virginia, allow school-bound children to skip immunizations for medical reasons. But while 48 states also permit exemptions on religious grounds, West Virginia and Mississippi do not, according to the U.S. Centers for Disease Control and Prevention. Of these other states, 20 also allow philosophical objections including neighboring Ohio and Pennsylvania.

At a House-Senate hearing last month, parents told lawmakers they want a religious exemption in West Virginia. They say they're wrongly forced to home school their children, or even enroll them in neighboring states, because they object to the immunization requirements.

"Every parent has the right to make informed, educated decisions regarding their children's health care, especially in the case of vaccination which is clearly a medical procedure," Lori Lee, a leader of this effort, told the Joint Committee on Health. The parents' reasons vary. Several speakers alleged a link between vaccines and abortions.

"Fourteen of the vaccines required by the state of West Virginia contain aborted fetal tissue, of over 150 babies, and their cell lines are aging," Lee told lawmakers. "That bothers me as a Christian, that I have to choose between my faith in God and sending my children to public or private school."

*Please see Parents, Page 6*



# EXHIBIT 40

# The Intelligencer

H.C. Ogden, Publisher 1904-1943

Saturday, January 31, 2015

## OPINION

## Drugs Affecting W.Va. Economy

Two of the toughest public issues state officials need to address if West Virginia is to move forward are drug abuse and the state's dismally low workforce participation rate. It appears they are linked.

In November, the state's workforce participation rate was — by far — the lowest in the nation, at 51.2 percent, according to the federal government. The rate is calculated as a percentage of people 16 and over who are able to work and are employed.

A look at the November unemployment rate, 6.1 percent, seems to indicate that the state's economy is not doing badly. But that does not take into account people who, for one reason or another, are not even looking for jobs.

Legislators this month, state lawmakers and others related to both drug and West Virginia's epidemic of drug abuse.

There is a good seen in the report, by an official of one of the state's top wood products companies.
Allegheny Wood Products Vice President Don Alanko told lawmakers severe problems in his industry from 2003-12 were improving. During that period, hardwood production in the state dropped by 55 percent compared to the previous few years.

But, helped by increasing exports, the industry is rebounding, Alanko said.

A major challenge in taking advantage of new markets is finding enough people to cut timber and process the wood products, however.

Alanko told legislators that if a wood products company can hire one employee who says wish it for a long period of time out of 20 applicants, it is doing well. Of those 20, 10 do not return after interviews for mandatory drug testing. Or of the remaining 10, half fail it.

## Going Big — But Not Too Big

## Just Ask Emily



## A Game Of Nam...

## Consider New Gas, Oil Drilling Rules