# EXHIBIT 41

## OPINION

# The Intelligencer. A Vision for the Year 2020

**H.C. Ogden, Publisher 1904-1943**

Perry A. Rorda, General Manager — John McCabe, Managing Editor

Tuesday, January 6, 2015

## Teach Students About Pain Pills

Hundreds of Ohioans, many of them young people, die of drug overdoses every year. While different substances are to blame, a common thread often is involved in drug abuse.

It is prescription painkiller pills. Addiction to them is bad enough, but it often leads painkiller victims to try — and become hooked on — harder drugs.

A new state law mandating that Ohio public schools educate students on the dangers of prescription painkillers is an excellent idea.

As an Associated Press story pointed out, painkiller pills are an epidemic among young people. It has been reported that one-fifth of high school students abuse painkillers. Almost always, they are obtained illegally but with relative ease.

Obviously, one danger is that young people will believe legal drugs such as painkillers are safer than illegal substances such as heroin. Too many die in learning that is not the case.

So educating students on the dangers of painkillers — starting at an early age — is important.

That said, school-based anti-drug programs need to be monitored closely to ensure they are effective.

Too many school programs intended to safeguard children from dangers ranging from driving while intoxicated to abusing drugs are based on fad approaches. In effect, they are marketed well — but may not be as effective as promoters claim.

Ohioans cannot afford to waste time, school resources, money and your children's lives on feel-good abuse programs that do not really deter young people from dangerous behaviors.

So by all means, Ohioans should be using schools as one weapon in the war against drug abuse. But results should be tested objectively to ensure the anti-painkiller program is working. If it is not, it should be abandoned and another more effective approach should be tried.

## Don't Aid Obama With GOP Bickering

Through much of his time who consider them...

Whoever the next president is, he will seek a second term in the year 2020. For the Republicans, they should take advantage of 2020 and tell us with foresight, not with hindsight, what their vision for America is.

In the next year, we could see close to two dozen Republicans go up and down in the polls, rise and fall in media attention and scramble for dollars. They will each go on news shows and before the public with multi-point plans to fix problems, change things and make us safer. The Republican presidents will blame much of what ails us on Barack Obama.

Frankly, the Republican campaign has the potential to turn into an Obama-bashing festival of the first order. Any malady can be blamed on him. Any foreign policy disruption will be placed on his shoulders. But what of the GOP?

This is where Mitt Romney failed spectacularly. He decided to approach the job of president not as president, but as CEO of a large corporation. His rhetoric was in terms of multipoint plans and business acumen. He won the war for the hearts and souls of chief executives and lost the gut poll question, "who cares for me?"

Republicans running in 2016 need to spend less time blaming Barack Obama and more time telling the public how the country will look in



2020. They should avoid the platitudes and unreal paint the picture.

We know right now that the middle class is stagnant. We know that the rich continue to get rich, but the poor are more and more subsidized and left comfortable with no way to break into the middle class. We know health care costs are going up. We know black Americans are worse off economically now than before President Obama took office. We know Russia, China, North Korea and other nations are constantly seeking to undermine our national interests. We know Americans distrust government to have all the answers and solutions.

President Obama will, by the time he leaves office, have created a nation where more than ever before the people have turned on each other, the police have turned on the public, and the public on the police, the military lacks confidence, the poor have given up, the government has failed at its basic tasks the bureaucracy has become a politicized weapon deployable against critics, and the elite have turned to managing and profiting from decline.

The first task of any Republican presidential candidates must be to convince the American people that they, not government, control their destiny. The candidate must, in order to do that, really believe that our best days are ahead of us and not just say

it because he is running for president.

The American people are grownups. The Republican electorate are grown-ups. It is time for Republican presidential candidates to stop trying to do their best imitation of Ronald Reagan and instead actually show us who they authentically are. Who is the optimist? Who is the leader? Who can paint the picture of the better tomorrow? Who can bring back hope?

The answers to those questions are not found in policy prescriptions. Nor are the answers found in healing up the president. The answers are found in their vision, in their demeanor, in their quiet confidence, in their eyes and in their smile. Polling suggests the public believes again there are better days ahead. Now we need someone to convince us they know what those better days look like and have the path to get there. The public needs someone to show them the way to those better days, not just give a fancy speech surrounded by Doric columns.

Every year my website, Red State.com, holds an annual gathering. This coming August it will be in Atlanta, Georgia. I hope to get as many of the 2016 Republican field as I can to come show us their vision for America with 2020 fore sight. The multi-point plans will be no good if the Republican nominee cannot convey that he cares. We need to find that happy warrior.

ERICK ERICKSON

MODE

REGION BRIEFS

**Electrocute coal miner i**

BEALLSVILLE
coal miner who was crushed early Monday the Century Mine i Beallsville escaped injury according to Broadhurst, a spokesman for Murray Energy at Clairsville.

According to the County 911, the man was transported to the Hospital just before 2 a.m. Monday. Details of the accident were not available as it was not an emergency station.

**Trail group meet Jan. 14**

WHEELING — The Ohio Valley Trail Partners will meet at 11:30 a.m. Jan. 14, at Generations Wheeling.

Topics will include Latest information on the Actionville Bridge and updates for Ohio, Initiatives and Belmont counties and other related topics.

**Church to ho concert Frid**

MOUNDSVILLE — A concert featuring the the Quartet and The will be held at 7 p.m. on day at Cornerstone Church of God, First Street and Poplar Avenue.

The public is invited to attend. A free will offering will be taken. For additional information call 304 845-7743 or 304-843-6133.

**Network to ho**

# EXHIBIT 42

# West Virginia

Telegram                     Sunday, January 11, 2015

## Ohio Co. deputy, wife work together to lose weight

### Officer's career crippling obesity pointed the couple toward healthier lifestyle change

By Fred Connors
THE INTELLIGENCER AND WHEELING NEWS-REGISTER

WHEELING — Chester and Heather Baar have eaten more fresh fruits and vegetables in the past year than they did in the previous 11 years they have been together.

A radical lifestyle change including calorie-conscious eating and daily workouts at the gym — have transformed the couples' looks and lives.

Chester at an Ohio County deputy — roll, has dropped half a body weight, going — 320 to 175 pounds in 11 weeks. Heather 52 has trimmed down from 280 to 154 lbs. They lost 180 and 126 pounds, respectively.

The extra weight from partially crippled Chester's law enforcement career and limited his wardrobe options.

"I got passed over twice because I could not pass the mandatory physical agility test," he said. "I also got tired of shopping in the big and tall sections of the clothing stores."

Chester's obesity prevented him from performing his like than climbing and agility. In September 2013, he learned his body mass readings were 100 bad.

"Even after being diagnosed with diabetes, it did not sink in," he said. "I was on two medications when my insurance coverage changed and I learned it would not cover my prescriptions. I decided at that time that I was not going to pay for medicine if there was any other means to treat it."

He soon learned that distress can be treated and even cured with healthy eating and a consistent exercise plan.

"We used to go the gym and workout, then go the pizza shop and pig out," he said. "Now we work at being healthy."

He no longer has diabetes and he takes no pre-



Chester and Heather Baar pose for a photo after Baar mentioned weight loss of almost 263 pounds.

scription drugs.

Heather, who joined the weight loss effort a few months after her husband, said she talked to a dietitian.

"She said we needed a lifestyle change, not a diet," she said.

The couple watched their weight intact up over the 11 years since they started, so they became their own support group.

"We put it on together," Heather Baar said "And, we took it all together. I got a new husband without getting a divorce."

Chester credits much of their success to a cellphone app called "My Fitness Pal." It has the tools to keep a diary of daily calorie intake and exercise.

The diet part of Chester and Heather's lifestyle change allows them to eat much of the same foods as they did before, but at smaller portions.

See WEIGHT, D3

## State tax reform remains hot topic

### Subject pre-dates West Virginia's statehood

by George Hohmann
THE STATE JOURNAL

CHARLESTON — Tax reform has been a hot topic in West Virginia for 164 years.

In his book, "The West Virginia Constitution: A Reference Guide," Robert Bastress noted that that citizens in the western counties were upset because the Virginia Constitution of 1851 taxed real estate and livestock in the Tidewater Basin at a fraction of the value of similar property in the west.




A 10-page history of state tax reform efforts is included in then-Gov. Joe Manchin's 2006 Tax Modernization Project report.

Recent efforts date back to 1888, when then-Gov. Cecil Underwood appointed a Commission on Fair Taxation. The commission conducted what, at the time, was the most comprehensive review of the state's tax structure in West Virginia's history.

Numerous Recommendations

After a 3 1/2-year effort, the commission made numerous recommendations, including elimination of the personal property tax, replacement of many of the state's business taxes with a single focus-based tax and the elimination of most state tax exemptions.

Although the commission had Underwood's support and Commission Chairman Robin Capehart chairmanned the state speaking about tax reform, the effort yielded few immediate results.

Looking back to the election in 2005 Capehart said, "If it made one mistake, it was not to put it on the legislative agenda. Until you put proposals to bills nothing is going to change."

Manchin took up tax reform in 2005 by appointing leading state financial executives and



Clockwise, from left: Gov. Earl Ray Tomblin, left, and Cabinet Secretary Bob Kiss. Former Gov. Underwood. Commission Chairman Robin Capehart.

academics to a Tax Modernization Project.

The project's report said the Underwood commission had "identified several problems" and "in so doing, even without implementation... helped to know a number of issues" and continued the long debate "That knew is an accomplishment.

Manchin-Era Changes

The Manchin-appointed group's work led to some important tax changes, including elimination of the personal income tax on families with incomes below the federal poverty level; elimination of the auto privilege tax; establishment of the Municipal Home Rule Pilot Program and, starting in 2006, reductions leading to the elimination of the sales tax on food

A gradual reduction in the corporate net income tax rate began in 2007. In 2008, the Legislature began scaling back the business franchise tax, which was eliminated as of Jan. 1.

Capehart revoiced outstanding issues in 2005 with "Real Tax Reform for West Virginia" a compilation of his columns on the subject that were published by The State Journal in 2004 and 2007.

Manchin recommended the Tax Modernization Project and Members decided to focus on two issues:

How to reduce or eliminate the property tax on business inventory and equipment, and

How to shore up the State Road Fund.

Manchin subsequently proposed an amendment to the state constitution that would have allowed the Legislature to exempt business machinery and equipment from the personal property tax. The amendment would have left it up to the Legislature to decide how local governments would make up lost revenue.

At the time, the property tax on business machinery and equipment raised about $150 million a year.

See TAX TALES, D3

## Overdose drug Naloxone dubbed 'double-edged sword'

by Linda Harris
THE STATE JOURNAL

CHARLESTON — West Virginia has the highest drug overdose death rate in the nation, and it's one of 22 states that does not allow first-responders to administer Naloxone, a life-saving drug that can reverse the deadly effects of heroin and prescription drugs.

Supporters say they'll try to change that by re-introducing legislation to allow the drug once the Legislature reconvenes for the 2015 regular session.

Lackley Farl happen

The bill, which has been introduced several times in the past few years, would aim to prevent deaths by

accidental overdose by requiring prescribers to offer a prescription of the medication Naloxone to patients for whom opioids are prescribed and by requiring that information and education on Naloxone's beneficial and proper use be made available or provided to patients, family members and caregivers of addicts.

"It saves lives. It works. It's been documented as a national level that we should have it," said Sen. Ron Stollings, D-Boone, who sponsored a Naloxone bill in the 2014 session.

His measure passed the Senate only to remain in the House Judiciary Committee — where it would stay until the end of the session. The

House also slapped a companion "good Samaritan" bill Stallings championed last year of its protections for people who call 911 to report drug overdoses.

"Those bills should not have failed last year," said Stollings, a physician. "I haven't been more upset or disappointed that I was that session when these two bills died.

"We started out talking about prescription drugs, but heroin has made a huge comeback in West Virginia, and now that it is back, it adds even more urgency."

Here it Works

Naloxone is an "opioid antagonist" that can counter the effects of an overdose of heroin, morphine or other

prescription drugs if it's administered in time and if the overdose victim has not too way pure. It only works if a person has opioids in his or her system and it has no potential for abuse.

"The antidote works," Stollings said. "It's dramatic, but it's short-acting. Simply giving someone an injection or giving it to them intra- nasally isn't enough, you do have to get them help.

"It will wear off after a while, and if they have a long-lasting opioid in their system, the effects will come back. It's not just getting them the shot or nasal delivery — it's about getting them help."

See OVERDOSE, D3

## Poca couple hopes gym works out

by Maureen Constantine
CHARLESTON DAILY MAIL

In the summer of 2012 Katie Terrell and Justin Smith met at a General Nutrition Centers store in Charleston where Katie worked.

Katie says Justin was a regular customer but she was too nervous to talk to him. They finally connected on Facebook and went on a date in November 2012.

"And then we got married," Justin laughed.

Katie, 22, and Justin Smith, 24, wed on Aug. 10, 2013, after a short engagement. Today, they are Putnam County's newest business owners.

See GYM, D6







## JOE R. PYLE

COMPLETE AUCTION & REALTY SERVICE

Phone: 304-592-6000 • Toll Free: 888-875-1599
Fax: 304-592-6008 • jrpyle@windstream.net

www.joerpyleauctions.com

# EXHIBIT 43

**Telegram**

**Obituaries, Local**

# Commission to discuss replacement for Romano



OBITUARY

**Joan Catherine Watson**

CLARKSBURG — Mrs. Joan Catherine Watson, age 78, of Clarksburg, WV, passed away on Monday, January 16, 2015, at 136 in Bridgeport.

Joan was born on September 17, 1936, in Cumberland, MD, a daughter of the late Justow Lafreae Higginman and Eva Patterson Ace.

**Melvin David Bol**

RAVENSWOOD — David Bolyard, of Ravenswood, WV, passed on January 19, 2015, in Parkersburg, WV.

# Commission approves funding for new library

## CALENDAR OF EVENTS



### Stoney Run Road accident sends 4 people to Ruby

BUCKHANNON — Four people were flown to Ruby Memorial Hospital after a single-vehicle accident on Stoney Run Road in Buckhannon Tuesday, officials said.

### LOCAL STATE

### Fellowsville wreck kills Grafton man, injures stepson

FELLOWSVILLE — A Grafton man was killed and his stepson injured in a single-car crash Monday on U.S. 50 near Fellowsville, State Police said.

### Elkins drug task force recognized



ELKINS — In its first full year, the Mountain Region Drug and Violent Crimes Task Force prosecuted 29 individuals in methamphetamine cases.

### Roland Brooks Daugherty



JANE LEW — Roland Brooks Daugherty, 64, of Jane Lew, passed away Jan. 16, 2015.

## MAKE TAX TIME EASY

# EXHIBIT 44

## ...les Ray Elder

CLARKSBURG — Charles ... Ray Elder ...

Charles was a graduate of Bridgeport High School and served in the U.S. Navy. He retired from the Louis A. Johnson VA Medical Center Department of Veterans Affairs after 50 years of service. He was a member of the Bridgeport American Legion and had attended Bridgeport Baptist Church.

Family requests that donations may be made in Charles Elder's memory to the Parkinson's Disease Foundation, 315 Broadway, Suite 1501, New York, NY 10004.

Private services at the Elder home to be held at a later date by the family.

brother, Paul Allen Elder.

Charles was a graduate of Bridgeport High School and served in the U.S. Navy. He retired from the Louis A. Johnson VA Medical Center Department of Veterans Affairs after 50 years of service. He was a member of the Bridgeport American Legion and had attended Bridgeport Baptist Church.

Family requests that donations may be made in Charles Elder's memory to the Parkinson's Disease Foundation, 315 Broadway, Suite 1501, New York, NY 10004.

Private services at the Elder home to be held at a later date by the family.

## Jaunita J. (Lewis) Hawkins

CLARKSBURG — Jaunita J. (Lewis) Hawkins, 83, of Joliet, Illinois, died Saturday, January 24, 2015, at the ...

A funeral services will be held at 2 p.m. Monday, February 2, 2015, in the Davis Funeral Home Chapel with the Reverend Les Benedum officiating. Interment will follow at the Stonewall Park Cemetery.

Condolences may be sent to the family at www.davisfuneralhomewv.com.

Davis Funeral Home is honored to serve the Hawkins family.



MEMORIAM

IN LOVING MEMORY OF
JOSEPH DELCASTRO
Jan. 31, 1931 - Jan. 2, 2014

We know you didn't want to leave us Jan 2nd, 2014 and we didn't want you to go, but we will love you the rest of our lives. Your goodness & kindness will live with us forever. Our memories will never die & you are always on our minds. You were the best husband, father & Pappaw anyone could ever have. We know you are in a beautiful place in heaven & God is loving you. Happy Birthday Joel. Your Wife Clara & Family

## Florence E. Kerns

CLARKSBURG — Florence E. Kerns, age 85, of Nutter Fort, WV, resident of Clarksburg Nursing and Rehabilitation, passed away on Wednesday, January 28, 2015, at the United Hospital Center in Bridgeport.

She was born on July 4, 1929, in Clarksburg, a daughter of the late Hayward and Mary Blackwell Campbell.

Surviving are three children, Carl E. Hayes Jr. of Stonewood, Glenda Maze of Nutter Fort and Peggy Bowen and husband Ricky of Salem, nine grandchildren, Cathy Imperial (John), David Maze (Kelly), Stephanie Ielaps (John), Zachary Bowen, Olivia Bryant, Elizabeth Bowen, Sam Jarkson, Aaron Jackson and Shawn Hayes, and seven great grandchildren. Also surviving are several nieces and nephews.

In addition to her parents, Florence was preceded in death by her husband, John O. Kerns, two brothers, John and William Campbell, three sisters, Wanda Setzer, Ruth Wilmoth and Martha Skinner, and one son-in-law, Rodney Maze.

Florence retired after 33 1/2 years of service with Hazel Atlas, CTC, Anchor Hocking and Newell Glass Companies. She enjoyed country music and taking bus tours to see shows and sightsee. Florence loved her family and especially her grandchildren. She was a wonderful mother, grandmother and friend.

The family will receive friends at the Davis Weaver Funeral Home, 329 E. Main Street, Clarksburg, WV, on Saturday, January 31, 2015, from 5 p.m. until the funeral hour at 1 p.m. Funeral services will be conducted on Saturday, January 31, 2015, at 1 p.m. at the funeral home with Rev. Johnie Cole presiding. Interment will follow at Floral Hills Memorial Gardens.

The Davis-Weaver Funeral Home is honored to serve the Kerns family during this time.



### Rod McKuen dies at age 81

By Hillel Italie
THE ASSOCIATED PRESS

NEW YORK — Rod McKuen, the husky-voiced "King of Kitsch" whose avalanche of music, verse and spoken-word recordings in the 1960s and '70s overwhelmed critical mockery and made him an Oscar-nominated songwriter and one of the best-selling poets in history, has died. He was 81.

McKuen died Thursday morning at a rehabilitation center in Beverly Hills, California, where he had been treated for pneumonia and had been ill for several weeks and was unable to digest food, his half brother Edward McKuen Habib said.

Until he was hospitalized in 1981, McKuen was an astonishingly successful and prolific force in popular culture, turning out hundreds of songs, poems and records. Sentimental, earnest and unashamed, he conjured a New Age spirit world that captivated those who didn't ordinarily like "poetry" and those who craved relief from the war, assassinations and riots of the time.

"I think it's a reaction people are having against so much inanity in the world..."

## Task force probes result in 41 total arrests in 2014

From Staff Reports

BRIDGEPORT — Forty-one individuals were arrested in 2014 as a result of Greater Harrison Drug and Violent Crimes Task Force investigations, according to the office of U.S. Attorney William J. Ihlenfeld II.



Walker

Sixteen arrests were for prescription pill trafficking, 10 for heroin, five for methamphetamine, four for bath salts, three for crack cocaine, two for marijuana and one for fraudulent prescriptions, according to Ihlenfeld's office.

Additionally, investigations by the task force led to sentencing of 36 individuals to a total of nearly 130 years – an average of 3.6 years per defendant – in 2014, according to Ihlenfeld's office.

Notable cases included the arrest, guilty plea and sentencing of Harrison County Sheriff's Department process server Jason Marple, the arrest and guilty plea of Mario Blount, who was mayor of Bridgeport at the time, as well as a plea mactac for a painkiller prosecution/distribution conspiracy, and "no contest" pleas by Dr. Edna Milan in a case in which she's accused of operating a painkiller distribution ring from her Bridgeport clinic.

Bridgeport Police Chief John Walker, who helps oversee the drug task force and its officers assigned to it, noted the impact drug addiction has had on quality of life.

"We are extremely fortunate to have proactive law enforcement officers who understand the problems and dangers that drugs bring to our communities," Walker said. "It is important for the residents of our communities to know that together we can make a difference, and we value their input. The officers serving in the Greater Harrison County Drug and Violent Crimes Task Force are to be commended for the excellent work and success they accomplished in 2014 and looking forward to their continuing success in the future."

Clarksburg Police Chief Robert L. "Robber" Hilliard also has officers on the unit and helps oversee it.

"Area law enforcement and the task force have a responsibility to keep the community safe. That is our community's top priority," Hilliard said. "We take it personally when illegal activity threatens the safety and well being of the citizens of this area."

The coopera... tive effort of coming together and working together in and our community of illegal drugs has proven successful over and over again.

The Greater Harrison County Drug and Violent Crimes Task Force is composed of representatives from the U.S. Attorney's Office, the Drug Enforcement Administration, the West Virginia State Police, the United States Marshals Service, the United States Postal Inspection Service, the Bureau of Alcohol, Tobacco, Firearms and Explosives, Internal Revenue Service-CI, the Clarksburg Police Department and the Bridgeport Police Department, according to Ihlenfeld's office.

The task force's tip line is (304) 709-5784, or tips can be sent by email to ghctftifs pline@gmail.com



Hilliard

## One man hurt after rolling his truck on Interstate 79

ANMORE — One man was taken to the hospital after rolling his truck on Interstate 79 Friday morning, according to the Harrison County Sheriff's Department.

Matthew Bennett was driving a 2007 Chevrolet Silverado on I-79 near Anmore about 6:47 a.m. when he traveled into the median and rolled the vehicle, Harrison Chief Deputy Steve Johnson said.

... alternative sentence.

The defendant, who will be required to pay restitution, could face 1-10 years in prison in the case investigated by Bridgeport Officer J. Prenni...

CARVELLI

DAVID ALLEN OLIVERIO
Mass of Christian Burial

Interment

MARY ELIZABETH GUNTER
Memorial Service

DAVID LEE "DJ" CROCK, JR.

HANNA CATHERINE CROCK

JOSHUA DAVID CROCK
Gathering of Family and Friends
2:00 - 4:00 pm Saturday
Amos Carvelli Funeral Home
Memorial Service
5:00 pm Saturday
Amos Carvelli
Funeral Home
Private Interment
Haldeman Cemetery

GERTRUDE FAYE "Gertie" FOGG
Visitation
2:00 - 4:00 pm &
6:00 - 8:00 pm Sunday
Amos Carvelli
Funeral Home
Service
1:00 pm Monday
Amos Carvelli
Funeral Home
Interment
Boring Cemetery

AMY MARIE ASHLEY
Visitation
2:00 - 4:00 pm Sunday
Amos Carvelli
Funeral Home
Service
1:00 pm Monday
Cemey Branch
Assembly of God

Perine Funeral Home

TIMOTHY D. SNYDER, SR.
Visitation
2:00 - 4:00 pm Sunday
Perine Funeral Home
Service
11:00 am Monday
Perine Funeral Home
Interment
Shinnston
Masonic Cemetery

304-592-5925
www.perinefunerals.com
Rt. 19 S. Shinnston
Timothy E. Perine
Owner/Licensed Director
Adam T. Perine
Family Owned
& Operated

WE ARE LOCALLY OWNED AND OPERATED

Harrison County's Only Davis Community at Davis Funeral Home

DAVIS
Funeral Home

JAUNITA J. (LEWIS) HAWKINS
Visitation



Davis Weaver
Celebrating 70 Years

LOCAL & STATE

# EXHIBIT 45

**Telegram**  The Exponent

Local, State

Wednesday, February 11, 2015   A3

# Feds tackle drug cases in Harrison, Randolph

by Matt Harvey
*ASSISTANT MANAGING EDITOR*

CLARKSBURG — A Michigan defendant in a Harrison County drug case was sentenced to about 12 1/2 years in prison on Tuesday by U.S. District Judge Irene M. Keeley.

In a separate case, meanwhile, a Florida man pleaded guilty to being involved in a six-year marijuana conspiracy in Randolph County.

In the Harrison County matter, Stanley "Smooth" Dye Jr., 32, of Detroit, previously had pleaded guilty to possession with intent to distribute oxycodone.

He also must serve 3 years on supervised release once he completes his incarceration, Keeley ruled in the hearing in U.S. District Court in Clarksburg. Dye gets credit for a year and about 2 months he served pending prosecution.

The Greater Harrison Drug and Violent Crimes Task Force investigated, making multiple controlled purchases of oxycodone from a residence on Blane Street in East View.

Agents seized oxycodone, guns and thousands of dollars in currency when they raided the dwelling on Dec. 19, 2013.

The Drug Task Force alleged Dye brought drugs



Judge Keeley

from Michigan through Ohio and then into the Clarksburg area for distribution by other defendants in the case. The investigation resulted in multiple convictions, including of two other Detroit residents.

Assistant U.S. Attorney Shawn Morgan represented the government, while Dye's lawyer was Roger D Curry of Fairmont.

In the Randolph County case, Arthur Woodrow Pritt Jr., 37, of Archer, in Florida's Alachua County, pleaded guilty to the marijuana conspiracy lasting from Dec 18, 2008, to last Dec. 16.

Pritt stipulated that proceeds from his conviction were around $110,000, and agreed to a forfeiture money judgment of that amount. Assistant U.S. Attorney Stephen Warner, defense lawyer Scott Shough and Pritt also reached an agreement that the defendant's total relevant drug conduct was at least 40 kilograms, but less than 60 kilograms.

Pritt's plea hearing was conducted by U.S. Magistrate John S. Kaull in Elkins. Pritt

will be sentenced at a later date by Chief U.S. District Judge John Preston Bailey.

The U.S. Forest Service, IRS and Drug Enforcement Administration investigated. Also

■ Three individuals have pleaded guilty in a case in which the office of U.S. Attorney William J Ihlenfeld II has alleged oxycodone was obtained in Detroit, New Jersey and Florida for redistribution in Northern West Virginia.

Entering pleas in Elkins on Tuesday before Magistrate Kaull were Stevie Lea Sharp, also known as Stevie Shreve, 27, of Coalton, Matthew Lee Cordero, 31, of Vineland, New Jersey, and Gregory Stephen Scott, 34, of Beverly.

Scott and Sharp pleaded guilty to aiding and abetting distribution of oxycodone June 6, 2013, in Randolph County

Cordero pleaded guilty to distribution of oxycodone Oct 17 in Elkins.

Scott, represented by Federal Defender Brian Kornbrath, stipulated to total relevant drug conduct of at least 100 kilograms marijuana equivalent, but not more than 400 kilograms.

Cordero, represented by attorney Scott Curnutte, stipulated total relevant drug

conduct of not more than 60 kilograms of marijuana equivalent.

And Sharp, represented by attorney Harry A Smith, stipulated to total relevant drug conduct of at least 10 kilograms of marijuana equivalent, but less than 20 kilograms

The fourth and final defendant, Jonathan Paul Calain, 34, of Elkins, is scheduled for a plea hearing.

Warner represented the government The Mountain Region Drug and Violent Crimes Task Force, State Police, the Randolph and Upshur sheriff's departments, the Drug Enforcement Administration and the IRS investigated

Chief Judge Bailey will preside over the sentencing hearings

■ Richard McNemar, 45 has lost another challenge of his imprisonment on Harrison County convictions for first-degree sexual abuse and sexual abuse by a parent, guardian, custodian or person in a position of trust.

McNemar was convicted by a jury in July 2008 and was sentenced to 10-20 years in prison that same year.

McNemar's initial legal challenge was rejected July 1, 2010, by Harrison Circuit Judge James A Matish



McNemar

In the second challenge, filed recently, McNemar had asserted the lawyer he had in the first challenge was ineffective

After reviewing the proceedings of the first challenge and considering applicable standards of law Matish ruled that McNemar is eligible for no relief

The defendant is projected to discharge his sentence July 21, 2018, via day for day good time credit That's also the same day he first would be eligible for parole

McNemar, held at the Huttonsville Correctional Center will have to register as a sex offender for life once he's released.

■ Tia Elana Stout, 24, of Shinnston, has been placed on probation for 3 years by Harrison Circuit Judge John Lewis Marks Jr. according to Assistant Prosecutor Laura Pickens

Stout previously had pleaded guilty to conspiracy to commit delivery of heroin in a case investigated by the Harrison County Street Crimes and Drug unit

■ Cameron Michael Denn

has pleaded guilty before Kaull in Elkins to distribution of oxycodone May 20 in Lewis County

Represented by Assistant Defender Kary Cmutte, Denn will be sentenced at a later date by Chief Judge Bailey

■ William Ray Justice has pleaded guilty before Kaull in Elkins to distribution of morphine Jan 19 2014 in Weston Justice also represented in Cmutte, will be sentenced later by Bailey

■ Melinda Kriss Means 37 of Clarksburg, has waived her probable cause hearing before Harrison Magistrate Warren "Guzzy" Davis

The waiver sends to court court the charge of felony third-offense shoplifting lodged against Means by Clarksburg Officer S T Vincent

Means stipulated from Walmart in early December Vincent has waived

■ Longtime area defense attorney Greta Davis is closing her practice according to a filing in Harrison County Circuit Court in which she asks off one of her cases

Davis and her family are relocating to another state according to the filing

Davis was an assistant defender for the county for several years before opening a private practice

# W.Va., Mississippi strictest on school immunizations

Neither allows



exemption was stripped from   The protection of students   want to keep the law as it is

# EXHIBIT 46

Case 3:17-cv-01362   Document 240-11   Filed 03/20/20   Page 12 of 81 PageID #: 3551

# The Exponent Telegra



**God Bless America**

75¢

*The Independent Voice of North Central West Virginia*

75¢

**INSIDE**

**LOCAL**



The Harrison County Commission approved the annexation of over 300 acres of property for Clarksburg

Page A4

**SPORTS**



The RCB boys basketball team routed Grafton, 75-46, Thursday night at home

Page B1



# Bridgeport hosts meeting to address drug abuse problem

## U.S. Attorney Ihlenfeld makes keynote speech on helping young people with addiction

by Brittany Murray
*STAFF WRITER*

BRIDGEPORT — Local residents gathered at Bridgeport High School Thursday evening for a town hall meeting to discuss drug abuse and overdoses in their communities and the state of West Virginia.

"It's somewhat symbolic that we're here at a high school, because so much of what we hope to accomplish tonight and going forward is helping our young people," said keynote speaker William Ihlenfeld II, U.S. attorney for the Northern District of West Virginia.

Heroin and opioid abuse is a public health crisis, Ihlenfeld said.

During his presentation Ihlenfeld stated that over 8,000 people in the U.S. died in 2013 from heroin overdoses — a 39 percent



Ihlenfeld

increase from 2012.

"We have not yet hit the peak of the problem," Ihlenfeld said. "We're still going up, and it hasn't flattened out and we haven't started to come back down the other side."

In 2013, about 750,000 people in the U.S. reported using heroin, Ihlenfeld said.

"That's a staggering num-

ber," he said.

Bridgeport High School graduate Brianna Stogran has dealt firsthand with the struggle of drug addiction and abuse.

In 2014, Stogran was arrested for possessing heroin, and later attended a treatment facility in North Carolina.

See ISSUES, A3



# Election law change sought in potential Manchin bid

# EXHIBIT 47

# In WV, Obama talks prevention, treatment to fight opioid epidemic

Gutman, David . TCA Regional News ; Chicago [Chicago]21 Oct 2015.

🔗ProQuest document link

## ABSTRACT

Obama came to Charleston to talk about opioids, including heroin and prescription painkillers, and ways to deal with the epidemic of drug abuse across West Virginia and the rest of the nation. Obama spoke at the East End Family Resource Center, in a small gymnasium, with hand-painted backboards, to an invited audience of health and law enforcement professionals, families affected by substance abuse and Democratic lawmakers and other officials.\n

## FULL TEXT

Oct. 21--As President Barack Obama sat in a small community center gym on Charleston's East End on Wednesday, Cary Dixon told him what opioid addiction has meant to her family.

"We dread the next phone call," said Dixon, whose son is in jail, battling his addiction. "We neglect our marriages. We neglect other children in our homes, who are thriving, because all our attention is focused on addiction and substance abuse. We rest better at night when our loved ones are incarcerated."

Dixon, of Huntington, leads a support group for parents with children battling addiction.

Obama said her story made him think of his own daughters.

"They're wonderful girls, but they're teenagers. They do some," Obama paused, "things."

Obama referenced his book, in which he wrote about his drug use as a young man.

"I did some," again Obama paused for emphasis, "stuff."

"What I think about is, 'There but for the grace of God . . . ' " the president said.

Obama came to Charleston to talk about opioids, including heroin and prescription painkillers, and ways to deal with the epidemic of drug abuse across West Virginia and the rest of the nation.

The president led the discussion that was focused on the scale and the possible solutions to the nation's opioid epidemic, which took off in the mid-1990s and has grown rapidly since then.

He said that, in contrast to a previous tough-on-crime mindset, officials need to focus on strategies to reduce the


PDF GENERATED BY SEARCH.PROQUEST.COM

demand side of the problem -- prevention and treatment.

"This is an illness, and we have to treat it as such," Obama said, to applause. "For a long time, I think, treatment was seen as a second-class citizen to interdiction and arrest."

The administration is not backing off on aggressive law enforcement, Obama said, just that, for far too long, prevention and treatment have been undervalued.

He talked about how addiction affects people all over the country, of all races and income levels.

"This is happening to families everywhere, with great parents who love their kids," the president said.

Obama also said, though, that race and income do play a role in making communities more vulnerable, and he touched on the connection between West Virginia's troubled economy and its spot leading the nation in overdose deaths.

"Part of the reason West Virginia probably has more cases partly has to do with the economics that have been taking place in some of these communities, which is why it's so important for us to push on that front, as well," the president said.

There were 259 million prescriptions written for opioid painkillers in 2012, Obama said, more than enough for every adult in America to have their own bottle of pills.

"As their use has increased," he said, "so has the misuse."

More Americans die from drug overdoses than car crashes, Obama said, and most of those overdoses come from legal prescription drugs.

The solution won't come from any one source, he said, talking about the importance of better training for drug prescribers, while also certifying more doctors to prescribe opioid treatment drugs like Suboxone and expanding the use of naloxone to save the lives of people who overdose.

"We've all got a role to play," the president said. "These are our kids. It's not somebody else's kids, it's our kids; it's not somebody else's neighborhood, it's our neighborhood."

In response to a question about the dearth of opioid treatment options in West Virginia, Obama pointed to his 2016 budget -- which has no chance of being passed by Congress. Obama's budget has more than $100 million in new money for overdose prevention programs and expanding medically assisted treatment programs.

He noted that the Affordable Care Act requires insurance plans to include coverage for substance abuse treatment, the same way they do for diabetes or heart disease.

The president pointed to America's success in battling smoking as an example of how the nation can battle the opioid epidemic -- on multiple points of attack.

The adult smoking rate has consistently declined, from about 40 percent of the population in 1965 to less than 20 percent today. The youth smoking rate has plummeted in the past 15 years, from about 35 percent to 18 percent.


PDF GENERATED BY SEARCH.PROQUEST.COM

"Nicotine is as addictive as any of the drugs we're talking about," Obama said. "There's no reason we can't do it here, as well."

Even though cigarettes have never been outlawed, he said that, through improved education, more difficult access, restrictions on tobacco advertising and cutting tobacco industry profits, the country has achieved big results.

Obama spoke at the East End Family Resource Center, in a small gymnasium, with hand-painted backboards, to an invited audience of health and law enforcement professionals, families affected by substance abuse and Democratic lawmakers and other officials.

Joining the president and Dixon on stage were U.S. Health and Human Services Secretary Sylvia Mathews Burwell, White House director of national drug control policy Michael Botticelli, Charleston Police Chief Brent Webster and Dr. Michael Brumage, director of the Kanawha-Charleston Health Department.

Obama said he was impressed with Charleston's Handle with Care program, described by Webster, in which police officers at violent crime scenes take the name of children present and then notify the child's school so they can receive special attention or counseling the next day.

The president said he'd like to see that program advertised more around the country.

"Most people probably look at the person in the uniform and think this is the guy who's going to tell me 'more jails,' and that's not me," Webster said.

"This is such an epidemic, and you cannot arrest your way out of this mess," the chief said to huge applause.

Obama noted that criminal justice reform and battling the opioid epidemic through treatment, rather than incarceration, is one of very few areas where there is bipartisan agreement in Washington.

Gov. Earl Ray Tomblin spoke briefly before the president's arrival, touting the steps that West Virginia has taken in the past several years to try to stem the flood of opioid abuse -- increasing community based treatment and treatment in state prisons, shutting down 11 "pill mills" and expanding access to naloxone, which reverses the effects of an overdose.

"Each of us has experienced this heartbreaking epidemic, in one way or another," said Tomblin, whose brother has struggled with opioid addiction. "It can affect the richest of the rich or the poorest of the poor."

During his trip to Charleston, Obama announced two new federal policies intended to help deal with the overabundance of prescription opioids and the dearth of available treatment for opioid abuse.

The president will require federal agencies to provide training, specifically on the prescription of opioids, to doctors and nurses who work for the federal government.

While heroin use has skyrocketed in recent years, it's still a problem that starts with legal drugs found in medicine cabinets.

Four out of five new heroin users started by abusing prescription medications, Obama said.


PDF GENERATED BY SEARCH.PROQUEST.COM

"Much of the morbidity and the mortality associated with prescription drug and heroin abuse correlates to over-prescribing of painkillers in the United States," Botticelli said.

Federal agencies also will have to examine the health insurance plans they offer, to make sure there are no barriers that prevent people suffering from opioid abuse from accessing medically assisted treatment like Suboxone.

Botticelli said the government is using federal grants to make sure local drug court programs are offering medically assisted treatment.

Both the changes affect only federal employees and agencies, so they will not have widespread effects, but like Obama's visit, they're intended to provide an example and shine a spotlight on the opioid epidemic.

"This is something that is not a top-down-solution type of problem alone," Obama said. "This is going to have to be everybody working together

Reach David Gutman at david.gutman@wvgazettemail.com, 304-348-5119 or follow @davidlgutman on Twitter.

Credit: The Charleston Gazette, W.Va.

## DETAILS

| | |
|---|---|
| Subject: | Substance abuse treatment; Drug overdose; Addictions; Presidents; Narcotics |
| Location: | West Virginia |
| Publication title: | TCA Regional News; Chicago |
| Publication year: | 2015 |
| Publication date: | Oct 21, 2015 |
| Publisher: | Tribune Content Agency LLC |
| Place of publication: | Chicago |
| Country of publication: | United States, Chicago |
| Publication subject: | Business And Economics |
| Source type: | Wire Feeds |
| Language of publication: | English |
| Document type: | News |
| ProQuest document ID: | 17 24702600 |



| Document URL: | https://search.proquest.com/docview/1724702600?accountid=30868 |
| --- | --- |
| Copyright: | _(c)2015 The Charleston Gazette (Charleston, W.Va.) Visit The Charleston Gazette (Charleston, W.Va.) at www.wvgazette.com Distributed by Tribune Content Agency, LLC. |
| Last updated: | 2017-11-22 |
| Database: | ProQuest Central |

Database copyright © 2020 ProQuest LLC. All rights reserved.

Terms and Conditions   Contact ProQuest



# EXHIBIT 48

### IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

IN RE: OPIOID LITIGATION.,                    Civil Action No.  19-C-9000

## MASS LITIGATION PANEL

**Alan D. Moats - Lead Presiding Judge**
**Derek C. Swope - Presiding Judge**
**Joanna I. Tabit, Lead Resolution Judge**
**Jay M. Hoke, Resolution Judge**
**Debra Scudiere, Resolution Judge**

## <u>HEARING</u>

BEFORE:  The Honorable Alan D. Moats, Lead Presiding Judge, the

Honorable Derek C. Swope, Presiding Judge, the Honorable Joanna I. Tabit, Lead

Resolution Judge, the Honorable Jay M. Hoke, Resolution Judge, and the

Honorable Debra Scudiere, Resolution Judge,  in the Kanawha County Courthouse,

Ceremonial Courtroom, Charleston, Kanawha County, West Virginia, at 10:04 a.m.,

on the 6th day of December, 2019.


APPEARANCES:     **CLAYTON J. FITZSIMMONS, Attorney at Law**
Fitzsimmons Law Firm PLLC
1600 Warwood Avenue
Wheeling, West Virginia 26003

and

Donna Miller-Mairs, Certified Court Reporter
7724 Sissonville Drive, Sissonville, West Virginia 25320
304-988-9581

APPEARANCES:   (Continued)

**HUNTER SHKOLNIK, Attorney at Law**
**JOSEPH L. CIACCIO, Attorney at Law**
Napoli Shkolnik, LLP
360 Lexington Avenue, Eleventh Floor
New York, New York  10118

            and

**LISA F. FORD, Attorney at Law**
**217 East Main Street**
**Clarksburg, West Virginia  26301**
  Counsel for Plaintiffs

**ANNE MCGINNIS KEARSE, Attorney at Law**
112 Capitol Street, Suite 200
Charleston, West Virginia  25301
  Counsel for Plaintiffs Clarksburg, Richwood, City of Nitro,
  South Charleston, WJ Springs, Bell

**STEPHEN B. FARMER, Attorney at Law**
Farmer, Cline & Campbell, PLLC
746 Myrtle Road
Post Office Box 3842
Charleston, West Virginia 25338

            and

**JOHN W. "DON" BARRETT, Attorney at Law**
Barrett Law Group, P.A.
404 Court Square North
Lexington, Mississippi 39095

            and

**LETITIA N. CHAFIN, Attorney at Law**
The Chafin Law Firm
Post Office Box 1799
Williamson, West Virginia 25661

            and

APPEARANCES:        (Continued)

**MARK TROY, Attorney at Law**
Troy Law Firm
222 Capitol Street, Suite 200 A
Charleston, West Virginia 25301
    Counsel for Plaintiffs Camden-Clark Memorial Hospital
    Corporation, The Charles Town General Hospital, City Hospital,
    Inc., Grant Memorial Hospital, Potomac Valley Hospital of
    W.Va., Inc., Reynolds Memorial Hospital, Inc., St. Joseph's
    Hospital of Buckhannon, Inc., West Virginia United Health
    System and Williamson Memorial Hospital, LLC

**JAMES D. YOUNG, Attorney at Law**
Morgan & Morgan Complex Litigation Group
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
    Counsel for Plaintiffs, The County Commission of Mason
    County, et al and Mayor Peggy Knotts Barney on behalf of City of
    Grafton and Mayor Philip Bowers on Behalf of City of Philippi

**ROBERT L. WHITE, Attorney at Law**
5605 Starling Drive
Charleston, West Virginia 25306
    Counsel for Mid-Ohio Valley 13 Plaintiffs

**ERIC J. HOLMES, Attorney at Law**
Law Offices of Harris & Holmes, PLLC
115 North Church Street
Ripley, West Virginia 25271
    Counsel for Plaintiffs 19-C-96 through 19-C-108

**VAUGHN T. SIZEMORE, Deputy Attorney General**
Consumer Protection Division
812 Quarrier Street, First Floor
Charleston, West Virginia 25301
    Counsel for State of West Virginia ex Rel Patrick Morrisey,
    Attorney General

**WILLIAM R. SLICER, Attorney at Law**
Shuman, McCuskey & Slicer, PLLC
1411 Virginia Street East, Suite 200
Post Office Box 3953
Charleston, West Virginia  25339

                  and

**JOHN A. McCAULEY, Attorney at Law**
2 Hopkins Plaza
Baltimore, Maryland  21201
    Counsel for Abbott

APPEARANCES:    (Continued)

**ANA M. FRANCISCO, Attorney at Law**
Foley & Lardner LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts  02199-7610
  Counsel for Anda, Inc.

**KEITH A. JONES**, Attorney at Law
**STEVEN LUXTON, Attorney at Law**
Jones Law Group, PLLC
Post Office Box 13395
Charleston, West Virginia 25360
  Counsel for Actavis, LLC, Actavis Pharma, Inc., Watson Pharma,
  Inc., Watson Laboratories, Inc., Teva Pharmaceuticals USA, Inc.,
  Cephalon, Inc, Teva Pharmaceuticals Industries Ltd., Inc. and
  Anda, Inc.

**PATRICIA M. BELLO, Attorney at Law**
Lewis Brisbois Bisgaard & Smith LLP
222 Capitol Street, Fifth Floor
Charleston, West Virginia 25301

    and

**DONNA WELCH, Attorney at Law**
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
  Counsel for Defendants Allergan Finance, LLC f/k/a/ Allergan,
  Inc. f/k/a Watson Pharmaceuticals

**CHRISTOPHER D. PENCE, Attorney at Law**
Hardy Pence PLLC
10 Hale Street, Fourth Floor
Charleston, West Virginia 25301

    and

**SARAH BENOIT, Attorney at Law**
Ulmer & Berne LLP
65 East State Street, Suite 1100
Columbus, Ohio 43215-4213
  Counsel for Amneal Pharmaceuticals LLC

**WILLIAM A. HAHN, Attorney at Law**
Barnes & Thornburg, LLP
11 South Meridian Street
Indianapolis, Indiana 42604
  Counsel for Defendant AmerisourceBergen Drug Corporation in
  action by Ohio County Commission and H.D. Smith LLC f/k/a
  H.D. Smith Wholesale Drug Co.

APPEARANCES:          (Continued)

**ALVIN L. EMCH, Attorney at Law**
Jackson Kelly PLLC
500 Lee Street, Suite 1600
Charleston, West Virginia 25322
  Counsel for Defendant AmerisourceBergen Drug Corporation in
  actions by Brooke, Hancock, Harrison, Lewis, Marshall, Tyler
  and Wetzel County Commission

**STEVEN R. RUBY, Attorney at Law**
Bailey & Glasser, LLP
200 Capitol Street
Charleston, West Virginia 25301
  Counsel for Defendant Cardinal Health, Inc.

**CARTE P. GOODWIN, Attorney at Law**
**ALEX J. ZURBUCH, Attorney at Law**
Frost Brown Todd LLC
500 Virginia Street East, Suite 1100
Charleston, West Virginia 25301

          and

**TODD A. MOUNT, Attorney at Law**
Shaffer & Shaffer
Post Office Box 38
Madison, West Virginia 25130
  Counsel for Defendant CVS Indiana, L.L.C.

**ERIK W. LEGG, Attorney at Law**
Farrell, White & Legg PLLC
The Farrell Building
914 Fifth Avenue
Post Office Box 6457
Huntington, West Virginia 25772

          and

**DAVID HIBEY, Attorney at Law**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
  Counsel for Endo Health Solutions Inc. And Endo
  Pharmaceuticals, Inc.

**JON "J. H." MAHANEY, Attorney at Law**
Dinsmore
611 Third Avenue
Huntington, West Virginia 25701
  Counsel for Fruth Pharmacy

APPEARANCES:         (Continued)

**RHONDA L. HARVEY, Attorney at Law**
**FATAL A. SHEER, Attorney at Law**
Bowles Rice LLP
600 Quarrier Street
Charleston, West Virginia 25301
  Counsel for Kroger Limited Partnership II

**JOHN J. MEADOWS, Attorney at Law**
**RUSSELL D. JESSE, Attorney at Law**
Steptoe & Johnson
707 Virginia Street, East
Charleston, West Virginia 25301

              **and**

**JAMISON H. COOPER, Attorney at Law**
Cooper Law Offices
240 W Main Street
Bridgeport, West Virginia  26330-1749
   Counsel for McKesson Corp.

**STEPHEN D. ANNAND, Attorney at Law**
**KEITH J. GEORGE, Attorney at Law**
Robinson & McElwee, PLLC
700 Virginia Street, Suite 400
Charleston, West Virginia 25301
   Counsel for Defendant Mallinkrodt and SpecGX LLC

**MICHAEL B. HISSAM, Attorney at Law**
Hissam Forman Donovan Ritchie PLLC
707 Virginia Street, East, Suite 260
Charleston, West Virginia 25301

              and

**REBECCA C. MANDEL, Attorney at Law**
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
   Counsel for Defendant Mylan Pharmaceuticals

**LISA FURBEE FORD, Attorney at Law**
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956

              and

APPEARANCES:        (Continued)

**MARC E. WILLIAMS, Attorney at Law**
**MATTIE HUDSON, Attorney at Law**
Nelson, Mullins, Riley & Scarborough, LLP
949 Third Avenue, Suite 200
Huntington, West Virginia 25701

        and

**MATTIE F. HUTTON, Attorney at Law**
1625 Eye Street NorthWest
Washington, DC 20006
  Counsel for Defendants Ortho-McNeil-Janssen
  Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.,
  Janssen Pharmaceutica, Inc. n/k/a Jannssen
  Pharmaceuticals, Inc., Johnson & Johnson

**JON B. ORNDORFF, Attorney at Law**
**KELLY CALDER MOWEN, Attorney at Law**
99 Cracker Barrel Drive, Suite 100
Barboursville, West Virginia  25504
  Counsel for Noramaco, Inc.

**WEBSTER J. ARCENEAUX, III, Attorney at Law**
Lewis Glasser, PLLC
300 Summers Street
Charleston, West Virginia 25326
  Counsel for Rite Aid of Maryland, Inc. and  Rite Aid of West
  Virginia, Inc.

**SARAH A. WALLING, Attorney at Law**
Jenkins Fenstermaker, PLLC
Post Office Box 2688
Huntington, West Virginia 25726
  Counsel for Richard Sackler, M.D.

**NEVA G. LUSK, Attorney at Law**
Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard, East
Charleston, West Virginia 25301

        and

**CHRISTOPHER J. LOVRIEN, Attorney at Law**
Jones Day
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071-2300
  Counsel for Wal-Mart Stores East, LP

APPEARANCES:      (Continued)

**JUSTIN TAYLOR, Attorney at Law**
Bailey & Wyant PLLC
500 Virginia Street, East, Suite 600
Charleston, West Virginia 25337
  Counsel for West Virginia Board of Pharmacy

**RITA MASSIE BISER, Attorney at Law**
Moore & Biser, PLLC
317 Fifth Avenue
South Charleston, West Virginia 25303
  Counsel for Henry Schein, Inc.

```
 1                  P R O C E E D I N G S
 2          JUDGE MOATS:  Good morning.  It is good to
 3   see everyone in such a great mood.  It is Friday.  We
 4   have bar from West Virginia and out of state here.
 5          I appreciate everybody's hard work that you
 6   have done back since September.
 7          I know you-all are waiting with bated breath
 8   to see what we are going to do today.  It depends on
 9   how things go.
10          First of all, I want to reintroduce our Mass
11   Litigation Panel.
12          To my left is Judge Jay Hoke.  He is from the
13   Lincoln and Boone County Circuit, and he is going to
14   be on the resolution part of the panel.
15          Next to him is our newest member of our Mass
16   Litigation Panel, Judge Debra Scudiere.  Judge
17   Scudiere is in Monongalia County, and she took the
18   bench back in --
19          JUDGE SCUDIERE:   April Fool's Day.
20          JUDGE MOATS:   -- April Fool's Day, she says.
21   She said it.  I didn't.
22          Before she took the bench, she was a long
23   time practicing attorney and recognized as one of the
24   foremost mediators in our state.
```

1        She has been active in every branch of the

2    legal profession and previous State Bar president, and

3    so she is a valuable addition.

4        I assigned her to the resolution side so we

5    can have her mediation skills.

6        Of course, I am Judge Moats.  I am the

7    chairman of our mass litigation panel, and I am the

8    Lead Presiding Judge in this case.

9        To my right is Judge Derek Swope from Mercer

10    county, and he is on the trial side, and he has been

11    here a long time.

12        He and I are very closely aligned as far as

13    talking all the time and working closely together in

14    this litigation.

15        To my far right is Judge Joanna Tabit from

16    here in Kanawha County.  Judge Tabit is the Lead

17    Presiding Resolution Judge in the case.

18        She has had long time experience in mediating

19    prior to becoming a judge and teaches mediation

20    courses.

21        So ordinarily, I told you before, when we do

22    these cases, normally we have an initial status with

23    all five or six or however many of the judges that we

24    have assigned to the case that are going to be

1    involved, and then after that first hearing we

2    normally don't get back together as a whole panel with

3    the two sides.

4           Now this time it is going to be different.

5    Until we actually begin the resolution phase, we are

6    going to continue to meet together because we believe

7    it is critically important in a case of this magnitude

8    and complexity that the resolution judges have full

9    understanding of what is happening, what has happened

10   to give them the extra tools and insight in this as

11   they go forward.

12          So that is why we are continuing to do this

13   in this manner.

14          Then once they start attempting to resolve

15   the case, then we will no longer be meeting and

16   working together.

17          Now as far as what we are going to do here

18   today, a few days ago I signed an order to extend some

19   deadlines pertaining to motions to dismiss.

20          I set some deadlines for the defendants for

21   the day after Christmas, and now yesterday some of the

22   defendants filed motions asking for an extension, and

23   they were quite kind in the way they did it.

24          They talked about the necessity of all the

1    work for today's hearing and getting ready instead of

2    saying, "Listen, Scrooge, what is wrong with you."

3              I just want you to be honest with me.  So I

4    do not want to be called Judge Scrooge.  Your motions

5    are granted, and you may have until January -- I think

6    you asked for the 9th, and that is fine.

7              After thinking about it, I was going to do it

8    anyway.  I already had it on my schedule to do.  I

9    didn't pay much attention, but I went back and looked

10   at it and I saw that I had given you until the 26th.

11             I didn't know if the attorneys here would do

12   it, but I figured some associate would be working hare

13   on Christmas Eve and Christmas night and New Year's

14   Eve or whatever, and I didn't want that.

15             So we will enter those orders to extend that

16   time period and Merry Christmas to one and all.

17             MR. MEADOWS:  Thank you, Your Honor.

18             JUDGE MOATS:   You are welcome.

19             Now in keeping with the holiday season, I

20   hope all of you had a wonderful Thanksgiving.  I hope

21   that you didn't have to spend Thanksgiving evening and

22   Thanksgiving and the day after working on this.

23             I did.  Judge Swope did.  Ms. Fields did, but

24   it didn't stop me from eating Thanksgiving dinner.  So

1    don't feel sorry for any of us.

2           When I was eating Thanksgiving dinner, I

3    really enjoyed it.  We always have big gatherings,

4    family gatherings, and I love Thanksgiving because it

5    seems to be a lot easier and more family and friends

6    oriented and I eat way too much.

7           So as I was doing that, I recalled back to

8    when I still had my mother growing up.  My mother

9    would say, "If you put it on your plate, eat it, and

10   if you don't want it, don't put it on your plate."

11          My grandmother used to tell me and I am sure

12   some of yours did, too, "Your eyes are bigger than

13   your belly."

14          When I was a little kid, I didn't know what

15   she meant by that.  I could not relate to that.  I

16   soon learned.

17          Now what does that have to do with today?

18   Rule 19.  We have read all of your responses, motions,

19   and I recalled back to my mother and my grandmother in

20   eating too much.

21          Looking at Rule 19, I see that there are

22   maybe 251 additional plaintiffs to bring in if we go

23   forward in that manner.

24          This case as I told you at the first hearing

1  is without question the most complex, complicated, and

2  trying matter we have ever dealt with.

3          Judge Polster says the same thing in federal

4  court, and I am sure judges in other states say the

5  same thing.

6          Judge Swope and I talk most every day early

7  in the morning, and we decided we were served an

8  elephant.  I said, "How do you eat an elephant?"  His

9  answer, "One bite at a time."

10         Well, we decided we are willing and we told

11  you we would eat the elephant that was served us, but

12  we decided we are not going to order a second helping.

13         As a result our rule to show cause in our

14  order to bring in all these other parties is

15  rescinded, and so that is the end of that.

16         We will eat it with what we have in front of

17  us.  We will deal with anymore that are filed -- and I

18  don't know if you are aware there were eight more

19  cases filed in the past couple of weeks all dealing

20  with municipalities, and those are in Marshall County.

21         I am sure in good order there will be more

22  and we will deal with those, but we will not be

23  bringing anybody in under Rule 19.

24         So the motion is granted and our order will

```
 1    be rescinded.
 2              Now along those lines, however, I told you
 3    the reason we were looking at that was to try to have
 4    a full and complete resolution in this state to all
 5    these matters.
 6              We have cases pending in federal court.  Some
 7    of you-all are in both state court and federal court.
 8              We have the huge issue of the federal class
 9    settlement negotiating class where all of the towns
10    and counties across this country had until November 22
11    to decide to opt out.
12              We talked about the novelty of that back on
13    September 20th.  That has never been done before, but
14    this kind of case has never occurred here.
15              Now a lot of places have decided to opt out.
16    I saw some article yesterday that said that 98 percent
17    of the parties decided not to opt out, but various
18    parties have decided to opt out.
19              We have both attempted to educate ourselves
20    as much as possible as far as what is happening in the
21    federal MBL for our purposes, and we are aware of what
22    Judge Polster is doing, and what he is doing is
23    nothing less than incredible, what he has been under
24    so far.
```

 1          I don't think any of us can understand the

 2   extent of the work that he has done over the past

 3   couple of years and is still doing.

 4          But I found it interesting for him to say

 5   what he has done, that the model that was in place is

 6   not working and it can't work.

 7          So he is going back to the drawing board as

 8   he goes forward.

 9          We know that he is talking about remanding

10   two cases here in this state, Cabell County and

11   Huntington, back to the Southern District, I assume in

12   Huntington.

13          Under certain terms and conditions, I guess

14   the Plaintiffs are going to have to decide whether

15   they are going to agree.  I have no idea other than

16   what was in that order.

17          However, a few months ago, I guess two or

18   three months ago, I had a case where Jack Smith -- is

19   Jack here?

20          He is on the Defendants hearing committee.  I

21   can't remember.  I think he said he was representing

22   some entity from California, but he offered to come in

23   and be involved to assist and cooperate in our state

24   case if it would be helpful to any of us.

1          Since then, Paul Farrell Jr., who is one of

2     the lead counsel in the federal case, has offered the

3     same -- has put forth, rather, the same offer to come

4     in and be involved.

5          So we have talked.  If you-all are willing,

6     is it possible to attempt to bring before our

7     resolution panel all the cases, not to do anything to

8     usurp anything that is in federal court, but I can't

9     imagine Judge Polster would object to cases settling

10    out. I am sure he would be very happy if that

11    happened.

12         So is it possible for you-all to get together

13    with your federal counterparts and attempt to resolve

14    all of the cases whether they are at the federal level

15    or here at the state level with the entire Mass

16    Litigation Panel process.

17         I would like you to look at that.  I would

18    like you to discuss it.  Mr. Farrell says he is

19    willing to.  I don't know if Jack Smith is on the

20    steering committee.  I don't know who the lead

21    attorney is.  I am sure you-all do.

22         Please consider that and let us know if you

23    are willing to do that.  If you would like to have a

24    status conference somehow to maybe lay some

```
 1   groundwork, we certainly are pulling to that.

 2          Because this is going to be a process and it

 3   is not going to happen overnight.

 4          We have various issues that we need to

 5   discuss.  The last time I raised an issue of statute

 6   of limitations.  We don't know the answer to this.

 7          Where is Mr. Linkous today?  Is he here as

 8   your liaison?

 9          MR. FARMER:  Mr. Linkous is unavailable

10   today, Your Honor, the one day on his calendar that he

11   could not make it.  He apologizes for his absence, but

12   he has delegated some of us to proceed in his absence.

13          JUDGE MOATS:  Well, I have one question to

14   the Plaintiffs.  Who is speaking for them?

15          MR. FARMER:  Pardon me?

16          JUDGE MOATS:  Who is going to speak for

17   them?

18          MR. FARMER:  Mr. Fitzsimmons was to speak

19   today on the Rule 19 issue.

20          JUDGE MOATS:  Well, he doesn't need to speak

21   to that.

22          MR. FARMER:  I am happy -- Steve Farmer --

23   as Co-Lead Counsel to --

24          JUDGE MOATS:  Mr. Farmer, I have one
```

```
 1    question.
 2            MR. FARMER:   Yes, sir.
 3            JUDGE MOATS:   How far back do the Plaintiffs
 4    believe they can go for damages?
 5            MR. FARMER:   Back to when this whole thing
 6    started, Your Honor.
 7            JUDGE MOATS:   Which is?
 8            MR. FARMER:   It started in 1996 with Perdue
 9    Pharma in the beginning of the false narrative and the
10    fraud about what these drugs could do and why they
11    should be prescribed.
12            JUDGE MOATS:   Okay.  So we are going to have
13    to have briefed this whole issue of statute of
14    limitations.
15            So you are going to have to show how you can
16    go back to 1996.  We all know it is a two-year statute
17    of limitations normally when you knew or reasonably
18    should have known.
19            So that is going to be the first issue we are
20    going to want to look at better.
21            We are going to want to look at how far in
22    the future do you think you can go.  We want that
23    briefed, and we would like to know how long do you
24    think it is going to take you to brief it because I am
```

```
 1    going to give both sides the same.

 2              MR. FARMER:   We can brief it in 30 days.

 3              JUDGE MOATS:   Sure.  Mr. Meadows?

 4              MR. MEADOWS:   Good morning, Your Honor.

 5              JUDGE MOATS:   Good morning.  I assume you

 6    disagree with Mr. Farmer's position.

 7              MR. MEADOWS:   Absolutely, Your Honor.

 8              JUDGE MOATS:   Okay, so how long do you

 9    believe that you need to be able to brief that issue

10    on statute of limitations?

11              MR. MEADOWS:   I am going to pivot, if you

12    don't mind, Your Honor, and look at my team.

13              JUDGE MOATS:   And I understand we have -- I

14    understand we have two holidays basically for two

15    weeks which makes things very difficult.  That is why

16    I gave you some more time.

17              MR. MEADOWS:   We believe, Your Honor, that

18    if they were granted 30 days to prepare a brief, we

19    could respond within 30 days of their submission.

20              JUDGE MOATS:   All right.

21              JUDGE SWOPE:   How far back do you think they

22    can go?  He said 1996.

23              MR. MEADOWS:   Two years, Your Honor.

24              JUDGE SWOPE:   Two years, okay.  So we know
```

1    to plan.

2            JUDGE MOATS:   That is all we want to know.

3    We are not going to argue your positions.

4            JUDGE SWOPE:   No, no.  What have you got?

5            MR. EMCH:   Just speaking as Lead Counsel for

6    today, Your Honor -- and first of all, let me thank

7    you for the ruling you ruled.

8            You said in the first hearing -- one of the

9    things you said in the first hearing was you don't

10   like to be told things you can't do.

11           I know you and I know the panel, and I know

12   you understand that there are times when lawyers have

13   to say to the Court, "Your Honors, we don't think we

14   can do this."

15           We appreciate your consideration of that

16   position in this situation, and Your Honor, on our

17   motion and our bringing this to the Court and the

18   ruling you made.

19           That is one thing I wanted to say to you.

20           The second thing on this issue I would simply

21   say Lincoln County v. The American Water Company case,

22   which you decided as far as how far back they could go

23   on the statute of limitations.

24           JUDGE MOATS:   I recall.

1          MR. EMCH:   And the 30 days, I agree with my

2     colleague, Mr. Meadows, and we usually try to be as

3     concise and consistent as we can on the defense side.

4          It is a very large and diverse group.  It

5     does not have a single face and it is difficult to

6     coordinate these things, but we will certainly do our

7     best, Your Honor.

8          JUDGE MOATS:   Well, you know what their

9     position is.  So you-all can start working on that

10    today.

11         MR. EMCH:   Yes, sir.

12         MR. FARMER:   Your Honor?

13         JUDGE MOATS:   Yes, sir.

14         MR. FARMER:   May I address the Court very

15    briefly --

16         JUDGE MOATS:   Go ahead.

17         MR. FARMER:   -- on the same subject?

18         JUDGE MOATS:   Go ahead.

19         MR. FARMER:   And that is on behalf of West

20    Virginia's hospitals, I would like the Court to

21    understand that on the motions to dismiss we did not

22    ask for extra time to respond to the motion to

23    dismiss, and the reason is simple.

24         That is our clients, the hospitals, don't

1   have extra time.  They are in a critical bind as far

2   as things, and the only thing I want to ask is on this

3   issue of statute of limitations, in an effort to move

4   this thing along, could we have 30 days?

5            We are happy to work through two holidays to

6   get these papers within 30 days, but I think it would

7   be fair and just and appropriate given the subject

8   matter that the briefs be submitted at the same time.

9            There is no reason to have another 30 days

10  for response.

11           JUDGE MOATS:   I will agree to that.  I will

12  give each of you 60 days.

13           MR. FARMER:   But we submit them at the same

14  time?

15           JUDGE MOATS:   Yes.

16           MR. FARMER:   Thank you, Your Honor.

17           JUDGE MOATS:   You are welcome.

18           MR. ARCENEAUX:   Your Honor?

19           JUDGE SWOPE:   Let me say something about

20  that.  Go ahead.

21           MR. ARCENEAUX:   Yes, Your Honor.  Jay

22  Arceneaux here on behalf of Rite-Aid.

23           I want to emphasize the point that Mr. Emch

24  made, which is we are diverse defendants, and I know

1    in particular Rite-Aid has been involved in litigation

2    for years, and it has a particular statute of

3    limitations argument that it would like to bring to

4    the Court, and I am aware that other pharmacies have

5    similar issues.

6            Would the Court entertain more than one brief

7    per side?

8            If people have a unique statue of limitations

9    argument, would they be entitled to present it at this

10   time?

11           JUDGE MOATS:   I guess it depends on how many

12   we are going to have.  If we are going to have -- I

13   don't know how many defendants we have.

14           I know a lot of you are -- there are

15   families, what I call families of defendants.  We

16   don't want 20 different briefs.

17           You know, we have limited time, too.  Both of

18   us have full dockets.  We deal with this at nights, on

19   weekends, on holidays, which brings up we just had

20   motions to dismiss the West Virginia Board of

21   Pharmacy.

22           We had that set for hearing today.  We worked

23   hours on that one.  That was --

24           JUDGE SWOPE:  Over Thanksgiving.

1            JUDGE MOATS:   Over Thanksgiving.  That is

2    why that I said that I worked on Thanksgiving, all

3    Thanksgiving week.

4            Part of that was spending hours on the Board

5    of Pharmacy motion to dismiss that was withdrawn two

6    days ago.

7            Now we can't do that.  That is the epitome of

8    frustration for a case that has been pending for a

9    long time, since January.

10           JUDGE SWOPE:   Which somebody dismissed that

11   in February.

12           JUDGE MOATS:   In February part of it was

13   dismissed, but yet two days before this hearing after

14   we, two judges and our law clerk and my staff and

15   Judge Swope's staff spends hours and hours working,

16   and it is not left.

17           Well, if we are going to do this and you-all

18   say how critical it is, we can't waste our time.  We

19   have to be like lasers focused on a topic.  That is

20   the only way this is going to work.

21           So I guess, Mr. Arceneaux, you need to

22   contact Mr. Meadows and he needs to submit something

23   once you can tell us how many briefs you actually

24   need.

```
 1              I cannot tell you and give you an answer
 2    today.
 3              MR. ARCENEAUX:   Okay, thank you.
 4              JUDGE MOATS:    Just do it in due course very
 5    shortly.
 6              MR. ARCENEAUX:   We will work with Mr.
 7    Meadows.  Thank you, Your Honor.
 8              JUDGE MOATS:   Okay, 60 days for both sides.
 9              JUDGE SWOPE:   I just want to add to that
10    here, too, if you don't mind.
11              JUDGE MOATS:   Go ahead.
12              JUDGE SWOPE:   Yesterday -- I guess Mr.
13    Linkous isn't here.  Yesterday he had filed or maybe
14    the day before as I was finishing my 30 criminal pre-
15    trials and I actually had an abuse and neglect until
16    6:00 Monday night, I get this thing that says, "Here
17    is our agenda," and there are a thousand pages.
18              Who the hell is going to read that?  Sit
19    down.  Who is going to read that?  Okay, the point
20    that I am trying to make here is brevity is the soul
21    of wit.  You know, and when you file things that are
22    just on and on -- if you ask for a hundred pages, we
23    probably got 99.
24              When you ask for that, how about bearing in
```

1   mind who is reading this.  We don't have an army of

2   law clerks.  We don't have people to -- we don't have

3   that.  You are looking at us right here.

4         So if you want to respect the Court, if you

5   appreciate what we do, how about getting to the point,

6   okay?  I am not smart.  I am not a law review person,

7   okay.

8         Just send it where the calves can get it, and

9   that is what I am going to read.

10         All right, everybody understand that?

11         So I don't need your law review article.  I

12   don't need your theme and thesis.  I don't need your

13   Phi Beta Kappa Ph.D. essay pieces.

14         I want you to get to the point on what you

15   want.  I don't care what they did in New Hampshire.  I

16   don't care what they did in Guam or Alaska, okay.

17         I want to know what we need to do here.  That

18   is all I am going to say, Judge Moats.  I am done for

19   the day.

20         JUDGE MOATS:  Now you are.

21         JUDGE SWOPE:  But that really upset me when

22   we spent time going over the Board of Pharmacy.  I

23   said why are we doing this?  They dismissed part of

24   that in February.  What are we doing this for?

1          So when I got that thing yesterday after I

2    had listened to God knows how many sexual abuse cases

3    of children, never mind.  What is it, Roseanne

4    Roseannadana, Saturday Night Live, never mind.

5          You know, that really upset me.  I guess you

6    probably figured that out.

7          Thank you, Judge Moats.

8          JUDGE MOATS:   You are welcome.

9          Now let's talk about overall the path this

10   case is going to take.  This is not simple, and

11   anybody that says it is is whistling past the

12   graveyard.

13         It is complicated.  There are so many parties

14   and there are so many moving parts.  We have this

15   issue of case management.

16         The Plaintiffs say, "Let's try every party,

17   every issue next June, and let's have a bifurcated

18   trial with liability and a punitive damage

19   multiplier."

20         There was a seismic shift in West Virginia in

21   2015.  Things changed as we know it in the field of

22   litigation.

23         Joint and several liability for the most part

24   was abolished, and a new punitive damage statute was

```
 1    enacted that same year.
 2              I was in the asbestos litigation back in
 3    2002.  Union Carbide was the last defendant standing.
 4    I went through a five-week trial.
 5              We bifurcated that case, liability, and you
 6    had a punitive damage multiplier.  What does the
 7    statute say now?  It doesn't say the plaintiffs can
 8    bifurcate.
 9              It says that the defendant may request for
10    bifurcation, and if it is granted, the jury first has
11    to decide the amount of the punitive -- or of the
12    compensatory damages before it can be submitted to the
13    jury on the issue of punitive damages.
14              So how do we do that?  We can't.  The joint
15    and several statute completely ended that.
16              We just wrapped up the Airport litigation,
17    the Airport up the street that collapsed when, back in
18    2000 --
19              JUDGE HOKE:  In '15.
20              JUDGE MOATS:  In March and all these
21    defendants in the case across the country, but we were
22    under the old law.
23              When it came time to go to trial, it was
24    again, the last defendant standing.
```

1          That was taken up on a writ of prohibition

2     because the last defendant wanted to be the defendant

3     that was viewed as the most culpable on the verdict

4     form.

5          When the Supreme Court summarily refused that

6     writ, the case settled within 15 minutes, right?

7          JUDGE SWOPE:   Yes.

8          JUDGE MOATS:   That is not where we are.

9     Every defendant will be on the verdict form.

10         Then we have the new matter that we have

11    never dealt with before.  I have never dealt with it

12    before.  I haven't had a jury trial yet where it has

13    come up, non-party fault.

14         But yet in this case I think almost everybody

15    has filed a notice of non-party fault, and everyone

16    that I read I keep looking for my name to see if I am

17    in there.  So far, I haven't seen my name in there as

18    causing this.

19         It is the old thing that it is everybody's

20    fault; it is nobody's fault.  I understand that.

21         I mean, we have all these categories, but it

22    is something that we are going to have to deal with

23    with bated breath.

24         We have never done this before.  It is going

```
 1   to take time, and we will deal with it, but we have to

 2   decide first issues first.

 3           We have 31 new motions to dismiss pending

 4   that are going to have to be dealt with before we know

 5   who all the players are.

 6           JUDGE SWOPE:   Can I say something?

 7           JUDGE MOATS:   Go ahead.

 8           JUDGE SWOPE:   I just want to say that I sure

 9   hope those 31 to 33 motions that you-all filed aren't

10   going to be cookie-cutter regurgitations of the ones

11   that have already been filed and ruled on.

12           I think there is a writ of prohibition on

13   that, isn't there?  What is going on with that writ in

14   Charleston?

15           Didn't you-all file a writ about the law of

16   the case?

17           Where is that at?

18           MR. FITZSIMMONS:   Your Honor, the writ is

19   pending before the Supreme Court.  They have issued a

20   briefing schedule --

21           JUDGE SWOPE:   It hasn't been ruled on yet?

22           MR. FITZSIMMONS:   No, Your Honor, it has

23   not.

24           JUDGE SWOPE:   Okay, that is just part of my
```

1   point.  You know, we just had another mass litigation

2   case where all the briefs we got were cookie-cutter,

3   cookie-cutter.

4          So I really hope, folks, that you have raised

5   novel new things that weren't raised before, and I

6   hope that I am not going to read 31 or 33 or whatever

7   it is of the same thing.

8          JUDGE MOATS:  All right, now let's talk

9   about something else.

10          What all of you seem to say is the real issue

11   here, what Judge Polster says seems to be the real

12   issue is a common theme across all the cases in front

13   of him that have been brought in from all over the

14   country, and I understand it has been alleged all over

15   the country.

16          It is our understanding from Judge Polster

17   that these cases are pending in state courts in all

18   but two states, and that is the issue of public

19   nuisance, and we hear that all the time.

20          Now we cannot see or we don't see in any of

21   the complaints exactly what statute you-all are

22   raising that under.

23          Mr. Farmer, can you tell us the statute that

24   you are basing your cause of actions on?

```
 1              MR. FARMER:   Your Honor, there is a robust
 2   common-law of public nuisance in West Virginia, and by
 3   the way, this was briefed in the motions to dismiss
 4   that are pending before Your Honors.
 5              JUDGE MOATS:   Okay, let me stop you there.
 6   You-all need to back up.  You say you are basing it in
 7   on common law?
 8              MR. FARMER:   Yes, Your Honor.
 9              JUDGE MOATS:   For a county commission or a
10   city to bring a common law --
11              MR. FARMER:   No, the hospitals.  I am
12   speaking on behalf of the hospitals.
13              JUDGE SWOPE:   Well, who is talking for the
14   counties and the cities?
15              JUDGE MOATS:   I understand your hospital
16   issue.  You are talking nuisance, and that is a
17   different matter.
18              MR. FARMER:   Okay.
19              JUDGE MOATS:   I am talking of all the
20   plaintiffs.
21              MR. FARMER:   I am hospitals only.
22              JUDGE MOATS:   Okay, public nuisance.  Who is
23   speaking for counties and cities?  Mr. Fitzsimmons?
24              MR. FITZSIMMONS:   Good morning, Your Honor,
```

```
 1   Clayton Fitzsimmons.
 2           JUDGE MOATS:   Okay, we need you to speak up
 3   and if necessary, come up here to the microphone so
 4   that we can hear you.
 5           What is your statute?
 6           MR. FITZSIMMONS:   I don't know the numeric
 7   number off the top of my head.  I can pull that out of
 8   the complaint, but I know that the counties, that
 9   there is a West Virginia Code, an ordinance, that
10   allows -- the statute allows them to pass an ordinance
11   declaring things to be public nuisances and also to
12   provide them a remedy to abate that.
13           JUDGE MOATS:   You are saying that there is a
14   statute that allows a county to pass an ordinance?
15           MR. FITZSIMMONS:   Yes, Your Honor.
16           JUDGE MOATS:  What is that statute?
17           MR. FITZSIMMONS:   I can pull it for you.  I
18   don't have it in front of me.
19           JUDGE MOATS:   Because I haven't seen it.
20           MR. FITZSIMMONS:   It was pled in our brief.
21           JUDGE MOATS:   What about the cities?
22           MR. FITZSIMMONS:   I don't represent the
23   Cities.  I can't speak on the Cities' behalf.
24           JUDGE MOATS:   All right.  I mean, I have
```

1    looked at it.  The only statute I can see is 16-3-6.

2    It is just nuisance affecting a county.

3         Basically it says county commissions or

4    municipalities all have a right to apply to circuit

5    court for an injunction to restrain or to abate a

6    public nuisance.

7         However, there was a case back in 1982,

8    Berkeley County Commission versus Chavez.  Under the

9    syllabus point it says that Code 16-3-6 authorizes

10   public officials, including a county commission, to

11   apply for circuit court injunctions to abate public

12   health nuisances.

13        County Commissions are not authorized to

14   petition for injunctions against any other public

15   nuisance.

16        But you are saying that has been overruled or

17   what?

18        MR. FITZSIMMONS:  I am saying that is not

19   the authority under which the counties are proceeding.

20        Again, Your Honor, I apologize.  I don't have

21   that off the top of my head.

22        JUDGE MOATS:  Okay.

23        MR. FITZSIMMONS:  I can get that to you and

24   I can provide you additional information if Your Honor

```
 1   would wish.

 2              JUDGE MOATS:   Okay.

 3              MR. FITZSIMMONS:   This issue was briefed and

 4   the motion has been dismissed that Judge Hummel had

 5   denied.

 6              JUDGE SWOPE:   Yes, because we are reading

 7   things like throwing out the Board of Pharmacy, you

 8   know, case in point.

 9              MR. FITZSIMMONS:   Your Honor, would you like

10   for us to provide a supplemental authority or position

11   on that?  We would be happy to do so.

12              JUDGE MOATS:   Sure, I would.

13              The same for the cities, what is the

14   authority for the cities, and are you saying that all

15   these counties have enacted ordinances?

16              MR. FITZSIMMONS:   The cities -- I believe

17   that the counties that I know we represent have passed

18   ordinances declaring the opioid epidemic a public

19   nuisance.

20              JUDGE MOATS:   When, before or after?

21              JUDGE SWOPE:    Is it expo facto law?  It is

22   something that just passed?

23              Do you know when?

24              Ms. Chafin, you represent some.  Did your
```

```
1    county do anything like that?  You represent my

2    county, Mercer County.

3            Did they do that?  I don't know.  Do you know

4    if Mercer County passed an ordinance?  Anybody?

5            MR. FITZSIMMONS:  Your Honor, I am lead

6    counsel for the hospitals only.  I don't know.

7            JUDGE SWOPE:   That is why I asked Ms.

8    Chafin.

9            MR. FITZSIMMONS:  I am sorry.  I thought you

10   were looking at me.

11           JUDGE SWOPE:  Yes, I asked Ms. Chafin.

12           MS. CHAFIN:  Your Honor, I am not aware of

13   it.

14           JUDGE MOATS:  Because in looking at the

15   complaints, I see nothing.  There hasn't been anything

16   alleged by any county or city that they are alleging

17   something under an ordinance.

18           We have a case going clear back -- it has

19   been cited by the Supreme Court several times, Parker

20   versus The City of Fairmont, a 1913 case.

21           It says Counsel may abate only maters a

22   nuisance which is recognized as such per se, which

23   means that in and of itself.

24           So if we are talking opiates, it would have
```

Donna Miller-Mairs, CCR

1    to be oxycodone in and of itself is a nuisance, and I

2    don't think that applies -- or granted as such by a

3    lawful statute or ordinance.

4              So the question would be does a county or

5    city just have -- do they have the authority to just

6    say this is a nuisance and it becomes so?

7              I question whether that is the authority.

8              If somebody puts a pile of radioactive

9    material, that would be a nuisance per se, but does a

10   county commission or authority -- or a county, rather,

11   or a city just have the authority to say, "We declare

12   this is a public nuisance"?  That is the question.

13             If that is something you are alleging, that

14   is what you are going to need to look at.

15             As I said, Chapter 16, Article 3, Section 6

16   allows it to be done if that is what you are operating

17   under.

18             We want to know what you are operating under

19   so we can decide which way to go.

20             Injunctions regularly are decided by courts.

21   It is an equitable type remedy ordinarily that

22   wouldn't be entitled to a jury trial.  It would be

23   decided by the Court.

24             The Court would determine what the proper

1    abatement is.  Judge Polster is dealing with that.  He

2    took the position, as I understand it, that there is

3    no absolute right to a jury trial, but he decided to

4    give them one.

5          Well, we haven't decided that.  We have a

6    case, <u>Turner versus Camden Clark Memorial Hospital</u>,

7    that says where there are legal issues coupled with

8    injunctive -- a request for injunctive relief, the

9    legal issue, if it is to be tried by a jury, it is to

10   go first.

11         Now we recognize these time frames.  The

12   Plaintiffs are saying we want this to go to trial.

13   Our towns and cities are bleeding.  Please help us.

14   Get us to trial and stop this public nuisance.

15         JUDGE SWOPE:   Our hospitals are suffering.

16         JUDGE MOATS:   And our hospitals are

17   suffering.

18         The Defense is saying this is going to take

19   we don't know how long to prepare all the discovery.

20         We are willing to cut through it all.  We are

21   willing to have a trial as soon as possible on

22   the issue of public nuisance before the Court.

23         We understand Judge Polster seems to say that

24   probably many plus percent of the liability discovery

1    has already been done.  You have got a report and you-

2    all have access to it.

3           Well, you-all are asking for this to be

4    abated.  If it is proven that it is a public nuisance,

5    we have that authority.

6           Now right now the question is well, are our

7    hands tied under <u>Turner versus Camden Clark Memorial</u>

8    <u>Hospital</u>?

9           You-all don't have to try it.  You say "Hey,

10   we waive that.  We want this to be decided."

11          I don't think anybody understands the

12   magnitude and the time periods that we are talking

13   about here that this is going to take.

14          There is no way that we can have a total

15   joint trial of all these issues against all these

16   defendants.  I don't know how to do it.  None of us

17   do.

18          It is going to overwhelm the court system.  I

19   don't know what facility we are going to use.  This is

20   the largest courtroom that we would have.

21          I have been told it would be extremely

22   problematic to tie this place up for several months.

23          How long would we be talking about having a

24   trial, six months, eight months, a year or more?

```
 1              Are we going to be able to have jurors commit
 2    to that?  How do we do this logistically?
 3              Judge Polster was able to do things we can't
 4    because of this seismic ship in our role in the state
 5    with the joint and several liability, that statute.
 6              He is severing these.  He is allowing the
 7    Cabell County and Huntington case to be severed, to
 8    just be tried against a particular group of defendants
 9    because he is doing that out in Cleveland with
10    pharmacies and he is sending other cases for the same
11    purpose.
12              He is going in a different direction we can't
13    go or at least there is no way that we know because
14    everybody has to be on that verdict form and fault has
15    to be determined for everybody.
16              Maybe you-all can come up with ideas that we
17    don't or we can't.  We have to be innovative.  We
18    can't do the same things we have always done even
19    though we have done it for a long time.
20              I have been doing this finishing my 23rd year
21    on the bench.  I have never done anything like this
22    before.  I don't know if any of you have actually
23    worked with this.
24              But we can do that if you-all want to.  I
```

```
 1    can't force you to do anything you don't want to do.
 2    We are willing to address the issue of public
 3    nuisance.
 4            That is what this is all about.  It is what
 5    it has always been about.  It is what Judge Polster
 6    says it is all about everywhere.
 7            JUDGE SWOPE:   It is what the Oklahoma court
 8    said it was all about.  They tried it for what, 33
 9    days out there, Judge?
10            JUDGE MOATS:   Thirty-three days.  Many of
11    the same defendants who are in this case were
12    involved.  That case didn't actually get tried.  I
13    understand J&J was the last one standing until the
14    time it went to trial.
15            But that is where we are.  You need to tell
16    us if you are willing to do that or not.  We want to
17    know and we can focus on that.
18            When we open up the discovery, we don't need
19    to have an all-issues trial with public nuisance right
20    off the bat.
21            We can decide, number one, whether it is
22    public nuisance as the discovery goes along, how to
23    complete a public nuisance if it is so found.
24            So it is not critical to have all the
```

Donna Miller-Mairs, CCR

1    discovery complete.  We can do it in phases.

2              I told you before we were going to give you

3    time for both sides to respond to case management.

4    The Plaintiffs said we can do everything next June.

5              The Defendants say that is impossible.  They

6    still have to cite the law why it is not possible.

7              I don't know how we are going to do this.

8    Mr. Farmer has 26 hospitals.

9              How are we going to do this with all those

10   hospitals and they are totally separate parties?

11   Where would we put everybody?

12             Now we have 68 plaintiffs.

13             We need your assistance. It can't be, "Here,

14   Judge, you decide this.  You figure it out."

15             We are not smart enough, at least I am not.

16   Judge Swope is much smarter than I am.

17             JUDGE SWOPE:   I don't know about that.

18             JUDGE MOATS:   I look at him and say, "Here,

19   give me a game plan.  I need help."

20             We need your help.  We need you to work

21   together.  The best case scenario, resolve these

22   cases.  That is the best case scenario.  Resolve these

23   cases and the federal cases.  You come up with a plan

24   where an entire state is taken off of the table.

1      That would be the best case scenario.

2      I don't know how it plays in the federal

3 negotiating class.  I have no idea.  There have to be

4 things happening behind the scenes that we don't know

5 about, we will never know about.

6      Does that somehow tie our resolution judge's

7 hands as far as what can be done or when it can be

8 done here?  I don't know.  Maybe some of you do.

9      We sort of feel like we are somewhat in the

10 dark.  We have learned a lot in the past two and a

11 half months.

12      Judge Polster tells other judges he doesn't

13 want them to go through what he has gone through over

14 the past two years.

15      We would like to have all his knowledge today

16 that he has worked so hard over two years to obtain

17 but we don't.

18      We have the benefit of all of his orders and

19 some of the transcripts, which have been extremely

20 helpful to us, and we will learn as we go along.

21      Right now it seems like chaos as do a lot of

22 these cases when we start.  Over time we can narrow

23 them down and bring order to the cases and we will

24 here but it is going to take hard work and it is going

```
 1   to take tremendous cooperation.

 2            It cannot be and it won't work if every time

 3   there is something said there has to be an argument

 4   and a fight about it or a writ of prohibition.  It

 5   just can't work.

 6            Next week, next Thursday Judge Alsop and I

 7   and going to be back up here and hope we are going to

 8   bring to resolution the tobacco litigation in West

 9   Virginia that has been pending since 1998,

10   approximately 1,300 plaintiffs, all the major tobacco

11   companies, 22 years in litigation, writs, appeals,

12   trials, attempts to get jurors.

13            Next week hopefully, hopefully we can finally

14   deal with that case.

15            This case has the same potential.  This case

16   has the potential to last that long.  It does.  You-

17   all may disagree, but it does unless you decide not

18   to.

19            So that is what we have to say today.  We

20   don't have a lot of answers for you.  I wish we did,

21   but this is not something that is going to happen

22   overnight.

23            We are no more prepared now to enter a case

24   management order than we were two and a half months
```

1   ago until we get these issues decided preliminarily.

2          So you have your briefing schedule for the

3   statute of limitations.  We want you to rack them up.

4   We want to know.  If you are alleging that there are

5   individual nuisance statutes that counties enacted,

6   and the statute by the way is supplemental (3)(k)(8)

7   probably that you are referring to.

8          Then there is a statute dealing with

9   municipalities and that is 8-12-5, Paragraph 23.

10         But again, it is going to have to be

11  something per se.  It can't be just because the county

12  commission or a city says this is a public nuisance.

13  They have no authority to declare something a public

14  nuisance that I am aware of.

15         I think that you are going to find out the

16  Supreme County cases say likewise unless it is

17  pursuant.

18         So I want you to look at that and I want you

19  to seriously consider and discuss seriously among

20  yourselves.

21         I want to know about this proposal that we

22  have to try the issue before the Court on public

23  nuisance, Phase I of the case, as you-all go about

24  your discovery for abatement issues, costs, and so

1   forth, and we will open it up for damages on all these

2   issues.

3           Then we will finish the matter when that is

4   complete and set the rest of it aside for the time

5   being or you can rely on Turner versus Camden Clark

6   and say, no, I am not going to do it, that this is

7   going to be a war to the bitter end.

8           That is how we are going to go about our

9   business.  The choice will be yours.

10          JUDGE SWOPE:   The whole thing, the point is

11  that, you know everybody keeps saying how it is

12  rattling us and you raise that point and we have all

13  said it.

14          We are offering right now a chance to stop

15  the bleeding.  We are offering a chance to stop the

16  bleeding and then we can pick up the pieces as to

17  that.

18          But you know, Judge Moats, I think you hit

19  the nail on the head.

20          JUDGE MOATS:   Judge Tabit, anything from

21  your standpoint?

22          JUDGE TABIT:   Just from our standpoint,

23  obviously on the decision made as to how we are going

24  to be moving forward, our panel certainly looks

```
 1   forward to working with that and moving toward some

 2   type of an amicable resolution to the matters.

 3          JUDGE MOATS:   Okay, are there any issues or

 4   anything else?

 5          I am not going to hear any arguments or

 6   anything, but is there anything procedurally that we

 7   need to discuss or bring up here today?

 8          Mr. Meadows?

 9          MR. MEADOWS:   Your Honor, if I could just

10   add one thing.

11          JUDGE MOATS:   Go ahead.

12          MR. MEADOWS:   Just for the good of the

13   order, the defendants work together on a lot of the

14   issues and we have the ability to communicate among

15   ourselves and handle almost any issue that this panel

16   wishes to raise.

17          It would be helpful in advance of future

18   status conferences if we could potentially work with

19   Plaintiffs' Liaison Counsel and Ms. Fields to agree on

20   the agenda.

21          For instance, today when you raised the

22   statute of limitations, there are many issues coming

23   from the Defendants which are related to that.  I have

24   my own client I am representing here.
```

```
1              Today when you asked the question off the
2      cuff, I pivoted to look at someone who doesn't
3      represent my client because I knew personally that he
4      had a vested stake in that.
5              JUDGE MOATS:   Sure.
6              MR. MEADOWS:   And certainly all these
7      defendants may have something to stay and I hate to
8      commit on behalf of the Defendants when we didn't even
9      know it was coming.
10             JUDGE MOATS:   I understand, but up to this
11     point it has been hard to really come up with a set
12     agenda because it has been such a moving target as the
13     days goes by leading up to a conference.
14             MR. MEADOWS:   I appreciate that, Your Honor.
15     Before they drag me out of here and tar and feather me
16     afterwards, I want to make sure I have at least said
17     that so that we can perhaps work on agendas in the
18     future just with Ms. Fields if that is appropriate.
19             JUDGE MOATS:   All right, another thing,
20     communicating with our Mass Litigation manager, Ms.
21     Fields, if you communicate with her it cannot be one-
22     sided and unfair.  If one side, one attorney
23     communicates with her, let them advise the other
24     party.
```

1          We all know you can't do that and it puts her

2     in a very difficult position, and it is not proper

3     just to communicate to her, "Hey, what do you think

4     the judges would do with this."  That is not her

5     function at all.

6          Anyway, anything else?  Yes, sir.  State your

7     name, please.

8          MR. SHKOLNIK:   Your Honor, Hunter Shkolnik

9     of Napoli Shkolnik.  I am one of the appointed co-

10    leads.  Thank you for your time today.

11         One issue you brought up, I think it would be

12    very helpful to the panel, there are other litigations

13    consolidated on issues going on across the country.

14         In fact, in New York we have a trial date

15    scheduled for March 20th.  Public nuisance will be the

16    only trial.

17         What I am suggesting in the future as part of

18    our agenda that we also provide you with an update of

19    any other consolidated litigations that would help the

20    Panel to know what else is going on other than Judge

21    Polster's orders that have been issued to help

22    streamline that case.

23         In fact, some of my colleagues here, we are

24    all going to be there Monday hashing out issues

1    regarding that trial.

2            I know you are trying to get your arms around

3    a mile here, and Judge Garguilo in New York is

4    wrestling those same issues and I just want to suggest

5    that we could provide updates.

6            JUDGE SWOPE:   Do you have the same statute

7    up there that we do on the verdict form.  I don't

8    think you do, do you?  About 25 states have that.  I

9    know because I looked at in the Airport case.

10           MR. SHKOLNIK:   We don't have -- we don't

11   have to have everybody on, but there is a portion of

12   liabilities –

13           JUDGE SWOPE:   But you don't have to put non-

14   parties, people who have settled, everybody else that

15   you can possibly throw into the mix on your verdict

16   form, right?

17           MR. SHKOLNIK:   No, we do not.

18           JUDGE SWOPE:   Okay.

19           JUDGE MOATS:   Our position to what you say

20   is we would absolutely love to have that.  For us it

21   is almost impossible to find.  We don't have any way

22   of digging all that out.  So it would be very helpful

23   to know that.

24           Along the same lines, back in 2007 and '08 we

52

1    had -- you may be seated.

2            JUDGE MOATS:   We had a case that was called

3    the Digitek Park litigation.  I don't know if any of

4    you were involved in any of that litigation, but there

5    was an MBL in that.

6            That went to Judge Joseph Goodwin here in the

7    Southern District of West Virginia, and our Mass

8    Litigation Panel had the West Virginia cases, and we

9    coordinated that with Judge Goodwin.

10           He really was great in leading that.  He

11   coordinated, reached out to all the other state court

12   judges, and it was not nearly as massive as this, but

13   we even had a joint conference in Philadelphia with

14   the state court judges and Judge Goodwin.

15           It was incredibly helpful to know what was

16   happening across the country, not just here in West

17   Virginia but for the other judges as well, and we

18   worked closely together as that case was resolved.

19           So it would be helpful for us to know what is

20   happening across the country.  We can find out in the

21   federal litigation, but we just don't have anyway to

22   know what goes on in other states.

23           So we would appreciate both sides working

24   with us to keep us informed.  It doesn't have to be

```
1    just when we come to these hearings.
2            You can do that periodically, and I would
3    like to know that because I even searched on news
4    sites to see if there was any news about that in other
5    states.
6            MR. SHKOLNIK:  Your Honors, we can work with
7    Defense Counsel and come up with not a one-sided but
8    we will come up with what should be jointly submitted.
9            JUDGE MOATS:  Sure, and maybe you can submit
10   that to us periodically, okay.
11           MR. SHKOLNIK:  We would be happy to do that.
12   Thank you.
13           Is that agreeable, Mr. Meadows?
14           MR. MEADOWS:  Yes, Your Honor.  I am in the
15   pit of this large room, but I am sure we can come up
16   with an agreement.
17           JUDGE MOATS:  I appreciate that.
18           MR. SHKOLNIK:  Thank you.
19           JUDGE MOATS:  Another issue that I wanted to
20   discuss which Judge Hoke reminded me of, one thing at
21   the federal level, I have been able to see Judge
22   Polster has appointed special masters under Rule 53 of
23   the Rules of Federal Civil Procedures.
24           That is fairly in-depth rule and it looks
```

```
 1    like those special masters are kept very busy and they

 2    do a lot of work.

 3            He also has, I assume, some of the federal

 4    magistrate judges overseeing some of the discovery

 5    issues.

 6            Our Rule 53 -- has anybody ever looked at

 7    that?  Take a look at that.  It is a rule that says

 8    absolutely nothing.

 9            JUDGE SWOPE:  It basically says we are going

10    to do what we have always done.

11            JUDGE MOATS:  It says that we can have

12    commissioners and they can do what has always been

13    done as far as chancellors, commissioners have been

14    done.  Well, what is that?  It doesn't say.

15            So what does that rule say?  I don't have any

16    idea.  You have the rule there, Mr. --

17            JUDGE SWOPE:  I have got it here, too.

18            JUDGE MOATS:  Can you explain that rule?

19            MR. MEADOWS:  I wouldn't dare to do that,

20    Your Honor.

21            JUDGE MOATS:  Okay.  I have read it.  It

22    doesn't say much of anything.  Here it is.  Rule 53

23    states that Commissioners and Chancellors shall be

24    known as Commissioners.
```

1          "The practice respecting the appointment of

2    such commissioners and references to them respecting

3    their powers and duties and powers and duties of

4    courts to hold a hearing upon their reports shall be

5    in accordance with the practice heretofore followed in

6    West Virginia."

7          What does that mean?  I have no idea.  So

8    anyway, what we have done in the past is to appoint a

9    discovery commissioner when issues come up, and we

10   have been very successful and we have had

11   commissioners do a great job.

12         That brings us to you, Mr. Arceneaux.  We are

13   extremely disappointed in your behavior in this case.

14   Mr. Arceneaux has been one of our discovery

15   commissioners.  So when I saw him in the first case, I

16   think he did this to us on purpose.

17         JUDGE SWOPE:   This is how you escape it.

18         JUDGE MOATS:   This is how he escaped our

19   clutches.  Jay has done a wonderful job as a discovery

20   commissioner, sometimes on such short notice we were

21   almost embarrassed to ask him, but he would drop what

22   he was doing and have hearings and issue responses.

23         He was always thoughtful and both sides

24   appreciated him, and that is what we are looking for.

1          So what I am going to ask both sides here is

2    to submit names of persons, lawyers, here in this

3    state that you believe would be acceptable, hopefully

4    that you can get together and agree on.

5          Now this is going to be difficult in this

6    case because of the wide breadth of people involved,

7    and I am going to ask that we use the federal Rule 53

8    as a model because number one, it is an issue of

9    disqualification, and Rule 53 of the federal rules

10   specifically addresses who would be disqualified.

11         It is almost going to be as if that person,

12   which they are, is going to be in a judicial capacity

13   and would be disqualified in the same category as I or

14   Judge Swope or any other judge here.

15         So it is going to have to be somebody who is

16   not involved in the litigation, somebody who is not

17   involved before us in other cases, somebody who is not

18   involved with you in an adversarial role in cases

19   because that would not be proper either.

20         So it really narrows the scope of available

21   people.

22         There would be a category of possible people

23   retired or senior status judges that could be brought.

24   A lot of them don't have support staff.  So we would

1    have to be looking at how to get them support staff to

2    do this as well.

3           I have no idea the extent of the discovery

4    disputes that have taken place in federal court.  I

5    can only assume they have been numerous based upon

6    what I have seen and read.

7           We don't have the capacity to do that.  We

8    don't have the time, and it is going to have to be

9    done with a commissioner.

10          So we are going to ask that you please work

11   together and come up with a proposed list for us to

12   look at.

13          All right, is that agreeable?  Thank you all.

14          Anything else?  Yes, ma'am.  State your name.

15   MS. KEARSE:   Judge, Ann Kearse with Motley

16   Rice.  I have the eight other cases that are pending

17   in Marshall County.

18          I submitted a proposed order for transfer to

19   the case, a joint order.  I submitted that yesterday.

20   So it may not have had time, but it is pending, a

21   proposed order of transfer to be in, if Your Honor

22   judges me to be qualified as --

23          JUDGE MOATS:   You were there, weren't you?

24          MS. KEARSE:   I was there, Your Honor, and in

1    some of the other cases.

2            JUDGE MOATS:   Just as an aside, I was

3    telling the panel this morning -- you can be seated

4    unless you have something else.

5            MS. KEARSE:   My co-lead, my partner, Joe

6    Rice, is the lead in the MBL and would be happy to

7    provide information about the MBL from the other state

8    proceedings, Your Honor.

9            JUDGE MOATS:   Okay, again, that is what I

10   want you-all to do to see if we can do this and is it

11   possible to attempt to mediate all that stuff, and so

12   you will have an insight there and reason perhaps for

13   them to be involved.

14           So as soon as that proposed order comes

15   through, if the Defendants are agreeable, just sign it

16   and submit it.

17           So we have come a long -- as I started to

18   say, my very first case on this Mass Litigation Panel

19   was the asbestos litigation.

20           I had never done anything like this before.

21   My first hearing was in Judge Haden's courtroom.  Were

22   you there for that one?

23           I remember I walked in and every seat in the

24   room was taken, the jury box, counsel table, attorneys

1    lined up around the wall and out in the hall.

2         I stood up and I thought what have I gotten

3    myself into?  So it was incredible.  Everybody was

4    very cooperative.

5         When I asked everybody, I said, "We are going

6    to have an expedited trial because we already have the

7    first liability trial set in September."

8         I was dealing with the deliberate and intent

9    part of all of those cases.  I said, "Everybody,

10   please pull out your calendars.  I want to pick a date

11   that is convenient for everybody.  What is convenient

12   for me is December 1.  We will try it the whole month

13   of December.  Any objections?"  Dead silence.

14        I have two lawyers in front of me now for a

15   car wreck case and I can't get them to agree on a date

16   over the next nine months.

17        So I want to say these are a different breed

18   of cases, and it takes incredible cooperation,

19   diligence, and a willingness to cooperate and work

20   together.  That is the only way this can be done, and

21   that is what we are asking for.

22        We will work hard because we have been

23   working hard.  We just ask you to not do things unless

24   they are absolutely necessary and don't raise issues

1    just for the sake of raising them.

2            Don't be afraid to give ground.  Take a close

3    look at your defendants.  Judge Polster told the

4    plaintiffs, the ones you are not serious about, get

5    rid of them.

6            This case can either be done or it can

7    collapse under its own weight.  Right now it is

8    extremely heavy, extremely, and unless some of the

9    issues and parties are narrowed down, it is going to

10   remain that way.

11           It is my understanding the last time you told

12   me that you were going to cast aside or at least shut

13   off all the individuals.

14           Has that been done?  I think I have signed

15   some orders to that effect.

16           MR. FITZSIMMONS:  Yes, Your Honor.

17           JUDGE MOATS:  All of them have been?

18           MR. FITZSIMMONS:  Yes, they have been

19   dismissed or settled.

20           JUDGE MOATS:  All right, thank you.  Okay,

21   with that, anything else?

22           I appreciate all of you coming here today.  I

23   wish you a joyous upcoming holiday season, and as soon

24   as we get these briefs sent in, we will reset the next

1    hearing.  We will reset something that was necessary

2    in the meantime.

3            Thank all of you so much.

4                        (WHEREUPON, at 11:08 a.m., the

5                        hearing was concluded.)

6

```
                    REPORTER'S CERTIFICATE


STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, TO-WIT:


        I, Donna Miller-Mairs, Certified Court

Reporter, hereby certify that the foregoing is, to the

best of my skill and ability, a true and correct

transcript of the evidence introduced and proceedings

had in the aforementioned case on the 6th day of

December, 2019, as reported by me by Stenomask

procedure.

        I hereby further certify that the transcript

within meets the requirements of the Code of the State

of West Virginia, 51-7-4, and all rules pertaining

thereto as promulgated by the Supreme Court of

Appeals.

        Given under my hand this 27th day of

December, 2019.

        My commission expires November 22, 2022.



                    _____
                         DONNA MILLER-MAIRS
                      Certified Court Reporter
```