# EXHIBIT 49

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE

June 20, 2017

```
------------------------------x
                              :
KANAWHA COUNTY COMMISSION,    :        CIVIL ACTION
                              :        NO.  2:17-cv-01666
         Plaintiff,           :
                              :
vs.                           :
                              :
RITE AID OF MARYLAND,         :
INC., et al.,                 :
                              :
         Defendants.          :
                              :
------------------------------x
                              :
CABELL COUNTY COMMISSION,     :        CIVIL ACTION
                              :        NO. 3:17-cv-01665
         Plaintiff,           :
                              :
vs.                           :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
         Defendants.          :
                              :
------------------------------x
```

```
----------------------------x
                             :
FAYETTE COUNTY COMMISSION,   :        CIVIL ACTION
                             :        NO. 2:17-cv-01957
        Plaintiff,           :
                             :
vs.                          :
                             :
CARDINAL HEALTH, INC.,       :
et al.,                      :
                             :
        Defendants.          :
                             :
----------------------------x
                             :
WAYNE COUNTY COMMISSION,     :        CIVIL ACTION
                             :        NO. 3:17-cv-01962
        Plaintiff,           :
                             :
vs.                          :
                             :
RITE AID OF MARYLAND,        :
INC., et al.,                :
                             :
        Defendants.          :
                             :
----------------------------x
                             :
BOONE COUNTY COMMISSION,     :        CIVIL ACTION
                             :        NO. 2:17-cv-02028
        Plaintiff,           :
                             :
vs.                          :
                             :
AMERISOURCEBERGEN            :
DRUG CORPORATION, et al.,    :
                             :
        Defendants.          :
                             :
----------------------------x
```

```
----------------------------x
                            :
LOGAN COUNTY COMMISSION,    :        CIVIL ACTION
                            :        NO. 2:17-cv-02296
        Plaintiff,          :
                            :
vs.                         :
                            :
CARDINAL HEALTH, INC.,      :
et al.,                     :
                            :
        Defendants.         :
                            :
----------------------------x
                            :
WYOMING COUNTY COMMISSION,  :        CIVIL ACTION
                            :        NO. 5:17-cv-02311
        Plaintiff,          :
                            :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
        Defendants.         :
                            :
----------------------------x
```

APPEARANCES:


For the Plaintiffs:


MR. ANTHONY J. MAJESTRO
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

APPEARANCES (Continued):


For the Plaintiffs;


MR. PAUL T. FARRELL, JR.
MR. BERT KETCHUM
Greene Ketchum Bailey Walker
Farrell & Tweel
P.O. Box 2389
Huntington, WV  25724-2389


MR. WARREN R. MCGRAW, II
McGraw Law Offices
P.O. Box 534
Pineville, WV  24874



For the Defendants:


MR. A. L. EMCH
MR. ADAM J. SCHWENDEMAN
Jackson Kelly
P.O. Box 553
Charleston, WV  25322-0553



MS. MEREDITH S. AUTEN
Morgan Lewis & Bockus
1701 Market Street
Philadelphia, PA  19103


MR. F. LANE HEARD, III
Williams & Connolly
725 Twelfth Street, NW
Washington, D.C.  20005

APPEARANCES (Continued):


For the Defendants:


MR. RUSSELL D. JESSEE
MR. JEFFREY WAKEFIELD
Steptow & Johnson
P.O. Box 1588
Charleston, WV  25326-1588


MS. ENU MAINIGI
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005


MR. STEVEN R. RUBY
Bailey & Glasser
209 Capitol Street
Charleston, WV  25301-1386



Also Present for Defendants:

MR. JOHN ANDREW SMITH

MR. MICHAEL J. FARRELL

MS. SUSAN M. ROBINSON

MR. KEIGH A. JONES

MS. NEVA G. LUSK

MR. CLIFFORD F. KINNEY

MR. GERARD R. STOWERS

MS. RONDA L. HARVEY

MR. THOMAS J. HURNEY, JR.

APPEARANCES (Continued):


Also Present for Defendants:


MS. LAURIE K. MILLER

MR. MARC E. WILLIAMS

MR. JAMES R. WOOLEY

MR. CARTE P. GOODWIN

MR. KEITH HOOVER

MR. JOHN J. POLAK

MR. WEBSTER J. ARCENEAUX, III

MR. MITCHELL J. RHEIN


Court Reporter:          Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography; transcript
produced by computer.

1               P R O C E E D I N G S

2          THE COURT:  Good morning.

3      This is the hearing on the motions to dismiss in the

4  seven opioid cases filed originally in this court.  I

5  believe there are seven of them.

6      If anybody's curious, I have an opinion in draft and

7  expect to rule on the remand motions in the two additional

8  cases that were removed before the end of the week.

9      Let me ask counsel to note their appearances, please.

10          MR. FARRELL:  Paul Farrell, Jr., on behalf of the

11  seven counties.

12          MR. MAJESTRO:  Anthony Majestro on behalf of six

13  of the seven counties, all but Wyoming.

14          MR. MAINIGI:  Enu Mainigi, Williams & Connolly, on

15  behalf of Cardinal Health, Your Honor.

16          MR. HEARD:  Lane Heard, Your Honor, also from

17  Williams & Connolly for Cardinal Health.

18          MR. JESSEE:  Russell Jessee, Your Honor, for

19  McKesson in four of the counties, and the three other

20  counties Jeff Wakefield with me.

21          THE COURT:  All right.

22          MR. EMCH:  Your Honor, Al Emch, Jackson Kelly here

23  in Charleston for AmerisourceBergen.  And I have with me

24  Meredith Auten from Morgan Lewis & Bockus in Philadelphia,

25  and my associate Adam Schwendeman here also with Jackson

1  Kelly.

2          THE COURT:  Thank you, Mr. Emch.

3      Is there anybody else who wants to note an appearance?

4          MR. MCGRAW:  Your Honor, my name is Warren

5  Randolph McGraw and I'm here on behalf of Wyoming County

6  along with Mr. Farrell.

7          THE COURT:  All right.  Thank you, Mr. McGraw.

8      Anybody else?

9      (No Response)

10         THE COURT:  All right.  The -- I'll hear from the

11 defendants, whoever wants to go first.

12     Mr. Emch.

13         MR. EMCH:  Your Honor, thank you very much.

14     I'm going to act a little bit, if the Court approves,

15 as a sort of master of ceremonies with respect to the

16 defendants.

17     What we have planned to do, again with the Court's

18 concurrence and approval, is for me to give some

19 introductory remarks, part of which I'm giving right now.

20 And I will talk about the role of the distributors in the

21 closed system of authorization, manufacture, distribution,

22 and dispensing of controlled substances in this country.

23     I will also talk -- and much of this will be embedded

24 in that previously mentioned part of my argument.  I will

25 also talk about the failure to appropriately and properly

1   and sufficiently plead their case in accordance with *Iqbal*

2   and *Twombly* and about the lack of proximate causation, the

3   lack of causation, and the lack of pleading of wrongdoing.

4        And my plan, Your Honor, once I launch into that

5   substance, is to take 10 to 15 minutes, if I can get through

6   it in that time, which I plan to do, and then I will turn it

7   over to my colleague, Mr. Jessee, representing McKesson who

8   would talk about the failure to plead and to have or to be

9   able to assert a cause of action under the Controlled

10  Substances Act or the, the state equivalent of that act.

11       And then, finally, my colleague, Mr. Heard, who

12  represents Cardinal Health, would talk about public

13  nuisance, the economic loss rule, and the free public

14  services doctrine.

15       And each of those would be geared for approximately 10

16  or 15 minutes, Your Honor.  And should Your Honor wish to

17  stop and permit the plaintiffs to respond *seriatim* or,

18  obviously, whatever procedure the Court would wish to

19  follow, certainly we are more than happy to follow.

20       I do have a couple of visual aids and a packet that

21  I'll ask Adam to give to the Court and set up over here so

22  that it can be used in my presentation.

23            THE COURT:  Thank you.

24            MR. EMCH:  And if you cannot -- the packet has

25  everything in it if you want to look at it there.  And

1   hopefully you'll be able to see -- there are not too many,

2   but I have found them to be extraordinarily helpful in

3   understanding what I'm about to talk to you about.

4        Now, I've talked to your clerk.  And with your

5   permission, I probably would like to move from the podium.

6   But if they are not picking me up, they're going to tell me

7   or signal me and then I'll move back behind the podium for

8   the rest of it.  But I do have a, a laser pointer here that

9   I'll use on the two exhibits.

10            THE COURT:  Okay.  You can go wherever you're

11   comfortable and if I can't hear you, I'll tell you.

12            MR. EMCH:  All right, Your Honor.  Thank you very

13   much.

14        Your Honor, the major point that we think is so crucial

15   to this entire case is the simple fact that in this country,

16   the manufacturing, the marketing, the distribution, the

17   dispensing, the prescribing of controlled substances is a

18   highly regulated activity.  And that activity is confined,

19   as far as the legal system is concerned, in what is called

20   the closed system of distribution; the closed system of all

21   of this for getting controlled substances into our system in

22   this country, our health system in this country, and to

23   those who need those controlled substances.

24        Now, the chart, the colorful chart over on the left,

25   Your Honor -- and hopefully, again, you can see that --

1   depicts this closed system.  The plaintiffs' case really

2   boils down to all generic conclusory group pled allegations,

3   very little in the way of facts other than the description

4   of the so-called opioid abuse epidemic of which we are all

5   sadly aware that exists in this country and in the State of

6   West Virginia.

7           THE COURT:  Have you read *Dreamland*, Mr. Emch?

8           MR. EMCH:  I have, Your Honor.  Have you read

9   *American Pain*.

10          THE COURT:  I haven't read *American Pain*.  It's

11  been recommended to me.  I finished *Dreamland* last week.

12          MR. EMCH:  Both excellent, both excellent, and

13  giving the entire picture and the entire history.  And that

14  does not surprise me that you have read those.  There are a

15  couple others I'll recommend to you later as well.

16          But the plaintiffs' case is all about too many pills --

17  that's their description -- too many pills, opioid abuse

18  epidemic.  And it is a numbers case up until now.  That's

19  all we see.  And those numbers are from 2007 and up to 2012.

20          You can't plead a case under the Federal Rules and the

21  federal requirements just using those two elements,

22  especially since when they talk about supply, which is the

23  numbers, the supply, the numbers that are coming into West

24  Virginia and, of course, we talk about demand and how demand

25  is set.

1      We, the distributors, Your Honor, have absolutely no

2  role in determining what the supply needs to be or in making

3  a determination of what the demand is.  Our system is set up

4  so that the DEA -- and I'll talk about this in a little bit

5  of detail as I go through the diagram -- but the DEA every

6  year sets the quota in this country for all Schedule I and

7  Schedule II controlled substances that may be manufactured

8  by the manufacturers.  And it sets that quota based on its

9  evaluation of the legitimate medical, scientific, and

10  industrial need for those substances.

11      THE COURT:  Is that nationwide or is it state

12  specific?  How is that broken down?

13      MR. EMCH:  Nationwide, Your Honor.  And this, this

14  second chart that's up right now over here on the right is

15  the last schedule that's published on the DEA website.  And

16  we've highlighted the two that get talked about the most

17  here which are hydrocodone and oxycodone.

18      THE COURT:  Does that overcome the obligation of

19  the distributors to be on the lookout for suspicious high

20  numbers of, of drugs going into specific areas?

21      MR. EMCH:  It does.

22      THE COURT:  Don't they have a duty to do that

23  under the law?

24      MR. EMCH:  They have a duty under a regulation

25  that's passed by the federal government, and many states

1    have the same, essentially the same regulation.  They are

2    obligated by that regulation to have a system that will

3    identify to them and then to report to the agencies who wish

4    those reports -- the DEA always does, most states do not --

5    and to report suspicious orders to the agencies that want

6    them.

7         Suspicious orders, Your Honor, are, are also completely

8    within the closed system.  And the point about the closed

9    system is that it is a legal, legal system.

10        Diversion is defined.  And the definition I usually use

11   is the one that's in the Board of Medicine, our state Board

12   of Medicine's policy on opioid use for the treatment of

13   chronic pain in September of 2013.  It's -- I don't think I

14   have that in the packet.  It might be in the packet.

15        But diversion is the intentional transfer of a

16   controlled substance from an authorized to an unauthorized

17   entity.  That's the, that's the definition, intentional

18   transfer.

19        Nothing that occurs in this closed system -- every

20   transfer in the closed system is tracked and is reported.

21   And every pill that passes down through the closed system

22   from the, from the manufacturer all the way down to the

23   pharmacy is accounted for.

24        And there's no allegation, or can they be, there be in

25   this case, that any distributor ever distributed with a

1  transaction that involved an unauthorized entity.  Every

2  player in that system has a DEA registration number.

3  They're registered with the DEA and authorized to perform

4  their role.

5      And in the various states, they're licensed by that

6  state to perform that role.  And that includes every

7  manufacturer, every distributor, every pharmacy, every

8  doctor, every entity that may have legal possession of a

9  controlled substance.  Where these substances leave the

10  closed system, Your Honor, is with the pharmacy and the

11  doctor.

12      Now, the roles here in the closed system I think I can

13  easily and quickly get through.  The FDA sits on top.  And

14  the FDA determines that drugs are effective.  They have

15  determined that opioids are effective if used in accordance

16  with their instructions, effective for the treatment of pain

17  in their various iterations.

18      The DEA sets these quotas, as I said, Your Honor.  They

19  set these quotas.  If you read *American Pain*, you'll see

20  that Mr. Temple talks about the fact that -- well, he talks

21  about how those quotas have increased for hydrocodone and

22  oxycodone from the time they were introduced every year,

23  astronomically in many years.

24      You can see when you look at the chart that the first

25  time we see the DEA begin to decrease the quotas is in the

1   last two or three years.  That's when they begin to come

2   down.

3       But the numbers here are indeed huge.  But that is

4   representing the DEA's judgment looking at demand.  Their

5   judgment is that the legitimate medical need in this

6   country, the demand and the legitimate demand -- they're not

7   estimating how much is going to be diverted, how much is

8   going to go out on the black market or in the various

9   methodologies that are used to obtain these for an illegal

10  purpose or use them for an illegal purpose.  They're

11  estimating legitimate medical need, demand.  And then they

12  authorize the supply.

13          THE COURT:  If I hear you correctly, they have

14  changed their mind about the legitimate demand and reduced

15  the quantities in recent years.  Is that right?

16          MR. EMCH:  Yes.

17          THE COURT:  After a significant heroin epidemic

18  has occurred, much of which, if we can believe the

19  information we read, is attributable to opioid addiction.

20          MR. EMCH:  That is the allegation and there is

21  some truth in that, Your Honor.  There's also a lot more

22  complexity involved in it than that.  And those of us who

23  have lived through a number of decades I think can form in

24  our own minds views and opinions about drug abuse and drug

25  misuse in this country.

1        But there's no doubt that the opioid abuse problem is a

2   complex, a very complex problem.  And in talking through

3   this system again, Your Honor, there are indeed roles that

4   each, each part of the system plays.

5        Let me say to you -- let me --

6              THE COURT:  You can take as much time as you need,

7   Mr. Emch.

8              MR. EMCH:  Thank you, Your Honor.

9              THE COURT:  Within reason.

10             MR. EMCH:  Well, of course, as long as you're

11  interested, you know, I can keep talking.

12       But the role of the distributors -- and it's almost

13  never characterized this way, but it is the primary role of

14  the distributor, Your Honor, -- is to assure a safe, secure,

15  timely, dependable delivery of controlled substances and

16  other drugs to those who need them to dispense them for

17  legitimate medical purposes in this country; to keep them

18  safe, to transport them securely, not to have them stolen,

19  not to lose them, to account for every single one, every

20  single pill that we get from a manufacturer and deliver to a

21  pharmacy.

22       Plaintiffs don't identify any pharmacy that they say

23  has been involved somehow in improperly or illegally giving

24  or dispensing controlled substances to the citizens of West

25  Virginia.

1       THE COURT:  But there are probably plenty of them

2  out there, aren't there?

3       MR. EMCH:  Well, that's a good question now, Your

4  Honor, because, for example, it wasn't until 2012 that West

5  Virginia had a statute that regulated pain clinics, for

6  example.

7       Now, a lot of the discussion that goes on in this state

8  about the opioid problem is, indeed, reflective of the

9  pre-2012 period and does involve pain clinics which were not

10  regulated, just places where somebody could set up two or

11  three doctors who were willing to play ball with a DEA

12  registration number and make what has been referred to as

13  pill mills.  That's getting better.  That's getting better.

14  The DEA may be getting better.

15       But the point again is distributors don't have any role

16  in determining what the supply is allowed to be.  We don't

17  have a role in determining which patients need, in the

18  doctor's best professional judgment, to have these

19  substances.

20       And there are, Your Honor, in this instance I would

21  suggest to you -- and there's not a lot of publicity about

22  that -- but there are unintended consequences certainly of

23  cutbacks in many of these drugs.

24       They are, in fact, effective.  They are, in fact,

25  useful if they are prescribed and taken in accordance with

1   appropriate medical guidelines.  And those guidelines have

2   been changing for the past several years and also tightening

3   up.

4        But back again to the distributor --

5             THE COURT:  Let me ask you a question and you may

6   not be the right person to ask, but it just occurred to me.

7        Are there any standards that a prescribing physician

8   can use to determine whether the patient who says, "I'm in

9   intense pain," really is?

10            MR. EMCH:  Well, now, that is a medical question

11  I'm not sure any of us are really qualified to answer.  But

12  I can tell you, Your Honor, you don't have to dig too deeply

13  to see -- and our Board of Medicine in West Virginia is a

14  very good example -- over time medical organizations,

15  medical professional organizations, regulating organizations

16  like our Board of Medicine publish guidelines.  I cited one

17  to you a moment ago.  And there are a series of them.

18       And you can watch the progression and you can watch the

19  development of those guidelines and the specificity of those

20  guidelines with respect to how doctors should, in their

21  practice, evaluate and make the decisions and the judgments

22  about when the patient's pain does require these

23  medications.

24       Today, as you've seen, we've all seen, you go in

25  emergency rooms, you go in your doctor's office and you, you

1   see and you hear words that were not heard in pre-like-2012

2   or pre-2013 when this got so much publicity and became such

3   an attention focus in the nation.

4       And those things are, you know, "If you come in the

5   emergency room, we're only going to give you a day's supply

6   or we'll just give you a few pills and you have to go to

7   your regular doctor and get them from him," those kinds of

8   things.

9       But the direct answer to your question, pain is a very

10  difficult thing for a doctor objectively to verify.  And I

11  don't think there's any dispute about that.  And that's a

12  problem for somebody who wants to obtain these substances

13  legitimately, legitimately because they lie to the doctor or

14  they, they go to the emergency room with, with a crisis and

15  say they're in pain and convince somebody they're in pain

16  and get them.

17      But there's no objective, or very few objectifiable

18  methods that a doctor can use to actually confirm pain.  But

19  the doctor's responsibility, Your Honor, -- we don't have --

20  you talked about the suspicious order reporting.  And

21  calling or determining that an order is suspicious is a --

22  is done by each individual distributor based only on that

23  distributor's knowledge and information about their own

24  customer and customers, only that.

25      We don't know anything about the other distributors.

1    We don't know anything about the total amounts that may be

2    coming into a pharmacy or a town or a county.  We don't have

3    that information.

4         That information is readily available.  It's readily

5    available in the ARCOS database, but only to the DEA, not to

6    us.  They get reported in some instances every day,

7    certainly by every month.

8         The ARCOS database has in it every order for a

9    controlled substance that is shipped by every distributor to

10   any customer - pharmacies, hospitals, clinics - in this

11   country.  They're all reported.  They're in that database.

12        If you called up the DEA right now and asked them --

13   named a pharmacy somewhere here in West Virginia and said,

14   "I need to know how many hydrocodone that pharmacy was

15   shipped in the past year by any and all distributors," they

16   can tell you.  We don't know that.  We know what we did, but

17   we don't know what they did.

18        Literally a similar situation exists past the West

19   Virginia State line when you get to the Board of Pharmacy in

20   West Virginia and the controlled substances monitoring

21   program database which we've had since 2000 in, in this

22   state.  And it's, it's a leading version of that database.

23        That database has every prescription for a controlled

24   substance written in the State of West Virginia reported to

25   it since 2012 every day, every day.  And that's a database

1    that the doctor can and is supposed to access.  That's a

2    database that the pharmacist can and is supposed to access

3    because the professional and legal obligation to take these

4    substances out of the closed system -- they're in the closed

5    system until they get to the dispenser.  And at the

6    dispensing level, they leave the closed system and they go

7    to a patient.

8         And there's not an allegation here that, that any pill

9    that any distributor distributed into West Virginia was

10   dispensed to someone other than a patient or to someone for

11   other than a legitimate medical need, which is a judgment

12   made first by the doctor.

13        The professional standard and the legal standard is

14   that the doctor writes a prescription, quote, in the usual

15   course of professional practice for a legitimate medical

16   purpose.  That's the standard, his or her judgment, writes

17   it in that standard.

18        And the pharmacist has the identical words.  If the

19   pharmacist has a reason to think that the prescription that

20   he or she is presented with was not written by the doctor in

21   the usual course of professional practice for a legitimate

22   medical purpose, the pharmacist has the obligation, the

23   professional obligation, legal obligation not to fill that

24   prescription.

25             THE COURT:  Does that impose on a pharmacist the

1   duty to -- if the pharmacist suspects that Dr. X is

2   prescribing too many pills, does the pharmacist have a duty

3   to second-guess that or, or just look for prescriptions that

4   might be forged or illegitimate or something?

5               MR. EMCH:  All of the above, Your Honor.

6               THE COURT:  Okay.

7               MR. EMCH:  I mean, there is -- back to the

8   information situation, of course the Board of Pharmacy again

9   has all of this information.  Again, you could call them

10  today.  They could look up Dr. X and they could see.  And

11  they do.  They do this now.  They produce lists.  They do

12  mine their database to look for doctors that seem to be

13  prescribing a lot, look for patients that are going to

14  multiple doctors.  They do that now.  They didn't do that

15  before 2012.  But they do it now.  They send lists to

16  professional organizations.

17      But, yes, the pharmacist -- and it's, you know, it's

18  probably applicable more maybe in West Virginia or in a

19  small town or someplace like that.  The pharmacist knows a

20  lot of the people.  The pharmacist knows his customer.  They

21  know doctors.  They know the prescribers.  They know where

22  the, where treatment is happening.  They know something

23  definitely about the people or a lot of the people who are

24  coming.

25      So they are on the ground.  I mean, they are in a

1   position to make some judgments.  I don't think any

2   professional, certainly not, not a conscientious

3   professional who does not wish to engage in criminal

4   conduct, is going to take lightly this responsibility.

5        And I mean that in both directions.  It's, it's -- it

6   can be a big thing to have someone come to you with a

7   prescription and to say, "I'm sorry.  I'm not going to fill

8   that for you." I mean, this is not a small deal for the vast

9   majority of people who do need the medication and who do not

10  abuse or criminally place into the, the illegal system these

11  drugs.  But that's where it comes out, Your Honor.

12       And my gentleman over there is telling me my time is

13  up.

14       I didn't touch directly -- if I may, I'll just take a

15  minute or two -- again on the pleading and the standards for

16  pleading.  I know you're well familiar with that.

17       We believe that the briefing demonstrates quite easily

18  that this is a case that simply does not live up to those

19  standards.  There is no factual support for even a causal

20  relationship, set aside a liability type relationship, but

21  just a factual causal relationship between our shipments

22  within the closed system into West Virginia and the abuse of

23  these drugs that we know is occurring.

24       There is a huge disconnect between what we actually do

25  and what our responsibility is that we perform and an actual

1    abuse of a particular pill or a set of pills.  They don't

2    name any pharmacies.  They don't say that anybody out there

3    can trace something back to a particular distributor.

4         Proximate cause also, Your Honor, I think is the orphan

5    child of our legal system in many ways, a very, very

6    important concept, and the place where the courts have a

7    very important gatekeeper role.

8         And proximate cause is completely lacking in this

9    circumstance, as the case law that we cite in our briefing,

10   Your Honor, demonstrates with no real opposition from the

11   plaintiffs.

12        Our conduct, what we do, is remote.  These substances

13   are not within our control when they are abused, when they

14   are diverted and abused, and the intervention as described

15   in the *Ashley County* case, Your Honor, the intervention of

16   this criminal conduct between, and way between what we do

17   and the actual diversion.

18        The chart that I've got over here, the colorful red

19   part outside talks about diversion and where the diversion

20   occurs.

21        There's another chart.  It's in the GAO report that's a

22   part of the packet.  I have a blow-up of it, but I'm not

23   going to take the time to put it up now.  And it shows

24   opportunities for diversion.

25        And, again, diversion is somebody transferring out of

1    the closed system from an authorized transfer to an

2    unauthorized transfer.

3        And the biggest thing, Your Honor, is this

4    intervention -- the remoteness and the intervention of

5    criminal conduct all around the side.

6        The last point I'll make, there's so much talk now

7    about the increases in the overdose problem in this country,

8    and those are real.  And as you may have seen on the

9    national news last night talking about the City of Dayton,

10   they are real and they are being driven by heroin and

11   primarily Fentanyl and Carfentanyl, all of which are illegal

12   drugs.  And they are illegal drugs.  Heroin's been around a

13   long time.  Fentanyl and Carfentanyl are mostly manufactured

14   in China and taken to Mexico, brought in by the drug

15   cartels, and, and extraordinarily powerful and dangerous

16   drugs.

17       And all of the literature that I've seen in the past

18   year or so traces the rise in overdose rates to the Fentanyl

19   and the Surfentanyl and the, and the heroin.

20       Thank you, Your Honor.

21            THE COURT:  Let me ask you one question before you

22   depart.

23            MR. EMCH:  Yes, sir.

24            THE COURT:  Mr. Emch, since you brought up

25   proximate cause, I hope you're the right one to address

1   this.  But the question is very much on, on my mind.

2        These cases are before me under diversity of

3   citizenship which obligates me to follow state law on point.

4        The case brought by Attorney General Morrisey in Boone

5   County, the Boone County case didn't make it to the Supreme

6   Court, but Judge Thompson wrote a rather, a very impressive

7   opinion dealing at great length with all of the legal issues

8   here which may, may be the highest pronouncement of any

9   State Court on a lot of these legal issues.

10       To what extent am I bound to follow that determination

11  since it arguably is the highest determination of state law

12  on these points that are involved in these cases?

13           MR. EMCH:  I don't think you're bound at all, Your

14  Honor.  I don't think any Circuit Court is bound to follow

15  those rulings.  And I don't -- I'm certain that the Supreme

16  Court would not follow those rulings.  And I would submit

17  that Your Honor is not at all -- it's not at all necessary

18  or appropriate for Your Honor to follow that ruling.

19       Judge Thompson also had before him a very lengthy and

20  well written opinion that would have gone the other

21  direction.  And we attempted to take that, that last opinion

22  to our Supreme Court of Appeals, but they did not take it at

23  that point.

24       So there's no binding authority, Your Honor, and

25  certainly no binding authority in West Virginia State Courts

1   that would cause Your Honor to have any pause, in my view,

2   with respect to applying the federal principles that are so

3   well briefed with respect to proximate cause.

4           THE COURT:  Well, I've got to figure out, if I

5   understand my obligation correctly, what the Supreme Court

6   of Appeals of West Virginia would do with these issues if

7   those issues came before it.

8       Now, the Boone County opinion would be some evidence

9   of, of that, would it not, or something I ought to consider

10  in trying to determine what our Supreme Court would do?

11          MR. EMCH:  My view probably would be "no," Your

12  Honor.  I hate to disagree with an old, with an old friend

13  and Federal Judge, but, but maybe you'll forgive me in this

14  instance.

15      You know how things work in State Court, and that is

16  not a binding precedent.  We were not able to get it to the

17  authority that would make a binding precedent.  And

18  certainly there is law on proximate cause if that's

19  specifically what you're talking about.

20          Now, there are -- Your Honor may be able to parse some

21  of this case.  And it's conceivable that you could believe

22  that you need the advice of the Supreme Court of Appeals on

23  an issue or issues if you believe them to be determinative

24  and important.  And you, I'm sure, understand that without

25  me telling you.  But that's certainly possible in this case

1    with the issues that are presented.

2        We simply say that whether, whether you're talking

3    about West Virginia binding precedent with respect to

4    proximate cause or federal precedent with respect to

5    proximate cause, this is not a hard call.  I mean, it just

6    to us is not a hard call, Your Honor.

7        It is -- this is so remote, involves so much conduct

8    that comes between what we do and this legitimate endpoint

9    where these substances go to patients, involves so much

10   professional judgment, judgment that can be taken correctly.

11       But as you'll see, and as the statistics -- plaintiffs

12   like statistics.  But as the statistics show in this

13   country, more than half of the opioids that are abused and

14   the majority of that more than half are obtained

15   legitimately by real patients.  They get them from they say

16   one doctor.  And then they share them or they sell them or

17   they give them to people.

18       But there are so many judgments maybe made honestly,

19   but other judgments and decisions made criminally that come

20   between our conduct in safely and securely delivering these

21   substances and the so-called opioid abuse epidemic that we

22   all decry.

23            THE COURT:  Thank you very much, Mr. Emch.

24            MR. EMCH:  You're welcome, Your Honor.

25            THE COURT:  Mr. Jessee.

 1          MR. JESSEE:  Good morning, Your Honor.

 2          THE COURT:  Good morning.

 3          MR. JESSEE:  To pick up on the last point that you

 4   were discussing with Mr. Emch about the possible

 5   precedential effect of the Boone County Circuit Court's

 6   order, that order did not address at all one of the central

 7   legal issues in this case.  And that is the federal question

 8   of the application of the federal Controlled Substances Act.

 9      The federal Controlled Substances Act and the West

10   Virginia Controlled Substances Act which exist solely

11   because of the savings clause of the federal --

12          THE COURT:  Does the implication of that federal

13   law make this a federal question case?

14          MR. JESSEE:  I believe so, Your Honor, because I

15   believe the plaintiffs have asserted that federal law

16   applies.  They have, they have asserted a federal question.

17   And federal questions can support federal question

18   jurisdiction even if the plaintiff is wrong about actually

19   stating a claim under that federal law.

20      So there are numerous decisions, as you're well aware,

21   that find removal jurisdiction based on federal question and

22   then the same decision then dismissed the case on 12(b)(6).

23      The Controlled Substances Act, the federal act, and the

24   parallel state act which, again, exists solely because of

25   the savings clause and the federal act and must be

1    consistent with the federal act, they unquestionably create

2    duties on distributors.

3         Plaintiffs repeatedly argue that their claims are based

4    on these duties created by the federal act and the state

5    act.

6         Part of the duties however, Your Honor, are purely

7    regulatory duties.  They are duties that are required of

8    distributors to maintain their federal registration and

9    their state license, and they're enforced only at a federal

10   level by the Drug Enforcement Administration and at the

11   state level by the West Virginia Board of Pharmacy.  No

12   duties in the federal Controlled Substances Act or the West

13   Virginia act run to the counties.

14        And Mr. Emch did a very good job of making this complex

15   closed system understandable.  But while the regulatory

16   system may be complex, this legal issue is simple and makes

17   this an easy case.

18        This Court, Southern District of West Virginia, is one

19   of the early cases to conclude that the federal Controlled

20   Substances Act creates no private right of action in 2001 in

21   the *McCallister* case.

22        As recently as two weeks ago on June 7th the Tenth

23   Circuit affirmed *Smith* against *Hickenlooper*.  And that case

24   holds federal courts have uniformly held that the CSA does

25   not create a private right of action.

1    According to its plain terms, the CSA is a statute

2    enforceable only by the Attorney General and by delegation

3    to the Department of Justice.  Again, Your Honor, that was

4    affirmed by the Tenth Circuit just two weeks ago.

5    Of particular importance to this case, Your Honor, are

6    the federal cases that hold that a private plaintiff cannot

7    end run this lack of a private cause of action by trying to

8    bootstrap to another act such as the federal Declaratory

9    Judgment Act or in a California case supplemental Rule G of

10   the Federal Rules of Civil Procedure.

11   We've cited *Jones* against *Hobbs*, Eastern District of

12   Arkansas from 2010, Your Honor.  Death row inmates could not

13   use the federal Declaratory Judgment Act to bootstrap a

14   purported CSA violation and challenge the Arkansas Method of

15   Execution Act.

16   That Court stated Congress committed complete

17   discretion to the Executive Branch to decide when and how to

18   enforce the CSA.  Congress authorized no private right of

19   action for enforcement of CSA.

20   And more importantly, Your Honor, the Declaratory

21   Judgment Act does not authorize a bypass of the CSA's

22   federal enforcement scheme.

23   Similarly, in a 2013 Northern District of California

24   case -- it has a long name -- *United States* against *Real*

25   *Property and Improvements Located at 1840 Embarcadero,*

1    *Oakland, California*, that Federal Court rejected the private

2    plaintiffs' arguments that they were not trying to enforce

3    the CSA per se.  The Court held that seeking an injunction

4    under supplemental G of the Federal Rules of Civil Procedure

5    which allows for a motion to have the Court preserve

6    property did not allow the plaintiffs to bootstrap a CSA

7    claim.

8              THE COURT:  Does your argument here go to the

9    nuisance claim as well as the negligence claim?

10             MR. JESSEE:  Yes, Your Honor.  And I will address

11   why they can't bootstrap through public nuisance as well,

12   yes.

13        There's no, there's no basis whatsoever in the federal

14   law or parallel state law to find a private cause of action,

15   to find a duty.  It doesn't really matter what label you put

16   on it, whether it's a lack of enforcement ability, lack of a

17   duty, lack of standing.  It's all the same.

18             THE COURT:  Well, with regard to the nuisance

19   claim, there's a question as to whether proximate cause is

20   implicated in that, isn't there?  Mr. Emch made a real

21   strong argument on the absence of proximate cause.

22        But if I understand the law relating to nuisance,

23   public nuisance, there might not be a proximate cause

24   requirement.

25        Am I way out in left field on that?  You're frowning.

1          MR. JESSEE:  Well, I'm frowning because Mr. Lane

2     [sic] will address the elements of public nuisance.

3          THE COURT:  Okay.

4          MR. JESSEE:  And, and, in fact, Your Honor, since

5     you brought it up, I'll jump to that.

6          The counties are allowed to declare public nuisances

7     within their boundaries.  And what they've done is they have

8     declared that the unlawful distribution of opioids or

9     prescription opioids is a public nuisance.

10          And it's very important that they -- to understand

11     exactly what they've tried to declare a public nuisance, the

12     unlawful distribution.  These resolutions didn't exist until

13     a few months ago.

14          The yardstick that the counties want to use to judge

15     the lawfulness or unlawfulness of the distribution is the

16     federal Controlled Substances Act.  That's what they want to

17     use as their yardstick.  They are co-opting the federal act.

18          The only duty that existed before these resolutions

19     with respect to distribution of the opioids, prescription

20     opioids were found in the federal CSA and the state

21     counterpart.

22          So the counties have explicitly tried to adopt the

23     federal CSA for their own purposes and co-opt it for their

24     own purposes.  And they can no more do that than the

25     plaintiffs in *Jones* against *Hobbs* could use the federal

1    Declaratory Judgment Act to bootstrap the CSA claim or the

2    private plaintiffs in the California property case could use

3    supplemental Rule G to bootstrap the CSA claim.

4         The West Virginia statute on public nuisance doesn't

5    create an actual civil cause of action.  Again, the duties

6    that they're seeking to enforce are only the federal and

7    state duties in the Controlled Substances Act.

8         The West Virginia statute 55-7-9 that says that

9    violations of some statutes can lead to a cause for damages

10   similarly cannot be used to bootstrap a federal CSA claim.

11        The West Virginia Supreme Court has been clear that for

12   a plaintiff to use 55-7-9 to state a claim, 55-7-9 does not

13   itself create a cause of action.  You must have a

14   substantive act that either expressly or impliedly states a

15   cause of action.

16        Clearly neither the CSA nor the West Virginia CSA

17   expressly create a private cause of action, nor do either of

18   those impliedly create a private cause of action.

19        The West Virginia law on whether West Virginia statute

20   impliedly creates private cause of action, the four *Hurley*

21   factors, the distributors have explained how all four of

22   those factors counsel against finding an implied private

23   right of action, state CSA.  And it makes no sense that the

24   state CSA would have a private right of action when federal

25   does not.

1          Defendants -- I'm sorry.  The plaintiffs, plaintiff

2     counties have not addressed any of the *Hurley* factors and

3     have not addressed that.  They simply assert that they can

4     bootstrap through 55-7-9, but they get that wrong.

5          The law is clear at this stage that there must be at

6     least an implied private cause of action in the substantive

7     statute that a plaintiff seeks to enforce, and that is not

8     here.

9          There are other issues, as you noted, Your Honor, about

10    the application of public nuisance law.  Mr. Heard is going

11    to address that.

12         To summarize my points, Your Honor, the existence of a

13    duty -- an enforceable duty is purely a legal question.  The

14    duties that the federal Controlled Substances Act and the

15    West Virginia counterpart have are purely regulatory duties

16    enforceable only by the DEA and the West Virginia Board of

17    Pharmacy.

18         Plaintiffs, however, seek -- explicitly seek to enforce

19    those duties.  They are not running from that position.  But

20    the plaintiff counties simply cannot end run the lack of a

21    private cause of action, the lack of an ability for them to

22    enforce those acts in this civil suit.

23         Thank you, Your Honor.

24              THE COURT:  Thank you, Mr. Jessee.

25         Mr. Jessee, one question.  So your position is that

1  Judge Thompson when he held the opposite of what you argued,

2  he just got it wrong; is that right?

3          MR. JESSEE:  Actually, Your Honor, Judge Thompson

4  did not address whether or not the federal Controlled

5  Substances Act creates a private cause of action.

6          THE COURT:  But he did with regard to the state,

7  did he not?

8          MR. JESSEE:  I believe -- I was not involved in

9  those suits.  My client was subsequently sued.  But I

10  believe what he was addressing, Your Honor, was

11  bootstrapping the West Virginia State act through the West

12  Virginia Consumer Credit and Protection Act.

13          THE COURT:  Right.

14          MR. JESSEE:  And I would argue, Your Honor, that,

15  that bootstrapping is impermissible in the same way that the

16  federal act cannot be bootstrapped.

17          THE COURT:  Okay.  Thank you.

18          MR. MAJESTRO:  Your Honor, before we start, could

19  you move those over so we can see them too?  We weren't

20  provided those blow-ups.

21          THE COURT:  Thanks to the miracle of modern

22  surgery, Mr. Heard, I can read that from here.

23          MR. HEARD:  Well, I'm glad, Your Honor.  We,

24  tried, we tried several sizes.

25      So let me go quickly.  I know the defense has taken a

1   lot of time, but let me talk about this public nuisance

2   claim which I think in many ways is at the very heart of

3   what the plaintiffs are trying to sustain.  And I want to

4   say at the beginning that there are probably two ways to

5   look at this claim.

6        Really the head-on way, which I'm going to talk about

7   here, is that the plaintiffs really skim the surface.  We've

8   been talking about what the elements of a nuisance claim

9   are.

10       And if we talk about the Boone County opinion, it too

11  skims the surface.  It says quite rightly that public

12  nuisance in West Virginia is governed by the Restatement.

13  But then it proceeds almost systematically to ignore the

14  elements of the claim as defined by the Restatement.

15       And we'll see when we get a little further into one of

16  these back boards proximate cause is very much an issue in

17  public nuisance claims.  And, in fact, I would say, Your

18  Honor, the most recent cases get hung up on just that point

19  because whether it's guns or it's lead paint, the conduct of

20  third parties who intervene between the seller and the user

21  the courts find don't satisfy the proximate cause test which

22  is part of a nuisance claim as it is of any tort claim.

23       So I'm going to go at this two ways.  In a way, this is

24  sort of the front door that looks at the elements of a

25  nuisance claim as they have traditionally conventionally

1   been recognized.  And West Virginia is very much in the main

2   stream.  They haven't done anything special.

3       The second way to look at this, which is almost the

4   back door on a public nuisance claim, is to see that there

5   are really four lines of legal authority that say a

6   government entity, city, county, township can't maintain a

7   public nuisance action for money damages.

8       There are other remedies.  There's injunctions.

9   There's abatement, not money damages.  So we can almost

10  start here and see that if you look at this authority, they

11  can't maintain a claim.

12      But let me, let me begin here with the conventional

13  approach.

14      And I will say by way of introduction these claims have

15  never, ever been maintained, as far as we can find, a public

16  nuisance claim in any case involving prescription drugs.

17  This would be breaking new ground.

18      And we can also fairly say that a public nuisance claim

19  has never been maintained against a distributor for the

20  distribution of a product unless we're talking about guns.

21  The only cases that have ever maintained an action against

22  distributors for the commercial sale of a product are guns.

23      And on that, let me pause for a moment to talk about

24  the currency of the authority being cited by the plaintiffs.

25              THE COURT:  What distinguishes guns from dangerous

1    drugs, Mr. Heard?  I mean, you've got an obvious dangerous

2    instrumentality in both cases.  Why is this case different?

3              MR. HEARD:  Well, for one thing, with drugs you

4    have a closed system subject to the most comprehensive

5    regulation in the country.  And that's important because the

6    Restatement of Torts on nuisance, 821B, says that it's very

7    unusual to maintain a public nuisance for the -- regarding a

8    lawful product.  Even less often can such claims be

9    maintained, the Restatement says, if it's a product subject

10   to comprehensive regulation.

11       So guns don't begin to be regulated with the intensity

12   and breadth of prescription drugs on the, on the question of

13   authority.

14       If you look at the plaintiffs' brief closely, Pages 34

15   and 35, and in particular Footnote 107, you will see the

16   public nuisance cases they rely on.  They fall in the period

17   from 2000 to 2003.  And they say those cases constitute a

18   trend.

19       But, in fact, the cases decided since then constitute

20   the trend.  And the cases since 2003 have almost without

21   exception found that a public nuisance claim could not be

22   maintained against guns, against lead paint, against the

23   drugs that the Eighth Circuit addressed in the *Pfizer* case,

24   the Eighth Circuit opinion in 2009.  And the cases on which

25   we're relying are the cases that all post-date the cases

1    cited by the plaintiffs.

2         The opinion by the Supreme Court of Rhode Island,

3    unanimous, the Supreme Court of New Jersey, the Court of

4    Appeals of New York, the Eighth Circuit, the Third Circuit,

5    the Illinois Supreme Court, all of those fall in the period

6    2004 to 2009 and they post-date, and they do constitute a

7    trend and it's a trend going the other way, all of them

8    granting motions to dismiss, and at least half of them

9    finding that proximate cause is the major obstacle to the

10   plaintiffs' claims.

11        I want to say that about the authority.  And I also

12   want to say about the authority that the case that the

13   plaintiffs rely most on, the *James* case out of New Jersey,

14   was an opinion by the appellate division, the intermediate

15   Court of Appeals.

16        The Supreme Court of New Jersey effectively overruled

17   the *James* case four years later in *In Re: Lead Paint* where

18   they rejected almost every argument implicitly that the

19   *James* case raised.

20        And the plaintiffs also cite the trial court level

21   opinion in *State* vs. *Lead Industries* in Rhode Island, a

22   unanimous Rhode Island Supreme Court reversal.

23        So what is the conventional law?  And we begin by

24   saying nuisance claims involve land.  And I want to be very

25   clear.  We're not saying it's always 100 percent land.  But

1    99 percent of those reported cases in West Virginia and

2    elsewhere all involve improper use or impact on land.

3    Either it's the defendant's impact on public land or an

4    impact on private owner's use of the land.  But we don't

5    have any aspect of that here.

6         So New Jersey says it's historically linked to the use

7    of land.  And what that also means is that the cases have

8    recognized it concerns property, not products.

9         And a product which has caused injury cannot be

10   classified as a nuisance.  And that's a treatise as well as

11   this I think you'll find very systematic and rigorous

12   opinion by the Rhode Island Supreme Court.

13        So if we start just here with the historical use of the

14   doctrine, we see that plaintiffs are already trying to walk

15   the Court into an area that's almost completely uncharted

16   because almost all of the cases involve land and concepts

17   that grow out of the use of land.

18        The Restatement makes clear it's not, it's not limited.

19   It's just a cautionary note because as we go on, we'll see

20   that these other elements are also missing.

21        And the second is in the cases there's almost some

22   immediacy of impact.  At a locale you can say in a nuisance

23   case the nuisance happened here.  There's a plant that's

24   emitting noxious odors.  There's a stone quarry where

25   they're doing, setting off explosions.  In the old days when

1   nuisance was also criminal, it would be a house of

2   prostitution.  This is a specific locale and the nuisance is

3   there.

4        But here there is no "there" there.  Where in the

5   county?  Well, what we know probably in most cases is it's

6   individuals using these opioids in their home in the privacy

7   of an intimate setting.

8        And the Michigan Appellate Court when it was dealing

9   with lead paint and asbestos said, you know, this doesn't

10  really look like a public nuisance to us because it's

11  happening in a lot of individuals' private homes.  It's not

12  in the public way.  There is no one specific locale where

13  this is happening.

14       So those first two elements the plaintiffs are far

15  afield of.

16       Third, and this is key, the Restatement defines a

17  public nuisance claim as having to do with a public good, a

18  public right.  And these cases grapple with what that means.

19       The Restatement tells us this in the comment.  It's

20  something that everybody enjoys.  And what it's not like is

21  it's not like a right not to be assaulted or defamed or

22  defrauded or negligently injured.

23       So in the lead paint cases which involves a public

24  health crisis to be sure, the Court addresses this very

25  concern.  They said this -- the plaintiff is arguing for a

1  public right, public right of public health to be free from,

2  from injury from the use of lead paint.  But they say that

3  seems to us to be covered by this, this individual right not

4  to be injured.

5      It's not a public right because public rights involve

6  public goods; the air, the water, the use of public rights

7  of passage, public ways of passage.

8      And it's certainly not an aggregate of private rights.

9  It's not because you have more people affected that it

10  becomes a public good.  This is just an aggregation of

11  private rights when there are a lot of people.

12      And one place this takes the courts and the

13  commentators is to say the distribution of products rarely,

14  if ever, causes a violation of a private right.

15      Why is that?  Because if it's a product, it's a

16  commercial transaction.  And a commercial transaction

17  inherently is a private right.  It involves private

18  contractual rights or private rights, you know, exercise

19  care not to be a defective product or a product that has an

20  inadequate warning, but it's not a public good.

21      And one of the best pieces of analysis -- I think this

22  case spends a lot of time worrying about what are public

23  rights and public goods.  It says the plaintiffs in this

24  case -- and this involves guns -- the Court says they're

25  talking about a public right to be free from the threat of

1    assault or injury with a handgun.

2        And they say is that really a public good or is it a

3    right not to be assaulted or negligently injured?

4        And the Court comes out this way and it says because if

5    you use the words "public health" or "public safety" in this

6    kind of loose way, say there's a right of public safety not

7    to be injured, what would it mean for alcohol?  There's a --

8    it's a legal product.  And at the same time, driving while

9    intoxicated is illegal.

10       Does that mean there's a public right to be free from

11   being injured by someone who's driving drunk?  If you can

12   make a public nuisance claim out of that, saying that you

13   have a right to passage on the highways without being hit by

14   a drunk driver, then you could make a public nuisance claim

15   against the brewer and the distiller and the tavern owner

16   and the barkeeper and the restaurant with a liquor license.

17       And, in fact, it's not just liquor.  The use of cell

18   phones in cars or any other instrumentality, any of those

19   could be framed by a careful and clever plaintiff to say as

20   a right of public safety, that's being infringed.  And the

21   Court says, no, it's not really a public good.

22       And you will not find in the plaintiffs' complaint or

23   in their opposition anything other than a very airy

24   statement that there's a right to public health and somehow

25   that triggers a public nuisance claim.  They've never

1   drafted and defined what is the public good, what is the

2   precise legal right.

3        Now, control.  Not always an element, but you find it

4   in the majority of cases that for there to be a public

5   nuisance claim, the defendant has to have control over the

6   product at the time of injury.  It's very, very basic and

7   it's tied to remedy.  How are you going to abate the

8   nuisance as a defendant if you don't have control over the

9   product?

10        In the lead paint cases that's very important.  It

11   happens to be important to some of the cases in the gun

12   cases too because, again, it's a commercial transaction that

13   triggers this.

14        In our case, the distributor sells to the pharmacy.  In

15   the case of the paint cases, the paint manufacturer sells to

16   a retailer who sells to a contractor who paints a house.

17   But the defendant has no control over the product at the

18   time it's misused or abused.

19        And, again, this is a, this is a factor the plaintiffs

20   don't discuss and it's one of the conventional traditional

21   elements of a nuisance claim and it's not here.

22        And then this gets us to the legal cause, the direct

23   connection.  In nuisance cases they're often talking about

24   directness, directness of the injury.

25        And in this case, the Court's saying exactly -- to have

1    that kind of connection, we've got to know what exactly was

2    used at what place at what time.  They couldn't find it here

3    and you can't find here where there's no pharmacy named

4    that's placed a suspicious order.  The abuse is long past

5    the pharmacy dispensing the product.

6         And, so, in the gun case in New York what they're

7    concerned with is intervening criminal activity because

8    everybody's agreed that after the manufacturer, distributor,

9    the dealer sells a gun, there's criminal activity that's

10   involved.

11        And they had somekind of statistics from -- I've

12   forgotten my federal agency here -- that, which traced guns.

13   And they could show that there were usually two intervening

14   owners between the deal or sale of the gun and its use

15   improperly.

16        And, of course, in lead paint the same thing.  It's,

17   it's gone out into the world.  It's been painted.  It's not

18   been maintained by some property owner for some substantial

19   period of time.

20        And, so, there's this intervening conduct.  And

21   particularly when there is criminal conduct, the Court has

22   said that's a step too far.  And those are the most recent

23   things.

24        And last of all -- and I'm usually weary of this kind

25   of language as hyperbole.  But I've cited it here because in

1   light of all these factors, the courts have said if you

2   overlook these things, nuisance law will just swallow up

3   tort law.  It will certainly swallow up product liability

4   law.

5       It's strong language, but I say it here because the

6   Supreme Court of New Jersey, the Court of Appeals of New

7   York, the Illinois Supreme Court, the Rhode Island Supreme

8   Court, and the District of Columbia Federal Court all said

9   this same thing.  That was what was bothering them.  They

10   wanted to see that all of these bases were touched by the

11   claim.

12       And here they're not.  They're certainly not pled.  And

13   they're not even argued.  So that's the front door.  I think

14   they just don't define.  They don't allege causes of action.

15       Now let's go to the back door.  Can a governmental

16   entity like a county even bring an action for damages?  No,

17   no.  The Restatement says "no."  821C makes no provision for

18   recovery of damages except in an individual action.

19       Now, the plaintiffs say, oh, no, that's not what the

20   Restatement means.  But they don't look at the case law.

21   And the case law is quite clear that that's what the

22   Restatement means because not just in this case, but several

23   others also say the only basis arrives in a private action

24   for public nuisance.  The public entity has only the right

25   to abate, not to collect damages for lost cause.  You can't

1    recover damages.  And it goes back to the days when public

2    nuisance was an action for criminal trespass.  It was a

3    crime, not even a tort.

4         So if we look at the common law, the common law is

5    quite clear.  And there is no West Virginia case to the

6    contrary except the Boone County opinion which never

7    addresses any of this, none of it, just as it doesn't

8    discuss any of the cases that we've cited in recent years.

9         Now, what's interesting is that this Restatement rule

10   is reflected in the West Virginia Code.  The County

11   Commissions have limited delegated powers.  It's really

12   quite interesting to go back and look at the full chapter

13   because, again, this is Section kk which says they can enact

14   ordinances, issue orders, and take other necessary action

15   for the elimination of -- that's abatement, kk.

16        There's 45 subsections.  Chapter 7 is the general

17   powers of County Commissions.  Article I are specific

18   defined powers.  And there are 45 of them.  This goes up to

19   ss.  And they are very precise and very discrete.

20        So we see clearly that the Legislature's being stingy

21   with County Commissions.  It defines exactly what they can

22   do and it doesn't define that they can seek money damages

23   for past payment of public services.

24        Now, 16 has to do with public health.  And, again,

25   it's, it's helpful to look back -- let's see here.  I have a

1    little cheat sheet.  Let's see.  Article III is communicable

2    and infectious diseases.  That's where this language goes,

3    powers having to do with infectious and communicable

4    diseases.  In Subsection 6 they can inquire and investigate

5    nuisances.

6        It's surrounded on both sides by provisions that have

7    to do with imposing a quarantine, dealing with communicable

8    diseases on a train, the immunization of children,

9    vaccinations, and, very narrow, the inflammation of eyes of

10   newborns.

11       So, again, what we see in these ordinances is the

12   Legislature being both stingy and precise in how it defines

13   the power of County Commissions.  And, so, here we find this

14   reflection of the Restatement rule.  They haven't expanded

15   the traditional rule that governing entities cannot seek

16   money damages.

17       And then, third, you find this again, this same notion,

18   this concept reflected in the free public services doctrine.

19       Now, where we part company with the plaintiffs, as Your

20   Honor knows, is they're looking into West Virginia case law

21   for some case that affirmatively adopts the free public

22   services doctrine.

23       And we say that's -- you've got it backwards because

24   the recovery of costs like that is unknown in common law.

25   If it's going to exist, it has to exist because the

1    Legislature provides for it.

2        If the police can sue because they come to your house

3    to answer an alarm and it's a false alarm, if the firemen

4    come to get the cat out of the tree and they want to send

5    you a bill for coming over, the Legislature needs to provide

6    for that.  Historically in common law you can't recover

7    those costs.

8        And, in fact, in *State* vs. *St. Clair* we find the Court

9    reflecting that very line of thinking.  Now, this involved a

10   criminal case.  It involved whether they, the county or

11   state could recover the costs of room and board for the guy

12   being in jail.  So it's a different context.

13       But what's the Court saying?  Room and board is

14   traditionally a public charge on the county.  And the

15   government doesn't get to recover these public charges on

16   the county in the absence of statutory authority.  It says

17   "in the absence of statutory authority" four times.

18       So we find that West Virginia has adhered to the

19   general rule that you don't go out and collect money damages

20   for things that have always been historically public

21   services.  That's what they're trying to do here; jails,

22   police, prosecutions, operation of the court, operation of

23   treatment centers, all of those costs connected with the

24   opioid epidemic.  And here's a third line of authority that

25   says we don't do that in West Virginia.

1    And, fourth, the economic loss doctrine.  You know, you

2    don't recover for economic loss absent some special

3    relationship.  It's not here.  The plaintiffs don't claim

4    there's a special relationship.  They rely on this sentence,

5    that *Aiken* at the end the Supreme Court said, "We've adopted

6    the doctrine but don't let anything we've said in this

7    opinion change our prior rulings regarding nuisance law."

8    Well, the prior rulings regarding nuisance law is all

9    this which says they don't have a claim for money damages

10   because they haven't satisfied all these elements.  But

11   what's interesting is the case that the Court cites for this

12   proposition.  It cites one nuisance case.

13   It is a case, *West*, involving a mandatory injunction.

14   It's a coal truck.  It's spilling coal dust.  They seek

15   relief from this public nuisance of having coal dust

16   covering everything in the neighborhood.

17   The Court at the trial level and the Supreme Court in

18   its discussion all are operating on the assumption in that

19   *West* case that the only remedy available for the state is

20   abatement.  And they even give a whole list of

21   illustrations.  You can cover the truck.  You can pave the

22   road.  You can water down the road.  No one ever considers

23   for a moment that they could recover past damages.

24   So four doctrines, four doctrines converge.  The

25   Restatement, the express delegation of authority in West

1    Virginia, the free public services doctrine, and the

2    economic loss doctrine all come together and converge to say

3    there's no claim for money damages.

4        So I could pretty much leave it there, but I'll just

5    say I think the lead paint cases are interesting by

6    comparison to here.  There's no question this was a public

7    health crisis.  Large numbers of people were affected.  I

8    mean, you could have a debate about which is worse.  Lead

9    paint affected children, stunted mental development.  But

10   this is pretty terrible too.

11       It involves the use of property.  Well, yes, that

12   conventional factor is present with lead paint.  It's being

13   used in buildings.  It's property that's deteriorating.

14   It's not here, absent.

15       Is there a public right?  The Court said "no."  This is

16   individuals using a product in their home.  It's not a

17   public good.

18       And we get to these other factors, lawful product,

19   lawful product, more than that.  It's an FDA approved

20   product subject to regulation.  Is it misused after sale?

21   Yes.  It was only misused after sale and after it was out of

22   the control of the defendant.  The same is true here.

23       Intervening criminal conduct, not with lead paint but

24   for sure here.  A doctor has to prescribe it for a

25   non-legitimate medical need.  The plaintiff has to be

1    shopping for prescriptions.  It goes on and on.

2       Comprehensive regulatory regime, not really.  Yes.  And

3    the Restatement says that's important.

4       So you've got a uniform set of decisions that find this

5    doesn't state a public nuisance claim.  So, Your Honor, they

6    haven't pled it.  They haven't argued it.  They just don't

7    have it.  This is taking the Court into this territory

8    (indicating).

9          THE COURT:  Thank you, Mr. Heard.

10      It might be well to take a ten-minute break at this

11   point and then we'll come back and hear from the plaintiffs.

12      (Recess taken from 11:12 a.m. until 11:23 a.m.)

13         THE COURT:  We have a missing defense lawyer over

14   here.

15      (Pause)

16         THE COURT:  Here we go.

17      Okay, Mr. Majestro or Mr. Farrell, you may proceed.

18         MR. MAJESTRO:  Thank you, Your Honor.  Am I loud

19   enough?  Can you hear me from here?

20         THE COURT:  Yes.

21         MR. MAJESTRO:  Okay.  If for some reason I lose

22   you, please let me know and I'll speak up or move closer to

23   the mic.

24         THE COURT:  Okay.

25         MR. MAJESTRO:  I want to start off with an

1    introduction, I think, of how the plaintiffs see these

2    cases, and sort of three global factors that -- and maybe

3    four, I suppose -- that, that sort of underlie all of our

4    arguments as to how we believe the very detailed complaint

5    in this case states a claim for purposes of Rule 12.

6         You know, we talked a lot -- the defendants talked a

7    lot about the gun cases and the lead paint cases and we can

8    argue what trend this is which way, but I think the parties

9    all agree that the cases on the subject go both ways.

10        But even the cases that find these nuisance claims and

11   the similar negligence claims don't exist, they're all

12   distinguishable from the claims in this case based on one

13   factor.

14        And that is the plaintiffs are not bringing claims

15   against the defendants because of their legal actions.  The

16   plaintiffs are bringing claims against the defendants based

17   upon alleged illegal conduct in failing to comply with

18   federal law, state law, and industry standards.

19        So we're not talking about -- they're talking about

20   lead paint was sold.  There was no prohibition on selling

21   lead paint.  There were no regulations on how manufacturers

22   distributed lead paint to whom and what warnings they had.

23        Similarly with the guns, while guns are regulated,

24   there is not the same kind of extensive regulations that

25   even the defendants claim supports their claims.  And it's

1    another thing both sides agree on, that these drugs are

2    extensively regulated.

3         The problem for the defendants is they simply weren't

4    following regulations.  And that is the basis of the

5    plaintiffs' claims in this case.

6         Now, a lot of the cases that, that would reject this

7    kind of claim in other contexts do so based on expansive

8    liability or foreseeability and these concepts where the

9    courts are afraid if we let this one through the door, then

10   we've opened up a tidal wave of cases and it will destroy

11   tort law.

12        But the one factor that distinguishes this case with

13   respect to the distribution and foreseeability is Congress

14   has factual findings in enacting the Controlled Substances

15   Act.  And we presume that West Virginia State law had

16   similar points in mind.

17        And that is in adopting this closed system that Mr.

18   Emch put up, they adopted the closed system precisely

19   because it was necessary to have all parties have duties to

20   prevent diversion.

21        We pled this in the complaint and we cited law.  The

22   1970 *U.S. Code Congressional and Administrative News* cited

23   in Paragraph 34 of the Kanawha County complaint, for

24   example, specifically states that such a closed system is

25   intended to reduce the widespread diversion of these drugs

1   out of legitimate channels into the illicit market while at

2   the same time providing the legitimate drug industry with a

3   unified approach to narcotic and dangerous drug control.

4       The thought is these are so serious, we're going to

5   impose duties on distributors of illegal products.  And

6   those duties are that we're imposing duties to monitor their

7   customers, monitor their sales, and take actions to prevent

8   suspicious sales.

9       Those are the explicit duties in the Controlled

10  Substances Act; to notify the DEA, to, to refuse to sell

11  when there is, when there's grounds to believe these drugs

12  are being, are going to be diverted, and the quantities are

13  for all the different factors that are in the statute.

14      So that is what makes this, again, makes this different

15  from the cases cited by my friends on the other side is that

16  we -- is we don't have the congressional findings that the

17  purpose of these regulations that they are accused of

18  violating is to prevent this exact conduct.

19      Finally, we hear a lot about the specifics and the lack

20  of specifics in the plaintiffs' complaint.

21      You know, that ARCOS data that Mr. Emch talked about

22  that the FDA has access to and the Board of Pharmacy data,

23  now, the defendants have access to the sales, obviously,

24  because they're making the sales.  The government has access

25  to that data.  But no one else does.

1    The limited data we have in our complaint is only made

2    possible because the DEA produced the, produced the data in

3    the Boone County case, and the *Charleston Gazette* won a

4    Pulitzer Prize for getting it made public.  So that's --

5              THE COURT:  You've talked about the duty here and,

6    and I understand your argument as to how it was breached,

7    duty of causation, damages, the elements of tort law.

8    What -- why does that duty run to the plaintiffs in

9    this case?  How does the, how does the duty that you -- I

10   understand the, your argument as to what the duty is.  I

11   understand that you're arguing about how it was breached.

12   But how does that duty run to the specific plaintiffs in

13   this case?

14             MR. MAJESTRO:  Well, we aren't --

15             THE COURT:  It just seems to me like it's a

16   general duty to the public.

17             MR. MAJESTRO:  Well, and, and that's what

18   nuisance -- I think I'd like to start off with answering

19   that in the context of a nuisance claim.

20   Very clearly, Mr. Heard tries to minimize the authority

21   that's granted the plaintiffs in this case to, to bring

22   claims based on nuisance.  But that, that clearly exists.

23   And when you look at what the definition of a nuisance

24   is, a nuisance is a, a violation of things that are

25   unreasonable, and that the unreasonable burden is being

1   imposed upon the citizens of a community.  And one of the

2   definitions is illegal conduct.

3       So let's just take a, let's take a more traditional

4   example of a nuisance.

5       If I wanted to put a dump next to Mr. Farrell's house,

6   there are lots of regulations that would be governed -- that

7   would govern that, pollution laws and things like that.

8   Some of them have private causes of action.  Some of them

9   don't.  But if I violate those statutes and my dump is

10  illegal, the county could come and bring a nuisance claim

11  against me.

12          THE COURT:  Your, your example fits right

13  specifically within Mr. Heard's argument that these things

14  relate almost exclusively, if not exclusively, to land.

15  Right?

16          MR. MAJESTRO:  Well, you know, that --

17          THE COURT:  It seems to me like you've walked

18  right into a trap there.

19          MR. MAJESTRO:  Well, I don't think it's -- it's

20  not a trap because what the courts have said -- and, again,

21  we acknowledge that the cases go both ways.  And I'll talk a

22  little bit about West Virginia law in a minute.

23      But the -- you know, there are many court opinions, or

24  almost as many opinions -- I didn't do the count -- finding

25  in the cases of the guns and the lead paint and the similar,

1    other similar products recognizing a claim for nuisance, not

2    strictly because of land.

3        And, Your Honor, the other point on that is if you look

4    at land in a little more holistic sense, what's happening

5    here is they're destroying communities.  I mean, they're not

6    physically damaging the land.

7        But Your Honor talked about the book and the publicity

8    about what's happening in these communities.  You know, I

9    think you'd have to be blind not to see the, the devastation

10   and destruction that is happening in the communities which

11   is, is similar to land.

12       THE COURT:  There's no argument about that.  I

13   don't think anybody in this courtroom, and certainly not

14   the, not the Court, would disagree with that.  The question

15   is who's responsible for it.

16       MR. MAJESTRO:  Well, and that's, that's, that's

17   another, another point that I think we should talk about.

18       And, and I would like to go to my fourth point, overall

19   point at this, at this stage.  And that is a lot of that

20   question as to who is responsible for it, these kinds of

21   proximate cause, causation, damages, you know, I listened to

22   their argument.  It sounded like they were arguing a summary

23   judgment motion or a directed verdict motion.  A lot of this

24   is well beyond the pleadings.

25       We acknowledge that we are going to have to prove our

1    claims for causation and damages.  The question is have we

2    pled sufficient facts to allow us to go do the discovery to

3    prove it.

4        And that, you know, I want to get back to my point

5    three.  And, that is, the data to do that is in their

6    control.  I mean, I think it's interesting that rather

7    than -- you know, we made a lot of very specific allegations

8    in the complaint about how they haven't been reporting and

9    how they haven't stopped suspicious sales, those sorts of,

10   those sorts of things.

11       We didn't say, you know, on January 12th, 2008, you

12   shouldn't have sold these thousands of pills to pharmacy X.

13   That's the data that's in their control.

14       But the combination of the facts in the complaint that

15   we have people, people overdosing, high rates of overdose,

16   we have gargantuan quantities of drugs coming in, that all

17   together we think meets the plausibility standard.  And

18   that's really what all we have to do at this stage.

19       The question is, the question is do -- if looking at

20   the facts of the complaint, is it plausible that the failure

21   to report and stop these sales of drugs to the community

22   cause damages and create a nuisance.

23       We don't have to prove every specific element of

24   damages at this stage, every specific element of causation.

25              THE COURT:  Well, how are you going to prove any

1  damages -- how are you going to quantify any damages on the

2  part of these local governmental entities?

3          MR. MAJESTRO:  Well, and, and that's, that's --

4  this is one of the questions that I think we agree with, to

5  a certain extent, with the defendants on.  And that is that

6  the remedy is abatement.  The remedy is fixing nuisance.

7      It's not -- you know, they're looking at this and

8  saying you have -- you know, you're not able to recover

9  damages.  They acknowledge, however, that we are allowed to

10  bring an action for abatement.

11      And, you know, the last case we cited in our brief was

12  one of the California lead paint cases where in that case,

13  Footnote 152 -- actually, no, it's Footnote 157, *People of*

14  *the State of California* vs. *Atlantic Richfield*.

15      In that case they had a trial over lead paint, whether

16  lead paint was a nuisance.  And in an abatement action the

17  Judge there awarded as costs of abatement $1,100,000,000.

18      So abatement damages are not limited to stopping the

19  conduct.  Abatement damages -- and, again, --

20          THE COURT:  But I assumed that was what it would

21  cost to get rid of the lead that was left -- lead residue

22  from the paint.  You don't have that here.  I mean, how, how

23  can you quantify -- assuming you get a judgment that's based

24  on abatement, how do you quantify the number?

25          MR. MAJESTRO:  Well, through experts about the

1  damage that's been done to the community and what it's going

2  to take to fix it.

3           THE COURT:  Okay.

4           MR. MAJESTRO:  And that's -- and, frankly, Your

5  Honor, that's what the statute provides.  It says that we

6  can bring that action, Subsection kk.  We're authorized to

7  enact ordinances, issue orders, and take appropriate and

8  necessary actions for the eliminations of hazards to public

9  health and safety and to abate or cause to be abated

10  anything which the commission determines to be a public

11  nuisance.

12     So what we are asking this Court to do ultimately would

13  be award the kind of damages necessary and the actions

14  necessary to abate the nuisance.

15           THE COURT:  I don't see how you could ever

16  possibly put a dollar number on that under the facts and

17  circumstances of this case.  I mean, how would you go about

18  abating the facts of this, if it is a nuisance, because

19  you've got streets full of heroin addicts?

20           MR. MAJESTRO:  Well, I think you, you treat

21  people, Your Honor.  You, you -- there are costs of

22  treatment.  There are costs -- you undo the -- you undo the

23  harm to the communities that, that the defendants' actions

24  caused.  And, you know, it's like taking the, the lead paint

25  out of the buildings.  You're taking the effect of the

1    addiction out of the people.

2        You know, Your Honor, I can go through point by point,

3    you know, everything.  We've briefed most of this.  Is there

4    anything -- are there other things that you particularly are

5    concerned with that I might address?

6        THE COURT:  Well, we talked about the application

7    or lack thereof of the Boone County opinion.  And the --

8    your opponents made a pretty compelling argument that I

9    don't have to, to follow it.

10       But assuming that I do, even if I do, Judge Thompson in

11   that opinion -- and I wish I had made a note of the page,

12   but I didn't -- he, he distinguished municipalities from the

13   state and explained that the, that his case was brought by

14   the state and -- my clerk handed me Page 34 of the, of the

15   opinion.  But even if that opinion were arguably binding

16   upon me, it's distinguishable on that point, isn't it?

17       MR. MAJESTRO:  Well, with respect to -- I mean --

18   and I don't have that, that in front of me, but my memory is

19   that the discussion of a municipality did not discuss

20   counties which have a different situation -- a different

21   situation under our state's law, including the very explicit

22   authorization to bring an action of nuisance.

23       THE COURT:  Well, he, he did explain it in terms

24   of municipalities.  That's true.

25       MR. MAJESTRO:  And, you know, in terms of it's

1    binding, you know, I'm not going to argue that a Circuit

2    Court judge in West Virginia's opinion is binding on, on

3    this Court.

4         However, you correctly stated the, the applicable

5    concern.  We're in effect interpreting West Virginia law.

6    And we believe that Your Honor should follow the law because

7    it's a West Virginia judge with familiarity with these

8    claims and because he's correct.

9         It's a very detailed opinion, goes through the elements

10   of West Virginia law, and comes to the conclusion that most

11   of the argument the defendants raise in this case have no

12   basis.

13        And, you know, Mr. Emch said it's not, not

14   precedential.  You know, I note he's filed a motion for

15   summary judgment on the grounds that his client's settlement

16   with the State of West Virginia after that opinion was, was

17   entered into is somehow binding on us.  And we'll respond to

18   that in time.

19        But two things we know.  One is that the Supreme Court

20   refused evidently -- and I'm hearing this for the first

21   time -- to hear those questions.  And, number two, that

22   their reaction -- the defendants' reaction to that was to

23   resolve the case.

24        So that combined with the, what we think are very good

25   arguments raised by Judge Thompson would lead -- you know,

1   what we see is cases going both ways.  And what is the one

2   case in West Virginia that is dealing with -- Mr. Heard said

3   no court has ever done this.  Well, that's certainly not

4   true.  Judge Thompson did it.

5       And, so, in resolving that dispute, we believe it's

6   appropriate for you to give some weight to that very well

7   written opinion.

8       You know, another point that I think on this question.

9   We talked about the development -- you know, plaintiffs

10  believe that we need to develop a record.  And the

11  independent -- I think it's the Indiana Supreme Court in the

12  *City of Gary* case vs. *Smith & Wesson* went through and

13  rejected most of these same claims Mr. Heard gave.

14      Now, it was 2003, however, but I think what's important

15  is -- and the Court expressed some of the same concerns you

16  did, Your Honor.  And this is how the Court concluded.

17      "These issues do not warrant dismissal of the

18  complaint, however.  It is sufficient here to observe that

19  the complaint alleges the City has incurred damages from the

20  nuisance.  This is a conventional tort pleading subject to

21  no requirement of specificity.  What form the City's proof

22  will take is currently not before us and we cannot say as a

23  matter of law it cannot establish some items of damage if

24  liability is proven.  As set forth below, we believe there

25  may be some major, perhaps insurmountable, obstacles to

1    establishing some or all of the damage items the City cites.

2    But that is not a basis to dismiss the complaint before

3    discovery has refined these issues and the precise nature of

4    the City's case is known."

5         I think that's very important here, not only because

6    it's true as applied to this, but in a case where we may be

7    asking an appellate court to tell us whether we got the law

8    right, the plaintiffs believe that those kind of

9    determinations are better made on a complete factual record.

10        So if we go forward, let us go forward and show you how

11   we're going to prove those things.  We can take up the issue

12   again on summary judgment.  We can take up the issue again

13   on directed verdict motions.  And maybe some day either the

14   Court of Appeals or the West Virginia Supreme Court in some

15   related litigation is going to tell us what the law is.

16        However, that ought to happen on a complete record.

17   And that's, that's what we believe.

18             THE COURT:  Let me -- do you agree that you have

19   to prove proximate cause on the nuisance claim?

20             MR. MAJESTRO:  No, Your Honor.

21             THE COURT:  You, you --

22             MR. MAJESTRO:  It's a much different standard.

23   The question is has, has their conduct resulted in this --

24             THE COURT:  But you do have to prove it with

25   regard to the negligence claim?

1          MR. MAJESTRO:  Yes.

2          THE COURT:  How do you do that?

3          MR. MAJESTRO:  Well, I think we do it the same way

4     you do it in any other case.  And the case we've cited, the

5     cases that say that -- the question of proximate cause is

6     foreseeability.

7          And, again, back to my theme, unlike the gun cases,

8     unlike the lead cases, the violations of the duties that are

9     imposed on them were imposed on them precisely because it is

10    foreseeable that if you, if you aren't doing the things that

11    the regulations require, you're going to have diversion.

12         THE COURT:  But you have multiple intervening

13    causes here, don't you?

14         MR. MAJESTRO:  And what the case law says is that

15    does not automatically disqualify you from finding proximate

16    cause, especially when you can show foreseeability.

17         THE COURT:  Okay.

18         MR. MAJESTRO:  You know, a couple of points that

19    Mr. Heard made I think is probably important to talk about.

20         And one of them is this idea that there is no public --

21    that there's, there's no public harm pled in this, in this

22    complaint.  And, you know, I -- you know, my jaw dropped

23    when I first read that.

24         And if you read through the complaint, we are talking

25    about the destruction of entire communities.  We're talking

1  about increased police, increased -- you know, we, we have

2  addicts overdosing on the streets.

3      The destruction of our communities is most certainly a

4  public harm.  And that's what the, that's what the counties

5  found in their ordinances.  What was going on was causing a

6  public harm.

7      And really that's the, the other point that I think

8  when you're looking at this expansive -- question of

9  expansive liability.  This is not a situation where, you

10  know, you have some people getting shot because you have

11  increased guns.  You have some people getting harmed because

12  they may have had exposure to lead paint.

13      But what's happening when, when you have systematically

14  caused the addiction to a large percentage of these

15  communities, you are in effect destroying the communities.

16      And that's on a level that is -- I mean, you know, we

17  would contend is higher than the traditional nuisance

18  claims.  I mean, you know, compare the destruction of a

19  community and the public harm that causes to pollution or

20  smell or noise.  To us those are rather minor things where

21  we traditionally allow nuisance claims compared to the

22  public destruction that we have pled in, in this, in this

23  complaint.

24      You know, and I -- you know, I'm just going to go

25  through my notes and hit on a couple --

1          THE COURT:  It might help me if you looked to me

2    as a first year torts student and you're the professor and

3    take me through the basic black letter hornbook requirements

4    for a tort case and tell me how you're going to prove it.

5          MR. MAJESTRO:  Okay.  Let's, let's start with the

6    nuisance.

7          THE COURT:  Start with the duty, causation,

8    damages, duty, breach.  You know what they are.

9          MR. MAJESTRO:  I do.  I do.  And I -- you know,

10   ironically the, the best place to find that, I think, is in

11   the complaint.  But, but let's go through and summarize it.

12         THE COURT:  Well, I read your complaint and it

13   certainly had a lot of stuff in there.  Mr. Farrell wrote

14   it?  It was longer than Judge Thompson's opinion.

15         MR. MAJESTRO:  Okay.  You know, let's start with,

16   with, with duty.

17      With respect to the nuisance, the nuisance claim, the

18   definition of a public nuisance in the Second Restatement is

19   an unreasonable interference with public health, safety,

20   peace, comfort, convenience, conduct that is contrary to a

21   statute, ordinance, or regulation or conduct that is of a

22   continuing nature or one which has produced a permanent,

23   long-lasting effect on the public right, an effect of which

24   the actor is aware or should have been aware.

25      So that's the, the duty in this case.  And we cite that

1   from the Second Restatement on Page, Page 37.

2        The breach of that duty is their actions in selling

3   these drugs in the quantities in which they're doing without

4   providing -- without stopping suspicious transactions,

5   without notifying the government of suspicious transactions.

6   And --

7            THE COURT:  But, but if I understood Mr. Emch

8   correctly, they had a closed system where they were given a

9   number of pills that they could, they could market over, I

10  guess, yearly or over some period of time.  And as long as

11  they did that, couldn't they take comfort in the fact that

12  they were within those limits and it was somebody else's

13  problem if the drugs were abused?

14           MR. MAJESTRO:  Well, the limits Mr. Emch is

15  telling you, showing you on this chart, that's not the, the

16  DEA -- that's nationwide for the entire industry.  And the

17  limits they are permitted to sell does not say they are

18  allowed to sell them in a manner in which they know they're

19  going to be diverted.

20       And what's interesting about the chart is they go up

21  for a while because I guess the DEA rightfully assumes --

22  again, we're way out of the record -- out of the pleadings

23  and into, you know, maybe a jury argument.

24       But, but they go up and then they go down.  And what

25  happens is that after 2012 when they started getting called

1    out both by the DEA and by, you know, people filing lawsuits

2    like the Attorney General in the case, is that they, the

3    numbers go down because they're starting to actually report

4    the suspicious orders and do their jobs.

5         The DEA never -- and they've cited no law that says

6    they have to sell all these drugs they're authorized to

7    sell.  There's no law that says because you're authorized to

8    sell a certain quantity of drugs that you can't stop

9    transactions that are suspicious.  I mean, that's completely

10   contrary to the closed system.

11        What that is is an overall cap on how much.  It's

12   another check in the system.  But it's not a, a defense to

13   say, "Oh, we were allowed to sell all these drugs so,

14   therefore, we could ignore the red flags of suspicious

15   conduct that were right in front of our face."

16        So that's, that's the duty on the, on the nuisance

17   claim.

18        With respect to the tort claim, you know, I think we

19   have an argument as to whether these kinds of statutes, the

20   state statute and the federal statute, are the kind of

21   statutes that could create a negligence duty.

22        However, they totally ignore the third claim of our, of

23   a duty that we pled in the complaint.  And that is industry

24   practice, custom standards which unquestionably under West

25   Virginia law can create a tort duty.

1    So that's the duty.  Breach is very simple.  The

2    complaint pled they did not report suspicious orders.  The

3    complaint pled they did not stop suspicious orders.  They

4    did not have procedures to determine suspicious orders.

5    That's the breach -- that's the breach of the duty.  And

6    that would go both with respect to -- so that's -- that

7    breach would apply both for the negligence and nuisance.

8        Excuse me, Your Honor.  I'll grab some water.

9        (Pause)

10        MR. MAJESTRO:  With respect to causation, you

11    know, we pled causation in the complaint, cited the studies.

12    I think we've gone well beyond what we need to do on a

13    pleading stage to prove causation.

14        And their challenges to causation based on remoteness

15    and based on illegal conduct, those sorts of challenges I've

16    gone through, Your Honor.  And as we've cited the cases in

17    the brief, those are dealing with situations where you don't

18    have foreseeability.

19        And we, and we would contend in this case that

20    statutorily Congress has found foreseeability for Your Honor

21    almost as a matter of law that when you don't take these

22    actions, it's foreseeable that diversion will occur.

23        And, you know, the other -- and the flip is, the point

24    I just made before, once the actions changed, once they

25    started to be reported, we have a decrease in the amount of

1    this illegal diversion.

2         But what we do have now is -- and we go to damages.

3    What we do have now is a bunch of people who are addicted to

4    drugs.  And they no longer can get the legal drugs because

5    the defendants are finally doing their job.

6         So because they no longer can get the legal drugs and

7    because the nuisance and the damages to them making them

8    addicts, what they've done is they've gone -- and the

9    studies that we've cited in the complaint show the

10   relationship -- they've gone to the illegal market.

11        And, so, the reason people are dying -- you know, early

12   on we pled the facts in the complaint -- are overdoses from

13   these legal drugs.  We still have some of those.

14        But what we have now is overdoses and problems from the

15   illegal drugs because of the actual -- what the defendants

16   have done is they've taken away the supply of the legal

17   drugs and forced the, the, the victims of their conduct to

18   turn to the illegal market.

19        So -- and those are the damages.  And, again, as I

20   said, as I explained, those are damages that can be abated

21   and there are damages that can be proven and recovered.

22        You know, Mr. Heard talked about some of the, what he

23   called the back door claims.  And, you know, I want to hit

24   some of those.

25        First is this free public services doctrine.  We've

1    cited the statutes and -- not statutes, the *Law Review*

2    articles and case law that this is a doctrine that the trend

3    is going the other way.  I think it's pretty clear that, as

4    the commentators have explained, this idea that, that

5    defendants' conduct that causes municipalities extensive

6    damages, especially when it is a continuing conduct, is not

7    subject to this free public services defense.

8        Now, there are a couple of exceptions to this doctrine

9    anyway.  One of them is a nuisance claim.  We cited case law

10   for that.

11       The second exception is statutory authorization which

12   we would contend that the counties' statutory authorization

13   to abate nuisances constitutes the authorization -- and to

14   do the other things that are set forth in that provision

15   constitute the statutory authorization that is an exception

16   to the free public services doctrine.

17       Mr. Heard talked about the *St. Clair* case.  And I

18   think, you know, facially that's, that's an argument that

19   has, has some appeal.  But I think if you look at the case,

20   you see that it is not as broad as he would read it.

21       The *St. Clair* case was dealing with a person that was

22   in jail trying to get out on, on probation.  And the -- what

23   the Court said was you couldn't have probation until court

24   costs were paid.  And that included the costs -- those court

25   costs included the cost of putting you in jail.

1      And, so, that claim, first of all, raised some

2    constitutional arguments, as the Court noted in Footnote 1.

3    And later the Court, the Supreme Court held that

4    conditioning parole on payment of criminal costs was subject

5    to due process analysis for ability to pay.

6      So, therefore, there was a very big due process

7    argument underlying that.  So the Court interpreted the

8    statute, which is a criminal statute, which under the rule

9    of lenity courts interpret those strictly, and said we're

10   not going to require that payment unless it's explicit under

11   the statute.

12      Now, that's -- contrast that with the Supreme Court's

13   opinion in *Sharon Steel* talking about the broad outlines of

14   a nuisance claim.  So just because we, we won't

15   unconstitutionally keep somebody in jail because they can't

16   pay for their cost of incarceration doesn't amount to an

17   adoption of this free public services doctrine that the

18   defendants say.

19      The second claim he argues is the economic loss rule.

20   Again, it explicitly doesn't apply to nuisance.  And he, he

21   notes the, the example the Supreme Court gave was a case

22   where trucks were going up and down the road.

23      Now, I note that one of the things the Court said could

24   be done as a matter of abatement was fix the roads.  It was

25   not just stop the trucks from going down the road, down the

1   road.  The Court -- he gave examples of how to abate the

2   nuisance.  You remove the harms that the nuisance caused.

3   So we think that supports our argument.

4       In addition, we cited a bunch of cases on Page 45 of

5   our brief where courts all over the country agree that the

6   economic loss rule doesn't apply to nuisance claims.

7       Secondly, as Judge Thompson found in the Boone County

8   case, the economic loss rule is premised on foreseeability;

9   that we, that we have these wide expansive liabilities on,

10  for economic losses and it's not fair to impose things that

11  are beyond the scope of foreseeability.

12      However, in this case we know that this is exactly --

13  what happened is exactly the foreseeable conduct that

14  Congress said in 1975 would occur and the reason they were

15  passing the laws to prevent that from happening.

16      So, therefore, we believe that we have -- we are

17  allowed, we are allowed to have those damages.

18      You know, Mr. --

19          THE COURT:  Let me interrupt you and ask you one

20  question that's on my mind.

21          MR. MAJESTRO:  Sure.

22          THE COURT:  Do you have a statute of limitations

23  problem here?  You do at least with the negligence claim,

24  don't you?

25          MR. MAJESTRO:  I think there are some claims that

1    are pled in the complaint that might be outside the statute

2    of limitations.  However, that is a -- for negligence.  I

3    think that is a -- I'm not sure which -- Cardinal has filed

4    that motion a couple of days ago.

5         However, with respect to the nuisance claims, the

6    statute of limitations doesn't begin to run until the

7    nuisance is abated.

8              THE COURT:  Okay.

9              MR. MAJESTRO:  So, so, you know, we don't believe

10   that is a, a substantial burden and believe that in terms of

11   doing discovery rule analysis that certainly a summary

12   judgment motion is something that shouldn't happen until

13   after discovery has happened.

14        You know, I want to take issue with one, another of the

15   arguments Mr. Heard made.

16        He interprets the Restatement as saying that

17   governments can't recover damages for nuisances and that

18   they're limited to, to these abatement ones.

19        And I think if you look at the Restatement -- and I

20   would, would -- I'd point the Court to Page 47 and 48 of our

21   brief.  That, that discussion that happens is in the context

22   of when private plaintiffs are allowed to recover damages

23   for a public nuisance.  And that is, that -- there's a test.

24   It's the special injury test.  And it is applied to private

25   plaintiffs.

1    Now, the notes of the Restatement are very explicit and

2    assume that the government entity has the claim.  In fact,

3    we quote -- it's Comment A to, to that section of the

4    Restatement.  It's noted at Page 48, Footnote 155, the, the

5    sentence that -- the provision ends, "Redress of the wrong

6    to the entire community is left to its duly appointed

7    representatives."

8    So if you have a special injury under public nuisance

9    law, you can recover damages even if it's a public nuisance.

10   However, redress to the community, which is what we're

11   talking about here, is left to the duly appointed

12   representatives who are the counties who are the plaintiffs

13   in this case who are statutorily authorized to bring a

14   nuisance claim.

15   Mr. Heard talked about control.  You know, the --

16   again, they -- sort of the premise of his argument is they

17   have no control over these drugs.  Of course they do.  The

18   statutory scheme is set up so that when you see a suspicious

19   order, you report it to the DEA.  You don't sell.  And you,

20   in fact, have an affirmative duty to have controls in place

21   so that you don't make those sales.

22   So once the drugs get into the system and then get out

23   of the system, then these foreseeable harms that the factors

24   are designed to prevent.  They violate the law when they

25   don't follow these regulations.  They have the control at

1   that stage and that's sufficient enough to bring a nuisance

2   claim.

3        The fact that it's like -- again, I keep using these

4   pollution examples because they're easy to analogize.  I

5   won't -- if I pollute the river, I lose control of what's

6   going to happen when it goes downstream.  It does not mean

7   my conduct in polluting the river is not a nuisance.  The

8   control I had at my facility or wherever it is where I

9   introduced the pollutant into the system is the control

10  that's necessary to cause liability for a nuisance.

11       Your Honor, I think I have gone through most of my

12  notes.  I think there may be some arguments they made that

13  are not, we haven't gone through in extreme detail, but, you

14  know, we would rely on our brief.  And unless you have any

15  other questions, I'd be happy to sit down now.

16            THE COURT:  Thank you very much.

17       I'll hear any rebuttal from the other side.

18            MR. MAJESTRO:  Thank you, Your Honor.

19            THE COURT:  Thank you.

20            MR. JESSEE:  I'll lead off on the rebuttal.

21       And I'll lead off with the law except for one factual

22  point that permeated what Mr. Majestro said and permeates

23  the plaintiffs' complaint and briefs.  And that is the

24  notion that distributors have flooded the market, have

25  poured drugs in, have dumped drugs.

1     As Mr. Emch explained to start this hearing, we're

2   responding to orders from pharmacies.  And those pharmacies

3   are filling prescriptions written by doctors.  The

4   distributors have no ability to flood.  That verb is

5   inapplicable in these cases.

6     Now to the law.  Mr. Majestro posited that distributors

7   have a duty not to ship.  If that duty exists at all, it

8   certainly doesn't exist in the text of any of these

9   statutes.  But if it exists at all, it exists because of how

10  the DEA has interpreted the federal Controlled Substances

11  Act.

12    Mr. Majestro says we're here to interpret West Virginia

13  law.  I would posit that we are here primarily to interpret

14  federal law because the plaintiffs have asserted that the

15  duties on distributors that they are asserting apply arise

16  under the federal Controlled Substances Act.

17    Mr. Majestro quoted the congressional intent behind the

18  federal Controlled Substances Act.  And the phrase in that

19  intent that stuck out to me is it's supposed to be a unified

20  approach, a national unified approach to the distribution of

21  prescription controlled substances.

22    The counties want an individualized approach here.

23  They want to contravene a unified national approach and say

24  that distributors have to treat each county separately

25  contrary to congressional intent.

1    They say they want to abate a public nuisance.  Well,

2    abatement must mean shipping fewer drugs.  They say they

3    want damages because too many drugs were shipped.  And,

4    clearly, it must mean turning down the task and shipping

5    fewer drugs.  They don't have the ability to do that under

6    the federal Controlled Substances Act.  It's a unified

7    national approach.  No county has the ability to legislate

8    through a resolution to say to distributors, "Ship fewer

9    drugs in response to orders from pharmacies in our county."

10    And by asking for abatement, they clearly are trying to

11    enforce the federal CSA.  They can't run from that.  But as

12    we've seen, it is uniform in this country in the federal

13    courts.  There is no private right of action to enforce the

14    federal CSA.  They have no legal ability to ask this Court

15    to take that federal national act and apply it individually

16    to seven counties.

17    Mr. Majestro said that in enacting the federal CSA

18    Congress found foreseeability.  Congress may have found

19    that.  I'm not here to tell you they didn't.  But what they

20    didn't do is provide for a private cause of action through

21    that act.

22    So no matter what Congress thought about the

23    foreseeability of the harms, Congress did not provide a

24    mechanism for private plaintiffs such as the counties to

25    address those harms.  That's a matter of law and it can't be

1    pleaded around.

2         Finally, Your Honor, Mr. Majestro referred to industry

3    guidelines.  Those were the HDMA guidelines.  They are no

4    longer in effect.  And they were developed to assist

5    distributors in complying with federal law.  They're the

6    DEA's interpretation of the federal Controlled Substances

7    Act.

8         It would be tail-wagging the dog, Your Honor, to not

9    have a private cause of action under the federal CSA, not

10   have a private cause of action under the West Virginia CSA,

11   but somehow to let plaintiffs continue because there were

12   industry guidelines no longer in effect that were designed

13   to help distributors comply with federal law which does not

14   have a private cause of action.

15        As far as the factual arguments, Your Honor, I will

16   leave it to my able colleagues, Mr. Emch and Mr. Heard, to

17   respond to those.

18             THE COURT:  Thank you.

19             MR. HEARD:  Your Honor, I want to address four

20   questions real quickly.

21        The first one is:  Should we be citing these issues on

22   a motion to dismiss?

23        The second issue is:  Are the plaintiffs seeking

24   economic damages?  And, if so, are they entitled to them?

25        The third question is:  Does this question of unlawful

1  behavior, failure to report suspicious orders, does that

2  distinguish away all the precedent?

3  And last of all:  Is simply naming a public harm the

4  same thing as alleging the predicate element for a public

5  nuisance claim which is there's a public right at stake and

6  there's a public good that's being interfered with?

7  This first question, should we even be here today or

8  should we be waiting somewhere down the road for a motion

9  for summary judgment?

10  The answer is "no" because the authorities that we have

11  cited, the most recent public nuisance cases from the

12  Supreme Court of New Jersey and Illinois and from the New

13  York Court of Appeals are cases throwing out the public

14  nuisance claim on a motion to dismiss and, more

15  specifically, relying heavily on the plaintiffs' failure to

16  plausibly plead the proximate cause element.

17  They were troubled by the layers of criminal activity

18  that they said were not foreseeable as a matter of law.  We

19  have the same layers of criminal activity.  They are even

20  alleged in the complaint.

21  No one can get addicted to these drugs without having a

22  doctor who's prescribing them for illegitimate medical

23  purposes or they're doctor-shopping or pharmacy-shopping or

24  they're stealing the drugs from a friend or neighbor or

25  family member.

1    The Centers for Disease Control says most of the

2    diversion is taking it from someone who has a legitimate

3    prescription.  There are layers of criminal activity the

4    same as in these other cases which grant a motion to

5    dismiss.  And here we have a further layer which negates any

6    kind of plausible foreseeability.

7    And that is we've got learned intermediaries between

8    the distributors and the abuse or diversion.  We have a

9    licensed professional, the doctor, and we have a licensed

10   and registered pharmacist, each of whom have duties to keep

11   these drugs out of the hands of people who don't need them,

12   two layers.

13   And that second layer of the learned intermediary in

14   the causal chain was of importance to Judge Chambers in the

15   employer's case which is cited in the brief.

16   So we say, yes, these issues are ripe for decision at

17   the motion to dismiss stage including proximate cause.

18   Second, damages.  Well, to listen to my friends, you

19   would have thought the only thing they're seeking by way of

20   relief is abatement.  We'll save that issue for another day.

21   Their complaint at Paragraphs 151, 152 and 156 allege

22   that they are seeking recovery of economic damages separate

23   and apart from abatement.

24   And what we discussed earlier was that there are four

25   lines of authority that converge to say that you don't get

1    economic damages first of all because the Restatement is

2    quite clear in Section 821C that damages are not available

3    to a government entity.

4        My friend reads the Restatement for himself and thinks

5    he sees in it support for a governmental entity seeking

6    money damages.  But look at the case law that discusses

7    821C.  The case law is unanimous that a public entity cannot

8    seek money damages and has granted motions to dismiss

9    because a public entity cannot recover money damages.

10            THE COURT:  But it's still a bit of a mystery to

11   me how the plaintiffs could prove monetary damages on behalf

12   of the governmental entity they represent.  Mr. Majestro

13   cited the cost of treatment, but the counties aren't going

14   to pay that necessarily.  I don't see how the --

15            MR. HEARD:  Well, --

16            THE COURT:  It's a question I'll be asking him.

17            MR. HEARD:  -- we share that skepticism and he

18   says expert testimony would fill that gap.  But even so,

19   that's, that's a claim for eliminating the harm.  And what

20   we know that the complaint alleges is they're seeking to

21   say, "Pay us back the money we spent for police, firemen,

22   courts, jails for the last 10 years or more."

23            MR. FARRELL:  Judge, I can answer that question if

24   you'd like.

25            THE COURT:  Well, I'll give you -- let Mr. Heard

1    finish, Mr. Farrell, and I'll let you answer that question

2    since I should have asked your side when the time came.

3    I'll -- don't let me forget to do that.

4         I'm sorry, Mr. Heard.  Go ahead.

5              MR. HEARD:  That's fine.

6         So we're seeking, Your Honor, to -- in the motion to

7    dismiss to dismiss the claims for past money damages or past

8    expenses, the recovery of that.  That's what the law allows.

9         The third question -- and I overlooked this in my

10   opening remarks -- the argument that, well, they're alleging

11   that we failed to report suspicious orders.  Therefore, that

12   was illegal conduct.  Therefore, they've got a nuisance

13   claim *ipso facto*.

14        Well, go back to almost the first thing that my friend

15   said in his opening remarks.  It's also at Page 28 of their

16   opposition almost verbatim.  The regulations create a closed

17   system.  And the purpose of the closed system is to, quote,

18   reduce diversion out of legitimate channels.

19        And, so, you had him go on to argue that what we should

20   have done -- what we failed to do was stop shipment of

21   suspicious orders or stop distribution.  It's not -- they

22   are -- the harm that they assert arises from shipping the

23   drugs, quite obviously, not from the suspicious failure to

24   report suspicious orders because -- and it seems to be

25   conceded the distributors sell only in legitimate channels.

1    There's no pleading to the contrary.  We're selling only to

2    registered and licensed pharmacies.

3         And there's no allegations in their complaint that

4    connect the failure to report suspicious orders with selling

5    outside of legitimate channels.

6         In other words, here's the analogy and it's not far

7    away from the *West* case which we talked about in connection

8    with the free services doctrine.  It's a nuisance case of

9    the traditional sort by the West Virginia Supreme Court and

10   it involved trucks in that case that were carrying coal

11   dust.  Coal and coal dust was coming from the trucks.

12        But imagine a claim that involved a truck that was

13   carrying hazardous materials to a business site.  The

14   trucker takes all appropriate precautions to make sure that

15   the hazardous materials aren't stolen, they don't fall off

16   the truck, they don't leak from the truck.  He's got

17   everything buttoned up tight.

18        The nuisance -- the problem nuisance is at the business

19   site where they handle the hazardous materials.  But the

20   plaintiff sues the trucker on the nuisance claim and says,

21   "But your drivers were traveling in excess speed.  They were

22   in violation of the speed limit.  And because they were

23   engaged in illegal activity, we can bring a nuisance claim

24   against them."

25        There's that same disconnect here.  Your failure to

1   report suspicious orders has nothing to do with the

2   continued distribution of opioids in the county because

3   there is no statute, no regulation at the federal or state

4   level that says distributors should stop shipments if

5   there's suspicious orders.  We're doing that to alert the

6   pharmacy and it's a redundant reporting system.

7       As you've already heard this morning, the pharmacies

8   already, apart from anything we do, report every pharmacy

9   prescription to the board -- to the state database.  We, the

10   distributors, report all of our shipments to the DEA ARCOS

11   database.  A suspicious order is a redundant reporting

12   requirement.

13       But even if we fail to report a suspicious order, that

14   doesn't connect distribution because there is no legal

15   obligation.  There's no duty.  There's no regulation that

16   says we're supposed to stop shipment.  And it's perfectly

17   obvious why that's so because imagine a situation where

18   you've got a suspicious order.  It's based on -- one of the

19   factors is volume.

20       Imagine a pharmacy that places four orders a month with

21   us.  The first order is fine.  The second order is fine.

22   The third order is fine.  The fourth order goes beyond the

23   volume of drugs that they have historically ordered for the

24   month.

25       Would it make sense for us to stop shipment of the

1    fourth order because it was suspicious?  Does that likely

2    mean that every drug in that fourth order is going to be

3    dispensed to someone without a valid medical prescription

4    for legitimate medical purposes?  Of course not.  And it

5    doesn't mean that everybody who picked up a prescription

6    based on the first three shipments in the month all

7    presented valid prescriptions.

8        If there's a problem with opioid abuse, there's likely

9    to be some people involved in all of those orders that the

10   pharmacy should have caught.  So there's a duty to report.

11   There's not a duty to shop shipment.  There's no connection

12   between the supposedly illegal activity and distribution

13   outside of legitimate channels.  It stays in the channel.

14   It is this simple, Your Honor.

15       Now, the truth of the matter is we distribute to the

16   pharmacy which is licensed and registered.  And all that

17   means is the drug sits on the pharmacy shelf behind the

18   counter, maybe under lock and key, until someone presents

19   with a valid prescription written by a doctor.

20       That's why you don't allege -- there's just no

21   allegation of proximate cause or the allegation of

22   illegality doesn't connect to distribution.

23       The last point is this.  Public nuisance requires a

24   public good, a public right.  My friend said he was

25   astonished because he said, well, of course, there's a

 1   public harm.

 2        Well, absolutely there's a public harm.  But what the

 3   Restatement requires in every one of these cases is that

 4   there be interference with a public right, not a private

 5   right.

 6        And these cases provide guidance to show that what's

 7   involved here are private rights.  There's a right to be

 8   free from addiction.  It's a private right.  It's not --

 9   doesn't involve public access to a public good like air,

10   water, or the right-of-way on public streets.

11        And remember what he said in answer to Your Honor's

12   question.  Talk about Pandora's box and how far they're

13   trying to walk you out on a plank.  He says the distributors

14   are now doing a good job.  And because we're doing a good

15   job reporting suspicious orders, people in the county cannot

16   get legal drugs.  They can't get opioids.  So now they're

17   using illegal drugs.  They're using heroin and other

18   substances.

19        And they want to sue us for that use of illegal drugs

20   even though we are now doing our job and they can't get

21   legal drugs even in the indirect way they've talked about

22   today.  That's so far extreme, you can't find a hint of that

23   anywhere in the case law.

24             THE COURT:  Are we going to hear from you again,

25   Mr. Emch?

1          MR. EMCH:  Briefly, yes, Your Honor.

2          THE COURT:  Please.

3          MR. EMCH:  Want me to do that?

4          THE COURT:  Yes.

5          MR. EMCH:  I'll try to be very brief, Your Honor.

6    We appreciate your attention through this long morning to

7    hear all of these arguments.

8        This is an important matter.  It's very important.  And

9    it will be important not just here in West Virginia, but

10   also can be important nationally as I'm sure you're very

11   aware.

12       We've talked a little bit about Judge Thompson.  I

13   don't want to belabor that, but I will say a couple of

14   things.

15       One is that we, we could talk -- I could certainly talk

16   in excruciating detail about the state case and about Judge

17   Thompson's approach to that case.  I will say to the Court

18   that he had similar problems, most specifically about the

19   damages and the damages issue that we've been discussing.

20   That's the main reason that we got to a second amended

21   complaint in that case.  And that was going to be a serious

22   problem.  He projected that in many, many ways.

23       But this is not that case.  And the discovery that was

24   done in that case and everything else is not what we're

25   really talking about here yet.

1      What we're primarily talking about is a pleading

2  standard that is required and, again, the validity of the

3  causes of action that the plaintiffs are attempting to

4  assert.

5      On the Judge Thompson point and the binding precedent,

6  some of my colleagues were quick to e-mail me a couple of

7  cases which I'll go ahead and mention to the Court if you

8  are indeed interested.

9      One is *State Ex Rel. Miller* vs. *Stone*, 607 S.E. 2d 485,

10  a 2004 case; *Smith* vs. *Hedrick*, 382 S.E. 2d 588, a 1989

11  case, both of which come out of our Supreme Court of Appeals

12  and say quite clearly that Circuit Court opinions are not

13  binding precedent on it.  And certainly if that is the case,

14  they are nowhere near binding precedent upon you.

15      Suspicious orders, Your Honor, are an administrative

16  reporting requirement.  We as distributors do not have any

17  authority, enforcement authority of any kind.  We have no

18  power other than our business power.  And that's our own

19  narrow individual business, our business, not the entire

20  industry's business because we don't have information about

21  that.  We don't have authority.  We don't have power.  We

22  don't have information.

23      Mr. Majestro speaks as though the data that we're

24  talking about, the data that they've used in their complaint

25  is somekind of secret.  It's not a secret.  The global data

1    is not a secret.  It's reported all of the time.  And the

2    agencies who are empowered by statute and charged with the

3    duty and responsibility of enforcing the requirements have

4    that data available to them.  Law enforcement has that data

5    available to them.  They have access to it.  Those with the

6    power to enforce can get to that data.

7         And the DEA had, as I mentioned earlier, all of the

8    data about what was shipped by every distributor, not just

9    one or two or any one, every one of them, to every one of

10   these counties, to every one of these cities, and to every

11   pharmacy that was in any one.  They had it all the time.

12   They have it right now.

13        And the Board of Pharmacy and the law enforcement in

14   West Virginia has the data about every prescription that's

15   written in this state and filled legitimately every single

16   day.

17        So the data is there for those who are responsible for

18   enforcement.  That data is not available to us.  We have a

19   narrow slice of this picture and that's all that we have.

20        We turn to the same theme that we started with here,

21   Your Honor, which is the pleading and the plausibility

22   standard of *Iqbal* and *Twombly* and the cases that have come

23   since that time.

24        It is not a situation in this day and age where the

25   plaintiff can come into court, make conclusory allegations,

1   say the magic words, "'You had a duty, you breached the

2   duty, you owe me money," and expect to go farther.

3       They still haven't come forth in pleading with facts,

4   actual facts that connects dots and makes the case, or at

5   least plausibly pleads that they can get facts into evidence

6   or have facts that show that there is wrongdoing, that there

7   is causation, that there can be proximate cause in this

8   case.

9       The final thing I'll say again, Your Honor, we -- you

10  saw the chart.  You saw my diagram about our role in this

11  closed system.

12      There is no allegation that we shipped an order that

13  resulted in -- that was not an order from a pharmacy that

14  was registered and licensed and from that pharmacy for

15  filling of legitimate prescriptions written by physicians

16  for patients who had a legitimate medical need.  There's no

17  allegation that there's a single prescription out there like

18  that.  The diversion occurs at the, at the point where they

19  exit the system.

20      Who is positioned to even have a chance to observe or

21  predict or say, make a decision about whether or not a

22  prescription is legitimate?  We have no line of sight to

23  that.  We don't see the patients.  We don't see the doctors.

24  We don't talk about the treatment.  We don't see the

25  records.  We don't see anything at that level.

1      Those decisions are made and that's what presents the

2   demand and it's our duty, our primary duty to fill,

3   legitimate demand for legitimate medical needs.  That's what

4   we do.

5           THE COURT:  All right, Mr. Farrell, I'll let you

6   swing at the last pitch here.

7           MR. FARRELL:  Thank you.

8      So we've heard -- there's seven counties.  And, so,

9   between Mr. McGraw and Mr. Majestro there's seven counties.

10  So I'll consider this the pitch on behalf of Wyoming County.

11     So what I want to point out is that what we've alleged

12  is conduct that is related to fines paid by the clients of

13  these lawyers.  They've paid hundreds of millions of dollars

14  in fines for the precise conduct we allege in our complaint.

15     They've had their license suspended, their registration

16  suspended for the conduct that we've alleged in the

17  complaint.

18          THE COURT:  The question was how are you going to

19  prove -- how are you going to put a monetary number on the

20  damages?

21          MR. FARRELL:  So when you look at -- if we can

22  prove the unlawful conduct, what my intention is is this.

23  I'm going to go into Wyoming County and I'm going to say to

24  Wyoming County, "Do you have a hazard to public health and

25  safety?  Is there a hazard to public health and safety in

1    Wyoming County?"

2        You have 25,000 people in your community and they're

3    distributing over two million pills a year.  The overdose

4    rate in Wyoming County --

5            THE COURT:  Well, you're still not answering my

6    question and it's not fair to the other side to let you make

7    a, another argument on the merits.

8            MR. FARRELL:  I'm going to call an expert witness.

9    I'm going to use a Johns Hopkins School of Medicine model.

10   And we're going to come in and we're going to make a

11   proposal on the cost to abate the public health crisis.

12           THE COURT:  But whose duty is it to abate it?

13   Does the county have a -- does Wyoming County have a duty to

14   abate the, the heroin opioid --

15           MR. FARRELL:  Yes.

16           THE COURT:  -- problem?

17           MR. FARRELL:  Yes.  The statute specifically says,

18   "Wyoming County Commission, you have the authority to take

19   actions to eliminate hazards to public health and safety and

20   abate or cause to be abated a public nuisance."

21           THE COURT:  Okay.

22           MR. FARRELL:  Judge, can I make one final point

23   just because it was raised by counsel?

24           THE COURT:  You've answered the question, Mr.

25   Farrell.  I want to be fair to the other side and I reopened

1    the rebuttal to let you answer the specific question I asked

2    Mr. Heard that I should have asked you.  I don't think it

3    would be fair to let you continue to make this argument.

4    And I'm sorry.

5              MR. FARRELL:  I understand.

6              THE COURT:  I'm sure before this case is over

7    you'll have an opportunity to.

8              MR. FARRELL:  That's encouraging, Judge.  Thank

9    you.

10             THE COURT:  All right.

11        (Proceedings concluded at 12:32 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2     States District Court for the Southern District of West

3     Virginia, do hereby certify that the foregoing is a true and

4     correct transcript, to the best of my ability, from the

5     record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    June 23, 2017

9              Reporter                          Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 50

## IN THE CIRCUIT COURT OF
## KANAWHA COUNTY, WEST VIRGINIA

IN RE: OPIOID LITIGATION                          Civil Action No. 19-C-9000

### THIS DOCUMENT APPLIES TO ALL CASES

*****

_____

### PLAINTIFFS' JOINT MEMORANDUM OF LAW
### REGARDING STATUTE OF LIMITATIONS AS IT RELATES TO DISCOVERY
_____

On December 12, 2019, the Court entered an Order requiring the parties to submit a memorandum of law concerning the statute of limitation "in order to determine the appropriate time period for discovery as it relates to liability and damages in these cases." Plaintiffs hereby submit their Joint Memorandum of Law in accordance with the Court's directives.

I. **ANY ATTEMPT BY DEFENDANTS TO REARGUE THE TIMELINESS OF PLAINTIFFS' CLAIMS AT THIS STAGE SHOULD BE REJECTED AS DEFENDANTS' STATUTE OF LIMITATIONS ARGUMENTS HAVE ALREADY BEEN DENIED BY THIS COURT AS WELL AS OTHER COURTS ACROSS THE COUNTRY OVERSEEING RELATED OPIOID LITIGATION.**

This Court's Order of December 12, 2019 directs the parties to submit their respective memoranda to address the statute of limitations as it relates to the appropriate scope of discovery. Nonetheless, Defendants may use this as an opportunity to attempt to reargue their previously denied 12(b) motions to dismiss. In fact, Defendants filed a motion seeking to double the allotted page limit for their memorandum just last week. But any attempts by Defendants to reassert their motions to be dismiss here should be rejected.

Plaintiffs' claims have already been found to have been timely filed in this litigation—by both this Court and the transferring Circuit Court who denied Defendants' motions to dismiss on statute of limitation grounds in their entirety. *See Brooke County Commission, et. al. v. Purdue Pharma L.P.*, *et. al.*, Nos. 17-C-248-255 (W.Va. Cir. Ct. Marshall County Dec. 28, 2018) (multiple

orders); *Monongalia County, et al. v. Purdue Pharma L.P.*, et al., Nos. 18-C-222-236 (hereinafter "*Monongalia County*") (multiple orders) (adopting and applying the reasoning and rulings from *Brooke County*). Specifically, the Court in *Brooke County* and *Monongalia County* held that there was no statute of limitations for an unabated and continuing public nuisance. *See also*, *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245, 488 S.E.2d 901, 925 (1997) (finding that there was no statute of limitations for unabated public nuisance claims because the plaintiff's claim had not accrued until the nuisance has been abated); and Syl. Pt. 6, *Taylor v. Culloden Pub. Serv. Dist.*, 214 W. Va. 639, 641, 591 S.E.2d 197, 199 (2003) ("The two year statute of limitations set forth in West Virginia Code § 55–2–12(a) (1959) (Repl.Vol.2000) does not begin to run in a nuisance action where the tort at issue is both temporary and continuing until the date of the last injurious act or when the acts constituting the nuisance have been abated or discontinued."). The Court in *Brooke County* and *Monongalia County* further found that Plaintiffs alleged facts sufficient to toll the statute of limitations on multiple grounds, including fraudulent concealment, the discovery rule, estoppel, and the continuing tort doctrine.

On March 7, 2019, Defendant Cardinal Health filed a Petition for *Writ of Prohibition* with the West Virginia Supreme Court of Appeals challenging the Circuit Court's Orders in *Brooke County* and arguing, in part, that the Circuit Court erred by denying its statute of limitations argument. This Petition was unanimously refused on June 4, 2019. Additionally, on November 15, 2019, Defendants filed another Petition for *Writ of Prohibition* with the West Virginia Supreme Court of Appeals challenging this Court's rulings in *Monongalia County* denying Defendants' Motions to Dismiss—which included numerous arguments regarding the statute of limitations. On February 3, 2020, the West Virginia Supreme Court unanimously refused this Petition—making this the fifth Petition filed by Defendants and unanimously refused by the Supreme Court in this

litigation. *State ex rel. AmerisourceBergen Drug Corp., et al. v. Honorable Alan D. Moats*, et al., No. 19-1051 (February 3, 2020).

Defendants have also asserted their same statute of limitations arguments in the form of both motions to dismiss and motions for summary judgment before the federal multidistrict litigation ("Federal MDL" or "MDL"), which consolidated the claims of approximately 2,000 cities, counties and other local governments. These arguments were similarly rejected by the MDL Court. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2020 WL 425890, at *1 (N.D. Ohio Jan. 27, 2020) (rejecting Pharmacy Defendants' argument that plaintiffs' claims were untimely against it because it did not distribute opioids after 2014 because no statute of limitations applies to public nuisance claims or to conspiracy claims based on a public nuisance); *Id.*, 2019 WL 4194296, at *12 (Sept. 4, 2019) (Opinion and Order Denying Defendants' Motions for Summary Judgment Based on Statutes of Limitations) (finding that there was no limitations period on plaintiffs' public nuisance claim and that there exist material fact questions concerning the plaintiffs' claim's accrual dates, whether the plaintiffs exercised reasonable diligence to discover facts necessary to bring suit, and the applicability of tolling doctrines); and *Id.*, 2018 WL 6628898, at *3 (Dec. 19, 2018)(denying motions to dismiss because the plaintiffs "have alleged facts sufficient to raise a plausible inference that the applicable limitations periods are subject to tolling—under either a fraudulent concealment theory or a continuing violation theory—and that no claims should be dismissed on statute of limitations grounds at this early stage in the litigation").

Plaintiffs' claims are not barred because their claims were timely filed, and any argument by Defendants to the contrary should likewise be rejected here.[1]  Furthermore, the Orders in this

---

[1]  Additionally, "[i]t is generally recognized that the [statute of limitations] issue presents a question of fact to be resolved by the jury." *Stemple v. Dobson*, 184 W.Va. 317, 321, 400 S.E.2d 561, 565 (1990 ) (citing cases); *Gaither v.*

litigation relating to the statute of limitations should also govern the scope of permissible discovery as these rulings relate to unabated and continuing public nuisances having no statute of limitations and the application of various tolling doctrines.

## II.  STATUTE OF LIMITATIONS AS IT APPLIES TO LIABILITY DISCOVERY

### A.  Plaintiffs are Entitled to Discovery Concerning Defendants' Conduct During All Time Periods in Which Defendants' Conduct Caused and/or Contributed to the Continuing and Unabated Opioid Public Nuisance.

As held in *Monongalia County* and *Brooke County*—which is consistent with the West Virginia Supreme Court's holdings in *Kermit Lumber*, *supra*, and *Taylor*, *supra*—the statute of limitations which governs public nuisances in West Virginia "does not accrue until the harm or endangerment to the public health, safety and the environment is abated." Syl. pt. 11, *Kermit Lumber*, 200 W. Va. at 225, 488 S.E.2d at 905; *Taylor*, 214 W. Va. at 647, 591 S.E.2d at 205. *See also Brooke County*, *Monongalia County*, *supra*. Here, Plaintiffs have asserted claims for a temporary and continuing public nuisance which remains unabated. *See Kermit Lumber*, 200 W. Va. at 245, 488 S.E.2d at 925 ("[T]he 'continuing' nature of the nuisance refers to the continuing damage caused by the offensive condition, not to the acts causing the offensive condition to occur.'") (quoting *Arcade Water Dist. v. United States*, 940 F.2d 1265, 1268 (9th Cir. 1991)). Any claim that West Virginia is not in the midst an opioid-related public nuisance and health crisis ignores reality. Indeed, Defendants have admitted that the conditions upon which Plaintiffs' public nuisance claims are predicated remain unabated. *See, e.g., State ex rel. AmerisourceBergen Drug Corp. v. Hummel*, Docket No. 19-0204, Petition for Writ of Prohibition, p. 2 (March 8, 2019) ("There is no doubt of the need to address the national opioid crisis ….").

---

*City Hosp., Inc.*, 199 W.Va. 706, 714-15, 487 S.E.2d 901, 909-910 (1997) ("In the great majority of cases, the issue of whether a claim is barred by the statute of limitations is a question of fact for the jury.") Thus, to the extent Defendants' arguments would raise any issues of fact, this issue should be submitted to the jury and is not appropriate for resolution at this stage.

Accordingly, the statute of limitations for the public nuisance claims asserted in this litigation has not accrued because the opioid epidemic remains unabated and continues to poison Plaintiffs' communities. *Kermit Lumber*, 200 W. Va. at 225, 488 S.E.2d at 905; *Taylor*, 214 W. Va. at 647, 591 S.E.2d at 205. Thus, Plaintiffs are entitled to discovery during all time periods wherein it is alleged that Defendants' conduct caused or substantially contributed to the public nuisance. *See* RESTATEMENT (SECOND) OF TORTS § 834 ("One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on."); RESTATEMENT (SECOND) OF TORTS § 433B, comment a (causation is established where the plaintiff produces "evidence that the conduct of the defendant has been a substantial factor in bringing about the harm he has suffered").

**B. Plaintiffs Are Entitled to Discovery Relating to Defendants' Conduct During the Entire Time in Which They Marketed and/or Distributed Opioid Pills in West Virginia Because this Evidence is Relevant to Defendants' Motive, Opportunity, Intent, Preparation, Plan, Knowledge, Identity, Absence of Mistake, or Lack of Accident.**

"The scope of discovery in civil cases is broad." *State ex rel. Massachusetts Mut. Life Ins. Co. v. Sanders*, 228 W. Va. 749, 754, 724 S.E.2d 353, 358 (2012). Here, Plaintiffs have alleged that Defendants tortiously marketed and distributed highly addictive and dangerous opioid prescription pills over the course of many years. Evidence of Defendants' actions and conduct during this entire time period is relevant as it may establish Defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Importantly, evidence of this nature is relevant and admissible under W.Va. R. Evid. 404(b).

**C. Discovery Concerning Defendants' Actions During the Entire Course of Time They Tortiously Marketed and/or Distributed Opioid Prescription Pills Is Also Relevant to Plaintiffs' Punitive Damage Claims.**

Plaintiffs have asserted claims against Defendants for punitive damages. Punitive damages may be assessed against Defendants if they acted with actual malice or with a conscious, reckless, and outrageous indifference to the health, safety, and welfare of others. W.Va. Code § 55-7-29(a). Evidence of Defendants' conduct during the entire period of time they conducted opioid-related business in West Virginia is relevant to the issue of punitive damages, particularly as it relates to how long Defendants continued their actions, whether Defendants were aware their actions were causing or were likely to cause harm, whether Defendants attempted to conceal or cover up their actions or the harm caused by them, and whether/how often Defendants engaged in similar conduct in the past. *See Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 658, 413 S.E.2d 897, 899 (1991), *holding modified by Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

**D. Discovery Relating to Defendants' Conduct Beyond the Two-Year Period Prior to the Filing of Plaintiffs' Complaint Should Be Permitted Because the Statute of Limitations on Plaintiffs' Tort Claims Was Tolled.**

Plaintiffs' claims in tort for negligence, misrepresentation, and fraud are governed by a two-year statute of limitations. *Trafalgar House Const., Inc. v. ZMM, Inc.*, 211 W. Va. 578, 583, 567 S.E.2d 294, 299 (2002) (citing W.Va. Code § 55-2-12); *Dunn*, 225 W. Va. at 56, 689 S.E.2d at 268. However, the two-year statute of limitations on Plaintiffs' claims in this litigation was tolled under multiple tolling doctrines. Given the applicability of multiple tolling doctrines, as well as the broad scope of discovery in civil cases under W. Va. R. Civ. P. 26,[2] discovery should be

---

[2] *See State ex rel. Arrow Concrete Co. v. Hill*, 194 W. Va. 239, 247, 460 S.E.2d 54, 62 (1995) (rejecting the assertion that the trial judge should have imposed time-period limitations upon plaintiff's discovery requests on the grounds that "common sense dictates that a comparison between how the defendants conducted business prior to plaintiff's entrance into the market with how the defendants conducted business after the plaintiff entered the market could rationally lead to the discovery of admissible evidence").

permitted for the entire time period that Defendants marketed, sold, and/or distributed prescription opioids in West Virginia.

    1)  <u>Defendants' Fraudulent Concealment of Their Tortious Conduct Tolls the Statute of Limitations.</u>

The concept of fraudulent concealment includes "concealment of the injury itself or the identity of the tortfeasor." *Cart v. Marcum*, 188 W.Va. 241, 245 n. 13, 433 S.E.2d 644, 649 n. 13 (W.Va. 1992). This concept is incorporated in the fourth prong of the West Virginia Supreme Court's five-part test to determine whether a cause of action is time-barred as set forth in *Dunn v. Rockwell*, 225 W. Va. 43, 689 S.E.2d 255 (2009):

> Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled.

Syl. Pt. 5, *Dunn*, 255 W.Va. at 53, 689 S.E.2d at 265.

In this litigation, Plaintiffs' claims are tolled because Defendants purposefully and fraudulently concealed the facts and their wrongful acts. Defendants fraudulently concealed their conduct by, *inter alia*: destroying and hiding documents from the governmental regulators; avoiding documenting opioid prescription orders as suspicious to eliminate evidence; manipulating customer ordering thresholds; making false public assurances that they would remedy past wrongdoing by complying with anti-diversion duties; presenting a false appearance of in-house compliance staffing to governmental authorities; and designing electronic systems that avoid recording and tracking orders exceeding customer thresholds. The facts alleged here associated with fraudulent concealment are intertwined with the allegations of Plaintiffs' Complaints (including the fraudulent concealment count itself) and include numerous allegations that the various defendants made misrepresentations as to the benefits of opioids and

misrepresentations as to their careful compliance with statutory and regulatory obligations. Plaintiffs have thus alleged that Defendants fraudulently concealed their misconduct and forestalled its discovery. These allegations are sufficient to satisfy the elements of fraudulent concealment such that any statute of limitations applied to Plaintiffs' claims is tolled.

      2)  <u>Plaintiffs' Tort Claims Are Tolled by the Discovery Rule</u>.

The "discovery rule" is generally applicable to all torts unless there is a clear statutory prohibition. In tort actions, absent this clear statutory prohibition, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury. Syl. pts. 2-3, *Dunn*, 689 S.E.2d 255.

Here, the identity of the manufacturers and wholesale distributors who marketed and distributed prescription opioids in West Virginia, let alone the conduct of those that may have engaged in unlawful conduct, was not public knowledge and/or reasonably known to Plaintiffs. Information concerning Defendants' identity and conduct was secreted in internal corporate documents and/or governmental databases—neither of which are generally available to Plaintiffs. Plaintiffs did not know (and did not have the means to know) the identity of the entity who owed Plaintiffs a duty to act with due care, and who may have engaged in conduct that breached that duty, or that the conduct of that entity has a causal relation to the injury prior to the expiration of any statute of limitations. Additionally, Defendants purposefully misled the public to believe that other actors were responsible for any opioid related problems and deflected attention away from their conduct.

In this litigation, Plaintiffs filed their claims within two years of when a reasonable person would have known, or by the exercise of reasonable diligence should have known, of the elements

of their respective causes of action. Thus, Plaintiffs' claims which arise from conduct dating back to when Defendants first tortiously marketed, sold, and distributed their highly addictive and deadly opioid pills, are timely and discovery relating to Defendants' conduct over this period of time should be permitted.

3)   <u>Equitable Estoppel Applies to Plaintiffs' Claims</u>.

"Estoppel applies when a party is induced to act or to refrain from acting to her detriment because of her reasonable reliance on another party's misrepresentation or concealment of a material fact." *Bradley v. Williams*, 195 W. Va. 180, 181, 465 S.E.2d 180, 181 (1995). As set forth above, Plaintiffs have alleged facts demonstrating how Defendants' conduct concerning their fraudulent misrepresentations and concealment forestalled the discovery of Defendants' tortious conduct and caused Plaintiffs to refrain from taking action. Accordingly, Plaintiffs have pleaded more than sufficient allegations to support tolling the statute of limitations based on equitable estoppel.

4)   <u>The Statute of Limitations on Plaintiffs' Tort Claims is Tolled Under the Continuous Violations Doctrine</u>.

West Virginia has adopted the continuing tort theory, which provides, "[w]here a tort involves a continuing or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury or when the tortious overt acts or omissions cease." *Graham v. Beverage*, 211 W. Va. 486, 566 S.E.2d 603, Syl. Pt. 11 (2002). In this litigation, Plaintiffs allege continuing tortious conduct by Defendants which has caused a repeated and continuous injury to Plaintiffs. Plaintiffs have further alleged that their damagers have not occurred all at once but have continued to occur and/or have increased as time progresses. Defendants will undoubtedly deny that their tortious conduct continues today and/or up and through the expiration of any applicable statute of limitations, but Defendants' conclusory denials are not sufficient to

prevail at this stage of the litigation. Accordingly, applying the continuous tort doctrine to the facts and allegations here, discovery should be permitted concerning the entire period of time wherein it is alleged that Defendants' tortious conduct occurred—from start to finish.

     5)  Defendants Engaged in a Civil Conspiracy to Unlawfully and Tortiously Market and Distribute Opioids, Including the Failure to Abide by their Prevention and Monitoring Duties, Misrepresentation, and Fraud. Accordingly, One Conspirator's Act of Fraudulent Concealment or Substantive Wrong Underlying the Conspiracy Tolls the Statute of Limitations for all Co-Conspirators.

Plaintiffs have alleged conspiratorial conduct on behalf of Defendants and asserted claims for civil conspiracy. With respect to co-conspirators, the general rule in West Virginia is that if the statute of limitations is tolled as to one defendant in a civil conspiracy, it is tolled as to all alleged co-conspirators. *Dunn v. Rockwell*, 225 W. Va. 43, 61, 689 S.E.2d 255, 273 (2009). Thus, discovery in this action should be allowed dating back to when any of those involved in the opioid conspiracy first fraudulently concealed their conduct or committed underlying tortious acts.

## E. Plaintiffs' Claims for Unjust Enrichment and Other Equitable Relief Are Not Barred by The Doctrine of Laches; Therefore, Broad Discovery is Permitted.

Plaintiffs have asserted claims for unjust enrichment which are equitable in nature. *Absure, Inc. v. Huffman*, 213 W. Va. 651, 655, 584 S.E.2d 507, 511 (2003). West Virginia law "is clear that there is no statute of limitation for claims seeking equitable relief." *Dunn*, 225 W.Va. at 54, 689 S.E.2d at 66.

Instead, the principle of laches applies to Plaintiffs' claims for unjust enrichment and equitable relief. *Absure*, 213 W. Va. at 655, 584 S.E.2d at 511. "Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." Syl. Pt. 2, *Bank of Marlinton v. McLaughlin,* 123 W.Va. 608, 17 S.E.2d 213 (1941). Importantly, "the defense of laches is sustainable only on proof of two elements: (1) lack of diligence by the party against whom the defense is asserted and (2)

prejudice to the party asserting the defense." *Adkins v. CMH Homes Inc.*, No 3:13-cv-32123, 2014 WL 2112859, at *6 (S.D. W.Va. May 19, 2014) (quotation marks and text alterations omitted). While Defendants will undoubtedly complain that they have been prejudiced by these suits, and that Plaintiffs were not diligent in bringing them, these conclusory assertions are not sufficient to bar Plaintiffs' claims. "The bare claim that something is 'manifestly unfair' or the mere existence of delay does not begin to meet the defendant's burden of *proving* either lack of diligence by the plaintiff or prejudice to the party asserting the defense, which is necessary in order to sustain the defense of laches." *Adkins*, 2014 WL 2112859, at *6 (emphasis added; quotation marks and text alterations omitted).

Because no prejudice or injury to Defendants or dilatory conduct by Plaintiffs exists sufficient to find Plaintiffs' equitable and unjust enrichment claims barred by laches, there are no time limitations or restrictions applicable to Plaintiffs' equitable claims. Therefore, discovery should be allowed relevant to any period of time wherein Defendants engaged in unjust or inequitable conduct underlying Plaintiffs' claims.

### III. STATUTE OF LIMITATIONS AS IT APPLIES TO PLAINTIFFS' RECOVERABLE DAMAGES.

#### A. Plaintiffs' Claims for Abatement and Future Damages Are Prospective and Not Limited by the Statute of Limitations.

Plaintiffs seek damages to abate the opioid epidemic public nuisance that is plaguing their communities. Plaintiffs are also seeking future economic damages. Abatement provides a "*prospective* remedy that compensates a plaintiff for the costs of rectifying the nuisance." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, Opinion and Order, p. 5 (Doc #: 2572) (N.D. Ohio Sept. 4, 2019) (emphasis added). Similarly, claims for future economic damages relate to losses that will be sustained going forward. Because abatement and future damages are prospective remedies, there is no statute of limitations for discovery relating to these damage claims.

**B. Plaintiffs May Recover Past Damages Sustained During the Entire Period of Defendants' Tortious Conduct Because the Two-Year Statute of Limitations Was Tolled by Fraudulent Concealment, the Discovery Rule and/or Other Applicable Tolling Doctrines.**

The scope of recoverable past damages on Plaintiffs' claims in tort for negligence, misrepresentation, and fraud are governed by a two-year statute of limitations. *Trafalgar*, 211 W. Va. at 583, 567 S.E.2d at 299 (citing W.Va. Code § 55-2-12); *Dunn*, 225 W. Va. at 56, 689 S.E.2d at 268. Similarly, the statute of limitations for recoverable past damages on Plaintiffs' public nuisance claims should be governed by a two-year statute of limitations.[3] *See*, *e.g.*, *Taylor*, 214 W. Va. at 647 & n.21, 591 S.E.2d at 205 & n.21 (2003) (applying two-year statute of limitations to public nuisance claim concerning discharge of effluents into waters that flow across the plaintiffs' property and allowing damages beginning two-years prior to filing the complaint).

In addition, Plaintiffs may recover past damages sustained in the years outside the two-year period for all claims wherein the statute of limitations was tolled by the discovery rule or other applicable tolling doctrine. In *Dunn*, *supra*, the West Virginia Supreme Court held that the "discovery rule" is "generally applicable to *all torts*, unless there is a clear statutory prohibition to its application" *Id.*, 225 W. Va. at 52, 689 S.E.2d at 264 (emphasis added). The discovery rule recognizes "the inherent unfairness of barring a claim when a party's cause of action could not have been recognized until after the ordinarily applicable period of limitation." *Harris v. Jones,* 209 W.Va. 557, 562, 550 S.E.2d 93, 98 (2001). And as discussed

---

[3] In *Kermit Lumber*, *supra*, the West Virginia Supreme Court applied a one-year statute of limitations to plaintiff's public nuisance claim. But that case is distinguishable here because the plaintiffs in that case sought damages only for abatement and not past damages. *Kermit Lumber,* 200 W. Va. at 242, 488 S.E.2d at 922. Notably, certain Defendants in this litigation have acknowledged that the statute of limitations to recover past damages on Plaintiffs' public nuisance claims is two-years. *See*, *e.g.*, *Brooke County Commission, et al. v. Purdue Pharma L.P.*, Civil Actions Nos. 17-C-248-255, Manufacturer Defendants' Joint Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim, p. 17 (April 24, 2018) ("The Counties' ***public nuisance***, fraud, negligence and strict liability claims are all governed by the two-year statute of limitations set forth in West Virginia Code § 55-2-12.") (emphasis added).

previously, "under the 'discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." Syl. Pt. 2, in part, *Gaither,* 199 W.Va. 706, 487 S.E.2d 901. Similarly, the doctrines of fraudulent concealment and equitable estoppel result in the tolling of the statute of limitations. *Dunn*, 255 W.Va. at 53, 689 S.E.2d at 265.

Since fraudulent concealment, the discovery rule, and the other tolling provisions toll of the statute of limitations, Plaintiffs may recover all past damages for any claim which was undiscovered or tolled—including claims and damages sustained beyond the two-year period prior to the filing of their Complaints and dating back to when Defendants first tortiously marketed and distributed their poisonous opioid pills. *See Patrick v. Sharon Steel Corp*., 549 F. Supp. 1259, 1266 (N.D.W. Va. 1982) (holding that plaintiff may recover damages for injuries not discovered before the expiration of the would-be statute of limitations under the discovery rule).

### C. The Hospital Plaintiffs' May Recover Past Damages Sustained Within the Two-Year Period Prior to November 30, 2017 Plus Damages Sustained in Those Years Prior To That Time When the Statute of Limitations Was Tolled by The Discovery Rule or Other Applicable Tolling Doctrines.

In addition to the discovery rule and other tolling doctrines applicable to the Hospital Plaintiffs' claims as discussed above, the Hospital Plaintiffs' claims were tolled on November 20, 2017 by the filing of a national hospital putative class action ("MDL Hospital Class Action") in *Southwest Mississippi Regional Medical Center v. AmerisourceBergen Drug Co*., Case No. 5:17-CV-145, Document 1 (S.D. Miss. Nov. 30, 2017).

In *American Pipe & Constra. Co. v. Utah*, the United States Supreme Court held that the filing of a class action tolled the applicable statute of limitations for all members of the asserted class. *Id*., 414 U.S. 538 (1974). The reasoning behind this principle is clear: "unless the statute of limitations [is] tolled by the filing of the class action, class members would not be able to rely on the existence of the suit to protect their rights" *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S.

345, 350 (1983). And, as further elaborated upon by the United States Supreme Court in *Crown,*

*Cork & Seal, supra:*

> "A tolling rule for class actions is not inconsistent with the purposes served by statutes of limitations. Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights, but these ends are met when a class action is commenced. Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights. Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims. And a class complaint "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. The defendant will be aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class. Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification… Moreover, although a defendant may prefer not to defend against multiple actions in multiple forums once a class has been decertified, this is not an interest that statutes of limitations are designed to protect."

*Id*. at 252-53 (internal citations omitted).

The West Virginia Supreme Court acknowledged the tolling doctrine espoused in

*American Pipe* doctrine in *In re West Virginia Rezulin Litigation*:

> Courts usually hold that the timely "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 766, 38 L.Ed.2d 713, 727 (1974). *See also, Vaccariello v. Smith & Nephew Richards, Inc.,* 94 Ohio St.3d 380, 763 N.E.2d 160 (2002) (class action filed in federal court; when class action status was later denied by federal court, state court held that statute of limitation had been tolled during pendency of class action, and allowed case to proceed in state court); Syllabus Point 2, *Waltrip v. Sidwell Corp.,* 234 Kan. 1059, 678 P.2d 128 (1984) ("The right of all putative members of a proposed class in an action filed pursuant to K.S.A. 60–223 to file a separate action is saved or preserved pending the determination of whether the initial case shall be maintained as a class action."); *Crown, Cork & Seal Company, Inc. v. Parker,* 462 U.S. 345, 354, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628, 636 (1983) ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action."); *Nolan v. Sea Airmotive, Inc.,* 627 P.2d 1035, 1042 (Alaska, 1981) ("the filing of a class action under Civil Rule 23 ordinarily tolls the statute of limitations

14

as to all members of the class, whether or not named in the complaint.").

*Id.*, 214 W. Va. 52, 66, 585 S.E.2d 52, 66 (2003).

Another case cited by our Supreme Court in *In re West Virginia Rezulin Litigation* is *Vaccariello v. Smith & Nephew Richards, Inc.,* 763 N.E.2d 160 (Ohio 2002). *Vaccariello* is particularly instructive given the facts of this case. In *Vaccariello*, the Ohio Supreme Court held that the filing of a class action in an MDL in the Eastern District of Pennsylvania tolled the statute of limitations for an Ohio plaintiff who filed a claim in Ohio State Court concerning a pedicle screw. *Vaccariello*, 763 N.E.2d at 163. In reaching its decision, the Supreme Court reasoned:

> We conclude that it is more important to ensure efficiency and economy of litigation than to rigidly adhere to the [the statute of limitations]. Whether a class action is filed in Ohio or the federal court system, the defendant is put on notice of the substance and nature of the claims against it. Therefore, allowing the filing of a class action in the federal court system to toll the statute of limitations in Ohio does not defeat the purpose of the statute. ….

> We hold that the filing of a class action, whether in Ohio or the federal court system, tolls the statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action …

> Our holding today merely allows a plaintiff who could have filed suit in Ohio irrespective of the class action filed in federal court in Pennsylvania to rely on that class action to protect her rights in Ohio. To do otherwise would encourage all potential plaintiffs in Ohio who might be part of a class that is seeking certification in a federal class action to file suit individually in Ohio courts to preserve their Ohio claims should the class certification be denied. The resulting multiplicity of filings would defeat the purpose of class actions.

*Id.*, 763 N.E.2d at 163.

On November 30, 2017, the MDL Hospital Class Action was filed. *Southwest Mississippi Regional Medical Center v. AmerisourseBergen Drug Co*., Case No. 5:17-CV-145, Document 1 (S.D. Miss. Nov. 30, 2017). The Hospital Plaintiffs in this litigation are putative class members of

the MDL Hospital Class Action.[4]  The public nuisance and opioid epidemic asserted in the MDL Hospital Class Action is the same nuisance and opioid epidemic alleged by the Hospital Plaintiffs in this litigation. The MDL Hospital Class Action also asserts the same nuisance, negligence, fraud and unjust enrichment claims as those being asserted by the Hospital Plaintiffs here. Moreover, the West Virginia Hospital Plaintiffs are represented by the same attorneys who filed the MDL Hospital Class Action. Accordingly, Defendants have been on notice of the West Virginia hospital claims as of the date of the filing of the MDL Hospital Class Action.

Thus, under the reasoning and holdings of *American Pipe, In re West Virginia Rezulin Litigation,* and *Vaccariello,* the Hospital Plaintiffs' claims were tolled on November 30, 2017—the date of filing of the MDL Hospital Class Action. The Hospital Plaintiffs may therefor recover past damages through at least November 30, 2015. In addition, for the reasons discussed *supra,* the time period applicable to the recovery of the hospitals' damages may have also been tolled for an additional time period before November 30, 2015, which must be added onto this time period of recoverable past damages.

### D. Laches Does Not Limit the Scope of Plaintiffs' Recoverable Damages for their Equitable Claims.

Plaintiffs' claims for unjust enrichment are equitable claims with no statute of limitations. *Absure*, 213 W. Va. at 655, 584 S.E.2d at 511. Rather, these claims are governed by latches—which do not bar Plaintiffs' claims here for the reasons discussed above. Accordingly, Plaintiffs may recover the full amount of benefits unjustly conferred upon Defendants during the entire duration of Defendants' tortious conduct. *Id. See also*, *Dunlap v. Hinkle,* 317 S.E.2d 508, 512

---

[4]  The putative class as defined in the MDL Hospital Class Action is: "All hospitals in the United States which treated patients with opioid conditions." "Patients with opioid conditions" are defined as patients with opioid overdose; patients with opioid addiction; babies born opioid addicted; opioid users committed to mental health treatment programs; and opioid users with pretextual excuses for obtaining opioids" *See St. Vincent Medical Center, et al. v. AmerisourceBergen Drug Co*., Case 1:17-MD-2804 op-45175, First Amended Class Action Complaint (Doc #31) at ¶ 932 (N.D. Ohio March 11, 2019).

(W.Va.1984) ("[R]estitution damages from a claim of unjust enrichment are measured in terms of the benefit the plaintiff conferred to the defendant."); *Prudential Ins. Co. v. Couch,* 376 S.E.2d 104, 109 (W.Va.1988)) ("[A] person may be unjustly enriched not only where he receives money or property but also where he otherwise receives a benefit. He receives a benefit ... where he has saved expense or loss.")

Moreover, it has long been recognized that restitution is an available remedy in public nuisance cases under the common law. A claim for restitution arises where "[a] person who has performed the duty of another, by supplying things or services ... and (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety." Restatement of Restitution § 115; *United States v. Boyd*, 520 F.2d 642, 644–45 (6th Cir. 1975). Comment b of the Restatement makes it clear that the "abatement of a serious public nuisance ... is another situation calling for the [award of restitution]." Restatement of Restitution, § 115 cmt. b. This common law doctrine is recognized in West Virginia. *State v. Aaer Sprayed Insulations*, No. 86-C-458, 1987 WL 1428107 (W.Va. Cir. Ct. Monongalia Cty., Sept. 4, 1987) (permitting restitution in public nuisance action by State seeking to recover costs of asbestos abatement, citing Restatement of Restitution § 115).

Restitution damages are equitable. *Patrick Henry Estates Homeowners Ass'n, Inc. v. Miller,* 758 F.Supp.2d 331, 340 (N.D.W.Va.2010) ("Generally, money damages are a legal remedy. There are two exceptions, however. Damages are equitable when they are: (1) restitutionary or (2) incidental to or intertwined with injunctive relief.") A claim for recovery of costs incurred and costs to be incurred in responding to an actual or threatened nuisance is also without question equitable in nature. Accordingly, because claims equitable in nature are governed under the principles of laches—which do not preclude or limit Plaintiffs' recovery—the scope of

17

Plaintiffs' recoverable damages extends beyond a two-year statute of limitations. *Absure*, 213 W. Va. at 655, 584 S.E.2d at 511.

## IV. CONCLUSION

For the reasons set forth above, discovery concerning Defendants' liability and conduct, together with Plaintiffs' damages, should be permitted for the entire period of time wherein Defendants engaged in their tortious conduct and when Plaintiffs' sustained their damages.

Respectfully Submitted,

By:     /s/ *Clayton J. Fitzsimmons*
        Robert P. Fitzsimmons (WV Bar # 1212)
        Clayton J. Fitzsimmons (WV Bar # 10823)
        Mark A. Colantonio (WV Bar #4238)
        **FITZSIMMONS LAW FIRM PLLC**
        1609 Warwood Avenue
        Wheeling, WV 26003
        Telephone: (304) 277-1700

        *Of counsel for Plaintiffs in:*

        *Brooke County Commission, et al. v. Purdue Pharma L.P., et al.,* Marshall County Civil Action Nos. 17-C-248 to 17-C-255,

        *Monongalia County Commission, et al. v. Purdue Pharma L.P., et al.*, Marshall County Civil Action Nos. 18-C-222 & 18-C-233 to 18-C-236

By:     /s/ *Stephen B. Farmer*
        Stephen B. Farmer (WV Bar # 1165)
        **FARMER, CLINE & CAMPBELL, PLLC**
        746 Myrtle Road
        P.O. Box 3842
        Charleston, West Virginia 25338
        Telephone: 304-346-5990

        /s/ *Timothy R. Linkous*
        Timothy R. Linkous (WV Bar # 8572)
        **LINKOUS LAW, PLLC**
        179 Hanalei Drive, Suite 100
        Morgantown, WV 26508
        Telephone: 304-554-2400

18

*Of counsel for Plaintiffs in:*

*West Virginia University Hospitals, Inc., et al. v. Purdue Pharma L.P., et al.,* Civil Action Nos. 19-C-69 to 19-C-88; and 19-C-134 to 19-C-139 (MSH)

*West Virginia University Hospitals, Inc., et al. v. McKesson Corporation, et al.,* Civil Action Nos. 19-C-215 to 19-C-239 (MSH)

By:  /s/ *Letitia N. Chafin*
Letitia N. Chafin (WV Bar #7207)
**THE CHAFIN LAW FIRM, PLLC**
P.O. Box 1799
Williamson, West Virginia 25661
Telephone:   304- 235-2221

*Of counsel for Plaintiffs in:*

*The County Commission of Mason County, et al. v. Purdue Pharma L.P., et al.,* Marshall County Civil Action Nos. 19-C-4 to 19-C-9

*Mayor Peggy Knotts Barney, on Behalf of City of Grafton, and Mayor Philip Bowers, on Behalf of City of Philippi v. Purdue Pharma, L.P., et al.,* Civil Action Nos. 19-C-151 and 19-C-152

By:  /s/ *Kevin C. Harris*
Kevin C. Harris (WV Bar #8814)
Eric J. Holmes (WV Bar #8557)
**LAW OFFICE OF HARRIS & HOLMES, PLLC**
115 North Church St.
Ripley, West Virginia 25271
Telephone: (304) 372-7004

*Of Counsel for Plaintiffs in*:

*Roane County Commission, et al., v. Mylan Pharmaceutical Inc., et al.,* Civil Action Nos 19-C-96 to 19-C-108

By:  /s/ *Anne McGinness Kearse*
Anne McGinness Kearse (WV Bar # 12547)
Natalie Deyneka (WV Bar # 12978)
**MOTLEY RICE LLC**

28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone:   843-216-9000
Fax:   843-216-9450

*Of Counsel for Plaintiffs in*:

*City of Clarksburg, West Virginia., v. Allergan
PLC, et al.*, Civil Action Nos. 19-C-259 to 19-C-26

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on this 7th day of February 2020, the foregoing ***PLAINTIFFS' JOINT MEMORANDUM OF LAW REGARDING STATUTE OF LIMITATIONS AS IT RELATES TO DISCOVERY*** was served using the File & Serve Xpress system, which will send notification of such filing to all counsel of record.

/s/ *Timothy R. Linkous*
Timothy R. Linkous (WV Bar # 8572)
*Plaintiffs' Liaison Counsel*

# EXHIBIT 51

Case 3:17-cv-01362 Document 240-12 Filed 03/20/20 Page 128 of 135 PageID #: 3743

https://www.wvgazettemail.com/news/cops_and_courts/drug-firms-poured-m-painkillers-into-wv-amid-rise-of/article_99026dad-8ed5-5075-90fa-adb906a36214.html

## Drug firms poured 780M painkillers into WV amid rise of overdoses

By Eric Eyre Staff writer    Dec 17, 2016



Buy Now

Kay Mullins (left) and Tiffany Vincent, mother and daughter of Mary Kathryn Mullins, pose for a portrait in the dining room of the house where they both live and where Mary Kathryn died of a drug overdose on Dec. 23, 2015. Over the years, Kay has helped raise her granddaughter Tiffany, who has also battled drug addiction, and her great-granddaughters, Kylie and Madyson.

SAM OWENS | Gazette-Mail

### Editor's Note

This is part one of a two-part series. For the second part, click here.

Follow the pills and you'll find the overdose deaths.

The trail of painkillers leads to West Virginia's southern coalfields, to places like Kermit, population 392. There, out-of-state drug companies shipped nearly 9 million highly addictive — and potentially lethal — hydrocodone pills over two years to a single pharmacy in the Mingo County town.

Rural and poor, Mingo County has the fourth-highest prescription opioid death rate of any county in the United States.

The trail also weaves through Wyoming County, where shipments of OxyContin have doubled, and the county's overdose death rate leads the nation. One mom-and-pop pharmacy in Oceana received 600 times as many oxycodone pills as the Rite Aid drugstore just eight blocks away.

In six years, drug wholesalers showered the state with 780 million hydrocodone and oxycodone pills, while 1,728 West Virginians fatally overdosed on those two painkillers, a Sunday Gazette-Mail investigation found.

# Prescription opioid shipments



### 224,260,980

Number of oxycodone dosages shipped to West Virginia pharmacies between 2007 and 2012

### 555,808,292

Number of hydrocodone dosages shipped to West Virginia pharmacies between 2007 and 2012

⬆ Share

infogram

Opioid-prescription shippments 2007-2012
Create your own infographics

The unfettered shipments amount to 433 pain pills for every man, woman and child in West Virginia.

"These numbers will shake even the most cynical observer," said former Delegate Don Perdue, D-Wayne, a retired pharmacist who finished his term earlier this month. "Distributors have fed their greed on human frailties and to criminal effect. There is no excuse and should be no forgiveness."

The Gazette-Mail obtained previously confidential drug shipping sales records sent by the U.S. Drug Enforcement Administration to West Virginia Attorney General Patrick Morrisey's office. The records disclose the number of pills sold to every pharmacy in the state and the drug companies' shipments to all 55 counties in West Virginia between 2007 and 2012.

Case 3:17-cv-01362 Document 240-12 Filed 03/20/20 Page 125 of 135 PageID #: 3745



Map created by 🌿 gazette-mail

The wholesalers and their lawyers fought to keep the sales numbers secret in previous court actions brought by the newspaper.

The state's southern counties have been ravaged by a disproportionate number of pain pills and fatal drug overdoses, records show.

The region includes the top four counties — Wyoming, McDowell, Boone and Mingo — for fatal overdoses caused by pain pills in the U.S., according to CDC data analyzed by the Gazette-Mail.

Another two Southern West Virginia counties — Mercer and Raleigh — rank in the top 10. And Logan, Lincoln, Fayette and Monroe fall among the top 20 counties for fatal overdoses involving prescription opioids.



Map created by 🌿 gazette-mail

While the death toll climbed, drug wholesalers continued to ship massive quantities of pain pills.

Mingo, Logan and Boone counties received the most doses of hydrocodone — sold under brand names such as Lortab, Vicodin and Norco — on a per-person basis in West Virginia. Wyoming and Raleigh counties scooped up OxyContin pills by the tens of millions.

The nation's three largest prescription drug wholesalers — McKesson Corp., Cardinal Health and AmerisourceBergen Drug Co. — supplied more than half of all pain pills statewide.

10/1/2019

Drug firms poured 780M painkillers into WV amid rise of overdoses | Cops & Courts | wvgazettemail.com

# Oxycodone wholesalers

Share

infogram

Oxycodone shippers
Create column charts

Case 3:17-cv-01362   Document 240-2   Filed 03/20/20   Page 128 of 135 PageID #: 3748

# Hydrocodone wholesalers

↥ Share



Hydrocodone wholesalers
Create column charts

For more than a decade, the same distributors disregarded rules to report suspicious orders for controlled substances in West Virginia to the state Board of Pharmacy, the Gazette-Mail found. And the board failed to enforce the same regulations that were on the books since 2001, while giving spotless inspection reviews to small-town pharmacies in the southern counties that ordered more pills than could possibly be taken by people who really needed medicine for pain.

As the fatalities mounted — hydrocodone and oxycodone overdose deaths increased 67 percent in West Virginia between 2007 and 2012 — the drug shippers' CEOs collected salaries and bonuses in the tens of millions of dollars. Their companies made billions. McKesson has grown into the fifth-largest corporation in America. The drug distributor's CEO was the nation's highest-paid executive in 2012, according to Forbes.

In court cases, the companies have repeatedly denied they played any role in the nation's pain-pill epidemic.

Their rebuttal goes like this: The wholesalers ship painkillers from drug manufacturers to licensed pharmacies. The pharmacies fill prescriptions from licensed doctors. The pills would never get in the hands of addicts and dealers if not for unscrupulous doctors who write illegal prescriptions.

In other words, don't blame the middleman.

"The two roles that interface directly with the patient — the doctors who write the prescriptions and the pharmacists who fill them — are in a better position to identify and prevent the abuse and diversion of potentially addictive controlled substance," McKesson General Counsel John Saia wrote in a recent letter released by the company last week.

But the doctors and pharmacists weren't slowing the influx of pills.

Cardinal Health saw its hydrocodone shipments to Logan County increase six-fold over three years. AmerisourceBergen's oxycodone sales to Greenbrier County soared from 292,000 pills to 1.2 million pills a year. And McKesson saturated Mingo County with more hydrocodone pills in one year — 3.3 million — than it supplied over five other consecutive years combined.



Map created by gazette-mail

Case 3:17-cv-01362 Document 240-13 Filed 03/20/20 Page 130 of 135 PageID #: 3750

Year after year, the drug companies also shipped pain pills in increasing stronger formulations, DEA data shows. Addicts crave stronger pills over time to maintain the same high.

"It starts with the doctor writing, the pharmacist filling and the wholesaler distributing. They're all three in bed together," said Sam Suppa, a retired Charleston pharmacist who spent 60 years working at retail pharmacies in West Virginia. "The distributors knew what was going on. They just didn't care."

Mary Kathryn Mullins' path of dependence took her to pain clinics that churned out illegal prescriptions by the hundreds, pharmacies that dispensed doses by the millions and, on many occasions, to a Raleigh County doctor who lectured her about the benefits of vitamins but handed her prescriptions for OxyContin.

"She'd get 90 or 120 pills and finish them off in a week," recalled Kay Mullins, Mary Kathryn's mother. "Every month, she'd go to Beckley, they'd take $200 cash, no insurance, and the pills, they'd be gone within a week."

Mary Kathryn Mullins' addiction, her mother said, started after a car crash near her home in Boone County. Her back was hurting. A doctor prescribed OxyContin.

"She got messed up," Kay Mullins said. "They wrote her the pain pills, and she just got hooked."

Kay Mullins has a hard time talking about the 10 years that followed, all the lies her daughter told to cover her addiction, stealing from her brother, the time she shot herself in the stomach in an attempt to end her life.

Mary Kathryn Mullins would go to dozens of doctors for prescriptions. She was a "doctor shopper."

Her mother can't recall most of the doctors by name. She said she believes the doctor who talked to her daughter about vitamins was recently in the news after being charged with prescription fraud. Many rogue pain clinics have been shut down in recent years.

"She'd go to his house in the woods for prescriptions," Kay Mullins said.

There also were stops at multiple pharmacies in Madison, Logan, Beckley and Williamson. Mary Kathryn Mullins always would find a way to get pills. She kept most for herself, but sometimes she sold them to others, her mother said.

"It tore my family up," said Kay Mullins, who works at a flower shop in Madison. "You don't sleep. One time she would be OK, and you think she would come out of it, but then something else happens."

Last December, Mary Kathryn Mullins' hunt for pain pills led her to South Charleston. A doctor prescribed her OxyContin and an anti-anxiety medication, her mother said. A pharmacy in Alum Creek filled it.

Two days later, she stopped breathing in her bed. Her brother, Nick Mullins, a Madison police officer, responded to the 911 call. He tried chest compressions, but he could not revive his sister.

At age 50, Mary Kathryn Mullins was dead.

After the funeral, her mother had one last thing to do. She found an appointment reminder card for Mary Kathryn Mullins' next scheduled visit to the doctor who wrote her final prescription. She dialed the phone number of the doctor's office and spoke to the receptionist.

"I told her my daughter was there Dec. 20," Kay Mullins recalled. "I said, 'Y'all wrote these prescriptions, and she's gone Dec. 23. I just wanted to let you know she won't be back.'"

In the drug distribution industry, they're called the "Big Three" — McKesson, Cardinal Health, AmerisourceBergen — and they bear no resemblance to the mom-and-pop pharmacies that ordered massive quantities of the drugs the wholesalers delivered in West Virginia.

The Big Three wholesalers together are nearly as large as Wal-Mart, with total revenues of more than $400 billion. Their revenues account for about 85 percent of the drug distribution market in the U.S.

Between 2007 and 2012 — when McKesson, Cardinal Health and AmerisourceBergen collectively shipped 423 million pain pills to West Virginia, according to DEA data analyzed by the Gazette-Mail — the companies earned a combined $17 billion in net income.

Over the past four years, the CEOs of McKesson, Cardinal Health and AmerisourceBergen collectively received salaries and other compensation of more than $450 million.

In 2015, McKesson's CEO collected compensation worth $89 million — more money than what 2,000 West Virginia families combined earned on average.

"What's most remarkable is that the boards of the companies are paying the CEOs as if they were innovators and irreplaceable entrepreneurs, when in fact they are just highly paid middlemen, betting on market consolidation and ever-rising drug prices," said Ken Hall, international secretary-treasurer of the Teamsters union.

Last month, the Teamsters sent a letter to McKesson board members urging them to investigate allegations raised by Morrisey in a lawsuit he filed against the company earlier this year. The complaint alleges McKesson "flooded" West Virginia with pain pills and gave bonuses and commissions to employees based on sales of highly addictive prescription drugs. The Teamsters' pension funds hold a stake in McKesson.

In a letter to the Teamsters released by McKesson last week, the company denied it gave incentives to executives and other personnel for sales of controlled substances.

McKesson added Morrisey's lawsuit assigns blame to drug wholesalers for West Virginia's opioid crisis "without acknowledging the role played by doctors, pharmacists and the regulatory agencies that oversee doctors and pharmacists."

"McKesson's shipments were in response to orders placed by these registered entities," the company's chief lawyer wrote. "Thus, McKesson lawfully shipped controlled substances to registered pharmacies."

A spokesman for AmerisourceBergen suggested health experts and law enforcement authorities would be better able to comment on whether there's a link between pain-pill volumes and overdose deaths.

Cardinal Health said it shipped 3.4 billion doses of medication in West Virginia between 2007 and 2012. So hydrocodone and oxycodone sales made up about 17 percent of the company's shipments.

"All parties including pharmacies, doctors, hospitals, manufacturers, patients and state officials share the responsibility to fight opioid abuse," said Ellen Barry, a spokeswoman for Cardinal Health.

In Southern West Virginia, many of the pharmacies that received the largest shipments of prescription opioids were small, independent drugstores like ones in Raleigh and Wyoming counties that ordered 600,000 to 1.1 million oxycodone pills a year. Or they were locally owned pharmacies in Mingo and Logan counties, where wholesalers distributed 1.4 million to 4.7 million hydrocodone pills annually.

By contrast, the Wal-Mart at Charleston's Southridge Centre, one of the retail giant's busiest stores in West Virginia, was shipped about 5,000 oxycodone and 9,500 hydrocodone pills each year.

At the height of pill shipments to West Virginia, there were other warning signs the prescription opioid epidemic was growing.

Drug wholesalers were shipping a declining number of oxycodone pills in 5 milligram doses — the drug's lowest and most common strength — and more of the painkillers in stronger formulations.

# Prescription opioid dosage strength

Case 3:17-cv-01362   Document 240-12   Filed 03/20/20   Page 133 of 135 PageID #: 3753



Share                                                                    infogram

Hydro strength
Create line charts

A DEA agent warned Morrisey's aides about the disturbing trend in January 2015, according to an email released by the attorney general in response to a Freedom of Information Act request from the Gazette-Mail.

Between 2007 and 2012, the number of 30-milligram OxyContin tablets increased six-fold, the supply of 15-milligram pills tripled and 10-milligram oxycodone nearly doubled, the DEA records sent to Morrisey's office show.

In the email to Morrisey, DEA agent Kyle Wright said the higher-strength oxycodone pills were commonly abused.

The DEA agent sent Morrisey's office a separate email about hydrocodone shipments to the state. West Virginia pharmacies were mostly buying 10-milligram hydrocodone tablets — the most potent dosage at the time.

Once hooked on painkillers, addicts typically demand higher and higher doses.

Chelsea Carter, a recovering 30-year-old addict who now works as a therapist at a drug treatment center in Logan County, remembers crushing, snorting and injecting OxyContin — always wanting the strongest pills she could get her hands on. She once shot up with eight to 10 doses of oxycodone, passed out and woke up with the needle still stuck in her arm.

"You're turned on to this potent substance, and your tolerance grows," said Carter, who quit using pills in 2008, the day she went to jail after taking part in a theft ring that sold stolen goods for painkillers.

"When they handcuff you, and you walk through the doors, and you're in an orange jumpsuit and they slam the doors behind you, that's when you wonder, 'is two to 20 years worth it for one OxyContin?'" Carter said. "That's when I hit my knees and prayed, 'Lord, if you ever bring me out of this, I'll never touch another drug again.'"

The addicted come to see Carter at the clinic just off Main Street in downtown Logan. They want to get off pain pills or heroin — a street drug causing more and more overdose deaths in West Virginia every year.

They talk to Carter, eight to 10 of them a day. They've lost children, parents, grandparents. They've lost homes. They're tired of living that way.

Carter listens and tells them her story, how every day she wakes up and makes a decision not to use pills.

"I've buried a lot of friends from drug addiction," Carter said. "I don't want to bury another one."

Her trail follows the direction of hope.

*Gazette-Mail staff writer Andrew Brown contributed to this story.*

Reach Eric Eyre at [ericeyre@wvgazettemail.com](mailto:ericeyre@wvgazettemail.com), 304-348-4869 or follow @ericeyre on Twitter.

---

Eric Eyre

10/1/2019

Statehouse Reporter

Drug firms poured m painkillers into WV amid rise of overdoses | Cops & Courts | wvgazettemail.com