**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON, <br><br> Plaintiff, <br><br> v. <br><br> AMERISOURCEBERGEN DRUG CORPORATION, et al., <br><br> Defendants. | Civil Action No. 3:17-01362 <br><br> Hon. David A. Faber |
| CABELL COUNTY COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> AMERISOURCEBERGEN DRUG CORPORATION, et al., <br><br> Defendants. | Civil Action No. 3:17-01665 <br><br> Hon David A. Faber |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE:
STATUTE OF LIMITATIONS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 3

PUBLICLY AVAILABLE, UNDISPUTED FACTS REGARDING STATUTE OF
LIMITATIONS ................................................................................................................... 6

ARGUMENT .................................................................................................................... 16

THE PLAINTIFFS' CLAIMS ARE TIME-BARRED. ............................................................ 16

A.      Plaintiffs' Nuisance Claim Accrued Before January 2016 ............................................. 16

B.      The Continuing-Tort Doctrine Does Not Apply and, Even If It Did, Does Not Save
        Plaintiffs' Claims That Accrued Outside of the Statutory Period. .................................. 18

        1.      The doctrine does not apply ........................................................................... 19

        2.      If the doctrine applied, it would permit recovery only for conduct within the one-
                year limitations period ................................................................................... 21

        3.      Plaintiffs seek non-injunctive, monetary relief .................................................. 23

C.      Plaintiffs Have Not Alleged and Cannot Prove the Elements Necessary to Invoke the
        Fraudulent Concealment Doctrine. ................................................................................. 25

CONCLUSION ................................................................................................................ 28

CERTIFICATE OF SERVICE .......................................................................................... 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Caldwell v. A.H. Robins Co.*, 577 F. Supp. 796 (W.D. Pa. 1984), aff'd, 735 F.2d 1347 (3d Cir. 1984) ........................................................................................................21

*Cook v. Mildred Mitchell-Bateman Hosp.*, 2016 WL 1306648 (S.D. W. Va. Apr. 1, 2016) ........11

*EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046 (3d Cir. 1993)................................16

*Huffman v. United States*, 82 F.3d 703 (6th Cir. 1996) ..................................22

*In re McNallen*, 62 F.3d 619 (4th Cir. 1995) ..............................................16

*Michael v. Consolidation Coal Co.*, 2017 WL 1197828 (N.D.W. Va. Mar. 31, 2017), aff'd per curiam, 773 F. App'x 767 (4th Cir. 2019) ........................................25, 26

*Nicolo v. Phillip Morris, Inc.*, 201 F.3d 29 (1st Cir. 2000) ..........................................21

*Patrick v. Sharon Steel Corp.*, 549 F. Supp. 1259 (N.D. W. Va. 1982) ........................................22

*Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751 (S.D. W. Va. 2009) .................19

*Schenker AG v. Société Air Fr.*, 102 F. Supp. 3d 418 (E.D.N.Y. 2015)........................................11

*Yancey v. Clark Atlanta Univ.*, 431 F. App'x 816 (11th Cir. 2011) (per curiam) ........................22

## STATE CASES

*Albright v. White*, 202 W. Va. 292, 503 S.E.2d 860 (1998) ..........................................16

*Cabell County Commission, et al. v. Purdue Pharma L.P., et al.*, Case No. 1-17-op-45053-DAP (Doc. 193, Sep. 12, 2019)........................................................................1

*Cart v. Marcum*, 188 W.Va.241, 423 S.E.2d 644 (1992) ..............................................16

*DeRocchis v. Matlack, Inc.*, 460 S.E.2d 663 (W. Va. 1995) ..........................................19

*Graham v. Beverage*, 566 S.E.2d 603 (W. Va. 2002)..................................................19

*Handley v. Town of Shinnston*, 289 S.E.2d 201 (W. Va. 1982) (per curiam)..............................19

*Henry v. Ohio River R. Co.*, 21S.E. 863, 867 (W. Va. 1895) ..........................................22

*Jones v. Trustees of Bethany College*, 177 W. Va. 168, 351 S.E.2d 183 (1986)..........................16

*Kessel v. Leavitt*, 511 S.E.2d 720 (W.Va. 1998) ........................................................25

*Merrill v. W. Va. Dep't of Health & Human Res.*, 632 S.E.2d 307 (W. Va. 2006) (per curiam) ................................................................................................................25

*Roberts v. W. Va. Am. Water Co.*, 655 S.E.2d 119 (W. Va. 2007) ................................................20

*State ex rel. McGraw v. Cardinal Health, Inc.*, No. 12-C-140 (W. Va. Cir. Ct. Boone Cty. June 26, 2012) (Ex. 10) ........................................................................................................8

*State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901 (W. Va. 1997), aff'd in part, 636 F.3d 88 (2011) ..........................................................................19, 20

*Taylor v. Culloden Pub. Serv. Dist.*, 591 S.E.2d 197 (W. Va. 2003) ......................................19, 22

*Trafalgar House Constr., Inc. v. ZMM, Inc.*, 567 S.E.2d 294 (W. Va. 2002) ........................25, 26

*Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo Cty.*, 235 W. Va. 283, 773 S.E.2d 627 (2015) ..............................................................................................................8

## OTHER AUTHORITIES

54 C.J.S. Limitations of Actions § 177 (1987) ..........................................................................20

Fed. R. Evid. 201 ..............................................................................................................................11

92 W. Va. L. Rev. 235, 268 (1990).............................................................................................20, 22

W. Va. Code § 55-2-12(c)...............................................................................................................16

William Mackel ed. Am Law Book ................................................................................................22

Plaintiffs base their nuisance claim on allegedly wrongful conduct that began in the late 1990s.[1]  Yet City of Huntington and Cabell County did not file their lawsuits until January 19 and March 9, 2017, respectively—nearly 20 years later.  The statute of limitations for nuisance is one year, however, and Plaintiffs admitted only last week that their nuisance claim accrued at least two years earlier—before May 25, 2015.[2]  Thus, Huntington may *at most* seek recovery based on wrongful conduct that occurred *after January 19 2016*, and, Cabell County, for wrongful conduct that occurred *after March 9, 2016*.[3]

Having expressly abandoned any claim for "past and future economic losses,"[4] Plaintiffs contend that they seek only the equitable remedy of abatement and that the statute of limitations does not run for an unabated nuisance.[5]  Plaintiffs' choice to disclaim past and future damages, however, does not render their nuisance claim timely.  Plaintiffs clearly continue to seek the payment of money from Defendants—and solely the payment of money—as the remedy in this action.[6]  Whatever the form of relief Plaintiffs seek, however, and no matter what they call it—

[1]  *E.g.*, *Cabell County Commission, et al. v. Purdue Pharma L.P., et al.*, Case No. 1-17-op-45053-DAP (Doc. 193, Sep. 12, 2019) Corrected Joint and Third Amended Complaint ("Compl.") ¶¶ 812, 829, 871.

[2]  Plaintiffs' Memorandum of Law in Support of Motion To Strike Defendants' Notices of Non-Party Fault (Doc. 225 Mar. 13, 2020) ("Motion To Strike") at 10 ("Plaintiffs' Nuisance Claims Arose Prior to May 25, 2015").

[3]  As explained below, the limitations period began to run when Plaintiffs discovered or should have discovered their alleged injury.  Plaintiff cannot rely on either the continuing-tort doctrine to save their time-barred claim nor on a theory of fraudulent concealment to toll the limitations period.  *See infra* Parts B & C.

[4]  Plaintiffs' Position Statement (Doc. 125, Jan. 23, 2020) ("Position Statement") at 4.

[5]  Compl. ¶ 1199.

[6]  *See, e.g.*, Position Statement, Doc. 125 at 4 ("With respect to these Defendants, Plaintiffs have waived all past and future economic losses sustained by the political subdivisions and seek abatement which is 'equitable in nature and provides a prospective remedy that compensates a plaintiff for the costs of rectifying the nuisance.'").

1

whether "money damages,"[7] "abatement damages,"[8] or otherwise—Plaintiffs can obtain relief only for wrongful ***conduct*** that occurred within the limitations period.  For example, if Defendants' alleged conduct caused a Cabell County resident to become addicted to opioids in 2005 or 2010 or 2015, then the statute of limitations bars Plaintiffs from asserting a claim arising out of that person's addiction—regardless of whether Plaintiffs continue to incur medical, social services or other expenses relating to that individual as of today or will do so in the future.

Resolution of the statute-of-limitations question has considerable practical importance. Because the relevant period begins on January 19, 2016 (or later), the scope of the evidence Plaintiffs may offer to prove their claims can be narrowed considerably.  The evidence about Defendants' conduct in 2005 or 2010 is not the same as the evidence about their conduct in 2015. Most obviously, the alleged wrongful conduct is Defendants' alleged failure since the late 1990s to report to federal and state regulatory authorities and to halt shipment of "suspicious" pharmacy orders" of opioids.  But the three Defendants' conduct was not monolithic over that 20-year period; each had its own suspicious-order-monitoring system.  Moreover, each Defendant's system did not remain static over that period; each implemented changes on an ongoing basis, albeit different changes and on different timetables, such that by the time Plaintiffs filed suit in 2017 Defendants were reporting and halting shipment of tens of thousands

---

[7]   Plaintiffs Cabell Cty. Comm'n and City of Huntington's Motion to Sever, Case No. 1-17-md-02804-DAP (Doc. 2989, Dec. 13, 2019) ("Motion to Sever") at 2 ("Plaintiffs intend to seek *only* money damages for the 'elimination of hazards to public health and safety and to abate or cause to be abated … a public nuisance.'") (emphasis in original).

[8]   Position Statement, Doc. 125 at 4 ("Plaintiffs allege the Big 3 are jointly liable for any *abatement damages* awarded."); *see also* Plaintiffs' Cabell Cty. Comm'n and City of Huntington's Notice of Voluntary Dismissal, Case No. 1-17-md-02804-DAP (Doc. 3024, Dec. 19, 2019) at 1 n.1 ("Plaintiffs' *damages* are limited to the 'elimination of hazards to public health and safety and to abate or cause to be abated … a public nuisance.'").  All emphases in this Memorandum are added unless otherwise indicated.

of pharmacy orders annually.  Resolution of this motion will ensure that Plaintiffs' case will be based on post-2016 conduct, as the law requires.

## INTRODUCTION

In *2012*, the State of West Virginia sued AmerisourceBergen and Cardinal Health, alleging—as do Plaintiffs now—that Defendants "flooded" the state with a volume of prescription opioids that was so large as to be suspicious on its face and that Defendants failed to report and halt shipment of these suspicious pharmacy orders, leading to increased addiction and related public expense.  The very fact of the State's high-profile, first-of-its-kind lawsuit put Plaintiffs on notice that they, too, potentially had claims against Defendants for "flooding" the city and county with prescription opioids.  The State's allegations in 2012 went farther, however, providing Plaintiffs a virtual roadmap for their claims.  And there is even more.

One year later, in *2013*, two Huntington residents sued 27 wholesale distributors (plus certain manufacturers, doctors, and others), alleging the use of an "aggressive marketing strategy" that misrepresented the risks and benefits of prescription opioids and a "failure to insure [sic] that the product was distributed properly in accordance with state and federal guidelines."  Also in *2013*, Boone and McDowell Counties, citing an "epidemic" of opioid abuse in the state, sued local pharmacies for "failing to establish effective controls and procedures against diversion of controlled substances," "failing to design an effective system to flag suspicious orders," and "failing to report and inform authorities of suspicious orders."  These lawsuits amplified the inquiry notice provided by the State's 2012 lawsuits against AmerisourceBergen and Cardinal Health.  Then, on January 8, *2016*, the Attorney General sued McKesson based on similar allegations.

Plaintiffs could not have missed these signals that they had potential claims against Defendants and other wholesale distributors.  Yet Plaintiffs waited *five years* to sue Defendants on similar claims, including nuisance.

Even had the West Virginia Attorney General never sued a manufacturer or distributor of prescription opioids, however, Plaintiffs still were on notice long before January 2016 of the claims they now assert, as the allegations of their complaints make clear:

**DEA settlements**.  In *2008*, McKesson agreed to pay more than $13 million to settle claims by the Drug Enforcement Administration ("DEA") alleging that McKesson failed to maintain effective controls against diversion and failed to report suspicious orders.  Also in 2008, Cardinal Health entered into a settlement agreement with the DEA relating to similar allegations, and agreed to pay $34 million in civil penalties.[9]

**178 DEA enforcement actions**.  The DEA filed enforcement actions—178 actions between *2008* and *2012*, according to the Complaint[10]—against various distributors for their alleged failure to maintain effective controls, including failure to report and halt shipment of suspicious pharmacy orders.  These enforcement actions were a matter of public record.  The Attorney General cited one such action and quoted from its allegations in the State's 2012 lawsuit against Cardinal Health.  Several DEA enforcement actions named Defendants and thus informed Plaintiffs (if they did not know already) which companies distributed controlled substances in their communities.

**DEA's publicly-reported data reflecting the volume of distributed opioids**.  Plaintiffs also knew or should have known from the early 2000s that the volume of prescription opioid

---

[9]   Compl. ¶ 788.

[10]   Compl. ¶ 788.

pills distributed to West Virginia pharmacies was increasing.  Plaintiffs allege that "[t]he sheer volume of prescription opioids flooding out of the doors of the … Defendants and into … Plaintiffs' Community, shocks the conscience and required each … Defendant[] to take appropriate action, such as investigating and reporting the orders as suspicious."  Compl. ¶ 1287; *id.* ¶¶ 3–5.  This volume and the upward trajectory of sales has long been a matter of public record available to Plaintiffs.  Beginning in ***2003***, the DEA publicly reported on a quarterly basis the total volume of opioids distributed by zip code (according to the first three digits).  Thus, anyone interested in prescription opioid use in Cabell County could go online and learn how many opioid pills were distributed each quarter to each of the county's two broad zip code areas (255-- and 257--).  And in a four-part series in ***2011***, citing the newspaper's review of DEA data (combined with Census figures), the Charleston Gazette reported that "West Virginia's consumption of the most abused opiate painkillers has skyrocketed over the past decade."[11]  In short, if the volume of opioids being prescribed, distributed, and dispensed was itself a red flag that there was conduct causing a public nuisance, as Plaintiffs allege, Compl. ¶ 1287, then that was public information that Plaintiffs themselves could not have missed.

**Local impact of opioid addiction**.  Plaintiffs knew or should have known the local impact of "flooding" the jurisdiction with prescription opioids—Plaintiffs' alleged injury—***at the time*** the impact occurred and when Plaintiffs allegedly made the increased public expenditures related to opioid addiction.  Plaintiffs allege that they have been "situated at ground zero of the opioid epidemic" for years, and that their communities received a "flood of opioids" that led to

---

[11]   Alison Knezevich, *Prescription Drug Abuse Takes a Deadly Toll in W.Va.*, Charleston Gazette (January 16, 2011); Alison Knezevich, *Medical Staff Grapple with Drug Epidemic*, Charleston Gazette (January 17, 2011); Alison Knezevich, *'AN OPEN SECRET' Prescription Drug Abuse Plagues Small W.Va. Town*, Charleston Gazette (January 23, 2011); Alison Knezevich, *No Magic Pill*, Charleston Gazette (January 24, 2011) (Exs. 1–4).

an increasing number of fatal overdoses.  *Id.* ¶¶ 10–11, 13, 17–18.  They necessarily knew about this when it was happening because their own first responders were reacting to and being affected by it.  Plaintiffs allege that this front-line response caused them to write bigger and bigger checks for law enforcement, fire departments, paramedics, foster care, criminal justice, and medical and health care costs, including addiction treatment, *id.* ¶¶ 13, 19, and Plaintiffs obviously knew when they wrote those checks what they were writing them for, and why.[12]

For all these reasons, Plaintiffs' claims that accrued before January 2016 are time-barred.[13]  As explained below, Plaintiffs' efforts to claim an exception to the statute of limitations fail because: (1) their invocation of the continuing-tort doctrine does not apply, and (2) Plaintiffs cannot prove fraudulent concealment.

**PUBLICLY AVAILABLE, UNDISPUTED FACTS
REGARDING STATUTE OF LIMITATIONS**

The following undisputed, publicly available facts demonstrate that Plaintiffs were on notice of their claims long before they filed suit:[14]

---

[12]   It is irrelevant that Plaintiffs have now disclaimed recovery of past damages.  They allege injury in the form of past, opioid-related public expenditures, and their knowledge of those injuries triggered the statute of limitations.

[13]   For the sake of brevity, the discussion that follows refers to the bar date as January 2016, although that date is 21 days later for Cabell County, which filed suit 21 days after Huntington.

[14]   In the related federal multidistrict litigation, *In re National Prescription Opiate Litigation*, MDL-2804 (the "MDL"), the discovery taken in the cases of the two bellwether Ohio counties included 150 million pages of documents and 400 depositions.  The two counties produced 19.5 million pages of documents and presented 90 current and former employees for deposition.  Much of that discovery concerned when the counties knew or should have known of their potential claims, and Defendants' summary judgment motion regarding the statutes of limitation quoted extensively from the documents produced, and testimony given, by the counties' employees.

Unlike in the MDL, *almost no discovery of Plaintiffs has yet taken place in this case*.  Defendants reserve the right to renew this motion after obtaining discovery from Plaintiffs.

6

1.     In *2006*, DEA issued an order to show cause concerning several McKesson distribution facilities, alleging that McKesson failed to maintain effective controls against diversion and failed to report suspicious orders.  In May *2008*, McKesson entered into a settlement agreement with the DEA relating to those allegations, and agreed to pay more than $13 million in civil penalties.  News of that settlement was written up by wire services and published in newspapers across the country.[15]  One such article noted that McKesson—together with Cardinal Health and AmerisourceBergen—"sell 95 percent of the products purchased by pharmacies from wholesalers," and noted that this "'Big Three'" had "been pinched [by DEA] for lack of oversight when customers, especially small pharmacies, suddenly began ordering controlled substances at much higher rates."

2.     In *2007* and *2008*, DEA commenced four enforcement actions against Cardinal Health, alleging similarly that Cardinal Health failed to maintain effective controls against diversion.  In September *2008*, Cardinal Health entered into a settlement agreement with the DEA relating to those allegations, *id.*, and agreed to pay $34 million in civil penalties.[16]

3.     In *2010*, 24 Mingo County residents sued four doctors, a medical center and a local pharmacy for "over prescribing and inappropriately prescribing addictive pain medications."  The lawsuit accused the defendants of acting in concert to operate a pill mill.[17] That lawsuit led to a nationally reported May 2015 decision by the Supreme Court of Appeals of

---

[15]   "McKesson To Settle U.S. Claims," Los Angeles Times (May 3, 2008) (Ex. 5); Josh Mitchell, "Pharmaceutical Distributor To Pay $13 Million in Fines," The Baltimore Sun (May 3, 2008) (Ex. 6).

[16]   Compl. ¶ 788; "Cardinal Health Inc., Agrees to Pay $34 Million To Settle Claims that It Failed To Report Suspicious Sales of Widely-Abused Controlled Substances," Department of Justice News (Oct. 2, 2008) (Ex. 7).

[17]   Compl., ¶ 1, *Collins v. Tug Valley Pharmacy, LLC, et al.*, No. 10-C-251 (Mingo Cty. Cir. Ct. Aug. 24, 2010) (Ex. 8).

West Virginia that upheld the plaintiffs' standing to sue despite their immoral or wrongful conduct.[18]

4.    In *2011*, the United States Attorney for the Southern District of West Virginia convened a West Virginia Summit on Prescription Drug Abuse that brought together key stakeholders from various organizations and state government entities to discuss current initiatives and future actions to address the "alarming increases in prescription drug abuse" in the state.  The Report and Recommendations of the Summit highlighted West Virginia communities' injuries, noting that the costs of prescription drug abuse are "shouldered by the criminal justice, health care, education, welfare, and workforce systems."[19]

5.    On *June 26, 2012*, the State filed a lawsuit against Cardinal Health in Boone County, alleging that the company had failed to report suspicious orders to the Board of Pharmacy and distributed excessive quantities of prescription opioids between 2007 and 2012.[20] The lawsuit alleged an "epidemic of prescription drug abuse" that had devastated communities across West Virginia, reduced the state's economic productivity, and imposed costs on the state's hospitals, schools, courts, social service agencies, jails, and prisons.  State Compl. ¶ 1.  The lawsuit further alleged that Cardinal Health, "as a major distributor of controlled substances in West Virginia, … supplied controlled substances to rogue drugstores which dispense controlled

---

[18]  *See Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo Cty.*, 235 W. Va. 283, 773 S.E.2d 627 (2015).

[19]  A West Virginia Summit on Prescription Drug Abuse: Report and Recommendations (2011) (Ex. 9)

[20]  Compl., *State ex rel. McGraw v. Cardinal Health, Inc.*, No. 12-C-140 (W. Va. Cir. Ct. Boone Cty. June 26, 2012) ("State Compl.") (Ex. 10).  The State's Complaint was amended twice. *See* Am. Compl., *State ex rel. Morrisey v. Cardinal Health, Inc.*, No. 12-C-140 (W. Va. Cir. Ct. Boone Cty. Jan. 9, 2014) ("State FAC") (Ex. 11); Second Am. Compl., *State ex rel. Morrisey v. Cardinal Health, Inc.*, No. 12-C-140 (W. Va. Cir. Ct. Boone Cty. Aug. 11, 2015) ("State SAC") (Ex. 12).

substances based on bogus prescriptions from unethical physicians who are prescribing controlled substances for illegitimate medical purpose." *Id*. ¶ 13.

6.      The State asserted claims, *inter alia*, for public nuisance, alleging that with knowledge of the "epidemic" Cardinal Health distributed controlled substances "in such quantities and with such frequency that [it] knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes," *id.* ¶ 45, thereby damaging "the health and safety of West Virginia citizens," *id.* ¶ 47.

7.      The State's First and Second Amended Complaints amplified these allegations. The State alleged that its purpose in filing the lawsuits was "to protect West Virginia communities," in part by enjoining Cardinal Health "from distributing controlled substances without sufficient monitoring and controls of suspicious orders, by requiring notice to the State in order to prevent the creation and operation of pill mills and distribution to any other suspicious prescription drug retailers."  State FAC ¶ 4; State SAC ¶ 7.  Concerning its public nuisance claim, the State alleged that Cardinal Health's conduct has "caused ongoing damage, hurt or inconvenience to the public health, the public safety and the general welfare of the citizens of West Virginia."  State FAC ¶ 47; State SAC ¶ 50.

8.      In a second lawsuit filed on ***June 27, 2012***, the State sued 13 more distributors, including Defendant AmerisourceBergen.  The complaint, as amended, made the same and similar allegations of injury and misconduct as did the complaint against Cardinal Health.[21]

9.      The local and national news media reported on the State's two lawsuits against the distributors at the time they were filed.  The Wall Street Journal reported that the Attorney

---

[21]   Am. Compl., *State ex rel. Darrell McGraw v. AmerisourceBergen Drug Corp. et al.*, C.A. No. 12-C-141 (Ex. 13).

General had sued 14 distributors for damages and medical monitoring and to "forc[e] companies to promptly alert state authorities when they see suspicious orders."[22]  The article quoted Attorney General McGraw as saying that the purpose of the lawsuit was to make distributors accept responsibility and pay "for their illicit actions."  He also stated his intention to interdict the "'pill mill' process that include[s] medical providers and pharmacies."  The Charleston Gazette's lede was:  "State authorities want to stop more than a dozen out-of-state drug companies that they say are selling suspicious amounts of prescription pills to West Virginia pharmacies."[23]  The article identified the defendant-distributors and, regarding Cardinal Health, also reported (as did the West Virginia Record) that the DEA had filed a separate action alleging that Cardinal Health had sold a "'staggeringly high'" volume of controlled pills to pharmacies.[24]  Both outlets reported the Attorney General's statement that prescription drug abuse places "enormous burdens on hospitals, courts, law enforcement and communities."  MetroNews reported that the Attorney General had filed the lawsuits in Boone County because Southern West Virginia had been "hit the hardest by prescription drug abuse," although the problem of prescription opioid abuse, according to the Attorney General, was "everywhere in West Virginia" and was "cost[ing] West Virginians $430 million a year."[25]  The article also reported the Attorney General's statement that the State had previously sued and settled with certain manufacturers, securing funding "for drug offender rehabilitation, alternative sentencing options

---

[22]   Jon Kamp, *West Virginia Sues Drug Distributors in Pill-Abuse Fight*, Wall St. J. (June 27, 2012) (Ex. 14).

[23]   Zac Taylor, *McGraw Targets "Pill Mill" Suppliers*, Charleston Gazette (June 27, 2012) (Ex. 15).

[24]   *Id.*; Chris Dickerson, *McGraw Files Suits Against 'Pill Mill' Distributors*, West Virginia Record (June 26, 2012) (Ex. 16).

[25]   Metro News Staff, *AG Takes on Pill Mills*, Metro News (June 27, 2012) (Ex. 17).

and Day Report Centers throughout the state." *See also W. Va. AG sues 14 pain pill mills*, The Intelligencer, June 27, 2013, at 16 (Ex. 18); Lawrence Messina, *W.Va. AG sues pain drug distributors*, The Clarksburg Exponent Telegram, June 27, 2012, at A8 (Ex. 19); Jon Kamp, *Corporate news: State sues drug distributors*, Wall Street Journal, June 28, 2012 (Ex. 20).[26]

      10.     Cardinal Health disclosed the State litigation in its Form 10-K filed with the SEC in August **2014**.[27]

      11.     After the State sued AmerisourceBergen and Cardinal Health in 2012, the State's private counsel urged various West Virginia counties to bring similar lawsuits against the distributors.  On **August 21, 2012**, they made a presentation to the Boone County Commission to explain why it should sue the "out-of-state" distributors for "dumping" opioids in Boone County,[28] after which the Commission authorized counsel to investigate the county's potential claims.[29]

---

[26]   The Court can take judicial notice of public filings—and public reporting about them. *Schenker AG v. Société Air Fr.*, 102 F. Supp. 3d 418, 422 (E.D.N.Y.  2015); Fed. R. Evid. 201; *see, e.g.*, *Cook v. Mildred Mitchell-Bateman Hosp.*, 2016 WL 1306648, at *1 & n.2 (S.D. W. Va. Apr. 1, 2016).

[27]   *See* Cardinal Health, Inc., Annual Report (Form 10-K) (filed Aug. 13, 2014) at 45, http://d1lge852tjjqow.cloudfront.net/CIK-0000721371/002928a6-efcf-4a53-90d0-44475be46180.pdf (excerpt attached as Ex. 21).

[28]   Audio Transcription, Boone County Commission Meeting (Aug. 21, 2012) ("Boone Tr.") at 5:2–3, 10:4–8 (Ex. 22).  Cardinal Health had the written transcript prepared from the audio, which is attached in full as Ex. 23.  Also attached as Ex. 24 is a clip that contains the relevant portion of the meeting.

[29]   Summary, Boone County Commission Regular Session at 4 (Aug. 21, 2012) (Ex. 25); Boone Tr. at 14:8–16.

      The factual record, absent these facts about Boone and Kanawha Counties, is more than sufficient to establish that Plaintiffs' claims are time-barred.  Discovery from Plaintiffs has only just begun, however, and it will almost certainly amplify the record—by showing, for example, that the same counsel who solicited Boone and Kanawha Counties (or others) also advised Plaintiffs that they too should sue Defendants.

12.     On **August 21, 2013**, McDowell County sued five local pharmacies, alleging that they dispensed an excessive number of prescription pain pills.[30]  And on **September 3, 2013**, Boone County filed suit against six local pharmacies, making similar allegations.[31]  Both the Charleston Gazette-Mail and the local newspaper reported on the filing of the lawsuit.[32]

13.     On **February 7, 2013**, the State's private counsel also made a presentation to the Kanawha County Commission.  The president of the Commission acknowledged his familiarity with the State's lawsuit and with what he called a "shocking number" of overdose deaths.  Like its Boone County counterpart, the Kanawha County Commission asked counsel to evaluate the county's costs related to opioid addiction, including "the sheriff's cost, and the city police cost," and "money from the state health insurance plan."[33]

14.     Also in **2013**, two Huntington residents sued various manufacturers, distributors, pharmacies, doctors and others (71 in all).  That lawsuit, like this one filed four years later, alleged that: "Defendants' aggressive marketing strategy … misrepresented the appropriate uses

---

[30]   *See* Compl., *Cty. Comm'n of McDowell Cty. v. Black Diamond Pharmacy LLC, et al.*, No. 13-C-148S (McDowell Cty. Cir. Ct. Aug. 21, 2013) (Ex. 26).  Like Boone County, McDowell County dropped its lawsuit.

[31]   *See* Compl., *Cty. Comm'n of Boone Cty. v. Larry's Drive-In Pharmacy, Inc., et al.*, No. 13-C-180 (Boone Cty. Cir. Ct. Sept. 3, 2013) (Ex. 27).  Days later, Boone County dropped the suit. Summary, Boone County Commission Meeting 3 (Sept. 17, 2013) (Ex. 28).

[32]   *See* E. Eyre, *Boone Reconsiders 'Pill Mill' Lawsuit*, Charleston Gazette-Mail (Sept. 16, 2013); E. Eyre, *Boone County Officials Drop 'Pill Mill' Suit*, Charleston Gazette-Mail (Sept. 18, 2013); Editorial, *Our View: Counties Should Not Be Suing Local Businesses; Boone Officials Have Smeared the Good Reputations of Six Pharmacies*, Charleston Daily Mail (Sept. 20, 2013); Staff, *Boone Co. Drops Lawsuit Against 6 Pharmacies*, Logan Banner (Sept. 25, 2013) (Exs. 29-32).

[33]   Video Transcription, Kanawha County Commission Meeting (Feb. 7, 2013) ("Kanawha Tr.") at 5:7–9 ("Now, my understanding is that the Attorney General's office has some litigation right now . . . ."); *id*. at 11:11–20, 12:13–18, 13:17–19 (Ex. 33).  The written transcript was prepared from the video, which is attached as Ex. 34.  Also attached as Ex. 35 is a clip that contains just the relevant portion of the meeting.

of the drugs and failed to adequately disclose and discuss the safety issues and possible adverse

effects of said drug use;" and "Defendants were negligent … [for] failure to insure [*sic*] that the

product was distributed properly in accordance with state and federal guidelines."[34]

15. Also in *2013*, the Governor's Advisory Council on Substance Abuse (created in

2011) issued its Progress & Recommendations Report. The Report addressed the

disproportionate number of opioid-related deaths in the state and the financial cost of substance

abuse.[35]

16. Newspapers throughout the state reported on the "opioid epidemic" in the years

before Plaintiffs filed the lawsuits in this Court, and even before the Attorney General sued

distributors in 2012. The Charleston Gazette published a four-part series in January *2011* that

said:

- West Virginia's per capita consumption of prescription opioids had "soared" from 1999 to 2009, based on data from DEA.

- "West Virginia has the nation's highest rate of drug deaths," with "more than nine out of 10 of those deaths involv[ing] prescription drugs."

- "'There's obviously a supply that exceeds the legitimate demand,'" quoting the Chief Deputy Attorney General, "whose office sued the makers of OxyContin in 2001."

- "Federal and state authorities are handling an ongoing investigation of the clinics" that over-prescribed opioids and that prescription drug abuse was one the U.S. Attorney's "top concerns."[36]

---

[34] Compl. ¶¶ 90–157, *Stephens v. Dean, et al.*, No. 13C-131 (Wayne Cty. Cir. Ct. June 29, 2013) (Ex. 36).

[35] The Governor's Advisory Council on Substance Abuse, Progress & Recommendations Report for Governor Earl Ray Tomblin (Dec. 31, 2013) (Ex. 37).

[36] *See supra* note 5 (Exs. 1-4).

17.     Indeed, The Gazette in *2011* made the following statements that would feature as allegations in Plaintiffs' complaints six years later:[37]

- "Things changed in the 1990s," with West Virginia and other states passing "laws saying doctors could not be disciplined or criminally punished for treating pain with controlled substances," and doctors thinking that "writing prescriptions is the easy way out."

- Medical societies "released guidelines encouraging expanded use of opiates to manage chronic pain."

- The Veteran's Administration adopted the slogan, "Pain is the fifth vital sign" and instructed doctors to have patients rate their pain on a 1 to 10 scale.

- The Joint Commission on the Accreditation of Hospitals similarly "issued guidelines requiring hospitals and nursing homes to regularly measure patients' pain."

- During this time, "pharmaceutical companies aggressively marketed opiate painkillers such as OxyContin."[38]

18.     Newspapers in other parts of the state also wrote articles along similar lines:

- The Wheeling News Register wrote in *July 2012* about local residents having become "drug tourists" who regularly obtained opioids in Florida for resale in West Virginia, resulting in a steady "flow of painkillers, whose prevalence have made drug overdoses the leading cause of accidental death in dozens of states."[39]

- Two editorials in The Intelligencer in early *2015* lamented the decline of workforce participation that they attributed to the ongoing "war against drug abuse," and praised efforts to educate school students on the dangers of prescription painkiller abuse, often a "common thread" in drug overdoses.[40]

---

[37]  Alison Knezevich, *Clinic Balances Pain Care, Abuse Dangers*, Charleston Gazette (January 17, 2011) (Ex. 38).

[38]  *See* Compl. ¶ 410.

[39]  Andrew Welsh-Huggins, *States Fight Drug "Tourists,"* Wheeling News-Register, July 9, 2012 (Ex. 39).

[40]  Editorial, *Drugs Affecting W. Va. Economy*, Intelligencer, Jan. 3, 2015, at 4 (Ex. 40); Editorial, *Teach Students About Pain Pills*, Intelligencer, Jan. 6, 2015, at 4 (Ex. 41).

- The Clarksburg Exponent Telegram said in early *2015* that "West Virginia has the highest drug overdose death rate in the nation," noting the efforts of legislators to permit first responders to administer Naloxone, an "opioid antagonist," to overdose victims.[41]

- Also in early *2015*, The Clarksburg Exponent Telegram described the efforts of area drug task forces in combating "prescription pill crimes"[42] and "prescription pill trafficking,"[43] recounted the guilty pleas of drug dealers admitting allegations that "oxycodone was obtained in Detroit, New Jersey and Florida for redistribution in Northern West Virginia,"[44] and wrote about a local town hall meeting at which the United States Attorney for the Northern District of West Virginia said that opioid abuse had become "a public health crisis."[45]

- And The Gazette in October *2015* reported on President Obama's visit to Huntington to highlight the problem of opioid abuse—an event at which Governor Tomblin spoke about State efforts to "stem the flood of opioid abuse," including "shutting down 11 'pill mills.'"[46]

19.    On *January 8, 2016*, the Attorney General sued McKesson.  That lawsuit, like the 2012 lawsuits against AmerisourceBergen, Cardinal Health and other distributors, alleged that the company had "flooded" the state with prescription opioids and failed to report and halt shipment of suspicious orders.

---

[41]    Linda Harris, *Overdose Drug Naloxone Dubbed "Double-Edged Sword,"* Clarksburg Exponent Telegram, Jan. 11, 2015, at D1 (Ex. 42).

[42]    *Elkins Drug Task Force Recognized*, Clarksburg Exponent Telegram, Jan. 21, 2015 (Ex. 43).

[43]    *Task Force Probes Result in 41 Total Arrests in 2014*, Clarksburg Exponent Telegram, Jan. 31, 2015 (Ex. 44).

[44]    Matt Harvey, *Feds Tackle Drug Cases in Harrison, Randolph*, Clarksburg Exponent Telegram, Feb. 11, 2015, at A3 (Ex. 45).

[45]    Brittany Murray, *Bridgeport Hosts Meeting to Address Drug Abuse Problem*, Clarksburg Exponent Telegram, Jan. 30, 2015, at A1 (Ex. 46).

[46]    David Gutman, *In WV, Obama Talks Prevention, Treatment to Fight Opioid Epidemic*, Charleston Gazette-Mail, Oct. 22, 2015 (Ex. 47).

# ARGUMENT

## THE PLAINTIFFS' CLAIMS ARE TIME-BARRED.

### A.    Plaintiffs' Nuisance Claim Accrued Before January 2016

The applicable statute of limitations for public nuisance is one year.  W. Va. Code § 55-2-12(c).[47]  Thus, Plaintiffs may not assert claims based on conduct that occurred more than one year before they filed suit.[48]

Plaintiffs have now admitted that their "Nuisance Claims Arose Prior to May 25, 2015."[49]  That unqualified assertion, made in a submission to this Court, is a judicial admission and is alone dispositive of this motion.  *See In re McNallen*, 62 F.3d 619, 625 (4th Cir. 1995) ("[R]epresentations made in the course of litigation, whether oral or written, are binding[.]") (citing *EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046, 1050 (3d Cir. 1993).[50]

That admission, however, only concedes what the undisputed factual record puts beyond doubt.  Plaintiffs allege that Defendants "flooded" West Virginia with prescription opioids because they failed to report and halt shipment of suspicious pharmacy orders.  Compl. ¶¶ 323, 761, 1414.  But Plaintiffs knew this years before they filed suit in January and March 2017.  The DEA had leveled the same allegations in enforcement actions that led to well-publicized settlements with McKesson and Cardinal Health *in 2008*.  And the State had leveled the same

---

[47]   MLP Hr'g Tr. 19–20, Dec. 6, 2019 (Ex. 48).

[48]   The general rule in West Virginia, as Plaintiffs acknowledge, "is that a cause of action accrues or arises when the acts constituting breach of a duty occurs resulting in an injury." Motion To Strike at 11 (citing *Albright v. White*, 202 W. Va. 292, 301, 503 S.E.2d 860, 869 (1998) (quoting Syl. Pt. 1, in part, *Cart v. Marcum*, 188 W.Va.241, 423 S.E.2d 644 (1992); *Jones v. Trustees of Bethany College*, 177 W. Va. 168, 351 S.E.2d 183 (1986)).

[49]   Motion To Strike at 10, 11–12.

[50]   The continuing-tort doctrine does not apply, but, even if it did, Plaintiffs' claims that accrued before January 19, 2016 are time-barred.  *See infra* Part B.  Plaintiffs cannot prove fraudulent concealment.  *See infra* Part C.

allegations against 14 distributors (i.e., a group that included AmerisourceBergen and Cardinal Health) in *2012*.

Thus, well before 2016—one year before they filed suit—Plaintiffs were on notice of their potential claims because: (1) the DEA's *2008* settlements and the State's *2012* complaints were a matter of public record; (2) state and national newspapers reported on the lawsuits in *2012*; and (3) the Attorney General told the local newspapers in *2012* that the problem of prescription opioid abuse was "everywhere in West Virginia" and was "cost[ing] West Virginians $430 million a year." On top of that, (4) Cardinal Health (for one) disclosed the lawsuit to investors in *2014*; (5) private counsel for the State in *2012* and *2013* solicited various counties to follow the State's lead in suing distributors; and (6) two Huntington residents sued Defendants (and others) in *2013* alleging a failure to ensure that prescription opioids were "distributed properly in accordance with state and federal guidelines." Plaintiffs, in sum, had notice upon notice.

That notice was more than a general awareness of the crisis of opioid addiction or their own alleged financial injury. And it was more than mere knowledge of the roster of wholesale distributors. The State's complaints provided Plaintiffs with a *template*, complete with factual allegations and causes of action, for bringing suit against distributors. What is more, those complaints pointed Plaintiffs to additional templates—the DEA's 178 enforcement actions between 2008 and 2012.

Plaintiffs also were on inquiry notice based on the barrage of media coverage about the opioid crisis in the years before 2015. Plaintiffs recite formulaically that they could not have discovered their claims through reasonable diligence. Compl. ¶ 1204. But their complaint concedes they were on notice of (1) the crisis of opioid abuse, (2) its many alleged harms and

17

costs, (3) the alleged obligation that distributors had to report suspicious pharmacy orders to DEA, and (4) the public fact that DEA filed 178 enforcement actions against various registrants from 2008 to 2012 alleging that they had failed to comply with their regulatory obligations. Compl. ¶¶ 4–12, 14–19, 692–695, 788.

And Plaintiffs also knew or should have known that the very information they allege was telltale evidence of Defendants' purported misconduct.  Plaintiffs contend that "***the sheer volume*** of prescription opioids flooding out of the doors of the … Defendants and into communities across the country, including the Plaintiffs' Community, shocks the conscience and required each [Defendant] to take appropriate action, such as investigating and reporting the orders as suspicious."  Compl. ¶ 1287.  But the "sheer volume"—for each West Virginia county down to three-digit zip code prefix—was public information as of ***2003***.  And the DEA updated that information on a quarterly basis for the next 14 years before Plaintiffs filed suit in 2017.  *See supra* pp. 4-5.  Thus, information about the "sheer volume" of opioid distribution was available to Plaintiffs at the same time that they were seeing and experiencing first-hand the problem of opioid addiction in their communities.

Accordingly, Plaintiffs were on notice of all they needed to know to trigger the one-year statute of limitations clock.  Because Plaintiffs did not sue until 2017, they cannot assert claims based on pre-2016 conduct.

**B.     The Continuing-Tort Doctrine Does Not Apply and, Even If It Did, Does Not Save Plaintiffs' Claims That Accrued Outside of the Statutory Period.**

Plaintiffs assert that their claims are not time-barred, relying in part upon the continuing-tort doctrine.  Compl. ¶ 1199.  The doctrine does not apply and, even if it did, it does not save Plaintiffs' claims that arose outside of the statute-of-limitations period.  That is because the doctrine does not extend the limitations period, but only preserves claims for conduct ***within the***

18

*limitations period* that, absent a continuing tort, would have expired.  In other words, it preserves claims only for that part of the continuing tortious conduct that occurred within the limitations period.

### 1.    The doctrine does not apply

The continuing-tort doctrine does not apply for two reasons.  First, tortious conduct is deemed "continuing" only "where events, which for all practical purposes are identical, [i] occur repeatedly, [ii] at short intervals, [iii] in a consistent, connected, rhythmic  manner."  *DeRocchis v. Matlack, Inc.*, 460 S.E.2d 663, 669 n.4 (W. Va. 1995).  The examples of such conduct provided in West Virginia case law almost exclusively involve water and/or land.[51]  The nuisance Plaintiffs allege, however, results from personal injuries—namely, the opioid addiction of Plaintiffs' residents—and it is opioid addiction and its effects that Plaintiffs seek to "abate."  No West Virginia court has applied the doctrine to financial loss from personal injuries (much less to financial loss from personal injuries caused by use or misuse of a product).

Second, the doctrine applies as a general rule to continuing ***conduct***, not continuing (*i.e.*, permanent or lingering) injury.  The state plaintiffs rely on *State ex rel. Smith v. Kermit Lumber*, Syl. 11, 488 S.E.2d 901, 905 (W. Va. 1997), a case involving "a business site containing

---

[51]  *See Graham v. Beverage*, 566 S.E.2d 603, 614 (W. Va. 2002) (applying continuing tort doctrine where a storm water management system redirected water onto the plaintiffs' land, leading to repeated flooding.  The defendant's negligent failure to correct the problem "constitute[d] continuing wrongful conduct from which continuing injuries emanate[d]."  *Id.*; *see also Handley v. Town of Shinnston*, 289 S.E.2d 201, 202–03 (W. Va. 1982) (per curiam) (water transmission line continually leaked water, causing damage to plaintiffs' yard and house); *Taylor v. Culloden Pub. Serv. Dist.*, 591  S.E.2d 197, 205 (W. Va. 2003) (wastewater treatment plant continuously dumped untreated sewage into a river);  *State ex  rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 916–17 (W. Va. 1997), *aff'd in part*, 636 F.3d 88 (2011) (continued presence of arsenic on business site, and continuous leakage from the site); *Rhodes v. E.I. du Pont de Nemours & Co.*,  657 F. Supp. 2d 751, 760–61 (S.D. W. Va. 2009) (continuing emission of perfluorooctanoic acid into the water supply).

19

hazardous waste found in the soil and flowing into the waters of this State." But the holding in the case—as the Supreme Court expressly noted—was an exception to the general rule that the continuing tort doctrine focuses on the defendant's conduct. In focusing on the continued presence of the environmental hazard in *Kermit Lumber*, the Supreme Court stated that "in the case before us, we are only concerned with a public nuisance involving hazardous waste which is found in the soil and leaching into a river." And the Court explained both that "[*a*] ***different public nuisance action may warrant a different analysis***" and why. 488 S.E.2d at 925 n. 29.[52] A "different analysis" would be appropriate because:

> [I]n that a nuisance is a tort, we acknowledge that ***generally '[a] continuing tort sufficient to toll a statute of limitations is occasioned by continued unlawful acts***, not by continual ill effects from an original violation, and for there to be a continuing tort there must be a continuing duty.

*Id*. (quoting 54 C.J.S. Limitations of Actions § 177 (1987) (emphasis added by court)). The general rule, in other words, is that the continuing tort doctrine applies only if there is continuing tortious conduct.

The law has always sharply distinguished between (i) continuing wrongful conduct and (ii) conduct that causes injury that continues into the future.[53] For example, the worker who loses her sight in an industrial accident has a "continuing" injury (his blindness) and future

---

[52] This action is altogether different from the public nuisance actions recognized in West Virginia case law, which all concern interference with property. *See* J. Lewin, *The Silent Revolution in West Virginia's Law of Nuisance*, 92 W. Va. L. Rev. 235, 268 (1990) ("The West Virginia nuisance decisions share one common factor, however: *all* of the opinions reflect the unresolved tension between the rights of plaintiffs to the undisturbed enjoyment of their *property* and the rights of defendants to make productive use of their *property*.").

[53] *See Roberts v. W. Va. Am. Water Co.*, 655 S.E.2d 119, 124 (W. Va. 2007) ("To be clear, the distinguishing aspect of a continuing tort with respect to negligence actions is continuing tortious conduct, that is, a continuing violation of a duty owed the person alleging injury, rather than continuing damages emanating from a discrete tortious act.").

damages (e.g., the costs of a seeing-eye dog or personal attendant; a computer reader), but the statute of limitations runs from the date of the accident because the wrongful conduct is not continuing.[54]

Here, the Distributors' allegedly wrongful conduct is not the kind that is "continuing" in nature.  It is not at all like the dumped arsenic in *Kermit Lumber*.  Each shipment of medicines is a discrete and separate event, made in response to discrete and separate orders placed by pharmacies, whose characteristics and ordering histories themselves changed over time. Moreover, the decisions to make (or to report to regulators) such shipments were made by Distributors using policies and procedures that changed over time.[55]  Such decisions, although they must be made routinely, are inherently different from leakage into a river at a toxic waste site and are not the stuff of a continuing tort.

## 2.     If the doctrine applied, it would permit recovery only for conduct within the one-year limitations period

Even if the continuing-tort doctrine applied, it would allow Plaintiffs to recover damages only *if* they state a cognizable claim[56] and *if* they can prove wrongdoing within that time period.[57]

---

[54]   *See*, e.g., *Caldwell v. A.H. Robins Co.*, 577 F. Supp. 796, 797 (W.D. Pa. 1984), *aff'd*, 735 F.2d 1347 (3d Cir. 1984) ("plaintiff is not entitled to a new limitations period to begin with the appearance of each new injury or complication").  *See also Nicolo v. Phillip Morris, Inc.*, 201 F.3d 29, 39 (1st Cir. 2000) (given plaintiff's knowledge that she had been "hooked" on cigarettes for years, any subsequent misrepresentation by defendants concerning their intent and knowledge bore no causal relation to plaintiffs' condition).

[55]   For example, AmerisourceBergen, Cardinal Health and McKesson, entered into separate settlements with DEA in 2007 (AmerisourceBergen) and 2008 (Cardinal Health and McKesson) that led to changes to their controlled substance monitoring systems.

[56]   Defendants do not concede that Plaintiffs have stated a cognizable nuisance claim. Assuming *arguendo* that Plaintiffs (i) have stated a cognizable nuisance claim and (ii) can prove it, they can recover at most for conduct that occurred within the statute-of-limitations period.

[57]   This will be a tall order.  Plaintiffs' counsel told the Court in 2017 that Defendants were then "doing their job."  Hr'g Tr. (June 20, 2017) at 73 (Ex. 49) (Plaintiffs' counsel: people who

Putting those "ifs" aside, even if the doctrine applied, it does not "toll" claims that accrued outside the statutory period. The doctrine would allow Plaintiffs to recover ***only*** for conduct that occurred ***within*** the statute-of-limitations period.  *See Taylor v. Culloden Pub. Serv. Dist.*, 591 S.E.2d 197, 205 n.21 (W. Va. 2003) (applying the continuing tort doctrine, but explaining that "the damages that [the plaintiffs] can recover … are ***limited to the two-year period in time prior to filing of their*** [***nuisance***] ***cause of action***"); *Henry v. Ohio River R. Co.*, , 21 S.E. 863, 867 (W. Va. 1895) (""[T]he general rule as to nuisances applies to this case" and "[t]hat rule is that every continuance from day to day is a new nuisance, for which a fresh action lies, so that, though action for the original nuisance be barred, damages are recoverable for the statutory period for injuries within it …."); *Patrick v. Sharon Steel Corp.*, 549 F. Supp. 1259, 1265 (N.D. W. Va. 1982) (where continuing tort doctrine applies, "***the recovery is limited to such damages as accrued  within the statutory period before the action***") (emphasis in original)); *see* Lewin, 92 W. Va. L. Rev. at 315 ("For a temporary nuisance, the expiration of the two-years statute of limitations [for damage to real property] is a bar only to recovery of damages occurring more than two years prior to suit, whereas for a permanent nuisance it would be a total bar.").[58]  The

---

are addicted can "no longer get the legal drugs *because the defendants are finally doing their job*").

[58] *See also Yancey v. Clark Atlanta Univ.*, 431 F. App'x 816, 818 (11th Cir. 2011) (per curiam) ("[T]he plaintiff in a continuing tort suit can recover for any damages that  were suffered within [the applicable statute of limitations period] prior to the filing of the suit." (second alteration in original) (internal quotation marks omitted)); *Huffman v. United States*, 82 F.3d 703, 705 (6th Cir. 1996) (recovery for a  temporary nuisance claim is limited to damages within the limitations period preceding initiation of action); 25 *Cyclopedia of Law and Procedure* 1138 (William Mackel ed. Am Law Book Co. 1907) ("Where continuing or recurring injury results from a wrongful act or from a condition  wrongfully created and maintained … so long as the cause of the injury exists and the damages continue to occur plaintiff is not barred of a recovery for such damages as have accrued within the statutory period beyond the action, although a cause of action based solely on the original wrong may be barred.").

statute of limitations forecloses Plaintiffs' attempt to recover money damages based upon conduct that occurred before the relevant limitations periods.

The following example illustrates this principle.  A plaintiff who knew ten years ago that his neighbor's irrigation system was flooding his land, but waited nine years to sue, would be altogether barred by the statute of limitations from suing for the damage caused by the flooding absent some exception.  If the irrigation system was continuing to flood the property in a "consistent, connected, rhythmic manner," however, the continuing-tort doctrine could apply and provide that exception.  But the doctrine would not excuse the plaintiff's failure to sue during the first nine years when he knew about the flooding.  Under the authority cited above, the doctrine would operate to preserve a nuisance remedy only for the continuing conduct (and damage) within the year before filing suit.   To allow the plaintiff to recover for the first nine years of interference and injury when he did nothing to assert his rights would contravene the letter and function of the statute of limitations.

In short, even if the continuing tort doctrine applies, and Plaintiffs can prove their nuisance claim, they can recover, at most, damages for the alleged wrongful conduct that occurred within the one-year statutory period before filing suit—*i.e.*, since January 2016.

### 3.    Plaintiffs seek non-injunctive, monetary relief

Plaintiffs have said before (and likely will say again) that the statute of limitations does not run so long as the nuisance remains unabated.[59]  But while it is true that the statute of limitations does not bar the government from ***enjoining*** a continuing nuisance, Plaintiffs are not suing to enjoin Defendants.  Indeed, they informed this Court in June 2017 that persons addicted

---

[59]   Compl. ¶ 1199.

to opioids "no longer can get the legal drugs [that Defendants distribute to pharmacies] *because the defendants are finally doing their job*."[60]

Plaintiffs deploy the term "abatement" as if it were a talisman that nullifies the statute of limitations. But the law looks to the nature and substance of the relief, not the label Plaintiffs attach to it. And Plaintiffs are seeking a massive award of monies, the greater part of which would go for medical treatment for addicted individuals. Such an award—(i) monies (ii) to reimburse public expenditures (iii) for public programs designed to treat problems of addiction that were allegedly caused by (iv) conduct that occurred years before January 2016—is not equitable in nature. It is like the cost of providing a personal injury plaintiff who lost her legs in an automobile accident with a personal attendant for life. Such costs are future damages for past wrongful conduct and past injury.[61] Plaintiffs acknowledged as much when they moved to sever all claims but their public nuisance claim, stating that they "intend to seek only *money damages*

---

[60]   Tr. of Hearing (June 20, 2017), *Cabell Cty. Comm'n v. AmericourceBergen Drug Corp.*, *et al.*, at 73.

[61]   In a submission to the Mass Litigation Panel, the state plaintiffs cited an opinion by the MDL court for the proposition that abatement is a prospective remedy, then baldly asserted that "[b]ecause abatement and future damages are prospective remedies, there is no statute of limitations for discovery relating to these damage claims." Plaintiffs' Joint Mem. of Law Regarding Statute of Limitations As It Relates to Discovery, *In re Opioid Litig.*, Civil Action No. 19-C-9000 (Kanawha Cty. Cir. Ct. Feb. 7, 2020) (Ex. 50) at 11. That assertion was doubly misleading.

First, Defendants are unaware of any West Virginia court that has so held, and the MDL court did not so hold in the opinion quoted by the plaintiffs (which did not even concern the statute of limitations). Second, regarding the plaintiffs' recovery of future costs for the treatment of persons who became addicted to opioids in the past, the MDL said, "*That's not equitable, and that's not abatement*." Hr'g Tr. (Sept. 16, 2019) at 12-16; *see* Hr'g Tr. at 15 (Oct. 15, 2019) (granting defendants' motion in limine to exclude evidence and argument regarding future damages: "that's granted, because plaintiffs can't seek future damages").

for the 'elimination of hazards to public health and safety and to abate or cause to be abated ... a public nuisance.'"[62]

Ultimately, however, it does not matter what label Plaintiffs or the Court attach to the relief Plaintiffs seek. Under West Virginia law, Plaintiffs cannot recover based upon **conduct** occurring prior to January 2016. That is so even if Plaintiffs continue to incur expense as a result of that conduct into the future. And it is so even if the payments they seek from Defendants to defray those future expenses are called "abatement."

### C.   Plaintiffs Have Not Alleged and Cannot Prove the Elements Necessary to Invoke the Fraudulent Concealment Doctrine.

To toll the statute of limitations based on fraudulent concealment, Plaintiffs must plead and prove "active concealment of information ***from a party*** with the intent to thwart ***that party's*** effort to conduct an investigation." *Michael v. Consolidation Coal Co.*, 2017 WL 1197828, at *13 (N.D.W. Va. Mar. 31, 2017), *aff'd per curiam*, 773 F. App'x 767 (4th Cir. 2019) (quoting *Kessel v. Leavitt*, 511 S.E.2d 720, 752 (W.Va. 1998)); *Merrill v. W. Va. Dep't of Health & Human Res.*, 632 S.E.2d 307, 318, n.22 (W. Va. 2006) (per curiam) (internal quotation marks omitted) ("Fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any act or omission tending to suppress the truth is enough."). This requirement calls for conduct both (i) directed at the plaintiff and (ii) designed to frustrate any investigation. And fraudulent concealment also requires the existence of a duty to disclose. *Trafalgar House Constr., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 300 (W. Va. 2002) ("Fraudulent concealment involves the concealment of facts by one with

---

[62]   Motion To Sever at 2 (bold-italics-underlining in original). While Plaintiffs' recent Position Statement (Doc. 125 at 4) disclaims "all past and future economic losses," we do not understand that formulation to amend Plaintiffs' prior declaration that they intend to seek <u>only</u> money damages ... to abate ... a public nuisance."

knowledge or the means of knowledge, ***and a duty to disclose***, coupled with ***an intention to mislead or defraud***.").  Plaintiffs have not pled, and cannot prove, such facts.

To begin with, the allegations of fraudulent concealment principally concern "the Marketing Defendants"—namely, the manufacturers of prescription opioids.  There are no comparable allegations against AmerisourceBergen, Cardinal Health, or McKesson.

Regarding AmerisourceBergen, Cardinal Health, and McKesson, the allegations of fraudulent concealment are boilerplate and not pleaded with the requisite particularity.[63]  They fail to identify a single act of concealment apart from the underlying alleged misconduct (e.g., failing to report and halt shipment of suspicious orders).  *See Michael*, 2017 WL 1197828, at *13 ("[F]raudulent concealment requires 'active concealment of information from a party with the intent to thwart that party's effort to conduct an investigation.'") (internal citation omitted); *Trafalgar House* 567 S.E.2d at 300.  Plaintiffs cannot credibly allege, much less prove, such concealment.  What Plaintiffs call the "epidemic" of opioid addiction was not hidden from county and city officials.  Nor was the "sheer volume" of pills to which Plaintiffs attribute the epidemic.[64]

Apart from concealment, Plaintiffs do not allege the requisite duty.  Any purported obligation that Defendants had to report and halt shipment of suspicious pharmacy orders ran to the DEA and the West Virginia Board of Pharmacy, not Plaintiffs.

---

[63]   Compl. ¶ 1200 (alleging in conclusory terms that "Defendants … undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, the Plaintiff, and Plaintiff's community, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered … distributor status in the State and to continue generating profits").

[64]   *See supra* 4-5.

Nor do Plaintiffs allege the requisite intent to frustrate any investigation. They do not allege such intent directed at either the DEA or the Board of Pharmacy—which regulate Defendants and therefore from which agencies Defendants arguably might have reason to conceal wrongful conduct—much less any such intent directed at Plaintiffs, which do not regulate Defendants and with which Defendants do not have any dealings.

Plaintiffs allege that Defendants concealed "the ARCOS database" and thereby prevented them from "confirm[ing]" the identities of potential defendants. Compl. ¶ 1206. But that excuse does not wash for three reasons. First, the DEA "owns," operates, and controls access to the ARCOS database. Second, Plaintiffs *did* have access to the ARCOS data showing the volume of opioids distributed to West Virginia counties, cities and towns by 3-digit zip code—i.e., the very information that Plaintiffs contend showed that things were amiss.[65] Third, given the DEA's enforcement actions (2008-2012) as well as the State's nuisance actions against AmerisourceBergen, Cardinal Health, and McKesson (2012, 2016), Compl. ¶ 788, Plaintiffs cannot, and do not, claim that they did not know or could not have discovered Defendants' identities long before Plaintiffs filed suit in 2017. That may be true for the smaller distributors and self-distributing pharmacies that Plaintiffs sued and have since dismissed. But it is not true for the three largest distributors: AmerisourceBergen, Cardinal Health, and McKesson. The statute of limitations begins to run when the plaintiff can by the exercise of due diligence discover the defendant's identity, not when the plaintiff can "confirm" that identity with definitive proof.

---

[65] *See* Eric Eyre, *Drug Firms Poured 780M Painkillers Into WV Amid Rise of Overdoses*, N.Y. Times (Dec. 17, 2016) (Ex. 51).

## CONCLUSION

For the foregoing reasons, Plaintiffs' nuisance claim is barred by the statutes of limitations.

Dated:  March 20, 2020

By:   */s/ Gretchen M. Callas*
    Gretchen M. Callas (WVSB #7136)
    gcallas@jacksonkelly.com

    JACKSON KELLY PLLC
    Post Office Box 553
    Charleston, West Virginia 25322
    Telephone: (304) 340-1000
    Facsimile: (304) 340-1050

Robert A. Nicholas
rnicholas@reedsmith.com
Shannon E. McClure
smcclure@reedsmith.com

    REED SMITH LLP
    Three Logan Square
    1717 Arch Street, Suite 3100
    Philadelphia, PA 19103
    Tel: (215) 851-8100
    Fax: (215) 851-1420

***Counsel for AmerisourceBergen Drug Corporation***

Respectfully submitted,

## CARDINAL HEALTH, INC.

By:   */s/ Steven R. Ruby*
    Brian A. Glasser (WVSB #6597)
    bglasser@baileyglasser.com
    Steven R. Ruby (WVSB #10752)
    sruby@baileyglasser.com

    BAILEY & GLASSER, LLP
    209 Capitol Street
    Charleston, WV 25301
    Telephone: (304) 345-6555
    Facsimile: (304) 342-1110

***Counsel for Cardinal Health, Inc., in Cabell County Commission action***

By: */s/ David R. Pogue*
Michael W. Carey (WVSB #635)
David R. Pogue (WVSB #10806)
mwcarey@csdlawfirm.com
drpogue@csdlawfirm.com

    CAREY, SCOTT, DOUGLAS & KESSLER, PLLC
    901 Chase Tower
    707 Virginia, East
    Charleston, West Virginia 25301
    Phone: (304) 345-1234
    Fax: (304) 342-1102

***Counsel for Cardinal Health, Inc., in City of Huntington action***

By:  */s/  Jeffrey M Wakefield*
 Jeffrey M. Wakefield (WVSB #3894)
 jwakefield@flahertylegal.com

  FLAHERTY SENSABAUGH
  BONASSO PLLC
  P.O. Box 3843
  Charleston, WV 25338-3843
  Telephone:  (304) 345-0200

 Mark H. Lynch
 Christian J. Pistilli
 Laura Flahive Wu
 Megan A. Crowey

  COVINGTON & BURLING LLP
  One CityCenter
  850 Tenth Street NW
  Washington, DC 20001
  Telephone (202) 662-6000

**Counsel for McKesson Corporation**

Enu Mainigi
emainigi@wc.com
F. Lane Heard III
lheard@wc.com
Ashley W. Hardin
ahardin@wc.com

 WILLIAMS & CONNOLLY LLP
 725 Twelfth Street, N.W.
 Washington, DC 20005
 Telephone: (202) 434-5000
 Facsimile: (202) 434-5029

**Counsel for Defendant Cardinal Health, Inc.**

**CERTIFICATE OF SERVICE**

I, Steven R. Ruby, counsel for Defendant Cardinal Health, do hereby certify that service of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE STATUTE OF LIMITATIONS** was filed electronically via the CM/ECF electronic filing system and served on all counsel registered in the system.

Dated:  March 20, 2020

*/s/ Steven R. Ruby*
Steven R. Ruby (WVSB #10752)

30