**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

THE CITY OF HUNTINGTON,

        Plaintiff,

v.                                                        CIVIL ACTION NO. 3-17-01362

AMERISOURCEBERGEN DRUG                Hon. David A. Faber
CORPORATION, et al.,

        Defendants.

-------------------------------------------------

CABELL COUNTY COMMISSION,

        Plaintiff,

v.                                                        CIVIL ACTION NO. 3-17-01665

AMERISOURCEBERGEN DRUG                Hon. David A. Faber

CORPORATION, et al.,

        Defendants.

**BRIEF OF *AMICUS CURIAE* STATE OF WEST VIRGINIA SUPPORTING
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT: *RES JUDICATA* AND RELEASE OF CLAIMS**

# TABLE OF CONTENTS

INTRODUCTION AND INTERESTS OF *AMICUS CURIAE*.................................................. 1

ARGUMENT ......................................................................................................................... 2

   I.   West Virginia Courts Have Already Rejected The Argument That The
       Settlement Agreements Bar Plaintiffs' Claims ................................................. 2

  II.   The State Settlement Agreements Deliberately Did Not Resolve Or
       Release Claims Of Political Subdivisions.......................................................... 5

 III.   *Res Judicata* Does Not Bar This Action Because There Is No Privity
       Between Plaintiffs And The State ..................................................................... 8

     A. There Is No Presumption That A State Settlement Resolves Claims
        Of Political Subdivisions ........................................................................... 9

     B. Under West Virginia Law The State Settlement Agreements Did Not
        Release Plaintiffs' Claims......................................................................... 11

 IV.   *Res Judicata* Is Defeated Because This Action Involves Distinct
       Claims From Those The State Settled ............................................................ 14

CONCLUSION................................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ball v. Freeman*,
    77 W. Va. 156, 87 S.E. 91 (1915) ........................................................................6

*Beahm v. 7-Eleven, Inc.*,
    223 W. Va. 269, 672 S.E.2d 598 (2008) ....................................8, 11, 13, 14, 16, 19

*Butler v. Tucker*,
    187 W. Va. 145, 416 S.E.2d 262 (1992) ...............................................................11

*City of Martinez v. Texaco Trading & Transport, Inc.*,
    353 F.3d 758 (9th Cir. 2003) ...............................................................................10

*City of New York v. Beretta U.S.A. Corp.*,
    315 F. Supp. 2d 256 (E.D.N.Y. 2004) ..................................................................18

*Cty. Com'n of Greenbrier Cty. v. Cummings*,
    228 W. Va. 464, 720 S.E.2d 587 (2011) ...............................................................11

*Dan Ryan Builders, Inc. v. Crystal Ridge Development, Inc.*,
    239 W. Va. 549, 803 S.E.2d 519 (2017) .................................................................2

*Envtl. Def. Fund, Inc. v. Higginson*,
    631 F.2d 738 (D.C. Cir. 1979) ...............................................................................9

*Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*,
    196 W. Va. 97, 468 S.E.2d 712 (1996) ...................................................................6

*Galanos v. Nat'l Steel Corp.*,
    178 W. Va. 193, 358 S.E.2d 452 (1987) ...............................................................13

*Gladstone Realtors v. Vill. of Bellwood*,
    441 U.S. 91 (1979) ...............................................................................................18

*Harris Cty., Tex. v. CarMax Auto Superstores Inc.*,
    177 F.3d 306 (5th Cir. 1999) ...............................................................................10

*In re Certified Question*,
    638 N.W.2d 409, 465 Mich. 537 (2002) .................................................................9

*In re Lease Oil Antitrust Litig. (No. II)*,
    16 F. Supp. 2d 744 (S.D. Tex. 1998) ....................................................................11

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*In Re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804 (N.D. Ohio Nov. 11, 2019), ECF No. 2893-1 ..................................................3

*Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*,
957 F.2d 1153 (4th Cir. 1992) ..........................................................................................3, 4

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
470 U.S. 373 (1985) ...........................................................................................................2, 10

*Martin v. Wilks*,
490 U.S. 755 (1989) ...........................................................................................................5, 6

*Meador v. Cty. Court of McDowell Cty.*,
141 W. Va. 96, 87 S.E.2d 725 (1955) .....................................................................................12

*Nash Cty. Bd. of Educ. v. Biltmore Co.*,
640 F.2d 484 (4th Cir. 1981) ........................................................................................2, 9, 10

*New Jersey v. New York*,
345 U.S. 369 (1953) ..................................................................................................................9

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ....................................................................................................5

*Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*,
296 F.3d 308 (4th Cir. 2002) ....................................................................................................2

*South Carolina v. North Carolina*,
558 U.S. 256 (2010) ............................................................................................................9, 10

*State ex rel. Discover Fin. Servs., Inc. v. Nibert*,
231 W. Va. 227, 744 S.E.2d 625 (2013) .................................................................................14

*State ex rel. Parsons v. Zakaib*,
207 W. Va. 385, 532 S.E.2d 654 (2000) ...................................................................................3

*State v. Ehrlick*,
64 S.E. 935 (W. Va. 1909) ......................................................................................................14

*U.S. ex rel. May v. Purdue Pharma L.P.*,
737 F.3d 908 (4th Cir. 2013) .............................................................................................5, 6

*United States v. Olin Corp.*,
606 F. Supp. 1301 (N.D. Ala. 1985) .......................................................................................17

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

**Statutes**

W. Va. Code § 5-3-1 ........................................................................................................12

W. Va. Code § 5-3-2 ........................................................................................................12

W. Va. Code § 7-1-1 ........................................................................................................12

W. Va. Code § 7-1-3kk ...............................................................................................12, 16

W. Va. Code § 8-10-1a .....................................................................................................12

W. Va. Code § 8-12-1 .......................................................................................................12

W. Va. Code § 8-12-5 ..................................................................................................12, 16

W. Va. Code § 14-2-3 .......................................................................................................11

W. Va. Code § 16-3-6 .......................................................................................................12

W. Va. Code § 29-12A-3 ...................................................................................................11


**Rule**

4th Cir. L. R. App. P. 29 .....................................................................................................1


**Other Authority**

19 Charles A. Wright et al., *Federal Practice & Procedure*, § 4507 (1982) ...................................3

**INTRODUCTION AND INTERESTS OF *AMICUS CURIAE***

The State of West Virginia files this brief pursuant to Fourth Circuit Rule of Appellate Procedure 29(a)(2), which permits States to file *amicus curiae* briefs without consent of the parties or leave of the Court.  The State has a strong interest in the proper interpretation of West Virginia law on issues of statewide importance, and in ensuring that the settlement agreements it signed with Defendants Cardinal Health, AmerisourceBergen Drug Corporation, and McKesson ("Defendants") are interpreted consistent with their terms and the parties' agreed intent.

With the exception of the scope of the Attorney General's common-law authority to bring public nuisance claims, the State strongly agrees with the arguments of the Cabell County Commission and the City of Huntington ("Plaintiffs") that their claims are not barred by *res judicata* and were not released by the State's settlements with Defendants.  These are state-law claims, this exact argument has already been rejected by a state circuit court, the West Virginia Supreme Court of Appeals declined to modify or reverse that decision, and the State's multi-district litigation panel adopted the circuit court's *res judicata* order (among others) as law of the case in very similar actions.  To this federal court applying state law, these decisions are strong reasons to conclude that West Virginia law does not favor Defendants' claims.

Further, the settlement agreements between the State and the Defendants do not bar claims brought by political subdivisions simply because their claims stem from the same course of events.  West Virginia gives its cities and counties broad power to litigate for themselves—indeed, state law expressly authorizes Plaintiffs to bring these claims.  Plaintiffs were not part of the prior litigation and neither participated in nor agreed to the settlements' terms.  And despite Defendants' repeated efforts to include political subdivisions in the settlement agreements, the State soundly rejected their proposed language and both parties ultimately agreed to terms that released claims

on behalf of the State and state entities alone.  Defendants thus seek to bind Plaintiffs to agreements to which they never agreed, in litigation they did not bring.  Neither the settlement agreements nor West Virginia preclusion law requires such an inequitable result.

## ARGUMENT

I.   **West Virginia Courts Have Already Rejected The Argument That The Settlement Agreements Bar Plaintiffs' Claims.**

Defendants' motions turn on state law, as federal courts sitting in diversity must refer "to the preclusion law of the State in which the judgment was entered."  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).  Consistent with this rule, the Supreme Court even called out by name a Fourth Circuit decision on which Defendants heavily rely because the court assessed the preclusive effect of a state-court judgment under federal rules of preclusion instead of North Carolina law.  *Id*. at 382 n.5 (1985) (discussing *Nash Cty. Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981)).  This distinction between federal and state law has practical consequences, "because West Virginia's rules of *res judicata* and claim preclusion differ somewhat from the rules used by federal courts."  *Dan Ryan Builders, Inc. v. Crystal Ridge Development, Inc.*, 239 W. Va. 549, 558, 803 S.E.2d 519, 528 (2017).

Where a State's high court has not definitively resolved the issue in question, federal courts' task is to predict "how that court would rule if presented with the issue."  *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).  There is little need to guess here.  Although the West Virginia Supreme Court of Appeals has not squarely resolved whether a State settlement can preclude local governments from pursuing public-nuisance claims arising from the same course of events, a state circuit court has already rejected the same argument Defendants raise here, and the Supreme Court of Appeals declined to reverse that order.

In 2018, Cardinal attempted to dismiss a similar lawsuit brought by other West Virginia counties against the Defendants in state court, claiming that the *same* settlement with the State it relies on here barred that action on *res judicata* and release grounds. *See* Notice of Supplemental Authority Ex. 1, at 1, *In Re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (N.D. Ohio Nov. 11, 2019), ECF No. 2893-1. The Circuit Court of Marshall County denied Cardinal's motion to dismiss "in its entirety," finding no preclusion based in part on lack of privity between the counties and the State and because the state Attorney General did not have authority to represent or release the counties' claims. *Id.* at 3-5, 9.

State lower court decisions, like this one, are good "indicia" of how state law resolves a specific question. *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992) (quoting 19 Charles A. Wright et al., *Federal Practice & Procedure* § 4507, at 94-95 (1982)). That indicia is especially strong here because the Marshall County court was presented with *this exact question*, rather than issues of claim preclusion more generally. On-point state lower court decisions should only be disregarded "if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.*

Here, the "data" shows that the Supreme Court of Appeals would not reach a different result. Cardinal sought a writ of prohibition to overturn the circuit court's decision, yet in June 2019 the Supreme Court of Appeals unanimously barred relief. Notice of Supplemental Authority, ECF No. 2893, at 2. Prohibition lies under West Virginia law to correct "substantial, clear cut" errors, *State ex rel. Parsons v. Zakaib*, 207 W. Va. 385, 388, 532 S.E.2d 654, 657 (2000), and the Supreme Court of Appeals is often generous with this remedy. For example, although in many jurisdictions a writ of prohibition is granted only rarely, a Westlaw search shows that the Supreme Court of Appeals granted almost half of the writs before it last year—10 out of 22 reported and

unreported cases brought under the Court's original jurisdiction.  Combined with the gravity, high-profile nature, and financial stakes of this issue, the state supreme court's failure to intervene on such an important question is strong evidence of its views on the merits.  Even Cardinal appears to recognize the significance of these state-court decisions: Cardinal filed a motion to dismiss on the same grounds Defendants raise here before Judge Polster in the MDL, but withdrew its fully briefed motion last November—19 days after it filed a notice informing Judge Polster of the state courts' rulings.  Withdrawal of Cardinal Health, Inc.'s Pending Mot. to Dismiss, *In Re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (N.D. Ohio Nov. 20, 2019), ECF No. 2942; Notice of Supplemental Authority, ECF No. 2893, at 1.

West Virginia's Multi-District Litigation Panel has also recognized the weight the Marshall County court's decisions carry, explaining that it will follow that court's decisions under the doctrine of law of the case.  Pls.' Mem. Opp. Defs.' Mot. Summ. J. Ex. H at 4, ECF No. 242-8.  Although the order did not specifically discuss the *res judicata* decision, there is no indication the court had reason to treat it separately—again, despite the significance of the issue for the litigation as a whole.  This action provides additional, albeit indirect, support that West Virginia law does not support Defendants' motions.

Principles of comity to state courts when interpreting state law thus strongly militate in favor of denying Defendants' motions.  Despite a clear opportunity to weigh in, the Supreme Court of Appeals refused to undo the Marshall County court's judgment in a case raising the identical question at issue here.  This Court is thus not writing on a blank slate; in the absence of "persuasive data" to counter the lower state court's interpretation of West Virginia law, its work is done.  *See Liberty Mut. Ins. Co.*, 957 F.2d at 1156.

## II.     The State Settlement Agreements Deliberately Did Not Resolve Or Release Claims Of Political Subdivisions.

Moving to the State's settlement agreements—the basis of Defendants' motions—neither the agreements' text nor principles of contract interpretation support dismissal.  To the contrary, the agreements were negotiated against the backdrop of a growing swell of lawsuits by political subdivisions, and while the settling Defendants tried to include provisions that would have specifically released claims like these, the State rejected those requests and Defendants chose to settle anyway.  The settlement agreements are thus no talisman to escape potential liability under these separate actions.

The traditional "res-judicata inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement." *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 913 (4th Cir. 2013).  In such cases, "the preclusive effect of a judgment . . . can be no greater than the preclusive effect of the agreement itself."  *Id*.  And background principles of contract law apply when interpreting the scope of a settlement agreement to ensure focus on "the intent of the parties."  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009) (citation omitted).  Further, the preclusive effects of a settlement agreement or consent decree are often *less* broad than those of a fully litigated case because these agreements "resolve[] issues as among [the parties], but [do] not conclude the rights of strangers to those proceedings."  *Martin v. Wilks*, 490 U.S. 755, 762 (1989).

Here, the language of the agreements speaks against binding Plaintiffs.  The State signed three separate agreements with the Defendants, each worded the same in relevant part.  *Compare* Cardinal Mot. Summ. J. Ex. 4, ECF No. 216-4, *with* McKesson Mot. Summ. J. Ex 1, ECF No. 222-1, *and* AmerisourceBergen Mot. Summ. J. Ex. 2, ECF No. 226-2.  Plaintiffs (nor any other political subdivision, for that matter) are neither addressed in nor signatories to the agreements—

5

the agreements are bereft of language concerning cities, counties, or municipalities.  The omission of these entities is telling, because when interpreting agreements courts "assume that [the parties] did not intend" to include terms they left out.  *Ball v. Freeman*, 77 W. Va. 156, 87 S.E. 91, 91 (1915).

Likewise, "[i]t is a principle of general application in Anglo-American jurisprudence" that parties are "not bound by a judgment" if they were not "designated as a party . . . [or] made a party by service of process."  *Martin*, 490 U.S. at 761 (citation omitted).  While there are "limited exceptions to the general rule," parties litigate with knowledge that unless an entity is "duly summoned to appear in a legal proceeding," that entity "may rest assured that a judgment recovered therein will not affect his legal right."  *Id*. at 762 n.2, 763 (citation omitted).  And generally speaking, American law puts the burden on the "parties to a lawsuit" to bring in additional parties "where such a step is indicated, rather than placing on potential additional parties a duty to intervene when they acquire knowledge of the lawsuit."  *Id*. at 765.  As a result, if Defendants had wanted to assure themselves that the settlement agreements would release claims of Plaintiffs and other political subdivisions, they could have sought to join them as necessary parties.  Because they did not take this step, the ordinary rule applies that agreements do not bind non-signatories. *May*, 737 F.3d at 914.

Nevertheless, even if the agreements were ambiguous on this point, extrinsic evidence of the parties' negotiating history shows that the parties specifically considered—but ultimately rejected—language that would have included Plaintiffs' claims.  *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont,* 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996).

The threat of political subdivisions bringing lawsuits related to the opioid epidemic was a concrete concern while the State negotiated its settlements with Defendants.  Far from a

6

hypothetical issue or something the parties failed to consider, McDowell County filed the first local-government lawsuit against Defendants days before the parties were ordered to finalize and publicly disclose the terms of the settlement agreements with Cardinal Health and AmerisourceBergen Drug Company, and Defendants were on notice that there were likely many more to come.  Pls.' Mem. Opp. 4-5, ECF No. 242.  The McKesson settlement was not finalized until May 2019, and by then Plaintiffs' actions had been pending for almost two years—along with over 100 more.  Pls.' Mem. Opp. 9, ECF No. 242.

This context makes it unsurprising that Defendants pressed for language to expressly release the claims of political subdivisions like Plaintiffs.  Yet although the parties considered language releasing those claims, the State did not agree, and Defendants chose to settle anyway. Cardinal Health produced an email and attachments showing three separate places where it tried— unsuccessfully—to include language releasing municipal claims.  Pls. Mem. Opp. Ex. D, ECF No. 242-4.  First, it proposed expanding the definition of "Releasor" to include "subdivisions" and "political subdivisions (as that term is defined [in] Chapters 5 and 29 of the West Virginia Code)." Pls.' Mem. Opp. Ex. E at 6, ECF No. 242-5.  The State rejected this language, and the definition in the final settlement includes "the State," acting "on its own behalf and on behalf of its departments, agencies" and other *state* entities.  Cardinal Mot. Ex. 4 at 4, ECF No. 216-4.  Second, the State rejected outright language that would have indemnified Defendants against any claim by "any 'Political Subdivision' and/or 'Municipality' in the State of West Virginia."  Pls.' Mem. Opp. Ex. E at 10, ECF No. 242-5.  Third, the State rejected language "[a]ccept[ing] the Settlement Payment on its behalf and on behalf of the citizens of West Virginia through its *parens patriae* authority."  Pls.' Mem. Opp. Ex. E at 6, ECF No. 242-5.  Instead, the final agreement explains that

"the State" released current and future claims—not the claims of political subdivisions.  Cardinal

Mot. Ex. 4 at 5, ECF No. 216-4.

Because the State's settlement agreements with the other Defendants are materially the

same, there is no reason to think that the agreed-to language has broader meaning there, either.

Counsel for AmerisourceBergen Drug Company was included on the same email chain discussing

Cardinal's three proposals, yet agreed to identical releases.  Pls.' Mem. Opp. Ex. D at 2, ECF No.

242-4.   And given the explosion of municipal lawsuits between late 2016 and spring 2019,

McKesson had even more notice of its potential exposure under an agreement that released state

claims alone.

Thus, far from attempting to bind political subdivisions, the settlement agreements go out

of their way *not* to include political subdivisions.  Any ambiguity over their scope must be resolved

in favor of the parties' intent, as supported by the language they did and did not include.

### III.    *Res Judicata* **Does Not Bar This Action Because There Is No Privity Between Plaintiffs And The State.**

The Court should also deny Defendants' motions because Defendants cannot meet their

burden to establish the affirmative defense of claim preclusion.  Together with the other elements

of a *res judicata* claim, West Virginia law requires defendants to prove that the relevant actions

"involve either the same parties or persons in privity with those same parties."  *Beahm v. 7-Eleven,*

*Inc.*, 223 W. Va. 269, 274, 672 S.E.2d 598, 602 (2008) (quotation omitted).  It is impossible for

Defendants to satisfy this element because West Virginia law makes clear that Plaintiffs are legally

distinct from and not in privity with the State.  For the same reasons, the State could not and did

not release Plaintiffs' statutory claims.

8

### A. There Is No Presumption That A State Settlement Resolves Claims Of Political Subdivisions.

To begin, Defendants are wrong that the Court should presume the West Virginia Attorney General spoke for West Virginia municipalities and other political subdivisions when settling claims against the Defendants in 2016 and 2019. There is no universal presumption that state Attorneys General may preclude localities' claims because (as explained above) the preclusive nature of a state action depends on state law—not federal. Defendants' purported examples to the contrary involve different States with their own regimes defining the powers of and relationship between their Attorneys General and political subdivisions. *E.g.*, Cardinal Mem. 15 & nn.24-25, ECF No. 220 (citing cases arising from North Carolina (*Nash*, 640 F.2d at 493) and Michigan (*In re Certified Question*, 638 N.W.2d 409, 465 Mich. 537 (2002)) to support argument that the West Virginia Attorney General "has common-law authority to represent not only citizens, but also political subdivisions of the State").

Cases involving leave to intervene in actions between States under the Supreme Court's original jurisdiction are likewise unavailing. Redress in those cases is available exclusively in federal court, and the actions are even further distinct from this case because they originate in the Supreme Court. That unique context demands an unusually "high" standard for "intervention in original actions by nonstate entities." *South Carolina v. North Carolina*, 558 U.S. 256, 267 (2010); *see also New Jersey v. New York*, 345 U.S. 369, 373-74 (1953); *Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979) (drawing guidance from "rigorous compelling interest" in original action jurisprudence when determining whether to allow political subdivision to intervene in action involving State). The demanding standard "serves the twin purposes of ensuring that due respect is given to sovereign dignity" in cases between States and "providing a working rule for good judicial administration" as original actions "tax the limited resources of [the] Court" and take

it outside its ordinary appellate role. *South Carolina*, 558 U.S. at 266-67 (citation omitted). Even setting aside the additional differences between permissive intervention and mandatory claim preclusion, the same concerns do not apply to a diversity action between nonstate entities in a federal trial court. This line of cases thus does not displace the rule that the power of a state Attorney General, like the *res judicata* standard itself, is a matter of state law.

Indeed, federal courts routinely engage in a contextual examination of state law when determining whether political subdivisions are in privity with their State. In *City of Martinez v. Texaco Trading & Transport, Inc.*, 353 F.3d 758 (9th Cir. 2003), for instance, the Ninth Circuit did not rely on any presumption that States speak for political subdivisions, but rather examined whether the State had actually served as a city's representative in one action before concluding that the city's subsequent action was not precluded. *Id.* at 764. Similarly, the Fifth Circuit concluded that an El Paso, Texas injunction did not bind Harris County—despite the Texas Attorney General's involvement in the prior litigation—because under Texas law the Attorney General does not necessarily speak for Texas counties. *Harris Cty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 318 (5th Cir. 1999).

So too for the Fourth Circuit. Defendants rely heavily on the 1981 *Nash* decision holding under *federal res judicata* principles that the North Carolina Attorney General's earlier lawsuit bound a later suit brought by local school districts on the same legal theory. 640 F.2d at 493. Yet as explained above, the Supreme Court rebuked that reasoning four years later, referencing *Nash* directly and explaining that the Fourth Circuit erroneously "applied federal preclusion principles" instead of looking in the "first instance to state law to determine the preclusive effect of the state judgment." *Marrese*, 470 U.S. at 382 n.5. Were *Nash* decided today, binding Supreme Court precedent would direct the Fourth Circuit to examine North Carolina law to determine preclusion.

10

*See also In re Lease Oil Antitrust Litig. (No. II)*, 16 F. Supp. 2d 744, 749 (S.D. Tex. 1998), *aff'd*, 200 F.3d 317 (5th Cir. 2000) (noting doubt over *Nash*'s continued vitality).  In short, there is no federal-law basis to find Plaintiffs' claims are precluded.

**B.  Under West Virginia Law The State Settlement Agreements Did Not Release Plaintiffs' Claims.**

With no presumption that a settlement agreement involving the State necessarily resolves a political subdivision's claims related to the same course of events, the proper question for assessing privity or release of claims is whether Plaintiffs were included in the agreements as a matter of state law.  They were not.

*First*, West Virginia law is clear that although cities and counties are creatures of the State, they are not the "same parties."  *Beahm*, 223 W. Va. at 274, 672 S.E.2d at 603.  When establishing the framework for bringing claims against the State, the West Virginia Code specifically excludes "county commissions, county boards of education, municipalities, [and] any other political or local subdivision of the state regardless of any state aid that might be provided" from the definition of "state agency."  W. Va. Code § 14-2-3.  The same is true where the Code discusses claims against political subdivisions: There, "State" encompasses each branch of state government as well as boards, agencies, departments, and more, but expressly "does not include political subdivisions." W. Va. Code § 29-12A-3(e).  Political subdivisions also have considerable authority in their own right under the State Constitution and Code because the State's founders were "concerned with an assurance of local self-government."  *Cty. Com'n of Greenbrier Cty. v. Cummings*, 228 W. Va. 464, 469, 720 S.E.2d 587, 592 (2011) (citation omitted).  As two examples of this principle, a "county commission is not considered to be an agency or unit of the executive branch of government," and commissions are protected by the Constitution "in the supervision and administration of the internal police and fiscal affairs of their counties."  *Butler v. Tucker*, 187 W.

11

Va. 145, 151, 416 S.E.2d 262, 268 (1992); *see also Meador v. Cty. Court of McDowell Cty*., 141 W. Va. 96, 109, 87 S.E.2d 725, 734 (1955).

Most relevant here, political subdivisions have power to sue and be sued in their own name. *See* W. Va. Code § 7-1-1(a).  Likewise, they may hire counsel to represent themselves in legal proceedings, *see id.* § 8-10-1a, unlike most state officers and entities that are represented by the Attorney General, *id.* § 5-3-1.  There is also no dispute that municipalities have express statutory authority to bring public-nuisance actions: County commissions may sue to abate public nuisances "affecting public health and safety."  *Id.* § 7-1-3kk; *see also id.* § 8-12-5(23) (same for "every municipality"); *id.* § 16-3-6 (similar for county and municipal health officers); *id.* § 8-12-1(3) (empowering municipalities to "institute . . . any civil action or other proceeding").

By contrast, the Attorney General's statutory and common law powers stop short of authority to represent municipalities in litigation without their explicit permission—much less to release claims on their behalf.  The Attorney General "shall defend" actions involving statewide entities and officers, but there is no corresponding duty to represent local entities.  W. Va. Code § 5-3-2.  Indeed, the Attorney General does not even *advise* political subdivisions; although the Attorney General gives "written opinions and advice" to all manner of state officers and entities, *id.* § 5-3-1, he weighs in on local issues only when county prosecutors request legal advice "in matters relating to the official duties of their office."  *Id.* § 5-3-2.  State-specific divisions of authority accordingly make clear that the State did not represent Plaintiffs in the earlier litigation nor release claims on their behalf.

*Second*, Plaintiffs were not parties to the State's actions and the concept of "virtual representation" when assessing privity does not apply.  Even though West Virginia municipalities had cases pending against many of the same Defendants before the relevant State actions were

12

settled, Pls.' Mem. Opp. 4-5, 9, ECF No. 242, neither Plaintiffs nor any other political subdivisions were joined to the State actions.  Nor are Plaintiffs in privity with the State because their claims arise from the same course of events.  The Supreme Court of Appeals demands more than "a common interest between the prior and present litigants" for privity to attach and refuses to "imply privity to all who derive injury from a single wrongful act." *Beahm*, 223 W. Va. at 273, 672 S.E.2d at 602 (citation omitted).  Instead, privity requires a "*substantial* identity of interests with a nonparty." *Id.* (emphasis added).

The concept of "virtual representation" is also no basis for privity.  This doctrine applies where a nonparty "actively participated in and exercised control over the conduct of the prior litigation" and "impliedly consents to abide by a prior judgment," and where the nonparty's "actions involve deliberate maneuvering or manipulation in an effort to avoid the preclusive effects of a prior judgment." *Galanos v. Nat'l Steel Corp.*, 178 W. Va. 193, 195, 358 S.E.2d 452, 454 (1987) (citation omitted).  None of those factors are present here.  There is no evidence that Plaintiffs actively participated in or controlled the State's actions, and in fact they did not.  Plaintiffs also did not agree—expressly or impliedly—to be bound by the State's settlements.  Nor can Defendants cite any evidence of manipulation on Plaintiffs' part to try to avoid being held to the terms of settlement agreements they neither negotiated nor signed.  These factors are fatal— Defendants have not pointed to a single West Virginia case where nonparties who did not engage in manipulative efforts to avoid preclusion were nonetheless prevented from proving their case.  In fact, the primary case Defendants champion found virtual representation on wholly different facts: In *Beahm*, the entities were represented by the same attorney and repeatedly attempted to join each other in crisscrossing state and federal cases in an effort to avoid a preclusive judgment.  223 W. Va. at 274, 672 S.E.2d at 603.  Plaintiffs are thus not closely enough connected to the State

13

to be deemed in privity for purposes of *res judicata*.   This is an independent basis to reject Defendants' motions.

**IV.    *Res Judicata* Is Defeated Because This Action Involves Distinct Claims From Those The State Settled.**

Finally, Plaintiffs' claims are not barred because Defendants cannot meet their burden to show that "the cause of action identified for resolution in the subsequent proceeding either [is] identical to the cause of action determined in the prior action" or "could have been resolved, had it been presented, in the prior action." *Beahm*, 223 W.Va. at 274, 672 S.E.2d at 603.   Plaintiffs have independent legal interests and injuries that the State did not and could not release, as the Legislature's decision to grant municipalities express authority to abate public nuisances confirms.

As an initial matter, allowing Plaintiffs' claims to proceed does not require endorsing an unduly narrow view of the Attorney General's ability to challenge public nuisances in court. Although the State strongly agrees with most of Plaintiffs' brief, state law is clear that the Attorney General retains common-law authority in this space.   As early as 1909 the Supreme Court of Appeals held that the State's Attorney General inherited common-law authority to sue for injuries caused by public nuisances. *State v. Ehrlick,* 64 S.E. 935, 939 (W. Va. 1909).   Seven years ago the same court confirmed that the Attorney General retains all common-law powers at least as long as the Legislature does not explicitly divest the Attorney General of this authority—and that this assessment must be made on a case-by-case basis. *State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 231 W. Va. 227, 249, 744 S.E.2d 625, 647 (2013).   Because no statute expressly removes or limits the Attorney General's authority to bring public nuisance actions to vindicate the State's interests, the State has the ability to bring public-nuisance claims related to public health and safety.   At a minimum, the Supreme Court of Appeals has never held otherwise.

14

Nevertheless, the Court need not resolve complex matters of state law concerning the division of powers between the West Virginia Attorney General and the State's political subdivisions to deny Defendants' motions.  *First*, the Court can reject Defendants' arguments on any of the separate bases discussed above or in Plaintiffs' opposition, including deference to prior state-court decisions on this precise question and the language and negotiating history of the settlement agreements themselves.

*Second*, the settlement agreements make clear that the State agreed to release *parens patriae* claims that the State or state entities have power to bring, but not claims any other entity could bring under different legal authority.  As explained above, *supra* Part II, the State released claims *it* could have brought under its *parens patriae* authority—claims "that *the State* has asserted or could have asserted on its own behalf or in its *parens patriae* capacity," and "subject to the conditions set forth herein."  Cardinal Mot. Ex. 4 at 5, ECF No. 216-4 (emphasis added).  And because "the State" could not have asserted claims arising under statutes directed to political subdivisions, the effect of releasing the State's *parens patriae* claims and refusing to expand the category of "Releasor" to include political subdivisions is that only the State of West Virginia and state entities are barred from future *parens patriae* claims.  A fair reading of the agreed language thus leaves Plaintiffs free to bring public-nuisance claims arising under their *separate* statutory authority.

Further, reading the settlements in context with the provision the parties considered—but left out—avoids Defendants' double-recovery concerns.  The parties specifically omitted language providing that the State accepted settlement funds "on behalf of the citizens of West Virginia under a *parens patriae* theory."  Pls.'s Mem. Opp. Ex. E at 6, ECF No. 242-5.  By rejecting this language accepting settlement payments for West Virginia's citizens, the parties foreclosed the argument

that it would be inequitable to allow Plaintiffs to act on the power the agreements reserved to them because their citizens have already been paid. As a result, the State's settlements are no obstacles to suit from other entities with power to raise a public-nuisance claim in their own right.

*Third*, although the State does not endorse the view that statutes giving cities and counties authority to abate public nuisances implicitly limit the Attorney General's authority, the Legislature's decision to unambiguously give political subdivisions this power underscores that they have interests in this arena—separate from the State's—that could not "have been resolved . . . in the prior action." *Beahm*, 223 W.Va. at 274, 672 S.E.2d at 603.

West Virginia Code Section 7-1-3kk grants county commissions power to enact ordinances aimed at "the elimination of hazards to public health and safety" with criminal misdemeanor penalties, as well as to "abate or cause to be abated anything which the commission determines to be a public nuisance." W. Va. Code § 7-1-3kk. All municipalities are likewise given authority "to abate or cause to be abated anything which in the opinion of a majority of the governing body is a public nuisance." *Id.* § 8-12-5(23). The Legislature's specific focus on abatement in these statutes reflects that local government bodies are often directly harmed by public nuisances and that these entities frequently bear the brunt of injury from *ongoing* public nuisances. As Plaintiffs explain, the State's actions did not seek the specific remedy of abatement, and there are important differences between remedies like damages and injunctions and more forward-looking relief like abatement measures. Pls.' Mem. Opp. 22, ECF No. 242. The Legislature specifically tailored municipalities' authority in this area to actions for abatement; combined with the State actions' different focuses, this is additional evidence that Plaintiffs are not attempting to re-litigate the same claims that the State settled for itself and on behalf of state—but not local—entities.

16

This case highlights the distinct legal interests of political subdivisions when bringing public-nuisance claims under these statutes. As Plaintiffs explain, they plainly have independent injuries from the public nuisance they allege. Pls.' Mem. Opp. 18-19, ECF No. 242. In Plaintiffs' Third Amended Complaint, for example, they specifically allege harm to their own interests in the form of "significant expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services," as well as "stigma damage, non-physical property damage, and damage" to "proprietary interests." Pls.' Third Am. Cmpl. 431-32, ECF No. 76. Similarly, Plaintiffs repeatedly allege harm not only to their constituents, but also to themselves. Plaintiffs allege that Defendants' conduct created an injury to the public, "which is the proximate cause of, and/or substantial factor leading to Plaintiffs' injury," Pls.' Third Am. Cmpl. 424, ECF No. 76, that Defendants' conduct caused "devastating consequences to Plaintiffs," *id.* at 426, that Plaintiffs faced "increased costs and expenses relating to healthcare services, law enforcement, the criminal justice system, social services, education systems, and property maintenance and clean-up," *id.* at 427, and that as a result of Defendants' conduct the Plaintiffs "incurred expenditures for special programs over and above Plaintiffs' ordinary public services" because of "wrongful acts which are neither discrete nor of the sort a local government [could] reasonably expect," *id.* at 432.

The nature of Plaintiffs' interests thus distinguishes the cases Defendants cite that analyze the consequences of a *parens patriae* suit on future *citizen* lawsuits. In *United States v. Olin Corp.*, 606 F. Supp. 1301 (N.D. Ala. 1985), for instance, the court held that a *parens patriae* lawsuit brought by Alabama and the United States barred a later suit by private citizens of Alabama on *res judicata* grounds. *Id.* at 1308. As local governments were not parties to the second suit, the court said nothing about whether the same analysis would have applied to Alabama's cities and counties.

17

And it certainly did not analyze the effects of any express statutory authority that Alabama law may give to municipalities, but not to private citizens.

The better analysis comes from a case involving the City of New York—which analyzed in detail the precise question here.  In *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256 (E.D.N.Y. 2004), the court considered a *res judicata* challenge to the City's lawsuit on the basis that the State of New York had previously brought a nuisance claim "in its *parens patriae* capacity."  *Id.* at 266.  The court carefully examined the state-law division of authority between the State and its political subdivisions and concluded that the City had clear authority to act—even though its claims involved many of the same residents covered by the State's *parens patriae* action. Although those "residents, if suing as private plaintiffs, might be barred from bringing suit," the court emphasized that the "City's interest cannot be characterized as coterminous with that of its inhabitants." *Id.*  The same is true here.  "[R]espect for the proper division of authority" between State and local entities—including the Legislature's express intent that West Virginia municipalities should have full power to abate nuisances—makes it "appropriate to allow [Plaintiffs] to continue with the instant suit notwithstanding [the settlement agreements]." *Id.* Because Plaintiffs' public-nuisance action involves a "municipal interest that is separate and distinct from, and not duplicative of, the interests of individual [West Virginians]," *id.*, their lawsuit should proceed.

In short, even if the Court rejects the parties' negotiation history and the agreements' language limiting the release to the State and state entities, the State still did not release public-nuisance claims arising from political subdivisions' separate, statutory cause of action.  Nor could it have, because there is no authority for concluding that the State could release claims related to injuries political subdivisions sustain.  True, the harm Plaintiffs allege purportedly stemmed from

18

the same course of conduct at issue in the State cases, but more is required for claim preclusion under West Virginia law than that a second party "derive[d] injury" from the same "wrongful act." *Beahm*, 223 W. Va. at 273, 672 S.E.2d at 602 (citation omitted).   At least in this respect, Defendants are incorrect that the State either "assert[ed] a nuisance claim on behalf of Plaintiffs," or "could have" done so.  Cardinal Mem. 14, ECF No. 220.  Were Defendants' theory to hold, the mere fact that the State sued first would make it impossible for the alleged injuries outlined above ever to be vindicated because the State does not represent municipalities nor assert claims on their behalf.   It cannot be the case that political subdivisions' interests are extinguished by the happenstance of which governmental entity sues first.

## CONCLUSION

This Court should deny Defendants' motions.

Respectfully submitted.                                              DATED: March 27, 2020

COUNSEL FOR
PATRICK J. MORRISEY,
in his official capacity as Attorney General
for the State of West Virginia

PATRICK MORRISEY
ATTORNEY GENERAL

/s/ Lindsay S. See
Lindsay S. See (WV Bar No. 13360)
  *Solicitor General*
  *Counsel of Record*
Benjamin E. Fischer (WV Bar No. 13720)
  *Assistant Solicitor General*
Office of the West Virginia
  Attorney General
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV  25305
Tel.: (304) 558-2021
Fax: (304) 558-0140
Lindsay.S.See@wvago.gov
Benjamin.E.Fischer@wvago.gov

Vaughn T. Sizemore (WV Bar No. 8231)
  *Deputy Attorney General*
Michelle L. Bradley (WV Bar No. 10129)
  *Assistant Attorney General*
Abby G. Cunningham (WV Bar No. 13388)
  *Assistant Attorney General*
Office of the West Virginia
  Attorney General
812 Quarrier Street, First Floor
Post Office Box 1789
Charleston, WV 25326
Tel.: 304-558-8986
Fax: 304-558-0184
Vaughn.T.Sizemore@wvago.gov
Michelle.L.Bradley@wvago.gov
Abby.G.Cunningham@wvago.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th date of March 2020, I electronically filed the foregoing BRIEF OF AMICUS CURIAE STATE OF WEST VIRGINIA SUPPORTING PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT: *RES JUDICATA* AND RELEASE OF CLAIMS with the Clerk of Court by using the CM/ECF System.

/s/ Lindsay S. See
Lindsay S. See (WV Bar No. 13360)
*Solicitor General*
*Counsel of Record*