# IN THE UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>  Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>  Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>  Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>  Defendants. | Civil Action No. 3:17-01665<br>Hon David A. Faber |

**DEFENDANTS' RESPONSE TO
BRIEF OF *AMICUS CURIAE* STATE OF WEST VIRGINIA
SUPPORTING PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT:
*RES JUDICATA* AND RELEASE OF CLAIMS**

The State's *amicus* brief sets the record straight on two critical points. First, it contradicts the major premise of Plaintiffs' opposition. Plaintiffs argued that final adjudication of the State's lawsuits against Defendants could not be *res judicata*, and the State could not have released Plaintiffs' public nuisance claim, because "the WVAG did not have authority to either bring or settle the Plaintiffs' claims." Pl. Mem. of Law in Opp. (Dkt. 242) ("Opp.") 25. But the *amicus* brief states unequivocally that the opposite is true: "state law is clear that the Attorney General retains common-law authority in this space," i.e., "the State has the ability to bring public-nuisance claims related to public health and safety." Brief of *Amicus Curiae* (Dkt. 267) ("Br.") at 14. There was only one public nuisance allegedly caused by Defendants' distribution of prescription opioids to pharmacies in Huntington and Cabell County. Neither the State nor Plaintiffs contend otherwise. Because the State litigated, then settled, that public nuisance claim—and because the State had authority both to bring and settle it—the *res judicata* doctrine bars Plaintiffs from re-litigating that claim.

Second, the State's *amicus* brief contradicts Plaintiffs' corollary contention that "[n]either the State nor the WVAG has *parens patriae* power to bring Plaintiffs' claims as the Legislature has not expressly given *parens patriae* authority to abate the public nuisance at issue here and has impliedly supplanted whatever common law authority might otherwise exist." Opp. 2. That contention, too, is not true. The *amicus* brief states that "the settlement agreements make clear that the State agreed to release *parens patriae* claims that the State or state entities have power to bring," Br. 15—a power the State does not deny includes the right to seek full relief, by way of damages and abatement, on behalf of the residents of Huntington and Cabell County. Accordingly, the *res judicata* doctrine and the Releases given to each Defendant also bar Plaintiffs from re-litigating the public nuisance claim.

The State seeks to come to Plaintiffs' aid by asserting that it "did not seek the specific remedy of abatement." Br. 16. But the State cannot, and makes no effort to, reconcile that

assertion with its repeated allegations and prayers for relief seeking abatement of a public nuisance.[1]  More significantly, the State fails to reckon with its express representations to the Boone County Circuit Court that "***Plaintiffs seek to abate the public nuisance in this case***"[2]—a representation the State repeated to the Supreme Court of Appeals, ""***The State seeks to abate the public nuisance in this case***."[3]

Part I explains more fully how the State's *amicus* brief pulls the linchpin from Plaintiffs' key argument; Part II, why the Releases given by the State to each Defendant are effective to release Plaintiffs' public nuisance claim; and Part III, why the state courts have not already decided either the *res judicata* or release issue.

## I. THE STATE HAD AUTHORITY TO BRING AND SETTLE THE *ONE* COMMON LAW, PUBLIC NUISANCE CLAIM.

The linchpin of Plaintiffs' argument that *res judicata* does not bar their common law public nuisance claim is that the State did not have authority to sue for the nuisance allegedly caused by Defendants in Huntington and Cabell County.  The State's *amicus* brief contradicts and rejects that argument.

---

[1]  *See, e.g.*, SAC, No. 12-C-140 (Dkt. 216-3) [Cardinal Health] at 24 ("The public nuisance created, perpetuated and maintained by Defendant can be abated and further occurrence of such harm and inconvenience can be prevented."); SAC, No. 12-C-141 (Dkt. 226-1) [AmerisourceBergen] at 59 ("[T]he public nuisance described herein has damaged the health and safety of West Virginia citizens in the past and will continue to do so in the future unless the nuisance is abated."); Am. Compl., No. 16-C-1 (Dkt. 222-2) [McKesson] at 56 ("Plaintiffs ... will continue to suffer economic harm in the future unless the above-described public nuisance is abated.").

[2]  Response to Cardinal Health's Motion to Dismiss, *State ex rel. Morrisey v. Cardinal Health, Inc.*, No. 12-C-140 (Ex. 1) at 20; *see also* State's Proposed Order, *State ex rel. Morrisey v. Cardinal Health, Inc.*, No. 12-C-140 (Ex. 2) at ¶ 52 ("Lastly, this case fits into [an] exception to the [municipal services] doctrine … *where the acts of Cardinal are alleged to have created a public nuisance which the State seeks to abate*.").  All emphases in this Response are added unless otherwise indicated.

[3]  Response to Petition for Writ of Prohibition, No. 15-1026 (Ex. 3) at 29; *see also id*. (arguing the municipal cost recovery doctrine did not apply because the State's claim was for "a public nuisance the government seeks to *abate*").

2

Consider what Plaintiffs do not dispute:

- Plaintiffs do not deny that they allege the same public nuisance as did the State—namely, the wrongful distribution of prescription opioids, leading to an epidemic of abuse, addiction, and overdose deaths.

- They do not deny that the State charged Defendants with causing the nuisance in Huntington and Cabell (plus in the other 54 counties).

- Plaintiffs also do not deny that the State, over a four-year period, litigated that claim to a final resolution and settlement.

- And Plaintiffs cannot deny that their lawsuits, which were only launched after the final adjudication of the State's claims against AmerisourceBergen, Cardinal Health, and other distributors, seeks to re-litigate the same alleged public nuisance, based on the same facts regarding Defendants' alleged conduct vis-à-vis Huntington and Cabell County.

All this conceded, the final adjudication of the State's common law public nuisance claim is plainly *res judicata*. Plaintiffs' only response—stated as their opening bullet-point and closing summary (and at multiple points in between)—is that the State's claim should be treated as a nullity for *res judicata* purposes because the State did not have the power to bring a common law public nuisance claim:

> Defendants cannot establish that the Plaintiffs and the WVAG were in privity with each other because Plaintiffs … bring public nuisance claims that the State and the WVAG ***do not have the power to bring***.
>
> ***Neither the State nor the WVAG has parens patriae power to bring Plaintiffs' claims*** ….
>
> [The legislature's grant to cities and counties of authority to address the public health and safety] ***remov***[***ed***] ***any common law authority from the WVAG*** over the Plaintiffs' claims.
>
> [T]he Legislature has not enacted a statute granting the State general authority to abate nuisances ….

3

> [N]e*ither the State nor the WVAG had any authority to bring the Plaintiffs' public nuisance claims seeking abatement* ….
>
> [T]*he State and the WVAG did not have authority to either bring or settle the Plaintiffs' claims* ….

Opp. at 2, 14, 15, 21, 25. No West Virginia court has ever so ruled. Indeed, the Supreme Court of Appeals has stated that in public nuisance cases the Attorney General may proceed "on behalf of the public to abate the nuisance, if it be one." *State v. Ehrlick*, 65 W.Va. 700, 64 S.E.935, 939 (1909). The Supreme Court of Appeals has also held that any limitation of the Attorney General's common law authority by the Legislature must be express, and Plaintiffs cannot point to, and do not claim that the Legislature has enacted, any such express limitation.

And, now, the State has filed an *amicus* brief confirming that Plaintiffs are wrong:

> [S]tate law is clear that *the Attorney General retains common-law authority in this space*.
>
> [T]*he State has the ability to bring public-nuisance claims related to public health and safety*.
>
> [T]he State does not endorse the view that statutes giving cities and counties authority to abate public nuisances implicitly limit the Attorney General's authority ….

Br. 14, 16.

If, as the State confirms, it had (and has) the power to bring common law public nuisance claims, the three-part test for *res judicata* is met:

**Final adjudication**. **N**either Plaintiffs nor the State dispute that there was a final adjudication of the State's public nuisance claims against Defendants.[4]

---

4   In reliance on *federal* decisions, the State argues that "the preclusive effects of a settlement agreement or consent decree are often *less* broad than those of a fully litigated case." Br. 5 (emphasis in original). But as the State correctly notes at the outset, "'West Virginia's rules of *res judicata* and claim preclusion differ somewhat from the rules used by federal courts.'" *Id*. at 2 (quoting *Dan Ryan Builders, Inc. v. Crystal Ridge Development, Inc.*, 803 S.E.2d 519, 528 (2017)). And no West Virginia court has adopted the position that final adjudication by settlement may, in some circumstances, have less preclusive effect.

State law controls, and, under West Virginia law, "[a] valid agreement of compromise and settlement of a case …, in the absence of any exception or reservation, constitutes a merger

4

**Same claims**.  Neither Plaintiffs nor the State dispute that the factual allegations supporting the public nuisance claim are the same.  That the underlying *facts* are the same is significant because, as the State notes, West Virginia's test for *res judicata* and the federal test "differ somewhat."  Br. 2 (citing *Dan Ryan Builders*, 803 S.E.2d at 528).  The State does not go on to say what that difference is, but it is that "West Virginia applies a narrow 'same evidence' test which examines whether 'the same *evidence* would support both actions or issues.'"  *Dan Ryan Builders*, 803 S.E.2d at 528 n.26.[5]

Given that Plaintiffs are basing their public nuisance claim on the same facts, it would be of no consequence if Plaintiffs were seeking a different remedy.[6]  But they are not.  The State, like Plaintiffs, sought abatement relief in its complaints.[7]  Any room for doubt was removed by the State's representations to the Boone County Circuit Court and the Supreme Court of Appeals that "***Plaintiffs seek to abate the public nuisance***"[8] and "[*t*]*he State seeks to abate the public nuisance*."[9]  Thus, it is a fact that the State sought abatement.

---

and a bar of all claims properly litigable in such case."  *See* syl. pt. 3, *State ex rel. Queen v. Sawyers*, 148 W.Va. 130, 133 S.E.2d 257 (1963).

[5] The Fourth Circuit applied the "same evidence" test in *Nash Cty. Bd. of Ed. V. Biltmore Co.*, 640 F.2d 484, 488 (4th Cir. 1981) (holding that the causes of action were the same because "[i]n both cases, the evidence will be identical").  Contrary to the State's assertion, Br. 10, the Supreme Court did not "rebuke[] that reasoning."  The Court said, "Our analysis does not necessarily suggest that the Court of Appeals for the Fourth Circuit erred in its holding in *Nash* …."  *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 382 (1985).

[6] *See* Cardinal Health Reply (Dkt. 252) at 5; McKesson Reply (Dkt. 253) at 18.

[7] *See supra* note 1.

[8] Response to Cardinal Health's Motion to Dismiss, *State ex rel. Morrisey v. Cardinal Health, Inc.*, No. 12-C-140 (Ex. 1) at 20; *see also* State's Proposed Order, *State ex rel. Morrisey v. Cardinal Health, Inc.*, C.A. No. 12-C-140 (Ex. 2) at ¶ 52 ("Lastly, this case fits into [an] exception to the [municipal services] doctrine … *where the acts of Cardinal are alleged to have created a public nuisance which the State seeks to abate*.").

[9] Ex.3, Response to Petition for Writ of Prohibition, No. 15-1026 at 29.

5

Not only did the State seek abatement, it applied the settlement monies to "abate" the nuisance.  Plaintiffs allege, after all, that the nuisance "can be abated … by, *inter alia* ... providing addiction treatment to patients who are already addicted to opioids."  TAC (Dkt. 76) at 74-75.  But that is exactly what the settlement monies paid for.  The ABDC and Cardinal settlements provided that "all settlement monies attributable to DHHR and DMAP shall be deposited into a 'DHHR Special Revenue Trust Account' dedicated to drug abuse prevention, treatment, programming, and enforcement."[10]  The State's settlement with McKesson likewise went towards "abatement" purposes as Plaintiffs define it, including efforts "to enhance prevention, treatment and recovery programs."[11]  In 2017, the Legislature passed House Bill 2428, which (i) created the Ryan Brown Addiction Prevention and Recovery Fund (the "Fund"), a special revenue account administered by the DHHR for substance use disorder treatment and recovery services, W.Va. Code §§ 16-53-1 & 2, and (ii) directed the Attorney General to transfer the ABDC and Cardinal Health settlement proceeds to the Fund, *id*. § 16-53-2.  Since then, the DHHR has announced grants of more than $21 million.[12]

**Privity**.  The State unwittingly confirms that Plaintiffs and it are in privity, and thus that the third and final *res judicata* requirement is also satisfied.  "[T]he key consideration for

---

[10] Cardinal Settlement Agreement (Dkt. 216-4) at 8-9; ABDC Settlement Agreement (Dkt. 226-2) at 10-11.  The dismissal orders reflected the same.  Order of Dismissal With Prejudice, No. 12-C-140 (Dkt. 216-5) at 2-3; Order of Dismissal With Prejudice, No. 12-C-141 (Dkt. 226-3) at 2-3.

[11] McKesson Settlement Agreement, No. 16-C-1 (Dkt. 222-1) at 8; Notice and Order of Dismissal With Prejudice, No. 16-C-1 (Dkt. 222-3) at 2; Ex.4, Chris Dickerson, *Morrisey Says Most of McKesson Money Should Go to Substance Abuse Programs*, West Virginia Record, May 7, 2019 at 3.

[12] *See* Ex. 5, 12/4/17 DHHR Press Release (announcing grant recipients for $20.8 million of Ryan Brown funding); Ex. 6, 2/7/19 DHHR Press Release (announcing $1 million in Ryan Brown funding to Thomas Health to expand substance use disorder residential treatment and recovery services); Ex. 7, Taylor Stuck, *After Decade Marred by Addiction, State Officials Mapping Out Road to Recovery From Opioid Epidemic*, The Herald-Dispatch, Dec. 22, 2019, at 3 (nothing that with proceeds from the 2017 settlements placed into the Ryan Brown Fund, "the state has been able to expand treatment beds to 1,000").

6

[privity's] existence," according to the Supreme Court, "is *the sharing of the same legal right* by parties allegedly in privity …." *Beahm v. 7 Eleven, Inc.*, 223 W.Va. 269, 273, 672 S.E.2d 598, 602 (W.Va. 2008) (per curiam). Plaintiffs' answer is that they cannot be in privity with the State because it did not have the legal right to bring a common law public nuisance claim—but that is precisely the far-fetched and unsupported argument that the State itself disclaims and rejects in its *amicus* brief.

For its part, the State offers only a series of straw man arguments. For example, the State points to the facts that it and Plaintiffs are different parties and that Plaintiffs have the right to sue or be sued in their own name. Br. 12. But privity is an issue, after all, precisely *because* the parties in the two cases are different and each has a right to sue.[13] Here, as in *Beahm*, the State and Plaintiffs (i) share "the same legal right," (ii) "were allegedly injured by the same" wrongful conduct, and (iii) would "advance substantially the same proof in both cases." *Id*. at 273–74.

Like Plaintiffs, the State ignores the fact that a public nuisance action, by definition, is a representative action. It is brought by a public official on behalf of the public to "vindicate the rights of the public." *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 596, 34 S.E.2d 348, 354 (1945); *see also Ehrlick*, 65 W.Va. 700, 64 S.E.at 939 (the Attorney General may proceed "on behalf of the public" to abate a public nuisance); *In re: Water Contamination Litigation*, No. 16-C-6000, Order Granting Defendants' Motion to Dismiss (Dkt. 250-1) at 14 (a public nuisance claim is a "representative action on behalf of the 'public'").[14] In 2015, before the Supreme Court of Appeals, the State fully embraced this principle:

---

[13] *See, e.g.*, *Beahm*, 223 W.Va. at 273, 672 S.E.2d at 603. The State also argues that (i) there is no presumption that the Attorney General speaks for political subdivisions and (ii) the Attorney General's powers stop short of representing municipalities without their permission. *Amicus* Br. 11–12. Defendants do not dispute these irrelevant propositions.

[14] It is well recognized that representative actions, such as one brought by government officials or agencies are an exception to the general rule against non-party preclusion. *See, e.g.*,

7

> The trial court correctly found [defendants'] "standing" arguments further ignore ***the well-recognized right of a State, through its officers ... to bring a parens patriae suit to vindicate "quasi-sovereign" interests on behalf of its citizens***. A State's "quasi-sovereign" interests include protecting the health and well-being—both physical and economic—of its residents in general—precisely what is at issue in the case at bar.[15]

Thus, the issue is not whether the State's settlements with Defendants resolved the claims of political subdivisions, Br. 5; the issue is whether the settlements resolved the public's claims. They clearly did.

In sum, Plaintiffs seek to litigate the very same public nuisance cause of action, against these same Defendants, based on the same factual allegations and evidence, in pursuit of the same remedy, as did the State. If the Court were to permit Plaintiffs to go forward, Defendants would be subject to defending themselves, and potentially paying out millions of dollars, a second time for the same alleged conduct. The *res judicata* doctrine exists to prevent just this consequence. Like Plaintiffs, the State provides no satisfactory explanation how re-litigation of the same claim, and potential double-recovery, can be squared with the *res judicata* doctrine.

## II. THE RELEASES ARE EFFECTIVE TO BAR PLAINTIFFS' NUISANCE CLAIM.

Plaintiffs argued that the State's separate settlements with Defendants do not bar their claims for two reasons: (1) because the State did not have the power to release their claim; and (2) because the terms of the parties' separate releases do not cover their claim. Opp. 13–19, 23–26. But the *amicus* brief makes clear that Plaintiffs' view of the State's powers is "unduly narrow;" the State has plenary common-law powers "to bring"—and thus to settle—"public-nuisance claims related to public health and safety," including the claims asserted by Plaintiffs here. *See* Br. 14; *supra* Part I. As for the terms of the several releases, for the reasons explained below, they do cover Plaintiffs' claim.

---

*Taylor v. Sturgell*, 553 U.S. 880, 894 (2008); Restatement (Second) of Judgments § 41(1)(d) (1982).

[15] Response to Petition for Writ of Prohibition, No. 15-1026 (Ex. 3) at 16.

8

### A. The Cardinal Health and AmerisourceBergen Releases

We focus on the language of Cardinal Health's and ABDC's separate, but virtually identical, settlement agreement that release all claims that the State asserted or could have asserted "on its own behalf *or in its parens patriae capacity*." The State makes two observations.

First, it states that this language left Plaintiffs "free to bring public-nuisance claims arising under their *separate* statutory authority." Br. 15 (emphasis in original). As a threshold matter, the State recognizes that statutory authority only "grants county commissions [and municipalities] power to enact *ordinances*" regarding public nuisances. Br. 16. Neither Plaintiff has enacted an ordinance, and therefore both lack standing to bring a public nuisance claim pursuant to statutory authority.[16] Even had Plaintiffs enacted ordinances of general applicability that defined the nuisance about which they now complain, the "independent injuries" the State says were allegedly suffered by Plaintiffs and preserved by the Release are *damages*.[17] Apparently, the State does not understand that Plaintiffs have disclaimed recovery of damages. That leaves abatement. The State inaccurately asserts it did not seek abatement and therefore concludes that "Plaintiffs are not attempting to re-litigate the same claims that the State settled for itself." *Id*. But, of course, the State did seek abatement, and so Plaintiffs are seeking both to re-litigate the same claim and obtain the same relief.

Second, the State acknowledges that it "agreed to release *parens patriae* claims that the State … ha[d] power to bring." Br. 15. This means that the State released all claims that it asserted, or could have asserted, on behalf of the individual residents of Huntington and Cabell

---

[16] *See* Defendants' Motion for Summary Judgment: Standing (Dkt. 238).

[17] Br. 17 (quoting Plaintiffs' complaint and referring to "'significant expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services;'" "'increased costs and expenses relating to healthcare services, [etc.];'" and "'expenditures for special programs for special programs over and above Plaintiffs' ordinary public services'").

9

County. When Plaintiffs seek recovery of "abatement costs" (misnomer though that is),[18] what they seek in greatest part are the costs of providing medical treatment and addiction-related services to residents—i.e., the same remedy that was available to, and obtained by, the State when it sued on behalf of residents in its *parens patriae* capacity. The State released that claim.

The State says that there will be no double-recovery because the State rejected proposed language that would have recited that the State accepted the settlement funds "on behalf of the citizens of West Virginia under a *parens patriae* theory." *Id.* But whether that clause was in the agreement or not, that is what it means for a state to settle or receive a judgment in its *parens patriae* capacity—that it received the funds on behalf of the citizens of the state.[19] Having done so, and having admitted that it released its *parens patriae* claims, the Release operates to release Plaintiffs' claim for abatement.[20]

### B. The McKesson Release

The State proceeds from the erroneous premise that McKesson's settlement agreement with the State is "materially the same" as the other Defendants' agreements to the incorrect conclusion that the McKesson Agreement did not release the public nuisance claims of political subdivisions. *See* Br. 8. That assertion is contradicted by the plain language of the McKesson agreement—which includes different and materially broader release provisions from the other settlements, includes a substantially larger settlement payment than the other defendants, and was negotiated separately from the other defendants.

The McKesson Agreement expressly released "any and all claims" (1) that the State "asserted or could have asserted [in its] *parens patriae* capacity," (2) that the State has or could

---

[18] Opp. to Pl. Motion to Strike Notices of Non-Party Fault (Dkt. 256) at 6-13.

[19] *See* Cardinal Health Mem. (Dkt. 220) at 12 & n.18.

[20] The differences, such as they are, between the ABDC and Cardinal Health settlement agreements and the McKesson settlement agreement do not change the fact that judgment should be granted to all Defendants.

10

have asserted with respect to public health, safety, and well-being in the State of West Virginia," and (3) "for damages or relief of any nature whatsoever related to the allegations in the Litigation, including any and all claims relating to any act, conduct, error, or omission in distributing controlled substances in West Virginia." McKesson Agreement at 3-4. It is beyond legitimate dispute that the plain language of these release provisions encompasses the claims asserted by Plaintiffs here. *See* McKesson Br. 12-14; McKesson Reply 14-15.

Ignoring the plain language of the McKesson Agreement, the State argues that "extrinsic evidence" demonstrates an intent to exclude the claims of political subdivisions from the release. Br. 6. Tellingly, however, the State does not discuss any "extrinsic evidence" relating to the McKesson Agreement.[21]

The State asserts that it "refus[ed] to expand the category of 'Releasor' to include political subdivisions," Br. 15, but the McKesson Agreement does not use the term "Releasor" at all. The McKesson Agreement, moreover, makes clear that the State entered into the Agreement on behalf of itself and "all the citizens *and entities* of the State, whether natural persons or otherwise." McKesson Agreement at 3; *see also id.* at 2 ("through this Litigation, the State seeks to protect the health and well-being of West Virginia residents *and their communities*"). Thus, the express language of the McKesson Agreement makes clear that the release extends to all entities of and communities within the State, including political subdivisions.

The State also observes that it rejected language proposed by Cardinal Health stating that the State was entering into the settlement "on behalf of the citizens of West Virginia." Br. 15. But the McKesson Agreement expressly includes such language: it settles claims "brought pursuant to the Attorney General's authority to bring claims *for the citizens of the State of West Virginia*." McKesson Agreement at 1; *see also id*. at 3-4. Thus, by the State's own logic, it

---

[21] As explained in McKesson's briefs, the Court should not consider extrinsic evidence where the terms of the settlement agreement are unambiguous—as are the terms of the McKesson agreement. *See* McKesson Br. 12-13 & n.9; McKesson Reply 15 & n.18.

would be "inequitable" to allow Plaintiffs to recover a second time on behalf of the very same citizens. *See* Br. 14-15.

Finally, the State asserts that the release encompasses only claims that the Attorney General "ha[d] power to bring." Br. 15. A page earlier, however, the State confirmed that it did have the power to bring—and thus to settle—claims to abate a statewide nuisance on behalf of its citizens and constituent entities, including political subdivisions. Br 14 (rejecting Plaintiffs' "unduly narrow view of the Attorney General's ability to challenge public nuisances in court"); *see supra* Part I. It is of no moment that the Legislature separately granted cities and counties certain powers relating to the abatement of a public nuisance. Because "the State has the ability to bring public-nuisance claims related to public health and safety," Br. 14, it plainly had the power to release, and did release, any and all claims against McKesson relating to "public health, safety, and well-being in the State of West Virginia," McKesson Agreement at 4.

### III. THE COURTS HAVE NOT RESOLVED THE *RES JUDICATA* ISSUE.

The State argues that this Court need not independently consider the question whether Plaintiffs' claims are barred by *res judicata* and release because West Virginia state courts already have addressed that question. Br. 23–24. This argument is contrary to both fact and controlling law.

As a threshold matter, no West Virginia state court has ever had occasion to construe the State's settlement agreements with McKesson or AmerisourceBergen. Nor, as explained in Part II, is the State correct that the release provisions of all three agreements are "materially the same." Br. 8. Accordingly, the Attorney General is plainly wrong to suggest that prior state court litigation involving only Cardinal Health and its agreement with the State resolves anything as to McKesson or Amerisource Bergen.

Even as to Cardinal Health, however, this Court is not bound by the decision of a West Virginia circuit court. It is black-letter law that "a federal court sitting in diversity is not bound by a state trial court's decision on matters of state law." *Twin City Fire Ins. Co. v. Ben Arnold-*

12

*Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 370 (4th Cir. 2005). Rather, where no state appellate decision decides the question, this Court "in effect, sit[s] as a state court" that is co-equal to other state trial courts. *Comm'r v. Bosch's Estate*, 387 U.S. 456, 465 (1967).[22]

There is good reason, moreover, why the decision of the Marshall County Circuit Court denying Cardinal Health's *res judicata* motion deserves little or no deference. The court requested that the parties submit proposed findings of fact and conclusions of law and then adopted the plaintiffs' submission **verbatim**. Accordingly, the court's decision does nothing more than uncritically re-hash the arguments made by plaintiffs' counsel in that case. In addition, the Marshall County plaintiffs asserted numerous causes of action, and, accordingly, the court did not address *res judicata* in the context of case asserting a single, representative public nuisance claim.

The State also errs in stating that the Mass Litigation Panel has rejected Defendants' *res judicata* arguments or "adopted" the decision of the Marshall County Circuit Court on that issue.

---

[22] The State argues that "lower court decisions should only be disregarded 'if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Amicus* Br. 3 (quoting *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992). But as the very decision cited by the State makes clear, that rule applies to the decisions of intermediate appellate courts—*not* trial courts. *Liberty Mut. Ins. Co.*, 957 F.2d at 1156; *see Bosch's Estate*, 387 U.S. at 465 (because "federal authority may not be bound even by an intermediate state appellate court ruling … the decision of a state trial court as to an underlying issue of state law should a fortiori not be controlling").

Also, a federal court sitting in diversity should not accord a state trial court's decision any more precedential value than it would receive in the state court system. *See King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("[A] federal court adjudicating a matter of state law in a diversity suit is, 'in effect, only another court of the State'; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted); 19 Charles Alan Wright *et al.*, Federal Practice and Procedure §4507 (3d ed.) ("[T]o give state court decisions more binding effect than they would have in the state court system would undermine the ability of federal courts to ensure that the outcome of the litigation be substantially the same as it would be if tried in a state court and subjected to that system's appellate process."). And circuit court decision have no precedential value in the Supreme Court's determination of West Virginia law. *State ex rel. Miller v. Stone*, 216 W.Va. 379, 382, 607 S.E.2d 485, 488 n.3 (2004) (per curiam) ("[C]ircuit court decisions have no precedential value in this Court.").

13

Br. 4.  To the contrary, at the Panel's most recent status conference, on March 13, 2020, Lead Presiding Judge Alan Moats observed that the Panel is monitoring this Court's resolution of the *res judicata* issue and expects to address the issue itself:

> That has not been brought to us yet, but it's my understanding that Judge Faber is going to be taking up that issue…. And so I'm sure somebody at some point in time is going to file that motion here before us as well.[23]

Even had the Panel made or adopted a ruling on the matter, it would be no more binding on this Court than a decision by any other West Virginia trial court.

Finally, the Court should reject the State's attempt to divine significance from the West Virginia Supreme Court of Appeals' denial of Cardinal Health's writ of prohibition.  As the State surely knows, under settled West Virginia law rejection of a discretionary writ "is not an indication that [the Supreme Court] find[s] the lower court's judgment correct unless [it] specifically state[s] as much."  *State ex rel. Miller v. Stone*, 216 W.Va. 379, 382 n.3, 607 S.E.2d 485, 488 n.3 (2004) (per curiam); *accord Perrine v. E.I. du Pont de Nemours and Co.*, 225 W.Va. 482, 521 n.45 (2010) ("denial of a petition for writ of prohibition is not a decision on the merits").  Here, the Supreme Court did not state in its writ denial that it agreed with the Marshall County court's decision on the merits.[24]

In summary, contrary to the State's arguments, this Court has a duty independently to decide whether the *res judicata* doctrine and Defendants' respective settlement agreements bar Plaintiffs' claims.

---

[23]  Tr. of MLP Status Conf. 18:22–19:11 (Mar. 13, 2020) (Ex. 8).

[24]  Also off the mark is the State's speculation that Cardinal Health withdrew its *res judicata* motion in MDL-2804 because it "recognize[d] the significance of these state-court decisions." *Amicus* Br. 4.  Cardinal withdrew the *res judicata* motion, just as all three Defendants withdrew their pending motion to dismiss, once it appeared likely that the Huntington and Cabell County cases would be remanded to this Court, which better able to decide questions of West Virginia law than an Ohio federal court.

14

Dated:  April 6, 2020

Respectfully submitted,

*/s/ Steven R. Ruby*
Brian A. Glasser (WVSB #6597)
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
BAILEY GLASSER LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
bglasser@baileyglasser.com
sruby@baileyglasser.com
rfranks@baileyglasser.com
*Counsel for Cardinal Health, Inc. in Cabell County action*

*/s/ David R. Pogue*
Michael W. Carey (WVSB #635)
David R. Pogue (WVSB #10806)
Carey, Scott, Douglas & Kessler, PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:   (304)   345-1234
mwcarey@csdlawfirm.com
drpogue@csdlawfirm.com
*Counsel for Cardinal Health, Inc. in The City of Huntington action*

Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC  20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
ahardin@wc.com
*Counsel for Cardinal Health, Inc.*

*/s/ Gretchen M. Callas*
A. L. Emch (WVSB #1125)
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
P. O. Box 553
Charleston, WV 25322
Telephone: (304) 340-1000
Email: aemch@jacksonkelly.com
Email: gcallas@jacksonkelly.com


*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
Email: rnicholas@reedsmith.com
Email: smcclure@reedsmith.com
**Counsel for AmerisourceBergen Drug Corporation**


*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200
Facsimile:  (304) 345-0260
Email: jwakefield@fsblaw.com

*/s/ Mark H. Lynch*
Mark H. Lynch
Laura Flahive Wu
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-5281
Email: mlynch@cov.com
Email: lflahivewu@cov.com
Email: mcrowley@cov.com
**Counsel for McKesson Corporation**

16

## CERTIFICATE OF SERVICE

I, Steven R. Ruby, counsel for Defendant Cardinal Health, Inc., do hereby certify that on April 6, 2020, the foregoing **DEFENDANTS' RESPONSE TO BRIEF OF *AMICUS CURIAE* STATE OF WEST VIRGINIA SUPPORTING PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTONS FOR SUMMARY JUDGMENT: RES JUDICATA AND RELEASE OF CLAIMS** was filed electronically via the Court's CM/ECF electronic filing system, which will send notification of such filing to all counsel of record.

*/s/ Steven R. Ruby*
Steven R. Ruby