# EXHIBIT 2

*1044673351*

## IN THE DISTRICT COURT OF CLEVELAND COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ex rel., | § | |
| MIKE HUNTER, | § | |
| ATTORNEY GENERAL OF OKLAHOMA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. CJ-2017-816 |
| | § | Judge Thad Balkman |
| (1) PURDUE PHARMA L.P.; | § | |
| (2) PURDUE PHARMA, INC.; | § | |
| (3) THE PURDUE FREDERICK COMPANY; | § | |
| (4) TEVA PHARMACEUTICALS USA, INC.; | § | |
| (5) CEPHALON, INC.; | § | |
| (6) JOHNSON & JOHNSON; | § | |
| (7) JANSSEN PHARMACEUTICALS, INC.; | § | |
| (8) ORTHO-McNEIL-JANSSEN | § | |
| PHARMACEUTICALS, INC., n/k/a | § | |
| JANSSEN PHARMACEUTICALS, INC.; | § | |
| (9) JANSSEN PHARMACEUTICA, INC., | § | |
| n/k/a JANSSEN PHARMACEUTICALS, INC.; | § | |
| (10) ALLERGAN, PLC, f/k/a ACTAVIS PLC, | § | |
| f/k/a ACTAVIS, INC., f/k/a WATSON | § | |
| PHARMACEUTICALS, INC.; | § | |
| (11) WATSON LABORATORIES, INC.; | § | |
| (12) ACTAVIS LLC; and | § | |
| (13) ACTAVIS PHARMA, INC., | § | |
| f/k/a WATSON PHARMA, INC., | § | |
| | § | |
| Defendants. | § | |

STATE OF OKLAHOMA
CLEVELAND COUNTY } S.S.

**FILED**

AUG 26 2019

in the office of the
Court Clerk MARILYN WILLIAMS

## JUDGMENT AFTER NON-JURY TRIAL

Beginning May 28, 2019 and ending July 15, 2019, the Court conducted a non-jury trial in the above-captioned matter. From the time this action was commenced on June 30, 2017, and through and including today, this Court has been the beneficiary of exemplary professionalism and legal work on the part of counsel for each of the parties – certainly on par with what one would hope for and expect in a case of this magnitude.  For that, I wish to express my sincere

appreciation to each of you. The Court, having heard testimony of the witnesses sworn and examined in open court, having observed their demeanor and credibility, having reviewed the exhibits admitted into evidence, and being fully advised in the premises, finds as follows:

## INTRODUCTION

1. The State's sole claim for relief against the Defendants was for causing a public nuisance pursuant to Okla. Stat. tit. 50, §1 et seq., and the State sought relief in the form of abatement of the nuisance. The Defendants sought no counterclaims at trial and contended the State failed to meet its burden of proof. In addition the Defendants asserted multiple theories of defense under both statutory and common law.

2. Over the course of 33 days of trial, the parties called 42 witnesses, submitted 874 exhibits into evidence and presented an additional 225 court exhibits.

3. The parties agree Oklahoma is suffering a crisis related to opioid drug abuse. The parties agree on certain statistics and data substantiating the crisis.The parties agree that from 1994 to 2006, prescription opioid sales increased fourfold and that from 2011-2015, more than 2,100 Oklahomans died of an unintentional prescription opioid overdose. It was undisputed that in 2015, over 326 million opioid pills were dispensed to Oklahoma residents, enough for every adult to have 110 pills. Oklahoma dispenses the most prescription fentanyl per capita. In 2017, 4.2% of babies born covered by SoonerCare were born with Neonatal Abstinence Syndrome (also called NAS), a group of conditions caused when a baby withdraws from certain drugs it's exposed to in the womb before birth.

4. The State, primarily under the leadership of the Oklahoma Department Mental Health and Substance Abuse Services ("ODMHSAS"), as well as through other agencies,

undertook substantial efforts to implement programs, plans and measures to combat and mitigate the consequences of the opioid overdose crisis.

5.     Pursuant to a grant awarded in 2008, ODMHSAS conducted a statewide assessment that identified the prevention of underage drinking and prescription drugs as the two most pressing issues facing the State of Oklahoma. In 2012, the State formed a Prescription Drug Working Group that identified a series of recommendations and issues to address and implement and proposed a "State plan to address prescription drug abuse." In 2016, the State released a second prescription drug plan for "reducing prescription drug abuse in Oklahoma" and "a review of progress and updated State plans." Some of the actions taken by the State included establishing opioid prescribing guidelines and a naloxone opioid reversal and overdose response program. And, in 2017, the Oklahoma Attorney General and Oklahoma Legislature assembled and convened the Oklahoma Opioid Commission, which issued a report that outlined and detailed recommendations for policies, legislation, regulations and other programs aimed at "combatting the opioid crisis in the State of Oklahoma. Those actions achieved some success in reducing the rate of unintentional opioid overdose deaths in the State.

6.     On March 29, 2017, President Donald J. Trump established the President's Commission on Combating Drug Addiction and the Opioid Crisis. The Commission studied ways to combat and treat drug abuse, addiction, and the opioid crisis.It assessed the availability and accessibility of treatment services and overdose reversal throughout the country and reported on best practices for addiction prevention, including healthcare provider education and evaluation of prescription practices, and the use and effectiveness of State prescription drug monitoring programs.

## FINDINGS OF FACT

To the extent any evidence in the record conflicts with one of the facts found below, the Court has weighed the competing evidence and found that the greater weight of the evidence weighs in favor of the facts set forth below.

1.      The State of Oklahoma and the public in general are currently experiencing an opioid crisis and epidemic (hereinafter referred to as the "Opioid Crisis"). See, e.g., Trial Tr. (6/25/19 a.m., Commissioner White) at 62:10-73:25, 105:14-108:3; Trial Tr. 6/26/19 p.m., Commissioner White) at 45:13-46:4, 47:17-48:19, 53:20-56:22, 65:17-22 ; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 15:18-16:04; Trial Tr. (5/30/19 p.m., J&J: Deem-Eshleman) at 36:21-22; Trial Tr. (6/5/19 a.m., J&J: Deem-Eshleman) at 80:08-13, 81:19-23 ; Trial Tr. (7/2/19 p.m., Diesselhorst) at 30:23-33:15; Trial Tr. (5/29/19 a.m., Courtwright) at 22:15-18.

2.      This current stage of the Opioid Crisis was started by and still primarily involves prescription opioids. See, e.g., Trial Tr. (6/11/19 a.m., Kolodny) at 74:11-15; Trial Tr. (5/29/19 a.m., Courtwright) at 22:19-21; Trial Tr. (6/6/19 a.m., Mazloomdoost) at 22:15-23; Trial Tr. (6/3/19, a.m. J&J: Deem-Eshleman) at 126:16-18.

3.      Through the mid-1990s, there was no opioid epidemic. Trial Tr. (6/26/19 p.m., Commissioner White) at 29:15-18, 66:25-67:6; see also, e.g., Trial Tr. (6/17/19 p.m., Beaman) at 73:8-19.

4.      Since at least the mid-1990s, Defendants have marketed, promoted and sold opioid drugs in Oklahoma. See, e.g., Ct. Ex. 0092 (Mashett) at 401:4-16. During this time period, Defendants specifically manufactured and sold certain of their own branded opioid drugs as a part of its pain franchise, including: (i) Duragesic—a transdermal patch made out of the active

4

pharmaceutical ingredient ("API"), fentanyl; (ii) Ultram and Ultram Extended Release ("ER")—
tablets made out of the API, tramadol; (iii) Ultracet—tablets made out of the APIs, tramadol and
acetaminophen; (iv) Nucynta and Nucynta ER—tablets made out of the API, tapentadol; (v)
Tylenol with Codeine—tablets made out of the APIs, acetaminophen and codeine; (vi) Tylox—
capsules made out of the APIs, acetaminophen and oxycodone. See, e.g., S-1073 at 10; J-2769 at
1; Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 43:4-9; Trial Tr. (6/27/19 a.m., Moskovitz)
at 21:7-22:13; Trial Tr. (6/11/19 a.m., Kolodny) at 108:5-7.

5.      Dr. Paul Janssen originally invented fentanyl in the 1950s. Trial Tr. (6/3/19 p.m.,
J&J: Deem-Eshleman) at 67:17-23; Trial Tr. (6/5/19 a.m., J&J: Deem-Eshleman) at 80:17-20.
Fentanyl is a highly addictive opioid. Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 47:02-05.
Fentanyl can always be abused. Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 47:06-12. As a
Schedule II opioid comprised of fentanyl, Defendants' Duragesic "has the highest potential for
abuse." See Trial Tr. (6/28/19 p.m., Moskovitz) at 93:03-07.

6.      As part of its "pain management franchise," from the 1990s through at least 2016,
Defendant Johnson & Johnson wholly owned two subsidiaries that, together, supplied other
opioid manufacturers with opioid APIs to be used in opioid drugs. See, e.g., S-0340; S-1048; S-
0006. First, Johnson & Johnson owned a subsidiary based in Tasmania, Tasmanian Alkaloids
Limited ("Tasmanian Alkaloids"), which cultivated and processed opium poppy plants to
manufacture narcotic raw materials that were imported into the U.S. to be processed and made
into APIs necessary to manufacture opioid drugs. See, e.g., S-0340; S-1048; S-0006. Second,
Johnson & Johnson owned a subsidiary based in the U.S., Noramco, Inc. ("Noramco"), which
imported the narcotic raw materials produced by Tasmanian Alkaloids, processed these materials

into APIs, then sold these APIs to other opioid manufacturers in the U.S. See, e.g., S-0340; S-1048; S-0006.

7. Up until 2016, when Johnson & Johnson sold its Noramco/Tasmanian Alkaloids businesses, Tasmanian Alkaloids and Noramco were "sister companies," as "both of them were" members of Defendants' "family of companies." Ct. Ex. 220 (Martin) at 9:17-23, 12:17-13:8, 104:5-107:2. Testimony from Noramco at trial demonstrated that Noramco employees did not believe Noramco maintained its own bank accounts, separate from Defendants' treasury. Ct. Ex. 220 (Martin) at 101:19-24. Defendants, Noramco and Tasmanian Alkaloids shared employees and resources that were "required to operate the business." S-1048 at 9. Noramco employees, including Mr. Martin, physically worked at Defendants' facilities in New Jersey at various times. Ct. Ex. 220 (Martin) at 8:20-9:1. Noramco employees "were with Johnson & Johnson." Ct. Ex. 220 (Martin) at 9:17-18, 9:21-23. Further, employees simultaneously held positions at multiple companies within the Johnson & Johnson Family of Companies at times. See, e.g., Trial Tr. (6/11/19 p.m., Kolodny) at 15:11-20. During this time, Noramco and Tasmanian Alkaloids were key parts of Defendants' "pain management franchise" or "pain franchise." Ct. Ex. 0092 (Mashett) at 75:3-11; S-0340. This "pain franchise" included all of Defendants' pain products and "was an important part of [Defendants'] business from the mid-1990s to after 2010." Ct. Ex. 0092 (Mashett) at 75:1-11.

8. Defendants, through these subsidiaries, supplied the following opioid APIs to other drug manufacturers in the U.S., including Purdue and Teva: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone. See, e.g., S-0340 at 4; S-1048 at 7, 10, 22; S-0006 at 6-7; Ct. Ex. 220 (Martin) at 155:2-162:15, 184:24-185:16; Ct. Ex. 0092 (Mashett) at 219:18-220:8, 230:8-24. By 2015, Defendants' "Noramco

World Wide Narcotics Franchise," comprised of Noramco and Tasmanian Alkaloids, had become "the #1 supplier of Narcotic APIs in the United States, the world's largest market." S-1048 at 6.

9.      In the 1980s, Johnson & Johnson acquired and formed Tasmanian Alkaloids and Noramco, in order to ensure a "reliable source of [narcotic] raw materials" and "security of supply" for its Tylenol with Codeine range of pain medications. See S-0006 at 3; S-1048 at 13; Trial Tr. (6/11/19 a.m., Kolodny) at 108:13-17.

10.     Noramco, located in the U.S., imports the narcotic raw materials produced by Tasmanian Alkaloids, like morphine or thebaine, into the U.S., processes them into API, then sells them to drug manufacturers in the U.S. See, e.g., S-340, S-1048. Noramco was "an important part of J&J's business" from the mid-1990s until at least after 2010. Ct. Ex. 0092 (Mashett) at 75:3-11. Johnson & Johnson's ownership of these subsidiaries uniquely positioned its pain management franchise to provide U.S. drug manufacturers, including Johnson &Johnson itself, with "Security of Supply"—"Direct Access to Narcotic Raw Material – From Our Fields to Your Formulations." S-1048 at 11-13. Through its subsidiary, Noramco, Johnson & Johnson supplied oxycodone API to other drug manufacturers. See Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 36:22-37:01, 44:02-04; see also, e.g., Trial Tr. (6/11/19 a.m., Kolodny) at 63:10-65:06, 100:1-134:11.

11.     In 1994, Defendants, in concert with subsidiary, Tasmanian Alkaloids, "anticipated demand" for oxycodone. See S-0006 at 6; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 59:19-24; Trial Tr. (6/11/19 a.m., Kolodny) at 113:2-13. Specifically, Defendants' scientists at Tasmanian Alkaloids began a project "in 1994 in order to develop a high thebaine poppy variety to meet the anticipated demand." S-0006 at 6. The result of Defendants' research

7

project was the creation of a "high thebaine" poppy, called the "Norman Poppy," which Defendants internally described as "a transformational technology that enabled the growth of oxycodone." See S-0006 at 6-7; S-340 at 7; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 42:14-62:02; Trial Tr. (6/11/19 a.m., Kolodny) at 106:4-111:18. In 1994, Purdue filed its new drug application ("NDA") for OxyContin. See Trial Tr. (6/11/19 a.m., Kolodny) at 113:2-13.

12. Through Noramco, Defendants met the anticipated opioid demand by selling API, including oxycodone, to Purdue. Ct. Ex. 0092 (Mashett) at 222:3-16; see also, e.g., S-1788; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 42:14-62:02; Trial Tr. (6/11/19 a.m., Kolodny) at 109:9-115:8.

13. Noramco and Tasmanian Alkaloids were an important part of Defendants' pain management enterprise that included all of Defendants' pain products and "was an important part of [Defendants'] business from the mid-1990s to after 2010." See S-0340 Ct. Ex. 0092 (Mashett) at 75:1-11.

14. Through Noramco, Defendants supplied API to other opioid manufacturers, including Teva. Ct. Ex. 0092 (Mashett) at 219:18-220:8, 230:8-24. Noramco sold the majority of its "controlled substance" via "long-term agreements" and had such agreements "with all 7 of the top U.S. generic companies." S-1048 at 18. Through Noramco, Defendants supplied other U.S. opioid manufacturers with opioid APIs, including: oxycodone, hydrocodone, morphine, codeine, buprenorphine, hydromorphone and naloxone. See, e.g., S-1048; Trial Tr. (6/11/19 a.m., Kolodny) at 127:4-134:11.

8

15.     Defendants' subsidiary, Noramco, grew to become the No. 1 narcotic API supplier of oxycodone, hydrocodone, codeine and morphine in the United States. S-1048; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 70:09-75:16.

16.     Through the mid-1990s, there was no opioid epidemic. Trial Tr. (6/26/19 p.m., Commissioner White) at 29:15-18, 66:25-67:6; see also, e.g., Trial Tr. (6/17/19 p.m., Beaman) at 73:8-19.

17.     In 1997, after seeing the success that Purdue had in marketing OxyContin for chronic non-cancer pain, Defendants re-launched their fentanyl-based Duragesic patch for the chronic, non-cancer market as well. S-2355; see also Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 78:07-81:05; Trial Tr. (6/3/19 p.m., J&J: Deem-Eshleman) at 25:01-03; Trial Tr. (6/13/19 p.m., Kolodny) at 16:15-25.

18.     Defendants, acting in concert with others, embarked on a major campaign in which they used branded and unbranded marketing to disseminate the messages that pain was being undertreated and "there was a low risk of abuse and a low danger" of prescribing opioids to treat chronic, non-malignant pain and overstating the efficacy of opioids as a class of drug. Trial Tr. (6/26/19 p.m., Commissioner White) at 29:15-31:9, 67:13-68:9, 82:7-21; see also, e.g., Trial Tr. (6/10/19 p.m., Stone) at 27:15-40:8; see also, e.g., Trial Tr. (6/13/19 p.m., Kolodny) at 11:25-12:05, 17:2-23:13; Trial Tr. (6/17/19 a.m., Kolodny) at 109:4-25.

19.     Defendants' marketing and promotional efforts were designed to reach Oklahoma doctors through multiple means and at multiple times over the course of the doctor's professional education and career in Oklahoma. See Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 63:01-66:20. Examples of such marketing and promotion include, among other things, "education"

from Defendants' sales representatives, literature funded by Defendants in medical journals and publications, materials from professional societies/patient advocacy groups, continuing medical education funded by Defendants, unbranded marketing materials, and Defendants' paid speakers. See Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 63:01-66:20. Other avenues included dinners and presentations where doctors spoke to other doctors, partnering with third-party advocacy groups or academic groups to hold seminars, symposiums and conferences. Ct. Ex. 2 (Portenoy) at 40:24-41:11. All of these many different efforts were intended to influence the prescribing behavior of physicians and, thus, increase Defendants' profits from opioids. See, e.g., Ct. Ex. 2 (Portenoy) at 43:8-19; Trial Tr. (6/13/19 p.m., Kolodny) at 11:25-12:5, 17:2-23:13; Trial Tr. (6/13/19 a.m., Kolodny) at 63:2-64:04; S-2364; S-1246; S-1372; S-1844; S-3961; S-3960; S-881; S-903; S-510; S-1163; S-1780.

20.     A key element in Defendants' opioid marketing strategy to overcome barriers to liberal opioid prescribing was its promotion of the concept that chronic pain was undertreated (creating a problem) and increased opioid prescribing was the solution. See, e.g., Trial Tr. (6/10/19 p.m., Stone) at 83:17-22; S-1239 at 4-6; S-0982; Trial Tr. (6/12/19 p.m., Kolodny) at 46:23-47:5.118.For example, Defendants' unbranded marketing campaigns frequently focused on [h]eightening awareness of the under treatment of pain and its consequences." See, e.g., S-0223 at 1; S-1239 at 5-6; S-2358. Defendants trained their Oklahoma sales representatives on how to use these campaigns, including through the use of "emotional selling" for opioids by convincing physicians that undertreated pain was harming patients. See, e.g., S-0223 at 3.

21.     Another unbranded marketing message Defendants used to accomplish the "[b]ehavior [c]hange" of "increase[d] opioid use" was that undertreated acute pain inevitably would turn into chronic pain. See 1163 at 17; S-1780; Trial Tr. (6/11/19 p.m., Kolodny) at

127:18-137:10. Defendants emphasized this message in their marketing materials that promoted opioids generally as a class of drug. See, e.g., S-0760; Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 54:20-63:25.

22.     Defendants used the phrase, "pseudoaddiction," to convince doctors that patients who exhibited signs of addiction—e.g., asking for "higher and higher doses" of opioids or returning to the doctor "early" before a prescription should have run out—were not actually suffering from addiction, but from the undertreatment of pain; and the solution, according to Defendants' marketing, was to prescribe the patient more opioids. See, e.g., Trial Tr. (6/11/19 a.m., Kolodny) at 87:3-88:6; Trial Tr. (6/13/19 a.m., Kolodny) at 74:25-89:11; Trial Tr. (6/6/19 a.m., Mazloomdoost) at 35:21-36:5, 44:7-45:4; Ct. Ex. 2 (Portenoy) at 215:24-219:8.Defendants repeatedly promoted the concept of "pseudoaddiction" in various publications over time. See, e.g., S-954 at 2; S-0740 at 6; S-0760 at 3.

23.     Defendants ran a website called Prescribe Responsibly as a form of unbranded marketing. S-0974; Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 90:17-91:07; see also S-0954; Trial Tr. (6/11/19 p.m., Kolodny) at 139:1-147:25.Information on the Prescribe Responsibly website promoted Defendants' messaging that the solution to "pseudoaddiction" was "to prescribe more opioids." See S-0954; Trial Tr. (6/11/19 p.m., Kolodny) at 139:1-147:25.

24.     Another unbranded marketing initiative that Defendants employed was the dissemination of a brochure, titled "Finding Relief." See S-1247; Trial Tr. (6/11/19 p.m., Kolodny) at 40:6-14. The Finding Relief brochure, which was widely disseminated, did not differentiate between different kinds of opioids and discussed them as a class of drugs without reference to any of the differences between them.  See S-1247; Trial Tr. (6/28/19 a.m., Moskovitz) at 108:02-110:09, 112:12-113:02.The Finding Relief brochure actively promoted the

concept that pain was undertreated. See S-1247; Trial Tr. (6/11/19 p.m., Kolodny) at 40:6-14.The brochure downplayed any risks associated with opioids. See, e.g., Trial Tr. (6/11/19 p.m., Kolodny) at 98:17-99:22.

25.     As part of Defendants' marketing and advocacy programs aimed at increasing opioid prescriptions, in addition to influencing doctors, Defendants employed strategies to influence a wide range of governmental agencies, through messages aimed at "optimizing the benefits of prescription opioids for pain management [and] minimizing their risks," including the risk of addiction, abuse and diversion. See, e.g., Trial Tr. (6/26/19 p.m., Commissioner White) at 57:21-61:4; S-1161 at 10; Trial Tr. (6/26/19 p.m., Commissioner White) at 110:2-111:8; Trial Tr. (6/10/19 p.m., Stone) at 36:3-37:22; Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 83:24-90:13.

26.     Defendants used a sales force in Oklahoma to promote, market and sell various types of opioids, including the branded opioid drugs that Defendants, themselves, manufactured: Duragesic, Ultram, and Nucynta. See Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 43:10-16.

27.     Defendants' training of their sales representatives in Oklahoma included teaching sales representatives to avoid the so-called "addiction ditch"—i.e., to avoid the negatives (addiction) and emphasize the positives (supposed efficacy) in sales calls—and to use a study from Dr. Portenoy "to create dialogue about Opiophobia as a barrier." S-1364 at 16; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 30:14-33:11; see also Trial Tr. (7/2/19 p.m., Diesselhorst) at 46:10-16; S-1162.

12

28.     As part of this training, Defendants trained their sales representatives that there was a 2.6% or lower risk of addiction when using opioids prescribed by a doctor. See S-1364; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 30:14-33:11.As part of this same training, Defendants trained sales representatives to "establish that moderate to severe acute pain continues to be undertreated." S-1364 at 10; Trial Tr. (6/3/19 p.m., J&J: Deem-Eshleman) at 7:02-14.

29.     Defendants' corporate representative was not aware of any training provided to Defendants' sales force in Oklahoma on the disease of addiction. See Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 46:19-51:06. Nor was Defendants' corporate representative aware of any training provided to the sales force related to the history of opioid use and epidemics in the U.S. or human history. See Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 46:19-51:06.

30.     Defendants trained their sales reps to target high-opioid-prescribing physicians, including pain specialists and primary care physicians. See S-2514; S-2515; S-2538; Trial Tr. (5/30/19 p.m., J&J: Deem-Eshleman) at 116:04-152:25. Defendants particularly targeted primary care physicians with their opioid marketing, identifying them as "Key Customer[s]" for Defendants' pain franchise. S-2358 at 15 (defining "Prescribers" as a "Key Customer Segment"); Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 129:20-130:23; Trial Tr. (6/12/19 p.m., Kolodny) at 115:10-14; see also, e.g., Ct. Ex. 2 (Portenoy) at 213:25-214:10 (testifying that after 1996, the pharmaceutical industry targeted primary care physicians with their marketing efforts in order to convince these doctors to prescribe opioids for chronic non-cancer pain).

31.     Defendants' Oklahoma call notes document that sales representatives distributed visual aids citing the Allan, Simpson and Milligan studies thousands of times, including, at a minimum: (i) 726 times between June 2002 and December 2002; (ii) 1,683 times in 2003; and

13

(iii) 754 times in 2004. See S-2481 – S-2492; see also Ct. Ex. 223. Defendants' Oklahoma call notes further document their sales representatives using the Allan, Simpson and Milligan studies over 1,000 times in sales visits to Oklahoma doctors between 1998 and 2004. See S-2481 – S-2492; see also Ct. Ex. 223.

32.     The representations in these marketing materials related to functionality and low abuse rates, DAWN data, and the Milligan, Allan, and Simpson Studies, were later described as false and misleading by the FDA. See, e.g., S-0038; see also Section F.3, infra. Defendants funded each of these studies. S-2517; S-2521; S-2523; Trial Tr. (5/30/19 p.m., J&J: Deem-Eshleman) at 152:23-152:25.

33.     Defendants did not train their sales representatives regarding red flags that could indicate a "pill mill," including, for example, pain clinics with patients lined up out the door or patients passed out in the waiting room. See Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 29:07-09; Trial Tr. (7/2/19 p.m., Diesselhorst) at 86:22-87:7, 170:6-172:6.

34.     Marketing strategies developed for Defendants' sales force included utilizing a coupon program as a marketing tool for Duragesic and sample voucher programs, in which a sales representative delivered to a physician a "sample voucher for a box of 25mcg or 50mcg patches redeemed at pharmacy for a free 15-day trial of DURAGESIC." S-2366; Trial Tr. (5/30/19 p.m., J&J: Deem-Eshleman) at 66:18-79:08; see also S-0582; and S-1358 at 14.

35.     Defendants' sales representatives called on Oklahoma medical professionals hundreds of thousands of times while selling opioids as evidenced by 35 boxes of call notes from Defendants' Oklahoma sales representatives over the last two decades. Defendants' Oklahoma sales representatives brought breakfast, lunch, coffee and snacks to Oklahoma doctors' offices

14

and used speaker programs as part of their sales strategies. See S-2481 – S-2492; see also Trial

Tr. (7/2/19 p.m., Diesselhorst) at 184:1-185:19; see also S-4497

36.     Defendants made substantial payments of money to a variety of different pain

advocacy groups and organizations that influenced prescribing physicians and other health care

professionals. The organizations included the American Academy of Pain Medicine ("AAPM"),

American Pain Society ("APS"), American Pain Foundation ("APF"), American Geriatrics

Society, American Chronic Pain Association, National Pain Foundation, Pain and Policies Study

Group ("PPSG"), Pain Care Forum, American Society of Pain Management Nursing, American

Academy of Pain Management/Academy of Integrative Pain Management ("AIPM"), Center for

Practical Bioethics, and Joint Commission on Accreditation of Healthcare Organizations

("JCAHO"). See, e.g., S-1349

37.     Two organizations Defendants funded, the AAPM and APS, issued a "Consensus

Statement" in 1996 that was drafted by a committee that included Robert Angarola, an attorney

who at one time represented Defendants on opioid-related issues. See S-0900; Trial Tr. (6/11/19

p.m., Kolodny) at 20:10-39:8. Specifically, the Consensus Statement was written by a committee

including David Haddox (former Purdue Pharma medical director), David Joranson (founder of

PPSG), Richard Payne (KOL, co-leader of Defendants' NPEC program), Matthew Midcap (who

had a financial relationship with Defendants), Daniel Carr (who had a financial relationship with

Defendants), and Robert Angarola (outside counsel to Defendants in 1990 related to thebaine

imports from Tasmania). Dr. Portenoy consulted on the Consensus Statement as well. Trial Tr.

(6/11/19 p.m., Kolodny) at 41:03-44:24.

15

38.     The Consensus Statement suggests pain is undertreated and doctors should prescribe more opioids and described a fear of addiction, regulatory action and diversion as "impediments" to the use of opioids. S-0900; Trial Tr. (6/11/19 p.m., Kolodny) at 20:10-39:08.

39.     Defendants actively promoted the Consensus Statement, ratifying and repeating its statements in Defendants' own marketing. See, e.g., S-0760

40.     Part of Defendants' marketing strategy included medical education activities. See, e.g., S-1358; S-2364; Trial Tr. (6/13/19 a.m., Kolodny) at 52:20-68:18. This included the creation and funding of a group known as "NPEC" (National Pain Education Council) whose purposes was to provide Continuing Medical Education ("CME") related to pain and opioids. See S-0975, S-0582; Trial Tr. (5/29/19 p.m., J&J: Deem-Eshleman) at 23:06-28:12; see also Ct. Ex. 2 (Portenoy) at 87:25-89:9.

41.     The target audience for Defendants' NPEC initiative included primary care physicians, pain specialists, oncologists, residents, nurses and pharmacists. S-0881 at 3. In Defendants' 2003 Business Plan Summary for Duragesic, Defendants described NPEC as serving "to benefit not only DURAGESIC but also all future Janssen pain products." S-1358 at 10.

42.     CME materials for Defendants' NPEC program in 2002 disseminated false and misleading statements regarding opioids and pain management. See, e.g., Trial Tr. (6/6/19 a.m., Mazloomdoost) at 48:12-62:24.

43.     Defendants viewed the efforts to schedule tramadol by agencies within the State of Oklahoma as a "threat." S-0463; see Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 49:07-54:15. In 2008, in response to Defendants learning that "the Oklahoma Board of Pharmacy is

threatening to schedule tramadol again," Defendants' Therapeutic Area Head and expert witness, Dr. Bruce Moskovitz, recommended that Defendants "mobilize" and send a "'swat' team" to Oklahoma to deal with the threat. S-0463; see Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 49:07-54:15.

44.     Defendants' opioid marketing, in its multitude of forms, was false, deceptive and misleading. See, e.g., Trial Tr. (6/11/19 a.m., Kolodny) at 69:6-72:23, 85:10-21, 90:21-91:25; Trial Tr. (6/13/19 p.m., Kolodny) at 17:2-23:13; Trial Tr. (6/17/19 a.m., Kolodny) at 109:4-25; Trial Tr. (6/25/19 a.m., Commissioner White) at 66:10-19; Trial Tr. (6/26/19 p.m., Commissioner White) at 112:21-113:15, 117:14-120:12, 129:2-13, 130:22-132:7; Trial Tr. (6/17/19 p.m., Beaman) at 64:20-71:12, 80:18-85:7-20; S-0760; S-0037; S-0038; S-2481 – S-2492; S-2524; S-2538; S-2515; S-0974; S-0954; S-1247; S-0712; S-4128; S-1249; S-1706; S-2354; S-2372.

45.     In 1998, the FDA found three different convention posters Defendants used to promote Duragesic to contain marketing messages that were "false and misleading" for numerous reasons including using misleading comparative efficacy claims without substantial evidence, taking data out of context to deliver misleadingly incomplete impressions, promoting unapproved uses, emphasizing the "chronic pain" indications without the limitations and restrictions, and deceptively minimizing risks and safety issues. See S-4128.

46.     In 2001, Defendants were advisedby Defendants' own hired scientific advisory board that many of the primary marketing messages Defendants used to promote opioids in general, and Duragesic specifically, were misleading and should not be disseminated. See S-0035. Specifically, Defendants were advised not to market opioids, including fentanyl-based Duragesic, using messages related to abuse or with claims about supposedly low abuse potential.

17

See S-0035; Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 94:16-124:21. Defendants were advised that no data existed that could support these claims, that the data Defendants pointed to (DAWN data) was incapable of supporting these claims, that aggressively marketing OxyContin on this same basis was what had gotten Purdue "in trouble," that minimizing the risk of abuse of Duragesic was "dangerous" due to its lethal nature, and that an increase of Duragesic sales would surely cause an increase in abuse of and addiction to the drug. S-0035. The "Conclusion: Do not include the abuse message. Do not sell opioids on the abuse issue." S-0035.

47. In 2004, the FDA sent Defendants a letter stating that a professional file card that Defendants used to promote Duragesic ("Duragesic file card") contained "false or misleading claims about the abuse potential and other risks of [Duragesic], and include[d] unsubstantiated effectiveness claims for Duragesic." S-0038 at 1. The FDA found that the Duragesic file card misbranded the drug by "suggesting that Duragesic has a lower potential for abuse compared to other opioid products," and "the file card could encourage the unsafe use of the drug, potentially resulting in serious or life-threatening hypoventilation." S-0038 at 1.

48. Substantiating the advice of Defendants' advisors in 2001, in 2004, the FDA found Defendants' suggestion that Duragesic was "less abused than other opioid drugs" was "false or misleading" because: (i) the FDA was "not aware of substantial evidence or substantial clinical experience to support this comparative claim"; (ii) "DAWN data cannot provide the basis for a valid comparison" among opioid products; and (iii) "DAWN is not a clinical database" but, rather, a "national public health surveillance system that monitors drug-related emergency department visits and deaths." S-0038 at 2; see also S-0035; S-1703.

49. The FDA concluded that Defendants' Duragesic file card made "false or misleading safety claims and unsubstantiated effectiveness claims for Duragesic" and "thus

18

misbrand[ed] Duragesic in violation of the Act (21 U.S.C. § 352(a))." S-0038 at 3. The FDA requested that Defendants "immediately cease the dissemination of promotional materials for Duragesic the same as or similar to those described" in this 2004 letter. S-0038 at 3. The FDA further mentioned that the "violations discussed" in the letter did not "necessarily constitute an exhaustive list" and it was Defendants' responsibility to "ensure that [its] promotional materials for Duragesic comply with each applicable requirement of the Act and FDA implementing regulations." S-0038 at 4.

50.     Many other promotional materials that Defendants used in Oklahoma contained the same false and misleading messaging as the file card. The file card was not the only piece of marketing that contained these materials. Evidence was presented of a variety of visual aids distributed in Oklahoma and utilized by sales representatives containing identical false and misleading messages. See, e.g., S-2524; S-2538.

51.     Defendants' marketing materials repeatedly used the Porter and Jick letter and the Milligan, Allan and Simpson Studies in deceptive ways to support misleading claims thatdownplay the risk of addiction and overstate the efficacy of opioids. See, e.g., S-1706; S-1710; S-1364; Trial Tr. (6/13/19 a.m., Kolodny) at 69:16-72:20.

52.     Defendants additionally executed their strategy of targeting high-opioid-prescribing physicians in Oklahoma, including doctors who ultimately faced disciplinary proceedings or criminal prosecution. See, e.g., S-1358; S-2357; S-1844; S-0510; S-903; Trial Tr. (6/10/19 p.m., Stone) at 53:20-54:17.

53.     Both Drs. Beaman and Mazloomdoost testified that the multifaceted marketing misinformation campaign by the opioid industry, including Defendants, influenced their

practices and caused them to liberally and aggressively write opioid prescriptions they would never write today. See, e.g., Trial Tr. (6/17/19 p.m., Beaman) at 40:22-41:13, 68:7-69:6, 79:1-81:23; Trial Tr. (6/6/19 a.m., Mazloomdoost) at 72:17-73:2.

54.     The increase in opioid addiction and overdose deaths following the parallel increase in opioid sales in Oklahoma was not a coincidence; these variables were "causally linked." Trial Tr. (6/25/19 a.m., Commissioner White) at 73:19-23. Dr. Beaman also testified that, in his opinion, the increase in opioid overdose deaths and opioid addiction treatment admissions in Oklahoma was caused by the oversupply of opioids through increased opioid sales and overprescribing since the late 1990s. See Trial Tr. (6/17/19 p.m., Beaman) at 69:2-73:19.

55.     Commissioner White testified that the oversupply and "significant widespread rapid increase in the sale of opioid prescription medications" beginning in the mid-1990s caused the "significant rise in opioid overdose deaths" and "negative consequences" associated with opioid use, including addiction, opioid use disorder, the rise in NAS, and children entering the child welfare system. Trial Tr. (6/25/19 a.m., Commissioner White) at 62:10-63:5.

56.     With respect to the prescription opioid epidemic in the U.S., on November 1, 2017, the President's Commission on Combating Drug Addiction and the Opioid Crisis issued its final report and recommendations. See S-1574; Trial Tr. (6/3/19 p.m., J&J: Deem-Eshleman) at 61:17-91:22.

57.     The President's Commission on Combating Drug Addiction and the Opioid Crisis found "Contributors to the Current Crisis" in the U.S. to include, among other things:

- •     the use of the Porter &Jick letter to make "unsubstantiated claims" by pharmaceutical companies;

20

- the lack of "[h]igh quality evidence demonstrating that opioids can be used safely for chronic non-terminal pain";

- the use of the phrase, "pain as the 'fifth vital sign,'" by the APS, JCAHO and others; and

- the fact that, "[t]o this day, the opioid pharmaceutical industry influences the nation's response to the crisis. For example, during the comment phase of the guideline developed by the [CDC] for pain management, opposition to the guideline was more common among organizations with funding from opioid manufacturers than those without funding from the life sciences industry."

See S-1574; Trial Tr. (6/3/19 p.m., J&J: Deem-Eshleman) at 68:21-69:21, 70:5-23, 81:13-23, 84:22-87:20; see also, e.g., S-1349; S-1350. Defendants did all of these things in Oklahoma. For example, Defendants used the Porter &Jick letter to make "unsubstantiated claims" about the risk of addiction when using opioids. Defendants made claims, unsupported by any high quality evidence, that opioids could be used safely for chronic non-terminal pain. Defendants used the phrase, "pain as the 'fifth vital sign,'" to influence doctors to liberally prescribe opioids.

58.     By no later than 2001, "a significant number of Oklahoma physicians, the healthcare community, law enforcement, medical advisory boards, the DUR Board" and others in Oklahoma were "being pushed and pushed and marketed [to] and misled" about opioids by Defendants. Trial Tr. (6/26/19 p.m., Commissioner White) at 47:17-48:19. For example, Dr. Terrell Phillips, gave a CME presentation to the Oklahoma State Medical Association ("OSMA") in October 2016 about how to avoid addiction in pain management, in which Dr. Phillips stated:

> "Everyone here knows how we got in this situation. They told us we were underprescribing. We need to prescribe more. It's the patient's rights to have pain medicine, so we all got on board. And when someone said they were hurting, we said,

21

Okay, we are going to give you something. Now it's just the opposite. Not everyone deserves pain medicine."

Trial Tr. (7/12/19 a.m., Phillips) at 71:2-23; see also S-4743 at 7:20-7:48.

## CONCLUSIONS OF LAW

1.     In Oklahoma, nuisance law is defined by statute. 50 O.S. 1981 §1, defines a nuisance as follows:

> A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:
>
>> First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or
>>
>> Second. Offends decency; or
>>
>> Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or
>>
>> Fourth. In any way renders other persons insecure in life, or in the use of property, provided, this section shall not apply to preexisting agricultural activities.

50 O.S. §2, states that a public nuisance "is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."

2.     The plain text of the statute does not limit public nuisances to those that affect property. Unlike other states' statutes that limit nuisances to the "habitual use or the threatened or contemplated habitual use of any place," Oklahoma's statute simply says "unlawfully doing an act, or omitting to perform a duty." There is nothing in this text that suggests an actionable nuisance requires the use of or a connection to real or personal property. See *Epps v. Ellison,*

22

1921 OK 279, ¶ 3, 200 P. 160, 161 ("Section 4250, Rev. Laws 1910 [(former numbering for 50

O.S. § 1)] defines a nuisance to be any act which annoys, injures, or endangers the comfort,

repose, health, or safety of others, or in any way renders other persons insecure in life or in the

use of property." (emphasis added)); see also *Hall v. Galmor,* 2018 OK 59, ¶ 45, 427 P.3d at

1070 ("Our task is to determine the ordinary meaning of the words that the Legislature chose in

the provision s of law at issue."); *Cox v. State ex rel. Oklahoma Dep't of Human Servs.,* 2004

OK 17, ¶ 26, 87 P.3d 607, 617("This Court does not read exceptions into a statute nor may we

impose requirements not mandated by the Legislature.").

      3.     Supreme Court precedent also supports the conclusion that Oklahoma's nuisance

law extends beyond the regulation of real property and encompasses the corporate activity

complained of here. "Section 4250, Rev. Laws 1910 [(former numbering for 50 O.S. § 1)]

defines a nuisance to be any act which annoys, injures, or endangers the comfort, repose, health,

or safety of others, or in any way renders other persons insecure in life or in the use of property."

*Epps v. Ellison,* 1921 OK 279, ¶ 3, 200 P. at 161.

      "Nuisance, as defined at 50 O.S. 1981 §1, consists in unlawfully doing an act, or omitting

to perform a duty, which act or omission annoys, injures or endangers the comfort, repose, health

or safety of others; or, in any way renders other persons insecure in life, or in the use of property.

Thus, the term "nuisance" signifies in law such a use of property or such a course of conduct

irrespective of actual trespass against others, or of malicious or actual criminal intent, which

transgresses the just restrictions upon use or conduct which the proximity of other persons or

property imposes. *Briscoe,* 1985 OK 43, ¶ 9, 702 P.2d 33 at 36.See also*Reaves v. Territory,*

1903 OK 92, 74 P. 951 "no claim of damages to property rights" [existed].

4.      However, and in the alternative, in the event Oklahoma's nuisance law does require the use of property, the State has sufficiently shown that Defendants pervasively, systemically and substantially used real and personal property, private and public, as well as the public roads, buildings and land of the State of Oklahoma, to create this nuisance.

5.      The State presented substantial evidence—which Defendants did not attempt to dispute—that Defendants' sales representatives were trained in their Oklahoma homes how to spread Defendants' marketing messages (see, e.g., Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 44:13-46:17, 51:7-9); they conducted their deceptive marketing and sales efforts in doctors' offices, hospitals, restaurants, and other venues; S-2481 – S-2492; Trial Tr. (6/13/19 a.m., Kolodny) at 92:13-25); they used company cars traveling on State and county roads to disseminate those misleading messages (see, e.g., Trial Tr. (7/2/19 p.m., Diesselhorst) at 168:10-170:4); Defendants paid speakers to deliver Defendants' messages to doctors in their Oklahoma offices (Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 52:20-53:3, 55:17-20, 62:12-22; Trial Tr. (7/2/19 p.m., Diesselhorst) at 168:10-170:4); S-3080); and Defendants sent their messages into the homes of thousands of Oklahomans via computers, smart phones or other devices (see, e.g., S-2358; S-1073; S-0974; S-0954; S-1239; Trial Tr. (5/30/19 a.m., J&J: Deem-Eshleman) at 137:14-139:04; Trial Tr. (6/3/19 a.m., J&J: Deem-Eshleman) at 90:17-91:17, 102:23-103:8) Ct. Ex. 0092 (Mashett) at 302:5-304:11), all of which involve the use of property, real and personal, to create and exacerbate the public nuisance.

6.      The challenged conduct here is Defendants' misleading marketing and promotion of opioids. The State claims that Defendants engaged in a false, misleading, and deceptive marketing campaign designed to convince Oklahoma doctors, patients, and the public at large that opioids were safe and effective for the long-term treatment of chronic, non-malignant pain.

The greater weight of the evidence shows that Defendants did, in fact, engage in such false and misleading marketing and the law is clear that such conduct qualifies as the kind of act or omission capable of sustaining liability under Oklahoma's nuisance law. See *Epps v. Ellison,* 1921 OK 279, ¶ 3, 200 P. 160, 161.

7.     Defendants promoted their specific opioids using misleading marketing. Among other things, they sent sales representatives into Oklahoma doctors' offices to deliver misleading messages, they disseminated misleading pamphlets, coupons, and other printed materials for patients and doctors, and they misleadingly advertised their drugs over the internet—all of which occurred here in Oklahoma. But Defendants also pervasively promoted the use of opioids generally. This "unbranded" marketing included things like print materials that misleadingly touted the safety and efficacy of opioids as a class of pain medication, as well as online materials that promoted opioids generally. Defendants used and viewed medical education events (including Speakers Bureau sessions and CME opportunities) as promotional endeavors that Defendants leveraged to increase the market for opioids through misleading messaging.

8.     According to Defendants' own internal training documents, Defendants concede that "False and Misleading" promotion includes at least the following types of conduct: Broadening of product indication; Data taken out of context; Minimization of safety issues; Omission of material information; Comparative efficacy or safety claims without substantial evidence; and Overstatements of efficacy or safety. See S-2376 at 20. The greater weight of the evidence demonstrated that Defendants engaged in promotional activities that violated each one of these rules.

9.     Based upon my finding that the Defendants' false, misleading, and dangerous marketing campaigns have caused exponentially increasing rates of addiction, overdose deaths,

and Neonatal Abstinence Syndrome, I conclude these are unlawful acts which "annoys, injures, or endangers the comfort, repose, health, or safety of others." 50 O.S. §1.

10.     The facts show Defendants engaged in false and misleading marketing of both their drugs and opioids generally, and the law makes clear that such conduct is more than enough to serve as the act or omission necessary to establish the first element of Oklahoma's public nuisance law.

11.     Accordingly, based on the foregoing, I conclude (a) that Defendants engaged in false and misleading marketing of both their drugs and opioids generally; and (b) this conduct constitutes a public nuisance under extant Oklahoma law.

12.     The First Amendment to the United States Constitution does not prohibit imposing liability for the acts complained of here. "First Amendment rights may not be used as the means or the pretext for achieving substantive evils which the legislature has the power to control." *Cal. Motor Transport Co. v. Trucking Unltd.,* 404 U.S. 508, 515(1971) (internal citation omitted). "The fact that dissemination of information and opinion on questions of public concern is ordinarily a legitimate, protected and indeed cherished activity does not mean, however, that one may in all respects carry out that activity exempt from sanctions designed to safeguard the legitimate interests of others. . . . Federal securities regulation, mail fraud statutes, and common-law actions for deceit and misrepresentation are only some examples of our understanding that the right to communicate information of public interest is not unconditional." *Curtis Pub. Co. v. Butts,* 388 U.S. 130, 150 (1967) (plurality op.).

13.     Moreover, Supreme Court precedent recognizes a "commonsense distinction between speech proposing a commercial transaction"—i.e., commercial speech—"which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Cent.*

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 562 (1980). "The Constitution, therefore, accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." Id. at 562-63. As a threshold test, "for commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading." Id. at 563-564. "Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." Id. at 563.

14.     This understanding of the First Amendment has led the Supreme Court to consistently "emphasize that some forms of commercial speech regulation are surely permissible," including "restrictions on false, deceptive, and misleading commercial speech." *Friedman v. Rogers,* 440 U.S. 1, 9 (1979). *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771-72 (1976)("Untruthful speech, commercial or otherwise has never been protected for its own sake. Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely."); *Bates v. State Bar of Ariz.,* 433 U.S. 350, 383 (1977) ("Advertising that is false, deceptive, or misleading of course is subject to restraint. Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech. And any concern that strict requirements for truthfulness will undesirably inhibit spontaneity seems inapplicable because commercial speech generally is calculated. Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability. This, the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the

27

commercial arena."); *Bolger v. Yongs Drug Prods. Corp.*, 463 U.S. 60, 69 (1983) ("The State may deal effectively with false, deceptive, or misleading sales techniques."); *44 Liquormart v. R.I.*, 517 U.S. 484, 501 (1996) (plurality op.) ("When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review."); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity."); *Thomas v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) ("Although commercial speech is protected by the First Amendment, not all regulation of such speech is unconstitutional. In Central Hudson, supra, we articulated a test for determining whether a particular commercial speech regulation is constitutionally permissible. Under that test we ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment.").

15.     The record proves the speech at issue here was clearly commercial in nature as defined by the Supreme Court as speech that "propos[es] a commercial transaction." See *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562 (1980).

16.     The First Amendment does not protect Defendants' messages which were misleading in that they were told by their own experts that marketing opioids on their abuse potential was dangerous and that Purdue had already shown that such a message was prone to mislead. S-0035. They were told that the data they cited did not support their claims before they

28

made them, and then again by the FDA after they had already started spreading that misleading message. Id. They knew the studies they were citing were incomplete, unsound, or fraught with misrepresentations. S-2511. The Defendants' sales reps delivered those messages, and as the call notes and the sales trends demonstrate, Oklahoma physicians were influenced by the misleading messages Defendants were delivering. S-2357 at 11-12. Accordingly, I conclude that the speech at issue here is commercial in nature and that it is therefore not protected speech under the First Amendment.

17.     As a matter of law I find that Defendants actions caused harm and those harms are the kinds recognized by 50 O.S. §1 because those actions annoyed, injured or endangered the comfort, repose, health or safety of Oklahomans. This statute requires the State to prove that Defendants' actions caused harm and that those harms are of the kind recognized under the statute. I further find that the State has satisfied its burden of proof and that the Defendants' actions were the cause-in-fact of its injuries.

18.     There are no intervening causes that supervened or superseded Defendants' acts and omissions as a direct cause of the State's injuries, or otherwise defeat a finding of direct and proximate cause. See, e.g., *Graham v. Keuchel,* 1993 OK 6, ¶ 9, 8447 P. 2d 342, 348 ("To rise to the magnitude of a supervening cause, which will insulate the original actor from liability, the new cause must be (1) independent of the original act, (2) adequate of itself to bring about the result and (3) one whose occurrence was not reasonably foreseeable to the original actor.").

19.     I further find that the facts of this action show by the greater weight of the evidence a public nuisance that "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." 50 O.S. §2. There can be no question that this nuisance

29

affects entire communities, neighborhoods, or a considerable number of persons. This nuisance
has negatively impacted the entire State.

20.     I further find that the public nuisance created by the Defendants has affected and
continues to affect at the same time entire Oklahoma communities and neighborhoods, as well as
a considerable number of Oklahomans, although the extent of the harm inflicted upon individual
Oklahomans may be unequal.

21.     The Court further finds no act or omission by the State was a direct or proximate
cause of public nuisance created by the Defendants.

22.     The public nuisance can be abated.

23.     The proper remedy for the public nuisance is equitable abatement.

24.     The Court finds that the appropriate remedy to address the Opioid Crisis is the
abatement of the nuisance.

25.     Wherefore it is the order of this Court that the contours of the State's proposed
Abatement Plan are reasonable and necessary to abate the public nuisance and to the execute the
aforesaid Abatement Plan the Court orders as follows:

**ABATEMENT OF NUISANCE**

1.      Commissioner Terri White, the "primary architect of the State's Abatement Plan,"
testified that the public nuisance in Oklahoma can be and "must be abated." Trial Tr. (6/25/19
a.m., Commissioner White) at 89:15-16, 101:13-102:4; Trial Tr. (6/26/19 p.m., Commissioner
White) at 129:19-130:1.

2.      As the President's Commission on Combating Drug Addiction and the Opioid
Crisis found: "Historical precedent demonstrated that this crisis can be fought with effective
medical education, voluntary or involuntary changes in prescribing practices, and a strong

regulatory and enforcement environment." S-1574; see also Trial Tr. (6/3/19 p.m., J&J: Deem-Eshleman) at 68:5-9.

3.      The State's experts used a public health approach to develop the State's Abatement Plan. Trial Tr. (6/20/19 p.m., Hawkins) at 106:10-13. The experts drew upon best practice documents from Johns Hopkins, the White House, the Oklahoma Commission, the Surgeon General and the CDC, among others. Trial Tr. (6/21/19 p.m., Hawkins) at 72:8-15; see also Ct. Ex. 116. The experts reviewed other State plans, academic literature, research, and produced an outline of recommendations. Id. The experts then engaged other stakeholders, such as other State agencies and professionals, in reviewing and contributing to the recommendations. Id.

4.      Commissioner White testified that, in her opinion, the State's Abatement Plan will abate the nuisance, save countless lives of Oklahomans in the future, save countless people from becoming addicted to opioids in the future, and eliminate the negative impact this nuisance has had on the State of Oklahoma. Trial Tr. (6/25/19 a.m., Commissioner White) at 112:8-17; see also, e.g., Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1. Oklahomans' lives can be saved if the State obtains the resources needed "to use evidence-based programs to abate this crisis." Trial Tr. (6/25/19 a.m., Commissioner White) at 117:13-118:14.

5.      Opioid Use Disorder Prevention, Treatment & Recovery Services are the central feature of the State's Abatement Plan. (6/20/19 p.m., Hawkins) at 114:21-22.

6.      Establishment of a comprehensive Opioid Use Disorder ("OUD") treatment program serving all Oklahoma residents who need OUD treatment services is necessary to abate the nuisance. Trial Tr. (6/20/19 p.m., Hawkins) at 116:22-117:2 & 117:15-20; Trial Tr. (6/25/19

31

a.m., Commissioner White) at 91:17-19 & 110:21-112:7; Trial Tr. (6/17/19 p.m., Beaman) at

83:17-20; Trial Tr. (6/13/19 p.m., Kolodny) at 125:4-19; S-4734 at 19.

7.       As part of the Addiction Treatment Services, all Oklahoma residents in need of

treatment services will be eligible to receive a biopsychosocial assessment based on the

American Society of Addiction Medicine ("ASAM") level of care placement criteria, and

comprehensive treatment and recovery services based on the ASAM level of care needed,

including early intervention, outpatient services, ambulatory detoxification, intensive outpatient,

partial hospitalization, residential care, medically managed detoxification and medication. Trial

Tr. (6/280/19 p.m., Hawkins) at 118:7-23; S-4734 at 19; S-3924.

8.       The total yearly cost for these services in 2019 dollars is $232,947,710.

9.       Addiction Treatment - Supplementary Services are necessary to abate the

nuisance. Trial Tr. (6/21/19 a.m., Hawkins) at 9:8-12; S-4734 at 20; Trial Tr. (6/25/19 a.m.,

Commissioner White) at 100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1.

These supplementary addiction treatment services include housing services, employment

services, as well as additional personnel for the juvenile justice system to support with assessing

and guiding youthful offenders and their family members in receiving mental health and

addiction services and care navigators to coordinate with opioid affected youth in the juvenile

justice and other State systems and their family to improve recovery outcomes.  Trial Tr.

(6/21/19 a.m., Hawkins) at 6:21-7:7; S-4734 at 20.

10.      The total yearly cost for these services in 2019 dollars is $31,796,011.

11.      Public medication and disposal programs are necessary to abate the nuisance.

Trial Tr. (6/21/19 a.m., Hawkins) at 16:13-18; Trial Tr. (6/25/19 a.m., Commissioner White) at

100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1; S-4734 at 22. This

includes maintaining existing programs like Safe Trips for Scripts and developing home based medication take-back and disposal programs.

12.     The total yearly cost for these services in 2019 dollars is $139,883.

13.     Enabling all primary care practices and emergency departments to enroll in the Screening, Brief Intervention and Referral to Treatment ("SBIRT") practice dissemination program for academic detailing, continuing education, electronic medical record integration consultation and embedded practice facilitation services, and implementing universal substance use patient screening and intervention for SoonerCare patients is necessary to abate the nuisance. Trial Tr. (6/21/19 a.m., Hawkins) at 25:11-20; Trial Tr. (6/25/19 a.m., Commissioner White) at 100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1; S-4734 at 26-27.

14.     Universal Screening has two components. Trial Tr. (6/21/19 a.m., Hawkins) at 22:3-9. The first component of universal screening supports the costs of providing SBIRT services to SoonerCare members in the State of Oklahoma. Trial Tr. (6/21/19 a.m., Hawkins) at 22:10-23:22; S-4734 at 26. The second component of universal screening is to widely disseminate the practice of SBIRT within primary care practices and emergency departments throughout the State. Trial Tr. (6/21/19 a.m., Hawkins) at 23:23-25:7; S-4734 at 27.

15.     The total yearly cost for these Universal Screening services in 2019 dollars is $56,857,054.

16.     Pain prevention and non-opioid pain management therapies, including cognitive behavioral therapy for pain, physical therapy, and exercise programs are necessary to abate the nuisance. Trial Tr. (6/21/19 a.m., Hawkins) at 32:22-33:1; Trial Tr. (6/25/19 a.m., Commissioner White) at 100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1; S-4734 at 29-30.

17.     The first component is a pain management benefit program for SoonerCare

members, this component includes administrative and personnel costs to oversee and administer

the pain management benefits program. Trial Tr. (6/21/19 a.m., Hawkins) at 28:24-31:5l; S-4734

at 29. The second component of Pain Services is the cost of physical therapists or occupational

therapists or similar providers to operate within the Oklahoma county health department system.

Trial Tr. (6/21/19 a.m., Hawkins) at 31:6-21; S-4734 at 30. The third component of Pain Services

is cognitive behavioral therapy for the treatment of chronic pain. Trial Tr. (6/21/19 a.m.,

Hawkins) at 32:4-21; S-4734 at 30.

18.     The total yearly cost for these services in 2019 dollars is $103,277,835.

19.     Expanded and targeted naloxone distribution and overdose prevention education

to those at high risk of experiencing or witnessing overdose is necessary to abate the nuisance.

(Trial Tr. (6/21/19 a.m., Hawkins) at 54:19-22; Trial Tr. (6/25/19 a.m., Commissioner White) at

100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1; Trial Tr. (6/13/19 a.m.,

Kolodny) at 125:20-126:02; S-4734 at 39-40.

20.     This component of the Abatement Plan is twofold: First, it includes continued

naloxone programming at ODMHSAS (the cost of the medication, overdose education services,

and administrative costs) Trial Tr. (6/21/19 a.m., Hawkins) at 52:10-53; S-4734 at 39.

21.     Second, the naloxone distribution/education component of the Abatement Plan

includes expanding the naloxone program through OSDH involving emergency medical services,

rural fire, and rural EMS services in Oklahoma to include all volunteer and fire departments in

the State and continue the emergency medical rural response program. Trial Tr. (6/21/19 a.m.,

Hawkins) at 53:7-19; S-4734 at 39. This requires personnel including a coordinator,

epidemiologist, a naloxone training coordinator for these emergency responders, and support staff. Trial Tr. (6/21/19 a.m., Hawkins) at 53:16-23; S-4734 at 39.

22.     The total yearly cost for these services in 2019 dollars is $1,585,797.

23.     Medical Case Management/Consulting (Project Echo) is necessary to abate the nuisance. Trial Tr. (6/20/19 a.m., Croff) at 77:7-12; Trial Tr. (6/20/19 p.m., Hawkins) at 116:15-21; Trial Tr. (6/25/19 a.m., Commissioner White) at 100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1; see also S-4734 at 48.

24.     The total yearly cost for these services in 2019 dollars is $3,953,832.

25.     Developing and disseminating NAS treatment evaluation standards, including continuing education courses is necessary to abate the nuisance. Trial Tr. (6/21/19 p.m., Hawkins) at 9:2-5; Trial Tr. (6/24/19 a.m., Hawkins) at 33:4-7 & 36:1-5; S-4734 at 53; Trial Tr. (6/25/19 a.m., Commissioner White) at 100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1.

26.     This component of the Abatement Plan is based on a high-quality national program of quality improvement, called the Vermont Oxford Network Quality Improvement package. Trial Tr. (6/21/19 p.m., Hawkins) at 8:10-16; 9:9-10; S-4734 at 53, n.119. This program will provide intensive training in and support to Oklahoma birthing hospitals to help certify them or accredit them as centers of excellence in NAS evaluation and assessment and shall be overseen by the University of Oklahoma Health Sciences Center as part of their perinatal quality improvement project. Trial Tr. (6/21/19 p.m., Hawkins) at 8:10-20.

27.     The total yearly cost for these services in 2019 dollars is $107,683,000.

28.     Funding the development of NAS as a required reportable condition, including OSDH and hospital-level management and infrastructure costs, is necessary to abate the

35

nuisance. Trial Tr. (6/21/19 p.m., Hawkins) at 37:11-14; Trial Tr. (6/24/19 a.m., Hawkins) at

37:19-22, 38:6-9 & 38:19-24; S-4734 at 64; Trial Tr. (6/25/19 a.m., Commissioner White) at

100:3-7; Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1. The purpose of this

component is to fund the costs for the oversight of NAS birth documentation and reporting. Trial

Tr. (6/24/19 a.m., Hawkins) at 37:9-10.

29.     The total yearly cost for these services in 2019 dollars is $181,983.

30.     Implementing universal substance use screening for pregnant women and

enabling all OB/GYN practices and hospitals to enroll in the SBIRT practice dissemination

program for academic detailing, continuing education, electronic medical record consultation,

and embedded practice facilitation services is necessary to abate the nuisance. Trial Tr. (6/21/19

p.m., Hawkins) at 12:16-21; Trial Tr. (6/25/19 a.m., Commissioner White) at 100:3-7; Trial Tr.

(6/26/19 p.m., Commissioner White) at 129:21-130:1; S-4734 at 54-55.

31.     The first component of Prenatal Screening is practice dissemination and the

second component is to support universal screening for pregnant SoonerCare members. Trial Tr.

(6/21/19 p.m., Hawkins) at 10:8-11; 11:20-21; S-4734 at 54.

32.     The total yearly cost for these services in 2019 dollars is $1,969,000.

33.     Medical treatment for infants born with NAS or suffering from opioid withdrawal

is necessary to abate the nuisance. Trial Tr. (6/21/19 p.m., Hawkins) at 14:22-15:2; Trial Tr.

(6/24/19 a.m., Hawkins) at 17:18-20; Trial Tr. (6/25/19 a.m., Commissioner White) at 100:3-7;

Trial Tr. (6/26/19 p.m., Commissioner White) at 129:21-130:1; S-4734 at 56.

34.     This component of the Abatement Plan funds additional costs above and beyond

costs for an ordinary birth for infants born with NAS due to the nuisance. Trial Tr. (6/21/19 p.m.,

Hawkins) at 13:22-25; (6/24/19 a.m., Hawkins) at 16:21-22.

35.     The total yearly cost for these services in 2019 dollars is $20,608,847.

36.     Funding for investigatory and regulatory actions related to the nuisance are
necessary to abate it. Trial Tr. (6/21/19, p.m., Hawkins) at 51:8-15; Trial Tr. (6/24/19 p.m.,
Hawkins) at 22:3-23; Trial Tr. (6/25/19 a.m., Commissioner White) at 100:3-7; Trial Tr. (6/26/19
p.m., Commissioner White) at 129:21-130:1; S-4734 at 65-70.

37.     Oklahoma law enforcement agencies, licensure boards and the Oklahoma Office
of the Chief Medical Examiners ("OCME") have been overwhelmed by cases related to opioids'
and the need to conduct investigations and do not have the necessary staffing and resources in
place to respond to this nuisance. Trial Tr. (6/21/19, p.m., Hawkins) at 38:2-14. This component
of the plan allows these agencies, offices and boards to meet the massive demands on their time
from heavy caseloads due to the nuisance. Trial Tr. (6/21/19, p.m., Hawkins) at 38:11-14.

38.     The first component of Enforcement/Regulatory relates to the ODMHSAS. Trial
Tr. (6/21/19 p.m., Hawkins) at 38:15-20; S-4734 at 65. Crisis Intervention Team Training (CIT)
is an activity that is performed with law enforcement agencies. Trial Tr. (6/21/19 p.m., Hawkins)
at 38:20-22. The cost of $500,000 per year allows ODMHSAS to bring this training statewide for
all law enforcement officers in the State. Trial Tr. (6/21/19 p.m., Hawkins) at 38:24-39:2; S-4734
at 65. CIT is training in recognizing addiction and addiction crises, intervening, deescalating
situations, assisting those in the community with finding referrals and resources and improving
overall law enforcement and community relations with regard to what these officers are seeing in
the community with addictive behaviors. Trial Tr. (6/21/19, p.m., Hawkins) at 39:2-8.

39.     The second component of Enforcement/Regulatory relates to OBN. Trial Tr.
(6/21/19 p.m., Hawkins) at 39:9-14; S-4734 at 65. OBN needs additional staff to deal with the
burdensome caseload resulting from the nuisance. Trial Tr. (6/21/19, p.m., Hawkins) at 38:2-10.

40.     There are personnel and non-personnel costs. The personnel costs include a
criminal/civil analyst and compliance inspectors/agents. The non-personnel costs include the cost
to cover OBN's registration system technology and its collaborative work with local law
enforcement for a heroin and opioid task force at an annual cost. Trial Tr. (6/21/19, p.m.
Hawkins) at 40:15-19; S-4734 at 65.

41.     The Oklahoma licensure boards also are overwhelmed by the nuisance in terms of
their capacity to investigate each case and the number of complaints they are receiving. Trial Tr.
(6/21/19 p.m., Hawkins) at 43:16-44:7. They require additional staff to deal with their high
caseloads as a result of this nuisance. Id.

42.     In addition, many of the boards participate in peer-assistance programs, where
they are working with their licensees who are affected with addiction. Id. Opioids are a
significant driver of their licensees needing these peer-assistance programs. Id. The nuisance has
placed an undue burden on these boards and their ability to process cases and serve their
licensees effectively. Id.  To adequately address the nuisance, the boards need additional
personnel and training. Trial Tr. (6/21/19 p.m., Hawkins) at 41:1-3.

43.     The Oklahoma Veterinary Board requires an additional investigator. Trial Tr.
(6/21/19 p.m., Hawkins) at 41:3-5; S-4734 at 66. The Board also requires non-personnel costs
including equipment and training for this additional investigator. Trial Tr. (6/21/19 p.m.,
Hawkins) at 41:5-10; S-4734 at 66. The Veterinary Board also requires annual training costs for
its investigators, the executive director, board counsel and one board member. Id.

44.     The Oklahoma State Osteopathic Board requires a full-time prosecutor, support
staff to assist the prosecutor, two full-time investigators, investigator support staff and additional

office space for these additional staff members. Trial Tr. (6/21/19 p.m., Hawkins) at 41:14-21; S-4734 at 66.

45. The Oklahoma Board of Nursing requires a full-time prosecutor, nurse investigators, a legal secretary, and a nurse case manager for the Peer Assistance Program. Trial Tr. (6/21/19 p.m., Hawkins) at 41:25-42:6; S-4734 at 67. The Peer Assistance Program is to assist their licensees who are struggling with substance use disorder. Trial Tr. (6/21/19 p.m., Hawkins) at 41:25-42:9; S-4734 at 67. The Board also requires an educator for the Board that will work with licensees through the State. Id.

46. In addition, the Nursing Board requires IT development costs for education materials and administrative costs, including office equipment for these new personnel. Trial Tr. (6/21/19 p.m., Hawkins) at 42:9-13; S-4734 at 67.

47. The Oklahoma Board of Medical Licensure and Supervision requires additional personnel to address the nuisance including, additional investigators, an assistant for these investigators, and a support services administrator. Trial Tr. (6/21/19 p.m., Hawkins) at 42:17-20; S-4734 at 67. The Board also requires specialized training and professional development for investigators. Trial Tr. (6/21/19 p.m., Hawkins) at 42:21-23; S-4734 at 67. It also requires additional expert medical reviews to help with the Board's heavy caseload of prescription opioid complaints against licensees. Trial Tr. (6/21/19 p.m., Hawkins) at 42:23-43:1; S-4734 at 67. Finally, it requires one-time costs in surveillance equipment. Trial Tr. (6/21/19 p.m., Hawkins) at 43:1-2; S-4734 at 67.

48. The Oklahoma Board of Dentistry requires additional full-time experienced investigators and training for Board members, Board staff, investigators and attorneys and its licensees. Trial Tr. (6/21/19 p.m., Hawkins) at 43:3-12; S-4734 at 67.

49.     The OCME also has been overburdened with heavy caseloads due to the nuisance. Trial Tr. (6/21/19, p.m., Hawkins) at 44:9-45:3. In order to keep up with this heavy caseload, the OCME requires additional equipment for autopsies and toxicology tests and personnel. Id.

50.     First, OCME requires additional salary for their medical examiner physicians to encourage retention. Trial Tr. (6/21/19, p.m., Hawkins) at 44:14-45:6; S-4734 at 68. OCME also requires forensic pathologists, a full-time forensic chemist and full-time medicolegal death scene investigators. Trial Tr. (6/21/19, p.m., Hawkins) at 45:7-11; S-4734 at 68.

51.     In addition, OCME requires costs for maintenance on instruments it purchased in order to address the heavy caseload in the toxicology lab and a new CT scanner due to the nuisance. Trial Tr. (6/21/19, p.m., Hawkins) at 45:12-25; S-4734 at 68.

52.     The Office of the Attorney General also requires services, programs and personnel to abate the nuisance. S-4734 at 69. The criminal justice division requires salary and benefits for additional assistant attorneys general, investigators and support staff as well as non-personnel costs for these employees in the form of equipment and training. Trial Tr. (6/21/19, p.m., Hawkins) at 46:2-16; S-4734 at 69.

53.     The Medicaid Fraud Control division requires salary and benefits for additional personnel including one assistant attorney general and investigators as well as non-personnel costs for these employees in the form of equipment and training. Trial Tr. (6/21/19, p.m., Hawkins) at 46:17-23; S-4734 at 69.

54.     The Legal/Agency Counsel division requires salary and benefits and non-personnel costs of equipment and training for assistant attorneys general. Trial Tr. (6/21/19, p.m., Hawkins) at 46:24-47:6; S-4734 at 69.

55.     Victim Services requires addiction and substance abuse training and travel for 7 individuals. Trial Tr. (6/21/19, p.m., Hawkins) at 47:1-3; S-4734 at 69.

56.     The Policy & Legislative Development and Tracking division requires salary and benefits and non-personnel costs in the form of equipment and training for one assistant attorney general. Trial Tr. (6/21/19, p.m., Hawkins) at 47:4-6; S-4734 at 69.

57.     The total yearly costs for these services in 2019 dollars is $11,101,076.

58.     The costs of Enforcement/Regulatory are reasonable and necessary expenses to implement this component of the Abatement Plan. Trial Tr. (6/21/19, p.m., Hawkins) at 51:16-22; Trial Tr. (6/25/19, a.m., Commissioner White) at 100:3-7; Trial Tr. (6/26/19, p.m., Commissioner White) at 129:21-130:1.

59.     The Court finds that the sum necessary to carry out the Abatement Plan in year one is the sum of $572,102,028.

60.     Though several of the State's witnesses testified that the plan "will take at least 20 years" to work, the State did not present sufficient evidence of the amount of time and costs necessary, beyond year one, to abate the Opioid Crisis. Trial Tr. (6/24/19, a.m., Hawkins) at 87:20-88:1.

61.     To the extent any argument or objection set forth by Defendants in their Renewed Motion for Judgment, or any other motion, filing or pleading, is not specifically addressed by the Court's Findings of Fact and Conclusions of Law, such argument and/or objection made by Defendants is hereby denied and overruled.

62.     The Court concludes that, pursuant to agreement between the State and its Outside Counsel governing the Oklahoma Action, Outside Counsel is expressly entitled to collect attorneys' fees from the abatement proceeds as a result of the Judgment entered in this

41

action. Outside Counsel is also entitled to compensation for all reasonable costs incurred in prosecuting this action as hereinafter determined by the Court. The attorneys' fees owed to Outside Counsel are fair, reasonable and appropriate under Oklahoma law. Outside Counsel are entitled to payment of the contractually agreed amounts from the abatement proceeds without further order from this Court and may obtain such payment by presenting this judgment. Consistent with the terms of that agreement, Outside counsel is also permitted to seek reimbursement of any future costs they may incur in prosecuting this action by subsequent application to this Court.

63.     The Court retains jurisdiction over the parties and the abatement proceeds, to the extent allowed by law, as a result of the Court's Final Judgment.

64.     The Court will enter such further Orders pertaining to the implementation of the Abatement Plan as necessary and in due course.

It is so ORDERED.

DATED this 26th day of August, 2019.


Honorable Thad Balkman, District Judge