## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**THE CITY OF HUNTINGTON,**
    **Plaintiff,**

**v.**                             **CIVIL ACTION NO. 3:17-01362**

**AMERISOURCEBERGEN DRUG**
**CORPORATION, et al.,**
    **Defendants.**
_____

**CABELL COUNTY COMMISSION,**
    **Plaintiff,**

**v.**                             **CIVIL ACTION NO. 3:17-01665**

**AMERISOURCEBERGEN DRUG**
**CORPORATION, et al.,**
    **Defendants.**


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON STANDING

### INTRODUCTION

Defendants are simply wrong about the standing requirements to bring an abatement action. Plaintiffs are authorized by statutes to bring this action to abate the public nuisance Defendants caused. Defendants' conduct violated state and federal law, and as such, it constitutes a per se nuisance. It also meets the definition of a common law nuisance. Plaintiffs are not required by West Virginia law to enact specific ordinances prohibiting Defendants' harmful acts. Defendants' motion should be denied.

## STATEMENT OF FACTS

The opioid epidemic has resulted in an interference with the public health, the public safety, the public peace, the public comfort and the public convenience in Huntington and Cabell County.[1] As noted in the Plaintiffs' Joint Complaint:

> One afternoon in August 2016, one call after another hit the 911 lines in Huntington – people overdosing in gas station bathrooms, passing out in the bath, collapsing outside the Burger King. Twenty-eight people overdosed over a period of four hours. . . . Overdoses in Huntington escalated to more than twelve hundred in 2016, nearly double the previous year. Paramedics reported going into homes to save a life and finding almost everything has been sold to pay for drugs or children sitting in the middle of the living room floor while their parents are passed out in the bedroom. One in ten babies born in Huntington is dependent on opioids.[2]

In bringing this motion, Defendants do not dispute the severity of the conditions in Huntington and Cabell County.[3] The problems facing Plaintiffs fit the classic definition of a public nuisance.[4]  The Defendants' distribution of literally millions of opioid pills while ignoring the requirements of state and federal law is the proximate cause of this

---

[1] *See* Civil Docket for Case #3:17-cv-01362 ("City of Huntington Doc.") Doc. 80 at 341-55 ("Joint Complaint") (detailing opioid epidemic in Plaintiffs' communities); *see also id* at ¶ 1167. ("Of the 100,000 people who live in Cabell County, an estimated 10,000 of them have become addicted to opioids."); *id.* at ¶ 1181 (Huntington is known as "the overdose capital of the country"); *id.* at ¶ 1196 ("At Cabell Huntington Hospital, one out of every five babies delivered has been exposed to drugs before they were born"). Throughout this brief, references will be made to the City of Huntington Civil Docket unless otherwise noted.

[2] Chris McGreal, American Overdose: The Opioid Tragedy in Three Acts, at 289.

[3] *See* Civil Docket for Case # 3:17-cv-01665 ("Cabell County Doc."), Doc. 30 at 1 (McKesson admitting "[p]rescription drug abuse also is undeniably a problem in West Virginia and Cabell County."); Doc 36 at 1 (Cardinal admitting "[t]o be sure, the problem of opioid abuse is real, and in no place more serious than West Virginia."); Doc. 144-1 at 1 (Distributor Defendants admitting, "the problem of opioid abuse is real").

[4] Restatement (Second) Torts § 821B.

nuisance. Plaintiffs have both the power and the duty to seek abatement from the Defendants.

On January 26, 2017, the Cabell Commission, passed a resolution officially recognizing these conditions in Cabell County constituted a public nuisance:

> Between 2007 and 2012, more than 40 million doses of prescription pain pills were sold in Cabell County which has a 2010 census population of 96,319. The dumping of millions of pain pills into our community has spawned a public health and safety hazard to the residents of Cabell County, devastated our families, hurt our economy, wasted our public resources and created a generation of narcotic dependence.[5]

In the resolution, Cabell County determined that "the unlawful distribution of prescription pain pills . . . has created a public nuisance to the people of Cabell County."[6] Recognizing it had a duty to "vindicate the rights of the residents of Cabell County and take action to abate this public nuisance," the Commission, under the authority granted by inter alia, W.Va. Code § 7-1-3kk, retained counsel to bring a civil action "to hold accountable those in the chain of distribution who caused this public nuisance and abate the same."[7]

Huntington's Mayor reached a similar conclusion.  The City of Huntington is structured and operates under the Strong-Mayor Plan specified in the West Virginia Code, wherein the Mayor is the administrative authority of the City of Huntington. Pursuant to W.V. Code § 8-10-1, the Mayor of Huntington is tasked with the power and duty to "see that the peace and good order of the municipality are preserved, and that

---

[5] *See* Doc. 238-2.

[6] *Id*.

[7] *Id*.

persons and property therein are protected."  The mayor also has the authority to employ "an attorney or firm of attorneys . . . to represent the municipality in connection with any legal matter or matters."  W.V. Code § 8-10-1a.  As Huntington Mayor Steve Williams described in an open letter addressed to the residents of Huntington and the Tri-State region: "The epidemic of addiction is now so pervasive that our standard of living, our way of life and our children's future is at stake."[8]  In recognition of the extreme hazard to the public safety of its residents, in 2017, the City of Huntington retained outside counsel in order to hold accountable those entities responsible for the crisis through this public nuisance lawsuit against these Defendants.  The City Council has been aware of and supportive of all efforts to abate the nuisance of the public health and safety crisis caused by the opioid epidemic, including the instant litigation.

In early 2017, Cabell and Huntington each filed complaints against the Defendants.[9]  Both Cabell and Huntington amended their complaints and ultimately filed a Joint Compliant.[10]  The Joint Complaint, brings a public nuisance claim in its first count and abatement as the first remedy sought in the prayer for relief.[11]  The Plaintiffs have dismissed all other claims against these Defendants, and the only remaining substantive

---

[8] Mayor Steve Williams, City of Huntington, Letter to the residents of Huntington and the Tri-State Region, Mayor's Office of Drug Control Policy Strategic Plan, August 24, 2015.

[9] Doc. 1, Attachments 2-4; Cabell Doc. 1.

[10] Doc. 80; Cabell Doc. 194.

[11] Doc. 80, Joint Complaint at 423-33 (count for public nuisance) and 467, ¶ 1603(a) (prayer for relief seeking "abatement of the nuisance).

claim before the Court is Plaintiffs' claim in equity seeking abatement of a public nuisance.[12]

## ARGUMENT

I.      **The Distribution Of Controlled Substances In Violation Of State And Federal Law Constitutes A Per Se Public Nuisance Which The Plaintiffs Have Standing To Bring An Action To Abate.**

    A.      **Plaintiffs' claims arise out of conduct by the Defendants in violation of State and Federal laws designed to prevent the precise harms caused by their conduct.**

Plaintiffs' claims do not arise out of conduct that, absent an ordinance, would be legal. Nor is this a case like a zoning complaint over the height of a fence or a challenge to operations of businesses otherwise in compliance with state and federal law. The Joint Complaint alleges conduct that violates both the federal Controlled Substances Act ("CSA") and the West Virginia Controlled Substances Act ("WVCSA"). The Defendants blatantly violated these laws and their implementing regulations, resulting in the precise harms the acts were designed to prevent.

The Joint Complaint sets forth in extensive detail the Defendants' duties under the CSA and the WVCSA.[13]   The Defendants are required under these statutes to maintain effective controls to prevent the diversion of controlled substances from legitimate use by monitoring for orders that are suspicious and refusing to ship those suspicious orders unless they first conduct due diligence and determine that that the order is not likely to

---

[12]Doc. 267 at 1 (offer by plaintiffs to dismiss all remaining claims other than public nuisance claim seeking abatement in exchange for bench trial); Doc. 191 (Defendants consent to bench trial).

[13] Joint Complaint, Doc. 80 at 195-205 (duties under the CSA and implementing regulations); *id.* at 205-08 (duties under the WVCSA).

be diverted into illegal channels.[14]  Similarly, the regulations implementing the WVCSA impose the same duty to prevent diversion[15] and incorporate by reference the requirements of federal law.[16]  The Joint Complaint contains detailed allegations regarding these Defendants' CSA and WVCSA violations.[17]

These federal and state laws were created to prevent diversion and the attendant harms from diversion. As the United States Supreme Court concluded: "Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants [like the Defendants], who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic."[18]  To prevent this diversion, the CSA provides for a "closed" system of drug distribution for legitimate handlers of such drugs. Such a closed system was designed to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market.[19]  These laws recognize the foreseeable and tragic harms

---

[14] *See generally* Doc. 189-2 (MDL Doc. 2483, Opinion and Order Regarding Plaintiffs' Summary Judgment Motions Addressing the Controlled Substances Act (Aug. 19, 2019)).

[15] W. Va. C.S.R. § 15-2-5.1.1 (previously W. Va. C.S.R. § 15-2-4.2.1).

[16] W. Va. C.S.R. § 15-2-3 (previously W. Va. C.S.R. § 15-2-2).

[17] Joint Complaint at ¶ 803 (Defendants "breached their above stated duties under federal and state law by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids; and/or (e) perform due diligence on orders which [Defendants] had reason to believe were suspicious, and instead shipping those orders without review."); *id.* at 233-39 (detailing ABDC violations); *id.* at 239-53 (detailing Cardinal violations); *id.* at 253-63 (detailing McKesson violations).

[18] *United States v. Moore*, 423 U.S. 122, 135 (1975).

[19] 1970 U.S.C.C.A.N. 4566, 4571-72 (emphasis added).

from diversion of controlled substances that resulted in the epidemic that plagues Cabell County and Huntington.[20]

      **B.**    **Cities and Counties have statutory authority to bring a civil action seeking abatement of a nuisance arising out of violations of the law.**

Both counties and cities have express power to "abate or cause to be abated" a public nuisance.[21]   Defendants argue that to bring a lawsuit, local governments must show either a nuisance per se or a violation of an ordinance of general applicability that brands the conduct as a nuisance.[22] Defendants misstate and misapply the law – counties and cities have standing to bring civil actions seeking to abate a nuisance alleging conduct that violates state and federal law.

Defendants concede that conduct that always constitutes a public nuisance can be the subject of an action seeking abatement by a city or a county.[23]   This category of "absolute" or *per se* nuisances[24] includes conduct that violates state and federal statutes.

---

[20] 21 U.S.C. § 801(2) (Congressional finding that improper distribution, possession, and use of controlled substances  has "a substantial and detrimental effect on the health and general welfare of the American people"); *Direct Sales Co. v. United States*, 319 U.S. 703, 710-11 (1943) ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, aris[es] from the latters' inherent capacity for harm. . . .").

[21] W.Va. Code § 8-12-5 (13), (23), and (44); W.Va. Code § 7-1-3kk.

[22] Doc. 239 at p.3.

[23] Doc. 239 at p.4.

[24] The terms "absolute nuisance," "per se nuisance," and "nuisance at law" are used interchangeably by courts and commentators. *Harless v. Workman,* 145 W. Va. 266, 275–76, 114 S.E.2d 548, 553 (1960) (citing 66 C.J.S. Nuisances) (using all three terms); *Cincinnati v. Beretta U.S.A. Corp.,* 2002-Ohio-2480, 95 Ohio St. 3d 416, 419–21, 768 N.E.2d 1136, 1142–43 ("A nuisance can be further classified as an absolute nuisance (nuisance per se) or as a qualified nuisance."); 66 C.J.S. Nuisances § 3 ("'absolute' nuisance" commonly also "referred to as being the same as a 'nuisance per se'").

In *Duff v. Morgantown Energy Assocs.,* the Supreme Court defined a public nuisance as "an act or condition that *unlawfully operates* to hurt or inconvenience an indefinite number of persons.[25]   Under the Restatement (Second) of Torts,[26] illegal conduct constitutes an unreasonable interference sufficient to constitute a public nuisance.[27]   Other authorities agree,[28] and it has long been the law in this State that engaging in any form of business in defiance of laws regulating or prohibiting business activities constitutes a nuisance per se.[29]

---

[25] 187 W. Va. 712, 716, 421 S.E.2d 253, 257 (1992) (emphasis added).

[26] The Court in *Duff* equated its definition of public nuisance with the Second Restatement's definition. *Id.* at 716, n.6, 421 S.E.2d at 257, n. 6 (characterizing its definition as "consistent with" Restatement (Second) of Torts § 821B (1979)); *see also Rhodes v. E.I. du Pont de Nemours and Company*, 657 F.Supp.2d 751, 768 (S.D. W.Va. 2009) (West Virginia's definition of nuisance is "consistent with the Restatement (Second) of Torts § 821B(1)." (citing *Duff, supra*)); *Sharon Steel Corp. v. City of Fairmont*, 175 W. Va. 479, 483, 334 S.E.2d 616, 620 (1985) (citing Second Restatement § 821B).

[27] Second Restatement § 821B(2)(c); *Cincinnati v. Beretta U.S.A. Corp.*, 2002-Ohio-2480, ¶ 8, 95 Ohio St. 3d 416, 418–19, 768 N.E.2d 1136, 1142 ("Unreasonable interference" under section 821B includes "conduct that is contrary to a statute, ordinance, or regulation").

[28] 66 C.J.S. Nuisances § 3 (absolute or per se nuisance includes "an act involving culpable *and unlawful conduct* causing unintentional harm" (emphasis added)); 58 Am. Jur. 2d Nuisances § 1 ("Nuisance is generally applied to that class of wrongs that arises from the unreasonable, unwarrantable, *or unlawful use* (emphasis added)); <u>Cincinnati v. Beretta U.S.A. Corp.</u>, 2002-Ohio-2480, 95 Ohio St. 3d 416, 419–21, 768 N.E.2d 1136, 1142–43 ("With an absolute nuisance, the wrongful act is either intentional or unlawful and strict liability attaches notwithstanding the absence of fault because of the hazards involved"). Even when the conduct is not expressly in violation of the law, it can still constitute an absolute nuisance or a nuisance per se "because of the hazards involved." 66 C.J.S. Nuisances § 3. The massive distribution of highly addictive controlled substances would certainly fall into this category.

[29] *Princeton Power Co. v. Calloway*, 99 W. Va. 157, 128 S.E. 89, 92 (1925).

Defendants argue that because they are "lawful" businesses, their actions cannot constitute a per se nuisance.[30]  Both the premise and conclusion of this argument are incorrect.

While the wholesale distribution of pharmaceuticals in compliance with the law is not illegal, Defendants' conduct violates the CSA and the WVCSA. Defendants are not being sued for distributing opioids, they are being sued for distributing opioids *in violation of the statutes and regulations* that require them to maintain effective controls to prevent the diversion of controlled substances.[31]

Nor does the fact that their general line of business is legal insulate Defendants from liability for creating a public nuisance by *operating in violation of the law.* The nuisance cases brought by private parties cited by the Defendants are distinguishable or support the contrary argument.

In *Burch v. NedPower Mount Storm, LLC*, the Court found the complaint's allegations stated a claim to *prospectively enjoin* as a private nuisance a windmill in a location approved by the Public Service Commission.[32]  In *Harless v. Workman*, the Supreme Court found that "[m]ining, when done "*in a lawful manner,*" is not a public nuisance,[33]  and in *McGregor v. Camden*, the Court upheld a preliminary injunction and noted that the disputed gas well in that case could operate to the extent that its operations

---

[30] Doc. 239 at 4-5.

[31] *See supra* 5-7, nn. 13, 14 (requirements of the CSA), nn. 15,16 (requirements of the WVCSA), n.17 (citing allegations of violations of CSA and WVCSA in Joint Complaint).

[32] 220 W. Va. 443, 453, 647 S.E.2d 879, 889 (2007).

[33] 145 W. Va. 266, 277, 114 S.E.2d 548, 554 (1960) (emphasis added).

were lawful, holding that equity could "*enjoin the continuance of the unlawful operation.*"[34] Importantly, *Burch, Duff,* and *McGregor* all involved private parties seeking prospective injunctions against the operations of legal businesses where a higher standard of proof exists.[35]  Yet, even in *Duff,* the only one of the three cases where injunctive relief was refused, the Court noted: "[o]ur holding … does not mean, however, that the plaintiffs are precluded from asserting their rights if the trucking results in a nuisance once it is operational."[36]

Here, the Plaintiffs do not seek prospective injunctive relief before Defendants' creation of the public nuisance. Instead, Plaintiffs seek the equitable remedy of abatement to rectify the impact of the Defendants' interference with the public rights alleged in the Joint Complaint. Plaintiffs do so based on conduct that violates the very laws designed to protect the public from these foreseeable harms.[37]  For these reasons, the allegations in the Joint Complaint constitute per se public nuisance for which Plaintiffs may seek abatement.

## II.    Plaintiffs Are Not Required To Sue Pursuant To An Ordinance.

Defendants devote the majority of their memorandum to a challenge to the manner in which Plaintiffs approved bringing these cases arguing that Plaintiffs were required to pass general ordinances with specific standards. While the per se nuisance

---

[34] 47 W. Va. 193, 34 S.E. 936, 938–39 (1899).

[35] *Burch, supra,* 220 W. Va. at 455, 647 S.E.2d at 891; *Duff, supra*, 187 W.Va. at 716-717, 421 S.E.2d at 257-258; and *McGregor, supra,* 47 W. Va. 193, 34 S.E. at 938–39.

[36] *Id.*

[37] *See supra* at 7 & nn. 18-20.

claims brought by Plaintiffs render the argument moot even under the Defendants' reading of the law, Plaintiffs comply with the applicable caselaw governing standing to seek abatement of a common public nuisance. Even assuming, *arguendo*, that Defendants' actions in distributing and selling opioids in a matter that facilitated and encouraged their flow into the illegal market, in direct violation of the applicable laws and regulations, did not constitute a per se nuisance, Plaintiffs, as public entities charged with the protection of the public rights alleged in the Joint Complaint, would nevertheless have standing to abate the nuisance pursuant to their necessary or fairly implied police powers.

### A.     Plaintiffs Have Broad Statutory Authority To Abate Nuisances.

Counties are entities created by the West Virginia Constitution. The Constitution establishes county commissions as separate units of government and grants them explicit authority over the "superintendence and administration of [their] internal police and fiscal affairs."[38] The Constitution further grants the Legislature plenary power to assign county commissions powers and duties.[39] Chapter seven of the Code sets forth the specific powers, duties, and obligations of County Commissions and their officers, implementing the Constitution's grant of police and fiscal powers.[40]

Among those explicit powers is the power to abate nuisances. Cabell County may "enact ordinances, issue orders and take other appropriate and necessary actions for the

---

[38] W. Va. Const., art. IX, sec. 11; *see also* W. Va. Code Ann. § 7-1-3 (county commissions have power over "the superintendence and administration of the internal police and fiscal affairs of their counties").

[39] *Id.*

[40] *See, e.g., id.* at art. 5 (fiscal affairs); *id.* at art. 8 (jail); *id.* at art. 14 (Deputy Sheriffs); *id.* at art. 15 (ambulance services).

elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determines to be a public nuisance."[41] In addition, West Virginia counties have authority to employ legal counsel "as [they] may deem necessary for the purpose of advising such county commission on matters of a civil nature and to conduct any litigation of a civil nature to which the county is a party."[42]

Similarly, the West Virginia Constitution grants home rule authority to the cities. Under this authority, the Legislature is authorized to grant cities like Huntington the power to "pass all laws and ordinances relating to its municipal affairs" so long as those actions are not "inconsistent or in conflict with" the Constitution or state law.[43]   As Supreme Court of Appeals of West Virginia has previously explained: "Under the police power of the State, the Legislature has power to provide for the protection of the safety, health, morals, and general welfare of the public, and may delegate such powers to municipalities created by it."[44]  "Acts of a municipality for the protection of the health of its inhabitants, under authority delegated to it by the Legislature, and where no profit accrues therefrom to the municipality, are acts performed in carrying out a governmental function."[45] The Legislature has in modern times greatly expanded home rule. In 2007,

---

[41] W.Va. Code § 7-1-3kk

[42] W.Va. Code § 7-4-3.

[43] W.Va. Const. art. 6, sec. 39a. Section 39a was added to the West Virginia Constitution in the 1936 Home Rule Amendment. Harris, Evelyn L., "Home Rule." *e-WV: The West Virginia Encyclopedia* (September 30, 2010) (https://www.wvencyclopedia.org/articles/466). The 1936 amendment granted municipalities the power to adopt their own charters; prior to that only the Legislature could enact such charters. *Id.*

[44] Syl. Pt. 1, *Hayes v. Town of Cedar Grove*, 126 W. Va. 828, 30 S.E.2d 726, 727 (1944), overruled on other grounds by *Long v. City of Weirton*, 158 W. Va. 741, 214 S.E.2d 832 (1975)

[45] *Id.* at Syl. Pt. 3.

the Legislature created a pilot program which granted Huntington, as one of five selected municipalities, "the authority to enact any ordinances, acts, resolutions, rules and regulations" so long as they are not contrary to the state or federal constitution, federal law, the West Virginia Controlled Substances Act ("WVCSA"), or the state criminal code.[46]

Even apart from the expansion of home rule, the Legislature has modernized municipal power.[47]  The modern provisions of the municipal code grant cities "plenary power and authority" to govern municipal affairs in specified areas including public services, police power, public safety, and health and safety.[48]  The modern code also grants other broad powers. In particular, W.V. Code sec. 8-12-5 grants municipalities—including the city of Huntington-- broad authority to combat public nuisances and protect the public, *inter alia*:

> (13) To prevent injury or annoyance to the public or individuals from anything dangerous, offensive or unwholesome;
>
> (23)  To provide for the elimination of hazards to public health and safety and to abate or cause to be abated anything which in the opinion of a majority of the governing body is a public nuisance;
>
> (44)  To protect and promote the public morals, safety, health, welfare and good order.[49]

Similarly, as discussed *supra*, the Mayor of Huntington is tasked with the power and duty to "see that the peace and good order of the municipality are preserved, and that persons

---

[46] W.Va. Code § 8-1-5a.

[47]  Harris, *supra*, n. 45 ("In 1969, the legislature enacted a new Municipal Code that modernized regulation of cities and towns.").

[48] W.Va. Code § 8-12-2(8), (9-11).

[49] W.Va. Code § 8-12-5.

and property therein are protected."[50]   Finally, Huntington has the power to hire counsel,[51] and to "institute, maintain and defend any civil action or other proceeding in any court."[52]

The Defendants' restrictive interpretation of the powers of local governments is contrary to the law. The Supreme Court has broadly interpreted the modern powers of political subdivisions and rejected the proposition that county and municipal power is limited to strictly construed express powers. For example, in 1992, the Supreme Court in *State ex rel. State Line Sparkler of WV, Ltd. v. Teach* found an implied power for a county to enact penalties for violations of the state building code absent any legislative authorization to do so, holding that "the general rule is that a grant of the police power to a local government or political subdivision necessarily includes the right to carry it into effect and empowers the governing body to use proper means to enforce its ordinances," and noting that, "even in the absence of an express grant of authority," a power can be "implied from the delegation by the legislature of the right to enforce a particular police power through ordinances or regulation."[53] Indeed, even the cases cited by Defendants,

---

[50] W.V. Code § 8-10-1.

[51] W.Va. Code § 8-10-1; *see also* Huntington City Charter, § 4.4 (authorizing Mayor or Council to "employ special counsel to represent either the Mayor or the Council as the case may be in the performance of their respective official duties, in the prosecution or defense of litigation in which the Mayor or the Council is involved.").

[52] W. Va. Code § 8-12-1(3).

[53] 187 W. Va. 271, 275, 418 S.E.2d 585, 589 (1992) (citing 5 McQuillan Municipal Corporations § 17.04 (3d ed. 1989); 56 Am.Jur.2d Municipal Corporations, Counties and Other Political Subdivisions § 414 (1971)); *see also id.* ("It appears, however, that such power may arise by implication.").

recognize the existence of powers "necessarily or fairly implied."[54]  Here, Plaintiffs' right to abate the nuisance is necessarily implied from their express authority to act as necessary in order to prevent injury to the public from anything dangerous, to eliminate hazards to public health and safety, and to protect and promote public health, safety, and welfare.

### B. Plaintiffs have the power to pursue public nuisance claims seeking abatement against the Defendants.

Defendants invent a requirement that cities and counties pass a general ordinance regulating specified conduct prior to the conduct occurring. They do so by misconstruing and misapplying West Virginia law. The very cases they cite authorize public nuisance actions where, as here, the conduct charged amounts to a public nuisance.

In its 1985 decision in *Sharon Steel Corp. v. City of Fairmont,*[55] the Supreme Court synthesized local government powers over the abatement of a public nuisance.   The Court confirmed the power of a local government to bring abatement actions even when it had not passed an ordinance that set forth specific standards of conduct.

In *Sharon Steel,* the city of Fairmont declared by an ordinance that the permanent disposal of hazardous waste was illegal.[56]   The Court construed the ordinance as

---

[54] *See* Doc. 239 at 3-4 (citing syl. pt. 3, *Barbor v. County Court of Mercer County*, 85 W. Va. 359, 101 S.E. 721 (1920) and syl. pt. 2, *State ex rel. Charleston v. Hutchinson*, 154 W. Va. 585, 176 S.E.2d 691 (1970)). *Barbor's* recognition of "powers reasonably and necessarily implied in the full and proper exercise of the powers so expressly given" was interpreted broadly in *State Line Sparkler, supra. Hutchinson, supra,* recognized municipal corporations have powers granted to it by the legislature or "necessarily or fairly implied," and predated both the home rule amendments to the code and *State Line Sparkler's* more expansive interpretation of implied local government powers.

[55] 175 W. Va. 479, 334 S.E.2d 616 (1985).

[56] 175 W. Va. at 481–82, 334 S.E.2d at 619–20.

"prohibiting the permanent storage of hazardous wastes which are improperly stored" when the waste may "cause, or significantly contribute to an increase in mortality, or [serious] illness ... or pose a substantial present or potential hazard to human health or the environment when stored.'"[57]   While the ordinance defined hazardous waste in a manner consistent with state law, it set no substantive standards for improper storage.

Fairmont's prohibition was enacted under W. Va. Code § 8-12-5(23), which permits cities to "provide for the elimination of hazards to public health and safety and to abate or cause to be abated anything which in the opinion of a majority of the governing body is a public nuisance."[58]   Subsection 23 is one provision relied upon by Huntington and is substantively identical to W.Va. Code § 7-1-3kk, one provision relied upon by Cabell.[59] The Court "stress[ed] that the ordinance is not a regulatory enactment, but is instead a penal ordinance designed to codify the common law of nuisance."[60]   The Court also characterized the ordinance as being "directed at abating a public nuisance condition."[61]

Faced with this general ordinance, the Court distinguished the enactment of a prohibition from its enforcement:

---

[57] *Id.* at 482, 334 S.E.2d at 620 (quoting Fairmont Ordinance §§ 1-2).

[58] *Id.* at 487, 334 S.E.2d at 625; W. Va. Code § 8-12-5(23). The *Sharon Steele* Court also found authorization for Fairmont to act in subsection 13, authorizing the prevention of anything that is dangerous, offensive, or unwholesome to the public, and subsection 44, authorizing the protection and promotion of public morals, safety, health, welfare, and good order. *Id.* at 487, 334 S.E.2d at 625.

[59] *See* W.Va. Code § 7-1-3kk (county commissions "are hereby authorized to enact ordinances, issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determines to be a public nuisance.").

[60] 175 W. Va. at 487, 334 S.E.2d at 624–25.

[61] *Id.* at 484, 334 S.E.2d at 622.

> It is generally recognized that even though a municipality has the power to enact an ordinance declaring some activity or thing to be a nuisance, such a declaration does not mean that the municipality is relieved of its burden to show that the activity or thing is in fact a nuisance when it seeks to enforce its ordinance.[62]

The Court upheld the ordinance.[63]

*Sharon Steele* was a challenge to the ordinance.   It was not an abatement or enforcement action.  The Court did not impose the specific standing requirements to bring such an action.   Instead, the Court recognized that when the challenged conduct did not constitute a per se nuisance, the local government's remedy was to seek enforcement by bringing an abatement action in court where the question of whether the condition was a nuisance is a question of fact.[64]

*Sharon Steele* did not change the law regarding local government powers over public nuisances. The cases cited by Defendants *are* part of "unbroken line of precedent—spanning one hundred years,"[65] but they do not require a local government to enact an ordinance unless, unlike here, the activity does not constitute a common nuisance.

Besides *Sharon Steele, supra,* the Defendants "unbroken line" consists of the Supreme Court's decisions in *Parker v. City of Fairmont,*[66] and *Donohoe v. Fredlock,*[67] two

---

[62] 175 W. Va. at 487, 334 S.E.2d at 625.

[63] *Id.*

[64] *Id.* at 488, 334 S.E.2d at 625 ("even though a municipality declares in an ordinance that something is a public nuisance, this does not give the municipality the authority to abate the nuisance without first prosecuting the matter in a court.").

[65] Doc. 239 at 8.

[66] 72 W. Va. 688, 79 S.E. 660 (1913).

[67] 72 W.Va. 712, 79 S.E. 736 (1913).

1913 cases, the 1951 decision in *State ex rel. Ammerman v. City of Philippi*,[68] and the West

Virginia Mass Litigation Panel's opinion in *Lincoln County v. W. Va.-Am. Water Works Co.*

(*In re: Water Contamination Litig.*).[69]  Each of these decisions is distinguishable.

First, *Parker, Donohoe,* and *Ammerman* all recognized the power of a local

government to abate as a per se nuisance conduct in violation of a statute.[70] Second, the

three decisions all involved conduct generally permissible (at least at the time) and not

otherwise in violation of the law.[71]  The concern of the courts was over declaring

nuisances not recognized by statute or the common law.[72]  Third, all three decisions

predate the modern home rule provisions of the code which are applicable here and

which greatly expand local government powers.[73]

---

[68] 136 W. Va. 120, 65 S.E.2d 713 (1951).

[69] No. 17-C-41 LCN (W. Va. MLP Dec. 12, 2018).

[70] Syl., *Parker,* 72 W. Va. at 688, 79 S.E. at 660. ("the council may abate only that as a nuisance which is recognized as such per se *or branded as such by lawful statute*"); *Donohoe*, 72 W. Va. 712, 79 S.E. at 736 (same; citing *Parker*); *Ammerman,* 136 W. Va. at 125, 65 S.E.2d at 716 (same; citing *Donohoe*); *see also Parker,* 72 W. Va. 688, 79 S.E. at 662 ("We repeat, [the defendant's] use is ordinarily lawful, and in behalf of the public it has not been branded as unlawful by an enactment within the power of the city.").

[71] *See Parker,* 72 W. Va. 688, 79 S.E. at 661 ("Plaintiff's business—his use of the premises—is not per se a nuisance. It is a lawful one. The provisions which we have quoted do not brand it as unlawful."); *Donohoe*, 72 W. Va. 712, 79 S.E. at 736 (ordinance declaring a fence illegal); *Ammerman,* 136 W. Va. at 125, 65 S.E.2d at 716 (denying permit for automobile tire recapping shop).

[72] *Lincoln County,* slip op at 12 ("Since the claimed public nuisance does not meet the definition of a nuisance at common law, it also cannot be a nuisance under Lincoln County's 2017 Ordinance."); *Parker*, 72 W. Va. 688, 79 S.E. at 661 ("That provision can not rightly be construed to mean that the council may determine that to be a nuisance *which is not such by the common law, by statute, or by ordinance*." (emphasis added)); *see also* Sharon Steel Corp., 175 W. Va. 479, 487, 334 S.E.2d 616, 624–25 (1985) ("We again stress that the ordinance is not a regulatory enactment, but is instead a penal ordinance designed to codify the common law of nuisance.").

[73] See supra at Part II(A).

Finally, in *Lincoln County,* the county declared the "lack of information" about the health effects from a chemical spill a nuisance. [74]  The Court rejected the claim the "lack of evidence" could constitute a common law nuisance as a matter of law.[75]  The harms to public health and safety here are easily distinguishable from the "lack of information" alleged to be nuisance in *Lincoln County.*

To the extent these decisions might be read to require a specific ordinance setting a standard when the challenged conduct falls within the definition of a common law public nuisance, they conflict with the Supreme Court's decision in *Sharon Steele* which held otherwise. Indeed, *Sharon Steele's* cited the language from both *Parker* and *Donohoe* relied upon by the Defendants while authorizing an abatement action to enforce the general ordinance.[76]  Finally, as Defendants concede, if a specific ordinance is adopted, conduct in violation of the ordinance would meet the definition of an abatable nuisance,[77] rendering *Sharon Steele's* requirement that the public nuisance be proven in court unnecessary.

Here the public nuisance claims fall squarely within *Sharon Steele's* holding even if the Defendants' conduct is not considered a per se nuisance. Defendants' conduct is not "ordinarily lawful."[78]  It violated state and federal law. The Defendants' actions and their

---

[74] Slip op at 10.

[75] Slip op at 12.

[76] 175 W. Va. at 487–88, 334 S.E.2d at 625–26.

[77] Doc. 239 at 6 ("the council may abate only that as a nuisance which is recognized as such per se or branded as such by a lawful . . . ordinance" (emphasis by Defendants; quoting *Donohoe*)).

[78] *Cf. Parker,* 72 W. Va. 688, 79 S.E. at 662.

impact on Plaintiffs' communities as described in the Joint Complaint squarely constitute conduct that unreasonably interferes with the public health, the public safety, the public peace, the public comfort and the public convenience that is cognizable as a common law nuisance.[79]  Plaintiffs stand ready to prosecute this abatement action and establish the public nuisance in this Court under the holding of *Sharon Steele*.[80]

C.      **Plaintiffs' are not required to pass an ordinance to prosecute this action.**

Defendants' final challenge to standing seeks to challenge the form of the governmental action taken by the Plaintiffs. This argument also fails because it is premised on their incorrect interpretation of *Parker* and its progeny.

To the extent the Defendants seek to impose a requirement that Plaintiffs pass an ordinance of general applicability that defines the illegal distribution of prescription opioids as a public nuisance in order to bring this abatement action, that argument rests on an incorrect reading of the West Virginia law addressed above. Indeed, "if the thing complained of does in fact operate injuriously upon the rights of the public, it is a common nuisance which may be enjoined as such regardless of whether or not a municipal ordinance specifically prohibits the conduct causing annoyance to the public."[81]  Such a nuisance is still subject to the requirement that the nuisance must be proven as such in a judicial proceeding.[82]  Here, the allegations in the Joint Complaint

---

[79] Restatement Second § 821B(2); *Sharon Steel, supra; cf. Lincoln County*, slip op. at 10, 12.

[80] 175 W.Va. at 488, 334 S.E.2d at 625.

[81] 51 W. Va. Op. Atty. Gen. 144, 1964 WL 72602, *3 (W.Va.A.G.) (citing 39 Am. Jur., Nuisances, §§ 64, 65).

[82] Sharon Steel, *supra*.

establish that the Defendants' conduct does operate to injure the rights of the public. And, as noted above, Defendants concede that an ordinance is unnecessary to abate a nuisance per se.

A formal ordinance is unnecessary. Defendants' citation to *State ex rel. Brown v. Corp. of Bolivar*, is not persuasive as *Brown* merely held that a resolution cannot overturn an existing zoning ordinance.[83] Here, there is no existing ordinance authorizing Defendants' distribution of millions of opioid pills in violation of state and federal law. Plaintiffs were not enacting a new law; they were authorizing this action to abate a nuisance condemned by statute and common law. As the treatise Defendants cite notes, a resolution is a "declaration with respect to future purpose or proceedings."[84] Plaintiffs appropriately declared and authorized the future action of bringing an abatement lawsuit. Other than the authorities distinguished above, Defendants cite no authority for the proposition that a local government must pass an ordinance to retain counsel and bring a lawsuit.[85]

Nor do Plaintiffs improperly seek a retroactive application of new obligations. Plaintiffs did not pass an ordinance and seek to impose new obligations on Defendants retroactively. The obligations on Defendants stem from common law and statutory

---

[83] 209 W. Va. 138, 142, 544 S.E.2d 65, 69 (2000).

[84] Doc. 239 at 9 (citing 5 McQuillin, Municipal Corporations § 15:2 (3d ed.)).

[85] *Cf.* W.Va. Code § 7-1-3kk (authorizing counties to "enact ordinances, issue orders *and take other appropriate and necessary actions*" to abate a public nuisance) (emphasis added); W. Va. Code § 8-12-5(23) (authorizing cities to "abate or cause to be abated" public nuisances without mentioning let alone requiring the enactment ordinances). In addition to these provisions, as noted above, this action is also authorized by the many other broad powers granted cities and counties noted above. *See supra* at p. 13.

provisions that have existed at all times relevant to this action.[86]  Defendants have had plenty of "advance notice" that their conduct was improper,[87] and contrary to Defendants' argument, Plaintiffs are seeking abatement of harms Defendants' caused, not penalties.  The unabated nuisance exists and there is no statute of limitations for an unabated public nuisance.[88]

Finally, as noted above, *Donohoe* does not require an ordinance specifying standards when the conduct constitutes a nuisance per se or common nuisance cognizable under the common law.  And, Defendants' argument that this action allows standardless liability is both wrong and contrary to its (baseless) argument this action is preempted by the extensive federal regulation of controlled substances.[89]

---

[86] W.Va. Code § 7-1-3kk (2002); W.Va. Code § 8-12-5 (23) (2008); W.Va. Code § 60A-8-7 (2013); and 21 U.S.C.A. § 823 (2000).

[87] *See* Doc. 80 at ¶¶804-821 (ABDC); ¶¶822-860 (Cardinal); ¶¶861-884 (McKesson).

[88] *See* Plaintiffs' Response to Defendants MSJ Re: Statute of Limitations at Part II.

[89] Doc. 239 at 12 & n. 14. Defendants' federal preemption claim was rejected by Judge Polster, MDL Doc. 2565 and constitutes the law of the case here. *See* Doc. 190 at 4-8.

## CONCLUSION

Plaintiffs have standing to bring this action, and Defendants motion should be denied.

Dated: April 6, 2020                                 Respectfully submitted,

**THE CITY OF HUNTINGTON**                 **CABELL COUNTY COMMISSION**

/s/ *Anne McGinness Kearse*                         /s/ *Paul T. Farrell, Jr.*
Anne McGinness Kearse (WVSB No. 12547)      Paul T. Farrell, Jr. (WVSB Bar No. 7443)
Joseph F. Rice                                      **FARRELL LAW**
**MOTLEY RICE LLC**                                 422 Ninth Street, 3rd Floor (25701)
28 Bridgeside Blvd.                                 PO Box 1180
Mount Pleasant, SC 29464                            Huntington, West Virginia 25714-1180
Tel: 843-216-9000                                   Mobile: 304-654-8281
Fax: 843-216-9450                                   paul@farrell.law
akearse@motleyrice.com
jrice@motleyrice.com
                                                    /s/ *Anthony J. Majestro*
                                                    Anthony J. Majestro (WVSB No. 5165)
Linda Singer                                        **POWELL & MAJESTRO, PLLC**
David I. Ackerman                                   405 Capitol Street, Suite P-1200
**MOTLEY RICE LLC**                                 Charleston, WV 25301
401 9th Street NW, Suite 1001                       304-346-2889 / 304-346-2895 (f)
Washington, DC 20004                                amajestro@powellmajestro.com
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com                              Michael A. Woelfel (WVSB No. 4106)
dackerman@motleyrice.com                            **WOELFEL AND WOELFEL, LLP**
                                                    801 Eighth Street
                                                    Huntington, West Virginia 25701
Charles R. "Rusty" Webb (WVSB No. 4782)             Tel. 304.522.6249
**THE WEBB LAW CENTRE, PLLC**                       Fax. 304.522.9282
716 Lee Street, East                                mikewoelfel3@gmail.com
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of April 2020, I electronically filed the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON STANDING with the Clerk of Court by using the CM/ECF System.

*/s/ Anthony J. Majestro*
Anthony J. Majestro