# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | **MDL 2804**<br>**Case No. 1:17-MD-2804**<br>**Judge Dan Aaron Polster** |
| THIS DOCUMENT RELATES TO:<br>*Track One Cases* | ) ) ) ) ) ) ) | **OPINION AND ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BASED ON STATUTES OF LIMITATIONS** |

Before the Court are the Manufacturers' and Distributors' Motion for Partial Summary Judgment on Statute of Limitations Grounds **(Doc. #: 1896)** and Pharmacy Defendants' Motion for Summary Judgment Based on the Statute of Limitations **(Doc. #: 1874)**. For the reasons stated below, both motions are **DENIED**.

## I. Introduction.

Defendants assert undisputed evidence establishes that Plaintiffs, County of Cuyahoga and County of Summit, knew or should have known facts sufficient to permit them to assert their claims long before their original Complaints were filed on October 27, 2017 and December 20, 2017, respectively. (Doc. #: 1896-1; Doc. #: 1874). In response, Plaintiffs contend none of their claims fail on limitations grounds, either because: (1) there is no limitations period applicable to the claim; or (2) there exist material fact questions concerning the claim's accrual dates, whether Plaintiffs exercised reasonable diligence to discover facts necessary to bring suit, and the applicability of tolling doctrines. (Doc. #: 2122-1).

Exhibit 3

There are three categories of Defendants – Manufacturers, Distributors, and Pharmacies – and they seek to assert the statute of limitations defense in different ways. Manufacturers and Distributors seek only to preclude Plaintiffs from recovering damages based on conduct pre-dating October 27, 2012. This date was calculated by counting back five years from October 27, 2017, which is the date Cuyahoga County—the first-filing Plaintiff—filed its original complaint. The five-year look-back is based on the five-year limitations period applicable to OCPA claims. *See* Ohio Rev. Code ("O.R.C.") §2923.34(J). (Doc. #: 1896-1 at 1-4, 12-25).[1] Manufacturers and Distributors do not seek to bar claims based on conduct that occurred within the five-year look-back period. (*Id*. at 1).

In contrast, Pharmacy Defendants, which are sued only in their capacity as distributors, move separately for dismissal of claims that accrued shortly before or after they allegedly ceased distribution of prescription opioids. The Pharmacies adopt Manufacturers' and Distributors' arguments regarding the accrual rules, applicable statutes of limitations, tolling doctrines, and what Plaintiffs allegedly knew or should have known prior to October 27, 2012. (Doc. #: 1874 at 1).

As discussed below, the Court concludes Defendants' arguments fail with regard to several of Plaintiffs' claims as a matter of law and undisputed fact, either because there simply is no applicable statute of limitations (in claims for public nuisance and for equitable relief under RICO), or it is clear that the limitations period has not run (in Plaintiffs' OCPA claims).

As to Plaintiffs' other claims (for damages under RICO and for civil conspiracy), Defendants make strong arguments that the applicable limitations period expired after these claims

---

[1]   The Court adopts this methodology for simplicity's sake, but notes that limitations periods and the dates applicable to them vary by claim and by the dates each Defendant was sued. Defendants provide a table setting forth the alleged bar date for each Plaintiff's claims asserted in the original complaints, with successive tables identifying alleged bar dates applicable to Defendants added in the first, second, third amended complaints. *See* (Doc. #: 1896-1 at 6-8).

2

accrued and before Plaintiffs filed suit. Ultimately, however, given the enormous volume and complexity of facts relevant to the parties' positions, the Court concludes summary judgment is not the appropriate vehicle for resolving questions regarding the dates these claims accrued or the periods they were tolled. That is, claim-accrual date issues, and questions of tolling, are appropriately determined only after a presentation of all the evidence at trial. Because the existing record demonstrates material factual disputes on these issues, the Court cannot conclude the evidence "is so one-sided that [Defendants] must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Iron Workers Local Union No. 17 Ins. Fund & Its Trustees v. Philip Morris Inc.*, 29 F. Supp. 2d 801, 805 (N.D. Ohio 1998) ("The statute of limitations issues are best decided by a jury at trial."). In so ruling, the Court notes that, at trial, it will have an opportunity to reevaluate the sufficiency of the evidence and nothing in this Order prevents the Court from granting judgment as a matter of law, if warranted. *See* Fed. R. Civ. P. 50.

## II. Applicable Statutes of Limitation.

The limitations periods applicable to Plaintiffs' five different types of claims are discussed below.[2]

### A. Common law absolute public nuisance.

Defendants contend Plaintiffs' common law absolute public nuisance claims are governed by Ohio's four-year statute of limitations applicable to "certain torts." *See* O.R.C. § 2305.09.

---

[2] On August 17, 2019, Plaintiffs filed a Notice of Dismissal (Doc. #: 2487) of certain causes of action pled in their Third Amended Complaints (Doc. #: 1466; Doc. #: 1631). The following claims remain to be tried: (1a) RICO – Marketing Enterprise; (1b) RICO – Supply-Chain Enterprise; (2a) Ohio Corrupt Practices Act – Marketing Enterprise; (2b) Ohio Corrupt Practices Act – Supply Chain Enterprise; (3) Statutory Public Nuisance; (4) Common Law Absolute Public Nuisance; and (5) Civil Conspiracy.

(Doc. #: 1896-1 at 5). Plaintiffs respond that no statute of limitations applies to these claims. (Doc. #: 2212-1 at 1 n.2, 17-19). For the reasons detailed below, the Court agrees with Plaintiffs.

A nuisance is the "wrongful invasion of a legal right or interest." *Taylor v. Cincinnati*, 55 N.E. 2d 724 (Ohio 1944); *Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46 (Ohio Ct. App. 2007). Ohio law recognizes two varieties of Ohio public nuisance claims—"absolute" and "qualified." Each is based on differing types of alleged conduct and each requires different elements of pleading and proof. *See, e.g.*, *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 621 F. Supp. 2d 513 (N.D. Ohio 2009), *aff'd*, 615 F.3d 496 (6th Cir. 2010); *Kramer*, 882 N.E.2d at 52.

Absolute nuisance claims may be premised either on conduct that is: (i) intentional or unlawful, or (ii) based on maintaining an abnormally dangerous condition, with the first "requiring more evidence of intent (akin to an intentional tort), the other requiring less (akin to a strict liability tort)." *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477–78 (6th Cir. 2017); *Kramer,* 882 N.E.2d at 52.

A qualified nuisance, in contrast, is based on negligent conduct and requires proof of a breached duty of care, for which damages are recoverable. *City of Cleveland*, 621 F. Supp. 2d at 521. Plaintiffs do not assert a claim for qualified public nuisance – they only assert a claim for absolute public nuisance. Caselaw addressing nuisance claims may refer to "tort" or "nuisance" generally, but the applicability of a given case depends on the specific category of nuisance alleged. Because Plaintiffs asset only a common-law claim for absolute public nuisance, only cases discussing that species of nuisance are apposite.

Arguing that a four-year statute of limitations applies to common law nuisance claims, Defendants incorrectly rely on caselaw pertaining to *qualified* nuisance claims brought by private parties seeking damages for negligent conduct. (Doc. #: 1896-1, at 9 & n.20, 42-43; Doc. #: 2537

4

at 26 & n.30; Doc. #: 1874 at 2). These cases are: *Brown v. County Comm'rs*, 622 N.E. 2d 1153 (Ohio Ct. App. 1993) (explaining that, where such a nuisance is continuing in nature, "a nuisance action can be brought for damages for those injuries incurred within the applicable four-year period, regardless of when the nuisance began"); *Haas v. Sunset Ramblers Motor Cycle Club, Inc.,* 726 N.E.2d 613 (Ohio Ct. App. 1999) (concerning private nuisance claims seeking injunction and damages); *Stewart v. Allen*, 2008 WL 918528, at *3 (Ohio Ct. App. Apr. 7, 2008) (affirming dismissal of a private party's nuisance claim for damages); and *Ashtabula River Corp. Grp. II v. Conrail, Inc.,* 549 F. Supp. 2d 981, 987-988 (N.D. Ohio 2008) (concluding a common law public nuisance claim was based on damages due to negligence, and ruling the plaintiff lacked standing to pursue a statutory nuisance claim that did not seek equitable relief or sue in the name of the state).

Unlike the plaintiffs in the above-cited cases, Plaintiff Counties plead *absolute* (not qualified) public nuisance based on intentional conduct, and seek equitable relief only. (Doc. #: 2212-1 at 1 & n.2). As such, longstanding precedent makes clear there is no limitations period applicable to these claims.[3] "A well-settled rule in Ohio is that no length of time can legalize a public nuisance and that therefore the statute of limitations does not run against an action to abate such a nuisance." 72 Ohio Jur. 3d Nuisances § 22; *see Lake Shore & M.S.R. Co. v. Hendricks,* 40 N.E. 408 (Ohio 1895); *Lawrence R. Co. v. Commissioners of Mahoning County,* 1878 WL 75 (Ohio 1878); *Little Miami R. Co. v. Commissioners of Greene County,* 1877 WL 31 (Ohio 1877); *Cleveland & P. Ry. Co. v. City of Cleveland*, 1910 WL 688 (Ohio Cir. Ct. 1910), *aff'd*, 102 N.E. 1122 (Ohio 1912).

---

[3] Some states have codified the common law rule that "[n]o lapse of time can legalize a public nuisance amounting to an actual obstruction of public right." *See, e.g.,* Cal. Civ Code § 3490; Okla. Stat. Ann. tit. 50, § 7; S.D. Codified Laws § 21-10-4.

Defendants attack Plaintiffs' argument, seeking to distinguish the cases upon which Plaintiffs rely by noting they date back a century or more and arise in the context of encroachments on public highways or public property. (Doc. #: 1896-1 at 42-43; Doc. #: 2537 at 26 & nn.30-31). But Defendants cite no authority overruling this precedent. Neither do they offer any authority supporting the proposition that equitable public nuisance actions, like those brought by Plaintiffs, are subject to a four-year, or any other, limitations period. The decisions on which Plaintiffs rely stand for the broad proposition that a governmental entity may maintain a suit to abate a public nuisance that interferes with a public right no matter how long the public nuisance has continued.[4] Although public nuisance law is frequently applied to claims concerning property rights, Ohio law does not limit public nuisance law to that context. *See Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E. 2d 1136, 1142 (Ohio 2002) (stating "there need not be injury to real property in order for there to be a public nuisance" and concluding that, "under the Restatement's broad definition, a public-nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public.").[5] Accordingly, the Court finds there is no period of limitations applicable to Plaintiffs' claims of common law absolute public nuisance.

---

[4] *See Cleveland and P. Ry. Co. v. City of Cleveland*, 1920 WL 688, at *7 (Ohio Cir. Ct. Jan. 17, 1910), *aff'd sub nom. Cleveland & P.R. Co., v. City of Cleveland*, 102 N.E.1122 (1912) ("More recent cases place the right of the public as against encroachments on its highways, however long continued, on the ground that they are public nuisances, in favor of which the statute of limitations does not run."); *Little Miami R. Co. v. Commissioners of Greene Cty,* 31 Ohio St. 338, 348-49 (1877) ("No principle is more firmly settled at common law, than that no length of time can legalize a public nuisance.").

[5] An Ohio trial court declared *Cincinnati v. Beretta* was superseded by the Ohio Products Liability Act ("OPLA"). *See City of Toledo v. Sherwin-Williams*, 2007 WL 4965044 (Ohio C.P. Dec. 12, 2007). This Court determined in an Order addressing a motion to dismiss, however, that Plaintiffs' public nuisance claim was not abrogated by OPLA. (Doc. #: 1203 at 23-28) (finding that more-recent case law shows the Plaintiff's common law nuisance claim, which does *not* seek compensatory damages, is *not* abrogated under the OPLA) (citing *Ohio v. Purdue Pharma,* Case No. 17 CI 261 (Ohio C.P. Aug. 22, 2018)).

**B. Ohio statutory nuisance.**

The parties do not analyze the statute of limitations applicable to Plaintiffs' statutory public nuisance claims. Nevertheless, the Court will undertake the analysis. Plaintiffs' claim arises under two sections of Ohio Rev. Code ("O.R.C."), neither of which specifies a limitation period.

The first statutory provision upon which Plaintiffs rely, § 3767.03 (Abatement of a Nuisance) states: "Whenever a nuisance exists," the persons authorized thereunder "may bring an action in equity . . . to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it." "Whenever" means "at any or every time that." Merriam-Webster Dictionary (11th ed. 2003).[6]

The second statutory provision, O.R.C. § 4729.35 (Violations Deemed Public Nuisance), declares that a person who violates any law "controlling the distribution of a drug of abuse" has acted in a way that is "inimical, harmful, and adverse to the public welfare of the citizens of Ohio," and this "constitute[s] a public nuisance." The statute authorizes the State Attorney General or Ohio counties (by their county prosecutors) to maintain an action to enjoin any person violating those rules, and does not limit the time to do so. *Id.* Because absolute public nuisance claims and claims under O.R.C. § 3767.03 are not subject to limitations periods, the Court construes O.R.C. § 4729.35 as similarly free of any governing statute of limitations.

**C. Ohio Corrupt Practices Act.**

Defendants assert that claims under the Ohio Corrupt Practices Act ("OCPA") are governed by a five-year limitations period, beginning when the cause of action first accrues, pursuant to O.R.C. § 2923.34(J). (Doc. #: 1896-1 at 5). But the same statute also provides two

---

[6] Absent a statutory definition, "a court may consult a dictionary definition for guidance discerning the plain meaning of the statute's language." *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1060 (6th Cir. 2014); O.R.C. § 1.42 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

exceptions. First, an OCPA claim also "may be commenced at any time within five years after the unlawful conduct terminates." *Id*. And second, if the State itself brings an OCPA lawsuit, then the limitations period for a separate civil action based on the same matters is "suspended" pending the State's action, and for two years following its termination. *Id.*; *see also Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 29 F. Supp. 2d 801, 809 (N.D. Ohio 1998) (OCPA "allows an action within five years of the latest of three dates.").

Defendants insist a simple five-year limitations period applies, but this is incorrect.[7] The first exception applies in this case, as Defendants do not even assert the complained-of conduct ceased more than five years prior to the filing dates of the Counties' Complaints. The second exception also applies, as Plaintiffs' limitations period is suspended for two years following termination of the similar pending action filed by the State of Ohio, *State of Ohio ex rel. Yost v. Purdue Pharma L.P. et al.,* Case No. CV-17 CI 000261 (Ross County Ct. C.P.). In this case, the Ohio Attorney General alleges, as do Plaintiff Counties here, that certain Defendants operated an opioid marketing enterprise in violation of the OCPA. (Doc. #: 2212-1 at 22 and referenced exhibits).[8] Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' OCPA claim on limitations grounds.

### D. Federal RICO.

"RICO provides for civil actions . . . by which '[a]ny person injured in his business or

---

[7] Defendants misplace reliance on *Doe v. Archdiocese of Cincinnati,* 879 N.E. 268, 278 (Ohio 2006), to support their argument that only the statute's five-year limitations period applies to this case. There, plaintiff admitted that the alleged sexual abuse occurred when he was 12-15 years old, more than 20 years prior to filing suit. *Id.* at 271, 277. The Court held the claim time-barred, explaining that the statute of limitations commenced five years after plaintiff reached the age of majority, which was the *latest* of the dates authorized by O.R.C. § 2923.34(J). Application of the statute's 'five years after termination of the conduct' clause would have commenced the limitation period more than 20 years earlier. In this case, application of the same clause acts very differently.

[8] The same exception also applies in connection with another related case filed by the State of Ohio: *State of Ohio ex rel. Yost v. McKesson Corp., et al,* Case No. CVH 2018055 (Madison Cty. Ct. C.P.), in which the Ohio Attorney General alleges certain Defendants operated an opioid supply-chain enterprise in violation of the OCPA.

property" by a RICO violation may seek treble damages and attorney's fees.' 18 U.S.C. § 1964(c)." *Rotella v. Wood,* 528 U.S. 549, 552 (2000). A four-year statute of limitations governs RICO civil claims for damages. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 156, (1987). Specifically, noting the absence of any limitations provision in the RICO Act itself, *Agency Holding* established the four-year statute for RICO civil claims for damages by "borrowing" the four-year period governing damages claims under the Clayton Act. *See Agency Holding,* 483 U.S. at 146-155.

Plaintiffs do not dispute that their RICO *damages* claims are subject to the four-year statute of limitations. Rather, they argue their claims for *equitable relief* under RICO are not subject to any statute of limitations, because the Clayton Act's equitable relief provision exempts such claims from any limitations. *See* Areeda and Hovenkamp, Antitrust Law, at ¶ 320 (4th ed. 2014) ("The §4B [of the Clayton Act] limitation period applies only to damage actions. Equity actions, private or governmental, are not restricted by the statute of limitation."). (Doc. #: 2212-1 at 23).

To refute Plaintiffs' position, Defendants cite dicta from a Sixth Circuit decision finding persuasive the proposition that RICO does not provide private litigants an equitable remedy in the first place, so the Court must simply apply the four-year limitations period applicable to Plaintiffs' claims for damages; no further analysis is needed.[10] *See Ganey v. Raffone*, 91 F.3d 143, 1996 WL 382278, at *4 n.6 (6th Cir. 1996) (discussing *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986)) ("[*Wollersheim*] held 'that injunctive relief is not available to a private plaintiff in a civil RICO action.' * * * Although we find the *Wollersheim* analysis persuasive, because this matter can be disposed of by other means, we do not rule on whether injunctive relief is available"

---

[10] Neither the instant motion for summary judgment based on limitations nor any other motion filed by Defendants seeks dismissal of Plaintiffs' claim for equitable relief under RICO.

under RICO).[11]  (Doc. #: 2537 at 27-28).

The Court concludes Defendants' argument that equitable relief is unavailable under RICO is not well-taken.  Neither the Supreme Court nor the Sixth Circuit has squarely addressed whether RICO provides an equitable remedy to private plaintiffs, and there is a Circuit split on the question. *See, e.g., Jackson v. Rohm & Haas Co.*, 2009 WL 948741, at *2 (E.D. Pa. Mar. 20, 2009) (collecting cases with differing conclusions), *aff'd,* 366 F. App'x 342 (3rd Cir. 2010).  Unlike the very brief dicta in *Ganey*, more recent Circuit cases undertaking deeper analysis conclude RICO does provide equitable relief.  *See Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2nd Cir. 2016) (joining the Seventh Circuit in concluding that federal courts are authorized to grant equitable relief to a private plaintiff establishing injury under Section 1962); *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001), *reversed on other grounds*, 537 U.S. 393 (2003).  The question of what limitations period applies to a RICO claim for equitable relief, therefore, is not moot.

The *Agency Holding* court held that the Clayton Act is more closely analogous to RICO than any state law, therefore its four-year statute of limitations governing claims by private parties seeking *damages* is most appropriate for RICO actions.  *See* 483 U.S. at 146-155.  Defendants rely on *Agency Holding*'s reasoning that, where federal statutes do not provide express statutes of limitations, "we do not ordinarily assume that Congress intended that there be no limit on actions at all; rather, our task is to 'borrow' the most suitable statute or other rule of timeliness from some other source."  *Id.* at 146 (internal quotation marks and citations omitted).

---

[11]  In *Ganey*, the Sixth Circuit also acknowledged a circuit split as to whether RICO confers equitable relief, and declined to rule on that question where the "sole issue" before the Court was interpretation of an arbitration award. *See* 91 F.3d at *1, *3-4 & n.6 (vacating District Court's order of injunction as improperly exceeding its authority where plaintiffs sought injunctive relief and damages under RICO in arbitration, but were awarded money damages only).

*Agency Holding*, however, did not address whether equitable claims could be brought under RICO in the first place or, if so, whether the Clayton Act's express exemption of injunctive claims from a limitations period would govern such claims. Defendants note the *Agency Holding* decision said nothing about borrowing the Clayton Act's rule exempting equitable claims from limitations periods. Defendants reason, "had Congress wanted to provide such an exemption, it would have said so." (Doc. #: 2526 at 28). This argument ignores that, had Congress wanted to include *any* statute of limitations in RICO, it could have done so, thereby obviating the need for the borrowing exercise undertaken by the *Agency Holding* court.

Defendants also contend that, because Plaintiffs' RICO claims seek both damages and equitable relief based on the same facts, the claims are governed by a general rule that the statute of limitations should apply to both types of remedy. *See Nemkov v. O'Hare Chicago Corp.,* 592 F.2d 351, 355 (7th Cir. 1979); *Cope v. Anderson,* 331 U.S. 461, 464 (1947). (Doc. #: 2637 at 28-29). But Defendants cite no caselaw applying that general rule to a RICO case. Further, the cases Defendants cite predate *Agency Holdings* and apply state law statutes of limitations to federal statutory claims that lack their own – whereas the Clayton Act, which provides that no statute of limitations applies to the injunctive relief it permits, is the source of statutes of limitation for RICO.

In the absence of controlling authority addressing what, if any, statute of limitations governs Plaintiffs' RICO claims seeking equitable relief, the Court follows controlling authority instructing courts to borrow from the Clayton Act. Based on that instruction, the Court concludes Plaintiffs' RICO claims for equitable relief, like those brought under the Clayton Act, and like public nuisance claims, are exempt from the operation of a limitations period. Notably, this result does not provide Plaintiffs with any more or different remedies than they seek or are allowed pursuant to their public nuisance claims.

### E. Civil conspiracy.

Under Ohio law, "[a]n underlying unlawful act is required before a civil conspiracy claim can succeed. Thus, the applicable statute of limitations for filing a civil conspiracy cause of action is the relevant limitations statute for the underlying cause of action." *Davis v. Clark Cty. Bd. of Commrs.*, 994 N.E.2d 905, 909 (Ohio Ct. App. 2013); *see also In re Fair Fin. Co.*, 834 F.3d 651, 679 (6th Cir. 2016) (same). The "underlying causes of action" are the public nuisance, OCPA, and RICO claims, the statues of limitations for which are all discussed above. Accordingly, for the same reasons and to the same extent as Plaintiffs' public nuisance, OCPA, and RICO claims are (or are not) barred by a statute of limitations, the same is true for Plaintiffs' conspiracy claims.

## III. Accrual.

As discussed above, it is clear that Plaintiffs' common law and statutory public nuisance claims were timely filed, as there is no applicable statute of limitations. The same analysis and conclusions apply to Plaintiffs' claims for equitable relief under RICO. And it is clear that Plaintiffs' OCPA claims were timely filed, given that the applicable limitations period does not expire until two years after termination of Ohio's still-pending, similar lawsuits.

This leaves Plaintiffs' RICO claims for damages, which has a four-year statute of limitations, and some related aspects of their civil conspiracy claims. With regard to these claims only, the pertinent questions become: (1) when did these claims first accrue, such that the limitations period began to run?; and (2) were the limitations periods tolled? For the reasons stated below, the Court concludes these questions combine to raise disputed issues of material fact and, except for equitable tolling, cannot be answered as a matter of law.

### A. General principles.

"Application of a statute of limitations presents a mixed question of law and fact; when a

cause of action accrues is a question of fact, but in the absence of a factual issue, application of the limitations period is a question of law." *Schmitz v. Nat'l Collegiate Athletic Ass'n,* 122 N.E.3d 80, 85 (Ohio 2018) (citations omitted). When a plaintiff knew or should have discovered its injury in the exercise of reasonable diligence is a factual determination based on the "facts and circumstances of each particular case." *Sizemore v. Smith*, 453 N.E.2d 632, 635 (Ohio 1983); *Laipply v. Bates*, 849 N.E.2d 308, 312 (Ohio Ct. App. 2006) ("The key is when a *reasonable* person is alerted … a factual determination") (emphasis in original); *Phelps v. Lengyel*, 237 F. Supp. 2d 829, 838 (N.D. Ohio 2002).

The RICO limitations period is triggered by "discovery of the injury, not discovery of other elements of a claim." *Rotella,* 528 U.S. at 555. The Sixth Circuit has explained that a RICO plaintiff

> need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of all facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings," not when he hears thunder and sees lightning.

*Isaak v. Trumbull*, 169 F.3d 390, 399 (6th Cir. 1999) (quoting *Harner,* 35 F.3d 565).

**B. Accrual dates applicable to Plaintiffs' claims.**

Defendants maintain undisputed evidence demonstrates that, by October 27, 2012, Plaintiffs knew, should have known, and/or were on inquiry notice of: (i) the volume of opioids shipped into their communities; (ii) an opioid use and abuse problem in their communities; and (iii) the resulting costs incurred. Defendants argue these facts sufficed to permit Plaintiffs to assert their claims by October 27, 2012; therefore, claims based on earlier conduct are barred. (Doc. #: 1896-1 at 12-24; Doc. #: 2537 at 3-19).

Plaintiffs rebut, as overly simplistic, Defendants' argument that Plaintiffs knew or should have known of their injuries prior to October 27, 2012, asserting that genuine issues of material

fact exist as to all of those matters.  They contend that numerous factors served to interfere with discovery of their claims until around 2016.  (Doc. #: 2212-1 at 3-16).

Defendants make some strong arguments regarding the timing of Plaintiffs' knowledge of facts that should have allowed them to assert their claims long before they did.  But Plaintiffs also point to evidence that creates disputed issues of material fact.  Some examples are discussed below.

### 1. Knowledge of the volume of opioids shipped to Plaintiffs' communities.

Defendants argue the volume of prescription opioids shipped to Plaintiffs' communities was known, publicly available, and an "active subject of discussion and inquiry before October 27, 2012" and, therefore, was or should have been known by Plaintiffs.  These facts, they contend, are exemplified by evidence of documents authored by Plaintiffs and other Ohio government agencies that include certain per capita dispensing data that appeared in a 2011 local news report; DEA Ohio pharmacy supply data circulated by the Ohio Department of Health; and charts and graphs created from DEA ARCOS data showing increases in distribution from 1997 to 2007 that were forwarded by a County agency to government and community leaders.  (Doc. #: 1896-1 at 13-15 and referenced exhibits; Doc. #: 2537 at 3-8 and referenced exhibits).

Distributors also argue the same "red flag[s]" and "facially suspicious nature" of opioid shipments that Plaintiffs allege should have alerted Defendants to report and halt those orders also put Plaintiffs on inquiry notice of the alleged misconduct prior to October 7, 2012.  Distributors maintain that, once the volume of opioids being distributed in the Counties was known to Plaintiffs via publicly available aggregate distribution data, "any reasonable inquiry" would have identified the suppliers and regulations governing their activities.  (Doc. #: 1896-1 at 26-27; Doc. #: 2537 at 4-8).

Plaintiffs counter that information such as the aggregate distribution statistics Defendants point to was insufficient to confer particularized constructive knowledge. Plaintiffs contend that sifting through the "opioid volume evidence" that Defendants identify as triggering accrual of Plaintiffs' claims would have required Plaintiffs to "cull through the labyrinth of distributional issues and identify Defendants as the culprits of systemic distribution failures (as well as Plaintiffs' attendant injuries)," thus raising a question of fact as to whether such measures would exceed reasonable diligence requirements. (Doc. 2212-1 at 32, 37-39). Plaintiffs also note other evidence (addressed further below) demonstrates that: (i) Defendants purposefully misled them to believe that other actors were responsible for the opioid epidemic, and (ii) Defendants delivered false assurances of future regulatory compliance after Defendants' misconduct was first revealed.

The Court finds the sum of the evidence regarding Plaintiffs' knowledge of the volume of opioids shipped to Plaintiffs' communities shows material facts in dispute, and leaves the Court unconvinced that no reasonable jury could find for Plaintiffs on the question of accrual.

## 2. Knowledge of the existence of an opioid use and abuse problem.

Defendants assert that the existence the "opioid use and abuse epidemic" was known by Plaintiffs well before 2012, as evidenced by: (i) deposition testimony of state and local government officials acknowledging that opioid problems commenced in the late 1990s and increased over the years; (ii) meetings, reports, studies, investigations, and task force documents relating to the opioid crisis; (iii) a May 2012 announcement by the DEA concerning the creation of a Cleveland-based diversion squad that would include police from Plaintiff Counties; (iv) numerous references to "epidemic" and "crisis" by government officials from 2010 to 2012; and (v) media coverage. (Doc. #: 1896-1 at 15-22 and referenced exhibits; Doc. #: 2537 at 6-8 and referenced exhibits).

Defendants stress that publicly accessible final decisions in DEA and Ohio enforcement

actions between 2007 and 2012 provided actual or constructive knowledge sufficient to develop Plaintiffs' claims as did a 2012 lawsuit brought by the West Virginia Attorney General, alleging defendant distributors failed to comply with anti-diversion obligations.[14]  *Hardin v. Reliance Trust Co.*, 2006 WL 2850455, at *7–8 (N.D. Ohio Sept. 29, 2006), *aff'd sub nom. Cline v. Reliance Trust Co.*, 245 F. App'x 503 (6th Cir. 2007) (lawsuits and other public records can be sufficient to put investors on inquiry notice).  (Doc. #: 1896-1 at 11-16, 25-39 and referenced exhibits; Doc. #: 2537 at 17-19 and referenced exhibits).

Plaintiffs respond that courts have declined to find as a matter of law that constructive knowledge was conferred by news accounts of misconduct in other locations or by suits by similarly-situated plaintiffs, or by local reports of out-of-state convictions that "provided no hint of illegal activity in Ohio."  *See, e.g., Montgomery v. Louis Trauth Dairy, Inc.,* 1996 WL 343340, at *4-5 (S.D. Ohio April 25, 1996).[15]  (Doc. #: 2212-1 at 29-32 and referenced exhibits).  Plaintiffs also discount the 2012 West Virginia lawsuit, asserting it revealed virtually no useful information regarding their claims and relevant evidence was initially sealed and disclosed only in redacted form.  (Doc. #: 2212-1 at 31-32 and referenced exhibits).

Plaintiffs do not deny that information about opioid use and misuse was emerging as early as 2000.  Rather, they cite multiple factors occurring prior to 2016 that interfered with their ability to discover the injuries on which their claims are based, or the causal links connecting the epidemic to Defendants' actions.  For example, Plaintiffs assert their efforts to address the increasing problems arising from opioid use and abuse from 2000 through 2014 focused on attacking street

---

[14]  Distributors also note that a year prior to the West Virginia filing, Ohio joined West Virginia and Kentucky to form the Interstate Opiate Task Force "to fight prescription-drug abuse" in the region. (Doc. #: 1896-1 at 30 and referenced exhibits).

[15]  The *Montgomery* court concluded that the media coverage triggered a duty to investigate, presenting an issue of fact as to plaintiff's diligence in investigating and discovering evidence warranting a claim.  *Montgomery* at *5.

level and physician diversion, pill mills, criminal sales, doctor shopping, and prescription fraud. They describe those investigative and prosecutorial initiatives as diligent measures that overwhelmed their resources. (Doc. #: 2212-1 at 6-9 and referenced exhibits).

Plaintiffs also assert that Defendants' used "calculated misdirection" to deflect attention from their wrongdoing with, for example, messaging initiatives designed to reinforce the notion that criminals, pill mills, overprescribing doctors, and doctor-shopping patients were the responsible parties. (*Id.* at 9-12, 33). Moreover, the Distributors' alleged gross failure to identify and report suspicious orders was part of the lack of information allowing Plaintiffs to understand the factual basis for their claims.

The Court finds the sum of the evidence regarding Plaintiffs' knowledge of the costs incurred for opioid-related services shows material facts in dispute, and leaves the Court unconvinced that no reasonable jury could find for Plaintiffs on the question of accrual.

### 3. Knowledge of the costs incurred for opioid-related services.

According to Defendants, Plaintiffs knew about their opioid-related expenses well before 2012, as demonstrated by testimony and commentary from task force members and government officials recognizing the demand for opioid-related services and the associated costs; additional funding requests from municipal departments to meet increased demand for opiate-related services; and media coverage of the financial impact of the opioid problem dating back to 2008. (Doc. #: 1896-1 at 22-23 and referenced exhibits; Doc. #: 2537 at 8-10 and referenced exhibits).

Plaintiffs do not dispute that budgetary impacts of the epidemic eventually led them to discover their injuries. Rather, they identify the date of accrual as 2016, when dramatic spikes in opioid deaths and a concomitant spike in budgetary consequences prompted them to trace expenses potentially related to the opioid crisis back to 2006. They assert that a comparison of various

budgets revealed that opioid-related expenses in 2006 had a relatively small impact and that 2016 financial data shows a precipitously increased impact. (Doc. #: 2212-1 at 13-16 and referenced exhibits). Plaintiffs also cite testimony of budget management personnel explaining that, while they knew the Counties incurred expenses for foster care, medical matters, and law enforcement, awareness that those costs were attributable to the opiate epidemic did not come to light contemporaneously. (*Id.*). The Court finds the sum of the evidence regarding Plaintiffs' knowledge of the costs incurred for opioid-related services shows material facts in dispute, and leaves the Court unconvinced that no reasonable jury could find for Plaintiffs on the question of accrual.

* * *

In sum, the Court disagrees with Defendants that the evidence is undisputed, or so one-sided, that Plaintiffs knew, should have known, and/or were on inquiry notice by October 27, 2012 of facts sufficient to permit Plaintiffs to assert their claims. The question of accrual must be submitted to a jury.

## IV. Tolling Doctrines.

### A. Equitable tolling.

Plaintiffs argue they did not receive granular ARCOS data until April 2018 and, therefore, the statutes of limitation applicable to their claims should be tolled pursuant to the doctrine of "equitable tolling." (Doc. #: 2212-1 at 34). The Court disagrees.

Equitable tolling has two elements. First, the party seeking to toll limitations "must establish 'that he has been pursuing his rights diligently.'" *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 749 (6th Cir. 2011) (quoting *Holland v. Florida*, 560 U.S. 631. 632 (2010). Second,

18

the party must show "that some extraordinary circumstance stood in his way and prevented timely filing." *Hall*, 662 F.3d at 749; accord *Credit Suisse Securities (USA) v. Simmonds*, 566 U.S. 221, 227 (2012) (discussing equitable-tolling principles).

The first element, pertaining to diligence, covers matters within a plaintiff's control. The second element, extraordinary circumstances, covers matters outside that party's control and "is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control." *See Menominee Indian Tribe of Wisconsin v. United States*, 136 S.Ct. 750, 756 (2016). The party seeking equitable tolling has the burden to prove both elements. *See id.* (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Addressing only one element without addressing the other is grounds to reject a request for equitable tolling. *Menominee Indian Tribe of Wisconsin*, 136 S.Ct. at 756.

Circumstances allowing equitable tolling are rare and courts have extended this relief only sparingly. *See Ata v. Scutt,* 662 F.3d 736, 741 (6th Cir. 2011); *see also North v County of Cuyahoga*, 2017 WL 3065502, at *9 (N.D. Ohio July 19, 2017) (citing *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010). As the Supreme Court noted:

> We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453 (citations omitted).

Having reviewed the evidence and arguments, the Court concludes Plaintiffs have not carried their burden to establish both elements necessary for the Court to apply the extraordinary relief afforded by the equitable tolling doctrine. (*See* Doc. #: 2212-1 at 37). To be entitled to equitable tolling, Plaintiffs must establish they were "pursuing their rights diligently." *Holland*,

560 U.S. at 632.  As proof of their due diligence, Plaintiffs reference only their "struggle and delay" in obtaining ARCOS data and that they were only able to obtain this critical information by court order.  (*See* Doc. #: 2212-1 at 36-37).  Even accepting this as true, however, Plaintiffs offer no evidence of when their "struggle and delay" began, what efforts they took before filing suit to obtain the granular ARCOS data they claim they needed to identify defendants, what efforts they undertook to identify Defendants other than through granular ARCOS data, why any such efforts were unsuccessful, or how they were stymied in such efforts.  That they now know these efforts may have been difficult or time-consuming does not excuse them from undertaking the effort.  *See Ruiz-Bueno v. Maxim Health Care Services*, 659 Fed. Appx. 830, 836 (6th Cir. 2016) (Ohio law requires a plaintiff to investigate and discover the identity of an alleged wrongdoer once the plaintiff has reason to believe it has been wronged); *see also Flowers v. Walker,* 589 N.E.2d 1284, 1287 (Ohio 1992).[19]

More important, Plaintiffs' Complaints, naming more than 20 Defendants *prior* to obtaining ARCOS data, including distributors, indicates Plaintiffs had the ability to bring their claims without the granular ARCOS data on which they rely in making their arguments.  (*See* Doc. #: 2537 at 20).

The Court finds that Plaintiffs have not submitted evidence establishing they met their burden on the first element of equitable tolling.  Because Plaintiffs are required to establish both elements, the Court need not address whether Plaintiffs have met their burden to establish the second prong, that some extraordinary circumstance also stood in their way and prevented timely

---

[19]  Plaintiffs never argue that their inability to obtain granular ARCOS data precluded them from bringing suit. Instead, they argue only that ARCOS data "would have assisted in building a case against Defendants."  (*See* Doc. #: 2212-1 at 29).  Plaintiffs also assert they "could have identified Distributor and Pharmacy Defendants as precipitators of the opioid epidemic "much sooner" with the benefit of ARCOS data."  (*Id.* at 36).  These assertions are almost certainly true, but they do not support application of the doctrine of equitable tolling.

filing.  This conclusion is made without prejudice to holdings below relating to issues of the Plaintiffs' diligence.

**B. Fraudulent concealment.**

To toll a statute of limitations based on fraudulent concealment, a plaintiff must prove:  (1) wrongful concealment by each defendant; (2) a failure to discover operative facts on which a claim is based within the limitations period; and (3) a diligent effort to do so until those facts are discovered.  *See, e.g., Dayco Corp. v. Firestone Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).  "Ohio law recognizes the fraudulent concealment doctrine to toll the statute of limitation 'where there is some conduct of the adverse party, such as a misrepresentation, which excludes suspicion and prevents injury.'"  *City of Cuyahoga Falls v. Johnson Controls, Inc.*, 2019 WL 1116006, at *4 (N.D. Ohio Mar. 11, 2019) (quoting *Bryant v. Doe*, 552 N.E.2d 671 (Ohio Ct. App. 1988)).  Furthermore, where proof demonstrates a conspiracy, "[f]raudulent concealment…may be established through the acts of co-conspirators."  *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 980 (N.D. Ohio 2015) (citing *In re Scrap Metal Antitrust Litig.*, 527 F. 3d 517, 538 (6th Cir. 2008)).

Plaintiffs identify evidence they assert establishes that Defendants concealed their failure to abide by anti-diversion obligations: by destroying and hiding documents from the DEA; avoiding documenting opioid prescription orders as suspicious to eliminate evidence; manipulating customer ordering thresholds; falsely and publicly assuring they would remedy past wrongdoing by complying with anti-diversion duties;  presenting a false appearance of in-house compliance staffing to federal authorities; and designing electronic systems that avoid recording and tracking orders exceeding customer thresholds.  (Doc. #: 2212-1 at 9-12, 45-51 and referenced exhibits).

Defendants contend their public assurances of compliance do not constitute fraudulent concealment because any such statements merely deny accusation of wrongdoing. *See Dayco Corp.,* 386 F. Supp. at 549. (Doc. #: 1896-1 at 45 and referenced exhibits). They also assert that no alleged concealment was directed at Plaintiffs and, therefore, did not prevent them from discovering facts essential to stating a claim. (Doc. #: 2537 at 23). Plaintiffs counter correctly that, if hundreds of thousands of suspicious orders were unreported, in violation of the duty to do so, this can constitute fraudulent concealment because, if the suspicious orders were concealed from the DEA, Plaintiffs also could not have learned of them. (Doc. #: 2212-1 at 51-52). In other words, regardless of whether Defendants' alleged concealment was "directed *at* Plaintiffs," the concealment *from* Plaintiffs still occurred.

As the Court previously concluded, Plaintiffs may not rely on Defendants' long-known marketing practices to toll their claims as fraudulently concealed (Doc. #: 1203 at 4-5) (Doc. #: 1896-1 at 23-25; Doc. #: 2537 at 16-17). But these motions raise material disputed facts regarding concealment of Defendants' alleged failures to cooperate with law enforcement and comply with anti-diversion duties that are properly determined at trial. *See Sizemore*, 453 N.E.2d at 635; *Phelps,* 237 F. Supp at 838 (discovery of fraudulent conduct "is a factual inquiry"). The Court will not reject Plaintiffs invocation of fraudulent concealment as a matter of law.

### C. Continuing violations.

The continuing violations doctrine is applicable where: "(1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendant at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009).

Defendants contend Plaintiffs' alleged injuries arise from 'repetitive discrete violations,'

not continuing violations. *See, e.g., Nat'l Credit Union Admin Bd. v. Ciuni & Panichi, Inc.,* 2019 WL 188472, at *10 (N.D. Ohio Jan. 11, 2019 (series of negligent annual audits were repetitive and discrete). They posit that "each time a Distributor allegedly shipped an improper order to a County pharmacy, that alleged conduct was a discrete wrong." (Doc. #: 2526 at 25). The term "discrete" describes acts that are easily identified and independently actionable. *See Nat'l Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 112-116 (2002).

Plaintiffs respond that evidence demonstrates a decades-long marketing and distribution scheme that continues unabated, satisfying the tolling requirement that alleged acts "cannot be said to occur on any particular day, but [rather] over a series of days or years." *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003); *Ohio Midland, Inc. v. Ohio Dep't of Transp.*, 286 F. App'x 905, 912 (6th Cir. 2008) ("Courts have allowed the statute of limitations to be tolled when . . . there is a "longstanding and demonstrable policy" of the forbidden activity.). (Doc. # 2212-1 at 55-57 & n.181).

The Court finds Plaintiffs' position persuasive. Material disputed facts that preclude summary judgment include the continuing nature of Defendants' alleged wrongdoing and whether further injury could have been avoided had Defendants ceased their conduct. The Court will not reject Plaintiffs invocation of the continuing violation doctrine as a matter of law.

## V. The Pharmacy Defendants' Motion for Summary Judgment.

The Pharmacies argue that Plaintiffs' claims are barred in whole or substantial part based on their terminating distribution of prescription opioids either prior to or soon after the claims accrued. (Doc. #: 1874; Doc. #: 2526).

Following the Court's Order granting *Track One* Plaintiffs' Motions to Sever certain

Defendants, (Doc. #: 2399), the only remaining Pharmacy is Walgreens. The claims remaining against Walgreens are common law absolute public nuisance, Ohio statutory nuisance, and civil conspiracy – Plaintiffs do not assert an OCPA claim or a RICO claim against Walgreens.

Asserting a four-year statute of limitations governs all of the claims against it, Walgreens argues the claims are barred because it ceased distribution of prescription opioids on April 9, 2014 – which is more than four years prior to April 25, 2018, the date Walgreens was named in Plaintiffs' Third Amended Complaints. (Doc. #: 1874).[20]

Walgreens submits evidence seeking to establish that the claims against it are neither suspended by the discovery rule nor extended by tolling doctrines. (Doc. #: 1874 at 6-12 and referenced exhibits; Doc. #: 2526 at 3-7 and referenced exhibits). But accrual dates and tolling doctrines are irrelevant regarding the pending claims against Walgreens, in light of the Court's conclusions that: (i) absolute and statutory public nuisance claims are exempt from a statute of limitations, and (ii) the statute of limitations governing civil conspiracy claims "is the relevant limitations statute for the underlying cause of action." *See Davis*, 994 N.E.2d at 909.

In the absence of any statute limiting Plaintiffs' claims against Walgreens,' the Court denies summary judgment.

---

[20] The Pharmacies' memorandum of law adopts the arguments raised by the Manufacturers and Distributors concerning applicable limitations periods, accrual dates, tolling doctrines, and marketing practices. The Court's determinations above apply to Walgreens.

## VI.  Conclusion.

Based on the foregoing, Manufacturers' and Distributors' Motion for Partial Summary Judgment on Statute of Limitations Grounds (Doc. #: 1896) and the Pharmacy Defendants' Motion for Summary Judgment Based on the Statute of Limitations (Doc. #: 1874) are **DENIED**.

**IT IS SO ORDERED.**

 /s/ Dan Aaron Polster  *September 4, 2019*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

25