IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>        Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>        Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>        Defendants. | Civil Action No. 3:17-01665<br>Hon David A. Faber |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL
DISCOVERY RESPONSES FROM DEA**

Defendants[1] seek the production of documents and communications responsive to Defendants' Subpoena to Produce Documents, Information, or Objects to the U.S. Drug Enforcement Administration ("DEA") served on February 21, 2020. A copy of the subpoena is attached as Exhibit A.

Following three lengthy meet-and-confer conferences ranging from 45 minutes to 105 minutes, DEA still will not commit to produce any responsive documents and has yet to serve any written objections to the requests. Throughout this process, DEA has not argued that any of

---

[1] AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation.

Defendants' requests are irrelevant.  Nor could it.  It is undisputed that DEA documents and materials responsive to Defendants' requests are highly relevant to the claims of this litigation.

DEA's concerns center on the burden of responding to a third party subpoena.  But, addressing each request individually during the meet-and-confer discussions, Defendants explained that they intend to minimize any burden on DEA by seeking information relevant to CT2 and general information newly discovered since discovery concluded in CT1.[2]  In addition, upon DEA's request, Defendants narrowed their requests by 50 percent—agreeing to move forward with eighteen priority and narrow requests.[3]  Defendants also proposed using the Attorneys' Eyes Only ("AEO") provision of the protective order to reduce any burden on DEA from reviewing documents for potential privilege issues raised by DEA, as has been done in other opioid litigation jurisdictions.  *See* Dkt. 1357, *In re: National Prescription Opiate Litigation*, 1:17-md-2804 (N.D. Ohio) (hereinafter "the AEO protective order").  Still, DEA refuses to provide any substantive response to Distributors' subpoena.

Regrettably, with the discovery period currently scheduled to close in two months, Defendants are forced to bring this motion to compel documents and information responsive to Defendants' priority requests.[4]

---

[2] "CT2" refers to the instant action of *The City of Huntington v. AmerisourceBergen Drug Corp. et al*. and *Cabell County Commission v. AmerisourceBergen Drug Corp et al.*  "CT1" refers to the MDL litigation in Cleveland of *The County of Summit, Ohio et al. v. Purdue Pharma et al.* and *The County of Cuyahoga, et al. v. Purdue Pharma et al.*

[3] The priority requests include Nos. 1, 3, 7, 8, 9, 13, 15, 16, 17, 18, 19, 21, 24, 26, 30, 32, 34, and 36.

[4] Defendants do not withdraw their non-priority requests or request for testimony by this motion, but focus the Court—for now—on compliance with Defendants' priority requests.  Defendants also seek production of DEA's long overdue privilege log from CT1, as discussed below.

I.      **Background**

Discovery from the DEA is central to the issues of this case.  Defendants know it.  Plaintiffs know it.  Plaintiffs contend that Defendants violated the Controlled Substances Act ("CSA") by failing to maintain effective controls against diversion.  Discovery from DEA is essential to these issues because DEA is the federal agency charged with enforcing the CSA.  During CT1, Plaintiffs and Defendants sought documents and testimony from DEA.  Defendants requested information about DEA's actions in Summit and Cuyahoga Counties and general information and testimony from DEA on issues known to Defendants at the time.  The last deposition of DEA in CT1 occurred in July 2019.  Defendants do not seek to repeat CT1 DEA discovery in CT2.

Since discovery concluded in CT1, there have been several significant developments relating to DEA's role in the opioid crisis.  For example, DEA determined estimates of diversion for prescription opioids pursuant to the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act (SUPPORT Act), Pub. L. 115-271, 132 Stat. 3894 (September 2019); the U.S. Department of Justice Office of the Inspector General issued its report titled *Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids* (September 2019); and the Government Accountability Office ("GAO") issued its report titled *Drug Control: Actions Needed to Ensure Usefulness of Data on Suspicious Opioid Orders*, GAO-20-118 (Washington, D.C., January 2020). Discovery also opened in CT2, highlighting the import of DEA's actions in Cabell County, the City of Huntington, and West Virginia, including actions reported in, for example, the House Energy and Commerce Committee's report titled *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia* (December 2018).

On February 21, 2020, Defendants served their CT2 subpoena seeking targeted information concerning DEA's actions in Cabell County, the City of Huntington, West Virginia and certain,

limited information learned since discovery closed in CT1 or not previously requested in CT1. Defendants' subpoena followed Plaintiffs' first CT2 subpoena. Plaintiffs subsequently served a second CT2 subpoena on DEA, and separately moved to compel from Defendants all communications between DEA and Defendants since 1980. *See* Dkt. 269.

The importance of DEA discovery to all parties underscores the need for symmetrical treatment of the parties by DEA. It became apparent through the meet-and-confer process over Defendants' discovery requests, however, that DEA refuses to treat Plaintiffs and Defendants symmetrically.

**DOJ's Uneven Treatment During Meet-and-Confer Process.** Prior to the first meet-and-confer conference on Defendants' subpoena, the Department of Justice ("DOJ"), which represents DEA, informed Defendants that Plaintiffs would be joining the discussion concerning Defendants' subpoena. Defendants had not been included in any discussions with DOJ concerning Plaintiffs' first CT2 subpoena, but were pleased to have Plaintiffs' participation, hoping it signaled DOJ would be approaching its responses to both Plaintiffs' and Defendants' subpoenas symmetrically in CT2 going forward. Unfortunately, that did not happen. Despite Plaintiffs' attendance at and vocal participation in all three of Defendants' meet-and-confer conferences and repeated requests from Defendants, DOJ and Plaintiffs have refused to commit to allowing Defendants the opportunity to participate in conferences concerning Plaintiffs' subpoenas (and, if any such conferences have occurred, Defendants have been excluded).

**DEA's Uneven Productions.** DOJ has now produced multiple volumes of documents in response to Plaintiffs' first CT2 subpoena. These productions include information relating to West Virginia and include, for example, DEA's investigative files for certain West Virginia pharmacies. *See, e.g.*, Ex. B (example of "Reports of Investigation" produced by DEA in response to Plaintiffs'

subpoena). And, although more than 45 days have passed since Defendants served their subpoena on DEA, DEA refuses to provide responses or objections to Defendants' requests (let alone any documents) and refuses to commit to a date certain to respond in a meaningful way. This is not symmetrical treatment.

**Defendants' Meet-and-Confer Efforts.** Defendants have worked in good faith with DEA to move the process along. Defendants and DEA participated in three meet-and-confer sessions over the course of three weeks, ranging in length from 45 minutes to 105 minutes. These meet-and-confer sessions failed to produce any meaningful response from DEA to Defendants' discovery requests and ended with DEA refusing to commit to the production of any documents.

During the first conference, Defendants listened as DOJ asserted that the requests were overbroad and burdensome and requested Defendants identify their priority requests. Defendants understood DOJ's primary concerns were that the requests sought information: (i) redundant to Defendants' CT1 subpoena and Plaintiffs' CT2 subpoena; (ii) not limited in geographical scope to West Virginia; and (iii) protected by privilege. Defendants agreed to review the requests for redundancy and geographical scope, but requested information from DOJ to understand the metes-and-bounds of the privileges asserted by DEA. When DEA declined to offer any explanation or guidance, Defendants renewed their request that DEA produce its long-overdue privilege logs from CT1, which Defendants initially requested over a year ago. DEA acknowledged the log would inform Defendants about the types of documents and information DEA was withholding based on multiple types of privilege claims, but could not provide any information about when a log would be forthcoming.

During the second conference, Defendants agreed to withdraw the single request that sought the same information requested by Plaintiffs, and reviewed each request individually with

DOJ to address DOJ's concerns regarding scope and privilege and identified eighteen priority requests.  Defendants again requested an understanding of DOJ's privilege concerns and production of DEA's CT1 privilege log.  DOJ offered only a minimal explanation of the scope of its privilege concerns (that it could not produce names of confidential informants or information revealing sensitive investigative techniques).  DOJ continued to insist that its CT1 privilege log would answer Defendants' questions about the nature and scope of DOJ's privilege claims, but again could not provide a production date for its log. DOJ stated it would need additional time to consider Defendants' narrowed requests and a deadline for production of the CT1 privilege log.

During the third conference, although conceding Defendants had "narrowed the scope of their requests by 50 percent," DOJ still would not commit to produce *any* documents in response to the priority requests. Instead, DOJ stated it would "have to hedge" in the negotiations and needed "more movement" from Defendants before it would commit to producing documents in response to *any* of the requests, even requests that DOJ acknowledged were narrowly targeted and not unduly burdensome.

DOJ would not agree to provide a response in writing and refused to explain the scope of its vague privilege concerns.  Instead, DOJ stated it would begin rolling out its CT1 privilege log—for documents it has been withholding from Defendants for over a year—by the end of April, with rolling installments to follow at unspecified times thereafter.  But, DOJ refused to identify how many documents are currently being withheld or how long the rolling production of a log would take.

## II.    Defendants' Priority Requests

Defendants' requests are highly relevant to the central issues of this litigation.  Plaintiffs contend that Defendants' alleged failure to report or halt shipments of suspicious orders resulted in harm to Plaintiffs.  Questions about whether and how DEA used ARCOS Data, suspicious order

reports, and the West Virginia Controlled Substance Automated Prescription Program relate directly to whether any alleged failure to report or halt suspicious orders caused Plaintiffs' alleged injuries. In addition, DEA's efforts to combat diversion and illicit opioid use in West Virginia are highly relevant because Plaintiffs' alleged injuries are largely related to users of illicit opioids (*e.g.* heroin and fentanyl-analogues) and users of opioids diverted from legitimate prescriptions.

At issue in this present Motion are Defendants' eighteen priority requests: Nos. 1, 3, 7, 8, 9, 13, 15, 16, 17, 18, 19, 21, 24, 26, 30, 32, 34, and 36 as conveyed during the second meet-and-confer. Defendants' requests are highly relevant and narrowly tailored to West Virginia and facts learned since discovery closed in CT1, covering the following topics:

Cabell County and the City of Huntington:

- DEA's use of ARCOS Data, Suspicious Order Reports, and/or the West Virginia Controlled Substance Automated Prescription Program to combat diversion or misuse of prescription opioids within or into the City of Huntington, Cabell County, or any town, village or city within Cabell County;

- Individuals or entities DEA knew or suspected to have unlawfully diverted and/or trafficked prescription opioids or illicit opioids within or into the City of Huntington, Cabell County, or any town, village or city within Cabell County;

- DEA's efforts to suspend, revoke, or seek the suspension or revocation of, fine, or otherwise sanction any distributors, doctors, pharmacies, pharmacists, healthcare providers or other persons or entities because of alleged diversion or trafficking of prescription opioids within or into the City of Huntington, Cabell County, or any town, village or city within Cabell County;

- Actions taken by DEA or any federal, state, or local agency within Cabell County or the City of Huntington to combat the use, misuse, abuse, sale, diversion, production, transportation, distribution, purchase, and/or trafficking of prescription or illicit opioids within or into the City of Huntington, Cabell County, or any town, village or city within Cabell County;

- Communications between DEA Headquarters and DEA field offices related to DEA's use of the Suspicious Order Reporting System (SORS), ARCOS data, or any other communications from Defendants to combat the diversion or misuse of prescription opioids within or into the City of Huntington, Cabell County, or any town, village or city within Cabell County.

West Virginia:

- DEA's submissions to the House Energy and Commerce Committee for the Committee's investigation that resulted in the 2018 report, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia*;

- Completed inspections, audits, or investigations by DEA of any Defendant located in or distributing to pharmacies in West Virginia, including McKesson facilities in Washington Courthouse, Newcastle, Ruther Glen, and Landover; ABDC facilities in Lockbourne and Glen Allen; and Cardinal's facility in Wheeling;

- DEA's use of suspicious order reports submitted by Defendants to DEA Headquarters relating to West Virginia registrants;

- Documents related to investigations of suspicious orders reported by Defendants for West Virginia pharmacies, hospitals or other dispensers;

- DEA's use of ARCOS data or the West Virginia Controlled Substance Automated Prescription Program data to investigate West Virginia pharmacies, pharmacists, or health care providers;

- DEA's investigation of and decision not to prosecute Wendell Kent Freeman;

- DEA's actions as a result of suspicious order reports for West Virginia pharmacies, hospitals, and other dispensers that were submitted by Defendants directly to DEA field offices in West Virginia;

Information learned since discovery closed in CT1 or not requested in CT1:

- DEA's policies, procedures, and training with respect to distribution or dispensing controlled substances for the treatment of pain;[5]

- DEA's response to the U.S. Department of Justice Office of the Inspector General's September 2019 report entitled *Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids*;[6]

---

[5] DEA's recommendations for the treatment of pain affected the standard of care for medical prescribers and the prescriptions for opioids.

[6] This September 2019 report criticized DEA's response to the opioid crisis, including quota levels set by DEA and DEA's failure to conduct preregistration inspections for physicians and pharmacists before granting DEA controlled substance registrations.

(continued…)

- DEA's determination of Aggregate Production Quotas for Prescription Opioids during the time period covered by the requests;[7]

- DEA's communications with or about the GAO relating to the following January 2020 report: *Drug Control: Actions Needed to Ensure Usefulness of Data on Suspicious Opioid Orders*;[8]

- The complete personnel file relating to the employment of Joseph Rannazzisi by the DEA;[9] and

- Communications between DEA registrants and the Office of Diversion Control's Liaison and Policy Section relating to registrants' obligations under 21 C.F.R. § 1301.74.[10]

## III.   DEA's Objections Fail to Justify Its Failure to Respond to Defendants' Subpoena

The objections offered by DOJ over the course of three meet-and-confers do not warrant DEA's failure to respond to Defendants' discovery requests.  As an initial matter, DEA has yet to provide formal, written objections to Defendants' requests.  Instead, DEA raised several purported objections during the extensive meet-and-confer process.  It is notable that DEA does not contend that Defendants' requests seek irrelevant documents.  Indeed, the critical role of DEA discovery in this litigation is undisputed.  Rather, DEA objects to Defendants' requests on the grounds that the requests are burdensome, asserting that the geographic scope of the requests and DEA's privilege objections would impose an outsized burden on DEA.[11]

---

[7] The 2019 OIG Report criticized DEA's determinations for aggregate production quotas from 1999 to 2017.

[8] The 2020 GAO Report states that DEA officials represented that "they rarely use suspicious order reports to generate potential investigative leads."

[9] Mr. Rannazzisi was the head of DEA's Office of Diversion Control and serves as both a fact and expert witness for Plaintiffs in opioids litigations.

[10] Section 1301.74 sets forth the definition of a "suspicious order."  The DOJ's 2019 OIG Report recommended "DEA should establish regulations, policies, and procedures that specifically define what constitutes a suspicious order, as well as what information should be included in a suspicious order report."

[11] DEA initially contended that certain requests of Defendants were redundant of Plaintiffs' requests.  To the extent DEA objected to a request from Defendants as redundant, Defendants withdrew the only duplicative request during the meet-and-confer process.

As discussed, in an effort to address DEA's concerns, Defendants narrowed their requests and identified priority requests.  To address DEA's concerns regarding the burden of reviewing and redacting documents for potentially privileged information, Defendants proposed that DEA produce the documents pursuant to the AEO protective order—a compromise DOJ accepted in other opioid litigations to reduce burden and allow timely production of materials. *See* Ex. C (April 2, 2020 letter in Rhode Island case stating that documents with DEA-sensitive materials could be produced under an AEO designation).  DOJ rejected these proposals.  DOJ refused to commit to production of documents responsive to *any* of the requests without "more movement" from Defendants toward global limitations on the scope of the entire subpoena.

Despite Defendants' good faith efforts to lessen the burdens on DEA and DOJ, DOJ continues to raise only global, unspecified burden objections.  The Court should reject those objections and compel production of documents responsive to Defendants' eighteen priority requests and a privilege log covering all documents DEA is withholding from all of its productions.

### A.    DEA's Geographic Scope Objection Is Misguided

DEA contends that Defendants' requests are unduly burdensome because the requests seek documents from a broad geographic area.  But twelve of the Defendants' eighteen priority requests are specifically targeted at the geographic areas of Cabell County, the City of Huntington, and/or West Virginia.[12]  Of the six remaining priority requests that are not expressly limited to West Virginia, those are narrowly targeted on critical subjects.[13]

DOJ acknowledged during the meet-and-confers that two of the remaining six priority requests—Nos. 21 and 32—are sufficiently narrow as they are directed to DEA's response to

---

[12] Request Nos. 1, 3, 7, 8, 9, 13, 16, 17, 18, 19, 24, and 26.

[13] Request Nos. 15, 21, 30, 32, 34, and 36.

(continued…)

federal government reports issued after the close of discovery in CT1.[14]  The remaining four requests seek targeted information critical to the central issues of this case.  For example:

**Request No. 15**: This request seeks information relating to DEA's policies with respect to distribution or dispensing controlled substances for the treatment of pain.  DEA itself previously issued a Joint Statement with 21 Health Care Organizations stating that "pain should be treated aggressively" and that "[f]or many patients, opioid analgesics—when used as recommended by established pain management guidelines, are the most effective way to treat their pain, and often the only treatment option that provides significant relief,"[15] and DEA previously stated its belief that 99 percent of physicians were prescribing opioids appropriately.[16]  Discovery relating to DEA's views and expectations of how opioid medications should be used provides critical context for the quantities of opioids that were prescribed and dispensed nationwide and in Cabell County, Huntington and the State of West Virginia.

**Request No. 30**: This request seeks information concerning DEA's determination of the aggregate production quota, a process through which DEA determines, on an annual basis, how much opioid medication it will permit to be produced in the United States, based on DEA's considerations of legitimate medical need and (at least in some time periods) DEA's estimates of diversion of pain medication.[17]  Like Request No. 15, DEA's evaluations of legitimate medical

---

[14]  DOJ nevertheless maintained that it would not produce documents responsive to these admittedly proper requests unless Defendants agreed to narrow other requests.

[15] https://www.deadiversion.usdoj.gov/pubs/advisories/painrelief.pdf

[16] Examining the Growing Problems of Prescription Drug and Heroin Abuse, Hearing Before the Committee on Energy and Commerce, House of Representatives, 113th Cong. 76 (Testimony of Joseph T. Rannazzisi).

[17] DEA authorized a 39-fold increase of the manufacturing quotas for prescription opioids between 1993 and 2015, based on its expert judgment that there was an increasing legitimate medical need for opioids throughout the United States.  *See* 21 U.S.C. § 826(a); Letter from Senators Richard (continued…)

need for opioid medications and rate of diversion of opioid medications are highly relevant to any evaluation of the quantity of opioids distributed by the DEA-registered Defendants nationwide and in Cabell County, Huntington, and the State of West Virginia.

**Request No. 36**: This request seeks communications between DEA registrants and the Office of Diversion Control's Liaison and Policy Section relating to registrants' obligations under 21 C.F.R. § 1301.74 (the regulation governing suspicious order reporting).  Defendants learned of the existence of these documents after DEA produced a handful of highly relevant examples in CT1.  During the meet-and-confer process, Defendants specifically identified two proposed custodians likely to have documents responsive to this request.

**Request No. 34**: This request seeks the personnel file of Joseph Rannazzisi.  After the close of discovery in CT1, Mr. Rannazzisi has been identified twice as a fact witness for Plaintiffs and once as an expert witness for Plaintiffs in the various opioid litigations.

Defendants did not request discovery on these specific topics in CT1, but learned of the significance or existence of each during or after discovery closed in CT1.  Defendants' priority requests are targeted.  Any objection to scope should be rejected.

### B.    DEA's Privilege Objections Are Erroneous

DEA further contends that the requests are unduly burdensome because they encompass materials subject to law enforcement privilege.  To be clear, DEA has not identified specific material that it contends is subject to withholding based on that qualified, limited privilege; rather, DEA has declined to even search for responsive documents on the basis that it knows the

---

Durbin, *et al.* to Chuck Rosenberg, Acting Adm'r, DEA (July 11, 2017). Drug Enforcement Agency, Aggregate Production Quota History for Selected Substances 2003–2013 (Oct. 2, 2012).

documents will contain *some* law enforcement privileged material, and therefore undertaking the search and review itself supposedly is too burdensome.  That contention too is meritless.

### 1. West Virginia Privilege Law Applies

As an initial matter, West Virginia law applies for any claims of privilege in this litigation because "state law supplies the rule of decision" on Plaintiffs' public nuisance and civil conspiracy claims.  Fed. R. Evid. 501; *see also, e.g.*, *Old White Charities, Inc. v. Bankers Ins., LLC*, 2018 WL 2211409, at *5 (S.D.W. Va. May 14, 2018) (applying West Virginia attorney-client privilege law where state law provided rule of decision on claim).  Significant to the analysis here, West Virginia "never adopted an all-encompassing law enforcement privilege." *Maclay v. Jones*, 542 S.E.2d 83, 86 (W. Va. 2000).  To the extent West Virginia recognizes a law enforcement privilege, it is narrow and qualified.

### 2. DEA Waived Any Objections to Defendants' Requests

As discussed, DEA has yet to serve a formal response to Defendants' CT2 subpoena. Failure to respond to discovery requests results in a waiver of any objection to those requests. *See, e.g.*, *Spina v. Vitamin World, Inc.*, 2008 WL 2001676, at *1 (N.D.W. Va. May 6, 2008) ("Any objections to the discovery requests were therefore waived, unless the Court finds good cause for the failure to timely respond."); *Harris v. PV Holding Corp.*, 2009 WL 2600415, at *1 (E.D. Pa. Aug. 20, 2009) ("Absent good cause, the failure to timely respond to discovery requests results in a waiver of the objection.").  In light of DEA's failure to formally object to Defendants' requests, DEA waived its privilege objections and should be ordered to produce responsive documents.

### 3. DEA's Assertions of Law Enforcement Privilege Are Not Well-Founded

DEA fails the standard for withholding documents as law enforcement privileged under West Virginia law as set forth in *Maclay v. Jones*.  542 S.E.2d at 90-91.  To satisfy the *Maclay*

test, DEA has the burden to first make a "substantial threshold showing" that disclosure of the documents will be harmful.  *See id.* at 91.  If DEA makes such a showing, then *Maclay* mandates that the Court balance (after *in camera* inspection of the documents) Defendants' need for the documents and the public interest in non-disclosure.  *See id.* at 91-92.  The requested documents are not law enforcement privileged under either *Maclay* requirement.

First, DEA fails the initial requirement because it has made no "substantial threshold showing" that disclosure of the requested documents will be harmful.  *See id.* at 91.  Indeed, DEA has yet to provide any formal response.  In addition, DEA has produced certain investigative records in response to Plaintiffs' discovery requests.  *See* Ex. B.  Aside from demonstrating DEA's asymmetric treatment of the parties, DEA's productions to Plaintiffs establish that DEA does not view disclosure of all documents as harmful.  DEA fails the first *Maclay* requirement and the documents should be produced on that basis alone.

Second, Defendants' need for the requested documents outweighs any purported public interest in withholding them.  *See id.* at 91-92.  Defendants have a strong need for the requested discovery.  In a case about opioids, Defendants seek documents from DEA—the agency responsible for regulating opioids and enforcing opioid laws—regarding DEA's actions in West Virginia, including DEA's investigations into unlawful diversion of prescription opioids that occurred long after the prescription opioids left the possession or control of any DEA-registered distributor.  Such information, which is only in the possession of the DEA, is crucial to assessing Plaintiffs' allegations of causation and the reasonableness of Defendants' conduct.  DEA has offered no reasons why the public interest favors non-disclosure.  Indeed, DEA's disclosure of investigative reports to the Plaintiffs shows that no such public interest exists.  The second *Maclay* requirement favors disclosure of Defendants' requested documents.

14

Defendants' requested documents cannot be withheld as law enforcement privileged under *Maclay*. Additionally, DEA cannot categorically object to even *look* for responsive documents because they believe *some* may be protected by the narrow and qualified law enforcement privilege. The Court should reject DEA's arguments to the contrary and order production of the requested documents.

### 4. Production of Potentially Privileged Materials Under the AEO Protective Order Resolves DEA's Objection

Even if law enforcement privilege could apply to materials responsive to Defendants' requests, the law enforcement privilege is a qualified privilege. *See* 542 S.E.2d at 90-91. To resolve any remaining concerns about law enforcement privilege, DEA can produce the requested discovery pursuant to the AEO protective order. It is well-established that "the use of protective orders is preferential to the total non-disclosure of requested materials that are otherwise subject to discovery." *Maclay*, 542 S.E.2d at 90 n.11. Although Defendants presented this option to DOJ during the meet-and-confer process, DOJ rejected it.

DEA's refusal to produce potentially law enforcement sensitive materials pursuant to the AEO protective order is inconsistent with its position in other opioid cases. In the opioid litigation in Rhode Island, DOJ is allowing the production of documents in the possession of the State "that could include highly sensitive DEA information" if those documents are designated "Confidential—Attorneys Eyes Only." *See* Ex. C. The agreement by DOJ in Rhode Island provides that after production of these materials as AEO, if a party wants to use specific documents in a filing or in a deposition setting, DOJ "will review the documents for de-designations and redactions." *Id.* This approach recognizes that production of law enforcement materials as AEO "limits the universe of documents requiring line-by-line review" and allows the production of "these documents to Defendants' promptly." *Id.*

In CT1, Plaintiffs produced local law enforcement materials pursuant to the AEO protective order.  The same protective order from CT1 is in place in this litigation.  Using the AEO protective order already in place will limit the number of people with access to the disclosed documents, while allowing the Defendants an opportunity for a fair defense. At the very least, DEA should be compelled to produce the requested documents with AEO protections.

**IV.    The Court Should Compel Production of DEA's CT1 Privilege Log**

Finally, the dispute set forth above over law enforcement privileges emphasizes the need for DEA to produce its long-overdue privilege logs from CT1. Defendants first requested DEA's privilege log in March 2019.  Federal Rule of Civil Procedure 45(e)(2)(A) requires a person withholding subpoenaed information under a claim of privilege to "(i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."   DOJ still has not done so, over a year after it completed its CT1 productions. That privilege log continues to be relevant, and indeed necessary, to the present litigation.[18]

During the three meet-and-confers in this case, Defendants repeatedly asked DEA to define the metes-and-bounds of the privileges it asserted (or would assert) in response to the parties' discovery requests.  DEA declined to offer any explanation or guidance, and instead demurred to the as-yet-unproduced privilege log that it has promised to provide to Defendants for over a year. Yet even now, DOJ could not provide an estimate of the number of documents it withheld in CT1

---

[18] Based on the DEA's prior clawing back of claimed privilege documents, Defendants believe that the DEA is likely over-designating documents as privileged under one or more vague privilege assertions.  If supported by the privilege log, Defendants anticipate bringing targeted challenges to DEA's withholdings.  The lack of a privilege log has prevented Defendants from bringing such challenges to date.

(continued…)

on privilege grounds,[19] let alone any specifics about the rationale it used to identify those documents.  DEA further refused to provide an estimate of the number of documents it withheld in CT1 on privilege grounds.  This lack of guidance on privilege from DEA makes productive discovery of DEA materials difficult.

To assess the privileges DEA is asserting, Defendants request the Court to compel DEA to produce its long-overdue privilege logs from CT1 within 45 days.

## V.    Conclusion

For the reasons set forth above, the Court should grant Defendants' Motion to Compel and order DEA to produce all documents responsive to Defendants' CT2 subpoena and the CT1 privilege log.

Dated: April 14, 2020

Respectfully submitted,

                                          **Defendants**

                                          ***McKesson Corporation***
By Counsel:

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
Jason L. Holliday (WVSB #12749)
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Tel: (304) 345-0200
jwakefield@flahertylegal.com
jholliday@flahertylegal.com

---

[19] DOJ suggested that its production of the privilege log might result in additional documents being produced as privilege downgrades or redactions.

*/s/ Carol Dan Browning*
Carol Dan Browning
Stites & Harbison, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202
Tel: (502) 587-3400
Fax: (502) 587-6391
cbrowning@stites.com

*/s/ Timothy C. Hester*
Timothy C. Hester
Mark H. Lynch
Christian J. Pistilli
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
mlynch@cov.com
cpistilli@cov.com
lflahivewu@cov.com

**AmerisourceBergen Drug Corporation**
By Counsel:

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com

18

smcclure@reedsmith.com

***Cardinal Health, Inc.***
By Counsel:

*/s/ Steven R. Ruby*
Brian A. Glasser (WVSB #6597)
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
BAILEY GLASSER LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
*Counsel in Cabell County action*


*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC  20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
emainigi@wc.com
lheard @wc.com
ahardin@wc.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on this 14th day of April, the foregoing "Memorandum in Support of Defendants' Motion to Compel Discovery Responses from DEA" was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
