# Exhibit E

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>    Plaintiff,<br><br>    v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 3:17-01362<br><br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 3:17-01665<br><br>Hon. David A. Faber |

**DECLARATION OF HEATHER WEHRLE IN SUPPORT OF MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO COMPEL DISCOVERY RESPONSES FROM DEA**

I, Heather Wehrle, hereby make this declaration pursuant to 28 U.S.C. § 1746.  I declare as follows:

1. I make the factual statements herein based on my personal knowledge and on information provided to me in my capacity as an employee of the United States Department of Justice (DOJ), Drug Enforcement Administration (DEA).  Should I be called as a witness, I would competently testify to the factual statements herein.

2. My tenure as a DEA employee spans almost 17 years. Currently, I serve as the Acting Diversion Group Supervisor in DEA's Charleston, West Virginia District Office located in Charleston, West Virginia ("Charleston Office"). I have been working in the Charleston Office since October 2017. Prior to working in the Charleston Office, I worked as a Diversion Investigator in DEA's Nashville, Tennessee District Office from 2003 to 2014, and in the Tampa, Florida District Office from 2014 to 2017.

3. As a Diversion Investigator, I have conducted or been involved in hundreds of investigations related to the unlawful use, misuse, sale, diversion, production, and transportation of prescription and illicit opioids, including ten such investigations in West Virginia. Based on my personal experience and information provided to me, the majority of DEA investigations handled in the Charleston Office require significant documentation.

4. As part of my duties and responsibilities as a Diversion Investigator, I am familiar with how documentation is handled in the Charleston Office.

5. The primary mission of DEA is to enforce the controlled substances laws and regulations of the United States and bring to the criminal and civil justice system of the United States, or any other competent jurisdiction, those organizations, involved in the growing, manufacture, or distribution of controlled substances appearing in or destined for illicit traffic in the United States.

6. DEA has three West Virginia offices in the cities of Charleston, Clarksburg, and Wheeling that support DEA's critical mission in the state. During the period 1996 to the present, DEA has employed approximately 95 Diversion Investigators, Special Agents, and other personnel who have supported DEA's critical mission in these three offices. DEA's Charleston Office has primary responsibility for DEA's mission in the City of Huntington and Cabell

County.  During the period 1996 to the present, DEA has employed approximately 67 Diversion Investigators, Special Agents, and other personnel who have supported DEA's critical mission in the Charleston Office.

7. I understand that the Defendants in this litigation have moved to compel the production of documents responsive to Requests 1, 3, 7, 8, 9, 13, 15, 16, 17, 18, 19, 21, 24, 26, 30, 32, 34, and 36 ("priority requests") in their subpoena dated March 11, 2020.  I have reviewed each of the priority requests.

8. Defendants' priority requests collectively seek documents concerning virtually every report, investigation, communication, and action by DEA relating to opioids in West Virginia from 1996 to present, a 24-year period.  Specifically, Defendants' priority requests 3, 7, 8, 9, 13, 16, 17, 18, 19, and 26 are not limited to a particular DEA case or category of DEA cases.

9. I conservatively estimate that the volume of potentially responsive documents for all priority requests would be tens of thousands of documents.

10. Based on my personal experience and knowledge, it would take several months for DEA employees in the Charleston Office to identify, locate, collect, copy, review, and redact this exceptionally large volume of potentially responsive documents.

11. Any undertaking to produce this voluminous amount of records would be an unreasonable drain on DEA's limited resources and would invariably undermine ongoing investigative activities.

12. For example, Defendants' Request 3 seeks "[a]ll Documents describing, relating to, or reflecting efforts made by [DEA] to access or utilize ARCOS Data, Suspicious Order

Reports, and/or West Virginia Controlled Substance Automated Prescription Program data[1] to combat the diversion or misuse of Prescription Opioids in the City of Huntington, Cabell County, or any town, village, or city within Cabell County."

13. Based on my experience in the DEA Charleston Office, DEA's diversion investigators, and other DEA personnel who support diversion control activities in the Charleston Office, use ARCOS data, SORs data, and/or data from the West Virginia Controlled Substance Automated Prescription Program (CSAPP) in connection with almost every effort to combat the diversion or misuse of prescription opioids in West Virginia. ARCOS, SORs, and CSAPP data are a core component of DEA's law enforcement investigation tools and techniques in West Virginia.

14. Accordingly, documents responsive to Request 3 could be located in various locations, including in hard-copy offsite storage and archives, in multiple DEA databases, electronic files, and emails associated with the approximately 95 current and former DEA employees in West Virginia.

15. Similarly, Defendants' Request 7 seeks "[a]ll Documents and Communications identifying, discussing, or relating to the individuals or entities You suspect or know have unlawfully produced, transported, diverted, sold, and/or trafficked Prescription or Illicit Opioids within or into the City of Huntington, Cabell County, or any town, village, or city within Cabell County."

16. Based on my experience in the Charleston Office, the vast majority of the documents potentially responsive to Request 7 include documents and communications

---

[1] All licensees who dispense Schedule II, III, IV and V controlled substances, along with opioid antagonists, to residents of West Virginia must provide the dispensing information to the West Virginia Board of Pharmacy each 24-hour period. *See* West Va. Code § 60A-9-1 *et seq.*

identifying, discussing, or relating to individuals or entities that DEA suspects or knows have unlawfully produced, transported, diverted, sold, and/or trafficked Prescription or Illicit Opioids within or into West Virginia. For all the reasons discussed with respect to Request 3, it would take several months for DEA employees in the Charleston Office to identify, locate, copy, and review, and redact this exceptionally large volume of potentially responsive documents for Request 7.

17. Moreover, Defendants' document requests that are nominally limited to certain West Virginia cities and counties are not so easily confined. Diversion of prescription opioids is rarely limited by geographic boundaries. A single case in West Virginia may impact several cities and counties and involve the efforts of several DEA personnel in the state. Accordingly, the Charleston Office does not organize documents, files, and information by cities and counties. Rather, the files are generally organized by and searchable by case identifiers.

18. In order for DEA to identify responsive information limited to certain geographic parameters, the Charleston Office would have to gather a voluminous set of documents in connection with the entire state of West Virginia. DEA staff then would have to review hard-copy and electronic documents to identify documents pertaining to the City of Huntington, Cabell County, or any town, village, or city within Cabell County. This review process would be extremely time-consuming for DEA staff. I estimate that it would take several hundred hours to complete such a review for any county or city.

19. Assuming DEA staff gathered all the electronic and hard copy documents that are potentially responsive to Defendants' priority requests, it is my belief that the vast majority of these documents would contain law enforcement sensitive information. Accordingly, these documents would have to undergo a painstaking review and redaction process for privileged, law

enforcement sensitive, and confidential information by the West Virginia field staff who are most familiar with the case matters.  Additionally, because DEA personnel often work with and share information with other federal, state and local law enforcement agencies, these materials may also have to be vetted through other law enforcement agencies for their equities and privileges.  These documents would also have to be reviewed by DEA attorneys for other applicable legal privileges.

20. The extensive amount of time and resources warranted to complete the necessary review and redactions would divert DEA from its critical law enforcement functions and duties.  This burdensome review will disrupt DEA's critical mission to prevent the diversion of controlled substances, because DEA staff with the relevant knowledge and expertise would be required to complete this task.

21. It is DEA policy not to produce documents and information associated with open investigations in civil discovery.  Therefore, prior to production, all potentially responsive documents would also have to be separately vetted by field personnel to identify any open investigations.  Because diversion investigators and special agents in the field are most familiar with active and closed cases, these redactions would have to be performed or supervised by DEA diversion investigators and special agents, which would detract from DEA's critical mission and operations.

22. Additionally, a significant number of documents may need to be referred to other federal, state or local law enforcement agencies because those documents belong to other agencies, the other agencies may have equities and privileges in these documents, and/or the other agencies may be most knowledgeable regarding the status of the case, including whether the investigation is open or closed.

23. Finally, as part of its search efforts for potentially responsive emails and other electronic files maintained on DEA's networks, DEA also would have to complete an electronic data capture for the approximately 95 former and current DEA employees that worked in DEA's field offices in West Virginia during the period 1996-present. The electronic data capture process would not be handled by DEA staff in the West Virginia field offices; however, I understand that this data capture could take approximately four months to complete due to the number of email custodians and limited DEA resources to devote to this task, which is not part of the agency's mission. The captured data would then need to be searched and reviewed for responsive documents, and any such documents would then need to be reviewed for privilege and potentially redacted.

For all these reasons, complying with this request would pose an unreasonable burden on DEA and consume countless labor hours and result in heavily redacted or withheld documents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

*Heather L. Wehrle*

04/30/2020
Date

Heather L. Wehrle
Declarant