UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**THE CITY OF HUNTINGTON,**
 Plaintiff,

v.

**AMERISOURCEBERGEN DRUG CORPORATION, et al.,**
 Defendants.

CIVIL ACTION NO. 3:17-01362

**CABELL COUNTY COMMISSION,**
 Plaintiff,

v.

**AMERISOURCEBERGEN DRUG CORPORATION, et al.,**
 Defendants.

CIVIL ACTION NO. 3:17-01665

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXTEND COURT DEADLINES**

**INTRODUCTION**

 The City of Huntington and Cabell County Commission (collectively, "Plaintiffs") oppose Defendants' motion to extend court deadlines. Defendants have failed to satisfy the good cause standard required to modify this Court's Scheduling Order. *See* Fed. R. Civ. P. 16(b)(4) and Local Rule of Civ. P. 16.1(f)(1). For the reasons noted below, this case remains on track for the August 31, 2020 trial.

**ARGUMENT**

A Court's Scheduling Order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. Pr. 16(b)(4). *See also* Local Rule Civ. P. 16.1(f) (time limits in the scheduling order for filing of motions, can completion of discovery, and dates for conferences before trial, a final pretrial conference, and trial may be modified for good cause by order.) This Court has found that "[g]ood cause requires the party seeking relief [to] show that the deadlines cannot reasonably be met despite the party's diligence." *Hunt v. Brooks Run Mining Co.*, 51 F.Supp.3d 627, 636 (S.D. W. Va. 2014) (Faber, J.) (internal quotations omitted). Other relevant factors include consideration of danger of prejudice to the non-moving party, the length of delay and its potential impact on the judicial proceedings, the reasons for the delay, and whether the movant acted in good faith. *Id.* Here, none of these factors favors continuing the trial date.

**I.     The Parties Can Comply with the Scheduling Order Deadlines.**

On December 31, 2018, Judge Polster chose the Track Two bellwether cases: (1) *Cabell County Commission, West Virginia v. AmerisourceBergen Drug Corp.*, Case No. 17-OP-45053 (N.D. Ohio); and (2) *City of Huntington, W.Va. v. AmerisourceBergen Drug Corp.*, Case No. 17-OP-45054 (N.D. Ohio). *See* Order at 1-2 (docket no. 1218). The Court opened Track Two discovery on October 15, 2019. *See* Transcript at 8-10 (docket no. 2827). Soon thereafter, on October 22, 2019 Plaintiffs served their first set of discovery on the Big 3 and on October 25, 2019 Defendants served discovery on Plaintiffs. The case was remanded to the Honorable David A. Faber on January 24, 2020. As described in Plaintiffs' Position Statement, filed January 24, 2020 (Case No. 3:17-cv-01362; Doc #: 139), Plaintiffs have gone to great lengths to streamline their case – severing all defendants except for the Big 3, narrowing their claims, and limiting their remedies. They did so in order to focus the case on a single theory of liability and expedite their case for trial. Defendants agreed to a bench trial in exchange for the Plaintiffs significantly limiting their case.

In spite of the Plaintiffs' streamlining their case and the significant discovery conducted in the MDL, Defendants have relentlessly requested broad based discovery and document productions from the Plaintiffs and Third Parties. The majority of this discovery was and is unnecessary and duplicative. Much of it has been completed, however, and to the extent that any of what remains is necessary, it should not stand in the way of commencing trial on August 31, 2020.

**A. Plaintiffs Have Produced the Documents Needed to Move Discovery Forward**

On October 25th, 2019 Defendants served their First Set of Interrogatories and Requests for Production on the City of Huntington and the Cabell County Commission. This included eleven interrogatories and twenty-five requests for production to each Plaintiff. Plaintiffs have gone through great lengths and expended significant time, expense and resources to respond and collect documents from numerous sources from within the City and County. The parties worked together and negotiated search terms for electronically stored documents.[1] To date, the City of Huntington has agreed to produce documents for fifty-one (51) custodians[2] and their departments impacted by the opioid crisis. The City has produced 366,069 total documents, totaling 1,780,185 pages. Likewise, Cabell County Commission has agreed to produce documents for forty-eight (48) custodians and their various departments impacted by the opioid crisis. This is no small feat, recognizing the breadth of the requests, the number of documents, and the data that has been scoured through in order to make these productions. More detailed information is set forth below.

---

[1] Extensive search terms were agreed upon on January 29, 2020.

[2] Fed. R. Civ. P. 26(b)(1) provides the general limits on the scope of discovery and clearly limits discovery to information, including electronically stored information ("ESI") that is "relevant to any party's claim or defense and proportional to the needs of the case." Pursuant to this rule, the relevant inquiry is not whether these custodial files could have documents with information responsive to Defendants' discovery requests, but rather, whether these files are likely to have relevant, non-duplicative documents, the production of which is likely to be proportional to the needs of the case and not otherwise cumulative. Nevertheless, Plaintiffs have agreed to produce any and all non-privileged, responsive documents to the extent they exist for 51 former and current employees in addition to departmental records.

**1. Cabell County Commission:**

To date, the Cabell County Commission has produced nearly half a million documents containing over two million pages collected from over one hundred individual custodians and the servers and other shared storage media used by the Commission and its subdivisions. These collections involved the Cabell County Clerk, Cabell County EMS, Cabell County 911, Cabell County Circuit Clerk, Cabell County Prosecutor's Office, and the Law Enforcement and Tax Divisions of the Cabell County Sheriff's Office. These documents were collected as both ESI and in paper hard copy form and represent over ten terabytes of data.

In its diligent efforts to fulfill its discovery obligations in this matter, the Cabell County Commission employed a team of experts in civil litigation and discovery, eDiscovery, IT matters, and digital forensic examination. As part of its extensive and thorough data mapping process Cabell County interviewed over one hundred current and former employees, agents, and vendors with knowledge of substantive issues of the facts surrounding the opioid crisis in Cabell County as well as IT professionals who gave a detailed and complete understanding of County IT infrastructure.

In addition to individual user profiles and other data from County workstations that contained relevant program files generated by County personnel, Cabell County also collected a large volume of County server data including: Commission agendas and minutes, budgets and other financial records for all subdivisions; insurance coverage and claim information; vital statistics and records; EMS and 911 dispatch records; reports and communications regarding Narcan training, acquisition, deployment and use; records and communications regarding training, community education and other efforts to prepare Cabell first responders to address the opioid crisis; law enforcement investigation and incident reports; judicial case files; and a host of administrative and operational information in the form of policies, procedures, and organizational charts.

Throughout the process of responding to Defendants' request for production and other written discovery, Cabell County Commission has communicated in good faith with Defendants to answer questions and discuss perceived deficiencies and other issues with our discovery responses and production of documents. Cabell County Commission has supplemented its initial discovery efforts with several rounds of additional interviews and collections in response to the meet and confer process and other communications with Defendants as well as to Discovery Order 1 to augment previous productions of documents regarding certain reporting and operational data from the Commission, the Sheriff's Office, and the Cabell Prosecuting Attorney. As a result of its exhaustive efforts to thoroughly fulfill its discovery obligations, Cabell County Commission has diligently produced relevant documents since December 7th, 2019 in twenty-four separate document productions.

On December 31, 2019, Defendants requested that the Cabell County Commission produce custodial files of one hundred forty-two (142) human custodians along with departmental files. However, many of the custodians requested were not within the custody and control of the Cabell County Commission. To date, Cabell County Commission has agreed to provide responsive documents for forty-eight (48) separate current and former employees, spanning various dates of tenure, departments, and job duties. A chart with information concerning those custodians is attached as Exhibit A.

The Cabell County Commission's document production is now substantially complete in compliance with the April 30th, 2019 written discovery deadline.[3,4] Nevertheless, consistent with its

---

[3] Defendants erroneously contend the Cabell County Commission has failed to explain why no documents are available for former Sheriff Kim Wolfe. While no documents have been produced for Kim Wolfe, the Cabell County Commission clearly explained to Defendants that the reason for the absence of documents was directly related to the length of time since he has been employed by the County. Kim Wolfe left his position with the County in 2009 and the Cabell County Commission expressly conveyed to Defendants that no documents were available for him because documents are not retained by the County for that length of time. (April 2, 2020 Letter to Defs', p. 5, attached as Ex. B).

[4] The Cabell County Commission has consistently objected to the production of custodial files of members of the Cabell County Prosecutor's Office due to the duplicative nature of the requests and the fact that these files

discovery obligations, the Cabell County Commission will continue to be mindful of Defendants' document requests and will notify Defendants if additional documents are located pursuant to their requests.

### 2. City of Huntington:

The City of Huntington has gone through great lengths and expended significant time, expense, and resources interviewing scores of former and current employees and collecting documents from various departments within the City of Huntington including the Police Department, Fire Department, Finance Department, Purchasing Department, Mayor's Office, City Council, Public Works, and Planning and Development. Plaintiffs have spent considerable time identifying, collecting and reviewing documents in hard copy files for the City's current and past employees. Document collection efforts also included coordinating with the IT department to extract electronic files and electronic mailboxes for these custodians and departments. Each collection of documents was searched with the agreed upon search terms and any electronic files or hard copy files that a custodian possessed was collected, searched and produced. Given that electronic mailbox files were not available for many of the City's former employees, Plaintiffs also obtained backup archival servers for the City of Huntington and the Huntington Police Department in order to retrieve electronic mail for all custodians. In an effort to be maximally thorough, Plaintiffs conducted searches for all agreed-to custodians against these archival servers using the relevant metadata fields to identify and review all electronic communications that included a requested custodian's name or email address.

Among the documents that the City has produced are police department incident reports, arrest records, court dispositions, drug unit investigative files, and various charts and exports of

---

contain information that is generally protected by the work product privilege. Defendants filed a motion to compel this information which was heard by the Special Master Wilkes who agreed with Plaintiffs that the request was overly broad and duplicative. (DR 3, Doc. 366 at 4-5) The Ruling required Plaintiffs to perform a search and complete production to Defendants by May 29, 2020. Plaintiffs do not believe that there will be any issue in meeting that deadline.

incidents and offenses from case management databases. The City has also produced documents from the Huntington Fire Department deriving from databases wherein they track overdose runs and dispatches of the members of the department and Narcan administration forms. Where feasible, Plaintiffs have identified many of these documents by bates range.[5]

Given the sensitive nature of the City's law enforcement documents, Plaintiffs have worked diligently to identify and designate certain documents under "Attorney Eyes Only"[6] in order to produce highly sensitive files, largely in part for individuals who served on the Drug Unit. Consistent with Plaintiffs responsibility in this discovery period and Judge Wilkes Order in Discovery Ruling No. I, Plaintiffs have continued to fulfill their duty to continuously and timely supplement any responsive documents.

Throughout the discovery period, Plaintiffs have communicated with Defendants with regard to their requests for custodians. On December 31, 2020, Defendants requested seventy (70) human custodians for the City of Huntington as well as departmental files. Some of these requested individuals were not in the custody or control of the City and many were duplicative and/or outside any relevant time frame. After agreeing to review and collect documents that may exist for forty-five (45) custodians, and subsequently producing documents therewith, Defendants remained unsatisfied and filed a Motion to Compel for six (6) additional custodians.[7] In a good faith effort to avoid further delay, The City of Huntington withdrew their opposition to Defendants' Motion and instead produced

---

[5] *See* April 10, 2020 Letter Re: Priority Deponent Response, attached as Ex. C.

[6] The City of Huntington worked with the USDOJ to facilitate the production of DOJ-related documents the City may have and, to that end, the City of Huntington has also designated certain DOJ-related documents with a "CONFIDENTIAL — ATTORNEYS EYES ONLY ('AEO')" designation to protect this sensitive law enforcement information. To the extent that any party wishes to use these documents in depositions or in filings, USDOJ will review the documents for de-designations and redactions.

[7] *See* December 31, 2020 Letter Re: custodial files, attached as Ex. D.

7

1935158.2

any non-privileged, responsive files that could be identified for these six individuals.[8] To date, The City of Huntington has agreed to provide and has provided responsive documents for 51 separate current and former employees, spanning various dates of tenure, departments and job duties. *See* Exhibit E.

Earlier this week, Plaintiffs were made aware of additional hard copy documents that were identified while members of the Huntington Police Department were updating workspaces and which are believed to be attributable the Huntington Police Department Drug Unit and/or the Huntington Violent Crimes & Drug Task Force. Consistent with Plaintiff's discovery obligations, these documents were immediately collected and are now being processed for review to be produced promptly. Plaintiff will continue to exercise its due diligence to ensure the thoroughness and completion of its production. However, aside from the discrete set of additional hard copy documents referenced and identified above, it is the City of Huntington's belief that it has now completed its document production.

**B. Status of Discovery with Defendants.**

1. **McKesson**

The status of discovery as to McKesson likewise does not warrant a three-month continuance of the trial date and related deadlines. From the outset, Plaintiffs have diligently pursued discovery against McKesson and have reached compromises where necessary to keep discovery moving efficiently. Additionally, Plaintiffs have narrowly tailored their requests for custodial files and depositions to ensure that this case can proceed to trial as currently scheduled even in light of the COVID-19 pandemic.

Plaintiffs have requested custodial files for seven custodians. The search terms needed to finalize the productions for these custodians have been in place for a significant period of time with the limited exception of negotiation concerning the search terms to be applied to the custodial file of

---

[8] See April 20, 2020 Letter Re: 6 Additional Custodial Files, attached as Exhibit F.

McKesson's former CEO, John Hammergren, which are now complete. The terms to be applied to his custodial file will be more limited than the terms that have been applied to other McKesson custodians, which should further streamline the production of his custodial documents. To date, McKesson has substantially completed productions for one of the seven custodians requested with the representation that it will complete the remaining custodial productions by May 15th.[9] Thus, there is ample time already built into the schedule for McKesson to complete productions for the remaining custodians without the need to move the established trial date and other deadlines.

Plaintiffs intend to take the depositions of all seven custodians for whom they have requested custodial files. Plaintiffs are prepared to proceed with these depositions while ensuring adequate safeguards are in place to protect the health and safety of those participating in the depositions. In fact, as part of the recent Order by Special Master Wilkes, one of these depositions has already been ordered to occur within the established discovery period even if it needs to be taken remotely. Plaintiffs are prepared to proceed with the remaining depositions within this time frame utilizing similar safeguards, if necessary. In short, given the state of discovery against McKesson, an August 31, 2020 trial date remains reasonable and appropriate for this case.

2. **AmerisourceBergen**

The status of discovery against AmerisourceBergen ("ABDC") does not warrant a three-month continuance of the trial date and attendant deadlines. Specifically, Plaintiffs agreed to limit their request for the production of custodial files of twelve individuals. Many of the twelve custodians were custodians in the MDL proceedings in Ohio and, consequently, will require only supplemental production efforts from ABDC. Furthermore, with the exception of one open negotiation concerning search terms to be applied against the custodial file of Steven H. Collis, Plaintiffs and ABDC long ago

---

[9] April 28, 2020 Email from Dale Rice to Brandon Bogle, attached as Exhibit G.

1935158.2

finalized their negotiations concerning search terms by accepting the search terms ABDC proposed with the addition of a search term block related to ABDC's CT2 customers.

Given this backdrop, it is not surprising that ABDC's document production is well underway. ABDC long ago stated that its production of CT2 customer due diligence files and transactional data was complete. Moreover, ABDC has already begun production of custodial files from three of the twelve agreed-upon custodians.

Finally, Plaintiffs have only requested six ABDC depositions to date. Although the current pandemic present new and unique challenges regarding preparation for and conduct of depositions, those challenges are not insurmountable within the current trial timeline when the Court considers the small number of ABDC depositions. This is especially true where, as here, ABDC already agreed to make ABDC witnesses available for deposition after the close of discovery if the parties are unable to conduct depositions before that date.

### 3. Cardinal Health

There is no justification for a three-month continuance of the trial date because of remaining discovery productions from Cardinal Health. Discovery against Cardinal Health has been pushed from the very beginning with the first joint call with Magistrate Judge Omar Aboulhosn on January 29, 2020. From that point Plaintiffs' reached agreement with Cardinal Health on twenty-six (26) custodians and the search terms to be applied. Cardinal Health has recently asserted that its custodial file productions are substantially complete.

Additional non-custodial productions are well on their way, as well. Cardinal Health has produced all transactional data for CT2 and also indicated that they have identified all suspicious orders reported to DEA and the West Virginia Board of Pharmacy from the CT2 jurisdiction. Cardinal Health has provided the "centralized" due diligence files for all of their CT2 customers. The only issue pending related to due diligence files is Cardinal's identification of bates

numbers for any additional due diligence that was not centrally stored, which is the subject of a pending Motion to Compel.

Finally, as it relates to depositions, Plaintiffs have only sought four depositions thus far and are willing to go forward with those with the appropriate precautions against COVID-19 in place. While Cardinal Health has resisted setting depositions, all Parties are now aware of the guidance from Special Master Wilkes, ordering Plaintiffs' deposition of a McKesson employee to proceed. Plaintiffs believe this will get the ball moving on depositions of Cardinal witnesses. With the progress that has been made in the productions to date and the pending issues before Special Master Wilkes to be resolved shortly, discovery from Cardinal Health is on track for an August 31, 2020 trial date.

    **C.**    **Status of Discovery with DEA**

Both Plaintiffs and Defendants have served formal Touhy requests to the U.S. Department of Justice seeking documents relevant to this case.

In their Motion, Defendants argue that "DEA still will not commit to produce any documents responsive to Defendants' subpoena and has not even served written objections to the requests." Although Plaintiffs agree that DEA documents are highly relevant to Plaintiffs' claims, many such documents were previously produced in CT1A. Indeed, as Judge Polster recently noted in his Response to Motion for Clarification (Doc. # 3263), "the DEA and the parties thoroughly and vigorously negotiated the scope of MDL discovery, in light of the needs of the case and the burden of the DEA as a non-party, governmental agency." As a result, it was the Court's opinion that "only limited, jurisdiction-specific discovery in the West Virginia cases would be necessary after remand." *Id.*

Plaintiffs first issued a Touhy request to the DEA in October 2019, seeking only nine categories of documents. On February 3, 2020, after Plaintiffs' case was remanded to the Southern District of West Virginia, Plaintiffs re-issued their prior Touhy request. The DEA has made two

productions in response to Plaintiffs' Touhy request – one production on December 20, 2019 and another on February 21, 2020.

On March 19, 2020, Plaintiffs served a second Touhy request that sought nine categories of jurisdiction-specific documents relating to specific pharmacies in West Virginia, including two requests seeking additional information concerning pharmacies that were the subject of Plaintiffs' prior requests. Plaintiffs conferred with the DEA concerning their March 19 requests on April 28.

Plaintiffs have reached an impasse with the DEA, and today filed a Motion to Compel, which will be heard by Special Master Wilkes. (Docs. 385, 386). Plaintiffs are confident that the narrow scope of the discovery dispute relating to their March 19 requests will not result in any impact on the parties' trial date.

Likewise, Defendants appear to be at an impasse with the Department of Justice as to certain discovery disputes. Unlike Plaintiffs' requests, Defendants' 36 requests for production, served only in March, seek broad categories of information, some covering subjects national in scope and not limited to these jurisdictions or to West Virginia. *See* Defs' Ex. A (Doc. 321-1), Subpoena Schedule A, Requests 2, 15, 20, 21, 30-32, 35-36. Defendants' requests also reach more broadly to cover *all* diversion, *all* unlawful opioid-related conduct, and *all* opioid-related investigations in Plaintiffs' jurisdictions. *See* Defs' Requests 3-5. In light of the discovery deadlines in this case, Plaintiffs sent Defendants a letter requesting that they not let their outstanding discovery disputes linger and, to the extent such disputes remain unresolved, that Defendants promptly seek the relief they believe necessary from the Court. Defendants subsequently filed a motion to compel (Docs. 320, 321) which will also be heard by Special Master Wilkes. While this matter no doubt will be promptly addressed, Defendants' belated and overbroad Touhy should not provide reason for delaying the trial, especially in light of discovery already received by Defendants in CT1.

The Unites State Department of Justice raised the timing of the Subpoenas when Defendants sought to personally serve an active FBI agent on April 3, 2020:

> We also question the timing of these subpoenas. The United States first received *Touhy* requests from plaintiffs for discovery in the above-captioned cases back in October 2019. Yet defendants waited five months – a month before April 30, 2020 discovery cut off and in the midst of a global pandemic that has impacted the abilities of businesses and government including the FBI, to conduct business as usual – to serve these subpoenas.[10]

### D.  Status of Discovery with Third Parties

Despite discovery opening on October 15, 2019, Defendants waited until February 11, 2020 to begin third-party discovery. As of May 1, 2020, Defendants have served seventy-eight (78) third party subpoenas in total, with thirty-nine (39) requesting document production, thirty-one (31) requesting testimony, and eight (8) requesting both testimony and document production. *See* Exhibit H (listing of subpoenas). Altogether, Defendants have made one thousand three hundred and four (1,304) requests for documents and six hundred thirty-nine (639) requests for testimony topics, totaling approximately one thousand nine hundred and forty-three (1,943) requests to third parties to date.

The timing of the depositions, broad scope of the subpoenas, and expansive categories of documents can be exhibited by just a few examples from the seventy-eight (78) subpoenas served. Taken together, they leave the definite impression that the third-party requests are, in part, motivated by a desire to obtain a continuance rather than seek needed discovery.

### a.  The West Virginia Office of Insurance Commissioner

---

[10] *See* letter dated 4/17/20 letter from Michael Stuart, U.S. Attorney, SDWV to McKesson Counsel Laura Flahive Wu, Covington & Burling LLC. (See Exhibit I)

The West Virginia Office of the Insurance Commissioner ("WVOIC") had two subpoenas served upon it on March 17, 2020 by McKesson Corporation. WVOIC sought to Quash the Subpoenas because they did not allow the WVOIC reasonable time to comply given the broad scope of the subpoena, and the subpoena sought statutorily confidential information. Furthermore, it was unreasonable for McKesson notice a deposition for deposition on March 31, 2020.[11]

In moving to quash the subpoena, WVOIC described the expansive and burdensome scope of the subpoenas:[12]

> The **Subpoena for documents** demanded WVOIC to produce by March 31, 2020 forty-three (43) expansive categories of documents from 1996 to present. [ ] The command included, but was not limited to, documents pertaining to contractors used for administering pharmacy benefits; the organizational structure of the WVOIC; workers' compensation claims data; knowledge of various opioid tracking databases; reimbursements paid for prescription opioids; policies for processing, tracking, and adjudicating claims for reimbursement of prescription opioids; evaluations and audits; actions taken against suspicious pharmacies; rebates and formulary or preferred drug list status; data analysis of potentially suspicious or problematic pharmacies, doctors and patients; practices, policies, discussions of and procedures for "alternative treatments"; actions and interactions with numerous entities regarding prescription opioid abuse and diversion; and knowledge of and response to the opioid crisis.
>
> Meanwhile, the **subpoena to testify** at a deposition demanded testimony for twenty-one (21) broad categories. [ ] The topics for examination included, but were not limited to, policies, procedures, and practices for prescription opioid dispensing and reimbursement; placement of opioids on drug formularies and preferred drug lists; identification of suspicious pharmacies, providers, patients, and claims; investigations undertaken by the Insurance Fraud Unit ad Special Investigations Unit; knowledge of and access to tracking systems; knowledge of and efforts taken in response to opioid abuse; collaboration with various entities; knowledge of diversion of prescription opioids; role in expanding Medicaid coverage for prescription opioids; considerations of legitimate medical needs; causes of opioid use; organizational structure of the WVOIC; and the subject matter of the documents in the simultaneously served document subpoena. Unlike the 24-year period provided in the subpoena for

---

[11] *See* Non-Party West Virginia Offices of the Insurance Commissioner's Motion to Quash Defendant McKesson Corporation's Subpoena to Produce Documents and Subpoena to Testify At a Deposition in a Civil Action. (Doc 259);

[12] *See* Non-Party West Virginia Offices of the insurance Commissioner's Memorandum of Law in Support of Motion to Quash Defendant McKesson Corporations Subpoena to Produce Documents and Subpoena to Testify at a Deposition in a Civil Action. (Doc. 261)

1935158.2

documents, the subpoena for a deposition included no direction on the applicable time frame.

Yesterday, the West Virginia Attorney General filed a Certificate of Service for a document production sent to Defense Counsel Jeffrey Wakefield. Today, Defendants reported to Special Master Wilkes that they believed that they were going to be able to work out an agreement with the WVIOC on a more limited production.

### b. The West Virginia Public Employees Insurance Agency

The West Virginia Public Employees Insurance Agency's ("PEIA") motioned to quash two subpoenas served upon them on March 17, 2020 requesting they produce documents and appear for a deposition on March 31, 2020. PEIA also stated the subpoenas were overbroad and unduly burdensome. In their supporting affidavit, Thomas Miller, Privacy and Security Officer of West Virginia's Public Employees Insurance Agency, testified that not only would it take one employee devoting 50 percent of their time along with other employees for 4-6 months to comply with the subpoena, "the data compilation will be tenuous because the subpoenas command a large amount of data, but have failed to ask for anything specific that assists in developing codes and search parameters."[13]

Today, Defendants reported to Special Master Wilkes that they believed that they were going to be able to work out an agreement with PEIA on a more limited production.

### c. Cabell Huntington Hospital

Cabell Huntington Hospital moved to quash a subpoena it received on March 17, 2020 from AmerisourceBergen requesting a production date of March 26, 2020 (subsequently extended to April

---

[13] *See West* Virginia's Public Employees Insurance Agency Motion to Quash (Doc 260)

1935158.2

9, 2020).[14] Noting that the subpoena "seeks approximately twenty-four (24) years of documents and information covering a broad range of various topics, CHH also wrote:

> Cabell notes, however, that this is not the ordinary subpoena. It requires a substantial amount of work by a multitude of various medical and legal personnel. Due to the nature and complexity of the information sought, it requires overlapping scrutiny for privileges and objections such as the Health Insurance Portability and Accountability Act, the Health Care Quality Improvement Act, or the Peer Review Privilege codified in W.Va. Code 30-3C-1 et seq., not to mention privileges such as attorney client privilege, the work product doctrine or any other rule-based objection, proprietary confidence or permissible privilege which may become evident during the requisite investigation. Cabell respectfully reserves the right to address those issues under a reasonable- and not rushed – timeframe for compliance.

Like the other requests, after meeting and conferring, Defendants reported to Special Master Wilkes today that they they were working with CHH and believed that they were going to be able to work out an agreement with CHH.

### d. Special Master Wilkes Remains Available to Resolve any other Discovery Disputes.

This Court has recently set forth a procedure for the Special Master to ensure continuity and timely review of discovery disputes involving third parties. (Doc 365). When disputes have been brought before Special Master Wilkes, they have either been promptly resolved by ruling, or in the majority of instances, by the agreement of the parties.

Today, when asked by the Special Master, no party identified any other discovery issue that they were aware of for resolution by the Special Master. The process for resolving disputes over Defendants' overly broad third-party requests is working.

### E. The COVID-19 Crisis Does not Require a Continuance.

Like Defendants, Plaintiffs are keenly aware of the recent impact of COVID-19 – both nationally and also within their communities. However, as the consequences of COVID-19 collide

---

[14] See Cabell Huntington Hospitals Memorandum of Law in Support of Petition and Motion to Quash Subpoena (Doc 310)

1935158.2

with another public health crisis – the opioid epidemic brought on by Defendants – it is clear that the resolution of Plaintiffs' claims is now more urgent than before.

Courts across the country have adopted mechanisms to continue litigation in the face of the crisis. *See* Doc. 327. Special Master Wilkes has already ruled that "if it remains impractical or impossible to be conducted in-person," depositions shall be conducted by remote means. Doc. 360 (Discovery Ruling Granting Plaintiffs' Motion to Compel Deposition of Tim Ashworth). The Supreme Court of Appeals of West Virginia has adopted procedures to permit discovery – directing the parties to comply with discovery requests notwithstanding the crisis with the "the aim to towards permitting otherwise proper discovery to the greatest extent possible." *See* Exhibit J at 3-4. Remote depositions and hearings are now being conducted in state and federal cases in West Virginia and across the County.

Moreover, the crisis appears to be abating. Governor Justice has announced that the "Stay at Home" order is being replaced with the new "Safer at Home" order that begins that process of opening up the State to business. *See* Exhibit K. While courts and attorneys were always considered essential under the Governor's orders, the new order signals that needed discovery will be able to proceed.

**II.     This Court can Commence Trial on August 31, 2020 and Permit the Parties to Finish any Remaining Discovery.**

Because this case is set for a bench trial, this Court has flexibility that it otherwise would not have. As Plaintiffs have previously noted, large portions of the case are trial ready now. *See* Doc. 139-0 at pp. 5-6. Trial can commence and staged so that any clean-up discovery can be completed during those proceedings or during the three-week break in the schedule.

## CONCLUSION

As set forth above, good cause does not exist here and the potential impact on the delay of the judicial proceedings weigh against an extension. Defendants have not been diligent in their efforts to comply with the existing schedule.

Dated: May 1, 2020                                                          Respectfully submitted,

| **THE CITY OF HUNTINGTON** | **CABELL COUNTY COMMISSION** |
|---|---|
| /s/ *Anne McGinness Kearse* | /s/ *Paul T. Farrell, Jr.* |
| Anne McGinness Kearse (WVSB No. 12547) | Paul T. Farrell, Jr. (WVSB Bar No. 7443) |
| Joseph F. Rice | **FARRELL LAW** |
| **MOTLEY RICE LLC** | 422 Ninth Street, 3rd Floor (25701) |
| 28 Bridgeside Blvd. | PO Box 1180 |
| Mount Pleasant, SC 29464 | Huntington, West Virginia 25714-1180 |
| Tel: 843-216-9000 | Mobile: 304-654-8281 |
| Fax: 843-216-9450 | paul@farrell.law |
| akearse@motleyrice.com | |
| jrice@motleyrice.com | /s/ *Anthony J. Majestro* |
| | Anthony J. Majestro (WVSB No. 5165) |
| Linda Singer | **POWELL & MAJESTRO, PLLC** |
| David I. Ackerman | 405 Capitol Street, Suite P-1200 |
| **MOTLEY RICE LLC** | Charleston, WV 25301 |
| 401 9th Street NW, Suite 1001 | 304-346-2889 / 304-346-2895 (f) |
| Washington, DC 20004 | amajestro@powellmajestro.com |
| Tel: 202-232-5504 | |
| Fax: 202-386-9622 | |
| lsinger@motleyrice.com | Michael A. Woelfel (WVSB No. 4106) |
| dackerman@motleyrice.com | **WOELFEL AND WOELFEL, LLP** |
| | 801 Eighth Street |
| Charles R. "Rusty" Webb (WVSB No. 4782) | Huntington, West Virginia 25701 |
| **The Webb Law Centre, PLLC** | Tel. 304.522.6249 |
| 716 Lee Street, East | Fax. 304.522.9282 |
| Charleston, West Virginia 25301 | mikewoelfel3@gmail.com |
| Telephone: (304) 344-9322 | |
| Facsimile: (304) 344-1157 | |
| rusty@rustywebb.com | |

1935158.2

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Anthony J. Majestro*

1935158.2