**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>     Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 3:17-01665<br>Hon David A. Faber |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO COMPEL DISCOVERY RESPONSES FROM DEA**

**I.      Introduction**

Defendants' Motion to Compel discovery from DEA rests on principles of fundamental fairness and Defendants' substantial need for the requested documents.  DEA's Response confirms it unapologetically refuses to produce ***any*** documents to Defendants, while at the same time producing documents in response to Plaintiffs' first CT2 subpoena with "no objection."  The documents requested by Defendants go to the heart of this litigation, such that the balance of factors clearly weighs in favor of disclosure.

Defendants move to compel on 14 requests.[1]  These 14 requests—four fewer than Plaintiffs' 18 total requests served in CT2—seek targeted, new information relating only to West Virginia and two federal government reports about DEA's actions published after CT1 discovery closed.  DEA concedes that the MDL court expected such "limited, jurisdiction-specific discovery in the West Virginia cases would be necessary after remand." DEA's Response at 2.  Yet DEA continues to argue that Defendants' requests are duplicative of their CT1 requests and unduly burdensome.  But tellingly, DEA still fails to identify ***any*** documents that it has produced that are responsive to Defendants' requests here.  DEA has not done so, because it cannot—it has not produced documents responsive Defendants' requests.  And DEA's Response provides no valid reason for its objections to Defendants' narrow, targeted requests seeking information highly relevant to the claims in this case.

DEA seeks to use the *Touhy* regulation and unsubstantiated, conclusory assertions of law enforcement privilege to further stonewall Defendants' discovery requests.  But DEA's haphazard assertions fail under principled scrutiny.  As an initial matter, DEA's reliance on the *Touhy* regulation is misplaced.  The *Touhy* regulation does not does not create any substantive or procedural rights for the federal government, and is not an independent privilege for the government to refuse to comply with valid subpoenas.

Further, under well-established Fourth Circuit law, Defendants' Motion before this Court is the proper avenue for Defendants to seek relief from DEA's refusal to comply with a valid

---

[1] Defendants have worked diligently to reduce any purported burden on DEA. First, Defendants worked diligently to narrow their CT2 discovery requests by 50 percent to eighteen requests in response to DEA's request that Defendants prioritize its requests.  Now, Defendants agree to further narrow their requests to fourteen so there can be no dispute that the requests seek new information not requested in CT1.  Defendants' remaining 14 requests at issue in this Motion are Nos. 1, 3, 7, 8, 9, 13, 16, 17, 18, 19, 21, 24, 26, and 32.  *See* Exhibit A of Motion.

subpoena.  Because Defendants' subpoena was issued by a federal court, no sovereign immunity concerns are raised when Defendants ask that federal court to enforce the subpoena against a federal agency.  Accordingly, this discovery dispute is governed by Rule 45(d), which requires the party resisting discovery to demonstrate that compliance with a subpoena will impose undue burden or the production of privileged material, and requires the Court to take into account the requesting party's substantial need for the discovery.

But even if the Administrative Procedure Act's ("APA") standard of review governs this Motion, DEA's refusal to comply with the subpoena is unlawful and should be set aside.  *See* 5 U.S.C. 706 (a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Here, DEA's conduct is "arbitrary and capricious," "an abuse of discretion," and "not in accordance with law."

First, DEA has indisputably treated Plaintiffs and Defendants differently throughout this litigation, producing documents in response to Plaintiffs' first subpoena while completely stonewalling Defendants' efforts to obtain similar discovery.  Second, DEA's sweeping assertions of law enforcement privilege are contrary to well-established law.  Third, DEA makes no attempt to satisfy its substantial threshold showing of specific harms that would result from disclosure, again contrary to well-established law.  And finally, DEA's cursory rejection of Defendants' proposal to use the AEO protective order—an approach advocated by federal district courts and used previously by DEA in the opioids litigation to advance a state plaintiff's discovery—is similarly arbitrary and capricious and an abuse of discretion.

Defendants' 14 requests are geographically targeted and highly relevant.  DEA's attempts to hide behind misplaced assertions of sovereign immunity, the *Touhy* regulations, and conclusory assertions of law enforcement privilege should be rejected.

## II.      Argument

### A.      No Separate APA Action Is Required in the Fourth Circuit

DEA contends Defendants were required to bring a separate action under the APA to enforce Defendants' subpoena.  Resp. at 11-12.  Not so.  Sovereign immunity issues do not arise when the underlying action is in federal court.  *See Lamb v. Wallace*, 2018 WL 847242, at *3 (E.D.N.C. Feb. 13, 2018) (finding *Smith* and *COMSAT* are "inapposite to the present issue because the sovereignty concern underlying those decisions is not present when the subpoenas stem from a proceeding initiated in federal court"); *Clay v. Consol Penn. Coal Co., LLC*, 2013 WL 12373597, at *2 & n.6 (N.D.W. Va. Oct. 17, 2013) (holding that where "the underlying case is already in federal court, a motion to compel compliance with the subpoena" is a "sufficient mechanism[] to allow a federal district court to review an agency's actions under its *Touhy* regulations").

Defendants are therefore not required to bring a separate APA action to enforce a subpoena against the government ***because this case originated in federal court***.  *See Lamb*, 2018 WL 847242, at *3; *accord U.S. E.P.A. v. General Elec. Co.*, 197 F.3d 592, 599 (2d Cir. 1999), *amended on reh'g*, 212 F.3d 689 (2d. Cir. 2000).  The two Fourth Circuit cases cited by DEA, *COMSAT* and *Smith*, Resp. at 12, do not require a different conclusion.  Each of those cases presented sovereign immunity issues because neither involved litigation in federal court.  *Smith* involved proceedings in state court and *COMSAT* involved proceedings before an arbitrator.  *Smith v. Cromer*, 159 F.3d 875, 879-883 (4th Cir. 1998); *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 275-278 (4th Cir. 1999).

DEA also presumes that the Administrative Procedure Act's "arbitrary and capricious" standard governs the Motion.  Resp. at 12.  But Federal Rule of Civil Procedure 45 governs

discovery of third parties. A majority of courts, including the MDL court,[2] have applied the standard of review found in Federal Rule of Civil Procedure 45 "under which the party refusing to comply with a subpoena bears the burden of showing good cause." 9A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2463.2 (3d Ed. 2017).

Under either standard of review, however, DEA's boilerplate and conclusory objections to Defendants' subpoena do not justify its wholesale failure even to search for, let alone produce, any responsive documents while producing documents in response to certain Plaintiffs' requests.

### B.     The *Touhy* Regulations Do Not Permit DEA's Wholesale Refusal to Comply with Defendants' Subpoena

DEA next contends that the *Touhy* regulations allow DEA to "refuse to comply with third-party subpoenas." Resp. at 14. DEA's sweeping assertion is contrary to well-established law.

To be clear, the *Touhy* regulation does not create substantive and procedural rights for the government to shield itself from valid subpoenas. The *Touhy* regulation itself explains that the regulations are "intended only to provide guidance for the internal operations of the Department of Justice, and is not intended to, and may not be relied upon to create any right or benefit,

---

[2] *See, e.g.*, *Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007) (explaining that "a challenge to an agency's refusal to comply with a Rule 45 subpoena should proceed and be treated not as an APA action but as a Rule 45 motion to compel"); *Exxon Shipping Co v. U.S. Dep't of Interior*, 34 F.3d 774, 780 (9th Cir. 1994) ("district courts should apply the federal rules of discovery when deciding on discovery requests made against government agencies…"); *Samadian v. Meade*, 2011 WL 13180181, at *7 (N.D. Tex. Dec. 22, 2011) (noting that "[t]he current trend is to review the decision under Federal Rule 45 within the same litigation"); *In re Packaged Ice Antitrust Litig.*, No. 08–MD–1952, 2011 WL 1790189, at *2 (E.D. Mich. May 10, 2011) (concluding that "the Sixth Circuit would join the opinions of those courts, mostly in this century, that have concluded that Federal Rule of Civil Procedure 45 and various available privilege rules provide sufficient limitations on discovery to adequately address legitimate governmental interests in objecting to a motion to compel compliance with a valid federal court subpoena."); *In re PE Corp. Sec. Litig.*, No. 00–CV–705, 2005 WL 806719 at *6–7 (D. Conn. April 8, 2005) (holding that the agency's refusal to produce an individual for a deposition would be analyzed under the applicable federal discovery rules); Order Regarding ARCOS Data at 8–9, *In re Nat'l Prescription Opiate Litig.*, Case No. 1:17-MD-2804 (N.D. Ohio Apr. 11, 2018) [ECF No. 233].

substantive or procedural, enforceable at law by a party against the United States."  28 C.F.R. §
16.21(d).  "There is no 'independent privilege to withhold government information or shield
federal employees from valid subpoenas' that arises from the regulations."  *Lamb*, 2018 WL
847242, at *5.  Courts emphasize that *Touhy* may not "be used as a tool by the executive to usurp
the judiciary's role in determining what evidence will enter into the courtroom."  *Streett v. United
States*, 1996 WL 765882, at *4 (W.D. Va. Dec. 18, 1996); *see also Owings v. Hunt & Henriques*,
673 F.Supp.2d 1104, 1106 (E.D. Cal. 2009) ("The U.S. Army's *Touhy* regulations do not authorize
the Army to ignore discovery requests or court orders addressing those discovery requests in a
pending federal action.").

Further, and contrary to DEA's assertion, there is no law enforcement privilege created by
the *Touhy* regulation that is separate from West Virginia privilege law, which governs in this
litigation.  DOJ's argument otherwise is flatly inconsistent with the *Touhy* regulation itself, which
states that *Touhy* "may not be relied upon to create any right or benefit, substantive or procedural,
enforceable at law." 28 C.F.R. § 16.21(d).  West Virginia law governs DEA's assertions of law
enforcement privilege, *see* Fed. R. Evid. 501, and West Virginia has "never adopted an all-
encompassing law enforcement privilege."  *Maclay v. Jones*, 542 S.E.2d 83, 86 (W.Va. 2000).

DEA's reliance on the *Touhy* regulations to shield itself from Defendants' subpoena is
misplaced.  Even if the *Touhy* regulation affords DEA the protection it claims (which it does not),
DEA articulates no reason—much less a "rationale"—sufficient to justify its wholesale refusal to
comply with Defendants' 14 clearly relevant and narrowed requests.  *See Ceroni v. 4Front
Engineered Solutions, Inc.*, 793 F. Supp. 2d 1268, 1278 (D. Colo. 2011) (finding USPS's denial
under *Touhy* was arbitrary and capricious because the response "is composed solely of boilerplate
objections, devoid of any individualized factual analysis").   Unilaterally concluding that

responding would not be "an appropriate use of DEA resources" is insufficient under any measure, particularly in view of DEA's decision to produce documents responsive to at least some of Plaintiffs' CT2 requests.

### C.     If the APA Applied, DEA's Blanket Denial of Defendants' Requests Should Be Set Aside

When DEA finally responded to Defendants' requests—10 days after Defendants were forced to seek relief because DEA refused to provide any substantive response—DOJ rejected every one of Defendants' requests, even those requests that it acknowledged were sufficiently narrow and targeted on their face.  Even assuming the APA standard of review applies, DEA's actions are the definition of arbitrary and capricious.

#### 1.     DEA's Treatment of Plaintiffs and Defendants is Night and Day

DEA's disparate treatment of Plaintiffs' and Defendants' requests is arbitrary and capricious.  "Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." *Burlington Northern & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005).  DEA's "explanation" that its behavior "is not favoritism" but is "how rational parties negotiate discovery disputes," Resp. at 8, rings hollow when one considers DEA's disparate treatment of the parties.

Plaintiffs served their first CT2 subpoena on DEA in late October 2019, prior to remand of the cases.  Plaintiffs re-served their first subpoena on DEA in February 2020, and served a second subpoena in March.  Defendants were not invited to participate in any meet-and-confer process regarding these subpoenas and still have no idea what discussions were had between DEA and Plaintiffs.  What is apparent is that DEA agreed to produce documents responsive to Plaintiffs' subpoena.  DEA began producing documents on December 20, 2019, explaining in its *Touhy*

authorization letter to Plaintiffs that DEA has "no objection" to Plaintiffs' requests. *See* Ex. D to Reply. Notably, ***DEA produced investigation files***—the very documents DEA now says are subject to a law enforcement privilege and are too sensitive to be produced in response to Defendants' subpoena. *See* Ex. B to Motion.

On February 21, 2020, Defendants served their CT2 subpoena. DEA did not respond in writing, instead requesting a meet-and-confer, inviting Plaintiffs to attend the meet-and-confers on Defendants' requests. As set forth in Defendants' Motion, the meet-and-confer process was not productive as DEA refused to agree to the production of a single document to Defendants after more than three hours of discussions. DEA requested that Defendants narrow the scope of their requests, and when the Defendants complied and spent hours walking DEA through each of the priority requests, DEA refused to produce a single document necessitating this Motion to Compel. DEA's Response confirms what Defendants realized only later—DEA never intended to produce documents responsive to Defendants' CT2 subpoena. Resp. at 20 ("DOJ reasonably concluded that responding to Defendants' overbroad and redundant requests was not an appropriate use of DEA resources and would divert agency personnel from carrying out mission-critical activities.").

By its own words, DEA effectively concedes it stonewalled Defendants through three meet-and-confer sessions over the course of three weeks, despite Defendants' history of being willing to compromise with DEA to reduce the agency's burden. *See S.E.C. v. Chakrapani*, 2010 WL 2605819, at *10 (S.D.N.Y. June 29, 2010) (holding that *Touhy* denial was "arbitrary and capricious" where government gave no credible reason for why it could give FBI files to one defendant but not another).

DEA's production of documents in response to Plaintiffs' first subpoena but its refusal to produce any documents in response to Defendants' request is the embodiment of an arbitrary

agency action.  *Cf. Baltimore Gas and Elec. Co. v. Heintz*, 760 F.2d 1408, 1418 (4th Cir. 1985) ("It is a well-settled proposition of administrative law that when an agency deviates from established precedent, it must provide a reasoned explanation for its failure to follow its own precedents. . . . It follows from that general proposition that when an agency treats two similar transactions differently, an explanation for the agency's actions must be forthcoming. . . . One legal basis for this requirement is the statutory requirement in the [APA] that the agency provide 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion.' If the agency fails to fulfil this requirement, then it may be deemed to have acted arbitrarily.").

## 2. DEA's Blanket Assertion of Law Enforcement Privilege Has No Basis in Law

As an initial matter, the fact that *some* documents may be privileged cannot and does not shield DEA from having to even *look for* responsive documents.  Here, DEA's claim that responsive documents would be protected by law enforcement privilege rings particularly hollow—DEA has not even attempted to look for responsive documents.  It cannot possibly already know that *every single* responsive document—or even most responsive documents—are protected by privilege.  Therefore, DEA's claim that some documents might be privileged is irrelevant.

But even if law enforcement privilege protects some documents from disclosure, it likely only applies to a small fraction of responsive documents.  As established above, the *Touhy* regulation "may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law."  28 C.F.R. § 16.21.  DEA's sweeping assertion that it can withhold all responsive documents as law enforcement sensitive under *Touhy* is contrary to the *Touhy* regulation's plain language and not in accordance with well-established law.  *See* 5 U.S.C. 706 (a

court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

This law enforcement privilege is a qualified privilege and "ceases once the reason for it no longer exists." *Lamb*, 2018 WL 847242, at *5. As this Court has recognized, global assertions that all documents may be privileged is not a sufficient ground to defeat a discovery request. *See* Discovery Ruling No. 3 at 4 ("Further, the general claims of privilege, etc. are too broad. The general claim that the request is unduly burdensome, privileged, work product, or cumulative is legally insufficient to defeat the requested internal memorandum and email communications concerning the subject matter.").

Indeed, even when reviewing government responses to discovery requests, courts are not "required to defer blindly to assertions made by a law enforcement official regarding the existence of the law enforcement privilege." *MacNamara v. City of N.Y.*, 249 F.R.D. 70, 85 (S.D.N.Y. 2008). Instead, federal courts require that "the party asserting the privilege must make 'a substantial threshold showing[] that there are specific harms likely to accrue from disclosure of specific materials, and that this burden must be discharged by presenting 'those facts that are the essential elements of the privileged relationship' and not 'by mere conclusory or *ipse dixit* assertions.'" *Id*. (internal citations omitted).

DEA's conclusory assertion that "much of the information sought by Defendants would reveal DEA's investigative techniques" fails to satisfy this threshold showing. Even if DEA could articulate a concern for information sought by some of Defendants' requests, there can be no dispute that the majority of Defendants' requests do not seek documents that would reveal sensitive information about ongoing DEA investigations. There also can be no dispute that DEA could find a way to produce non-sensitive materials, as it did when producing the investigation files for

9

Plaintiffs.  There is no justification for DEA's blanket refusal to produce under the guise of a law enforcement privilege.  *See* 5 U.S.C. 706 (a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). DEA should be required, like all party and non-party litigants, to produce what it can and provide a timely log describing what it withholds.

### 3.   AEO Protective Orders Resolve DEA's Concerns Over Law Enforcement Sensitive Materials

And even if DEA has concerns about law enforcement sensitive information, DEA can and should utilize an "Attorneys Eyes Only" protective order.  DEA concedes it has used "Attorneys Eyes Only" protective orders to restrict the disclosure of DEA law enforcement sensitive information from the public eye.  Resp. at 19-20.  Notwithstanding this fact, DEA invoked *Touhy* to reject the use of the AEO protective order here.  DEA's sole reason for rejecting Defendants' request here: The documents produced in the Rhode Island opioid litigation were with the State and "outside of [DEA's] possession and control."  *Id.*

Setting aside the question of how the State obtained these sensitive files, DEA somehow retained enough control to require DOJ review for de-designations and redactions of any documents the parties intended to use in depositions or filings.  *See* Ex. C to Motion.  There is no reason—and DEA cites no authority—why DEA could not do the same here to "limit[] the universe of documents requiring line-by-line review and allow[] the [production of] these documents to Defendants promptly."  *Id.*  Indeed, DEA, in its *Touhy* authorization letter to Plaintiffs in CT2, recognized that protective orders could alleviate sensitivity concerns in CT2: "DOJ, on behalf of the DEA, may request a further order of the Court as contemplated in paragraph 4 of the Protective Order if we determine that such an order is necessary and appropriate to adequately protect the DEA's interests in future productions."  *See* Ex. D to Reply.

District courts frequently recommend that parties produce materials under AEO protective orders to resolve concerns that the materials are law enforcement sensitive.  When evaluating whether to compel disclosure of materials subject to assertions of law enforcement privilege, "the Court 'must consider the effect of a protective order restricting disclosure to the [party] or the [party's] attorney, or to the [party's] attorney alone.  Such an order can mitigate many if not all of the oft-alleged injuries … to law enforcement." *MacNamara*, 249 F.R.D. at 80 (noting that "any intelligence documents" produced will be "subject to an 'attorneys' eyes-only' designation"). Courts also recognize that protective orders limiting disclosure may resolve concerns about the effect of disclosure on other matters. *Lamb*, 2018 WL 847242, at *7.  Lastly, it is well-established under West Virginia law that "the use of protective orders is preferential to the total non-disclosure of requested materials that are otherwise subject to discovery." *Maclay*, 542 S.E.2d at 90 n.11. Producing responsive materials pursuant to the AEO protective order would reduce the burden on DEA and resolve DEA's contention that production would "enable wrongdoers to avoid detection."

DEA's unfounded rejection of Defendants' proposal to use the AEO protective order is arbitrary and capricious.

**D.      Defendants' Fourteen Requests Seek Targeted Information About West Virginia and Newly Issued Federal Government Reports Critical to Their Defense in CT2**

DEA contends that its refusal to produce documents to Defendants is proper because Defendants' requests are "unreasonably cumulative or duplicative" and the burden on DEA "outweighs the likely benefit of the materials sought." Resp. at 16.  This is incorrect.  Defendants' narrowed requests seek targeted, localized discovery about DEA's actions in West Virginia or

reports issued after the close of discovery in CT1.  Defendants' substantial need for these materials outweighs any burden on DEA.

Rather than acknowledge Defendants' efforts to seek narrow, targeted discovery, DEA strains to characterize Defendants' narrowed CT2 requests as cumulative or duplicative of CT1 discovery.  DEA's assertions are intended to deflect from the current state of Defendants' discovery requests.  Defendants' 14 requests that are the subject of this Motion are not "unreasonably cumulative or duplicative" of prior discovery because the requests are targeted to Cabell County, the City of Huntington, or West Virginia, or concern reports issued after the close of discovery in CT1.

### 1.     Twelve of Defendants' 14 Requests Are Geographically Targeted to Cabell County, the City of Huntington, or West Virginia

In Exhibit C to DEA's Response, DEA classifies ten of Defendants' 14 priority requests as duplicative of CT1, even though these ten specifically request information related to Cabell County, the City of Huntington, or West Virginia.[3]  DEA contends that the ten requests were encompassed in CT1 requests that had no geographic limitation.  This argument fails.

Twelve of Defendants' 14 requests are directed at DEA's actions in Cabell County, the City of Huntington, and/or West Virginia.[4]  Defendants did not request discovery concerning Cabell County, the City of Huntington, or West Virginia in CT1, and DEA did not produce documents from West Virginia in CT1.[5]  Defendants did not request documents targeting West

---

[3] Request Nos. 3, 7, 8, 9, 13, 16, 17, 18, 19, and 26. DEA does not contend Request Nos. 1 and 24 are duplicative.

[4] Request Nos. 1, 3, 7, 8, 9, 13, 16, 17, 18, 19, 24, and 26.

[5] DEA's remark that it produced "hundreds of millions of records" is misleading.  DEA produced ARCOS data and SORs data relating to West Virginia (along with all other states)—which was a few files of data, not "hundreds of millions of records," and is completely irrelevant to the twelve West Virginia-specific requests at issue here.  ARCOS data is transactional data submitted by (continued…)

12

Virginia in CT1 because CT1 concerned Summit and Cuyahoga Counties in Ohio.[6]  At no point during any of the parties' three lengthy meet-and-confers did DEA ever point Defendants to documents concerning West Virginia that DEA believes it had already produced in response to these requests—nor could it since the requests are not duplicative.  Defendants' requests are highly relevant in CT2, however, because they pertain to DEA's actions or inactions in this jurisdiction.

### 2. Defendants Do Not Seek to "Reopen Discovery"

Defendants do not seek to repeat CT1 DEA discovery in CT2 or otherwise "reopen discovery" taken in CT1.  As discussed, twelve of Defendants' 14 requests are geographically limited to West Virginia. The remaining two requests (Nos. 21 and 32) seek information regarding DEA's responses to or communications about two federal government reports related to the opioid crisis published *after* discovery in CT1 closed.  Documents related to these reports are critical to understanding what DEA did or did not do in response to the opioid crisis, and could not have been requested in CT1.  Defendants cannot "reopen discovery" about two reports that were not issued before the close of discovery in CT1.  And DEA itself acknowledged during the meet-and-confer process that Request Nos. 21 and 32 were sufficiently narrow, but that it would not produce documents responsive to these requests because there was not agreement on other requests.

DEA is particularly misleading regarding Request No. 32, which requests communications with or about a federal government report that was published only a few months ago in January

---

manufacturers and distributors to DEA that DEA produced in CT1 in response to Plaintiffs' requests.

[6] Indeed, when issuing its first Suggestion of Remand, the MDL Court noted that "global" discovery had been conducted with respect to Defendants, but plaintiff-focused discovery was "specific" to the CT1 jurisdictions and was not conducted on a global scale.  Dkt. No. 2941 at 4, *In re: National Prescription Opiate Litigation*, 1:17-md-02804-DAP (N.D. Ohio).  This further highlights that discovery into Cabell County, the City of Huntington, or West Virginia was not conducted in CT1, and remains outstanding.

(continued…)

13

2020, months after CT1 discovery closed.  DEA labels this request as "not case specific" and as "a particularly good example of Defendants' use of remand as an opportunity to reopen discovery." DEA's Response, Exhibit C at 15.  DEA's mischaracterization of Request No. 32 illustrates its efforts to avoid producing any discovery to Defendants in CT2.[7]  The GAO did not even *issue* this report until January of this year—months after discovery in CT1 closed.  And this report discusses DEA's use of suspicious order reports submitted by registrants, including Defendants, and DEA's use of data.

### 3.    Defendants' Requests Do Not Impose an Undue Burden on DEA and Are Clearly Relevant to Defendants' Defenses

DEA argues that the "immense burden on DEA to identify, review, and produce these documents greatly outweighs the likely benefit to Defendants."  Resp. at 18.  This argument is incorrect.

### a)    Defendants' Substantial Need for Discovery from DEA Outweighs the Purported Burden on DEA

A party's discovery request to a third-party government agency is "not particularly burdensome" when it seeks a "narrow class of documents," and is "not an open-ended fishing expedition."  *Lamb*, 2018 WL 847242, at *6.  Several of Defendants' requests seek sets of documents that have already been produced by DEA to other governmental entities.[8]  Furthermore, the government faces lesser burdens where it "has already conducted the search for records" that the party seeks.  *Id.*  Defendants' requests are narrow, seeking information only on the narrow categories of information discussed above.  And by DEA's own admission, it already collected

---

[7] DEA admits that two of Defendants' priority requests—Nos. 1 and 24—are not duplicative of CT1 discovery.  *See* DEA's Response, Exhibit C at 15-16. DEA does not address Request 21, but it is not duplicative because it concerns a report published after CT1 discovery closed.

[8] Request Nos. 1, 21, and 32.

millions of pages of documents in CT1. Surely, given the very broad collection that DEA seems to have undertaken, some documents responsive to Defendants' narrow requests have already been collected by DEA, and now reside in whatever document review repository it is using, significantly lessening the burdens on DEA.

The government's burden arguments must also be weighed against the significance of the lawsuit and the relevance of the discovery sought. *See id.* (finding no undue burden on the government where Plaintiff "alleged a constitutional violation of great magnitude" that the government "continued to conceal"). It is indisputable that the discovery sought by Defendants from DEA is highly relevant to Plaintiffs' claims and Defendants' defenses in this complex action. DEA's conclusory arguments regarding burden are outweighed by Defendants' demonstrated substantial need for the requested discovery.

For example, Plaintiffs allege in their complaints that Defendants' alleged failure to report suspicious orders of opioids to DEA resulted in harm to Plaintiffs. Discovery concerning DEA's receipt and use in this jurisdiction of suspicious order reports, ARCOS transactional data, and the West Virginia Controlled Substance Automated Prescription Program ("WVCSMP") is directly relevant to whether any alleged failure by Defendants resulted in Plaintiffs' alleged injuries. If DEA did not use suspicious order reports (or, instead, relied on ARCOS data or the WVCSMP) to investigate potentially suspicious orders, then any alleged failure by Defendants to report suspicious orders could not have caused Plaintiffs' alleged injuries. Indeed, there is reason to believe this discovery may be fruitful. *See* OIG, *Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids* (Sept. 2019) at 31 (stating that a DEA diversion program manager described DEA's suspicious order report database as a "joke"); GAO, *Actions Needed to Ensure Usefulness of Data on Suspicious Opioid Orders* (Jan.

15

2020) at 32 (noting GAO found during interviews with "DEA officials and DEA field division offices" that "they rarely use suspicious order reports to generate potential investigative leads."). Such evidence is critical to Defendants' defense.

Defendants' request for documents concerning DEA audits and investigations of their distribution centers servicing West Virginia is also directly relevant to the issues of this litigation. In Track 1B, Special Master Cohen considered a request by a pharmacy defendant for certain DEA distribution center audits—a request that mirrors Defendants' Request No. 13 at issue in this motion. DEA was ordered to produce the documents because the DEA documents were "at the very center of the issues to be decided in the upcoming trial" and "could not be more relevant." *See* Dkt. No. 3258 at 4, *In re: National Prescription Opiate Litigation*, 1:17-md-02804-DAP (N.D. Ohio). DEA's claims of law enforcement privilege over the audits was similarly rejected as "hyperbolic." *Id*. at 7-8 ("[P]roduction of the audits is not protected by law enforcement privilege.").

Defendants' requests directed to DEA's efforts to combat diversion and illicit opioid use in Cabell County, the City of Huntington, and West Virginia are similarly highly relevant to Plaintiffs' alleged injuries that purportedly result from users of illicit opioids and users of opioids diverted from legitimate prescriptions. Information about DEA's efforts relating to diversion of prescription opioids and trafficking of illicit opioids into Plaintiffs' geographical boundaries is critical to assessing whether Defendants' alleged conduct resulted in harm to Plaintiffs.

As another example, Defendants seek information relating to DEA's submissions to the U.S. House of Representative's Energy and Commerce Committee for the Committee's investigation that resulted in the 2018 report, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia*. This report has been the subject of

multiple discovery requests by Plaintiffs to Defendants.  But this report also investigated DEA's conduct in West Virginia, including DEA's response to red flags identified by distributors in West Virginia.[9]  DEA's failure to act on red flags raised by distributors is highly relevant to Defendants' defenses.  In addition, the documents sought by Defendants in this request were already produced by DEA during the congressional investigation.  Because this material has already been produced by DEA, there should be no burden to reproduce the materials in this litigation; DEA only should have to duplicate its production CDs.

### b)    DEA's "Slippery Slope" Should Be Rejected

DEA also claims that granting Defendants' Motion will lead to future requests for discovery from DEA.  DEA offered this same "slippery slope" argument in its petition to Special Master Cohen to deny DEA discovery requested from a pharmacy defendant in Track 1B of the MDL.

DEA's burden and "slippery slope" arguments were rejected in view of the demonstrated substantial need for the documents.  *See* Dkt. No. 3258 at 6, *In re: National Prescription Opiate Litigation*, 1:17-md-02804-DAP (N.D. Ohio) ("In any event, all of DOJ's arguments regarding burden and relevance are conclusory or incorrect, and the slippery slope argument is of no more avail.  The substantial need Rite Aid has demonstrated for the requested discovery, to defend itself in this national litigation, is certainly not disproportional to the burden placed on DOJ to produce it.").

---

[9] The report found, for example, "[m]any of the suspicious orders [reported by distributors to DEA] involve the same customers, meaning that DEA was alerted that some pharmacies were repeatedly being denied controlled substance orders because distributors were concerned about possible diversion."  U.S. House of Representatives Energy & Commerce Committee, *Red Flags and Warning Signs Ignored:  Opioid Distribution and Enforcement Concerns in West Virginia* (Dec. 19, 2018) at 61.

          **c)**        **DEA Should Be Directed To Complete a Privilege Log By a Date Certain**

Last week, on April 30, 2020, DEA produced a privilege log with a mere 179 entries, relating to documents it had withheld from productions made over a year earlier.  As part of that process, DEA also revealed that it would be de-designating and producing some unspecified number of previously withheld documents, and DEA clawed back 25 documents it asserts were inadvertently produced.

Although DEA stated in that correspondence that its review and logging is ongoing, it has made no representations about how many more documents it must log or when that work will be completed.  DEA's reliance on its production in CT1 to avoid further production in this Court is particularly troubling given that DEA has failed to produce a privilege log for the likely thousands of documents it has withheld, depriving the parties of the opportunity to challenge DEA's privilege assertions for certain documents.  The Court should establish a deadline for DEA to complete its log of documents withheld so that Plaintiffs and Defendants can evaluate whether any challenges are necessary.

## III.    Conclusion

For the reasons set forth above and in Defendants' Motion, the Court should grant Defendants' Motion to Compel and order DEA to produce documents responsive to Defendants' 14 requests.

Dated: May 6, 2020

Respectfully submitted,

                                            **Defendants**

                                            ***McKesson Corporation***
                                            By Counsel:

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
Jason L. Holliday (WVSB #12749)
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Tel: (304) 345-0200
jwakefield@flahertylegal.com
jholliday@flahertylegal.com

*/s/ Carol Dan Browning*
Carol Dan Browning
Stites & Harbison, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202
Tel: (502) 587-3400
Fax: (502) 587-6391
cbrowning@stites.com

*/s/ Timothy C. Hester*
Timothy C. Hester
Mark H. Lynch
Christian J. Pistilli
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
mlynch@cov.com
cpistilli@cov.com
lflahivewu@cov.com

**AmerisourceBergen Drug Corporation**
By Counsel:

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

19

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

**Cardinal Health, Inc.**
By Counsel:

*/s/ Steven R. Ruby*
Brian A. Glasser (WVSB #6597)
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
BAILEY GLASSER LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
*Counsel in Cabell County action*

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC  20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
emainigi@wc.com
lheard @wc.com
ahardin@wc.com

20