UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,
    Plaintiff,

v.                                          CIVIL ACTION NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

CABELL COUNTY COMMISSION,
    Plaintiff,

v.                                          CIVIL ACTION NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT
AMERISOURCEBERGEN DRUG CORPORATION'S APPEAL
FROM DISCOVERY RULING 11**

Discovery Ruling 11 (ECF 639) correctly applied the standards set forth in *In re C.R. Bard, Inc.*, MDL No. 2187, 2014 WL 12703776 (S.D. W. Va. June 30, 2014), to compel the deposition of Steven H. Collis, Chief Executive Officer of Defendant AmerisourceBergen Drug Corporation ("ABDC"). ABDC's appeal (ECF 674) misstates the applicable law, ignores the substantial record evidence supporting the Special Master's ruling, and should be summarily rejected. Plaintiffs request that the Court adopt the findings of fact and conclusions of law set forth in DR11 as approved, accepted, and ordered by the Court in accordance with the Order of Appointment (ECF 200).

## INTRODUCTION

On May 8, 2018, Collis, and executives of other Defendant and non-defendant opioid distribution companies, testified in a hearing of the U.S. House of Representatives Energy & Commerce Committee as part of its investigation into opioid distribution and alleged "pill dumping," with a focus on West Virginia. During the hearing and in follow-up correspondence, Collis gave sworn answers demonstrating his extensive and unique knowledge of ABDC's policies to prevent diversion of the opioids it distributes, and how these developed and evolved out of conversations between ABDC and federal and state regulators.

Based on Collis's unique knowledge of this highly relevant subject matter, Plaintiffs notified ABDC of their intent to depose him on the subjects he addressed before the House Committee. ABDC did not agree to produce Collis. Plaintiffs thus moved to compel.

In DR11, the Special Master granted Plaintiffs' motion. The ruling correctly analyzes the law governing depositions of high-ranking corporate executives and the record evidence supporting the motion. The Special Master followed the Court's holding in *Bard* that, under the "apex doctrine," a party deposing a high-ranking executive must show that he or she has unique knowledge of relevant information not readily obtainable from other sources. DR11 at 5 (citing *Bard*, 2014 WL 12703776, at *3). He found that the record shows Collis has had personal involvement in and direct knowledge of the factual issues this Court must decide in the bench trial. *Id.* at 6. Finally, he also found that allowing the deposition is consistent with the requirement of Fed. R. Civ. P. 26(b)(1) that discovery be proportional to the needs of the case in light of the importance of the issues and the amount in controversy in this case, in which Plaintiffs seek to abate the opioid epidemic in their jurisdictions. *See id.* at 7-8.

ABDC's appeal provides no grounds for reversal. The Court thus should adopt DR11.

**STATEMENT OF FACTS**

During and after the May 8, 2018 Congressional hearing on the topic of "Combatting the Opioid Epidemic: Examining Concerns About Distribution and Diversion," Collis provided extensive testimony demonstrating his knowledge of ABDC's anti-diversion policies over time and their relationship to federal and state regulators' demands.[1]

Collis testified under oath and at length about ABDC's diversion control policies at issue in this action. He testified that "our best-in-class diversion control team endeavors to track patterns and behavior beyond just individual suspicious orders that have led us to refuse service or terminate service to pharmacies we've identified as problematic, including several of the pharmacies we have all heard about today in West Virginia."[2] He also testified: "I wouldn't say we don't make mistakes, but I will tell you one of [the] pharmacies that's been mentioned several times, we had them on service for 38 days, and we reported them 36 of the 38 days. And on the 38th day we stopped servicing them."[3]

Collis also made statements that directly placed his knowledge of ABDC's diversion-control practices dating back almost 40 years into issue. He provided the Committee with 12 pages of written testimony, including over two pages solely about ABDC's purportedly rigorous compliance program.[4] With respect to West Virginia specifically, Collis testified about over 800

---

[1] *See generally* Plaintiffs' Exhibit 3 (ECF 517-2), Transcript of 5/8/2018 Subcommittee Hearing; Plaintiffs' Exhibit 9 (ECF 517-6), ABDCMDL00321879-90)—AmerisourceBergen Corporation, Written Statement of Steven H. Collis; Plaintiffs' Exhibit 61 (ECF 606-6), ABDC-WVFED00132070-82—Additional Questions for the Record, Responses Submitted by Steven Collis on Behalf of AmericourceBergen Drug Corporation.

[2] Pltfs' Ex. 3 (ECF 517-2), Transcript of 5/8/2018 Subcommittee Hearing at 36-37.

[3] *Id.* at 93.

[4] Pltfs' Ex. 9 (ECF 517-6) ABDCMDL00321879 at 321885-87.

orders that ABDC reported and refused to ship to West Virginia while it simultaneously refused to do further business with customers on its "Do Not Ship" list.[5]

Collis's testimony about ABDC's diversion control policies and interactions with the DEA includes statements that demonstrate his personal involvement in and unique knowledge of events material to this action. Responding to a series of questions about what if any guidance the DEA has given ABDC on diversion control, Collis testified that:

> Well in 2007, we had a lot of discussion with them, and we developed our current controlled substance monitoring program with the understanding that this was where they wanted the industry to go.[6]

This answer makes Collis a fact witness both as to ABDC's discussions with the DEA around its 2007 investigation and, even more importantly, as to the origins and objectives of ABDC's diversion control policies. This personal knowledge is directly relevant to ABDC's asserted defense that it did not know what the DEA expected of it and that the DEA had approved its prior compliance plan.

Collis also testified that, even as late as 2018, ABDC did not understand what is and is not a suspicious order. A series of questions and answers about what the DEA does with the information distributors provide to it culminated in this exchange:

> Q. Mr. Collis, do you have any idea what DEA does with this?
>
> A. No. No. We would like more feedback. We'd also like [off mic] the rules, for example, on what constitutes a suspicious order.[7]

---

[5] *Id.* at 321886.

[6] Pltfs' Ex. 3 (ECF 517-2), Transcript of 5/8/2018 Subcommittee Hearing at 101.

[7] *Id.* at 101.

Here, too, only Collis can testify about what he believed ABDC did not know or understand in carrying out its duties to identify, report, and stop suspicious orders in and before 2018, as the opioid epidemic raged in West Virginia.

In his answers to the Committee's post-hearing questions, Collis again demonstrated detailed knowledge of issues central to this litigation. For example, he describes ABDC's access to and use of pharmacies' opioid dispensing data.[8] He also details why ABDC resumed distributing opioids to a West Virginia pharmacy that it previously terminated for compliance failures.[9] He also responds to a question about whether the dramatic decline in the volume of hydrocodone it shipped to West Virginia after 2009—a decline of more than 10 million pills—can be attributed to belated due diligence.[10]

Collis also explains how ABDC does not "maintain a list of pharmacies by potential geographic reach" or even use the term "service region" because "ABDC's diversion control program believes factors besides the size of a service community are more relevant to analyzing the customer's purchasing patterns."[11] This, of course, is of particular interest to Huntington and Cabell County, which were flooded by hydrocodone and other opioids distributed by ABDC in amounts far beyond what communities of their size should reasonably receive or could bear.

Collis's post-hearing answers also include statements that demonstrate his personal involvement in and unique knowledge of material facts pertaining to the history of ABDC's diversion control programs and the company's interactions with both the DEA and West Virginia authorities:

---

[8] Pltfs' Ex. 61, ABDC-WVFED00132070-82 at 132070 (Answer to Question 1).

[9] *Id.* at 132074 (Answer to Question 13).

[10] *Id.* at 132081 (Answer to Question 1).

[11] *Id.* at 132073 (Answer to Question 1).

**9. Are you aware of your company's efforts to defect, address, and report suspiciously large orders in West Virginia?**

Answer: Since at least the 1980s, AmerisourceBergen Drug Corporation has had in place a system to monitor the orders it receives, the **OMP [Order Monitoring Program].** We worked with DEA to enhance the system in 1998, and again in 2007, and have continually reviewed and improved it, including a comprehensive 2015 revision to build on current data, respond to trends in prescription drug abuse, and adopt improved technological capabilities, including data-driven analytical tools. ABDC's Order Monitoring Program has been consistent with DEA's guidance, including the September 2006, February 2007, and December 2007 letters sent by DEA to the distributors.

**10. Are you aware that for years your company never followed West Virginia law by reporting all suspicious orders to the West Virginia Board of Pharmacy?**

Answer: ABDC reached out to the West Virginia Board of Pharmacy multiple times, including in 2012 after the litigation filed against ABDC on behalf of the Attorney General and certain West Virginia agencies was filed. During the course of those conversation, ABDC was instructed that it was not required to report suspicious orders to the West Virginia Board of Pharmacy as long as those orders were reported to DEA. Since that time, the head of the West Virginia Board of Pharmacy has repeatedly stated publicly, and tested in the litigation, that the West Virginia Board of Pharmacy received very few suspicious order reports prior to 2012 and, when it started to receive suspicious orders, took no action in response to those orders. ABDC began providing suspicious order reports to the West Virginia Board of Pharmacy in early 2017, once it received instruction to do so.[12]

Collis's unique knowledge of ABDC's actions on these West Virginia-specific issues makes him a necessary and proper fact witness, as the Special Master found.

## ARGUMENT

### A. Legal Standard

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, and parties' relative access to

---

[12] *Id.* at 132079-80 (Answers to Questions 9-10).

relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Rule 26 provides a "broad scope of discovery." *CSS, Inc. v. Herrington*, No. 2:16-cv-01762, 2018 WL 7131556, at *2 (S.D. W. Va. Jan. 9, 2018). Moreover, the "rules of discovery, including Rule 26, are to be given broad and liberal construction." *White v. Sam's East, Inc.*, No. 5:14-cv-26106, 2016 WL 205494, at *1 (S.D. W. Va. Jan. 15, 2016).

When a party objects to discovery of relevant information on grounds of allegedly undue burden, "[t]he objecting party carries the burden of proving that the challenged discovery production should not be permitted." *Minke v. Page Cty., Va.*, No. 5:18-cv-82, 2019 WL 922249, at *2 (W.D. Va. Feb. 25, 2019) (internal quotations and citation omitted).

The "'apex doctrine' applies to a specific subset of deposition notices that demand the appearance of high-level executives or high-ranking government officials." *Bard*, 2014 WL 12703776, at *3. The "apex doctrine is both an expression of the proportionality requirement found at Federal Rule of Civil Procedure 26(b)[(1)] and a presumption of good cause for a protective order under [Rule] 26(c)." *Id.* To invoke the doctrine's presumption of good cause, the party seeking protection "need only submit an affidavit from the executive stating that he or she lacks superior or unique knowledge of the relevant facts . . . ." *Id.* at *4. This shifts the burden to the party seeking the deposition to show that the executive "(1) possesses special or unique information relevant to the issues being litigated, and (2) the information cannot be obtained by a less intrusive method . . . ." *Id.* at *3.

The Court's review of the Special Master's discovery ruling is de novo as to both its conclusions of law, Fed. R. Civ. P. 53(f)(4), and its findings of fact, Fed. R. Civ. P. 53(f)(3); Order of Appointment (ECF 200) at 5.

7

### B. The Special Master Correctly Applied the Law in DR11.

ABDC devotes much of its appeal to arguing that the "Special Master's ruling is contrary to law." ABDC Appeal at 2. But it identifies no controlling law whatsoever that the Special Master allegedly disregarded. This is because there is none.

Rather, the Special Master faithfully followed this Court's decision in *Bard* setting forth the Rule 26 and apex doctrine principles applicable to depositions of high-level executives. The Special Master followed *Bard* to a tee in holding that:

- the apex doctrine is an expression of Rule 26(b)'s proportionality requirement and Rule 26(c)'s good cause requirement for a protective order; DR11 at 4-5 (citing *Bard*, 2014 WL 12703776, at *3);

- to invoke the apex doctrine's presumption of good cause, the party seeking protection need only submit an affidavit by the executive stating that he or she lacks unique or superior knowledge of relevant facts; *id.* at 5 (citing *Bard*, 2014 WL 12703776, at *4); and that

- the discovery opponent's satisfaction of this threshold showing shifts the burden to the discovery proponent to show that the executive possesses special or unique knowledge not readily obtainable through other means; *id.* (citing *Bard*, 2014 WL 12703776, at *3).

The Special Master then correctly applied these standards in finding that ABDC did not make the threshold showing, *id.* at 6, that Plaintiffs demonstrated that Collis possesses "special or unique information relevant to the issues being litigated through a wide range of subject matters addressed during the Congressional inquiry," *id.* (internal quotation marks omitted), and that any burden created by this discovery is proportional to the needs of this case under Rule 26(b)(1) because of the great importance of the issues presented and the amount in controversy, *id.* at 7.

In its determination to find a legal error in this careful analysis, ABDC first makes the remarkable argument that the Special Master erred *by applying Rule 26* to this discovery dispute.

*See* ABDC Appeal at 4 ("[T]he ruling engages in a discussion of broader (and irrelevant) proportionality principles . . . ."); *id.* at 14 ("The Special Master's ruling . . . shifted to a vague discussion of inapplicable discovery principles . . . ."). As ABDC understands the law governing the proposed deposition of Collis as a fact witness, the Court may consider *only* the burden this imposes on Collis as ABDC's Chief Executive Officer and must ignore the facts of the case concerning the opioid epidemic ABDC created in Plaintiffs' communities, which Plaintiffs seek to redress:

> The Special Master's approach also led him to pivot away from Mr. Collis and whether Plaintiffs had satisfied the apex requirements—where the focus actually belonged—and to look instead at the 'proportionality principles of Rule 26(b)(1),' which the Special Master identified as the 'importance of the issues at stake,' the 'amount in controversy, and the parties' 'relative access to relevant information.' . . . ***None of this has anything to do with the inquiry under the apex doctrine.***

*Id.* at 15 (quoting DR11 at 7) (emphasis added).

This, thankfully, is not what the law requires. Just the opposite, the Court in *Bard* and numerous other courts have held that the Rule 26 factors of the importance of the issues presented and the amount in controversy in a case are essential considerations in applying the apex doctrine. *See*, *e.g.*, *Bard*, 2014 WL 12703776, at *5 ("The extraordinary number of cases and the astronomical amount in controversy clearly weigh against the application of a rigid apex deposition rule better suited to an 'individual personal injury, employment, or contract dispute in which the 'apex' official had not personal knowledge.'") (quoting *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002)); *Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 125 (S.D.N.Y. 2015) ("'This is far from a trivial case. Enough is at stake to justify the deposition of an apex witness' like [defendant's Co-CEO] Mr. Moran.") (quoting *Chevron Corp. v. Donziger*, No. 11-cv-691, 2013 WL 1896932, at *1 (S.D.N.Y. May 7, 2013)).

The Special Master also correctly assessed the burden of proof. *See* DR11 at 6 ("ABDC did not submit an affidavit from Mr. Collis denying unique, personal knowledge of relevant facts. Nor does ABDC attest that deposing its CEO will be difficult from the standpoint of 'convenience and burdensomeness' . . . ."); *see also Bard*, 2014 WL 12703776, at *4 (opponent of executive's deposition must submit affidavit showing absence of unique knowledge to shift burden to proponent of the discovery).

ABDC contends that this, too, is a legal error. *See* ABDC Appeal at 3 ("Compounding the problem, the Special Master turned the apex doctrine on its head by improperly requiring ABDC to prove a negative—that is, that Mr. Collis has no unique personal knowledge—despite the ***controlling law*** that places the burden firmly on Plaintiffs and places no burden on ABDC . . .") (emphasis added); *see also id.* at 16-17 ("Imposing such a requirement is contrary to law."). Here again, ABDC identifies no "controlling law" whatsoever on this point, and there is none since the Fourth Circuit has not even addressed the apex doctrine.

While there is no "controlling law," the threshold-proof and burden-shifting framework this Court applied in *Bard* and the Special Master followed here actually places a *lighter* burden on ABDC than would courts in other circuits that assess executive depositions strictly under Rule 26(c)(1), which places the burden of proof on the party resisting discovery. *See*, *e.g.*, *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012) ("Even in cases where we have considered extensively a corporate officer's knowledge and, thus, capacity to provide information relevant to the case, we have declined to credit a corporate officer's bald assertion that being deposed would present a substantial burden, and still required the corporate officer to meet Rule 26(c)(1)'s requirements.") (internal quotation marks and citation omitted); *United Automobile Ins. Co. v. Stucki & Rencher, LLC*, No. 2:15-cv-834, 2019 WL 2088537, at *7 (D. Utah May 13,

2019) ("Finally, under either type of analysis, it is clear the party seeking to resist [executive deposition] discovery bears the burden to show specific and particular facts why discovery should be limited.") (internal quotation marks and citation omitted); *Finisar Corp. v. Nistica, Inc.*, No. 13-cv-3345, 2015 WL 3988132, at *2 (N.D. Cal. June 30, 2015) ("Even when the apex doctrine is at issue, however, the burden remains on the party seeking to avoid the deposition.") (internal quotation marks and citation omitted). The Special Master (and the Court in *Bard*) thus did not err by placing a threshold evidentiary burden on the party resisting discovery.

In sum, the Special Master correctly applied Rule 26 and apex doctrine considerations in this litigation seeking to abate an opioid epidemic by allowing Plaintiffs to take Collis's deposition based on his demonstrated personal and unique knowledge of the company policy and regulatory matters he testified on under oath before Congress. Since the Special Master correctly applied the law, the Court should deny ABDC's appeal and should adopt DR11.

### C. The Special Master Correctly Assessed the Facts in DR11.

ABDC's alternative argument for reversal is that the Special Master erred in assessing the facts and that Plaintiffs did not show that Collis has unique or superior personal knowledge or that the information they seek is not available from other sources. This, too, is incorrect.

First, Plaintiffs demonstrated that Collis has unique knowledge of facts he testified about under oath to Congress concerning the origins and objectives of ABDC's diversion control policies and the company's interactions with federal and state regulators. *See supra*, Statement of Facts at 3-6. ABDC answers that "the mere fact that diversion control was discussed during Mr. Collis's testimony by no means makes him uniquely situated or places him in a superior position to discuss diversion control efforts." ABDC Appeal at 10. That is not Plaintiffs' argument.

11

Rather, Plaintiffs have shown through Collis's testimony that he has unique information about the topic of ABDC's diversion control policies from his personal involvement in their development based upon his understanding of the DEA's demands or expectations. *See* Pltfs' Ex. 3 (ECF 517-2), Transcript of 5/8/2018 Subcommittee Hearing at 101 ("Well in 2007, we had a lot of discussion with [DEA], and we developed our current controlled substance monitoring program with the understanding that this was where they wanted the industry to go."). He also testified that ABDC nonetheless lacked an understanding of what the DEA considered to be a suspicious order. *See id.* ("We would like more feedback. We'd also like [off mic] the rules, for example, on what constitutes a suspicious order."). Collis's unique vantage point on what the DEA wanted ABDC to do and when, and how this impacted the development and goals of ABDC's diversion control policies makes him a necessary and appropriate fact witness.

So, too, do his answers to the Committee's post-hearing questions about ABDC's practices in West Virginia. In these answers, Collis exhibited a unique knowledge of ABDC's diversion control policies dating back almost 40 years to the 1980s, with reference to the company's coordination with the DEA in the 1990s and consultation with the West Virginia Board of Pharmacy in the last decade. *See* Pltfs' Ex. 61 (ECF 606-6), ABDCWVFED00132070 at 132079-80 (Answers to Questions 9-10).

Since Collis in this testimony connected his personal observations to factual matters at issue in this litigation, such as the origin and objectives of ABDC's diversion control policies, the Special Master correctly found that he has "special or unique information relevant to the issues being litigated." DR11 at 6.

Second, based on the foregoing, Plaintiffs also have demonstrated that they cannot obtain the unique material information Collis possesses through other available means. ABDC does not

in any of its discussion of other company witnesses' testimony, *see* ABDC Appeal at 10-11, 13, or of other evidence produced in this and other cases, *see id.* at 7, identify any other source of the foregoing information on which Collis testified. Nor can it since Collis in this testimony connected his personal observations of discussions with regulators, particularly the DEA and also the West Virginia Board of Pharmacy, to important material facts such as the development and objectives of ABDC's diversion control policies in and after 2007. The record evidence thus shows satisfaction of this element of the apex doctrine whichever party bears the burden of proof on this issue.

Third, the Special Master also correctly assessed the facts relating to proportionality under Rule 26 and the appropriateness of Plaintiffs deposing Collis in light of the significance of the issues and the amount in controversy in this litigation. The Special Master found that the "'importance of the issues at stake' in this case are paramount and unparalleled." DR11 at 7 (quoting Fed. R. Civ. P. 26(b)(1)). Other courts have observed exactly the same about litigation seeking to abate the opioid epidemic across the country. *See*, *e.g.*, *HD Media Co. , LLC v. U.S. Dept. of Justice*, 927 F.3d 919, 924 (6th Cir. 2019) ("In an order, the district court aptly characterized the opioid epidemic that provides the tragic backdrop of this case, observing that the vast oversupply of opioid drugs in the United States has caused a plague on its citizens and their local and State governments.") (internal quotation marks and citation omitted); *In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, 2018 U.S. Dist. LEXIS 90002, at *74-75 (N.D. Ohio April 11, 2018) (the "public health emergency caused by addition to opioids" creates an "overwhelming need for the Plaintiffs in this case to learn the truth surrounding marketing and distribution of opioids . . . .").

ABDC's only answer on this point is to assert once again that protecting Collis as its CEO under the apex doctrine is more important than what is at issue in this case. *See* ABDC Appeal at 16 ("The apex doctrine is the beginning of the analysis—proportionality does not even come into play unless the doctrine's requirements are met."). This is an untenable position. *See Bard*, 2014 WL 12703776, at *5 ("The extraordinary number of cases and the astronomical amount in controversy clearly weigh against the application of a rigid apex deposition rule[.]"). It also is wrong as a factual matter inasmuch as the Special Master correctly found that all requirements of the apex doctrine are satisfied based on the record evidence discussed herein.

Since the Special Master's ruling compelling Collis's deposition is correct on both the applicable law and the facts of record, ABDC's appeal should be denied.

## CONCLUSION

For all of the reasons set forth, the Court should deny ABDC's appeal and should adopt the findings of fact and conclusions of law set forth in DR11 as approved, accepted, and ordered by the Court in accordance with the Order of Appointment (ECF 200).

Dated: July 13th, 2020

Respectfully submitted,

| | |
|---|---|
| **THE CITY OF HUNTINGTON** | **CABELL COUNTY COMMISSION** |
| /s/ *Anne McGinness Kearse* | /s/ *Paul T. Farrell, Jr.* |
| Anne McGinness Kearse (WVSB No. 12547) | Paul T. Farrell, Jr. (WVSB Bar No. 7443) |
| Joseph F. Rice | **FARRELL LAW** |
| **MOTLEY RICE LLC** | 422 Ninth Street, 3rd Floor (25701) |
| 28 Bridgeside Blvd. | PO Box 1180 |
| Mount Pleasant, SC 29464 | Huntington, West Virginia 25714-1180 |
| Tel: 843-216-9000 | Mobile: 304-654-8281 |
| Fax: 843-216-9450 | paul@farrell.law |
| akearse@motleyrice.com | |
| jrice@motleyrice.com | /s/ *Anthony J. Majestro* |
| | Anthony J. Majestro (WVSB No. 5165) |
| Linda Singer | **POWELL & MAJESTRO, PLLC** |
| David I. Ackerman | 405 Capitol Street, Suite P-1200 |
| **MOTLEY RICE LLC** | Charleston, West Virginia 25301 |

401 9th Street NW, Suite 1001
Washington, DC 20004
Tel: 202-232-5504
Fax: 202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb (WVSB No. 4782)
**THE WEBB LAW CENTRE, PLLC**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Michael A. Woelfel (WVSB No. 4106)
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

15

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT AMERISOURCEBERGEN DRUG CORPORATION'S APPEAL FROM DISCOVERY RULING 11 was filed electronically using the Court's CM/ECF system and thereby was served upon all counsel registered in the system on July 13, 2020, and was served *via email only* to Plaintiffs listserv at MDL2804Discovery@motleyrice.com and to Defendants' CT2 listserv at Track2OpioidDefendants@reedsmith.com.

/s/ Monique Christenson
Monique Christenson (SC Bar No. 104063)
**MOTLEY RICE LLC**