# EXHIBIT B

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4                       -   -   -
 5

    IN RE:  NATIONAL          :   MDL NO. 2804
 6  PRESCRIPTION OPIATE       :
    LITIGATION                :
 7                            :
    -------------------------------------------------
 8  THIS DOCUMENT RELATES TO  :  CASE NO.
    ALL CASES                 :  1:17-MD-2804
 9                            :
                              :  Hon. Dan A.
10                            :  Polster
11                       -   -   -
12                  February 8, 2019
13                       -   -   -
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14               CONFIDENTIALITY REVIEW
15
16               Continued videotaped deposition
    of CHRISTOPHER ZIMMERMAN taken pursuant to notice,
17  was held at the law offices of Reed Smith LLP, Three
    Logan Square, 1717 Arch Street, Suite 3100,
18  Philadelphia, Pennsylvania, beginning at 1:44
    p.m., on the above date, before Ann Marie
19  Mitchell, a Federally Approved Certified Realtime
    Reporter, Registered Diplomate Reporter,
20  Registered Merit Reporter and Notary Public.
21
                         -   -   -
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line

Request for Production of Documents
Page Line

Stipulations

Page Line

Question Marked

Page Line

Page 11

1    THE VIDEOGRAPHER:  We're now on
2  the record.  My name is David Lane,
3  videographer for Golkow Litigation
4  Services.  Today's date is February 8,
5  2019.  Our time is 1:44 p.m.
6    This deposition is taking place
7  in Philadelphia, Pennsylvania in the
8  matter of the National Prescription
9  Opiate Litigation, MDL.
10    Our deponent today is Chris
11  Zimmerman.  Counsel will be noted on the
12  stenographic record.
13    Our court reporter today is Ann
14  Marie Mitchell and will now swear in our
15  witness.
16    - - -
17    CHRISTOPHER ZIMMERMAN, after
18  having been duly sworn, was examined and
19  testified as follows:
20    - - -
21    EXAMINATION
22    - - -
23  BY MR. PIFKO:
24    Q.    Good afternoon, Mr. Zimmerman.

Page 12

1  My name is Mark Pifko.  We met some months ago
2  when I deposed you before.
3    Do you recall?
4    A.    Yes, I do.
5    Q.    Okay.  So the court reporter has
6  just placed you under oath.  It's the same oath
7  you took when you were deposed before.
8    Understood?
9    A.    Yes.
10    Q.    Okay.  And that means that if
11  you're untruthful or intentionally misleading or
12  dishonest in some way, you could be subject to
13  penalties from the court.
14    Do you understand that?
15    A.    Yes.
16    Q.    Do you intend to provide truthful
17  and accurate testimony today?
18    A.    I do.
19    Q.    Are you undergoing any medical
20  treatment or suffering from any condition that
21  would inhibit your ability to provide truthful
22  and accurate testimony today?
23    A.    No.
24    Q.    Is there any reason that you can

Page 13

1  state as far as why this deposition should not go
2  forward?
3    A.    No.
4    Q.    All right.  The -- 2007
5  AmerisourceBergen entered into a settlement
6  agreement with the DEA.  Correct?
7    A.    Yes.
8    Q.    And prior to that, there was an
9  order to show cause that was sent to
10  AmerisourceBergen.  Correct?
11    A.    Correct.
12    Q.    And you're familiar with the
13  order to show cause?
14    A.    I know we got an order to show
15  cause, yes.
16    Q.    Okay.  You were the top person
17  with respect to diversion control at the time.
18  Correct?
19    A.    I was in charge of regulatory --
20  corporate security and regulatory affairs is the
21  department I was responsible for.
22    Q.    But diversion control was under
23  your authority.  Correct?
24    A.    That aspect would be one of the

Page 14

1 aspects under my control, yes.
2     Q.    And to this day, it's still --
3 diversion control is something that's underneath
4 your purview.  Correct?
5     A.    Correct.
6     Q.    And you're the top person with
7 respect to diversion control issues.  Correct?
8     A.    I'm the top person in charge of
9 that department that diversion control reports up
10 to, yes.
11     Q.    I understand you have other
12 responsibilities as well.  Correct?
13     A.    Yes.  I have dedicated people
14 underneath me responsible for diversion control
15 as well.
16     Q.    So you are familiar with the
17 order to show cause that was sent to
18 AmerisourceBergen at that time.  Correct?
19     A.    At that time, we had an order to
20 show cause, yes.
21     Q.    Do you have an understanding
22 about what specifically it was that led the DEA
23 to suspend the registration of the Orlando
24 facility?

Page 15

1         MR. NICHOLAS:  Object to the
2     form.
3         THE WITNESS:  The -- my
4     recollection, it had to do -- the order
5     to show cause had to do with distribution
6     of controlled substances and I believe
7     possibly to an internet pharmacy.  I'm
8     not -- I don't recall specifically.
9 BY MR. PIFKO:
10     Q.    Okay.  What I'm trying to get at,
11 though, is I understand you're -- well, I
12 shouldn't assume that.
13         What I'm trying to get at is,
14 what specifically did the DEA contend that
15 AmerisourceBergen did wrong that led it to
16 suspend the registration of the Orlando facility?
17         MR. NICHOLAS:  Object to the
18     form.
19         THE WITNESS:  I would need to --
20     I don't recall exactly what was written
21     in the order to show cause from 11 years
22     ago.  If I saw the document, I could
23     refresh my memory.
24 BY MR. PIFKO:

Page 16

1     Q.    One of the things that -- after
2 the suspension order, AmerisourceBergen as part
3 of the settlement agreement with the DEA
4 undertook some changes to its diversion control
5 policies and procedures.  Correct?
6     A.    We made some enhancements and
7 changes to the program.  Correct.
8     Q.    Okay.
9     A.    At the request of DEA.
10     Q.    One of those changes was the
11 initiation of a process by which
12 AmerisourceBergen would not ship an order that it
13 had deemed to be suspicious.  Correct?
14     A.    That was part of the settlement
15 agreement, yes.
16     Q.    Okay.  That was not something the
17 company was doing prior to that settlement
18 agreement.  Correct?
19     A.    Correct.
20     Q.    Are you aware that -- do you know
21 who David May is?
22     A.    Yes.
23     Q.    He's someone who works for you.
24 Correct?

Page 17

1     A.    Correct.
2     Q.    He had a lengthy history with the
3 DEA.  Correct?  Prior to joining
4 AmerisourceBergen?
5     A.    Correct.
6     Q.    Are you aware that he was deposed
7 in this case as well?
8     A.    Yes.
9     Q.    The day after your first
10 deposition?
11     A.    Yes.
12     Q.    And he served as a 30(b)(6) for
13 the company.  Correct?
14     A.    I believe so.  For a certain time
15 period.
16     Q.    Okay, right.  So you served as a
17 30(b)(6) for certain issues, and he did as well.
18 Correct?
19     A.    Correct.
20     Q.    And the distinction between you
21 was that he provided testimony from a time period
22 more recently than you did.  Correct?
23     A.    Correct.
24     Q.    Do you remember the time period

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 contend that there is?
2        MR. NICHOLAS: Object to the
3    form, mischaracterizes the testimony,
4    asked and answered, bickering.
5        THE WITNESS: I don't know what
6    the context of the discussion that you
7    and Mr. May had and with him to --
8    whatever comment he made, if he did. But
9    my answer is, I'm not aware of the
10   shipping requirement as stipulated in the
11   federal regulations.
12 BY MR. PIFKO:
13   Q.    If there is no requirement that
14 you not ship an order that's deemed to be
15 suspicious, why would the company have agreed to
16 undertake such a requirement?
17   A.    Because that was part of our
18 negotiations in order to get our registration
19 reinstated, was to implement a program that
20 halted orders that we deemed to be suspicious.
21   Q.    Why would you have to agree to
22 something that's not in the regulations?
23        MR. NICHOLAS: Object to the
24    form.

Page 23

1        THE WITNESS: It was the
2    negotiation. That's what we agreed upon.
3 BY MR. PIFKO:
4    Q.    It was something that the DEA
5 asked you to agree to?
6    A.    Yes.
7    Q.    Did you tell the DEA they were
8 wrong?
9        MR. NICHOLAS: Object to the
10    form.
11        THE WITNESS: It was a part of
12    the negotiation process of the areas that
13    we would implement that would enhance our
14    program. That was one of the items that
15    we had discussed, in addition to others,
16    was that we would not ship an order that
17    we deemed to be suspicious.
18 BY MR. PIFKO:
19   Q.    Were you one of the people who
20 was negotiating the settlement agreement with the
21 DEA?
22   A.    Yes.
23   Q.    And did you ever tell the DEA
24 that you felt that wasn't a requirement under the

Page 24

1 law that they were asking you to do, to halt the
2 shipment of orders that you had identified as
3 suspicious?
4        MR. NICHOLAS: Object to the
5    form.
6        THE WITNESS: Yes.
7 BY MR. PIFKO:
8    Q.    You did tell them that you
9 thought that was wrong?
10   A.    During the negotiations, yes.
11   Q.    Okay. What specifically did you
12 tell them?
13   A.    I told them that our requirement
14 is to report suspicious orders, and the way we've
15 been doing it for the previous 17 years was to
16 report after the fact. And that has been the way
17 we've been doing it for 17 years. We negotiated
18 with DEA with the program in '98, which they were
19 well aware that we were shipping the products --
20 we were reporting them after we ship the
21 products, and that was approved by DEA.
22        So my previous negotiations with
23 DEA, what the regulations state, there's no --
24 nowhere that I could find that says you can't

Page 25

1 ship an order that has been reported as
2 suspicious. In fact, it's the way it's been
3 done.
4        This was a change in the
5 industry. No one else was stopping orders. We
6 had never done it in the past. So again, that
7 was my understanding.
8        So in the negotiation process, I
9 said, this is the way we've been doing it. This
10 has been approved by DEA in the past. It's been
11 inspected by DEA. Our -- DEA audits our
12 distribution centers. And in all of our audits,
13 they've never once said that you're not supposed
14 to ship an order that you deem to be suspicious.
15 So my -- that was my response into the
16 negotiation, I don't agree with that.
17   Q.    And what was their response when
18 you said that?
19        MR. NICHOLAS: Object to the
20    form.
21        THE WITNESS: I mean, do you want
22    to go back and forth through the
23    negotiations or -- I mean...
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1     Q.   Well, I want you to tell me what
2 they said in response to you saying that to them.
3         MR. NICHOLAS: Same objection.
4         THE WITNESS: They disagreed at
5 that time.
6 BY MR. PIFKO:
7     Q.   What did they say was the basis
8 for their disagreement?
9         MR. NICHOLAS: Object to the
10 form.
11         THE WITNESS: They wanted that
12 order not to be shipped if it's deemed to
13 be suspicious. I mean, that's what they
14 said.
15 BY MR. PIFKO:
16     Q.   They didn't tell you why?
17     A.   No.
18     Q.   And you just ended up agreeing to
19 it?
20         MR. NICHOLAS: Object to the
21 form.
22         THE WITNESS: In order to -- as
23 part of the negotiation, that was an area
24 that we agreed upon in order to get our

Page 27

1 license reinstated in Orlando, yes.
2 BY MR. PIFKO:
3     Q.   Did you agree to anything
4 specific related to internet pharmacies in the
5 settlement agreement in order to get your license
6 back or lift -- the suspension lifted at the
7 Orlando facility?
8     A.   I don't recall.
9     Q.   You don't believe there was
10 anything specific to internet pharmacies in the
11 settlement agreement?
12     A.   I don't -- I don't recall.
13     Q.   Okay. The changes that you made
14 in response to the settlement agreement with --
15 that were made as a result of the suspension of
16 the Orlando facility, those were systemic
17 companywide changes. Correct?
18         MR. NICHOLAS: Object to the
19 form.
20         Go ahead.
21         THE WITNESS: Yes. Part of the
22 negotiation was that, even though it was
23 the Orlando distribution center's license
24 that was suspended, that they wanted us

Page 28

1 to implement a program for all of our
2 drug company distribution centers.
3 BY MR. PIFKO:
4     Q.   They wanted you to make changes
5 companywide. Correct?
6     A.   They wanted us to implement the
7 program companywide, correct.
8     Q.   And that's what you did.
9 Correct?
10     A.   Yes.
11     Q.   And the programs that you
12 implemented, those weren't specific to internet
13 pharmacies. Correct?
14     A.   The program was -- regardless of
15 an internet pharmacy or not, I mean, if we
16 identified an order that we deemed to be
17 suspicious, we would not ship it and report it to
18 DEA. So it was an internet pharmacy, that would
19 apply.
20         And then we have an additional
21 due diligence process that was also negotiated --
22 negotiated on the front end as well.
23     Q.   But that was for a broad array of
24 customer types. Correct?

Page 29

1     A.   Yeah, all retail pharmacies. All
2 pharmacies licensed as retail pharmacies.
3     Q.   And the due diligence requirement
4 you're saying that you -- didn't apply, however,
5 to chain pharmacies. Correct?
6         MR. NICHOLAS: Object to the
7 form.
8         THE WITNESS: Part of our
9 negotiations was identifying the program
10 and what was -- what aspects it would
11 cover, would it include hospitals,
12 Department of Defense. Chains were
13 discussed. And part of the negotiation
14 was that it was determined that a chain
15 of ten or more stores would not be
16 included in the due diligence process,
17 still in the order monitoring process.
18 BY MR. PIFKO:
19     Q.   This implementation of a shipping
20 requirement or an agreement not to ship an order
21 that had been identified as suspicious, that
22 applied regardless of the customer type.
23 Correct?
24     A.   Correct.