# EXHIBIT C

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                       -  -  -
 5   IN RE:  NATIONAL       :  MDL NO. 2804
     PRESCRIPTION OPIATE    :
 6   LITIGATION             :
     ------------------------------------------
 7                          :  CASE NO.
     THIS DOCUMENT          :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                            :  Hon. Dan A.
 9                          :  Polster
10                       -  -  -
              Friday, August 3, 2018
11                       -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
13                       -  -  -
14            Videotaped deposition of
     CHRISTOPHER ZIMMERMAN, taken pursuant to
15   notice, was held at the law offices of
     Reed Smith, LLP, Three Logan Square, 1717
16   Arch Street, Suite 3100, Philadelphia,
     Pennsylvania 19103, beginning at 9:00
17   a.m., on the above date, before Amanda
     Dee Maslynsky-Miller, a Certified
18   Realtime Reporter.
19                       -  -  -
20
21
22
              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph| 917.591.5672 fax
                  deps@golkow.com
24
```

Page 138

1 marked as Exhibit-5. This is a document
2 Bates labeled ABDCMDL 00279854 to 65.
3    Have you seen this document
4 before?
5    A.  Yes.
6    Q.  Can you tell me what this
7 is?
8    A.  This is our settlement and
9 release agreement with the DEA for
10 Orlando distribution center.
11    Q.  So as a result of the
12 enforcement action with the DEA, this was
13 the agreement that was reached between
14 AmerisourceBergen and the DEA, correct?
15       MR. NICHOLAS:  Object to the
16    form.
17       THE WITNESS:  This is the
18    agreement, yes, that was made
19    after the order to show cause.
20 BY MR. PIFKO:
21    Q.  Was there any money paid,
22 under this agreement, from
23 AmerisourceBergen to the United States
24 government?

Page 139

1    A.  No.
2    Q.  But as a result of this
3 agreement, AmerisourceBergen changed its
4 suspicious order monitoring program,
5 correct?
6       MR. NICHOLAS:  Object to the
7    form.
8       Go ahead.
9       THE WITNESS:  It modified
10    the existing program, yes.
11 BY MR. PIFKO:
12    Q.  Can you tell me how the
13 agreement modified the existing program?
14       MR. NICHOLAS:  Object to the
15    form.
16       THE WITNESS:  So through
17    negotiations with DEA and in
18    enhancing our existing order
19    monitoring program that we had in
20    place at the time, DEA wanted us
21    to include a more in-depth due
22    diligence process in addition to
23    ensuring that we only distribute
24    products to licensed individuals.

Page 140

1    And they also wanted us to
2    modify our suspicious order
3    monitoring program to stop orders
4    that we believed -- stop orders
5    that could possibly be suspicious
6    and then to any suspicious -- any
7    order we deem suspicious should
8    not be shipped.
9 BY MR. PIFKO:
10    Q.  Did AmerisourceBergen agree
11 to do that?
12    A.  We modified our program per
13 this agreement, correct.
14    Q.  Can we refer to this
15 agreement as the shipping requirement?
16       MR. NICHOLAS:  Object to the
17    form.
18 BY MR. PIFKO:
19    Q.  If I say "shipping
20 requirement," can we have an
21 understanding that I'm referring to the
22 idea that you're not supposed to ship an
23 order that's deemed to be suspicious?
24       MR. NICHOLAS:  I'll object

Page 141

1    to the form.
2       I want to understand, are
3    you asking the witness if
4    heretofore we can refer to this
5    agreement as the shipping
6    requirement?  Because if so, I'd
7    object to that.
8 BY MR. PIFKO:
9    Q.  Do you understand the
10 question?
11    A.  Do you want to repeat it?
12    Q.  All I'm asking is if, for
13 ease of reference, going forward, we can
14 refer to the idea that you don't ship an
15 order that's been identified as
16 suspicious as the shipping requirement?
17       MR. NICHOLAS:  I'll object
18    to the form.  And the language.
19       THE WITNESS:  We never --
20    the shipping requirement was never
21    discussed in this document and is
22    not a term that we had used in
23    presentations or requirements.
24       We chose, through our work

Page 186

1  A. That was the discussion in
2 our negotiations with DEA, is that you
3 have to make a business decision whether
4 you want to complete the transaction.
5 It's up to the business to make that
6 decision.
7  Q. What's a business -- what's
8 a business decision mean?
9   MR. NICHOLAS: Objection.
10   Object to the form. You're asking
11   him what the DEA meant by
12   "business"?
13   MR. PIFKO: I didn't ask him
14   that. You're telling him what to
15   say. Stop doing that.
16   THE WITNESS: The
17   business -- the decision is based
18   upon the information you have and
19   whether -- again, this talks --
20   this isn't talking about shipping
21   a suspicious order, this is
22   talking about shipping an order.
23   So if a customer has a
24   patient need that they need to

Page 187

1   fulfill, then we need to make a
2   decision whether we ship that
3   product or not. It's our decision
4   whether we ship the product. It's
5   not the DEA's decision.
6 BY MR. PIFKO:
7  Q. Is AmerisourceBergen a
8 for-profit business?
9  A. We are a business that makes
10 profit, yes.
11  Q. You don't understand this
12 bullet point to be referring to
13 suspicious orders?
14   MR. NICHOLAS: Object to the
15   form.
16   THE WITNESS: No, it's not
17   in reference to suspicious orders
18   at all.
19 BY MR. PIFKO:
20  Q. It's just saying the
21 distributor can decide whether to ship
22 any order that it is presented with?
23  A. Correct.
24  Q. And you say that the DEA

Page 188

1 told you this?
2  A. If you go to the one above
3 it, DEA will not tell a distributor you
4 should or should not ship an order.
5   There's nothing about
6 suspicious order in that statement.
7   And then the second one is
8 we have to -- we have to make a decision
9 on what orders we ship and which orders
10 we do not ship. We also have to make a
11 decision which orders are suspicious and
12 we need to report.
13  Q. You said earlier, just a few
14 moments ago, that was the discussion in
15 our negotiations with DEA, is that you
16 have to make a business decision whether
17 to -- you want to complete the
18 transaction.
19   Do you recall saying that?
20   MR. NICHOLAS: I'll object
21   to this. I'll object to the
22   practice of apparently trying to
23   cross-examine Mr. Zimmerman with
24   testimony he's given in this

Page 189

1   deposition.
2   This is a 30(b)(6). You're
3   supposed to be seeking
4   information.
5   THE WITNESS: I would need
6   to read two or three questions
7   before that and after to
8   understand the context of my
9   statement. You're reading a
10   statement. I'm not sure --
11 BY MR. PIFKO:
12  Q. All I'm asking you --
13  A. -- the back-and-forth.
14  Q. -- do you recall saying the
15 discussion in our -- that was the
16 discussion in our negotiations with DEA,
17 is that you have to make a business
18 decision whether you want to complete the
19 transaction?
20  A. And what was the question?
21  Q. What I want to know is, what
22 discussions did you have with the DEA
23 about making business decisions about
24 completing transactions?

Page 190

1  MR. NICHOLAS: Object to the
2  form.
3  Go ahead.
4  THE WITNESS: And so you
5  asked me what our discussion is
6  about making transactions, and my
7  response was it's our decision.
8  Yes, I said that.
9  BY MR. PIFKO:
10  Q. So you said that you
11  discussed this business decision in your
12  negotiations with DEA.
13  MR. NICHOLAS: Object to the
14  form.
15  THE WITNESS: I said --
16  MR. NICHOLAS: This is
17  cross-examination.
18  Go ahead.
19  THE WITNESS: If there's
20  confusion, I said that came --
21  that was brought up by DEA. It
22  wasn't brought up by ABC.
23  That was -- that business
24  decision context is, you can find

Page 191

1  previous DEA presentations where
2  they make that statement. That
3  isn't an ABC term. That was a DEA
4  term. Just to clarify the record.
5  BY MR. PIFKO:
6  Q. That's what I'm trying to
7  get at.
8  A. Okay. Thanks.
9  Q. Is -- so it's your testimony
10  that the DEA told you that you must make
11  a business decision whether or not to
12  ship an order?
13  MR. NICHOLAS: Objection.
14  Object to the form.
15  THE WITNESS: They stated,
16  their terms, not mine, that the
17  business -- it's up to the
18  companies to make a business
19  decision of what they ship and
20  what they don't ship. They are
21  not going to tell a distributor
22  what you can ship and what you
23  can't ship, which refers back to
24  the bullet above, the one about

Page 192

1  the business decision.
2  BY MR. PIFKO:
3  Q. And when did they tell you
4  that? You said in your negotiations?
5  A. In negotiations in 2007.
6  Q. And they made a presentation
7  to you?
8  A. In 2005.
9  Q. And they used that exact
10  language, the business decision, that's
11  in quotes?
12  A. I believe so. I believe so.
13  Q. Do you have a copy of that
14  presentation that you believe that DEA
15  made to you in your office somewhere?
16  A. We may have it somewhere,
17  yes.
18  Q. Did you make any attempts to
19  look for it?
20  MR. NICHOLAS: Objection.
21  We're making productions as we're
22  required to do in this case.
23  THE WITNESS: Is there a
24  question?

Page 193

1  BY MR. PIFKO:
2  Q. I asked if you made any
3  attempt to look for that document?
4  A. No, I did not.
5  Q. Is that something -- you
6  said you might have that in your office
7  somewhere?
8  A. I won't have -- no, I don't
9  have that in my office. We may have it
10  on file or in storage or something. It's
11  from years ago.
12  MR. NICHOLAS: Again, just
13  in case there's any implication on
14  the record that we haven't
15  produced something we were
16  supposed to produce.
17  MR. PIFKO: Again, the
18  speaking -- I got it. There's no
19  implication. The record is what
20  it is.
21  MR. NICHOLAS: Good. That's
22  all I want to hear. There's no
23  implication. That's fantastic
24  news.

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1 program, that that can adversely impact
2 diversion because they could adjust their
3 activity to evade your system?
4     MR. NICHOLAS: Object to the
5     form. Asked and answered.
6     THE WITNESS: I don't agree
7     with that.
8     MR. PIFKO: We're going to
9     take a break.
10     VIDEO TECHNICIAN: Going off
11     the record. 6:02 p.m.
12     - - -
13     (Whereupon, a brief recess
14     was taken.)
15     - - -
16     VIDEO TECHNICIAN: Back on
17     the record at 6:11 p.m.
18 BY MR. PIFKO:
19   Q. If I wanted to ask you about
20 the company's records regarding specific
21 sales of controlled substances products
22 in the Track 1 jurisdictions -- are you
23 familiar with what the Track 1
24 jurisdictions are? If I use that term,

Page 479

1 does that mean anything to you?
2   A. Not exactly. I've seen it,
3 but I don't --
4   Q. Sorry. Let me ask it a
5 different way.
6     If I wanted to talk to
7 someone who was familiar with the
8 company's records of which products they
9 shipped to specific customers and amounts
10 and when, who would that be?
11     MR. NICHOLAS: I'll object
12     to the form.
13     THE WITNESS: I believe if
14     you're just looking for data, it
15     would be somebody in our IT
16     department.
17 BY MR. PIFKO:
18   Q. But to understand how the
19 system works?
20     MR. NICHOLAS: Object to the
21     form.
22     THE WITNESS: The system --
23     the suspicious order monitoring
24     system or our operating system?

Page 480

1 BY MR. PIFKO:
2   Q. Well, okay. Based on your
3 production, and we were just looking at
4 the SAP and the STAR system, it's my
5 understanding that in the STAR system
6 time period, there's one document that
7 tells you what orders -- what orders were
8 placed and whether they were shipped.
9 There's another document that tells you
10 if there was an investigation, and
11 there's another document that tells you
12 if there was a report to the DEA.
13     Are you familiar with that
14 idea?
15     MR. NICHOLAS: Object to the
16     form.
17     THE WITNESS: I don't know
18     the specifics of the -- how it was
19     developed. I assume you're
20     talking about 2007 to --
21 BY MR. PIFKO:
22   Q. The STAR system from 2007 to
23 2012.
24   A. Right. I was involved --

Page 481

1 when I was negotiating the settlement
2 with DEA, our IT group was having
3 discussions with DEA as well. And I'm
4 not sure how they structured it.
5     I'm not sure what your
6 question is.
7   Q. Is there someone, though,
8 from the CSRA who would be familiar about
9 how the system works and what the data in
10 the different databases reflects?
11     MR. NICHOLAS: Object to the
12     form.
13     THE WITNESS: I am not sure
14     who that would be. It would be
15     somebody, I would think, in our IT
16     group.
17 BY MR. PIFKO:
18   Q. Is there a specific type of
19 title that that person would have?
20     MR. NICHOLAS: Object to the
21     form.
22     THE WITNESS: I don't know
23     who would -- I don't know that
24     person.