UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CABELL COUNTY COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*<br><br>    Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE NUISANCE**

For tactical reasons of their own, the City of Huntington and the Cabell County Commission ("Plaintiffs") elected to pursue only a single claim (public nuisance) against a single group of defendants (Distributors). For two independent reasons, Plaintiffs do not have a valid public nuisance claim:

First, West Virginia law has never recognized a public nuisance claim in circumstances like those in this case, and the *Erie* doctrine precludes this Court from expanding West Virginia common law. In West Virginia, nuisance law historically has been confined to cases involving the misuse of, or interference with, public property or resources. West Virginia law has never recognized a public nuisance claim based on harm allegedly caused by a product. Indeed, the Restatement of Torts, which the Supreme Court of Appeals has cited approvingly in defining West Virginia public nuisance law, states that public nuisance liability based on the distribution of a product "has been rejected by most courts, and is excluded by this Section, because the

common law of public nuisance is an inapt vehicle for addressing the conduct at issue."[1] *See infra* Part I.

Second, a public nuisance claim requires proof of interference with a public right—i.e., a commonly held right involving public resources or the right to move freely and safely "in public." Plaintiffs allege instead interference with a private right—i.e., the right not to be injured by another's claimed negligence or an allegedly dangerous product. As a matter of law, the nature of such harm is private, no matter how many persons are harmed. *See infra* Part II.

Defendants therefore are entitled to summary judgment.[2]

## ARGUMENT

**I.  Public Nuisance Law Does Not Encompass Plaintiffs' Product-Based Claims**

Plaintiffs ask the Court to entertain a type of claim never before recognized by the West Virginia Supreme Court as a public nuisance claim— namely, a claim based on the distribution and subsequent misuse of a product—and thereby dramatically to expand the definition of public nuisance under West Virginia law. The *Erie* doctrine precludes a federal district court from expanding state law in this way. *See, e.g.*, *Rhodes v. E.I. DuPont de Nemours*, 636 F.3d 88, 96 (4th Cir. 2011) (holding that federal courts must "respond conservatively when asked to discern governing principles of state law").[3] The West Virginia Supreme Court has long recognized the existence of a public

---

[1] Restatement (Third) of Torts: Liab. for Econ. Harm, § 8, comment g.

[2] As Distributors' pending motion for summary judgment explains, Plaintiffs lack standing even to pursue a public nuisance claim. *See* Defendants' Motion for Summary Judgment: Standing, Dkt. 238.

[3] *See also Mid-Vol Coal Sales, Inc. v. Balli Steel PLC*, No. CV 1:11-0985, 2014 WL 12617727, at *3 (S.D.W.Va. Aug. 26, 2014) (Faber, J.) "[I]n the absence of authority by the highest state court in West Virginia, our role in the exercise of our diversity jurisdiction is limited. A federal court acting under its diversity jurisdiction should respond conservatively

nuisance only in cases concerning the misuse of, or interference with, public property or resources. There is no reason to believe that the Supreme Court would now expand public nuisance law beyond its traditional confines. Indeed, there is every reason to believe the Supreme Court would reject an expansion of public nuisance to cases (like this one) that involve the distribution and use of a product, because the Restatement of Torts, which the Court has cited in defining the scope of public nuisance law, makes clear that liability for public nuisance **based on products** "has been rejected by most courts" and is "an inapt vehicle" for product claims.

> A. **West Virginia Public Nuisance Law Has Been Confined to Interference or Misuse Involving Public Property or Resources**

The West Virginia Supreme Court for more than 150 years has restricted application of public nuisance law to cases involving interference with public property or resources. This Court may not, under *Erie*, adopt the radical expansion of West Virginia public nuisance law that Plaintiffs propose.

In *Sharon Steel Corp. v. City of Fairmont*, 334 S.E. 2d 616, 621 (W.Va. 1985), the Supreme Court spoke of a "broad" and "flexible" definition of nuisance, "adaptable to a wide variety of factual situations." It did so, however, with reference to a near-exhaustive catalogue of West Virginia public nuisance cases from 1878 to 1982. Tellingly, every case in the catalogue concerns the misuse of, or interference with, public property or resources:

> As suggested by this broad definition, nuisance is a flexible area of
> the law that is adaptable to a wide variety of factual situations. We

---

when asked to discern governing principles of state law. . . . Therefore, in a diversity case, a federal court should not interpret state law in a manner that may appear desirable to the federal court, but has not been approved by the state whose law is at issue.") (citations and quotations omitted); *Montrosse v. Conseco Fin. Servicing Corp.*, 2000 WL 33775396, at *3 (S.D.W. Va. Dec. 20, 2000) ("This action is a diversity action, and thus the substantive law for the court to follow, under the *Erie* doctrine, is state law.").

3

>have decided nuisance cases involving [1] land being used for rock concerts, [2] a school site near an airport, [3] dust created by coal trucks, [4] an automobile junk yard, [5] a used car lot, [5] a rail tramroad built on a public road, [6] a house of prostitution, [7] an automobile garage built out of inflammable materials, [8] fences, [9] coal smoke and soot emitted by a dye works plant, [10] a carpenter shop with a steam engine, [11] damage to property adjacent to a railroad track, [12] a merry-go-round, [13] explosives factory, [14] a house built partially on city property, [15] noise from a factory, and [16] an obstruction of a public road.

*Id*. (citations omitted).  In introducing this catalogue of West Virginia precedent, the Supreme Court reaffirmed what it had said three decades earlier about "what may constitute a nuisance":

>"***A nuisance is anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable***…. A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort…. A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby…. When the prosecution of a business, of itself lawful, in a strictly residential neighborhood, impairs the enjoyment of homes in the neighborhood …."

334 S.E.2d at 621 (quoting *Martin v. Williams*, 93 S.E.2d 835, 844 (W. Va. 1956)).[4]  And the Supreme Court concluded its catalogue of West Virginia nuisance cases with two observations: that "[n]uisance law has been particularly effective in addressing environmental problems" and that "'[t]here is simply no common law doctrine that approaches nuisance in comprehensiveness or detail as a regulator of land use.'"  *Id*.  The cases decided since *Sharon Steel* in 1985 are no different.[5]

---

[4]  All emphases are added unless otherwise indicated.

[5]  *Duff v. Morgantown Energy Assoc.*, 421 S.E.2d 253 (W.Va. 1992) (alleging private and public nuisance from trucking coal, gob, limestone and ash to and from power plant); *Hendricks v. Stalnaker*, 380 S.E.2d 198 (W.Va. 1989) (alleging private nuisance from drilling of water well that interfered with planned septic system).

4

The Supreme Court's summary of nearly 150 years of West Virginia law reflects that, while public nuisance law may be "adaptable to a wide variety of factual situations," *Sharon Steel*, 334 S.E.2d at 621, this flexibility is confined to a category of injury involving public property or resources. *Erie* precludes this Court from expanding West Virginia law beyond these boundaries.

### B. The West Virginia Supreme Court, Like Most Courts, Has Not Recognized Product-Based Public Nuisance Claims

Even assuming that West Virginia's definition of public nuisance doctrine might extend beyond the traditional confines of public property or resources, this Court should reject Plaintiff's attempt to expand the doctrine to cases (like this one) involving the distribution and subsequent use or misuse of a product. The West Virginia Supreme Court has never recognized or endorsed a products-based public nuisance theory like the one Plaintiffs advance here. If authorized by this Court, Plaintiffs' theory would vastly expand West Virginia public nuisance law to a wide range of consumer and food products (such as guns, lead paint, cigarettes, alcohol, sugary sodas, and fatty foods) that might similarly be claimed to cause to harm to the health of large numbers of individuals.

Again, *Erie* forbids this: the Court is called upon only to apply West Virginia law as the Supreme Court has applied it. And that court, like most high courts across the country, has not applied public nuisance law to claims involving products. As the Rhode Island Supreme Court observed, "[t]he law of public nuisance never before has been applied to products, however harmful." *State v. Lead Indus. Ass'n*, 951 A.2d 428, 456 (R.I. 2008); *see Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993) ("Nuisance thus would become a monster that would devour in one gulp the entire law of tort."); *City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F. Supp.2d 882, 909 (E.D. Pa. 2000), *aff'd*, 277 F.3d 415 (3d Cir. 2002)

5

("courts across the nation have begun to refine the types of cases amenable to a nuisance theory").[6]

To be sure, some courts in other states, often in reliance on the Restatement (Second) of Torts § 821B, have extended nuisance liability to claims involving the use or misuse of products. But the West Virginia Supreme Court has never cited § 821B for that proposition.[7] And the Restatement (Third) of Torts: Liability for Economic Harm, section 8, clarifies that, whatever its scope, public nuisance does not encompass claims for injury caused by products and that the

---

[6]  *Accord In re Lead Paint Litig.*, 924 A.2d 484, 505 (N.J. 2007) (refusing to permit lead-paint plaintiffs "to supplant an ordinary product liability claim with a separate [public nuisance] cause of action as to which there are apparently no bounds"); *D.C. v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 651 (D.C. 2005) (declining to recognize a public nuisance claim regarding guns "where an effect may be a proliferation of lawsuits … against other types of commercial enterprises … in order to address a myriad of societal problems" (alterations omitted)); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004) (rejecting a public nuisance claim regarding guns as "so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it"); *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 196 (2003) ("[G]iving a green light to a common-law public nuisance cause of action today will … likely open the courthouse doors to a flood of limitless, similar theories of public nuisance … against a wide and varied array of other commercial and manufacturing enterprises."); *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 521 (Mich. Ct. App. 1992) ("manufacturers, sellers, or installers of defective products may not be held liable on a nuisance theory for injuries caused by the defect"); *Sills v. Smith & Wesson Corp.*, No. 99C-09-283, 2000 WL 33113806, at *7 (Del. Super. Ct.) ("Delaware has yet to recognize a cause of action for public nuisance based upon products."); *Penelas v. Arms Technology, Inc.*, 1999 WL 1204353, at *6 (Fla. Cir. Ct. Dec. 13, 1999) ("Public nuisance does not apply to the design, manufacture, and distribution of a lawful product. A separate body of law (strict product liability and negligence) has been developed to apply to the manufacture and design of products.")

[7]  The West Virginia Supreme Court has cited § 821B only twice: in a string cite, without comment, *Sharon Steel*, 334 S.E.2d at 620; and in a footnote stating that the Court's traditional definition of a public nuisance as an act or condition that "affects the general public" is consistent with the Restatement (Second) of Torts § 821B(1) (1979), which defines a public nuisance as "an unreasonable interference with a right common to the general public," *Duff*, 421 S.E.2d at 257, n.6.

Restatement (Second) should not be read to say that it does.[8] Section 8 explains that while "problems caused by dangerous products might once have seemed to be matters for the law of public nuisance because the term 'public nuisance' has sometimes been defined in broad language that appears to encompass anything injurious to public health and safety," the "traditional office of the tort … has been narrower." *Id*. § 8, cmt. g. Liability for public nuisance based on products "has been ***rejected by most courts***, and is ***excluded*** by [the Restatement], ***because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue***." *Id*. cmt. g.[9]

In short, the Supreme Court of Appeals has never recognized a product-based public nuisance. There is no basis to believe that it would do so now, when the Restatement (Third) has explained that the "traditional office" of public nuisance claims—as the Supreme Court's own decisions over more than 150 years reflect—does not extend to product-based claims. The *Erie* doctrine requires the Court to apply West Virginia law as it finds it. Accordingly, summary judgment is appropriate.

---

[8] Section 8 is explicit that "[t]his Section does not seek to restate the substantive law of public nuisance except as necessary to explain those cases that produce liability in tort for economic loss. … Many public nuisances are not of that character …, as when a defendant's pollution causes damage to property that the plaintiff owns." Comment a.

[9] *See id*. ("[m]ass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake" and that "[c]laims for reimbursement of expenses made necessary by defendant's products might also be addressed by the law of … restitution"); *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d at 456 ("public nuisance and products liability are two distinct causes of action, each with rational boundaries that are not intended to overlap"); *In re Lead Paint Litig.*, 924 A.2d 484, 505 (N.J. 2007) (rejecting public nuisance claim because it would "supplant an ordinary products liability claim with a separate cause of action as to which there are apparently no bounds").

## II.  There Is No Evidence That Distributors Interfered With a Public Right.

Even if West Virginia law extends beyond injury to public property or resources, a product-based public nuisance claim still would fail for a second, independently dispositive reason. In West Virginia, as in virtually every other jurisdiction, the invasion of a public right is a defining element of a public nuisance claim.[10] It therefore is essential to understand the "public" in public right and to distinguish public from private rights. Plaintiffs skirt that distinction. The harm that Plaintiffs seek to abate—i.e., the addiction, drug overdoses and deaths of individual drug users and their attendant costs—implicate only the inherently private right that each individual has not to be injured by a product. And it is the inherent nature of the right, not the number of persons affected, that defines a public right for purposes of public nuisance law. That many people have been injured by their individual use or misuse of opioid medicines is consequential for public policy, but the number of persons injured does not change the fact that the affected right is inherently private in nature. As explained below, Plaintiffs' claims do not implicate a public right, as that right has been defined in the law of public nuisance.

A public right is a right that is shared equally by all members of the public, like access to air, water, or public rights-of-way.[11] If a party obstructs a public thoroughfare, he interferes with

---

[10]  *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W.Va. 1945) ("The distinction between a public and private nuisance is that the former affects the general public"); *see Duff*, 421 S.E.2d at 257, n.6 (quoting *Hark* and stating that "this definition is consistent with" the Restatement (Second) definition of a public nuisance as "'an unreasonable interference with a right common to the general public'"); *Sharon Steel*, 334 S.E.2d at 620 (quoting *Hark* and citing W. Prosser and W. Keeton, The Law of Torts § 90: "[t]o be considered public, the nuisance must affect an interest common to the general public").

[11]  *See Hendricks v. Stalnaker*, 380 S.E.2d 198, 200 (W. Va. 1989) (describing public nuisance as that which "affects the general public as public"); *Lead Indus.*, 951 A.2d at 453 ("The interference must deprive all members of the community of a right to some resource to which they otherwise are entitled."); *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 132 (Conn. 2001) ("[A] public nuisance by definition injures all in a common way."); *Stockdale v. Rio*

a public right because every member of the public has a right to travel that thoroughfare. It does not matter how many persons travel that route or, indeed, whether any member of the public does so while the thoroughfare is blocked. *See Keystone Bridge v. Summers*, 13 W. Va. 476 (1878); Restatement (Second) of Torts § 821B, cmt. b (citing as a public right "the obstruction of a public highway or a navigable stream"). Likewise, if a party pollutes a public reservoir, he interferes with a public right because every member of the public has a right to make use of the water, whether for private recreation or because it supplies the city's drinking water. *See Sharon Steel*, 334 S.E.2d at 621 (noting that "[n]uisance law has been particularly effective in addressing environmental problems" and citing as examples "the operation of landfills, incinerators, sewage treatment facilities, activities at chemical plants, aluminum, lead and copper smelters, oil refineries, pulp mills, rendering plants, quarries and mines, textile mills, and a host of manufacturing activities").[12] Similarly, in the public health context, if a party with a highly contagious disease goes out in public, he interferes with the right of the general public to go about their public business in safety. *See* W. Prosser and W. Keeton, The Law of Torts § 90 at 643, nn. 3-4 (5th ed.) (giving as examples the carrying of a child with smallpox on a public highway and the keeping of diseased animals or malarial pond); Restatement § 821B, cmt. b (citing as examples of interference with the public health "keeping diseased animals or the maintenance of a pond breeding malarial mosquitos").

---

*Grande W. Ry. Co.*, 77 P. 849, 851 (Utah 1904) ("If all people have the right to use it, it is a public [right].").

[12] *See also State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 905 (W. Va. 1997) (alleged public nuisance from run-off of arsenic and chromium into Tug Fork River).

A private right, by contrast, is an individual right or a right shared only by a limited number of persons. *Hendricks v. Stalnaker*, 380 S.E.2d 198, 200 (W. Va. 1989). It is "***the individual right*** that everyone has not to be assaulted or defamed or defrauded ***or negligently injured***." Restatement, § 821B, comment g; *see also Lead Indus. Ass'n, Inc.*, 951 A.2d at 454 ("Were we to hold otherwise, we would change the meaning of public right to encompass all behavior that causes widespread interference with the private rights of numerous individuals."). To use the Restatement's example, "the pollution of a stream that merely deprives fifty or one hundred riparian owners of the use of water for purposes connected with their land does not for this reason alone become a public nuisance," whereas "[i]f the pollution … prevents the use of a public bathing beach …, it becomes a public nuisance." *Id*. For this reason, a public right can be violated whether or not any member of the public is actually affected. To use the Restatement example, pollution of a public beach prevents its use by every member of the public, whether or not any member chooses to go to the beach on that day. On the other hand, while everyone has a right not to be defrauded or negligently injured, that right is private because only those persons who are in fact defrauded or negligently injured have a claim. To use the Restatement's example again, the riparian owners who are actually deprived of the use of clean water from the stream have a claim for private nuisance. Thus, it is the nature of the right that defines a public nuisance, not the number of persons affected. That many individuals have their private rights violated does not alter the nature of the right. *Id*. ("Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons.").

For this reason, an adverse impact on "public health" arising from adverse effects on individuals exposed to an allegedly harmful or dangerous product does not implicate a "public right." For example, the prevalence of obesity in the general population is a "public health"

problem. But the decisions of individuals to eat fatty foods or drink sugary sodas involves adverse effects on the health of individuals and thus implicates private rather than public rights, even though in the aggregate this conduct by many individuals harms the public health of the community. *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d at 453 ("a public right is more than an aggregate of private rights by a large number of injured people"). Likewise here, individuals took prescription opioids, and some tragically misused them, resulting in addiction or overdose. Cumulatively, those adverse effects on individuals implicate the public health, but they do not involve a public right that gives rise to a public nuisance claim. *See, e.g.*, *Lead Indus.*, 951 A.2d at 436, 448 ("lead poisoning constitutes a public health crisis," but does not involve public rights).[13]

Attentive to this distinction between public and private rights, the Illinois Supreme Court affirmed the dismissal of public nuisance claims against the manufacturers, distributors, and retail sellers of handguns. *City of Chicago*, 821 N.E.2d at 1105–07. Just as Plaintiffs mistakenly equate "public health" with public right, the plaintiff City of Chicago attempted to equate "public safety" with public right. The City alleged that the ready availability of firearms "'create[d] an unreasonable and significant interference' with public safety," causing increased suicides, accidental shootings, and illegal gun violence. But these allegations, the court held, did not involve interference with a public right, because there is no public right to be "free from the threat of illegal conduct by others." *Id*. at 1114. The harm alleged—"'a higher level of crime,

---

[13] To be sure, conduct that interferes with the public health *can* sometimes implicate a public right, such as where the conduct spreads contagious disease and thereby interferes with the public right safely to travel in public and make use of public spaces. *See* p. 10, *supra* (W. Prosser and W. Keeton, The Law of Torts § 90 at 643, nn. 3-4 (5th ed.); Restatement § 821B, cmt. b). But that does not mean that the two terms are synonymous, or that every interference with the public health involves a public right.

death, and injuries to Chicago citizens, a higher level of fear, discomfort and inconvenience to the residents of Chicago,'" *id.* 1115–16—was better characterized, the court said, as "merely an assertion, on behalf of the entire community, of **the individual right** not to be assaulted." *Id*. at 1116 (citing Restatement § 821B, cmt. g). The court recognized that to treat this individual right as "public" would make the concept of public right "so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it." *Id.*

For example, the court reasoned, if the sale of guns is said to interfere with a public right because it leads to greater gun violence, then the sale of alcohol could also be said to interfere with a public right:

> If there is [a] public right to be free from the threat that others may use a lawful product to break the law, … [t]his public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars … all of whom could be said to contribute to an interference with the public right.

*Id.* The same would be true of other lawful products, like cell phones and DVD players, that may be misused: "A public right to be free from the threat that [others] may defy these laws [driving while using cell phones, etc.] would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products that are intended to be, or are likely to be, used by drivers, distracting them and causing injury to others." *Id.*

The Illinois Supreme Court "concluded that there is **no authority for the unprecedented expansion of the concept of public rights**" urged by the City of Chicago and therefore declined to recognize "a public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that may create a risk of harm to another." *Id.*

12

The same distinction between public right and individual right exists here. Just as Chicago alleged that handgun distributors sold a large volume of firearms into the city with the knowledge that "a significant number of the guns will ultimately find their way into an illegal secondary gun market and then into the hands of persons who cannot legally possess those guns," *id.* at 1109, so Plaintiffs charge Distributors with "selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses," allegedly leading to illegal use of the prescription opioids (i.e., diversion) and, in turn, to use of illegal opioids. Compl. ¶ 15; *id.* ¶¶ 11, 12, 801, 823, 862. Like the epidemic of gun violence in Chicago, the opioid epidemic likewise consists of "harm to individual members of the public, not to the public generally." *City of Chicago*, 821 N.E.2d at 1115.

In sum, if there is a right not to become addicted to prescription opioids by reason of allegedly deceptive marketing or claimed over-distribution, then that is "**the individual right** that everyone has not to be … negligently injured." Restatement, § 821B, cmt. g. The harm Plaintiffs seek to abate, after all, is the addiction of individual city and county residents. *City of Chicago* stands for the proposition that there is no public right to be free from the threat that individuals will use prescription opioids illegally and harm **others** in the process. *A fortiori* there is no **public** right to be free from the threat than an individual may use prescription opioids to harm himself or herself.

Plaintiffs' failure to identify a public right with which Distributors interfered is fatal to their public nuisance claim.

## CONCLUSION

It bears noting that while granting this summary judgment motion will end the case against Distributors, it will not truly end the case brought by these Plaintiffs. When Plaintiffs

13

filed their Third Amended Complaints less than one year ago, they named 76 defendants and asserted claims for RICO violations, West Virginia Controlled Substances Act violations, negligence, and unjust enrichment.  Of the 76 defendants, 48 were manufacturers of prescription opioids (or officers and directors of those companies)—the very defendants that Plaintiffs allege are the root cause of the opioid crisis because they caused doctors to over-prescribe opioids for the long-term treatment of chronic pain.[14]  Plaintiffs can continue to pursue these multiple theories of recovery against the nearly 50 manufacturers and other defendants they have sued—claim that remain before Judge Polster in the MDL proceedings.[15]

In this case against Distributors, there is only one claim, and it is without legal basis or evidence to support it.  The Court therefore should grant summary judgment.

Dated: September 22, 2020                                                    Respectfully submitted,

**AMERISOURCEBERGEN DRUG CORPORATION**

By: */s/ Robert A. Nicholas*
    Robert A. Nicholas
    Shannon E. McClure
    REED SMITH LLP
    Three Logan Square
    1717 Arch Street, Suite 3100
    Philadelphia, PA 19103
    Tel: (215) 851-8100
    Fax: (215) 851-1420
    nicholas@reedsmith.com
    smcclure@reedsmith.com

By: */s/ Gretchen M. Callas*
    Gretchen M. Callas (WVSB #7136)
    JACKSON KELLY PLLC
    Post Office Box 553
    Charleston, West Virginia 25322
    Tel: (304) 340-1000
    Fax: (304) 340-1050
    gcallas@jacksonkelly.com

*Counsel for AmerisourceBergen Drug Corporation*

---

[14]  *Id*. ¶¶ 374–75.  There is, of course, no allegation in the 468-page complaint—and no evidence in the record that Distributors knew about the manufacturers' deceptive messaging or the deceptive means they used to disseminate that message and create a new standard of care for prescribing opioids.

[15]  *See* MDL Dkt. 2990 (Dec. 16, 2019).

**Cardinal Health, Inc.**

By: */s/ Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
**CAREY DOUGLAS KESSLER & RUBY PLLC**
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
ahardin@wc.com
jwicht@wc.com

*Counsel for Cardinal Health, LLC*

**McKESSON CORPORATION**

By: */s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

By: */s/ Timothy C. Hester*
Timothy C. Hester
Paul W. Schmidt
Christian J. Pistilli
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
pschmidt@cov.com
cpistilli@cov.com
lflahivewu@cov.com

*Counsel for McKesson Corporation*

## CERTIFICATE OF SERVICE

I, Steven R. Ruby, counsel for Defendant Cardinal Health, Inc., do hereby certify that on this 22nd day of September, 2020, the foregoing **"Memorandum in Support of Defendants' Motion for Summary Judgment Re Nuisance"** was filed electronically via the CM/ECF electronic filing system and served on all counsel registered in the system.

*/s/* Steven R. Ruby
Steven R. Ruby (WVSB #10752)
