UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CABELL COUNTY COMMISSION,<br><br>　Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*<br><br>　Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT:
NO RIGHT TO ABATEMENT**

Apart from whether the Cabell County Commission (the "Commission) can prove its public nuisance claim, and whether it lacks standing to bring that claim, there is yet a third reason that Defendants are entitled to summary judgment on the Commission's public nuisance claim. The sole relief sought in this litigation is abatement of the alleged nuisance. But the Commission—by its own admission—lacks the authority to engage in any such abatement.

**The Material, Undisputed Facts**

**A.  The Facts Regarding the County's Exercise of Authority to Abate the Opioid Addiction Crisis**

Beth Thompson is the County Administrator for Cabell County. She was deposed as the Rule 30(b)(6) designee of the Commission on July 23, 2020. Topic 10 of the 30(b)(6) notice provided for testimony on "actions that the county has taken to abate the opioid problem." In her capacity as Rule 30(b)(6) designee, Ms. Thompson testified that the Commission has taken no steps to abate the alleged public nuisance other than filing this lawsuit (which it lacks standing to

bring). She further testified that it has not done so because, given the Commission's function, it has no power to abate the opioid crisis.

1. The Commission became aware of the opioid crisis in 2006, but did nothing between that time and 2017 (when it filed this lawsuit) except "watch[] things get set up, like Lily's [P]lace …."[1]

2. The Commission has never passed an ordinance of any kind to address the opioid problem.[2]

3. The Commission never took any steps to limit the amount of prescription opioids it would pay for (as a self-insurer for its employees).[3]

4. The Commission never considered the opioid problem in selecting health department board members.[4]

---

[1] Appendix ("App.") 42; Deposition of Beth Thompson (July 23, 2020) at 39 ("Q. You testified that the county became aware of the opioid problem here around 2006; is that correct? A. That's what we've alleged in the lawsuit. Q. And when was that lawsuit in this case filed? A. 2017. Q. What did the county do about the opioid problem here in the 11 years between 2006 and 2017? A. Well, the county watched things get set up, like Lily's Place, and all of those sober living homes, and Suboxone clinics … we watched all of it get set up to try to scratch the surface of this problem. And none of it was working.").

[2] App. 43; Thompson Dep. at 42 ("Q. … Has the County ever passed an ordinance to address the opioid problem? A. No. Q. Why not? A. I'm not sure.").

[3] App. 45; Thompson Dep. at 96 ("Q. Did the county ever take any steps to impose limits on the prescription opioids that it would reimburse or pay for? A. The county has no function or role whatsoever in that.").

[4] App. 47; Thompson Dep. at 102 ("Q. In the course of selecting board members for the health department, has the County Commission ever considered the effect that a selection would have on the opioid problem? A. I don't believe it has at this time.").

5. During the time it controlled three seats on the Cabell Huntington Hospital board (until 2017), the Commission never made any effort to learn about opioid prescribing by the Hospital.[5]

6. The Commission never took any steps to identify doctors who were mis-prescribing opioids[6] or pharmacies that were inappropriately dispensing opioids[7] because it was not the Commission's function.

7. The Commission has never communicated with the sheriff's office about the theft of prescription opioids nor budgeted any specific funds for the sheriff to address the problem of theft.[8]

8. The Commission has not budgeted specific funds to police the selling of prescription drugs by street dealers, nor taken any other steps to prevent street dealers from selling prescription opioids.[9]

---

[5] App. 47; Thompson Dep. at 104 ("Q. Did the County Commission ever make any effort to acquire information about prescription opioids that were prescribed to [*sic*] Cabell Huntington? A. Not that I'm aware of.").

[6] App. 49; Thompson Dep. at 110 ("Q. What steps has the Commission taken to identify doctors in Cabell County who are inappropriately prescribing opioids? A. The Commission hasn't taken any steps. It's not our function or role to know this.").

[7] App. 50; Thompson Dep. at 113 ("Q. … What steps has the Commission taken to identify any other pharmacies in Cabell County that are inappropriately dispensing opioids? A. Other than hiring attorneys and experts [in this lawsuit], no other steps.").

[8] App. 39-40; Thompson Dep. at 27, 29–30.

[9] App. 44; Thompson Dep. at 46–47 ("Q. Has the County Commission done anything to prevent street dealers from selling prescription pills here? A. It's not a function it can do. * * * Q. … Has the Commission ever allocated any funding specifically for the purpose of preventing street dealers from selling prescription opioids? A. It would be the law enforcement budget. * * * Q. Meaning all crime? A. Correct. Q. Not prescription opioids specifically? A. Correct.…").

9. The Commission can do nothing to address crime problems caused by the opioid crisis, including the diversion of prescription opioids from one family member to another.[10]

10. The Commission did not have any role in setting up or funding Lily's Place, sober living homes, or Suboxone clinics in the county because it is not the Commission's function to do so.[11]

11. The Commission lacks the power to provide any assistance to programs like Lily's Place, sober living homes, or Suboxone clinics[12]—even to allocate funding to drug rehabilitation programs if it wanted to.[13]

12. In short, any abatement activities were "***not a function of county commission government***."

---

[10] App. 41; Thompson Dep. at 35 ("Q. Once the Commission became aware that people in Cabell County were getting prescription from family members, what did it do to prevent that? A. … The only thing it can do to address crime problems caused by the opioid crisis was to file this lawsuit.").

[11] App. 42-43; Thompson Dep. at 40–41 ("Q. What was the County Commission's involvement in setting up Lily's Place? A. None. Q. You also mentioned sober living homes. What was the County Commission's involvement in establishing sober living homes? A. None. … The Commission doesn't have those kind of functions and roles. Q. Did the Commission provide any funding for Lily's Place? A. No. Q. Did the Commission provide any funding for sober living homes? A. No. Q. … Did the Commission have any role in setting up Suboxone clinics in Cabell County? A. No. Q. Did it provide any funding for those clinics? A. No. Q. Why not? A. That's not part of our function.").

[12] App. 43; Thompson Dep. at 41 ("Q. So is it the Commission's position that it lacked the power to provide any assistance for the programs that you just testified about? A. Yes."). This was also Ms. Thompson's testimony in her personal capacity. Deposition Transcript (July 7, 2020) at 43 ("Q. During your time as county administrator, has any county official submitted a budget request that includes funding for a program that addresses the opioid problem in Cabell County? A. No. County government's not set up that way.").

[13] *Id*. ("Q. So it would be beyond the discretion of the County Commission to allocate funding to those kinds of drug rehabilitation and drug response programs, even it wanted to do that? A. Correct.").

Q. … In the view of the Commission, is there anything that the Commission could have done to try to abate the opioid problem in Cabell County besides filing this lawsuit?

A. No.

\* \* \*

Q. What actions has the Commission taken to mitigate or abate the opioid problem in Cabell County?

A. Filed this lawsuit.

Q. Others?

A. No.

Q. Does the county provide any addiction treatment?

A. No.

Q. Has the county ever considered doing that?

A. No. ***It's not part of county commission government***.

Q. Does the county provide any funding for programs that provide addiction treatment?

A. No.

Q. Has the county ever considered doing that?

A. No. ***It's not a function of county commission government***.

Q. Has the county ever taken any action to limit the number of opioid prescriptions that a doctor can write?

A. No. ***It's not a function of county commission government***.

Q. Has the county ever taken action to limit the number of opioid prescriptions that a pharmacy can fill?

A. No. ***It's not a function of county commission government***.[14]

---

[14] App. 51; Thompson Dep. at 133–34 (emphases added).

13. Ms. Thompson's testimony was consistent with the record evidence, which indicates that Cabell County and the City of Huntington do not provide funding for substance abuse treatment and recovery apart from any grants for which they may apply and receive.[15]

> **B. The Facts Regarding the State's Exercise of Authority to Abate the Opioid Addiction Crisis**

Christina Mullins is the Commissioner for the Bureau of Public Health in the West Virginia Department of Health and Human Resources. She testified pursuant to a Rule 30(b)(6) notice issued to the Bureau. Bill Crouch is Secretary of the West Virginia Department of Health and Human Resources ("DHHR"). Ms. Mullins and Mr. Crouch testified that the State, not cities and counties, fund substance-abuse services through a combination of state budget allocations and federal grants. In testimony to Congress in 2020, Ms. Mullins said that (i) West Virginia has the resources it needs to provide substance-abuse services and (ii) the State had not spent more than half of the $147 million received in federal grants. Mr. Crouch testified that the State desires greater flexibility in spending federal monies because the current problem is methamphetamine abuse.

14. The Bureau carries out its mission through three offices: (1) the Office of Adult Services, which has a substance abuse team that distributes grants to local communities and administers the Ryan Brown Fund and federal substance abuse block grants; (2) the Office of Children's Programs, which addresses substance abuse and mental health prevention; and (3) the Office of Planning and Evaluation, which provides training and collects and evaluates epidemiological data.[16]

---

[15] App. 5; Deposition of Bill Crouch (Aug. 25, 2020) at 102 ("Q. [Y]ou're not aware of any routine funding or non-grant funding that cities and counties provide for substance abuse treatment or recovery? A. I am not, no.").

[16] App. 17-19; deposition of Christina Mullins (July 14, 2020) at 33–34, 39.

15. The state Opioid Response Program, because of its high visibility and high priority, operates outside the Bureau and reports directly to the Deputy Commissioner for Programs in DHHR.[17]

16. The Bureau does not itself provide services; it provides funding for the treatment centers, group homes, substance use disorder services, and other partners that deliver services.[18]

17. The source of the funds allocated by the Bureau for substance abuse programs are federal and state grants. In 2019, federal grants totaled $147 million (not counting Medicaid reimbursement for substance use disorders). The State allocated another $58–59 million.[19]

18. In written testimony to Congress (the House of Representatives Committee on Energy and Commerce), dated January 14, 2020, Ms. Mullins testified, "The significant federal investments have allowed West Virginia the flexibility to focus on the hardest hit regions and localities while also allowing us to address statewide needs that benefit *all West Virginians*. In other words, we did not have to choose between much needed critical projects. For perhaps the first time, *West Virginia had the resources to fund what it needed*."[20]

19. Ms. Mullins's testimony informed Congress that "West Virginia has not fully expended the total amount of federal funding at the time of this testimony."[21]

---

[17] App. 18-19; Mullins Dep. at 34, 38.

[18] App. 20; Mullins Dep. at 44.

[19] App. 22; Mullins Dep. at 106–07.

[20] App. 23 & 24; Mullins Dep. at 112 & Ex. 5; App. 23; Mullins Dep. at 113 ("At that time that we wrote that, those things were in fact true, but … we now do see where we could use— we'll have to grow some more stuff. Our dreams haven't stopped.").

[21] App. 24; ex. 5 at 7.

20. West Virginia informed Congress that, as of October 2019, the state had used/allocated *only $65,772,093* of the *$146,959,646* in federal funding.

21. The director of the West Virginia Office of Drug Control Policy informed colleagues on June 7, 2020, that, regarding the Ryan Brown fund (i.e., monies from the State's 2016 settlement with AmerisourceBergen and Cardinal Health), "[w]e did not use 2 million this year through the AFA [Announcement of Funding Availability] because of the lack of quality proposals."[22]

22. The State used the Ryan Brown fund to build brick-and-mortar facilities for in-patient treatment. The number of residential treatment beds increased from 197 to 850.[23] The vacancy rate in early 2019 was 25–30 percent.[24]

23. The State has sought greater flexibility in using federal monies granted to address the opioid abuse problem because other drugs are a bigger part of the addiction problem, and the use of methamphetamines, which is "the flavor of the month,"[25] is "the primary driver" of addiction.[26]

---

[22] App. 6 & 9; Crouch Dep. at 131–32 & Ex. 24; App. 7; *id*. at 135 ("I think we had problems … finding applicants that … met the requirements.").

[23] App. 21; Mullins Dep. at 77.

[24] App. 8 & 11; Crouch Dep. at 143 & Ex. 29.

[25] App. 3; Crouch Dep. at 71 ("It's the flavor of the month. It's just whatever is readily available….").

[26] App. 2, 4; Crouch Dep. at 61, 80 ("Q. And the reason for that primarily is the rapid increase in the use of methamphetamines? A. Certainly … the use of other substances. So—but that was probably at that time the primary driver.").

# ARGUMENT

### A.  County and City Governments Are the "Wrong" Plaintiffs.

The testimony of Beth Thompson, the County Commission's 30(b)(6) witness demonstrates that the Commission is the wrong plaintiff.  In moving to dismiss the claims in this case,[27] then later for summary judgment regarding the remaining single public nuisance claim, Defendants have never argued that they cannot be held accountable for any wrongful conduct they may have committed (although Defendants deny that they have committed any wrongful conduct).  Defendants' position—in this case and in the litigation at large—has been that cities and counties are the wrong plaintiffs and public nuisance is the wrong claim.

The Drug Enforcement Administration and state boards of pharmacy—not city and county governments—regulate the wholesale distribution of prescription drugs.  The power to enforce those regulations is vested in federal and state authorities, which have been vigilant and aggressive in the performance of their enforcement responsibilities.  Plaintiffs themselves allege that the DEA alone "issued final decisions in 178 registrant actions [i.e., actions against registered distributors] between 2008 and 2012."[28]

It is not just Defendants that say these Plaintiffs are the wrong plaintiffs.  The states also have been vocal that cities and counties are the wrong plaintiffs—indeed, that their lawsuits impede a global resolution with opioid manufacturers, distributors, pharmacies, and others.  In the run-up to the MDL bellwether trial in 2019, the State of Ohio petitioned the Sixth Circuit Court of Appeals to halt the trial, arguing that it (not city and county governments) was the

---

[27]  The Court will recall that the parties argued the motion in 2017, but the cases were transferred to the MDL while the Court had the motion under advisement.  Defendants renewed the motion in the MDL proceedings, where Judge Polster did not consider it.  When it became clear that the cases would be remanded, Defendants withdrew the motion.

[28]  App. 69; *id*. ¶ 788.

9

proper plaintiff. Thirteen states and the District of Columbia filed an *amicus curiae* brief in support. They said:

> *[S]maller political subdivisions lack the broad powers and duties that are necessary to effectively protect the States' citizenry as a whole*.
>
> *The opioid crisis is a matter of statewide impact that requires a statewide response*. The States should not be hindered by various claims brought by separate instrumentalities making separate arguments from separate attorneys.
>
> [T]he State Attorneys General have been and remain intimately involved in ongoing efforts to address the opioid crisis through a wide variety of means, including litigation, investigations, and negotiations regarding potential resolution with many of the parties.[29]

Thirty-eight states submitted an *amicus curaie* letter to the federal MDL judge opposing the certification of a so-called "negotiation class" and explaining:

> The Attorneys General are expending significant resources prosecuting state law enforcement actions in our respective state courts against the companies responsible for the opioid crisis. *In bringing these actions, the Attorneys General are exercising our unique roles as the top law enforcement officers of our States, with broad statutory, constitutional, and common-law powers to bring suit and obtain meaningful relief on behalf of all of our citizens*. A number of these suits rely on investigative powers, statutory enforcement mechanisms, and remedies available only to state enforcement authorities. *While the Attorneys General recognize the tremendous impact the opioid crisis has had on many cities and counties within our States, the [cities and counties] lack the broad powers and duties that are necessary to effectively protect the States' citizenry as a whole*.[30]

---

[29] App. 52; Brief of Amici Curiae States of Michigan, Alaska, Arizona, Connecticut, Hawaii, Indiana, Kansas, Montana, Nebraska, North Dakota, South Dakota, Tennessee, Texas, And District of Columbia In Support of the State Of Ohio's Petition For Writ Of Mandamus at 13-15, *In Re: National Prescription Opiate Litigation*, No. 19-3827 (6th Cir. Sept. 6, 2019), available at 2019 WL 4390968.

[30] App. 63; Amicus Curie Letter Regarding Plaintiffs' Renewed and Amended Notice of Motion for Certification of Rule 23(b)(3) Cities / Counties Negotiation Class at 2, *In Re: National Prescription Opiate Litigation*, 1:17-md-02804-DAP, Doc # 1951 (N.D. Ohio July

Reflecting this point, West Virginia was the first state to sue Defendants—in 2012, five years before Plaintiffs sued.[31]

### B. The Cabell County Commission Cannot Abate the Nuisance.

One reason the Cabell County Commission cannot abate the alleged public nuisance is that it lacks standing to do so (for the reasons set forth in Defendants' pending motion for summary judgment).[32] The now-completed discovery record, which includes the Rule 30(b)(6) testimony of County Administrator Beth Thompson, provides the second reason. Her testimony constitutes a frank admission that the Commission is the wrong plaintiff. The Commission has known about the opioid problem in the county since 2006, but it has been a passive observer. Asked about a range of actions the Commission conceivably might have taken to address aspects of the problem—e.g., theft of prescription opioids, street-dealing, diversion by family members—Ms. Thompson's answer invariably was the same, "*It's not our function or role.*" Asked about alleged causes of the problem—e.g., doctors who mis-prescribed and pharmacies that inappropriately dispensed—and what the Commission might have done about them, her answer was the same.

---

    23, 2019). The Court may take judicial notice of the file in another case. *Drabek v. East Lyme*, 234 Conn. 390, 398 (1995) ("There is no question that the trial court may take judicial notice of the file in another case, whether or not the other case is between the same parties."); *Jewett v. Jewett*, 265 Conn. 669, 678 n. 7 (2003) (same).

[31] As we have argued elsewhere, the fact that the State sued AmerisourceBergen and Cardinal Health in 2012—five years before Plaintiffs filed their cases—means that the statute of limitations bars Plaintiffs' claims. As a matter of law, Plaintiffs should have known of their claims in 2012—and the record now demonstrates that they did know, but took no action.[31] The settlement and dismissal of the State's lawsuits against Defendants also mean that those lawsuits have *res judicata* effect, in particular because the State acted *in parens patriae* to secure relief for all state residents, including the residents of Huntington and Cabell.

[32] Dkt. 238-239.

Her unequivocal testimony was that the Commission cannot take remedial action of any kind to address the opioid problem in the county. The Commission cannot establish or fund treatment centers (like Lily's Place), sober living homes, Suboxone clinics, or other similar measures because—Ms. Thompson repeatedly testified—"***It's not a function of county commission government***." Asked directly whether the Commission lacks the power to provide any assistance for such programs, she answered, "Yes."[33] And asked whether "it would be beyond the discretion of the County Commission to allocate funding to those kinds of drug rehabilitation and drug response programs," she answered, "Correct."[34]

Ms. Thompson gave this testimony as the Commission's designated representative pursuant to a Rule 30(b)(6) notice of deposition. In that role, she unquestionably spoke for the Commission, as Plaintiff in this case. She did not submit an errata sheet to correct her testimony in any respect.[35] Her testimony is binding on the Commission.[36] The only remedy the Commission seeks is abatement. Thus, even if the Commission had standing to bring a public nuisance claim, and even if the Commission could prove its claim, the Commission—by its own admission—lacks the power to create or fund abatement programs.

---

[33] App. 43; Thompson Dep. at 41.

[34] *Id*.

[35] Ms. Thompson was represented at the deposition by Mr. Paul Farrell.

[36] *Thornton v. Fed. Deposit Ins. Corp.*, 2007 WL 391571, at *1 (S.D.W. Va. Feb. 1, 2007) (quoting *United States v. Taylor,* 166 F.R.D. 356, 362 n. 6 (M.D.N.C.1996)); *see* 7 James Wm. Moore et al., *Moore's Federal Practice* § 30.25[3] (3d ed. 2016) ("[A] corporation generally cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative."); *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34 (2d Cir. 2015) ("[The plaintiff] rightly notes that an organization's deposition testimony is binding in the sense that whatever its deponent says can be used against the organization. But Rule 30(b)(6) testimony is not binding in the sense that it precludes the deponent from correcting, explaining, or supplementing its statements." (footnote and quotation marks omitted). As noted, Thompson had the opportunity to correct her testimony by timely submitting an errata sheet, but she did not.

This admission should come as no surprise. County commissions do not possess plenary power; "they possess only the powers expressly granted to them by the state constitution or legislature." *EQT Prod. Co. v. Wender*, 191 F. Supp. 3d 583, 602 (S.D. W. Va. 2016); Syl. pt. 4, *State ex rel. W. Va. Parkways Auth. v. Barr*, 228 W. Va. 27, 716 S.E. 689 (2011). While "[t]he legislature has not been miserly" in granting powers to county commissions, those powers have come in slivers. Examples abound: the legislature enacted new code sections to give county commissions the authority to install radio equipment for sheriff's offices, § 7-1-3b; purchase photocopying equipment, § 7-1-3c; govern massage businesses, W. Va. Code §§ 7-1-3p; make grants for nutrition programs or water and sewer systems, §§ 7-1-3t, 3y; govern parking, § 7-1-3s; require mobile home permits, § 7-1-3p; and so on and on. The incremental additions to the authority of county commissions fill the code sections from § 7-1-3a to -3tt. So strictly do the West Virginia courts construe legislative delegations of authority that, even if a county commission is expressly authorized by statute to ***take*** a given action, for example, it may not ***rescind*** that same action absent a specific statutory authorization to rescind.[37] A county commission may not expend funds or enter into contracts, regardless of amount, for purposes beyond its statutory authority.[38]

No code provision, however, authorizes county commissions to provide or pay for treatment or recovery services for substance abuse. Recent history reflects this fact. The various

---

[37] *Barr*, 228 W. Va. at 33, 716 S.E. at 695 (holding that "county commissions are limited in their authority" and that the "statute does not give county commissions the ability to rescind that approval [of a highway project] or revisit their decision after having issued the required resolution.").

[38] *See* 55 W. Va. Op. Atty. Gen. 28 (W. Va. A.G.), 1972 WL 125382 (1972) (county commission lacked power to fund $5000 air pollution study; "[w]e have diligently searched the statutes and we have been unable to find any provision of law which specifically authorizes county courts to engage in any activities relating to air pollution").

providers of these services—such as Lily's Place, Prestera Mental Health Services, Cabell Huntington Hospital,[39] Cabell Huntington Health Department,[40] Huntington City Mission, Marshall Health, Marshall University, Recovery Point West Virginia (formerly Healing Place of Huntington), St. Mary's Medical Center, United Way of the River Cities, Valley Health Systems, Inc.—are not county agencies and are not funded by the Commission. As Ms. Thompson testified:

> Q. What was the County Commission's involvement in setting up Lily's Place?
>
> A. None.
>
> Q. … What was the County Commission's involvement in establishing sober living homes?
>
> A. None. …
>
> Q. Did the Commission provide any funding for Lily's Place?
>
> A. No.
>
> Q. Did the Commission provide any funding for sober living homes?
>
> A. No.
>
> Q. … Did the Commission have any role in setting up Suboxone clinics in Cabell County?
>
> A. No.
>
> Q. Did it provide any funding for those clinics?

---

[39] The Commission once had authority to appoint three members to the Hospital board of directors, but sold that authority.

[40] The Commission collects a local levy that it directs to the Department. But the Commission exercises no administrative or fiscal authority over the Department. *See* App. 75; Response to Interrog. No. 3 (Apr. 30, 2020); App. 47; Thompson Dep. 101 ("Q. Does the County Commission have any decision-making or supervisory role with respect to the health department? A. No.").

14

A. No.

Asked "why not," Ms. Thompson answered, "That's not part of our function."[41]

Section 7-1-3kk authorizes a county commission to abate nuisances within its borders. But that provision does not authorize the "abatement" sought by the Commission for two reasons. First, the power to abate is the power to enjoin.[42] No West Virginia court has construed the power otherwise.[43] The Commission, however, does not seek an injunction.[44]

Second, when the state comprehensively regulates an area, a county commission cannot use §7-1-3kk to take action. *EQT Prod. Co. v. Wender*, 191 F. Supp. 3d 583, 602 (S.D. W. Va. 2016). In *Wender*, the Fayette County Commission, in reliance on §7-1-3kk, prohibited the storage in the county of wastewater from oil and gas drilling. The district court found that "field

---

[41] App. 4243; Thompson Dep. at 40–41.

[42] *See, e.g.*, Restatement (Third) of Torts §8 ("An action by a public official will commonly lie to abate the nuisance by injunction"); Dobbs, *Handbook On the Law of Remedies* at 2 (1973) ("The injunction is a personal command to the defendant to act or to avoid acting in a certain way."); Prosser and Keeton, *The Law of Torts*, 631 (referring to the "fundamental distinction between entitlement to damages and entitlement to abatement of the nuisance"); 66 C.J.S. Nuisances § 149 ("A nuisance abatement action is an equitable action arising from the state's police power in which injunctive relief is sought, and it is governed by the same equitable principles that apply to injunctive actions generally. Likewise, the granting of an injunction to abate a nuisance is an equitable remedy.").

[43] *Burch v. Nedpower Mount Storm, LLC*, 220 W.Va. 443, 456–58, 647 S.E.2d 879, 892–94 (2007) (using abatement and injunctive relief interchangeably, and holding that "an unsightly activity may be abated when it occurs in a residential area and is accompanied by other nuisances"); *Duff v. Morgantown Energy Assocs.*, 187 W.Va. 712, 716, 421 S.E.2d 253, 257 (1992) ("While courts generally grant injunctions to abate existing nuisances, there is also authority for courts to enjoin prospective or anticipatory nuisances."); *Mahoney v. Walter*, 157 W.Va. 882, 305 S.E.2d 692 (1974) (holding that an automobile salvage yard was a nuisance that could be abated by injunction); *Martin v. Williams*, 141 W.Va. 595, 605, 93 S.E.2d 835, 841 (1956) ("Mandatory injunctions are awarded for the abatement of nuisances more frequently than for any other purposes."); syl. pt. 5, *State v. Navy*, 123 W.Va. 722, 17 S.E.2d 626 (1941) ("A bawdy house is a public nuisance *per se* that may be abated by injunction.").

[44] Whether § 7-1-3kk would permit the Commission to recover damages is a moot point, as the Commission has disclaimed damages.

preemption applies as between state and local governments substantially in the same way as it does between the states and the federal government." *Id*. at 597.  Therefore, because the state comprehensively regulates oil and gas drilling under the West Virginia Oil and Gas Act, the state has "left no room for local control," and the court held that the local ordinance purporting to regulate wastewater storage was preempted by state law.  The state also comprehensively regulates the distribution of prescription drugs, including controlled substances,[45] thereby preempting the field and leaving "no room for local control" by the Cabell Commission.[46]

## CONCLUSION

The Commission has done nothing to abate the alleged public nuisance.  That is not its function, as Ms. Thompson testified repeatedly.[47]  "[W]e've watched this county suffer," she stated, "and the only thing we could do, we did, we filed this lawsuit."[48]  The Commission has never provided or funded treatment and recovery services because the legislature has never delegated that power to county commissions.  The State exercises that power itself.  Thus, even if Plaintiffs could prove their public nuisance claim and were awarded the billions they seek to abate the opioid crisis, they could not use the money for that purpose.  Accordingly, Defendants are entitled to summary judgment against the Cabell County Commission.

Dated: September 22, 2020                                         Respectfully submitted,

---

[45]  *See, e.g.*, Uniform Controlled Substances Act, W. Va. Code § 60A *et seq*; Rules and Regulations of the Board of Pharmacy for the Uniform Controlled Substances Act, 15CSR2.

[46]  This is not to say that a county commission could not recover damages in an appropriate case.  But, again, the Cabell County Commission has disclaimed damages.  Truly to abate the nuisance—by enjoining the nuisance-causing activity—is to regulate the activity.

[47]  App 51; Thompson Dep. at 133–34.

[48]  App. 42; *id.* at 38.

**AMERISOURCEBERGEN DRUG CORPORATION**

**By**: /s/ *Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

By: /s/ *Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
nicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*

**Cardinal Health, Inc.**

By: /s/ *Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
**CAREY DOUGLAS KESSLER & RUBY PLLC**
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

/s/ *Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
emainigi@wc.com
lheard @wc.com
ahardin@wc.com
jwicht@wc.com

*Counsel for Cardinal Health, Inc.*

**McKESSON CORPORATION**

By: */s/ Jeffrey M. Wakefield*
    Jeffrey M. Wakefield (WVSB #3894)
    jwakefield@flahertylegal.com
    Jason L. Holliday (WVSB #12749)
    jholliday@flahertylegal.com
    FLAHERTY SENSABAUGH BONASSO PLLC
    P.O. Box. 3843
    Charleston, WV 25338-3843
    Telephone: (304) 345-0200

By: */s/ Timothy C. Hester*
    Timothy C. Hester
    Paul W. Schmidt
    Christian J. Pistilli
    Laura Flahive Wu
    COVINGTON & BURLING LLP
    One CityCenter
    850 Tenth Street NW
    Washington, DC 20001
    Tel: (202) 662-5324
    thester@cov.com
    pschmidt@cov.com
    cpistilli@cov.com
    lflahivewu@cov.com

*Counsel for McKesson Corporation*

## CERTIFICATE OF SERVICE

I, Steven R. Ruby, counsel for Defendant Cardinal Health, Inc., do hereby certify that on this 22nd day of September, 2020, the foregoing **"Memorandum in Support of Defendants' Motion for Summary Judgment: No Right to Abatement"** was filed electronically via the CM/ECF electronic filing system and served on all counsel registered in the system.

*/s/* Steven R. Ruby
Steven R. Ruby (WVSB #10752)
