## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

    Plaintiff,

vs.          CIVIL ACTION
          NO. 3:17-01362
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

CABELL COUNTY COMMISSION,
    Plaintiff,
vs.          CIVIL ACTION
          NO. 3:17-01665
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

    Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *

    Videotaped and videoconference deposition
of BILL CROUCH taken by the Defendants under the
Federal Rules of Civil Procedure in the above-
entitled action, pursuant to notice, before Teresa
S. Evans, a Registered Merit Reporter, at DHHR Main
Office, 1 Davis Square, Charleston, West Virginia,
on the 25th day of August, 2020.

## Page 2

1          APPEARANCES:
2
3  APPEARING FOR THE PLAINTIFFS:
     David D. Burnett, Esquire (via Zoom)
4     Anne Kearse, Esquire (via Zoom)
     MOTLEY RICE
5     28 Bridgeside Boulevard
     Mt. Pleasant, SC  29464
6
7  APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
8     Jyoti Jindal, Esquire (via Zoom)
     WILLIAMS & CONNOLLY
9     725 Twelfth Street, N.W.
     Washington, DC 20005
10
     Steven R. Ruby, Esquire
11    CAREY, DOUGLAS, KESSLER & RUBY
     901 Chase Tower
12    707 Virginia Street, East
     Charleston, WV  25323
13
14  APPEARING FOR THE DEFENDANT AMERISOURCEBERGEN:
15    Jessica Robey, Esquire
     JACKSON KELLY
16    500 Lee Street, East
     Suite 1600
17    Charleston, WV  25322-0553
18
19  APPEARING FOR THE DEFENDANT McKESSON CORPORATION:
20    Laura Flahive Wu, Esquire (via Zoom)
     COVINGTON & BURLING
     One City Center
21    850 Tenth Street NW
     Washington, DC  20001
22
23
24

## Page 3

1        APPEARANCES (Contd.)
2
  APPEARING FOR THE DEPARTMENT OF HEALTH & HUMAN
3  RESOURCES:
4     Steven Compton, Esquire
     Deputy Attorney General
5     WEST VIRGINIA ATTORNEY GENERAL'S OFFICE
     812 Quarrier Street, Floor 2
6     Charleston, WV  25301-2661
7     April Robertson, Esquire
     General Counsel
8     DEPARTMENT OF HEALTH & HUMAN RESOURCES
     1 Davis Square
9     Charleston, WV  25301
10    Vaughn Sizemore, Esquire
     Deputy Attorney General
11    1900 Kanawha Boulevard, East
     Charleston, WV  25305
12
13  APPEARING ON BEHALF OF WEST VIRGINIA MLP
  PLAINTIFFS:
14
     Rachel L. Shkolnik, Esquire
15    NAPOLI SHKOLNIK, PLLC
     400 Broadhollow Road
16    Suite 305
     Melville, NY  11747
17
     Renee Cook, Esquire
18    MORGAN & MORGAN
     76 South Laura Street
19    Suite 1100
     Jacksonville, FL  32202
20
21  ALSO PRESENT:
22    Adam Hager, Videographer
     Harrison Cyrus, Esquire
23
24

## Page 4

EXAMINATION INDEX

BY MR. RUBY          10

Page 61

1   article?
2       A.  I have.
3       Q.  And do you know what federal action is
4   being referred to here with the phrase "Feds okay
5   use of opioid funding toward other substances?"
6       A.  Correct.
7       Q.  Do you know what it is that the Feds did
8   that this article is -- is discussing?
9       A.  Again, it's part of -- it's part of the
10  change of responding and reacting to -- to
11  different drugs now being part of the addiction
12  problem.
13          So the epidemic has -- has changed as
14  we go forward, and the federal government is
15  changing with regard to allowing us to utilize
16  funds for different purposes.
17          Initially the SOR grant was tied to MAT
18  use or MAT services at some part -- as some part of
19  those grants.  So they've relaxed that -- that
20  requirement.
21      Q.  The SOR grant that you refer to, that is
22  State Opioid Response?
23      A.  That is correct.
24      Q.  And that is federal money that is provided

Page 62

1   to the states to address opioid-related problems;
2   is that right?
3       A.  That is correct.
4       Q.  And that has since been - as reflected here
5   in the article - expanded to address drugs other
6   than opioids; is that right?
7       A.  That's correct.
8       Q.  And that's a result of the sharp increase
9   in the abuse of meth and other nonopioid drugs?
10      A.  I think that was the trigger.  We've had
11  folks who've -- we've seen a move to heroin and
12  then back to opioids and then back to meth -- and
13  then to meth.  So again, it seems to be more the
14  availability, but -- what's readily available.
15          But that's correct.
16      Q.  Do you see the bottom paragraph here on
17  page 1 of Exhibit 64?  It starts with "West
18  Virginia has seen a dramatic increase"?
19      A.  Uh-huh.  Okay.
20      Q.  And you're quoted later in this paragraph,
21  but I want to go through some of the information in
22  here with you.  It says, "West Virginia has seen a
23  dramatic increase in meth usage, according to the
24  most recent data from the State Department of

Page 63

1   Health and Human Resources."
2           I think based on our prior discussion,
3   you would agree that West Virginia has seen a
4   dramatic increase in meth usage?
5       A.  Correct.
6       Q.  The next sentence says, "More than
7   one-third of drug overdose deaths in 2018 involved
8   meth."  Is that consistent with your understanding?
9       A.  It's been a while since I've been involved.
10  But I'm assuming that's correct information, yes,
11  that was quoted.
12      Q.  And you -- you don't have any reason to
13  disagree with that; is that right?
14      A.  Not at all, no.
15      Q.  It goes on to say, "This continues a
16  significant and rapidly rising trend seen in recent
17  years from just 3% in 2014 to 36% in 2018."
18          Is that, again, consistent with your
19  understanding of the change in meth-related
20  overdose deaths?
21      A.  That sounds correct, yes.
22      Q.  So there's been a really remarkable
23  increase in meth-related overdoses from -- just in
24  that four-year period; is that right?

Page 64

1       A.  That's correct.
2       Q.  And it also says -- before it gets to the
3   part where it mentions you -- it says, "More than
4   half of all methamphetamine-related deaths also
5   involved fentanyl, according to DHHR;" is that
6   right?
7       A.  Again, I'm not looking at the data; I'm
8   looking at a quote from me.  So assuming the quote
9   is correct and I was correct, yes, I agree with it.
10      Q.  And you believe that this -- this refers to
11  illicit fentanyl primarily as opposed to fentanyl
12  that is used in hospitals and so forth?
13      A.  Something dropped in the floor here.
14  Sorry.
15      Q.  It did.
16      A.  We're okay.
17      Q.  You can grab it if you want.
18      A.  It's okay as long as -- thank you.
19      Q.  It's not the microphone, so we can keep
20  going.
21      A.  Gotcha.
22      Q.  These things sometimes slip off.
23          The fentanyl that's referred to here
24  that's involved in overdose deaths, that's

Page 69

people?

A. Well, right now, overdoses are up. Our expectation is that during this pandemic -- especially during safe at home when individuals could not -- could not get out into the community and had lost relationships with their -- with caregivers or support groups, that the drug abuse problem has gotten worse.

And we're concerned that overdose deaths are based upon preliminary data -- and I'll qualify that by saying it sometimes takes months and months - up to six months - to get toxicology reports back. And so it's difficult to track this in realtime or -- or in a time frame that is sometimes useful to us.

But we're beginning to look harder at anecdotal data in terms of the information that we have, and right now we're concerned that those numbers are on the rise.

So -- I'm not sure if that answers your question. I'm not trying to get around it. But we certainly don't see a reduced need for these teams, which is kind of where I thought you were going with that.

Page 70

Q. No, and I'm doing a poor job of asking the question, I think. I was focused on this -- your statement that's related here in the article that QRTs "may become less effective as those with substance use disorder transition to substances that come with fewer overdoses."

A. I understand that a little better now. It's because MAT is not effective with meth, there are probably less ways for those teams to maybe be effective. But the idea is to get -- to get to those individuals regardless of what they overdosed on and get them -- to get them help.

So I'm not sure that I -- I probably didn't phrase that correctly in terms of that meeting.

Q. And so there -- with the shift to meth, there will have to be a resultant shift of other ways to reaching people who are using meth. Is that fair to say?

A. Maybe not other ways to reach them. The Quick Response Teams can still reach them. It's maybe the treatment that is needed to get those folks clean.

So it's not the same treatment. But

Page 71

there is treatment, and we certainly want to get -- get individuals who are on meth off of meth and reduce the substance use for those individuals as well as those individuals who use opiates.

Q. Are there other shifts that will be need -- that will need to be made or that are being made in the State's approach to substance abuse because of the shift to meth?

A. Sure. I think we're always going to have to respond to what the issues are and what the problems are and the substances being used. That's what we -- that's what we need to do to address the problems.

Q. There is a -- another quote from you in the next paragraph that says, "'We do have to make shifts, and we are already looking at our population,' Crouch said. It's the flavor of the month. It's just whatever is readily available. If fentanyl continues coming into our country from China at the rate it is now, that's going to continue to be our biggest problem. If opioids are available, people take opioids. They are going to take what is available. Substance use disorder is a brain disorder that makes people think

Page 72

differently.'"

Is that an accurate quote?

A. It sounds accurate, yes.

Q. The statement there about fentanyl, does that refresh your recollection as to the -- the primary source of the illicit fentanyl that's coming into West Virginia?

A. Again, I do recall hearing that -- and I think there were -- may have been article -- newspaper articles at the time that quoted others as saying that was the primary source, so -- but that sounds accurate, yes.

Q. When you say, "It's the flavor of the month. It's just whatever is readily available," what do you mean?

A. Again, these are -- this is information I have to get from other people. I'm not -- I'm not part of a Quick Response Team; I'm not on the boots on the ground people and first responders who see this and talk to people.

But it was my clear -- and is still -- my clear recollection that in many instances, whatever is available in a community is what drug users will utilize. So what -- if that's heroin --

Page 77

1      A.  I have it.
2      Q.  There's a question here in bold in the
3  middle.  And I take it that these bolded questions
4  are questions that were directed to the Department
5  by the Energy and Commerce Committee.  Is that
6  right?
7      A.  Okay, I see it, yes.
8      Q.  It says, "Do federally appropriated funds
9  to address the opioid crisis provide your state
10  with the flexibility to focus on the hardest hit
11  regions or localities?  Please describe" below if
12  at all -- sorry, I misread that.
13          "Please describe how, if at all, this
14  flexibility has helped West Virginia in using funds
15  to target vulnerable populations or at-risk areas.
16  If no, please explain what flexibility should be
17  considered in your state address" - that's in the
18  original - "the hardest hit regions or localities."
19          And so then under that, if you look at
20  the last paragraph there on page 7, this is the --
21  this is the Department's response, correct, the
22  regular nonbolded text of the letter?
23          Is that right?
24      A.  That's correct, yes.

Page 78

1      Q.  And then the last paragraph says, "While
2  the funding allows appropriate funding flexibility
3  to address OUD, the restriction to OUD strategies
4  limits the ability to be flexible in responding to
5  emerging polysubstance use issues."
6          OUD is opioid use disorder; is that
7  right?
8      A.  That's correct.
9      Q.  And when it says here, "polysubstance use
10  issues," what does "polysubstance use" mean?
11      A.  Simply what it refers to, many -- many
12  substances in the body with that.  When we -- when
13  we get our toxicology reports from overdose deaths,
14  it's surprising how many substances individuals
15  have many times.
16      Q.  It's rare, in fact, isn't it, to see an
17  overdose death where there's only -- where there's
18  only one substance involved?
19      A.  I haven't looked at that in some time, but
20  I think that's accurate.
21      Q.  It goes on to say here, and Commissioner
22  Mullins responds:  "Currently these activities are
23  being funded via other mechanisms, but additional
24  flexibility would allow for streamlining processes.

Page 79

1  Overall, overdose deaths with opioid prescription
2  involvement have been declining, and 2018 will be
3  the first year since 2014 there has not been an
4  increase in overdose deaths associated with
5  fentanyl. The same, however, cannot be said for
6  overdose deaths that involve psychostimulants.  For
7  example, in 2014, 3% of overdose deaths involved
8  methamphetamine.  In 2018, 36% of overdose deaths
9  involve methamphetamine."
10          I'll break that down into pieces.
11  Commissioner Mullins says, "Currently these
12  activities are being funded via other mechanisms."
13  Do you know what those funding sources were to
14  address poly substance use issues?
15      A.  I'm not sure specifically what was being
16  referred to, but we -- we have other sources of
17  funding through State appropriations to deal with
18  the SUD problem.  I'm assuming that's what she was
19  referring to.
20      Q.  She says, "additional flexibility would
21  allow for streamlining processes."  Do you know
22  what she had in mind with that?
23      A.  Where was that again?
24      Q.  Same sentence.  She says, "Currently these

Page 80

1  activities are being funded via other mechanisms,
2  but additional flexibility" - which is the second
3  part of the sentence - "would allow for
4  streamlining processes."
5      A.  I would assume she's referring to again
6  relaxing the language requiring MAT to be included
7  as a part of the funding for -- for that SAMHSA
8  money.
9      Q.  Overall, this represented a -- "request"
10  might be too strong a word but represented a
11  position that federal SUD funding should be made
12  available to address substances other than opioids;
13  is that right?
14      A.  That's correct.
15      Q.  And the reason for that primarily is the
16  rapid increase in the use of methamphetamines?
17      A.  Certainly the -- certainly the use of other
18  substances.  So -- but that was probably at that
19  time the primary driver.
20          As I mentioned earlier, the utilization
21  of illegal drugs and legal drugs varies, depending
22  upon the availability of those drugs.
23          But I think this was probably prompted
24  by the increased use of meth at the time, and

Page 101

1    back on the record.  The time is 12:49 p.m.
2    BY MR. RUBY:
3       Q.  Secretary Crouch, when we broke for lunch,
4    we were talking about funding for substance abuse
5    programs, and in particular, for treatment and
6    recovery.  We talked about State funding.
7          Is there any significant direct Federal
8    funding for substance abuse treatment or recovery
9    in West Virginia, as opposed to pass-through
10   through DHHR or Medicaid and so forth?
11      A.  Direct funding --
12      Q.  Federal.  Direct Federal funding.
13      A.  To DHHR?
14      Q.  Direct Federal funding to --
15      A.   -- to the community providers?
16      Q.  Correct.
17      A.  Oh, to community providers.  FQHC is the
18   federally qualified health centers, do get funding,
19   a fair amount of funding, directly from the federal
20   government.  That money does not come through the
21   DHHR.  I believe most of the behavioral health
22   funds, those for our comprehensive behavioral
23   health centers, do some through DHHR.
24          There are other -- there are other

Page 102

1    funds that do not come through DHHR but through, I
2    believe, EMS community -- or some community first
3    responders out there.  But I don't have a lot of
4    knowledge of what that is.
5       Q.  Are you aware of any significant funding
6    from county budgets that goes to pay for substance
7    abuse treatment or recovery?
8       A.  I am not familiar with -- with the details
9    of those.  I know there are grants that many
10   counties -- cities and counties have gotten.
11   I don't know of any routine funding.
12   There may be.  I'm just not aware of that.
13      Q.  And that would be true of both counties and
14   cities?
15      A.  I have heard both have applied and received
16   funding, yes.
17      Q.  And in particular, the -- you're not aware
18   of any routine funding or nongrant funding that
19   counties or cities provide for substance abuse
20   treatment or recovery?
21      A.  I am not, no.
22      Q.  Could you open exhibit six -- actually,
23   it's already open.  It's in the paper clipped set
24   that I gave you at the beginning that's not in the

Page 103

1    envelopes.  Exhibit 6.
2          CROUCH DEPOSITION EXHIBIT NO. 65
3          (Beckley Register-Herald article
4          "DHHR's Medicaid program to expand
5          substance use treatment and services"
6          dated 10-11-17 was marked for
7          identification purposes as Crouch
8          Deposition Exhibit No. 65.)
9       A.  All right.
10          All right.
11      Q.  This is a October 11th, 2017 Beckley
12   Register-Herald article regarding DHHR's
13   announcement of the Federal 1115 waiver; is that
14   right?
15      A.  That's correct.
16      Q.  And I take it you recall the announcement
17   that's being reported on here?
18      A.  Yes.
19      Q.  We talked about it a little bit in the
20   morning.  But if you could just explain what the --
21   the Medicaid 1115 waiver is and what it does.
22      A.  We talked earlier about the peer support
23   that we provide through recovery programs, but it
24   was more than that with regard to the change to

Page 104

1    allow Medicaid to pay for treatment services and to
2    pay for facilities that -- in excess of 16 beds.
3          So what it does is expand the
4    individuals it might cover as well as those
5    settings in which individuals could be covered.
6          So treatment beds are classified in
7    three or four different categories based upon the
8    level of service that they can provide and the
9    intensity of those services.  So Medicaid can now -
10   under that system - pay for those services based
11   upon that level of care.
12      Q.  In the Medicaid world, a waiver is
13   essentially a mechanism by which the federal
14   government agrees that the State can use Medicaid
15   dollars to pay for something that it couldn't
16   ordinarily use them for?  Is that roughly right?
17      A.  That's right.  Medicaid's required to cover
18   certain services to be consistent and compliant
19   with federal regulations.  We have quite a few
20   waivers.  The most visible is the IDD waiver which
21   is -- allows us to pay for care for individuals who
22   have intellectually developmentally disable -- or
23   disabilities.  And we had to get a waiver to do
24   that.

Page 129

1 a bit of a different way.  When you reviewed this
2 letter and realized that at least -- based on what
3 the letter said -- there were 81 million dollars in
4 unspent federal substance abuse funding, did that
5 concern you?
6      A.   Yes, but -- I will say yes, but again, my
7 recollection was there a lot of answers in
8 terms of that funding and the times that -- the
9 dates we got that funding in to DHHR and the
10 efforts that had been taken and were underway to
11 move that money out into the community.
12           So -- so I certainly didn't -- I viewed
13 it and was concerned about it and made sure that we
14 were doing the right thing to move it out as
15 quickly as we could.
16      Q.   Were the -- those answers ever put in any
17 kind of a written form that you can think of, even
18 if it was just a series of e-mails?
19      A.   I don't recall that.  I don't recall that.
20 It's possible.
21      Q.   Do you recall getting answers verbally from
22 Commissioner Mullins or any of the other people
23 that you mentioned being involved in this?
24      A.   I do recall having a discussion, more than

Page 130

1 one discussion, I think, with Christina; probably
2 Jeremiah Samples, Deputy Secretary, and others.  We
3 certainly did discuss -- discuss moving this money
4 out into the community.  I don't remember the
5 details of those at this point.
6      Q.   Let me -- and we'll -- there are -- there's
7 a lot in Exhibit 17, which is the letter to the
8 Energy and Commerce Committee, so we'll come back
9 to that.  But I'll ask you to set it aside for a
10 moment and turn to Exhibit 23.
11           CROUCH DEPOSITION EXHIBIT NO. 24
12           (E-mail chain between Crouch, Samples,
13           Hansen and others Re: Thursday ODCP
14           meeting dated 6-7-20 through 6-8-20
15           (CROUCH_FEDWV_00002990-991) was marked
16           for identification purposes as Crouch
17           Deposition Exhibit No. 24.)
18      Q.   Let me -- we'll do 23 next.  Let me ask you
19 to get out 24 first.
20      A.   All right.
21      Q.   All right.  And 24 is a couple of pages of
22 an e-mail exchange involving you and Deputy
23 Commissioner Samples and some others at the
24 Department.  If you want to take a look, I'll have,

Page 131

1 I think, really just one question about it.
2           And in particular, I'm focusing -- I'm
3 going to focus on the bottom e-mail in the chain,
4 the June 7, 2020 e-mail from Robert Hansen, page 2.
5      Q.   My question, first of all -- you know who
6 Robert Hansen is?
7      A.   Certainly.
8      Q.   Who is Mr. Hansen?
9      A.   Bob is the director of the Office of Drug
10 Control Policy.
11      Q.   And he writes -- and it's one of these --
12 the way this e-mail reproduced, you can't see who
13 Mr. Hansen's June 7th, 2020 message was to, but if
14 you look above, if you go back to the bottom of
15 page 1, you can see that that same day, June 7th,
16 2020, he replied to the message, and so it appears
17 that you were one of the recipients.
18           Mr. Hansen says in his e-mail on page 2
19 of this document, "Good morning, We held a brief
20 meeting last week.  Three items were discussed, I
21 am briefly summarizing the discussion and
22 direction."  And in Bullet Point 2, he says, "Ryan
23 Brown funding.  We did not use 2 million this year
24 through the AFA process because of the lack of

Page 132

1 quality proposals."
2           Do you see that?
3      A.   I do.
4      Q.   What is the AFA process?
5      A.   The Announcement of Funding Availability.
6 Again, it's part of the State process and part of
7 what slows down the State process.  When we have
8 grants that we want to provide to a community - and
9 which is what we did with the Ryan Brown funds - we
10 make that available -- the grant available through
11 an announcement to the public.
12           So entities who wish to apply for those
13 funds have to submit an application.  All of that's
14 online, and we then take all of those
15 applications -- I don't recall -- Ryan Brown is a
16 good example.
17           I don't recall the number of applicants
18 we had, but we chose somewhere in the neighborhood
19 of 18 - is my rough memory of the number of
20 applicants - Ryan Brown applicants that were
21 funded.
22           I believe we had in excess of eight or
23 ten additional applicants who were not funded, for
24 one reason or another did not meet the statutory

Page 133

1    requirements of the grant.  They either were --
2    they were not good applications; they were
3    applications that we did not think would provide
4    adequate services to the population looking -- that
5    were looking to treat.
6            Or a variety of reasons.  But the
7    announcement goes out with the criteria for funding
8    with the specifics as to who is eligible for
9    grants, and these are generally -- generally not
10   for profit entities out there who provide services
11   to citizens in the State and their community.  Or
12   new providers many times who sometimes are unproven
13   and do not have adequate staff, etc.
14           So the process is lengthy.  We make --
15   we do the AFA.  We then -- we have a deadline for
16   submission of applications.  We then compile those
17   applications.  We name a review team who then
18   scores those applications, and then presents a
19   review of those applications ranked by priority in
20   terms of how they score.
21           And then the final team that made those
22   decisions were the Commissioners and myself and Bob
23   Hansen.  So again the process can take weeks to do
24   that.

Page 134

1            The reference here, I believe, the 2
2    million, this is -- it's hard to believe this was a
3    June email -- is referenced not to the original
4    Ryan Brown dollars, but the legislature awarded an
5    additional 2 million dollars through a supplemental
6    in, I believe, the -- I believe it was the end of
7    the 2019 legislative session.
8            So these are additional dollars and not
9    settlement money dollars.  They decided to leave
10   the Ryan Brown Fund in place and to fund that
11   periodically with -- with other sources of dollars.
12   Q.  And so the legislature, in a supplemental
13   appropriation, had put 2 million dollars into the
14   Ryan Brown Fund that the State ultimately wasn't
15   able to effectively spend because of lack of
16   quality proposals; is that right?
17   A.  The first go-around, I think we had
18   problems, my recollection, finding applicants
19   that -- that met the requirements.  But -- so
20   that's correct.
21   Q.  This, of course, was just a couple months
22   ago, even though it probably seems to you like a
23   couple of years.
24           Do you know what the status of that

Page 135

1    money is now?
2    A.  I do not.  I'm hesitant to say at this
3    point.  Again, hard to believe that was June -- a
4    June e-mail.  But I know they were looking for
5    additional providers to -- to fund.
6    Q.  The -- I'd then ask you to go back to
7    Exhibit 23.
8    A.  Yeah.  Exhibit 23?
9    Q.  23.
10   A.  Oh, okay.
11   Q.  I called it out a minute ago and then
12   changed my mind.
13         CROUCH DEPOSITION EXHIBIT NO. 23
14         (E-mail chain between Mullins, Crouch,
15         Samples and Hansen Re: Proposed
16         Settlement Budget Talking Points dated
17         5-6-19 through 5-7-19
18         (CROUCH_FEDWV_00005906-908) was marked
19         for identification purposes as Crouch
20         Deposition Exhibit No. 23.)
21   A.  All right.
22   Q.  This is another -- this is earlier.  This
23   is May of 2019, but it's another e-mail exchange
24   involving you and a few other officials at DHHR.

Page 136

1    So take -- take a look, if you would.
2    A.  All right.
3    Q.  If you go back to the very first --
4    earliest message in the e-mail chain which starts
5    at page 2 and continues over to page 3.  That is a
6    May 6th, 2019 e-mail from Commissioner Mullins to
7    you and Deputy Commissioner -- sorry.
8            -- Deputy Secretary Samples with a cc
9    to Mr. Hansen; is that right?
10   A.  Which --
11   Q.  I'm at the bottom of page 2.
12   A.  Oh.  May 2019, correct?
13   Q.  Uh-huh.  It's an e-mail from Commissioner
14   Mullins to you and Deputy Secretary Samples and
15   then a carbon copy to Mr. Hansen.
16   A.  Yes, okay.
17   Q.  And the subject is:  "Proposed Settlement
18   Budget Talking Points."  Do you see that?
19   A.  Yes, uh-huh.
20   Q.  And it begins, "Good afternoon, Bob and I
21   met after our management meeting to put together
22   some possible budget talking points for the
23   McKesson Settlement."
24           Is that right?

Page 141

1  in a lot of ways, correct that we needed more
2  treatment beds.  And where everyone -- not --
3  certainly not just me, but I think the whole
4  country began looking at this problem.  Was you
5  didn't need to stay in a bed that long.  You didn't
6  need to stay in an institutional bed for a year or
7  six months to a year.
8      So that changed with regard to the Ryan
9  Brown Fund and the dictate to -- the requirement
10  that we only use those dollars to build treatment
11  beds in West Virginia, reinforced my position even
12  more that we need flexibility with these dollars
13  because things change quickly.
14      And I think I even testified to that
15  the following year when we -- when we were looking
16  at changes, is that, "Give us flexibility to fight
17  this -- this thing and we won't have to make
18  changes down the road."
19  Q.  Of the original money from the Cardinal
20  Health and AmerisourceBergen settlements that went
21  to the Ryan Brown Fund, has all that been spent?
22  A.  The -- yes.  There was 200 or 300 --
23  actually, there might have been $400,000 that was
24  unobligated after the initial grants were --

Page 142

1      THE DEPONENT:  Excuse me.  I need
2  something for my throat.  Talking too much.  Thank
3  you.
4  A.  I think there was about $400,000 that was
5  unobligated or left.  But that money, I feel
6  certain, is long gone at this point as well.
7      But with the original, I think it was
8  22.6 or 22.8 million dollars.  All but $400,000
9  went out to construction of -- of treatment beds.
10  Q.  Let me ask you to open Exhibit 29.
11  A.  Say it again?  Sorry.
12  Q.  Exhibit 29.
13      CROUCH DEPOSITION EXHIBIT NO. 29
14      (E-mail from Crouch to Bray and others
15      Re: Internal and Deliberative/
16      Confidential:  Requested Materials
17      dated 1-2-19 with attachment
18      (MARSHALL_FEDWV_00374502-507) was
19      marked for identification purposes as
20      Crouch Deposition Exhibit No. 29.)
21  A.  All right.
22  Q.  I have a question in particular about the
23  third page.  Rather than have you read all the way
24  through it, I can just direct you.  There's one

Page 143

1  line I want to ask you about.  First as to the
2  document in general, is this an e-mail from you to
3  some personnel in the Governor's office dated
4  January 2nd, 2019?
5  A.  Yes.
6  Q.  It says, "See attached information as per
7  the request this morning.  If you need anything
8  further, or need any" additional "clarification on
9  any of this, please let us know."
10      Is that right?
11  A.  Yes.
12  Q.  So then if you go to the third page past
13  the map, there's a page that is titled "General
14  Questions." do you see that?
15  A.  Yes.
16  Q.  And the first general question is:  "What
17  is the vacancy rate for West Virginia's inpatient
18  treatment providers?"  The answer given is:  "The
19  overall vacancy rate for West Virginia is
20  approximately 25" to "30%."
21      Did I read that correctly?
22  A.  That's correct.
23  Q.  Is that consistent with your understanding?
24  A.  Again, my recollection's -- I would accept

Page 144

1  the document.  Those rates varied over time, so
2  yes.
3  Q.  Do you know why 25 to 30 percent of the
4  capacity in the State's inpatient treatment
5  providers is -- is vacant?
6  A.  The very part of it was distribution.
7  That's one of the reasons why we tried to get
8  treatment beds geographically placed throughout the
9  State.  We went for a time with no treatment beds
10  in the eastern panhandle, and people in Charleston
11  or Huntington or southern West Virginia don't
12  really want to go to the panhandle to be treated,
13  so that was a -- that was part of it.
14      And in some instances, we had
15  available -- more beds per population in areas
16  that -- that they were using at the time.  Again,
17  people want to stay in their community, but if you
18  have enough beds in that particular community --
19  because you get two or three providers, and again,
20  the 400 and some beds we have were mostly private
21  providers out there.
22      So the market kind of takes care of
23  itself in a lot of these -- in a lot of these areas
24  that we provide services, but sometimes it takes a

Message
_____

| | |
|---|---|
| **From:** | Bill.J.Crouch@wv.gov [Bill.J.Crouch@wv.gov] |
| **Sent:** | 6/8/2020 5:03:02 PM |
| **To:** | Samples, Jeremiah [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2605e83d66db41f199c0fd67a76ade25-Samples, Je]; Robertson, April L [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=8512a377e57a4af1af393023eb8a6c39-Robertson,] |
| **CC:** | Hansen, Robert H [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=aeac455c66154a4b9d14f62f298b54c1-Hanson, Rob] |
| **Subject:** | Re: Re: Thursday ODCP meeting |

My recollection is that the legislative change and specifically the language on the supplemental actually  ties it to recovery. That said, the question is a good one. I'm copying April and asking her to verify this change in direction.

Thanks,
Bill


On Jun 8, 2020, at 9:55 AM, Samples, Jeremiah <Jeremiah.Samples@wv.gov> wrote:

> In terms of the Ryan Brown funding, would the shift to recovery residences, which I support, put us in
> conflict with statutory changes by the Legislature directing those funds?
>
> On overdoses, how does WV compare to other states?  In other words, is our increase in line with the
> national/ regional averages or are we increasing at a higher rate?
>
> Jeremiah Samples
> Deputy Secretary
> West Virginia Department of Health and Human Resources
> 1 Davis Square, Suite 100E
> Charleston, WV 25301
> 304-356-5405 (office phone)
> 304-380-5944 (cell phone)
> Jeremiah.samples@wv.gov
>
> **Montani Semper Liberi**
>
> NOTE:  The information contained in this electronic message is legally privileged and confidential under
> applicable state and federal law and is intended for the individual named above.  If the recipient of the
> message is not the above-named recipient, you are hereby notified that any distribution, copy or
> disclosure of this communication is strictly prohibited.  All communications to DHHR staff are internal
> and deliberative in nature and should not be shared.  If you have received this communication in error,
> please notify Jeremiah Samples, West Virginia Department of Health and Human Resources, and discard
> this communication immediately without making any copy or distribution.
>
> **From:** Crouch, Bill J <Bill.J.Crouch@wv.gov>
> **Sent:** Sunday, June 7, 2020 11:15 AM
> **To:** Hansen, Robert H <Robert.H.Hansen@wv.gov>
> **Cc:** Samples, Jeremiah <Jeremiah.Samples@wv.gov>
> **Subject:** Re: Thursday ODCP meeting
>
> Thanks for the update Bob. With regard to:

Confidential

1. I think that is great and I concur completely;
2. I think this is a good approach too.  As I recall, the $2 million put in the fund last year was specifically for recovery services, so we don't want to lose site of that.;
3. I think we should bring this up again in press briefing, and maybe see if we can get more naloxone distributed throughout the state.  Is that a possibility?

As for the meeting in Beckley, keep me in the loop and be safe!

Bill


On Jun 7, 2020, at 8:14 AM, Hansen, Robert H <Robert.H.Hansen@wv.gov> wrote:


Good morning,

We held a brief meeting last week. Three items were discussed, I am briefly summarizing the discussion and direction:

1. McKesson settlement funds of 1.5 million. The decision is to expand Family Treatment Courts. I have talked to the staff of the Supreme Court about this and they are on board. Linda Watts is also since this requires redirection of a CPS worker per location. I think we can add 6 to 8 new courts throughout FY2021. The locations have not been chosen but that is the next step.
2. Ryan Brown funding. We did not use 2 million this year through the AFA process because of the lack of quality proposals. It is our proposal to blend these funds with funding from the WVHDF to create a large pool of financial help for the creation or improvement of recovery residences. We are also planning (probably virtually) a training session in conjunction with WVHDF for interested people on how to apply for these funds and others funds that are available. Alex Alston and I are conferencing with Erica Boggess and her  staff this this week on the next steps.
3. Overdose fatalities and overdoses generally. Definitely going up all through the country not just WV. Talking points have been given to communication and the Secretary. We are also funding through BPH six new QRTs. Getting naloxone out is a key helping save lives.


Just an FYI. I am going to Beckley Monday to meet with Senator Cline and others about the Wyoming County project-in particular the Wyoming county Recovery Network piece of the large effort. She and I are on the same page. No problems there. One possible solution that will come up is to turn that part of the project over to Recovery Point. I agree with the Senator that this needs to be an in person meeting. Doing it at the Health Dept conf room.

Bob H

Confidential

Message

| | |
|---|---|
| **From:** | Crouch, Bill J [Bill.J.Crouch@wv.gov] |
| on behalf of | Crouch, Bill J |
| **Sent:** | 1/2/2019 10:08:41 PM |
| **To:** | Cary, Bray [Bray.Cary@wv.gov]; Abraham, Brian R [Brian.R.Abraham@wv.gov] |
| **CC:** | Samples, Jeremiah [Jeremiah.Samples@wv.gov]; Hansen, Robert H. [/o=Marshall University/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a3b0c087796f4ec8a782d9b78efb7819-Hans]; Mullins, Christina R [Christina.R.Mullins@wv.gov] |
| **Subject:** | FW: Internal and Deliberative / Confidential: Requested Materials |
| **Attachments:** | Overvi~1.pdf; Respon~1.doc |

Bray and Brian,

See attached information as per the request this morning.  If you need anything further, or need addition clarification on any of this, please let us know.

Bill

---

**From:** Mullins, Christina R <Christina.R.Mullins@wv.gov>
**Sent:** Wednesday, January 2, 2019 4:49 PM
**To:** Crouch, Bill J <Bill.J.Crouch@wv.gov>; Samples, Jeremiah <Jeremiah.Samples@wv.gov>; Hansen, Robert H. <rhansen@marshall.edu>
**Subject:** Internal and Deliberative / Confidential: Requested Materials

Please see attached.  Let me know if there are problems or changes are needed.

Christina Mullins, MA
Commissioner, Bureau for Behavioral Health
West Virginia Department of Health and Human Resources
350 Capitol Street
Room 350
Charleston, WV 25301
Christina.R.Mullins@wv.gov
Phone:  304-356-4771

***Confidentiality Notice:***  *This message, including any attachments, is for the sole use of the individual or entity named above. The message may contain confidential health and/or legally privileged information. If you are not the above-named recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy all copies of the original message.*

Confidential



Overview of Available and Upcoming Treatment Beds in West Virginia

Existing Treatment Beds

Expected Ryan Brown Beds

1-2-19

Confidential

**General Questions**

1. **What is the vacancy rate for West Virginia's inpatient treatment providers?**
- The overall vacancy rate for West Virginia is approximately 25-30%.

2. **What is the percentage of people who complete treatment?**
- According to the Substance Abuse Mental Health Services Administration, 43.4% of persons discharged from Substance Abuse Treatment Services in the United States (US) were discharged because they completed treatment. It is expected that at least 40-60% of those individuals that complete treatment will relapse.
- US participants received the following types of treatment:
    - Outpatient: 38.7%
    - Intensive outpatient: 12.9%
    - Short-term residential: 10.2%
    - Long-term residential: 7.6%
    - Hospital residential: .2%
    - Detoxification: 21.1%
    - Medication assisted opioid therapy / detoxification: 9.3%

3. **What is the average length of treatment?**
- The median length of stay (days) for those US residents that completed treatment is as follows:
    - Outpatient: 128
    - Detoxification: 4
    - Intensive outpatient: 89
    - Short term residential: 26
    - Long-term residential: 90
    - Hospital residential: 25
    - Outpatient Medication Assisted Therapy: 186
    - Medication Assisted Detoxification: 5

4. **What percentage of people with substance use disorder have been involved with the criminal justice system?**
- National data indicates that 31% of individuals discharged by a treatment center in the US were referred by the criminal justice system, and an estimated 65% of incarcerated adults have a substance use disorder. The Bureau for Behavioral Health could not identify a data source that precisely answered this question, but we have provided the best information that we could identify.

WVDHHR/BBH/January 2019

Confidential

### Ryan Brown Openings by Quarter

| Anticipated Opening of Ryan Brown Residential Treatment Beds | | | | |
|---|---|---|---|---|
| Quarter | Agency | Location | # Beds | Total Beds Added Per Qtr |
| October - Dec 2018 | Marshall University (Currently Open) | Cabell County | 18 women + children | Open |
| January - March 2019 | Serenity Hills (Heart2Heart Volunteers) | Ohio County | 30 Coed | 110 |
| | St. Joseph's | Wood County | 64 Coed | |
| | Thomas Health | Kanawha County | 16 Coed | |
| April - June 2019 | Serenity Hills (Heart2Heart Volunteers) | Ohio County | 30 Coed | 72 |
| | West Virginia University | Monongalia County | 42 Coed | |
| July - Sept 2019 | Valley Healthcare System | Marion County | 52 Coed | 136 |
| | FMRS | McDowell County | 12 Women | |
| | | Nicholas | 12 Men | |
| | | Raleigh | 12 Coed | |
| | Mountaineer Behavioral Health | Berkeley | 48 Coed | |
| October - Dec 2019 | Serenity Hills (Heart2Heart Volunteers) | Ohio County | 25 Coed | 89 |
| | Westbrook | Wood County | 24 Coed | |
| | FMRS | Fayette | 40 Men | |
| | | | Total New Beds | 407 |

WVDHHR/BBH/January 2019

Confidential

MARSHALL_FEDWV_00374506
MARSHALL_FEDWV_00374505-2

[ PAGE  \* MERGEFORMAT ]

**Summary of Available and Upcoming Treatment Beds**

- As of January 2, 2019, there are approximately 535 treatment beds in West Virginia available for use.
- During 2019, West Virginia expects to add 407 beds as a result of the Ryan Brown funds, bringing the total number to 942.



WVDHHR/BBH/January 2019

Confidential

MARSHALL_FEDWV_00374507
MARSHALL_FEDWV_00374505-3

```
                                                    Page 1

 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3
 4    * * * * * * * * * * * * * * * * * * * * * * * * *
 5   THE CITY OF HUNTINGTON,
 6            Plaintiff,
 7   vs.                                  CIVIL ACTION
                                      NO. 3:17-01362
 8   AMERISOURCEBERGEN DRUG
     CORPORATION, et al.,
 9
              Defendants.
10
     _____
11
     CABELL COUNTY COMMISSION,
12
              Plaintiff,
13                                        CIVIL ACTION
                                      NO. 3:17-01665
14
     AMERISOURCEBERGEN DRUG CORPORATION, et al.,
15
              Defendants.
16
     * * * * * * * * * * * * * * * * * * * * * * * * *
17
18
              Videotaped and videoconference
19        deposition of CHRISTINA MULLINS taken by
          the Defendants under the Federal Rules of
20        Civil Procedure in the above-entitled
          action, pursuant to notice, before
21        Teresa L. Harvey, a Registered Diplomate
          Reporter and West Virginia notary public,
22        the witness appearing via videoconference
          from Charleston, West Virginia, on the
23        14th day of July, 2020.
24
```

Page 30

1 resources to fund that expansion.
2  Q.  Okay.  Okay.  Other than Ms. O'Connell and
3 Crowder and the individual from PROACT -- well, what do
4 you recall of your discussions with the individual from
5 PROACT?
6  A.  That was really just a -- kind of a -- it was
7 a tour and explained how PROACT worked, how people
8 flowed in, what services were provided there at the
9 facility.  That was the extent of that conversation.  It
10 was a summary of their activities that they do and
11 conduct there at that site.
12  Q.  Okay.  Other than those three individuals, do
13 you recall speaking with anybody else that you would
14 consider associated with the City of Huntington?
15  A.  The only other person is Sarah Murray, who was
16 also one of the founders of Lily's Place.
17  Q.  And what were the discussions that you had?
18  A.  All of the discussions I've had with her
19 professionally have been around Lily's Place and just
20 her passion, concern for the health and well-being of
21 the infants who are born substance-exposed and what
22 happens after -- after the birth and after Lily's --
23 from either the hospital or Lily's Place.
24  Q.  Okay.  Okay.  Do you recall having any

Page 31

1 discussions with anybody associated with Cabell County
2 prior to the lawsuit?
3  A.  So as the -- as the Commissioner for the
4 Bureau for Behavioral Health, I interact very closely
5 with the CEO for Prestera Center, and we do provide
6 funding to address substance use disorder to that mental
7 health -- mental health agency, so I've interacted quite
8 a bit with Karen Yost.  That facility serves the region
9 but also specifically Cabell County.
10  Q.  How about anybody else from Cabell?
11  A.  I have interacted with Dr. Kilkenny at the
12 Cabell-Huntington Health Department.
13  Q.  And what have been the nature of those
14 conversations?
15  A.  He also served on the Governor's Advisory
16 Council, and we have talked a lot about harm reduction
17 and just connections with treatment services in terms of
18 how to utilize PROACT and some of the services that are
19 available within the Huntington area.
20     His and I -- mine and his conversations
21 have been a little bit broader at the system level as
22 part of the Governor's Advisory Council, not so much
23 the specifics or details at his local health department.
24  Q.  Okay.  Anybody else on behalf of Cabell

Page 32

1 County?
2  A.  I did meet with Bob Hansen one time before he
3 came out the drug policy director there.  We discussed
4 the possibility of how our Birth to Three Program -- I
5 was the MCH director at that time --
6     COURT REPORTER:  Excuse me --
7     THE DEPONENT:  -- and how our Birth to
8 Three Program might help some of the kids -- or help
9 them more in that Cabell County and Huntington area and
10 that's -- that's all I can think of.
11  Q.  Okay.  All right.  Thank you.
12     Switching gears just a little bit, are
13 you familiar with what a prescription drug distributor
14 is?
15  A.  Not in the way that you phrased it, no.
16  Q.  Okay.  What is -- what is your understanding
17 of what I just phrased?
18  A.  I wonder if -- the question that came to my
19 mind is do you mean the -- just the distribution company
20 that take it from the manufacturer ... (further answer
21 unintelligible to the court reporter.)
22     (Whereupon a brief discussion was had off
23     the record regarding the court reporter's
24     audio.)

Page 33

1     VIDEOGRAPHER:  The time is 10:47.  We are
2 now going off the record.
3     (Brief recess.)
4     VIDEOGRAPHER:  The time is 10:58.  We are
5 now back on the record.
6 BY MR. GARY:
7  Q.  Ms. Mullins, I'd like to switch gears just a
8 little and talk to and ask you some questions about
9 the Bureau for Behavioral Health, the BBH.
10     Generally speaking, what is the mission
11 of the BBH?
12  A.  Hmm, we have a brand new mission statement and
13 I can't remember it off the top of my head, but,
14 generally speaking, it is that -- to provide support for
15 mental health, substance use, intellectual developmental
16 disabilities, to promote wellness and recovery is our
17 general mission.
18  Q.  And what is it in applying that mission and
19 satisfying it?  What does the BBH do?
20  A.  We're broken out into three offices.  We have
21 an Office of Adult Services that also has a substance
22 use disorder team that works on distributing grants to
23 local communities.  We administer the Ryan Brown Fund in
24 that unit.  We administer our Substance Abuse Block

9 (Pages 30 - 33)

Page 34

1 Grant from SAMSHA in that unit.  We also have -- in the
2 adult program have the Mental Health Block Grant that we
3 administer, along with our Intellectual and
4 Developmental Disabilities Program.
5         We have an Office of Children's Programs.
6 And in that office we do a lot of prevention, and not
7 just prevention of substance use disorder but prevention
8 in mental health issues.  It's focused on kids, so we do
9 a lot of kids' work.  Some examples of that include
10 expanded school mental health as probably one of our
11 more exciting projects that we have, but we also fund
12 prevention lead organizations in local communities so
13 that that work trickles down into the communities.
14         Then we have another Office of Planning
15 and Evaluation.  That office does a lot of training;
16 also, a lot of work on policy and thinking about what
17 might need -- might be needed in the future.
18         And then we have our financial -- that's
19 on our program side, and I did leave off our state Opiod
20 Response Program, which we do have self-standing outside
21 of a specific office because of it's high visibility and
22 high priority.
23         And then we have a -- our deputy
24 commissioner, who is also responsible for

Page 35

1 administrative -- administration.  So, financial
2 management, grants management, those types of things
3 occur out of our -- out of that section of our bureau.
4         So that's kind of the high points of what
5 we do.
6    Q.   Okay.  The deputy commissioner comes out of
7 the planning and evaluation section?
8    A.   There's two deputy commissioners:  One of
9 programs, and that program person is Elliott Birckhead,
10 and he has responsibility for the policy and planning
11 adult, kids and the state Opioid Response Project.
12         And then my Deputy Commissioner of
13 Administration, who is Damon Iarossi, oversees all of
14 the finances, HR, and all of the administrative aspects
15 of the -- of the bureau.
16    Q.   Okay.  Does -- so you mentioned these three
17 offices.  Where are the physical locations of those
18 offices?
19    A.   The physical locations are here at 350 Capitol
20 Street.
21    Q.   Okay.
22    A.   We're teleworking a lot right now, though,
23 so -- given the COVID pandemic, but our official offices
24 are here on Capitol Street.

Page 36

1    Q.   Okay.  Does the BBH also have other
2 regional-type offices throughout the state or does it
3 only have those offices you just mentioned?
4    A.   So, we have a couple of employees who are what
5 I will refer to as outstations, but we do not have
6 official regional offices.  But we are tied, too, in the
7 state Code, so we have 13 comprehensive mental health
8 centers that are located in different regions throughout
9 the state.
10         They are autonomous, but we are connected
11 to them legally as our state's e-net support system for
12 mental health and substance use services.  So that
13 relationship is very close and -- but our relationship
14 with them is through grant -- our legal relationship and
15 financial relationships are tied up through those grant
16 agreements that we give to those centers.
17    Q.   Okay.  So does the -- stepping back to the
18 three offices that you mentioned:  The Adult Services,
19 the Office of Children's Programs, and the Planning and
20 Evaluation, do those three offices then have
21 responsibility for the entire state of West Virginia?
22    A.   Yes, our approach is a statewide approach.
23    Q.   Okay.  In the 13 mental health centers,
24 those -- do they -- I take it they have responsibilities

Page 37

1 for their own regional areas in which they're located?
2    A.   Yes.
3    Q.   Okay.  Are there any mental health centers
4 that are located in Cabell County or Huntington?
5    A.   That is the Prestera Mental -- Prestera Mental
6 Health Services.  Prestera Center.
7    Q.   Okay.  Any others?
8    A.   Prestera Center is the -- is the designated
9 comprehensive mental health center for that region.
10 There are other behavioral health providers, but
11 Prestera Center is the state-designated comprehensive
12 behavioral health center.
13    Q.   Okay.  And what does the Prestera Center do?
14 What is its focus?
15    A.   It is a mental health agency, so it provides
16 mental health services from everything from your -- from
17 depression to schizophrenia to personality disorders,
18 but it also provides substance use disorder treatment
19 and a variety of other community-based and prevention
20 services funded through the Bureau.
21         And they're very successful in also
22 getting their own grants from the Substance Abuse Mental
23 Health Services Administration, or SAMHSA, as it's
24 commonly called.  So they don't just get grants from us.

10 (Pages 34 - 37)

Page 38

1 They're very -- fairly -- for a mental health center,
2 they are the largest mental health center and do a lot
3 of -- have actually a very broad work plan of different
4 activities that they address.
5     Q.  Okay.  Okay.  What -- you touched on this just
6 a little bit, but what divisions within the BBH are
7 specifically devoted to or geared towards opioids?
8     A.  So, we have a substance abuse team in the
9 Adult Mental Health -- so, let me back up for just a
10 second and tell you that there are -- most of our work
11 teams have some sort of substance -- substance use
12 disorder focus.
13         In our adult unit, that is -- there is a
14 substance use division that -- that works on the Block
15 Grant, and we have a Prescription Drug Overdose Grant.
16         Then we have our state opioid response
17 team, which is not located within the office.  It is a
18 direct report to the Deputy Commissioner for Programs.
19 And that is specific to opioids, at least through
20 September of this year, and that started in September
21 of 2018.
22         Our children's office, though, also
23 received some of the funds from the state Opioid
24 Response Grant and the adult -- the -- not the adult,

Page 39

1 but the Substance Abuse Block Grant II for Prevention.
2 So they use those funds to prioritize prevention
3 services for children and youth.
4         And then even our policy and evaluation
5 team will -- are also thinking and brainstorming about
6 what might MAT -- or medication-assisted treatment --
7 policies look like in the future.  They provide a lot of
8 training, so they are a training hub.  And they do --
9 they facilitate a statewide Epidemiological Outcomes
10 Workgroup where they share a lot of the data that comes
11 in from different places within the department, or even
12 externally from the department.  So they'll host
13 quarterly meetings for information sharing within DHHR,
14 and some of our external partners as well.
15         And then, of course, on our
16 administrative side, the Deputy Commissioner for
17 Administration is responsible for rolling out all of
18 those grants.  So our work around substance use disorder
19 and our opioid response crosses quite a bit of our
20 bureau, cuts through in a lot of different places.
21     Q.  Okay.  Are there policies that are in place
22 within the BBH that are devoted specifically to opioid
23 use and abuse, policies and guidelines?
24     A.  We have grant policies and procedures.  I'm

Page 40

1 not sure -- I cannot think of any other procedures
2 that -- off the top of my head that we have that aren't
3 specific to how we administer our grants.
4     Q.  Okay.  So when you say grant policies and
5 procedures, that speaks to how you administer the funds
6 received?
7     A.  Yes.
8     Q.  Does it govern anything else?
9     A.  No.  It's our regulatory work that we do to
10 make sure that we're complying with the laws around
11 grants administration and the different policies that
12 our funders put in place to make sure that, you know,
13 we're in line with how they intended those funds to be
14 used.
15     Q.  Okay.  All right.  As far as the -- going back
16 to the services that BBH provides, you mentioned one
17 involving prevention.  What specifically are types of
18 services BBH provides with respect to prevention?
19     A.  We do -- are working right now with the
20 Department of Education to purchase curriculums that can
21 be used in schools.  They have to be evidence-based.
22 They have to meet a certain threshold of efficacy,
23 return on investments.  They have to cost -- they have
24 to have a good cost -- the return on investment, so you

Page 41

1 also have -- but it also has to be affordable.
2         So we're working with the Department of
3 Education to purchase those curricula.  We will then,
4 through our prevention lead organizations, make training
5 available for those curricula later in the fall, so that
6 those curricula can be implemented in the local school
7 districts.
8         We are also working right now on a -- to
9 update our Prevention Strategic Plan.  We're looking at
10 summits for the fall so that teens and young people can
11 get together and hear some factual presentations and
12 also to empower them in helping them make decisions
13 about their lives as they're moving into adulthood.
14         And then we have the prevention lead
15 organizations that are kind of our foundation for how we
16 roll out community-based programs, because they're our
17 trainers in the communities.  They are our -- they run
18 local coalitions in each of the counties, a -- groups of
19 people who work together on different issues.
20         So those are probably -- well, that's
21 what I can think of right now off the top of my head.
22     Q.  Okay.  And are those services -- prevention
23 services, that is, are they provided to Cabell and
24 Huntington?

11 (Pages 38 - 41)

Page 42

1   A.   Yes.  And I also want to emphasize expanded
2 school mental health and that is a -- another key
3 component of what we do, because we work with the
4 individual schools to try to develop programming that
5 speaks about everything from how the building's
6 organized and how teens are greet -- or not teens but
7 young people are greeted when they come in the schools,
8 and trying to de-escalate problems as they occur, and
9 that really goes toward prevention of a lot of things.
10 But that's not in all schools, but it is located
11 throughout the state in some schools.
12   Q.   Okay.  Is it provided to schools in Cabell and
13 Huntington?
14   A.   I know that Prestera provides those services.
15 I am not -- I can't -- I'd have to look it up to see
16 exactly where those services are provided.
17   Q.   Okay.  Any other prevention services?
18   A.   There are other services that are not drug --
19 necessarily directly related to drugs.  We do wraparound
20 services for children with severe mental health
21 disturbances.  We also do positive behavioral support
22 programs.  We are working on a crisis hotline right now
23 that would allow us to deploy mobile crisis response to
24 children statewide.  I've got a couple regions still to

Page 43

1 bring onboard and -- but those are some of our biggest
2 initiatives that we're working on right now are those
3 wraparound supports and the mobile crisis response.
4   Q.   Okay.
5   A.   And our suicide prevention programs.  I don't
6 want to leave those out.
7   Q.   Uh-huh.  Okay.  How about the treatment
8 programs that are provided by BBH?
9   A.   The majority of our treatment programs are
10 funded out to those comprehensive behavioral health
11 centers.  They get core grant funds.  They also get
12 different grant funds that they can apply for, so some
13 of the comprehensive behavioral health centers have
14 applied for the State Opioid Response Grant, but we also
15 provide core funding support.
16   Initially, some of the centers, and other
17 agencies in this case, applied for Ryan Brown funds to
18 increase the number at residential treatment for
19 substance use disorder.
20   A few years ago we weren't in very good
21 shape in terms of being able to provide residential
22 treatment, so there was a $21 million investment, and
23 each of the regions tended to get about $3 million.
24 There was -- some regions got a little more, but where

Page 44

1 we built out residential treatment beds working with
2 communities.  We didn't do it for us; we just provided
3 the technical support system and the funding, which is
4 how we support treatment services.
5   A few years ago we provided a lot more
6 funding directly from the Bureau, but as Medicaid
7 implemented their 1115 waiver, they now provide a lot of
8 the funding for the direct services whereas we think
9 more about infrastructure and supports.
10   Q.   Okay.  So that's a good segue to my next
11 question, then.  So what kind of treatment services,
12 then, does BBH provide?
13   A.   So just to be clear, we are not the provider
14 of the services.
15   Q.   Uh-huh.
16   A.   We fund the centers or our partners to do
17 those services.  We are not the providers.  But we
18 support services for mental health, substance use
19 disorder, and IDD services.  We also help support the
20 forensic group homes.  In terms of direct services
21 provision, the mental health supports for kids and
22 adults are the core foundation of what we do, as well as
23 the substance use disorder services.  And then, of
24 course, you know, we do a lot of IDD group homes and

Page 45

1 forensic group homes as well.
2   And then there are certainly some special
3 population -- special projects that -- where cases just
4 become sometimes very complicated that we have to kind
5 of help figure out creative solutions for, and we don't
6 always have the infrastructure in-state to provide those
7 services.
8   Q.   Okay.  And just so I understand, because BBH
9 is not providing treatment services, I then presume that
10 BBH is not an expert in how you treat somebody with an
11 opioid addiction, for example?
12   A.   We have clinical staff on -- clinical staff
13 available on our team.  We also contract with a lot of
14 national experts to help provide guidance to our
15 providers.  But to say that the Bureau, as a whole, is a
16 treatment expert, I wouldn't say that.  But there are
17 staff here who certainly have provided those services
18 and are on -- are able to provide guidance as decisions
19 are made.
20   Q.   Okay.  Okay.  Other than prevention and
21 treatment, what -- what other services -- well, I should
22 stop before I move on from treatment.  Is there anything
23 else under the treatment umbrella that BBH performs?
24   A.   Not that I can think of right now.

12 (Pages 42 - 45)

Page 74

1 Public Health on toxicology screens to kind of have a
2 feel for what's going on in the communities.  We also
3 try to talk with people in treatment, or even people who
4 are in Harm Reduction Programs who are coming in.  It's
5 a more informal way of understanding what's going on in
6 the community, but -- it's not like we can give people a
7 survey, necessarily, to tell us how the drugs -- how
8 they acquired the drug that they might choose to use.
9 So that's the best way that we have, but we're not the
10 primary trackers of that data.  We keep track of it; we
11 use it.
12     Q.  Who are the primary trackers of that data?
13     A.  Your Office of Chief Medical Examiner would
14 collect on the toxicology screen, but they report to our
15 Health Statistic Center and that becomes a part of the
16 official death certificate records.  And we've been
17 tracking that data pretty closely since about 2001, I
18 think, as a larger agency.  And the Appalachia HIDTA I
19 think keeps track of some of the law enforcement data so
20 that they can see what is coming -- flowing in and
21 flowing out.
22         We also get some reports from the
23 Department of Justice, sometimes in terms of when
24 there's a clinic or pharmacy about to be closed in a

Page 75

1 community.  We don't get the details, but we do get
2 notice we need to be ready to mobilize the support
3 patients of those facilities.
4     Q.  Thanks.  Okay.  All right.  Okay.  So going
5 back to Exhibit 5, so this was your -- is this a
6 transcription of the -- no.  This is something -- so
7 how -- can you explain to me how this works?  You
8 submitted this to -- yeah, go ahead.
9     A.  A different kind of process.  So there -- I
10 don't know if you've ever watched C-SPAN or not for
11 those testimonies, but what they do is when you are
12 called in to do your actual testimony, you're given
13 5 minutes for your opening remarks.  And then each
14 congressional representative gets 5 minutes to kind of
15 quiz bowl you throughout that.
16         So to start the process, you get to
17 submit your written testimony, which is formal, and then
18 posted to the record, if you will.  It gets posted
19 online, and then the congressional delegations get to
20 review your testimony before the hearing.  And then they
21 get to base their questions off of your written
22 testimony.  And then a couple hours of testimony is kind
23 of a -- you get your 5 minutes for opening remarks and
24 then the delegates or senators get to quiz you for

Page 76

1 5 minutes.  And they can pick any one of the witnesses
2 that they want to choose.
3     Q.  Okay.  All right.  So this was the written
4 statement submitted.  This is just, I guess,
5 seven months ago, thereabouts, to the day, January 14,
6 2020.  And this was submitted by you to the committee?
7     A.  Yes.
8     Q.  Okay.  And subcommittee.  Okay.
9         Well, if you could turn to Page 2, in the
10 first paragraph you state that:  "The resources provided
11 by both the state and federal governments have allowed
12 West Virginia to transform the state's response to the
13 opioid crisis."
14         Do you still feel that is true?
15     A.  Yeah.  There is a lot of evidence to support
16 that we've been able -- we've accomplished a lot,
17 despite the circumstances.
18     Q.  Okay.  Can you -- we may end up going into
19 some of the details here, and I'll try not to be too
20 repetitive, but can you just explain to me now what --
21 you say that you've accomplished a lot.  Can you explain
22 to me what you've accomplished?
23     A.  Sure.  We have been able -- so, one of the big
24 things to stick out was there was 197 residential

Page 77

1 treatment beds a few years ago.  That's all that we had
2 in the entire state.  Medicaid did not pay for
3 residential treatment.  The State of West Virginia
4 invested other drug settlement funds into an account
5 called the Ryan Brown account.  That money was divvied
6 out, and now we have, not just because of that
7 investment but because of statewide interest and because
8 of Medicaid's changes in payment, we have -- and I don't
9 have the exact number, but it's around 850 residential
10 treatment beds now as opposed to just 197, so that
11 really does expand access.
12         We've been able to increase the number of
13 prescribers for medication-assisted treatment by quite a
14 bit.
15         We've distributed over 10,000 doses of
16 naloxone to local health departments.
17         As you -- we've discussed earlier, the
18 number of opioid prescriptions in West Virginia has
19 decreased.  We have really been able to also increase
20 the number of treatment programs for women and children
21 so that mothers and babies -- so that treatment can
22 start with prenatal care and families be followed one to
23 two years post-delivery.
24         We also have residential treatment

20 (Pages 74 - 77)

21

Page 106

1  Q. Okay. How about PFS fundings?
2  A. That is another one that we can look up for
3 you.
4  Q. Okay. How about Substance Abuse Prevention
5 and Treatment Funding, SAP Block Grants?
6  A. I'm sure that Prestera gets a portion of those
7 dollars, but I don't know how much.
8  Q. Okay. So is that something that BBH could
9 figure out?
10  A. Yes.
11     MR. GARY: Okay. Okay. Allen, I'll just
12 be following up with you on these various items.
13     MR. CAMPBELL: Okay. we'll see what we
14 can do about it.
15     MR. GARY: Thanks. Okay.
16  Q. And lastly, the Medicaid reimbursement claimed
17 by substance use disorder providers, is that information
18 that BBH would have at least with respect to how it
19 might impact Cabell and Huntington?
20  A. We would not have the Medicaid claims
21 information. You would need to contact the Bureau for
22 Medical Services for that.
23  Q. Okay. All right. Okay. Jumping ahead to
24 Page 7 in Exhibit 5 -- are you okay? Do you need a

Page 107

1 break?
2  A. I'm okay.
3  Q. Okay. Let me know if you need one.
4     You state that as of December 20, 2019,
5 West Virginia has received $147 million in federal funds
6 to address the opioid crisis and an additional 58,
7 almost 59 million in state funds.
8     Is that -- what makes up those dollar
9 amounts?
10  A. So the dollar amounts that would be awarded to
11 both in terms of grant -- federal grant funds to the
12 Bureau for Public Health and to the Bureau for
13 Behavioral Health, it would represent the total grant
14 awards and the monies allocated to both bureaus.
15  Q. Okay. And are those then provided to the
16 localities within West Virginia --
17  A. Yes.
18  Q. -- through the grants we just discussed?
19  A. Yes.
20  Q. Okay. Okay. In the next paragraph you talk
21 about surveillance reports supported by the CDC grants.
22 What is a surveillance report?
23  A. So the CDC, initially when they started
24 working in the opioid space, really wanted to improve

Page 108

1 our data analytic capabilities, and so they funded a
2 couple of different grants. One was called BOOST. I
3 think it started in, I don't know, 2015-ish. And
4 what -- and then they converted it over to another
5 prescription drug overdose grant, and I think it's
6 called Prevention for States. They funded
7 epidemiologists, and even epidemiologists at the Board
8 of Pharmacy, so that folks could start analyzing the
9 data more to better understand what's happening in the
10 communities.
11     So that's when we started to see some of
12 the county profiles popping out, analysis on prescribing
13 patterns. We started to see reports like the 2016
14 fatality analysis. These efforts were coordinated
15 through the Bureau for Public Health, or are still
16 coordinated through the Bureau for Public Health, but
17 some of these programs started under me when I was the
18 Office of Maternal, Child and Family Health Director.
19  Q. All right. Okay. And it states that these
20 documents, these reports, allows DHHR to identify hot
21 spots and high burden areas. Were either Cabell or
22 Huntington identified as a hotspot?
23  A. In some of the reports, Cabell County -- I
24 don't recall how far down the ZIP code level some of

Page 109

1 those reports went, but some of those reports would have
2 shown Cabell County as popping out.
3  Q. Okay. And what is the result of identifying a
4 locality as being a hot spot? Is it -- what does that
5 mean for the locality?
6  A. So, in terms of resources, it means we would
7 ask questions like: Do you have a Quick Response Team?
8 Do you have adequate access to treatment programs? What
9 does your naloxone supply look like? What this bureau
10 would look at was: Do you have enough recovery homes?
11     We would ask lots of questions about kind
12 of the immediate need to stop deaths, which is where we
13 would put things like: Can we do MAT induction in
14 emergency rooms?
15     It would affect deployment of resources
16 to those communities.
17  Q. Okay. And do you -- do you recall if those
18 types of questions were asked of Cabell or Huntington?
19  A. That's the -- what sometimes is a little bit
20 different about Cabell is because Cabell self started a
21 lot of these things. They would have had one of
22 the first Quick Response Teams in the state, if not the
23 first. And they got it funded from somewhere else,
24 because they needed it.

28 (Pages 106 - 109)

1       They -- but they're certainly -- some of
2   what Cabell did was leading efforts that we would then
3   undertake in other parts of the state.
4       Q.   Okay.  So led the effort in establishing a
5   Quick Response Team.  Do you know who funded that, by
6   the way?
7       A.   I do not.  Director Hansen would know, though.
8       Q.   Okay.  And when was that?
9       A.   Director Hansen came to the department in
10  early 2019, so I would say at some point in -- and I'm
11  ballparking this — I want to qualify that — sometime in
12  2018 or late 2017.
13      Q.   Okay.  So the Quick Response Team effort would
14  have been around that time?
15      A.   Yes.
16      Q.   2018?
17      A.   Yes.
18      Q.   Okay.  Do you -- do you know if Cabell or
19  Huntington are still receiving funds from that same
20  source for the Quick Response Team?
21      A.   I don't know if it's the same source or if
22  that funding source has switched over to the department.
23      Q.   Okay.  But you believe it's still receiving
24  funding for that?

1       A.   Yes, I do believe that.
2       Q.   And what other -- you mentioned it was leading
3   the way in other efforts.  Was it with respect to
4   naloxone supply?  Was Cabell --
5       A.   For things like PROACT, which was a really --
6   is a unique way of looking at treatment and integrating
7   social services and the treatment and making it not -- a
8   one-stop shop for everything.  It's hard to replicate,
9   because that community is -- it's special.  They've
10  really come together around this effort and have been
11  able to accomplish some things because of the community
12  unity around this topic.
13      Project Hope was another thing that they
14  really worked hard to push the treatment program for
15  moms and babies.  Lily's Place grew up out of a
16  dedicated group of nurses who wanted a better way to
17  serve the babies.  I mean, they have really, I mean,
18  laid down tracks for a lot of the first types of those
19  kinds of services in the state.
20      Q.   Okay.  The types of services that West
21  Virginia is trying to build in other places?
22      A.   Yes.  Now, we did have other pregnant women
23  sites, residential-type treatment sites, but just the
24  way that they kind of designed Project Hope and the way

1   that they were able to get the apartments for the women
2   and kind of be in that courtyard was really -- really
3   unique and cool.  But other places did have that, though
4   not everything was completely unique, but sometimes it
5   was a spin on it, and they were able to do some of those
6   things --
7       Q.   Okay.
8       A.   -- that we would later replicate in other
9   communities.
10      Q.   Okay.  So you state, then, in the same
11  paragraph as the hot spots paragraph, the last sentence
12  of that paragraph:  "For perhaps the first time, West
13  Virginia had the resources to fund what it needed."
14      Do you still feel that way?
15      A.   So, at that time that we were working on some
16  of these things, we were not having to make difficult
17  decisions on -- having to pick and choose which project
18  to fund.  We were able to fund quality projects.  That
19  doesn't mean we were funding everything that came at us,
20  but when we put out our AFA, we were able to fund the
21  ones that we believed stood a high degree of success
22  with the scoring criteria that we put in place.
23      We were able to dream a little and say:
24  What do we need?  And not have to do everything on a

1   shoestring budget.
2       Q.   Uh-huh.
3       A.   Now, I will say this:  At that time that we
4   wrote that, those things were in fact true, but as we
5   have grown our infrastructure, we now do see where we
6   could use -- we'll have to grow some more stuff.  Our
7   dreams haven't stopped.
8       Q.   Sure.  No, of course.  But this was as
9   of December 2019?
10      A.   Yes.
11      Q.   So setting aside the pandemic -- setting aside
12  the pandemic and, of course, wanting to do more, do you
13  still feel, though, that this is the first time West
14  Virginia has the resources that it needs?
15      A.   It definitely for the first time felt like we
16  had the money to do much of what we needed and we didn't
17  have to pick and choose so much.
18      Q.   Okay.  And again, setting aside the pandemic,
19  do you still feel that that's the case?
20      A.   It's hard for me to set aside the pandemic
21  right now.
22      Q.   Right, but short of that, do you still feel,
23  had there been no pandemic --
24      A.   We still have the momentum and the money to do

29 (Pages 110 - 113)

# A Public Health Emergency:
# West Virginia's Efforts to Curb the Opioid Crisis

Testimony to:

The House of Representatives Committee on Energy and Commerce
Subcommittee on Oversight and Investigations

The Honorable Frank Pallone, Jr., Chairman
The Honorable Greg Walden, Ranking Member
The Honorable Brett Guthrie, Ranking Member
The Honorable Diana DeGette, Subcommittee Chair

2125 Rayburn House Office Building

Submitted By:

Christina Mullins, Commissioner
Bureau for Behavioral Health
West Virginia Department of Health and Human Resources

350 Capitol Street, Room 350
Charleston, West Virginia 25301

Email:  Christina.R.Mullins@wv.gov

Tuesday, January 14, 2020
2123 Rayburn House Office Building

EXHIBIT

0002

Chairman Pallone, Ranking Member Walden, Ranking Member Guthrie, Subcommittee Chair DeGette and members of the Committee on Energy and Commerce, I am Christina Mullins, the Commissioner of the Bureau for Behavioral Health within the West Virginia Department of Health and Human Resources (DHHR).  First, I want to thank the Committee for your commitment to address this crisis.  Without the resources provided by this Committee, West Virginia might be in a considerably worse position.  I also want to thank you for the opportunity to discuss the importance of the initiatives in West Virginia to address the opioid crisis and the impact of the funding made available through this committee in the effort to promote prevention, treatment and recovery of substance use disorder.  The resources provided by both the state and federal governments have allowed West Virginia to transform the state's response to the opioid crisis.  This work is saving lives through expanded opportunities for prevention, treatment, and recovery.

While overdose rates in West Virginia have increased since the early 2000s, staff within West Virginia's DHHR began to receive increasing numbers of calls from providers of all kinds in the mid-2000s.  Overdose deaths were going up, clients were presenting with substance use disorders, and neonatologists were complaining that the neonatal intensive care units were full of infants withdrawing from drugs.  We had no idea that this was only the beginning of what would happen to our state.

Further compounding our challenges during this time was that Medicaid did not pay for residential treatment, and the utilization of medication assisted treatment (MAT) in any setting was very low.  Residential treatment services were either privately sponsored or funded by DHHR using the Substance Abuse Prevention and Treatment Block Grant (SAPT) or state revenue.  As a result, there were only 197 treatment beds to serve the entire state of West Virginia.  Put simply, West Virginia had nowhere near the resources it needed to respond to the worsening crisis.

It is no secret that West Virginia is ground zero of the opioid crisis.  There are award winning documentaries and Pulitzer Prize winning stories that describe what happened to our state, and I am sure that these efforts played a significant role in bringing much needed resources to West Virginia.  But today, I would like to tell a different story.  With your help, West Virginia has reduced overdose deaths for the first time in over 10 years.  Opioid prescriptions have decreased by 48%, opioid doses have decreased by 50%, and naloxone prescribing has increased by 208%.  Additionally, we have distributed over 10,000 doses of naloxone to local health departments.  Treatment capacity has also shifted.  The number of Data Addiction Treatment Act (DATA) waivered providers has increased 208% since 2017, and the number of residential treatment beds has increased from 197 to 740.  Our records indicate that 85% of these beds are always in use.  Additionally, nearly all birthing facilities have access to integrated substance use disorder treatment in their community.  This fundamental shift in infrastructure and capacity is the result of the significant financial investment of federal, state and drug settlement funds.

West Virginia leveraged federal investments to increase outpatient treatment capacity (including MAT), increase the number and quality of its workforce, distribute life-saving naloxone, conduct

2

rigorous provider education on opioid prescribing, and stand up Quick Response Teams to follow-up on individuals experiencing non-fatal overdoses.  The state used settlement funds and its general revenue to undertake the development of bricks and mortar projects that expanded the availability of residential treatment, including facilities that specialize in pregnant and post-partum women.  The scope of this problem required a significant financial investment to adequately respond to this crisis.  Braiding available funding sources allowed West Virginia to balance the need for immediate interventions and services with the long-term need to address the systemic issues that serve as an ongoing challenge to the state's opioid response.  This testimony will describe how West Virginia transformed its substance use system of care using available federal dollars as a critical cornerstone.

## Impact of Crisis

West Virginia is one of the states most impacted by the current opioid crisis.  In 1999, West Virginia had a lower rate of overdose deaths than the national average at 4.1 per 100,000 population versus a national rate of 6.0.  In 2001, West Virginia surpassed the national rate and in 2010 became the state with the highest rate of overdose deaths in the nation.  West Virginia continues to lead the nation in overdose deaths, with its highest rate of 57.8 recorded in 2017.

Loss of life is not the only impact of this crisis.  Substance use disorder has had a profound impact on children and their families.  West Virginia leads the nation in Neonatal Abstinence Syndrome (NAS), a withdrawal syndrome associated with prenatal exposure to both illicit and legally prescribed drugs.  In 2018, 4.9% of infants born in West Virginia were diagnosed with NAS.  Of continued concern is that an additional 9.4% of infants were determined to have intrauterine substance exposure (illicit and legally prescribed). Overall, 14.3% of the infants born in West Virginia may have long-term consequences due to exposure to drugs during pregnancy.

Substance use has also directly impacted the state's foster care system.  Foster care placement in West Virginia has risen from 4,129 children in care in September 2011 to 6,895 in September 2019, an increase of 67%.  Of those currently in foster care placement, the most common reasons are drug use by the parent (51.3%) followed by neglect (34.6%).  It is important to note that drug use alone is not sufficient cause for removal.  Furthermore, infants in foster care were 420% more likely to have been diagnosed with NAS.

In addition to loss of life and impact to families, the state has also experienced increases in infectious diseases including an outbreak of hepatitis A in March 2018.  Nearly 70% of infected individuals reported illicit drug use, and 9% reported experiencing homelessness.  Additionally, in 2018 and 2019, the state had 114 new HIV cases associated with injection drug use compared to only 25 cases in 2016 and 2017.  This has increased the stigma associated with substance use disorder in certain communities.

There are many contributing factors to the high rate of overdose deaths in West Virginia, including high rates of opioid prescribing, poor economic status and lack of capacity to provide evidence-based treatment.  Prior to 2016, there were 197 residential substance use treatment beds available.  Additionally, the state has a mental health and substance use

3

disorder professional workforce shortage making retention of qualified providers very difficult.  The Health Resources and Service Administration (HRSA) estimates that only 16.9% of West Virginia's mental health professional need is being met (the workforce with the primary responsibility of delivering substance use disorder treatment), which further strains the state's ability to expand prevention, treatment and recovery programs.

Data is crucial to describe and inform the response to the opioid crisis. Since the start of the opioid crisis, West Virginia has implemented multiple initiatives, each adding lessons learned and informing future strategies. In 2001, the state expanded the capacity to track fatal overdoses in more detail. This was pivotal and helped government officials understand what was happening within the state.  In 2011, this information caused the Governor's Office to establish the Governor's Advisory Council on Substance Abuse (GACSA) to help define and guide the response to the opioid crisis.  GACSA was the beginning of the stakeholder collaboration that defines West Virginia's approach by working to maximize resources to address the opioid crisis.

Recommendations from GACSA led to state appropriations for expanding prevention, treatment and recovery programs. Despite these efforts, overdose and NAS rates continued to climb. From 2000 to 2016, there were multiple initiatives and laws passed to address the opioid crisis in the state. However, the resources available at the time could not even begin to meet the demand of the response needed. Various agencies were applying and receiving federal grants, and while this allowed the state to leverage federal resources and expertise, the state still struggled to meet the demands of the response.

In 2017, several significant events converged allowing the state to expand and solidify its response to the opioid crisis.  First, at the direction of this committee, West Virginia began to receive an increase in federal support and funding. At about the same time, the West Virginia Legislature passed the West Virginia Drug Control Policy Act, which created the Office of Drug Control Policy (ODCP) to coordinate, support and improve the state's response to substance use. West Virginia also created an appropriations fund to receive state opioid settlements, known as the Ryan Brown Fund.  This fund allows for settlements with drug companies to be utilized for the creation of new treatment and recovery infrastructure. Another significant event was the approval of West Virginia for a Centers for Medicare and Medicaid Services (CMS) 1115 Substance Use Disorder Demonstration project.  This expansion of Medicaid significantly increased access to residential treatment, medication assisted treatment (including methadone) and peer recovery support services.

In addition to policy and funding changes, the state completed the first of its kind 2016 Overdose Fatality Analysis, funded by the Prescription Drug Overdose: Prevention for States Cooperative Agreement, that helped inform initiatives and led to the near simultaneous development of a Rapid Response Plan (supported by state revenue, the State Targeted Response (STR) grant, and the Prescription Drug Overdose: Prevention for States Cooperative Agreement) with a  primary goal to decrease fatal overdoses.  The Rapid Response Plan informed both the deployment of financial resources and the passage of the Opioid Reduction Act that required the development of voluntary nonopioid advanced directives and limited the initial supply of opioid prescriptions.

4

In 2018, Governor Jim Justice convened a new advisory council to advise ODCP and develop a long-term strategic plan (encompassing all available funding mechanisms) with broader goals for continuing to expand prevention, treatment and recovery programs with an emphasis on reducing the impact to children and families. This plan will help to coordinate the implementation of all programs, regardless of funding sources. Over the past year, the ODCP strategic planning process has facilitated streamlined coordination within and across agencies.  These combined components will help West Virginia continue to expand the service array for those most in need. Figure 1 illustrates the convergence of key steps taken by West Virginia since 2017.

*Figure 1*



In West Virginia, DHHR is the primary recipient of the federal funds allocated through this committee.  DHHR is comprised of multiple offices and bureaus including the Bureau for Behavioral Health, the federally designated Single State Agency (SSA) which manages the Substance Abuse Prevention and Treatment Block Grant (SAPT) and the State Opioid Response Grant (SOR); the Bureau for Public Health which manages funds from the Centers for Disease Control and Prevention (CDC); the Office of Drug Control Policy (ODCP) which coordinates funding across agencies; the Bureau for Medical Services, the state Medicaid agency; and the Bureau for Children and Families, the agency responsible for child and family services.  One important outcome of the federal funding received by West Virginia is that state agencies have been working together across funding streams and breaking down the silos of traditional areas of focus.  Through weekly collaborative meetings organized by the ODCP and DHHR's Cabinet Secretary, this structure allows the bureaus to maximize and leverage financial and human resources across bureaus.

To be successful, coordination of programming must go beyond DHHR's internal agencies.  As a result, the ODCP facilitates regular meetings with the West Virginia Department of Military

5

Affairs and Public Safety, the agency responsible for law enforcement and corrections in the state, the West Virginia judicial system, members of the higher education system in the state, Workforce West Virginia, the state agency that oversees the unemployment insurance program among other activities, the West Virginia Department of Education, and the West Virginia Board of Pharmacy to facilitate a common vision.  Each of these agencies are responsible for implementing key elements of the state's strategic response.  In addition to coordination with other state agencies, regional community meetings are typically conducted once per year to get input from community members throughout the state.  The most recent rounds of regional meetings were held in the both the fall of 2018 and again in the fall of 2019. Key stakeholders and collaborators are highlighted below:

**State Departments and Boards**
- West Virginia Department of Health and Human Resources
- West Virginia Department of Education
- West Virginia Department of Military Affairs and Public Safety
- West Virginia Board of Medicine
- West Virginia Board of Pharmacy
- West Virginia Judiciary
- West Virginia State Police
- WorkForce West Virginia

**Professional Organizations, Associations, and Coalitions**
- West Virginia Association of Recovery Housing
- West Virginia Behavioral Health Planning Council
- West Virginia Behavioral Health Providers Association
- West Virginia Primary Care Association
- West Virginia Healthcare Information Network
- West Virginia Hospital Association
- Various Local Coalitions and Community Groups

**Local Governments**
- City and County Courts and Day Report Programs
- City and County Health Departments
- City and County Sheriff's Departments
- City and County Emergency Medical Services

**Hospitals, Healthcare Systems, Provider Networks**
- Comprehensive Community Behavioral Health Centers
- Federally Qualified Health Centers
- An Array of Licensed Behavioral Health Centers
- Managed Care Organizations
- Marshall Health
- West Virginia University Medicine

**Social Service Institutions and Agencies**

6

- Prevention Lead Organizations
- West Virginia Perinatal Partnership
- Homeless Service Agencies Including Continuums of Care
- Various Faith and Community Based Nonprofit Organizations

**Universities and Academic Institutions**
- Marshall University
- University of Charleston
- West Virginia School of Osteopathic Medicine
- West Virginia University

As of December 20, 2019, West Virginia has received $147,356,427 in federal funds to address the opioid crisis. An additional $58,908,723 in state funds have also been allocated since July 2016 to support the state's response to this crisis. This total does not include the state share of expenses billed under the 1115 Substance Use Disorder Medicaid Waiver. The total amount of funding allocated/encumbered is constantly changing as new programs are initiated. While West Virginia has not fully expended the total amount of federal funding at the time of this testimony, I cannot stress enough that these funds have been critical in the state's substance use disorder response. West Virginia is constantly working to balance the need to deploy financial resources as quickly as possible while assuring that the funds are effectively and efficiently managed to ensure that we are accountable for these critical resources.

Surveillance reports supported by CDC grants (including Prescription Drug Overdose: Prevention for States (PDO:PFS), Enhanced State Opioid Overdose Surveillance (ESOOS), and the Crisis Notice of Funding Opportunity Announcement) allowed DHHR to identify "hot spots" and high burden areas. Of note is that every county and community in West Virginia has been impacted by the opioid crisis, with all able to document some level of need. West Virginia used this data to develop a clear picture of where the gaps in service were, where the greatest need existed, and where there was sufficient capacity so funds could be used in the most impactful manner. The significant federal investments have allowed West Virginia the flexibility to focus on the hardest hit regions and localities while also allowing us to address statewide needs that benefit all West Virginians. In other words, we did not have to choose between much needed critical projects. For perhaps the first time, West Virginia had the resources to fund what it needed.

DHHR awards grants to outside entities to perform an assortment of programmatic functions and activities funded with federal and state resources. DHHR uses both a purchasing process and a competitive Announcement of Funding Availability (AFA) process to determine which local governments and/or entities receive federal funding, with prioritization given to specific areas of need/personnel in agencies to develop programs. While there are slight variations within and between agencies, all agencies follow the same overall guidelines. The process for DHHR's Bureau for Behavioral Health is provided as one example. The Bureau for Behavioral Health releases an AFA through an established public announcement process, which includes both group e-mails and website postings. AFAs note the services to be provided, the geographic location for those services, the budget limits, grant expectations/requirements, and requests a proposal for the delivery of the specified services. After a public application period, all

7

30

grant applications are reviewed using an independent proposal review team. Proposals are scored on the content of the proposal. Based upon the results of the review, funding recommendations are provided to DHHR leadership for consideration and final decision.

In consideration of programmatic awards, West Virginia looks at past performance of programmatic applicants, ability to provide required activities, ability to provide services in the needed geographic location(s) and ability to manage federal funds per required guidance.  In some instances, DHHR may direct award agencies for specific programs.  In these cases, the agencies selected are the only providers eligible for this service.  These awards may be in the form of a grant award or a purchase contract. An example of this type of process would be a contract with a data platform provider that is the sole source provider of an eligible software solution.

In order to effectively and efficiently respond to the opioid crisis, additional workforce was also needed by key state agencies to manage programs and provide the vision for services, as well as at the local level for direct service provision. The addition of qualified personnel takes time; however, this growth has been realized in large part and is already making a difference in the oversight, provision and delivery of the necessary programs.  West Virginia has improved its infrastructure and ability to monitor this crisis by hiring additional personnel, acquiring new data systems, and improving the use of existing systems. Enhancements in this area have led to a greater understanding of the opioid crisis and its impact on individuals, families, counties and the state.  For example, the PDO:PFS grant supports the Board of Pharmacy (BOP) data analytical team, which includes the first two epidemiologists ever hired by the BOP in order to increase the use of Prescription Drug Monitoring Program (PDMP) data. A research specialist was hired with federal funds from the CDC's ESOOS funding and sends a monthly internal fatal overdose report to key decision makers. Additionally, State Opioid Response (SOR) funding has allowed DHHR to employ additional Bureau for Behavioral Health personnel to ensure coordination across prevention and treatment activities, effectively doubling the workforce of the SSA that focuses on substance use disorder. Challenges often exist in staffing new initiatives in a timely manner. Due to the urgent nature of addressing opioid use and its outcomes, direct assistance from federal partners, such as the CDC, was extremely beneficial to quickly staff initiatives while allowing the state to work on internal hiring.

West Virginia faced several challenges in the deployment of federal resources to its local communities.  Some of the issues involved a lack of infrastructure at the local community level to administer federal funding appropriately and/or a lack of a qualified workforce at the local level.  To help address these issues, DHHR used technical assistance funds from SAMHSA to provide technical assistance to several entities on the state processes and federal grant requirements. These training opportunities will continue in the future as West Virginia works to strengthen and expand the capabilities of local and regional agencies providing services to those most in need.

Another way the state ensures that every county and every community impacted by this issue has some ability to respond to this crisis is by providing funding to agencies that are the backbone of the behavioral health system. As such, some level of funding has been provided to every county in the state.  DHHR uses the SAPT, STR, and SOR to support the statewide behavioral health

infrastructure for prevention via six Prevention Lead Organizations to provide and build prevention infrastructure and activities, including the funding of county coalitions. Treatment is tasked to 13 regional Comprehensive Behavioral Health Centers (CBHC), which serve as the public behavioral health centers in the state. Funding has been awarded to all PLOs and CBHCs to increase capacity and enhance infrastructure to respond to the drug crisis.

The challenges associated with workforce cannot be overemphasized. Overall, West Virginia has one of the lowest participation rates in the workforce of any state in the nation at 53.9% in 2018. It is well known that engagement in the workforce is a factor that contributes to long-term recovery. To overcome the workforce shortages in the state and to promote recovery, West Virginia is actively working to address this issue with a jobs program. Governor Jim Justice's administration has created Jobs and Hope West Virginia (https://jobsandhope.wv.gov/), to help those in recovery locate employment and higher education.  Transition agents are located throughout the state to help connect employed individuals with a substance use disorder to recovery and treatment options and unemployed individuals in recovery with jobs and education.

***Prevention Works***

West Virginia has a well-established Prevention First Network that includes state, regional and local leaders  who contribute to prevention planning  and  coordination activities in the state, including the information and resources shared on Help and Hope West Virginia (https://helpandhopewv.org) and Stigma Free West Virginia (https://stigmafreewv.org).  DHHR funds six Regional Prevention Lead Organizations and community coalitions via multiple federal SAMHSA grants. Several of  these agencies also receive funds directly from SAMHSA's Drug Free Community program, HRSA, and other private and government grant programs.  With support from DHHR, Prevention Lead Organizations collaborate with 51 county coalitions to implement evidence-based interventions in all 55 counties.

Media campaigns are also being used to provide anti-stigma messaging and inform the audience of available services and programs.  A statewide media campaign is currently being tested using SOR funds to increase the awareness that addiction is a disease and reduce the stigma around MAT.  All media campaigns direct residents to a 24/7/365 statewide call line, 1-844-HELP4WV, to help people seeking assistance access all levels of treatment and recovery.  This state funded call line has fielded more than 41,000 calls since September 2015, with over 14,000 receiving a warm hand-off to a service provider.

West Virginia has also used funds from SAMHSA's SAPT, and STR to increase access to Naloxone, creating a statewide deployment strategy that addresses the highest risk counties in the state while also targeting high contact agencies and providers in other areas/counties. Through these efforts, DHHR has distributed over 10,000 doses of Naloxone to local health departments and Naloxone prescribing has increased 208% from 2017 to 2019.  These funds are allowing services to literally save lives and build pathways to recovery.

Funding from SAMHSA's SPF Rx and SAPT sponsor drug take back activities to decrease potential diversion.  Two drug take back days occurred in the past year with thirteen counties participating.  A total of 269.7 pounds (lbs.) of medication were collected during these events. An additional 539.2 lbs. of medications were collected at permanent drop boxes.  Additionally,

9

over 5,000 Drug Deactivation Kits have been distributed as part of this activity. It is important to note not all medications counted in these totals were controlled substances.

***Treatment is Effective***

West Virginia is making use of its federal and state funds to improve access to evidence-based treatment by increasing both providers and residential treatment capacity. West Virginia, a Medicaid expansion state, received a CMS 1115 Substance Use Disorder Demonstration Waiver, which has increased access for Medicaid covered individuals to treatment. Services under the waiver include Peer Recovery Support Specialist (PRSS) funding for stronger participant engagement and navigation of needed services; expansion of access to non-emergency medical transportation to and from treatment; and coverage of residential treatment services. West Virginia further leveraged this investment by using SOR funds to sponsor treatment for those individuals with no insurance or insurance that does not cover substance use disorder treatment.

As required by SAMHSA's STR, West Virginia completed both a strategic plan and a needs assessment. Due to a state mortarium on Opioid Treatment Programs (OTP), the only programs allowed to prescribe Methadone in West Virginia, the plan focused on other evidence-based strategies to increase access to buprenorphine and naltrexone. These activities included promoting and expanding the Comprehensive Opioid Addiction Treatment (COAT) model (a Hub and Spoke model for MAT), increasing the number of DATA-Waivered practitioners and use of the ECHO model for MAT (linking expert specialist teams at an academic 'hub' with primary care clinicians in local communities) to access treatment experts. Overall, federal funding (STR and SOR) has allowed West Virginia to expand access to clinically appropriate, evidence-based practices for out-patient treatment. In 2017, West Virginia had 243 DATA-Waivered providers but as of October 2019, the total has risen to 584. This is a 140% increase in the number of providers that can prescribe buprenorphine. A DATA Waiver is not required to prescribe naltrexone. West Virginia is closely monitoring the expansion of MAT, and there are residents in all 55 counties receiving MAT treatment. From January 2019 to October 2019, over 21,400 Medicaid members were prescribed MAT with approximately 30,000 Medicaid members with an opioid use diagnosis. Buprenorphine was most common MAT prescription (74%), followed by naltrexone (18%) and methadone (8%).

West Virginia has also been able to synchronize other sources of funding to complement its federally funded activities, specifically its drug settlement funding. West Virginia created an appropriations fund to receive state opioid settlements, known as the Ryan Brown Fund. These funds have been utilized to expand treatment capacity through the construction and renovation of new residential treatment and recovery support services. Through use of the Ryan Brown Fund, West Virginia has added 282 new treatment beds, with an additional 110 still under development. In response to the substance use disorder Waiver, another 133 beds have been made available for residential treatment. Treatment expansion has targeted all American Society of Addiction Medicine (ASAM) levels of care and has been designed to allow for increased accessibility no matter what region of the state someone may reside. When completed, this expansion will more than double the number of residential treatment beds available in 2016, allowing for greater access to clinically appropriate treatment models, specifically, MAT.

Some of the more innovative and exciting projects have involved cooperation across state agencies with differing funding streams. With the creation of the ODCP, we have seen increased cooperation and sharing of data and resources in pursuit of common goals. Using both SOR and state funds, West Virginia has begun to expand the use of MAT, including methadone, buprenorphine and naltrexone, to all ten of West Virginia's regional jails through a collaboration between different state agencies, allowing for fewer interruptions in treatment for those who become incarcerated. In addition, a 20-bed correctional unit has been established as an alternative to a court ordered prison term for individuals with substance use disorder who choose to participate in a long-term MAT program. Further cooperation is highlighted by the development of Law Enforcement Assisted Diversion (LEAD) programs in 15 counties, which aim to divert adults with substance use disorder from the criminal justice system to community-based treatment and recovery supports.

As West Virginia leads the nation in NAS, need for increased treatment for pregnant women was also identified as an area of high need in the STR strategic plan.  The West Virginia Perinatal Partnership, using funding from DHHR and the Claude Worthington Benedum Foundation, started a wraparound, comprehensive treatment program in 2012 for pregnant women called the Drug Free Moms and Babies Program.  Initial evaluation results were promising, and the program has since expanded from the original 4 sites to 11 additional sites for a current total of 15, with STR funding leading the expansion efforts.  This expansion is also a prime example of collaborations across multiple funding streams to include multiple federal grants (Maternal and Child Health Title V Block Grant, SAMHSA's SAPT, and STR), state dollars, and private sector funding to address the need for treatment for pregnant women.  It is important to note this expansion has allowed for a program in the catchment area of 63% of the 24 available birthing facilities in the state.  As an example of the work being done in these programs, please note the video located on the Perinatal Partnership website:  https://wvperinatal.org/initiatives/substance-use-during-pregnancy/drug-free-moms-and-babies-project/.

Using both the STR and SOR grants, DHHR provided funding to train over 1,000 professionals and peer recovery coaches on effective MAT practices, with a focus on pregnant and postpartum women, opioid overdose survivors, and hospital emergency departments.  With SOR funding, West Virginia has worked with the three medical schools in the state to broaden their curriculum and professional development to expand the clinical workforce across West Virginia.  In order to compliment the work of the medical schools, West Virginia created the state funded Statewide Therapist Loan Repayment (STLR) program.  STLR will repay a portion of eligible student loan expenses in exchange for a 2-year substance use disorder service obligation at a qualified facility in West Virginia.  Over 100 people applied demonstrating that, given the opportunity, people want to stay in West Virginia to address the drug crisis.  To date, 22 clinicians or future clinicians have been approved for the STLR program and this number is expected to double in the next six months.

Quick Response Teams (QRT) have been established in 20 high risk communities using the SOR grant and state funds.  These teams identify and engage individuals who have experienced an opioid-related overdose. Typically, teams are composed of emergency response personnel, law

11

enforcement officers or health department personnel and a substance use treatment or recovery provider. The purpose of a QRT is to identify individuals who have overdosed and engage them in treatment. Once a person has an opioid overdose and is revived by first responders, the Quick Response Team will contact and engage survivors within 24-72 hours to discuss treatment options. The team will contact victims through repeated house visits, phone calls, text messages, and other communication routes. The goal of QRTs is to reduce the incidence of repeat overdoses and overdose fatalities and to increase the number of people who participate in treatment for opioid use disorder.

Transportation, a long-term issue for rural states such as West Virginia, is being addressed in ways that allow for greater access to treatment and recovery services. As West Virginia is one of the most rural states in the nation, with a lack of mass transit options for many residents, transportation has long been a significant barrier in access to treatment and recovery services. Several strategies have been employed to address this barrier. The 1115 Substance Use Disorder Waiver allows Medicaid funded transportation to treatment via the non-emergency medical transportation provider. Additionally, with SOR funding, West Virginia has partnered with the West Virginia Public Transit Authority to offer after hours transportation and expanded route access to cover more rural areas specifically to assist individuals in accessing treatment and recovery services.

### Recovery is Possible
Since 2016, West Virginia has also increased recovery options for those experiencing a substance use disorder. As noted above, PRSS have been added to the Medicaid funded system of care to increase engagement in recovery. PRSSs, individuals in recovery themselves, are critical to those in recovery. These positions serve as engagers and navigators to and through every level of care. To support recovery efforts, PRSSs have the knowledge and lived experience to not only connect persons in need of recovery to an appropriate program, but to also show the benefits of utilizing these ongoing supports.

Engagement activities as a pathway to treatment have also been expanded. STR and SOR funds have allowed PRSS to be located in regional jails, emergency departments, harm reduction programs, college campuses, and non-profit agencies. There are currently 347 PRSSs certified by Medicaid located throughout the state. As an example of the impact of PRSSs, approximately 3,340 individuals received peer support services through this initiative between May 2018 and April 2019. To strengthen peer services, the Bureau for Behavioral Health used STR funds to sponsor its first peer conference in April 2019 with 265 individuals attending. The two-day training session increased peer workers' intervention skills by practicing methods such as motivational interviewing and developing skills necessary to support others. Peer workers also learned about ethical guidelines and how to respond to overdose survivors.

West Virginia has funded recovery housing for many years utilizing SAMHSA's SAPT and state funds. Currently, there are over 1,200 recovery beds across West Virginia. The majority of the current recovery beds operate under an abstinence-based philosophy, creating a gap for individuals who choose MAT. With the growth in treatment access, West Virginia is utilizing state funds to expand recovery housing, with two current AFAs in process that are targeted to include all pathways of recovery, increasing the availability of MAT friendly recovery housing.

12

In 2019, West Virginia passed legislation, House Bill 2530, to allow DHHR to contract with an entity to serve as the certifying agency for a voluntary certification program for substance free recovery.  The West Virginia Association of Recovery Residences (WVARR), a statewide chapter of the National Alliance of Recovery Residences (NARR), will expand the availability of well-operated, ethical, and supportive recovery housing.  WVARR certification is open to any residence or provider willing and able to meet national best-practice standards. Additionally, the legislation requires that only certified agencies may receive referrals or funding from state agencies.  WVARR will maintain a directory of recovery residences and serve as an oversight of recovery residence standards.

West Virginia recognizes family engagement is a crucial component of recovery and is expanding programs to support families remaining together by funding residential treatment centers that accommodate mothers and their children. Additionally, DHHR is seeking to identify childcare options for parents to utilize while seeking treatment.  We currently have family residential treatment programs in five of the seven Ryan Brown regions with two additional programs in the planning phases for the two remaining regions (northern and eastern panhandles).

As noted earlier, Governor Justice has established a program, Jobs and Hope West Virginia, to help those in recovery locate employment and higher education.  This program offers support through a statewide collaboration of agencies that provide West Virginians in recovery the opportunity to obtain career training and to ultimately secure meaningful employment. Transition agents are located throughout the state to help connect employed individuals with a substance use disorder to recovery and treatment options and unemployed individuals in recovery with jobs and education.  In the first few months of operation, the 12 transition agents have already coordinated over 1,235 referrals.  This program is being expanded to utilize PRSSs in conjunction with the transition agents to better serve the needs of those in the program.

## Moving Forward

While significant progress has been made, certain barriers and challenges remain.  West Virginia continues to experience workforce shortages, gaps in training related to psychostimulants and polysubstance use, and a lack of evidence-based practices for children impacted by this crisis.  It is essential that West Virginia continue to utilize a multi-pronged approach to address workforce shortages.  The state is seeking to increase workforce participation rates, especially by those individuals in recovery, retain our young people, and continue to support those individuals already in the workforce. It is challenging to identify flexible resources to fund the scholarships and loan repayment programs that will help keep recent graduates in West Virginia to provide substance use disorder treatment.

We know that our children have experienced multiple adverse childhood experiences which places them at a significantly higher risk for future problems.  Continued research, monitoring, and support will also be needed for the children impacted by substance use disorder as some of the consequences of the drug crisis are not solved with treatment options, and some consequences are not yet known. The ability to use funding to address downstream effects and unintended consequences such as potential long-term effects of prenatal exposure to drugs is

crucial for the state to continue to address all facets of this crisis.

West Virginia is experiencing increased utilization of psychostimulants and polysubstance use. Federal funding allows appropriate flexibility to address opioid use disorder; however, the restriction to opioid use disorder only strategies limits the ability to be flexible in responding to emerging polysubstance use issues.  Currently, these activities are being funded via other mechanisms, but additional flexibility would allow for streamlining processes.  Overall, overdose deaths with opioid prescription involvement have been declining, and in 2018 will be the first year since 2014 there has not been an increase in overdose deaths involving fentanyl.  However, the same cannot be said for overdose deaths involving psychostimulants.  For example, in 2014, 3% of overdose deaths involved methamphetamine.  In 2018, 36% of overdose deaths involved methamphetamine.

A key concern when utilizing time-limited grant dollars is sustainability of efforts in thinking about a bigger, longer-term investment if these endeavors are to have a significant impact and make death rates go down.  With the two-year availability of funds some agencies are reluctant to risk expanding programs because of worries associated with sustainability.  This concern also affects recruitment of highly qualified staff.  The predictable and sustained provision of resources is key to allow States and providers to plan and rely on future year commitments. It can be difficult if not impossible to successfully plan and operate programs if providers are not confident resources will be available beyond a one-year commitment. While this remains a challenge, it has been helped substantially through the approval of carryover requests.  From an administrative perspective, I would like to express appreciation for allowing both carryover requests and no-cost extensions.  This has allowed West Virginia to implement projects that took additional time to complete but has also facilitated the state's ability to initiate additional projects beyond originally proposed work plans.  This flexibility has also allowed the state to respond to unexpected changes in funding and infrastructure.

It would be difficult to believe that West Virginia could have accomplished so much without the support of this committee.  These funds have allowed West Virginia to have the resources that it needed to respond to this crisis and resulted in a decrease in overdose deaths and transformed our system of care.  The financial resources are crucial to our continuing success and maintaining momentum.  While barriers remain, West Virginia is better poised to address future challenges and continue its forward progress.  In summary, West Virginia wishes to say thank you to this Committee.  Thank you for the support, thank you for the resources, and thank you for allowing us to share what is happening and what is working in West Virginia.

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

*********************************************************

THE CITY OF HUNTINGTON,

  Plaintiff,

v.    CIVIL ACTION NO 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al,
   Defendants.

CABELL COUNTY COMMISSION,
   Plaintiff,

vs.

AMERISOURCEBERGEN DRUG
CORPORATION, et al,
   Defendants.
*********************************************************
 Videotaped and videoconference deposition of BETH
THOMPSON, taken by the Defendants pursuant to the West
Virginia Federal Rules of Civil Procedure, in the
above-entitled action, pursuant to notice, before Twyla
Donathan, Registered Professional Reporter and Notary
Public, at the Mountain Health Arena, One Civic Center
Plaza, Huntington, West Virginia, on the 23rd day of
July, 2020.

**Page 2**

A P P E A R A N C E S
APPEARING FOR THE PLAINTIFFS:
PAUL T. FARRELL, ESQUIRE
FARRELL LAW
422 Ninth Street, 3rd Floor
Huntington, West Virginia 25701
(304)523-7285
paul@farrell.law

APPEARING FOR DEFENDANT AMERISOURCEBERGEN:

ROBBY J. ALIFF, ESQUIRE
JACKSON KELLY, PLLC
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304)340-1000
raliff@jacksonkelly.com
APPEARING FOR DEFENDANT CARDINAL HEALTH:
STEVEN R. RUBY, ESQUIRE
CAREY SCOTT DOUGLAS & KESSLER, PLLC
901 Chase Tower
707 Virginia Street, East
Charleston, West Virginia 25301
(304) 345-1234

ALSO PRESENT:
Chris Leigh, Videographer
Michael J. Fuller, Plaintiff  (by Zoom)
Al Sebok, AmerisourceBergen  (by Zoom)
Suzanne salgado, Cardinal Health  (by Zoom)

**Page 3**

C O N T E N T S
EXAMINATION OF BETH THOMPSON   PAGE
By Mr. Ruby     5

E X H I B I T S
(Attached to the transcript)

DESCRIPTION OF EXHIBITS    PAGE
Exhibit No. 1A  Notice of Deposition   7
Exhibit No. 1B  Modified Notice of Videotaped  13
  30(b)(6) Deposition of Cabell
  County Commission
Exhibit No. 17  Website page: County Ordinances 43

**Page 4**

```
 1          P R O C E E D I N G S
 2          VIDEOGRAPHER:  Good afternoon.  We are
 3  going on the record at 1:16 p.m. on July 23rd, 2020.
 4  This is Media Unit 1 of the video recorded deposition
 5  of Beth Thompson, as a 30(b)(6) of the Cabell County
 6  Commission, taken by counsel for Defendant in the
 7  matter of the City of Huntington and the Cabell
 8  County Commission vs. AmerisourceBergen Drug
 9  Corporation, et al, filed in the U.S. District Court
10  for the Southern District of West Virginia, Case Nos.
11  3:17-01362 and 3:17-0165.
12          This deposition is being held at the
13  Mountain Health Arena, located in Huntington,
14  West Virginia.  My name is Chris Leigh from the firm
15  Veritext and I am the videographer.  The court
16  reporter is Twyla Donathan.  From the firm Veritext.
17          I am not authorized to administer an
18  oath, I am not related to any party in this action,
19  nor am I financially interested in the outcome.
20          Counsel and all present in the room
21  and everyone attending remotely will now state their
22  appearance and affiliations for the record.  If there
23  are any objections to proceeding, please state them
24  at the time of your appearance beginning with the
```

Page 25

1    Q  Yes?  When you say "dumping," you were
2  referring to filling orders from pharmacies?
3    A  Yes.
4    Q  Okay.  We talked about theft.  You said
5  that the County Commission became aware that theft of
6  prescription opioids was a problem around 2006; is
7  that right?
8       MR. FARRELL:  Objection to form.
9  BY MR. RUBY:
10    Q  Is that correct?
11    A  You know, we've made good faith allegations
12  in the Complaint.  That's the time period that we've
13  asserted.
14    Q  How did the Commission first become aware
15  that theft of prescription opioids was a problem?
16    A  Can you repeat it again?  Did you say how
17  or when?
18    Q  Yeah.  How did the Commission first become
19  aware that theft of prescription opioids was a
20  problem here?
21    A  I would think through news, through reports
22  through sheriff's department or, you know, just ...
23    Q  And what did the Commission then do in
24  response when it learned that there was a problem

Page 26

1  with theft of prescription opioids?
2    A  The Commission doesn't have a role in that
3  to respond to it.
4    Q  Is it within the power of the Commission to
5  ask the sheriff's office to respond to a crime
6  problem?
7    A  They're different constitutional offices,
8  and they don't have any control over the other.
9    Q  I understand that, but I think it's worth
10  exploring a little more.  What is the relationship
11  between -- the legal relationship between the County
12  Commission and the sheriff's office?
13    A  They're different constitutional offices.
14  The Commission is -- they're fiscal agents for the
15  county, and the sheriff is the tax collector and the
16  law enforcement.
17    Q  Does the County Commission control the
18  budget for the sheriff's office?
19    A  It sets the budget, yes.  Once it sets it,
20  it doesn't have any control of what he does with it.
21    Q  So the County Commission determines how
22  much money the sheriff's office has to operate each
23  year; is that right?
24    A  In a sense, yes.

Page 27

1    Q  Is there a sense in which that's incorrect?
2    A  Well, there is only so much money there for
3  each office to operate on.
4    Q  Okay.  So your point is that the county has
5  a finite budget, but within that budget the County
6  Commission sets the budget of the sheriff's office;
7  is that right?
8    A  Yes.
9    Q  Does the County Commission communicate with
10  the sheriff's office about problems that exist in the
11  county?
12    A  From time to time, yes.
13    Q  What would be an example of that?
14    A  Like the jail bill being so high, that the
15  sheriff would communicate with the Commission
16  regarding ways to try to reduce the jail bill,
17  putting more people on home confinement.  Home
18  confinement is a cheaper way to handle people than
19  just sending them to jail, so -- for the county.
20  Things like that.
21    Q  Has the County Commission ever budgeted any
22  specific funds for the sheriff's office to address
23  the problem of theft of prescription opioids?
24    A  No.

Page 28

1    Q  Why not?
2    A  That's not how our budgets are set through
3  the state.
4    Q  Does the Commission -- Do the Commission
5  approve every year of a line item budget for the
6  sheriff's office?
7    A  Yes.
8    Q  And when I say "line item," I mean a budget
9  that allocates funds for the sheriff's office in
10  particular categories.  So payroll, equipment, et
11  cetera, et cetera.
12    A  Yes.
13    Q  Is that how that works?
14    A  Yes.
15    Q  And has the Commission ever in that budget
16  allocated any funds to the sheriff's office to
17  address theft of prescription opioids?
18    A  Well, in the sense the Commission could
19  be -- all of it could be addressing theft, crime.
20  That's what law enforcement does, so.
21    Q  Has the Commission ever allocated any funds
22  to the sheriff's office specifically to address theft
23  of prescription opioids?
24    A  The Commission would think all of it would

Page 29

1  be -- any of the law enforcement would be to address
2  any crime problems in the county.
3      Q   And I think I understand what you're
4  saying, Ms. Thompson, but my question is a different
5  one, which is whether the County Commission has ever
6  allocated funds to the sheriff's office specifically
7  to address theft of prescription opioids.
8      A   The Commission would think that all of it
9  specifically addresses all crime.
10     Q   Is the answer then that the sheriff's
11 office -- that the Commission has never specifically
12 allocated funds to the sheriff's office to address
13 theft of prescription opioids?
14         MR. FARRELL:  Counsel, when you're
15 talking about theft of prescription opioids, you're
16 talking about when somebody actually steals pills
17 from a pharmacy?
18         MR. RUBY:  Theft of prescription
19 opioids from any source.  A pharmacy, a home.
20     A   Again, the law enforcement portion of the
21 sheriff's budget would address all crime throughout
22 the county.
23     Q   Has the County Commission ever communicated
24 with the sheriff's office about the problem of theft

Page 30

1  of prescription opioids?
2      A   Not that I'm aware of specifically.
3      Q   And the reason I ask the question is that
4  you testified earlier that theft of prescription
5  opioids is a significant problem in Cabell County.
6  And so what I'm trying to understand is whether the
7  Commission has taken any steps to address that
8  problem.
9          MR. FARRELL:  Objection to form.  It
10 misstates the testimony.
11 BY MR. RUBY:
12     Q   Has the County Commission taken any steps
13 that you're aware of to address the problem of theft
14 of prescription opioids?
15     A   Yes.  It filed this lawsuit.
16     Q   How does this lawsuit address theft of the
17 prescription opioids?
18     A   Well, my testimony earlier, I think, was
19 about all crime related to this and all the problems
20 it has created, not just theft of the opioids, but
21 the crimes, stealing children's bicycles to go get
22 your next fix or you, know, whatever the problem is.
23 That's what we filed this lawsuit for, is to address
24 all of it.

Page 31

1      Q   Who do you understand to be the defendants
2  in this case?
3      A   The distributors.
4      Q   Who are the distributors?
5      A   AmerisourceBergen, Cardinal Health, and
6  McKesson in this case.
7      Q   And you don't believe that any of the
8  defendants in this case steal prescription opioids in
9  Cabell County, do you?
10     A   What was that question again?
11     Q   Do you believe that any of the defendants
12 in this case steal prescription opioids in Cabell
13 County?
14     A   Steal them?  The defendants?
15     Q   Correct.
16     A   I have no way of knowing that.
17     Q   Do you have any reason to believe that the
18 defendants in this case steal prescription opioids in
19 Cabell County?
20     A   No, we wouldn't have any reason to believe
21 that.
22     Q   So you've mentioned this lawsuit.  Other
23 than this lawsuit, has the Commission taken any steps
24 to -- that -- in its view are intended to address the

Page 32

1  theft of prescription opioids?
2      A   The Commission's functions and roles are
3  set out very specifically, and this is the only thing
4  that the Commission could do to address it.
5      Q   Is the answer no?
6      A   No, the answer is that we filed this
7  lawsuit to address it.
8      Q   And my question is:  Other than this
9  lawsuit, has the Commission taken any steps intended
10 to address the theft of prescription opioids?
11     A   It took the only step it could take.
12     Q   And understanding that that's the
13 Commission's position, when you say it took the only
14 step it could take, you mean filing this lawsuit?
15     A   Yes.
16     Q   And so is it the Commission's view that
17 there's nothing else it could do to address the theft
18 of prescription opioids?
19     A   Correct.
20     Q   Including providing additional funding to
21 the sheriff's office?
22     A   Correct.
23     Q   Does the Commission believe that providing
24 additional funding to the sheriff's office would have

Page 33

1  helped address the theft of the prescription opioids?
2     A   Can you repeat the question?
3     Q   Is it the Commission's view that providing
4  additional funding to the sheriff's office would have
5  helped address the theft of the prescription opioids?
6     A   The Commission funded the sheriff's office
7  appropriately.
8     Q   Would additional funding have helped
9  prevent or reduce the theft of prescription opioids?
10    A   The Commission doesn't know.  It wasn't --
11 The Commission isn't aware that the sheriff ever
12 asked for any more funding to specifically address
13 it.
14    Q   Has the sheriff's office ever asked the
15 Commission for any funding related to the opioid
16 problem in Cabell County?
17    A   The Commission isn't aware of anything
18 specific.
19    Q   We're still on Topic 1, talking about
20 diversion.  We've talked about diversion by theft.
21 Is another path to diversion in Cabell County people
22 obtaining prescription opioids from family members?
23    A   Yes, the Commission would think that was
24 another way, yes.

Page 34

1     Q   Is that a significant problem?
2     A   I think I testified earlier that the
3  Commission thinks that everything involved with this
4  opioid crisis is a significant problem within our
5  county.
6     Q   And I appreciate that testimony.  It's
7  important, as we go through the deposition, to -- for
8  me to understand specifically, to break that down and
9  to understand specifically what the Commission
10 believes is a problem or is not a problem here in
11 Cabell County.
12       So I want to make sure that we have a clear
13 record.  Does the Commission believe that people
14 obtaining prescription opioids from family members is
15 a significant problem in Cabell County?
16    A   Yes.
17    Q   When did the county become aware of the
18 problem of people getting prescription opioids from
19 family members?
20    A   I still think the Commission would refer
21 back to the dates that we talk about in our lawsuit,
22 the 2006.
23    Q   And with respect to this pathway of
24 diversion, obtaining prescription opioids from family

Page 35

1  members, how did the Commission become aware of that?
2     A   It would be the same way.  News, stories
3  of -- personal stories from family members, same
4  ways.
5     Q   Once the Commission became aware that
6  people in Cabell County were getting prescription
7  opioids from family members, what did it do to
8  prevent that?
9     A   The Commission has specific roles and
10 functions that are set out in Code, and it does what
11 it can do as far as sets the budgets, and the only
12 thing that it can do to address crime problems caused
13 by the opioid crisis was to file this lawsuit.
14    Q   Does the Commission have the power to pass
15 ordinances?
16    A   It does.  But then it also has a problem
17 with enforcing those.
18    Q   What's the problem?
19    A   It's all over the state.  It's how our
20 county governments are set up.  The enforcement of
21 codes through county government are just -- it's an
22 issue.  It's -- ordinances -- county ordinances are
23 hard to enforce.
24    Q   And why is that?

Page 36

1     A   The way that the laws are set up, the way
2  the Code is set up.
3     Q   Is that because of a lack of law
4  enforcement capability?  Is that the problem?
5     A   It's different in each county, I believe.
6     Q   Are there specific ordinances in Cabell
7  County that the county has had trouble enforcing?
8     A   Yes, a noise ordinance.
9     Q   Why is the noise ordinance difficult to
10 enforce?
11       MR. FARRELL:  Objection.  Outside the
12 scope.  This isn't law school.
13       MR. RUBY:  Well, we're talking about
14 what the county could or couldn't have done.  And
15 Ms. Thompson has testified that ordinances are
16 difficult to enforce.  I am trying to understand why.
17       MR. FARRELL:  As far as I know, the
18 big three distributors that sold a hundred million
19 pills into Cabell County aren't alleging that the
20 Cabell County Commission failed to mitigate damages
21 that are comparative of the fault.  So this seems
22 more like you're trying to make a point than arrive
23 at discovery.
24       MR. RUBY:  Counsel, I am going to ask

Page 37

1   you not to testify.  It's a perfectly legitimate
2   question, and it may be embarrassing for the county
3   that it's failed to do anything to combat the opioid
4   problem here, but that doesn't mean it's an
5   inappropriate question.
6            MR. FARRELL:  So we can continue the
7   back-and-forth with the argumentative soliloquy.
8   That doesn't negate the point this is a discovery
9   deposition, and you're trying to make argumentative
10  points that aren't part of the legal issues or
11  factual issues pending.  So you just need to get to
12  your point and not argue with her about it.
13           MR. RUBY:  Counsel, I'm going to take
14  the deposition however I want to take the deposition.
15           MR. FARRELL:  So we can take a break
16  and get the Special Master on the phone to find out
17  whether or not it's appropriate for you to ask
18  questions about noise ordinances.
19           MR. RUBY:  Are you instructing the
20  witness not to answer?
21           MR. FARRELL:  No, I'm asking you
22  politely as a colleague to ask questions that are
23  remotely admissible.
24           MR. RUBY:  No, Counsel.  It's a

Page 38

1   perfectly reasonable question.  Are you instructing
2   the witness not to answer?
3            MR. FARRELL:  Continue.
4            MR. RUBY:  Could you read it back?
5            (The reporter read back the following
6   as requested:  "QUESTION:  Why is the noise ordinance
7   difficult to enforce?"
8       A   First of all, I want to say that the county
9   is not embarrassed over anything.  The County
10  Commission did what it could do by filing this
11  lawsuit because of the problem that you all created
12  here.  So the Commission is not embarrassed about
13  anything.
14           And enforcement of a noise ordinance code
15  in our county is just -- it's ridiculous to even be
16  asking us that, number one, but enforcement is --
17  there is all kinds of reasons.  I don't know all the
18  specifics, but I do know that functions of county
19  government are specific, and controlling what the
20  distributors did in this county is not one of the
21  functions that we have any control over.
22           So we're not embarrassed about anything.
23  And we've watched this county suffer, and the only
24  thing we could do, we did, we filed this lawsuit.

Page 39

1       Q   You testified that the county became aware
2   of the opioid problem here around 2006; is that
3   correct?
4       A   That's what we've alleged in the lawsuit.
5       Q   And when was the lawsuit in this case
6   filed?
7       A   2017.
8       Q   What did the county do about the opioid
9   problem here in the 11 years between 2006 and 2017?
10      A   Well, the county watched things get set up,
11  like Lily's Place, and all of these sober living
12  homes, and Suboxone clinics and, you know, we watched
13  all of it get set up to try to scratch the surface of
14  this problem.  And none of it is working.
15           So we finally were able to step in and do
16  something for the county by filing this lawsuit.
17      Q   The programs that you mentioned -- and I'll
18  start with Lily's Place, what was the county's
19  involvement in setting up Lily's Place?
20           MR. FARRELL:  Objection.  Form.
21           This isn't being argumentative.
22  Counsel, for purposes of creating a clean record,
23  when you say "county," does that mean the County
24  Commission, or are you talking about the people

Page 40

1   within the county?
2   BY MR. RUBY:
3       Q   What was the County Commission's
4   involvement in setting up Lily's Place?
5       A   None.
6       Q   You also mentioned sober living homes.
7   What was the County Commission's involvement in
8   establishing sober living homes?
9       A   None.  That's my point.  The Commission
10  doesn't have those kind of functions and roles.
11      Q   Did the Commission provide any funding for
12  Lily's Place?
13      A   No.
14      Q   Did the Commission provide any funding for
15  sober living homes?
16      A   No.
17      Q   You mentioned Suboxone clinics.  Did the
18  Commission have any role in setting up Suboxone
19  clinics in Cabell County?
20      A   No.
21      Q   Did it provide any funding for those
22  clinics?
23      A   No.
24      Q   Why not?

Page 41

```
 1       A   That's not part of our function.
 2       Q   Could the Commission have provided funding
 3  for Lily's Place?
 4       A   I don't know.  I would have to check into
 5  it.
 6       Q   Does the Commission provide any funding or
 7  grants for nonprofit organizations in the county?
 8       A   There are specific things they can do for
 9  hotel/motel tax dollars, but not -- but that's for
10  tourism.  And then there is a senior levy that they
11  have some discretionary monies for, but that's it,
12  and it's specific to senior programs.
13       Q   So is it the Commission's position that it
14  lacked the power to provide any assistance for the
15  programs that you just testified about?
16       A   Yes.
17       Q   So it would be beyond the discretion of the
18  County Commission to allocate funding to those kinds
19  of drug rehabilitation or drug response programs,
20  even if it wanted to do that?
21       A   Correct.
22       Q   And that's because of -- well, let me ask
23  the question.  Is that because of State Code that the
24       A   Yes, our budgets are set forth by the
```

Page 42

```
 1  State.  There is very little discretionary monies in
 2  there.
 3       Q   Okay.  I want to return to ordinances.  And
 4  I think you anticipated the question I was going to
 5  ask when you raised the problem of enforcing
 6  ordinances.  Has the county ever passed an ordinance
 7  to address the opioid problem?
 8       A   No.
 9       Q   Why not?
10       A   I'm not sure.
11       Q   Has the county ever considered passing an
12  ordinance to address the opioid problem?
13       A   Not that we're aware of.
14       Q   What are the subjects or the areas in which
15  the county has ordinances?
16       A   Like I say, off the top of my head, a noise
17  ordinance comes to mind.  Honestly, I would have to
18  pull up our website to -- which, I'm sure you have
19  already done, but they're on there.
20       Q   I'm sorry.  I missed the last bit of that.
21  What did you say?
22       A   I said I'm sure you've already pulled them,
23  so.
24       Q   If you want to take a look at Exhibit 17.
```

Page 43

```
 1       MR. FARRELL:  Is it the press release?
 2       MR. RUBY:  Seventeen should be -- Do
 3  you have that?  No.
 4       Is that marked 17?  Is that the right
 5  box -- that's not my box.  That must be left over
 6  from another depo.
 7  BY MR. RUBY:
 8       Q   Ms. Thompson, I've handed you what has been
 9  marked Exhibit 17.
10       A   Okay.
11       Q   You can take a minute to familiarize
12  yourself with it.  Do you recognize this?
13       A   Yes.
14       Q   What is it?
15       A   It's a page off of the website that says
16  "County Ordinances," and then it's ordinances in
17  behind it.
18       Q   And on page 1 of the exhibit here, there is
19  a list of county ordinances; is that right?
20       A   Yes.
21       Q   And the first ordinance that's listed here
22  is "Adults Only Establishments."
23       Is that right?
24       A   Correct.
```

Page 44

```
 1       Q   Are you familiar with what that ordinance
 2  does?
 3       A   It would refer to what it says, adults only
 4  establishments.  But I see it's not in here, so.
 5       Q   And the next one on the list is Adults Only
 6  Permit Applications; is that right?
 7       A   Correct.
 8       Q   And then E911?
 9       A   Correct.
10       Q   Do you know what the E911 ordinance does?
11       A   It would be referencing the 911 Center.
12       Q   And then there is an ordinance on leash
13  law.  Do you see that?
14       A   I see it, yes.
15       Q   And then one on mapping and addressing,
16  noise control one, noise control two, floodplain
17  ordinance, building a floodplain permit application,
18  dog shelter permit application, and smoking ban.
19       Did I read that correctly?
20       A   You did.
21       Q   And my question -- the reason for reading
22  all of those is this:  Why has the County Commission
23  chosen to enact ordinances on all of these subjects
24  but no ordinance on the subject of opioid abuse?
```

Page 45

1        MR. FARRELL: Objection.
2   Argumentative.
3        A   These ordinances have been here for a
4   while, and the Commission is doing what it feels like
5   it can for the county by filing the lawsuit.
6        Q   Would the county have been able to use the
7   same legal authority through which it enacted these
8   ordinances to also enact an ordinance on prescription
9   opioids if it had chosen?
10       A   I believe we could have, yes.
11       Q   But to your knowledge, the county has never
12   considered doing that?
13       A   Correct.
14       Q   We have talked, Ms. Thompson, about a
15   couple methods of diversion, one of those being theft
16   of prescription opioids, one of those being people
17   obtaining prescription opioids from family members.
18   Is it also true that a diversion pathway in Cabell
19   County is the sale of prescription opioids by street
20   dealers?
21       A   Yes, that could be one.
22       Q   Is that, in fact, a problem that exists in
23   Cabell County?
24       A   Yes.

Page 46

1        Q   Is it a significant problem here?
2        A   Yes.
3        Q   Is it the case that many of those street
4   dealers come from outside the state to sell
5   prescription pills here?
6        A   Probably.
7        Q   When did the County Commission first become
8   aware that it had a problem with street dealers
9   selling prescription pills?
10       A   I'm going to go back to the allegations in
11   the lawsuit.  In 2006.
12       Q   Has the County Commission done anything to
13   prevent street dealers from selling prescription
14   pills here?
15       A   It's not a function that it can do.
16       Q   Has the County Commission allocated any
17   funding to prevent street dealers from selling
18   prescription pills here?
19       A   It would be the Commission's opinion that,
20   you know, all of the law enforcement budget would
21   fight all crime.
22       Q   I'll ask a question similar to the one that
23   I asked about -- about theft of prescription opioids
24   here in Cabell County.  Has the Commission ever

Page 47

1   allocated any funding specifically for the purpose of
2   preventing street dealers from selling prescription
3   opioids?
4        A   It would be the law enforcement budget.
5        Q   Is there any specific part of the law
6   enforcement budget that is dedicated to prescription
7   opioids?
8        A   It's dedicated to crime in the county.
9        Q   Meaning all crime?
10       A   Correct.
11       Q   Not prescription opioids specifically?
12       A   Correct.  That's our function, is to handle
13   the whole county.
14       Q   If the County Commission had chosen to
15   allocate a specific portion of the sheriff's office
16   budget to fighting prescription opioids, would it
17   have had the legal authority to do that?
18       A   No, I don't believe so.
19       Q   And what would have prevented the County
20   Commission from doing that?
21       A   The County Commission sets the budget for
22   the officeholders, the other constitutional officers.
23   It cannot tell them how to place in their line items.
24   And then the state tells each of us, each of the

Page 48

1   officeholders what the line items are.
2        Q   Can the County Commission adjust the amount
3   in any given line item of an officeholder's budget?
4        A   No.
5        Q   And I'm genuinely trying to understand
6   this.  If the sheriff's office presents a budget, and
7   it has, let's just say $500,000 in the line for
8   payroll, you're saying that the County Commission
9   doesn't have the ability to change that to 450,000 or
10   550,000?
11       A   The officeholders themselves have to
12   request the changes.
13       Q   I see.  Okay.  And so you're saying that
14   the County Commission simply has to say "yes" or "no"
15   on each line?  In other words, it can't -- it can't
16   change the amount that is on any line of the
17   sheriff's office budget?
18       A   Correct.  It gives -- it gives the -- each
19   officeholder like a bottom line, and that
20   officeholder decides within its line items how it
21   wants it allocated.
22       Q   Does the County Commission have the power
23   to reject the allocation among line items that the
24   officeholder proposes?

Page 93

1    Q   And before that, it was EBSO?
2    A   For a year, yes.
3    Q   Does the county know of any opioid
4  prescription that the county's health insurance has
5  paid for that has contributed to the harms alleged in
6  the county's Complaint?
7            MR. FARRELL: Objection. I think
8  that's outside the scope. That's not what No. 4
9  says.
10           MR. RUBY: Four is: "Each
11 prescription identified in response to Topic No. 3,
12 whether the prescription was reimbursed on
13 Plaintiff's behalf."
14           MR. FARRELL: Right.
15           MR. RUBY: Right. So reimbursement by
16 the county's health insurance is a reimbursement on
17 the Plaintiff's behalf.
18           MR. FARRELL: Can I see the notice?
19 No. 4 says: "For each prescription
20 identified in response to Topic 3." And we didn't
21 identify any prescriptions in response to No. 3.
22           But nonetheless, the topic concerns
23 the length of time Plaintiff provided payment or
24 reimbursement for an opioid prescription. And I'm

Page 94

1  not sure that the County Commission has reimbursed
2  anybody for an opioid prescription.
3            MR. RUBY: Right. But the topic
4  itself asks for reimbursement on Plaintiff's behalf.
5            MR. FARRELL: Meaning whether the
6  insurance company sought a subrogation case?
7            MR. RUBY: No.
8            MR. FARRELL: I'm sorry. Counsel, I
9  don't understand.
10           MR. RUBY: The county's health insurer
11 provides reimbursement. I mean, I can ask the
12 question under a different topic.
13           MR. FARRELL: No, I mean, I'm fully
14 prepared to walk through it. The County Commission
15 is unaware of any reimbursement of prescription
16 opioids. If you're asking whether or not the health
17 insurance companies have paid for any prescription
18 opioids, that's outside of the institutional
19 knowledge of the County Commission. And you guys
20 have subpoenaed PEIA and everybody else.
21           MR. RUBY: And my questions are going
22 to concern any efforts that the county has made to
23 determine whether its health insurer is reimbursing
24 opioid prescriptions.

Page 95

1  BY MR. RUBY:
2    Q   So, Ms. Thompson, is the county aware of
3  any opioid prescriptions paid for by its health
4  insurers that have contributed to harms alleged in
5  the Complaint?
6    A   The County Commission, under PEIA, is not
7  self-insured anymore and so, no, it wouldn't be aware
8  of it, although when it was self-insured, there may
9  be times that it was -- It would be something you
10 would have to talk to the insurance companies.
11   Q   Prior to 2019, was the county self-insured
12 for employee health insurance?
13   A   Yes. But again, you would have to talk to
14 the insurance companies about...
15   Q   When the county was self-insured, what
16 information did it receive about prescriptions that
17 it was reimbursing or paying for?
18   A   That would be information you could get
19 from our broker.
20   Q   Well, there may be a lot of different
21 places we could get it, but you're here. And my
22 question is whether the county received information
23 when it was self-insured about prescriptions that it
24 was paying for?

Page 96

1    A   I'm sure it did.
2    Q   And in particular, did the county receive
3  information about opioid prescriptions that it was
4  paying for?
5    A   If it was in the records from the
6  insurance, yes, we would have received it.
7            MR. FARRELL: He is not asking about
8  the insurance company. He is asking about the County
9  Commission itself. Not the insurance companies.
10           THE DEPONENT: We would have received
11 information regarding the claims.
12   Q   Including claims for payment of
13 prescription opioid prescriptions?
14   A   I would have to go back and verify, you
15 know, with the HIPAA regulations and everything. I
16 can't remember exactly what was in the claim
17 information.
18   Q   Did the county ever take any steps to
19 impose limits on the prescription opioids that it
20 would reimburse or pay for?
21   A   The county has no function or role
22 whatsoever in that.
23   Q   And that may be a reason that the county in
24 its view -- or the Commission in its view hasn't

Page 97

1    taken those steps, but my question is whether the
2    county has ever taken any steps to --
3       A   No.  It can't.  No.  It would have no way
4    of doing that.
5       Q   Did the County Commission ever take steps
6    to increase its reimbursements for treatments that
7    are alternatives to opioids?
8       A   Can you repeat that?  I'm not sure.
9       Q   Are you aware that physical therapy, for
10   example, can be an alternative course of treatment to
11   prescribing opioids for pain relief?
12      A   We aren't doctors.  We aren't
13   prescribing -- We're not health insurance providers.
14      Q   Did the County Commission -- and I'll make
15   it a little more concrete.  Did the County Commission
16   ever take any steps to provide reimbursement for
17   physical therapy as an alternative to prescription
18   opioids for its employees?
19         MR. FARRELL:  Again, I think we're
20   stuck on some terminology.  You keep saying
21   reimbursement.  Who is it that is getting reimbursed?
22   The insurance company pays direct bills.  I don't
23   know about reimbursement or who is getting
24   reimbursed.

Page 98

1          MR. RUBY:  That's a fair question,
2    Counsel.
3    BY MR. RUBY:
4       Q   Did the county ever take any steps to cause
5    its insurer to make physical therapy available as an
6    alternative to prescription opioids?
7       A   Not that we're aware of.
8       Q   Was that something that the county ever
9    considered?
10      A   We don't recall considering anything like
11   that.
12         MR. FARRELL:  So the answer is?
13         THE DEPONENT:  No.
14      Q   And setting aside physical therapy, did the
15   county ever take any steps to cause its health
16   insurer to make any alternative to prescription
17   opioids available to county employees?
18      A   Not that we're aware of.
19      Q   Topic No. 5.  Does the County Commission
20   employ any physicians?
21      A   I believe -- I believe there's one employed
22   through EMS.
23      Q   Do you know who that person is?
24      A   I think his name is David Wright.

Page 99

1       Q   And what is Mr. Wright's title?
2       A   He ...
3          MR. FARRELL:  Medical director.
4          THE DEPONENT:  Thank you.  Medical
5    director.
6       Q   What are his job duties?
7       A   I believe he reviews the medical records
8    for EMS.
9       Q   Does he provide any medical treatment?
10      A   Not that I'm aware of.
11      Q   Does the county employ any physicians --
12   Does the County Commission employ any physicians who
13   provide medical treatment?
14      A   No.
15      Q   Does the County Commission employ any other
16   health care providers who provide medical treatment?
17         MR. FARRELL:  Now, we're getting into
18   a heated debate, Counsel, on whether EMS is a health
19   care provider under the Medical Malpractice Act.
20         MR. RUBY:  Is there an objection,
21   Counsel?
22         MR. FARRELL:  No, I'm just making an
23   observation.  It's a sore point for the EMS people.
24         MR. RUBY:  All right.

Page 100

1          You can answer, Ms. Thompson.
2       A   Can you repeat the question, please?
3       Q   Does the -- Other than Mr. Wright, does the
4    County Commission employ any other health care
5    providers who provide medical treatment?
6       A   If EMS and paramedics are considered health
7    care providers, then, yes, it would.
8       Q   Do paramedics write prescriptions?
9       A   No.
10      Q   What's the nature of the relationship
11   between the County Commission and the Cabell
12   Huntington Health Department?
13      A   There is a levy that the Cabell County
14   citizens have approved for years, and the tax -- when
15   the taxes are paid into the sheriff's office, then
16   it's distributed back out to the health department
17   based on that levy language.
18      Q   So the county provides funding for the
19   health department?
20      A   The taxpayers do, yes.
21      Q   Does that funding flow through the County
22   Commission?
23      A   We're just a pass-through.  It comes into
24   the sheriff's office and goes straight back out to

Page 101

1    the health department.
2    Q   Does the County Commission approve that
3    funding as part of its annual budget?
4    A   No.
5    Q   Does the County Commission select board
6    members for the health department?
7    A   No.
8    Q   Who are the -- How are the board members
9    for the health department selected, if you know?
10   A   I'm not quite certain.
11   Q   Does the County Commission have any
12   decision-making or supervisory role with respect to
13   the health department?
14   A   No.
15       MR. FARRELL:  For the record, I
16   believe that state law provides that the County
17   Commission appoints the board members -- or some of
18   the members to the health department?
19       THE DEPONENT:  Oh, yeah, I think we do
20   have a seat.  I'm sorry.
21   Q   Would it be correct to say that half of the
22   board members of the health department are appointed
23   by the County Commission and half are appointed by
24   the city?

Page 102

1    A   Yes.
2    Q   How does the County Commission select its
3    appointees to the health department board?
4    A   The Commissioners ask members from the
5    community and then vet them.  They're selected that
6    way.
7    Q   The County Commission votes to select board
8    members --
9    A   Yes.
10   Q   -- to select its board members on the
11   health department?
12   A   Yes.
13   Q   In the course of selecting its board
14   members for the health department, has the County
15   Commission ever considered the effect that a
16   selection would have on the opioid problem?
17   A   I don't believe it has at this time.
18   Q   Does the Cabell Huntington Health
19   Department have any employees who write
20   prescriptions?
21       MR. FARRELL:  If you know.
22   A   I'm not sure.
23   Q   Was there a time when the County Commission
24   controlled board seats at Cabell Huntington Hospital?

Page 103

1    A   Yes.
2    Q   When was that?
3        MR. FARRELL:  Objection.  It's outside
4    the scope and has been testified to ad nauseam by
5    those involved.
6        MR. RUBY:  And the notes to Topic 5,
7    Counsel, I'll note, refer to "facilities affiliated
8    with the County Commission."
9        MR. FARRELL:  Duly noted, Counsel.
10   That's a stretch.  But okay.  The witness -- and I
11   will stipulate that the witness has not been -- the
12   County Commission witness has not been extremely
13   prepped on the procedural history of the Cabell
14   County Huntington Hospital board seats that were --
15   but that Kelli Sobonya -- and I can't remember who
16   else, has testified about the sequence of events
17   involving that.  But you're free to ask whatever you
18   want.
19   BY MR. RUBY:
20   Q   Ms. Thompson, do you recall testifying
21   about the Cabell County Huntington board seats in
22   your individual deposition?
23   A   Honestly, I don't, but if you say I did,
24   then I did.  I'm a little tired this afternoon.

Page 104

1    Q   I can represent to you that you did, and so
2    I'll ask again.  When was the period of time when the
3    County Commission had the power to appoint three
4    board seats at Cabell Huntington Hospital?
5    A   I believe it ended in 2017.
6    Q   While the county controlled seats on the
7    Cabell Huntington Hospital board, did it receive any
8    information about opioids that were prescribed by
9    Cabell Huntington Hospital?
10   A   I don't believe it did.
11   Q   Did it receive -- did it, being the County
12   Commission, receive any information about opioids
13   that were dispensed by Cabell Huntington Hospital?
14   A   I don't believe it did.
15   Q   Did the County Commission ever make any
16   effort to acquire information about prescription
17   opioids that were prescribed to Cabell Huntington?
18   A   Not that I'm aware of.
19   Q   Why not?
20       MR. FARRELL:  Again, I'm going to put
21   an objection on this.  I'm not quite sure whether or
22   not a board seat that the Cabell County Commission
23   designates for the Cabell Huntington Hospital is
24   necessarily information that would be imputed to the

Page 105

1    County Commission.
2         MR. RUBY:  I'll go ahead and ask the
3    question subject to the objection.
4         MR. FARRELL:  Okay.
5         THE DEPONENT:  Can you repeat it?
6         MR. FARRELL:  He said:  Why not?
7    **A    Oh, why not?  Why we didn't ask for it from**
8    **the board members?**
9    **Q    Yes.**
10   **A    About why we didn't ask for it?  It wasn't**
11   **part of our role or function.  We didn't know we**
12   **needed to.**
13   **Q    Before we break, I want to go back and**
14   **clarify one thing.  You testified when we were**
15   **discussing the county's knowledge of specific**
16   **prescriptions, specific harmful prescriptions, you**
17   **testified, I believe, that the county had attempted**
18   **to obtain data in that subject area; is that correct?**
19        MR. FARRELL:  The lawyer said that,
20   yes.
21        MR. RUBY:  And I believe after counsel
22   coached the witness, she then reiterated the point in
23   her testimony.
24   BY MR. RUBY:

Page 106

1    **Q    Is that correct, Ms. Thompson?**
2    **A    Yes.**
3    **Q    Is it correct to say -- strike that.  How**
4    **has the county attempted to obtain that information?**
5    **A    Through its counsel.**
6    **Q    And more specifically, from whom has the**
7    **county attempted to obtain that information?**
8    **A    From its counsel.**
9    **Q    From whom has counsel attempted to obtain**
10   **the information?**
11   **A    From you all, as far as I know.**
12   **Q    Is it the position of the County Commission**
13   **that the defendants in this case have information**
14   **about specific prescriptions that were written in**
15   **Cabell County?**
16   **A    I would think it would have the general**
17   **knowledge of how much it sent in here to Cabell**
18   **County.**
19   **Q    That's a different question.  So my**
20   **question is whether it's the position of the County**
21   **Commission that the defendants in this case have**
22   **information about specific prescriptions written in**
23   **Cabell County?**
24   **A    I wouldn't think it would, due to HIPAA.**

Page 107

1         **MR. RUBY:  Okay.  Thank you.  We can**
2    **take a break.**
3         THE DEPONENT:  Okay.
4         VIDEOGRAPHER:  The time is 3:43 p.m.
5    We're off the record.
6         (A recess was taken.)
7         THE COURT:  The time is 3:58 p.m.
8    We're back on the record.
9    BY MR. RUBY:
10   **Q    All right, Ms. Thompson.  We are moving on**
11   **to Topic 6.  And I think this is another one on your**
12   **highlighted list, but I'm still going to have a few**
13   **questions about what the County Commission does and**
14   **doesn't know.  The topic is:  "your understanding and**
15   **awareness of the proper prescribing and use of**
16   **prescription opioids, including patient and**
17   **population characteristics, that may increase the**
18   **rate of proper prescribing and use of prescription**
19   **opioids."**
20        **Is there any appropriate use for**
21   **prescription opioids?**
22   **A    The Commission would think so, yes.**
23   **Q    And what is the appropriate use for**
24   **prescription opioids?**

Page 108

1    **A    The Commission is not a doctor, pharmacist,**
2    **by any means.  It's not part of our function or role,**
3    **but we would think that anything with a legal**
4    **prescription would be proper use.**
5    **Q    Okay.**
6    **A    Taken by the person it was intended for.**
7    **Q    Has -- or is the County Commission aware of**
8    **any instance in which a physician in Cabell County**
9    **has inappropriately prescribed opioids?**
10   **A    Yes.  The County Commission is aware of --**
11   **and I believe we answered that in some of the**
12   **interrogatory answers.**
13   **Q    Can you tell me what -- tell me an**
14   **instance, and if there are none, we'll talk through**
15   **them, but what's an instance in which the County**
16   **Commission is aware in which a physician here has**
17   **inappropriately prescribed opioids?**
18   **A    I believe there was Anita Dawson.**
19   **Q    Anita Dawson was a physician here in Cabell**
20   **County?**
21   **A    Physician, yes.  Milton.**
22   **Q    What did she do?**
23   **A    She was a DO, I believe, and she actually**
24   **prescribed too many prescriptions -- too many opioid**

Page 109

1    prescriptions and ultimately lost her license.  And
2    that's one instance, yes, the Commission is aware of.
3        Q    Was Dr. Dawson prosecuted?
4        A    Yes.
5        Q    Dr. Dawson was prescribing opioids
6    illegally; is that right?
7        A    Yes.
8        Q    And that's the reason that the Commission
9    believes that her prescriptions were inappropriate;
10   is that right?
11       A    Yes.
12       Q    Does the Commission know of any other
13   physicians who inappropriately prescribed opioids in
14   Cabell County?
15       A    I believe there was a doctor in
16   Barboursville -- or maybe he was a pharmacist, I
17   can't remember.
18       Q    Are you thinking of the A+ Pharmacy?
19       A    Yes.  Yes.  I'm sorry.  Yeah.
20       Q    We'll get to pharmacies here in a minute.
21       A    Okay.
22       Q    But sticking to doctors for now, is the
23   Commission aware of any doctors besides Dr. Dawson
24   who inappropriately prescribed opioids in Cabell

Page 110

1    County?
2        A    I don't think so.  I mean, other than what
3    would be in the news or...
4        Q    What steps has the Commission taken to
5    identify doctors in Cabell County who are
6    inappropriately prescribing opioids?
7        A    The Commission hasn't taken any steps.
8    It's not our function or role to know this.
9        Q    Let's talk about pharmacies.  You mentioned
10   a pharmacy in Barboursville.  I asked you, I think,
11   if that was A+ Pharmacy.  Is the County Commission
12   aware of whether A+ Pharmacy in Barboursville
13   inappropriately dispensed prescription opioids?
14       A    Yes.
15       Q    And A+ Pharmacy did do that?
16       A    Yes.
17       Q    What exactly did A+ Pharmacy do as far as
18   the County Commission knows?
19       A    Prescribed -- prescribed the opioids
20   illegally.
21       Q    When you say "prescribed," do pharmacies
22   prescribe opioids?
23       A    I'm sorry.  Dispensed them illegally.
24       Q    Do you know anything more, any more detail

Page 111

1    about what A+ Pharmacy did wrong?
2        A    It would be in our interrogatory answers, I
3    think, what we knew.
4        Q    And you're consulting a document there
5    that's in front of you --
6        A    I was going to look for it, yes.
7        Q    Is that the county's interrogatory answers?
8        A    Yes, that's what the Commission knows.
9        Q    Was A+ Pharmacy prosecuted for illegally
10   dispensing prescription opioids?
11       A    I believe so, yes.
12       Q    Was the sheriff's office involved in that
13   investigation?
14       A    I'm not sure.
15       Q    What about the Dawson investigation?
16       A    I'm not sure.  I believe it would have
17   been -- I can't remember where that wreck was, but I
18   believe so.  I would have to check with the sheriff's
19   office to make sure.
20       Q    When you say "that wreck," what are you
21   referring to?
22       A    There was a wreck that the -- there was a
23   fatality, and the victims -- the lady had been
24   prescribed opioids by Dr. Dawson.

Page 112

1        Q    And was that part of the means by which
2    Dr. Dawson's conduct came to light?
3        A    Yes, we believe so, yeah.
4        Q    Other than A+ Pharmacy, is the Commission
5    aware of any other pharmacy in Cabell County that's
6    inappropriately dispensed opioids?
7        A    Yes.  I believe we've -- had answered that
8    in our interrogatories as well.
9        Q    What other pharmacies would fall into that
10   category?
11       A    I would have to look back and see in the
12   answers.  Do you want me to do that?
13       Q    You can go ahead.
14       A    I don't see it.  I'm sorry.
15       Q    That's fine.  Other than the pharmacies
16   that are described in the county's interrogatory
17   responses, is the Commission aware of any other
18   pharmacy in Cabell County that's inappropriately
19   dispensed opioids?
20       A    Other than what would be in the news, no.
21       Q    Are there any pharmacies in that category
22   that you're aware of from the news that weren't in
23   the county's discovery responses?
24       A    I'm unsure.

Page 113

1    Q   There is no specific pharmacy that you're
2  aware of from the news that wasn't in the county's
3  discovery responses; is that right?
4    A   Correct.
5    Q   Okay.  What steps has the county taken --
6  strike that.  What steps has the Commission taken to
7  identify any other pharmacies in Cabell County that
8  are inappropriately dispensing opioids?
9    A   Other than hiring the attorneys and
10  experts, no other steps.
11    Q   To the best of the County Commission's
12  knowledge, then, is it correct that physicians in
13  Cabell County, other than Anita Dawson, have
14  prescribed prescription opioids appropriately?
15    A   Can you say the first part of the question
16  again?
17    Q   To the best of the Commission's knowledge,
18  have physicians in Cabell County, other than
19  Dr. Dawson, prescribed opioids appropriately?
20    A   To the best of its knowledge, yes.
21    Q   And to the best of the Commission's
22  knowledge, have pharmacies in Cabell County other
23  than those identified in the Commission's discovery
24  responses, dispensed opioids appropriately?

Page 114

1    MR. FARRELL:  I'm going to place a
2  placeholder objection.  We have expert witness
3  reports that are due August 3rd.  What you're
4  asking about is the historical knowledge base of the
5  County Commission in the absence of the discovery in
6  this litigation.
7    MR. RUBY:  That's correct.
8    A   Can you say it again, please?
9    Q   To the best of the Commission's knowledge,
10  have pharmacies in Cabell County, other than those
11  identified in the Commission's discovery responses,
12  dispensed opioids appropriately?
13    MR. FARRELL:  Hold on.  You just said
14  something differently there.
15    MR. RUBY:  I just read it off the
16  screen.
17    MR. FARRELL:  Yeah, and I objected to
18  that one.  What I want to make sure is, the record is
19  clear, that we will be disclosing on August 3rd
20  expert witness reports that address a number of these
21  factors.  What you're asking for is the historical
22  knowledge of the County Commission, separate from and
23  distinct from the work product of this litigation.
24  BY MR. RUBY:

Page 115

1    Q   I am not asking any question about the work
2  product of the county's attorneys or experts.  So
3  setting that aside, to the best of the county's
4  knowledge, have pharmacies in Cabell County, other
5  than those identified in the Commission's discovery
6  responses, dispensed opioids appropriately?
7    A   To the best of its knowledge, yes.
8    Q   Does the Commission agree that it's up to
9  doctors to decide when a patient needs prescription
10  opioids?
11    A   The Commission is not a doctor, but would
12  agree that, yes, that's -- it would be up to a
13  doctor.
14    Q   Is it true that over time, doctors have
15  written more and more opioid prescriptions?
16    A   I mean, that's all information that we've
17  hired the attorney and experts to determine.
18    Q   Does the Commission know whether more
19  opioid prescriptions are written in Cabell County
20  today than there were in, say, 2000?
21    A   It's not a function of the county
22  commission government to know that.
23    MR. FARRELL:  So the answer is?
24    THE DEPONENT:  No.

Page 116

1    Q   Does -- Has there been any period of time
2  in which the number of opioid prescriptions written
3  in Cabell County has increased?
4    A   It would be information that we have hired
5  the attorneys and the experts to determine.
6    Q   So independent of what the Commission may
7  or may not know from experts and attorneys involved
8  in this litigation, the Commission doesn't know
9  whether the number of opioid prescriptions written in
10  Cabell County has ever increased?
11    A   Other than what we have learned from this
12  litigation, no.
13    Q   Okay.  Topic No. 7 concerns the standard of
14  care with respect to the treatment of pain.  Do you
15  know what that phrase means, Ms. Thompson, "standard
16  of care with respect to the treatment of pain"?
17    A   No.
18    MR. FARRELL:  Hold on.  Can we
19  rephrase the question?  Ms. Thompson is not being
20  deposed.  The County Commission is being deposed.
21    Q   Sure.  And my question is directed to you,
22  Ms. Thompson, as the representative of the County
23  Commission.
24    A   No, the Commission is not -- their function

Page 133

1      A  I would have -- we would have to go back
2  and compare it for you, but -- I can't sit here and
3  tell you right now.
4      Q   Has the county ever attempted to quantify
5  what part of its law enforcement expenditures are
6  related to the opioid problem?
7      A   No.
8      Q   So we've covered law enforcement, jail
9  bill, and health insurance.  Any other specific
10  expenditures that the Commission believes are related
11  to the opioid problem?
12      A   We can't think of any at the moment.
13      Q   Topic 10:  Programs, actions that the
14  county has taken to abate the opioid problem.  What
15  actions has the Commission taken to mitigate or abate
16  the opioid problem in Cabell County?
17      A   Filed this lawsuit.
18      Q   Others?
19      A   No.
20      Q   Does the county provide any addiction
21  treatment?
22      A   No.
23      Q   Has the county ever considered doing that?
24      A   No.  It's not a part of county commission

Page 134

1  government.
2      Q   Does the county provide any funding for
3  programs that provide addiction treatment?
4      A   No.
5      Q   Has the county ever considered doing that?
6      A   No.  It's not a function of county
7  commission government.
8      Q   Has the county ever taken any action to
9  limit the number of opioid prescriptions that a
10  doctor can write?
11      A   No.  It's not a function of county
12  commission government.
13      Q   Has the county ever taken action to limit
14  the number of opioid prescriptions that a pharmacy
15  can fill?
16      A   No.  It's not a function of county
17  commission government.
18      Q   Has the County Commission ever pursued any
19  grants to address the opioid problem?
20      A   The County Commission, with the sheriff
21  applying for grants, prosecutor's office applying for
22  grants, having the Commission be the financial
23  officer listed on those grants, some of those grants
24  probably were to fight the problem.

Page 135

1      Q   Can you identify any of those?
2      A   No, not right offhand.
3      Q   What is the County Commission's role in
4  grants that are pursued by county officers?
5      A   To be the financial agent.
6      Q   And what does that entail?
7      A   The officeholders will make the
8  application, and then the Commission has to provide
9  the resolution and acceptance and those type of
10  things for it and sign off on it for the
11  officeholders.
12      Q   When you say the Commission has to provide
13  the resolution, what do you mean?
14      A   It would go through a commission meeting.
15  A resolution to authorize the application.
16      Q   Okay.  So in order for a county officer to
17  apply for a grant, the County Commission has to adopt
18  a resolution approving that?
19      A   They have to authorize the application.
20      Q   Okay.  Does the County Commission have the
21  ability to itself pursue grants?
22      A   Yes.
23      Q   Has it ever done that?  And my first
24  question is general:  Has the County Commission ever

Page 136

1  pursued a grant for anything?
2      A   Yes.
3      Q   What's an example of that?
4      A   The Commission itself pursues grants for
5  the courthouse facilities improvements.  That's the
6  main one that comes to mind at the moment.
7      Q   Has the Commission ever pursued a grant to
8  abate the opioid problem?
9      A   Not that I'm aware of.
10      Q   Has the Commission ever been aware of
11  grants that might be available to it to abate the
12  opioid problem?
13      A   No.
14      Q   Has the Commission ever taken action to
15  identify grants that might be available to abate the
16  opioid problem?
17      A   Not that I'm aware of.
18      Q   How did the Commission find out about the
19  grant that you mentioned for courthouse facilities
20  improvements?
21      A   It's usually posted on the LISTSERV for the
22  Commission Association.
23      Q   The West Virginia Association of Counties?
24  Is that what you mean?

2019 WL 4390968 (C.A.6) (Appellate Petition, Motion and Filing)
United States Court of Appeals, Sixth Circuit.

In re: NATIONAL PRESCRIPTION OPIATE LITIGATION STATE OF OHIO, Petitioner.

No. 19-3827.
September 6, 2019.

Appeal from the United States District Court Northern District of Ohio at Cleveland
Honorable Dan Aaron Polster

**Brief of Amici Curiae States of Michigan, Alaska, Arizona, Connecticut, Hawaii, Indiana,
Kansas, Montana, Nebraska, North Dakota, South Dakota, Tennessee, Texas, and
District of Columbia in Support of the State of Ohio's Petition for Writ of Mandamus**

Dana Nessel, Michigan Attorney General, Fadwa A. Hammoud (P74185), Solicitor General, D.J. Pascoe (P54041), Opinions
Division Chief, Ann M. Sherman (P67762), B. Eric Restuccia (P49550), Deputy Solicitors General, State of Michigan, P.O.
Box 30212, Lansing, MI 48909, 517-335-7628, for amicus curiae.

## *i TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii
Statement of Interest of Amicus Curiae States ................................................................... 1
Introduction and Summary of Argument ............................................................................ 2
Argument ............................................................................................................................. 4
I. A writ of mandamus is an appropriate vehicle .............................................................. 4
A. This Court will eventually have jurisdiction over this case .......................................... 5
B. This extraordinary writ is the only way to achieve the necessary interlocutory review ........................... 5
II. States must control major litigation affecting the entire State, including the opioid litigation at issue here ...... 12
A. States are in a position to enter into global settlements, which are jeopardized by local, piecemeal
litigation ............................................................................................................................. 12
B. States protect all communities through statewide implementation of policy, ensuring equitable
distribution of available funds ........................................................................................... 16
Conclusion and Relief Requested ...................................................................................... 19
Certificate of Compliance .................................................................................................. 22
Certificate of Service ......................................................................................................... 23

## *ii TABLE OF AUTHORITIES

**Cases**

Amchem Prods. v. Windsor, 521 U.S. 591 (1997) ............................................................. 11
Assoc. Builders & Contractors v. City of Lansing, 499 Mich 177 (2016) ......................... 10
Ex parte Crane, 5 Pet. 190 (1832) .................................................................................... 5
F.Tii.iiC. v. Dean Foods Co., 384 U.S. 597 (1966) ........................................................... 5
Guertin v. State, 912 F.3d 907 (6th Cir. 2019) ................................................................. 10
Hunter v. City of Pittsburgh, 207 U.S. 161 (1907) ........................................................... 10, 13
In re Am. Med. Sys., 75 F.3d 1069 (6th Cir. 1996) ........................................................... 11
In re Bendectin Prods. Liab. Litig., 749 F.2d 300 (6th Cir. 1984) ..................................... 7, 12
In re Lott, 424 F.3d 446 (6th Cir. 2005) ........................................................................... 7
In re NLO, Inc., 5 F.3d 154 (6th Cir. 1993) ...................................................................... 6
In re Parker, 49 F.3d 204 (6th Cir. 1995) ......................................................................... 6, 8
In re Perrigo Co, 128 F.3d 430 (6th Cir. 1997) ................................................................. 7
*iii Landis v. North American Co., 299 U.S. 248 (1936) .................................................. 8
Mallard v. United States District Court, 490 U.S. 296 (1989) ......................................... 6

*Missouri v. Illinois*, 180 U.S. 208 (1901) ............................................................... 9

*Nash Cty Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981) .............................. 13

*Ohio Env'tl Council v. U.S. Dist. Court, Southern Dist. of Ohio, Eastern Div.*, 565 F.2d 393 (6th Cir. 1977) ................................................................................................ 8

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ..................................................... 11

*Phillips v. Snyder*, 836 F.3d 707 (6th Cir. 2016) ..................................................... 10

*Sailors v. Bd. of Ed. of Kent County*, 387 U.S. 105 (1967) ....................................... 9

*United States v. Battisti*, 486 F.2d 961 (6th Cir. 1973) .............................................. 5

*United States v. Ford (In Re Ford)*, 987 F.2d 334 (6th Cir.), *cert. denied*, 506 U.S. 862 (1992) ............................................................................................................. 6

**Statutes**

2017 Mich. Pub. Act 246 ....................................................................................... 16

2017 Mich. Pub. Act 247 ....................................................................................... 16

2017 Mich. Pub. Act 248 ....................................................................................... 17

2017 Mich. Pub. Act 249 ....................................................................................... 17

28 U.S.C. § 1651(a) .............................................................................................. 5

**\*iv  Other Authorities**

*Prescribing Policies: States Confront Opioid Overdose Epidemic*, National Conference of State Legislatures, 6/30/2019 ................................................................................ 16

**Rules**

Fed. R. App. P. 29(a)(2) ......................................................................................... 2

## \*1  STATEMENT OF INTEREST OF AMICUS CURIAE STATES

The mandamus action filed by the State of Ohio implicates two critical, interrelated matters that deeply affect the authority and interests of many States, including the Amici States (Michigan, Alaska, Arizona, Connecticut, Hawaii, Indiana, Kansas, Montana, Nebraska, North Dakota, South Dakota, Tennessee, Texas) and District of Columbia. The first relates to the authority of the States to manage litigation that will affect the entire State, and to enter into binding agreements that will make all of its residents whole. The second relates to the opioid crisis that has had devastating effects for the citizens of the States. It has been one of the leading causes of death, often exceeding those who die by car accidents or murder. The States are the chief guardians of the health and safety of their citizens, and they seek to ensure that their efforts are not impeded.

For this reason, the States write here in support of Ohio's exercise of its sovereign authority to bring an action on behalf of all of its citizens to address the opioid crisis. The States also join Ohio in asserting that the right is a state right, not available to its municipalities, and that only States may exercise it. This amicus curiae  **\*2**  brief is being filed pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The significance of the opioid crisis to the States is hard to overestimate. It has devastated the communities in Ohio and in the Amicus States, leaving a trail of death and economic woe in its wake. The human toll has been incalculable. In economic terms, the two local governments here are seeking $8 billion, fast on the heels of a judgment from the State of Oklahoma for more than $500 million. The economic stakes are profound and uniquely relate to the parens patriae, statutory, and common-law authority of the Attorney General to govern the litigation. Cases like this one and those related come only once in a generation. The only analogy is the tobacco settlement.

The Amici States raise two points here.

*First*, this Court issues the extraordinary writ of mandamus only in extreme and unusual cases. This is such a case. The State of Ohio is not a party to the two cases that have been scheduled for trial. In each, a local government seeks relief from the same parties subject to suit by Ohio in state court. Ohio has no other recourse here, and it is no  **\*3**  answer to suggest that Ohio may intervene in federal court, where Ohio has already chosen to pursue its claims in state court.

*Second*, the district court has erred in a critical way by allowing the local governments' suits to move forward in the absence of a state legislative grant of authority to pursue these claims. Such an action undermines the exclusive authority invested in the State as sovereign to protect the interests of all communities within the State. The local governments do not - and cannot by their nature - serve in this role. This role cannot be alienated, cannot be derogated, and should not be defeated by procedural maneuvering. [1] Related to this point, any principle that allows the locals to take the lead and draw from an admittedly finite pool of resources from the defendants comes at the expense of the central role that the State must play in ensuring a fair distribution of relief. The first-in rule cannot govern here, where it may leave uncompensated those residents and communities who have suffered most deeply, as measured by lives lost and economic ruin. The **\*4** protection of these residents is the function of state, not local, government.

[1]    Each state legislature has the authority to grant standing to its municipalities to bring actions to address harm to its citizens of the nature at issue here. The court, however, does not have the power to bestow parens patriae authority on municipal subdivisions in the absence of a state legislative grant of authority.

The constitutional order depends on the States playing this role, and the Attorney General is the counsel for the States. These are not just traditional roles, but necessary ones. They ensure that the deep wrongs of private actors may be rectified and that all the State's citizens may be made whole. This is the extraordinary case.

## ARGUMENT

### I. A writ of mandamus is an appropriate vehicle.

The State of Ohio, a nonparty in the district court litigation, has chosen to file a writ of mandamus to this Court, seeking to stop or delay the consolidated bellwether trial involving two Ohio subdivisions that have sued manufacturers, distributors, and others responsible for the nation's opioid epidemic. This extraordinary writ is an appropriate vehicle because this Court will eventually have jurisdiction over the issues involved in the underlying litigation, and a writ is the only adequate avenue for Ohio to obtain relief, since the consolidated trial will include claims that only a State Attorney General has standing to prosecute - claims that vindicate generalized harm to the entire State.

### **\*5** A. This Court will eventually have jurisdiction over this case.

This Court's jurisdiction stems from the All Writs Act, 28 U.S.C. § 1651(a). The Act empowers the federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *F.Tii.iiC. v. Dean Foods Co.*, 384 U.S. 597, 603 (1966). "The exercise of this power 'is in the nature of appellate jurisdiction' where directed to an inferior court." *Id.* (quoting *Ex parte Crane*, 5 Pet. 190, 193, 8 L. Ed. 92 (1832) (Marshall, C.J.)). It extends to the potential jurisdiction of the appellate court "where an appeal is not then pending but may be later perfected." *Id.*

Here, this Court would eventually have jurisdiction because any appeals related to the bellwether trials would be filed in this Court.

### B. This extraordinary writ is the only way to achieve the necessary interlocutory review.

This Court issues the extraordinary writ of mandamus only in "extreme and unusual cases." *United States v. Battisti*, 486 F.2d 961, 964 (6th Cir. 1973) (citation omitted). This Court has explained what is required for a petitioner to seek a writ of mandamus: the petitioner must "show a clear and indisputable right to the relief sought." **\*6** *In re Parker*, 49 F.3d 204, 206 (6th Cir. 1995). This Court has further explained that, for the writ to issue, "[t]here must be a demonstrable abuse of discretion or conduct amounting to usurpation of judicial power." *Id.* at 206-07 (citing *Mallard v. United States District Court*, 490 U.S. 296, 309

(1989); *In re NLO, Inc.*, 5 F.3d 154, 156 (6th Cir. 1993); *United States v. Ford (In Re Ford)*, 987 F.2d 334, 341 (6th Cir.), *cert. denied*, 506 U.S. 862 (1992)). "The general principle which governs proceedings by mandamus is, that whatever can be done without the employment of that extraordinary writ, may not be done with it. It lies only where there is practically no other remedy." *In re Parker*, 49 F.3d at 206 (cleaned up).

This Court has adopted a five-step process for examining whether there are extraordinary circumstances warranting mandamus relief:

(1) whether the party seeking the writ has no other adequate means, such as direct appeal, to attain the relief needed;

(2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal;

(3) whether the district court's order is clearly erroneous as a matter of law;

(4) whether the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules; [and]

**\*7**  (5) whether the district court's order raises new and important problems, or issues of law of first impression.

*In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 303-04 (6th Cir. 1984). These factors are cumulative and should be balanced, and they need not "all point to the same conclusion." *Id.* (citation omitted). Not every factor need be met, and in fact, "[r]arely if ever will a case arise where all the guidelines point in the same direction or even where each guideline is relevant or applicable." *In re Lott*, 424 F.3d 446, 449 (6th Cir. 2005). This Court has cautioned that it is "in favor of a 'flexible' rather than a 'rigid' approach" to the factors because the writ of mandamus "cannot be wholly reduced to formula." *In re Perrigo Co*, 128 F.3d 430, 435 (6th Cir. 1997) (citations omitted).

Here, these factors weigh in favor of mandamus. This is an exceptional case that may fundamentally affect Ohio's ability to make its residents whole in its own action seeking redress for the harm caused by the opioid crisis.

As to factor one, Ohio cannot obtain the requested stay in any other manner. It is not a party to any of the federal cases below. (Indeed, Ohio has indicated that it does not want to be a party.) (6th **\*8**  Cir. docket No. 1, Petition at 11.) So it cannot file a dispositive motion below.

Nor can Ohio file a direct appeal, so factor two weighs in Ohio's favor. Any involvement Ohio might have at the appeal level would be too little, too late, and hardly an "adequate" means to secure the relief it seeks - control over the opioid litigation. *Compare In re Parker*, 49 F.3d at 207 (in issuing mandamus, noting that Kentucky had *som*e other possible means of gaining some relief because "the state could directly appeal the stay.")

With respect to factor three, the district court's refusal to stay or delay the bellwether trials was contrary to law. A district court has considerable discretion in determining whether to issue a stay, and that power " 'is incidental to the power inherent in every court to control the disposition of the cases in its docket with economy and time and effort for itself, for counsel and for litigants.' " *Ohio Env'tl Council v. U.S. Dist. Court, Southern Dist. of Ohio, Eastern Div.*, 565 F.2d 393, 396 (6th Cir. 1977) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936)). But there is a pressing need for a stay or delay here. Notably, the claims at issue below essentially assert parens patriae claims, and **\*9**  only the State, as parens patriae, has standing to assert those claims. And it has long been established that the State has a sovereign right to seek relief from interference by its political subdivisions. *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("[I]f the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them."). The claims alleged in the opioid litigation below are statewide harms - and, for the reasons set forth more fully in Argument II, it must be the State that litigates them to fruition. The scheduled bellwether trials, which have statewide impact (6th Cir. Dkt. No. 1, Pet. at 9), frustrate that sovereign interest.

Local governments are "subordinate governmental instrumentalities created by the State to assist in the carrying out of a state governmental function." *Sailors v. Bd. of Ed. of Kent County*, 387 U.S. 105, 107-08 (1967). These governmental units "are 'created as convenient agencies for exercising such of the governmental powers of the state, as may be entrusted to them,' and the 'number, nature and duration of the powers conferred upon (them) ... and the territory over which they shall be exercised rests in the *absolute discretion of the state*." *Id*. (quoting **\*10** *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907) (emphasis added)). In numerous contexts, this Court has recognized the authority of States over their local governments. *See e.g.*, *Phillips v. Snyder*, 836 F.3d 707, 715 (6th Cir. 2016) (citing *Sailors* and upholding Michigan's emergency manger law, explaining that there is no fundamental right to have local officers exercising governmental functions selected by popular vote). Although municipalities "have 'great[ ] latitude to conduct their business,' " *Guertin v. State*, 912 F.3d 907, 938 (6th Cir. 2019) (quoting *Assoc. Builders & Contractors v. City of Lansing*, 499 Mich 177 (2016)), this Court nevertheless has recognized the role of the State in serving the State as a whole, in contrast to a municipality, which serves "only a limited number of people within its boundaries," *Guertin*, 912 F.3d at 936, 938 (rejecting an argument that the City of Flint was an "arm of the state."). There are issues - like the opioid crisis at issue here - that affect the entire State. In regard to those issues, the State must be able to step in and act in its own interests.

Factor four and five are sometimes in tension, but not here. Courts sometimes look at the broader context, not just a particular judge's own rulings. *See* **\*11** *In re Am. Med. Sys.*, 75 F.3d 1069, 1089 (6th Cir. 1996). When the broader context is considered here, the recurring problem is elevating settlement of all municipalities in the multi-district litigation (MDL), through the bellwether trials, to the detriment of the State. *See generally Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (warning that a desire to settle large civil actions cannot override restraints on federal-court authority); *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) (same).

Finally, factor five weighs in favor of mandamus, since this situation raises an important and somewhat novel problem for which the federal rules do not account - a stay or delay of local litigation in order to ensure adequate State resolution of a statewide problem. That is the best strategy for States attempting to protect *all* their local communities that are impacted by that problem. It is the State, not its instrumentalities, that should direct opioid monies where they are most needed. In contrast, if the bellwether trials take place, they essentially allow the State's political subdivisions to usurp the State's sovereign role. And they jeopardize Ohio's ability to settle its own state-court actions.

**\*12** Mandamus is an appropriate vehicle here. If the bellwether trials proceed, Ohio will be damaged in a way that cannot be corrected later through the course of an ordinary appeal. *See Bendectin*, 749 F.2d at 304. The Court should issue the extraordinary writ.

## II. States must control major litigation affecting the entire State, including the opioid litigation at issue here.

### A. States are in a position to enter into global settlements, which are jeopardized by local, piecemeal litigation.

The district court judge managing this MDL previously recognized that "it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting." (Doc # 146, Case 1:17-md-02804-DAP, Feb. 27, 2018 Dist. Ct. Order Regarding State Court Coordination, PageID #806.) The judge also admonished that "nobody should construe the AGs' participation in MDL settlement discussions as a limitation on litigation in the sovereign States." (*Id.*; *see also* Doc # 94, Jan. 24, 2018 Dist. Ct. Order clarifying State Attorneys General appearance at 1/30/18 conference, PageID #523.)

**\*13** In bringing their actions, Attorneys General have exercised their unique roles as the top law enforcement officers of their respective States, with broad statutory, constitutional, and common-law powers to obtain meaningful relief on behalf of *all* their citizens. Maintaining the prominent role of the Attorneys General acting on behalf of the State as a whole through its parens patriae authority and specific statutory empowerment, is crucial to resolving the claims of the people of the State on a fair and equitable basis. Quite simply, in the absence of a state legislative grant of authority, smaller political subdivisions lack the

broad powers and duties that are necessary to effectively protect the States' citizenry as a whole. *See Hunter*, 207 U.S. at 178 (explaining that "[m]unicipal corporations are political subdivision of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them."); see also *Nash Cty Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 496 (4th Cir. 1981) (holding that the North Carolina Attorney General had the authority to litigate on behalf of localities without their consent, and explaining that "[i]t would seem self-evident that common sense dictates that when an alleged wrong affects governmental units on a state-wide basis, the **\*14** state should seek redress on their behalf as well as on its own rather than parceling out the actions among local agencies.") Moreover, an ineffective piecemeal approach is the only result when various inferior instrumentalities of the State pursue conflicting or overlapping claims. Those localities' efforts hinder, rather than help, global, statewide resolution.

An example of this piecemeal approach is the district court judge's consideration of a novel class certification scheme premised on the multitude of claims brought by counties and local municipalities. This proposed arrangement would work to undermine the settlement process by creating an unworkable number of claims and claimants and seeking to include within its jurisdiction those state instrumentalities that have not sought to seek relief separate from that being sought by the States. The opioid crisis is a matter of statewide impact that requires a statewide response. The States should not be hindered by various claims brought by separate instrumentalities making separate arguments from separate attorneys.

As has been pointed out by various Attorneys General, "Doling out small buckets of funds without regard to how the funds should be spent **\*15** is the opposite of a 'coordinated' response, which would balance statewide efforts - such as public education campaigns, with local efforts. It also purports to override State decision-making about how best to apply resources to the epidemic and may well interfere with existing State programs and priorities." (R. 1726, June 24, 2019 Letter to Judge Polster, Case 1:17-md-02804-DAP Doc #1726 Filed: 06/24/19, PageID #51637.)

As this Court is aware, the State Attorneys General have been and remain intimately involved in ongoing efforts to address the opioid crisis through a wide variety of means, including litigation, investigations, and negotiations regarding potential resolution with many of the parties. The opioid epidemic remains a national crisis that plagues countless individuals and the States in their role as States. Allowing bellwether trials for an individual county or municipality undermines the ability of the States to secure an ultimate resolution, whether through litigation or settlement, either of which considers the State's local instrumentalities. At its core, the current path impedes the ability of the State of Ohio to seek resolution for all its people.

### \*16  B. States protect all communities through statewide implementation of policy, ensuring equitable distribution of available funds.

As noted by the National Conference of State Legislatures, the States have through various measures worked to identify statewide responses to the opioid epidemic. "State lawmakers are crafting innovative policies - engaging health, criminal justice, human services and other sectors - to address this public health crisis while also ensuring appropriate access to pain management." *Prescribing Policies: States Confront Opioid Overdose Epidemic*, National Conference of State Legislatures, 6/30/2019. [2]

[2]    Available at http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx.

Part of the effort to address the opioid epidemic from a statewide perspective includes enacting laws that affect prescribing rules limiting access to opioids. For example, Michigan has amended its Public Health Code to address this problem. See 2017 Mich. Pub. Act 246 (requiring a prescriber to discuss certain issues and obtain signed parental consent prior to issuing the first prescription to a minor under certain circumstances); 2017 Mich. Pub. Act 247 (requiring prescriber of **\*17** a controlled substance to be in a bona fide prescriber-patient relationship with patient being prescribed the controlled substance); 2017 Mich. Pub. Act 248 (requiring a licensed prescriber to obtain and review a patient's Michigan Automated Prescription System report

before prescribing certain controlled substances to the patient, and outlining disciplinary action for violations); 2017 Mich. Pub. Act 249 (similar to PA 248).

This state-level policy and implementation are also key in other facets of the response to the crisis. Prescription drug monitoring programs are one of the strategies with significant evidence backing their effectiveness to improve opioid prescribing and protect patients. Distribution of and access to Naloxone, a medication that can reverse an opioid overdose, is also a key component of statewide response to the ongoing crisis. States have also created requirements for and implemented training and education of health care providers and other relevant entities regarding best practices and remediation concerning opioids, including training in prescribing controlled substances, pain management and identifying substance use disorders.

**\*18**  Coordinated management of data is a further example. The Healthcare Information and Management Systems Society has encouraged States to integrate prescription drug monitoring program data into electronic health records. And statewide provision of services, sometimes via novel modalities, can ensure statewide access to treatment. As an illustration, the Centers for Medicare & Medicaid Services (CMS) have noted that States can deliver services through telehealth modalities that may be more effective in various areas.

In Michigan, Governor Gretchen Whitmer recently issued Executive Order 2019-18, creating the Michigan Opioids Task Force. The Task Force brings together key leaders from across state government - including the State's Chief Medical Executive, the Attorney General, and the Chief Justice of the Michigan Supreme Court, as well as directors from various state departments - to implement a statewide response to the opioid epidemic. As noted in the Executive Order,

> Combating an epidemic of this size and impact requires a coordinated and comprehensive approach: one that identifies and confronts the full scope of the epidemic's root causes and contributing factors in Michigan; that pools, optimizes, and augments the efforts and resources on all levels - public and private; local, state, and federal - that are **\*19** available to address the epidemic; and that raises public awareness of the epidemic, its causes and effects, the resources available to those afflicted by it, and the actions that can be taken to combat it.

The implementation of statewide responses and remedial efforts is hindered when individual communities dilute the coordinated approach of statewide efforts that can maximize outcomes on a statewide basis. And in this regard, States as States are in the best position to both bring the claims and settle with responsible parties, ensuring an appropriate implementation of State policy through coordinated use of State resources to address this crisis of statewide concern. Such implementation is undercut where various local-level claims are tried, risking both inconsistent results and inequitable distribution of resources.

## CONCLUSION AND RELIEF REQUESTED

This is an extreme and unusual case where the Writ of Mandamus is needed to stay or delay scheduled bellwether trials below. States must be able to control litigation that affects the State as a whole. They are in the best position to enter into global settlements and to protect all communities through statewide implementation of policy and ensuring equitable distribution of available funds.

**\*20**  WHEREFORE, Amici States respectfully request that this Court grant Ohio's petition for a Writ of Mandamus.

Respectfully submitted,

**Kevin G. Clarkson**

Attorney General

State of Alaska

P.O. Box 110300

Juneau, AK 99811

**Mark Brnovich**

Attorney General

State of Arizona

1275 W. Washington St.

Phoenix, AZ 85007

Dana Nessel

Michigan Attorney General

Fadwa A. Hammoud (P74185)

Solicitor General

D.J. Pascoe (P54041)

Opinions Division Chief

*Ann M. Sherman (P67762)*

B. Eric Restuccia (P49550)

Deputy Solicitors General

Co-Counsel of Record

Attorneys for Amicus Curiae

State of Michigan

P.O. Box 30212

Lansing, MI 48909

517-335-7628

ShermanA@michigan.gov

**William Tong**

Attorney General

State of Connecticut

55 Elm Street

Hartford, CT 06106

**Karl A. Racine**

Attorney General for the District of Columbia

441 4th Street, NW

Suite 630 South

Washington, D.C. 20001

**\*21 Clare E. Connors**

Attorney General

State of Hawaii

425 Queen St.

Honolulu, HI 96813

**Curtis T. Hill, Jr.**

Attorney General

State of Indiana

200 W. Washington St., Rm. 219

Indianapolis, IN 46204

**Derek Schmidt**

Attorney General

State of Kansas

120 S.W. 10th Ave., 2nd Fl.

Topeka, KS 66612-1597

**Timothy C. Fox**

Attorney General

State of Montana

P.O. Box 201401

Helena, MT 59620-1404

**Douglas J. Peterson**

Attorney General

State of Nebraska

2115 State Capitol Bldg.

Lincoln, NE 68509

**Wayne Stenehjem**

Attorney General

State of North Dakota

600 E. Boulevard Ave.

Bismarck, ND 58505-0040

**Jason Ravnsborg**

Attorney General

State of South Dakota

1302 E. Highway 14, Ste. 1

Pierre, SD 57501-8501

**Herbert H. Slatery III**

Attorney General and Reporter

State of Tennessee

301 6th Ave. N.

Nashville, TN 37243

**Ken Paxton**

Attorney General

State of Texas

P.O. Box 12548

Austin, TX 78711-2548

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.



**National Association**
*of* **Attorneys General**

PRESIDENT
**Jeff Landry**
*Louisiana Attorney General*

PRESIDENT-ELECT
**Tim Fox**
*Montana Attorney General*

VICE PRESIDENT
**Karl A. Racine**
*District of Columbia*
*Attorney General*

IMMEDIATE PAST PRESIDENT
**Derek Schmidt**
*Kansas Attorney General*

EXECUTIVE DIRECTOR
**Chris Toth**

July 23, 2019

Honorable Dan Aaron Polster
Carl B. Stokes United States Courthouse
801 West Superior Avenue, Courtroom 18B
Cleveland, Ohio 44113 1837
dan_polster@ohnd.uscourts.gov

cc:
Helen Norton, Judicial Assistant
Helen_Norton@ohnd.uscourts.gov
and
Katherine King, Deputy Clerk
Katherine_King@ohnd.uscourts.gov

*Via Electronic Mail*

RE: Plaintiffs' Renewed and Amended Notice of Motion for
Certification of Rule 23(b)(3) Cities / Counties Negotiation Class, *In
Re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Judge Polster:

The undersigned Attorneys General, having reviewed the July 9, 2019
Plaintiffs' Renewed and Amended Notice of Motion for Certification of Rule
23(b)(3) Cities / Counties Negotiation Class (the "amended proposal"), and
many having previously directed two letters to the Court's attention on June
24, 2019 regarding the original certification motion, respectfully submit this
letter to provide our views on the amended proposal.[1]

We appreciate the Court's statement at the June 25, 2019 hearing that
it was concerned about the issues raised in our June 24, 2019 letters and
expected that any revised class certification motion would incorporate the
input that we had offered. The undersigned Attorneys General respectfully
submit that the amended proposal does not resolve the problems we identified
regarding the original class certification motion; instead, Plaintiffs continue to
propose an unprecedented process that, among other problems, would make
"global peace" more, not less, difficult to achieve. Moreover, the proposal
continues to intrude on state sovereignty by purporting to regulate the States'
resolution of their state court enforcement actions. Accordingly, the
undersigned Attorneys General urge the Court to deny the Motion.

1850 M Street, NW
Twelfth Floor
Washington, DC 20036
Phone: (202) 326-6000
http://www.naag.org/

[1] The Attorneys General submit this letter only as *amici curiae* to offer their input on
the question before the Court as the chief legal officers of our respective States; this
letter is written without prejudice to any State's ability to enforce its consumer
protection laws or otherwise investigate claims related to the issues here in dispute in
its state courts, as the Court has repeatedly acknowledged it does not have
jurisdiction over the Attorneys General.

1

The Attorneys General are expending significant resources prosecuting state law enforcement actions in our respective state courts against the companies responsible for the opioid crisis. In bringing these actions, the Attorneys General are exercising our unique roles as the top law enforcement officers of our States, with broad statutory, constitutional, and common-law powers to bring suit and obtain meaningful relief on behalf of all of our citizens. A number of these suits rely on investigative powers, statutory enforcement mechanisms, and remedies available only to state enforcement authorities. While the Attorneys General recognize the tremendous impact the opioid crisis has had on many cities and counties within our States, the political subdivision Plaintiffs lack the broad powers and duties that are necessary to effectively protect the States' citizenry as a whole.[2]

Moreover, as previously noted, the Attorneys General have an overarching interest and express statutory role in protecting class members under the Class Action Fairness Act ("CAFA"), which prescribes a role for Attorneys General in the class action settlement approval process.[3] The Attorneys General again write to protect both of these interests.[4]

The Attorneys General have participated in discussions regarding possible resolutions with manufacturers and distributors who are also Defendants in this MDL and understand the difficulty in achieving any global resolution. We also appreciate the efforts that Plaintiffs' counsel took in drafting the amended motion and seeking to address at least some of the Attorneys General's previously stated concerns. However, while the Attorneys General share the parties' and the Court's desire to achieve a fair, appropriate, and comprehensive resolution, we would note that any vehicle chosen must be reasonably capable of achieving this important goal. The Negotiation Class is unlikely to provide such a solution, for at least the following reasons:

- The amended proposal would interfere with the States' ability to vindicate the rights of their citizens. The proposal continues to purport to give class counsel and this Court a role in the negotiations between each State and its political subdivisions over any allocation of settlement funds obtained through the state court enforcement actions. Notwithstanding the amended proposal's insistence that it does not encroach on the States' sovereignty, that is exactly its effect.
- The amended proposal's legal defects would almost certainly lead to objections from class members and ultimately appeals, delaying and possibly derailing any settlement process, including getting funds for remediation to our States and local communities.
- The amended proposal's approach cannot be fair, reasonable, and adequate at the point of a future settlement, as will be required under Rule 23(e)(2).
- The amended proposal's proposed Negotiation Class does not meet the prerequisites for certification under Rules 23(a) and 23(b)(3).

---

[2] *See* Hunter v. City of Pittsburgh, 207 U.S. 161, 178 (1907) ("It is basic in our structure of government that cities are political subdivisions of their states . . . created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them.").

[3] *See* 28 U.S.C. § 1715 (Pub. L. No. 115-281); *see also* S. REP. 109-14, 2005 U.S.C.C.A.N. 3, 6 (requirement "that notice of class action settlements be sent to appropriate state and federal officials," exists "so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.").

[4] Many of the undersigned Attorneys General have engaged in previous efforts to promote fairness in class action settlements, which have produced meaningful settlement improvements for class members.

- The amended proposal raises practical concerns.

1) **The Proposed Negotiation Class Settlement Process Would Intrude Upon State Settlement Allocation Discussions And Jeopardize The States' Ability To Settle State Enforcement Actions**

Plaintiffs recognize[5] that, in any enforcement action brought by an Attorney General, the defendants may very well propose a joint settlement to a State and its political subdivisions. The amended proposal contemplates that consideration of such an offer may require the State and its political subdivisions to decide how to negotiate its allocation, stating it would be "the preferred result of that discussion … for each State to reach agreement with the cities and counties within the State on the allocation and use of the money within the State." Plaintiffs propose that, in the event a State and its political subdivisions cannot reach agreement about how to allocate any such joint settlement offer, the State would be forced to negotiate with counsel who largely represent out-of-state non-parties over the allocation of settlement monies the Attorney General obtained through litigation of her or his own state court action.

The Motion and Memorandum provide conflicting indications about what would happen at that point. The Motion provides that any settlement allocation agreed to in a negotiation between a State and its political subdivisions (represented by proposed MDL class counsel) would then be submitted to the nationwide Negotiation Class of cities and counties for a vote and ultimately – if, as the proposal states, it is "treated as a settlement" – submitted to this Court for approval under Rule 23(e).[6] By contrast, the Memorandum provides that the negotiated in-State allocation would be submitted to members of the Negotiation Class "in that state for a vote"[7] – a dramatically different proposal. Either way, the amended proposal is not only unworkable but unconstitutionally impinges on state sovereignty in at least the following ways.

First, the proposed Negotiation Class interferes with the authority of the Attorneys General to settle their state court enforcement actions without the interference of out-of-state non-parties. To the extent Plaintiffs propose that there is any scenario in which the nationwide Negotiation Class is or may be entitled to vote on a State's allocation of settlement monies with its political subdivisions, they propose giving non-party, out-of-state cities and counties effective veto power over any State's resolution of its state court enforcement action. Such a result is both illegal and untenable.

As this Court has recognized, "nobody should construe the AG's participation in MDL settlement discussions as a limitation on litigation in the sovereign States."[8] Purporting to require Attorneys General to gain supermajority approval for an in-state allocation in settling their own state court enforcement actions would violate exactly that principle. The amended proposal inverts the relationship between each State and its own political subdivisions, even if, as the Memorandum indicates, the in-state political subdivisions would be the only class members who would have to "pass" the proposed allocation.[9]

---

[5] Memorandum at 53.
[6] Mot. at 10 ("Any agreed-to allocation would be treated as a settlement and submitted to the Negotiation Class for its consideration").
[7] Memorandum at 53.
[8] Dkt. 146.
[9] Even if, as the Memorandum states, only members of the Negotiation Class in the particular State would be allowed to vote on the negotiated allocation between that State and its subdivisions of a recovery obtained in a state court action, the proposal still gives counsel representing out-of-state non-parties an

Second, to the extent the amended proposal treats any negotiated intra-state allocation as a settlement requiring federal court approval under Rule 23(e),[10] the proposal improperly seeks to subject State enforcement actions to federal jurisdiction and strip state courts of the authority to settle cases properly before them. This violates the principles of federalism.[11] This Court has properly acknowledged that it "has no jurisdiction over (i) the Attorneys General or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting."[12]

The practical effect of Plaintiffs' amended proposal would be to allow political subdivisions within and outside of a State to hamstring the settlement of State enforcement actions that were properly filed and remain pending in state courts. Even if the Court decides to approve a Negotiation Class to settle the MDL despite our concerns, there is no reason for that class or this Court to approve or otherwise oversee State settlements or allocations, and the amended proposal does not offer one. If State cases brought by Attorneys General and federal cases brought by cities, counties, and other political subdivisions proceed on parallel, separate tracks, in different courts, as they have until now, there is little to no risk of double recovery in any event.

To safeguard this constitutionally-protected interest, the undersigned Attorneys General respectfully submit that the Court should decline to invade state sovereignty through the exercise of jurisdiction over the settlement of state enforcement actions brought in state court. States and their political subdivisions must be allowed to settle and resolve any allocation issues between themselves, without this Court's oversight and the unnecessary and improper federal court oversight and the Negotiation Class process proposed here.

## 2) The Proposed Negotiation Class Settlement Process Will Likely Generate Uncertainty and Delay and/or Derail Any Potential Settlement

As noted previously, given Plaintiffs' admittedly unprecedented approach, this settlement process is likely to generate numerous objections and appeals, causing additional delay to any potential resolution of this nationwide health crisis, including receiving funds for remediation. Contrary to the amended proposal's assertion that this process will help to buy "global peace," the approval of an unprecedented "negotiation class" at this stage will invite meritorious legal challenges to any eventual settlement, adding uncertainty and making it more difficult for the parties to achieve a global resolution. The amended proposal fails to provide even a cursory response to the Attorneys General's previously stated concerns regarding the likely delay and

---

unwarranted gatekeeping role as negotiators with the State while also subjecting States to the MDL process they have chosen to avoid.

[10] *See* Memorandum at 8.

[11] The U.S. Supreme Court has held that "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities," Horne v. Flores, 557 U.S. 433, 448 (2009), a principle that is particularly implicated by the amended proposal purporting to require a State to seek class and federal court approval for the allocation of resources obtained through its own state court action as between statewide and intra-state local initiatives to address the opioid crisis. Indeed, our established "constitutional structure" protects the 'dignity' to which States are entitled" by preventing them from being involuntarily "dragged" into any court, especially a federal one. West Virginia ex rel. McGraw v. CVS Pharmacy, Inc., 646 F.3d 169, 178 (4th Cir. 2011) (*quoting* Alden v. Maine, 527 U.S. 706, 713–18 (1999)).

[12] Dkt. 146.

uncertainty that would arise here if a Negotiation Class is certified, much less what would occur if the proposed negotiation class settlement process was ultimately deemed to be unlawful.

Additionally, although the amended proposal repeatedly cites the "benefit" of the proposed Negotiation Class as not requiring the same scrutiny as a class action settlement under Rule 23(e), in reality, the Negotiation Class is an additional hurdle and a hindrance to future Rule 23(e) approval, which would still be required once any settlement is reached with a particular defendant. Any eventual settlement would be subject to additional appellate proceedings at that stage due to the unprecedented nature of the process itself. Moreover, the unprecedented nature of the process leaves open the very real possibility that any class release that may be part of an eventual settlement would be subject to a potentially meritorious due process challenge through litigation years in the future by a purportedly bound class member.[13] It seems unlikely that there will be peace with all county and municipal governments – let alone global peace – with these significant legal uncertainties about finality that will remain unresolved for years.

### 3) The Proposed Negotiation Class Settlement Process Does Not Satisfy The Due Process And Fairness Requirements Of Rule 23(e)

Plaintiffs have stated that the Negotiation Class will be certified neither for settlement nor for trial, and the Attorneys General respectfully submit that such a procedure may not even be considered by the Court under Rule 23 despite Plaintiffs' assertions to the contrary. The nature of the proposed Negotiation Class settlement process demands additional protections like those afforded to putative settlement class members during the preliminary approval process. Proposed class members are being asked to opt out or to be bound by any settlement approved by a supermajority of the voting class members following an order certifying the Negotiation Class, like they would be asked similar to the preliminary approval stage of a traditional class action settlement. Therefore, the standards of Rule 23(e)(1)(b) should apply. Indeed, the fact that proposed class members will, by design, have very little idea what the terms of any settlement will be makes it all the more important to apply the due process requirements reflected in Rule 23(e)(1)(b).

"Courts have long recognized that 'settlement class actions present unique due process concerns for absent class members.'"[14] As the Court is aware, Rule 23(e) was amended just last year to provide for greater due process protections. As previously noted, the Attorneys General have significant concerns as to whether political entities differing in size, representation, and knowledge of the ongoing proceedings will be prejudiced due to the potential inability to evaluate this unprecedented Negotiation Class process and obtain the proper authority under their particular decision-making process within the proposed 60 day opt-out period.

Although the amended proposal mentions two methods of direct notice, such notice for a governmental entity is not as "direct" as it would be for an individual. The amended proposal also fails to provide details regarding how Epiq will determine where to send direct notice. It

---

[13] Cf. Elliott v. GM LLC (In re Motors Liquidation Co.), 829 F.3d 135, 158-66 (2d Cir. 2016) (overturning "free and clear" sale provision in GM's 2009 bankruptcy plan as applied to litigation brought after the plan's confirmation by plaintiffs who did not receive adequate notice of the plan).

[14] In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011); see also Taylor v. Sturgell, 553 U.S. 880, 901 (2008) (Rule 23 protections are "grounded in due process").

may take days or even weeks for the notice to reach the correct decision-maker, especially depending on the address or email that Epiq selects for notice.

In addition, an opt-out request must be notarized after it has been signed by an official or employee of that city or county itself, which may be burdensome on rural class members and on those who have outside counsel representing them. For instance, in New England the practice of a "town meeting" is common. Under this form of government, residents of the towns gather only once a year and act as a legislative body, voting on operating budgets, laws, and other matters. Maine annual town meetings, for instance, are traditionally held in March.

Furthermore, the provided notice itself appears to be both inaccurate and inadequate. The proposed notice does not provide the easy to read "options" chart that standard settlement notices provide, explaining what will happen if class members "do nothing," "opt out," etc. There is significant ambiguity in the description of the Special Needs Fund, even though its terms will likely be of great interest to class members, especially those that may not receive funds directly from any proposed settlement, as discussed below.

Moreover, the notice describes a process regarding allocations of funds from a hypothetical State settlement that the States themselves have not approved and do not support. The proposed notice describes the Negotiation Class as promoting global resolution and global peace, and making settlement offers more likely, a characterization that the undersigned vehemently disagree with.

The notice and FAQ description of the allocation of settlement proceeds is insufficient to inform class members, particularly municipalities, of their potential allocation. They refer to an online Allocation Map that uses an example with a $1 billion settlement to illustrate county and city allocations; however, that settlement amount is far from certain and may provide an overinflated view at first glance to class members who do not further calculate their percentage.

Without the class member's percentages provided, or a calculator to facilitate, any detailed analysis becomes more difficult for potential class members and less like the Tool described by Plaintiffs in their original motion. Additionally, the Memorandum describes only in a footnote, as does the Allocation Map, that if a municipality's share would be less than $500, that amount will instead be distributed to the county by default in the absence of another arrangement. If the city has less than $500 and it is within a county without a county government, that amount would revert to the Special Needs Fund.

In Pennsylvania, for instance, this would result in 52.2% of class members being allocated less than $500, and thus, potentially receiving nothing through a proposed Negotiation Class settlement. This allocation procedure should be described more prominently to provide adequate notice, given the sizeable portion of the class that it will likely affect, if it is permitted at all.

Additionally, as discussed in the June 24, 2019 letters, class members receiving notice would have insufficient information to allow them to make an informed choice regarding opting out of the Negotiation Class. They do not know the defendants with which they may be settling, the amount of a settlement fund, how much they will be paying the Class Counsel through the Common Benefit Fees, or even how much of the settlement they will be permitted to keep due to the further allocation between counties and cities. Moreover, for those who become bound by the Negotiation Class by failing, or choosing not, to opt out, it appears the Negotiation Class process does not contemplate a further opportunity to opt out despite the availability of such an opportunity under Rule 23(e)(4).

6

Because many of these proposed class members are headed by elected officials, it is even more concerning that they might become subject to the collective will of other jurisdictions – ultimately being required to bow to the will of the supermajority of voting political subdivisions nationally, including parts of the country that have been impacted by the opioid crisis very differently.

Plaintiffs also argue that the Negotiation Class would allow class members a more "active voice" and role in the settlement process than a settlement where the terms have already been decided. However, proposed class members are only provided with a singular up-down vote regarding the overall settlement fund, and no further opportunity to opt out. Unless they are a representative class member, the proposed class members actually have a far less active voice than in an ordinary settlement, where they would be permitted to make objections or provide comments to a settlement, while retaining opt out rights at the point any particular settlement is proposed.

Plaintiffs characterize this structure as permitted through the *Principles of the Law of Aggregate Litigation* ("ALI Principles") but the amended proposal omits the significant differences between the two scenarios. The plaintiffs in the ALI Principles model "opt in" and affirmatively agree to participate; in contrast, the Negotiation Class involves a negative option, forcing class members to be bound.

Finally, the Negotiation Class procedure does not meet the requirements for preliminary approval under Rule 23(e)(1)(B), which requires that the court likely will be able to approve a proposed settlement under Rule 23(e)(2). The Court would at least have to determine that the amended proposal met the requirements for certification of a class for settlement, the more lenient standard. Due to the lack of fairness and due process outlined above, as well as the numerous violations of the provisions of Rule 23, the undersigned respectfully submit that the Court will be unable to approve any ultimate settlement to which the Negotiation Class would be bound, thus demonstrating the fatally flawed nature of the amended proposal's approach.

**4)**    **The Negotiation Class As Currently Proposed Cannot Meet The Requirements Of Rules 23(a) And 23(b)(3)**

Rule 23(a) and Rule 23(b)(3) identify prerequisites to be met for certification, prerequisites that the amended proposal recognizes must be met before the Negotiation Class can be certified. These prerequisites are particularly difficult to meet in the proposed Negotiation Class because no subclasses are currently designated. Such a nationwide class of varying political subdivisions likely could not meet the requirements of adequacy of representation, typicality, commonality, and superiority.

Conflicts of interest between class members and their counsel are a particular concern regarding adequacy of representation in the Negotiation Class structure. Intra-class conflicts exist that can only be remedied through sub-classes. Class Counsel have already laid the groundwork through their Memorandum for other plaintiffs' counsel to receive common benefit awards, prior to any settlement even coming to fruition, creating further opportunities for intra-class conflicts.

In addition, the claims or defenses of the proposed representative class members are not "typical." Despite the "diverse array" Plaintiffs purport to have chosen as representatives, many types of representatives have been omitted from the list of forty-nine, such as representatives from twenty States, and representatives from smaller counties and cities.

The proposed representative class members also cannot fairly represent the class if they have assisted in developing the plan for distribution. It is likewise unclear whether they will

7

receive "awards" as representatives after other class members are bound. Additionally, urban or city-dwelling class members' citizens may be counted more than rural class members' citizens in the supermajority voting mechanism since they could be, for example, counted both in a municipality and a county, again evidencing against typicality. This information has now been omitted from the amended proposal but is still relevant.

With current Negotiation Class definition, commonality and predominance cannot be satisfied. Class members have different litigation postures, political structures, and thus damages, claims, and even potential defendants. The amended proposal relies upon the Class Representatives chosen by Plaintiffs' counsel and a random sample of only the litigating class members to prove commonality and predominance when this approach overlooks the vast majority of class members who have not sued and likely will have divergent interests from litigating class members.

Furthermore, because political subdivisions differ in the ways they operate and are funded, their harms would necessarily differ, not to mention the differences in the scope of the harms. Although this issue alone may not, by itself, necessarily defeat commonality or predominance, it should not be disregarded, especially since damages are already decided under the Negotiation Class model.[15] This is precisely one of the flaws inherent in the Negotiation Class model itself – that the allocation system should not be determined based on the class definition proposed.

In fact, the proposed allocation presents more commonality problems, because cities are treated differently than counties, with counties receiving certain funds by default, including potentially all of a city's funds should that city's allocation be less than $500, as discussed above. Differences in the claims asserted include state law public nuisance claims, the variety of effects of the opioid crisis in those areas, and the varying conduct of Defendants in subdivisions.

The amended proposal claims that these varying issues do not "predominate" and that the most important issue is the marketing itself, which it says is common to all Defendants and thus a common question overriding all other individual questions. However, the sheer number and the overall importance of the questions that differ for class members demonstrate that common issues do not in fact predominate, despite the self-serving examples taken from litigating class members. Furthermore, while many proposed class members are pursuing damages remedies, other litigating members are bringing public enforcement actions seeking only non-damages remedies.[16]

Superiority is also unlikely to be met, as there are existing, alternative methods to resolution that are superior to the amended proposal's Negotiation Class structure. For example, class counsel could, even without a certified Negotiation Class in place, negotiate a settlement on behalf of all cities and counties that includes a blow-up provision allowing a defendant to back-out of a deal if a minimum number or percentage of proposed class members opt out of the

---

[15] *See* Memorandum at 86.

[16] *See* Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581 (9th Cir. 2012) (Vacating class certification ruling because differences between California law and other jurisdictions were material and that class members' claims were governed by consumer protection laws of their own jurisdictions); Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481, 497 (7th Cir. 2012) ("superficial common questions—like whether each class member … 'suffered a violation of the same provision of law'—are not enough. ... Rather, '[c]ommonality requires the plaintiffs to demonstrate that the class members "have suffered the same injury."'").

8

settlement. The likelihood of meritorious objections and lengthy and possibly successful appellate proceedings regarding this untested and unprecedented Negotiation Class process also undermines any claim of superiority here.

### 5) __Additional Practical Concerns__

The Attorneys General appreciate the revisions that were made to the Memorandum to attempt to address some of the practical concerns raised in our prior letters. Nevertheless, many of our practical concerns remain, likely because they are inherent to the proposed Negotiation Class structure itself.[17]

The allocation system under the amended proposal is at odds with the stated goal of "coordinated" solutions to the opioid crisis. Doling out small buckets of funds without regard to how the funds should be spent is the opposite of a "coordinated" response, which would balance statewide efforts – such as public education campaigns – with any local efforts. Indeed, this problem has been made worse in the amended proposal, as thousands of often tiny townships have now been added to the proposed class definition. It also purports to override State decision-making about how best to apply resources to the epidemic and may well interfere with existing State programs and priorities. Additionally, a notice for a Negotiation Class competing with a potential future motion for settlement under another mechanism would likely create mass confusion amongst the proposed class members, who may ultimately believe that the separately filed settlement is subject to a vote or that they have already "opted in" when they have not.

Finally, the Attorneys General respectfully submit that the amended proposal's provisions concerning attorneys' fees, including the awarding of common benefit fees, are contrary to the goal of providing maximum resources to abate the opioid crisis. The Attorneys General question whether there need to be two different manners in which private counsel for the local governments can seek to obtain attorneys' fees: the 10% "Private Attorneys' Fee Fund," and a separate application for Class Counsel / Common Benefit Fees to be approved by the Court pursuant to Rule 23(h). Most troubling, it appears there is no requirement that the fees awarded from the Private Attorneys' Fee Fund be tied to work that advanced the litigation for the benefit of Plaintiffs generally, which is the applicable standard for awarding Common Benefit Fees. Although Plaintiffs' counsel should have the opportunity to seek fair compensation for their work in this complex MDL proceeding, it is also a reality that Defendants will likely provide a finite amount of money to resolve all the cases, and any grant of excess compensation to Plaintiffs' counsel would unnecessarily lessen the funds available to abate the crisis.

In light of the foregoing practical, procedural, and sovereignty concerns, the Attorneys General respectfully request the Court deny the Motion. However, in recognition of the shared interest in pursuing "global peace," the Attorneys General are willing to participate in further discussions with Plaintiffs' counsel or to provide additional input to this Court upon its request.

Respectfully submitted,

---

[17] Under the amended proposal it is still not clear exactly how closely the operation of the settlement class, if approved, would follow the procedures and mechanisms explained in the filing. The submitted proposed order still makes explicit reference only to the class action notice and frequently asked questions, but not to the memorandum in support of the amended proposal, which provides the most granular detail about many aspects of the proposed settlement class's operation.

9

Xavier Becerra
California Attorney General

Ashley Moody
Florida Attorney General

Herbert H. Slatery III
Tennessee Attorney General

Ken Paxton
Texas Attorney General

Steve Marshall
Alabama Attorney General

Kevin G. Clarkson
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Phil Weiser
Colorado Attorney General

William Tong
Connecticut Attorney General

Kathleen Jennings
Delaware Attorney General

Karl A. Racine
District of Columbia Attorney General

Chris Carr
Georgia Attorney General

Leevin T. Camacho
Guam Attorney General

Clare E. Connors
Hawaii Attorney General

Lawrence Wasden
Idaho Attorney General

Kwame Raoul
Illinois Attorney General

10

Tom Miller
Iowa Attorney General

Derek Schmidt
Kansas Attorney General

Jeff Landry
Louisiana Attorney General

Aaron Frey
Maine Attorney General

Brian Frosh
Maryland Attorney General

Maura Healey
Massachusetts Attorney General

Dana Nessel
Michigan Attorney General

Keith Ellison
Minnesota Attorney General

Eric Schmitt
Missouri Attorney General

Doug Peterson
Nebraska Attorney General

Gurbir S. Grewal
New Jersey Attorney General

Letitia A. James
New York Attorney General

Josh Stein
North Carolina Attorney General

Wayne Stenehjem
North Dakota Attorney General

Dave Yost
Ohio Attorney General

Josh Shapiro
Pennsylvania Attorney General

Peter Neronha
Rhode Island Attorney General

Jason Ravnsborg
South Dakota Attorney General

T.J. Donovan
Vermont Attorney General

Mark Herring
Virginia Attorney General

Patrick Morrissey
West Virginia Attorney General

Josh Kaul
Wisconsin Attorney General

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

THE CITY OF HUNTINGTON,
    **Plaintiff,**

v.                                                                      **CIVIL ACTION NO. 3:17-01362**

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    **Defendants.**
_____

CABELL COUNTY COMMISSION,
    **Plaintiff,**

v.                                                                      **CIVIL ACTION NO. 3:17-01665**

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    **Defendants.**

**PLAINTIFF CITY OF HUNTINGTON, WEST VIRGINIA'S**
**SUPPLEMENTAL RESPONSES AND OBJECTIONS TO**
**DISTRIBUTOR DEFENDANTS' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, the Case Management

Order in *In re National Prescription Opiate Litigation* (Dkt. No. 232 in No.:17-cv-2804), ESI

Protocol entered in this matter and Discovery Orders issued by this Court, the City of Huntington,

West Virginia ("Plaintiff") hereby responds to Distributor Defendants'[1] First Set of Interrogatories

(the "Interrogatories" and, each individually, an "Interrogatory"), as follows:

---

[1] For purposes of these Responses, "Distributor Defendants" or "Distributors" refers to the
following entities who served collective requests on October 25, 2019: AmerisourceBergen Drug
Corporation, Cardinal Health, Inc., H.D. Smith Corporation, and McKesson Corporation.

| Department | Employees |
|---|---|
|  | - Carl Eastham- Former Fire Chief (2013-2016)<br>- Ray Canafax- Huntington Fire Department, Deputy Chief (1999- Present, Deputy Chief since 2018) |
| Human Resources | - Sherry Lewis – Director (2001-Present) |
| Planning and Development | - Scott Lemley –Planning and Development, Director (2017-Present); former member of the MODCP (2014-2017) |
| Purchasing Department | - Kim Bailey – Director (2016-Present) |

**<u>Interrogatory 3</u>**

Identify each Person in Your entity, for each year of the Timeframe, who held the following positions or their equivalents: mayor, city manager, city clerk, city council member, county commissioner, county administrator, chief health officer, health department physician director, health department nursing director, health department administrator, county sheriff, chief of police, head of the city or county law enforcement narcotics unit, district attorney or other chief prosecutor, chief prosecutor for drug crimes, court clerk, drug court coordinator or administrator, emergency medical services director, 9-1-1 director, medical examiner, coroner, county assessor, county clerk, finance director, budget director, planning and development director, city or county attorney, correctional facility warden or supervisor, fire chief, director of family and/or children's services, director of substance abuse treatment services, human resources director, members of any task forces or other entities former or used to address opioid abuse, and any other person whose work or other activities have concerned opioid use and abuse and/or any element of the damages that You allege. Include as part of Your response each Person's name, position, and period of time during which he or she held the position.

14

**Response 3**

Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the

extent that it requires Plaintiff to identify "each" of the subject Persons. Subject to and without

waiving its objections, Plaintiff answers as follows:

| Position | Names/Years |
|---|---|
| Mayor | Steve Williams (2013-present)<br>Roger Kim Wolfe (2009-2012)<br>David Felinton (2001-2008)<br>Jean Dean (1993-2000) |
| City Manager/Director of Administration and Finance | Cathy Burns (2016-2019)<br>Margaret Mary Layne (2014-2016)<br>Brandi-Jacobs Jones (2007-2014)<br>Jack Thornburg (2001-2007)<br>David Harrington (1993-2001) |
| City Clerk | Barbara Miller |
| City Council Members | Term: 01/01/05 through 12/31/08<br>Mr. James Ritter<br>Teresa Loudermilk<br>Frances Jackson<br>Mary Neely<br>Sandra M. Clements<br>Cal Kent<br>Scott Caserta<br>Kirk S. Gillenwater<br>Jim Insco<br>AT-LARGE<br>Garry Black<br>Paul Farrell<br><br>Term: 01/01/09 through 12/31/12<br>Mr. James Ritter<br>Teresa Loudermilk<br>Frances Jackson<br>Nate Randolph<br>Sandra M. Clements<br>Mark A. Bates<br>Scott Caserta<br>Russell "Russ" Houck |

15

| Position | Names/Years |
|---|---|
| | Jim Insco<br>AT-LARGE<br>Steve Williams<br>Rebecca Thacker<br><br>Term: 01/01/2013 through 12/31/2016<br>Joyce Clark<br>Bill Rosenberger<br>Frances Jackson<br>Gary L. Bunn<br>Sandra M. Clements<br>Mark A. Bates<br>Scott Caserta<br>Tom McGuffin<br>John David Short<br>AT LARGE<br>Rebecca Thacker<br>David G. Ball<br><br>Term: 01/01/2017 through 12/31/2020<br>Joyce Clark<br>Charlie McComas<br>Alex Vence<br>Jennifer Wheeler<br>Tonia Kay Page<br>Mark A. Bates<br>Mike Shockley<br>Tom McGuffin<br>Tina Brooks<br>AT LARGE<br>Rebecca Thacker<br>Carol Polan |
| Chief of Police | Hank Dial<br>Joe Ciccarelli<br>Skip Holbrook<br>Gene Baumgardner |
| Head of City Law Enforcement Narcotics Unit | Sergeant Paul Hunter |
| Finance Director | Kathy Moore (2017-present)<br>Pam Chandler (2015-2017)<br>Deron Runyon (2009-2015) |

16

| Position | Names/Years |
|---|---|
|  | Robert Wilhelm (2001-2008)<br>Glenn White (1987-2001) |
| Budget Director | Scott Arthur (2017-present)<br>Rick Montgomery (2017-2017)<br>Kathy Moore (2016-2017)<br>Darla Bentley (2003- 2016) |
| Planning and Development Director | Scott Lemley |
| City Attorney | Scott Damron |
| Fire Chief | Jan Rader<br>Carl Eastham<br>C. Moore Craig<br>Greg Fuller |
| Human Resources Director | Sherry Lewis (2001-present)<br>James Bumgardner (Interim 2001)<br>John Queen (2001)<br>Russell Houck (1995-2001) |
| Task Force Members (Mayor's Office of Drug Control Policy) | Jim Johnson, Director (2014-2017)<br>Jan Rader (2014-2017)<br>Scott Lemley (2014-2017) |

To the extent all positions and identities are not noted, Plaintiff will conduct a reasonable and diligent search for and, if such information is in Plaintiff's possession, custody, or control, will identify such individuals. Plaintiff reserves the right to supplement, amend or modify this response as discovery proceeds.

**Supplemental Response to Interrogatory 3**

Plaintiff incorporates by reference its objections and response to this request as stated above. Subject to and without waiving all objections, Plaintiff answers as follows:

| Position | Names/Years |
|---|---|
| Mayor | -    Steve Williams (2013-present) |

17

| Position | Names/Years |
|---|---|
| | - Roger Kim Wolfe (2009-2012)<br>- David Felinton (2001-2008)<br>- Jean Dean (1993-2000) |
| City Manager/Director of Administration and Finance | - Cathy Burns (2016-2019)<br>- Margaret Mary Layne (2014-2016)<br>- Brandi-Jacobs Jones (2007-2014)<br>- Jack Thornburg (2001-2007)<br>- David Harrington (1993-2001) |
| City Clerk | - Barbara Miller (2001- Present) |
| City Council Members | Term: 01/01/05 through 12/31/08<br>    Mr. James Ritter<br>    Teresa Loudermilk<br>    Frances Jackson<br>    Mary Neely<br>    Sandra M. Clements<br>    Cal Kent<br>    Scott Caserta<br>    Kirk S. Gillenwater<br>    Jim Insco<br>    AT-LARGE<br>    Garry Black<br>    Paul Farrell<br><br>Term: 01/01/09 through 12/31/12<br>    Mr. James Ritter<br>    Teresa Loudermilk<br>    Frances Jackson<br>    Nate Randolph<br>    Sandra M. Clements<br>    Mark A. Bates<br>    Scott Caserta<br>    Russell "Russ" Houck<br>    Jim Insco<br>    AT-LARGE<br>    Steve Williams<br>    Rebecca Thacker<br><br>Term: 01/01/2013 through 12/31/2016<br>    Joyce Clark<br>    Bill Rosenberger<br>    Frances Jackson |

| Position | Names/Years |
|---|---|
| | Gary L. Bunn<br>Sandra M. Clements<br>Mark A. Bates<br>Scott Caserta<br>Tom McGuffin<br>John David Short<br>AT LARGE<br>Rebecca Thacker<br>David G. Ball<br><br>Term: 01/01/2017 through 12/31/2020<br>Joyce Clark<br>Charlie McComas<br>Alex Vence<br>Jennifer Wheeler<br>Tonia Kay Page<br>Mark A. Bates<br>Mike Shockley<br>Tom McGuffin<br>Tina Brooks<br>AT LARGE<br>Rebecca Thacker (Howe)<br>Carol Polan<br>Charles Shaw<br>Ted Kluemper |
| Chief of Police | - Ray Cornwell (2019- Present)<br>- Hank Dial (2018-2019)<br>- Joe Ciccarelli (2014-2018)<br>- Skip Holbrook (2007-2014)<br>- Gene Baumgardner (2004-2007) |
| Head of City Law Enforcement Narcotics Unit | - Sergeant Paul Hunter (2019- Present; 1998-Present with HPD)<br>- Captain Rocky Johnson (2012-2019) |
| Huntington Violent Crime and Drug Task Force / FBI Task Force | - Sergeant Paul Hunter (2019- Present)<br>- Cpl. Paul Matovich (2005- Present)<br>- Cpl. Stephen Maniskas<br>- Det. Adrian Rosario<br>- Sgt. Greg Moore<br>- Pfc. Sid Hinchman |
| DEA Heroin Task Force | - Craig Preece (1998-Present) |

19

| Position | Names/Years |
|---|---|
| | - Cpl Paul Matovich (2005- Present)<br>- |
| Finance Director | - Kathy Moore (2017- Present)<br>- Pam Chandler (2015-2017)<br>- Deron Runyon (2009-2015)<br>- Robert Wilhelm (2001-2008)<br>- Glenn White (1987-2001) |
| Budget Director | - Scott Arthur (2017-Present)<br>- Rick Montgomery (2017-2017)<br>- Kathy Moore (2016-2017)<br>- Darla Bentley (2003- 2016) |
| Planning and Development Director | - Scott Lemley (2017-Present); Member of MODCP (2014-2017) |
| City Attorney | - Scott Damron (2015 – Present)<br>- Ericka Hernandez (Acting City Attorney, October -2014 - March 2, 2015)<br>- Scott McClure (2005- 2014). |
| Fire Chief | - Jan Rader (2017- Present)<br>- Carl Eastham (2013-2017)<br>- Randy Ellis (2012-2013)<br>- Deputy Chief Ralph Rider ( Interim, 2011-2012)<br>- C. Creig Moore (2009-2011)<br>- Greg Fuller (1999-2009) |
| Human Resources Director | - Sherry Lewis (2001- Present)<br>- James Bumgardner (Interim 2001)<br>- John Queen (2001)<br>- Russell Houck (1995-2001) |
| Task Force Members (Mayor's Office of Drug Control Policy) | - Jim Johnson, Director (2014-2017)<br>- Jan Rader (2014-2017)<br>- Scott Lemley (2014-2017) |

**<u>Interrogatory 4</u>**

State the years during which You claim each Distributor Defendant engaged in conduct for which You seek damages or injunctive relief.