**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>   Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>   Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>   Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>   Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MCKESSON CORPORATION'S MOTION FOR DISMISSAL**
**ON DERIVATIVE SOVEREIGN IMMUNITY GROUNDS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

LEGAL STANDARDS ....................................................................................... 3

ARGUMENT ...................................................................................................... 5

I.      THIS COURT MUST DISMISS PLAINTIFFS' PUBLIC NUISANCE CLAIM
        TO THE EXTENT IT RELIES ON MCKESSON'S FEDERAL PPV
        DISTRIBUTION .......................................................................................... 5

        A.      The Government Authorized McKesson's Actions. ............................... 8

        B.      The Government Validly Conferred Authorization. ............................ 11

II.     THIS COURT SHOULD DISMISS PLAINTIFFS' PUBLIC NUISANCE
        CLAIM IN FULL. ...................................................................................... 14

        A.      McKesson's PPV Shipments Are Inextricably Intertwined With Plaintiffs'
                Public Nuisance Claim ........................................................................ 14

        B.      McKesson's Non-PPV Shipments Do Not Constitute an "Unreasonable"
                Interference With a Public Right. ....................................................... 16

CONCLUSION ................................................................................................. 17

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ackerson v. Bean Dredging LLC*,
   589 F.3d 196 (5th Cir. 2009) ...................................................................7

*Alden v. Maine*,
   527 U.S. 706 (1999)...................................................................................5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...................................................................................5

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006)...................................................................................3

*Boruski v. United States*,
   803 F.2d 1421 (7th Cir. 1986) ..................................................................7

*Burgess v. Colorado Serum Co.*,
   772 F.2d 844 (11th Cir. 1985) ..................................................................7

*Butters v. Vance Int'l, Inc.*,
   225 F.3d 462 (4th Cir. 2000) ...........................................................2, 5, 6

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...................................................................................4

*CTB, Inc. v. Hog Slat, Inc.*,
   954 F.3d 647 (4th Cir. 2020) ....................................................................5

*Cunningham v. General Dynamics Information Tech., Inc.*,
   888 F.3d 640 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 417 (2018)................................. *passim*

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*,
   166 F.3d 642 (4th Cir. 1999) ....................................................................4

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994)...................................................................................5

*Filarsky v. Delia*,
   566 U.S. 377 (2012)...................................................................................6

*Hodgin v. UTC Fire & Sec. Americas Corp.*,
   885 F.3d 243 (4th Cir. 2018) ....................................................................4

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
　790 F.3d 532 (4th Cir. 2015) ................................................................4

*In re KBR, Inc., Burn Pit Litig.*,
　744 F.3d 326 (4th Cir. 2014) ............................................................6, 8

*Lilly v. Taylor*,
　151 W. Va. 730, 155 S.E.2d 579 (1967) ..............................................17

*Myers v. United States*,
　323 F.2d 580 (9th Cir. 1963) ................................................................7

*In re Nat. Prescription Opiate Litig.*,
　327 F. Supp. 3d 1064 (N.D. Ohio 2018) ..................................... *passim*

*Pope v. Edward M. Rude Carrier Corp.*,
　138 W.Va. 218, 75 SE 2d 584 (1953) ..................................................16

*Pornomo v. United States*,
　814 F.3d 681 (4th Cir. 2016) ................................................................5

*Robb v. United States*,
　80 F.3d 884 (4th Cir. 1996) ............................................................3, 8

*Showalter v. Weinstein*,
　233 F. App'x 803 (10th Cir. 2007) ..................................................3, 8

*Sucampo Pharm., Inc. v. Astellas Pharma., Inc.*,
　471 F.3d 544 (4th Cir. 2006) ................................................................3

*Tracy v. Cottrell ex rel. Cottrell*,
　206 W. Va. 363, 524 S.E.2d 879 (1999) ..............................................16

*Velasco v. Gov't of Indon.*,
　370 F.3d 392 (4th Cir. 2004) ................................................................4

*Williams v. United States*,
　50 F.3d 299 (4th Cir. 1995) ................................................................4

*Yearsley v. W.A. Ross Const. Co.*,
　309 U.S. 18 (1940) ..................................................................2, 6, 13

**Statutes and Rules**

38 U.S.C. § 301(b) ....................................................................................11

38 U.S.C. § 513 ........................................................................................12

38 U.S.C. §§ 1701 *et seq.* ........................................................................11

Fed. R. Civ. P. 12(b)(1)............................................................................................3, 4, 8, 17

Fed. R. Civ. P. 12(h)(3)...............................................................................................3, 8, 17

Fed. R. Civ. P. 56......................................................................................................3, 4, 17

Fed. R. Civ. P. 56.........................................................................................................4, 17

## INTRODUCTION

In 2004, McKesson Corporation ("McKesson") contracted with the U.S. Department of Veterans Affairs ("VA") to ship medical and pharmaceutical products—including prescription opioid medications—to certain government facilities.[1]  The resulting Pharmaceutical Prime Vendor Contract ("PPV Contract"), a version of which remains in force to this day, requires McKesson to "provide next day … delivery of a complete order," placed by a government facility, and establishes that McKesson (1) may only refuse shipment when "investigational facts suggest [the order] will be diverted" and (2) "may not unreasonably delay filling an … order[] pending its investigation" of potential diversion.  *See* Ex. 4 (PPV Contract) at 29, 79.  As the MDL court has concluded, "[w]hen the government submits an order under the contract, ***McKesson is obligated to fill the order***."  *In re Nat. Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1075 (N.D. Ohio 2018) (all emphases added unless otherwise noted).

The undisputed record in this case demonstrates that almost ***eighty percent*** of the prescription opioids[2] that McKesson distributed in Plaintiffs' jurisdictions during the relevant time period was ordered by and shipped to the VA Medical Center ("VAMC") in Huntington, West Virginia.  *See* Ex. 6 (Boberg Rep.) at ¶ 76.  Put differently, with respect to McKesson, nearly four

---

[1] *See* Ex. 3 (CBO Report) at 7.  Facilities from the following government agencies are participants to the contract: VA, State Veterans Homes, Department of Health and Human Services ("HHS") Program Support Center, Supply Service Center, HHS Indian Health Service, Immigration Health Service Corps., Department of Homeland Security ("DHS"), Bureau of Prisons ("BOP"), Howard University, Public Health Service ("PHS"), Federal Health Care Centers, Peace Corps, and VA Commercial Repackaging Contractor.  *See* Ex. 4 (PPV Contract) at 3.

[2] For purposes of this analysis, "prescription opioids" consist of oxycodone, fentanyl, hydrocodone, morphine, hydromorphone, oxymorphone, tapentadol, codeine, meperidine, levorphanol, powdered opium, and dihydrocodeine.  McKesson has not included buprenorphine and methadone because those "treatment" opioids were excluded from the analyses of Plaintiffs' expert.  *See* Ex. 5 (McCann Rep.) ¶ 104 n.37 ("I do not analyze transactions in two treatment drugs: buprenorphine and methadone.").

out of every five prescription opioids at issue in this litigation were (1) ordered by a federally-owned and operated facility and (2) shipped by McKesson to that facility pursuant to a government contract that explicitly required McKesson to do so the "next day."

Plaintiffs allege that McKesson, among other defendants, "created and maintained a public nuisance by … distributing … opioids, and/or exacerbating the flood of opioids" into Huntington and Cabell County. *See, e.g.*, Third Amend. Compl. ¶ 1405. But the overwhelming majority of prescription opioids that McKesson distributed in Huntington and Cabell County were ordered by and shipped to ***the federal government***. And it is "well-settled law that contractors … acting within the scope of their employment for the United States have derivative sovereign immunity." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000). Where, as here, "th[e] authority to carry out the [contract] was validly conferred [by Congress] … there is no liability on the part of the contractor for executing its will." *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20–21 (1940).

Pursuant to this well-established doctrine, McKesson is entitled to derivative sovereign immunity for its contractually-required shipments of prescription opioid medications to the VAMC in Huntington. Because derivative sovereign immunity "operates as a jurisdictional bar to suit," *Cunningham v. General Dynamics Information Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 417 (2018), this Court must dismiss Plaintiffs' public nuisance claim to the extent it relies on those shipments. *See infra* Part I.

Moreover, this Court should dismiss the remainder of Plaintiffs' public nuisance claim against McKesson for two independent reasons:

- First, because Plaintiffs claim that the aggregate total of McKesson's distribution into Huntington and Cabell County created a single, indivisible public nuisance, McKesson's federal PPV shipments (accounting for 80% of that allegedly excessive

distribution and over which this Court lacks subject matter jurisdiction) are inextricably intertwined with Plaintiffs' public nuisance claim. *See infra* Part II.A.

- Second, Plaintiffs have no evidence that the very small proportion of prescription opioids shipped by McKesson to entities other than the federal government were a substantial factor in bringing about the alleged nuisance. Those shipments, in total, amount to ***only five percent*** of the volume of prescription opioids that were delivered to Huntington and Cabell County, and Plaintiffs have no evidence whatsoever establishing that those *de minimis* shipments created a public nuisance. *See infra* Part II.B.

For all these reasons, McKesson respectfully requests that this Court dismiss Plaintiffs' public nuisance claim pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) or, in the alternative, grant summary judgment on that claim pursuant to Fed. R. Civ. P. 56.

## LEGAL STANDARDS

**Subject Matter Jurisdiction.** "If the court determines at any time that it lacks subject-matter jurisdiction, the court ***must*** dismiss the action." Fed. R. Civ. P. 12(h)(3). A motion to dismiss brought under Rule 12(b)(1) therefore "may be brought at any time—even on appeal—regardless of whether a litigant raised the issue in an initial pleading."[3] It is well-established that a Court may dismiss part of a claim for lack of subject matter jurisdiction.[4]

---

[3] *Sucampo Pharm., Inc. v. Astellas Pharma., Inc.*, 471 F.3d 544, 548 (4th Cir. 2006); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction … may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.").

[4] *See, e.g.*, *Robb v. United States,* 80 F.3d 884, 886–87 (4th Cir. 1996) (upholding district court's dismissal of "[plaintiff's] claim, to the extent that it relied on the alleged negligence of [the independent contractor physicians], for lack of subject matter jurisdiction."); *Showalter v. Weinstein*, 233 F. App'x 803, 803–04 (10th Cir. 2007) ("The district court granted [defendant's]

"The plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). "[W]hen a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (noting that "the court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction").

**Summary Judgment.** "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, Plaintiffs may not rest upon "[c]onclusory or speculative allegations." *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018). Instead, they must come forward with "specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record[.]").

The moving party need not prove the absence of a genuine issue of material fact, but may instead discharge its burden by pointing out the absence of evidence to support the nonmovant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat summary

---

Fed. R. Civ. P. 12(b)(1) motion to dismiss … that portion of claim three that did not pertain to retaliatory termination … and we affirm.").

judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (same).

## ARGUMENT

*Part I* discusses the doctrine of derivative sovereign immunity and explains why, based on the undisputed record, this Court lacks subject matter jurisdiction over Plaintiffs' public nuisance claim to the extent it is premised on McKesson's federal distribution pursuant to the PPV Contract. *Part II* explains why this Court should dismiss Plaintiffs' public nuisance claim in full for two independent reasons: (1) McKesson's federal PPV shipments are inextricably intertwined with Plaintiffs' indivisible public nuisance claim; and (2) Plaintiffs have no evidence that McKesson's *de minimis* volume of non-federal shipments gave rise to a public nuisance.

## I.  THIS COURT MUST DISMISS PLAINTIFFS' PUBLIC NUISANCE CLAIM TO THE EXTENT IT RELIES ON MCKESSON'S FEDERAL PPV DISTRIBUTION.

"As a sovereign, the United States is immune from all suits against it absent an express waiver." *Pornomo v. United States*, 814 F.3d 681, 687 (4th Cir. 2016).[5]  And because "[i]mposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work … particularly in light of the government's unquestioned need to delegate governmental functions," "courts have extended derivative immunity to private contractors."  *Butters*, 225 F.3d at 446; *see also id.* (sovereign immunity "exists because it is in the public interest to protect the exercise of certain governmental functions," and "[t]his public interest remains intact when the government delegates that function down the chain of command").

---

[5] *See also, e.g.*, *Alden v. Maine*, 527 U.S. 706, 749 (1999) ("It is unquestioned that the Federal Government retains its own immunity from suit not only in state tribunals but also in its own courts."); *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").

Consequently, it is "well-settled law that contractors … acting within the scope of their employment for the United States have derivative sovereign immunity." *Id.* This doctrine "recognizes that private employees can perform the same functions as government employees and concludes that they should receive immunity from suit when they perform these functions." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 344 (4th Cir. 2014). It also "combats the 'unwarranted timidity' that can arise if employees fear that their actions will result in lawsuits" and "prevent[s] the harmful distractions from carrying out the work of government that can often accompany damages suits." *Id.* (quoting *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012)).

Derivative sovereign immunity was first articulated by the Supreme Court in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 20–21 (1940). In that case, a group of individuals sued the defendant construction company for property damage resulting from dikes the defendant built on the Missouri River. *Id.* at 19. In response, the defendant argued that it could not be held liable because the dikes were built "pursuant to a contract with the United States Government." *Id.* The Supreme Court ruled in favor of the defendant, reasoning that "if th[e] authority to carry out the [contract] was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing [Congress's] will." *Id.* at 20–21. Because the Court found that (1) the government had authority to enter into the contract and (2) the defendant acted in accordance with it, the defendant was held to be immune from liability. *Id.* at 23.

Since *Yearsley* was decided, courts across the country—including the Fourth Circuit—have applied the doctrine of derivative sovereign immunity to dismiss claims brought against government contractors. *See, e.g.*, *Cunningham v. General Dynamics Information Tech., Inc.*, 888 F.3d 640, 643–44 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 417 (2018) (dismissing federal claims

against contractor hired by the Center for Medicaid and Medicare Services to place phone calls regarding enrollment in government health insurance plans).[6]  Indeed, in the Fourth Circuit, unlike some other jurisdictions, it is well-established that derivative sovereign immunity "operates as a jurisdictional bar to suit." *Id.* at 650.

Based on the transactional data produced and relied on by Plaintiffs' own expert, Dr. Craig McCann, ***almost eighty percent*** of the prescription opioids that McKesson distributed in Huntington and Cabell County from 2004–2018 were ordered by and shipped to the VAMC:

Table 6: Dosage Units Shipped to the VA Medical Center in Huntington, WV
Based on Shipments into Cabell County and Huntington City
ARCOS (2006-2014) Supplemented by McKesson Shipment Data (2004-2018)

| Year | Dosage Units of 12 Non-Treatment Opioids Shipped by McKesson to VA Medical Center | Dosage Units of 12 Non-Treatment Opioids Shipped by McKesson to All Buyers | VA Medical Center's Share of Dosage Units Shipped by McKesson |
|---|---|---|---|
| 2004 | 612,689 | 691,490 | 88.6% |
| 2005 | 2,808,359 | 3,145,406 | 89.3% |
| 2006 | 2,803,120 | 3,202,157 | 87.5% |
| 2007 | 2,919,541 | 3,702,918 | 78.8% |
| 2008 | 3,379,442 | 4,312,835 | 78.4% |
| 2009 | 2,318,327 | 2,910,878 | 79.6% |
| 2010 | 1,951,541 | 2,552,301 | 76.5% |
| 2011 | 1,992,372 | 2,737,451 | 72.8% |
| 2012 | 2,032,266 | 2,686,291 | 75.7% |
| 2013 | 1,889,968 | 2,433,465 | 77.7% |
| 2014 | 2,371,780 | 3,177,255 | 74.6% |
| 2015 | 3,668,757 | 4,716,171 | 77.8% |
| 2016 | 3,097,891 | 4,171,679 | 74.3% |
| 2017 | 1,989,805 | 2,729,939 | 72.9% |
| 2018 | 1,345,438 | 1,750,961 | 76.8% |
| Total | 35,181,296 | 44,921,197 | 78.3% |

---

[6] *See also, e.g.*, *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009) (affirming dismissal of claims against government contractor whose dredging activities allegedly caused environmental damage); *Boruski v. United States*, 803 F.2d 1421, 1430 (7th Cir. 1986) (affirming dismissal of claims against government contractor who manufactured swine flu vaccine); *Burgess v. Colorado Serum Co.*, 772 F.2d 844, 847 (11th Cir. 1985) (affirming dismissal of claims against government contractor who manufactured brucellosis vaccine); *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963) (concluding that "no liability can be imposed upon" contractor for work done under contract with the government).

*See* Ex. 6 (Boberg Rep.) at ¶ 76; *see also supra* n.2.  As demonstrated by the above table, the relative percentage of government vs. non-government distribution was even higher in some years, reaching as high as ***89.3 percent*** in 2005.  *Id.*

In assessing whether a contractor is entitled to derivative sovereign immunity, courts have typically focused on two elements: (1) whether "the government authorized the contractor's actions"; and (2) whether the government "validly conferred" that authorization.  *Cunningham*, 888 F.3d at 643; *see also In re KBR*, 744 F.3d at 342 (same).  Because both elements are satisfied here, McKesson is entitled to derivative sovereign immunity for its shipments to the VAMC and this Court "***must***" dismiss any claim against McKesson to the extent it is based on those shipments. *See* Fed. R. Civ. P. 12(h)(3).[7]

   A.   **The Government Authorized McKesson's Actions.**

The first element of derivative sovereign immunity asks whether the government authorized the actions at issue—in other words, whether the contractor "adhered to the terms of its contract."  *Cunningham*, 888 F.3d at 648; *see also In re KBR*, 744 F.3d at 345 (contractor "is entitled to derivative sovereign immunity only if it adhered to the terms of its contract with the government.").  Here, the MDL court has already held that "the PPV Contract deals specifically with how McKesson ***must*** distribute pharmaceuticals."  *In re Natl. Prescription Opiate Litig.*, 327

---

[7] *See also Cunningham*, 888 F.3d at 650; *Robb,* 80 F.3d at 886–87 (upholding district court's dismissal of "[plaintiff's] claim, to the extent that it relied on the alleged negligence of [the independent contractor physicians], for lack of subject matter jurisdiction."); *Showalter*, 233 F. App'x at 803–04 ("The district court granted [defendant's] Fed. R. Civ. P. 12(b)(1) motion to dismiss … that portion of claim three that did not pertain to retaliatory termination … and we affirm.").

F. Supp. 3d at 1072.  Because there is no record evidence that McKesson distributed opioids to the VAMC in violation of the PPV Contract, this first element is satisfied.

McKesson's distribution of prescription opioids to the VAMC is governed by the terms of the PPV Contract.  *See id.* ("All items ordered ***shall*** be provided to the ordering facilities ***in accordance with the terms and conditions*** of the PPV Contract.") (emphasis added by MDL court) (citing Ex. 4 (PPV Contract) at 14).  In particular, the PPV Contract provides that upon receipt of an approved order from a participating government facility, McKesson must "provide next day … delivery" of the complete order.  *See* Ex. 4 (PPV Contract) at 29.  Further, McKesson may only decline to ship an order if it possesses "investigational facts [that] suggest [the order] ***will*** be diverted," and "***may not unreasonably delay*** filling an … order[] pending its investigation" of potential diversion.  *Id.* at 79.  Finally, even if McKesson did refuse shipment, the PPV Contract empowers the government to review and override that decision.  *Id.* ("The [Contracting Officer] may instruct the Contractor to fill an executive-agency-level order and/or resume acceptance of executive agency indirect orders ….").

Upon review of these same contractual provisions, the MDL court properly concluded that "McKesson … had little discretion whether to fill an order, and could not unilaterally choose to not fill a government order or otherwise suspend an [order]."  *In re Natl. Prescription Opiate Litig.*, 327 F. Supp. 3d at 1073; *see also id.* at 1074 ("McKesson … did not have the discretion, under the contract, to unilaterally refuse to fill orders based on its concerns about potential diversion").  Put differently, "[w]hen the government submits an order under the contract, ***McKesson is obligated to fill the order***."  *Id.* at 1075.

Plaintiffs have no evidence that McKesson failed to comply with the terms of the PPV Contract.  As an initial matter, the PPV Contract does not require McKesson to investigate or stop

orders placed by the federal government; rather, it provides only that McKesson ***may*** under certain circumstances do so, as long as the investigation does not "unreasonably delay" the shipment of the order.  *See* Ex. 4 (PPV Contract) at 79.  But even if the PPV Contract did so require, Plaintiffs have no evidence of any suspicious orders placed by the federal government.  Although Plaintiffs' experts purport to identify certain opioid shipments that McKesson could have flagged for investigation, those experts ***specifically exclude*** McKesson's PPV distribution from their analyses.[8]  Moreover, the experts do not opine that (1) McKesson was ever aware of any "investigational facts" suggesting that any orders placed by the federal government "will be diverted,"[9] or (2) that a single prescription opioid that McKesson shipped to the VAMC was actually diverted.[10]  Accordingly, Plaintiffs cannot possibly demonstrate that any of McKesson's shipments to the VAMC violated the PPV Contract.

---

[8] Dr. Craig McCann purports to estimate the number of shipments McKesson (along with other wholesale distributors) could have flagged for further investigation, but he completely excluded McKesson's distribution to the VAMC from his analysis.  *See* Ex. 5 (McCann Rep.) at ¶ 103 (excluding VAMC distribution from his analysis); *see also* Ex. 7 (McCann Dep.) at 134:8–16 ("Q. You don't identify orders that McKesson should have investigated prior to shipping to the [VAMC] in Huntington; correct? A. Correct. Q. You don't perform your flagging methodologies on the [VAMC] in Huntington; correct?  A.  Correct."); Ex. 8 (Rafalski Dep.) at 275:18–20 ("Q. Did you review any VA orders for Huntington?  A.  Uhm, I don't recall doing that; no, sir.").

[9] *See* Ex. 7 (McCann Dep.) at 134:2–7 ("Q. You don't offer the opinion that McKesson was aware of facts suggesting potential diversion at the [VAMC] in Huntington; correct?  A.  Anymore than any of the other dispensers in Cabell County, that's correct."); Ex. 8 (Rafalski Dep.) at 276:6–10 ("Q. Have you identified … any VA orders by … Huntington VA that should have been blocked by McKesson but were not?  A.  No, sir.").

[10] *See* Ex. 7 (McCann Dep.) at 133:21–134:2 ("Q. You don't offer the opinion or any opinion that diversion occurred at the [VAMC] in Huntington, do you?  A.  Or at any of the other dispensers, that's correct."); Ex. 8 (Rafalski Dep.) at 276:11–15 ("Q. Have you identified any orders … McKesson shipped to the Huntington VA that should have been reported as suspicious and were not?  A.  No, sir.").

It is not enough for Plaintiffs to argue that some portion of McKesson's PPV distribution violated the federal Controlled Substances Act ("CSA") or its implementing regulations.  As the MDL court has already held, "the **_PPV Contract_** deals specifically with how McKesson must distribute pharmaceuticals" to the government.  *In re Natl. Prescription Opiate Litig.*, 327 F. Supp. 3d at 1072.  Thus, arguments concerning McKesson's alleged non-compliance with the CSA are irrelevant in assessing the propriety of McKesson's PPV distribution.[11]  The PPV Contract provides that McKesson may only refuse to ship orders if it possesses "investigational facts [that] suggest [the order] will be diverted," Ex. 4 (PPV Contract) at 79—otherwise, "McKesson is obligated to fill the order," *In re Natl. Prescription Opiate Litig.*, at 1075.

Because Plaintiffs have no evidence that McKesson shipped prescription opioids to the VAMC in violation of the PPV Contract, the first element of derivative sovereign immunity is satisfied.

### B.    The Government Validly Conferred Authorization.

The second element of derivative sovereign immunity is likewise satisfied here because the federal government validly conferred authorization on McKesson to ship medical and pharmaceutical products to certain government facilities in accordance with the PPV Contract. "Authorization is 'validly conferred' on a contractor if [1] Congress authorized the government agency to perform a task and [2] empowered the agency to delegate that task to the contractor,

---

[11] As set forth more fully in Defendants' memorandum in opposition to Plaintiffs' motion to adopt the MDL court's erroneous CSA ruling, the CSA and its implementing regulations do not impose any "duties" or legal proscriptions on wholesale distributors.  *See* Dkt. 235 at 14, 16–19.  In particular, it is clear that neither the CSA nor its implementing regulations require McKesson not to ship so-called "suspicious orders."  *See id*. at 17–19.  Rather, those provisions identify non-exhaustive factors for DEA's consideration in making registration determinations, and DEA has *consistently renewed* McKesson's registration to distribute controlled substances in West Virginia. *Id*.

11

provided it was within the power of Congress to grant the authorization." *Cunningham*, 888 F.3d at 646–47.  Here, it was squarely within VA's statutory authority to contract with McKesson to assist in providing certain medical benefits to eligible veterans.

The VA has a statutory mandate to provide medical benefits (among other benefits and services) to eligible veterans.  *See* 38 U.S.C. § 301(b); 38 U.S.C. §§ 1701 *et seq*.; *see also* Ex. 3 (CBO Report) at 5 ("The Department of Veterans Affairs provides prescription drugs as part of its medical benefits package for all enrolled veterans.").  Moreover, the Secretary of the VA has explicit statutory authority to "enter into contracts or agreements with private … agencies or persons … for such necessary services (including personal services) as the Secretary may consider practicable."  38 U.S.C. § 513.  Together, these statutory provisions grant the VA authority to contract with private parties in order to fulfill its obligations—including by providing prescription opioid medications (together with other medical and pharmaceutical products).

The VA implemented the Pharmaceutical Prime Vendor Program in 1996 to "avoid costs of operating its warehouse system for storing and distributing drugs and supplies."  Ex. 3 (CBO Report) at 5.  In June 2003, the VA—in accordance with the Federal Acquisition Regulation— issued a solicitation for a new Pharmaceutical Prime Vendor.  *Id.* at 6.  After reviewing bids from seven wholesale distributors, the VA selected McKesson and the PPV Contract went into effect as of April 1, 2004.  *Id.* at 7.  This entire process, including all subsequent renewals, was done in accordance with all applicable laws and regulations.

Plaintiffs may argue that the government did not "validly confer" on McKesson authority to distribute controlled substances in a manner that violated the law, but that misunderstands the nature of this element.  As explained in *Cunningham*, "[t]he question is not whether [the task] violated the law, but rather whether Congress had the authority to assign [the contractor] to

12

complete that task." 888 F.3d at 648 (citing *Yearsley*, 309 U.S. at 20).[12]  Indeed, because "[t]he purpose of [derivative sovereign] immunity is to prevent a government contractor from facing liability for an alleged violation of law, … it cannot be that an alleged violation of law *per se* precludes [derivative sovereign] immunity." *Id.* at 648–49.

Here, as previously explained, the PPV Contract—not any other law or regulation—establishes "how McKesson must distribute pharmaceuticals" to the government.  *In re Natl. Prescription Opiate Litig.*, 327 F. Supp. 3d at 1072; *see* Ex. 4 (PPV Contract) at 14 ("All items ordered ***shall*** be provided to the ordering facilities in accordance with the terms and conditions of the PPV contract …."). The only question for purposes of this prong is whether VA had authority to direct McKesson to distribute prescription opioid medications in accordance with the terms of the PPV Contract.  Because the VA undoubtedly has authority to (1) provide medical benefits, including prescription medications, to veterans and (2) contract with McKesson to accomplish that task, the second element of derivative sovereign immunity is satisfied.

* * *

In sum, McKesson is entitled to derivative sovereign immunity with respect to its shipments to the VAMC.  Accordingly, at a minimum, liability may not be imposed on McKesson on the basis of those shipments and it is entitled to judgment as a matter of law with respect to those shipments.

---

[12] This inquiry is thus analogous to the "acting under" prong of federal officer removal, which "is not concerned with the specific actions actually taken by McKesson, but rather asks whether McKesson was directed by a federal officer, pursuant to a legal obligation, to perform a task that otherwise the government would be required to do." *In re Natl. Prescription Opioid Litig.*, 327 F. Supp. 3d at 1075.

## II.     THIS COURT SHOULD DISMISS PLAINTIFFS' PUBLIC NUISANCE CLAIM IN FULL.

For two independent reasons, this Court should dismiss Plaintiffs' public nuisance claim against McKesson in full.  First, because McKesson's PPV shipments are inextricably intertwined with Plaintiffs' indivisible public nuisance claim, the claim must be dismissed in full for lack of subject matter jurisdiction.  Second, because McKesson's non-governmental shipments account for *only 5 percent* of the total opioid shipments into Huntington and Cabell County and Plaintiffs have no evidence that those *de minimis* shipments caused any harm, Plaintiffs cannot establish that McKesson's conduct was a substantial factor in bringing about the alleged public nuisance.

### A.     McKesson's PPV Shipments Are Inextricably Intertwined With Plaintiffs' Public Nuisance Claim.

Even though McKesson's non-federal shipments are not entitled to derivative sovereign immunity, Plaintiffs cannot use those shipments as a backdoor means of obtaining relief for McKesson's PPV shipments.  To do so would implicate this Court in an improper exercise of subject matter jurisdiction.  Because McKesson's PPV shipments are inextricably intertwined with Plaintiffs' public nuisance claim, this Court must dismiss that claim in full to preserve the derivative sovereign immunity to which McKesson is clearly entitled.

Plaintiffs allege that *the aggregate total* of McKesson's distribution into Huntington and Cabell County contributed to a single, "*indivisible* injury."  Third Amend. Compl. ¶ 1448.  Indeed, the operative complaint plainly puts at issue *all* of McKesson's prescription opioid shipments into Huntington and Cabell County—not just its shipments to non-federal clients.  *See, e.g.*, Third Amend. Compl. ¶¶ 144, 862 (detailing McKesson's total distribution into Huntington and Cabell from 2006 to 2014).  Because Plaintiffs do not carve out McKesson's federal PPV shipments, those

shipments—over which this Court lacks subject matter jurisdiction—are necessarily included within the scope of Plaintiffs' public nuisance claim.[13]

McKesson's PPV shipments are also necessarily included in the scope of Plaintiffs' requested relief for future abatement damages. Plaintiffs allege that the sum of McKesson's distributions "contributed substantially to the public nuisance and harms alleged in the Plaintiffs' Community," *id.* ¶ 863, and seek to recover abatement damages consisting of future "expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services," *id.* ¶ 1437. But Plaintiffs do not—and cannot—sever the alleged abatement costs of responding to McKesson's PPV distribution from the costs of abating harms allegedly caused by McKesson's distribution to non-federal customers. On the contrary, Plaintiffs have made clear that they are not seeking to hold each defendant liable for their alleged share of distribution—let alone that portion of their alleged share that is justiciable—but are rather seeking to hold each defendant jointly and severally liable for creating ***the entire public nuisance***.[14]

Put simply, Plaintiffs' public nuisance claim is based on the alleged oversupply of prescription opioids within Huntington and Cabell County, and Plaintiffs themselves have asserted that their public nuisance claim cannot be divided between opioids distributed pursuant to the PPV Contract—over which this Court lacks subject matter jurisdiction—and those distributed to non-federal customers. Because Plaintiffs do not exempt McKesson's immune PPV shipments from

---

[13] Even though Plaintiffs' experts do not analyze McKesson's PPV shipments, *see supra* Part I, Plaintiffs have not disclaimed reliance on those shipments, which are clearly encompassed within the scope of Plaintiffs' public nuisance claim.

[14] *See, e.g.*, Third Amend. Compl. ¶ 1419 ("Each Defendant is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Plaintiff."); *id.* ¶ 1433 ("It was reasonably foreseeable that Defendants' actions and omissions would result in *the public nuisance* and harm to Plaintiffs described herein.").

their "indivisible" public nuisance case, and because Plaintiffs cannot distinguish between any harm allegedly caused by McKesson's immune and non-immune shipments, this Court must dismiss Plaintiffs' public nuisance claim against McKesson in its entirety for lack of subject matter jurisdiction.

**B.    McKesson's Non-PPV Shipments Do Not Constitute an "Unreasonable" Interference With a Public Right.**

Dismissal is warranted for a second, independent reason: Plaintiffs have no evidence and cannot prove that McKesson's non-federal shipments of opioids to pharmacies in Huntington and Cabell County were a substantial factor in bringing about the alleged public nuisance.

Conduct "which the public convenience imperatively demands[] cannot be a public nuisance." *Pope v. Edward M. Rude Carrier Corp.*, 138 W.Va. 218, 226, 75 SE 2d 584, 589 (1953) (citing 39 Am. Jur., Nuisances, Section 8). It is beyond legitimate dispute that the vast majority of McKesson's distributions of prescription opioid medicines were demanded and required by the public, acting through the VA. For the reasons described above, the prescription opioids that McKesson shipped to the VAMC pursuant to the PPV Contract are entitled to derivative sovereign immunity, and therefore cannot support a finding of liability on the part of McKesson. *See* Part I.

Stripped of their ability to premise a public nuisance claim on the aggregate total of McKesson's opioid shipments, Plaintiffs must demonstrate that McKesson's non-federal shipments—*i.e.*, the only shipments over which this Court even arguably has subject matter jurisdiction—were a "substantial factor" in bringing about the alleged public nuisance. *See Tracy v. Cottrell ex rel. Cottrell*, 206 W. Va. 363, 380 n.17, 524 S.E.2d 879, 896 n.17 (1999) ("An

16

indivisible injury results when two or more causes combine to produce a single injury … and each is a ***substantial factor*** in bringing about the harm.").[15]  Plaintiffs cannot meet this burden.[16]

McKesson's distribution of prescription opioids to non-federal customers constitutes ***only five percent*** of the total opioid distribution into Huntington and Cabell County from 2006 to 2014. *See* Ex. 6 (Boberg Rep.) at ¶ 77.  Plaintiffs, moreover, have ***no evidence*** that this small portion of the overall prescription opioid distribution into Huntington and Cabell County caused them any harm.  At most, Plaintiffs identify ***two specific pharmacies*** in Huntington and Cabell County that McKesson purportedly supplied in quantities "that were inconsistent with public health."  Ex. 9 (Siegel Rep. at 60–65) (discussing McKesson's distribution to Rite Aid Pharmacy #3311 and #968).  But McKesson's distribution to those pharmacies accounted for only 1.6% of the total volume of opioids distributed into Cabell/Huntington, *see* Ex. 10 (Distribution Summary 2006-2014), and Plaintiffs make no showing and have no evidence that any (let alone a significant number) of the prescriptions filled by those pharmacies were not the result of doctors' medical judgments under then-prevailing standards of care.  Such a small sliver of total shipments into Cabell/Huntington could not have substantially contributed to the claimed public nuisance of an "excess supply" of prescription opioids.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' public nuisance claim for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3).  Alternatively,

---

[15] *See also Lilly v. Taylor*, 151 W. Va. 730, 747, 155 S.E.2d 579, 589 (1967) ("The proximate cause of an injury is the superior or controlling agency from which springs the harm, as contradistinguished from those causes which are merely incidental or subsidiary to such principal and controlling cause.").

[16] For the same reasons, Plaintiffs likewise cannot establish that McKesson's conduct *substantially* and *unreasonably* interfered with any public right.

the Court should dismiss Plaintiffs' public nuisance claim as a matter of law pursuant to Fed. R.

Civ. P. 56(a).


Dated: September 22, 2020


Respectfully Submitted,

**McKesson Corporation**
By Counsel:

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*/s/ Timothy C. Hester*
Timothy C. Hester
Paul W. Schmidt
Christian J. Pistilli
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
pschmidt@cov.com
cpistilli@cov.com
lflahivewu@cov.com

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on this 22nd day of September, 2020, the foregoing "MEMORANDUM OF LAW IN SUPPORT OF MCKESSON CORPORATION'S MOTION FOR DISMISSAL ON DERIVATIVE SOVEREIGN IMMUNITY GROUNDS" was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jeffrey M. Wakefield
Jeffrey M. Wakefield (WVSB #3894)