# EXHIBIT 2

# FILED UNDER SEAL

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * * * * * *
THE CITY OF HUNTINGTON,
            Plaintiff,
vs.                                   CIVIL ACTION
                                    NO. 3:17-01362
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

            Defendants.

_____

CABELL COUNTY COMMISSION,

            Plaintiff,

vs.                                   CIVIL ACTION
                                    NO. 3:17-01665
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
            Defendants.
* * * * * * * * * * * * * * * * * * * * * * * * * *


            Videotaped and videoconference deposition of
JAMES GELDHOF taken by the Defendants under the Federal
Rules of Civil Procedure in the above-entitled action,
pursuant to notice, before Teresa L. Harvey, a West
Virginia notary public and Registered Diplomate
Reporter, the witness appearing via videoconference from
Detroit, Michigan, West Virginia, on the 22nd day of
September, 2020.

Page 16

1      A.   To the best of my knowledge, yes.

2      Q.   Did you find those documents yourself from some

3  larger dataset or were those documents that were given

4  to you by the -- by the plaintiff lawyers?

5      A.   I requested the documents and they provided

6  them to me.

7      Q.   What specifically was your request in terms of

8  documents that you wanted?

9      A.   When they asked me to prepare this witness

10  report, the purpose of it was to assist the court in

11  giving an inside look or basically DEA's role within the

12  closed system of distribution.  Knowing that, I wanted

13  to look at certain documents I thought would impact my

14  ability to make that -- you know, that -- that report.

15      Q.   And what were those categories of documents you

16  wanted to look at that would impact that report?

17      A.   I wanted to look at the actions taken by DEA.

18  I wanted to take a look at the Congressional inquiry

19  into West Virginia.  I wanted to look at correspondence

20  between DEA and HDMA in guiding -- in policy guidance.

21  I'm trying to think of anything else off the top of my

22  head.  There were other -- I wanted to look at the --

23  the suspicious -- the -- I'm sorry, the meetings that

24  Rannazzisi had, the distributor initiative meetings.  I

1    1    wanted to look at Rannazzisi's letter.  I wanted to look

2    2    at the letters that DEA sent -- the letters where he

3    3    sent back to, I think it was Mr. Walker, a culmination

4    4    of the meetings.  I'd have to go through the report and

5    5    look at others.  Those are off the top of my head.

6    6        Q.  Why was it important to you to look at actions

7    7    taken by the DEA?

8    8        A.  Because I think it summarizes our response to

9    9    the opioid epidemic as it pertains to the distributor

10   10   initiative.

11   11       Q.  And why was it important for you to look at

12   12   meetings that Mr. Rannazzisi had with distributors?

13   13       A.  Because I think it set the table for him

14   14   putting them on notice of what the expectations were of

15   15   them.

16   16       Q.  When did those meetings occur where he put the

17   17   distributors on notice as to what was expected of them?

18   18       A.   I think the first distributor initiative

19   19   meeting was fall of 2005, maybe the end of August,

20   20   September 2005.

21   21       Q.  Are you aware of any equivalent meetings DEA

22   22   held with distributors before then where they put them

23   23   on notice of what was expected of them?

24   24       A.  I believe the DEA headquarters did have

25

Page 19

1    1    Cardinal before the fall of 2005 to put them on notice

2    2    of what was required of them?

3    3        A.  I wouldn't know.  That's, again, a headquarters

4    4    situation.

5    5        Q.  A moment ago when you were talking about the

6    6    DEA you referred to the DEA as -- as "we," and what we

7    7    did.  You're not here to speak for the DEA; correct?

8    8        A.  I am not.

9    9        Q.  You -- did you obtain any kind of clearance to

10   10   testify from DEA?

11   11       A.  There was a -- not -- not in this matter, no.

12   12       Q.  Are you familiar with a regulation that's

13   13   referred to as the Touhy regulation?

14   14       A.  I am.

15   15       Q.  Did you submit your report or your proposed

16   16   testimony to DEA to obtain Touhy approval under that

17   17   regulation?

18   18       A.  I did not.

19   19       Q.  Do you intend to comply with that regulation as

20   20   you understand it?

21   21       A.  Absolutely.

22   22       Q.  Okay.  And so what -- what is it you understand

23   23   that Touhy permits or doesn't permit you to testify

24   24   about?

25

1       A.  It does not permit me to -- to testify about

2   anything that would not be public information.

3       Q.  So if I were to ask you details of

4   investigatory work you did at the DEA, would you answer

5   those questions?

6       A.  No.

7       Q.  You mentioned in your report some

8   investigations that you were involved in, including

9   regarding McKesson.  If I ask you for details about the

10   McKesson investigation, would you answer those

11   questions?

12       A.  No, only what's public information.

13       Q.  Other than the fact of -- of the McKesson

14   settlements, is there anything you would tell me about

15   the McKesson investigations?

16       A.  Off the top of my head -- I'd have to hear a

17   question, but off the top of my head, probably not.

18       Q.  Okay.  For example, if I were to ask you

19   questions -- and this goes for any investigation, but

20   I'll focus in on McKesson.  If I were to ask you

21   questions as to information you learned that might not

22   be reflected in the settlement agreement, would you

23   share that with me?

24       A.  No.

25

Page 21

1       Q.   If I were to ask you questions about whether

2   there were differences of opinion within the DEA or with

3   counsel working with the DEA over the course of action

4   or the strength of the evidence, would you answer those

5   questions?

6       A.   No.

7       Q.   If I were to ask you whether there were

8   recognized weaknesses in the case within the DEA or with

9   DEA's counsel, would you answer those questions?

10      A.   No.

11      Q.   If I were to ask you if there were dissenting

12  voices who said this is the wrong course of action,

13  we're actually going to harm public health by pursuing

14  this action, would you answer those questions?

15      A.   No.

16      Q.   Okay.  And I just had to give you some specific

17  ones just to make sure I covered the waterfront.  There

18  is nothing you can identify for me in terms of details

19  of your investigation of McKesson or other distributors

20  or other pharmacies or doctors that you would share with

21  me provided it's not public; correct?

22      A.   Correct.

23      Q.   Let's go back to the documents you looked for.

24  Did -- did you conduct any independent search of

25

Page 22

1    documents that have been produced in this case by ABDC,

2    Cardinal or McKesson?

3        A.   Search?  I would say no.

4        Q.   Did you conduct any search of the documents

5    that have been produced by Huntington or Cabell County?

6        A.   No.

7        Q.   Did you conduct any -- any media search or

8    literature search or news search by yourself?

9        A.   No, not really.  I checked -- you know, just

10   general searches regarding the companies and any

11   dealings they might have had with DEA that I didn't know

12   about but that was it and I didn't -- I didn't really

13   see anything.

14       Q.   Did you review any documents that were not

15   provided to you by the attorneys in preparing your

16   report?

17       A.   I don't believe so.

18       Q.   Do you know how much of a proportion or

19   fraction of the total documents that have been provided

20   in this case you actually reviewed?

21       A.   No.

22       Q.   Do you take any issue with it being a tiny

23   fraction?

24       A.   I wouldn't know whether to take issue with it

25

Page 23

1      1    or not.  I don't know.

2      2          Q.  Okay.  Do you have your report in front of you?

3      3          A.  I do.

4      4          Q.  Exhibit 1, did you write this or was it written

5      5    for you?

6      6          A.  I wrote it.

7      7          Q.  Are you ready to testify fully regarding the

8      8    opinions in the report?

9      9          A.  I am.

10     10         Q.  Is there any further work you know of that you

11     11   need to do to be able to testify?

12     12         A.  No.

13     13         Q.  Does it contain all the opinions you intend to

14     14   offer in this case?

15     15         A.  Yes.

16     16         Q.  All right.  So let's just go through it quickly

17     17   at a high level.  On Page 1 you give your experience and

18     18   training.  And then from Pages 2 through 3 you talk

19     19   about the laws and regulations.

20     20         A.  Yes.

21     21         Q.  Or some of the laws and regulations that apply

22     22   relating to the DEA and controlled substances; correct?

23     23         A.  Yes.  Yes.

24     24         Q.  And you're not here testifying as a lawyer on

25

                                                          Page 26

1        enforcement actions.

2            Q.   Oh, got it.  Got it.  Are there any opinions

3        that you give in your report that you intend to testify

4        about regarding the specific conduct of any defendant in

5        this case?

6            A.   No.

7            Q.   And, for example, you don't talk about any

8        defendants' Suspicious Order Monitoring Systems;

9        correct?

10           A.   No.

11           Q.   I don't believe you reviewed those in preparing

12       your opinion; correct?

13           A.   Correct.

14           Q.   Do you -- if I were to ask you for Cardinal or

15       ABDC or McKesson, what are the names of their programs

16       at different points in time, would you be able to answer

17       that?

18           A.   No.

19           Q.   You didn't review, as I understand it, any

20       communications between ABDC, Cardinal and McKesson on

21       the one hand or, one of them individually, and the DEA

22       about their Suspicious Order Monitoring Programs, did

23       you?

24           A.   I did.

25

Page 31

1    1    distributor into West Virginia?

2    2         A.  Yes.

3    3         Q.  Were they a meaningful distributor into Cabell

4    4    County and Huntington?

5    5         A.  I don't -- I can't remember the counties.  I

6    6    can only tell you in the state.

7    7         Q.  Do you know if McKesson, Cardinal and ABDC

8    8    specifically distributed into Cabell County and

9    9    Huntington?

10   10        A.  I don't.

11   11        Q.  Do you know if Miami-Luken and McKesson,

12   12   Cardinal, ABDC are all defendants in this case?

13   13        A.  Miami-Luken isn't.

14   14        Q.  And do you know why they're not?

15   15        A.  I believe they're out of business.

16   16        Q.  Do you -- do you have any opinions against

17   17   Miami-Luken?

18   18        A.  Yes.

19   19        Q.  And what are your opinions with respect to

20   20   Miami-Luken?

21   21        A.  My personal opinions?

22   22        Q.  Sure.

23   23        A.  I think they were a pretty bad company and they

24   24   sold a lot of pills for illicit purposes into West

25

Page 32

1       1       Virginia, as did others.

2       2               Q.  Why were they -- sorry I cut you off.

3       3               A.  Okay.  As did others.

4       4               Q.  Why -- why were they a pretty bad company?

5       5               A.  Their volume of sales was pretty extreme.  It

6       6       was sales of abuse of hydrocodone, oxycodone, rural

7       7       counties.  I think the -- the addiction rate in West

8       8       Virginia has been pretty well chronicled, and I think

9       9       it's -- I'm pretty familiar with Portsmouth, Ohio and

10      10      it's been basically the same area.  And I think what

11      11      happened to people down in that area of the country

12      12      is -- is outrageous.  I really do.

13      13              Q.  Are you offering any specific opinions against

14      14      Miami-Luken in your report?

15      15              A.  No.

16      16              Q.  Are you offering any specific opinions against

17      17      McKesson in your report?

18      18              A.  No.  No.

19      19              Q.  Same answer for ABDC and Cardinal, no specific

20      20      opinions against them in your report?

21      21              A.  Correct.

22      22              Q.  All right.  And just to round out that line of

23      23      questions.  You've not reviewed any testimony from

24      24      employees of ABDC, Cardinal, or McKesson taken in this

25

1    to review depositions, probably a couple years ago.   I

2    reviewed certain depositions and then it ended probably

3    a year and a half ago.  So I have read depositions of

4    people from ABC [sic], Cardinal, and -- and McKesson.

5         Q.   My question is did you undertake a complete

6    review of all the depositions?

7         A.   No.

8         Q.   Did you undertake a complete review even of all

9    the depositions of people at those companies who were

10   responsible for meeting Controlled Substances Act

11   responsibilities?

12        A.   I read the depositions of some of them.   I

13   don't know what you mean by "review," but I have read

14   them.

15        Q.   That's my question.  Did you review all of

16   them?

17        A.   Oh, no, I did not.

18        Q.   Have you undertaken any review of whether

19   McKesson's, Cardinal's and ABDC's compliance with the

20   Controlled Substance -- Substances Act was better,

21   worse, the same as other distributors in West Virginia?

22        A.   No.  I was not asked to do that.

23        Q.   Am I correct that you have not studied ABDC,

24   Cardinal or McKesson customers in Cabell County?

25

1    A.   That's correct.

2    Q.   You don't identify any problematic customers

3  that they had in Cabell County or Huntington; correct?

4    A.   I don't.

5    Q.   You don't know of an instance where they

6  shipped to a pharmacy or other dispensing entity in

7  Cabell County or Huntington that was not licensed by the

8  DEA and the State of West Virginia?

9    A.   I -- I didn't review that, no.

10   Q.   You don't know of instances where they shipped

11  and the pills they shipped were dispensed without valid

12  prescription; correct?

13   A.   I have no knowledge of that.

14   Q.   And have you -- you have not identified any

15  volume of pills they supplied in Cabell County or

16  Huntington that were -- that were diverted; correct?

17   A.   Correct.

18   Q.   In your report, you talk about -- and you've

19  already mentioned this today.  You talk about a

20  Congressional hearing report from the Energy and

21  Commerce Committee?

22   A.   Yes.

23   Q.   Do you know what I'm -- what I'm referencing?

24   A.   I do.

Page 37

1       Q.  And let's just go ahead, I'm going to show you

2    a demonstrative.  I'll just put it up on the screen.

3    It's just going to be some names.

4       A.  Okay.

5              MR. SCHMIDT:  If you could put up the

6    demonstrative with the pharmacies.

7       Q.  Do you see these names here?  And I'll just

8    read them into the record:  Sav-Right No. 1, Family

9    Discount, Tug Valley, West Side, Hurley Drug Company,

10   Beckley.  Do you recognize those -- those pharmacy

11   names?

12      A.  I do.

13      Q.  Do you know that those are the pharmacies

14   mentioned specifically in the Energy and Commerce

15   Report?

16      A.  I can't remember if they're specific in that,

17   but I know the names.

18      Q.  Which one of those pharmacies, if any, are in

19   Huntington or Cabell County?

20      A.  I don't know.

21      Q.  Do you know if any of the pharmacies identified

22   in the Energy and Commerce Report are in Huntington or

23   Cabell County?

24      A.  I do not.

25

1     A.  No.

2     Q.  Did you review diligence files for pharmacies

3   in Cabell County or Huntington?

4     A.  No.

5     Q.  Did you review thresholds change request

6   documentation for Cabell County and Huntington?

7     A.  No.

8     Q.  Did you review the diligence undertaken as to

9   existing customers by ABDC, McKesson, or Cardinal in

10  Cabell County or Huntington?

11    A.  No.

12          COURT REPORTER:  Hold on one second,

13  please, so I can mute my mic, if I can find it.

14          I'm sorry, go ahead.

15    Q.  So am I correct that you've got no opinions as

16  to the due diligence conducted by McKesson, Cardinal or

17  ABDC for Huntington or Cabell County pharmacies?

18    A.  Correct.

19    Q.  Am I correct that you did not review any

20  records of shipments blocked by the distributors to

21  pharmacies in Cabell County or Huntington?

22    A.  I did not.

23    Q.  Do you have any opinions about doctors --

24  specific doctors or other prescribers in Cabell County

25

Page 45

1    or Huntington?

2         A.  No, I do not.

3         Q.  Have you undertaken any review of prescribing

4    practices or medical need in Cabell County or

5    Huntington?

6         A.  No.

7         Q.  You're not offering any view as to whether --

8    as to what the appropriate level of prescription opioids

9    for Cabell and Huntington are, are you?

10         A.  I am not.

11         Q.  You're not offering any views on whether any

12    specific level of appropriate prescription opioid

13    shipments were exceeded in Cabell County or Huntington;

14    correct?

15         A.  I'm not.

16         Q.  You're not offering an opinion on whether there

17    was actual diversion of pills sent by McKesson or

18    Cardinal or ABDC to Huntington or Cabell County;

19    correct?

20         A.  I am not.

21         Q.  You're not offering any opinion on whether

22    pills sent by McKesson, Cardinal or ABDC to Huntington

23    or Cabell County actually caused harm in those

24    jurisdictions; correct?

25

Page 46

1        A.   Correct.

2        Q.   Your -- your report does not discuss any West

3    Virginia state legal obligations; correct?

4        A.   Correct.

5        Q.   And I take it you've not studied those

6    obligations or how defendants met them?

7        A.   I have not.

8        Q.   I think I covered this.  You didn't review any

9    specific suspicious orders made for Huntington or Cabell

10   County by defendants or anyone else?

11       A.   I did not.

12       Q.   Do you know which distributor was the largest

13   distributor at any point in time into Cabell County or

14   Huntington?

15       A.   I do not.

16       Q.   Do you know if it was one of the three: ABDC,

17   Cardinal or McKesson?

18       A.   I do not.

19       Q.   You reviewed -- if you -- if you go back to

20   your report, Exhibit 1.

21       A.   Uh-huh.

22       Q.   Right at the very end of the materials

23   considered, there's a list of DEA testimony, on Page 5.

24   Tell me when you -- when you have that there.

25

1    1         Q.  Am I correct that you've not reviewed testimony

2    2    from Mr. Strait, Ms. Harper-Avilla, Ms. Howard, and

3    3    Mr. Martin?

4    4         A.  That's correct.

5    5         Q.  And is there a reason you didn't review their

6    6    depositions?

7    7         A.  I probably didn't even know about them.

8    8         Q.  Am I correct that you've not reviewed documents

9    9    generated by Cabell County or Huntington regarding

10   10   prescription opioids?

11   11        A.  Correct.

12   12        Q.  And there's no analysis you've conducted as to

13   13   harm from the opioid crisis, specifically in Cabell

14   14   County or Huntington; is that correct?

15   15        A.  Correct.

16   16        Q.  There's no opinion you're giving regarding harm

17   17   caused by McKesson, ABDC, or Cardinal in Cabell County

18   18   or Huntington?

19   19        A.  That's correct.

20   20        Q.  Was -- was it important for you, in the

21   21   categories of documents that you did look at, for you to

22   22   review the complete set of documents in that given

23   23   category?

24   24        A.  I don't -- I'm sorry, I don't understand the

25

1       1    question.  Could you --

2       2         Q.  Yeah, of course.  There -- there were certain

3       3    categories of documents you looked at, and you mentioned

4       4    some of them earlier.  For example, you mentioned the

5       5    meetings that Mr. Rannazzisi had with the distributors.

6       6              Do you remember referencing that?

7       7         A.  Yes.

8       8         Q.  When you were looking at a -- at a topic like

9       9    that, was it important for you to review all the

10      10    documents you could find regarding that topic?

11      11         A.  I tried to, yes.

12      12         Q.  For example, are you aware that there are

13      13    meeting minutes of some of those meetings that were held

14      14    during the Distributor Initiatives with the distributors

15      15    in this case that do not appear on your list of

16      16    documents reviewed?

17      17         A.  No, I'm not.

18      18         Q.  Have you reviewed such meeting minutes

19      19    reflecting the meetings between DEA and the distributors

20      20    in this case as part of a Distributor Initiative?

21      21         A.  I have not.

22      22         Q.  You list on your list -- and I can point you to

23      23    where it is, if you want, but you list on your list some

24      24    communications that Congress had with the companies in

25

Page 62

1           1           (Brief recess.)

2           2                   VIDEOGRAPHER:  The time is 10:15 a.m.  We

3           3       are on the record.

4           4                   MR. SCHMIDT:  I don't have Mister --

5           5       Mr. Geldhof on the screen.  Is that just a problem on my

6           6       end?

7           7                   Oh, now I do.

8           8       BY MR. SCHMIDT:

9           9           Q.  Mr. Geldhof, are you ready to proceed?

10          10          A.  I am.

11          11          Q.  Okay.  Just -- just to clarify something you

12          12      referenced a couple times.  You're here as an expert

13          13      witness; correct?

14          14          A.  Correct.

15          15          Q.  You're not here as a fact witness regarding

16          16      your work at DEA; correct?

17          17          A.  Correct.

18          18          Q.  And the reason I ask that is because you've --

19          19      you've mentioned personal opinions a few times, and I've

20          20      not delved into some of those personal opinions in

21          21      detail.

22          22                  You're not here to offer your personal

23          23      opinions; correct?

24          24          A.  Absolutely not.  Only if I'm asked.

25

Page 63

1     1     Q.   Okay.  And I take it your personal opinions are

2     2    based on the specific work you did at the DEA; correct?

3     3     A.   Correct.

4     4     Q.   Including work that, if I were to ask you to

5     5    detail us about, you would say, "I can't talk about that

6     6    because of that Touhy issue we were discussing."

7     7    Correct?

8     8     A.   Correct.

9     9     Q.   Okay.  Have you ever been to Huntington or

10    10   Cabell County?

11    11     A.   I don't believe so.

12    12     Q.   When you discuss in your report various

13    13   settlement documents, do you -- do you understand that

14    14   those settlements focus on specific distribution centers

15    15   and specific pharmacies?

16    16     A.   Yes.

17    17     Q.   Do you know that none of those -- do you know

18    18   whether any of those distribution centers supplied

19    19   Cabell County or Huntington?

20    20     A.   I would like to just amend my -- my last

21    21   statement.  While -- and I -- I don't know for sure that

22    22   this was the fact, but, a lot of times, while the

23    23   specific administrative or civil action may cover one or

24    24   two distributorships, generally speaking, the MoUs cover

25

Page 113

1        Q.  Are there any pharmacies in West Virginia you

2     can point me to where DEA specifically acted on those

3     suspicious orders with respect to the pharmacy in terms

4     of investigation or in terms of reregistration of that

5     pharmacy?

6        A.  No.

7        Q.  Are you aware that DEA has access to ARCOS

8     data?

9        A.  Yes.

10       Q.  And does that ARCOS data include data on

11    pharmacy dispensing?

12       A.  It includes data on pharmacy purchases.

13       Q.  Does DEA have access to individual

14    doctor-prescribing information?

15       A.  I'll qualify that.  Yes, through the different

16    state programs, but there's different criteria to use

17    those programs.  I don't -- a lot of states do not share

18    the information as much as they should and I -- you

19    know, but technically, yes.

20       Q.  Do you have any knowledge of any limitations in

21    access to prescriber data in West Virginia that DEA

22    suffered from?

23       A.  I have no idea.

24       Q.  Do you know of any actions in registering or, I

25

Page 114

1    1    guess, in reregistering doctors that DEA -- strike that.

2    2              Do you know if DEA ever looked at ARCOS

3    3    data in reregistering pharmacies?

4    4         A.  I have no idea.

5    5         Q.  Do you know if DEA ever evaluated prescribing

6    6    data in reregistering doctors or deciding whether to

7    7    investigate doctors?

8    8         A.  You know, West Virginia was not my field

9    9    division.  I can't speak to that.

10   10        Q.  What about nationwide?  Do you know if

11   11   nationwide the DEA ever routinely looked at prescriber

12   12   data in reregistering doctors or deciding whether

13   13   they're going to investigate them?

14   14        A.  You mean -- are you talking about state --

15   15   state data?

16   16        Q.  Yeah.

17   17        A.  I can only speak about Detroit.  I can't speak

18   18   about other offices.

19   19        Q.  Okay.  In Detroit, did DEA regularly consult

20   20   with state prescribing data before reregistering

21   21   doctors?

22   22        A.  I wouldn't say regularly, but it was done.

23   23        Q.  And do you know if it ever led to any

24   24   individual doctor not being reregistered?

25

1         1        A.   That's correct.

2         2        Q.   And are you aware of whether there's any single

3         3   entity or person you could point me to and say, if that

4         4   company wouldn't have done what they did, or that

5         5   individual wouldn't have done what they did, standing

6         6   alone, the opioid crisis would have been meaningfully

7         7   different in Cabell County or Huntington?

8         8        A.   No.

9         9             MS. QUEZON:   Object to the form.

10        10             THE WITNESS:   No information.

11        11        Q.   Okay.   And that includes the distributors in

12        12   this case; correct?

13        13             MS. QUEZON:   Object to the form.

14        14             THE WITNESS:   I have no information about

15        15   how much a distributor is sending to all of West

16        16   Virginia.

17        17        Q.   Okay.   You've -- you've given no opinion on

18        18   what it will take to remediate the opioid crisis in

19        19   Cabell County; right?

20        20        A.   Yes.

21        21        Q.   Do you know how much of remediation efforts

22        22   should be focused on prescription versus illegal drugs?

23        23             MS. QUEZON:   Object to the form.

24        24             THE WITNESS:   No idea.

25

Page 315

1   don't know if counsel knows right now what the actual

2   specific hours are.

3                   MS. QUEZON:  I don't.

4                   MR. SCHMIDT:  We will request

5   confirmation of that.

6                   MS. QUEZON:  Okay.

7                   MR. SCHMIDT:  Let me just look at my

8   notes for a minute, Mr. Geldhof.

9                   VIDEOGRAPHER:  Are we going off the

10  record?

11                  MR. SCHMIDT:  No, let's stay on the

12  record.

13  BY MR. SCHMIDT:

14      Q.  Are there any opinions you were asked to give

15  in this case that you couldn't give for any reason?

16      A.  No.

17      Q.  Are there any opinions that you were given in

18  this case that the lawyers did not ask you to give?

19      A.  No.

20      Q.  Are there any other experts in this case from

21  the plaintiffs or the defendants that you've spoken to

22  in connection with your work on this case?

23      A.  Not about the report or not about the

24  deposition.

25