IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,
    Plaintiff,

v.

AMERISOURCEBERGEN
DRUG CORPORATION, et al.,
    Defendants.

CIVIL ACTION NO. 3:17-01362
Honorable David A. Faber

———

CABELL COUNTY COMMISSION,
    Plaintiff,

v.

AMERISOURCEBERGEN
DRUG CORPORATION, et al.,
    Defendants.

CIVIL ACTION NO. 3:17-01665
Honorable David A. Faber

**DEFENDANTS' MOTION TO EXCLUDE
EXPERT TESTIMONY OF THOMAS McGUIRE**

### Introduction

Plaintiffs intend to present expert testimony from Thomas McGuire, a professor of health economics, to answer a legal question—whether "the sales and distribution of [all] prescription opioid products" in the City of Huntington and Cabell County constitutes a "public nuisance." Apart from the question being a legal one, which McGuire is not competent to answer, it is the wrong legal question. Because McGuire's opinion does not "fit" the facts of this case, and because it is fundamentally flawed in two additional ways, each of which requires its exclusion under Rule 702 and *Daubert*, the Court should exclude McGuire's testimony.

To understand why, certain context is helpful. It is commonplace in this litigation that prescription opioids were at all relevant times (and are to this day) FDA-approved medications that are safe and effective for their indicated uses. Plaintiffs' experts recognize that prescription opioids have a legitimate medical use[1]—certainly for "treating acute, post-operative, and procedural pain and end-of-life care,"[2] but also for chronic pain, if the benefits for pain-reduction and function outweigh the risks.[3] Thus, Plaintiffs do not claim that doctors in the City and County should not have prescribed opioids at all; they claim that these doctors over-prescribed opioids—and, consequently, pharmacies "over-dispensed" by filling those prescriptions, and, in turn, distributors "over-supplied" by filling orders from those pharmacies.

But Plaintiffs also recognize (as the complaints allege) that the treatment guidelines for prescribing opioids changed to approve the long-term use of opioids for chronic pain and that the vast majority of doctors prescribed opioids in good faith. Thus, Plaintiffs do not claim that, in over-prescribing opioids, doctors committed malpractice and should be held accountable in this litigation for the crisis of opioid addiction; rather, Plaintiffs allege that doctors were duped by deceptive marketing and manufacturer-influenced treatment guidelines into over-prescribing.

---

[1] See Appendix ("App.") 2 (Report of Daniel Ciccarone, MD, MPH, p. 36) (describing the "legitimate medical use of opioids for pain"); App. 7 (Report of Katherine Keyes, PhD, p. 8) (describing prescription opioids as "approved for medical use in the United States for the control of moderate to severe pain," and noting that they may be "prescribed by a physician and used as directed by that physician exercising professional judgment"); App. 11 (Report of Anna Lembke, M.D., p. 63) (noting that prescription opioids provide "acute pain relief").

[2] See App. 191 (Final Report of The President's Commission on Combatting Drug Addiction and the Opioid Crisis (Nov. 1, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf, p. 48); App. 91-143 (CDC Guideline for Prescribing Opioids For Chronic Pain—United States, 2016, Recommendations and Reports/ Mar. 18, 2016/ 65/1; 1-49. https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf).

[3] App. 108 (CDC Guideline at 16) ("Determining When to Initiate or Continue Opioids For Chronic Pain, No. 1").

Finally, Plaintiffs do not contend that the three distributor Defendants created a public nuisance simply because they distributed prescription opioids; they allege that Defendants engaged in wrongful conduct (failing to flag and halt shipment of "suspicious" pharmacy orders) and that this wrongful conduct created, or substantially contributed to, a public nuisance.

All this is basic. But McGuire's opinion that "the sale and distribution of [all] prescription opioid products" created a public nuisance ignores the basic facts that (i) not all opioid prescribing from 2006 to 2018 was medically illegitimate (even according to current guidelines), (ii) not all "over-prescribing" was contrary to the then-prevailing guidelines, (iii) not all distribution of prescription opioids constituted "over-supply," (iv) not all distribution of prescription opioids in the City and County was even by these Defendants, and (v) not all opioids distributed to (then dispensed by) pharmacies in the City and County were diverted to illicit use. McGuire's failure to account for these basic facts requires the exclusion of his testimony under Rule 702 and *Daubert* for the following three reasons:

- First, his opinion that the distribution of prescription opioids constituted a public nuisance is irrelevant—it does not "fit" the facts of the case, as *Daubert* requires—because his **economic** analysis concerns the calculation of "negative externalities" and has little or nothing to do with public nuisance, as **West Virginia law** defines the cause of action.

- Second, even if that frame of analysis were relevant, McGuire analyzed the wrong question—i.e., whether **all sales and distribution** of prescription opioids to pharmacies in the City and County imposed costs that exceeded the benefits of the medications. The right, and only relevant, question concerns **a subset** of all sales and distribution—namely, whether (i) the wrongful distribution (ii) by these Defendants, (iii) of prescription opioids

that were prescribed contrary to the prevailing treatment guidelines and (iv) were diverted to illicit use imposed costs that exceeded the benefits of the medications. Not only did McGuire not address that question, he testified, "I wouldn't know how to do it. It's not within my expertise."[4]

- Third, although McGuire purports to opine about costs—*weighed against* the benefits—of sales and distribution to pharmacies in the City and County, he does not reliably take account of the benefits of prescription opioids. Although he independently quantified each category of costs, he made no comparable effort to quantify the benefits of these medicines. Having failed to measure the benefits of prescription opioids when properly prescribed, McGuire does not have a reliable methodology that weighs the costs against the benefits of prescription opioids.

### McGuire's Report and Testimony

In describing his assignment, McGuire states that he was asked three questions:

1. Does microeconomics provide a framework by which economists can determine the existence and extent of what is known, "under the law," as a public nuisance?

2. If so, what is the magnitude of the economic costs, "net of any benefits," imposed on the City and County "by the sales and distribution of prescription opioid products" there?

3. Are the net costs imposed by the sales and distribution of prescription opioid products "of sufficient magnitude to constitute a public nuisance" to the City and County?[5]

---

[4] App. 84 (Deposition ("Dep.") of Thomas McGuire (Sept. 9, 2020), p. 59).

[5] App. 19-20 (Report of Professor Thomas McGuire Regarding Public Nuisance in the Cabell Huntington Community in West Virginia, p. 4-5). McGuire was also asked to limit his analysis to the time period from 2006 to the present or the most recent period for which data are available, which he determined was 2018. App. 20 (*id*. at 5).

He answered those questions as follows:

1. There is a framework, known as "negative externalities." It analyzes the social consequences of private behaviors that impose harms on others.

2. The economic costs incurred by the City and County by the sales and distribution of prescription opioids "far exceed any benefits" to the tune of $4.17 billion (amended by errata to $3.499 billion). The principal components of that cost ($3.94 billion, amended to $3.27 billion) are excess deaths and morbidity.

3. The sales and distribution of prescription opioids imposed "net economic costs of sufficient magnitude to constitute a public nuisance."[6]

The starting point and subject of McGuire's analysis is "the sales and distribution of prescription opioid products" to pharmacies in the City and County. He purports to calculate the "magnitude of the economic costs, net of any benefits" imposed on the City and County by that "sales and distribution." At his deposition, McGuire was asked what he meant by "the sales and distribution of prescription opioid products":

> Q. … [Y]ou are quantifying the harms imposed by *all* sales and distribution of prescription opioids from 2006 through 2018. Correct?
>
> A. Well, yes. These are net harms. But yes. Other than that, I agree with your statement.
>
> Q. And so in quantifying the harms resulting from the sale or distribution of prescription opioids, *you didn't exclude any prescription opioid sales or distributions during that time period, 2006 to 2018*. Correct?
>
> A. *Didn't exclude*.
>
> \* \* \*

---

[6] App. 22-23 (*id*. at 7-8).

5

>    A.  Well, I considered, in total, the net harms or net costs associated with the sale and distribution of prescription opioids. ***I didn't think of myself as excluding anything***.
>
>    Q.  … [W]as there some category of prescription opioids that were sold and distributed that you excluded from your quantification of harms?
>
>    A.  No, I don't think so. ***I think I included everything***.[7]

In short, when McGuire calculated the net cost of opioid use, he did not separate out the costs from distributions by wholesale distributors other than Defendants ("my role was to estimate the total, and I understand that not have involved separating out the contribution of different actors").[8] Nor did he separate out the sales and distribution of opioids that would have represented an "appropriate" or "reasonable" level of prescribing.[9] Nor the volume of

---

[7] App. 8 (McGuire Dep. at 46-47). All emphases are added unless otherwise indicated. *See also* App. 82 (*id.* at 50) ("My understanding of my assignment would be to … account the net costs of *all* prescription opioids … without attempting to segment them into various categories"); App. 82 (*id.* at 51) ("Q. … So, again, you quantified what you call the net economic harm imposed by the sale and distribution of *all* prescription opioids in Cabell County, West Virginia from 2006 through 2018, right? A. … I would say 'net cost,' though. But yes, it's the net cost over that time period of the sale and distribution of *all* prescription opioids.").

[8] App. 81 (*id*. at 48); App. 83 (*id.* at 54); App. 83 (*id.* at 55) ("Q. And are you offering any opinion of what portion of the net economic harms or costs you quantified are due to the sale and distribution of prescription opioids *by the defendants in this case*? A. … *I also did not … apportion that to particular defendants. Or non-defendants*.").

He does not even know whether there were "sellers" (e.g., pharmacies, hospitals, pill mills) that did not get prescription opioids from Defendants or other wholesale distributors. App. 82 (*id*. at 49) ("Q. … Were there sellers of prescription opioids in Cabell County, West Virginia who did not get the prescription opioids they sold from wholesale distributors? … A. I'm not sure.").

[9] App. 82 (*id*. at 51-52) ("Q. … [Y]ou didn't do anything to further separate out or segment or tease out the economic harms based on an appropriate level of sales and distribution versus an inappropriate level of sales and distribution? A. … [M]y answer is the same: That my job was to look at the total net … costs of … the sale and distribution of *all* prescription opioids over that time period. And issues with respect to clinical appropriateness were not part of my assignment."); App. 82 (*id.* at 52) ("Q. … Did you separate out … the net economic harms or costs imposed by an excessive amount of sales and distributions of all prescription opioids versus a reasonable level of sale and distribution of prescription opioids? A. Well,

distribution that complied with Defendants' legal duties.[10] Nor the volume necessary to fill prescriptions written for a patient by their personal doctor,[11] nor the volume necessary to meet a legitimate medical need.[12] McGuire did not proceed on the premise that all distributions of prescription opioids by Defendants were unlawful, yet he also did not separate out lawful distributions (however Plaintiffs might define "lawful")[13] or distributions that were not diverted to illegal use.[14] Not only did McGuire testify clearly and repeatedly that he did not partition the total volume of sales and distributions in these ways (or any way), but also he testified that he did not know how to do so: "Again, I did not partition on this basis. I don't—*I wouldn't know how to do it. It's not within my expertise*."[15]

---

'reasonable' and 'excessive' in this context … are clinical terms. … [M]*y job was to look at the total* and look at the net."); App. 83 (*id*. at 53-54) (stating that he did not draw a dividing line between the level of distribution that constituted a nuisance and a level that did not).

[10] App. 83 (*id*. at 55) ("Q. So did you take any steps to eliminate from your calculations the economic harms or the costs of prescription opioids that were sold and distributed by the defendants in this case *without breaching any duty*? A. I think the answer to that is that I did not try to segment the sale and distribution of prescription opioids nor the economic costs associated with them ….").

[11] App. 84 (*id*. at 58) ("Did you make any assessment of which of the prescription opioids that were sold and distributed by defendants in this case were taken by people *pursuant to prescriptions written to them by their treating physician*? A. That's another partition of the total that I did not make.").

[12] App. 83-84 (*id*. at 56-57) ("Q. Did you make any assessment of which of the prescription opioids that were sold and distributed by defendants in this case were *justified by a clinical need*? A. Well, certainly not at the individual level did I attempt to determine whether individual prescriptions were a result of medical need.")

[13] App. 84 (*id*. at 59) ("Q. Then did you differentiate at all between the economic harms or costs that were imposed by *the unlawful sale and distribution of prescription opioids versus the lawful sale* and distribution of prescription opioids? … A. … I did not partition on this basis.").

[14] App. 84 (*id*. at 58-59) ("Q. Did you make any assessment of which of the prescriptions that were sold and distributed by defendants were *diverted* long after they left the closed distribution system? … A. No, I didn't make a quantification of diversion in this case.").

[15] App. 84 (*id*. at 59).

7

Because McGuire did not partition all sales and distributions in any of these ways, the figure for net economic costs he calculates—the figure on which he relies to conclude that sales and distributions constituted a public nuisance—even includes costs that admittedly were not proximately caused by prescription opioids:

> Q. You say in your report, 'From an economic standpoint, the costs due to the sales and distribution of prescription opioids include costs for which prescription opioids are the proximate cause' 'and those for which prescription opioids were the ultimate but not necessarily the proximate cause.'
> …
>
> Q. … It's page 17 of your report. …
>
> Q. Okay. So is it accurate to say that the costs you've calculated … as being due to the sales and distribution of prescription opioids include some costs for which prescription opioids are the proximate cause and some costs for which prescription opioids were not necessarily the proximate cause?
>
> A. I think that's fair to say.[16]

## ARGUMENT

### A. The Court Should Exclude McGuire's "Net Costs" Opinion Because It Does Not "Fit" the Facts of the Case.

Plaintiffs propose presenting McGuire to render an expert opinion on the ultimate issue in the case—whether the sales and distribution of prescription opioids to the City and County constituted a public nuisance. Rule 704 of the Federal Rules of Evidence provides that an opinion is not objectionable "just because it embraces an ultimate issue," and Defendants do not ask the Court to exclude McGuire's testimony on that basis. But under Rule 702, as interpreted by *Daubert*, all expert testimony—particularly testimony that opines on the ultimate issue—must "fit" the facts of the case. *U.S. v. Ancient Coin Collectors Guild*, 899 F.3d 295, 318 (4th Cir.

---

[16] App. 90 (*id*. at 145).

2018), cert. denied, 139 S. Ct. 1191 (2019) (expert witness's knowledge must "assist the . . . trier of fact to understand the evidence or to determine a fact in issue," which means the expert's proposed testimony must be relevant to the facts at issue or "fit" the case) (internal quotations omitted); *Garlinger v. Hardee's Food Sys., Inc.*, 16 Fed. App'x 232, 235 (4th Cir. 2001) (unpublished) ("The consideration of relevance requires the district court to determine whether the testimony "fits" the instant case; not all *reliable* expert testimony is *relevant* expert testimony.") (emphasis in original). McGuire's opinion that sales and distributions imposed $4.17 billion (amended to $3.499 billion) in net costs on the City and County and therefore constituted a public nuisance fails the "fit" test for two reasons.

First, his analysis is not based on the legal definition of public nuisance. The Court must decide whether Plaintiffs have proven a public nuisance under West Virginia law. McGuire is a professor of health economics, not a professor of law, and he does not pretend to offer a legal opinion or an analysis that tracks the legal definition of public nuisance under West Virginia law. His report recites that he was instructed by Plaintiffs' counsel "to be guided by" (i) a quotation about public nuisance from *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 620 (W. Va. 1985), and (ii) a definition of public nuisance taken from the Restatement (Second) of Torts § 821B.[17] But, regarding the former quotation, which refers to "an act or condition that ***unlawfully*** operates to hurt or inconvenience an indefinite number of persons," McGuire does not analyze whether any "sales and distributions" were unlawful; he simply proceeds on the "understanding that Plaintiffs will prove that Defendants have unlawfully sold and distributed prescription opioids in the Cabell Huntington Community."[18] And, regarding the Restatement definition, he

---

[17] App. 20 (McGuire Report at 5).

[18] App. 21 (*id*. at 6).

says nothing. His analysis contains no reference to the Restatement's key criteria of "unreasonable interference" and "a right common to the general public." Thus, although his report includes a passing reference to *Sharon Steel* and the Restatement, his opinions are clearly not tied to the standards of West Virginia law on public nuisance.

Second, and even more strikingly, McGuire's opinion does not "fit" the case because it has nothing to do with Defendants and any wrongful conduct on their part. McGuire could not have been more clear in his deposition that Plaintiffs' counsel instructed him to analyze the net costs of **all** sales and distributions of prescription opioids in the City and County ***regardless*** of whether the distributions were made by a Defendant, ***regardless*** of whether the distribution constituted unlawful or wrongful conduct by a Defendant, ***regardless*** of whether the shipment (or any part of it) was later diverted to illegal use, ***regardless*** of whether the distribution allowed a pharmacy to fill a prescription written by a doctor pursuant to the prevailing treatment guidelines, even ***regardless*** of whether the distribution served a legitimate medical need for the medications according to current guidelines. And not only did McGuire fail to perform his "negative externalities" analysis with reference to Defendants and their alleged conduct, he testified that he did not know how to perform such an analysis—indeed he acknowledged, "It's not within my expertise."[19]

Plaintiffs allege that Defendants' failure to report and halt shipment of "suspicious" pharmacy orders resulted in "flooding" the City and County with prescription opioids and that that conduct constituted a public nuisance. The Court will decide that question, not whether ***all*** sales and distributions imposed net economic costs.

---

[19] App. 84 (McGuire Dep. at 59). None of Plaintiffs' other experts claim that expertise, and none take McGuire's net economic costs and partition it to reflect a portion attributable to Defendants' alleged wrongful conduct.

### B. The Court Should Exclude McGuire's "Net Costs" Opinion Because He Did Not Account Properly for the Benefits of Prescription Opioids.

McGuire purports to have performed an analysis of "net" economic costs—a word he uses 37 times in his deposition to describe the analysis. But he committed a two-fold methodological error in evaluating the benefits of prescription opioids.

First, McGuire did no real analysis of his own regarding the benefits of prescription opioids. His report proceeds, category by category, calculating the costs resulting from prescription opioids generally (e.g., mortality, morbidity, neonatal abstinence syndrome, crime, etc.), but there is no section that considers or attempts to value the benefits of prescription opioids.[20] The Report contains a Table 10, labeled "Conservative Assumptions Applied in Estimating Costs in this Report." But one will not find a comparable table labeled "Conservative Assumptions Applied in Estimating **Benefits** in this Report." McGuire's only consideration of the benefits of opioid medication is based on "potential benefit in terms of effects on workforce participation."[21] That is so obviously flawed as a measure of benefits for a pain medicine that it undermines the entirety of his methodology. Prescription opioids are commonly used to treat cancer pain, acute pain following surgery or a traumatic injury, or for end-of-life pain and suffering. The self-evident benefits of reducing pain and suffering in these and other circumstances cannot be measured by "effects on workforce participation."[22] By measuring the benefits of prescription opioids so narrowly, and failing entirely to take account of the benefits of

---

[20] *See* App. 32-74 (McGuire Report at 17-59).

[21] App. at 19 (*id*. at 4 n.10).

[22] All that McGuire's 64-page report has to say about this subject is, "Opioids are medically indicated for severe pain associated with trauma, post-surgery, and cancer end-of-life care, conditions for which pain reduction may not have a large effect on labor force participation." App. 47-48 (*id.* at 32-33 (¶ 56)).

11

these medicines to reduce pain and suffering, Dr. McGuire undermined his entire methodology and analysis -- because his weighing of "costs" against "benefits" is so clearly flawed.

In other words, if prescription opioids provides a terminal cancer patient six pain-free months in hospice care before dying, but it doesn't allow the person to become a more productive worker, McGuire takes no account of that benefit. This is entirely flawed as a methodology for measuring the benefits of a pain medicine. *See Garlinger*, 16 Fed. App'x at 235-36 (excluding testimony of expert in thermodynamics who opined that coffee served at 180-190 degrees was unreasonably dangerous without "determining the utility of serving coffee at a lower temperature, i.e., "whether it is *possible* for Hardee's to serve quality coffee at a lower temperature"); *see also McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) ("[W]e must understand the benefits of hot coffee in relation to its costs.").

Second, in apparent recognition that an analysis limited to worker productivity does not capture the full benefits of pain relief, McGuire argues that "[m]y opinion that the costs of prescription opioids **in terms of workforce participation** outweigh the potential benefits is complemented by the opinions of medical experts **regarding the clinical costs and benefits**."[23] In considering "the opinions of medical experts," however, McGuire does not do what a Harvard professor of health economics would do in preparing a paper for peer review, which is what *Daubert* requires to ensure the methodological rigor of expert testimony.[24] He does not cite the

---

[23] App. 50 (*id.* at 35 (¶ 63)).

[24] *Higginbotham v. KCS Intern., Inc.*, 85 Fed. Appx. 911, 915 (4th Cir. 2004) (unpublished) (affirming exclusion of expert testimony where the expert failed to perform adequate testing and conceded that his methodology rested upon "assumptions," "not science"); *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 482 (4th Cir. 2018), *cert. denied sub nom. Hickerson v. Yamaha Motor Corp., U.S.A.*, 139 S. Ct. 105 (2018) (affirming exclusion of expert testimony where expert "had not tested" his opinion and "admitted he provided no research to support" his theory); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (where the

scientific literature regarding the clinical costs and benefits of prescription opioids; he cites the expert report of Dr. Anna Lembke. Dr. Lembke has published articles in the scientific literature and written a book about opioids for a general audience, but McGuire does not cite them, and he does not claim ever to have consulted them. Instead, he relied on her report as a retained expert in this case. The Court can be certain he has never relied on comparable "evidence" in his twelve books or 285 published papers.

To make matters worse, McGuire misread Dr. Lembke's report. As he testified, he relied on her supposed opinion that the clinical costs of prescription opioids outweigh their benefits:

> Q. So you're relying on Doctor Lembke's opinion that the costs vastly outweigh the benefits?
>
> A. I am relying on that opinion, yes.
>
> \* \* \*
>
> Q. [B]ased on your review and your understanding of what Doctor Lembke has said, does Doctor Lembke say that the costs of prescription opioids outweighs the benefits of prescription opioids when prescription opioids are used to treat acute pain? …
>
> A. Well, I did come to that conclusion from this ….[25]

But in the very passage from her report that McGuire quotes, Dr. Lembke makes a far more limited claim. That passage does not address the use of prescription opioids to treat acute pain, or cancer pain, or end-of-life pain. Rather, the opinion on which McGuire purports to rely is addressed only to the benefits of using prescription opioids to treat chronic pain and, even then, only on a long-term basis: "[I]t is my view that **at a population level**, the risks of **long-term**

---

    expert opinion "has a greater potential to mislead than to enlighten," that evidence "should be excluded").

[25] App. 87-88 (McGuire Dep. at 71, 74-75).

*opioids for chronic pain* far outweigh the benefits."[26] In a second passage quoted by McGuire from the appendix to Dr. Lembke's report, she concludes more broadly that the costs outweigh the benefits, but, as a physician, she makes no effort to quantify the costs and benefits.

Thus, having explained that his assignment was to say whether "within the area of applied microeconomics" it is possible to "*measure* the extent of" a public nuisance, and having purported to do so (in the amount of $3.449 billion), it turns out that he didn't make any calculation of the benefits at all:

> Q. And did you do any calculation of the benefits of these prescription opioids? Or are you, instead, just relying on what you understand Doctor Lembke and Doctor Waller to have said?
>
> A. *I'm relying on their opinion that … the costs outweigh the benefits* and that implies to me that the net costs are positive.[27]
>
> Q. And are you relying on anything else besides Doctor Lembke and Doctor Waller for that proposition?
>
> A. No, *I'm just relying on … those clinicians*.
>
> \* \* \*
>
> Q. And on the cost side, you purported to independently measure and quantify those costs.
>
> A. [W]ell, yes, in much of my report, *I did quantify those costs*.
>
> Q. And *on the benefits side, rather than attempting to measure them, you are relying on Doctors Lembke and Waller for what you understand them to be saying, which is the costs outweigh the benefits*.

---

[26] App. 51 (McGuire Report at 36 (¶ 64)) (italics emphasis in original).

[27] In his report, McGuire noted Dr. Waller's (i) belief that opioids are appropriately used for "pain treatment in severe acute trauma, palliative care, and hospice treatment" and (ii) characterization of "palliative care and hospice as the 'core scope under which opioids may be used appropriately.'" App. 52 (*id.* at 52 n.111).

14

       A.       Well, I'm relying on the clinicians, Lembke and Waller, to consider the clinical benefits and costs of prescription opioids and to come to a determination … from their perspective—whether the clinical costs outweigh the clinical benefits, and that's how I read their reports.[28]

In short, McGuire (i) did not do what he said he would do—i.e., measure both the costs and benefits, (ii) did not consistently apply his methodology, based on a microeconomics framework, to measure both costs and benefits, and, as a consequence, (iii) produced a result-driven conclusion. *Daubert* requires the exclusion of such opinions.[29]

## CONCLUSION

McGuire's opinion about "negative externalities" is not relevant to public nuisance as defined by West Virginia law. Moreover, he did not measure (and admitted he did not know how to measure) any negative externalities that were the result of wrongful distribution by Defendants of prescription opioids that were prescribed contrary to the prevailing treatment guidelines and were diverted to illicit use. To compound matters, although McGuire purports to opine about the costs "net of any benefit," he does not reliably take account of the recognized benefits of prescription opioids that are properly prescribed. For each of these reasons, the Court should exclude the expert testimony of Thomas McGuire pursuant to FRE 702 and *Daubert*.

---

[28] App. 88-89 (McGuire Dep. at 76-78).

[29] *See Cady v. Ride-Away Handicap Equip. Corp.*, 702 Fed. App'x 120, 125-27 (4th Cir. 2017) (unpublished) (affirming exclusion of expert testimony that contained unexplained omissions and inconsistencies, where the expert failed to take key considerations "into account"); *Higginbotham*, 85 Fed. App'x at 915 (affirming exclusion of expert testimony where expert, "without any valid basis, simply jumps to the conclusion" that his theory "must have been" correct) (internal quotation marks omitted); *Hickerson*, 882 F.3d at 482 (affirming exclusion of expert testimony where expert "had not tested" his opinion); *Koger v. Norfolk S. Ry. Co.*, CIV.A. 1:08-0909, 2010 WL 692842, at *4 (S.D.W. Va. Feb. 23, 2010) (excluding expert testimony where expert "did not apply the principles and methods reliably to the facts of the case," and failed to consider relevant factors).

DATED: October 2, 2020

By Counsel:

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB #635)
David R. Pogue (WVSB #10806)
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
drpogue@csdlawfirm.com
sruby@cdkrlaw.com
rfranks@cdkrlaw.com

Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
emainigi@wc.com
lheard@wc.com
ahardin@wc.com
jwicht@wc.com
**Counsel for Defendant Cardinal Health, Inc.**

| | |
|---|---|
| */s/ Gretchen M. Callas* | */s/ Jeffrey M. Wakefield* |
| Gretchen M. Callas (WVSB #7136) | Jeffrey M. Wakefield (WVSB #3894) |
| JACKSON KELLY PLLC | Jason L. Holliday (WVSB #12749) |
| Post Office Box 553 | FLAHERTY SENSABAUGH BONASSO PLLC |
| Charleston, WV 25322 | P.O. Box. 3843 |
| Telephone: (304) 340-1000 | Charleston, WV 25338-3843 |
| Facsimile: (304) 340-1050 | Telephone: (304) 345-0200 |
| gcallas@jacksonkelly.com | Facsimile: (304) 345-0260 |
| Robert A. Nicholas | jwakefield@flahertylegal.com |
| Shannon E. McClure | jholliday@flahertylegal.com |
| REED SMITH LLP | |
| Three Logan Square | Geoffrey E. Hobart |
| 1717 Arch Street, Suite 3100 | Mark H. Lynch |
| Philadelphia, PA 19103 | Christian J. Pistilli |
| Telephone: (215) 851-8100 | Laura Flahive Wu |
| Facsimile: (215) 851-1420 | COVINGTON & BURLING LLP |
| rnicholas@reedsmith.com | One CityCenter |
| smcclure@reedsmith.com | 850 Tenth Street NW |
| **Counsel for Defendant AmerisourceBergen Drug Corporation** | Washington, DC 20001 |
| | Telephone: (202) 662-5281 |
| | Facsimile: (202) 662-6291 |
| | ghobart@cov.com |
| | mlynch@cov.com |
| | cpistilli@cov.com |
| | lflahivewu@cov.com |
| | **Counsel for Defendant McKesson Corporation** |

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, the foregoing ***Defendants' Motion to Exclude Testimony of Thomas McGuire*** was filed using the Court's CM/ECF system, which will serve notification of such filing on all counsel of record.

*/s/ Steven R. Ruby*
Steven R. Ruby (WVSB #10752)
