Page 1

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

    ********************************************************

3

THE CITY OF HUNTINGTON,

4

            Plaintiff,

5

    v.                      CIVIL ACTION NO 3:17-01362

6

AMERISOURCEBERGEN DRUG

7   CORPORATION, et al,

8            Defendants.

9

10  CABELL COUNTY COMMISSION,

11           Plaintiff,

12  vs.

13

    AMERISOURCEBERGEN DRUG

14  CORPORATION, et al,

15           Defendants.

16  ********************************************************

17          Videotaped and videoconference deposition of

18  KAREN BOWLING, taken by the Defendants pursuant to the

19  West Virginia Federal Rules of Civil Procedure, in the

20  above-entitled action, pursuant to notice, before Twyla

21  Donathan, Registered Professional Reporter and Notary

22  Public, at the Law Offices of Farmer Cline & Campbell, 746

23  Myrtle Road, Charleston, West Virginia, on the 20th day of

24  August, 2020.

Page 2

```
 1              A P P E A R A N C E S
 2   APPEARING FOR THE PLAINTIFFS:
 3   CLAYTON J. FITZSIMMONS, ESQUIRE
     MARK A. COLANTONIO, ESQUIRE          (by Zoom)
 4   FITZSIMMONS LAW FIRM
     1609 Warwood Avenue
 5   Wheeling, West Virginia  26003
     (304)277-1700
 6   clayton@fitzsimmonsfirm.com
 7   APPEARING FOR DEFENDANT AMERISOURCEBERGEN:
 8   JESSICA L. ROBEY, ESQUIRE
     JACKSON KELLY, PLLC
 9   500 Lee Street East, Suite 1600
     Charleston, West Virginia  25301
10   (304)340-1000
     jessica.robey@jacksonkelly.com
11
     APPEARING FOR DEFENDANT CARDINAL HEALTH:
12
     STEVEN R. RUBY, ESQUIRE
13   CAREY SCOTT DOUGLAS & KESSLER, PLLC
     901 Chase Tower
14   707 Virginia Street, East
     Charleston, West Virginia 25301
15   (304) 345-1234
16
17   ALSO PRESENT:
18
19   On behalf of the Karen Bowling:
20      Stephen B. Farmer, Esquire
        sbfarmer@fcclaw.net
21
22      Vaughn Sizemore, Deputy Attorney General  (by Zoom)
23
24   Chris Leigh, Videographer
```

Page 3

```
 1            C O N T E N T S
 2   EXAMINATION OF KAREN BOWLING         PAGE
 3   By Mr. Ruby                  6
     By Mr. Fitzsimmons            211
 4   By Mr. Ruby                 237
 5
 6            E X H I B I T S
 7         (Attached to the transcript)
 8   DESCRIPTION OF EXHIBITS              PAGE
 9   Exhibit No. 34  Settlement Agreement and Release   69
                 between State of West Virginia
10               and AmerisourceBergen, January
                 2017, Bates BOP MDL 2nd
11               Production 012223-012239
12   Exhibit No. 37  Settlement Agreement and Release   70
                 between the State of West
13               Virginia and Cardinal Health,
                 January 2017
14
     Exhibit No. 33  Governor's Advisory Council on    98
15               Substance Abuse Report 2016,
                 pages 1-75
16
     Exhibit No. 11  Charleston Gazette-Mail Article,  169
17               March 9, 2016, "Suboxone clinic
                 rules move toward passage
18
     Exhibit No. 24  Email chain from Karen Bowling to 181
19               Rachelle Martin, March 2,
                 2016, Subject:
20               New CDC guidelines
21   Exhibit No. 25  Email from Karen Bowling, May 11,  187
                 2016, Subject Re: NY Times on
22               our pain program, with attached
                 article, "Treating Pain Without
23               Feeding Addiction at Epicenter
24               for Opioids"
```

Page 4

```
 1   DESCRIPTION OF EXHIBITS                  PAGE
 2
 3   Exhibit No. 28  TSG Consulting, Legislative Update  194
 4               December 19, 2016
 5
 6   Exhibit No. 19  Email from Karen Bowling to Hallie  196
 7               Mason, January 28, 2015,
 8               Subject: Governor's Office
 9               request for assistance
10
11   Exhibit No. 22  Email from Karen Bowling to        203
12               Jeffrey Coben, November 30,
13               2015, Subject: Physicians who
14               prescribe and only take cash
15
16   Exhibit No. 35  WVU Hospitals, Inc., et al, v.     238
17               Purdue Pharma L.P., et al,
18               Civil Action 19-C-69 through
19               -88, First Amended Complaint
20
21
22
23
24
```

Page 5

```
 1           P R O C E E D I N G S
 2        VIDEOGRAPHER:  Good morning.  We are
 3   going on the record at 10:08 a.m. on August 20th;
 4   2020.  This is Media Unit One of the video recorded
 5   deposition of Karen Bowling, taken by counsel for
 6   Defendant in the matter of the City of Huntington and
 7   the Cabell County Commission vs. AmerisourceBergen
 8   Drug Corporation et al, filed in the U.S. District
 9   Court for the Southern District of West Virginia,
10   Case Nos. 3:17-01362 and 3:17-0165.  This deposition
11   is being held at the offices of Farmer, Cline &
12   Campbell, located in Charleston, West Virginia.
13        My name is Chris Leigh from the firm
14   Veritext, and I am the videographer.  The court
15   reporter is Twyla Donathan, from the firm Veritext.
16   I am not authorized to administer an oath.  I'm not
17   related to any party in this action, nor am I
18   financially interested in the outcome.
19        Counsel and all present in the room
20   and everyone attending remotely will now state their
21   appearance and affiliations for the record.  If there
22   are any objections to proceeding, please state them
23   at the time of your appearance beginning with the
24   noticing attorney.
```

2 (Pages 2 - 5)

Page 6

```
 1       MR. RUBY:  Steve Ruby, representing
 2 Cardinal Health.
 3       MS. ROBEY:  Jessica Robey on behalf of
 4 AmerisourceBergen.
 5       MR. FARMER:  Steve Farmer appearing on
 6 behalf of your witness, Karen Bowling.
 7       MR. RUBY:  Anybody on the phone or the
 8 Zoom?
 9       MR. COLANTONIO:  Mark Colantonio and
10 Clayton Fitzsimmons, representing City of Huntington
11 and Cabell County Commission.
12       MR. SIZEMORE:  Vaughn Sizemore, Deputy
13 Attorney General.
14       VIDEOGRAPHER:  Would the court
15 reporter please swear the witness.
16       (Witness duly sworn)
17       K A R E N   B O W L I N G
18    having been duly sworn, testified as follows:
19   EXAMINATION BY COUNSEL FOR CARDINAL HEALTH:
20 BY MR. RUBY:
21   Q   Ms. Bowling, good morning.
22   A   Good morning.
23   Q   I know we had a chance to meet beforehand,
24 but if you don't mind, would you introduce yourself
```

Page 7

```
 1 for the sake of the transcript.
 2   A   Yes, I'm Karen Bowling.
 3   Q   And my name is Steve Ruby.  I'm an attorney
 4 representing Cardinal Health here today.  We
 5 appreciate you being here.  I know that you have been
 6 deposed at least once before, because I've seen a
 7 transcript from one of those depositions.  So I know
 8 you're familiar with this process.
 9       You understand that you're under oath this
10 morning; is that right?
11   A   I do.
12   Q   And you understand that that's the same
13 oath that you would take if you were in a courtroom
14 with a judge and all the formalities that attach to
15 that; is that right?
16   A   I do.
17   Q   The court reporter here, of course is
18 taking down everything that we say today, and a
19 couple of things that will help her is if we take
20 turns.  So I'll ask a question and you can give the
21 answer, and then I'll wait until you're finished to
22 ask the next question, so we're not talking over her;
23 is that all right?
24   A   Absolutely.
```

Page 8

```
 1   Q   And if you can't understand me -- We're all
 2 wearing masks here this morning.  So we're going to
 3 be as clear as we can.  So if I ask a question and
 4 you don't understand it, just ask me to repeat it.
 5 If you can understand the words that I'm saying, but
 6 they don't make any sense, then you can ask me to
 7 rephrase it and I'll be happy to do that as well,
 8 okay?
 9   A   Yes.
10   Q   And we'll take a break -- It's about ten
11 after 10:00 right now.  We'll take a break about
12 every hour so we can stretch and get a drink of
13 water, what have you.  But if you need a break at any
14 time, you just let me know.
15   A   Okay.  Thank you.
16   Q   And we'll be happy to take one.
17       Let's talk first about your prior occasions
18 on which you've given deposition testimony or trial
19 testimony.  You have been deposed before; is that
20 right?
21   A   That is correct.
22   Q   And you were deposed in particular in a
23 prior case that involves some of the same defendants
24 that are defendants in this case; is that right?
```

Page 9

```
 1   A   That is correct.
 2   Q   That was in 2016?
 3   A   Yes.
 4   Q   And, of course, as I alluded to, I've seen
 5 a transcript of that deposition.  Are there other
 6 occasions on which you've given deposition testimony?
 7   A   Related to this matter or just in general?
 8   Q   In general.
 9   A   Yes.  I was deposed in a case when I was
10 the CEO at Raleigh General Hospital.  It was a
11 federal case.  Department of Justice.  It was an
12 antitrust case, and I was deposed in that case.
13   Q   When was that approximately?
14   A   I'm sorry.  I can't recall the date.
15   Q   Been a while?
16   A   Yes, it has.
17   Q   And was that a -- So that was an antitrust
18 case?
19   A   Yes.
20   Q   Did it have anything to do with opioids at
21 all?
22   A   No, it did not.
23   Q   Any other occasions on which you've been
24 deposed that you can think of?
```

3 (Pages 6 - 9)

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

    Plaintiff,

vs.        CIVIL ACTION
         NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

CABELL COUNTY COMMISSION,
    Plaintiff,

vs.        CIVIL ACTION
         NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

    Defendants.

* * * * * * * * * * * * * * * * * * * * * *

Videotaped and videoconference deposition
of RAHUL GUPTA, M.D., taken by the Defendants under
the Federal Rules of Civil Procedure in the above-
entitled action, pursuant to notice, before Teresa
S. Evans, a Registered Merit Reporter, all parties
located remotely, on the 11th day of September,
2020.

## Page 2

1
2          APPEARANCES:
3   APPEARING FOR THE PLAINTIFFS:
4       Anne McGinness Kearse, Esquire
        Monique Christenson, Esquire
5       MOTLEY RICE
        28 Bridgeside Boulevard
        Mt. Pleasant, SC 29464
6
7       Paul T. Farrell, Jr., Esquire
        FARRELL LAW
        422 Ninth Street
8       3rd Floor
        Huntington, WV 25714-1180
9
10  APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
11      Jyoti Jindal, Esquire
        WILLIAMS & CONNOLLY
12      725 Twelfth Street, N.W.
        Washington, DC 20005
13
14      Steven R. Ruby, Esquire
        David R. Pogue, Esquire
15      CAREY, DOUGLAS, KESSLER & RUBY
        901 Chase Tower
        707 Virginia Street, East
16      Charleston, WV 25323
17
18  APPEARING FOR THE DEFENDANT McKESSON CORPORATION:
19      James A. Goold, Esquire
        Nicole Antione, Esquire
20      COVINGTON & BURLING
        One City Center
        850 Tenth Street NW
21      Washington, DC 20001
22
23
24

## Page 3

1          APPEARANCES (Contd.)
2
3   APPEARING FOR THE DEPONENT:
4       Mark Colantonio, Esquire
        Robert Fitzsimmons, Esquire
5       FITZSIMMONS LAW FIRM
        1609 Warwood Avenue
        Wheeling, WV 26003
6
7   ALSO PRESENT:
8       Adam Hager, Videographer
        Hunter Shkolnik, Esquire
9       Lauren Mahaney, Esquire
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1          EXAMINATION INDEX
2
3   BY MS. JINDAL              9
    BY MR. COLANTONIO        115
4   BY MS. KEARSE            181
    BY MS. JINDAL           188
5   BY MR. GOOLD            328
    BY MS. JINDAL           338
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 5

EXHIBIT INDEX

Exhibit 1  Deposition transcript of Dr,           12
Gupta dated 8-16-16, State of WV
ex rel v. AmerisourceBergen, et
al., Circuit Court of Boone
County, WV, Civil Action No.
12-C-141

Exhibit 4  E-mail from Haddy to Haddy and         299
others Re: WV HAN #128 Novel
Opiate dated 12-13-16 with
"Health Advisory #128 Novel
Opiates" attached

Exhibit 5  E-mail from Massey to Kilkenney        295
Re: MMWR dated 5-27-17 with
"Public Health Investigation of
an Opioid Overdose Outbreak -
West Virginia, August 2016"
attached

Exhibit 14 E-mail from Gupta to Mock and          308
Taylor Re: Presentation dated
4-4-17 and E-mail from Richman
to Boggs Re: April 4th - MCMS
dated 3-29-17
(DHHR_FEDWV_0038760)

Exhibit 15 "2017 Legislation and Substance        308
Use Disorder Epidemic: West
Virginia's Call to Action" by
Gupta dated 4-4-17
(DHHR_FEDWV_0038761)

Exhibit 16 E-mail from Christy to Wagoner         303
and others Re: GUPTA DATA NEEDS
UPDATED - Social Worker
Conference (next week) dated
4-21-17 (DHHR_FEDWV_0047102)

Exhibit 17 "West Virginia's Contemporary         303
Public Health Challenge: Drug
Overdose Deaths" by Gupta dated
4-29-17

## Page 6

EXHIBIT INDEX (Contd.)

Exhibit 20 E-mail chain between Gupta and         339
others Re: MEDIA REQUEST = Fatal
overdose victims by county and
where they were from dated
9-27-17 to 9-29-17

Exhibit 37 E-mail chain between Melton,           246
Gupta and others Re: Overdose
Death Investigations dated
3-26&27-18 with 2016 West
Virginia Overdose Fatality
Analysis attached
(DHHR_FEDWV_0317258-322)

Exhibit 38 Gupta testimony before the House       254
Oversight and Government Reform
Committee entitled "A
Sustainable Solution to the
Evolving Opioid Crisis:
Revitalizing the Office of
National Drug Control Policy"
dated 5-17-18
(DHHR_FEDWV_0391628-651)

Exhibit 45 E-mail from Dora to Gupta and          313
others Re: 2018.07.05 Final
packet mailed to Judges re MAT
dated 7-5-18
(DHHR_FEDWV_1148108-126)

Exhibit 51 Resume of Rahul Gupta, MD, MPH,         60
MBA, FACP
(WVSMA_FEDWV_00039036-091)

Exhibit 54 "State of Health" presentation          99
by Rahul Gupta, MD, MPH, MBA,
FACP dated 10-26-18
(CT2_RGupta000919-966)

Exhibit 56 "Notice of Plaintiffs'                   23
Preliminary Witness List," U.S.
Dist. Ct. Case No. 3:17-01362
filed 6-3-20

## Page 7

P R O C E E D I N G S

VIDEO OPERATOR:  Good morning.  We are going on the record at 9:04 a.m. on September the 11th, 2020.  Please note that microphones are sensitive and may pick up whispering, private conversations and cellular interference.  Please turn off all cell phones or place them away from the microphones as they can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video recorded deposition of Rahul Gupta, M.D., taken by counsel for the Defendants in the matter of City of Huntington and Cabell County Commission versus AmerisourceBergen Drug Corporation, et al, filed in the United States District Court for the Southern District of West Virginia, being Civil Action Nos. 3:17-01362 and 3:17-01665.

This deposition is being conducted remotely via Zoom conferencing.  My name is Adam Hager from the firm Veritext and I'm the videographer.  The court reporter is Teresa Evans

## Page 8

from the firm Veritext.

I am not authorized to administer an oath; I'm not related to any party in this action; nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record.

If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MS. JINDAL:  Jyoti Jindal with Williams & Connolly on behalf of Cardinal Health.

MR. RUBY:  And Steve Ruby and David Pogue also for Cardinal Health.

MR. GOOLD:  James Goold, Covington & Burling and Nicole Antonine from Covington & Burling for McKesson Corp.

MR. FARRELL:  Paul Farrell, Jr. and Anne Kearse for Plaintiffs.

MR. COLANTONIO:  Mark Colantonio, Bob Fitzsimmons representing Doctor Gupta for purposes of this deposition.

VIDEO OPERATOR:  If there are no further appearances to be noted, would the court

Page 9

1 reporter please swear the witness?
2 (The witness was sworn.)
3 VIDEO OPERATOR: Please begin.
4 R A H U L   G U P T A, M. D.
5 was called as a witness by the Defendant, and
6 having been first duly sworn, testified as follows:
7 EXAMINATION
8 BY MS. JINDAL:
9 Q. Good morning, Doctor Gupta. We met just a
10 little bit ago, but I'm going to introduce myself
11 again right now. I am Jyoti Jindal and I am the
12 attorney for Cardinal Health, one of the defendants
13 in this lawsuit.
14 I understand that you are former State
15 Health Officer and Commissioner of the Bureau of
16 Public Health in West Virginia.
17 Before we get into your work for those
18 roles, I have a few preliminary questions. Have
19 you ever testified under oath before?
20 A. Yes.
21 Q. How many times?
22 A. I would say one time that I can recollect
23 in the last three years or so. Prior to that, I
24 may have two to four times or two or three times.

Page 10

1 I do not have specific recollection.
2 Q. And in the last -- before we get into the
3 most recent time you testified, those previous
4 times, was that at trial?
5 A. Previous was a deposition.
6 Q. Uh-huh. The two to four times that you
7 mentioned before the most recent time, were those
8 at trial?
9 A. They were depositions, and there was one
10 trial also.
11 Q. Okay. And was -- do you recall the nature
12 of those cases?
13 A. The ones that I can recall right now
14 included my deposition in the Attorney General of
15 West Virginia versus AmerisourceBergen. There was
16 one of plaintiffs against West Virginia-American
17 Water.
18 There was one that I was deposed for --
19 I believe it was related to Bayer a while back,
20 it's difficult to recognize -- remember.
21 And then there was maybe one or two
22 that would have related more of -- one, of a
23 personal nature, related to my spouse.
24 Q. I see. Of the ones that you mentioned

Page 11

1 regarding Bayer, what was the nature of your
2 testimony in that case, if you recall? Just at a
3 high level.
4 A. Public health.
5 Q. Okay. And was that also the case with the
6 water case that you mentioned?
7 A. It was related to the 2014 West Virginia
8 water crisis.
9 Q. Okay. And were -- in both of those cases,
10 were you testifying on behalf of the plaintiffs or
11 defendants or neither party?
12 A. Plaintiffs.
13 Q. Were you an expert in those cases?
14 A. I believe not. Although in the West
15 Virginia water crisis, I was the local health
16 officer in charge of that, so I would not be clear
17 -- I would not be sure at this point whether I was
18 testifying on behalf of the plaintiffs or actually
19 I believe to be that my testimony was based on my
20 knowledge and dealings during the crisis more so
21 than being on behalf of one side or the other.
22 Q. Uh-huh. And you say you also testified in
23 the West Virginia case against AmerisourceBergen.
24 Was that in 2016, sir?

Page 12

1 A. I believe so.
2 Q. Okay. Could you please open Exhibit 1?
3 GUPTA DEPOSITION EXHIBIT NO. 1
4 (Deposition transcript of Dr. Gupta
5 dated 8-16-16, State of WV ex rel v.
6 AmerisourceBergen, et al., Circuit
7 Court of Boone County, WV, Civil
8 Action No, 12-C-141 was marked for
9 identification purposes as Gupta
10 Deposition Exhibit No. 1.
11 MR. COLANTONIO: Okay, go ahead.
12 Q. Doctor Gupta, is this a transcript of your
13 2016 testimony in the West Virginia versus
14 AmerisourceBergen case?
15 A. I can go through it.
16 MR. COLANTONIO: While the doctor is
17 going through that, I just want to note for the
18 record that this copy of the deposition does not
19 have a signed errata sheet, so I'm not sure if that
20 was ever done, but this one that's being offered is
21 not signed.
22 A. So this seems in testimony familiar to --
23 and the time frame is familiar to my deposition.
24 However, I have not read through this deposition so

Page 13

1    I cannot ascertain to the validity of my responses
2    as of right now.
3        Q.   Sure.  I'm not asking you to determine the
4    validity of your responses, but do you have any
5    reason to doubt that it is not a true and accurate
6    copy of your testimony in that case?
7        A.   I do not believe I have had a chance to
8    review and correct any errors, so I would not be
9    able to provide that opinion at this time.
10       Q.   Okay.  All right.  You can go ahead and set
11   Exhibit 1 aside for now.
12           Do you -- so because you've testified
13   under oath before, I under -- I would expect that
14   you understand what that means.  Correct?
15       A.   Yes.
16       Q.   And so you know that it's the same oath
17   that you'd give if we were in a courtroom in front
18   of a judge?
19       A.   Yes.
20       Q.   And my questions today are about what you
21   know to the best of your ability, not about what
22   your lawyers know.  So -- or what they've told you.
23   And is there any reason why you may not be able to
24   testify accurately and fully today?

Page 14

1        A.   Not to my knowledge.
2        Q.   I'm going to do my best to make my
3    questions clear and presentable -- I'm sorry,
4    understandable.  Off to a great start here.
5            So if you ever need clarification or
6    you want me to rephrase my question, just let me
7    know.  Okay?
8        A.   Yes.
9        Q.   And as your lawyers may have already told
10   you, it's important that only one of us speak at a
11   time so that the court reporter can keep track of
12   everything.  I'll do my best not to start my next
13   question until you finish your answer, and please
14   just -- I ask that you wait until I finish my
15   question before you begin your answer.
16           Can we agree to do that?
17       A.   Yes.
18       Q.   And if I make a mistake in that regard and
19   cut you off, just let me know and we'll fix that.
20       A.   Understand.
21       Q.   You received a sealed box prior to the
22   start of this deposition.  Correct?
23           MR. COLANTONIO:  Well, the -- this is
24   --

Page 15

1        Q.   Your lawyer --
2            MR. COLANTONIO:  The attorneys
3    received -- his attorneys received a sealed box,
4    and we delivered them to the doctor here today.
5            MS. JINDAL:  Okay.
6        Q.   And that box, as you've already become
7    aware, contains documents that we're going to
8    review today.  Pursuant to the deposition protocol
9    in this case, you and your lawyer may not review
10   any of those documents until I ask you to do so.
11   Do you understand?
12       A.   Understood.
13       Q.   Doctor Gupta, what did you do to prepare
14   for this deposition?
15       A.   I had spoken to my attorneys to understand
16   what the deposition would be about.
17           I was also able to - on the request -
18   provide documentations that were requested in the
19   subpoena, so in that process, I was able to seek,
20   find, review and provide, including providing the
21   technological - including scanning, and copying and
22   other measures - to be able to provide that to you
23   and to my attorneys.
24       Q.   Thank you, Doctor.  You said you've met

Page 16

1    with your attorneys -- I'm sorry, you said you
2    spoke to your attorneys.  How many times did you
3    speak to them?
4        A.   I spoke to my attorneys yesterday, and
5    there may have been a few other times for very
6    brief chats, for questions I may have had in the
7    past as well.
8        Q.   And who were those attorneys?
9        A.   That's Mark Colantonio, and yesterday I was
10   able to also speak with Bob Fitzsimmons.
11       Q.   Anyone else?
12       A.   No.
13       Q.   You said you met with them for a few short
14   times previously.  How long did you meet with them
15   yesterday?
16       A.   So I met with them yesterday for, I would
17   say, about approximately five to six hours, and
18   prior to that, I did not meet with them.  I had
19   brief phone calls.  And that was with Mark.
20       Q.   And approximately how long did those phone
21   calls last?
22       A.   They could last anywhere between five
23   seconds to 15 minutes, and that's a range.
24       Q.   And other than Mr. Colantonio and

Page 17

1   Mr. Fitzsimmons, did you have any conversations
2   with the lawyers for either Cabell County or the
3   City of Huntington in this case?
4        A.  I did not.  However, I would like to
5   qualify that with the fact that I do recollect
6   receiving e-mails for contact -- this was a while
7   back, so I do not exactly know the dates/times.
8        Q.  Do you recall what those e-mails were
9   about?
10       A.  Some would be about establishing or
11  attempting to establish contact.
12       Q.  Did you respond to those e-mails?
13       A.  I may have on an occasion provided a
14  courteous response, but there was no - that I can
15  remember - conversations that continued beyond
16  that.
17       Q.  Okay.  And in your meeting yesterday with
18  Mr. Colantonio and Mr. Fitzsimmons, what did you do
19  to prepare?
20            MR. COLANTONIO:  Let me just object.
21  I think that that goes beyond the scope of what's
22  permissible and gets into attorney/client
23  privileged information, so unless you would give me
24  a good reason why he should answer, I'm going to

Page 18

1   instruct him not to answer.
2            MS. JINDAL:  Let me rephrase my
3   question.
4        Q.  During your preparation yesterday -- or
5   your meeting yesterday, did you review any
6   documents?
7        A.  No.
8        Q.  Have you read the Complaint in this case?
9        A.  I have not.
10       Q.  Do you know what the Complaint is?  I just
11  want to make sure you understand that question
12  fully.
13       A.  I understand broadly based on my prior
14  experience with depositions and being the
15  Commissioner as well as public reports what that
16  would be.  However, I've had not had an opportunity
17  to specifically read this particular Complaint.
18       Q.  Aside from your time with your attorney
19  yesterday, did you review any documents on your own
20  in preparing for this deposition?
21            MR. COLANTONIO:  Just to be clear, I
22  think he's already testified when the assimilated
23  documents, he had a chance to review the things
24  that we sent you all.  So I just wanted to make

Page 19

1   sure that -- he's already said that.
2            MS. JINDAL:  Right.  And I'm sorry, I
3   understood that as to be a review for
4   responsiveness and to satisfy -- you know, in
5   response to a subpoena.
6            I'm asking whether he reviewed any
7   documents specifically in preparation for this
8   deposition today.
9        A.  I will answer it as this:  I reviewed the
10  documents, including conducting the search for and
11  ensuring that those documents pertained to the
12  request that was made, and that included not just
13  review, but also making copies or scanning them in,
14  providing them to you.
15       Q.  And did any of those documents refresh your
16  recollection about the work you did as
17  Commissioner?
18       A.  Yes.
19       Q.  Which documents were those?
20       A.  The last time I reviewed those documents
21  was several weeks ago, so I would be happy to go
22  through them if I would be allowed to remember that
23  again.
24       Q.  Okay.  So you don't recall right now the

Page 20

1   documents — is it fair to say that the documents
2   you produced in response to the subpoena refreshed
3   your recollection about your work as Commissioner?
4        A.  They may have.  I cannot say that at this
5   point without having to take another look at those
6   documents.
7        Q.  Did you review any deposition transcripts?
8        A.  I did not.
9        Q.  And outside of your meetings with your
10  attorneys, did you talk to anyone about the
11  substance of this deposition?
12       A.  No.
13       Q.  And in searching for documents in response
14  to the subpoena, what did you do?
15       A.  I'm sorry, could you repeat that, please?
16       Q.  Sure.  You testified that you were made
17  aware of the subpoena, that you collected
18  documents, you scanned and sent them to your
19  attorneys.  Is that right?
20       A.  Yes.
21       Q.  In terms of searching for the documents,
22  what did you do?
23       A.  I - to the best of my ability - searched my
24  personal files, my home in Virginia, my home in

Page 21

1   West Virginia, any of the aspects of files that may
2 be electronically stored, and did the best of my
3 ability to recollect and remember for any files or
4 documents as well as there were a number of
5 documents that I had to -- I did recollect, but I
6 did not have immediately with me, and there may
7 have been some that I had to search online to be
8 able to get in response to that and provide those.
9    Q.  The ones that you --
10    MS. JINDAL:  Strike that.
11    Q.  You understand, Doctor Gupta, that you're
12 being deposed in connection with an ongoing
13 litigation, right?
14    A.  Yes.
15    Q.  And who do you understand to be the
16 plaintiff in this case?
17    A.  My understanding is the plaintiffs is
18 Cabell County and the City of Huntington.
19    Q.  And who do you understand to be the
20 defendants?
21    A.  I understand the defendants represented
22 here today include Cardinal Health, McKesson, as
23 well as AmerisourceBergen.
24    Q.  And in your own words, what is the case

Page 22

1 about?
2    A.  I'm sorry, can you repeat that, please?
3    Q.  Sure.  What is your understanding of this
4 case?  What is it about?
5    A.  My understanding is that this case is
6 related to the number of overdose deaths and
7 generally the suffering and the carnage that has
8 occurred broadly in the state of West Virginia, but
9 narrowly in Cabell County and the City of
10 Huntington as a result of oversupply as well as the
11 over-availability of prescription opioids and the
12 consequences resulting from that.
13    Q.  And what is the basis of your
14 understanding?  How did you come to have that
15 understanding?
16    A.  As I had mentioned before, that including
17 my work as the Commissioner for the Bureau of
18 Public Health as well as the State's chief health
19 officer, having worked in this area, having read
20 the reports as well as public records and accounts
21 and have been deposed and involved in the workings
22 of the Department of Health and Human Resources of
23 West Virginia, is how I come about to have that
24 understanding.

Page 23

1    Q.  Okay.  And are you aware that your name was
2 disclosed in plaintiffs' preliminary witness list
3 that they filed on June 3rd, 2020?
4    A.  I am not aware.
5    Q.  Doctor Gupta, could you please open Exhibit
6 56?
7    MR. COLANTONIO:  I'm sorry, did you
8 say "56?"
9    MS. JINDAL:  56, yes.  I apologize.
10 We're going to be jumping around a bit today.
11    MR. COLANTONIO:  Let me just find it
12 here.  Hold on.  Okay.  56.
13    GUPTA DEPOSITION EXHIBIT NO. 56
14    ("Notice of Plaintiffs' Preliminary
15    Witness List," U.S. Dist. Ct. Case No.
16    3:17-01362 filed 6-3-20 was marked for
17    identification purposes as Gupta
18    Deposition Exhibit No. 56.)
19    MR. COLANTONIO:  Like some kind of a
20 game show.
21    THE DEPONENT:  Thank you.
22    A.  I have this in front of me.
23    Q.  Okay.  Doctor Gupta, this is --
24    MR. COLANTONIO:  Could you just hold

Page 24

1 for a second until I get my copy, please?
2    Thanks.  Okay, go ahead.  I'm sorry.
3 Go ahead.
4    MS. JINDAL:  I'm sorry.  Are you
5 ready?
6    MR. COLANTONIO:  Yes.  Go ahead,
7 please.  Thank you.
8    MS. JINDAL:  Okay.
9    Q.  Doctor, this is a filing filed by
10 plaintiffs in this action.  It is dated, as you can
11 see, at the very top in blue in the center, dated
12 June 3rd, '20, and it states here that "Plaintiffs
13 have identified the following individuals likely to
14 be called as witnesses at trial."
15    And if you turn to the second page, you
16 will see your name as No. 22.  Is that correct?
17    A.  That is correct.
18    Q.  And your testimony is you were not aware
19 that your name was going to be included on such a
20 list.
21    A.  This is -- my testimony is this is the
22 first time I'm actually seeing this.
23    Q.  Okay.  Setting aside the document, were you
24 aware that plaintiffs intended to call you as a

Page 25

1  witness at trial?
2      MR. COLANTONIO:  Objection, asked and
3  answered.
4      A.  As of this date that you mentioned, I was
5  not formally aware of that.
6      Q.  Did you become aware after that date?
7      MR. COLANTONIO:  He's aware now.
8      A.  I am aware.
9      Q.  When did you become aware, besides --
10  outside of today's conversation?
11      A.  Today is when I've been made aware that --
12  of the document that officially lists me as
13  plaintiff witness.
14      Q.  I'm not doing a good job of making my
15  question clear; I apologize.  Doctor Gupta, when --
16  did plaintiffs ever contact you about testifying on
17  their behalf at trial in this case?
18      A.  Yes.
19      Q.  When was that?
20      A.  I would have to go back for that.
21  Approximately about eight to twelve months.  And
22  with that, I want to say, Ms. Jindal, I'm not an
23  attorney, so I am -- I'm a physician, so I am not
24  often aware of that just a contact means I'm on a

Page 26

1  list somewhere.
2      So I just want to make sure that you
3  understand that my understanding of legal
4  proceedings is very minuscule as opposed to the
5  court and the system.
6      MR. COLANTONIO:  And --
7      Q.  Sure, absolutely.
8      MR. COLANTONIO:  I don't mean to
9  interrupt, but just so you're clear, he may be
10  confusing his involvement in the state case with
11  this case.  I'm not -- so I just want to be -- you
12  may want to question about that, because that may
13  explain his answers better.
14      But it's your deposition.
15      MS. JINDAL:  Thank you, I appreciate
16  that.  And I will get to that other case.
17      MR. RUBY:  Just -- Jyoti, just a
18  second.  Mark, when you say "the state case," you
19  mean the old AG case or the current --
20      MR. COLANTONIO:  No, I'm sorry, what I
21  meant was the MLP case.
22      MR. RUBY:  Okay.  I thought that's
23  what you meant.  I just wanted to make sure it was
24  clear.

Page 27

1      MR. COLANTONIO:  Yes.
2  BY MS. JINDAL:
3      Q.  And Doctor Gupta, have plaintiffs contacted
4  you -- attorneys for Cabell County and City of
5  Huntington, have any attorneys for those two
6  entities, contacted you about testifying in this
7  case, which is set to begin trial on October 19th,
8  2020?
9      A.  As I mentioned, that there may have been
10  e-mails in that time frame, as I mentioned, the
11  past eight to twelve months, that I may have
12  received and provided a courtesy response to that
13  -- that e-mail.
14      But beyond that, I have -- I do not
15  recollect having any phone conversations,
16  agreements with others with -- you know, with any
17  particular attorney, but I can -- I can provide you
18  the information that I do have on that -- on this
19  case.
20      I'm happy to do that.
21      Q.  Okay.  I just need to know what you know
22  today.  I will follow up as needed, Doctor.  Thank
23  you.
24      Did you agree in response to those

Page 28

1  e-mail inquiries to testify for plaintiffs in this
2  trial?
3      A.  I did not respond, as I mentioned, beyond
4  courtesy responses.  I can tell you that the --
5  meet -- at the time that all of this communication
6  was occurring, I did not also have the time to be
7  able to make decisions on that and so -- and I
8  would really like to know which attorneys we're
9  talking about, because once again, I don't want to
10  conflate with the -- you know, people who have been
11  -- who attempt to contact me, so I would love to
12  know the names who might be that we're talking
13  about here.
14      Q.  Sure.  Has Paul Farrell, Jr. contacted you
15  about testifying in the case brought on behalf of
16  Cabell County?
17      A.  Yes, and that may be the e-mail that I have
18  provided -- had provided a courtesy response to.
19      Q.  And do you currently intend to testify at
20  trial in this case?
21      MR. COLANTONIO:  Well, if he's
22  subpoenaed to testify at trial, then depending on
23  what the subpoena is -- I mean, he'll -- he'll, you
24  know, respond to that appropriately.

Page 29

1      But are you asking him if a lawyer for
2  the plaintiffs has asked him to appear voluntarily
3  or -- I'm --
4      I just want to make sure we're being
5  clear.
6      MS. JINDAL:  I am asking him:
7  **Q.  Do you plan to testify at trial currently?**
8  **A.  I have not been asked to testify beyond my**
9  **appearance today for trial.**
10     MS. KEARSE:  This is Anne Kearse.  Let
11 me just -- you know, Doctor Gupta is represented by
12 counsel, so our communications upon finding that
13 Doctor Gupta is represented by counsel have been
14 through counsel, so I just want to make that record
15 there too as well.
16     And there has not been some direct
17 contact once we realized he was represented by
18 counsel.
19     MR. FARRELL:  And this is Paul
20 Farrell.  Hey, Doctor Gupta, will you come testify
21 at our trial?
22     THE DEPONENT:  If I am available and
23 if I can, I would be able to do that.
24     MS. KEARSE:  Thank you, Doctor.

Page 30

1  BY MS. JINDAL:
2  **Q.  All right, Doctor.  If you are called at**
3  **trial, what do you expect to testify about?**
4      MR. COLANTONIO:  Object to the form.
5  **A.  I would provide my expertise, my experience**
6  **and the knowledge that I have with respect to both**
7  **being a local health officer for Kanawha County,**
8  **Putnam County as well as the State's Health**
9  **Commissioner for Bureau of Public Health and the**
10 **state health officer.**
11 **Q.  And we did hear -- we did talk briefly**
12 **about another opioid litigation that's currently**
13 **going on, the state MLP case.  Do you have any**
14 **intend to testify currently -- do you have any**
15 **intention to testify in that case?**
16     MR. COLANTONIO:  He -- he'll testify
17 in that case.
18 **A.  My response would be very similar, because**
19 **if I am asked to, I would consider, subject to the**
20 **availability to do that.**
21 **Q.  And will the subject of your testimony be**
22 **the same, or different?**
23     MR. COLANTONIO:  That hasn't been
24 determined yet.

Page 31

1  **A.  As I am asked, I will be able to provide**
2  **that.**
3  **Q.  And Doctor Gupta, other than your**
4  **expertise, experience and knowledge in the -- in --**
5  **through your work at the local -- as a local health**
6  **officer for Putnam and Kanawha County Health**
7  **Departments as well as your work as State Health**
8  **Officer and Commissioner for Bureau of Public**
9  **Health, is there anything else that you expect to**
10 **testify about in this case?**
11     MR. COLANTONIO:  Object to the form.
12 **A.  I have certainly provided national**
13 **expertise and would be able - in a limited amount**
14 **of circumstances, subject to my expertise - to**
15 **provide national trend information.**
16 **Q.  When you say "national" --**
17     MS. KEARSE:  This is Anne Kearse.  Let
18 me just say it again:  Doctor Gupta obviously has
19 extensive history in the state of West Virginia on
20 the opioid epidemic, and so he's being deposed
21 today for you to inquire about what he knows about
22 the public health hazards associated with opioids
23 and what it's done to the state.
24     So the fact that he may not know

Page 32

1  specifically what question we're going to ask him
2  at trial, to the extent he comes to trial, I think
3  that is an unfair question to ask him what he's
4  going to be asked.
5      He's got extensive knowledge about the
6  public health crisis in the state of West Virginia
7  that includes the City of Huntington and Cabell
8  County, so I would suggest you move on and just ask
9  him the questions about what he knows and what he
10 knows about the public health epidemic.
11     MR. RUBY:  Anne, it's a fair question
12 -- let's not -- let's not have this speech making.
13 If he intends to testify, it's perfectly fair game,
14 and let's not have -- let's not have the speaking
15 objections, please.
16     MS. JINDAL:  Thank you, Steve.
17 BY MS. JINDAL:
18 **Q.  Doctor Gupta, when you say "national**
19 **expertise," what do you mean?**
20 **A.  With regards to the opioid crisis and the**
21 **public health crisis resulting from the opioid**
22 **crisis.**
23 **Q.  Thank you, Doctor.  And any other subject**
24 **matter with regard to your testimony?**

Page 33

1          MR. COLANTONIO:  He'll respond to
2    questions as asked.  I think that's -- go ahead,
3    Doctor, if you can have a magic ball and figure out
4    what they're going to ask you, go for it.
5          A.  I will be happy to respond to the questions
6    and know that my portfolio and I will keep
7    reiterating that was not exclusively limited to
8    opioids during my tenure, so I'm unable to answer
9    what I would testify to not knowing what the
10   questions will be.
11          Q.  I understand that, Doctor.  Have you been
12   retained as an expert - if you are familiar with
13   that specific term in the context of a legal case -
14   by plaintiffs in the -- in this case?
15          MR. COLANTONIO:  No.
16          Q.  Have you been retained -- I'm sorry.
17   Doctor Gupta, you can respond.
18          A.  No.
19          MR. COLANTONIO:  No, to the extent
20   that that involves a legal --
21          Q.  Thank you.  Have you --
22          A.  My response is "No," but with a caveat that
23   I am not really aware of what the legal meaning of
24   -- of this -- he says, what this question is.

Page 34

1          Q.  Sure.  I guess have you been asked to --
2          MR. COLANTONIO:  I'm sorry, I don't
3    mean to interrupt, but just so we're clear, he's
4    not been retained as an expert, but he has a volume
5    and wealth of factual information about these
6    issues, and he also is prepared to render opinions
7    if asked about these issues.
8          So while he's not retained as an
9    expert, he's both a person who has facts and is
10   prepared to render opinions.
11          Q.  Doctor Gupta, are you -- have you been
12   asked to draft -- write any expert reports about
13   your work or experience or knowledge relating to
14   the opioid crisis in West Virginia?
15          A.  I have been asked to provide my opinion, my
16   -- using my knowledge, asked to -- what would it
17   take to solve the problem that we're facing.
18          MR. COLANTONIO:  And just so we're
19   clear, again, the doctor is not used to the
20   process, so just -- I'm going to put this on the
21   record.  He's been retained as a consultant in the
22   MLP case on the issue of maintenance at this point,
23   so I think he's speaking with that.
24          But just to be clear, he has

Page 35

1    information and opinions about other issues, so if
2    he's asked the questions, he'll respond.
3          A.  I think one of the challenges for me is to
4    be able to differentiate between what case and what
5    specific legalities, so do let me know on that
6    aspect as you ask those questions.
7          Q.  I will, Doctor.  Your answer is perfectly
8    fine.  I understood what you meant.  Thank you.  I
9    just want to have one little clarifying question.
10   When you said, "solve the problem we're facing," do
11   you mean the opioid abuse problem in West Virginia?
12          A.  Yes.  And the public health ensuing crisis.
13          Q.  Thank you.  Doctor, do you have a general
14   understanding of the system of distribution for
15   prescription opioids?
16          A.  My role as the State Health Commissioner
17   and public health officer, I have a broad bird's
18   eye view of the understanding of the system of
19   distribution.
20          Q.  What is that understanding, sir?
21          A.  My understanding is that based on the quota
22   that's determined by the DEA, manufacturers are
23   able to produce the volume of those pills and then
24   the distributors are able to - as registrants of

Page 36

1    the DEA - able to provide that volume of pills to
2    other registrants in terms of pharmacies which then
3    fill the prescriptions that have been written by
4    licensed providers.
5          Q.  You mentioned DEA registrants.  Are you
6    familiar with that registration process?
7          A.  To the extent that I am a -- one of the
8    registrants of the DEA to prescribe scheduled
9    substances, I am familiar.
10          Q.  Doctor Gupta, what -- please describe your
11   experience registering as a DEA -- as a DEA
12   registrant authorized to prescribe Schedule II
13   controlled substances.
14          A.  So my initial registration was many moons
15   ago, so I can probably recollect that most of the
16   experience will be renewing my DEA registration,
17   which has to occur every two years.
18          That involves going through a process
19   at the very beginning, we go on the website, the
20   DEA; we enter our DEA number and a few specifics
21   like Social Security number and date of birth; and
22   it opens up a form.
23          You provide your specific information;
24   you acknowledge to being able to prescribe; and

Page 37

1  then there are a few other questions that you have
2  to answer, you know, and then you pay the
3  appropriate fees unless you're waived, you work in
4  government, and that makes your registration.
5      I know this so well because as my
6  registration was expiring this month, I've just
7  done that last week.
8      Q.  You said that you have to provide specific
9  information on a form.  What kind of information do
10  you have to provide?
11      A.  It's all electronic.  You have to provide
12  your practice location, your mailing address, if
13  you are going to be prescribing or anticipate/plan
14  to prescribe Schedule II, III, IV substances.
15      You also have to attest that,
16  obviously, you have not have had a felony and other
17  offenses, asks you to testify to that.
18      So it's mostly details:  Street address
19  of your work, your mailing address, things of that
20  nature.
21      Q.  And when asked to describe your current
22  prescribing or plans to prescribe controlled
23  substances, how did you respond this month?
24      A.  There isn't a lot.  I just -- I believe --

Page 38

1  my recollection is that there is a box that you
2  have to check or at least somewhere that you are
3  going to prescribe those substances, that you are
4  eligible to prescribe those substances.
5      There is also a place where you have to
6  provide your medical license information, including
7  the state, so those are some of the areas.
8      Q.  And that's all part of the renewal process,
9  correct?
10      A.  Yes.
11      Q.  As best as you can recall, what was the
12  initial registration process like?
13      A.  What I can recall, it was more extensive
14  than the renewal process, but that's the extent
15  that I can recall at this point.
16      Q.  And this is the process that all physicians
17  who want to or need to prescribe controlled
18  substances need to go through to be able to do so.
19  Is that correct?
20      A.  I would say all prescribers, because
21  prescribers may include physicians, but they may
22  not be exclusively physicians.
23      Q.  You're right, Doctor.  This is a process
24  that all prescribers need to go through to be able

Page 39

1  to prescribe controlled substances in the United
2  States, correct?
3      A.  To my knowledge, yes.
4      Q.  And as you said earlier, this is also a
5  process that all pharmacies who dispense
6  prescription opioids also need to go through.
7  Correct?
8      A.  To my understanding, yes.
9      Q.  Right.  I understand you're not familiar
10  with the details of the process on -- from the
11  perspective of a pharmacy, but you do understand
12  that pharmacies also need to be registered with the
13  DEA to receive and dispense controlled substances?
14      A.  My understanding is that -- that all those
15  who are involved in the -- from a manufacturing, to
16  distribution, dispensing and writing prescriptions
17  have to be registrants of the DEA.
18      Q.  You said you learned about this process
19  through your work as a Commissioner for the Bureau
20  of Public Health.  Do you recall approximately when
21  you came to learn about this process?
22      A.  The process of being registered is
23  something that occurred way back when I was -- I
24  was going through finishing up my residency and

Page 40

1  getting into clinical practice.  I could not tell
2  you exactly, but approximately -- I finished my
3  residency was in 1999, so that would have been
4  around the years based on my license, permitted
5  license, that I would have filled out that process.
6      So I would be aware of the DEA
7  registration process since that time.
8      Q.  I see.  Thank you.  I -- my question was
9  confusing.  We started by talking about the system
10  of distribution for controlled substances.  When
11  did you become generally aware of that system of
12  distribution?
13      A.  So it was -- it was more during my term as
14  the health commissioner and the state health
15  officer because I was engaged in addressing the
16  opioid crisis and the public health consequences
17  that I became more aware and became more in contact
18  with the Board of Medicine, the Board of Pharmacy
19  and the controlled substances monitoring program
20  and that was the time during which I came to know
21  much more about the process than I had previously.
22      Q.  And beyond the requirements for all of the
23  actors in the supply chain to be DEA registrants,
24  what else have you learned about the -- that

Page 41

1   process?
2      A.  I'm sorry, if you can ask me a more
3   specific question?  I'm not sure I can answer it
4   and address my four years of experience in one
5   question.
6      Q.  No, so I'm asking specifically with respect
7   to the system of distribution.  For example, are
8   you aware also that distributors are -- as you
9   said, through your work with the Board of Pharmacy,
10  that they're regulated by the West Virginia Board
11  of Pharmacy in West Virginia?  Is that correct?
12     A.  I'm sorry, can you repeat that, please?
13     Q.  Sure.  You said you learned more about the
14  system of distribution during your term as
15  Commissioner, correct?
16     A.  Yes.
17     Q.  And you said part of that learning came
18  from your work with the Board of Pharmacy.
19  Correct?
20     A.  Correct.
21     Q.  Could you describe in detail --
22        MS. JINDAL:  Strike that.
23     Q.  What did you learn from your work with the
24  Board of Pharmacy with respect to the system of

Page 42

1   distribution for controlled opioids?
2      A.  I do think, Ms. Jindal, you know, that this
3   is an area of process that you're meeting with the
4   Board, you're attending their meetings, providing
5   perspective and you're learning over time.
6         So it's very difficult for me to
7   outline that as one, two, three, four, five things.
8   But broadly speaking, I developed a better
9   understanding and a more improved understanding of
10  the process of distribution from the volume to the
11  prescribing and dispensing.
12        We worked closely both to understand
13  what was going well, what was not going well, what
14  were the components of the controlled substances
15  monitoring program; what were the obligations.
16        Also -- within the Bureau of Public
17  Health.  But also, what can we do more?  I mean,
18  part of my work was not just learning, but also
19  trying to and attempting to - oftentimes struggling
20  to - find solutions to a crisis that we did not
21  create.
22     Q.  You said one of the things that you learned
23  more about was the volume.  What do you mean by
24  that?

Page 43

1      A.  What I mean by "the volume" aspect is,
2   clearly by the time I became Commissioner, it was
3   becoming more relevant and more clear that there
4   was a volume issue when it came to the deaths and
5   the suffering on the streets.
6         What that meant was, the overwhelming
7   volume that was reaching the people of West
8   Virginia was plainly involved in the killing of
9   West Virginians almost every 12 hours around the
10  clock, and that became important to us, as well as
11  other sufferings that were occurring.
12     Q.  Volume of what?
13     A.  The volume of prescription opioid pills.
14     Q.  And what was the source of that volume?
15     A.  So the source of that volume clearly was
16  coming from -- through the manufacturers and
17  distributors into the state of West Virginia and
18  then through the pharmacies, being dispensed into
19  the hands of innocent public.
20     Q.  You said you also looked at what was going
21  well and what was not going well.  What did you
22  think was going well?
23     A.  Well, by the time I came into the office,
24  clearly we had passed some policies -- please mind

Page 44

1   you, that these are downstream efforts.  We were
2   drowning, and we were trying - struggling - to do
3   what we could do at a city, county and a state
4   level to help people survive.
5         So what we did was, we had passed
6   several pieces of legislation and policy that had
7   made its way into commonplace, which means that we
8   had by the time figuring out how to get physicians
9   trained into understanding how diversion occurs,
10  how they could prescribe more responsibly to
11  prevent that diversion.  Although they're trying to
12  help the people that they're working with, meaning
13  their patients.
14        We were looking at figuring out how to
15  provide the antidote called naloxone into the hands
16  of the public so they can actually get an
17  opportunity to live.
18        We were trying to figure out how to
19  control -- you know, provide limitations to the --
20  some of the bad docs, and how do we go after those
21  bad docs?
22        So there was a whole host of initial
23  work that was happening in terms of downstream
24  attempts to control what we could control, what was

Page 45

1    within our hands, our power, to be able to do, at a
2    cost that was overwhelming.
3            Because at the same time, we were
4    having more and more children going to foster care.
5    Our child welfare cost was rising at an enormous
6    rate that we were having difficulty to control,
7    controlling the budget for the state.
8            So we were at the edges of going
9    bankrupt as a state, and primarily the crisis was
10   being driven but through the volume that was coming
11   up upstream to us.
12           So those were some of the things that
13   we were attempting to do.  We were also trying to
14   do justice reform, criminal justice reform,
15   reinvestments into -- because what we found was a
16   significant proportion of people that were ending
17   up incarcerated had substance abuse problems, and
18   that was primarily the reason, and they were not
19   being helped by being incarcerated and being in
20   prison.
21           We were losing -- as I mentioned, every
22   12 hours, we were losing a working West Virginian,
23   never to come back again, so this was a
24   transgenerational crisis.

Page 46

1            Q.  Doctor, did your -- you said that you
2    focused on educating physicians about diversion and
3    how to prescribe more responsibly.  Did that help
4    address the volume issue you were talking about?
5            A.  So yes, in an incremental way.  We were
6    taking baby steps to a problem.  I would hasten
7    back to the dam was broke, our cities were being
8    flooded and now we were trying to put sandbags to
9    form some type of levy while people are dying
10   because of the flood.
11           That's literally what was happening in
12   West Virginia.
13           Q.  I see.  And then when you said that you
14   limited or tried to go after bad doctors, did that
15   also help with the volume issue?
16           A.  Again, in incremental ways, but right now,
17   having the hindsight, I don't know if it helped or
18   hurt more.
19           Q.  Why do you say that?
20           A.  I say that because every time we went after
21   bad doctors, we shut the operations down.  There
22   were some really legitimate and credible patients
23   that need -- also needed pain medications.  They
24   could not find other physicians and prescribers in

Page 47

1    the community.
2            There were some people who had
3    addiction to these things that could not find
4    addiction treatment facilities.  So what would
5    these people do?  That we learned again in
6    hindsight.
7            They would go and try to seek these
8    pills on the street.  And as we were attempting, in
9    our way, incrementally to reduce the supply on the
10   street through these actions, they were starting to
11   transition into the more readily available cheaper
12   and affordable street alternative, which was at the
13   time heroin, and other -- some of the other
14   injection drugs.
15           Q.  There's a lot there, Doctor, so I'm just
16   going to try and take it one at a time.
17           Let's go back to the -- you said that
18   these actions only helped curb the volume of
19   prescription opioids in an incremental way.  Did
20   you do anything --
21           MS. JINDAL:  Strike that.  Let me
22   rephrase my question.
23           Q.  Did you take any actions to regulate the
24   conduct of distributors?

Page 48

1            MR. COLANTONIO:  I'm sorry, object to
2    the form of the question.  Are you asking him as a
3    State Health Officer if he somehow can regulate
4    through the Controlled Substances Act the
5    distributors?
6            I'm not sure I understand your
7    question.
8            MS. JINDAL:  Sure.  Let me rephrase.
9            Q.  Doctor, as State Health Officer and as
10   Commissioner for the Bureau of Public Health, you
11   were in a position to propose legislation, correct?
12           A.  Yes.
13           Q.  And you were also on the Governor's Council
14   -- Advisory Council on Substance Abuse, correct?
15           A.  That's correct.
16           Q.  And these positions put you in a position
17   to offer suggestions for what could be done to
18   abate the opioid problem in West Virginia, correct?
19           A.  Yes.
20           Q.  And you also testified that you learned
21   about the system of distribution through your work
22   on these -- on these committees and in your
23   position as Commissioner for the Bureau of Public
24   Health, correct?

Page 49

1      A.  Yes.
2      Q.  At the end of all that, did you propose any
3  solution or regulation or law that was directed at
4  the conduct of wholesale distributors?
5      A.  As a result of all of the aspect of
6  questions that you've asked me, we did put a task
7  force together and did everything possible under
8  the sun under my authority in the state of West
9  Virginia that we could do to address this terrible
10  killer of a crisis that was happening.
11          And I'd be happy to talk to you about
12  that.
13      Q.  Okay.  Doctor, that was not my question.
14  Did you ever propose a course of action with
15  respect to the conduct of wholesale distributors
16  and geared at abating the opioid problem in West
17  Virginia?
18          MR. COLANTONIO:  Objection to the
19  form.
20          Go ahead, Doctor, if you can answer
21  that.
22      A.  I did not have -- as State Health Officer,
23  did not have the authority to propose and control
24  the Controlled Substance Act, a federal law, and as

Page 50

1  part of the authority of state health commissioners
2  all across the country, we have the ability to do
3  what we can within our states and our communities,
4  and that's exactly what I was attempting to do:
5          MR. RUBY:  I'm going to call a
6  time-out here and just note for the record that the
7  witness' answer is parroting the improper speaking
8  objection in which his counsel coached him to give
9  testimony as to the Controlled Substances Act, and
10  I'm going to ask counsel to refrain from speaking
11  objections to coach the witness as to how you'd
12  like him to answer.
13          MR. COLANTONIO:  Well, that wasn't
14  intended as a speaking objection, Steve.  It was an
15  objection intended to be a proper objection, so
16  we'll move on and I'll object as I see fit, and you
17  can --
18          MR. RUBY:  Well, no, no, the -- we
19  make objections to form.  We don't make an
20  objection and ask if the question is asking the
21  witness whether he had the authority do thus and
22  such under the Controlled Substances Act and then
23  invite him to testify - as he just did - that he
24  didn't have the authority to do thus and such under

Page 51

1  the Controlled Substances Act.
2          That's exactly what happened there,
3  and we're not going to -- we're not going to put up
4  with that as the day goes on.
5          MR. COLANTONIO:  Yeah.  Whatever.
6          MR. FITZSIMMON:  Steve, the witness
7  wants a break also.
8          MR. COLANTONIO:  Oh, okay.  Can we
9  take a break now for a few minutes?
10          MS. JINDAL:  I just have a couple more
11  questions, and then I think we can take a break if
12  that's okay.
13          MR. COLANTONIO:  Go ahead.
14  BY MS. JINDAL:
15      Q.  Doctor Gupta, through your work with the
16  Board of Pharmacy, are you aware that the Board of
17  Pharmacy licenses and regulates distributors in the
18  state of West Virginia?
19      A.  What I'm aware of is that the Board of
20  Pharmacy does have the ability and the authority to
21  provide the licensing and -- for the distributors,
22  yes.
23      Q.  And members of the Board of Pharmacy were
24  on the Governor's Advisory Council for Substance

Page 52

1  Abuse, correct?
2      A.  I do not recall that at the time.  I mean,
3  I think we can check the record on that.
4      Q.  Okay.  But you were able to call someone up
5  at the Board of Pharmacy if you wanted to while you
6  were Commissioner, correct?
7      A.  That would be reasonable.
8      Q.  Okay.  Did you ever call someone at the
9  Board of Pharmacy and ask them to look into the
10  conduct of wholesale distributors?
11      A.  I would have conversations all the time to
12  be asking the Board of Pharmacy to make sure that
13  they do everything they can under their authority
14  to help us reduce this crisis.
15          So the answer is yes.
16      Q.  And do you think the Board of Pharmacy has
17  done all it could to help abate the opioid problem
18  in West Virginia?
19          MR. COLANTONIO:  Object to the form.
20      A.  My knowledge and my interactions lead me to
21  believe with the small, minuscule sometimes staff
22  that they had that they did everything that they
23  potentially could to respond to the crisis.
24      Q.  And if they continued to license and renew

Page 53

1    the licenses of wholesale distributors --
2        MS. JINDAL:  Strike that.
3        Q.  Are you aware that the Board of Pharmacy,
4    like the DEA, requires renewal of licenses?
5        A.  I would assume so at this time to the best
6    of my knowledge that that would be the case, just
7    because I am a registrant of the DEA and I am
8    required to make sure that I renew my registration.
9    That would be the same mechanism for any of those.
10       Q.  And if you had a particular concern with
11   the conduct of wholesale distributors, you would
12   expect that Board of Pharmacy -- you would have
13   shared that concern with someone at the Board of
14   Pharmacy, correct?
15       MR. COLANTONIO:  Object to the form.
16       A.  Can you repeat that question?
17       Q.  Sure.  You said you asked the Board of
18   Pharmacy to do anything and everything within its
19   power to help abate the opioid problem in West
20   Virginia, correct?
21       A.  Yes.
22       Q.  And if you had any particular concern about
23   conduct of wholesale distributors, you would have
24   communicated that in those discussions, correct?

Page 54

1        A.  Just so you know, my previous statement
2    still holds, because I specifically requested to
3    the Board of Pharmacy and its leaders to do
4    everything in their power to help us stop the
5    killing of West Virginians by the hour, and that in
6    -- that wasn't exclusive of anyone.
7            That was inclusive of every aspect that
8    they can do and turn over every case that they can.
9        Q.  Did you ever have any specific
10   conversations regarding the conduct of wholesale
11   distributors?
12       A.  I did not have specific conversations that
13   I can recollect at this time.  I can't recall
14   specific conversation, and please note this has
15   been several years ago.
16       Q.  Understood.
17       MS. JINDAL:  I think we can go ahead
18   and take a break now.  Maybe about ten minutes,
19   Doctor?
20       THE DEPONENT:  Sure.  Thank you.
21       VIDEO OPERATOR:  Going off the record.
22   The time is 10:11 a.m.
23           (A recess was taken after which the
24           proceedings continued as follows:)

Page 55

1        VIDEO OPERATOR:  This begins Media
2    Unit 2 in the deposition of Rahul Gupta, M.D.  We
3    are back on the record.  The time is 10:26 a.m.
4    BY MS. JINDAL:
5        Q.  Doctor Gupta, you had -- had you heard of
6    Cardinal Health before you became Commissioner?
7        A.  I had not.
8        Q.  When did you first hear of Cardinal Health?
9        A.  I do not recall a specific date and time.
10   I would say somewhere in 2015, I would have heard
11   it, after joining in January my position.
12       Q.  In what context did you hear about Cardinal
13   Health?  How did you first learn of them?
14       A.  It's very difficult to recall for me at
15   this point in what context.  At this point, I think
16   it would have been around the opioid crisis as well
17   as, you know, what can we do to solve the crisis
18   and, you know, what's the mechanism --
19           It's my sort of practice to under --
20   when I -- when I go into a position, to understand
21   the -- both the entire history as well as where we
22   are we going with it and that sort of thing.  So it
23   would have been my attempt to better get a
24   comprehensive view of the crisis.

Page 56

1        Within my purview, I had about 130
2    different program lines with -- you know, sort of
3    mandate, statutory mandate to monitor the public
4    health and its consequences across the state of
5    West Virginia, and so this would have been my
6    attempt during that time to better get to
7    understand the most current and devastating public
8    health crisis that was eating up the state, and
9    that's what --
10           You know, in the process of
11   understanding and learning more -- more
12   comprehensively the crisis, I would have -- it
13   would have come to understand that -- I would have
14   come to understand that.
15       Q.  Have you ever had any professional
16   interactions with an employee of Cardinal Health?
17       A.  Not that I'm aware of.
18       Q.  And is the -- had you heard of McKesson
19   before you became -- McKesson Corporation before
20   you became Commissioner?
21       A.  No.
22       Q.  And when did you learn about McKesson
23   Corporation?
24       A.  I would say it would have been very similar

Page 57

1 to the details I provided about Cardinal Health.
2     Q.  And have you ever had any professional
3 interactions with an employee of McKesson?
4     A.  Not to my knowledge.
5     Q.  And is your answer equally applicable to
6 AmerisourceBergen Drug Corporation?
7     A.  I would say yes.
8     Q.  And just to be clear, that -- you mean that
9 you had not heard of AmerisourceBergen before you
10 came Commissioner?
11     A.  That's correct, to my ability to recall at
12 that time.
13     Q.  And as best as you can recall, you learned
14 about ABDC, AmerisourceBergen Drug Corporation,
15 after you became Commissioner while you were
16 learning more about the opioid problem in West
17 Virginia?
18     A.  That's to the extent that I can recall at
19 this time.
20     Q.  And as far as learning more about the
21 opioid problem after you became Commissioner, do
22 you -- just at a high level, what sort of sources
23 did you rely on?
24     A.  I relied on a number of nationally-known

Page 58

1 sources, state level sources, regulatory sources.
2 So that would be the reports that may be coming out
3 from the CDC, from other federal agencies. It
4 would be media reports as well, both national,
5 state and local.
6     It would be talking to families
7 individually and -- because I was on the ground
8 dealing with the deaths literally every single day.
9     It would also be the state reports as
10 well as the data that we would be collecting as
11 well as monitoring and providing reports.
12     It would also be the chief medical
13 examiner's office that was under my purview, that
14 -- the challenge that we were going through to deal
15 with the death and destruction on a daily basis and
16 the challenges that we were having with resources.
17     It would be the legislature, West
18 Virginia legislature. That would be -- you know,
19 some other -- other sources as well that I cannot
20 recall at this time.
21     Q.  And do you recall West Virginia's lawsuit
22 against wholesale distributors?
23     A.  I do not recall a lot of -- any significant
24 great detail at this time.

Page 59

1     Q.  But do you recall the fact that West
2 Virginia filed suit against Cardinal Health,
3 AmerisourceBergen and McKesson Corporation?
4     A.  At some point in my thinking back in my
5 time at -- as a Commissioner, I would have been
6 contacted by the general counsel of the -- my
7 parent agency - Department of Health and Human
8 Services - to both brief me as well as ask for work
9 in understanding better the opioid crisis and the
10 devastation it was causing in terms of these
11 programs we had, as well as then to -- to be
12 deposed subsequently.
13     That would be the context, now looking
14 back, that I would learn about that.
15     Q.  Did you ever have an opportunity to read
16 the Complaint in those cases?
17     A.  I do not recall.
18     Q.  Did you agree with West Virginia's decision
19 to file suit?
20     MR. COLANTONIO:  Object to form.
21     A.  I don't think I could provide you an
22 opinion there, because that was something that was
23 existing before my time. I had no input into that
24 decision-making process.

Page 60

1     Q.  I'm going to go ahead and switch gears now
2 and talk to you a bit about your background. Do
3 you have an undergraduate degree?
4     A.  I have a one-year bachelor of science. So
5 I do not have a full undergraduate degree.
6     Q.  And where is that from?
7     A.  That's from University of Delhi.
8     Q.  And when was that?
9     A.  That was 1987 to 1988.
10     Q.  And what did it focus on?
11     A.  It focused on biology.
12     Q.  So bachelor's of science in biology?
13     A.  Correct.
14     Q.  And you -- do you have any advanced
15 degrees?
16     A.  I do have a doctor of medicine degree. I
17 have an additional master's of public health. And
18 a master's of business administration.
19     Q.  Doctor Gupta, if I could ask you to open
20 Exhibit 51.
21     GUPTA DEPOSITION EXHIBIT NO. 51
22     (Resume of Rahul Gupta, MD, MPH, MBA,
23     FACP (WVSMA_FEDWV_00039036-091) was
24     marked for identification purposes as

Page 61

1          Gupta Deposition Exhibit No. 51.)
2          MS. KEARSE: I'm sorry, what exhibit?
3          MS. JINDAL: 51. 5-1.
4      A.  I have it.
5      Q.  Doctor Gupta, are you familiar with this
6  document?  And I'll specify.  Are you familiar with
7  the attachment to this e-mail that was sent to you?
8      A.  Yes, it seems like it's my resume.
9      Q.  And was this your resume as of March 23rd,
10  2017?
11     A.  I'm going to check.
12     Q.  I'm just using the date of the e-mail,
13  Doctor.
14     A.  Yes, I see the date on the e-mail, and that
15  is the appropriate attachment that it should be.
16     Q.  And did you draft this resume?
17     A.  I would -- I would think so.
18     Q.  Doctor, if you turn to -- do you see in the
19  lower right-hand corner of each document, there are
20  two Bates stamp numbers?  They start with some
21  letters WVSMA here and then they end with a serial
22  number?
23     A.  Yes.
24     Q.  I'm going to ask you to focus on the top

Page 62

1  document when we review the documents.  And the top
2  number -- could you please turn to the page that
3  ends with 9042?
4          MR. COLANTONIO: 9042.
5          THE DEPONENT: Yeah, I've got it.
6      Q.  I believe it's page 6 of your resume, if
7  that makes things easier.
8      A.  I see it.
9      Q.  Okay.  And you see the heading "Education"?
10     A.  Yes.
11     Q.  And does that accurately reflect the dates
12  and universities from which you have received those
13  advanced degrees that we just discussed?
14     A.  Yes.
15     Q.  And did you complete your residency
16  training at St. Joseph Hospital in Northwestern --
17  of Northwestern University in Chicago, Illinois?
18     A.  Yes.
19     Q.  And what did you complete your residency
20  in, Doctor?
21     A.  Internal medicine.
22     Q.  And do you have any special trainings or
23  certificates?
24     A.  I trained prior to my residency in

Page 63

1  pulmonary medicine.  That's listed as "Chest
2  Diseases and Tuberculosis" with a two-year diploma,
3  and then I have had since then the special training
4  in public health as reflected here with an M.P.H.
5  degree from the University of Alabama-Birmingham,
6  and it was followed by a specialization in business
7  administration that is listed as the M.B.A. in
8  Information and Technology Management.
9      Q.  Aside from the subspecialty training of
10  chest disease and tuberculosis and your training in
11  internal medicine, have you had any other
12  specialized medical training?
13     A.  No.
14     Q.  And have you -- have you had any -- aside
15  from these trainings, do you participate in any
16  ongoing physician education?
17     A.  Yes.
18     Q.  And is that pursuant to any active licenses
19  that you currently have?
20     A.  Yes.
21     Q.  What are those currently active licenses?
22     A.  License to practice in the state of West
23  Virginia.
24     Q.  And have you principally practiced as -- in

Page 64

1  internal medicine since you completed your
2  residency?
3      A.  I have practiced in the areas of internal
4  medicine, primary care, family medicine, as well as
5  I had to also cover the emergency room on occasions
6  in the past.
7      Q.  And I'm going to try and save us some time.
8  Rather than -- does -- if we can, could you please
9  go through the various hospitals and clinics that
10  you've worked at over the years since you completed
11  your residency?
12     A.  I certainly can.  Would it be okay if I use
13  my listed Exhibit 51 as a reference?
14     Q.  Absolutely.
15     A.  Thank you.  Can you please clarify exactly
16  what aspects you want to cover -- want me to cover?
17     Q.  Sure.  Let me clarify the question.  On
18  page Bates stamped at the end, last four digits are
19  9039, page 3 of your resume --
20     A.  Yes.
21     Q.  -- after you completed your residency, did
22  you practice as a physician, as a primary care
23  physician, as Florala Medical Clinic in Alabama?
24     A.  Yes.

Page 65

1    Q.  And after -- and you were there for four
2   years?
3    A.  Yes.
4    Q.  And after you completed that, you became a
5   physician at the University of Alabama-Birmingham?
6    A.  Yes, in Huntsville, Alabama.
7    Q.  And what was your practice there?
8    A.  I was a primary hospitalist, academic
9   physician.  My position was assistant professor of
10  medicine for the school, and also did primary care.
11  So I was an internal medicine hospitalist and then
12  saw patients outpatient care as well and did
13  teaching of the residency program and the medical
14  school at UAB.
15   Q.  What courses did you teach there?
16   A.  I taught internal medicine, public health,
17  various aspects of internal medicine, as well as
18  preventive medicine and public health.
19   Q.  Did any of your courses focus on treatment
20  of pain?
21   A.  There was a broad focus on pharmacology of
22  compounds.  There was a daily focus in the hospital
23  rounds on treatment, including treatment for pain,
24  because we saw a range of patients admitted from

Page 66

1   cancer and the end-of-life to all the way to, you
2   know, broken bones, head trauma, accidents,
3   neurosurgery, those type of patients.
4        So there was a various range of
5   patients that we would typically see for a
6   hospitalist, and so our education that I provided
7   to -- in realtime, along with the School of
8   Pharmacy, Auburn School of Pharmacy, was on a daily
9   basis that we discussed management of conditions,
10  including management of pain.
11   Q.  And in discussing the management of pain,
12  did you teach with respect to the prescribing of
13  prescription opioids?
14   A.  It's difficult for me to recall at this
15  time specifically what was taught, but I could say
16  that amongst the pharmacology and teaching would
17  have included the appropriate prescribing of
18  opioids and appropriate prescribing for antibiotics
19  and a number of other groups of medications.
20   Q.  And when you say "appropriate prescribing,"
21  what would you consider to be the appropriate
22  prescribing that you would have taught them?
23   A.  The appropriate prescribing would be one in
24  which we utilized opioids not as first line and not

Page 67

1   something for that is for everyone.  But we
2   actually made sure that these are treated as
3   serious medications, prescription medications,
4   potentially deadly medications, and they are
5   provided to patients when the -- there is an
6   appropriate indication for these medications.
7    Q.  And is that also what you taught with
8   respect to antibiotics use?
9    A.  Yes.  And in the antibiotic use, it would
10  be a little bit different.  We would focus on the
11  development of resistance to antibiotics, which was
12  also a major issue, and you would want to make
13  sure -- as an example, just like that, you know, a
14  very simple skin lesion with a little bit of
15  inflammation, you would not be automatically
16  jumping to prescribe opioids.
17        Same way if you had a cold, you would
18  not be jumping to prescribe an antibiotics.  Both
19  of the results are not good for medicine and
20  they're not good for certainly public health, and
21  they have both of these examples have deadly
22  consequences.
23   Q.  So your approach to prescribing of opioids
24  was similar -- was your general approach to

Page 68

1   prescription -- to prescribing any medicine.  Is
2   that fair to say?
3        MR. COLANTONIO:  Object to the form.
4    A.  My approach to prescriptions and care of
5   the patient was primarily not only driven by data
6   and science, but the oath we take to first do no
7   harm, and I happen to take that very seriously, and
8   I made sure that my residents and my medical
9   students and my pharmacy students and nursing
10  students were taught the same approach.
11   Q.  And after you left the Florala Medical
12  Clinic -- I'm sorry, after you left the University
13  of Alabama-Birmingham, you then taught at
14  Vanderbilt University; is that right?
15   A.  I was the primary faculty at Meharry
16  Medical College which is also at Nashville, with a
17  secondary appointment at Vanderbilt Medical Center.
18   Q.  And you were both practicing and teaching
19  in those places as well?
20   A.  Yes, I was practicing primarily at
21  Nashville General Hospital, downtown Nashville.  I
22  was both a hospitalist, very similarly placed, but
23  also a primary care and an outpatient physician in
24  a very inner city environment where we had a lot of

Page 69

1    African-American urban population with a little bit
2    of different set of challenges that was to consult.
3         We -- this was the only public hospital
4    in Nashville, surrounded by several private
5    hospitals, so the population was a little
6    different.  But I was still also teaching medical
7    students of the Meharry Medical College as well as
8    the internal medicine program residents and
9    typically involved in helping the residency program
10   become successful.
11        Q.  And did any of the courses there involve or
12   relate to management and treatment of pain and the
13   use of prescription opioids?
14        A.  So my teaching is very similar to what I
15   was doing in Huntsville.  It involved daily rounds
16   and hospitals when I was posted to the wards, so to
17   speak, and understanding and teaching students how
18   to properly manage various medical conditions,
19   including pain.
20        We also had an incarceration, like a
21   jail ward, on the top floor, which was very
22   similar, but it was important to have the students
23   and residents understand that the concepts of both
24   pain management as well as good medical management

Page 70

1    are not contradictory to each other.
2         Q.  So you didn't teach any specialized courses
3    concerning the management or treatment of pain?
4         A.  I don't -- I did not -- I did not teach any
5    specialized courses.
6         Q.  And then after your time in Tennessee, is
7    that when you moved to West Virginia in 2009?
8         A.  Yes.
9         Q.  And when you moved to West Virginia, what
10   were you doing?
11        A.  So when I moved to West Virginia, I became
12   the health officer for Kanawha/Charleston Health
13   Department.  That was a combined city/county health
14   department, the largest in the state, local health
15   department.
16        I was the local health officer,
17   physician director.  So my responsibility and
18   jurisdiction was Kanawha County.  And the
19   responsibility was amongst various aspects that
20   included everything from monitoring safe water to
21   air to making sure that there were clean indoor air
22   regulations, that people -- various programs of
23   health and prevention, while making sure that
24   restaurants were properly monitored for the food

Page 71

1    code, the sewage, the licensing of making sure
2    that, you know, there were proper sewage and air
3    conditioning and other things -- aspects.
4         Hotels, licensing, making sure that
5    they were properly done from a health aspect.
6         So I was responsible for all of those
7    public health aspects of the county.
8         I was also teaching at the same time.
9    I obtained as a -- I don't exactly remember -- I'd
10   have to go back to my resume and look at it as to
11   when, but a faculty appointment at West Virginia
12   University as well as University of Charleston.
13        I became a clinical teaching faculty at
14   the largest hospital in the state of West Virginia,
15   which is CAMC, and I was also volunteering at the
16   local charitable clinic called Health Right, West
17   Virginia Health Right.
18        Q.  What prompted you to pursue a career in
19   public health at that point?
20        A.  The primary driving force for me was as a
21   primary care physician in a town of about 850,
22   Florala, I was seeing a lot of challenges that were
23   primarily public health in nature.
24        I was also seeing at the same time that

Page 72

1    whereas I had a more traditional evidence-based
2    approach, I did have colleagues that were much more
3    liberal - who we know now as bad doctors, by the
4    way - in opioid prescribing.
5         But that wasn't the only piece.  It
6    was part of the conversation that prompted me to
7    seek a better understanding of our systems, our
8    health policy and our health care systems, and
9    that's the reason I got my master's in public
10   health after which --
11        Because during the same time, I would
12   consult with UAB, and I recognized that, you know,
13   a confirmation health approach as pretty decently
14   good as I was in clinical medicine, to understand
15   and just had mostly clinical teaching in the wards
16   and on the campus --
17        -- that I could have a larger impact in
18   addressing the more population aspect of crises and
19   challenges that we face, whether it's obesity, the
20   consequences of which, or other aspects.
21        And that was the primary driver for me
22   to be able to do good at a much larger upstream
23   level, just to be more impactful in addition to
24   individual level of care which I still felt was

Page 73

1    important to be grounded.
2           That was the reason that I continued to
3    donate my personal time to the charity clinic in
4    addition to understanding and working on policy and
5    other problematic aspects of public health.
6        Q.  I want to go to the beginning of your
7    answer there, Doctor.  You said you had some
8    colleagues at Florala Medical -- I don't recall the
9    name.
10          -- Florala Medical Clinic in Alabama
11   who you characterize as "bad doctors."
12          Could you describe more about what your
13   concern was there?
14          MR. COLANTONIO:  Object to the form.
15      A.  So you know, we're going to go back and I'm
16   going to talk about this, having the benefit of
17   doubt that we have today in 2020.  But when I was
18   there at the time in the year 2000, this was a time
19   when I -- this is the Town of Florala, as well as
20   my colleagues, were getting regular visits - if not
21   daily, certainly weekly, multiple visits - from
22   pharmaceutical representatives who were telling us
23   that, yeah, we should prescribe and adequately
24   treat pain.

Page 74

1           I was a front-line physician that was
2    managing not only a full-time clinic, but also the
3    emergency room of the local hospital every third
4    day by rotation, every third weekend by rotation.
5    So that was a lot of coverage.
6           And we were being bombarded at the time
7    with these messages that were coming to us.
8    Samples were being dropped.  And some of us took
9    the approach of being driven still by data and
10   evidence, whereas there were a few that did not.
11          And so those are the colleagues I talk
12   about, which we now know as bad doctors, that
13   perhaps at the time we hadn't recognized that they
14   had incentives to be able to writing prescriptions
15   -- did have patients come from far off, sometimes
16   hundreds of miles away, line up in the parking lot,
17   and having cash-only clinics.
18          These are not bad people; they were
19   just what we know now as bad doctors.  Not bad
20   human beings, but just bad prescribers.  And the
21   ones at least I know, I know they were trying to
22   help do the best they could for the training they
23   received and they were sold a bill of goods that
24   they felt that they were trying to help the

Page 75

1    patients.
2        Q.  Do you recall ever expressing any concern
3    about the lack of data and evidence-driven
4    prescribing?
5        A.  It's hard to go back 20 years or 15 years.
6    But yes, I generally -- and I say that because I
7    generally have a view of utilizing data and
8    evidence to drive -- drive my decisions, whether
9    it's in policy making or clinical care.
10          So I do remember being concerned about
11   this issue.  As I was concerned, to be honest, at
12   the time -- as an example, we were using -- this is
13   -- doesn't relate to opioids, but we were using a
14   lot of Celebrex and Vioxx.
15          These are jus -- you may or may not
16   remember these medications, but they were also
17   being consumed and used.  And I had done the review
18   of their initial studies, and that did show
19   casualties.  And I was skeptical about that too.
20   That some of the patients I was seeing were having
21   DVTs and they were having consequences.
22          So that's the level of detail that I
23   had happened to focus on. Many of my colleagues -
24   and most of my colleagues - did, but some did not.

Page 76

1    And so that's an example of where when all the
2    prescribers were being sold the bill of goods, most
3    decided to do the right thing and follow what they
4    were taught to follow in medical school, but just
5    follow the science.
6           And some fell victim to the message.
7    And as a result, now what we know became bad docs.
8        Q.  And when you say they "fell victim to the
9    message," are you referring to the messaging from
10   manufacturers about prescription opioids?
11      A.  I would overall generally say yes, and the
12   reason for that is that the representatives that
13   were coming to our offices did represent
14   manufacturers, and they had a product to sell,
15   bottom line.
16          But it was also other things which --
17   you know, physicians were asked to go on trips, to
18   take weekends to other type of lavish and
19   extravagant type of investments that were being
20   made.  I could not tell you who was making those
21   because I wasn't part of that.
22          But there were other aspects of this
23   too.
24      Q.  Do you recall ever a wholesale distributor

Page 77

1  approaching you about prescription opioids?
2      A.  As I testified earlier, I was -- I do not
3  recall any -- any wholesale distributors
4  approaching me.
5      Q.  Have you ever heard any of your colleagues
6  say they were approached by a wholesale
7  distributor?
8      A.  At this time, it would be hard for me to
9  recall that.
10      Q.  So you don't recall whether your colleagues
11  have ever said that they have been approached by a
12  wholesale distributor with respect to their
13  prescription opioids?
14      A.  I don't recall that.  I also don't recall
15  them telling me that they were approached by
16  manufacturers.  So that's the rationale, that I
17  just -- that is -- we talk more about patient care
18  as -- and as the standards began to change for
19  pain, we began to discuss and sort of in a
20  scientific way, discussed the basis of the
21  standards that were changing, not really how that
22  was being caused --
23          At the time.  I go back to this thing
24  -- it's very easy now in hindsight to look at this.

Page 78

1  But at the time that we were in, we were
2  prescribers and primary care physicians who's first
3  duty was actually to help our patients, because
4  that's where we were engaged mostly.  We were not
5  in policy making.
6          And we would discuss the standards and
7  how they're changing literally in realtime during
8  the 2000s.  That's what I do recall about that.
9      Q.  What do you recall about the change in
10  standards with respect to treatment of pain?  Or
11  the use of prescription opioids?
12      A.  I recall that the American Pain Society
13  promoted pain as being the fifth vital sign.  At
14  the time, I wasn't acutely aware that they were
15  being supported with financing by a pain
16  manufacturer or others.
17          I recall that at the time both the --
18  what we know as Joint Commission now - but JCAHO
19  then - came out with recommendations for utilizing
20  pain as a vital sign, pushed by the American Pain
21  Society.
22          As I would be in the hospital in
23  subsequent years, as a hospitalist, we would be
24  subject to the ten-point pain scale with the happy

Page 79

1  faces.  That was a consequence of that.
2          And that all sort of played into
3  changing the standard of pain as a fifth vital sign
4  when we did not go to that extent to change other
5  four vital signs at that time.
6          That's why it stood out, because we
7  took a subjective symptom and we turned it into a
8  vital sign without any of the data or research or
9  work that had gone into the other four vital signs.
10          So in that sense, for many of us - for
11  most of us, I would say - the standard of -- for
12  pain were changing and evolving around the 2000s
13  when I was practicing in Florala.
14      Q.  Doctor, going back to your resume, I want
15  to draw your attention to the -- page 4 of your
16  resume.  It ends with Bates Stamp No. 9040.
17      A.  I have it.
18      Q.  And I want you to focus on the bottom of
19  this resume, it says you were an associate
20  professor at the University of Charleston School of
21  Pharmacy starting in 2011.  How long did you teach
22  there?
23      A.  I believe I should be still faculty there,
24  but the last time would have been sometime before I

Page 80

1  left West Virginia.  That would be in 2018 that I
2  actually taught a class.  I could not recall an
3  exact month and time.
4          But that -- you know, I taught there.
5  I teach at -- I was a professor at Harvard as well,
6  as well as Johns Hopkins and West Virginia
7  University and Georgetown, so --
8      Q.  And just continue to focus as the
9  University of Charleston School of Pharmacy, I'm
10  going to just talk to you about that first bullet
11  point there.  You "Teach class on the role of
12  community pharmacist in addressing public health
13  challenges."
14          Did I read that correctly?
15      A.  Yes.
16      Q.  What do you mean by "community
17  pharmacists?"
18      A.  So community pharmacists have oaths to pure
19  -- and I'm not very well versed in the science of
20  this from a pharmacy standpoint but as opposed to a
21  retail pharmacy -- pharmacist or a wholesale
22  pharmacist.
23          Really relates back to the mom and pops
24  across the country, the pharmacists that are

Page 81

1  embedded in the community, that the role that they
2  have in ensuring that they're addressing whatever
3  the contemporary public health crisis or challenges
4  may be ongoing in their own communities.
5     Q.  And when you talk about the public health
6  challenges that could be going on in the community,
7  do you have any specifics in mind?
8     A.  Yes.  So I'll give you a couple examples.
9  One, the class really came across because when I
10 was in Florala, I would have oftentimes the person
11 who owned the Florala pharmacy call me and say,
12 "Hey, Doc, I've got two cases of diarrhea.  You
13 sure there's nothing going around, like a bug?"
14    So this was -- this was our community
15 way of being the sentinel providers and working
16 with each other to figure out challenges when the
17 robust system -- to become those sentinel providers
18 and detectors -- or these detectives.  That was one
19 example.
20    The other can clearly be -- at least
21 part of what I taught, the second example was:
22 Okay, if you're starting to see a lot of
23 prescriptions come in for opioids, that you really
24 have to question that as well.  And you could be

Page 82

1  that sentinel provider that could raise that
2  concern.
3     Q.  And do you talk about the role, I guess, as
4  a sentinel in -- for prescription opioids in the
5  class?
6     A.  Yes.
7     Q.  And what kinds of --
8        MS. JINDAL:  Strike that.
9     Q.  Let me put it this way.  You said there
10 were -- you know, you had a pharmacist who called
11 you about two cases of diarrhea.  In terms of
12 educating your students, what did you tell them
13 should generate or lead to a call to a physician
14 about prescription opioids?
15    A.  An example would be if they start -- you're
16 seeing a volume of prescriptions come from the same
17 place or same prescriber or a prescription that
18 doesn't look like -- it could have been fabricated,
19 then you make sure you conduct your due diligence,
20 your responsibility as a pharmacist - to these
21 students - that you ensure that you're not
22 dispensing any of these drugs that could
23 potentially harm your community members.
24    And remember -- I just want to add here

Page 83

1  that these -- this is an example of the kind of
2  things we were doing that would potentially help
3  with downstream have some even a minute amount of
4  incremental impact to help the crisis that we had
5  not generated or we had not caused.
6     Q.  And do you believe there are pharmacists
7  who failed to fulfill the community pharmacist role
8  in West Virginia?
9     A.  I can only base my opinions on reports that
10 I would read like the public or anyone else.  I do
11 not have any data or knowledge beyond that.
12    Q.  Based on those reports, what is your
13 opinion?
14    A.  My opinion is that there was plenty of
15 blame to go around, and there was definitely, you
16 know, some pharmacies in West Virginia that could
17 have done a better job at conducting their own due
18 diligence.
19    Q.  Do you have any particular pharmacies in
20 mind?
21    A.  Not at this time.  I -- you know, I haven't
22 reviewed the data and everything.  This has been a
23 while back.
24    Q.  At one time, did you have any particular

Page 84

1  pharmacies in mind?
2     A.  I'm sure I did.  I do not recall at this
3  point.
4     Q.  Do you recall what you did once you learned
5  that there might be some specific pharmacies who
6  are failing to fulfill their community caretaking
7  role or maybe not conducting their due diligence?
8     A.  I am not sure if I was a physician -- if I
9  was in Florala and I was reading about a pharmacy
10 and kind of see -- I don't think I had the role or
11 the ability to influence that, unfortunately.
12    And that goes back to my answer about
13 why I decided to go to public health.
14    Q.  Sure.  I'm actually focused on pharmacies
15 in West Virginia.  So let's just stick to your time
16 in West Virginia from 2009 on.  Did you ever come
17 to believe that pharmacies in West Virginia were
18 not fulfilling their community caretaking role?
19    A.  So the time that I was the local health
20 officer from 2009 to the end of 2014 -- I'm trying
21 to recall if there were any times - and I can't -
22 within my jurisdiction that we had a problem and I
23 did not recognize those.
24    I don't remember that -- being aware at

Page 85

1   the time of that.
2       Q.  Okay.  And then while you were a
3   Commissioner or -- and on the Governor's Advisory
4   Council on Substance Abuse, were there any
5   particular pharmacies that were brought to your
6   attention as ones that were problematic or had
7   failed to fulfill their role as community care --
8   community pharmacists?
9           And again, focusing on West Virginia
10  pharmacies.
11      A.  So that wouldn't be brought to my attention
12  because that would be brought to the attention of
13  the Board of Pharmacy and I would not be made aware
14  of that, because those investigations would be
15  confidential in nature.
16          So that would be the reason that I
17  wouldn't be made aware of that.  My knowledge comes
18  still from the published reports at the time, as
19  I've stated earlier.
20      Q.  And did you refer any West Virginia
21  pharmacies to the Board of Pharmacy for
22  investigation?
23      A.  I would have no cause to investigate or
24  find any cause to report those pharmacies.  Back to

Page 86

1   my earlier assertion that, you know, in my contact
2   with the Board of Pharmacy, and being secretary of
3   the Board of Medicine as well as the State Health
4   Commissioner of Public Health and State Public
5   Health Officer, my singular message was - for the
6   Board of Pharmacy - do everything they can within
7   their power and within their jurisdiction to ensure
8   that they curb the supply that's coming out in the
9   state of West Virginia.
10      Q.  And if you ever heard a patient describe a
11  interaction with a pharmacist that you believed to
12  be problematic or not fulfilling his role of a
13  community pharmacist, would you have referred that
14  pharmacist or pharmacy to the Board of Pharmacy for
15  investigation?
16      A.  I would.  I just don't recall that -- you
17  know, specific instances.  But my --
18      Q.  Okay.  Thank you.
19      A.  -- practice is if I had, I would.
20      Q.  Okay, thank you.  I think we talked a
21  little bit about this already, but you agree that
22  there's a role for prescription opioids in the
23  treatment of pain.  Correct?
24      A.  I would agree with that.

Page 87

1       Q.  And including chronic pain?
2       A.  I would agree with that.
3       Q.  Is it fair to say then that a prescription
4   for opioids is not, in and of itself, illegitimate
5   or illegal?
6       A.  I'm not sure if I would agree with that.
7       Q.  You believe that there are some instances
8   in which -- let me clarify my question, and maybe
9   this will help.  A prescription for opioids written
10  by a DEA-registered and state-licensed medical
11  professional is not, in of itself, illegitimate,
12  correct?
13          MR. COLANTONIO:  Object to the form.
14      A.  The way I would respond to that question
15  would be that no prescription that becomes
16  illegitimate just because it's a prescription; in
17  fact, just the opposite is true.  However, it's the
18  intent with which the prescription is written as
19  well as the whom to which the prescription is
20  written and what purpose that is the essence of a
21  prescription writing process.
22      Q.  Okay.  So when a pharmacist receives a
23  prescription or --
24          MS. JINDAL:  Sorry, strike that.

Page 88

1       Q.  When a pharmacist has a patient come in
2   with a prescription for opioids, is it fair to say
3   that a pharmacist needs more information to make a
4   judgment about whether or not that prescription is
5   one that should be dispensed or filled?
6           MR. COLANTONIO:  Object to the form.
7       A.  They could.  I mean, if you could repeat
8   that question -- I'm trying my best to answer.
9       Q.  Sure.  I guess what I'm trying to say is:
10  We talked a little bit about it already.  You said
11  that when a pharmacist, for example, generally
12  might be concerned when he starts seeing too many
13  prescriptions from a prescriber or a facility for
14  prescription opioids or he might be concerned when
15  the patient who comes in through the door is
16  someone who is from far away.
17          What I'm trying to get at is:  That all
18  -- that information -- that kind of information is
19  not ascertainable from the prescription itself.
20  Correct?
21      A.  Just the face of the prescription, it
22  depends.  If it's an electronic prescription, that
23  can be ascertained through the required
24  interrogation of the prescription monitoring

Page 89

1    program.
2         So it just depends.  It doesn't have to
3    be a black or white answer.  It just depends.
4         Q.  Okay.  And are pharmacists in West Virginia
5    required to check the prescription monitoring
6    program before they fill a prescription for
7    opioids?
8         A.  Yes.  Now.
9         Q.  When did that become law?
10        A.  I believe the -- what West Virginia called
11   its Controlled Substance Monitoring Program - it's
12   the PDMP version - it's called the CSMP.  It was
13   established in 1995, and there were changes that
14   have been made over time.
15        The last one, I would say,
16   approximately around 2012 when they were -- when
17   they were able to do that, and I think during 2015.
18   I don't -- I can't exact -- I can't exactly tell
19   you when.  But we did work on that over my tenure
20   to require that.
21        Q.  And when you refer to that requirement, are
22   you referring to the requirement that pharmacists
23   are required to enter any information about
24   prescriptions that are dispensed within 24 hours of

Page 90

1    having dispensed them?
2         A.  Broadly, I believe so.  Again, I'm not a
3    pharmacist, and I do not own any pharmacies, so I
4    -- it's very hard for me to speak about the
5    regulations within the pharmacy world.  At least
6    I'm going to try to answer the best I can.
7         Q.  Sure.  So you could be mistaken that --
8    about whether pharmacists are required to check
9    that database before deciding whether to fill a
10   prescription for opioids?
11        A.  I have a reasonable degree of certainty
12   that they are required to do that.  Now, there
13   could be some that do not do that, and I cannot
14   vouch for those people.
15        Q.  Turning back to Exhibit 51, and staying on
16   that same page and focusing on the University of --
17   your work with the University of Charleston School
18   of Pharmacy.  The second bullet describes your
19   class on "expansion of the role of pharmacy under
20   the Patient Protection and Affordable Care Act."
21        Did that class involve any discussion
22   of prescription opioids?
23        A.  That one did not.  To my recollection.
24        Q.  So we've discussed your work with the

Page 91

1    Kanawha/Charleston Health Department from 2009 to
2    the end of 2014.  And then you became a
3    Commissioner starting in January 2015, correct?
4         A.  Yes.
5         Q.  Turning to the first page of your resume,
6    that describes - at a high level - some of the work
7    you did as the Commissioner and State Health
8    Officer for the Bureau of Public Health, correct?
9         A.  Yes.
10        Q.  Okay.  Turning to that second page, I just
11   want to focus on the last bullet of -- under that
12   heading of Commissioner and State Health Officer.
13   This states, "Serve as Secretary and Ex Officio
14   member of the West Virginia Board of Medicine where
15   along with the President, I am responsible as
16   signatory authority for all medical licensing,
17   disciplinary, and other actions of the Board."
18        Did I read that correctly?
19        A.  Yes.
20        Q.  How long did you serve as secretary of the
21   West Virginia Board of Medicine?
22        A.  So the service of this position is inherent
23   with the job of the Commissioner of the State
24   Public Officer through statute in West Virginia.

Page 92

1    So this is a position that comes along with being
2    the Commissioner and the State Health Officer.
3         So my tenure was the same.  The day I
4    joined as the Commissioner/State Health Officer, I
5    became the secretary and ex officio member.  The
6    day I left the prior position is the day I tendered
7    my resignation for this position as well.
8         Q.  Did you have any involvement with the Board
9    of Medicine before you became Commissioner?
10        A.  I was a licensee of the Board of Medicine
11   in West Virginia since 2009.
12        Q.  And do you recall the process for becoming
13   a licensee of the Board of Medicine?
14        A.  I can vaguely do my best to -- to tell you
15   that.
16        Q.  As best as you recall, please.
17        A.  So generally licensing requirements for
18   states require that you demonstrate a proficiency
19   in the practice of medicine, that you agree to the
20   medical practice act of that state, understand the
21   policy and procedures and read those.
22        You also have to demonstrate your
23   passing of whatever qualifications of the states
24   are for the minimum licensing requirements, which

Page 93

1   includes medical school, residency of some sort,
2   several years.  And then providing documents to
3   authenticate that, and as well as references.
4           Certain states, I believe, like West
5   Virginia have questionnaires around, you know,
6   child support, alimony and others.  There's
7   questionnaires around previous criminal acts
8   demonstrating that you must be in good standing.
9           Previous acts by other boards of
10  medicine that could be against your license or --
11          So there's a whole course of questions
12  including, as I mention, your acts and actions
13  against your DEA certificate or your state
14  certificates.
15          So it's a whole entire process that
16  takes anywhere from an average of two to twelve
17  months in any particular state given -- to be able
18  to obtain your license.  It's a long a tenuous
19  process.
20      Q.  And you said there are specific questions
21  directed at your DEA registration as part of that
22  process?
23      A.  I would like -- I recall that.  Please
24  don't hold me to it, but I believe that there are.

Page 94

1       Q.  And any other questions about prescriptions
2   -- prescribing of controlled substances?
3       A.  I don't recall that point.  But most of the
4   questions come -- emanate with the application
5   process tend to pretty much be in the statute of
6   rules of West Virginia Medical Practice Act for
7   licensing aspects.
8       Q.  Doctor, you said that you are currently
9   teaching at West Virginia University and Harvard
10  Schools of Public Health; is that correct?
11      A.  That's correct.
12      Q.  And what do you teach at those schools?
13      A.  So -- I'll start with Harvard because that
14  one particular class next week.  I'm a visiting
15  faculty and I teach risk communications, primarily
16  using the West Virginia water crisis as example,
17  but walk through the class.
18          We have anywhere between 60 or so
19  participants from all over the world.  It's an
20  executive education class that are mid to high
21  level, to be taken by experts from nuclear
22  propulsion labs to the eco labs of China to
23  Singapore, FDA, CDC, all of them.  And we basically
24  -- I'm part of the faculty that teaches them how to

Page 95

1   communicate risk in a time of crisis.
2       Q.  And do any of those classes involve
3   discussions of prescription opioids?
4       A.  My teaching part does not.  I cannot recall
5   if any of the -- because it's an interactive class
6   and the participants may have asked in the last
7   several years that I've been teaching the class
8   that could have been related to opioids, but I do
9   not specifically recall any of that.
10          In West Virginia University, I do
11  teach at the School of Public Health, grand rounds
12  generally, focused on public health issues.  That
13  does involve detailing the opioid crisis.
14          I'm someone who helped the process of
15  founding of the School of Public Health in West
16  Virginia University, so I feel vested in ensuring
17  that the school's graduates have a comprehensive
18  education, and it's the only School of Public
19  Health in the state in both public health, but also
20  specifically whatever the crises are ongoing in the
21  state, which has tended to be opioids for several
22  years now.
23      Q.  And does your focus in that class on --
24  I'll start again.

Page 96

1           You said you focus on the opioid --
2   detailing the opioid crisis in that class.  Does
3   your investigation include the causes of the opioid
4   epidemic?
5       A.  We have a discussion on the description of
6   charts and historical perspective.  We created -- I
7   ordered - as one of the first acts of being a
8   Commissioner - a historical perspective report that
9   - it's online available - of West Virginia's opioid
10  crisis from 2000 to 2015 data.
11          I take several pieces of information
12  from that report, that's a public report, done
13  under -- I believe, it was Governor Justice.  And I
14  use that as an example to talk about historical.
15  We talk about, obviously, all aspects/facets --
16  it's a pandemic -- it's an epidemic of epidemics.
17          We talk about all the consequences that
18  are happening.  And then we talk about things that
19  we're doing to solve.  The bottom line is, we do
20  talk about, you know, how we got here; but our
21  focus often is:  How do we fix this?
22          And we want, you know, in West Virginia
23  our students to understand that while we didn't
24  break it, we'll have to fix it.  And we're going to

Page 97

1   have to get together.
2        So whether it's the HIV outbreaks that
3   happened in Cabell County recently -- which is the
4   second-largest HIV outbreak in the nation's history
5   recently, in Vienna, or the Hepatitis A outbreak
6   that I personally dealt with during my tenure; or
7   the highest levels of Hepatitis C.
8        We have a record in our country being
9   first or second - compete with Kentucky oftentimes
10  - and the highest levels of -- historic high levels
11  of Hep B, which both transmitted through IV drug
12  use and other aspects.  15 -- 13 to 15 times the
13  national average.
14       We talk about those things.  We talk
15  about:  How do you solve these problems?  We talk
16  about how do we prevent, you know, 5 percent of the
17  babies that are born with neonatal abstinence
18  syndrome in this state, and that costs a million
19  dollars a baby.  And that's a billion dollars - if
20  you add the numbers - of an ongoing liability to
21  the state every single year.
22       I produced a white paper to -- to the
23  Senate finance chairman about that years ago.
24       So we talk about actual real issues,

Page 98

1   fighting this crisis on the ground, trying to stop
2   people from dying, trying to get people to enter
3   into treatment.
4        So you know, frankly enough, we have a
5   job to do when I teach, and I'm not -- I don't --
6   my job is really to figure out how to solve this
7   crisis with the tools we have.  Not the tools we
8   wanted or we could have.
9        But what we've got, we have to work
10  with to solve a really deadly problem.  And that's
11  where a lot of my focus and effort is, not really
12  on a daily basis playing the blame game.  That's
13  not what I focus on, frankly and honestly.
14       I could talk about it, but that's --
15  really honestly, that's not -- my focus has been to
16  solve the problem.
17       Q.  I appreciate that, Doctor.  And I'm going
18  to just ask you to focus on my questions and
19  limiting your answers to what I specifically ask.
20  It just will help us get through this a lot faster.
21       And so I'm going to repeat my question,
22  and I think I heard the answer, but is it accurate
23  to say that you do discuss the causes of -- or the
24  factors that led to the opioid problem in West

Page 99

1   Virginia or the extent of the opioid problem in
2   West Virginia?
3        A.  We do discuss and have a discussion around
4   the factors that mainly lead -- have led to the
5   opioid crisis and its consequences in West
6   Virginia.
7        Q.  And could you please turn to Exhibit 54?
8            GUPTA DEPOSITION EXHIBIT NO. 54
9            ("State of Health" presentation by
10           Rahul Gupta, MD, MPH, MBA, FACP dated
11           10-26-18 (CT2_RGupta000919-966) was
12           marked for identification purposes as
13           Gupta Deposition Exhibit No. 54.)
14       MR. COLANTONIO:  Is this a new one?
15       MS. JINDAL:  And I recognize I'm
16  introducing a topic that, you know, will go on for
17  a while.  I suggest we take a break at 12:00 -- I
18  recognize -- I think opposing counsel also want to
19  ask some questions, so why don't we continue until
20  12:00 o'clock, we can take a short break for lunch,
21  and then opposing counsel can ask their questions.
22       Does that sound fair?
23       MR. COLANTONIO:  That sounds fine.
24  That's fine.  Let me just --

Page 100

1        Q.  Doctor Gupta, are you okay with that?
2            MR. COLANTONIO:  She wants to know if
3   you're okay with that.
4        A.  I'm okay with that.
5            MR. COLANTONIO:  I'm sorry.  Let me
6   try to get this envelope open here.  I'm trying --
7   I don't want to mess this up, because I lose things
8   very easily, that what my wife says anyway --
9            Exhibit 54.  This is an opportunity to
10  -- okay.  Got it.
11       A.  Okay, we're there.
12       Q.  I apologize.  My computer's taking a little
13  bit so --
14           Doctor Gupta, are you familiar with
15  this document?
16       A.  These slides do look familiar, yes.
17       Q.  And I'm going to direct your attention to
18  the -- it's hard to see on the first page, but it's
19  a bit easier to see on the second page.  Do you see
20  how in the left -- bottom left corner, there's an
21  -- and it's vertical.  There's a similar sort of
22  serial number?
23       A.  Yes.
24       Q.  And I'll represent to you, these documents

Page 101

1  were -- or this is one of the documents that your
2  counsel produced to us. Is this something that you
3  collected and gave to your counsel?
4      A. I would say so. This looks very familiar
5  to some of the documents I had provided.
6      Q. Okay. And this is a presentation titled
7  "State of Health"?
8      A. Yes.
9      Q. And it's dated October 26, 2018?
10     A. Yes.
11     Q. And is this something you created?
12     A. Yes, I would have created. I may have used
13  the assistance of my employees at the Bureau to
14  create this.
15     Q. Okay. But they would have done so at your
16  direction, correct?
17     A. Yes.
18     Q. I would like you to turn to that first
19  slide of the presentation, and I'll tell you it's
20  the Bates stamp number that ends in 0920.
21     A. Yes.
22     Q. The second bullet on here discusses "the
23  worst public health crisis in recent American
24  history - the opioid epidemic - as a supply/demand

Page 102

1  issue."
2          Did I read that correctly?
3      A. Yes.
4      Q. And what do you mean by "supply/demand
5  issue?"
6      A. So over the time -- as you see, the date is
7  2018, and I was in the office January of 2015, and
8  I'm, of course, living in West Virginia. You could
9  not escape this crisis even in 2009.
10         There have been various ways to discuss
11  the most impactful crisis in a generation in the
12  state, and I was always figuring out how can I talk
13  about this topic and issue -- everybody's
14  passionate about it.
15         But how can I explain and talk about it
16  in a way that I can get the most of the time --
17  make most of the time that I have the time, and
18  often -- often it's easier to talk about -- it's
19  very easy -- let me rephrase that.
20         It's very easy to become a passionate
21  supporter of one side or another side or one aspect
22  or blame folks. What is important - and was
23  important for me; and still remains so - is to be
24  able to communicate in evidence-based,

Page 103

1  science-driven manner the complexities of the
2  challenges that we were dealing with in a simple
3  way.
4          So the challenge for the Commissioner
5  is to distill down extremely complex issues that
6  are killing Americans in general and West
7  Virginians every 12 hours in a way that you can
8  make people understand - all audiences of all types
9  - in a matter of, you know, 30 minutes, 40 minutes,
10  the big points.
11         And this was my way of explaining in a
12  way as a demand/supply that people get it.
13     Q. And did that discussion include a
14  explanation of essentially how the crisis came to
15  be, or the factors that led to the development of
16  the opioid epidemic?
17     A. Not necessarily always. Oftentimes, the
18  factors discussed was oftentimes the volume of pain
19  pills. It wasn't - as I mentioned before -
20  necessarily a blame game that we did in public. It
21  was more about, "Listen, we had this volume; here's
22  how much it evolved over time; here's how it
23  correlates with death and destruction; and then
24  here's what we're doing about it," which is the

Page 104

1  third bullet.
2      Q. And if you could turn to Slide 30, which is
3  ending in Bates stamp number 0949.
4      A. I'm here.
5      Q. Does that reflect your discussion of a
6  supply-side driver?
7      A. It's a blank slide. It does say "Supply-
8  side drivers."
9      Q. It does or it does not?
10     A. It does. It just says "Supply-side
11  drivers." It's not a slide.
12     Q. Right, I apologize. But going from there
13  to Slide 35 which ends in Bates stamp number 0954,
14  does that reflect your completion discussion of the
15  supply-side drivers?
16         MR. COLANTONIO: Object to form.
17     A. I -- no, it doesn't. That's a really easy
18  to answer, which is it does not.
19     Q. Why not?
20     A. Because this discussion doesn't talk about
21  all of the factors. It uses the opioids, both in
22  West Virginia, changes that has happened to opioids
23  in West Virginia, as opposed to the country, as
24  well as one of the factors, and it --

Page 105

1      But it doesn't talk about the entire
2   demand/supply chain; it doesn't talk about
3   manufacturing; it doesn't talk about production; it
4   doesn't talk about quotas; it doesn't talk about
5   distribution; it doesn't talk about pharmacies; it
6   doesn't talk about dispensing; it doesn't talk
7   about the transition to heroin and fentanyl.
8      It doesn't talk about how the
9   transition has happened from prescription to
10  actively illegal and illegitimate drugs; it doesn't
11  talk about how the deaths transitioned to meth and
12  other stimulants in addition to depressants.
13     So there's a lot of facets to this. As
14  I mentioned before, my job was to get people in a
15  simplified way to understand in a matter of 30 to
16  40 minutes. So I could spend all day talking about
17  it but I wouldn't have anybody listening to me,
18  because they would all be gone.
19     Q.  Sure. And I understand that this doesn't
20  reflect the full description of the opioid problem
21  in West Virginia or nationally. What I'm asking
22  is:  Does this reflect your discussion of the
23  supply-side drivers, as you've written here, of the
24  opioid epidemic?

Page 106

1      MR. COLANTONIO:  Object as asked and
2   answered.
3      A.  So that isn't -- I only answered the
4   supply-side. You know, all my previous answer
5   includes that. I only talked about the
6   consequences of HIV, Hep C.
7      I only talked about the supply-side, so
8   the entire -- the entirety of my answer includes
9   the supply-side dynamics which I do not include in
10  the slide -- in the slides that I have here.
11     Q.  Okay. So does this rep -- I think you used
12  the term "the big points." Does this reflect your
13  understanding of "the big points" as far as supply-
14  side drivers go?
15     MR. COLANTONIO:  I'm sorry, object to
16  the form. I'm sorry, I didn't hear what you said.
17  You said "big point" --
18     MS. JINDAL:  I'm sorry. He testified
19  just a bit ago that his presentation here was the
20  --
21     Q.  So you said, Doctor:  "So the challenge for
22  the Commissioner is to distill down extremely
23  complex issues that are killing Americans in
24  general and West Virginians every 12 hours in a way

Page 107

1   that you can make people understand - all audiences
2   of all types - in a matter of, you know, 30
3   minutes, 40 minutes, the big points."
4      Does this reflect your understanding of
5   what the big points are when it comes to supply-
6   side drivers?
7      A.  No, I think my big points are the three
8   bullets that you see on page 2 of that
9   presentation. Those are the big points.
10     So if you see, I don't have a list of
11  -- under Objectives, ten things. It's like three
12  big points. Update on state of health; discuss the
13  demand/supply issue. But that -- the big points
14  doesn't relate to every slide or every aspect. The
15  big --
16     So I could have objectives -- 20
17  objectives, but at the end of the day, I have to
18  have three big points. Like here's what I'm gonna
19  talk about. I'm going to talk about the demand
20  side here. That doesn't mean that the supply issue
21  is also a big point that I have in slides or the
22  demand side.
23     I can tell you the same thing in demand
24  side, it doesn't include the big points. There's a

Page 108

1   number of points, but that's not it.
2      So I refer to the big points as the
3   objectives of my talk.
4      Q.  I see. So when you put this presentation
5   together, focusing again just on your -- the
6   supply-side drivers, you recognize that you
7   couldn't talk about everything under the sun,
8   correct?
9      MR. COLANTONIO:  Object to the form.
10     A.  Could you please repeat that, please?
11     Q.  Sure. When you wanted to put together some
12  slides that explain the supply-side drivers of the
13  opioid epidemic, you knew that you couldn't spend
14  your entire 40-minute presentation on just that.
15  Correct?
16     A.  That would be reasonable.
17     Q.  And you wanted to focus on the most
18  significant take-away for your audience, correct?
19     A.  That's correct. But I will ask if you look
20  at the top of Slide No. 30, the title is "Opioid
21  Epidemic - An Evolving Crisis."
22     So if you listen to me speak at the
23  time, I would caveat this particular slide with a
24  lot of things. So I can say, you know, "This is an

Page 109

1   evolution and I don't want you to take away from
2   this that this is exclusively what I focused on
3   here.  There are other aspects."
4          So I can get a discussion out of the
5   public or whoever I'm presenting so we can have a
6   discussion.  So I wouldn't take what's on the
7   slides as the -- the entirety or as the most
8   important pieces.
9              They are very important parts of a
10  discussion.  I just want to make that clear.
11         Q.  When you were determining what to include
12  in this discussion of supply-side drivers, what
13  were the other things that you could have included
14  in this discussion but did not?
15         A.  So as I mentioned, I would -- I would
16  include -- "Let me explain to you how it works.
17  Let me explain to you where the quotas come from.
18  Let me explain to you the goal of everyone on the
19  supply chain side."  To the extent that I'm aware
20  of that.
21             But you know, I would also say, "This
22  is something that you should go look into, you
23  should learn more about, because these things all
24  relate back, you need to have a level of

Page 110

1   understanding about these things, because they do
2   impact whether" --
3          So I'm speaking to an audience of
4   physicians or residents, I will say, "This impacts
5   your prescribing."  If I was speaking to a lay
6   audience, I would say, "This impacts, you know,
7   your son who has died or your uncle who has died
8   and this is the reason this is the case."
9          So based on the audiences, I would be
10  able to relate this back to those audiences.  But
11  this would be part of that discussion, but it would
12  include a number of other factors, but those
13  factors would also be guided by the audience I was
14  speaking to.
15         So it's not a monogamous kind of
16  discussion each time.
17         Q.  And if you could just go through Slide 31
18  really quickly.  Slide 31 and 32 show the rate of
19  all the prescriptions in West Virginia compared to
20  the rest of the country, correct?
21         A.  Yes.
22         Q.  And this is not focused on opioid
23  prescriptions specifically, but all prescriptions?
24         A.  Yes.

Page 111

1          Q.  Okay.  And you've highlighted West Virginia
2   here on Slide 32 and Bates 0951, where West
3   Virginia ranks number one in its rate of
4   prescriptions.
5          A.  Yes.
6          Q.  Okay.  And that is the statistic as of
7   2016?
8          A.  The source for that is the QuintilesIMS
9   Xponent data of 2017.  That's actually referenced
10  at the bottom.
11         Q.  Okay.  I think I'm focusing on the title at
12  the top.  It says --
13         A.  Yes, that's 2016 data.
14         Q.  I'm sorry?
15         A.  Yes.  2016.
16         Q.  2016.  So West Virginia ranked number one
17  in the annual prescriptions per capita in 2016?
18         A.  According to this data, yes.
19         Q.  Okay.  And the next slide reflects the
20  decrease in opioid prescription rates specifically
21  from 2015 to 2016 in West Virginia, correct?
22         A.  Yes.
23         Q.  And West Virginia had the greatest decrease
24  at 15.6 percent, correct?

Page 112

1          A.  According to this data, yes.
2          Q.  Okay.  And this is, again, the
3   QuintilesIMS Xponent 2017 data for that report?
4          A.  Yes.
5          Q.  Do you have any reason to doubt the
6   accuracy of this data?
7          A.  I would not.
8          Q.  And Slide 34 and 35 - these end in Bates
9   Nos. 0953 and 0954 - these reflect the number of
10  opioid prescriptions that were filled per capita in
11  2017 -- in 2016, correct?
12         A.  Yes.
13         Q.  And meaning the number of prescriptions
14  that were written by DEA-registered and state-
15  licensed doctors and that were presented to a
16  DEA-registered and state-licensed pharmacy by a
17  patient, right?
18         A.  "Prescribers" is the correction I would
19  make.
20         Q.  I --
21         A.  But generally, yes.
22         Q.  Thank you.  I appreciate that.  And is it
23  fair to say that just looking at these slides, your
24  assessment of the supply-side factors that led to

Page 113

1  the epidemic - at least the ones that you have the
2  most information on - is that prescribers wrote too
3  many prescriptions for opioids?
4      A.  Could you please restate that question?
5      Q.  Yes.  Let me put it this way:  Why do you
6  discuss the volume of prescriptions in West
7  Virginia and in the rest of the nation as part of
8  this presentation focusing on supply-side factors?
9      A.  Because the total volume that was available
10  had a direct relationship and a correlation with
11  the death and destruction that was happening
12  related to overall overdoses in the state of West
13  Virginia.
14      Q.  And when you say that the "total volume
15  that was available," do you mean the total volume
16  of prescriptions?
17      A.  "Prescription" is a surrogate for the
18  amount of pills that were flowing through in
19  communities across towns of West Virginia.
20      Q.  And the number of prescriptions are a
21  surrogate for the number of pills why, in your
22  opinion?
23      A.  Because that is probably the closest way
24  for a public health commissioner like me to be able

Page 114

1  to correlate.  I would not have access to the
2  actual data other than published reports, you know,
3  to the tune of what we found later to be 780
4  million or what have you pills.
5      We at the time - as I recollect -
6  weren't really aware of actual numbers, or we were
7  close to aware of that -- being aware of that, but
8  at the same time, prescriptions is the way to have
9  the pills out there.  I mean, there is appropriate
10  prescribing and there is inappropriate prescribing.
11      But at the end of the day, it is
12  through prescriptions that the flow of the pills
13  are gonna end up there and be diverted.
14      Q.  Okay, Doctor, I think we're almost at noon
15  now.  Why don't we go ahead and take that lunch
16  break for about, say, until 12:30 and then we can
17  come back and opposing counsel can take their -- do
18  their questioning?
19      A.  Okay.
20          MR. COLANTONIO:  Okay, thank you.
21          THE DEPONENT:  Thank you.
22          VIDEO OPERATOR:  Going off the record.
23  The time is 11:53 a.m.
24          (A recess was taken for lunch after

Page 115

1  which the proceedings continued as
2  follows:)
3          VIDEO OPERATOR:  Now begins Media Unit
4  3 in the deposition of Rahul Gupta, M.D.  We are
5  back on the record.  The time is 12:34 p.m.
6          MS. JINDAL:  And I'll just explain --
7  we are going to pass the witness to counsel for
8  Cabell County and City of Huntington for an
9  opportunity for them to ask their questions, and
10  then they will pass the witness back.
11          Go ahead.
12          MR. COLANTONIO:  Okay.  This is Mark
13  Colantonio, and I'm counsel for Doctor Gupta.  I
14  was actually going to ask Doctor Gupta questions
15  now if that's okay with everybody.
16          MS. JINDAL:  Sure.  I'm sorry.  I --
17  that's fine.
18          MR. COLANTONIO:  That's okay.
19          THE DEPONENT:  Do you want me to move
20  the camera --
21          MR. COLANTONIO:  No.  You know what.
22  This is a little bit awkward because we're doing
23  this Zoom, and I'm actually sitting beside Doctor
24  Gupta.  So --

Page 116

1          EXAMINATION
2  BY MR. COLANTONIO:
3      Q.  Doctor, just because of the extraordinary
4  circumstances of this case in terms of the COVID
5  and everything, what I would suggest is just look
6  at the camera and what I will do is ask questions
7  from the side, and then if you don't understand or
8  need me to, you know, rephrase the question, just
9  tell me and I'll do that.  Okay?
10      A.  Okay.
11      Q.  All right.  So Doctor, what I'd like to do
12  in the next hour or so is kind of go through first
13  your background, training and experience a little
14  bit, and then go through -- you answered questions,
15  bits and pieces, of your knowledge of this problem.
16      And I want to go through it basically
17  from start to finish and what your views are and
18  what conclusions you have been able to reach
19  concerning what you've done in West Virginia and
20  hopefully to give us some ideas about or opinions
21  about how we might be able to potentially fix this
22  problem.  Okay?
23      A.  Yes.
24          MR. GOOLD:  Counsel, before you start,

Page 117

1   this is Jim Goold.  I represent -- Covington
2   Burling.  I represent McKesson.  I just want to
3   interpose a -- I'll call it a standing objection,
4   that as far as I know, the doctor -- the good
5   doctor is not a party, so he's not entitled to be
6   run through a direct examination by his personal
7   counsel.
8           I won't object to every question as we
9   go along, but I do want the record to have my
10  objection on it.  Thank you.
11          MR. COLANTONIO:  I understand, and you
12  can have that standing objection.  Okay?
13          MR. RUBY:  And Mark, this is Steve --
14  in a maybe related vein, just to make sure we are
15  clear on the record, you are also - in addition to
16  being counsel for Doctor Gupta here today - you are
17  counsel for Cabell County and the City of
18  Huntington in the cases before Judge Faber.
19          MR. COLANTONIO:  That's correct, we
20  are, and we have appeared as such.  That's right.
21          MR. RUBY:  But your position is that
22  you are questioning Doctor Gupta today as his
23  counsel and not -- not on behalf of the plaintiffs
24  in the case?

Page 118

1           MR. COLANTONIO:  Well, I would take
2   the position that we're questioning at this time on
3   behalf of both.
4           MS. KEARSE:  And this is Anne Kearse.
5   I'm appearing on behalf of the City of Huntington,
6   so -- if there's any issue with that.
7           MR. RUBY:  So you're -- Mark, you are
8   -- you're questioning as counsel for plaintiffs.
9           MR. COLANTONIO:  That is correct.
10          MR. GOOLD:  Well, but I believe you
11  introduced yourself as appearing as personal
12  counsel for the witness.
13          MR. COLANTONIO:  I have.  That's
14  right, I have.  I represent two -- at this point in
15  time, I represent the witness and I represent
16  Cabell County.  That's correct.
17          MR. GOOLD:  Well, we'll have to sort
18  this out later.  Okay.
19          MR. COLANTONIO:  But no, I do.
20  There's no question that in this particular
21  instance, myself and Mr. Fitzsimmons represent both
22  Doctor Gupta as a witness in this case, and we have
23  - and still do - represent Huntington and Cabell
24  County in connection with the litigation.  That's

Page 119

1   correct.
2           MR. GOOLD:  But he's not as -- has not
3   been designated an expert witness in Cabell/
4   Huntington.
5           MR. COLANTONIO:  I don't -- I think
6   he's been designated as a nonretained expert, but I
7   haven't reviewed the pleadings.
8           He's not a party; you're right about
9   that.  But he's not a -- I don't believe he's a
10  retained expert.  I believe he's a nonretained
11  person who may render opinions as a nonretained
12  expert.
13          MR. GOOLD:  Okay, well, my objection
14  stands, but I don't like to get into a long
15  colloquial --
16          (Phone ringing)
17          MR. GOOLD:  It's noted.
18          MR. COLANTONIO:  Understood.
19  BY MR. COLANTONIO:
20      Q.  All right, Doctor.  So quickly just going
21  through your educational background, you did retain
22  -- you did obtain your doctor's degree from the
23  University of Delhi.  Is that correct?
24      A.  Yes.

Page 120

1       Q.  And that's 1993?
2       A.  Yes.
3       Q.  And then you obtained a master's in public
4   health from the University of Alabama-Birmingham.
5   You testified to that, correct?
6       A.  Yes.
7       Q.  And you also obtained a master's in
8   business administration from the London School of
9   Business and Finance, true?
10      A.  Yes.
11      Q.  And then you have some teaching positions
12  that you've held through the years and even now; is
13  that correct?
14      A.  Yes.
15      Q.  You described some of these.  Let's go
16  through them briefly.  So you were an assistant
17  professor of medicine at the University of Alabama;
18  is that correct?
19      A.  Yes.
20      Q.  And also a clinical assistant professor of
21  medicine at Vanderbilt -- from 2007 to 2009?  Is
22  that true?
23      A.  Yes.
24      Q.  You also were assistant professor of

Page 121

1    medicine at Meharry Medical College in Nashville;
2    is that true, from 2007 to 2009?
3        A.  Yes.
4        Q.  You've held clinical teaching faculty
5    position at the West Virginia School of Osteopathic
6    Medicine in Charleston from 2010 to '14; is that
7    correct?
8        A.  Yes.
9        Q.  You are a -- were a clinical assistant
10   professor at the WVU School of Medicine in the
11   Charleston campus from 2010 to 2015; is that true?
12       A.  Yes.
13       Q.  You are an associate professor at the
14   University of Charleston School of Pharmacy from
15   2011 to now; is that correct?
16       A.  Yes.
17       Q.  And you are a visiting professor at the
18   Chan School of Public Health, Harvard University,
19   from 2015 to now.  Is that correct?
20       A.  Yes.
21       Q.  An adjunct professor of the Department of
22   Health Policy, Management and Leadership at the
23   public -- School of Public Health in West Virginia;
24   is that correct?

Page 122

1        A.  Yes.
2        Q.  And did I understand you to say that you
3    helped form that school or helped form that
4    program?
5        A.  Yes.  I helped both speak to the
6    legislature to find the funding as well as instill
7    the idea of the School of Public Health, the first
8    school in the state of West Virginia.
9        Q.  And you are board certified in internal
10   medicine; is that true?
11       A.  I am board certified as of 2019.  I have
12   passed the first part of the board exam in 2020.  I
13   let that certification lapse, again, because I was
14   busy with other things, but I intend to regain that
15   certification.  The second examination is in
16   October of this year.
17       Q.  And I've looked at your resume.  It appears
18   that you have approximately 123 or so peer-reviewed
19   articles you've published; is that correct?
20       A.  Yes.
21       Q.  And you've also appeared nationally on
22   various national television programs and different
23   programs related to opioids.  Is that true?
24       A.  Yes.

Page 123

1        Q.  Can you give us some examples of that?
2        A.  Yes, so the PBS Nova did a documentary
3    called "Addiction" and I was one of the four --
4    three or four people that was featured, and the
5    work of West Virginia was featured in that
6    documentary.  That's an example.
7            Politico did a feature on the work that
8    was happening as well.  And we've had over the time
9    several number of both people recording, visiting
10   and sort of following the work that has been
11   happening in West Virginia.
12       Q.  All right.  And you've also served on
13   editorial boards of different entities; is that
14   correct?
15       A.  Yes.
16       Q.  You served as a peer review on several
17   entities; is that correct?
18       A.  Several medical journals and public health
19   articles, yes.
20       Q.  Have you also done some work for the CDC in
21   connection with opioids?
22       A.  Yes, I've worked very closely with CDC and
23   their physician and have had the director of the
24   CDC visit and he really made comments that he'd

Page 124

1    like to see the work that we had done replicated
2    across the country and other areas as well.
3            We've had also -- hosted the
4    then-secretary of HHS, Tom Price, as well as the
5    counsel to the president, you know, to demonstrate
6    and showcase what was happening in West Virginia
7    with Kellyanne Conway.
8        Q.  And I've heard this term before of social
9    autopsy.  Have you heard that term often?
10       A.  Yes.  We -- so we seeing the declines in
11   death about 10 to 15 to 20 percent each year during
12   my tenure from 2016 and prior to that to -- finally
13   in 2017, I asked -- one of the responsibility of
14   the Commissioner is to be able to produce reports.
15   So I asked my department to work at cross
16   structures in West Virginia - for example, the
17   Medicaid program, the EMS program, the Office of
18   Medical Examiner, the Board of Pharmacy, the Board
19   of Medicine - payors, to create a social autopsy.
20           What that meant was:  We went back to
21   all of the thousand or so deaths in 2016 from
22   overdose and we basically conducted - a simplistic
23   way to say it - a CSI-type of investigation.
24           So we up and did, we wanted to learn

Page 125

1  from the dead to help inform those who are living.
2          And one of the ways we did that is:  We
3  looked at every single death and we investigated
4  their past one year prior to death and understand
5  what happened, what led to them dying, and then we
6  cataloged that and published that report.
7          That report helped form -- helped us
8  form an opioid task force where we brought in
9  experts from Johns Hopkins, Marshall University,
10  West Virginia University, as I had helped create
11  the Office of Drug Control Policy under the
12  supervision of the State Health Office and
13  Commissioner at the time.
14          The drug czar that I hired who was the
15  former police chief of Huntington, West Virginia,
16  he led this task force that came up with
17  recommendations that then subsequently resulted in
18  two pieces of legislation - the Senate Bill 273 and
19  Senate Bill 272 in 2018 - one of which was called
20  the Opioid Reduction Act.
21          Now, back to the social autopsy, why we
22  ended up with the Senate -- two Senate bills
23  essentially passing unanimously for both parties
24  and being signed by the Governor is because of the

Page 126

1  findings, the evidence-based findings that we had
2  from the social autopsy.
3          We found that even then - in 2016 - a
4  significant amount of people who were dying had
5  filled their prescription within 30 days of their
6  death.  We also found a significant type of people
7  that were incarcerated and then released and then
8  died, overdosed and died.
9          We found that three out of those four
10  people that died tried to seek help before their
11  time of death within the last year.  We also found
12  that there wasn't sufficient amount of naloxone
13  that was being given to people to help them
14  survive.
15          There weren't enough facilities that
16  were available.  So those are the kind of things
17  that became important, and that was something that
18  was not only done in West Virginia, but subsequent
19  to that, we started receiving requests from states
20  and large cities all over the country, because they
21  wanted to repeat what we had done.
22          So we started providing temporary
23  assistance to, you know, a handful of states at the
24  time, but many more afterwards, and therefore the

Page 127

1  CDC director obviously made that point to me
2  personally that he wants to see this happen for
3  other diseases as a way -- a new way to learn in
4  order to inform how to address the problems.
5      Q.   And when you mention you did this -- you
6  did this study about deaths and you said within 30
7  days of their death, they had a prescription, a
8  prescription for what?
9      A.   Prescription for a controlled substance.
10      Q.   And did those controlled substances include
11  opioids?
12      A.   Yes.
13      Q.   So you also obviously served as the chief
14  health officer in Kanawha County, State Health
15  Officer, correct?
16      A.   I was the local health officer for Kanawha
17  County prior to becoming the State Health Officer.
18      Q.   And Kanawha County is from '09 until what
19  year?
20      A.   December of '14.
21      Q.   In December of '14, you took the role as
22  the state chief officer and you kept that role
23  until 2018?
24      A.   January of 2015 to November of 2018.

Page 128

1      Q.   And in your positions in West Virginia, did
2  you deal with the issues related to the opioid
3  problem on essentially a daily basis?
4      A.   Yes.
5      Q.   You've also served on some advisory
6  councils listed in your CV, and do any of those
7  specifically deal with - as you recall - opioids?
8      A.   The Governor's advisory council, as was
9  mentioned earlier, is one of the most prominent
10  ones that my position allowed me to sit on and this
11  had mostly the heads of the agencies within the
12  state of West Virginia that were working to attempt
13  to help create solutions to this crisis.
14      Q.   You now work for March of Dimes; is that
15  true?
16      A.   Yes.
17      Q.   What's your position?
18      A.   I'm the senior vice president and the chief
19  medical and health officer and interim chief
20  science officer of March of Dimes.
21      Q.   And what's the mission of the March of
22  dimes?
23      A.   It's to have healthy moms and strong
24  babies, so it's basically maternal and infant

Page 129

1 health.
2    Q.   And you mentioned your background and
3 experience in terms of primary care physician, you
4 did have some experience in Alabama and Tennessee;
5 is that correct?
6    A.   Yes.
7    Q.   And you were able to see firsthand from
8 that experience the -- as you describe, the change
9 in how opioids were being prescribed?
10    A.   Yes, I saw it -- I actually wanted to
11 mention it -- and I'll mention now -- the fact that
12 today is September 11th, and I could tell you, on
13 September 11th, 2001, I was in Florala, and I
14 believe on September 12th, 2001, as I came to my
15 office around 8:00 o'clock in the morning, my
16 secretary said, "Hey, there's two FBI agents
17 waiting for you in the waiting room."
18         And you can imagine.  I mean, it was a
19 very fearful time for everybody across the country.
20 And as they came into my office and started
21 talking, it became very clear -- this is, again, a
22 very rural town in the middle of nowhere literally.
23         And basically they brought with them a
24 fake prescription of someone that had managed to

Page 130

1 provide my signatures and they basically were doing
2 the due diligence investigation and it was for
3 opioids. Basically asking --
4         So this is something that I dealt with
5 firsthand, both from a suffering patient standpoint
6 to both, you know, having law enforcement agencies,
7 and work with them in a local capacity, to see the
8 carnage that was happening at the time.
9    Q.   All right.  So in your roles that you
10 served in West Virginia in dealing with this
11 problem, the opioid problem, did you -- did it
12 cause you to learn over the years, working there,
13 the number of prescriptions or pills delivered to
14 the state of West Virginia during the time you were
15 there?
16    A.   Yes.
17    Q.   How about the number of overdoses in West
18 Virginia during the time that you were there?
19    A.   I oversaw -- remained over the chief
20 medical examiner, I oversaw -- you know, I was
21 monitoring that.
22    Q.   How about the number of deaths that was
23 occurring in West Virginia and the addiction rates
24 in West Virginia?

Page 131

1    A.   So the deaths were so bad, now they hear on
2 the news, you know, that New York City has
3 air-conditioned trailers out there for pandemic.  I
4 can tell you we had those back in 2015.  We had
5 dead bodies that were accumulating at a rate that
6 we could not keep up at the medical examiner's
7 office.
8         So we had to get trailers that were air
9 conditioned, and when we sort of figure out what --
10 how do we say that, so we can keep the gracefulness
11 of dead bodies.  So we -- you know, we developed
12 names, mobile units, blank lines so that when we
13 explained to the public how we are doing it, we are
14 speaking in a graceful way so it doesn't look like
15 we are disrespecting the dead.
16         But the fact of the matter was, we were
17 putting bodies in trailers outside because we were
18 so overwhelmed with the number of bodies that were
19 coming in every single day.
20         Now, on one hand, that was happening.
21 That's carnal.
22         The second side of this was, you know,
23 our medical examiner offices inside Charleston had
24 bullet holes in it.  So that was the other

Page 132

1 consequence -- law enforcement consequence.  That
2 this was leading to drug wars and other aspects
3 within the town and our building was physically
4 being destroyed.  That was the safety.
5         And the third half aspect was that we
6 were not only having autopsies conducted as
7 accordance with law, but we were also monitoring
8 the number of drugs in decedents.
9         So we would send it off and we have
10 sophisticated labs -- better laboratories than the
11 office of the chief medical examiner, and we were
12 finding that there was an incline in the number of
13 drugs that were being found in the body of the
14 decedents, legal and illegal.  So they would have
15 between three and five substances being found.
16         That often included opioids; it could
17 include street drugs; it could include the
18 benzodiazepine group of drugs as well.
19    Q.   And so did you also learn from these
20 experiences the type of drugs that were being used
21 and abused and by people that were addicted to
22 these drugs?
23    A.   Yes, we had some of the best data in the
24 country because we were being very meticulous in

Page 133

1  the way we were doing things though we were lacking
2  a lot of resources.
3      Q.  And in your role -- roles you served in
4  West Virginia, did you become -- did you deal with
5  families yourself on a daily basis?
6      A.  Yes.  So I had a open door sort of method
7  to my office, so I would often get calls from
8  individual families.  I would go to funerals when I
9  could.  I would go to town halls, work off of
10  members of the legislature to hold town halls.
11         I would hear mothers talking about that
12  they'd rather their child stays in the jail just so
13  that they wouldn't die because they know that
14  they're gonna die if they get on the street.
15         So we heard a lot of heartbreaking
16  stories, first person, of families that were
17  suffering.  Oftentimes -- I mean I vividly remember
18  going to speak at the County Board of Education --
19  we had about 400 school teachers, at least, and I
20  asked the question when I'm speaking, I said, "How
21  many of you -- raise your hand if you've been
22  affected by the opioid crisis."
23         And not a single hand that did not go
24  up.  So this was a routine -- that was a rule, not

Page 134

1  an exception.  That any meeting I'd go to - whether
2  there was 100 people, 10 people, 1,000 people in
3  West Virginia - I would have -- see literally every
4  hand go up when you asked people, and they would
5  all have their own stories to tell.
6      Q.  And in your experience in West Virginia,
7  your roles as you've described, did you also have
8  occasion then to deal with -- identifying, as
9  you've described, and deal with this problem of
10  volume?
11     A.  We did.  We actually worked with the Board
12  of Pharmacy, so we got funded by the CDC.
13  Somewhere in 2015-16, it was the PDO grant, I
14  remember, prescription drug monitoring grant, that
15  we were then able to embed a person from the Board
16  of Pharmacy and pay for them, basically, to be able
17  to --
18         One of my initial problems was, other
19  than law enforcement, we didn't have access to the
20  data.
21         So it was very easy to say, how do we
22  fix it -- but the problem was that the law
23  enforcement and other people, I mean, the law did
24  not allow us free access to the data, and then it

Page 135

1  should not either allow anybody free access to very
2  sensitive data.
3         So one of the ways we were working with
4  it -- we were trying to work within the confines of
5  the law to make things happen to find solutions.
6  So we were able to embed an individual -- an
7  employee of the Board of Pharmacy, so that's when
8  we started to understand better the characteristics
9  of the dead.
10        That's when we did the social autopsy
11  and that's when we were getting a better idea of
12  what was happening.
13     Q.  And you also, is it true, firsthand dealt
14  with West Virginia's response to this epidemic and
15  problems and things were responsive to; is that
16  true?
17     A.  Yes, so we saw -- oversaw a HIV outbreak.
18  We saw a -- not only in Huntington subsequently,
19  but prior to that, we saw a outbreak of HIV in the
20  LGBT community in southern West Virginia.  And I
21  can tell you that was one of the most sensitive and
22  and difficult outbreaks to manage without having to
23  raise flags.
24        Because we knew -- I had seen in my

Page 136

1  experience in local hospitals where in our state in
2  West Virginia, just being outed as a gay person
3  could get you killed, to be honest.
4         So we had an outbreak that came -- had
5  to deal with, a very -- so we have to work with
6  dark web and other aspects.  We saw Hepatitis A
7  outbreak that was directly related to the opioid
8  crisis and the IV drug use that was happening,
9  which was large and started -- part of a
10  multi-state outbreak, but it got really ingrained.
11        But we had -- we continued to have the
12  highest levels of Hepatitis B and C also in
13  addition to other challenges.  We had from 83 to 85
14  percent of the foster care cases that were
15  happening - which is one of the largest budgets of
16  DHHR - was actually being attributed to, in one way
17  or the other, opioids, whether through the family
18  or otherwise.
19        But we were dealing with that, in
20  addition to the neonatal abstinence syndrome
21  tsunami that was coming in.
22     Q.  All right.  So do you believe from your
23  background trending experience - especially in West
24  Virginia - that you had a firsthand seat viewing

Page 137

1 the causes and effects of this opioid problem in
2 West Virginia?
3    A.  Unfortunately, I did.  And I had to see
4 firsthand what was happening on a daily basis,
5 going to the practitioner, as somebody who lived in
6 the community, had children going to school in the
7 community and seeing those consequences as part of
8 being in the community, as well as being one that
9 was trusted to find solutions to this.
10    Q.  And that would include Cabell County, true?
11    A.  Yes.
12    Q.  And now, you mentioned the term in some
13 questioning before "upstream/downstream."  What do
14 you mean by that?
15    A.  So there are limitations to what states can
16 do, and that has to be recognized, and I certainly
17 did.
18        The upstream relates to things that are
19 not directly under our control.  That means it's
20 everywhere from having the quotas, enough to
21 manufacture, to be able to have the manufacturing
22 to be -- and to distribution.
23        Most people have something that -- if
24 we compare it to, it's like the dam.  There are

Page 138

1 aspects of that dam that are in place, and there's
2 rules and systems in place that generally are
3 governed by federal law in order to prevent
4 downstream effects.
5        But when that dam breaks, the problem
6 is the flooding of towns and cities and death and
7 destruction.  So the downstream effects that happen
8 because that is all of the things that we were
9 trying to do:  Incrementally address problems
10 through legislation, policy changes, you know,
11 doing everything we could in our power to bring
12 from social autopsy to finding ways to start Harm
13 Reduction clinics.
14        I was the first Commissioner to -- in
15 the first few months of my coming in, I helped fund
16 the first program in Cabell County, Harm Reduction
17 Program, that still exists today from state dollars
18 because we knew that was important.  So those are
19 the downstream pieces.
20        And a lot of times the downstream
21 pieces are just being reactive.  You're trying to
22 fix the problems because if not, people die or
23 suffer.  But the opportunities really to do
24 something, I believe, are much more being proactive

Page 139

1 at the upstream.
2    Q.  So based upon your experience you
3 described, your background, training and
4 experience, you believe that you possess a high
5 degree of understanding about addiction?
6    A.  I believe I possess a -- a pretty good
7 degree of understanding addiction.
8    Q.  And how it happens?
9    A.  Yes.
10    Q.  About what it does to the body?
11    A.  Yes.
12    Q.  About its consequences?
13    A.  Yes.
14    Q.  And about potential treatment of that?
15    A.  Yes.
16    Q.  Do you also believe that you possess a high
17 degree of understanding as to the opioid crisis/
18 epidemic in West Virginia?
19    A.  Yes.
20    Q.  As to its timeline?
21    A.  Yes.
22    Q.  As to its causes?
23    A.  Yes.
24    Q.  As to its consequences to the state of West

Page 140

1 Virginia, including Cabell County?
2    A.  Yes, having lived and seen it, yes.
3    Q.  And hopefully - this is maybe the most
4 important question - potentially how to fix it or
5 abate it?
6    A.  Yes.
7    Q.  All right.  So let's talk a little bit
8 about history and -- so go back to the 1990s, that
9 time frame.  You've described this before.  There
10 are legitimate reasons to prescribe opioids.  Is
11 that correct?
12    A.  I believe so.
13    Q.  And what is -- in your view, what are the
14 legitimate reasons to prescribe opioids?
15    A.  So I believe the legitimate reasons that
16 opiates have not really changed a lot since the
17 1990s.  And they can be chronic disabling pain
18 towards the end of life, especially unrelenting --
19 the pain that happens as a consequence of cancer,
20 some of those areas.
21        There are sometimes disabling arthritic
22 disease -- a number of arthritic processes through
23 which they are progressive, chronic and difficult
24 to deal with, those situations.

Page 141

1   So there are a number of chronic
2   conditions in which -- these are two examples where
3   opioids should be the last resort, but they do
4   often become the last resort and it's very
5   important that we continue to have the ability and
6   availability to provide that.
7       Q.  All right.  And that --
8       A.  And --
9       Q.  I'm sorry.  Go ahead.
10      A.  Of course, I was going to say, acute pain,
11  oftentimes same way.  When fractures happen,
12  injuries happen, post-operative, other aspects.
13  There are places for opioids to be appropriate to
14  supply.
15      Q.  All right.  And post-operatively, acute
16  pain, would that be what you would consider
17  short-term, long-term or how would you --
18      A.  That would be short-term, and that may not
19  be a first choice.  Opiates may not be a first
20  choice to prescribe that, but they would be in the
21  process somewhere in there.
22      Q.  And is it true -- were you involved with an
23  act in West Virginia that talks about prescribing
24  opioids and the appropriate circumstances?  Are you

Page 142

1   familiar with that?
2       A.  If you are referring to the Opioid
3   Reduction Act --
4       Q.  Yes.
5       A.  -- which is Senate Bill 273 in 2018 -- and
6   I know that because I helped draft that.
7       Q.  All right.  And would that bill contain
8   your views about opioids?
9       A.  So we drafted it.  We could get legislation
10  successfully passed with overwhelming support, and
11  it applied -- you really need, you know, all sides
12  to come together.
13      So one of the things that happened was
14  that it went through the process of negotiation and
15  agreeing.  So I met with the chairman of both the
16  House and -- House Health Committee and other
17  leaders, to make sure that it got to a place where
18  everybody was satisfied and agreed and did not
19  compromise the essence of both CDC guidelines as
20  well as good clinical practice.
21      So we ended up in passing that Act, was
22  a -- a reasonable effort to address the
23  contemporary crisis that we were facing.
24      Q.  Have you had a chance to examine statistics

Page 143

1   concerning - as you described - the legitimate uses
2   for opioids?  Have you had a chance to examine
3   statistics that showed the need in the West
4   Virginia population for those legitimate needs, as
5   it existed back, let's say, in the 1990s?
6       A.  So part of the Commissioner's job is to be
7   a -- not only Commissioner with force, but be
8   monitoring those reports -- so yes, as time went on
9   in my tenure at the office, it was very important
10  for me to monitor:  What are the rates of obesity?
11  What are the rates of arthritis overall going on?
12  What's the rate of poor health condition?  What's
13  the rate of dental health?  What's the rate of, you
14  know, injuries that are happening overall?
15      So some of the reasons for which you
16  would provide opioids are the rates that we monitor
17  year after year.
18      Q.  All right.  And so you've heard the term
19  "baseline" before?
20      A.  Yes.
21      Q.  What -- in your view, would those
22  statistics, in your view, form sort of a baseline
23  for -- you could consider as a physician, as a
24  public health person experienced as a baseline for

Page 144

1   need of opioids back in the 1990s for West
2   Virginia?
3       A.  Yeah, I think that would be as a fair
4   assumption, not having absolute numbers and
5   absolute science behind it.  I think you could say
6   that whatever the prescriptions were happening
7   before the standards of care for pain changed could
8   be taken and construed fairly as a baseline, but
9   also understanding at the same time that some of
10  those dynamics also may involve a change.
11      For example, you know, cancer rates or
12  the mining jobs that may have required opioids
13  before, the changes in job -- actually should
14  change -- also parallel the need for opioids over
15  time.
16      Q.  Yeah.  So that gets to my next question,
17  which is:  Have you had a chance to look at whether
18  there were changes in those -- the rates or the
19  number of those categories of people that might
20  lead you to believe there was a need -- increased
21  need for opioids?
22      A.  So when I commissioned the report to look
23  at analytically the opioid crisis from a historical
24  context from 2000-2015 - again, that was the first

Page 145

1  report of its kind during this crisis - I don't
2  recollect at this point whether it made it in there
3  or not, but we did look at those numbers.
4          And, you know, we had found that, hey,
5  the cancer rates are actually going down over time.
6  We found that, for example, mining jobs went down.
7  I mean, that's kind of public knowledge.  So you
8  know, industry jobs that require hard labor and
9  other aspects, that was part of the job loss that
10  we were having.
11          We know that the mining injuries were
12  going down.  That was the -- you know, the mining
13  work.  We know that the -- you know, there was a
14  little rise in arthritis because there was a rise
15  in obesity, so to counter that.
16          There was some -- you know, one point
17  rise in arthritis.  There was additional people
18  that came into by the expansion of ACA that I was a
19  proponent of in 2010 to Governor Tomblin, and there
20  were some more people that were sick and needed
21  medication.
22          But that was a miniscule amount as
23  opposed to the people that had cancer or mining
24  injuries or other things, other prescriptions going

Page 146

1  down.
2          But as a minimum, it was a fair -- no
3  change.  But it could be that the need went a
4  little bit down actually over time.
5      Q.  So from that analysis, were you able to
6  form any conclusions about whether or not these
7  legitimate needs for opioids had changed from the
8  1990s to, let's say, 2016/2017 in West Virginia?
9      A.  Yes.  So the population loss happened
10  overall in West Virginia over that time, and as I
11  mentioned, the legitimate need - at best - was the
12  same, and most likely actually went down a little
13  bit.
14      Q.  And during that same time period, were you
15  able to discern from your -- the statistic you had
16  available and the work you did whether the volume
17  of opioid pills from the 1990s to 2000 to '16/'17
18  actually decreased?
19      A.  The volume clearly increased several fold,
20  several loss --
21      Q.  And do you have any statistics you can you
22  tell us -- you mentioned prescriptions and some
23  questioning for in terms of number of
24  prescriptions, the number of pills, give us an idea

Page 147

1  of the increase in volume that you found.
2      A.  You know, I think the most compelling is
3  the review of the work that I -- you know, I read,
4  which is -- it comes from Eric Eyre's work which is
5  about 780 million pills between the span of between
6  2006/'07 and 2012.  That would be in terms of
7  volume.
8          That would be the most emphatic to me
9  to look at.
10      Q.  And do you have anything for us to compare
11  that to to give us an idea of what would be -- how
12  big that measure is, that 700 and some million
13  pills, compared to something -- something else?
14      A.  So for a population of 2 million people,
15  approximately 1.8 million people, clearly that
16  would be significant.  In my presentation, I also
17  talk about, you know, overall the total volume in
18  the country was the total volume prescription per
19  person in 2006.
20          That was about 130 prescriptions per
21  100 people - men, women and child - in West
22  Virginia, and clearly the numbers -- I don't
23  remember right now, but the numbers are
24  significantly lower in the '90s.

Page 148

1      Q.  Now, you mention in some questions and
2  answers about change in the standard of care and
3  attitudes about opioids.  What I'd like you to do
4  now is, if you can -- do you first have an opinion
5  as to what you believe was the cause of the
6  dramatic increase in opioid pills delivered to
7  West Virginia within Cabell County from the late
8  1990s through the mid two thousand teens?
9      A.  So as I stated, the first inciting event
10  was the effort to change the standards of pain and
11  care for pain.  As we changed the standard of care
12  for pain in somewhere around late 1990s -- and
13  really, I think it was like Robert Wood Johnson
14  funded the work initially in 1997 that led to the
15  JCAHO having that changed standard and the Pain
16  Society working at the same time, the VA, federal
17  government had changed, and this extraordinary
18  effort was placed.
19          There was quote, you know, several
20  reasons for it that we were being detailed on.  One
21  was the more ethical, we have an obligation to
22  provide patients an absolute zero level of pain,
23  they have to come down from 10 to zero.
24          The other was, you know, you could be

Page 149

1   held liable if you don't do that, so it was the
2   most punitive aspects of it.
3           And the third was, that there is no
4   addiction, no consequences and this was a really
5   good safe medication to buy and there's no
6   diversion.
7           What was happening really during this
8   time was the message that was being sent to us -
9   now looking in retrospective back - was that, you
10  know, you have a set population that was going to
11  get the prescriptions in this context of changed
12  standard of care of pain.
13          They were getting the prescriptions, so
14  you get a tooth pulled - and that numbers hasn't
15  changed over time - you know, and you get 30 days
16  of -- 30 days of liberal prescribing of an opioid.
17          You may be using two pills or three
18  pills and then they go, you know, in your closet,
19  medicine cabinet.
20          So what happens is:  If you used it for
21  more than three to five days, you have a high risk
22  of becoming addicted -- having addiction.  If you
23  used it for fewer days, then there's a high risk of
24  diversion right there.

Page 150

1           When that diversion started to happen,
2   and it became a norm in the community - meaning
3   your children or grandchildren or other people;
4   they were there, they got it - friends and
5   families, then that caused those people to become
6   addicted to these medications.
7           When that happened, then that diversion
8   led for those people to find ways to get those
9   prescriptions.  So they would then figure out all
10  of the inappropriate prescribing began or continued
11  and really got voluminous at that point.
12          So what then happens was:  These people
13  were pushing through doctor shopping; they were
14  pushing through -- come out of the woodwork in so
15  many ways.  There were lost prescriptions, you
16  know, getting and stealing from anywhere they can
17  steal from, and that just drove the volume -- that
18  continued to drive the volume.
19          And that volume continued to get
20  diverted.  So we got to a point where the
21  significant percentage of that volume that was
22  coming out was inappropriate, and the -- it
23  basically -- you know, the appropriate volume that
24  was appropriate at one point just dwarfed in front

Page 151

1   of the extremely high amount of inappropriate
2   volume, which is actually going towards diversion
3   in all of these cases literally, and that as a
4   result of that, the only way to get out of that was
5   to die.
6           So once you have addiction and we --
7   there were no -- an adequate amount of treatment
8   facilities, because that hasn't been identified as
9   an issue at the time, and the way you could get out
10  of addiction is by dying, by overdose and dying.
11          So that was the -- that was what was
12  happening at the time.
13      Q.  All right.  Let's talk a little bit about
14  addiction.  So how do you define "addiction"?
15  What's your working definition?
16      A.  So the way these medications -- I can just
17  broadly first of all say addiction is a process
18  that can be physical or physiological in nature
19  where your body gets used to whatever that
20  substance is and wants to have it -- desires it a
21  lot more.
22          Now, it can result in both a physical
23  addiction as well as a psychological addiction,
24  either or both.

Page 152

1           Speaking of the opioids in specific,
2   when we take opioids, we have this very basic
3   foundational understanding of the brain.  There's
4   our inner brain or the fundamental places of the
5   brain, you know, there's stimulus that allow us to
6   survive.
7           What that means -- what I mean by that
8   is it exists in all animals.  You -- you feel
9   hungry, there's a reason you eat, because when you
10  eat, you feel good.
11          The reason you feel good is that
12  there's a release of this chemical called Dopamine.
13  So same way, when you're thirsty, you drink.  The
14  result of that drinking water is that your Dopamine
15  gets released and tells you -- that's a positive
16  reinforcement for you.
17          Same way with sexual activity.  So
18  there are a few things that are important to our
19  survival as human beings, or any animal.  The way
20  we get rewarded, the reward system, is by this
21  Dopamine release and it makes us feel good.
22          Now, these medications, seem to work
23  similarly.  But what they do is basically they
24  hijack that system.  And so in that hijacking, that

Page 153

1   inner brain that is causing the release of
2   Dopamine --
3           Initially the morphine - actually, or
4   opioid of any type - makes you release that
5   Dopamine, and you feel good.
6           After a while, it doesn't work as well.
7   And then you start to require an escalation of the
8   dose.  And so basically that inner brain, if it
9   doesn't get that, it asks your outer brain in some
10  way - it's a prefrontal cortex - to do things, to
11  change its behavior in ways in order to seek that
12  drug to supply it.
13          So after a while, it's not just about
14  getting high; it's actually about surviving and not
15  getting withdrawal symptoms.  So typically, if you
16  don't do it, the inner brain is going to punish
17  you.
18          And a person is fearful of that
19  punishment, so that inner brain sends messages to
20  the outer brain to say, "Hey, I need you to go and
21  engage in activity" - whether that's stealing,
22  prostitution, other aspects - "in order to feed me
23  the habit to continue with the drugs."
24          And that's why when we say it isn't an

Page 154

1   addiction, it's a disease, it's not a will -- it's
2   not something that people can will to do.  Maybe it
3   was a will the first couple of times; but
4   afterwards, it's not.  It truly is a disease,
5   because that inner brain basically hijacks the rest
6   of your brain and the rest of your body.
7       Q.  All right.  So is it fair to say - and you
8   tell me if I'm wrong about this - that when people
9   become addicted; when they're not able to get what
10  they can to fill the addiction that they -- the
11  brain tells them, "Go out and do anything you can
12  to fill that need."
13      A.  Yes.
14      Q.  And does that, in your opinion -- or do you
15  have an opinion whether that leads to things like
16  diversion and further abuse of drugs and adverse
17  consequences of addiction?
18      A.  So at that point, that person is not in
19  control of themselves.  Their inner brain has
20  hijacked the entire body.  At that point, this
21  monster inside is telling them to seek opioids in
22  one form, shape or other.
23          Whether it's for them to divert the
24  prescription pills; it's for them to fake a

Page 155

1   prescription; it's for them to go to the doctor and
2   lie in order to get their prescription; or it's for
3   them to go and harm themselves or their children -
4   which I have also seen - or their pets - which I
5   have also seen - and get those medications by hook
6   or by crook; or go on the street, if it's not
7   available, and get heroin or fentanyl-laced heroin.
8           It doesn't matter to them, the brain.
9   What matters to the brain is:  It needs that feed.
10  And that's basically the forces that are in play.
11      Q.  You mentioned "inappropriate prescriptions"
12  before and used that term.  And "inappropriate," do
13  you mean both diverted and unnecessary
14  prescriptions in your view?
15      A.  Yes.  So the one side of supply which is,
16  you know, when you make the standards of care
17  change, what basically happens is, you're
18  logorhythmically increasing the number of people
19  who become addicted, and as they are using more
20  prescriptions, they are also demanding and aquiring
21  more prescriptions.
22          So that's where the inappropriate
23  prescriptions lead to increased volume, and most of
24  that is diverted volume.

Page 156

1           So basically that's the inappropriate
2   prescription, and it may have begun with being
3   unnecessary:  Like I said, 30 days prescription for
4   a tooth pulled.  But it eventually leads to
5   diversion.  And that diverted prescription leads to
6   more diverted prescriptions and more diversion of
7   pills.
8           So over time -- that's the reason you
9   saw progressive increase in deaths.  It wasn't in
10  2000 the system changed and in 2003 we have the
11  peak.  We start to increase because more and more
12  population over the time gets more and more
13  addiction and then so therefore they need more and
14  more prescriptions.
15      Q.  All right.  And so do you -- based on this
16  -- your opinions you form in this -- this crisis
17  and your work, if you were to take a hypothetical
18  year sometime in - I don't know, 2010, 2008 - and
19  look at the total volume of prescriptions or pills
20  in West Virginia, would you be able to have an
21  opinion as to how much of that total volume would
22  be what you call "inappropriate" versus
23  "appropriate?"
24      A.  So you would have to -- you could do that.

Page 157

1     What you would have to do is you would have to go
2     back to the baseline, and you have to make an
3     assumption here that, let's say, before 2000, the
4     amount of prescriptions --
5          If you have a relatively stable
6     population and relatively stable conditions for
7     which the opioid prescribing was done, you use that
8     as a baseline prior to the change in the standard
9     of practice -- standard of care for pain.
10         And then you start comparing it
11    throughout those years.  And you see the
12    prescriptions are going up, that means the pills
13    are increasing more in amount as well as in volume
14    as well as in the strength.  But the conditions
15    aren't changing and your population necessarily
16    isn't changing.
17         So that tells you how much of a
18    difference between the two is the diversion of
19    prescriptions -- and so that's how you get there.
20         If you ask me what that number would be
21    - I think that's what you're trying to ask - I
22    think it -- at best, that would be about 80 percent
23    of those prescriptions are diverted, at best.  It
24    could be more than that, clearly based on whatever

Page 158

1     the numbers are in 2000.  But that's what I would
2     say.
3          Q.  All right.  In terms of addiction -- you
4     talk about how it affects the brain.  In your back
5     -- based on your background, training and
6     experience, do you believe that the addiction's
7     effects on the body can be altered or --
8          A.  I'm sorry, could you repeat that?
9          Q.  Sure.  So in terms of -- you talk about one
10    of the effects of this crisis is the number of
11    addicted people, to the drugs.  Do you believe that
12    that addiction can be -- I don't want to use the
13    word "cured, fixed."
14         Can it be abated, can it be -- can that
15    problem be solved?
16         A.  So it could be solved basically two ways.
17    The one is the way we would -- we -- it's being
18    solved before anything, which is by death.  So that
19    would be the ultimate liberator.
20         And unfortunately, that's been
21    happening way too much in West Virginia.  In fact,
22    we have 33 percent above the next state year after
23    year.
24         The second way to do is - which I think

Page 159

1     there's a very broad agreement of this - is to
2     actually have evidence-based programs that could
3     provide the FDA -- free medication that are FDA-
4     approved, some version of it -- and engage the
5     person but it's not just medicine.  It's actually
6     medicine, it's counseling; it's providing best
7     supportive lifelong care.
8          Because once a person becomes addicted
9     -- you know, it's like anything else, whether
10    you're addicted to -- in some ways, addicted to
11    food, addicted to tobacco, alcohol, others, you
12    need lifelong support.
13         So yes, you can.  And if you get
14    appropriate lifelong care, you have three out of
15    four people, we will be able to actually help them.
16         Now, how far do we fix them?  We just
17    don't know that.  There are some characteristics,
18    some people that might need treatment for a few
19    years and they may be able to get off.  Others may
20    need lifelong.  We don't know in science very well
21    with high level of confidence what drives some
22    people to get off --
23         Just like we don't know if you give ten
24    people opioids for four to five days, few -- some

Page 160

1     people become addicted and not others.  So there is
2     lot we don't know in science.
3          Q.  These medications, the treatment, how do
4     they work in terms of trying to fix the brain?
5          A.  So there's three FDA-approved medicines:
6     Methadone, Buprenorphine, Naloxone.  So the
7     methadone is a agonist.  So there's immune
8     receptors in the brain.  That's where the opioid
9     acts.  And they're acting in a different way.
10         So the methadone is an agonist, meaning
11    it goes and attaches to the receptor, pretty much,
12    stimulates it a little bit and keeps it occupied.
13         Buprenorphine is kind of a
14    agonist/antagonist.  So in some properties, it is
15    an agonist and does occupy it; in some properties,
16    it doesn't supp -- push a lot of the good feeling.
17    And then you combine with that naloxone, which is
18    an antagonist.
19         So basically the bottom line is they
20    occupy the same receptors and in occupying the same
21    receptors, the way people who have suffered through
22    addiction - having described it to me personally -
23    is that they say -- when they get into the
24    treatment, after a few days or weeks, we feel like

Page 161

1  the monster is off their head.
2       "Now when I go to my family, I can
3  actually have a conversation and remember it with
4  my family. I can start to feel feelings. I feel
5  I've come back from death. I can watch television,
6  I can remember and I can understand what's
7  happening."
8       So that piece -- it allows these
9  medications allow you not to worry about just
10  seeking your next fix; it allows you to actually
11  get a job, have a purpose in life, rebuild your
12  community, rebuild your family and actually be able
13  to function.
14       Q. All right. So turning back to the
15  evolution of this opioid problem in West Virginia,
16  did you at some point see an evolution, a change,
17  from opioids to heroin?
18       A. As I came in as the Commissioner in 2015, I
19  think that evolution was occurring. I think we
20  were starting to see some of the laws that had been
21  taking place in 2012-2013 -- certainly Governor
22  Tomblin had initiated the Governor's Advisory
23  Committee on Substance Abuse and some of the
24  results were happening.

Page 162

1       So we had a sliver of hope at the time
2  that, "Listen, I think we're starting to see a
3  light at the end of the tunnel" in the sense that,
4  look, we're seeing slight reductions, and that's in
5  the presentation you saw where I showed from 2015
6  to 2016, we went down 15 percent.
7       So we were becoming very hopeful that
8  now perhaps the deaths will follow, meaning
9  reduction in deaths and suffering and other things.
10       Q. I'm sorry, you said reduction -- reduction
11  in --
12       A. Reduction in deaths.
13       Q. I'm sorry, you said you saw a slight
14  reduction --
15       A. Reduction in prescriptions. So we started
16  to see from 2015 to 2016, about a 15 to 20 percent
17  reduction in opioid prescriptions.
18       Q. Okay.
19       A. And then we were hopeful that we would
20  start to see a reduction in deaths. But we didn't.
21  And then we started to search that why that we're
22  seeing reduction in prescribing but we're not
23  seeing reduction in the deaths from overdose; we're
24  not seeing significant reduction in the substances

Page 163

1  of overdose people when they died.
2       And one of the elements that was
3  happening at the time that, again, now it's easier
4  -- a little bit more easier to recognize, is that
5  every time law enforcement would go and do a drug
6  bust of the bad docs, those people would end up on
7  the street that once were addicted to medication --
8  prescription medications, now would have to find --
9  seek and find an alternative, and they would go to
10  the street.
11       And then they started to use IV drugs,
12  heroin. That was not the only reason it was
13  happening. It was also because the supply of
14  prescription drugs from a diversion standpoint was
15  drying up a little bit.
16       So as the diverted drugs - opioid
17  prescription drugs - were drying up, then people
18  still needed that fix, as I explained the addiction
19  pathway. That doesn't solve the problem. We were
20  too naive to think just reducing the prescription
21  -- diversions would just cure the problem.
22       And what actually happened is the
23  opioid crisis began to evolve -- evolve into a
24  second crisis, which would then started to become

Page 164

1  this heroin crisis. As we were dealing with that
2  current crisis within the first, a third crisis,
3  which is --
4       You know, everyone asking -- you know,
5  wanting to make most profit from its product, and
6  we saw the -- this happen, the phenomenon happen,
7  with -- where people were dealing heroin, frankly.
8  So they found -- they realized that they could get
9  a bigger profit if they were -- if they could cut
10  their heroin with another substance that could
11  still give the high or give the need that needs to
12  be fed to the people.
13       That was called fentanyl. It was a
14  clandestine lab-produced fentanyl that's about 50
15  to 100 times more potent than morphine. So they
16  would -- they began to cut the heroin with this
17  substance on the street.
18       The problem that became for people who
19  are addicted is: A, they wouldn't know that; the
20  second, B, every time they inject themselves, not
21  only are they risking HIV or hepatitis or what have
22  you, but they're also basically playing Russian
23  roulette with their life, because they wouldn't
24  know if this is the time they were going to die/

Page 165

1    overdose.
2            This stuff was so potent that some of
3    our law enforcement officials, sometimes they
4    happened to inhale or touch it and they would be
5    overdosed.
6            So I saw a lot of people who had
7    addiction, they didn't want to die.  Neither did
8    the drug dealers want them to die.  So what they
9    started to do, as a cry out for help, they would
10   actually go to restaurants, they would go to gas
11   stations, they would go to malls in the bathrooms
12   and inject themselves just so they could be found
13   if they played the Russian roulette and the gun got
14   fired.
15           So we started to find dead bodies in
16   those places as a result of that.  So that's the
17   evolution.  That's when I came into the office and
18   I was seeing on literally on a daily basis.
19      Q.  So do you have an opinion based upon
20   everything you've done in your work in West
21   Virginia and your background, training and
22   experience as to whether or not the abuse of
23   heroin, fentanyl, methamphetamines and these
24   cocktail drugs that you saw in the 2014 to 2018

Page 166

1    time frame was a -- was caused by the original
2    opioid volume that you saw that resulted in these
3    addicted people.
4       A.  So for a majority of them.  There would
5    always be a small portion of people who will have
6    and seek, you know, various forms of addictive
7    substances.  That's been true for civilizations
8    over time.
9            But for the majority of them, there's
10   no doubt in my mind that there's a direct
11   correlation between the diverted prescription pills
12   and its evolution into street drugs in terms of
13   heroin, fentanyl, meth, you name it.
14      Q.  And when you say "a majority," are you able
15   to quantify that any further in terms of if you
16   take 100 percent as total, were you able to
17   quantify it any more specific than that?
18      A.  When I say "majority," I'm really talking
19   about 80 to 90 percent of the population that
20   actually suffered through this.  Because if you go
21   back and look at the overdose death rate numbers,
22   prior to this epidemic, it would be like that,
23   Counsel, to get that -- that's where I would go
24   back.

Page 167

1       A small amount of people -- certainly
2    those, the noninvolved people - that would be a
3    general baseline - do not tend to be generally also
4    the population that dies.  They tend to be people
5    that would use one form of drug or the others - a
6    tiny population, proportion - that has existed, as
7    I said, through civilization, hundreds of years,
8    thousands of years.
9            But that is minuscule as compared to
10   what we're dealing with today.
11      Q.  And in terms of overdose deaths, you do
12   have knowledge from your work as to the number of
13   overdose deaths -- overdose deaths in West Virginia
14   from, let's say, 2004 until 2018 when you left.  Is
15   that true?
16      A.  Yes.  I mean, I'm trying to recall the -- I
17   mean, I can recall that in 2017, we finally passed
18   the 1,000 number, which was not only the -- one of
19   the highest rates ever, but it was consistently
20   about 33 percent higher than the second state --
21   and the second state varied.  Sometimes it was New
22   Hampshire, sometimes it was Ohio, sometimes it was
23   Pennsylvania.
24           But we could -- what didn't change was:

Page 168

1    We were high and there's a bunch of lots of states,
2    and then it was the next state in line.
3       Q.  And do you have an opinion as to whether
4    the increase in overdose deaths West Virginia saw
5    during that time was caused by the large volume of
6    opioid pills that originally was deposited or
7    delivered to West Virginia?
8       A.  I think there's no doubt for that.
9       Q.  Now, are NAS babies a causative issue in
10   terms of the opioid epidemic?
11      A.  Yes.
12      Q.  So what is an NAS baby?
13      A.  So NAS stands for neonatal abstinence
14   syndrome, also sometimes called NOWS, or neonatal
15   opioid withdrawal syndrome.  We try to
16   differentiate between opioids and other substances.
17           But in essence, it's a -- it's a
18   syndrome, it's a set of symptoms that could happen
19   in a baby as soon as they're born to a few hours or
20   days afterwards.
21           Those symptoms could include incessant
22   crying, not being able to be fed, being over
23   irritable.  They can have seizures.  They can have
24   diarrhea.

Page 169

1    And unfortunately, in the early part
2 especially of the crisis, they could die. It is --
3 we saw that it was directly linked, and here's why:
4 As we saw the total amount of diverted drugs
5 increase, we also saw a similar increase in the
6 number of pregnant women that were taking these
7 diverted drugs.
8    The pregnant women are still part of
9 the same community, part of the same population.
10 They're no different. So it would be an
11 extraordinary thing to think that they would behave
12 differently.
13    As they were also taking -- at one
14 point, one in four pregnant women were taking some
15 of these diverted medications. As they do, they
16 become addicted, and as they develop the addiction,
17 and continue to feed their addiction, so is the
18 baby getting the same medications through the
19 placenta while the baby is in the womb.
20    So the baby's brain, now imagine, is
21 also being fed through the same mechanism. This
22 developing new life inside the womb is also getting
23 the same line of feeding of opioids through the
24 bloodstream of the mother.

Page 170

1    So its brain is also -- not only not as
2 -- it's not -- it's supposed to be developing right
3 when it's not only -- we don't know a lot about how
4 it develops in the presence of opioids, but it's
5 developing the same time as being confounded by
6 these opioids.
7    So as the cord gets cut, meaning the
8 placenta gets cut and the baby gets delivered, that
9 baby goes into withdrawals. It's literally the
10 equivalent of a withdrawal. We know that because
11 we treat the withdrawals by various mechanisms, but
12 one of the mechanisms -- the pharmaceutical
13 mechanism to treat it, is through morphine. Giving
14 the baby morphine.
15    I mean, it's one of the last resorts,
16 but that's one of the ways we do it. So what we
17 don't know about neonatal abstinence syndrome yet -
18 because there's a lot of work going on - is: These
19 are the immediate side effects.
20    We have also seen some associations
21 with birth defects, like heart defects, gastric
22 defects. We also have had some literature that
23 shows there's defects in hearing, vision, other
24 aspects.

Page 171

1    Now, when I was speaking to schools,
2 officials, teachers, parents, oftentimes they would
3 tell me that in 2015, some of those babies that
4 were born in 2006, '07 would be then eight, nine,
5 ten years old and they're getting to a point and
6 they're --
7    What is happening to the babies now is:
8 These teachers would tell me that "We have these
9 kids," it's called -- you know, opioid babies, they
10 are now being -- "they are not able to control
11 their impulse. They're not able to keep attention.
12 So they're having some version of attention deficit
13 disorder; they're having impulse control issues."
14    So because that's a problem and
15 teachers' job is to teach, they were referring to
16 the parents -- if there were parents. Because in
17 often cases, these kids got moved around three,
18 four, five times a year in the school system.
19    And they were often within foster care
20 or the care of grandparents or great-grandparents
21 at times. But then they ultimately end up in the
22 doctor's office, at a pediatrician, and the
23 pediatrician would diagnose them oftentimes -
24 erroneously or let's just say through symptoms -

Page 172

1 with ADD, and guess what happens then?
2    These kids get prescribed another
3 addictive potential drug called Adderall.
4    So then we basically -- we already know
5 that kids who are born with NAS have a higher
6 predilection to get -- to become addicted in the
7 future. And now through the system, we're actually
8 providing them the same drugs that they actually
9 have a further habit with.
10    So we're actually setting up these kids
11 to fail in life, and this is a huge problem in West
12 Virginia. We're talking about 5 percent of the
13 entire population. It's a huge number. And then a
14 higher percentage perhaps in Cabell County and
15 Huntington.
16    So all these kids -- we don't even know
17 what the long-term consequences will be. Will they
18 be able to adjust in society? Will they be able to
19 have sustained social interaction and enjoy life
20 the same way as others? We don't know that.
21    But we do know that there are some
22 short and long-term consequences of NAS.
23    Q.   Has anybody tried to -- you or anybody you
24 know tried to quantify the cost of the effects of

Page 173

1   NAS babies on a single NAS baby?
2       A.  So we were working very hard -- one of the
3   reasons that I am at March of Dimes today is
4   because of my work that I focused a lot of work on
5   this issue, and not only did we expand the
6   drug-free moms and babies program, but one of the
7   things we did was we tried -- again, downstream
8   work, incremental impact, but that's all we could
9   do at the time.
10          But one of the things that happened
11  was:  We figure, how can we prevent this?  And one
12  of the ways to prevent this is to offer in a
13  nonthreatening way women who have addiction, the
14  ability to have family planning.
15          And there is a women's prison, there
16  are jails, and these women are -- you know, are
17  cycling through and we offer it to men and women,
18  by the way, family planning.  It's not
19  gender-biased.
20          So we wanted to have funding beyond
21  Federal funding, because Federal funding for IUDs
22  and other things does not go for the prisons.  So
23  we wanted to make a case -- lay out a case to a
24  Republican legislature in West Virginia why it

Page 174

1   makes sense for us to think about family planning.
2       It's a tough issue.  It's a tough
3   issue.  So what we did was:  We did an analysis and
4   we provided a white paper to the Senate Finance
5   Chairman at the time, Craig Blair, which basically
6   laid out -- and we accounted for all the costs, the
7   ICU costs.
8           We laid out the costs of child welfare
9   costs, the development costs.  But do we know what
10  will happen long-term?
11          And that cost we calculated was a
12  little over a million dollars per baby.
13      Q.  Per NAS baby?
14      A.  Per NAS baby.  And for 5 percent -- we have
15  about 20,000 births in West Virginia approximately,
16  and 5 percent of that is about 1,000 babies, and
17  that would be about a billion dollars if we
18  multiply the math, a billion dollars per year, year
19  after year, that were incurring this future cost to
20  the state of West Virginia.
21          And when we went into that, I can tell
22  you, the only thing -- this is a very conservative
23  Senator from a very conservative part of West
24  Virginia, and his response was, "Here's the money.

Page 175

1   What can I do more for you to make sure that we
2   allow these women who have addiction to enter
3   treatment programs so when they do get pregnant,
4   they have a shot at life and their kids have a shot
5   at life."
6           And this came -- and we were, you know,
7   pleasantly surprised.  He came back to us year
8   after year to give us more money to appropriate
9   because it was a just cause.  So these are the type
10  of downstream impact things we were doing.
11      Q.  All right.  Now -- so you worked in West
12  Virginia from '09 to '18 and you've talked about
13  different efforts that were made, you've talked
14  about this problem in depth.  And I want you to
15  think back and I want you to see if you can answer
16  this question for me.
17          Do you believe in your heart of hearts
18  that you and everybody in West Virginia that you
19  were associated with - whether it's DHHR, PEIA,
20  other departments, legislature - did what you could
21  do with the resources you had to fight this problem
22  that, as you stated, you didn't create?
23      A.  Yes, I can tell you my entire time in West
24  Virginia, you know, some of the best people on

Page 176

1   earth that you will find, warm people wanting to
2   chip in and help give you, you know, a shirt from
3   their back, if they can.  If they're wearing a
4   shirt --
5           And they was -- everybody was in as a
6   team, had the best intentions with limited
7   resources, and we were struggling every day to help
8   do everything within the power of our state as well
9   as individuals, their capacity, to find those
10  solutions.
11          So we did everything possible.  We left
12  no corner unturned in order to find solutions.  But
13  once again, this seemed to have fallen short in our
14  expectations each time, because it's very difficult
15  - and very inefficient, to be honest - to provide
16  and spend that amount of money when this can be and
17  could have been prevented upstream.
18      Q.  Okay.  Now, you talk about -- a little bit
19  about this transition from opioids to heroin, and
20  what I'd like to do is ask you some more questions
21  about that.  In terms of heroin in connection with
22  the opioids, is there some chemical somewhere --
23  why would people take heroin as opposed to opioids?
24      A.  Well, basically heroin -- when you take

Page 177

1  street heroin, it breaks down into two compounds
2  and both are active, and one of those is morphine.
3  So heroin is basically nothing but a form of
4  morphine. It is the same chemical release.
5  They're all related. They work through the same
6  receptors, and the body cannot tell one from the
7  other.
8        And so chemically speaking, you know,
9  you could have synthetic opioids; you could have
10  semi-synthetic; you could have natural opioids.
11  But to the body that needs to feed the need, it's
12  the same compound.
13       And so chemically speaking, what you
14  write in the prescription pills, again it's the
15  same feed -- the feeding mechanism is the brain.
16  It does not discriminate.
17   Q.  Right. So it's your opinion that heroin --
18  if someone went to heroin, that would satisfy the
19  need created by an opioid addiction?
20   A.  Absolutely.
21   Q.  All right. In terms of the number of
22  opioid addicts that transitioned to heroin, is
23  there any way for us to quantify in terms of the
24  total number of people that would be moving to

Page 178

1  heroin -- how many of those people started out as
2  opioid-addicted people?
3   A.  I think what we have to do is -- I'll go
4  through the math a little bit here. We know that
5  for every person who overdoses -- we're going to do
6  the math in reverse.
7        So every person who dies in overdose,
8  there's about 25 to 30 people that have what we
9  call nonfatal overdose. Because we saw that in our
10  social autopsy, that people -- overdose is a cry
11  for help. And we have 25 to 30 people.
12       For every fatal overdose, there's about
13  250 to 300 people that actually are suffering from
14  addiction, basically. So if you look at the
15  numbers in West Virginia - there's 1,000 people
16  that have died of overdose, and obviously there's
17  anywhere from 250,000 to 300,000 people that are
18  suffering from addiction - and that addiction could
19  be -- the more you turn the pump off, the tap off,
20  from the diverted prescription pills, they're gonna
21  go to the street drugs available in terms of
22  heroin.
23       So it's a free-flow basically. I don't
24  see a difference between if it's the diverted

Page 179

1  prescription opioids or it's the heroin, except
2  that they are able to die very quickly -- with the
3  contaminated heroin, the cut heroin. So that's the
4  only way.
5   Q.  Is there a way to look at national
6  statistics that might help us glean more
7  information about that transition in terms of
8  heroin or opioids?
9   A.  Yeah, I think the -- what we have learned
10  over time is the more -- you know, you go -- again
11  -- this is not -- not meant to defend bad docs, but
12  it's meant to say we need to have better systems
13  downstream in order to manage the people who are
14  addicted when we do drug busts.
15       But, you know, the more we become
16  aggressive in drying up, the more people downstream
17  are going to convert into heroin and fentanyl
18  addiction, basically.
19   Q.  All right. I'm going to transition a
20  little bit here to a different topic. Can we take
21  a two-minute break?
22       MR. RUBY:  Hey, Mark, where are you on
23  time overall?
24       MR. COLANTONIO:  Another -- I can be

Page 180

1  done in 40 minutes? Is that okay?
2        MR. RUBY:  40?
3        MR. COLANTONIO:  Yeah. 30?
4        MR. RUBY:  If you guys -- if you guys
5  were taking your own evidentiary depo of Doctor
6  Gupta, I wish you'd noticed it.
7        MR. COLANTONIO:  Okay, well -- let's
8  take a --
9        MR. ZIMMERMAN:  To answer your
10  question, Steve, 40 minutes. Approximately 30-40,
11  try to get it done.
12       MR. COLANTONIO:  What time is it?
13       MR. GOOLD:  It is --
14       MR. ZIMMERMAN:  1:48.
15       MS. JINDAL:  1:48.
16       MR. COLANTONIO:  All right. Let's
17  take a two-minute break and then we can talk about
18  it. Is that okay?
19       MR. RUBY:  That's fine.
20       MR. COLANTONIO:  All right, thanks.
21       VIDEO OPERATOR:  Going off the record.
22  The time is 1:48 p.m.
23       (A recess was taken after which the
24       proceedings continued as follows:)

Page 181

1      VIDEO OPERATOR:  This begins Media
2   Unit 5 in the deposition of Rahul Gupta, M.D.  We
3   are back on the record.  The time is
4   2:00 o'clock p.m.
5      MR. GOOLD:  Let me just -- this is Jim
6   Goold for McKesson.  Let me just briefly reserve an
7   objection on the record for opinion testimony from
8   the witness while we check about the previous
9   designations of the witness which we will do off
10   the record at a later point.
11      MR. COLANTONIO:  Ready?
12      VIDEO OPERATOR:  Yes, please begin.
13   BY MR. COLANTONIO:
14      Q.  All right.  So Doctor, have all of the
15   opinions that you've rendered here in response to
16   my questions here today been rendered by you to a
17   reasonable degree of certainty, whether it's public
18   health certainty, medical certainty or certainty
19   within your field?
20      A.  Yes.
21      MR. COLANTONIO:  I have no further
22   questions.
23         EXAMINATION
24   BY MS. KEARSE:

Page 182

1      Q.  Doctor Gupta, this is Anne Kearse with the
2   City of Huntington and Cabell County as well.  I
3   only want to follow up with a couple of things that
4   I believe you testified about today and just make
5   sure I've got the documents or the reports that you
6   issued correct.
7      MS. KEARSE:  Monique, can you pull up
8   the first -- August 17, 2017 document?  And I'll
9   mark this as, I guess, Plaintiff's No. 1 for the
10   purposes of this deposition.
11      PLAINTIFF'S EXHIBIT NO. 1
12         ("West Virginia Drug Overdose Deaths
13         Historical Overview dated August 17,
14         2017 was marked for identification
15         purposes as Plaintiff's Exhibit No.
16         1.)
17      Q.  Doctor Gupta, you testified today about  an
18   historical overview since 2001 to 2015 of drug
19   overdose deaths.  Is that correct?
20      A.  It's, I believe, 2000 to -- yeah, yeah,
21   that's -- thank you for that.  Yes.
22      Q.  Okay.  And that's -- and that's what -- I
23   just wanted to make sure for the record that
24   this --

Page 183

1      MS. KEARSE:  Monique, wait a second,
2   please.
3      Q.  -- that this document, cover page "West
4   Virginia Drug Overdoes Deaths Historical Overview
5   2001-2015" is a report that you were referring to
6   today.  Is that correct?
7      A.  That's correct.
8      MS. KEARSE:  And Monique, if you'll go
9   to the second page, just for the record.
10      Q.  This is a report that obviously your name
11   is on there, Doctor Gupta, as the Commissioner for
12   the Bureau of Public Health, the State Health
13   Officer.  Is that correct?
14      A.  That's correct.
15      Q.  And you were involved not only in working
16   on the analysis and reported here of this, but you
17   were doing this in the capacity of your role as
18   Commissioner of the Bureau for Public Health.  Is
19   that correct?
20      A.  Yes, I ordered the commission of this
21   report.
22      PLAINTIFF'S EXHIBIT NO. 2
23         ("2016 West Virginia Overdose Fatality
24         Analysis" was marked for

Page 184

1      identification purposes as Plaintiff's
2      Exhibit No. 2.)
3      Q.  And then Doctor Gupta, I believe also
4   Plaintiff's No. 2, in your capacity as the
5   Commissioner for the Bureau for Public Health, state
6   of West Virginia, I believe you also testified
7   about a 2016 overdose fatality analysis?
8      A.  Yes, and I have submitted that, I believe,
9   as part of the documents that I was requested to
10   provide.
11      Q.  Okay.
12      MS. KEARSE:  And just for the record,
13   Plaintiff's Exhibit No. 2, is this the report and
14   analysis that you were referring to in your
15   testimony earlier today titled "2016 West Virginia
16   Overdose Fatality Analysis"?
17      A.  Yes.
18      MS. KEARSE:  And Monique, if you'll go
19   to page No. 2 on that.
20      Q.  And that's also -- you appear on that as
21   the Commissioner for the Bureau of Public Health;
22   is that correct?
23      A.  Yes.
24      Q.  And in your -- both of these reports, these

Page 185

1  were reports either done at your direction and your
2  involvement and you're thoroughly familiar with the
3  -- with the conclusions and opinions issued in
4  those reports; is that correct?
5     A. Yes.
6     Q. And in addition to your testimony today,
7  you would be prepared to testify - if you do come
8  to trial - in regards to the analysis and results
9  contained in those reports. Is that correct?
10    A. Yes.
11       MS. KEARSE:  Thank you, Doctor Gupta.
12       THE DEPONENT:  Thank you.
13       MR. COLANTONIO:  Hey, Steve?
14       MR. RUBY:  Sorry, I was muted.  Yeah,
15  Mark.
16       MR. COLANTONIO:  So I just want --
17  think about this, the questions earlier about our
18  roles here and make sure we're clear about that.
19       So just to be clear, we have appeared
20  in this case in specific instances in deposition,
21  so our role in this case as counsel has been - at
22  this point, at least - limited to depositions, and
23  today we are appearing as counsel to Doctor Gupta
24  and -- his personal counsel.

Page 186

1       So that's our role today, as his
2  personal counsel.  And we have appeared in other
3  depositions for purposes of those depositions so
4  far.  That's been our role.
5       MR. RUBY:  Okay.  And I don't want to
6  -- I have to -- we may have to think through all
7  the implications of it and we would certainly
8  preserve any -- any objection that might relate to
9  it.
10       But Mark, just so I'm clear on your
11  position, does that amend your --
12       MR. COLANTONIO:  Yes.
13       MR. RUBY:  -- statement at the outset
14  of the questioning that you were questioning him on
15  behalf of the County --
16       MR. COLANTONIO:  Yes.  We're
17  representing him today.  That's our role.
18       MR. RUBY:  Okay, so the questioning --
19  and, again, I have to think through what the
20  significance is, if any.  But the evidence today
21  that you've conducted of Doctor Gupta, your behalf
22  is that it's now not on behalf of the County or the
23  City; is that right?
24       MR. GOOLD:  It is what it is.

Page 187

1       MR.COLANTONIO:  Yea, we're
2  representing him personally.
3       MS. KEARSE:  But Steve, to the extent
4  then that any of the testimony that Doctor Gupta
5  has given is the testimony on -- that applies also
6  to the City of Huntington and Cabell County, Paul
7  Farrell and Anne Kearse are both here in that
8  capacity, as well as Mark Colantonio --
9       COURT REPORTER:  Anne, I'm having a
10  terrible time hearing -- Anne, I can hardly hear
11  you at all.  I don't know if the record is picking
12  you up but if you have a better way to get to a
13  phone or closer or something.
14       MS. KEARSE:  Okay.  All I was saying
15  to Mr. Ruby's comments that Dr. Gupta's testimony
16  today's is also applicable to the City of
17  Huntington and Cabell County, which is what this
18  case is being taken for.
19       MR. RUBY:  It's a depo in 1332, in the
20  Cabell and Huntington case.  And like I said, Anne,
21  I would have to think of what the significance of
22  it is.  I just wanted to make sure I understood
23  Mark's position clearly on the record.
24       MS. KEARSE:  Okay.  It's Friday.  You

Page 188

1  hear that?  Thank you, Doctor Gupta.
2       MS. JINDAL:  Okay, Anne, are you done?
3       MS. KEARSE:  Yes, I'm done.  So you
4  can keep going.
5       EXAMINATION
6  BY MS. JINDAL:
7     Q. Okay great.  Doctor Gupta, I'm just -- this
8  is Jyoti Jindal just for the record on behalf of
9  Cardinal Health.  I'm just going to ask you a quick
10  follow-up question to Ms. Kearse's questioning.
11       Are there any other documents that you
12  relied on in forming your opinions that you can
13  name right now?
14    A. I don't remember if I submitted this to
15  you, but there was an order in my role as the
16  secretary of the Board of Medicine that had to do
17  with 2017 guidance to the physicians, orders on
18  prescribing or somewhat related to that, like the
19  practicing standards for opioids.
20       And that was 2017.  Because we
21  attempted to make sure that the 2016 CDC
22  recommendations were actually being followed in the
23  state of West Virginia.
24       So that may be another document.  I'm

Page 189

1  not sure right now that that was one of the ones
2  that was submitted or even I thought about it.
3          I don't have possession of it, but it
4  would be available somewhere online somewhere.
5      Q.  And that was an order issued by the Board
6  of Medicine which you signed as secretary for the
7  Board of Medicine?
8      A.  Yes.
9      Q.  And if you recall any other documents upon
10  which you relied or research upon which you relied
11  in the course of forming your opinions, I would
12  appreciate it if you could name those for me on the
13  record so we can follow up after this.
14      A.  Of course I will.
15      Q.  Thank you.  All right.  I am going to go
16  back a bit.  You talked a little bit about the DEA
17  quota.  What is that?
18      A.  It is my understanding that the DEA quota,
19  is the amount up to which manufacturer is able to
20  produce their particular drugs related to
21  controlled substances.
22      Q.  So it's the amount of controlled substances
23  that a manufacturer can make.  Is that right?
24      A.  It's the -- it's the amount of what -- it's

Page 190

1  the amount -- it's the limit basically -- to up to
2  which it can be.
3      Q.  I see.  And how is that limitation or quota
4  determined?
5      A.  That quota really goes back to really the
6  sales data.  So it's the amount of sales in the
7  previous year has been a -- sort of a guiding
8  principle, one of the guiding principles, for DEA
9  to determine what the quota for next year would be
10  for manufacturers and distributors.
11      Q.  And what are other guiding principles?
12      A.  That's the extent to which I understand.
13  I'm sure there are other frame works, but that's my
14  role in understanding this piece.
15      Q.  And DEA is the Drug Enforcement
16  Administration?
17      A.  Correct.
18      Q.  And that's a federal agency?
19      A.  Correct.
20      Q.  And aside from the DEA, who else is
21  involved in setting the quotas?
22      A.  To my knowledge, in addition to what I've
23  mentioned, I'm not aware of other actors.
24      Q.  Thank you.  Do you know what the quota was

Page 191

1  that was set by the DEA for controlled substances
2  in 1980?
3      A.  I could not tell you that.  I do not know.
4      Q.  Do you know it for prescription opioids in
5  particular in 1980?
6      A.  No.
7      Q.  What about just, let's say, oxycodone in
8  1980?
9      A.  No.
10      Q.  Okay.  Do you know what the DEA's quota was
11  for oxycodone in 1990?
12      A.  No.
13      Q.  What about 2000?
14      A.  No.
15      Q.  2010?
16      A.  No.
17      Q.  2020?
18          UNIDENTIFIED MALE:  Say that again?
19  Hello, can you hear me --
20          MS. JINDAL:  Can you hear me?
21          Someone needs to mute themselves, I
22  think.
23      Q.  Doctor Gupta, you talked about 1990, the
24  amount of prescriptions for -- that were sold --

Page 192

1  that were written in 1994, prescription opioids, as
2  providing a baseline for the need for prescription
3  opiates.  Is that a fair summary of what you
4  testified to?
5      A.  Your voice was a little muffled.  Could you
6  please repeat the question?
7      Q.  Sure.  Let me see if -- does this help?
8      A.  Yes.
9      Q.  Okay.  You talked about a baseline for
10  determining legitimate need for prescription
11  opioids, and you set that baseline as 1990, the
12  number of prescriptions in 1990.  Is that correct?
13      A.  I said 1990s, with an "s," so if you could
14  take a particular year prior to 2000.
15      Q.  So --
16      A.  Or the average of multiple years.
17      Q.  Okay.  So your baseline for determining the
18  legitimate need for prescription opioids is rooted
19  to the 19 -- the entire decade of 1990 -- to 1999.
20      A.  Well, no.  What I am saying is that you can
21  determine a -- determine the baseline need of a
22  community or a state for the need for opioids based
23  on a variety of -- you could either do a particular
24  year in the 1990s or you can take statistically an

Page 193

1    average of a few years and then look at that.
2        But that would be the closest prior to
3    2000 when the standards changed.
4        Q.   And do you know what the number of
5    prescriptions that were written for prescription
6    opioids in 1990 were?
7        MR. COLANTONIO:  I'm sorry, you said
8    "1990?"
9        MS. JINDAL:  Yes, 9-0.
10       MR. COLANTONIO:  1990.  Okay.
11       A.   I would not know off the top of my head
12   right now.
13       Q.   Okay.  In the course of determining that --
14   the decade immediately prior to the change in the
15   standard of care was the -- should be the baseline
16   or assumption, why did you come to that conclusion?
17       A.   Because if you take the decade prior to
18   that, that would be too far off of the population
19   demographic changes that would happen.
20       If you take the decade after that, that
21   would make no sense, because the distribution of
22   prescriptions, the diversion and the amount of
23   pills that flowed, we have enough of evidence that
24   we can all agree upon that that would not be

Page 194

1    applicable.
2        So the only reasonable conclusion would
3    be that you would look at the time prior.  This is
4    not something I would -- this is a very routine way
5    to do biostatistics, and you know, you know, in the
6    epidemiological world, this is not abnormal at all.
7        And then I say a number of years to
8    average, because sometimes there tends to be to
9    these trends and others that could provide you a
10   wrong number.  So that's why I would favor
11   potentially looking at an average year.  If the
12   numbers were flat for all ten years for the 1990s,
13   then you could take a particular year.
14       If the numbers went up and down, then
15   you could take an average of few years.  So the
16   idea is to get to a baseline within a reasonable
17   degree of certainty that you can make predictions
18   moving forward for.
19       Q.   And in making that baseline assumption, do
20   you -- you mentioned the changes in population.
21   Right?
22       For example, the migration and
23   immigration into and out of the state of Virginia.
24   Is that one of the things that you would have to

Page 195

1    control for, to make sure your baseline assumption
2    is accurate with, as you said, a reasonable degree
3    of certainty?
4        MR. COLANTONIO:  I'm sorry, I think
5    you said "Virginia."
6        MS. JINDAL:  West Virginia.
7        Q.   Sorry.  I'm from Virginia, so sometimes
8    I slip up --
9        MR. COLANTONIO:  We were one state at
10   one sometime.
11       A.   There could be a lot of factors.  One of
12   those -- so you have to account for all of the --
13   the both directions to being accurate.  So you have
14   to account for all of the variables potentially.
15   One of those variables would be the demographics.
16       The other variables would be the
17   movement in/out, in population loss.  Another
18   variable would be the need for legitimate
19   prescription.  That would be, for example, okay, in
20   an average -- what was the '90s average for mining
21   jobs, for example, or timber jobs as a industry,
22   for example, and then you look at.
23       So for example, if the mining jobs were
24   35,000 in, you know, 1996 - making this up - and

Page 196

1    they end up becoming 35,000 to 20,000 in 2006, you
2    have to account for that because those -- those are
3    the conditions - the ruggedness, the arthritic
4    condition and others - that actually can explain
5    and justify some of the opioid prescriptions used
6    even in the '90s.
7        So what I'm saying is that a curve of
8    the '90s, the numbers, you could use that as a
9    baseline, but you may have to say, then moving
10   forward, we'll have to adjust that curve down or up
11   based on consideration of all these factors,
12   including cancer and some of the end-of-life
13   issues.
14       Q.   And in the change in the standard of care,
15   is it also possible that doctors are now meeting a
16   need that was previously unrecognized in terms of
17   treating pain?
18       A.   I am sorry, could you repeat -- I think I
19   understand.  I'm not sure I understand 100 percent.
20       Q.   Sure.  Before the standard of care changed,
21   as you said, in 2000, the focus on treating pain
22   was - I believe you said - limited to end-of-life
23   care, acute post-operative pain and injury-based
24   pain.  Is that correct?

Page 197

1    A. No, there was multiple other recommendation
2 for use of opioids and other medications for pain.
3 It was not exclusively those areas.
4    When the standard of pain of care --
5 standard of care for pain changed, what we're
6 talking about is that we almost began to prioritize
7 the use of opioids over other alternatives, in
8 addition to expand the vocabulary or the areas in
9 which opioids could be used.
10    Q. Right. And so in terms of expanding or --
11 focusing on that last bit, expanding the areas in
12 which prescription opioids could be used, how did
13 that translate to the medical conditions for which
14 prescription opioids could be used now versus
15 before the standard of care changed?
16    A. So if you look at various conditions, for
17 example, in West Virginia over time, we have
18 reduction in some of the cancer cases. We have
19 certainly a reduction over time in mining injuries.
20 We have slight increases in arthritis.
21    We have slight increases in disability
22 or fair poor condition. A lot of that is related
23 to obesity, and diabetes, high blood pressure.
24    So it's not going to be a clear bag one

Page 199

1    A. I do not have evidence to suggest that.
2    Q. And you said this is an analysis that needs
3 to be done. So it's not something you have done.
4    A. I have not --
5    MR. COLANTONIO: Object to the form of
6 the question.
7    But go ahead, Doctor, if you understand
8 it.
9    A. No, I did not conduct that specific
10 analysis as I have elicited here today.
11    Q. And just to be clear, what you're saying is
12 that you have not done the analysis of determining
13 -- of controlling for all these other factors we
14 discussed - demographic, population size change,
15 legitimate need for pain - to determine what should
16 be the baseline assumption in determining the
17 legitimate need for pain.
18    MR. COLANTONIO: Object to form.
19    A. I have provided you a very high level of
20 certainty of my opinion without actually conducting
21 that analysis during my tenure as the State Health
22 Commissioner.
23    Q. And so how -- I guess my question is: How
24 are you certain in your opinion when you haven't

Page 198

1 way or the other. It will be a mixed bag. We will
2 have to do that analysis, what I'm saying. But I
3 would not suggest that for some reasons that the
4 doctors for the last 100 plus years were not doing
5 their job by undertreating pain. I think that
6 would be a false conclusion to arrive at.
7    Q. But it is possible that some doctors were
8 undertreating pain before 2000. Is that poss -- is
9 is that fair to say?
10    A. Anything is possible. But it is very
11 difficult for me to agree that the state of West
12 Virginia needed 780 million pills coming into West
13 Virginia, a population of 1.8 million, to
14 sufficiently and adequately treat the pain of West
15 Virginians.
16    Q. I'm going to refocus you on my question,
17 Doctor --
18    MS. JINDAL: And move to strike that
19 answer as nonresponsive.
20    Q. -- is it possible that doctors, before 2000
21 - some of them, at least - were undertreating pain
22 in West Virginia?
23    MR. COLANTONIO: Objection. Asked and
24 answered.

Page 200

1 conducted the analysis that you -- that needs to be
2 conducted to come to that conclusion?
3    A. Through my work, my experience, my detailed
4 analyses of each one of these individual factors,
5 and following these trends in my job on a daily
6 level. That's how I accumulated the knowledge and
7 the expertise to be able to provide you an opinion
8 with a high level of certainty.
9    Q. So I want to be clear. The first part of
10 your answer seemed to point to anecdotal evidence
11 that you've seen in your field work. Is that
12 correct?
13    MR. COLANTONIO: Object to the form.
14 Objection.
15    A. No, that is not correct.
16    Q. Okay. So when you said that -- you said
17 that you have -- my question was: "How are you
18 certain in your opinion about what is the accurate
19 baseline assumption for determining" -- and I'm
20 adding words here. I understand. I just want to
21 be clear.
22    How are you certain in your opinion
23 that 1990 is the best decade for determining a
24 baseline assumption for the need for prescription

Page 201

1    opioids when you haven't conducted the analysis
2    that you say needs to be conducted to come to that
3    conclusion?
4            And you answered, "Through my work, my
5    experience, my detailed analyses of each one of
6    these individual factors and following these trends
7    in my job on a daily level."
8            And my question is: When you said
9    "Through my work and my experience and my detailed
10   analyses," what do you mean?
11           A.   What I mean is, it is a 20 -- 25-plus years
12   of expertise and experience in the field with
13   highest levels of degrees that I have and working
14   within the population, that's where my opinion
15   comes from.
16           And just as an example, you don't need
17   to conduct a analysis of people on a plane, that
18   you throw some of those people without a parachute
19   and some with a parachute, just to figure out if
20   you need a parachute to come down.
21           Some of this is very much a common
22   sense analyses which I present to you.
23           Q.   What part of it is a common sense analyses?
24           A.   The fact that you look at the decade before

Page 202

1    in order to figure out what was the baseline of
2    prescriptions that would be legitimate and include
3    the criteria of requirements of pain that I've
4    elicited to you to look at how much of that in the
5    next forward decade that you would need the opioid
6    prescriptions for.
7            Q.   Okay.  So if I understand you correctly,
8    your opinion was that 1990s would be the best
9    decade, but you don't actually have a specific
10   baseline in mind.  You just think 1990s would be
11   the best decade to study to determine a baseline.
12   Is that correct?
13           MR. COLANTONIO:  Object to the form.
14           A.   No, I do have a specific timeline in mind,
15   and that's the 1990s.  There's a reason I didn't
16   compare with 1890s or 1860.  But the reason I say
17   "1990s" is because of those specific reasons that
18   conforms to my expertise, which is a very common
19   thing in the medical sphere.
20           When you don't have abject data, you
21   provide expert opinion.  That is not an abnormal
22   thing, and I am here providing you that my
23   expertise with -- both being a former Commissioner
24   of West Virginia as well as experience in this

Page 203

1    field through training, education and experience.
2            Q.   And I just -- maybe I'm -- I don't -- I
3    just want to make sure we're not speaking past each
4    other, Doctor.  That's all.  I understand that you
5    said 1990s is the best decade to determine a
6    baseline for legitimate need for prescription
7    opioids.  Is that correct?
8            A.   Yes.
9            Q.   Okay.  Do you have a specific number in
10   mind as to:  This is the number that is my baseline
11   for what -- these number of prescriptions represent
12   the legitimate need for prescription opioids in
13   2019 -- in 1990?
14           MR. COLANTONIO:  Object to the form of
15   the question.
16           Q.   100 prescriptions or 200 prescriptions?
17   That's what I'm trying to get at.
18           A.   I think I've already asserted that we would
19   need to look at that data, so for me to sit here
20   and guess that data would not be appropriate.
21           Q.   Okay.  And so all you've determined is the
22   decade to review to determine the baseline for
23   legitimate need.
24           MR. COLANTONIO:  Object to the form.

Page 204

1            A.   So I -- so I've mentioned the 1990s is the
2    decade, and what -- where you can get a peek of the
3    assessment, is start to look at some of my reports,
4    that you -- and the -- the counsel -- the
5    plaintiff's counsel have highlighted.
6            If you care to review that report, you
7    can see that I've done the analysis from the year
8    2001 onwards, and the year 2001 can give you a hint
9    as to what was happening in the late 1990s.
10           And that's where I formed the opinion
11   that 80 -- perhaps 80 to 90 percent of the volume
12   in the 2000s and onwards was being diverted and was
13   being used inappropriately, whether it was
14   unnecessary prescriptions or diverted
15   prescriptions.
16           So I keep answering the question.  The
17   bottom is, you need to look at the report I've
18   submitted.
19           Q.   Sure.  And if you look at that report, will
20   I find an analysis of the 1990s in there?
21           A.   How could you when the title says 2001 to
22   2015?
23           Q.   Okay.  Thank you.
24           I want to talk about some of the

Page 205

1    demographic changes that you mentioned that would
2    need to be studied.  Is one of them the age of the
3    population?
4         A.  Yes.
5         Q.  And has West Virginia's average age of its
6    population grown over the last two decades?
7         A.  Yes.
8         Q.  Has it grown since the 1990s?
9         A.  Yes.
10        Q.  And is -- does West Virginia in fact have
11   one of the highest -- or I'm sorry, one of the
12   oldest populations in the state -- in the country?
13        A.  Yes.
14        Q.  And is another factor the number of adverse
15   childhood events that an individual is exposed to?
16   Is that something you would need to analyze to
17   determine -- strike that.
18        Doctor, we previously looked at Exhibit
19   54.  Could you go back to that exhibit?
20        MR. COLANTONIO:  You want me to pull
21   it up --
22        MS. JINDAL:  Yes, please.
23        MR. COLANTONIO:  Let me find it for
24   you.  I'm sorry, can you identify that for me?

Page 206

1    Because my envelopes -- I didn't put it back in.
2    Is that the --
3         MS. JINDAL:  That's the State of
4    Health presentation that was dated October 26,
5    2018.
6         MR. COLANTONIO:  He's got it.
7         A.  I have it.
8         Q.  And could you please turn to Slide 6 of
9    that presentation?  It's Bates stamped 0925, I
10   believe.
11        A.  I'm here.
12        Q.  And do these reflect some of the
13   demographics that you would need to study to
14   determine the legitimate -- the legitimate need for
15   prescription opioids --
16        A.  Yes.
17        Q.  -- in a particular state?
18        A.  Yes.
19        Q.  Okay.  And the first of these, the one we
20   just discussed, is the median age.  Is that right?
21        A.  Yes.
22        Q.  And does this identify that West Virginia
23   has the fourth-highest in the nation based on the
24   2016 U.S. Bureau of the Census America Community

Page 207

1    Progress?
2         A.  I think we just agreed to that.
3         Q.  Great, okay.  The next one is Medicaid,
4    correct?
5         A.  Yes.
6         Q.  And does this reflect the fact that 30
7    percent of West Virginia residents are served by
8    Medicaid?
9         A.  As of the date that's down there, yes.
10        Q.  And that date is March 2017, right?
11        A.  Yes.
12        Q.  And further to determine legitimate pain,
13   we'd also have to review the percent of the
14   population that is disabled.  Is that the third
15   factor that's there?
16        MR. COLANTONIO:  Just object to the
17   form of the question.
18        A.  Yeah, so --
19        Q.  I apologize.  I'll withdraw and ask again.
20   I want to be sure that my question is clear.  The
21   third factor -- the third demographic factor that
22   you've identified here is the percent of the
23   population that is disabled.  Is that right?
24        MR. COLANTONIO:  On this page.

Page 208

1         A.  On this page, not to determine the need for
2    opioids.
3         Q.  But would you want to look at the rates of
4    disability to determine the need for prescription
5    opioids?
6         A.  Yes, but not necessarily the Medicaid
7    population.  I just want to be clear about that.
8         Q.  I see.  So you would not consider the
9    percentage of people who are on Medicaid in terms
10   of considering whether or not there's a legitimate
11   need for prescription opiates?
12        A.  Not necessarily.
13        Q.  I appreciate -- okay.  When you say "not
14   necessarily," could you explain?
15        A.  Yes.  So it can be in some states the
16   Medicaid population; in other states, it can be the
17   percentage of the Medicaid population.  Because
18   Medicaid is insurance status and no way are we
19   trying to say that people on Medicaid are more or
20   less likely to use opioids.
21        That's a political statement, and I
22   would like to -- I don't think that bears any
23   weightage or evidence behind it.
24        Q.  Okay.  Thank you for that clarification.

Page 209

1    Going back to the third factor you've
2 identified here, disability, is that one that you
3 would measure to determine the legitimate need for
4 prescription opioids?
5    A.  Yes.
6    Q.  And does West Virginia have a disability
7 population of 18 percent compared to 12 percent of
8 the U.S. population?
9    A.  Yes.
10   Q.  And that's as of the March 2017 date,
11 correct?
12   A.  I -- the asterisk is --
13   Q.  Or --
14   A.  -- only for Medicaid.  So I would say at
15 the time of the presentation, those were probably
16 valid and most current data.
17   Q.  Okay, thank you.  And then going to the
18 next page, are these factors that you would
19 consider in determining the legitimate need for
20 prescription opioids?
21   A.  You know, some might be; some might not be.
22 So I wouldn't say necessarily.  There are some that
23 are missing, like you know -- so this -- these
24 slides, these two slides, were not meant to convey

Page 210

1 the message, I think, what -- what we're trying to
2 convey here.
3    Q.  Sure.  I understand.  But when you say some
4 of them would be something you would consider in
5 determining legitimate need, which ones would those
6 be?
7    A.  I would use --
8    Q.  Just focusing on the slide -- I'm sorry,
9 Doctor.  Just focusing on the slide, there are
10 three factors, correct --
11   A.  Yes.
12   Q.  -- that are listed on this slide?  And one
13 of those -- the first is "Bachelor's degree or
14 higher"?
15        MR. COLANTONIO:  I'm sorry, I wanted
16 to make sure we're clear.  You said there's three
17 on the slide.  Are you referring to --
18        THE DEPONENT:  Flip over.
19        MR. COLANTONIO:  Well, it says, four,
20 five and six.  That's why I'm a little bit confused
21 because it indicates --
22        MS. JINDAL:  I see.
23        MR. COLANTONIO:  Not three, but --
24        MS. JINDAL:  I will ask again.

Page 211

1    Q.  I apologize, Doctor, I know we're moving a
2 little fast here.  On the Slide 7 which ends in
3 Bates 096, you identify additional demographic
4 factors that you have studied, correct?
5    A.  Yes.
6    Q.  And the fourth of these demographic factors
7 - or the one that's numbered No. 4 on this slide -
8 is the percentage of the population that has a
9 bachelor's degree or higher, correct?
10   A.  That is it, correct.
11   Q.  Okay.  And is that a factor that you would
12 consider in determining the legitimate need for
13 pain -- or legitimate need for prescription
14 opioids?
15   A.  Not necessarily.
16   Q.  Could you please explain your answer?
17   A.  Sure.  Because if -- if I was looking at
18 the legitimate needs for opioid prescription, I
19 would focus my attention on -- in addition to the
20 trend data from the 1990s, with actual conditions
21 that actually require people to use opioids as a
22 last resort, not necessarily the determinants of
23 their living meaning, you know, what's their
24 income, what's the degree, are they poor or not.

Page 212

1    I think those would be very
2 stigmatizing factors to figure out, and that would
3 not be the way I would recommend necessarily that
4 we go first and foremost.  I would be focused more
5 on health conditions at the end of the day, because
6 when we write people opioids -- at least when we're
7 supposed to write prescriptions -- legitimate
8 prescriptions for opioids, they have to be related
9 back to their health and medical conditions, not
10 the other way around.
11   Q.  Okay.  So just to be clear, you would -- I
12 think actually, you were clear.  I'm going to move
13 on.
14    The next one, is that the same true for
15 median household income, it's not the first thing
16 you would consider, but it's something you might
17 consider if you needed to?
18   A.  Yeah, again, these are the socially
19 determinant factors that I would generally not
20 prioritize in the consideration for the need for
21 pain medications overall, but also for need for
22 nonpharmaceutical options.
23    And so when I say -- when we talk about
24 opioids, I like to make sure that we're talking

Page 213

1 about nonpharmaceutical options, pharmaceutical,
2 nonopioid options and opioid options. So there's
3 these three categories, going backwards.
4 So that's -- those are the things that
5 I would look at. But these are not the categories
6 I would look at beyond age and disability.
7 Q. Okay. So I'm a little confused now,
8 Doctor, because I thought we were talking about a
9 baseline assumption for the need for prescription
10 opioids.
11 A. Uh-huh.
12 Q. Were we not?
13 A. Yes. I can explain that if you would like
14 me to.
15 Q. No. What I'm trying to understand is,
16 Doctor, your -- when you said that you would look
17 at the 1990s as the decade for determining the
18 baseline for the need for prescription opioids, you
19 were talking -- when you said "Prescription opioids
20 there," you were talking about controlled
21 substances, correct?
22 A. Yes.
23 Q. Okay. And so when I asked you if you would
24 consider the demographics listed on page 0926 of

Page 214

1 Exhibit 54, you were saying that these are some
2 that you may consider in terms of determining
3 social -- the social environment in the 1990s in
4 ultimately determining a real number for that
5 baseline. Is that correct?
6 MR. COLANTONIO: Object to the form.
7 A. No. And once again, I like to be clear and
8 consistent rather than have twisted way of getting
9 through, so if you don't mind, I'd like to clarify
10 once again, but I'd like to be very clear and
11 consistent about it, if that's okay.
12 Q. Please.
13 A. So what I basically said both to my
14 counsel, plaintiffs, and to you, is this: That in
15 order to figure out what would be the appropriate
16 prescriptions or the legitimate credible
17 prescriptions for opioids today or in the last few
18 years, what you would have to see is you would have
19 to find a baseline.
20 The closest you can get to baseline is
21 within the decade, some formula for in the 1990s.
22 If that's a consistent prescribing, you could take
23 a particular year; if it's a up and down, then you
24 could do an average.

Page 215

1 Now, with that, when you took -- take a
2 number of other factors to determine that. Those
3 factors include individual health factors of folks.
4 They may or may not include Medicaid status, for
5 the reason we mentioned.
6 They also include the -- what we know
7 now. So that means that we cannot ignore the CDCs
8 evidence-based recommendations of 2016 that now say
9 that we do not use opioids as first line of
10 treatment. To the point and to the extent that
11 that was being done in the 1990s, we need to
12 correct for that.
13 And that's where the thought comes in
14 that we have to look at those numbers and that we
15 have to look at, okay, if there was 100
16 prescriptions, you know, for 1,000 people, how many
17 of those would have been credibly reduced by using
18 nonpharmaceutical options, and then how many of
19 those would have been further reduced by using
20 nonopioid pharmaceutical options, and then we get
21 to the bottom line of, okay, how many would have
22 been okay to use for opioids.
23 So that's why I'm not -- I'm not coming
24 to you with a "I know the answer." I'm giving you

Page 216

1 a range that I believe 80 to 90 percent.
2 But at the end of the day, if you do
3 the math, then we can know for certain. But those
4 are the factors, the pillars of how -- what it
5 would take to make that determination.
6 But it may -- it may be 80 percent
7 diverted; it may be 90 percent diverted; it may be
8 99 percent diverted.
9 I cannot tell you that right now
10 sitting here. But I can tell you the factor that
11 would take -- and again, I'm -- I'm working very
12 hard to be clear and consistent.
13 Q. No, that was really helpful. Thank you,
14 Doctor. So again, this is an anal -- what we're
15 outlining here, what we're discussing here, is the
16 analysis and how it should be conducted, not what
17 your old analysis has been, correct?
18 MR. COLANTONIO: Object to the form.
19 A. No, I think I have a right to provide --
20 look, when the Governor of the State asks me --
21 Q. Doctor --
22 MR. COLANTONIO: Hold on. Let him
23 finish his answer, please.
24 A. When the Governor of the State, in my

Page 217

1  capacity as the State Health Commissioner, State
2  Health Officer, asks me, I don't go after every
3  question and say, "Governor, I can't answer you.
4  Let people die until I conduct an analysis."
5      We provide -- and the way the medicine
6  and public health works is we provide our best
7  estimate based on our experience and based on our
8  knowledge and training in order to move forward and
9  provide solutions. And that's exactly what I'm
10 providing to you here.
11     Q. Okay. So your analysis that 80 to 90
12 percent of prescriptions were unnecessary in the --
13 I'm sorry, Doctor, I actually don't know if you
14 gave a range.
15     MS. JINDAL: I'll strike all that.
16     Q. Your analysis that 80 to 90 percent of
17 prescriptions were unnecessary, that is based on
18 your experience and you -- but not any particular
19 scientifically-rigorous analysis that you have
20 conducted. Is that fair to say?
21     MR. COLANTONIO: Object to the form of
22 the question.
23     A. I don't think so. Because if you look at
24 my report, you will find the rigorous scientific

Page 218

1  analysis that was conducted and that gives you a
2  very good cry tear I can't to build that off of
3  from and to arrive at that estimate that I have
4  provided.
5      Q. So you -- and just to be clear, when you
6  say your report, you're referring to Plaintiff's
7  Exhibit 1?
8      MR. COLANTONIO: Object to the form.
9      Q. Is that the historical overview?
10     MR. COLANTONIO: Object to the form.
11     A. I -- I'm referring to wherever the analysis
12 resides that I know of exists which is the
13 prescription -- prescription opioids overlaid with
14 the deaths and other substances. That was --
15 wherever the form might be. I'm happy to find it
16 for you and provide it for you, but that's what the
17 analysis was.
18     It might be in the report. I have not
19 had a chance to review that report fully.
20     MS. JINDAL: Mark, do you have a copy
21 of the report with you by any chance?
22     MR. COLANTONIO: I'm sorry, I'm a
23 little confused myself. Because I'm not sure what
24 you're referring to. And I just don't -- I don't

Page 219

1  want to --
2      Well, I don't want to --
3      MR. FITZSIMMONS: Didn't we make that
4  as an exhibit?
5      MR. COLANTONIO: I don't want to make
6  any speaking objections, but I think maybe there's
7  a miscommunication going on. I think what the
8  doctor is trying to tell you is he's done a lot of
9  reports and in those reports, he's got a lot of
10 information, some of which may or may not be
11 exhibits here, and if you want us to - after this
12 deposition or sometime - give you something that --
13     I mean, I don't know what to tell you.
14 It -- anyhow, I don't know what you're referring
15 to, so --
16     MS. JINDAL: Okay.
17     MR. COLANTONIO: That's as clear as I
18 can be.
19 BY MS. JINDAL:
20     Q. Doctor Gupta, you don't know right now any
21 particular report that contains your opinion that
22 80 to 90 percent of prescription opioids were
23 illegitimate -- a prescription for opioids was
24 illegitimate?

Page 220

1      MR. COLANTONIO: Objection to the form
2  of the question.
3      I'm sorry, I don't think he said that.
4  What he's saying is that the basis for his -- part
5  of the basis for what he's saying is in that
6  report, the data. I think.
7      He's gonna speak for himself, and I
8  don't mean to interrupt. Just trying to help.
9      A. It's an opinion -- to answer the question,
10 it's an opinion that I'm providing to you based on
11 the question being asked to me, of me, and based on
12 my extensive work, knowledge, products created over
13 time as well as what exists nationally in terms of
14 the prescription opioids, the trend data as well as
15 the overdose data.
16     So that would be my answer.
17     Q. And just to be clear, you haven't written
18 out this analyses that ultimately led to your
19 conclusion that 80 to 90 percent of prescriptions
20 for opioids were unnecessary anywhere. Anywhere in
21 one place. To be clear.
22     A. I personally did not write down what I have
23 expressed to you as my expert opinion today.
24     Q. One of the factors -- or one of the things

Page 221

1    you talked about, Doctor, was -- I want to go back
2    to your testimony, because I want to make sure I
3    get this right.
4        You said if you -- and this is in the
5    context of -- this was in response to plaintiff's
6    counsel's questions.  Plaintiff's counsel asked you
7    about the cause of the dramatic increase in opioid
8    pill prescriptions in West Virginia from the late
9    1990s to the mid two thousand teens.
10       And as part of that answer, you said,
11   "If you use it" - "it" referring to prescription
12   opioids - "for more than three to five days, you're
13   at a high risk of becoming addicted or having an
14   addiction."
15       And what is your basis for believing
16   that?
17       MR. COLANTONIO:  I'm just going to
18   maybe ask you to read the whole answer so he can
19   get the context.
20       MS. JINDAL:  Yeah.  The whole answer
21   is a very long one, but I can point you to it if --
22   if you can, but --
23       MR. COLANTONIO:  I don't have the --
24       MS. JINDAL:  Sure.  I'll read the

Page 222

1    whole answer.
2        Q.  "So as I stated, the first inciting event
3    was the effort to change the standards of pain and
4    care for pain.  As we changed the standard of care
5    for pain in somewhere around late 1990s -- and
6    really, I think it was like Robert Wood Johnson
7    funded the work initially in 1997 that led to the
8    JCAHO having that changed standard and the Cancer
9    Society work at the same time, the VA, the federal
10   government had changed, and this extraordinary
11   effort was placed.
12       There was quote 'several reasons for it
13   that we were getting details on.'  One was the more
14   ethical, we have an obligation to provide patients
15   an absolute zero level of pain, it had to come down
16   from 10 to zero.
17       The other was that you could be held
18   liable if you don't do that, so it was about
19   punitive actions.
20       And the third was, there is no
21   addiction, no consequence and this was a really
22   good safe medication and there was no --
23       What was happening really during this
24   time - now looking in retrospective in fact - was

Page 223

1    that, you know, you have a set population that was
2    going to get the prescriptions in this context of
3    changed standard of care of pain.
4        They were getting the prescriptions, so
5    you get a tooth pulled - and that numbers hasn't
6    changed over time - you know, anything you get 30
7    days of -- 30 days of liberal prescribing of an
8    opioid.
9        You may be using two pills or three
10   pills and they go, you know, in your closet,
11   medicine cabinet.
12       So what happens is:  If you used it for
13   more than three to five days, you have a high risk
14   of becoming addicted -- having addiction.  Use it
15   for a few days, then there's a high risk of
16   diversion right there."
17       And I'm going to stop reading there
18   because I just want to focus on that first sentence
19   right there, "If you use it for more than three to
20   five days, you have a high risk of becoming
21   addicted."
22       Now, there, were you referring to
23   someone with a prescription for opioids?
24       A.  So I just want to correct -- if I made the

Page 224

1    mistake, the Robert Wood Johnson work was
2    commissioned in 1997, I believe, just for details.
3        I was -- yes.  So to the answer, yes.
4    I was referring to someone who may have
5    appropriately or inappropriately been prescribed a
6    prescription for opioids.
7        Q.  Okay.  And you said "If someone is using
8    prescription opioids pursuant to their prescription
9    and they use it for more than three to five days,
10   you have a high risk of becoming addicted."
11       My question for you is:  Where does
12   that -- where does that number come from?  Where
13   does that understanding come from?
14       A.  So the higher risk as opposed to no risk of
15   becoming addicted after using three to five days is
16   well established in literature, and the most --
17   probably the best reference would be the CDC's
18   opioid guidelines of 2016, the opioid prescribing
19   guidelines.
20       Q.  And have you reviewed that literature
21   yourself?
22       A.  Yes.  The opioid -- CDC's opioid
23   guidelines, yes, I have.  I have not recently, so
24   I'm gonna have a little bit difficult time

Page 225

1    recalling every aspect of it right now.
2        Q.  And you haven't reviewed the underlying
3    study that the CDC cited?
4        A.  I do not recall right now.  I believe I
5    would have.  It was one of the basis for me to --
6    for the Opioid Reduction Act, Senate Bill 273,
7    where we agreed on limiting the initial
8    prescription to four days.
9            There was a -- a good discussion about
10   this, three to five days, within the physician
11   community, of the legislature and myself and
12   others, and we agreed upon four days.
13           So yes, I have.
14       Q.  And you said "use it for a few days and
15   then there's a high risk of diversion right there."
16           So I want to ask you:  Your -- when an
17   individual is prescribed opioids and they use them
18   for, let's say, two to three days and then leave
19   the remainder in their medicine cabinet, do the
20   prescription opioids sitting in the medicine
21   cabinet themselves induce addiction in others?
22           MR. COLANTONIO:  Object to the form.
23       A.  I'm sorry, I don't know -- I didn't
24   understand that question.

Page 226

1        Q.  Okay.  I'm talking about the pills in the
2    medicine cabinet that are, as you said, there's a
3    risk -- high risk of diversion right there.  Is
4    that accurate?
5            MR. COLANTONIO:  I'm sorry.  I object
6    to the form of the question.  I'm not sure of the
7    question.
8        A.  Could you repeat the question, please?
9        Q.  Sure.  Do prescription pills that are --
10   you said prescription pills in a medicine cabinet
11   form a high risk of diversion.  Why is that?
12       A.  I did not say that.
13       Q.  Okay.  Do prescription pills in a medicine
14   cabinet --
15           MS. JINDAL:  Let me strike that.
16       Q.  You know, it might be that my coff -- my
17   tea was too weak and I need some coffee.  So if we
18   can, can we just take a ten-minute break and then
19   I'll gather my notes and we'll come back?
20           MR. COLANTONIO:  Okay.
21           VIDEO OPERATOR:  Going off the record.
22   The time is 2:55 p.m.
23           (A recess was taken after which the
24           proceedings continued as follows:)

Page 227

1            VIDEO OPERATOR:  Now begins Media Unit
2    6 in the deposition of Rahul Gupta, M.D.  We're
3    back on the record.  The time is 3:10 p.m.
4    BY MS. JINDAL:
5        Q.  Doctor Gupta, you've been retained as an
6    expert consultant for opioid litigation in West
7    Virginia, correct?
8        A.  I'm looking at -- because I've been asked
9    for this deposition and --
10           (A discussion was had off the record
11           regarding the court reporter having
12           been disconnected.)
13       A.  Could you -- could you repeat the question
14   please.
15       Q.  Dr. Gupta, not focusing on today's
16   deposition, you have been retained as an expert
17   consultant for opioid litigation in West Virginia,
18   correct?
19           MR. COLANTONIO:  In the MLP, yes.
20       Q.  Dr. Gupta, if you can answer?
21           VIDEO OPERATOR:  Now begins Media Unit
22   6 in the deposition of Rahul Gupta, M.D.  We're
23   back on the record.  The time is 3:10 p.m.
24   BY MS. JINDAL:

Page 228

1        Q.  Doctor Gupta, you've been retained as an
2    expert consultant for opioid litigation in West
3    Virginia, correct?
4        A.  I'm looking at -- because I've been asked
5    for this deposition and --
6            (A discussion was had off the record
7            regarding the court reporter having
8            been disconnected.)
9        A.  Could you -- could you repeat the question
10   please.
11       Q.  Dr. Gupta, not focusing on today's
12   deposition, you have been retained as an expert
13   consultant for opioid litigation in West Virginia,
14   correct?
15           MR. COLANTONIO:  In the MLP, yes.
16       Q.  Dr. Gupta, if you can answer?
17           THE COURT REPORTER:  Are we back on
18   the record and I missed that piece. Did Adam put us
19   back on the record.
20           VIDEO OPERATOR:  We never went off the
21   record but we heard you when your phone audio cut
22   and so we just paused and we've been waiting.
23           THE COURT REPORTER:  Okay.  I'm sorry.
24       A.  So, yes for MLP and, yes.

Page 229

1    Q.  By Mr. Colantonio's firm?
2        MR. COLANTONIO:  Yes.  And Napoli
3  Shkolnik as well.
4    A.  Napoli Shkolnik.
5    Q.  In addition to Mr. Colantonio's firm?
6    A.  Yes.
7    Q.  And are you being paid for that work?
8    A.  I have received -- yes.
9    Q.  By the hour?
10   A.  Yes.
11   Q.  How much per hour?
12   A.  I believe it's $500.
13   Q.  And the opinions that you've expressed in
14 your testimony today, are those opinions that you
15 provided in the course of your expert consulting
16 for Mr. Colantonio's firm?
17       MR. COLANTONIO:  No, he has not.
18   A.  No.  It's -- I'm providing because I was
19 asked to be -- I was asked -- I was provided a
20 subpoena and I was asked to be deposed today.
21   Q.  Well, I'm not asking why you're testifying
22 today, sir.  I'm asking whether the opinions that
23 you have expressed today in your deposition
24 testimony are also ones that you've provided in the

Page 230

1  course of your consulting, expert consulting, for
2  Mr. Colantonio's firm.
3        MR. COLANTONIO:  So let me just place
4  an objection.  So this -- we are in state court in
5  West Virginia.  The state court in West Virginia,
6  as a consultant, I don't believe you're entitled to
7  obtain information about his opinions as a
8  consultant.
9        We've not yet identified trial experts.
10 And so if he does become a trial expert, at that
11 point you will be able to find that out.  But at
12 this point, he's a consultant, and so I want to
13 have a continuing objection about that, and I'm not
14 sure - given the overlay of this deposition in
15 federal court - how that would play out
16 procedurally, but I don't believe you're entitled
17 to inquire in state court in the litigation at this
18 point because he's a consultant, not identified as
19 a trial expert, testifying expert, yet so you can't
20 inquire into those areas.
21       MR. SHKOLNIK:  This is Hunter
22 Shkolnik.  I'm also on this deposition.  I'm
23 objecting because under the Federal Rules, 26, you
24 are not entitled to any information about a

Page 231

1  retained consultant until they're a designated
2  expert, and I'm directing him not to answer, and
3  I'll make the motion in federal -- I'll go to
4  federal court and argue that.
5        MR. RUBY:  He is a -- he has - and I
6  did confirm this over the break - been designated
7  as an expert in this case.
8        He's been evidently retained as a paid
9  expert by counsel for the plaintiffs in this case,
10 and --
11       MR. COLANTONIO:  No, no.  Hey, Steve,
12 that's not correct.  Let me make sure -- let me
13 tell you exactly what the -- what this is, okay,
14 just so we're clear.
15       He has not -- hc has been retained as a
16 paid expert consultant in the MLP case, okay?
17       He has not been retained as an expert,
18 paid expert, or a retained expert in the federal
19 case.  As I understand it, he is a nonretained
20 expert in the federal case.
21       He is a retained consultant in the
22 state MLP case, which I think Hunter is correct,
23 does not entitle you to get into what we're talking
24 about in the state case because he's a consultant

Page 232

1  at this point, not identified as trial testifying
2  expert.
3        But he's not -- he's not been retained
4  as a -- as a retained expert in the federal case.
5        MR. RUBY:  No, I understand the
6  distinction that's being attempted, but --
7        MR. COLANTONIO:  No, it's a fact.
8  That's a fact.  That's not being attempted.  That's
9  what it is.
10       MR. FITZSIMMONS:  Let me just put it
11 on the record, let's move on.  Come on.  Let's move
12 on, let's go.
13       MR. RUBY:  Well, I -- there's a --
14 there's a question -- the problem, Bob, is that
15 there's a question pending and Mr. Shkolnik has
16 instructed him not to answer.
17       MR. FITZSIMMONS:  Okay.  So that -- so
18 we can move on from there.
19       MR. RUBY:  No, I think we -- I'm
20 trying to work this out before we have to call
21 Judge Wilkes --
22       MR. COLANTONIO:  Let me make sure I'm
23 clear.  So it's a timing issue.  He was retained as
24 a consultant in the MLP case before you guys issued

Page 233

1   a subpoena, all right?  So, I mean, your subpoena
2   is with -- what brought him here, not nothing else
3   but your subpoena.
4            So I mean, it is what it is.  He
5   responded to subpoena, and so that's what brought
6   him here, nothing else.  And if you hadn't issued a
7   subpoena, we wouldn't be here and this wouldn't be
8   an issue.
9            MR. FITZSIMMONS:  Right.
10           MR. RUBY:  No, no, no, we're here and
11  we issued a subpoena because he -- because he was
12  on plaintiffs' initial list of witnesses, and as
13  has already been pointed out, he's disclosed as --
14           MR. FITZSIMMONS:  Whatever.
15           MR. RUBY:  -- he's disclosed as an
16  expert in this case, as a nonretained expert in
17  this case, and yet he's being paid under a retainer
18  agreement by counsel for the plaintiffs in this
19  case, and so --
20           MR. COLANTONIO:  He's not being paid
21  by -- in this case.  He's not being paid in this
22  case.  You can ask him that.
23           MS. KEARSE:  Just to be clear, it's
24  clear in our disclosure that he's an unretained

Page 234

1   expert.  While his testimony will be very factual
2   in nature, there could be information that may be
3   considered expert testimony based on his
4   experiences and his work, so that's why it's under
5   Rule 26(a)(2)(C) that we have disclosed him as an
6   unretained expert in addition to a witness with
7   knowledge in regards to the issues in the federal
8   case.
9            MR. RUBY:  And he's being paid in a
10  different case where he's a consultant for counsel
11  who are also counsel for plaintiffs in this case.
12  Is that correct?  Is that the position?
13           MR. COLANTONIO:  That's true.  But it's
14  a different case.
15           MR. RUBY:  And the question --
16           MS. KEARSE:  I want to clarify it to
17  the -- I'm not -- I do not know in the MLP case on
18  behalf of my Motley Rice clients on what that
19  relationship is.  There may be some other cases
20  that have formerly retained him.
21           We are all in the MLP, but I, as
22  counsel for the City of Huntington, I just don't
23  think it would be correct to say that plaintiffs'
24  counsel, that is, the City of Huntington and Cabell

Page 235

1   County in this case, have retained him in the other
2   case.
3            That may be a down-the-road case and I
4   would have to talk with Mr. Colantonio about that
5   as well, just for clarity's sake on that.
6            MR. RUBY:  And I think the -- just so
7   we're all clear, I think the question that is
8   pending, the question that's on the floor, is
9   whether the opinions to which he's testified today
10  are opinions that he has provided in his retained
11  engagement in other West Virginia opioid
12  litigation.
13           MR. COLANTONIO:  Are we on the record
14  or off the record, by the way?
15           MR. RUBY:  We're on.
16           MR. COLANTONIO:  I'm sorry, on or off?
17           MR. RUBY:  I don't think anybody's
18  taken us off.  And we'd like to stay on for this
19  discussion.
20           MR. COLANTONIO:  Okay, that's fine.
21  Well, whatever, Bob.  Is there a question pending?
22           MR. RUBY:  Yes.
23           MR. FITZSIMMONS:  What's the question?
24           MR. RUBY:  Teresa, are you able to go

Page 236

1   that far back?
2            THE COURT REPORTER:  Sure.  Yes.
3            "And the opinions that you have
4   expressed in your testimony today are those
5   opinions that you provided in the course of your
6   expert consulting for Mr. Colantonio's firm?"
7            MR. COLANTONIO:  And I think at that
8   point -- Hunter, are you instructing him not to
9   answer?
10           MR. FITZSIMMONS:  He is.
11           MR. SHKOLNIK:  Yes, because first of
12  all he's not retained by any firms other than ours,
13  not Motley Rice or anybody else, and under the
14  federal rules, he does not have to be giving
15  answers as a retained consulting expert as to what
16  he's considered, done, his opinions or anything
17  along those lines.
18           MR. RUBY:  And the problem --
19           MR. SHKOLNIK:  And just so -- wait.
20  The problem is, the question specifically asks,
21  what did you do in the MLP case for my firm and the
22  Colantonio firm, and that's the inappropriate
23  question.
24           If you rephrase the question, it may be

Page 237

```
1    appropriate.
2         MR. RUBY:  The question doesn't say
3    anything about the MLP; the question is about
4    Mr. Colantonio's firm, which is counsel for the
5    plaintiffs in the case in which this deposition is
6    being taken.
7         MR. SHKOLNIK:  No, that's not the
8    question.  Read it back again.
9         MS. KEARSE:  We clarified that.
10        MR. COLANTONIO:  The question was:
11   Did you provide these opinions in the other case in
12   which we retained him, and that's -- that's what
13   Hunter's saying.  That's the question.  You're
14   asking for whether or not --
15        MR. SHKOLNIK:  It's under the federal
16   rules of civil procedure.
17        MR. COLANTONIO:  -- in the other case.
18   That gets into the other case.
19        MR. RUBY:  And so -- well, if -- just
20   let me make sure I understand.  If your -- if your
21   position is that we can't ask whether he's provided
22   these opinions as part of his retained
23   engagement --
24        MR. COLANTONIO:  -- in the MLP --
```

Page 238

```
1         MR. FITZSIMMONS:  Why don't you just
2    have, Steve -- have Jyoti answer the question
3    again.  Let's go from there.
4         MR. RUBY:  Jyoti, go ahead.
5         MS. JINDAL:  Sure.
6    BY MS. JINDAL:
7         Q.  The opinions that you expressed in your
8    testimony today, are those opinions that you
9    provided in the course of your expert consulting
10   for Mr. Colantonio's firm?
11        MR. FITZSIMMONS:  Mark.
12        MR. COLANTONIO:  Hunter, are
13   you instructing him not to answer?  Is Hunter on
14   there?
15        MR. SHKOLNIK:  Yeah, I'm here.  That
16   question, is it something they gave to
17   Mr. Colantonio's firm, I think that's privileged.
18   We're his counsel for this deposition.
19        MR. RUBY:  Oh, come on.  He's your
20   expert and your client so everything you discuss
21   with him as an expert is privileged?
22        MR. SHKOLNIK:  Until he's a designated
23   expert in litigation, yes.
24        In our litigation.
```

Page 239

```
1         MR. RUBY:  His relationship with your
2    firm, Hunter, I think is different from your
3    relationship with Mark's because you haven't
4    appeared as counsel for the plaintiffs in this
5    case, but the Fitzsimmons firm has, and he is a
6    disclosed expert in this case, in which Mark and
7    Bob are counsel for plaintiffs.
8         MS. KEARSE:  And I think I clarified
9    earlier, Mr. Colantonio has appeared, I believe,
10   his firm, on some depositions on there, but
11   Mr. Colantonio's firm does not represent the City
12   of Huntington.  No, they --
13        MR. RUBY:  They've noticed an
14   appearance for the City of Huntington.  I mean, you
15   can't notice an appearance for a specific
16   deposition and say "We're only representing you in
17   this deposition."
18        MS. KEARSE:  Well, there are certain
19   depositions in the ML -- in the MDL versus the MLP
20   that they've appeared, some third-party
21   depositions, and I understand on behalf of the
22   Prosecutor's Office in Cabell County.
23        MR. RUBY:  That was -- that's
24   different.  My understanding is they were
```

Page 240

```
1    representing the Prosecutor's Office there.  But
2    they filed -- they have appeared as counsel for
3    plaintiffs, Cabell County Commission and City of
4    Huntington, in this case.
5         MR. FITZSIMMONS:  Hey, Steve, this is
6    Bob.  Do you mind if we just take a moment -- we'll
7    step out.  Do you mind if we actually talk to our
8    client at this point?  Because we're talking about
9    privilege here and it gets a little -- the
10   designation with Hunter --
11        MR. RUBY:  Sure, that's fine.
12        MR. FITZSIMMONS:  -- resolve this for
13   a second.
14        MR. RUBY:  Yeah, let's go off the
15   record.
16        MR. FITZSIMMONS:  Okay.
17        VIDEO OPERATOR:  Going off the record.
18   The time is 3:25 p.m.
19        (A recess was taken after which the
20        proceedings continued as follows:)
21        VIDEO OPERATOR:  Now begins Media Unit
22   7 in the deposition of Rahul Gupta, M.D.  We are
23   back on the record.  The time is 3:29 p.m.
24   BY MS. JINDAL:
```

Page 241

1    Q.   Doctor Gupta, the opinions that you
2    expressed in your testimony today, are those
3    opinions that you've provided in the course of your
4    expert consulting for Mr. Colantonio's firm?
5        A.   No.
6        Q.   And did Mr. Colantonio approach you to
7    serve as an expert consultant for opioid litigation
8    in West Virginia?
9        A.   No.
10       Q.   Apologies.  Did someone from
11   Mr. Colantonio's firm approach you to serve as an
12   expert consultant for opioid litigation in West
13   Virginia?
14       A.   No.
15       Q.   Who approached you to serve as an expert
16   consultant for opioid litigation in West Virginia?
17       A.   I am not sure that I -- I've been
18   approached to serve as expert consultant in West
19   Virginia.  I mean, I am sorry, I'm not a legal
20   person, as I said at the very beginning, so various
21   cases, I don't --
22       Q.   Let me try to make myself more clear.  Who
23   did you -- who first contacted you about serving as
24   an expert consultant for opioid litigation

Page 242

1    regarding the opioid crisis in West Virginia?
2        A.   I think I spoke with Hunter a bit back and
3    we had talked about, and I really -- you know, it's
4    been a long time, but I did not really have the
5    time for quite a bit to be able to do any work
6    beyond --
7            So we had a good discussion.  I
8    listened to him and said I will just, you know,
9    make a decision based on being available and time
10   and other things.
11           So that's basically where I think, you
12   know, my work or my agreements or talks have been,
13   with mostly Hunter.
14       Q.   And that's Mr. Hunter, the Hunter you're
15   referring to, that's of Hunter Shkolnik, the firm?
16       A.   Yes, Hunter Shkolnik.
17       Q.   The firm Hunter & Napolini, I believe -- or
18   I'm sorry, Shkolnik Napolini.
19       MR. GOOLD:  I believe it's Napoli.
20       MS. JINDAL:  Sorry, Napoli.  I
21   apologize.  You see it so many times on e-mails
22   that you don't actually read it after a while so --
23   BY MS. JINDAL:
24       Q.   Doctor, you were asked about a social

Page 243

1    autopsy; is that right?
2        A.   Yes.
3        Q.   And that refers to the 2016 fatality
4    overdose analysis that your team at the West
5    Virginia Bureau for Public Health conducted,
6    correct?
7        A.   Yes.
8        Q.   And the purpose of that study was to
9    identify causes of overdose deaths.  Correct?
10       A.   The purpose of the work was to understand
11   better the factors associated with people that
12   result in death, but the entire consequence of a
13   period of time by one year prior to their death, to
14   better understand their characteristics.
15       Q.   And was it all deaths or just opioid
16   deaths?
17       A.   This was all deaths from overdose in 2016
18   in the state of West Virginia.
19       Q.   So that includes prescription opioids, for
20   example?
21       A.   Yes.
22       Q.   It also includes heroin, for example?
23       A.   It could.
24       Q.   Does it also include overdose deaths where

Page 244

1    methamphetamines was used?
2        A.   It could.
3        Q.   Almost every overdose death involves
4    multiple substances, correct?
5        A.   Not necessarily.
6        Q.   You're right.  I used the word -- sorry.
7            Doctor, if you could turn back to that
8    Exhibit 54.
9        A.   That's the presentation?
10       Q.   Yes.  State of Health on October 26, 2018.
11       A.   I have it.
12       Q.   Okay.  Could you please turn to Slide 17?
13   And that ends with Bates No. 0936.
14       A.   Yes.
15       Q.   Okay.  And does this slide reflect the fact
16   that most overdoses include multiple drugs?
17       A.   I'm reviewing it.
18           So the slide we're looking at really
19   involves the average number of drugs per fatal
20   overdose.  That is very different than the
21   statement that you provided me.  What this means is
22   that it could be out of 100, that one person could
23   have 100 substances and we could call it -- there's
24   -- and the other 99 would have a total of 100

Page 245

1   substances, and we could say, "Well, it's two
2   substances per person" because we added up and
3   divided by 100.
4        Or it could be that the other 100 could
5   have two each rather than having 100 substances in
6   one person.  So I don't think this slide provides
7   adequate evidence to make the claim as has been
8   stated.
9        Q.   Focusing just on the time period from 2001
10  to 2013 there, is there a general trend --
11        I'm sorry.  Focusing on the dark blue
12  box that's on that slide - it's written "2001" to
13  "2017 Percentage Difference:"  Plus "16.9%" - does
14  that reflect an average trend upward in the number
15  of average drugs -- in the average number of drugs
16  involved in per fatal overdose over that time period?
17        A.   Yes, from 2001 to 2017, if you look at the
18  numbers above the blue bar, you will see in 2001,
19  it says, "2.32."  And in 2017, you see it says
20  "2.79."  If you subtract the two and you get a
21  number and you divide it by 2.32 and multiply that
22  by 100, I believe you will arrive at the number of
23  16.9 percent.
24        Now, simplistically looking at that,

Page 246

1   we'll ignore the fact that these values peaked in
2   2012 and '13 and '14, and there have been a
3   crescendo effect.
4        Q.   And the average increase per year is
5   identified as 1 percent.  Am I reading that
6   correctly?
7        A.   You're reading that correctly.
8        Once again, that's 17 years and 17
9   percent, so the average becomes 1 percent per year.
10        Q.   Going back to the 2016 autopsy report that
11  you were discussing, did that report say anything
12  about wholesale distributors?
13        A.   I don't have the report in front of me.  I
14  did submit that, so I am not able to collect --
15  recollect that information right off -- right now,
16  without reviewing the report.
17        Q.   Sure.  I think it's Exhibit 37.
18        GUPTA DEPOSITION EXHIBIT NO. 37
19        (E-mail chain between Melton, Gupta
20        and others Re: Overdose Death
21        Investigations dated 3-26&27-18 with
22        2016 West Virginia Overdose Fatality
23        Analysis attached
24        (DHHR_FEDWV_0317258-322) was marked

Page 247

1        for identification purposes as Gupta
2        Deposition Exhibit No. 37.)
3        A.   It will take me a little bit of time to
4   review this.
5        Q.   And Doctor, you're welcome to review it at
6   your pace.  But I will represent to you that it
7   does not include the word "wholesale distributors"
8   in there.
9        A.   I will -- I will believe you at this point
10  and concede at that point without having to fully
11  review the report.
12        Q.   Sure.  You said that many people who died
13  of drug overdoses had filled prescriptions for
14  controlled substances in the 30 days before they
15  died?
16        A.   Yes.
17        Q.   And were those prescriptions written by a
18  physician?
19        A.   I would make an assumption that those
20  prescriptions were provided by prescribers.
21        Q.   I apologize.  You've always got me on that.
22  I appreciate it.
23        Were those prescriptions written by
24  prescribers?

Page 248

1        A.   I cannot be as certain of that - I can make
2   an assumption - but if there were any fraudulent
3   prescriptions, I could not -- I could not tell you
4   in a verified way.
5        Q.   So as far as assuming that the
6   prescriptions were written by prescribers and did
7   not include fraudulent prescribe -- prescriptions,
8   were the prescribers -- they would have been
9   licensed by the state of Virginia, correct?
10        MR. COLANTONIO:  Object to the form of
11  the question.
12        A.   It is possible, plausible, but not for
13  sure.  And the reason I say that is because what I
14  -- we found was that those decedents who went to
15  three or more pharmacies -- four or more
16  pharmacies, were 70 times -- I'm sorry, were 70
17  times more likely to have died.
18        What that means is -- so let me repeat
19  that.  So it says here, the decedents that were
20  more -- 70 more times likely to have a prescription
21  as four more pharmacies that died.
22        What that means is because we were
23  sharing data with CSMP with cross border states,
24  some could have obtained it in doctor shopping,

Page 249

1  diverted prescriptions from elsewhere, but the data
2  did come from CSMP.
3      I cannot validate whether they were
4  exclusively West Virginia prescriptions.
5      Q.  I see.  Would the prescribers have been
6  licensed by a state, if not West Virginia?
7      A.  I would hope so.
8      Q.  And they would have also have had to have
9  been registered with the DEA, correct?
10     A.  Similarly, I would hope so.
11     Q.  Okay.  And did you do any -- did you
12  identify any physicians who wrote those
13  prescriptions -- I'm sorry, any prescribers who
14  wrote those prescriptions without being licensed?
15     A.  Our study was -- and work was not intended
16  to study and look at the licensure aspects of
17  prescribers.
18     Q.  So the answer is no, you didn't review the
19  -- because you did not review the licensure of the
20  physicians in the database, you don't -- you did
21  not identify any who were not licensed.
22         MR. COLANTONIO:  Object to the form.
23     A.  It was not the purpose of the study that --
24  I already testified to the purpose of the study, so

Page 250

1  it does not -- the answer does not conform -- the
2  question does not conform to what I have already
3  stated.
4      Q.  You testified that you started to develop
5  an understanding of the overdose problem when you
6  got better access to the controlled substances
7  program -- monitoring program data.  Is that
8  correct?
9      A.  That would be accurate.
10     Q.  Wholesale distributors don't have access to
11  the data in the CSMP, correct?
12     A.  I have no knowledge to verify that.
13     Q.  You did testify that access to the CSMP is
14  regulated, correct?
15     A.  Correct.
16     Q.  And it's not something that anyone has
17  access to, right?
18         MR. COLANTONIO:  Object to the form.
19     A.  It is not something that's open as a public
20  database.  That's the way to answer it.
21     Q.  And in fact, you, as a Commissioner for the
22  Bureau of Public Health, did not have access to the
23  CSMP, correct?
24     A.  The Bureau of Public Health did

Page 251

1  subsequently have access to it.
2      Q.  At the time you started, you did not have
3  access, correct?
4      A.  I don't know that for sure.  The work --
5  when we did this work, we did have access to the
6  CSMP.  I cannot tell -- say for certainty that in
7  2015 I personally, as Commissioner, did or did not
8  have access to the CSMP for the purposes of what we
9  call fishing.
10     I am reasonably certain in my statement
11  that I did not have authority to go fishing inside
12  the database of the West Virginia's Controlled
13  Substances Monitoring Program.
14     Q.  And I suppose I'm referring to your
15  testimony earlier today, that you had to embed
16  somebody within the Board of Pharmacy to gain
17  access to the CSMP data, correct?
18     A.  We embedded Board of Pharmacy employee into
19  the Bureau for Public Health - that was in
20  accordance with the law at the time - to be able to
21  conduct public health surveillance activities, in
22  the due process of which we're able to access some
23  of the queries that we had.
24     Q.  So again, it was only a Board of Pharmacy

Page 252

1  employee who was able to access the CSMP data in
2  that?
3      A.  That would be accurate.
4      Q.  You testified also that the medical
5  examiner's office had bullet holes in it, correct?
6      A.  Correct.
7      Q.  Is it your testimony that those bullet
8  holes had something to do with opioids?
9          MR. COLANTONIO:  Object to the form.
10     A.  I wanted to -- before I answer that
11  question, I also want to say:  So in my capacity as
12  a licensed physician and a registered prescriber, I
13  did have access to CSMP to interrogate the CSMP if
14  I were to for a patient.
15     I did not have the authority to fish or
16  interrogate CSMP for those who are not my personal
17  patients.  I just wanted to add that.
18     The bullet holes were a result of
19  violence; oftentimes the violence was a result of
20  individuals who were under the influence of various
21  drugs; and oftentimes those drugs included opioids.
22     Q.  Do you know whether the individual who put
23  bullet holes in the medical examiner's office was
24  under the influence of opioids at the time?

Page 253

1     A.  I do not know who the individual was who
2   put the bullet holes in the Office of the Chief
3   Medical Examiner's office.
4     Q.  But do you know whether that individual --
5   without knowing their name, do you know whether
6   that individual was under the influence of opioids
7   at the time?
8     A.  If I do not know the identity of that
9   individual who shot through - whether it was a cop,
10   it was a criminal or somebody under the influence -
11   there's no way for me to make a judgment as to what
12   they were under the influence of.
13     Q.  The IV drug use problem that you mentioned,
14   that's related to the use of nonprescription drugs,
15   correct?
16     A.  Could you repeat that question, please?
17     Q.  Uh-huh.  You --
18       MS. JINDAL:  Ms. Evans, if you could
19   read it back.
20       THE COURT REPORTER:  "The IV drug use
21   problem that you mentioned, that's related to the
22   use of nonprescription drugs, correct?"
23     A.  The IV drug use problem was an evolution of
24   the prescription drug problem.

Page 254

1     Q.  And users -- individuals who inject these
2   drugs, they are -- IV use is primarily associated
3   with heroin.  Is that right?
4     A.  It could be used with heroin, although we
5   have seen that evolve into being cut with fentanyl
6   and other substances as well.
7     Q.  Someone who's just using prescription drugs
8   is unlikely to be using -- is unlikely to be
9   injecting that; is that right?
10       MS. KEARSE:  Object to form.
11     A.  Not necessarily.
12     Q.  Doctor, if you could turn to Exhibit 38.
13       GUPTA DEPOSITION EXHIBIT NO. 38
14       (Gupta testimony before the House
15       Oversight and Government Reform
16       Committee entitled "A Sustainable
17       Solution to the Evolving Opioid
18       Crisis:  Revitalizing the Office of
19       National Drug Control Policy" dated
20       5-17-18 (DHHR_FEDWV_0391628-651) was
21       marked for identification purposes as
22       Gupta Deposition Exhibit No. 38.)
23     A.  I have it.
24     Q.  And I know, Doctor, you're not on that

Page 255

1   cover e-mail.  I'd like you to focus on the
2   attachment that begins on page 1630 -- or the Bates
3   -- I'm sorry, the Bates, the last four numbers are
4   1630.
5     A.  I have it.
6     Q.  Okay.  And I point that out just to reflect
7   that this document that begins on Bates stamp
8   DHHR_FEDWV_0391630 is an attachment to the cover
9   e-mail dated December 20th, 2019 from Carolyn
10   Mullen to Christina Mullins.
11       Do you see that, Doctor?
12     A.  Yes.  No relation between the two Mullins.
13     Q.  Right.  And the document that ends with the
14   Bates stamp 1630, are you familiar with this?
15     A.  Yes.
16     Q.  What is it?
17     A.  It's my testimony to the House Oversight
18   and Government Reform Committee in Congress on May
19   17, 2018.
20     Q.  And did you give this testimony as a part
21   of a hearing titled "A Sustainable Solution to the
22   Evolving Opioid Crisis: Revitalizing the Office of
23   National Drug Control Policy?"
24     A.  Yes.

Page 256

1     Q.  Could you turn to page 3 of this testimony,
2   the Bates stamp that ends in 1632?
3     A.  Okay.
4     Q.  And I'm going to read from the penultimate
5   paragraph on this page.  It begins, "The opioid
6   crisis is evolving."  Do you see that?
7     A.  I see it.
8     Q.  Okay.  You write, "The opiate crisis is
9   evolving -- illicit fentanyl and other synthetic
10   opioids are the major driver of overdose deaths in
11   many parts of the country now.  While the opioid
12   crisis is not just a criminal justice issue, we
13   must support and strengthen the role of law
14   enforcement to address the supply of illicit
15   fentanyl, as well as other emerging illicit drugs.
16   Overdose deaths are increasingly being associated
17   with methamphetamine, indicating that a
18   comprehensive approach to all illicit substances,
19   that include law enforcement and health agencies,
20   is needed."
21       Did I read that correctly?
22     A.  Yes.
23     Q.  Do you still agree with the statement?
24     A.  I think in the context of my testimony,

Page 257

1 including the first two and a half pages, I do
2 agree with the statement. At the time.
3       Q.  And the defendants in this case don't
4 distribute heroin, do they?
5       A.  Not to my knowledge.
6       Q.  And they don't distribute illicitly
7 manufactured fentanyl, do they?
8       A.  I have never received any reports of such.
9       Q.  And they don't distribute methamphetamine,
10 correct?
11      A.  I'm not sure about that one.
12      Q.  They don't distribute illicit
13 methamphetamine, correct?
14      A.  Excuse me.  Illicit methamphetamine could
15 be produced through some other pharmaceutical
16 products that are available over the counter, which
17 the distributors may be distributing that I'm not
18 aware of.
19      Q.  Okay.  But in this -- in the context of
20 your testimony here, were you referring to over-the
21 -- not over-the-counter, but were you referring to
22 controlled substances that are also stimulants?  Or
23 were you referring to illicit methamphetamine?
24      A.  I was referring to methamphetamine which

Page 258

1 tends to be illicit, but it can be developed from
2 licit drugs, as well as in factories in Mexico.
3       So it could be developed -- illicit
4 methamphetamine could be developed through licit or
5 illicit routes.
6       Q.  Are you aware of defendants in this case
7 developing licit methamphetamine?
8       A.  I'm aware of over-the-counter products,
9 pharmaceutical products, that can lead individuals
10 to generate methamphetamine -- methamphetamine, and
11 my depth of knowledge does not lead for me to know
12 one way or the other if the defendants were
13 distributors for those products.
14      Q.  You're referring to codeine, for example,
15 like Sudafed.
16      A.  Yes.
17      Q.  Okay.  So setting aside precursor chemicals
18 for methamphetamine, are you aware of wholesale
19 distributors distributing methamphetamine, the drug
20 itself, in the form to be used by someone for the
21 purposes of obtaining a high?
22      A.  Not that I'm aware of.
23      Q.  Thank you.  You testified that the change
24 in the standard of care for opioids started with a

Page 259

1 change in the standard of care for treatment of
2 pain, and you also mentioned that, for example, the
3 Joint Commission and the American Pain Society
4 promoted that change.
5       Is that correct?
6       A.  Yes.
7       Q.  What prompted that change?
8       A.  Are you asking me to hypothesize?
9       Q.  No.  As far as you know, what prompted the
10 change in the standard of care for treatment of
11 pain and prescription of opioids?  Prescribing of
12 opioids, excuse me.
13      A.  I think in the medical community, there's a
14 general consensus that the approval of OxyContin in
15 the few years prior to that was an -- a factor in
16 prompting that change.  But I'm not aware of any
17 specific indications for what prompted the change.
18      Q.  And are you aware of any evidence that
19 distributors played any role in that?
20      A.  No.
21      Q.  You testified that a significant part of
22 the volume that was coming in was inappropriate.
23 Correct?
24      A.  Could you please repeat?  I missed one

Page 260

1 word.
2       Q.  Uh-huh.  You testified earlier today that a
3 significant part of the volume that was coming in
4 was inappropriate.  Correct?
5       A.  I testified that the significant amount of
6 prescriptions that were being provided for opioids
7 were inappropriate.
8       Q.  In what way were they inappropriate?
9       A.  They were inappropriate because they were
10 either unnecessary or they were being diverted.  Or
11 they were unnecessary that led to diversion.
12      Q.  In taking the first set - you said the ones
13 that were unnecessary - did the prescribers who
14 wrote them know that those prescriptions were
15 unnecessary?
16      A.  It's hard for me to state that if every one
17 of those prescribers, whether they knew or did not
18 know.  That's where the context of change in
19 standards of care for pain come into play.
20      So if a dentist wrote someone a 30 days
21 of opioid prescription, that's clearly unnecessary.
22      If a 17-year-old kid got a football
23 ankle sprain and got three months of Lortabs,
24 that's clearly unnecessary.

Page 261

1    Whether the writer of that prescription
2  knew about that or not, I do not know for each one
3  of those prescribers across the United States or
4  for West Virginia or for Huntington, West Virginia.
5    Q.  So your categorization of them as
6  unnecessary is based on your retrospective review?
7    A.  Both retrospective and prospective, because
8  I was not one of those physicians when I was
9  practicing that was writing that volume of
10  prescriptions for those particular indications.
11    Q.  And did the physicians who wrote -- or the
12  prescribers who wrote these prescriptions that you
13  categorize as unnecessary, did they know that the
14  standard of care was wrong?
15    MR. COLANTONIO:  Object to the form of
16  the question.
17    A.  It's hard for me to say what they were
18  thinking and what they felt, how they felt about
19  this changing standard of care for pain.
20    Q.  Is that also your answer for the categories
21  that you said were unnecessary but led to
22  diversion?
23    MR. COLANTONIO:  Object to the form.
24    A.  Could you restate the question?

Page 262

1    Q.  Sure.  You identified three categories of
2  ways that you can identify prescriptions that were
3  inappropriate.  You said some were unnecessary;
4  some were diverted; and some were unnecessary that
5  led to diversion.
6    Correct?
7    A.  Yes.
8    Q.  So your perspective that you don't know
9  whether the prescribers who wrote the unnecessary
10  prescriptions, whether they knew that the
11  prescriptions were unnecessary or that they knew
12  that the standard of care was wrong, does that
13  equally apply to the ones that wrote unnecessary
14  prescriptions that led to diversion?
15    Let me -- let me maybe rephrase that a
16  little bit.  The prescribers who wrote
17  prescriptions that were unnecessary that led to
18  diversion, did they know that those prescriptions
19  were gonna be diverted at the time they wrote them?
20    A.  So I think they -- it's impossible to
21  categorize the entire prescribers in the United
22  States - or for that matter, West Virginia - in one
23  box.  I think the fact of the matter is, to be
24  frank and honest, that we had some bad docs and bad

Page 263

1  prescribers.  They clearly knew what they were
2  doing.
3    And we have others that were of the
4  category that they were taking a reasonable,
5  prudent approach as from evidence-based care.
6    And the third category that felt that
7  what they were doing what they could to help the
8  patients.
9    And in a change of standard of care
10  scenario, they felt that they could give more
11  prescriptions and they were being told these
12  prescriptions were safe and they are helpful and
13  they could get sued if they didn't do that, and
14  they were just trying to help people at the end --
15  bottom -- end of the day.
16    So I think we do have to start to look
17  at prescribers differently based on those
18  intentions.  So that was my answer.
19    Q.  And the prescribers who are just trying to
20  do the best by their patients, would you say that
21  they were prescribing those opioids in good faith?
22    A.  I would say in the environment of changed
23  standards of care for pain, they were prescribing
24  -- for some, it was in good faith and helping.  For

Page 264

1  others, it was making sure not getting sued or
2  being -- being regulated for the Board of Medicine
3  for the full management of pain.
4    And still others, they were ensuring
5  that - for example, in hospitals, when I was a
6  hospitalist - that you're making sure that if
7  people are -- you know, to the extent possible,
8  having adequate controlling of pain, but also then
9  there were colleagues of mine that were looking at
10  the pain scales, the happy faces, and ensuring that
11  everybody had a little nice sticker with a happy
12  face on them.
13    Q.  And is it your testimony that 80 percent or
14  more of the prescriptions that physicians wrote in
15  West Virginia were inappropriate?
16    A.  Over a period of time, yes.
17    Q.  What period of time is that?
18    A.  I would say you start to look at that from
19  2001, and clearly it starts to rise slowly.  In
20  about 2006, I think it was about 130 prescriptions
21  per 100 people - man, woman, child, infant - and
22  then, you know, peaking perhaps around 2012 and
23  then starting to decline.
24    So if you look at it over the period of

Page 265

1 time -- that period of time, that would be my
2 estimate.
3    Q.  So 2001 to 2012?
4    A.  I think it was with a -- with a gradual
5 rise.  Between 2006 and 2012, clearly.  That would
6 be my testimony.
7    Q.  I'm sorry, so I just want to be clear.  Is
8 it your testimony that 80 percent or more of the
9 prescriptions that physicians wrote during 2006 to
10 2012 were inappropriate?
11    A.  That would be my testimony.
12    Q.  Okay.  2006 to 2012.  Should pharmacies
13 have refused to fill those prescriptions?
14    A.  So the pharmacies, the distributors,
15 physicians, prescribers, everyone had a duty for
16 due diligence at the end of the day.
17       So everybody has a responsibility.
18 That's how our system is set up.  There's a
19 upstream responsibility which can actually prevent
20 and avoid a lot of the carnage downstream, and then
21 pharmacies are clearly part of the downstream
22 impact.  They also have a responsibility.  They
23 also have a level of impact.  So the answer is yes.
24    Q.  So your answer is yes, pharmacies should

Page 266

1 have refused to fill those prescriptions.
2       MR. COLANTONIO:  Object to form.
3    A.  The pharmacies should have conducted a due
4 diligence in filling any and all prescriptions,
5 just like the distributors should have as well.
6    Q.  All right.  And so is it your testimony
7 that distributors are presented with prescriptions?
8    A.  It's my testimony that the distributors are
9 part of the supply chain through which those
10 prescriptions are filled.
11    Q.  Is it -- are you saying the distributors
12 know what prescriptions are going to be filled when
13 they fill an order for prescription opioids placed
14 by a pharmacy?
15    A.  No.  What I'm saying is:  When hundreds of
16 millions of pills are being distributed across a
17 state with 1.8 million population, we should be
18 able to recognize that pattern clearly.
19       MS. JINDAL:  I'm going to move to
20 strike everything after "No" as nonresponsive.
21 Thank you.
22       MR. COLANTONIO:  Well --
23    Q.  Did you ever propose any action to reduce
24 the number of prescription opioids that a pharmacy

Page 267

1 could order?
2       MR. COLANTONIO:  Hold on a minute.
3 That -- I just want to make a comment.  He
4 responded to your question.  You may not like the
5 answer, but you asked a question and he responded
6 to it.
7       Go ahead.
8       MS. JINDAL:  Well, I'll leave that on
9 the record and we can fight about it another day.
10    Q.  Did you ever propose any action to reduce
11 the number of prescription opioids that a pharmacy
12 could order?
13       MR. COLANTONIO:  Object to the form.
14    A.  I'm sorry, pharmacies are not ordering
15 prescriptions, so I don't understand the context of
16 the question --
17    Q.  I'm sorry, I may have missed a word in my
18 question.  Did you ever propose any action to
19 reduce the number of prescription opioids that a
20 pharmacy could order?
21       MR. COLANTONIO:  Object to the form of
22 the question.
23    A.  I once again do not understand the question
24 real well, so if you could rephrase it for me,

Page 268

1 please.
2    Q.  When a pharmacy -- how does a pharmacy get
3 prescription opioids?
4       MR. COLANTONIO:  Object to the form of
5 the question.
6    A.  My understanding is that the pharmacy would
7 make the request to the distributor to provide the
8 supplies.
9    Q.  And did you ever consider legislation or
10 action that would reduce the number of -- the
11 quantity of prescription opioids that a pharmacy
12 could request from a wholesale distributor at any
13 one time?
14       MR. COLANTONIO:  Object to the form of
15 the question.
16    A.  We did promulgate legislation that reduces
17 the amount of prescriptions including the initial
18 prescribing, which would lead to reduction in
19 pharmacies requesting supplies of opioids from
20 distributors.
21    Q.  I understand.  Separate and aside from what
22 you did with respect to what prescribers could
23 prescribe, did you ever propose any regulations
24 that would directly impact the number of

Page 269

1  prescriptions that a pharmacy could order --
2  prescription opioids that a pharmacy could order at
3  any one time?
4     A.  Our role to impact the amount of
5  prescriptions was by doing everything we could to
6  reduce the amount of prescriptions, and that's what
7  we did.  I still do not understand the question
8  that you're asking, so if you can restate that in
9  some other form, I'm happy to answer it.
10       I just don't --
11  Q.  Sure.
12     A.  I'm not sure --
13  Q.  We agreed that a pharmacy has to place an
14  order or request prescription opioids from a
15  wholesale distributor before it obtains them.
16  Correct?
17     A.  Yes.
18  Q.  And let's say a pharmacy places an order
19  for 10,000 prescription opioids for the month of
20  July 2007.
21     A.  Yes.
22  Q.  Okay.  Did you ever consider telling all
23  pharmacies in West Virginia -- regulating all
24  pharmacies in West Virginia and saying, "You cannot

Page 270

1  order more than 5,000 prescription opioids for any
2  month in any year"?
3       MR. COLANTONIO:  Object to the form of
4  the question.
5  Q.  Is that -- does that make the question
6  clearer?
7     A.  Yeah.  There is something called the
8  Controlled Substances Act that already requires the
9  distributors and pharmacists to ensure that their
10  suspicious orders that are monitored, raised,
11  investigated, quarantined.
12       Why would we do that when there was
13  already existing federal law to prevent that?
14  Q.  There is also existing federal law about --
15       MS. JINDAL:  Strike that.
16  Q.  Prescribers are also regulated by federal
17  law with respect to their prescribing of controlled
18  substances, correct?
19     A.  Yes.
20  Q.  They also have to be regulated by DEA,
21  correct?
22     A.  Yes.
23  Q.  And yet you still passed law that regulated
24  their conduct within the state of West Virginia,

Page 271

1  correct?
2       MR. COLANTONIO:  Object to the form of
3  the question.
4     A.  Yes.
5  Q.  So why does the fact that there is federal
6  law that also regulates the conduct of pharmacies
7  impact your decision whether or not to propose any
8  legislation with -- that would amount -- that would
9  regulate pharmacies under West Virginia law?
10       MR. COLANTONIO:  Object to the form of
11  the question.
12     A.  The law that we passed with respect to what
13  you're stating had to do with standards of care.
14  This was -- it was to align ourselves with CDC
15  recommendations, following CDC recommendations and
16  guidelines that came out.
17       We wanted to make sure we were aligned
18  with that, and it's about people of West Virginia.
19  It's about making sure that the people and the
20  residents of West Virginia are getting the highest
21  standard of care, and that's what that related --
22  the law was related to.
23       We expect that -- to do that.  That's
24  our responsibility.  Now, let's be clear.  It is

Page 272

1  not our responsibility to ensure that there's
2  enforcement of the federal law.  That's not our
3  job.  That's your job.  That's your client's job.
4       And we did everything we could to make
5  sure that the standards of care for health, for
6  medicine, were being held to the highest standards
7  possible, and that includes the CDC guidelines.
8       Now, when it comes to maintaining
9  suspicious orders - and I'll call them suspicious
10  orders - and adhering to rules and laws that
11  already exist, we depend on this relationship for
12  the system to function that we are all doing our
13  own respective jobs.  And that clearly wasn't the
14  case here.
15  Q.  If you had limited the number of
16  prescription opioids that a pharmacy could order,
17  then there's a certain percentage of prescriptions
18  that they would not have been able to fill.
19  Correct?
20       MR. COLANTONIO:  Object to form.
21     A.  That would be inherently unfair to the
22  citizens of West Virginia, because if you
23  understand a rural state like West Virginia, you
24  would understand that oftentimes -- and you

Page 273

1   yourself mentioned that we have an aging
2   population.  You mentioned yourself that we have a
3   disabled population.  50 percent higher than the
4   rest of the country.
5       And the last thing we want them to be
6   doing is driving 80 miles because the quota for
7   some pharmacy has been filled.  So this is a
8   balancing act, and we -- we really need all actors
9   to be working in good faith, to be doing their part
10  of the work.
11      If we have -- if we had one fix to all
12  solutions, believe me, we would have done it.
13  Everything that we could have done was on the
14  table.
15      But what happens -- or maybe -- what
16  states in policy, we have to make sure that at the
17  end of the day, we're not hurting the people of
18  West Virginia more than what they're already being
19  hurt.
20      So this is the reason why it was
21  important for all of us to do it our own
22  respectives -- to take on our own due diligence and
23  do our jobs.
24      That's my response.

Page 274

1       Q.  And you're not aware of the Board of
2   Pharmacy taking any action against wholesale
3   distributors for not doing their jobs, correct?
4       A.  I'm not aware, right.
5       Q.  You testified that the majority of heroin
6   use in West Virginia was caused by prescription
7   opioid use.  Correct?
8       A.  I testified that -- yes.
9       Q.  Is your evidence for that -- let me
10  rephrase.  What is your evidence for that?
11      A.  So if you see the pattern over the years in
12  my report, you will see that as prescription drugs
13  and prescriptions for that have fallen over the
14  years because of the incremental actions that have
15  been taken at state level, we did not see a
16  proportionate fall in overdose deaths.
17      We certainly did not see a fall in the
18  number of people who were having nonfatal
19  overdoses, as well as those who were having
20  addiction.
21      And at the same time, you'll see the
22  chart, the graph that demonstrates an increasing
23  utilization of heroin as well as synthetic opioids.
24  That's indisputable.

Page 275

1       Q.  And that -- does that "use of prescription
2   opioids" refer to use pursuant to a doctor or
3   another prescriber's prescription, or does that
4   refer to nonmedical use as well?
5       A.  It refers to the amount of volume of pills
6   that were there.  As they begin to dry up because
7   of all the incremental steps and mechanisms that
8   were put into place - so at the end of the day,
9   it's all about volume - as the volume starts to
10  decrease, the tap starts to turn off, we should see
11  a proportional declines in addiction and overdose
12  if it was a simple chart like that.
13      And that's why I mentioned evolving
14  crisis, because this crisis may have begun with the
15  prescription opioids, but it certainly has
16  continued to evolve.
17      Q.  And that evolution includes nonopioid such
18  as methamphetamine, correct?
19      A.  It has been a recent phenomena, and it is a
20  part of the evolution, and it is not only in Cabell
21  County, Huntington or West Virginia.  This is a
22  national trend that we're seeing, yes.
23      Q.  Is it your testimony that the -- that users
24  who use prescription opioids also transition to

Page 276

1   methamphetamines because they used prescription
2   opioids?
3       A.  They can transition to methamphetamine.
4   They can transition to heroin.  They can transition
5   to a lot of things.  If you allow me, I would like
6   to provide you a real life example.
7       I mentioned prior that I volunteer at a
8   charity clinic.  One of the patients that I saw was
9   a 72-year-old grandmother, and this woman was on
10  opioids, prescriptions, for her shingles for a long
11  time.
12      And as we turned the policy and turned
13  the corner, her physician refused to give her any
14  further prescriptions for opioids.  So as a result,
15  she began to take heroin.
16      Now, when I talked to her - she's my
17  patient - and I said, "Hey, can I help you?  How
18  can I help you?"  Her response was, "Listen, I
19  completely trust my drug dealer."  This is what she
20  said, she said, "I completely trust my drug dealer.
21  Yet when I -- I don't do my drugs every day.  But
22  when I do, I do -- I take three syringes.  I take
23  the first, a small trial dose, to make sure I don't
24  die.

Page 277

1    I take a little bit of higher dose,
2  inject, and if I'm still alive, then I take the
3  full bolus." She's afraid because of the
4  contamination with fentanyl, illicit fentanyl.
5  She's taking heroin.  And she has addiction, and
6  she has other problems.
7    But when I offer her to get treatment,
8  she doesn't want to go because she says, "I have my
9  son that lives with me.  He drops me here at the
10  free clinic, but if I go to a mental health clinic,
11  he's gonna wonder what's wrong with me."
12    So unfortunately, this is not a
13  theoretical issue for me.  This is a reality.  I've
14  seen these patients firsthand when they have
15  transitioned from prescription opioids and the
16  stigma and the suffering and the addiction that
17  goes.
18    And it is not limited to this one group
19  of people; it's an entire community that's being
20  destroyed as a result of this in West Virginia.
21    Q.  Right.  And I'm just trying to understand
22  the -- the transition that happened there, is that
23  due to the desire to -- what you -- the phrase you
24  used earlier, I believe, was "to get the monster

Page 278

1  off your back."  Is that -- the transition to
2  another -- let me rephrase.
3    The transition to another drug, is that
4  fueled by the disease of addiction, or is that
5  fueled by the nature of the previous drug that was
6  used?
7    A.  It's primarily fueled by addiction.  The
8  person is now in the grips of a disease, which is
9  substance use disorder, and they've got this
10  disease because of diverted opioids, prescription
11  medications, and now this addiction has gotten
12  ahold of them and they need to find somewhat to
13  continue to fuel the habit.
14    And it's really not a habit; it's a
15  disease.  And that's what drives them going on to a
16  cheaper affordable street alternative, which causes
17  - as I mentioned before - a whole set of different
18  problems for us.
19    Q.  And as far as what drug they transition to,
20  it -- heroin is a cheap readily-available drug in
21  West Virginia.  Correct?
22    A.  Yes.  And to answer the question about
23  transition, you know, we initially saw the people
24  either would take suppressants like heroin or

Page 279

1  opioids, or stimulants.  But as this crisis has
2  evolved, the distinction has become without a
3  difference.
4    So we now see combinations on the
5  street that has combined stimulants and
6  depressants.  So there -- the fine line that
7  existed between people who took meth as opposed to
8  heroin has also been done away with.
9    Q.  So the fact that someone used prescription
10  drugs and they needed to find another drug to fuel
11  that addiction doesn't mean that they're more
12  likely to use heroin over methamphetamine over a
13  combination of the two or anything.  Correct?  Is
14  that what -- is that the trend you're describing?
15    A.  That's the trend.  That's the evolution,
16  and unfortunately for a brain that has -- is
17  suffering from addiction and has been hijacked,
18  something is better than nothing.  And nothing
19  could spell lots of pain and eventually could be
20  potentially fatal.
21    MR. COLANTONIO:  You okay?
22    THE DEPONENT:  I'm okay.
23    Q.  Sorry.  I'm just reviewing a document.
24  Have you ever looked at research that has

Page 280

1  demonstrated a link between prescription opioids
2  and illicit drugs like heroin?
3    A.  Not recently.
4    Q.  When -- the research that you have
5  reviewed, do you know whether that research looked
6  at users who had taken prescription opioids
7  pursuant to a prescription?
8    MR. COLANTONIO:  Object to the form.
9    A.  So there's two -- the 2017 survey by
10  SAMHSA, it surveyed about 1.1 million people in the
11  country, and what they found was of the -- the
12  inappropriate diverted opioids, about a third of
13  those were actually prescribed by a physician; a
14  little over half of the people got it from friends
15  or family, which is all diversion; and the rest of
16  it was anywhere between stealing, buying, you know,
17  all of those aspects.
18    So that's at least what actual data
19  shows.
20    Q.  I guess what I'm asking, Doctor, is a
21  little bit different.  Focusing on the population
22  of people who have used prescription drugs pursuant
23  to a medically-necessary prescription that you
24  would qualify -- that you would qualify as a

Page 281

1  medically-necessary prescription, what percentage
2  of those people end up being addicted?  Do you
3  know?
4      A.  So if -- if somebody has cancer - I'm going
5  to put that in real terms - at the end-of-life
6  cancer and they're being given opioids for their
7  long-term pain control and they have, let's say,
8  six months to live because of terminal cancer, if
9  you're asking what percentage of those people end
10 up becoming addicted, I would answer first of all
11 for that person, who cares?
12      It's the quality of life at the end of
13 life that's important.
14      Second, I would say that there's -- you
15 can -- if you are -- you can and you could have
16 some addiction in a certain number of people, but
17 that's the precise reason why you have to make sure
18 the people who are legitimately receiving long-term
19 opioids for pain control is the right group of
20 people.
21      Because there could be people who might
22 need opioids for 10, 15 or 20 years.  But you want
23 to keep them functional.  If they end up developing
24 addiction, then you have to deal with that.

Page 282

1      So you know, I would say a certain
2  percentage can happen, but I think we significantly
3  lower that percentage if we actually follow
4  appropriate prescribing for legitimate pain.
5      Q.  And assuming appropriate prescribing, for
6  someone that's been -- for the population that has
7  been appropriately prescribed opioids for long-term
8  pain, do you know what percentage of that
9  population ends up being addicted to prescription
10 opioids?
11     A.  So first I'll say this:  No certain way to
12 know that what exact percentage will be.  But it is
13 possible for those people at certain percentage to
14 be, but at this point right now off the top of my
15 head, I couldn't tell you exactly what that
16 percentage would be.
17     Q.  Is it correct that the vast majority of
18 people who take prescription opioids do not become
19 addicted to them?
20     A.  Not necessarily.  And I like to say that
21 because there's a lot of underdiagnosis oftentimes
22 of addiction.
23     So you know, it goes back to my
24 previous answer.  We just don't know that exactly.

Page 283

1  But I think it would be -- it would not be accurate
2  to say that the vast majority of people that are
3  appropriately prescribed would never become
4  addicted to these medications.
5      That's the --
6      Q.  Are you aware --
7      A.  Go ahead.
8      Q.  No, I'm sorry, I didn't mean to cut you
9  off.
10     A.  I'm saying that's the previous position and
11 presumption under which the bill of goods was sold
12 in the early 2000s based on a, you know, two-or-
13 three-sentence letter to the Editor, New England
14 Journal of Medicine by Jane Porter, and that just
15 has not panned out to be true.
16     Q.  Are you aware, though, that research
17 actually demonstrates that?
18     A.  I'm not aware of that.
19     Q.  Have you ever looked for research on this
20 connection?
21     A.  Yes.
22     Q.  And what -- what research specifically have
23 you reviewed?
24     A.  Recently, I have not reviewed any

Page 284

1  particular research.  At the time, we did look at
2  some of these, but I would not be able to tell you
3  right now specifically which research I looked at.
4      Q.  You testified about the chemical similarity
5  between prescription opioids and heroin, correct?
6      A.  Yes.
7      Q.  And there's no chemical similarity between
8  opioids and methamphetamine, correct?
9      A.  There is no chemical similarity, that's
10 correct.
11     Q.  Earlier today, you testified that for every
12 fatal overdose, there are 25 to 30 people who are
13 using but are not overdosing.  Correct?
14     A.  I testified that for every fatal overdose,
15 there's 25 to 30 nonfatal overdoses.
16     Q.  I apologize.  And where did you get that
17 number?
18     A.  From literature.  I could not tell you
19 exactly right now which particular study.
20     Q.  You also said that for every fatal
21 overdose, there are 200 to 300 people who are
22 addicted.  Correct?
23     A.  (Nodded affirmatively).
24     Q.  Where did you get that number?

Page 285

1       A.  From literature.
2       Q.  Do you know what analyses that literature
3   conducted to determine from fatal overdoses the
4   numbers that were nonfatal overdoses?
5       A.  I'm sorry, could you restate that, please?
6       Q.  Sure.  I know that you can't recall the
7   exact name of the literature you reviewed or a
8   particular study.  Do you recall what methodology
9   was used to determine that for every fatal
10  overdose, there are 200 to 300 people who are
11  addicted?
12      A.  I don't recall.  I'll be very happy to
13  provide you the references for each of these
14  statements.  I will add in addition to that that
15  this is no different than what we have seen in West
16  Virginia.
17          So if you look at the visitation rates
18  and one of the things that did happen as a
19  consequence of some of the legislation is there's a
20  dashboard that has been developed that actually
21  keeps tab in West Virginia of the overdoses coming
22  to the emergency room.
23          What we're seeing in real life
24  experience is very consistent with what we're

Page 286

1   seeing in literature and my research.  But we're
2   happy to provide you both of those as needed and
3   when needed.
4       Q.  I would appreciate that.
5           UNIDENTIFIED MALE:  Hello.
6           MS. JINDAL:  Yes?  I'm sorry, I
7   thought someone was trying to say something.
8       Q.  Doctor, why don't we take a ten-minute
9   break and then we'll reconvene.  Thank you.
10          MR. RUBY:  Hey, Adam, real quick
11  before we get off the record and before we break,
12  just in the interest of not spending another hour
13  pulling teeth on this:  Mark, I just wanted to make
14  sure we've got clarity on the nature of Doctor
15  Gupta's engagement with your firm.
16          Can we just stipulate among counsel
17  that the subject matter of Doctor Gupta's paid
18  expert work for your firm is the opioid problem in
19  West Virginia and move on from that?
20          MR. COLANTONIO:  Well, it's more
21  compli -- I don't think that says it.  But --
22  that's not -- that's not what happened.  We talked
23  about this.  You and I talked about this before the
24  deposition.

Page 287

1           I mean, I -- we retained him in the MLP
2   and --
3           MR. FITZSIMMONS:  We're still on the
4   record.
5           MR. COLANTONIO:  Are we on the record?
6           MR. RUBY:  Yeah.
7           MR. COLANTONIO:  We'll go off the
8   record and talk about it.
9           MR. RUBY:  No, no, I want to -- it's
10  fine.  We're going to have to keep going at this on
11  the record.
12          MR. COLANTONIO:  We can't agree to
13  that stipulation.  I don't think we can agree to
14  that stipulation.  The way you said it, Steve, I
15  don't think we can agree to it.
16          MR. RUBY:  I just -- I would like to
17  get on the record and we can either stipulate it --
18          MR. COLANTONIO:  Okay.  So what do you
19  want put on the record?  You want something -- us
20  to again tell you what his retaining arrangement
21  is with us?
22          MR. RUBY:  What's the subject matter
23  of his engagement?
24          MR. COLANTONIO:  Which engagement?

Page 288

1           MR. RUBY:  His engagement with your
2   firm.
3           MR. COLANTONIO:  Okay.  So we have --
4   we have engaged him as a consulting expert in the
5   MLP litigation.  Now, as far as the subject matter,
6   I'm not sure that's something -- I mean, he was
7   retained initially to talk about abatement.
8           MR. RUBY:  Uh-huh.
9           MR. COLANTONIO:  That's it.  That's
10  it.  We've not discussed with him in that case
11  anything else but abatement.
12          And then this subpoena came up, and --
13          MR. FITZSIMMONS:  Those subpoenas
14  aren't designated.
15          MR. COLANTONIO:  No, they're not
16  designated.  They're not.  That was the scope of
17  his retention at that time, and eventually, when
18  you get into the deposition in that case, you'll
19  find that out.
20          The scope of his retention was just to
21  talk about abatement, and then the subpoena came
22  up.  He retained us as counsel, and we're here.
23  That's the truth.
24          MR. RUBY:  And has the scope of his --

Page 289

1   his work in the -- in the other case expanded
2   beyond abatement?
3        MR. COLANTONIO:  I can tell you that
4   -- here's -- I think I told you this before the
5   deposition.  I know we had this conversation a
6   while back.
7        But what I told you, I think, was that
8   since he retained us as counsel in this -- with
9   respect to this deposition, we have not had any
10  discussions about the MLP case.  All our
11  discussions have been about this retention, this
12  deposition.
13       And at that time, it was only
14  abatement.  That's all it was.  And he --
15       MS. KEARSE:  And Steve, on behalf of
16  -- you know, we also have clients in the MLP, and
17  we have not disclosed expert witnesses, obviously,
18  and are just working through that, and I can
19  represent we have not had any discussions at all
20  with Doctor Gupta about retaining him as --
21       MR. COLANTONIO:  It was only because
22  we had a mediation, so we -- that's -- that's where
23  that came about.
24       MR. RUBY:  And I hope, at least, that

Page 290

1   you all can understand why we want to understand --
2        MR. COLANTONIO:  I get it.  I
3   understand.  I'm trying to explain it.  But that's
4   -- what happened is:  We retained him sometime ago
5   - and I forget when it was; I don't remember -- it
6   was a while ago - in the MLP to talk about
7   abatement.  That was what we talked about, was
8   abatement.
9        And in that -- in that retention -- and
10  we never had -- I mean, I'm not gonna get into --
11       MR. FITZSIMMONS:  Quit talking about
12  it.
13       MR. COLANTONIO:  It was about
14  abatement and that's it, and we haven't talked
15  about it since -- and that -- we haven't talked
16  about that case since he retained us in this case
17  about this deposition.  That's it.
18       MR. RUBY:  Okay.  I mean, look, it's
19  an unusual arrangement to have counsel for a party
20  paying an expert in one of a set of parallel cases
21  and taking the position that he is a lay expert in
22  another closely-related parallel case.  That's why
23  I wanted to make sure --
24       MR. COLANTONIO:  Yeah, and I --

Page 291

1        MS. KEARSE:  This is Anne.  I'm not
2   going to agree with your characterization about
3   that, but we can talk about it later.
4        MR. COLANTONIO:  Yeah.  I don't know
5   how unusual it is.  I'm -- it is what it is.  But
6   -- so there you have it.
7        MR. RUBY:  Okay.
8        MR. COLANTONIO:  Okay.
9        VIDEO OPERATOR:  We can go off the
10  record?  Okay.  Going off the record.  The time is
11  4:45 p.m.
12       (A recess was taken after which the
13            proceedings continued as follows:)
14       VIDEO OPERATOR:  Now begins Media Unit
15  8 in the deposition of Rahul Gupta, M.D.  We are
16  back on the record.  The time is 5:02 p.m.
17  BY MS. JINDAL:
18  Q.  We've talked today about diversion of
19  prescription opioids.  What do you qualify as
20  diversion?
21  A.  So diversion would be any medications that
22  are being used without being properly prescribed
23  and properly indicated.  So that would be -- and
24  they are unintended for the user.

Page 292

1        So any medications that are not being
2   used by the prescribe -- the patient who has been
3   prescribed those medications.
4   Q.  And if someone were --
5   A.  Go ahead.
6   Q.  I'm sorry.  Did I cut you off?
7   A.  No.
8   Q.  Someone who obtains and uses prescription
9   opioids that weren't prescribed to them, is that an
10  illegal act?
11  A.  Illegal act in the sense that do people get
12  jail for that?  I'm not sure I know a lot of people
13  that have been jailed in West Virginia because they
14  took their grandma's pain pill.
15  Q.  Right.  But the purpose of the -- the
16  purpose of state laws and federal laws regulating
17  the supply of distribution is to ensure that people
18  who are not prescribed prescription opioids do not
19  obtain them.  Correct?
20  A.  I think the purpose of -- for myself being
21  a licensed DEA to be able to prescribe, the
22  distributors being registrants, the pharmacy being
23  registrants, is for the primary purpose of ensuring
24  that we are - all of us - are responsible and

Page 293

1 accountable for our actions.
2     I think by calling it -- laying the
3 blame and the responsibility on the public is the
4 upside down way of looking at things.
5     Q.  If someone is in possession of prescription
6 opioids that were not prescribed to them, can they
7 be arrested for that?
8     A.  Sure.  People can be arrested for
9 jaywalking.  I mean, I -- I go back and I will
10 reassert that I think that is the upside down way
11 of looking at it, that let's go start arresting
12 people.
13     I'm not aware of in Kanawha County or
14 Cabell County or any other county that a single
15 elected prosecutor went ahead and arrested people
16 for using -- including children, for using somebody
17 else's prescription drugs.  But I'm not a lawyer.
18     Q.  Okay.  So setting aside whether they should
19 or should not be arrested, is it against the law to
20 possess prescription opioids that were not
21 prescribed to you?
22     A.  I would guess so.  I'm -- again, I'm not a
23 prosecutor or a lawyer; I'm a physician.
24     Q.  Someone who takes a prescription opioid

Page 294

1 from a family member's medicine cabinet, is that
2 diversion?
3     A.  Yes, someone who is not prescribed the --
4 that particular prescription or that particular
5 medication and then accesses -- someone accesses
6 that, of course, that would be part of that
7 diversion.
8     Q.  And can someone be arrested for doing that?
9     A.  Again, I couldn't tell you that, because
10 again, I'm not -- neither a prosecutor nor a
11 lawyer.
12     I tell my patients, when I would write
13 for them -- I would make sure my prescriptions are
14 prescribing appropriate, for legitimate pain, and I
15 would tell them to store it and just sufficient
16 quantities to relieve them.
17     Now, what happens after that or who's
18 legally responsible, that's something after --
19 that's up to law enforcement and prosecutors.
20     Q.  Do wholesale distributors have control over
21 an individual's medicine cabinet?
22         MR. COLANTONIO:  Object to the form.
23     A.  Wholesale distributors do not have the
24 physical control over people's medicine cabinets,

Page 295

1 no.
2     Q.  Doctor Gupta, could you turn to Exhibit 5?
3     GUPTA DEPOSITION EXHIBIT NO. 5
4     (E-mail from Massey to Kilkenney Re:
5     MMWR dated 5-27-17 with "Public Health
6     Investigation of an Opioid Overdose
7     Outbreak - West Virginia, August 2016"
8     attached was marked for identification
9     purposes as Gupta Deposition Exhibit
10     No. 5.)
11     A.  I have it.
12     Q.  The first page is a cover e-mail from
13 Doctor Kilkenny, correct?
14     A.  It's from Doctor Massey to Doctor Kilkenny.
15     Q.  I'm sorry.  You're right.  I'll like you to
16 turn to the next page.
17     A.  Okay.
18     Q.  Are you familiar with this document?
19     A.  It's been a while, so it seems like one of
20 the manuscripts that would have been submitted as a
21 result of the outbreak in Cabell County, yes.
22     Q.  And the first page, that e-mail that you
23 were just looking at, does that refresh your memory
24 at all about what the attachment is?

Page 296

1     A.  Yes.
2     Q.  And are you one of the authors of the
3 attachment?
4     A.  Yes.  My memory is to the point that I
5 could see this to the extent that I see myself as
6 author at the time.
7     Q.  And does this report gather various data
8 and -- together to study the 20 opioid overdoses in
9 Huntington in August 2016?
10     A.  It's more than three years old.  I'd really
11 have to go through it to understand it and review
12 it.
13     Q.  Sure.  Just looking at that first page --
14 and I'll just help direct you for your review to
15 Bates stamp 8533.  That first paragraph reads, "On"
16 August 20 -- "August 15, 2016, the Mayor's Office
17 of Drug Control Policy in Huntington, West Virginia
18 notified the Cabell-Huntington Health Department
19 (CHHD), that several calls regarding opioid
20 overdose had been received by the Emergency Medical
21 System (EMS) during 3:00 p.m." to "8:00 p.m. that
22 day.  A public health investigation and response
23 conducted by the West Virginia Bureau of Public
24 Health (BPH) and CHHD identified 20 opiate overdose

Page 297

1   cases within a 53 hour period in Cabell County,
2   West Virginia; all cases included emergency
3   department (ED) encounters."
4       Did I read that correctly?
5   A.   Yes.
6   Q.   And it goes on.  "Concurrent" -- sorry.  In
7   the next paragraph, does this essentially describe
8   -- does this refresh your recollection that this
9   document describes the public health investigation
10  that occurred with respect to this opioid overdose
11  outbreak in Cabell County in 2016?
12      MS. KEARSE:  Counsel, this is Anne
13  Kearse, and I just -- this appears to be a draft.
14  I just wanted to put that on the record there.  I
15  don't think it's a final document that you're using
16  or going to show, but it's a just a draft of a
17  report.  So I just wanted to say that for the
18  record.
19  A.   Yeah, I am unable to at this point
20  recollect the accuracy of the report, and when I
21  look at this Page No. 1, it talks about several of
22  the medical reviewers have made revisions and
23  comments.
24      I do not see comments here attached.

Page 298

1   So -- I also do not see a final MMWR publication
2   that would have probably alluded to the actual
3   report rather than just a, you know, undone
4   preliminary manuscript that I have in front of me.
5   I don't know for what reason that would
6   not be available, but without -- without any
7   certainty, I'm -- unless I read the whole, it would
8   be difficult for me to talk about one of the
9   versions of the manuscript.
10      Because sometimes manuscripts do go
11  through several versions and final version is very
12  different than the initial version.  So I don't --
13  I don't want to misstate any -- any statements
14  here.
15  Q.   I appreciate that, Doctor.  I will
16  represent for the record that this is how it was
17  produced to us, so whether or not it's written
18  comments, that's how it was produced.
19      And I will also note that the cover
20  e-mail says it's a clean copy that is attached.
21      MS. KEARSE:  This didn't come from
22  Doctor Gupta's files.  I'm just noting that.
23      MR. FITZSIMMONS:  There's no question
24  pending.

Page 299

1       MR. COLANTONIO:  Do you have a
2   question?
3   Q.   Setting aside the report, do you recall the
4   2016 outbreak in Cabell County?
5   A.   Only remotely at this point.
6   Q.   Do you recall commissioning an analysis of
7   the -- of that outbreak?
8   A.   Yes.
9   Q.   Could you please turn to Exhibit 4?
10      GUPTA DEPOSITION EXHIBIT NO. 4
11      (E-mail from Haddy to Haddy and others
12      Re: WV HAN #128 Novel Opiates dated
13      12-13-16 with "Health Advisory #128
14      Novel Opiates" attached was marked for
15      identification purposes as Gupta
16      Deposition Exhibit No. 4.)
17  A.   I have it.
18  Q.   All right.  I apologize.  My computer's
19  taking a second here.  Is this -- I'm not sure if
20  the cover e-mail is familiar to you, but the
21  attachment, the second page, is titled a health --
22  public "Health Advisory Number 128."  Do you see
23  that?
24  A.   Yes.

Page 300

1   Q.   And this advisory is dated from October of
2   2016, correct?
3   A.   It's dated December of -- 13, 2016.
4   Q.   I apologize.  I'm still waiting for it to
5   load.  December 13, 2016.  I'm going to read from
6   -- is this -- are you listed as an author of that
7   health advisory?
8   A.   Yes, the health advisories would normally
9   go out from the Commissioner, State Health Officer,
10  as a -- that the standard.
11  Q.   And this health advisory is titled "Novel
12  Opiates"?
13  A.   I see that.
14  Q.   And this is something that you would have
15  distributed "TO COMMUNITY HEALTH PROVIDERS,
16  HOSPITAL-BASED PHYSICIANS, INFECTION CONTROL
17  PREVENTIONISTS, LABORATORY DIRECTORS, AND OTHER
18  APPLICABLE PARTNERS"?
19  A.   Yes.
20  Q.   And you also directed that it be
21  distributed "TO ASSOCIATION MEMBERS, STAFF, ETC."?
22  A.   Yes.
23  Q.   Which association members and staff did you
24  mean?

Page 301

1      A.   Local health department associations and
2  staff.
3      Q.   That first sentence says, "The West
4  Virginia DHHR/"Bureau of Public Health - "Office of
5  the Chief Medical Examiner (OCME) has detected
6  analog fentanyls that are contributing to overdose
7  deaths in West Virginia."
8          Did I read that correctly?
9      A.   Yes.
10     Q.   Any reason to dispute the accuracy of that
11 statement?
12     A.   Not that I know, at that time.
13     Q.   The next is "Multiple derivatives of
14 fentanyl are being detected in toxicology results
15 in West Virginia, as well as other states."  Did I
16 read that correctly?
17     A.   Yes.
18     Q.   And is there any reason to dispute that
19 statement?
20     A.   At the time, there would not be to my
21 understanding.
22     Q.   I'm sorry.  Do you mean that you don't have
23 a reason to dispute it now, or you don't have a --
24 you didn't have a reason to dispute it then when it

Page 302

1  was written?
2      A.   I would not have a reason to dispute it now
3  as of the events that were happening then.
4      Q.   Describe -- it goes on to describe a prior
5  health advisory that you issued, Health Advisory
6  #126, titled "Carfentanil responsible for West
7  Virginia overdose deaths."
8          Correct?
9      A.   I see that written here.
10     Q.   The next paragraph says that "The presence
11 of novel opioids in the illicit drug market cause
12 concern for increasing overdose death, even among
13 opioid-toleranced users. Now, seven other analogs,
14 such as U-47700 (Pink or Pinky), Acetyl fentanyl,
15 Furanyl fentanyl, para-Fluoro (iso)butyrnl fentanyl,
16 Acryl fentanyl, and 3-Methyl fentanyl, in addition
17 to Carfentanil, are being detected in toxicology
18 results and linked to overdose deaths.  Emergency
19 departments visits for heroin overdoes with suspect
20 fentanyl laced analogs are an alarming new trend."
21         Is that correct?
22     A.   That's appropriate statement.
23     Q.   And you have no reason to dispute that
24 statement today?

Page 303

1      A.   I have no reason to dispute it today for
2  what it said at the time.
3      Q.   The next statement says "The preliminary
4  number of drug overdose" "in West Virginia reported
5  as of December 8th, 2016 totaled 624."  Correct?
6      A.   You missed the "deaths" part in there, but
7  --
8      Q.   I'm sorry.  Overdose deaths.  Did you ever
9  quantify the number of those deaths that were
10 attributed to fentanyl or a fentanyl analog?
11     A.   I cannot recollect at this time with this
12 information that I have in my hands.
13     Q.   Could you please turn to Exhibit 17?
14     A.   Okay.
15     GUPTA DEPOSITION EXHIBIT NOS. 16 and 17
16         (E-mail from Christy to Wagoner and
17         others Re: GUPTA DATA NEEDS UPDATED -
18         Social Worker Conference (next week)
19         dated 4-21-17 (DHHR_FEDWV_0047102) and
20         "West Virginia's Contemporary Public
21         Health Challenge: Drug Overdose
22         Deaths" by Gupta dated 4-29-17 were
23         marked for identification purposes as
24         Gupta Deposition Exhibit Nos. 16 and

Page 304

1          17.)
2      Q.   And if you'd also look at Exhibit 16.
3          And I'll represent, Doctor, that
4  Exhibit 16 -- I'm sorry, 15, was produced as -- no,
5  I apologize.  I got that backwards.
6          Exhibit 14 is the cover e-mail to
7  Exhibit 15.
8      MR. COLANTONIO:  Would you like him to
9  --
10     MS. JINDAL:  So we're looking at
11 Exhibit 17 and Exhibit 16, sorry.
12     Q.   Yes, Exhibit 16 is a cover e-mail to
13 Exhibit 17.  I apologize.  It gets a little bit
14 more confusing with the native PowerPoints.
15     MR. COLANTONIO:  Okay.  So he's
16 looking at 16 and 17, is what you want him to do
17 now, right?
18     MS. JINDAL:  Yes.  And 16 is the cover
19 e-mail for Exhibit 17.
20     MR. COLANTONIO:  Okay, he's got those.
21     A.   I have it.
22     Q.   And Doctor Gupta, is Exhibit 16, does that
23 reflect a conversation among your staff concerning
24 your request for a presentation?

Page 305

1     A.   Yes, Exhibit 16 reflects that my staff were
2  providing me with slides and PowerPointing those
3  slides for me to present at a presentation, at a
4  conference.
5     Q.   And if you could turn to Slide 35.
6     A.   I have it.
7     Q.   And Slide 35, is that -- is that a graph
8  document the presence of various drugs in overdose
9  deaths from 2001 to 2016 in West Virginia?
10    A.   Slide 35 is a trend analysis looking at
11  five prescription drugs of which most of the fifth
12  ones is fentanyl that is illicit and
13  nonprescriptions and it's comparing a trend of very
14  select group of opioids from 2001 to 2016.
15    Q.   Okay.  And with respect to that fentanyl
16  line, do you see that the increase for fentanyl has
17  gone up from just over 50 in 2014 to somewhere
18  between 150 and 200 in 2015 and well over 350 in
19  2016?
20    A.   Yes, that's consistent with my testimony
21  that in 2015, 2014, is the time I was starting to
22  see a transition happen from exclusively opioid --
23  or majority opioid prescriptions to street drugs.
24    Q.   And it's written here that the vast

Page 306

1  majority -- on the slide, that the "Vast majority
2  of fentanyl deaths are believed to be illicit."
3          Did I read that correctly?
4     A.   Yes.
5     Q.   And these graphs reflect the number of
6  deaths involving this particular drug, correct?
7     A.   Correct.
8     Q.   So just to be clear, there could be overlap
9  in these deaths in the sense that some of these
10  deaths could have involved both fentanyl and
11  oxycodone, for example?
12    A.   Correct.  And this is 2016 preliminary
13  data, just to make a point.
14    Q.   Yes.  The previous slide, Slide 34, looks
15  at major selected drugs, correct?
16    A.   It does look for overdose deaths in West
17  Virginia for the same period of time for certain
18  selected group of drugs.
19    Q.   And the title supplied is "Trend Analysis -
20  Major Selected Drugs," correct?
21    A.   Correct.
22    Q.   And this one also documents the right --
23  this one also documents heroin, correct?
24    A.   Yes.

Page 307

1     Q.   And is there a general trend in the
2  increase in heroin?
3     A.   Yes, the general trend and declines in
4  oxycodone and hydrocodone with a heroin increase
5  trends in heroin exists.
6     Q.   And it may be a little hard to see, but do
7  you also see the line for cocaine?
8     A.   I'm --
9     Q.   A --
10    A.   I think I found it.
11    Q.   And does it also show that cocaine -- there
12  have been deaths involving cocaine as going as far
13  back as 2001?
14    A.   I can try to follow the line of cocaine to
15  2001.  Yes.
16    Q.   And does that line show a general increase
17  in about 2014?
18    A.   I believe it does.
19    Q.   So since 2014, the incidence of heroin --
20  I'm sorry, cocaine in overdose deaths has grown in
21  West Virginia, correct?
22    A.   I would say along with other substances in
23  this chart, cocaine use also went up.  Deaths from
24  cocaine.

Page 308

1     Q.   Does the -- could you please turn to
2  Exhibit 15?  And then also Exhibit 14?
3          MR. COLANTONIO:  14 and -- I'm sorry,
4  14 and 15?
5          MS. JINDAL:  Yes, please.
6        GUPTA DEPOSITION EXHIBIT NOS. 14 and 15
7          (E-mail from Gupta to Mock and Taylor
8          Re: Presentation dated 4-4-17 and
9          E-mail from Richman to Boggs Re: April
10         4th - MCMS dated 3-29-17
11         (DHHR_FEDWV_0038760) and "2017
12         Legislation and Substance Use Disorder
13         Epidemic: West Virginia's Call to
14         Action" by Gupta dated 4-4-17
15         (DHHR_FEDWV_0038761) was marked for
16         identification purposes as Gupta
17         Deposition Exhibit Nos. 14 and 15.)
18         MR. GOOLD:  What's the time with the
19  court reporter on the deposition and what time did
20  Mark take?
21         This is Jim Goold.  I'm going to have
22  about ten or fifteen minutes that I'm going to be
23  happy to start when I can.
24         What's the time with the court

Page 309

1    reporter on the time because --
2        VIDEO OPERATOR:  This is the
3    videographer.  Give me one moment and I can give
4    you a total time.
5        MR. GOOLD:  Okay, good.  Thank you.
6    Q.  Doctor, I would like you to look at Exhibit
7    14, which is the cover e-mail to which Exhibit 15
8    is attached.  Is Exhibit 14 a cover e-mail to you
9    from Allen Mock?
10   A.  Yes.
11   Q.  And Mr. Mock is the -- the chief medical
12   examiner for West Virginia, correct?
13   A.  Doctor Mock is the Chief Medical Examiner
14   of West Virginia, yes.
15   Q.  Doctor Mock, I apologize.  The PowerPoint
16   that you've attached is titled "2017 Legislation
17   and Substance Use Disorder Epidemic:  West
18   Virginia's Call to Action."  Correct?
19   A.  Yes.
20   Q.  And you authored this presentation?
21   A.  As you've seen in the previous exhibits, I
22   often do not personally author presentations as the
23   Commissioner.  I had staff that does that.
24   Q.  Did you commission this presentation?

Page 310

1    A.  I do not recollect at this time.  However,
2    I was requested -- the request was made for the
3    Commissioner to provide a presentation and
4    generally I would commission the development of
5    such a presentation and then appropriate -- myself,
6    with the appropriate staff availability to do the
7    presentation.
8        VIDEO OPERATOR:  This is the
9    videographer.  We've been on the record for about 6
10   hours, 45 minutes total.
11       MR. COLANTONIO:  Okay.
12       MR. GOOLD:  Did you take out
13   Mr. Colantonio's examination in that?
14       VIDEO OPERATOR:  I did not.  That's
15   just the total time.
16   Q.  And Doctor, if you could turn to Slide 26
17   of this presentation.  I'm sorry, Slide 27.
18   A.  Okay.  I have it.
19   Q.  And I apologize.  It's the nature of
20   working on a computer.  I was looking at my PDF
21   number versus the number in the lower right-hand
22   corner.  I do mean Slide 26 as indicated by the
23   number in the lower right-hand corner of the
24   presentation, so the slide that is titled, in

Page 311

1    quotes, "The Heroin Landscape."
2        Do you see that?
3    A.  Yes.
4    Q.  And it's written here, "Heroin use is part
5    of a larger substance abuse problem."  Correct?
6    A.  Yes.
7    Q.  Do you still agree with that statement?
8    A.  I would agree with that statement as it's
9    stated here.
10   Q.  And you've written here that nearly all
11   people who use heroin also use at least 1 other
12   drug.  Most use at least 3 other drugs."  Correct?
13   A.  That would be correct at the time this was
14   done.
15   Q.  Do you have any reason to believe it's not
16   correct now?
17   A.  I don't have the most current statistics to
18   be able to say whether this is or this is not
19   correct at this time.
20   Q.  And you've also written here that "People
21   who are addicted to ... Alcohol are 2" times "...
22   more likely to be addicted to heroin."  Correct?
23   A.  Yes.
24   Q.  And "People who are addicted to...

Page 312

1    Marijuana are 3" times "...more likely to be
2    addicted to heroin."
3    A.  Correct.
4    Q.  And "People who are addicted to...Cocaine
5    are 15" times "...more likely to be addicted to
6    heroin."
7    A.  That's what it says.
8    Q.  And "People who are addicted to...
9    Prescription opioid painkillers are 40" times
10   "...more likely to be addicted to heroin."
11   Correct?
12   A.  That's what it says.
13   Q.  And this doesn't define a causal
14   relationship between one drug and another drug,
15   correct?
16   A.  This is a very strong correlation, not
17   causal.
18       MR. COLANTONIO:  Let me just object to
19   the form of the question, as it's calling for a
20   legal --
21   Q.  Doctor, could you please turn to Exhibit
22   45?
23       GUPTA DEPOSITION EXHIBIT NO. 45
24       (E-mail from Dora to Gupta and others

Page 313

1      Re: 2018.07.05 Final packet mailed to
2      Judges re MAT dated 7-5-18
3      (DHHR_FEDWV_1148108-126) was marked
4      for identification purposes as Gupta
5      Deposition Exhibit No. 45.)
6      A.  I have it.
7      Q.  And this first page reflects an e-mail to
8  you from -- from a Dora; is that right?
9      A.  I can't see on the top who the e-mail is
10  from.  I can only see one single name, Dora.  I do
11  not recognize that name right away.
12      Q.  This e-mail's addressed to you as well as
13  secretary Bill Crouch of the DHHR, correct?
14      A.  That's what it seems like.
15      Q.  Do you have any reason to doubt that this
16  e-mail is not what it is?
17      A.  I just don't know Dora.  I mean, I don't
18  know who Dora is.
19      Q.  Sure.  Do you have any reason to doubt that
20  this was not an e-mail sent to you on Thursday,
21  July 5th, 2018?
22      A.  I'll take it as it is.
23      Q.  If you could turn to the second page, this
24  is ending -- this is Bates stamped

Page 314

1  DHHR_FEDWV_1148109.  Does this reflect a letter
2  from the West Virginia Department of Health and
3  Human Resources to the Honorable Anita Ashley, a
4  judge in West Virginia?
5      A.  It does seem to reflect as you stated.
6      Q.  And does this reflect -- this attachment in
7  total reflect a packet of information that was sent
8  to a judge regarding medication-assisted treatment?
9      A.  I would have to review the attachments to
10  the packet or to review -- just a second.
11      Upon a cursory review, it looks to me
12  like there's a letter to one judge in the front.
13  There seems to be an anonymous kind of "Your Honor"
14  letter from Secretary Crouch, and then I see a
15  letter to another judge from a different county.
16      So I'm not sure if this is all part of
17  the same packet.  It does seem to be going to
18  different places, the packet, including anonymous
19  people.
20      Q.  Okay.  Just focusing on that first letter,
21  the one that's ending in Bates stamp 8109, do you
22  see the part where it says, "Enclosed with this
23  communication are the following documents"?
24      A.  I see that here.

Page 315

1      Q.  Okay.  And the first describes -- that
2  first bullet describes "A letter from Bill J.
3  Crouch, DHHR Cabinet Secretary, directed to
4  Attendees of the Spring Circuit Judges Training
5  conducted May 2nd, 2018 in Morgantown, West
6  Virginia."
7      Did I read that correctly?
8      A.  I believe you did.
9      Q.  And the second bullet reflects "A letter
10  from Dr. Rahul Gupta, State Health Officer from
11  West Virginia DHHR Bureau of Public Health; and,
12  co-written with Doctor James Becker, DHHR Bureau of
13  Medical Services."  Did I read that correctly?
14      A.  Yes.
15      Q.  Does that refresh your recollection about
16  what the second document is, the second letter?
17      A.  My recollection is that that letter is not
18  to Judge Ashley; that's to Judge Tatterson here
19  that I see here, so I cannot verify the accuracy of
20  this packet.
21      Q.  You're saying that you doubt that the -- I
22  guess what I'm saying is:  The letter to Judge
23  Ashley describes communications that are being sent
24  to her, correct?

Page 316

1      A.  The first bullet looks to me a letter from
2  Bill J. Crouch, Cabinet Secretary, presented to the
3  Spring Circuit Judges Training conducted May 2nd,
4  2018 in Morgantown, West Virginia.
5      I do not see that.  All I see is a
6  letter -- the next document is a letter dated May
7  1st, not May 2nd.  So I'm confused as to where that
8  letter to the packet is.
9      Q.  Okay.  Well, I'll represent that this is
10  how the attachment was produced as part of this
11  e-mail and there have been no alterations made to
12  this attachment by us.  So if there were any typos
13  in this document, you know, I can't be -- I'm just
14  trying to tell you that I didn't create the typos
15  in this document.
16      I didn't create this document period.
17  This is how it was produced to us, and this is how
18  I'm presenting it to you.
19      A.  I'll take your word for it.
20      Q.  Okay, thank you.  I just want you to see
21  that -- the final bullet here is a white paper
22  entitled "Medication-assisted treatment-An
23  Evidence-based Pathway to Recovery in West
24  Virginia."

Page 317

1          Do you see that?
2     A.  Yes.
3     Q.  Okay.  Could you please turn to the —
4  sorry.  I've got to find the page myself.  It ends
5  with Bates stamp 8119?
6     A.  Yes.
7     Q.  Okay.  It's about halfway in the
8  presentation.  And do you see that it's titled
9  "Medication Assisted Treatment"?
10    A.  I do.
11    Q.  And the subtitle is "An evidence-based
12 pathway to recovery in West Virginia."
13    A.  I do see that.
14    Q.  And it's published on the West Virginia
15 Department of Health and Human Resources -- it's
16 lettered -- it's got the stamp right there in the
17 upper left-hand corner, correct?
18    A.  I see that is submitted by a Rebecca Roth,
19 the Office Director of Policy, Research, Planning
20 and Compliance at the Bureau of --
21    Q.  And the date of --
22    A.  -- Behavioral Health and Health Facilities.
23    Q.  And the date of this document is May 20,
24 '18, correct?

Page 318

1     A.  That's what it seems like.
2     Q.  Could you please turn to the -- I believe
3  it's the fourth page of this document, is Bates
4  stamped 8123.
5     A.  Yes.
6     Q.  I'm going to read from the third paragraph
7  down under the heading "POLYSUBSTANCE USE AND MAT."
8  "In 2016" -- do you see where it says that?
9     A.  I see that.
10    Q.  It says, "In 2016, preliminary data
11 indicated that heroin-related and fentanyl-related
12 overdose deaths increased dramatically since 2014."
13 And it's cited as West Virginia Health Statistics
14 Center, Vital Statistics System.
15         It goes on to say, "Stimulant overdoses
16 are also on the rise; amphetamine or
17 methamphetamine-related, as well as cocaine-related
18 overdoes deaths increased significantly between
19 2004 and 2016."
20         Did I read that correctly?
21    A.  Yes.
22    Q.  Do you have any reason to dispute the
23 accuracy of those statements?
24    A.  I wouldn't, but I would want to review the

Page 319

1  full report before I would make a statement,
2  because I don't know what the rest of the report is
3  about since I can't remember/recall that and it was
4  not authored by myself.
5     Q.  Do these statistics reflect the ones we
6  just looked at in the graph from your presentation?
7     A.  That would be accurate.
8     Q.  I'm going to turn to the next paragraph,
9  the one beginning "The focus on opioids."  Do you
10 see that?
11    A.  Yes.
12    Q.  "The focus on opioids does not in any way
13 diminish the need to address other substance use
14 disorders or mental health disorders nationally or
15 in West Virginia.  Prevalence of alcohol use
16 disorders (AUDs) has increased dramatically over
17 the last decade in multiple populations subgroups:
18 Women (83.7% increase); African-Americans (92.8%);
19 age 45-64 (81.5% increase); and age 65" plus
20 (106.7% increase); only high school education
21 (57.8% increase); individuals with incomes less
22 than $20,000 (65.9% increase)."
23         Did I read that correctly?
24    A.  I think so.

Page 320

1     Q.  Do you have any reason to doubt the
2  accuracy of those statistics?
3     A.  It's been quite awhile, so I -- I would
4  have to believe these statistics.  I have not
5  myself verified any of these statistics, at least
6  recently.
7     Q.  It goes on to say that "More than 1 in 4
8  (26.3%) of WV women reported smoking during
9  pregnancy, double the national rate of 13%, and 60%
10 of births in WV are to mothers with Medicaid.  More
11 than 4,000 births in WV are to mothers with
12 substance use disorders.  Cannabis is the most
13 commonly used drug among pregnant women, at 11.63%
14 of pregnant mothers, and leads to 2.3 times greater
15 risk of still birth as well as poor cognitive
16 functioning."
17         Did I read that correctly?
18    A.  Yes.
19    Q.  And do you have any reason to doubt the
20 accuracy of this -- these statistics?
21    A.  At the time that was written, I -- I just
22 -- I have not done the verification of research
23 around this, but I would take it as for what it
24 states here at the time.

Page 321

1    Q.  Could you turn back to Exhibit 38?
2         And again, this is your testimony in
3  front of the House Committee, correct?
4    A.  I have it, yes.
5    Q.  And this testimony is dated May 2018?
6    A.  It's actually May 17th, 2018.
7    Q.  Thank you.  Could you please turn to page 5
8  of this testimony?  The last four numbers of the
9  Bates stamp are 1634.
10   A.  Okay.
11   Q.  I'm going to read from the second full
12 paragraph down.  It says, "As the committee" -- do
13 you see that?
14   A.  I see that.
15   Q.  "As the Committee considers evidence-based
16 approaches to the opioid crisis specifically, I
17 strongly urge you to refrain from a narrow focus
18 on," in quotes, "'opioids.'  While the opioid
19 epidemic is a crisis of the moment, in many states
20 other drugs such as methamphetamine, cocaine, and
21 benzodiazepines, often in combination with opioids,
22 are the emerging predominant causes of substance
23 abuse and misuse among some populations.  This is
24 in addition to the long-standing challenge of

Page 322

1  alcohol misuse and addiction."
2         Did I read that correctly?
3    A.  Yes.
4    Q.  And is your testimony today consistent with
5  the statistics that we saw in the white paper that
6  we just reviewed?
7         MR. COLANTONIO:  Object to form.
8    A.  I think without any context whatsoever, I
9  cannot agree to it being consistent.
10   Q.  What greater context do you need, Doctor?
11   A.  I think you read me out of a paragraph from
12 one document and another paragraph of another
13 document and you're piecing together a theory
14 without providing any additional content or having
15 me the opportunity to actually address the context
16 of the previous document or this document.
17   Q.  Doctor, if you would like to go through the
18 white paper in greater detail, you're welcome to.
19 I -- there are sources listed at the back of that
20 document.  And I just -- you know, this is your
21 testimony.  I'm just trying to make sure -- make
22 sense of what you testified and why you might have
23 testified that way.
24        MR. COLANTONIO:  Okay.  Let him go

Page 323

1  through the report then, Doctor.  Take your time
2  and go through the report.
3         Which report --
4         THE DEPONENT:  The previous one.
5    A.  I feel like this is unfair to me as a
6  witness by having me read pieces and moving because
7  I feel I'm not getting adequate opportunity to be
8  able to provide context to the data without
9  reading.
10   Q.  Let me make this a little bit easier then,
11 Doctor.  The paragraph I just read from your
12 testimony --
13        MR. COLANTONIO:  Hold on.  You wanted
14 -- I thought we were going to read the report.  You
15 want to read --
16        THE DEPONENT:  The previous one.
17        MS. JINDAL:  Let me just see if I can
18 try to ease the doctor's concerns, please.
19   Q.  The paragraph we just read from your
20 testimony, what was your basis for making those
21 statements?
22   A.  So the paragraph you just read and the
23 paragraph in the previous letters to the judges
24 that you took out, by itself, does not have a leg

Page 324

1  to stand on.  It's in the context of an opioid
2  crisis that has transitioned now killing West
3  Virginians from opioid prescription drugs to heroin
4  to cocaine, and we've established that as we went
5  through.
6         And now to take that out of context and
7  to act like opioid prescriptions have nothing to do
8  with it is unfair and not really in context, so I
9  take offense to that fact that we're taking pieces
10 and trying to cobble those together instead of
11 actually allowing a fair opportunity to be
12 explaining what actually happened in West Virginia.
13        So I -- that's the piece that I think
14 that is unfair.
15   Q.  Has alcohol use disorder been a long-term
16 -- long-standing challenge in West Virginia?
17   A.  Yes, an alcohol disorder within -- which I
18 will discuss as a very different challenge in many
19 of the states, and we've already talked about today
20 earlier how there will be always a level of
21 population where there will be addictive behaviors.
22        So now to take that out wouldn't be
23 fair because alcohol -- alcoholism and alcohol
24 challenge did not rise by thousands of percent over

Page 325

1  a decade.  Opiate prescription drugs and volume of
2  that did rise.
3           Alcohol did not contribute to killing
4  West Virginians in this way.  Opioid drugs did.  So
5  it would not be fair to blame alcohol for the sins
6  of the volumes that have called West Virginians.
7       Q.  And just to be clear, Doctor, I'm not
8  trying to do that.  I'm just trying to understand
9  the prevalence of alcohol use disorder in West
10  Virginia.  Would you agree --
11       A.  But you -- sorry.  If you are wanting to do
12  that, then we would be sharing data from CDC, from
13  behavior risk to factors surveyed on the prevalence
14  of binge drinking.  We would be in a way different
15  area right now than what we are doing picking and
16  choosing pieces to cobble together.
17           This is not the type or the veracity of
18  data, I'm -- you know, you can look up and you can
19  see the West Virginia alcohol use data.  I have the
20  surveys of those, and I can tell you this is not
21  where you go to look for that data.
22       Q.  So to be clear, you are not sure about the
23  accuracy of the data that is represented in this
24  publication that was published by the West Virginia

Page 326

1  Department of Health and Human Resources while you
2  were Commissioner for the Bureau for Public Health?
3       A.  That is absolute misconstruing of my
4  statement.
5       Q.  Okay.  How am I misconstruing your
6  statement, Doctor?
7       A.  Because I am trying to provide you context
8  and you are misconstruing that to the letters and
9  the statements are false, which is just anything
10  but the truth.
11       Q.  Okay.  So if the statements regarding the
12  increase in alcohol use disorder in West Virginia
13  is accurate, then is it fair to say that your
14  testimony that alcohol use has been a long-standing
15  challenge in West Virginia is accurate as well?
16           MR. COLANTONIO:  Object to the form of
17  the question.
18       A.  In the last nine hours or so, you have not
19  provided me an iota of evidence that suggests the
20  claims you are making now.
21       Q.  To be clear, Doctor, I'm not making these
22  claims.  I'm just reading to you what is from the
23  document, asking whether this is in agreement with
24  your testimony in front of Congress.

Page 327

1           MR. COLANTONIO:  That is -- wait a
2  minute.  That's not a question.  You want to ask
3  him a question?
4           MS. JINDAL:  I guess what I'm
5  trying --
6       Q.  My question is:  Did I read -- do you -- do
7  you have any concern with how -- my accuracy of
8  reading these statements into the record?
9           MR. COLANTONIO:  Object to the form of
10  the question.
11       A.  I do have concerns that you have construed
12  the -- as an example, the last line, that "This is
13  in addition to longstanding challenge of misuse and
14  addiction" and you just made a statement about "the
15  rising evidence of alcohol use in West Virginia"
16  without providing me any evidence of such, and I do
17  have objections to the characterization of the use
18  of alcohol without any evidence -- and we're making
19  West Virginians seem like they've been doing
20  nothing but sitting on their toes and feet and just
21  drinking alcohol, and I think that's a very unfair
22  characterization of people of West Virginia.
23       Q.  And I want to be very clear that that is
24  not what I am trying to say.  I think you're being

Page 328

1  a little bit unfair right now.  But I think we
2  should just take a break for about five minutes.
3  Let's cool off.  And then we can reconvene.
4           MR. COLANTONIO:  Cool off?  All right,
5  we're going off for five.
6           VIDEO OPERATOR:  Going off the record.
7  The time is 5:56 p.m.
8           (A recess was taken after which the
9           proceedings continued as follows:)
10           VIDEO OPERATOR:  Now begins Media Unit
11  9 in the deposition of Rahul Gupta, M.D.  We are
12  back on the record.  The time is 6:01 p.m.
13           MS. JINDAL:  Doctor Gupta, I have no
14  more questions for you today, so I am going to pass
15  you as the witness.  Thank you.
16           EXAMINATION
17  BY MR. GOOLD:
18       Q.  Doctor Gupta, my name is Jim Goold.  Good
19  afternoon.  I'll try to be as short as possible.
20  It really won't be very long, I promise.  Just some
21  follow up on a couple of things.
22           First, as Commissioner of Public Health
23  in West Virginia, you did understand that diversion
24  involved illegal acts.  Is that right?

Page 329

1    A.  Yes.
2    Q.  Okay.  And we talked earlier, there was
3  discussion about a report -- I believe it was
4  called the social autopsy report, and you mentioned
5  that you commissioned it.  Do you recall that just
6  generally?
7    A.  Yes.
8    Q.  I take it that you had the authority to
9  commission a report on any aspect of the opioid
10  crisis that you considered as something that was
11  important to study.
12    A.  I would have the authority within the
13  confines of the public health aspect of it to --
14  and at the same time, would be commissioning
15  opioids and this crisis wasn't the only thing that
16  was happening in West Virginia, so there was - as I
17  mentioned earlier - 130 different program lines we
18  were managing, so when I commission a report, I
19  have to balance of the use of taxpayer dollars and
20  resources with the necessity and importance and the
21  ability for us to make an impact and change.  I
22  would have to measure that.
23    Q.  Understood.  Thank you.  And looking at the
24  opioid crisis from a public health point of view --

Page 330

1  which was your perspective, right?
2    A.  Yes.
3    Q.  -- that would include understanding --
4  trying to understand the causes of the crisis,
5  correct?
6    A.  Correct.
7    Q.  Okay.  Did West Virginia ever do a study of
8  what substances people who had opioid overdoses had
9  consumed before they began using and misusing
10  opioids?
11    A.  I am not aware of such.
12    Q.  Just to be a little more specific, in case
13  it helps, for example, did West Virginia ever look
14  at the extent to which people who later had
15  problems with prescription opioids had first smoked
16  marijuana?
17    A.  I am not aware of that, but I will also
18  caveat this with a -- the issue that I saw and
19  experienced was that not everyone who received a
20  prescription necessarily was the only one that was
21  abusing the prescription.
22    The core behind diversion was:  There's
23  a lot of unsuspecting victims of this crisis that
24  were obtaining the pills, not necessarily through

Page 331

1  the doctor's office.
2    In fact, some of the data that I
3  highlighted today from SAMSHA demonstrates that.
4    Q.  Okay, thank you.  I understand that not
5  every person who later had a prescription opioid
6  problem first smoked marijuana, but you never
7  looked at or the state never looked at whether it
8  was 40 percent or 50 percent or 70 percent or 80
9  percent or whatever number it was?
10    Am I right about that?
11    A.  I think the closest understanding of what
12  happens to the opioid overdose deaths, you can find
13  in the social autopsy work, that's as close as
14  we've gotten to understanding the year before the
15  death of individuals who have died from overdose.
16    Q.  Thank you.  Just to make sure I've got it
17  right then, that's what you would point to as the
18  best source of data on the substance abuse history
19  of people who died of opioid overdoses.  Is that
20  right?
21    A.  For one year.  And I'm not aware -- to
22  directly answer your question, I'm personally not
23  aware of the data.  It may exist.  I'm not aware of
24  that.

Page 332

1    Q.  Okay.  And have you ever looked at the
2  literature for studies addressing that done by
3  doctors or scientists in the United States?
4    A.  I cannot recall now.  I'm sure I have in
5  the past, but I don't recall it now.
6    Q.  Do you recall any data on the extent to I
7  with amphetamine use precedes opioid --
8  prescription opioid misuse?  Any studies on that
9  question?
10    A.  I do not recall.
11    Q.  Okay.  Same thing about benzodiazepines.
12    A.  Correct.
13    Q.  Alcohol?  Same question.
14    A.  Correct.
15    Q.  And tobacco, same question.
16    A.  Correct.
17    Q.  Okay.  You also talked about Dopamine in
18  your examination by Mr. Colantonio.  Do you recall
19  that?  I'm just taking you back to that subject
20  generally.  Okay?
21    A.  Yes.
22    Q.  Am I right that the point that you were
23  making was that elevated levels of Dopamine in the
24  brain can be addictive?

Page 333

1      A.  No, and please let me clarify the point I
2  was making.  I'm sure I said very similar earlier
3  as well, which is:  Any substance, we can use
4  opioids, but you can also attach a number of other
5  substances.  It's also true for some foods; it's
6  also true for smoking and other things.
7      A pathway -- the reward pathway is the
8  same, which is when you take the drug, it
9  stimulates the release of Dopamine or the continued
10  action of Dopamine that then tells the -- signals
11  the front part of your brain that you're happy,
12  you're satisfied, and that's the reward mechanism
13  that is fed by opioids and a lot of other
14  substances, as you just have mentioned.
15      But as I stated to you, I'm not aware
16  of someone who's doing heroin or amphetamine now
17  wants to go back and use a prescription drug to
18  reap the same rewards.  In fact, we've seen exactly
19  the opposite.
20      Q.  Do you know what level of Dopamine is
21  required to trigger addiction?
22      A.  I am not aware of exact micro --
23  microlevels in the blood or in the brain at this
24  time.

Page 334

1      Q.  And you don't know how long or how much
2  exposure over time there needs to be to an elevated
3  level of Dopamine in order to trigger addiction.
4  Is that right?
5      A.  The time factor can vary within individuals
6  and human beings, and at some point, the -- there's
7  a need for higher escalation of dose, and then for
8  variable period of time - that varies within the
9  population and individuals - then there occurs more
10  escalation for the dose, because we build something
11  called tolerance.
12      And as tolerance gets built - which is
13  different from different -- for different people -
14  it requires a higher dose or strength of the
15  substance.
16      Q.  Do you know whether smoking tobacco leads
17  to an increased level of Dopamine in the brain?
18      A.  Tobacco's effects are more -- have to do
19  with nicotine, and it is -- so there's multiple
20  substances in tobacco.  There are many cancerous
21  substances, but most of the impacts of tobacco
22  comes from a substance known as nicotine which
23  breaks down into cordamine that actually stimulates
24  the heart, stimulates the -- your heart rate and

Page 335

1  breathing and others and also goes through your
2  brain as well, and similar type of pathways.
3      Q.  Okay.  Do you have any understanding as to
4  whether smoking tobacco leads - directly or
5  indirectly - to an increased level of Dopamine in
6  the brain?
7      A.  It could lead to increased levels.
8      Q.  Okay.  Do you know -- have a -- know any
9  data that emperically compares the level of
10  Dopamine from smoking tobacco to any particular
11  dose of an opioid?
12      A.  I'm not aware of such that I can recall
13  that data.
14      Q.  How about alcohol?  Do you have any
15  understanding as to whether drinking alcohol -
16  directly or indirectly - leads to an increase of
17  Dopamine in the brain?
18      A.  So alcohol can serve through various
19  pathways and different mechanisms, and for those
20  who become chronic alcoholics, that could be a
21  potential path with them.
22      Q.  And do you have any understanding as to
23  comparisons of Dopamine levels for alcohol or
24  alcoholism and opioids?

Page 336

1      A.  I'm not -- I cannot recall any data that
2  may compare that.
3      Q.  Okay.  Let me ask the same questions about
4  cocaine.  Do you have an understanding as to what
5  level of increased Dopamine cocaine leads to and as
6  compared to opioids?
7      A.  I'm not able to recall any emperical data
8  comparing cocaine and opioids.
9      Q.  A couple more.  Benzodiazepines?  Same
10  question.
11      A.  Same answer.
12      Q.  Okay.  How about behaviors, human behaviors
13  or activities?  Do you understand that there are
14  human behaviors or activities that cause increased
15  levels of Dopamine?
16      A.  So I want to just add that the suppressants
17  like benzodiazepine, alcohol, you know, one of the
18  things in the reward system that may or may not
19  function through the reward system Dopamine.
20  Behaviors certainly can.
21      So you could have addiction to food;
22  you could have addiction to other things, which the
23  pathways may be similar, although the receptors
24  where these things act are different.

Page 337

1    Q. And are you able to empirically compare the
2 effects of Dopamine from these activities to
3 effects of Dopamine from opioids?
4    A. I think to the extent that we have learned
5 that there are different receptors on which each of
6 these and variety of these compounds and components
7 can act to activate Dopamine. That's a
8 differentiating point.
9        For example, opioids act on
10 neuroreceptors to activate the system, and there
11 are various different receptors of different types.
12       To that extent, we do have the
13 knowledge of.
14    Q. Are you an expert -- you consider yourself
15 an expert on this area of neurobiology?
16    A. I'm not necessarily an expert in
17 neurobiology. I am a internal medicine physician
18 with a long-term experience in both public health,
19 prevention and especially in opioids.
20    Q. But you're not able to empirically compare
21 the effects of increased Dopamine from these other
22 activities to opioids. Is that right?
23    A. I am not a neurobiologist, and I cannot
24 recall the data at this point.

Page 338

1        MR. GOOLD: Thank you. I'm finished
2 as well.
3        MR. COLANTONIO: Read and sign?
4        MR. RUBY: So Adam --
5        MR. GOOLD: Thank you, Doctor.
6        MR. RUBY: Adam, if I'm right, we are
7 at about, I'd say, six hours and ten minutes on the
8 record if we exclude Colantonio's examination of
9 what has now been represented as a -- or what has
10 now been represented as a nonparty, I suppose,
11 deposition.
12       VIDEO OPERATOR: Yes, that is very
13 close.
14       MR. RUBY: Okay. So we -- we do, I
15 think, have a few more minutes. Jyoti, do you have
16 anything else you want to cover? You're muted.
17       MS. JINDAL: I had to think. Doctor,
18 if you're patience for a few more questions, I do
19 have them. But I appreciate it's been a long day.
20 So if you'll -- if you'll just bear with me, I
21 promise it will be fast.
22       THE DEPONENT: Okay.
23            EXAMINATION
24 BY MS. JINDAL:

Page 339

1    Q. Could you please turn to Exhibit 20?
2        MR. COLANTONIO: I'm sorry, 20?
3        MS. JINDAL: 20, 2-0.
4        MR. COLANTONIO: Okay.
5        GUPTA DEPOSITION EXHIBIT NO. 20
6        (E-mail chain between Gupta and others
7        Re: MEDIA REQUEST = Fatal overdose
8        victims by county and where they were
9        from dated 9-27-17 to 9-29-17 was
10       marked for identification purposes as
11       Gupta Deposition Exhibit No. 20.)
12    A. I have it.
13    Q. Doctor Gupta, are you familiar with this
14 document?
15    A. I am not. I am -- sounds like -- trying to
16 familiarize myself.
17    Q. Just let me know when you're ready, Doctor.
18    A. Okay. I'm ready.
19    Q. Is this an e-mail chain -- and I'll just
20 look at the top-most e-mail there. Is that an
21 e-mail from Doctor Allen Mock?
22    A. Yes, I see Doctor Allen Mock and a number
23 of people, including myself, who have been -- this
24 e-mail has been sent to and copied to several

Page 340

1 others.
2    Q. Okay. And this e-mail is dated September
3 29, 2017?
4    A. Correct.
5    Q. And does this e-mail chain reflect a
6 discussion of the number of non-Cabell County
7 residents who have a fatally overdosed in Cabell
8 County?
9    A. It reflects a request from a reporter about
10 fatal overdose victims who have died in Cabell
11 County up to this point in that year.
12    Q. And you're looking at the bottom of the
13 e-mail, and I'm just going to read it out loud. It
14 says, "I'd like to request the county of residence
15 for each fatal overdose victim who died in Cabell
16 County up to this point in the year." Correct?
17    A. Yes.
18    Q. And that reporter's e-mail is dated
19 September 27th, 2017, correct?
20    A. Correct.
21    Q. So the middle e-mail here from Gary
22 Thompson -- do you see that?
23    A. Yes.
24    Q. Who is Gary Thompson?

Page 341

1    A.  Gary Thompson, at the time, was the State
2  registrar.
3    Q.  And the e-mail directly below
4  Mr. Thompson's e-mail from Toby Wagoner, does he --
5  does Mr. Wagoner ask Gary or another individual
6  named Dan, Daniel Christy, to look into whether the
7  DHHR has this information?
8    A.  That's what it seems so -- to be.
9    Q.  And so does Mr. Gary Thompson's e-mail
10  respond to that with the information requested by
11  the reporter?
12    A.  It would seem so.
13    Q.  And does Mr. Thompson -- would you have any
14  reason to doubt the accuracy of the numbers that he
15  reports here?
16    A.  Yes, because these would be preliminary
17  numbers.  These would not be final numbers.  And
18  final numbers can often change.
19    Q.  Are those preliminary numbers the number of
20  overdoses?
21    A.  That's what it says in the -- that's what
22  it says here.
23    Q.  Okay.  But it's not preliminary in terms of
24  the identity of the county of residence or the

Page 342

1  individual who overdosed, correct?
2    A.  Not necessarily.  I mean, it could happen
3  that new information could come out and that
4  individual may actually be a resident of a
5  different county or a different county resident
6  could be a resident of Cabell County, so this is --
7  that's the reason when we produce data prematurely,
8  we say it's preliminary data, and until the data is
9  final, the data is not final.
10    And this does not seem to be anywhere
11  stated here that this is a final data.
12    Q.  Has DHHR ever published statistics like
13  these?
14    MR. COLANTONIO:  Object to form.
15    A.  We published -- I think all throughout the
16  day, we talked about overdose deaths.  We do
17  publish overdose deaths.  We publish overdose
18  deaths by the county of residence each year.
19    Q.  So this data breaking down the number of
20  deaths -- overdose deaths that were reported by
21  county of residence is available in a final form
22  elsewhere?
23    A.  I believe if you look at my report, you
24  might find it there, but the final report for

Page 343

1  overdose deaths by county of residence should be
2  available year after year in the standard format.
3    MS. JINDAL:  Okay, Doctor.  I think
4  those were all the questions I have.  Thank you.
5    THE DEPONENT:  Thank you.
6    MR. FITZSIMMONS:  Read and sign.
7    MR. COLANTONIO:  Anybody else?  All
8  right.  He'll read and sign.
9    VIDEO OPERATOR:  We are off the record
10  at 6:23 p.m., and this concludes today's testimony
11  given by Rahul Gupta, M.D.  The total number of
12  Media Units used was nine and will be retained by
13  Veritext.
14    (Having indicated he would like to
15    read his deposition before filing,
16    further this deponent saith not).
17
18
19    --oOo--
20
21
22
23
24

Page 344

1  STATE OF WEST VIRGINIA,
2  COUNTY OF JACKSON, to wit;
3
4    I, Teresa V. Evans, a Notary Public within
  and for the County and State aforesaid, duly
5  commissioned and qualified, do hereby certify that
  the foregoing deposition of RAHUL GUPTA, M.D. was
6  duly taken by me and before me at the time and
  place and for the purpose specified in the caption
7  hereof, the said witness having been by me first
  duly sworn.
8
9    I do further certify that the said
  deposition was correctly taken by me in shorthand
10  notes, and that the same were accurately written
  out in full and reduced to typewriting and that the
11  witness did request to read his transcript.
12    I further certify that I am neither
  attorney or counsel for, nor related to or employed
13  by, any of the parties to the action in which this
  deposition is taken, and further that I am not a
14  relative or employee of any attorney or counsel
  employed by the parties or financially interested
15  in the action and that the attached transcript
  meets the requirements set forth within article
16  twenty-seven, chapter forty-seven of the West
  Virginia Code.
17    My commission expires October 25, 2020.
18  Given under my hand this 15th day of September,
  2020.
19
  <%610538,Signature%>
20  Teresa S. Evans
  RMR, CRR, RPR, WV-CCR
21
22
23
24

## Page 345

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to wit;

I, Teresa Evans, owner of Realtime Reporters, LLC, do hereby certify that the attached deposition transcript of RAHUL GUPTA, M.D. meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code to the best of my ability.

Given under my hand this 15th day of September, 2020.

<%10538,Signature%>
Registered Professional
Reporter/Certified Realtime Reporter

---

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4242146
CASE NAME: City of Huntington v. Amerisourcebergen Drug Corporation, et al.
DATE OF DEPOSITION: 9/11/2020
WITNESS' NAME: Rahul Gupta, M.D.
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have made no changes to the testimony as transcribed by the court reporter.

_____   _____
Date                     Rahul Gupta, M.D.
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of _____, 20___.

_____
Notary Public

_____
Commission Expiration Date

---

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

September 16, 2020

To: Mark Colantonio, Esquire

Case Name: City of Huntington v. Amerisourcebergen Drug Corporation

Veritext Reference Number: 4242146

Witness: Rahul Gupta, M.D. Deposition Date:  9/11/2020

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

---

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4242146
CASE NAME: City of Huntington v. Amerisourcebergen Drug Corporation, et al.
DATE OF DEPOSITION: 9/11/2020
WITNESS' NAME: Rahul Gupta, M.D.
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____   _____
Date                     Rahul Gupta, M.D.
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.
I have affixed my name and official seal

this _____ day of _____, 20___.

_____
Notary Public

_____
Commission Expiration Date

1         ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2         ASSIGNMENT NO: 4242146
3   PAGE/LINE(S) /   CHANGE   /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

20  Date_____   Rahul Gupta, M.D.
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24  _____
25  Commission Expiration Date

Page 1

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

        ************************************************************

3

   THE CITY OF HUNTINGTON,

4

               Plaintiff,

5

   v.                          CIVIL ACTION NO 3:17-01362

6

   AMERISOURCEBERGEN DRUG

7   CORPORATION, et al,

8               Defendants.

9

10   CABELL COUNTY COMMISSION,

11               Plaintiff,

12   vs.

13

   AMERISOURCEBERGEN DRUG

14   CORPORATION, et al,

15               Defendants.

16   ************************************************************

17          Videotaped and videoconference deposition of

18   DAVID POTTERS, taken by the Defendants pursuant to the

19   West Virginia Federal Rules of Civil Procedure, in the

20   above-entitled action, pursuant to notice, before Twyla

21   Donathan, Registered Professional Reporter and Notary

22   Public, at the Law Offices of Jackson Kelly, 500 Lee

23   Street, East, Suite 1600, Charleston, West Virginia, on

24   the 14th day of August, 2020.

Page 2

```
 1              A P P E A R A N C E S
 2    APPEARING FOR THE PLAINTIFFS:
 3    ROBERT P. FITZSIMMONS, ESQUIRE
      CLAYTON J. FITZSIMMONS, ESQUIRE
 4    FITZSIMMONS LAW FIRM
      1609 Warwood Avenue
 5    Wheeling, West Virginia 26003
      bob@fitzsimmonsfirm.com
 6
      APPEARING FOR DEFENDANT AMERISOURCEBERGEN:
 7
      GRETCHEN M. CALLAS, ESQUIRE
 8    AL F. SEBOK, ESQUIRE
      JACKSON KELLY, PLLC
 9    500 Lee Street East, Suite 1600
      Charleston, West Virginia 25301
10    (304)340-1000
      gcallas@jacksonkelly.com
11    asebok@jacksonkelly.com
12    SHANNON MCCLURE, ESQUIRE      (by Zoom)
      REED SMITH, LLP
13    7900 Tysons One Place
      Suite 500
14    McLean, Virginia 22102
      (703) 641-4338
15    smcclure@reedsmith.com
16
17    APPEARING FOR DEFENDANT CARDINAL HEALTH:
18
19    STEVEN R. RUBY, ESQUIRE
20    CAREY SCOTT DOUGLAS & KESSLER, PLLC
21    901 Chase Tower
22    707 Virginia Street, East
23    Charleston, West Virginia 25301
24    (304) 345-1234
```

Page 3

```
 1    APPEARING FOR DEFENDANT MCKESSON CORPORATION:
 2    CHRISTOPHER K. EPPICH, ESQUIRE  (by Zoom)
      ALISON DICIURICIO, ESQUIRE      (by Zoom)
 3    COVINGTON & BURLING, LLP
      One City Center
 4    850 Tenth Street, NW
      Washington, DC 20001-4956
 5    (202)662-5815
      ceppich@cov.com
 6
 7
 8    ALSO PRESENT:
 9
      ON BEHALF OF THE WV BOARD OF PHARMACY
10       and DAVID POTTERS:
11    JUSTIN C. TAYLOR, ESQUIRE
      BAILEY & WYANT, PLLC
12    500 Virginia Street, East, Suite 600
13    Charleston, West Virginia 25337-3710
14    (304) 345-4222
15    jtaylor@baileywyant.com
16
17    HEATHER M. NOEL, ESQUIRE
18    MACCORKLE LAVENDER PLLC
19    2004 White Willow Way
20    Morgantown, West Virginia 26505
21    (304) 599-5600
22    hnoel@mlclaw.com
23
24    Chris Leigh, Videographer
```

Page 4

```
 1              C O N T E N T S
 2    EXAMINATION OF DAVID POTTERS            PAGE
      By Ms. Callas                      9
 3    By Mr. Ruby                      144
 4    By Mr. Clayton Fitzsimmons       282
      By Mr. Robert Fitzsimmons        331
 5    By Mr. Ruby                      363
 6
 7              E X H I B I T S
 8        (Attached to the transcript)
 9    DESCRIPTION OF EXHIBITS (by AmerisourceBergen)  PAGE
10    Exhibit No. 8   WV Board of Pharmacy Uniform   18
                      Controlled Substances Act 2001
11    Exhibit No. 9   "2012 version of the same rule"  20
                      with Section 4.4 related to
12                    suspicious orders
      Exhibit No. 15  West Virginia Controlled       98
13                    Substance Drug Monitoring
                      Program 2013 Annual Report
14    Exhibit No. 16  West Virginia Controlled      110
                      Substances Monitoring Program
15                    2014 Annual Report
      Exhibit No. 22  WVBOP Complaint No. 2014-07-27,  130
16                    Order Dismissing Complaint
      Exhibit No. 3   Email chain, 1/6/2016, from C.V.  133
17                    Selby to David Potters, RE:
                      Closed Pharmacy Notification,
18                    Bates WVBOP_FEDWV_00037777
      Exhibit No. 1   Deposition Transcript of David  142
19                    Potters, July 12, 2016
20
21    DESCRIPTION OF EXHIBITS (by Cardinal Health)    PAGE
22    Exhibit No. 133 Gazette-Mail article, "Suspicious  151
                      drug order rules never enforced
23                    by state," Eric Eyre,
24                    December 18, 2016
```

Page 5

```
 1    DESCRIPTION OF EXHIBITS (by Cardinal Health)    PAGE
 2    Exhibit No. 100 Email from Jim Wallace to Tom   201
                      Susman, 2/6/2012, Re:
 3                    Legislative Update from TSG
                      Consulting
 4    Exhibit No. 101 TSG Consulting, Legislative     201
                      Update, February 6, 2012
 5    Exhibit No. 102 Regulatory Board Review, West   207
                      Virginia Board of Pharmacy,
 6                    January 2011
      Exhibit No. 105 WV Board of Dentistry Email to  232
 7                    David Potters, June 26, 2012,
                      Subject: Board of Pharmacy
 8                    meeting in Martinsburg
      Exhibit No. 106 WV Board of Dentistry Email from  240
 9                    Richard Gerber to Susan Combs,
                      Subject: Letter to CSMP
10                    Advisory Committee
      Exhibit No. 132 State of WV AG's Office, "Best  244
11                    Practices for Dispensing
                      Opioids in West Virginia."
12    Exhibit No. 111 Email from WVAGO to David       245
                      Potters, 5/20/2016, re: Best
13                    Practices Event/Morphine
                      Equivalency Calculator
14    Exhibit No. 109 Structured Interview: WV Board  260
                      of Pharmacy, September 30,
15                    2015, Bates
                      WVBOP_FEDWV_00021165 - 00021207
16    Exhibit No. 108 Email from Herb Linn to David   261
                      Potters, 6/1/2016, Subject:
17                    Transcript from September 30,
                      2015 Meeting
18    Exhibit No. 131 Mayor Robert Carlton o/b/o The  269
                      City of Williamson vs. WVBOP,
19                    Civil Action No. 17-c-99,
20                    Complaint
21    Exhibit No. 116 Email from Dennis Lewis to Buck  273
                      Selby, 1/11/2017, Subject:
22                    Suspicious Order Issue, Bates
23                    WVBOP_FEDWV_00036349
24
```

2 (Pages 2 - 5)

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

93

Page 6

| | | |
|---|---|---|
| 1 | DESCRIPTION OF EXHIBITS (by Plaintiffs) | PAGE |
| 2 | | |
| 3 | Exhibit No. A   U.S. Department of Justice DEA, | 294 |
| 4 |  Letter from Joseph T. | |
| 5 |  Rannazzisi, Office of Diversion | |
| 6 |  Control | |
| 7 | Exhibit No. B   Cardinal Health Suspicious Order | 362 |
| 8 |  Reports, Bates | |
| 9 |  WVBOP-FEDWV_00006200 - 6305 | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

Page 8

1     MS. CALLAS:  This is Gretchen Callas
2 with the law firm of Jackson Kelly, for
3 AmerisourceBergen Drug Corporation.  I'm here today
4 with Al Sebok for AmerisourceBergen, and I believe
5 Shannon McClure as well.
6     MR. RUBY:  Steve Ruby, Cardinal
7 Health.
8     MR. ROBERT FITZSIMMONS:  Bob
9 Fitzsimmons on behalf of the Plaintiff, Huntington
10 and Cabell County.
11     MR. CLAYTON FITZSIMMONS:  Clayton
12 Fitzsimmons on behalf of the Plaintiff, City of
13 Huntington.
14     MS. NOEL:  Heather Noel on behalf of
15 David Potters.
16     MR. TAYLOR:  Justin Taylor on behalf
17 of David Potters and the West Virginia Board of
18 Pharmacy.
19     VIDEOGRAPHER:  Does anyone remotely
20 need to announce their presence?
21     MR. EPPICH:  This is Chris Eppich of
22 Covington & Burling, and with me is Alison DiCiurcio.
23     MS. MCCLURE:  Shannon McClure, from
24 Reed Smith, for AmerisourceBergen.

Page 7

1     P R O C E E D I N G S
2     VIDEOGRAPHER:  Good morning.  We are
3 at 10:05 a.m. on August 14th, 2020.  This is Media
4 Unit One of the video recorded deposition of David
5 Potters, taken by counsel for Defendant in the matter
6 of the City of Huntington and the Cabell County
7 Commission, vs. AmerisourceBergen Drug Corporation,
8 et al, filed in the U.S. District Court for the
9 Southern District of West Virginia, Case Nos.
10 3:17-01362 and 3:17-0165.  This deposition is being
11 held at Jackson Kelly, located in Charleston,
12 West Virginia.
13     My name is Chris Leigh from the firm
14 Veritext, and I'm the videographer.  The court
15 reporter is Twyla Donathan, from the firm Veritext.I
16 am not authorized to administer an oath.  I am not
17 related to any party in this action, nor am I
18 financially interested in the outcome.
19     Counsel and all present in the room
20 and everyone attending remotely will now state their
21 appearance and affiliations for the record.  If there
22 are any objections to proceeding, please state them
23 at the time of your appearance beginning with the
24 noticing attorney.

Page 9

1     (Witness duly sworn)
2     D A V I D   P O T T E R S
3 having been duly sworn, testified as follows:
4 EXAMINATION BY COUNSEL FOR AMERISOURCEBERGEN:
5 BY MS. CALLAS:
6   Q   Good morning, David.  How are you today?
7   A   I'm good.  How are you?
8   Q   Good.  I want you to start by telling us
9 your full name.
10   A   It's David Earl, E-A-R-L, Potters.
11   Q   And do you go by David or Dave?
12   A   Either one.
13   Q   Who is your current employer?
14   A   The City of Charleston, West Virginia.
15   Q   And how long have you been employed there?
16   A   The first time a little less than two
17 years, and I believe it was '06, '07.  And then I've
18 been there for about two years now, a little over two
19 years now.
20   Q   So we're here today to talk to you about
21 your time with the West Virginia Board of Pharmacy.
22 So I'm going to start by asking you a few questions
23 about that.  Tell me when you started with the
24 West Virginia Board of Pharmacy.

3 (Pages 6 - 9)

Veritext Legal Solutions