# EXHIBIT 2

Page 1

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2
3
   * * * * * * * * * * * * * * * * * * * * * * *
4
   THE CITY OF HUNTINGTON,
5
              Plaintiff,
6
   vs.                                  CIVIL ACTION
7                                       NO. 3:17-01362
   AMERISOURCEBERGEN DRUG
8  CORPORATION, et al.,
9            Defendants.
10 _____
11 CABELL COUNTY COMMISSION,
12           Plaintiff,
13 vs.                                  CIVIL ACTION
                                        NO. 3:17-01665
14 AMERISOURCEBERGEN DRUG
   CORPORATION, et al.,
15
              Defendants.
16
   * * * * * * * * * * * * * * * * * * * * * * *
17
18
19        Videotaped and Zoom videoconference
   deposition of CRAIG MCCANN, PH.D. taken by the
20 Defendants under the Federal Rules of Civil
   Procedure in the above-entitled action, pursuant to
21 notice, before Jennifer Vail-Kirkbride, a Registered
   Merit Reporter, on the 1st day of September, 2020.
22
23
24

Page 13

1   morning, but I'll try to speak up.

2       Q.  Okay, so Doctor McCann, I am going to refer

3   collectively to those instances of prior testimony

4   as your prior opioid testimony.  Is that fair?

5       A.  Yes.

6       Q.  Okay.  And since giving your prior opioid

7   testimony, have you developed any additional

8   expertise related to suspicious order monitoring for

9   pharmaceuticals?

10      A.  No.

11      Q.  You don't hold yourself out as an expert

12  today in suspicious order monitoring?

13      A.  Correct.

14      Q.  Have you -- since giving your prior opioid

15  testimony, have you reviewed the suspicious order

16  monitoring programs for any of the distributor

17  defendants in this case?

18      A.  No.

19      Q.  Do you know or have you come to learn since

20  giving your prior opioid testimony whether any of

21  the distributor defendants has ever used any of the

22  five flagging methodologies that you discuss in your

23  report?

24      A.  No.

1  Q.  Have you since giving your prior opioid

2  testimony formed any opinion as to whether any of

3  the five flagging methods that you discuss in your

4  report are appropriate for identifying flagged

5  orders?

6  A.  Well, they are certainly appropriate for

7  the purpose I put them to in this report.  I'm not

8  opining that any one of them individually should be

9  implemented by any of the distributors that would --

10  that would require more work and more information

11  about the internal systems I have, but for the

12  purposes that I put them to, they were certainly

13  appropriate.

14  Q.  Okay.  And that sort of leads to my -- my

15  next question, which is whether since giving your

16  prior opioid testimony, you have formed any opinion

17  as to whether any of the five flagging methodologies

18  that you discuss in your report is appropriate for

19  identifying suspicious orders?

20  A.  Not beyond the answer I gave you to the

21  previous question.  They are appropriate for the

22  purpose that I put them to in this report.  They

23  would need to be developed further or enhanced with

24  internal information at the distributors that I

Page 15

1   don't have and would require more work, but

2   conceptually I think that -- that they would be

3   useful and for the distributors and they are

4   certainly appropriate for the purpose I put them to.

5        Q.   Okay.   Doctor McCann, I don't mean this in

6   any sort of pejorative sense, but you, yourself,

7   have testified multiple times repeatedly, you are

8   just the calculator.   Do you recall testifying to

9   that effect?

10       A.   Yes, at least in some context, including

11  significant aspects of my work here, that's correct.

12       Q.   And -- and so do you -- you stand by that

13  with respect to the opinions and conclusions that

14  you set forth in your report in -- in this case?

15       A.   Well, certainly with respect to the

16  flagging methods you were just asking me about.   I

17  think that that is approximately half of the report,

18  maybe less than half -- maybe substantially less

19  than half of the report.   The rest of the report

20  deals with processing the ARCOS data and producing

21  summaries of that data.   And I -- I think that goes

22  beyond being a simple calculator.

23            But when I have in the past discussed

24  the flagging methods, I explained that I took that

Page 17

1    bring down or a bring forward, you -- you have been

2    asked a lot about prior discussions that you may

3    have had with other experts for the plaintiffs in

4    these opioid lawsuits, and that testimony stands as

5    it is and I don't intend to ask you again about any

6    meetings that you may have had or discussions that

7    you may have had with Mr. Rafalski, for example, or

8    any of the other plaintiffs' experts.

9              But I am interested to know whether

10   since you gave your prior opioid testimony, you had

11   any additional discussions?  Let's start with

12   Mr. Rafalski?

13        A.   Yes.  I have.

14        Q.   Okay.  When was that?

15        A.   Saturday morning, this past weekend.

16        Q.   And since your prior opioid testimony, is

17   that the only discussion you have had with

18   Mr. Rafalski?

19        A.   Yes.

20        Q.   Was anyone else a part of that discussion?

21        A.   Yes, some of the plaintiffs' lawyers were

22   on that call.  They -- they coordinated it and I

23   participated.

24        Q.   Okay.  So just in terms of the attendance

Page 18

1    list, we have got you, we have got Mr. Rafalski,

2    Certain plaintiffs' attorneys.  Anyone else?

3         A.  Yes.  One staff member from my office, Mike

4    Yan, Y-A-N.

5         Q.  Anyone else?

6         A.  No, I think the others were -- were lawyers

7    or staff at the law firms.  There were three or four

8    people on the call besides Mr. Rafalski, Mike, and

9    myself.

10        Q.  Was it a videoconference like this or a

11   phone call or --

12        A.  A videoconference, yes.

13        Q.  Were there any written materials,

14   PowerPoint slides, other documents exchanged before

15   or during the meeting?

16        A.  No.

17        Q.  How long was the meeting?

18        A.  Approximately 30 minutes.  It might have

19   been five or ten minutes more or less, but there was

20   -- it was approximately 30 minutes.

21        Q.  What was the purpose of the meeting?

22        A.  Well, I'm not entirely certain.  I didn't

23   organize it.  I can tell you about the substance of

24   the -- what I participated in.  I can't really -- I

Page 19

```
 1   don't know what the purpose was.
 2       Q.  Okay.  Please do.
 3       A.  Well, the -- the main thing I remember is
 4   that there were some details of our flagging methods
 5   that -- that I think we have discussed in prior
 6   depositions that may not be fully explained in the
 7   expert reports.  And Mr. Rafalski had some
 8   understanding of what we had done, and he just
 9   wanted to confirm that his understanding was correct
10   directly with me.  He had received an understanding
11   of what we had done as a result of back and forth
12   through the attorneys, and he wanted to just ask
13   some questions and confirm directly with us that
14   understanding.  And that's what we did.
15       Q.  Okay, just so I'm sure that I'm following
16   your answer, is it your testimony that Mr. Rafalski
17   was attempting to confirm his understanding of how
18   you and your team applied one or more of the
19   flagging methodologies?
20       A.  Yes, I think that is how I would
21   characterize it.  As I said, he -- he had an
22   understanding.  It turned out to be correct.  I
23   don't think that we -- we ended up correcting or
24   changing his understanding in any way, but he had an
```

Page 20

1   understanding of exactly how we had implemented the

2   flagging methods as a result of communications with

3   us through the lawyers.  But since he had been asked

4   in prior depositions about his understanding, he

5   just wanted to confirm that -- that his

6   understanding was correct.

7              That's what I -- that's what I took

8   away from the discussion, although, again, what he

9   wanted to do or what the attorneys who set up the

10  call wanted to do, I don't know.  You would have to

11  ask them.  I can only tell you what I experienced

12  during that 25- or 30- or 35-minute call.  And it is

13  as I described it.

14     Q.  You mentioned that Mr. Rafalski -- first,

15  let me back up.  Was the discussion that you had

16  with Mr. Rafalski related to all of the flagging

17  methods or some number of them less than all?

18     A.  Some number less than all.  Well, I'm

19  sorry.  There might be some aspect of some of the

20  discussion that would touch on all of them.  I guess

21  there was, but, uhm, any sort of detail questions

22  would have been on -- on only a subset of the five

23  or six flagging methods.

24     Q.  Okay.  Can you expand for me, please, on

Page 104

1   document out and send it to you?

2        A.   I don't recall precisely.  I saw this first

3   a couple of years ago when we started and I'm

4   certain that I didn't independently identify this

5   document and ask the lawyers for a copy.  Exactly

6   how they, to use your language, picked it out and

7   sent it to me, I don't recall.  Whether it was

8   something that they -- they left me for context

9   early on or exactly how I -- how I first came into

10  possession of this, but it was -- it was a couple of

11  years ago.

12       Q.   Doctor McCann, you did not independently go

13  out and obtain a copy of this opinion yourself, did

14  you?

15       A.   Correct.

16       Q.   How do you use the Masters decision in your

17  analysis?

18       A.   Uhm, well, to just get a -- a general sense

19  of -- of what the Court -- to get a general sense of

20  what the Court described as a potentially suspicious

21  order.

22       Q.   Okay.  Does the Masters decision describe

23  the assumption you were asked by plaintiffs' counsel

24  to apply?

Page 105

1      A.  No, it doesn't provide that level of

2  detail.

3      Q.  Is the Masters decision the only document

4  that you used to develop your computer algorithm for

5  the maximum monthly trailing six-month threshold

6  methodology?

7      A.  Well, not literally.  Of course, there is a

8  lot of work done with the ARCOS data and a lot of

9  documents that went into that, but if you are

10  talking about after all of that is done, that we sit

11  down with the data so that -- to implement this

12  first algorithm, I guess at some level that's

13  correct.  I can't think of any other document

14  besides this document that -- that I used at least

15  conceptually to think about the first algorithm.

16      Q.  You didn't review any operating procedures

17  for the Masters suspicious order monitoring program?

18      A.  Correct.

19      Q.  You didn't refer to any witness testimony

20  taken during the Masters case.

21      A.  Correct.

22      Q.  You didn't talk to anyone at Masters

23  Pharmaceuticals about its suspicious order

24  monitoring program?

Page 115

1    I would have agreed with you, yes.  But then when

2    you add that phrase, you are characterizing what we

3    did in our code incorrectly.

4        Q.  Masters did not compare a calendar month

5    shipments to those shipments made during the prior

6    six calendar months; correct?

7        A.  Correct.

8        Q.  Masters compared a rolling 30-day shipment

9    history to shipments made during the prior six

10   months; correct?

11       A.  That is what this document says.

12       Q.  Yes or no, sir?

13       A.  I don't know what they actually did.  I am

14   just saying -- that's how I understand what you just

15   read out of this document.

16       Q.  And you agree that your computer algorithm

17   for the maximum monthly trailing six-month threshold

18   methodology does not follow what we have read here

19   in the operating procedures for the SOMS program

20   described in the Masters Pharmaceutical

21   Comprehensive Compliance Policy Manual that has been

22   marked as Exhibit 6?

23       A.  Correct.

24       Q.  If we could turn back to page 61 of your

1        Q.  And you agree, sir, that your trailing
2    six-month maximum monthly fixed after first
3    triggered threshold methodology does not follow the
4    operating procedures of the SOMS program described
5    in the Masters Pharmaceutical Comprehensive
6    Compliance Policy Manual, Exhibit 6?
7        A.  Correct.
8        Q.  Let's turn to page 68 in your report,
9    sir.  Page 68, you describe methodology 4, the three
10   times trailing 12-month average pharmacy dosage
11   units.  Do you see that, sir?
12       A.  Yes.
13       Q.  In paragraph 117, you describe this
14   methodology 4 and it reads "Under the fourth
15   approach, I identify transactions that cause the
16   number of dosage units shipped by a distributor
17   defendant to a pharmacy in a calendar month to
18   exceed three times the trailing 12-month average
19   dosage units to retail and chain pharmacies served
20   by the distributor defendant."  Did I read that
21   correctly, sir?
22       A.  Yes.
23       Q.  You developed a computer algorithm to
24   operationalize the three times trailing 12-month

Page 125

1    or the fourth method intended to implement the

2    Chemical Handler's Manual.  I think as we have

3    discussed before, each of these methods are stylized

4    illustrations suggested by the underlying documents

5    that you have identified, not attempting to

6    implement these documents precisely.

7                    MR. MOUGEY:  Move to strike everything

8    after "yes."

9         Q.  Doctor McCann, you reviewed the standard

10   operating procedures from McKesson's Lifestyle Drug

11   Monitoring Program, yes or no?

12        A.  I apologize.  Could you ask that again,

13   please, Mr. Eppich?

14        Q.  Yes, of course.  You reviewed the standard

15   operating procedures from McKesson's Lifestyle Drug

16   Monitoring Program; correct?

17        A.  Correct.

18        Q.  Now you cite to those standard operating

19   procedures in your list of materials considered;

20   correct?

21        A.  Correct.

22        Q.  And when you were designing your computer

23   algorithm to operationalize the maximum 8,000 dosage

24   units monthly, you had to choose which drugs to