# EXHIBIT 6

```
 1                                                                    1

 2       SUPREME COURT OF THE STATE OF NEW YORK
         COUNTY OF SUFFOLK: PART 48
 3       ------------------------------------------------x

 4       IN RE: OPIOID LITIGATION

 5
                                     INDEX NO.:400000/2017
 6
         ------------------------------------------------x
 7
                                     August 18, 2020
 8                                   Central Islip, New York

 9
                     MINUTES OF FRYE HEARING
10                   (Testimony of James Rafalski

11       B E F O R E:       HON. JERRY GARGUILO
                            Supreme Court Justice
12
         A P P E A R A N C E S:
13
         SIMMONS HANLY CONROY, LLC
14       Attorneys for Suffolk County
         112 Madison Avenue
15       New York, New York 10016
         BY:  PAUL J. HANLY, JR., ESQ.
16            JAYNE CONROY, ESQ,
              (212) 784-6401
17            phanly@simmonsfirm.com
              jconroy@simmonsfirm.com
18

19       NAPOLI SHKOLNIK, PLLC
         Attorneys for Nassau County
20       400 Broadhollow Road, Suite 305
         Melville, New York 11747
21       BY:  HUNTER SKOLNICK, ESQ.
              SALVATORE C. BADALA, ESQ.
22            JOSEPH L. CIACCIO, ESQ.
              (212)397-1000
23            pnapoli@napolilaw.com
              sbadala@napolilaw.com
24            jciaccio@napolilaw.com

25
```

```
 1                    Opioid Frye Hearing                    6
 2          Q.   And, sir, can I ask you to focus on my
 3    questions.  There's a regulation that contains that
 4    requirement to report orders of unusual size,
 5    pattern or frequency, correct?
 6          A    That is correct.
 7          Q.   You agree with me that that regulation
 8    gives some guidance on a suspicious order, but you
 9    think the actual full definition is up to the
10    registrar depending on a lot of factors, the scope
11    of their business, and the scope of those customers
12    that receive products from them?
13          A    Yes, sir.
14          Q.   For example, the regulation does not
15    tell distributors how to figure out if an order is
16    of unusual size, correct?
17          A    That's correct.
18          Q.   That's up to the registrar to define,
19    correct?
20          A    Yes.
21          Q.   There's no single generally accepted way
22    to say this is an order of unusual size, correct?
23          A    There's not any language specific to
24    that statement, you mean, no, sir.
25          Q.   There's no single generally accepted way
```

```
 1                    Opioid Frye Hearing                    7
 2    to say this is an order of unusual frequency or
 3    unusual pattern, correct?
 4         A    That is correct, sir.
 5         Q.   And you're aware that government
 6    watchdogs, some of the ones we talked about
 7    yesterday, have recommended that it would be good
 8    for the DEA to develop additional guidance for
 9    distributors and manufacturers when it comes to
10    suspicious order monitoring and suspicious order
11    reporting?
12         A    I am aware of that either publications
13    or that information, yes, sir.
14         Q.   And you agree with that recommendation,
15    correct?
16         A    Generally speaking, yes.  Maybe not --
17    maybe you might interpret that question different
18    than me, but, yes, generally, yes.
19         Q.   Using your words in terms of lack of
20    greater clarity from the DEA, the reason for the
21    lack of greater clarity from the DEA is that you
22    don't really think there's a one-size-fits-all
23    suspicious monitoring system or program, correct?
24         A    Yes.  I don't think I used that exact
25    terminology, but that concept would be consistent
```

```
 1                     Opioid Frye Hearing                    8
 2     for the way that I answered about that, yes, sir.
 3          Q.   There's no one-size-fits-all suspicious
 4     order monitoring system, correct?
 5          A    Yes, that's correct.  Yes, sir.
 6          Q.   Even today distributors or manufacturers
 7     are left to design their own suspicious order
 8     monitoring programs, correct?
 9          A    They are, yes, sir.
10          Q.   And there's no generally accepted system
11     saying this is exactly what a suspicious order
12     monitoring system has to look like, correct?
13          A    That's correct.
14          Q.   As a result every distributor and every
15     manufacturers' suspicious order monitoring programs
16     are different from each other, right?
17          A    Yes.  Yes.  In some ways there are some
18     differences.
19          Q.   And you read, as part of your
20     preparation in this case, testimony from the DEA's
21     former head of Office of Diversion Control, Joe
22     Rannazzisi, correct?
23          A    I have read some of his deposition
24     testimony, yes, sir.
25          Q.   I take it you saw that when he was asked
```

```
 1                    Opioid Frye Hearing                    9
 2     about giving guidance or giving a checklist to
 3     registrants as to what's required to be in a
 4     suspicious order monitoring system, he said that's a
 5     business decision based on what the registrant's
 6     needs are, and the Drug Enforcement Administration
 7     does not tell a registrant what that specific system
 8     should look like.
 9               Do you remember seeing that testimony
10     from him?
11          A    I do not recall that.  I could review
12     it, if you'd like, but I don't disagree with that
13     statement.
14          Q.   Well, that's where I was going.  Maybe I
15     can short circuit it.  Do you agree with the idea
16     that when it comes to designing a suspicious order
17     monitoring system, that's a business decision based
18     on what the registrant's needs are, and the Drug
19     Enforcement Administration does not tell a
20     registrant what that specific system should look
21     like?
22          A    I agree with that statement.
23          Q.   And I lost you for a second.  Did you
24     say you agree with that statement?
25          A    I did.  I agree with that statement,
```

```
 1                    Opioid Frye Hearing                  10
 2    sir.
 3         Q.   Evaluating suspicious order monitoring
 4    programs has to involve a company-by-company
 5    assessment, correct?
 6         A    You mean a customer-by-customer
 7    assessment?
 8         Q.   And companies by companies in terms of
 9    their business and who they're dealing with.
10         A    Yes.  Yes, sir.
11         Q.   What works for one distributor or
12    manufacturer in your view may not necessarily work
13    for another, correct?
14         A    It may work, but I don't think that I
15    would impose one system from one company on another,
16    but, certainly there are some businesses that are
17    very similar that potentially they could work.
18         Q.   In your report you lay out some I think
19    you call it key components that you believe should
20    be included in a suspicious order monitoring system.
21    Are you aware of that?
22         A    In my report?
23         Q.   Yes, sir.
24         A    I don't know if I say they should be
25    included, if that's my exact language.  I think that
```

```
 1                  Opioid Frye Hearing                    11
 2     I might say that one would expect to see, but yes,
 3     sir.
 4            Q.    Well, actually that's where I'm going,
 5     is it possible to have a compliant suspicious order
 6     monitoring system without all of those components?
 7            A     Depending on the scope of business or
 8     the type of customer, I think it's possible to not
 9     include some of those things.
10            Q.    Okay.  There are no -- stated
11     differently -- there are no generally accepted set
12     of requirements that every single suspicious order
13     monitoring program must have, correct?
14            A     Correct statement.
15            Q.    Let's look at Plaintiff's Exhibit 1.
16     Chris, it's Tab 1 in the binder that we -- it's Tab
17     1 in our document set that we used yesterday.
18                  This is your report, Mr. Rafalski, and
19     could we put that up on the screen, please?  Page
20     45, please.  You have a section of your report that
21     says, Analysis of the methodologies to quantify
22     suspicious orders distributed in New York.  Do you
23     see that?
24            A     Yes, sir.
25            Q.    And if you look down near the bottom
```

```
 1                    Opioid Frye Hearing                   20
 2    review.
 3         Q.   Okay.  I want to go back to your
 4    methods.  You talked a lot yesterday about what you
 5    did while you were at the DEA.  Am I correct that
 6    while you were at the DEA, the DEA never analyzed
 7    ARCOS data using the methodologies that Dr. McCann
 8    presented and you also presented in your report?
 9         A    That exact specific scenario, no, sir.
10         Q.   You never used those methodologies,
11    correct?
12         A    No, sir.
13         Q.   And I think the way I'm asking the
14    question, I just want to make sure we're not talking
15    past each other.  What I said is correct, yes?
16         A    I never specifically applied these
17    methodologies during one of my occasions, and I'm
18    not aware that the DEA did.  I'm not saying they
19    didn't, but typically these methodologies, no, sir.
20         Q.   Thank you.  Before I dive into
21    Methodology A, which is the one I'm going to focus
22    on because it's the one that you rely on, I want to
23    cover some general points about your work regarding
24    flagged orders and suspicious orders.
25              And let's go back to Plaintiff's Exhibit
```

```
 1                    Opioid Frye Hearing                    23
 2     diligence file.
 3           Q.    That's true for all distributors?
 4           A     Yes, sir.
 5           Q.    That's true for all manufacturers?
 6           A     Yes, sir.
 7           Q.    That's true for pharmacy Defendants in
 8     this case?
 9           A     Every specific due diligence file,
10     that's a correct statement, yes, sir.
11           Q.    You told us yesterday that it is
12     absolutely important that there be an uninterrupted
13     supply of prescription opioids for patients who need
14     them.  Do you recall that testimony?
15           A     I stand by that statement.
16           Q.    You agree that manufacturers and
17     distributors and pharmacies play an important role
18     in ensuring an adequate and uninterrupted supply of
19     legitimate prescription opioids, correct?
20           A     Yes, sir.
21           Q.    And relevant to ensuring the
22     distributors and pharmacies and manufacturers play
23     that role, that critical role in ensuring an
24     adequate and uninterrupted supply of legitimate
25     prescription opioids, you don't have an estimate as
```

```
 1                    Opioid Frye Hearing                  24
 2    to how much of prescribing or prescriptions are
 3    legitimate in terms of prescription opioids?
 4          A    I wasn't requested to conduct that
 5    analysis so, no, sir, I do not.
 6              THE COURT:  Mr. Schmidt, in connection
 7          with strictly a Frye analysis, strictly a
 8          Frye analysis, where are you going with this
 9          line of questioning?
10              Frye analysis over here, and, of course,
11          examination during the trial of foundational
12          material.
13              It seems to the Court, and perhaps it's
14          far from me to question your needs and
15          methods -- pardon the play on the words
16          gentlemen and ladies -- what's the
17          connection?
18              The Frye analysis -- the Court expects
19          to hear a detailed explanation of
20          methodology.  The Court expects to hear
21          testimony as to general acceptance or
22          consensus of the methodology and testimony as
23          to reliability.
24              It seems to the Court that a great deal
25          of your examination is dealing with the
```

```
 1                 Opioid Frye Hearing                  33
 2              Now, was it -- did they use specifically
 3    a, you know, methodology or diagnostic tool A, B, C,
 4    or D, no, but within the DEA, I believe the same
 5    type of analysis was conducted to come to some
 6    conclusion on some of the cases, yes, sir.
 7         Q.   Okay.  That's not my question, sir.
 8    Please focus on my question.  Can you point me to
 9    any time you're aware of when anyone has used Method
10    A to try to estimate, not flagged orders, not even
11    suspicious orders, but actually diverted orders?
12    Yes or no.
13         A    No.
14         Q.   Is it generally accepted?  Is there any
15    measure of general acceptance you can point me to
16    for using Method A to estimate, not flagged orders,
17    not suspicious orders, but actually diverted orders,
18    as you have done in your testimony?
19         A    No.
20         Q.   Are you aware that the DEA has actually
21    used techniques to try to estimate the amount of
22    diversion?
23         A    Yes.
24         Q.   And are you aware of the numbers that
25    they have come up with when they use those
```

```
 1                    Opioid Frye Hearing                    38
 2             A    Yes, sir.
 3             Q.   We can take that title down.  If you
 4    look across the top, there's a year of -- there's a
 5    range of years.  I'm going to focus on what DEA was
 6    focused on, 2018.  Do you see that?
 7             A    Yes.
 8                  MR. SCHMIDT:  And I'm sorry that this is
 9             not the most elegant way to be able to show
10             this to you.  It's hard doing this remotely,
11             but, Chris, could we call out the line for
12             hydrocodone sale and oxycodone sale, please.
13    BY MR. SCHMIDT:
14             Q.   And I hope you can see this with me,
15    Mr. Rafalski.  I just want to lay out what the math
16    is, and then I'll tell you what I get from these
17    numbers.
18                  The hydrocodone estimated diversion from
19    the DEA is, if we look at the left, 24.259.  Do you
20    remember that number?
21             A    Yes.
22             Q.   And if we divide that by the 2018 number
23    for total hydrocodone it's 43,027.640, correct?
24             A    Yes, sir.
25             Q.   And that comes up to .056 percent.  Does
```

```
 1                   Opioid Frye Hearing                39
 2     that sound right to you?
 3          A    Yeah.  I wouldn't argue with that.  I'm
 4     not going to calculate it, but...
 5          Q.   And let's just do the same for
 6     oxycodone.  It's kind of covered, if you can pull
 7     the left side down a little bit, Chris.  There we
 8     go.
 9               So for oxycodone the amount of diversion
10     for 2008 is 57.051; do you see that?
11          A    Yes, sir.
12          Q.   Divided by 79,596.606.  Do you see that?
13          A    I don't see the .606.  Is that the
14     calculation you're doing?
15          Q.   No.  That's the number at the end of --
16               THE COURT:  It's a suggested
17          calculation.
18               MR. SCHMIDT:  No, it's actually not.
19          That's the number reported in Exhibit I of
20          the table.  It's probably hard to read.
21          Maybe we can blow up that number a little
22          bit, the 79,596.606 under 2018, Chris.
23     BY MR. SCHMIDT:
24          Q.   Do you see that?
25          A    I can see that number, but my
```

```
 1                    Opioid Frye Hearing                     42
 2          Q.   Okay.  And you don't have alternative
 3   numbers using either their methodology or any other
 4   methodology for actual diversion for years other
 5   than 2018, correct?
 6          A    I do not.
 7          Q.   Okay.  Let me go back to some of the
 8   questions I was asking you.  Do you know if any of
 9   the orders that were flagged by Dr. McCann's
10   methodology that you adopted, do you know if any of
11   those orders were actually diverted?
12          A    When you say the word "actually," I have
13   to answer that no, sir.
14          Q.   You don't know?
15          A    No, sir.
16          Q.   To the contrary, would you agree with me
17   that just a suspicious order in an amount outside of
18   the normal, which is either an amount that's a large
19   order, orders that are frequent orders, or the other
20   criteria that's listed in the regulation, that in
21   itself doesn't mean guarantee that it's going to be
22   put into an illicit market?
23               Do you agree with that?  And I'll just
24   ask, I don't know if you heard the end of what I
25   said.  Someone was not on mute, so I'll just ask
```

```
 1                  Opioid Frye Hearing              58
 2    you turned in this report, did you?
 3         A    Well, your first question was pretty
 4    broad.  Specifically about this report, no, sir.
 5         Q.   You didn't read his deposition in the
 6    New York case, did you?
 7         A    I read portions of it.
 8         Q.   But not in its entirety?
 9         A    No, not the entirety.
10         Q.   You've not checked his calculations,
11    have you?
12         A    Definitely I have not done that, sir.
13         Q.   And in terms of what we see on this
14    page, your Method A, this is, again, copied in this
15    case word for word and number for number from what
16    Dr. McCann did, correct?
17         A    That would be my expectations, yes, sir.
18         Q.   You didn't change anything?
19         A    I did not.
20         Q.   And even the format that this appears
21    in, that was given to you and adopted by you as your
22    own, in your words, correct?
23         A    The Excel spreadsheet system, yes, I
24    didn't design this.  That's correct.
25         Q.   You didn't know, until we talked at your
```

```
 1                  Opioid Frye Hearing                     59
 2      deposition, that in coming up with these numbers and
 3      getting from the data to the opinions you offered,
 4      the methodology he used that you adopted, you didn't
 5      know until we talked at your deposition that he had
 6      to make some judgment calls in coming up with these
 7      numbers, did you?
 8            A     So I remember that testimony, and I
 9      think there were some -- I think the term that was
10      used was assumptions, and I was a little confused by
11      that.
12                  I know there was some questions on how
13      to apply the methodology, and I -- so I may have
14      answered that I did not know, but I think I was
15      confused by the question.
16            Q.    You knew his algorithm required certain
17      judgment calls?
18            A     Well, I had some discussions or -- not
19      directly with him in regards to the start and stop
20      point, whether it was 30 days or whether it was
21      calendar months, but specifically I know there was a
22      little bit of he needed to make some assumptions or
23      judgments to run it, but specifically, I didn't have
24      any conversations directly with him about it.
25            Q.    And you can't say, one way or another,
```

```
 1                    Opioid Frye Hearing                    60
 2     whether you agree with the judgment calls he made in
 3     performing his algorithm, correct?
 4            A     That's not a totally true statement.  So
 5     on applying the Methodology A, if you went by the
 6     calendar months, I would agree.  I agree with that.
 7            Q.    Is it true that you don't know the
 8     entirety of his judgment calls?
 9            A     I reviewed his deposition testimony.  If
10     there's some outside of that, I would not be aware
11     of them.
12            Q.    Okay.  Let's look at your February 7th,
13     2020 deposition transcript, page 204, line 13 to 22.
14     This is Tab 2, page 204, 13 to 22.
15                  "QUESTION:  Okay.  Maybe that answers my
16            next question, which is do you know, can you
17            say one way or the other whether you agree
18            with the judgment calls he made in performing
19            his algorithm?
20                  ANSWER:  I don't know the entirety of
21            his judgment call, so I can't, I can't answer
22            that question."
23                  Did I read that correctly?
24            A     You did.
25            Q.    Do you recall being asked that question
```

```
 1                      Opioid Frye Hearing                    61
 2     and giving that answer at your deposition?
 3          A    I don't specifically recall it, but I
 4     don't dispute the deposition record.
 5          Q.   Do you dispute the truth of that
 6     statement?
 7          A    Yes, sir.
 8          Q.   You do dispute the truth of that
 9     statement that you made?
10          A    I do not.  I'm sorry.
11          Q.   Okay.  And you looked at his testimony.
12     Do you see the part of his testimony where he said,
13     I probably would come up with 5 or 10 different
14     small decisions that needed to be made in order to
15     operationalize it?  Did you see that portion of his
16     testimony?
17          A    I don't specifically recall that.
18          Q.   Okay.  Do you know what the 5 to 10
19     decisions he had to make to be able to perform his
20     Method A calculation that you relied on?  Do you
21     know what those 5 to 10 decisions were?
22          A    No, sir.
23          Q.   So not knowing how he took the data and
24     made the 5 to 10 decisions, you don't know how far
25     of a gap there is between his outputs and that
```

```
 1                    Opioid Frye Hearing                    62
 2     additional data in terms of those 5 to 10 decisions
 3     that he made.  Am I correct in that?
 4          A    Yes, sir.  That's correct.  That is a
 5     correct statement.
 6          Q.   Now, let's show the Judge how your
 7     method works in application.  Under your Method A,
 8     you look to see if the level of opioids in a given
 9     month is more than any in the prior single six
10     months, right?
11          A    Trailing six months, yes, sir.
12               MR. SCHMIDT:  And if we illustrate that,
13          can we pull out Demonstrative Exhibit 4?
14          We'll mark this as Court Exhibit K.  Let me
15          just give a moment for it to be passed out in
16          court.
17     BY MR. SCHMIDT:
18          Q.   So do you see I've written up on the
19     screen, Year 1.  I start in February, 5,000, go
20     through July, and the number of pills vary per
21     month, 5,000, 10,000, 7,000, 8,000, 9,500.  Do you
22     see that?
23          A    I do.
24          Q.   And do you recognize that these are the
25     very same numbers that Dr. McCann gives as an
```