# EXHIBIT 3
# FILED UNDER SEAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

3

   * * * * * * * * * * * * * * * * * * * * * * *

4

   THE CITY OF HUNTINGTON,

5

            Plaintiff,

6

   vs.                                 CIVIL ACTION
7                                       NO. 3:17-01362

   AMERISOURCEBERGEN DRUG
8  CORPORATION, et al.,
9            Defendants.
10 _____
11 CABELL COUNTY COMMISSION,
12           Plaintiff,
13 vs.                                  CIVIL ACTION
                                        NO. 3:17-01665
14 AMERISOURCEBERGEN DRUG
   CORPORATION, et al.,
15
            Defendants.
16
   * * * * * * * * * * * * * * * * * * * * * * *
17

18

19        Videotaped and Zoom video conference
   deposition of JAMES RAFALSKI taken by the Defendants
20 under the Federal Rules of Civil Procedure in the
   above-entitled action, pursuant to notice, before
21 Jennifer Vail-Kirkbride, a Registered Merit
   Reporter, on the 11th day of September, 2020.

22

23

24

1      Q.   And did that include testimony?  Did you

2    review testimony in detail?

3      A.   Uhm, in detail, uhm, that would -- to me --

4    when you define detail, would that be from beginning

5    to end?

6      Q.   Yes.

7      A.   In all of the depositions; no, sir.

8      Q.   Are there any depositions you read

9    beginning to end specific to the West Virginia case?

10     A.   Yes.

11     Q.   Which ones?

12     A.   Uh, I didn't keep notes on that, some of

13   the 30(b)s, I don't remember specifically which

14   ones.

15     Q.   Okay.  There are categories of documents,

16   obviously, you did not review; correct?

17     A.   Uh, I don't have any categories that I did

18   not review, but in the volume of the documents, I

19   think it's reasonable that I didn't look at every

20   one.

21     Q.   Well, for example, looking at your reliance

22   list, you did not review any West Virginia Board of

23   Pharmacy documents; correct?

24     A.   I don't have a direct relect --

Page 32

1    recollection of looking at those; no, sir.  I know

2    they were available to me.  I may have opened them

3    and glanced at them, but I -- I don't have any

4    recollection of analyzing them relative to any of

5    the pharmacies I was looking at; no, sir.

6              MR. SCHMIDT:  Well, then I will ask

7    counsel.  They don't appear on the reliance list,

8    which means either Mr. Rafalski didn't get them or

9    we've got a detective reliance list and we need to

10   get a corrected one so we can have a deposition on

11   the actual reliance list.  Is counsel representing

12   that the reliance list is accurate, including its

13   omission of any West Virginia Board of Pharmacy

14   documents?

15             MR. FULLER:  To the best of my

16   knowledge at this point.

17       Q.  Okay.  And you didn't review any deposition

18   transcripts of any West Virginia Board of Pharmacy

19   witnesses; correct, Mr. Rafalski?

20       A.  I do not recall reviewing depositions of

21   Board of Pharmacies.

22       Q.  And none appear on your reliance list that

23   I believe you're looking at right now, correct?

24       A.  I do not see any; no, sir.

Page 33

1    Q.  And no West Virginia Board of Pharmacy

2    documents appear on your reliance list; correct?

3    A.  They do not.

4    Q.  Okay.

5    A.  And I don't -- I don't think I misspoke on

6    that.  I looked at a lot of documents.  I don't know

7    if maybe there were some contained in some of the

8    other records I looked at, but it does not appear on

9    my list.

10   Q.  Do you know how often the West Virginia

11   Board of Pharmacy reviews pharmacy licenses and

12   renews them?

13   A.  I do not, sir.

14   Q.  Do you know when that review process

15   occurs, that West Virginia Board of Pharmacy

16   officials actually inspect the pharmacies?

17   A.  Specific to West Virginia; no, sir.

18   Q.  Do you know that they often write detailed

19   reports on their inspections?

20   A.  If it's similar to the State of Michigan,

21   that would not surprise me, sir.  I think that is

22   one of their routine jobs.

23   Q.  Do you know if they do that?

24   A.  I do not.

1    Q.  Would reports written by West Virginia

2  Board of Pharmacy inspectors detailing their on-site

3  inspections of West Virginia pharmacies, including

4  West Virginia pharmacies you talked about, be useful

5  and relevant for you to review in assessing those

6  pharmacies?

7           Yes or no?

8    A.  I -- it's more complicated than a yes or

9  no.  It's a possibility -- [overtalking] it's a

10  possibility they could be relevant, depending on how

11  the assessment or the inspection was done.

12    Q.  Okay.

13    A.  Without being present and having a full

14  knowledge of what they did, I'm familiar with how,

15  you know, my DEA experience was more of a

16  recordkeeping inspection in the State of Michigan,

17  making sure that the records are maintained for, you

18  know, specifically prescriptions and drug storage

19  and records are on-site.

20           There wasn't -- unless it was a

21  focused investigation in Michigan - I'm only talking

22  about my experience with Michigan and somewhat with

23  Ohio - they weren't typical diversion investigations

24  unless that was their purpose outside of an

Page 35

1  inspection.

2      Q.  Do you know anything about how West

3  Virginia inspectors inspect pharmacies in the course

4  of renewing their registration every two years?

5      A.  I do not, sir; no, sir.

6      Q.  Okay, so let's focus on West Virginia.  I'm

7  not going to be asking you about Michigan because we

8  are not in a Michigan case.  In terms of West

9  Virginia, are you aware that the DEA in making

10  licensing decisions regarding pharmacies in West

11  Virginia routinely relied on actions taken by the

12  West Virginia Board of Pharmacy in terms of their

13  licensing decisions, yes or no?

14      A.  I am not aware if they did or didn't, sir.

15      Q.  Okay.  Would it be relevant to you if you

16  were talking about a West Virginia pharmacy and the

17  West Virginia pharmacy board -- the West Virginia

18  Board of Pharmacy inspected that pharmacy and in

19  their notes wrote "Good pharmacy," exclamation mark,

20  would that be relevant to you in evaluating that

21  pharmacy?

22              MR. FULLER:  Form.

23      Q.  Yes or no?

24      A.  I wouldn't put a high level of importance,

Page 44

```
 1   geographic areas.
 2        Q.   Why?
 3        A.   Because my report was designed to be for
 4   those two geographic areas.
 5        Q.   Why not look more broadly in West Virginia?
 6             Well, let me try the question
 7   differently, because I don't want to put you on the
 8   spot on this.
 9        A.   Did you understand your focus to be
10   pharmacies in Cabell County and in Huntington, yes
11   or no?
12             Or let me rephrase the question
13   because I think I'm tripping you up with
14   pharmacies.  Did you understand your focus to be on
15   distribution within Cabell County and Huntington,
16   yes or no?
17        A.   That question would be yes.
18        Q.   Okay.  Thanks for letting me rephrase it
19   then.
20        A.   Okay.
21        Q.   Did you review licensing documents from the
22   West Virginia Board of Pharmacy for the defendants
23   in this case?
24        A.   So -- so I understand that question, you're
```

Page 45

1   saying did I -- did I review the state licensing for
2   the -- for each of the three defendants?
3       Q.  Yes, sir.
4       A.  I don't think so; no, sir.
5       Q.  Do you know what standards West Virginia
6   applies to register distributor distribution centers
7   that distribute into the state of West Virginia?
8       A.  No, sir.
9       Q.  Do you know what findings they have to make
10  about the ability to maintain effective controls or
11  follow the law in order to register a distributor as
12  distribution centers to ship into West Virginia?
13      A.  No, sir.
14      Q.  Do you know what kind of inspections they
15  do to make findings about whether distributors'
16  operations are in compliance with all federal, legal
17  requirements applicable to wholesale distribution
18  before they allow them to ship into West Virginia?
19      A.  I do not, sir.
20      Q.  Do you know what findings they make
21  regarding the maintenance and effective controls
22  against diversion of controlled substances that West
23  Virginia makes in order to allow ship distributors
24  to ship into the state of West Virginia?

Page 46

1        A.   No, sir.

2        Q.   Is it fair to say that from your

3    perspective, you don't consider findings that the

4    West Virginia Board of Pharmacy has made regarding

5    these distributors in this case, their ability to

6    maintain effective controls or comply with the law

7    regarding controlled substances to be relevant to

8    your opinions?

9        A.   Well, understanding that I answered no to

10   all those questions, but in my review of the due

11   diligence documents that are submitted by the

12   defendants, I don't have any recollection of seeing

13   anything, any records or communications which was on

14   that subject matter.  So, you know, if those records

15   exist, I -- I either didn't have access to them or

16   they weren't provided or.

17             But I did not ever see any documents

18   in regards to West Virginia inspections or the

19   competency of distributors as assessed by West

20   Virginia, at least in the due diligence records, the

21   central and the subsequent records provided by the

22   defendants.

23       Q.   My question is simply:  Is it relevant to

24   you?  It is relevant to your opinions, the standards

Page 47

1   that -- and let me just -- I asked a poor
2   question.  I'm sorry.  I kind of paused for a
3   second.  Is it relevant to your opinion the
4   standards that West Virginia applies in allowing
5   distributors to distribute prescription opioids into
6   West Virginia?  Is that relevant to your opinions,
7   yes or no?
8       A.  I think it has a limited relevancy, but,
9   yes.
10      Q.  Okay.  Are the findings that West Virginia
11  makes regarding distributors and their distribution
12  centers relevant to your opinions, yes or no?
13      A.  Uhm, I think it has, again, a limited
14  relevancy based on I do not have any idea what type
15  of inspections, how in-depth, what they evaluate, so
16  it has a limited relevancy, so I would say yes.
17      Q.  Is it relevant to you that licensing
18  decisions and the renewals we were alluding to
19  earlier that the Board of Pharmacy in West Virginia
20  makes regarding pharmacies in West Virginia?
21      A.  No, I don't think that's relevant.
22      Q.  Okay.  Have you ever been to Cabell County,
23  sir?
24      A.  Yes.

Page 85

1      A.   Yes, sir.

2      Q.   West Virginia conduct?

3      A.   Yes, sir.

4      Q.   Okay.  Do you see these six flagging

5    analyses --

6      A.   I do.

7      Q.   -- starting on page 48?

8      A.   Yes, I do, sir.

9      Q.   Each of these six was performed by Doctor

10   McCann; correct?

11     A.   Yes, sir.

12     Q.   And you did not check the math on any of

13   these six; correct?

14     A.   I did not.

15     Q.   You did not speak with Doctor McCann before

16   he ran these calculations that were -- that you

17   adopted into your report; correct?

18     A.   That's correct, I did not.

19     Q.   As I understand it, for the first time you

20   spoke with Doctor McCann on August 29th?

21     A.   Not literally the first time, but the first

22   time in regards to CT2.

23     Q.   Okay.  And when did you literally speak to

24   him for the first time?

1      A.   Uhm, I don't remember the exact date, but

2   it was right after the ARCOS material was received

3   by his firm.  I was there at his firm for a couple

4   days and then subsequent.

5      Q.   Okay.

6      A.   Go ahead.  Sorry.

7      Q.   You didn't give him directions as to how to

8   run your -- these six analyses before he ran them

9   for CT2 and they were incorporated into your report;

10  correct?

11     A.   Are we speaking the first time I was with

12  him or is that just an open question ever?  I'm

13  sorry, I --

14     Q.   Before -- my question was before he ran

15  these analyses that appear in your report at CT 1,

16  you didn't speak with him about those analyses;

17  correct?

18     A.   I did not; no, sir.

19     Q.   Why did you speak with him after he ran

20  these analyses on August 29th?

21     A.   I had some -- a couple questions.  I read

22  his deposition.  I had a couple questions that I

23  needed some clarification on.

24     Q.   Okay.  So you read his deposition in this

Page 87

1   matter and then you had questions to clarify with

2   him?

3       A.  I believe that's the sequence; yes, sir.

4       Q.  And what were those questions?  What were

5   the points you wanted to clarify?

6       A.  Uh, the one point I remember is on the

7   Masters Methodology B, or we'll call it maybe

8   Masters B, I was -- wanted to make sure on the

9   triggering order that he was -- his calculation on

10  dosage units was the whole order and not the amount

11  that just was above the triggering amount, if that

12  hopefully makes sense to you.

13      Q.  It does, yes.  And you weren't sure of that

14  before you reached out to him? [overtalking]

15      A.  Well, no, that's why I reached out, if I

16  was sure, then I wouldn't have done it.

17      Q.  That's why that was an easy

18  question.  Collectively your different methods flag

19  tens of millions of orders; correct?

20      A.  They do.

21      Q.  You've not reviewed each of those flagged

22  orders; correct?

23      A.  No, sir.

24      Q.  Do you know how many of the tens of

Page 88

1    millions you've actually reviewed?

2         A.   Yes, I have not reviewed any of them.

3         Q.   None of the initial orders, none of the

4    follow-up orders; correct?

5         A.   No, sir.

6         Q.   So you did not personally determine whether

7    any of the flagged orders when you look at them, you

8    actually consider them to be suspicious; correct?

9         A.   Well, I think the fact that they are

10   identified by the trigger, the algorithm, makes --

11   makes them not a suspicious order.

12        Q.   Okay.  Did you individually review any of

13   them to see if you just looked at the order on its

14   face whether you would consider it to be suspicious?

15        A.   No, sir.

16        Q.   Did you individually look at any of them to

17   consider just based on the information you had about

18   the actual order whether you would consider it to be

19   likely to be diverted?

20        A.   Can you say that one more time, please.

21        Q.   Sure.  Did you look at the individual

22   orders to consider whether based on the information

23   actually reflected in the individual orders, you

24   would make the judgment that there were likely to be

Page 91

1    did you actually evaluate any single order and make

2    a judgment, "This order is likely to be diverted,"

3    based on the facts of looking at this order,

4    separate and apart from your flagging exercise.  Did

5    you look at any orders to see "Based on the facts of

6    this order I can come to a judgment that it's likely

7    to be diverted"?

8        A.  I think my opinion is that more likely than

9    not all of those orders are diverted.

10       Q.  Well, that's what I'm going to come to.  My

11   question is did you actually look at any of the

12   individual ones to say, "When I look at this

13   individual one, this looks like it's likely to be

14   diverted"?

15       A.  No, sir, not individually.

16       Q.  Okay.  Did you review the diligence files

17   for every one of these tens of millions of flagged

18   orders?

19       A.  There -- that wouldn't be possible.

20       Q.  For example, you can't say you reviewed the

21   complete diligence files for McKesson in Cabell

22   County; correct?

23       A.  Well, that's a different question, is that

24   outside of discussing the trigger orders?

Page 92

1      Q.   Just in total.   Or as to the trigger

2   orders, let me ask you as to the trigger orders.

3   Did you review all of the McKesson diligence files

4   for every one of tens of millions of triggered

5   orders in Cabell County that you identified?

6      A.   Well, there -- I didn't do that because I'm

7   not sure that when I applied the methodology, that

8   that triggered order would be investigated by

9   McKesson.   So it wouldn't have been -- I guess I

10  could have, but it -- I wouldn't expect that for

11  every triggered order McKesson would have conducted

12  a due diligence investigation because my application

13  is kind of hypothetical that McKesson didn't have

14  any knowledge.

15     Q.   Okay.   Did you -- where there was a

16  diligence file in these tens of millions of

17  triggered orders, did you review every diligence

18  order for McKesson that exists?

19     A.   Outside of the trigger -- outside of the

20  triggered orders, I reviewed the -- McKesson's due

21  diligence files.

22     Q.   As to triggered orders, where diligence

23  files exist as to the triggered orders, did you

24  review every one of the McKesson diligence files

1   corresponding to the tens of millions of triggered

2   orders?

3       A.  I did not.

4       Q.  Did you review every one of the ABDC

5   diligence files corresponding to the tens of

6   millions of triggered orders?  Where they exist.

7       A.  I'm struggling on this one, because if I

8   reviewed the due diligence files, I guess I would

9   have an expectation that somewhere in those

10  triggered orders would be potentially an order that

11  was triggered by a due diligence file I -- I

12  reviewed.  So to turn that around is -- is my review

13  of due diligence files I would have an expectation

14  that -- that there would be an order for that

15  particular customer.  Hopefully, that makes sense.

16      Q.  I'm not sure it does.  So let me follow

17  up.  As to Cardinal and ABDC for the tens of

18  millions of orders you flagged for them, do you know

19  yes or no, that you've reviewed all the diligence

20  files that exist regarding those tens of millions of

21  orders?

22      A.  It's difficult for me to answer because I

23  extensively reviewed some of the files, but if we

24  look -- when you say tens of millions of orders, I

Page 94

1    didn't specifically go in and confirm that one of

2    those identified orders was in the due diligence

3    file I reviewed.  So I guess if I don't specifically

4    know, I would say, no.

5        Q.  Okay.

6        A.  But I have a high -- high expectation that

7    that occurred, but I don't -- I didn't specifically

8    do it the way you asked, so I would answer no.

9        Q.  Okay.  And you said you -- you intensively

10   reviewed some of the diligence files.  Do you know

11   that you reviewed all the diligence files that have

12   been produced in this case?

13       A.  I -- yes.

14       Q.  In their entirety in that 109 hours or 119

15   hours you said that you spent reviewing documents

16   and thousands of pages of testimony and writing a

17   very extensive report in the first instance by

18   yourself.

19       A.  Yes.

20       Q.  Okay.

21       A.  Let me just clarify.  Could I just clarify

22   that.  I -- I reviewed the documents and ongoing --

23   and I was comfortable with my review at the time I

24   turned in my report, and I'm fairly certain,

1    any of these orders.

2        Q.  Well, let me -- let me be more precise in

3    my question.  I don't -- and let me ask you to stick

4    to my question.  The way your Method A works is

5    there is an initial flagged order and then an

6    assumption that every order after that was improper;

7    correct?

8        A.  Yes, sir.

9        Q.  Do you know of those initial flagged orders

10   under Method A, how many between zero and 100

11   percent were actually investigated and the flag

12   cleared by the defendants?

13       A.  I don't have a definitive answer to that,

14   sir.

15       Q.  Okay.  That's not something you tried to

16   evaluate; correct?

17       A.  I did not.

18       Q.  That's not something Doctor McCann tried to

19   evaluate, to your knowledge, correct?

20       A.  Well, in forming my opinion, it wasn't

21   necessary, but I'm responding to the question.  I

22   don't -- I can't speak for what Doctor McCann did, I

23   don't think he would do that because his job was

24   only to apply the algorithm, so I don't think he did

Page 100

1   any independent evaluation outside of that.  But I

2   can't answer for Doctor McCann.

3       Q.  Do you know what percentage of these tens

4   of millions of orders that Doctor McCann's

5   calculations flagged actually went to fill

6   legitimate medical need?

7       A.  I do not.

8       Q.  Do you know if it's 100 percent, zero

9   percent, or somewhere in between?

10      A.  Well, 100 percent is definitive, so it

11  wouldn't be 100 percent.  Based on my review of the

12  records I did for the compliance efforts by the

13  three defendants in regards to their own suspicious

14  orders, and whether or not they cleared those and

15  how they evaluated them, there was a systemic

16  failure there.

17              So that, you know, that percentage,

18  and I'm not going to give you a percentage because I

19  don't think I can, but those orders that are flagged

20  by -- by this methodology, there's no other -- I can

21  give you no other reason other than there is a

22  total, systemic due diligence failure -- a

23  maintenance of effective controls failure to give

24  you a percent, but it's -- it's more likely than not

Page 101

1   all of them.

2       Q.   Okay.  Do you know whether it was between 1

3   and 99 percent of these orders that went to fill

4   legitimate medical needs?

5       A.   I don't know, sir.

6       Q.   Do you know -- am I right in understanding

7   you believe all of these tens of millions of orders

8   should have been reported to the DEA as suspicious?

9       A.   Oh, that's a different question.

10      Q.   Should they -- should all of these tens of

11  millions of orders that you flagged in Method A have

12  been reported to the DEA as suspicious?  Yes or no?

13      A.   No.

14      Q.   Okay.  How many should have been reported

15  to the DEA as suspicious?

16      A.   The nature of my application of the

17  methodology, the algorithm, wasn't for the purpose

18  to identify orders that would be reported to the

19  DEA.  It was just a triggering mechanism to identify

20  orders from the transactional data from the

21  defendants.  It -- it would -- it's a much -- it's

22  broader, it's a broader requirement for the

23  defendants than -- than just to -- for me to apply

24  an algorithm to their transactional data and then

Page 105

1   brought along based on your assumption?

2       A.   For each defendant there is one first order

3   and every subsequent one is flagged if we are

4   talking about Masters A?

5       Q.   Yes, how many first orders?

6            MR. FULLER:   Object to form.

7       Q.   Like, let's take an example of the 11.6

8   million oxycodone orders for ABDC, how many of those

9   11.6 million were initial orders and how many of

10  them just came along due to the assumption?

11      A.   One initial order.

12      Q.   And then the remaining 11,610,919 orders

13  were cumulatively flagged?

14      A.   Yes, sir.

15      Q.   Okay.  And is that true for every one of

16  your defendants, that there was only one initial

17  order flagged and then every other order you

18  identify was flagged based on the assumption that

19  because there was not diligence on that initial

20  order, the subsequent orders should have been held?

21      A.   So -- just so I'm clear, the totality of

22  all of -- all of the figures here or are we talking

23  about Masters A?

24      Q.   Masters A.  Just Masters A.

Page 106

1      A.  All right.  I didn't want to answer

2  incorrectly or make assumptions.  The first one on

3  Masters A, each defendant would be yes to that

4  answer, the first one.

5      Q.  Okay.  And so am I correct that for Method

6  A, for each defendant there is one, single order

7  that drives the remaining millions of orders that

8  you have flagged?

9      A.  Yes, sir.

10      Q.  And have you looked -- have you identified

11  those single orders for -- in their entirety for

12  McKesson, Cardinal, and ABDC?

13      A.  I don't understand the question, sir.

14      Q.  Have you looked at those initial orders for

15  McKesson, Cardinal, and ABDC that are the initial

16  flagged orders of your Method A?

17      A.  No, sir.

18      Q.  Do you know the diligence that was

19  conducted on those initial flagged orders for

20  McKesson, Cardinal, and ABDC, not having looked at

21  the actual orders themselves?

22      A.  Well, I couldn't know the diligence if I

23  answered I didn't know the orders.  And as I

24  answered earlier, understanding your question, I

Page 121

1    A.  Go ahead, I'm ready.

2    Q.  All right.  So "Question:  And your

3  computer algorithm was based on the standard

4  operating procedures from McKesson's Lifestyle Drug

5  Monitoring Program; correct?"  And then the answer,

6  "Uhm, broadly speaking based on, yes, it wasn't

7  intended to implement precisely McKesson, uhm,

8  limits anymore than the first method was intended to

9  implement precisely the Masters decision or the

10  fourth method intended to implement the Chemical

11  Handler's Manual. I think as we have discussed

12  before, each of these methods are stylized --

13            (The court reporter requested

14  clarification)

15    Q.  "I think as we have discussed before, each

16  of these methods are stylized illustrations

17  suggested by the underlying documents that you have

18  identified, not attempting to implement these

19  documents precisely."  Did I read that correctly?

20    A.  Yes, sir.

21    Q.  Now, let me drill down on some of that

22  specific language.

23            First of all, do you see where he

24  says at the bottom of 180 -- 124 and the top of 125,

Page 122

1  that the first method was not intended to implement

2  precisely the Masters decision?

3      A.  Yes, sir.

4      Q.  And do you agree with that?  Is that a true

5  statement?

6      A.  Yes, sir.

7      Q.  The first method does not implement

8  precisely the Masters decision; correct?

9      A.  I do.

10      Q.  And then at the end, he says, again, that

11  we were not attempting to "implement these documents

12  precisely."  Is that a true statement as to every

13  one of your six methods that you copied from Doctor

14  McCann?

15      A.  Yes.

16      Q.  Each one of them is based on something a

17  distributor was doing or it was in the Chemical

18  Handler's Manual, but none of them are an attempt to

19  implement those documents precisely; correct?

20      A.  That's correct.

21      Q.  And he uses this phrase they are "stylized

22  illustrations suggested by the underlying

23  documents."  Do you agree with that as an accurate

24  description of what you were doing in Methods A

1  answer.  So I'm hopefully not answering it

2  differently, but it's always plausible to use

3  it.  Whether or not it would be a appropriate

4  trigger is a different question.

5      Q.  Do you stand behind your testimony that

6  Method A and Methods C through F, Method A is the

7  only one that you think would be plausible?  Is that

8  a true statement?

9      A.  Yes.  Well --

10     Q.  Do you stand behind your testimony that

11 between Method A and Methods C through F, you would

12 not use Methods C through F?

13     A.  That's a correct statement.

14     Q.  Okay.

15     A.  If you're referring to, I guess, the

16 hypothetical that I was a defendant and I was a

17 distributor and I would use it for an algorithm

18 trigger of suspicious orders, if that's what your

19 question is, I would not.

20     Q.  Did you -- when you were at the DEA, let's

21 focus on Methods A and B.  First of all, you agree

22 with me that Method A does not look at pattern or

23 frequency; right?

24     A.  That's correct.

Page 133

1  to correspond, to be a stylized illustration of what

2  Masters was doing, you were okay with the Masters

3  methodology which did not take into consideration

4  unusual pattern or frequency; correct?

5      A.  Yes, sir.

6      Q.  Did you ever actually run -- Method A and

7  Method B are both based on Masters; correct?

8      A.  Yes, sir.

9      Q.  Which is closer to Masters, Method A or

10  Method B?

11     A.  If we're talking about the algorithm,

12  they're the same, so both.

13     Q.  Well, they generate radically different

14  numbers.  So which is closer as to -- which is less

15  of a stylized illustration and closer to reality in

16  terms of what Masters was doing in the real world,

17  Method A or Method B?

18     A.  Well, it's -- it's not as simple as saying

19  A or B.  Both of them are the same trigger and order

20  the same amount -- identify the same number of trans

21  -- the same initial transaction when applied to the

22  data.  A has the due diligence assumption and B does

23  not.  So once the first trigger, I don't know that I

24  looked at them as one is effective as the

Page 134

1    other.  They are the same initial trigger and one

2    removes the due diligence assumption.

3        Q.  Did Masters use the due diligence

4    assumption?

5        A.  No, sir.

6        Q.  So Masters is closer to B; correct?

7        A.  Uhm, the exercise of applying these

8    algorithms to the transaction data wasn't to assess

9    which one was most similar or closer or had anything

10   to do with Masters.  It was just an algorithm

11   triggering mechanism as part of the whole due

12   diligence -- or the whole maintenance of effective

13   controls to be applied to the transactional

14   data.  So I never really considered the -- whether

15   or not one or the other was -- was better for

16   Masters.

17            MR. SCHMIDT:  Move to strike as

18   entirely nonresponsive.

19       Q.  Method B is closer to Masters than Method

20   A; correct?

21       A.  I never assess them as whether one is more

22   like or less like Masters.  It's just an algorithm.

23       Q.  Which one is closer to Masters, sir?

24       A.  I don't have a response to that.

Page 137

1    the due diligence assumption?

2         A.   No, sir.

3         Q.   Okay.  And the difference between A and B

4    is that A includes the due diligence assumption and

5    B does not; correct?

6         A.   That's correct.

7         Q.   And so in that regard, B is closer to

8    Masters and the real world than A; correct?

9         A.   I don't know that it's closer.  It's

10   different and why I say that is because B removes

11   any consideration whether due diligence is even

12   done.  And that would be way outside the scope of

13   Masters, too, so when you're drawing those

14   comparisons, as far as the triggering, I'll go back,

15   they're exactly the same.

16              MR. SCHMIDT:  Move to strike as

17   totally nonresponsive.

18        Q.   Sir, A and B are the same except A has a

19   due diligence assumption and B does not; correct?

20        A.   That's correct.

21        Q.   The due diligence assumption in A was not

22   used in the Masters program in the real world;

23   correct?

24        A.   That's correct.

1    Q.  So in that regard, the only difference

2  between the two, Method B is closer to how Masters

3  was used in the real world than Method A; correct?

4    A.  I don't want to be argumentative.  They

5  both identified the first suspicious order, so it

6  was used the same.  If you're saying the number of

7  orders identified depended on the due diligence

8  assumption, then I guess the answer is yes.  But

9  then -- (audio distortion) -- I'm not done,

10  Mr. Schmidt.  That doesn't mean that I accept B

11  because that assumes there is no due diligence.  So

12  it's -- it's just a different evaluation.

13    Q.  I am not asking you which one you

14  accept.  I'm asking you which one is closer to the

15  way that Masters flagged suspicious orders in the

16  real world.  And in terms of which is closer, how

17  Masters flagged suspicious orders in the real world,

18  it's B; correct?

19    A.  I generally would agree with that.

20    Q.  Okay.  And you did not include Method B in

21  any of your earlier reports, did you?

22    A.  That's correct.

23    Q.  And why is -- why is it that you for the

24  first time have included Method B in your West

Page 139

1    Virginia report?

2         A.  Well, I was -- I was interested in -- in

3    running that methodology without the due diligence

4    against the transactional data to see how many

5    orders were flagged.  And as -- and, you know, to

6    see what the anticipated results were.  I saw the

7    results.  I think it's still a significant number

8    and, you know, it was interested -- I think it was

9    just an interesting different way to look at the

10   data with a different methodology.

11        Q.  Are you aware -- did you ever run the

12   Masters methodology when you were at the DEA to any

13   set of data.

14        A.  No, sir.

15        Q.  Are you aware of anyone at DEA who ever ran

16   the Masters methodology when you were at the DEA to

17   any set of data?

18        A.  No, sir.

19        Q.  Are you aware of any company or regulator

20   who has ever run Masters Exhibit A with the due

21   diligence assumption to any set of data in the

22   history of the world?

23        A.  No, sir.  Not at least up to when I left my

24   employment.

Page 140

1      Q.  What about since?  In review of any

2  documents or continued work you do to maintain your

3  expertise?

4      A.  I have not seen that; no, sir.

5      Q.  Is there any general acceptance you can

6  point me to for Method A with its due diligence

7  assumption?

8      A.  Acceptance by --

9      Q.  Anyone, distributors, regulators,

10  academics?

11      A.  No, sir.

12      Q.  Okay.  Are you aware that Mister -- Doctor

13  McCann identified -- well, let me just be sure I --

14  I have your testimony.  Did you ever see Masters

15  apply Method A or Method B to their distribution

16  over a period of time?

17      A.  No, sir.

18      Q.  And what I'm struck by is when I look at

19  Method A, the percentages you have are pretty

20  stunning, 90.6 percent, 91.1 percent, 93.1 percent,

21  82.5 percent, 87.9 percent, 87.4 percent, and I can

22  read those slower into the record.  They're not

23  particularly critical, but my point is they're all

24  above 80 percent; correct?

Page 148

1   basis or on a rolling 30 day basis; correct?

2       A.  I don't remember us having a specific

3   discussion about that.  I could be wrong.  I only

4   recall the calendar month.

5       Q.  Okay.  You recall that issue has come

6   up.  You've seen that -- you saw that discussed in

7   Doctor McCann's deposition; right?

8       A.  I don't ever remember it an issue we

9   discussed or had some contention about.  I don't

10  recall that.

11      Q.  Well, let me try it this way.  Do you know

12  whether Doctor McCann used a calendar month

13  calculation or a rolling 30-days calculation in

14  his --

15      A.  Calendar month.  I'm sorry, calendar month.

16      Q.  And do you know whether Masters used a

17  calendar month or a 30-day rolling calculation?

18      A.  I believe in reading their policy, it was a

19  30 day.

20      Q.  So in that regard, what Method A and Method

21  B do is different than Masters; correct?

22      A.  Yes, sir.

23      Q.  And you saw that Doctor McCann acknowledged

24  that in his deposition.

Page 151

1      Q.   The threshold is never changed under Method
2   B based on any subsequent developments; correct?
3      A.   That's correct.
4      Q.   It doesn't change if the population in
5   Cabell County changes; correct?
6      A.   That's correct.
7      Q.   It doesn't change if the medical need in
8   Cabell County changes; correct?
9      A.   It's fixed, sir; right after the first
10  trigger.
11     Q.   So correct?
12     A.   Yes.
13     Q.   It doesn't change if the demographics of
14  the pharmacy or the circumstances of the pharmacy
15  change; correct?
16     A.   It does not.
17     Q.   If a cancer center opens up next door or a
18  competing pharmacy closes, that doesn't cause a
19  change in Method B; correct?
20     A.   It does not.
21     Q.   It doesn't change to account for increases
22  in the DEA's own quotas; correct?
23     A.   That is correct.
24     Q.   Now, Masters did not lock in the first six

Page 152

1  months for all time as the threshold, did it?

2       A.  It did not.

3       Q.  In Masters after a six-month history with a

4  control group, the monthly limit will be established

5  and updated on the first of every month, correct?

6       A.  Yes, sir.

7       Q.  And so that is another deviation between

8  Method B and Masters; correct?

9       A.  It's not the same exactly as Masters,

10  that's correct.

11      Q.  Because it's locked in for all time based

12  on six months in Method B, it was not locked in

13  based on all -- for all time as Masters used it.

14      A.  Uhm, there's a reason for that, but, yes,

15  that's a correct statement.

16      Q.  Okay.  Did you ever look at all the Masters

17  diligence files to see how many Masters cleared

18  flagged orders under their methodology in every

19  instance?

20      A.  Did you say every due diligence file?

21      Q.  Yes.

22      A.  I did not.

23      Q.  Okay.  If we go back to -- and I wrote it

24  down because I want to make sure I have the verbiage

Page 159

1          So that's not right to you?

2      A.  Are you asking me, Mr. Schmidt?

3      Q.  Yes, having heard nothing from one of my

4  colleagues that I mis -- misstated what Doctor

5  McCann says in his report.

6      A.  I have a general recollection that he does

7  do an example like that.

8      Q.  Okay.  So if the highest level in the

9  preceding six months is 10,000, if in month seven

10  you get an order for 10,100 bills which is an extra

11  bottle, that would -- that would be flagged under

12  your methodology?

13      A.  Yes, it would.

14      Q.  In your view, if the moment that flagged

15  order came in, the pharmacy calls a sales rep at the

16  distributor or some other employee at the

17  distributor or a regulatory employee at a

18  distributor - and I'm getting a friendly assist here

19  from my colleague so I know it is in fact 10,000 -

20  if they got a call from the pharmacy and the

21  pharmacy said, "Hey, we ordered one extra bottle

22  this month.  We're going to order one less next

23  month, are you okay with that?"  Would that be a

24  suspicious order to you or should that order be

Page 250

1    although I don't have any reason to believe it

2    wouldn't be the same systemic failure with due

3    diligence that it would be for all the other

4    registrants, so -- but it wasn't applied, so I just

5    don't know, just to arbitrarily talk about numbers.

6              MR. SCHMIDT:  Move to strike as

7    nonresponsive.

8         Q.  My question is:  Do you believe that every

9    order flagged under your Method A is likely to be

10   diverted; yes or no?

11        A.  Based on the systemic failure of the due

12   diligence, yes.

13        Q.  Do you believe that 95 percent or more than

14   90 percent of orders if this not real world Method A

15   were applied to the Veterans' Administration orders

16   are likely to be diverted; that 90 percent of those

17   Veterans' Administration orders are likely be

18   diverted?

19        A.  Well, I don't know if it's not real world,

20   but, again, you know, looking at the total systemic

21   failure of the due diligence and it's not -- it's

22   not just due diligence, it's encompassing all of the

23   requirements to maintain effective controls of

24   diversion.  That not occurring after a triggering

Page 284

1      Q.  Well, how much have you spent since then?

2      A.  Since the submission of my report?

3      Q.  Yes.

4      A.  I -- I don't have a total calculation.

5              MR. SCHMIDT:  Okay.  I'm just going to

6      say for the record, my understanding is the

7      plaintiffs have objected to producing invoices and

8      so we do not plan to produce invoices for our

9      witnesses.  But at a minimum, we need to be told how

10     many hours Mr. Rafalski has spent.  And if we could

11     get that information, ideally in this deposition,

12     but promptly.  And we'd ask that it be divided

13     between before and after his report.  I would

14     appreciate that.

15              Is there an objection to providing

16     that?

17              MR. FULLER:  Let me see what I can do

18     about getting it before we finish here today.

19              MR. SCHMIDT:  Thank you, I'd

20     appreciate that.

21     Q.  Let's go back to Exhibit A -- Exhibit 1,

22     I'm sorry, your report.  And let's go back to page

23     48.

24              And I just want to make sure I

Page 285

1   understand one aspect of your flagging methodology,

2   please.  Exhibit A identifies tens of millions of

3   orders; correct?

4       A.  Yes.

5       Q.  And do I have your testimony correct that

6   you believe every single one of those orders are

7   likely to be diverted?

8       A.  I guess, I think I answered this

9   earlier.  If you -- if that question means that you

10  are asking me to definitively -- to tell you

11  definitively that every one of those orders,

12  individual orders were diverted, I don't -- I can't

13  do that, but my opinion is based on the lack of due

14  diligence, the systemic lack of due diligence, that

15  more likely than not they were.

16      Q.  All of them?

17      A.  More likely --

18      Q.  -- all of the millions were likely

19  diverted?

20      A.  More likely than not; yes, sir.

21      Q.  And where is that diversion occurring?

22      A.  I don't understand that question.  In a

23  geographic area of my evaluation of the -- the

24  distributors' distributions.

1    Q.  Would it be valuable for the DEA to be able

2  to run the simplistic code that is reflected in

3  Method A and determine that 80 to 90 percent of

4  orders being shipped by distributors were likely to

5  be diverted?  Would that be valuable if that were,

6  in fact, a valid exercise?

7    A.  I don't think it's a valid exercise, so

8  I --

9    Q.  Okay.  I don't think it is, either.  DEA

10 has never conducted that exercise that you're aware

11 of, have they?

12    A.  No, not that I am aware of.

13    Q.  And are you aware of -- all right.  That's

14 fine.

15           Let me show you a couple of examples

16 just to make sure I understand your methods.

17           MR. SCHMIDT:  Could we -- I'm not sure

18 what the tab number is, Megan, for demonstrative

19 3.  Do we -- do we have --  we don't have --

20           MS. MONAGHAN:  Oh, sorry.  Yeah,

21 sorry.  It's going to be tab 12 for demonstrative

22 3.

23           MR. SCHMIDT:  Let's call this Exhibit

24 12 and let's put it up on the screen, if we could.

Page 299

1      Q.  And then any order after that that was over

2    10,000 would be flagged under Method A; correct?

3      A.  That's correct.

4      Q.  And not just any order after that, but any

5    order -- I'm sorry, not just any order over 10,000,

6    but every one from the first -- let me try it again.

7              Once an order was flagged as being

8    over 10,000 every order after that would be flagged;

9    correct?

10     A.  Under Methodology A?

11     Q.  Yes.

12     A.  Yes, sir.

13     Q.  So in this scenario, the order in August

14   would be flagged, correct?

15     A.  That's correct.

16     Q.  And then every order after that would be

17   flagged, as well.

18     A.  In this hypothetical situation; yes, sir.

19     Q.  Just so I'm clear, this is the level of

20   information that Doctor McCann's calculations draw;

21   correct?  Just the sheer numbers and nothing else.

22     A.  Yes, sir.

23     Q.  It doesn't do any evaluation of diligence

24   files, it doesn't do any evaluation of pharmacy

Page 300

1    circumstances, community circumstances, DEA quota

2    levels, changes in prescribing practices, anything

3    like that; correct?

4        A.   Correct.

5        Q.   And so if Doctor McCann were given just

6    this example, August and everything after August

7    would be flagged; correct?

8        A.   Yes, sir.

9        Q.   And you would say that August and

10   everything after August would be likely to be

11   diverted; correct?  Under your 51 percent, more

12   likely than not rationale; correct?

13       A.   Well, it's -- I didn't say 51 percent.  And

14   if I'm using Methodology A with the due diligence

15   assumption, if the 10,100 was not investigated, if

16   there was no due diligence, the trigger is --

17   identifies the order.

18            The size, it could be 100, we settled

19   on because we don't do it a pill at a time or it

20   could be a million would stop the order, and if

21   there is no due diligence to clear that, more likely

22   than not independent of the size, any of those

23   subsequent orders could be subject to diversion

24   because the -- the -- there was no investigation to

Page 306

1   diverted because it was 100 pills higher than the

2   March order, would you reach that conclusion?  Yes

3   or no?

4        A.   Mr. -- Mr. Schmidt, you can't interject

5   Mr. McCann's methodology and then say -- and then

6   eliminate the methodology and ask me to look at a

7   number.  If what you're saying if I just looked at

8   that string of numbers, there's no particular number

9   I would pick out.  But if you interject Doctor

10  McCann running the methodology, that -- that would

11  provide a different answer.

12       Q.   I'll try it one more time and then we'll

13  call the Judge.

14            Looking at those numbers and the fact

15  that August is 100 pills more than March, would that

16  lead you to conclude that August is -- those pills

17  are reasonably -- more likely than not, likely to be

18  diverted; yes or no?

19       A.   If we're looking at a string of data and

20  now you have dropped the Doctor McCann application

21  of the methodology and if I'm just looking at a

22  string of data, the answer would be, no, I could not

23  tell.

24       Q.   Okay.  So I'm going to try one more time

1   without the speech.  If you just looked at these

2   numbers, because I'm not sure if you understand what

3   Doctor McCann did.  Do you know all of his

4   assumptions?

5       A.  Uh, yes, sir.

6       Q.  Okay.  Tell me the ten assumptions he made

7   in coming up with his code that he testified about

8   under oath.

9       A.  I do not know all ten; no, sir.

10      Q.  Okay.  Thank you.  Looking at Doctor McCann

11  -- looking at these numbers, does the fact that

12  you've got 100 more pills in August than in March

13  tell you that that August order more likely than not

14  is -- is likely to be diverted?

15      A.  I'm going to answer the same way.  Just

16  purely looking at the string of numbers if that's

17  your question, no.

18      Q.  Does it tell you that the orders from

19  September Year 1 through July Year 2 are more likely

20  than not, likely to be diverted?

21      A.  Purely looking at those numbers; no, sir.

22      Q.  Okay.  Let's look at another example.

23              MR. SCHMIDT:  Megan, what's the tab

24  for demonstrative 4?