# EXHIBIT 3

```
                                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3
      _____
 4
      IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
 5    OPIATE LITIGATION                  Case No. 17-md-2804
 6
      This document relates to:          Judge Dan
 7                                       Aaron Polster
 8    The County of Cuyahoga v. Purdue
      Pharma, L.P., et al.
 9    Case No. 17-OP-45005
10    City of Cleveland, Ohio vs. Purdue
      Pharma, L.P., et al.
11    Case No. 18-OP-45132
12    The County of Summit, Ohio,
      et al. v. Purdue Pharma, L.P.,
13    et al.
      Case No. 18-OP-45090
14    _____
15
16
17
18        Videotaped Deposition of Joseph Rannazzisi
19                    Washington, D.C.
20                     April 26, 2019
21                        8:37 a.m.
22
23
24    Reported by:  Bonnie L. Russo
25    Job No. 3301876
```

Page 80

1    that you would get paid for your work with the
2    Fields firm?
3               MR. UTTER:  You can answer that.
4               THE WITNESS:  Yes.
5               BY MR. EPPICH:
6         Q.    Did you sign a contract with them?
7         A.    Yes.
8         Q.    How much are you paid per hour?
9               MR. UTTER:  You can answer.
10              THE WITNESS:  $500 an hour.
11              BY MR. EPPICH:
12        Q.    And how many hours have you billed
13   to date?
14              MR. UTTER:  That I would instruct
15   you not to answer.
16              THE WITNESS:  I don't --
17              MR. UTTER:  That I would instruct
18   you not to answer.
19              SPECIAL MASTER COHEN:  No, you can
20   answer that question.
21              MR. UTTER:  Go ahead.
22              THE WITNESS:  I don't know.
23              BY MR. EPPICH:
24        Q.    Do you know how much money you
25   received from the Fields firm to date?

Page 81

```
 1                MR. UTTER:  Go ahead.
 2                THE WITNESS:  I don't know.
 3                BY MR. EPPICH:
 4        Q.    Is it more than $10,000?
 5        A.    Yes.
 6        Q.    More than $50,000?
 7        A.    Yes.
 8        Q.    More than $100,000?
 9        A.    I would say yes.
10        Q.    More than a quarter million dollars?
11        A.    No.
12        Q.    Are you billing the Fields firm for
13     your testimony here today?
14        A.    No.
15        Q.    Are you billing the Fields firm for
16     your preparation sessions for this deposition
17     today?
18        A.    No.
19        Q.    Are you being compensated by any
20     lawyer or entity for your testimony here today
21     or the preparations for your testimony here
22     today?
23        A.    Well, I was under the impression I
24     got a witness fee from the defendants.
25        Q.    Other than that?
```

Page 267

1   that question for you.  You did not ask him,
2   what did you tell registrants about what was an
3   unusual size which is what would be within No.
4   3.
5           BY MS. MAINIGI:
6       Q.   Well, let's make sure we do both,
7   Mr. Rannazzisi.
8           You gave me your definition of
9   unusual size, correct?
10      A.   Yes.
11      Q.   And I think you also told me earlier
12  that you don't recall yourself elaborating for
13  any registrant as you did in this deposition,
14  what unusual size meant to you, correct?
15          MS. SINGER:  Objection.  Misstates
16  prior testimony.
17          MR. BENNETT:  I join that objection.
18          MR. UTTER:  Same objection.
19          Go ahead.
20          THE WITNESS:  I don't -- I haven't
21  had the opportunity -- well, I have never told
22  a registrant what their responsibility is as
23  far as what my definition of a suspicious order
24  is.  That would have come from my staff or the
25  liaison policy section or the pharmaceutical

Page 268

1    investigation section or E-commerce, you know,
2    if they were still there, but it wouldn't have
3    come from my office directly.
4            BY MS. MAINIGI:
5        Q.   And were you ever aware of any
6    definition that could have been offered by one
7    of your staff to registrants?
8        A.   I wasn't aware of what -- they were
9    trained, they are trained to follow what the
10   regulation says, and I'm sure they can give
11   examples just like I just did, but no, I am not
12   aware of any specific guidance that they gave.
13   I mean, we had companies calling in for all
14   different types of issues, not just related to
15   suspicious orders.  They were trained to give
16   guidance based on the regs and the Controlled
17   Substances Act.
18       Q.   Companies would call in, though, I
19   take it, to ask for further elaboration on the
20   definition of a suspicious order, correct?
21            MS. SINGER:  Objection.  Foundation.
22            MR. BENNETT:  Same objection.
23            THE WITNESS:  Companies have called
24   in to liaison and policy and also to -- back
25   when E-commerce was E-commerce and other

Page 320

1  Q. So you, yourself, have never even
2  inspected a suspicious order monitoring system,
3  fair?
4  MR. BENNETT: Objection. Misstates
5  testimony. Objection. Scope.
6  THE WITNESS: I have never gone on
7  site and reviewed a suspicious order monitoring
8  system, no.
9  BY MS. MAINIGI:
10  Q. Have you ever viewed one on paper?
11  MR. SMITH: Objection. Scope.
12  THE WITNESS: I may have looked
13  years ago at the framework of a suspicious
14  order monitoring system on paper.
15  BY MS. MAINIGI:
16  Q. Do you have an understanding of what
17  would separate an acceptable compliance
18  suspicious order monitoring system from one
19  that was not compliant with regulations?
20  MS. SINGER: Objection. Vague.
21  Foundation. Scope.
22  MR. BENNETT: Join the scope
23  objection.
24  MR. UTTER: Go ahead.
25  THE WITNESS: Again, the suspicious