# EXHIBIT 1

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2

3

    * * * * * * * * * * * * * * * * * * * * * *
4

    THE CITY OF HUNTINGTON,
5

              Plaintiff,
6

    vs.                                CIVIL ACTION
7                                   NO. 3:17-01362

    AMERISOURCEBERGEN DRUG
8    CORPORATION, et al.,
9              Defendants.
10   _____
11   CABELL COUNTY COMMISSION,
12              Plaintiff,
13   vs.                                CIVIL ACTION
                                     NO. 3:17-01665
14   AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
15

              Defendants.
16

    * * * * * * * * * * * * * * * * * * * * * *
17

18

19          Videotaped and videoconference deposition
    of GEORGE A. BARRETT taken by the Defendants under
20   the Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa
21   S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 21st day of September,
22   2020.

23

24

Page 9

1   past.

2       Q.   Okay.  And approximately how many remote

3   depositions have you taken, or given?

4       A.   More than ten.

5       Q.   Okay.  So nothing we'll do today I think

6   will be new to you at least procedurally.  Why

7   don't we jump into it.  Can you break down, again

8   very roughly, the types of cases for which you've

9   been retained by -- by type or category in the

10  past?

11      A.   Almost all of my testimony has been with

12  regard to compensatory damages, as well as punitive

13  damages.  So I've certainly focused on damages,

14  concepts, as an expert witness.

15           Those types of damages that I've

16  calculated and testified have included loss of

17  earnings and personal injury in wrongful death

18  cases, loss of household services, the present

19  value of future medical and care costs.

20           I've also worked on a number of

21  commercial damages cases.

22      Q.   In terms of the percentage of cases that

23  you've been involved in, approximately what percent

24  have been personal injury cases?

Page 10

1    A.   I really couldn't tell you that, because I

2    don't track the cases by the status of the

3    plaintiff whether it's a personal injury or a

4    wrongful death.

5    Q.   Do you keep a list of the cases in which

6    you've testified by way of deposition or at trial?

7    A.   Yes.   In those cases where I've actually

8    testified, yes, I maintain a list.   I do not

9    maintain a list of all the cases in which I've

10   consulted and/or produced a written report.

11   Q.   Did you produce a list of such cases in

12   connection with your report in this matter?

13   A.   I believe that a list of testimonies from

14   the last four calendar years was produced.

15   Q.   Okay.   Would you say that more or less than

16   half of the cases you've testified in in the past

17   have been personal injury cases?

18   A.   Again, it's difficult for me to quantify

19   that, but certainly the vast majority of cases in

20   which I've provided expertise as well as testified

21   have been in personal injury and wrongful death

22   matters.

23   Q.   Okay.   In wrongful death matters, what has

24   your testimony generally comprised of?

Page 11

1      A.    The calculation of lost earnings,

2    calculation of lost household services.

3      Q.    And in the personal injury cases in which

4    you've testified, what has your testimony consisted

5    of?

6      A.    Lost earnings, lost household services, as

7    well as the present value of future medical and

8    care costs.

9      Q.    Now, you've used the term a couple times

10   that was a three-word term that the first word was

11   "lost" and the last word was "services" and I've

12   not understood the word between there.  Can you do

13   that again for me?

14     A.    Yes, household.

15     Q.    Household.

16     A.    Household services.

17     Q.    Got it.  Sorry.  I think if we were in the

18   same room, I would have caught it, but I think over

19   the computer, I couldn't catch that.  Okay.

20             You've written a fair amount of

21   material relevant to your profession by way of, you

22   know, professional publications.  Is that right?

23     A.    Yes, I have.

24     Q.    And what have the subject matters,

Page 23

1    model, correct?

2        A.   I did, yes.

3        Q.   And you prepared your own Excel spreadsheet

4    that mirrors the categories in Doctor Alexander's

5    redress model, correct?

6        A.   Yes, I did.

7        Q.   And what is the difference between your

8    spreadsheet and Doctor Alexander's redress model

9    spreadsheet?

10       A.   Doctor Alexander's spreadsheet contains a

11   lot of technical information that I'm not really

12   qualified to discuss as it relates to his field of

13   expertise, which I believe to be epidemiology.

14            But there is a category of information

15   or several categories of information from his Excel

16   spreadsheet that are relevant for my work, and very

17   similar to what I would be looking at if it was a

18   case in which we were talking about a personal

19   injury and there was a life care plan involved;

20   meaning that I still need to know those three

21   pieces of information:  What the thing that is

22   going to be needed into the future, what that thing

23   is, a good or a service; how frequently that thing

24   is going to be needed; and how much does it cost.

Page 24

1         Now, in this particular case, there

2    was an additional piece of information that Doctor

3    Alexander provides, and that is the number of

4    people.  Because unlike in a personal injury case,

5    when we are assuming that just one individual is

6    going to be requiring this, this is a large group

7    of people that are needing these things in the

8    future, so the numbers of people are important to

9    me as well, because I have to have something to

10   multiply with the base numbers before I project

11   into the future.

12         As far as my report goes and what

13   makes my report unique from Doctor Alexander's, is

14   because -- is that I am looking at the base cost of

15   each one of those items, multiplied by the number

16   of people per Doctor Alexander, and Doctor Young as

17   well, and then projecting the future value of that

18   out through a 15-year time period based upon the

19   proper inflationary measure, depending upon the

20   category that that particular identified item would

21   fall into.

22   Q.   With respect to inputs received from either

23   Doctor Alexander or Doctor Young concerning numbers

24   of people, did you at any time question Doctor

Page 25

1   Alexander or Doctor Young as to why they were

2   deriving the number of people they had been -- they

3   had derived?

4        A.   No, I did not.

5        Q.   Do you think it's the proper work of a

6   forensic accountant such as yourself to question

7   medical or population inputs that he or she

8   receives?

9        A.   As a matter of clarification, I am not an

10  accountant; I'm an economist.

11       Q.   Okay.

12       A.   However, to answer your question, I do not

13  believe that an accountant, nor an economist, would

14  be qualified to review the expert opinions provided

15  by a medical expert - in this case an

16  epidemiologist; or in the case of Doctor Young, an

17  expert social worker - as those individuals are

18  experts in their field and economists and

19  accountants are not.

20       Q.   Mr. Barrett, you are also a vocational --

21  you have been in the past a vocational evaluator.

22  Is that right?

23       A.   Yes, that is correct.

24       Q.   And can you describe what that is?

Page 26

1     A.   Yes.  I am trained as a certified

2   rehabilitation counselor.  That certification and

3   training -- and I have a master's degree in

4   rehabilitation counseling from West Virginia

5   University.  That training is necessary for me to

6   work with individuals who have experienced physical

7   impairments that could perhaps result in work

8   disabilities.

9              And the idea is that we work as

10  counselors with individuals to try to get them back

11  to work after the onset of injury.  There's some

12  exceptions to that, but generally, that's what we

13  do as rehabilitation counselors.  As a subspecialty

14  within that particular field, I am a certified

15  vocational evaluation specialist or a CVE.

16              So that additional credential

17  specializes on the identification of transferable

18  job skills that individuals may have.  So if we

19  have an individual who has been injured, I can

20  evaluate that person's job skills and then utilize

21  the medical information in the case to determine

22  what types of jobs would be consistent with their

23  residual functional abilities.

24              That information is then utilized in

1   the economic calculation of lost earnings to

2   project what the lost earnings are in a model where

3   post-injury earnings, those residual earnings the

4   person can now earn, are subtracted from what they

5   would have earned had they not been injured.

6       Q.   And in this case, did you employ any of

7   your knowledge or experience as a vocational

8   evaluator?

9       A.   I believe that I did, yes.

10      Q.   Can you point me to where in your report

11  you did?

12      A.   Sure.  Probably the easiest way to answer

13  your question is to look at Appendix L of my

14  report.  And Appendix L is a table which lists the

15  cost data sources which were utilized in my

16  calculations, and there are three different

17  individuals who provided those cost data.

18          You'll see in the second column, the

19  first expert identified is myself, Barrett, and

20  under that column are all of the specific items

21  that I identify costs, because those particular

22  cost items were based upon wage rates which would

23  be paid to individuals who are working in the

24  Huntington local labor market.

Page 87

1          Now, just like we saw with the wage of

2     the pharmacists, we have to increase into the

3     future that $70.67.  That's the starting point,

4     again in 2019 dollars.  Just like before, I'm going

5     to use 3.49 percent to move from 2019 to 2020, and

6     then we get $73.14.

7          Then I increase that by 3.44 percent -

8     again the 30-year average of hourly wage growth in

9     the United States - and we get $75.66 per hour.  So

10    when you look at Tab 1A2, in the Year 2021, the

11    hourly rate, weighted proportionately to employment

12    within the occupations, is $75.66 - that's the

13    first column - multiplied by the total number of

14    continuing education hours specified by Doctor

15    Alexander, 5,015, and so the total in 2021, the

16    total cost, is $379,425.

17         And we just simply do that math all

18    the way across, using Doctor Alexander's population

19    numbers, which here represent the continuing

20    education hours, multiplied by the future value in

21    each year of the weighted average for the median

22    wages for these occupations, and then we get the

23    grand total all the way across of $4,130,552.

24         Q.   Now, currently, are doctors practicing in

Page 88

1  the Cabell/Huntington area required to participate

2  in continuing medical education programs?

3      A.   I'm not a medical expert, so I -- I'm

4  reluctant to answer the question as to what their

5  continuing education requirements are.  But what I

6  can tell you is that Doctor Alexander specifically

7  identified that the total number of hours for this

8  abatement plan would be 5,015.

9              Whether or not those are above and

10  beyond what the normal continuing education hours

11  would be or not, I can't tell you.

12      Q.   But you do understand from your prior work

13  that doctors in West Virginia are required to

14  participate in continuing medical education, right?

15      A.   I have heard that they are required to

16  fulfill CE requirements, yes.

17      Q.   Okay.  And do you know who mandates that

18  doctors in West Virginia participate in continuing

19  medical education?  Is that the West Virginia Board

20  of Medicine?

21      A.   I don't know.  I'm not an expert in that

22  field, so I'm not comfortable in commenting or

23  opining on the government agencies responsible for

24  monitoring that.

Page 89

1     Q.   Do you have any reason to think that the

2   City or County has anything to do with mandating

3   continuing medical education for doctors?

4     A.   Again, I don't have any opinions on the

5   matter, because I've relied exclusively on Doctor

6   Alexander's estimate that the beginning point is

7   5,015 hours per year.

8     Q.   Do you have any certifications yourself,

9   professional certifications, that require you to

10  participate in continuing education programs?

11    A.   Yes, I do.

12    Q.   And do you ever get paid by anybody for

13  attending those when you're not presenting but just

14  when you're participating?

15    A.   No, I do not.

16    Q.   And do you know whether doctors in West

17  Virginia are ever paid for satisfying their

18  continuing medical education requirements by

19  participating in courses?

20    A.   Actually, I don't know the answer to that

21  question.

22    Q.   Do you know that currently the West

23  Virginia Board of Medicine requires a three-hour

24  Drug Diversion Training and Best Practice

Page 90

1   Prescribing of Controlled Substances Training for

2   all doctors in West Virginia?

3       A.   No, I'm unfamiliar with that.

4       Q.   And how, if at all, is the program that

5   Doctor Alexander is contemplating different than

6   the already-required three-hour program that the

7   West Virginia Board of Medicine currently requires?

8       A.   I'm actually uncertain as to how it

9   differs, and I think that's probably a better

10  question for Doctor Alexander.

11      Q.   But, the way you analyze this, is you

12  assume that doctors participating in this class -

13  whatever it is - would be actually paid their

14  customary wages for attending that class.  Right?

15      A.   Well, I think the idea is that there's an

16  opportunity cost, so that if a medical provider is

17  not at work and -- and working, and therefore

18  billing their time and collecting for the services

19  that they're providing, they're foregoing those

20  wages, and instead, they are somewhere receiving

21  training.

22              So it's a lost opportunity cost that's

23  being valued by the weighted average hourly wage

24  rate of those specific occupations.

1      Q.   And who suffers that opportunity cost?  The

2  doctors?  Or does the City and County somehow

3  suffer?

4      A.   I suppose it would depend upon who the

5  employer is.  The physicians will be missing out on

6  the work opportunity, and the potential employer

7  would be missing out on the employees who are going

8  to be absent and at the training during that time

9  period.

10     Q.   Do you know whether doctors who engage in

11  continuing medical education generally do that

12  after work or during work?

13     A.   I do not know when they perform their

14  continuing education hours.

15     Q.   Who are you employed by?

16     A.   I am self-employed.

17     Q.   Self-employed in a solo practice, or with

18  others?

19     A.   I have a business partner.

20     Q.   But in a real world sense, you're assuming

21  that -- not that doctors will be paid for

22  attending, but that either they or their employer

23  will suffer an opportunity cost loss because they

24  engaged in this newly-mandated County-level

Page 92

1   training as contemplated by the redress model.

2   Correct?

3       A.   I think that's the fear in the model, yes.

4   If they're not at work because they're attending

5   training, then they're missing out on wages, and

6   that means that the clinics that they work for, the

7   agencies that they work for, the firms that they

8   work for are not recovering the revenue for the

9   services that they're being provided during those

10  time periods.

11      Q.   And are you aware of any current or past

12  mandatory continuing medical education requirement

13  imposed by the City or the County as opposed to

14  imposed by the West Virginia Board of Medicine?

15      A.   I'm unfamiliar with the rules and

16  regulations governing that aspect of the practice.

17      Q.   In your profession, are there any county or

18  city-level continuing education requirements?

19      A.   In my work as a forensic economist and

20  vocational evaluator?

21      Q.   Right.

22      A.   No, I cannot think of any.

23      Q.   Okay.  Can we turn to the next tab in your

24  Appendix M, which is 1B, Patient And Public

Page 93

1    Education.

2        A.    Yes.

3        Q.    Now, this tab costs out a mass media

4    campaign that would somehow be, you know,

5    anti-opioid use or addiction prevention.  Is that

6    right?

7        A.    I'm actually unfamiliar with the content of

8    what the mass media campaign would represent.  I

9    relied upon Doctor Alexander's estimate of what the

10   cost and the coverage area would be for this

11   particular item.

12       Q.    And as a resident of West Virginia, have

13   you ever seen either billboards or TV commercials

14   that address the opioid abuse crisis?

15       A.    I believe I have seen a billboard.

16       Q.    Okay.  And in terms of your pricing work in

17   this case, did you make any effort to determine who

18   funds such billboards in West Virginia and what

19   those are costing?

20       A.    No, I did not.  I relied upon Doctor

21   Alexander's opinions for this particular item.

22       Q.    So what input, if any, did you supply to

23   the analysis in this tab, as opposed to it being

24   supplied by Doctor Alexander?

Page 94

1      A.    The growth rate.  The growth rate that I

2  utilized was based upon the Consumer Price Index

3  less all medical categories of price inflation.

4            So the government, in keeping track of

5  inflationary data, have an entire market basket -

6  we call that the Consumer Price Index - and

7  included in that are all types of items, including

8  medical care.

9            There was an article that I read -- I

10  don't recall the name of the article, but there was

11  an article that I read that discussed the

12  calculation of the future cost of mass media

13  campaigns as it relates to substance abuse

14  programs, and it was advised in that article that

15  the Consumer Price Index less inflation -- less

16  medical costs should be used.

17            So I've actually calculated that.  You

18  also have that as an Appendix in the main report,

19  and the growth rate on average between 1990 and

20  2019 is 2.33 percent.

21      Q.    In your conversations with County and City

22  executives, did you ever ask any of them about any

23  media campaigns they were currently running or had

24  run in the past concerning opioid addiction?

Page 95

1      A.    No, I did not.

2      Q.    As we sit here today, or during the course

3   of your work, are you aware of any City or

4   County-administered or funded media campaigns

5   concerning opioid addiction?

6      A.    No, I'm not.

7      Q.    So I take it you don't know how much, if

8   anything, the City or County have paid in the past

9   to run or fund opioid addiction media campaigns; is

10  that right?

11     A.    I don't.  And again, I think that may be an

12  invalid way of looking at it, because the City has

13  a finite amount of resources available.

14           So -- but the type of media campaign

15  that is being considered by Doctor Alexander's

16  redress model may not be what the City has ever

17  done before, if the City has ever done anything

18  before.

19     Q.    Well, we talked earlier today about the

20  mayor's Two-Year Plan and The City of Solutions

21  plan.  Did either of those discuss any media

22  campaigns?

23     A.    I don't recall the specifics on it.

24     Q.    In your conversations with City and County

Page 96

1    executives, has anyone ever told you that they

2    thought that the current media campaigns were

3    inadequate or needed to be expanded?

4        A.   No.  Again, that's outside the field of my

5    expertise.

6              MR. HALLER:  Okay.  Why don't we take

7    a short break, maybe come back a little bit after

8    11:30 or so?  Does that make sense?

9              MR. BURNETT:  Sure.

10             VIDEO OPERATOR:  The time is 11:22,

11   we're going off the record.

12             (A recess was taken after which the

13             proceedings continued as follows:)

14             VIDEO OPERATOR:  The time is 11:35, we

15   are back on the record.

16   BY MR. HALLER:

17       Q.   So Mr. Barrett, we were discussing Tab 1B

18   of Appendix M, which is Patient and Public

19   Education.  That's Exhibits 3 and 3A.  Do you

20   recall that in Doctor Alexander's report, he talked

21   about media campaigns that were funded by the

22   federal CDC?  That's like in Paragraphs 58, 59 and

23   60 of his report.

24       A.   No, I don't recall that.

Page 97

1      Q.    Okay.  Do you recall his -- that he
2  discussed at least two media campaigns currently in
3  -- you know, in the -- currently or in the past in
4  the Cabell/Huntington community called Healthy
5  Connections and Wake Up West Virginia?
6      A.    No, I don't specifically recall that.
7      Q.    Okay.  Did you make any -- when you were
8  doing your costing analyses, did you make any
9  effort to determine the degree to which such media
10 campaigns would be funded by the federal CDC?
11     A.    No.  I relied upon Doctor Alexander's input
12 for this category.
13     Q.    And did you make any effort to determine
14 what portion, if any, of the Healthy Connections
15 and Wake Up West Virginia campaigns currently in
16 place were funded by the County or City as opposed
17 to being funded by the federal CDC?
18     A.    No, I did not.
19     Q.    And do you know whether the media campaign
20 you're pricing out here in this tab would meet and
21 be -- meet CDC guidelines and be funded by the
22 federal CDC?
23     A.    No, that's beyond the field and scope of my
24 expertise.

Page 98

1      Q.   Let's move to the next tab, which is the

2   Tab 1C, Safe Storage and Drug Disposal.  Again,

3   we're still on Appendix M, Exhibits 3 and 3A.

4      A.   Okay.

5      Q.   Are you aware of any past or current safe

6   disposal efforts in the Cabell/Huntington

7   community?

8      A.   No, I've relied upon Doctor Alexander for

9   this item.

10      Q.   And do you recall that in his report, he

11   discussed, among other things, National Take-Back

12   Day and some permanent collection sites at the

13   Huntington and Milton Police Departments?

14      A.   No, I don't recall those specific

15   references from his report.  I simply noted from

16   his redress model what the per capita costs and the

17   population numbers would be.

18      Q.   And did you make any effort to determine

19   the costs incurred by the County or City, if any,

20   in connection with the existing collection sites at

21   the Huntington and Milton Police Departments?

22      A.   No, I did not.  I -- again, I relied upon

23   Doctor Alexander.

24      Q.   You spoke to certain police department

Page 107

1          Have you done any work looking at

2   community that -- Communities that Care model to

3   determine how programs implementing that model are

4   funded?

5      A.   No.  And again, that would be beyond the

6   scope of my expertise in this case.  That

7   particular issue, I believe, would be addressed by

8   Doctor Alexander.

9      Q.   You assume in your analysis that two

10  community organizers would be hired.  Who do you

11  assume is going to hire those community organizers

12  and pay them?  Would they be employees of the

13  County or the City, or would they be employees of

14  some other organization and the County or City

15  would fund their salaries?

16     A.   This is a community organization, as it's

17  been identified.  I don't know if these would be

18  government employees or if they would be private

19  sector employees that are working for a nonprofit

20  that is being coordinated or funded by a government

21  agency or some other funding source, perhaps the

22  defendants.

23          But -- it's just unclear as to who's

24  actually going to be doing the work.  Doctor

Page 108

1   Alexander simply noted -- noted that the community

2   organization will need to be staffed, and I have

3   identified the costs necessary to staff the

4   organization.

5       Q.   And in your experience, are community

6   organizers typically government employees, or are

7   they typically employees of nonprofits?

8       A.   Just in general, you know, I've seen both,

9   actually.

10      Q.   So tell me some examples of community

11  organizers you're aware of that are government

12  employees.

13      A.   There are lots of community outreach

14  programs which are part of municipal governments,

15  county governments, state agencies that perform

16  that type of service.

17              One is, at the State level, is the

18  Women, Infants and Children's program which

19  provides baby formula for mothers below a certain

20  income threshold.  That is a community

21  organization, which is a government agency as well.

22              And privately, I mean, there are a

23  number of nonprofit organizations that exist that

24  promote certain special interests and goals within

Page 109

```
 1   a particular geography, so you know, I've seen
 2   both.
 3        Q.   And who provides funding for the winthrop
 4   program that you mentioned?
 5        A.   The WIC program?  Is that what you're
 6   asking me?
 7        Q.   I thought you said winthrop.  Maybe you
 8   said WIC --
 9        A.   No, it's the Women, Infants and Children,
10   WIC.
11        Q.   And who funds -- who provides the funding
12   for that program?
13        A.   The federal government through the U.S.
14   Department of Agriculture.
15        Q.   Are you aware of any prior instance where
16   Cabell County or the City of Huntington have
17   employed a community organizer?
18        A.   I don't know that, no, I do not.
19        Q.   Now, are you aware of any prior instance
20   where the Cabell County or City of Huntington has
21   paid the funding for a community organizer employed
22   by a nonprofit?
23        A.   I know that grants are issued by various
24   government agencies, and that could include
```

Page 110

1   municipalities as well as states as well as the

2   federal government.  And grants are primarily what

3   nonprofits rely upon for their funding source.

4       Q.   And are you aware of any grants provided by

5   Cabell County or City of Huntington to any

6   nonprofit?

7       A.   Well, I wouldn't expect them to, because

8   they probably lack the money necessary to do it.

9            But no, to answer your question, I'm

10  unaware of any.  But again, it's not surprising

11  that they wouldn't exist because of the lack of

12  funding.

13      Q.   Why don't we go to the -- we can skip the

14  next tab, which I think are your comparables,

15  right?

16      A.   Yes.

17      Q.   And then the next tab, we can skip that

18  which shows your trend rates for renting shelter,

19  and then we can skip the next tab which relates to

20  community organizer wages.

21            Well, actually, let's stick on that

22  tab for a little bit, with regard to community

23  organizer wages.  You employ a 3.44 percent growth

24  rate beginning in 2020.  Where did you derive that

Page 116

1    just like the previous, Doctor Alexander provided

2    the number of opioid injection drug users reached

3    by the syringe service program.  He also provided

4    with -- provided in the redress model the cost per

5    client for the syringe service program.

6        Q.   Did you make any effort to determine the

7    cost of existing syringe service programs in the

8    Cabell/Huntington community in connection with your

9    work?

10       A.   No.  Again, Doctor Alexander provided this

11   information, and I relied upon his opinion for

12   these calculations.

13       Q.   And with respect to existing syringe

14   service programs, do you know who has provided the

15   funding for those, whether it's come from the

16   County or City or alternatively, from some Federal

17   or State source?

18       A.   No.  But again, just like we've talked

19   about with these other costs, even if such a

20   program was being funded by another party, the

21   intention from this particular redress model is to

22   identify and effectively deal with the costs that

23   have been created by the opioid epidemic.

24                 So if some other funding mechanism or

Page 117

1  some other agency was perhaps paying for this,

2  typically we would not expect the defense to get a

3  benefit from that just because they were lucky

4  enough to have triggered an opioid epidemic in a

5  geographic area which was providing a syringe

6  program in the first place.

7      Q.   Well, as far as you know, has the City or

8  County ever funded, in whole or in part, a syringe

9  service program using its own funds?

10     A.   I believe that there was - and have been -

11 some programs with regards to a syringe collection

12 effort.  I do recall that -- those types of

13 programs and those types of costs have existed.

14     Q.   So you are aware that -- of a syringe

15 collection program taking place within the

16 geographic boundaries of the City or County, but do

17 you know who funded any such program?

18     A.   No.  Again, I'm not familiar with that, and

19 I think that that would be irrelevant because it

20 would -- it would be in violation of the collateral

21 source rule as it relates to whether or not a

22 defendant gets the benefit of a third party

23 participating in and contributing toward the

24 funding of one of -- any of these types of

Page 118

1    programs.

2         Q.   Well, under the collateral source rule, if

3    somebody makes an expenditure that is later

4    reimbursed, you're saying the defendant can't

5    necessarily benefit from that.  What I'm asking is:

6    Has the County or City ever even in fact even made

7    the expenditure, or are those programs just funded

8    by others?

9         A.   I'm not certain of that.

10             MR. BURNETT:  I'll just make a general

11   objection to the extent the question calls for a

12   legal conclusion.

13        Q.   In your annual growth cost growth rate in

14   this category, what -- what comparable, you know --

15   how did you come up with this cost growth rate that

16   you use here, and how does that compare with

17   syringe service programs?

18        A.   The future value growth rate inflationary

19   category that I utilized is from the medical care

20   commodities category for medical cost price

21   inflation, and that includes medical equipment,

22   essentially.  So the types of costs that would be

23   associated with this type of a program would be

24   dealing with medical equipment because we're

Page 119

1   talking about syringes and the collection points

2   for syringes.

3              The rate of growth that I utilize for

4   this over the long term, as you see here on this

5   tab, is 3.16 percent annual growth.

6              If you look at the next page, you'll

7   see that, again, the growth rates are specific for

8   each year in the past.  The cost per client is

9   provided in Doctor Alexander's redress model at

10  $774.30 in 2016 dollars, and then you'll see that I

11  move from 2016 to 2017, I'm at 2.8 percent.

12             The next year, it's at 1.16.  The year

13  after that, the price actually decreases.  The

14  price index goes down by 0.04, and then the next

15  year, it goes up by 3.12 percent.

16             So using a 30-year average again, a

17  1990 through 2019 average of the Medical Care

18  Commodities Index, the average is 3.16 percent per

19  year, and that's what I used to move those annual

20  syringe service programs to a future value in each

21  year.

22    Q.   The next Tab 1E2a, is Drug Checking

23  Machines.  What does that reflect the cost of, a

24  machine that does what?

Page 139

1  treatment, right?

2      A.   Yes, that is correct in the first year.

3      Q.   Plus 41 people getting inpatient treatment.

4  Right?

5      A.   Yes, that is correct.

6      Q.   All right.  So I -- so let's see.  So we've

7  got 439 plus 452 plus forty -- oops.  Sorry, I keep

8  on hitting the wrong buttons here.  That adds up to

9  3,152 people, right?

10     A.   I did not do the math, so I will trust your

11  number.

12     Q.   Yea.  You can trust 3,152 as the sum of

13  2,220, 439, 452 and 41.  So if you go back to the

14  bus trips, 359,021 bus trips divided by 3,152

15  people, we have 114 bus trips per person getting

16  OUD.  Does that sound about right?

17     A.   I did not do the math that way.  I looked

18  at Doctor Alexander's redress model under Tab 2A

19  and the seventh line identified in the first year,

20  2021, it states, "The total number of

21  transportation vouchers needed per year, 359,021."

22     Q.   And the Agency Profile shows 20 percent of

23  the funding for the Transit Authority comes from

24  federal assistance, right?  At least for operating

Page 140

1    funds.

2        A.   20.7 percent from federal assistance,

3    according to this document.

4        Q.   Right.  And in terms of capital funds,

5    federal assistance provides 77 percent of that

6    funding.  Right?

7        A.   76.9 percent.

8        Q.   So if the system needed to buy new buses,

9    would you assume that's capital funds or operating

10   funds?

11       A.   Capital funds, I would assume.

12       Q.   So in doing your calculations, did you make

13   any effort to determine if new buses or additional

14   buses were needed to make these trips, did you take

15   into account the fact that 77 percent of that

16   funding for those new buses would come from federal

17   assistance?

18       A.   No, because again, as we've discussed

19   previously regarding the other categories, it's a

20   collateral source.  I mean, just because the

21   federal government is there and providing funding

22   sources doesn't mean that the burden is placed upon

23   the federal government for the opioid epidemic

24   that's been unleashed on Huntington.

1    Q.   And you're saying that Huntington or Cabell

2  has a claim to recover those funds instead of the

3  federal government having a claim to recover those

4  funds.  Is that what you're saying?

5    A.   No, I'm not making that distinction,

6  because that's a legal conclusion that needs to be

7  determined by -- by you attorneys and the trier of

8  fact.  I'm simply calculating what the cost of the

9  fares based upon the number of trips that are being

10  specified in Doctor Alexander's redress model.

11    Q.   But now if the figures that you're showing

12  on this tab for Bus Fares, those are not -- you

13  don't re -- those aren't reduced based on the

14  reception of federal assistance; those are the full

15  amounts before any deduction, if it's warranted,

16  for the amount received from the federal

17  government.  Right?

18    A.   Are you speaking specifically about the

19  individual $1.00 fares or the total amount of money

20  included in my calculation?

21    Q.   I assume the $1.00 fares are -- well, you

22  tell me.  Are the $1.00 fares some notional effort

23  on your part to determine the cost of transporting

24  people, or is this actually, you're going to -- you

Page 161

1    that type of a calculation to test the 7,882

2    assumption that Doctor Alexander uses?

3        A.   No.  I find it -- it would be incredibly

4    inappropriate for me to go behind Doctor Alexander

5    and make that kind of calculation, because that's

6    his area of expertise, not mine.  I'm just simply

7    not qualified to do that.  I'm an economics expert;

8    I'm not an epidemiologist.

9        Q.   Well, now, if you had used for your

10   calculations -- this is probably an obvious point,

11   right?  But if you had used for your calculations

12   not a population of 3,152 people who were getting

13   treatment, but a population of about 460 people who

14   were getting treatment in Cabell/Huntington in that

15   first year, your totals would be, you know, one

16   sixth or so or one seventh or so of what are

17   reflected in this tab.  Correct?

18       A.   I do agree with you that hypothetically, if

19   there are less people receiving treatment, then the

20   total costs will be less, yes.

21       Q.   And just using the most simple math, if the

22   population were 460 instead of 3,152, 460 is 15

23   percent of 3,152, then your dollar amounts on this

24   page would be about 15 percent of what we see

Page 162

1    instead.  Correct?

2        A.   Generally I would say that that may be

3    true, but you have to remember that there are four

4    different levels of treatment which have different

5    costs associated with those levels, so it would be

6    weighted a little bit differently --

7        Q.   Yeah.

8        A.   -- depending upon how many people show up

9    in each of the categories.

10       Q.   Yeah, and I totally recognize that it would

11   be -- there would be some variation.  I was just

12   trying to give a real rough ballpark.

13       A.   And I think what you did is a real rough

14   ballpark.  Yes, I agree with that.

15       Q.   Now, do you know who currently pays for

16   opioid use disorder treatment in Cabell/Huntington?

17       A.   No, I do not.

18       Q.   Do you know whether the County or City have

19   ever paid even a dollar towards the treatment of

20   people in their community with opioid use disorder?

21       A.   No, I do not.

22       Q.   Do you understand that many or most people

23   with opioid use disorder are -- have their

24   treatment paid for by Medicaid?

Page 163

1      A.    Which would be the federal government?

2      Q.    Be a combination of the Federal and the

3   State government.  Do you know whether or not

4   that's true that most people with opioid use

5   disorder in Cabell/Huntington, their treatment is

6   paid for by Medicaid?

7      A.    Well, given the income level of the local

8   area and Medicaid being a federal transfer payment

9   program, essentially welfare, that makes sense,

10  yes.

11     Q.    And -- just transitioning to a real world

12  -- and what does this mean in a real world, if

13  there were an -- if Doctor Alexander's abatement

14  program were put in place, do you -- is it your

15  understanding that Cabell/Huntington would begin to

16  run a public health system by which they themselves

17  would treat everyone with opioid use disorder in

18  their community rather than letting hospitals paid

19  for by Medicaid handle that?

20          MR. BURNETT:  Objection.

21     A.    I don't have an opinion on that.  I simply

22  valued the cost based upon the number of

23  individuals identified by Doctor Alexander and the

24  costs associated with those treatment sources.

Page 164

1     Q.   And you are agnostic as to who was actually

2   going to pay that cost in the future; is that

3   right?

4     A.   Yes, throughout the course of my work in

5   this case, who has paid for and who is going to pay

6   for is not my opinion.  I don't have any

7   conclusions or any say on that.  These are simply

8   the dollars that are necessary to pay for the

9   things that have been identified by Doctor

10  Alexander.

11    Q.   Okay.  Now, if you go to the Medications

12  tab, which is the next tab -- it's still 2B, but

13  it's 2B5, 6 and 7.

14    A.   Yes.

15    Q.   What does that reflect?  Does that reflect

16  the cost of the treatment drugs used for the people

17  who are getting treated with OUD?

18    A.   It's my understanding, yes, these are the

19  medications that would be prescribed as part of the

20  treatment protocols for individuals with opioid use

21  disorder.

22    Q.   Okay.  And similar to the treatment itself,

23  you know, the cost of treatment, you don't know who

24  has paid in the past or who will pay in the future

Page 165

1   for these drugs; is that right, these treatment

2   drugs?

3        A.   Yes, that is correct.

4        Q.   Okay.  And if we go to Tab 2C, which are

5   complications, are these the costs of screening for

6   and treating for Hep C and HIV?

7        A.   Yes, in Tab 2C1, these are the costs for

8   diagnostic screening of individuals for Hepatitis C

9   and HIV.

10       Q.   And 2C2 is the cost of treating people with

11  Hep C, correct?

12       A.   Yes, that is correct.

13       Q.   And 2C3 is for treating people with HIV,

14  correct?

15       A.   Yes, that is correct.

16       Q.   Do you know whether the numbers of

17  individuals reflected on this page are people who

18  -- like in the HCV treatment, the 446 number --

19       A.   Uh-huh.

20       Q.   -- and for HIV treatment, the 25 number, do

21  you know whether any effort was made to determine

22  whether those are individuals or -- whose Hep C or

23  HIV post-dated and derived from an opioid use

24  disorder or whether, in reverse, they had HIV or

Page 185

1      Q.   Well, the document you're referring to is

2   an e-mail from Sean Bowles to Dan Underwood,

3   correct?

4      A.   Yes, that is correct.

5      Q.   And in that e-mail, Mr. Bowles tells

6   Mr. Underwood at the bottom, "Please remember the

7   TRC was employed by Prestera and assigned to us."

8   Do you see that?

9      A.   Yes, that is correct.

10      Q.   And so is it your understanding as well

11   that in the past, the triage and referral

12   coordinator used in the LEAD program was not

13   employed by the County or the City but was employed

14   by an independent organization, Prestera, and was

15   assigned to the County or City.  Correct?

16      A.   That -- according to this document, that

17   would be correct, yes.  But for purposes of my

18   calculations, again, who pays for it and who they

19   work for is largely irrelevant because this is the

20   cost of that program.

21      Q.   But at least for this program, that cost

22   was originally incurred and paid for by Prestera,

23   maybe underwritten by some grant.  Is that right?

24      A.   I'm not so sure about that.  According to

Page 186

1    this document, it just basically states that the

2    individual was an employee of Prestera.  So they're

3    getting their paychecks from Prestera.  Who pays

4    for that funding - is it transferred, is it a

5    grant, is it reimbursed - I don't know.  This

6    document doesn't signify that.

7        Q.   Now, why is your firm's letterhead -- or

8    legend stamped on the bottom of this page?

9        A.   It just so happened to be the paper that

10   was in the printer whenever I printed this.  My

11   apologies for that.

12       Q.   That's fine.  I assumed there was some

13   innocuous explanation.  I was just curious of what

14   it was.  Or maybe that you stamped all documents

15   that you received with that stamp.

16       A.   No, no, not at all, it's just that was the

17   doc -- the paper that was in the printer at the

18   time.

19       Q.   I've done that before, and it annoys me

20   because the letter stock is more expensive than the

21   regular paper.

22       A.   Me too.

23       Q.   Yeah.  So again, just -- we sort of just

24   touched on this a second ago, but in terms of your

Page 187

1   calculation of the -- that $80,000 cost for the two

2   triage and referral coordinators, you're agnostic

3   as to who's actually going to pay for that in the

4   future.  Correct?

5       A.   That is correct.

6       Q.   Okay.  And I think I asked this earlier

7   about the LEAD program.  Are you aware or not aware

8   of the fact that LEAD programs across the United

9   States are funded in whole or in part by the

10  federal government?

11      A.   I can't recall specifically who provides

12  the funding for those types of programs.  But for

13  purposes of my calculations, again, it doesn't

14  matter.

15      Q.   And I note -- you also don't have this

16  category for Specialized Overdose Units.  These are

17  -- you used detective salaries for those, so you're

18  assuming two detectives will be assigned full-time

19  to a specialized overdose unit; is that right?

20      A.   That's right.  Previously when we looked at

21  the redress model by Doctor Alexander and how it

22  identified law enforcement, first responders

23  generally from their occupations, average wage data

24  was sufficient for making the estimate.

1        But here, in this specific category,

2   Doctor Alexander recommends that the cost be based

3   upon a detective's full-time equivalent annual

4   compensation.

5        Q.   And those individuals would be responding

6   to overdose calls; is that right?

7        A.   I am not certain as to what the job

8   responsibilities of those individuals would be.

9   For the scope of my work, I don't really need to

10  understand that because Doctor Alexander has told

11  me specifically that it should be valued at the

12  median annual detective's salary and that there are

13  two needed.

14       Q.   Well, in -- was it you or Doctor Alexander

15  who gave them the name Specialized Overdose Units?

16       A.   I did not give them that name.  I didn't

17  identify or give any of these categories names.

18       Q.   Doctor Alexander is -- gave you that name?

19       A.   If you took at Tab 3A in the Appendix to

20  Doctor Alexander's report, under Row 3, he

21  identifies this to be the Specialized Overdose

22  Unit.

23       Q.   Okay.  Well -- and maybe this is something

24  you don't know about, but let me just try -- I

Page 223

1    Toddlers, Developmental Services.

2              And as part of that, there is an

3    identified cost that Doctor Young provides at

4    $1,300 per intervention, and because this is

5    provided in Doctor Young's report, I would assume

6    that it's a 2020 value.  And that's a conservative

7    assumption, because I'm not going to increase that

8    value from prior years up to 2020.  I'm just going

9    to assume that it's already in 2020 dollars.

10             So I'm going to increase that into the

11   future by 2.5 percent, which is the Services by

12   Other Medical Professionals rate of increase, and

13   so when you look at that column -- or that row of

14   data starting with $1,333, which is the early

15   intervention cost estimate provided by Doctor

16   Young, we'll increase those figures by 2.5 percent,

17   moving from left to right, year by year.

18             When you get out to Year 2035, you'll

19   see that the price increase has gone up to $1,883.

20             Now, if you're looking at the same

21   version that I am, which is the errata version, the

22   number of individuals is a little bit different

23   than was in the first August -- the initial August

24   3rd report, and so the estimated costs are all a

Page 224

1  little bit different for each year from what they

2  were previously.  But those should be identified in

3  red for you.

4      Q.   Sorry, bear with me one second here.  In

5  terms of these IDEA assessments and these

6  individualized family service plans, do you

7  understand who historically has funded the

8  provision of those assessments and reviews?

9      A.   Typically the county boards of education

10 would have been responsible for that, with funding

11 through the State government and supplemented by

12 the Federal government.

13     Q.   And jumping down to the special education

14 services referenced in 4A4c, are those likewise

15 typically provided by -- well, who typically

16 provides and pays for special education in West

17 Virginia?

18     A.   The state of West Virginia, again,

19 supplemented by the Federal government and the

20 county school system as well.  There are three

21 levels of funding which take place.

22     Q.   And the figures reflected here in your

23 report for special education services, that

24 reflects the full cost.  It doesn't seek to

Page 225

1    allocate as between which portion is funded by the

2    Federal government, which by the State government

3    and which by the County government; is that right?

4        A.   That's right.  Just as we've been talking

5    about, all the other previous categories, I'm not

6    looking at a particular funding source; I'm simply

7    calculating how much the future values are going to

8    be for each one of these categories.

9        Q.   Okay, let's go to 4B, which is Adolescents

10   and Young Adults.

11       A.   Okay.

12       Q.   The first item that you price out are

13   School-Based Prevention Programs, correct?

14       A.   Yes.

15       Q.   And are you aware of any school-based

16   prevention programs currently in place in the

17   Cabell/Huntington community?

18       A.   No, I've not reviewed any, no.

19       Q.   Okay.  Do you know whether there's any life

20   skills training programs in place in the

21   Cabell/Huntington community?

22       A.   Life skills training as a component of

23   special education services?  I have not looked at

24   Cabell County's curriculum.  It should be a

Page 234

1   Oop.  Now we're getting the dog.

2              MR. HALLER:  Without the echo.

3              MR. BURNETT:  We've got a Jim Peterson

4   and a Jim.  I don't know that that matters.  I'm

5   just pointing it out.  Two separate dials in.

6       Q.   And similarly here -- you -- what you know

7   about the services is only what's reflected in the

8   Young report; is that right?

9       A.   Yes, that is correct.

10      Q.   Okay.  And the $2,332 figure, is that

11  related to her $2,018 cost estimate?

12      A.   That is representative of what she

13  identifies to be the intensive --

14      Q.   Right.

15      A.   -- parent child intervention cost per

16  family, and she makes a distinction for this

17  particular category that in addition to those

18  intensive parent/child interventions, that there's

19  going to be peer family mentoring services, and

20  it's that peer family mentoring cost that she has

21  reduced the cost from $30,000 to $12,500.

22      Q.   Right.  And she references the START

23  program in connection with that previously $30,000

24  and now $12,000 amount.  Correct?

Page 235

1      A.   Yes, that is my understanding.

2      Q.   And do you know where the funding currently

3  comes from for the START programs throughout the

4  U.S.?

5      A.   No, I do not.

6      Q.   Okay.  And is that -- if it's the federal

7  government that funds the START programs, I take it

8  you have not made any attempt to reduce the dollar

9  amounts of your figures by the amount of Federal

10  funding.  Again you are agnostic as to where the

11  funding is coming for for these programs, right --

12  coming from for these programs, right?

13      A.   Yes, that is correct.  I'm indifferent as

14  to the funding source.  These are simply

15  representative of what the future value costs will

16  be.

17      Q.   The next category, Support for Children in

18  Foster Care, do you know how the number of children

19  in foster care due to parental opioid use is

20  derived?

21      A.   Doctor Alexander identifies that number on

22  page 4C in Row 6 under the Subcategory, Support for

23  Children in Foster Care.  The number starts off at

24  239 children and then changes from year to year.  I

Page 236

1    believe that it actually decreases every year until

2    2035.

3        Q.   And in West Virginia, who pays for foster

4    care services, the County or the State?

5        A.   The State Department of Health and Human

6    Resources makes a reimbursement payment to families

7    based upon a minimal monthly amount.  But the

8    actual payments will be dependent upon the

9    individual families that are paying for the foster

10   children in their care.

11       Q.   And again, I know this is repetitive, and I

12   appreciate your patience.  But the -- even though

13   the State is paying for foster care services in

14   West Virginia, not the County, that doesn't affect

15   your numbers because you're agnostic as to who's

16   paying these amounts; is that right?

17       A.   That is correct, yes.

18       Q.   Now, the next tab -- I have a 4C tab that's

19   all in red.  That's 4C2d --

20       A.   Yes.

21       Q.   And can you describe what you're pricing on

22   that page?

23       A.   Yes, I can.  When Doctor Young's first

24   report was submitted, she did not include any

Page 237

1      information which would allow me to calculate what

2      the future values would be for this category of

3      Intensive Parent-Child Interventions & Family

4      Treatment Court for Foster Families.

5                  And it was the Family Treatment Court

6      which was a new item -- it's not a Drug Court, it's

7      something that's unique for children and families.

8      And I needed to have that information, and it

9      wasn't provided to me until very, very, very late

10     on the last day that the production of the

11     calculations were being done.

12                 So I wasn't able to include that

13     information into the initial report.  So my errata

14     includes the inclusion of this category of costs

15     which did not appear in my first report.

16        Q.   And what is your understanding of what a

17     family treatment court for foster families is and

18     what it does?

19        A.   I don't have very much understanding at all

20     about this.  This is a somewhat new concept for me,

21     even within the practice of vocational

22     rehabilitation.  I don't have much of an

23     understanding of this one.

24        Q.   And do you have any vague understanding, or

Page 253

1    utilized historical data for what the plaintiff had

2    expended on themselves for their own medical care

3    prior to the award of a lump sum settlement or any

4    type of judgment, the quality and quantity of the

5    care is going to be adversely affected by the lack

6    of funds which could be assumed because of the

7    injury.

8              So if you have a person who's not

9    working and therefore has no income stream, you

10   would not want to use what they historically had

11   paid for their own health care treatment or even

12   household services replacement costs based upon the

13   money that they didn't have to spend on the

14   adequate replacement of those services and

15   treatment items.

16             The same would be true here.  And I've

17   alluded to that several times today as we've been

18   talking.  You can't assume that the money that has

19   either been spent or has not been spent is relevant

20   to the particular redress model because the

21   financial resources of Huntington are limited in to

22   what they could actually pay for.

23             So I believe that that would adversely

24   affect any type of a projection that you would be

Page 254

1    made.

2         Q.    Okay.   Do you have any view as to whether,

3    in your expert work, if you're relying on the work

4    of another expert that you do due diligence on the

5    work of that other expert?

6         A.    Absolutely not.   I have no qualifications

7    to verify the conclusions of an expert in another

8    field of expertise, so no, I would find it very

9    inappropriate to make any distinctions as to the

10   qualifications of an expert in another field or the

11   quality of the work that they performed in another

12   field of expertise.

13        Q.    Have you ever written in a newsletter the

14   following - and I'll quote it - quote, "Another

15   suggestion, especially when two experts have not

16   previously worked together," if a telephone call --

17   "is that a telephone call between the two occur

18   before either issues a report.   Rather than being a

19   sinister activity, we view this as an important due

20   diligence when one expert is the foundation for the

21   other."

22        A.    Sure, absolutely, I recall that.

23        Q.    And so in that statement, you seem to be

24   suggesting that due diligence on the work of

Page 255

1    another expert that you're relying on is an

2    important part of your process when that other

3    expert's work is a foundation for your own.  And

4    can you explain to me why that can be generally

5    true but not true in this instance?

6        A.    Absolutely.  When we speak about due

7    diligence in that newsletter, as that relates to

8    having a conversation with a related expert, what I

9    am referring to is understanding what that expert

10   is giving me in their opinion.  Understanding that

11   information is important.

12              The due diligence is not me

13   questioning the abilities or the opinions or the

14   accuracy or the validity of the opinions of what

15   that expert is saying.  It's necessary so that I'll

16   understand what that expert is talking about.

17              And that's exactly what transpired in

18   this case from the very beginning of my work in

19   early spring in having routine, regular telephone

20   conversations with Doctor Alexander and Doctor

21   Alexander's staff so that I would understand the

22   information that was being presented to me.

23              That is the necessary due diligence.

24   It's not a matter of me questioning the integrity,