# EXHIBIT 2

Confidential

# Expert Report of George Barrett
## MBA, MSRC, CRC, CVE

August 3, 2020

BROOKSHIRE BARRETT & ASSOCIATES, LLC
(304) 562-0180
www.forensiceconomics.org

Confidential

## I. INTRODUCTION

1. The Cabell Huntington Community[1] has been hit hard by the opioid epidemic and is one of the hardest-hit counties in the United States.[2]

2. At the same time, the local community has spent considerable effort in addressing the epidemic. For example, Mayor Steve Williams created the Mayor's Office of Drug Control Policy, which "was established to assist in creating a dialogue in our community and throughout the region about the pervasive nature of this epidemic of addiction." In May 2017 the Office issued a Two-Year Strategic Plan for Addressing the Opioid Crisis in the City of Huntington/Cabell and Wayne Counties, West Virginia. The Division of Addiction Sciences in the Department of Family and Community Health at the Joan C. Edwards School of Medicine at Marshall University in Huntington prepared a report entitled "City of Solutions: A Guide to What Works (and what does not) in Reducing the Impact of Substance Use on Local Communities." These reports and others describe the prescription opioid epidemic and measures which are being taken locally to try to address it.

3. Dr. Caleb Alexander's expert report for this litigation proposes a comprehensive plan to abate the opioid epidemic in the Cabell Huntington Community (the "Abatement Plan"). Dr. Alexander is a Professor of Epidemiology and Medicine at Johns Hopkins Bloomberg School of Public Health, and he has been involved in opioid research and litigation for many years. His Abatement Plan draws on academic research and information about local and national public-health programs focused on addressing opioids-related harms. The Abatement Plan takes into

---

[1] The Cabell Huntington Community is defined as the City of Huntington and Cabell County, and is thus coextensive with the geographic area of the plaintiffs in this litigation, the City of Huntington and the Cabell County Commission.

[2] *See, e.g.*, August 3, 2020 expert report of Katherine Keyes, PhD in this litigation.

Confidential

account the abatement interventions currently underway in the Cabell Huntington Community as well as the unmet needs.

4. Dr. Alexander recommends interventions—roughly grouped into prevention, treatment, and recovery, as described below and in detail in his report—which he expects to reduce the epidemic's impact in the Cabell Huntington Community over time.[3]

5. I am a practicing forensic economist. I live and work in Hurricane, WV, received my undergraduate degree at West Virginia State University in Charleston, WV, and received an MBA at Marshall University in Huntington. I have been retained by Plaintiffs in this litigation to quantify the total cost of Dr. Alexander's Abatement Plan for a 15-year period, from 2021 to 2035, based on my experience as an economist in southwestern West Virginia. I applied national and local cost data, certain cost data from the expert reports of Dr. Alexander and Dr. Nancy Young, inflationary rate data, and standard economic principles to Dr. Alexander's Abatement Plan to calculate its total cost.

## II. QUALIFICATIONS

6. I am a practicing forensic economist and vocational evaluator. I am a co-owner of Brookshire Barrett & Associates LLC, an economic consulting firm based in Hurricane, West Virginia. Our firm applies economic theory, data sources, and methods to litigation issues and courtroom testimony. While the majority of our work involves the calculation of economic damages in personal injury and wrongful death cases, our work regularly includes wrongful discharge, discrimination, other labor market cases, and lost profits and other commercial damages cases.

---

[3] *See generally* August 3, 2020 expert report of Dr. Caleb Alexander in this litigation.

3

Confidential

7. In my forensic practice, I calculate economic damages and provide expert testimony in a wide variety of civil litigation in numerous jurisdictions across the nation. Primarily, these cases include lost earning capacity, lost household services, and cost of lifecare plans such as future medical care valuations. In my field I regularly rely on financial and budget documents, interviews with witnesses, and input from other experts.

8. I served as an adjunct professor of Rehabilitation Counseling at Minnesota State University, Mankato and as an adjunct instructor of economics at West Virginia State University. I also served as a vocational expert with the Social Security Administration. My research on incremental cost issues of life care planning, medical monitoring, punitive damages, and other aspects of forensic economics have been published in numerous peer-reviewed journals and textbooks.[4]

9. I graduated *magna cum laude* from West Virginia State University, earning a Bachelor of Arts (BA) degree in Economics. I earned a Master of Business Administration (MBA) degree from Marshall University in Huntington, West Virginia. I also completed the Master of Science in Rehabilitation Counseling (MSRC) degree from West Virginia University and achieved the professional designation of a Certified Rehabilitation Counselor (CRC) and Certified Vocational Evaluation Specialist (CVE). I also completed the graduate certificate program in Forensic Rehabilitation Counseling (FRC) at The George Washington University.

10. I serve on the board of referees for the Journal of Forensic Economics and the Journal of Legal Economics. I served on the board of directors of the American Rehabilitation Economics Association (AREA) for a period of six years between 2007-2012. In 2011, I was elected President of that organization. I served as editor of AREA's peer-reviewed journal, *The*

---

[4] See *Curriculum Vitae*, attached as Exhibit O

4

Confidential

*Earnings Analyst*, between 2008 and 2011 and remain on the board of referees. I was appointed as a member of the Advisory Council for the College of Business at West Virginia State University in 2011.

11. I am being compensated on an hourly basis for my work on this matter at a rate of $300 per hour. I am also being reimbursed for my out-of-pocket expenses. My compensation does not depend on the outcome of the case or the substance of my opinions.

12. My *curriculum vitae* is included as Appendix O.

### III.  SUMMARY OF OPINIONS

13. In this report I present the following opinions and describe the evidence and analysis related thereto.[5]

14. As an economist, I can reasonably calculate the aggregate cost of Dr. Alexander's proposed Abatement Plan over the next 15 years, from 2021 to 2035, using the data available to me. My calculations draw on established principles of applied economics. I have been asked to precisely follow the interventions listed in Dr. Alexander's Abatement Plan, including his projections of target population needs and medical costs. I relied on the Abatement Plan and did not alter any components of his plan or otherwise deviate from it. From my own research, I identified the most accurate and relevant costs for most of the Abatement Plan's data inputs, drawing on a combination of local and national cost data. For medical-related costs, I relied upon Dr. Alexander's recommended cost inputs, which are provided in Appendix D of his expert report. For costs related to services for children, I relied on the expert report of Dr. Nancy Young. I then applied relevant inflationary growth rates to each cost component of Dr.

---

[5] The opinions and conclusions in this report are based on information and documentation available to me at this time, and I reserve the right to supplement and revise the opinions and conclusions expressed in this report based on additional evidence or information provided to me after the date of this report.

5

Confidential

Alexander's plan, over time, to determine the cost per component of the Abatement Plan, per year, for 15 years.

15.   As detailed further below in Table 1 and in my cost spreadsheets, attached as Appendix M to this report, I estimate the total cost of implementing the programs in Dr. Alexander's Abatement Plan, for the time period 2021 to 2035, to be $2.589 billion. My calculations are based on the target population figures provided by Dr. Alexander, cost data collected by me and recommended by Dr. Alexander and Dr. Young, and adjusted for inflation.

### Table 1

### Categorical Costs of Dr. Alexander's Abatement Plan

| Category | Total Category Costs |
|---|---|
| Category 1: Prevention – Reducing Opioid Oversupply and Improving Safe Opioid Use | |
| 1A: Health Professional Education | $5,437,224 |
| 1B: Patient Public Education | $538,834 |
| 1C: Safe Storage and Drug Disposal | $35,972 |
| 1D: Community Prevention and Resiliency | $18,910,666 |
| 1E: Harm Reduction | $19,598,535 |
| 1F: Surveillance, Evaluation, and Leadership | $5,229,383 |
| Category 2: Treatment – Supporting Individuals Affected by the Epidemic | |
| 2A: Connecting Individuals to Care | $28,308,727 |
| 2B: Treating Opioid Use Disorder | $1,682,783,888 |
| 2C: Managing Complications Attributable to the Epidemic | $301,682,032 |
| 2D: Workforce Expansion and Resiliency | $6,185,398 |
| 2E: Distributing Naloxone and Providing Training | $10,127,152 |

6

Confidential

| Category 3: Recovery – Enhancing Public Safety and Reintegration | |
|---|---|
| 3A: Public Safety | $11,623,562 |
| 3B: Criminal Justice System | $43,773,325 |
| 3C: Vocational Training and Job Placement | $41,912,512 |
| 3D: Reengineering the Workplace | N/A |
| 3E: Mental Health Counseling and Grief Support | $3,651,622 |
| Category 4: Addressing Needs of Special Populations | |
| 4A: Pregnant Women, New Mothers, and Infants | $92,587,170 |
| 4B: Adolescents and Young Adults | $33,990,116 |
| 4C: Families and Children | $277,822,612 |
| 4D: Homeless and Housing Insecure Individuals | $4,855,715 |
| 4E: Individuals with Opioid Misuse | N/A |
| **Total:** | **$2,589,054,447** |

16. Detailed calculations of the total costs of the Abatement Plan, showing the components, data sources, and inflationary rates I relied upon in developing my cost figures, are listed in Appendix M. Appendix M is an Excel spreadsheet. The first tab summarizes the costs of each category and subcategory of the Abatement Plan. The other two dozen tabs list detailed cost data for individual components of the Abatement Plan.

17. While a significant sum, my estimate that the Abatement Plan will cost $2.589 billion for the time period 2021 to 2035 is conservative. My cost calculations are conservative. Where the data suggests a range of costs, I averaged the figures, resulting in lower costs for the Abatement Plan. For example, while the average annual rate of increase in earnings has

Confidential

historically been at 3.44%, I discovered that the wage rate increase for Huntington Police Department officers increased by only 2.00% between 2017 and 2018. I elected to increase the rates of public safety abatement costs at the more conservative 2.00% rate rather than the more generalized 3.44% annual rate.

## IV. DR. ALEXANDER'S ABATEMENT PLAN

18. The Abatement Plan identifies four major categories of needed services: (1) Prevention - Reducing Opioid Oversupply and Improving Safe Opioid Use; (2) Treatment - Supporting Individuals Affected by the Epidemic; (3) Recovery – Enhancing Public Safety and Reintegration; and (4) Addressing Needs of Special Populations. The Abatement Plan includes subcategories within each of the four categories, for a total of 21 subcategories. Table 2 below, excerpted from the data spreadsheets enclosed with Dr. Alexander's expert report, lists the categories and subcategories of the Abatement Plan. These categories are described in detail in Dr. Alexander's report and his Redress Model.

### Table 2

### Elements of Dr. Alexander's Abatement Plan

**Abatement Categories**

**Category 1: Prevention - Reducing Opioid Oversupply and Improving Safe Opioid Use**
1A. Health Professional Education
1B. Patient and Public Education
1C. Safe Storage and Drug Disposal
1D. Community Prevention and Resiliency
1E. Harm Reduction
1F. Surveillance, Evaluation, and Leadership

**Category 2: Treatment - Supporting Individuals Affected by the Epidemic**
2A. Connecting Individuals to Care

8

2B. Treating Opioid Use Disorder

2C. Managing Complications Attributable to the Epidemic

2D. Workforce Expansion and Resiliency

2E. Distributing Naloxone and Providing Training

**Category 3: Recovery - Enhancing Public Safety and Reintegration**

3A. Public Safety

3B. Criminal Justice System

3C. Vocational Training and Job Placement

3D. Reengineering the Workplace

3E. Mental Health Counseling and Grief Support

**Category 4: Addressing Needs of Special Populations**

4A. Pregnant Women, New Mothers, and Infants

4B. Adolescents and Young Adults

4C. Families and Children

4D. Homeless and Housing Insecure Individuals

4E. Individuals with Opioid Misuse

## V. METHODOLOGY

19. I calculated the aggregate cost of implementing Dr. Alexander's Abatement Plan using the categories, subcategories, population data, and suggested medical costs set forth in the plan, without modification. I also relied on Dr. Young for recommended costs related to children's services.

20. For Abatement Plan costs other than those recommended by Dr. Alexander and Dr. Young, I estimated the costs by identifying national and local sources of reasonable, reliable cost data relevant to each category, subcategory, and line item of the plan. I gathered cost data from academic articles, national studies, governmental databases, news articles, and West Virginia state and local data. I sought the most accurate and reliable cost data. Where possible, I

9

Confidential

looked for data specific to the Cabell Huntington Community, or specific to West Virginia more broadly, so that my cost calculations are relevant to the local community. For example, I drew on current local salary information from the U.S. Department of Bureau of Labor Statistics, using its Occupational Employment Statistics for the Huntington-Ashland, WV-KY-OH Metropolitan Statistical Area. Appendix L to this report identifies the data sources for each cost input.

21. I have relied on Dr. Alexander to identify the costs of all medical-related components of his plan. Those medical-related costs are listed in Appendix D enclosed with Dr. Alexander's report, and I incorporated them without modification into my report's cost calculations. I relied on Dr. Nancy Young, another expert, to identify certain costs related to children's services given her expertise on subjects involving women and children. I identified all other costs for the Abatement Plan, other than medical-related costs, including costs such as salaries and program costs.

22. Future values of costs identified in the Abatement Plan are estimated categorizing each item by relevant categories of price inflation. For each identified inflationary category, a 30-year (1990-2019) average change in price are calculated. The corresponding 30-year average price change is then applied to the base level costs identified in the Abatement Plan. Appendices A through J demonstrate these categorical inflationary trend rates.

23. I had numerous conversations with local government employees and professors, with counsel and other experts present, to discuss the opioid epidemic in the Cabell Huntington Community. I met with local witnesses in person in Huntington and I joined numerous phone calls with witnesses. I gathered further input on local cost data from those conversations and

10

confirmed that my cost calculations are reasonable. A list of individuals I met with or spoke to by phone is attached as Appendix N.

24. The approach used in Dr. Alexander's report, Dr. Young's report, and mine, taken together—identifying the target populations, assessing population needs, selecting the set of programs that can best meet these needs, and then estimating the costs of providing the programming—is widely applied in economics. Evaluating community needs based on quantitative data and then verifying the estimates based on information obtained from local experts is also standard practice.[6]

25. My analysis does not address how abatement costs should be allocated among defendants or others. Nor do I address to what extent the Cabell Huntington Community has existing programs which may overlap with Dr. Alexander's Abatement Plan. Existing programs that seek to address the harms caused by the opioid crisis have been funded by a variety of public and private sector sources, but there is no guarantee that these funding sources will remain available indefinitely. My cost calculations reflect the interventions identified by Dr. Alexander's Abatement Plan as necessary to serve the Cabell Huntington Community, regardless of which entity would be funding or delivering the services.

26. The costs described in this report reflect the information available to me at the time of my writing, including the Abatement Plan as currently conceived. When it becomes time to implement the Abatement Plan, it may be useful to update the plan and corresponding cost data based upon the latest information and conditions in the Cabell Huntington Community. Implementing the Abatement Plan could also involve further engagement with community

---

[6] *See, e.g.*, Slesnick, F. (1990). Forecasting medical costs in tort cases: the role of the economist. *Journal of Forensic Economics*, 4(1), 83-99.

Confidential

members and local experts so as to ensure the most effective possible implementation of the Abatement Plan for the Cabell Huntington Community.

Confidential

August 3, 2020

*[signature]*

George Barrett

Hurricane, WV