# EXHIBIT 7

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION. et al.,<br>    Defendants. | CIVIL ACTION NO. 3:17-01362 |
| CABELL COUNTY COMMISSION,<br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION. et al.,<br>    Defendants. | CIVIL ACTION NO. 3:17-01665 |

**EXPERT REPORT OF**
**ROBERT J. RUFUS, DBA, CPA, CFF, CVA (Emeritus)**

August 27, 2020

**Table 2.12**
**Compass - City and/or County and External Donated Funds**

|  | Annual Amount | Total Amount |
|---|---:|---:|
| City of Huntington General Fund and Donations | $   5,162 | $   15,486 |
| **Subtotal - City and/or County Funds** | **5,162** | **15,486** |
|  |  |  |
| Cabell Huntington Hospital | 3,333 | 10,000 |
| Marshall University Health | 1,667 | 5,000 |
| **Subtotal - Funding from External Sources** | **5,000** | **15,000** |
| **Total Non-Grant Funding** | $   **10,162** | $   **30,486** |

*Source: HUNT_00002187 and HUNT_00025302*

*Externally Funded and Operated Programs*

2.61 In addition to the programs discussed above, the Plaintiffs have identified a number of community partnerships that reach beyond the boundaries of Cabell County. Of special note is the collaboration of the community's health care organizations – e.g., Cabell-Huntington Health Department, Cabell Huntington Hospital, St. Mary's Medical Center, Marshall University, and Marshall Health – offering supportive programs including, but not limited to:

   a. Provider Response Organization for Addiction Care and Treatment (PROACT)

   b. Project Hope

   c. Maternal Opioid Mediation Support (MOMS) program

   d. Great Rivers Regional System for Addiction Care

   e. Healthy Connections

   f. Cabell County Substance Abuse Partnership (CCSAPP)

2.62 Absent from the above discussion, but worthy of note, is treatment funded by the federal and state governments through Medicaid and Medicare, and through grants including from SAMHSA.

**Task 2 Summary Opinion**

2.63 Table 2.13 quantifies the annual investments made by the Plaintiffs and third parties (external sources) to support the noted intervention programs. As evidenced in Task One, these collective efforts, in conjunction with support and services from the Federal and State government, have changed the course of the opioid abuse epidemic. That said, the annual

investments made by the Plaintiffs totals $136,520, including in-kind contributions.

**Table 2.13**
**Programs Operated by the City and/or County**

| Program | City and/or County Funds | | | External Funds | Total |
|---|---|---|---|---|---|
| | Direct | In-Kind | Total | | |
| LEAD (a) (Table 2.1) | | $ 16,667 | $ 16,667 | $ 83,333 | $ 100,000 |
| Harm Reduction (b) | | | $ - | $ 222,066 | $ 222,066 |
| Drug Court / WEAR | | | | | |
|   WV Supreme Court (Table 2.2) | | | $ - | $ 271,085 | $ 271,085 |
|   SAMHSA (Table 2.3) | | | $ - | $ 141,237 | $ 141,237 |
|   BJA (Table 2.4) | | | $ - | $ 73,335 | $ 73,335 |
|   BJA In-Kind (Table 2.5) | | $ 54,750 | $ 54,750 | | $ 54,750 |
|   Judicial In-Kind (Table 2.6) | | $ 14,623 | $ 14,623 | | $ 14,623 |
| Turn Around (Table 2.8) | | | $ - | $ 337,308 | $ 337,308 |
| QRT (Tables 2.9 and 2.10) | | $ 45,318 | $ 45,318 | $ 467,491 | $ 512,809 |
| Compass (c) (Tables 2.11 and 2.12) | $ 5,162 | | $ 5,162 | $ 338,333 | $ 343,495 |
| **Total** | **$ 5,162** | **$ 131,358** | **$ 136,520** | **$ 1,934,188** | **$ 2,070,708** |

*Notes:*
(a) The grant closed on Sept 30, 2019. This value quantifies pre-close investments.
(b) 2019 Harm Reduction Program expenses from the CHHD Annual Report.
(c) The External Funds for the Compass program include the average grant award ($333,333) plus $5,000 from CHH and Marshall.

***Task 3.*** **Analyze the Plaintiffs' financial reports and related data to determine if any additional investments (costs) were made by the Plaintiffs, not captured in task 2.**

**Task 3 Analytical Facts / Observations**

3.1  As stated, the purpose of this task is to analyze the Plaintiffs' financial reports and related data to determine if any additional investments (costs) were made by the Plaintiffs, not captured in task 2. To that end, I have analyzed the available financial data[k] including annual proposed and approved budgets, annual financial reports for the City and County, and supporting materials. Special consideration was given to departments identified by the Plaintiffs that may have been involved in opioid related intervention efforts.[74] For Cabell County, this included the Western Regional Jail, Sherriff, Fire Protection, and EMS. For the City of Huntington, this included the police department and the fire department.

3.2  As prescribed by the West Virginia State Auditor, the City's expenditures are broken down into five broad categories:

    a. *General Government*. Includes the elected officials' general operating accounts, city hall, other buildings, community, economic and industrial development, building

---

[k] See Statement of Limiting Conditions.

**Task 3 Summary Opinions**

3.36   Based upon the study and analysis conducted, it is my opinion that the Plaintiffs made no measurable intervention program investments, not previously discussed or captured in Task 2.

*Task 4*:   Task 4 has four parts.  First, I will consider the interventions proposed by Dr. Alexander to respond to the opioid abuse epidemic in the context of the Plaintiffs' respective structure and services provided to their citizens.  Second, I will identify federal and state funding currently in place for interventions.  Third, I will consider the primary economic drivers of Dr. Alexander's report and address methodological failures (if any) related thereto.  Finally, I will consider George Barrett's report and address methodological failures (if any) related thereto.

**Task 4 Analytical Facts / Observations**

*Note:*  I am not a public health expert, and thus I take no position on the reasonableness or efficacy of Dr. Alexander's recommended "abatement" responses and interventions.

**Dr. Alexander's Report**

4.1   Dr. Alexander has proposed a variety of measures ("abatement" interventions) he believes should be used to reduce opioid-related harms (para. 17).

4.2   Dr. Alexander acknowledges that many of the interventions he proposes "have already been implemented in the Cabell-Huntington Community" (para. 18).

4.3   Dr. Alexander acknowledges that the Cabell-Huntington community and other stakeholders (e.g., State of West Virginia) have collaborated to address the opioid abuse epidemic head-on, including prevention, harm reduction, and treatment measures (paras. 26 - 28).

4.4   Dr. Alexander acknowledges the success of the response and intervention efforts, noting a "22-26% decline in opioid-overdose deaths between 2017 and 2018 in Cabell County" and "reductions in the rate of new HIV infections linked to injection drug use" (para. 29).

4.5   Dr. Alexander's proposed "abatement" interventions have been grouped into four categories:

    1) Prevention – reducing oversupply and improving safe opioid use

    2) Treatment – supporting individuals affected by the epidemic

    3) Recovery – enhancing public safety and reintegration

    4) Addressing the needs of special populations

4.6    Dr. Alexander's plan fails to consider the Plaintiffs' respective structures, functions and services provided to its citizens. Moreover, he fails to consider the different layers of government – local, state, and federal – and functions of external agencies such as SAMHSA, Medicaid, Medicare, private insurance companies, private and non-profit healthcare, and social services providers.

4.7    Based on my analysis of the City's financial reports, I have determined that its functions include general municipal government (e.g., city hall operations, economic development, building inspections and zoning), basic utility services, and public safety (e.g. police and fire). Similarly, my analysis of the Cabell County Commission's financial reports determined its main functions include general county government (e.g. courthouse, administrative services), support of elected officials, and public safety (e.g. Sheriff's Department). Importantly, health care services *fall outside the functions of local government*.

4.8    The responsibility for health care is significant because such services constitute the majority of the interventions proposed by Dr. Alexander. Specifically, interventions for Opioid Use Disorder (OUD) treatment and family welfare services, which are administered by the West Virginia Department of Health & Human Resources, and federal programs such as Medicaid and Medicare, amount to \$2.1 billion[s] of the total \$2.6 billion quantified by Mr. Barrett.[87] Moreover, many of the proposed interventions are currently available to the Plaintiffs' citizens via third parties, including the State of West Virginia.

4.9    A void in Dr. Alexander's discussion is funding. To that end, he fails to consider available funding via federal and state grants for the treatment of substance use disorders, as well as for other programs he describes. The evidence would suggest that sufficient grant funding has been available to cover the successful response of intervention programs previously described, and neither county general funds or budget surpluses have been utilized or needed to pay for these programs.[88]

4.10    According to Lyn O'Connell (O'Connell Depo, p 63), federal funding for treatment and related services for opioid and substance use disorders has increased over the last four years,[89] and the state has actively allocated funds directly to addressing opioid abuse.

4.11    According to Christina Mullins,[t] as of December 20, 2019, the state of West Virginia "has

---

[s] Sums the categories of 2B. Treating Opioid Use Disorder, 2C. Managing Complications Attributable to the Epidemic, and 4C. Families and Children.
[t] Commissioner of the Bureau of Public Health, WV DHHR.

received $147,356,427 in federal funds to address the opioid abuse epidemic. An additional $58,908,723 in state funds have also been allocated since July 2016 to support the state's response to this crisis" (Mullins Depo., p. 107, Ex. 5). Importantly, these funds are disbursed through grants to localities within West Virginia (p 107). Federal grants received by West Virginia (2016 – 2020) for the treatment of OUD are illustrated in Table 4.1.

Table 4.1
**West Virginia Federal Grants Related to OUD or SUD Prevention and Treatment Through Fiscal Year 2020**

| Grant | Total |
|---|---:|
| State Targeted Response (STR) - Cures Act | $ 12,096,567 |
| SAMHSA State Opioid Response (SOR) | 56,055,022 |
| SAMHSA State Opioid Response (SOR) - Continuation/Supplement | 14,630,361 |
| Enhanced State Surveillance of Opioid-Involved Morbidity and Mortality | 1,209,138 |
| Overdose Data to Action | 14,689,676 |
| Prescription Drug Overdose Prevention for West Virginia | 5,767,779 |
| Public Health Emergency Response - Cooperative Agreement to Emergency Response - Public Health Crisis Response | 3,654,254 |
| Expansion of Naloxone Distribution to EMS Agencies and WV State Police and High Risk Selected Communities Pilot Prevention Programs | 1,567,184 |
| Comprehensive Abuse Site-Based Program | 6,500,000 |
| Emergency Department Surveillance of Nonfatal Suicide-Related Outcomes | 293,970 |
| Public Health Emergency Response - Cooperative Agreement to Emergency Response - Public Health Crisis Response (in-kind) | Unable to Locate |
| WV PDO Grant Contribution | 2,434,442 |
| Substance Abuse Prevention & Treatment Block Grant | 34,326,828 |
| WV Strategic Prevention Framework for Prescription Drug | 1,900,897 |
| Strategic Prevention Framework-Partnerships for Success | 5,271,906 |
| **Grand Total** | **$ 160,398,024** |

*Sources: (1) https://taggs.hhs.gov/SearchAward, (2) https://bja.ojp.gov/funding/awards/2019-ar-bx-k046*
*(3) https://nasadad.org/wp-content/uploads/2017/08/West-Virginia-Partnerships-for-Success-Program.pdf*
*(4) SAMHSA SOR FAQs.pdf, (5) SOR Grant Summary 12-3.pdf (6) Deposition of Christina Mullins, July 14, 2020, Exhib*

4.12 Relatedly, Dr. Alexander fails to consider the expanded coverage for SUD and OUD treatment under the 1115 Substance Use Disorder Medicaid Waiver.[90] In 2017 alone, Medicaid paid for $89.9 million in opioid use disorder related treatment.[u]

4.13 The amounts summarized above also do not include an additional $84 million received by the State of West Virginia[91] from opioid litigation settlements. Roughly $21 million of these funds have been distributed across the state (including Huntington) from the Ryan Brown Addiction Prevention Recovery Fund for treatment programs and additional treatment beds.[v] The state has used these funds to invest heavily in expanding

---

[u] Medicaid: The Linchpin in State Strategies to Prevent and Address Opioid Use Disorders. Manatt Health. March 2018.
[v] https://wvpress.org/breaking-news/20-8m-opioid-settlement-distributed-treatment-beds-wv/

infrastructure and treatment options in West Virginia.[92]

4.14 Over the past three years, West Virginia increased residential treatment beds from 197 to 850,[93] distributed over 10,000 doses of naloxone to local health departments, increased women and children specific treatment programs, established neonatal abstinence centers (one in Huntington), and has "really changed the system of care for West Virginia."[94] According to Commissioner Mullins, "significant federal investments have allowed West Virginia the flexibility to focus on the hardest hit regions and localities while also allowing us to address statewide needs that benefit all West Virginians. For perhaps the first time, West Virginia had the resources to fund what it needed" (Mullins Depo., p. 112, Ex. 5) and that the state "still [has] the momentum and the money to do much of the things we need to do right now."[95] Therefore, funding constraints do not appear to be barriers to expansion at the state level for many of the Plaintiffs' experts' proposed programs.

4.15 In sum, a majority of the interventions proposed by Dr. Alexander fall outside the Plaintiffs' organizational structure, functions and responsibilities to their citizens. Moreover, many of the programs are in place and are being funded by the state and federal government, and private sources, and it is reasonable to believe those services will continue to be funded and operated as such in the future.

4.16 Additionally, although Dr. Alexander acknowledges that current programs serving individuals within Cabell County and the City of Huntington have succeeded to date in reducing the effects of the opioid abuse epidemic, he does not account for how these programs are factored into his assessment of needs within the Cabell-Huntington community.

**Dr. Alexander's Data**

4.17 The primary economic drivers in Dr. Alexander's proposal are: 1) the implied OUD population in Cabell County, and 2) the duration of "abatement."

OUD Population

4.18 Although Dr. Alexander uses various populations in his plan, the most significant is the number of individuals with Opioid Use Disorder (OUD) in Cabell County (hereinafter "OUD Population"). This factor directly drives costs of treatment, which is by far the largest cost category. Specifically, of the $2.6 billion total costs determined by Mr. Barrett, more than 78%[96] is attributable to Dr. Alexander's Category 2: Treatment.

4.19 Dr. Alexander relies on Dr. Keyes' 2018 OUD population estimate of 8,252.[97] Dr.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

\*     \*     \*

The opinions described in this report are presented within a reasonable degree of professional certainty and are based on the information available to me as of the date of this report. I reserve the right to supplement my opinions based on any additional information that I might obtain. In addition, Dr. Caleb Alexander and Mr. George Barrett submitted errata to their expert reports late on August 26, 2020, the day before my report was to be served. Due to the exceptionally brief opportunity I had to review these materials, I reserve the right to add new analyses or opinions, and to supplement or modify existing analyses or opinions, that are based on or respond to Dr. Alexander's and Mr. Barrett's reports. If asked to offer testimony at trial, I may use documents or materials referred to in this report, or information from those documents and materials, as exhibits. In addition, I respectfully reserve the right to use demonstratives, enlargements, or tables or graphs using the information stated or referred to in my report in order to illustrate my opinions.

_____

Robert J. Rufus, DBA, CPA, CVA (Emeritus)

Dated: August 27, 2020