IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*<br><br>    Defendants. | Civil Action No. 3:17-01362 |
| CABELL COUNTY COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*<br><br>    Defendants. | Civil Action No. 3:17-01665 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF GEORGE BARRETT**

Plaintiffs present George Barrett, a forensic economist and vocational and rehabilitation specialist, to tabulate the cost of Dr. Alexander's proposed "Abatement Plan."

Mr. Barrett's opinions should be excluded because over 80 percent of Mr. Barrett's purported abatement costs consist of costs to treat individual residents who have opioid use disorder (OUD), HIV, neo-natal abstinence syndrome (NAS), Hepatitis C (HCP), and other purported OUD co-morbidities. Yet *all* of these treatment costs have been and will continue in the future to be paid by non-party insurers, primarily Medicaid, to non-party healthcare providers. None of those costs has been or ever will be borne by the County and City. In a similar vein, the next largest cost category in Mr. Barrett's calculations are costs for prevention and response

programs that the County or City might participate in or administer, but which are funded by grants from the federal or state governments, or other sources. Like the treatment costs, none of these grant-funded costs has ever been paid by the County and City, and there is no evidence suggesting that any of these costs will ever be covered by the County or City in the future.

This is not surprising because the actual and expected contribution of the County and City in responding to the opioid abuse crisis, by contrast to federal, state and other funding, has been and will continue in the future to be modest. Although Mr. Barrett recognizes this disparity, he makes no effort at all to distinguish costs that the federal and state governments and other non-parties have paid and will pay, from costs that the County and City have paid and will pay. He repeatedly testified at his deposition that he was agnostic whether his calculated costs would be paid by the County or City, or instead would be borne by the federal and state governments and other funders. His testimony therefore does not fit the facts of this case, and will not assist the Court in fashioning an abatement remedy, if liability were to be found.

**I.      Background**

Mr. Barrett frequently offers his expertise as a vocational and rehabilitation expert and forensic economist in personal injury and wrongful death cases. Ex. 1, Deposition of George Barrett ("Barrett Dep.") 10:15-22 (Sep. 21, 2020). In this case, to calculate the cost of Dr. Alexander's "Abatement Plan," Mr. Barrett imports the opinions and recommended costs of Drs. Alexander and Young wholesale into his calculations and sources certain additional information from publicly available websites or other broadly available sources. Ex. 2, Barrett Rep. ¶¶ 19, 21. For example, for certain programs Dr. Alexander proposed, Dr. Alexander specified the number of employees to be hired, the number of hours they would work, and the level of skill and education they must have. *See, e.g.*, Ex. 3, Barrett Rep. App'x M 1A1; Ex. 4, Alexander Rep. App'x D 1A. Mr. Barrett then looked up the wage rate for that job profile in the

Occupational Employment Statistics ("OES") available publicly on the Department of Labor's Bureau of Labor Statistics website. *See* Ex. 5, Barrett Reliance Materials, OES Statistics for Pharmacists. He then used the wage rates, along with the other inputs Dr. Alexander provided, to tabulate the annual cost of staffing each program. Ex. 3, Barrett Rep. App'x M 1A1. Similarly, Mr. Barrett identified the cost of bus fare from the Tri State Transit Authority's ("TTA") website, *see* Ex. 6, Barrett Reliance Materials, TTA Bus Fares, and using Dr. Alexander's estimate for the number of transportation vouchers needed, *see* Ex. 3, Barrett Rep. App'x M 2A; Ex. 4, Alexander Rep. App'x D 2A, multiplied out (vouchers x bus fare) the total cost of transportation assistance. Ex. 3, Barrett Rep. App'x M 2A.

Apart from those additions, Mr. Barrett relied entirely on information provided by Drs. Alexander and Young. He relied on Dr. Alexander "to identify the costs of all medical-related components of his plan," which he incorporated "without modification into [his] report's cost calculations." Ex. 2, Barrett Rep. ¶ 21. He relied on Dr. Young to identify costs related to family and children's services, which he again incorporated without modification. *Id.* Mr. Barrett did not question any of Dr. Alexander or Dr. Young's proposed inputs. Ex. 1, Barrett Dep. 24:22-25:4 (Q. With respect to inputs received from either Doctor Alexander or Doctor Young, . . . did you at any time question [them] as to why they were deriving the number . . . they had derived? A. No, I did not.); Ex. 1, Barrett Dep. 254:2-6 (Q. Do you have any view as to whether, in your expert work, if you're relying on the work of another expert that you do due diligence on the work of that other expert? A. Absolutely not.).

## II.     Legal Standard

Under Federal Rule of Evidence 702, expert testimony is admissible if the expert is qualified and his testimony will be (1) helpful to the trier of fact; (2) "based on sufficient facts or data"; and (3) the product of "reliable principles and methods" that (4) have been "reliably

applied . . . to the facts of the case." Fed. R. Evid. 702.  Because "expert witnesses have the potential to be both powerful and quite misleading," the district court must first assess the expert and his proposed testimony before allowing him to testify, even in a bench trial.  *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832-33 (3d Cir. 2020).  The court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  *Cooper*, 259 F.3d at 199 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

In the Fourth Circuit, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger ConstCo. Inc. v. Pensacola Const. Co.,* 29 F.3d 137, 142 (4th Cir. 1994).  An opinion may also be rejected as unreliable if it is "connected to existing data only by the *ipse dixit* of the expert."  *Cooper*, 259 F.3d at 203 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999)).  In addition, an expert's opinion may be rejected if it is based on "[r]esult-driven analysis" or "cherry-picking" of relevant data, which constitute "a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."  *In re Lipitor*, 892 F.3d 624, 634 (4th Cir. 2018).

### III. Mr. Barrett's Testimony Should Be Excluded Because It Does Not "Fit" With the Facts of the Case.

Like Dr. Alexander's "Abatement Plan," Mr. Barrett's calculation of its cost exists in a vacuum, untethered to this litigation or its context.  Because he accepted Dr. Alexander's "Abatement Plan" *without modification or question*, Mr. Barrett's cost calculations ignore the reality that federal, state and other grants fund the vast majority of the programs Dr. Alexander proposes, and likewise ignore the fact that the County and City have not, do not, and will not administer or incur expenses for most all of the proposed programs.  More specifically:

4

- Of the total abatement costs of $2.52B calculated by Mr. Barrett, $2.06B or over 81%, are comprised of costs to treat OUD, HIV, NAS, HCP and other purported co-morbidities, all of which costs have been and will continue in the future to be paid by non-party insurers, primarily Medicaid, to non-party healthcare providers. Ex. 3, Barrett Rep. App'x M 2B, 2C, 4A1, 4A2a, 4A2b, 4A4a. None of those costs have been or ever will be borne by the County and City.

- In addition to treatment costs paid by non-party payors to non-party healthcare providers, the "abatement" costs calculated by Mr. Barrett also include significant costs for programs that the County or City might participate in or administer, but the funding for which has been paid by grants from the federal or state governments, or other sources. This grant funding has been in the range of $1.9MM annually. Ex. 7, Rufus Rep. Table 2.13. None of the grant-funded costs have ever been paid by the County and City, and there is no evidence in the discovery record suggesting that existing grants will not be renewed.

- After those large irrelevant cost categories, what is left are minor total abatement costs of about $136K annually that the County or City have paid in-kind or in cash. Ex. 7, Rufus Rep. Table 2.13. These are the only costs, even if liability were established, that potentially would be recovered by way of an abatement remedy.[1]

Mr. Barrett makes no effort to distinguish between these cost categories, and is unhelpfully agnostic as to whether the costs he identifies are paid by federal or state government or other

---

[1] As Defendants repeatedly have made clear, under West Virginia nuisance law, "abatement" refers to an injunction to start or stop some conduct. "Abatement" does not mean the payment of money damages and does not mean paying to remedy all the downstream ills that may have resulted from an alleged nuisance. *See* Opp. to Pls.' Mot to Strike Defs.' Notices of Non-Party Fault, ECF No. 256.

funders, or instead are paid by the County or City. *See, e.g.*, Ex. 1, Barrett Dep. 164:1-10, 186:23-187:4, 235:6-16. His testimony, therefore, cannot aid the Court in crafting any abatement remedy within the appropriate area of responsibility of the County and City.

To render an expert opinion admissible under Rule 702, an expert must have "scientific, technical, or other specialized knowledge" to "help the trier of fact," and must use reliable principles and methods to arrive at his opinion. *Daubert*, 509 U.S. at 589-92; *see also*, *Koger v. Norfolk S. Ry. Co.*, No. CIV. 1:08-0909, 2010 WL 692842, at *1 (S.D.W. Va. Feb. 23, 2010) (J. Faber) ("Helpfulness to the trier of fact is the touchstone of Rule 702."). It is axiomatic that "expert testimony which does not relate to any issue in the case is not relevant [and] non-helpful." *Edwards v. Ethicon, Inc.*, 2014 WL 3361923, at *2 (S.D.W. Va. July 8, 2014) (quoting *Daubert*, 509 U.S. at 591–92); *cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A] model purporting to serve as evidence of damages . . . must measure only those damages attributed to [the plaintiff's] theory."). In other words, for the expert's testimony to be relevant and to "fit" the facts of the case, there "must be a valid . . . connection to the pertinent inquiry before testimony is admissible." *Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., Inc.*, 189 F. Supp. 2d 482, 495 (S.D.W. Va. 2002) (citing *Kumho Tire Co. v. Charmichael*, 526 U.S. 137, 150 (1999)).

"Scrutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness . . . ." *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.2d 137 (4th Cir. 1994) (quoting *Eastern Auto Distribs. Inc. v. Peugeot Motors of Am.*, 795 F.2d 329, 338 (4th Cir. 1986) (internal quotation omitted). "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Const. Co. Inc.*, 29 F.3d at 142. Courts may also consider whether an expert has

adequately accounted for obvious alternative explanations in determining whether or not that expert is reliable. Fed. R. Evid. 702 advisory committee's note (2000 amendment); *see also Pharmanetics, Inc. v. Aventis Pharms., Inc.*, 182 Fed. App'x 267, 270–73 (4th Cir. 2006) (proposed expert was properly excluded where he assumed appellee's actions caused all of appellant's losses instead of causes reasonably inferred from the record).

Mr. Barrett openly concedes that his calculations ignore critical distinctions as to which government (federal, state, county, city) administers and funds identified abatement programs. For example, Mr. Barrett describes his work as "reflect[ing] the interventions identified by Dr. Alexander's Abatement Plan as necessary to serve the Cabell Huntington Community, *regardless* of which entity would be funding of delivering the services." Ex. 2, Barrett Rep. ¶ 25 (emphasis added); Ex. 1, Barrett Dep. 164:1-10.[2] He similarly acknowledges that he did not "address to what extent the Cabell Huntington Community has existing programs which may overlap with Dr. Alexander's "Abatement Plan." Ex. 2, Barrett Rep. ¶ 25. And he admits that he "does not address how abatement costs should be allocated among defendants or others." *Id.* But without assessing what programs exist, who has paid for them in the past and who will pay for them in the future, Mr. Barrett's calculations are unhelpful to the Court.

---

[2] Drs. Alexander and Young, on whom Mr. Barrett relies, also did not account for existing programs and the sources of funding for those programs. *See, e.g.*, Ex. 8, Young Dep. 138:20-139:1 (Q. And in calculating the cost estimates that are in your report, you did not take into account the current federal, state, other grant funding or existing programs paid by third parties and not Cabell County-Huntington; is that also correct? A. That is true.); Ex. 9, Alexander Dep. 223:1-16 (Q. You're not offering opinions in the case as an expert, that Cabell County or the City of Huntington has had to fund any of the programs that they have decided to put in place to address the opioid epidemic. A. No. No I'm not. Q. Okay. And in terms of future payments, you're not offering any opinions that should your plan for abatement be put in place in Cabell County/Huntington that any aspect of the plan would need to be paid for or funded by the City or County. You're not offering opinions as to that; is that correct? A. Yeah, that's for the judge to decide, you're correct.).

These facts that Mr. Barrett ignored show that almost all of his costs would be borne by non-parties, and not the City of Huntington or Cabell County, rendering his calculations irrelevant to the Court.  For instance, Mr. Barrett includes and calculates the cost of certain continuing medical education programs.  Ex. 3, Barrett Rep. App'x M. 1A2.  But Mr. Barrett concedes that the cost of continuing medical education is not borne by the County or City, and of course the County and City do not mandate or administer continuing medical education programs.  Ex. 1, Barrett Dep. 88:17-89:7, 91:1-9, 92:11-22.  At his deposition, Mr. Barrett conceded that the cost of continuing medical education is borne by the doctor or her employer.  *Id.* at 91:1-9.  That cost, according to Mr. Barrett, is "an opportunity cost, so that if a medical provider is not at work and — and working, and therefore billing their time and collecting for the services that they're providing, they're foregoing those wages . . . ." *Id.* at 90:15-20.  In other words, it is *not* a cost for which they can fairly recover.  Relatedly, Mr. Barrett apparently did not investigate and therefore did not know that the West Virginia Board of Medicine already mandates "a three-hour Drug Diversion Training and Best Practice Prescribing of Controlled Substances Training for all doctors in West Virginia," and could not say how, if it all, that state-mandated program is different from Dr. Alexander's proposal.  *Id.* at 89:22-90:10.

Equally problematic but on a much larger scale, Mr. Barrett's cost projections for treating OUD and other conditions is irrelevant and unhelpful to the decisions this Court will make.  Mr. Barrett calculates the cost of treating these conditions to exceed $2 billion.  Ex. 3, Barrett Rep. App'x M 2B, C.  But neither the City nor the County has ever treated individuals for these conditions, and has never paid for that treatment.  Ex. 1, Barrett Dep. 162:18-21 (Q. Do you know whether the County or City have ever paid even a dollar towards the treatment of people in their

community with opioid use disorder. A. No, I do not.). Rather, as Mr. Barrett later conceded, this cost is one borne by Medicaid.

> Q. Do you understand that many or most people with opioid use disorder are -- have their treatment paid for by Medicaid?
>
> A. Which would be the federal government?
>
> Q. Be a combination of the Federal and the State government. Do you know whether or not that's true that most people with opioid use disorder in Cabell/Huntington, their treatment is paid for by Medicaid?
>
> A. Well, given the income level of the local area and Medicaid being a federal transfer payment program, essentially welfare, that makes sense, yes.

*Id.* at 162:22-163:10; *see also* Ex. 7, Rufus Rep. ¶ 4.8.

These are not isolated examples, easily excised from his testimony. In category after category, Mr. Barrett tabulates costs that have not been, are not, and will not be incurred by the County and City Plaintiffs. *See, e.g.*, Ex. 1, Barrett Dep. 236:3-10 (agreeing that the State Department of Health and Human Resources pays for foster care services in West Virginia); *id.* at 95:2-6, 97:7-12 (admitting that he made no effort to determine whether Dr. Alexander's proposed mass media campaign would be paid for by the CDC); *id.* at 108:10-109:14 (stating that the Women, Infants, and Children program is funded by the federal government); *id.* at 224:13-21 (explaining that West Virginia and the federal government pay for special education).[3]

---

[3] Mr. Barrett's invocation at his deposition of the collateral source rule to excuse his failure to account for outside funding sources is misguided. *See, e.g.*, Barrett Dep. 117:13-118:9, 140:12-

Because Mr. Barrett's testimony does not fit the facts of the case and would not be helpful to the Court in deciding the issues before it, it should be excluded.

## IV. Conclusion

For the reasons stated above, Defendants request that this Court exclude the testimony of George Barrett.

Dated: October 2, 2020

Respectfully submitted,

*/s/ Timothy C. Hester*
Timothy C. Hester (DC 370707)
Laura Flahive Wu
Andrew P. Stanner
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
lflahivewu@cov.com
astanner@cov.com

*/s/ Paul W. Schmidt*
Paul W. Schmidt
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018

---

24. Under the collateral source rule, "benefits received *by plaintiff* from a source collateral to defendant may not be used to reduce that defendant's liability *for damages*." Dobbs on Remedies § 3.8(1) (emphases added). The collateral source rule only applies to payments received by plaintiffs, and in the largest cost category here, relating to treatment, plaintiffs never received any funds. Instead, funds were paid directly from non-party insurers to non-party healthcare providers. Moreover, the doctrine is applicable only in actions for *damages*, and is inapplicable in this action seeking equitable relief. *See, e.g., Ilosky v. Michelin Tire Corp.,* 172 W. Va. 435, 446–47 (1983) ("Simply put, the collateral source rule excludes payments from other sources to plaintiffs from being used to reduce damage awards imposed upon culpable defendants. The rule is premised on the theory that it is better for injured plaintiff to receive the benefit of collateral sources in addition to actual damages than for defendants to be able to limit their liability for damages merely by the fortuitous presence of these sources.").

Tel: (212) 841-1000
pschmidt@cov.com

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*Counsel for McKesson Corporation*

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, WV 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com


*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East

11

P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
emainigi@wc.com
lheard @wc.com
ahardin@wc.com
jwicht@wc.com

*Counsel for Cardinal Health, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on this 2nd day of October, the foregoing **Motion to Exclude the Expert Testimony of George Barrett** was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Timothy C. Hester*
Timothy C. Hester
