UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CITY OF HUNTINGTON,<br>    Plaintiff,<br>v.<br>AMERISOURCE BERGEN DRUG<br>CORPORATION, et al.,<br>    Defendants. | Civil Action No. 3:17-cv-01362 |
| CABELL COUNTY COMMISSION,<br>    Plaintiff,<br>v.<br>AMERISOURCE BERGEN DRUG<br>CORPORATION, et al.,<br>    Defendants. | *Consolidated case:*<br>Civil Action No. 3:17-cv-01665 |

### PLAINTIFFS' MOTION *IN LIMINE* FOR AN ORDER RULING IQVIA DATA ADMISSIBLE

Plaintiffs, pursuant to Federal Rule of Evidence 104(a), move *in limine* for the Court to order that the IQVIA XPONENT and XPONENT PLANKTRAK data produced in discovery in the MDL, *In Re: National Prescription Opiate Litigation*, N.D. Ohio, Case No. 1:17-MD-2804 ("IQVIA Data") is admissible.[1]

### STATEMENT OF FACTS

The IQVIA Xponent® data is one of many datasets owned and maintained by IQVIA, a healthcare information company formerly known as IMS Health and Quintiles. The data is part of the National Prescription Audit ("NPA") and "is the

---

[1] A copy of the data on a hard drive, produced in the MDL as ALLERGAN_MDL_02485011 and ALLERGAN_MDL_03281086, will be separately filed with the Clerk and is Exhibit 1 to this Motion.

industry standard for measuring the retail outflow of prescriptions through the 'front door' into the hands of consumers." The data is said to "integrate real-world data" to provide a "timely, accurate picture of[…] competitive performance and demand," as well as a "deep understanding of[…]key drug dispensing channels." IQVIA data is considered by some pharmaceutical companies as the "gold standard in terms of understanding prescription trends." *See* Expert Report of Lacey R. Keller, (attached as Ex. 2) at p. 5, ¶ 8.

IQVIA describes the key prescription information offerings of Xponent® data as: "A suite of sub-national reporting providing granular prescription performance perfectly aligned to help manage customer operations, sales targeting, and representative incentive compensation."[2] IQVIA is not reported through a government agency but is proprietary and purchased by financial and pharmaceutical companies.[3] Available on a monthly or weekly basis, IQVIA data consists of a "representative sample of Retail (Chain, Foodstore, Independent pharmacies), Mail Service and Long Term Care pharmacies."[4] The data includes 93% of retail distributions from nearly 60,000 pharmacies,[5] 72% of mail order pharmacies' distributions obtained from nearly 400 locations, and 78% of long-term care

---

[2] *See Expert Report Lacey R. Keller,* at p. 5, ¶ 9, attached as Ex. 2 (citing "Prescription Information." *IQVIA,* www.iqvia.com/locations/united-states/commercial-operations/essential-information/prescription-information.)

[3] *Id.*

[4] *Id*

[5] *Id.*

pharmacies' distributions obtained from over 3,000 locations originating at the pharmacy terminal level.[6]

Lacey Keller, Plaintiffs' expert witness, testified "that IQVIA was widely available for purchase by the pharmaceutical industry. We know for a fact that based on internal documents from -- McKesson, AmerisourceBergen, and Cardinal -- all three had purchased products from IQVIA."[7] Keller noted that the "government has purchased that data, and peer reviewed articles also have utilized that data."[8] Keller testified that "it is a reliable dataset and widely used by industry - - everybody in the industry appears to be using it, at least based off of the records I have read from IQVIA. They say that it's widely purchased by the pharmaceutical industry and others, including regulators and payers and pharmacies."[9]

Given that IQVIA reflects the prescribing history of physicians, the dataset could allow anyone who purchases it to determine how frequently a physician prescribed particular drugs, as well as what formulations and in what dosages, and how prescribers ranked among other prescribers.[10] The data also allows for the identification of opioid prescribing patterns of individual physicians compared to

---

[6] *Id.*

[7] *See* Deposition Transcript of Lacey Keller at 98:5-10, attached as Ex. 3. Keller maintained that "data was available for purchase. They could have purchased it." *Id.* at 102:1-2. "I determined that they were able to purchase products from IQVIA and that they had purchased products from IQVIA, and that has been available to them for over 25 years." *Id.* at 102:6-9.

[8] *Id.* at 194:6-8.

[9] *Id.* at 194:15-21.

[10] Ex. 2 at 6, ¶10.

3

their cohorts based on specialty, geography (e.g., city, county, zip code, state), and time period.[11]

Defendants' expert witness John J. MacDonald, III, testified that the IQVIA data is "often provided by pharmaceutical companies in relation to information we use. It's highly expensive…"[12] MacDonald testified that he "embrace[d] IQVIA as a well-peer-reviewed data set that's highly relied upon by many players touching the pharmaceutical industry."[13] Dr. MacDonald admitted that IQVIA is the "largest and best known" data aggregator to track the prescribing trends and evaluate the level of controlled substances prescribed over time.[14] Indeed, MacDonald relied on the report "[f]or purposes of measuring the legitimate demand, kind of the aggregate level, pharmacy fill information at the aggregate level, I would agree that it is - - it is very reliable."[15]

The IQVIA data was produced in the course of regular discovery in MDL 2804, *In Re: National Prescription Opiate Litigation*, N.D. Ohio, Case No. 1:17-MD-2804. MDL Plaintiffs made discovery requests to the Defendants, including Allergan Finance, LLC, seeking documents and data from IQVIA. (MDL Doc. # 1375).

---

[11] *Id.*

[12] *See* Deposition Transcript of John J. MacDonald, III, at 118:17-21, attached as Ex. 4. MacDonald testified, "it was an exceedingly expensive data set" which he defined as "hundreds of thousands and often millions of dollars" and "IQVIA charges a premium price for their aggregated data." *Id.* at 119:25-120:1; 120:10-11; 122:23-24.

[13] *Id.* at 114:22-25.

[14] *Id.* at 117:3-13.

[15] *Id.* at 117:18-23.

Allergan Finance, LLC purchased IQVIA's XPONENT and XPONENT PLANKTRAK data related to prescriptions of opioids from 1997 to the present on May 15, 2018.[16] On August 10, 2018, Allergan Finance, through counsel, produced in the MDL data from IQVIA's XPONENT and XPONENT PLANTRAK products related to prescriptions of opioids from 1997 to the present.[17] Exhibit 1, ALLERGAN_MDL_02485011 and ALLERGAN_MDL_03281086, are the files that Allergan obtained from IQVIA and produced to Plaintiffs.[18]

## ARGUMENT

## THE IQVIA DATA IS ADMISSIBLE

### A. The IQVIA Data is authentic.

To establish that evidence is authentic, a proponent need only present "evidence sufficient to support a finding that the matter in question is what the proponent claims."[19] The requirement of showing authenticity or identity falls into the category of relevancy and is governed by the procedure set forth in Rule 104(b)."[20]

---

[16] *See* 8/31/2018 letter from Donna Welch to the Plaintiffs' Executive Committee; and Allergan MDL02485011, attached as Ex. 5.

[17] *See* Exhibit 5; 8/10/2018 letter from Rana Dawson of Kirkland & Ellis LLP to Plaintiffs' Executive Committee, attached as Ex. 6. The hard drive was produced via Federal Express to Evidence Intake, RICOH USA, Inc., 3100 South Gessner Road, Suite 520, Houston, TX 77063. *Id.*

[18] *See* Stipulation Regarding Authenticity of IQVIA Data, attached as Ex. 7.

[19] Fed.R.Evid. 901(a).

[20] *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 542 (D. Md. 2007) (citing Fed.R.Evid. 901 advisory committee's note).

These two evidentiary concepts are considered together when determining the admissibility of exhibits or documents.[21]

The burden to authenticate under Rule 901 is not a high barrier to overcome.[22] Only a *prima facie* showing is required.[23] Once the *prima facie* showing has been made, the evidence should be admitted, and the trier of fact must determine whether the evidence is what it purports to be.[24]

The IQVIA data produced by Allergan is authentic. Plaintiffs should not have to waste trial time calling witnesses to establish this undisputed fact, nor should the Court's resources be wasted hearing such testimony. While this should be a routine matter of stipulation, Defendants have refused to do so despite outstanding requests to do so.

The evidence cited above establishes authenticity. Allergen purchased the data from IQVIA, and, thereafter produced it in discovery to plaintiffs. Defendants have never raised, nor could they raise, any credible issue regarding the authenticity or the chain of custody of the evidence.

---

[21] *Id.*

[22] *Cantrell v. Rubenstein,* 2016 WL 5723601 at * 8 (S.D. W.Va. August 23, 2016).

[23] *Id.*; *United States v. Goichman,* 547 F.2d 778, 784 (3d Cir.1976) ("There need only be a *prima facie* showing, to the court, of authenticity, not a full argument on admissibility"); *see also* Weinstein's Federal Evidence § 901.02[3] (2008) ("Generally speaking, the proponent of a proffered exhibit needs only to make a *prima facie* showing that the exhibit is what the proponent claims it to be.").

[24] *U.S. v. Vidacak,* 553 F.3d 344, 350 (4th Cir. 2009).

### B. The IQVIA Data is relevant.

The IQVIA Data is relevant. Relevant evidence is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Here this burden is easily met. The IQVIA Data is admissible because it makes it more likely to show the opioid prescribing habits of physicians in Cabell County and Huntington. These are all facts of consequence.

### C. The IQVIA Data is not inadmissible hearsay.

Defendants may contend that the IQVIA Data is hearsay. There are several hearsay exceptions could be applicable depending on how Plaintiffs use the IQVIA Data at trial. However, at this stage of the proceedings this Court can find the IQVIA Data admissible because (1) it falls within the hearsay exception for "Commercial Publications" under Rule 803(17) and (2) if it is used to show notice, it is not hearsay because it is not offered for the truth of the matter asserted. Fed. R. Evid. 801(c)(2).

First, Rule 803(17) creates an exception to the hearsay rule for "Market Reports and Similar Commercial Publications" defined as "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." As the Fourth Circuit has noted, "[t]he basis of trustworthiness" for evidence admitted under the exception should be "the motivation of the compiler to foster reliance by being accurate."[25]

---

[25] *In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 924 (4th Cir. 2016) (quoting Fed.R.Evid. 803(17), advisory comm. note (1972)).

7

Here the IQVIA Data is a compilation of pharmacy records relied upon by the industry. Defendants' own expert, Dr. MacDonald, concedes that that the data set is "a well-peer-reviewed data set that's highly relied upon by many players touching the pharmaceutical industry" from the "largest and best known" data aggregator.[26] This is sufficient to meet the Rule's "generally relied on" prong.[27]

Such a data set easily meets Rule 803(17)'s test. The data is purchased by those in the pharmaceutical industry in spite of the fact that it can cost "millions of dollars."[28] IQVIA's compilers have the motivation to assure the accuracy of the IQVIA Data because they "know that their work will be consulted; if it is inaccurate, the public or the trade will cease consulting [and purchasing] their product."[29] Electronic compilations meet the test.[30] And, the fact that IQVIA obtains its data from others is not "proper ground upon which to deny admission" as the author is not "necessarily required to have firsthand knowledge."[31]

---

[26] *See, supra,* p. 4 & n 13.

[27] *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.,* 881 F.3d 293, 314 (4th Cir. 2018) (finding Rule 803(17) test met by testimony that "the two studies 'were widely cited in the industry' and were 'the most substantial published publicly available studies' on the issue").

[28] *See, supra,* n 12.

[29] *Avondale Mills, Inc. v. Norfolk S. Corp.,* No. C/A/ 1:05-2817-MBS, 2008 WL 6953956, at *4 (D.S.C. Feb. 21, 2008) (quoting *Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534, 575 n. 53 (D.Md.2007).

[30] *Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534, 575 (D. Md. 2007) (electronically stored compilations and directories fall within Rule 803(17)).

[31] *Ellis v. Int'l Playtex, Inc.,* 745 F.2d 292, 302–03 (4th Cir. 1984) (citing cases; internal quotations omitted).

Second, the IQVIA Data is relevant to show notice. The Defendants are among the purchasers of the IQVIA Data. Dr. Keller's report provides a detailed listing of the prescription habits of the top prescribers of opioids. As she concluded:

> The 1 percent of opioid prescribers – between five and nine prescribers – wrote upwards of 43% of all opioid dosage units and 65% of MMEs each year, totaling nearly 80 million dosage units and over 1.6 billion MMEs. In other words, a half dozen prescribers wrote enough opioid prescriptions to give every man, woman, and child in the county over 60 pills per year for several years between 2007 and 2011.[32]

The IQVIA Data should have put the Defendants on notice of these outlier physicians. The Fourth Circuit has emphasized that evidence used to show notice is not hearsay:

> Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted. A statement that would otherwise be hearsay may nevertheless be admissible if it is offered to prove something other than its truth, and this includes statements used to charge a party with knowledge of certain information.[33]

### D. The Court should rule *in limine* that the IQVIA Data is admissible.

Rule 104(a) permits the Court to decide "any preliminary question about whether . . . evidence is admissible." In so deciding, the court is not bound by evidence rules, except those on privilege.[34] Plaintiffs request that the Court make this preliminary ruling before trial. This evidence is central to Plaintiffs' case. A favorable pretrial ruling will streamline trial and obviate the need to call witnesses to establish foundation. If in the unlikely event Defendants have valid objections, a

---

[32] Keller Report at p. 59, ¶ 52.

[33] *In re C.R. Bard, Inc.,* 810 F.3d at 25–26 (citations and internal quotations omitted).

[34] Fed. R. Evid. 104(a).

9

pretrial ruling will permit Plaintiffs to be prepared at trial with the evidence necessary to establish the foundation for admissibility. Deciding these questions now will permit the parties to prepare and try the case efficiently:

> Pretrial rulings on admissibility save time at trial and may enable parties to overcome technical objections by eliminating inadmissible material, obtaining alternative sources of proof, or presenting necessary foundation evidence. In addition, such rulings may narrow the issues and enable counsel to plan more effectively for trial. Receiving exhibits into the record during the final pretrial conference can also save time by avoiding the need for formal offers at trial.[35]

## CONCLUSION

The Court should enter an order granting the Plaintiffs Motion *in Limine* and finding that the IQVIA data produced by Defendant Allergan is admissible.

---

[35] Manual for Complex Litigation, Fourth, § 11.642.

Dated: October 2 , 2020    Respectfully submitted,

| | |
|---|---|
| **THE CITY OF HUNTINGTON** | **CABELL COUNTY COMMISSION** |
| /s/ *Anne McGinnessKearse* | /s/ *Paul T. Farrell,Jr.* |
| Anne McGinness Kearse | Paul T. Farrell, Jr. |
| (WVSB No 12547) | (WVSB Bar No. 7443) |
| Joseph F. Rice | **FARRELL LAW** |
| **MOTLEY RICE LLC** | 422 Ninth Street, 3rd Floor (25701) |
| 28 Bridgeside Blvd. | PO Box 1180 |
| Mount Pleasant, SC 29464 | Huntington, West Virginia 25714 |
| Tel: 843-216-9000 | Mobile: 304-654-8281 |
| Fax: 843-216-9450 | paul@farrell.law |
| akearse@motleyrice.com | |
| jrice@motleyrice.com | Anthony J. Majestro |
| | (WVSB No. 5165) |
| Linda Singer | **POWELL & MAJESTRO, PLLC** |
| David I. Ackerman | 405 Capitol Street, Suite P-1200 |
| **MOTLEY RICE LLC** | Charleston, WV 25301 |
| 401 9th Street NW, Suite 1001 | 304-346-2889 / 304-346-2895 (f) |
| Washington, DC 20004 | amajestro@powellmajestro.com |
| Tel:  202-232-5504 | |
| Fax:  202-386-9622 | Michael A. Woelfel (WVSB No. 4106) |
| lsinger@motleyrice.com | **WOELFEL AND WOELFEL, LLP** |
| dackerman@motleyrice.com | 801 Eighth Street |
| | Huntington, West Virginia 25701 |
| Charles R. "Rusty" Webb | Tel. 304.522.6249 |
| (WVSB No. 4782) | Fax. 304.522.9282 |
| **The Webb Law Centre, PLLC** | mikewoelfel3@gmail.com |
| 716 Lee Street, East | |
| Charleston, West Virginia 25301 | |
| Telephone: (304) 344-9322 | |
| Facsimile: (304) 344-1157 | |
| rusty@rustywebb.com | |

## CERTIFICATE OF SERVICE

I certify that on October 2, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Anthony J. Majestro*