IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON, <br><br> Plaintiff, <br><br> v. <br><br> AMERISOURCEBERGEN DRUG CORPORATION, *et al.* <br><br> Defendants. | Civil Action No. 3:17-01362 <br> Honorable David A. Faber |
| CABELL COUNTY COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> AMERISOURCEBERGEN DRUG CORPORATION, *et al.* <br><br> Defendants. | Civil Action No. 3:17-01665 <br> Honorable David A. Faber |

**DEFENDANTS' MOTIONS *IN LIMINE***

**No. 1: To Preclude Plaintiffs From Presenting Individualized Evidence of Opioid Misuse and Diversion**

Plaintiffs should be precluded from offering testimony or other evidence relating to individual instances of opioid diversion and misuse—including personal stories of addiction—because Plaintiffs have represented that they will not rely on such evidence and have admitted that it cannot be linked to Defendants and thus is irrelevant and is inadmissible hearsay.

1. ***Plaintiffs have disavowed reliance on individualized evidence.*** Plaintiffs have insisted throughout this litigation that they intend to prove their claims through "aggregate proof" rather than through specific instances of diversion or misuse. Indeed, in response to Defendants' interrogatories requesting this type of information, Plaintiffs acknowledged they "do

not have access to [the pharmacy] dispensing data" that would permit them to link individual instances of diversion to Defendants.[1] Plaintiffs thus represented that they will not present this type of individualized evidence at trial: "***Plaintiffs will not contend at trial that specific prescriptions were wrongfully dispensed or prescribed, or that specific individuals wrongfully obtained opioids.***"[2] In conducting discovery in this case, Defendants relied on that representation.

The Court should hold Plaintiffs to their word and bar them from presenting individualized evidence of diversion or misuse for that reason alone. *See Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."); *see also* Fed R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); *Sharkey v. Fortress Sys. Int'l, Inc.*, No. 318CV00019FDWDCK, 2020 WL 2220188, at *3 (W.D.N.C. May 7, 2020) ("Plaintiff's failure to respond and/or supplement the interrogatory procedurally results in Plaintiff's inability to use that information at a trial." (original marks and ellipses omitted)).

**2.      *Plaintiffs cannot link these stories to Defendants.*** Even had Plaintiffs properly disclosed individualized evidence of medicines being diverted or personal stories of people becoming addicted to opioids, that evidence should be precluded. As Plaintiffs acknowledge, they cannot link a Defendant's distribution of any particular pill—or even any shipment—to any

---

[1] Ex. 1, Huntington's April 30, 2020 Responses to Interrogatory No. 8 at 28; Ex. 2, Cabell Counties' April 30, 2020, at 15 (incorporating by response Huntington's response to Interrogatory No. 8).

[2] Ex. 1 at 28.

particular instance of diversion or to any particular individual becoming addicted.[3] Because each Defendant can be held liable only for the prescription opioids that *it* distributed (if Plaintiffs could meet their burden to establish all requisite elements of their claims, which they cannot), evidence of diversion or misuse that cannot be tied to any particular Defendant has no bearing on this case and should be excluded as irrelevant.

This prohibition should extend to witnesses offering personal stories of addiction or opioid abuse. As described above, Plaintiffs admit they have no ability to tie a given witness's addiction or abuse to medicines distributed by a particular Defendant. For example, Kelli Sobonya, current Cabell County Commissioner, testified at her deposition about how her nephew and cousin became addicted to prescription opioids after being prescribed them to treat physical injuries, and that various of her friends also have become addicted to opioids[4]; and Darla Bentley, Huntington's Budget Manager, testified that her brother had a fatal overdose on prescription opioids.[5] Testimony about these addictions and overdoses is irrelevant because (i) Plaintiffs cannot establish that the particular opioids those people used were distributed by a Defendant in this case; and (ii) even if they could, there is no evidence that any Defendant committed any wrongdoing in supplying medicines that were lawfully prescribed to treat injuries.

**3.** ***The testimony is inadmissible hearsay.*** Sobonya's deposition testimony illustrates that the personal stories testimony is inadmissible hearsay: It is based on Commissioner Sobonya's out-of-court conversations with others who are not subject to cross-

---

[3] *See id.* at 29.

[4] Ex. 3 (Sobonya Dep. Tr.) at 235:19–238:6.

[5] Ex. 4 (Bentley Dep. Tr.) at 23–25:22.

examination at trial (including calls with Commissioner Sobonya's friends[6]), and the testimony is being used to prove the truth of the out-of-court statement—i.e., that the individuals Commissioner Sobonya spoke with in fact became addicted to and/or overdosed on opioids. *See* FRE 801(c), 802.

Plaintiffs may argue that this motion should be denied or deferred to trial because the MDL court permitted the plaintiffs there to present individualized evidence to the extent it was actually disclosed in discovery. *Nunc Pro Tunc* Evidentiary Order, *In re: National Prescription Opiate Litigation*, No. 1:17-MD-2804, ECF No. 3058 (N.D. Ohio) at 42–43 ("MDL *Nunc Pro Tunc* Order"). Any such argument should be rejected because Plaintiffs here have foresworn presenting evidence of particular prescriptions being diverted or misused, have failed to disclose individualized evidence in discovery, and have admitted that they are unable to tie any such evidence to Defendants.[7]

For these reasons, Plaintiffs should be barred from presenting or offering testimony about individualized instances of diversion, misuse, or persons who have suffered from addiction, including any personal stories of opioid addiction.[8]

## No. 2: To Preclude Lay Testimony About Prescription Opioids Being a "Gateway" to Illicit Drug Use

---

[6] Ex. 3 at 238:16–20 ("And I got the call from her that her daughter, who was waiting for a treatment bed -- she was addicted to opioids for a number of years, and I got the call of her screaming and saying that her daughter, waiting for a treatment bed, used again and she died of an overdose.").

[7] Ex. 1, Huntington's April 30, 2020 Responses to Interrogatory No. 8 at 28.

[8] This motion should not be interpreted to foreclose *Defendants* from presenting individualized evidence of non-parties diverting or misusing pills. Although Plaintiffs should be precluded from presenting this evidence because it does not support their claims against Defendants, this evidence *is* relevant if offered by a Defendant because it, *inter alia*, undermines Plaintiffs' theory of causation, supports Defendants' affirmative defenses (such as non-party fault and equitable contribution), and rebuts any theory that Defendants are jointly and severally liable for the opioid crisis. Defendants thus should be permitted to present this type of evidence.

Plaintiffs should be precluded from eliciting lay opinion testimony in support of any hypothesis of a causal connection, or "gateway," between use of prescription opioid medications and later heroin or other illicit drug abuse.[9]  *See, e.g.*, Third Am. Compl., ECF No. 193 ("TAC"), ¶ 22.  The Court should prohibit Plaintiffs from introducing such lay testimony about gateway hypotheses because it is (1) inconsistent with the narrow scope of lay opinion testimony authorized under Rule 701 and (2) based on unbridled speculation, inadmissible hearsay, or both.

Plaintiffs' "gateway hypothesis"—which asserts that use of prescription opioid medications can lead to abuse of heroin and other illicit drugs—is admissible only to the extent it is supported by reliable scientific studies.  Anecdotes offered by Plaintiffs' witnesses are inherently misleading and unreliable.  That some patients using prescription opioid mediations later used illicit drugs does not prove that use of prescription opioid medications caused the later use of illegal drugs.

During depositions, fact witnesses on Plaintiffs' trial witness list testified about their personal observations concerning gateway hypotheses—testimony that invariably was based on unscientific observation, speculation, inadmissible out-of-court conversations, and review of scientific data they are not qualified to interpret.  For example:

- Connie Priddie, a Cabell County EMS Quick Response Team (QRT) Coordinator, testified that she has heard "[f]rom the Quick Response Team and their experience," that approximately 70 or 80 percent of people who start using prescription opioids later turn to heroin.  Ex. 5 (Priddy Dep. Tr.) at 93:18–24.  She admitted that she had no data to support this statement.  *Id.* at 130:23–131:5.

- Rocky Johnson, a Captain in the Huntington Police Department, testified that he has "interviewed a lot of people" who "switched over" to illicit opioids, including people who purportedly became addicted to opioids after being injured in the timber or coal mining industries.  Ex. 6 (Johnson Dep. Tr.) at 74:16–75:12.

---

[9] This motion is directed only at *non-expert* evidence offered by Plaintiffs on this topic.  Defendants will move separately to exclude certain expert testimony on this subject on *Daubert* grounds.

> Captain Johnson was not able to provide any specific names, but said that people switching from prescription to illicit opioids "was a common thread" that he heard "a lot." *Id.* at 76:23–24.[10]

- William Holbrook, Chief of the Huntington Police Department, testified that based on his conversations with "addicts," "parents," and "friends," almost everyone who is addicted to illicit opioids started with prescription opioids: "I wouldn't say it's a hundred percent, but it's probably very close to that." Ex. 7 (Holbrook Dep. Tr.) at Tr. 79:5–18.

1. ***The testimony is inadmissible under Rule 701.*** Rule 701 permits opinion testimony from lay witnesses only when it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This rule "is designed to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pretrial disclosure requirements set forth in" Rule 26. *United States v. Kilpatrick*, 798 F.3d 365, 381 (6th Cir. 2015); *see* Fed. R. Evid. 701, Advisory Committee Note (explaining that 701(c) was added in 2000 "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing"). Therefore, "if the opinion testimony draws on scientific, technical, or other specialized knowledge, then its admissibility should be assessed under Rule 702, not Rule 701." *Kilpatrick*, 798 F.3d at 381.

Opinions suggesting that there is a "gateway" from prescription to illicit opioids necessarily require "specialized knowledge within the scope of Rule 702"—and thus are precluded under Rule 701. That is because the question whether there is any causal connection between prescription opioid use and later use of illicit "street drugs" such as heroin is

---

[10] Of course, this testimony also is irrelevant because Defendants cannot be liable where opioids were legitimately prescribed by a doctor, as may be the case in these examples.

indisputably the subject of medical, epidemiological, and statistical research. Indeed, Plaintiffs disclosed three experts to address this theory—Anna Lembke, M.D., Katherine Keyes, Ph.D; and Daniel Ciccarone, M.D. These individuals may offer testimony only if they satisfy the strictures on expert testimony set forth in *Daubert* and its progeny, and Plaintiffs should not be permitted to side-step the *Daubert* process by offering unqualified lay witness testimony on these very same subjects.

      2.      ***The testimony is inadmissible hearsay.*** To the extent the lay testimony of these witnesses is based on anything other than speculation, it relies on inadmissible hearsay. Almost invariably, the basis for such testimony is out-of-court conversations with unnamed third-parties who will not be subject to cross-examination at trial. For example, the basis for Coordinator Priddie's testimony was conversations she had with her "[t]eam"; the basis for Chief Holbrook's testimony was his conversations with unidentified "addicts," "parents" and "friends"; and the basis for Captain Johnson's testimony was his "interview[s]" with "a lot of people." *See supra* at 5–6. Plaintiffs are attempting to use these out-of-court statements to prove the truth of the matter—i.e., that the individuals with whom these witnesses spoke (or others still further removed) became addicted to illicit opioids as a result of their use or abuse of prescription opioids. Accordingly, all of this testimony is inadmissible hearsay. *See* FRE 801(c), 802.

      Plaintiffs may argue that this motion should be denied because the MDL court permitted one lay witness, Cuyahoga County's medical examiner, to testify about facts—but *not* opinions—related to her investigation of data that purportedly showed a link between prescription opioid use and deaths caused by heroin. MDL *Nunc Pro Tunc* Order at 29–30. The MDL court's ruling is not binding here, however, and the Court was not considering the particular witnesses at issue in this case. The MDL court also *did* prohibit the plaintiffs in that

7

case from offering testimony that was lacking foundation, based on hearsay, or that was not "factual." *Id.* at 30. Here, the testimony of Chief Holbrook, Coordinator Priddie, and Captain Johnson—and others with similar opinions—is based on their own speculative conclusions drawn from unscientific, anecdotal observations, and out-of-court conversations with others. As such, their testimony would properly be excluded even under the MDL court's standard.

For the foregoing reasons, any testimony by lay witnesses about the "gateway hypothesis," or a causal connection between prescription opioid use and illicit drug use, should be precluded.

**No. 3: To Bar Plaintiffs from Introducing Evidence of Defendants' Prescription Opioid Shipments to Places Outside Cabell County and the City of Huntington**

Plaintiffs have demonstrated an intent to introduce evidence and argument concerning distributions to pharmacies in locations other than Cabell County and City of Huntington. Such evidence should be excluded as (i) irrelevant, (ii) impermissible "prior bad acts" evidence, (iii) unfairly prejudicial; and (iv) a waste of judicial resources.

1. ***The evidence is irrelevant***. Plaintiffs allege that "excessive" distributions to pharmacies in Florida, Kentucky, Ohio, and other parts of West Virginia "migrated" to Cabell County and Huntington, which contributed to the opioid crisis in the county and city. TAC ¶¶ 36–38. Plaintiffs' expert, James Rafalski, opines that pills dispensed by pharmacies in Florida migrated to West Virginia, but he does not offer any opinion about (i) whether Defendants' distributions to Florida pharmacies were wrongful, or (ii) whether (wrongful or not) the pills that migrated to Cabell County were ever even distributed by Defendants. Indeed, neither Rafalski

nor any other Plaintiff expert or fact witness has identified a single pill that was distributed by a Defendant in Florida and arrived in Cabell and Huntington.[11]

Rafalski's report, moreover, makes clear that the movement of drugs from Florida to other states—what he calls the "Oxy Express" or "Blue Highway"—was the result of third-party criminal conduct, not the conduct of any Defendant. The Cabell and Huntington law enforcement documents Rafalski cites establish that criminal drug-seekers and diverters "traveled to Florida to obtain prescription opioids in Florida and bring them back to their home area for illicit purposes."[12] The fact of this criminal drug trafficking—which allegedly originated from prescriptions written and filled entirely in another state—does not establish either that Defendants shipped too many pills to Florida pharmacies or that they acted to cause a public nuisance in Cabell and Huntington.

Rafalski claims that Defendants were aware of the phenomenon[13]—as were the DEA, Florida law enforcement, and Cabell/Huntington law enforcement—but awareness that illegal drug trafficking takes place is not a sufficient evidentiary basis from which to argue that Defendants' out-of-state distributions were wrongful or caused that drug trafficking.[14]

Also irrelevant is evidence of distributions to pharmacies in other West Virginia counties. There is no evidence in the record that shipments to those pharmacies, let alone shipments to those pharmacies *from Defendants*, migrated to Cabell/Huntington or caused any harms in the

---

[11] Numerous wholesale distributors other than Defendants operated in Florida during this time-period.

[12] Ex. 8, Rafalski Rep. at 53–54; Ex. 9, Rafalski Dep. Tr. at 163:20–164:11.

[13] Rafalski cites four documents for his assertion that "Defendants were aware of the problem with pills migrating from Florida into Plaintiffs' area." Rafalski Rep. at 54–55. But none of the documents actually mention West Virginia, much less Cabell or Huntington, and none mentions that any of the pills that were migrating came from wholesale distributors such as Defendants.

[14] Defendants do not seek to exclude testimony or evidence of trafficking of *illicit drugs*, such as heroin, into Cabell County and City of Huntington from other jurisdictions.

city or county. Absent evidence that connects Defendants' distributions of prescription opioids to pharmacies in other states or counties with medicines misused in Cabell or Huntington, testimony about Defendants' distributions to those other places is irrelevant. This is particularly true where, as here, this case relates specifically to Cabell/Huntington and not the dozens of other West Virginia counties that have commenced their own active lawsuits against the Defendants.

    2.  *__The evidence is inadmissible pursuant to Rule 404(b).__* Because Plaintiffs cannot show the relevance of Defendants' out-of-jurisdiction shipments or conduct to what happened in Cabell or Huntington, the only purpose for which Plaintiffs might seek to introduce such evidence would be to try to establish that Defendants are repeat bad actors and have a propensity to commit the very wrongdoing about which Plaintiffs complain. That type of "other bad acts" evidence is inadmissible under Federal Rule of Evidence 404(b). Rule 404 specifies only limited allowable purposes for such evidence—to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2). None of those purposes is implicated in this case.

    3.  *__The evidence is unfairly prejudicial and a waste of judicial resources.__* Permitting Plaintiffs to introduce evidence of Defendants' alleged conduct outside of their jurisdictions would be a waste of time and unfairly prejudicial because it could subject Defendants to repeated judgments based on the same allegedly wrongful conduct. Allowing introduction of evidence from one county or state into other county or state cases also is prejudicial because those counties or states can (and in many cases do) maintain separate lawsuits against Defendants in those jurisdictions. Even if a plaintiff could prove wrongdoing in (for example) Florida, without direct evidence of the fact and amount of impact on that non-

Florida plaintiff, myriad plaintiffs nationwide would be able repeatedly to seek recovery based on the alleged wrongdoing. Such duplicative liability is legally untenable. This case is about Cabell and Huntington, and the Court should limit the evidence accordingly—leaving alleged wrongdoing elsewhere to be litigated in the appropriate jurisdiction.

Allowing this out-of-jurisdiction evidence also would create time-consuming mini trials because Defendants would be entitled to rebut any allegation or evidence that an out-of-jurisdiction shipment was wrongful. *See United States v. Gessa*, 971 F.2d 1257 (6th Cir. 1992). Thus, opening the door to evidence of shipments to other locations would require an inordinate amount of trial time to be expended on what is *at best* a collateral issue.

For these reasons, Plaintiffs should be limited to proving their case through evidence of alleged wrongful shipments and conduct occurring in Cabell County and City of Huntington, and the Court should exclude evidence of out-of-jurisdiction conduct and shipments absent a direct evidentiary connection to both Defendants' alleged wrongdoing and harm occurring within the Plaintiff jurisdictions.

**No. 4: To Preclude Plaintiffs From Offering Evidence of, or Arguments about, Defendants' Settlements with the DEA or the Track One MDL Plaintiffs**

The Court should preclude Plaintiffs from offering evidence or making arguments related to Defendants' settlements (1) in opioid-related litigation outside West Virginia and (2) in administrative settlements with the federal Drug Enforcement Administration ("DEA") or other government agencies. *See* Exs. 10–16.

Between 2007 and 2017, each Defendant entered into one or more settlement agreements with DEA or other agencies of the United States government. In 2019, Defendants entered into a settlement with Cuyahoga and Summit Counties in Ohio in the federal MDL litigation (the "Track One MDL Plaintiffs"). In their complaints and throughout this litigation, Plaintiffs repeatedly have

11

cited civil and administrative settlement agreements as evidence that Defendants failed to report and block suspicious orders.  The Court should preclude Plaintiffs from offering evidence of, reference to, or arguments about these settlements to establish liability in this case because they are inadmissible under (1) Rule 408 of the Federal Rules of Evidence, which prohibits the use of settlement evidence to prove the validity of disputed claims, (2) Rules 401 and 402, because they are irrelevant given that they do not concern Distributor facilities that serviced Cabell County or Huntington, and (3) Rule 403, because any minimal probative value the settlements might have (and there is none) is far outweighed by the unfair prejudice that would result if Plaintiffs were allowed to prove their case in reliance on these settlements.[15]

**1.** *The Settlements Are Inadmissible Under Rule 408.*  Allowing Plaintiffs to admit evidence or make arguments about the settlements would contravene both the text and purpose of Rule 408, which bars the admission of settlement agreements when offered "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a); *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir. 1988); 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 408.03[5] (2d ed. 2017) ("Rule 408 applies . . . to completed compromises when offered against a compromiser.").  "The purpose of this rule is to encourage settlements which would be discouraged if such evidence were admissible." Fed. R. Evid. 408 advisory committee notes, 1974 Enactment; *Fiberglass*, 856 F.2d at 654 ("'By preventing settlement negotiations from being admitted as evidence, full and open disclosure is encouraged, thereby furthering the policy toward settlement.'" (citation omitted)).

---

[15] This motion should not be interpreted to foreclose *Defendants* from presenting evidence of settlements for the purposes of defending this case, including explaining the history of and defending their suspicious monitoring programs.

Under Rule 408, evidence of both the existence and content of prior settlement agreements is inadmissible for purposes of proving liability on a later civil claim. For example, in *Massachusetts Mutual Life Insurance Co. v. DLJ Mortgage Capital, Inc.*, 251 F. Supp. 3d 329 (D. Mass. 2017), the court precluded the plaintiff from relying on "certain facts set forth and acknowledged by Credit Suisse in a settlement agreement" with the Department of Justice to establish liability. *Id.* at 331. "[T]he letter, policy, and development of Rule 408" demonstrated that the DOJ settlement agreement, including the statement of facts expressly acknowledged by Credit Suisse therein, was "inadmissible" to establish liability. *Id.* at 332; *see also*, *e.g.*, *City of Mishawaka v. Uniroyal Holding, Inc.*, No. 3:04-cv-125, 2009 WL 499105, at *5 (N.D. Ind. Feb. 26, 2009) (rejecting plaintiff's attempt to use "prior settlement agreements" to "establish . . . liability by admission" because such a use of the agreements would be "precisely for the reasons prohibited by [Rule 408]").

Plaintiffs clearly intend to rely on the settlements to prove Defendants' alleged failure to maintain adequate controls against diversion. *See*, *e.g.*, TAC ¶¶ 787–94. Because the settlements represent the acceptance of a compromise of disputed claims, Plaintiffs' attempt to use the settlements to establish liability in the present cases is barred by Rule 408. That is reason enough to bar any evidence of, reference to, or arguments about the settlements.

    **2.** ***The Settlements Are Irrelevant Under Rules 401 and 402.*** Plaintiffs also should be precluded from introducing evidence to establish liability because they are irrelevant to Plaintiffs' claims and, therefore, are inadmissible under Rules 401 and 402. Put simply, the fact that Defendants resolved administrative claims brought by government agencies or settled litigation involving claims asserted by different claimants has no bearing on whether the claims asserted by Plaintiffs for public nuisance are valid in West Virginia.

To establish relevance, Plaintiffs must show that evidence of the settlements make any "fact . . . of consequence" in these cases "more or less probable than it would be without the evidence." Fed. R. Evid. 401 (test for relevant evidence); *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). To begin with, three of the settlements with the DEA and the Track One MDL settlement all expressly disclaim any admission or concession of liability. These three settlement agreements therefore are inadmissible, for mere hearsay allegations of wrongdoing prove nothing.

Of the four agreements with DEA that do contain narrow admissions, ***none*** implicates distribution of opioids into Cabell County or Huntington:

- Cardinal's 2012 MOA and 2016 Settlement arose out of DEA investigations of one facility in Lakeland, Florida, Ex. 10 at 1–2; Ex. 12 at 3.

- McKesson's 2017 settlement does not identify any particular pharmacies or shipments in West Virginia, nor are there any admissions concerning McKesson's operations in West Virginia (Ex. 13).

- Neither ABDC's April 19, 2007 Initial Suspension Order nor the June 22, 2007 Settlement Agreement contains allegations concerning distribution of opioid medications to Cabell or Huntington pharmacies specifically, or to West Virginia pharmacies generally (Exs. 15–16).

The limited admissions contained in those three agreements do not make them relevant to establish Plaintiffs' claims or render them admissible by Plaintiffs. First, Rule 408 does not make any distinction based on the contents of a settlement agreement—prior settlements cannot be used to prove liability, full stop. Second, any reference to those agreements necessarily would depend on a "if it happened there, it must be happening here" premise—which courts repeatedly have held is prohibited. *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402 (3d Cir. 2015) (quoting Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Application, ¶ 1421a, at 160); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51–52 (2d Cir.

14

2007)).[16] Third, the narrow admissions do not establish any element of Plaintiffs' public nuisance claims because they do not prove that Defendants intentionally caused a nuisance in Cabell/Huntington, and Plaintiffs cannot rely on alleged regulatory compliance issues under the CSA to establish a tort duty running to Plaintiffs.[17]

       **3.**     ***The Settlements Are Inadmissible Under Rule 403.***  Even if the settlements had some relevance (which they do not), Plaintiffs still could not admit them because Rule 403 requires the exclusion of evidence "if its probative value is substantially outweighed" by the "danger" of "unfair prejudice." Fed. R. Evid. 403. Plaintiffs seek to recover abatement costs for the alleged nuisance that exists in their jurisdictions. They should have to establish the elements of their claim based on evidence that Defendants caused such a nuisance in Cabell County and City of Huntington. They should not get a short-cut to that proof by simply relying on prior settlements with other government entities to establish fault or causation. That would be unfair and prejudicial to Defendants and would undermine the "strong public policy favoring exclusion" of settlement agreements. *Fiberglass*, 856 F.2d at 655.

Dated: October 2, 2020

---

[16] In the Track One case, No. 17-MD-2804 (N.D. Ohio), Judge Polster denied defendants' motion to exclude evidence of prior settlements. *See* Doc. No. 3058. This ruling should be disregarded for several reasons, including because the ruling was based on the suggestion that the settlement agreements might be relevant to Defendants' "knowledge" or "state of mind" because they somehow put Defendants on notice that they were violating the CSA. But even if that were true, that reasoning has no applicability here, because those settlements do not establish any element of Plaintiffs' narrower public nuisance claims in this litigation.

[17] *See* ECF 1007.3.

Respectfully submitted,

/s/ *Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
**CAREY DOUGLAS KESSLER & RUBY PLLC**
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

/s/ *Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Jennifer G. Wicht
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard @wc.com
jwicht@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc.*

*/s/ Timothy C. Hester*
Timothy C. Hester (DC 370707)
Laura Flahive Wu
Christian J. Pistilli
Andrew P. Stanner
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
lflahivewu@cov.com
cpistilli@cov.com
astanner@cov.com

*/s/ Paul W. Schmidt*
Paul W. Schmidt
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000
pschmidt@cov.com

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*Counsel for McKesson Corporation*

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, WV 25322
Telephone: (304) 340-1000
Facsimile: (304) 340-1050
gcallas@jacksonkelly.com

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
Joseph J. Mahady
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com
jmahady@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, the foregoing **Defendants' Motions *in Limine*** was filed using the Court's CM/ECF system, which will serve notification of such filing on all counsel of record.

*/s/ Steven R. Ruby*
Steven R. Ruby (WVSB #10752)
