**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>     Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>     Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>     Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
EXCLUDE EXPERT TESTIMONY FROM G. CALEB ALEXANDER PURPORTING
TO RELATE TO ABATEMENT COSTS AND EFFORTS**

i

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

LEGAL AND FACTUAL BACKGROUND ......................................................... 3

    A.    Rule 702 Legal Standards ...................................................................... 3

    B.    Dr. Alexander's Opinion Offered In Support of Abatement Costs ....................... 4

ARGUMENT ...................................................................................................... 8

    A.    Failure to Account for Existing Programs Available in Huntington and Cabell County ....................................................................................... 9

    B.    Failure to Account For or Allocate Costs .......................................... 12

    C.    Failure to Distinguish Between the Effects of Prescription Opioid Medications and Illegal Street Drugs ................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., Inc.*,
  189 F. Supp. 2d 482 (S.D. W. Va. 2002), *aff'd,* 85 F. App'x 964 (4th Cir.
  2004) ..................................................................................................................4, 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993).........................................................................................3, 9

*Kopf v. Skyrm*,
  993 F.3d 374 (4th Cir. 1993) ................................................................................3

*Osborne v. Robinette*,
  No. Civ. No. 05-0106, 2006 WL 5309949 (S.D. W. Va. Oct. 4, 2006) ..................12

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
  949 F.3d 825 (3d Cir. 2020)...................................................................................4

**Other Authorities**

Fed. R. Evid. 702 ......................................................................................................3, 4

## INTRODUCTION[1]

As Defendants have previously explained in this case, abatement has only ever meant one thing under West Virginia law:  the issuance of an injunction to halt the offending conduct or undo its consequences.[2]  Plaintiffs proffer an "Abatement Plan" by Dr. Caleb Alexander, but that plan is not an abatement plan at all.  Instead, it is offered as support for what essentially is the recovery of money damages, which is not a valid abatement remedy.  For that reason alone, this Court should exclude Alexander's testimony.  But even if this Court were to allow Plaintiffs to pursue "abatement" in the form of money damages, Alexander should be precluded from testifying because he was not asked to provide—and consequently does not propose—a plan that would abate the harm suffered by **Plaintiffs** as a result of **Defendants' alleged misconduct**.  He does not even attempt to identify what is needed to abate harms allegedly caused by Defendants' misconduct (and relating to only prescription opioids) as opposed to all opioid-related harms generally.  Instead, he engages in a purely academic exercise, offering a buffet of potential programs that **could be used** to abate all opioid-related harms.  Put simply, his one-size-fits-all plan does not "fit" the facts of this case.

---

[1] Judge Polster ruled in Track One that Alexander's testimony would be permitted.  *See* Ex. *, *In re:  National Prescription Opiate Litigation*, No. 1:17-MD-2804, 2019 WL 4043938, at *2-3 (N.D. Ohio August 26, 2019).  But in rendering his decision, Judge Polster twisted Defendants' argument into one about whether Plaintiffs had to prove causation prior to trial, rather than whether Alexander's testimony fit the facts of the case, as Defendants argue here.  *See id.*  To the extent that Judge Polster did address Defendants' *Daubert* arguments, he did so by viewing abatement as an equitable remedy—again, avoiding the question at hand.  *Id.*  Given Judge Polster's approach, this Court should not give credence to the prior ruling, and should consider Alexander's new opinion, which arises in the context of new and different facts, on its own merits.

[2] *See* Opp. to Pls.' Mot. to Strike Defs.' Notices of Non-Party Fault, ECF No. 256 at 7-8 & n.13, and sources cited therein.

Alexander's focus on generic and untailored "abatement" strategies results in an irrelevant plan that fails to account for several critical facts.  First, it recommends primarily programs and services that already are provided and paid for by third parties (including the state and federal governments), while failing to account for the reduced need that results from what has and is already being done.  Second, the proposed plan does not even attempt to identify what is needed to address the nuisance allegedly caused by Defendants' misconduct, because much of his treatment and prevention programs are aimed at individuals who suffer from Opioid Use Disorder ("OUD") in Huntington and Cabell County, yet use only illegal opioids like heroin and fentanyl.  And his plan includes individuals who do not even have OUD today, but who *may* develop it at some point in the next 15 years.  Thus, it fails to address unmet needs *today*, as opposed to prognosticating about future need.

As a result, Alexander's plan includes unnecessary programs and proposals that duplicate programs already in place (that are working) and that are funded by others including—most prominently—the federal and state governments.  It is also not helpful because it fails to meet Plaintiffs' burden to show what is needed *now* to abate the harm allegedly caused by Defendants *in Huntington and Cabell County* and includes programs to address harms that may spring up in the future.  Indeed, while Alexander's report mentions and discusses programs that already exist in Huntington and Cabell County, that discussion is nothing more than window dressing, because he does not adjust his generic abatement proposal to account for these existing programs or resources,[3] or assess whether additional "abatement" programs are, in fact, needed to address a

---

[3] For instance, Marshall University, Cabell Huntington Hospital, St. Mary's Hospital, and Prestera Center have joined with the County and City in effectively addressing the substance abuse crisis in the region.

nuisance in Huntington and Cabell County.[4]   Indeed, the largest component of his plan, accounting for over 80 percent of the dollars sought, is for treatment of OUD and other conditions that is largely paid for by Medicaid, and that the County and City cannot possibly lay claim to that recovery without it being a complete and unjust windfall.  These failures result in an opinion that is completely unhelpful to the Court as trier of fact should there ultimately be a finding of liability in this case and should be excluded under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

## LEGAL AND FACTUAL BACKGROUND

**A.     Rule 702 Legal Standards**

Under Federal Rule of Evidence 702, trial courts serve a vital "gatekeeping role" and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."   *Daubert*, 509 U.S. at 597.   "[E]xpert evidence can be both powerful and quite misleading."   *Id.* at 595 (citation omitted).   To that end, one of the touchstones of Rule 702 is whether the proffered expert testimony is helpful to the trier of fact. *Kopf v. Skyrm*, 993 F.3d 374, 377 (4th Cir. 1993).  Beyond helpfulness, the Rule 702 analysis covers three inquiries:  (1) qualification; (2) reliability; and (3) fit.   *See* Fed. R. Evid. 702, Advisory Comm. Note.

On the question of relevance or fit, courts recognize that an expert's "testimony must be sufficiently tied to the facts of the case that it will be of assistance to the factfinder in resolving a

---

[4] By way of example, according to the testimony of Dr. David Chaffin, a Marshall University OB/GYN, who was asked whether today more needs to be done, there are adequate resources in Huntington and Cabell County to address existing need for pregnant women seeking medical treatment for OUD, and "[t]here are very few barriers to getting medication-assisted therapy while you're pregnant."  Ex. I, Deposition of Dr. David Chaffin, July 29, 2020, at 29:1-8. Yet, Alexander's plan calls for Defendants to fund expanded medication-assisted treatment for pregnant women with OUD.

disputed fact." *Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., Inc.*, 189 F. Supp. 2d 482, 495 (S.D. W. Va. 2002), *aff'd,* 85 F. App'x 964 (4th Cir. 2004) (citing *Kumho Tire Co. v. Charmichael*, 526 U.S. 137, 150 (1999)).  In other words, to "fit" the facts of the case, there "must be a valid … connection to the pertinent inquiry before testimony is admissible." *Id.* (internal quotation marks omitted).  Even in the bench trial context, where a judge rather than a jury sits as the factfinder, Rule 702 plays no less an important part in the consideration of expert testimony.  *See UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832-33 (3d Cir. 2020) (recognizing that "Rule 702 applies whether the trier of fact is a judge or a jury," and noting that "the failure to conduct any form of 'assessment' of an expert and the proposed testimony before admitting the testimony is an abuse of discretion").

**B.    Dr. Alexander's Opinion Offered In Support of Abatement Costs**

Dr. Caleb Alexander is an internist and Professor of Epidemiology and Medicine.  Ex. A (Alexander 8/3/2020 Rep.) at 3.  As a primary care physician, he does not specialize in the care of patients with OUD.  *Id.*  Outside of litigation, he has researched opioid issues, but not in a way that is specific to Cabell County or the City of Huntington.  *Id.*  Here, Alexander purports to provide "recommended cost estimates for certain abatement interventions," which he will then leave to others with local knowledge to provide "remaining costs."  *Id.*

Alexander outlines three categories of programs and services he believes would "abate" the alleged nuisance, each of which in turn contains numerous specific programs aimed at purportedly achieving the identified goal:  (1) improving the safe use of prescription opioids and treatment of pain; (2) identifying and treating individuals with OUD; and (3) customizing abatement remedies for specific subpopulations.  *Id.* at 15.  Critically, Alexander notes in his report that "many of [these abatement proposals] have already been implemented in the Cabell-Huntington Community."  *Id.* at 8.

4

To that end, Alexander offers important caveats about the conclusions he reaches in his report:

- "Here and throughout, while I suggest remedies that ***should*** be included as part of a comprehensive abatement plan, and ***while I consider programs that are already underway***, I leave it to the Community[] to determine the degree to which further investment should be undertaken." *Id.* at 15 (emphasis added).

- "The optimal program for a given city or county will depend upon a variety of different factors including the adequacy of the primary care and specialty workforce, urbanicity, and ***existing infrastructure devoted to addiction treatment***." *Id.* at 39.

Alexander testified at his deposition that his abatement plan does not account for the facts on the ground in Huntington and Cabell County. Despite writing that "a given community's response" should be "based on a comprehensive needs assessment," Ex. A at 32, Alexander admitted that he "did ***not*** perform a comprehensive needs assessment that included collecting primary data from individuals residing within the County." Ex. B, Transcript of Dr. Caleb Alexander's Deposition ("Tr.") at 327:14-16 (emphasis added). Indeed, Alexander admitted that he did not consider whether various components of his abatement plan already were in place and implemented and funded by third parties. For example, when asked about his proposal for data collection and surveillance, Ex. A at 32, he acknowledged that "[s]ome of [those services] [are] in place," but that he "was not asked to perform a comprehensive evaluation of the services to date." Tr. at 343:14-346:6. As illustrated herein, this refrain was repeated throughout his deposition in this case.

Nor does Alexander estimate the scope of any abatement plan based on the actual needs and resources in Huntington and Cabell County, and whether in fact anything more needs to be done to address OUD.  Critically, when asked about his extensive proposals to expand addiction treatment capacity in Huntington and Cabell County—programs that comprise the vast majority of the costs estimated to implement his proposed plan (more than $2B of the overall cost estimate of $2.7B)—he testified that he

> ***[Did not] do a needs assessment*** of specifically how many beds are currently occupied or how many people are currently in treatment … and how many additional people should be treated…. I didn't try to quantify … current levels of staffing or provision of care and incorporate these quantitatively into my abatement program ….  And so I'm – but I did not look and try to quantify or evaluate the specific current levels of staffing or provision of care in any given program.

Tr. at 258:18-261:7 (emphasis added).  In other words, he is proposing interventions and programs estimated to cost more than $2 billion without any consideration whatsoever of whether there is a need for such programs in Huntington and Cabell County.  The same is true of his comprehensive and wide ranging proposals related to housing, Tr. 254:13-256:10; physician education, Tr. 297:10-18; education in the general population, Tr. 317:16-21; combatting stigma, 327:5-329:23; and data integration, 245:17-350:7.

Moreover, Alexander did not consider whether the existing programs are sufficient to abate the alleged nuisance of purported prescription opioid 'oversupply,' or whether his proposed programs are more likely to be effective than existing programs.  *See generally* Ex. A at 16-73.  On this point, Alexander explicitly testified that he "was not asked to evaluate the incremental impact of the particular components [of the abatement remedies] that [he] proposed" on Huntington and Cabell County.  Tr. 350:14-17.  When asked more directly about what the unmet needs were in Huntington and Cabell County and the degree to which he considered

whether interventions and programs already in place addressed those needs, Alexander testified as follows:

> A.  So my plan was not to – to add on the margin.  I was not asked to – no one asked me to come in and figure out what exactly is being done and then to add on exactly what I thought was necessary to reach an adequate program.
>
> I wasn't asked to figure out where that line lies for each of these categories, and so it may well be that there is widespread investment in – in education that's already been made. … But even if they are adequate, it's – I wasn't asked to figure out if they're adequate and then add on a little bit more.  I was asked what I think constitutes a comprehensive abatement program.

Tr. 329:12-330:4.

Despite failing to consider what was actually necessary to abate an alleged public nuisance of prescription opioid 'oversupply' in Huntington and Cabell County, Alexander formulated an abatement plan that roughly estimates the cost of abating the general opioid crisis in Huntington and Cabell County (not limited to prescription opioids) at approximately $2.5 billion over the course of 15 years.  Tr. 344:13-23.[5]  Despite affixing this staggering dollar amount to his plan, Alexander has never opined that such costs (if his plan were put in place) would be paid by Cabell County or the City of Huntington themselves, because it is "not for [him] to decide" such things.  Tr. 223:8-21.  Perhaps not, but directly relevant to this point, the Commissioner of the West Virginia Department of Health and Human Resources, informed Congress just this year that "[f]or perhaps the first time, West Virginia had [as of December

---

[5] Alexander has changed his abatement plan significantly from what he presented in the Track One MDL litigation.  Specifically, he has added several new interventions and programs that were never addressed in Track One, but he admits he has no specific reason for suggesting them in this litigation based on Plaintiffs' needs because, as discussed extensively herein, he never considered whether there were any unmet needs in the first place.  *See, e.g.*, Tr. at 170:22-172:2; 172:11-13;  173:11-17;  175:8-176:19;179:19-24;  182:8-191:20  Moreover, he (seemingly arbitrarily) has added an additional five years to this abatement plan for a total of fifteen, as opposed to ten years for the abatement plan in Track One.  *Id.* at 192:3-12; 197:22-198:1.

2019] the resources to fund what it needed" in order to combat the opioid crisis, and that it has not spent the vast majority of the federal grant money it has received to do so. *See* Ex. C, Mullins, "A Public Health Emergency: West Virginia's Efforts to Curb the Opioid Crisis," Testimony to: The House of Representatives Committee on Energy and Commerce Subcommittee on Oversight and Investigations, January 14, 2020, at 7.

## ARGUMENT

While Alexander's plan ostensibly is aimed at abating an opioid crisis in Cabell County and the City of Huntington, even a cursory review reveals that he was asked to—and ultimately did—exercise *carte blanche* in crafting an abatement plan that pays little heed to either: (1) Plaintiffs' actual current needs or (2) the nuisance allegedly caused by Defendants' conduct (as distinct from all opioid-related harms existing in Huntington and Cabell County). Thus, his plan has little connection to the facts of this case.[6] In other words, Alexander's opinion is the product of an academic exercise in designing a comprehensive abatement plan to address *any* "opioid crisis" unmoored to the specific facts of this case and the questions at hand.

Indeed, Alexander readily admits that he was not asked, nor did he attempt, to account for the facts on the ground when crafting his abatement plan. For example, he fails to account for state, local, and federal programs already in place and sources of funding for the very same programs and services he says need to be implemented. In doing so, he relies on over-inclusive data that includes users of illegal street drugs, such as heroin and fentanyl and includes other

---

[6] The problem here is that Alexander's abstract opinions about what *could be done* are divorced from any reliable or relevant data that shows what *actually already has been done and what actually remains to be done* in Huntington and Cabell County as a result of Defendants' alleged misconduct. Without such data, his abstract ideas are unhelpful, because they merely offer a panoply of options, without any reliable basis to justify his nearly unbounded opinion about what is needed to abate the nuisance allegedly caused by Defendants here.

individuals who have never been diagnosed with OUD today as potentially suffering from OUD at some point in the future.  His plan thus will provide no help to the Court if there is a determination that a remedy is needed to address alleged wrongful conduct by Defendants.

An "abatement" plan is not admissible unless it pertains to abatement measures that directly relate to Defendants' alleged culpable conduct; are actually needed based on what is already in place; can actually be implemented; and are reasonable and justified based upon the facts in the case.  Alexander's plan fails to do any of this—and  thus it should be excluded as irrelevant.  *Bourne*, 189 F. Supp. 2d at 495 (recognizing that part of the *Daubert* analysis "focuses on whether the expert's testimony will be helpful to the trier of fact in deciding a fact in issue.  Included in that analysis is the question of relevancy of 'fit'").

### A.    Failure to Account for Existing Programs Available in Huntington and Cabell County

The primary problem with Alexander's opinion is that it fails to account for the myriad programs already in place in Huntington and Cabell County and the degree to which those programs and interventions address existing need.  When asked about some of those programs,[7] Alexander acknowledged that "[t]here are literally dozens or hundreds of different programs that have been deployed over time in the City of Huntington and Cabell County."  Tr. 284:1-10.  He even mentions some (but not all) of those programs throughout his Report.[8]  Indeed, given the

---

[7] As noted above, Christina Mullins has testified before Congress that West Virginia has more than sufficient funding in place, and in fact reported that "WV has not fully allocated all its resources at the time of this [letter].  *See* Ex. D, Oct. 18, 2019 Letter from Christina Mullins to Chairman Pallone, Committee on Energy and Commerce, at 5; *see also supra*, note 4.

[8] On a number of occasions throughout his deposition, Alexander acknowledged certain programs that he referenced in his Report, yet he could not articulate what it is they did or how they performed.  *See, e.g.,* Tr. at  212:17- ("I did not conduct any comprehensive sort of program evaluation of the performance of the interventions to date."); Tr. 229:10-16 (admitting lack of

*Continued on following page*

existing programming, there exists a very real question about whether there is in fact an unmet need that is not currently being met through the comprehensive and extensive programs in place in Huntington and Cabell County—particularly through its strong partnership with multiple healthcare providers in the area like Marshall University and Cabell Huntington Hospital.  As such, Alexander's plan is not tailored to specifically target the unmet needs and he readily admits that he has not attempted to do so.  *See* Tr. 256:11-18 ("Generally would you agree with me that virtually every aspect of your proposed abatement, the programs and interventions you have in the plan, there is some aspect of that already in place in [the Communities]?  That's true, isn't it?  A.  Yes. … I believe that's the case."); *see also* Tr. 329:12-16; Tr. 311:1-10; Tr. 329:2-330:4.

This issue came up throughout his deposition.  Most significantly, as it relates to treatment, Alexander testified:  "Q.  And I guess my question … Doctor Alexander, is:  Isn't it a good idea when you're formulating and proposing an abatement plan to see whether or not there's an unmet need in that particular community?   And you haven't done that here.  Isn't that true? … A.  Yeah, I did not perform a comprehensive needs assessment that included collecting primary data from individuals residing within the County…."  Tr. at 327:5-16.  He went on to concede that he did not look to see whether any of the treatment programs he identified was "at capacity, whether there was a wait list or people waiting to get in," Tr. 261:13-22, or whether any of those programs "are at capacity now or have had a waiting list."  Tr. 259:21-260:12; *see also* Tr. 256:3-8 ("I carefully considered existing programs and services within the community as I developed my recommendations, but I did not do – I was not asked to perform a needs assessment per se, so I [do] not attempt in my abatement plan to net out current levels of care

---

*Continued from previous page*

familiarity with the Great Rivers Regional System for Addiction Care); Tr. 283:3-19; 284:11-24 (admitting lack of familiarity with the Prevention First program).

….").  Another example relates to drug take-back programs outlined as a necessary intervention in his plan; when he was asked "[a]re you aware of any information that the national and state-based take-back programs implemented in West Virginia have been inadequate to address the needs of the community?"  Tr. 341:17-20.  He responded:  "Well -- … I wasn't asked to add only the margin, so none of my efforts are based on some assessment and conclusion about sort of the marginal need for additional effort …."  Tr. 341:23-342:2.

Alexander further indicated that he did not consider ongoing efforts as part of his recommendations for other programs, too, including:  addiction helplines, Tr. 353:9-19 ("[W]hat I am proposing is that any abatement plan that's going to work needs to link people to care and one of the mechanisms to do so is a help line"); coordination, Tr. 344:15-345:8 ("I didn't provide an opinion about where this should sit.  I'm merely stating that I think that any abatement program … needs to have some resources to the types of functions that I articulate …."); and housing, Tr. 254:13-256:10.

Alexander refers to these myriad efforts by Huntington and Cabell County as "laudable" throughout his testimony.  *See, e.g.,* 212:21-213:7; 213:8-10; 336:1-4; 347:11-13.  Yet he does not take any of them into account in his plan as it relates to either the existing level of programs or services being offered, or how effective they are.  *See* Tr. 212:17-20 ("Yeah, I was asked to look forward, not look backwards, and I did not conduct any comprehensive sort of program evaluation of the performance of the interventions to date.")  Instead, his assumption at every turn appears to be that more is better, and that if he recommends it, it should be paid for (presumably by Defendants).  Tr. 261:14-24 ("Just so I'm clear, in forming your abatement plan, you did not look to determine whether or not any of these treatment programs were at capacity,

whether there was a wait list or people waiting to get in.  You did not do that in forming your opinions in this case.  Is that correct?  …  A.  It is correct[.]").

This failure to account for existing programming renders Alexander's opinion entirely unhelpful.  What Plaintiffs must do—and by extension, what any purported expert must do—is present opinions that will help the Court (if necessary) to identify the programs and interventions necessary to abate the public nuisance allegedly caused by Defendants' conduct within Cabell County and the City of Huntington, and to identify programs or additional capacity that are not already being provided.  Alexander's academic exercise does not do that, and as a result, it must be excluded.  *See, e.g., Osborne v. Robinette*, No. Civ. No. 05-0106, 2006 WL 5309949, at *5 (S.D. W. Va. Oct. 4, 2006) (admitting in part expert testimony where it was clear that the expert had studied and applied the specific circumstances of the case when rendering his opinion).

## B.     Failure to Account For or Allocate Costs

Another example of Alexander's failure to account for the facts on the ground arises in the context of costs.  He readily admits that his cost estimates frequently rely on information that is untethered to any present or future costs that may or may not actually be incurred by Huntington and Cabell County.[9]  *See* Tr. 249:3-6 (confirming that he did not consider local or

---

[9] A separate example of costs not fitting the facts of the case arises in relation to the "Real Cost" media campaign that Alexander recommends as part of the "Patient and Public Education" component of his plan.  *See* Report at 22-23; Tr. at 305:18-306:6.  When asked about his cost estimate for this campaign, Alexander indicated that it was based on the "per capita" cost of the similar nationwide campaign.  But upon being questioned about that estimate, he revealed that there were a number of factors that may have increased the "per capita" cost as it related to the nationwide campaign that likely would not apply to Huntington and Cabell County, including the higher cost of national television and magazine ads. Tr. 322:2-323:18.  Rather than attempt to calculate an expected cost for carrying out the program in Huntington and Cabell County, Alexander simply claimed that "I tried to use local sources whenever they were available, and when they were not available…I would use a regional or national source." Tr. 323:19-324:23. Of course, Alexander could have determined the local cost of such ads, he simply declined to do so.

federal funding).  In the context of costs borne by third parties, Alexander's plan fails to "fit" the issue of abatement because it includes programs that Plaintiffs do not now (and could not in the future) implement or pay for.  *See* Tr. 223:22-224:3 ("….I was not asked to examine the sources of funding for currently-existing programs.").

But even more significantly, federal government and other funding sources already pay for most, if not all, of the existing programs available to address OUD in Huntington and Cabell County.  *See* Ex. D, Oct. 18, 2019 Letter from Christina Mullins to Chairman Pallone, Committee on Energy and Commerce, at 1 ("Quite simply, the federal funds at the heart of this request, have allowed WV the ability to address the opioid crisis in a holistic manner.  WV has utilized these funds to improve every aspect of the Substance Use Disorder (SUD) system of care ….").  Plaintiffs' expert George Barrett readily admitted in his deposition testimony that neither Huntington nor Cabell County has *ever* paid to provide OUD treatment (which, as noted, is by far the most significant cost in Alexander's abatement plan).  *See* Ex, E, Barrett Dep. 162:18-21 ("Q.  Do you know whether the County or City have ever paid even a dollar towards the treatment of people in their community with opioid use disorder.  A.  No, I do not."); *see also* Ex. K, Deposition of Beth Thompson [County Administrator, Cabell County Commission], July 28, 2020, at 336:3-9 (the County has made no specific expenditure dedicated to abating the opioid problem); Ex. J, Deposition of Deron Runyon, June 16, 2020, at 124:22-125:14; 95:12-18 (during the time that he served as finance director for Huntington from 2009-2015, he does not recall any budget revisions or a city department or division making a line item request for prescription opioid-related spending); *id*. at 221:12-249:18 (he was also unable to identify any spending that Huntington had undertaken during his tenure that lined up with the planned response categories in the city's Resiliency Plan or a previously published City of Solutions

guidebook).   This is because Medicaid programs, and not Huntington and Cabell County, provide funding for most of the OUD treatment provided, as later acknowledged by Mr. Barrett. Ex. E, Barrett Dep. 162:22-163:10 ("Do you know whether or not that's true that most people with [OUD] in Cabell/Huntington, their treatment is paid for by Medicaid?  A.  Well, given the income level of the local area and Medicaid being a federal transfer payment program, essentially welfare, that makes sense, yes.").   In fact, the cornerstone of OUD treatment – medication assisted treatment (MAT) – is funded primarily from the federal government through Medicaid, Medicare, grants, and federally-operated programs such as the Veteran's Administration.[10]   MAT is also covered by private insurers at times, but as discussed above none of the treatment available for individuals with OUD has ever been paid for by Huntington or Cabell County.

Other significant costs related to OUD programs are covered by state and federal grant funding, which Huntington Mayor Steve Williams indicates both the City and County "aggressively" pursue.   Ex. G, Deposition of Steve Williams, 210:10-12 (June 30, 2020). Examples of programs funded by grants include by way of example:  drug take-back programs, Tr. 341:1-344:2, as well as the Law Enforcement Assisted Diversion (LEAD) program, the Women's Empowerment and Recovery Program (WEAR), development of early warning systems, purchasing drug-testing kits, creation of harm reduction programs, creation of the Quick Response Team, and the Turnaround Program at the Western Regional Jail.  *See* Ex. H, City of

---

[10] Ex. L, Expert Report of Stephenie Colston at pages 28-31 (discussing the expanded federal and state programs available to fund OUD treatment, including Medicaid and Medicare. Importantly, while Medicaid funds the vast majority of OUD treatment, in West Virginia Medicare also plays an important role as these beneficiaries comprise 25% of the total population, the highest in the country, whereas the national average is 18%; this is likely attributable to West Virginia's large population of people with disabilities).

Huntington Report of Grants, Contributions and Awards, 2013-Present; *see also* Ex. F, Rufus Rep. Table 2.13 (indicating that grant funding to the City and County is in the range of $1.9M annually).

As a result of the extensive federal and state funding already in place, Plaintiffs would essentially receive a windfall under Alexander's plan, because the reality is that third parties will continue to fund the programs and interventions Alexander proposes in his plan.  And Alexander offers no opinion to the contrary.  *See* Tr. 207:9-22; Tr. at 223:1-16 ("Q.  You're not offering opinions in the case as an expert, that [the Cabell-Huntington Communities] has had to fund any of the programs that they have decided to put in place to address the opioid epidemic.  A.  No. No I'm not.  Q.  Okay.  And in terms of future payments, you're not offering any opinions that should your plan for abatement be put in place in [the Communities] that any aspect of the plan would need to be paid for or funded by [Huntington and Cabell County]. … A.  Yeah, that's for the judge to decide, you're correct.").

This failure to account for what is already being spent to abate the opioid crisis, or who is spending the money to do so, is fatal to Alexander's testimony.  Indeed, this is perhaps the clearest example of how Alexander provides an entirely unhelpful opinion when it comes to the only question that could possibly be relevant:  what would be required to abate the public nuisance allegedly caused by Defendants in Huntington and Cabell County?  On this point, Alexander does not advance the ball at all, and his opinion should, accordingly, be excluded.

## C.   Failure to Distinguish Between the Effects of Prescription Opioid Medications and Illegal Street Drugs

Alexander's proffered opinion also should be excluded as irrelevant on a third ground, specifically, that it fails to distinguish between harms that Defendants are alleged to have caused related to prescription opioids and harms Defendants are not alleged to have caused.  To that end,

Alexander admits that his plan does not limit the interventions and programs to individuals who developed OUD through their use of prescription opioids; instead, he lumps prescription opioids together with illegal street drugs such as heroin and fentanyl that cannot be part of any nuisance caused by Defendants' alleged misconduct.  Tr. at 243:24-244:12 ("Q.  Okay … just to be clear … [t]his would include individuals who never touched a prescription opioid, and in the future, they may start using heroin or fentanyl or carfentanil and develop [OUD].  Those individuals would also be beneficiaries of your 15-year abatement plan ….  A.  Yes, they would be beneficiaries.").  Moreover, Alexander did not account for the illegal diversion of prescription opioids to those who use them illegally.  Tr. 281:11-282:8 (acknowledging that he was not asked to opine on "the broader point … that there is at least some level of diversion all the way through the supply chain, so you can talk all the way from drug warehouses to end users, and there is some degree of diversion throughout the supply chain") or make any attempt to differentiate between the treatment costs associated with the misuse and abuse of prescription medications (due to any cause) from those associated with the abuse of illegal street drugs.  *See* Tr. at 89:9-91:11; 94:18-95:2 ("In your proposed abatement plan that you're putting forward … in terms of treatment … it does not matter whether or not an individual with opioid use disorder ever used a prescription opioid.  Isn't that true?  A.  Yes, that is true"); 96:20-97:19; 243:12-23 (illustrating that he does not distinguish the use of prescription medication from illicit drugs).  Perhaps the most glaring evidence of this is those aspects of Alexander's plan designed to address medical complications existing only as the result of intravenous (IV) drug use, which by its very nature involves only illegal drugs such as heroin and fentanyl.[11]

---

[11] *See* Tr. 336:14-21 (people who inject drugs do so illegally); Ex. M, Deposition of Judith Feinberg, M.D. Sept. 2, 2020, 75:2-5 (people who inject drugs do so for non-medical use); *see*

*Continued on following page*

These oversights are particularly concerning given recent trends in Cabell County and the City of Huntington which reflect that, for every year from 2013 through 2018 (the most recent period for which data is available), the drug problem has shifted away from prescription opioids and now relates primarily to illegal opioids like heroin and fentanyl (in addition to upward trends relating to non-opioid drug use such as methamphetamine). Indeed, in 2017, the death rate from illicit fentanyl alone, was approximately nine times higher than the death rate from prescription opioids.[12] Yet Alexander's plan includes programs and interventions designed to address all OUD, and not just harms stemming from Defendants' alleged misconduct with respect to prescription opioids.

In short, Alexander's abatement plan does not address the public nuisance allegedly caused by the Defendant's misconduct. Instead, by its design and as acknowledged by his testimony, the plan would render Defendants responsible for individuals with OUD who exclusively use illegal, non-prescription opioids such as heroin and fentanyl, as well as individuals who do not now even have OUD but may develop it in the future—an even greater (and impermissible) stretch. See Tr. 243:12-21 (agreeing that individuals who do not have OUD or SUD, or use prescription opioids, would still be beneficiaries of his plan if they develop OUD in the future). This goes far beyond what could ever be causally related to Defendants' alleged

---

*Continued from previous page*
*also id*. at 72:6-14 (prescription opioids are not injected).

[12] The source for these data is the Centers for Disease Control & Prevention's "WONDER" database. The data are specific to Cabell, Putnam, Lincoln and Wayne Counties, plus two adjacent Kentucky counties and one Ohio County. In 2018, the data show a reduction in the death rate for illicit fentanyl use, heroin use, and prescription drug use. *See* WV DHHR, *Gov. Justice – DHHR Data Suggests West Virginia Overdose Deaths Appear to be* Declining (Sept. 5, 2019), *available at* https://dhhr.wv.gov/News/Pages/Gov.-Justice---DHHR-Data-Suggests-West-Virginia-Overdose-Deaths-Appear-to-be-Declining.aspx

misconduct with respect to prescription opioids, and as such do not fit the facts of this case and should be excluded.

## CONCLUSION

For the foregoing reasons, this Court should exclude the testimony of Plaintiffs' abatement expert Dr. Caleb Alexander.

Dated: October 2, 2020

Respectfully Submitted,

***AmerisourceBergen Drug Corporation***
By Counsel:

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

***McKesson Corporation***
By Counsel:

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*/s/ Timothy C. Hester*
Timothy C. Hester
Laura Flahive Wu
Andrew P. Stanner
COVINGTON & BURLING LLP

One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
lflahivewu@cov.com
astanner@cov.com

*/s/ Paul W. Schmidt*
Paul W. Schmidt
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1000
pschmidt@cov.com

**Cardinal Health, Inc.**
By Counsel:

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
emainigi@wc.com
lheard@wc.com
ahardin@wc.com
jwicht@wc.com

Michael W. Carey (WVSB #635)
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
David R. Pogue (WVSB #10806)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com

sruby@cdkrlaw.com
rfranks@cdkrlaw.com
drpogue@cdkrlaw.com

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 2nd day of October, the foregoing **Memorandum in Support of Defendants' Motion to Exclude the Expert Testimony of G. Caleb Alexander** was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)