## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01362 |
| | Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | |
| Defendants. | |
| | |
| CABELL COUNTY COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01665 |
| | Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | |
| Defendants. | |

## DEFENDANTS' MOTION FOR A TRIAL CONTINUANCE DUE TO
## THE COVID-19 PANDEMIC AND REQUEST FOR EXPEDITED CONSIDERATION

On May 11, when the Court set the trial date in this case, Kanawha County's rate of new Covid-19 cases was just 1.44 per 100,000 people, barely enough to rise into the yellow on the Harvard Global Health Institute's color-coded map (anything under 1 was green). Since late June, however, Covid cases here have soared.[1] Within the past week, the county's new-case rate rose to 29.75 per 100,000—***20 times higher*** than when the trial date was set, and more than double the

---

[1] *See* Harvard Global Health Institute, Risk Levels Downloadable Data (Microsoft Excel spreadsheet), https://globalepidemics.org/key-metrics-for-covid-suppression (last accessed October 2, 2020) (hereinafter "Harvard Data Spreadsheet").

national rate.[2]  Kanawha County's infection rate, in fact, is now higher than the rate that existed in New York City on May 11, when the Court scheduled the trial date—and when New York was still nearly a month away from lifting its total lockdown order.[3]  Kanawha County has spent most of the past two weeks in the red, a category for which the Harvard Institute says stay-at-home orders are necessary, and the county has seen double-digit rates—placing it in at least the orange category—since mid-August.[4]  With available ICU beds dwindling, county officials have been forced to request two field hospitals to provide extra treatment capacity in the event of a further surge.[5]  And public health experts expect things to get worse before they get better, projecting an autumn spike that will coincide with flu season and stretch already overburdened hospitals to the breaking point.[6]

---

[2] *See* Harvard Data Spreadsheet, *supra* note 1. The new-case metric is a rolling seven-day average of daily new Covid-19 cases per 100,000 residents.

[3] *See* Harvard Data Spreadsheet, *supra* note 1; *New York City is Expected to Open June 8, Cuomo Says*, New York Times, May 29, 2020, https://www.nytimes.com/2020/05/29/nyregion/coronavirus-new-york-live-updates.html.

[4] To determine when schools could open, West Virginia originally adopted a protocol tied to the Harvard Global Health Institute color-coding system.  In recent weeks, however, the Governor made a series of modifications to the criteria (adding, for example, a "gold" category that does not exist on the Harvard map); as a result, Kanawha County schools are set to reopen this week.  Public health experts have criticized the revised protocol, and the West Virginia Education Association has said it will sue the state over the recent changes. *See* Lucas Manfield & Gabriella Brown, *Harvard experts say state map is flawed*, Beckley Register-Herald, Sept. 19, 2020, https://www.register-herald.com/health/harvard-experts-say-state-map-is-flawed/article_24033edb-0696-5be3-8b1b-d0e79d72ad07.html; Brad McElhinny, *W. Va. teachers union says it's ready to sue over changes to virus map that determines school status*, wvmetronews.com, Sept. 29, 2020, https://wvmetronews.com/2020/09/29/w-va-teachers-union-says-its-ready-to-sue-over-changes-to-virus-map-that-determines-school-status.

[5] Moriah Davis, *Kanawha County requests two field hospitals to help fight COVID-19*, WOWK TV, Sept. 17, 2020, https://www.wowktv.com/news/kanawha-county-requests-two-field-hospitals-to-help-fight-covid-19. The request was described by Health Officer for the Kanawha-Charleston Health Department and by Kanawha County Commission President Kent Carper, whose law firm represents Plaintiffs in this case.

[6] *See* Lena H. Sun, *Covid-19: A bad flu season colliding with the pandemic could be overwhelming*, Wash. Post, Sept. 5, 2020, https://www.washingtonpost.com/health/covid-flu-season-collide/2020/09/04/23254d68-eb98-11ea-99a1-71343d03bc29_story.html.

The parties and the Court hoped that the local infection rate would remain low enough to permit a safe trial in October, but by now the reality is clearly otherwise.  The national events of the last few days only serve to underscore the risks of bringing together large groups of people from across the country who might unwittingly infect each other and could serve as a "super-spreader" event in Charleston.[7]  It is untenable and unduly risky to commence a 12-week trial involving scores of participants in a county where the Covid-19 rate is so persistently high that officials are requesting field hospitals.  Defendants are deeply concerned about asking their counsel, their staffs, company witnesses,  others who will necessarily be in attendance, and of course the families of everyone involved, to expose themselves to this life-threatening risk just now, when the health risks here and across the country are so acute.  The danger of a worst-case outcome for a trial participant or courthouse employee is simply too high right now to proceed with trial as scheduled.

Defendants therefore seek to continue trial until January 4, 2021, to allow time for the county's infection rate to subside and, it is hoped, for further progress to be made in treating and preventing Covid-19.  This modest continuance should avoid or minimize conflicts with other opioid trials involving these Defendants, which currently are scheduled to begin in March.

## I.    INTRODUCTION

Over the last eight months, the Covid-19 pandemic has profoundly changed the day-to-day lives of all Americans.  Covid-19 has led to tremendous disruption to our jobs and economy, our family and social relationships, our children's schooling, and our health care system.  Close to

---

[7] Zeynep Tufekci, *This Overlooked Variable Is the Key to the Pandemic: It's Not R,* The Atlantic, Sept. 30, 2020,       https://www.theatlantic.com/health/archive/2020/09/k-overlooked-variable-driving-pandemic/616548/ (noting that while "[m]uch is still unknown about the super-spreading of SARS-CoV-2 …. [i]n study after study, we see that super-spreading clusters of COVID-19 almost overwhelmingly occur in poorly ventilated, indoor environments where many people congregate over time ….").

7 million people in the country have been infected with Covid-19. And, as of September 22, 2020, more than 200,000 Americans have died from Covid-19.[8] Some epidemiologists estimate that the total could climb to 300,000 by the end of 2020.[9]

Following nationwide shutdowns, courts around the country have been struggling with when and how to reopen their doors safely to litigants. Many—including this Court—have recognized the special risks presented by trials, which necessarily require many people to gather together indoors, sometimes for an extended period of time. Given all of this, an October trial in this matter would be an especially risky venture. That is both because West Virginia is facing an increasing number of Covid-19 cases, which most experts predict will only get worse in the coming months, and because a trial in this case will be especially large, especially long, and especially complex. Indeed, having many dozens of people travel to West Virginia from all over the country for a six-week-long, all-day, indoor gathering with yet dozens of other participants from across West Virginia, all scheduled to coincide with the predicted second wave of the pandemic and the onset of the flu season is perhaps the riskiest scenario one could imagine.

An October trial will present serious health risks for all involved, and even for those who are not involved but have other business at the courthouse or come into contact with the many trial participants from across the country that will travel to this trial, as well as potentially insurmountable logistical challenges. The prospect of an October trial in these circumstances also raises many unanswered questions, including what will happen if and when someone involved with the trial (or even someone who lives with someone involved with the trial) displays symptoms of Covid-19 or worse still tests positive for the virus. And it will require trade-offs and decisions

---

[8] *The virus death toll in the U.S. surpasses 200,000*, N.Y. Times, Sept. 22, 2020, https://www.nytimes.com/2020/09/22/world/covid-coronavirus.html#link-19bfa512.

[9] *Id.*

by dozens of people regarding their willingness to appear at trial, which could significantly impact Defendants' ability to fairly defend themselves.  Reflecting the inherent obstacles of taking this case to trial at this time, Judge Goodwin recently granted a mistrial, with the parties' apparent agreement, a few days into a jury trial after concerns about possible Covid exposure arose.  *Sutphin v. Ethicon, Inc.*, Civil Action No. 2:14-cv-01379, ECF No. 405 (Sept. 18, 2020).

There is no compelling reason to press forward with this trial in October that outweighs this overwhelming and potentially increasing risk.  Defendants respectfully request that the Court delay the trial until January 4, 2021 when it hopefully can proceed in a safe fashion and in circumstances that will avoid the risk that any or all of the parties will be unable to fully and fairly present their case.

## II.    ARGUMENT

### A.    The Covid-19 Virus Presents an Unacceptable Health Risk to All Involved in the Upcoming Trial

Our collective understanding of the Covid-19 virus has advanced significantly over the past several months, and is continuing to advance.  There is much we know, and much we don't yet understand.  But what we do know now creates a serious cause for concern as it relates to this trial:

*Infected individuals often unwittingly spread the virus without knowing they are sick.*

- The median incubation period for Covid-19 is 4 to 5 days, but it can extend to 14 days.[10] This means that a person who has been exposed to Covid-19 will typically not display symptoms until 4 to 5 days later.  And certain individuals may not display symptoms until up to two weeks later.  During this time, the individual may have no idea they have been infected and could be infecting others.

---

[10] CDC, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed Oct. 4, 2020).

- Indeed, research has shown that much of the spread is caused by individuals transmitting the virus up to three days *before* they show symptoms.[11]

- Moreover, in many cases, individuals with Covid-19 are asymptomatic, meaning that the individual never develops symptoms and may never realize he or she is infected and infectious.[12]   Estimates of the percentage of infected individuals who are asymptomatic have ranged from 20% to as high as 50%.[13]

- Asymptomatic transmission poses even greater risks because without the later onset of symptoms, the individual does not know to alert others of their possible exposure.

**Covid-19 symptoms are varied, common, and easily confused with other illnesses.**

- The CDC's list of possible Covid-19 symptoms continues to grow, and includes many symptoms that can be confused with the flu, the common cold, and seasonal allergies. Testing may be needed to confirm whether someone has Covid-19 or another of these illnesses.[14]

- Symptoms can include:  fever or chills; cough; shortness of breath or difficulty breathing; fatigue; headache; nasal congestion or runny nose; muscle or body aches; sore throat; new loss of smell or taste; nausea or vomiting; and diarrhea.[15]  The CDC has cautioned that this list is not exhaustive.

- This overlap with other illnesses has two notable consequences.  First, people may mistakenly believe they have a cold when they actually have Covid-19, and may not take the necessary precautions based on that false belief.  And second, anyone with any of these numerous symptoms may need to quarantine or be tested.

**The chances of infection are highest when groups of people congregate indoors, in close proximity, for long periods of time.**

- "COVID-19 is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs,

---

[11] Apoorva Mandavilli, *'A Smoking Gun': Infectious Coronavirus Retrieved From Hospital Air*, N.Y. Times, Aug. 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html?.

[12] CDC, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html         (last accessed Oct. 4, 2020).

[13] Dennis Thompson, *4 Out of 5 People With COVID-19 Will Develop Symptoms: Study*, U.S. News, Sept. 22, 2020, https://www.usnews.com/news/health-news/articles/2020-09-22/4-out-of-5-people-with-covid-19-will-develop-symptoms-study.

[14] CDC, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing /symptoms.html (last accessed Oct. 4, 2020).

[15] *Id.*

or talks. Infectious droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs."[16]

- Covid-19 is more transmissible in indoor, poorly-ventilated spaces than in outdoor spaces.[17]

- The longer someone spends in proximity to someone infected with Covid-19, the greater the chances that person will become infected themselves.[18]

- Covid-19 outbreaks have been associated with large gatherings, including "super spreader" events, where a single gathering can lead to tens of thousands of infections around the country.[19]

Equally relevant and potentially of even greater concern is what we do not yet know about the Covid-19 virus.  There are several critical questions about Covid-19 that remain unanswered. These include:

- ***Is Covid-19 airborne?  Probably.*** New evidence suggests that "aerosols contain live virus" that can travel up to 16 feet—and even farther through HVAC systems.[20]   A recent article in Time concluded that "the evidence overwhelmingly supports aerosol transmission" of Covid-19.[21]   Aerosol transmission would be a third method of transmission, in addition to transmission via contact with surfaces and through exposure to droplets.  "'Aerosol' (sometimes referred to as 'airborne') transmission is

---

[16] CDC, *COVID-19 Overview and Infection Prevention and Control Priorities in non-US Healthcare Settings*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/overview/index.html   (last accessed Oct. 4, 2020).

[17] CDC, *Deciding to Go Out*, https://www.cdc.gov/ coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html; Zeynep Tufekci, *This Overlooked Variable Is the Key to the Pandemic: It's Not R,* The Atlantic, Sept. 30, 2020, https://www.theatlantic.com/health/archive/2020/09/k-overlooked-variable-driving-pandemic/616548/.

[18] *Id.*

[19] Carl Zimmer, *One Meeting in Boston Seeded Tens of Thousands of Infections, Study Finds*, N.Y. Times, Aug. 26, 2020, https://www.nytimes.com/ 2020/08/26/health/covid-19-superspreaders-boston.html; Zeynep Tufekci, *This Overlooked Variable Is the Key to the Pandemic: It's Not R,* The Atlantic, Sept. 30, 2020,    https://www.theatlantic.com/health/archive/2020/09/k-overlooked-variable-driving-pandemic/ 616548/.

[20] Apoorva Mandavilli, *'A Smoking Gun': Infectious Coronavirus Retrieved From Hospital Air*, N.Y. Times, Aug. 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html?.

[21] Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, Time, Aug. 25, 2020,  https://time.com/5883081/covid-19-transmitted-aerosols/.

similar to droplet transmission, except that the bits of fluid are so small that they can linger in the air for minutes to hours."[22]

- ***Is six feet enough space to social distance?  Maybe not.***  A recent analysis in the BMJ argues that six feet may not be enough space to avoid droplet transmission.[23]  More space may be necessary depending on several factors, including "air circulation, ventilation, exposure time, crowd density, whether people are wearing face masks and whether they are silent, speaking, shouting or singing." [24]

- ***Is Covid-19 becoming more contagious?  Possibly.***  A recent, extensive study of Covid-19 in the United States found that the virus has undergone numerous mutations over the last several months, "one of which may have made it more contagious."[25]  One expert who reviewed the study said that "the findings point to the strong possibility that the virus, as it has moved through the population, has become more transmissible, and that this 'may have implications for our ability to control it.'" [26]

- ***Will there be a "second wave" in the fall and winter?  Likely yes.***  "Infectious-disease experts are warning of a potential cold-weather surge of coronavirus cases — a long-feared 'second wave' of infections and deaths, possibly at a catastrophic scale."[27]

- ***How will the Covid-19 pandemic overlap with the seasonal flu?  Poorly.***  Public health experts fear that the Covid-19 pandemic could collide with the seasonal flu this fall and winter, resulting in a "twindemic" that could overwhelm hospital systems.[28]  "Even a mild flu season could stagger hospitals already coping with Covid-19 cases."[29]

In short, the information we have about Covid-19 is deeply concerning:  people showing

no symptoms can transmit the virus, the symptoms are wide-ranging and common, the risk of

---

[22] *Id.*

[23] Ben Guarino, *Six feet may not be enough to protect against coronavirus, experts warn*, Wash. Post, Aug. 27, 2020,  https://www.washingtonpost.com/health/2020/08/27/coronavirus-social-distancing-6-feet/.

[24] *Id.*

[25] Chris Mooney, *et al.*, *Massive genetic study shows coronavirus mutating and potentially evolving amid rapid U.S. spread*, Wash. Post, Sept. 23, 2020, https://www.washingtonpost.com/health/2020/09/23/houston-coronavirus-mutations/.

[26] *Id.*

[27] Joel Achenbach & Rachel Weiner, *Experts project autumn surge in coronavirus cases, with a peak after Election Day*, Wash. Post, Sept. 5, 2020, https://www.washingtonpost.com/health/coronavirus-fall-projections-second-wave/2020/09/04/6edb3392-ed61-11ea-99a1-71343d03bc29_story.html.

[28] Jan Hoffman, *Fearing a 'Twindemic,' Health Experts Push Urgently for Flu Shots*, N.Y. Times, Aug. 16, 2020, https://www.nytimes.com/2020/08/16/health/coronavirus-flu-vaccine-twindemic.html.

[29] *Id.*

infection is higher indoors and increases with longer exposure, and outbreaks are associated with large gatherings. The information we don't yet have can only serve to make the situation worse—likely airborne transmission of a potentially even-more transmissible virus, which may escalate during fall and winter and overlap disastrously with the impending flu season.

### B.    West Virginia's Increasing Infection Rates Make it Unsuitable for a Large Trial

Over the last eight months, States across the country and their residents have alternatively fared better and worse with the Covid-19 virus. Unfortunately, the situation has recently become increasingly more acute and more dangerous in West Virginia. Since August 27, 2020, West Virginia's seven-day average for reported cases has more than doubled—from an average of 93 cases per seven days, to an average of 187 cases.[30] The situation is especially troublesome in Kanawha County, which has repeatedly fluctuated between West Virginia's "orange" and "red" status during the month of September.[31] And, as recently as September 25, a news outlet reported that: "Gov. Jim Justice announced the 330th death in West Virginia from Covid-19 during Friday's briefing. It wasn't just the 11 deaths in the past day that officials discussed. The speed at which Covid -19 has been ramping up drew some concern."[32]

Other states have expressed concern with the infection rates in West Virginia. For example, as of September 23, 2020, West Virginia was on the quarantine lists for Washington, D.C., New York, Massachusetts, New Jersey, and Connecticut—meaning that anyone (including

---

[30] The New York Times, *The Coronavirus Outbreak, West Virginia Covid Count and Casemap* (Interactive), N.Y. Times, https://www.nytimes.com/interactive/2020/us/west-virginia-coronavirus-cases.html (last accessed October 4, 2020).

[31] West Virginia Department of Health & Human Resources, Coronavirus Disease 2019 (COVID-19), https://dhhr.wv.gov/COVID-19/Pages/default.aspx (last accessed October 4, 2020).

[32] Paul Giannamore, *Speed of Covid Deaths in West Virginia Drawing Concern*, WTOV9 Fox, Sept. 25, 2020, https://wtov9.com/news/local/speed-of-covid-deaths-in-west-virginia-drawing-concern.

many counsel in this case) who travels to those states from West Virginia must quarantine for 14 days upon arrival or return. That includes large numbers of counsel who will not be able to return home without a 14-day quarantine. (Earlier in the pandemic, West Virginia had imposed the same restrictions on travelers from several of those states, and if such a restriction is re-imposed, it could vastly complicate witness availability.)

For its part, this Court has repeatedly expressed concern over the Covid-19 pandemic. In March, the Court issued General Order No. 3, postponing all trials.[33] The Court explained: "Preventing the spread of the COVID-19 pandemic requires limiting public contact to essential matters. Participants in court proceedings are necessarily often in close proximity to each other." The Court also noted that "West Virginia has a relatively high elderly population and greater incidence of other medical conditions that can make individuals more vulnerable to the virus."

While the Court did subsequently allow operations to resume with precautions in place, the Court recently has had to adjust protocols again in light of the changing course of the pandemic. In General Order No. 9, issued on September 18, 2020, the Court wrote:

> The Court further finds that over the past few weeks, ***the presence of the virus in the community has increased***. According to figures available from the West. Virginia Department of Health and Human Resources as well as other public health authorities, ***daily positive case counts have increased significantly, hospitalizations and deaths have increased, and a majority of the counties that comprise the Southern District of West Virginia are considered to be at a higher risk level for indoor in-person activities***.[34]

The Court accordingly continued all jury trials until further order of the Court. In reaching this decision, the Court explained that "Petit jury trials and grand jury meetings, in particular, require

---

[33] General Order No. 3 (S.D.W.V. Misc. Case No. 2:20-mc-00052) (Mar. 23, 2020).

[34] General Order No. 9 (S.D.W.V. Misc. Case No. 2:20-mc-00052) (Sept. 18, 2020) (emphasis added).

large groups of individuals from throughout the district to travel and assemble indoors, often in close proximity to each other."

Simply put, now is not the time for a large trial in West Virginia.

### C.      A Trial in this Matter Would Present Unique Problems and Risks

As the Court is aware, this is not a typical case and will not be a typical trial—in terms of size, duration, and complexity.  All of these factors will dramatically compound the serious risks associated with proceeding to trial at this time.

*Size of the trial.*  This case is filed by two governmental plaintiffs against three corporate defendants.  Each party necessarily has large legal teams.  And among the five parties, more than 200 individuals have been included on witness lists.  Indeed, Plaintiffs' witness list alone includes more than 100 individuals that they either will or may call live, with more than half of them classified as "will call."  The parties also have trial consultants, including technical support, who will need to be in the courtroom.  This is all in addition to the Court and the Court's staff.  Even assuming the Court caps the size of the parties' courtroom legal teams (for example, five people per party has been suggested), there still will be dozens of individuals in the courtroom— and more coming in and out of the courthouse—on a regular basis.  And, on top of that, a cap on the number of individuals in the courtroom will not limit the overall universe of individuals interacting with the trial team on a day-to-day basis.  Each party will have large teams of lawyers, paralegals, and other support staff in remote work spaces nearby.[35]

---

[35] Initially, the Court indicated that each side would have a separate courtroom within the courthouse where additional counsel and staff could view the trial via livestreaming.  On October 1, 2020, the Court advised that this accommodation would no longer be provided, due to health concerns.  Nevertheless, Defendants understand that counsel for all parties has secured nearby workspace for their additional team members, who will come into contact daily with those attending the trial in the courtroom.

***Indoor setting of the trial.***  The trial will necessarily take place indoors in a courtroom with no windows.  The individuals in the courtroom will not always be able to maintain six feet of distance between them—if that is even sufficient.  For example, members of the same legal team will need to be able to privately converse in real time with each other, which requires very close contact between two or more people.  And when lawyers and witnesses are speaking, the Court has indicated that they will not be wearing a mask.  Even if the individual speaking is more than six feet away from others, this is concerning in light of the recent evidence of airborne transmission—especially in an indoor setting.

The challenges will not end outside the courtroom.  Simply getting into and around the courthouse will present unique challenges, as individuals have to wait in the security line and then ride elevators.  Routine activities like using the restroom during a break or eating lunch will require far more time and planning than they usually would, and would present still greater risk of exposure throughout the day—day after day.  That risk will extend not just to the dozens of parties involved in this case, but also to other judges and parties who may be required to be in the courthouse to address emergent or time-sensitive matters.

***Geographic diversity of the participants.***  While each party has West Virginia counsel, each party also has counsel from outside West Virginia.  These out-of-state lawyers will be both in the courtroom and in the remote working rooms.  The trial will easily involve more than 100 people traveling to Charleston from all over the country, and back again, over a four month period, all during the predicted "second wave."  And that is just the legal teams.  There will also be dozens of witnesses traveling to court from all over the country.  For example, the parties' expert witnesses alone come from ***seventeen*** different states.

**Duration of the trial.**  The Court's current schedule contemplates six weeks of trial, followed by a five week break (at which time everyone would return to their home states to spend the end of year holidays with their loved ones, further increasing the risk of viral spread), and then an additional six weeks of trial.  This is a very long time to be exposed to such a large group of people.  This is especially true because trial necessarily involves long days.  The risk of infection is further compounded because everything related to the trial—the trial itself, the working rooms, and even dining, given that it will be fall and winter—will necessarily take place indoors.  As set forth above, prolonged, indoor exposure is the most risky.  Indeed, this scenario is would fall in the CDC's highest risk by category:  "a "[l]arge in-person gathering[] where it is difficult for individuals to remain spaced at least 6 feet apart and attendees travel from outside the local area."[36]

**Traveling to and Staying in Charleston.**  As noted above, many dozens of lawyers and witnesses will all need to travel to Charleston from other counties and other states.  During the Covid-19 pandemic, this once simple task will become enormously complex and risky.  The CDC has stated that "[t]ravel increases [the] chance of getting and spreading COVID-19."[37]  Many of the trial participants live too far to drive to Charleston.  But there are risks associated with commercial air travel.  The CDC has explained that "[a]ir travel requires spending time in security lines and airport terminals, which can bring you in close contact with other people and frequently touched surfaces" and that "social distancing is difficult on crowded flights, and sitting within 6 feet of others, sometimes for hours, may increase your risk of getting COVID-19."[38]  These risks are compounded when travelers must make a connection at a different airport, which is often then

---

[36]   CDC, *Considerations for Events and Gatherings*, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html (last accessed Oct. 4, 2020)

[37]  CDC, *Travel during the COVID-19 Pandemic*, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last accessed Oct. 4, 2020).

[38]  *Id.*

case when traveling to Charleston.  Traveling by car is not risk-free either, especially on a longer trip (for example, the 7-hour drive from Philadelphia), where individuals risk exposure at gas stations and rest stops.

The risk is not over when the trial teams and witnesses have arrived in Charleston.  Most of the lawyers and witnesses will be living in a small number of hotels, where they will have constant contact with each other, as well as exposure to hotel lobbies, elevators, staff, other guests, and those preparing food.  Even if the trial participants forego the occasional trip home to see family, there is a profound risk of exposure to Covid-19 in these circumstances.

### D. Significant Questions Remain About Safety Protocols During Trial

With a trial of this size and duration, simple precautions like wearing masks, frequent handwashing, and maintaining six feet of space (where possible) will not be enough.  There is much more that will be needed to protect the health and lives of the participants, which raises even more questions.

*What safety protocols will the Court and trial teams follow?*  Defendants have sought guidance from Covid-19 experts to design protocols to keep their trial teams as safe as possible. Such protocols can include use of various forms of personal protective equipment; frequent cleaning and disinfection of work spaces, living spaces and vehicles; special air filtration devices; food safety measures; and periodic testing of individuals for Covid-19.  But as recent experience within the tightly-controlled world of professional sports has shown, an issue with one team's safety protocols can have a ripple effect on others.  All the precautions taken by one trial team in this case can be easily and swiftly upended by one or two individuals on another trial team who contract Covid-19 but are asymptomatic-but-contagious—or who become actually symptomatic, but for whatever reason, do not reveal their symptoms or diagnosis to others working on the trial.

*What will happen when someone is symptomatic or tests positive for Covid-19?*  It is unavoidable that someone—be it trial teams, war room teams, support staff, a witness, the Court staff, or a family member of any of these individuals—will exhibit one or more symptoms of Covid-19 during trial.  People will have headaches, and they will get colds. When that happens, will the person be required to report their (or their family member's) symptoms to the Court and all participants?  Will the trial be put on hold until the individual's diagnosis is confirmed?  And what will happen if someone tests positive for Covid-19?  Will everyone involved in the trial be placed under quarantine, and for how long?  Will everyone be required to undergo testing?  How will that testing be provided?  What notifications or contact tracing will be required for others who may have been in the courthouse at the same time?

An example illustrates the problem: if a paralegal for one of the parties has a cough, protocols would require that everyone he or she came into contact with quarantine until a test is complete.  That person and all other trial participants would return to their hotel rooms or homes (although travel restrictions prevent such a return for many) and wait for a test result, trial is shut down for a period of days in the interim.  Given the size and complexity of this trial during winter, this scenario is not hypothetical, but inevitable and will happen repeatedly.  Further, if counsel were to become ill or have Covid-19, a far more extended shut down will be unavoidable.

These issues present serious privacy and safety concerns for all involved.  And they could lead to numerous and prolonged delays to the trial schedule, which could be very disruptive and costly to the court and the parties alike.

### E.     There is No Reason to Disregard the Numerous Risks Associated with an October Trial in this Matter

Everything we know, as well as what we don't know—about this virus, about this jurisdiction, and about this case—counsel *against* proceeding to trial in October.  The Court has

prudently suspended all jury trials because of the pandemic.  The fact that this case is a non-jury trial is a distinction without a difference.  In describing the risks associated with jury trials, the Court explained that they involve "large groups of individuals from throughout the district to travel and assemble indoors, often in close proximity to each other."  This description is equally applicable to this case—except that this trial will involve individuals from around the country and not just the district.

Plaintiffs no doubt will respond to this Motion by accusing Defendants of using the Covid-19 pandemic as an excuse to delay the trial.  This is not the case.  To the contrary, Defendants have participated in discovery in this matter on a compressed schedule with diligence and haste—a statement that Special Master Wilkes would no doubt agree with.  In the past 5 months, for example, Defendants have taken more than 100 depositions.  Defendants have also been working exhaustively on summary judgment motions and pre-trial submissions like witness lists, exhibit lists, and *Daubert* motions.

This Motion is filed in response only to the risks presented by the Covid-19 pandemic.  Covid-19 poses serious risks that to all who are involved, but even greater risks to some.  There are individuals at higher risk for Covid-19 infection among Defendants' trial teams, their in-house counsel, their employee witnesses, their expert witnesses, as well as among the many other courthouse personnel who unavoidably will be impacted by the activities in the courthouse.  These include people over the age of 65 and people with preexisting health conditions.  Separate and apart from this trial, each Defendant also has travel restrictions and other pandemic-related policies in place that would forbid attendance by their employees at an event like this trial.  Moving forward with this trial at this time forces all of these individuals to choose between their own and their families' health and safety, on the one hand, and the defense of their employer or client in this

large, important trial, on the other.  Many individuals would need to quarantine for fourteen days upon returning home, either as mandated by state law or based on simple caution.  Certain such individuals undoubtedly will not be able to attend trial because the risk or burden is simply too great, and that will compromise Defendants' ability to fairly defend themselves.

Moreover, this is not a case that requires expedited treatment.  This is not a criminal matter that raises "speedy trial" concerns and Plaintiffs do not seek injunctive or emergency relief. Moreover, neither Plaintiff opposed transfer of their cases to the MDL, and were thus aware of and accepted the fact that there would likely be a significant passage of time before their cases proceeded to trial, if ever.

Recognition that this trial is too risky at this particular phase of the Covid-19 pandemic does not mean that work on this case would ground to a halt.  There is much that can be done in the meantime, including additional trial preparation and pre-trial work.  For example, the parties could make additional progress on evidentiary issues and deposition designations.  If the Court rules on pending motions regarding summary judgment or other issues, the scope of the case could be narrowed or adjusted to respond to those rulings.  The parties could also collaborate on health and safety protocols so that this trial can be rescheduled as quickly as possible, without the present uncertainty as to how to keep all involved safe and how to respond when individuals are symptomatic or test positive for Covid-19.

As the Court is aware, there are many different opioid matters proceeding through litigation across the country.  The schedules in many of those active cases have recently been adjusted, based in whole or in part on issues related to the Covid-19 pandemic.[39]  A continuance of this matter

---

[39] For example, the First Judicial District Court in Santa Fe, New Mexico recently observed that a September 2021 opioid trial date in a case brought by the New Mexico Attorney General was not realistic in light of the Covid-related docket backlog in that court, limitations on physical space where a trial of this magnitude could proceed safely, and the practical problems of social distancing during the trial of such a large,

until January 4 should not cause scheduling difficulties for the parties, since all currently are planning to have trial teams in Charleston through at least mid-February.  To the extent there are other trials set to start during the month of March 2021,[40] Defendants submit that the overlap between this trial and those matters will be handled in the same way Defendants were preparing to proceed to trial beginning on October 19 in both this case and *State of OH v. McKesson Corp., et al*.  Furthermore, the resolution of various legal issues pending before the Court may streamline the case in ways that allow it to be tried in less than the 12 weeks currently allotted.

## III.    CONCLUSION

This case, and the issues it raises, are undoubtedly important—to Plaintiffs and Defendants alike.  That importance, however, does not justify disregarding public health guidance and subjecting hundreds of people to unnecessary risk.  That is especially true because we still have much to learn about Covid-19, and because this pandemic is poised to enter a dangerous new phase.  Defendants respectfully urge the Court to grant this Motion for a trial continuance until January 4, 2021, the date currently scheduled for the commencement of the second phase of the trial.

Given the rapidly-approaching trial, Defendants respectfully request that the Court issue a decision on this motion by Friday, October 9, 2020.

---

complex case.  The judge moved that trial date to September 2022.  Courts in Alaska, Missouri, Washington State, and Texas have also postponed trial dates in opioid cases by 9, 8, 7, and 5 months respectively, for similar reasons.

[40] There are two trials currently set to begin in March 2021.  One is the action brought by the Ohio Attorney General, which had been set to commence on the same date as this trial, but recently was continued until March 8.  Defendants were preparing to try both of those cases at the same time.  The second is the consolidated action in the West Virginia Mass Litigation Panel, currently set to start on March 21. Defendants already filed a motion to continue that matter to the fall of 2021, based on delays in discovery. The MLP currently has that motion under advisement.

Dated:  October 5, 2020                                      Respectfully submitted,

**AMERISOURCEBERGEN DRUG CORPORATION**

/s/ Robert A. Nicholas                                       /s/ Gretchen M. Callas
Robert A. Nicholas                                           Gretchen M. Callas (WVSB #7136)
Shannon E. McClure                                           **JACKSON KELLY PLLC**
**REED SMITH LLP**                                           Post Office Box 553
Three Logan Square                                           Charleston, West Virginia 25322
1717 Arch Street, Suite 3100                                 Tel: (304) 340-1000
Philadelphia, PA 19103                                       Fax: (304) 340-1050
Tel: (215) 851-8100                                          gcallas@jacksonkelly.com
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

**CARDINAL HEALTH, INC.**

/s/ Steven R. Ruby                                           /s/ Enu Mainigi
Michael W. Carey (WVSB No. 635)                              Enu Mainigi
Steven R. Ruby (WVSB No. 10752)                              F. Lane Heard III
David R. Pogue (WVSB No. 10806)                              Ashley W. Hardin
Raymond S. Franks II (WVSB No. 6523)                         Jennifer G. Wicht
**CAREY DOUGLAS KESSLER & RUBY**                             **WILLIAMS & CONNOLLY LLP**
**PLLC**                                                     725 Twelfth Street NW
901 Chase Tower, 707 Virginia Street, East                   Washington, DC 20005
P.O. Box 913                                                 Tel: (202) 434-5000
Charleston, WV 25323                                         Fax: (202) 434-5029
Telephone: (304) 345-1234                                    emainigi@wc.com
Facsimile: (304) 342-1105                                    lheard @wc.com
mwcarey@csdlawfirm.com                                       ahardin@wc.com
sruby@cdkrlaw.com                                            jwicht@wc.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

**MCKESSON CORPORATION**

/s/ Jeffrey M. Wakefield                                     /s/ Timothy C. Hester
Jeffrey M. Wakefield (WVSB #3894)                            Timothy C. Hester
jwakefield@flahertylegal.com                                 Paul W. Schmidt
Jason L. Holliday (WVSB #12749)                              Christian J. Pistilli
jholliday@flahertylegal.com                                  Laura Flahive Wu
**FLAHERTY SENSABAUGH BONASSO**                              **COVINGTON & BURLING LLP**
**PLLC**                                                     One CityCenter
P.O. Box. 3843                                               850 Tenth Street NW
Charleston, WV 25338-3843                                    Washington, DC 20001

Telephone: (304) 345-0200

Tel: (202) 662-5324
thester@cov.com
pschmidt@cov.com
cpistilli@cov.com
lflahivewu@cov.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on this 5th day of October, 2020, the foregoing ***Defendants' Motion for a Trial Continuance Due to the Covid-19 Pandemic and Request for Expedited Consideration*** was served upon counsel of record electronically.


<u>*/s/ Gretchen M. Callas*</u>
Gretchen M. Callas (WVSB #7136)