# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON,**
     **Plaintiff,**
**v.**                                     **Civil Action No. 3:17-cv-01362**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
     **Defendants.**

_____

**CABELL COUNTY COMMISSION,**
     **Plaintiff,**                          *Consolidated case:*
**v.**                                     **Civil Action No. 3:17-cv-01665**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
     **Defendants.**

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO JOINT MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO PROVE FAULT ELEMENT OF PUBLIC NUISANCE CLAIMS

October 6, 2020

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION .............................................................................................. 1

ARGUMENT ................................................................................................... 1

I.   IN WEST VIRGINIA, A PUBLIC NUISANCE IS BASED ON UNREASONABLE
     CONDUCT. ...................................................................................... 1

II.  DISPUTED ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF
     DEFENDANTS' INTENTIONAL CONDUCT. ............................................... 3

III. PLAINTIFFS' NUISANCE CLAIMS MAY BE BASED ON DEFENDANTS' UNLAWFUL
     CONDUCT. ...................................................................................... 9

     A.   Plaintiffs Need Not Establish that Defendants Were Negligent or
          Owed Duties to Plaintiffs. ...................................................... 9

     B.   The CSA and WVCSA Require Defendants To Maintain
          Effective Controls against Diversion. ..................................... 10

          1.   *Plaintiffs Do Not Seek To Enforce the CSA.* ........................... 10

          2.   *The CSA and WVCSA Require Defendants To Identify and
               Report Suspicious Orders and To Block Shipments Pending
               Investigation.* ............................................................. 12

     C.   Plaintiffs' Claims Based on Defendants' Failure To Maintain
          Effective Controls Against Diversion Are Not Preempted. ................. 16

IV.  SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANTS' NEGLIGENT CONDUCT IS
     NOT WARRANTED BECAUSE PLAINTIFFS ARE NOT REQUIRED TO PROVE
     DEFENDANTS OWED PLAINTIFFS A DUTY. ............................................. 19

CONCLUSION ................................................................................................ 22

i

## TABLE OF AUTHORITIES

*Page*

### CASES

*Astra USA, Inc. v. Santa Clara Cty., Cal.*,
 563 U.S. 110 (2011) ........................................................................................................11

*Bansbach v. Harbin*,
 728 S.E.2d 533 (W. Va. 2012) ........................................................................................3

*Barker v. Naik*,
 No. 2:17-CV-04387, 2018 WL 3824376 (S.D.W. Va. Aug. 10, 2018) (Johnston,
 C.J.) ..................................................................................................................................1

*Bausch v. Stryker Corp.*,
 630 F.3d 546 (7th Cir. 2010) ........................................................................................19

*Bragg v. United States*,
 741 S.E.2d 90 (W. Va. 2013) ........................................................................................21

*Buckman Company v. Plaintiffs' Legal Committee*,
 531 U.S. 341 (2001) ......................................................................................................19

*Callihan v. Surnaik Holdings of WV, LLC*,
 No. 2:17-CV-04386, 2018 WL 6313012 (S.D.W. Va. Dec. 3, 2018) ...............................1

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ......................................................................................................20

*City and County of San Francisco v. Purdue Pharma L.P.*,
 No. 3:18-CV-07591-CRB, 2020 WL 5816488 (N.D. Cal. Sept. 30, 2020)................13, 16

*City of Bos. v. Purdue Pharma, L.P.*,
 No. 1884CV02860, 2020 WL 977056 (Mass. Super. Jan. 31, 2020) ..............................22

*Desiano v. Warner-Lambert & Co.*,
 467 F.3d 85 (2d Cir. 2006), *aff'd sub nom. Warner-Lambert Co., LLC v. Kent*, 552
 U.S. 440 (2008) ..............................................................................................................19

*Duff v. Morgantown Energy Assocs. (M.E.A.)*,
 421 S.E.2d 253 (W. Va. 1992) .....................................................................................1, 2

*Flanagan v. Gregory & Poole*,
 67 S.E.2d 865 (W. Va. 1951) ........................................................................................20

*Hendricks v. Stalnaker*,
　　380 S.E.2d 198 (W. Va. 1989) ....................................................................2, 3

*In re Flood Litig.*,
　　607 S.E.2d 863 (W. Va. 2004) ..................................................................2, 21

*In re Nat'l Prescription Opiate Litig.*,
　　No. 1:17 MD 2804, 2019 WL 4178591 (N.D. Ohio Sept. 3, 2019) ..........16, 19

*In re Nat'l Prescription Opiate Litig.*,
　　No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ...............22

*In re Opioid Litigation*,
　　No. 4000002017, 2018 WL 4827862 (N.Y. Sup. Ct. July 17, 2018) ..............22

*Kizer v. Harper*,
　　561 S.E.2d 368 (W. Va. 2001) .......................................................................21

*Lemongello v. Will Co.*,
　　No. CIV.A. 02-C-2952, 2003 WL 21488208 (W. Va. Cir. Ct. June 19, 2003)
　　(Berger, J.) ...............................................................................................2, 22

*Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*,
　　861 F.3d 206 (D.C. Cir. 2017) ..................................................................12, 15

*Pollard v. United States*,
　　166 F. App'x 674 (4th Cir. 2006) ....................................................................20

*Reed v. Smith Lumber Co.*,
　　268 S.E.2d 70 (W. Va. 1980) ..........................................................................20

*Rhodes v. E.I. du Pont de Nemours and Company*,
　　657 F.Supp.2d 751 (S.D. W.Va. 2009) .............................................................1

*Robertson v. LeMaster*,
　　301 S.E.2d 563 (W. Va. 1983) ........................................................................20

*Sharon Steel Corp. v. City of Fairmont*,
　　334 S.E.2d 616 (W. Va. 1985) ..........................................................................1

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*,
　　No. 12-C-141, 2014 WL 12814021 (W. Va. Cir. Ct. Dec. 12, 2014).......1, 2, 21, 22

*Stengel v. Medtronic, Inc.*,
　　704 F.3d 1224 (9th Cir. 2013) (*en banc*) ........................................................19

*United States v. Moore*,
  423 U.S. 122 (1975) ................................................................................21

*West v. National Mines Corp.*,
  285 S.E.2d 670 (W. Va. 1981), *reh'g on appeal*, 336 S.E.2d 190 (W. Va. 1985) ...............2

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ................................................................................18

*Yourtee v. Hubbard*,
  474 S.E.2d 613 (W. Va. 1996) ................................................................20

## STATUTES

21 U.S.C. § 801 ................................................................................21

21 U.S.C. § 812 ................................................................................4

21 U.S.C. § 823 ................................................................................14

21 U.S.C. § 903 ................................................................................17, 18

W.VA. CODE § 7-1-3kk ................................................................................10

W.VA. CODE § 8-12-2 ................................................................................11

W.VA. CONST. art. 6, sec. 39a ................................................................................10, 11

## OTHER AUTHORITIES

21 C.F.R. § 1301.71 ................................................................................12, 13, 14

21 C.F.R. § 1301.74 ................................................................................12, 13, 14

"Dispensing Controlled Substances for the Treatment of Pain,"
  71 Fed. Reg. 52716-01, 2006 WL 2540907 (Sept. 6, 2006) ................................17, 18

*Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.*,
  2016 WL 1321983 (D.C. Cir. April 4, 2016) ................................................................22

PL 115-271, § 3272 ................................................................................15

RESTATEMENT (SECOND) OF TORTS § 8A ................................................................................3

RESTATEMENT (SECOND) OF TORTS § 821B ................................................................1, 2, 9, 14

RESTATEMENT (SECOND) OF TORTS § 821C ................................................................................10

RESTATEMENT (SECOND) OF TORTS § 822 .................................................................................2

RESTATEMENT (SECOND) OF TORTS § 825 .................................................................................3

*Southwood Pharmaceuticals, Inc.; Revocation of Registration,*
   72 FR 36487-01, 2007 WL 1886484 (DEA July 3, 2007)....................................12, 13, 15

## INTRODUCTION

Defendants contend that Plaintiffs cannot satisfy the fault element of their public nuisance claims because: (i) there is no evidence Defendants acted intentionally; (ii) Defendants owed no common law duty to Plaintiffs; and (iii) the Controlled Substances Act ("CSA") and the West Virginia Controlled Substances Act ("WVCSA") impose no actionable duties on Defendants. Each of these arguments is without merit and should be rejected. First, there is substantial evidence of Defendants' intentional misconduct. Additionally, under West Virginia law, a public nuisance claim can be based on a defendant's unlawful conduct (*e.g.*, Defendants' violations of the CSA/WVCSA). Finally, Plaintiffs need not establish that Defendants owed them a duty. Under West Virginia law, everyone owes an absolute duty not to create or maintain a public nuisance. Defendants' motion should be denied.

## ARGUMENT

### I.   IN WEST VIRGINIA, A PUBLIC NUISANCE IS BASED ON UNREASONABLE CONDUCT.

Defendants claim that public nuisance liability can only be based on intentional, negligent, or abnormally dangerous conduct. That is incorrect. Courts in West Virginia have adopted the definition of "public nuisance" set forth in § 821B of the Restatement (Second) of Torts ("Restatement"):[1] "A public nuisance is an unreasonable interference with a right

---

[1] *See Duff v. Morgantown Energy Assocs. (M.E.A.)*, 421 S.E.2d 253, 257 n.6 (W. Va. 1992); *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 620 (W. Va. 1985); *State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, No. 12-C-141, 2014 WL 12814021, at *9 (W. Va. Cir. Ct. Dec. 12, 2014); *Rhodes v. E.I. du Pont de Nemours and Company*, 657 F.Supp.2d 751, 768 (S.D. W.Va. 2009); *Barker v. Naik*, No. 2:17-CV-04387, 2018 WL 3824376, at *3 (S.D.W. Va. Aug. 10, 2018) (Johnston, C.J.); *see also Callihan v. Surnaik Holdings of WV, LLC*, No. 2:17-CV-04386, 2018 WL 6313012, at *5 (S.D.W. Va. Dec. 3, 2018).

common to the general public." RESTATEMENT § 821B(1) (1979).[2]  Thus, in West Virginia, the touchstone of public nuisance liability is unreasonableness.[3]  An unreasonable interference can be based on conduct that is intentional or negligent (*see, e.g.,* RESTATEMENT § 821B(2)(iii); *infra* at § II & § IV), but it need not be. In particular, public nuisance liability may also be based on unlawful conduct, regardless of *mens rea*. *See, e.g.,* RESTATEMENT § 821B(2)(ii) (noting that circumstances "that may sustain a holding that an interference with a public right is unreasonable[,]" include "whether the conduct is proscribed by a statute, ordinance, or administrative regulation");[4] *West*, 285 S.E.2d at 676 (nuisance may arise from acts that are unlawful); *Morrisey,* 2014 WL 12814021, at *9 ("unreasonable interference" includes, *inter alia,* conduct that is contrary to a statute, ordinance, or regulation).[5]

In their motion, Defendants do not demonstrate that, as a matter of law, their conduct was reasonable, nor could they. For that reason alone, their motion for summary judgment

---

[2] Notably, the authorities cited by Defendants for the proposition that intentional, negligent, or abnormally dangerous conduct is required for nuisance claims were discussing the standard for **private** nuisance claims. *See In re Flood Litig.*, 607 S.E.2d 863, 872 (W. Va. 2004); *Hendricks v. Stalnaker*, 380 S.E.2d 198, 200–01 (W. Va. 1989); RESTATEMENT § 822 (1979). They cite no West Virginia case holding that the same standard applies to public nuisance claims. Defendants' only basis for applying the same standards to both private and public nuisances is Restatement § 821B cmt. e. But the language they point to in that comment is simply describing the historical development of public nuisance law generally.

[3] *See, e.g., Duff,* 421 S.E.2d at 262 (reasonableness of conduct determines whether conduct constitutes a nuisance); *West v. National Mines Corp.*, 285 S.E.2d 670 (W. Va. 1981), *reh'g on appeal*, 336 S.E.2d 190 (W. Va. 1985) (activity must be reasonable to avoid liability for nuisance).

[4] Section 821B(2) lists three examples of circumstances that may establish unreasonableness. Importantly, this list does "not purport to be exclusive" and the circumstances "are listed in the disjunctive" such that "any one may warrant a holding of unreasonableness." RESTATEMENT § 821B cmt. e.

[5] However, West Virginia courts have rejected the argument that conduct **must** be unlawful in order to constitute a nuisance. *See Lemongello v. Will Co*., No. CIV.A. 02-C-2952, 2003 WL 21488208, at 2 (W. Va. Cir. Ct. June 19, 2003) (Berger, J.)

should be denied.

## II.  DISPUTED ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANTS' INTENTIONAL CONDUCT.

Defendants argue that Plaintiffs "cannot satisfy the 'intentional' prong of the fault element of a public nuisance claim." Def. Br. at 3. Not so. There is ample evidence of Defendants' intentional wrongdoing. Contrary to Defendants' assertions, Plaintiffs need not prove that Defendants intended the consequences of their acts. Rather, under West Virginia law, "[a]n interference is intentional when the actor knows or should know that the conduct is causing a substantial and unreasonable interference." *Hendricks*, 380 S.E.2d at 202;[6] *see also Bansbach v. Harbin*, 728 S.E.2d 533, 537 (W. Va. 2012) (same).[7] Even if a Defendant's conduct was not at first intentional, it becomes intentional if Defendant continues the conduct after becoming aware of its consequences, as Defendants did here once they became aware of diversion resulting from their suspicious order monitoring ("SOM") system failures. RESTATEMENT § 825, cmt. d ("[W]hen the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional."). Here, the summary judgment record demonstrates that: (i) in order to increase their opioid business and maximize profits,

---

[6] Defendants quote this very language from *Hendricks* in their motion, and also acknowledge that "[a]n interference with a public right is intentional if the defendant 'acts for the purpose of causing [the consequence of his act]' **or 'knows that [the consequence] is resulting or is substantially certain to result from his conduct**.'" Def. Br. at 3 & n.8 (quoting RESTATEMENT § 825 (1979)) (emphasis added). They then quote § 825 cmt. c as stating that "[i]t is not enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing the invasion." *Id*. at p. 3. But they leave out the very next sentence in that comment: "He must **either** act for the purpose of causing it **or know that it is resulting or is substantially certain to result from his conduct**." RESTATEMENT § 825 cmt. c (emphasis added).

[7] *See also* RESTATEMENT § 8A cmt. b (1965) ("Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.").

Defendants deliberately facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market; and (ii) Defendants knew or should have known such conduct was causing a substantial and unreasonable interference nationwide, including in the City of Huntington and Cabell County.

Defendants knew the opioids they were distributing had "a high potential for abuse" that could lead to severe psychological or physical dependence" (21 U.S.C. § 812(b)(2)), and thus knew that the diversion of opioids would create a public health hazard.[8]  They also knew that they were legally required to implement effective controls against diversion.[9]  But Defendants were determined to increase their opioid sales as much as possible.[10]  So instead

---

[8] **Ex. 2** (US-DEA-00001767-770) at p. 1; **Ex. 3** (Hartman Tr. excerpts) (CAH) at 157:1-10, 320:21 – 322:8; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 67:17-20, 403:11 – 404:5, 418:18 – 419:14; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 41:18 – 44:5, 57:7-23, 59:3-13, 65:3-10, 68:13-23, 89:23 – 90:4, 166:16 – 169:5, 216:-20, 218:6-16, 220:22 – 221:1, 266:20 – 267:16, 268:12-15, 278:15-24, 293:16 – 294:17, 297:2-7, 320:14 – 321:10, 364:19-25, 365:22 – 366:6; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 62:6-16, 95:24 – 96:8, 98:15 – 99:14, 100:6-13; **Ex. 7** (Hazewski Tr. excerpts) (ABDC) at 71:17 – 72:10; **Ex. 8** (Rafalski Rep. excerpts) at p. 109; **Ex. 9** (MCKMDL00336833-886); **Ex. 10** (MCKMDL00407451); **Ex. 11** (Siegel Rep. excerpts) at pp. 80-105.

[9] *Infra* at § III.B.2; **Ex. 2** (US-DEA-00001767-770); **Ex. 12** (US-DEA-00001771-1772); **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at pp. 107-109, 230-234, 271-275; **Ex. 3** (Hartman Tr. excerpts) (CAH) at 95:7-22, 98:13 – 100:19, 101:8 – 102:11, 109:21 – 111:7, 277:9-19; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 45:1 – 46:16, 82:5-12, 102:12 – 103:8, 177:15 – 178:4, 179:11-21, 244:22 – 248:19; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 36:14 – 37:4, 38:5-19, 57:7-23, 70:16-19, 72:5-22, 73:18-25, 78:4-10, 85:2-9, 169:20 – 170:12, 228:6-11, 261:9 – 262:4, 285:6 – 286:15, 297:20 -298:10; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 25:23 – 26:7, 28:19 – 29:10, 103:10-20, 104:7 – 106:8, 255:18 – 257:15; **Ex. 14** (Cherveny Tr. excerpts) (ABDC) at 300:3 – 301:11.

[10] **Ex. 3** (Hartman Tr. excerpts) (CAH) at 181:5 – 184:1; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 481:13-16; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 278:8 – 280:19; **Ex. 16** (MCKMDL00543971-973) at 972 ("We are in the business to sell product. If we could produce a report . . . that warned a customers [sic] approach to the threshold . . . work could begin on justifying an increase in threshold prior to any lost sales."); **Ex. 17** (CAH_MDL_PRIORPROD_DEA07_00827893-894) at 894 ("Perhaps our results-oriented culture is leading to ill-advised or short-sighted decisions."); **Ex. 18** (MCKMDL00409224-246) at 234 ("Our investigation has revealed a disturbing pattern:

Defendants took steps to ensure the flow of opioids would continue unimpeded. For example, Defendants designed and implemented their SOM systems in such a way that they would not identify all, or even most, suspicious orders.[11]   Even when suspicious orders were identified, Defendants consistently failed to report them to regulators when discovered, and often never reported them at all.[12]   They also distributed suspicious orders to their customers without first conducting sufficient due diligence to determine whether those orders were likely to be

---

McKesson-Aurora's desire for increased sales and retaining its customers overrode its obligations to report suspicious orders."); **Ex. 19** (ABDCMDL00158926, P-00001_00001-046) at p. 4.

[11] **Ex. 8** (Rafalski Rep. excerpts) at pp. 57-59, 65-79, 81-83, 89-90, 95-100, 102-109, 121-122; **Ex. 3** (Hartman Tr. excerpts) (CAH) at 250:23 – 251:24, 254:8-20, 262:16 – 263:14, 265:6 – 266:1, 275:6-21, 297:15 – 300:10; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 71:16 – 72:5, 147:14-21, 427:17 – 428:6, 456:2-20; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 311:15 – 312:7, 182:19 – 183:10, 189:5-23, 308:3-20, 314:14-25; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 116:8 – 117:9, 176:8-22; **Ex. 20** (Snider Tr. excerpts) (MCK) at 221:6 – 226:6; **Ex. 21** (2/8/19 Mays Tr. excerpts) (ABDC) at 62:18-24, 63:16 – 64:23, 68:1 – 71:23, 72:1-5, 72:22 – 73:3; **Ex. 12** (US-DEA-00001771-1772); **Ex. 22** (CAH_MDL_PRIORPROD_DEA07_00968964-968) at 965 (noting "Cardinal does not yet have a system for detecting all suspicious orders"); **Ex. 23** (CAH_MDL2804_03309960-971); **Ex. 24** (MCKMDL00518064-080) at 078 (McKesson telling employees to "[r]efrain from using the word 'suspicious' in communications" to avoid being "required to act"); **Ex. 25** (ABDCMDL00278212) (ABDC "Sales Talking Points" coaching customers on how to avoid being detected by its SOMs); **Ex. 26** (5/17/19 Prevoznik Tr. excerpts) (DEA) at 845:25 – 850:1; **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at pp. 195, 200-229.

[12] **Ex. 8** (Rafalski Rep. excerpts) at pp. 60-61, 79-80, 84-85, 100, 103-105, 115-116, 122; **Ex. 3** (Hartman Tr. excerpts) (CAH) at 273:16-22, 281:8 – 282:8, 340:21 – 341:15, 372:2 – 373:8; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 32:14 – 34:10, 356:8 – 359:1, 424:4 – 425:2, 427:17-19; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 128:9 – 129:2, 307:12 – 308:1, 311:2-13, 355:13-18; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 211:23 – 212:18, 213:11-22; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 109:6-10, 110:16-22, 459:6-10; **Ex. 21** (2/8/19 Mays Tr. excerpts) (ABDC) at 81:13 – 82:5; **Ex. 27** (MCKMDL00409453-458) at 455-456; **Ex. 28** (MCKMDL00510747-752) at 747; **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at p. 16 ("McKesson did not submit suspicious order reports to the DEA regarding orders placed by West Virginia pharmacies until August 1, 2013."; "Cardinal did not have a consolidated suspicious order reporting system in place until 2012 and was unable to produce comprehensive suspicious order reports regarding West Virginia pharmacies prior to 2012."), pp. 235-255; **Ex. 12** (US-DEA-00001771-1772) at p. 1 ("Filing a monthly report of completed transactions . . . does not meet the regulatory requirement to report suspicious orders."), p. 2 ("Daily, weekly, or monthly reports submitted by a registrant indicating 'excessive purchases' do not comply with the requirement to report suspicious orders, even if the registrant calls such reports 'suspicious order reports.'").

diverted.[13]

Defendants also knew or should have known diversion was occurring but deliberately chose to do nothing to prevent it. They were well aware of the growing opioid epidemic ravaging this country.[14] Yet they continued to distribute far greater quantities of prescription opioids than they knew could be necessary for legitimate medical uses.[15] They had access to extensive distribution and dispensing data demonstrating patterns and instances of improper

---

[13] **Ex. 8** (Rafalski Rep. excerpts) at pp. 61-62, 80-81, 85-86, 88-98, 100-101, 103-107, 109-117, 121; **Ex. 3** (Hartman Tr. excerpts) (CAH) at 279:12 – 280:13, 281:24 – 282:5; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 170:6-21, 241:14 – 242:4, 323:7 – 324:1, 327:23 – 328:9, 426:16 – 428:6, 496:4-24, 512:20 – 513:4; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 173:6-24, 213:16 – 214:20, 316:12 – 317:9; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 52:21 – 53:3, 296:19 – 298:14; **Ex. 20** (Snider Tr. excerpts) (MCK) at 77:3 – 78:4, 142:20 – 143:4; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 121:1 – 122:3, 142:16 – 143:24, 144:21 – 145:2; **Ex. 14** (Cherveny Tr. excerpts) (ABDC) at 281:14 – 282:8, 337:22 – 338:2; **Ex. 21** (2/8/19 Mays Tr. excerpts (ABDC) at 74:13-21, 84:4-12; **Ex. 29** (MCKMDL00634329-332) at 330-331; **Ex. 18** (MCKMDL00409224-246) at 237 ("McKesson-Aurora was often willing to increase a pharmacy's threshold for the flimsiest of reasons and without adequate investigation."); **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at pp. 12-18, 125-171, 275-292.

[14] **Ex. 30** (ABDCMDL07354362-364); **Ex. 2** (US-DEA-00001767-770) at p. 1; **Ex. 9** (MCKMDL00336833-886); **Ex. 10** (MCKMDL00407451); **Ex. 3** (Hartman Tr. excerpts) (CAH) at 19:1 – 20:12, 322:4-8; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 67:17-20, 413:3 – 414:3; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 36:1 – 40:9; **Ex. 20** (Snider Tr. excerpts) (MCK) at 83:11 – 85:4, 179:12 – 183:6; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 271:8 – 272:5, 272:21 – 273:19; **Ex. 11** (Siegel Rep. excerpts) at pp. 80-105.

[15] **Ex. 8** (Rafalski Rep. excerpts) at pp. 52-53, 63-65, 86-88, 91-92, 94-95, 114, 118-120; **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at p. 6 ("AmerisourceBergen, Cardinal Health, and McKesson, sent more than 900 million doses of hydrocodone and oxycodone to West Virginia between 2005 and 2016."), pp. 12, 14-16, 18, 125, 130-131, 135-136, 141, 211, 225, 249; **Ex. 11** (Siegel Rep. excerpts) at pp. 32-78; **Ex. 3** (Hartman Tr. excerpts) (CAH) at 82:4-12, 348:2 – 351:5; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 155:17 – 157:11, 328:10 – 333:22, 372:4-20, 398:22 – 399:8, 473:10 – 475:6, 476:12 – 480:2, 481:23 – 483:22, 485:1 – 487:7; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 136:23 – 138:3, 363:11 – 364:5; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 111:7 – 116:7, 148:6 – 150:14, 213:11-22; **Ex. 20** (Snider Tr. excerpts) (MCK) at 190:7 – 208:13, 225:21 – 234:14, 235:23 – 236:24, 237:17 – 244:11, 249:3 – 254:20, 267:6-13, 273:6 – 276:14, 283:14 – 284:6, 286:9 – 288:6, 291:20-24, 293:21 – 295:6; **Ex. 27** (MCKMDL00409453-458) at 456; **Ex. 31** (Snider Dep. Ex. 12); **Ex. 32** (ALLERGAN_MDL_00381552-566) at 562-563; **Ex. 33** (4/18/19 Prevoznik Tr. excerpts) (DEA) at 605:3 – 607:16; **Ex. 26** (5/17/19 Prevoznik Tr. excerpts) (DEA) at 967:19 – 968:22.

distribution, prescribing, and use of opioids; although they eagerly utilized such data to improve their marketing efforts and boost sales, they refused to utilize that same data to prevent diversion, instead ignoring red flags and other irregularities plainly present in such data and continuing to fill suspicious orders and prescriptions.[16]   Defendants were also subject to investigations and enforcement actions, or parties to settlements, in which they were informed of diversion and/or sanctioned for their failures to prevent diversion.[17]   They admitted to unlawful conduct for various distribution centers, evidencing systematic failures of their nationwide SOM programs.[18]   Yet despite repeated warnings and sanctions, Defendants

---

[16] **Ex. 34** (Keller Rep. excerpts) at pp. 5-59; **Ex. 35** (Cameron Tr. excerpts) (CAH) at 347:16 – 348:15; **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at p. 109-118, 124; **Ex. 36** (CAH_NYConsolidated-0151612); **Ex. 37** (MCKMDL01208679-680); **Ex. 4** (Reardon Tr. excerpts) (CAH) at 485:1 – 488:7, 490:3-13; **Ex. 38** (Collett Tr., MCKMDL00402789-828 excerpts) at 46:21 – 50:6, 62:3 – 63:4, 66:5 – 69:11.

[17] **Ex. 8** (Rafalski Rep. excerpts) at pp. 59-60, 83-84, 106-107; **Ex. 3** (Hartman Tr. excerpts) (CAH) at 21:9 – 22:13, 62:5 – 64:9, 81:1 – 84:3, 189:21 – 190:3; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 149:4 – 158:17, 170:6-21, 173:13 – 178:12, 183:12 – 185:10, 187:11 – 190:9, 191:19 – 193:15; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 62:21 – 63:3, 150:22 – 151:7, 155:18 – 158:2, 181:7-15, 200:22 – 201:3, 222:15 – 223:18, 299:21 – 303:4, 305:17-24, 307:12 – 308:1, 308:15-20, 316:12 – 317:12; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 114:19 – 115:17, 208:16 – 214:25; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 124:8-14, 137:13-16, 138:6-19; **Ex. 14** (Cherveny Tr. excerpts) (ABDC) at 114:1-14, 116:1 – 117:19, 165:10 – 167:12, 341:22 – 344:23; **Ex. 21** (2/8/19 Mays Tr. excerpts) (ABDC) at 18:3-5, 20:7 – 26:24, 27:24 – 29:17, 32:11-21, 33:12-19, 34:6 – 35:6, 40:17 – 42:7, 44:18 – 45:5, 46:13 – 47:11, 48:2 – 49:6, 55:19 – 56:17, 57:4 – 59:21, 60:13 – 61:2; **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at pp. 33-35; **Ex. 27** (MCKMDL00409453-458) at 454; **Ex. 39** (CAH_MDL2804_02465983-6053); **Ex. 9** (MCKMDL00336833-886) at 846-847; **Ex. 40** (MCKMDL00337001-024); **Ex. 41** (MCKMDL00355349-363); **Ex. 42** (ABDCMDL00269383-387); **Ex. 43** (MCKMDL00496876-878); **Ex. 44** (MCKMDL00545048-055) at 050; **Ex. 45** (ABDCMDL00279854-865).

[18] **Ex. 39** (CAH_MDL2804_02465983-6053) at 984 ("Cardinal admits that its due diligence efforts for some pharmacy customers and its compliance with the 2008 MOA, in certain respects, were inadequate."); **Ex. 41** (MCKMDL00355349-363) at 352 ("McKesson acknowledges that, at various times during the period from January 1, 2009 up through and including [January 17, 2017], it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious[.]"); **Ex. 27** (MCKMDL00409453-458) at 454 (DOJ noted the "nationwide scope of McKesson's failure to report suspicious orders and to maintain effective controls against diversion"); **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 307:3 – 309:7;

continued to facilitate and encourage the oversupply and diversion of their opioids.[19] Moreover, knowing they would all benefit from the increased sales and impeded regulation of opioids, Defendants actively worked together and with others in the industry, through contractual agreements, meetings, and trade associations, to achieve those goals.[20]   For example, in an effort to influence public perception and evade regulation, they misled regulators and the public regarding their purported efforts to prevent diversion.[21]   They also worked in combination with opioid manufacturers and others to create, increase, and maintain

---

**Ex. 21** (2/8/19 Mays Tr. excerpts) (ABDC) at 24:18-22, 56:11-17, 57:4 – 58:15, 72:22 – 73:4; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 108:11 – 109:10, 139:2 – 140:13 (admitting that prior to its 6/07 settlement agreement with DEA, ABDC did not stop shipment of suspicious orders); **Ex. 3** (Hartman Tr. excerpts) (CAH) at 229:7 – 230:3.

[19] **Ex. 8** (Rafalski Rep. excerpts) at pp. 59-60, 83-84, 120-121; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 173:13 – 178:12; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 200:22 – 201:3, 299:21 – 303:4; **Ex. 21** (2/8/19 Mays Tr. excerpts) (ABDC) at 32:11-21, 33:12-19; **Ex. 39** (CAH_MDL2804_02465983-6053) at 5983; **Ex. 27** (MCKMDL00409453-458) at 454 (DOJ: "[W]e hope that McKesson distribution centers that maintain DEA registrations after a global settlement will take their responsibilities under federal law more seriously than they did after the 2008 settlement."); **Ex. 33** (4/18/19 Prevoznik Tr. excerpts) (DEA) at 617:6-11, 621:17-20, 624:13-18; **Ex. 26** (5/17/19 Prevoznik Tr. excerpts) (DEA) at 967:19 – 975:16; **Ex. 13** (5/17/19 Prevoznik Dep. Ex. P46 excerpts) at p. 6.

[20] **Ex. 46** (Mohr Rep. excerpts) at pp. 4-6, 15-66; **Ex. 47** (Kelly Tr. excerpts) (HDA) at 36:15 – 39:21, 60:1 – 66:8, 77:4 – 79:18, 304:2 – 312:23, 332:2 – 347:23, 369:7 – 370:12; **Ex. 4** (Reardon Tr. excerpts) (CAH) at 105:14 – 106:12, 537:6 – 541:22; **Ex. 35** (Cameron Tr. excerpts) (CAH) at 25:16 – 27:8, 28:2 – 29:15; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 273:3-19, 274:18 – 275:15, 321:19 – 326:4; **Ex. 15** (Hilliard Tr. excerpts) (MCK) at 26:8 – 28:10, 187:25 – 188:19; **Ex. 6** (8/3/18 Zimmerman Tr. excerpts) (ABDC) at 304:7 – 305:16, 309:10 – 311:11, 329:21 – 332:24; **Ex. 21** (2/8/19 Mays Tr. excerpts) (ABDC) at 91:10 – 94:9, 96:2-9, 102:20 – 103:8; **Ex. 48** (HDS_MDL_00492992-994); **Ex. 49** (CAH_MDL2804_01505341-349); **Ex. 50** (HDA_MDL_000087806-824); **Ex. 51** (HDA_MDL_000156141-260 excerpts) at 156, 182, 203-204, 227.

[21] **Ex. 52** (HDA_MDL_000014961-987); **Ex. 53** (PPLPC004000159312-314) at 312-313; **Ex. 54** (MCKMDL00543612-613) at 613 (at the same time they were publicly announcing stricter SOMs controls, McKesson was assuring their customers that it was "business as usual"); **Ex. 47** (Kelly Tr. excerpts) (HDA) at 241:5 – 250:5, 356:1 – 360:17; **Ex. 49** (CAH_MDL2804_01505341-349) at 346-349; **Ex. 50** (HDA_MDL_000087806-824); **Ex. 51** (HDA_MDL_000156141-260 excerpts) at 150, 162, 175, 241, 248.

demand by contributing to the misconceptions and myths that led to the overprescribing and oversupply of opioids.[22]

It is certainly reasonable to infer from this evidence that Defendants knew or should have known that their distribution conduct was causing a substantial and unreasonable interference with a public right in the City of Huntington and Cabell County. Thus, Defendants' motion as to intentional conduct should be denied.

### III. PLAINTIFFS' NUISANCE CLAIMS MAY BE BASED ON DEFENDANTS' UNLAWFUL CONDUCT.

#### A. Plaintiffs Need Not Establish that Defendants Were Negligent or Owed Duties to Plaintiffs.

Defendants argue that Plaintiffs cannot establish Defendants' negligence through violations of federal or state law. But this misstates West Virginia nuisance law and misapprehends the nature of Plaintiffs' claims. As discussed above (*supra* at § I), Defendants may be held liable in nuisance if their conduct was **unlawful**, regardless of whether it was also negligent. Because Plaintiffs' claims predicated on Defendants' unlawful conduct do not implicate the doctrine of negligence, they need not establish that Defendants owed them a duty, as such duties are an element of negligence, not of nuisance. On the contrary, it is sufficient, to establish Defendants' liability, for Plaintiffs to show that Defendants created an unreasonable interference with a right common to the general public and that they did so through conduct that was unlawful.[23]

---

[22] **Ex. 46** (Mohr Rep. excerpts) at pp. 4-67; **Ex. 55** (Kolodny Rep.) at pp. 2-3, 6-113; **Ex. 56** (Lembke Rep. excerpts) at pp. 7-262.

[23] RESTATEMENT § 821B. As discussed above and below, Plaintiffs may, in the alternative, establish Defendants' liability for nuisance by showing that the conduct creating the nuisance was intentional, or that it was negligent, but neither of those methods of proving Defendants' liability turns on showing that Defendants violated the federal CSA or the WVCSA.

Defendants also contend that Plaintiffs cannot establish a violation of the CSA or the WVCSA because those statutes place no obligations on them. They further argue that any claim predicated on a violation of those statutes would be preempted. Neither argument is correct.

**B.    The CSA and WVCSA Require Defendants To Maintain Effective Controls against Diversion.**

  *1.    Plaintiffs Do Not Seek To Enforce the CSA.*

Defendants argue that Plaintiffs may not rely on the CSA as a source of Defendants' duties because the CSA contains no private right of action. But this is beside the point, for Plaintiffs do not seek to enforce the CSA. Had Defendants **merely** violated the CSA and not thereby created a nuisance or otherwise violated parallel common-law duties, Plaintiffs would have no claim. But Plaintiffs do not base their claim on a bare violation of the CSA. As discussed above, the fact that conduct is unlawful is a basis for finding that an interference with a public right is unreasonable, and thus that a defendant may be found liable for creating or maintaining a nuisance. That the unlawfulness of Defendants' conduct is relevant to whether that conduct constitutes or has created an unreasonable interference with a public right does not mean that Plaintiffs are seeking to enforce the CSA.

Indeed, it would make no sense for the Restatement to prescribe that a nuisance action may be predicated on the unlawfulness of the defendant's conduct if the only plaintiffs that could seek relief from the nuisance were those otherwise entitled to enforce the underlying statute. Nuisance actions are not so limited. Rather, as the Restatement makes clear, a public official or public agency representing a political subdivision may always bring an action to abate a nuisance. RESTATEMENT § 821C; *see also id.* at cmt. j. Indeed, West Virginia specifically empowers Plaintiffs to sue to abate a nuisance. *See* W.VA. CODE § 7-1-3kk; W.VA.

CONST. art. 6, sec. 39a; W.VA. CODE § 8-12-2(8), (9-11). This right to seek abatement is not limited based on the particular means of demonstrating that the interference with a public right is unreasonable. The additional element urged by Defendants, that the plaintiff must also have the right to enforce the statute that rendered the defendant's conduct unreasonable by virtue of its unlawfulness, appears nowhere in the Restatement or in West Virginia law. It has simply been manufactured by Defendants.

Defendants rely on a single case involving indirect enforcement of statutes that do not provide for a private right of action, *see* Def. Br. at 7, n.19, *citing Astra USA, Inc. v. Santa Clara Cty., Cal.*, 563 U.S. 110, 118 (2011),[24] but that case is not on point and does not support Defendants' argument.[25] Plaintiffs are not suing Defendants, directly or indirectly, for violating the CSA. They are suing Defendants for having created a public nuisance. While the illegality of Defendants' conduct is a factor in whether they can be liable for that nuisance, it is the nuisance itself, and not the CSA violation, that gives rise to Plaintiffs' claims. Plaintiffs

---

[24] The remainder of the cases cited by Defendants on this issue stand only for the anodyne proposition, not in dispute here, that private rights of action under federal statutes must be created by Congress.

[25] *Astra* involved the Public Health Services Act (the "Act")*,* which created price ceilings for drugs sold to certain health-care facilities, but provided no private right of action for those facilities to enforce the ceilings. *Id.* at 113. Drug manufacturers were, however, required to sign a price "agreement" with the Secretary of Health and Human Services; the "agreement" included no negotiable terms and simply recited and recognized the manufacturers' responsibilities under the Act, including the price ceilings. *Id.* The plaintiffs in *Astra* were health-care facilities who alleged that certain manufacturers had charged prices in excess of the applicable ceiling. *Id.* at 116. Recognizing that they had no right to sue directly under the Act, the health-care facilities argued that they were third-party beneficiaries of the "agreements" and could sue for breach of contract to enforce those agreements. *Id.* The Supreme Court rejected this argument, holding that if the health-care facilities could not sue directly under the Act, they could not use the defendants' recitation of their responsibilities in a government form to create a right of enforcement. *Id.* at 113-14.

are no more enforcing the CSA than a RICO plaintiff is enforcing the underlying criminal statutes that constitute RICO predicate acts.

2.    *The CSA and WVCSA Require Defendants To Identify and Report Suspicious Orders and To Block Shipments Pending Investigation.*

Defendants contend that, even if CSA violations may provide a predicate for Plaintiffs' claims, there are no such violations here, because, Defendants assert, the CSA does not require them to report suspicious orders, nor to halt shipment of those orders pending investigation. Defendants are wrong.

Plaintiffs have separately briefed to this Court the question of Defendants' duties under the CSA, *see* Doc. # 1018, *Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment Concerning Defendants' Statutory and Regulatory Duties* ("Pltfs MSJ"), and respectfully refer the Court to that briefing, which is hereby incorporated. In sum, the CSA explicitly requires Defendants to:   (1) maintain effective controls against diversion, *see* 21 C.F.R. § 1301.71(a) ("[a]ll applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances"); (2) identify and report to the DEA suspicious orders, *see* 21 C.F.R. § 1301.74 ("a registrant "shall design and operate a system to disclose to the registrant suspicious orders of controlled substances" and the registrant "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."); and (3) refrain from shipping suspicious orders until they are able to determine through investigation that the orders are not likely to be diverted.[26] As the MDL Court explained, this last duty arises directly from the

---

[26] *See* **Ex. 1** (MDL Order on Ps' CSA MSJs) at pp. 1, 4-19; *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, 861 F.3d 206, 212-213 (D.C. Cir. 2017); *see also Southwood*

requirement to maintain effective controls against diversion set forth in 21 C.F.R. § 1301.71(a):

> [G]iven the overriding duty of a registrant to maintain effective controls against diversion, the Court is hard-pressed to think of a more basic requirement than not to ship a dubious order bearing indicia that the drugs could be diverted to illegal channels. How can a registrant freely ship suspicious orders and still comply with its duty to maintain controls against diversion? It cannot. It has a duty not to ship the order unless due diligence reasonably dispels the suspicion.

**Ex. 1** (MDL Order on Ps' CSA MSJs) at pp. 18-19. On September 30, 2020, Judge Breyer, the federal district judge presiding over the case remanded from the MDL to the Northern District of California, adopted Judge Polster's conclusion on this point. *See City and County of San Francisco v. Purdue Pharma L.P.*, No. 3:18-CV-07591-CRB, 2020 WL 5816488, at *4 (N.D. Cal. Sept. 30, 2020).[27]

Defendants urge this Court to reject Judge Polster's ruling, but their arguments should be rejected. First, despite the clear and unequivocal directives in §§ 1301.71 and 1301.74, Defendants contend that these regulations merely set forth the criteria for approval and maintenance of their registrations with the DEA and create no affirmative obligations in the registrants themselves. This argument disregards entirely the unqualified use of the word "shall" in both regulations:

> "All applicants and registrants **shall** provide effective controls and procedures to guard against theft and diversion of controlled substances."

> A registrant "**shall** design and operate a system to disclose to the registrant suspicious orders of controlled substances" and "**shall** inform the Field Division

---

*Pharmaceuticals, Inc.; Revocation of Registration*, 72 FR 36487-01, 36500, 2007 WL 1886484 (DEA July 3, 2007).

[27] Significantly, Judge Breyer held that the rulings of the MDL court were not binding on him, but were "highly persuasive authority to the extent that these decisions are consistent with California and Ninth Circuit authority." 2020 WL 5816488, at *2. He specifically found Judge Polster's ruling with respect to the duties of distributors under the CSA to be "persuasive." *Id.*

> Office of the Administration in his area of suspicious orders when discovered
> by the registrant."

21 C.F.R. §§ 1301.71, 1301.74 (emphasis added). These are not directives or suggestions to

the DEA as to criteria to consider in granting or renewing registration; they are affirmative,

mandatory obligations placed directly on the registrants themselves. The plain language admits

of no other interpretation. *Cf.* 21 U.S.C. § § 823(a)(1), (b)(1) (setting forth, as factors for the

DEA to consider in granting registration, "maintenance of effective controls against

diversion").

Next, Defendants argue any requirement to maintain "effective controls" pertains only,

or primarily, to physical security against theft. This argument, too, disregards the plain

language of the regulation, which specifically requires Defendants to guard against "theft **and**

diversion," 21 C.F.R. § 1301.71 (emphasis added), and explicitly requires them to design a

system to detect suspicious orders, which are defined to include "orders of unusual size, orders

deviating substantially from a normal pattern, and orders of unusual frequency."

21 C.F.R. § 1301.74. This requirement, and the definition of suspicious orders it includes,

simply cannot be squared with Defendants' theory that the regulations are addressed only, or

primarily, to physical security and the prevention of theft.

Nor are Defendants correct that the DEA's authority to renew their registrations if they

are in substantial compliance means that the CSA places no obligations on them. That the DEA

is empowered to overlook insubstantial violations of law does not mean that the law has not

been violated; it goes only to the consequences of those violations. Defendants may wish to

argue here that their CSA violations were not sufficiently substantial so as to meet the

requirements of Restatement § 821B for the imposition of nuisance liability, but that is an

argument that turns on factual disputes about the scope of those violations that cannot be resolved on summary judgment.

Finally, Defendants argue that there is no duty to halt shipments pending investigation because that duty is not specifically spelled out in the regulations.[28] But this argument ignores the most basic duty in the regulations – to maintain effective controls against diversion. Defendants do not explain how they can maintain such effective controls if they are permitted to ship orders known to be suspicious. Indeed, the MDL court rejected precisely this argument. **Ex. 1** (MDL Order on Ps' CSA MSJs) at pp. 15-19. Defendants' argument also flies in the face of numerous repeated statements from the DEA stating distributors may not ship suspicious orders without first ascertaining that those orders are not likely to be diverted.[29,30]

As Plaintiffs have explained elsewhere, the WVCSA imposes the same requirements on Defendants as the federal CSA. *See* Pltfs MSJ (Doc. #1018) at pp. 15-17. Defendants'

---

[28] This argument sits oddly with Defendants' position that the explicit language in the regulations with regard to maintaining effective controls and identifying suspicious orders creates no affirmative obligations – apparently, Defendants believe that regardless of whether the regulations affirmatively spell out obligations or not, no obligations are created.

[29] *See* **Ex. 2** (US-DEA-00001767-770); **Ex. 12** (US-DEA-00001771-1772); *Southwood Pharmaceuticals*, 72 FR 36487-01, 36500, 2007 WL 1886484 (revoking Southwood's registration because it failed to perform proper due diligence with respect to its customers, and continued to ship to certain customers, even though the orders it shipped met the criteria to be considered "suspicious"); *see also Masters*, 861 F.3d at 212-213 ("Once a distributor has reported a suspicious order, it must make one of two choices: decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order.").

[30] As set forth in greater detail in Plaintiffs' prior briefing (Pltfs MSJ (Doc. #1018) at pp. 11-13), Defendants' argument also disregards that Congress acknowledged and ratified the "no-shipping" duty in the SUPPORT Act, which explicitly recognizes a duty to block suspicious orders, provides distributors with additional tools to investigate such orders, and provides that distributors are not absolved by these tools of their responsibilities to "(1) identify, **stop**, and report suspicious orders; or (2) maintain effective controls against diversion. . . ." PL 115-271, § 3272 (emphasis added).

argument to the contrary echoes their arguments about the federal CSA – that there is no private right of action and that Plaintiffs lack standing to enforce the WVCSA – and should be rejected for the reasons discussed above.

### C. Plaintiffs' Claims Based on Defendants' Failure To Maintain Effective Controls Against Diversion Are Not Preempted.

Defendants argue that Plaintiffs' claims interfere with the DEA's authority to enforce the CSA and so those claims are barred by implied conflict preemption. They made the very same argument in the MDL, which Judge Polster correctly rejected:

> Distributor Defendants contend imposition of state tort liability would stand as an obstacle to DEA's ability to regulate and enforce the Controlled Substances Act ("CSA"). Congress struck a balance between the risk of diversion and the risk of access to important medications and vested DEA with the authority to implement that framework. The Court has previously rejected this obstacle preemption argument, albeit with respect to the FDA, and now does so with respect to the DEA.

*In re Nat'l Prescription Opiate Litig.*, No. 1:17 MD 2804, 2019 WL 4178591, at *12 (N.D. Ohio Sept. 3, 2019). *See also City and County of San Francisco*, 2020 WL 5816488, at *28-29. This Court should do the same.

Defendants argue that the CSA strikes a balance between preventing misuse of controlled substances and fostering their beneficial use, and that the imposition of state tort liability would "stand as an obstacle to accomplishment of the purposes and objectives of Congress in enacting the CSA and of the DEA in regulating under it." Def. Br. at 14. But they are wrong; Plaintiffs' claims do not interfere with the CSA in any way. Plaintiffs merely seek to hold the Defendants responsible for conduct that violates state law as well as the CSA. Rather than interfere with the CSA, Plaintiffs' claims are of the type specifically contemplated by it: the CSA welcomes the states' traditional enforcement of tort law to supplement the federal enforcement scheme. Congress essentially said as much when it included a provision

in the CSA titled "Application of State Law" and stated therein:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

21 U.S.C. § 903. Congress thus clearly embraced the states' continued exercise of their traditional role in the enforcement of tort law, even in circumstances where liability might be premised in part on the violation of the CSA – so long as there is not "a positive conflict" between state law and the CSA.

Defendants cite a DEA policy statement in their brief: "Dispensing Controlled Substances for the Treatment of Pain," 71 Fed. Reg. 52716-01, 2006 WL 2540907 (Sept. 6, 2006), *cited* at Def. Br. at 13-14, nn.45 & 48. Defendants quote a passage stating the DEA's "obligation to ensure that there is no interference with dispensing of controlled substances to the American public in accordance with the sound judgment of their physicians," Def. Br. at 13, suggesting that Plaintiffs' claims would somehow "interfere" with legitimate opioid prescribing. But the policy statement actually acknowledges and reinforces the dual role of both the states and the federal government in the regulation of controlled substances, and urges states to continue their historic role of regulating the flow of dangerous medications into their communities:

> DEA's role under the CSA is to ensure that controlled substances are prescribed, administered, and dispensed only for legitimate medical purposes by DEA-registered practitioners acting in the usual course of professional practice and otherwise in accordance with the CSA and DEA regulations. Each State also has its own laws (administered by State agencies) requiring that a prescription for a controlled substance be issued only for a legitimate medical purpose by State-licensed practitioners acting in the usual course of professional practice.

17

> There is nothing new in this arrangement of responsibilities between the Federal and State governments. For more than 90 years (starting with the Harrison Narcotic Act of 1914, which was superseded by the CSA in 1970) Federal law has placed certain restrictions on the medical use of federally controlled substances while, at the same time, the States have regulated the practice of medicine generally. In this respect, there has long been a certain amount of overlap between the Federal and State oversight of controlled substances. … Accordingly, it has been the case for more than 70 years that a practitioner who dispenses controlled substances for other than a legitimate medical purpose, or outside the usual course of professional practice, is subject to legal liability under both State and Federal law.

71 Fed. Reg. 52716-01, 52717.1. This is especially important where, as here, Plaintiffs allege that Defendants failed to control against **diversion** of controlled substances for uses other than for legitimate medical purposes. There is no "balance" to be struck with respect to such illegitimate use.

As the United States Supreme Court observed when it rejected an obstacle-preemption argument similar to the one made by the Defendants (albeit in the context of the federal Food, Drug, and Cosmetic Act (FDCA)), the FDA, with "limited resources to monitor the 11,000 drugs on the market," "regarded state law as a complementary form of drug regulation." *Wyeth v. Levine*, 555 U.S. 555, 579 (2009). The Supreme Court noted that "the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation." *Id*. at 580. The Supreme Court explained:

> If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70–year history. But despite its 1976 enactment of an express pre-emption provision for medical devices…Congress has not enacted such a provision for prescription drugs.… Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness.

*Id*. at 574–75. The same can be said of the CSA and DEA: Congress expressly disclaimed an intent to displace state law in the CSA (21 U.S.C. § 903, quoted above), and the DEA said as

18

much in the policy statement referenced above.

Nor are Defendants correct that Plaintiffs' claims are preempted under *Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). *See Nat'l Prescription Opiate Litig.*, 2019 WL 4178591, at \*12 (rejecting *Buckman* preemption). *Buckman* stands only for the proposition that claims arising **solely** from a defendant's alleged violation of federal law are preempted. 531 U.S. at 351-52 (distinguishing cases not preempted where plaintiffs' claims were based "on traditional state tort law principles" and do not exist solely by virtue of federal statutory requirements). As other courts have recognized, *Buckman* leaves traditional state-law claims that parallel, and do not conflict with, federal law untouched. *Id.*; *see also Desiano v. Warner-Lambert & Co.*, 467 F.3d 85 (2d Cir. 2006), *aff'd sub nom. Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008); *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1232-33 (9th Cir. 2013) (*en banc*); *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010).

Here, as discussed above, Plaintiffs' claims do not arise solely under the CSA. Rather, Plaintiffs' claims arise under traditional state tort law, in particular, the law of nuisance. That the standard for traditional nuisance incorporates by reference other violations of law does not mean that Plaintiffs' claims arise only under such laws; rather, it ensures that Plaintiffs' state law claims parallel, and do not conflict with, the CSA. Such claims are not preempted.

## IV.  SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANTS' NEGLIGENT CONDUCT IS NOT WARRANTED BECAUSE PLAINTIFFS ARE NOT REQUIRED TO PROVE DEFENDANTS OWED PLAINTIFFS A DUTY.

Defendants claim they cannot be held liable for public nuisance based on their negligent conduct because they owed no duty to Plaintiffs. Def. Br. at 5-6. Not so. Defendants are conflating the elements needed to establish a general negligence claim with the elements needed to establish a public nuisance claim. But these are two distinct causes of action. West

Virginia law imposes an **absolute** duty not to create a nuisance. *See Flanagan v. Gregory & Poole*, 67 S.E.2d 865, 871 (W. Va. 1951) ("The creation of a nuisance is the violation of an absolute duty. Negligence is the violation of a relative duty.").[31] Indeed, "a[n] act done with the best of care may result in a nuisance." *Flanagan*, 67 S.E.2d at 871. As discussed above, the critical inquiry with respect to a public nuisance claim is whether the defendant's conduct is "unreasonable." *Supra* at § I. Thus, to the extent Defendants' failure to exercise reasonable care in distributing dangerous opioids was "unreasonable," such conduct can form the basis of a public nuisance claim.[32]

Moreover, even if Plaintiffs were required to establish the existence of a duty, that requirement would be easily satisfied here. West Virginia has long recognized that the existence of a duty depends on the foreseeability of the injury. *See Robertson*, 301 S.E.2d at

---

[31] The cases cited by Defendants are thus inapposite, as they involved general negligence rather than public nuisance claims. *See Yourtee v. Hubbard*, 474 S.E.2d 613, 615 (W. Va. 1996) (no duty owed to person participating in theft of car); *Robertson*, 301 S.E.2d at 569 (fact issue as to whether employer's conduct in requiring employee to work long hours and drive home exhausted created a foreseeable risk of harm to others on the road which employer had duty to guard against).

[32] Defendants' entire argument regarding negligent conduct is premised on a purported lack of duty. As previously noted, Defendants have not argued in their motion that their conduct was reasonable as a matter of law. *Supra* at § I. Nor have they argued that there is no evidence of negligence. As the movants, Defendants bear "the initial responsibility of informing the [Court] of the basis for [their] motion[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only if they satisfy their initial burden does the burden shift to Plaintiffs to provide opposing evidence. *See Pollard v. United States*, 166 F. App'x 674, 678 (4th Cir. 2006) ("Before the burden ever shifts to the non-movant to come forward with record evidence establishing a genuine issue of material fact, the movant must first carry the initial burden of 'pointing out to the district court' those portions of the record that show 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325). Regardless, as demonstrated above, there is ample evidence that Defendants did not exercise reasonable care to prevent diversion when distributing opioids and that such conduct was unreasonable. *Supra* at §§ II, III.B.2. Defendants' motion as to negligent conduct should be denied. *See, e.g.,* Syl. Pt. 5, *Robertson v. LeMaster*, 301 S.E.2d 563, 564 (W. Va. 1983) (negligence is a fact issue); *Reed v. Smith Lumber Co.*, 268 S.E.2d 70, 70 (W. Va. 1980) ("'[I]ssues of negligence are not ordinarily susceptible to adjudication upon a motion for summary judgment.'") (citation omitted).

567-68; Syl. Pt. 3, *Bragg v. United States*, 741 S.E.2d 90, 91 (W. Va. 2013). It is entirely foreseeable that the failure of distributors of dangerously addictive opioids to exercise reasonable care to prevent diversion is likely to harm the public, their communities, and the governmental entities that run those communities.[33]  Indeed, the potential that opioids could cause widespread harms to communities was so foreseeable that federal and state laws were enacted to attempt to prevent addiction, abuse, and diversion from occurring. *See e.g.,* 21 U.S.C. § 801(2) (1970) ("The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."); *United States v. Moore*, 423 U.S. 122, 135 (1975); *supra* at § III.B.2.[34]  Imposing a duty of care here would impose little, if any, burden beyond that which the law already imposes.[35]  For these reasons, numerous other

---

[33] *See, e.g.,* **Ex. 57** (Marshall County, WV Circuit Ct. Order Denying Big 3's MTD) at ¶¶ 9-14; *Morrisey*, 2014 WL 12814021, at *19 ("Here, it is foreseeable the conduct alleged—failing to put in place proper anti-diversion controls so that West Virginia Pill Mills would not be supplied and enabled to fuel the prescription drug epidemic—is sufficiently likely to result in the State having to spend additional resources to combat the escalation of the prescription drug epidemic."); *see also supra* at fn. 8; **Ex. 5** (7/31/18 Hartle Tr. excerpts) (MCK) at 91:11-17 (McKesson acknowledges it "owes a common law duty to the American public to prevent the diversion of [opioids] into the illicit market"); **Ex. 11** (Siegel Rep. excerpts) at pp. 19-32; *Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.,* 2016 WL 1321983, at *3 (D.C. Cir. April 4, 2016) (amicus brief filed on behalf of Defendants by their trade association).

[34] Notably, in West Virginia, a violation of a statute or regulation can constitute *prima facie* evidence of negligence. *See* Syl. Pt. 3, *Kizer v. Harper*, 561 S.E.2d 368, 370 (W. Va. 2001); *Morrisey*, 2014 WL 12814021, at *7 & n.6. The CSA and WVCSA define a standard of care for the underlying common law duty by establishing how a reasonable distributor of controlled substances would behave. *Supra* at § III.B.2; s*ee also Flood*, 607 S.E.2d at 877 ("It is settled law that a statute or regulation merely sets a floor of due care. Circumstances may require greater care, if a defendant knows or should know of other risks not contemplated by the regulation.") (internal citations omitted).

[35] *See* **Ex. 57** (Marshall County, WV Circuit Ct. Order Denying Big 3's MTD) at ¶13; *Morrisey*, 2014 WL 12814021, at *20; *supra* at § III.B.2. Moreover, recognition of a common law duty under these circumstances will not expose defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act. The governmental entities

courts, including in West Virginia and in the federal opioid MDL, have recognized the appropriateness of a common law duty in these or similar circumstances.[36]

## CONCLUSION

For the foregoing reasons, this Court should deny in its entirety Defendants' joint motion for summary judgment on the issue of fault.

Dated:  October 6, 2020

[SIGNATURE BLOCK ON FOLLOWING PAGE]

---

within West Virginia forced to bear the public costs of increased harm from the oversupply and diversion of opioids in their communities are a known and identifiable group.

[36] *See, e.g.,* **Ex. 57** (Marshall County, WV Circuit Ct. Order Denying Big 3's MTD) at ¶¶ 9-14; *Morrisey*, 2014 WL 12814021, at *6-7, *19-20 (plaintiffs' allegations sufficient to demonstrate opioid distributors owed State a duty to exercise reasonable care when distributing opioids); *Lemongello*, 2003 WL 21488208, at *2 (holding it was not unreasonable to impose duty on firearm manufacturers and sellers "to guard against the negligent distribution of firearms"); *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 6628898, at *19 (N.D. Ohio Dec. 19, 2018) ("When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, 'black' market created for those drugs. It is also foreseeable that local governments will be responsible for combatting the creation of that market and mitigating its effects. Thus, the Court affirms the R&R's conclusion that Defendants owe Plaintiffs a common law duty of care."); *City of Bos. v. Purdue Pharma, L.P.*, No. 1884CV02860, 2020 WL 977056, at *5 (Mass. Super. Jan. 31, 2020) (plaintiffs' allegations sufficient to demonstrate opioid distributors owed cities a duty to exercise reasonable care when distributing opioids); *In re Opioid Litigation*, No. 4000002017, 2018 WL 4827862, at *16 (N.Y. Sup. Ct. July 17, 2018) (plaintiffs "adequately pled the existence of a duty owed by the distributor defendants by alleging that societal expectations required different behaviors on their part, including, but not limited to, refusing to fill suspicious orders for opioids ").

Respectfully submitted,

**THE CITY OF HUNTINGTON**
/s/ *Anne McGinness Kearse*
Anne McGinness Kearse
WVSB No. 12547
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb
WV No. 4782
**THE WEBB LAW CENTRE**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

**CABELL COUNTY COMMISSION**
/s/ *Paul T. Farrell, Jr.*
Paul T. Farrell, Jr.
WVSB Bar No. 7443
**FARRELL LAW**
422 Ninth Street, 3rd Floor (25701)
PO Box 1180
Huntington, West Virginia 25714-1180
Mobile: 304-654-8281
paul@farrell.law

/s/ *Anthony J. Majestro*
Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Michael A. Woelfel
WVSB No. 4106
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

On Brief:

M. Michelle Carreras
**THE LANIER LAW FIRM**
10940 W. Sam Houston Parkway N.
Houston, TX 77064
Tel: 713-659-5200
Fax: 713-659-2204
michelle.carreras@lanierlawfirm.com

23

Andrea Bierstein
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel: 212-784-6400
Fax: 212-213-5949
abierstein@simmonsfirm.com

Lou Bograd
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lbograd@motleyrice.com

Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Paulina do Amaral
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  212-355-9500
Fax:  212-355-9592
pdoamaral@LCHB.com

**CERTIFICATE OF SERVICE**

I certify that on October 6, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to: Track2OpioidDefendants@ReedSmith.com and CT2_Opioid_Team@mail-list.com.

*/s/ Anthony J. Majestro*
Anthony J. Majestro

25