# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 3 – Hartman Tr. Excerpts

```
1              UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

2                   EASTERN DIVISION

3                     - - -

4   IN RE:  NATIONAL            )

    PRESCRIPTION               )  MDL No. 2804

5   OPIATE LITIGATION          )

    _____ )  Case No.

6                              )  1:17-MD-2804

    THIS DOCUMENT RELATES       )

7   TO ALL CASES               )  Hon. Dan A. Polster

8                     - - -

9          THURSDAY, NOVEMBER 15, 2018

10      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                CONFIDENTIALITY REVIEW

11

                    - - -

12

13       Videotaped deposition of Mark Hartman,

14   held at the offices of BakerHostetler, 200 Civic

15   Center Drive, Suite 1200, Columbus, Ohio, commencing

16   at 9:06 a.m., on the above date, before Carol A. Kirk,

17   Registered Merit Reporter and Notary Public.

18

19                    - - -

20

21

22

23          GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

24             deps@golkow.com
```

```
 1          A.    Yeah.

 2          Q.    Okay.  Did you do any consulting

 3    for Cardinal from that point forward?

 4          A.    Never.

 5          Q.    Okay.  And you worked for Cardinal

 6    for over a decade; is that right?

 7          A.    Yes.

 8          Q.    Okay.  Let's pull up P13900.

 9                      - - -

10          (Cardinal-Hartman Exhibit 1 marked.)

11                      - - -

12          MR. FULLER:  And, Steve, I'm just

13          going to hand you all the copies and let

14          you pass them out; is that okay?

15          MR. PYSER:  Yeah, that's great.

16          Thank you.

17          MR. FULLER:  Sure.

18          This will be marked Plaintiff's

19          Number 1 or -- yeah, however y'all label

20          them.

21          (Discussion held off the record.)

22    BY MR. FULLER:

23          Q.    So, Mr. Hartman, sort of how this

24    is going to work, is you have a screen in front
```

1   of you.  You'll see the document that I'm

2   referring to on the screen, and wherever I'm

3   flowing or we're flowing on the document will be

4   highlighted for you, as well as potentially

5   blown up.  So you'll have the hard copy in front

6   of you as well as the screen to use.  Okay?

7           A.    Okay.

8           Q.    All right.  Have you seen this

9   e-mail before?

10          A.    Yes.

11          Q.    This is an e-mail that explains

12  back in December of 2007 you were taking

13  appointment as a senior vice president of Supply

14  Chain Integrity and regulatory operations for

15  HSCS; is that correct?

16          A.    That's right.

17          Q.    And what is HSCS, for the jury?

18  Healthcare Supply Chain Services?

19          A.    Thank you.

20          Q.    You're welcome.

21          A.    I forgot the acronym.

22          Q.    I understand.  I understand.

23                And if you look down at the

24  announcement portion, and this was sent out, at

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     "We are pleased to announce the

 2   appointment of Mark Hartman to the position of

 3   Senior Vice President, Supply Chain Integrity

 4   and Regulatory Operations for HSCS reporting to

 5   both of us."

 6              Q.     And "both of us" indicates who?

 7              A.     And -- let's see.

 8              Q.     If you look at the front section.

 9              A.     So that's Jeff Henderson and

10   Gary Dolch.

11              Q.     And who is Mr. Henderson; do you

12   know?

13              A.     Yes.  He's the -- he was the chief

14   financial officer at the time and the interim

15   CEO.

16              Q.     And the CEO for Healthcare Supply

17   Chain Services, correct?

18              A.     HS -- yeah, yes, that's correct.

19              Q.     The acronym that we were

20   struggling with earlier?

21              A.     Correct.

22              Q.     And who is Mr. Dolch?

23              A.     EVP quality and regulatory

24   affairs.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And just for the jury, EVP is

2   what?

3         A.    Executive vice president.

4         Q.    Fair enough.

5              And then go on, if you will, and

6   read your portion where it describes your role,

7   what role you'll be filling for Cardinal.

8         A.    "Mark will be responsible for

9   leading HSCS' initiative to build and operate

10  state of the art diversion prevention, supply

11  chain integrity and regulatory compliance

12  processes and systems."

13        Q.    And you know when you were coming

14  into this role that the supply chain integrity

15  was lacking, correct?

16        A.    In what way?

17        Q.    It wasn't sufficient?

18             MR. PYSER:  Object to form.

19        Q.    Or do you disagree with that?

20        A.    Yeah.  I'm not sure it was not

21  sufficient.

22        Q.    Let's continue.  Read the next

23  sentence for us.

24        A.    "This position is a critical role

Highly Confidential - Subject to Further Confidentiality Review

1    for the company as supply chain integrity

2    continues to become an area of increased focus

3    by regulatory agencies and customers alike."

4         Q.    And you're aware during this time

5    that this was an issue of focus, particularly

6    for the DEA?

7         A.    I'd become aware of it as the role

8    was offered to me.

9         Q.    Okay.  You also became aware that

10   Cardinal had three facilities get their license

11   suspended for the lack of supply chain

12   integrity, correct?

13              MR. PYSER:  Object to form.

14        A.    As the role was offered to me,

15   that's when I became aware of what had happened.

16        Q.    Okay.  And that was that three

17   distribution centers, Lakeland, Swedesboro, and

18   Washington, had their license stripped from them

19   because of supply chain integrity issues.  Is

20   that your understanding?

21              MR. PYSER:  Object to form.

22        A.    Their licenses were suspended, as

23   I came to understand.

24        Q.    Did the DEA just come in and

```
 1   suspend them for no reason?

 2              What were the allegations, if you

 3   know, Mr. Hartman?

 4         A.    I would need to review it, but I

 5   believe it was due to the anti-diversion issues

 6   that the company was facing with the DEA.

 7         Q.    And that's included in supply

 8   chain integrity; isn't that right?

 9         A.    That's right.

10         Q.    Okay.  So it was the supply chain

11   integrity issues that caused the license to be

12   suspended.  We can agree on that, correct?

13         A.    Yes.

14         Q.    Okay.  Continue reading,

15   "Reporting to Mark ..."

16         A.    "... will be Steve Reardon, Vice

17   President, Quality and Regulatory Affairs for

18   HSCS, and Michael Moné, Vice President of

19   Anti-Diversion."

20         Q.    So if we're looking at the

21   hierarchy now, when you come into this

22   position -- and this is a new position for you,

23   correct?

24         A.    Yes.
```

1    Q.    No, sir.  I asked if you had dug

2    down and looked at what was going on.

3         A.    Certainly I looked at what was

4    going on, but ...

5         Q.    Then tell the jury what was going

6    on at the three distribution centers that got

7    their licenses suspended.

8         A.    Again, this was after -- this was

9    before my time of stepping into role, and I did

10   not have input or any involvement in the

11   regulatory affairs as I believe this happens.

12   So with what you put in front of me, this -- is

13   this the immediate suspension orders?  What are

14   we looking at?

15        Q.    Sir, this is the -- not only the

16   immediate suspension orders, but also the

17   settlement and release agreement that was

18   entered by your company, Cardinal, during the

19   time you were filling this role, during the time

20   that you were over the regulatory division.

21             MR. PYSER:  Object to form.

22        Q.    And these immediate suspension

23   orders that are attached, one is from November,

24   right before you got there.  Two are from

Case 1:17-md-02804-Doc Doc #: 3075-3 Filed: 10/06/20 Page 399 of 529 PageID #: 326813

1    December.  Another one from January.  And you

2    were there in January, right?  You were in the

3    role?

4          A.    That -- that was Houston, yes.

5          Q.    And were you involved in the

6    decision by the Houston distribution center to

7    voluntarily give up its license and stop

8    shipping controlled substances?  Because by the

9    time -- you're there in the driver's seat,

10   right?

11         A.    Working on our anti-diversion

12   processes and practices.  So that decision, I

13   might have been in the room to listen in.  I

14   don't know that I was in any way -- that I -- I

15   certainly wasn't the one that made that decision

16   around Houston.

17         Q.    Were you involved in that decision

18   around Houston?

19         A.    I don't recall.

20         Q.    Okay.

21         A.    I mean, I recall certainly Houston

22   and the suspension.  I'm sure I was in a meeting

23   or two, but ...

24         Q.    And you know that ultimately they

```
 1    voluntarily gave up --

 2         A.    I do know that.

 3         Q.    -- their license to deliver and

 4    distribute controlled substances based on the

 5    conduct that the government found going on

 6    there, right?

 7              MR. PYSER:  Object to form.

 8         Misstates evidence.

 9         A.    Yes.

10         Q.    Okay.  So let's turn to page 16,

11    and I'll tell you, Mr. Hartman, there may be

12    page numbers on the bottom, but if you look at

13    the upper left-hand -- or excuse me -- upper

14    right-hand corner, as you will recollect, I

15    called out 4230?

16         A.    Yes.

17         Q.    So that's the number we go by.

18    And then it will be point whatever page number

19    it is.

20         A.    Okay.

21         Q.    So if you go to .16, that will be

22    page 16 that I'm referring to.  Okay?

23              And all the documents will be

24    marked the same way, just for ease for -- you
```

```
 1          Q.    So let's first look at -- well,
 2   now let's move on from Washington to Florida.
 3                And if you look at Number 2 there
 4   on the immediate suspension order.
 5                Do you see that?
 6          A.    I see it.
 7          Q.    Do you see where it says "From
 8   August 2005 to October 2007 ..."
 9                Can you continue.
10          A.    "... Respondent distributed over
11   8,000,000 dosage units of combination
12   hydrocodone products to customers that it knew
13   or should have known were diverting hydrocodone
14   into the other -- into other than legitimate
15   medical, scientific, and industrial channels."
16          Q.    Did you do anything to determine
17   whether that was an accurate statement or not?
18                Did you do anything to verify
19   whether the DEA was wrong?
20                MR. PYSER:  Object to form.
21          A.    I spent no time on that.
22          Q.    You didn't worry about that?
23          A.    I worried about what we had been
24   suspended for and what we needed to do to have
```

 1    the system in place that Cardinal would be able

 2    to serve our customers and we would be able to

 3    meet the requirements of DEA.

 4         Q.    So this is what you were suspended

 5    for --

 6         A.    I understand you.

 7         Q.    -- dumping 8 million dosage units

 8    to drugstores and pharmacies that Cardinal knew

 9    or should have known were being diverted?

10              MR. PYSER:  Object to form.

11         Q.    Right?  That's what it says.

12         A.    That's the accusation.

13         Q.    Okay.  Let's go to page 30 of the

14    document.  I want to take a quick look at the

15    Texas distribution, the Texas -- Stafford,

16    Texas, show cause order.

17              Did you get there, Mr. Hartman?

18         A.    Yes.

19         Q.    Okay.  And this is a show cause

20    order that we mentioned earlier for Texas, isn't

21    that right?  The Stafford distribution center?

22         A.    Yes.

23         Q.    And when was it issued?

24         A.    January 30, 2008.

```
 1              Q.    This is during your time frame

 2   heading up this division; you're in this role

 3   full time now, right?

 4              A.    I had been there six weeks.

 5              Q.    Exactly.  So let's go down --

 6   let's see.  Let's go down to page 31.  On

 7   paragraph 7, this is from January of 2007

 8   through September 11, 2007.  "Registrant

 9   distributed approximately 1.385" -- well, excuse

10   me.  "1,381,500 dosage units of hydrocodone to

11   Richmond Pharmacy, or approximately 160 [sic]

12   dosage units each month."

13              Does that cause you any concern,

14   that a distribution center under your watch was

15   making those type of distributions to a single

16   pharmacy?

17              MR. PYSER:  Object to form.

18              A.    What I spent my time on was not

19   trying to refute or change or fight with the DEA

20   about these accusations.

21              Q.    Yes, sir.

22              A.    I spent all of my time on, what do

23   we need to do to improve our system and

24   practices and training and anything else we
```

 1    needed to do in order to get our licenses back,

 2    serve our customers, and do what the DEA said we

 3    needed to do.

 4          Q.    And you made that abundantly

 5    clear.  But my question is, does this type of

 6    distribution pattern cause you any concern as

 7    the head of the regulatory department?

 8          A.    I didn't spend time looking at it.

 9    I had a team that was now investigating.  With

10    our new practices, we were getting ready to

11    put -- as we got them in place, and we -- it

12    took some time.  It wasn't that we had it day

13    one.  To look at these kind of issues and what

14    were the practices, what are the issues, what

15    are -- what is being said here, what is our

16    performance around this.

17                I didn't spend time on trying to

18    figure out what's right or what went wrong.  I

19    spent my time on the process and the -- and the

20    system, using my subject matter experts to look

21    at these issues.

22          Q.    Again, my question, you're in this

23    role for approximately three years, right?  End

24    of 2007 to 2010?

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    I mean, you can't do your job if

2    you don't know what you have to comply with, can

3    you?

4        A.    That's right.

5        Q.    Not very well at least, right?

6        A.    I would say that's right.

7        Q.    Okay.  So explain to the jury what

8    your understanding was of Cardinal's obligations

9    under the Controlled Substances Act?

10            MR. PYSER:  Same objection.

11       A.    We were required to have a

12   suspicious order monitoring system, and we were

13   to have reported suspicious orders to the DEA.

14   I don't think that's a quote of the regulation.

15       Q.    All right.  So you're saying your

16   obligations under the Controlled Substances Act

17   was suspicious order monitoring system, that one

18   had to be created, implemented, and utilized by

19   Cardinal during this time frame, correct?

20       A.    Cardinal was to have -- as a

21   distributor, to be licensed by the DEA, had to

22   have a suspicious order monitoring system.

23       Q.    Now, do you know when you came

24   into your position in the end of 2007, December,

Highly Confidential - Subject to Further Confidentiality Review

1    Okay?  Are you understanding me right now?

2           A.    Understanding.

3           Q.    Okay.  I'm asking you, was this

4    regulation actually in place and required of

5    Cardinal when you came in in December of 2007,

6    or was this something enacted by the government

7    after that point?

8           A.    Is that the same question you've

9    been asking me?

10          Q.    Yes, sir.

11          A.    So you're asking me if the

12   Controlled Substances Act was in place?

13          Q.    I'm asking you if that

14   regulation -- if that requirement, which you

15   testified to just now, was already in place when

16   you came into the position in December of 2007,

17   or was it a new requirement that was passed

18   sometime after you came into that position?

19          A.    The Controlled Substances Act had

20   been in place for a long time.

21          Q.    Do you know how long?  Because you

22   testified earlier things had changed, and I want

23   to try to sort this out.

24          A.    Back in the '70s, I believe, is

1    when it was first passed.

2         Q.    So you believe this requirement

3    was in place since the 1970s?

4         A.    I think so.

5         Q.    Now, you mentioned operating a

6    system and then you mentioned another

7    requirement.  What was that other requirement

8    that you believe was in place when you came into

9    this role?

10        A.    To report suspicious orders to the

11   DEA.

12        Q.    And you and I can agree, can we

13   not, those are two different requirements, one

14   is to have a system in place and operate that

15   system; the other is actually to report things,

16   suspicious orders, to the DEA, right?

17        A.    I agree with that.

18        Q.    Okay.  Now, this report suspicious

19   orders to the DEA, when did -- was this

20   requirement already in place when you came into

21   the role, or was this something new after you

22   came into the role?

23        A.    I'm not clear on whether you're

24   asking me if the Controlled Substances Act was

```
1    in place, or if you're asking me specifically

2    about Cardinal.  Which are you asking me?

3           Q.    I'm asking whether the regulation

4    was in place.

5           A.    The regulation was in place.

6           Q.    And do you know how long that

7    regulation had been in place?

8           A.    I believe it's all part of the

9    original Controlled Substances Act, so I presume

10   from its inception.

11          Q.    So 1970s again, right?

12          A.    Yes.

13          Q.    So you believe Cardinal had the

14   obligation to have a suspicious order monitoring

15   system and, therefore, to report suspicious

16   orders to the DEA since the 1970s, right?

17                MR. PYSER:  Object to form.  Calls

18          for a legal conclusion.

19          A.    Yes.

20          Q.    Okay.  Now -- sorry.

21                Do you know whether there was

22   any -- well, let me ask, just to make sure we're

23   complete.  Were there any other requirements

24   that you're aware of related to the Controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    Substances Act or anything else related to

2    anti-diversion?

3            A.    Related to the Controlled

4    Substances Act, the regulation.  Those were the

5    two elements of it --

6            Q.    Okay.

7            A.    -- as I understand it.

8            Q.    Now, do you agree or disagree that

9    there was a U.S. Code that required Cardinal to

10   maintain effective controls against diversion of

11   particular controlled substances into other than

12   legitimate medical, scientific, and industrial

13   channels?

14           A.    It sounds right.  I'd need to see

15   the document, but I think you're reading from

16   it.

17           Q.    Well, we're going to show you the

18   document.  Don't worry about that.

19                 4916, please.

20                 Have you ever looked at the

21   Controlled Substances Act, Mr. Hartman?

22           A.    Yes.

23           Q.    When did you do that?

24           A.    I don't recall when, but as I

Highly Confidential – Subject to Further Confidentiality Review

1   stepped into the role, I probably would have

2   looked at this act so -- to see what it was that

3   we were supposed to abide by.

4          Q.   So when you say "I probably would

5   have," that's different than yes.

6          A.   I don't recall.  It's ten years

7   ago when I did --

8          Q.   Okay.

9          A.   -- or didn't.  My -- I answered

10  your question in that I did, certainly looked at

11  it.

12         Q.   Okay.  And so this is portions of

13  the Controlled Substances Act.  As you know,

14  it's multiple pages and a little lengthy, right?

15              Is that correct, or do you

16  remember?

17         A.   No.  I remember the act to be this

18  regulation in front of me or the pieces that we

19  focused on.

20         Q.   Okay.  So the portion in front of

21  you is from the United States Congress.

22              Do you see that seal there?

23              MR. PYSER:  Object to form.

24         Q.   Do you see that?

```
1              MR. PYSER:  That was not a

2         speaking objection.  I was explaining

3         the basis for my objection when you

4         misstate evidence.

5              MR. FULLER:  Okay.

6              MR. PYSER:  Continue, and I will

7         abide by the deposition protocol.

8              MR. FULLER:  The order of the

9         Court is only form objections, and if I

10        want a clarification as to what the form

11        objection is, I will certainly ask.

12             MR. PYSER:  Continue your

13        examination.

14             MR. FULLER:  But until I do so, I

15        would ask you to refrain from the

16        speaking objections.  I appreciate it.

17        Thank you.

18   BY MR. FULLER:

19        Q.   Again, Mr. Hartman, I apologize

20   for that.

21             This U.S. Code requires that the

22   registrant maintain effective controls against

23   diversion, right?

24             MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    That's what it says.

 2           Q.    We have to try to prevent

 3    diversion.  Isn't that the idea that you get

 4    from the code?

 5           A.    That's what it says.

 6           Q.    That should be what everyone tries

 7    to do, isn't it, or shouldn't it be?

 8                 MR. PYSER:  Object to form.

 9           A.    I agree with preventing diversion.

10           Q.    Okay.  So not only do we --

11    according to what you said, we have to report,

12    we also have to try to prevent diversion,

13    correct?

14           A.    Yes.

15           Q.    And if we are shipping orders that

16    we know are suspicious or are likely to be

17    diverted, you would agree that we'd be breaking

18    this law?

19                 MR. PYSER:  Object to form.  Calls

20          for a legal conclusion.

21           A.    I'm sorry, the question one more

22    time.  If we're --

23           Q.    Sure.

24                 If we're shipping orders that we
```

```
 1    know are suspicious or are likely to be

 2    diverted, then we're not complying with this

 3    regulation?

 4              MR. FULLER:  Object to form.  Same

 5         objection.

 6         Q.    Correct?

 7         A.    I agree with that.

 8         Q.    Okay.  So that's the U.S. Code.

 9    We've talked about that.  That's the Controlled

10    Substances Act.  So let's move to 4916 -- or,

11    no, 4915.

12              THE VIDEOGRAPHER:  Counsel, your

13         mic fell off.

14                   - - -

15         (Cardinal-Hartman Exhibit 4 marked.)

16                   - - -

17    BY MR. FULLER:

18         Q.    So you understand the difference,

19    Mr. Hartman, this is a C.F.R., Code of Federal

20    Regulations, not enacted by Congress, but

21    enacted by an agency given the authority to

22    institute regulations.  Okay?

23         A.    Yes.

24         Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    We'll see.  And here's the thing,

 2    Mr. Hartman, because Cardinal's entrusted with

 3    dealing with what has been labeled and

 4    legislatively enacted as dangerous drugs.

 5              You're aware of that, right?

 6    Control IIs are --

 7              MR. PYSER:  Object to form.

 8              Q.    -- by definition dangerous drugs.

 9    You're aware of that, correct?

10              A.    Yes.

11              Q.    This is not a place to skimp.  You

12    would agree with that?  Regulatory needs to be

13    beefed up so they can do the job they need to do

14    in compliance with the regulations we talked

15    about earlier.

16              We can both agree on that as well,

17    correct?

18              MR. PYSER:  Object to form.

19              A.    Well, the only -- the only thing I

20    agree with is this is a document that came out

21    in a major transformation from one of the

22    functions about, we need more money, we need

23    more resources.  And the way to do that is to

24    highlight things like you're seeing right here,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    We also have -- let's see.

 2    "Relocation for new director."

 3                  Do you see that second one?

 4            A.    I do.

 5            Q.    So this budget includes adding

 6    those new employees in that they're requesting,

 7    correct?

 8            A.    Yes, looks like that.

 9            Q.    What -- according to this, what is

10    the ask from compliance for 2007 fiscal year?

11            A.    Are you asking me what this budget

12    was asking for?

13            Q.    Yes, sir.

14            A.    It appears to be $997,000.

15            Q.    So less than a million dollars is

16    what compliance is asking for for their entire

17    corporate department, correct?

18            A.    Well, I mean, we tend to --

19                  MR. PYSER:  Object to form.

20            A.    We tend to round.  I mean, a

21    million dollars would probably be --

22            Q.    We'll say a million dollars.  Fair

23    enough?

24            A.    Okay.  Let's say that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    Okay.  A million dollars.

2                  Now, you know that shortly after

3    this, you prepared a PowerPoint presentation

4    which represents that Cardinal was making,

5    generating revenue of $87 billion, correct?

6            A.    Ask me that again.  Did you say I?

7            Q.    Yes.  Let's back up.

8                  You know that Cardinal generates

9    revenue in the billions of dollars, correct?

10           A.    Yes.

11           Q.    And if documents indicated that

12   revenue was around $87 billion, you wouldn't

13   have any reason to dispute that, would you?

14           A.    No.

15           Q.    Do you know what percentage a

16   million dollars makes of 87 billion?

17           A.    Well, I'd need to do the math, but

18   it's a -- it's a small percentage.

19           Q.    A very small fraction of a

20   percentage point, right?

21           A.    That's what it is.

22           Q.    How does that -- and let me ask.

23                 Do you have any idea what the

24   sales team's budget was?
```

 1           A.    I have no idea.

 2           Q.    So Mr. Lanctot -- do you know

 3    Mr. Lanctot?

 4           A.    It doesn't ring a bell.

 5           Q.    Regional sales manager for the

 6    central United States?

 7           A.    I don't recall him.  I might know

 8    him.  I might have met him.  I don't recall him.

 9           Q.    So you -- he testified that he had

10    a sales force of over 100 persons.

11           A.    Okay.

12           Q.    For the center of the United

13    States.

14           A.    Okay.

15           Q.    And that there was an east and a

16    west.

17                 Fair to say sales budget is going

18    to be far in excess of a million dollars, isn't

19    it?

20                 MR. PYSER:  Object to form.

21           Q.    Just based on the number of

22    employees alone.

23           A.    Yes.

24           Q.    Without question, right?

```
1              A.    Yes.

2              Q.    This budget, if you were coming in

3    during this time frame, wouldn't be sufficient

4    for you, would it?

5                    MR. PYSER:  Object to form.  Calls

6         for speculation.

7              A.    I don't know.  I wasn't there.  I

8    wasn't in the department.

9              Q.    Well, you --

10             A.    When I took it over, I've already

11   told you what I did.

12             Q.    And let's back up.

13                   You were there at Cardinal during

14   this time?

15             A.    I was, yes.

16             Q.    You just weren't in the regulatory

17   or compliance department?

18             A.    That's right.

19             Q.    So let's go to what you did do.

20   Let's go to 3874.

21                          - - -

22        (Cardinal-Hartman Exhibit 10 marked.)

23                          - - -

24
```

1    coming into this department, right?

2         A.    It looks like it.

3         Q.    And is, again, that because you

4    felt that was what was necessary to be able to

5    monitor compliance through all these

6    distribution centers?

7         A.    Yeah.  As I came into role, I

8    was -- and understanding as I got into role

9    these immediate suspensions, what we needed to

10   do, the changes that had come from the DEA and

11   what we needed to do in order to accommodate

12   those changes, yes, I was out to staff this with

13   more people.

14        Q.    Now, we talked about the situation

15   on changes, and we're not going to revisit that

16   because I think we made that clear.  But you

17   were envisioning, when you came into this

18   department, fixing it to the point that you

19   could feel comfortable that proper compliance

20   was being maintained; is that right?

21        A.    I came into the role under some

22   pretty tenuous circumstances that Cardinal had

23   been issued the suspensions.

24        Q.    Three suspensions, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    It was three suspensions.

 2              Q.    And another Order to Show Cause?

 3              A.    That's right.

 4              Q.    And it was voluntarily given up?

 5              A.    In January of 2008 --

 6              Q.    And then a fine as well?

 7              A.    Houston --

 8              MR. PYSER:  Counsel, let him

 9         finish his answer before you ask another

10         question.

11              MR. FULLER:  Sure.  I apologize.

12    BY MR. FULLER:

13              Q.    Go ahead.

14              A.    Okay.  What -- the fine you're

15    talking about is from when?  What fine were you

16    mentioning just now?

17              Q.    The DEA investigation related to

18    the suspensions.

19              A.    So later in 2008, when we had a

20    settlement?  Okay.  Let me come back to -- I'm

21    sorry.  What was I commenting on?  You threw me

22    on the fine.

23              Q.    No, no, no.  You're fine.  I

24    apologize.  It's my fault.
```

 1     A.    Yes.

 2     Q.    "Regulatory oversight for

 3 Cardinal's 27 pharmaceuticals and 50 medical

 4 distribution centers nationally."

 5         Across the entire country, right?

 6     A.    Yes.

 7     Q.    And let's talk about that.  When

 8 you were building out this new system, which,

 9 obviously, you had accomplished some by the time

10 we get to this presentation, your system was

11 being devised to be applied across the entire

12 country, wasn't it?

13     A.    Yes.

14     Q.    All distribution centers?

15     A.    Yes.

16     Q.    It was a systemic application

17 from, like we talked about earlier, Auburn,

18 Washington, all the way down to Lakeland

19 Florida?

20     A.    Yes.

21     Q.    And you wanted that because you

22 wanted everybody operating under the same rules?

23     A.    Yes.

24     Q.    Everybody performing the functions

1    the same way?

2            A.    Consistency and commonality is

3    what we were after.

4            Q.    Absolutely.

5                  Let's go to page 5.

6                  This is entitled "Supply Chain

7    Integrity."

8                  Do you see that?

9            A.    Yes.

10           Q.    And there you go again.  "Supply

11   Chain Integrity is a holistic approach to the

12   supply chain ecosystem of an industry aimed at

13   creating a safe and secure supply chain from

14   manufacturer to end user."

15                 And let's talk about that just for

16   a second, because this supply chain that you're

17   working with is what is known as a "closed

18   system," isn't it?

19           A.    I think that's the term we used,

20   yes.

21           Q.    It's also the term the legislature

22   used in creating the CSA as well.  Okay?

23                 But do you know or have an

24   understanding what that means?

1    the top?

2          A.    Yes.  I see that.

3          Q.    This is supposed to be secret,

4    right?

5                MR. PYSER:  Object to form.

6          Q.    Somebody indicated it was supposed

7    to be confidential?

8          A.    I think your term "secret" is a

9    wholly different -- you know, I think you

10   commented on my military background.  Secret is

11   a completely different category.

12         Q.    Confidential clearance versus

13   confidential clearance?

14         A.    Confidential -- well,

15   "confidential" just means that we keep it

16   in-house to our -- whoever needs to see it.  It

17   would be, 1 guess, my descriptions, I don't

18   recall.  I don't know.  But that's how I saw

19   confidential.  You just don't leave them around.

20   You don't hand them out to everybody.  It's who

21   needs to see it.

22         Q.    Fair enough.

23               And this is regulatory compliance

24   review, June 2006, pharmaceutical distribution,

Highly Confidential – Subject to Further Confidentiality Review

```
 1    Birmingham, Alabama, right?

 2          A.    Okay.

 3          Q.    You guys had a distribution

 4    center, or do have, in Birmingham, Alabama,

 5    right?

 6          A.    Yes, we do.

 7          Q.    And if you'll turn to the section

 8    on "Significant Issues" on page 4.

 9                Do you have that in front of you?

10          A.    Yes.

11          Q.    Have you seen these type of

12    reports before?  I would assume in your

13    regulatory department you would review these

14    regularly?

15          A.    And in my early career jobs on the

16    pharma side, I certainly saw them.

17          Q.    Fair enough.

18                "Significant Issues, DEA."  And go

19    down to where it says "There is no system."

20                Do you see that?

21                "There is no system to determine

22    excessive or suspicious ordering by customers of

23    controlled substance products."

24          A.    Yes, I see it.
```

```
 1            A.    Headquarters was providing reports

 2    to the DEA on a monthly basis that we were

 3    required to report.  And the DEA agreed with

 4    that.  They told us we were doing a good job.

 5    That's what I know about the prior system.  I

 6    don't know a lot about it.  Others will be able

 7    to tell you much more, but that's what I know.

 8            Q.    So, Mr. Hartman, you testified

 9    earlier that the regulation required -- the

10    regulation and statute required three things.

11    One, to operate a suspicious order monitoring

12    system, right?

13            A.    Yes.

14            Q.    This says Birmingham, as a

15    registrant, has no suspicious ordering system,

16    doesn't it?  I mean, isn't that what it says

17    here?

18            A.    That's what the document --

19            Q.    No system?

20            A.    -- says.

21            Q.    So that means they're breaking the

22    law.

23            A.    I don't know that -- I don't know

24    if that -- if that included or didn't include
```

```
 1    noses."

 2               This is coming from somebody

 3    that's working in Lakeland during the time that

 4    Lakeland got its license suspended, right?

 5               That's this time frame, isn't it?

 6         A.    Yes.

 7         Q.    And they have concerns about,

 8    apparently, the system that was in place back

 9    then relying on pickers and checkers.  That's

10    what their voicing, correct?

11               MR. PYSER:  Object to form.

12         Misstates evidence.

13         A.    It looks like he's calling out

14    some inefficiencies that he felt needed to be

15    worked on.

16         Q.    Now, you know that the policy and

17    procedure relied on pickers and checkers to

18    identify excessive orders in the distribution

19    centers, correct?

20         A.    That's my recollection, yes.

21         Q.    Now, so these pickers and

22    checkers, these people that are policing our

23    excessive orders in the distribution centers, do

24    you know what kind of qualifications that these
```

1    pickers would have to have, these people that we

2    have policing our highly dangerous controlled

3    substances?  What kind of -- I mean, do they

4    have DEA backgrounds; do you know?

5              MR. PYSER:  Object to form.

6         A.    Not that I'm aware of, unless

7    somebody just hired in that happened to have

8    that.

9         Q.    Do you know if they have any sort

10   of law enforcement experience?

11        A.    Not that I'm aware of.

12        Q.    Do you know if they have any sort

13   of diversion experience?

14        A.    Not that I'm aware of.

15        Q.    And these are the -- at least part

16   of the system that Cardinal was relying on on

17   these pickers is policemen, basically, to pick

18   up on excessive orders, at least according to

19   this person.

20              MR. FULLER:  Let's go to 3879.

21              MR. PYSER:  Object to form.

22                   - - -

23        (Cardinal-Hartman Exhibit 17 marked.)

24                   - - -

 1    product according to the laws and regulations

 2    for handling controlled substances."

 3              And let's go down to the bottom

 4    under "Education and/or Experience" and see what

 5    Cardinal Health required for these policemen.

 6              Tell the jury what Cardinal's

 7    requirements were to be a policeman for the

 8    controlled substances or for people who are

 9    supposed to be policing excessive orders at all

10    the distribution centers across the country.

11              MR. PYSER:  Object to form.

12         A.    "Qualifications.  To perform this

13    job successfully, an individual must be able to

14    perform each essential duty satisfactorily.  The

15    requirement listed below are representative of

16    knowledge, skill, and/or ability required.  The

17    reasonable accommodations may be made to enable

18    individuals with disabilities to perform the

19    essential functions."

20         Q.    And what's the education and

21    experience requirement that Cardinal Health has

22    for these employees?

23         A.    High school diploma or equivalent,

24    warehousing or distribution experience

1    preferred.

2         Q.    A high school diploma or

3    equivalent.  No special training on diversion,

4    at least according to this, right?

5         A.    This is an old logo.  I can't even

6    imagine the time frame this was from.  This is

7    pretty far back.  So I have no idea, first of

8    all, if this is what exists today or later.

9    I -- this is an old -- this is a very old

10   document.

11        Q.    Mr. Hartman, it was part of what

12   the lawyers and Cardinal produced to us in this

13   regard.  This is what I have to go off of.

14        A.    So there's not a time frame on

15   this?

16        Q.    It was produced in 2007 to the

17   DEA.  You can tell that by the Bates number.

18              MR. PYSER:  If we're going to be

19         interpreting that, that means it's from

20         sometime before 2007.

21        Q.    So, Mr. Hartman, again, there's no

22   regulatory training or education required for

23   this position, right?

24              MR. PYSER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1   distribution centers with concerns about the way

2   the system is operating.  You get that, right?

3             Do you understand that that's a

4   concern that this individual has and he's trying

5   to bring it to someone's attention?

6        A.    The question is?

7        Q.    Do you get that this person, in

8   Exhibit 15, is trying to bring to the attention

9   of someone that there's problems with the

10  system, that --

11       A.    That could exist.

12       Q.    -- many, many, more pills could be

13  going out right underneath our own noses?

14             MR. PYSER:  Object to form.

15       A.    That could exist.

16       Q.    Yes.  And Florida's license was

17  suspended at this time because of failure to

18  comply with suspicious order reporting

19  requirements, right?

20             MR. PYSER:  Object to form.

21       A.    During this time frame, that's

22  correct.

23       Q.    Clearly, it couldn't exist or

24  maybe could exist.  It did exist?

1          A.     It appears he's calling out some

2    situations and issues that he sees in his

3    distribution center that he's looking, again, to

4    get some program and some strategies in place to

5    resolve.

6          Q.     And his concern is with the

7    pickers being the policemen to identify

8    excessive orders.

9                 Let's read what he says.  He says,

10   "The manual process we perform now with the

11   discovery of suspected excessive purchases being

12   left up to keyer notifying me or a picker or

13   double-checker or QCer questioning the amount of

14   the process seems to leave ample opportunity to

15   failure."

16                Right?  Is that how it reads?

17         A.     It appears that he's calling out,

18   as an individual, a person -- a issue that he

19   sees of multiple people involved, and he's

20   saying that presents a problem.  I don't know if

21   it is or isn't.

22         Q.     Well, we know --

23         A.     And I, quite frankly, don't think

24   that we should stop from hiring a high school

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     So, Mr. Hartman, tell the jury

 2   whether the law requires Cardinal to have a

 3   sufficient system to spot suspicious orders --

 4   suspicious order in place.

 5                 MR. PYSER:  Object to form.

 6          A.     I don't know that that's an exact

 7   quote, but I think that's the law that we abide

 8   by.

 9          Q.     And you agree that Cardinal has an

10   obligation to prevent diversion the best they

11   can, right?

12                 MR. PYSER:  Object to form.

13          A.     Cardinal Health has a

14   responsibility to identify suspicious orders, to

15   monitor those, to have a program in place, to

16   make its best evaluation, and if they determine

17   a suspicious order, to report that to the DEA so

18   the DEA has all the information that we believe

19   is relevant to a potential problem.

20          Q.     And is Cardinal still able to ship

21   that suspicious order?

22          A.     Under my time frame, we were not.

23   The rules had changed.

24          Q.     And you believe prior to, you
```

Highly Confidential - Subject to Further Confidentiality Review

1    better analytics, a better IT system for us to

2    work with, an opportunity for us to expand on

3    Know Your Colleagues -- Know Your Customer, the

4    training for that, as well as I expanded the

5    team and investigators.

6            Q.    And my question was a simple one.

7    You say that that's the part that changed, and

8    you're referring to the shipping requirement,

9    right, or the not shipping requirement?

10           A.    How I recall it in that time

11   period.

12           Q.    Right.  And so it's your

13   understanding that prior to that change, you

14   could ship a suspicious order, correct, or do

15   you know?

16               MR. PYSER:  Object to form.

17           A.    Sorry.

18               MR. PYSER:  Go ahead.

19           A.    The only part that I'm aware of --

20   or I think what was going on is that our team

21   felt they were abiding by the DEA guidelines,

22   which meant that they aggregated data on a

23   monthly basis.  So when you asked me, "Can you

24   ship a suspicious order?" the reality is, is

1    that the orders were already out of the

2    distribution center as the reports went into the

3    DEA.

4                    That's what I recall the team

5    telling me about how it was operating, and I

6    come into role and I put down some pretty strong

7    measures for us to take the DEA's guidance and

8    to move forward.

9         Q.    And let me just make sure I

10   understand.  That's because the orders were

11   shipped the next day after the order was made,

12   generally speaking, right?

13        A.    Generally, that's right.

14        Q.    And as you described earlier, it

15   was to be able to get the medications, whatever

16   it may be, to the drugstore as quickly as

17   possible to keep down inventory and all that

18   kind of stuff that we talked about earlier,

19   correct?

20        A.    This is an efficient supply chain.

21   We're trying to take costs out of the system,

22   certainly for -- for the pharmacies who, if --

23   before these supply chains were operated in that

24   capacity, they were getting deliveries maybe one

```
 1    or two times a week.  You had to carry a lot

 2    more inventory, much higher costs.

 3            Q.    Sure.

 4            A.    Costs are passed on.

 5            Q.    Sure.

 6            A.    So you work hard to get a very

 7    efficient system in place.

 8            Q.    So the way the system was working

 9    when you came in, is that the suspicious orders

10    reports, this monthly reporting was done at the

11    end of the month, or, I'm assuming, the

12    beginning of the next month, whenever it was

13    compiled, right?

14            A.    That's what I -- that's how I

15    recall it being described to me.  Again, brief

16    detail.  As I told you earlier, I didn't spend a

17    lot of time trying to go backwards.

18            Q.    You were looking forward?

19            A.    I put a stake in the ground to go

20    forward.  What is the DEA requiring us?  We

21    tried to call them.  We tried to talk to them.

22    We tried to understand, what is it we need to

23    do?  It's changed.

24            Q.    And because the report is not
```

1    going out until the end of the month, all the

2    month -- orders made during the month were

3    already gone?

4            A.    That's my understanding.  Well,

5    the orders were gone, for sure.

6            Q.    Yeah.

7            A.    My understanding was the report

8    went in at the end of the month.

9            Q.    Sure.

10                THE WITNESS:  Can I ask if we take

11           just a really quick break?

12                MR. FULLER:  Oh, no, no.  Fine.

13           Absolutely.  We've been going a while.

14                THE VIDEOGRAPHER:  The time is now

15           3:35.  We are going off the record.

16                (Recess taken.)

17                THE VIDEOGRAPHER:  The time is now

18           3:55.  Back on the record.

19    BY MR. FULLER:

20           Q.    Mr. Hartman, we bounced off your

21    presentation, but let's go back to your

22    presentation on page 6.

23           A.    13?

24                MR. PYSER:  It's the one with 3892

```
 1    are one of the safety rules we have in our

 2    country to try to keep people safe on the

 3    street, fair?

 4          A.    Yes.

 5          Q.    The statutory obligations that we

 6    looked at earlier are the safety rules to try to

 7    keep us safe when we're dealing with controlled

 8    substances.  Can we agree with that?

 9                MR. PYSER:  Object to form.

10          A.    Oh, I understand that.

11          Q.    And that's part of what you tried

12    to do at Cardinal, is ensure compliance with

13    those, correct?

14          A.    No.  I did do that.  I didn't try.

15                MR. FULLER:  So let's pull up the

16          Congressional testimony, clip 6.

17                (Video started.)

18                "MS. WALTERS:  Now, when

19                Cardinal began setting

20                threshold limits for

21                pharmacies in 2008, the

22                company set family

23                discount's hydrocodone

24                threshold at 27,000 doses
```

```
 1              a month.  In a little over

 2              a year, Cardinal adjusted

 3              the pharmacy's threshold 14

 4              times.  And by August 2009,

 5              it was cleared to receive

 6              110,000 hydrocodone pills a

 7              month.  The pharmacy's

 8              threshold for hydrocodone

 9              reached a peak of 150,000

10              dosages a month in

11              January 2010, a level it

12              remained at for a year and

13              a half before Cardinal

14              officials reviewed and

15              reduced it.

16                  "Mr. Barrett, when a

17              pharmacy goes over its

18              monthly drug threshold,

19              does Cardinal inquire about

20              the reason for the higher

21               drug order?

22              "MR. BARRETT:  Thank you,

23              Congressman.

24                  "Today if an order
```

```
 1              reaches its threshold, it

 2              simply stops.  So the process

 3              is, the threshold is set, and

 4              the threshold is set based

 5              on a number of factors; the

 6              size of the community it

 7              serves -- not just the

 8              population but the community

 9              it serves.  Other factors.

10              Does it serve a hospice

11              center or a surgical center,

12              et cetera.

13                  "If an order reaches

14              that threshold, that limit,

15              it simply stops.

16              "MS. WALTERS:  But in the

17              past, did it -- did it

18              question it before today's?

19              "MR. BARRETT:  So as I look

20              back at some of the historical

21              documents, I think the

22              thresholds probably should

23              have been set with a different

24              set of eyes.  I've mentioned
```

```
 1              this notion of asking

 2              different questions, and

 3              I think today would probably

 4              set those quite differently.

 5                  "But I think at the time

 6              of those pharmacies you

 7              referred to, thresholds probably

 8              should have been adjusted down

 9              more quickly.

10              "MS. WALTERS:  Did they -- did

11              Cardinal make an assessment

12              as to whether the explanation

13              for increasing the threshold

14              made sense and verified it in

15              any way?

16              "MR. BARRETT:  It's hard for

17              me to answer that fully.

18              Again, this is part of the

19              history.  I have no reason

20              to question the good intent

21              of those doing that kind of

22              assessment.  They were

23              professionals.

24                  "I think they were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    identify, report, don't ship?

 2         A.    That's my understanding.

 3         Q.    Okay.  So, again, during this

 4    period of time when we go from 300,000 oxies --

 5    316,000 oxies in 1996 to 7,200,000 in 2002, that

 6    was during the period -- during the period of

 7    time that Cardinal was identifying, reporting,

 8    and shipping?

 9              MR. PYSER:  Object to form.

10         A.    Again, I'm -- I don't have a -- I

11    don't have a clear understanding of that prior

12    system.  As I took over, the team that I had

13    felt that they were meeting the obligations.  So

14    I'm just going to say I don't know.

15         Q.    But you knew that the change that

16    they explained to you --

17         A.    In December of 2007.

18         Q.    -- is that "we can't ship

19    anymore"?

20         A.    That, I understood.

21         Q.    Okay.  Let's go to page 14, if we

22    can.  And, sir, this is in regards to the -- how

23    long sort of this epidemic has been building.

24              And the report to Congress here
```

1    says, "Media reports of OxyContin abuse and

2    diversion began to surface in 2000.  These

3    were -- reports first appeared in rural areas of

4    some states, generally in the Appalachian

5    region, continued to spread to other rural areas

6    and larger cities in several states.  Rural

7    communities in Maine, Kentucky, Ohio,

8    Pennsylvania, Virginia, and West Virginia were

9    reportedly being devastated by the abuse and

10   diversion of OxyContin."

11             And then if we go on to the next

12   page, sir, about halfway down, that first

13   paragraph, "The media also reported on deaths

14   due to OxyContin.  For example, a newspaper's

15   investigation of autopsy reports involving

16   oxycodone-related deaths found that OxyContin

17   had been involved in over 200 overdose deaths in

18   Florida since 2000."

19             Were you aware, sir, that there

20   were certain parts of the country that were

21   being affected more significantly than other

22   parts of the country when it came to the opioid

23   epidemic?

24        A.    During what time period?

1          Q.     Any time period.

2          A.     At this time period that you're

3   reading from, I was not.

4          Q.     When did you become aware?

■          ■          ███████████████████████████

■          ████████████████████████████████████████

7   I started to become much more informed in

8   understanding this problem in December of 2007.

■          ■          ███████████████████████████

■          █████████████████████████████████

■          ■          ██████████████████

■          ■          ███████████     ████████████████

■          ██████████████████████████████████████

■          █████████████████████████████

■          ██████████████████████████████████████████

■          ████████████████████████████████████

■          ███████████████████████████████████

■          ████████     ███████████████████████████

■          ███████████

■          ■          █████████

■          ■          ██████████████████ if we can, to the

22  time frame just before December of 2007.

23                 MS. QUEZON:  And it's P14195,

24                 please.  Exhibit 22.

1    improved our prior systems and reported

2    suspicious orders under that.

3                MS. QUEZON:  Let's go to 4699

4        please.  Theirs is prettier than mine.

5    BY MS. QUEZON:

6            Q.    I'll give you a minute to take a

7    look at it.

8                Are you familiar with this type of

9    summary report?

10           A.    I recall this, seeing this.

11           Q.    Okay.  And at the top there, it

12   says, "February 2009 Summary."

13               Do you see that?

14           A.    Yes.

15           Q.    And it looks like that these are

16   different suspicious order monitoring events per

17   distribution center, different types of summary

18   information for 2008 from March of 2008 to

19   February of 2009, correct?

20           A.    It looks like that.

21           Q.    All right.  Let's go to page 2

22   of 3.  And what I want to look at is that -- is that

23   that table at the right top corner, "Suspicious

24   orders reported to the DEA."

```
 1                    And this is throughout all of

 2    Cardinal, correct?

 3          A.    If that's what the report is

 4    about.  I don't recall what -- I suspect it is.

 5          Q.    All right.  And do you see, sir,

 6    that in August of 2008, September of 2008, and

 7    October of 2008, there were zero suspicious

 8    orders reported?

 9          A.    Yes.  I see that.

10          Q.    A couple of months -- let's see,

11    in June there were two throughout the entire

12    United States.  In December, there were two.

13    And in February there were two.

14                    Do you see that?

15          A.    I see that.

16                    MS. QUEZON:  Okay.  Let's go to --

17          let's go to 3842, please.

18                        - - -

19      (Cardinal-Hartman Exhibits 24 - 26 marked.)

20                        - - -

21                        - - -

22                    MS. QUEZON:  Oh, I'm sorry.  What

23          exhibit number are we on?

24                    MS. SHIVERS:  3859 is
```

1    been done.

2         Q.   Well, let's do it.  And I picked

3    Illinois for a reason.  Because Illinois is

4    pretty close geographically to Ohio, and

5    Illinois has a million more people in its

6    boundaries than Ohio does.  But they're pretty

7    comparable when it comes to geography and to

8    population.  If you can look with me in 2006.

9              MS. QUEZON:  And if we can do

10             the -- let's do the PowerPoint.

11             All this is is just a

12             demonstrative aid of the actual numbers

13             here.  If we can look in 2006 in

14             Illinois, there were 4,964,195 dosage

15             units of oxycodone shipped only by

16             Cardinal into Illinois.  In that same

17             year, 67 million pills shipped into

18             Ohio.

19             Now, I understand this is during

20   the period of time when suspicious orders, at

21   least according to what you were told, were not

22   being halted.  They -- that requirement was not

23   yet there.  But let's keep looking.

24             In 2007, about 6 million pills

```
 1    into Illinois, and into Ohio almost 73 million

 2    pills with a population of a million fewer

 3    people.

 4                 Did you know this was going on?

 5                 MR. PYSER:  Object to form.

 6         A.    I personally became aware --

 7         Q.    Around 2007?

 8         A.    -- in December 2007.

 9         Q.    Well, let's go ahead and get

10    there.

11                 In 2008, 6 million pills into

12    Illinois.  75 million pills -- 75.5 million

13    pills into Ohio.  In 2009, about 7 million

14    pills.  85 million pills into Ohio.

15                 Now, sir, if we -- if we go back

16    to our simple -- our simplified premise that the

17    more pills that had flooded into a community,

18    the higher the likelihood of abuse and

19    diversion, can you start to get a picture of why

20    Ohio suffered so much more greatly than other

21    places?

22                 MR. PYSER:  Object to form.

23         A.    What I do know is my own narrative

24    about what's going on here, and it begins with
```

Highly Confidential - Subject to Further Confidentiality Review

1    our government.

2         Q.   Do you take any responsibility?

3    Any responsibility, sir?

4              MR. PYSER:  Object to form.

5              Please let the witness answer the

6              question.

7         Q.   This isn't the government putting

8    the pills into Ohio.  This is your company.

9              MR. PYSER:  Object to the form.

10        A.   These pills -- these pills are

11   available because the DEA, who is the licensee,

12   sets the quotas for a distributor to fulfill

13   orders from licensed DEA pharmacies for

14   prescriptions written by licensed DEA doctors.

15   That's what I know at the time, other than my

16   head was down, banging away at trying to get my

17   company in a position that we had responded to

18   the DEA's immediate suspension orders, to get

19   our systems in place in response to those so

20   that we could get our licenses back, serve our

21   customers -- that's what I know.

22        Q.   Mr. Hartman, had you known in

23   2007, had you done this analysis when you came

24   in, or 2008, and you knew that for a state with

Highly Confidential - Subject to Further Confidentiality Review

```
 1   a million fewer people, you were sending in ten

 2   times the amount of oxycodone, would you have

 3   done something differently?

 4              MR. PYSER:  Object to form.

 5        A.    I don't know.

 6              MS. QUEZON:  Can we total this?

 7   BY MS. QUEZON:

 8        Q.    When all is said and done, sir,

 9   Cardinal sent in to the State of Ohio

10   800 million pills, and into Illinois, with a

11   million more people in it, 76 million pills?

12              MR. PYSER:  Object to form.

13              MS. QUEZON:  Could we take just

14        about five minutes, and I may be just

15        about through.

16              THE VIDEOGRAPHER:  The time is now

17        5:27.  We're going off the record.

18              (Recess taken.)

19              THE VIDEOGRAPHER:  The time is now

20        5:35.  Back on the record.

21   BY MS. QUEZON:

22        Q.    Mr. Hartman, I just have a couple

23   more questions.

24              First of all, and if it's for
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. FULLER:

2        Q.    Mr. Hartman, you've testified

3   repeatedly about these limiter reports, right,

4   that were submitted monthly?

5        A.    Yes, I've commented on them.

6        Q.    And you're aware, are you not,

7   that the limiter reports are only submitted for

8   those substances and entities that exceed their

9   limits, correct?

10       A.    I don't recall exactly what these

11  reports were about prior to.  I know what

12  reports were talked about, what the team

13  responded to to the DEA and were required to

14  submit.  And then they did that on a monthly

15  basis, and it was at the end of the month that

16  those reports went in.

17       Q.    And who at the DEA said that was

18  okay; do you know, or are you relying on your

19  people to tell you that?

20       A.    My folks commented on that.

21       Q.    So you have no knowledge of the

22  DEA approving that process, do you?

23       A.    Prior to my time in role, I don't

24  have the conversations with the DEA.  My
```

1    folks -- the people that worked for me at the

2    time did.

3            Q.    Fair enough.

4                  So, again, I guess my question is,

5    no one at the DEA ever told you that that was

6    acceptable?

7                  MR. PYSER:  Object to form.

8            A.    Correct.

9            Q.    And then -- and I apologize

10   because I missed the first one.

11                 When you first came to Cardinal,

12   what was it that you were doing, you told me

13   Pyser you were doing?

14           A.    I was a regional vice president

15   for the Midwest region.

16           Q.    How many people did you oversee?

17           A.    Probably about 200, somewhere in

18   that range.

19           Q.    And what was your budget?

20           A.    Budget for?

21           Q.    Your entire budget, the money you

22   had control of for the Midwest region.

23           A.    I have -- I don't recall what the

24   budget was.