# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 4 – Reardon Tr. Excerpts

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

5

6      *****************************

7      IN RE:

8      NATIONAL PRESCRIPTION OPIATE    MDL NO. 2804

       LITIGATION

9

       This document relates to:      Case No. 17-MD-2804

10

       All cases                      Hon. Dan A. Polster

11

       *****************************

12

13              HIGHLY CONFIDENTIAL - SUBJECT TO

14               FURTHER CONFIDENTIALITY REVIEW

15                VIDEOTAPED DEPOSITION OF:

16                      STEVE REARDON

17                  ALOFT BOSTON SEAPORT

18                    401-403 D Street

19                   Boston, Massachusetts

20            November 30, 2018      9:03 a.m.

21

22                  Darlene M. Coppola

23                Registered Merit Reporter

24                Certified Realtime Reporter

Highly Confidential - Subject to Further Confidentiality Review

 1    a prescription for -- only for the feeling.  The

 2    most recent year for which there is data -- and

 3    then what I want to ask you is you were there in

 4    2010, right?  You were at Cardinal in 2010,

 5    true?

 6              MR. PYSER:  Object to form.

 7       A.   Yes.

 8    BY MR. PAPANTONIO:

 9       Q.   What were you doing in 2010?

10       A.   I was the vice president of quality and

11    regulatory affairs overseeing DC operations.

12       Q.   And you were overseeing a man by the name

13    of Eric Brantley, weren't you?

14              MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16       Q.   He worked under you, didn't he, Eric

17    Brantley?

18       A.   Correct.

19       Q.   How many people were in your department in

20    2010 that were actually reviewing -- doing the

21    same type of reviews that Eric Brantley did?

22              MR. PYSER:  Object to form.

23    Misstates evidence.  Vague as to time.

24       A.   In 2010.  I believe there were three, to

```
 1    BY MR. PAPANTONIO:

 2        Q.   All right.  Well, let's take -- take a

 3    look at 1941.

 4                 MR. PAPANTONIO:  Show him 1941.

 5

 6            (Exhibit No. 3 marked for

 7    identification.)

 8

 9    BY MR. PAPANTONIO:

10        Q.   Now, Mr. Reardon, on the record you told

11    us that Cardinal had a monitoring system in place.

12    That was your testimony, correct?

13        A.   Correct.

14        Q.   Take a look at this, please.  This is from

15    Bill with McKesson and the subject is HDMA notes.

16    It says "Gary and I attended the HDMA conference

17    last week.  These are my notes.  Perhaps the most

18    surprising revelation was Steve Reardon and

19    Gilberto Quintero saying Cardinal does not report

20    suspicious orders to the DEA, no upside."

21            Now, who is -- that's you.  You're Steve

22    Reardon, right?

23        A.   Yes.

24        Q.   And what year is this?
```

```
 1      A.   2013.

 2      Q.   2013.  And you know who -- you know who

 3   this fellow is, Mahoney?

 4      A.   I believe I've met him at industry

 5   conferences.

 6      Q.   Well, you had dinner with him, didn't you?

 7      A.   Possibly.

 8      Q.   Yeah.  And this says "perhaps the most

 9   surprising revelation was Steve Reardon and

10   Gilberto Quintero saying Cardinal does not report

11   suspicious orders to the DEA."

12           Sir, would you agree that if you don't

13   report suspicious orders to the DEA you are

14   breaking the law, correct?

15               MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17      Q.   You agree that you're breaking the law if

18   you don't -- if you fail to comply with the CFRs,

19   you're breaking the law?

20      A.   We have --

21               MR. PYSER:  Object to form.  Calls

22   for a legal conclusion.

23      A.   We have an obligation to report suspicious

24   orders.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   And if you don't, you're breaking the law,

 3   true?

 4                   MR. PYSER:  Object to form?

 5       A.   We're violating a regulation.

 6   BY MR. PAPANTONIO:

 7       Q.   And a regulation is a law; is that

 8   correct?

 9                   MR. PYSER:  Object to form.

10       A.   I view it as a regulation.

11   BY MR. PAPANTONIO:

12       Q.   Is it hard for you to say that your

13   company was breaking the law, sir?

14                   MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   I mean, is that difficult for you this

17   morning, to say, in light of what we're reading

18   right here, that your company was breaking the law

19   in not having a monitoring system?

20                   MR. PYSER:  Object to form.

21   Misstates evidence.  Assumes fact not in -- not

22   established.

23       A.   We had a monitoring system.  I don't know

24   what the conversation was here.  I don't recall
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.  Well, you remember the DEA actually going

2    around and actually having PowerPoint

3    presentations for people explaining in detail what

4    the statute from 1971 meant, right, 1971?

5    A.  Right.

6    Q.  And they would go around and they would

7    give actual seminars, and they would talk about

8    the statute that was the CFR 1301.74.  They would

9    talk about the fact A) it's been around since

10   1971, right?

11                MR. PYSER:  Object to form.

12   A.  Right.

13   BY MR. PAPANTONIO:

14   Q.  And they would say, B) you, as a company,

15   have a responsibility to make sure you comply with

16   it, correct?

17   A.  Correct.

18   Q.  And C) if you don't, you're breaking the

19   law, correct?

20                MR. PYSER:  Object to the form.

21   BY MR. PAPANTONIO:

22   Q.  Correct?

23   A.  Violating the regulation, yes.

24   Q.  Yes.  And they even told you -- they

1    said -- the DEA was so specific as far back in

2    1971 when this was -- when this was given to your

3    company, that suspicious orders include orders of

4    unusual size, orders deviating substantially from

5    a normal pattern, and orders of unusual frequency.

6          Do you remember that?

7                MR. PYSER:  Object to form.

8    A.   Yes.

9    BY MR. PAPANTONIO:

10   Q.   Do you remember those standards that

11   were -- that were not only written in 1971 for all

12   distributors that were selling narcotics, but they

13   actually went around and met with companies and

14   told them what their obligations were, correct?

15   DEA did that?

16   A.   Correct.

17   Q.   All right.  And so you're saying that --

18   according to this document that came from

19   Mr. Mahoney, where you said that Cardinal is not

20   reporting suspicious orders to DEA on advice of

21   outside counsel, you said you never said that?

22   A.   I did not.

23   Q.   Well, sir, do you know Linden Barber?

24   A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    five drugs.

2             Sir, do you understand -- I'm just curious

3    just about what you understand about the -- about

4    the physiology of the human body where it comes

5    into a possibility of a drug overdose.

6             Do you know how drug overdose takes

7    place?

8                  MR. PYSER:  Object to form.

9        A.  I do not.

10       Q.  Have you taken any time in the 20 years

11   that you've worked for the company to find out

12   what happens in a overdose death?  How does -- how

13   does a young man die from an overdose death?

14                 MR. PYSER:  Object to form.

15       A.  I don't know.

16   BY MR. PAPANTONIO:

17       Q.  But were you aware that there were

18   overdose deaths taking place all over the United

19   States, right?

20       A.  I was aware that some -- yes.

21       Q.  You were aware that Cardinal was selling

22   the very drugs that was -- that had the potential

23   to cause overdose deaths, true?

24                 MR. PYSER:  Object to the form.

 1    weren't you, sir?

 2         I mean, part of your job was to be a

 3    leader in those positions, correct?

 4         A.   Correct.

 5         Q.   It says "Approximately February 2009

 6    through 2010, monthly oxy -- oxycodone sales to

 7    Florida practitioners steadily increased and well

 8    surpassed monthly oxycodone sales in the remaining

 9    states."

10         Now, did you know that Florida actually

11    had the highest sales in the country during that

12    period of time?

13              MR. PYSER:  Object to form.

14         A.   I was not aware.

15    BY MR. PAPANTONIO:

16         Q.   But you were there in 2005, what was

17    your -- daily, in 2005, you would review orders

18    that would come in from the company, correct?

19              MR. PYSER:  Object to form.

20         A.   Not personally.

21    BY MR. PAPANTONIO:

22         Q.   Not personally, but you had a department

23    that did that.  There was three of you all?

24         A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Out of 30,000 employees, there were three

 2   of you, correct?

 3                  MR. PYSER:  Object to form.  Asked

 4   and answered.

 5        A.   Correct.

 6   BY MR. PAPANTONIO:

 7                  You see where it says "On July 1,

 8   2011, the State Health Officer and Surgeon

 9   General, Frank Farmer, issued a statewide public

10   health emergency declaration in response to the

11   ongoing problem of prescription drugs in the

12   division of Florida titled the State General --

13   State Surgeon General Declares Public Health

14   Emergency Regarding Prescription Drug Abuse

15   Epidemic.

16           Now, did you -- you reviewed, that didn't

17   you?

18                  MR. PYSER:  Object to form.

19        A.   Did not.

20   BY MR. PAPANTONIO:

21        Q.   You didn't review the Surgeon General

22   writing an article called State Surgeon General

23   Declares Public Emergency Regarding Prescription

24   Drug Abuse Epidemic in Florida?
```

1    law.  That's 1971 CFR, right?

2                  MR. PYSER:  Object to form.

3        A.   Right.

4    BY MR. PAPANTONIO:

5        Q.   Here, this is talking about a letter.

6    September 2006, DEA sent a letter to Cardinal

7    detailing what your responsibilities were.

8        You see that?

9        A.   Yes.

10       Q.   Did you review a -- do you remember

11   reviewing a letter in 2006?

12       A.   I did.

13       Q.   It says "The letter reminded distributors

14   that they have a statutory responsibility to

15   exercise due diligence to avoid filling suspicious

16   orders that might be diverted into legitimate --

17   illegitimate channels and warned that the failure

18   to exercise such due diligence could provide a

19   statutory basis for revocation or suspension of

20   the distributor's registration."

21       And you know, sir, that Cardinal had

22   multiple -- had multiple suspensions of their

23   license to sell narcotics throughout the country

24   by this time?

1        Q.    It says -- back on page 7 of that

2    document, it says -- okay.  So first of all, I

3    want to be clear on something.  1971 was the first

4    time that the company was told what the rules are,

5    CFR, in selling narcotic drugs, 1971, correct?

6        A.    Correct.

7        Q.    And then this is talking about 2006.  Tell

8    me about -- was there anything in between 1971 and

9    2006 where the DEA contacted you and told you what

10   you were supposed to do?

11       A.    I don't recall.

12       Q.    Well, 2006 comes next.  And then we go

13   down here, "DEA" -- very last paragraph, "DEA sent

14   a similar letter to all distributors" --very last

15   paragraph, "DEA sent a similar letter to all

16   distributors including respondent" -- which is

17   Cardinal, correct?  Correct?

18       A.    Correct.

19       Q.    -- "on December 27, 2007.  The letter

20   reminded distributors of their obligation to

21   maintain effective controls against diversion and

22   emphasized it is the sole responsibility of the

23   registrant."

24             Would you underline that for me, please,

1    "the sole responsibility of the registrant"?

2            In other words, sir, you -- it would be

3    improper for you to delegate a responsibility to a

4    pharmacy to do your job for you.  They -- your job

5    was separate from their job as far as selling

6    narcotics correct?

7                    MR. PYSER:  Object to form.

8        A.   Correct.

9    BY MR. PAPANTONIO:

10       Q.   You don't delegate your responsibility

11   under CFR to somebody else.  You couldn't do that,

12   true?

13       A.   Correct.

14       Q.   And to do that would be illegal?

15                   MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   Correct?

18       A.   It would be a violation if we didn't meet

19   the requirements of the regulation.

20       Q.   Let's go back to speeding tickets.  A

21   speeding ticket is a violation and it's illegal,

22   isn't it?

23                   MR. PYSER:  Asked and answered.

24   BY MR. PAPANTONIO:

```
 1    how a distributor should avoid breaking the law

 2    where it comes to selling narcotics, correct?

 3                MR. PYSER:  Object to form.

 4        A.   I was at the conference.

 5    BY MR. PAPANTONIO:

 6        Q.   Actually, you had DEA agents face-to-face.

 7    You had a chance the talk to them face-to-face,

 8    didn't you?

 9        A.   If the opportunity presented, yes.

10        Q.   Did it present itself?

11        A.   I know at some conferences I interacted

12    with DEA investigators.  I don't recall if I

13    specifically did at this one.

14        Q.   Then the bottom paragraph -- it says "DEA

15    also provides presentations and holds meetings

16    with the industry trade group HDMA" -- Healthcare

17    Distribution Management Association, HDMA -- "of

18    which Cardinal is an active member."

19             Now, you actually went to HDMA meetings,

20    didn't you?

21        A.   Yes.

22        Q.   And Cardinal truly was an active member as

23    this says.  You were an active member in HDMA,

24    correct?
```

```
 1        A.   Correct.

 2        Q.   Between May 6, 2008 and December 31, DEA

 3   representatives gave presentations and held

 4   meetings with HDMA in Maryland, District of

 5   Columbia, and Florida and Virginia on 11

 6   occasions.

 7             Did you go to any of these DEA meetings

 8   where they said, okay, these are the rules you got

 9   to play by?

10             MR. PYSER:  Object to form.

11        A.   I would say I was an attendee at at least

12   some of them.

13   BY MR. PAPANTONIO:

14        Q.   Do you remember being an attendee?  Do you

15   remember they gave PowerPoints and showed you

16   specifics about what you could and couldn't do as

17   a distributor?

18             MR. PYSER:  Object to form.

19        A.   That was essentially their agenda at every

20   meeting, so I can't speak specifically to any of

21   these meetings.

22   BY MR. PAPANTONIO:

23        Q.   We have some of their PowerPoints we'll

24   talk about this afternoon.
```

```
1              Do you see that?

2              And then last one says "Not enough

3    people."

4              Do you see that?

5    A.   Right.

6    Q.   So --

7    A.   So what that would mean is you have good

8    people in the role.  This is succession planning.

9    You want to make sure you have enough people on

10   your bench that are ready to go, so you would do

11   succession planning.  You would say, who's ready

12   now, who's ready in 1 to 3 months, who's ready in

13   6 to 12, et cetera.  That's what that's all about.

14   Q.   And you had 30,000 people working with the

15   company, but you had three people in charge of

16   quality regulatory, right?

17              MR. PYSER:  Object to form.

18   A.   Three people --

19   BY MR. PAPANTONIO:

20   Q.   At corporate.

21   A.   Looking at the ingredient limit reports.

22   Q.   Right, exactly, three people.  Is it three

23   people or isn't it three people?

24              MR. PYSER:  Object to form.
```

1    see.  It says "ISO" -- what's an ISO.  That's an

2    immediate suspension order, right?

3        A.   Right.

4        Q.   "ISOs issued between November 28, 2007 and

5    January 2008 based on DEA's conclusion that they"

6    -- and we're talking about Cardinal here, right --

7    "they failed to maintain effective controls

8    against diversion," right?  That's what it says?

9                    MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11       Q.   Now, it says between 2007 and 2008, your

12   company, based on DEA conclusions, failed to

13   maintain effective controls against diversion,

14   right?

15                   MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   That's what it says?

18       A.   Right.

19       Q.   Tell the jury what diversion is.

20       A.   Diversion is the illegal distribution of

21   controlled substances.

22       Q.   This says "DEA immediately suspended

23   respondent" -- that's Cardinal, right -- "based on

24   its conclusion that for approximately two years

1    and two months, between August 2005 and October

2    2007, the facility distributed over 8 million

3    dosage units of hydrocodone-combination products

4    to customers it knew or should have known were

5    diverting hydrocodone into the -- into other than

6    legitimate medical, scientific industrial

7    channels."

8              That's what it says, right?

9        A.   Right.

10       Q.   And those were the very years that you

11   were in charge of quality regulatory, correct?

12       A.   Correct.

13       Q.   2005, I mean, this is talking about you

14   right here, right, Mr. Reardon?

15              MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   Am I right?

18       A.   It's the time frame I was in the role.

19       Q.   Right.  And it -- so this says -- while

20   you were in the role, you distributed 8 million

21   pills to people that you knew or should have known

22   were using those pills illegally, right?

23              MR. PYSER:  Object to form.

24   Misstates evidence.

```
 1   BY MR. PAPANTONIO:

 2       Q.   That's what it says, doesn't it?

 3       A.   Well, we distributed controlled substances

 4   that we purchased from licensed manufacturers to

 5   licensed pharmacies who dispensed them pursuant to

 6   prescriptions.

 7       Q.   And according to this, you knew, when you

 8   were doing that, that they were using them

 9   illegally.  That's what this says, doesn't it?

10                MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12       Q.   It says you knew they were being used for

13   illegal purposes?

14       A.   I didn't know that.

15                MR. PYSER:  Object to form.

16   Misstates evidence.

17   BY MR. PAPANTONIO:

18       Q.   Well, that's what this --

19                MR. PYSER:  Object to form.

20   Misstates evidence.  You've got to give me a

21   chance to get the objection on the record.

22   BY MR. PAPANTONIO:

23       Q.   This -- well, let me read it again just so

24   it's very clear.  I think the jury can read this
```

```
 1    all right, but it says --

 2                 MR. PYSER:  You're not reading it

 3    clearly.  You're missing words as you go through

 4    it.

 5    BY MR. PAPANTONIO:

 6        Q.  Let's read it again.  We won't miss any

 7    words.

 8                 "DEA" -- that's the Drug Enforcement

 9    Agency, correct, right?

10        A.  Right.

11        Q.  Those are the people that go after people

12    who break the law where it comes to selling

13    narcotics, right?

14                 MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16        Q.  Right?  They're the people in charge of

17    going after people who break laws where narcotics

18    are sold illegally, correct?

19        A.  Correct.

20        Q.  And it says "The DEA immediately

21    suspended" -- what does that mean, "Immediately

22    suspended Cardinal's license to sell narcotics"?

23    What does that mean?

24                 MR. PYSER:  Object to form.  It was
```

```
 1     not Cardinal's license.  It was one facility.

 2     BY MR. PAPANTONIO:

 3         Q.   What does that mean?

 4              No.  Wait, wait, wait, no.

 5              You don't -- first of all, he's trying to

 6     tell you what to say.  And just in the rule

 7     vernacular, that's not how this happens.

 8              But -- so let me ask the question this

 9     way.  You know what respondent means, don't you?

10     In that situation, you know it's Cardinal,

11     correct?

12         A.   Correct.

13         Q.   Okay.  So it's saying Cardinal's license

14     was suspended, correct?

15         A.   But not every distribution center.

16         Q.   I know.  We're going to talk about a lot

17     of them.  We're just on number one right now,

18     buddy.

19                   MR. PYSER:  Object to form.

20     BY MR. PAPANTONIO:

21         Q.   So as number one, it was suspended,

22     correct?  Cardinal license was suspended by the

23     very people who were in charge of making sure that

24     narcotics are not sold to illegal purposes
```

```
 1    throughout the country, yes or no?

 2              MR. PYSER:  Object to form.

 3        A.    Three distribution centers.

 4        Q.    Yes.  Well, we -- there are a lot more

 5    here.  Okay.

 6              So anyway, you would agree with that

 7    though.  And you knew or should have known that

 8    was going on.  That's what this says, you knew or

 9    should have known it was going on?

10              MR. PYSER:  Object to form.

11        A.    We had a program in place that DEA

12    approved.

13    BY MR. PAPANTONIO:

14        Q.    That was your watch.  2005 through 2007

15    was your watch, wasn't it?

16        A.    And we had our report that DEA approved

17    that we submitted to them on a regular basis.

18        Q.    Well, it must not have been a very good

19    report because here the DEA is busting you for not

20    doing it right, correct?

21              MR. PYSER:  Object to form.

22        A.    It was a report they reviewed and approved

23    with the trade association.

24        Q.    Well, somebody didn't approve it because
```

1    here you're being busted for doing it illegally,

2    correct?

3                    MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.   Am I right?  I mean, am I right?

6                    MR. PYSER:  Object to form.

7        A.   Based on this -- based on this, the

8    licenses were suspended.

9    BY MR. PAPANTONIO:

10       Q.   Right.  And based on this, you knew or

11   should have known that the drugs were being used

12   illegally --

13                   MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15       Q.   -- based on this?

16       A.   Based on this.

17       Q.   All right.  It says "The ISO noted that

18   although the average retail pharmacy in Florida

19   distributes less than 8,000 dosage units of

20   hydrocodone per month, the ten retail pharma" --

21   the ten retail, you see that number ten? -- "the

22   ten retail pharmacies that respondent supplied

23   distributed considerably more."

24                   Do you see that?  So we're talking about a

```
1      Florida average of 8,400.  Do you understand that?

2          A.   Yes.

3          Q.   They're saying the typical Florida average

4      is 8,400.  Then this goes to say "Monthly averages

5      at those ten pharmacies range from 11,000 to

6      287,000 dosage units."

7               Let's see.  My quick calculation that's

8      about 30 times what the Florida average is, about

9      30 times.

10                    MR. PYSER:  Object to form.

11     BY MR. PAPANTONIO:

12         Q.   Do you see that?

13                    MR. PYSER:  Ongoing objection.

14     Ongoing objection to the use of this document.

15     BY MR. PAPANTONIO:

16         Q.   8,400 versus 287,000, about 30 times,

17     right?

18         A.   Correct.

19         Q.   It says "The ISO alleged that the unusual

20     size of some of the orders, among other factors,

21     should have prompted Cardinal to conclude that

22     orders were suspicious."

23               What does that mean, "orders were

24     suspicious," within the vernacular of regulatory
```

1    as you've been involved with for so many years?

2        A.   Unusual size, pattern, or frequency.

3        Q.   Well, this is certainly an unusual size if

4    the average -- Florida average is 8,000 pills and

5    you're selling 280,000 pills.

6             That certainly is higher than the average,

7    isn't it?

8                     MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10       Q.   Right?

11       A.   Yes.

12       Q.   Then it goes on to say "The ISO alleged

13   that the unusual size of some of the orders were,"

14   as you pointed out, suspicious -- "were suspicious

15   as that term is used in the regulations."

16            So the term "suspicious orders" is well

17   defined in regulations, isn't it, well defined,

18   isn't it?

19                    MR. PYSER:  Objection.

20       A.   Unusual size, pattern or frequency.

21   BY MR. PAPANTONIO:

22       Q.   "Respondents in other facilities seized

23   all distribution of controlled substances on the

24   day they received the ISO."

```
 1              Do you see that?

 2                   MR. PYSER:  Object to form.

 3    BY MR. PAPANTONIO:

 4         Q.   In other words, it -- do you see that --

 5         A.   Yes.

 6         Q.   -- where I read that?

 7         A.   Uh-huh.

 8         Q.   In other words, it took an investigation

 9    by the drug enforcement agency to actually have --

10    to stop the sale of these kind of numbers to these

11    facilities, right?

12                   MR. PYSER:  Object to form.

13    BY MR. PAPANTONIO:

14         Q.   That's what it took, you selling these

15    numbers until they started their investigation,

16    right?

17         A.   It appears so.

18         Q.   It says "DEA also issued an order to show

19    cause to revoke the registration of Cardinal

20    Health's Stafford, Texas" -- so first of all,

21    we're talking about Florida, right?  First -- the

22    paragraph right at top talking about Florida, and

23    then, underneath, all of a sudden now we're

24    shifting to Texas.
```

Highly Confidential - Subject to Further Confidentiality Review

 1    and other facilities ceased all distribution of

 2    controlled substances on the date they received

 3    the ISO.  And the ISO is an immediate suspension

 4    order, correct, right?

 5        A.   Correct.

 6        Q.   Then the next paragraph says "DEA also

 7    issued order to show cause to revoke registration

 8    of Cardinal Health's Stafford, Texas, facility

 9    based on failure to conduct appropriate due

10    diligence.

11            "In addition, the three Cardinal Health

12    distribution facilities that received ISOs, DEA

13    also alleged that Cardinal Health failed to

14    maintain effective controls against the diversion

15    of controlled substances at three other

16    facilities.  In total, DEA had reason to believe

17    that 7 of Cardinal Health's 27 distribution

18    centers roughly 25 percent were not adhering to

19    their responsibility as registrants."

20            You do see where I read that, right?

21        A.   Correct, yes.

22        Q.   I want to be sure about something.  Not

23    everybody can go out and sell narcotics, can they?

24        A.   No.

```
 1                    MR. PYSER:  Object to form.

 2       A.   Correct.

 3   BY MR. PAPANTONIO:

 4       Q.   But here your company paid a fine of 35 --

 5   $35 million -- $34 million right?  You paid a fine

 6   of $34 million?

 7       A.   Correct.

 8       Q.   Nobody went to prison, as far as you

 9   know?

10                    MR. PYSER:  Object to form.

11       A.   Not to my knowledge.

12   BY MR. PAPANTONIO:

13       Q.   So let me -- let me make sure I've got

14   this right.  You know that this -- we're -- this

15   document is a 2012 document.

16            Do you see the front of it?  2012,

17   right?

18       A.   Right.

19       Q.   You had already been -- in 2008, had

20   already been ordered to show cause and had

21   already, in 2008, had some of these Florida

22   facilities, these Florida pharmacies, have their

23   license suspended, 2008.  Do you remember the MOU

24   for 2008?
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   Yes.

 3   BY MR. PAPANTONIO:

 4        Q.   Well, tell the jury what you remember

 5   about the trouble that Cardinal got into in 2008.

 6                    MR. PYSER:  Object to form.

 7   BY MR. PAPANTONIO:

 8        Q.   What do you remember about that?

 9        A.   It was essentially a similar issue.

10        Q.   The same thing, wasn't it?  You were

11   selling drugs and you weren't doing it pursuant to

12   the way that the government told you you had to do

13   it, correct?

14                    MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16        Q.   2008?

17        A.   We -- we had a computer program approved

18   by the DEA that we submitted to them, as

19   requested, on a monthly basis.  We had our

20   employees in the cage involved --

21        Q.   And you thought --

22        A.   -- with the ability to raise their hand,

23   to question orders, and report those to the DEA.

24        Q.   Well -- and they did.  In 2008, they
```

Highly Confidential - Subject to Further Confidentiality Review

1    looked at what were you doing and they busted you

2    for doing it wrong.  They actually accused you of

3    breaking the law again in 2008, right?

4              MR. PYSER:  Object to form.

5    BY MR. PAPANTONIO:

6      Q.   True?  Do you remember 2008 or you want

7    the see the document?  You know what, let's go

8    ahead and pull it out so we -- you have it in

9    front of you?

10       You see it says "2008 Settlement and

11    Release Agreement."  You see that?  This is

12    virtually the same thing that we're looking at in

13    2012, right?

14             MR. PYSER:  Object to form.

15      A.   Right.

16    BY MR. PAPANTONIO:

17      Q.   It's the same thing.  You were accused of

18    the same thing.  You did the same thing in 2008,

19    and then didn't you promise them, in 2008, that

20    you were going to have a system to solve all those

21    problems?

22             MR. PYSER:  Object.

23    BY MR. PAPANTONIO:

24      Q.   You were going to put in place, your

1    obligation -- let me scratch that.

2         Your obligation after 2008 was to pay $34

3    million and put in place a system that the DEA

4    thought was acceptable in monitoring your

5    customers, correct?

6              MR. PYSER:  Object to form.

7    A.   In 2008 and after, I wasn't involved in

8    that process, but I know there was a creation of

9    an anti-diversion team that put together a new

10   program based in consultation with the DEA.  DEA

11   came in and looked at that program and blessed it.

12   BY MR. PAPANTONIO:

13   Q.   Right.  In other words, if you had

14   actually performed your program like you promised

15   you were going to do, your -- that's what you told

16   the government, we promise that we're going to do

17   a program that you can approve of.  That was what

18   happened in 2008, right?

19              MR. PYSER:  Object to form.

20   A.   I can't speak to what was told to the

21   government.  I wasn't involved in that.

22   BY MR. PAPANTONIO:

23   Q.   Did you ever see what the -- what your

24   company agreed to in 2008 as far as putting

Highly Confidential - Subject to Further Confidentiality Review

```
 1    together an anti-diversion system?

 2         A.   I believe I saw the settlement.

 3         Q.   Yeah.  And the settlement was that you

 4    would have in place a system that prevented the

 5    very kind of drug diversion that we're talking

 6    about in 2012, correct?

 7              MR. PYSER:  Object to form.

 8         A.   In 2012, I can't speak to what the system

 9    did or didn't do.

10    BY MR. PAPANTONIO:

11         Q.   Well, we're looking at what the system did

12    because you were -- Lakeland was -- you had a

13    distribution center in Lakeland, didn't you?

14         A.   Yes.

15         Q.   And then -- okay.  So that's 2008, when

16    you agreed to have a system that was in place for

17    anti-diversion, right?

18              And then you know that in 1971 the

19    government told you what you had to do to prevent

20    diversion, right?  CFR told you clearly what you

21    had to do to prevent diversion, correct?

22              MR. PYSER:  Object to form.

23    Misstates evidence.

24    BY MR. PAPANTONIO:
```

```
 1        Q.   All the way back to 1971, the government

 2   specifically told you what you had to do to

 3   maintain your license, correct?

 4        A.   That's when the regulation came.

 5        Q.   Right, 1971.  So then in 2006 -- we just

 6   saw Rannazzisi.  He writes you a letter and says,

 7   hey, you need to take another look at what you're

 8   doing, here's another -- here's another letter to

 9   tell you how you're supposed to do this properly,

10   right, Rannazzisi with the DEA?

11                  MR. PYSER:  Object to form.

12        A.   Right.  And we looked at our program and

13   we were submitting the DEA-approved report --

14   BY MR. PAPANTONIO:

15        Q.   Right, exactly.

16        A.   -- which during numerous cyclical

17   inspections was reviewed and looked at, what our

18   process was, without issue.

19        Q.   And then nevertheless, in 2012, you're

20   still breaking the law, correct?

21                  MR. PYSER:  Object to form.

22   BY MR. PAPANTONIO:

23        Q.   2012, you're still doing the same thing,

24   breaking the law?
```

```
 1      A.   I would disagree.

 2              MR. PYSER:  Object to form.

 3   BY MR. PAPANTONIO:

 4      Q.   We're going to go through it, but -- so so

 5   far -- let me just make sure we have this right,

 6   okay, because I want the jury to understand what

 7   you knew, when you knew it.

 8              MR. PAPANTONIO:  Could I get an

 9   Elmo, please, or is that -- is it on?

10   BY MR. PAPANTONIO:

11      Q.   Here we go.  So let's get this right.

12           1971, CFR, right, that tells you the law

13   relating to narcotic distribution.  You remember

14   that -- you've read it, you've reviewed it, right?

15      A.   Yes.

16      Q.   Correct.  Now, there's some other stuff in

17   between here, but we know that in 2006 -- 2006,

18   you got another letter from the DEA telling you

19   again what your responsibilities were.  Do you

20   recall that?  We already talked about that.

21      A.   Yes.

22      Q.   And then in -- the next year, 2007, you

23   get another letter, another DEA letter, telling

24   you what your responsibilities are, correct?
```

1    to put this down here, 2012.  Why do you think I'm

2    putting that down there?

3                   MR. PYSER:  Object to form.

4    Vague.

5    BY MR. PAPANTONIO:

6       Q.   I'm putting it down there because of all

7    the things that happened between 2007 and 2012,

8    okay.  As we go forward, we're going fill that in,

9    so --

10                   MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12      Q.   So the next thing that occurs is in

13   2012 -- I'm going to leave a box here.  We'll fill

14   some stuff in as we go.

15           In 2012, the DEA, again, after 2008 --

16   well, I forgot 2008.  2008 is up here and that's

17   where you're busted for diversion, right?  That's

18   what I just showed you.  That's where DEA busted

19   you for improper diversion, right?

20                   MR. PYSER:  Object to form.  Ongoing

21   objection to the use of this document.  Move to

22   strike the document and all testimony concerning

23   it.

24   BY MR. PAPANTONIO:

```
 1       Q.   Am I right?

 2       A.   There was an issue in 2008.

 3       Q.   2008, right.  So you're busted there?

 4            MR. PYSER:  Object to form.  Object

 5   to the use of word "busted" on the document and in

 6   the testimony.

 7   BY MR. PAPANTONIO:

 8       Q.   And when you were busted, some of it

 9   involved the same pharmacies that we're talking

10   about in 2012, doesn't it?

11            MR. PYSER:  Objection to form.

12       A.   I don't have knowledge of that.

13   BY MR. PAPANTONIO:

14       Q.   Well, let's go ahead and help -- see if I

15   can help you with knowledge.  Let's take it off

16   here.  Let's go back to the document.  Let's go

17   back to -- 4085.11 is where we are.

18            So you see where it says "The MOA"?  Tell

19   the jury what an MOA is.

20       A.   Memorandum of understanding -- or

21   agreement.

22       Q.   So the MOA and corresponding settlement

23   also required Cardinal Health to pay $34 million

24   in civil penalties.  Now, you remember -- you
```

```
 1    understand that's in 2008 where that's happening.

 2    2008.  You were -- 2008, you paid $34 million,

 3    right?

 4        A.   Correct.

 5        Q.   Nobody went to jail.  You just paid $34

 6    million --

 7                    MR. PYSER:  Object to form.

 8    BY MR. PAPANTONIO:

 9        Q.   -- correct?

10        A.   Correct.

11        Q.   But again, just so it can be clear, a

12    child -- a young man selling three ounces of

13    marijuana on the street corner can go to jail for

14    that, can't he?

15                    MR. PYSER:  Object to form.

16    BY MR. PAPANTONIO:

17        Q.   Am I right?

18        A.   I don't know the specific laws around

19    that.

20        Q.   Well, you were a police officer.  Did you

21    ever arrest anybody for selling drugs?

22                    MR. PYSER:  Object to form.

23        A.   Possession, not dealing.

24    BY MR. PAPANTONIO:
```

```
 1    BY MR. PAPANTONIO:

 2        Q.   -- according to these documents?

 3                    MR. PYSER:  Object to form.

 4    Misstates evidence.

 5    BY MR. PAPANTONIO:

 6        Q.   Well, let's go on.  Your attorney says it

 7    misstates it.  Let's see if I misstated it, okay?

 8    Read on with me.

 9                    MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11        Q.   It says "The MOA and corresponding

12    settlement also required that Cardinal pay $34

13    million in civil penalties."  That was in 2008 you

14    had to do that, correct?

15        A.   Correct.

16                    MR. PYSER:  Object to form.

17    BY MR. PAPANTONIO:

18        Q.   That was a different incident where you

19    were involved in the -- not following the law

20    where it comes to distribution of narcotics.  That

21    was in 2008, correct?

22                    MR. PYSER:  Object to form.

23        A.   2008.

24    BY MR. PAPANTONIO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   2008, correct?

 2           Then it goes on, "34 million in civil

 3      penalties and settlement of claims, potential

 4      claims for civil penalties made by the United

 5      States of America, for failing to report

 6      suspicious orders of controlled substances.  Of

 7      that sum, Cardinal agreed to pay 16 million for

 8      conduct alleged to have occurred within the middle

 9      district of Florida," right?

10           Do you see that?

11      A.   It's what it says.  I was --

12      Q.   Right.

13      A.   -- not aware of that.

14      Q.   So the very thing that we're looking at --

15      you know where Lakeland, Florida is?

16      A.   Yes.

17      Q.   It's in the middle of Florida, isn't it?

18      A.   Yes.

19      Q.   In 2008 was the same problem that you had

20      in middle Florida, correct?  You paid a $35

21      million fine for it, correct?

22      A.   Correct.

23      Q.   And you -- and did you know prior to

24      coming here that the Oxy Express actually
```

1    originated in Florida, started in Florida and went

2    all the way up the East Coast?  Has anybody ever

3    told you that?

4                    MR. PYSER:  Object to form.

5        A.   No.

6    BY MR. PAPANTONIO:

7        Q.   First time you've ever heard the term "Oxy

8    Express" was today, correct?

9                    MR. PYSER:  Object to form.

10       A.   Correct.

11   BY MR. PAPANTONIO:

12       Q.   It says "Middle district of Florida where

13   respondent is located."  So you actually had a

14   business location right there where all of this

15   was going on, right?

16                   MR. PYSER:  Object to form.  Vague.

17       A.   Correct.

18   BY MR. PAPANTONIO:

19       Q.   "The remainder was appropriated -- was

20   apportioned among the six other districts housing

21   Cardinal Health distribution centers at issue in

22   amounts of 1- to $8 million."

23            Now, it says "Prior to the DEA and

24   Cardinal Health MOA, the largest" -- I don't know

```
 1    if you know this.  But "Prior to the DEA and

 2    Cardinal 2008 MOA, the largest civil monetary

 3    penalty paid by a DEA registrant in violation of

 4    CSA was $13 million."

 5            That was McKesson.  Do you remember when

 6    they were hit with -- McKesson was hit for $13

 7    million?

 8                    MS. MONAGHAN:  Object to form.

 9        A.   I'm familiar with it.

10    BY MR. PAPANTONIO:

11        Q.   You followed the news, certainly.  They

12    were one of your competitors and you followed the

13    news when they were busted for illegally complying

14    with standards of the CSA?

15                    MS. MONAGHAN:  Object to form.

16        A.   I was aware of it.

17    BY MR. PAPANTONIO:

18        Q.   You were aware of it.  Why were you aware

19    that McKesson also had been accused by the DEA and

20    paid a fine for improperly conducting business

21    pursuant to the CFR?  Why did you know about that?

22                    MS. MONAGHAN: Object to form.

23        A.   I believe I saw a DEA press release.

24    BY MR. PAPANTONIO:
```

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.   That's what I was going to ask.  Press

 2   releases were sent out every time they were --

 3   every time they would -- they would create --

 4   revoke a license, every time they would do a

 5   immediate suspension.  DEA would communicate that

 6   to all the distributors, correct?

 7                MR. PYSER:  Object to form.

 8      A.   I don't believe it came directly to

 9   distributors.  It was either on their website or

10   in a publication.

11                MR. PYSER:  I also just want to

12   pause for a second and note for the record that

13   the attorney for McKesson objected to the last

14   rounds of questions.  I don't know if the court

15   reporter can hear her because she's not mic'd up,

16   but there were objections to some of the questions

17   related to McKesson.

18   BY MR. PAPANTONIO:

19      Q.   "Prior to the DEA and Cardinal Health 2008

20   MOA, the largest monetary penalty paid the DEA

21   registrant pursuant to the CSA was 13.25 million

22   civil penalty against McKesson" -- it says against

23   McKesson -- "in April of 2008.  Standing alone,

24   the civil penalties assessed against the

```
 1    respondent surpassed the existing record

 2    settlement in the McKesson case."

 3            Sir, now you understand that what the --

 4    what the DEA right here was doing, they were

 5    putting you in what they call a penalty box,

 6    correct?  I mean you've heard the term penalty

 7    box --

 8                   MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10        Q.   -- right?

11        A.   Hockey term.

12        Q.   Yeah, it's a hockey term.  You know,

13    there's different penalty boxes, I guess.

14            But you know what a penalty box is,

15    right?

16                   MR. PYSER:  Object to form.

17        A.   Yes.

18    BY MR. PAPANTONIO:

19        Q.   And you know that you -- that your

20    organization --

21                   MR. PAPANTONIO:  4391 please.

22    BY MR. PAPANTONIO:

23        Q.   -- your organization was put in a penalty.

24    And we're talking about a penalty box right here
```

1    where your license is being suspended because

2    you're not following the law.  We can agree to

3    that, right?

4                    MS. MOORE:  Reardon 12.

5

6            (Exhibit No. 12 marked for

7    identification.)

8

9                    MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11        Q.   Right?

12                   MR. PYSER:  Object to form.

13        A.   We paid a fine.

14   BY MR. PAPANTONIO:

15        Q.   Yes, you certainly did.

16            Now, it says -- if you look at the first

17   page on this, it says Mike Kaufmann.  Who is Mike

18   Kaufmann?

19        A.   Mike Kaufmann is currently the Cardinal

20   Health CEO.

21        Q.   What did you all do to Barrett?

22                   MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24        Q.   Where's Barrett?

1    Q.    And you felt like that's all you were

2   supposed to do, identify the order and report it

3   to the DEA?  Is that your testimony?

4              MR. PYSER:  Object to form.

5   Misstates testimony.

6      A.    In two steps.  In the second step of what

7   we did, our employees in our distribution centers

8   who were filling orders would also identify

9   anything that they felt warranted further

10   investigation and then contact the local DEA to

11   make a determination as to whether or not they

12   could ship it.

13   BY MR. PAPANTONIO:

14      Q.    Well, sir, we're going to see -- you

15   understand that you identified suspicious orders

16   and shipped the narcotic anyway after you

17   determined that it was a suspicious order.  Your

18   company did that routinely, didn't they?

19              MR. PYSER:  Object to form.

20   Misstates evidence.

21   BY MR. PAPANTONIO:

22      Q.    Yes or no?

23      A.    The requirement was to report them.

24      Q.    Okay.  But -- so okay.  So your -- in your

Highly Confidential - Subject to Further Confidentiality Review

1    head, the only requirement was for you to report

2    them?  We can agree on that, right?

3                    MR. PYSER:  Object to form.

4        A.    Correct.

5                    MR. PYSER:  Object to form.  Asked

6    and answered.  Misstates testimony.

7    BY MR. PAPANTONIO:

8        Q.    Report them?  Is that your testimony?

9        A.    That's what the regulation states.

10                   MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12       Q.    And you know the regulation was written in

13   1971, and it told you you had to do a lot more

14   than just report the suspicious order to the DEA?

15   You know that as we sit here today, that your

16   obligation was to do more than report it to the

17   DEA, correct?

18                   MR. PYSER:  Object to form.

19       A.    Based on additional guidance from DEA that

20   evolved over time, yes.

21   BY MR. PAPANTONIO:

22       Q.    Wait a second.  Now, you started -- you --

23   right now we understand you're selling the drug

24   all the way back to -- you know that they're

1    this demonstrative.

2              MR. PAPANTONIO:  Yeah, okay, I hear

3    you.

4    BY MR. PAPANTONIO:

5        Q.   So the next thing is we find out you

6    know -- well, actually, let's just show it to him.

7    Show him 4008.  Show him 4008, please.

8              Sir, tell me who -- you said you never met

9    Mr. Rannazzisi, is that correct?  You told me

10   that?

11       A.   Correct.

12       Q.   Give one to your counsel there, if you

13   would.

14             MR. PYSER:  Thank you.

15   BY MR. PAPANTONIO:

16       Q.   So this document, I don't believe you've

17   ever seen, I don't think so.  It's 2007.  December

18   2007, right?

19             MR. PYSER:  Object to form.

20       A.   Correct.

21   BY MR. PAPANTONIO:

22       Q.   And it says right up at the top, Cardinal

23   Health, and it gives the address, Syracuse,

24   New York.  Do you see that?

```
 1      A.   Yes.

 2      Q.   It says "Dear Registrant."

 3           First of all, let's look at who it's from.

 4  Look on the last page.  You see who that's from

 5  Joseph Rannazzisi.  Do you see that?

 6      A.   Yes.

 7      Q.   And you knew Joseph, correct?

 8                MR. PYSER:  Object to form.

 9      A.   I knew of him.

10  BY MR. PAPANTONIO:

11      Q.   You knew of him.

12           It says "Dear Registrant.  This letter is

13  being sent to every entity in the United States

14  registered with the Drug Enforcement

15  Administration, DEA, to manufacture or distribute

16  controlled substances."

17           Then it says "The purpose of this letter

18  is to reiterate the responsibilities of controlled

19  substance manufacturers and distributors to inform

20  DEA of suspicious orders in accordance with 21

21  CFR."

22           Do you see that?  And you're familiar with

23  what 21 CFR is, right?

24      A.   Yes.
```

```
 1      Q.    "In addition to, and not in lieu of, the

 2   general requirement under 21 USC 823 that

 3   manufacturers and distributors maintain effective

 4   controls against diversion, DEA regulations

 5   require that all manufacturers and distributors to

 6   report suspicious orders of controlled

 7   substances."

 8         Do you see that?

 9      A.    Yes.

10      Q.    And then it goes on to say, if -- if you

11   look at the next paragraph, look at what that is

12   controlling -- this control of suspicious orders.

13         It says "The regulation also requires that

14   the registrant inform local DEA division office of

15   suspicious orders when discovered by the

16   registrant."

17         You're saying you did?  That's your

18   testimony, right?

19         Right?

20      A.    In using the ingredient limit report and

21   the process that we employed by our -- used by our

22   employees in the distribution centers.

23      Q.    And we've seen the results of you using

24   the ingredient report.  We know that in 2008 that
```

```
1    you had to pay $34 million fine because you were

2    not following the laws pursuant to the CFR,

3    correct?  We've already talked about that, right?

4         A.   That was the allegation.

5         Q.   And you paid a $34 million fine?

6                    MR. PYSER:  Object to form.

7    BY MR. PAPANTONIO:

8         Q.   Correct?  You didn't, but your company

9    did?

10        A.   Correct.

11        Q.   And it says, if you look at the last

12   paragraph -- the last line of that     Paragraph

13   3, it says "Reporting an order" -- here it is,

14   "Reporting an order as suspicious will not absolve

15   the registrant of responsibility if the registrant

16   knew or should have known that the controlled

17   substances were being diverted."

18        Right?  That's what it says, isn't it?

19   It's very clear.

20                   MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.   Right?  "Reporting an order as suspicious

23   will not absolve the registrant of responsibility

24   if the registrant" -- underline "knew or should
```

Highly Confidential - Subject to Further Confidentiality Review

1    have known," please -- "knew or should have known

2    that the controlled substances were being

3    diverted."

4              That's what it says?

5                   MR. PYSER:  Object to form.

6        A.   Yes.

7    BY MR. PAPANTONIO:

8        Q.   Did I read that right?

9        A.   Yes.

10       Q.   So in other words, sir, your

11   responsibility is more than just reporting to the

12   DEA.  This is telling you that's not enough.  You

13   can't just report to the DEA and be absolved of

14   your responsibility.  You know that, don't you?

15                  MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   True?

18       A.   As of the meeting they had in September of

19   '07 and then subsequently this letter.

20       Q.   Because truthfully, you weren't doing --

21   you were not doing anything except sending in

22   reports to the DEA.  That's all you did, true?

23                  MR. PYSER:  Object to form.

24   Misstates evidence.

```
 1    group.

 2         Q.   But you -- in other words, you weren't

 3    responsible for not doing this; is that correct?

 4                    MR. PYSER:  Object to form.

 5         A.   Correct.

 6    BY MR. PAPANTONIO:

 7         Q.   Let's go to the next page.  It says --

 8    408516.  It says -- let's pick up, you see where

 9    it says "The investigation at respondent revealed

10    a persistent failure -- a persistent failure to

11    exercise due diligence to ensure that controlled

12    substances were not being diverted."

13         Do you see that?

14         A.   Yes.

15                    MR. PYSER:  Object to form.  Same

16    objections on this document.

17    BY MR. PAPANTONIO:

18         Q.   Now, DEA concluded that over a period of

19    approximately three years, November 2008 to 2011,

20    "Respondent's anti-diversion controls were

21    inadequate to meet their due diligence

22    responsibilities."

23         Do you see that?

24                    MR. PYSER:  Object to form.
```

```
 1      A.   Yes.

 2   BY MR. PAPANTONIO:

 3      Q.   Underline that for me, please.

 4           Because didn't you just tell me that when

 5   2007 came along and you knew what all the rules

 6   were that you started playing by those rules?

 7   Isn't that what you told me earlier?

 8                MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10      Q.   Right?

11      A.   Yes, that was a transition.

12      Q.   Yes.  So you said there was a transition

13   that took place, but it says right here, DEA

14   concluded that over a period of approximately

15   three years, November 2008 to 2011, respondent's

16   anti-diversion controls were inadequate to meet

17   their due diligence responsibilities.

18           That doesn't sound -- I mean, you told me

19   that after 2007, you made this adjustment and you

20   did things right.

21           Didn't you tell me that just earlier

22   today?

23                MR. PYSER:  Object to form.  Ongoing

24   objection on this document.  Hearsay.
```

 1    identification of orders that were stopped at the

 2    distribution center and questioned.

 3    BY MR. PAPANTONIO:

 4        Q.   Right.  So what we know is this:  We know

 5    that all that you just described didn't work,

 6    because in 2008 you had to pay $43 million fine

 7    for that system that you just described, right?

 8                    MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10        Q.   Correct?

11                    MR. PYSER:  Objection.  Misstates

12    evidence.

13        A.   34 million.

14    BY MR. PAPANTONIO:

15        Q.   34 million, excuse me.  Okay.

16             And then we know this now, so 2007 is when

17    you said there was this new change in how things

18    were being done.

19             Remember, we talked about that, right?

20        A.   Yes.

21        Q.   The new change?

22        A.   Yes.

23        Q.   And after the new change took place in

24    2007, this document says that even as late as 2011

```
 1    that your respondent's anti-diversion controls

 2    were inadequate to meet their due diligence

 3    responsibilities.  That's what that says, right?

 4                   MR. PYSER:  Object to form.  Ongoing

 5    objection to the use of this document.

 6         A.   Yes.

 7    BY MR. PAPANTONIO:

 8         Q.   Am I right?

 9         A.   That's what it says.

10         Q.   And then if you go to the next paragraph,

11    it says "Between November 2008 and December 2011

12    you -- Cardinal sold over 12.9 million dosage

13    units of oxycodone to its top four retail pharmacy

14    customers."

15              True?

16                   MR. PYSER:  Object to form.

17    BY MR. PAPANTONIO:

18         Q.   That's what it says?

19         A.   That's what it says.

20         Q.   And it says "From 2008 to 2009,

21    respondent's oxycodone sales to its top four

22    retail pharmacies increased approximately

23    803,000."

24              803,000.
```

```
 1                    MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.  Did you know that your company -- I mean,

 4   we're -- do you understand that this is one year,

 5   2008 to 2007.

 6             I have to write this down.  Give me a

 7   piece of paper.  Here it is.  Make sure I've got

 8   this right.

 9             From 2008 to 2007, that Cardinal increased

10   their sales to this company by     803 percent?

11                    MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.  Did you know that?  That's a startling --

14   that's a big number.  That's a big percentage

15   increase, isn't it, for a year between 2008 and

16   2009?

17        A.  I don't know all the facts and

18   circumstances around it.  I can't comment on it.

19        Q.  You can't comment that an 803 percent

20   increase in one year in the sales of narcotics to

21   one customer is a big increase?

22                    MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24        Q.  You don't know whether that's a big
```

```
 1    increase or not?

 2                 MR. PYSER:  Object to form.

 3        A.   It's to four customers, I think.

 4    BY MR. PAPANTONIO:

 5        Q.   Oh, four customers.

 6        A.   Yeah.

 7        Q.   So all four customers, there was an 803

 8    percent increase?

 9                 MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11        Q.   And that doesn't seem like a big number to

12    you?

13        A.   On face value, it seems like a big number.

14        Q.   Yeah.  It says then, it says after that,

15    "From 2009 to 2010," that's another one year,

16    "respondent's oxycodone sales increased

17    approximately 162 percent.

18           Do you see that?

19                 MR. PYSER:  Object to form.

20    BY MR. PAPANTONIO:

21        Q.   And then between 2009 and 2011,

22    respondent's oxycodone sale to its top four retail

23    pharmacies increased 241 percent.

24           Now, sir, you have to agree, those are big
```

 1    increase numbers for a year period of time, isn't

 2    it?

 3                    MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5        Q.   I mean, those are big numbers?  For the

 6    increase of sale of narcotics, those are big

 7    increases of numbers, aren't they?

 8                    MR. PYSER:  Object to form.

 9        A.   On the face, but I -- I think it -- at

10    this time DEA continued to increase the quota for

11    oxycodone, right?

12    BY MR. PAPANTONIO:

13        A.   Let's see if they did, because it's going

14    to talk about that right here.

15            It says "Compared to the advantage

16    number" -- "Compared to the average number of

17    dosage units distributed monthly to respondent's

18    other Florida retail pharmacies, the average" --

19    stay with me here -- "the average monthly

20    distribution to respondent's top four customers is

21    staggering."

22            That's their word, staggering.  Do you see

23    that?

24                    MR. PYSER:  Object to form.

```
 1    BY MR. PAPANTONIO:

 2         Q.   Would you please circle the word

 3    "staggering."

 4                   MR. PYSER:  Object to form.  Move to

 5    strike Counsel's commentary at the beginning of

 6    the question.

 7    BY MR. PAPANTONIO:

 8         Q.   Would you move -- would you please, madam,

 9    you have "staggering."

10         What does staggering mean to you, sir?

11    Staggering.  The term staggering, what does that

12    mean when you hear that's staggering, what does

13    that mean to you?

14         A.   Significant.

15         Q.   Yeah, okay, I'll go with significant.

16                   MR. PYSER:  Object to form.

17    BY MR. PAPANTONIO:

18         Q.   It says "Respondent's other Florida retail

19    pharmacies received on average," is that --

20    "received on average 5,364 dosage units per month

21    from October 1, 2008 to December 2011."

22         Do you see that?

23         The average per month -- put an arrow next

24    to that, if you would, the dosage, 5,364, put an
```

 1    arrow next to that, because I want to make a

 2    comparison.

 3            And then it says "Units per month, October

 4    2008 through 2011, based on 66,286 pharmacies."

 5            So, in other words, you understand that

 6    DEA took 66,000 pharmacies and they said the

 7    average number for those pharmacies is only 5,364.

 8            Do you see that?

 9                    MR. PYSER:  Object to form.

10       A.   Yes.

11    BY MR. PAPANTONIO:

12       Q.   And then it goes on to say, "In contrast"

13    -- do you see where it says "In contrast"?

14            "In contrast, CVS 5195 received

15    approximately 58,000 dosage units per month from

16    respondent."

17            That would be -- that would be your

18    company, Cardinal, right?

19                    MR. PYSER:  Object to form.

20    BY MR. PAPANTONIO:

21       Q.   Right?

22       A.   Right.

23       Q.   So the average dosage is 5,300, and you

24    were shipping to your customer 58,223 units,

 1

 2                    (Recess taken from 2:50 p.m.

 3                    to 3:06 p.m.)

 4

 5                    THE VIDEOGRAPHER:  The time is 3:06

 6    p.m., on the record.

 7    BY MR. PAPANTONIO:

 8        Q.   So looking at 4085 still, the document

 9    we've been dealing with most of the day, it says,

10    4085.22.  Look for the .22.

11              It says "Low numbers of suspicious orders

12    reported."

13              So on -- there on 22, it says "Low numbers

14    of suspicious orders reported.  Respondent's

15    electronic suspicious order monitoring system

16    flags certain orders as suspicious, which required

17    respondent to place a hold on the order until it

18    decides whether to release the order or cancel --

19    or cut the order."

20              Then it says this -- highlight this,

21    please, for me.

22              "From October 1, 2008, through

23    October 26, 2011, respondent reported only 41

24    suspicious orders to DEA."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So in four years, your company reported 41

 2    suspicious orders, according to this.  And you

 3    don't have any way -- you don't have any -- you

 4    don't dispute that, you do?

 5                   MR. PYSER:  Object to form.

 6        A.   That's what it states.

 7    BY MR. PAPANTONIO:

 8        Q.   "Based on information provided by

 9    Cardinal, respondent suspended sales of controlled

10    substances to 19 DEA registrants from December

11    2010 to October 2011 at the service of the AIW."

12              You remember what the AIW is?

13                   MR. PYSER:  Same ongoing objections

14    to this document.

15    BY MR. PAPANTONIO:

16        Q.   Do you remember the AIW?  It was a

17    warrant, right?

18        A.   Right.

19        Q.   And it says "Only three of the 41

20    suspicious orders reported were orders from 19

21    customers respondent suspended."

22              "Only 3 of the 41 suspicious orders

23    reported were orders from the 19 customers

24    respondent suspended."
```

 1          Now, it goes on and says "Between October

 2    26, 2011," the day following the execution of the

 3    AIW, "and January 31, 2012, respondent terminated

 4    28 customers."

 5          So according to this, Cardinal gets

 6    wind -- well, they actually get copies of the fact

 7    that the -- the warrants have been issued for

 8    their facilities, right, Cardinal businesses?

 9              MR. PYSER:  Object to form.  Calls

10    for speculation.

11    BY MR. PAPANTONIO:

12        Q.   Right?

13        A.   That's...

14        Q.   That's what it says?

15        A.   I don't know.  I mean, it says that the

16    service of.

17        Q.   Yeah, right.  So after --

18              MR. PYSER:  Object to form.

19    BY MR. PAPANTONIO:

20        Q.   After the -- after they receive the AIW,

21    the warrant, then respondent terminated 28

22    customers after they received that warrant.

23          That's what that says, doesn't it?

24              MR. PYSER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   That's what it states.

 2   BY MR. PAPANTONIO:

 3      Q.   So you really only terminated 28 customers

 4   because the DEA had filed an AIW, a warrant,

 5   true?

 6                MR. PYSER:  Object to form.  Calls

 7   for speculation.

 8      A.   I can't speak to that.  I wasn't part of

 9   this team.

10   BY MR. PAPANTONIO:

11      Q.   Sir, but you understand that this team --

12   this team that you keep saying "this team," --

13   this team was working for Cardinal, correct?

14                MR. PYSER:  Object to form.

15      A.   Correct.

16   BY MR. PAPANTONIO:

17      Q.   Is that right?

18      A.   Correct.

19      Q.   And you were in corporate up in Columbus,

20   Ohio with Cardinal, correct?

21                MR. PYSER:  Object to form.

22      A.   Correct.

23   BY MR. PAPANTONIO:

24      Q.   And part of your job was to oversee, as
```

```
 1      A.   That's -- I can't speak to that.  That's

 2    what it states.

 3    BY MR. PAPANTONIO:

 4      Q.   Okay.  "Additionally, GS Carter will

 5    testify respondent knew or should have known that

 6    the large quantities of oxycodone it distributed

 7    to its top four customers were not being dispensed

 8    for legitimate medical purposes.

 9           "She will testify to the due diligence

10    files associated with the four pharmacies and will

11    testify that had the respondent conducted proper

12    due diligence, Cardinal would have realized that

13    the volume of oxycodone ordered by these four

14    pharmacies well exceeded that of any other Florida

15    retail pharmacy supplied by Cardinal."

16           Do you see that?

17               MR. PYSER:  Object to form.

18    BY MR. PAPANTONIO:

19      Q.   Now --

20      A.   That's what it states.

21      Q.   -- understand, this is -- this is to your

22    company, first of all --

23           I left something out as far as the number

24    of times that your company was put on notice of
```

1    supplier of respondent's, had noticed high

2    oxycodone sales to three Florida pharmacies and

3    asked that CVS go out to the three pharmacies to

4    ensure that oxycodone purchases were legitimate."

5            Now, it would be completely improper and

6    absolutely violating the regulations to ask CVS to

7    monitor itself, wouldn't it?

8                    MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10       Q.   You would agree that it would be totally

11   improper to ask one of your customers to go out

12   and check to see if things were being done

13   right?

14                   MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   Right?  That would be wrong, wouldn't

17   it?

18                   MR. PYSER:  Object to form.

19       A.   I would think you would want an employee

20   to visit.

21   BY MR. PAPANTONIO:

22       Q.   And the next page, the very top, it says,

23   .3, "She will further testify that respondent

24   not -- that had respondent not relied on CVS to

 1    conduct their own due diligence and had CVS

 2    properly conducted due diligence, respondent and

 3    CVS would have been aware that their sales of

 4    controlled substances were being diverted to

 5    illegitimate channels."

 6          That's what Miss Carter said, right?

 7              MR. PYSER:  Object to form.

 8      A.   That's what she said.

 9              MR. PAPANTONIO:  Let's go and

10    introduce 4093, the declaration of Michael

11    Leonhart -- excuse me, Michele Leonhart.  Let's

12    introduce that.

13

14          (Exhibit No. 28 marked for

15    identification.)

16

17              MS. MOORE:  This is Cardinal Reardon

18    28.

19    BY MR. PAPANTONIO:

20      Q.   Now let me ask you something.  You

21    understand what the standards of -- the industry

22    standards of how a company should conduct

23    business.  You understand what an industry

24    standard is, right?

```
 1    quantified as constituting an imminent danger to

 2    public health and safety?

 3            Had anybody ever he told you the conduct

 4    of those pharmaceutical companies, those

 5    pharmacies we're talking about, that the conduct

 6    had actually risen to being an imminent danger to

 7    the public health and safety?

 8                  MR. PYSER:  Object to form.

 9        A.   I had not heard that.

10    BY MR. PAPANTONIO:

11        Q.   Well, now that you have, look at      page

12    18 of this affidavit that you have in front of

13    you, this declaration by Michele Leonhart.  Take a

14    look at that.  Look at page 18.

15                  MR. PYSER:  Object to form, and move

16    to strike "now that you have" commentary by

17    Counsel.

18    BY MR. PYSER:

19        Q.   Do you see that page 18?

20        A.   Yes.

21        Q.   It says "Collectively, these findings led

22    me to conclude that Cardinal, Lakeland's continued

23    registration while these proceedings are pending,

24    constitutes an imminent danger to the public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    health and safety."

 2            And then you see where down there, it says

 3    "Possibility of public harm resulting from" -- you

 4    see where it says "possibility of public harm"?

 5        A.   Yes, I see that.

 6        Q.   You understand that's how they're

 7    describing the company that you're selling

 8    narcotics to is that the conduct is so bad,

 9    they're describing it as imminent danger to the

10    public health and safety?

11            Is that the first time you've seen that?

12                MR. PYSER:  Object to form.

13        A.   This?  Yes.

14    BY MR. PAPANTONIO:

15        Q.   I'm sorry.  That is the first time you saw

16    that?

17        A.   Yes.

18        Q.   I want you to go to page 35 of document

19    4085 that we've been talking about all day.

20            Do you see where it says,

21    "November 18, 2008, CareMed's owner, Roscoe Heim,

22    stated on a survey response that he used the

23    following distributors:  Cardinal, API, ExpertMed,

24    Spectrum, PCCA, Hawkins, and Masters."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    letter.

 2    BY MR. FULLER:

 3        Q.   And you didn't know that before today; is

 4    that right?

 5        A.   My focus was on the regulation.

 6        Q.   You were focusing on the suspicious order

 7    requirements, right?

 8        A.   Right.

 9        Q.   Okay.  So that's one part of the system,

10    correct?

11             And according to Mr. Rannazzisi the United

12    States Code enacted by Congress, the other part is

13    to maintain effective controls against diversion,

14    correct?

15                  MR. PYSER:  Object to form.

16        A.   It seems to appear that way.

17    BY MR. FULLER:

18        Q.   And let's talk as a moral company.  If

19    you're going to operate a company that operates

20    with a moral basis, you're dealing with highly

21    addictive and dangerous medications, particularly

22    in Schedule IIs, are you not?

23        A.   Yes.

24        Q.   And you want to maintain effective
```

```
 1    controls against diversion, don't you?

 2         A.   That would make sense, yes.

 3         Q.   And I mean, you want to protect the public

 4    from the harm that these drugs can do.  That's why

 5    we have this closed system, isn't it?

 6                   MR. PYSER:  Object to form.

 7         A.   We want to meet the requirements that will

 8    take us in that direction.

 9    BY MR. FULLER:

10         Q.   Well, do you also want to protect the

11    public from the harm that these drugs can cause?

12                   MR. PYSER:  Object.

13         A.   I think we do that by meeting the

14    requirements.

15    BY MR. FULLER:

16         Q.   So you would agree that we have two

17    separate requirements, based on Mr. Rannazzisi's

18    letter, right?

19         A.   That's what it appears to be.

20         Q.   Do you disagree with that?

21         A.   No.  I'm going by the letter that --

22         Q.   And this is a letter you read back in

23    2006?

24         A.   Yes.
```

```
 1    before?  It appears to be an ingredient limit

 2    report, correct?

 3        A.   Not in this format, but yes.

 4        Q.   It is an ingredient limit report?

 5        A.   Yes.

 6        Q.   And this is something Cardinal kept in the

 7    normal course of business; is that right?

 8        A.   Yes.

 9        Q.   And I'll represent to you that Cardinal's

10    produced this to the plaintiffs in this case,

11    amongst other ingredient limit reports, some of

12    them going back to 2005.  We should have, at least

13    according to your testimony, ingredient limit

14    reports going back prior to that; is that right?

15             MR. PYSER:  Object to form.  You can

16    testify about what you should have.

17        A.   It was implemented '94, '95.

18    BY MR. FULLER:

19        Q.   So you believe ingredient limit reports

20    started being created by Cardinal in 1994 or '95.

21    Correct?

22        A.   Correct.

23        Q.   And it's your understanding that these

24    documents were provided to the DEA; isn't that
```

```
 1    true?

 2        A.   Correct, on a monthly basis.

 3        Q.   And it's also your testimony that this

 4    document, this 535-page document, if I can get my

 5    copy.

 6

 7              (Brief pause in proceedings.)

 8

 9              MR. FULLER:  You stay right there.

10              MR. PYSER:  Move to strike.

11

12        (Brief pause in proceedings.)

13

14    BY MR. FULLER:

15        Q.   These, again, were kept in the normal

16    course of business at Cardinal and provided to the

17    DEA; is that correct?

18        A.   Correct.

19        Q.   And this is 535 pages of suspicious

20    orders; isn't that true?

21        A.   I haven't counted the pages, but...

22        Q.   If you go to the last page, I think it

23    will tell you what it was.

24              MR. PYSER:  I'm going to object to
```

1    the claims and the length of this.  The way it's

2    presented has added significantly to the page

3    number.

4                    MR. FULLER:  This is the way it was

5    produced.

6        A.   Not the format that it typically comes

7    in.

8    BY MR. FULLER:

9        Q.   Fair enough.  You may see it in a

10   different format?

11       A.   Yes.

12       Q.   But this document is inclusive of, at

13   least out of the Wheeling distribution center,

14   right you see that at the top?

15       A.   Yes.

16       Q.   Out of the Wheeling distribution center

17   for July of 2007, if this report was run

18   accurately and produced to us in the format that

19   Cardinal kept it in, this would be how many ever

20   pages are here, I'm saying there's 535, whatever

21   the page count is, this is all suspicious orders,

22   right?

23       A.   Based on the criteria that the DEA agreed

24   to.

```
 1        Q.   Based on whatever.  These are all

 2   suspicious orders under your CFR reporting

 3   requirement, correct?

 4        A.   Correct.

 5        Q.   And Cardinal shipped all these orders out

 6   into our communities across the country, didn't

 7   they?

 8             MR. PYSER:  Object to form.

 9        A.   It may have been some that were caught at

10   the distribution center and investigated.

11   BY MR. FULLER:

12        Q.   Well, this report isn't generated until

13   the end of the month, right?

14        A.   But it's a two-step process.

15        Q.   I understand, but just listen to my

16   question.

17             This report isn't generated until the end

18   of month, correct?

19        A.   Correct.

20        Q.   And any shipments that have gone, have

21   long gone out because it's usually 24-hour

22   turnaround, correct?

23        A.   Correct.

24        Q.   So if you look, there's, actually, I
```

Highly Confidential - Subject to Further Confidentiality Review

1    think, a run date of August 5, 2007 on here,

2    right?

3        A.   Yes.

4        Q.   So these orders were gone by the time this

5    report was printed.  You agree?

6        A.   Correct.

7        Q.   We'll come back to that document in just a

8    minute, but you're talking about the second part

9    of this process.

10           The second part of this process is for

11   pickers and checkers to pick up on excessive

12   orders in the distribution centers; is that true?

13       A.   Correct.

14       Q.   And pickers and checkers are the people

15   filling the orders at the distribution facilities,

16   right?

17       A.   Correct.

18       Q.   And if a picker and checker finds an order

19   that exceeds some sort of internal limit, then

20   they are to pull that order and report that

21   specific order as suspicious; isn't that right?

22       A.   They're required to -- not necessarily a

23   limit.  If something they see based on their

24   experience with the customer or other customers,

1      A.   Correct.

2      Q.   When you were over and you saw all those

3    distribution centers that you oversaw across the

4    entire country -- and let's be clear.  This is a

5    systemic approach, right?  And by that, I mean

6    you're applying the same systems to the entire

7    country from Washington state all the way down to

8    Florida, correct?

9      A.   It was the same system.

10     Q.   And you expected it to be implemented the

11   same way in all your distribution centers; is that

12   fair?

13     A.   That's fair.

14     Q.   And you were trying to ensure that

15   everybody was trained on the system and that it

16   was being operated in the same form or fashion,

17   whether it was in Lakeland, Florida, Wheeling,

18   West Virginia, or -- I think it's Valencia,

19   California, right?

20     A.   Correct.

21          MR. PYSER:  Counsel, let's take a

22   little break.  We've been going about an hour.

23   It's getting late in the day.

24          THE VIDEOGRAPHER:  The time is 4:55

```
 1       A.   Correct.

 2   BY MR. FULLER:

 3       Q.   And you don't know, sitting here today,

 4   what the result of that was that Cardinal

 5   conducted or should have conducted?

 6               MR. PYSER:  Object to form.

 7       A.   It would have been conducted by the

 8   anti-diversion team.

 9   BY MR. FULLER:

10       Q.   Let's do the pill comparison, please.  So

11   during the time frame that you were there, part of

12   your job was to look for -- we talked about

13   suspicious orders and to look for patterns,

14   right?

15       A.   Correct.

16       Q.   Did you -- well, you testified earlier you

17   didn't look at any pill counts, correct?

18               MR. PYSER:  Object to form.

19       A.   I did not personally.

20   BY MR. FULLER:

21       Q.   Well, let's start.  So Ohio is -- I mean,

22   you know where Ohio is.  You were based in

23   Columbus or the Columbus area, correct?

24       A.   Correct.
```

```
 1        Q.    Illinois is two states over.  Are you

 2   aware that the states are similarly situated?  I

 3   mean, Illinois has about a million more people

 4   than Ohio.  Are you aware of that?

 5        A.    No.

 6        Q.    Both considered midwest states.  Can we

 7   agree on that?

 8        A.    Yes.

 9        Q.    And it's a neighboring state.  It's got

10   some unimportant state in between the two of them,

11   right?

12        A.    Yes.

13        Q.    Kidding.  They're geographically similar.

14   They're similar in size and, based on my

15   representations, about the same population, right?

16        A.    Yes.

17        Q.    And if we're looking at pills distribution

18   across the entire country, we can say safely

19   there's probably not -- or shouldn't be a

20   significant difference between Ohio and Illinois,

21   fair enough?

22                  MR. PYSER:  Object to form.  Calls

23   for speculation testimony.

24        A.    I wouldn't know enough about it to --
```

```
 1    BY MR. FULLER:

 2        Q.   If we saw a significant difference, it

 3    might be something we would want to look into,

 4    correct?

 5                 MR. PYSER:  Object to form.

 6        A.   May raise a question to say why.

 7    BY MR. FULLER:

 8        Q.   Let me ask.  You're a cop, worked the

 9    street, right, here in Boston, correct?

10        A.   Outside of Boston.

11        Q.   Outside of Boston.  If you were driving

12    doing your patrol and you see something suspicious

13    going on, you're going to take initiative and

14    investigate it, aren't you?

15                 MR. PYSER:  Object to form.

16        A.   Yes.

17    BY MR. FULLER:

18        Q.   May not be that there is anything with it.

19    There may not be any laws being broken, but until

20    you do your investigation you're not going to know

21    that, are you?

22        A.   Correct.

23        Q.   I mean, I don't want to insult you, but

24    let's go back.  I prosecuted a ton of DUIs.  You
```

1    may see somebody weaving on the road.  Well,

2    doesn't mean they're drunk, does it?

3        A.   Not necessarily.

4        Q.   But it's an indicator, hey, there may be

5    something going on.  It could be a health concern.

6    It could be that they're texting and driving at

7    least now probably, not when you were a cop not,

8    when I was a prosecutor.  But that's the type of

9    thing you would want to investigate to see what

10   the issue is, correct?

11       A.   Correct.

12       Q.   So let's look at the comparison between

13   Illinois and Ohio.  Let's go for 2006.  4.9

14   million -- and this is just oxycodone, okay?  You

15   understand?

16       A.   Yes.

17       Q.   Okay.  4.9 million dosage units, pills,

18   into Illinois.  67 million pills into Ohio in the

19   same year.  This is just Cardinal alone.  That

20   causes you some concern, doesn't it,

21   Mr. Reardon?

22            MR. PYSER:  Object to form.

23       A.   It would --

24   BY MR. FULLER

 1     Q.   Now --

 2     A.   -- warrant a further look.

 3     Q.   Exactly.  We're not saying that there's

 4   anything nefarious going on yet, but we're not

 5   going to know unless we investigate, are we?

 6     A.   Correct.

 7     Q.   And we both know Cardinal had this

 8   information.  This is your sales data.  And I say

 9   yours.  I mean the royal you and Cardinal,

10   correct?

11     A.   Correct.

12     Q.   Somebody could have had this information

13   pulled, right?

14     A.   (Witness nodding.)

15     Q.   In 2006, you've already told us -- Mr.

16   Hartman has already testified, as well as others,

17   that we are in the middle of an opioid crisis, we

18   should be doing comparisons like this.  Would you

19   agree with that?

20            MR. PYSER:  Object to form.

21     A.   It would make sense.

22   BY MR. FULLER:

23     Q.   So let's go to 2007.  5.9 million in

24   Illinois.  72 million in Ohio.  Again, huge

 1    disparity.

 2                    MR. FULLER:  Let's keep going, Gina.

 3    BY MR. FULLER:

 4        Q.   2008, 2009, 2010, 2011, 2012.  Let's stop

 5    there for a second.

 6             2012, 10 million pills into Illinois, 100

 7    million pills into the state of Ohio with a

 8    million less people.  This pattern causes you

 9    concern, sitting here today, doesn't it,

10    Mr. Reardon?

11                    MR. PYSER:  Object to form.

12        A.   It raises the question of why.

13    BY MR. FULLER:

14        Q.   Exactly.  Let's keep going, 13, 14.

15    Mr. Brantley raised a good question, well, did we

16    have more customers in Ohio than we did Illinois?

17             Let's go.  Cardinal customers in Illinois,

18    1,716.  Cardinal customers in Ohio, 1,744.  We can

19    agree that statistically that's close enough,

20    right?

21                    MR. PYSER:  Object to form.

22    BY MR. FULLER:

23        Q.   That's not going to provide the

24    explanation for the significant difference between

1    the two states, is it?

2        A.   I think you have to dig deeper --

3        Q.   So that's my question.

4             MR. PYSER:  Were you done with your

5    answer?

6    BY MR. FULLER:

7        Q.   Go ahead.

8        A.   -- and determine types of customers.

9        Q.   So you tell me who at Cardinal -- because

10   they had this information, who was it that dug

11   deeper?

12            MR. PYSER:  Object to form.

13       A.   I don't -- I don't have that knowledge.

14   BY MR. FULLER:

15       Q.   I mean, you would agree with me, would you

16   not, that it shouldn't take a lawsuit against

17   Cardinal before it would look into something like

18   this going on in its company, correct?

19            MR. PYSER:  Object to form.

20       A.   Correct.

21   BY MR. FULLER:

22       Q.   So there we have it, 798 million dosage

23   units for that time frame into a population of

24   11.7 million for Ohio.  Only 76 million with a

1    million more people, 12.8, correct?

2        A.   Correct.

3        Q.   I mean, sitting here today, you didn't

4    know this before today, right?

5        A.   No.

6        Q.   No one shared this with you?  No one

7    pulled the numbers for you even back when you were

8    there at Cardinal, correct?

9        A.   Correct.

10       Q.   I mean, do you find that shocking, that

11   disparity?  I mean, it's ten times the amount of

12   pills.

13       A.   I -- I still think you need to dig deeper,

14   customers.

15       Q.   Now, we also know -- and the jury will

16   have heard by now -- that back in 2003 the GOA,

17   Government Office of Accounting, did a report,

18   OxyContin and its abuse and -- abuse and addiction

19   or something like that and they found that opioid

20   epidemic was hitting certain states more than

21   others.  That would also be something that

22   Cardinal would want to be aware of.  Can we agree

23   with that?

24       A.   I think so.

```
 1        Q.   I mean, let's go back to our -- again, our

 2   investigative days.  You want to gather all the

 3   information you can, correct --

 4                  MR. PYSER:  Object to form.

 5        A.   Correct.

 6   BY MR. FULLER:

 7        Q.   -- particularly when you're one that has

 8   been entitled, been privileged with the ability to

 9   operate in this closed system.  Cardinal -- no one

10   forced this licensing, this registrant status, on

11   Cardinal, did they?

12        A.   No.

13        Q.   Cardinal went out and wanted to get into

14   this business so they could distribute and make

15   money, correct?

16        A.   Correct.

17        Q.   But they took on an obligation when they

18   did that.  We've looked at that.  Based on

19   Rannazzisi's letters, they took on obligations to

20   ensure to do the best job they could to keep our

21   community safe, right?

22        A.   Correct.

23        Q.   And doing an analysis of this kind of

24   data, this disparity between Illinois and Ohio, is
```

Highly Confidential - Subject to Further Confidentiality Review

1    part of what follows within that obligation,

2    doesn't it?

3                    MR. PYSER:  Object to form.

4        A.   It would warrant a look to see why the

5    disparity -- the digger.

6    BY MR. FULLER:

7        Q.   Like you said --

8        A.   Deeper down.

9        Q.   -- deeper dig down.  Sitting here today,

10   you don't know of anybody at Cardinal that

11   bothered to do that you, do?

12                   MR. PYSER:  Object to form.

13       A.   I have no knowledge.

14                   MR. FULLER:  Let's go on, Gina, next

15   slide.  Yes, West Virginia.  Oh, this is the

16   total.  Yeah, let's go to the total.

17   BY MR. FULLER:

18       Q.   Another explanation Mr. Brantley mentioned

19   was maybe other wholesaler distributors were more

20   primary in Illinois versus Ohio.  Fair part of our

21   investigation, you would agree, correct?

22       A.   It's a possibility.

23       Q.   So this is all distributors.  The graph

24   looks the same, doesn't it?

```
 1      A.   (Witness nodding.)

 2      Q.   From --

 3      A.   Very similar.

 4      Q.   -- from 2006 to 2014, over that entire

 5  year, all distributors into these respective

 6  states only put in 351 million pills into

 7  Illinois, and 2.1 billion pills into Ohio, six

 8  times?

 9               DEFENSE COUNSEL:  Objection to

10  form.

11  BY MR. FULLER:

12      Q.   Six times the difference, right?

13               DEFENSE COUNSEL:  Objection to form.

14      A.   Right.

15  BY MR. FULLER:

16      Q.   I mean, how do people take that many pills

17  in the state of Ohio?

18               MR. PYSER:  Object to form.

19  BY MR. FULLER:

20      Q.   It doesn't seem right, does it?

21      A.   I don't -- without having further

22  information, I can't speculate.

23      Q.   It's the investigative process that should

24  have been done years ago, right?
```

1    Q.   Let's go to West Virginia.  Now, West

2    Virginia is another state over from Ohio, right,

3    going east?  You're aware of West Virginia is --

4    A.   Correct.

5    Q.   -- a much smaller state though, right?

6    A.   I...

7    Q.   I'll tell you.  You'll see.  1.8 million

8    people compared to the 12.8 of Illinois.  You

9    would expect to see more pills going into Illinois

10   than West Virginia, all things being equal,

11   correct?

12   A.   Possibly.

13   Q.   I mean, seven times smaller?

14   A.   Again, depends.

15   Q.   It depends on whether we're dumping pills

16   into a state or we're complying with our

17   regulatory requirements, right?

18             MR. PYSER:  Object to form.

19   A.   It depends on the number of pharmacies,

20   customer type.

21   BY MR. FULLER:

22   Q.   Let's look at it.  2006, 4.9 million pills

23   into Illinois again.  Same number, 10.5 million

24   into West Virginia.

Highly Confidential - Subject to Further Confidentiality Review

1           2007, let's keep going, 2008, 2009, 2010,

2      '11, '12, all the way to '14.  Let's do the total.

3           Population of 12.8 in Illinois, only 1.8

4      in West Virginia, 7 times the difference and yet

5      you've got almost double the pills.  Someone at

6      Cardinal should have picked up on this as well,

7      correct?

8                    MR. PYSER:  Object to form.

9      BY MR. FULLER:

10         Q.   Right?

11         A.   If they had the info.

12         Q.   This is Cardinal's numbers.  Cardinal had

13     the info, right?  I mean, come on.  Cardinal's

14     making these sales.  You know that Cardinal tracks

15     where its making sales.  You know they do track

16     where they're making sales, don't you?

17         A.   They would.

18         Q.   They do all sorts of analysis on sales and

19     distribution of pills, don't they?

20                    MR. PYSER:  Object to form.

21         A.   I don't know the detail on what they do.

22     BY MR. FULLER:

23         Q.   You know they do a lot of it though,

24     correct?

```
 1                    MR. PYSER:  Object to form.

 2        A.   They would do sales analysis.

 3   BY MR. FULLER:

 4        Q.   And then let's look at the number of

 5   customers.  There are less than half as many

 6   customers in West Virginia that Cardinal is

 7   serving, 765 pharmacies compared to 1,700 in

 8   Illinois, right?

 9        A.   It's what it says.

10        Q.   So that means they must have been dumping

11   nearly double the amount of pills through each

12   pharmacy in West Virginia if the numbers are going

13   to make sense, correct?

14                    MR. PYSER:  Object to form.

15        A.   I don't have enough information to --

16   BY MR. FULLER:

17        Q.   Well --

18        A.   I can see totals.

19        Q.   Right.  And you can see that there's more

20   than double the amount of pills having to run

21   through those 765 pharmacies to make up that pill

22   count, correct?

23        A.   That's what the numbers say.

24        Q.   And based on your investigative
```

Highly Confidential - Subject to Further Confidentiality Review

1    background, that's going to send up red flags

2    that -- hey, what's going on in West Virginia, we

3    need to take a look at this.

4             That's the whole idea behind the

5    suspicious order system, isn't it?

6                     MR. PYSER:  Object to form.

7        A.   To monitor customer purchases.

8    BY MR. FULLER:

9        Q.   Monitor the purchases, monitor how many

10   pills are going into the different communities

11   around the country, right?

12       A.   Well, that would tie to -- the customer

13   monitoring would tell you.

14       Q.   Right.  Because all these pharmacies are

15   in, you know, Cleveland, Ohio; Summit County,

16   Ohio; West Virginia; Mount Gay; Kermit, West

17   Virginia.  I'm sure you've heard some of the --

18   did you watch the congressional testimony of that

19   Mr. Barrett gave?

20                    MR. PYSER:  Object to form.

21   Objection compound.

22       A.   I did not.

23   BY MR. FULLER:

24       Q.   Why not?

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A.   Correct.

 2  BY MR. FULLER:

 3     Q.   You want to look and see why is this

 4  happening.  And here's the shocking thing.  The

 5  people within Cardinal -- there are people within

 6  Cardinal that had this information.  You can't

 7  deny that, can you?

 8               MR. PYSER:  Object to form.

 9     A.   I can't deny it.  I just don't know for

10  sure, but --

11  BY MR. FULLER:

12     Q.   It's their sales data?

13     A.   I would assume that's sales data, yeah.

14     Q.   You also know they knew who their

15  customers were?

16               MR. PYSER:  Object to form.

17  BY MR. FULLER:

18     Q.   Right?  They have to, correct?

19     A.   Correct.

20     Q.   And no one ever brought this to your

21  attention?

22               MR. PYSER:  Object to form.

23     A.   Not that, no.

24  BY MR. FULLER:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FULLER:

 2        Q.   Okay.  Well, let's limit my question to up

 3    to the end of 2007.

 4             It was Cardinal's practice to report

 5    suspicious customers, not suspicious orders,

 6    right?

 7                   MR. PYSER:  Object to form.

 8    Misstates evidence.

 9        A.   Well, the ingredient limit report showed

10    both, the customer and the orders.

11    BY MR. FULLER:

12        Q.   Fair enough, fair enough.

13             And those are all the orders -- the

14    suspicious orders that Cardinal shipped over the

15    years, right?

16                   MR. PYSER:  Object to form.

17        A.   They did ship.

18    BY MR. FULLER:

19        Q.   And that was the same practice.  Whether

20    it was out at the Wheeling center, the Lakeland

21    center, the Valencia center, wherever else they

22    had distribution centers, that was the same

23    practice everywhere, right, correct?

24        A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Cardinal Health complied with 21 CFR 1301.74(b).

2    Can be describe that for me?

3        A.   Yes.  Employees who worked in the cage

4    involved -- that filled orders were tasked with

5    monitoring the auto process, and if there was

6    anything that they identified based on their

7    knowledge of customers, like customers, and

8    they -- they had the obligation and the ability to

9    pull that order and hold that order.

10       Q.   You were also asked about Exhibit P in the

11   DEA compliance manual.  You can just look at it on

12   the screen.

13       A.   Yes.

14       Q.   Do you recall some questions on that?

15       A.   Yes.

16       Q.   Is every order above the limit in Exhibit

17   P, the poster that's up in the cage and vault --

18   is that necessarily a suspicious order?

19       A.   No.

20       Q.   In the event that someone working in the

21   cage and vault saw an order above the posted limit

22   but did not think it was of unusual size,

23   frequency or pattern, what would Cardinal Health's

24   policies have expected them to do?

```
 1                    MR. PAPANTONIO:  Objection as to

 2    what anybody thought about a pattern.

 3         A.   They would process the order and allow it

 4    to be shipped.

 5    BY MR. PYSER:

 6         Q.   Were there times when Cardinal Health

 7    sought guidance from DEA as to what to do next on

 8    an order that had been flagged as an order of

 9    interest?

10         A.   Yes.

11         Q.   How did that work?

12         A.   Local distribution center would contact

13    the local DEA office.

14         Q.   Now, the process may be different today,

15    but back, say, in 2007, how did the process work

16    for filling orders of a controlled substances for

17    say a hospital in the cage and vault?

18         A.   Well, depending on the product -- so if

19    it's a Schedule II product, DEA form 222 comes in

20    and that's reviewed by the order entry person to

21    make sure that it's filled out completely and

22    according to the regulations.

23              And if there are no alterations, it's

24    signed and dated.  And if it looks okay per the
```

1

2          (Exhibit No. 43 marked for

3     identification.)

4

5     BY MR. PAPANTONIO:

6          Q.   What do you have in front of -- you see

7     what we're reading in front of you right now?

8          A.   I have --

9          Q.   It's got your name on top of it, right?

10         A.   Yes.

11         Q.   And it says -- now, this is -- I don't

12    believe they asked you about this when they

13    brought this up, so let me ask you about it.

14    "HDMA met with DEA officials last Friday,

15    September 7."  You were at that meeting, is that

16    right, Mr. Reardon?

17         A.   No.

18         Q.   Well, is -- this is your -- you simply are

19    passing this on, is that correct?  It's got your

20    name on top of it, right?

21         A.   Correct.

22         Q.   It says "Summary of DEA meeting."

23              Do you see that?

24         A.   Yes.

```
 1       Q.   And this is your summary, correct?

 2       A.   It's my summary of the DEA conference, not

 3    the HDMA meeting.

 4       Q.   Okay.  Well, let's see what you said about

 5    the conference.

 6            "HDMA met with DEA officials last Friday,

 7    September 7, to discuss the agency's current

 8    policy position on suspicious orders of controlled

 9    substances.  A summary highlight, the key points

10    made during the meeting are attached for your

11    review.

12            "DEA is setting a new standard with which

13    we must comply.  This is all coming about as a

14    result of the problems with the Internet

15    pharmacies and controlled substances diversion.

16    Recently, they suspended an ABC registration and

17    used the suspension to get them to implement a

18    complex and onerous suspicious order monitoring

19    program that meets the criteria spelled out in the

20    HDMA."

21            What is the HDMA?

22                 MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24       Q.   What is the HDMA?
```

```
 1      A.   Trade association.

 2      Q.   Right.  It's the trade association you

 3   were a member of, correct?

 4      A.   Yes.

 5      Q.   And you're describing the new standard

 6   that I think you just talked about.  You're

 7   describing it as complex, onerous.  That's --

 8   those are your words, right, "complex" and

 9   "onerous"?

10      A.   Yes.

11      Q.   And then it's -- what's complex and

12   onerous about it?

13      A.   Primarily it's a change to the business

14   model and the impact on customers who are going to

15   have to come up with new inventory management

16   processes and how they manage their inventory and

17   how they order their stock and then opening up to

18   site visits.

19      Q.   So you were worried about your customers.

20   Is that what you're telling me?  This new change,

21   you're worried about your customers.  Is that your

22   testimony?

23              MR. PYSER:  Object to form.

24   Misstates testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2        Q.   Right?

 3                   MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5        Q.   You said it was going to be too onerous

 6    and complex for customers?

 7        A.   It's a change in the business model for

 8    the customers.

 9        Q.   It says "Recently they suspended the ABC

10    registration."  Then goes on to say,

11    "ABC presented their program at the DEA industry

12    conference this week that I attended."

13                   DEFENSE COUNSEL:  Objection to form.

14    BY MR. PAPANTONIO:

15        Q.   It says "I attended," right?

16        A.   This is two separate meetings.

17        Q.   Okay.  Well, let's ask.  It says "ABC

18    presented their program at the DEA industry

19    conference" -- were you there --

20        A.   Yes.

21        Q.   Okay.  -- "this week that I attended and I

22    have attached a copy of the presentation.  DEA

23    referred to ABC program as the new industry

24    standard.  I will be setting up a meeting to
```

Case 1:17-cv-01362-DAP Doc #: 1973-22 Filed: 10/06/20 1 of 5. PageID #: 492367
Case 1:17-cv-01362-DAP Doc #: 1973-22 Filed: 10/06/20 Page 1 of 5. PageID #: 492967

```
1     initiate discussions on this topic in the near

2     future.  Additionally, I'm aware that MCK" -- what

3     is MCK?

4         A.   McKesson.

5         Q.   -- "is in ongoing negotiations DEA related

6     to -- related to an order to show cause.  An order

7     to show cause effects the registrant and the

8     opportunity to argue why a registration should be

9     suspended," right?

10             Is that what it said?

11        A.   Correct.

12        Q.   Look at the last paragraph.  These are

13    your words, aren't they?  These are your words?

14        A.   Yes.

15        Q.   "We need to be proactive and implement a

16    program that we develop that will satisfy DEA

17    expectations and that is not dictated to us by the

18    agency pursuant to the regulatory actions."

19             You didn't want to be dictated to by the

20    DEA.  That's what this says, right?

21                 MR. PYSER:  Objection.

22        A.   No, we didn't.

23                 MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:
```