# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 5 – Hartle Tr. (7-31-18) Excerpts

```
 1              UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

      IN RE: NATIONAL           )
 4    PRESCRIPTION              )  MDL No. 2804
      OPIATE LITIGATION         )
 5    _____   )  Case No.
                                )  1:17-MD-2804
 6                              )
      THIS DOCUMENT RELATES  )  Hon. Dan A.
 7    TO ALL CASES           )  Polster
 8
                  TUESDAY, JULY 31, 2018
 9

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW
11                      - - -
12            Videotaped deposition of Nathan J.
13    Hartle, held at the offices of Covington &
14    Burlington, LLP, One City Center, 850 Tenth
15    Street Northwest, Washington, DC, commencing
16    at 9:04 a.m., on the above date, before
17    Carrie A. Campbell, Registered Diplomate
18    Reporter, Certified Realtime Reporter,
19    Illinois, California & Texas Certified
20    Shorthand Reporter, Missouri & Kansas
21    Certified Court Reporter.
22                      - - -
              GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25
```

Page 14

1 O'Croinin, CVS.
2       MS. MONAGHAN:  Meghan Monaghan,
3 Covington & Burling, on behalf of
4 McKesson and the witness.
5       MS. HENN:  Emily Henn,
6 Covington & Burling, on behalf of
7 McKesson and the witness.
8       VIDEOGRAPHER:  Via telephone?
9       MS. PEDROZA:  This is Monica
10 Pedroza on behalf of Teva
11 Pharmaceuticals USA, Inc., Cephalon
12 Inc., Watson Laboratories, Inc.,
13 Actavis, LLC, and Actavis Pharma, Inc.
14       MR. LAVELLE:  John Lavelle on
15 behalf of Rite Aid.
16       MR. MONTMINY:  Brendan Montminy
17 on behalf Henry Schein, Inc., and
18 Henry Schein Medical Systems, Inc.
19       MR. AUBEL:  Bill Aubel, Jackson
20 Kelly, on behalf of Miami-Luken, Inc.
21       MR. WEINBERGER:  Pete
22 Weinberger on behalf of the
23 plaintiffs.
24       VIDEOGRAPHER:  The court
25 reporter is Carrie Campbell, who will

Page 15

1 now administer the oath to the
2 witness.
3
4       NATHAN J. HARTLE,
5 of lawful age, having been first duly sworn
6 to tell the truth, the whole truth and
7 nothing but the truth, deposes and says on
8 behalf of the Plaintiffs, as follows:
9
10       DIRECT EXAMINATION
11 QUESTIONS BY MR. FARRELL:
12    Q.    Good morning.
13    A.    Good morning.
14    Q.    Please state your name.
15    A.    My name is Nathan -- I go by
16 Nate -- John Hartle.
17    Q.    And what is your occupation,
18 and who is your employer?
19    A.    I'm currently a vice president
20 of regulatory affairs and compliance for
21 McKesson Corporation.
22    Q.    How long have you been employed
23 by McKesson?
24    A.    Since May of 2014.
25    Q.    Have you ever had your

Page 16

1 deposition taken before?
2    A.    20 years ago when I -- when I
3 worked at a previous employer for a theft
4 case, investigative.
5    Q.    So if you'll bear with me,
6 we're going to do a little bit of paperwork
7 to start -- to start off.
8    A.    Okay.
9    Q.    The first thing is, is are you
10 aware that today you'll be testifying not as
11 Nate Hartle but as McKesson Corporation?
12    A.    I am.
13       (McKesson-Hartle Exhibit 1
14    marked for identification.)
15 QUESTIONS BY MR. FARRELL:
16    Q.    I'm going to have marked and
17 show you McKesson 30(b)(6) Document 1, and
18 this is the first notice of deposition that
19 was filed in this case.
20       Have you had a chance to review
21 this document before today?
22    A.    I do.  I have copies of this.
23    Q.    And you understand that today
24 I'll be asking you questions about the
25 subject matters that are in Exhibit 1, and

Page 17

1 McKesson has been kind enough to designate
2 you as its spokesman to answer these
3 questions?
4       MS. HENN:  Objection to form.
5       THE WITNESS:  I understand.
6       (McKesson-Hartle Exhibit 2
7    marked for identification.)
8 QUESTIONS BY MR. FARRELL:
9    Q.    There's a second notice.  We'll
10 have that marked as Exhibit 2, and it's MCK
11 30(b)(6)_02.
12       Have you had a chance to review
13 this document before today?
14    A.    I have.
15    Q.    Now, it's my understanding that
16 McKesson has designated you to testify on
17 certain subject matters within this document
18 but not all.
19       Is that your understanding?
20    A.    Correct.
21    Q.    And those numbers are numbers
22 9, 14, 16, 17, 18, 19, 20, 21 and 22.
23       Is that your understanding as
24 well?
25    A.    Yes.

Page 34

1  QUESTIONS BY MR. FARRELL:
2      Q.    Have you read this document in
3  preparation for today's deposition?
4      A.    Did I have it in the past?
5      Q.    No.
6            In preparation for today's
7  deposition, have you read this as McKesson's
8  corporate designee?
9      A.    I did not read this specific
10 right before the deposition.
11     Q.    So it's not -- it's not a
12 memory contest --
13     A.    Right.
14     Q.    -- and that's why I brought the
15 documents --
16     A.    Right.
17     Q.    -- so that -- so that we can
18 talk about some of the subject matters.
19           The first thing I'd like you to
20 do is turn to the Bates stamp page 7.  And
21 you'll notice that there are two columns, and
22 in the bottom right-hand corner the paragraph
23 heading number 2.
24           Do you see that?
25     A.    Yes.

Page 35

1      Q.    And midway down through, you'll
2  see that in the parentheses it says the
3  "reporting requirement."
4      A.    I see that.
5      Q.    Do you see it?
6      A.    I do.
7      Q.    And then immediately after
8  that, it describes what the reporting
9  requirement is.  And I don't know if you do
10 better reading it aloud or reading it to
11 yourself.
12           Would you like me to read it,
13 or would you like to read it?
14     A.    I can read it.
15     Q.    All right.  Starting with "the
16 reporting requirement is a relatively modest
17 one," will you finish the sentence?
18     A.    I read that sentence.
19     Q.    Okay.  Now, will you read it
20 aloud?
21     A.    "It requires only that a
22 distributor provide basic information about
23 certain orders to DEA so that DEA
24 investigators in the field can aggregate
25 reports from every point along the legally

Page 36

1  regulated supply chain and use the
2  information to ferret out potentially illegal
3  activity."
4      Q.    Does McKesson acknowledge that
5  it has a duty under the reporting
6  requirement?
7            MS. HENN:  Objection to form.
8            THE WITNESS:  Acknowledge that
9            we -- we, as part of the designing and
10           operating the suspicious order system,
11           have to report suspicious orders.
12 QUESTIONS BY MR. FARRELL:
13     Q.    That wasn't my question.
14           My question is:  Does McKesson
15 acknowledge the reporting requirement, as you
16 just read aloud, is a duty owed by McKesson
17 under the federal regulations and United
18 States Code?
19           MS. HENN:  Objection to form.
20           THE WITNESS:  And it's our
21           responsibility to report suspicious
22           orders.
23 QUESTIONS BY MR. FARRELL:
24     Q.    So the answer to my question is
25 yes --

Page 37

1      A.    Yes.
2      Q.    -- no, or I don't know.
3            MS. HENN:  Objection to form.
4            THE WITNESS:  It is our -- yes.
5  QUESTIONS BY MR. FARRELL:
6      Q.    Okay.  Now, I want you to go
7  down, and if you actually flip the page,
8  we'll cheat to the end, and it's the end of
9  the first sentence in the top left-hand
10 corner.  In parentheses it says, "The
11 shipping requirement."
12           Do you see that?
13     A.    Where am I looking again?
14 Sorry.
15     Q.    Very top left-hand corner
16 there's a --
17     A.    Okay.  Shipping requirement.  I
18 see that.
19     Q.    All right.  Now what we're
20 going to do is go to the beginning of that
21 sentence on the previous page, and it's the
22 last full sentence.  It starts with "once a
23 distributor has."
24           Do you see that sentence?
25     A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  Q.    Now I'm going to give you a
2  chance to read it without -- and digest it
3  for a second.
4      A.    I've read that.
5      Q.    All right.  Now, can you read
6  it aloud for the record?
7      A.    "Once a distributor has
8  reported a suspicious order, it must make one
9  of two choices, decline to ship the order or
10 conduct some due diligence, and if it is able
11 to determine that the order is not likely to
12 be diverted into illegal channels, ship the
13 order."
14     Q.    Does McKesson acknowledge that
15 the shipping requirement is a duty it owes
16 under the United States Code and the Code of
17 Federal Regulations?
18         MS. HENN:  Objection to form.
19         THE WITNESS:  Yes.
20         (McKesson-Hartle Exhibit 5
21 marked for identification.)
22 QUESTIONS BY MR. FARRELL:
23     Q.    We'll come back to this later.
24         All right.  The next document
25 we're going to reference is MCK 30(b)(6)_5.

Page 39

1  And so to make this easy so I don't have to
2  say all those letters and numbers, as we move
3  forward I'm just going to refer to it exhibit
4  such-and-such.
5      A.    Okay.
6      Q.    And when I do, we're talking
7  about the exhibit for this deposition.
8          I'm going to represent to you
9  that there are four pages to this exhibit,
10 that you won't find this exhibit anywhere on
11 the Internet because I made them myself.  I'm
12 going to give you a second to flip through
13 them, and what I'm going to represent to you
14 is that these are four different provisions
15 from four different United States Code
16 provisions.  So I'll give you a second to
17 review.
18     A.    Okay.
19     Q.    So the first thing I want you
20 to take note of on Exhibit 5, page 1, is the
21 top left-hand corner, which is the great seal
22 of our United States Congress.
23         And if you look under the
24 United States Code, Title 21, for food and
25 drugs, under Chapter 13, Drug Abuse

Page 40

1  Prevention and Control, Subchapter 1, Control
2  and Enforcement, Part A, Introductory
3  Provisions, this is the beginning of the
4  Controlled Substances Act.
5          McKesson is aware of and
6  acknowledges that its role in the chain of
7  distribution of opioids is governed by the
8  Controlled Substances Act, agreed?
9          MS. HENN:  Objection to form.
10         THE WITNESS:  Yes.
11 QUESTIONS BY MR. FARRELL:
12     Q.    Now, I'm going to have you look
13 down all the way at all those letters and
14 numbers at the very bottom, Public Law
15 91-513, Title 2.  And the date there is
16 October 27, 1970.
17         McKesson is aware that the
18 Controlled Substances Act has been in force
19 and effect since 1970, correct?
20         MS. HENN:  Objection to form.
21         THE WITNESS:  Correct.
22 QUESTIONS BY MR. FARRELL:
23     Q.    So Section 801, which is on the
24 first page, is Congressional findings and
25 declarations regarding controlled substances.

Page 41

1          Do you see that?
2      A.    I do.
3      Q.    And it says, "The Congress
4  agrees makes the following findings and
5  declarations."
6          And to be fair, paragraph 1,
7  will you read it aloud?
8      A.    "Many of the drugs included
9  within this subchapter have a useful and
10 legitimate medical purpose and are necessary
11 to maintain the health and general welfare of
12 the American people."
13     Q.    Does McKesson acknowledge and
14 agree with that finding?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  Yes.
17 QUESTIONS BY MR. FARRELL:
18     Q.    Now, will you read Section 2
19 aloud, please?
20     A.    "The illegal importation,
21 manufacture, distribution and possession and
22 improper use of controlled substances have
23 substantially and detrimentally effect --
24 have a substantial and detrimental effect on
25 the health and general welfare of the

Page 42

1 American people."
2      Q.    Does McKesson acknowledge and
3 agree with those findings?
4          MS. HENN:  Objection to form.
5          THE WITNESS:  Yes.
6 QUESTIONS BY MR. FARRELL:
7      Q.    So you'll notice in paragraph 2
8 it includes distribution, correct?
9      A.    Correct.
10     Q.    And McKesson is engaged in the
11 distribution business, agreed?
12     A.    We are.
13     Q.    And that if they do not follow
14 the law as provided by the US code and the
15 Code of Federal Regulations, it has a
16 substantial and detrimental effect on the
17 health and general welfare of the American
18 people, agreed?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  Could you restate
21     that question for me, please?
22 QUESTIONS BY MR. FARRELL:
23     Q.    Yeah.
24         You agree with paragraph 2 --
25     A.    Right.

Page 43

1      Q.    -- as McKesson's
2 representative, correct?
3      A.    Correct.
4      Q.    And what it says is that the
5 illegal, and one of the words is
6 distribution, of controlled substances has a
7 substantial and detrimental effect on the
8 health and general welfare of the American
9 people.
10         I'm asking you if McKesson
11 agrees and acknowledges with this finding by
12 Congress in 1970.
13         MS. HENN:  Objection to form.
14         THE WITNESS:  Yes, that the
15     illegal distribution can -- could
16     potentially have an impact on the
17     American --
18 QUESTIONS BY MR. FARRELL:
19     Q.    Well, it doesn't say
20 "potential" in paragraph 2, does it?
21     A.    It doesn't.
22     Q.    It says that if you break the
23 law, it has a substantial and detrimental
24 effect on the health and general welfare of
25 the American people.

Page 44

1      A.    That's what it says, correct.
2      Q.    Does McKesson agree and
3 acknowledge that finding?
4          MS. HENN:  Objection to form.
5          THE WITNESS:  Yes.
6 QUESTIONS BY MR. FARRELL:
7      Q.    Now, if you flip to page 2,
8 this is section A 12 of the Controlled
9 Substances Act, and what it says is it places
10 drugs into one of several categories.
11         Is McKesson aware of the
12 scheduling of controlled substances?
13     A.    We are.
14     Q.    Okay.  And what we're dealing
15 with in this litigation primarily today are
16 Schedule II drugs, correct?
17     A.    Correct.
18     Q.    Now, there was a period of time
19 when certain hydrocodone combination products
20 were Schedule III, but they've since been
21 reclassified as Schedule II, agreed?
22     A.    Agreed.
23     Q.    And McKesson picked up a book
24 of business when that happened on the HCPs,
25 agreed?

Page 45

1          MS. HENN:  Objection to form.
2          THE WITNESS:  Can you rephrase
3     the book of business and the question
4     a little bit?
5 QUESTIONS BY MR. FARRELL:
6      Q.    Yeah, that was a little too
7 country.
8         Is McKesson aware that its
9 sales of hydrocodone combination products
10 rose following the reclassification of those
11 opioids from Schedule III to Schedule II?
12     A.    Yes.
13     Q.    So nonetheless, when we're
14 talking about these products, I'm referencing
15 Schedule II for today.
16     A.    Understood.
17     Q.    So the Schedule II has a
18 definition, does it not, under the United
19 States Code?
20     A.    It does.
21     Q.    There's three aspects to it.
22         Do you see those three aspects?
23     A.    I do.
24     Q.    Could you read aspect A?
25     A.    "The drug or other substance

Case 3:17-cv-01362 Document 1025-5 Filed 12/09/19 Page 7 of 53 PageID #: 16372974
Case 3:17-cv-01362 Document 1025-5 Filed 12/09/19 Page 7 of 53 PageID #: 16372974
Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  the Congressional history of all those codes
2  that we just walked through. And I'm not
3  going to ask you to read the entire document
4  because I've highlighted certain sections for
5  you.
6       The first thing I'd like you to
7  do is I'd like for you to turn to Bates stamp
8  page 5. And while you read the document to
9  yourself, I'm going to read it out loud to
10 save you some time.
11     A.   Okay.
12     Q.   Under Title 2, Control and
13 Enforcement, it states, "The bill provides
14 for control by the Justice Department of
15 problems related to drug abuse through
16 registration of manufacturers, wholesalers,
17 retailers and all others in the legitimate
18 distribution chain and makes transactions
19 outside the legitimate distribution chain
20 illegal."
21     Does McKesson acknowledge this
22 finding from Congress?
23     MS. HENN: Objection to form.
24     THE WITNESS: Yes.
25

Page 55

1  QUESTIONS BY MR. FARRELL:
2     Q.   I'm going to have you to turn
3  to Bates stamp page 8. And again, these are
4  my highlights. Congress didn't highlight
5  this in 1970; Paul Junior did. So while you
6  read it, I'm going to read it out loud.
7     "The bill was designed to
8  improve the administration and regulation of
9  the manufacturing, distribution and
10 dispensing of controlled substances by
11 providing for a closed system of drug
12 distribution for legitimate handlers of such
13 drugs. Such a closed system should
14 significantly reduce the widespread diversion
15 of these drugs out of the legitimate channels
16 into the illicit market, while at the same
17 time providing the legitimate drug industry
18 with a unified approach to narcotic and
19 dangerous drug control."
20     Does McKesson acknowledge the
21 truth of this finding by Congress?
22     MS. HENN: Objection to form.
23     THE WITNESS: Yes.
24 QUESTIONS BY MR. FARRELL:
25     Q.   So let's just talk about this

Page 56

1  for a minute.
2     McKesson understands that in
3  1970 Congress created a closed system,
4  agreed?
5     A.   Agree.
6     Q.   What a closed system means is
7  that laissez-faire economics don't apply,
8  agreed?
9     MS. HENN: Objection to form.
10    THE WITNESS: Have to refresh
11    my memory on laissez-faire economics.
12 QUESTIONS BY MR. FARRELL:
13    Q.   It's just a fancy French word
14 for "hands off." The government is
15 intervening in the marketplace of the chain
16 of distribution for opium pills, agreed?
17    A.   For controlled substances.
18    Q.   Well, for all controlled
19 substances --
20    A.   Correct.
21    Q.   -- but today we're talking
22 about opium pills.
23    A.   Understood.
24    Q.   So the controlled substances
25 are in a chain of distribution that are

Page 57

1  closed off to the rest of the marketplace.
2  McKesson acknowledges that?
3     MS. HENN: Objection to form.
4     THE WITNESS: Correct. It's a
5     closed system.
6  QUESTIONS BY MR. FARRELL:
7     Q.   And in order to participate in
8  the closed system, you have to be one of the
9  select few that gets a registration
10 certificate from the DEA, agreed?
11    A.   Agreed.
12    Q.   And the reason Congress did
13 this was to reduce diversion. Does McKesson
14 acknowledge that?
15    MS. HENN: Objection to form.
16    THE WITNESS: Yes, I believe
17    that was the overall intent.
18 QUESTIONS BY MR. FARRELL:
19    Q.   So it's creating rules to
20 prevent diversion to the best of their
21 ability. McKesson acknowledges that fact?
22    MS. HENN: Objection to form.
23    THE WITNESS: Yes.
24 QUESTIONS BY MR. FARRELL:
25    Q.   Because if McKesson doesn't

Page 58

1 follow the law, then diversion is likely.
2 You agree with that statement?
3      MS. HENN: Objection to form.
4      THE WITNESS: I don't know if
5      I'd say -- always characterize it as
6      likely all the time, but diversion can
7      happen.
8 QUESTIONS BY MR. FARRELL:
9    Q.   Okay. Well, in this specific
10 provision, the United States Congress passed
11 a law to close the system of distribution and
12 enact laws to reduce the widespread diversion
13 of these drugs. You agree with that? That's
14 the purpose of this law?
15      MS. HENN: Objection to form.
16      THE WITNESS: Yes.
17 QUESTIONS BY MR. FARRELL:
18    Q.   So the idea here is that -- to
19 close the system of distribution so that we
20 keep these dangerous opium pills inside the
21 legitimate market for medical care, agreed?
22    A.   Agreed.
23    Q.   And that's why we have these
24 laws enacted, so that we can do our best to
25 keep these drugs to the patients that need

Page 59

1 them, agreed?
2    A.   Agreed.
3    Q.   And if you don't follow those
4 laws, then what happens is we have diversion
5 into the illicit market?
6      MS. HENN: Objection to form.
7      THE WITNESS: That can happen
8      if you don't follow those laws.
9 QUESTIONS BY MR. FARRELL:
10    Q.   And that's the reason Congress
11 created the laws as stated in this finding?
12      MS. HENN: Objection to form.
13      THE WITNESS: Correct.
14 QUESTIONS BY MR. FARRELL:
15    Q.   Next I'm going to have you flip
16 to page 11. And I just highlighted one
17 sentence in here. And it says, "The price
18 for participation in this traffic," which is
19 illicit drug trafficking, "should be
20 prohibitive."
21      Do you see that sentence?
22    A.   I see that.
23    Q.   Does McKesson acknowledge that?
24      MS. HENN: Objection to form.
25

Page 60

1 QUESTIONS BY MR. FARRELL:
2    Q.   Does McKesson acknowledge that
3 sentence to be true?
4      MS. HENN: Objection to form.
5      THE WITNESS: Yes.
6 QUESTIONS BY MR. FARRELL:
7    Q.   It just makes sense, right? If
8 you're going to punish somebody and the
9 punishment isn't very severe, they're likely
10 to what?
11      MS. HENN: Objection to form.
12      THE WITNESS: To do it again.
13 QUESTIONS BY MR. FARRELL:
14    Q.   Why?
15    A.   There's no penalty or
16 accountability.
17    Q.   And so by making the penalty
18 prohibitive, what does it do?
19      MS. HENN: Objection to form.
20      THE WITNESS: Could you ask the
21      question in a -- again? What --
22 QUESTIONS BY MR. FARRELL:
23    Q.   If you make the penalty
24 prohibitive, then what happens?
25      MS. HENN: Objection to form.

Page 61

1      MR. MONTMINY: Objection to
2      form. Calls for speculation. This is
3      Brandon Montminy for Henry Schein.
4      MS. HENN: And just to note for
5      everyone's knowledge, many of you know
6      this, but in the deposition protocol,
7      one defendant's objection counts for
8      all defendants, so there's no need to
9      do depositions {sic} if I'm done them.
10      But if on the phone you can't hear me,
11      I can try to speak up.
12      MR. FARRELL: So that means
13      you're not allowed to object to this
14      question because Henry Schein objected
15      to it.
16      MS. HENN: I already did, I'm
17      afraid to say. There are two.
18 QUESTIONS BY MR. FARRELL:
19    Q.   So back to my original
20 question.
21    A.   Yeah, could you put it in
22 simpler terms in --
23    Q.   Yeah. Let me put it --
24    A.   Just so I know.
25    Q.   -- in other terms.

Page 62

1  A.  Yeah.
2  Q.  Let's say that a speeding
3  ticket is a dollar.  What would happen across
4  America if a speeding ticket was a dollar?
5  MS. HENN:  Objection to form.
6  QUESTIONS BY MR. FARRELL:
7  Q.  What would happen?
8  A.  It wouldn't hold the same
9  weight or it wouldn't -- it may not deter
10  people from speeding.
11  Q.  What if the speeding ticket was
12  a million dollars?  What would that do?
13  MS. HENN:  Objection to form.
14  THE WITNESS:  I'm just
15  guessing, but likely people would not
16  speed.
17  QUESTIONS BY MR. FARRELL:
18  Q.  Because the penalty would be
19  prohibitive, agreed?
20  A.  Agreed.
21  Q.  Like not to be cute, but
22  McKesson was fined $13 million in 2008 and
23  then was fined again in 2017 $150 million.
24  Do you think that the second
25  fine was intended to be more prohibitive than

Page 63

1  the first fine?
2  MS. HENN:  Objection to form.
3  THE WITNESS:  I believe so.
4  QUESTIONS BY MR. FARRELL:
5  Q.  All right.  Now, let's go to
6  Bates stamp page 26.
7  And it says, "Titles 2 and 3 of
8  the bill deal with law enforcement aspect of
9  drug abuse and provide authority for the
10  Department of Justice to keep track of all
11  drugs subject to abuse, manufactured or
12  distributed in the United States, in order to
13  prevent diversion of these drugs from
14  legitimate channels of commerce."
15  Does McKesson acknowledge the
16  truth of that statement?
17  MS. HENN:  Objection to form.
18  THE WITNESS:  Yes.
19  QUESTIONS BY MR. FARRELL:
20  Q.  This is just another reflection
21  of the US Code that we were reading that
22  Congress is giving the authority to the
23  Department of Justice to enact safety rules
24  in order to prevent the diversion of
25  controlled substances, including opium pills,

Page 64

1  from legitimate channels into illegitimate
2  channels.
3  Does McKesson acknowledge that?
4  MS. HENN:  Objection to form.
5  THE WITNESS:  Yes.
6  QUESTIONS BY MR. FARRELL:
7  Q.  Flip to page 27, the very next
8  page.
9  It says, "The legislation
10  provides that all persons engaged in a
11  legitimate distribution chain involving drugs
12  included in one of the schedules under the
13  bill must be registered with the Attorney
14  General."
15  So again, this is bringing full
16  circle the authority of the Attorney General
17  and the Department of Justice to promulgate
18  rules for those that wish to engage in the
19  closed system of distribution for controlled
20  substances, and McKesson acknowledges that?
21  MS. HENN:  Objection to form.
22  THE WITNESS:  Yes.
23  QUESTIONS BY MR. FARRELL:
24  Q.  Now flip to page 34.  And I
25  would like for you to please read that

Page 65

1  provision that's highlighted aloud.
2  A.  One second.
3  "The illegal importation,
4  manufacture, distribution and possession and
5  improper use of controlled substances have a
6  substantial detrimental effect on the
7  public's health and general welfare."
8  Q.  Does McKesson acknowledge the
9  truth of that statement?
10  A.  Yes.
11  Q.  So if somebody in the chain of
12  distribution breaks the law, it has a
13  substantial detrimental effect on the public
14  health and general welfare, agreed?
15  MS. HENN:  Objection to form.
16  THE WITNESS:  It can.
17  QUESTIONS BY MR. FARRELL:
18  Q.  Now go to page 44.
19  Again, this is another
20  reiteration that Congress authorizes the
21  Attorney General to "promulgate rules and
22  regulations and to charge reasonable fees
23  relating to the registration and control of
24  the manufacture, distribution and dispensing
25  of substances covered by the Act."

Page 66

1    Does McKesson acknowledge the
2  authority of the Department of Justice and
3  the Attorney General to do so?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  Yes.
6  QUESTIONS BY MR. FARRELL:
7    Q.    Now flip to page 45, the very
8  next one.  This is a little bit longer, so
9  I'm going to give you a chance to read it
10  real quick.
11    A.    Okay.  I've read it.
12    Q.    So I'm going to read it aloud,
13  and I'm going to stop and ask you some
14  questions.
15        It's -- Section B of
16  Section 303 states that the Attorney General,
17  when issuing registrations, is going to
18  consider several factors, agreed?
19    A.    Can you say that again?  I was
20  looking at --
21    Q.    Yeah, I was trying to summarize
22  the first four lines.
23    A.    Yeah.
24    Q.    Basically, what it really boils
25  down to is this is a reiteration of the

Page 67

1  findings behind the statute that I showed you
2  regarding maintaining effective control.
3        So if you drop down to where it
4  says number 1 at the bottom of the page --
5  can you start reading there?
6    A.    Yeah.  Okay.
7    Q.    Will you read that aloud,
8  please, starting with "maintenance of
9  effective controls"?
10    A.    "Maintenance of effective
11  controls against diversion of particular
12  controlled substances into other than
13  legitimate medical, scientific and industrial
14  channels."
15    Q.    All right.  So again, what
16  we're talking about is the enactment of rules
17  to prevent diversion?
18    A.    Correct.
19    Q.    Last factor, factor 5, would
20  you read that?
21    A.    "Such other factors as may be
22  relevant to and consistent with the public
23  health and safety."
24    Q.    Does McKesson acknowledge that
25  Congress gave the Department of Justice the

Page 68

1  authority to promulgate rules which govern
2  McKesson so that they maintain effective
3  controls against diversion, and to adopt any
4  other rule they want that may be relevant and
5  consistent with public health and safety?
6        MS. HENN:  Objection to form.
7        THE WITNESS:  Agree.
8  QUESTIONS BY MR. FARRELL:
9    Q.    I just want to make sure that
10  we start off with the premise that the rules
11  we're about to go through aren't designed
12  to -- let me ask it in a better way.
13        The rules that we're about to
14  get into, McKesson acknowledges, are designed
15  with the primary purpose of preventing
16  diversion?
17        MS. HENN:  Objection to form.
18        THE WITNESS:  Correct.
19  QUESTIONS BY MR. FARRELL:
20    Q.    Because diversion impacts
21  public health and safety, and McKesson
22  acknowledges that?
23    A.    Yes.
24        MS. HENN:  Objection to form.
25        (McKesson-Hartle Exhibit 7

Page 69

1    marked for identification.)
2  QUESTIONS BY MR. FARRELL:
3    Q.    The next exhibit we'll have is
4  marked as Exhibit 7, and correspondingly in
5  the top right-hand corner it's MCK
6  30(b)(6)_07-01, and it's just one page.
7        Once we get through this
8  section, we can take a break if you like.
9        All right.  So what I'm going
10  to represent to you is that you will not find
11  this anywhere on the Internet either because
12  I made it.  In the top left-hand corner is
13  the Department of Justice seal, and in the
14  top right-hand corner is the Drug Enforcement
15  Administration seal, and in the middle is
16  where you can trace down the rules that
17  govern McKesson.
18        Does McKesson acknowledge that
19  Title 21 CFR 1301.74 governs its conduct with
20  the distribution of controlled substances,
21  including opium pills?
22        MS. HENN:  Objection to form.
23        THE WITNESS:  Yes.
24  QUESTIONS BY MR. FARRELL:
25    Q.    Part B is what we're going to

Page 70

1  spend the rest of the day on.
2        Have you read part B before?
3     A.    Yes.
4     Q.    Does McKesson acknowledge that
5  part B governs its conduct?
6        MS. HENN:  Objection to form.
7        THE WITNESS:  Yes.
8  QUESTIONS BY MR. FARRELL:
9     Q.    Does McKesson acknowledge that
10  for it to be lawfully carrying out its job of
11  dispensing controlled substances and opium
12  pills, it must follow paragraph B?
13        MS. HENN:  Objection to form.
14        THE WITNESS:  Yes.
15  QUESTIONS BY MR. FARRELL:
16     Q.    And if McKesson does not follow
17  paragraph B, its conduct is illegal?
18        MS. HENN:  Objection to form.
19        THE WITNESS:  Yes.
20  QUESTIONS BY MR. FARRELL:
21     Q.    To make it clear --
22     A.    Yeah.
23     Q.    -- if McKesson follows
24  paragraph B, its conduct is legal?
25     A.    Correct.

Page 71

1     Q.    And if McKesson does not follow
2  paragraph B, its conduct is illegal?
3        MS. HENN:  Objection to form.
4        THE WITNESS:  Correct.
5  QUESTIONS BY MR. FARRELL:
6     Q.    And so bringing full circle, we
7  understand that the purpose of this
8  regulation, one of them, is the prevention of
9  diversion, correct?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  Correct.
12  QUESTIONS BY MR. FARRELL:
13     Q.    So if you engage in illegal
14  conduct and violate paragraph B, the result
15  of that is diversion?
16        MS. HENN:  Objection to form.
17  QUESTIONS BY MR. FARRELL:
18     Q.    It's the whole reason this law
19  was enacted?
20        MS. HENN:  Objection to form.
21  QUESTIONS BY MR. FARRELL:
22     Q.    Does McKesson acknowledge that?
23     A.    Could you ask the specific
24  question again?
25        MS. HENN:  Objection to form.

Page 72

1  QUESTIONS BY MR. FARRELL:
2     Q.    Yeah, it got very complicated
3  because it was a compound question with
4  compound objections.
5        Does McKesson acknowledge that
6  paragraph B that we're looking at here is
7  intended to prevent diversion?
8        MS. HENN:  Objection to form.
9        THE WITNESS:  Yes.
10  QUESTIONS BY MR. FARRELL:
11     Q.    And that if you follow -- if
12  McKesson abides by paragraph B, its conduct
13  is legal and diversion is prevented?
14        MS. HENN:  Objection to form.
15        THE WITNESS:  Agreed.
16  QUESTIONS BY MR. FARRELL:
17     Q.    And if McKesson does not abide
18  by paragraph B, its conduct is illegal and
19  the result could be diversion?
20        MS. HENN:  Objection to form.
21        THE WITNESS:  Agree.  The
22  result could be diversion.
23  QUESTIONS BY MR. FARRELL:
24     Q.    Well, if McKesson is
25  distributing orders of unusual size, could it

Page 73

1  be anything other than diversion?
2        MS. HENN:  Objection to form.
3        THE WITNESS:  It could.
4  QUESTIONS BY MR. FARRELL:
5     Q.    All right.  Give me some
6  examples.
7        MS. HENN:  Objection to form.
8        THE WITNESS:  Maybe the best --
9  a customer adds, you know -- their
10  business model changes or they add --
11  for example, a pharmacy may add
12  contracts with multiple long-term care
13  facilities and require that they now
14  dispense more for legitimate reasons,
15  so they could order more in that
16  context.
17  QUESTIONS BY MR. FARRELL:
18     Q.    So what's the purpose of the
19  Department of Justice making McKesson follow
20  paragraph B?
21        MS. HENN:  Objection to form.
22        THE WITNESS:  Say that again?
23        What's the purpose of why we
24  follow that?  To try to prevent
25  diversion.

1 to mark it as Exhibit 9.
2    A.    So your question again?
3    Q.    Yeah.
4        Does McKesson acknowledge that
5 the CFR provision cited in Masters
6 Pharmaceutical case, which is 21 CFR
7 1301.74 B, is and always has been the law
8 governing McKesson's conduct since 1971?
9        MS. HENN:  Objection to form.
10       THE WITNESS:  Yes.
11       MR. FARRELL:  And
12 unfortunately, I'm not going to be
13 able to get all of my pretty-colored
14 books on the videotape.
15       Let the record reflect that the
16 office of the Federal Register has a
17 kaleidoscope of colors that it uses
18 for the front cover of all of its CFR
19 booklets.
20       And with that, we'll take our
21 first break.
22       VIDEOGRAPHER:  The time is
23 10:23 a.m.  We're going off the
24 record.
25    (Off the record at 10:23 a.m.)

1        VIDEOGRAPHER:  The time is
2 10:40 a.m., and we're back on the
3 record.
4 QUESTIONS BY MR. FARRELL:
5    Q.    I forgot to warn you before the
6 break, but during the break, did you have any
7 meaningful conversations with your counsel
8 about your testimony?
9        MS. HENN:  Objection to form.
10       THE WITNESS:  No.
11 QUESTIONS BY MR. FARRELL:
12    Q.    Did you talk about your
13 testimony at all?
14       MS. HENN:  Objection to form.
15       THE WITNESS:  Not really my
16 testimony, just --
17       MS. HENN:  And I'm just going
18 to instruct the witness not to divulge
19 what we talked about.  I don't think
20 that's an appropriate question.  I
21 think you got the answer you were
22 looking for.
23       MR. FARRELL:  I think I almost
24 got the answer I'm looking for.
25

1 QUESTIONS BY MR. FARRELL:
2    Q.    Did you talk to your lawyer
3 about the substance of your testimony during
4 the break?
5        MS. HENN:  And I'll instruct
6 the witness not to divulge particulars
7 of what we talked about.
8        But you may answer that
9 question yes or no.
10       THE WITNESS:  Yes.
11 QUESTIONS BY MR. FARRELL:
12    Q.    Okay.  What did you talk about?
13       MS. HENN:  I'm going to
14 instruct the witness not to answer
15 that question as calling for
16 privileged information.
17       MR. FARRELL:  Right.  But the
18 deposition protocol and the rules
19 governing this litigation state that
20 counsel is not allowed to discuss with
21 the witness the substance of any
22 testimony during a break.
23       And so his answer in the
24 affirmative indicates that that
25 occurred, and so I should be allowed

1 to inquire about that.
2        MS. HENN:  All right.  Well,
3 let's take a break, and we will
4 discuss outside and have a privileged
5 conversation, and we'll see if there's
6 any answer that he can provide without
7 divulging privileged information that
8 I don't believe you're entitled to.
9        MR. FARRELL:  Okay.  So you're
10 going to have a second conversation
11 during a break about the substance of
12 his testimony?
13       MS. HENN:  No, Counsel, that's
14 not what's going to happen.  But I'd
15 like to take a break so that I can
16 talk to my witness about answering the
17 question inquiring into discussions
18 with counsel.
19       MR. FARRELL:  Okay.
20       MS. HENN:  Thank you.
21       VIDEOGRAPHER:  The time is
22 10:42 a.m.  We're going off the
23 record.
24    (Off the record at 10:42 a.m.)
25       VIDEOGRAPHER:  The time is

Page 82

1  10:46 a.m. We're back on the record.
2      MR. FARRELL: So what did you
3  find out?
4      MS. HENN: Counsel, just to
5  protect the privilege, I'm just going
6  to instruct the witness that when he
7  answered yes to your question and
8  indicated affirmatively that we'd
9  talked about the substance of his
10  testimony, I'm going to ask him to
11  answer your question and tell you what
12  he deemed to be the substance of his
13  testimony, but I'm also going to ask
14  him not to repeat what I -- my
15  response.
16      So let's do that, and we can
17  discuss if you're still concerned.
18      Okay?
19      MR. FARRELL: Not really. Let
20  me make --
21      MS. HENN: Go ahead and ask
22  your question.
23      MR. FARRELL: Let me make it
24  even easier.
25

Page 83

1  QUESTIONS BY MR. FARRELL:
2      Q.    Did anything your lawyer say to
3  you cause you to change or withdraw anything
4  you said this morning?
5      A.    Absolutely not.
6      Q.    Did anything your lawyer told
7  you during the break impact or affect your
8  testimony the rest of the day?
9      A.    No.
10      Q.    That's fair enough.
11      A.    Okay.
12      Q.    Aside from the statutory duty
13  and the duty that's in the regulation, does
14  McKesson acknowledge that it has a general
15  duty to protect the public against diversion
16  of controlled substances and opium pills?
17      MS. HENN: Objection to form.
18      THE WITNESS: Could you restate
19      that, please?
20  QUESTIONS BY MR. FARRELL:
21      Q.    Does McKesson acknowledge that
22  it has a general duty to protect the public
23  against diversion of controlled substances
24  and opium pills into the illicit market?
25      MS. HENN: Objection to form.

Page 84

1      THE WITNESS: Yes, a general
2      duty as part of our responsibility,
3      regulatory responsibilities and
4      general responsibilities.
5  QUESTIONS BY MR. FARRELL:
6      Q.    So let's be careful. I want
7  to -- the wording sometimes makes a
8  difference.
9      A.    Okay.
10      Q.    Aside from the statute from the
11  United States Code and the regulations
12  promulgated by the Department of Justice,
13  does McKesson acknowledge that it owes a duty
14  to the general public to prevent diversion of
15  controlled substances and opium pills into
16  the illicit market?
17      MS. HENN: Objection to form.
18      THE WITNESS: We do feel
19      strongly about playing a role in
20      preventing diversion.
21  QUESTIONS BY MR. FARRELL:
22      Q.    So the answer needs to be
23  "yes," "no," or "I don't know."
24      A.    Yes.
25      MS. HENN: Objection to form.

Page 85

1  QUESTIONS BY MR. FARRELL:
2      Q.    So your answer is, yes, aside
3  from the statutory and regulatory provisions,
4  McKesson acknowledges that it owes a duty to
5  the general public to prevent diversion of
6  controlled substances and opium pills into
7  the illicit market?
8      MS. HENN: Objection to form.
9      THE WITNESS: Yes.
10      (McKesson-Hartle Exhibit 10
11      marked for identification.)
12  QUESTIONS BY MR. FARRELL:
13      Q.    I'm going to mark what is going
14  to be Deposition Exhibit 10. The top
15  right-hand corner is going to be 1910_01_11.
16  And I'll show it to you, to counsel, two
17  extra copies for my new best friends. And
18  I'm going to give you a little introduction
19  to this document before you start flipping
20  through it.
21      The front is the HathiTrust.
22  Are you familiar with the HathiTrust?
23      A.    I am not.
24      Q.    I wasn't either until this
25  litigation.

Page 86

1 The HathiTrust is an
2 organization, nonprofit organization, that
3 collects public documents and puts them
4 online.
5 A. Okay.
6 Q. This one is from December 1910
7 and January 1911. That's a long time ago,
8 isn't it?
9 A. That would be a long time ago.
10 Q. 100 years ago.
11 This predates 1970s US Code and
12 the 1971 Code of Federal Regulations, agreed?
13 A. Clearly, yes.
14 Q. This is a hearing on -- take a
15 guess.
16 A. Opioids.
17 Q. In particular, opium. And it
18 was about the importation of opium into
19 America back in the early turn of the
20 century.
21 McKesson was around back then,
22 wasn't they?
23 A. McKesson was -- has been
24 around.
25 Q. They were around back during

Page 87

1 this time frame, agreed?
2 A. Agreed.
3 Q. So why do you think I'm
4 bringing this up?
5 MS. HENN: Objection to form.
6 THE WITNESS: I don't want to
7 speculate why I think you're bringing
8 it up.
9 QUESTIONS BY MR. FARRELL:
10 Q. Guess who testified during this
11 hearing.
12 MS. HENN: Objection to form.
13 THE WITNESS: Don't know.
14 QUESTIONS BY MR. FARRELL:
15 Q. Take a wild guess.
16 MS. HENN: Same objection.
17 THE WITNESS: I don't have
18 honestly a guess.
19 QUESTIONS BY MR. FARRELL:
20 Q. Mr. McKesson.
21 So what I'm going to have you
22 flip to, is I'm going to have you flip to
23 page 72.
24 Now, without going through the
25 entire boring history of commerce clause, the

Page 88

1 United States Constitution, I'm just going to
2 give you a broad statement.
3 What this is, is this is
4 America's first attempt to regulate opium
5 trafficking in America. And back then there
6 was a big debate on whether or not this was
7 something the federal government can do or
8 it's something that should be left to the
9 states.
10 So what the federal government
11 decided to do was pass the Harrison Narcotic
12 Act. What that did was it basically taxed
13 opium as a way for the federal government to
14 control, and this is a debate about the
15 taxation on the importation of opium.
16 A. Okay.
17 Q. Page 72 is the beginning of the
18 testimony of Mr. McKesson from McKesson &
19 Robbins, which is the predecessor and when
20 McKesson Corporation was in the private hands
21 of the McKesson family.
22 You acknowledge that?
23 A. Correct.
24 Q. I'm going to have you flip to
25 page 75. And if you look near the top, one

Page 89

1 of congressmen asks Mr. McKesson about
2 whether or not he supports this bill. And
3 I'm going to give you an opportunity to read
4 to yourself the provision before I ask you to
5 read it aloud.
6 A. Which specific part do you want
7 me to start and end at?
8 Q. The first time it says
9 "Mr. McKesson."
10 A. Okay.
11 Q. He's asked about whether or not
12 he's in favor of the bill.
13 Do you see that?
14 A. I do.
15 Q. And his answer is, "Yes, very
16 much in favor of the bill."
17 Do you see that provision?
18 A. I do.
19 Q. Now, would you please begin
20 reading the next sentence?
21 A. Out loud?
22 Q. Please.
23 A. "Our firm was founded in 1832,
24 and we have been ever since against the sale
25 of habit-forming drugs and all that kind of

Page 90

1 thing. Orders which have come to us from
2 suspicious people we have put in the hands of
3 the proper authorities for tracing and
4 prosecution, if necessary."
5    Q.   So you agree with me that even
6 before the enactment of the Controlled
7 Substances Act and the Code of Federal
8 Regulations, which we discussed earlier this
9 morning, is that McKesson, Mr. McKesson
10 hisself, was acknowledging that if they have
11 suspicious people, they're going to turn it
12 over to law enforcement for prosecution,
13 agreed?
14      MS. HENN:  Objection to form.
15      THE WITNESS:  Agreed based on
16   what I'm reading in this document.
17 QUESTIONS BY MR. FARRELL:
18    Q.   And this duty predates the US
19 Code and predates the Code of Federal
20 Regulations, agreed?
21      MS. HENN:  Objection to form.
22      THE WITNESS:  Agreed.
23 QUESTIONS BY MR. FARRELL:
24    Q.   So would you agree, would
25 McKesson agree, that it owes a common law

Page 91

1 duty to the American public to prevent
2 diversion if it's engaged in the distribution
3 of controlled substances, including opium
4 pills, to prevent their diversion into the
5 illicit market?
6      MS. HENN:  Objection to form.
7      THE WITNESS:  Can you ask it in
8   a shorter version there?
9 QUESTIONS BY MR. FARRELL:
10    Q.   Probably not.
11      Does McKesson acknowledge it
12 owes a common law duty to the American public
13 to prevent the diversion of controlled
14 substances, including opium pills, into the
15 illicit market?
16      MS. HENN:  Objection to form.
17      THE WITNESS:  Yes.
18 QUESTIONS BY MR. FARRELL:
19    Q.   Now, the first part of the
20 sentence, it kind of grabbed my attention.
21 It says, "McKesson has ever since been
22 against the sale of habit-forming drugs."
23 And this was in 1910.
24      Do you see that?
25    A.   I see that.

Page 92

1    Q.   When did McKesson begin the
2 business of selling opium pills?
3      MS. HENN:  Objection to form.
4      THE WITNESS:  I do not know.
5 QUESTIONS BY MR. FARRELL:
6    Q.   At some point in time
7 McKesson's philosophy changed, and it went
8 from not selling habit-forming drugs to now
9 selling habit-forming drugs, agreed?
10      MS. HENN:  Objection to form.
11      THE WITNESS:  Agreed.
12 QUESTIONS BY MR. FARRELL:
13    Q.   Has McKesson considered, given
14 the presence of the opioid epidemic in
15 America, perhaps returning to the stance of
16 1910 of its founder, Mr. McKesson?
17      MS. HENN:  Objection to form.
18      THE WITNESS:  Again, I'm not
19   aware of that.  Can't answer that
20   question.
21 QUESTIONS BY MR. FARRELL:
22    Q.   Well, you could choose not to
23 sell opium pills anymore in America, could
24 you not?
25    A.   You could choose to.

Page 93

1    Q.   But McKesson chooses to
2 continue to sell opium pills in America,
3 despite the fact that we have an opiate pill
4 epidemic?
5      MS. HENN:  Objection to form.
6      THE WITNESS:  We do.
7      (McKesson-Hartle Exhibit 11
8   marked for identification.)
9 QUESTIONS BY MR. FARRELL:
10    Q.   The next exhibit we're going to
11 have marked as Exhibit 11.  In the top
12 right-hand corner, this is 1996, 04, 01.
13      We've acknowledged that in
14 1971, Department of Justice adopted CFR
15 provision 1301.74, agreed?
16    A.   Agree.
17    Q.   And then we went through and
18 it's the law today, agreed?
19    A.   Agreed.
20    Q.   It's the law that was
21 referenced in the Masters Pharmaceutical
22 case, agreed?
23    A.   Agreed.
24    Q.   And it hadn't changed through
25 all those colorful books I showed you,

Page 126

1 want them?
2 QUESTIONS BY MR. FARRELL:
3     Q.    Correct.
4     A.    Aware of informal discussions
5 and communications but maybe not formal.
6     Q.    So Mr. Boggs, Gary Boggs,
7 testified a couple weeks ago in this case as
8 the 30(b)(6) designee for communications with
9 the DEA.  He testified he was not aware of
10 any such thing.
11         I'm asking you today, as the
12 McKesson designee for the suspicious order
13 monitoring program, whether or not you're
14 aware under Section 55 if McKesson received
15 in writing any notice from the DEA telling
16 them they don't want the reports.
17         MS. HENN:  Objection to form.
18 Outside the scope.
19         THE WITNESS:  I'm not aware.
20 QUESTIONS BY MR. FARRELL:
21     Q.    Why would you have in your
22 policy the insistence that such a directive
23 be in writing?
24         MS. HENN:  Objection to form.
25 Outside the scope.

Page 127

1         THE WITNESS:  Could you ask the
2 question a different way?
3         Why would we request that it be
4 in writing?
5 QUESTIONS BY MR. FARRELL:
6     Q.    Yes.
7     A.    To formalize things,
8 documentation.
9     Q.    Under paragraph F it says, "The
10 monthly controlled substance suspicious
11 purchase reports and the monthly ARCOS
12 customer recap variance must be sent
13 certified mail, return receipt requested."
14         Do you see that?
15     A.    I see that.
16     Q.    Why would McKesson, in its
17 Section 55 policy, want confirmation that it
18 was sending reports to the DEA?
19         MS. HENN:  Objection to form.
20 Outside the scope.
21         THE WITNESS:  To verify that
22 they received them.
23 QUESTIONS BY MR. FARRELL:
24     Q.    Have you seen such reports?
25         MS. HENN:  Objection to form.

Page 128

1         THE WITNESS:  The actual
2 suspicious order report or a
3 verification that they received --
4 QUESTIONS BY MR. FARRELL:
5     Q.    Verification.
6     A.    A verification that DEA -- that
7 we -- I have not seen those reports of
8 verifications.
9     Q.    Now, at the very bottom of the
10 page, page 4, do you see what it -- it says
11 "Continued Reporting Responsibility"?
12     A.    I do.
13     Q.    Will you read that aloud, first
14 sentence?
15     A.    The first -- okay.
16         "Forwarding these reports to
17 DEA does not relieve the distribution center
18 of responsibility to review the reports and
19 note order quantities of unusual size."
20     Q.    So you acknowledge, sitting
21 here today as McKesson, that simply
22 submitting reports to the DEA does not comply
23 with the US Code or the Code of Federal
24 Regulations?
25         MS. HENN:  Objection to form.

Page 129

1 Outside the scope.
2         THE WITNESS:  Agree.
3 QUESTIONS BY MR. FARRELL:
4     Q.    You have a duty to review and
5 note orders of unusual size?
6     A.    It's part of our -- this
7 document program, yes.
8     Q.    Page 33.  It's talking about
9 controlled substances, and it says under
10 paragraph 5, "Controlled substances and
11 List I product order fillers must be aware of
12 our responsibilities.  They are expected to
13 report to management any unusual purchase
14 request before orders are filled."
15         Do you see that?
16     A.    I do see that.
17     Q.    So again, it was the policy of
18 McKesson as of July of 2000 that they were
19 still going to ship suspicious orders as long
20 as they got reported?
21         MS. HENN:  Objection to form.
22 Outside the scope.
23         THE WITNESS:  Can you rephrase
24 that for me, please?
25

Page 134

1    Q.    It's a Congressional record
2 from 2001.
3         Can you read the title of the
4 Congressional investigation?
5    A.    "OxyContin: Its use and abuse:
6 Hearing before the Subcommittee and Oversight
7 and Investigations of the Committee on Energy
8 and Commerce, House of Representatives, 107th
9 Congress, First Session, August 28th of
10 2001."
11    Q.    Does McKesson acknowledge that
12 the use and abuse of OxyContin was on the
13 national radar at least as early as
14 August 28, 2001, with a Congressional
15 hearing?
16         MS. HENN:  Objection to form.
17         THE WITNESS:  Yes.
18 QUESTIONS BY MR. FARRELL:
19    Q.    I'm going to have you flip to
20 page 8.  This is the introductory statement
21 from the chairman, James Greenwood, on the
22 Subcommittee on Oversight and Investigations.
23 He's from Pennsylvania.
24         Two-thirds of the way down, the
25 sentence says, "These actions, though

Page 135

1 commendable, also appear long overdue."
2         Do you see that sentence?
3    A.    I do see that.
4    Q.    Will you begin reading,
5 starting with "according"?
6    A.    "According to DEA, the number
7 of oxycodone-related deaths has increased
8 400 percent since 1996, the same time period
9 in which the annual number of prescriptions
10 for OxyContin has risen from approximately
11 300,000 to almost 6 million."
12    Q.    And how did these
13 prescriptions -- how did these pills get from
14 Purdue Pharma, who makes OxyContin, to the
15 pharmacies?
16         MS. HENN:  Objection to form.
17         THE WITNESS:  After being
18 prescribed by a doctor --
19 QUESTIONS BY MR. FARRELL:
20    Q.    Yes.
21    A.    -- and sent to pharmacies --
22    Q.    Yes.
23    A.    -- or other by distributors.
24    Q.    Right.
25         So between 1996 and the year

Page 136

1 2001, the number of prescriptions went from
2 300,000 to almost 6 million.  So the
3 OxyContin business was a-booming, wasn't it?
4         MS. HENN:  Objection to form.
5 Outside the scope.
6         THE WITNESS:  It increased
7 significantly.
8 QUESTIONS BY MR. FARRELL:
9    Q.    And McKesson was amongst the
10 distributors that were delivering the pills
11 from Purdue Pharma to the pharmacies?
12         MS. HENN:  Objection to form.
13         THE WITNESS:  We were.
14 QUESTIONS BY MR. FARRELL:
15    Q.    Do you believe that the
16 increase from 300,000 prescriptions to 6
17 million is an increase of unusual size?
18         MS. HENN:  Objection to form.
19 Outside the scope.
20         THE WITNESS:  Could you ask
21 that again?
22 QUESTIONS BY MR. FARRELL:
23    Q.    You go from 300,000
24 prescriptions to 6 million in five years.  Do
25 you think that that is an unusual increase?

Page 137

1         MS. HENN:  Objection to form.
2 Outside the scope.
3         THE WITNESS:  It appears to be
4 a significant increase.  I don't -- I
5 don't have the context of before --
6 everything before, but it's a large
7 increase.
8 QUESTIONS BY MR. FARRELL:
9    Q.    Well, assuming in 1996 there
10 were 300,000 prescriptions and five years
11 later there were 6 million, would you --
12 would you characterize that increase as
13 unusual?
14         MS. HENN:  Objection to form.
15 Outside the scope.
16         THE WITNESS:  I don't know if I
17 would characterize it as -- it's
18 significant.
19 QUESTIONS BY MR. FARRELL:
20    Q.    Significant enough to get
21 McKesson's attention?
22         MS. HENN:  Objection to form.
23         THE WITNESS:  Significant
24 enough.
25

Page 138

1 QUESTIONS BY MR. FARRELL:
2     Q.   Yes?
3     A.   Yes.
4     Q.   Now, two paragraphs down it
5 says, "In its testimony today" --
6        Do you see that paragraph?
7     A.   I do.
8     Q.   -- "Purdue Pharma will argue
9 that the death figures heralded by newspapers
10 nationwide are inaccurate and are the prime
11 mover of the negative hype surrounding
12 OxyContin."
13        Do you see that sentence?
14     A.   I do see that sentence.
15     Q.   So does McKesson acknowledge
16 that death figures are being heralded by
17 newspapers nationwide as of 2001?
18        MS. HENN:  Objection to form.
19 Outside the scope.
20        THE WITNESS:  Could you ask
21 that again in a different way, maybe?
22 QUESTIONS BY MR. FARRELL:
23     Q.   Yeah.
24        This is saying that there's
25 newspaper headlines across the country of

Page 139

1 people dying taking opium pills that McKesson
2 is distributing.
3        Does McKesson acknowledge that?
4        MS. HENN:  Objection to form.
5 Outside the scope.
6        THE WITNESS:  Not that --
7 there's certainly headlines of
8 opioid-related deaths.
9 QUESTIONS BY MR. FARRELL:
10     Q.   In 2001?
11     A.   I don't know of any
12 specifically.  I'm assuming there were in
13 that time frame.
14     Q.   And it's a little unfair to ask
15 you because you weren't there in 2001, but as
16 McKesson's corporate designee I'm simply
17 looking for an acknowledgement that the chain
18 of distribution McKesson was involved in is
19 being heralded in newspapers as causing
20 deaths across the country.
21        MS. HENN:  Objection to form.
22 Outside the scope.
23 QUESTIONS BY MR. FARRELL:
24     Q.   Does McKesson acknowledge that
25 fact?

Page 140

1        MS. HENN:  Same objections.
2        THE WITNESS:  I haven't seen
3 any of those headlines, so I can't
4 speak to whether us as a distributor
5 was called out in those.
6 QUESTIONS BY MR. FARRELL:
7     Q.   I'm not asking you if you were
8 called out as a distributor.  What I'm asking
9 you is if McKesson acknowledged that the
10 pills that it was selling was causing deaths
11 nationwide and resulted in newspaper
12 headlines across the country.
13        MS. HENN:  Objection to form.
14 Outside the scope.
15        THE WITNESS:  Yes, pills that
16 we distribute were in headlines.
17 QUESTIONS BY MR. FARRELL:
18     Q.   And Purdue Pharma says that
19 "those headlines are inaccurate and the prime
20 mover of the negative hype surrounding
21 OxyContin."
22        Does McKesson Corporation,
23 sitting here today, concur with Purdue
24 Pharma?
25        MS. HENN:  Objection to form.

Page 141

1 Outside the scope.
2        THE WITNESS:  Reading the rest
3 of this if you don't -- I'm reading
4 down a little bit more, so...
5        Can you ask your question
6 again?
7 QUESTIONS BY MR. FARRELL:
8     Q.   Yeah.
9        Does McKesson Corporation,
10 sitting here today and testifying, concur
11 with Purdue Pharma that the nationwide
12 newspapers about overdose deaths are
13 inaccurate?
14        MS. HENN:  Objection to form.
15 Outside the scope.
16        THE WITNESS:  I can't speak to
17 that.  I'd just be speculating.
18 QUESTIONS BY MR. FARRELL:
19     Q.   You don't share Purdue Pharma's
20 disavow of the problems caused by its
21 OxyContin pills?
22        MS. HENN:  Objection to form.
23 Outside the scope.
24        THE WITNESS:  I'm not saying
25 that.  I'm saying I can't answer the

Page 150

1    Q.   I'm going to have marked
2  Exhibit 15, and the exhibit in the top
3  right-hand corner is 2004_ 06_17.  And for
4  those of you playing at home, this is an
5  excerpt from another Congressional record.
6         This Congressional record was
7  900 pages long, and so I did not copy the
8  whole thing; I just pulled out the part that
9  interested me.
10         This is part of the US Senate
11  Permanent Subcommittee on Investigations, and
12  it was a hearing in June of 2004.  And the
13  title of the hearing was "Buyers Beware:  The
14  Dangers of Purchasing Pharmaceuticals Over
15  the Internet."
16         Now, McKesson has some
17  experience with this, agreed?
18         MS. HENN:  Objection to form.
19         THE WITNESS:  Can you define --
20  experience.  What type of experience?
21  QUESTIONS BY MR. FARRELL:
22    Q.   Well, McKesson was selling to
23  Internet pharmacies in this time frame,
24  agreed?
25         MS. HENN:  Objection to form.

Page 151

1         THE WITNESS:  I believe so.
2  QUESTIONS BY MR. FARRELL:
3    Q.   Well, McKesson should know so
4  because you paid a $13 million fine to the
5  DEA for doing that very thing in 2008.
6         MS. HENN:  Objection to form.
7         THE WITNESS:  Understood.
8  QUESTIONS BY MR. FARRELL:
9    Q.   Okay.  So this is a report, and
10  it was -- if you flip to page 2, it was
11  generated by a company called the
12  Pharmaceutical Research Manufacturers of
13  America.  I guess they call it PhRMA.
14         Is that how you say it?
15    A.   I don't know.
16    Q.   Well, McKesson is a member of
17  this organization, and so colloquially within
18  your ranks do you call it PhRMA?  PhRMA?
19  PhRMA?  What do you say?
20         MS. HENN:  Counsel, I'm sorry,
21  just a quick clarification.  I'm not
22  seeing a reference -- I see reference
23  to Giuliani and his organization, but
24  I don't see PhRMA.
25         Can you just point out where

Page 152

1  you're seeing that?
2         MR. FARRELL:  Yeah, it's up on
3  the screen there, and it's in the very
4  middle.
5         MS. HENN:  Thank you.  I
6  appreciate that.
7  QUESTIONS BY MR. FARRELL:
8    Q.   So does McKesson -- first, does
9  McKesson acknowledge that it is an associate
10  member of the Pharmaceutical Research and
11  Manufacturers of America?
12         MS. HENN:  Objection to form.
13  Outside the scope.
14         THE WITNESS:  I can't speak to
15  that.  I don't know.
16  QUESTIONS BY MR. FARRELL:
17    Q.   I'll represent to you that -- I'll
18  represent to you that you are.
19    A.   Okay.
20    Q.   And do you know who this Rudy
21  Giuliani fellow is?
22    A.   I do know who Mr. Giuliani is.
23    Q.   He's a lawyer, too, isn't he?
24    A.   He is.
25    Q.   And he was hired to do this

Page 153

1  investigation by the pharmaceutical industry.
2         Do you see that?
3         MS. HENN:  Objection to form.
4  Outside the scope.
5         THE WITNESS:  I don't know if I
6  see where specifically it states that.
7  QUESTIONS BY MR. FARRELL:
8    Q.   It says, "Giuliani Partners has
9  been" --
10    A.   Oh, in the middle.  Okay.
11  Sorry.
12    Q.   They have been retained by
13  PhRMA to do an evaluation.
14    A.   Understood.  I see that.
15    Q.   Now what I'm going to have you
16  do is I'm going to have you flip over to
17  page 4, and it's interesting what Rudy
18  Giuliani found.
19         Do you see where it says "the
20  distribution chain"?
21         It says, "On its face, it
22  appears that the distribution chain for
23  prescription medicines in the United States
24  is fairly straightforward."
25    A.   I was on the wrong number 4.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1 I see where it says that.

2 Q. And it says, "Manufacturers
3 sell their products to wholesalers."
4 That'd be you, McKesson,
5 correct?

6 A. Correct.

7 Q. "Who, in turn, sell the
8 products to retail pharmacies and stores,
9 who, in turn, dispense medicines to patients
10 with prescriptions."

11 Do you see that?

12 A. Yes.

13 Q. And that's a straightforward
14 system is what Rudy Giuliani is saying.

15 Will you read the next
16 sentence, please?

17 A. "It is not until the system is
18 studied in greater detail that one begins to
19 appreciate both the complexities and the
20 vulnerability of the distribution chain and
21 potential for exploitation or abuse."

22 Q. So big pharma is acknowledging
23 in 2004, through hiring their own expert in
24 presenting to Congress, that this chain of
25 distribution that McKesson is engaged in is

Page 155

1 complex and vulnerable for exploitation or
2 abuse, agreed?

3 MS. HENN: Objection to form.
4 Outside the scope.

5 THE WITNESS: It's what they
6 listed in here and documented, yes.

7 QUESTIONS BY MR. FARRELL:

8 Q. And the very first factor for
9 contributing factors, will you read aloud
10 what it says?

11 A. "Wholesalers or distributors
12 are primarily regulated by the states, with
13 no uniform standards across state borders.
14 States have a comparatively small number of
15 investigators to monitor the licensed
16 wholesalers; thus, given the sheer number of
17 wholesalers, oversight is minimal."

18 Q. In the very next paragraph it
19 says, "There are thousands of secondary
20 pharmaceutical wholesalers in addition to
21 McKesson, AmerisourceBergen and Cardinal
22 Health, the big three."

23 Do you see that sentence?

24 A. I see that.

25 Q. So this is a recognition by big

Page 156

1 pharma's own consultant that the chain of
2 distribution, at least in 2004 with respect
3 to rogue Internet pharmacies in particular,
4 was subject to exploitation or abuse.

5 MS. HENN: Objection to form.
6 Outside the scope.

7 QUESTIONS BY MR. FARRELL:

8 Q. Agreed that's what it says?

9 MS. HENN: Same objections.

10 THE WITNESS: Agree that's what
11 it says.

12 QUESTIONS BY MR. FARRELL:

13 Q. And in fact, McKesson paid a
14 fine for some of these exploitations and
15 abuse in 2008.

16 MS. HENN: Objection to form.

17 QUESTIONS BY MR. FARRELL:

18 Q. Agreed?

19 A. There was a fine as part of the
20 settlement.

21 Q. Related to this specific topic?

22 MS. HENN: Objection to form.

23 THE WITNESS: It was included
24 in the settlement.

25

Page 157

1 QUESTIONS BY MR. FARRELL:

2 Q. So yes?

3 A. Yes.

4 Q. So in 2004, we've got big
5 pharma acknowledging the chain of custody for
6 wholesalers is subject to exploitation or
7 abuse because of a lack of oversight?

8 MS. HENN: Objection to form.
9 Outside the scope.

10 THE WITNESS: Would you say
11 that again? Ask --

12 QUESTIONS BY MR. FARRELL:

13 Q. In 2004, big pharma hired Rudy
14 Giuliani's firm to do an evaluation of the
15 chain of distribution of prescription
16 medicines, and what he found was that the
17 chain of distribution was subject to
18 exploitation or abuse because of lack of
19 oversight?

20 A. That's what's stated in the
21 document, correct.

22 Q. And that during this time
23 frame, McKesson paid a fine for that very
24 thing?

25 MS. HENN: Objection to form.

Case 1:17-md-02804-DAP Doc #: 3075-5 Filed: 01/09/20 Page 21 of 53. PageID #: 476988
Case 1:17-md-02804-DAP Doc #: 1075-5 Filed: 10/09/19 Page 91 of 53. PageID #: 261988
Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 THE WITNESS: In the 2008
2 settlement, yes.
3 QUESTIONS BY MR. FARRELL:
4 Q. And that fine was related to
5 McKesson selling an unusual size of
6 prescription opiate pills to rogue Internet
7 pharmacies?
8 MS. HENN: Objection to form.
9 THE WITNESS: Can you ask that
10 again, one more time? Sorry.
11 QUESTIONS BY MR. FARRELL:
12 Q. Yeah.
13 In this time frame, McKesson
14 ended up paying a fine to the DEA for selling
15 too many opium pills to rogue Internet
16 pharmacies in violation of federal law?
17 MS. HENN: Objection to form.
18 THE WITNESS: To be accurate,
19 I'd have to look at the document again
20 in terms of specific language, but it
21 was part of the settlement.
22 QUESTIONS BY MR. FARRELL:
23 Q. We'll get to that after lunch.
24 A. Okay.
25 Q. But you acknowledge that what

Page 159

1 Rudy Giuliani said in 2004 came home to roost
2 with McKesson when it paid a fine in 2008?
3 MS. HENN: Objection to form.
4 Outside the scope.
5 THE WITNESS: I don't know if I
6 would characterize it as coming home
7 to roost, but they're connected or
8 they're related.
9 MR. FARRELL: Take a break.
10 VIDEOGRAPHER: The time is
11 12:04 p.m. We're going off the
12 record.
13 (Off the record at 12:04 p.m.)
14 VIDEOGRAPHER: The time is
15 1:05 p.m. We're back on the record.
16 (McKesson-Hartle Exhibit 16
17 marked for identification.)
18 QUESTIONS BY MR. FARRELL:
19 Q. I'm going to reference
20 Exhibit 16 which we've just had marked. The
21 top right-hand corner is 2006_09_27,
22 Bates-stamped MCKMDL00478906.
23 Do you recognize this document?
24 A. I do.
25 Q. What is it?

Page 160

1 A. It's a letter from DEA to
2 registrants from Joe Rannazzisi.
3 Q. Is this -- you might need help
4 with counsel a little bit on this.
5 I don't see where this letter
6 is addressed to McKesson as the recipient;
7 however, this document was produced by
8 McKesson. And I'm assuming this is the 2006
9 Rannazzisi letter that was sent to McKesson.
10 Is that your understanding?
11 A. Yes.
12 Q. So there's no question
13 September 27, 2006, McKesson received this
14 communication.
15 Do you know whether or not
16 there was one document sent to McKesson or
17 there was a letter sent to each of your
18 distribution facilities?
19 A. That, I do not know.
20 MR. FARRELL: Okay. Can I ask,
21 Counsel, do you know?
22 MS. HENN: I'm sorry, I don't.
23 QUESTIONS BY MR. FARRELL:
24 Q. Anyway, if in fact there is
25 another document that has a specific one,

Page 161

1 you'll agree with me that all of these 2006
2 letters that were sent out, they were sent
3 out to all the registrants across the
4 country?
5 MS. HENN: Objection to form.
6 THE WITNESS: Yeah, that's what
7 I believe to be the case, yeah.
8 QUESTIONS BY MR. FARRELL:
9 Q. In fact, the first sentence
10 says --
11 A. Right.
12 Q. -- this letter is being sent to
13 every commercial entity in the United
14 States --
15 A. Right.
16 Q. -- registered --
17 A. Whether it went to all of our
18 individual DCs, I can't confirm, but --
19 Q. But sitting here today as the
20 McKesson corporate designee, you acknowledge
21 receipt of the September 27, 2006 letter from
22 Joe Rannazzisi?
23 A. Yes.
24 Q. My understanding -- and we'll
25 get into it other documents -- is that prior

Page 166

1 prescription drug abuse problem in the United
2 States of America. That's in the very first
3 paragraph.
4         Does McKesson acknowledge that?
5     A.    Yes.
6     Q.    The next sentence says, "As
7 each of you is undoubtedly aware, the abuse,
8 nonmedical use, of controlled prescription
9 drugs is a serious and growing health problem
10 in the country."
11         Does McKesson agree and
12 acknowledge that fact as of 2006?
13         MS. HENN: Objection to form.
14         THE WITNESS: Yes.
15 QUESTIONS BY MR. FARRELL:
16     Q.    The next full paragraph says,
17 "The Controlled Substances Act was designed
18 by Congress to combat diversion by providing
19 for a closed system of drug distribution in
20 which all legitimate handlers of controlled
21 substances must obtain a DEA registration; as
22 a condition of maintaining such registration,
23 must take reasonable steps to ensure that
24 their registration is not being utilized as a
25 source of diversion."

Page 167

1         Does McKesson acknowledge and
2 agree with that statement?
3         MS. HENN: Objection to form.
4         THE WITNESS: I agree with
5     that.
6 QUESTIONS BY MR. FARRELL:
7     Q.    I'd like you to read the next
8 sentence aloud, please.
9     A.    Where it starts "distributors
10 are"?
11     Q.    Yes.
12     A.    "Distributors are, of course,
13 one of the key components of the distribution
14 chain."
15     Q.    Keep going, please.
16     A.    You want me to read the whole
17 paragraph? Okay.
18         "If the closed system is to
19 function properly as Congress envisioned,
20 distributors must be vigilant in deciding
21 whether a prospective customer can be trusted
22 to deliver controlled substances only for
23 lawful purposes. The responsibility is
24 critical, as Congress has expressly declared
25 that the illegal distribution of controlled

Page 168

1 substances has a substantial and detrimental
2 effect on the health and general welfare of
3 the American people."
4     Q.    So again, this is the DEA
5 reiterating what we've discussed before:
6 that failing to abide by the Code of Federal
7 Regulations has a substantial and detrimental
8 effect on the health and general welfare of
9 the American people.
10         Does McKesson agree and
11 acknowledge with that fact?
12         MS. HENN: Objection to form.
13         THE WITNESS: Yes.
14 QUESTIONS BY MR. FARRELL:
15     Q.    Go to the next page, page 2,
16 the second full paragraph. It says,
17 "Nonetheless, given the extent of
18 prescription drug abuse in the United States,
19 along with the potential -- along with
20 dangerous and potentially lethal consequences
21 of such abuse" -- will you please finish that
22 sentence?
23     A.    "Even just one distributor that
24 uses its DEA registration to facilitate
25 diversion can cause enormous harm."

Page 169

1     Q.    Does McKesson acknowledge and
2 accept that fact?
3         MS. HENN: Objection to form.
4         THE WITNESS: I agree with
5     that.
6 QUESTIONS BY MR. FARRELL:
7     Q.    If you go down to the third to
8 last paragraph, it says, "In addition to
9 reporting all suspicious orders, a
10 distributor has a statutory responsibility to
11 exercise due diligence to avoid filling
12 suspicious orders that might be diverted into
13 other than legitimate medical, scientific and
14 industrial channels."
15         Does McKesson acknowledge and
16 accept that to be true?
17         MS. HENN: Objection to form.
18         THE WITNESS: Yes.
19 QUESTIONS BY MR. FARRELL:
20     Q.    And then the last sentence of
21 the next paragraph says at the end, "The
22 distributor should exercise due care in
23 confirming the legitimacy of all orders prior
24 to filing."
25         Do you see that sentence?

Page 170

1 Not "filing." "Prior to
2 filing."
3    A.   I see that sentence.
4    Q.   All right. Since I butchered
5 that sentence, will you please read the last
6 sentence that's highlighted on the screen?
7    A.   "The distributor should
8 exercise due care in confirming the
9 legitimacy of all orders prior to filling."
10    Q.   Now, this is in September
11 of 2006, agreed?
12    A.   Agreed.
13    Q.   And this is a clear statement
14 from the DEA; would you agree with that?
15    A.   I would agree with that.
16    Q.   McKesson's official position is
17 that when it received communications from the
18 DEA, the DEA was clear as of 2006?
19    MS. HENN: Objection to form.
20 Also beyond the scope.
21    THE WITNESS: The only question
22 I would have about possibility is due
23 care, what the definition of what due
24 care means.
25

Page 171

1 QUESTIONS BY MR. FARRELL:
2    Q.   Okay. Fair. Fair enough.
3    If you flip to the next page,
4 there's a laundry list of due care.
5    Do you agree on page 3 going
6 through this, the DEA was clear with McKesson
7 about the circumstances that might be
8 indicative of diversion?
9    MS. HENN: Objection to form.
10    THE WITNESS: I wouldn't
11 classify these -- I wouldn't call them
12 due care. These are to be red flags,
13 indicators.
14 QUESTIONS BY MR. FARRELL:
15    Q.   So in 2006, the DEA is telling
16 McKesson, you have to exercise due care prior
17 to filling an order which you deem to be
18 suspicious, agreed?
19    MS. HENN: Objection to form.
20    THE WITNESS: Could you ask
21 that again? Restate that?
22 QUESTIONS BY MR. FARRELL:
23    Q.   In 2006, the DEA is telling
24 McKesson, you have to exercise due care prior
25 to filling an order which you deem to be

Page 172

1 suspicious, agreed?
2    A.   That's what's in the document,
3 yes.
4    Q.   Okay. Do you disagree with
5 that?
6    A.   That they shared that, they --
7 I don't disagree with that.
8    Q.   Yet your Section 55 policy, you
9 testified this morning, you were shipping
10 suspicious orders?
11    MS. HENN: Objection to form.
12    THE WITNESS: There was a
13 process by which those reports were
14 reviewed, which I would consider to be
15 part of due care in a review.
16 QUESTIONS BY MR. FARRELL:
17    Q.   Is there a due care file for
18 each of those?
19    MS. HENN: Objection to form.
20    THE WITNESS: Not that I'm
21 aware of.
22 QUESTIONS BY MR. FARRELL:
23    Q.   So there's no documentation of
24 the due care of each suspicious order that
25 was shipped by McKesson in accordance with

Page 173

1 the July 2000 policies and procedures?
2    MS. HENN: Objection to form.
3    THE WITNESS: Could you restate
4 that, please?
5 QUESTIONS BY MR. FARRELL:
6    Q.   Is there any documentation of
7 the due care performed by McKesson from
8 July 2000 onward pursuant to Section 55 with
9 regard to suspicious orders that were
10 shipped?
11    MS. HENN: Objection to form.
12 Outside the scope.
13    THE WITNESS: I can't speak to
14 the specific documentation and how it
15 was documented those reviews that were
16 conducted of those specific reports
17 that were generated. Could have been
18 documentation on a form.
19 QUESTIONS BY MR. FARRELL:
20    Q.   Have you seen such
21 documentation?
22    MS. HENN: Objection to form.
23    THE WITNESS: I haven't
24 personally seen examples of that.
25

Page 178

1    A.    Correct.
2    Q.    McKesson, in July of 2000,
3 adopted a policy that we've been referring to
4 as Section 55 --
5    A.    Correct.
6    Q.    -- to do that very thing?
7    A.    Correct.
8    Q.    That policy states that it's
9 not a subjective determination of whether to
10 report; it's a statistical fact of whether
11 you should report?
12        MS. HENN:  Objection to form.
13        THE WITNESS:  The report is a
14    statistical -- a statistically
15    generated one, yes.
16 QUESTIONS BY MR. FARRELL:
17    Q.    And whether to report it to the
18 DEA is not a subjective determination; it's
19 mandatory if you detect a suspicious order?
20        MS. HENN:  Objection to form.
21    Outside the scope.
22        THE WITNESS:  I believe that to
23    be the case.
24 QUESTIONS BY MR. FARRELL:
25    Q.    So if you didn't do that, it's

Page 179

1 a violation of federal law?
2        MS. HENN:  Objection to form.
3    Outside the scope.
4        THE WITNESS:  I believe so.
5 QUESTIONS BY MR. FARRELL:
6    Q.    Big if, right?
7    A.    If, right.
8    Q.    If that happened, if McKesson
9 detected a suspicious order following the
10 Section 55 enactment and did not report it to
11 the DEA, that's a violation of federal law?
12    A.    If.
13        MS. HENN:  Objection to form.
14        (McKesson-Hartle Exhibit 17
15    marked for identification.)
16 QUESTIONS BY MR. FARRELL:
17    Q.    I'm going to mark what's going
18 to be Exhibit 17.  The document ID is
19 2007_04_25.  I apologize, there is no MDL
20 Bates stamp that I could locate; however,
21 there is a prior production Bates stamp of
22 MCK-HOI-002 dash a whole bunch of zeros and
23 then 1.
24        I'll give you a few minutes to
25 look through this.

Page 180

1        Sir, have you seen this
2 document before today?
3    A.    I don't believe I've seen this
4 specific one.
5    Q.    I'll give you a minute to
6 review.
7    A.    Okay.  I've read that.  Thank
8 you for taking the time.
9    Q.    No problem.
10        So to start off with on this
11 exhibit, you acknowledge that there was a
12 meeting with the DEA on April 5, 2007.  It's
13 from the very first paragraph.
14    A.    Yes.
15    Q.    So at this point in time, the
16 DEA had issued an order to show cause against
17 McKesson, agreed?
18    A.    Correct.
19    Q.    I've yet to see any
20 documentation of anything that predates
21 April 25, 2007, related to this
22 investigation.
23        Have you seen such documents?
24        MS. HENN:  Objection to form.
25        THE WITNESS:  I don't believe

Page 181

1 so, no.
2 QUESTIONS BY MR. FARRELL:
3    Q.    To the extent that such
4 documents do exist, we again reserve our
5 right to come back and discuss them further,
6 subject to the objection of counsel.
7        But for what we have here, this
8 appears that at least in April of 2007, the
9 DEA had already issued a rule to show cause
10 complaining that one of your distribution
11 centers was not following federal law,
12 agreed?
13        MS. HENN:  Objection to form.
14        THE WITNESS:  That's what they
15    alleged.
16 QUESTIONS BY MR. FARRELL:
17    Q.    When you go to page 2 under
18 Proposed Action Plan, does this indicate to
19 you that McKesson is acknowledging that they
20 need to do better to comply with federal law?
21        MS. HENN:  Objection to form.
22        THE WITNESS:  I think this is
23    acknowledge -- excuse me --
24    acknowledgement of just improvements
25    in the program, taking information in

Page 182

1  to evolve the program based on
2  collaboration with DEA and information
3  they're receiving.
4  QUESTIONS BY MR. FARRELL:
5      Q.    You're in management, are you
6  not?
7      A.    I am.
8      Q.    And have you ever written a
9  proposed action plan for an employee?
10     A.    I have.
11     Q.    And is it just to document
12 something new, or are you trying to correct
13 something?
14         MS. HENN:  Objection to form.
15         THE WITNESS:  There can be many
16     different types of action plans.  I've
17     done both.
18 QUESTIONS BY MR. FARRELL:
19     Q.    Okay.  In this one, the very
20 first sentence says, "We," meaning McKesson,
21 "agree that it is in McKesson's interest to
22 implement a program across all of its DCs
23 that can assist the company in identifying
24 potential excessive purchases and enable the
25 company to work more closely with the DEA."

Page 183

1          Did I read that accurately?
2      A.    You did.
3      Q.    So as of April 25th of 2007,
4  McKesson did not have a program across all of
5  its distribution centers, did it?
6          MS. HENN:  Object to form.
7          THE WITNESS:  I believe that's
8      accurate.  The review of suspicious
9      orders, the DU 45s, consider that to
10     be programmatic, or a program.
11 QUESTIONS BY MR. FARRELL:
12     Q.    So then why did your lawyers
13 for McKesson tell the DEA you were
14 implementing a program across all the
15 distribution centers?
16         MS. HENN:  Objection to form.
17 QUESTIONS BY MR. FARRELL:
18     Q.    There's only one of two
19 reasons:  One is that there was no program,
20 or two is that all of the distribution
21 centers were not following it.
22         MS. HENN:  Objection to form.
23 QUESTIONS BY MR. FARRELL:
24     Q.    Can you think of a third
25 alternative?

Page 184

1          MS. HENN:  Objection to form.
2          THE WITNESS:  I don't think
3      it's that black and white in terms of
4      how you implement a program in
5      business, or when you mentioned a
6      personnel action plan, it could be a
7      combination of both.  It could be to
8      improve upon what you've been doing
9      because of new information or trends
10     or data that you've received.  It
11     could be a number of things.
12 QUESTIONS BY MR. FARRELL:
13     Q.    As a McKesson corporate
14 designee, are you willing to admit here today
15 that as of April 25, 2007, McKesson was not
16 fulfilling its obligations under federal law
17 regarding the monitoring of the distribution
18 of controlled substances?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  Can you ask that
21     again, please?
22 QUESTIONS BY MR. FARRELL:
23     Q.    As a McKesson corporate
24 designee, are you willing to admit here today
25 that as of April 25, 2007, McKesson was not

Page 185

1  fulfilling its obligations under federal law
2  regarding the distribution of controlled
3  substances?
4          MS. HENN:  Objection to form.
5          THE WITNESS:  I believe in
6      partnership with DEA and always in
7      good faith, McKesson was believed to
8      be compliant with the regulations.
9  QUESTIONS BY MR. FARRELL:
10     Q.    I understand that McKesson as a
11 corporate entity -- McKesson, it's not a
12 person, right?  McKesson Corporation is a
13 fictional piece of paper that creates a
14 business model, agreed?
15         MS. HENN:  Objection to form.
16 QUESTIONS BY MR. FARRELL:
17     Q.    Is there a Mr. McKesson still
18 running the company?
19     A.    No, there's not.
20     Q.    All right.  So McKesson is a
21 corporation?
22     A.    Agreed.  I understand that.
23     Q.    And in April of 2007, it was
24 meeting with the federal government, the DEA,
25 and changing the way it was doing business,

Page 186

1  agreed?
2        MS. HENN:  Objection to form.
3        THE WITNESS:  Changing,
4    enhancing, adding.
5  QUESTIONS BY MR. FARRELL:
6    Q.   Okay.  And in part, it was
7  because McKesson was not fulfilling its
8  obligations under federal law?
9        MS. HENN:  Objection to form.
10  QUESTIONS BY MR. FARRELL:
11    Q.   Can that even be disputed?
12        MS. HENN:  Same objection.
13  QUESTIONS BY MR. FARRELL:
14    Q.   You paid a $13 million fine as
15  a result of this investigation.
16        Can you not acknowledge today,
17  in 2007 there were shortcomings in your
18  controlled substance monitoring program?
19        MS. HENN:  Objection to form.
20        THE WITNESS:  We denied those
21    allegations in that settlement, and we
22    obviously -- as any program does,
23    wants to improve and expand and take
24    new information in.
25

Page 187

1  QUESTIONS BY MR. FARRELL:
2    Q.   So you paid $13 million as a
3  tax write-off?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  As a settlement
6    between both parties.
7  QUESTIONS BY MR. FARRELL:
8    Q.   To settle what?  Allegations of
9  what?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  Issues related to
12    the regulations.
13  QUESTIONS BY MR. FARRELL:
14    Q.   The allegations were that
15  McKesson was not fulfilling its obligations
16  under federal law, agreed?
17    A.   That was the allegations.
18    Q.   And McKesson wrote an action
19  plan and paid a fine to the DEA to get a
20  release for its conduct?
21        MS. HENN:  Objection to form.
22        THE WITNESS:  I think that's
23    accurate.  We did.
24  QUESTIONS BY MR. FARRELL:
25    Q.   And on page 2 of this exhibit,

Page 188

1  it says you're going to implement this
2  Lifestyle Drug Monitoring Program by May 1,
3  2007.
4        Do you see that paragraph?
5    A.   I do.
6    Q.   So is it fair to say that
7  Section 55, which was in force beginning in
8  July of 2000, was replaced on May 1, 2007, by
9  the Lifestyle Drug Monitoring Program?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  I don't think
12    it's fair to say it was completely
13    replaced.
14  QUESTIONS BY MR. FARRELL:
15    Q.   Modified, amended.
16        So that we're no longer
17  referencing Section 55, we're now going to
18  begin referencing the Lifestyle Drug
19  Monitoring Program.
20        MS. HENN:  Objection to form.
21        THE WITNESS:  There's
22    components of both that still existed.
23  QUESTIONS BY MR. FARRELL:
24    Q.   Formulated and assimilated into
25  the Lifestyle Drug Monitoring Program?

Page 189

1        MS. HENN:  Objection to form.
2        THE WITNESS:  Parts of it.
3    This was an advancement of that.
4  QUESTIONS BY MR. FARRELL:
5    Q.   Okay.  You'll see in
6  paragraph 2 that it says that you are
7  "developing the technology that will enable
8  each McKesson distribution center to generate
9  an automated report to identify threshold
10  sales."
11        Do you see that?
12    A.   I do.
13    Q.   Prior to this, you did not have
14  that technology?
15        MS. HENN:  Objection to form.
16        THE WITNESS:  I can't speak to
17    whether we actually had the technology
18    to create a report like that, but I
19    think this is referencing -- you know,
20    putting that into -- into play with
21    the idea of establishing thresholds
22    and creating reports off of that.  So
23    we didn't have that report.
24  QUESTIONS BY MR. FARRELL:
25    Q.   You remember this morning we

Page 198

1   a...
2     Q.    Maybe this is just a
3 terminology issue.
4     A.    Might be.
5     Q.    Block -- all I'm saying is, is
6 that McKesson's not allowed to ship a
7 suspicious order without looking into it
8 first, agreed?
9     MS. HENN:  Objection to form.
10     THE WITNESS:  That's how I read
11   that language.
12 QUESTIONS BY MR. FARRELL:
13     Q.    That is the law?
14     A.    Yeah.
15     Q.    Yes?
16     MS. HENN:  Objection to form.
17     THE WITNESS:  The law is to
18   design a system to identify suspicious
19   orders.
20 QUESTIONS BY MR. FARRELL:
21     Q.    That's one part of the law.
22     A.    Right.
23     Q.    What does the CFR say?
24     MS. HENN:  Objection to form.
25     THE WITNESS:  To identify

Page 199

1   orders of unusual size, pattern and
2   frequency.
3 QUESTIONS BY MR. FARRELL:
4     Q.    And so if you ship a suspicious
5 order without doing due diligence, is that
6 lawful or unlawful?
7     MS. HENN:  Objection to form.
8     THE WITNESS:  Again, I'm -- the
9   CFR says you must design and operate a
10   system, right, and to identify
11   suspicious orders.  I don't believe it
12   says to halt them.
13 QUESTIONS BY MR. FARRELL:
14     Q.    It does?
15     A.    In that specific language.
16     Q.    It does or does not?
17     A.    Does not.
18     Q.    Is your interpretation of
19 federal law that you're allowed to ship a
20 suspicious order without conducting due
21 diligence?
22     MS. HENN:  Objection to form.
23 QUESTIONS BY MR. FARRELL:
24     Q.    Maybe this explains why
25 McKesson paid a $150 million fine.

Page 200

1     MS. HENN:  Objection to form.
2 QUESTIONS BY MR. FARRELL:
3     Q.    Let's get back to it.
4     Masters Pharmaceutical has a
5 reporting requirement and a shipping
6 requirement.  We reviewed it this morning,
7 agreed?
8     A.    Parts of it, correct.  Agreed.
9     Q.    It's premised upon a code
10 provision.  The United States Congress passed
11 a US Code provision in 1970, agreed?
12     A.    Agreed.
13     Q.    And it passed -- the Department
14 of Justice enacted regulations which are
15 binding as federal law related to this very
16 topic, agreed?
17     A.    Agreed.
18     Q.    And if you don't follow those
19 rules, McKesson can be fined by the federal
20 government?
21     A.    Agreed.
22     Q.    McKesson's been fined twice
23 that I know of, once for 13 million in 2008
24 and once for 150 million in 2017, for
25 violating these very laws.

Page 201

1     MS. HENN:  Objection to form.
2     THE WITNESS:  That's what was
3   alleged.
4 QUESTIONS BY MR. FARRELL:
5     Q.    So my question to you is:  Is
6 that the shipping requirement that you have
7 to halt a suspicious order under federal law
8 until you do due diligence is and always has
9 been the law in the United States of America?
10     MS. HENN:  Objection to form.
11   Outside the scope.
12     THE WITNESS:  Can you ask that
13   again, please?
14 QUESTIONS BY MR. FARRELL:
15     Q.    The shipping requirement and
16 the reporting requirement as outlined in the
17 Masters Pharmaceutical case is and always has
18 been the law in the United States of America?
19     MS. HENN:  Objection to form.
20   Outside the scope.
21     THE WITNESS:  I believe that's
22   the law.  I mean...
23 QUESTIONS BY MR. FARRELL:
24     Q.    Well, you're McKesson --
25     MS. HENN:  Did you finish your

Page 210

1  County?
2        MS. HENN: Objection to form.
3    Outside the scope.
4  QUESTIONS BY MR. FARRELL:
5      Q.   It's okay if you haven't, and I
6  don't want you guessing.
7      A.   No, I understand.
8    I've seen files. I don't know
9  about files during this time frame with a
10 Level 1, 2 or 3 review. I can't recall.
11     Q.   Let me ask you this: How --
12 how many pharmacies in May of 2007, in
13 Cuyahoga and Summit County, do you reckon
14 ordered more than 8,000 pills of hydrocodone
15 or oxycodone?
16       MS. HENN: Objection to form.
17   Outside the scope.
18       THE WITNESS: I don't know.
19   I'd be guessing.
20 QUESTIONS BY MR. FARRELL:
21     Q.   Let's say there's ten. Should
22 there be ten customer files that document why
23 McKesson was exceeding 8,000 pills a month?
24       MS. HENN: Objection to form.
25       THE WITNESS: There should be

Page 211

1    documentation.
2  QUESTIONS BY MR. FARRELL:
3      Q.   And if there was no due
4  diligence performed but those pills were
5  still shipped, is that lawful or unlawful?
6        MS. HENN: Objection to form.
7  QUESTIONS BY MR. FARRELL:
8      Q.   Do you want me to repeat the
9  question?
10     A.   Sure.
11     Q.   If, if, if, three ifs, no due
12 diligence was performed, yet McKesson still
13 shipped more than 8,000 oxycodone pills to a
14 pharmacy in Cuyahoga or Summit County in May
15 of 2007, is that lawful or unlawful according
16 to the federal regulations?
17       MS. HENN: Objection to form.
18 QUESTIONS BY MR. FARRELL:
19     Q.   Why are you struggling with
20 this?
21     A.   I'm just thinking. I mean,
22 it's -- if it's -- it wouldn't be lawful.
23     Q.   That makes it...
24     A.   If there weren't documentation.
25 Or due diligence, excuse me.

Page 212

1      Q.   Then it would be lawful or
2  unlawful?
3        MS. HENN: Objection to form.
4        THE WITNESS: It would be
5    unlawful.
6  QUESTIONS BY MR. FARRELL:
7      Q.   So it's summarizing altogether.
8  If in May of 2007 McKesson is shipping to a
9  pharmacy in Cuyahoga or Summit County,
10 Cleveland, Ohio, or Akron, Ohio, more than
11 8,000 pills of hydrocodone or more than 8,000
12 pills of oxycodone, without conducting a due
13 diligence review, then McKesson is engaging
14 in unlawful conduct according to federal law,
15 agreed?
16       MS. HENN: Objection to form.
17       THE WITNESS: Can you ask it
18   again? I apologize. Let's pause
19   here. I'm not a lawyer.
20 QUESTIONS BY MR. FARRELL:
21     Q.   I know you're not. And again,
22 I'm going to reiterate --
23     A.   There's discretion in how this
24 due diligence is done and documented, so I'm
25 trying to understand.

Page 213

1      Q.   That's right. So -- you're
2  right. So let me see if I can say it again.
3        If in May of 2007 McKesson
4  Corporation is shipping to a pharmacy in
5  Cuyahoga or Summit County, Cleveland, Ohio,
6  or Akron, Ohio, more than 8,000 pills of
7  oxycodone or more than 8,000 pills of
8  hydrocodone without conducting due diligence,
9  then McKesson Corporation is engaging in
10 unlawful conduct according to federal law?
11       MS. HENN: Object to form.
12       THE WITNESS: I don't know how
13   to answer that exactly. It depends.
14 QUESTIONS BY MR. FARRELL:
15     Q.   Depends on what?
16       If you ship more than 8,000
17 pills without conducting due diligence,
18 McKesson is engaging in unlawful conduct
19 according to federal law?
20       MS. HENN: Objection to form.
21   Go ahead.
22       THE WITNESS: It can be
23   interpreted that way. I mean, it --
24 QUESTIONS BY MR. FARRELL:
25     Q.   Well, the DEA certainly

Page 214

1  interprets it that way, agreed?
2      A.    They have.
3      Q.    And McKesson has paid fines
4  based on that DEA interpretation, agreed?
5          MS. HENN:  Objection to form.
6          THE WITNESS:  We've paid fines.
7      Again, we're --
8  QUESTIONS BY MR. FARRELL:
9      Q.    Based on the allegations by the
10 DEA that you shipped suspicious orders
11 without conducting due diligence?
12         MS. HENN:  Objection to form.
13     Go ahead.
14         THE WITNESS:  Based on those
15     allegations.
16 QUESTIONS BY MR. FARRELL:
17     Q.    Yes.
18     A.    Right.
19     Q.    The answer is yes?
20     A.    Yes.
21     Q.    See, a yes just gets me moving
22 faster.  Oh, this one's gonna be fun.
23         MR. FARRELL:  Why don't we take
24     a quick break.
25         MS. HENN:  Okay.

Page 215

1          VIDEOGRAPHER:  The time is
2      2:08 p.m., and we're going off the
3      record.
4       (Off the record at 2:08 p.m.)
5          VIDEOGRAPHER:  The time is
6      2:20 p.m., and we're back on the
7      record.
8          (McKesson-Hartle Exhibit 18
9      marked for identification.)
10 QUESTIONS BY MR. FARRELL:
11     Q.    The next exhibit we're going to
12 have marked is Exhibit 18.
13         For reference, the top
14 right-hand corner is 2007_04_XX.  The reason
15 it's XX is the metadata has not yet told me
16 what day of the month it is.
17         Do you know what day of the
18 month this conference was back in 2007?
19     A.    I can't think off the top of my
20 head, no.  Yeah.
21     Q.    The Bates stamp, we have a MDL
22 Bates stamp of MCKMDL00403340.
23         Do you recognize this document?
24     A.    I do.
25     Q.    What is it?

Page 216

1      A.    This is a presentation given by
2  Don Walker about -- at a company meeting
3  about the Lifestyle Drug Program.
4      Q.    And Don Walker at the time
5  was -- would be working for McKesson?
6      A.    Yes.
7      Q.    So this is a McKesson document?
8      A.    Excuse me, yes.
9      Q.    It's produced in the MDL by the
10 McKesson lawyers?
11     A.    Yes.
12     Q.    From the McKesson files?
13     A.    Yes.
14     Q.    And is a true and accurate copy
15 of the presentation given at the national
16 operations conference in 2007?
17         MS. HENN:  Objection to form.
18         THE WITNESS:  Yes, I believe
19     so.  I wasn't there, but I believe so,
20     yeah.
21 QUESTIONS BY MR. FARRELL:
22     Q.    So this national operations
23 conference 2007, this is a conference that is
24 just for McKesson employees.  Is that your
25 understanding?

Page 217

1      A.    Yeah, they typically are.
2      Q.    It's from -- Mr. Boggs
3  testified about it previously.  So this was
4  in 2007.  Management basically gets together,
5  and Don Walker is the senior vice president
6  of distribution operations, is giving a
7  presentation on a number of topics in the
8  form of a PowerPoint slide?
9      A.    Correct.
10         MS. HENN:  Objection to form.
11 QUESTIONS BY MR. FARRELL:
12     Q.    Yes?
13     A.    Correct.
14     Q.    So the title of this is
15 "Lifestyle Drugs and Internet Pharmacies."
16         "Lifestyle drugs" is an
17 interesting choice of words.
18         Do you know where it came from?
19     A.    It's my understanding that's
20 the language that was -- the DEA used as well
21 and had referenced.
22     Q.    Some of the files that I've
23 seen has the DEA asking McKesson where you
24 came up with the oxycodone, hydrocodone and
25 opium pills as lifestyle drugs.

Page 218

1     MS. HENN:  Objection to form.
2     THE WITNESS:  All I can tell
3 you is I -- what I've heard is that
4 it's the term that came from DEA.
5 QUESTIONS BY MR. FARRELL:
6     Q.    On page 2, it identifies
7 several different topics:  public health
8 issue, DEA focus, McKesson involvement,
9 current status, and Lifestyle Drug Monitoring
10 Program.  So these will be our jeopardy
11 questions today.
12     Public health issues.  Can you
13 read what the very -- on page 3, can you read
14 what the first item is?
15     A.    "Abuse of prescription drugs
16 has risen 66 percent since 2000."
17     Q.    So this is McKesson telling
18 McKesson employees that we're in the business
19 of selling opium pills, and abuse has risen
20 66 percent since 2000.
21     Does that not give you,
22 Mr. McKesson Corporation, pause to think
23 about whether or not your role in the chain
24 of distribution is contributing to the abuse?
25     MS. HENN:  Objection to form.

Page 219

1     THE WITNESS:  Can you ask that
2 again, please?
3 QUESTIONS BY MR. FARRELL:
4     Q.    This is McKesson telling
5 McKesson employees that abuse of prescription
6 drugs has risen 66 percent since the year
7 2000.
8     Does that not give you,
9 Mr. McKesson Corporation, pause to think
10 about whether or not your role in the chain
11 of distribution is contributing to such
12 abuse?
13     MS. HENN:  Objection to form.
14     THE WITNESS:  I think it's --
15 it should give everybody pause that
16 that was the trend that was going on,
17 and it's a piece of information shared
18 with leaders to inform them.  So --
19 QUESTIONS BY MR. FARRELL:
20     Q.    But not everybody is selling
21 opium pills; McKesson is.
22     MS. HENN:  Counsel, can we just
23 make sure we let the witness finish
24 his answers?
25     MR. FARRELL:  Sure.  I was

Page 220

1 trying to make a snarky remark.
2     MS. HENN:  Thank you.
3 QUESTIONS BY MR. FARRELL:
4     Q.    Not everyone is engaged in the
5 chain of distribution of opium pills, though?
6     MS. HENN:  Objection to form.
7     THE WITNESS:  Agree.
8 QUESTIONS BY MR. FARRELL:
9     Q.    So I'm asking you, McKesson
10 Corporation, whether or not you have any
11 regrets about selling so many opium pills.
12     MS. HENN:  Objection to form.
13 Outside the scope.
14     THE WITNESS:  Back to your
15 question about this, I would -- sure
16 that gives you pause, I mean, to
17 understand that there's an epidemic
18 out there.  And clearly there's many
19 players involved in the flow of
20 distribution.
21 QUESTIONS BY MR. FARRELL:
22     Q.    As of 2007, McKesson is
23 recognizing that opioid painkillers kill more
24 than cocaine and heroin combined, agreed?
25     MS. HENN:  Objection to form.

Page 221

1     THE WITNESS:  Agree.
2 QUESTIONS BY MR. FARRELL:
3     Q.    And these are McKesson's words.
4     Where is McKesson getting this
5 data from?
6     MS. HENN:  Objection to form.
7 Outside the scope.
8     THE WITNESS:  I don't know
9 specifically where they -- their
10 source of data for that particular
11 line, but information from different
12 sources.  Could be DEA, could be CDC,
13 it could be wherever.
14 QUESTIONS BY MR. FARRELL:
15     Q.    It says here, "Rogue Internet
16 pharmacies distributing oxycodone,
17 hydrocodone, phentermine and alprazolam," yet
18 McKesson was selling to rogue Internet
19 pharmacies, true?
20     MS. HENN:  Objection to form.
21 Outside the scope.
22     THE WITNESS:  Can you ask that
23 again, please?
24 QUESTIONS BY MR. FARRELL:
25     Q.    McKesson is noting that rogue

Page 222

1 Internet pharmacies are selling oxycodone and
2 hydrocodone, yet what's missing from this
3 slide is the fact that McKesson was supplying
4 the pills to the rogue Internet pharmacies.
5     MS. HENN: Objection to form.
6     THE WITNESS: And what's your
7    specific question again?
8 QUESTIONS BY MR. FARRELL:
9    Q. What gives?
10     MS. HENN: Objection to form.
11     THE WITNESS: I don't know what
12    type of response a "what gives"
13    question is.
14 QUESTIONS BY MR. FARRELL:
15    Q. Yeah. You're noting that
16 people are dying, and part of the reason is
17 that rogue Internet pharmacies are out there.
18 Yet McKesson, during this time frame, is
19 selling to some of those very same Internet
20 pharmacies, and that's what the DEA fined you
21 for.
22    So is this ignorance of who
23 you're selling to? Is this repackaging,
24 reframing the issue? Or is it just flat out
25 a misrepresentation?

Page 223

1     MS. HENN: Objection to form.
2    Outside the scope.
3     THE WITNESS: This is raising
4    awareness in -- about the issues that
5    are the public health issues,
6    communicating with leaders and sharing
7    the -- where McKesson is enhancing the
8    program.
9 QUESTIONS BY MR. FARRELL:
10    Q. But you understand that the
11 rogue Internet pharmacies were getting their
12 pills from, among other people, McKesson,
13 agreed?
14    A. I understand.
15     MS. HENN: Objection to form.
16 QUESTIONS BY MR. FARRELL:
17    Q. Agreed?
18    A. I understand. Agreed.
19    Q. I'm asking if you understand.
20 I want you to confirm that the rogue Internet
21 pharmacies were in fact getting some of their
22 pills from McKesson.
23     MS. HENN: Objection to form.
24     THE WITNESS: I don't have
25    specific details on that, but --

Page 224

1 QUESTIONS BY MR. FARRELL:
2    Q. You understand that to be true?
3    A. -- I understand that to be
4 true.
5    Q. So McKesson Corporation admits
6 it was selling oxycodone and hydrocodone to
7 rogue Internet pharmacies in and around 2007?
8     MS. HENN: Objection to form.
9    Outside the scope.
10     THE WITNESS: Again, I don't
11    know the specific examples and --
12 QUESTIONS BY MR. FARRELL:
13    Q. I'm not asking for specific
14 examples.
15    A. Right.
16    Q. I'm asking you to confirm that
17 in 2007, McKesson Corporation was selling
18 oxycodone and hydrocodone to rogue Internet
19 pharmacies.
20     MS. HENN: Objection to form.
21    And, Counsel, I'll just ask you
22    to let him finish his answers so that
23    he can get his answers out.
24     MR. FARRELL: Yes, ma'am.
25     THE WITNESS: Again, I don't

Page 225

1 have the specific examples. I believe
2    that to be true, but I don't know the
3    specific details.
4 QUESTIONS BY MR. FARRELL:
5    Q. The next page, page 4,
6 "Internet pharmacies." It says,
7 "Investigative work hours have doubled."
8    Do you know what it doubled
9 from or to?
10    A. I do not.
11    Q. "Cutting supply critical to
12 success."
13    What does that mean?
14    A. I don't know. I don't know
15 what the speaking points or -- it's one
16 bullet. I'm not sure how it was represented
17 or communicated.
18    Q. Do you know what price
19 diversion is?
20    A. Not specifically.
21    Q. Was McKesson at this time
22 considering that some of the Internet
23 pharmacies were competing with McKesson for
24 business?
25     MS. HENN: Objection to form.

Page 226

1   THE WITNESS:  I do not know.
2   Pricing is not my area.
3   QUESTIONS BY MR. FARRELL:
4   Q.   Okay.  It says, "Wholesalers.
5   DEA expects that you know your customers."
6   What does that mean?  It's in
7   quotations.
8   A.   Right.
9   MS. HENN:  Objection to form.
10  MR. FARRELL:  Well, it is in
11  quotations, isn't it?
12  MS. HENN:  I was objecting to
13  asking what DEA means when they said
14  "know your customers."  That was what
15  was my objection.
16  QUESTIONS BY MR. FARRELL:
17  Q.   So McKesson is writing a slide
18  following a meeting with the DEA, reporting
19  to the DEA employees what the DEA's focus
20  was, and what McKesson is reporting is that
21  the DEA expects you to know your customers.
22  Is that fair?
23  A.   That's fair.
24  Q.   And when we do, quote, "know
25  our customers," end quote, that's a tag line

Page 227

1   for distributors with regard to knowing the
2   customers you're selling opium pills to?
3   MS. HENN:  Objection to form.
4   THE WITNESS:  That is a DEA tag
5   line.
6   QUESTIONS BY MR. FARRELL:
7   Q.   And then the next sentence, can
8   you read it out loud, please?
9   A.   The next bullet?
10  Q.   Yes.
11  A.   "Wholesalers accountable for
12  controlling quantities shipped."
13  Q.   Is that true or not true?
14  MS. HENN:  Objection to form.
15  THE WITNESS:  Can you add a
16  little more context to your question?
17  I know it's a true/false question,
18  but --
19  QUESTIONS BY MR. FARRELL:
20  Q.   Yes.
21  The DEA expects the wholesalers
22  to be accountable for controlling quantities
23  that they ship.
24  Is that fair or unfair?
25  MS. HENN:  Objection to form.

Page 228

1   Go ahead.
2   THE WITNESS:  That's what
3   the -- that's what the DEA expects, I
4   guess, yeah.
5   QUESTIONS BY MR. FARRELL:
6   Q.   Does McKesson acknowledge that
7   it is accountable for controlling the
8   quantities of opium pills shipped to American
9   pharmacies?
10  A.   We're accountable as a
11  distributor.
12  Q.   The next thing says, "5,000
13  dose units is average."
14  The average American pharmacy
15  in 2007, as reported by the DEA to McKesson,
16  was that 5,000 doses of oxycodone or 5,000
17  doses of hydrocodone was average.
18  A.   That's what the DEA -- DEA
19  calculations.
20  Q.   And McKesson at least validated
21  that number by repeating it on a slide to the
22  national operations conference in 2007.
23  MS. HENN:  Objection to form.
24  QUESTIONS BY MR. FARRELL:
25  Q.   Agreed?

Page 229

1   A.   I wouldn't say that they
2   validated.  We just repeated what was shared.
3   Q.   Did McKesson undertake any
4   investigation to determine what the average
5   was itself?
6   A.   I believe they did.  I can't
7   speak to the examples, but we've used
8   analysts and reviewed data when developing
9   thresholds and...
10  Q.   Does McKesson acknowledge that
11  in 2007 5,000 dose units was average in the
12  United States of America?
13  MS. HENN:  Objection to form.
14  Outside the scope.
15  THE WITNESS:  We acknowledge
16  that's what the DEA shared.  I mean,
17  there's many ways to get averages.
18  QUESTIONS BY MR. FARRELL:
19  Q.   Sitting here today, does
20  McKesson Corporation have any reason to
21  disagree or dispute the DEA's estimation of
22  what the average dose unit was?
23  MS. HENN:  Objection to form.
24  Outside the scope.
25  THE WITNESS:  What I would

Page 258

1    Nobody, no reasonable person,
2 could say that the DEA failed to tell
3 McKesson what the rules of the road were.
4    MS. HENN:  Objection to form.
5 Outside the scope.
6    THE WITNESS:  I agree that they
7    mentioned that in many -- in many ways
8    and many times.  There's still -- you
9    know, there are areas of the
10    regulation that are still unclear, and
11    DEA does not provide clear guidance on
12    what is an order of unusual size,
13    frequency and pattern.  They put that
14    back on the distributors to design our
15    own.
16    So they're not -- they're clear
17    on that guidance, but not on how to do
18    it all the time.
19 QUESTIONS BY MR. FARRELL:
20    Q.    All right.  So it's clear in
21 2008 what they're telling the DEA -- telling
22 McKesson is that whatever you're doing, we
23 think it's not enough?
24    MS. HENN:  Objection to form.
25    THE WITNESS:  It's clear that

Page 259

1    that's what they were alleging.
2 QUESTIONS BY MR. FARRELL:
3    Q.    And one of the things that's
4 clear is that you have a duty to halt
5 suspicious orders and perform due diligence.
6    Is there any reasonable person
7 in the United States of America as of 2008
8 could possibly argue that it's unclear
9 whether or not you should halt a suspicious
10 order before shipping?
11    MS. HENN:  Objection to form.
12    THE WITNESS:  I can't speak for
13    all reasonable people in the US.
14 QUESTIONS BY MR. FARRELL:
15    Q.    Well, what if somebody came up
16 and said, "We don't know whether or not we
17 have a duty to halt before shipping a
18 suspicious order," what you say to them as of
19 May 2, 2008, on the heels of paying
20 $13 million to the DEA?
21    MS. HENN:  Objection to form.
22 Outside the scope.
23    THE WITNESS:  Can you ask that
24    again?
25

Page 260

1 QUESTIONS BY MR. FARRELL:
2    Q.    Yes.
3    Would you be a moron if you
4 took the position out of May 2, 2008, that
5 the DEA was unclear as to whether or not you
6 could ship a suspicious order?
7    MS. HENN:  Objection to form.
8 Outside the scope.
9    THE WITNESS:  I wouldn't call
10    anybody a moron, but it's clear what
11    they expect.
12 QUESTIONS BY MR. FARRELL:
13    Q.    And they expect what?
14    A.    To design and operate a system
15 to disclose suspicious orders.
16    Q.    And?
17    MS. HENN:  Objection to form.
18    THE WITNESS:  And report.
19 QUESTIONS BY MR. FARRELL:
20    Q.    And?
21    MS. HENN:  Same objection.
22 QUESTIONS BY MR. FARRELL:
23    Q.    Is it clear whether or not you
24 can ship a suspicious order without
25 conducting due diligence?

Page 261

1    MS. HENN:  Objection to form.
2 Outside the scope.
3    THE WITNESS:  I think it
4    depends.  It's -- there are other
5    types of suspicious order systems.
6 QUESTIONS BY MR. FARRELL:
7    Q.    I understand.  I'm just trying
8 to take it from a very basic standpoint.
9    Could the DEA have made it any
10 clearer that McKesson has a duty to monitor
11 and detect suspicious orders?
12    MS. HENN:  Objection to form.
13 Outside the scope.
14    THE WITNESS:  To monitor and
15    detect suspicious orders.
16 QUESTIONS BY MR. FARRELL:
17    Q.    That's what it says.
18    A.    Very clear.
19    Q.    Could they have been any
20 clearer that if you get a suspicious order,
21 you can't just ship it?
22    MS. HENN:  Objection to form.
23 Outside the scope.
24    THE WITNESS:  That's clear.
25

Page 262

1  QUESTIONS BY MR. FARRELL:
2      Q.    Clear or very clear?
3          MS. HENN:  Objection to form.
4          THE WITNESS:  It's very clear.
5  QUESTIONS BY MR. FARRELL:
6      Q.    Can you report the suspicious
7  order to the DEA and still ship it?
8          MS. HENN:  Objection to form.
9  Outside the scope.
10          THE WITNESS:  Can you ask that
11     one again or restate it?
12  QUESTIONS BY MR. FARRELL:
13      Q.    Can you report the suspicious
14  order to the DEA and still ship it?
15          MS. HENN:  Same objections.
16          THE WITNESS:  Without due
17     diligence or some sort of review?
18  QUESTIONS BY MR. FARRELL:
19      Q.    If you're reporting a
20  suspicious order to the DEA, what are you
21  doing?
22          MS. HENN:  Objection to form.
23          THE WITNESS:  Okay.  Can we
24     start with the original question?  I'm
25     getting a little -- I want to make

Page 263

1  sure I'm going to answer your question
2  right --
3  QUESTIONS BY MR. FARRELL:
4      Q.    Yeah, I'm going to show you --
5      A.    -- the right question.
6      Q.    I'm going to show you here in a
7  few minutes some of your brethren who still
8  haven't gotten the message by May 2008, and
9  I'm trying to see if you'll call them morons.
10          So what I'm asking you is from
11  McKesson's corporation, is it clear by May 2,
12  2008, you -- the shipping requirement and the
13  reporting requirement?
14          MS. HENN:  Objection to form.
15  Outside the scope.
16          THE WITNESS:  That's how we
17     designed our program, and that's what
18     we believed it to be.
19  QUESTIONS BY MR. FARRELL:
20      Q.    Based on federal law?
21          MS. HENN:  Objection to form.
22          THE WITNESS:  Based on the
23     regulations and the guidance and the
24     information we collected.
25          (McKesson-Hartle Exhibit 26

Page 264

1      marked for identification.)
2  QUESTIONS BY MR. FARRELL:
3      Q.    I'll mark Exhibit 26.  Top
4  right is 2008_07_031.  It's Bates stamp
5  MCK-HOI-002-0000042.
6          Have you seen this document
7  before?
8      A.    Yes, I have.
9      Q.    And what is it?
10      A.    This is a PowerPoint.
11      Q.    Made by who?
12      A.    By McKesson.
13      Q.    For purposes of?
14      A.    Discussion with DEA.
15      Q.    Regarding?
16      A.    Our controlled substance
17  monitoring program.
18      Q.    And it's dated when?
19      A.    It's dated July 31, 2008.
20      Q.    So this is before or after your
21  settlement agreement with the DEA?
22      A.    Shortly after.
23      Q.    So that must have been kind of
24  awkward, right, your coming in after paying
25  the fine?

Page 265

1          What are you doing here?  Are
2  you giving the DEA an update of all of the
3  parts of your action plan you're
4  implementing?
5          MS. HENN:  Objection to form.
6          THE WITNESS:  I can't say if it
7     was awkward or not, but standard -- or
8     a communication and updating them on
9     what we were doing.
10  QUESTIONS BY MR. FARRELL:
11      Q.    Go to page 004.  Roman numeral
12  number III, "Block orders that exceed
13  thresholds."
14          That's because you have a duty
15  to halt suspicious orders, correct?
16          MS. HENN:  Objection to form.
17  Outside the scope.
18          THE WITNESS:  That's how we
19     designed our new program, to block.
20  QUESTIONS BY MR. FARRELL:
21      Q.    And is that a requirement of
22  federal law?
23      A.    It's our interpretation of how
24  we --
25          MS. HENN:  Same objection.

Page 266

1      Go ahead.
2      THE WITNESS:  Our
3   interpretation of how -- what we
4   thought we needed to do with our
5   program.
6   QUESTIONS BY MR. FARRELL:
7      Q.    Page 5.  In April of 2007, you
8   created your three-tier review process.
9      Do you see that?
10     A.    Correct.  Yep.
11     Q.    That means prior to that, you
12  didn't have a three-tier review process --
13     MS. HENN:  Objection to form.
14  QUESTIONS BY MR. FARRELL:
15     Q.    -- under Section 55.
16     MS. HENN:  Objection to form.
17     THE WITNESS:  We did not.  We
18  had a different process.
19  QUESTIONS BY MR. FARRELL:
20     Q.    September 2007, DEA meeting
21  triggered new development.  This is your new
22  CSMP, and this is what you're describing to
23  the DEA, agree?
24     A.    Agree.
25     Q.    Bate Stamp 8.  If you're over

Page 267

1   your threshold, what happens to your order?
2      A.    It gets blocked.
3      Q.    Why?
4      A.    That's the design of our
5   system.
6      Q.    For what purpose?
7      A.    To report suspicious orders --
8      Q.    Why is that important?
9      A.    -- block.
10     To prevent diversion, to play a
11  role in preventing diversion.
12     Q.    The more pills that get
13  diverted, what happens?
14     MS. HENN:  Objection to form.
15     THE WITNESS:  You can assume
16  that there's more abuse.
17  QUESTIONS BY MR. FARRELL:
18     Q.    Do you believe there's a direct
19  correlation between the more pills that get
20  sold and the more pills that get diverted?
21     MS. HENN:  Objection to form.
22     THE WITNESS:  Can you rephrase
23  that question?
24  QUESTIONS BY MR. FARRELL:
25     Q.    Yes.

Page 268

1      Is there a relationship between
2   the number of pills that get sold and the
3   number of pills that get diverted?
4      MS. HENN:  Objection to form.
5      THE WITNESS:  It's hard to say,
6   but you could assume that the -- you
7   know --
8   QUESTIONS BY MR. FARRELL:
9      Q.    I don't want you to assume.
10     A.    Yeah.
11     Q.    I want you to use common sense.
12     A.    Yeah.  Using common sense and
13  basic logic, you could assume the more pills
14  that are out there, the more potential for
15  diversion there could be.
16     Q.    So if I were to tell you that a
17  company sold 100 pills and 10 of them got
18  diverted, and then I come back to you and say
19  a year later, a thousand pills got sold, what
20  does common sense and logic tell you as
21  McKesson Corporation how many pills get
22  diverted?
23     MS. HENN:  Objection to form.
24     THE WITNESS:  I don't think
25  it's that easy of a connection to say

Page 269

1   that happened.  There could be many
2   different reasons why a thousand
3   pills -- there may be an increase of a
4   thousand pills with zero diversion.
5   QUESTIONS BY MR. FARRELL:
6      Q.    That's true.
7      Do you expect as McKesson
8   Corporation to find in general a direct
9   correlation to volume of pills sold and
10  volume of pills diverted?
11     MS. HENN:  Objection to form.
12  Outside the scope.
13     THE WITNESS:  Depends.  I don't
14  know if there's a statistic on how
15  many pills are diverted.  Again,
16  there's reasons why you may have very
17  large volumes of pills for legitimate
18  reasons and there may be zero
19  diversion.
20  QUESTIONS BY MR. FARRELL:
21     Q.    That's true.  Let me ask it a
22  different way.
23     Do you believe it's foreseeable
24  that the more pills you sell, the more pills
25  get diverted?

Page 270

1     MS. HENN: Objection to form.
2     THE WITNESS: I would say that
3  there -- that, you know, the volume
4  of -- the more pills you have, there
5  could be, could be more to diversion.
6  It doesn't mean that there is. Or I
7  would foresee that just an increase in
8  volume is going to increase diversion.
9  There could be.
10 QUESTIONS BY MR. FARRELL:
11    Q.    The more pills that are
12 diverted -- let me ask you a different way.
13    A.    Okay.
14    Q.    Does McKesson believe that the
15 more pills that get diverted, the more pills
16 get abused?
17    MS. HENN: Objection to form.
18 Outside the scope.
19    THE WITNESS: Sorry, could you
20 rephrase that one again? Let me --
21 QUESTIONS BY MR. FARRELL:
22    Q.    As McKesson Corporation, do you
23 acknowledge that the more pills that get
24 diverted, the more pills get abused?
25    MS. HENN: Same objections.

Page 271

1     THE WITNESS: Again, I'd say
2  what I said previously: It could --
3  that could be a possibility. It
4  depends, but...
5  QUESTIONS BY MR. FARRELL:
6     Q.    Are people diverting pills to
7  engage in lawful conduct?
8     MS. HENN: Objection to form.
9     THE WITNESS: I don't know why
10 everybody is diverting pills every
11 single time, but generally, no.
12 QUESTIONS BY MR. FARRELL:
13    Q.    Right.
14    So in general, the more pills
15 that gets diverted, the more abuse and
16 addiction we find with prescription opium
17 pills?
18    A.    There's that possibility.
19    (McKesson-Hartle Exhibit 27
20    marked for identification.)
21 QUESTIONS BY MR. FARRELL:
22    Q.    I'm going to have marked what
23 is Deposition Exhibit 27. The top right-hand
24 corner is 2012_5_9.
25    This is an amicus brief.

Page 272

1     Do you know what an amicus
2  brief is?
3     A.    I do not. I do not have legal
4  background.
5     Q.    Okay. McKesson Corporation is
6  a member of the Healthcare Distributors and
7  Manufacturers Association, now known as the
8  Healthcare Distributors Association, agreed?
9     A.    Healthcare Distributors
10 Management Association?
11    Q.    Management, I'm sorry, yes.
12    A.    Yes.
13    Q.    Okay. And on May 9, 2012,
14 Cardinal Health had gotten itself into a
15 little trouble with the DEA, hadn't it?
16    MS. HENN: Objection to form.
17    THE WITNESS: I'm aware of that
18    time frame and...
19 QUESTIONS BY MR. FARRELL:
20    Q.    They got in trouble with the
21 DEA, very similar to how McKesson got in
22 trouble with the DEA in 2008, agreed?
23    MS. HENN: Objection to form.
24    THE WITNESS: I haven't
25    reviewed this document or all the

Page 273

1  details, but in spirit, in general.
2  QUESTIONS BY MR. FARRELL:
3     Q.    So in -- on May 9th of 2012,
4  HDMA, the Healthcare Distribution Management
5  Association, wrote a brief to a federal court
6  here in Washington, DC, in support of
7  Cardinal Health and against the DEA.
8     Was McKesson Corporation aware
9  of this amicus brief?
10    MS. HENN: Objection to form.
11 Outside the scope.
12    MR. FARRELL: It's actually
13 not. It's actually referenced
14 directly in the notice.
15    MS. HENN: I'm not sure that's
16 the case, but we can disagree about
17 that.
18    THE WITNESS: I don't know for
19 100 percent certain, but I assume so.
20 QUESTIONS BY MR. FARRELL:
21    Q.    Well, I don't want you to
22 guess. This is relatively important.
23    Have you seen any
24 acknowledgement within McKesson Corporation
25 validating or affirming or reviewing or

Page 274

1 participating in this amicus brief?
2    A.   I have not.
3    Q.   Are you aware of McKesson being
4 involved at all in the amicus briefs?
5        MS. HENN: Objection to form.
6        THE WITNESS: I'm not.
7        (McKesson-Hartle Exhibit 28
8 marked for identification.)
9 QUESTIONS BY MR. FARRELL:
10    Q.   I'm going to have marked
11 Exhibit 28, 2012_05_05.
12        Are you aware of the Wayback
13 Machine?
14    A.   Excuse me?
15    Q.   Are you aware of the Wayback
16 Machine?
17    A.   I am not.
18    Q.   The Wayback Machine is an
19 Internet service that's free, and what it
20 does is it's able to go and bring up old
21 websites based on dates and time.
22        And it just so happens that the
23 Wayback Machine captured the HDMA website in
24 May of 2012.  This comes from the HDMA
25 website, and this is a list of the board of

Page 275

1 directors.
2        Now, what's an executive
3 committee on a board of directors?
4        MS. HENN: Objection to form.
5 Outside the scope.
6        THE WITNESS: That's the senior
7    leaders driving this group.
8 QUESTIONS BY MR. FARRELL:
9    Q.   And, Mr. McKesson Corporation,
10 you were on the executive committee of HDMA
11 of 2012, were you not?
12        MS. HENN: Objection to form.
13 Outside the scope.
14        THE WITNESS: One of our senior
15    leaders is.
16 QUESTIONS BY MR. FARRELL:
17    Q.   You're in the senior leadership
18 of HDMA, and you signed off on an amicus
19 brief submitted to a federal court in
20 Washington, DC, in support of one of your
21 colleagues and members, Cardinal Health.
22        MS. HENN: Objection to form.
23 Outside the scope.
24 QUESTIONS BY MR. FARRELL:
25    Q.   So I'm going to ask you a

Page 276

1 couple of questions about it.
2    A.   Okay.
3    Q.   If you flip to page 3...
4    A.   Of the brief?
5    Q.   Of the brief.
6        The very bottom of the page --
7        MS. HENN: Are you talking
8 about the Bates numbers or the --
9        MR. FARRELL: Yeah, the Bates
10 number.
11        MS. HENN: Thank you.
12 QUESTIONS BY MR. FARRELL:
13    Q.   It says, "HDMA's members have
14 not only statutory and regulatory
15 responsibilities to detect and prevent
16 diversion of controlled prescription drugs,
17 but undertake such efforts as responsible
18 members of society."
19        Do you see that?
20    A.   I do.
21    Q.   Do you recognize this as an
22 acknowledgement that all of the distributors
23 in the country have a common law duty to the
24 people of the United States of America to
25 prevent diversion of controlled substances

Page 277

1 because you're selling controlled substances?
2        MR. SUDDATH: Objection.
3        MS. HENN: Objection to form.
4 Outside the scope.
5        THE WITNESS: Okay.  Could you
6    ask me that again?
7 QUESTIONS BY MR. FARRELL:
8    Q.   Do you recognize this as an
9 acknowledgement that all of the distributors
10 in the country have a common law duty to the
11 American citizens to prevent controlled
12 substances from being diverted into the
13 illicit market?
14        MR. SUDDATH: Objection.
15        MS. HENN: Objection to form.
16 Outside the scope.
17 QUESTIONS BY MR. FARRELL:
18    Q.   I mean, isn't this what we
19 talked about earlier?
20    A.   I do.
21    Q.   You do, don't you?  Yes?
22    A.   Yes.
23    Q.   Because it's not just
24 statutory, regulatory.  You're engaged in
25 selling opium pills.  You owe a duty to the

Page 278

1 American people to do your very best to
2 prevent diversion.
3          MS. HENN: Objection to form.
4 Outside the scope.
5 QUESTIONS BY MR. FARRELL:
6     Q.   Agreed?
7     A.   Agreed.
8     Q.   And this is your trade
9 organization making the same representation
10 to a federal court in Washington, DC?
11          MS. HENN: Same objections.
12 Objection to form. Outside the scope.
13          THE WITNESS: Yes.
14 QUESTIONS BY MR. FARRELL:
15     Q.   Next sentence: "The public
16 health dangers associated with the diversion
17 and abuse of controlled prescription drugs
18 have been well-recognized over the years by
19 Congress, DEA, HDMA and its members, and
20 public health authorities."
21     Is that all true?
22          MS. HENN: Objection to form.
23 Outside the scope.
24          THE WITNESS: Yes.
25

Page 279

1 QUESTIONS BY MR. FARRELL:
2     Q.   The next sentence. This is the
3 part that I'd like to talk to you about, the
4 highlighted part. "The agency," meaning DEA,
5 "has failed to provide meaningful guidance to
6 assist the regulated industry in complying
7 with the DEA's interpretation of its
8 implementing regulations. HDMA respectfully
9 submits that despite the agency's oft-recited
10 refrain that the regulations are clear, the
11 regulated industry does not know the rules of
12 the road because DEA has not adequately
13 explained them."
14          McKesson has said the opposite
15 publicly and to its own people, agreed?
16          MS. HENN: Object to form.
17 QUESTIONS BY MR. FARRELL:
18     Q.   Remember the slide that said
19 clear? Remember your testimony about the
20 letters and the settlement agreement? You
21 said a few minutes ago it was clear.
22     A.   I do remember all of that. I
23 also --
24          MS. HENN: Object to form.
25          Go ahead.

Page 280

1          THE WITNESS: Oh, excuse me.
2          I also remember saying that
3 certain parts of those regulations
4 related to what a suspicious order is
5 is not clear.
6 QUESTIONS BY MR. FARRELL:
7     Q.   Page 7. "The societal costs of
8 prescription drug abuse are" -- what's it
9 say?
10     A.   I flipped to the wrong page.
11 Excuse me.
12     "Huge."
13     Q.   And if a distributor engages in
14 unlawful conduct, should the distributor be
15 held accountable for such societal costs?
16          MS. HENN: Objection to form.
17 Outside the scope.
18          THE WITNESS: Can you repeat
19 that, please?
20 QUESTIONS BY MR. FARRELL:
21     Q.   If a wholesale distributor
22 engages in unlawful conduct, should it be
23 held accountable for the societal costs of
24 prescription drug abuse?
25          MR. SUDDATH: Objection.

Page 281

1          MS. HENN: Same objections.
2          THE WITNESS: I believe
3 distributors have a responsibility in
4 preventing diversion.
5 QUESTIONS BY MR. FARRELL:
6     Q.   So should they be held
7 accountable for the societal costs that are
8 documented in this pleading and referenced as
9 huge?
10     A.   I think it depends.
11          MS. HENN: Objection to form.
12 QUESTIONS BY MR. FARRELL:
13     Q.   Depends on what?
14          MS. HENN: Same objection.
15          Go ahead.
16          THE WITNESS: It depends on the
17 facts and circumstances and, you know,
18 the information about the specific
19 situation.
20 QUESTIONS BY MR. FARRELL:
21     Q.   If a distributor repeatedly
22 fails to report suspicious orders, do you
23 believe it should be held accountable for the
24 societal costs of prescription drug abuse?
25          MR. SUDDATH: Objection.

Page 282

1 MS. HENN: Objection to form.
2 THE WITNESS: And I believe it
3 depends.
4 QUESTIONS BY MR. FARRELL:
5 Q. On?
6 A. The facts and circumstances.
7 Q. How about the facts and
8 circumstances which led to McKesson paying
9 $150 million fine?
10 MS. HENN: Objection to form.
11 THE WITNESS: Again, I think it
12 depends.
13 QUESTIONS BY MR. FARRELL:
14 Q. Do you think McKesson is partly
15 responsible for the societal costs of
16 prescription drug abuse in America?
17 MS. HENN: Objection to form.
18 THE WITNESS: Could you ask
19 that one again, please?
20 QUESTIONS BY MR. FARRELL:
21 Q. Do you think McKesson is partly
22 responsible for the societal costs of
23 prescription drug abuse in America?
24 MS. HENN: Objection to form.
25 THE WITNESS: Again, there's a

Page 283

1 lot of people involved in -- it's a
2 very complicated and multi-faceted
3 issue, so...
4 QUESTIONS BY MR. FARRELL:
5 Q. We'll get to the other people
6 in a second.
7 MS. HENN: Are you done with
8 your answer?
9 THE WITNESS: I am done.
10 MS. HENN: Okay.
11 QUESTIONS BY MR. FARRELL:
12 Q. We'll get to the others in a
13 second. I want to talk about McKesson first.
14 This is your opportunity to
15 accept partial responsibility for the
16 societal costs of prescription drug abuse in
17 America; yes or no?
18 MS. HENN: Objection to form.
19 Also outside the scope.
20 THE WITNESS: So again, it
21 depends on -- it depends.
22 QUESTIONS BY MR. FARRELL:
23 Q. You're McKesson Corporation.
24 A. Right.
25 Q. You're sitting here today. You

Page 284

1 have the opportunity to look in the camera
2 and tell the jury whether or not you accept
3 partial responsibility for the societal costs
4 of prescription drug abuse in America.
5 MS. HENN: Objection to form.
6 Outside the scope.
7 QUESTIONS BY MR. FARRELL:
8 Q. I'd ask you to answer yes or
9 no.
10 MS. HENN: Same objections.
11 THE WITNESS: I'm not sure how
12 to answer that -- that question
13 specifically.
14 QUESTIONS BY MR. FARRELL:
15 Q. Well, you can say yes or --
16 A. I understand that.
17 Q. -- you can say no.
18 A. I understand that.
19 MS. HENN: Objection to form.
20 QUESTIONS BY MR. FARRELL:
21 Q. If I asked you the same
22 question in your personal capacity, would
23 that help you answer the question better?
24 MS. HENN: Same objection.
25 Objection to form.

Page 285

1 THE WITNESS: Again, it
2 depends -- I would say it doesn't
3 change my answer. It depends on the
4 role that they played.
5 QUESTIONS BY MR. FARRELL:
6 Q. Well, back to McKesson
7 Corporation, which is you sitting in the
8 chair today. Knowing what you know as the
9 30(b)(6) representative, the corporate
10 designee, knowing about your past conduct,
11 knowing about the past interactions with the
12 DEA, I'm going to ask you again: Does
13 McKesson Corporation accept partial
14 responsibility for the societal costs of
15 prescription drug abuse in America?
16 MS. HENN: Objection to form.
17 THE WITNESS: Again, you know,
18 I -- we're part of the closed system,
19 so we're responsible for preventing
20 diversion.
21 QUESTIONS BY MR. FARRELL:
22 Q. So the answer is?
23 MS. HENN: Objection to form.
24 THE WITNESS: Again, I think
25 we're responsible for something. I

Page 286

1  don't know what -- how you define all
2  societal costs and -- I still believe
3  it depends on different circumstances.
4  QUESTIONS BY MR. FARRELL:
5      Q.    Sir, we're not going to parse
6  out percentages.
7      A.    Yeah.
8      Q.    Let's just talk globally for
9  McKesson Corporation.  So I don't want to put
10 words in your mouth because it's got to come
11 out of your mouth.  So the answer is yes or
12 no.
13         MS. HENN:  Objection to form.
14         THE WITNESS:  I would say yes,
15     partially.
16 QUESTIONS BY MR. FARRELL:
17     Q.    How about Purdue Pharma?  Does
18 McKesson Corporation take the position that
19 Purdue Pharma is partially responsible for
20 the societal costs of prescription drug abuse
21 in America?
22         MS. HENN:  Objection to form.
23     Outside the scope.
24         THE WITNESS:  I'm not going to
25     answer for other companies.  I'm --

Page 287

1      it's like I answered my question:
2      Those involved in this space,
3      depending on the facts and
4      circumstances, may be.  So, yes.
5  QUESTIONS BY MR. FARRELL:
6      Q.    Flip to page 8, the last
7  paragraph.  Your trade organization is saying
8  that the "DEA's goal, the prevention of
9  diversion of controlled prescription drugs,
10 is, of course, a public good."
11         Does McKesson validate,
12 acknowledge and affirm that statement?
13         MS. HENN:  Objection to form.
14         THE WITNESS:  Absolutely.  The
15     prevention of the diversion of
16     controlled substances is good for the
17     public.
18         (McKesson-Hartle Exhibit 29
19     marked for identification.)
20 QUESTIONS BY MR. FARRELL:
21     Q.    Next exhibit I'm going to have
22 marked is Exhibit 29.  It's Exhibit
23 2013_09_13.  It's Bates stamp
24 MCK-AGMS-006000880.
25         Have you seen this document?

Page 288

1      A.    I have not.
2      Q.    Do you know who Gary Boggs is?
3      A.    I do know Gary.
4      Q.    I'll represent to you that on
5  the metadata that was provided by the --
6  McKesson, indicates that this presentation is
7  dated in late 2012 -- wait, late 2013, I
8  think, probably before Gary Boggs came on to
9  McKesson.  We'll ask him when we depose him.
10         But anyway, this is a McKesson
11 spreadsheet from Gary Boggs.  Gary Boggs is
12 former DEA.
13     A.    PowerPoint, not spreadsheet.
14     Q.    Yeah, I'm sorry.
15     A.    Okay.
16     Q.    He's former DEA, correct?
17     A.    Correct.
18     Q.    He was the number 2 man on Joe
19 Rannazzisi, yes?
20     A.    Yes.
21     Q.    And as we'll see later, he was
22 actually in the room for one of the
23 presentations when DEA was negotiating with
24 McKesson on the 2008 settlement.
25         Is that your memory as a

Page 289

1  corporate entity?
2          MS. HENN:  Objection to form.
3          THE WITNESS:  I wasn't aware
4      that he was specifically in the room,
5      but...
6  QUESTIONS BY MR. FARRELL:
7      Q.    The title of this PowerPoint
8  slide is what?
9      A.    Oh, "State of prescription drug
10 abuse."
11     Q.    And on the second page, talks
12 about the impact of effective compliance.
13 And it uses lots of America-related stuff,
14 eagles and flags and such.
15         Do you see that?
16     A.    I do see that.
17     Q.    "Protecting America from
18 Prescription Drug Diversion."
19         The next page is a history of
20 understanding the problem, and on page 4 it
21 talks about a collision course.
22         And presumably this is two
23 planes colliding in the air, and that's
24 OxyContin and Percocet.
25         Do you see that?

Page 290

1      MS. HENN:  Objection to form.
2      THE WITNESS:  I see that.
3  QUESTIONS BY MR. FARRELL:
4      Q.    "In the late 1990s, doctors
5  aggressively prescribing painkillers - a
6  radical change in health care behavior."
7          And that radical change in
8  health care behavior did what to the number
9  of prescriptions?
10      MS. HENN:  Objection to form.
11      THE WITNESS:  Increased them.
12  QUESTIONS BY MR. FARRELL:
13      Q.    Which resulted in an increase
14  or decrease in the number of pills McKesson
15  sold?
16      A.    I don't know exact numbers, but
17  it increased.
18      Q.    And then the last part,
19  "Manufacturers fueled the use of prescription
20  painkillers."
21          This is coming from your new
22  head of regulatory affairs at McKesson,
23  agreed?
24      MS. HENN:  Objection to form.
25      THE WITNESS:  Can you say that

Page 291

1  again?
2  QUESTIONS BY MR. FARRELL:
3      Q.    Yeah.
4      A.    He's not -- he wasn't the head
5  of regulatory affairs.
6      Q.    Then, but he is now?
7      A.    He's one of the leaders on the
8  regulatory affairs team.
9      Q.    Okay.  And this is his
10  statement that "Manufacturers fueled the use
11  of prescription painkillers."
12          Is that McKesson's position?
13      MS. HENN:  Objection to form.
14      THE WITNESS:  I don't know if
15      that's his own specific words or he
16      got that from a previous deck from
17      DEA.  I'm not sure.
18  QUESTIONS BY MR. FARRELL:
19      Q.    We'll have to ask him.
20          But I'm asking McKesson whether
21  or not it shares this view.
22      MS. HENN:  Objection to form.
23      Outside the scope.
24      THE WITNESS:  Manufacturers are
25      part of the closed system, like -- and

Page 292

1  played a role.
2  QUESTIONS BY MR. FARRELL:
3      Q.    Does McKesson believe the
4  manufacturers fueled the use of prescription
5  painkillers?
6      MS. HENN:  Objection to form.
7      Outside the scope.
8      THE WITNESS:  I think they
9      played a role.  I think there's many
10      reasons -- many things that fueled the
11      epidemic.
12  QUESTIONS BY MR. FARRELL:
13      Q.    So would you rather just punt
14  on the question?
15      MS. HENN:  Objection to form.
16      THE WITNESS:  That's what I'm
17      going to share.  That's my answer.
18  QUESTIONS BY MR. FARRELL:
19      Q.    So yes or no, does McKesson
20  Corporation believe manufacturers fueled the
21  use of prescription painkillers?
22      MS. HENN:  Objection to form.
23      Outside the scope.
24      THE WITNESS:  Like I said,
25      my -- they're part of the system.

Page 293

1  They played a role.
2  QUESTIONS BY MR. FARRELL:
3      Q.    So the answer is?
4      A.    They played a role.  I wouldn't
5  say -- I wouldn't characterize it as fueled.
6  I don't know that I would use that language.
7      Q.    Fair enough.
8          The next page, 5 and 6,
9  document Purdue Pharma's $635 million fine,
10  Cephalon's $425 million fine.
11          Going to page 7, it's comparing
12  the US rates of opioid overdose deaths, sales
13  and treatment admissions.
14          Do you see that?
15      A.    I see that.
16      Q.    What is the correlation between
17  opioid sales and opioid deaths?  Are they
18  related or unrelated?
19      MS. HENN:  Objection to form.
20      THE WITNESS:  They're both
21      increasing at a similar rate.
22  QUESTIONS BY MR. FARRELL:
23      Q.    So that means they're related
24  or unrelated?
25      MS. HENN:  Objection to form.

Case 1:17-md-02804-DAC Doc #: 3075-5 Filed: 11/06/19 75 of 82. PageID #: 481009
Case 1:17-md-02804-DAC Doc #: 3075-5 Filed: 11/06/19 75 of 82. PageID #: 481009
Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    THE WITNESS: They appear to be
2  related.
3  QUESTIONS BY MR. FARRELL:
4    Q.    Does McKesson believe that
5  opioid sales are related to opioid deaths?
6    MS. HENN: Objection to form.
7  Outside the scope.
8    THE WITNESS: Can you ask that
9  one more time, please?
10 QUESTIONS BY MR. FARRELL:
11   Q.    Does McKesson believe that
12 opioid sales are related to opioid deaths?
13   MS. HENN: Objection to form.
14 Outside the scope.
15   THE WITNESS: The volume of
16 opioids in the market and diversion is
17 related to opioid deaths, certainly.
18 QUESTIONS BY MR. FARRELL:
19   Q.    Page 8, the Controlled
20 Substances Act, the very last provision says,
21 "Creates checks and balances between
22 registrants to protect the public health and
23 safety."
24   Again, this is again a
25 reaffirmation from Gary Boggs, who is now one

Page 295

1  of your senior regulatory affairs management,
2  acknowledging that the registrants and the
3  DEA have a duty to protect the public health
4  and safety, agreed?
5    A.    Agreed.
6    Q.    Page 13. It says, "What can
7  happen when these checks and balances
8  collapse?"
9    What do you believe this is a
10 picture of?
11   MS. HENN: Objection to form.
12   THE WITNESS: It's a building
13 falling down.
14 QUESTIONS BY MR. FARRELL:
15   Q.    A disaster?
16   A.    It's a building that's falling
17 down. Why it fell down could be a disaster.
18   Q.    What do you infer from
19 Mr. Boggs' implication?
20   A.    That things can go wrong,
21 something can happen.
22   Q.    Page 16, pictures of pain
23 clinics and people waiting in line to
24 purchase pills sold by McKesson to
25 pharmacies.

Page 296

1    MS. HENN: Objection to form.
2    MR. FARRELL: You're right.
3  That's not necessarily a picture of
4  McKesson.
5  QUESTIONS BY MR. FARRELL:
6    Q.    You would agree with me that if
7  a McKesson sales agent came upon a pain
8  clinic and saw this, that would be a red
9  flag?
10   MS. HENN: Objection to form.
11   THE WITNESS: It would.
12 QUESTIONS BY MR. FARRELL:
13   Q.    Page 17, historical comparison.
14 He's comparing the opioid crisis to the BP
15 oil spill where 11 people were killed and BP
16 paid 40 billion, plus 16 billion to the Clean
17 Water Act.
18   Have more or less than 11
19 people been killed by the opioid crisis?
20   A.    Clearly more.
21   Q.    Have more people died today
22 than 11 people?
23   MS. HENN: Objection to form.
24   THE WITNESS: Based on the
25 statistics, yes.

Page 297

1  QUESTIONS BY MR. FARRELL:
2    Q.    Page 24. Does McKesson
3  acknowledge and agree there is a national
4  epidemic of prescription pill addiction,
5  abuse, morbidity and mortality?
6    MS. HENN: Objection to form.
7    THE WITNESS: Absolutely.
8  QUESTIONS BY MR. FARRELL:
9    Q.    Does McKesson acknowledge the
10 economic impact of this national epidemic in
11 America is greater than $57 billion per year?
12   MS. HENN: Objection to form.
13 Outside the scope.
14   THE WITNESS: I don't know
15 where that -- the -- how the 57
16 billion was derived, but there's
17 clearly an -- or an economic impact to
18 the country.
19 QUESTIONS BY MR. FARRELL:
20   Q.    Page 37, "distributors have
21 great power." The last provision.
22   You, McKesson Corporation,
23 control the supply to downstream customers.
24 Does McKesson acknowledge that duty?
25   MS. HENN: Objection to form.

Page 298

1    THE WITNESS: We control what
2  we sell.
3  QUESTIONS BY MR. FARRELL:
4    Q.    So yes?
5    A.    Yes.
6    Q.    Page 38. And Mr. -- I take
7  exception with Mr. Boggs here. He attributes
8  this to some guy named Voltaire, but actually
9  this is Spiderman. "With great power comes
10  great responsibility."
11    Does McKesson acknowledge that?
12    You don't have to answer that
13  question.
14    Page 41, "Detecting Suspicious
15  Orders." Most importantly, Mr. Boggs is
16  telling McKesson that you cannot ignore what.
17    A.    Warning signs.
18    Q.    Page 46, "Without sustained
19  sources of supply, major diversion schemes
20  wither away."
21    Who are the major sources of
22  supply?
23    MS. HENN: Objection to form.
24    THE WITNESS: Those in the
25  closed system of distribution:

Page 299

1  manufacturers, distributors. There's
2  also sources, illicit sources, outside
3  of the closed network.
4  QUESTIONS BY MR. FARRELL:
5    Q.    They all originate within the
6  closed network, do they not?
7    MS. HENN: Objection to form.
8    THE WITNESS: What do you mean
9  by "all originate"?
10  QUESTIONS BY MR. FARRELL:
11    Q.    Well, Bob, in his trailer in
12  southern West Virginia, isn't making
13  OxyContin pills.
14    A.    No, I'm saying there's other --
15  I understand your point. They come
16  ultimately from the manufacturer,
17  distributor, pharmacy.
18    (McKesson-Hartle Exhibit 30
19    marked for identification.)
20  QUESTIONS BY MR. FARRELL:
21    Q.    Exhibit 30, 2013_10_23, Bates
22  stamp MCKMDL00409046. This is October 23,
23  2013.
24    McKesson is in trouble again
25  with the DEA, agreed?

Page 300

1    MS. HENN: Objection to form.
2    THE WITNESS: There's
3  allegations.
4  QUESTIONS BY MR. FARRELL:
5    Q.    Same ones as before, agreed?
6    MS. HENN: Objection to form.
7    THE WITNESS: Related to the
8  regulations.
9  QUESTIONS BY MR. FARRELL:
10    Q.    Same as the 2008?
11    MS. HENN: Objection to form.
12    THE WITNESS: Around suspicious
13  orders.
14    (McKesson-Hartle Exhibit 31
15    marked for identification.)
16  QUESTIONS BY MR. FARRELL:
17    Q.    Exhibit 31, dated November 6,
18  2013. It's 2013_11_6, MCKMDL00409048.
19    It's again from the United
20  States Attorney in the Northern District of
21  West Virginia. It's talking about further
22  explanations.
23    You would agree with me this is
24  the same conduct that McKesson got in trouble
25  for in 2008?

Page 301

1    MS. HENN: Objection to form.
2    THE WITNESS: Yeah, it has to
3  do with suspicious orders, which is
4  similar.
5  QUESTIONS BY MR. FARRELL:
6    Q.    And it's Covington & Burlington
7  at a place called 1201 Pennsylvania Avenue,
8  Northwest.
9    Do you know where that is?
10  Isn't that here?
11    MS. HENN: Old office.
12    MR. FARRELL: The old office.
13  All right.
14    THE WITNESS: In town.
15  QUESTIONS BY MR. FARRELL:
16    Q.    But again, this is the same
17  thing.
18    Do you know Bill Ihlenfeld?
19    A.    I do not.
20    Q.    Yeah, he was the US Attorney
21  for the Northern District of West Virginia
22  and a classmate of mine. He's calling on
23  McKesson, and he's essentially telling
24  McKesson, "Hey, you're not doing your job
25  again."

Case 3:17-cv-01362 Document 1075-5 Filed 10/09/19 Page 44 of 53 PageID #: 26811
Case 1:17-md-02804-DAP Doc #: 3075-5 Filed: 12/09/19 Page 44 of 53. PageID #: 481811
Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    MS. HENN: Objection to form.
2  QUESTIONS BY MR. FARRELL:
3    Q.  "And you're dumping pills into
4  my state."
5    MS. HENN: Same objection.
6    (McKesson-Hartle Exhibit 32
7  marked for identification.)
8  QUESTIONS BY MR. FARRELL:
9    Q.  Exhibit 32, 2014_1_XX,
10  MCKMDL00409050. In fact, they put a whole
11  presentation together.
12    Have you seen this
13  presentation?
14    A.  I have seen this one.
15    Q.  I'm not going to go through
16  this because we'll go through with it a lot
17  more tomorrow.
18    In essence, what I'm trying to
19  accomplish here is that you understand that
20  the United States District Attorney for the
21  Northern District of Ohio, and then it turns
22  out other ones, including Colorado, are
23  basically telling McKesson: You have a
24  systemic failure to monitor, detect and
25  report suspicious orders.

Page 303

1    Is that what they're alleging?
2    MS. HENN: Objection to form.
3    THE WITNESS: Yes, that's what
4  they're alleging.
5    (McKesson-Hartle Exhibit 33
6  marked for identification.)
7  QUESTIONS BY MR. FARRELL:
8    Q.  Exhibit 33, this is your
9  response, 2014_03_12, Bates-stamped
10  MCKMDL00409116.
11    This is you responding, saying,
12  "Nuh-uh, no, we didn't."
13    Does that about wrap it up?
14    MS. HENN: Objection to form.
15  QUESTIONS BY MR. FARRELL:
16    Q.  You've seen this document
17  before?
18    A.  I have not, so I'm going to go
19  through it.
20    Q.  Okay. My summary of this is
21  that McKesson's response is, "We don't have
22  to report all suspicious orders. We only
23  have to report suspicious customers."
24    Does that sound familiar?
25    MS. HENN: Objection to form.

Page 304

1    THE WITNESS: I haven't
2  finished reading this, but I know
3  there was discussions with DEA about
4  both.
5  QUESTIONS BY MR. FARRELL:
6    Q.  We agree that you saw from
7  Section 55 on McKesson has said, "If you
8  ain't going to turn in suspicious orders, you
9  need to have it in writing."
10    Neither you nor Mr. Boggs has
11  ever been able to find such a piece of
12  writing.
13    MS. HENN: Objection to form.
14    (McKesson-Hartle Exhibit 34
15  marked for identification.)
16  QUESTIONS BY MR. FARRELL:
17    Q.  In fact, Exhibit 34 is the
18  response to the presentation, March 20, 2014.
19  It's 2014_03_20, MCKMDL00409174, from my good
20  friend Bill Ihlenfeld's office, which
21  basically says "bull."
22    MS. HENN: Counsel, just to
23  clarify, I think Exhibit 33 you
24  might -- you have two documents in
25  here.

Page 305

1    MR. FARRELL: Maybe. It may
2  have included it.
3    MS. HENN: Ah, is that why?
4    MR. FARRELL: Maybe.
5    MS. HENN: Okay. That's fine.
6  Just wanted to make sure you knew.
7  QUESTIONS BY MR. FARRELL:
8    Q.  And at this point in time, it
9  appears that McKesson had hired AGI --
10    A.  Can I read this one? I have
11  not read this one before.
12    Q.  Okay. I'm not going to drill
13  you on that letter. It's got --
14    A.  No, I'm about done. I just
15  wanted to read the summary here, too.
16    Okay. Thank you.
17    Q.  Now, skipping through all of
18  the other correspondence because we'll get
19  into that more tomorrow, more recently, as a
20  result of all of this, even though McKesson
21  is denying liability, you understand that
22  McKesson did enter into another settlement
23  agreement?
24    A.  I understand that.
25    (McKesson-Hartle Exhibits 35,

Page 306

1    36 and 37 marked for identification.)
2    QUESTIONS BY MR. FARRELL:
3       Q.    2017_01_05A, 35, Exhibit 35,
4    MCKMDL00355322, the settlement agreement and
5    release.
6          Exhibit 37, 2017_01_5B,
7    MCKMDL00355477.
8          MS. HENN: Did you skip 36?
9    QUESTIONS BY MR. FARRELL:
10      Q.    I didn't.
11         36 will be 2017_01_05B, the
12   compliance addendum.
13         MS. HENN: 37.
14         MR. FARRELL: Oh, okay, I'm
15   sorry. But it's okay because we'll
16   just put 36 as the administrative
17   memorandum, which is 2017_01_5C,
18   MCKMDL0355513.
19         MS. HENN: And, Counsel, we've
20   been going about an hour, so if we
21   could have a break at a good stopping
22   point. It doesn't have to be this
23   second, but if there's one very soon,
24   that would be great.
25         MR. FARRELL: Yeah, very soon.

Page 307

1          MS. HENN: Great.
2    QUESTIONS BY MR. FARRELL:
3       Q.    Just to acknowledge, McKesson's
4    still is denying liability, and this time the
5    cost has become more prohibitive with the
6    fine, 150 million.
7          MS. HENN: Objection to form.
8    QUESTIONS BY MR. FARRELL:
9       Q.    Agreed?
10      A.    Agreed. We settled with the
11   settlement agreement, agreed.
12      Q.    McKesson's distribution
13   facilities were systematically failing to
14   report suspicious orders and resulted in a
15   $150 million fine assessed by the DEA and
16   paid by McKesson Corporation; true or not
17   true?
18         MS. HENN: Objection to form.
19         THE WITNESS: We did pay that
20   fine, $150 million.
21   QUESTIONS BY MR. FARRELL:
22      Q.    Because you were systematically
23   not reporting suspicious orders?
24         MS. HENN: Same objection.
25         THE WITNESS: That was at the

Page 308

1    core of it.
2    QUESTIONS BY MR. FARRELL:
3       Q.    So let's just be fair. There
4    were certain distribution facilities that
5    utterly failed to fulfill their obligations
6    under federal law to monitor, detect, halt
7    and report suspicious orders, which resulted
8    in McKesson paying the largest fine in the
9    history of the DEA; true or not true?
10         MS. HENN: Objection to form.
11         THE WITNESS: Could you
12   simplify that question a little bit?
13   QUESTIONS BY MR. FARRELL:
14      Q.    Yeah.
15         McKesson wasn't following the
16   law and got fined $150 million?
17         MS. HENN: Objection to form.
18         THE WITNESS: We acknowledged
19   that certain orders did not get
20   flagged in our system.
21   QUESTIONS BY MR. FARRELL:
22      Q.    Thousands.
23         MS. HENN: Objection to form.
24   QUESTIONS BY MR. FARRELL:
25      Q.    Thousands of orders?

Page 309

1       A.    Orders.
2       Q.    Like some facilities reported
3    none.
4          MS. HENN: Objection to form.
5    QUESTIONS BY MR. FARRELL:
6       Q.    Yes?
7       A.    Systematically none.
8       Q.    Systematically none.
9          And it wasn't just an isolated
10   distribution facility. It was several
11   different facilities across the spectrum at
12   McKesson had utterly failed to comply with
13   federal regulations to prevent diversion of
14   controlled substances?
15         MS. HENN: Objection to form.
16         THE WITNESS: We believed we
17   were in good faith working with DEA as
18   part of the 2008 agreement to report
19   customers and report orders in a
20   different way that was mutually agreed
21   upon. So --
22   QUESTIONS BY MR. FARRELL:
23      Q.    Yeah, I'm not asking --
24      A.    -- I would say --
25         MR. FARRELL: You're right.

Page 310

1 You're right.
2      THE WITNESS: I know you say
3 zero, but I -- you know, there are
4 situations and scenarios where we
5 reported based on what we agreed to
6 with the DEA, based on that settlement
7 agreement.
8      So I understand systematically
9 they weren't being reported, but they
10 were being reported in other ways.
11 QUESTIONS BY MR. FARRELL:
12     Q.    Sitting here today does
13 McKesson Corporation acknowledge that it
14 utterly failed in its obligations to prevent
15 diversion of opium pills into the American
16 illicit market?
17      MS. HENN: Objection to form.
18      THE WITNESS: No, I don't
19 believe we utterly failed. We, again,
20 in good faith over the years have
21 worked with DEA, taken guidance,
22 developed programs, enhanced programs,
23 evolved them over the course of time.
24      So I wouldn't characterize it
25 as utterly failing.

Page 311

1 QUESTIONS BY MR. FARRELL:
2     Q.    Well, when you report zero
3 suspicious orders over years at the same time
4 selling tens of millions of opium pills into
5 a community, you're not meeting your
6 obligations under federal law, agreed?
7      MS. HENN: Objection to form.
8      THE WITNESS: Again, there's
9 certain times in which we acknowledged
10 that we did not report orders. That
11 does not mean that we did not conduct
12 diligence, that we did not evolve our
13 program to help prevent.
14 QUESTIONS BY MR. FARRELL:
15     Q.    And I understand the desire to
16 want to say in good faith you did your best.
17 What I'm asking for is a very simple
18 acknowledgement that McKesson was not
19 following the law and got fined for it on two
20 occasions.
21      MS. HENN: Objection to form.
22      THE WITNESS: Those were the
23 allegations.
24 QUESTIONS BY MR. FARRELL:
25     Q.    Do you accept those allegations

Page 312

1 as partially true?
2      MS. HENN: Objection to form.
3      THE WITNESS: Again, we --
4 partially, in the second agreement, we
5 did acknowledge that, you know, we
6 didn't identify all the suspicious
7 orders that we could have.
8 QUESTIONS BY MR. FARRELL:
9     Q.    In fact, in some distribution
10 facilities you didn't identify any?
11      MS. HENN: Objection to form.
12 QUESTIONS BY MR. FARRELL:
13     Q.    This isn't like we missed a
14 needle in a haystack. This is we missed the
15 hay.
16      MS. HENN: Objection to form.
17      THE WITNESS: So the thing I
18 would just share is that, again, all
19 of those orders were blocked and not
20 shipped. And we may not have
21 systematically, as I mentioned
22 earlier, reported, but --
23      MR. FARRELL: Hold on.
24      MS. HENN: Wait, he's not done
25 with his answer.

Page 313

1      THE WITNESS: I'm just
2 reiterating the point I made earlier
3 about the 2008 agreement, mutually
4 discussing with DEA the fact that we
5 were focusing on customers and would
6 report suspicious orders in a mutually
7 format -- a mutually-agreed-upon
8 format.
9      So you say zero, but it may not
10 always be zero.
11 QUESTIONS BY MR. FARRELL:
12     Q.    Just to be fair with you, we're
13 going to take a break.
14     A.    All right.
15     Q.    I have the transactional data
16 in Cuyahoga and Summit County from McKesson
17 sales of opium pills. I also have the
18 suspicious order reports.
19      So let's be clear: McKesson
20 didn't get in trouble for blocking orders and
21 not reporting them. McKesson paid a record
22 fine for shipping suspicious orders and not
23 reporting them.
24      MS. HENN: Objection to form.
25      THE WITNESS: Say that again.

Page 314

1    I want to be very clear what I heard.
2  QUESTIONS BY MR. FARRELL:
3    Q.    Me, too.
4    A.    Yeah.
5    Q.    You're telling me that
6  McKesson's conduct that it admitted to,
7  McKesson's position is that it blocked
8  suspicious orders and then just simply didn't
9  report them in the right way.  That's your
10  position?
11    A.    We systematically -- based on
12  the design of our system, orders were
13  blocked.
14    Q.    You believe that McKesson was
15  blocking all the suspicious orders and paid
16  $150 million because of the manner in which
17  it reported?
18    A.    Earlier I said we did
19  acknowledge that some orders, not all, we
20  didn't block.
21    Q.    Okay.  So let's get back --
22    A.    We didn't -- let me rephrase
23  that.  We acknowledge that our system may not
24  have detected orders that could be deemed as
25  suspicious.

Page 315

1    Q.    And that the orders that your
2  system did detect as suspicious, you still
3  shipped anyway without reporting them?
4    MS. HENN:  Objection to form.
5    THE WITNESS:  No.
6  QUESTIONS BY MR. FARRELL:
7    Q.    You believe that's not true?
8    A.    Based on my understanding of
9  our systems and how things work in -- when
10  they hit a threshold and they're blocked,
11  those do not get shipped.
12    Q.    All right.  So fair --
13    A.    That's how we define those
14  suspicious orders.
15    Q.    Fair enough.
16    Let me ask you this:  If your
17  system detects a suspicious order and you
18  ship it anyway and you don't report it, is
19  that unlawful?
20    MS. HENN:  Objection to form.
21    THE WITNESS:  Please say that
22  again.
23  QUESTIONS BY MR. FARRELL:
24    Q.    If your system detects a
25  suspicious order and you ship it anyway

Page 316

1  without reporting it, is that unlawful?
2    MS. HENN:  Objection to form.
3    THE WITNESS:  I think it
4  depends.
5  QUESTIONS BY MR. FARRELL:
6    Q.    On?
7    A.    There could be a technical
8  glitch --
9    Q.    Okay.
10    A.    -- or some computer error.  I
11  mean --
12    Q.    I'm talking about hundreds and
13  hundreds and hundreds of orders that are
14  red-flagged by McKesson and shipped anyway
15  without reporting a suspicious order.
16    The US Attorney for the
17  Northern District of West Virginia doesn't
18  say this was a technical glitch.  He says it
19  was a systematic failure by your company to
20  abide by West Virginia law -- or federal law.
21    You paid a record fine, and
22  you're disavowing the underlying conduct
23  today?
24    MS. HENN:  Objection to form.
25    THE WITNESS:  I'm just trying

Page 317

1  to communicate that our system that
2  was designed to detect suspicious
3  orders using the concept of thresholds
4  blocked all of the -- blocked those
5  suspicious orders.
6    We recognize that and
7  acknowledge that it may not have
8  picked up on all of the suspicious
9  orders and...
10    MR. FARRELL:  One more and
11  we'll take a quick break.
12    MS. HENN:  If it's okay, I'd
13  like to take it now.  It's been now an
14  hour and 15 minutes.  It's pretty
15  tiring to be a witness.  So if we
16  could just take a five-minute break,
17  that would be great.
18    MR. FARRELL:  Okay.
19    MS. HENN:  Thank you.
20    VIDEOGRAPHER:  The time is 4:29
21  p.m.  We're going off the record.
22    (Off the record at 4:29 p.m.)
23    VIDEOGRAPHER:  The time is
24  4:45 p.m.  We're back on the record.
25    MR. FARRELL:  Thank you.

Page 318

1   So we have about an hour left;
2 we've been going about -- almost six
3 hours. So by agreement we've kept the
4 deposition days to seven hours long,
5 and I'll honor that.
6   MS. HENN: More than by
7 agreement. It's also ordered by the
8 judge.
9   MR. FARRELL: No question.
10   MS. HENN: Just a slight
11 clarification.
12   MR. FARRELL: No question.
13 Seven hours of answering questions is
14 enough for anybody.
15   MS. HENN: It is.
16   MR. FARRELL: That being said,
17 I know there's a burden on travel and
18 arrangements; we have a tight
19 schedule. So what I'm going to do is
20 I'm going to finish up some topics,
21 and I'm going to state for the record
22 that I have not been able to get
23 through all of the designated topics
24 today.
25   That being said, there are some

Page 319

1 additional topics that you were not
2 designated for. There's essentially
3 two notices.
4   So what we're -- what I'm going
5 to do is recommend that I finish up
6 the topics that I want to get to, and
7 then tomorrow is your fact deposition.
8 And what we'll do is work out with
9 counsel if there are any of these
10 questions that can be answered in
11 writing to avoid you having to come
12 back and testify on things that can be
13 answered.
14   And then in addition, there are
15 records and there are -- there is
16 transactional data historically and
17 suspicious order report historically
18 that have not been disclosed yet
19 because of our tight schedules that
20 I'll -- I will be going to ask --
21 eventually to ask for some additional
22 time from you to finish the stuff we
23 didn't get to finish and to ask
24 questions about documents that have
25 not been disclosed yet.

Page 320

1   Obviously, it's going to be
2 subject to the objection of your
3 lawyers, and I just wanted to place
4 that on the record.
5 QUESTIONS BY MR. FARRELL:
6   Q.   Jumping in real quick, I'm not
7 going to spend a whole lot of time on this; I
8 have a very specific question.
9   Before we get into the
10 document, there's a reference in here about
11 heroin, and I just wanted to see if I could
12 cut to the chase with you.
13   A.   Okay.
14   Q.   As the McKesson corporate
15 representative, do you acknowledge that abuse
16 of prescription opium pills is a gateway to
17 the initiation of heroin?
18   MS. HENN: Objection to form.
19 Outside the scope.
20   THE WITNESS: Based on
21   everything that I've read and in the
22   media and statistics and discussion, I
23   would agree -- agree to that.
24 QUESTIONS BY MR. FARRELL:
25   Q.   If you abuse prescription

Page 321

1 opiates, the CDC says that you're 40 times
2 more likely to initiate heroin use.
3   Does McKesson acknowledge
4 that -- that prescription opiate pill abuse
5 is a driving factor in the heroin epidemic
6 we're also experiencing?
7   MS. HENN: Objection to form.
8 Outside the scope.
9   THE WITNESS: Yeah, it's a
10   factor.
11 QUESTIONS BY MR. FARRELL:
12   Q.   That was easy.
13   A.   Yeah.
14   Q.   All right. Back to this amicus
15 business.
16   (McKesson-Hartle Exhibit 38
17   marked for identification.)
18 QUESTIONS BY MR. FARRELL:
19   Q.   I'm going to mark as
20 Exhibit 38, it's 2016_04_04. This is another
21 amicus brief. This one is Masters
22 Pharmaceutical.
23   Does McKesson acknowledge that
24 in 2016 when this amicus brief was submitted
25 that it was still on the executive committee

Page 322

1 of HDMA?
2          MS. HENN:  Objection to form.
3 Outside the scope.
4          THE WITNESS:  I can't speak to
5 that.  If I saw a list of who was on
6 the executive committee...
7          (McKesson-Hartle Exhibit 39
8 marked for identification.)
9 QUESTIONS BY MR. FARRELL:
10      Q.    Fair enough.  Exhibit 39,
11 2016_04_05, the Wayback Machine.
12          So looking at the Exhibit 39,
13 can you acknowledge that McKesson was on the
14 executive board of HDMA --
15      A.    Yes.
16      Q.    -- at the time that this amicus
17 brief was submitted?
18      A.    Yes.
19      Q.    Have you had a chance to review
20 the amicus brief?
21      A.    I had a chance to look at some
22 of the highlighted sections.
23      Q.    So let's go to 2016_04_04,
24 page 5.
25      A.    Page 5.

Page 323

1      Q.    Down the right-hand side, you
2 can see two-thirds of the way down it starts,
3 "DEA."  The one below that.  Yeah.
4          "DEA has required distributors
5 not only to report suspicious orders but to
6 investigate orders by interrogating
7 pharmacies and physicians and take action to
8 halt suspicious orders before they are
9 filled.  Those added obligations would
10 significantly expand a report-only duty of
11 distributors under the long-standing
12 regulatory scheme and impose impractical
13 obligations on distributors."
14          Is that McKesson's position?
15          MS. HENN:  Objection to form.
16 Outside the scope.
17          THE WITNESS:  Obviously we're
18 part of the organization.  In parts,
19 you know, I agree with the added --
20 what it would -- you know, the added
21 responsibility or time that it would
22 take to -- you know, to investigate
23 each order.
24          I don't know if I'm answering
25 your question, but...

Page 324

1 QUESTIONS BY MR. FARRELL:
2      Q.    You're stumbling toward it.
3      A.    Yeah.
4      Q.    Let's go to page 6, a little
5 more direct.  The second highlighted
6 provision:  "As the final order in this case
7 underscores, however, DEA now appears to have
8 changed its position to require that
9 distributors not only report suspicious
10 orders but investigate and halt suspicious
11 orders."
12          This is a 2016 document by your
13 trade organization, of which McKesson sits on
14 the executive board, and its telling the DC
15 Circuit Court of Appeals that it does not
16 have a duty to investigate and halt
17 suspicious orders.
18          Does McKesson validate this
19 position?
20          MS. HENN:  Objection to form.
21          THE WITNESS:  Can you rephrase
22 that for me?
23 QUESTIONS BY MR. FARRELL:
24      Q.    Yeah.
25          In 2016, your trade

Page 325

1 organization is telling the second highest
2 court in the land, the DC Circuit Court of
3 Appeals, that the DEA is now requiring them
4 to investigate and halt suspicious orders.
5          Haven't we agreed that's been
6 the duty since 1971?
7          MS. HENN:  Objection to form.
8 Outside the scope.
9 QUESTIONS BY MR. FARRELL:
10      Q.    Tough position to defend, isn't
11 it?
12          MS. HENN:  Same objections.
13          THE WITNESS:  You know, again,
14 I -- I recognize that other
15 distributors have different systems
16 and have worked with DEA over the
17 years on different methodologies,
18 whether it's a threshold to block it
19 or it's a hold and investigate and
20 then block it.  And so, you know, I
21 recognize that.
22 QUESTIONS BY MR. FARRELL:
23      Q.    You recognize this position is
24 problematic given your experience, McKesson
25 Corporation, with the DEA?

Page 326

1      MS. HENN: Objection to form.
2      THE WITNESS: I recognize that
3 I'm sure there's lots of disagreements
4 about this.
5 QUESTIONS BY MR. FARRELL:
6    Q.   Yeah.
7      But we're still trying to
8 figure out from internal communications
9 whether or not McKesson signed off on this
10 brief.
11      Are you aware of whether or not
12 they signed off on this?
13      MS. HENN: Objection to form.
14      THE WITNESS: I don't -- I am
15    not aware of the process that goes
16    into signing off on these briefs and
17    what that specific looks like. I know
18    how trade organizations work and how
19    they get to a point of consensus.
20 QUESTIONS BY MR. FARRELL:
21    Q.   Let me ask you in a different
22 way.
23      We talked about the original
24 enactment of the Controlled Substances Act
25 where the penalty for engaging in unlawful

Page 327

1 conduct should be prohibitive.
2      Do you remember talking about
3 that this morning?
4    A.   I do.
5    Q.   And so in 2008, McKesson
6 Corporation paid $13 million, and in 2017,
7 McKesson paid $150 million.
8      What would happen in today's
9 world if McKesson went to the DEA and said,
10 "We don't have a duty to investigate and halt
11 suspicious orders"? What do you reckon would
12 happen then?
13      MS. HENN: Objection to form.
14    Outside the scope.
15      THE WITNESS: I'm not sure
16    exactly what would happen, but they
17    wouldn't be thrilled.
18 QUESTIONS BY MR. FARRELL:
19    Q.   So what do you think the fine
20 will be next time?
21    A.   I can't speculate what it would
22 be. It depends on the facts and
23 circumstances and...
24    Q.   So just simply stated, sitting
25 here today, McKesson Corporation, do you

Page 328

1 accept or reject the position your trade
2 organization is taking regarding the
3 interpretation of the shipping requirement
4 and reporting requirement?
5      MS. HENN: Objection to form.
6    Outside the scope.
7      THE WITNESS: I apologize. Can
8    you ask -- ask me again or rephrase?
9    Do we accept --
10 QUESTIONS BY MR. FARRELL:
11    Q.   Yeah.
12      The sentence you see up there
13 on the screen --
14    A.   Yeah.
15    Q.   -- submitted by your trade
16 organization to which McKesson sits as an
17 executive board member, this is a position in
18 a legal document submitted to the second
19 highest court in the United States of
20 America.
21      Sitting here today, does
22 McKesson Corporation accept or reject this
23 position?
24      MS. HENN: Objection to form.
25    Outside the scope.

Page 329

1      THE WITNESS: I'd say we accept
2    this -- accept this --
3 QUESTIONS BY MR. FARRELL:
4    Q.   You accept --
5    A.   -- as part of that
6 organization.
7    Q.   What is that?
8    A.   As being part of that
9 organization.
10    Q.   So your position today is
11 McKesson does not have a duty to investigate
12 and halt suspicious orders?
13      MS. HENN: Objection to form.
14 QUESTIONS BY MR. FARRELL:
15    Q.   You're in a tough spot here.
16    A.   I can tell you what our program
17    does, right? We halt -- we block suspicious
18    orders.
19    Q.   All right. So let's go
20 further. Page 8. "The 2006 letter from Joe
21 Rannazzisi fails to explain how the statutory
22 command of the US Code 823 Section E, a
23 command that the Attorney General consider
24 when adjudicating an application for
25 registration of the applicant's maintenance

Page 354

1    MS. HENN:  Objection.
2  QUESTIONS BY MR. FARRELL:
3    Q.    That's what it looks like.
4    MS. HENN:  Objection to form.
5    THE WITNESS:  I know that's how
6  that was -- that was pulled and the
7  time frame that the blocked orders
8  were sent, transmitted to
9  headquarters.
10    Prior to that, based on
11  discussions with DEA, out of the 2008
12  settlement, you know, there were
13  customers -- I can't say if there were
14  customers specifically in this county,
15  I'm talking about in terms of, you
16  know, the program.  We know there were
17  reports of suspicious orders, along
18  with customers.
19  QUESTIONS BY MR. FARRELL:
20    Q.    All right.  So to be clear,
21  right now all I can tell you is what the
22  record is in this litigation.  And on behalf
23  of Summit County, it appears that the first
24  suspicious order that was reported, based on
25  the data provided by McKesson, was August 1,

Page 355

1  2013.
2    So if you, McKesson
3  Corporation, are aware of suspicious orders
4  that predate this, I'd love to see them.
5    A.    Understood.
6    Q.    Now, if we take column D and we
7  filter it with just 2011/05.  So what this
8  is, is you recall there's 62,000 pills that
9  were distributed into Summit County in May
10  of 2011.
11    Remember that?
12    A.    Yes.
13    Q.    This is the omit report for the
14  number of orders from Rite Aid 3151 that got
15  flagged by your system.
16    How many of those orders got
17  reported?
18    A.    Based on the spreadsheet, none.
19    Q.    So what I'm trying to figure
20  out is if you look at -- on May 20, it looks
21  like your system flagged oxycodone 7.5s on
22  the omit report.  And if we go and we look,
23  it wasn't turned in to the DEA.  And when we
24  go and we pull up the transaction data, it
25  appeared you shipped it anyway.

Page 356

1    So assuming that fact to be
2  true, what would we need to see in the due
3  diligence file to justify the shipping of an
4  order that got flagged by your omit report?
5    MS. HENN:  Objection to form.
6    THE WITNESS:  I'm trying to
7  understand the situation.  So can we
8  talk through it again --
9  QUESTIONS BY MR. FARRELL:
10    Q.    Yeah.
11    A.    -- in terms of the mechanics of
12  the here?
13    Q.    So we know there were a whole
14  bunch of transactions in May of 2011 that
15  resulted in 62,000 pills being delivered into
16  Summit County.
17    A.    Understood.
18    Q.    It looks like your system
19  flagged Rite Aid 3151 for oxycodone base code
20  9143 on May 20 but did not report it to the
21  DEA.  And I'll suggest to you, and we don't
22  have to do it today, that if you go and look
23  at the transactions, while these two --
24  May 20th two oxycodone orders appear on your
25  omit report, other oxycodone on the same day

Page 357

1  did not.  And in fact, even though you
2  flagged the May 20 order, you still sold more
3  pills later in the month.
4    So I'm trying to figure out
5  what I would see in a file, what documents
6  would I need to see to make sense of the fact
7  that your system is only flagging a couple of
8  the orders of 62,000, number one, and number
9  two, make sense of how these flagged orders
10  didn't get reported to the DEA.
11    What documents theoretically
12  would exist?
13    MS. HENN:  Objection to form.
14    THE WITNESS:  I'm not sure what
15  documents specifically would exist.  I
16  think there's a couple components to
17  this, or pieces to talk through.  One
18  of them is this time frame, 2000 --
19  QUESTIONS BY MR. FARRELL:
20    Q.    '11.
21    A.    Correct.
22    -- was during the time frame
23  where post the 2008 agreement, in
24  conversations with DEA and discussions about
25  the fact that we were -- we were going to

Page 362

1 Waterloo Road, Akron, number 2 pharmacy?
2        Look at what the number 4 one
3 is, just right down the street.
4        So again, I think it's worth
5 looking into, don't you think?
6    A.    I agree.  I would love to have
7 more context and get into the details.
8    Q.    Okay.  This is going to draw an
9 objection from your counsel.  What would be a
10 reason to set a threshold for 999,999?
11        MS. HENN:  Objection to form.
12        THE WITNESS:  There are -- in
13    the system there are subsets to base
14    codes, and so a -- for example, 91 --
15    91 -- 9193, which is hydrocodone, may
16    have some subsets for reporting
17    purposes for us.  There may be a
18    subset, and there could be one or more
19    of these.  There could be a subset for
20    10 milligram.  There could be a subset
21    for the single entity hydrocodone.
22        And so we can carve those out
23    from reporting purposes.  That's --
24    the 999,999 does not mean that they
25    can get 999,000 pills.  It means that

Page 363

1    that base code does not conflict with
2    the main parent -- what I would call a
3    parent base code.
4        And so it's for reporting
5    purpose only.  It has nothing to do
6    with allowing the amount of that total
7    base code.  The parent trumps that
8    one.  It's for reporting purposes
9    only.
10 QUESTIONS BY MR. FARRELL:
11    Q.    Do you know how many doses
12 McKesson distributed of oxycodone nationwide
13 from January 1, 2006 and December 31, 2014?
14 This is from ARCOS.
15    A.    I don't have that number.
16        MS. HENN:  Objection to form.
17 QUESTIONS BY MR. FARRELL:
18    Q.    9,288,258,480 doses of
19 oxycodone nationwide.  That's more than
20 there's people in our country.
21        Distributed 423 million
22 oxycodone doses in the state of Ohio.  That's
23 over 119 billion milligrams of oxycodone.
24        Do you think that's too many?
25        MS. HENN:  Objection to form.

Page 364

1        THE WITNESS:  You know, I
2    can't -- I can't say on the data and
3    the comparison compared to -- those
4    are data points to look at.  They're
5    big numbers, no doubt.
6 QUESTIONS BY MR. FARRELL:
7    Q.    Do you agree that one of the
8 foreseeable harms of engaging in unlawful
9 conduct in the distribution of prescription
10 opioids is diversion?
11        MS. HENN:  Objection.  Form.
12        THE WITNESS:  Could you ask
13    that again?
14 QUESTIONS BY MR. FARRELL:
15    Q.    One of the harms --
16    A.    You said foreseeable first, but
17 harms --
18    Q.    I'll go back and do it.
19        Do you agree that one of the
20 foreseeable harms of engaging in unlawful
21 conduct in the distribution of prescription
22 opioids is diversion?
23        MS. HENN:  Objection to form.
24        THE WITNESS:  I think it can
25    be.

Page 365

1 QUESTIONS BY MR. FARRELL:
2    Q.    Do you agree that filling
3 suspicious orders is a direct and proximate
4 cause of prescription opioid abuse,
5 addiction, morbidity and mortality?
6        MS. HENN:  Objection to form.
7        THE WITNESS:  Filling specific
8    orders?
9        MS. HENN:  Suspicious orders is
10    the word he used.
11        THE WITNESS:  Suspicious
12    orders.
13        There's a lot of reasons for --
14    that orders may get flagged as
15    suspicious, so I think it depends.
16 QUESTIONS BY MR. FARRELL:
17    Q.    That's fair.
18    A.    They'll get flagged as an order
19 of unusual size, frequency or pattern and not
20 mean that it's suspicious or
21 diversion-related.
22    Q.    Do you believe the prescription
23 opiate epidemic is an immediate hazard to
24 public health and safety?
25        MS. HENN:  Objection to form.

Page 366

1   THE WITNESS:  How do you -- how
2   are you defining "immediate hazard"?
3   QUESTIONS BY MR. FARRELL:
4   Q.   A hazard.
5   A.   A hazard?
6        Sure.
7        MR. FARRELL:  Okay.  We will
8   adjourn with the reservation of rights
9   for one day, continuing the subject
10  matters that most interest the
11  plaintiffs in the MDL in the 30(b)(6)
12  notices.
13       MS. HENN:  And, I mean, we will
14  object to continuing past the limit
15  set by the Court.  We feel that there
16  was a lot of time today that was spent
17  asking legal questions that could have
18  been spent on topics.
19       MR. FARRELL:  There was also a
20  lot of time spent reading documents
21  that were listed in my 30(b)(6).
22       MS. HENN:  Documents that you
23  put in front of the witness and wanted
24  him to read.
25       But more importantly, I wanted

Page 367

1   to ask the court reporter to please
2   designate this transcript
3   provisionally highly confidential,
4   which is required under the deposition
5   protocol, and I also wanted to reserve
6   the right to read and sign.
7        I have no questions, and so I
8   think we are finished.
9        VIDEOGRAPHER:  Okay.  The time
10  is 5:47 p.m., July 31, 2018.  Going
11  off the record completing today's
12  videotaped session.
13       (McKesson-Hartle Exhibit 40
14  marked for identification.)
15  (Deposition concluded at 5:47 p.m.)
16            - - - - - - -
17
18
19
20
21
22
23
24
25

Page 368

1
2              CERTIFICATE
3        I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
4   Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
5   of the examination, Nathan J. Hartle was duly
    sworn by me to testify to the truth, the
6   whole truth and nothing but the truth.
7        I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
8   testimony as taken stenographically and
    before me at the time, place and on the date
9   hereinbefore set forth, to the best of my
    ability.
10
         I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
                _____
17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    California Certified Shorthand
19  Reporter #13921
    Missouri Certified Court Reporter #859
20  Illinois Certified Shorthand Reporter
    #084-004229
21  Texas Certified Shorthand Reporter #9328
    Kansas Certified Court Reporter #1715
22  Notary Public
23  Dated:  August 3, 2018
24
25

Page 369

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8        After doing so, please sign the
9   errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13       It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25