# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 6 – Zimmerman Tr. (8-3-18) Excerpts

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                     -  -  -
           Friday, August 3, 2018
11                     -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13                     -  -  -
14             Videotaped deposition of
     CHRISTOPHER ZIMMERMAN, taken pursuant to
15   notice, was held at the law offices of
     Reed Smith, LLP, Three Logan Square, 1717
16   Arch Street, Suite 3100, Philadelphia,
     Pennsylvania 19103, beginning at 9:00
17   a.m., on the above date, before Amanda
     Dee Maslynsky-Miller, a Certified
18   Realtime Reporter.
19                     -  -  -
20
21
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph| 917.591.5672 fax
                deps@golkow.com
24
```

BY MR. PIFKO:

Q. I've just handed you what's marked as Exhibit-1, which is a first notice of deposition under Rule 30(b)(6).

It's got some topics on here, there are page numbers under there. The topics start on the bottom of the page, Page 6.

Do you see that?

A. Yes.

Q. Have you seen this document before?

A. I don't believe so.

Q. Have you seen these topics before?

A. Let me take a quick look at them.

Q. Sorry?

A. I'm reading through these real quickly.

Q. Just for housekeeping, we didn't go over that, but there are, again, I'm sure your counsel told you some of these things in preparing for the

depo, but there's a couple of ground rules that we have to remember because we're on the record here. Try to annunciate clearly if you're providing an answer, give an audible response and don't say words like uh-huh and uh-uh because when you read it on the transcript, you can't tell if it's a yes or no.

Understood?

A. Yes.

Q. So you're reviewing the document right now?

A. Yes.

Q. To be clear, my question was if you had seen these topics before, which start on Page 6, and they're lettered A through O.

A. Yes.

Q. You have seen these topics before?

A. I have.

Q. Okay. When was the first time you saw these?

A. A couple of weeks ago, maybe.

Q. And are you prepared to provide testimony on behalf of the company with respect to these topics?

A. Within a certain time frame, yes.

Q. I understand the time frame goes from -- up until the end of 2014; is that correct?

A. Correct.

MR. NICHOLAS: Just for the record, just one of these topics, Topic O, is one which I believe there's an agreement among counsel that we will respond to in writing as opposed to in testimony here today.

MR. PIFKO: Well, we can meet and confer, but I don't intend to take testimony on that topic today in any event.

MR. NICHOLAS: Well, just to be clear, though, I think there's

an agreement that we're responding to this in writing.

MR. PIFKO: I'm not aware of such an agreement. I'm not disputing -- or I'm not taking a position.

MR. NICHOLAS: Okay.

MR. PIFKO: But we can be clear that that's not part of the deposition today, however we end up handling it.

MR. NICHOLAS: Okay.

BY MR. PIFKO:

Q. And so you understand that you're also being deposed here in your individual capacity as well.

Do you understand that?

A. Yes.

Q. For the most part, you can imagine, the company is made up of many individuals, and so it's hard to have someone speak for the company.

So what we do in these situations is we have these topics and

Page 18

1  you, right now sitting in that chair for
2  the purpose of this case, are
3  AmerisourceBergen with respect to these
4  topics.
5         Do you understand that?
6         MR. NICHOLAS:  Object to the
7     form.
8         You can answer.
9         THE WITNESS:  Yes, I'm going
10    to be speaking on these topics.
11 BY MR. PIFKO:
12    Q.   And from time to time, I
13 might be asking, does AmerisourceBergen
14 do this or that?  And you'll be
15 answering, you know, so long as it's
16 within the scope of these topics, you'll
17 be answering on behalf of the company.
18        Do you understand that?
19        MR. NICHOLAS:  Same
20    objection.
21        But go ahead.
22        THE WITNESS:  Yes, I'll be
23    answering questions.
24 BY MR. PIFKO:

Page 19

1     Q.   And you understand that
2  you'll be answering them on behalf of the
3  company?  That's what I'm trying to get
4  at.
5         MR. NICHOLAS:  Same
6     objection.
7         You can answer.
8         THE WITNESS:  It depends on
9     whether it's as I'm representing
10    the company.  You also indicated
11    I'll be answering questions for
12    myself.
13 BY MR. PIFKO:
14    Q.   But with respect to these
15 topics, you understand that for the date
16 range we discussed, you'll be answering
17 on behalf of the company?
18    A.   Yes.
19    Q.   Okay.  And then I just
20 handed you what's marked as Exhibit-2.
21         - - -
22        (Whereupon, Amerisource
23    Bergen-Zimmerman Exhibit-3, Notice
24    of 30(b)(6) Deposition, was marked

Page 20

1     for identification.)
2         - - -
3  BY MR. PIFKO:
4     Q.   It's marked as Exhibit-3,
5  which is the notice that calls us here
6  today.
7         And it also, in addition to
8  calling for your 30(b)(6) testimony, it
9  calls for your individual testimony as
10 well.
11    A.   Okay.
12    Q.   Are you familiar with The
13 Controlled Substances Act?
14    A.   Yes.
15    Q.   How long have you been
16 working at AmerisourceBergen?
17    A.   Since January 1990.
18    Q.   And you are currently senior
19 vice president, chief compliance officer?
20    A.   Correct.
21    Q.   And you're also senior vice
22 president in charge of the -- what's your
23 exact title for the aspect of the company
24 that deals with compliance with the CSA?

Page 21

1     A.   So I'm senior vice president
2  of corporate security and regulatory
3  affairs.
4     Q.   And you guys called that
5  CSRA within your company?
6     A.   That's the abbreviation,
7  yes.
8     Q.   So if I use the term "CSRA,"
9  you understand what that means?
10    A.   Yes.
11    Q.   AmerisourceBergen is a
12 registrant under The Controlled
13 Substances Act, correct?
14    A.   We are a DEA registrant,
15 correct.
16    Q.   Have you ever heard the
17 term, I think -- I'm from California, we
18 drive a lot there, there's a phrase they
19 use that says, driving is a privilege,
20 not a right.
21         Have you ever heard that
22 kind of a phrase before?
23    A.   Not really.
24    Q.   AmerisourceBergen sells

Page 22

1 drugs, correct?
2    A.   Correct.
3    Q.   Included among those drugs
4 are controlled substances, correct?
5    A.   Yes.
6    Q.   And it's AmerisourceBergen's
7 position as a registrant that allows the
8 company to sell controlled substances,
9 correct?
10        MR. NICHOLAS:  Object to the
11    form.
12        THE WITNESS:  We have a
13    controlled substance registration
14    that allows us to distribute.
15 BY MR. PIFKO:
16    Q.   And absent that
17 registration, it's not legal for
18 AmerisourceBergen to sell controlled
19 substances, correct?
20    A.   Correct.
21    Q.   So do you understand that
22 along with the privilege and the right
23 to -- the ability to sell controlled
24 substances, certain duties are attached

Page 23

1 to that as well.
2        Do you understand that?
3        MR. NICHOLAS:  Object to the
4    form.
5        THE WITNESS:  I'm not sure
6    what you're referring to as
7    "duties."
8 BY MR. PIFKO:
9    Q.   Okay.  You understand there
10 are restrictions on what you can do as an
11 entity selling controlled substances,
12 correct?
13    A.   There's requirements that we
14 follow.  I don't know if I'd refer to
15 them as restrictions, but there's
16 regulatory requirements that we have to
17 adhere to.
18    Q.   Right.  So my question is,
19 the ability to sell controlled substances
20 also comes with certain obligations,
21 correct?
22        MR. NICHOLAS:  Object to the
23    form.
24        Go ahead.

Page 24

1        THE WITNESS:  Can you say
2    your question one more time?
3 BY MR. PIFKO:
4    Q.   The ability to sell
5 controlled substances also comes with
6 certain obligations that you must follow,
7 correct?
8        MR. NICHOLAS:  Same
9    objection.
10        THE WITNESS:  It's the
11    obligations of the requirements of
12    the Code of Federal Regulations.
13 BY MR. PIFKO:
14    Q.   And specifically, that's The
15 Controlled Substances Act, correct?
16    A.   The regulations from the
17 act, correct.
18    Q.   So The Controlled Substances
19 Act and the regulations that follow,
20 correct?
21    A.   Yes.
22    Q.   Do you know what a duty to
23 maintain effective controls is?
24        MR. NICHOLAS:  Object to the

Page 25

1    form.
2        THE WITNESS:  I'm not sure
3    what your question is.  We -- I'm
4    not sure what your question is.
5 BY MR. PIFKO:
6    Q.   Have you heard the phrase,
7 "duty to maintain effective controls"?
8    A.   No.
9    Q.   You've never heard that term
10 before?
11    A.   No.
12    Q.   Do you have an understanding
13 that under The Controlled Substances Act,
14 AmerisourceBergen has a duty to maintain
15 effective controls to prevent diversion
16 of certain substances?
17    A.   Yes.  We have to maintain
18 effective controls from diversion.  I
19 just don't know duty was included in that
20 or not.
21    Q.   I'll represent to you that
22 the word "duty" is in there.
23        So you do understand that
24 you have an obligation to maintain

Page 26

1  effective controls as part of your
2  serving as a registrant and selling
3  controlled substances?
4      A.   Yes, we have an
5  obligation -- there's a regulatory
6  responsibility to have effective controls
7  to prevent diversion.
8      Q.   What's your understanding of
9  what that means?
10     MR. NICHOLAS:  Object to the
11  form.  I object to the question.
12  It's too big.
13     THE WITNESS:  I guess --
14  that's an overarching statement.
15     If you can clarify what
16  instances within the Code of
17  Federal Regulations you're
18  referring to with the effective
19  controls, there's several
20  different areas in there.
21     MR. PIFKO:  We're going to
22  have to not have any speaking
23  objections.  Saying "too big" is
24  not an objection, and it's

Page 27

1  obviously influencing the
2  witness's testimony.
3      So you can state your
4  objection with clarity.  You can
5  state form or foundation.  But
6  that's all you can do, okay?
7      MR. NICHOLAS:  Mark, I
8  appreciate the instruction, but
9  I'm going to have to handle my own
10  objections the way I see fit.
11     MR. PIFKO:  If you're going
12  to be coaching the witness
13  throughout the day, we're going to
14  stop the deposition, we're going
15  to seek sanctions and we're going
16  come back here.
17     Do you understand that?
18     MR. NICHOLAS:  You can do
19  whatever you think you need to do.
20  I'm not coaching the witness.  I'm
21  stating what I think are
22  appropriate objections in the
23  appropriate manner.  And you can
24  proceed.

Page 28

1      MR. PIFKO:  Well, if you
2  tell the witness the question is
3  too big and then he responds, I
4  don't know how to answer it, it's
5  too big, then we've got a problem
6  here because you're telling him
7  what to say.
8      Do you understand?
9      MR. NICHOLAS:  No, I'm not
10  telling him what to say.  I'm
11  making an objection.  So why don't
12  you just go ahead?
13     MR. PIFKO:  I hope that we
14  can have compliance with the rules
15  here.  And understanding that
16  we're going to be doing that, I'm
17  going to proceed.
18  BY MR. PIFKO:
19     Q.   You have a duty to maintain
20  effective controls to prevent against
21  diversion, correct?
22     A.   Correct.
23     Q.   Do you understand what that
24  means?

Page 29

1      A.   Yes, I understand what that
2  means.
3      Q.   What is your understanding
4  of what that means?
5      A.   We have to have effective
6  controls to prevent diversion, both on
7  the physical security operational side,
8  as well as ensuring we only distribute to
9  licensed entities, and a duty to report
10  suspicious orders.
11     Q.   You mentioned there, "duty
12  to report suspicious orders."
13     If I refer to that as the
14  "reporting requirement," do you have an
15  understanding of that?
16     A.   If you are referring to the
17  regulation that we have to design and
18  operate a system to identify suspicious
19  orders and report those suspicious orders
20  to DEA, yes.
21     Q.   Okay.  So at various points
22  today we might refer to that as the
23  "reporting requirement."
24     Will you understand that?

Case 3:17-cv-01362 Document 1027-6 Filed 10/09/20 Page 7 of 22 PageID #: 42027
Case 3:17-cv-01362 Document 1027-6 Filed 10/09/20 Page 7 of 22 PageID #: 42027
Christopher Zimmerman (AmerisourceBergen)

Page 102

BY MR. PIFKO:
1  BY MR. PIFKO:
2      Q.   Do you have an understanding
3  that a drug that has a high potential for
4  abuse could cause death to people who
5  consume that drug?
6          MR. NICHOLAS:  Objection.
7  Outside the scope.
8          THE WITNESS:  I don't know.
9  I don't know.
10         I mean, drugs -- people can
11     overdose on drugs, and I'm aware
12     of that, yes.
13 BY MR. PIFKO:
14     Q.   Do you have an understanding
15 that someone is more likely to suffer
16 harm from a Schedule II drug than a drug
17 that's not a Schedule II drug?
18         MR. NICHOLAS:  Objection.
19 Outside the scope.
20         THE WITNESS:  I don't know
21     that.
22 BY MR. PIFKO:
23     Q.   Let's go back to our duties
24 to prevent diversion.

Page 103

1          You recall discussing that?
2          MR. NICHOLAS:  Object to the
3      form.
4          THE WITNESS:  Yes.
5  BY MR. PIFKO:
6      Q.   You agree that
7  AmerisourceBergen has a duty to prevent
8  diversion of controlled -- I keep messing
9  that up.
10         You agree that
11 AmerisourceBergen has a duty to prevent
12 diversion of Schedule II substances?
13         MR. NICHOLAS:  Object to the
14     form.  I'm not sure it's within
15     the scope either.  But I
16     definitely object to the form.
17         THE WITNESS:  We have a duty
18     to -- we have an obligation to
19     prevent diversion while the drugs
20     are under our control.
21 BY MR. PIFKO:
22     Q.   And if you don't carry out
23 that duty, diversion can occur, correct?
24         MR. NICHOLAS:  Objection.

Page 104

1          Outside the scope.
2          THE WITNESS:  It calls for a
3      conclusion.  I don't know that.
4  BY MR. PIFKO:
5      Q.   You don't know either way?
6      A.   I don't know --
7      Q.   If AmerisourceBergen does
8  not maintain effective controls to
9  prevent diversion of Schedule II
10 substances, they can be diverted,
11 correct?
12         MR. NICHOLAS:  Object to the
13     form.  Outside the scope.
14         THE WITNESS:  Again, if we
15     don't adhere to our effective
16     controls to prevent diversion,
17     yes, diversion could occur.
18 BY MR. PIFKO:
19     Q.   Let's discuss some of the
20 company's policies and procedures with
21 respect to diversion.
22         Before we do that, do you
23 agree that the laws and regulations with
24 respect to preventing diversion remain --

Page 105

1  have remained unchanged for the last 45
2  years?
3          MR. NICHOLAS:  Object to the
4      form.  Outside -- definitely
5      outside the scope.
6          THE WITNESS:  The CSA was
7      passed in 1970 and in -- the
8      federal regulations that regulate
9      our responsibilities have not
10     changed.
11 BY MR. PIFKO:
12     Q.   So it's your understanding
13 that there haven't been changes with
14 respect to the duties to prevent
15 diversion since the passage of the
16 statute?
17         MR. NICHOLAS:  Object to the
18     form.  Outside the scope.  You're
19     asking him a legal question.
20         THE WITNESS:  The
21     regulatory -- the regulations have
22     not changed.
23 BY MR. PIFKO:
24     Q.   So AmerisourceBergen has the

Page 106

1 same duty under the regulations today as
2 it did in 1990, correct?
3        MR. NICHOLAS:  Object to the
4    form.  You're asking him a legal
5    question.  Outside the scope.
6        THE WITNESS:  We have a
7    requirement to have effective
8    controls to prevent diversion.
9 BY MR. PIFKO:
10    Q.    And that requirement hasn't
11 changed since the passage of The
12 Controlled Substances Act, correct?
13        MR. NICHOLAS:  Object to the
14    form.  Calls for a legal
15    conclusion.  Outside the scope.
16        THE WITNESS:  I'm not aware
17    if the regulations have changed.
18 BY MR. PIFKO:
19    Q.    You're familiar with the --
20 AmerisourceBergen's practices and
21 procedures under The Controlled
22 Substances Act going back to the '80s,
23 correct?
24    A.    The '90s.

Page 107

1    Q.    Okay.  The '90s.
2        And you testified about the
3 company's practices with respect to
4 preventing diversion dating back to the
5 '90s in connection with the West Virginia
6 litigation, correct?
7        MR. NICHOLAS:  Objection.
8    Outside the scope.
9        Go ahead.
10        THE WITNESS:  I don't
11    remember, but --
12 BY MR. PIFKO:
13    Q.    You testified in 2006,
14 correct?
15    A.    2006?
16    Q.    '16, sorry.
17    A.    Yes.
18    Q.    In preparing for this
19 deposition, did you review your
20 transcript of that proceeding?
21    A.    I looked at it, yes.
22    Q.    When was the last time you
23 looked at it?
24    A.    A couple of weeks ago.

Page 108

1    Q.    Sorry, I'm not quite as
2 organized as I want to be.
3        From the time you started
4 with AmerisourceBergen -- let's back up.
5        You started working for
6 AmerisourceBergen in the 1990s?
7    A.    January, correct.
8    Q.    Do you remember the exact
9 date and year?
10    A.    January 2nd, 1990.
11    Q.    Okay.  From the time that
12 you started with AmerisourceBergen until
13 about 1998, AmerisourceBergen's
14 monitoring protocol was that every order
15 that exceeded the threshold was deemed to
16 be suspicious, correct?
17        MR. NICHOLAS:  Object to the
18    form.  Outside the scope.
19        THE WITNESS:  So when I
20    started with the company, the
21    process was a two-step process.
22    It was an excessive order report
23    that was produced monthly to send
24    to DEA, and then we also had a

Page 109

1    manual process at the distribution
2    centers where the order fillers
3    would identify suspicious orders
4    and report those.
5 BY MR. PIFKO:
6    Q.    And the orders were reported
7 after they were shipped, correct?
8        MR. NICHOLAS:  Object to the
9    form.  Outside the scope.
10        THE WITNESS:  Correct.
11 BY MR. PIFKO:
12    Q.    Prior to 2007,
13 AmerisourceBergen's system shipped all
14 orders at night and reported any orders
15 that it deemed to be suspicious the next
16 day, correct?
17        MR. NICHOLAS:  Objection.
18    Outside the scope.
19        THE WITNESS:  That was the
20    program that we developed in
21    conjunction with DEA over a
22    two-year process, that we tested a
23    new -- a process of reporting
24    suspicious orders that we

Page 110

1 developed with DEA and then worked
2 with them for two years testing
3 the program until they approved
4 the program in '98.
5 BY MR. PIFKO:
6 Q. I'm not asking for
7 approvals, or I didn't ask you the
8 formulation for the policy. I just asked
9 if that was a correct statement about
10 what the practice was.
11 So I'll just -- let's get a
12 clear answer to the question.
13 A. That was the practice that
14 we did in conjunction with DEA's
15 guidance.
16 Q. Just so we have a clear
17 record, the practice was to ship the
18 orders at night, and then the next day
19 any orders that were identified as
20 suspicious were then reported to the DEA;
21 is that correct?
22 A. Correct.
23 Q. Are you familiar with the
24 term "threshold"?

Page 111

1 A. Yes.
2 Q. That's an attribute of your
3 suspicious order monitoring system,
4 correct?
5 MR. NICHOLAS: Object to the
6 form.
7 THE WITNESS: You need to
8 put it into context of time,
9 because the program has been
10 enhanced over the years.
11 BY MR. PIFKO:
12 Q. Well, for the time period
13 for which you're here to testify, which
14 ends in 2014, at all times there's been
15 some threshold requirement in the system,
16 correct?
17 A. Correct.
18 Q. Can you tell me what a
19 threshold is?
20 MR. NICHOLAS: Object to the
21 form.
22 THE WITNESS: A threshold is
23 the -- is a trigger that we have
24 put into the program to create --

Page 112

1 to identify an order of interest
2 for further review.
3 BY MR. PIFKO:
4 Q. And so the threshold is the
5 first step in the suspicious order
6 monitoring program, correct?
7 MR. NICHOLAS: Object to the
8 form.
9 THE WITNESS: It is a step.
10 BY MR. PIFKO:
11 Q. Is there a step before the
12 threshold?
13 A. We train our employees at
14 the distribution centers also to be aware
15 of, and train them on suspicious orders.
16 And if they identify a suspicious order,
17 they're to report it.
18 Q. The threshold is a key
19 factor that's used to identify
20 potentially suspicious orders, correct?
21 MR. NICHOLAS: Object to the
22 form.
23 THE WITNESS: It's an
24 identifier that we use

Page 113

1 systematically to trigger a
2 potential order of interest.
3 BY MR. PIFKO:
4 Q. What other identifiers does
5 AmerisourceBergen use to identify a
6 potential order of interest?
7 MR. NICHOLAS: What time
8 period? Are we in the same time
9 period?
10 Before you answer, I'd like
11 to know what --
12 MR. PIFKO: That's a
13 fact-related objection. You can't
14 make that objection. You can
15 object vague, and that's all you
16 can say.
17 MR. NICHOLAS: I wasn't
18 objecting. I was asking you to
19 clarify the question.
20 MR. PIFKO: I'm asking the
21 witness a question.
22 THE WITNESS: Can you
23 restate the question, please?
24 MR. PIFKO: Now you've

Page 118

1    The employees in the cage
2  can identify an order of interest by
3  identifying that order as being of an
4  unusual size, frequency or deviating from
5  the normal pattern?
6    MR. NICHOLAS:  Object to the
7    form.
8    THE WITNESS:  As I
9    indicated, they are trained, if
10    they identify something of such,
11    they are to report it.
12  BY MR. PIFKO:
13    Q.   And the same is true with
14  respect to employees in the vault?
15    A.   Correct.
16    MR. NICHOLAS:  Object to the
17    form.
18  BY MR. PIFKO:
19    Q.   And the other way an order
20  can be identified as an order of interest
21  is if it exceeds a threshold that's
22  defined by AmerisourceBergen?
23    MR. NICHOLAS:  Object to the
24    form.

Page 119

1    THE WITNESS:  There's a
2    threshold that identifies a
3    potentially -- an order of
4    interest, not a suspicious order.
5    And that is -- that is determined
6    by a threshold.
7  BY MR. PIFKO:
8    Q.   Are there any other ways an
9  order can be identified as an order of
10  interest?
11    MR. NICHOLAS:  Object to the
12    form.
13    I really would appreciate,
14    for the record, some clarity as to
15    the time frame that we're talking
16    about.
17    Are you still unwilling to
18    do that?  It seems very -- it
19    seems very plain vanilla.
20    MR. PIFKO:  We're talking
21    about the time period for which
22    you were designated, sir.
23    THE WITNESS:  Not that I am
24    aware of.

Page 120

1  BY MR. PIFKO:
2    Q.   Let's talk about the
3  pre-2007 period and thresholds within
4  that period.
5    Do you have an understanding
6  of how AmerisourceBergen calculated
7  thresholds before 2007?
8    MR. NICHOLAS:  Objection.
9    Outside the scope.
10    These are being answered in
11    his individual capacity.
12    THE WITNESS:  In what time
13    period?
14  BY MR. PIFKO:
15    Q.   Well, let's start, you
16  testified in West Virginia that there
17  were certain changes made with respect to
18  the calculation of thresholds from the
19  1990s to 2007, correct?
20    MR. NICHOLAS:  Same
21    objection.
22    THE WITNESS:  There was a
23    change in '98.
24  BY MR. PIFKO:

Page 121

1    Q.   Okay.  Before 1998, what was
2  the method of calculating a threshold at
3  AmerisourceBergen?
4    MR. NICHOLAS:  Same
5    objection.  Outside the scope of
6    the 30(b)(6).
7    THE WITNESS:  The method of
8    calculating the threshold prior to
9    that was that you would -- all
10    pharmacies would be in one
11    category, hospitals would be in
12    another category.  You take all
13    the pharmacies within that
14    category and divide by the number
15    of pharmacies to come up with an
16    average volume for the month per
17    drug category.  And then there was
18    a multiplier of three.  Any order
19    that was over the threshold amount
20    would be produced an excessive
21    order report.
22  BY MR. PIFKO:
23    Q.   But it would still be
24  shipped?

Page 122

1    A.   The product?
2    Q.   Yes.
3    A.   Yes.
4    Q.   After 1998, what was the
5  practice with respect to calculating
6  thresholds?
7         MR. NICHOLAS:  Same
8    objection.  Outside the scope.
9         THE WITNESS:  So in 1996, we
10   worked with DEA, for two years,
11   on -- in order to provide DEA with
12   more -- we feel, more accurate
13   information, that we worked on a
14   project to where we would identify
15   a customer based upon its own
16   purchase history versus all
17   pharmacies in one big bucket.
18        And then we calculated a
19   rolling four-month average of that
20   pharmacy's purchases.  And then
21   created a multiplier of three to
22   identify a trigger that would
23   identify a suspicious order.
24 BY MR. PIFKO:

Page 123

1    Q.   That practice was in place
2  from 1998 to when?
3         MR. NICHOLAS:  Object to
4    the -- objection.  Scope.  Same
5    objection as I've been stating.
6         THE WITNESS:  So that -- so
7    once we got approval from DEA to
8    enact that program nationally, we
9    tested it for -- with one DEA
10   office and then several, and then
11   Washington, D.C. approved it for
12   national use throughout in 1998.
13        And that was the practice
14   until 2007.
15 BY MR. PIFKO:
16   Q.   So to be clear, from 2007 --
17 I'm sorry, from 1998 to 2007, the
18 practice was to take a specific
19 customer's order history over the prior
20 four-month period and then average the
21 order history and multiply that by three,
22 and that would be its threshold, correct?
23   A.   That was the agreed-upon
24 process through our testing with DEA over

Page 124

1  that two-year period.
2         We continued to make changes
3  in the program, and that was the final
4  calculation that we came up with.
5    Q.   And that calculation was
6  used from 1998 to 2007?
7    A.   Yes.
8    Q.   Something happened in 2007,
9  correct?
10   A.   Yes.
11   Q.   You had an enforcement
12 action brought against you by the DEA,
13 correct?
14   A.   Correct.
15   Q.   The three times multiplier,
16 where does that come from?  Scratch that
17 question for a second.
18        You agree that throughout
19 the time period we just discussed, from
20 the 1990s to 2007, there was always a
21 three times multiplier used in connection
22 with calculating the threshold, correct?
23   A.   So for -- so from 1990 to
24 '98, the excessive report for ARCOS

Page 125

1  items, which would be your Schedule II
2  and reportable IIIs had a three times
3  multiplier.  Non-ARCOS items, I think it
4  might have been six; it might have been a
5  higher multiplier.
6         Our program that we
7  implemented in '98 set them all at three.
8    Q.   And do you know what the
9  methodology was in calculating that three
10 times multiplier?
11        MR. NICHOLAS:  Object to the
12   form.  And same objection, as to
13   outside -- as to the scope here of
14   all these questions.
15        THE WITNESS:  So the three
16   times multiplier had been in place
17   when I came on board in 1990.  And
18   that was the program that we were
19   submitting and working with DEA in
20   1990 all the way up to '96.
21        And then when we started to
22   work on the new program in
23   conjunction with DEA and testing
24   it and refining it for that

Page 134

1 these numbers, 1, 2, 3, 4. And then it
2 has, Note.
3          Do you see that?
4      A.   Yes.
5      Q.   And it says, Factor equals
6 3.
7          Do you see that?
8      A.   Yes.
9      Q.   Is that what you were
10 talking about?
11      A.   Yes.
12      Q.   And you worked with the task
13 force that was responsible for coming up
14 with this manual?
15      A.   I participated on it. I
16 wasn't the -- the industry could have one
17 member, but there was a group of people
18 within the industry.
19      Q.   Did you help in drafting any
20 of the language that was in the manual?
21      A.   I don't recall.
22      Q.   Do you recall if the DEA
23 asked you for comment on the final
24 version of the manual?

Page 135

1      A.   I don't.
2      Q.   Your work on this task force
3 was through the Healthcare Distribution
4 Alliance, which I guess was under a
5 different name at that time?
6      A.   They had the -- yeah, there
7 was -- I think there was one member, one
8 slot on the task force for the
9 wholesaler. It was through the HDMA at
10 the time, I believe it was called.
11      Q.   And so the DEA said that the
12 HDMA could have a member participate on
13 the task force, and you were the selected
14 member; is that correct?
15      A.   No.
16          MR. NICHOLAS:  Objection to
17      the form.
18          Go ahead.
19          THE WITNESS:  No.  No, I was
20      not.  I said I participated.  The
21      group --
22 BY MR. PIFKO:
23      Q.   There was someone else who
24 was the HDMA member?

Page 136

1      A.   There was a designee of one
2 person.  It wasn't me.  I wasn't the
3 one-person designee.
4      Q.   Do you know who that was?
5      A.   I don't.
6      Q.   Do you know what company
7 they worked for?
8      A.   I want to say it was
9 Cardinal or McKesson, but I'm not sure.
10 It wasn't ABC.
11      Q.   Did you work with anyone
12 from Cardinal or McKesson -- so I asked
13 you who the designated person was, and
14 you said maybe it was Cardinal or
15 McKesson.
16          Setting aside who the
17 designated person was, when you were
18 involved with this task force, did you
19 work with anyone from McKesson or
20 Cardinal on the task force?
21          MR. NICHOLAS:  Object to the
22      form.  Scope.
23          Go ahead.
24          THE WITNESS:  I can't

Page 137

1      remember who specifically was
2      involved.
3 BY MR. PIFKO:
4      Q.   But you generally feel like
5 maybe McKesson or Cardinal was involved?
6          MR. NICHOLAS:  Object to the
7      form.
8          THE WITNESS:  Again, I don't
9      know exactly who was involved.  I
10      wouldn't be comfortable saying who
11      exactly that would be.
12 BY MR. PIFKO:
13      Q.   In 2007, there was a DEA
14 enforcement action against
15 AmerisourceBergen, correct?
16      A.   Yes.
17              - - -
18          (Whereupon, Amerisource
19      Bergen-Zimmerman Exhibit-5,
20      ABDCMDL 00279854-54, was marked
21      for identification.)
22              - - -
23 BY MR. PIFKO:
24      Q.   I'm handing you what is

Page 138

1 marked as Exhibit-5. This is a document
2 Bates labeled ABDCMDL 00279854 to 65.
3         Have you seen this document
4 before?
5     A.   Yes.
6     Q.   Can you tell me what this
7 is?
8     A.   This is our settlement and
9 release agreement with the DEA for
10 Orlando distribution center.
11     Q.   So as a result of the
12 enforcement action with the DEA, this was
13 the agreement that was reached between
14 AmerisourceBergen and the DEA, correct?
15         MR. NICHOLAS:  Object to the
16     form.
17         THE WITNESS:  This is the
18     agreement, yes, that was made
19     after the order to show cause.
20 BY MR. PIFKO:
21     Q.   Was there any money paid,
22 under this agreement, from
23 AmerisourceBergen to the United States
24 government?

Page 139

1     A.   No.
2     Q.   But as a result of this
3 agreement, AmerisourceBergen changed its
4 suspicious order monitoring program,
5 correct?
6         MR. NICHOLAS:  Object to the
7     form.
8         Go ahead.
9         THE WITNESS:  It modified
10     the existing program, yes.
11 BY MR. PIFKO:
12     Q.   Can you tell me how the
13 agreement modified the existing program?
14         MR. NICHOLAS:  Object to the
15     form.
16         THE WITNESS:  So through
17     negotiations with DEA and in
18     enhancing our existing order
19     monitoring program that we had in
20     place at the time, DEA wanted us
21     to include a more in-depth due
22     diligence process in addition to
23     ensuring that we only distribute
24     products to licensed individuals.

Page 140

1         And they also wanted us to
2     modify our suspicious order
3     monitoring program to stop orders
4     that we believed -- stop orders
5     that could possibly be suspicious
6     and then to any suspicious -- any
7     order we deem suspicious should
8     not be shipped.
9 BY MR. PIFKO:
10     Q.   Did AmerisourceBergen agree
11 to do that?
12     A.   We modified our program per
13 this agreement, correct.
14     Q.   Can we refer to this
15 agreement as the shipping requirement?
16         MR. NICHOLAS:  Object to the
17     form.
18 BY MR. PIFKO:
19     Q.   If I say "shipping
20 requirement," can we have an
21 understanding that I'm referring to the
22 idea that you're not supposed to ship an
23 order that's deemed to be suspicious?
24         MR. NICHOLAS:  I'll object

Page 141

1     to the form.
2         I want to understand, are
3     you asking the witness if
4     heretofore we can refer to this
5     agreement as the shipping
6     requirement?  Because if so, I'd
7     object to that.
8 BY MR. PIFKO:
9     Q.   Do you understand the
10 question?
11     A.   Do you want to repeat it?
12     Q.   All I'm asking is if, for
13 ease of reference, going forward, we can
14 refer to the idea that you don't ship an
15 order that's been identified as
16 suspicious as the shipping requirement?
17         MR. NICHOLAS:  I'll object
18     to the form.  And the language.
19         THE WITNESS:  We never --
20     the shipping requirement was never
21     discussed in this document and is
22     not a term that we had used in
23     presentations or requirements.
24         We chose, through our work

Case 8:17-cv-01365-DOC-DDC Document 302-43 Filed 11/02/20 Page 37 of 125 Page ID #:49034
Case 8:17-cv-01362-DOC-DDC Document 302-43 Filed 11/02/20 Page 37 of 125 Page ID #:49034
Christopher Zimmerman (AmerisourceBergen)

Page 142

1 with the DEA, that if we
2 defined -- ABC defined an order as
3 suspicious, that we would report
4 it and would not ship it.
5 BY MR. PIFKO:
6 Q. Did DEA ever tell you that
7 there was a -- prior to entering into
8 this agreement, did DEA ever tell you
9 that an order that's suspicious should
10 not be shipped?
11 MR. NICHOLAS: Object to the
12 form.
13 THE WITNESS: Did DEA ever
14 tell us? No.
15 BY MR. PIFKO:
16 Q. We talked about this
17 Chemical Handler's Manual and how it
18 provided guidance on the three times
19 threshold requirement, correct?
20 A. Yes.
21 Q. Did you take any guidance
22 from that manual about the idea of not
23 shipping an order that's deemed to be
24 suspicious?

Page 143

1 MR. NICHOLAS: Object to the
2 form. Outside the scope.
3 THE WITNESS: No.
4 BY MR. PIFKO:
5 Q. Let's take a look at that
6 manual again. I'd like to direct your
7 attention to Page 21 of that document.
8 Exhibit-4, for the record.
9 Looking at the second full
10 paragraph of Page 21, can you read that
11 to me?
12 A. On Page 21? You want me to
13 read it out loud?
14 Q. Yes, please.
15 A. When a regulated person
16 suspects that an order may be intended
17 for illicit purposes, good practice
18 requires that every reasonable effort be
19 made to resolve those suspicions. In
20 addition to making the required reports,
21 the transaction should not be completed
22 until the customer is able to eliminate
23 the suspicions. The distributor may have
24 to forego some transactions.

Page 144

1 Q. That's good. Thank you.
2 A. Do you want me to read the
3 whole thing?
4 Q. That's all I was asking you
5 to read.
6 MR. NICHOLAS: You asked him
7 to read the whole thing.
8 MR. PIFKO: You can read to
9 yourself the rest of that
10 paragraph, if you please. But all
11 I wanted you to read for the
12 record was that portion.
13 MR. NICHOLAS: You asked
14 him, for the record, to read the
15 whole paragraph. Are you now
16 telling him you don't want him to
17 read the whole paragraph?
18 MR. PIFKO: You don't need
19 to read any more.
20 BY MR. PIFKO:
21 Q. Did you ever consider
22 foregoing some transactions, as a result
23 of reading this document?
24 MR. NICHOLAS: Object to the

Page 145

1 form. Outside the scope.
2 THE WITNESS: No.
3 - - -
4 (Whereupon, Amerisource
5 Bergen-Zimmerman Exhibit-6,
6 ABDCMDL 00269683-694, was marked
7 for identification.)
8 - - -
9 BY MR. PIFKO:
10 Q. I'm handing you what has
11 been marked as Exhibit-6. For the
12 record, these are a series of letters
13 from the Department of Justice, Bates
14 labeled ABDCMDL 00269683 to 694.
15 For the record, there's four
16 letters in this packet. This is how they
17 were produced. They are dated -- the one
18 in the back is the earliest, it's on Page
19 ABDCMDL 00269691, and it's dated
20 September 27th, 2006. And there's
21 another one dated February 7th, 2007;
22 another one dated December 27th, 2007;
23 and another one with a stamp on it, June
24 12th, 2012.

Christopher Zimmerman (AmerisourceBergen)

Page 254

1  on diversion control?
2          MR. NICHOLAS:  Objection.
3      These are being answered in his
4      individual capacity.
5  BY MR. PIFKO:
6      Q.   To clean that up, all
7  questions on this right now are in the
8  individual capacity.  I'll let you know
9  when we're switching gears.
10     A.   To provide them update on
11 our regulatory compliance.
12     Q.   But you said you don't meet
13 with them regularly about diversion
14 control.
15         So what I was trying to
16 understand was, why this meeting on
17 diversion control at this time?
18         MR. NICHOLAS:  Object to the
19     form.
20         Go ahead.
21         THE WITNESS:  We were
22     updating them on the diversion
23     control program.
24 BY MR. PIFKO:

Page 255

1      Q.   You said there's a committee
2  that you -- that you meet with.
3          Is there a name for this
4  committee?
5      A.   It's the audit committee.
6      Q.   How many members of the
7  board of directors sit on that committee?
8      A.   I believe it's four.
9      Q.   Do you know which specific
10 individuals?
11     A.   The names?
12     Q.   Yes.
13     A.   Lon Greenberg, David Durkin.
14 And they just changed this last quarter,
15 so I'm not sure if Mike Long is still on
16 the committee or not.  Mike Long.  And I
17 can't think of the other.
18     Q.   Okay.  Let's go back to
19 Exhibit-8.
20         I do want to -- for the
21 record to be clear, I'm asking you this
22 as a 30(b)(6) witness.
23         You state here, These
24 requirements -- well, actually, let's

Page 256

1  back up.
2          You have a sentence here
3  that, The Controlled Substance Act,
4  passed in 1970, is the statute
5  establishing U.S. drug requirements for
6  the storage and distribution of
7  controlled substances as stipulated in
8  the Code of Federal Regulations and
9  enforced by the Drug Enforcement
10 Administration.
11         Primarily, you must have a
12 DEA distributor registration to
13 distribute controlled substances.  You
14 can only distribute controlled substances
15 to a DEA-registered location.  You must
16 have adequate controls in place to
17 prevent diversion; cages, vaults, alarms,
18 background checks, et cetera.  And, you
19 must have a system to identify suspicious
20 orders and report those orders to DEA
21 when discovered.
22         Do you see that?
23     A.   Yes.
24     Q.   It says, These requirements

Page 257

1  have gone unchanged for the past 45
2  years.
3          Do you see that?
4      A.   Yes.
5      Q.   Do you agree with that
6  statement?  You wrote it.
7          MR. NICHOLAS:  Object to the
8      form.
9          THE WITNESS:  I did write --
10     yes, I wrote it.
11 BY MR. PIFKO:
12     Q.   And you agree with it?
13         MR. NICHOLAS:  Object to the
14     form.
15         THE WITNESS:  Yes.
16 BY MR. PIFKO:
17     Q.   At the bottom here, it says,
18 In 2014, ABC -- and we haven't talked
19 about that one on the record, but ABC refers
20 to AmerisourceBergen Corporation,
21 correct?
22     A.   Correct.
23     Q.   Okay.  It says, ABC
24 voluntarily -- and there's more to the

Page 270

1  methamphetamine abuse or any other
2  area.
3        And in the past, we had a
4  great working relationship with
5  the DEA to resolve these issues.
6  When it was methamphetamine, they
7  passed a bill, enacted regulations
8  and requirements, as we talked
9  about, with the handling.
10       But in the opioid crisis,
11 there's no implementation of
12 bills, there was no -- there was
13 no input from DEA like they had in
14 past crises, for the opioid
15 crisis.
16       We worked with DEA in 2007.
17 We felt we built a program that
18 was, again, I think,
19 state-of-the-art in the industry.
20 And that was the program we
21 implemented.
22       We shared our program with
23 all the other industry
24 memberships.  It wasn't -- we were

Page 271

1  open about our process.  And, you
2  know, I think that, on itself,
3  shows the efforts of
4  AmerisourceBergen.
5  BY MR. PIFKO:
6     Q.   I'm going to ask this
7  question two different ways.
8        First, from -- for the
9  30(b)(6) period of the deposition, the
10 time period, are you aware of any
11 meetings where the company discussed the
12 opioid crisis and what steps it could
13 take to improve its diversion control
14 measures to address those issues?
15       MR. NICHOLAS:  Object to the
16 form.
17       THE WITNESS:  We
18 regularly -- the department
19 regularly meets and discusses our
20 programs and processes and what we
21 do at the distribution centers,
22 but also with this program as
23 well.  And it's open dialogue.
24       And if there's areas we can

Page 272

1  do that to enhance our program, we
2  do.  It's not -- it's not static.
3  We don't just implement it in 2007
4  and there's just no changes.  It's
5  a constant.
6  BY MR. PIFKO:
7     Q.   Right.  But I'm asking if
8  you had a specific discussion about
9  changing or adding to the program as a
10 result of issues stemming from the opioid
11 crisis?
12       MR. NICHOLAS:  Object to the
13 form.  You're arguing.
14       THE WITNESS:  I don't know
15 if there was a specific meeting
16 titled exactly how you're stating
17 it.  No, I don't know.
18 BY MR. PIFKO:
19    Q.   Okay.  I told you I would
20 ask you the question a different way.
21       Now as an individual -- or
22 as the chief compliance officer and the
23 head of the CSRA, are you aware of any
24 conversations, at any time when you

Page 273

1  worked at the company, where there was
2  discussion of improving diversion control
3  measures specifically in response to the
4  opioid crisis?
5        MR. NICHOLAS:  Object to the
6  form.
7        THE WITNESS:  As I
8  previously stated, there is always
9  discussions about our program and
10 our processes, not just with the
11 suspicious order monitoring but
12 how we handled things across the
13 scope of the distribution center
14 and all of our requirements.
15       So you're asking me, did
16 have -- can I point to one
17 specific meeting?  Not that I'm
18 aware of.  But it was a topic that
19 we generally discussed.
20       VIDEO TECHNICIAN:  Going off
21 the record.  2:01 p.m.
22       - - -
23       (Whereupon, a brief recess
24 was taken.)

Page 302

1    THE WITNESS: I'm not going
2  to answer a hypothetical.
3    You're throwing, if somebody
4  did X, would we do Y? I'm just
5  not in a position to make those
6  kinds of statements.
7  BY MR. PIFKO:
8    Q.   So it wouldn't bother you if
9  a company was coming to you to circumvent
10  a competitor's controlled substances
11  requirements?
12    MR. NICHOLAS: Object to the
13  form. Asked and answered.
14  Mischaracterizes the testimony.
15  Probably way outside the scope of
16  the 30(b)(6) as well.
17    THE WITNESS: Again, you're
18  giving me a hypothetical set of
19  circumstances and you want me to
20  give you an answer. And I can't,
21  because I don't know the -- all
22  the -- whatever else you're
23  including in your hypothetical.
24    - - -

Page 303

1    (Whereupon, Amerisource
2  Bergen-Zimmerman Exhibit-11,
3  CAH_MDL_PRIORPROD_DEA_07_00880890-
4  92, was marked for
5  identification.)
6    - - -
7  BY MR. PIFKO:
8    Q.  I'm handing you what is
9  marked as Exhibit-11.
10    It's a document produced by
11  Cardinal Health in this matter, which we,
12  under the protective order, obtained
13  prior approval to use it in this
14  deposition. It's Bates labeled
15  CAH_MDL_PRIORPROD_DEA07_00880890 to 92.
16    It's an e-mail at the top
17  from Steve Reardon, dated September 11,
18  2007, to Mr. Zimmerman. The subject is,
19  Summary of September 7th meeting with DEA
20  and attachments.
21    Let me know when you're done
22  reviewing it.
23    A.  Okay.
24    Q.  Do you recall receiving this

Page 304

1  e-mail?
2    A.  I don't.
3    Q.  Do you have any reason to
4  believe this is not a true and correct
5  copy of an e-mail that you received?
6    A.  No, I don't doubt that.
7    Q.  We did talk about the HDMA a
8  little bit earlier.
9    Did you serve -- did you
10  serve, in any capacity, on any committee
11  or board or group within the HDMA?
12    A.  At some point, I was on the
13  regulatory affairs committee. And now
14  I'm on the public -- I think they call it
15  the public policy committee.
16    Q.  Do you believe that you were
17  on the regulatory affairs committee at
18  around the time this e-mail was sent in
19  September of 2007?
20    A.  Could have been, yes.
21    Q.  Do you recall what your
22  responsibilities were as a member of the
23  regulatory affairs committee?
24    A.  As a member, I mean, we

Page 305

1  would talk about regulatory issues facing
2  wholesalers.
3    Q.  Regulatory issues concerning
4  The Controlled Substances Act; is that
5  correct?
6    A.  It could be a whole host of
7  things. It could be destruction. It
8  wasn't only for controlled substances.
9  Anything involving wholesale distribution
10  in the healthcare chain.
11    Q.  But that could include
12  controlled substances?
13    A.  Yes.
14    Q.  Okay. How about diversion
15  control, would that include that?
16    A.  Yes.
17    Q.  Do you recall HDMA setting
18  up a meeting with members of the DEA
19  around this time in 2007?
20    A.  I don't.
21    Q.  This is around the time of
22  some of the Dear Registrant letters.
23    Do you agree?
24    A.  Yes. Yes.

Page 306

1    Q.   Do you recall there being
2  more activity between members of the
3  industry and DEA at that time?
4    A.   As I previously stated, I
5  mean, when I started, we met with DEA
6  every six months and it was a regular
7  activity.  And then with the training
8  program, we met with them a lot more;
9  there was a lot more communication.
10       In 2007, this came shortly
11 after -- this is probably within weeks
12 after we got our distribution center back
13 and implemented our new program.  So
14 there was a lot of activity on this
15 subject matter.
16   Q.   Do you know why the HDMA
17 would have been having a meeting with the
18 DEA at this time?
19       MR. NICHOLAS:  Object to the
20 form.
21       THE WITNESS:  As I
22 indicated, at that time, they
23 would meet regularly with them; if
24 not every six months, every year.

Page 307

1    I don't know if this is a regular
2  meeting that they have to discuss
3  issues with distributors or
4  distributors wanting
5  clarification.
6    I'm not really sure what the
7  nexus of this meeting was about.
8 BY MR. PIFKO:
9    Q.   Did you ever attend DEA
10 conferences?
11   A.   Yes.
12   Q.   How often does the DEA put
13 on conferences?
14   A.   I believe every other year
15 for distributors, and then the other
16 years pharmacy practitioners.  I'm not
17 positive about that.
18       But I know our meetings
19 are -- usually every two years, DEA will
20 have an industry meeting for
21 distributors.
22   Q.   Do you always attend those?
23   A.   I attended a lot of them
24 earlier on.  I probably haven't attended

Page 308

1  one in years.  People on my staff attend
2  them.
3    Q.   When do you recall having
4  last attended one?
5    A.   It may have been 2009.  I am
6  not sure if I attended one in 2011.  But
7  I know I haven't attended one for the
8  last, you know, years.
9    Q.   You've always -- someone
10 from Amerisource has always been sent to
11 one of these conferences?
12   A.   Usually, yes.
13   Q.   And do they continue to this
14 day?
15   A.   Yes.
16   Q.   Do you know if there was one
17 in 2016?
18   A.   I don't know if it's 2016 or
19 2017, but they have them every two years.
20   Q.   Okay.  Does anyone take
21 notes at these meetings?
22   A.   I don't know if HDA as --
23 does that or not.  I don't know.
24   Q.   Do you direct any of your

Page 309

1  staff members to take notes of the
2  meetings if you don't attend?
3    A.   They would -- I would assume
4  they would take notes.  DEA usually
5  provides the slides that they produce at
6  the industry conferences.  I'm not sure
7  if they put them on their website -- I'm
8  not sure if they put them on their
9  website or not.
10   Q.   Do you discuss the
11 presentations or the conferences with
12 other members of the HDMA?
13   A.   Do we discuss the DEA
14 conferences with HDMA members?  Most of
15 them are usually there.  I shouldn't say
16 all of them, but a lot of the members are
17 there at the DEA conference.
18   Q.   So you meet with each other
19 while you're at these conferences?
20 You're there together?
21   A.   Yes.
22   Q.   Do you discuss diversion
23 control while you're at these
24 conferences?

Christopher Zimmerman (AmerisourceBergen)

Page 310

1    MR. NICHOLAS:  I'm going to
2  just object to the questions, only
3  to the extent that the witness
4  said he hasn't been to one of
5  these conferences himself since
6  2009 or maybe 2011.
7    So I want to make sure the
8  record is clear that we're, you
9  know -- he's not talking about --
10  he can only talk about what he can
11  talk about.
12    Go ahead.
13    THE WITNESS:  Years back,
14  yeah, we would talk about
15  regulatory issues or how we do
16  things or, you know, what -- those
17  type of things.
18  BY MR. PIFKO:
19    Q.   Is there a meeting through
20  the HDMA, after these conferences, where
21  the members get together and discuss what
22  was said at the conference and their
23  views on the information that the DEA
24  might have shared at the conference?

Page 311

1    MR. NICHOLAS:  Same
2  objection for the same reason.
3    THE WITNESS:  My
4  recollection was that, you know,
5  there would be discussions prior
6  to the meetings if there's
7  questions that we wanted to bring
8  up, as an industry.
9    I don't recall if there was
10  a structured debrief or anything
11  like that after.
12  BY MR. PIFKO:
13    Q.   Let's look back at
14  Exhibit-11.
15    It says here -- well, first,
16  do you know who Brian Cherico is?
17    A.   I'm not familiar with Brian.
18    Q.   How about Steve Reardon?
19    A.   Yes.
20    Q.   Who is Steve Reardon?
21    A.   He was -- I don't know if
22  he's director or senior director or vice
23  president of regulatory.  I've known him
24  for quite some time.

Page 312

1    Q.   Do you know if he still
2  works at Cardinal Health?
3    A.   He does not.
4    Q.   Does he work for another
5  distributor, do you know?
6    A.   He's retired.
7    Q.   How about Anita Ducca, do
8  you know who that is?
9    A.   I believe -- yes, I do.
10    Q.   Who is she?
11    A.   I believe she's vice
12  president of regulatory affairs for HDMA.
13    Q.   So then Brian sends this to
14  Steve Reardon, and says, Steve, pasted
15  below please find the summary of HDMA's
16  meeting with the DEA last Friday.  Please
17  let me know if you need anything else.
18    Do you see that?
19    A.   Yes.
20    Q.   And then it's got a summary
21  of the meeting here.
22    It says, Key takeaways from
23  the meeting were -- do you see where that
24  is?

Page 313

1    A.   Yes.
2    Q.   DEA's policy was to expect
3  more than just reporting suspicious
4  orders.  If there was a suspicious order,
5  the distributor should either stop the
6  delivery or should evaluate the customer
7  further before delivering it.
8    Do you see that?
9    A.   Yes.
10    Q.   Did you have an
11  understanding, at that time, that that
12  was DEA's position?
13    A.   Yes.  This was the program
14  that we had just negotiated.
15    Q.   It says, Simply complying
16  with the suspicious orders regulatory
17  requirement does not mean, in the
18  agency's view, that the registrant is
19  maintaining an effective program to
20  detect and prevent diversion.
21    Do you see that?
22    A.   Yes.
23    Q.   Did you have an
24  understanding that that was the DEA's

Christopher Zimmerman (AmerisourceBergen)

Page 326

1    A.   I don't know.  I don't know.
2    Q.   Well after 2007?
3    A.   I don't know.  After 2007,
4  we were getting 590s on existing
5  customers, as we were building our
6  program.
7    Q.   I'm just asking about this
8  process that you said, at some point, you
9  undertook an effort to get it from
10  existing customers, just going through
11  and getting them, regardless of whether
12  there was an incident.
13       And I'm just trying to
14  understand --
15    A.   And I don't know --
16    Q.   -- about when that happened.
17    A.   -- when that happened.  I
18  don't know.
19    Q.   Do you recall taking any
20  action, as a result of receiving this
21  e-mail describing the DEA's position on
22  the issues we just discussed?
23       MR. NICHOLAS:  Object to the
24  form.

Page 327

1        THE WITNESS:  I'm not sure
2  what action -- I don't recall
3  getting the e-mail, so I don't
4  recall reading the e-mail and then
5  any action.
6        This is two weeks after we
7  put our program in place, which is
8  pretty much the points that
9  they're hitting on.
10       And I think this is in
11  September.  And I spoke at their
12  conference, I think it was
13  November, and covered pretty much
14  these same points.  So our program
15  was already meeting these
16  requirements.
17       MR. NICHOLAS:  Mark before
18  you go to another document, it's
19  been two hours.  Can we take a
20  break?
21       MR. PIFKO:  Sure.
22       VIDEO TECHNICIAN:  Going off
23  the record.  3:05 p.m.
24        - - -

Page 328

1        (Whereupon, a brief recess
2  was taken.)
3        - - -
4        VIDEO TECHNICIAN:  We're
5  back on record at 3:26 p.m.
6        - - -
7        (Whereupon, a discussion off
8  the record occurred.)
9        - - -
10       (Whereupon, Amerisource
11  Bergen-Zimmerman Exhibit-12,
12  MNKT1_0000291614-1620, was marked
13  for identification.)
14        - - -
15  BY MR. PIFKO:
16    Q.   I've just handed you what's
17  marked as Exhibit-12.  It's a document
18  Bates labeled MNKT1_0000291614 through --
19       MR. CLUFF:  This is another
20  one --
21  BY MR. PIFKO:
22    Q.   -- 1620.
23       MR. CLUFF:  -- where we
24  obtained permission from

Page 329

1  Mallinckrodt's counsel prior to
2  its use today.
3        MR. NICHOLAS:  Okay.
4  BY MR. PIFKO:
5    Q.   Could you take a minute to
6  take a look at this document, please?
7    A.   Yes.
8    Q.   Let me know when you're
9  done.
10       I was only going to ask you
11  about a couple of things on here, in the
12  interest of time.  Feel free to look at
13  it, but I can direct you to the couple of
14  questions.
15       Have you seen this document
16  before?
17    A.   I don't recall seeing it
18  before.
19    Q.   It says, HDMA, DMC expo,
20  2011.
21       Do you know what an HDMA,
22  DMC expo is?
23    A.   HDMA has an annual
24  management conference, I'm assuming

Page 330

1 that's what they're referring to.
2     Q.  When you were on -- you've
3 been -- you've had a role with respect to
4 the HDMA for a long time now, right?
5 You've had different roles.
6       I think -- I forget, but you
7 were on one committee and then you're on
8 some other committee now, right?
9     A.  That's correct.
10     Q.  So you've always had an
11 affiliation with the HDMA?
12     A.  Yes.
13     Q.  Have you attended this
14 conference in the past?
15     A.  I have.
16     Q.  Do you believe you attended
17 this one?
18     A.  I may have.  It's like with
19 the other one, I don't -- I haven't
20 attended them the last -- for years.  I
21 just don't know when -- when I stopped
22 attending.
23     Q.  You see at the top here, it
24 says, Attendees included

Page 331

1 AmerisourceBergen, Cardinal, H.D. Smith,
2 McKesson, Lilly, Johnson & Johnson,
3 Purdue, Sanofi, Aventis, AmeriCares and
4 many more.
5       Do you see that?
6     A.  Yes.
7     Q.  So you believe you would
8 always send someone to these conferences
9 if you didn't attend yourself?
10     A.  Yes.
11     Q.  I just want to know, I want
12 to ask you about your familiarity with
13 some of the topics that were discussed
14 here.
15       This is -- the notes here
16 are about a specific DEA session that
17 occurred on March 7th at this conference.
18       Do you see that just on the
19 first page at the top?
20     A.  Yes. ^^
21     Q.  Do you know who Cathy
22 Gallagher is?
23     A.  I do.
24     Q.  Is that someone you've

Page 332

1 interacted with before?
2     A.  I have.
3     Q.  It says she's chief policy
4 and liaison, Drug Enforcement
5 Administration.
6     A.  Correct.
7     Q.  What did she do, as far as
8 your interactions with her?
9     A.  She would be one, if we had
10 a policy question or a process question,
11 that we would either write to her or call
12 her.
13     Q.  It says here, Cathy gave a
14 brief overview of hot topics current
15 within the DEA.
16       Do you see that?
17     A.  Yes.
18     Q.  In conferences -- in HDMA
19 conferences you do remember attending, do
20 you remember the DEA presenting current
21 topics of interest to the members of the
22 industry at these conferences?
23     A.  Yes.  There was usually a
24 segment that DEA presented at.

Page 333

1     Q.  One of these, if you scroll
2 way down to the bottom,
3 second-to-the-last bullet point, Increase
4 of ER visits are 97 percent contributable
5 to pharmaceuticals; opioids are the most
6 frequent.
7       Do you see that?
8     A.  Yes.
9     Q.  Do you recall that being a
10 topic of discussion within the industry
11 in 2011?
12     MR. NICHOLAS:  Object to the
13     form.
14     THE WITNESS:  No.
15 BY MR. PIFKO:
16     Q.  Do you recall discussing
17 that with anyone at the HDMA at any
18 point?
19     A.  I don't recall discussions
20 regarding emergency room visits, no.
21     Q.  Do you have any reason to
22 dispute this fact?
23     MR. NICHOLAS:  Object to the
24     form.

Page 458

1  distribution centers, their
2  customer base.
3       So part of our negotiations
4  with DEA, in 2007, is they wanted
5  to make sure that the distribution
6  centers had an understanding of
7  the customers that they were
8  servicing as well.
9       And that was what the
10 training for the responsible
11 person in charge consisted of.
12 And that's what they're referring
13 to.
14      So DOD accounts, this is in
15 the height of the Iraq War, and we
16 didn't want to be not holding up
17 orders to the DOD at this time.
18 So if they came through at night
19 and it wasn't something -- you
20 know, it wasn't suspicious, then
21 they had the ability to release
22 that order.
23 BY MR. PIFKO:
24    Q.  How about chain or grocery

Page 459

1  customers?
2     A.   It was all depending upon
3  their knowledge of the customer that they
4  were servicing from the distribution
5  center day in and day out.
6        And these were all things we
7  were discussing with the DEA when we were
8  talking about holding -- because, again,
9  keep in mind, before 2007, orders were
10 reported after the fact.  So DEA -- if
11 DOD or Cleveland Clinic placed an order
12 for medication that they needed the very
13 next day, they would get it; and if it
14 was suspicious, we would report it.
15       With this the new program,
16 now you could be impacting patient care
17 at a hospital, surgery center or DOD, in
18 the event that in the middle of the night
19 they had to release that order.
20            - - -
21       (Whereupon, Amerisource
22       Bergen-Zimmerman Exhibit-19,
23       ABDCMDL 00002405-2418, was marked
24       for identification.)

Page 460

1           - - -
2  BY MR. PIFKO:
3     Q.   I'm handing you what has
4  been marked as Exhibit-19.  It's a
5  document Bates labeled ABDCMDL 00002405
6  through 2418.
7        Take your time to review it,
8  but, again, I just have some questions
9  about specific areas in here.
10       Let me know when you're
11 ready.
12    A.   Okay.
13    Q.   Are you ready?
14       This document is titled,
15 Order Monitoring Program, OMP, Setting
16 the Record Straight.
17       Do you see that?
18    A.   Yes.
19    Q.   And it's talking about the
20 difference between the non-SAP, or S-A-P,
21 and the post-SAP system.
22       Can you explain what that is
23 about?
24    A.   So we moved -- SAP is an

Page 461

1  operating platform that a lot of
2  manufacturers operate on, and we moved to
3  that operating platform.
4        So this is a move from the
5  old operating platform for the company to
6  the new SAP operating platform.
7     Q.   And prior to the SAP system,
8  the system you employed was called STAR?
9     A.   I believe so.
10    Q.   I want to direct your
11 attention to Page 5 of the document.
12 That's 2409.
13       Let me know when you're
14 there.
15    A.   Yes.
16    Q.   Frequently asked questions.
17       Do you see that?
18    A.   Yes.
19    Q.   These are questions that a
20 customer might ask?
21    A.   No.  These are to the
22 distribution centers.
23    Q.   Okay.  By the way, have you
24 seen this document before?