# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 7 – Hazewski Tr. Excerpts

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
                          - - -

   IN RE:  NATIONAL           :   HON. DAN A.
   PRESCRIPTION OPIATE        :   POLSTER
   LITIGATION                 :
                              :
   APPLIES TO ALL CASES       :   NO.
                              :   1:17-MD-2804
                              :


                - HIGHLY CONFIDENTIAL -

        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                          - - -

                     October 25, 2018

                          - - -


              Videotaped deposition of
   EDWARD HAZEWSKI, taken pursuant to
   notice, was held at the law offices of
   Reed Smith, LLP, 1717 Arch Street,
   Philadelphia, Pennsylvania, beginning at
   9:36 a.m., on the above date, before
   Michelle L. Gray, a Registered
   Professional Reporter, Certified
   Shorthand Reporter, Certified Realtime
   Reporter, and Notary Public.

                          - - -

            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
```

Page 18

1  why you think this deposition should not
2  proceed today?
3      A.  No.
4      Q.  Are you taking any
5  medications or undergoing any treatment
6  that would impair your ability to tell
7  the truth?
8      A.  No.
9      Q.  Are you -- same thing, are
10 you taking the medications or undergoing
11 the treatment that would impair your
12 memory?
13     A.  No.
14     Q.  Okay.  From time to time,
15 we're going to obviously be talking about
16 things that happened in the past.  I'm
17 entitled to your best recollection of
18 those events.  Okay?
19     A.  Okay.
20     Q.  At the same time, I don't
21 want you to guess.  So if you have a
22 rough estimate or a memory of something,
23 please provide it to the best you're able
24 to do so.  But if -- if you just simply

Page 19

1  don't know, I don't want you to make up
2  an answer.  Okay?
3      A.  Okay.
4      Q.  So you are currently
5  employed by AmerisourceBergen, correct?
6      A.  Correct.
7      Q.  What's your current title?
8      A.  Director diversion control
9  and security.
10     Q.  Who do you report to?
11     A.  David May.
12     Q.  Where are you physically
13 located?  Here in Pennsylvania?
14     A.  Yes.  In Valley Forge,
15 Pennsylvania.
16     Q.  When did you first become
17 employed by AmerisourceBergen?
18     A.  June of 2007.
19     Q.  What was the position that
20 you took when you were first hired?
21     A.  I believe the title was
22 corporate investigator.
23     Q.  How long did you hold that
24 position?

Page 20

1      A.  Roughly a year.
2      Q.  And then what -- what was
3  your next role?
4      A.  My next role was as manager
5  of the diversion control program.
6      Q.  And sorry, when you started
7  at the company as a corporate
8  investigator, who did you report to?
9      A.  My best recollection is
10 Bruce Gundy was my direct report -- or I
11 reported directly to him.
12     Q.  Is Bruce Gundy still with
13 the company?
14     A.  Yes, he is.
15     Q.  What role is he in now?
16     A.  He is director diversion
17 control and security, in charge of
18 investigations.
19     Q.  So you said you are director
20 of diversion control.  What is your area
21 of focus currently?
22     A.  Currently it's special
23 projects as identified by David May.
24     Q.  How long have you been in

Page 21

1  that role?
2      A.  Probably since March of this
3  year.
4      Q.  Okay.  Going back.  So
5  corporate investigator, and then manager
6  of diversion and control.  Who did you
7  report to when you were manager of
8  diversion control?
9      A.  Chris Zimmerman.
10     Q.  How long were you in that
11 position?
12     A.  From 2008 until 2014.  I
13 can't be more specific in terms of --
14     Q.  Okay.  In 2014, what role
15 did you move into?
16     A.  I -- I moved into the role
17 as -- with corporate investigations,
18 working along with Bruce Gundy.
19     Q.  And how long were you in
20 that role?
21     A.  I would say approximately
22 two years.
23     Q.  And then where did you move
24 to?

Page 70

1  You just had it, right
2 there, with your left hand. Keep going.
3      A.   Gotcha.
4      Q.   One more. There you go.
5      A.   Yes, I see it.
6      Q.   Okay. Why is that a red
7 flag of diversion.
8      A.   For reasons that are unclear
9 to me, that particular strength of
10 oxycodone seemed to be considered to be
11 more highly abused than other -- other
12 strengths of the same product.
13     Q.   What was the basis for that
14 knowledge?
15          MR. NICHOLAS: Object to the
16     form.
17          THE WITNESS: Information
18     received from the DEA as well as
19     trade organizations in the
20     industry.
21 BY MR. PIFKO:
22     Q.   And why would it be a
23 concern if a pharmacy was dispensing more
24 of this than other types of oxycodone?

Page 71

1      A.   Well, knowing that it's more
2 prone to abuse, that would become a
3 concern for -- for us.
4      Q.   You see on your copy and on
5 the screen, these pills are blue.
6          Do you see that?
7      A.   Yes.
8      Q.   Have you ever heard of
9 something called the Blue Highway?
10     A.   I've not heard that term.
11     Q.   Okay. Have you heard of the
12 idea that -- let's look at one of the
13 other slides here.
14          Go a few pages down.
15 There's a page with a bunch of license
16 plates, going towards -- yeah.
17          Have you heard of the idea
18 that people would travel to places like
19 Florida and bring pills back into other
20 areas like West Virginia and Ohio, among
21 other states?
22     A.   I've heard of that.
23     Q.   Where did you hear that?
24     A.   I can't -- I couldn't say

Page 72

1 who specifically I heard it from. But it
2 was generally discussed information in
3 the industry.
4      Q.   When do you believe was the
5 first time you heard that?
6      A.   My best recollection would
7 have probably been when I took -- became
8 manager of the diversion control team.
9      Q.   When was that?
10     A.   2008.
11     Q.   So looking at this slide --
12 I know we're going out of order, but it
13 was relevant to the area that we were
14 discussing. Why is dispensing
15 prescriptions to patients or from
16 physicians not from the local area a red
17 flag?
18     A.   Well, it suggests that they
19 can't get the prescriptions they want
20 locally, so they branch out, would be my
21 best guess.
22     Q.   Right. That the idea that
23 someone who has a legitimate medical need
24 for a prescription probably wouldn't be

Page 73

1 driving out of the area to get their
2 prescription, correct?
3      A.   I would agree with that.
4      Q.   Let's go back to, a few
5 pages earlier, this page with the money
6 and the pills on it. The other way. The
7 other way, towards the beginning.
8          So you see another red flag
9 is accepting an unusually large
10 percentage of cash transactions for
11 prescriptions.
12          Do you see that?
13     A.   I do.
14     Q.   Why is that a red flag of
15 diversion?
16     A.   Cash payments were generally
17 looked at as being subject to trying to
18 determine more information on those
19 transactions because of not being able to
20 track that information as you would
21 that's being paid by a third-party payor.
22     Q.   Is it also the idea that
23 again a legitimate prescription, not
24 always but most likely, would have some