# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 14 – Cherveny Tr. Excerpts

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                       - - -
 5
    IN RE:  NATIONAL        :   HON. DAN A.
 6  PRESCRIPTION OPIATE     :   POLSTER
    LITIGATION              :
 7                          :
    APPLIES TO ALL CASES    :   NO.
 8                          :   1:17-MD-2804
                            :
 9
              - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       - - -
12
                November 9, 2018
13
                       - - -
14
15            Videotaped deposition of
    ERIC CHERVENY, taken pursuant to notice,
16  was held at the law offices of Reed
    Smith, LLP, 1717 Arch Street,
17  Philadelphia, Pennsylvania, beginning at
    9:50 a.m., on the above date, before
18  Michelle L. Gray, a Registered
    Professional Reporter, Certified
19  Shorthand Reporter, Certified Realtime
    Reporter, and Notary Public.
20
                       - - -
21
22       GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

Page 22

1  MR. NICHOLAS: Object to the
2  form. Asked and answered.
3  THE WITNESS: I mean, it's
4  going to vary depending on
5  lawsuit, from lawsuit to lawsuit.
6  I'm not going -- - I'm sure they
7  have a case against the company
8  for whatever reasons, you know,
9  that they have. But I don't know
10  anything -- any details about the
11  litigation beyond that.
12 BY MR. CLUFF:
13  Q. When you say "they," do you
14 mean customers?
15  A. It could be customers. It
16 could be government entities.
17  Q. What kind of cases do
18 government entities file against ABDC?
19  MR. NICHOLAS: Objection to
20  form. Asked and answered.
21  THE WITNESS: I think I've
22  answered the question. I don't
23  have anything more than a basic
24  understanding that the company has

Page 23

1  lawsuits placed against it. I
2  don't have any detailed knowledge
3  about anything about the lawsuits
4  that are placed against it other
5  than what I've told you.
6 BY MR. CLUFF:
7  Q. Sure. So your lawyer just
8 objected "asked and answered." And your
9 response was "I think I've answered the
10 question."
11  So your lawyer, like I said,
12 is entitled to object. But I'm entitled
13 to the answer that you were going to give
14 me prior to the objection unless you're
15 instructed not to answer.
16  So if you hear an objection
17 like asked and answered, I'm still
18 entitled to my answer. You can't just
19 change your answer to say that you've
20 answered the question.
21  Sometimes my questions are
22 going to be slightly different than the
23 ones that I've previously asked. Does
24 that make sense?

Page 24

1  A. Yes.
2  Q. Okay. So going forward I
3 think we'll understand that, and there
4 won't be an issue.
5  All right. We might come
6 back to these lawsuits a little bit
7 later. But I think let's talk about your
8 experience and your job. Does that make
9 sense?
10  A. Yes.
11  Q. Okay. So are you employed
12 by ABDC?
13  A. No.
14  Q. Okay. So who are you
15 employed by?
16  A. I'm employed by the parent
17 company, ABC.
18  Q. Okay. How does your
19 relationship to ABDC work out then?
20  MR. NICHOLAS: Object to the
21  form.
22  THE WITNESS: Subsidiary
23  company of ABC.
24 BY MR. CLUFF:

Page 25

1  Q. Okay. And so what
2 responsibilities as an employee of ABC do
3 you have towards ABDC?
4  A. I'm the director of
5 diversion control and security for the
6 company.
7  Q. Is diversion control the
8 same thing as security?
9  A. No.
10  Q. So you have kind of two
11 responsibilities then, it sounds like,
12 diversion control and then security
13 separate from diversion control?
14  A. The formal title has some
15 security components to it. But it's
16 primarily diversion that I'm responsible
17 for.
18  Q. Okay. How long have you
19 been an employee of ABC?
20  A. Going on 22 years.
21  Q. 22 years. So that's
22 sometime in the '90s, maybe '96?
23  A. Yes.
24  Q. Okay. And when you started

Page 114

1  Q. Are you aware of any events
2 in the south region from a licensing or
3 regulatory compliance point of view that
4 would concern you?
5      MR. NICHOLAS: Object to the
6   form.
7      THE WITNESS: Yes. Events
8   did occur that impacted the south
9   region.
10 BY MR. CLUFF:
11  Q. What events?
12  A. I recall that in 2007 the
13 Orlando distribution center had their DEA
14 license suspended.
15  Q. So previously I asked you if
16 there was anything that happened in that
17 region that concerned you from an
18 auditing standpoint. And you said no.
19  A. That's correct.
20  Q. So is your answer that the
21 suspension of a distribution center's
22 license doesn't concern you?
23      MR. NICHOLAS: Objection.
24   It's just arguing.

Page 115

1      MR. CLUFF: It's a question,
2   Bob.
3      MR. NICHOLAS: Go ahead.
4   It's just arguing. Stalling.
5      MR. CLUFF: Bob, I'm allowed
6   to ask argumentive questions.
7   It's a deposition. Don't coach
8   this witness.
9      MR. NICHOLAS: I'm not --
10   that's not coaching. I just said
11   you're arguing. Period.
12   Objection.
13      Go ahead.
14      THE WITNESS: I don't think
15   that the -- that the action taken
16   against that distribution center
17   affected my -- from an audit
18   standpoint. So that's the
19   question that I was answering.
20      My audits -- my audits were
21   conducted regardless of what
22   action is taken on a distribution
23   center.
24 BY MR. CLUFF:

Page 116

1  Q. Have there ever been any
2 actions against registrations of
3 distribution centers in the regions that
4 you were responsible for between 2002 and
5 2015?
6  A. Yeah. Various actions were
7 taken on my distribution centers through
8 that period.
9  Q. Okay. What actions were
10 taken against your distribution centers?
11  A. Over a 13-year period?
12  Q. Yes, please.
13  A. We had multiple DEA audits
14 during -- during that period of time,
15 multiple state audits during that time.
16 I couldn't give you specifics on actions
17 that were taken in all distribution
18 centers that spans such a long period of
19 time. I don't recall.
20  Q. Were there ever any
21 suspensions of a distribution center's
22 license in your regions?
23  A. Not that I recall.
24  Q. Were there any

Page 117

1 investigations of diversion at any of the
2 distribution centers within your regions
3 between 2002 and 2015?
4      MR. NICHOLAS: Object to the
5   form.
6      THE WITNESS: Yes.
7 BY MR. CLUFF:
8  Q. What were some of those?
9  A. I can't speak to them in
10 detail. Diversion, internal thefts,
11 in-route thefts were investigations that
12 we routinely conducted through that
13 period.
14  Q. So would you agree with me
15 that if a theft occurs inside of
16 AmerisourceBergen, that would constitute
17 diversion?
18  A. Yes, that would qualify as
19 diversion.
20  Q. So AmerisourceBergen was
21 essentially investigating diversion
22 within its own company while you were
23 working as a regional supervisor from
24 2002 to 2015?

Page 162

1 the specific schedule that that occurred.
2   Q.   Do you recall that that
3 happened in 2012?
4   A.   I don't recall.
5   Q.   Do you recall if your audit
6 was before or after this conversion from
7 Distrack to Metastorm?
8   A.   No.
9   Q.   Do you recall if it was
10 before or after the conversion from that
11 system to SAP?
12   A.   Well, the -- the conversion
13 from Metastorm to SAP occurred after
14 that.  So it was definitely before the
15 conversion to SAP.
16   Q.   So if we could pinpoint on a
17 calendar when the conversion from
18 Metastorm to SAP was, we could narrow
19 down the time period that you audited the
20 Orlando distribution center, right?
21   A.   We can state it would have
22 been before that period.
23   Q.   But you have no recollection
24 when the SAP system went into effect?

Page 163

1   A.   No, not specifically.
2   Q.   Do you -- do you know if it
3 was before 2015?
4   A.   Yes, it was before 2015.
5   Q.   So you audited it, audited
6 the Orlando distribution center before
7 2015?
8   A.   That's correct.
9   Q.   This audit of the Orlando
10 distribution center that you so
11 specifically recall, why do you
12 specifically recall it?
13       MR. NICHOLAS:  Object to the
14     form.
15       THE WITNESS:  I just
16     remember being there.
17 BY MR. CLUFF:
18   Q.   What do you remember about
19 being there?
20   A.   I remember being in Orlando.
21   Q.   That's it?
22   A.   That's it.
23   Q.   Do you remember filling out
24 an audit checklist while you were there?

Page 164

1   A.   I'm sure that one was filled
2 out since I conducted an audit.
3   Q.   Do you remember if it was
4 before or after the license was suspended
5 in Orlando?
6   A.   I don't recall.
7   Q.   Do you remember if there
8 were any specific procedures or policies
9 that Orlando was faulting -- following
10 during that audit that were implemented
11 as a result of the settlement with the
12 DEA in 2007?
13   A.   No.
14   Q.   Is that something you would
15 have audited if they had been in place?
16       MR. NICHOLAS:  Object to the
17     form.
18       THE WITNESS:  If a change
19     was made to the audit protocol
20     then I would have followed it
21     during the audit.
22 BY MR. CLUFF:
23   Q.   If there were policies or
24 procedures that the Orlando distribution

Page 165

1 center was following as a result of the
2 settlement with the DEA, would you have
3 audited those?
4       MR. NICHOLAS:  Object to the
5     form.
6       THE WITNESS:  It would
7     depend if it was part of the audit
8     checklist.
9 BY MR. CLUFF:
10   Q.   Are you familiar with why
11 the Orlando distribution center lost its
12 DEA license?
13   A.   I have a general
14 understanding that the DEA suspended the
15 license because they made the allegation
16 that we were not following the
17 regulation.
18   Q.   Which regulation?
19   A.   To report and identify
20 suspicious orders.
21   Q.   Where did you obtain that
22 general understanding?
23   A.   During the occurrence.
24   Q.   So during the suspension of

Page 166

1 the Orlando distribution center's license
2 you became aware why the registration was
3 suspended?
4      MR. NICHOLAS: Object to the
5    form.
6      THE WITNESS: Yeah, I recall
7    the general allegation.
8 BY MR. CLUFF:
9    Q.  Where did you hear about
10 that from?
11   A.  I don't recall. Big news
12 back then.
13   Q.  It was big news. People
14 talking about it in the halls?
15     MR. NICHOLAS: Object to the
16   form and the commentary.
17     Go ahead.
18     THE WITNESS: There was a
19   lot of discussions surrounding it.
20 BY MR. CLUFF:
21   Q.  Were there meetings about
22 it?
23   A.  Yes.
24   Q.  Were reports written about

Page 167

1 it?
2   A.  None that I'm specifically
3 aware of.
4   Q.  Do you understand that
5 reports may have been written about it?
6     MR. NICHOLAS: Well, I'll
7   object to the form of that
8   question.
9     Go ahead.
10    THE WITNESS: I assume so.
11   None that I was directly involved
12   in -- involved with.
13 BY MR. CLUFF:
14   Q.  You wouldn't have
15 participated in discussing the suspension
16 in your role as an auditor?
17     MR. NICHOLAS: Object to the
18   form.
19     THE WITNESS: You know,
20   right when that happened, my
21   father passed away, and I had to
22   take a leave of absence. So when
23   I got back, a lot of that -- a lot
24   of those changes had been -- had

Page 168

1   been completed or were in process,
2   and I was not part of that -- that
3   process.
4 BY MR. CLUFF:
5   Q.  When I asked you if reports
6 were written about the suspension, you
7 said you assume so.
8     Why do you assume that they
9 would have been written?
10    MR. NICHOLAS: Object to the
11   form. And of course, Mr. Cluff
12   will be the first to tell you that
13   you shouldn't assume in an answer
14   to a question.
15     So go ahead.
16     THE WITNESS: When you have
17   an occurrence like that, I would
18   assume that it would, you know,
19   involve a chain reaction and a lot
20   of different departments would be
21   involved in handling the
22   suspension.
23     So I would assume, as a
24   previous auditor, that reports

Page 169

1   would have been generated as a
2   result of the action taken against
3   us.
4 BY MR. CLUFF:
5   Q.  So based on your 13 years of
6 experience as an auditor, your
7 understanding is that an event like the
8 suspension of a distribution center's
9 license would result in the creation of
10 reports about why the suspension
11 occurred?
12    MR. NICHOLAS: Is that a
13   question?
14    MR. CLUFF: I'm exploring
15   his understanding, Bob.
16    MR. NICHOLAS: I just want
17   to hear it in the form of a
18   question. You're making a
19   statement.
20    MR. PIFKO: Just say "is
21   that correct."
22 BY MR. CLUFF:
23   Q.  Is that correct?
24    MR. NICHOLAS: Yeah, say "is

Page 278

1  to review the report. I don't remember
2  how I was instructed.
3      Q.  Do you know who would have
4  given you the instructions?
5      A.  I believe Steve would have
6  done that.
7      Q.  Okay. And so tell me what
8  your recollection of what you were
9  supposed to look at on this report was.
10     A.  So the report contained
11 sales data for customers. And I believe
12 it was Oxycodone and hydrocodone
13 products. If they breached a parameter,
14 it would trigger this report to be
15 generated. So I got the report
16 periodically and it may have been, you
17 know, I don't remember how much it was,
18 but I would separate it by customer,
19 because it would be, I believe
20 alphabetical or it might have been by DEA
21 number. But it would basically be, you
22 know, one customer, then another
23 customer, and it would just be -- it
24 would span multiple customers in

Page 279

1  grouping. So I would group them in
2  separate -- in separate files and then I
3  would conduct the investigation of those
4  customers.
5      Q.  Okay. And then what -- what
6  things would you do to conduct the
7  investigation of those customers?
8      A.  I had a couple support staff
9  within the CSRA department that I used to
10 assist me with this, that I would work
11 with those individuals to contact the
12 sales executive, to contact the customer
13 to inquire as to why they were buying,
14 you know, that quantity of controlled
15 substances. We would collect all the
16 information on the customer. We would
17 take their responses to our questions and
18 our follow-up questions, and we would
19 complete an investigation of each
20 customer.
21     Q.  Would there be some sort of
22 document that you would create at the
23 culmination of your investigation?
24     A.  Yeah. It would be an

Page 280

1  investigation report.
2      Q.  Okay. And then would you
3  save that somewhere?
4      A.  Yeah. I believe it was
5  maintained in Law Track.
6      Q.  And then was there a goal of
7  the investigation that you were trying to
8  determine something?
9          MR. NICHOLAS: Object to the
10     form.
11         THE WITNESS: We were trying
12     to determine if any improprieties
13     were happening with regard to
14     those orders. I would -- I would
15     collect all the information that
16     I -- that I could from the
17     customer to explain, you know, the
18     reasoning as to why they were
19     buying that quantity of controls,
20     and I would take the findings and
21     I would, you know, provide it to
22     Steve Mays. And what he did with
23     it, you know, I'm not sure.
24         Because at that point the

Page 281

1      decision -- the decisionmaking
2      regarding my investigation that I
3      completed was conducted, you know,
4      outside of my realm. So I'm not
5      sure what the -- what the -- what
6      the results of those -- those
7      investigations entailed.
8  BY MR. PIFKO:
9      Q.  Did you make any
10 recommendations for actions in the
11 report?
12     A.  You know, it's been so long
13 ago, I don't recall.
14     Q.  Do you recall if one of the
15 things that you were evaluating was
16 whether to fill the order?
17     A.  Well, keep in mind this was
18 a system that we operated that was
19 prior -- prior to the system that held
20 orders.
21     Q.  Okay.
22     A.  So this was investigations
23 that occurred after the shipment was
24 already completed.

Page 282

1  Q. Okay. So it's your
2 understanding that all these orders and
3 in the possible suspicious order report
4 had already been shipped; is that
5 correct?
6  A. Yes. Those were -- those
7 were orders that have already been
8 shipped. That's correct.
9  Q. Okay. And you would look at
10 it to evaluate whether there were
11 concerns, and you would generate a
12 report, but you didn't make any
13 recommendations for a course of action
14 going forward; is that correct?
15  A. That's correct.
16  Q. You provided that to Steve
17 Mays, the report?
18  A. Yes. I believe I give it
19 directly to Steve Mays.
20  Q. Did you send it by e-mail?
21  A. I don't recall. We may have
22 just put it in the Law Track system and
23 he retrieved it from there. I don't
24 recall how I gave it to him.

Page 283

1  Q. Do you recall about how long
2 it would take you to conduct an
3 investigation of a customer that was
4 identified in this report?
5  A. I don't recall.
6  Q. Is it like -- put me in your
7 shoes. I'm sitting -- I'm sitting at
8 your desk. Is it like a thing that takes
9 a week, and you're kind of doing it off
10 and on? Is it something that you sit
11 down and do in a few hours? Do you do it
12 all day? Can you explain to me how long
13 the process took in that regard?
14    MR. NICHOLAS: Object to the
15   form.
16   You can go ahead and answer.
17   Can we a break soon, Mark,
18   maybe after this question?
19   MR. PIFKO: Yeah.
20   MR. NICHOLAS: Okay. Go
21   ahead.
22   THE WITNESS: Yeah, the --
23   it would depend on how quickly we
24   got the information that we asked

Page 284

1 for. Sometimes we would contact
2 the customer, and it would take
3 them time to respond to us. So it
4 would depend on the investigation,
5 anywhere from, you know, best case
6 scenario, a couple days to maybe a
7 couple weeks, just off the top of
8 my head. But I -- it's been so
9 long I don't recall.
10    MR. PIFKO: Okay. Thank
11   you. We'll take a break.
12    THE VIDEOGRAPHER: Going off
13   the record. 2:32 p.m.
14    (Short break.)
15    THE VIDEOGRAPHER: Back on
16   record, 3:07 p.m.
17 BY MR. PIFKO:
18  Q. Welcome back.
19  A. Thank you.
20  Q. I want to talk about your
21 educational background and training for a
22 little bit. Okay?
23  A. Yeah.
24  Q. All right. So earlier we

Page 285

1 talked that you -- let me make sure I
2 have a clear understanding. You went to
3 high school, graduated high school. Then
4 you went to Golden West College for a
5 year, and then you decided to join the
6 Navy, and did that, and then you got a
7 job with Amerisource -- or with the
8 Bergen Corporation, correct?
9  A. Yes.
10  Q. How long were you in the
11 Navy?
12  A. Five years.
13  Q. And you had the same
14 controller job during the entire duration
15 of your service?
16  A. Yes.
17  Q. Okay. So when you got to
18 the Bergen Corporation, you started as a
19 security guard, you said, correct?
20  A. Security officer. Yes.
21  Q. Okay. And then when you
22 moved into the regional manager director
23 position, did you get any specific
24 training?

Golkow Litigation Services                Page 72 (282 - 285)

Page 298

1  obstructing me from getting it out
2  of him right now.
3  BY MR. PIFKO:
4      Q.   Okay.  With that said,
5  what's the correction that you would like
6  to make?
7      A.   The report that I reviewed,
8  the periodic report that I referenced
9  earlier, I indicated that it was a
10 possible suspicious order report.  It's
11 actually called the possible excessive
12 purchase report.
13     Q.   Okay.
14     A.   That's the correction.
15     Q.   But you remember it being
16 called the suspicious order report
17 because you were evaluating the
18 suspicious natures of the orders; is that
19 correct?
20          MR. NICHOLAS:  Object to the
21     form.
22          THE WITNESS:  No.  We're
23     just talking multiple years since
24     I reviewed the report.  So I just

Page 299

1  misunderstood -- I misremembered
2      what it was called.
3  BY MR. PIFKO:
4      Q.   Okay.  Why did you think it
5  was called a possible suspicious order
6  report?
7      A.   I don't know.  I just didn't
8  remember.
9      Q.   Do you have an understanding
10 what an order that exceeds the threshold
11 is?
12     A.   Well, it would depend.
13     Q.   Well, before 2007, are you
14 aware that the company reported all
15 orders that exceeded thresholds as
16 suspicious to the DEA?
17     A.   No.  I don't know how those
18 reports were submitted and what was
19 submitted.
20     Q.   Are you aware that the
21 company reported suspicious orders to the
22 DEA before 2007?
23     A.   I did not know that.  I
24 didn't know when it started.  I didn't

Page 300

1  know when that happened or how it
2  happened.
3      Q.   Are you aware that the
4  company has a duty to identify and report
5  suspicious orders?
6      A.   Yes.  We have a
7  responsibility to report suspicious
8  orders.
9      Q.   And to identify them as
10 well?
11     A.   Well, I think reporting it
12 would be identifying them, wouldn't it?
13     Q.   Okay.  Well, I just want to
14 make sure we are using the correct words
15 here.
16          Okay.  So you are aware that
17 that's a requirement that the company
18 has, correct?
19     A.   Yes, to review orders and
20 identify suspicious orders and block them
21 and report them.
22     Q.   Okay.  Is that a new
23 requirement?
24     A.   No.

Page 301

1      Q.   Okay.  That's something that
2  you've always been required to do,
3  correct?
4          MR. NICHOLAS:  Object to the
5      form.  Go ahead.
6          THE WITNESS:  Yes.
7  BY MR. PIFKO:
8      Q.   As long as your tenure with
9  the company going back to the late '90s,
10 correct?
11     A.   Yes.
12     Q.   Okay.
13     A.   Well, the regulation has
14 been -- has stated that since the early
15 '90s, yes.
16     Q.   So we were going -- we
17 were -- before we went into that sidebar,
18 we were discussing your training and some
19 of your responsibilities as the regional
20 manager.
21          So you supervised about
22 eight compliance managers, five to eight,
23 depending on the time, and you were
24 responsible for conducting the audits,

Page 334

1  A.  Order monitoring program?
2  Q.  Well, where it says,
3 "48-hour reporting to DEA, know your
4 customer"?
5  A.  Yeah.
6  Q.  All those things, do you see
7 that?
8  A.  Yeah.
9  Q.  Okay.  Are you familiar with
10 what those enhancements were?
11  A.  Not in a detailed way, no.
12  Q.  Do you know what "know your
13 customer" means?
14  A.  Yes.  I understand the DEA's
15 "know your customer" component.
16  Q.  What is that, what is your
17 understanding of what that means?
18  A.  That we should have a good
19 understanding of what their business
20 model is so we have a better
21 understanding of the orders that they are
22 placing with -- with our distribution
23 centers.
24  Q.  And when you say "they," you

Page 335

1 mean your customer?
2  A.  Correct.
3  Q.  Did you -- have you -- other
4 than the investigations that you
5 conducted between 2005 and 2007, did you
6 ever conduct any due diligence
7 investigations concerning customers?
8  A.  When you say --
9     MR. NICHOLAS:  Object to the
10   form.
11     THE WITNESS:  When you say
12   due diligence investigations, I
13   was -- I was conducting
14   investigations of a possible
15   excessive purchase report.  So if
16   you would classify that as a due
17   diligence, then I would say yes.
18 BY MR. PIFKO:
19  Q.  This is after 2007 is what
20 I'm asking.
21  A.  Post 2007?
22  Q.  Yeah.
23  A.  No.  My responsibilities
24 ceased after 2007 regarding that.

Page 336

1  Q.  Okay.  So did you -- did you
2 have any involvement with conducting this
3 "know your customer" due diligence that's
4 discussed here that was implemented in
5 2007?
6  A.  No, I don't believe so.
7 That was handled by a different team.
8  Q.  Do you know the team that
9 handled that?
10  A.  That was the diversion
11 control team under corporate.
12  Q.  Who -- who was on that team?
13  A.  I don't recall the specific
14 individuals.  I know it was headed by Ed
15 Hazewski.
16  Q.  Anyone else that you can
17 think of?
18  A.  Those investigators
19 transitioned in and out.  I don't recall.
20 Scott Kirsch was one investigator.
21  Q.  Anyone else?
22  A.  I can't remember.
23  Q.  Order monitoring program.
24 Next thing down here.  It's got establish

Page 337

1 thresholds.  Do you know what a threshold
2 is?
3  A.  Yes, I have a basic
4 understanding of what a threshold is.
5  Q.  Okay.  What's your
6 understanding?
7  A.  I don't know exactly what
8 went into those thresholds.  I know it's
9 a level at which, you know, purchase
10 activity would draw a flag and hold the
11 order until it could be investigated.
12  Q.  And then it says, "Review at
13 distribution centers."  Is that what it
14 says?
15  A.  Yes.
16  Q.  Okay.  What does that mean,
17 do you know what that means?
18  A.  I believe that's when the
19 RPICs were implemented at the DC level.
20  Q.  And before that what was the
21 process?
22  A.  Prior to 2007 orders weren't
23 held when investigation -- or when a
24 suspicious order was flagged.  We would

Page 338

1 conduct those investigations after the
2 fact.
3    Q.   And so was there a personnel
4 change? I believe we -- we talked about
5 that under the computer ordering system,
6 there are other reasons for an order to
7 be flagged like if there was a payment
8 credit issue -- I forget, there was some
9 other reason that you said for an order
10 to be held. So there was already someone
11 whose job it was to be doing that prior
12 to 2007; is that correct?
13        MR. NICHOLAS: Object to the
14    form. Go ahead.
15        THE WITNESS: Yeah. There
16    were -- there were other hold
17    codes that did not include the
18    order monitoring program hold
19    code. So there was a number of
20    hold codes that would hold an
21    order, like licensing, credit and
22    that kind of thing.
23 BY MR. PIFKO:
24    Q.   Okay. And so there was

Page 339

1 already someone's job who it was to deal
2 with those holds, correct?
3    A.   Yes. I believe so.
4    Q.   Okay. Were -- were those
5 same people then added this
6 responsibility of reviewing the order
7 monitoring program holds?
8    A.   Back in that time frame, I
9 don't recall who was handling those kinds
10 of holds at the distribution center
11 level.
12    Q.   You don't know who the RPICs
13 were when this program was initiated?
14    A.   No.
15    Q.   Okay. I believe you
16 testified earlier that the -- the data
17 manage -- data management people, I
18 forget what the term you used?
19    A.   It was just one of -- they
20 were usually an RPIC.
21    Q.   Okay.
22    A.   But there were other people
23 at the division -- at the -- at the DC
24 level who had that responsibility as

Page 340

1 well.
2    Q.   Who else had that
3 responsibility?
4    A.   A number of -- a number of
5 associates held that responsibility
6 including the warehouse managers,
7 compliance clerks.
8    Q.   The order -- we talked about
9 the filling of orders earlier. Do you
10 recall that? It comes in from the
11 computer. They put it in the totes,
12 things like that?
13    A.   Yes.
14    Q.   That occurs at night,
15 correct?
16    A.   Depending on the
17 distribution center. Some of those
18 happen during the day as well.
19    Q.   Okay. Does it primarily
20 occur at night?
21    A.   Yes.
22    Q.   The investigation thing here
23 on Page 5. Do you see that?
24    A.   Yes.

Page 341

1    Q.   Do you know what that's
2 referring to?
3    A.   It states, "Report to DEA."
4 I can't state specifically what they are
5 referring to in that bullet point.
6    Q.   The next section, on Page 6,
7 it says, "Audits, investigations, and
8 regulatory activity."
9        That's -- that was --
10 includes activities in your purview as
11 the regional director, correct?
12    A.   Yes.
13    Q.   Go to the next page. It's
14 got a summary of DEA audits.
15        Do you see that?
16    A.   Yes.
17    Q.   Are you familiar with these
18 statistics?
19    A.   Not for this particular
20 PowerPoint. But I would take this
21 information as being accurate.
22    Q.   These are -- concern audits
23 and inspections at AmerisourceBergen's
24 facilities?

Page 342

1  A. Yes.
2  Q. It mentions this MOU here.
3  Do you see that, in 2006?
4  A. Yes.
5  Q. Do you know what that was?
6  A. No, I don't recall.
7  Q. It says here, "Not good."
8  Do you see that?
9  A. Yes.
10  Q. You agree with -- that an
11  MOU is not -- not good?
12  A. From a regulatory --
13  MR. NICHOLAS: Object to --
14  THE WITNESS: Sorry.
15  MR. NICHOLAS: Object to the
16  form.
17  THE WITNESS: Yeah, from a
18  regulatory standpoint we don't
19  like MOUs.
20  BY MR. PIFKO:
21  Q. Why is that?
22  A. Because we were doing
23  something wrong, according to DEA.
24  Q. When there's an MOU, do you

Page 343

1  try to change what's going on at the
2  facility so you don't -- so it doesn't
3  happen again?
4  A. Yes.
5  Q. It's a serious event?
6  MR. NICHOLAS: Object to the
7  form.
8  THE WITNESS: Yes, it is.
9  BY MR. PIFKO:
10  Q. How about a letter of
11  admonition? Do you see that? Just above
12  that?
13  A. Yes. Yes, I do.
14  Q. Is that a significant event?
15  A. Yes.
16  MR. NICHOLAS: Object to the
17  form.
18  THE WITNESS: Yes.
19  BY MR. PIFKO:
20  Q. Do you recall what that's
21  referring to in 2006?
22  A. No, I don't.
23  Q. It talks about 2007
24  activities, the registration suspension.

Page 344

1  That's for the Orlando facility?
2  A. Yes.
3  Q. And then it says, "Six
4  distribution center inspections for order
5  monitoring program compliance."
6  Is that correct?
7  A. Yes.
8  Q. Do you know what those were?
9  A. I believe they were the six
10  distribution centers that the DEA audited
11  as a precursor to get our registration
12  back in active status for the Orlando
13  distribution center.
14  Q. Okay. So the Orlando
15  distribution center had issues that led
16  to the suspension, and then the DEA went
17  to inspect other facilities as a result
18  of that?
19  MR. NICHOLAS: Object to the
20  form.
21  THE WITNESS: That's my
22  understanding of the chronology,
23  yes.
24  BY MR. PIFKO:

Page 345

1  Q. How did you come to that
2  understanding?
3  MR. NICHOLAS: Same
4  objection.
5  THE WITNESS: Based on this
6  report.
7  BY MR. PIFKO:
8  Q. Did you talk to anyone at
9  the company about that?
10  A. I don't recall back in that
11  time period.
12  Q. Okay. But looking at that,
13  you're able to tell the chronology?
14  MR. NICHOLAS: Same
15  objection.
16  THE WITNESS: I very vaguely
17  recall, you know, what transpired
18  in the 2007 time frame. I
19  remember there was audits from the
20  DEA in order to get the
21  registration back in active
22  status.
23  BY MR. PIFKO:
24  Q. Would you have attended any