# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 15 – Hilliard Tr. Excerpts

```
 1                UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE: NATIONAL              )   MDL No. 2804
     PRESCRIPTION OPIATE          )
 4   LITIGATION                   )   Case No. 1:17-MD-2804
                                  )
 5                                )   Hon. Dan A. Polster
     THIS DOCUMENT RELATES TO     )
 6   ALL CASES                    )
                                  )
 7
 8
 9                         — — —
10               Thursday, January 10, 2019
                           — — —
11
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12                  CONFIDENTIALITY REVIEW
                           — — —
13
14
15
16        Videotaped Deposition of GARY HILLIARD,
     held at Winstead PC, 2728 N. Harwood St.,
17   Dallas, Texas, commencing at 9:06 a.m. on the
     above date, before Susan Perry Miller,
18   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Realtime
19   Captioner, and Notary Public.
20
21
                           — — —
22
                 GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | fax 917.591.5672
                      deps@golkow.com
24
25
```

Page 14

1          PROCEEDINGS
2          GARY HILLIARD,
3    having taken an oath to tell the truth, the
4    whole truth, and nothing but the truth,
5    testified as follows:
6               EXAMINATION
7    QUESTIONS BY MR. BOGLE:
8        Q.   Good morning.
9        A.   Good morning.
10       Q.   Can I get your full name,
11   please?
12       A.   Gary Lawrence Hilliard.
13       Q.   And, Mr. Hilliard, my name is
14   Brandon Bogle. I'm going to be asking you
15   some questions today. Before we get into the
16   substance, though, have you ever had your
17   deposition taken before?
18       A.   I have not.
19       Q.   Okay. Just a few ground rules
20   to hopefully make things go as smoothly as
21   possible for us. I'm going to ask questions
22   and I'd ask that you wait till I finish my
23   question before you provide an answer, number
24   one, to make sure you understand my question;
25   number two, to allow the court reporter to

Page 15

1    more easily transcribe things.
2             Does that make sense?
3        A.   Yes, it does.
4        Q.   Okay. And if at any point in
5    time you want to take a break, just let me or
6    your counsel know. I'm happy to do that.
7    It's not an endurance contest.
8             The other thing is if I ask a
9    question that you don't hear or don't
10   understand, please ask me to repeat it or
11   rephrase it and I will do so. Otherwise, I
12   assume if you're answering my question that
13   you understood it. Is that fair?
14       A.   Yes.
15       Q.   Okay. Where are you currently
16   employed, sir?
17       A.   Tech Data Corporation.
18       Q.   Where is that located?
19       A.   The corporate office is in
20   Clearwater, Florida.
21       Q.   Okay. Are you out of
22   Clearwater or somewhere else?
23       A.   I'm out of a Fort Worth
24   facility.
25       Q.   Give me just a general sketch

Page 16

1    of what you do at Tech Data. What is your
2    job?
3        A.   I'm a dangerous goods safety
4    advisor, so my role is to manage hazardous
5    materials for our company in the United
6    States, Canada and Mexico.
7        Q.   Okay. Does Tech Data in any
8    way, shape or form sell, distribute or deal
9    in opioids?
10       A.   No. It's all electronics.
11       Q.   All electronics, okay.
12            When did you start working for
13   Tech Data?
14       A.   In September 2016.
15       Q.   Okay. And prior to working at
16   Tech Data, were you employed at McKesson?
17       A.   I was.
18       Q.   Okay. Can you give me the span
19   of time that you worked for McKesson?
20       A.   From 1997 till 2016.
21       Q.   Okay. And why did you leave
22   McKesson?
23       A.   I was part of a workforce
24   reduction.
25       Q.   Okay. Were you given the

Page 17

1    opportunity to transfer to another department
2    or just outright told that they were
3    eliminating your position and there was no
4    other position for you?
5        A.   Outright elimination.
6        Q.   Okay. Now, the time from 1997
7    to 2016 while you were at McKesson, during
8    that entire span, were you a director of
9    regulatory affairs?
10       A.   I started as a manager of
11   regulatory affairs.
12       Q.   Okay. So tell me what time
13   period you were the manager.
14       A.   It was approximately a year, so
15   approximately '97-98.
16       Q.   Okay.
17       A.   I don't remember the exact time
18   frame.
19       Q.   That approximation is good
20   enough. So approximately 1998 you take over
21   as director of regulatory affairs. Do you
22   hold that position until 2016 when you leave?
23       A.   That's correct.
24       Q.   Okay. Do you know what month
25   in 2016 you left?

Case 3:17-cv-01362 Document 1075-13 Filed 10/09/20 Page 4 of 19 PageID #: 26808
Case: 1:17-md-02804-DAP Doc #: 3025-13 Filed: 10/06/19 Page 4 of 19. PageID #: 436308
Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  what the scope is here.
2       You also said you handled DEA
3  registrations and state licensure?
4       A.   Correct.
5       Q.   For what time period did you
6  have those responsibilities?
7       A.   '97 till 2016.
8       Q.   Okay.  You mentioned being
9  actively involved in the -- I think it was
10 NWMA?  Is that right?
11      A.   HDMA.
12      Q.   Right.  I think you mentioned
13 the predecessor term.
14      A.   NWDA, National Wholesale Drug
15 Association.
16      Q.   Which then became the HDMA,
17 right?
18      A.   And now is NDA, I believe, yes.
19      Q.   I think maybe HDA.
20      A.   HDA.
21      Q.   I think so.  It doesn't matter.
22      A.   Okay.
23      Q.   Okay.  What sort of committees
24 were you on at NWDA?
25      A.   I was on the federal committees

Page 27

1  in reference to DEA, also state committee,
2  pharmaceutical waste management committee,
3  transportation committee.
4       Q.   Okay.  Let's talk about the
5  federal DEA committee.  What did you do --
6  what was your involvement with that
7  committee?  What did you do?
8       A.   We would meet typically
9  annually and with our counterparts from other
10 wholesalers and sometimes manufacturers, and
11 we would discuss issues that were happening,
12 proposed regulations that were coming up.
13 That's primarily it.
14      Q.   Okay.  And so this NWDA was a
15 trade association for pharmaceutical
16 distributors primarily, correct?
17      A.   That's correct.
18      Q.   Okay.  And so as part of that
19 association, as a member of that association,
20 you would have interactions with other
21 employees of other pharmaceutical
22 distributors.  Is that fair?
23      A.   That's correct.
24           MR. EPPICH:  Object to the
25      form.

Page 28

1       Give me a minute to object, if
2  you don't mind.
3  QUESTIONS BY MR. BOGLE:
4       Q.   How frequently would you attend
5  meetings for NWDA, approximately?
6       A.   Approximately twice a year.
7       Q.   Okay.  Would those meetings
8  generally be attended by employees of other
9  pharmaceutical distributors as well?
10      A.   That's correct.
11      Q.   Okay.  You also mentioned
12 having responsibility for ARCOS.  Can you
13 tell me what you did related to ARCOS?
14      A.   I would train our employees at
15 our facilities when they needed training.  I
16 would assist in problems that they may have
17 understanding what types of code assignments
18 would be associated with a type of
19 transaction.  If they had error reports that
20 they needed assistance with, and any
21 communications from ARCOS corporate, then I
22 would typically work with them on that.
23      Q.   Okay.  And when it came to the
24 ARCOS training you're referring to, are you
25 talking about training people at the

Page 29

1  distribution centers?
2       A.   That's correct.
3       Q.   All right.  So from 1997 to
4  2007, would you have had responsibility for
5  regulatory compliance for all of McKesson's
6  distribution centers?
7       A.   For the pharmaceutical
8  division.
9       Q.   Okay.  Well, let me rephrase it
10 because I think that's a fair clarification.
11          So from 1997 to 2007, would you
12 have had responsibility for compliance with
13 the Controlled Substances Act as it pertained
14 to all of McKesson's distribution centers?
15      A.   That would be correct.
16      Q.   Okay.  And, now, in 2008, as I
17 understand it, there were some additional
18 people added to McKesson's regulatory team.
19 Is that true?
20      A.   That's correct.
21      Q.   Okay.  And so when that change
22 occurred and additional people were added, as
23 I understand it, you would then have not been
24 responsible for all of those distribution
25 centers when it pertains to Controlled

Page 34

1 communications took place between McKesson
2 headquarters and DEA headquarters.
3 QUESTIONS BY MR. BOGLE:
4 Q. Okay. Do you recall what
5 presentations you received in that regard?
6 A. There was a DEA conference
7 where they had a presentation and they were
8 talking about the levels of opioids that were
9 being used out -- illegitimately. I don't
10 recall the exact details of it, but they had
11 a presentation --
12 Q. Okay.
13 A. -- at a national conference.
14 Q. Okay. Would that have been a
15 conference you attended in 2007?
16 A. I don't recall the exact date
17 of that conference.
18 Q. Okay. Did you ever have any
19 personal concern while you were at McKesson
20 that there was an opioid epidemic ongoing?
21 A. No, I didn't.
22 MR. EPPICH: Object to the
23 form.
24 QUESTIONS BY MR. BOGLE:
25 Q. Okay. Are you familiar with

Page 35

1 the term "diversion"?
2 A. I am.
3 Q. What do you understand that
4 term to mean?
5 MR. EPPICH: Object to the
6 form. Calls for a legal conclusion.
7 A. Controlled substance
8 pharmaceuticals being utilized outside the
9 course of legal requirements under the CSA.
10 QUESTIONS BY MR. BOGLE:
11 Q. And while you were at McKesson,
12 did you see any instances of diversion of
13 McKesson-supplied opioids?
14 MR. EPPICH: Object to the
15 form.
16 A. Not that I recall.
17 QUESTIONS BY MR. BOGLE:
18 Q. All right. I'm going to hand
19 you what I'm marking as Exhibit 1.1651, which
20 is also Exhibit 1 to your deposition, and
21 that's MCKMDL00498169.
22 (McKesson-Hilliard Exhibit 1
23 was marked for identification.)
24 QUESTIONS BY MR. BOGLE:
25 Q. There you go, sir.

Page 36

1 Okay, Mr. Hilliard. What I've
2 handed you as Exhibit 1 you see is an e-mail
3 on the first page and then sort of a
4 PowerPoint slide deck behind it.
5 Do you see that?
6 A. I see that.
7 Q. Okay. And starting with the
8 e-mail on the first page, you see that's an
9 e-mail from Donald Walker dated May 2, 2012,
10 to several individuals, including yourself,
11 right?
12 A. I see that.
13 Q. Okay. And the subject is Know
14 Your Customer.
15 Do you see that subject line?
16 A. Yes, I see that.
17 Q. He says there in the first line
18 in the body: On Monday I will be making a
19 presentation to the ISMC sales force at NSC
20 around Know Your Customer.
21 What was Know Your Customer?
22 A. It's the name of the
23 presentation.
24 Q. Okay. Are you aware of any
25 program that McKesson implemented at any

Page 37

1 point in time to know their customers as it
2 related to opioid purchases?
3 MR. EPPICH: Object to the
4 form.
5 A. I don't recall it in that
6 specifics.
7 QUESTIONS BY MR. BOGLE:
8 Q. Okay. The next sentence in the
9 e-mail says: This is intended to be an
10 awareness awakening session that we as a
11 regulatory team will follow up on during the
12 upcoming year.
13 Do you see that?
14 A. I see that.
15 Q. Okay. And then if you look,
16 I'm on page .5, the page numbers at the top
17 right. That says there Government's View of
18 the Problem at the top of that slide.
19 Do you see that?
20 A. I see that.
21 Q. Okay. And in the box on the
22 left it says: Alarming rate of increase of
23 prescription drug abuse beginning
24 approximately five years ago, especially
25 hydrocodone (Vicodin) and opioid pain drugs

Golkow Litigation Services                Page 10 (34 - 37)

Case 3:17-cv-01362 Document 1075-13 Filed 10/09/19 Page 6 of 19 PageID #: 46397
Case 1:17-md-02804 Doc #: 3075-17 Filed: 12/16/19 90 of 132. PageID #: 463943
Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  (Oxycontin and Oxycodone).
2       Do you see that?
3    A.   I see that.
4    Q.   Okay.  And on the right it
5  says, the first bullet point:  CDC currently
6  classifies prescription drug abuse as an
7  epidemic.
8       Do you see that?
9    A.   I see that.
10   Q.   Does this jog your memory about
11 receiving any information about a potential
12 opioid epidemic while you were at McKesson?
13       MR. EPPICH:  Object to the
14   form.  Misstates the document.
15   A.   I vaguely recall the
16 presentation.  I don't recall the details of
17 the presentation but this would have been
18 considered a training document.
19 QUESTIONS BY MR. BOGLE:
20   Q.   Okay.  Is this a document you
21 would have reviewed as a matter of course
22 when you received it?
23   A.   I don't recall receiving it,
24 but it does -- it does seem familiar, so
25 probably in the normal course I would review

Page 39

1  it.
2    Q.   Okay.  Let's take a look at the
3  second bullet point here.  It says:  27,000
4  died from prescription drug overdoses in
5  2007, a five fold increase since 1990.
6       Do you see that?
7    A.   I see that.
8    Q.   Okay.  And the next bullet
9  point says:  During the same time period ten
10 fold increase in medical use of painkillers
11 such as oxycodone and hydrocodone.
12      Do you see that there?
13   A.   I see that.
14   Q.   Okay.  Do you ever recall
15 becoming aware that there was a, during that
16 1990-2007 time frame, a ten-fold increase in
17 the use of painkillers like oxycodone and
18 hydrocodone?
19      MR. EPPICH:  Object to the
20   form.
21   A.   I don't recall.
22 QUESTIONS BY MR. BOGLE:
23   Q.   And the next bullet point says:
24 Today number of overdose deaths involving
25 prescription pain medication exceeds deaths

Page 40

1  from heroin and cocaine combined.
2       Do you see that?
3    A.   I see that.
4    Q.   And the last bullet point said:
5  In some states death from prescription
6  painkiller overdoses surpass those from
7  traffic accidents.
8       Do you see that?
9    A.   I see that.
10   Q.   Is that information you recall
11 being aware of while you were at McKesson?
12   A.   Again, I don't recall the
13 details of this.
14   Q.   Are you aware that there have
15 been congressional hearings in the last
16 couple of years related to the opioid
17 epidemic?
18   A.   I am.
19   Q.   You are, okay.
20      I'm going to hand you what I'm
21 marking as Exhibit 2 to your deposition,
22 which is Exhibit 1.264.  This is a public
23 document so no Bates numbers.
24      (McKesson-Hilliard Exhibit 2
25   was marked for identification.)

Page 41

1  QUESTIONS BY MR. BOGLE:
2    Q.   Okay.  You see here this is a
3  document from the U.S. House of
4  Representatives Committee on Energy and
5  Commerce from May 4, 2018.
6       Do you see that?
7    A.   I see that.
8    Q.   Okay.  And it's -- the
9  regarding line says:  Hearing entitled
10 "Combatting the Opioid Epidemic:  Examining
11 Concerns About Distribution and Diversion."
12      Do you see that there?
13   A.   I do see that.
14   Q.   Okay.  Have you followed the
15 outcomes of any of these congressional
16 hearings on the opioid epidemic?
17   A.   I have not.
18   Q.   You said you were aware of
19 them, right?
20   A.   I am aware of them but I have
21 not followed them.  I've been out of
22 pharmaceuticals for a while now.
23   Q.   If you look at the second page
24 of this document, underneath the chart it
25 says:  The U.S. continues to experience an

Case 3:17-cv-01362 Document 1075-13 Filed 10/09/19 Page 70 of 19 PageID #: 46397
Case 1:17-md-02804 Document 3045-13 Filed 12/19/19 Page 70 of 19 PageID #: 463711
Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  suspicious orders?
2      MR. EPPICH: Object to the
3      form.
4  QUESTIONS BY MR. BOGLE:
5      Q.  Why that was a component of it?
6      MR. EPPICH: Object to the
7      form.
8      A.  A guidance document provided by
9  Rannazzisi.
10 QUESTIONS BY MR. BOGLE:
11     Q.  And do you recall when you
12 first saw that guidance document?
13     MR. EPPICH: Object to the
14     form.
15     A.  Approximately 2006.
16 QUESTIONS BY MR. BOGLE:
17     Q.  Okay. And so prior to
18 receiving that document in approximately
19 2006, it was your personal belief that there
20 was no responsibility for McKesson to block
21 suspicious orders. Is that true?
22     MR. EPPICH: Object to the
23     form. Calls for a legal conclusion.
24     A.  It was not a requirement of the
25 CSA.

Page 51

1  QUESTIONS BY MR. BOGLE:
2      Q.  Okay. And so if I'm
3  understanding your testimony correctly, prior
4  to the implementation of the CSMP in 2008, it
5  was not McKesson's policy to block suspicious
6  orders. Is that true?
7      MR. EPPICH: Object to the
8      form.
9      A.  Blocking of the orders was not
10 a requirement under the CSA.
11 QUESTIONS BY MR. BOGLE:
12     Q.  Yeah. I'm just asking whether
13 it was a company policy to block suspicious
14 orders prior to 2008. I'm not asking about
15 the CSA right now.
16     MR. EPPICH: Object to the
17     form.
18     A.  We complied with requirements
19 under the CSA.
20 QUESTIONS BY MR. BOGLE:
21     Q.  Yeah. I'm just asking whether
22 prior to 2008 when the CSMP was implemented,
23 was it McKesson's policy to not block
24 suspicious orders when they were detected?
25     MR. EPPICH: Object to the

Page 52

1      form.
2      A.  We complied with the CSA
3  requirements.
4  QUESTIONS BY MR. BOGLE:
5      Q.  Okay. I guess I don't
6  understand how that applies to my question.
7  I'm just asking if you guys blocked
8  suspicious orders prior to 2008.
9      MR. EPPICH: Object to the
10     form.
11     A.  Blocking was not a requirement.
12 QUESTIONS BY MR. BOGLE:
13     Q.  So the answer is no, that that
14 wasn't done --
15     MR. EPPICH: Object to the
16     form.
17 QUESTIONS BY MR. BOGLE:
18     Q.  -- prior to 2008?
19     A.  We complied with the CSA
20 requirements.
21     Q.  Okay. I got that that's your
22 answer, but I'm trying to just get a specific
23 answer to a specific question, which is to
24 nail down in time when McKesson, to your
25 understanding, started blocking suspicious

Page 53

1  orders for controlled substances. Can you
2  tell me when that started occurring?
3      A.  The CSMP, which was about 2008.
4      Q.  Okay. I'm going to hand you
5  what I'm marking as Exhibit 3, which is
6  1.1464, and that's MCKMDL00478906.
7      (McKesson-Hilliard Exhibit 3
8      was marked for identification.)
9  QUESTIONS BY MR. BOGLE:
10     Q.  And you see this is a letter
11 from the U.S. Department of Justice Drug
12 Enforcement Administration dated
13 September 27, 2006.
14     Do you see that?
15     A.  I see that.
16     Q.  Is this the guidance document
17 from Mr. Rannazzisi that you were referring
18 to a minute ago?
19     A.  Yes, it is.
20     Q.  Okay. So you've seen this
21 document before. True?
22     A.  Yes.
23     Q.  Okay. I want to look at a
24 couple of components of this letter. It
25 says, in the first line: This letter is

Case 3:17-cv-01362 Document 1075-13 Filed 10/09/19 Page 90 of 132 PageID #: 46398
Case 1:17-md-02804 Document 3075-13 Filed 12/16/19 Page 9 of 19 PageID #: 439912
Highly Confidential - Subject to Further Confidentiality Review

## Page 110

1     A.    I don't recall the other states
2 other than what was listed in the other
3 letter.
4 QUESTIONS BY MR. BOGLE:
5     Q.    Okay. Well, we looked at
6 Exhibit 4 a minute ago. One of the
7 pharmacies listed there was United
8 Prescription Services.
9         You recall that?
10    A.    Yes.
11    Q.    You know that's a Florida
12 pharmacy, right?
13        MR. EPPICH: Object to the
14     form. Calls for speculation.
15    A.    That's my recollection.
16 QUESTIONS BY MR. BOGLE:
17    Q.    Okay. We'll look at it in a
18 minute. I mean, if you don't know, I can
19 show you.
20        The next bullet point actually
21 says: Specifically addressed concerns with
22 United Prescription Services, a current
23 customer of McKesson's.
24        Do you see that?
25    A.    Yes, I see that.

## Page 111

1    Q.    And we do know that was covered
2 in the September 1, 2005 meeting, right?
3    A.    Agreed.
4    Q.    Their concerns about that
5 pharmacy?
6    A.    Agreed.
7    Q.    Okay. It continues: On
8 October 6, 2005, Mr. Mapes called Mr. Gilbert
9 to discuss comments the E-Commerce Section
10 had received that McKesson Corp. was not
11 taking the Internet pharmacy problem
12 seriously. Mr. Mapes was assured by
13 Mr. Gilbert that McKesson Corp. was taking
14 the matters seriously and working to change
15 their procedures.
16        Do you see that?
17    A.    Yes, I see that.
18    Q.    Who is Mr. Gilbert?
19    A.    Outside counsel.
20    Q.    So he's you guys' lawyer,
21 right?
22    A.    Correct.
23    Q.    Okay. And that's on October
24 5th.
25        And the next entry is on

## Page 112

1 October 10. It says: On October 10, 2005, a
2 DEA investigator from the Tampa District
3 Office contacted Bill Mahoney at the McKesson
4 Distribution Center in Lakeland, Florida, and
5 expressed concerns of hydrocodone sales to
6 United Prescription Services.
7        Do you see that?
8    A.    I see that.
9    Q.    Okay. Then the next entry
10 says: The E-Commerce Section retrieved ARCOS
11 data which revealed that between October 10
12 and October 21, 2005, the following alleged
13 Internet pharmacies received the identified
14 quantities of hydrocodone.
15        And then there's one, two,
16 three, four, five, six pharmacies listed,
17 right?
18    A.    Yes, that's what's listed here.
19    Q.    Okay. And for this 11-day
20 period, it's noted in this letter that United
21 Prescription Services received 252,100 dosage
22 units of hydrocodone from McKesson, right?
23        MR. EPPICH: Object to the
24     form. Foundation.
25    A.    That's what's stated on the

## Page 113

1 document.
2 QUESTIONS BY MR. BOGLE:
3    Q.    Okay. And that Universal Rx
4 received 254,700 dosage units during this
5 11-day period from McKesson of hydrocodone,
6 right? That's what the letter states.
7        MR. EPPICH: Object to the form
8     and foundation.
9    A.    That's listed on this letter,
10 yes.
11 QUESTIONS BY MR. BOGLE:
12    Q.    Okay. And that Bi-Wise
13 Pharmacy received 158,400 dosage units of
14 hydrocodone during this 11-day period, from
15 McKesson, right?
16        MR. EPPICH: Object to the
17     form; foundation.
18 QUESTIONS BY MR. BOGLE:
19    Q.    That's what the letter states.
20    A.    That's what the letter states.
21    Q.    The letter also states that
22 Avee Pharmacy received 220,200 dosage units
23 of hydrocodone from McKesson in this 11-day
24 period, right?
25        MR. EPPICH: Object to the

Case 3:17-cv-01362 Document 1075-13 Filed 10/09/19 Page 90 of 139 PageID #: 46399
Case 1:17-md-02804 Doc #: 3075-17 Filed: 12/19/19 Page 9 of 19. PageID #: 463913
Highly Confidential - Subject to Further Confidentiality Review

Page 114

1     form; foundation.
2 QUESTIONS BY MR. BOGLE:
3     Q.   That's what the letter states.
4     A.   That's what the letter states.
5     Q.   The letter also states that
6 Medipharm Rx received 500,900 dosage units of
7 hydrocodone in 11 days from McKesson, right?
8     MR. EPPICH: Object to the
9     form; foundation.
10    A.   That's what the letter states.
11 QUESTIONS BY MR. BOGLE:
12    Q.   And finally, Accumed Pharmacy
13 received 404,400 dosage units of hydrocodone
14 from McKesson in 11 days, right?
15     MR. EPPICH: Object to the form
16     and foundation.
17    A.   That's what the letter states.
18 QUESTIONS BY MR. BOGLE:
19    Q.   It continues thereafter and
20 says: Mr. Rannazzisi then addressed the
21 representatives of McKesson Corp. and
22 informed them that it was his concerted
23 opinion based on the information presented,
24 the DEA needed to ask for the surrender of
25 McKesson's Lakeland Distribution Center

Page 115

1 registration or DEA would pursue an Order to
2 Show Cause against the DEA registration of
3 the McKesson facility in Lakeland, Florida.
4     Do you see that?
5    A.   Yes, I see that.
6    Q.   So having a DEA registration
7 surrendered or having an Order to Show Cause
8 brought against a distribution center, those
9 are serious enforcement actions, right?
10     MR. EPPICH: Object to the
11     form.
12    A.   They are serious.
13 QUESTIONS BY MR. BOGLE:
14    Q.   Okay. And in fact, the DEA did
15 file for an Order to Show Cause against
16 Lakeland after this point in time, right?
17    A.   Yes, they did.
18    Q.   Okay. Continuing on down in
19 this letter, I'm skipping that paragraph and
20 going to the next one that says, "Through the
21 course of the above."
22     Do you see that?
23    A.   Yes, I see that.
24    Q.   It says: Through the course of
25 the above discussion, McKesson Corp., by

Page 116

1 their own admission, was unable to provide a
2 plausible explanation for the sale of over
3 2 million dosage units of hydrocodone in a
4 21-day period to pharmacies previously
5 identified by DEA to McKesson Corp.
6     Do you see that?
7    A.   Yes, I see that.
8    Q.   Okay. And then the last
9 paragraph on the bottom of this page
10 references you and says: After the
11 conclusion of this meeting, it was learned
12 from Gary Hilliard of McKesson Corp. that one
13 of the reasons they were not able to realize
14 the full volume of hydrocodone product going
15 out to the Florida pharmacies was that their
16 reports only included the name brand
17 hydrocodone products distributed and was
18 not -- and was leaving out the generic
19 products. It was only after realizing that
20 the generic were not being reported was
21 McKesson Corp. then able to see the large
22 quantities that DEA was bringing to
23 McKesson's attention.
24     Do you see that?
25    A.   Yes, I see that.

Page 117

1    Q.   Okay. And you recall making
2 that statement to somebody at the DEA that
3 after the meeting, you recognized that the
4 reports you guys ran to track controlled
5 substances purchases like this weren't
6 picking up the generic products?
7     MR. EPPICH: Object to the
8     form.
9    A.   That's my recollection.
10 QUESTIONS BY MR. BOGLE:
11    Q.   That is your recollection?
12 Okay.
13     And what sort of report were
14 you referring to?
15    A.   I don't recall the report, but
16 it was based on item number or SKU number, so
17 the identification of the items left out the
18 generic items because it was in error.
19    Q.   Okay. So was the report for
20 these pharmacies in Florida run any
21 differently than the reports for any other
22 pharmacies around the country in tracking
23 hydrocodone purchases?
24     MR. EPPICH: Object to the
25     form. Calls for speculation.

Page 146

1  QUESTIONS BY MR. BOGLE:
2      Q.   Okay.  And what I've handed
3  you, sir, is another document produced to us
4  by McKesson related to this Order to Show
5  Cause proceeding.  And you see there's a
6  government exhibit sticker number 38 for this
7  one.
8           Do you see that at the bottom?
9      A.   Yes, I see that.
10     Q.   Okay.  And so this data, I'll
11 represent to you, matches up with their
12 exhibit numbers they list in the Order to
13 Show Cause pleadings we just looked at, okay?
14     A.   Okay.
15     Q.   If you have any reason to
16 disagree with me, let me know.  But I looked
17 at it.
18          And so if you look here, this
19 actually has McKesson hydrocodone sales for
20 October 1, 2005 through January 31, 2006.
21          Do you see that?
22     A.   Yes, I see that.
23     Q.   And there's a pie chart there,
24 right?
25     A.   Yes, I see that.

Page 147

1      Q.   And so, for example, for Avee
2  Pharmacy, it notes 1,754,800 doses during
3  this October 1, 2005 to January 31, 2006
4  period of time for McKesson hydrocodone
5  sales.
6           Do you see that?
7           MR. EPPICH:  Object to the
8      form.  Misstates the document.
9      A.   I see what's stated on the
10 document.
11 QUESTIONS BY MR. BOGLE:
12     Q.   Okay.  Do you have any reason
13 to think that's not what that's referring to?
14     A.   I don't know enough about this
15 document to know otherwise.
16     Q.   Okay.  And it lists there for
17 example, as well, Medipharm, 1,252,000 doses
18 of hydrocodone from October 1, 2005 to
19 January 31, 2006.
20          Do you see that in the chart?
21     A.   Yes, I see it on the chart.
22     Q.   And, for example, if you go to
23 the second page here, so further discussion
24 on this, and they actually compared these
25 seven pharmacies to 299 other pharmacies.

Page 148

1           Do you see the data there?
2           MR. EPPICH:  Objection to form.
3      Foundation.
4      A.   I see what's stated.
5  QUESTIONS BY MR. BOGLE:
6      Q.   Okay.  And that chart is titled
7  McKesson Hydrocodone distributions October 1,
8  2005 through January 31, 2006.
9           Do you see that title?
10          MR. EPPICH:  Objection to form;
11     foundation.
12     A.   I see what's stated on the
13 document.
14 QUESTIONS BY MR. BOGLE:
15     Q.   Okay.  And there's a sum of
16 dosage units, and for 299 other pharmacies
17 the DEA lists 10,767,050 doses of hydrocodone
18 for 299 pharmacies, right?
19          MR. EPPICH:  Objection to the
20     form.
21 QUESTIONS BY MR. BOGLE:
22     Q.   That's the data provided here.
23          MR. EPPICH:  Objection,
24     foundation.
25     A.   That's what's stated on the

Page 149

1  document.
2  QUESTIONS BY MR. BOGLE:
3      Q.   Okay.  And they compare that to
4  these other seven pharmacies, and just doing
5  the rough math for these other seven
6  pharmacies during this three-month period in
7  time, four-month period in time, there's
8  almost 7 million doses of hydrocodone to
9  these seven pharmacies, right?  As compared
10 to these 299 other pharmacies.
11          MR. EPPICH:  Object to form;
12     foundation.
13 QUESTIONS BY MR. BOGLE:
14     Q.   You see that math, right?
15          MR. EPPICH:  Object to form;
16     foundation.
17     A.   I see what's listed on the
18 document.
19 QUESTIONS BY MR. BOGLE:
20     Q.   Okay.  And that's the math,
21 right?
22          MR. EPPICH:  Object to the form
23     and foundation.
24     A.   I see what's written on the
25 document for the total.

Page 150

1  QUESTIONS BY MR. BOGLE:
2      Q.  Okay.  And the grand total is
3  17,136,250, which counts the 299 pharmacies
4  plus the other seven pharmacies subject to
5  the Order to Show Cause, right?
6          MR. EPPICH:  Objection,
7      foundation.
8      A.  I see what's stated on the
9  form.
10 QUESTIONS BY MR. BOGLE:
11     Q.  And that's what's stated,
12 right?
13     A.  That's what's listed on the
14 form.
15     Q.  Okay.  Have you ever reviewed
16 this exhibit before?
17     A.  In the preparing,
18 pre-deposition.
19     Q.  Okay.  And while you guys were
20 getting ready for the Order to Show Cause
21 hearing, I didn't see it in the pleadings --
22 let me know if you see it anywhere -- was
23 there any submission by McKesson saying this
24 data is wrong that the DEA is submitting here
25 that I just reviewed with you?

Page 151

1          MR. EPPICH:  Object to form;
2      foundation.  Calls for speculation.
3      A.  I don't know anything about it.
4  QUESTIONS BY MR. BOGLE:
5      Q.  Okay.  Well, again, you've got
6  the pleadings in front of you.  If you happen
7  to see anything that shows that you guys
8  contested that -- I didn't find anything.  If
9  you find anything that shows that you guys
10 contested that, let me know during the
11 deposition, okay?
12         MR. EPPICH:  Object to the
13     form; calls for speculation.
14 QUESTIONS BY MR. BOGLE:
15     Q.  And these seven pharmacies
16 during this period of time, late October
17 to -- '05 -- strike that.
18         These pharmacies from October
19 '05 to January '06 were also some of the
20 biggest purchasing pharmacies for hydrocodone
21 in the country, right?
22         MR. EPPICH:  Objection,
23     foundation.
24 QUESTIONS BY MR. BOGLE:
25     Q.  You know that, don't you?

Page 152

1          MR. EPPICH:  Foundation, calls
2      for speculation.  Form.
3      A.  I don't know.
4  QUESTIONS BY MR. BOGLE:
5      Q.  Never heard that before?
6          MR. EPPICH:  Objection, form.
7      Calls for speculation.
8      A.  I don't recall.
9  QUESTIONS BY MR. BOGLE:
10     Q.  Okay.  Let me hand you another
11 DEA exhibit for the Order to Show Cause
12 hearing marked as Exhibit 10, which is
13 1.1951, Bates number is MCKMDL00496536.
14         THE REPORTER:  10?
15         MR. BOGLE:  Did I skip one?
16     I'm sorry, let me get that number
17     back.  I may have skipped -- missing
18     some stickers here.  Oh, I buried it.
19     Okay.  Sorry.
20         (McKesson-Hilliard Exhibit 8
21     was marked for identification.)
22 QUESTIONS BY MR. BOGLE:
23     Q.  So it's actually Exhibit 8 is
24 Exhibit 1.1951, so correcting the number.
25 Same document, just correcting the exhibit

Page 153

1  number.
2          Okay.  And this again has a
3  government exhibit number, number 3.  You see
4  that stamp on there?
5      A.  Yes, I see that.
6      Q.  Okay.  And this document is
7  titled Pharmacy Rankings for Hydrocodone,
8  October 1, 2005 to January 31, 2006.
9          Do you see that?
10     A.  Yes, I see that.
11     Q.  Okay.  And again, it lists
12 these same seven pharmacies that we've been
13 talking about, right?
14         MR. EPPICH:  Object to the
15     form; foundation.
16     A.  I see what's listed here.
17 QUESTIONS BY MR. BOGLE:
18     Q.  Which is the names of the same
19 seven pharmacies, right?
20         MR. EPPICH:  Objection to the
21     form; foundation.
22     A.  They appear to be the same
23 names.
24 QUESTIONS BY MR. BOGLE:
25     Q.  Okay.  And, for example, if we

Page 174

1  dates for each of these, right?
2      A.   Yes, there is.
3      Q.   And you invoice at the time of
4  sale, right?
5           MR. EPPICH:  Objection;
6      foundation, calls for speculation.
7      A.   I don't recall if it was the
8  time of sale or date of shipment.
9  QUESTIONS BY MR. BOGLE:
10     Q.   Or of shipment, okay.
11     A.   Shipment date.
12     Q.   All right.  So, for example,
13 what we've got here as Exhibit 10 is, I
14 believe, about 600-plus pages of what
15 McKesson deemed for this month to be
16 suspicious Schedule II or Schedule III
17 controlled substance orders, right?
18          MR. EPPICH:  Objection to the
19     form.
20     A.   These are what showed up on our
21 suspicious order report as -- and then
22 reported to the DEA.
23 QUESTIONS BY MR. BOGLE:
24     Q.   Right.  But what the whole
25 purpose of this was, you're providing 600 --

Page 175

1  in this instance, 600-plus pages to the DEA
2  for this month of suspicious controlled
3  substance sales that McKesson had made from
4  the prior month, right?
5           MR. EPPICH:  Objection to the
6      form and the characterization.
7      A.   They were submitted for DEA to
8  review.  The report is titled "suspicious"
9  but it's orders that need to be reviewed and
10 they were supplied to DEA for review.
11 QUESTIONS BY MR. BOGLE:
12     Q.   Okay.  So let me make sure I
13 understand that.  So when these reports would
14 have been submitted to the DEA, it was not
15 the intent of the regulatory department for
16 the conclusion to be drawn that McKesson
17 believed these were suspicious orders.  Is
18 that true?
19          MR. EPPICH:  Object to the
20     form; calls for speculation.
21     A.   This was part of the Suspicious
22 Order Task Force.  This was the format for
23 which industry came to the conclusion to
24 provide this information to the DEA and DEA
25 was good with it.  There was DEA inspections

Page 176

1  that had occurred in our facilities and there
2  was never an issue with that.  So this is the
3  format for which the original documentation
4  was supplied to DEA.
5           MR. BOGLE:  I move to strike as
6      nonresponsive.
7  QUESTIONS BY MR. BOGLE:
8      Q.   My question was simply that
9  during the time that you were with McKesson
10 in the regulatory department, was it your
11 understanding that the intent was when a DU45
12 report like the one we're looking at here was
13 supplied to the DEA, was that -- was that
14 intended to or not intended to be what
15 McKesson deemed to be suspicious orders from
16 the prior month?
17          MR. EPPICH:  Object to the
18     form.  It calls for speculation; asked
19     and answered.
20     A.   Yeah.  Again, it was -- this is
21 what needed to be reviewed.  This was not
22 specifically a suspicious order.
23 QUESTIONS BY MR. BOGLE:
24     Q.   Okay.  So the view during this
25 time period when DU45s were used were that

Page 177

1  this is not specifically a suspicious order
2  report.  Am I understanding you right?
3           MR. EPPICH:  Object to the
4      form.  Misstates prior testimony.
5  QUESTIONS BY MR. BOGLE:
6      Q.   If I'm misstating it, let me
7  know.  I'm trying to understand.
8      A.   The title was Suspicious Order
9  Report or Suspicious Purchase Report, but
10 this -- with the vast quantity of orders that
11 are conducted on a daily and nightly basis,
12 this provides a threshold for which to
13 review.
14          And so reviews would be
15 conducted nightly on the reports and they'd
16 be flagged and then submitted to the DEA, and
17 then the report in its entirety would be
18 provided to the DEA on a monthly basis.  So
19 they would have all this information.
20     Q.   Right.  I'm asking about from
21 McKesson's perspective, though, not DEA's
22 perspective.  So from McKesson's perspective
23 as you understood it in the regulatory
24 department -- strike that, let me make it
25 even easier.

Case 3:17-cv-01362-D Document 3075-13 Filed 10/09/20 Page 48 of 90 PageID #: 46403
Case 1:17-md-02804-DAP Doc #: 3025-13 Filed: 10/16/19 Page 48 of 90 PageID #: 464317
Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    MR. EPPICH: Object to the
2    form. Calls for a legal conclusion.
3    A.   I don't know what each of them
4 did after they conducted that report to the
5 DEA. I don't know what they kept on file.
6 There was a notification log for
7 documentation that they did maintain.
8 QUESTIONS BY MR. BOGLE:
9    Q.   Okay. So, again, so to the
10 extent that was done, there should be a log
11 out there that shows it was done, right?
12    MR. EPPICH: Object to the
13    form. Calls for speculation.
14    A.   Part of the SOP was for them to
15 fill out a log whenever they made contact to
16 DEA.
17 QUESTIONS BY MR. BOGLE:
18    Q.   Okay. So going back to the
19 question I asked a couple minutes ago, in
20 2007, the DEA specifically notified
21 McKesson's regulatory department that the
22 DU45 report, in its view, was not sufficient
23 to satisfy the requirements of reporting
24 suspicious orders, right?
25    MR. EPPICH: Object to the

Page 187

1    form. Calls for speculation.
2    A.   I don't recall the exact
3 verbiage of what was requested.
4 QUESTIONS BY MR. BOGLE:
5    Q.   Okay. Do you remember any
6 discussion along those lines, that the DU45
7 wasn't gonna cut it?
8    MR. EPPICH: Object to the form
9    and the characterization.
10    A.   I don't recall exactly what was
11 requested.
12 QUESTIONS BY MR. BOGLE:
13    Q.   Okay.
14    (McKesson-Hilliard Exhibit 11
15    was marked for identification.)
16 QUESTIONS BY MR. BOGLE:
17    Q.   I'm going to hand you what I'm
18 marking as Exhibit 1.1823, which is
19 Exhibit 11 to your deposition, and that's
20 MCKMDL00574906. And this is titled Summary
21 of DEA-HDMA Meeting on Suspicious Orders,
22 Meeting Date: September 7, 2007.
23    Do you see that?
24    A.   Yes, I see that.
25    Q.   And you would have been a

Page 188

1 member of HDMA at this point in time, right?
2    A.   I was a member during this
3 time.
4    Q.   Okay. What does HDMA stand
5 for?
6    A.   Healthcare Distribution
7 Management Association.
8    Q.   And again, that was y'all's
9 trade association, right?
10    A.   That's correct.
11    Q.   Okay. So looking at this
12 document, it notes that there are attendees
13 at this meeting from both HDMA and DEA,
14 right, at the top?
15    A.   Yes, that's what's stated.
16    Q.   And one of the DEA attendees is
17 a person we talked about before, Mr. Mike
18 Mapes, right?
19    A.   Yes, it is.
20    Q.   Okay. And if you go to the
21 second page of this document, the top bullet
22 point says: DEA also does not want to
23 receive suspicious order reports that merely
24 reflect volumes that went over a threshold;
25 they wanted reports that are "true"

Page 189

1 suspicious orders. Similarly, they do not
2 want to receive what they called "excessive
3 purchase" reports which had been used in the
4 past.
5    Do you see that?
6    A.   I see that.
7    Q.   Okay. And were you aware of
8 this discussion that went on with your trade
9 association and DEA in September 2007?
10    A.   I recall that there was a
11 meeting.
12    Q.   Okay. And so this information
13 I just read to you about the DEA's
14 expectations, that would have been conveyed
15 to you and your regulatory team, right?
16    MR. EPPICH: Object to the
17    form. Misstates prior testimony.
18    A.   I don't recall specifically
19 receiving it, but it is likely that I did.
20 QUESTIONS BY MR. BOGLE:
21    Q.   Okay. And I think I can
22 represent to you this came out of McKesson's
23 files, so at least somebody at McKesson got
24 this.
25    And so what they're referencing

Page 206

1  Q.  Okay. And you know that they
2  were specifically talking about the DU45
3  report, right?
4      MR. EPPICH: Objection,
5      foundation.
6  QUESTIONS BY MR. BOGLE:
7  Q.  It's referenced by name, isn't
8  it?
9      MR. EPPICH: Objection,
10     foundation.
11 A.  I believe it was stated in the
12 e-mail trail.
13 QUESTIONS BY MR. BOGLE:
14 Q.  All right. So now that you
15 have a chance to review the full context of
16 this entire e-mail chain, do you agree or
17 disagree with Mr. Gustin's following
18 statement: Simply reporting
19 larger-than-usual orders does not, when there
20 are so many plausible and routine reasons for
21 orders to be larger than normal -- and "does
22 not," he's referring to meeting the spirit
23 and letter of the regulation for reporting
24 suspicious orders.
25     Agree or disagree or no opinion

Page 207

1  on Mr. Gustin's statement there?
2      MR. EPPICH: Objection to the
3      form; calls for a legal conclusion.
4  A.  I don't have an opinion on
5  his -- on his statement.
6  QUESTIONS BY MR. BOGLE:
7  Q.  Okay. And I looked to see if
8  you responded with disagreement to the
9  statement. I didn't find anything. Do you
10 have any specific recollection of you
11 disagreeing with his statement here?
12     MR. EPPICH: Objection to the
13     form. Calls for speculation.
14 A.  I don't recall the specifics of
15 this e-mail.
16 QUESTIONS BY MR. BOGLE:
17 Q.  Okay. Again, I think my
18 question is different than that.
19     Do you have a specific
20 recollection of disagreeing with his e-mail
21 in writing?
22     MR. EPPICH: Objection to the
23     form.
24 A.  I do not have a recollection of
25 reviewing this e-mail or making a response to

Page 208

1  the e-mail.
2      MR. BOGLE: Okay. I'm going to
3      something else, so if you want to take
4      it now or I can plug along if you
5      want.
6      MR. EPPICH: That's fine, let's
7      take a lunch.
8      THE VIDEOGRAPHER: Off the
9      record at 12:31.
10     (Recess taken, 12:31 p.m. to
11     1:17 p.m.)
12     THE VIDEOGRAPHER: Stand by.
13     The time is 1:17 p.m. Back on the
14     record, beginning of File 4.
15 QUESTIONS BY MR. BOGLE:
16 Q.  All right, Mr. Hilliard. Just
17 to reorient ourselves here, earlier in the
18 deposition, you recall discussing with me the
19 DEA's investigation of the Lakeland
20 distribution center regarding distribution of
21 hydrocodone to seven Florida pharmacies?
22 A.  That's correct.
23 Q.  Okay. And you're aware after
24 that investigation, the DEA also began
25 investigating some other distribution centers

Page 209

1  within McKesson as to their distribution of
2  opioids?
3      MR. EPPICH: Object to the
4      form.
5  A.  Yes. There was additional
6  investigations.
7  QUESTIONS BY MR. BOGLE:
8  Q.  Okay. And ultimately those
9  investigations culminated in McKesson
10 entering into a settlement agreement with the
11 DEA in 2008, right?
12     MR. EPPICH: Object to the
13     form.
14 A.  There was a settlement
15 agreement in 2008.
16 QUESTIONS BY MR. BOGLE:
17 Q.  Okay. And you're aware that
18 occurred, right? That a settlement occurred
19 in 2008?
20 A.  Yes, I am.
21 Q.  Okay. And you're aware that
22 settlement pertained to allegations from the
23 DEA that McKesson violated the Controlled
24 Substances Act in distributing opioids from
25 several of its distribution centers, right?

Page 210

1  A.  Correct.
2  Q.  Okay.  Have you seen the
3  settlement agreement itself?
4  A.  I have seen it at one time.
5  Q.  Okay.  All right.  I'm going to
6  hand you what I'm marking as Exhibit 13,
7  which is also 1.889, and that's
8  MCKMDL00337001.
9       (McKesson-Hilliard Exhibit 13
10      was marked for identification.)
11 QUESTIONS BY MR. BOGLE:
12 Q.  Here you go, sir.
13      Okay.  What I've just handed
14 you, Mr. Hilliard, as Exhibit 13 is titled at
15 the top Settlement and Release Agreement and
16 Administrative Memorandum Agreement dated in
17 the first paragraph May 2nd, 2008.
18      Do you see that?
19 A.  Yes, I see that.
20 Q.  Okay.  And do you recognize
21 this to be the settlement agreement we just
22 referenced from 2008?
23 A.  Yes.
24 Q.  Okay.  And if we'd go
25 specifically to -- let's see, my page numbers

Page 211

1  are different here.  There's an Appendix B
2  about halfway through the document that
3  starts the actual settlement agreement.  Do
4  you see where I'm at there?  Sorry, my page
5  numbers don't match yours on this so I can't
6  give you a specific number.  I'm sorry, I
7  would if I could.  For reason -- but that's
8  what the page looks like right there.
9       MR. EPPICH:  I think it's on
10      Bates 337012.
11 QUESTIONS BY MR. BOGLE:
12 Q.  It says Appendix B at the top
13 left, Settlement Agreement at the top middle.
14      See where I'm at?
15 A.  Found it.
16 Q.  All right.  So this starts the
17 actual settlement agreement itself.  So I
18 want to go to the next page that talks about
19 the covered conduct in the agreement, which
20 is number 8 in the middle of the page.
21      Do you see where I'm at?
22 A.  Yes, I do.
23 Q.  Okay.  And A there says:
24 Within the District of Maryland:  From
25 January 2005 through October 2006,

Page 212

1  McKesson-Landover sold approximately
2  3 million dosage units of hydrocodone to
3  NewCare Pharmacy in Baltimore, and failed to
4  report these sales as suspicious orders to
5  DEA when discovered, as required by and in
6  violation of -- and then it lists the C.F.R.
7  and the U.S.C.
8       And then it says:  Further,
9  from August 2006 to February 2007,
10 McKesson-Landover sold large quantities of
11 phentermine-based products to Smeeta Pharmacy
12 in Highland, Maryland, and failed to report
13 these sales as suspicious orders to DEA when
14 discovered, as required by and in violation
15 of -- and again it lists the statutes.
16      Do you see where I'm reading
17 there?
18 A.  I see that.
19 Q.  Okay.  Were you involved at all
20 in investigating whether the allegations the
21 DEA was making here were accurate or not?
22 A.  Not that I recall.
23 Q.  Okay.  Then if you see in
24 section B, and I wasn't going to read this
25 whole section but you can look at it here for

Page 213

1  yourself, this talks about the conduct that
2  we actually covered for the seven
3  pharmacies -- seven Florida pharmacies that
4  were handled by the Lakeland distribution
5  center, right?
6  A.  Yes.  It's listed here.
7  Q.  And that's the same conduct we
8  talked about before, right?  That's what they
9  discuss here.
10 A.  Yes.
11 Q.  Okay.  And then in letter C:
12 Within the Southern District of Texas, it
13 says:  From February to September 2007,
14 McKesson-Conroe sold approximately 2.6
15 million dosage units of hydrocodone to
16 Mercury Drive Pharmacy and Maswoswe's
17 Alternative Pharmacy and failed to report
18 these sales as suspicious orders to DEA when
19 discovered, as required by and in violation
20 of -- and again it lists the statutes.
21      You see that there?
22 A.  I see that.
23 Q.  And on the next page, it
24 continues with letters D, E and F.  Letters D
25 involve allegations of large quantities of

Page 214

1  hydrocodone sent to three Colorado pharmacies
2  out of the McKesson-Aurora distribution
3  center from September 2005 to November 2007,
4  right?
5      A.    I see that.
6      Q.    E involves McKesson-Salt Lake
7  and distribution of 824,000 units of
8  hydrocodone, oxycodone, fentanyl and
9  methadone to the Blackfeet Clinic in
10 Browning, Montana from January 2005 to
11 October 2007.
12           Do you see that?
13     A.    I see that.
14     Q.    Okay.  And then finally, there
15 is, from McKesson-West Sacramento,
16 allegations of theft or significant loss of
17 controlled substances on 28 separate
18 occasions that were not reported timely to
19 the DEA.
20           Do you see that?
21     A.    I see that.
22     Q.    Okay.  And you know that for
23 this covered conduct, there was a fine paid
24 of $13.25 million by McKesson, right?
25     A.    Correct.

Page 215

1      Q.    Okay.  And as a result of these
2  investigations by DEA in 2005 and 2006, in
3  addition to entering the settlement
4  agreement, McKesson modified its Suspicious
5  Order Monitoring Program to shift to the
6  Lifestyle Drug Monitoring Program, right?
7          MR. EPPICH:  Object to the
8      form.  Calls for speculation.
9      A.    The Lifestyle Drug Monitoring
10 Program was developed in the 2007 time frame.
11 QUESTIONS BY MR. BOGLE:
12     Q.    Okay.  We'll take a look at a
13 few things related to the LDMP -- you're okay
14 with me calling it LDMP?
15     A.    Please.
16     Q.    Okay.  I think we're talking
17 about the same thing there.
18           All right.  So I'm going to
19 hand you what I'm marking as Exhibit 1.1830,
20 which is Exhibit 14 to your deposition, and
21 that is, for those keeping track of these
22 things, MCKMDL00403340.
23           (McKesson-Hilliard Exhibit 14
24     was marked for identification.)
25              --oOo--

Page 216

1  QUESTIONS BY MR. BOGLE:
2      Q.    There's yours, sir, and there's
3  yours.
4           All right.  I've handed you a
5  PowerPoint deck titled Lifestyle Drugs &
6  Internet Pharmacies.
7           Do you see that?
8      A.    I see that.
9      Q.    Okay.  And it's noted to be, in
10 the slide at the far right there, it says
11 National Operations Conference 2007.
12          Do you see that reference?
13     A.    I see that.
14     Q.    Okay.  Have you seen this slide
15 deck before?
16     A.    I have seen it before.
17     Q.    Okay.  And it's noted to be
18 created by Donald Walker, who we've talked
19 about a little bit earlier, right?
20     A.    That's correct.
21     Q.    Okay.  And if you go here to
22 page .3, there's a slide on this PowerPoint
23 deck titled Public Health Issues.
24          Do you see where I'm at?
25     A.    I see that.

Page 217

1      Q.    Okay.  The first bullet point
2  there says:  Abuse of prescription drugs has
3  risen 66% since 2000.
4           Do you see that reference?
5      A.    I see it.
6      Q.    And the third bullet point
7  says:  Opioid painkillers kill more than
8  cocaine and heroin combined.
9           Do you see that as well?
10     A.    I see that.
11     Q.    Okay.  Do you know in what
12 context this information was presented, like
13 where it was presented?
14     A.    It was an operations
15 conference.  I don't recall if I was there or
16 not.  I was not always invited to them, but I
17 could have been there.
18     Q.    And then if we go to the next
19 page, page .4, it says DEA Focus is the title
20 of this slide.
21          Do you see where I'm at?
22     A.    I see that.
23     Q.    Okay.  And it says -- you see
24 where it says, "DEA expects"?
25     A.    I see it.

Page 278

1 form; misstates prior testimony.
2  A. No.
3  MR. EPPICH: Assumes facts not
4 in evidence.
5  A. No, I do not recall ever having
6 any conversations of that nature.
7 QUESTIONS BY MR. BOGLE:
8  Q. Okay. I'm going to hand you
9 what I'm marking as Exhibit 23, which is
10 1.1804, and that's MCKMDL00543971.
11  (McKesson-Hilliard Exhibit 23
12  was marked for identification.)
13 QUESTIONS BY MR. BOGLE:
14  Q. There you go, sir.
15  All right. Let's start at the
16 last page of the document, .3. There's an
17 e-mail at the bottom from you, October 23,
18 2006, to a Sharon Mackarness.
19  Do you see that?
20  A. I see that.
21  Q. Okay. There you say: McKesson
22 will establish a monthly threshold of 10,000
23 dosage forms of hydrocodone for all customers
24 at each of its facilities. Customers
25 requesting to purchase more than this amount

Page 279

1 will be required to provide additional
2 information on its dispensing practices to
3 justify amounts above this threshold. Such
4 information will be reviewed by McKesson
5 Regulatory Affairs before a customer will be
6 authorized to purchase more than 10,000
7 dosage forms per month. McKesson will also
8 establish thresholds for other controlled
9 substances purchases.
10  Do you see that e-mail?
11  A. I see that.
12  Q. Okay. So then if you go to
13 page .2, I'm looking at the e-mail from
14 Sharon Mackarness back to you, October 26,
15 2006, at 3:44 p.m.
16  Do you see that?
17  A. Yes, I see that.
18  Q. Okay. The second paragraph she
19 says to you: JB -- JD brought up a valid
20 point in the meeting. We are in the business
21 to sell product. If we could produce a
22 report (you may already have one) that warned
23 a customer's approach to the threshold, say
24 at 85% of their 10,000 dosages, work could
25 begin on justifying an increase in threshold

Page 280

1 prior to any lost sales.
2  Do you see that?
3  A. I see that.
4  Q. Okay. And do you see your
5 response above in the second sentence in your
6 next e-mail, and what is that?
7  A. "I think JD's idea is good."
8  Q. Okay. And that's the idea
9 you're referencing, the one I just read
10 about, right?
11  A. The one stated in Sharon's
12 e-mail, yes.
13  Q. Right, okay. Which talks about
14 being in the business to sell product and
15 coming up with a threshold warning style
16 report that would allow customers to justify
17 an increase prior to McKesson losing sales,
18 right?
19  A. That's what's stated, yes.
20  Q. Okay.
21  MR. EPPICH: Are you at a good
22 place to take another break?
23  MR. BOGLE: Yeah, I was
24 actually about to say the same thing.
25 You read my mind.

Page 281

1  MR. EPPICH: Let's go ahead and
2 go off the record.
3  THE VIDEOGRAPHER: Off the
4 record at 2:34.
5  (Recess taken, 2:34 p.m. to
6 2:50 p.m.)
7  THE VIDEOGRAPHER: Stand by.
8 The time is 2:50. Back on the record,
9 beginning of File 5.
10 QUESTIONS BY MR. BOGLE:
11  Q. All right, Mr. Hilliard. You
12 recall earlier in the deposition we talked
13 about the PowerPoint that was presented by
14 Mr. Mapes at the September 1, 2005 meeting
15 with McKesson? Do you recall discussing that
16 generally?
17  A. Yes, I do.
18  Q. Okay. If we can pull that back
19 out, which I believe is Exhibit 4, and I want
20 to go back to page .9. We talked about this
21 a little bit before, but that bottom slide
22 there titled Suspicious Orders, the last
23 bullet point says: Report suspicious orders
24 to DEA when discovered.
25  Do you see that?

Page 294

1 There was some collaboration or
2 agreement that took place whereas we were
3 sending information directly to DEA based on,
4 I think, the agreement from 2008.
5   Q.   But if you go down to your
6 e-mail, your first e-mail response towards
7 the bottom of the first page, you
8 specifically say:  If a transaction/order is
9 suspicious, we're not to fulfill the order,
10 thus nothing to transmit.
11       Right?
12  A.   That was the discussion point.
13  Q.   Right.  But that's exactly the
14 opposite of what Mr. Mapes told you
15 September 11, 2007, when he's saying
16 specifically to report suspicious orders.  To
17 stop the order, to block the order, and
18 report it, right?
19       MR. EPPICH:  Objection.
20 QUESTIONS BY MR. BOGLE:
21  Q.   You're saying here in the same
22 vein there would be nothing to transmit if
23 that happened.
24       MR. EPPICH:  Object to the
25   form.  Misstates the document.

Page 295

1  A.   This was developmental
2 discussions in regards to what -- what and
3 how things would populate on reports and
4 transmits, and I honestly don't recall the
5 specifics or the outcome of this other than
6 what we were discussing in this
7 communication.
8 QUESTIONS BY MR. BOGLE:
9  Q.   Okay.  But three -- more than
10 three years after this first presentation
11 from Mr. Mapes in September 2005, you guys
12 are now in August 2008 and you're still not
13 clear on how to report suspicious orders that
14 you didn't fill?  That's what this indicates,
15 right?
16       MR. EPPICH:  Object to the
17   form.  Calls for speculation,
18   misstates the document.
19  A.   I don't recall what all
20 additional conversations are outside of this
21 one e-mail communication.  But again, this
22 was our work that we were trying to work
23 towards obtaining a better program, which was
24 a CSMP program.
25       So this was just an element of

Page 296

1 that development and discussions on how to
2 get there, and, again, I don't know what else
3 was communicated.
4 QUESTIONS BY MR. BOGLE:
5  Q.   But when you go back to the top
6 e-mail that you wrote, you're actually
7 discussing the potential options of how you
8 might report a suspicious order, right?
9       MR. EPPICH:  Object to the
10   form.
11 QUESTIONS BY MR. BOGLE:
12  Q.   How you would even do that.
13       MR. EPPICH:  Object to the
14   form.  Misstates the document.
15  A.   Again, this is bouncing ideas
16 off of each other, coming up with development
17 on how these reports would work.
18 QUESTIONS BY MR. BOGLE:
19  Q.   I guess my question is simply
20 that we've looked at three documents from
21 September 2005 to September 2007 where
22 members of the DEA are expressing that
23 suspicious orders need to be blocked and
24 reported when they are blocked.
25       How could it be possible that

Page 297

1 three years later you guys still don't know
2 how to do that?
3       MR. EPPICH:  Object to the
4   form.  Misstates the document.
5   Argumentative.
6  A.   The process was difficult.  The
7 process took time.  It took time to
8 implement, it took time for development.
9       Again, this is just one piece
10 of that project review and trying to get to a
11 better program.
12 QUESTIONS BY MR. BOGLE:
13  Q.   Was it so complicated that it
14 took more than three years to develop how to
15 report a suspicious order if it's been
16 blocked?
17       MR. EPPICH:  Objection to the
18   form; misstates the document, assumes
19   facts not in evidence.
20  A.   Again, it took time for the
21 development.  We were working towards doing
22 the blocking of the transactions and this was
23 just part of that development process.
24 QUESTIONS BY MR. BOGLE:
25  Q.   Okay.  But, again, we looked at

Case 3:17-md-02804-DAP Doc #: 3075-13 Filed: 10/09/19 76 of 90. PageID #: 464023
Case 1:17-md-02804-DAP Document 3025-13 Filed: 12/06/19 Page 19 of 19 PageID #: 464323
Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  three documents; Exhibit 4, Exhibit 3, and
2  Exhibit 20, all where the DEA is saying make
3  a sales decision, block a sale, report
4  suspicious orders when they're blocked. Yet
5  we're looking now in August 2008 and you guys
6  still don't know how to do that, right?
7       MR. EPPICH: Objection to the
8    form; misstates the document, assumes
9    facts not in evidence, and asked and
10   answered.
11      A.  It took us until the
12  implementation of the CSMP in order to get
13  our systems to where they could appropriately
14  conduct the blocking.
15  QUESTIONS BY MR. BOGLE:
16      Q.  And the reporting, it appears
17  like, too, right? Because you're saying if
18  they block it, you thought in August 27, 2008
19  there would be nothing to transmit, no report
20  to make if you blocked it.
21      MR. EPPICH: Object to the
22   form. Misstates the document.
23  QUESTIONS BY MR. BOGLE:
24      Q.  Isn't that what you're saying
25  here?

Page 299

1       MR. EPPICH: Same objections.
2       A.  I don't recall the context of
3  this document.
4  QUESTIONS BY MR. BOGLE:
5       Q.  Okay. Well, I'm looking at
6  your own statement. I'm not asking you to
7  interpret anybody else's. You say, on
8  August 27, 2008, at 5:51 a.m.: If a
9  transaction/order is suspicious, we're not to
10 fulfill the order, thus nothing to transmit.
11      That's exactly what you said,
12 right?
13      MR. EPPICH: Objection to the
14   form; argumentative, asked and
15   answered, misstates the document.
16 QUESTIONS BY MR. BOGLE:
17      Q.  Did I read any of that
18 incorrectly?
19      A.  This was the discussion in 2008
20 10 years ago. I don't recall what all the
21 other discussions that were going on. This
22 was us working on the development process.
23      Q.  My question was simply did I
24 read any portion of that sentence wrong?
25      MR. EPPICH: Objection to the

Page 300

1    form.
2       A.  You read the e-mail.
3  QUESTIONS BY MR. BOGLE:
4       Q.  Correctly, right?
5       MR. EPPICH: Objection to the
6    form.
7       A.  You read the e-mail.
8  QUESTIONS BY MR. BOGLE:
9       Q.  I'm just asking if you think I
10 read something wrong there.
11      A.  Not that I'm aware of.
12      Q.  Okay. And even after this
13 discussion in August 2008, there were
14 systematic failures at McKesson in reporting
15 suspicious orders, weren't there?
16      MR. EPPICH: Objection to the
17   form; calls for speculation, assumes
18   facts not in evidence.
19      A.  Not that I recall.
20 QUESTIONS BY MR. BOGLE:
21      Q.  Okay. All right. Let me hand
22 you what I'm marking as Exhibit 25. It's
23 1.1443. It's also MCKMDL00409453.
24      (McKesson-Hilliard Exhibit 25
25   was marked for identification.)

Page 301

1  QUESTIONS BY MR. BOGLE:
2       Q.  You see what I've got here is a
3  letter from November 4, 2014, from the U.S.
4  Department of Justice, Drug Enforcement
5  Administration.
6       Do you see that?
7       A.  I see that.
8       Q.  And it's to a Geoffrey Hobart
9  at Covington & Burling.
10      Do you see that being the
11 recipient?
12      A.  I see that.
13      Q.  And the re: line is
14 Registration Consequences for McKesson
15 Corporation for Violations of the Controlled
16 Substances Act.
17      Do you see that reference?
18      A.  I see that.
19      Q.  Okay. Let's take a look at a
20 couple of things here in the letter. If
21 you'd go to the second page, and I'm looking
22 at the third paragraph here where it says:
23 That having been said, we remain concerned
24 that McKesson fails to appreciate the serious
25 and systemic nature of the CSA-related