# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 20 – Snider Tr. Excerpts

Highly Confidential - Subject to Further Confidentiality Review

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OHIO

3                EASTERN DIVISION

4

5    ---------------------------x

6    IN RE: NATIONAL PRESCRIPTION    ) Case No.

7    OPIATE LITIGATION               ) 1:17-MD-2804

8    APPLIES TO ALL CASES            ) Hon. Dan A. Polster

9    ---------------------------x

10        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11               CONFIDENTIALITY REVIEW

12

         VIDEOTAPED DEPOSITION OF BLAINE M. SNIDER

13

                   WASHINGTON, D.C.

14

             THURSDAY, NOVEMBER 8, 2018

15

                    8:34 A.M.

16

17

18

19

20

21

22

23

24    Reported by: Leslie A. Todd

Page 18

1    A    Blaine Matthew Snider.
2    Q    And am I correct that you're currently
3  employed with McKesson?
4    A    Yes.
5    Q    Okay.  And have you ever been deposed
6  before?
7    A    No.
8    Q    Okay.  Just a few basic ground rules
9  that might help both of us here today.  I'm going
10 to be asking you some questions, and if you don't
11 understand the question I ask or don't hear it,
12 it's perfectly okay for you to ask me to repeat or
13 rephrase the question.  Okay?
14   A    Okay.
15   Q    If you need a break at any point in
16 time, just let me know or your counsel know.
17 Happy to take a break whenever you need it.  All
18 I'd ask is if I've got a question pending, that
19 you answer that question, and then we can break
20 for whenever you want.
21        And also I'm going to ask you questions,
22 you're going to provide answers.  I'd ask that we
23 try not to talk over each other.  So I'll ask my
24 question, try to give you ample opportunity to

Page 19

1  answer before I ask my next question.  Is that
2  fair?
3    A    Okay.
4    Q    Okay.  And how long have you been with
5  McKesson?
6    A    Almost 40 years.
7    Q    Okay.  Am I correct that you currently
8  hold the director of operations position at the
9  New Castle Distribution Center?
10   A    Yes.
11   Q    Okay.  How long have you held that
12 specific position?
13   A    Eighteen -- eighteen years.
14   Q    Okay.  What was your job at McKesson
15 prior to that?
16   A    I was distribution center manager in
17 Sewickley, Pennsylvania, and North Canton, Ohio.
18   Q    Okay.  How long did you have that role?
19   A    About three years.
20   Q    How about prior to that?
21   A    I was operations manager in Cincinnati,
22 Ohio, and North Canton previous to that.
23   Q    How long did you hold that position?
24   A    Oh, I can't remember now.  Eight, ten

Page 20

1  years, I guess.
2    Q    Okay.  What was your job prior to that
3  at McKesson, just the title?
4    A    I started as a supervisor almost 40
5  years ago.
6    Q    Okay.  So would it be fair to say, just
7  doing the rough math here, that you have nearly 30
8  years of experience as a distribution center
9  operations manager at McKesson?
10   A    Yes.
11   Q    Okay.  Now, McKesson itself as an entity
12 has, as I understand it, 37 distribution centers
13 around the country; is that right?
14       MR. COLLINS:  Objection to the form.
15       THE WITNESS:  I can't answer to -- it
16 sounds like you're including med-surg or something
17 else.  I know there's 28 distributions centers for
18 U.S. pharma.
19 BY MR. BOGLE:
20   Q    Okay.  And New Castle is one of those 28
21 distribution centers for U.S. pharma, correct?
22   A    Yes.
23   Q    And just so I understand, as director of
24 operations for New Castle, it would be your

Page 21

1  general responsibility to run the day-to-day
2  operations for the facility, correct?
3        MR. COLLINS:  Objection.  Form.
4        THE WITNESS:  I'm in charge of the
5  facility, yes.
6  BY MR. BOGLE:
7    Q    Right.  So it's fair to say that you're
8  the highest ranking McKesson employee at New
9  Castle that has responsibility exclusive to that
10 distribution center, right?
11       MR. COLLINS:  Objection to form.
12       THE WITNESS:  Well, I'm not sure.  I
13 have a VP/GM I report to, but I run the
14 distribution center.
15 BY MR. BOGLE:
16   Q    Who do you report to?
17   A    Brian Ferreira, the VP/GM.
18   Q    When it comes to decisions specific to
19 the operations of New Castle, would it be fair to
20 say that the buck stops with you?
21       MR. COLLINS:  Objection to form, vague.
22       THE WITNESS:  I don't think so.
23 BY MR. BOGLE:
24   Q    Okay.  Who do you think the buck stops

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  Administration, September 27, 2006.
2        Do you see that?
3     A    Yes.
4     Q    Okay.  Have you ever seen this letter
5  before?
6     A    No, I haven't.
7     Q    You have not.  Okay.
8        Communications from the DEA regarding
9  your responsibilities at New Castle, do those
10  generally not make their way to you?
11        MR. COLLINS:  Objection.  Assumes facts
12  not in evidence, argumentative, foundation, form.
13        THE WITNESS:  Yes, they made their way
14  to us, and we would adopt -- adapt the manual and
15  follow the SOPs and new procedures.
16  BY MR. BOGLE:
17     Q    Okay.  But you've never seen this
18  letter?
19     A    No, I'm sorry, I don't remember seeing
20  it.
21     Q    Well, let me ask you about a couple of
22  things in here.
23        To start, it says:  "This letter is
24  being sent to every commercial entity in the

Page 75

1  United States registered with the Drug Enforcement
2  Administration to distribute controlled
3  substances.  The purpose of this letter is to
4  reiterate the responsibilities of controlled
5  substance distributors in view of the prescription
6  drug abuse problem our nation currently faces."
7        Do you see that?
8     A    Yes.
9     Q    Okay.  And then the third paragraph on
10  the first page which starts with "Distributors
11  are," do you see that sentence?  It's the second
12  sentence in that paragraph.
13        MR. COLLINS:  Third paragraph, the
14  second sentence.
15        THE WITNESS:  Oh, okay.
16  BY MR. BOGLE:
17     Q    It says:  "Distributors are of course
18  one of the key components of the distribution
19  chain.  If the closed system is to function
20  properly as Congress envisioned, distributors must
21  be vigilant in deciding whether a prospective
22  customer can be trusted to deliver controlled
23  substances only for lawful purposes."
24        Do you see that?

Page 76

1     A    Yes.
2     Q    Do you agree with that statement?
3        MR. COLLINS:  Objection.  Form.
4  Foundation.
5        THE WITNESS:  Yes.
6  BY MR. BOGLE:
7     Q    It says:  "This responsibility is
8  critical as Congress has expressly declared that
9  the illegal distribution of controlled substances
10  has a substantial and detrimental effect on the
11  health and general welfare of the American
12  people."
13        Do you see that?
14     A    Yes.
15     Q    If you go to the second page here, I'm
16  about three-quarters of the way down the page, the
17  paragraph starting with "Thus."  Do you see that?
18     A    Yes.
19     Q    It says:  "Thus, in addition to
20  reporting all suspicious orders, a distributor has
21  a statutory responsibility to exercise due
22  diligence to avoid filling suspicious orders that
23  might be diverted into other than legitimate
24  medical, scientific and industrial channels."

Page 77

1        Do you see that?
2     A    Yes.
3     Q    Okay.  But in 2006, I think we just
4  talked about the fact that when a suspicious order
5  was detected at your facility at least, it was
6  filled, right?
7        MR. COLLINS:  Objection.  Form,
8  foundation.
9        THE WITNESS:  Not always.
10  BY MR. BOGLE:
11     Q    Okay.
12     A    I testified that not always.  We would
13  cut orders down on occasion.
14     Q    When you thought they had fat fingers.
15  I think that was the term you used.
16     A    Or they -- yeah, or they made a mistake.
17     Q    Right.  But if you thought that they
18  were ordering what they were -- intended to order,
19  that order was filled, even though you're saying
20  that a suspicious order report would have been
21  provided to the DEA, right?
22        MR. COLLINS:  Objection.  Form.
23        THE WITNESS:  If the definition is off
24  of that report, three times or the eight times,

Page 78

1  yes.
2  BY MR. BOGLE:
3      Q    Then it would have been filled, right?
4      A    Yes.
5      Q    Okay.  And this letter from the DEA
6  indicates that you shouldn't be filling those kind
7  of prescriptions, right?
8          MR. COLLINS:  Objection.
9  BY MR. BOGLE:
10     Q    If you've identified them as suspicious.
11         MR. COLLINS:  Objection.  Foundation,
12  compound, argumentative, calls for a legal
13  conclusion.
14         THE WITNESS:  I don't see it that way.
15  BY MR. BOGLE:
16     Q    You don't think that's what that says?
17     A    No.
18     Q    Okay.  And the responsibility to avoid
19  shipment of orders deemed suspicious by a
20  distributor, that policy has always been in effect
21  since the Controlled Substances Act was enacted in
22  1970, right?
23         MR. COLLINS:  Objection.  Form, assumes
24  multiple facts, legal conclusion.

Page 79

1          THE WITNESS:  I can't say that.  1970,
2  I -- I don't know that.
3  BY MR. BOGLE:
4      Q    Well, do you think this -- this sentence
5  I read to you here about avoiding filling
6  suspicious orders was something new that was added
7  to the regulations in '06?
8          MR. COLLINS:  Objection.  Calls for a
9  hypothetical, speculation.
10         THE WITNESS:  I don't know.
11         MR. COLLINS:  Calls for a legal
12  conclusion.
13  BY MR. BOGLE:
14     Q    You don't know?
15     A    No.
16     Q    And the next paragraph down, the last
17  sentence says:  "Again, to maintain effective
18  controls against diversion, as Section 823(e)
19  requires, the distributor should exercise due care
20  in confirming the legitimacy of all orders prior
21  to filling."  Right?
22     A    Yes.
23     Q    Okay.  And you know that's not a new
24  policy either, right?

Page 80

1          MR. COLLINS:  Objection.
2  BY MR. BOGLE:
3      Q    In '06.
4          MR. COLLINS:  Objection.  Vague, calls
5  for a legal conclusion.
6          THE WITNESS:  I don't know that.
7  BY MR. BOGLE:
8      Q    Okay.  Do you have any disagreement that
9  that's what the law required in '06?
10         MR. COLLINS:  Objection.  Calls for
11  speculation, legal conclusion, asked and answered.
12         THE WITNESS:  I have no disagreement
13  with it it's -- that it's written there.
14  BY MR. BOGLE:
15     Q    Okay.  And would you agree with the
16  notion that reporting a suspicious order to the
17  DEA and not filling it gives the DEA the
18  opportunity to investigate that order without
19  having the potential of getting into the public
20  for potential diversion?
21         MR. COLLINS:  Objection, if that's a
22  question.  Calls for a legal conclusion, it's
23  compound, it's vague.
24  BY MR. BOGLE:

Page 81

1      Q    You can answer.
2          MR. COLLINS:  And it calls for
3  speculation.
4          THE WITNESS:  I can't answer to that.  I
5  don't know.
6  BY MR. BOGLE:
7      Q    Okay.  Do you think the DEA has the same
8  ability to investigate and prevent diversion after
9  you've filled the order versus if you hadn't
10  filled it at all?
11         MR. COLLINS:  Objection.  Foundation,
12  argumentative, compound.
13         THE WITNESS:  I know in New Castle, we
14  had a relationship with the DEA, and I talked to
15  them, they called me.  At one point the DEA agent
16  in charge was my neighbor, so I knew them, and I
17  knew if there was a problem, they would let me
18  know.
19         MR. BOGLE:  Move to strike as
20  nonresponsive.
21  BY MR. BOGLE:
22     Q    My -- my question simply was, if you
23  fill an order that you deem suspicious, then it
24  naturally is going to be harder to the DEA to

Page 82

1　prevent diversion from that suspicious order as
2　opposed to if you had reported it and not filled
3　it at all, right?
4　　　　MR. COLLINS: Objection. Closing
5　argument. Assumes facts not in evidence, calls
6　for speculation, form, compound, vague.
7　　　　THE WITNESS: I don't know that.
8　BY MR. BOGLE:
9　　Q　You don't know.
10　　A　No.
11　　Q　Okay. Are you aware that in 2006 the
12　DEA began investigating McKesson concerning its
13　diversion practices as it pertains to controlled
14　substances?
15　　　　MR. COLLINS: Objection. Form,
16　foundation.
17　　　　THE WITNESS: I'm aware now. Yes.
18　BY MR. BOGLE:
19　　Q　When you say "now," when did you become
20　aware of that?
21　　A　I'm not sure.
22　　Q　Okay. What -- what caused you to become
23　aware of that?
24　　A　McKesson. My bosses.

Page 83

1　　Q　Okay. Do you have any idea what year
2　even you were made aware of that?
3　　A　No, I'm not sure. I can't remember.
4　　Q　Okay. I'm going to hand you what I'm
5　marking as Exhibit 1.1830, Exhibit 4 to your
6　deposition.
7　　　　(Snider Exhibit No. 4 was marked
8　　　　for identification.)
9　　　　MR. COLLINS: Thank you.
10　BY MR. BOGLE:
11　　Q　And you see this is a PowerPoint titled
12　"Lifestyle Drugs and Internet Pharmacies" from the
13　National Operations Conference 2007. Do you see
14　that?
15　　A　Yes.
16　　Q　And the author is noted to be Donald
17　Walker, Senior Vice President, Distribution
18　Operations, right?
19　　A　Yes.
20　　Q　Are you familiar with Mr. Walker?
21　　A　Yes, I am.
22　　Q　And his role in this point in time in
23　2007 would be to oversee the operations of all the
24　distribution centers within U.S. pharma, right?

Page 84

1　　　　MR. COLLINS: Objection. Foundation,
2　vague, calls for a legal conclusion.
3　　　　THE WITNESS: Yeah, operationally.
4　BY MR. BOGLE:
5　　Q　Yeah. And if you go to page .3, the
6　slide is titled "Public Health Issues," and it
7　says -- the first bullet point below that says:
8　"Abuse of prescription drugs has risen 66 percent
9　since 2000." And the third bullet point says:
10　"Opioid painkillers kill more than cocaine and
11　heroin combined."
12　　　　Do you see that?
13　　A　Yes.
14　　Q　Is that a statistic you were familiar
15　with in 2007?
16　　　　MR. COLLINS: Objection. Form.
17　　　　THE WITNESS: I -- I was there I believe
18　at the -- his meeting.
19　BY MR. BOGLE:
20　　Q　Okay. So you would have been made aware
21　of that statistic at that meeting?
22　　A　Yes.
23　　Q　Okay. So you were -- you were present
24　when this was actually presented, this PowerPoint

Page 85

1　deck, right?
2　　A　I believe so, yes.
3　　Q　Okay. Where was it presented?
4　　A　At a national meeting, I believe. I
5　don't know the date -- what's the date here?
6　　Q　It just says 2007, I think.
7　　A　It would have to be that -- I'd have to
8　check the date, depending -- I can't remember
9　where I was.
10　　Q　Okay. And if you go to .4, the next
11　slide says "DEA Focus." And under "Wholesalers,"
12　it says "DEA Expects." Do you see that?
13　　A　Yes.
14　　Q　And it says: "We know our customers."
15　That's the first bullet point.
16　　A　Yes.
17　　Q　The second bullet point is "Wholesalers
18　accountable for controlling quantities shipped."
19　Right?
20　　A　Yes.
21　　Q　Okay. You understand that concept to
22　mean the DEA expected you guys to not ship
23　suspicious orders, right?
24　　　　MR. COLLINS: Objection.

Page 142

1 Q And when a threshold increase is
2 requested, there's a form that has to be
3 completed, right?
4 A Yes. A form or a SharePoint site.
5 Q Okay. And the SharePoint site, there's
6 dropboxes that you complete and documentation that
7 is attached, right?
8 A That's what I recall.
9 Q Okay. And those forms or the SharePoint
10 information is supposed to be completed at the
11 time the threshold request is made, not at some
12 time thereafter, right?
13 MR. COLLINS: Objection. Vague.
14 THE WITNESS: It could be after the
15 request, because they were doing the due
16 diligence. So I can't honestly say I put one in
17 if I thought there was more due diligence to be
18 done.
19 BY MR. BOGLE:
20 Q Okay. But it would not be appropriate
21 to increase a threshold, supply product to a
22 customer before a threshold request increase form
23 had been completed, true?
24 MR. COLLINS: Objection. The question

Page 143

1 is vague.
2 THE WITNESS: Well, from 2000 to 2006,
3 we usually reported those, but we already shipped
4 them. I didn't get the report till afterwards.
5 After the lifestyle drugs, it was more proactive
6 in that I could get the data and send it to them
7 electronically for them to review and then
8 approve. So it may take some time.
9 BY MR. BOGLE:
10 Q Let me make sure that my question is
11 clear.
12 From 2008 on, under the Controlled
13 Substances Monitoring Program when a threshold
14 increase was requested, the drug should not be
15 shipped under that increased amount without a
16 form -- threshold increase form having already
17 been completed, true?
18 A Yes.
19 Q Okay. You mentioned red flags from a
20 due diligence perspective a moment ago, and I want
21 to ask you something about that. One sort of red
22 flag aspect of the McKesson system has been
23 setting the threshold number, whether it be 8,000
24 under the Lifestyle Drug Monitoring Program or

Page 144

1 based on the last six months of sales, that's been
2 a red flag -- if you go above that number, that's
3 a red flag that requires due diligence, right?
4 A Well, we didn't call that a red flag.
5 By red flags, I meant customers that we did
6 Level I visits on.
7 Q Okay. But do you consider a customer
8 going over their threshold number a red flag that
9 requires due diligence?
10 A Can you define "red flag"?
11 Q How would you define it? You used the
12 term earlier in the deposition.
13 A But I used it in the context of Level I,
14 red flags to know your customer. So when we did
15 the visit, we would make sure they met all the
16 criteria, et cetera.
17 Q Okay. So would you consider a customer
18 exceeding their threshold for hydrocodone or
19 oxycodone as being something that requires due
20 diligence to assess whether that was legitimate
21 for them to do so?
22 MR. COLLINS: Objection. Form, vague,
23 and calls for a legal conclusion.
24 THE WITNESS: Yes, there would be some

Page 145

1 kind of due diligence.
2 BY MR. BOGLE:
3 Q And another mechanism that's been
4 employed more recently at McKesson to assess red
5 flags for customers is looking at the percentage
6 of controlled substances a customer purchases
7 versus their overall prescription purchases,
8 right?
9 A Yes, the DRAs do the -- some analysis.
10 There is a lot of data-driven analysis that's
11 evolved, and I know Izzy and those guys do a good
12 job of that.
13 Q And that's not something that was done
14 until the 2014, 2015 time frame, right, doing that
15 sort of analysis?
16 MR. COLLINS: Objection. Vague.
17 THE WITNESS: I don't know. If they did
18 it in 2008 or not, I don't know -- I don't know
19 that.
20 BY MR. BOGLE:
21 Q That's an important metric, though, to
22 look at to assess whether a customer's orders are
23 suspicious or not is to look at whether the
24 percentages of controlled substances versus

Page 178

1    Q   2008 to 2013.
2    A   Yes.
3    Q   You've seen them do this specific
4 analysis?
5    A   Yes.
6    Q   Okay.  So you know it can be done.
7    A   Yes.
8    Q   Okay.  And it's a reasonable analysis to
9 conduct, right?
10      MR. COLLINS:  Objection.  Vague, form.
11      THE WITNESS:  If you can, I think it
12 would be a good idea.
13      MR. BOGLE:  Yeah.  Let me look real
14 quick.  I think -- yeah.  We can take a break now
15 is good.
16      MR. COLLINS:  Yep.
17      THE VIDEOGRAPHER:  The time is
18 11:14 a.m.  We're going off the record.
19      (Recess.)
20      THE VIDEOGRAPHER:  The time is 11:29
21 a.m., and we're back on the record.
22 BY MR. BOGLE:
23    Q   All right.  Mr. Snider, the -- your New
24 Castle Distribution Center is in -- located in

Page 179

1 Pennsylvania, right?
2    A   Yes.
3    Q   Okay.  But you guys service customers
4 outside of the state of Pennsylvania, correct?
5    A   Yeah -- oh, yes.
6    Q   For example, you service customers in
7 Ohio, right?
8    A   Yes.
9    Q   You service customers in West Virginia,
10 right?
11    A   Yes.
12    Q   Okay.  And we talked a little bit about
13 the opioid epidemic earlier in your deposition,
14 but you understand that West Virginia is one of
15 the states that's been hit hardest by the opioid
16 epidemic, right?
17    A   Yes.
18    Q   And In fact, there have been
19 congressional investigations into McKesson's
20 conduct specific to pharmacies supplied in West
21 Virginia.
22      Do you understand that?
23      MR. COLLINS:  Objection.  Form.
24      THE WITNESS:  I don't know that.  I'm

Page 180

1 sorry.
2 BY MR. BOGLE:
3    Q   Okay.  You've never been told that?
4    A   No.
5    Q   Okay.
6      (Snider Exhibit No. 12 was marked
7      for identification.)
8 BY MR. BOGLE:
9    Q   I'm going to hand you 1.44, Exhibit 12
10 to your deposition.
11      Okay.  This is noted at the top to be
12 from the House of Representatives, Congress of the
13 United States, February 15, 2008.  Do you see
14 that?
15    A   Yes.
16    Q   Okay.  And it's a letter sent to
17 Mr. John Hammergren.  That's the CEO of McKesson,
18 right?
19      MR. COLLINS:  Objection.  Lack of
20 foundation.
21      THE WITNESS:  Yes.
22 BY MR. BOGLE:
23    Q   Do you see where it's -- he's noted to
24 be the recipient, "Dear Mr. Hammergren"?

Page 181

1    A   I would think he got it.
2      MR. COLLINS:  Objection.
3 BY MR. BOGLE:
4    Q   Do you see that this was designed to be
5 sent to him, right?
6      MR. COLLINS:  Objection.  The witness
7 has no firsthand knowledge.
8      THE WITNESS:  I don't know anything
9 about this document, so I can't answer to that.
10 BY MR. BOGLE:
11    Q   All right.  But you see it says, "Dear
12 Mr. Hammergren," right?  Do you see that on the
13 first page?
14    A   Yeah, I see that.
15    Q   You see that?
16    A   Yeah.
17    Q   Okay.  And so if you look at the first
18 page of this document, it says in the second
19 paragraph, "As part of our investigation."  Do you
20 see that?
21    A   Yes.
22    Q   It says:  "As part of our investigation,
23 the Committee wrote to you on May 8, 2017,
24 regarding your distribution practices generally,

Case: 1:17-md-02804 Doc #: 3027-22 Filed: 12/06/20 47 of 91. PageID #: 474364
Case: 1:17-md-02804 Doc #: 3027-22 Filed: 12/06/20 47 of 91. PageID #: 474364
Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 and in particular with respect to West Virginia.
2 As we mentioned in the letter, the opioid epidemic
3 has been particularly devastating to West
4 Virginia. For example, in 2015, West Virginia had
5 the highest opioid overdose death rate in the
6 nation."
7        And then it goes on, the last sentence
8 in that paragraph says: "Court filings also
9 indicate that between 2007 and 2012, McKesson
10 distributed 46,179,600 doses of hydrocodone and
11 54,304,980 doses of oxycodone, meaning that
12 McKesson shipped a total of 100,484,580 doses to
13 West Virginia during this time period."
14        Have you ever seen that kind of data
15 talking about the number of hydrocodone and
16 oxycodone pills McKesson distributed to West
17 Virginia during this time frame?
18     A    No, I haven't.
19     Q    Okay. You know that a fair amount of
20 those pills that are being referenced here came
21 from your distribution center, right?
22        MR. COLLINS: Objection. Lack of
23 foundation. Lack of firsthand knowledge.
24        THE WITNESS: I don't know that.

Page 183

1 BY MR. BOGLE:
2     Q    Okay. Well, you know from 2007 to 2012
3 that -- that the New Castle Distribution Center
4 was sending hydrocodone and oxycodone to
5 pharmacies in West Virginia, right?
6     A    Yes.
7     Q    Okay. So, therefore, you must present
8 some of this number coming from New Castle, right?
9        MR. COLLINS: Objection. The question
10 is vague.
11        THE WITNESS: If I could answer that,
12 the DEA has done audits on us. We've never been
13 found to do anything wrong. New Castle has an
14 exemplary record.
15        MR. BOGLE: Move to strike as
16 nonresponsive.
17 BY MR. BOGLE:
18     Q    My question simply was, of these 100
19 million plus doses referenced here, you know that
20 a portion of those came from your distribution
21 center --
22        MR. COLLINS: Objection.
23 BY MR. BOGLE:
24     Q    -- during this time frame, correct?

Page 184

1        MR. COLLINS: The question was asked and
2 answered last -- a moment ago.
3 BY MR. BOGLE:
4     Q    Correct?
5        MR. COLLINS: Same -- same objection.
6 Asked and answered.
7        THE WITNESS: A -- a portion probably
8 did.
9 BY MR. BOGLE:
10     Q    Well, you know they did, right? From
11 2007 to 2012, you know that the New Castle
12 Distribution Center was servicing West Virginia
13 pharmacies, right? So it has to be part of this
14 number, true?
15        MR. COLLINS: Objection.
16 BY MR. BOGLE:
17     Q    You know that.
18        MR. COLLINS: Objection. The question
19 is compound three different ways. It's
20 argumentative. It's been asked and answered.
21 BY MR. BOGLE:
22     Q    You know that, don't you?
23        MR. COLLINS: Objection. Form.
24        THE WITNESS: I've never seen this

Page 185

1 document. And we do have customers in West
2 Virginia.
3 BY MR. BOGLE:
4     Q    Okay. But you know that -- okay. I
5 think the document speaks for itself.
6        Now, specifically in West Virginia,
7 Mace's is one of the pharmacies that New Castle
8 has serviced over time, right?
9     A    I believe so.
10     Q    Okay. You recall we saw Mace's Pharmacy
11 referenced in that 2007 chart which indicated them
12 exceeding their thresholds in opioids in November
13 2007. Do you recall discussing that?
14        MR. COLLINS: Objection.
15 Mischaracterization, lack of foundation, lack of
16 knowledge.
17        THE WITNESS: I do recall seeing the
18 document. I believe Mace's was on it.
19 BY MR. BOGLE:
20     Q    Okay. Now, at your distribution center
21 for the conduct that occurred prior to McKesson
22 switching over to SharePoint, you actually have
23 hard copy files for many of the pharmacies that
24 you serviced, right?

Page 190

1    And the information conveyed for
2 hydrocodone was 15 and oxycodone .41, and then
3 it's noted, "Less than half a person, OxyContin
4 only."
5    Do you see those two?
6    A   Yes.
7    Q   Okay.  And you recall that pretty
8 quickly after this questionnaire was completed in
9 June 2007, you specifically had concerns about
10 whether Mace's was diverting opioids, correct?
11    A   I don't remember.
12    Q   Okay.  Well, let's take a like at
13 page .49 in this document.
14    I'm looking at the e-mail on the bottom
15 of this page that carries over to the next page.
16 It's from you, October 9, 2007, to a Jim
17 Gavatorta, cc Brian Ferreira.
18    Do you see that?
19    A   Yes.
20    Q   Entitled "Mace's Hydrocodone."
21    A   Yes.
22    Q   Okay.  And who is -- who is Jim
23 Gavatorta?  What did he do?
24    A   He was the executive salesperson.

Page 191

1    Q   Okay.  And Brian Ferreira, I think you
2 said was vice president/general manager?
3    A   Yes.
4    Q   What sort of oversight did Brian
5 Ferreira provide for you?
6    A   He was in charge of the distribution
7 center over all the operations, my boss, and Jim
8 reported to him directly.
9    Q   Reported to him, you said?
10    A   Yeah.
11    Q   Okay.  All right.  Let's go to the next
12 page for the substance of the e-mail.
13    You say:  "Jim, let me know re Mace's.
14 Could be a good candidate for a Level II,"
15 question mark.  "They, 868673, had 10,764 doses of
16 hydrocodone in July.  In August it was 27,716,
17 possibly due to duplicate T&T orders.  The account
18 still had 26,464 doses in September.  Can you look
19 into?  This customer and Town & Country are the
20 only two retail accounts that have over 20,000
21 doses in any of the lifestyle drugs this month."
22    Do you see that?
23    A   Yes.
24    Q   Okay.  And Mace's a -- is a pharmacy

Page 192

1 in West Virginia, right, just so we're clear?
2    A   Yes.
3    Q   Okay.  And what ended up happening
4 thereafter is another visit and another
5 questionnaire was completed in December 2007
6 related to Mace's, right?
7    MR. COLLINS:  Objection.  Lack of
8 foundation.
9 BY MR. BOGLE:
10    Q   To investigate your concerns here.
11    MR. COLLINS:  Objection.  Lack of
12 foundation.
13    THE WITNESS:  I'm sorry, I'd have to
14 look through it.
15 BY MR. BOGLE:
16    Q   Okay.
17    A   You want me to do that?
18    Q   We're going to go there.  I'm just
19 asking your recollection first.
20    But, actually, before we go there, this
21 e-mail was sent October 9, 2007, and references
22 purchases from July, August, and September of 2007
23 for hydrocodone, right?
24    MR. COLLINS:  Objection.  Form.

Page 193

1 BY MR. BOGLE:
2    Q   That's what you say.
3    A   Yeah, as part of the Level I to get a
4 three-month purchase report.
5    Q   Right.  And so at this point in time, we
6 can see that for July, August and September of
7 2007, Mace's did end up actually filling more than
8 8,000 doses for hydrocodone, right, based on your
9 e-mail here?
10    A   Okay.  (Peruses document.)
11    I see August, September.  I'm not sure
12 of July, but --
13    Q   July says 10,764 doses.
14    A   Okay.
15    Q   That's your first or your second --
16    A   Oh, yeah, I see that now.  Yep.
17    Q   Okay.  So we can agree at least for
18 those three months in 2007, per your e-mail,
19 you're saying that got more than 8,000 doses of
20 hydrocodone in those months, right?
21    A   I would say yes.
22    Q   Okay.  Let's look at --
23    A   Now, I just want to make clear that
24 trade and travel order, or the T&T, that could be

Case 1:17-md-02804 Document 3075-22 Filed 12/09/19 Page 131 of 312 PageID #: 137066.
Case 1:17-md-02804 Document 3075-22 Filed 12/09/19 Page 131 of 312 PageID #: 137066.
Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 a duplicate that they returned. You don't know
2 the credit. It's not in here either.
3    Q   But we do know that you don't raise that
4 concern for September, right, in your e-mail?
5 That was only as to August.
6    A   Right. Right.
7    Q   Okay. So let's go to the -- the
8 pharmacy questionnaire from December 2007, which
9 is page .60.
10        And you see here there's "Mace's
11 Pharmacy, December 10, 2007, Pharmacy
12 Questionnaire." Do you see that?
13   A   Yes.
14   Q   And again, your signature appears on
15 this page, right?
16   A   Yes.
17   Q   If we go to the next page, page .61, it
18 says in number 8, which is the same question you
19 asked a few months earlier of them: "How many
20 prescriptions for the following products does the
21 pharmacy fill on a daily basis?"
22        Do you see here they've said, 475
23 prescriptions for hydrocodone; 103 for oxycodone?
24        Right?

Page 195

1    A   Yes.
2    Q   That's what the form indicates.
3    A   Yes.
4    Q   Which is, you would agree with me, a
5 huge increase from what they told you four months
6 earlier in June 2007, right?
7        MR. COLLINS: Objection to the form.
8        THE WITNESS: I wouldn't agree that it's
9 a huge increase unless I knew what kind of
10 business they gained.
11 BY MR. BOGLE:
12   Q   Okay. But we can agree that in
13 June 2007, on page .12, they tell you 15
14 prescriptions of hydrocodone a day and .41 for
15 oxycodone. Right?
16   A   Yes, as I recall.
17   Q   And October the same year, that number
18 has risen to 475 a day for hydrocodone and 103 a
19 day for oxycodone, right? We can agree those are
20 the numbers.
21   A   Yes.
22   Q   All right. Did you investigate what was
23 causing that increase?
24   A   I don't remember.

Page 196

1    Q   Okay.
2    A   Yes, it looks like I sent it -- just
3 from what the documents show, that we did a
4 Level I, a Level II, and then sent that up to the
5 DRA for review, and they took it from there.
6    Q   Okay. My question is, in 2007, did you
7 personally investigate what was causing such a
8 significant increase over a four-month period of
9 time in hydrocodone and oxycodone prescriptions?
10       MR. COLLINS: Objection. Asked and
11 answered.
12       THE WITNESS: I don't remember.
13 BY MR. BOGLE:
14   Q   Okay. And if you do the math, for
15 example, on hydrocodone, at 475 prescriptions a
16 day with an average of 30 pills a prescription, an
17 average of 30 days, that's actually 427,500 doses
18 a month.
19       Do you want to do the math on that?
20   A   No, I don't.
21   Q   Okay. So if you guys are giving them
22 20,000 or so doses a month based on your prior
23 e-mail, how do you explain how they're prescribing
24 this much?

Page 197

1    A   I would have to go through the due
2 diligence that was done here.
3    Q   Okay.
4    A   As you can see, there's quite a bit of
5 documentation on this that we did for that. I
6 don't recall everything, but I'm sure --
7    Q   Wouldn't that raise a red flag --
8        MR. COLLINS: I'm sorry.
9 BY MR. BOGLE:
10   Q   -- that they're using other
11 distributors?
12       MR. COLLINS: I'm sorry. Please let the
13 witness finish his answer before you cut him off.
14 I've let you do that a couple of times. I'm going
15 to insist the witness answer.
16       Finish your answer.
17 BY MR. BOGLE:
18   Q   Go ahead.
19   A   I sent this up to the DRA for review.
20 You can tell that. So I don't know what their
21 result was. I don't know if we cut them off or --
22 or what right now. I would have to go through
23 this.
24   Q   Would that math indicate to you a

Case 2:17-cv-01362-DRC Document 3075-22 Filed 12/09/21 Page 12 of 31 PageID #: 47187367
Case 3:17-cv-01362 Document 1027-22 Filed 12/06/19 Page 12 of 31 PageID #: 124367
Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 potential red flag that they're using more
2 distributors than just McKesson for hydrocodone
3 and oxycodone?
4      MR. COLLINS: Objection. Form.
5      THE WITNESS: The increase would cause
6 concern that I would push it up to the DRA.
7 BY MR. BOGLE:
8   Q  Okay. Now, Mace's -- let's take a look
9 at -- find the spot here -- the threshold change
10 request that was submitted December 16th, 2008,
11 which is .63 in this document.
12      MR. COLLINS: Any time you want to
13 review the document, go ahead.
14      THE WITNESS: Okay.
15 BY MR. BOGLE:
16   Q  Okay. You see here this is a threshold
17 change form for Mace's Pharmacy in -- hope I'm
18 pronouncing this correctly -- Philippi, West
19 Virginia.
20      Do you see that?
21   A  Yes.
22   Q  Do you know about how many people live
23 in Philippi, West Virginia?
24   A  I don't.

Page 199

1   Q  Is that something you guys would look at
2 back in 2008 when evaluating a request like this?
3   A  I can't --
4      MR. COLLINS: Object -- objection to the
5 term we -- "you would look at."
6 BY MR. BOGLE:
7   Q  Would you?
8   A  No, I don't know.
9   Q  Okay.
10   A  I can't speculate on that.
11   Q  Okay. So if, for example, the city of
12 Philippi, West Virginia, had fewer than 3,000
13 people in it around this time frame, would that
14 raise concerns to you about how much hydrocodone
15 you're giving this company -- this pharmacy?
16      MR. COLLINS: Objection. Assumes facts
17 not in evidence, lack of foundation.
18      MR. BOGLE: Let's put it into evidence.
19 Exhibit 14, 1.1892.
20      (Snider Exhibit No. 14 was marked
21      for identification.)
22 BY MR. BOGLE:
23   Q  Here is the Census Bureau data for
24 Philippi, West Virginia, from 2010. Do you see

Page 200

1 there's a total population there noted to be 2,966
2 people in 2010?
3      MR. COLLINS: Objection. Lack of
4 foundation. You haven't established this witness
5 has any knowledge of this.
6      MR. BOGLE: I think that's the problem.
7 BY MR. BOGLE:
8   Q  Do you not -- did you not know that?
9   A  I did not --
10      MR. COLLINS: Object --
11      THE WITNESS: Sorry.
12      MR. COLLINS: I'm sorry. Please let me
13 object.
14      Argumentative. Object to the theatrics.
15      THE WITNESS: I did not know there were
16 2,966 people in the Philippi -- is that the whole
17 area or is that just the town?
18 BY MR. BOGLE:
19   Q  It's the city.
20   A  Okay.
21   Q  You didn't know that.
22   A  No.
23   Q  Okay. Let's go back and look at the
24 threshold change form request from December 16,

Page 201

1 '08, for Mace's.
2      Do you see here they're requesting to
3 increase their amount 20 percent for hydrocodone,
4 and their current threshold is set at 34,000 doses
5 a month? Do you see that?
6   A  Yes.
7   Q  Okay. And the reason for change that's
8 given here, it says: "Threshold is set too low
9 for this customer. Their monthly purchases are
10 400,000 a month. We need to increase the
11 hydrocodone family amount by 6800 units."
12      Do you see that?
13   A  Yes.
14   Q  There's no other reason given here for
15 this increase, is there?
16   A  No.
17   Q  Okay. And you, in fact, signed off on
18 this increase, right, under "Approved by DCM
19 Blaine Snider, 12/16/08." That's your signature,
20 right?
21      MR. COLLINS: Objection. The question
22 is compound. I object to the term "signed off."
23 We've gone over and over this again.
24 Mischaracterization of his prior testimony.

Page 202

1    MR. BOGLE:  Yeah, I'm sorry.  I'll --
2  I'll withdraw the question.
3  BY MR. BOGLE:
4    Q   Do you see where it says "Approved by"
5  on that form?
6    A   Yes.
7    Q   Okay.  Who's that below that that's
8  noted?
9    A   Michael Oriente.  He's the director of
10  Regulatory Affairs.
11    Q   You skipped your signature, didn't you?
12    A   Oh, I thought you meant who was below my
13  name.  I apologize.
14    Q   Your name is there right below "Approved
15  by," isn't it?
16    A   Yep.
17    Q   Okay.  That's your signature, true?
18    A   To go up to the DRAs, that was the
19  process.
20    Q   That's your signature, true?
21    MR. COLLINS:  Please let the witness
22  finish his answer.
23    THE WITNESS:  It's true it was to go up
24  to the DRA.  Also there's attachments in here.

Page 203

1  You don't know what that was.
2  BY MR. BOGLE:
3    Q   Oh, I looked at them.  I've looked at
4  them.
5    A   Okay.
6    Q   So what's noted here is that you
7  approved these to go -- as you say, to go to
8  Mr. Oriente, right?
9    A   Yes, the --
10    Q   You didn't raise any concerns that this
11  wasn't appropriate, did you?
12    MR. COLLINS:  Objection.  Argumentative.
13    THE WITNESS:  I'm sure I talked to him.
14  BY MR. BOGLE:
15    Q   Did -- ultimately you put your signature
16  on this line under "Approved by," right?
17    A   Yes.
18    Q   Not disagrees with.  "Approved by,"
19  right?
20    A   Yes.
21    Q   Okay.  So after these concerns are
22  raised by you in 2007, and the subsequent
23  questionnaire was completed in December 2007 that
24  shows a huge spike in hydrocodone and oxycodone

Page 204

1  prescriptions being written, you guys -- you and
2  Mr. Oriente actually approve an additional
3  threshold increase for hydrocodone; is that right?
4    MR. COLLINS:  Objection.
5  Mischaracterization, assumes facts not in
6  evidence.
7    You're testifying to that.  He has no --
8  he said he has no knowledge of this, and he needs
9  to look at the documents.  So --
10  BY MR. BOGLE:
11    Q   Take a look at it.  You see your
12  signature?
13    MR. COLLINS:  You don't have all the
14  documents here, he just pointed out.
15  BY MR. BOGLE:
16    Q   This is the whole file.
17    A   I keep trying to tell you my signature
18  represents that it went to Michael Oriente, who
19  was the director of Regulatory Affairs, who could
20  look at all the data, make a judgment.  Also he
21  could call the customer or he could check with the
22  federal regs or the State Board of Pharmacy.
23    Q   But I believe you told me earlier you
24  wouldn't put your signature on something approving

Page 205

1  a threshold increase request if you thought it was
2  inappropriate, right?
3    A   If I knew it was inappropriate, I
4  wouldn't put it on there.
5    Q   Right.  Let's go to page .66 on this
6  document.
7    See this is another threshold change
8  form from January 28, '09, for Mace's, and this
9  pertains to their thresholds for oxycodone, right?
10    A   Yes.
11    Q   Okay.  And you see the current threshold
12  is noted to be 13,000 at this point in time,
13  right?
14    A   I'm sorry.  Yes.
15    Q   Okay.  And there's an increase approved
16  here to increase their oxycodone threshold by
17  20 percent, right?
18    A   I'm sorry, I'm not seeing the 20.
19    Q   See where it says "Increase amount,
20  20 percent"?
21    A   Oh, yes.
22    Q   Okay.  And then for reason for change,
23  it says:  "Threshold is set too low for this
24  customer.  Their monthly purchases are 400,000 a

Page 206

1  month. We need to increase the oxycodone family
2  amount by 2500 units."
3      Right, that's the reason given on this
4  form?
5  A   Yes.
6  Q   Okay. And then there's a different
7  signature on this. It says "BPM," and then
8  there's some -- a signature after that. Do you
9  know who that is?
10  A   Yes. Dale Nusser.
11  Q   I'm sorry?
12  A   Dale Nusser, my -- one of my managers.
13  Q   Okay. So Dale Nusser worked underneath
14  you at your direction, right?
15  A   Yes.
16  Q   Okay. And this indicates it was also
17  approved by Michael Oriente in Regulatory, right?
18  A   Oh, yes.
19  Q   Okay. All right. Let's go to page .80.
20      You see here this is another threshold
21  change form, December 30, 2009, for Mace's. Do
22  you see that?
23  A   Yes.
24  Q   Okay. And at this point 9143 is the

Page 207

1  code. That's for oxycodone, correct?
2  A   I don't remember. I'm sorry.
3  Q   Okay. It says -- well, first of all,
4  you see that under "Reason for requested change,"
5  it says: "Tom Dadisman, pharmacist, has requested
6  an increase of 10 percent on oxycodone due to
7  increased number of prescriptions received per
8  category from local doctors who are changing
9  patients from morphine-based items to oxycodone-
10  based items."
11      Do you see that?
12  A   Yes.
13  Q   Okay. So this would indicate that this
14  is related to oxycodone based on the --
15  A   Yes.
16  Q   -- request, right? Okay.
17      And that's the only information
18  supporting this request that's located here,
19  right?
20      MR. COLLINS: Objection. Form.
21      THE WITNESS: That I can see, yes.
22  BY MR. BOGLE:
23  Q   Okay. And if you see anything else,
24  please let me know.

Page 208

1  A   Okay.
2  Q   This is noted to be a permanent change,
3  right?
4  A   Yes.
5  Q   Increasing their threshold from 17,600
6  doses a month by 10 percent, right?
7  A   Yes.
8  Q   Okay. Submitted by you, right? That's
9  your signature. Right?
10  A   Yes.
11  Q   Okay. And also John Kuczynski of sales
12  and approved by Michael Oriente, right?
13  A   Yes.
14  Q   Okay. Do you see any evidence from
15  around this time frame in December 2009 in this
16  file that you actually got any prescription data
17  to support this?
18  A   I don't know. I'd have to go through
19  it.
20  Q   Yeah.
21      MR. BOGLE: Let's go off the record.
22  You can go through it.
23      MR. COLLINS: No, no, we're going to
24  stay on the record.

Page 209

1      MR. BOGLE: We don't need to stay on the
2  record. If he wants time to look at it, he can,
3  but don't stay on the record. There's no such
4  requirement.
5      MR. COLLINS: Well, listen, to go off
6  the record, you need an agreement. So if you want
7  to have him start leafing through documents, we're
8  staying on the record.
9      MR. BOGLE: Okay. That's fine. We'll
10  do that.
11  BY MR. BOGLE:
12  Q   You can't point me to anything that
13  shows that you requested any prescription data,
14  can you?
15      MR. COLLINS: He just asked to go
16  through documents. You want him to go through
17  documents --
18      MR. BOGLE: He's not going to blow
19  through hours of my time looking at something that
20  he should already be familiar with.
21      MR. COLLINS: Well, no, he -- this isn't
22  a 30(b)(6) deposition.
23      MR. BOGLE: Doesn't have to be.
24      MR. COLLINS: This is in his personal

Page 218

1 supporting any change made to a threshold based on
2 business growth, right?
3        MR. COLLINS: Objection. Assumes facts
4 not in evidence.
5 BY MR. BOGLE:
6    Q   We just looked at this a few minutes
7 ago.
8        MR. COLLINS: Objection. Show it to him
9 again.
10 BY MR. BOGLE:
11    Q   You don't recall that?
12    A   I'm sorry. I don't -- you'll have to
13 repeat the question.
14    Q   My question was, to support a threshold
15 change based on business growth, supporting
16 documentation is required under the CSMP, right?
17        MR. COLLINS: Objection. Assumes --
18 BY MR. BOGLE:
19    Q   As of 10/2010?
20        MR. COLLINS: Objection. Assumes facts
21 not in evidence.
22        THE WITNESS: I don't know that that
23 wasn't provided.
24 BY MR. BOGLE:

Page 219

1    Q   Not my question, sir. That was
2 required, wasn't it?
3        MR. COLLINS: Objection. Form.
4 BY MR. BOGLE:
5    Q   Yes or no?
6        MR. COLLINS: Objection.
7 BY MR. BOGLE:
8    Q   Or you don't know?
9        MR. COLLINS: Objection to form.
10        THE WITNESS: I don't know.
11 BY MR. BOGLE:
12    Q   You don't know if that was required?
13    A   It was required for Michael maybe, but
14 not for me.
15    Q   Okay. So you -- so for Dale Nusser to
16 sign off on his portion, he didn't need any
17 documentation to support this.
18    A   Correct.
19    Q   Okay. But Michael, you understand,
20 Oriente would?
21    A   Yes.
22    Q   Okay. So in the McKesson files that
23 have been produced to us pertaining to this
24 increase, we should find some supporting

Page 220

1 documentation if the CSMP was followed, right?
2 I'm not saying in your files or whose files. It
3 should be in somebody's files.
4    A   I don't know that.
5    Q   You don't know.
6    A   I can't testify to what's in their
7 files.
8    Q   I didn't ask -- I didn't say "is it." I
9 said "should it be."
10    A   I can't --
11        MR. COLLINS: Objection. Calls for a
12 legal conclusion.
13        THE WITNESS: I can't testify. It was
14 electronic.
15 BY MR. BOGLE:
16    Q   Okay. Was there a policy at McKesson in
17 2010 to destroy evidence of due diligence review?
18        MR. COLLINS: Objection. Argumentative.
19 Object to the theatrics.
20 BY MR. BOGLE:
21    Q   There's a question.
22    A   Can you repeat the question?
23    Q   Was there a policy written or unwritten
24 at McKesson in October 2010 to destroy evidence of

Page 221

1 due diligence review?
2        MR. COLLINS: Object to the theatrics
3 and the argument.
4        THE WITNESS: No.
5 BY MR. BOGLE:
6    Q   Okay. Target, that's another -- that's
7 another large customer for McKesson over time,
8 right?
9        MR. COLLINS: Objection. Form, vague.
10        THE WITNESS: They aren't our customer
11 anymore.
12 BY MR. BOGLE:
13    Q   Okay. Back in 2008, they were, right?
14    A   I would -- I would think, yes.
15    Q   Okay. Let's take a look at Exhibit 15,
16 which is 1.1782.
17        (Snider Exhibit No. 15 was marked
18        for identification.)
19    Q   All right. This is another file that
20 was produced to us. You see it's pertaining to
21 Target No. 2231. Do you see that?
22    A   Yes.
23    Q   Okay. Let's start back at page .7.
24 There's an e-mail chain there.

Page 222

1 And do you see the e-mail at the bottom
2 of that page from Dave Gustin to Michael Bishop
3 dated September 16, 2008, titled "Could you do me
4 a favor?" Do you see that?
5 A Yes.
6 Q Okay. It says there: "I just need a
7 TCR form you signed and dated the 30th. I will
8 use it for the 30 percent increases I made for the
9 RNAs that day after you e-mailed me all those
10 reports."
11 Do you see that?
12 A Yes.
13 Q And then Mr. Bishop responds: "This is
14 the Thanksgiving increases," question mark.
15 Do you see that?
16 A Yes.
17 Q Okay. And if you follow the e-mail
18 chain to the next page, Mr. Gustin says: "Yep,
19 11/28."
20 Do you see that?
21 A Yes.
22 Q Okay. Then if you go to page .5, it's
23 another e-mail from Dave Gustin to several
24 individuals, December 17, 2008. It says: "All:

Page 223

1 On November 28, I was sent requests by Michael for
2 over 200 thresholds to get 30 percent increases
3 for various national accounts. The attached TCR
4 form covers all RNA increases made that date.
5 Please sign and file."
6 Do you see that?
7 A Yes.
8 Q Okay. And if you go to page .4, it's a
9 threshold change form from 11/28/08, the same day.
10 Do you see that? It's referenced earlier by
11 Mr. Gustin.
12 A Yes.
13 Q And it's noted to be for various
14 controlled substances, right?
15 A Yes.
16 Q And a 30 percent increase. Do you see
17 that?
18 A Yes.
19 Q What's the reason for the change given
20 there on the form?
21 A Thanksgiving holiday.
22 Q Okay. Do -- was it a McKesson policy in
23 2008 to give permanent threshold increases based
24 on holidays?

Page 224

1 A Yes, it was. Sometimes the vendors --
2 like I just got a notice today, the vendors close
3 during the holidays and product is unavailable.
4 And my customers know that too, hospitals, nursing
5 homes, pharmacies. So at that time they want to
6 make sure they get it before the pharmacy closes.
7 Q And that's a justification to increase
8 30 percent permanently?
9 A I believe so. It looks like it was
10 approved.
11 Q Okay. So each time that a big holiday
12 would come, thereafter you get 30 more percent
13 increase permanently?
14 MR. COLLINS: Objection.
15 BY MR. BOGLE:
16 Q Is that what you're saying?
17 MR. COLLINS: Objection.
18 Mischaracterization.
19 THE WITNESS: I did not say that.
20 BY MR. BOGLE:
21 Q Okay. Well, you're saying the 30
22 percent increase here was justified by the fact
23 that it was a Thanksgiving holiday and that could
24 justify a permanent increase, right?

Page 225

1 MR. COLLINS: Objection.
2 Mischaracterization.
3 THE WITNESS: I don't know the due
4 diligence that Dave did, but he was the national
5 accts DRA and he justified it.
6 BY MR. BOGLE:
7 Q Okay. Well, the reason for change given
8 here is what we just read, increase due to
9 Thanksgiving holiday, 30 percent increase, right?
10 A That's what -- did I say that?
11 Q That's what's stated here for reason for
12 change, right? It's what the form says.
13 A Who -- oh, the form, yes.
14 Q Right.
15 A Okay.
16 Q And under "Approved by," whose signature
17 is that?
18 A Blaine Snider. "B. Snider."
19 Q That's you, right?
20 A Yep.
21 Q And if we go to page .2, this is another
22 threshold change form from 11/28/08 for the Target
23 store in Triadelphia, West Virginia. Do you see
24 that?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  A   Yes.
2  Q   Okay.  And this is for a 30 percent
3 increase to their morphine thresholds, and under
4 "Reason for change," you would agree with me there
5 is nothing listed there, right?
6  A   Yes.
7  Q   Okay.  And again, under "Approved by,"
8 that's your signature, isn't it?
9  A   That I sent it to Regulatory, if I did.
10  Q   That's your signature, isn't it?
11  A   Yes.
12  Q   Okay.  Did you raise any questions as to
13 why there was no reason given to you here?
14  A   I don't even know that it was -- the
15 threshold was increased.
16  Q   Well, it says "Approved by."
17     MR. COLLINS:  Objection.  We've been
18 over this --
19 BY MR. BOGLE:
20  Q   Right?
21     MR. COLLINS:  -- a dozen times.
22 Objection.  Mischaracterization.
23 BY MR. BOGLE:
24  Q   Right?

Page 227

1  A   That does not mean I approved it.  I
2 cannot send a -- make a threshold change.  I can't
3 do it.
4  Q   But you didn't raise any concerns at
5 this point in time about forwarding this on to --
6  A   There's nothing on this paper --
7  Q   -- approve it, correct?
8  A   There's nothing on this paper that says
9 he approved it or raised any concerns.
10  Q   There's nothing on this paper that
11 indicates that you raised any concerns or in this
12 file that indicates that you raised any concerns
13 about this threshold change form, does it?
14  A   I don't know if it even was complied
15 with.
16     MR. BOGLE:  Okay.  Not my question, sir.
17 Move to strike as nonresponsive.
18 BY MR. BOGLE:
19  Q   There's nothing in this file that
20 indicates you raised concerns about the lack of
21 reason for threshold increase in this form, is
22 there?
23     MR. COLLINS:  Objection.  Foundation,
24 form.

Page 228

1     THE WITNESS:  I don't know that.
2 BY MR. BOGLE:
3  Q   You don't know if there's any reason
4 listed?
5  A   Correct.
6  Q   Okay.  Can you see the form?
7  A   Yes.
8  Q   Okay.  Do you see any indication on this
9 form that you disapproved this request with zero
10 information provided for a reason?
11     MR. COLLINS:  Object to the terminology,
12 "disapproved" and "approved."
13     THE WITNESS:  I dispute that there
14 was -- wasn't any evidence of that.
15 BY MR. BOGLE:
16  Q   Well, we've got the file right here.
17 This one -- this one's shorter, so this is eight
18 pages.  I'd like you to show me where in this file
19 there is specific documentary evidence showing why
20 a Target in West Virginia needed a 30 percent
21 increase on this date.
22  A   Okay.  On page .6.
23  Q   .6.  Okay.
24  A   There was an e-mail on December 17th

Page 229

1 about a -- with an attachment threshold change
2 form, that could have had the reason on it.  I
3 don't know.  It's -- it's not here.
4  Q   Okay.  This is what was produced to us.
5 Can you point to anything that was produced to us
6 in this file that indicates a reason for this
7 threshold change increase?
8     MR. COLLINS:  Objection.  Asked and
9 answered.
10     THE WITNESS:  Not to my knowledge.
11 BY MR. BOGLE:
12  Q   Okay.  Best Care Pharmacy, are you
13 familiar with them?
14  A   I -- I do know them, yes.
15  Q   It's another one of New Castle's former
16 customers in West Virginia, right?
17  A   Yes.
18  Q   Okay.  And actually, Best Care actually
19 operated multiple pharmacies in West Virginia,
20 didn't they?
21  A   As I recall.
22     (Snider Exhibit No. 16 was marked
23     for identification.)
24 BY MR. BOGLE:

Page 230

1    Q   Okay. I'm going to hand you what is
2  marked as 1.1812, Exhibit 16.
3        You see here this is another document,
4  file folder document with the name "Best Care" on
5  the front.
6        Do you see that?
7    A   Yes.
8    Q   Okay. And if we go to page .10, do you
9  see this is your signature related to an approval
10 that a questionnaire has been completed and
11 affidavit signed for this customer, right?
12   A   It's a -- I testified that it's a
13 Level I observation form.
14   Q   No, .10.
15   A   I testified that that's a Level I
16 observation form.
17   Q   We may be on different pages.
18       Do you see what's pulled up here on the
19 screen?
20   A   Yes.
21   Q   Okay. That's your signature related to
22 Best Care Pharmacy, you are saying for, what, a
23 Level I observation?
24   A   Yes. It says "CSMP Observation Level I

Page 231

1  Documentation Form."
2    Q   On this page?
3        MR. COLLINS: Page 9.
4        THE WITNESS: Oh, I'm sorry. It's a --
5  it's a continuation of that.
6  BY MR. BOGLE:
7    Q   Okay. Well, let's look at the pharmacy
8  questionnaire that follows thereafter.
9    A   Okay.
10   Q   You see this customer is noted to be a
11 new customer as of October 1, 2009, right?
12   A   Yes.
13   Q   And it's for Best Care Pharmacy in
14 Weston, West Virginia. Do you see that?
15   A   Yes.
16   Q   Okay. Do you know about how many people
17 lift in Weston, West Virginia?
18   A   A lot more than Philippi.
19   Q   Think so?
20   A   Yes.
21   Q   Okay. Would it surprise you that it's
22 fewer than 5,000 people?
23   A   In that area?
24   Q   In Weston, West Virginia.

Page 232

1    A   Yes.
2    Q   That would surprise you?
3    A   Yes.
4        (Snider Exhibit No. 17 was marked
5        for identification.)
6  BY MR. BOGLE:
7    Q   I hand you Exhibit 1.1909 marked as
8  Exhibit 17.
9        It says: "Population data for Weston,
10 West Virginia," indicated to have a population of
11 4,085 people. Do you see that?
12       MR. COLLINS: Objection. Lack of
13 foundation, lack of authentication, lack of
14 knowledge.
15       THE WITNESS: What year is this, please?
16 BY MR. BOGLE:
17   Q   This is the current data.
18       MR. COLLINS: Yeah, I mean -- it's the
19 internet, it's accurate.
20       THE WITNESS: What's that?
21       MR. BOGLE: Well, I'm sure you guys are
22 going to produce census data that shows otherwise,
23 so we'll just wait to see that.
24       MR. COLLINS: I'll withdraw my

Page 233

1  objection.
2        MR. BOGLE: I would hope so.
3        MR. COLLINS: It's a lack of foundation,
4  lack of knowledge.
5  BY MR. BOGLE:
6    Q   4,085 people, right? That's what it
7  says.
8    A   That's what it says right here.
9    Q   Right. That's wrong; is that your
10 testimony?
11       MR. COLLINS: Objection. Lack of
12 foundation. You haven't established the witness
13 has any knowledge about this issue.
14       MR. BOGLE: Well, he said he thought it
15 was wrong.
16       THE WITNESS: I said I was surprised,
17 and I am. I'm sorry.
18 BY MR. BOGLE:
19   Q   You're surprised?
20   A   Yes.
21   Q   Okay. All right. Let's go back to
22 Exhibit 1.1812, back on .11. See the pharmacist's
23 name there is a Matthew Genin. Do you see that?
24   A   Yes.

Page 234

1    Q   Okay.  And further on in this form,
2   page .14, under "Purchasing Information," it's
3   asked what percentage of their purchases are
4   controlled substances, and they indicate 40
5   percent.  Right?
6        MR. COLLINS:  Sorry.  Where are you?
7   BY MR. BOGLE:
8    Q   Page .14 under Section IV(c).
9        Right?
10   A   Yes.
11   Q   And this was, if you look at the next
12   page, as of October 2009.  Do you see that's when
13   all this form was signed?
14   A   Yes.
15   Q   Okay.  That in and of itself would be
16   a red flag for potential diversion, right, that
17   40 percent of their purchases are controlled
18   substances?
19        MR. COLLINS:  Objection.  Form.
20        THE WITNESS:  I would have sent this up
21   to the DRA to make sure they vet it out.
22   BY MR. BOGLE:
23   Q   I'm asking your opinion, though, sir.
24   40 percent, is that a red flag to you?

Page 235

1    A   And my opinion is I definitely would
2   send this up to the DRA so they can vet it out,
3   yes.
4    Q   Because that's a concern, right, 40
5   percent?
6    A   I would send it to the DRA so they could
7   vet it out for sure.
8    Q   Because that's a concern.  40 percent of
9   their purchases being controlled substances, that
10   is a concern, a potential red flag, right?
11   A   At the time I don't remember, but I know
12   I sent it up to the DRA for vetting out.
13   Q   Okay.  My question was simply whether
14   that would be concerning to you in October 2009,
15   when you signed this form.
16   A   I don't know that --
17   Q   When you read this form, you don't know?
18   A   I don't know that when I signed that.
19   Q   Okay.
20   A   There's documentation as to why, and
21   then they do their due diligence.  That's part of
22   the process of that year also.
23   Q   But 40 percent is a high figure, right,
24   for controlled substances?

Page 236

1        MR. COLLINS:  Objection.  Asked and
2   answered.
3        THE WITNESS:  It depends on their
4   business.
5   BY MR. BOGLE:
6    Q   Okay.  That's -- that's well above the
7   norm, isn't it?
8    A   It's above the average, yes.
9    Q   Yeah.  If you go to the next page,
10   page .15, they provide more detail on their
11   controlled substance purchases.  They indicate
12   6,199 doses dispensed per month for hydrocodone.
13   Do you see that?
14   A   Yes.
15   Q   And 4,905 doses of oxycodone per month
16   is what they are telling you, right, as of this
17   time?
18   A   Yes.
19   Q   Okay.  And there's a request for
20   anything over 5,000 to provide a reason, which is
21   indicated as -- they underlined "Frequent
22   referrals from pain clinics," et cetera.  Do you
23   see that?
24   A   Yes.

Page 237

1    Q   Okay.  Again, that's a potential red
2   flag if they're getting frequent referrals from
3   pain clinics, right?  We talked about that
4   earlier.
5        MR. COLLINS:  Objection.  Form,
6   compound.
7        THE WITNESS:  That one I would do the
8   due diligence on for sure.
9   BY MR. BOGLE:
10   Q   Right.
11   A   And send it up to the director of
12   Regulatory Affairs, yes.
13   Q   And you would hope that they would vet
14   that closely, right?
15   A   Yes.
16   Q   That issue.
17        All right.  Let's go to page .43.
18        So you've got a threshold change form
19   here from -- dated October 9, 2009.  Do you see
20   that?
21   A   Yes.
22   Q   Okay.  And this is for a permanent
23   change regarding 9193, which I will represent is
24   hydrocodone.  That's y'all's code for hydrocodone.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    Do you see that code listed there?
2    A    Where is that listed?
3    Q    "CS requested" -- 9191 is slashed
4 through and 9193 is written.
5    A    Oh, on the left.  I'm sorry.
6    Q    Yeah.  Do you see that?
7    A    9193, yes.
8    Q    Okay.  And if you see here, the current
9 threshold at this point in time in October 2009 is
10 8,000, and they're requesting an increase by
11 12,000 additional doses.
12    Do you see that?
13    A    Sorry.  It says 5,000.
14    MR. COLLINS:  I'm -- I'm confused, and I
15 think the witness is too.
16 BY MR. BOGLE:
17    Q    Current threshold, 8,000.  Do you see
18 that?
19    A    No, I don't see 8,000.
20    MR. COLLINS:  I don't see it either.
21 BY MR. BOGLE:
22    Q    On .43.  Let me check my page here.
23    All right.  So, I'm sorry.  Actually,
24 it's .44.  My fault.

Page 239

1    A    Okay.
2    Q    All right.  So this is -- let's go back
3 and make sure we're talking about the same thing.
4    October 9, 2009, threshold change form,
5 right?
6    A    Yes.
7    Q    For Best Care, right?
8    A    Yes.
9    Q    9193 is the base code entered, which
10 again I'll represent to you is hydrocodone.
11 That's how you guys code that.
12    A    Yes.
13    Q    Okay.  And you see the current threshold
14 is at 8,000.
15    A    Yes.
16    Q    It's a permanent -- request for a
17 permanent increase, right?
18    A    Yes.
19    Q    Increase by 12,000 units, right?
20    A    Yes.
21    Q    And this threshold change request was
22 submitted on October 9, 2009, by you, correct?
23    A    Yes.
24    Q    Okay.  And under "Reason for requested

Page 240

1 change," what's provided there?
2    A    Nothing.  Just the date.
3    Q    And if we go then to the next form --
4    A    If I could say on there, also it says
5 "Question of declaration on file:  Yes, dated
6 10/1/09."  So someone was just in there nine days
7 before this threshold request.
8    MR. BOGLE:  Move to strike as
9 nonresponsive.
10 BY MR. BOGLE:
11    Q    I asked you what was written there under
12 "Reason for requested change" section.
13    MR. COLLINS:  His answer is what it is.
14 BY MR. BOGLE:
15    Q    All right.  Let's go to Bates page
16 ending 4225, since my pages are wrong on this
17 document, which is bottom right, 4225.
18    It's another threshold change form,
19 October 26, 2009, for a permanent change for
20 hydrocodone for Best Care.
21    Do you see that?
22    A    Yes.
23    Q    Okay.  And at this point because the
24 threshold has just been increased a couple of

Page 241

1 weeks earlier, which we just saw, now their
2 current threshold is at 20,000, right?
3    A    I don't remember when the other one was.
4    Q    Sure.  We just looked at it.  We can
5 look at it again.
6    A    If you can just give me the date, I
7 would be fine.
8    Q    It was October 9, 2009 is what we just
9 looked at.  I can take you back to that page if
10 you want.
11    A    Okay.  And this one is --
12    Q    So here you go, page -- Bates page
13 ending 4227, two pages later as the one we just
14 looked at.
15    A    Yes.
16    Q    Okay.  We see hydrocodone, there's a
17 requested increase from 8 to 20.
18    A    Yes.
19    Q    Okay.  Which was submitted by you that
20 day.  So we're now a couple of weeks later, same
21 product, we show the threshold is 20,000, which
22 you indicated it was approved previously, right?
23    A    Yes.
24    Q    Okay.  And now there's a request for an

Page 242

1 additional 5,000 dosage units for hydrocodone,
2 right?
3    A    Yes.
4    Q    Okay.  And is there any specific reason
5 for the requested change given here?
6    A    It says questionnaire declaration was
7 done two weeks previously, or a week and a half.
8 And it was a new customer.
9    Q    Okay.  My question was, under "Reason
10 for requested change," what's the reason provided
11 there?
12        MR. COLLINS:  Asked and answered.
13        THE WITNESS:  Only that I referenced the
14 questionnaire and declaration on file.
15 BY MR. BOGLE:
16    Q    Right.  You don't give any specific
17 reason for the change that's being requested, do
18 you?
19        MR. COLLINS:  Objection.
20 Mischaracterization, asked and answered.
21        THE WITNESS:  Only that I would
22 reference the questionnaire.
23 BY MR. BOGLE:
24    Q    Right.  There's no documented reason why

Page 243

1 there's an increase here, especially given that
2 you've already increased it just two weeks before.
3 Right?
4        MR. COLLINS:  Objection.  It's a
5 mischaracterization of the document and his prior
6 testimony.
7        MR. BOGLE:  So I'll strike that.
8 BY MR. BOGLE:
9    Q    We can agree this was increased just two
10 weeks prior, right?
11    A    Yes.
12    Q    Okay.  And we can agree there's an
13 additional request being submitted two weeks later
14 without any additional documentation supporting
15 why they would need 5,000 more doses a month just
16 two weeks later, is there?
17        MR. COLLINS:  Objection.
18 Mischaracterization of the document and his prior
19 testimony.
20        THE WITNESS:  I would have to reference
21 the questionnaire and the visit.
22 BY MR. BOGLE:
23    Q    Right.  So -- but for the reason for
24 requested change, we can agree there is zip

Page 244

1 written there, nothing, right?
2        MR. COLLINS:  Object.  That's a
3 mischaracterization of the document and his
4 testimony.
5        THE WITNESS:  The document says:  "Refer
6 to questionnaire or -- and declaration on file
7 10/1/09."  So that was within nine days.
8 BY MR. BOGLE:
9    Q    No, this is now three weeks, and you
10 already increased it after that.
11    A    Right.
12    Q    What I'm saying, though, this whole
13 "Reason for requested change" section is supposed
14 to be completed, right?  You don't just refer to a
15 declaration.  That's the whole purpose of this,
16 right, you document your reason for the business
17 change?
18        MR. COLLINS:  Objection.
19 BY MR. BOGLE:
20    Q    You don't say "See declaration."
21        MR. COLLINS:  Objection.
22 BY MR. BOGLE:
23    Q    Right?
24        MR. COLLINS:  There's about four

Page 245

1 questions within one.  Compound, form, asked and
2 answered.
3 BY MR. BOGLE:
4    Q    Sure, I'll reask it.
5        The reason for requested change
6 is supposed to be -- there's supposed to be a
7 written reason documented as to why this change is
8 needed, right?
9    A    In totality, I would have to refer to
10 the questionnaire on file.
11        MR. BOGLE:  Move to strike as
12 nonresponsive.
13 BY MR. BOGLE:
14    Q    "Reason for requested change, be
15 specific."
16        MR. COLLINS:  If that's --
17 BY MR. BOGLE:
18    Q    That's what it says, right?
19        MR. COLLINS:  If that's a question,
20 objection.  Asked and answered.
21 BY MR. BOGLE:
22    Q    Does it say "Be specific"?
23        MR. COLLINS:  Objection.  Asked and
24 answered multiple times.

Highly Confidential - Subject to Further Confidentiality Review

Page 246

BY MR. BOGLE:

2    Q    Does it say "Be specific"?

3    A    And I had the same response: Be
specific, and refer to the questionnaire and
declaration on file.

6    Q    Does it say, "Be specific, please refer
to questionnaire"?  Does that say that's good
enough?

9    A    It's right underneath that.

10   Q    No, you -- it says "Questionnaire or
declaration."  It just asks whether it's there.
It doesn't say that that's sufficient, does it?

13   A    It's -- it's --

14       MR. COLLINS:  Objection. Argumentative.
I would ask you to move on to something else.

16   BY MR. BOGLE:

17   Q    So is it your testimony that your
understanding that as of 2009, you could simply
put "See questionnaire," and that was fine?

20       MR. COLLINS:  Objection.

21   BY MR. BOGLE:

22   Q    Or "See declaration," and that was --
that was justified to increase any threshold based
on that?

---

Page 247

MR. COLLINS:  Object --

2    BY MR. BOGLE:

3    Q    Is that your testimony?

4        MR. COLLINS:  Objection.  The question
is compound.  It's about three or four questions.
It's been asked and answered.

7    BY MR. BOGLE:

8    Q    Is that your testimony?

9        MR. COLLINS:  It's been asked and
answered.  It's a mischaracterization of his
testimony.

12       THE WITNESS:  No, my testimony is that I
did the due diligence and sent it up to Michael
Oriente, the director of Regulatory Affairs.

15   BY MR. BOGLE:

16   Q    You're saying you did your due diligence
because there was a questionnaire and declaration
on file, right?

19   A    Yes.  You can see quite a bit of
information on the store for Best Care, and sales
data and vetting out the store.  And I -- I'm
sorry, it was 10/26, so it was done on 10/1.

23   Q    Right.  Which we already discussed
that -- and you've already increased it --

---

Page 248

A    I did.

2    Q    -- requested increase 10/9?

3    A    And it's a new customer, yes.

4    Q    Okay.  But this is the second increase
in a month.

6    A    Yes.

7    Q    And there's -- you would agree with me,
other than saying "Questionnaire and declaration
on file, yes," there's no written justification
here provided, right?

11       MR. COLLINS:  Objection.
Mischaracterization.  It's been asked and
answered.

14       THE WITNESS:  I would agree to reference
the questionnaire and also the DRA's approval.

16   BY MR. BOGLE:

17   Q    So the questionnaire, which tells us how
much they're dispensing of controlled substances,
and the declaration that they claim they're doing
everything above board, that's good enough, right?

21       MR. COLLINS:  Objection. Argumentative.

22   BY MR. BOGLE:

23   Q    Right?

24   A    I don't know that.

---

Page 249

Q    Okay.  Okay.  Let's take a look at Bates
page ending 4234.

3        See it's another threshold change form
for Best Care, 11/24/09, right?

5    A    Yes.

6    Q    This time the request is to increase the
oxycodone threshold from 8,000 to 12,000, right?

8    A    Yes.

9    Q    Permanently, right?

10   A    Yes.

11   Q    And the reason for change provided here
is: "Store business warrants increase to 12,000,"
right?

14   A    Yes.

15   Q    And that would have been provided by
you, that information, right?

17       MR. COLLINS:  Objection. Form.

18       THE WITNESS:  I don't know that.

19   BY MR. BOGLE:

20   Q    Your name appears under "Approved by,"
right?

22   A    Yes.

23       MR. COLLINS:  Objection.  Asked and
answered, mischaracterization.

---

Page 250

BY MR. BOGLE:
1  Q   That's what it says, right?
2  A   Yes.
3  Q   Okay.  And is there any other reason
4 listed for the change other than "Store business
5 warrants increase to 12,000" --
6  A   No.
7  Q   -- provided on this form?
8      MR. COLLINS:  Objection.  Objection.
9 Mischaracterization.
10 BY MR. BOGLE:
11  Q   If we go to Bates page ending 4239.
12      So this has indicated a Level I review
13 for hydrocodone from June 2010.  Do you see that?
14  A   Yes.
15  Q   And it's noted that they've omitted for
16 hydrocodone, right?
17      It says "EOM omit" under "Supporting
18 Information" -- or next to "Supporting
19 Information."
20  A   Yes.  I'm sorry, I'm not familiar with
21 these.  These are only documents the DRA has
22 knowledge of.
23  Q   What is an omit?

Page 251

1  A   It means something wasn't filled.
2  Q   Okay.  And one way in which somebody can
3 omit is because they've reached their threshold,
4 right?
5  A   Yes.
6  Q   Okay.  If you go to the next page here,
7 do you see where it says "Supporting Information"?
8      Do you see that, the next page, Bates
9 page ending 4240?
10  A   Yes.
11  Q   Okay.  "Supporting Information" says:
12 "Due to an increase in local prescriptions for
13 hydrocodone, Matt has requested we raise his
14 threshold on this item."
15      Do you see that?
16  A   Yes.
17  Q   And the reason for TCR, two below that,
18 says:  "Business growth should be supported by
19 corresponding sales increase."
20      Do you see that?
21  A   Yes.
22  Q   Okay.  And the specific request is to
23 increase the number of hydrocodone doses by 5,000
24 units, right?  5,000 doses.

Page 252

1  A   Yes.
2  Q   Okay.  And you see the next page, there
3 are approvals from Dale Nusser and Michael Oriente
4 on July 8, 2010, right?
5  A   Yes.
6  Q   Okay.  And Dale Nusser, I think we
7 talked about earlier works -- worked beneath you
8 at this point in time, right?
9  A   Yes.
10  Q   So to approve this based on business
11 growth, you would agree there should be some
12 supporting documentation somewhere to support
13 that, right, that their business has in fact grown
14 legitimately?
15  A   I don't know that.
16  Q   You don't know whether that should be
17 there?
18  A   I don't know if Mike got that or not.
19  Q   I'm asking whether it should be there.
20 I'm not asking whether it is there.
21  A   I don't know.
22  Q   You don't know whether that should be
23 there or not?
24  A   That would be up to Michael.

Page 253

1  Q   Okay.
2  A   I don't know if he had to keep that or
3 he disposed of it.  I don't know.
4  Q   You don't in fact know whether they got
5 it, do you?
6      MR. COLLINS:  Objection.  Calls for
7 speculation.
8      THE WITNESS:  I'll testify that I never
9 saw this document, and I'm not responsible for the
10 document, but it's Michael Oriente that had the
11 document.
12 BY MR. BOGLE:
13  Q   Okay.  Do you see page 4242 in this
14 document?
15      It's another threshold change request,
16 this time from July 23rd, 2010.  Do you see that?
17 The date's on the second page.
18  A   Oh, thank you.
19  Q   Do you see that date on there?
20  A   Yes.
21  Q   Okay.  And this is to increase
22 hydrocodone doses by 5,000 doses at this point in
23 time, right?
24      MR. COLLINS:  Objection.  Lack of

Page 254

1  foundation.
2       THE WITNESS: Yes.
3  BY MR. BOGLE:
4    Q   Okay.  And the reason cited is again
5  business growth, right?
6    A   It says -- if I could interject, it
7  says: "Should be supported by corresponding sales
8  increase."
9    Q   Yeah.  That's what it says, right?
10   A   Yes.
11   Q   And then "Supporting Information," it
12  says: "The account opened last October 2009.  The
13  new owner is trying to increase his business in
14  the area and reestablish the pharmacy.  He has
15  increased a number of prescriptions and requesting
16  another increase for hydrocodone.  He was already
17  given an increase of 5,000 on the 8th of this
18  month."
19       Do you see that?
20   A   Yes.
21   Q   So, again, whoever is approving this,
22  Michael Oriente or otherwise, should be requesting
23  documentation to support that increase, right?
24       MR. COLLINS: Objection.  Form.

Page 255

1       THE WITNESS: I don't know.  He may have
2  it.
3  BY MR. BOGLE:
4    Q   Should he?  Should he, right?  He
5  should.
6       MR. COLLINS: Objection.  Calls for a
7  legal conclusion.
8       THE WITNESS: He may have it.  I don't
9  know.
10  BY MR. BOGLE:
11   Q   Right.  My question is, should he?
12       MR. COLLINS: Same objection.  Calls for
13  a legal conclusion.
14       THE WITNESS: I don't know that he
15  doesn't have that.
16  BY MR. BOGLE:
17   Q   That, sir, was not my question.  I'm
18  asking should he have requested it.  I'm not
19  asking whether he did or whether he's got it or
20  what happened to it.  I'm just asking if he
21  should.
22   A   I don't know that.
23       MR. COLLINS: I'm sorry --
24  BY MR. BOGLE:

Page 256

1    Q   You don't know if he should have?
2       MR. COLLINS: Let me object.  Lack of
3  foundation, lack of firsthand knowledge, calls for
4  a legal conclusion.
5  BY MR. BOGLE:
6    Q   You see on the next page, page 4243,
7  this was approved by Michael Oriente and Duane
8  McPherson.  Do you see that?
9    A   Yes.
10   Q   Does Duane McPherson work at your
11  distribution center?
12   A   Yes.
13   Q   Okay.  Works beneath you?
14   A   Yes.
15   Q   We'll look at another one from the same
16  month for oxycodone, July 2010, which is page
17  4244.
18       Do you see they've omitted here for
19  oxycodone, July 2010?  Do you see that?
20       MR. COLLINS: Objection.  Lack of
21  foundation.  The witness hasn't testified he has
22  firsthand knowledge of this.
23       THE WITNESS: Yeah, I don't know what
24  this is.  If it doesn't respond to another

Page 257

1  threshold change request earlier, is this the same
2  one we went over?
3  BY MR. BOGLE:
4    Q   We're about to walk through that.  Just
5  bear with me.
6    A   Okay.
7    Q   What it says here is an oxycodone omit,
8  July 2010, right?
9       MR. COLLINS: Objection.  Lack of
10  foundation.  Lack of firsthand knowledge.
11      THE WITNESS: This document is new to
12  me, but that's what it says.
13  BY MR. BOGLE:
14   Q   And it notes a Level I review, right?
15      MR. COLLINS: Objection.  Lack of
16  foundation.
17      THE WITNESS: Yes, it says "Document
18  type."
19  BY MR. BOGLE:
20   Q   Yep, Level I review.  And Level I
21  reviews at this point in time in 2010 were to be
22  done by you or your designee at the distribution
23  center, right?
24   A   Or director of regular -- Regulatory

Page 266

1    THE WITNESS: That's what it says there.
2  BY MR. BOGLE:
3    Q    And this was one approved January 27,
4  2011, by Diane Martin and Michael Oriente. Do you
5  see that, the next page?
6    A    Yes. Michael's director of Regulatory
7  Affairs.
8    Q    Also approved by Diane Martin, as
9  indicated on that form, right?
10    A    She evidently put it in.
11    Q    Right. Do you recall another location
12  of Best Care being in Lumberport, West Virginia?
13    MR. COLLINS: Are you -- I'm sorry.
14  We've been going 70 minutes. Is this a good time
15  to break?
16    MR. BOGLE: That's fine. I'm moving to
17  a different pharmacy. That's fine.
18    THE VIDEOGRAPHER: The time is 12:47
19  p.m. We're going off the record.
20    (Lunch recess.)
21    THE VIDEOGRAPHER: The time is
22  1:35 p.m., and we're back on the record.
23  BY MR. BOGLE:
24    Q    All right, Mr. Snider, we're back from

Page 267

1  lunch. I wanted to pick up from where we were
2  talking about before we broke.
3    So we were talking about Best Care
4  Pharmacy. You recall that generally?
5    A    Yes.
6    Q    Okay. And I want to talk to you about
7  their pharmacy in Lumberport, West Virginia. Are
8  you familiar with that pharmacy?
9    A    A little bit, yeah.
10    Q    Okay. And that's a pharmacy that New
11  Castle has serviced historically, right?
12    A    Yes. It -- I believe it -- the
13  documents show 2009, was it, it went onboard.
14    Q    Okay. Yeah. So I want to take a look
15  at some documents related to that location.
16    (Snider Exhibit No. 18 was marked
17    for identification.)
18  BY MR. BOGLE:
19    Q    I'm going to hand you Exhibit 1.1821,
20  also marked as Exhibit 18 to your deposition.
21    All right. This is another one of these
22  files, and you see the name on the outside is
23  "Lumberport."
24    Do you see that?

Page 268

1    A    Yes.
2    Q    Okay. And I want to walk through, first
3  of all, the pharmacy questionnaire when they were
4  onboarded.
5    So if you go to page .2, you see there's
6  a signature there on that page from you. Do you
7  see that?
8    A    Yes.
9    Q    Okay. Related to Lumberport Pharmacy.
10  And would this be you signing off on the pharmacy
11  questionnaire that follows?
12    A    Yes. And the affidavit was signed by
13  the pharmacist, I believe.
14    Q    Okay. So let's go to the questionnaire
15  that starts on page .3. And you see there,
16  they're noted to be a new customer going live
17  October 1, 2009. Do you see that?
18    A    Yes.
19    Q    Okay. And the pharmacist's name there
20  is a Matt Genin. Do you see that at the bottom?
21    A    Yes.
22    Q    Okay. You recognize that is the same
23  name we just saw going through the Best Care
24  Pharmacy at Weston, West Virginia. Do you recall

Page 269

1  that name?
2    A    I don't remember, but it could be.
3    Q    Okay. Well, I can show you if you want
4  to refresh on it. Let me -- give me one second to
5  find that document.
6    MR. COLLINS: I honestly don't remember
7  it, but --
8    MR. BOGLE: It's not a huge point, but I
9  decided I wanted to make it, so we're --
10    MR. COLLINS: Fine. Fair enough. It's
11  your depo.
12  BY MR. BOGLE:
13    Q    All right. So it's 1.1812, which I
14  believe would be Exhibit 17 as well, the Best Care
15  document we looked at right before lunch. I think
16  it's the one you've got in your hand right there.
17    MR. COLLINS: That's 16.
18    MR. BOGLE: Oh, is it 16? Okay. Then
19  that's the one I want, 16.
20    MR. COLLINS: What page? I'm sorry.
21  BY MR. BOGLE:
22    Q    So if you go to page on this one .11.
23  It's again the pharmacy questionnaire.
24    Do you see the pharmacist's name there?

Page 270

1  A   Yes.
2  Q   Do you see it's the same individual
3  we're talking about there?
4  A   Yes.  Same license.
5  Q   Yeah, same license number as well.
6  Okay.
7      So we're dealing with the same
8  pharmacist involved with this Lumberport location
9  here.  So in looking further, he's also noted on
10  .4 as the owner of the pharmacy.
11     Do you see that?
12  A   I believe the owner, it says Bob Reep.
13  Q   Are you at -- are you back on
14  Exhibit 18?  Because I'm looking at page .4.
15  A   Well, I'm not sure who's the owner.  Is
16  it Bob Reep or Matt Genin?
17  Q   Well, let's look at .4, and we can take
18  a look at that first.
19  A   Okay.
20  Q   So on .4, it says "Ownership/business
21  history," and it says "Owner's name:  Matt Genin,
22  dba," which I believe means doing business as,
23  "Best Care Pharmacy."
24     Do you see that?

Page 271

1  A   Yes.
2  Q   Okay.  And it's actually got the Weston
3  address of the Best Care Pharmacy we just looked
4  at, right?
5  A   Yes.
6  Q   And continuing further on in this
7  questionnaire, page .7, and you see here again
8  they're outlining their controlled substances
9  purchases as of October 2009, and they note 80
10  percent of the controlled substances purchases
11  were for hydrocodone.
12     Do you see that?
13  A   Yes.
14  Q   Okay.  And you would agree 80 percent of
15  their controlled substances purchases being
16  hydrocodone is a potential red flag that needs to
17  be reviewed from the perspective of diversion,
18  right?
19  A   I would agree that the director of
20  Regulatory Affairs would have to look at that.
21  Q   Okay.  It's something that should be
22  looked at.  I'm not saying -- again, I'm not
23  saying necessarily that it's you on the front
24  lines looking at that, but that should be

Page 272

1  investigated, correct?
2  A   It's something that I think the director
3  of Regulatory Affairs should look at.
4  Q   All right.  Now, Lumberport, you
5  understand that's another very small city, right?
6      MR. COLLINS:  Objection.
7  BY MR. BOGLE:
8  Q   In West Virginia.
9      MR. COLLINS:  Objection to form.
10     THE WITNESS:  I don't remember.
11  BY MR. BOGLE:
12  Q   Okay.  Have you ever been to Lumberport?
13  A   No, I don't remember being there.
14  Q   Okay.
15     (Snider Exhibit No. 19 was marked
16     for identification.)
17  BY MR. BOGLE:
18  Q   I hand you Exhibit 19.
19     Actually, let me ask you this:  If the
20  census data indicated there were fewer than a
21  thousand people living in Lumberport, would you
22  have reason to dispute that?
23     MR. COLLINS:  Again, foundation.
24     THE WITNESS:  I wouldn't know.  I'd have

Page 273

1  no reason to dispute it.
2  BY MR. BOGLE:
3  Q   Okay.  Let's just take a look real quick
4  then.  Exhibit 19, also marked as 1.1908, is what
5  I'm handing you.
6      All right.  It's another printout with
7  population and other data.  You see it's for
8  Lumberport, West Virginia?
9  A   Yes, I see.
10  Q   And this is the most current data that I
11  was able to obtain.  The population noted here for
12  Lumberport is 881 people.  Do you see that?
13  A   Yes.
14  Q   Okay.  Do you have any specific
15  knowledge that would contradict that being the
16  most current population data for Lumberport?
17     MR. COLLINS:  Objection.  Foundation.
18     THE WITNESS:  I don't have any knowledge
19  of the surrounding area of Lumberport.
20  BY MR. BOGLE:
21  Q   Okay.  All right.  So let's go back to
22  Exhibit 1.1821, and I want to specifically look at
23  .19 is the page.
24  A   Can you give me that exhibit again?

Page 274

1    Q   It's 1.1821, the page is .19.  The page
2   should look like this (indicating).
3        MR. COLLINS:  He's referring to the
4   numbers at the top.
5        THE WITNESS:  Oh, 1821.19, okay.
6   BY MR. BOGLE:
7    Q   Yeah.
8    A   Thank you.
9    Q   Are you at that page?
10   A   Yes.
11   Q   Okay.  And you see here this is for
12  threshold change form, October 19, 2009, for a
13  permanent threshold change.  Do you see that?
14       MR. COLLINS:  Objection.  Form.
15       THE WITNESS:  I don't know if it's to
16  start them.  It looks like the day we opened them.
17  BY MR. BOGLE:
18   Q   Yeah, I'm just saying the date is
19  October 19, 2009, right?
20   A   Yes.
21   Q   Okay.  And it's a threshold change form
22  requesting a permanent threshold change, right?
23   A   Yes, but I think it's the start of their
24  ownership.  I'm not sure because I'm -- we had a

Page 275

1   Level I questionnaire on that date.
2    Q   Okay.  But all I'm --
3    A   So I'm --
4    Q   Okay.  All I'm asking, though, is it's
5   indicated to be a permanent change being
6   requested, right?
7    A   Yes.
8    Q   Okay.  And this is related to 9193,
9   which I believe is hydrocodone.  Do you see that?
10   A   Yes.
11   Q   And the current threshold is noted to be
12  8,000 at this point in time, right?
13   A   Yes.
14       MR. COLLINS:  Objection.
15  Mischaracterization.
16  BY MR. BOGLE:
17   Q   And there is a request to increase that,
18  to double that, to 16,000 doses per month, right?
19       MR. COLLINS:  Objection.  Foundation.
20       THE WITNESS:  Well, I'd have to -- oh,
21  plus -- plus 8,000.
22  BY MR. BOGLE:
23   Q   Right.
24   A   Yes.

Page 276

1    Q   They're asking to add 8,000 to the
2   existing threshold, right?
3    A   Yes.
4    Q   Okay.  So -- and it says for -- the
5   reason for the requested change -- actually,
6   strike that.
7        When it's noted to increase a threshold,
8   and we talk about by a certain number of doses, a
9   dose when it comes to hydrocodone or oxycodone is
10  a pill, right?
11   A   Usually a pill or an ounce.
12   Q   All right.  When it comes in pill form,
13  it's going to be a single pill, right?
14   A   Usually, yes.
15   Q   Okay.
16   A   That I know of.
17   Q   Okay.  And the reason noted for the
18  requested change here is:  "Brand new account.
19  Family threshold is set too low."  Do you see
20  that?
21   A   Yes.
22   Q   Okay.  And this was submitted by you on
23  October 20th, 2009, right?
24   A   Yes.

Page 277

1    Q   And in addition, from sales, Jim
2   Gavatorta; approved by Michael Oriente, right?
3    A   Yes.
4    Q   Okay.  And to establish that the
5   threshold is too low for the specific product, you
6   would need to be able to look at the prescription
7   data for hydrocodone and the overall prescription
8   data to indicate whether this is too low.
9        You agree with that, right?
10       MR. COLLINS:  Objection.  Form.
11       THE WITNESS:  I would not have to look
12  at that.  I'd look at the --
13       What year was this, please?
14  BY MR. BOGLE:
15   Q   October 2009.
16   A   I believe I would get the sales and the
17  director of Regulatory Affairs or the -- or Jim
18  would have gotten the script information.
19   Q   Right.  But my question simply was,
20  to -- whoever is making this determination at
21  Regulatory would need to look at how much they're
22  selling of hydrocodone and how that compares to
23  their overall prescription sales at that time,
24  right?

Page 282

1 that indicates an attachment here, there's actual
2 physical documentation attached here showing
3 purchase data?
4      MR. COLLINS: Objection. Form.
5      THE WITNESS: I don't see anything
6 except that Word document attachment that's not
7 attached here.
8 BY MR. BOGLE:
9      Q   Okay.  And how do you know that's not
10 attached?
11      A   I don't see it.
12      Q   Okay.  Do you see there's a -- on that
13 same day -- I think you're looking at page .20.
14      A   Yes.
15      Q   Okay.  And that references a Lumberport
16 TCF, hydrocodone, 10/19/09, right?
17      A   I don't know.
18      Q   So the document -- that's what it says,
19 the attachment, right, that you're referring to?
20      A   Yes.  Yeah.
21      Q   Okay.  And you see the previous page,
22 10/19/09, I believe is the one we just looked at a
23 minute ago, same date, hydrocodone, increase
24 request?

Page 283

1      MR. COLLINS: Objection. Form.
2      THE WITNESS: I -- I --
3      MR. COLLINS: What's the question?
4      THE WITNESS: I see it.
5 BY MR. BOGLE:
6      Q   It's the same date and for the same
7 product that you're refer- -- that's being
8 referenced in the attachment there, right?  And
9 the same pharmacy.
10      A   Yes, it is.
11      Q   Okay.  And TCF is threshold change,
12 right, form?
13      A   Yes.  That's usually what we refer to.
14      Q   All right.  Let's go to next page .15 in
15 this document.
16          And on .15 and .16 is an additional
17 threshold change request for hydrocodone for an
18 additional 2,000 doses.
19          Do you see that?
20      MR. COLLINS: Objection. Foundation.
21      THE WITNESS: Yeah, this is a Pharmacy
22 Regulatory Affairs document.  I didn't always see
23 these, and I didn't see this.
24 BY MR. BOGLE:

Page 284

1      Q   Okay.  Do you see that there, though,
2 the request for 2,000 additional doses for
3 hydrocodone?
4      MR. COLLINS: Same objections.
5      THE WITNESS: It's what it looks like,
6 yes.
7 BY MR. BOGLE:
8      Q   And on .16, this was approved by Diane
9 Martin at your facility and Michael Oriente,
10 October 26, 2010 -- or August 26, 2010, right?
11      MR. COLLINS: Objection. Foundation.
12      THE WITNESS: That would mean Diane
13 would have sent it in to the director of
14 Regulatory Affairs.
15 BY MR. BOGLE:
16      Q   Right.  But what's noted in the document
17 is approval dates, August 26, 2010, for both of
18 them, right?
19      A   I believe that's when Diane sent it in,
20 yes.
21      Q   Okay.  And what's noted here, if you go
22 back to page .15 for supporting information, it
23 says: "This accounts purchases are up overall.  A
24 review and visit were done by Dale Nusser and Jim

Page 285

1 Gavatorta in the fall of 2009."
2          Do you see that?
3      A   Yes.
4      Q   Okay.  So that's a full year prior to
5 this request when this review was done, right?
6      MR. COLLINS: Objection. Misstates the
7 document.
8      THE WITNESS: I would think that's
9 reasonable.
10 BY MR. BOGLE:
11      Q   Okay.  So the supporting information for
12 this increase in August 2010 is that there had
13 been a review and site visit nearly a year before,
14 right?
15      A   I don't know what else was included with
16 Michael's DRA due diligence.
17      Q   But that's what's indicated here for
18 supporting information on this form, right?
19      A   The form says that, yes.
20      Q   Right.  And it's for a permanent
21 request, again based on "Business growth should be
22 supported by corresponding sales increase."
23 That's what's indicated on the form, right?
24      MR. COLLINS: Objection. Form.

Page 286

1    THE WITNESS:  That's what it says on the
2 form.  I don't know that he doesn't have that.
3 BY MR. BOGLE:
4    Q   Right.  You don't know either way,
5 right?
6    A   No.
7    Q   And for Lumber -- I'm sorry, strike
8 that.
9       For Best Care, they also had a pharmacy
10 in Belington, West Virginia, right?  Do you recall
11 that, servicing that pharmacy too?
12    A   Yes, I do.
13    Q   Okay.  And Belington, West Virginia, do
14 you know anything about the population for that
15 city?
16    A   No, I don't.  I don't.  I don't think I
17 remember being there.
18    Q   Okay.  Any reason to dispute they have
19 about 2,000 people in Belington, West Virginia?
20       MR. COLLINS:  Objection.  Foundation.
21       THE WITNESS:  I wouldn't dispute that.
22 I don't know.
23       (Snider Exhibit No. 20 was marked
24       for identification.)

Page 287

1 BY MR. BOGLE:
2    Q   Okay.  And I want to look at some of the
3 documentation on the Belington location.  I hand
4 you Exhibit 20, also marked as Exhibit 1.1822.
5       All right.  We see here, we start with
6 page .5.  It's a threshold change form from
7 August 20, 2009.  Do you see that?
8    A   It's a Level I documentation, yes.
9    Q   Right.  You say Level I documentation.
10 I'm looking at the threshold change form.  Are we
11 looking at something different?
12    A   Oh, I'm sorry.  Yeah, .5?
13    Q   Yes.  Yes, sir.
14    A   I apologize, I was.
15    Q   That's all right.
16       Okay.  You see -- you see August 20,
17 2009, there on that one, right?
18    A   Yes.
19    Q   Where it says "Belington Prescription in
20 Belington, West Virginia."
21    A   Yes.
22    Q   Do you see that name?
23    A   Yep.
24    Q   And the current threshold noted here for

Page 288

1 them on hydrocodone is 12,000.  Do you see that?
2    A   Increase amount 2,000 -- current
3 threshold, 12, yes.
4    Q   Right.  And they're asking for 2,000
5 more, right?
6    A   Yes.
7    Q   Okay.  And the reason for change noted
8 here is:  "Increase in business, stopped buying
9 from competitor Bellco.  All hydrocodone bought
10 from McKesson."
11       Do you see that as the reason noted?
12    A   I see that, yes.
13    Q   Okay.  When customers tell you that
14 they've stopped buying from one of your
15 competitors, that's something you would ask for
16 them to substantiate, right, to prove that?
17    A   That's something Michael would ask to
18 substantiate that so he could get the data.
19    Q   And that -- that should be confirmed,
20 right?
21       MR. COLLINS:  Objection.  Form.
22       THE WITNESS:  I can't answer if he did
23 or didn't.
24 BY MR. BOGLE:

Page 289

1    Q   I didn't ask you that.  That should be
2 confirmed, right?
3       MR. COLLINS:  Objection.  Calls for a
4 legal conclusion.  Form.  Foundation.
5       THE WITNESS:  I can't answer if he did
6 or didn't.
7 BY MR. BOGLE:
8    Q   Okay.  Listen to my question.
9       That should be confirmed, right?  I
10 didn't ask you whether he did confirm.  I'm
11 asking, that's something that should be confirmed
12 when a customer tells you that?
13       MR. COLLINS:  Objection.  Calls for a
14 legal conclusion, form, foundation.
15       THE WITNESS:  I answered.  I can't --
16 I'm not sure if he did or didn't.
17 BY MR. BOGLE:
18    Q   Right.  But should he have, from your
19 perspective?
20    A   I can't answer for him, sir.
21    Q   Okay.  And this is noted as being
22 approved by both yourself and Michael Oriente on
23 August 20, 2009, right?
24       MR. COLLINS:  Objection to the term

Page 290

1  "approved."
2          THE WITNESS: I signed the threshold
3  change request to be put through.
4  BY MR. BOGLE:
5      Q   Right. This says "Approved by," and
6  there's your name and there's Michael Oriente's
7  name, right?
8          MR. COLLINS: Objection.
9  Mischaracterization.
10         THE WITNESS: I signed it to be sent to
11 the Regulatory Affairs director.
12 BY MR. BOGLE:
13     Q   And if you go to page .11.
14         MR. BOGLE: .11 and .12, can we just
15 pull those up side by side on the screen? Thanks.
16 BY MR. BOGLE:
17     Q   Do you see this is a threshold change
18 request for hydrocodone for Belington approved
19 August 16, 2010? Do you see that?
20         MR. COLLINS: Objection. Foundation.
21         THE WITNESS: I didn't -- I don't know
22 this document. I'm sorry. Can you go through it
23 again?
24 BY MR. BOGLE:

Page 291

1      Q   Yeah. You see on page .12, "DC approval
2  status: Approved Duane McPherson, August 16,
3  2010." Right?
4          MR. COLLINS: Objection. Foundation.
5          THE WITNESS: Yes.
6  BY MR. BOGLE:
7      Q   And "DRA approval status: Approved by
8  Michael Oriente," three minutes later, "August 16,
9  2010." Right?
10         MR. COLLINS: Objection. Foundation.
11         THE WITNESS: I already testified to how
12 it works. I don't know what due diligence was
13 done before or after the call.
14 BY MR. BOGLE:
15     Q   Right. I'm just asking if that's --
16 that's what is indicated here.
17     A   You said three minutes.
18     Q   Yeah, 10:59 to 11:02.
19     A   Correct.
20     Q   And then -- so going back to .11,
21 they're requesting here an increase of 4,000 doses
22 for hydrocodone, a permanent increase, right?
23     A   It looks like this form says it was
24 increased.

Page 292

1      Q   Right. That's what they were
2  requesting, and that's what they got, right?
3      A   Well, I don't see the TCR with this, but
4  I do see this form.
5      Q   Okay. And "Supporting Information"
6  says: "Belington was recently sold to Best Care
7  Pharmacy Group in May 2010. New scripts from this
8  acquisition has caused a need for an increase in
9  their hydrocodone threshold."
10         Do you see that?
11     A   Yes.
12     Q   Okay. And again, business growth is the
13 reason provided, right?
14     A   No, it was sold.
15     Q   Right. But the reason for TCR, it says:
16 "Business growth should be supported by
17 corresponding sales increase." Right?
18         MR. COLLINS: Objection. Lack of
19 foundation.
20         THE WITNESS: Yeah, supporting
21 correspondence above, yes.
22 BY MR. BOGLE:
23     Q   Okay. And so, again, if there's an
24 acquisition which has caused an increased need,

Page 293

1  that's again something that would need to be
2  confirmed with documentation, right?
3          MR. COLLINS: Objection. Calls for a
4  legal conclusion.
5          THE WITNESS: I don't know. It could
6  have been done with a phone call or a check of the
7  pharmacy license or a call to the State Board of
8  Pharmacy.
9  BY MR. BOGLE:
10     Q   But just the purchase itself doesn't
11 mean they need more pills, right? You would need
12 to show a business need documented beyond just the
13 purchase itself, right?
14         MR. COLLINS: Objection. Calls for a
15 legal conclusion, foundation, form.
16         THE WITNESS: I don't know what Michael
17 did to show on that.
18 BY MR. BOGLE:
19     Q   Okay. All right. So let's go to
20 page .13 and .14.
21         Do you see here this is another
22 threshold change request for hydrocodone
23 requesting a temporary increase of 9,000 doses?
24 Do you see that?

Page 294

1    A    Yes.
2    Q    This was approved by Joel Zwick and
3 Michael Oriente, November 15, 2010, right?
4    A    Joel sent it to Michael.
5    Q    The note is approving on November 15 --
6    A    Oh, I'm sorry, I correct myself.
7        Dale Nusser sent it to Michael.
8    Q    Right.  .14 indicates that Joel Zwick
9 and Michael Oriente both noted as approving this
10 on November 15, 2010, right?
11       MR. COLLINS:  Objection.  Lack of
12 foundation, lack of firsthand knowledge.
13       THE WITNESS:  Joel sent it, yes.  I
14 believe.  I don't know this form.  But it shows
15 that Joel sent it, and then above here, it says
16 "Submitter name:  Dale Nusser."
17 BY MR. BOGLE:
18    Q    And it does show it was approved, right?
19       MR. COLLINS:  Objection.  Form.
20       THE WITNESS:  The way I see it, I don't
21 see a signature, but the -- the -- Michael
22 Oriente's name is on the -- this document.
23 BY MR. BOGLE:
24    Q    And it says "Approved," right?

Page 295

1        MR. COLLINS:  Objection.  Form.
2 BY MR. BOGLE:
3    Q    On .14.
4        MR. COLLINS:  Objection.  Form.
5        THE WITNESS:  "DRA approval status:
6 Approved."
7 BY MR. BOGLE:
8    Q    Yep.  And for "Supporting Information"
9 on this one, it says:  "The customer was robbed on
10 Sunday.  All hydrocodone products were stolen
11 except for two bottles of Vicodin 5/500.  Customer
12 to send a copy of police report when received."
13       Do you see that?
14    A    Yes.
15    Q    Do you see a copy of the police report
16 here in this file?
17       MR. COLLINS:  Objection.  Foundation.
18       THE WITNESS:  I don't know that that's
19 in here.  I don't see it in what you gave me.
20 BY MR. BOGLE:
21    Q    Okay.  This is the document as produced.
22 I'm giving you what was produced to us.
23       Do you see it in this?
24    A    I didn't produce it.

Page 296

1    Q    Huh?
2    A    I didn't produce it.  I don't know.
3    Q    I'm just asking you if you see the
4 police report in this packet related to this
5 pharmacy.
6        MR. COLLINS:  Objection.  Argumentative.
7        THE WITNESS:  I don't see it in here.
8 BY MR. BOGLE:
9    Q    Okay.  Are you aware that ultimately one
10 of the owners of Best Care was prosecuted for
11 illegally diverting opioids?
12    A    I am aware that an owner of Best Care
13 was prosecuted, and we cut them off.
14    Q    Well, you're aware that there was a --
15 there was an arrest and a prosecution for one of
16 the owners of Best Care for diversion of opioid
17 products, right?
18       MR. COLLINS:  Objection.  Foundation.
19       THE WITNESS:  I was aware that he was
20 arrested.  That's all.
21       (Snider Exhibit No. 21 was marked
22       for identification.)
23 BY MR. BOGLE:
24    Q    Okay.  Let me hand you 1.1251,

Page 297

1 Exhibit 21.
2        This is a news release from the U.S.
3 Department of Justice, June 3rd, 2014, titled
4 "Pharmacist charged with illegal distribution of
5 painkillers."
6        Do you see that?
7    A    Yes.
8    Q    Have you ever seen this press release
9 related to Best Care?
10   A    No, I haven't.
11   Q    Okay.  How did you become aware of the
12 arrest then?
13   A    I don't remember.  Probably the DRA.
14   Q    And if you look in the press
15 release, it says:  "A West Virginia pharmacist has
16 been indicted on charges that he dispensed
17 prescription painkillers outside the scope of his
18 professional practice."
19       And then it says:  "United States
20 Attorney William Ihlenfeld, II, announced that
21 Mario Blount, 51, of Bridgeport, West Virginia,
22 was arrested this morning on charges of conspiracy
23 to possess and distribute Schedule II controlled
24 substances, distribution of oxycodone and a