# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 21 – Mays Tr. (2-8-19) Excerpts

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4                        -  -  -

 5

       IN RE:  NATIONAL            :   MDL NO. 2804
 6     PRESCRIPTION OPIATE         :
       LITIGATION                  :
 7                                 :

       ------------------------------------------------
 8     THIS DOCUMENT RELATES TO    :   CASE NO.
       ALL CASES                   :   1:17-MD-2804
 9                                 :
                                   :   Hon. Dan A.
10                                 :   Polster

11                        -  -  -

12                   February 8, 2019

13                        -  -  -

          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                 CONFIDENTIALITY REVIEW

15

16            Continued videotaped deposition
       of STEPHEN MAYS taken pursuant to notice, was
17     held at the law offices of Reed Smith LLP, Three
       Logan Square, 1717 Arch Street, Suite 3100,
18     Philadelphia, Pennsylvania, beginning at 11:12
       a.m., on the above date, before Ann Marie
19     Mitchell, a Federally Approved Certified Realtime
       Reporter, Registered Diplomate Reporter,
20     Registered Merit Reporter and Notary Public.

21

                          -  -  -

22

               GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com

24
```

Page 14

1    Q.   Okay.  So you were deposed a few
2   months ago or so in this case.
3           Do you recall?
4    A.   I do.
5    Q.   Okay.  One of the things we
6   discussed in your prior deposition was your work
7   history with your current employer.
8           Do you recall that?
9    A.   Yes.
10    Q.   During your last deposition, we
11   discussed how one of the things that you did was
12   you established the Orlando facility for the
13   company.
14           Do you recall that discussion?
15           MS. McCLURE:  Objection to form.
16           THE WITNESS:  I didn't establish
17       it alone.  I was the operations manager.
18   BY MR. PIFKO:
19    Q.   Okay.
20    A.   When it was opened, yes.
21    Q.   But you were one of the people
22   who was responsible for establishing the Orlando
23   facility.  Correct?
24    A.   That's right.

Page 15

1           MS. McCLURE:  Objection to form.
2   BY MR. PIFKO:
3    Q.   You moved from, I believe you
4   were in Kentucky or Tennessee?
5    A.   Tennessee.
6    Q.   Okay.  Tennessee.  You moved from
7   there to Orlando in order to help establish the
8   Orlando facility.  Correct?
9    A.   That's correct.
10    Q.   And then you -- what was your
11   first role at the Orlando facility?
12           MS. McCLURE:  Objection, asked
13       and answered.
14           THE WITNESS:  I was the
15       operations manager.
16   BY MR. PIFKO:
17    Q.   And did you have that role the
18   whole time that you were there?
19    A.   Not the whole time, no.
20    Q.   What was your most senior role
21   when you left the Orlando facility?
22           MS. McCLURE:  Objection, asked
23       and answered, form.
24           THE WITNESS:  Operations manager

Page 16

1   was the most senior role.
2   BY MR. PIFKO:
3    Q.   And then later you became an
4   auditor.  Correct?
5    A.   Yes.
6    Q.   And part of your responsibilities
7   involved auditing the facilities, including the
8   Orlando facility.  Correct?
9    A.   Originally not the Orlando
10   facility.
11    Q.   But ultimately you did have
12   responsibilities that included auditing the
13   Orlando facility.  Correct?
14    A.   I believe --
15           MS. McCLURE:  Objection, asked
16       and answered.
17           THE WITNESS:  I believe that was
18       in my area of responsibility, yes.
19   BY MR. PIFKO:
20    Q.   Are you familiar with the order
21   to show cause that was issued concerning the
22   Orlando facility?
23    A.   Yes.
24           MS. McCLURE:  Objection, asked

Page 17

1   and answered.
2       Are we doing a continuation of
3   the exhibit numbering?
4           MR. PIFKO:  We're calling it
5       Volume 2.
6           MS. McCLURE:  Thank you.
7           - - -
8       (Deposition Exhibit No. Mays
9   V2-1, Order to Show Cause and Immediate
10   Suspension of Registration, Bates stamped
11   ABDCMDL00269383 through ABDCMDL00269387,
12   was marked for identification.)
13           - - -
14   BY MR. PIFKO:
15    Q.   I'm handing you what's marked as
16   Exhibit 1.  Volume 2, Exhibit 1.
17       For the record, it's a letter
18   from the DEA dated April 19, 2007, Bates labeled
19   ABDCMDL00269383 through 387.
20       Have you seen this exhibit
21   before?
22           MS. McCLURE:  The document or the
23       exhibit?
24           THE WITNESS:  I've seen this

Page 18

1     document before, yes.
2  BY MR. PIFKO:
3        Q.   Can you tell me what this is?
4        A.   It is an order to show cause and
5  immediate suspension of the Orlando registration.
6        Q.   When was the last time you saw
7  this document?
8        A.   I can't recall.
9        Q.   Is this something that you
10  reviewed in preparing for your deposition?
11       A.   No.
12       Q.   Okay.  Do you believe you saw
13  this on or around the time it was issued in April
14  of 2007?
15            MS. McCLURE:  Objection to form.
16            THE WITNESS:  Sometime after the
17       suspension.  I didn't see it immediately.
18  BY MR. PIFKO:
19       Q.   Okay.  But sometime on or
20  around -- it was -- after it was issued, it was
21  provided to you.  Correct?
22       A.   That's correct.
23       Q.   Who would have provided it to
24  you?

Page 19

1            MS. McCLURE:  Objection to form.
2            THE WITNESS:  I don't recall.
3  BY MR. PIFKO:
4        Q.   Were you part of discussions
5  about what was going to be done to respond to
6  this order to show cause?
7            MS. McCLURE:  Objection to form.
8            THE WITNESS:  Internally or with
9       DEA?
10  BY MR. PIFKO:
11       Q.   Internally.
12       A.   Internally.  Yes.  I was part of
13  some discussions, yes.
14       Q.   Who did you discuss this order to
15  show cause with?
16       A.   My boss, Chris Zimmerman.
17       Q.   Anyone else?
18       A.   Not that I remember.
19       Q.   What was the nature of your
20  discussion with Mr. Zimmerman?
21       A.   I don't recall exactly.
22       Q.   Did you discuss that you were
23  going to make any changes to the operations at
24  the Orlando facility as a result of seeing this

Page 20

1  order to show cause?
2            MS. McCLURE:  Objection to form.
3            THE WITNESS:  I'm not sure what
4       that -- I'm not sure what you mean by
5       changes operationally.
6  BY MR. PIFKO:
7        Q.   Well, let's go through and see --
8  let's look at Exhibit 1 and see what the
9  Department of Justice said to AmerisourceBergen
10  in this letter.
11            It said, "Respondent" -- you see
12  on the first page here, there's a number of
13  paragraphs, starting about halfway down.
14            It says, "Respondent has failed
15  to maintain effective controls against diversion
16  of particular controlled substances into other
17  than legitimate medical, scientific and
18  industrial channels, in violation of 21 U.S.C.
19  Sections 823(b)(1) and (e)(1)."
20            Do you see that?
21       A.   I do.
22       Q.   Did I read that correctly?
23       A.   I believe you did.
24       Q.   And then it says, "From January

Page 21

1  1, 2006, through January 31, 2007, Respondent
2  distributed over 3.8 million dosage units of
3  combination hydrocodone products to customers
4  that it knew or should have known were diverting
5  the hydrocodone into other than legitimate
6  medical, scientific and industrial channels."
7            Do you see that?
8        A.   Yes, I do.
9        Q.   Did I read that correctly?
10       A.   I think you did.
11       Q.   Did you understand at the time
12  that that was a concern raised by the Department
13  of Justice with respect to AmerisourceBergen?
14       A.   Yes, I understand that.
15            MS. McCLURE:  Objection to the
16       form.
17  BY MR. PIFKO:
18       Q.   Did you have an understanding
19  about what the specific basis was for that
20  concern?
21            MS. McCLURE:  Objection to the
22       form.
23            THE WITNESS:  Can you repeat that
24       question again?

Page 22

BY MR. PIFKO:

Q. So it says here that AmerisourceBergen failed to maintain effective controls against diversion. And then it says that AmerisourceBergen distributed over 3.8 million dosage units of combination hydrocodone products to customers that it knew or should have known were diverting them.

Did I read that -- summarize it correctly?

A. I just asked you to repeat the question.

Q. Yeah. Did I summarize that correctly?

A. I think you did.

Q. Okay. So my question is, do you have an understanding about the specific basis of why the Department of Justice said that?

A. Yes.

Q. Okay. What is your understanding?

A. That the Department of Justice felt like we were shipping a large quantity to -- of hydrocodone combination products to customers

Page 23

in Florida, in their opinion.

Q. Were you in fact shipping the quantities that they said you were shipping?

A. I can't verify that to the number.

Q. Do you recall ever --

A. I'm sure -- go ahead.

Q. Do you recall ever disputing that the numbers that they were providing were incorrect?

MS. McCLURE: Objection to form.

THE WITNESS: I don't recall that we disputed it, no.

BY MR. PIFKO:

Q. So to your recollection, you never told the Department of Justice their numbers were wrong. Agreed?

MS. McCLURE: Objection to form.

THE WITNESS: I wasn't involved in the discussions with the Department of Justice.

BY MR. PIFKO:

Q. Okay. But to your knowledge, no one at AmerisourceBergen told the Department of

Page 24

Justice they were wrong. Correct?

MS. McCLURE: Objection to form.

THE WITNESS: I don't know.

BY MR. PIFKO:

Q. Sitting here today, you're not aware of anyone responding to the Department of Justice in connection with this and saying the sales figures you're providing in your letter are incorrect.

Would you agree with that?

MS. McCLURE: Objection to form.

THE WITNESS: Again, I don't know what was said.

BY MR. PIFKO:

Q. What was your title at this time?

A. 2007, I would have -- I believe I was director of regulatory affairs.

Q. Were the policies and procedures at the Orlando facility consistent with the company's policies around the country?

MS. McCLURE: Objection to form.

THE WITNESS: Yes, they were.

BY MR. PIFKO:

Q. So with respect to diversion

Page 25

control, there was nothing different going on at the Orlando facility than there was at any other facility. Correct?

MS. McCLURE: Objection to form.

THE WITNESS: Not that I know of.

BY MR. PIFKO:

Q. Do you know why you said earlier that the Department of Justice was concerned about the volume of these products, these hydrocodone combination products, that were being sold to customers? Agreed?

MS. McCLURE: Objection to form.

THE WITNESS: I agree that they -- I would assume they were concerned or they wouldn't have suspended the registration.

BY MR. PIFKO:

Q. Why were they concerned about these volumes?

MS. McCLURE: Objection to form.

THE WITNESS: I don't know.

BY MR. PIFKO:

Q. You have no idea why this was a concern?

Page 26

1    MS. McCLURE:  Same objection.
2    THE WITNESS:  I didn't have any
3    conversations with DEA about it, so I
4    don't know how they formed that opinion.
5 BY MR. PIFKO:
6    Q.    Well, let's go to the second page
7 here.
8    Again, there's numbered
9 paragraphs.  There's a paragraph number 5 at the
10 bottom there.
11    A.    Okay.
12    Q.    I'm going to read it to you, and
13 tell me if I read it correctly.
14    It says, "On August 10, 2005, DEA
15 personnel met with Steve Mays, Respondent's
16 Director of Regulatory Affairs, to inform him
17 about the common characteristics of pharmacies
18 that divert large amounts of controlled
19 substances by filling invalid prescriptions
20 obtained by customers using the Internet."
21    Do you see that?
22    A.    Yes, I do.
23    Q.    Did I read that correctly?
24    A.    Yes, you did.

Page 27

1    Q.    Do you recall having a meeting
2 with DEA personnel on August 10, 2005?
3    MS. McCLURE:  Objection, asked
4    and answered.
5    THE WITNESS:  I don't recall if
6    that was the exact date, but I do recall
7    the meeting, yes.
8 BY MR. PIFKO:
9    Q.    Does this refresh your
10 recollection about what your title was on or
11 around this time?
12    A.    Yes.
13    Q.    Okay.  So when it says here that
14 you were director of regulatory affairs, is that
15 correct?
16    A.    That's correct.
17    Q.    Was that your title on or around
18 the time that this order to show cause was
19 issued?
20    MS. McCLURE:  Objection, asked
21    and answered.
22    THE WITNESS:  I think so, yes.
23 BY MR. PIFKO:
24    Q.    So you recall having this meeting

Page 28

1 with the DEA, correct --
2    A.    Yes, I do.
3    Q.    -- in 2005?
4    MS. McCLURE:  Objection, asked
5    and answered.
6 BY MR. PIFKO:
7    Q.    Who was present at this meeting?
8    MS. McCLURE:  Objection, asked
9    and answered.
10    THE WITNESS:  Myself and Mike
11    Mates (ph) from DEA.  And then there was
12    an attorney there, counsel, that I don't
13    recall his name.
14 BY MR. PIFKO:
15    Q.    Attorney for the Department of
16 Justice?
17    A.    Yes.  Or for DEA.
18    Q.    Okay.  Was there anyone else from
19 AmerisourceBergen who was present at this
20 meeting?
21    MS. McCLURE:  Objection, asked
22    and answered.
23    THE WITNESS:  No, there wasn't.
24 BY MR. PIFKO:

Page 29

1    Q.    Do you agree with the
2 characterization in this letter that at that
3 meeting they informed you about the common
4 characteristics of pharmacies that divert large
5 amounts of controlled substances by filling
6 invalid prescriptions obtained by customers using
7 the internet?
8    A.    Yes.
9    Q.    It says, going on to page 3, "DEA
10 personnel reminded Respondent that under 21
11 U.S.C. Sections 823(b)(1) and (e)(1), Respondent
12 was responsible to prevent the diversion of
13 controlled substances."
14    Do you see that?
15    A.    I see that, yes.
16    Q.    Did I read that correctly?
17    A.    Yes, you did.
18    Q.    Do you recall the DEA informing
19 you during that meeting that AmerisourceBergen
20 was responsible for preventing diversion of
21 controlled substances?
22    MS. McCLURE:  Objection to form.
23    THE WITNESS:  I don't recall that
24    specifically.

Page 30

BY MR. PIFKO:
1
2    Q.    How about generally?
3        MS. McCLURE:  Same.
4        THE WITNESS:  Same.
5 BY MR. PIFKO:
6    Q.    Do you recall during that meeting
7 the DEA discussing AmerisourceBergen's
8 responsibilities under the Controlled Substances
9 Act?
10       MS. McCLURE:  Objection to form.
11       THE WITNESS:  Not specifically.
12 BY MR. PIFKO:
13    Q.    How about generally, do you
14 remember --
15    A.    That was 12 years ago.
16    Q.    Okay.  How about generally, do
17 you remember them discussing any expectations
18 about what AmerisourceBergen was supposed to do
19 with respect to complying with the Controlled
20 Substances Act?
21       MS. McCLURE:  Objection to form.
22       THE WITNESS:  Not specifically.
23 BY MR. PIFKO:
24    Q.    How about generally?

Page 31

1        MS. McCLURE:  Same objection.
2        THE WITNESS:  Not -- not
3    generally.
4 BY MR. PIFKO:
5    Q.    So you don't have any
6 recollection of whether you discussed the
7 Controlled Substances Act at that meeting?
8        MS. McCLURE:  Objection, asked
9    and answered.
10       THE WITNESS:  Not specifically.
11 BY MR. PIFKO:
12    Q.    When you left that meeting, you
13 reported back to Chris Zimmerman.  Correct?
14       MS. McCLURE:  Objection, asked
15    and answered.
16       THE WITNESS:  I don't recall that
17    I did.
18 BY MR. PIFKO:
19    Q.    Did you tell anybody about that
20 meeting?
21       MS. McCLURE:  Same objection.
22       THE WITNESS:  Not -- I don't
23    recall specifically.  I'm sure I did, but
24    I don't recall specifically.

Page 32

BY MR. PIFKO:
1
2    Q.    Who would you have told if you
3 told someone?
4        MS. McCLURE:  Objection to form,
5    calls for speculation.
6        THE WITNESS:  I would have to
7    speculate.  I don't know.  I couldn't
8    tell you for sure.  Again, that was 12
9    years ago.
10 BY MR. PIFKO:
11    Q.    Okay.  Next sentence here,
12 "Notwithstanding the information provided to
13 Respondent, after the August 10, 2005 meeting,
14 Respondent sold over 5.2 million dosage units of
15 hydrocodone to pharmacies that bore the
16 characteristics that DEA described in the August
17 10, 2005 meeting."
18       Do you see that?
19    A.    Yes, I do.
20    Q.    Did I read that correctly?
21    A.    I believe you did.
22    Q.    Do you agree with that statement?
23       MS. McCLURE:  Objection to form.
24       THE WITNESS:  I can't verify the

Page 33

1    quantities.
2 BY MR. PIFKO:
3    Q.    Other than verifying the
4 quantities, do you agree with that statement?
5        MS. McCLURE:  Same objection.
6        THE WITNESS:  I can't really
7    agree with it because I don't -- I don't
8    know.  I don't recall.
9 BY MR. PIFKO:
10    Q.    You don't know either way?
11    A.    No.
12    Q.    Do you have any reason to dispute
13 that AmerisourceBergen sold over 5.2 million
14 dosage units of hydrocodone products to
15 pharmacies that bore the characteristics
16 discussed at this August 10, 2005 meeting?
17       MS. McCLURE:  Objection to form.
18       THE WITNESS:  I don't have any
19    specific reason to dispute it, no.
20 BY MR. PIFKO:
21    Q.    Do you remember the DEA
22 discussing specific characteristics of
23 hydrocodone products during the August 10, 2005
24 meeting?

Page 34

1  MS. McCLURE: Objection to form,
2  asked and answered.
3  THE WITNESS: Characteristics of
4  hydrocodone products? Not that I recall.
5  BY MR. PIFKO:
6  Q.  How about do you recall DEA
7  describing certain characteristics of sales to
8  certain types of pharmacies?
9  MS. McCLURE: Objection to form.
10  THE WITNESS: I recall that, yes.
11  BY MR. PIFKO:
12  Q.  What specifically do you recall
13  about that?
14  A.  We discussed characteristics of
15  internet pharmacy and what to look for.
16  Q.  What specifically were you
17  supposed to look for with respect to internet
18  pharmacies?
19  MS. McCLURE: Objection to form.
20  THE WITNESS: I don't recall
21  everything. A few things. I can tell
22  you what I do remember.
23  BY MR. PIFKO:
24  Q.  Yeah, that's what I'm asking.

Page 35

1  A.  Okay. I'm trying to recall.
2  To look for like FedEx boxes or
3  UPS boxes piled up in the pharmacy that would
4  indicate they're shipping drugs other than just
5  filling them at the store. Other than that, I
6  can't remember the specifics.
7  Q.  When you came back to this
8  meeting, did you instruct anyone at
9  AmerisourceBergen to look for those type of
10  characteristics?
11  MS. McCLURE: Objection to form.
12  THE WITNESS: I don't recall
13  specifically.
14  BY MR. PIFKO:
15  Q.  How about generally?
16  MS. McCLURE: Same.
17  THE WITNESS: I'm sure I did, I
18  just don't recall.
19  BY MR. PIFKO:
20  Q.  Who would you have told?
21  MS. McCLURE: Objection to form.
22  THE WITNESS: Don't recall
23  specifically.
24  BY MR. PIFKO:

Page 36

1  Q.  Do you recall writing anything
2  down to change AmerisourceBergen's procedures
3  with respect to the due diligence it may perform
4  with respect to customers after you had this
5  meeting?
6  MS. McCLURE: Objection to form.
7  THE WITNESS: I don't recall
8  writing things down.
9  BY MR. PIFKO:
10  Q.  Do you recall changing any
11  policies or procedures in order to look for the
12  criteria that the Department of Justice
13  identified to you during this meeting?
14  MS. McCLURE: Objection to form,
15  assumes facts not in evidence,
16  foundation.
17  THE WITNESS: I don't recall
18  specifically.
19  BY MR. PIFKO:
20  Q.  How about generally?
21  MS. McCLURE: Same.
22  THE WITNESS: Generally, I know
23  we made some changes.
24  BY MR. PIFKO:

Page 37

1  Q.  What changes did you make?
2  A.  In -- we started conducting due
3  diligence of customers --
4  Q.  What was --
5  A.  -- that had the parameters of our
6  program --
7  Q.  Any other things --
8  A.  -- on the reports.
9  Q.  Anything else that you changed?
10  A.  I can't recall specifically.
11  Q.  What was the nature of the due
12  diligence that you started performing at that
13  time?
14  A.  We started using a questionnaire
15  in the due diligence.
16  Q.  Was there a name for the
17  questionnaire?
18  A.  A name of it? Can't recall
19  specifically what the name was.
20  Q.  Who was supposed to fill out this
21  questionnaire?
22  MS. McCLURE: Objection to form.
23  THE WITNESS: The
24  AmerisourceBergen sales representative,

Page 38

1    along with the customer.
2  BY MR. PIFKO:
3       Q.    And then what would you do with
4  that questionnaire?
5            MS. McCLURE:  Objection to form.
6            THE WITNESS:  Well, we would
7       review that to see if they answered the
8       questions adequately to -- so we could
9       ensure that they weren't engaged in that
10      type of activity.
11 BY MR. PIFKO:
12      Q.    Did you do anything else?
13      A.    Not specifically.  I don't know
14 what you're asking.
15      Q.    What was the nature of your
16 review to determine if the customer adequately
17 provided information?
18      A.    I'm not sure what you're asking.
19      Q.    You said you would review the
20 question to see if the -- they were adequately
21 filled out so you could ensure that they weren't
22 engaged in that type of activity.
23      A.    Right.
24      Q.    So I'm asking, what was the

Page 39

1  nature of your review to conduct that analysis?
2            MS. McCLURE:  Form.
3            THE WITNESS:  We would verify as
4       much of the information as they gave us.
5  BY MR. PIFKO:
6       Q.    How would you verify it?
7       A.    I can't remember specifically.
8  You know, if they gave us a website or something
9  like that, we would verify that website, to make
10 sure that they weren't filling prescriptions
11 based on the questionnaire.
12      Q.    Did the questionnaire include any
13 photographs?
14           MS. McCLURE:  Objection, form.
15           THE WITNESS:  I can't remember in
16      the beginning if we required photographs,
17      but I know at some point we required
18      the -- whoever went on site, typically it
19      was a salesperson, to take photographs
20      inside and outside of the building.
21 BY MR. PIFKO:
22      Q.    Did you ask people to look for
23 FedEx packages?
24           MS. McCLURE:  Objection, asked

Page 40

1  and answered.
2            THE WITNESS:  I don't recall
3       specifically, but I believe that was part
4       of the questionnaire.
5  BY MR. PIFKO:
6       Q.    Let's go back to Exhibit 1 here.
7            On the third page of the exhibit,
8  tell me when you're there.
9       A.    Oh.  I thought that's where we
10 were.
11      Q.    Yeah, we were.
12      A.    Okay.
13      Q.    It's got a bunch of -- well,
14 remember we just read a sentence in the top of
15 the first paragraph.
16      A.    Uh-huh.
17      Q.    Starting where we left off, it
18 says, "Respondent continued to sell controlled
19 substances to Grand, Discount Mail Meds and" Med
20 Assistant "even though Respondent knew, or should
21 have known, that these pharmacies were diverting
22 controlled substances into other than legitimate
23 medical, scientific and industrial channels."
24           Do you see that?

Page 41

1       A.    Yes, I see that.
2       Q.    Did I read that correctly?
3       A.    Yes, you did.
4       Q.    If you go back to page 2,
5  paragraph 3, it talks about how AmerisourceBergen
6  distributed approximately a million dosage units
7  of hydrocodone products to Grand Pharmacy.
8            Do you see that?
9            MS. McCLURE:  Objection to form.
10           THE WITNESS:  I do.
11 BY MR. PIFKO:
12      Q.    Did I read that correct -- did I
13 summarize that correctly?
14      A.    I believe you did.
15      Q.    Okay.  And then in paragraph 4,
16 it talks about supplying hydrocodone products to
17 a number of other pharmacies.
18           Do you see that?
19      A.    Yes, I do.
20      Q.    And then it says in paragraph 4
21 that the distribution of those was under
22 circumstances that should have alerted
23 AmerisourceBergen that the pharmacies were
24 diverting hydrocodone.

Page 42

1  Do you see that?
2  A.  You said paragraph 4?
3  Q.  Yeah.  The last sentence in the
4  bottom of that first paragraph there.
5  A.  Okay.  I see it.
6  Q.  Did I read that correctly?
7  A.  Yes, sir.
8  Q.  Okay.  Do you believe that the
9  policies and procedures that you implemented
10  after this August 2005 meeting were sufficient to
11  detect diversion?
12  MS. McCLURE:  Objection, form.
13  THE WITNESS:  I believe that the
14  actions that we took enabled us to
15  identify internet pharmacies.  And I
16  think we ceased distributing to some of
17  these.  I can't tell you exactly which
18  ones, but I believe we cut those off.
19  BY MR. PIFKO:
20  Q.  After you received this letter?
21  A.  No.  I think some of these were
22  cut off before this action was taken.  I can't --
23  I don't remember specifically which ones, but I
24  do recall that when this happened, some of these

Page 43

1  customers that were mentioned, we had cut off
2  before the suspension.
3  Q.  Did receiving this letter cause
4  AmerisourceBergen to be concerned that it wasn't
5  doing enough to comply with diversion control
6  laws and regulations?
7  MS. McCLURE:  Objection to form.
8  THE WITNESS:  I couldn't tell you
9  what the company thought.
10  BY MR. PIFKO:
11  Q.  How about you?  You were
12  regulatory affairs manager.
13  A.  Director.
14  Q.  Director.
15  A.  Uh-huh.
16  Q.  Did you feel like the company was
17  doing enough to prevent diversion when you
18  received this order to show cause?
19  MS. McCLURE:  Objection, form.
20  THE WITNESS:  Yes, I did.
21  BY MR. PIFKO:
22  Q.  So even though the Department of
23  Justice said that you were distributing
24  substances to customers when you knew or should

Page 44

1  have known that they were diverting them to
2  illegitimate channels, you still feel like the
3  company was doing enough, as the director of
4  regulatory affairs?
5  MS. McCLURE:  Objection, form.
6  THE WITNESS:  I felt like we were
7  doing the best we could as a distributor
8  to comply with the regulations.  And we
9  took steps to improve our due diligence
10  and our monitoring of our customers.
11  BY MR. PIFKO:
12  Q.  Do you believe you took adequate
13  steps to improve your due diligence and monitor
14  customers?
15  MS. McCLURE:  Objection, form.
16  THE WITNESS:  Yes.
17  BY MR. PIFKO:
18  Q.  Going to page 3 here, it says, in
19  the middle of the second paragraph -- tell me
20  when you're there -- "it is my preliminary
21  conclusion that Respondent's continued
22  registration while these proceedings are pending
23  would constitute an imminent danger to the public
24  health and safety because of the substantial

Page 45

1  likelihood that Respondent will continue to
2  supply pharmacies that divert large quantities of
3  controlled substances."
4  Did I read that correctly?
5  A.  Yes, you did.
6  Q.  Upon receiving that, did that
7  give you, as the director of compliance and
8  regulatory issues, concern about whether the
9  company's practices were sufficient?
10  MS. McCLURE:  Objection to form.
11  THE WITNESS:  No.
12  BY MR. PIFKO:
13  Q.  Did you think the Department of
14  Justice's conclusions were wrong?
15  A.  I think so, yeah.  They weren't
16  completely accurate, in my opinion.
17  Q.  Why do you say that they weren't
18  completely accurate?
19  A.  I can't really say.  I just don't
20  think they were completely accurate.  I felt like
21  we were doing the best we could to monitor the
22  distribution of these drugs.
23  Q.  Do you have any factual basis to
24  challenge that Department of Justice's conclusion

Case 7:17-md-02804 Document 3075-24 Filed 11/06/20 Page 28 of 72. PageID #: 733307
Case 1:17-md-02804 Document 3075-24 Filed 11/06/20 Page 13 of 22. PageID #: 739397.
Highly Confidential - Subject to Further Confidentiality Review

Page 46

¹ there?

² MS. McCLURE: Objection to form,
³ asked and answered.
⁴ THE WITNESS: Not today I don't,
⁵ no.
⁶ BY MR. PIFKO:
⁷ Q. Do you know what happened after
⁸ you received -- the company received this letter?
⁹ MS. McCLURE: Form.
¹⁰ THE WITNESS: What do you mean,
¹¹ what happened?
¹² BY MR. PIFKO:
¹³ Q. The Orlando facility did get its
¹⁴ registration suspended. Correct?
¹⁵ A. Yes, that's correct.
¹⁶ Q. And you had to halt shipments of
¹⁷ product for some time period from that facility.
¹⁸ Correct?
¹⁹ MS. McCLURE: Objection, form.
²⁰ THE WITNESS: Ask the question
²¹ again, please, I'm sorry.
²² BY MR. PIFKO:
²³ Q. You had to halt shipments of
²⁴ product from that facility for some period of

Page 47

¹ time after that. Correct?
² MS. McCLURE: Objection, form.
³ THE WITNESS: We had to halt
⁴ shipments of controlled substances from
⁵ the facility.
⁶ BY MR. PIFKO:
⁷ Q. Do you know how long that was in
⁸ place, where you weren't allowed to ship
⁹ controlled substances from that facility?
¹⁰ A. I couldn't tell you exactly, but
¹¹ it was about three months.
¹² Q. Some years later, the Houston
¹³ facility also almost lost its registration.
¹⁴ Correct?
¹⁵ MS. McCLURE: Objection to form.
¹⁶ THE WITNESS: I don't know what
¹⁷ you're talking about.
¹⁸ BY MR. PIFKO:
¹⁹ Q. You don't have any recollection
²⁰ of the DEA almost suspending the registration of
²¹ the Houston facility?
²² MS. McCLURE: Objection to form.
²³ THE WITNESS: I have no
²⁴ knowledge. No knowledge of that.

Page 48

¹ BY MR. PIFKO:
² Q. Are you aware of any other
³ actions where the DEA was investigating the
⁴ company for potential violations of diversion
⁵ control laws?
⁶ A. I -- actions -- I mean, I can't
⁷ recall specifics.
⁸ Q. How about generally?
⁹ A. There's always investigations.
¹⁰ They inspect our facilities frequently, and there
¹¹ could -- there's always -- I shouldn't say
¹² always, but often there's minor violations that
¹³ are part of their investigation, part of the
¹⁴ Controlled Substances Act and the regulations.
¹⁵ Q. Do you recall any criminal
¹⁶ investigations that were occurring with respect
¹⁷ to AmerisourceBergen's diversion control
¹⁸ practices?
¹⁹ A. I assume if the New Jersey case
²⁰ is considered a criminal action, yes.
²¹ Q. Okay. What do you know about the
²² New Jersey case?
²³ MS. McCLURE: Objection to form.
²⁴ THE WITNESS: I just know that

Page 49

¹ it's a -- that it was a criminal case
² that I think began in 2012, I believe.
³ BY MR. PIFKO:
⁴ Q. Did it concern the company's
⁵ diversion control practices?
⁶ A. I believe so.
⁷ Q. When did you first learn about
⁸ that?
⁹ A. I learned about that because I
¹⁰ was the person they called to ask where to send
¹¹ the initial subpoena. So it was sometime in
¹² 2012, I believe.
¹³ Q. So the Department --
¹⁴ A. I'm sorry. When I say "they,"
¹⁵ New York US -- I don't know if it was US Attorney
¹⁶ or New York AG. I can't remember.
¹⁷ Q. Okay. So someone from a
¹⁸ government enforcement agency contacted you and
¹⁹ said they were going to send a subpoena to the
²⁰ company and asked where to send it?
²¹ A. That's what I recall, yes.
²² Q. Okay. What did you do when you
²³ received that inquiry?
²⁴ MS. McCLURE: Objection to form.

Page 54

BY MR. PIFKO:

1  Q.   Did you make any changes to the

company's practices after learning about that

investigation?

    MS. McCLURE:  Objection to form.

    THE WITNESS:  I don't recall

    making any changes.

BY MR. PIFKO:

    Q.   Were you concerned at the time

that there were criminal investigations of

AmerisourceBergen that were occurring?

    MS. McCLURE:  Objection to form.

    THE WITNESS:  Oh, yes, I was

    concerned.  Yes.

BY MR. PIFKO:

    Q.   Why were you concerned?

    A.   Because we were being

investigated.

    Q.   Why did being investigated give

you cause for concern?

    A.   That's always a concern.  If

you're being investigated, that's a concern.

    Q.   Do you know what the ultimate

outcome of that investigation was?

Page 55

1   A.   No, I don't.

    Q.   Okay.

    A.   My understanding, it's still

ongoing.

    MR. PIFKO:  Let's take a short

    break.

    THE VIDEOGRAPHER:  Going off the

    record at 11:50 a.m.

       - - -

    (A recess was taken from

    11:50 a.m. to 12:07 p.m.)

       - - -

    THE VIDEOGRAPHER:  Back on the

    record at 12:07 p.m.

BY MR. PIFKO:

    Q.   I want to bring your attention

back to Exhibit 1.

    A.   Okay.

    Q.   All right.  So I just want to

confirm, as we discussed before we went on the

break, there was nothing different about the

procedures at the Orlando facility as opposed to

any other facility, any other distribution

facility ran by AmerisourceBergen.  Correct?

Page 56

    MS. McCLURE:  Objection, asked

and answered.

    THE WITNESS:  Would that be prior

    to the suspension?

BY MR. PIFKO:

    Q.   Yes.

    A.   Is that what you're asking?

    Q.   Yes.

    A.   As I recall, it would be the same

as any of the other facilities.

    Q.   Okay.  So at the time this letter

was sent, AmerisourceBergen's diversion control

systems were the same at all of its distribution

centers.  Correct?

    MS. McCLURE:  Objection to form.

    THE WITNESS:  That's what I

    recall, yes.

BY MR. PIFKO:

    Q.   So anything occurring at this

Orlando facility could be occurring at any other

distribution center.  Correct?

    MS. McCLURE:  Objection, form.

    THE WITNESS:  I disagree.

BY MR. PIFKO:

Page 57

    Q.   What do you disagree?

    A.   Because they're a different

customer base, different region of the country.

    Q.   But with respect to

AmerisourceBergen's procedures, the same things

that are occurring at this facility are the same

thing that are occurring at other facilities.

Correct?

    MS. McCLURE:  Objection to form.

    THE WITNESS:  As far as our

    procedures and how -- our policies and

    procedures, yes, they're -- they would be

    the same for all of the distribution

    centers.

BY MR. PIFKO:

    Q.   Okay.  Did AmerisourceBergen

employ any sort of different system to monitor

internet pharmacies as opposed to retail

pharmacies or chain pharmacies?

    MS. McCLURE:  Objection, form.

    THE WITNESS:  No.  As far as a

    system itself, no.

BY MR. PIFKO:

    Q.   So AmerisourceBergen's system

Page 58

1  used to monitor internet pharmacies was the same
2  system that it used to monitor retail and chain
3  pharmacies. Correct?
4       MS. McCLURE: Objection, form.
5       THE WITNESS: Well, we weren't
6    specifically monitoring internet
7    pharmacies. We were monitoring our
8    customers, our pharmacy customers.
9  BY MR. PIFKO:
10      Q.   And that system that was used was
11  the same for all customers, regardless of the
12  type of customers. Correct?
13      MS. McCLURE: Objection to form,
14    asked and answered.
15      THE WITNESS: As I recall, yes.
16  BY MR. PIFKO:
17      Q.   Let's go to page 2 of Exhibit 1.
18      A.   Okay.
19      Q.   So looking at paragraph 4, it
20  says, the bottom of paragraph 4, "Respondent
21  distributed hydrocodone under the following
22  circumstances that should have alerted Respondent
23  that the pharmacies were diverting hydrocodone."
24      Do you see that?

Page 59

1       A.   Yes, I do.
2       Q.   Did I read that correctly?
3       A.   Yes, you did.
4       Q.   Then it's got subparts A through
5  D.
6       Do you see those?
7       A.   Yes, I do.
8       Q.   Part A says, "Respondent
9  distributed hydrocodone to each of the named
10  pharmacies, and others, in amounts that far
11  exceeded what an average pharmacy orders to meet
12  the legitimate needs of its customers."
13      Do you see that?
14      A.   Yes, I do.
15      Q.   Did I read that correctly?
16      A.   Yes, you did.
17      Q.   "Respondent knew that orders of
18  an unusual size were 'suspicious' as that term is
19  used in 21 C.F.R. section 1301.74(b)."
20      Did I read that correctly?
21      A.   Yes, you did.
22      Q.   What was AmerisourceBergen's
23  system that was in place to monitor the amounts
24  that its customers ordered --

Page 60

1       MS. McCLURE: Objection.
2  BY MR. PIFKO:
3       Q.   -- at that time?
4       MS. McCLURE: Asked and answered.
5       THE WITNESS: As I recall, it was
6    a system that generated a report that
7    indicated any orders that were above
8    certain parameters looking back over that
9    customer's average purchases. And they
10   would be flagged on that report if they
11   exceeded that average or that parameter.
12  BY MR. PIFKO:
13      Q.   So you agree here that the DEA is
14  saying in this letter that AmerisourceBergen
15  nevertheless distributed hydrocodone to
16  pharmacies even though the amounts exceeded what
17  an average pharmacy would order for legitimate
18  needs.
19      Do you see that?
20      MS. McCLURE: Objection, form.
21      THE WITNESS: You're on the
22    subparagraph A?
23  BY MR. PIFKO:
24      Q.   Yes.

Page 61

1       A.   I agree that that's what DEA is
2  saying, yes.
3       Q.   So did AmerisourceBergen at this
4  time not have a way of monitoring what a
5  customer's volume was with -- as compared to what
6  an average pharmacy would need to meet legitimate
7  needs of its customers?
8       MS. McCLURE: Objection, form.
9       THE WITNESS: I don't recall the
10   specific algorithms of that program.
11  BY MR. PIFKO:
12      Q.   You believe there was a program
13  that had algorithms?
14      A.   I'm sorry?
15      Q.   You believe there was a program
16  that had some algorithm?
17      A.   I don't know if algorithm is a
18  correct word, but it had a formula built into the
19  system, a certain percentage. And it basically
20  looked at that customer's purchases over, I
21  believe it was -- I believe it was a rolling
22  three-month average. And if it exceeded that by
23  a certain amount, then it would be flagged on
24  this report as a possible excessive order.

Case 1:17-md-02804-DAP Document 3075-23 Filed 11/06/19 Page 18 of 22. PageID #: 467404
Case 1:17-md-02804-DAP Document 3025-24 Filed 11/05/19 Page 18 of 22. PageID #: 467404
Highly Confidential - Subject to Further Confidentiality Review

Page 62

1   Q.   But according to DEA, you failed
2 to alert DEA and you failed to prevent orders of
3 unusual size from being shipped to customers.
4 Correct?
5        MS. McCLURE:  Objection to form.
6        THE WITNESS:  Can you repeat that
7   again?  I'm sorry.
8 BY MR. PIFKO:
9   Q.   Yes.  So in A here it's saying
10 that you nevertheless shipped orders beyond what
11 an average pharmacy needed?
12       MS. McCLURE:  Objection, form.
13       THE WITNESS:  I don't know what
14   an average pharmacy needed.
15 BY MR. PIFKO:
16   Q.   Okay.
17   A.   So...
18   Q.   So at the time AmerisourceBergen
19 had no way of evaluating what an average pharmacy
20 needed; is that correct?
21       MS. McCLURE:  Objection, form.
22       THE WITNESS:  We only had the
23   ability to know what our customers were
24   purchasing.

Page 63

1 BY MR. PIFKO:
2   Q.   Did you take any steps to know
3 what the average pharmacy within your own
4 customers would need to fill legitimate needs of
5 its customers?
6        MS. McCLURE:  Objection, form.
7        THE WITNESS:  I don't recall.
8 BY MR. PIFKO:
9   Q.   Would you agree that there was a
10 failure of AmerisourceBergen's system that led to
11 the receipt of this order to show cause?
12       MS. McCLURE:  Objection, form.
13       THE WITNESS:  No, I don't agree
14   that there was a failure to our system.
15 BY MR. PIFKO:
16   Q.   Going to page 3 here, the top
17 paragraph.  We looked at this earlier.
18   A.   Uh-huh.
19   Q.   It said that AmerisourceBergen
20 shipped over 5.2 million dosage units of
21 hydrocodone to pharmacies that had certain
22 characteristics that were discussed in your
23 August 10, 2005 meeting.
24       Do you see that?

Page 64

1        MS. McCLURE:  Objection, asked
2   and answered.
3        THE WITNESS:  I see that in
4   general, yes.
5 BY MR. PIFKO:
6   Q.   And if you go on the first page
7 here, it says that, in paragraph 1, "Respondent
8 distributed over 3.8 million dosage units of
9 combination hydrocodone products to customers
10 that it knew or should have known were diverting
11 the hydrocodone into other than legitimate
12 medical, scientific and industrial channels."
13       Do you see that?
14       MS. McCLURE:  Objection, form.
15       THE WITNESS:  I see that.
16 BY MR. PIFKO:
17   Q.   And so my question to you is,
18 there's a failure of AmerisourceBergen to catch
19 this volumes that the Department of Justice
20 identified.  Correct?
21       MS. McCLURE:  Objection, form.
22       THE WITNESS:  In their opinion,
23   yes.
24 BY MR. PIFKO:

Page 65

1   Q.   What I'm trying to understand is
2 where -- what occurred to result in that failure?
3        MS. McCLURE:  Objection to form.
4        THE WITNESS:  I didn't say there
5   was a failure.
6 BY MR. PIFKO:
7   Q.   Did you not know that those
8 volumes of hydrocodone products were being
9 shipped to AmerisourceBergen customers?
10   A.   I didn't know personally, no.
11   Q.   Was the company doing anything to
12 monitor the potentially significant volumes of
13 hydrocodone products that were being shipped to
14 its customers?
15       MS. McCLURE:  Objection, form.
16       THE WITNESS:  We had a suspicious
17   order monitoring program.
18 BY MR. PIFKO:
19   Q.   Okay.  So did the system just not
20 catch these orders?
21       MS. McCLURE:  Objection, form.
22       THE WITNESS:  I couldn't tell you
23   that.
24 BY MR. PIFKO:

Page 66

1  Q.   Do you know if the system caught
2  these orders and then they were simply released?
3        MS. McCLURE:  Objection, form.
4        THE WITNESS:  If these orders
5     were suspicious, they would have been on
6     that report and they would have been
7     reported to DEA as suspicious.
8  BY MR. PIFKO:
9     Q.   The DEA here is saying these
10 orders are suspicious.
11       Do you agree?  Let's look at page
12 2, paragraph 4a.
13       MS. McCLURE:  Objection.
14 BY MR. PIFKO:
15    Q.   "Respondent knew that orders of
16 an unusual size were 'suspicious' as that term is
17 used in 21 C.F.R. Section 1301.74(b)."
18       MS. McCLURE:  What's the
19    question?
20       THE WITNESS:  Yeah.
21 BY MR. PIFKO:
22    Q.   My question to you was, the DEA
23 was saying these orders were suspicious.
24 Correct?

Page 67

1        MS. McCLURE:  Objection.
2     Objection, form.
3        THE WITNESS:  I don't see where
4     DEA says those orders were suspicious.
5  BY MR. PIFKO:
6     Q.   Well, it's saying each of these
7  pharmacies and others where you distributed
8  hydrocodone products to them in amounts that far
9  exceeded what an average pharmacy orders to meet
10 the legitimate needs of its customers.
11       Do you see that?
12    A.   Yes, I see that.
13    Q.   Okay.  And it's talking about
14 orders that AmerisourceBergen shipped to its
15 customers.  Correct?
16    A.   Yes, yes, that's correct.
17    Q.   And then it says, you knew that
18 orders of an unusual size were suspicious.
19       Do you see that?
20    A.   I see that.
21    Q.   Did you not know that the orders
22 that exceeded what an average pharmacy would need
23 were suspicious?
24       MS. McCLURE:  Objection to form.

Page 68

1        THE WITNESS:  Again, I don't know
2     what an average pharmacy's purchases
3     were.
4  BY MR. PIFKO:
5     Q.   Okay.  So AmerisourceBergen had
6  no steps to monitor what an average pharmacy's
7  needs were at that time.
8        MS. McCLURE:  Objection.
9  BY MR. PIFKO:
10    Q.   Is that correct?
11    A.   That's --
12       MS. McCLURE:  Objection, form,
13    asked and answered and misstates the
14    witness's prior testimony.
15       You may answer.
16       THE WITNESS:  I disagree.  We
17    have a suspicious order monitoring
18    program.
19 BY MR. PIFKO:
20    Q.   Okay.  But you just said, I don't
21 know what an average pharmacy would need.
22    A.   That's correct.
23    Q.   Did AmerisourceBergen have any
24 policies or procedures in place to evaluate what

Page 69

1  an average pharmacy might need?
2        MS. McCLURE:  Objection, form.
3        THE WITNESS:  We have a
4     suspicious order monitoring program to
5     monitor our own customers.  We don't
6     know -- we didn't know what an average
7     pharmacy purchased, what the quantities
8     were for an average pharmacy.
9  BY MR. PIFKO:
10    Q.   So at that time, there was
11 nothing in AmerisourceBergen's system to evaluate
12 what an average pharmacy might need for its
13 legitimate needs for its customers.  Correct?
14       MS. McCLURE:  Objection, form.
15       THE WITNESS:  Not other than our
16    own customers.  That's the only data we
17    have or that we had at that time.
18 BY MR. PIFKO:
19    Q.   But you were saying, under
20 AmerisourceBergen's systems in place at that
21 time, it only monitored the average of each
22 customer against its own orders at that time.
23 Correct?
24       MS. McCLURE:  Objection, form,

Case 1:17-md-02804 Document 3075-23 Filed 11/06/19 Page 18 of 22 PageID #: 473402
Case 1:17-md-02804 Document 3075-23 Filed 11/06/19 Page 18 of 22 PageID #: 473402
Highly Confidential – Subject to Further Confidentiality Review

Page 70

1 THE WITNESS: That's what I
2 recall, yes.
3 BY MR. PIFKO:
4 Q. You weren't undertaking any
5 effort to compare a pharmacy's orders compared to
6 another pharmacy's orders at that time. Correct?
7 MS. McCLURE: Objection to form.
8 THE WITNESS: Not that I know of.
9 BY MR. PIFKO:
10 Q. Let's go to paragraph 4b.
11 A. Okay.
12 Q. It says, "Respondent distributed
13 hydrocodone to each of the named pharmacies, and
14 others, even though the pharmacies ordered small
15 amounts of other drug products relative to the
16 pharmacies' hydrocodone purchases from
17 Respondent."
18 Do you see that?
19 A. Yes, I do.
20 Q. "Respondent knew orders for large
21 amounts of hydrocodone in combination with small
22 amounts of other drug products deviated from the
23 normal pattern of orders placed by pharmacies."
24 Do you see that?

Page 71

1 A. I see that.
2 Q. Did you know, as the head of
3 regulatory and compliance issues for diversion
4 control at that time, that an order for large
5 amounts of hydrocodone as compared to other drug
6 products was something that deviated from the
7 normal pattern of ordering for a pharmacy?
8 MS. McCLURE: Objection, form.
9 THE WITNESS: Repeat the
10 question, please?
11 BY MR. PIFKO:
12 Q. Did you know, as the head of
13 regulatory and compliance issues for diversion
14 control issues at that time, that an order for
15 large amounts of hydrocodone, as compared to
16 other drug products, was something that deviated
17 from the normal pattern of ordering for a
18 pharmacy?
19 MS. McCLURE: Objection to form.
20 THE WITNESS: We were -- we
21 monitored the purchases of that customer,
22 compared to their previous purchases, is
23 the way our system worked.
24 BY MR. PIFKO:

Page 72

1 Q. Okay. Did you have any system in
2 place to monitor its purchasing of Schedule II or
3 III controlled substances as it compared to other
4 types of substances?
5 A. Not that I know of.
6 Q. Let's go to paragraph 4c.
7 It says, "Respondent distributed
8 hydrocodone to each of the named pharmacies, and
9 others, even though the pharmacies ordered
10 hydrocodone much more frequently than
11 Respondent's other pharmacy customers."
12 Do you see that?
13 A. Yes, I do.
14 Q. Did you read that correctly?
15 A. Yes, you did.
16 Q. It says, "Respondent knew that
17 orders of unusual frequency were 'suspicious' as
18 that term is used in 21 C.F.R. Section
19 1301.74(b)."
20 Did I read that correct?
21 A. That's correct.
22 Q. Did AmerisourceBergen have any
23 system in place at that time to evaluate the
24 frequency of orders of controlled substances

Page 73

1 placed by its customers?
2 MS. McCLURE: Objection to form.
3 THE WITNESS: Not that I know of.
4 BY MR. PIFKO:
5 Q. You said something earlier
6 about -- that after the 2005 meeting with DEA
7 that's referenced in here --
8 A. Uh-huh.
9 Q. And let's be specific, the one
10 that's referenced in paragraph 5 of Exhibit 1.
11 A. Okay.
12 Q. You said that after that meeting,
13 you initiated some sort of due diligence process.
14 Correct?
15 MS. McCLURE: Objection, form.
16 THE WITNESS: That's correct.
17 BY MR. PIFKO:
18 Q. Prior to that time, did you have
19 no due diligence process in place?
20 MS. McCLURE: Objection to form.
21 THE WITNESS: Yes, we had due
22 diligence. Yes.
23 BY MR. PIFKO:
24 Q. What due diligence process was in

Page 74

1  place before that meeting?
2      A.    The same due diligence that we
3  had had in place for years.
4      Q.    And what was it --
5      A.    Do you want me to describe it?
6      Q.    Yes.
7      A.    Our responsibility was to make a
8  good faith effort to make sure that that
9  customer's properly licensed with the state and
10 registered with DEA.
11     Q.    Anything else?
12     A.    No.
13     Q.    So at that time of the meeting in
14 2005, the only due diligence that was in place
15 was a process to make sure that the customer was
16 properly licensed; is that correct?
17         MS. McCLURE:  Objection, form.
18         THE WITNESS:  Properly licensed
19         by the state and registered with DEA.
20         That was our requirement under the
21         federal regulations.
22 BY MR. PIFKO:
23     Q.    How is it that AmerisourceBergen
24 missed these millions of orders in its suspicious

Page 75

1  order monitoring system, as discussed here in
2  Exhibit 1?
3         MS. McCLURE:  Objection, form,
4         foundation.
5         THE WITNESS:  I'm not sure we
6         missed them.  I believe they were
7         reported to DEA as suspicious orders.
8  BY MR. PIFKO:
9      Q.    It's your testimony that these
10 orders were picked up by the suspicious order
11 monitoring system and reported to DEA?
12     A.    I'm not saying every one.  I'm
13 just -- I know that, from what I recall, some of
14 these customers that were mentioned in here, as I
15 recall, had orders that were reported to DEA as
16 suspicious.
17     Q.    Do you have any sense of the
18 percentage of the orders, if any, that were
19 caught?
20     A.    No, I do not.
21     Q.    If you reported these orders to
22 DEA, do you have any understanding as to why DEA
23 issued this order to show cause?
24         MS. McCLURE:  Objection, form.

Page 76

1         THE WITNESS:  No, I don't.
2  BY MR. PIFKO:
3      Q.    Did you do anything other than
4  report these orders to -- some of the orders that
5  you discussed to DEA to prevent diversion?
6         MS. McCLURE:  Objection, form.
7         THE WITNESS:  Yes.
8  BY MR. PIFKO:
9      Q.    What did you do?
10     A.    We cut off -- I believe we cut
11 off some of these pharmacies, if not all of them.
12 I can't recall exactly which ones.
13     Q.    Do you know how many you cut off?
14     A.    Couldn't -- don't recall.
15     Q.    Do you know when you cut them
16 off?
17     A.    Either prior to the suspension or
18 after.
19     Q.    So you cut some of them off maybe
20 after the suspension order?
21         MS. McCLURE:  Objection, form.
22         THE WITNESS:  Well, it would have
23         been prior, because we weren't able to
24         ship after -- after the suspension order.

Page 77

1      So it would have been prior to that.
2  BY MR. PIFKO:
3      Q.    Would that be contained in any
4  document?
5         MS. McCLURE:  Objection, form.
6         THE WITNESS:  I'm sure -- no, I
7         don't want to speculate.  I don't know.
8  BY MR. PIFKO:
9      Q.    Based on your -- you've been with
10 the company for over 30 years.  Right?  Longer?
11     A.    Longer.
12     Q.    40 years?
13     A.    Yes.
14     Q.    Based on your knowledge of the
15 company's practices and procedures, if you cut
16 off a customer, where would that be documented?
17         MS. McCLURE:  Objection, form.
18         THE WITNESS:  It depends on what
19         system we're using to document things at
20         a specific time.  We've changed
21         documentation processes over the years
22         many times.
23 BY MR. PIFKO:
24     Q.    At the time of this order to show

Page 78

1 cause.
2          MS. McCLURE: Objection, form.
3          THE WITNESS: Again, I'm not sure
4      where it would have been documented.
5 BY MR. PIFKO:
6      Q.    You don't know if it would have
7 been documented at all?
8          MS. McCLURE: Objection, form,
9      misstates the witness's prior testimony.
10          THE WITNESS: I don't recall
11      exactly.
12 BY MR. PIFKO:
13      Q.    How about generally?
14      A.    Generally --
15          MS. McCLURE: Same objection.
16          THE WITNESS: Generally, I would
17      say that they were documented somewhere.
18 BY MR. PIFKO:
19      Q.    Did you review anything in
20 preparing for your deposition that would have
21 discussed the company's shipments or orders
22 from -- with respect to the pharmacies in
23 Exhibit 1?
24          MS. McCLURE: Objection, form.

Page 79

1          THE WITNESS: No, no.
2 BY MR. PIFKO:
3      Q.    If you were going to do that, how
4 would you do that?
5          MS. McCLURE: Objection, form.
6          THE WITNESS: How would I do
7      what?
8 BY MR. PIFKO:
9      Q.    If you were going to research the
10 order history --
11      A.    Uh-huh.
12      Q.    -- and shipments made to any of
13 the customers discussed in Exhibit 1, how would
14 you go about doing that?
15          MS. McCLURE: Objection, form.
16          THE WITNESS: I would go back to
17      find out whatever system we were using to
18      document and look through that and do a
19      search.
20 BY MR. PIFKO:
21      Q.    It's true that today you can log
22 on to AmerisourceBergen's system and look back at
23 customer histories and correspondence. Correct?
24          MS. McCLURE: Objection, form.

Page 80

1          THE WITNESS: I can't.
2 BY MR. PIFKO:
3      Q.    You're unable to do that?
4      A.    Login to, which system are you
5 talking about? Our business system?
6      Q.    AmerisourceBergen's diversion
7 control systems.
8          MS. McCLURE: Objection, form.
9          THE WITNESS: No. I don't login
10      to that.
11 BY MR. PIFKO:
12      Q.    Do members of your team login to
13 that?
14          MS. McCLURE: Objection, form.
15          THE WITNESS: Not on my team, no.
16 BY MR. PIFKO:
17      Q.    Do you know who Eric Cherveny is?
18      A.    Yes, I do.
19      Q.    Is he someone that was under your
20 team at any point?
21          MS. McCLURE: Objection, form.
22          THE WITNESS: He was under my
23      team back in, you know, I can't
24      remember -- in the 2005 to 2010, sometime

Page 81

1      in that area.
2 BY MR. PIFKO:
3      Q.    If he testified that you could go
4 back and look into AmerisourceBergen's systems
5 and get ordering information and information
6 about a customer's history going back at least as
7 early as 2000, would you have any reason to
8 disagree with him?
9          MS. McCLURE: Objection, form.
10          THE WITNESS: I'm not sure how
11      you would, but maybe he can.
12 BY MR. PIFKO:
13      Q.    With respect to these orders, you
14 would have reported them after you shipped them.
15 Correct?
16          MS. McCLURE: Objection, form.
17          THE WITNESS: Which orders are
18      you talking about specifically?
19 BY MR. PIFKO:
20      Q.    The 5.2 million orders of
21 hydrocodone products or dosage units discussed in
22 Exhibit 1.
23          MS. McCLURE: Objection to form.
24          THE WITNESS: At that time, they

Page 82

1    would have been reported after.
2  BY MR. PIFKO:
3       Q.    None of these orders would have
4  been reported prior to shipment.  Correct?
5       A.    That's correct.
6       Q.    And all of these orders would
7  have been shipped without any due diligence.
8  Correct?
9           MS. McCLURE:  Objection, form.
10          THE WITNESS:  That's incorrect.
11  BY MR. PIFKO:
12      Q.    Other than checking their
13  registration?
14          MS. McCLURE:  Objection, form.
15          THE WITNESS:  Checking the
16      registration, the licensing and all the
17      other due diligence that we do on
18      customers, whether it's credit, their
19      ability to pay and whatever else that
20      our -- there's different -- other parts
21      of our due diligence that are done.  But
22      as far as controlled substances, it was
23      the licensing.
24  BY MR. PIFKO:

Page 83

1       Q.    Okay.  So the orders of the
2  5.2 million dosage units that are discussed in
3  Exhibit 1, the only due diligence with respect to
4  diversion control that would have been performed
5  on those would have been checking the licensing?
6           MS. McCLURE:  Objection, form,
7      misstates the witness's prior testimony.
8           THE WITNESS:  Well, let me take
9      you back, because actually, since 2005,
10      after that meeting with DEA, we did put
11      the due diligence process in place with
12      questionnaires.  And probably I'm sure a
13      lot of these pharmacies had been -- had a
14      due diligence investigation, had a
15      questionnaire and a site visit.
16  BY MR. PIFKO:
17      Q.    But that's something you
18  conducted -- it's static.
19      You conduct the -- you collect
20  the questionnaire, and it sits in a file.
21  Correct?
22          MS. McCLURE:  Objection, form.
23          THE WITNESS:  No.  It gets
24      reviewed.  It would be reviewed, and a

Page 84

1       decision would be made about that
2       customer based on that due diligence.
3  BY MR. PIFKO:
4       Q.    Right.  But my point is, there's
5  no specific due diligence that you conduct with
6  respect to an order?
7       A.    To each order?
8           MS. McCLURE:  Objection to form.
9  BY MR. PIFKO:
10      Q.    Right.
11      A.    Not -- not for each specific
12  order, no.
13      Q.    Okay.  So the only due diligence
14  that would have been conducted would have been a
15  collecting of a form and reviewing that form and
16  deciding as a general matter whether to do
17  business with that customer.  Correct?
18          MS. McCLURE:  Objection, form.
19          THE WITNESS:  That's -- that's
20      incorrect.  That's not correct.
21  BY MR. PIFKO:
22      Q.    What's incorrect about my
23  statement?
24      A.    Well, the due diligence is

Page 85

1  just -- that due diligence questionnaire is just
2  part of the process.  So any -- an order that
3  would have shown up on that suspicious order
4  report would have prompted a due diligence
5  investigation --
6           MS. McCLURE:  Objection.  Sorry.
7           THE WITNESS:  -- and a site
8      visit.
9  BY MR. PIFKO:
10      Q.    So I'm getting mixed statements
11  from you.
12      You said that there was no
13  specific due diligence with respect to an order;
14  is that correct?
15      A.    Well, that due diligence could
16  have been prompted by an order.
17      Q.    Explain that to me.
18      A.    Okay.  So when we -- when we
19  started doing the questionnaires, the basis for
20  doing those questionnaires would have been that
21  possible excessive and suspicious order report,
22  and that's when that would prompt that
23  questionnaire.  So it is related to -- it would
24  have been related to an order.

Page 90

BY MR. PIFKO:

Q.    So did this prompt any changes to AmerisourceBergen's suspicious order monitoring system?

MS. McCLURE:  Objection, form.

THE WITNESS:  Did what prompt?

BY MR. PIFKO:

Q.    This order to show cause.

A.    Oh, yes, yes.

Q.    That resulted in a settlement agreement with DEA.  Correct?

MS. McCLURE:  Objection, asked and answered.

THE WITNESS:  Yes.

BY MR. PIFKO:

Q.    What were the nature of the changes that you instituted after this?

MS. McCLURE:  Objection, form. And objection, asked and answered.

THE WITNESS:  We enhanced our suspicious order monitoring program at the direction of DEA.  They wanted us to develop a system that would stop and hold an order and determine whether it was

Page 91

suspicious before shipping it.

- - -

(Deposition Exhibit No. Mays V2-2, Email chain, top one dated 3 Mar 2013, Bates stamped ABDCMDL00378483 through ABDCMDL00378488, was marked for identification.)

- - -

BY MR. PIFKO:

Q.    Handing you what's marked as Mays Volume 2, Exhibit 2.

For the record, it's an email thread labeled ABDCMDL00378483 through 88.

Let me know when you're done, take a moment to review that.

A.    (Reviewing document.)

Okay.

Q.    Right.  If you go to the second to last page here.

A.    Okay.

Q.    It's the start of -- well, it's an email -- that part of the header is on the prior page, but it's an email from you to people at Cardinal Health, McKesson and HD Smith.

Page 92

Do you see that?

A.    Yes, I do.

Q.    You are talking about attending an HDMA conference.  Agreed?

A.    Agree.

Q.    It says, "The HDMA DMC agenda."

Do you see that?

A.    Yes, I do.

Q.    What's the HDMA DMC?

A.    HDMA DMA is a distribution management conference.  It's an annual conference that HDMA conducts.

Q.    The subject of this email is "'Big Four' DEA Strategy Discussion 2."

Do you see that?

A.    Yes.

Q.    So you're reaching out to, at this time, people from McKesson, Cardinal Health and HD Smith to have a big four DEA strategy discussion.  Correct?

MS. McCLURE:  Objection, form.

THE WITNESS:  It's what it says, yeah, yeah.

BY MR. PIFKO:

Page 93

Q.    Why were you reaching out to representatives from this company -- these companies to have a DEA strategy discussion at this time?

A.    I think we would typically get together sometime around those -- those conferences, because it was about the only time of the year we had face-to-face time.  And we would just talk about common concerns and issues that we have and do some benchmarking, share ideas about how we can improve our programs.

Q.    When you say programs and concerns, you're talking about specifically in the diversion control area.  Correct?

A.    No.  It could be anything regulatory, not just diversion.  It could be things about, you know, sometimes we would talk about DEA inspections and how they -- how they're handled, just to get some -- help each other out.

Q.    Okay.  But what I'm trying to ask is, when you were talking about concerns and benchmarking and programs, you're talking about programs that relate to DEA compliance.  Correct?

A.    I think for the most part.  It's

Page 94

1  basically anything regulatory that we could talk
2  about.
3      Q.    And these other people at
4  McKesson, Cardinal Health and HD Smith, they all
5  had similar responsibilities for regulatory and
6  compliance issues like you did?
7          MS. McCLURE:  Objection to form.
8          THE WITNESS:  For the most part
9      as I recall, yes.
10 BY MR. PIFKO:
11     Q.    So this was -- this specific
12 subject line says, "Strategy Discussion 2."
13         Do you see that?
14     A.    Yeah.
15     Q.    So this was -- and as you just
16 testified, this was something that you regularly
17 did in connection with HDMA meetings that
18 occurred annually?
19         MS. McCLURE:  Objection to form.
20         THE WITNESS:  Not always.  I
21     think we'd met before.  Might not have
22     been at an HDA meeting.
23 BY MR. PIFKO:
24     Q.    But you had, with some degree of

Page 95

1  regularity, meetings with these people to discuss
2  regulatory and compliance issues?
3          MS. McCLURE:  Objection, form.
4          THE WITNESS:  I wouldn't say
5      regularity.  We only met like that maybe
6      two or three times.
7  BY MR. PIFKO:
8      Q.    When was the first time you had
9  such a meeting like that?
10     A.    I can't remember if it was before
11 this one or after this one.  We met in Chicago at
12 the airport one time.  And I think Cardinal
13 hosted that meeting.
14     Q.    Do you have a rough idea about
15 when that was?
16         MS. McCLURE:  Objection.
17         THE WITNESS:  No, I don't.
18         MS. McCLURE:  Asked and answered.
19 BY MR. PIFKO:
20     Q.    But it was a meeting in Chicago
21 at the airport?
22     A.    I believe it was, yeah.
23     Q.    Was that in connection with an
24 HDMA conference?

Page 96

1      A.    No, I don't believe it was.
2      Q.    What was your recollection that
3  brought you all to Chicago?
4      A.    I think it had been after, you
5  know, the companies -- you know, we had had
6  action taken against us and I think Cardinal and
7  I'm not sure if McKesson had at the time.  And I
8  think the idea was just to get together and see
9  how we could do things better.
10     Q.    You think that would have been in
11 2007 or '8?
12         MS. McCLURE:  Objection.
13         THE WITNESS:  I don't think so.
14     I think it might have been after that.  I
15     don't know.
16 BY MR. PIFKO:
17     Q.    What action had been taken
18 against you that you're recalling?
19     A.    The suspension that we were
20 previously talking about.
21     Q.    And you recall that Cardinal had
22 had some action taken against it around the time
23 of this meeting as well?
24     A.    Yeah.

Page 97

1      Q.    What specifically was the nature
2  of your understanding about the action taken
3  against Cardinal at that time?
4      A.    The one -- the meeting in
5  Chicago?  That was when -- because I remember the
6  guy was at that meeting, Michael Mone from
7  Cardinal.  And he got called during the meeting,
8  and he had to leave.  And I think it was when
9  they had their -- one of their registrations
10 suspended or something and he had to leave.  We
11 didn't know what it was about, but he had to just
12 leave all of a sudden.
13     Q.    Okay.  Do you have a rough idea
14 on or around the time that was?
15     A.    No, I don't.
16     Q.    Did that -- your recollection
17 lead to a fine against Cardinal Health?
18         MS. McCLURE:  Objection, form.
19         THE WITNESS:  I think it did
20     after that, but I'm not -- I don't --
21     because it seems like they had a couple.
22     And I'm not sure if both resulted in
23     fines.
24 BY MR. PIFKO:

Page 102

1    MS. McCLURE:  Objection to form.

2    THE WITNESS:  I don't recall.

3    This was 11 years ago.  I don't remember

4    why I sent it to him.

5  BY MR. PIFKO:

6    Q.    Did you have regular

7  communications with Steve Reardon?

8    MS. McCLURE:  Objection, form.

9    THE WITNESS:  Well, how -- define

10    regular.  Every day, every week, every

11    month, every year?

12  BY MR. PIFKO:

13    Q.    With any degree of regularity.

14    MS. McCLURE:  Objection to the

15    definition.

16    THE WITNESS:  What's regularity?

17  BY MR. PIFKO:

18    Q.    What's regular to you?

19    A.    Regular would be every day.

20    Q.    Did you talk to Steve Reardon

21  with some frequency?

22    MS. McCLURE:  Objection to form.

23    THE WITNESS:  I would say

24    occasionally, at HDA calls, HDA meetings,

Page 103

1    things like that.  Not a lot of back and

2    forth, no.

3  BY MR. PIFKO:

4    Q.    From time to time you would share

5  information, though, with him about issues in the

6  drug distribution business.  Correct?

7    A.    Yes.  As long as it was not

8  proprietary information from ABC.

9    MR. PIFKO:  Go off the record for

10  a minute.

11    THE VIDEOGRAPHER:  Going off the

12    record, 12:56 p.m.

13    - - -

14    (A recess was taken from

15  12:56 p.m. to 1:00 p.m.)

16    - - -

17    THE VIDEOGRAPHER:  Back on record

18  at 1:00 p.m.

19    MR. PIFKO:  All right.  We don't

20  have any further questions at this time.

21    MS. McCLURE:  No further -- no

22  questions.

23    THE VIDEOGRAPHER:  This ends

24  today's deposition.  We're going off the

Page 104

1  record at 1:00 p.m.

2    (Witness excused.)

3    (Deposition concluded at

4  approximately 1:00 p.m.)

Page 105

1

2    CERTIFICATE

3

4

5    I HEREBY CERTIFY that the witness

was duly sworn by me and that the deposition is a

6  true record of the testimony given by the

witness.

7

    It was requested before

8  completion of the deposition that the witness,

STEPHEN MAYS, have the opportunity to read and

9  sign the deposition transcript.

10

11

12

13

14    _____

    ANN MARIE MITCHELL, a Federally

    Approved Certified Realtime

15    Reporter, Registered Diplomate

    Reporter, Registered Merit Reporter and

16    Notary Public

17

18

19    (The foregoing certification of

20  this transcript does not apply to any

21  reproduction of the same by any means, unless

22  under the direct control and/or supervision of

23  the certifying reporter.)

24