# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 26 – Prevoznik Tr. (5-17-19) Excerpts

```
  1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
  2                    EASTERN DIVISION
  3
      IN RE: NATIONAL            )
  4   PRESCRIPTION               )  MDL No. 2804
      OPIATE LITIGATION          )
  5   _____    )  Case No.
                                 )  1:17-MD-2804
  6                              )
      THIS DOCUMENT RELATES      )  Hon. Dan A.
  7   TO ALL CASES               )  Polster
  8
                   FRIDAY, MAY 17, 2019
  9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 10              CONFIDENTIALITY REVIEW
 11                      - - -
 12          Videotaped deposition of Thomas
 13   Prevoznik, Volume III, held at the offices of
 14   WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
 15   NW, Washington, DC, commencing at 8:10 a.m.,
 16   on the above date, before Carrie A. Campbell,
 17   Registered Diplomate Reporter and Certified
 18   Realtime Reporter.
 19
 20
 21                      - - -
 22
                 GOLKOW LITIGATION SERVICES
 23         877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
 24
 25
```

```
 1                EXAMINATION (continued)
 2     QUESTIONS BY MR. FARRELL:
 3          Q.     Good morning.
 4          A.     Good morning.
 5          Q.     Welcome back to day three of
 6     your deposition, Mr. Prevoznik.
 7                 I'll remind you or let me ask
 8     you to recall that today you'll be testifying
 9     on behalf of the United States Drug
10     Enforcement Administration, the DEA, on
11     subject matters that have been requested in
12     this litigation.
13                 Continuing the line of
14     discussion, I'm going to -- I have marked,
15     premarked, and am showing you Plaintiff's
16     Exhibit 17, and the first thing I'd like to
17     do is I'd like to direct your attention to
18     the bottom right-hand corner.
19                 And you see the numbers
20     US-DEA-00025656?
21          A.     Yes, I do.
22          Q.     I'll represent to you that's a
23     Bate stamp number provided by the Department
24     of Justice.  And what I wanted to do was to
25     lay a little foundation on the documents that
```

```
1    QUESTIONS BY MR. FARRELL:
2         Q.    Now, the next one is McKesson,
3    and we're going to take a real quick stop to
4    take a look at this one.
5               This is dated -- the first one
6    is December 6, 2005, and it appears to be a
7    conference call with Mr. John Gilbert.
8               Do you see that?
9         A.    Yes.
10        Q.    And Mr. Mapes and Kyle Wright
11   of the DEA.
12              Who are Mr. Mapes and
13   Mr. Wright of the DEA?
14        A.    Mr. Mapes was the section chief
15   of our E-Commerce section, and Kyle Wright at
16   this time was a staff coordinator in
17   Mr. Mapes' section.
18        Q.    So the next plaintiff's exhibit
19   has the Bates stamp at the bottom corner of
20   US-DEA-00000371, and you'll see that it's
21   dated January 23, 2006, but it's referencing
22   a January 3, 2006 meeting.
23              Do you see that?
24        A.    Yes.
25        Q.    And in it you can see where it
```

```
 1    looks like it contains -- this is the

 2    memorandum of the meeting between McKesson

 3    and the DEA as a result of the distributor

 4    initiative.  Agreed?

 5              MR. EPPICH:  Object to form and

 6         foundation.

 7              THE WITNESS:  Yes.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.   Now, what I'm going to ask you

10    to do is I'm going to ask you to go to the

11    end of page 2.  And at the bottom, starting

12    with the word "after," the very last

13    paragraph, I'd ask you to read that into the

14    record.

15         A.   "After the conclusion of this

16    meeting, it was learned from Gary Hilliard of

17    McKesson Corp that one of the reasons they

18    were not able to realize the full volume of

19    hydrocodone product going out to the Florida

20    pharmacies was that their reports only

21    included the name brand hydrocodone products

22    distributed and was leaving out the generic

23    products."

24         Q.   The next sentence.

25         A.   "It was only after realizing
```

```
 1    that the generic were not being reported was
 2    McKesson Corp then able to see the large
 3    quantities that DEA was bringing to
 4    McKesson's attention."
 5         Q.    So I don't know how to say this
 6    any other way, but in 2006 when the DEA met
 7    with McKesson with its distributor initiative
 8    program, was it discovered that McKesson was
 9    only tracking the brand name prescription
10    opiates?
11              MR. EPPICH:  Object to form.
12         Foundation.  Calls for speculation.
13         Scope.
14              THE WITNESS:  Could you please
15         repeat it?
16    QUESTIONS BY MR. FARRELL:
17         Q.    This document, following the
18    distributor initiative meeting between the
19    DEA and McKesson, appears to present the fact
20    that the DEA discovered McKesson was only
21    tracking brand name prescription opiates.
22         A.    Correct.
23              MR. EPPICH:  Object to the
24         form.  Foundation.  Calls for
25         speculation.
```

```
 1                THE WITNESS:  Correct.
 2   QUESTIONS BY MR. FARRELL:
 3        Q.    If, in fact, McKesson was only
 4   tracking brand name prescription opiates and
 5   leaving out the generic products, is that a
 6   violation of federal law?
 7                MR. EPPICH:  Object to form.
 8         Foundation.  Calls for speculation.
 9         Calls for a legal conclusion.
10                THE WITNESS:  Yes.
11   QUESTIONS BY MR. FARRELL:
12        Q.    Sitting here today as the
13   custodian of ARCOS and the institutional
14   knowledge of the Drug Enforcement
15   Administration, if this is true, how many
16   generic prescription orders do you estimate
17   that McKesson missed prior to 2005?
18                MR. EPPICH:  Object to the
19         form.  Calls for speculation.  Calls
20         for a legal conclusion, and I believe
21         it would be outside the Touhy
22         authorization.
23                MS. MAINIGI:  Join.
24                MR. FINKELSTEIN:  Scope.  Calls
25         for speculation.
```

```
 1                   You can answer in your personal
 2         capacity, but not on behalf of the
 3         DEA.
 4                   THE WITNESS:  I have no idea.
 5    QUESTIONS BY MR. FARRELL:
 6         Q.    A lot?
 7                   MR. EPPICH:  Same objections.
 8                   MR. FINKELSTEIN:  Same
 9         objection.
10                   THE WITNESS:  Yes.
11    QUESTIONS BY MR. FARRELL:
12         Q.    All right.  On a scale of 0 of
13    10 of screw-ups, how big of a screw-up is
14    this?
15                   MR. EPPICH:  Object to form.
16         Argumentative.
17                   MR. FINKELSTEIN:  Same
18         objection.
19                   You can answer in your personal
20         capacity, but not on behalf of the
21         DEA.
22                   THE WITNESS:  In my personal
23         capacity, a big one, a really big one.
24    QUESTIONS BY MR. FARRELL:
25         Q.    Epic?
```

```
 1        A.    Yes.

 2              MR. EPPICH:  Same objections.

 3              (Prevoznik Plaintiff's Exhibit

 4        P26 marked for identification.)

 5   QUESTIONS BY MR. FARRELL:

 6        Q.    We're now going to jump ahead a

 7   little bit.  I'm going to show you what's

 8   next marked as Plaintiff's 26.

 9              This is a series of letters

10   that the DEA, institutionally and with

11   perfect recollection, will recall that --

12   between the lawyers for Cardinal Health and

13   the DEA, the first time they got in trouble

14   for breaking the law in 2008.

15              MS. MAINIGI:  Objection.

16        Scope.  Foundation.  Form.

17   QUESTIONS BY MR. FARRELL:

18        Q.    Now, without having to go

19   through all of the nuances, what I'm going to

20   ask you to do is I'm going to make a

21   reference now.  At the bottom right-hand

22   corner is Bates stamp CAH_MDL2804_01376799.

23              Do you see that?  799 are the

24   last three numbers.

25        A.    Yes, I have it.
```

```
 1              Foundation.  Calls for speculation.
 2                    THE WITNESS:  Yes.
 3      QUESTIONS BY MS. SINGER:
 4         Q.     "Apparently the DEA soon
 5      realized that the largest distributors were
 6      not taking their compliance requirements with
 7      sufficient seriousness.  In 2007 and 2008,
 8      the DEA took enforcement action through legal
 9      settlements against the three largest
10      wholesale distributors in the US for alleged
11      violations of the CSA, with multi-million
12      dollar fines involving two of them."
13                    Is that also accurate?
14                    MR. EPPICH:  Object to form.
15                    MS. MAINIGI:  Objection to
16         form.
17                    THE WITNESS:  Yes.
18      QUESTIONS BY MS. SINGER:
19         Q.     Last paragraph.  "Despite these
20      settlement agreements and the subsequent
21      policy enhancements that the three
22      distributors made in their aftermath, the
23      committee found that the distributors
24      continued to ship large volumes of opioids
25      into West Virginia.  The three largest
```

```
 1    wholesale drug distributors in the United

 2    States - AmerisourceBergen, Cardinal Health

 3    and McKesson - sent more than 900 million

 4    doses of hydrocodone and oxycodone to West

 5    Virginia between 2005 and 2016.  Cardinal

 6    Health was the largest supplier of controlled

 7    substances to West Virginia out of the five

 8    companies examined as part of the Committee's

 9    investigation, and distributed more than 366

10    million doses of hydrocodone and oxycodone to

11    West Virginia pharmacies between 2005 and

12    2016.  From April 2006 through 2016, McKesson

13    supplied 299.87 million doses of hydrocodone

14    and oxycodone to West Virginia pharmacies,

15    AmerisourceBergen distributed 248.16 million

16    doses of hydrocodone and oxycodone to West

17    Virginia pharmacies between 2005 and 2016."

18             Is that also consistent with

19    DEA's understanding of what had occurred?

20             MR. EPPICH:  Object to the

21       form.  Foundation.

22             THE WITNESS:  Yes.

23    QUESTIONS BY MS. SINGER:

24       Q.    Turn the page, please.  "Among

25    the Committee's findings, distributors
```

```
 1    suffered a series of breakdowns or had a lack
 2    of follow-through in their -- through in
 3    their due diligence evaluations of
 4    prospective pharmacy customers.  As
 5    demonstrated in the report, the committee
 6    found instances of insufficient due diligence
 7    by distributors who merely required
 8    pharmacies to complete new customer
 9    applications."
10              Now, we talked about that
11    earlier, correct?
12              MR. EPPICH:  Object to the
13        form.
14              THE WITNESS:  Correct.
15    QUESTIONS BY MS. SINGER:
16        Q.   And that is not sufficient to
17    comply with the registrant's obligation to
18    know their customers, correct?
19              MR. EPPICH:  Object to the
20        form.  Foundation.
21              MS. MAINIGI:  Calls for a legal
22        conclusion.
23              THE WITNESS:  Correct.
24    QUESTIONS BY MS. SINGER:
25        Q.   "There were cases where data
```

```
 1    submitted by a new customer was not

 2    critically analyzed to identify any red flags

 3    of controlled substance diversion, for

 4    example, potential red flags regarding a

 5    pharmacy's prescribing physicians that raised

 6    concerns about possible diversion were not

 7    questioned."

 8              Is that consistent with DEA's

 9    understanding of what occurred?

10              MR. EPPICH:  Object to form.

11         Foundation.

12              THE WITNESS:  Yes.

13    QUESTIONS BY MS. SINGER:

14         Q.   Goes on to say, "The

15    investigation found instances where there

16    were failures to monitor the volume of

17    controlled substances sold to customers.

18    Some distributors used thresholds to track

19    customers' purchases of controlled substances

20    and flag orders as suspicious when purchases

21    exceeded those limits.  But some of these

22    thresholds were assigned arbitrarily and not

23    effective.  Committee found instances in

24    which distributors set thresholds but failed

25    to enforce them, assigned artificially high
```

```
 1    hydrocodone threshold limits with little to
 2    no documented justification, or continued to
 3    raise threshold levels without thoroughly
 4    investigating or documenting the
 5    justifications presented by a customer
 6    pharmacy."
 7                Again, is that what DEA
 8    observed happened during this time period?
 9                MR. EPPICH:  Object to the
10         form.  Foundation.  Calls for
11         speculation.
12                MS. MAINIGI:  Join.
13                THE WITNESS:  Yes.
14    QUESTIONS BY MS. SINGER:
15        Q.    Okay.  And is that failure to
16    flag suspicious orders, to approve them
17    without justification and to continue to
18    raise thresholds, a violation of the
19    Controlled Substances Act?
20                MS. MAINIGI:  Objection.  Calls
21         for a legal conclusion.  Outside the
22         scope.
23                MR. EPPICH:  Objection to the
24         form.
25                MR. FINKELSTEIN:  Object to
```

1       form.

2                THE WITNESS:  Yes.

3       QUESTIONS BY MS. SINGER:

4            Q.   It goes on, "Despite efforts by

5       DEA to educate distributors about their

6       responsibility to report suspicious orders,

7       the companies reviewed by the committee

8       failed to address suspicious orders" -- I'm

9       sorry -- "suspicious order monitoring in

10      critical ways.  Rather than reporting

11      individual suspicious orders as they were

12      identified, some distributors reported a

13      variety of other types of information to DEA

14      over the years.  This information included

15      excessive orders encompassing drug shipments

16      that had already been shipped and suspicious

17      customers such as pharmacies with which

18      distributors had terminated business

19      relationships.  Neither of these types of

20      reports informed DEA about suspicious orders

21      in realtime, nor did they guarantee the

22      suspicious orders reported to DEA were also

23      blocked by the distributors.  The committee

24      also found that one distributor lacked any

25      formal order monitoring program.  Rather, the

```
 1    distributor's employees relied on subjective
 2    criteria to investigate {sic} orders it
 3    considered suspicious."
 4                Does that also reflect what the
 5    DEA knew to happen during this time period?
 6                MS. MAINIGI:  Objection.  Form.
 7        Foundation.  Outside scope.
 8                MR. FINKELSTEIN:  Object to the
 9        form.
10                THE WITNESS:  Yes.
11    QUESTIONS BY MS. SINGER:
12        Q.    And the last paragraph.
13    "Another critical failure identified by the
14    Committee involved instances in which
15    distributors appeared to turn a blind eye to
16    red flags of possible drug diversion.
17    Despite available information, distributors
18    at times took only minimal steps to
19    investigate possible warning signs of
20    diversion and continued to ship controlled
21    substances to suspect pharmacies.  In several
22    cases, distributors either failed to fully
23    investigate potentially troubling information
24    they obtained from customer pharmacies or
25    willfully ignored it.  These failures raise
```

```
 1   substantial concern given that DEA has said

 2   existing knowledge of a geographic area's

 3   problem with controlled substance abuse is a

 4   factor that distributors should take into

 5   account when evaluating customers."

 6              Now, is that true, that DEA had

 7   said knowledge of a geographic area's problem

 8   with controlled substance abuse is a factor

 9   that should be taken into account by

10   registrants?

11              MR. EPPICH:  Object to the

12       form.

13              MS. MAINIGI:  Object to form.

14              THE WITNESS:  Yes.

15   QUESTIONS BY MS. SINGER:

16       Q.   Okay.  "West Virginia has the

17   highest drug overdose rate in the country,

18   meaning distributors should have been

19   particularly attuned to any red flags

20   encountered when conducting due diligence on

21   pharmacies in that state."

22              Is that also an accurate

23   reflection of a registrant's duty when

24   shipping controlled substances into West

25   Virginia or other hotspots?
```

```
 1                MR. EPPICH:  Object to form.
 2        Calls for a legal conclusion.
 3                MS. MAINIGI:  Outside the
 4        scope.
 5                THE WITNESS:  Yes.
 6   QUESTIONS BY MS. SINGER:
 7        Q.   Okay.  And this whole paragraph
 8   that I just read, does that also reflect the
 9   DEA's understanding of what happened during
10   this time period?
11                MR. EPPICH:  Object to the
12        form.  Vague.  Calls for a legal
13        conclusion.
14                MR. FINKELSTEIN:  Join in the
15        form objection.
16                THE WITNESS:  Yes.
17   QUESTIONS BY MS. SINGER:
18        Q.   Okay.  Turn to page 10, please.
19   Bottom of page 10 there's a bullet that says,
20   "For due process reasons, it is current DEA
21   practice not to inform distributors or other
22   registrants about customers that may have
23   engaged in improper behavior."
24                Do you see where I am?
25        A.   The bottom?
```