# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 35 – Cameron Tr. Excerpts

```
 1              THE STATE OF MONTANA

             OFFICE OF THE ATTORNEY GENERAL

 2            OFFICE OF CONSUMER PROTECTION

 3

 4                      - - -

 5              SEPTEMBER 26, 2018

 6              HIGHLY CONFIDENTIAL

 7                      - - -

 8

 9       Oral testimony of TODD CAMERON, taken

10   pursuant to notice, was held at the law offices of

11   Baker & Hostetler, LLP, 250 South Civic Center Drive,

12   Suite 1200, Columbus, Ohio 43215, commencing at 10:23

13   a.m., on the above date, before Carol A. Kirk, a

14   Registered Merit Reporter.

15

16                      - - -

17

18

19

20

21          GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

22              deps@golkow.com

23

24
```

```
 1         understood.
 2              MS. WICHT:  Okay.
 3   BY MS. SINGER:
 4         Q.   Mr. Cameron, have you had a chance
 5   to look at the list of subjects?
 6         A.   Yes.
 7         Q.   All right.  Are you familiar with
 8   all of those subject areas in your work at
 9   Cardinal?
10         A.   I am familiar with the areas, yes.
11         Q.   Okay.  When did you start working
12   at Cardinal?
13         A.   August of 1993.
14         Q.   Was it your first job?
15         A.   It was.
16         Q.   And in what capacity did you start
17   with the company?
18         A.   I was involved in the IT
19   department around data elements of the
20   distribution side of the company.
21         Q.   And was that on the compliance or
22   marketing side of Cardinal Health?
23         A.   Marketing.
24         Q.   And can you take us through your
```

```
 1   positions at Cardinal Health.
 2       A.    I can try.  I was in --
 3       Q.    If you can't, I can't.
 4       A.    Right.  Yeah.
 5             I was in the -- and the reason I
 6   hesitate is when I started, the company was very
 7   small.  And we didn't have the specific
 8   department structure silos that we have today.
 9   It was really kind of a group of -- it was very
10   small.  It was about 70 people when I started.
11             But I was in the marketing
12   department as far as customer data elements that
13   were used on the distribution side of the
14   business, and moved into an IT role that was
15   focused around customer IT solutions from an
16   inventory management standpoint side.
17             And then moved into what at the
18   time was referred to as sales administration.
19   Then went back into another IT role.  Then went
20   into a consumer health role, which was all the
21   front-end nonprescription products that Cardinal
22   carries.
23             Then went back into a sales
24   operations role.  And then went from there into
```

```
 1   the anti-diversion team.  And each of those

 2   steps had two or three jobs within those

 3   movements.

 4           Q.   Okay.  And so what is your current

 5   title at Cardinal?

 6           A.   I believe it is -- and I say that

 7   because I'm not sure what the actual HR roadmap

 8   title is.  But I believe it is SVP of supply

 9   chain integrity.

10           Q.   All right.  Do we need to check

11   your business card?

12           A.   Yeah, I don't have one with me.

13   But I think that's what it says.

14           Q.   So this is not the part of the

15   testimony where you're supposed to get squishy?

16           A.   Well, I haven't stood up yet.  So

17   I'm still sitting down.

18           Q.   Okay.  And so in your current

19   position, whatever it is, at Cardinal Health,

20   you're responsible for anti-diversion

21   compliance; is that correct?

22           A.   Correct.

23           Q.   And when did you first move into a

24   role related to anti-diversion compliance?
```

```
 1   events, to determine if we are setting the dials
 2   correctly.  But I don't have a specific thing
 3   that has to happen.
 4         Q.    Okay.  So you are satisfied that
 5   there aren't currently any shortcomings in
 6   Cardinal's compliance efforts or anti-diversion
 7   efforts that need to be addressed?
 8         A.    From Cardinal's distribution
 9   position that we sit in in the supply chain, no.
10         Q.    And when you qualify that
11   response, what are you excluding?
12         A.    I mean it would be great if there
13   was something we could do to decrease the
14   overprescribing of opioids.  That would
15   obviously help a ton.
16         Q.    Okay.  Do you participate in your
17   current role at Cardinal in any trade
18   associations related to distribution or
19   compliance?
20         A.    Does HDA qualify as one?
21         Q.    In my book, yes.
22         A.    Then, yes, HDA.
23         Q.    And HDA is?
24         A.    I'm not sure -- they've changed
```

```
 1   their name recently.  I'm not sure what HDA

 2   stands for.

 3           Q.    Okay.  Does it sound like the

 4   Healthcare Distribution Alliance?

 5           A.    I think so, yes.  There used to be

 6   an M in there maybe.

 7           Q.    Used to.

 8           A.    Yeah.

 9           Q.    They rebranded.

10           A.    Yes.

11           Q.    What is your role on Cardinal's

12   behalf in the HDA?

13           A.    Representing Cardinal on the calls

14   that take place with HDA and other distributors

15   around DEA compliance, anti-diversion issues,

16   new regulations that could be coming out from

17   either the federal government or specific state

18   governments.

19           Q.    Are there other people from

20   Cardinal who participate in those calls?

21           A.    There are.

22           Q.    Who else?

23           A.    I don't know everybody.  I know a

24   lot of the regulatory lawyers are involved in
```

1    those calls. Gary Cacciatore, Martha Russell,

2    to name two of the attorneys that I think were

3    usually on those calls.

4         Q.   And how often do those calls

5    happen?

6         A.   I don't know that there's a

7    specific cadence. I would say it probably feels

8    like maybe monthly.

9         Q.   And do you have an official role

10   in HDA? Do you serve on a board or a committee?

11        A.   No.

12        Q.   And, to your knowledge, does

13   anybody from Cardinal serve on the HDA's board

14   or committee?

15        A.   I don't know. If they would, I

16   wouldn't know it.

17        Q.   Okay. Are there any other

18   industry associations or organizations with

19   which you are involved?

20        A.   No.

21        Q.   Any associations that

22   manufacturers of opioids also participate in?

23        A.   That I'm involved?

24        Q.   Yes.

```
 1            A.    No.
 2            Q.    From your involvement in HDA
 3    calls, is that only distributors of prescription
 4    and other healthcare products or manufacturers
 5    as well?
 6            A.    I believe on the calls that I'm
 7    on, I think it's only distributors.  But I know
 8    there are a lot of other HDA calls that
 9    different groups are involved in that I'm not
10    on.
11            Q.    Okay.  And the calls you
12    participate in, is there a particular subject
13    area or group that they fall within?
14            A.    Usually related around controlled
15    substances.  And, again, a lot of it's been
16    around potential new regulations coming out from
17    specific state Boards of Pharmacy lately.
18            Q.    Okay.  And I take it there are
19    e-mails that flow from HDA to you and other
20    members of that group about those topics?
21            A.    I'm sure there are.
22            Q.    Okay.  Do you recall specifically?
23            A.    I do not.
24            Q.    And you mentioned that those calls
```

```
 1    have been about regulatory developments.
 2         A.    Yes.
 3         Q.    Have there been discussions in
 4    particular about DEA guidance and authority and
 5    enforcement?
 6         A.    The two subjects that I think have
 7    been the most common lately that I can
 8    specifically recall are Ohio is putting out a
 9    new regulation around controlled substance
10    distributions, the things that distributors are
11    required to do from a due diligence standpoint.
12    And New York has put out or is putting out an
13    opioid tax.  Those have been -- probably the
14    last 15 calls I've been on have been about one
15    of those two subjects.
16         Q.    Okay.  And over the course of your
17    tenure, going back farther than the last couple
18    of weeks or months, are there other topics you
19    recall discussing?
20         A.    No.
21         Q.    Have there been any issues that
22    have come up relating to the State of Montana?
23         A.    No, not that I can recall.
24         Q.    Have you all discussed any issues
```

```
 1    questions.
 2            We still set the thresholds.
 3    They're not involved in that process.  But as
 4    far as the documenting of the KYC for the
 5    national accounts, that's done by that team.
 6        Q.    So my understanding is that
 7    national chain accounts are treated differently
 8    on the -- because of the assumption that they
 9    have their own anti-diversion programs.  Is that
10    accurate?
11        A.    Treated differently in what way?
12        Q.    They aren't subject to the same
13    kind of Know Your Customer onboarding as
14    independents.
15        A.    That is true.
16        Q.    And does Cardinal make any effort
17    to audit or check a chain pharmacy's
18    anti-diversion program?
19        A.    The benefit to the national
20    accounts is we get corporate level --
21    corporate-provided store level data.  And those
22    national accounts buy all of their controls from
23    us.  So we actually have a better picture of the
24    national chains because they're not buying from
```

```
 1   four or five wholesalers like independents are.
 2   So I would say we actually have more scrutiny on
 3   the chains than we do the independents.
 4          Q.    Okay.  Because they give you more
 5   data?
 6          A.    Yes.
 7          Q.    And because you're the only
 8   distributor?
 9          A.    Exactly.
10          Q.    And -- okay.  So understanding
11   that that gives you a confidence level --
12          A.    Yes.
13          Q.    -- do you all do any examination
14   of their own anti-diversion programs?
15          A.    No.
16          Q.    And has it always been the case
17   that chains have given you this corporate level
18   data for all of the pharmacies you supply?
19          A.    Since I've been in the role.
20          Q.    Okay.  Have you done any analysis
21   to determine whether chains or independents
22   generate more suspicious orders?
23          A.    Have we done specific analysis?
24   No.
```