# Plaintiffs' Memorandum in Opposition to Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims

# Ex 47 – Kelly Tr. Excerpts

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5
     IN RE:  NATIONAL        :  HON. DAN A.
 6   PRESCRIPTION OPIATE      :  POLSTER
     LITIGATION               :
 7                            :
     APPLIES TO ALL CASES     :  NO.
 8                            :  1:17-MD-2804
                              :
 9
             - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                     -  -  -
12
                  May 10, 2019
13
                     -  -  -
14
15          Videotaped deposition of
     PATRICK KELLY, taken pursuant to notice,
16   was held at the offices of Baron & Budd,
     600 New Hampshire Avenue, NW, Washington,
17   D.C., beginning at 8:58 a.m., on the
     above date, before Michelle L. Gray, a
18   Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
19   Realtime Reporter, and Notary Public.
20                     -  -  -
21
             GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
```

```
 1    BY MR. PIFKO:

 2         Q.    All right.  So you

 3    understand that you're here to answer

 4    questions and your counsel may object

 5    from time to time.  But unless he

 6    instructs you not to answer, you're still

 7    going to answer the question.

 8    Understood?

 9         A.    Understood.

10         Q.    Okay.  So you understand

11    that you're here in your individual

12    capacity but you're also here as the

13    official representative of HDA with

14    respect to certain topics, correct?

15         A.    I understand that, yes.

16         Q.    Okay.  And so that means

17    when you answer within those topics,

18    you're answering as if you are the HDA.

19    Do you understand that?

20         A.    I understand that.

21         Q.    Okay.  I'm going to hand you

22    a copy of the notice.

23              (Document marked for

24              identification as Exhibit
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I have.

2    Q.    Okay.  This is a document

3  from Anita Ducca to you dated October 31,

4  2016.  Agreed?

5    A.    Yes.

6    Q.    Okay.  Who is Anita Ducca?

7    A.    Anita Ducca is the senior

8  vice president of regulatory affairs for

9  Healthcare Distribution Alliance.

10    Q.    She reports to you?

11    A.    She does.

12    Q.    How long have you been with

13  the HDA?

14    A.    I joined in January of 2011.

15    Q.    The HDA is an organization

16  that acts on behalf of its members,

17  correct?

18    A.    That's correct.

19    Q.    Your members include the,

20  what we refer to in the case as the big

21  three distributors, Cardinal Health,

22  AmerisourceBergen, and McKesson; is that

23  correct?

24    A.    In addition to -- in

Case 1:17-md-02804 Document 1975-50 Filed 07/24/20 Page 5 of 59. PageID #: 245984

1    addition to 29 other companies, yes.

2         Q.    Okay.  And you also have

3    manufacturers who are members of the

4    organization, correct?

5         A.    They are in a different

6    membership category, yes.

7         Q.    But they are still members?

8         A.    They are members in a

9    different category.

10        Q.    Okay.  Mallinckrodt is a

11   member?

12        A.    In the affiliate member

13   category I believe so, yes.

14        Q.    Okay.  Purdue?

15        A.    I believe so, in the -- in

16   the affiliate member category.

17        Q.    Janssen and Janssen?

18        A.    Johnson & Johnson?

19        Q.    Sorry.  Janssen -- Janssen

20   or Johnson & Johnson?

21        A.    Yes, I believe in the

22   affiliate member category.

23        Q.    Actavis?

24        A.    Actavis, I believe so in the

1    affiliate member category.

2         Q.    Teva?

3         A.    I believe so.

4         Q.    Endo?

5         A.    I believe so.

6         Q.    Okay.  The HDA doesn't act

7    on it -- on its own, it acts in the

8    interest of its members and on behalf of

9    its members, correct?

10              MR. WEINSTEIN:  Objection.

11         Objection to form.

12              Go ahead.  You've just got

13         to give me a moment to object.

14              THE WITNESS:  Sorry, I'm

15         sorry, I apologize.

16              We act on behalf of our core

17         members which are the distributor

18         members.

19   BY MR. PIFKO:

20         Q.    Okay.  You have a board,

21   correct?

22         A.    We do.

23         Q.    The board membership always

24   includes members from the big three,

1    AmerisourceBergen, McKesson, and Cardinal

2    Health, correct?

3           A.    In addition to the 29 other

4    members, yes.

5           Q.    Okay.  But the board always

6    has somebody from those companies on it?

7           A.    That's correct.

8           Q.    And then there's an

9    executive committee as well, correct?

10          A.    That is correct.

11          Q.    And what's the makeup of the

12   executive committee?

13          A.    The --

14                MR. WEINSTEIN:  Objection to

15          form.

16                THE WITNESS:  The executive

17          committee is seven members, three

18          members from the big three,

19          AmerisourceBergen, McKesson, and

20          Cardinal have a standing position

21          on the executive committee.

22                And then there are four

23          other positions that are other

24          member companies that filter

Case 3:17-cv-01362 Document 1975-50 Filed 07/06/20 Page 8 of 59 PageID #: 82287

1    Q.    This is another e-mail from

2  Ms. Ducca.  The subject is HDMA DEA

3  strategy meeting, availability response

4  requested on alternative dates.  It's

5  dated September 26, 2007.  And it's got

6  another e-mail below also from Ms. Ducca

7  dated September 25, 2007.

8         MS. WICHT:  Can you just

9      hold on until we have the

10      document --

11         MR. PIFKO:  Yeah, no

12      problem.  I was just going to -- I

13      was going to read the Bates label.

14         Bates label is

15      CAH_MDL_PRIORPROD_DEA07_00877471

16      through 473.

17  BY MR. PIFKO:

18    Q.    So take a minute to review

19  it and let me know when you're ready.

20    A.    Okay.

21    Q.    All right.  So on the first

22  page here again it's talking about

23  setting up some -- some meetings.

24         On the first page at the

Highly Confidential - Subject to Further Confidentiality Review

1   bottom of her -- Anita Ducca's e-mail,

2   dated September 25, 2007.

3            Do you see that?

4       A.    I do.

5       Q.    Okay.  She says, "Dear HDMA

6   committee members."  So, the HDMA

7   committee members, that includes all

8   members?

9            MR. WEINSTEIN:  Objection to

10           form.

11           THE WITNESS:  In this

12           instance it appears to be the

13           regulatory affairs committee and

14           the federal government affairs

15           committee.

16  BY MR. PIFKO:

17      Q.    And it's cc'd to the

18  government public policy committee as

19  well?

20      A.    Government public policy

21  council.

22      Q.    Oh, council.  Okay.

23           Those all include

24  representatives from all the HDA

1   distributor members?

2          A.    That participate in those

3   committees, yes.

4          Q.    Okay.  And again, that --

5   those include members from the big three

6   distributors, correct?

7          A.    Yes.

8          Q.    So she says here, "Given the

9   intensity and impact of the Drug

10  Enforcement Administration's recent

11  actions, and the concerns expressed by

12  HDMA's executive committee last week,

13  HDMA recommends developing a

14  comprehensive DEA strategy."

15              Do you see that?

16         A.    I do.

17         Q.    So at this time, the HDA on

18  behalf of its members was developing a

19  comprehensive DEA strategy as a result of

20  what they understood to be an -- intense

21  actions from the DEA; is that correct?

22              MR. WEINSTEIN:  Objection to

23         form.

24              THE WITNESS:  Yes, that is

1    correct.

2    BY MR. PIFKO:

3        Q.    And then if you go to the

4    second page of the document, she outlines

5    some of the topics of discussions.

6              Do you see that?

7        A.    I do.

8        Q.    Okay.  So she says, "Our

9    initial thoughts are" -- I'm on the

10   second paragraph at the top there.  Are

11   you with me?

12       A.    Yes, I am.

13       Q.    She says, "Our initial

14   thoughts are to review the major DEA

15   issues."

16             Do you see that?

17       A.    I do.

18       Q.    And then she has in

19   parentheses what those issues are, right?

20       A.    Yes.

21       Q.    And one of them is

22   suspicious orders, correct?

23       A.    Yes.

24       Q.    And then she says, she wants

1    to develop a specific policy and

2    positions and supporting information for

3    those issues.

4              Do you see that?

5         A.    Yes.

6         Q.    As well as an overall

7    strategy for identifying solutions.

8              Do you see that?

9         A.    I do.

10        Q.    "We would also

11   comprehensively assess HDMA's role in

12   future DEA interactions."

13             Do you see that?

14        A.    I do.

15        Q.    I said that correctly?

16        A.    Yes, you did.

17        Q.    Okay.  So then she says,

18   "Specific topics could include."  And

19   there are several bullet points here.

20             Do you see that?

21        A.    I do.

22        Q.    So she says, "For suspicious

23   orders," she says, are -- I'm reading the

24   second bullet point.  "Are there

1   alternatives we can propose to DEA, or

2   specific objections we should raise?

3   What supporting information exists?  Can

4   we develop a strategy for DEA's concerns?

5   Who should be involved?"

6            Do you see that?

7        A.    Yes.

8        Q.    So, again, there was a

9   discussion within the HDMA and its

10  members at this time about a strategy for

11  communicating with DEA, correct?

12       A.    Yes.

13       Q.    Another -- the

14  second-to-last bullet point, she has

15  here, she says, "What, if any, legal

16  options do we have to address all of the

17  above?"

18            Do you see that?

19       A.    I do.

20       Q.    So in addition to a DEA

21  strategy, HDMA and its members at this

22  time were also evaluating legal options

23  they might have to address these issues,

24  correct?

1          MR. WEINSTEIN:  Objection to

2     form.

3          THE WITNESS:  According to

4     this, yes.

5  BY MR. PIFKO:

6     Q.    You don't have any reason to

7  dispute the accuracy of this?

8     A.    I don't.

9          (Document marked for

10     identification as Exhibit

11     HDA-Kelly-5.)

12  BY MR. PIFKO:

13     Q.    I'm handing you what's

14  marked as Exhibit 5.  It is a single-page

15  e-mail.  It's Bates-labeled

16  HDA_MDL_000213427.  Take a minute to

17  review it and let me know when you're

18  ready.

19     A.    Okay.

20     Q.    There's two e-mails in here,

21  only really one of substance.  The

22  substantive e-mail is from John Gray

23  to -- is it Paul Julian dated Tuesday,

24  October 30th, 2007, and then John Gray

1          Do you see that?

2     A.    Yes.  That's what it says,

3  yes.

4     Q.    Turn to the third page of

5  the document, of the -- the slides.  So

6  it's technically the fourth page of the

7  document.  "Suspicious orders - policy

8  questions" is the heading of the slide.

9          Do you see that?

10     A.    I do.

11     Q.    Halfway down the slide it

12  says, "Should we support DEA's efforts?"

13          Do you see that?

14     A.    Yes.

15     Q.    So there are some questions

16  about whether HDMA and its members were

17  going to support DEA's efforts, correct?

18     A.    Yes.

19          MS. MACKAY:  Object to form.

20          MR. WEINSTEIN:  Objection to

21     form.  Just got to give a second

22     after the question.

23          THE WITNESS:  Oh, I'm sorry.

24  BY MR. PIFKO:

1      Q.    One of the bullet points is,

2  "Develop business practices," which is --

3  business practices is in quote.

4            Do you see that?

5      A.    I do.

6      Q.    Do you now understand what

7  that refers to?

8      A.    I -- I think what it led to,

9  yes.

10     Q.    The industry compliance

11  guidelines, correct?

12     A.    Yes.

13     Q.    And then it says,

14  "Alternatively do we want to challenge

15  DEA's expectations?"

16            Do you see that?

17     A.    Yes.

18     Q.    And that was something else

19  HDMA and its members were considering at

20  this time, correct?

21            MS. MACKAY:  Object to form.

22            THE WITNESS:  Again, I think

23       there was a variety of

24       considerations going on at the

1          time, yes.

2     BY MR. PIFKO:

3          Q.    But this was one of them,

4     correct?

5          A.    According to this, yes.

6          Q.    Again, it says, "What are

7     our legal options?"

8               Do you see that?

9          A.    I do.

10          Q.    So there were some

11     evaluations of what legal strategies can

12     be employed to challenge the DEA's

13     expectations?

14               MR. WEINSTEIN:  Objection to

15          form.

16               THE WITNESS:  Again, I think

17          those considerations were being

18          discussed.

19               (Document marked for

20          identification as Exhibit

21          HDA-Kelly-7.)

22     BY MR. PIFKO:

23          Q.    I'm handing you what's

24     marked as Exhibit 7, it is a two-page

1   webinars and seminars to educate the

2   members and the customers about the

3   guidelines as well"?

4          A.    Yes.

5          Q.    And Scott also told DEA that

6   "HDA would discuss, explain and encourage

7   acceptance of the guidelines by other

8   trade associations, including

9   manufacturing and pharmacy groups."

10             That's the second bullet

11  point on the page?

12         A.    Yes, yes, yes, yes, yes.

13         Q.    So you agree, a key message

14  that Scott was communicating to DEA here

15  was that HDA was going to work to make

16  sure its members and other participants

17  in the supply chain in the pharmaceutical

18  industry would implement these

19  guidelines, correct?

20             MR. WEINSTEIN:  Objection to

21       form.

22             THE WITNESS:  I think we --

23       we meant to basically educate the

24       rest, that they were available.

1           Again, we are not a

2      standards agency, we are not a

3      regulatory authority.  We can't

4      basically make any entity comply

5      with the guidelines.  We were just

6      going to educate as many folks as

7      we could about their existence and

8      make them available.

9  BY MR. PIFKO:

10     Q.    But you told DEA that you

11 wanted to help your members implement the

12 guidelines, correct?

13          MR. WEINSTEIN:  Objection to

14     form.

15          THE WITNESS:  That's -- yes,

16     that's what it -- that's what it

17     says here, yes.

18 BY MR. PIFKO:

19     Q.    Handing you what's marked as

20 Exhibit 24.

21          (Document marked for

22     identification as Exhibit

23     HDA-Kelly-24.)

24 BY MR. PIFKO:

Case 1:17-md-02804 Document 1975-70 Filed 07/24/2019 Page 20 of 59 PageID #: 284599

1    Q.    It is a three-page e-mail

2    between HDA and AmerisourceBergen.

3    Bates-labeled HDA_MDL_000156499 through

4    156501.

5             Take a minute to review

6    this, and let me know when you're done.

7             There is some discussion

8    about whether Chris Zimmerman from

9    AmerisourceBergen is going to serve as

10   a -- a chairman of a committee.  I'm not

11   interested in that part of the discussion

12   here.

13   A.    Okay.

14   Q.    This goes back to earlier in

15   the process of developing the industry

16   compliance guidelines or best practices,

17   agree, it's back in early January 2008?

18   A.    Yes.

19   Q.    And this is before this

20   meeting with DEA, correct?

21   A.    It is.

22   Q.    Okay.  And in this e-mail on

23   the first page, 156499, Mr. Zimmerman

24   tells HDA's Anita Ducca, "I think we need

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/19 248 of 50. PageID #: 284600

1   to discuss the suspicious order project.

2   Since ABC has an agreement with DEA, it

3   does not matter what best practices HDMA

4   develops because ABC must adhere to its

5   written agreement with DEA.  I assume

6   Cardinal will be in the same boat.

7   Therefore, I'm not sure what benefit ABC

8   would receive from this project."

9           Do you see that?

10      A.    I do.

11      Q.    Did I read that correctly?

12      A.    You do.

13      Q.    Okay.  So you agree that at

14   this time Mr. Zimmerman is saying that

15   he's not going to implement any

16   guidelines or best practices, and he

17   assumes Cardinal is not going to either,

18   correct?

19           MS. ROLLINS:  Object to

20      form.

21           MR. WEINSTEIN:  Objection to

22      form.  Foundation.

23           THE WITNESS:  I think what

24      he's implying is that they are

Highly Confidential - Subject to Further Confidentiality Review

1          already under strict adherence to

2          a specific plan with -- directly

3          with the DEA that satisfies their

4          obligations.  But it's specific to

5          those companies individually,

6          therefore, a model plan or

7          guidelines is irrelevant for them.

8    BY MR. PIFKO:

9          Q.    And they have no plan on

10   implementing them at this time, correct?

11              MS. ROLLINS:  Objection to

12         form.

13              MR. WEINSTEIN:  Objection to

14         foundation and form.

15              THE WITNESS:  Because they

16         have their own policies in place.

17   BY MR. PIFKO:

18         Q.    You said here that they have

19   a plan that satisfies the DEA.  Where

20   does it say that it satisfies the DEA?

21         A.    I'm deducing from this

22   document that since ABC has an agreement

23   with DEA, it does not matter what best

24   practices HDMA develops because ABC must

Case 1:17-md-02804 Document 1975-70 Filed 07/24/24 Page 23 of 59. PageID #: 284802

1    adhere to its written agreement with DEA.

2        Q.    What about Cardinal?

3            MR. WEINSTEIN:  Objection to

4        form.

5            MS. CHARLES:  Objection to

6        form.

7  BY MR. PIFKO:

8        Q.    It doesn't say anything like

9  that about Cardinal, does it?

10           MR. WEINSTEIN:  Objection to

11       form.  Foundation.

12          THE WITNESS:  An individual

13       from ABC insinuates that Cardinal

14       may be a similar position due to

15       a -- maybe a consent decree that

16       Cardinal entered into with DEA as

17       well that would be in the same

18       constriction with regard to their

19       practices that ABC is at the time.

20  BY MR. PIFKO:

21        Q.    And so the HDA knew this

22  information before it had the meeting

23  with DEA, correct?

24        A.    Obviously we were apprised

Case 1:17-md-02804 Document 1975-70 Filed 07/24/2024 Page 248 of 590 PageID #: 286903

1  that they were basically not going to be

2  of help in developing the guidelines or

3  adopting the guidelines, because they are

4  there are under a separate agreement.

5      Q.    Do you know if

6  AmerisourceBergen ever asked DEA if it

7  could follow the guidelines as an

8  improvement on measures it was already

9  engaged in?

10          MS. ROLLINS:  Objection to

11      form.

12          MR. WEINSTEIN:  Objection to

13      form.  Foundation.

14          THE WITNESS:  I do not.

15  BY MR. PIFKO:

16      Q.    No one ever told you that

17  they had requested anything from DEA as

18  far as being able to implement the

19  industry compliance guidelines?

20          MS. ROLLINS:  Objection to

21      form.

22          THE WITNESS:  That ABC had

23      requested?  Again, I don't know.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2        Q.    Same question about Cardinal

3    Health.

4             MS. CHARLES:  Objection to

5        form.

6             THE WITNESS:  Again I don't

7        know.  I don't know.

8    BY MR. PIFKO:

9        Q.    To your knowledge, did any

10   distributor implement the industry

11   compliance guidelines?

12            MR. WEINSTEIN:  Objection to

13       form.  Foundation.

14            THE WITNESS:  Again, I don't

15       know.  They were -- they were

16       guidelines.  Many of the

17       companies, from what I understand,

18       already had various processes in

19       place.  These guidelines were

20       developed to better inform them

21       about expectations within the DEA.

22       And if they -- they could beg and

23       borrow, and again it was meant to

24       be kind of something that could be

Case 1:17-md-02804 Document 1975-70 Filed 07/24/2024 Page 26 of 59 PageID #: 287805

1      applicable to various size

2      companies and be able to adapt.

3            So again I don't know if

4      anybody adopted the entire

5      document verbatim or not.  And we

6      didn't ask.

7  BY MR. PIFKO:

8      Q.    You don't know if anybody

9  adopted parts of the document either,

10  correct?

11            MR. WEINSTEIN:  Objection to

12      form.

13            THE WITNESS:  We don't.

14  BY MR. PIFKO:

15      Q.    So sitting here today, you

16  don't know, and at no time does HDMA know

17  if any members or other distributors

18  adopted all or part of the industry

19  compliance guidelines, correct?

20            MR. WEINSTEIN:  Objection to

21      form.

22            THE WITNESS:  I don't know,

23      nor did we ask.  And again, I

24      stated before, we are not a

Case 1:17-md-02804-DAP Document 1975-70 Filed 07/24/20 Page 27 of 59. PageID #: 284806

1   regulatory authority; we are not a

2   standard-setting body.  We are

3   simply doing our best to inform

4   our members about existing

5   policies.

6   BY MR. PIFKO:

7       Q.    And to your knowledge, no

8   pharmaceutical manufacturer ever adopted

9   the industry compliance guidelines or any

10  portion of them, correct?

11          MR. WEINSTEIN:  Objection to

12      form.

13          MS. MACKAY:  And foundation.

14          THE WITNESS:  And again,

15      they were not -- they were not

16      developed for manufacturers.  They

17      were developed for our core

18      members, the distributor members

19      of HDA.

20  BY MR. PIFKO:

21      Q.    But you did discuss them

22  with the Pain Care Forum, which included

23  manufacturers, correct?

24          MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    For the record Exhibit 33 is

3    a Word document that was -- file name --

4    name GAO Meeting on DEA Draft, TPs,

5    092010.  It's Bates-labeled HDMA -- or

6    sorry, HDA_MDL_000139905 to 000139910.

7    Take a minute to review it and let me

8    know when you're done.

9         A.    Okay.

10        Q.    You done?

11        A.    Yes.

12        Q.    So if you recall, we were

13   looking earlier at a document, that

14   document about the strategy for testimony

15   on the Hill.  Do you recall that?

16        A.    Yes, I do.

17        Q.    And one of the tactics that

18   was discussed there was getting a

19   congressperson to talk to the DEA to

20   address the industry's concerns.  Do you

21   recall that?

22        A.    I do.

23        Q.    Another tactic that HDA was

24   considering was communicating with the

1    Government Accountability Office about

2    the -- its concerns about the DEA,

3    correct?

4                    MR. WEINSTEIN:  Objection to

5           form.

6                    THE WITNESS:  I don't know

7           if that was part of that.  I

8           didn't -- was that part of that?

9    BY MR. PIFKO:

10          Q.    Irrespective of that

11   document, I'm just asking you --

12          A.    It is --

13          Q.    -- if that was another

14   tactic that HDA was investigating?

15                   MR. WEINSTEIN:  Objection to

16          form.

17                   THE WITNESS:  Again, we

18          don't have the ability to launch

19          GAO investigations, but we can

20          talk to members of Congress who

21          may think that's a correct course

22          of action.

23   BY MR. PIFKO:

24          Q.    Okay.  And so that was

Case 1:17-md-02804 Document 1975-70 Filed 07/24/2019 Page 30 of 59 PageID #: 274809

1    something that HDA was exploring about

2    whether there could be a dialogue with

3    GAO about the industry's concerns about

4    the DEA, correct?

5              MR. WEINSTEIN:  Objection to

6         form.

7              THE WITNESS:  Again I don't

8         know if we -- if we specifically

9         requested that.  I know that this

10        GAO report was requested by

11        members of Congress.

12   BY MR. PIFKO:

13        Q.    Okay.  These are talking

14   points about the industry's concerns that

15   would be presented at the GAO, correct?

16        A.    Correct.

17        Q.    So, this talks about, I'm on

18   the second page of the document.  It

19   first says, "Background on HDMA, who we

20   represent, show the graphic of wholesale

21   distribution we have online, number of

22   members, et cetera."

23              So in connection with the

24   discussion, there would have been a

Case 1:17-md-02804 Document 1975-50 Filed 07/24/20 Page 48 of 59 PageID #: 274910

 1  discussion about who the members are that

 2  are represented by HDA, correct?

 3            MR. WEINSTEIN:  Objection to

 4       form.

 5            THE WITNESS:  Yes.

 6  BY MR. PIFKO:

 7       Q.    And then this identifies

 8  recent concerns.  Do you see that

 9  discussion in Section 4 here?

10       A.    Yes, I see Section 4.

11       Q.    It says, "Recently DEA has

12  exerted extreme pressure on wholesale

13  distributors to take controlled

14  substances suspicious order

15  responsibilities much further."

16            Do you see that?

17       A.    I do.

18       Q.    Do you agree that was a

19  concern from HDA and its distributor

20  members?

21            MR. WEINSTEIN:  Objection to

22       form.

23            THE WITNESS:  It was.

24  BY MR. PIFKO:

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/19 32 of 59. PageID #: 273011

1    Q.    And then it gives bullet

2    points elaborating on that concern,

3    agree?

4    A.    It appears to, yes.

5    Q.    And the first one is, "DEA

6    invited members of the distribution

7    industry, firm by firm to a meeting where

8    DEA point blank told them that they

9    should identify customers who are selling

10   for illicit purposes, e.g., pill mils, or

11   illicit internet pharmacies such as those

12   filling orders without a prescription."

13        Do you see that?

14   A.    I do.

15   Q.    So that was part of the

16   basis for the HDA and its members'

17   concerns about DEA's pressures to take

18   controlled substances order

19   responsibilities further?

20        MS. WICHT:  Objection to

21   form.

22        MR. WEINSTEIN:  Objection to

23   form.

24        THE WITNESS:  Again, that

1           was -- that was an event or a

2           process that DEA had undertaken.

3           I have no reason to doubt that

4           that was part of the pattern of

5           concern.

6      BY MR. PIFKO:

7           Q.    And then another part of

8      that concern was that that action was

9      followed by revoking several

10     registrations in 2007, agreed?

11          A.    That's what is stated, yes.

12          Q.    And then it says, "HDA went

13     to great lengths to seek resolution with

14     DEA."  And then it's got some bullet

15     points.  Some of them are discussing the

16     industry compliance guidelines we just

17     discussed, agree?

18          A.    Yes.

19          Q.    And then in all bold, all

20     caps, it says, "Despite these efforts,

21     DEA has revoked another wholesale

22     distributor registration spring 2010."

23               Do you see that?

24          A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So the DEA's revoking or

2  suspending registrations, was a

3  significant concern for HDA and its

4  members?

5              MR. WEINSTEIN:  Objection to

6        form.

7              THE WITNESS:  Yes.

8  BY MR. PIFKO:

9    Q.    If you go to the page --

10  they are not numbered here --

11  HDA_MDL_000139907.  There's a heading,

12  "Key Concerns."

13    A.    I see it.

14    Q.    So this summarizes key

15  concerns that HDA and its members had

16  with respect to the DEA's enforcement

17  activities, correct?

18              MR. WEINSTEIN:  Objection to

19        form.

20              THE WITNESS:  Yes, at the

21        time.

22  BY MR. PIFKO:

23    Q.    So one of them is, it says,

24  "It's unreasonable for DEA to expect a

1    distributor to seek information about

2    pharmacies that they are barred from,

3    either through confidential business

4    practices or legal restrictions, e.g.,

5    HIPAA."

6              Do you see that?

7        A.    Yes, I do.

8        Q.    That was a key concern?

9              MS. CHARLES:  Objection to

10        form.

11              THE WITNESS:  Again, this

12        means that they were unreasonable

13        for DEA to expect distributors to

14        get prescribing information that

15        would have been HIPAA protected.

16   BY MR. PIFKO:

17        Q.    And then it says under here,

18   "DEA has asked distributors where

19   pharmacies' prescriptions came from, also

20   to research the pharmacies' customer

21   base.

22              So was that -- that was the

23   basis for that concern?

24        A.    I think that's part of the

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/20 Page 38 of 59. PageID #: 274815

1    concern, yes.

2         Q.    Then it says, "Even if the

3    distributor does their due diligence

4    regarding a customer, there's no

5    guarantee that the pharmacy will tell the

6    truth."

7              That was another concern?

8         A.    That is -- that is a

9    concern, yes.

10        Q.    Then here it says, again,

11   "DEA used an extreme tactic by suspending

12   a license.  This action is intended for

13   when there is an imminent threat to the

14   public health and safety."

15             Do you see that?

16        A.    Yes.

17        Q.    So again, this tactic of

18   suspending or revoking registrations was

19   a critical concern for HDMA and its

20   members, correct?

21             MR. WEINSTEIN:  Objection to

22        form.

23             THE WITNESS:  Yes.

24   BY MR. PIFKO:

1    BY MR. PIFKO:

2         Q.    I'm handing you what's

3    marked as Exhibit 35.  It's an e-mail

4    from you dated December 19, 2013,

5    Bates-labeled CAH_MDL2804_01110712

6    through 715.

7              Take a moment to review this

8    and let me know when you're done.

9         A.    Okay.

10        Q.    At some point a drug

11   diversion DEA strategy task force was

12   formed, correct?

13        A.    Yes.

14        Q.    Are you familiar with the

15   formation of that task force?

16        A.    I am.

17        Q.    Were you involved in the

18   formation of that task force?

19        A.    We were.  I was.

20        Q.    When was that formed?

21        A.    I want to say in 2013 at

22   some point.  It was a amalgam of a

23   variety of different committees that had

24   been involved.  Regulatory affairs

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/20 Page 38 of 59. PageID #: 274817

1  committee, federal government affairs

2  committee, individuals, and then to

3  basically brainstorm some suggestions for

4  additional things that we could do to

5  continue to move forward on addressing

6  suspicious orders and improving

7  interaction with the DEA.

8      Q.    So that task force is an

9  outcrop of some of the types of

10  discussions that you had in Exhibit 34?

11      A.    Yeah.  It's not specifically

12  referenced here.  But yeah, it's just an

13  ongoing discussion and dialogue with the

14  membership about what we can do to

15  improve.

16      Q.    Who was on that task force

17  as far as the HDA's distributor members?

18      A.    So if you look at the top,

19  AmerisourceBergen, Cardinal Health,

20  Mutual Drug, Smith Drug, HD Smith, Henry

21  Schein, I think was at one point

22  involved.

23      Q.    McKesson?

24      A.    McKesson, sorry, yes.  And

Highly Confidential - Subject to Further Confidentiality Review

1   then we had a -- after we had engaged

2   APCO at the time there, they came and

3   participated.

4          Q.    And so you had regular

5   meetings with this task force?

6          A.    This -- I believe this task

7   force met once.

8          Q.    Okay.  And so this is a list

9   of action items that came out of the task

10  force meeting?

11         A.    Recommendations, yes.

12         Q.    Okay.  And then the attached

13  document, summary of recommendations?

14         A.    Right.

15         Q.    From December 11, 2013, task

16  force meeting.  That's a summary of the

17  items that the group came up with that

18  you could move forward with?

19              MR. WEINSTEIN:  Objection to

20         form.

21              THE WITNESS:  Yes.

22              Sorry.

23              Yes, with the -- the

24         specific action items highlighted.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PIFKO:

2         Q.    And you typed this up?

3         A.    I believe I typed the

4    e-mail, and then the notes were kind of

5    probably a shared product of the

6    government affairs staff that

7    participated.

8         Q.    Okay.  But you ultimately

9    sent it out to everybody?

10         A.    I sent it out, yes.

11         Q.    Did you have an official

12   title or role with this task force, like

13   chairman or --

14         A.    No.

15         Q.    -- coordinator?

16         A.    No, there was -- and again

17   it was an ad hoc group of various

18   members.  It was set up to do one thing,

19   and this was the one thing.

20         Q.    So going to the attachment,

21   CAH_MDL2804_01110714.  Are you there?

22         A.    I am.

23         Q.    So Item 2 is, "Address

24   specific challenges and interactions

1   with" -- "with DEA."

2            Do you see that?

3       A.    Yes.

4       Q.    So you have this broken out

5   into different types of communications

6   like one with the media, public

7   officials, another with DEA, and another

8   with a branding campaign; is that

9   correct?

10           MR. WEINSTEIN:  Objection to

11      form.

12           THE WITNESS:  Yeah.

13  BY MR. PIFKO:

14      Q.    Okay.  Sorry, I pointed you

15  to 2, but I want to ask you about 1 for a

16  minute.

17      A.    Okay.

18      Q.    So in 1, there's a

19  discussion about joining with various

20  other industry groups?

21      A.    Mm-hmm.

22      Q.    Is that correct?

23      A.    Yes.

24      Q.    Okay.  What's the Alliance

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/19 Page 43 of 59. PageID #: 274921

1 to Prevent Abuse of Medicines?

2      A.    That was a coalition that

3 formed, I want to say in about 2012, to

4 address abuse issues, kind of across the

5 supply chain. So they had formed -- the

6 American Medical Association, the members

7 that were listed there were participants.

8 Cardinal Health had suggested possibly

9 including HDA as a member, because other

10 associations were involved.

11           THE VIDEOGRAPHER:

12     Mr. Kelly, you keep hitting --

13           THE WITNESS: I'm sorry.

14 BY MR. PIFKO:

15      Q.    So then Item 2 says,

16 "Address specific challenges and

17 interactions with DEA."

18           Do you see that?

19      A.    I do.

20      Q.    Then it says, "Issue

21 statement of support for Marino/Blackburn

22 legislation when introduced."

23           Do you see that?

24      A.    I do.

Case 1:17-md-02804 Document 1975-70 Filed 07/24/23 Page 44 of 59. PageID #: 274022

1    Q.    Okay.  So that hadn't yet

2    been introduced at this time?

3    A.    I don't know the specific

4    introduction date, but I would deduce

5    from this that obviously it had not.

6    Q.    Okay.  Was the -- that

7    legislation drafted out of the HDMA?

8    A.    No.  I believe

9    Mr. Blackburn -- or I'm sorry, Mr. Marino

10    was moving forward with that issue, had

11    requested feedback from a variety of

12    constituencies, and was in the process of

13    kind of fleshing it out.

14    Q.    When was the first time you

15    became aware of that bill or that

16    legislation?

17    A.    It -- it might have been at

18    this -- at this meeting.  One of our

19    member companies had been contacted by

20    Mr. Marino about participating in the --

21    in the kind of the general drafting

22    process of -- of that bill.  And it was

23    suggested that we -- we work with -- or

24    HDA work with Congressman Marino and

Case 1:17-md-02804 Document 1975-70 Filed 07/24/20 Page 44 of 59. PageID #: 274823

1    Congresswoman Blackburn.

2         Q.    Do you know which member

3    company it was?

4         A.    It was Cardinal.

5         Q.    Okay.  So Mr. Marino had

6    reached out to Cardinal and asked them to

7    assist in drafting this bill?

8         A.    That's my understanding.

9         Q.    And then they reached out to

10   you and asked HDA to participate?

11        A.    They did.

12        Q.    And did HDA end up providing

13   any drafting on the bill?

14        A.    We provided feedback on

15   drafts that they -- they would -- that

16   they would basically share drafts with

17   us.  I don't know if it was in advance of

18   the actual introduction.  But they go

19   through iterative processes of kind of

20   taking comments and providing subsequent

21   drafts.  We did participate in that

22   process.

23        Q.    Do you know who -- who

24   specifically at Cardinal did you interact

Case 1:17-md-02804 Document 1975-70 Filed 07/24/19 Page 45 of 59 PageID #: 274824

1  with on that issue?

2          MS. WICHT:  Objection to

3      form.

4          THE WITNESS:  Connie

5      Woodburn was the government

6      affairs person for Cardinal at the

7      time.

8  BY MR. PIFKO:

9      Q.    Okay.  But did you interact

10 with anyone else from Cardinal?

11     A.    Not specifically with regard

12 to this.

13     Q.    Okay.  Did -- do you -- do

14 you know, were there other people who

15 maybe you didn't talk to but that would

16 have been copied on e-mails or there are

17 things would have been forwarded from

18 Cardinal with respect to the

19 Marino/Blackburn bill?

20          MS. WICHT:  Objection to

21     form.

22          MR. WEINSTEIN:  Objection to

23     form, foundation, scope.

24          THE WITNESS:  I can't say

Case 1:17-md-02804 Document 1975-70 Filed 07/24/20 Page 46 of 59. PageID #: 274825

1          for certain.

2     BY MR. PIFKO:

3          Q.    Do you know if Linden Barber

4     was involved in the Marino/Blackburn

5     bill?

6               MR. WEINSTEIN:  Same

7          objections.

8               MS. WICHT:  Object to form.

9               THE WITNESS:  I don't know

10         initially.  It was a multi-year

11         process.

12    BY MR. PIFKO:

13         Q.    Do you know if any other HDA

14    distributor members were involved in

15    discussions with Marino at that time

16    concerning the bill?

17              MS. WICHT:  Objection to

18         form.

19              MR. WEINSTEIN:  Objection to

20         form, foundation, scope.

21              THE WITNESS:  At that time I

22         do not.

23    BY MR. PIFKO:

24         Q.    How about later?

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/19 443 of 590. PageID #: 274826

1          MS. WICHT:  Objection to

2     form.

3          MR. WEINSTEIN:  Same

4     objections.

5          THE WITNESS:  Well, as soon

6     as -- as soon as HDA basically

7     endorsed the -- the initiative, I

8     think the entire membership was

9     supportive of the -- the prospect

10     of that legislation.

11  BY MR. PIFKO:

12     Q.   Okay.  And obviously the

13  entire member -- or the -- the members we

14  just discussed here having been involved

15  with this drug diversion task force all

16  knew about it because it was discussed at

17  this meeting, correct?

18          MR. WEINSTEIN:  Objection to

19     form.

20          MS. WICHT:  Foundation.

21          THE WITNESS:  Correct.

22  BY MR. PIFKO:

23     Q.   So it says here, "This

24  legislation would establish definitions

1   and parameters for specific provisions in

2   the Controlled Substances Act pertaining

3   threats to 'public health and safety' and

4   'imminent danger.'

5            "In addition, this

6   legislation would allow DEA registrants

7   the opportunity to submit a corrective

8   action plan to address specific concerns

9   that could otherwise lead to the

10  suspension or revocation of a

11  registration."

12           Did I read that correctly?

13      A.    You did.

14      Q.    Is that consistent with your

15  understanding about what this bill would

16  do or legislation would do?

17           MR. WEINSTEIN:  Objection to

18      form.

19           THE WITNESS:  It is.  There

20      was another provision ultimately

21      of the bill.  But it was a

22      draft -- a report from the

23      government on the effectiveness of

24      the government's efforts to

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/20 44 of 59. PageID #: 274628

1    address prescription drug abuse

2    and diversion.

3  BY MR. PIFKO:

4         Q.    Okay.  So it's your

5  understanding there were changes to the

6  requirements for suspending a

7  registration, and there was another

8  component to the legislation that

9  involved a report?

10           MR. WEINSTEIN:  Objection to

11      form.

12  BY MR. PIFKO:

13      Q.    Is that correct?

14           MR. WEINSTEIN:  Same

15      objection.

16           THE WITNESS:  So, basically

17      the crux of it was to provide a

18      definition for the threshold for

19      immediate suspension orders.

20      Which was not anywhere in law.

21      The immediate -- the immediate --

22      imminent danger was not defined.

23      And so we basically sought to

24      establish a threshold for what

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/19 50 of 59. PageID #: 274829

1      constitutes imminent danger.

2  BY MR. PIFKO:

3      Q.    If we go to the next page of

4  your notes.  Another action item that

5  this task force was working on was Item

6  D, "Anticipate and develop responses to

7  Marino/Blackburn opponents"?

8      A.    I see that.

9      Q.    That was something that this

10  task force was working on, correct?

11      A.    Well, again, it wasn't one

12  of the action items.  But it was -- it

13  basically was something that we

14  discussed.  It was, you know, how do

15  we -- how do we explain what this does if

16  people are concerned that it's somehow

17  diminishing the capacity of the DEA.

18      Q.    Item 3 here is, "Engage in

19  initial HDMA public relations branding

20  campaign."

21      Do you see that?

22      A.    I do.

23      Q.    Item C there says, "Utilize

24  material prepared by APCO to begin

1   targeted media outreach."

2         Do you see that?

3     A.    I do.

4     Q.    That's the material that

5  includes the crisis playbook, correct?

6         MR. WEINSTEIN:  Objection to

7      form.

8         THE WITNESS:  Again, I'm not

9      exactly sure.  The crisis playbook

10     was never -- it was a draft format

11     that was never released.  It was

12     never published.  It was -- we

13     didn't do anything with it.  But

14     that was a product that APCO did

15     provide us in their initial

16     engagement.

17  BY MR. PIFKO:

18     Q.    Okay.  And you shared that

19  product with the HDA's members, correct?

20         MS. CHARLES:  Objection to

21      form.

22         MR. WEINSTEIN:  Objection to

23      form.

24         THE WITNESS:  Again, I don't

1          recall.  Our communications

2          department handled all that

3          interface with APCO.

4   BY MR. PIFKO:

5          Q.    You wouldn't have any reason

6   to dispute that it was shared with

7   members?

8              MR. WEINSTEIN:  Objection to

9          form.

10             MS. CHARLES:  Objection to

11         form.

12             MS. ROLLINS:  Objection to

13         form.

14             THE WITNESS:  I can't say

15         one way or another.

16  BY MR. PIFKO:

17         Q.    You would agree if it was

18  produced by one of the members in this

19  litigation, it must have been shared with

20  them obviously, right?

21             MR. WEINSTEIN:  Objection to

22         form.

23             THE WITNESS:  Yes.

24

1    Q.    I'm handing you what's

2  marked as Exhibit 39.

3           (Document marked for

4           identification as Exhibit

5           HDA-Kelly-39.)

6  BY MR. PIFKO:

7    Q.    This document is not

8  Bates-labeled.  We printed it from HDA's

9  website.  Take a moment to review it.

10          For the record, it's a

11  document that is identified on the first

12  page as "Statement from John Gray,

13  President and CEO, Healthcare

14  Distribution Management Association For

15  the U.S. House of Representatives Energy

16  and Commerce Committee, Subcommittee on

17  Health," dated April 7, 2014.  It's a

18  five-page document.

19          Have you seen this before?

20    A.    I have.

21    Q.    Did you assist in preparing

22  this testimony?

23    A.    I did.

24    Q.    And this is testimony that

1    Mr. Gray provided for the House of

2    Representatives energy and commerce

3    committee subcommittee on health --

4            A.    It --

5            Q.    -- from April 7, 2014?

6            A.    It is.

7            Q.    These are statements that he

8    made before that committee?

9            A.    This is the written

10   statement.  I don't know how much it

11   deviated from the oral statement.

12           Q.    Okay.  And you participated

13   in -- in writing this?

14           A.    I helped to prepare it, yes.

15           Q.    Okay.  Anyone else?

16           A.    The whole government affairs

17   team.  Probably our communication team as

18   well.

19           Q.    And in this he's discussing,

20   the Marino/Blackburn bill, correct?

21           A.    Yes.

22           Q.    Second sentence, "Thank you

23   for the opportunity to discuss with the

24   subcommittee important legislation

Highly Confidential - Subject to Further Confidentiality Review

1    introduced by Representatives Blackburn

2    and Marino, the Ensuring Patient Access

3    and Effective Drug Enforcement Act of

4    2014," correct?

5         A.    Yes.

6         Q.    Then the next paragraph,

7    second sentence, he says, "Our industry's

8    primary mission is to operate the safest

9    and most secure and efficient supply

10   chain in the world."

11            Agree with that statement?

12        A.    I do.

13        Q.    "As part of this mission,

14   the pharmaceutical industry is committed

15   to addressing the serious national

16   epidemic of prescription drug abuse."

17            Do you see that?

18        A.    I do.

19            MR. WEINSTEIN:  You missed

20       the word "distribution" in there,

21       you missed.

22            MR. PIFKO:  Sorry.  I'll

23       read it again for the record.

24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    To be clear, so Mr. Gray

2    testified before this committee and said

3    that "the pharmaceutical distribution

4    industry is committed to addressing the

5    serious national epidemic of prescription

6    drug abuse," correct?

7    A.    Yes.

8    Q.    Next paragraph.  Mr. Gray

9    also told the committee, "HDMA's members

10   are committed to working proactively with

11   DEA," correct?

12   A.    Yes.

13   Q.    Page 2 of the testimony.  He

14   says, "This is one of the reasons" --

15   second full paragraph.  "This is one of

16   the reasons why HDMA supports HR 4069."

17   That's the Marino/Blackburn

18   bill, correct?

19   A.    Yes.

20   Q.    He says this -- he told the

21   committee, "This legislation is a timely

22   and thoughtful approach to addressing the

23   prescription drug epidemic," correct?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And he said, "We will

2  believe it will foster greater

3  collaboration, communication and

4  transparency between" -- "between

5  industry stakeholders and regulators,

6  especially the DEA," correct?

7      A.    Correct.

8      Q.    And then in the next

9  paragraph he talks about establishing a

10  collaborative working relationship with

11  the DEA.

12          Do you see that?

13      A.    Yes.

14      Q.    And he provided that

15  testimony to the subcommittee as well,

16  correct?

17      A.    Yes.

18          (Document marked for

19          identification as Exhibit

20          HDA-Kelly-40.)

21  BY MR. PIFKO:

22      Q.    I'm handing you what's

23  marked as Exhibit 40.  It's an e-mail

24  from you to Ann Berkey of McKesson,

Case 1:17-md-02804-DAP Doc #: 1975-70 Filed: 07/24/19 58 of 59. PageID #: 279837

1 final version of that legislation.

2          MR. WEINSTEIN:  We've been

3     going about an hour.

4          MR. PIFKO:  We'll take a

5     break in about two seconds.

6 BY MR. PIFKO:

7     Q.    I want to turn your

8 attention back to Exhibit 31 to Page 11

9 and 12.  I want to direct you to language

10 on Page 12, but 11 tells you that this

11 was a discussion that occurred at the

12 September 28, 2015, board of directors

13 meeting.  Turn to Page 12.  Tell me when

14 you're ready.

15     A.    Okay.

16     Q.    During this September 28,

17 2015, board of directors meeting,

18 "President Gray noted HDMA executive

19 committee had discussed and agreed to

20 prioritize objectives on prescription

21 drug abuse in the following order:  Item

22 Number 1, exhaust all efforts to secure

23 passage of S.483."

24          Do you see that?

1    A.    On -- which page are you on?

2    Q.    12.

3    A.    Oh, yes.  Okay, I see it.

4    Q.    Did I read that correctly?

5    A.    "Exhaust all efforts to

6    secure passage of S.483."  Yes.

7    Q.    So S.483 is the final

8    version that got passed?

9    A.    It was, yes, the bill that

10   got passed by the senate and approved

11   unanimously both -- in both chambers and

12   signed by President Obama.

13              MR. PIFKO:  Okay.  We can

14         take a break.

15              THE VIDEOGRAPHER:  The time

16         is 3:51 p.m.  We are going off the

17         record.

18              (Short break.)

19              THE VIDEOGRAPHER:  The time

20         is 4:11 p.m.  We are back on the

21         record.

22              (Document marked for

23         identification as Exhibit

24         HDA-Kelly-41.)