# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON,**
     **Plaintiff,**
**v.**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
     **Defendants.**

**Civil Action No. 3:17-cv-01362**

_____

**CABELL COUNTY COMMISSION,**
     **Plaintiff,**
**v.**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
     **Defendants.**

*Consolidated case:*
**Civil Action No. 3:17-cv-01665**

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
# ON PROXIMATE CAUSATION GROUNDS

## TABLE OF CONTENTS

**Page Number**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND: THE OPIOID EPIDEMIC IN HUNTINGTON AND
CABELL COUNTY ............................................................................................... 2

SUMMARY JUDGMENT STANDARD ................................................................ 4

ARGUMENT .......................................................................................................... 5

    Plaintiffs Have Raised Triable Issues of Fact with Respect to Causation for Their
    Public Nuisance Claims ..................................................................................... 5

    I.    The Standard for Causation under West Virginia Law ................................ 5

    II.    Defendants Failed to Maintain Effective Controls against the Diversion of
    Prescription Opioids .................................................................................... 7

    III.    Defendants' Failures Significantly Contributed to Massive Quantities of
    Opioids Flooding Huntington and Cabell County ........................................ 9

    IV.    The Massive Increase in Opioids Caused a Public Nuisance in Huntington
    and Cabell County ..................................................................................... 12

    V.    Alleged Intervening Acts Do Not Break the Chain of Causation ............... 18

CONCLUSION ..................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aikens v. Debow,*
  541 S.E.2d 576 (W.Va. 2001) ........................................................................................7

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ......................................................................................................4

*BCS Servs., Inc. v. Heartwood 88,*
  637 F.3d 750 (7th Cir. 2011) ........................................................................................6

*Brooke County Commission v. Purdue Pharma L.P., et al.,*
  No. 17-C-248 (W.Va. Cir. Ct. Dec. 28, 2018) ...........................................2, 5, 20

*City And County Of San Francisco, et al., v. Purdue Pharma L.P., et al.,*
  3:18-cv-07591, Dkt. 285 (Sept. 30, 2020).........................................1, 7, 16, 19, 21

*City of Charleston, W. Virginia v. Joint Comm'n,*
  2020 WL 4116952 (S.D.W. Va. July 20, 2020) .......................................................21

*City of Chicago v. Purdue Pharma, L.P.,*
  211 F. Supp. 3d 1058 (N.D. Ill. 2016)..........................................................................1

*Com. v. Endo Health Solutions Inc.,*
  2018 WL 3635765 (Ky. Cir. Ct. July 10, 2018)...........................................................1

*Commonwealth v. Purdue Pharma, L.P.,*
  2019 WL 6497887 (Mass. Super. Nov. 6, 2019)..........................................................1

*Direct Sales Co. v. United States,*
  319 U.S. 703 (1943) ....................................................................................................20

*Estate of Hough v. Estate of Hough,*
  519 S.E.2d 640 (W.Va. 1999) ......................................................................................6

*Everly v. Columbia Gas of W. Virginia, Inc.,*
  171 W. Va. 534 (1982)..................................................................................................5

*Gillingham v. Stephenson,*
  209 W. Va. 741 (2001)..................................................................................................6

*Gonzales v. Raich,*
  545 U.S. 1 (2005) ........................................................................................................20

*Grewal v. Purdue Pharma L.P.*,
2018 WL 4829660 (N.J.Super.Ch. Oct. 02, 2018) ...................................................................1

*Hundall v. Mate Creek Trucking, Inc.*,
200 W.Va. 454, 490 (1997) ...................................................................................................5

*Huskey v. Ethicon*,
2015 WL 4944339 (S.D.W. Va. Aug. 19, 2015) ....................................................................6

*In re Flood Litigation*,
607 S.E.2d 863 (W.Va. 2004) ................................................................................................6

*In re: Nat'l Prescription Opiate Litig.*,
1:17-md-02804, Dkt. 1203 (Dec. 19, 2018) ...............................................................2, 19, 21

*In re: Nat'l Prescription Opiate Litig.*,
1:17-md-02804, Dkt. 2561 (Sept. 3, 2019) ...............................................1, 4, 12, 13, 16, 17

*In re: Nat'l Prescription Opiate Litig.*,
1:17-md-02804, Dkt. 2483 (Aug. 19, 2019)........................................................................7, 17

*In re: Nat'l Prescription Opiate Litig.*,
1:17-md-02804, Dkt. 2580 (Aug. 19, 2019)..........................................................................19

*In re: Nat'l Prescription Opiate Litig*,
927 F.3d 919 (6th Cir. 2019) ..................................................................................................2

*In re Neurontin Mktg. & Sales Practices Litig. (Harden)*,
712 F.3d 60 (1st Cir. 2013) .....................................................................................................9

*Scottsdale Ins. Co. v. Lynnhaven Inlet Fishing Pier Corp.*,
113 F. App'x 526, 531 (4th Cir. 2004) ..................................................................................12

*Marcus v. Staubs*,
230 W. Va. 127 (2012) ...........................................................................................................6

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...............................................................................................................4

*Monongalia County, et al. v. Purdue Pharma L.P., et al.*,
Nos. 18-C-222-236 (W.Va. Mass. Lit. Panel Oct 9, 2019), .....................................................2

*People v. ConAgra Grocery Products Co.*,
17 Cal.App.5th 51 (Cal. App. 2017) ....................................................................................16

*Perry v. Melton*,
171 W. Va. 397 (1982) ...........................................................................................................5

*Qura v. D.R. McClain & Son*,
    97 F.3d 1448 (4th Cir. 1996) ................................................................................7

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*,
    2014 WL 12814021 (W.Va. Boone Co. Cir. Ct. Dec. 12, 2014) .......................1, 5, 18, 20, 21

*State v. Purdue Pharma Inc.*,
    2018 WL 4566129 (N.H. Super. Sep. 18, 2018) .......................................................1

*State v. Purdue Pharma L.P.*,
    2018 WL 4468439 (Alaska Super. July 12, 2018) .....................................................1

*State v. Purdue Pharma L.P.*,
    2019 WL 2331282 (Tenn. Cir. Ct. Feb. 22, 2019) ....................................................1

*State, ex rel. Dewine v. Purdue Pharma L.P.*,
    2018 WL 4080052 (Ohio Com.Pl. Aug. 22, 2018) ....................................................1

*Sydenstricker v. Mohan*,
    217 W. Va. 552 (2005) .......................................................................................6

*United States v. Moore*,
    423 U.S. 122 (1975) ..........................................................................................20

*Wehner v. Weinstein*,
    191 W. Va. 149 (1994) ....................................................................................5, 6

**Federal Statutes**

21 U.S.C. § 801 et seq ............................................................................................7, 11

W. Va. C.S.R. § 15-2-5 ...............................................................................................7

W. Va. C.S.R. § 15-2-3 ...............................................................................................7

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................4

## INTRODUCTION

The evidence establishes, or at least creates a dispute of material fact, that Defendants substantially contributed to the opioid epidemic in Huntington and Cabell County. Defendants' failures to prevent diversion of deadly drugs[1] created an over-supply of prescription opioids which led to dangerous and inappropriate licit and illicit use of prescription and non-prescription opioids. Plaintiffs present several categories of proof, each separately sufficient to establish causation. Evidence from Defendants themselves establishes conduct expected to cause Plaintiffs' public nuisance. In such circumstances, issues of causation are left to the trier-of-fact.

Defendants' legal arguments have been rejected by the MDL court,[2] the judge overseeing the remanded bellwether case in the Northern District of California,[3] and the vast majority of opioid litigation courts,[4] including West Virginia state courts.[5] This Court should reach the same result here.

---

[1] Separately, Plaintiffs' experts have established that Defendants engaged in misleading, deceptive, and fraudulent marketing conduct which also substantially contributed to opioid over-supply and the public nuisance in Plaintiffs' communities. *See* discussion *infra*, pp. 16-17. This provides an additional, independent basis for denying Defendants' motion here.

[2] *In re: Nat'l Prescription Opiate Litig.*, 1:17-md-02804, Dkt. 2561 (Sept. 3, 2019) (Att. as Ex. 36)

[3] *City And County Of San Francisco, et al., v. Purdue Pharma L.P., et al.*, 3:18-cv-07591, Dkt. 285 (Sept. 30, 2020) (Att. as Ex. 37).

[4] *See, e.g, Commonwealth v. Purdue Pharma, L.P.*, 2019 WL 6497887 (Mass. Super. Nov. 6, 2019); *City of Chicago v. Purdue Pharma, L.P.,* 211 F. Supp. 3d 1058 (N.D. Ill. 2016); *Grewal v. Purdue Pharma L.P.*, 2018 WL 4829660 (N.J.Super.Ch. Oct. 02, 2018); *Com. v. Endo Health Solutions Inc.*, 2018 WL 3635765 (Ky. Cir. Ct. July 10, 2018); *State v. Purdue Pharma L.P.*, 2019 WL 2331282 (Tenn. Cir. Ct. Feb. 22, 2019); *State v. Purdue Pharma L.P.*, 2018 WL 4468439 (Alaska Super. July 12, 2018); *State, ex rel. Dewine v. Purdue Pharma L.P.,* 2018 WL 4080052 (Ohio Com.Pl. Aug. 22, 2018); *State v. Purdue Pharma Inc.*, 2018 WL 4566129 (N.H. Super. Sep. 18, 2018).

[5] *See, e.g., State ex rel. Morrisey v. AmerisourceBergen Drug Corp.,* No. 12-C-1412014, 2014 WL 12814021 (W.Va. Boone Co. Cir. Ct. Dec. 12, 2014), *writ denied, State. ex. rel. AmerisourceBergen Drug Corp v. Thompson,* No. 15-1026 (W.Va. January 5, 2016) (Att. as

## FACTUAL BACKGROUND: THE OPIOID EPIDEMIC IN HUNTINGTON AND CABELL COUNTY

As Judge Polster aptly observed in the MDL: "It is accurate to describe the opioid epidemic as a man-made plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated . . . ." *In re: Nat'l Prescription Opiate Litig.*, 1:17-md-02804, Dkt. 1203 at 38 (Dec. 19, 2018). The Sixth Circuit has similarly observed that the opioid epidemic "affect[s] the health and safety of the entire country . . . [and is] . . . certainly compelling." *In re: Nat'l Prescription Opiate Litig*, 927 F.3d 919, 923 (6th Cir. 2019) (citation omitted).

Nowhere is the opioid epidemic more severe than in Huntington and Cabell County, which are known as ground zero of the opioid crisis, and as the "overdose capital of the world." Ex. 1, Kolodny Rep. at 20; Ex. 2, Alexander Rep. at 9.

Defendants caused an enormous quantity of opioids to flood into Plaintiffs' jurisdictions. From 2006-2014, over 127 million opioid dosage units and 3.3 billion morphine milligram equivalents ("MME") were sent into Cabell County. Ex. 3, McCann Rep. at 9. This is enough opioids for each resident in Cabell County to consume 142 dosage units or 3,650 MME per year. *Id.* Cabell County was, at times, among the top 20 of the United States' more than 3,000 counties in terms of dosage units per capita. Ex. 4, Keller Rep. at 59. And, the pills distributed were

---

Ex. 13); *Brooke County Commission v. Purdue Pharma, L.P.,* No. 17-C-248, p. 11 (W.Va. Marshall Co. Cir. Ct. Dec. 28, 2018), *writ denied, State ex rel. Cardinal Health v. Hummel,* No. 19-0210 (W.Va. June 4, 2019) (Att. as Ex. 14); *Monongalia County, et al. v. Purdue Pharma L.P., et al.,* Nos. 18-C-222-236 (W.Va. Mass. Lit. Panel Oct 9, 2019), *writ denied, State ex rel. AmerisourceBergen Drug Corp. v. Moats,* 19-1051 (W.Va. January 30, 2020) (Att. as Ex. 38).

disproportionally prescribed by a handful of local physicians, many of whom either lost their license to practice medicine or were criminal charged. *Id.* at 19-56, 59 ("between five and nine prescribers—wrote upwards of 43% of all opioid dosage units and 65% of MMEs").

As the volume of prescription opioids flooding into Plaintiffs' communities increased, so, too, did deaths. The data is shocking. Prescription opioid overdose deaths in Cabell County nearly quadrupled from 2001 to 2017. Ex. 5, Keyes Rep. at 35. The Cabell County death rate from all opioids in 2018 was five times the rate seen in 2006, and, in 2017 was over 10 times the national average. *Id.* at 34. In 2016, the opioid death rate was three times higher than the West Virginia average as a whole, the highest out of any county in the state, and the second highest in the nation. Ex. 6, Siegel Rep. at 10.

Aside from opioid overdose and mortality, Cabell County has experienced record level increases in community harms including neonatal abstinence syndrome, emergency department visits, admissions for treatment, and non-medical opioid use among adolescents. Ex. 5 at 38-40. As the Cabell County Commission observed in 2017: "The dumping of millions of pain pills into our community has spawned a public health and safety hazard to the residents of Cabell County, devastated our families, hurt our economy, wasted our public resources and created a generation of narcotic dependence." 17-cv-01665, Dkt. 238-2. And, as Huntington's Fire Chief has stated: "It is horrendous . . . It's a war zone for children. That's all they know growing up, is death and destruction." Ex. 1 at 23. Cabell County's EMS

director further described the devastation as: "Going into houses where the mothers have overdosed and the kids are sitting there crying, wanting to know what [sic] wrong with their mother . . . . [I]t absolutely destroyed this community." *Id.*

In the MDL, Defendants—responsible for over 90% of opioid shipments nationwide—sought to escape any blame for causing this devastation, as they do here. There, Judge Polster denied summary judgment, finding:

> [G]iven the massive increases in the supply of prescription opioids into the Track One Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, *a factfinder could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs*. Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, *Plaintiffs have done enough to withstand summary judgment* . . .

*In re: Nat'l Prescription Opiate Litig.*, 1:17-md-02804, Dkt. 2561 at 5-6 (Sept. 3, 2019) (emphasis added) (Attached as Ex. 36). This Court is faced with an influx of opioids and resulting harms which exceed that seen in the Case Track One ("CT1") jurisdictions, and should reach the same result here.

## SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party bears the burden to demonstrate that there is *no* genuine issue as to any material fact. Fed. R. Civ. P. 56(a). The court will not "weigh the evidence and determine the truth of the matter . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

4

## ARGUMENT

**Plaintiffs Have Raised Triable Issues of Fact with Respect to Causation for Their Public Nuisance Claims**

## I.   The Standard for Causation under West Virginia Law

When multiple wrongdoers each contribute to a combined harm, all that is required to show proximate cause is that the action of a tortfeasor "contributes in any degree to the injury." *Wehner v. Weinstein*, 191 W. Va. 149, 155 (1994); *see also Perry v. Melton*, 171 W. Va. 397, 400 (1982) ("negligence must be a proximate or *contributing cause* before liability is established") (emphasis added).[6] A plaintiff is not required to show that defendant's actions were the sole proximate cause, only that they were *a* proximate cause. *Everly v. Columbia Gas of W. Virginia, Inc.*, 171 W. Va. 534, 536 (1982). It is also clear that *"in public nuisance claims, where the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases."* *Brooke County Commission v. Purdue Pharma L.P. et al.*, No. 17-C-248 at 14 (W.Va. Cir. Ct. Dec. 28, 2018) (internal citations and quotations omitted, emphasis added) (Ex. 14).

Moreover, under established proximate causation principles, "[i]f a particular act might be expected to cause a particular result and, if that result has in fact

---

[6] To be clear, some West Virginia courts have suggested that to be liable, the concurrent wrongdoer should be a "substantial factor" in causing the harm. *See State ex rel. Morrisey,* 2014 WL 12814021, at *12 ("When several factors contribute to produce an injury, one actor's negligence will be considered a proximate cause of the harm if it was a substantial factor in producing the injury.") (quoting *Hundall v. Mate Creek Trucking, Inc.*, 200 W.Va. 454, 490 (1997)). However, as explained below, Plaintiffs have also adequately met this standard, which was applied by Judge Polster in rejecting Defendants' motion for summary judgment.

followed, the conclusion may be justified that the causal relation exists."
Restatement (Second) of Torts § 433B, comment b (1965); *see also Huskey v.
Ethicon*, 2015 WL 4944339, at *6 (S.D.W. Va. Aug. 19, 2015), aff'd, 848 F.3d 151
(4th Cir. 2017) (same). Put differently, "[o]nce a plaintiff presents evidence that he
suffered the sort of injury that would be the expected consequence of the defendant's
wrongful conduct, he has done enough to withstand summary judgment on the
ground of absence of causation." *BCS Servs., Inc. v. Heartwood 88*, 637 F.3d 750,
758 (7th Cir. 2011) (J. Posner). This is particularly true where, as here, a plaintiff
shows a statutory violation: "The violation of the statute is rightly considered the
proximate cause of any injury which is a natural, probable, and anticipated
consequence of the nonobservance." *Gillingham v. Stephenson*, 209 W. Va. 741, 748–
49 (2001) (quotation omitted). Judge Polster has found similarly. *See* Ex 36 at 5-6.

An intervening act does not automatically vitiate proximate causation. In
West Virginia, "[a] tortfeasor whose negligence is a substantial factor in bringing
about injuries is not relieved from liability by the intervening acts of third persons if
those acts were reasonably foreseeable." *Marcus v. Staubs*, 230 W. Va. 127, 139
(2012); *see also In re Flood Litigation*, 607 S.E.2d 863, 878 (W.Va. 2004) (same).
Even a deliberate illegal act does not cut off liability if it is foreseeable. *Id.*; s*ee also
Estate of Hough v. Estate of Hough*, 519 S.E.2d 640, 648 (W.Va. 1999). The burden
is on the Defendants to prove intervening cause. *See Sydenstricker v. Mohan*, 217
W. Va. 552, 559 & n.13 (2005). That burden requires a showing that the intervening
act "operate[s] independently of any other act." *Wehner*, 191 W. Va. at 154–55.

6

Ultimately, however, proximate cause is a question of fact. *See Qura v. D.R. McClain & Son*, 97 F.3d 1448 (4th Cir. 1996); *see also Aikens v. Debow*, 541 S.E.2d 576, 580 (W.Va. 2001) (same). As explained below, Plaintiffs present several categories of proof, each sufficient to establish that Defendants' failures were a foreseeable, contributing, and substantial factor in causing opioid over-supply in Plaintiffs' communities, which in turn led to massive opioid-related harms. This is sufficient evidence to raise a disputed issue of material fact to be resolved at a trial.

## II. Defendants Failed to Maintain Effective Controls against the Diversion of Prescription Opioids

Distributors of opioids are required under the federal CSA and West Virginia law to design and operate systems to identify and report suspicious orders, and to refrain from shipping such orders prior to investigation. *See* 21 U.S.C. §§ 801 et seq.; 21 C.F.R. 1301 et seq.; W. Va. C.S.R. § 15-2-5.1.1, § 15-2-3. In CT1, Judge Polster was "hard-pressed to think of a more basic requirement." 17-md-02804, Dkt. 2483 at 19 (Aug. 19, 2019). In Case Track Two ("CT2"), Judge Breyer found similarly. *See City And County Of San Francisco, et al., v. Purdue Pharma L.P., et al.,* 3:18-cv-07591, Dkt. 285 at 5-6 (Sept. 30, 2020) (Ex. 37).

Substantial and undisputed evidence here shows that each Defendant blatantly failed to comply with these duties. Defendants' dereliction of their CSA duties was staggering. One need only look at their own public admissions as well as the numerous DEA investigations conducted against them. Cardinal, for example, admitted in its May 2012 agreement with the DEA "that its due diligence efforts for some pharmacy customers and its compliance with the 2008 MOA, in certain

7

respects, were inadequate." Ex. 15 at 5984. Cardinal had also been issued numerous DEA suspension orders in 2007 and 2008 as a result of its lax anti-diversion practices. Ex. 16 at 00013056-3103.

Similarly, in a January 2017 settlement with the DEA, McKesson acknowledged that from 2009-2017 "it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious . . ." Ex. 17 at 5352. This came less than a decade after DEA and DOJ, in 2008, punished McKesson for its flagrant noncompliance with the CSA. Ex. 18 at 0001048-1071. AmerisourceBergen ("ABDC"), too, was subject to DEA enforcement actions for its filling and shipping of orders of controlled substances ABDC knew, or should have known, to be suspicious. Ex. 19 at 00269383-9387.

Defendants' public admissions are corroborated by their actual diversion practices and policies. It is undisputed, for example, that Cardinal did not have a policy to stop shipment of suspicious orders at all until 2008, and from 2008-2011, it reported only a few dozen suspicious orders per year. Ex. 20 at 2438.

McKesson had a policy in place from 1997-2007, though its own employees have acknowledged that this system did not flag true suspicious orders. Ex. 21 at 0747; Ex. 22 at 176:8-22. Even when McKesson implemented new "threshold" measures, they were either set far too high to be triggered, or were increased without adequate justification. Ex. 23 at 7799; Ex. 24 at 3455.

ABDC's pre-2007 policy entailed shipping all orders of controlled substances it identified as suspicious before a due diligence investigation ever occurred. Ex. 25

at 281:14-282:8. Even after 2007, ABDC's policies were arbitrary, ineffective, and inconsistently implemented. Ex. 7, Rafalski Rep. at 121-122.

As Plaintiffs' expert James Rafalski opines, Defendants "each failed to develop and implement a SOMS that would ensure the maintenance of effective controls against diversion." *Id.* at 8. The bottom line is that Defendants did not want to comply with the CSA and WVCSA. Instead, the evidence demonstrates that they buried their heads in the sand and made billions while their opioid products poured into Plaintiffs' communities.

## III.    Defendants' Failures Significantly Contributed to Massive Quantities of Opioids Flooding Huntington and Cabell County

Plaintiffs offer considerable expert testimony, circumstantial evidence, and admissions that Defendants' anti-diversion failures led directly to an astonishingly high percentage of suspicious orders shipped without proper investigation, which in turn led to high amounts of opioid drugs flooding Plaintiffs' communities. This evidence is more than sufficient to raise a triable issue of fact. *See In re Neurontin Mktg. & Sales Practices Litig. (Harden),* 712 F.3d 60, 68 (1st Cir. 2013) (combination of expert evidence with circumstantial evidence is enough to create a jury question on causation.).

Mr. Rafalski, a controlled substances diversion prevention expert, assessed Defendants' SOM programs and identified their serious flaws with regard to the maintenance of effective controls against diversion. Ex. 7 at 1. He describes six different methodologies that could have been used, but were usually not, to identify suspicious orders that should not have been shipped without further investigation.

*Id.* at 47-50. Rafalski concludes that most of the Oxycodone and Hydrocodone orders in Huntington and Cabell County should have been flagged as suspicious. *Id.*

For example, Rafalski details one Huntington pharmacy, "Safescript," which received the most opioid pills in Cabell County and was among the top five purchasers of oxycodone in West Virginia. *Id.* at 110. ABDC was aware that it was not a "usual pharmacy," that it had "heavy security," and had installed bulletproof glass. *Id.* at 115. ABDC knew transactions were being conducted through a turnstile where cash would go in and pills would come out. *Id.* However, ABDC continued to send opioids to SafeScript unchecked until 2013. *Id.* at 111-114.

Dr. Craig McCann, Plaintiffs' expert economist, explains the deficiencies of Defendants' SOM programs and the magnitude of suspicious orders that would have been identified had they been adequate. Specifically, Dr. McCann analyzed ARCOS data to quantify estimates of the number of suspicious orders that were distributed into Huntington and Cabell County. Ex. 3 at 57-77. Dr. McCann concludes that between 74,014 to 195,831 orders of opioids shipped to Huntington and Cabell County should have been flagged as suspicious by Defendants. *Id.*[7]

Another of Plaintiffs' experts, Lacey Keller, is a data-mining expert. In her report, Keller establishes that Defendants had access to IQVIA Xponent data, which, if utilized, would have identified suspicious prescribers in Huntington and Cabell County who were issuing millions of opioid prescriptions, thousands of transactions, millions of dosage units, and billions of MMEs. Ex. 4 at 59. The data

---

[7] Dr. McCann also details pharmacies near, but outside of, Cabell and Huntington, that received numerous suspicious orders. *See id.* at App'x 9-10.

distributors had available to them—but which they failed to utilize—is shocking. Keller details twelve Cabell County prescribers, many who were issuing 25 to 400 times the average amount of opioids for their specialty. *Id.* at 19-56. Many of these prescribers ultimately had their licenses revoked, or were criminally charged. *Id.*

The influx of suspicious opioid orders into Huntington and Cabell County as a result of lax anti-diversion policies is exactly the result Congress intended to avoid when enacting the CSA, and when DEA adopted its implementing regulations. As a 2007 letter from DEA to Defendants states: "***even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm***." Ex. 26 at 9687-9688 (citing 21 U.S.C. § 801(2)) (emphasis added).

Defendants were certainly aware that unlawful shipments of opioids led to diversion in West Virginia. Cardinal Health's Director of Independent Retail Sales acknowledged that more opioid pills in a community "may have" increased the likelihood of diversion and abuse. Ex. 27 at 27:14-28:14.

For its part, McKesson's Vice President of Regulatory Affairs, Gary Boggs, acknowledged that Distributors have great power to "control the supply to downstream customers," that "Compliance!!!" with regulatory requirements stops diversion, and "major diversion schemes [will] wither away." Ex. 28 at 7232, 7241. McKesson's Nate Hartle testified that "[u]sing common sense and basic logic, you could assume the more pills that are out there, the more potential for diversion there could be." Ex. 29 at 268:8-15. Mr. Hartle was explicit on causation: diversion "can happen if you don't follow those laws." *Id.* at 59:3-13. ABDC's 30(b)(6) witness

11

admitted "if we don't adhere to our effective controls to prevent diversion, yes, diversion could occur." Ex. 30 at 104:7-17.

Thus, it was entirely foreseeable and foreseen by Defendants that failing to employ sufficient SOM policies and shipping suspicious orders causes significant diversion, leading to opioid abuse. As Plaintiffs experts establish, controls against diversion— if used— would have worked. Instead, Defendants sat on their hands while orders they knew to be suspicious poured into Huntington and Cabell County.

## IV.  The Massive Increase in Opioids Caused a Public Nuisance in Huntington and Cabell County

Defendants' conduct and the resulting over-supply of opioids was a substantial factor in producing the public nuisance in Huntington and Cabell County. As discussed above, Judge Polster analyzed substantially similar evidence under a substantially similar legal standard and found that Plaintiffs had established genuine dispute of material fact with respect to causation. Ex. 36.

Plaintiffs' evidence here is even more compelling than it was in CT1. Plaintiffs' experts in epidemiology, healthcare, economics, and addiction science marshal literature to show that over-supply of prescription opioids causally correlates to an increased rate of overdose deaths and overdoses. Over-supply of prescription opioids also causally correlates to an increase in the rates of heroin and fentanyl use, which resulted in additional harms to Plaintiffs. Such expert evidence is sufficient to establish material fact disputes at the summary judgment stage. *See Scottsdale Ins. Co. v. Lynnhaven Inlet Fishing Pier Corp.,* 113 F. App'x 526, 531 (4th Cir. 2004).

Reliable epidemiological data using a variety of study designs across independent investigators and across geographic areas, show consistent, statistically-significant, and strong associations between opioid supply and the number of opioid-related overdoses and deaths in a region, all of which allow the conclusion that the association is causal.

Analyzing peer-reviewed medical literature, Plaintiffs' expert and epidemiologist Dr. Keyes opines that "[t]he driving force in increasing opioid-related morbidity and mortality was, and continues to be, access to and wide-spread availability of opioids." Ex. 5, Keyes Rep. at 7. Keyes also attributes opioid over-supply to other harms experienced by Huntington and Cabell County, including emergency department visits, increased burden in the treatment and chemical dependency provider system, instances of neonatal abstinence syndrome (NAS), opioid use disorder and opioid use among medical users, non-medical users, adults and adolescents. *Id.* Over-supply of prescription opioids are also causally related to additional harms from opioids including transition to heroin addiction. *Id.*

This data alone allows an inference of causation. As Judge Polster found: "Katherine Keyes, an epidemiologist, reviewed dozens of studies and concluded that increases in prescription opioids are causally related to increases in various opioid-related harms. Based on this evidence, a jury could reasonably conclude that the increases in prescription opioids proximately caused harm to Plaintiffs." Ex. 36 at 5.

Plaintiffs' expert, Dr. Anna Lembke, a psychiatrist and addiction specialist, describes how "[i]ncreased supply" of legally prescribed opioids, "contributed to

more diversion of prescription opioids" in Huntington and Cabell County. Ex. 8, Lembke Rep. at 180. Dr. Lembke further found that "[t]he sheer scale of access to opioids made possible through the distribution and supply chain, led individuals who otherwise would never have been exposed, to use and subsequently be killed or harmed by opioids." *Id.* at 151. Dr. Lembke opines that that increases in the supply of prescription opioids causes increases in the use of heroin. *Id.* at 131.

Plaintiffs' expert Dr. Corey Waller, an addiction specialist, explains the "rising devastation paralleling the rising sales of Defendants' Drugs," and how the opioid "epidemic was caused by a dramatic exposure to prescription opioids, including primarily Defendants' Drugs." Ex. 35, Waller Rep. at 43, 56.

Expert Dr. Andrew Kolodny attributes overdose deaths, neonatal opioid withdrawal, impacts on family services, injection-related infectious diseases, increased use of heroin and other illicit drugs, and an impact on the workforce in the Plaintiffs' communities, to over-supply of prescription opioids. Ex. 1 at 2. Plaintiffs' public health expert Dr. Daniel Cicarrone similarly opines that "increased availability of prescription opioids has resulted in increased number of heroin users, transitioning from opioid pill misuse to heroin use." Ex. 9, Cicarrone Rep. at 10. Such illicit use has led to other related harms including HIV and other infectious diseases. Ex. 10, Feinberg Rep. at 5.

Finally, Dr. Thomas McGuire quantifies the net economic costs relating to deaths, morbidity, neonatal abstinence syndrome, crimes, property value loss, and

child maltreatment in Plaintiffs' communities from 2006 to 2018. Ex. 11, McGuire Rep. at 58. Dr. McGuire estimates costs to be in the billions of dollars. *Id.*

The causal connection between opioid over-supply and diversion and these problems is plainly logical and foreseeable. Defendants have admitted as much. McKesson's representative admitted that McKesson "played a role" in fueling the opioid epidemic, and that opioid addiction is a direct gateway to illicit heroin use. Ex. 29 at 292:19-293:4, 320:14-321:10. McKesson's Director of Regulatory Affairs admitted with respect to the opioid epidemic that "[w]e did play a role as a distributor, yes." Ex. 32 at 324:17-325:4. Cardinal Health too admitted that, "[t]housands of deaths have been attributed to supply chain challenges." Ex. 33 at 1297. ABDC's 30(b)(6) witness also admitted "if we don't adhere to our effective controls to prevent diversion, yes, diversion could occur." Ex. 30 at 104:7-17.

Defendants expend the lion's share of their motion parsing out different strands of conduct that contributed to opioid crisis. Def. Mot. at 9 ("Legitimate Prescribing"), 14 ("Illicit Prescribing or Dispensing), 15 ("Illegal, Non-Prescription Opioids"). But as explained above, Plaintiffs allege the public nuisance is the opioids crisis—a single, unified harm—to which defendants are each substantial contributing factors. Instead, Defendants' argument is related to the separate and distinct issue of apportionment, if any, of the total cost of abatement, an issue not raised by any of the pending motions before this Court. As Prosser and Keeton explain:

> Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as

15

> to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. ***The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes***.

Prosser and Keeton, § 52, p. 345 (emphasis added); *see also People v. ConAgra Grocery Products Co.*, 17 Cal.App.5th 51, 108 (Cal. App. 2017) (same).

Defendants also claim that they are immune from liability as a result of prescribing standards at the time of their conduct. Def. Mot. at 9, 11-15. This too is a fact question. In denying this exact argument in CT1, Judge Polster found:

> The Distributors . . . assert Plaintiffs have not shown their alleged injury resulted from the diversion of suspicious orders, as opposed to an increase in good faith prescriptions based on the Manufacturers' alleged fraudulent marketing practices . . . ***This argument overlooks the fact that whether the alleged harm was caused by fraudulent marketing or ineffective controls, or a combination of both, involves questions of disputed facts for the jury to resolve***.

Ex. 36 at 9 (emphasis added). And, as Judge Breyer recently stated in CT2 when rejecting similar arguments: "both parties' [Manufacturers and Distributors] conduct allegedly caused the City's injuries." 3:18-cv-07591, Dkt. 285 at 79 (Ex. 37).

Moreover, Distributors *themselves* contributed to misinformation campaigns that downplayed the risk of opioid addiction to prescribers and altered the so-called prevailing standard of care. Plaintiffs' expert Dr. Kolodny details how Defendants "used various marketing tools to promote opioid analgesics and the revisionist message of liberalized prescribing that fostered sales and addiction." Ex. 1 at 14. Expert Dr. Jakki Mohr similarly opines that the Defendants "participated in an

integrated supply chain that collectively increased opioid sales over time through various marketing efforts." Ex. 12, Mohr Rep. at 4-5.

Defendants also argue that had they actually conducted due diligence on orders, many may have cleared investigation. Def. Mot. at 11-13. This is beside the point. For the period in question, Defendants failed to maintain effective, or in some cases any, controls to flag suspicious orders. Absent such controls, Defendants could not lawfully ship any of these orders. Judge Polster held that the CSA requires due diligence before shipping an order. 17-md-02804, Dkt. 2483. Accordingly, after-the-fact evidence of what due diligence might have shown is inadmissible. *See* Ex. 34 at 30:3-32:13; 26:5-30:9 (Judge Polster excluding pharmacist testimony unless pharmacist was consulted in connection with pre-shipping due diligence).

Finally, Defendants argue that Plaintiffs have failed to identify specific shipments which were then diverted into the black market, Def. Mot. at 14-15. As explained above, there is no doubt that some of the suspicious orders Defendants shipped were in fact diverted; it makes no difference which ones. Judge Polster previously denied Defendants' efforts to force individualized proof, observing that "aggregate proof of causation [is] sufficient to overcome summary judgment." Ex. 36 at 8. Like in CT1, Plaintiffs here proceed on the theory that details of individual shipments are not relevant; rather, they will rely principally on experts and circumstantial evidence to connect SOM deficiencies to the public nuisance.

Thus, it is clear that the harms incurred by Plaintiffs were a direct result of the over-supply into their jurisdictions. Plaintiffs have submitted sufficient evidence

to establish an issue of material fact with regard to Defendants' role in causing this epidemic. In telling moments in their depositions and their own internal documents, Defendants have admitted as much. The MDL Court rejected identical arguments to those Defendants make here, and this Court should do the same.

## V.   Alleged Intervening Acts Do Not Break the Chain of Causation

Plaintiffs have demonstrated that Defendants' unlawful distribution practices led to a massive increase in opioid supply in the Plaintiffs' jurisdictions, which in turn led to devastating and unprecedented levels of harms.

Defendants nevertheless argue that Plaintiffs' claims are insufficiently direct because intervening events or actions by third-parties or rogue criminal actors break the chain of causation as a matter of law. Defendants are wrong.

As explained above, (*see* discussion pp. 5-7) in West Virginia, foreseeability is the "touchstone" of the proximate cause analysis. *State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, 2014 WL 12814021, at *2 (W.Va.Cir.Ct. Dec. 12, 2014) (Ex. 13). Accordingly, an allegedly "intervening act," even an illegal act, does not sever causation if it is foreseeable. (*See* discussion pp. 5-7). An intervening cause must "operate independently of any other act" to break the chain of causation. *Id.*

In an attempt to side-step West Virginia's well-established "foreseeability" standard for proximate cause, Defendants invoke *Holmes*' "directness" test, arguing that it precludes liability here. Def. Mot. at 3-4. Defendants cite no case which stands for the proposition that *Holmes*' three-pronged analysis is applicable to non-RICO claims to the exclusion of clearly established state law causation standards.

*See also* (Ex. 37) (J. Breyer) (Applying *Holmes* to RICO claims (pp. 37-49), and foreseeability standard to public nuisance claims (pp. 69-80)). But even if *Holmes* departs from the relevant state law standard, and even if it does inform the standard for non-RICO claims, Plaintiffs have adequately met that standard, as Judge Polster correctly determined in the MDL with respect to plaintiffs' RICO claims. *See* 1:17-MD-2804, Dkts. 2561, 2580 (summary judgment), 1203 (motion to dismiss).

Plaintiffs' harms were the foreseeable, expected (and even intended) result of Defendants' conduct. *See* Restatement (Third) of Torts § 33(b) (2010) ("An actor who intentionally or recklessly causes harm is subject to liability for a broader range of harms."). Defendants do not even contest this fact, and for good reason. The flood of pills into West Virginia was staggering. The sheer volume of pills Defendants sold into Huntington and Cabell County, coupled with the lack effective mechanisms to control that supply, made it foreseeable and inevitable that diversion, addiction, misuse, criminal activity, overdose, and death would occur.

Indeed, Defendants' failures to implement controls on the supply chain is deemed wrongful precisely because over-supply and diversion is expected to cause serious harm to the general public. This is the entire reason Congress passed the Controlled Substances Act. A 2007 letter from DEA to Defendants states that "[their] responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people . . . ." Ex. 26 at 9687-9688.

19

Likewise, the Supreme Court has long recognized the inherent causal relationship between opioid diversion and harm. *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) ("The difference between sugar, cans, and other articles . . . on the one hand, and narcotic drugs . . .  on the other, aris[es] from the latters' inherent capacity for harm and from the very fact they are restricted . . . ."); *United States v. Moore* , 423 U.S. 122, 135 (1975) (when enacting the CSA, "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels."); *Gonzales v. Raich*, 545 U.S. 1, 12–13, (2005) (same).

West Virginia state courts handling similar opioid litigation claims have rejected the arguments Defendants make here. In *Morrisey*, 2014 WL 12814021 (2014) (Ex. 13), West Virginia brought claims against opioid distributors for nearly the exact conduct and harms alleged here. Analyzing West Virginia law, the court found that any alleged intervening acts were foreseeable to Defendants, and therefore insufficient to cut off the chain of liability as a matter of law. *Id.* at *11-12.

Similarly, in *Brooke County*, No. 17-C-248 (2018) (Ex. 14), the West Virginia Circuit Court rejected distributor defendants proximate cause arguments, finding that: "Defendants' conduct was not too remote from the opioid epidemic—even considering that third party conduct may have also contributed to the opioid epidemic—and that the acts of third parties (even criminals) were foreseeable and did not create a new effective cause or operative independently." *Id.* at 12. (citing *Morrisey*).

And, as discussed above, Judge Polster rejected Defendants' arguments concerning a too-attenuated causal chain, observing, "the relationship between Plaintiffs' injury and Defendants' alleged conduct . . . is not too remote to support a finding of proximate cause here." 1:17-md-02804, Dkt. 1203, at 9-10. Most recently, Judge Breyer rejected similar causation arguments. (Ex. 37 at 69-80). The vast majority of opioid litigation courts around the county are in accord. *See supra*, fn. 4.

Defendants argue that *City of Charleston, W. Virginia v. Joint Comm'n*, requires a finding of no proximate cause here. 2020 WL 4116952 (S.D.W. Va. July 20, 2020). But that case actually supports Plaintiffs' position. In *City of Charleston*, the Court determined that an accreditation commission's conduct—issuing false "pain management standards"—is "too attenuated from the resulting harms and influenced by too many intervening causes." *Id.* at *26. However, the Court found that a distributor's conduct *was not* too attenuated. The Court expressly distinguished *Summit County* on the grounds that the accreditation "defendants had no role in . . . distributing . . . opioids." *Id.* at *25. It is clear that had distribution conduct been before it, the court—like the other West Virginia courts discussed above—would have found proximate cause present.

## CONCLUSION

Plaintiffs have ample evidence for each Defendant, to establish, at the very least, a genuine issue of material fact on causation. There is no legal doctrine that would limit Defendants' liability for the consequences of their wrongful conduct. Thus, summary judgment for lack of proximate causation must be denied.

Dated: October 6, 2020

Respectfully submitted,

**THE CITY OF HUNTINGTON**
/s/ *Anne McGinness Kearse*
Anne McGinness Kearse
WVSB No. 12547
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb
WV No. 4782
**THE WEBB LAW CENTRE**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

On Brief:

Tara D. Sutton
Eric M. Lindenfeld
**ROBINS KAPLAN LLP**
800 Lasalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel:  612-349-8500
Fax:  612-339-4181
tsutton@robinskaplan.com
elindenfeld@robinskaplan.com

**CABELL COUNTY COMMISSION**
/s/ *Paul T. Farrell, Jr.*
Paul T. Farrell, Jr.
WVSB Bar No. 7443
**FARRELL LAW**
422 Ninth Street, 3rd Floor (25701)
PO Box 1180
Huntington, West Virginia 25714-1180
Mobile: 304-654-8281
paul@farrell.law

/s/ *Anthony J. Majestro*
Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Michael A. Woelfel
WVSB No. 4106
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

Lou Bograd
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lbograd@motleyrice.com

Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Paulina do Amaral
**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  212-355-9500
Fax:  212-355-9592
pdoamaral@LCHB.com

## CERTIFICATE OF SERVICE

I certify that on October 6, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to:

Track2OpioidDefendants@ReedSmith.com and CT2_Opioid_Team@mail-list.com.

/s/ *Anthony J. Majestro*