Ex 37 - *City And County Of San Francisco, et al., v. Purdue Pharma L.P., et al.,* 3:18-cv-07591, Dkt. 285 (Sept. 30, 2020)

Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Proximate Causation Grounds

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

Plaintiffs,

v.

PURDUE PHARMA L.P., et al.,

Defendants.

Case No. 3:18-cv-07591-CRB

**ORDERING GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTIONS TO
DISMISS THE FIRST AMENDED
COMPLAINT**

The City and County of San Francisco ("San Francisco") and the People of the State of California (collectively, "the City"), acting by and through San Francisco City Attorney Dennis Herrera, have brought a lawsuit intended to address the impact of the opioid epidemic in San Francisco. The lawsuit targets two distinct sets of defendants, "Marketing Defendants"[1] and "Distributor Defendants"[2] (collectively, "Defendants").[3] See infra App. A. The City alleges that: (1) "RICO Marketing Defendants"[4] violated RICO by forming an illegal Opioid Marketing Enterprise and defrauding San Francisco; (2) "RICO Supply Chain Defendants"[5] also violated RICO by forming an illegal Opioid Supply Chain Enterprise and defrauding San Francisco; (3) all Defendants contributed to the creation of a public nuisance, i.e., the opioid epidemic, in violation of California Civil Code §§ 3479–3480; (4) all Defendants, except Walgreens, violated

---

[1] See Appendix A (detailing the categories of defendants).
[2] Id.
[3] However, the actions against all Purdue Entities and individual Sackler family members are currently stayed pending bankruptcy proceedings. In re Purdue Pharma L.P., et al., No. 19-23649. Additionally, the actions against Insys Therapeutics, Inc. are currently stayed pending different bankruptcy proceedings. In re Insys Therapeutics, Inc., et al., No. 19-11292.
[4] See App. A
[5] Id.

United States District Court
Northern District of California

California's Unfair Competition Law ("UCL"); and (5) Marketing Defendants engaged in acts that violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.

Five categories of Defendants—all Defendants,[6] Manufacturers,[7] Distributors,[8] Walgreens,[9] and Anda, Inc.—move to dismiss the City's First Amended Complaint ("FAC") for failure to state a claim. Foreign Defendants also move to dismiss for lack of personal jurisdiction and insufficient service of process, with Endo Int'l and MNK plc also moving to dismiss for insufficient process. The Court hereby GRANTS Defendants' motion to dismiss the City's RICO claims and DENIES all other bases for dismissal.

## I.    BACKGROUND

The opioid crisis has infiltrated communities throughout the country. Between 1999 and 2016, more than 350,000 people died from opioid-related overdoses—2017, alone, added nearly 48,000 people to the total number of opioid-related deaths. FAC (dkt. 128) ¶¶ 3–4. San Francisco has been particularly impacted. From 2006 through 2016, the number of people who inject drugs in San Francisco has jumped from 10,000 to over 25,000 persons. Id. ¶ 52. In 2018, San Francisco paramedics administered naloxone[10] to 1,647 people, which was nearly double the amount administered in 2016. Id. ¶ 55 (citing Brian Rinker, Drug Users, Equipped With Naloxone, Are Helping to Reverse Overdoses in San Francisco, ABC News (June 14, 2019), available at https://abcnews.go.com/Health/drug-users-equippednaloxone-helping-reverse-overdoses-san/story?id=63696298). Hospitalizations and overdose deaths have also increased substantially since 2014. Id. ¶ 54 (citing Dr. Phillip O. Coffin, et al., Substance Use Trends in San Francisco Through 2018 at 9 (December 2019), available at https://ndews.umd.edu/sites/ndews.umd.edu/files/San-Francisco-Substance-Use-2019-Annual-Report-Trends-Through-2018.pdf). Not only has the opioid crisis impacted San Francisco's streets, but San Francisco's

---

[6] In fact not all Defendants join this motion—Teva Ltd., Mallinckrodt plc ("MNK plc"), Allergan plc, and Endo International ("Endo Int'l") (together, "Foreign Defendants") do not move to dismiss for failure to state a claim.

[7] Id.

[8] Id.

[9] Walgreens files its motion in its capacity as both a distributor and dispenser.

[10] Naloxone is a medication designed to reverse opioid overdoses. FAC ¶ 61.

United States District Court
Northern District of California

jails are seeing an influx of opioid contraband. <u>See id.</u> ¶ 57. The San Francisco Sheriff's Department purchased mail screening equipment to combat the massive influx of fentanyl. <u>Id.</u> Even though San Francisco budgeted $23.2 million to address the opioid crisis, the opioid epidemic persists. <u>See id.</u> ¶ 58 (citing City & County of San Francisco, California Mayor's 2017–2018 & 2018–2019 Proposed Budget, Mayor's Office of Public Policy and Finance at 15 (June 1, 2017), available at https://sfmayor.org/sites/default/files/CSF_Budget_Book_2017_Final_CMYK_LowRes.pdf).

As a result of the epidemic, over 2,700 lawsuits, including this one, were filed against opioid manufacturers, distributors, and dispensers. These actions were transferred to Judge Dan A. Polster in the U.S. District Court for the Northern District of Ohio. In February 2020, Judge Polster remanded this action back to the Northern District of California to proceed as a bellwether trial. One month later, the City filed its FAC.

The City alleges that Defendants are responsible for two primary causes of the opioid crisis in San Francisco. First, Marketing Defendants used false and deceptive advertising techniques in a marketing scheme designed to increase the demand and sale of prescription opioids. <u>Id.</u> ¶¶ 7–11. These defendants allegedly created and used a marketing enterprise that targeted physicians, patients, lawmakers, and enforcement agencies, in a systematic effort to change prescriber habits and public perception regarding prescription opioids. <u>Id.</u> ¶¶ 225–546. Second, Defendants manufactured, distributed, and dispensed greater quantities of opioids than they knew would be necessary for legitimate medical uses, failed to design and implement effective controls over the distribution of opioids, and failed to report and take steps to halt suspicious orders that were being diverted into illegal secondary markets. <u>Id.</u> ¶¶ 7, 12. In doing so, Defendants allegedly violated their legal obligations under the Controlled Substances Act ("CSA"), California law, and common law. <u>Id.</u> ¶¶ 579–83. Despite this conduct, Defendants publicly represented that they complied with their legal obligations. <u>Id.</u> ¶¶ 668–80. These factual allegations form the underlying basis for the City's claims.

Now pending are nine motions to dismiss and one request for judicial notice.

## II.    DISCUSSION

### A.    The MDL court's decisions are not binding "law of the case."

As a preliminary matter, Defendants argue that this Court should not adopt the MDL's rulings in other cases as the law of this case.  Law of the case doctrine is a discretionary practice whereby courts do not redecide issues resolved by the transferee court.  15 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 3867 (4th ed. Apr. 2020 Update).  The MDL court has ruled on several pre-trial motions that applied to all cases consolidated before the MDL; however, the MDL court never ruled on a motion to dismiss involving the present case.  See, e.g., In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804, 2020 WL 4550400, at *7 (N.D. Ohio Aug. 6, 2020) (denying motions to dismiss Lake and Trumbull counties' claims against pharmacy defendants).  Defendants argue that the doctrine is inapplicable here because it applies only to rulings in the same case, and thus, the prior MDL rulings on motions to dismiss should not prevent this Court from independently reviewing each of Defendants' arguments in this case.  Def. Mot. (dkt. 169) at 5.  The City warns that this would result in "piecemeal decision making that MDL centralization is intended to avoid."  Opp. (dkt. 208) at 7 (quoting 15 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 3867 (4th ed. Aug. 2019 Update)).  But even the City acknowledges that the MDL's decisions are not binding—just, given the similarities, highly persuasive.  Id. at 8.  This Court agrees: the MDL's rulings will serve as a "springboard."  This Court will independently review Defendants' arguments, but will rely on the MDL's rulings as highly persuasive authority to the extent that these decisions are consistent with California and Ninth Circuit authority.

The City relies excessively on this Court's statement that it will "not review or alter any of the rulings [that] have already been entered in the MDL litigation."  Id. at 6–7 (internal citations omitted).  This Court will not disturb the decisions by Judge Polster with respect to the entire MDL.  But a transferee judge's decision to grant a motion depends on the factual record in that case, not on the record of a separate case adjudicated by the MDL court.  See In re Nat'l Prescription Opiate Litig., 956 F.3d 838, 845 (6th Cir. 2020); see also Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993) ("[A] court is generally precluded from reconsidering an issue that has

4

already been decided by the same court, or a higher court in <u>the identical case</u>." (emphasis added) (internal citation omitted)).

Accordingly, this Court will independently consider Defendants' arguments to the extent that they (1) were not raised in the MDL, or (2) rely on California or Ninth Circuit precedent. However, the Court adopts as persuasive the MDL's conclusions regarding one of Defendants' threshold arguments that the MDL court has repeatedly rejected and that is not based on Ninth Circuit precedent: that the CSA and its implementing regulations do not impose duties on Defendants. <u>See, e.g.</u>, Def. Mot. at 11–12, 17–19, 19 n.18, 29–30, 30 n.28 (relying on its arguments to the MDL court). The Court begins with this issue because several other issues turn on the question whether the CSA imposes such duties. <u>See</u> <u>infra Subparts</u> II.E.4; II.E.5.a; II.E.5.c.ii; II.E.6.a.i.

### 1. Duties under the CSA and its implementing regulations.

The CSA and its implementing regulations <u>do</u> impose duties on Defendants. The CSA authorizes the Attorney General to "promulgate rules and regulations . . . relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances . . . ." 21 U.S.C. § 821. Pursuant to this authority, the DEA Administrator promulgated § 1301.71(a), which requires all registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). The DEA Administrator also promulgated § 1301.74(b), which imposes a legal obligation on non-practitioner registrants—manufacturers and distributors—to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. 1301.74(b). The MDL court concluded that these regulations impose duties on manufacturers and distributors to identify, report, and refrain from shipping suspicious orders. <u>In re Nat'l Prescription Opiate Litig.</u>, No. 1:17-md-2804, 2019 WL 3917575, at *7-9 (N.D. Ohio, Aug. 19, 2019); <u>In re Nat'l Prescription Opiate Litig.</u>, No. 1:17-cv-02804, 2019 WL 2477416, at *16-18 (N.D. Ohio Apr. 1, 2019), <u>report and recommendation adopted in part, rejected in part</u>, No. 1:17-md-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019). Defendants argue that these regulations do not create legal duties, and ask the Court to reject the MDL court's contrary conclusion. Def. Mot. at 18. The

5

Court will not do so.

First, the MDL court concluded that both §§ 1301.71 and 1301.74 impose "legal duties" on the defendants. The MDL court noted that the DEA promulgates regulations "'relating to the registration <u>and control</u>' of the manufacture and distribution of controlled substances," <u>In re Nat'l Prescription Opiate Litig.</u>, 2019 WL 3917575, at *7 (emphasis added) (quoting 21 U.S.C. § 821), which demonstrates that the CSA's regulations do not impose duties solely in the context of the registration process. <u>Id.</u> So, while § 1301.74(b) sets out factors for the DEA to evaluate whether an entity may remain a registrant, it also imposes, "as a matter of law, duties that registrants must" abide by. <u>Id.</u> The MDL court's decision is buttressed by the D.C. Circuit's decision in <u>Masters Pharmaceutical, Inc. v. DEA</u>, which concluded that "[§ 1301.71(a)] imposes a <u>general duty</u> on pharmaceutical distributors to 'provide effective controls . . . against [the] diversion' of control substances." 861 F.3d 206, 221 (D.C. Cir. 2017) (emphasis added) (quoting 21 C.F.R. § 1301.71(a)). Thus, §§ 1301.71 and 1301.74 set out factors used to evaluate an entity's registration and impose general duties on registrants to protect against diversion.

Second, the MDL court detailed these duties. Relying on <u>Masters Pharmaceutical, Inc.</u>, 861 F.3d at 212, the MDL court concluded that § 1301.74 imposes a duty on registrants to "(1) design and operate a system to disclose to the registrant suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrants." <u>In re Nat'l Prescription Opiate Litig.</u>, 2019 WL 3917575, at *7. The MDL court held that § 1301.71 requires registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances." <u>Id.</u> at *8 (quoting 21 C.F.R. § 1301.71(a)) (internal quotation marks omitted). Relying again on the D.C. Circuit's decision in <u>Masters Pharmaceutical Inc.</u>, 861 F.3d at 212–213, 222, and the DEA's administrative decision in <u>Southwood Pharmaceuticals, Inc.</u>, 72 Fed. Reg. 36487-01, 36498, 2007 WL 188484 (DEA July 3, 2007), the MDL court concluded that the distributor defendants had a duty, implicit in section 1301.71(a), not to ship suspicious orders. <u>In re Nat'l Prescription Opiate Litig.</u>, 2019 WL 3917575, at *8.

Nothing in Defendants' briefs suggest that the Ninth Circuit has interpreted the CSA differently, nor do Defendants argue any novel theories not heard by the MDL court. <u>See</u> Def.

1   Mot. at 17–19; Def. Reply at 13–16.  Rather, Defendants rely on the same positions used in the

2   MDL to argue that the CSA regulatory provisions "merely set out procedures relating to the

3   registration of manufacturers and wholesale distributors," not substantive duties.  Def. Mot. at 17.

4        This Court therefore adopts the MDL court's conclusions on this issue and rejects

5   Defendants' argument that the CSA's implementing regulations do not impose legal duties.  See In

6   re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7–8.

7        The Court now turns to each of the motions to dismiss.

8       **B.**    **Walgreens' motion to dismiss for lack of Article III standing.**

9        Walgreens argues that the City lacks Article III standing to bring a public nuisance claim

10   because its alleged injury—San Francisco's opioid epidemic—is not "fairly traceable" to

11   Walgreens' alleged conduct.  Wal. Mot. (dkt. 168) at 1 (internal citations omitted).  Walgreens'

12   argument fails because the City's allegations demonstrate that, at the very least, Walgreens'

13   oversupply of opioids and failure to report suspicious orders caused third parties to act in a way

14   that injured the City, which satisfies the traceability requirement.

15        In order to have Article III standing, "[t]he plaintiff must have (1) suffered an injury in

16   fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to

17   be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547

18   (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  "Proximate causation

19   is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly

20   traceable to the defendant's conduct."  Lexmark Int'l, Inc. v. Static Control Components, Inc., 572

21   U.S. 118, 134 n.6 (2014).  "Causation may be found even if there are multiple links in the chain

22   connecting the defendant's unlawful conduct to the plaintiff's injury . . . .  [W]hat matters is not

23   the length of the chain of causation, but rather the plausibility of the links that comprise the

24   chain."  State v. Ross, 358 F. Supp. 3d 965, 1006 (N.D. Cal 2019) (quoting Mendia v. Garcia, 768

25   F.3d 1009, 1012–13 (9th Cir. 2014)) (internal quotation marks omitted).

26        Here, Walgreens relies on the length of the causal chain to argue that its alleged conduct is

27   not traceable to the City's injury.  See Wal. Mot. at 3–4.  But the City has plausibly alleged that

28   Walgreens' conduct caused the City's public nuisance injury.  The City alleges that Walgreens

United States District Court
Northern District of California

repeatedly failed to maintain effective controls to prevent diversion, including by failing to use its data to identify, investigate, and halt prescriptions that were suspicious. FAC ¶¶ 555–56, 563–78. Further, the FAC states that Walgreens installed dispensing and compensation policies that discouraged its pharmacists from performing due diligence on suspicious prescriptions. Id. ¶ 575. As a result of Walgreens' failure to prevent the diversion of prescription opioids into the illegal market, the City was forced to expend resources to alleviate the effects of Walgreens' failures: abuse, addiction, overdoses, and death. See id. ¶¶ 555, 563, 566, 571–72, 577. These are all concrete and specific examples of how Walgreens' conduct allegedly caused the City to incur extraordinary municipal costs. See id. ¶¶ 22, 57–58, 70 (detailing municipal costs).

Walgreens relies on Kaing v. Pulte Homes, Inc., No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), aff'd sub nom. Kaing v. Pultegroup, Inc., 464 F. App'x 630 (9th Cir. 2011), to argue that the City's allegations amount to an "effects-of-effects" causation theory that does not satisfy the traceability requirement. Wal. Mot. at 4–5.[11] Specifically, Walgreens argues that there are "innumerable third parties" that affect the causal chain. Id. at 4. In Kaing, the plaintiffs asserted that local foreclosures by owners who accepted the defendants' subprime mortgages caused the plaintiffs' property values to diminish. 2010 WL 625365, at *5. The court rejected the claim because it concluded that the claim depended upon a variety of independent factors including unemployment, health problems, general weakening economy, and other financial conditions. Id. at *6.

Unlike Kaing, the City's allegations here demonstrate that, at the very least, Walgreens' oversupply of opioids caused third parties to act in a way that injured the City. See Mendia, 768 F.3d at 1013. Walgreens cites several links that it asserts make the City's causal chain more

---

[11] Walgreens also relies on City of New Haven v. Purdue Pharma, L.P., No. X07HHDCV176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019). The Connecticut Superior Court rejected New Haven's claims against Purdue Pharma L.P.; however, it did so under Connecticut state law. Id. at *2. The court engaged in a standing analysis that is meaningfully different from typical Article III standing principles. For example, the court relied on Ganim v. Smith & Wesson Corp., 780 A.2d 98 (Conn. 2001), which hinged on a "policy judgment" by the Connecticut Supreme Court to conclude that the plaintiff lacked standing. City of New Haven v. Purdue Pharma, L.P., 2019 WL 423990, at *3. Such "policy judgment[s]" do not factor into Article III's standing analysis.

United States District Court
Northern District of California

attenuated. Wal. Mot. at 4. Not only has the MDL court rejected these links, <u>In re Nat'l Prescription Opiate Litig</u>., No. 1:18-op-45090, 2018 WL 4895856, at *6 (N.D. Ohio, Oct. 5, 2018) <u>report and recommendation adopted in part</u>, No. 1:17-MD-2804, 2018 WL 6628898, at*1 (N.D. Ohio Dec. 19, 2018) [hereinafter <u>Summit County</u>], but Walgreens ignores that its alleged conduct—distributing and dispensing large amounts of opioids that it knew could not be used for legitimate uses—plausibly resulted in the City's immense costs. See FAC ¶¶ 555–56, 563–78. Thus, the City satisfies the standing requirement's traceability prong because the City alleges a plausible causal relationship between its public nuisance injury and Walgreens' conduct. Walgreens' motion to dismiss for lack of Article III standing is therefore DENIED.

### C. Motions to dismiss for lack of personal jurisdiction.

Foreign Defendants argue that this Court lacks personal jurisdiction. See Teva Mot. (dkt. 165) at 2; Allergan Mot. (dkt. 162) at 1–2; MNK Mot. (dkt. 166) at 6; Endo Mot. (dkt. 176) at 4. The City argues that it has pled a prima facie basis for exercising specific personal jurisdiction over the Foreign Defendants under either the alter-ego theory or successor-in-interest theory. See Teva Opp. (dkt. 205-4 *SEALED*) at 1–4; Allergan Opp. (dkt. 204) at 5–24; MNK Opp. (dkt. 209) at 5–19; Endo Opp. (dkt. 202) at 1–2. As explained below, the Court concludes that the City has made a prima facie showing of personal jurisdiction and DENIES WITHOUT PREJUDICE Foreign Defendants' motion to dismiss for lack of personal jurisdiction.[12]

#### 1. Legal standard for personal jurisdiction.

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction. The plaintiff bears the burden of establishing the court's personal jurisdiction over a defendant. Cubbage v. Merchent, 744 F.2d 665, 667 (9th Cir. 1984).

---

[12] The Court does not address the City's successor liability theory of personal jurisdiction with respect to Teva Ltd., MNK plc, and Endo Int'l for two reasons: (1) the City has made a prima facie showing that this Court has jurisdiction over these entities under the alter ego doctrine, and thus, there is no need to address the successor liability arguments; and (2) like the City's alter-ego theory, the Foreign Defendants each dispute several of the facts underlying the City's successor liability theory—many of which are intertwined with the merits—and so the Court will wait until trial to settle these factual disputes. Similarly, the Court does not address the City's alter-ego theory with regard to Allergan plc because the City has made a prima facie showing that the Court has jurisdiction over Allergan plc under successor liability theory, and there are factual disputes that require a full trial record to resolve.

United States District Court
Northern District of California

In assessing whether personal jurisdiction exists, the court may consider evidence presented in affidavits or order discovery on jurisdictional issues. Data Disc, Inc., 557 F.2d at 1285. "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995) (internal citations omitted).

A plaintiff can make this prima facie showing by producing admissible evidence which, if believed, would be sufficient to establish personal jurisdiction. See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clemens Ltd., 328 F.3d. 1122, 1129 (9th Cir. 2003). "[U]ncontroverted allegations in [plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor." Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1127 (9th Cir. 2010) (internal citations omitted). Even if a plaintiff makes a prima facie showing, it does not necessarily mean that the case proceeds to the merits; rather, if the pleadings and submitted materials raise "disputed questions of fact with regard to jurisdiction," the district court can exercise its discretion to hold a preliminary hearing in order to resolve the dispute. Data Disc, Inc., 557 F.2d at 1285. But, if the "jurisdictional facts are intertwined with the merits," such that "a decision on a jurisdictional issue is dependent on the merits . . . . [i]t is preferable that this determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." Id. at 1285 n.2 (internal citations omitted).

### 2. Alter-ego liability

Under federal law, "if a corporation is the alter ego of an individual defendant, or one corporation the alter ego of another, the Court may 'pierce the corporate veil' jurisdictionally and attribute 'contacts' accordingly." RAE Sys., Inc. v. TSA Sys., Ltd., No. C 04-2030 FMS, 2005 WL 1513124 (N.D. Cal. June 24, 2005) (quoting Certified Building Products, Inc. v. NLRB, 528 F.2d 968, 969 (9th Cir. 1975)). In order to demonstrate that an alter ego relationship exists, the plaintiff must make a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their

1   separate identities] would result in fraud or injustice." <u>Ranza v. Nike, Inc.</u>, 793 F.3d 1059, 1073

2   (9th Cir. 2015) (quoting <u>Doe v. Unocal Corp.</u>, 248 F.3d 915, 926 (9th Cir. 2001)) (internal

3   quotation marks omitted).

4       Factors suggesting that two entities have a unity of interest and ownership include: (1)

5   inadequate capitalization, (2) commingling of funds and other assets, (3) disregard of corporate

6   formalities and failure to maintain an arm's length relationship, (4) holding out by one entity that

7   is liable to the debts of the other, (5) identical equitable ownership, (6) use of the same offices and

8   employees, (7) lack of segregation of corporate records, (8) manipulating assets between entities

9   so as to concentrate the assets in one and the liabilities in another, and (9) identical directors and

10  officers. <u>See</u> <u>Daewoo Elecs. Am. Inc. v. Opta Corp.</u>, 875 F. 3d 1241, 1250 (9th Cir. 2017)

11  (internal citations omitted). These factors help determine whether the parent corporation "totally

12  controls the actions of the subsidiary so that the subsidiary is the mere alter ego of the parent,"

13  such that the Court may exercise jurisdiction over both the parent and its subsidiary. <u>Howard v.</u>

14  <u>Everex Sys., Inc.</u>, 228 F.3d 1057, 1069 n.17 (9th Cir. 2000).

15      In addition to demonstrating that a unity of interest exists between a parent company and

16  its subsidiaries, a plaintiff must demonstrate that "an inequitable result will follow if the acts are

17  treated as those of the [subsidiaries'] alone." <u>RRX Indus., Inc. v. Lab-Con, Inc.</u>, 772 F.2d 543,

18  545 (9th Cir. 1985). An inequitable result includes enabling a "shell game," in which an entity

19  deflects liability on to shell corporations to avoid liability, to continue. <u>See</u> <u>Cadence Design Sys.,</u>

20  <u>Inc. v. Pounce Consulting, Inc.</u>, No. 17-cv-04732-PJH (SK), 2019 WL 1768619, at *6 (N.D. Cal.

21  Apr. 1, 2019), <u>report and recommendation adopted</u>, No. 17-cv-04732-PJH, 2019 WL 1767332

22  (N.D. Cal. Apr. 22, 2019).

23      The alter-ego doctrine is not limited to intentional fraud, nor does it require bad faith.

24  <u>RRX Indus., Inc.</u>, 772 F.2d at 546; <u>Pac. Bell Tel. Co. v. 88 Connection Corp.</u>, 15-cv-04554-LB,

25  2016 WL 3257656, at *3 (N.D. Cal. June 14, 2016). So long as there is a unity of interest and

26  ownership, courts will ignore the corporate form and attribute wrongful or inequitable conduct to

27  the organization controlling the corporation. <u>Pac. Bell</u>, 2016 WL 3257656, at *3 (citing <u>Sonora</u>

28  <u>Diamond Corp. v. Super. Ct.</u>, 83 Cal. App. 4th 523, 538 (2000)).

United States District Court
Northern District of California

The Court now turns to each of the Foreign Defendants.

a. **Teva Ltd.**

The City argues that Teva Ltd.'s subsidiaries—Teva USA, Cephalon, and the Actavis Generic Entities that Teva Ltd. acquired from Allergan plc—are its alter-ego, and thus, the Court can impute these subsidiaries' contacts to Teva Ltd.[13] Teva Opp. at 1.

i. **Unity of interests and ownership.**

The City argues that Teva commingled its funds and assets, shared virtually identical officers and committee members on its Executive Committee and subsidiaries' subcommittees, manipulated its subsidiaries assets to benefit itself, controlled both the high-level and day-to-day decisions of its subsidiaries, and integrated its subsidiaries into a single economic unit, known as "One Teva." See Teva Opp. at 6–14.[14] Teva disputes these allegations.

Teva Ltd.'s shared corporate history, structure, management, and officers demonstrates that it sought to fully integrate and control its subsidiaries. Teva Ltd. is an Israeli corporation and parent company of several indirect generic manufacturing subsidiaries, including Teva USA, Cephalon, Watson Laboratories, Inc., Warner Chilcott Company, LLC, Actavis Pharma, Inc., Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc., and Actavis Laboratories FL, Inc. FAC ¶¶ 120–35. Teva Ltd. depicts itself as "One global brand, One story, One Teva," Teva Opp. (dkt. 205-4) at 6, and its indirect subsidiaries report directly to Teva Ltd. See, e.g., Teva Opp. at 6–7. According to a 2018 "Segment Memorandum," Teva Ltd.'s CEO is "ultimately responsible" for allocating all of Teva's resources. Teva Opp. at 8 (quoting Fahey Decl. (dkt. 205-3) at 21) (internal quotation marks omitted). Around the same time, Teva Ltd. implemented "a new organizational structure" to help integrate Teva "into one commercial organization," thereby blurring the layers of separation between Teva Ltd. and its subsidiaries. Teva Opp. at 8–9

---

[13] None of these subsidiaries dispute the existence of personal jurisdiction, so there is no minimum contacts issue.

[14] "Courts may consider evidence presented in affidavits and declarations in determining personal jurisdiction." Krypt, Inc. v. Ropaar LLC, No. 19-cv-03226-BLF, 2020 WL 3639651, at *3 (N.D. Cal. July 6, 2020) (citing Doe, 248 F.3d at 922).

United States District Court
Northern District of California

1 (quoting Fahey Decl. at 22) (internal quotation marks omitted).

2 Teva Ltd. argues that these facts amount to "appropriate parental involvement and do not

3 indicate that" it is "improperly controlling the subsidiary." Teva Reply (dkt. 219) at 5 (quoting

4 Unocal Corp., 248 F.3d at 926) (internal quotation marks omitted). But that Teva Ltd.'s CEO

5 allocated its subsidiaries' resources, and that Teva Ltd. desired to integrate into "one commercial

6 organization," suggest a desire to "totally control" the subsidiaries. See Howard, 228 F.3d at 1069

7 n.17. These allegations, in conjunction with the following allegations, demonstrate Teva Ltd.'s

8 efforts to control its subsidiaries.

9 Teva Ltd.'s control encompasses its subsidiaries' day-to-day activities. The City alleges

10 that Teva Ltd. controls its subsidiaries' day-to-day activities. Teva Opp. at 11. For example, Teva

11 Ltd.'s Executive Vice President and Head of North America facilitated a withdrawal of a Teva

12 opioid product that had received FDA approval. Id. (quoting Ex. 25) (internal quotation marks

13 omitted). The head of Teva Ltd.'s Global Research and Development division controls Teva's

14 product formulation, design, and commercial execution and determined that the product would be

15 unprofitable, prompting the Executive Vice President's decision. Id. (quoting Fahey Decl. at 11).

16 Additionally, Teva Ltd. implemented guidelines that enabled it to nominate, select, and approve

17 the Executive Committee and Sub-committee members for itself and its U.S. subsidiaries,

18 resulting in substantial control over the subsidiaries' marketing, administration, manufacturing,

19 research and development, purchase of supplies, finance, and "other significant supporting

20 operations conducted in 'shared and commingled assets.'" Id. at 13–14 (quoting Fahey Decl. at

21 28–29).

22 Teva Ltd. both disputes the truth of the City's allegations and recharacterizes them as

23 "critical high-level decisions that impact the 'Teva' brand as a whole—not involvement in day-to-

24 day activities." Teva Reply at 9–10. Teva Ltd. cites the testimony of its corporate representative,

25 Doron Herman, who testified that the day-to-day operations are solely controlled by the

26 subsidiaries. Id. at 9 (citing Herman 30(b)(6) Tr., at 190:2-20, 258:1-11, 373:9-374:6, 377:4-17,

27 378:23-379:1). Teva Ltd. also characterizes the City's allegation that Teva Ltd. Forces all

28 subsidiaries to utilize the same website portal as typical "parental management." Id. at 10 (citing

United States District Court
Northern District of California

Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980)). While Mr. Herman's testimony does raise a factual dispute, Teva Ltd. does not address all of the City's allegations, specifically Teva Ltd.'s alleged control over who sits on certain boards and commercial strategies and execution. These allegations implicate several of the factors listed in Daewoo: (1) the commingling of funds and other assets, (2) the use of the same employees, and (3) virtually identical officers and committee members. See 875 F. 3d at 1250. Thus, the City's allegations satisfy several factors indicative of a "unity of interests and ownership."

Teva's shared financial structure demonstrates that it completely controlled its subsidiaries' finances. The City alleges that Teva Ltd. financially controlled its subsidiaries through "a trade receivables securitization program that took control and commingled its subsidiaries' receivables and collections via a Special Purpose Entity (SPE)," which Teva Ltd. owns, controls, and primarily benefits from. Teva. Opp. at 9 (citing Fahey Decl. at 25) (internal quotation marks omitted). Additionally, the City alleges that Teva used its subsidiaries' cash flows to repurchase its own shares and pay dividends to shareholders. Id. at 10 (citing Fahey Decl. at 26). Teva Ltd. also allegedly controlled large contracts signed by its subsidiaries, to "protect itself from third-party claims from those subsidiaries." Id. (citing Fahey Decl. at 27). These allegations suggest that Teva Ltd. (1) commingled funds and assets and (2) manipulated assets between the two entities, both of which further the City's theory that Teva Ltd. financially controlled its subsidiaries.

Teva Ltd. disputes the underlying allegations and maintains that it did not commingle funds, fail to maintain arms-length relationships, or manipulate assets between its entities. First, Teva Ltd. asserts that "none of Teva Ltd.'s [U.S.]-based subsidiaries even participate in the SPE program . . ." which directly conflicts with the City's assertion. Compare Teva Reply at 8 (citing 2nd Herman Decl. ¶ 4) with Teva. Opp. at 9 (citing Fahey Decl. at 25). Second, Teva Ltd. asserts that it did not commingle funds in the SPE program because participating subsidiaries exchange receivables for immediate compensation. Teva Reply at 8 n.9 (citing Herman 30(b)(6) Tr., at 178:5–179:21). Again, this directly conflicts with the City's assertion that Teva Ltd. commingles funds in the SPE program. See Teva Opp. at 9.

United States District Court
Northern District of California

1      While the City's allegations, accepted as true, establish a prima facie case that Teva Ltd.

2  and its U.S. subsidiaries lack separate personalities, and thus, are unified in interests and

3  ownership, Teva Ltd. raises questions of fact that <u>must be resolved either at a preliminary hearing</u>

4  <u>or at trial</u>.  <u>See</u> <u>Data Disc, Inc.</u>, 557 F.2d at 1285, 1285 n.2.[15]  The Court will permit Teva Ltd. to

5  raise this motion again after trial because these jurisdictional issues are intertwined with the

6  merits.  <u>Id.</u>

7                                        ii.      **Injustice or fraud.**

8      Moreover, treating Teva Ltd. and its subsidiaries as separate entities would result in a

9  substantial injustice to the City.  In <u>Cadence Design Sys., Inc.</u>, the court concluded that treating

10  the defendants—Pounce USA and Pounce SA—as separate entities would lead to an inequitable

11  result because Pounce USA would continue to underfund Pounce SA, preventing the plaintiff from

12  collecting a default judgment from Pounce SA.  2019 WL 1768619, at *6.  The plaintiff obtained a

13  default judgement after Pounce SA failed to defend against the plaintiff's copyright lawsuit.  <u>Id.</u> at

14  *2.  After several attempts to collect the judgment against Pounce SA, the plaintiff sued Pounce

15  USA, alleging that the two entities were alter egos of one another.  <u>Id.</u> at *3.  The court agreed,

16  noting that the majority shareholder of the two entities used Pounce USA to shield his assets.  <u>Id.</u>

17  at *5–6.  This "shell game" between Pounce USA and Pounce SA prevented the plaintiff from

18  collecting the judgment, which constituted an "inequitable result."  <u>Id.</u> at *6 ("Pounce USA

19  strategically denies its relationship to Pounce SA to obfuscate reality and avoid consequences for

20  both entities.  Denial of <u>alter ego</u> liability in this case would enable that shell game to

21  continue . . . ." (emphasis in original)).

22      Here, like <u>Cadence</u>, the City plausibly alleges that treating Teva Ltd. and its subsidiaries as

23  separate entities would further a shell game and prevent the City from recovering expenses

24

25  ───────────────

[15] "If the pleadings and other submitted materials raise . . . disputed questions of fact with regard
26  to jurisdiction, the district court has the discretion to take evidence at a preliminary hearing in
order to resolve the contested issues. . . . Where the jurisdictional facts are intertwined with the
27  merits, a decision on the jurisdictional issues is dependent on a decision of the merits
. . . .  However, it is preferable that this determination be made at trial, where a plaintiff may
28  present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the
merits."  <u>See</u> <u>Data Disc, Inc.</u>, 557 F.2d at 1285, 1285 n.2.

resulting from both Teva Ltd.'s and its subsidiaries' conduct. The City alleges that Teva Ltd.'s total financial control over its U.S. subsidiaries, including their trade receivables, protects the subsidiaries from creditors. Teva Opp. at 15 (citing Pac. Bell, 2016 WL 3257656, at *6). Teva Ltd. counters that "[t]he plaintiff must be more than just a creditor attempting to recover unsatisfied debts . . . ." Teva Mot. at 10 (quoting NuCal Foods, Inc. v. Quality Egg LLC, 887 F. Supp. 2d 977, 992 (E.D. Cal. 2012)). But the City does not allege a mere creditor-debtor relationship. The City also alleges that Teva Ltd.'s shell game with its subsidiaries abuses the corporate form. Teva Opp. at 16. The alter ego test's injustice prong contemplates precisely such abuses. Pac. Mar. Freight, Inc. v. Foster, No. 10-cv-0578-BTM-BLM, 2010 WL 3339432, at *7 (S.D. Cal. Aug. 24, 2010) ("Alter-ego theory is essentially an equitable tool used to vindicate the rights of those damaged by the abuse of the corporate form." (citing Mesler v. Bragg Mgmt. Co., 39 Cal.3d 290, 301 (1985)). The City's allegations plausibly suggest that Teva Ltd.'s abuses the corporate form by using its subsidiaries as shells to prevent the City's recovery, and thus constitute a preliminary showing that treating these entities as distinct would result in injustice.

Teva Ltd. argues that the City's allegations are false because none of its U.S. subsidiaries participate in the SPE program that allegedly enables Teva Ltd. to control its subsidiaries' finances. Teva Reply at 11. The City and Teva Ltd. rely on conflicting evidence to support their assertions. Compare Teva Opp. Ex. 4 at 19 ("On an individual seller basis, each Teva subsidiary sells receivables to BNP . . . . Teva is considered to be the primary beneficiary.") with Teva Reply 2nd Herman Decl. ¶ 4 ("None of Teva Ltd.'s United States-based subsidiaries participate or otherwise make use of the Teva corporate family's trade receivables securitization program."). Under Rule 12(b)(2), "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." Schwarzenegger, 374 F.3d at 800 (internal citations omitted). Thus, the City succeeds in making a prima facie showing that Teva Ltd. and its subsidiaries are alter-egos.

Teva Ltd.'s Motion to Dismiss is therefore DENIED WITHOUT PREJUDICE.

### b. Mallinckrodt plc

The City also alleges that MNK plc is the alter ego of its U.S. subsidiaries. See MNK

Opp. at 7.

i.  **Unity of interests and ownership.**

The City alleges: (1) that MNK plc exerts control over the daily affairs of its subsidiaries, MNK LLC and SpecGx; (2) that MNK plc and its subsidiaries share the same employees and corporate officers; (3) that MNK plc and its subsidiaries engage in the same business enterprise; (4) that they use the same assets; and (5) that they did not maintain separate books and financial statements. Id. at 9–15. Two or three factors can be enough to plead a unity of interest. Johnson v. Serenity Transp., Inc., 141 F. Supp. 3d 974, 985 (N.D. Cal. 2015) (citing Daewoo Elecs. Am. Inc., 2013 WL 3877596, at *5; Pac. Mar. Freight, Inc., 2010 WL 3339432, at *6). Like Teva Ltd., MNK plc disputes these allegations. See MNK Reply (dkt. 218) at 7–13.

MNK plc manages the day-to-day affairs of its subsidiaries. MNK, LLC and SpecGX, LLC are wholly-owned U.S.-based subsidiaries of MNK plc—an Irish public limited company. FAC ¶¶ 159, 812. According to MNK plc, its board and committees oversee the manufacturing of opioids, in addition to managing the risks of its operation. MNK Opp. at 10 (citing Chalos Dec. Ex. 17 at 40). While MNK plc is correct that "reviewing and approving major decisions" constitutes macro-management that would not fall under "day-to-day business operations," the City's allegations are much more extensive. See MNK Reply at 7–8. For example, the City alleges that "MNK plc controlled its subsidiaries' 'sales and marketing strategies,'" and implemented programs to "review and approve product-specific materials, presentations and external communications." MNK Opp. at 9–10 (quoting Chalos. Dec. Exs. 15, 16). Contrary to MNK plc's argument, this type of oversight-approval program monitors "first-hand" "how approved promotional and other materials are used, as well as monitoring . . . sales representative expenses." Chalos. Dec. Ex. 16 at 29. Thus, this degree of control over daily operations of MNK plc's subsidiaries weighs in favor of an alter-ego relationship.

MNK plc uses the same assets as its subsidiaries. The City alleges that MNK plc transferred MNK, LLC's opioid business assets to SpecGx, LLC. MNK Opp. at 11, 14 ("[A]fter MNK plc formed SpecGx LLC . . . MNK LLC transferred its assets, operations, and patents to SpecGx, LLC."). Not only did MNK plc transfer assets between subsidiaries, but the City also

17

1  alleges that MNK plc disregarded corporate formalities by commingling funds through inter-
2  company transfers and using the same assets as its subsidiaries through inter-company transfers.
3  Id. at 14.  Specifically, MNK plc allegedly shared facilities, a service office, and "assets used to
4  manage the Company's total business" in the U.S., including "IT, Finance, Human Resources,
5  Corporate Compliance, Communications & Government Affairs."  Id. (quoting Chalos Dec. Ex. 6
6  at 73) (internal quotation marks omitted).

7        MNK plc argues that that it did not inappropriately commingle funds and assets.  MNK
8  Reply at 7 (citing Gardner v. Starkist Co., 418 F. Supp. 3d 443, 463 (N.D. Cal. 2019)).  MNK plc
9  and the City dispute whether using "centralized cash pools" constitutes inappropriate commingling
10  of funds.  Compare MNK Opp. at 11 with MNK Reply at 11 (citing Einwalter Decl. ¶¶ 3–10)
11  (claiming that it is "standard corporate practice" to use centralized cash pools).  Under Rule
12  12(b)(2), this type of factual dispute must be resolved in the City's favor, see Schwarzenegger,
13  374 F.3d at 800; thus, for now, the Court will accept that MNK plc inappropriately commingled
14  funds.  MNK plc further argues that sharing offices and services "do not alone establish alter ego,
15  or even where other factors may be met."  MNK Reply at 11 (emphasis added) (citing Payoda, Inc.
16  v. Photon Infotech, Inc., No. 14-CV-04103-BLF, 2015 WL 4593911, at *3 (N.D. Cal. July 30,
17  2015)).  Alone, this factor may not be determinative, but it is probative of an alter ego relationship.
18  See Daewoo Elecs. Am. Inc., 875 F. 3d at 1250; Stewart v. Screen Gems-EMI Music, Inc., 81
19  F. Supp. 3d 938, 954 (N.D. Cal. 2015) ("When assessing whether there is unity of interest for the
20  purposes of alter ego liability courts consider the . . . use of the same offices and employees . . . ."
21  (quoting Sandoval v. Ali, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) (internal quotation marks
22  omitted))).

23        MNK plc and its subsidiaries share the same employees and corporate officers.  The City
24  cites six officers that SpecGx LLC and MNK LLC share with MNK plc, all of whom actively
25  work on behalf of MNK plc and its U.S. subsidiaries.  MNK Opp. at 12.  MNK plc argues that it is
26  standard corporate practice for a corporate parent and its subsidiaries to share management.  MNK
27  Reply at 9.  Further, only four of the six aforementioned officers maintained roles at MNK plc and
28  its subsidiaries at the same time.  Id.  MNK plc relies on Stewart to support its argument.  Id. at 10

United States District Court
Northern District of California

1    (citing <u>Stewart</u>, 81 F. Supp. 3d at 956).  However, in <u>Stewart</u>, the court found that the defendant

2    corporation shared two officers with its subsidiaries, which weighed in favor of finding an alter

3    ego relationship.  81 F. Supp. 3d at 956.  Even if only four of MNK plc's officers simultaneously

4    worked for both MNK plc and its subsidiaries, these officers had substantial authority in both

5    entities, which weighs in favor of finding an alter ego relationship.

6         <u>MNK plc does not engage in the same business enterprise at its subsidiaries.</u>  MNK plc

7    argues, and the MDL court agreed, that MNK plc never "marketed, sold, manufactured, or

8    distributed prescription opiates in . . . the United States . . . .  Nor is [MNK plc] registered with the

9    [DEA] to manufacture or sell opioid drugs."  <u>In re Nat'l Prescription Opiate Litig.</u>, 2019 WL

10   3553892, at *4 (internal citations omitted).  This Court agrees that the City has failed to allege that

11   MNK plc engaged in any of these operations.  <u>See</u> MNK Reply at 10–11.  The City solely relies

12   upon corporate filings to argue that MNK plc is "actively engaged in the pharmaceutical

13   business," MNK Opp. at 13, but, as MNK plc notes, that is not the same as manufacturing,

14   distributing, and selling prescription opioids.  MNK Reply at 7.

15        <u>MNK plc, MNK LLC, and SpecGx LLC each maintain separate financial books and</u>

16   <u>records.</u>  The City has not plausibly alleged that MNK plc and its subsidiaries fail to maintain

17   separate books and records.  <u>Id.</u> at 12.  The City alleges that MNK plc's lenders require it to send

18   consolidated budgets, MNK Opp. at 15, but that alone does not suggest that MNK plc and its

19   subsidiaries do not maintain separate financial records, especially given that it is a requirement

20   under Irish law.  <u>See</u> MNK Reply at 12.

21        In sum, although not every relevant factor supports the City, these allegations are sufficient

22   to make a prima facie showing that MNK plc and its subsidiaries are not distinct entities.

23                           ii.    **Injustice or fraud.**

24        Treating MNK plc and its subsidiaries as separate entities would result in a substantial

25   injustice to the City.  The same analysis that applies to Teva Ltd. applies here.  <u>See</u> <u>supra</u> Subpart

26   II.C.2.a.ii.  Again, given the disputed facts, this Court will reserve this alter-ego determination

27   until <u>after the parties have the benefit of a full trial record</u>.  <u>See, e.g.</u>, <u>In re Nat'l Prescription</u>

28   <u>Opiate Litig.</u>, 2019 WL 3553892, at *4.  MNK plc's motion to dismiss is therefore DENIED

WITHOUT PREJUDICE.

### c. Endo Int'l

The City also alleges that Endo Int'l and its U.S. subsidiaries are alter egos. <u>See</u> Endo Opp. at 7.

### i. Unity of interests.

The City relies on the following allegations to argue that Endo Int'l and its subsidiaries have an alter-ego relationship: (1) Endo Int'l uses its subsidiaries in furtherance of a single venture; (2) Endo Int'l is financially inseparable from its U.S. subsidiaries; (3) Endo Int'l shares the same offices as its subsidiaries; (4) the Endo defendants fail to maintain an arm's-length relationship because Endo Int'l controls the incentive plans for all Endo employees; (5) the Endo defendants share many of the same directors and officers. Endo Opp. at 7–11. Courts accept each of these factors, if alleged with supporting facts, as probative of the existence of an alter-ego relationship. <u>See, e.g.</u>, <u>Associated Vendors, Inc. v. Oakland Meat Co.</u>, 210 Cal. App. 2d 825, 840 (1962); <u>Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok Co.</u>, 364 F. Supp. 3d 1061, 1078 (N.D. Cal. 2019).

<u>Endo Int'l's U.S. subsidiaries further a single venture.</u> A parent corporation's use of its subsidiary as an instrument for a single venture alone is insufficient to establish an alter-ego relationship, but in conjunction with other factors can establish an alter-ego relationship between the entities. <u>See, e.g.</u>, <u>MP Nexlevel of Cal., Inc. v. CVIN, LLC</u>, No. 1:14-CV-288-LJO-GSA, 2014 WL 5019639, at *15 (E.D. Cal. Oct. 7, 2014) (concluding that facts demonstrating undercapitalization and use of subsidiaries as conduits were sufficient to raise a plausible inference of an alter ego relationship). The City largely relies on three allegations: (1) Endo Int'l's efforts to ensure that its subsidiaries comply with federal and California law regarding the sale and marketing of pharmaceuticals; (2) Endo Int'l's response and attempt to mitigate opioid sales; and (3) Endo Int'l's Independent Directors Report, which states that Endo Int'l governs its subsidiaries' internal and external interactions. Endo Opp. at 9.

Endo Int'l argues that these facts are insufficient to establish the degree of "pervasive control" necessary to establish jurisdiction under the alter-ego doctrine. Endo Reply (dkt. 216) at

4–5.  It relies on Ranza to argue that these facts indicate an active "parent corporation" that is involved with the "macro-management of its subsidiaries." Id. at 4 (quoting Ranza, 793 F.3d at 1074).  But Endo Int'l's argument and reliance on Ranza largely depends on disputed allegations. For example, Endo Int'l disputes that the 2018 Independent Board of Directors Report plausibly suggests it had pervasive control over its subsidiaries.  Id. at 4–5.  However, the plain language of the report describes a Code of Conduct that "applies to every person conducting business for Endo and to all Endo locations, subsidiaries and affiliates." Endo Opp. Ex. E. (dkt. 202-6) at 4 (emphasis added).  Further, Endo Int'l's Compliance Department—which is overseen by Endo Int'l's Board of Directors—enforces the Code of Conduct.  Id.  A parent corporation that oversees its subsidiaries' internal and external interactions suggests control over "routine matters of day-to-day operation," rather than macro-management.  See Ranza, 793 F.3d at 1074.

In Ranza, the Ninth Circuit concluded that Nike and its subsidiary, NEON, remained separate, and therefore, the court did not impute Nike's contacts to NEON.  Id. at 1073–74.  In order to demonstrate that two entities lack formal separation, the plaintiff must show that one entity "dictates every facet of [the other entity's] business, including routine matters of day-to-day operation." Id. at 1074 (quoting Unocal, 248 F.3d at 926) (internal quotation marks omitted). Ranza sued NEON and Nike for sex and age discrimination in violation of Title VII and argued that the Oregon District Court could impute Nike's contacts to NEON for personal jurisdiction purposes.  Id. at 1065.  Each entity leased its own facilities, maintained its own books and records, entered into contracts on its own, and had separate boards of directors; however, Nike controlled NEON's budget, approved large purchases, established human resources procedures for both entities, involved itself in NEON's hiring decisions, and ensured that the Nike brand was marketed consistently.  Id. at 1074.  The court concluded that Nike and NEON were separate entities because NEON negotiated its own contracts and licenses, made purchasing decisions "without Nike's consultation, and ha[d] its own human resources division that handle[d] day-to-day employment issues." Id.

Contrary to Endo Int'l's argument, the crucial allegations missing in Ranza exist here.  The 2018 Independent Directors Report notes that Endo Int'l oversees and enforces the implementation

of its compliance program.  <u>See</u> Endo Opp. Ex. E. at 1–2, 6.  This includes training employees, developing policies and procedures, auditing and monitoring the implementation of these procedures, and correcting any behavior that deviates from the program.  <u>Id.</u> at 4–5.  Such responsibilities reflect the type of "human resources division that handles day-to-day employment issues" absent in <u>Ranza</u>.  <u>See</u> 793 F.3d at 1074.  Further, the compliance program extends to its salespersons' interactions with healthcare providers, <u>see</u> Endo Opp. Ex. E. at 5, which suggests that "routine [sales] decisions" require some consultation with Endo Int'l's compliance committee—another fact absent in <u>Ranza</u>.  <u>See</u> 793 F.3d at 1074.  These allegations are therefore sufficient—albeit disputed—to demonstrate a pervasive level of control, indicating the existence of an alter-ego relationship.

<u>Endo Int'l's reliance on its subsidiaries' loans and revenue do not suggest an alter ego relationship.</u>  The parties dispute whether Endo Int'l guaranteed loans for its subsidiaries or vice versa.  Compare Endo Opp. at 9 ("Endo International relies on its U.S. Subsidiaries to guarantee its loans and fund its overhead costs.") with Endo Reply at 5–6 ("Endo International has guaranteed certain loans and received revenue from its U.S. operating companies . . . .").  Even if Endo Int'l guaranteed loans for its subsidiaries, this allegation does not  suggest an alter ego relationship.  <u>See, e.g.</u>, <u>Unocal</u>, 248 F.3d at 928 ("[N]o alter ego relationship was created where the parent company guaranteed loans for the subsidiary . . . ." (internal citations omitted)).  Further, the City has cited no decisions recognizing an alter ego relationship based on a subsidiary guaranteeing loans for its parent company.  <u>See</u> Endo Opp. at 9.

<u>Endo Int'l's use of same offices, business, employees, and attorneys as its subsidiaries suggests an alter ego relationship.</u>  Endo Int'l does not dispute that it shares its U.S. headquarters with EHS.  It also shares the same legal counsel and has virtually identical officers and directors as its U.S. subsidiaries.  Endo Opp. at 10.  While these facts alone are not determinative, they weigh in favor of an alter-ego relationship.  <u>See</u> <u>Daewoo Elecs. Am. Inc.</u>, 875 F. 3d at 1250.

<u>Endo Int'l fails to maintain an arm's-length relationship with its subsidiaries because it controls stock and options plans for all Endo employees</u>.  Endo Opp. at 10.  Decisions regarding compensation and incentives constitute day-to-day decisions that evidence control.  <u>See, e.g.</u>,

Pehle v. Dufour, No. 2:06-cv-1889-EFB, 2012 WL 4490955, at \*6 (E.D. Cal. Sept. 28, 2012) ("Here, plaintiff has adequately established that there is a unity of interests . . . since [parent] also dictates the day-to-day business of the corporation, including determinations regarding wage and hour policies."); see also Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Servs., Inc., 206 Cal. App. 3d 1, 11 (1988) (concluding that the parent corporation's control over incentive decisions supports a finding of alter-ego liability). The parties do not dispute that Endo Int'l has control over the stock and option incentive plans for all Endo employees; rather, Endo Int'l argues that such control does not constitute evidence of control over day-to-day decisions. Endo Reply at 6 (citing Fru-Con Const. Corp. v. Sacramento Municipal Utility Dist., No. 05-cv-583, 2007 WL 2384841, at \*5 (E.D. Cal. Aug. 17, 2007); United States v. Pangang Group. Co., Ltd., 879 F. Supp. 2d 1052, 1063–64 (N.D. Cal. 2012)). However, Endo Int'l relies on distinguishable authority, which does not support its argument.[16] Thus, Endo Int'l's control over incentive plans for all Endo employees indicates that Endo Int'l, EPI, and EHS lack corporate separation.

Thus, the City's allegations, accepted as true, establish a prima facie case that Endo Int'l and its U.S. subsidiaries are alter egos because they lack separate and distinct personalities.

ii. **Injustice or fraud.**

Treating Endo Int'l and its subsidiaries as separate entities would result in a substantial injustice to the City. The same analysis that applies to Teva Ltd. and MNK plc applies here. See supra Subpart II.C.2.a.ii; II.C.2.b.ii. Again, given the disputed facts, this Court shall reserve this alter-ego determination until after the parties have the benefit of a full trial record. See, e.g., In re Nat'l Prescription Opiate Litig., 2019 WL 3553892, at \*4. Endo Int'l's motion to dismiss is therefore DENIED WITHOUT PREJUDICE.

---

[16] In Fru-Con Const. Corp., the court concluded that "setting an annual salary budget for employees" constituted "macro-management" decisions, which is distinct from the City's allegation that Endo Int'l controls all stock and option incentive decisions, not simply the budget. See 2007 WL 2384841, at \*5 (emphasis added). Similarly, in Pangang Group. Co., the court did not conclude that the defendant's control over its subsidiaries' salaries weighed against finding "control." On the contrary, the court seemingly acknowledged that it did demonstrate some degree of control. 879 F. Supp. 2d at 1063–64 ("Even if [controlling subsidiaries' salaries] shows some level of control . . . .").

United States District Court
Northern District of California

23

### 3. Successor liability

The City argues that Allergan plc is the successor to Actavis, Inc, (n/k/a Allergan Finance, LLC) and thus, this Court has jurisdiction over Allergan plc pursuant to the successor jurisdiction theory. Allergan Opp. at 8. Personal jurisdiction over a successor company exists where "(i) the court would have had personal jurisdiction over the predecessor and (ii) the successor company effectively assumed the subject liabilities of the predecessor." Swagelok Co., 364 F. Supp. 3d at 1073–74 (internal citations omitted). A successor company assumes its predecessor's liabilities if one of the following exceptions to the presumption of non-liability exists:

> (1) the successor expressly or impliedly agrees to assume the subject liabilities; (2) the transaction amounts to a consolidation or merger of the successor and the predecessor (de facto merger); (3) the successor is a mere continuation of the predecessors; or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts.

Lefkowitz v. Scytl USA, No. 15-cv-05005-JSC, 2016 WL 537952, at *4 (N.D. Cal. Feb. 11, 2016) (citing Ray v. Alad Corp., 19 Cal. 3d 22, 28 (1977)). The successor liability inquiry is highly fact-specific, and thus, courts tend to avoid ruling "on the substantive merits of plaintiffs' case for successor liability at the pleadings stage." Wilson v. Metals USA, Inc., No. CIV. S-12-0568 LKK/GGH, 2012 WL 4888477, at *10 (E.D. Cal. Oct. 12, 2012).

Allergan plc (f/k/a Actavis plc) is incorporated in Ireland and maintains its administrative headquarters in Madison, New Jersey. FAC ¶ 115. Between 2013 and 2015, Allergan plc acquired Warner Chilcott plc, Allergan Finance, LLC (f/k/a Actavis, Inc.), and Allergan, Inc. Id. Allergan Finance, LLC—incorporated in Nevada and headquartered in Madison, New Jersey—is a defendant in the present action. Id. ¶ 117. When Allergan Finance, LLC (f/k/a Actavis, Inc.) became Allergan plc's wholly-owned subsidiary, each of Allergan Finance, LLC's common shares were converted into one Actavis plc share. Id. ¶ 115.

The City asserts three theories to support successor jurisdiction: (1) Allergan plc has expressly and impliedly assumed the liability of numerous defendants in this action, including Actavis, Inc's debts and liabilities; (2) Allergan plc merged or consolidated with Actavis, Inc.; and (3) Allergan plc continued Actavis, Inc.'s business after it was purchased. Allergan Opp. at 8.

24

Allergan plc argues that successor jurisdiction cannot exist because (1) Allergan Finance, LLC is the true successor to Actavis, Inc, and (2) Allergan plc did not engage in an asset sale with Allergan Finance, LLC. Allergan Reply (dkt. 214) at 2.

Allergan plc disputes the validity and weight of the allegations underlying the City's arguments for successor jurisdiction. For example, in addressing the City's "assumption of liabilities" argument, Allergan plc disputes that the agreement between Teva Ltd. and Allergan plc implies that Allergan plc assumed liability for its former generic opioids business, such as Allergan Finance, LLC. Allergan Reply at 4. Moreover, like the arguments in the MDL, Allergan plc disputes that it ever characterized itself as having engaged in the same business as Allergan Finance, LLC, i.e., "distributing, manufacturing, and selling opioids." Compare Allergan Mot. at 10–11 with Allergan Opp. at 10.

As a result of these factual disputes, this Court shall adopt the MDL court's approach and DENY WITHOUT PREJUDICE Teva Ltd., Endo Int'l, MNK plc, and Allergan plc's motions to dismiss for lack of personal jurisdiction until after the parties have the benefit of a full trial record. See Summit Cnty., 2018 WL 3553892, at *5.

### D. Motions to dismiss for insufficient service of process.

Counsel for the Foreign Defendants refused to sign a service waiver because they argue that the City's service must conform with the Hague Convention. See, e.g., Allergan Mot. at 12–13; Teva Mot. at 15; MNK Mot. at 5; Endo Mot. at 3[17]; see also Allergan Opp. Ex. 49 (dkt. 204-38). However, the MDL court ordered all MDL defendants to accept service for a "foreign entity that is a parent or subsidiary of any corporate defendant in the MDL." In re Nat'l Prescription Opiate Litig., No. 1:17-md-2804, ECF No. 1108 (N.D. Ohio Nov. 9, 2018). The City relies on this order, arguing that this Court should deem the Foreign Defendants served because the City attempted to serve the Foreign Defendants' outside counsel in accordance with the MDL court's order. See Allergan Opp. at 24–25; MNK Opp. at 19; Endo Opp. at 17–18; Teva Opp. at 24.

---

[17] Endo Int'l and MNK plc also assert that the complaint should be dismissed for insufficient process under Rule 12(b)(4). See MNK Mot. at 5; Endo Mot. at 3. The analysis for Rule 12(b)(5) is incorporated and applied to these defendants' motion under Rule 12(b)(4).

25

"[A] court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." Thomas, 983 F.2d at 154 (emphasis added) (internal citation omitted). As discussed earlier, this Court will not disturb Judge Polster's decisions "with respect to the entire MDL." Supra Subpart II.A. The MDL court order regarding service for a "foreign entity that is a parent or subsidiary of any corporate defendant in the MDL" applied to all cases in the MDL, including this one. Id. Thus, the City's attempt to serve the Foreign Defendants' counsel constitutes proper service under Rule 12(b)(5).

The Court DENIES Foreign Defendants' motions to dismiss for insufficient service. In accordance with the MDL court's order, domestic defendants must accept service on behalf of any Foreign Defendant that is their parent or subsidiary. See In re Nat'l Prescription Opiate Litig., No. 1:17-md-2804, ECF No. 1108 (N.D. Ohio Nov. 9, 2018).

### E. Motions to dismiss for failure to state a claim.

Defendants bring five motions to dismiss for failure to state a claim.[18] These motions primarily argue that: (1) the RICO claims fail to allege an injury to property or business, racketeering activity, conspiracy, and causation; (2) federal law preempts all state law claims premised on Defendants' alleged duty to halt suspicious orders, marketing, and Defendants' failure to comply with the CSA and its implementing regulations; (3) the public nuisance claim fails to allege affirmative conduct with knowledge of the hazard and causation; and (4) the UCL and FAL claims lack sufficient particularity, do not rely on actionable duties, and ignore the benefits of opioids, among other bases for dismissal.

#### 1. Legal Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019). A complaint must plead "enough facts to state a claim to relief that is plausible on its face."

---

[18] See Def. Mot.; Man. Mot. (dkt. 171); Distr. Mot. (dkt. 170) Wal. Mot.; Anda. Mot. (dkt. 167).

Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake."  Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).  "The circumstances constituting the fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'"  Mou v. SSC San Jose Operating Co. LP, 415 F. Supp. 3d 918, 924 (N.D. Cal. 2019) (quoting Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985)).

If a court does dismiss a complaint for failure to state a claim, it should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to deny leave to amend due to, among other things, "futility of amendment."  Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

### 2.    The FAC's sufficiency under Rules 8 and 9(b) as to Anda.

Anda argues that the City's RICO claim fails because the City has not alleged tortious acts or omissions specifically by Anda.  Anda Mot. at 4–5.  Anda contends that Rule 9(b) requires

United States District Court
Northern District of California

facts "regarding each defendant's involvement in the alleged fraud, including specific facts as to the defendant's alleged misrepresentations . . . ." Id. at 5 (citing Garrison v. Oracle Corp., 159 F. Supp. 3d 1044, 1075 (N.D. Cal. 2016)). However, as the MDL court concluded, this oversimplifies the law. See In re Nat'l Prescription Opiate Litig., No. 1:18-op-45459, 2019 WL 2468267, at *13 (N.D. Ohio Apr. 1, 2019). Rule 9(b) requires facts specific enough to give defendants notice of the conduct that gave rise to the fraud charge. Swartz, 476 F.3d at 764. "There is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." United States ex rel. Swoben v. United Healthcare Ins. Co., 848 F.3d 1161, 1184 (9th Cir. 2016). Anda mischaracterizes the City's permissible "collective allegations" as prohibited "general allegations." See Anda Mot. at 5.

The City alleges that Anda distributed 2,659,892 dosage units of opioids to San Francisco residents over the course of an eight-year period. FAC ¶ 45. During that period, San Francisco experienced 100 to 120 overdose deaths per year, the majority of which were caused by prescription opioids. Id. ¶ 66. Distributors, including Anda, allegedly violated their legal obligations by failing to maintain effective controls to detect and report suspicious orders, which led to diversion. Id. ¶¶ 166, 580. For example, in the eight-year history of Anda's opioid shipments to San Francisco, Anda allegedly never identified a single suspicious order to the California State Board of Pharmacy, despite its obligations to do so. Id. ¶ 913.

Anda, along with the other defendants, allegedly participated in the Healthcare Distribution Association ("HDA"), which Defendants allegedly used as an intermediary to coordinate and ensure that the DEA's aggregate production quotas, individual quotas, and procurement quotas remained high. FAC ¶ 627. Defendants allegedly utilized their membership in the HDA to engage in fraudulent behavior by coordinating their responses to CSA obligations and agreeing not to identify, report, or halt suspicious orders in order to avoid DEA scrutiny. Id. ¶ 714. Anda was allegedly aware that suspicious orders left its facilities, yet it omitted this material information from its reports to the DEA. Id. ¶ 807. Anda and its fellow Supply Chain Defendants also allegedly falsely represented to the DEA that they were complying with their obligations to (1)

design systems to prevent diversion and (2) report suspicious orders to the DEA.  Id. ¶ 804.

While it is true that the City does not identify a specific misrepresentation made by Anda, the law does not impose such a strict pleading requirement.  See, e.g., Swartz, 476 F.3d at 764 ("[T]here is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant.").  Rather, "the purpose of Rule 9(b) is 'to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge.'"  Anda Reply (dkt. 217) at 4 (quoting Swartz, 476 F.3d at 764).  Here, Anda is on notice that, since at least 2006, it has allegedly engaged in fraudulent behavior consisting of failing to maintain effective controls to prevent diversion and omitting material information to the DEA pertaining to suspicious orders of prescription opioids.  FAC ¶¶ 166, 580, 609, 612–30, 714, 715, 858.  These facts are sufficient to put Anda on notice of the "who, what, when, where, and how of the misconduct alleged."  See Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009).

Anda's motion to dismiss is therefore DENIED.

### 3. RICO

The City brings two claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  The first claim asserts that Purdue, Cephalon, Janssen, Endo, and Mallinckrodt ("RICO Marketing Defendants") knowingly participated in and conducted an Opioid Marketing Enterprise by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).  FAC ¶¶ 826–54.  The second claim asserts that Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, Anda, and AmerisourceBergen ("RICO Supply Chain Defendants") formed an Opioid Supply Chain Enterprise and engaged in patterns of racketeering activity—mail and wire fraud—to profit from increased opioid sales in the United States.  FAC ¶¶ 855–85.

Defendants mount numerous challenges to the City's RICO claims, but the Court will address just two: (a) that the City's asserted injuries fail to establish RICO standing because they are not injuries to "business or property," Def. Mot. at 6, 9; and (b) that the City fails to demonstrate proximate causation because its injury is not a direct result of Defendants' predicate

acts.  Man. Mot. at 2, 4; Distr. Mot. at 4.  As explained below, while the City survives the

challenge as to injury, it cannot overcome the challenge as to proximate causation.

### a.    RICO injury.

RICO standing is limited to plaintiffs who have suffered (1) an injury to "business or

property," that is (2) "by reason of" a RICO violation.  In re Volkswagen "Clean Diesel" Mktg.

Sales Practices, & Prod. Liab. Litig., No. 15-md-02672 CRB (JSC), 2017 WL 4890594, at *4–5

(N.D. Cal. Oct. 30, 2017) (quoting 18 U.S.C. § 1964(c)) (internal quotation marks omitted).  The

City argues that Defendants' conduct inflicted three RICO injuries: (1) the extraordinary cost of

providing governmental services to combat the opioid epidemic, Plain. Supp. (dkt. 229) at 6; (2)

damage to the City's physical property, such as its main library, and losses incurred in the

consumer marketplace, id. at 9; and (3) damage to the City's businesses in the form of lost revenue

and clean-up costs.  Opp. at 58–59; Plain. Supp. at 9–10, 14–15.  However, the City may only

recover for the second and third categories of injuries.  See Canyon Cnty. v. Syngenta Seeds, Inc.,

519 F.3d 969, 976 (9th Cir. 2008).  See also Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005) (en

banc) (cognizable RICO injury requires plaintiff to plead "harm to a specific business or property

interest," which is "a categorical inquiry typically determined by reference to state law.").

In Canyon County, the Ninth Circuit dismissed Canyon County's RICO claim, which

sought to hold four companies liable for the costs that Canyon County claimed to have incurred

for "public health care and law enforcement services for undocumented immigrants."  519 F.3d at

971.  First, Canyon County argued that the defendants knowingly employed undocumented

immigrants, which cost Canyon County "millions of dollars for health care services and criminal

justice services for the illegal immigrants who have been employed . . . in violation of federal

law."  Id. at 972–73 (internal quotation marks omitted).  The court held that a government entity

acting in its sovereign capacity, by "seeking to enforce the laws or promote the public well-

being . . . cannot claim to have been 'injured in [its] . . . property' for RICO purposes based solely

on the fact that it has spent money in order to act governmentally."  Id. at 976 (emphases added).

If accepted, Canyon County's argument would have substantially broadened the scope of RICO

liability because "[i]f government expenditures alone sufficed as injury to property," then "any

30

RICO predicate act that provoked any sort of governmental response would provide the government entity with standing to sue . . . ." Id. (emphasis added) (citing 18 U.S.C. § 1964(c)). The court considered this interpretation of RICO "highly improbable," yet it acknowledged that a consumer who has been overcharged may claim an injury to her property in the context of a commercial transaction. Id. Thus, while a consumer has sustained an injury if he is overcharged in a transaction, a governmental entity is not "'injured in its property' when it spends money on . . . additional public services, given that those services are based on legislative mandates and are intended to further the public interest." Id.

Canyon County next argued that, if it did not have a property interest in governmental expenditures, it must have a property interest in the services themselves, e.g., "law enforcement or health care services." Id. at 977. The court rejected this argument as well. It reasoned that a governmental entity does not possess a property interest in law enforcement or health care services, and thus, "a governmental entity is not 'injured in its property' when greater demand causes it to provide additional public services of this type." Id. The court primarily relied on two justifications: (1) the ordinary meaning of "property" does not include local government functions, and (2) the Supreme Court has interpreted section 1964(c)'s statutory framework "to exclude claims for damages to governments' non-proprietary interests." Id. (citing Reiter, 442 U.S. at 341–42). Further, the court relied on the Second Circuit's decision in Town of West Hartford v. Operation Rescue, 915 F.2d 92, 104 (2nd Cir. 1990), which concluded that impaired police and emergency services did not qualify as an injury to a government's business or property. Canyon Cnty., 519 F.3d at 978–79 (citing Town of West Hartford, 915 F.2d at 104). Thus, the court concluded that governmental entities do not have a property interest in governmental services. Id. at 980.

With this understanding of Canyon County, the Court turns to the parties' arguments about the City's claimed RICO injuries in this case.

i.     **Governmental expenditures and services.**

The City relies on the MDL court's analysis of Canyon County to argue that governmental expenditures plus something else are sufficient to constitute a cognizable RICO injury. Opp. at

31

58–59 (citing Summit Cnty., 2018 WL 6628898, at *10). The City argues that the extraordinary

costs, "scope[,] and magnitude" of the opioid epidemic qualify as a "plus" factor necessary to

establish RICO standing. Id.; Plain. Supp. at 7–10. But Canyon County did not hold that

governmental expenditures, particularly health care and law enforcement costs, "plus something

else" can constitute a cognizable RICO injury. While the MDL court suggested that the

extraordinary costs, "scope[,] and magnitude" of the opioid epidemic could create cognizable

RICO injuries, it was following Sixth Circuit precedent. See Summit Cnty., 2018 WL 6628898, at

*10 ("[U]nder the broadest reading of Sixth Circuit precedent . . . [p]laintiffs may recover

damages . . . [incurred] in their capacity as a sovereign . . . .").[19] This view of RICO injury

conflicts with Ninth Circuit precedent, which this Court must follow.

In Summit County, the MDL court held that Summit County's injuries stemmed from

alleged violations of the pharmaceutical defendants' duties as distributors and manufacturers of

Schedule II controlled substances, which it found distinguishable from the injuries asserted in

Canyon County. Id. Further, the MDL court interpreted the use of "solely" in the sentence, "a

governmental body . . . cannot claim to have been 'injured in [its] . . . property' for RICO purposes

based solely on the fact that it has spent money in order to act governmentally," to suggest that

governmental entities could assert a cognizable injury to their property based on expenditures and

"something else." Id. (quoting Canyon Cnty., 519 F.3d at 976). The MDL court thus determined

that Canyon County did not establish "a bright-line rule" that "governmental entities are barred

from seeking RICO claims for services provided in their sovereign or quasi-sovereign capacities."

Id.

Contrary to the MDL court's analysis, Canyon County established that governmental

entities cannot assert a RICO claim based on expenditures or services provided in their sovereign

or quasi-sovereign capacities. 519 F.3d at 976–77. The Ninth Circuit reaffirmed this rule recently

in City of Almaty v. Khrapunov, explaining that in "Canyon County . . . we decided that a

---

[19] The City also argues that the law of the case doctrine bars this Court from deviating from "MDL rulings absent clear error or intervening change in law or fact," but, as noted earlier, this doctrine does not apply to separate cases. See supra Subpart II.A.

government's expenditures on healthcare and policing services are not an injury to business or property because the government does not have a property interest in the services it provides to enforce law and promote public welfare." 956 F.3d 1129, 1133 (9th Cir. 2020). The Fifth Circuit also concluded that governmental entities "cannot claim damages for general injury to the economy or 'to the Government's ability to carry out its functions.'" Welborn v. Bank of New York Mellon Corp., 557 Fed. Appx. 383, 387 (5th Cir. 2014) (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 265 (1972)).

Moreover, while both the City and MDL court interpret Canyon County's use of "solely" to imply "that [municipalities] might be able to assert an injury to their property based on the expenditure of money plus something else," context suggests a different interpretation. Plain. Supp. at 8 (quoting Summit Cnty., 2018 WL 4895856, at *10). In Canyon County, the court first rejected any argument that governmental "expenditures alone" were sufficient to confer RICO standing. 519 F.3d at 976 (emphasis added). The court subsequently analyzed whether Canyon County had a RICO property interest in its services:

> As the County cannot satisfy the requirement of injury to a "specific property interest" based solely on its expenditure of money to provide public services, we must examine whether the County can claim a property interest in the services themselves.

Id. (emphases added). In this context, the use of "solely" followed by "themselves" reflects the unique, co-dependent relationship of "expenditures" and the "services" they produce, not an invitation to consider unrelated factors—such as the scope or magnitude of an event—that would cumulatively create a property interest. To the contrary, after determining that governmental services do not qualify—either independently of or in conjunction with expenditures—as a property interest, the court held that "the costs of . . . law enforcement and public health care services are not recoverable damages under civil RICO." Id. at 980; see also City of Almaty, 956 F.3d at 1133. Thus, the court's use of "solely" did not endow governmental entities with standing to sue based on expenditures "plus something else." Contra Summit Cnty., 2018 WL 4895856, at *10.

In addition, the City argues that it does not seek to recover the "ordinary and customary

costs related to everyday governmental services" that <u>Canyon County</u> addressed.  Plain. Supp. at 7–9; Mot. Trans. (dkt. 272) at 14, 17–20.  But nothing in <u>Canyon County</u> suggests that the Ninth Circuit distinguished between "extraordinary costs" and "ordinary costs."  In fact, the costs in <u>Canyon County</u> largely parallel the costs here.  The City seeks to recover the costs for

> 'additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction and disease,' 'training emergency and/or first responders and other city employees in proper treatment of drug overdoses,' 'training emergency and/or first responders and other city employees in proper treatment of drug overdoses,' and 'emergency responses . . . to opioid overdoses.'

Plain. Supp. at 8 (citing FAC ¶¶ 851, 882).  <u>Canyon County</u> alleged that it was "forced . . . to pay millions of dollars for health care services and criminal justice services" as a result of the defendant corporations' conduct.  519 F.3d at 971.  The nature of the expenses are virtually identical.  Def. Supp. at 5.  For example, "training emergency and/or first responders and other city employees in proper treatment of drug overdoses," FAC ¶ 851, falls within the category of "law enforcement and health care services" that the court held are "not recoverable damages under civil RICO."  <u>Canyon Cnty.</u>, 519 F.3d at 980.  Further, neither the City nor the MDL court articulate where the line is between "ordinary" and "extraordinary" costs, aside from the amorphous concept of "scope and magnitude."  Opp. at 58–59 (<u>Summit Cnty.</u>, 2018 WL 4895856, at *10).

The Court therefore rejects any "extraordinary cost" exception to RICO standing.

### ii.    **Injuries to the City's property interests.**

<u>Real Property</u>.  The City also alleges that it has suffered "[i]ncreased costs associated with the destruction of city property and public infrastructure" related to improper needle and syringe disposal.  FAC ¶ 851(g).  <u>Canyon County</u> does not preclude the City from recovering under RICO for such injuries.  <u>See</u> Plain. Supp. at 9–10.  Governmental entities have non-sovereign, proprietary interests, which include "own[ing] land or participat[ing] in a business venture."  <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez</u>, 458 U.S. 592, 601 (1982); <u>see</u> <u>Oscar v. University Students Co-op. Ass'n</u>, 965 F.2d 783, 786 (9th Cir. 1992) (recognizing as

34

1    "compensable under RICO" "out-of-pocket expenditures as a . . . result of the racketeering

2    activity . . . for example costs incurred to repair damage to [] personal property . . . .") <u>abrogated</u>

3    <u>on other grounds by</u> <u>Diaz v. Gates</u>, 420 F.3d 897 (9th Cir. 2005).

4            Defendants argue that this injury is "identical" to the injuries rejected in <u>Canyon County</u>.

5    Def. Supp. at 2; Def. Mot. at 8.  However, Defendants fail to identify any damage to Canyon

6    County's real property that parallels the claimed damage to the City's existing real property.

7    Further, Defendants abandoned their argument at the hearing, conceding that the damage to the

8    main library's toilet grinders amounts to a cognizable RICO injury.  Mot. Trans. at 26.  The City

9    also asserted that, if granted leave to amend, it would allege additional injuries to its property,

10   including damage to its sewage system, park bathrooms, and navigation centers.  <u>Id.</u> at 15–16.

11   Thus, the damages to the City's existing real property constitute cognizable RICO injuries.

12           <u>Consumer or Market Participant</u>.  A governmental entity can also recover losses sustained

13   "as a consumer or other type of market participant."  <u>Canyon Cnty.</u>, 519 F.3d at 976.  When a

14   consumer operating as a commercial enterprise "suffers a loss of money[,] it suffers an injury in

15   both its 'business' and 'property.'"  <u>Reiter</u>, 442 U.S. at 340.  A consumer suffers an injury to their

16   business when a party inhibits their ability to provide a commercial service.  <u>See id.</u>  A consumer

17   suffers an injury to its property when a party deprives the consumer's commercial enterprise of

18   money.  <u>See</u> <u>Canyon Cnty.</u>, 519 F.3d at 976.

19           The City argues that its purchase of naloxone, buprenorphine, protective equipment,

20   specialized screening equipment, and specialized training courses and materials for handling and

21   disposing of fentanyl constitute injuries in its proprietary capacity as a "consumer or other type of

22   market participant."  Plain. Supp. at 10 (quoting <u>Canyon County</u>, 519 F.3d at 976 (internal

23   quotation marks omitted)); FAC ¶¶ 57, 61, 851, 882; Mot. Trans. at 19 ("Training librarians to

24   deal with patrons in crisis and in overdose is different than just hiring or training more librarians

25   as librarians.").  The City attempts to distinguish <u>Canyon County</u> by arguing that it is unclear

26   whether Canyon County alleged that it was forced to purchase "weapons and cars" to deal with the

27   corporate defendants' hiring of undocumented immigrants.  Plain. Supp. at 12.  Regardless, the

28   City argues that its expenditures—naloxone, opioid-screening equipment, training courses and

1   materials for opioid disposal, buprenorphine—are "qualitatively different." Id.  Unlike weapons

2   and cars, the City's expenditures "relate specifically—and exclusively—to combating the opioid

3   pandemic . . . ." Id. (emphasis included).

4       There are two flaws with the City's argument.  First, Canyon County requires that a

5   consumer injury arise out of a commercial transaction, which the City has not alleged.  519 F.3d at

6   976 ("[G]overnment entities that have been overcharged in commercial transactions and thus

7   deprived of their money can claim injury to their property.").  The City relies on Reiter, 422 U.S.

8   at 342 and Hawaii v. Standard Oil Co., 405 U.S. 251 (1972), to argue that its "forced"

9   expenditures constitute an injury.  Plaintiff's Supp. at 11–12.  But in each of these cases, the

10  alleged injuries—typically overcharges in a commercial transaction—arose from the commercial

11  transaction between the parties.  See, e.g., Reiter, 422 U.S. at 330 ("She and the class . . . have

12  been forced to pay illegally fixed higher prices."); Standard Oil Co., 405 U.S. at 253

13  ("[O]vercharges for petroleum products . . . .").  Unlike Reiter and Standard Oil Co., the City does

14  not allege that its injury derived from some distortion in the marketplace—such as an

15  overcharge—or other wrongful conduct stemming from the transaction itself.  Rather, the City's

16  alleged injury stems from Defendants allegedly forcing the City to engage in commercial

17  transactions with third parties.  But none of the cases recognize injuries arising from external

18  conduct, like Defendants' predicate acts, that did not impact the terms of a transaction.  That

19  Defendants did not engage in wrongful conduct related to the City's transactions for Naloxone and

20  other products demonstrates that these cases are not applicable.

21      Second, if accepted, the City's argument would blur the distinction between recoverable

22  proprietary harms and unrecoverable governmental harms.  This argument would enable all

23  purchases that further a governmental purpose to qualify as a RICO injury, thus creating an end-

24  run around Canyon County's holding.  519 F.3d at 976 ("If government expenditures alone

25  sufficed as injury to property, any RICO predicate act that provoked any sort of governmental

26  response would provide the government entity with standing to sue under § 1964(c)—an

27  interpretation of the statute that we think highly improbable.").  The City argues that it would not

28  create an end-run around Canyon County because it draws a line at purchases that would not have

United States District Court
Northern District of California

36

been made absent the opioid epidemic. Plain. Supp. at 12. This argument only works if the Court accepts that, historically, all opioid use, including heroin, stems from Defendants' conduct. But opioid addiction and abuse existed long before Defendants' alleged Marketing and Supply Chain Enterprises, see FAC ¶ 177, and many heroin users never use prescription opioids. Id. ¶ 5. These allegations belie the City's argument that its purchases stem solely from Defendants' conduct. The City presumably incurred opioid-related expenditures for emergency and law enforcement services prior to the opioid epidemic, which suggests that these expenditures are not substantively different from traditional government expenditures. Because the City used these expenditures to promote its residents' public welfare, a core government function, none constitute injuries in the City's proprietary capacity.

### iii. Injuries to the City's business interests.

Finally, the City argues that its parking lot and advertising businesses have incurred opioid-related clean-up expenses and lost revenue, both of which constitute cognizable injuries to its "businesses." Plain. Supp. at 14–15. Sovereign entities that undertake commercial business endeavors, such as providing a service or goods, are "engaged in a business" for purposes of RICO standing. Reiter, 442 U.S. at 340. However, the City failed to plead these injuries in its FAC, and only raised the argument in its supplemental brief. At the hearing, the City listed several injuries to its businesses that it would include in its complaint, if granted leave to amend. Mot. Trans. at 17–20. The Court will assume for the following proximate cause analysis that the City has adequately pled injuries to its businesses.

Thus, while the bulk of the City's alleged injuries do not constitute cognizable RICO injuries, the City has alleged a cognizable injury to its real property and businesses.

### b. Proximate Cause.

A plaintiff must show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992). The City must therefore demonstrate that there is "some direct relation between [its asserted injury] and the injurious conduct alleged." Id. at 269 (emphasis added). The City's only surviving RICO injuries stem from its allegation that Defendants' conduct caused damage to city-

37

owned property and businesses, such as the City's main library.  FAC ¶¶ 57, 851(f); see also supra Subpart II.E.3.a.  As discussed below, these injuries are too attenuated to satisfy RICO's narrow definition of proximate cause.  See, e.g., City of Oakland v. Wells Fargo & Co., et al., No. 19–15169, 2020 WL 5035815, at *12 n.22 (9th Cir. 2020) ("[T]he Supreme Court has clearly held that RICO 'should not get . . . an expansive reading' . . . ." (quoting Holmes, 503 U.S. at 266)).

### i.  Basic Legal Framework.

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).  Proximate cause "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'"  Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654–55 (2008) (quoting Holmes, 503 U.S. at 272 n.20).

Three main cases guide this Court's analysis of direct causation: Bridge, 553 U.S. at 639; Hemi Grp., LLC v. City of New York, 559 U.S. 1 (2010) ("Hemi"); and Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd., 943 F.3d 1243 (9th Cir. 2019) ("Painters").  In Bridge, the Court concluded that the plaintiffs, a group of losing auction bidders, satisfied proximate cause by demonstrating that their injury—the loss of property liens—was the direct result of the defendant bidders' fraudulent misrepresentations to the county.  553 U.S. at 658.  The defendants allegedly engaged in a scheme in which they submitted false statements to the county's office that enabled them to obtain more liens in auctions than would otherwise be permitted under the county's auction rules.  Id. at 643–44.  The Court determined that "[i]t was a foreseeable and natural consequence of petitioners' scheme . . . that other bidders would obtain fewer liens" because the scheme directly siphoned away property liens from compliant bidders, and there were no independent factors that could account for the plaintiffs' injury.  Id. at 658.  Thus, the Court held that the plaintiffs had established proximate cause.  Id.

In Hemi, the Supreme Court dismissed a RICO action by the City of New York against an out-of-state tobacco company, Hemi, for failing to file required customer information with the state in conformance with the Jenkins Act.  559 U.S. at 4.  Hemi's failure allegedly caused the City of New York to lose millions of dollars in unrecoverable tax revenue because it could not

determine which of Hemi's customers had paid the city's tax.  Id. at 9.  The city of New York  and the dissent relied on Bridge to argue that proximate cause should turn on whether the defendant's conduct could foreseeably cause the harm, not just whether it directly caused the harm.  Id. at 28 (Breyer, J., dissenting) (citing Bridge, 553 U.S. at 657–59).  The plurality rejected this argument for two reasons.  First, it determined that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.  Indeed, Anza and Holmes never mention the concept of foreseeability."  Id. at 12.  Second, Bridge's causal chain did not involve any intervening third-party conduct, which meant that the defendants' conduct directly caused the plaintiffs' harm.  Id. at 11.  Thus, the plurality concluded that the City of New York's theory stretched proximate cause too far because the customers' failure to pay their taxes, not Hemi, was "directly responsible for the City's harm . . . ."  Id. at 11.

Justice Ginsburg concurred with the plurality's judgement because she concluded that the City of New York's RICO claim was an attempt to "assert authority to collect tobacco taxes from Hemi [] or to reshape the . . . limited remedies Congress imposed for violations of the Jenkins Act."  Id. at 19 (Ginsburg, J., concurring).  However, Justice Ginsburg expressly did not join the plurality's proximate cause analysis.  Id.  Justice Ginsburg's concurring opinion represents the narrowest grounds of agreement between the Justices who concurred in the judgment, and thus, constitutes the controlling opinion in Hemi.[20]  See Marks v. United States, 430 U.S. 188, 193 (1977).  Therefore, the plurality's deemphasis on foreseeability does not control lower courts' proximate cause inquiries.

Nevertheless, the Ninth Circuit has generally followed the Hemi plurality's approach.  See, e.g., Fields v. Twitter, Inc., 881 F.3d 739, 748 (9th Cir. 2018) (relying on the Hemi plurality to conclude that "Congress chose to use the phrase 'by reason of' to require proximate cause showing, and the Court has consistently rejected arguments that this language requires only foreseeability[,]" and interpreting Hemi as "affirming Anza's rejection of foreseeability in favor of

---

[20] Justice Sotomayor recused herself because she joined the Second Circuit's decision below, which considered foreseeability in its proximate cause analysis.  See City of New York v. Smokes-Spirits.com, Inc., 541 F.3d 425, 440–42 (2d Cir. 2008).

focus 'on the directness of the relationship between the conduct and the harm . . . .'"); Couch v. Cate, 379 Fed. Appx. 560, 565 (9th Cir. 2010) ("The Supreme Court recently clarified that this proximate cause requires 'some direct relation between the injury asserted and the injurious conduct alleged' and explicitly rejected foreseeability as a standard for determining proximate causation." (quoting Hemi, 559 U.S. at 12)). However, recently, in Painters, foreseeability crept back into the Ninth Circuit's proximate cause analysis. 943 F.3d at 1260.

Painters incorporates the Hemi plurality's direct injury requirement while leaving room for foreseeability to play a role in determining whether an intervening event severed the causal chain. See 943 F.3d at 1250, 1260. A group of patients whose physicians prescribed them Actos, a diabetes treatment drug, brought a RICO suit against Takeda Pharmaceuticals—the manufacturer of Actos—for engaging in a marketing campaign to intentionally mislead physicians about the drug's efficacy. Id. at 1247. Takeda argued that the prescribing physicians constituted "intervening causes that sever[ed] the chain of proximate cause . . . ." Id. at 1257. The court rejected this argument and held that prescribing physicians could not constitute an intervening cause because "[a]n intervening cause is a 'later cause of independent origin that was not foreseeable.'"[21] Id. (quoting Mendez v. Cnty. of Los Angeles, 897 F.3d 1067, 1081 (9th Cir. 2018)). "[I]t was perfectly foreseeable that physicians who prescribed Actos would play a causative role in Defendants' alleged fraudulent scheme to increase Actos's revenues." Id. (emphasis included). Indeed, the fraudulent scheme necessarily contemplated that physicians would play such a role. See id. The court thus concluded that the causal chain alleged was consistent with the Hemi plurality's focus on "the direct relation between the alleged violation and alleged injury," and thus, satisfied proximate cause. Id. (citing Hemi, 503 U.S. at 12).

In addition to evaluating the directness of the causal relationship, courts typically consider the Holmes factors, which are three nonexhaustive policy considerations that help determine whether an injury is too remote to permit recovery. They are:

---

[21] This is consistent with the dissent in Hemi, which asserted that "an intervening third-party act, even if criminal, does not cut a causal chain where the intervening act is foreseeable and the defendant's conduct increases the risk of its occurrence." Hemi, 559 U.S. at 25 (Breyer, J., dissenting).

> (1) whether there are more direct victims of the alleged wrongful conduct who can
> be counted on to vindicate the law as private attorneys general; (2) whether it will
> be difficult to ascertain the amount of the plaintiff's damages attributable to
> defendant's wrongful conduct; and (3) whether the courts will have to adopt
> complicated rules apportioning damages to obviate the risk of multiple recoveries.

In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., 349 F. Supp. 3d 881, 906 (N.D. Cal. 2018) (quoting Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1169 (9th Cir. 2002); see also In re Bextra & Celebrex Mktg. Sales Practices, No. 11-CV-00310 CRB, 2012 WL 3154957, at *4 n.8 (N.D. Cal. Aug. 2, 2012). Even if several factors weigh in favor of a particular outcome, one factor alone can be dispositive. See Oregon Laborers-Emp. Health & Welfare Tr. Fund v. Philip Morris Inc., 185 F.3d 957, 965 (9th Cir. 1999) ("Oregon Laborers") ("The difficulty of ascertaining the damages attributable to defendants' alleged wrongful conduct and the complexity involved in calculating these damages weigh heavily, if not dispositively, in favor of barring plaintiffs' actions."); City of Los Angeles v. Wells Fargo & Co., 22 F. Supp. 3d 1047, 1058 (C.D. Cal. 2014) ("Oregon Laborers sets forth a three-factor test and not an elements test, so even if one factor tips in favor of Defendants' position, the totality of the circumstances compels the Court to find in favor of the City.").

This Court will first evaluate whether Marketing and Supply Chain Defendants directly caused the injuries to city-owned property, and then address those policy considerations.

### ii. The Causal Chain Most Resembles Hemi.

While the parties agree that the City must allege a causal chain in which the Defendants' violations led directly to the City's injuries, they disagree as to whether the causal chain here is more akin to the chain that the Supreme Court accepted in Bridge, 553 U.S. at 657–58, and to the one that the Ninth Circuit accepted in Painters, 943 F.3d at 1260, or to the chain that the Supreme Court rejected in Hemi, 559 U.S. at 2. Defendants are correct that this case is more like Hemi.

The City's theory here is that Defendants' predicate acts—mail fraud, wire fraud, and CSA violations—caused the City's property damage, which it sustained when individuals improperly disposed of the needles they used to inject illegal drugs.[22] See FAC ¶¶ 826–85. But unlike the

---

[22] The City alleges that Defendants' conduct caused addicted residents to revert to other illegal and intravenous drugs, such as heroin and methamphetamine. See FAC ¶ 59.

predicate acts in <u>Bridge</u> and <u>Painters</u>, RICO Marketing and Supply Chain Defendants' predicate acts did not directly cause the City's harm. The City's causal chain resembles the chain rejected in <u>Hemi</u>: it involves too many links and depends on independent and intervening acts—including criminal conduct—by third and fourth parties. For example, third—and potentially fourth and fifth—parties allegedly diverted or sold illicit opioids, administered opioids intravenously,[23] and improperly discarded the used needles, which harmed city-owned property and businesses. While it is plausible that Defendants' conduct <u>enabled</u> this third-party behavior, it is impossible to conclude that Defendants' conduct <u>directly</u> caused the City's harm within the meaning contemplated by <u>Hemi</u>.

First, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step," <u>see</u> <u>Holmes</u>, 503 U.S. at 272 (quoting <u>Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 533 (1918)) (internal quotation marks omitted), but the relationship here between Defendants' conduct and the City's harm extends well beyond the first step. Unlike <u>Painters</u>, where the court concluded that the defendant manufacturers' conduct (the predicate act) flowed through intermediary prescribers (Link 1) and pharmacists (Link 2) to directly cause patients to purchase manufacturers' drug (the harm), 943 F.3d at 1257, here, under the most generous reading of the City's causal chain, Defendants' conduct (the predicate act) flows through prescribing physicians (Link 1), pharmacists (Link 2), and patients (Link 3) who then illegally misuse opioids, improperly discard the needles, and thus damage city-owned property and businesses (the harm).[24] Neither the Ninth Circuit nor the Supreme Court have ever accepted a RICO proximate cause theory that involves three intermediaries.

---

[23] To the Court's knowledge, Manufacturers did not design their products to be administered intravenously; however, opioid users allegedly manipulated some products, like Opana ER, to abuse intravenously. <u>See, e.g.</u>, FAC ¶ 387. This is significant because it theoretically shortens the chain of causation to a lone third-party, who receives a prescription, manipulates the prescription, administers the opioid intravenously, and improperly disposes of the needle.

[24] This chain assumes that damage to city-owned property stems from prescribed opioids that have been manipulated for intravenous use; however, the FAC indicates that addiction and overdoses from heroin, fentanyl, and methamphetamine have skyrocketed, which would add an additional step in the causal chain, namely a drug dealer who provides illegal narcotics or diverted opioids. FAC ¶¶ 5, 16, 19, 52, 59, 62–71.

Second, the nexus leading to the City's injuries is qualitatively different from the nexus leading to the injuries in <u>Bridge</u> and <u>Painters</u>. <u>City of Oakland</u> instructs courts to focus "on the <u>continuity</u> between the defendant's alleged violation and the plaintiff's indirect injury, not how many 'steps' were in between." 2020 WL 5035815, at *13 (emphasis added) (citing <u>Bridge</u>, 553 U.S. at 653–58). There, the court concluded that "plaintiffs need not be the most immediate victims of a defendant's misconduct to satisfy proximate cause, as long as their injuries have some direct relation and are surely attributable to the misconduct." <u>Id.</u> Here, the City's property damage is not "surely attributable" to Defendants' misconduct, and therefore, lacks continuity. <u>See id.</u> The City's injuries are "surely attributable" to drug users, not Defendants. Some of these drug users suffered injuries—such as addiction and overdoses—that directly[25] stemmed from Defendants' predicate acts. However, unlike <u>Bridge</u> and <u>Painters</u>, where the defendants' conduct flowed through unharmed intermediaries (in <u>Bridge</u>, the county treasurer's office; in <u>Painters</u>, prescribing physicians), here the drug users cannot fairly be characterized as "intermediaries" because they subsequently engaged in separate conduct—discarding needles—that injured the City. This makes them unlike the physicians in <u>Painters</u> who, as contemplated by the fraudulent scheme, would prescribe a harmful drug to their patients. 943 F.3d at 1256. And this distinct third-party conduct severed any continuity stemming from Defendants' predicate acts, making the relationship between those acts and the City's injury insufficiently direct. <u>See Anza</u>, 547 U.S. at 458 (holding that the causal relationship was insufficiently direct because the plaintiff's asserted harms "were entirely <u>distinct</u> from the alleged RICO violation (defrauding the state)" (emphasis added)).

Third, at oral argument, the City argued that drug users' injury-causing conduct was not an independent intervening act because it <u>foreseeably</u> resulted from Defendants' RICO violations, given the impact of addiction on voluntariness. <u>See</u> Mot. Trans. at 35–36. "An intervening cause is a 'later cause of independent origin that was not foreseeable.'" <u>Painters</u>, 943 F.3d at 1257 (quoting <u>Mendez</u>, 897 F.3d at 1081). Courts must evaluate foreseeability retrospectively "when

---

[25] These injuries directly stem from the sources that provide the opioids to drug users, such as a prescribing physician, pharmacist, or drug dealer.

United States District Court
Northern District of California

assessing whether an intervening event" breaks the causal chain.  Mendez, 897 F.3d at 1081–82.  It is unclear whether voluntariness is a requirement of the intervening causes doctrine.[26]  Compare City and Cnty. of San Francisco v. Philip Morris, Inc., 957 F. Supp. 1130, 1137–38 (N.D. Cal. 1997) (concluding that voluntariness is not a requirement of the intervening causes doctrine) with Falise v. American Tobacco Co., 94 F. Supp. 2d 316, 344 (E.D.N.Y. 2000) (concluding that nicotine addiction cannot be an intervening cause).  Regardless, it is unlikely that Defendants could foresee that their predicate violations—wire fraud, mail fraud, and violations of the CSA— would cause drug users to litter needles on municipal property.  Defendants' violations foreseeably caused physicians to prescribe more opioids, and consequently increased rates of addiction and overdoses.  But it is difficult to foresee the City's harm as the links in the causal chain become more attenuated.  See Paroline v. United States, 572 U.S. 434, 445 (2014) ("A requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.").

The City's attenuated chain is unlike any that the Supreme Court or Ninth Circuit has approved in the RICO context; in principle, it is more like Joseph Herscher's Rube Goldberg Machine, "How to Pass the Salt While Maintaining Proper Social Distance," which includes over one hundred steps and ends with the following events: (1) a marble ball knocks over a domino; (2) the domino knocks over other dominoes, (3) those dominoes eventually dislodge a glass cup; (3) the cup rolls, spilling salt until the cup hits another ball; (4) the next ball rolls through a ramp, collides with a barrier, and falls into a hanging cup; (5) the weight of the ball pulls the string attached to the cup; (6) the string pulls a wheel containing the spilled salt; (7) the wheel rotates

---

[26]  Under the City's theory, Defendants would be liable for all conduct perpetuated by addicted individuals, which would not only make damages incalculable but impose "infinite liability" on defendants, a result that the Supreme Court discouraged in Holmes.  503 U.S. at 266 n.10 ("In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond.  But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would set society on edge and fill the courts with endless litigation." (internal quotation marks omitted) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984))).

United States District Court
Northern District of California

into a hand broom; and then several more events occur before (8) a toy dump truck pushes the spilled salt into a spoon that slams into a container, tossing the salt onto Joseph's food. Joseph's Machines, How to Pass the Salt While Maintaining Proper Social Distance, YouTube (Mar. 22, 2019) https://www.youtube.com/watch?v=nORRgU8sGdE&list=RD166mE6lPig4&index=4. It is foreseeable that the first rolling marble would knock over the domino, and that that domino would knock over other dominoes, but it is not foreseeable that this first event would cause a series of events that resulted in salted food. Although the City's causal chain is not nearly so convoluted, the same principle applies. It is foreseeable that Defendants' predicate acts would result in increased prescriptions by doctors and a subsequent increase in addiction and overdoses, but it is not foreseeable that addicted individuals would turn to illegal opioids, administer them intravenously on City property, then discard the needles in a manner that injured the City. Even if the harm is foreseeable in some sense— because, in retrospect, one can draw a line, however zig-zagged, from the final event (a needle-clogged toilet) back to the first (a pamphlet marketing opioids)—it extends beyond the Supreme Court's acceptable scope of directness. See Hemi, 559 U.S. at 10 ("'The general tendency of the law, in regard to damages at least, is not to go beyond the first step.' . . . Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement." (quoting Holmes, 503 U.S. at 271–72)).[27]

---

[27] Even under the Hemi dissent's broader proximate cause formulation, the City's injury was arguably not foreseeable in the relevant sense. See 559 U.S. at 22–29 (Breyer, J., dissenting). The dissent would apply a test of "reasonable" foreseeability, focusing on factors such as whether the defendant committed its predicate acts "in order to" bring about the alleged injury, and whether that injury falls "within the bounds of the kinds of harms" that the law proscribing those predicate acts "seeks to prevent." Id. at 22–23 (emphasis in original). Here, there is no indication that the drug users' actions that damaged city property furthered Defendants' alleged scheme, or that the laws proscribing Defendants' misrepresentations and oversupply of prescription opioids were intended to prevent drug users from discarding their needles in a manner that injured the City's property and business interests.

United States District Court
Northern District of California

Because the City's RICO claim most closely resembles <u>Hemi,</u> the City has failed to establish a direct relationship between its injuries and Defendants' predicate acts. Such failure is fatal to the City's RICO claim.

### iii.    <u>Holmes</u> factors.

The <u>Holmes</u> factors further support Defendants' argument that proximate cause does not exist. 503 U.S. at 269.

First, <u>Holmes</u> establishes that when more directly injured victims can be counted on to vindicate the law, less directly injured victims cannot satisfy RICO's proximate cause requirement. 503 U.S. at 269–70. In <u>Oregon Laborers</u>, the court rejected health care funds' RICO claims against tobacco manufacturers. 185 F.3d at 964. The health care funds alleged that tobacco companies fraudulently downplayed the health risks associated with smoking, which led to more smoking related diseases. <u>Id.</u> at 961. As a result, the health care funds incurred higher expenditures to cover their participants' medical bills. <u>Id.</u> at 961. The court held that "no direct link [existed] between the alleged misconduct of defendants and the alleged damage to plaintiffs" because <u>all</u> of the health care funds' claims relied on "alleged injuries to smokers" and "without any injury to smokers, plaintiffs would not have incurred" their injuries. <u>Id.</u> at 963 (emphasis included) (internal citations omitted). Further, the court determined that smokers' self-interest would motivate them to vindicate their injuries, making them the most reliable and direct victims. <u>Id.</u> at 964. Thus, the health care funds' injuries were too remote to establish proximate cause.

Here, as in <u>Oregon Laborers</u>, the City's alleged injuries are not directly related to Defendants' conduct because the City would not have suffered its injuries but-for city residents' own injuries: addiction, utilizing intravenously administered drugs, and overdoses. 185 F.3d at 964. As discussed above, the City's injuries result from city residents' improper disposal of needles, which is independent of Defendants' predicate acts. The City argues that its residents are less likely to vindicate their rights because they engaged in illegal conduct that would bar their recovery. <u>See</u> Opp. at 68 (citing <u>Mendoza</u>, 301 F.3d at 1170 (concluding that undocumented workers could not be counted on to bring suit for backpay because several decisions barred their

46

ability to recover backpay wrongfully withheld)). Not so. Illegal drug use does not bar recovery under California's tort regime. See Whittemore v. Owens Healthcare-Retail Pharmacy, Inc., 185 Cal. App. 4th 1194, 1197 (2010) ("[T]he doctrine of unclean hands does not preclude recovery in circumstances covered by the [Drug Dealer Liability] Act because the very purpose of the Act is to permit recovery in specified circumstances by the user and others damaged by the illegal use of drugs.") (citing Cal. Health & Safety Code §§ 11705–06); Kim v. Interdent Inc., C. 08-5565 SI, 2009 WL 3833832, at *3 (N.D. Cal. Nov. 16, 2009) (concluding that the wife of decedent who died of a Fentanyl overdose stated viable negligence and wrongful death claims, based in part on violations of the CSA, against a company that provided Fentanyl); Easley v. 3M Co., C. 07-03507, 2007 WL 3217536, at *2 (N.D. Cal. Oct. 29, 2007) (concluding that the plaintiffs' daughter's consumption of illegal drugs did not bar their negligence claim). The City's harm derives from its residents' harm, and these residents can recover for such harms under state tort law. See Holmes, 503 U.S. at 273.

Second, difficulty "ascertain[ing] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors" weighs against finding proximate cause. Holmes, 503 U.S. at 269. The nature of the City's alleged injuries creates difficulties in ascertaining the damages attributable to Defendants' wrongful conduct. The City's claim would force this Court to parse out individual contributions to the City's injuries among (1) RICO Marketing Defendants, (2) RICO Supply Chain Defendants, (3) opioid-addicted residents that damage city property, (4) individuals who supplied the opioids to the addicted residents, and (5) sources who supplied residents with illegal paraphernalia. See Distr. Reply at 5. This weighs "heavily, if not dispositively, in favor of barring plaintiffs' actions." See Oregon Laborers, 185 F.3d at 965.

Third, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." Holmes, 503 U.S. at 269. Like the nicotine users in in Oregon Laborers, opioid users can recover under state tort law theories. 185 F.3d at 966. This raises concerns that courts will not be able to protect Defendants from

United States District Court
Northern District of California

47

duplicative recovers.  See id.  At the very least, courts will be forced to adopt "complicated rules apportioning damages among" a long list of plaintiffs.  See Holmes, 503 U.S. at 269.  In addition to individuals claims by opioid users and their families, the State of California, hospitals, physicians, and pharmacists may also seek relief against Defendants.  The difficulty of apportioning damages and risk of duplicative recoveries therefore cuts against the City's claim.

Each of the Holmes factors suggest that the City's RICO claim against Defendants is too remote, which suggests a lack of proximate cause.

### iv.   Summit County is Distinguishable.

Nor does Summit County require the Court to conclude that RICO Marketing and Supply Chain Defendants caused damage to city-owned property and business.

First, Summit County's causal chain focused on RICO injuries that the MDL court defined as "costs associated with . . . attempts to stop the flow of opioids into local communities."  2018 WL 6628898, at *5.  That is not an injury this Court recognizes, as discussed above.  The City's RICO injury here consists of costs associated with damage to city property and businesses.  See FAC ¶ 882(g).

Second, based on that RICO injury, the MDL court narrowed the causal chain to three links:

> i.   "RICO Marketing Defendants made deceptive claims in promoting their opioids in order to sell more opioids than the legitimate medical market could support (the conduct);
> ii.  [T]he excess opioids marketed by the RICO Marketing Defendants and distributed by the RICO Supply Chain Defendants were then diverted into an illicit, black market;
> iii. Plaintiffs were forced to expend resources beyond what they had budgeted to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up."

Summit Cnty., 2018 WL 6628898, at *5.  But the MDL court's chain omits the city residents who (1) ingested or injected opioids and (2) subsequently damaged city-owned property and businesses.  See FAC ¶ 882(g).  This Court has previously rejected four-step causal chains that show such hallmarks of indirectness and that give rise to a risk of duplicative recoveries.  See In re Volkswagen "Clean Diesel" Mktg., 2020 WL 3316116, at *4 (citing Holmes, 503 U.S. at 15).

48

Summit County is therefore distinguishable because the City's injuries here are more attenuated from the injury-causing conduct.

### v. Conclusion as to Proximate Causation.

The City's causal chain as alleged in the FAC does not satisfy proximate cause under prevailing case law. See Hemi, 559 U.S. at 11; Painters, 923 F.3d at 1250–51. The City's failure to adequately allege proximate cause is fatal to its RICO claims. Thus, the Court GRANTS Defendants' Motions to Dismiss both RICO claims. The Court does so with prejudice because the City can only allege indirect injuries to its property and businesses stemming from conduct by third parties. Such injuries do not satisfy proximate cause, and therefore, any amendment would be futile. See Leadsinger, Inc., 512 F.3d at 532.

### 4. Preemption

Defendants argue that federal law preempts the City's state law claims under three theories: (1) the City's state law claims pose an obstacle to the DEA's ability to enforce the CSA and its implementing regulations; (2) Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2001) preempts the state law claims to the extent they are attempts to punish fraud on the FDA; and (3) the Federal Food, Drug, and Cosmetic Act ("FDCA") conflicts with and therefore preempts any claims premised on Manufacturers' alleged false marketing. Manufacturers provide a fourth argument in support of preemption: the City premises its claims against generic manufacturers on a failure to warn theory that is preempted to the extent that it would require generic manufacturers to change their labels. See Man. Mot. at 14–15. The Court rejects all four theories.

### a. Obstacle preemption theory.

Implied preemption occurs when it is impossible for a defendant to comply with both state and federal law, or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995) (internal citation omitted). Defendants argue that the City's state law claims conflict with and are therefore impliedly preempted by the CSA, specifically by posing an obstacle to (1) the

49

DEA's obligation to ensure "no interference" with the lawful dispensing of prescription opioids, Def. Mot. at 29 (quoting Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg. 52,716, 52,719–20 (DEA Sept. 6, 2006)), and (2) Congress's goal of fostering "the beneficial use of [opioid] medications." Def. Mot. at 25–26 (internal citations omitted); see also Def. Reply at 21–22 (quoting Gonzalez v. Raich, 545 U.S. 1, 24 (2005)).

When Congress enacted the CSA, it included 21 U.S.C. § 903, which states:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

This provision precludes any argument that Congress intended to preempt state laws that enforce the CSA absent a positive conflict. No such conflict exists. Defendants characterize the City's state law claims as "an absolutist theory that 'the [fewer opioids], and the sooner, the better,'" which is similar to the conflict in Geier v. American Honda Motor Co., Inc., 529 U.S. 861 (2000). Def. Reply at 22 (quoting Geier, 529 U.S. at 874). This not only misses the nuance of the City's claim, but also ignores the facts of Geier.

In Geier, the Court concluded that the Federal Motor Vehicle Safety standard preempted the plaintiff's defective design claim, relying on the Department of Transportation's affirmative representation that the plaintiff's tort claims conflicted with the agency's goals. 529 U.S. at 864– 65. Unlike Geier, there is no DEA policy, statement, or CSA regulation here that conflicts with the City's tort claims. Defendants attempt to equate a vague DEA policy statement to the Department of Transportation's affirmative statement in Geier. They argue that the City's claims interfere with the DEA's obligation "to ensure that there is no interference with the dispensing of controlled substances to the American public in accordance with the sound medical judgment of their physicians." Def. Mot. at 29 (quoting Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg. 52,716, 52,719–20). However, the cited excerpt narrowly addresses the DEA's obligation to ensure that it does not make "exaggerated statements regarding the likelihood of a

United States District Court
Northern District of California

1  DEA investigation" that result in "physicians mistakenly concluding that they must scale back

2  their patients' use of controlled substances to levels below that which is medically appropriate."

3  Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg. at 52,720.  The

4  statement by the DEA is distinct from the City's state law claims, which seek to hold Defendants

5  accountable for allegedly breaching their duties to maintain effective controls and to halt

6  suspicious orders.  See Opp. at 51–53; FAC ¶¶ 225–667.  Concluding that state law claims conflict

7  with the DEA policy statement on Dispensing Controlled Substances for the Treatment of Pain

8  would mean that state criminal actions conflict with the DEA's policy statement, which the CSA

9  clearly welcomes.  See 21 U.S.C. § 903.  Thus, the DEA's policy statement is distinguishable

10  from the policy goals in Geier.

11      Further, the state law claims are entirely consistent with the CSA's goals of "foster[ing] the

12  beneficial use of those medications," and ensuring "no interference with the dispensing" of

13  lawfully prescribed opioids.  Gonzales v. Raich, 45 U.S. 1, 24 (2005) (interpreting the CSA).

14  Even if Defendants' mischaracterization of the City's position—"fewer opioids, and the sooner,

15  the better"—was true, this does not necessarily conflict with the two aforementioned goals.  If

16  anything, that the DEA limits the sale of Schedule I and II substances each year suggests that this

17  characterization is consistent with the CSA's and DEA's goals.  See FAC ¶¶ 585–86.  But the City

18  does not argue that the "fewer opioids, the sooner, the better."  Rather, they allege that Defendants

19  have not implemented effective controls to prevent the unlawful diversion of opioids.  Id. ¶ 580,

20  590.  The City's allegation falls within the CSA's goals of "foster[ing] the beneficial use of those

21  medications," and ensuring "no interference with the dispensing" of lawfully prescribed opioids.

22  Gonzales, 45 U.S. at 24 (interpreting the CSA)..  Thus, the CSA's provisions demonstrate that

23  state tort actions pose no obstacle to its goals and DEA enforcement.

24      Defendants also rely on an undeveloped theory that the City's state claims are preempted

25  because parallel claims can "still create[] a conflict" with federal law "[w]hen two separate

26  remedies are brought to bear on the same activity . . . ."  Def. Mot. at 30 (quoting Garner v.

27  Teamsters, Chauffeurs & Helpers, Local Union No. 776 (A.F.L.), 346 U.S. 485, 498–99 (1953));

28  Def. Reply at 23.  Defendants rely on the Supreme Court's decision in Garner and this Court's

decision in <u>In re Volkswagen "Clean Diesel" Marketing</u>, 310 F. Supp. 3d 1030, 1044–45 (2018). Def. Reply at 23. However, <u>Garner</u> is distinguishable; the Supreme Court has applied its holding only to cases involving the NLRA due to the unique nature of that statute. See <u>Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters</u>, 436 U.S. 180, 193–94 (1978) ("This reasoning has its greatest force when applied to state laws regulating the relations between employees, their union, and their employer. It may also apply to certain laws of general applicability which are occasionally invoked in connection with a labor dispute." (footnotes omitted)). Further, the Ninth Circuit recently reversed the portion of this Court's decision in <u>In re Volkswagen "Clean Diesel" Marketing</u> upon which Defendants rely. 959 F.3d 1201, 1211–25 (9th Cir. 2020). For these reasons, Defendants' enforcement preemption theory fails.

### b. Fraud on the DEA.

Claims that are not based on any sort of "fraud-on-the-agency" theory,[28] but that instead rely on traditional state law principles that parallel, rather than obstruct, federal duties are generally not preempted. See <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 495 (1996); see also <u>Stengel v. Medtronic Inc.</u>, 704 F.3d 1224, 1228 (9th Cir. 2013) (en banc), <u>cert. denied</u>, 573 U.S. 930 (2014). Defendants argue that <u>Buckman</u> preempts the City's claims because those claims are an attempt to police fraud committed against the DEA. Def. Mot. at 25 (citing 531 U.S. 341 (2001)). The MDL court persuasively considered and rejected this argument because the claims are premised on independent common law duties that parallel, and do not conflict with, the duties created under the CSA. See <u>In re Nat'l Prescription Opiate Litig.</u>, 2019 WL 4178591, at *5, *12.

In <u>Buckman</u>, the plaintiffs asserted violations of state tort law against several defendants based on injuries they sustained from the manufacturer defendant's bone screws. 531 U.S. at 343. The claims were premised on the defendant's duty to accurately represent their device to the FDA: but-for the FDA's approval of the screws, the plaintiffs would not have been injured. <u>Id.</u> The Court held that the plaintiffs' state law claims inevitably conflicted with the FDA's "responsibility to police fraud," because an applicant might be deterred from seeking approval of their devices if

---

[28] State claims that rely on a defendant's breach of duty owed to an agency are frequently called "fraud-on-the-agency" claims. Here, the subject agency is the DEA.

they had to comply with fifty state tort regimes and the FDA. Id. at 350. The Court distinguished the disputed fraud-on-the-agency claims from prior decisions focusing on traditional state tort law, concluding that "[i]n the present case . . . the fraud claims exist solely by virtue of the FDCA disclosure requirements." Id. at 353 (emphasis added) (citing Lohr, 518 U.S. at 481). Thus, the Court held that state claims are preempted to the extent that federal requirements are the "critical element" of the state claim. Id.

Defendants mischaracterize the CSA and its implementing regulations as "critical aspect[s]" of the City's state law claims. Def. Mot. at 25. In Buckman, the Court used the words "solely" and "critical" to describe the state law claims' relationship with federal law, i.e., federal law was essential to the existence of the state law claims. 531 U.S. at 353. That type of dependent relationship does not exist here. Plaintiffs seek to enforce state statutes that impose duties distinct from the CSA and that would exist absent the CSA.

In the Ninth Circuit, state duties with a federal parallel are not necessarily preempted. See Stengel, 704 F.3d 1224. In Stengel, the plaintiff sued Medtronic after its medical device paralyzed him, claiming that "because Medtronic failed to comply with its duty [to monitor the product and warn the FDA] under federal law, it breached its 'duty to use reasonable care' under Arizona negligence law." Id. at 1227, 1232. The court distinguished Buckman, noting that those plaintiffs' claims "were concerned exclusively with alleged fraud on the FDA," whereas in Stengel, the plaintiffs' failure to warn claim derived from Arizona law, which developed as a result of Arizona's desire to protect consumers from harms by manufacturers. Id. at 1230. The Ninth Circuit concluded that the claim existed under settled Arizona law and imposed a duty that paralleled the federal duty, and thus was not preempted by the Medical Device Amendments (MDA). Id. at 1233.

Here, the facts are more analogous to Stengel than Buckman. The City's state law claims—public nuisance, unfair competition, and false advertising—are predicated on Defendants' common-law duty to "exercise reasonable care in delivering dangerous narcotic substances." FAC ¶ 580. These are traditional state law claims that exist independent of Defendants' duties under the CSA and its implementing regulations. While the City repeatedly refers to Defendants' duties

53

under the CSA and its implementing regulations, those references do not prove that federal law is "critical" to the existence of the City's state law claim.  Overlap should not be mistaken for dependence.  Because the City's state law claims are premised on independent duties that overlap with duties imposed by the CSA and its implementing regulations, <u>Buckman</u> does not apply.[29]

c.    **Preemption of marketing-based state law claims.**

Defendants' argument as to the marketing-based state law claims is twofold: (1) that the FDCA preempts such claims because they are premised on Defendants' alleged "false position that opioids were safe and effective," FAC ¶ 453, when in fact the FDA approved opioids as "safe and effective"; and (2) that the FDA approved four of the nine categories of alleged misrepresentations on the label.

First, Defendants characterize the City's claims as attempts to hold Defendants liable for either (i) failing to make statements about the safety of prescription opioids beyond those approved by the FDA or (ii) promoting prescription drugs as "safe and effective" in accordance with their FDA labeling, both of which are preempted by the FDCA.  Def. Mot. at 27–28 (citing <u>Mut. Pharm. Co., Inc. v. Bartlett</u>, 570 U.S. 472, 488 (2013)).  In doing so, Defendants rely on the City's assertion that Defendants expressed the "false position that opioids were safe and effective for treatment of chronic pain."  <u>Id.</u>  (quoting FAC ¶ 453).

While the City does periodically state that opioid medications are unsafe and ineffective for chronic non-cancer pain, none of those allegations are crucial to the City's state law claims.  <u>See</u> Def. Reply at 24.  The City's state law claims are premised on the following nine categories of alleged misrepresentations, none of which contradict the FDA-approved position that prescription opioids were "safe or effective":

1)  The risk of addiction from chronic opioid therapy is low;

2)  To the extent there is a risk of addiction, it can be easily identified and managed;

3)  Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

---

[29] Nor does <u>Astra USA, Inc. v. Santa Clara County</u>, <u>see</u> Def. Reply at 23, which did not deal with state law claims that exist separately and independently of the subject federal statute.  563 U.S. 1342, 118 (2011).

54

4)  Opioid withdrawal can be avoided by tapering;

5)  Opioid doses can be increased without limit or greater risks;

6)  Long-term opioid use improves functioning;

7)  Alternative forms of pain relief pose greater risks than opioids;

8)  OxyContin provides twelve hours of pain relief; and

9)  New formulations of certain opioids successfully deter abuse.

FAC ¶ 228; see also Opp. at 53–54.  These nine categories support the City's underlying

contention that Manufacturers engaged in a marketing scheme to understate the risk of opioid

addiction, overstate the benefits of opioid use, and "trivialize[] the risks of the long-term use of

opioids."  See FAC ¶ 8.  There is no preemptive conflict between the City's state law claims and

the FDCA, because federal law does not permit marketing schemes comprised of falsehoods and

omissions to promote prescription drugs.[30]  See 21 C.F.R. § 202.1.  Thus, like in the MDL,

Defendants interpret the FAC too narrowly.[31]

---

[30] Defendants argue that this amounts to the "stop-selling"—or in this case "stop-promoting"—argument that the Supreme Court rejected in Mutual Pharmaceutical Company, Inc. v. Bartlett. 570 U.S. 472, 488 (2013).  Defendants argue that they can only avoid a conflict and comply with both state and federal requirements by ceasing all marketing efforts.  Def. Reply. at 25.  However, not only is the principle "stop-selling" distinguishable from "stop-promoting," but the City's claims rest on the allegations that Defendants illegally marketed their opioids.  The City's claims would not exist if they were premised on lawful marketing practices.  Defendants do not have to "stop promoting" in order to avoid liability.

[31] Defendants cite several cases that the MDL court previously distinguished.  See Def. Mot. at 27–28 (citing In re Celexa & Lexapro Mktg. Sales Practices Litig., 779 F.3d 34, 42–43 (1st Cir. 2015); Utts v. Bristol-Meyers Squibb Co., 251 F. Supp.3d 644, 663–73 (S.D.N.Y. 2017).  But see In re Nat'l Prescription Opiate Litig., 2018 WL 4895856, at *23 ("The cases upon which Defendants rely are all distinguishable. . . . In In re Celexa, it was argued that the FDA should not have approved Lexapro, and that defendant should have shared negative efficacy information with the FDA.  779 F.3d at 36–43.  Because the FDA had reviewed this information and approved the drug, the state law claim was in conflict with federal law.  Id.  In Utts, the plaintiffs' fraud-based claims were preempted, because they alleged a fraud upon the FDA.  251 F. Supp. 3d at 679–680 (citing Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 350 (2001) (holding that state law fraud on the FDA claims conflict with federal law and are impliedly preempted)).  Herein, the state law claims are not premised upon inappropriate labeling or a fraud upon the FDA, but rather fraudulent marketing in the promotion and sale of their opioids."  (footnote omitted)).  Defendants also rely on Cerveny v. Aventis, Inc., 855 F.3d 1091, 1105 (10th Cir. 2017), to support their preemption argument; however, this case is also factually distinguishable.  See Def. Mot. at 28. Cerveny is similar to In re Celexa in that the state's claim—failure to warn—was premised on risks not presented in the FDA-approved warning label, which is distinguishable from the nine categories of misrepresentations alleged here.  See 855 F.3d at 1105.

Second, Defendants rely on <u>Strayhorn v. Wyeth Pharmaceuticals, Inc.</u>, 737 F.3d 378 (6th Cir. 2013), to argue that the FDCA preempts challenges to marketing and promotional materials that are consistent with FDA-approval labeling. Def. Mot. at 27. In <u>Strayhorn</u>, the court held that the FDCA preempts state law claims to the extent that they seek to change FDA-approved labeling. 737 F.3d at 394. The plaintiffs sought to correct misleading promotional materials— brochures, booklets, and catalogues—used to "supplement[] or explain[]" the prescription. <u>Id.</u> at 384, 394. However, the court determined that these materials fell into the definition of "labeling," and were therefore preempted because the FDA had approved the label. <u>Id.</u> at 394 (citing <u>Kordel v. United States</u>, 335 U.S. 345, 349–50 (1948)).

<u>Strayhorn</u> does not apply because the City's claims are premised on nine categories of alleged falsehoods used to promote opioids that go far beyond what was consistent with FDA-approved labels. Opp. at 53–54. Only four even arguably conflict with the approved label. <u>See</u> Def. Reply at 24–25. The Court discusses each below.

<u>Falsehood #3</u>: Defendants argue that the FDA-approved label encompasses Falsehood #3, which alleges that Defendants promoted "pseudoaddiction," <u>i.e.</u>, that people who exhibited signs of addiction suffered from undertreatment of pain, not addiction, and therefore, should receive higher doses of opioids. Def. Reply at 24 (quoting Joint Request for Judicial Notice[32] ("JRJN") (dkt. 172) Exs. 1–8 (§ 9.2)). The relevant part of the label states,"[p]reoccupation with achieving adequate pain relief can be appropriate behavior in a patient with poor pain control." <u>Id.</u> (quoting JRJN Exs. 1–8 (§ 9.2)) (internal quotation marks omitted). This language suggests that there are appropriate instances where a patient's attempt to obtain more opioids stems from existing pain, not an actual addiction to opioids. The City agrees that "[t]here is nothing wrong with" that language, but argues that the label does not suggest that the solution to these symptoms is to

---

[32] Defendants ask the Court to take judicial notice of these documents. That is appropriate. A court can take judicial notice of documents properly submitted with the complaint or upon which the complaint necessarily relies if the materials' "authenticity is not uncontested" and comprise "matters of public record." <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001) <u>overruled on other grounds by</u> <u>Galbraith v. Cnty. of Santa Clara</u>, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). Documents permitted for judicial notice include those that are "made publicly available by government entities" and in which "neither party disputes the[ir] authenticity." <u>Daniels-Hall v. Nat'l Educ. Ass'n</u>, 629 F.3d 992, 998 (9th Cir. 2010).

United States District Court
Northern District of California

increase a patient's dosage.  Mot. Trans. at 72, FAC ¶ 268.  The City is correct.  Defendants have not identified a part of the label that permits, let alone encourages, prescribers to increase a patient's dosage if he exhibits signs of addiction or pseudoaddiction.

Falsehood #4: Defendants argue that the following excerpt of Falsehood #4 conflicts with the FDA-approved label: "Manufacturers 'falsely claimed that . . . physical dependence is not the same as addiction' and that 'gradually tapering patients' doses [would] avoid the adverse effects of withdrawal.'"  Def. Reply at 24 (quoting FAC ¶ 303).  The label states, "[a]buse and addiction are separate and distinct from physical dependence and tolerance," JRJN Exs. 1–8 (§ 9.2), and recommends "gradually taper[ing] the dosage" when discontinuing use.  See JRJN Ex. 3 (§ 5.13).  But the unabridged excerpt of Falsehood #4 states, "'[Manufacturers] falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and <u>can be easily addressed</u>."  FAC ¶ 303 (emphasis added).  The City is not alleging that physical dependence and addiction are the same thing.  Rather, it is claiming that Defendants depicted "physical dependence" as something that "can be easily addressed," in contrast to addiction.  Nothing in the FDA-approved label suggests that physical dependence is "easy to address."  Nor does the label assert that patients can "avoid the adverse effects of withdrawal" by gradually tapering.  See <u>id.</u>  The label only recommends gradually tapering to mitigate withdrawals, but it does not pretend that patients can "avoid" withdrawals altogether if they gradually taper.  See <u>id.</u> ¶ 305.  Thus, Falsehood #4 does not conflict with the label.

Falsehood #5: Defendants mischaracterize Falsehood #5 as asserting that "[t]he City alleges Manufacturers deceptively claimed that prescribers 'could safely increase a patient's dose to achieve pain relief.'"  Def. Reply at 25 (quoting FAC ¶ 307).  Falsehood #5 accuses Defendants of deceptively "omit[ing] warnings of increased adverse effects that occur at higher doses" to get doctors to prescribe a stronger dose of opioids.  FAC ¶¶ 305–311.  Nothing in the FAC suggests that the City disagrees with the proposition that prescribers can increase a patient's dose to achieve pain relief.  See Def. Reply at 25.  Rather, Falsehood #5 focuses on Defendants' alleged omission of critical information related to increasing dosages.

Falsehood #2: Defendants rely on <u>State ex rel. Stenehjem v. Purdue Pharma L.P.</u>, No. 08-

1   2018-cv-01300, 2019 WL 2245743, at *6 (N.D. Dist. May 10, 2019), to argue that Falsehood

2   #2—"doctors can effectively identify and manage [the risk of addiction] by using screening tools

3   or questionnaires"—is entirely consistent with the FDA-approved Risk Evaluation and Mitigation

4   Strategy.  Def. Reply at 25.  Again, Defendants mischaracterize the City's allegations.  While the

5   FDA may have approved screening tools and questionnaires, Falsehood #2 asserts that Defendants

6   promoted the efficacy of these tools well beyond what the FDA contemplated.  See e.g., FAC ¶

7   286 ("Purdue and Cephalon . . . falsely reassured patients that opioid agreements between doctors

8   and patients can 'ensure that you take the opioid as prescribed.'").

9       Strayhorn and the other cases cited by Defendants are therefore largely inapplicable

10  because the City's claims are predicated on Defendants' promotion of the use of opioids far

11  beyond what was contemplated in the approved label.

12              d.       **State law claims against generic manufacturer defendants.**

13      Manufacturer Defendants rely on PLIVA, Inc. v. Mensing, 564 U.S. 604, 613 (2011), to

14  argue that the FDCA preempts the City's state law claims against Generic Manufacturers[33] to the

15  extent the claims are premised on a duty to disclose the brand-name manufacturers' alleged

16  misrepresentations.  Man. Mot. at 2.  Not so.  The City's claims are not based on a duty to

17  disclose, but on allegations that Generic Manufacturers engaged in the "fraudulent promotion of

18  prescription opioids."  Opp. at 54.  Mensing does not apply because the City alleges that both

19  generic and brand-name manufacturers participated in a massive marketing campaign based on

20  false and misleading information to promote the use of prescription opioids.  See FAC ¶¶ 8–10,

21  23–37.  Nothing in the FAC suggests that the City's claims rest on an alleged duty to disclose

22  information that would correct brand-name manufacturers' false statements.[34]

---

[33] "Generic Manufacturers," include Watson Laboratories, Inc.; Warner Chilcott Company, LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Actavis LLC; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc.; Actavis Laboratories FL, Inc.; Par Pharmaceutical, Inc.; Par Pharmaceutical Companies, Inc.; Mallinckrodt LLC; and SpecGx LLC.  Man. Mot. at 2 n.1.  ¶
[34] In response, Manufacturers argue that the City simply lumps Generic Manufacturers with brand-name manufacturers without satisfying Rule 9(b)'s requisite particularity.  Man. Mot. at 14.  "Instances of corporate fraud may also make it difficult to attribute particular fraudulent conduct to each defendant as an individual.  To overcome such difficulties . . . the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the

United States District Court
Northern District of California

### 5. The City states a viable public nuisance claim.

A nuisance is "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." Cal. Civ. Code § 3479. Public nuisances "affect[] at the same time an entire community or neighborhood, or any considerable number of persons . . . ." Id. § 3480. The City[35] alleges that Defendants' conduct created a public nuisance—the opioid epidemic—in San Francisco. FAC ¶¶ 223, 892–906. Defendants argue that the City's public nuisance claim fails for two reasons: (1) the FAC does not contain facts showing that Defendants engaged in affirmative conduct with the requisite knowledge that their conduct would create a public health epidemic; and (2) the FAC fails to allege causation. Def. Mot. at 3.[36] Additionally, Walgreens argues that the Court should dismiss the public nuisance claim because the City has not identified any dispensing duty owed by Walgreens. Wal. Mot. at 7. Defendants' arguments all fail.

#### a. Dispenser duties under the CSA.[37]

Public nuisance claims require the existence of a duty. Id. (citing Melton v. Boustred, 183 Cal. App. 4th 521, 542 (2010); In re Firearm Cases, 126 Cal. App. 4th 959, 988 (2005) ("[T]he necessary elements for proof of a cause of action for public nuisance include the existence of a duty and causation.")).[38] Walgreens argues that the CSA and its implementing regulations—21

---

individual defendants in the misrepresentations." Moore, 885 F.2d at 540 (citing Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987)). The City does just that. It identifies both the misrepresentations and the group of manufacturers who made such misrepresentations, and it attributes these allegations to generic and brand name manufacturers alike. Opp. at 55 (citing FAC ¶¶ 254–62, 272–82). Further, the MDL court concluded that Summit County's almost-identical allegations satisfied Rule 9(b) because they put defendants on notice as to the nature of the City's claims. Summit Cnty., 2018 WL 4895856, at *19–20. Like Summit County, the allegations here satisfy Rule 9(b)'s particularity requirement because the City attributes these allegations to all manufacturers, which is sufficient to put Manufacturers on notice of the circumstances of the City's claim. Id. at *19; see also In re Nat'l Prescription Opiate Litig., 2019 WL 4178591, at *6.

[35] Although the Court uses "the City" as shorthand, its use encompasses both the City and County of San Francisco and the People of the State of California for the state law claims.

[36] Each category of Defendants—Manufacturers, Distributors, and Walgreens—make different arguments as to why the City fails to allege knowledge and causation.

[37] As indicated above, the MDL court held that Marketing Defendants and Distributors both have duties under the CSA and its implementing regulations. Any argument to the contrary has been addressed in supra Subpart II.A.1.

[38] Although the City briefly argues that nothing in California's public nuisance statute or Restatement requires that a defendant violate a legal duty, Opp. at 9, the bulk of California cases

C.F.R. §§ 1301.71(a), 1306.04(a)—do not impose a duty on dispensers like Walgreens, just on its pharmacists. Wal. Mot. at 8–9. Not so. Section 1301.71(a) imposes a duty on all registrants to provide effective controls against diversion, and section 1306.04(a) imposes on pharmacists, pharmacies, and pharmacy owners a duty not to dispense illegitimate prescriptions. Both regulations impose duties on Walgreens in its capacity as a dispenser to implement systems designed to prevent diversion, the violations of which can serve as a premise for liability under California's public nuisance law.

i.    **Section 1301.71(a)**

Section 1301.71(a) states:

> All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances. In order to determine whether a registrant has provided effective controls against diversion, the Administrator shall use the security requirements set forth in §§ 1301.72–1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. Materials and construction which will provide a structural equivalent to the physical security controls set forth in §§ 1301.72, 1301.73 and 1301.75 may be used in lieu of the materials and construction described in those sections.

Walgreens argues that § 1301.71(a)'s duty to maintain effective controls applies only to in-store security systems. Wal. Reply (dkt. 215) at 6; 9 n. 7 (citing ChipRx L.L.C. d/b/a City Center Pharmacy, 82 Fed. Reg. 51,433-02, 2017 WL 5069230 (D.E.A. Nov. 6, 2017)). ChipRx L.L.C. d/b/a City Center Pharmacy involved, but did not limit, § 1301.71(a)'s application to in-store security requirements. 82 Fed. Reg. 51,433-02, 2017 WL 5069230 (D.E.A. Nov. 6, 2017). Further, other authority correctly assumed that § 1301.71 applies to all efforts to divert controlled substances. See e.g., Holiday CVS, L.L.C. v. Holder, 839 F. Supp. 2d 145, 151 (D.D.C.), vacated and remanded on other grounds, 493 F. App'x 108 (D.C. Cir. 2012) ("Under the DEA's regulations, registered pharmacies must 'provide effective controls and procedures to guard against theft and diversion of controlled substances.' 21 C.F.R. § 1301.71(a). . . . Pharmacies are therefore required to ensure that

---

require the existence of a duty. See, e.g., Melton, 183 Cal. App. 4th at 542; In re Firearm Cases, 126 Cal. App. 4th at 988.

prescriptions for controlled substances are issued for a legitimate medical purpose. . . ." (internal quotation marks omitted)).  The MDL court recently homed in on § 1301.71's use of "and" when distinguishing between "theft <u>and</u> diversion" to conclude that "<u>all</u> registrants have an affirmative obligation to protect not only against diversion via theft but also other forms of diversion more broadly."  <u>In re Nat'l Prescription Opiate Litig.</u>, 2020 WL 4550400, at *7 (emphasis included).  This Court agrees.  Section 1301.71(a) requires "all registrants," including dispensers like Walgreens, to provide effective controls to prevent against diversion.

ii. **Section 1306.04(a)**

The CSA requires "[e]very person who manufacturers or distributes any controlled substance" to register with the Attorney General, and it applies the same rule to "[e]very person who dispenses, or proposes to dispense, any controlled substance."  21 U.S.C. §§ 822(a)(1)–(2).  The CSA's implementing regulation further provides:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of [21 U.S.C. § 829] and <u>the person</u> knowingly filling such a purported prescription, as well as <u>the person</u> issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

21 C.F.R. § 1306.04 (a) (emphases added).  Walgreens argues unpersuasively that section 1306.04(a) does not impose an actionable duty on pharmacies, just pharmacists.  Wal. Mot. at 9.

In <u>United States v. Appalachian Regional Healthcare, Inc.</u>, 246 F. Supp. 3d 1184 (E.D. Ky. 2017) ("<u>Appalachian</u>"), the district court concluded that § 1306.04(a)'s use of "person" contemplates liability for corporate entities, <u>e.g.</u>, pharmacies, in addition to pharmacists.  246 F. Supp. 3d at 1189.  The government instituted an enforcement action against Appalachian Regional Hospital (ARH) after learning that it filled fake prescriptions.  <u>Id.</u> at 1187.  ARH argued that it could not be held liable under § 1306.04(a) because the regulation only applied to individual

United States District Court
Northern District of California

pharmacists.  Id. at 1187–88.  The court noted that other provisions of the CSA defined person as "any individual, corporation, government or governmental subdivision or agency, business trust, partnership, association, or other legal entity."  Id. at 1189 (quoting 21 U.S.C. § 1300.01) (internal quotation marks omitted).  Further, section 1306.04(a)'s use of "practitioner" and "pharmacist," in lieu of "person," demonstrated to the court that the drafters deliberately did not limit liability solely to practitioners and pharmacists.  Id. at 1190.

Walgreens argues that Appalachian is distinguishable because that case did not rely on the "corresponding responsibility" of pharmacists to fill prescriptions for legitimate medical purposes; rather, it relied on the final sentence of § 1306.04(a), "which separately" provides that any person who fills an illegitimate prescription is subject to penalties.  Wal. Reply at 9 (emphasis added).  But Walgreens cites no authority to support the argument that the last sentence of § 1306.04(a) imposes some separate requirement.  To the contrary, several courts treat the last sentence of § 1306.04(a) as one of three elements, which, if met, results in a violation of the regulation: (1) knowingly and intentionally prescribing a controlled substance; (2) outside the usual course of professional medical practice, and (3) for no legitimate medical purposes.  See, e.g., United States v. Kohli, 847 F.3d 483, 494 (7th Cir. 2017) (citing 21 U.S.C. § 841(a); 21 C.F.R. § 1306.04(a)); Jones Total Health Care Pharmacy, LLC v. DEA, 881 F.3d 823, 831 (11th Cir. 2018).  Further, Walgreens argues that the City cannot cite to any authority aside from Appalachian to support the argument that pharmacies are subject to § 1306.04(a), but it ignores the Eleventh Circuit's conclusion in Jones Total Health Care Pharmacy, 881 F.3d at 831.  See Wal. Reply at 8 n.9; Jones Total Health Care Pharmacy, 881 F.3d at 830 ("The record supports the agency's determination that Jones Pharmacy unlawfully filled numerous controlled substance prescriptions that were not issued for a legitimate medical purpose.  See 21 C.F.R. § 1306.04(a).").

Walgreens also argues that unlike in Appalachian, the City failed to allege that Walgreens "knowingly participated in the wrongful filling of particular unlawful prescriptions."  Wal. Reply at 9–10.  However, the City has alleged that, "Walgreens was keenly aware of the oversupply of prescription opioids through the extensive data and information it developed and maintained both

United States District Court
Northern District of California

1  as a distributor and a dispenser. Yet . . . Walgreens continued to participate in the oversupply and

2  profit from it." FAC ¶ 555. This allegation is sufficient to demonstrate that Walgreens

3  "knowingly filled" prescriptions that were not for legitimate purposes, as Walgreens, a dispenser,

4  had no other means of "participating in the oversupply" than by wrongfully filling unlawful

5  prescriptions.

6       _Appalachian_'s conclusions are further buttressed by the MDL court's recent decision,

7  which held that pharmacies have a corporate-level obligation to "design and implement systems,

8  policies, or procedures to identify red flag prescriptions." See In re Nat'l Prescription Opiate

9  Litig., 2020 WL 4550400, at *12. The MDL court relied on pharmacies' record-keeping duties

10 under 21 C.F.R. § 1304.22(c) to conclude that dispensers must monitor their records to prevent

11 diversion. Id. at *8 ("It would undermine the entire purpose of the CSA (and defy logic) for the

12 Act to require a pharmacy to collect the dispensing data listed in § 1304.22(c), but then allow the

13 pharmacy to ignore this data when fulfilling its fundamental obligation to guard against

14 diversion.").

15      Walgreens argues that California law "prohibits anyone except for a state-licensed

16 pharmacist from evaluating the legitimacy of a prescription . . . ." Wal. Reply at 4–5 (citing CAL.

17 CODE REGS., tit. 16, § 1793.1). This argument is plainly wrong. The California Board of

18 Pharmacy determined that <u>both</u> pharmacists and pharmacies have obligations "to determine the

19 legitimate medical purpose of controlled prescriptions before dispensing, under Health and Safety

20 Code section 1153, subdivision (a)." In the Matter of the Accusation Against Pacifica Pharmacy;

21 Thang Tran, Precedential Decision No. 2013-01, at *1 (Aug. 9, 2013)

22 https://www.pharmacy.ca.gov/enforcement/fy1011/ac103802.pdf. Thus, contrary to Walgreens'

23 argument, California welcomes, if not requires,[39] pharmacies' corporate-level obligations under

24 ───────────────

25 [39] In Vermont & 100th Medical Arts Pharmacy v. Bd. of Pharmacy, the California Court of
   Appeal held that the defendant pharmacy must have been aware of suspicious orders, in part,
26 because it had filled 10,000 prescriptions over a 45-day period. 125 Cal. App. 3d 19, 22 (1981).
   The California Board of Pharmacy revoked the pharmacists' individual licenses and the
27 pharmacy's permit because it concluded that such conduct violated Cal. Health & Safety Code §
   11153, 21 U.S.C. § 841, and 21 C.F.R. § 1306.04(a). Id. at 23. In affirming the Board of
28 Pharmacy's decision, the court concluded that the statutory scheme contemplates evaluating "the
   sheer volume of controlled substances prescribed by a single practitioner for a small number of

the CSA to "design and implement systems, policies, or procedures to identify red flag prescriptions." See In re Nat'l Prescription Opiate Litig., 2020 WL 4550400, at *12; see also Plain. Opp. at 22.

### b. Affirmative conduct with actual knowledge.

"A public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B; see also People v. ConAgra Grocery Prod. Co., 17 Cal. App. 5th 51, 79 (2017) ("A public nuisance cause of action is established by proof that a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right."). The Restatement lists three circumstances that qualify as "unreasonable":

> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience, or
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B(2).

The parties agree that California's public nuisance law requires a showing of affirmative conduct that disturbed a public right; however, they disagree as to whether a plaintiff must also allege that the defendant acted with "actual knowledge" of the public health hazard allegedly created. Defendants argue that the City's public nuisance claim fails because it has not alleged that (1) Defendants engaged in affirmative conduct (2) with actual knowledge of the hazards its conduct would create. Def. Mot. at 22–23. Relatedly, the parties also disagree on the extent to which California has adopted the Restatement.

### i. Actual knowledge of the nuisance-causing hazards.

This Court need not decide whether California has incorporated an "actual knowledge" element into its public nuisance law because the City has pled facts that would satisfy the "actual

---

persons" in determining whether orders are suspicious. Id. at 25. This suggests that like the CSA, California requires pharmacies to implement effective controls to prevent diversion.

United States District Court
Northern District of California

knowledge" requirement.  See FAC ¶¶ 7, 12, 20, 51–57, 62–70, 545–46, 557, 567, 580, 584, 592, 597, 659, 668, 681–85, 688, 751, 755, 760, 797, 807–08, 818, 877, 898, 900.

Defendants largely rely on People v. ConAgra to argue that the City has not offered any allegation that Defendants knew that their conduct would enable a public health crisis.  See Def. Reply at 19; see also Distr. Mot. at 12.  In ConAgra, the California Court of Appeal concluded that the defendants had affirmatively promoted their lead paint despite knowing that the paint could cause harm. 17 Cal. App. 5th at 84.  The court interpreted California's public nuisance law as containing an actual knowledge element, which requires that the defendant engage in conduct "with knowledge of the hazard that such use would create." Id. at 83 (emphasis included) (quoting Cnty. of Santa Clara v. Atl. Richfield Co., 137 Cal. App. 4th 292, 309–10 (2006) (internal quotation marks omitted)).  The record indicated that the defendants had learned about the harms and hazards of lead exposure by the 1920s, yet still promoted its lead products. Id. at 85.  Thus, the court concluded that defendants had actual knowledge of the hazards associated with its products. Id.

Here, the City alleges that Defendants misleadingly promoted, distributed, and dispensed opioids, despite knowing "of the hazard that such [conduct] would create"—the opioid epidemic. See FAC ¶¶ 23, 51, 59, 85 n.56, 124, 126, 130, 132, 135, 142, 149, 161, 163, 180, 259, 375, 434–41, 555–56, 571, 580, 582, 597–603, 631–55, 730–32, 880, 900.  The City alleges that Marketing Defendants misleadingly promoted prescription opioids despite knowing that their products were being abused and diverted for unlawful purposes, which fueled the opioid epidemic. Id. ¶¶ 12, 33, 40, 45–49, 59, 69, 547, 555, 571, 580, 632, 634, 655–56, 664, 666–67.  In ConAgra, the court concluded that the defendants must have known that lead posed a serious risk of harm to children because defendants received publications from congressional hearings and trade associations detailing the hazards of lead paint. 17 Cal. App. 5th at 87.  As in ConAgra, the City alleges that Defendants knew that diverted opioids were creating a public health hazard, yet continued to promote their use. FAC ¶¶ 51, 59, 259, 375, 434-41, 555–56, 571, 580, 597–603, 631–55, 730–32, 880, 900; see e.g., FAC ¶ 730 ("All of the Defendants, moreover, knew that large and suspicious quantities of opioids were being poured into communities throughout the United States,

United States District Court
Northern District of California

yet, despite this knowledge, they took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion."). These allegations are sufficient to demonstrate that the Marketing Defendants had "actual knowledge" that their promotional tactics would increase the manufacture, distribution, and prescription of opioids, thereby creating and furthering the opioid epidemic.

Distributors and Walgreens both argue that the City's allegations do not plausibly suggest that Defendants possessed actual knowledge that its conduct would result in the opioid epidemic. See Distr. Mot. at 12–13 (arguing that Distributors were "fooled" just like "doctors [and] state medical boards" and did not know that opioid orthodoxy was the product of deceptive promotion); see also Wal. Mot. at 6–7 (similar). This is a red herring. The City alleges that Distributors failed to design, implement, and enforce policies and procedures necessary to identify and stop suspicious orders, despite being aware of the growing opioid epidemic, in violation of their duties under the CSA and its implementing regulations. See, e.g., FAC ¶ 33 ("Like the Marketing Defendants, the Distributor Defendants (and Walgreens, in its additional role as a dispensing defendant), were aware of a growing epidemic arising from the addiction to, and abuse of, prescription opioids they supplied."); see also id. ¶¶ 547–680, 731 (alleging that Distributors and Walgreens knowingly shipped and filled suspicious orders that they knew would flood markets with harmful amounts of opioids).

The City identifies specific instances in which law enforcement sanctioned Distributors for failing to maintain effective controls against diversion, which suggests that Distributors were aware that their conduct could further public health hazards. See, e.g., id. ¶¶ 576–78, 744–61. For example, the City alleges that the DEA sanctioned AmerisourceBergen's distribution center in Orlando and Cardinal's distribution center in Swedesboro for failing to maintain effective safeguards against diverted opioids. Id. ¶ 747. The DEA also sanctioned Walgreens for similar conduct. Id. ¶ 34 ("Walgreens . . . paid a then-record $80 million in civil penalties to resolve multiple open investigations alleging an 'unprecedented number of record-keeping and dispensing violations" of the [CSA] . . . . Walgreens admitted it failed to uphold its obligations as a CSA registrant." (internal citation omitted)). These actions by the DEA strengthen the City's

66

allegations that both Walgreens and Distributors were aware of obligations they had under the CSA and its implementing regulations to prevent diversion. Thus, the City's allegations support its theory that both Walgreens and Distributors had actual knowledge that their actions would contribute to the public health epidemic.

ii.   **Affirmative conduct.**

"A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition." Santa Clara, 137 Cal. App. 4th at 309–10. The City alleges that Defendants engaged in several forms of affirmative conduct: (1) Defendants, particularly Distributors and Walgreens, failed to implement systems designed to identify and stop suspicious orders, Opp. at 13–19; (2) Walgreens failed to provide effective controls against diversion in violation of its duties under the CSA, id. at 16, 22–31; and (3) Defendants engaged in the "illegal sale of controlled substances" by shipping, dispensing, and or failing to report suspicious orders of opioids. Id. at 19–22 (citing FAC ¶¶ 12, 33–34, 36–37, 49, 171, 555, 564–66).[40] The City has plausibly alleged that Defendants engaged in affirmative conduct that enabled the opioid epidemic in San Francisco.

First, the City alleges that Distributors and Walgreens failed to implement systems designed to identify and stop suspicious orders. Distributors and Walgreens rely on Santa Clara to argue that, under California law, the only form of "affirmative conduct" that can give rise to a public nuisance claim is the promotion of a product for hazardous uses, not simply distributing hazardous products. Distr. Mot. at 12; Wal. Mot. at 5–6. In Santa Clara, the California Court of Appeal concluded that manufacturers and distributors could be held liable under California's public nuisance law for intentionally promoting the use of lead paint on buildings' interiors with knowledge of the health hazards that could result. 137 Cal. App. 4th at 310. Santa Clara sued lead paint manufacturers and distributors alleging that they created a nuisance by engaging in a

---

[40] The City also alleges that Marketing Defendants engaged in affirmative conduct by deceptively promoting opioids. Opp. at 11–12. Marketing Defendants and Manufacturers do not dispute that the City has adequately pled affirmative conduct.

1   pattern of deceit intended to minimize the risks of lead paint and attribute lead poisoning to other

2   sources. Id. at 300. The court held that the plaintiffs had established liability, not by simply

3   alleging that defendants distributed hazardous products, but by also alleging that defendants

4   promoted these products with knowledge of the hazards that could result. Id. at 310.

5         Nothing in Santa Clara suggests that promotion is the only form of "affirmative conduct"

6   necessary to state a public nuisance claim. Affirmative conduct encompasses any action that

7   "assist[s] in creating a system that causes" hazardous conditions. Opp. at 13 (quoting City of

8   Modesto Redevelopment Agency v. Superior Court, 119 Cal. App. 4th 28, 40–41 (2004)) (internal

9   quotation marks omitted). The court in Santa Clara specifically noted that the affirmative conduct

10  at issue was the defendants' promotion of lead paint, but the court did not limit affirmative

11  conduct to promotional acts. See 137 Cal. App. 4th at 309–10 ("A public nuisance cause of action

12  is . . . premised on . . . affirmative conduct that assisted in the creation of a hazardous condition.

13  Here, the alleged basis for defendants' liability . . . is their affirmative promotion of lead

14  paint . . . .").

15        Indeed, in the Ninth Circuit, the scope of actionable "affirmative conduct" under public

16  nuisance law is much broader than corporate promotions. See Ileto v. Glock, Inc., 349 F.3d 1191

17  (9th Cir. 2003). In Ileto, shooting victims and their family members brought a public nuisance

18  claim against firearm manufacturers, distributors, and dealers, alleging that they "knowingly

19  establish[ed], suppl[ied], and maintain[ed] an over-saturated firearms market that facilitates easy

20  access for criminal purposes, including access by persons prohibited to purchase or possess

21  firearms under state or federal law." Id. at 1198. Specifically, the plaintiffs alleged that the

22  distributors "develop[ed] distribution channels that promote straw purchases and other means of

23  distribution that facilitate[ed] access to guns by prohibited purchasers." Id. at 1215. In

24  concluding that the plaintiffs had asserted sufficient facts to survive a motion to dismiss, the court

25  relied on allegations that the defendant

26            knew which distribution channels were providing guns to illegal
              purchasers and was in a position to use the information the ATF made
27            available to it to modify its distribution practices . . . that would help
              them identify straw purchasers and purchasers who would in turn sell
28            to illegal purchasers . . . .

United States District Court
Northern District of California

1   Id.

2        The City alleges that, much like the defendants in Ileto, Distributors and Walgreens

3 distributed and sold opioids in a manner that fueled an illegal, secondary market through their

4 failure to implement effective controls that would effectively deter diversion. See FAC ¶ 898; see

5 also Opp. at 14–15 (citing 21 U.S.C. § 823; 21 C.F.R. 13701.71(a); 21 C.F.R. 1301.74(b); 21

6 C.F.R. § 1306.04(a); Cal. Health & Safety Code § 11153.5; Cal. Bus. & Prof. Code §§ 4164(a),

7 4169.1, 4301(d)–(e); FAC ¶¶ 558–60, 582, 588, 893–97, 912–13); see, e.g., FAC ¶ 580 ("By

8 flooding San Francisco with more opioids than could be used for legitimate medical purposes and

9 by filling and failing to report orders that they knew or should have realized were likely being

10 diverted for illicit uses, Defendants . . . both created and failed to prevent a foreseeable risk of

11 harm."). Like Ileto, Distributors have access to unique insights and information into the ordering

12 activities of their dispensing customers, which places them in a position to protect against

13 dangerous diversion. FAC ¶¶ 590–93. Yet, despite Distributors' legal obligation to implement

14 effective controls against diversion, they allegedly distributed greater quantities of opioids than

15 they knew could be necessary for legitimate uses. FAC ¶¶ 12, 33, 34, 40, 45–49, 59, 69, 547, 555,

16 571, 580, 597–99, 632, 634, 655–56, 664, 666–67.

17        For example, the federal government sanctioned McKesson, Cardinal, AmerisourceBergen,

18 and Walgreens for violating their distribution and dispensing duties. FAC ¶¶ 34, 171, 658–66.

19 McKesson admitted that it "failed to maintain effective controls against diversion of particular

20 controlled substances into other than legitimate medical, scientific and industrial channels by sales

21 to certain of its customers in violation of the CSA and the CSA's implementing regulations . . . at

22 the McKesson Distribution Centers." FAC ¶ 659. The City alleges that this conduct led to

23 increased rates of overdose deaths and addiction in San Francisco. FAC ¶¶ 50–57. Thus, as in

24 Ileto, the City plausibly alleges that Distributors and Walgreens engaged in affirmative conduct

25 that created hazardous conditions. See 349 F.3d at 1215.

26            **c.**     **Legal and factual causation.**

27        "The elements of a cause of action for public nuisance include . . . causation." Melton, 183

28 Cal. App. 4th at 542 (internal citations omitted). A plaintiff must establish causation in fact,

which requires facts demonstrating that the defendant's conduct was a "substantial factor in bringing about the result." <u>ConAgra</u>, 17 Cal. App. 5th at 101 (internal citation omitted). Additionally, a plaintiff must establish that the defendant's wrongful conduct was not "too remote from the current hazard to be its 'legal cause,'" <u>i.e.</u>, proximate cause. <u>Id.</u> at 103.

The City argues that it has satisfied both factual and legal causation because a jury could reasonably conclude that (1) Manufacturers' misleading marketing tactics substantially increased the supply of prescription opioids; (2) these increases proximately caused harm to the City; (3) each manufacturer failed to maintain effective controls against diversion; (4) Distributors and Walgreens also failed to maintain effective controls against diversion; and (5) each defendants' conduct was a "substantial factor in producing the alleged harm suffered by Plaintiffs." Opp. at 5 (quoting <u>In re Nat'l Prescription Opiate Litig.</u>, No. 1:17-MD-2804, 2019 WL 4178617, at *2-4 (N.D. Ohio Sept. 3, 2019)) (internal quotation marks omitted). Manufacturers and Distributors argue that (1) the City has failed to plead facts demonstrating that the nuisance would not have occurred but-for Defendants' conduct, (2) nor has the City demonstrated that the alleged harms were foreseeable. <u>See</u> Man. Mot. at 13; Distr. Mot. at 13–15; <u>see also</u> Man. Reply at 8–9; Distr. Reply at 9–10. The City has plausibly alleged both factual and legal causation.

### i. **Factual causation.**

The factual "causation element of a public nuisance cause of action is satisfied if the conduct of a defendant is a substantial factor in bringing about the result." <u>ConAgra</u>, 17 Cal. App. 5th at 101 (citing <u>Citizens for Odor Nuisance Abatement v. City of San Diego</u>, 8 Cal. App. 5th 350, 359 (2017)). However, the parties disagree over the scope of the "substantial factor" element. <u>Compare</u> Opp. at 32 ("Thus, even 'a very minor force that does cause harm is a substantial factor.'" (quoting <u>Bockrath v. Aldrich Chem. Co.</u>, 21 Cal. 4th 71, 72 (1999))) <u>with</u> Man. Reply at 8 ("[T]o be a substantial factor in causing an injury, a defendant's act must be either a necessary or 'sufficient' cause of that injury." (citing <u>Viner v. Sweet</u>, 30 Cal. 4th 1232, 1240 (2003))).

The substantial factor standard is broad, "requiring only that the contribution of the individual cause be more than negligible or theoretical." <u>Rutherford v. Owens-Illinois, Inc.</u>, 16

70

Cal. 4th 953, 978 (1997), as modified on denial of reh'g (Oct. 22, 1997). Manufacturers argue that the California Supreme Court's decision in Rutherford "makes clear that conduct is not a 'substantial factor' if the harm still would have occurred in the absence of defendants' conduct." Man. Reply at 8 (citing Rutherford, 16 Cal. 4th at 968–69). But Manufacturers ignore the court's additional conclusion that the substantial factor standard subsumes "but for" causation to also address situations "involving independent or concurrent causes in fact." Rutherford, 16 Cal. 4th at 969 ("[T]he substantial factor standard [was] formulated to aid plaintiffs as a broader rule of causality than the 'but for' test . . . ."). If a defendant's conduct operated concurrently with other forces to produce the harm, it is a substantial factor, so long as "the injury, or its full extent, would not have occurred but for that conduct." In re Ethan C., 54 Cal. 4th 610, 640 (2012). The California Supreme Court has reaffirmed this interpretation of the substantial factor standard. See, e.g., Viner, 30 Cal. 4th at 1240 ("[I]f 'two forces are actively operating . . . and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.'" (quoting Restatement Second of Torts § 432)). Thus, the City must demonstrate that Manufacturers' and Distributors' conduct was necessary in bringing about the full extent of the City's injuries.

Manufacturers. The FAC contains allegations against Manufacturers that satisfy the substantial factor standard. The City alleges that "[d]rug manufacturers' deceptive marketing and sale of opioids . . . is one of the main drivers of the opioid epidemic." FAC ¶ 23. Manufacturers' decades-long marketing strategies allegedly "changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids . . . ." Id. ¶¶ 541–44. This alleged marketing strategy entailed "infiltrating professional medical societies and crafting and influencing industry guidelines" to disseminate "[f]alse messages about the safety, addictiveness and efficacy" of opioids. Id. ¶ 28. The FAC even cites conspiracies to "bribe practitioners to prescribe" certain opioids. Id. ¶ 537. As a result, the City alleges that Manufacturers' marketing strategies "caused prescribing . . . opioids as a class, to skyrocket." Id. ¶ 550. The City further alleges that "[a]s a direct and foreseeable result" of Defendants' conduct, San Francisco experienced "skyrocketing addiction, overdose and death;

71

black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl

abuse by individuals who can no longer legally acquire or simply cannot afford prescription

opioids." Id. ¶ 14.  Contrary to Manufacturers' argument, the City has plausibly alleged that the

full extent of its harm would not have occurred absent Manufacturers' conduct.

Distributors.  Similarly, the FAC contains allegations against Distributors that satisfy the

substantial factor standard.  The City alleges that Distributors "failed to design and operate

systems to identify suspicious orders of prescription opioids, maintain effective controls against

diversion, and halt distribution and dispensing of suspicious orders, thereby contributing to the

oversupply of such drugs and fueling an illegal secondary market." Id. ¶ 7.  Further, the opioid

crisis was allegedly fueled "by those involved in the supply chain of opioids, including

manufacturers, distributors, and pharmacies, who . . . actively sought to evade such controls." Id.

¶ 12.  These failures allegedly "fueled the flood of pills into and significantly contributed to rising

addiction and overdose rates in San Francisco." Id. ¶ 33 (emphasis added).  For example, the FAC

alleges that in San Francisco between 2006 and 2017 prescription opioids caused more overdose

deaths than heroin.  Id. ¶ 66 (internal citation omitted).  The City has plausibly alleged that its

injuries stemming from the oversupply of opioids would not have occurred absent Distributors'

failure to halt distribution of suspicious orders.  See In re Ethan C., 54 Cal. 4th at 640.  Thus, the

City has satisfied factual causation at this stage in the litigation.[41]

_____

[41] This conclusion is consistent with the MDL and state decisions.  See, e.g., California v. Purdue
Pharma L.P., No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. Orange Cnty. Feb. 13, 2018)
(denying demurrer brought, in part, on causation grounds); In re Nat'l Prescription Opiate Litig.,
406 F. Supp. 3d 672, 676 (N.D. Ohio 2019) ("[F]actfinders could reasonably infer that
Manufacturers' fraudulent marketing and failures to maintain anti-diversion controls were
substantial factors in producing the alleged harm suffered by Plaintiffs."); State v. Purdue Pharma
L.P., No. 1-173-18, 2019 WL 2331282, at *5 (Tenn. Cir. Ct. Feb. 22, 2019) (applying substantial
factor test and finding the same); State v. Purdue Pharma L.P., No. 3AN-17-09966CI, 2018 WL
4468439, at *4 (Alaska Super. Ct. July 12, 2018) (same); State v. Purdue Pharma Inc., No. 217-
2017-CV-00402, 2018 WL 4566129, at *4 (N.H. Super. Ct. Sep. 18, 2018) (finding the State had
sufficiently pled causation on its public nuisance claims); State v. Purdue Pharma L.P., No.
CV2018002018, 2019 WL 1590064, at *3–4 (Ark. Cir. Apr. 05, 2019) (same); In re Opioid Litig.,
No. 400000/2017, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018) (same); State v.
Purdue Pharma L.P., No. PC-2018-4555, 2019 WL 3991963, at *11 (R.I. Super. Ct. Aug. 16,
2019) ("The Court is satisfied that the State has properly alleged that . . . Defendants' conduct
caused the public nuisance." (internal citation omitted)); Commonwealth v. Purdue Pharma, L.P.,
No. 1884CV01808BLS2, 2019 WL 5495866, at *5 (Mass. Super. Ct. Sept. 17, 2019) ("Purdue
contends that this case raises several causation issues. Many of these arguments are fact-based,

ii.    **Proximate cause.**

Manufacturers and Distributors argue that the City's public nuisance allegations are insufficient to establish proximate cause.  See Distr. Mot. at 14; Man. Mot. at 13.  Proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." Ferguson v. Lieff, Cabraser, Heimann & Bernstein, 30 Cal. 4th 1037, 1045 (2003) (quoting Mosley v. Arden Farms Co., 26 Cal. 2d 213, 221 (1945) (Traynor, J. concurring)) (internal quotation marks omitted).  Unlike RICO, courts place great emphasis on "foreseeability of harm" in determining whether a public nuisance claim sufficiently alleges proximate cause.  Compare Novak v. Cont'l Tire N. Am., 22 Cal. App. 5th 189, 196 (2018), reh'g denied (Apr. 5, 2018) ("One policy consideration subsumed within the broad concept of proximate cause is the extent to which a defendant should be held liable for unforeseeable consequences." (citing Prosser & Keeton, Torts (5th Ed. 1984) § 42, p. 279)); Pac. Shores Properties, LLC v. City of Newport Beach, 730 F.3d 1142, 1168 (9th Cir. 2013) (citing BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 758 (7th Cir. 2011)); with Couch, 379 Fed. Appx. at 565 ("Hemi Group definitely foreclosed RICO liability for consequences that are only foreseeable without some direct relationship." (internal citation omitted)).  While a RICO claim cannot satisfy proximate cause absent a direct relationship between the conduct and injury, a public nuisance claim satisfies proximate cause if the defendant's conduct is likely to cause a significant invasion of a public right.  See In re Firearm Cases, 126 Cal. App. 4th at 988.  As determined above, Defendants' misrepresentations and oversupply of opioids did not foreseeably cause the City's injuries stemming from drug users discarding needles.  See supra Subpart II.E.3.b.v.  However, at this stage in the litigation, the City has satisfied the proximate cause requirement with respect to some injuries because it has plausibly alleged that Defendants could reasonably foresee (1) that their conduct would likely increase addiction, overdoses, and deaths related to the abuse of prescription opioids, see FAC ¶

which this Court sees no need to discuss, given the standard applicable to a Rule 12(b)(6) motion."); State v. Purdue Pharma LP, No. CJ-2017-816, 2019 WL 4019929, at *14 (Okla. Dist. Ct. Aug. 26, 2019) ("I further find that the State has satisfied its burden of proof and that the Defendants' actions were the cause -in-fact of its injuries.").

United States District Court
Northern District of California

19, 52–71, and (2) each link in the causal chain, such that no intervening acts sever that chain.

Manufacturers. Manufacturers argue that the City fails to plead a causal connection between Defendants' conduct and the City's alleged harm, largely because the City's harm "is just as plausibly the result of a myriad intervening acts—including the decision-making of prescribers, patients, distributors, pharmacies, and third-party criminals . . . ." Man. Mot. at 13 (citing In re Firearm Cases, 126 Cal. App. 4th at 973; Martinez v. Pac. Bell, 225 Cal. App. 3d 1557, 1566 (1990)). Manufacturers principally rely on In re Firearms Cases, 126 Cal. App. 4th at 959, and Martinez, 225 Cal. App. 3d at 1566. However, this argument fails in the context of the public nuisance claim because Manufacturers could reasonably foresee the intervening acts of third parties. Manufacturers' conduct—fraudulent marketing and oversupply of opioids—violated laws aimed at preventing the very harms—increased third-party addiction, overdoses, and deaths—that these laws were designed to prevent.

Public nuisance cases involving no underlying legal violation are therefore inapposite. For example, in In re Firearms Cases, the court rejected several California cities' and counties' public nuisance claims against gun manufacturers, distributors, and retailers because there was no "causal connection" between the defendants' lawful manufacture and distribution of firearms and firearm-related crimes. 126 Cal. App. 4th at 989. The court concluded that California's public nuisance law requires more than allegations of "risky" behavior; instead, a plaintiff must allege that the "defendant[']s acts are likely to cause" harm. Id. at 988 (emphasis added). The plaintiffs alleged that the defendants' marketing, distribution, promotion, and design of firearms facilitated the use of firearms to commit crime, which caused a public nuisance. Id. at 968. But the plaintiffs did not seek to hold the manufacturers or distributors liable for any "wrongful or illegal" actions; rather, the plaintiffs sought to hold them liable for "failing to take proactive steps to control" a small number of high-risk retailers. Id. at 972. The court relied on defendants having abided by federal law and guidelines to conclude that "there [was] no causal connection between any conduct of the defendants and any incident of illegal acquisition of firearms or criminal acts or accidental injury by a firearm." Id. at 989. In part because defendants' conduct did not violate any law, the court concluded that the evidence was not strong enough to establish a causal connection between the

74

defendants' conduct and plaintiffs' alleged harm.  See id. at 988.[42]

In re Firearms Cases is distinguishable and, if anything, supports the City's public nuisance claim.  Unlike the plaintiffs in In re Firearms Cases, the City alleges that Manufacturers unlawfully marketed prescription opioids and violated their duties to maintain effective controls against diversion.  See FAC ¶¶ 224, 582.  These violations allegedly resulted in increased opioid addiction, abuse, overdose death, and diversion.  See id. ¶¶ 686–96.  The very existence of the duties to maintain effective controls supports the notion that opioid misuse is foreseeable.  "A lack of reasonable care in the handling, distribution, and administration of controlled substances can foreseeably harm the individuals who take them.  That's why they're 'controlled' in the first place—overuse or misuse can lead to addictions and long-term health problems."  Dent v. National Football League, 902 F.3d 1109, 1119 (9th Cir. 2018) (citing the CSA).

Manufacturers dispute that their conduct could foreseeably cause the full extent of the City's harm—including "'San Franciscans . . . shooting up on the street,' 'specialized mail screening equipment . . . to detect fentanyl being sent into the jails,' and 'increased heroin, fentanyl, and methamphetamine use,'"—because independent and intervening acts of third parties break the causal chain.  Man. Reply at 8–9 (quoting FAC ¶¶ 56–60) (citing Martinez, 225 Cal. App. 3d at 1565).  This argument fails.

Martinez addressed another scenario in which a plaintiff's public nuisance theory rested on no underlying violation of the law.  The court dismissed the plaintiff's public nuisance claim against a telephone company for maintaining a public telephone booth that was primarily used to facilitate crime.  225 Cal. App. 3d at 1559.  The court held that nuisance liability extends to harm that is proximately caused by the defendant's conduct, but "not to damage suffered as a proximate result of the independent intervening acts of others."  Id. at 1565.  The plaintiff in Martinez was assaulted three times over a two-year period, allegedly stemming from drug dealers using and

---

[42] Manufacturers' argument is further undermined by the court's affirmative statement that public nuisance claims premised on risky, but not illegal, conduct could establish proximate cause.  In re Firearms Cases, 126 Cal. App. 4th at 992 ("We do not hold that the theories asserted would never be tenable under different evidence.  We merely find, based on the evidence presented here, that the evidence does not sufficiently establish the alleged acts of the defendants caused the diversion of firearms to the criminal market." (footnote omitted)).

United States District Court
Northern District of California

loitering near the defendant's telephone booth.  Id. at 1561.  The court noted that the plaintiff

sought to impose vicarious liability on the defendant for a separate and intervening act—the

battery—rather than liability for any direct harm from the telephone booth.  Id. at 1566.  The court

analogized the dispute to Gonzalez v. Derrington, 56 Cal. 2d 130, 133–34 (1961), in which the

California Supreme Court held that a gas station's unrelated violation of a local ordinance

designed to prevent accidental gasoline fires could not make it "more likely" or "foreseeable" that

the gasoline would be used to intentionally injure others.  Martinez, 225 Cal. App. 3d at 1566–67.

Just as violating a statute designed to prevent accidental fires does not make it foreseeable that a

third-party would commit arson, maintaining a telephone booth that is used to facilitate drug

crimes did not make it foreseeable that a third-party would assault the plaintiff.  See id.  Thus, the

court concluded that the defendant could not be held vicariously liable for intentional torts

committed by third parties, despite the tangential connection to a public telephone.  Id. at 1559.

Unlike the battery in Martinez, here the intervening acts—including decisions by

prescribers, patients, distributors, pharmacies, and third-party criminals—are reasonably

foreseeable, and thus not superseding acts.  "The general test of whether an independent

intervening act, which operates to produce an injury, breaks the chain of causation is the

foreseeability of the act."  Schrimsher v. Bryson, 58 Cal. App. 3d 660, 664 (1976) (citing Custodio

v. Bauer, 251 Cal. App. 2d 303 (1967)).  "An act is not foreseeable and thus is a superseding cause

of the injury 'if the independent intervening act is highly unusual or extraordinary, not reasonably

likely to happen . . . .'"  Id. (quoting Witkin Summary of California Law (8th ed) Torts, § 628).  In

Martinez, the battery constituted a "highly unusual or extraordinary [intervening event], not

reasonably likely to happen," because lawfully maintaining a telephone booth is unrelated to and

could not foreseeably result in a battery.  See 225 Cal. App. 3d at 1566.  Unlike Martinez,

Manufacturers allegedly knew that (1) opioids were highly addictive and subject to abuse; (2) they

were "influencing prescribers and increasing prescriptions"; and (3) orders were vulnerable to

diversion.  See FAC ¶¶ 33, 224, 538–44, 549, 558, 579–96, 654, 675, 686–96, 760.

Yet, Manufacturers argue that harms such as "increased heroin, fentanyl, and

United States District Court
Northern District of California

methamphetamine use" are "far too attenuated."[43]  Man. Reply at 9.  This ignores the nature of opioid addiction.  The opioid industry is heavily regulated because it is not unforeseeable or "far too attenuated" that opioid-addicted individuals would resort to illicit forms of opioids, such as heroin or fentanyl.  See, e.g., Dent, 902 F.3d at 1119 ("That's why they're 'controlled' in the first place . . . .") (citing the CSA); Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943) ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arise[s] from the latter['s] inherent capacity for harm and from the very fact they are restricted . . . .").  In Martinez, the telephone booth lacked a "tangential connection" to the plaintiff's battery theory, but here, opioid addiction, abuse, and diversion provide a much stronger causal connection that could foreseeably result in harms such as increased fentanyl, heroin, and methamphetamine abuse.  See 225 Cal. App. 3d at 1559.  And in Gonzalez, the gas station violated an ordinance designed to prevent accidental fires rather than intentional injury, but here, opioid regulations are intended to prevent the precise harms that comprise the City's injuries.  See 56 Cal. 2d 130, 133–34 (1961).

In sum, for the reasons discussed supra Subpart II.E.3.b.v., the City's injuries stemming from the improper disposal of needles are not a foreseeable result of Defendants' conduct.  But the City has sufficiently pled proximate causation because its alleged harms—costs associated with addressing increased rates of opioid use, addiction, and overdoses, but not needle clean-up—are the foreseeable result of Manufacturers' conduct.[44]

---

[43] Unlike the RICO claims, public nuisance claims do not limit governmental entities to "business or property" injuries.  See, e.g., Cnty. of Santa Clara, 137 Cal. App. 4th at 309–10 (concluding that governmental entities are entitled to seek relief from public nuisances on behalf of the People).  Here, the City alleges on behalf of the People that Defendants' conduct caused increased drug-use, addiction, and overdoses.  FAC ¶¶ 16–18, 686–96, 911–18.  These are all direct and foreseeable harms that stem from over-supplying communities, like San Francisco, with prescription opioids.

[44] Manufacturers also argue that the City has not cited any California case law.  Man. Reply at 9.  But neither party cited any strongly analogous case law on this issue.  Further, the Ninth Circuit adopted the City's logic in an unpublished opinion, where it held that a medical clinic's failure to follow its own policy requiring a chaperone to accompany patients during gynecological examinations was the proximate cause under California law of a patient's injuries from sexual assault by a doctor.  Avitia v. United States, 24 F. App'x. 771, 774–75 (9th Cir. 2001) ("It is no stretch of imagination that such safety concerns would include the prevention of the kind of inappropriate conduct complained of here.  If the policy was put in place to prevent such conduct, the assault was foreseeable and Shohayeb's intentional conduct did not supersede the negligent

United States District Court
Northern District of California

Distributors.  Like Manufacturers, Distributors rely on In re Firearm Cases to argue that the City fails to plead a causal connection between Distributors' conduct and any incident of illegal diversion.  Distr. Mot. at 13–14 (citing In re Firearm Cases, 126 Cal. App. 4th at 959); see also Distr. Reply at 9.  But as stated above, In re Firearm Cases is distinguishable because those distributors lawfully distributed handguns.  126 Cal. App. 4th at 991–92.  Distributors' argument fails for the same reason as Manufacturers': Distributors, like the rest of the Defendants, had a duty to "maintain effective controls against diversion by identifying, reporting, and stopping shipment of suspicious orders until such suspicions were resolved," see FAC ¶¶ 579–96, and their alleged failure to do so led to diversion and the public health and community harms.  See Opp. at 37; FAC ¶¶ 656–96, 887–900.

The City alleges that Distributors flooded San Francisco with massive amounts of opioids and failed to prevent the diversion of opioid orders bound for San Francisco.  FAC ¶¶ 656, 667. While the City does not cite to a specific example of diversion that occurred in San Francisco, it does cite enforcement actions that various agencies took against Distributors' nationwide failure to report suspicious orders of controlled substances, which frequently resulted in diversion.  See FAC ¶¶ 571 n.206, 644–46, 652, 656–86.  Based on the City's allegations and these widespread failures, it is reasonable to infer that Defendants' conduct also occurred in San Francisco.  Further, just as Manufacturers' alleged false promotion could foreseeably result in increased opioid addiction, abuse, and overdoses, Distributors' alleged failure to maintain effective controls against diversion could foreseeably result in the same harms.  See, e.g., Dent, 902 F.3d at 1119 ("That's why they're 'controlled' in the first place . . . .").

Next, Distributors argue that their shipments "cannot be the legal cause of increased addiction and overdoses in the City" because, according to the FAC, Manufacturers' marketing campaign "created the new standard of care" causing an increase in prescriptions that Distributors had "no ability (and no duty) to second-guess."  Distr. Mot. at 15; Distr. Reply at 9–10. Distributors also argue that their conduct cannot be considered "independent and concurring"

acts of the clinic and Barbosa.").

78

1   causes of the City's injury because a concurrent cause "must be 'operative at the moment of

2   injury,'" Distr. Reply at 10 (quoting West's Comm., Cal. Civil Jury Instructions 3.77), and an

3   independent cause must not be causally related to other tortious acts. Id. (citing State Farm Mut.

4   Auto. Ins. Co. v. Partridge, 10 Cal. 3d 94, 103–04 (1973)). Distributors are incorrect on both

5   fronts.

6        First, Manufacturers' alleged false marketing and Defendants' alleged failure to maintain

7   effective controls to prevent diversion are both independent causes of the City's harm.

8   Distributors rely on Partridge to argue that Manufacturers' false marketing and Distributors'

9   failure to maintain effective controls are causally related, and thus, cannot be considered

10  "independent" for the purpose of proximate causation. See id. But in Partridge, the California

11  Supreme Court held that the insured's modification to his gun and his negligent driving were

12  independent causes that resulted in a victim's injuries. 10 Cal. 3d at 104 n.10 ("[B]oth causes

13  were independent of each other: the filing of the [gun's] trigger did not 'cause' the careless

14  driving, nor vice versa. Both, however, caused the injury."). As in Partridge, here the City has not

15  alleged that Manufacturers' false marketing caused the Distributors' failure to maintain effective

16  controls, nor vice versa. Rather, both parties' conduct allegedly caused the City's injuries. See id.

17       Second, Distributors rely on California Civil Jury Instruction 3.77 to argue that

18  Manufacturers and Distributors' conduct cannot be concurrent because Distributors' conduct was

19  not "operative at the moment of injury." Distr. Reply at 10 (quoting West's Comm., Cal. Civil

20  Jury Instructions 3.77). "We agree with the People that ['operative' and 'substantial factor'] have

21  no special meaning . . . beyond the common meaning of the terms themselves." People v.

22  Jennings, 50 Cal. 4th 616, 670 (2010) (internal citations omitted). "Operative" means

23  "characterized by operating or working; being in operation or force; (also) exerting force or

24  influence, or active in producing or having the power to produce effects; productive of

25  something." Oxford English Dictionary (3rd ed., 2004). Distributors' role in the supply chain

26  may end after it delivers prescriptions to pharmacies, but this does not mean that its causal conduct

27  in the transaction ceases to be "operative." Because Distributors' alleged failure to stop suspicious

28  orders remains "active in producing" the City's injury, their conduct falls within the definition of

United States District Court
Northern District of California

"operative."  See California Civil Jury Instruction 3.77.

The City has successfully pled proximate causation, and as a result, Defendants' motion to dismiss the City's public nuisance claim is DENIED.

### 6.  Unfair Competition Law and False Advertising Law claims.

The City asserts UCL claims against all Defendants except Walgreens, FAC ¶¶ 911–12, and a FAL claim against Manufacturers.  Id. ¶ 923.  California's UCL is a broad remedial statute that prohibits "unfair competition," which it defines as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  Cal. Bus. & Prof. Code § 17200.  On a motion to dismiss, the plaintiff must allege that the alleged conduct is either "(1) proscribed by law, (2) unfair, meaning the harm to the victim outweighs any benefit, or (3) fraudulent, meaning it is likely to deceive members of the public."  Quattrocchi v. Allstate Indemnity Co., No. 2:17-cv-01578-JAM-EFB, 2018 WL 347779, at *2 (E.D. Cal. Jan. 9, 2018) (citing Lippitt v. Raymond James Fin. Servs., Inc., 340 F.3d 1033 (9th Cir. 2003)).  Each of these prongs provides for a "'separate and distinct theory of liability' and an independent basis for relief."  Cappello v. Walmart Inc., 394 F. Supp. 3d 1015, 1018 (N.D. Cal. 2019) (internal citation omitted).

The City alleges two theories of UCL liability, the second of which overlaps with its FAL claim.  FAC ¶ 911, 912.  First, the City asserts a claim under each prong of the UCL based on its allegation that Defendants "engaged in fraudulent and unfair practices by failing to design and operate a system to monitor suspicious orders of controlled substances, and failed to disclose such suspicious orders" in violation of 21 C.F.R. 1301.74(b) and Cal. Bus. & Prof. Code §§ 4301 and 4164.  FAC ¶ 912.  Second, the City alleges that Manufacturers "circulated false and misleading information concerning, among other things, the safety and efficacy of . . . opioids . . . and falsely and misleadingly downplayed or omitted the risk of addiction arising from their use," which triggers liability under both the FAL and each prong of the UCL.  FAC ¶¶ 911, 923.

Defendants argue that: (1) the unlawful prong fails because the City fails to allege an unlawful act or practice; (2) the fraudulent prong lacks sufficient particularity under Rule 9(b) and none of Defendants' alleged statements would deceive the public; and (3) the unfair prong lacks a

80

1  cognizable harm to consumers and does not consider Defendants' justification for manufacturing

2  and distributing opioids.  Def. Mot. at 16, 17, 21–22.

3       Manufacturers argue separately that the Court should dismiss the City's FAL and UCL

4  claims against Manufacturers because: (1) California's safe harbor doctrine forecloses both the

5  UCL and FAL claims, Man. Mot. at 6; (2) the statements could not mislead reasonable consumers,

6  Man. Mot. at 7; and (3) third-party statements are not attributable to Manufacturers.  Man. Mot. at

7  10.

8       Finally, Distributors argue separately that the City is not entitled to restitution from

9  Distributors.  Distr. Mot. at 15.

10      Defendants' arguments are almost all unavailing.

11                    a.    **UCL unlawful prong.**

12      "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of

13  other laws and treats them as unlawful practices' that the unfair competition law makes

14  independently actionable." Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th

15  163, 180 (1999).  Four alleged predicate violations serve as bases for the City's claims under the

16  unlawful prong: (1) all Defendants violated their obligations under 21 C.F.R. §§ 1301.71 and

17  1301.74 of the CSA and Cal. Bus. & Prof. Code § 4169.1 to identify, report, and halt, suspicious

18  orders, in addition to their obligation to provide effective controls against diversion; (2) all

19  Defendants violated RICO[45]; (3) Manufacturers violated the FAL, and (4) Manufacturers violated

20  the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.

21                    i.    **Violations of 21 C.F.R. §§ 1301.71 and 1301.74.**

22      Section 1301.74(b) of Title 21 of the Code of Federal Regulations imposes a duty on

23  registrants to "(1) design and operate a system to disclose to the registrant suspicious orders; and

24  (2) inform the DEA of suspicious orders when discovered by the registrants," and

25  section 1301.71(a) requires registrants to "provide effective controls and procedures to guard

26  against theft and diversion of controlled substances." In re Nat'l Prescription Opiate Litig., 2019

27  _____

28  [45] As determined above, the City fails to sufficiently allege a RICO claim.  See supra Subpart
    II.E.3.b.v.

WL 3917575, at *7 (internal citation omitted); see supra Subpart II.A.1. Section 4169.1 of the California Business and Professions Code adopts section 1301.74 by requiring wholesalers, including Defendants, to report suspicious orders to California's Board of Pharmacy. Defendants argue that none of these provisions can serve as a basis for the City's UCL claim. Def. Mot. at 17–21. Defendants primarily argue that these provisions constitute "regulatory guidelines and requirements that do not define unlawful acts . . . [and thus,] cannot [be the] predicate [of] a cause of action under the UCL." Id. at 19 (quoting Samura v. Kaiser Found. Health Plan, Inc., 17 Cal. App. 4th 1284, 1301 (1993) (internal quotation marks omitted)). Defendants also argue that the City cannot assert an unlawful prong claim under Cal. Bus. & Prof. Code § 4169.1 because the FAC lacks any well-pled allegations that Defendants failed to report suspicious orders after section 4169.1's effective date in 2018. Def. Mot. at 19 n.19.

But the MDL court held, and this Court agrees, that 21 C.F.R. §§ 1301.71 and 1301.74 do impose legal duties on manufacturers and distributors. In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7; see supra Subpart II.A.1. While the MDL court opted not to determine the "scope of possible liability for breach of those duties," In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7, California's UCL permits the City to use the CSA's regulations as predicate violations that trigger liability. See Samura, 17 Cal. App. 4th at 1302.

In Samura, the plaintiff sought to hold Kaiser Foundation Health Plan, Inc. liable for violating the Knox-Keene Act and its implementing regulations. Id. at 1301. According to the court, the Knox-Keene Act and its implementing regulations did "not define unlawful acts that may be enjoined under [the UCL]." Id. at 1301. The plaintiff's UCL claim could not proceed because the subject regulations pertained to the exercise of the Department of Corporation's regulatory power, not a matter of substantive law. Id. at 1302. Thus, the court held that a UCL claim requires unlawful acts to be the "predicate [of] a cause of action under [the UCL]." Id.

Unlike Samura, here the MDL court explicitly rejected Defendants' arguments that these regulations simply amount to "procedures relating to the registration of manufacturers and wholesale distributors." Def. Mot. at 17; but see In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7, *9 ("[B]ut the CSA also sets out, as a matter of law, duties that registrants must

82

shoulder in order that adequate controls are maintained over controlled substances."). Rather, the MDL court determined, and this Court agrees, that violations of 21 C.F.R. §§ 1301.71, 1301.74 constitute a breach of legal duties. See In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7, *9. Thus, the City may use violations of §§ 1301.71, 1301.74 as predicate acts to assert a UCL claim under the unlawful prong. See Samura, 17 Cal. App. 4th at 1302.

Defendants are correct, though, in arguing that the City's unlawful claim fails to the extent that it relies on Cal. Bus. & Prof. Code § 4169.1, because the FAC lacks any well-pled allegations that Defendants failed to report suspicious orders after section 4169.1's effective date in 2018. See Def. Mot. at 19 n.19. The City has not identified any failures by Defendants since 2018. The vast majority of the City's allegations regarding 2018 pertain to overdose statistics and budgetary considerations. See FAC ¶ 19, 58, 65, 67, 69, 692, 693. Thus, while the City cannot rely on Cal. Bus. & Prof. Code § 4169.1 for its UCL claim, it may amend the FAC to add allegations supporting its UCL claim premised on violations of section 4169.1.

ii.     **Violations of the CLRA.**

The City alleges that Manufacturers' violations of the CLRA constitute predicate acts that give rise to an action under the UCL's unlawful prong. Opp. at 43. To maintain a CLRA action, plaintiffs must plead facts demonstrating that (1) the defendant committed an unlawful practice and (2) the consumer suffered harm as a result. Meyer v. Sprint Spectrum L.P., 45 Cal. 4th 634, 641 (2009). The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices . . . intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). These prohibited methods include falsely misrepresenting a product's characteristics, uses, or benefits, id. § 1770(a)(5), and disparaging another product using false or misleading representations of fact. Id. §1770(a)(8).

The City alleges that Manufacturers violated § 1770(a)(5) by disseminating false and misleading information pertaining to opioids' efficacy and associated risk of addiction. FAC ¶¶ 336–45. The City also alleges that Defendants violated § 1770(a)(8) by making false misrepresentations about other medications, including nonsteroidal anti-inflammatory drugs

("NSAIDS").[46] Id. Manufacturers' conduct allegedly cost the City millions of dollars to combat the huge spike in opioid abuse and overdoses. Id. ¶¶ 51, 55, 57–58. Manufacturers argue that these allegations suffer from two flaws: (1) California's safe harbor doctrine bars the City's claim based on § 1770(a)(5), Man. Mot. at 11–12; and (2) the FAC fails to allege any disparaging statements to a specific competitor's product that would trigger liability under § 1770(a)(8). Id. at 12.[47] Both arguments fail.

First, Manufacturers cannot rely on California's safe harbor doctrine because the City's claim rests on a series of alleged falsehoods that are not permitted by law, and thus not protected by the safe harbor. See Opp. at 43. California's safe-harbor doctrine forecloses claims— including UCL, FAL, and CLRA claims—"if some other provision bars [the claim]." Cel-Tech, 20 Cal. 4th at 184. Manufacturers mischaracterize the City's allegations as "claims regarding a drug's FDA-approved labeling . . . [and] advertisements and promotions that 'generally comport' therewith." Man. Mot. at 6 (quoting Prohia v. Pfizer, Inc., 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007)). However, the City argues that Defendants made nine misrepresentations that went far beyond the FDA-approved label. Opp. at 43–44 (citing FAC ¶ 228); see supra Subpart II.E.4.c (concluding that the nine categories of misrepresentations were not approved by the FDA). These misrepresentations preclude Manufacturers' use of the safe harbor.

Second, Manufacturers rely on Hartford Cas. Ins. Co. v. Swift Distrib., Inc., to argue that disparagement under section 1770(a)(8) of the California Civil Code requires the City to, at least, clearly implicate a false or misleading statement that refers to and demeans a specific competitor's

---

[46] NSAIDS include acetaminophen and ibuprofen.

[47] Manufacturers also argue that the City fails to plead injury and causation. See Man. Mot. at 11–12. "To establish standing under the CLRA, FAL, and UCL, a plaintiff must allege that the plaintiff suffered an 'injury in fact' and has 'lost money or property' as a result of a defendant's alleged conduct." Tabler v. Panera LLC, 19-CV-01646-LHK, 2019 WL 5579529, at *9 (N.D. Cal. Oct. 29, 2019). Manufacturers do not challenge the City's standing to bring a FAL or UCL claim, nor would they succeed. The FAC is replete with allegations that Manufacturers specifically targeted San Francisco physicians, which caused these physicians to over-prescribe opioids to patients. FAC ¶¶ 38–71. Just as in its public nuisance claim, see supra Subpart II.E.5.c, the City satisfies the CLRA, FAL, and UCL's standing requirements by alleging that Manufacturers' false marketing caused substantial injuries to its residents and property through opioid addiction, overdoses, and property damage. Id. See 1075 Mkt. St. Owners' Assoc. v. U.S. Dep't of Health & Hum. Servs., No. 19-cv-07313-SK, 2020 WL 5229163, at *19 (N.D. Cal. Feb. 11, 2020) (applying the public nuisance injury and proximate cause analysis to the UCL claims).

product.  Man. Mot. at 12 (citing 59 Cal. 4th 277, 284 (2014) ["Hartford"]).  But Hartford is distinguishable because in that case, the California Supreme Court dealt with a disparagement claim stemming from an insurance policy, not the CLRA.  59 Cal. 4th at 284.  California courts have indicated that the CLRA only requires a party to have made disparaging statements about competing products generally, rather than about specific products.  See Shaeffer v. Califia Farms, LLC, 44 Cal. App. 5th 1125, 1139 (2020).  The City sufficiently alleges that Manufacturers disparaged all NSAIDs and relies on particularized facts to support its allegations.  FAC ¶¶ 336, 338–39, 343–45, 911.  For example, Purdue, Cephalon, Janssen, and Endo each allegedly sponsored separate materials that attributed false risks to NSAIDs.  FAC ¶¶ 336, 338–39, 343–45 (identifying the title and sponsors of materials that falsely attributed risks to NSAIDs).  Thus, the City has satisfied the requirements of Cal. Civ. § 1770(a)(8).

### iii.     FAL claim against Manufacturers.

The City alleges that Manufacturers' violations of California's FAL constitute both an independent basis for finding liability and a predicate act that gives rise to an action under the UCL's unlawful prong.  Opp. at 43.  California's FAL prohibits any "unfair, deceptive, untrue or misleading advertising."  Moore v. Mars Petcare US, Inc., No. 18-15026, 2020 WL 4331765, at *4 (9th Cir. July 28, 2020) (quoting Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008)) (internal quotation marks omitted).  The FAL extends to false advertising and "advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."  Kasky v. Nike, Inc., 27 Cal. 4th 939, 951 (2002) (citation omitted).  Any violation of the FAL "necessarily violates the UCL."  Id. at 950 (citation omitted).  As with the UCL, a FAL claim premised on false advertising or promotional practices requires that "members of the public are likely to be deceived."  Id. at 951 (2002) (citation omitted).

Manufacturers argue that: (1) none of the eight misrepresentations[48] would likely deceive a reasonable consumer given that opioid labels disclose potential risks; (2) claims premised on

---

[48] This excludes Purdue's misrepresentations about OxyContin's duration of relief, see FAC ¶ 346, because the actions against Purdue are currently stayed pending bankruptcy proceedings.  See In re Purdue Pharma L.P., et al., No. 19-23649.

United States District Court
Northern District of California

omissions or lack of substantiation are not cognizable; and (3) the City relies on third-party statements that are not legally attributable to Manufacturers. See Man. Mot. at 6–10.[49]  None are persuasive.

(i)  <b>Reasonable consumer</b>.

Both the UCL and FAL utilize the "reasonable consumer test" to determine whether a business practice is deceptive or misleading. Moore, 2020 WL 4337165, at *5.  "[T]he reasonable consumer standard requires a probability 'that a significant portion of the general consuming public or targeted consumers, acting reasonably in the circumstances, could be misled.'" Id. (quoting Ebner v. Fresh, Inc., 838 F.3d 958, 965 (9th Cir. 2016)).  Manufacturers argue that the targeted consumers were physicians, not patients, and that Manufacturers' labels and branded promotions adequately detail the allegedly misrepresented risks.  Man. Mot. at 7–8.

This argument implicitly relies on the "learned intermediary doctrine,"[50] which states that, "in the case of prescription drugs, the duty to warn runs to the physician, not to the patient . . . . [t]hus a pharmaceutical manufacturer may not be required to provide warning of a risk known to the medical community." Carlin v. Superior Ct., 13 Cal. 4th 1104, 1116 (1996).  The learned intermediary doctrine stems from the rationale that a prescribing doctor typically serves as an intervening party that cuts off the causal chain. See Magee v. Wyeth Labs. Inc., 214 Cal. App. 2d 340, 351–52 (1963) ("Failure to follow an unchallenged method of use prescribed by the manufacturer constitutes a break in causation which exonerates the manufacturer from any liability.").

Manufacturers' argument ignores the crux of the City's allegations.  The City alleges that Defendants engaged in a systematic campaign that specifically targeted physicians in order to influence physicians' prescribing decisions and mitigate concerns regarding prescription opioids, thereby misleading both physicians and patients.  Opp. at 47.  Both the MDL court and California

---

[49] Manufacturers also argue that their statements are protected by California's safe harbor doctrine, but the Court rejected this argument above. See supra Subpart II.E.6.a.ii.

[50] While Manufacturers' motion and reply do not specifically identify the "learned intermediary doctrine," Manufacturers conceded at the motion hearing that their argument relies on this doctrine. See Mot. Trans. at 73–74.

United States District Court
Northern District of California

courts have concluded that such allegations are sufficiently plausible, if they are supported by facts, to demonstrate that both the public and prescribers were misled.[51]  This Court agrees.

Here, the City has pled facts to support its claim.  For example, Manufacturers allegedly sent sales representatives to visit physicians in San Francisco and paid these physicians millions of dollars for expenses, including "food and beverage," "charitable contribution," "travel and lodging," and "consulting fees."  FAC ¶ 39.  They also allegedly published and circulated articles and guides to prescribers that contained false claims regarding opioid abuse and addictiveness.  FAC ¶¶ 278, 284–86, 307, 342–43, 396, 488, 504.  Some manufacturers allegedly even paid prescribers to prescribe their products.  Id. ¶ 514.  Manufacturers' data allegedly confirms that their marketing tactics positively impacted prescribers' behavior.  Opp. at 47 (citing FAC ¶¶ 538–44).  Thus, the learned intermediary doctrine does not apply.

(ii)    **Omissions or lack of substantiation.**

Manufacturers argue that the City fails to allege that certain statements by Manufacturers were unsubstantiated or false as a matter of law, because the studies that the FAC cites do not concern "specific products, let alone purports to disprove any specific claim."  Man. Mot. at 9 (citing FAC ¶¶ 319, 321, 332, 372, 380, 700).  A FAL cause of action premised on allegations that the advertisement's claims "lacks evidentiary support is said to be unsubstantiated." Engel v. Novex Biotech LLC, No. 14–cv–03457–MEJ, 2014 WL 5794608, at *3–4 (N.D. Cal. Nov. 6, 2014).  "A claim can survive a lack of substantiation challenge by, for example, alleging studies showing that a defendant's statement is false." Kwan v. SanMedica Int'l, LLC, No. 14–cv–03287–MEJ, 2014 WL 5494681, at *3–4 (N.D. Cal. Oct. 30, 2014) (quoting Bronson v. Johnson

---

[51] See e.g., In re Nat'l Prescription Opiate Litig., 2018 WL 4895856, at *23 ("[T]he complaint alleges that prescribing physicians were also targets of the misrepresentations.  Given these allegations, the court declines to find that physicians' act of writing prescriptions breaks the causal chain, as a matter of law, when the very purpose of the Defendants' alleged scheme was to achieve exactly that result."); Thompson v. Janssen Pharmaceuticals, Inc., No. CV 16–2628 PSG (AGRx), 2017 WL 5135548, at *9 (C.D. Cal. Oct. 23, 2017) ("California courts have in the past recognized that the learned intermediary doctrine may not apply where medication has been overpromoted to the extent that any warnings would have been nullified."); Steven v. Parkes, Davis & Co., 9 Cal. 3d 51, 65 (1973) ("[A]n adequate warning to the [medical] profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings give.").

& Johnson, Inc., No. C 12–04184 CRB, 2013 WL 1629191, at 8 (N.D. Cal. Apr. 16, 2013)).

There is no requirement that studies must address a specific brand of product.[52]

    The City argues that Manufacturers made false, not unsubstantiated, statements.  Opp. at

48.  The FAC is replete with external studies to support the City's allegations that Manufacturers

made false assertions.  See FAC ¶¶ 30, 232–34, 266, 384–86.  For example, the City cites two

studies by the CDC and FDA to disprove Manufacturers' claim that "long-term use of opioids

improves patient function and quality of life."  FAC ¶ 332 ("The FDA, for years, has made clear

through warning letters to manufacturers the lack of evidence for claims that the use of opioids for

chronic pain improves patients' function and quality of life.  Based upon a review of the existing

scientific evidence, the CDC Guideline concluded that 'there is no good evidence that opioids

improve pain or function with long-term use.'" (internal citation omitted)).  The City also relies on

a series of articles stating that long-term opioid use "may actually worsen pain and functioning."

FAC ¶¶ 332–35.  Manufacturers argue that these studies fail to demonstrate that Manufacturers'

claims were false because they use words like "may" and describe opioid benefits as "uncertain."

Man. Mot. at 9.  However, this argument ignores the studies cited in the FAC, including one

describing a study of 69,000 women with recurrent pain, which concluded that the patients who

received opioid therapy were less likely than the placebo-controlled group to have improved pain

and had worsened function.  FAC ¶ 333 (citing Thomas R. Frieden and Debra Houry, Reducing

the Risks of Relief—The CDC Opioid Prescribing Guideline, New Eng. J. of Med. 1503 (Apr. 21,

2016)).  Such allegations, accepted as true, refute the notion that opioids improve long-term pain

and function.  Id.  Thus, Manufacturers' argument fails.

    Next, Manufacturers argue that they have no duty to disclose omitted risk information

related to unbranded promotional materials, and thus, the City cannot rely on these alleged

---

[52] See e.g., In re Clorox Consumer Litigation, 894 F. Supp. 2d 1224, 1232–33 (N.D. Cal. Aug. 24, 2012) (concluding that studies demonstrating that baking soda-based cat litter is not inferior to carbon-based litter were sufficient to demonstrate that the Clorox's claims about Fresh Step cat litter were false); In re NJOY, Inc. Consumer Class Action Litig., No. 14-428, 2015 WL 12732461, at *18 (C.D. Cal. May 27, 2015) (concluding that plaintiffs did more than allege that there was no competent evidence to support the defendant's claims about its product, NJOY, because plaintiffs cited several studies finding that e-cigarettes, generally, contain dangerous carcinogen, thus making the defendant's assertion false).

omissions to support its FAL claim. Def. Mot. at 9; Def. Reply at 5. In order to prevail on a FAL claim premised on omissions of material fact, the omission "must be contrary to a representation actually made by the defendants, or an omission of a fact that the defendant was obligated to disclose." Daugherty v. American Honda Motor Co., Inc., 144 Cal. App. 4th 824, 835 (2006). A duty to discloses arises when (1) "the defendant had exclusive knowledge of material facts not known to the plaintiff;" (2) "the defendant actively conceals a material fact from the plaintiff;" and (3) "the defendant makes partial representations but also suppresses some facts." Andren v. Alere, Inc., 207 F. Supp. 3d 1133, 1142 (S.D. Cal. 2016). "A defendant has exclusive knowledge giving rise to a duty to disclose when 'according to the complaint, [defendant] knew of this defect while plaintiffs did not, and, given the nature of the defect, it was difficult to discover.'" Id. (citation omitted).

The City plausibly alleges that Manufacturers had "exclusive knowledge of material facts not known to the plaintiff." Id. at 1142. For example, the City alleges that Endo knew that its product, Opana ER, was widely abused, yet still marketed it as tamper resistant and abuse deterrent. FAC ¶¶ 373–89. Additionally, Endo, Janssen, Purdue, and Cephalon allegedly circulated information pertaining to pseudoaddiction, despite their own key opinion leaders ("KOL"),[53] Dr. Lynn Webster, acknowledging that they had "debunk[ed] [pseudoaddiction] as a concept." Id. ¶¶ 292–302. While the City could theoretically access secondary sources that challenged alleged misrepresentations like pseudoaddiction, they could not discover that Manufacturers knew that concept was "debunk[ed]." Id. ¶ 302. These allegations support the City's assertion that Manufacturers omitted material information related to defects in opioids, and plaintiffs, like the City, were unable to discover the information.

**(iii)    Third-party statements.**

Manufacturers argue that the City has not pled facts to support its assertion that Manufacturers controlled third parties who made unlawful statements, and thus, Manufacturers cannot be held liable for the statements. Man. Mot. at 10. "A defendant's liability must be based

---

[53] KOLs are "doctors who were [allegedly] paid by the Marketing Defendants to promote their pro-opioid message . . . ." FAC ¶ 402.

United States District Court
Northern District of California

on his personal participation in the unlawful practices' and 'unbridled control' over the practices

that are found to violate section . . . 17500." Emery v. Visa Inter'l. Serv. Ass'n, 95 Cal. App. 4th

952, 960 (2002) (quoting People v. Toomey, 157 Cal. App. 3d 1, 15 (1984)). "Liability may be

imposed on those who aid and abet another's violation of the UCL if the individual knows the

other's conduct constitutes a violation and gives substantial assistance or encouragement to the

other to so act." Decarlo v. Costco Wholesale Corp., No. 14cv00202 JAH-BLM, 2020 WL

1332539, at *5 (S.D. Cal. Mar. 23, 2020) (citing People v. Sarpas, 224 Cal. App. 4th 1539, 1563

(2014)).

Manufacturers characterize the City's allegations as general allegations of "funding and

generic oversight" over third parties, Man. Mot. at 10, but this ignores the City's detailed

allegations of Manufacturers' substantial involvement and control over third-party conduct. FAC

¶¶ 403–06, 410–12, 451–74. Manufacturers allegedly utilized several third parties to misrepresent

prescription opioids: Front Groups, KOLs, and Continuing Medical Education ("CME") programs.

FAC ¶ 403.

Manufacturers allegedly contributed millions of dollars to front groups, their individual

executives, staff members, and board members, who then published and distributed materials that

overstated prescription opioids' benefits and understated their risks. Id. ¶¶ 403–06 (citing U.S. S.

Homeland Sec. & Governmental Aff. Comm., Ranking Members' Office, Fueling an Epidemic

(Feb. 12, 2018), https://www.hsdl.org/?abstract&did=808171). In order to receive funding from

Manufacturers, the American Pain Foundation ("APF")—an alleged front group—submitted grant

proposals tailored around activities and publications that Manufacturers had previously suggested.

Id. ¶ 412. Not only did Manufacturers allegedly fund front groups, but the City also alleges that

Manufacturers controlled front groups by developing, reviewing, approving, and distributing their

published content. See e.g., id. ¶ 410 ("[I]t was Endo that substantially controlled NIPC, by

funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC

materials."). Some Manufacturers, like Purdue, even allegedly signed consulting services

agreements with APF, which gave Purdue and its KOLs substantial control over APF's

promotional projects. Id. ¶ 413. Cephalon, Endo, Purdue, and Janssen, allegedly sponsored and

United States District Court
Northern District of California

90

substantially controlled messages espoused by KOLs, like Dr. Lynn Webster, Dr. Russell

Portenoy, and Dr. Perry Fine. Id. ¶¶ 451–74. Dr. Fine even allegedly served on Purdue's advisory

board, provided medical consulting for Janssen, and participated in CME activities on behalf of

Endo. Id. ¶ 468.

Manufacturers claim that these allegations demonstrate only that Manufacturers provided

"funding and generic oversight." Man. Mot. at 10 (citing Emery, 95 Cal. App. 4th at 960; Gen.

Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 395 (1982); Batzel v. Smith, 333

F.3d 1018, 1036 (9th Cir. 2003)). However, Manufacturers rely on authority that does not

preclude the existence of funding as an indicator of control. Id. (citing Batzel, 333 F.3d at 1036

("Sponsorship alone is insufficient to render the sponsor the guarantor of the truth of all statements

made in a publication." (internal citation omitted))). Rather, courts have concluded that

allegations of creative control are sufficient to raise a plausible inference that a defendant had

"unbridled control" over unlawful practices. Slims v. Campbell Soup Company, No. EDCV 18-

668 PSG (SPx), 2018 WL 7568640, *8 (E.D. Cal. Sept. 24, 2018) (concluding that an

advertisement agency who "wrote or approved" misleading labels and messages was sufficient to

raise a plausible inference that they had control over the misstatements).

The City's allegations go well beyond "funding and generic oversight," Man. Mot. at 10,

especially in light of the allegations that Manufacturers approved and helped develop these

misrepresentations. FAC ¶¶ 257 n.99, 408–15, 447–92. Thus, these allegations are sufficient to

raise a plausible inference that Manufacturers controlled third-party misrepresentations, which are

attributable to Manufacturers.[54]

Because the City's allegations plausibly demonstrate that members of the public could be

---

[54] This conclusion negates Manufacturers' argument that the third-party statements constitute
protected non-commercial speech. Man. Mot. at 10 (citing Critical Care Diagnostics, Inc. v. Am.
Ass'n for Clinical Chemistry, Inc., 13cv1308 L (MDD), 2014 WL 634206, at *8 (S.D. Cal. Feb.
18, 2014). "In typical commercial speech cases, the speaker is likely to be someone engaged in
commerce—that is, generally, the production, distribution, or sale of goods or services—or
someone acting on behalf of a person so engaged . . . ." Critical Care Diagnostics, Inc., 2014 WL
634206, at *8 (citation omitted). The allegations above plausibly demonstrate that the third parties
"act[ed] on behalf of" speakers engaged in the "production, distribution, or sale of goods," and
therefore engaged in commercial speech. See id., at *8 (citation omitted).

1  deceived by Manufacturers' statements, the Court hereby DENIES Manufacturers' motion to

2  dismiss the City's FAL claim and the UCL claim to the extent that it relies on the unlawful prong.

3          b.     **UCL fraudulent prong.**

4          "Claims stated under the fraud[ulent] prong of the UCL are subject to the particularity

5  requirements of [Rule] 9(b)." In re Anthem, Inc. Data Breach Litig., 162 F. Supp. 3d 953, 990

6  (N.D. Cal. 2016) (citing Kearns, 567 F.3d at 1125). Defendants argue that the City fails to allege

7  a violation of the UCL's fraudulent prong with the degree of particularity required by Rule 9(b)

8  for two reasons: (1) the City does not identify any specific suspicious orders that Defendants

9  should have reported; and (2) members of the public "cannot be . . . deceived by Defendants'

10 alleged failure to maintain internal suspicious order monitoring systems or to provide confidential

11 reports to regulators." Def. Mot. at 16 (citing Holmes v. Johnson & Johnson, 617 F. App'x 639

12 (9th Cir. 2015)); see also Def. Reply at 12. The City must show that members of the public are

13 likely to be deceived by Defendants' conduct. See In re Tobacco II Cases, 46 Cal. 4th 298, 312

14 (2009). It has done so.

15         In Johnson & Johnson, the plaintiff generally alleged that Johnson & Johnson used false

16 and misleading advertising to promote its drug Levaquin and "failed to disclose the risk of severe

17 subcutaneous adverse reaction conditions." Id. at 643–44. The court rejected the plaintiff's UCL

18 claim under the fraudulent prong because the plaintiff failed to "specify what information was

19 likely to deceive Holmes or her doctor . . . ." Id. at 944.

20         Here, the City specifies "the who, what, when, where, and how" of Defendants' failure to

21 maintain effective controls and report suspicious orders, and the misrepresentation that Defendants

22 abided by their legal obligations. Opp. at 46 (citing FAC ¶¶ 579–680).[55]

23         For example, between 2016 and 2017, McKesson, Cardinal, Mallinckrodt, and

24 AmerisourceBergen were each forced to pay federal and state fines for failing to report suspicious

25 orders to the DEA as required by law. FAC ¶¶ 34, 658–67. Additionally, in 2017, after

26

27 [55] Defendants argue that the City attempts to "amend its Complaint through its opposition brief." Def. Reply. at 13. However, the City incorporated all allegations in its complaint for each cause

28 of action, which includes Defendants' statements regarding regulatory compliance. See FAC ¶ 907.

United States District Court
Northern District of California

McKesson allegedly continued to breach its duties under the CSA by failing to identify and report suspicious orders throughout the U.S., including California, it entered into a settlement agreement with the DEA in which it admitted to repeatedly breaching its duties to monitor and report suspicious orders. Id. ¶¶ 659, 750; see also id. ¶ 665 (alleging that Cardinal did the same between January 1, 2009 and May 14, 2012). Further, Defendants allegedly used the HDA as an intermediary to coordinate and to ensure that the DEA's aggregate production quotas, individual quotas, and procurement quotas remained high. Id. ¶ 627. Defendants allegedly engaged in fraudulent behavior by using the HDA and Pain Care Forum to coordinate responses to their legal obligations and by agreeing not to identify, report, or halt suspicious orders in order to avoid DEA scrutiny. Id. ¶¶ 623, 624, 628–30. Defendants allegedly recorded and maintained data that made them aware of suspicious orders departing their facilities, yet they omitted any of this material information from their reports to the DEA. Id. ¶¶ 630, 633–42. Instead of reporting these orders, Defendants allegedly used this data to target doctors who wrote the largest quantities of opioid prescriptions and encouraged them to prescribe more, despite later claiming that these doctors "fooled" Defendants. Id. ¶¶ 647–55. The FAC alleges that throughout this conduct, Defendants—including Purdue, AmerisourceBergen, Mallinckrodt, Cardinal, McKesson—falsely and publicly maintained that they abided by their legal obligations. Id. ¶¶ 668–80.

Defendants counter that these public statements of compliance "constitute nonactionable puffery." Def. Reply at 13 (citing Vitt v. Apple Computer, Inc., 469 F. App'x 605, 607 (9th Cir. 2012); Oestreicher v. Alienware Corp., 322 F. App'x 489, 493 (9th Cir. 2009)). However, the authority that Defendants rely upon is substantively distinguishable. In Vitt, the court concluded that statements such as "the iBook G4 is mobile, durable, portable, rugged, built to withstand reasonable shock, reliable, high performance, high value, an affordable choice, and an ideal student laptop" constituted inactionable puffery because they were not factual representations. 469 F. App'x at 607 (internal quotation marks omitted). Likewise, in Oestreicher, the court concluded that statements about product superiority such as "superb, uncompromising quality . . . faster, more powerful, and more innovative than competing machines," constituted inactionable puffery because they were generalized and vague. Oestreicher v. Alienware Corp.,

93

544 F. Supp. 2d 964, 973 (N.D. Cal. Apr. 1, 2008) aff'd mem. 322 F. App'x 489, 493 (9th Cir. 2009).

Defendants cite no authority suggesting that California treats statements about legal compliance as puffery. If anything, California treats only "statement[s] of opinion," as inactionable puffery. See, e.g., Hauter v. Zogart, 14 Cal. 3d 104, 111 (1975) ("If defendants' assertion of safety is merely a statement of opinion—mere 'puffing'—they cannot be held liable for its falsity."). Defendants' statements go beyond opinion to factually represent that they have a "best-in-class controlled substance monitoring program to help identify suspicious orders," despite being cited by the DEA for failing to maintain a suspicious monitoring program. FAC ¶¶ 669, 771. Defendants' use of "best-in-class" may be an opinion, but their claim to have a controlled substance monitoring program is belied by the DEA's determination that they did not maintain their program. Id. The DEA's enforcement action demonstrates that Defendants' statements regarding legal compliance are objectively verifiable, and thus, do not constitute puffery. The City can therefore rely on false claims of legal compliance to assert its UCL fraudulent prong claim.

Thus, this Court DENIES Defendants' motion to dismiss the City's UCL claim to the extent that it relies on the fraudulent prong.

### c. **UCL unfair prong.**

Defendants argue that the City cannot state a claim under the UCL's unfair prong because prescription opioids "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people." Def. Mot. at 22 (quoting 21 U.S.C. § 801(1) (internal quotation marks omitted)).[56] "[A] practice may be deemed unfair even if not specifically proscribed by some other law." Cel-Tech Comm'ns, 20 Cal. 4th 163, 180 (1999). The definition of "unfair" is currently in flux; however, both parties rely on the Ninth Circuit's

---

[56] Defendants also argue that the City's claim fails because the City has not alleged (1) that Defendants' conduct directly harmed consumers nor (2) how a failure to report suspicious orders could harm consumers. Def. Mot. at 21. The Court rejected these causation arguments in the public nuisance section above. See supra Subpart II.E.5.c; see also Gamache v. Airbnb., No. A146179, 2017 WL 3431651, at *4 (Cal. Ct. App. Aug. 10, 2017) (applying the same causation analysis to both public nuisance and UCL claims).

1    balancing test, which weighs "the harm to the consumer" against "the utility of the defendant's

2    practice." Lozano v. AT&T Wireless Servs., Inc., 504 F.3d 718, 736 (9th Cir. 2007). "An unfair

3    business practice occurs when it offends an established public policy or when the practice is

4    immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Bardin v.

5    DaimlerChrysler Corp., 136 Cal. App. 4th 1255, 1268 (2006).

6          But the City has alleged a series of practices that led to the oversupply of prescription

7    opioids in San Francisco: "(i) promoting their use in a manner that minimized serious risks; (ii)

8    improperly touting purported benefits; and/or (iii) failing to make reasonable efforts to prevent

9    diversion." Opp. at 45 (quoting FAC ¶ 915) (internal quotation marks omitted). Despite any

10   positive impacts that prescription opioids have on the health and general welfare of society, the

11   practices used to promote such opioids allegedly violated public policies and substantially injured

12   consumers through addiction, abuse, overdoses, and death, in addition to the City's remedial costs.

13   FAC ¶¶ 16–18, 686–96, 911–18.

14         Defendants also argue that if they had declined to sell and fill opioid orders, they would

15   have violated patients' rights. Def. Reply at 17 (citing Cal. Health & Safety Code § 124960(g)–

16   (i); Cal. Bus. & Prof. Code § 2241.5(a)). But California and the CSA knowingly permit

17   manufacturers and distributors to abridge these rights by imposing duties to halt suspicious orders

18   because the threat of diversion is far more substantial. See 21 C.F.R. §§ 1301.71(a), 1301.74(b);

19   Cal. Health & Safety Code § 11135(a); Cal. Bus. & Prof. Code § 4164. The City's alleged

20   harms—such as increased costs associated with opioid addiction, abuse, and overdose deaths—

21   exemplify the substantial threat that Defendants' duties are meant to prevent. See FAC ¶¶ 51, 55,

22   57–58, 516–22, 538–46. Thus, the City has pled a cognizable UCL claim based on the unfair

23   prong because the City's harm sufficiently outweighs the utility of Defendants' marketing and

24   distribution tactics.

25               d.    **Restitution from Distributors.**

26         Finally, Distributors argue that the City is not entitled to restitution for the income, profits,

27   and other benefits Distributors allegedly obtained from San Francisco residents, because

28   Distributors did not acquire residents' money by failing to report suspicious orders or maintain

United States District Court
Northern District of California

effective controls. Distr. Mot. at 16; Def. Reply at 17. "[I]n the UCL context . . . restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it." Shersher v. Superior Court, 154 Cal. App. 4th 1491, 1497 (2007). A defendant can be liable for restitution under the UCL even if it is not the direct recipient of a plaintiff's misappropriated funds. See Troyk v. Farmers Group, Inc., 171 Cal. App. 4th 1305, 1340 (2009). "The UCL 'requires only that the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means.'" Id. (quoting Shersher, 154 Cal. App. 4th at 1500).

The City's demand for restitution rests on a theory that Distributors' failure to report suspicious orders led to an oversupply of prescription opioids in San Francisco, which patients paid money to pharmacists to obtain, and that the pharmacists then paid money to distributors for more opioids. See FAC ¶¶ 12–18, 45, 580. Had Distributors implemented effective controls to prevent against diversion, fewer City residents would have obtained diverted opioids, which would have decreased both demand for Distributors' products and their profits. See id. While Distributors were not the direct recipients of City residents' payments, Distributors' financial success necessarily relies on the societal demand for opioids, which can allegedly be traced to transactions for diverted opioids. See FAC ¶¶ 656–67. Because the UCL permits restitution as a remedy for indirectly misappropriated funds, the City's claim against Distributors for restitution may proceed. See Troyk, 171 Cal. App. 4th at 1340.

## III.    CONCLUSION

For the foregoing reasons:

1.  Walgreens' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (dkt. 168) is DENIED.

2.  All Defendants' Motion to Dismiss for Failure to State a Claim (dkt. 169) is GRANTED in part, and DENIED in part.

    a.  The City's RICO claims are DISMISSED WITH PREJUDICE.

    b.  The City's Public Nuisance, Unfair Competition Law, and False Advertising

United States District Court
Northern District of California

Law claims remain.

3. Distributors' Motion to Dismiss for Failure to State a Claim (dkt. 170) is GRANTED in part, and DENIED in part.

   a. The City's RICO claims are DISMISSED WITH PREJUDICE.

   b. The City's Public Nuisance, Unfair Competition Law, and False Advertising Law claims remain.

4. Manufacturers' Motion to Dismiss for Failure to State a Claim (dkt. 171) is GRANTED in part, and DENIED in part.

   a. The City's RICO claims are DISMISSED WITH PREJUDICE.

   b. The City's Public Nuisance, Unfair Competition Law, and False Advertising Law claims remain.

5. Anda's Motion to Dismiss for Failure to State a Claim (dkt. 167) is DENIED.

6. Specially Appearing Teva Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 165) is DENIED WITHOUT PREJUDICE.

7. Mallinckrodt plc's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 166) is DENIED WITHOUT PREJUDICE.

8. Endo International plc's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 176) is DENIED WITHOUT PREJUDICE.

9. Allergan plc's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 162) is DENIED WITHOUT PREJUDICE.

The Court retains jurisdiction over the remaining state law causes of action. The City shall have ten days to amend and add allegations to its complaint supporting its UCL claim premised on violations of Cal. Bus. & Prof. Code § 4169.1. The parties will file a status conference statement in twenty days in order to address how they plan to proceed on the state law claims.

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: September 30, 2020



CHARLES R. BREYER
United States District Judge

**Appendix A**

| | | |
|---|---|---|
| **Defendants** | | |
| **Marketing Defendants** (FAC ¶¶ 80–165) | **RICO Marketing Defendants** (FAC ¶ 165 n.65) | **Manufacturers** (Man. Mot. 16–19) |
| - <u>Purdue Entities</u>: Purdue Pharma L.P. ("PPL"); Purdue Pharma Inc. ("PPI"); The Purdue Frederick Company, Inc. ("PFC"); Rhodes Pharmaceuticals L.P. ("Rhodes"); Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; the Trust for the Benefit of Members of the Raymond Sackler Family.<br>- <u>Actavis Entities</u>: Allergan plc (f/k/a Actavis plc); Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA; Watson Laboratories, Inc.; Warner Chilcott Company LLC; Actavis Pharma, Inc.; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City); Actavis Laboratories FL, Inc. (f/k/a Wat Laboratories Inc. Florida).<br>- <u>Cephalon Entities</u>: Teva Pharmaceuticals USA, Inc. ("Teva USA"); Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") (collectively "Teva); Cephalon, Inc.;<br>- <u>Janssen Entities</u>: Johnson & Johnson ("J&J"); Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals"); Noramco, Inc. ("Noramco"); Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"); Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica");<br>- <u>Endo Entities</u>: Endo International plc ("Endo Int'l"); Endo Health Solutions, Inc. ("EHS"); Endo | - <u>Purdue Entities</u>: PPL; PPI; PFC; Rhodes.<br>- <u>Cephalon Entities</u>: Teva USA, Teva Ltd. Cephalon, Inc.<br>- <u>Janssen Entities</u>: J&J; OMP; Janssen Pharmaceuticals; Noramco; Janssen Pharmaceutica.<br>- <u>Endo Entities</u>: EHS; EPI; and Par Pharmaceutical, Inc.<br>- <u>Mallinckrodt Entities</u>: MNK plc; MNK LLC; and SpecGx LLC. | - Allergan Finance, LLC,<br>- Allergan Sales, LLC<br>- Allergan USA, Inc.,<br>- Endo Pharmaceuticals Inc.,<br>- Endo Health Solutions Inc.,<br>- Par Pharmaceutical, Inc.,<br>- Par Pharmaceutical Companies, Inc.,<br>- Johnson & Johnson,<br>- Janssen Pharmaceuticals, Inc.,<br>- Ortho-McNeil-Janssen Pharmaceuticals, Inc.,<br>- Janssen Pharmaceutica, Inc.,<br>- Mallinckrodt LLC,<br>- SpecGx LLC,<br>- Noramco, Inc.,<br>- Teva Pharmaceuticals USA, Inc.;<br>- Cephalon, Inc.;<br>- Actavis LLC;<br>- Actavis Pharma, Inc.<br>- Watson Laboratories, Inc.;<br>- Warner Chilcott Company LLC;<br>- Actavis South Atlantic LLC;<br>- Actavis Elizabeth LLC;<br>- Actavis Mid Atlantic LLC;<br>- Actavis Totowa LLC;<br>- Actavis Kadian LLC;<br>- Actavis Laboratories UT, Inc.;<br>- Actavis Laboratories. |

United States District Court
Northern District of California

|  |  |  |
|---|---|---|
| Pharmaceuticals, Inc. ("EPI"); Par Pharmaceutical, Inc.<br>- Insys Therapeutics, Inc.<br>- <u>Mallinckrodt Entities</u>: Mallinckrodt plc ("MNK plc"); Mallinckrodt LLC ("MNK LLC"); SpecGx LLC. |  |  |
| **Distributor Defendants**<br><br>(FAC ¶ 166)<br><br>- Amerisource Bergen Drug Corporation ("AmerisourceBergen");<br>- Anda, Inc. ("Anda");<br>- Cardinal Health, Inc. ("Cardinal");<br>- McKesson Corporation ("McKesson"); and<br>- Walgreen Co. ("Walgreens") (as both a dispenser and distributor). | **RICO Supply Chain Defendants**<br>(FAC ¶ 797)<br>- Purdue Entities;<br>- Cephalon Entities;<br>- Endo Entities;<br>- Mallinckrodt Entities;<br>- Actavis Entities;<br>- McKesson;<br>- Cardinal;<br>- Anda; and<br>- AmerisourceBergen | **Distributors**<br><br>(Distr. Mot. at 17; Wal. Mot. at 1; Anda Mot. at 1)<br><br>- Amerisource Bergen Drug Corporation ("AmerisourceBergen");<br>- Anda, Inc. ("Anda");<br>- Cardinal Health, Inc. ("Cardinal");<br>- McKesson Corporation ("McKesson"); and<br>- Walgreen Co. ("Walgreens") (as both a dispenser and distributor). |

United States District Court
Northern District of California