```
 1           UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
 2
      THE CITY OF HUNTINGTON,      )
 3                                 )
              Plaintiff,           )
 4                                 )
      vs.                          )
 5                                 )  Civil Action
      AMERISOURCEBERGEN DRUG       )  No. 3:17-01362
 6    CORPORATION, et al.,         )
                                   )  Hon. David A. Faber
 7          Defendants.            )
      _____    )
 8                                 )
      CABELL COUNTY COMMISSION,    )
 9                                 )
              Plaintiff,           )
10                                 )  Civil Action
      vs.                          )  No. 3:17-01665
11                                 )
      AMERISOURCEBERGEN DRUG       )  Hon. David A. Faber
12    CORPORATION, et al.,         )
                                   )
13          Defendants.            )
14
              MONDAY, SEPTEMBER 14, 2020
15
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16            CONFIDENTIALITY REVIEW
17                  - - -
18          Remote videotaped deposition of
      Tricia Wright, M.D., held at the location of
19    the witness in San Francisco, California,
      commencing at 8:06 a.m. Pacific Time, on the
20    above date, before Carrie A. Campbell,
      Registered Diplomate Reporter and Certified
21    Realtime Reporter.
22
                    - - -
23

          GOLKOW LITIGATION SERVICES
24    877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
25
```

```
 1              A P P E A R A N C E S :
 2
 3     MOTLEY RICE LLC
       BY:  MICHAEL J. PENDELL
 4          mpendell@motleyrice.com
            JESSICA C. COLOMBO
 5          jcolombo@motleyrice.com
       20 Church Street, 17th Floor
 6     Hartford, Connecticut 06103
       (860) 882-1681
 7
       and
 8
 9     MOTLEY RICE LLC
       BY:  JOHN D. HURST
10          jhurst@motleyrice.com
       28 Bridgeside Boulevard
11     Mount Pleasant, South Carolina 29464
       (843) 216-9000
12
13     and
14
       HILL, PETERSON, CARPER, BEE &
15     DEITZLER, PLLC
       BY:  AARON L. HARRAH
16          aaron@hpcbd.com
       500 Tracy Way
17     Charleston, West Virginia  25311
       (304) 205-1810
18     Counsel for Plaintiffs
19
20     CAREY, SCOTT, DOUGLAS & KESSLER,
       PLLC
21     BY:  S. BENJAMIN BRYANT
            sbbryant@csdlawfirm.com
22     901 Chase Tower
       707 Virginia Street, East (25301)
23     Charleston, West Virginia 25323
       (304) 345-1234
24     Counsel for Cardinal Health
25
```

 1

        BAILEY WYANT PLLC
 2      BY:  SULEIMAN O. OKO-OGUA
             sokoogua@baileywyant.com
 3      500 Virginia Street East, Suite 600
        Charleston, West Virginia 25301
 4      (304) 345-4222
        Counsel for West Virginia Board of
 5      Pharmacy
 6
 7      SHOOK, HARDY & BACON, LLP
        BY:  MICHELLE M. FUJIMOTO
 8           mfujimoto@shb.com
        5 Park Plaza, Suite 1600
 9      Irvine, California  92614
        (949) 475-1500
10
        and
11
        COVINGTON & BURLING LLP
12      BY:  EMILY ULLMAN
             eullman@cov.com
13      850 Tenth Street, NW
        Washington, DC 20001-4956
14      (202) 662-6000
        Counsel for McKesson Corporation
15
16
    VIDEOGRAPHER:
17      CHRIS RITONA,
        Golkow Litigation Services
18
19
                        - - -
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          INDEX

 2                                          PAGE

 3    APPEARANCES................................   2

 4  EXAMINATIONS

 5    BY MR. PENDELL...........................   6

 6

 7                        EXHIBITS

 8  No.  Description                        Page

 9  1    Tricia E. Wright, MD FS FACOG DFASAM    72
         curriculum vitae

10

         2    Expert Report by Tricia Wright, MD,    84

11         MS, FACOG, DFASAM

12    (Exhibits attached to the deposition.)

13    CERTIFICATE................................139

14    ACKNOWLEDGMENT OF DEPONENT.................141

15    ERRATA....................................142

16    LAWYER'S NOTES............................143

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  We are now on
 2        the record.
 3                My name is Chris Ritona.  I am
 4        the videographer with Golkow
 5        Litigation Services.
 6                Today's date is September 14,
 7        2020, and the time is approximately
 8        11:06 a.m.
 9                This remote video deposition is
10        being held in the matter of the City
11        of Huntington, et al., versus
12        AmerisourceBergen Drug Corporation, et
13        al., for the United States District
14        Court for the Southern District of
15        West Virginia.
16                The deponent today is
17        Dr. Tricia Wright.
18                All parties to this deposition
19        are appearing remotely and have agreed
20        to the witness being sworn in
21        remotely.
22                Due to the nature of remote
23        reporting, please pause briefly before
24        speaking to ensure all parties are
25        heard completely.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Will counsel please identify
 2         themselves for the record.
 3              MR. PENDELL:  This is Mike
 4         Pendell tell from Motley Rice for the
 5         plaintiffs in this lawsuit.
 6              MS. FUJIMOTO:  Michelle
 7         Fujimoto on behalf of McKesson
 8         Corporation and on behalf of
 9         Dr. Wright.
10              MR. HURST:  John Hurst on
11         behalf of plaintiffs.  Motley Rice.
12              VIDEOGRAPHER:  Okay.  The court
13         reporter today is Carrie Campbell, and
14         she will now please swear in the
15         witness.
16
17              TRICIA WRIGHT, M.D.,
18    of lawful age, having been first duly sworn
19    to tell the truth, the whole truth and
20    nothing but the truth, deposes and says on
21    behalf of the Plaintiffs, as follows:
22
23              DIRECT EXAMINATION
24    QUESTIONS BY MR. PENDELL:
25         Q.    Good morning, Doctor.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    How are you?

 2         A.      Good.  How are you?

 3         Q.      Good.  Welcome to this very

 4    weird situation where we're doing this via

 5    Zoom.  But I'll tell you at the outset, I

 6    appreciate your time today.  Okay?

 7         A.      Okay.

 8         Q.      Could you just tell me your

 9    full name and your address?

10         A.      Tricia Elaine Wright.  My home

11    address?

12         Q.      Oh, sure.

13         A.      Yes.  629 Miramar Avenue, San

14    Francisco.

15         Q.      You understand, Doctor, that

16    you're under oath today, correct?

17         A.      I do.

18         Q.      Okay.  And you're prepared to

19    testify fully and truthfully, regardless of

20    whether or not your testimony hurts the

21    position taken by any defendant in this case,

22    correct?

23         A.      Correct.

24         Q.      Who are the defendants in this

25    case?
```

1      A.      My understanding, it is --

2   well, I am representing McKesson Corporation,

3   and then there is a few other drug

4   distributors.

5      Q.      Okay.  And so you sort -- you

6   of anticipated my next question, which was,

7   you understand who it is that you are

8   providing the expert testimony on behalf of?

9              Is it just McKesson, or is it

10   your understanding that your report is also

11   being provided on behalf of other defendants?

12              MS. FUJIMOTO:  Object.  Form.

13              THE WITNESS:  I -- I was hired

14         by McKesson, and then I understood

15         that it was being used in this global

16         matter.

17   QUESTIONS BY MR. PENDELL:

18      Q.      Okay.  And aside from McKesson,

19   do you know who any of the other defendants

20   are in this particular matter?

21      A.      I do not.

22      Q.      I had asked Ms. Fujimoto prior

23   to make sure that you had with you your

24   expert report and your CV.  And we're not

25   going to talk about those right now.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  But aside from your expert

 2   report and CV, do you have any other

 3   documents there with you in front of you for

 4   the purposes of this deposition?

 5        A.     Not for the purposes of this

 6   deposition, no.

 7        Q.     Did you bring any notes with

 8   you to the deposition?

 9        A.     I did not.

10        Q.     Am I correct that you did some

11   things to prepare for the deposition today?

12        A.     Yes, I did.

13        Q.     Tell me everything you did to

14   prepare for the deposition today.

15               MS. FUJIMOTO:  Object.  Form.

16               THE WITNESS:  I reviewed my

17          expert testimony, looked over my CV.

18          I talked with counsel, and we went

19          over some possible questions, and I

20          looked through some of the past

21          research.

22   QUESTIONS BY MR. PENDELL:

23        Q.     And when you say "some of the

24   past research," do you mean some of the

25   research that you conducted in doing your
```

Highly Confidential - Subject to Further Confidentiality Review

1    report?

2         A.    Yes.

3         Q.    Okay.  So your reliance

4    materials?

5         A.    I'm sorry, I'm not

6    understanding the --

7         Q.    I'm sorry.  So what you looked

8    at was reliance materials that were listed at

9    the end of your report?

10        A.    I did not look through them

11   completely, but I did look at the titles and

12   read through the report completely.

13        Q.    Understood.

14              I just wanted to make sure

15   there was not something other than what was

16   disclosed with your report that you looked

17   at.

18        A.    No.

19        Q.    Okay.  Aside from counsel --

20   and we'll get into your meetings with counsel

21   in a minute -- was there somebody else you

22   spoke with to prepare for this deposition?

23        A.    No.

24        Q.    Okay.  Is there anybody you

25   feel that you should have spoken to in order

1    to prepare for this deposition?

2        A.    No, I don't think so.

3        Q.    That's one of my favorite

4    questions.

5              You mentioned that you had met

6    with counsel to prepare for the deposition.

7              Specifically which lawyers did

8    you meet with to prepare?

9        A.    I met with Michelle Fujimoto

10   and with -- I am blanking on their name.

11   There was two other ones.

12             Michelle, can you -- oh, I

13   can't talk to you.

14             Yeah, one from McKesson

15   themselves, and I'm blanking on her name.

16       Q.    And was that -- was it your

17   understanding that the one from McKesson was

18   an in-house attorney for McKesson?

19             MS. FUJIMOTO:  Object to form.

20       Don't speculate.

21             THE WITNESS:  It is -- that is

22       my understanding, yes.

23   QUESTIONS BY MR. PENDELL:

24       Q.    Okay.  But as far as you --

25   your understanding is all the folks you met

```
 1   with were attorneys, correct?

 2        A.      Correct.

 3        Q.      How many times did you meet

 4   with lawyers to prepare for your deposition

 5   today?

 6        A.      For this deposition today, I

 7   met with lawyers twice.

 8        Q.      Okay.  And so let me ask you

 9   first about the very first meeting you had to

10   prepare for this deposition.

11                When was that?

12        A.      That was shortly after the

13   Loudin report, in my recollection.

14        Q.      Okay.  And how long was that

15   meeting?

16        A.      I would have to look at my

17   notes.  I don't recall off the top of my

18   head.  I think it was about an hour and a

19   half.

20        Q.      Okay.  So we can say

21   approximately an hour and a half, give or

22   take a little bit of time?

23        A.      Yeah, that sounds about right.

24        Q.      Okay.  And how about the second

25   meeting; when was that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I met just briefly with

2  Ms. Fujimoto last night on a telephone call.

3    Q.    Okay.  And how long was that

4  discussion?

5    A.    Probably -- I'd have to again

6  look at my notes, but probably about 15, 20

7  minutes.

8    Q.    And I assume that -- well, let

9  me not just assume anything.

10          That first meeting that you

11  had, was that remotely like we're doing now?

12    A.    Yes.

13    Q.    And then I believe you said you

14  spoke with Ms. Fujimoto via telephone; is

15  that correct?

16    A.    Correct.

17    Q.    Did you -- strike that.

18          Did you read the complaint in

19  this case?

20    A.    Did I read the complaint?

21    Q.    Yes.

22    A.    I did not read the complaint in

23  this case.

24    Q.    Okay.  What is your

25  understanding as to what the plaintiffs in

Highly Confidential - Subject to Further Confidentiality Review

1    this case -- and I'm going to say "the

2    plaintiffs."  And when I say "the

3    plaintiffs," I'm referring to both

4    Huntington, West Virginia, and Cabell County,

5    West Virginia, okay?

6             And if for some reason you need

7    me to be more specific about which plaintiff

8    I'm talking about, I don't think that'll be

9    necessary, but let me know and I'll do that.

10            Okay?

11            What is your --

12       A.    Oh, go ahead.

13       Q.    So my question was going to be,

14   what is your understanding as to what the

15   plaintiffs in this case allege that McKesson,

16   Cardinal and AmerisourceBergen did wrong?

17       A.    My understanding is that the --

18   the complaint is that there was some red

19   flags of excess drugs being sent to these

20   counties that should have been picked up on

21   and, you know, leading to an excess of these

22   medications in this county.

23       Q.    Did you ask anyone at McKesson

24   if the allegations were true?

25       A.    I did not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How about at Cardinal Health?

2  Did you ask anyone at Cardinal Health if the

3  allegations were true?

4    A.    I've never talked to anybody at

5  Cardinal Health.

6    Q.    And I assume you've never

7  talked to anyone at AmerisourceBergen,

8  correct?

9    A.    Correct.

10    Q.    Okay.  Would it matter to you

11  if the allegations are proved to be true?

12    A.    It would not matter to me

13  because I don't think those are the issues

14  that my testimony is speaking to.

15    Q.    Would it matter to you

16  personally?

17        MS. FUJIMOTO:  Objection.

18        THE WITNESS:  It would not

19    matter to me personally because --

20  QUESTIONS BY MR. PENDELL:

21    Q.    Why not?

22    A.    Because this -- that is not the

23  issues that I am speaking to with this

24  deposition and my report.

25    Q.    What subject areas do you

1    consider yourself to be an expert in?

2         A.    I am an expert in the care of

3    pregnant women with substance use disorders.

4    I am board certified in both obstetrics and

5    gynecology, and I am a -- board certified in

6    addiction medicine, both by the American

7    Academy -- or American Society of Addiction

8    Medicine -- or the American Board of

9    Addiction Medicine, sorry, and the American

10   Board of Preventive Medicine.

11             I've been taking care of

12   pregnant women with substance use disorders

13   for over 13 years, and I have published

14   widely on the subjects of substance use

15   disorders in pregnancy, including opiate use

16   disorders.

17        Q.    And anything else aside from

18   those areas?

19             MS. FUJIMOTO:  Object to form.

20             THE WITNESS:  Well, I'm a

21        general -- obstetrician/gynecologist,

22        so I take care of women throughout

23        their reproductive lives.

24   QUESTIONS BY MR. PENDELL:

25        Q.    Prior to this case, had you

1   ever provided professional services to

2   McKesson?

3        A.     Prior to this case, I was

4   retained for the purposes of the NAS lawsuit

5   from McKesson.

6        Q.     Okay.  So I was going to get

7   into this in a second.

8              Let's set aside the opioid

9   litigation for a moment.  So setting aside

10  opioid litigation, have you ever been engaged

11  by McKesson to provide any type of

12  professional consulting services?

13       A.     I have not.

14       Q.     And I'm going to ask you

15  anyway, although I think I know the answer to

16  this.  How about Cardinal Health?

17       A.     No.

18       Q.     How about AmerisourceBergen?

19       A.     No.

20       Q.     It's my understanding from the

21  cases that I'm involved in that you've been

22  disclosed as an expert in this case for

23  McKesson and also in the State of Washington

24  opioid case.

25              Is that correct?  Is that your

Highly Confidential - Subject to Further Confidentiality Review

1    understanding as well?

2         A.    Yes.

3         Q.    Okay.  Are there any other

4    cases that you know of that you've been

5    disclosed as an expert witness on behalf of

6    McKesson?

7         A.    Not that I know of, no.

8         Q.    Okay.  When were you first

9    contacted about being an expert in this case?

10        A.    In this case, it was either the

11   end of July or the beginning of August.  I

12   would have to look at my notes.

13        Q.    And that would be of 2020?

14        A.    Correct.

15        Q.    So I'm sorry, you said July or

16   August of 2020 you were contacted about being

17   an expert.

18             How soon after you were

19   contacted were you actually retained?

20        A.    I --

21             MS. FUJIMOTO:  I'm sorry, Mike,

22        but you're talking about -- because

23        I -- when we were off camera, you were

24        talking about this case?  The West

25        Virginia?

```
 1              MR. PENDELL:  Correct.

 2              MS. FUJIMOTO:  Okay.

 3              MR. PENDELL:  And correct me if

 4         I'm wrong, her testimony was that she

 5         was first contacted for this case in

 6         July or August of 2020.

 7    QUESTIONS BY MR. PENDELL:

 8         Q.    So now my next question is, how

 9    soon after you were contacted were you

10    actually retained?

11         A.    Soon --

12              MS. FUJIMOTO:  In this case,

13         not the opioid litigation generally?

14              MR. PENDELL:  In this case.

15              MS. FUJIMOTO:  All right.

16         Thank you.

17              MR. PENDELL:  Sure.

18              THE WITNESS:  Yes, soon after

19         that.  I don't know exactly when.

20    QUESTIONS BY MR. PENDELL:

21         Q.    Okay.  Were you provided with

22    any material to review before you were

23    actually retained in this case?

24         A.    I was sent the Loudin report,

25    and I believe -- I'm not sure if it was
```

1    before or after I was retained, but I believe

2    it was after.

3         Q.    Okay.  Did you do any

4    independent research prior to agreeing to be

5    an expert witness in this case?

6         A.    I did not, other than just

7    knowing what I knew from before.

8         Q.    Did you do any independent

9    research about McKesson or the other

10   defendants prior to your being retained in

11   this case?

12        A.    In this case, no, because I had

13   done -- I looked at -- into it before.

14        Q.    Okay.  So you had previously

15   done some of your own research on McKesson

16   prior to agreeing to be an expert witness on

17   its behalf?

18        A.    I am generally aware of what

19   they do and what -- you know, I've been in --

20   you know, involved in ordering all sorts of

21   supplies from them.

22        Q.    Okay.  So prior to your

23   engagement in the opioid litigation, so this

24   case or the Washington case, did you know

25   that in May of 2008, McKesson paid a

1   $13 million penalty related to its

2   distribution of controlled substances?

3                   MS. FUJIMOTO:  Object to form.

4                   THE WITNESS:  Yes, I was aware

5        that there was a previous settlement.

6   QUESTIONS BY MR. PENDELL:

7        Q.     Prior to your engagement in

8   this case, did you know that in September

9   of 2008, Cardinal Health agreed to pay a

10  $34 million penalty and entered into a

11  settlement agreement with the DEA for failing

12  to maintain effective controls against

13  diversion?

14                  Did you know that?

15                  MS. FUJIMOTO:  Object to form.

16                  THE WITNESS:  I was aware that

17       there were some settlements made.  I

18       was not aware of the specifics of the

19       other firms that I was not engaged or

20       hired by.

21  QUESTIONS BY MR. PENDELL:

22       Q.     Prior to your engagement in

23  this case, did you know that in December

24  of 2016, Cardinal Health agreed to pay a

25  $44 million penalty to resolve allegations

1    that it failed to report suspicious orders

2    and meet its obligations under the CSA in

3    Florida, Maryland, New York and Washington?

4              MS. FUJIMOTO:  Object to form.

5              THE WITNESS:  Again, I did

6         not -- I -- it does not have any

7         relevance to my appearance in this

8         case.  And my opinions.

9    QUESTIONS BY MR. PENDELL:

10        Q.    And finally, prior to your

11   engagement in this case, did you know that in

12   January of 2017, McKesson agreed to paid

13   $150 million penalty for failing to identify

14   and report suspicious orders at its

15   facilities in Colorado, Illinois, New Jersey,

16   Wisconsin, Florida, Maryland, Nebraska,

17   Michigan, Massachusetts, California, Ohio?

18   Did you know that?

19             MS. FUJIMOTO:  Object.  Form.

20             THE WITNESS:  Again, it has no

21        relevance in my testimony in this case

22        or my opinion.

23   QUESTIONS BY MR. PENDELL:

24        Q.    Okay.  My question is a little

25   bit different.  I'm just wondering whether

1    you knew that.

2            MS. FUJIMOTO:  Same objection.

3            THE WITNESS:  Again, it has no

4        relevance on the bearing on my opinion

5        in this case.

6    QUESTIONS BY MR. PENDELL:

7        Q.    Okay.  So is that a no, you did

8    not know that?

9        A.    I was aware of some

10   settlements, yes.

11       Q.    Okay.  Were you aware of that

12   particular settlement for $150 million in

13   2017?

14           MS. FUJIMOTO:  Object.  Form.

15           THE WITNESS:  Again, I was

16       aware of some settlements.  I'm not

17       sure of the specifics of which ones

18       have been done and...

19   QUESTIONS BY MR. PENDELL:

20       Q.    Who first contacted you about

21   being an expert witness for McKesson?

22       A.    Michelle Fujimoto.

23       Q.    And did you know Ms. Fujimoto

24   previously?

25       A.    I did not.

1    Q.    Had you had any dealings with

2    anyone at McKesson in a professional capacity

3    prior to your engagement in the opioid

4    litigation?

5    A.    No, I have not.

6    Q.    Okay.  So you didn't know

7    anyone at McKesson at all?

8    A.    No.

9    Q.    Not even a sales

10   representative?

11   A.    I might have possibly in the

12   past interacted with a sales representative,

13   but I'm generally not the one that does the

14   ordering or anything like that.

15   Q.    Who generally does the

16   ordering?

17   A.    Well, I work with several

18   different practices, so I can't -- you know,

19   it's usually the practice manager.

20   Q.    Okay.  Did you know anyone at

21   the law firm, at Ms. Fujimoto's law firm?

22   Setting aside Ms. Fujimoto, did you know

23   anyone at her law firm prior to your

24   engagement in the opioid litigation?

25   A.    No, I did not.  Not to my

Highly Confidential - Subject to Further Confidentiality Review

1    knowledge, no.

2        Q.    And did you know anyone at

3    Cardinal Health prior to your work on this

4    case or the opioid cases in general?

5        A.    Not to my knowledge, no.

6        Q.    How about at AmerisourceBergen?

7        A.    No, not to my knowledge.

8        Q.    Have you ever done any work

9    with the law firm of Arnold & Porter?

10       A.    I've never heard of them.

11       Q.    Okay.  How about the Reed Smith

12   firm?

13       A.    I've never heard of them.

14       Q.    How about Kirkland & Ellis?

15       A.    Never heard of them.

16       Q.    Okay.  How about Jones Day?

17       A.    Never heard of them.

18             Sorry, just a second.

19       Q.    That's okay.

20       A.    I'm muting my phone.

21             Sorry, go ahead.

22       Q.    Have you ever done any work

23   with the Dechert law firm?

24       A.    Not to my knowledge.

25       Q.    How about Morgan and Lewis?

1        A.      Not to my knowledge.

2        Q.      How about a law firm called

3    Williams & Connolly?

4        A.      Not to my knowledge.

5        Q.      How about Covington & Burling?

6        A.      Not to my knowledge.

7        Q.      Ropes & Gray?

8        A.      Not to my knowledge.

9        Q.      We're almost there, I promise.

10               A law firm called O'Melveny &

11   Myers?

12       A.      Not to my knowledge.

13       Q.      Zuckerman Spaeder?

14       A.      Not to my knowledge.

15       Q.      Barnes & Thornburg?

16       A.      Not to my knowledge.

17       Q.      Holland & Knight?

18       A.      Not to my knowledge.

19       Q.      So is it fair for me to say

20   then that prior to your work in the opioid

21   litigation, you have not done any consulting

22   or any type of professional work with law

23   firms?  Is that correct?

24       A.      That is correct.

25       Q.      Okay.  I probably could have

1    just asked you that at the outset.

2                    How much are you being

3    compensated for your work in this case?

4         A.    My rates are $400 an hour for

5    reviewing and talking with counsel, and 550

6    an hour for depositions and any trial.

7         Q.    Okay.  How did you come up with

8    those rates?

9         A.    That was based on what my boss

10   at the time, who had recommended

11   Ms. Fujimoto, had said.

12        Q.    Gotcha.

13                    So your boss at the time was

14   the one who recommended you to Ms. Fujimoto?

15        A.    Correct.

16        Q.    And who was your boss at the

17   time?

18        A.    Her name was Dana Gossett.

19        Q.    Was this when you were working

20   in Hawaii?

21        A.    No, this was -- she --

22   actually, I had not started working for her.

23   She worked at the University of

24   California-San Francisco.

25        Q.    Okay.  Gotcha.

Highly Confidential - Subject to Further Confidentiality Review

1    So it's your -- is this your

2    current boss?

3         A.    No, because she left.

4         Q.    Gotcha.  Okay.

5    But at the time, she was your

6    future boss.  Then you came there and she was

7    your boss; is that right?

8         A.    That is correct.

9         Q.    Okay.  And do you know how she

10    came to know Ms. Fujimoto?

11         A.    I believe she had worked on a

12    previous case.

13         Q.    Gotcha.

14    And is it your understanding

15    that that was an opioid case?

16         A.    That was not an opioid case.

17         Q.    That was another case.

18    Was that also for McKesson?

19         A.    I don't believe so, no.

20         Q.    And what is your understanding

21    as to why you were recommended?

22         A.    Because I'm an expert in the

23    treatment of opioid use disorders and

24    pregnancy.

25         Q.    And did the person who

Highly Confidential - Subject to Further Confidentiality Review

1    recommend you, is it your understanding that

2    she felt that was outside her expertise?

3             MS. FUJIMOTO:  Object to form.

4             THE WITNESS:  Yes.

5             That is my understanding.

6    QUESTIONS BY MR. PENDELL:

7        Q.    Have you spoken to her since

8    your engagement on these cases?

9        A.    Well, I mean, other than for

10   work-related matters, no.

11            I mean, I spoke to her daily

12   for work-related matters, but not for this

13   case.

14       Q.    Sure.  Let me ask you a better

15   question.

16            Have you spoken to her about

17   your role in these cases?

18       A.    No, I have not.

19       Q.    How many hours have you put

20   into this case to date?

21       A.    I would have to look through my

22   invoices.  For this particular case, I

23   believe it was -- because of my previous

24   involvement in the other litigation and

25   having done the reviews for that, I think for

Highly Confidential - Subject to Further Confidentiality Review

1    this case alone it's been, I think,

2    approximately eight to ten hours.

3         Q.    And how much time do you expect

4    to spend on this case after today, if any?

5         A.    Well, it depends on what

6    happens with this going forward.

7         Q.    Sure.  Okay.

8              Well, let me ask this:  Setting

9    aside the fact that you may testify at trial,

10   do you expect to do anything in this case

11   between today and the time that you're asked

12   to come to West Virginia for testimony?

13        A.    Again, I think it depends on

14   what happens today and in the future.  I

15   can't speculate for what is needed.

16        Q.    Has all of your time been

17   billed up till today?

18        A.    I have not submitted any

19   invoices as of yet.

20        Q.    When do you -- I'm sorry, I

21   apologize.

22              Part of the problem with not

23   being in the same room, too, is sometimes I

24   may think you're done because there's a

25   little lag.  And I don't mean to speak up --

1    over you, so I apologize in advance if that

2    happens from time to time.

3              When do you generally send out

4    your billing in cases?

5         A.    Generally, when I get around to

6    it.

7         Q.    Fair enough.

8              So there's no rhyme and reason.

9    It's when you can get it out, you'll do it;

10   is that fair?

11        A.    Yes.  Yes.

12        Q.    Who keeps track of how much

13   time you've spent in this matter?  Is that

14   something you do?

15        A.    Yes.

16        Q.    And are you the one who

17   prepares the invoices?

18        A.    I am.

19        Q.    And you are charging for your

20   time today, correct?

21        A.    I am charging for my time

22   today, yes.

23        Q.    And you'll also be charging for

24   any time you spent preparing for this

25   deposition, correct?

1      A.      Correct.

2      Q.      Do you charge for your travel

3   time, Doctor?

4      A.      In regards to this case or in

5   regards to what?

6      Q.      Okay.  So if you have to show

7   up in trial in West Virginia, San Francisco

8   to West Virginia is a bit of a hike.

9           Will you charge for the time

10  that you spend traveling from San Francisco

11  to West Virginia for trial?

12     A.      Yes, I will.

13     Q.      Is there anybody who helped you

14  in preparing your report in this case?

15     A.      Other than Ms. Fujimoto, no.

16     Q.      Okay.  So you don't have like a

17  staff or an assistant that helped with the

18  research or the writing of the report; is

19  that correct?

20     A.      No, I do not.

21           I'm in academia.  I don't have

22  a whole a lot of support for these things.

23     Q.      You currently are a professor

24  for the University of California, correct?

25     A.      Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And that's in San Francisco?

2    A.    Yes.

3    Q.    Let's talk about that for a

4    minute.

5          What specifically do you teach

6    at the University of California?

7    A.    So I am a professor of

8    obstetrics and gynecology and also addiction

9    medicine.  I teach general obstetrics and

10   gynecology to residents and medical students,

11   and then I serve on the addiction consult

12   service at Zuckerberg San Francisco General

13   Hospital where -- and I also work at The

14   Bridge Clinic there and teach addiction

15   medicine fellows.

16   Q.    So how much of your time is

17   spent actually in the classroom teaching

18   versus clinical work with students?

19   A.    Well, as a medical student

20   professor, we don't teach much in the

21   classrooms.  It is more on the wards

22   teaching.

23         I do teach a one class, a

24   block.  So the medical students rotate

25   through the block, and I teach one class a

1    block for that.

2              And then in general, the rest

3    of the teaching is during my clinical work.

4         Q.    Gotcha.

5              And when you're talking about

6    the block that you teach, is that focused on

7    the OB/GYN work or the addiction work or

8    both?

9         A.    It's an -- the intersection, so

10   it's talking about addiction in pregnant

11   women.

12        Q.    Understood.

13             And how -- strike that.

14             Do you have to -- as part of

15   your job as a professor, do you hold office

16   hours?

17        A.    No, it's not like that.

18        Q.    Okay.  And I assume that's

19   because when people are rotating through

20   clinical work with you, they're seeing you

21   face to face at that time; is that --

22        A.    Correct.

23        Q.    Okay.  How much do you get paid

24   as a professor at the University of

25   California?

```
 1            A.     Well, it's a matter of public

 2      record.  I make what a tier 1 professor of

 3      OB/GYN makes.

 4            Q.     And do you know what that is?

 5                   MS. FUJIMOTO:  Object to form.

 6            I'm going to object.  That's

 7            irrelevant.  Personal, private

 8            information.  No need to answer.

 9            Annual income is not discoverable.

10                   MR. PENDELL:  I believe she

11            just said it was public record, so I

12            think your objection --

13                   MS. FUJIMOTO:  Then it --

14                   THE WITNESS:  Well, I can tell

15            you what the base salary is, but as --

16            you know, and you can look it up.

17      QUESTIONS BY MR. PENDELL:

18            Q.     Sure.

19                   What is the -- what is the base

20      that you know?

21            A.     The base that I know of is 320.

22            Q.     320.

23                   Who do you report to at

24      University of California-San Francisco?

25            A.     Well, my direct -- the division
```

1    director is Andrea Jackson.

2         Q.    And is Ms. Jackson a physician?

3         A.    Dr. Jackson is a physician,

4    yes.

5         Q.    And do you know -- I'm sorry, I

6    didn't mean to cut you off.

7         A.    Oh, and then the department

8    chair is Dr. Amy Murtha.

9         Q.    Is Dr. Jackson an OB/GYN?

10        A.    She is.

11        Q.    Okay.  And how about -- I

12   believe you said Dr. Murtha?  Did I say that

13   correctly?

14        A.    Yes.

15        Q.    Is Dr. Murtha an OB/GYN?

16        A.    She is.

17        Q.    Do you know if the University

18   of California has a conflict of interest

19   policy that requires professors to disclose

20   their work as a paid expert witness in

21   litigation on behalf of the pharmaceutical

22   industry?

23        A.    Yes, they do.

24        Q.    And what is your basic

25   understanding of that policy?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      We have to report it to both

 2   our supervisors and get permission to act as

 3   expert witnesses, and then we have to

 4   disclose yearly -- or actually at the time,

 5   so it tends to be quarterly, of the amount of

 6   time that we spend and the amount me bill.

 7          Q.      And you've done that here?

 8          A.      Yes, I have.

 9          Q.      Who did you have to -- or who

10   did you report to about your work on this

11   case as a paid expert for the pharmaceutical

12   industry?

13          A.      We have an online tracking

14   system.

15          Q.      Gotcha.

16                  Has anyone at the university

17   expressed concern about your being a paid

18   expert for the pharmaceutical industry in

19   opioid litigation?

20          A.      No, they have not.

21          Q.      Have you ever had any

22   discussions with any other faculty at the

23   university about your being a paid,

24   testifying expert for the pharmaceutical

25   industry in opioid litigation?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. FUJIMOTO:  Object to form.

 2                  THE WITNESS:  I have not.

 3    QUESTIONS BY MR. PENDELL:

 4         Q.     I'm sorry?

 5         A.     I said I have not.  Not to my

 6    knowledge, no.

 7         Q.     Do you ever discuss your

 8    consulting on behalf of the pharmaceutical

 9    industry with your students?

10         A.     I do not.  I disclose it at the

11    beginning of all my -- any CME, so continuing

12    medical education.  I disclose that I receive

13    consulting income from McKesson.

14         Q.     You disclose specifically what

15    the consulting you're providing is, or is it

16    limited to just that you're consulting?

17         A.     I disclose that I am a

18    consultant.

19         Q.     Do you disclose that you're an

20    expert in opioid litigation?

21         A.     I just disclose I am a

22    consultant, and then if there's further

23    questions, I would disclose what it is about.

24         Q.     Do you teach anything to your

25    students about prescription opioids?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.      I do.

2         Q.      What do you teach them?

3         A.      I teach about kind of safe

4    opioid prescribing practices and also, you

5    know, alternatives to opioids.

6         Q.      Do you tell your students about

7    the risks of addiction associated with

8    prescription opioids?

9              MS. FUJIMOTO:  Object to form.

10             THE WITNESS:  I talk to my

11        students about, you know, the risks of

12        addiction with all medications.  You

13        know, any medication can be misused.

14   QUESTIONS BY MR. PENDELL:

15        Q.      Doctor, is it your position

16   that all medications are addictive?

17        A.      I am not saying that all

18   medications are addictive.  I am saying that

19   I have had patients misuse many medications.

20        Q.      Okay.  But -- okay.  So you do

21   consult -- or, I'm sorry, you do teach your

22   students specifically about the risk of

23   addiction related to prescription opioids; is

24   that right?

25        A.      I teach my students about the
```

1   risks of addictions with all psychoactive

2   medications that have addictive properties,

3   including benzodiazepines.  I've had patients

4   misuse Benadryl, for that example.

5        Q.    And that includes prescription

6   opioids, correct?

7        A.    That does include prescription

8   opioids.

9        Q.    And you do believe that

10  prescription opioids are addictive, correct?

11            MS. FUJIMOTO:  Object to form.

12            THE WITNESS:  I believe all

13       opioids can be addictive, yes.

14  QUESTIONS BY MR. PENDELL:

15       Q.    Including prescription opioids,

16  right?

17       A.    Yes, prescription opioids can

18  be addicted {sic}.

19       Q.    Do any of the journals that you

20  work on or on editorial boards require an

21  expert witness in pharmaceutical industry --

22  strike that.

23            Do any of the journals that you

24  work on require you to disclose your being an

25  expert witness for the pharmaceutical

1    industry in opioid litigation?

2         A.     They do.

3         Q.     And have you made those

4    disclosures?

5         A.     I have made those disclosures.

6         Q.     And you've never consulted for

7    any of the opioid manufacturers; is that

8    correct?

9         A.     I have not.

10        Q.     Even in nonopioid-related

11   matters, correct?

12        A.     Correct.

13        Q.     Doctor, are you the creator of

14   any patents?

15        A.     I am not.

16        Q.     Do you own any stock in a

17   pharmaceutical company, to your knowledge?

18        A.     To my knowledge, no.

19        Q.     I appreciate you may have a

20   401(k) that's administered by somebody else.

21   I'm just interested in, you know, whether or

22   not you know that specifically you've went

23   out and purchased stock in a pharmaceutical

24   company.

25        A.     No, I have not.

1    Q.     How about anyone in your

2    immediate family?  Do you know if anyone in

3    your immediate family is a -- has a stock

4    ownership in pharmaceutical companies?

5              MS. FUJIMOTO:  Object to form.

6              THE WITNESS:  Not to my

7         immediate -- or not to my knowledge,

8         no.

9    QUESTIONS BY MR. PENDELL:

10   Q.     Aside from the hourly work

11   you're doing in this case and the other

12   opioid cases, does any company involved in

13   the pharmaceutical industry have any

14   financial obligation to you?

15   A.     To my -- so are you asking

16   me -- can you repeat that question, please?

17   Q.     Sure.

18            So aside from the work that

19   you're doing in these opioid-related cases,

20   is there any company involved in the

21   pharmaceutical industry that has any

22   financial obligation that it owes to you?

23   A.     Not to my knowledge, no.

24   Q.     Are there any types of

25   companies that you would not be willing to

1    provide your professional services to?

2         A.    Yes, I think there are quite a

3    few companies that I think we have moral and

4    ethical obligations not to provide testimony

5    for.  I can think of tobacco companies, for

6    example.

7         Q.    I knew that's where you were

8    going to go.

9               And any others aside from

10   tobacco companies that you can think of?

11        A.    Well, I'm not a big fan of

12   Purdue pharmaceuticals, but that's my own...

13        Q.    What is it about Purdue that

14   makes you not a big fan?

15        A.    Well, they did look pretty bad

16   when they started, you know, using a

17   half-page letter to the editor to justify

18   their work.

19        Q.    Did you do any research about

20   the relationship between Purdue Pharma and

21   McKesson at all?

22             MS. FUJIMOTO:  Object to form.

23             THE WITNESS:  I did not.

24   QUESTIONS BY MR. PENDELL:

25        Q.    Did anyone describe for you or

1  tell you about the relationship between

2  McKesson and Purdue Pharma?

3            MS. FUJIMOTO:  Object to form.

4            THE WITNESS:  Not to my

5       knowledge, no.

6  QUESTIONS BY MR. PENDELL:

7       Q.     Would it surprise you to know

8  that there was a relationship between

9  McKesson and Purdue Pharma?

10            MS. FUJIMOTO:  Object to form.

11            THE WITNESS:  Well, given that,

12       you know, drug distributors, you know,

13       have to have business relationships,

14       I'm not -- I would not be surprised.

15  QUESTIONS BY MR. PENDELL:

16       Q.     Doctor, in your clinical work,

17  you still see patients.

18            How often do you see patients

19  in a given week?

20       A.     Every day.

21       Q.     And your patients are all

22  women, correct?

23       A.     No, I do see some men in the

24  addiction medicine clinic now.

25       Q.     Okay.  But -- fair enough.

```
 1                    But on the OB/GYN side, all

 2   your patients are women, correct?

 3        A.    Yes, unless they're transsexual

 4   men, yeah.

 5        Q.    Fair enough.  Fair enough.

 6                    And you currently treat

 7   pregnant women with opioid use disorder; is

 8   that correct?

 9        A.    I do.

10        Q.    For how many years have you

11   treated women with OUDs?  Is it okay if I

12   call it OUD?

13        A.    Yes, that's fine.

14                    I have been treating women with

15   opioid use disorder since 2007.

16        Q.    And I'm going to ask you an

17   unfair question, which are my favorite types

18   of questions to ask.

19                    But ballpark, how many pregnant

20   women would you say you treat in a year?

21        A.    Well, prior to moving here,

22   when I was in Hawaii -- I'm sorry, pregnant

23   women in general or -- I mis --

24        Q.    Fair enough.

25                    What I mean by -- just pregnant
```

1    women in general.  How many patients would

2    you say you see over the course of a year

3    that are pregnant women?

4          A.     I think that varies, but quite

5    a few.  I would say in the hundreds.

6          Q.     Okay.  More than a hundred?

7          A.     Yes.

8                 Emily is her name, I forgot her

9    name, and now she just --

10         Q.     Of the pregnant women that you

11   see over the course of a year, how many of

12   those women would you say had a substance use

13   disorder of any kind?

14         A.     Well, currently I -- because

15   I'm mainly treating the general obstetrics

16   population, the -- you know, in our general

17   population if you look at tobacco, alcohol

18   and all -- and cannabis and all other

19   substances, it's generally around 3 to

20   4 percent.

21                When I staff an addiction

22   clinic, it's obviously much higher.

23         Q.     What do you mean "by staff an

24   addiction clinic"?  What does that mean?

25         A.     Well, there's -- you know, when

Highly Confidential - Subject to Further Confidentiality Review

1    I ran my addiction clinic in Hawaii, you

2    know, probably 80 to 90 percent of the

3    patients there had a substance use disorder.

4          Q.     And when is the last time that

5    you staffed an addiction clinic?  Was that in

6    Hawaii?

7          A.     No, I staff one here, The

8    Bridge Clinic here, but it doesn't

9    specifically take care of pregnant women.

10         Q.     Understood.  Understood.

11                So going back to -- I believe

12   you said 3 to 4 percent of women that you

13   currently are treating over the course of

14   this -- of a year have a substance use

15   disorder.

16                What is the percentage of those

17   women who specifically have an opioid use

18   disorder?

19         A.     Well, a diagnosed opioid use

20   disorder is probably less than 1 percent

21   because it is the general obstetrics

22   population.

23         Q.     Let's go back to your time in

24   Hawaii.

25                What was the -- what was the

1    general makeup there of women that you

2    treated that had opioid use disorder versus

3    some other substance use disorder?

4         A.    Approximately -- probably

5    10 percent of opioid use disorder and then,

6    you know, 40 percent methamphetamines, 60 to

7    70 percent tobacco.

8         Q.    And were you seeing about the

9    same number of patients a year when you were

10   doing your work in Hawaii as you're doing

11   now?

12        A.    In general, I was probably

13   seeing a few less patients.  In general,

14   OB/GYN and more patients with substance use

15   dis -- more pregnant patients with substance

16   use disorder.

17        Q.    What has the number of pregnant

18   women with OUD looked like from your

19   perspective over the last 10 to 15 years?

20   Has it increased?  Has it decreased?

21        A.    From my perspective, just going

22   from Hawaii, I saw methamphetamines still was

23   the number one drug, but the amount of

24   opioids did increase over that time.

25        Q.    And I'm sorry, I just want to

 1    make sure that I'm understanding your

 2    testimony.

 3              When you say increased over

 4    that period of time, was that -- the period

 5    of time you're referring to, is that while

 6    you were in Hawaii or the crossover from

 7    Hawaii to California?

 8        A.    That was while I was in Hawaii,

 9    yes.

10        Q.    And what is it looking like

11    from your perspective now?

12        A.    Well, because I don't have a

13    specific clinic for substance use disorder

14    right now in pregnant women, it -- I can't

15    judge, you know.  And it is two different

16    areas.  But I can tell you that the great

17    majority of women use more than one

18    substance.

19              So, you know, there's a lot of

20    opioids, a lot of methamphetamines, a lot of

21    benzodiazepines and alcohol and tobacco.

22        Q.    Doctor, you are not a

23    pediatrician; is that correct?

24        A.    I am not a pediatrician,

25    correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How many babies that you

2   delivered over the course of your career have

3   you followed after birth?

4    A.    Well, I have followed their

5   mothers after birth, so I have seen them grow

6   up and -- but I have not followed them as

7   patients.

8    Q.    And you've not provided them

9   medical care, correct?

10    A.    I have not provided them

11   medical care, correct.

12    Q.    How many babies have you

13   delivered over the course of your career that

14   you personally diagnosed with opioid-related

15   NAS?

16    A.    I don't diagnose opioid-related

17   NAS.

18    Q.    And is it okay -- because I

19   know you use the term NOWS and then also NAS.

20   Is it all right if I just say opioid-related

21   NAS when talking about those two conditions?

22    A.    Yeah, I prefer neonatal

23   withdrawal because I think it's a much more

24   accurate term.

25    Q.    So who generally would diagnose

Highly Confidential - Subject to Further Confidentiality Review

1    one of the babies that you delivered with NAS

2    after delivery?

3           A.     Generally the pediatricians

4    taking care of those babies.

5           Q.     There is some transience with

6    your patient population; is that correct?  Is

7    that fair?

8           A.     Define transience.

9           Q.     Sure.  So some of the pregnant

10   women that you treat sometimes move, and you

11   don't see them again after a certain period

12   of time of treating them; is that fair?

13          A.     Yes, that is fair.

14          Q.     And some of them may just for

15   some reason stop coming or they may find

16   another OB/GYN.

17                 That happens from time to time,

18   correct?

19          A.     That does happen from time to

20   time, yes.

21          Q.     How often would you say -- how

22   often would you say that you lose patients in

23   a given year, for moving or whatever reason?

24          A.     Well, when we've looked at our

25   follow-up rates, you know, and in general,

1    you know, given that I'm a general OB/GYN,

2    some don't follow up for -- in any

3    population.

4              But when we looked at our

5    follow-up rates at the clinic I was at, it

6    was -- we had about 50 percent that we would

7    see again.

8        Q.    Doctor, do you agree that

9    approximately 35 percent of people treated

10   with opioids for chronic pain go on to

11   develop an opioid use disorder?

12       A.    I do not agree with that.

13       Q.    Tell me everything that

14   supports your position on that.

15       A.    I have read many reports that

16   have looked at rates varying anywhere from

17   less than 1 percent to 30 to 40 percent.

18   It's really hard to pin down that number

19   because it is so complicated in who has

20   prescribed it, whether they had a preexisting

21   substance use disorder, including tobacco or

22   alcohol, and other risk factors going along

23   with that.

24       Q.    What is the -- is there a

25   percentage that you generally think is the

1    appropriate percentage of people treated with

2    opioids for chronic pain that go on to

3    develop opioid use disorder?

4                    MS. FUJIMOTO:  Object to form.

5                    THE WITNESS:  Again, it depends

6            on the population and the reason why

7            they're being treated for the chronic

8            pain and whether they had a coexisting

9            substance use disorder and other risk

10           factors.

11   QUESTIONS BY MR. PENDELL:

12       Q.    Do you agree that women are

13   more likely to prescribe opioids for pain

14   relief than men?

15       A.    I do agree with that.

16       Q.    And do you agree that women are

17   most often prescribed opioids for conditions

18   for which they are not effective, like

19   migraine, fibromyalgia or osteoarthritis?

20                   MS. FUJIMOTO:  Object to form.

21                   THE WITNESS:  Well, I was going

22           to say, you've looked at some of my

23           presentations, haven't you?

24   QUESTIONS BY MR. PENDELL:

25       Q.    I read everything, Doctor.

1        A.      I figured as much.

2        Q.      So you do agree with that?

3        A.      I do agree with that.

4        Q.      And you do agree that the great

5  majority of women who received prescription

6  opioids were of childbearing age, correct?

7        A.      I do agree with that.

8        Q.      And you agree that because of

9  that, it has led this country to its current

10  epidemic of infants needing treatment for

11  neonatal abstinence syndrome?

12              MS. FUJIMOTO:  Object to form.

13              THE WITNESS:  And you are --

14          you are taking something out of a

15          presentation I gave and not looking at

16          the entire picture.  But, yes, we

17          do -- if you look at the Patrick

18          article which you are talking about,

19          there was an increase.  But to say

20          that it is simplistically because of

21          prescription opioids is nuanced, to

22          say the least.

23  QUESTIONS BY MR. PENDELL:

24        Q.      In what way?

25        A.      There are many other factors,

Highly Confidential - Subject to Further Confidentiality Review

1   and I talk about the -- you know, if you

2   looked at that thing, it shows the book

3   Dreamland, and it shows the many nuanced

4   factors that led to the opioid -- if you want

5   to call it a crisis and overprescribing.

6        Q.    You do agree, though, that one

7   of the common factors was the prescribing of

8   prescription opioids, correct?

9        A.    I think, looking in retrospect,

10  I think we did definitely prescribe opioids.

11       Q.    And do you agree that treating

12  babies born with opioid-related NAS cost the

13  United States over $500 million annually?

14            MS. FUJIMOTO:  Object to form.

15            THE WITNESS:  Well, that is

16       something that was quoted.

17  QUESTIONS BY MR. PENDELL:

18       Q.    I'm sorry, something that was

19  quoted?

20       A.    In one of those papers, yes.

21       Q.    Any reason to disagree with

22  that?

23       A.    I have no reason to disagree.

24       Q.    Do you agree that pregnant

25  women being treated for OUD have babies that

Highly Confidential - Subject to Further Confidentiality Review

1    do better than pregnant women with OUD that

2    are not being treated by medical

3    professionals for OUD?

4         A.    I do agree that women with

5    opioid use disorder who are treated

6    appropriately with medications do much

7    better.

8         Q.    And their babies do better,

9    correct?

10        A.    And their babies do better,

11   correct.

12        Q.    Doctor, it's my understanding

13   you hold a waiver to prescribe bupe; is that

14   correct?

15        A.    Yes, I do prescribe

16   buprenorphine.  I do hold a waiver.

17        Q.    I call it bupe because as many

18   times as I practice, I can never say it

19   appropriately, so...

20        A.    At least don't call is subs.

21        Q.    What is bupe?

22        A.    Buprenorphine is a partial

23   opioid agonist.  So it works on the opioid

24   receptors, partially -- it blocks the effects

25   of other opioids, but it does not activate

1    the opioid receptor, so that you don't get

2    the feelings of euphoria.

3        Q.    And it is used to treat opioid

4    use disorder the same way that methadone is

5    used, correct?

6        A.    It is used to treat opioid use

7    disorder, yes.

8        Q.    And I understand they're not

9    the same thing, but they're used for the same

10   purpose with regards to OUD, right?

11       A.    Yes, correct.

12       Q.    How long do your patients

13   typically remain on bupe?

14       A.    They can remain on bupe

15   anywhere from -- you know, if they tolerate

16   and do well, it, you know, could be a

17   long-term treatment.  Or, you know, if they

18   don't tolerate it, they may not stay on it

19   and may need to be on something else.

20       Q.    In patients that can tolerate

21   it, it could possibly be years that they're

22   on it, correct?

23       A.    Correct.

24       Q.    Some people could possibly be

25   on it for life; is that correct?

1          MS. FUJIMOTO:  Object to form.

2          THE WITNESS:  We haven't -- we

3     haven't had that much experience with

4     it to say that they would need to be

5     on it for life, but we know that there

6     are -- just extrapolating from people

7     that are on methadone, we know that

8     they need life-long treatment, or can

9     need lifelong treatment.

10  QUESTIONS BY MR. PENDELL:

11     Q.    It's not outside the realm of

12  possibilities; is that fair?

13     A.    It's not outside the realm of

14  possibilities.  I liken it to the treatment

15  of diabetes.  You know, some people are able

16  to lose weight and get off their diabetes

17  medications.

18     Q.    And having read what I've read

19  and what I know about you, I assume you agree

20  that in those instances where the alternative

21  is, you know, someone either being treated by

22  bupe or going back to, you know, being opioid

23  dependent, it's your position that they

24  should remain on bupe if they can tolerate

25  it, correct?

```
 1              MS. FUJIMOTO:  Object to form.

 2              THE WITNESS:  It is my opinion

 3         that people that are successfully

 4         treated on buprenorphine do much

 5         better than if they go back on to

 6         other opioids that they were misusing,

 7         correct.

 8    QUESTIONS BY MR. PENDELL:

 9         Q.    Can you tell me some of the

10    people that you consider to be experts in

11    opioid addiction?

12         A.    You know, in the field, in

13    pregnant women in general or in opioid -- I

14    mean, the field is huge.

15         Q.    Let's start just with opioid

16    addiction.

17              Like, who do you look to as

18    authoritative?

19         A.    There's many people that I look

20    to as authoritative.  You know, off the top

21    of my head, I -- you know, I'm thinking of my

22    colleague, Mishka Terplan, who treats opioid

23    use disorder in pregnant women.  You know,

24    the list is huge, so...

25         Q.    How about with regard to
```

1    opioid-related NAS?  Aside from yourself, who

2    are the folks that you look to as

3    authoritative or experts in that field?

4         A.    Well, Loretta Finnegan

5    certainly, you know, having come up with the

6    Finnegan Score, and Karol Kaltenbach because

7    they both wrote the chapter in my textbook.

8              And then the people out of Yale

9    who came up with the eat, sleep, console

10   method.

11        Q.    Have you heard of Dr. Matt

12   Grossman?

13        A.    I have heard of him, yes.

14        Q.    Do you consider him to be an

15   expert on opioid-related NAS?

16        A.    I am not familiar enough with

17   his work to say for sure.

18        Q.    Setting aside bupe and

19   methadone and other medications used to treat

20   OUD, have you yourself ever prescribed an

21   opioid for pain relief?

22        A.    I have.

23        Q.    How often have you done that?

24        A.    Well, I'm also a gynecologic

25   surgeon, so after cesarean section and

Highly Confidential - Subject to Further Confidentiality Review

1    hysterectomies, it is appropriate to

2    prescribe opioids in small amounts.

3         Q.    In those instances you just

4    gave me, I assume that those opioids -- you

5    would consider that prescribing opioids for

6    acute pain; is that fair?

7         A.    That is fair.

8              MS. FUJIMOTO:  Object to form.

9    QUESTIONS BY MR. PENDELL:

10        Q.    Have you ever prescribed an

11   opioid for chronic pain?

12        A.    I have.

13        Q.    How often have you done that?

14        A.    Not that often, but a fair

15   amount because I also have women with chronic

16   pain who were referred to me during pregnancy

17   who were being treated for their chronic

18   pain, and then their chronic pain physicians

19   decided that they didn't feel comfortable

20   treating pregnant women, and, you know,

21   talking to them about alternatives and --

22   of -- with opioids.  Sometimes it is

23   appropriate to continue the medication.

24        Q.    For what conditions have you

25   prescribed opioids?  What type of chronic

Highly Confidential - Subject to Further Confidentiality Review

```
 1    conditions?

 2        A.      Well, I've had some patients

 3    who have been on chronic pain {sic} for some

 4    things like sickle cell anemia.  You know,

 5    even some conditions that may or may not have

 6    been appropriate, it is working for them.

 7    Chronic, low back pain.

 8        Q.      And what type of -- or what

 9    opioids have you prescribed; do you remember?

10        A.      I have prescribed, depending on

11    what they have been on before, oxycodone,

12    hydrocodone, even codeine.

13        Q.      Do you have a go-to brand or a

14    preferred opioid that you prescribe more than

15    others?

16              MS. FUJIMOTO:  Object to form.

17              THE WITNESS:  I don't have a --

18        I don't prescribe by brands.  I use

19        generics whenever possible.

20    QUESTIONS BY MR. PENDELL:

21        Q.      Sure.  Okay.

22              So do you have -- do you have a

23    type of generic like, for example, a fentanyl

24    patch versus, you know, a pill?  Is there one

25    that you -- you know, you prefer over
```

1    another?

2         A.     Well, if I'm treating chronic

3    pain, generally it's not that I have

4    initiated it.  I generally will continue what

5    they have been on before.

6         Q.     And let me ask you a little bit

7    about that, Doctor.

8                Is part -- is part of your --

9    if a pregnant woman comes to see you and

10   she's already being prescribed opioids for

11   chronic conditions from another doctor, do

12   you have concerns about weaning that woman

13   off the opioids while pregnant?

14               MS. FUJIMOTO:  Object to form.

15          Foundation.

16               THE WITNESS:  I'm not sure what

17          you mean by "concerns."  I mean,

18          there's some instances where it is

19          appropriate, if she's wanting to wean

20          down, to wean down during pregnancy,

21          and there are some instances where

22          it's not appropriate to wean down the

23          medications.

24   QUESTIONS BY MR. PENDELL:

25         Q.     Doctor, you've never been

Highly Confidential - Subject to Further Confidentiality Review

1  deposed before; is that right?  This is your

2  first time?

3       A.     This is not my first time.

4  I've before deposed as a witness in another

5  litigation of a colleague.

6       Q.     Okay.  So were you a fact

7  witness, what's called a fact witness, in

8  that case?

9       A.     Yes.

10      Q.     Was that a medical malpractice

11  case?

12      A.     It was.

13      Q.     Did you have to testify at

14  trial or was it just at deposition?

15      A.     Just at deposition.

16      Q.     And that's the only other time

17  you've ever given sworn testimony?

18      A.     No, I had a deposition of my

19  own for a medical malpractice case.

20      Q.     And you were a defendant as --

21      A.     Yes.

22      Q.     And did you have to testify at

23  trial or just at deposition?

24      A.     Just at deposition.

25      Q.     And did that case settle?

1       A.      Yes.

2       Q.      And so I'm correct then, those

3   were both as fact depositions, and aside from

4   today, you've never been deposed wearing the

5   expert witness hat; is that fair?

6       A.      That is correct.

7       Q.      Have you ever submitted a

8   report in a case as an expert witness, aside

9   from the opioid litigation?

10      A.      Aside from the opioid

11  litigation, no, this is the first time.

12      Q.      Okay.  So you've never been

13  precluded by a court.  Your expert opinions

14  have never been precluded by a court as we

15  sit here today, correct?

16      A.      Yes.  I -- well, I've -- was

17  going to testify for a case in Missouri, but

18  that case was dropped.  It was a criminal

19  case, and I was testifying for the defense.

20      Q.      Gotcha.

21              And you didn't submit a report

22  in that case, though; is that right?

23      A.      I did not.

24      Q.      But the case went away before

25  you got to do your thing; is that fair?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Correct.

 2          Q.      All right.  This allows me to

 3     cut out a whole bunch of questions, so it's

 4     good for you.

 5                  MR. PENDELL:  Ms. Fujimoto,

 6          we've been going for an hour and ten

 7          minutes, and I'm happy to keep going,

 8          or if -- Doctor, if you need to quick

 9          a break, we can do that, too, because

10          I'm moving on to another area of

11          questioning.  It's up to you-all.

12                  MS. FUJIMOTO:  I'm going to

13          leave that up to Dr. Wright.

14                  How you doing?

15                  THE WITNESS:  Let me just go

16          get a cup of tea real quick and I'll

17          be right back.

18                  MS. FUJIMOTO:  Let's take a

19          short five, ten-minute break.

20                  VIDEOGRAPHER:  12:07 p.m.  We

21          are off the video record.

22           (Off the record at 12:07 p.m.)

23                  VIDEOGRAPHER:  12:14, we are on

24          video record.

25
```

```
 1    QUESTIONS BY MR. PENDELL:

 2         Q.     Welcome back, Doctor.

 3                Have you ever testified before

 4    Congress?

 5         A.     I have testified at the White

 6    House, not before Congress, no.

 7         Q.     What was your testimony at the

 8    White House in regards to?

 9         A.     That how we need more addiction

10    providers.

11         Q.     And when was this,

12    approximately?

13         A.     It was approximately 2019, I

14    want to say May, but I'm not positive.

15         Q.     So it was before the Trump

16    White House?

17         A.     No, it was -- it was during the

18    current administration.

19         Q.     That's what I mean, the

20    Trump -- the Trump White House?

21         A.     Yes.

22         Q.     And was it actually -- were you

23    actually testifying to the president, or who

24    were you testifying to?

25         A.     No, to the ONDCP.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the ONDCP is?

2    A.    The Office of National Drug

3  Control Policy, I believe.  That's the

4  acronym.

5    Q.    Were there -- I'm sorry.  Were

6  there any other doctors who were there

7  speaking with you?

8    A.    Yeah, there were several other

9  doctors.  It was about addiction medicine and

10  the need for more addiction medicine

11  providers.

12    Q.    So let me ask you this to

13  follow up on that.

14          You do agree that there is a

15  need nationally for more addiction provider

16  doctors, correct?

17    A.    Yes, there is definitely a need

18  for more addiction medicine providers.

19    Q.    Have you ever testified before

20  a legislative committee?

21    A.    In the state of Hawaii I have.

22    Q.    And what was your testimony in

23  the state of Hawaii in regards to?

24    A.    In regards to get money to

25  start the perinatal addiction treatment

1    center that I set up in Hawaii.

2         Q.    What year did you set that up?

3         A.    In -- I opened in 2007.

4         Q.    And so approximately what year

5    was your testimony?

6         A.    Well, several times over 2006,

7    2007.

8         Q.    Is it your understanding that

9    that testimony is publicly available?

10        A.    It is my understanding.

11        Q.    Have you ever been interviewed

12   in either a personal or professional capacity

13   by the DEA?

14        A.    Well, everybody that gets a

15   buprenorphine waiver has to inter -- they

16   have an office visit from the DEA.

17        Q.    And setting aside that

18   interview with the DEA for the purpose of

19   getting a bupe waiver, have you ever been

20   interviewed in any personal or professional

21   capacity by the DEA?

22        A.    Not to my knowledge, no.

23        Q.    Am I correct that that

24   interview that you did with the DEA for the

25   bupe waiver, that was just a conversation?

1    You didn't submit any written testimony,

2    correct?

3         A.    Correct.  Just a conversation

4    and an office visit.

5         Q.    Have you ever been interviewed

6    in a personal or professional capacity by the

7    Department of Justice?

8         A.    Not to my knowledge, no.

9         Q.    Have you ever been interviewed

10   in either a personal or professional capacity

11   by the FDA?

12        A.    No, not to my knowledge.

13        Q.    Have you done -- have you ever

14   been interviewed in either a personal or

15   professional capacity by the CDC?

16        A.    By the CDC?

17        Q.    Yes.

18        A.    I -- I have done some work for

19   the CDC on -- and actually visited the CDC

20   for Screening, Brief Intervention and

21   Referral to Treatment.

22        Q.    And when was it that you did

23   that with the CDC?

24        A.    2012, I believe.  I would have

25   to look at my records.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Did you provide any sworn

 2    testimony or statement to the CDC?

 3          A.      No.

 4          Q.      And I assume no -- I asked you

 5    about interviews, but no sworn testimony or

 6    sworn statements to the FDA or the DOJ

 7    either, correct?

 8          A.      Correct.

 9          Q.      Is there any other work that

10    you have done in your professional capacity

11    for the government that I've not asked you

12    about?

13          A.      Not to my recollection.

14          Q.      Have you ever testified before

15    a grand jury?

16          A.      No.

17          Q.      Have you ever been charged with

18    a crime or a misdemeanor?

19          A.      No.

20          Q.      Have you been arrested?

21          A.      No.

22          Q.      Have you ever faced any

23    disciplinary hearings in your professional

24    capacity?

25          A.      No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Do you advertise your
2   availability to testify as an expert witness?
3          A.     I do not.
4          Q.     Does someone advertise on your
5   behalf?
6          A.     No.
7          Q.     So how do you promote your
8   expert witness services?
9          A.     I don't promote it.
10         Q.     And no one else promotes it on
11  your behalf?
12         A.     No.
13                (Wright Exhibit 1 marked for
14         identification.)
15  QUESTIONS BY MR. PENDELL:
16         Q.     If we could look, Doctor, at
17  Exhibit 1, which I marked ahead of time.
18  It's going to be your CV.
19         A.     Uh-huh.
20         Q.     And this was the CV that was
21  provided to us along with your report.
22                Do you have that?
23         A.     Yes.
24                MR. PENDELL:  Court reporter,
25         may I -- I sent a link to these, so
```

1         hopefully you have them and they've

2         already been premarked.

3    QUESTIONS BY MR. PENDELL:

4         Q.     Is this CV up to date?

5         A.     There's a few talks and one

6    paper that have not been put on it.  I was

7    just looking over it this morning and saying,

8    oh, I need to update that.

9         Q.     Were those -- let's start with

10   the talks.

11              Were the talks done in 2020?

12        A.     Yes.

13        Q.     And what were the talks

14   generally?

15        A.     In general, it was the American

16   Society of Addiction Medicine on -- it was on

17   alcohol use disorders in pregnancy.

18        Q.     Was that pre-COVID?

19        A.     No.

20        Q.     And were both talks on that

21   subject matter?

22        A.     One talk was for the ASAM, and

23   then we -- I did have a conference in January

24   about the same, actually, alcohol use

25   disorders in pregnancy, and also stigma and

1   racial or social justice.

2        Q.      And I believe you also said

3   that there was a paper?

4        A.      Yes.  It hasn't come out yet,

5   but it was on maternal mortality.

6        Q.      And you anticipated another

7   question I had which -- well, we'll get to

8   it.

9             If there are any updates to

10  your CV between now and the time of trial, I

11  just ask that you let Ms. Fujimoto know so

12  she can take whatever steps she needs to let

13  know me that something has changed.

14            Okay?  Is that --

15       A.      I will.

16       Q.      I appreciate that.

17            Do you have a different CV for

18  non-testifying work, or is this your only CV?

19       A.      This is my only CV.

20       Q.      If you look at the section that

21  says "Selected Presentations."  I believe

22  that's on page -- yeah, I'm sorry, National,

23  International Invited Conferences and

24  Symposium Presentations on page 7.

25            You just updated that for me,

Highly Confidential - Subject to Further Confidentiality Review

1    that's correct?  That's what you're talking

2    about with regards to additional

3    presentations?

4         A.     Yes.

5         Q.     You're license to practice in

6    Colorado, according to your CV, is currently

7    inactive, correct?

8         A.     Correct.

9         Q.     Why is that?

10        A.     Because I moved from Colorado

11   and I didn't keep it active.

12        Q.     And you used to teach in

13   Colorado; is that correct?

14        A.     I was in private practice, but

15   I was a teaching physician for the University

16   of Colorado, so I had a few residents in

17   surgery or deliveries with them.

18        Q.     So was that in the Boulder area

19   where you were practicing?

20        A.     No, it was in Aurora.

21        Q.     Aurora.  Gotcha.

22               You mentioned one article that

23   is not yet published that's not listed here;

24   is that right?

25        A.     Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Does that relate to opioids?

2      A.      Yes, it's maternal mortality

3   and need for OB/GYNs to be more conversant in

4   the treatment of opioid use disorder to

5   prevent maternity mortality.

6      Q.      And do you have any coauthors

7   on that article?

8      A.      I do.

9      Q.      Who are the coauthors?

10     A.      Marcela Smid, Mishka Terplan,

11  and Charles Shauberger.

12     Q.      And is there a particular

13  place -- strike that.

14             Do you know, sitting here

15  today, where it is going to be published?

16     A.      At the American Journal of

17  OB/GYN MFM.

18     Q.      And will that be published this

19  year?

20     A.      Yes.

21     Q.      Any article that you're

22  currently working on or publications you're

23  working on that have not yet been sent out

24  for publication or are being shopped around

25  for publication?

1        A.      There is one I'm working on on

2    smoking cessation that I'm still working on.

3        Q.      Are you working with anyone on

4    that article?

5        A.      My former resident.

6        Q.      Have you ever spoken at any

7    conferences involving the legal industry?

8        A.      Involving -- I'm not familiar

9    with those conferences.

10       Q.      So you've never been to any

11   conferences that were put on for lawyers

12   specifically?

13       A.      No.

14       Q.      Are there lawyers, to your

15   knowledge, that attend the presentations that

16   you do for the medical community?

17       A.      I would assume so.

18       Q.      Is that something that you've

19   investigated or kept track of?

20       A.      No.

21       Q.      So on page 8 of your CV, you

22   have a -- there's a presentation that you

23   have listed here a couple of times called

24   "NAS is temporary; FAS is permanent."

25              Do you know which one I'm

Highly Confidential - Subject to Further Confidentiality Review

 1   talking about?

 2        A.    Yes.

 3        Q.    Did you read from a prepared

 4   speech, or do you have a PowerPoint or a

 5   visual aid that you would use at that

 6   presentation?

 7        A.    I have a PowerPoint that I

 8   would use, yes.

 9        Q.    And is that updated from

10   presentation to presentation?

11        A.    I attempt to, yes.

12        Q.    Have you maintained a copy of

13   that presentation?

14        A.    I do have a copy of that

15   presentation.

16        Q.    And who is -- who is the

17   audience, generally, when you give that

18   presentation?

19        A.    It is either obstetrician/

20   gynecologists or addiction medicine

21   providers.

22        Q.    And can you tell me generally

23   about what your message is or the conclusions

24   you make in that presentation about NAS being

25   temporary?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.  So my conclusions are

2  that fetal -- or fetal alcohol syndrome is a

3  permanent, lifelong condition caused by

4  alcohol use during pregnancy, and it often

5  coexists with neonatal abstinence syndrome,

6  so that for the addiction medicine providers,

7  I am having them focus and looking for

8  co-occurring alcohol use along with the

9  opioid use.

10    And for the OB/GYNs that

11  focus -- I'm trying to get them to screen for

12  alcohol use during pregnancy, which is much

13  more harmful than opioid use.

14    Q.    And do you cite to any studies

15  for the proposition that NAS is temporary?

16    A.    Yes, there's very many studies

17  looking at long-term outcomes.  We've had

18  almost 50 years of experience with methadone.

19  And when they've looked at the children and

20  now adults, when you control for other

21  factors, including co-occurring tobacco use,

22  alcohol use, poverty, poor diet, systemic

23  racism, there has been no effects that can be

24  directly linked to the opioids themselves.

25    Q.    So, Doctor, can you say to a

1  reasonable degree of medical certainty that

2  NAS is temporary?

3       A.     I can say that, yes.  It is a

4  temporary and treatable condition.

5       Q.     If I'm able to work it out with

6  Ms. Fujimoto, do you personally have any

7  objection to sharing that presentation with

8  me?

9       A.     I do not.  I think it's

10  available on the Internet probably.

11       Q.     Okay.  I appreciate that.

12            MS. FUJIMOTO:  And, Mike, we

13       can work with you off the record on

14       that request.

15            MR. PENDELL:  I appreciate

16       that.

17            Just what I wanted, more

18       reading material.

19  QUESTIONS BY MR. PENDELL:

20       Q.     On page -- also on page 9 --

21  I'm sorry.  On page 9 of your report -- of

22  your CV, not your report, there's a 2017

23  presentation on Opioid Use Disorders During

24  Pregnancy:  An Update.

25            Do you see what I'm talking

1    about?

2          A.     Yes.

3          Q.     I assume this is a document, a

4    presentation, that you also maintain in your

5    files or your records?

6          A.     Yes, it should be there.

7          Q.     And what was the update that

8    you were providing; do you remember?

9          A.     There was a study in 2016 that

10   some researchers in Tennessee showed a group

11   of women who were withdrawn from opioids

12   showing relative safety, in their words, of

13   withdrawing the babies -- or sorry, strike

14   that -- withdrawing the women during

15   pregnancy from opioids and looking at the

16   birth outcomes.

17               And my update was that it

18   shouldn't change the standard of care for

19   treating women with opioid use disorders,

20   because they didn't look at the babies

21   afterwards.  And also, the groupings, a lot

22   of the women were forced to withdraw,

23   including a quarter of the women were

24   actually incarcerated.

25               So I was giving the update that

1    this new study shouldn't really change their

2    management.

3            Q.    And same question as before:

4    Assuming that I am able it work it out with

5    Ms. Fujimoto, you don't personally have any

6    objection to sharing that presentation with

7    you, do you?

8            A.    I do not.

9            Q.    One more I wanted to ask you

10   about, also on page 9, was a 2016

11   presentation called Emerging Crisis of Opioid

12   Addiction.

13               Do you see that one?

14           A.    That was the title given by the

15   HRSA, yes.

16           Q.    It was given by who?

17           A.    It was put on by HRSA, and they

18   asked me to give this webinar.

19           Q.    What is HRSA?

20           A.    The Health Resources and

21   Service Administration.

22           Q.    And they contacted you and

23   asked if you would do this presentation on

24   this topic?

25           A.    Correct.

1    Q.    Is that -- did you have any

2    prior dealings with HRSA, prior to them

3    reaching out to you for this particular

4    topic?

5    A.    No.

6    Q.    Do you know how they came about

7    you or reached out to you specifically?  Was

8    it by word?

9    A.    Probably either through the

10   American Society of Addiction Medicine or the

11   American College of Obstetrics and

12   Gynecology.

13   Q.    And is that -- was that a

14   presentation that you still have as well?

15   A.    I believe so, yes.

16   Q.    And again, assuming I'm able to

17   work it out with Ms. Fujimoto, do you

18   personally have any objection to sharing that

19   with me?

20   A.    No, and I believe it's still

21   available online.

22   Q.    And can you give me a general

23   synopsis about the presentation?

24         Did you discuss any conclusions

25   or the cause of the emerging crisis from your

1     perspective?

2            MS. FUJIMOTO:  Object to form.

3            THE WITNESS:  Well, my -- going

4        back to my recollection, it was mostly

5        on the need to treat opioid use

6        disorders and substance use disorders

7        in general and to broaden the

8        perspective for the visiting nurses.

9            I mean, my feeling is that all

10       women deserve to have home visiting

11       after birth, not just opioid or

12       substance use -- women with substance

13       use disorder.

14   QUESTIONS BY MR. PENDELL:

15       Q.    And, Doctor, from listening to

16   you talk today and reading all the stuff I've

17   read about you, fair for me to say you agree

18   that people with opioid use disorder -- we

19   can say specifically women -- or pregnant

20   women with opioid use disorder should be

21   treated for opioid use disorder, correct?

22       A.    I believe all people with

23   substance use disorder, in general, should be

24   treated.

25            (Wright Exhibit 2 marked for

 1          identification.)

 2     QUESTIONS BY MR. PENDELL:

 3          Q.    Okay.  I'm going to go now to

 4     Exhibit 2.  I'm going to introduce Exhibit 2,

 5     Doctor, which is a copy of your report.

 6               Looking at your report, Doctor,

 7     page 11, that signature there is yours,

 8     correct?

 9          A.    That is an electronic version

10     of my signature, correct.

11          Q.    And is this report a complete

12     statement of the opinions that you intend to

13     express in this case, sitting here today?

14          A.    It is a complete expression of

15     my opinions, correct.

16          Q.    Are there any changes or

17     supplementations that you need to make to

18     this report, sitting here today?

19          A.    Not to my knowledge, no.

20          Q.    Were you asked to make any

21     assumptions in rendering your opinions in

22     this report?

23          A.    I was not asked to -- these are

24     my opinions.

25          Q.    On page 12 of your report,

1    there is a -- the section that starts

2    "Materials Considered and/Or Relied Upon."

3                 Do you see that?

4    A.      Yes.

5    Q.      And is this a complete list of

6    the materials that you considered or relied

7    on in rendering your opinions in this case?

8                 MS. FUJIMOTO:  Object to form.

9                 THE WITNESS:  Well, my opinions

10        are based on not only my extensive

11        review of the literature but also from

12        the 13 years that I've spent taking

13        care of women with substance use

14        disorder.  So I can't say that this

15        is, you know, the complete knowledge

16        of my head.

17   QUESTIONS BY MR. PENDELL:

18   Q.      Sure.

19                I appreciate -- setting aside

20   your experience and, you know, the stuff that

21   you learned in medical school --

22                Am I still on?  Can you still

23   hear me, everyone?

24                MS. FUJIMOTO:  Yes.

25

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. PENDELL:

2        Q.    Sorry, my thing looked like it

3    froze up.

4              So, Doctor, setting aside your

5    medical school training and your experience

6    practicing medicine, focusing on written

7    materials and things that you reviewed

8    specifically for -- to render the opinions

9    that you have in this case, is this a

10   complete list of the written materials that

11   you considered or relied upon?

12       A.    This is a complete list of --

13   yes, for -- but, again, I can't -- there's a

14   lot of things in my -- from my experience and

15   past.

16       Q.    Any corrections or

17   supplementations you need to make to the list

18   of the materials, things that you considered,

19   sitting here today?

20       A.    Not that I know of, no.

21       Q.    And as far as written materials

22   go, is it fair to say that if a piece of

23   written literature does not appear on this

24   list, you did not consider it specifically

25   for this case?

```
 1                 MS. FUJIMOTO:  Object to form.
 2                 THE WITNESS:  Again, there are
 3          many, many things that I have read
 4          over the years that I can't -- that
 5          form the basis of my opinions that I
 6          can't begin to, you know, write them
 7          all down.
 8    QUESTIONS BY MR. PENDELL:
 9          Q.    Is there anything in particular
10    you can think of that you -- that you would
11    have relied on because it's in your head that
12    you did not write down?
13          A.    Not that I can think of off the
14    top of my head.
15          Q.    Did you select these materials
16    considered yourself?
17                 MS. FUJIMOTO:  Object to form.
18                 THE WITNESS:  Some of them I
19          selected and some were sent to me.
20    QUESTIONS BY MR. PENDELL:
21          Q.    They would have been sent to
22    you by the lawyers, correct?
23          A.    Correct.
24          Q.    Are there any documents you
25    requested from defendant's lawyers that you
```

Highly Confidential - Subject to Further Confidentiality Review

1    did not receive?

2        A.    No.

3        Q.    I wanted to -- on page 3 of

4    your report, and you can look at this if

5    you'd like to, but this is a very general

6    question.  I just wanted to orient you to

7    where I was getting.

8              On page 3 of your report where

9    it starts to go into substance of your

10   report, at the top it says, "Dr. Loudin's

11   report and the opinions oversimplify a

12   complex and multifactorial problem," and then

13   in parentheses it says "addiction," "that has

14   plagued this country for decades."

15             Do you see that?

16       A.    Yes.

17       Q.    You read Dr. Loudin's report,

18   correct?

19       A.    I did read Dr. Loudin's report,

20   yes.

21       Q.    Did you read any of the

22   materials that Dr. Loudin references or

23   relied upon in that report?

24       A.    I did not read all of them, but

25   I did read a great majority of them, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall sitting here

2  today what ones you read?

3    A.    I looked at his -- some of his

4  supplementary things on the -- because some

5  of the things he quoted, like a 10 percent

6  rate of women with opioid use disorder in

7  this country, and I tried to see where that

8  came from because that number made no sense

9  to me.

10    Q.    Can you tell me all the factors

11  that you believe contribute to the addiction

12  problem that you say has plagued this country

13  for years?

14    A.    I think there -- it's so

15  multifactorial.  I mean, poverty, but it

16  really -- systemic racism, the war on drugs.

17  The former Surgeon General would say our

18  inability to connect with each other as human

19  beings, isolation.

20    Q.    Any others that you can --

21    A.    Adverse -- sorry, I forgot the

22  most important one, which is childhood

23  adverse events.

24    Q.    Any others you can think of?

25    A.    Oh, there's many, many others,

Highly Confidential - Subject to Further Confidentiality Review

1  yes, but those are the ones that come off the

2  top of my head.

3       Q.    Is the availability of a

4  particular drug a factor?

5            MS. FUJIMOTO:  Object to form.

6            THE WITNESS:  Well, I think

7       that is a factor in all societies,

8       whatever is -- will -- whatever is

9       available will be used.

10 QUESTIONS BY MR. PENDELL:

11      Q.    And how about societal

12 acceptance of a particular drug, is that a

13 factor?

14           MS. FUJIMOTO:  Object to form.

15           THE WITNESS:  That is

16      definitely a factor.

17 QUESTIONS BY MR. PENDELL:

18      Q.    And in your opinion, how did

19 Dr. Loudin oversimplify the addiction crisis?

20      A.    Well, he blamed it all on the

21 availability of prescription opioids when --

22 and ignore -- and said that that led to this

23 addiction crisis, when, you know, the first

24 drug that's usually used is alcohol or

25 tobacco.  And people get addicted to very

Highly Confidential - Subject to Further Confidentiality Review

1    many drugs, not just opioids.

2         Q.    And when Dr. -- in Dr. Loudin's

3    report, was Dr. Loudin making that -- making

4    that statement particularly about Huntington

5    and Cabell County, West Virginia, or was

6    Dr. Loudin making that statement nationally?

7              MS. FUJIMOTO:  Object to form.

8              THE WITNESS:  He was making

9         the -- I believe just from my

10        recollection, having read the report a

11        while ago, is that he was making it

12        both nationally and locally.

13   QUESTIONS BY MR. PENDELL:

14        Q.    Did you do any research

15   specifically about the addiction crisis in

16   Huntington, in Cabell County, West Virginia?

17        A.    Other than Dr. Loudin's report

18   and looking at his data, no.

19        Q.    Did you read any other expert

20   reports in this case other than Dr. Loudin's?

21        A.    Not particularly for this case.

22              I don't have any other --

23        Q.    You may have looked at expert

24   reports for other opioid cases; is that what

25   you're telling me?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     But with regards to the West

3  Virginia -- I'm sorry, the Huntington, West

4  Virginia, in Cabell County, West Virginia

5  case today, you only read Dr. Loudin's

6  report; is that right?

7      A.     That is correct.

8      Q.     How about any deposition

9  transcripts?  Did you read any deposition

10  transcripts from this case?

11      A.     I can't recall because they're

12  blending together with the other case, to be

13  honest.

14      Q.     Do you know if Dr. Loudin has

15  been deposed in this case?

16      A.     I don't recall.

17      Q.     So it's fair to say if

18  Dr. Loudin has been deposed, you probably

19  didn't read Dr. Loudin's deposition in this

20  case, correct?

21      A.     I can't recall, no.

22      Q.     Have you considered any

23  additional material following the submission

24  of this report?

25      A.     What do you mean, "considered

1  any additional material"?

2      Q.    Sure.

3          So after the time that your

4  report was written and provided to counsel to

5  produce in this case, I'm just wondering

6  whether, for example, there are other

7  articles you went back and read or, you know,

8  whether you went back and read, you know,

9  additional materials that Dr. Loudin had

10 cited that you did not read prior to writing

11 your report, stuff like that.

12     A.    I did look at -- like I said, I

13 was trying to figure out where he got the

14 10 percent value, so I looked at that, but I

15 don't remember -- I mean, I read constantly

16 about opioids, about -- also about all

17 substances in general, so -- to say, you

18 know, anything specifically for this report

19 or not.

20     Q.    Well, let me ask you -- let me

21 ask you a slightly different question.

22          Have you read anything related

23 to -- strike that.

24          Have you read anything after

25 the submission of this report that has led

Highly Confidential - Subject to Further Confidentiality Review

1  you to either change your opinions or

2  strengthen your opinion or change your

3  opinion in any way?

4      A.    No.

5      Q.    Do you have a case file for

6  this case?  Do you keep a file at home or

7  something?

8      A.    I have a file on my computer,

9  yes.

10      Q.    So you keep it in your file, so

11  it's electronic?

12      A.    Yes.

13      Q.    What's in the file generally?

14          MS. FUJIMOTO:  Object to form.

15          THE WITNESS:  Generally the

16      articles that were sent to me.

17  QUESTIONS BY MR. PENDELL:

18      Q.    Anything else?

19      A.    And -- well, I don't have them

20  separated out by the cases, so there are some

21  depositions for the other cases that I've

22  read.

23      Q.    Anything else that you can

24  think of?

25      A.    Not off the top of my head.

1    Q.    Do you know personally or by

2   reputation any of the other experts disclosed

3   by the defendants in this case?

4    A.    I know of -- well, like I said,

5   it's hard for me to tease out the defendants

6   for this case and the defendants for the

7   opioid NAS litigation.

8    Q.    So let me ask you this.  Let me

9   ask you a little broader question then.

10      Do you know personally or by

11   reputation any expert disclosed in any of the

12   opioid cases that you're aware of?

13    A.    I know Anna Lembke.

14    Q.    How do you know Dr. Lembke?

15    A.    I've worked with her for the

16   American College of Academic Addiction

17   Medicine.

18    Q.    How long have you worked with

19   Dr. Lembke?

20    A.    I have not personally worked

21   with her.  I mean, I know her from that, but

22   I have known her for probably three or four

23   years.

24    Q.    So you know her work because of

25   being on that?

```
 1        A.      Yeah.

 2        Q.      Do you have an opinion of

 3   Dr. Lembke?

 4              MS. FUJIMOTO:  Object to form.

 5              THE WITNESS:  I think

 6        Dr. Lembke is a -- a good addiction

 7        medicine provider.

 8   QUESTIONS BY MR. PENDELL:

 9        Q.      Have you -- I'm sorry, were you

10   finished?

11        A.      Yeah.

12        Q.      Have you read any of

13   Dr. Lembke's reports from the opioid cases

14   that you've been involved with?

15        A.      I have read her report for the

16   opioid litigation.

17        Q.      In Washington?

18        A.      In Washington, yes.

19        Q.      Sitting here today, do you

20   recall anything in the report you read of

21   hers that you disagree with?

22              MS. FUJIMOTO:  Object to form.

23              THE WITNESS:  Again, I think

24        Dr. Lembke, as do all of the

25        litigation witnesses, tend to
```

1          oversimplify the prescribing of

2          medications and look at it somewhat

3          with 20/20 hindsight.

4     QUESTIONS BY MR. PENDELL:

5          Q.     And any other opinions, or is

6     that the only one that stands out?

7               MS. FUJIMOTO:  Object to form.

8               THE WITNESS:  That's the one

9          that stands out right now.

10    QUESTIONS BY MR. PENDELL:

11         Q.     Sitting here today, do you know

12    if you plan to use any demonstratives at

13    trial?

14         A.     What do you mean by

15    "demonstratives"?

16         Q.     Like a PowerPoint presentation

17    or a graph that, you know, you'd use to

18    supplement your testimony or to illustrate

19    your testimony?

20         A.     Not -- not -- no.

21         Q.     Have you met with or spoken to

22    any other expert witnesses in this case?

23         A.     I have not.

24         Q.     How about experts from the

25    Washington opioid case, have you met with or

Highly Confidential - Subject to Further Confidentiality Review

```
 1    spoken to any of them?

 2         A.     Not regarding this case, no.

 3         Q.     And you did not speak with or

 4    meet with any other lawyers representing

 5    Cardinal Health or ABDC in this case,

 6    correct?

 7         A.     Not to my knowledge, no.

 8         Q.     Did you meet with or speak to

 9    any fact witnesses in this case?

10         A.     Not to my knowledge, no.

11         Q.     And you did not speak to any

12    medical professionals in Huntington or Cabell

13    County, West Virginia, that treat pregnant

14    women with OUD, correct?

15         A.     Not in those particular

16    counties, no.

17         Q.     Have you done so anywhere in

18    the state of West Virginia?

19         A.     Not regarding this case.  I do

20    know a provider from West Virginia.

21         Q.     And who is the provider you

22    know from West Virginia?

23         A.     I work with him on the FASDH

24    champions.  I don't recall his name off the

25    top of my head.
```

1    Q.    Do you recall the last time you

2   spoke with that provider?

3    A.    It was a couple of years ago.

4    Q.    Have you spoken with any

5   medical professionals in Huntington or Cabell

6   County, West Virginia, that deliver babies

7   born with opioid-related NAS?

8    A.    I have not talked to anybody

9   recently.

10    Q.    Have you spoken to anyone in

11   Huntington or Cabell County, West Virginia,

12   that provide medical care for children born

13   with opioid-related NAS?

14    A.    I have not, no.

15    Q.    Have you spoken with any

16   medical professionals in Huntington or Cabell

17   County, West Virginia, at all?

18    A.    Not to my knowledge.

19    Q.    Anybody else you spoke to or

20   met with about this case or the opioid cases

21   in general that I have not already asked you

22   about?

23    A.    No, not to my knowledge.

24    Q.    Do you plan to be at trial in

25   October?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      Well, it depends.  I'm not

 2    allowed to -- it depends on the situations

 3    and COVID.  I'm not allowed to have

 4    nonessential travel, based on my employment.

 5           Q.      Understood.

 6                   And now you've got those

 7    terrible fires to deal with about, so, crazy.

 8                   What, if any -- well, strike

 9    that.

10                   Is there any information that

11    you're aware of, sitting here today, that you

12    did not have, that you need, to give your

13    opinions at trial?

14           A.      Not that I'm aware of, no.

15           Q.      Is there any information that

16    you do not have, sitting here today, that

17    would strengthen or weaken your opinions?

18           A.      No, not that I'm aware of.

19           Q.      Are there any facts you can

20    think of you did not have at the time you

21    wrote this report that would influence or

22    change your opinions?

23           A.      Not that I know of, no.

24           Q.      And, Doctor, can you say to a

25    reasonable degree of medical certainty that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    opioid-related NAS does not cause permanent

2    harm or developmental delays?

3              MS. FUJIMOTO:  Object to form.

4              THE WITNESS:  I can say with

5         reasonable medical certainty that

6         there -- the developmental delays

7         that -- or problems that might be seen

8         are multifactorial and not just

9         secondary to opioids and secondary to

10        many other factors, including poverty,

11        smoking, alcohol and other substances.

12   QUESTIONS BY MR. PENDELL:

13        Q.    Is the science on this issue

14   settled, or is it still emerging?

15             MS. FUJIMOTO:  Object to form.

16             THE WITNESS:  I would say the

17        science -- we've known and studied

18        babies with neonatal abstinence

19        syndrome for over 50 years, and I

20        think the science is pretty settled

21        that it is multifactorial.

22   QUESTIONS BY MR. PENDELL:

23        Q.    Well, let me ask you this:

24   When you say that we studied babies with NAS

25   for 50 years, have we specifically studied
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    babies with opioid-related NAS for 50 years?

 2              MS. FUJIMOTO:  Object to form.

 3              THE WITNESS:  Yes.  I mean, the

 4         treatment of opioid use disorders with

 5         methadone has been used for pregnant

 6         women for over 50 years, and we have

 7         over 50 years of looking at those

 8         children.

 9    QUESTIONS BY MR. PENDELL:

10         Q.    Has the science related to

11    opioid-related NAS been as thorough or robust

12    as the science related to tobacco-related

13    development issues with regards to infants?

14              MS. FUJIMOTO:  Object to form.

15              THE WITNESS:  Well, I think --

16         I think tobacco-related developmental

17         issues is still also being studied.

18    QUESTIONS BY MR. PENDELL:

19         Q.    Is the science as robust for

20    opioid-related NAS as it is for fetal alcohol

21    syndrome?

22              MS. FUJIMOTO:  Object to form.

23              THE WITNESS:  Again, we have a

24         lot of information on fetal alcohol

25         syndrome and has shown much more
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          deleterious effects than opioid use

 2          disorders.

 3    QUESTIONS BY MR. PENDELL:

 4          Q.     It's also been more studied,

 5    hasn't it, Doctor?

 6               MS. FUJIMOTO:  Object to form.

 7               THE WITNESS:  I think alcohol

 8          use disorders has been studied and

 9          fetal alcohol syndrome has been

10          studied, but so has opioid use

11          disorders.

12    QUESTIONS BY MR. PENDELL:

13          Q.     Yes, but fetal alcohol syndrome

14    has been studied more than opioid-related

15    NAS, correct?

16               MS. FUJIMOTO:  Object to form.

17               THE WITNESS:  Again, because it

18          is a specific syndrome, whereas there

19          is no specific syndrome for opioid use

20          disorders, NAS, opioid-related NAS.

21    QUESTIONS BY MR. PENDELL:

22          Q.     That's yes, correct?

23          A.     I'm not stating yes, no.

24          Q.     You're not saying -- so are you

25    saying no?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     I -- restate your question.

 2                And I am saying that the -- the

 3    science has been studied for many years.

 4    There is a lot of information on

 5    opioid-related NAS and the long-term effects.

 6    There is a lot of studies looking at fetal

 7    alcohol syndrome and their long-term effects.

 8    And we know for a fact that fetal alcohol

 9    syndrome is much more deleterious to the

10    developing fetal brain.

11         Q.     And so my question was:  Do you

12    agree that the research and science on FAS is

13    more robust and deeper than the science and

14    study on opioid-related NAS?

15                MS. FUJIMOTO:  Object to form.

16                THE WITNESS:  I do not agree

17         with that.

18    QUESTIONS BY MR. PENDELL:

19         Q.     Doctor, although you provide

20    a -- the materials -- on the materials

21    considered relied on at the end of your

22    report, there's no citations in your report

23    to point me to where you're getting the

24    information that you're producing.

25                So if we look, for example, on
```

Highly Confidential - Subject to Further Confidentiality Review

1    page 6 of your report, the very first full

2    paragraph, that first sentence you say,

3    "Women who are prescribed opioids for acute

4    pain and even chronic pain, while pregnant or

5    otherwise, and who do not have another

6    substance use disorder, including tobacco,

7    will have a low risk of developing an opioid

8    use disorder.  One study showed that for

9    women who had a cesarean section and were

10   prescribed opioids, the risk of developing an

11   opioid use disorder is approximately 1 in

12   300."

13            Do you see where I'm reading

14   from?

15       A.    Yes.

16       Q.    Aside from reading every line

17   of all the documents that you have on your

18   reliance list, is there a way for me to

19   figure out where that came from?

20       A.    I could tell you it was -- I'm

21   looking through the list.  I can't tell you

22   off the top of my head, but I know that it

23   was a study on opioid use disorders after

24   prescribing -- after prescriptions of -- and

25   I believe it was probably cited in the Ecker

Highly Confidential - Subject to Further Confidentiality Review

1    study and also -- because it was Brian

2    Bateman whose work that is.

3          Q.    Similarly on page 7, it's the

4    third sentence of the second full paragraph

5    where it says, "Among women who had an OUD

6    during pregnancy, up to 97 percent also use

7    tobacco."

8                Do you see that?

9          A.    Yes.

10         Q.    Do you know what material that

11   statement came out of?

12         A.    That is from different

13   treatment facilities.  I know from my own --

14   you know, just talking to other treatment

15   facilities, I know for my own treatment it

16   was about 67 percent, and so that would have

17   been my own study.  But some other opioid

18   treatment centers have quoted up to

19   97 percent.

20               So, again, this is my own

21   knowledge.

22         Q.    So my question is -- I mean, so

23   is there a reason why you didn't provide

24   citations in the report?  Because I mean,

25   I --

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     I was --

2        Q.     Go ahead.

3        A.     I was counseled by my --

4               MS. FUJIMOTO:  Objection.

5               THE WITNESS:  -- counsel to --

6               MS. FUJIMOTO:  Wait.  Wait.

7    Wait.  I'm going to object to form.

8               THE WITNESS:  Okay.

9               MS. FUJIMOTO:  And -- okay?

10   I'm going to object to form, Mike.

11   You know there's no obligation on

12   that.

13               But go ahead, Tricia, and do

14   not disclose any conversations with

15   counsel.

16               THE WITNESS:  Okay.

17   QUESTIONS BY MR. PENDELL:

18       Q.     So I assume that you're not

19   going to be able to answer my question then,

20   correct?

21       A.     Correct.

22       Q.     So how am I supposed to know,

23   looking at your report, what came from a

24   study and what is based on your experience?

25       A.     Well, I thought you read
```

Highly Confidential - Subject to Further Confidentiality Review

1    everything.

2         Q.    Well, I read a lot of stuff.  I

3    read all the stuff that you have quoted --

4    or, I'm sorry, that you cited on your

5    reliance materials, but I can't find some of

6    that stuff in there.

7              So I assume if I can't find it

8    in what you provided, you're basing it on

9    your personal experience; is that right?

10              MS. FUJIMOTO:  Object to form.

11              THE WITNESS:  My personal

12         experience.  And like I said at the

13         beginning, I can't begin to quote all

14         of the studies that I have read over

15         the course of my lifetime.

16    QUESTIONS BY MR. PENDELL:

17         Q.    You understand, though, that

18    under the rules that as plaintiff -- the

19    plaintiffs have a right to understand what it

20    is that is the basis or forms the basis of

21    your opinion.

22              You understand that, correct?

23         A.    Correct.

24              And like I said, I have been

25    doing this for 13 years and have many things

Highly Confidential - Subject to Further Confidentiality Review

1    that form the basis of my opinion that I

2    can't particularly cite.

3              MS. FUJIMOTO:  And let me just

4         interject and state for the record,

5         Mike, that you know that there is no

6         requirement that every sentence or

7         opinion be footnoted, particularly in

8         situations where numerous studies can

9         support numerous different opinions

10        with lots of different data points.

11             She provided the materials

12        reviewed list and has explained what

13        that was intended to capture.

14             MR. PENDELL:  I appreciate the

15        speaking objection, but you also know

16        that there's not a single citation

17        anywhere in this report to anything.

18        Not one.

19             MS. FUJIMOTO:  Yes.  And there

20        is no obligation that that be done.

21        And it's particularly appropriate when

22        opinions can be supported by various

23        many studies and in different

24        respects, given the circumstances and

25        subject matter of the opinion.

```
 1              So I'm just objecting to the

 2         suggestion that somehow there was an

 3         obligation to provide footnotes and

 4         citations to every statement or

 5         opinion, because that's not the case.

 6              MR. PENDELL:  So I think -- I

 7         think -- I think the correct objection

 8         is "objection to form," period.  I

 9         think that's --

10              MS. FUJIMOTO:  Well, that's

11         what I've been doing, Mike, until you

12         got into this --

13              MR. PENDELL:  I don't need you

14         to explain to me your interpretation

15         of the rules or what you think the

16         rules require.

17    QUESTIONS BY MR. PENDELL:

18         Q.    Because what we can do, Doctor,

19    is I can go through this report line by line,

20    and after every sentence ask you whether or

21    not that is based on one of the reliance

22    materials that you have in the back of your

23    report or whether or not that's anecdotal

24    evidence based on your experience through the

25    years.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  I'd prefer not to do that
 2   because we'll be here all day.
 3                  So I'm just trying to figure
 4   how I or anybody else in this case is
 5   supposed read your report and figure out what
 6   is based on actual literature and studies
 7   versus what you are anecdotally saying based
 8   on your observations.
 9                  Is there a way for anybody to
10   do that, looking at your report?
11              MS. FUJIMOTO:  Besides looking
12          at her materials reviewed list?
13              MR. PENDELL:  The question is
14          for the doctor, Ms. Fujimoto.
15              MS. FUJIMOTO:  Object to form.
16              THE WITNESS:  I am saying that
17          many studies form the basis of my
18          opinions, and it is hard to come up
19          with one specific study when many
20          studies show this.
21   QUESTIONS BY MR. PENDELL:
22          Q.    And in some instances, you did
23   not come up with any studies to show this?
24              MS. FUJIMOTO:  Object to form.
25              THE WITNESS:  In some instances
```

1        if there is no studies that -- that --

2        or many, many studies that support

3        this, it comes up with the basis of my

4        opinion, or it is from my experience

5        from treating the women that I treat.

6    QUESTIONS BY MR. PENDELL:

7        Q.    And again, just looking at the

8    face of your report, there's no way for us to

9    distinguish which statement is based on many,

10   many studies versus what you have seen

11   anecdotally in your practice, correct?

12            MS. FUJIMOTO:  Object to form.

13            THE WITNESS:  I usually have

14        said that studies have shown versus if

15        it is from my experience, I have cited

16        specific instances.

17   QUESTIONS BY MR. PENDELL:

18       Q.    All right.  So let's look at

19   page 8 of your report.  It's the second full

20   paragraph, the sixth sentence of that

21   paragraph.

22            Let me know when you're there,

23   Doctor.

24       A.    Is this -- I don't have line

25   numbers on mine.  "The timing of" -- the

1  paragraph starting "The timing of drug

2  exposure"?

3       Q.    So, yeah, it starts -- correct.

4  And the sentence I'm particularly focused on

5  says, "The great majority of studies looking

6  at the relationship with opioid exposure and

7  birth defects have found no association with

8  NAS or opioid exposure."

9            Do you see that?

10      A.    Yes.

11      Q.    Can you name for me the studies

12  you're referring to here?

13      A.    There are many, many studies

14  that have shown this when they are controlled

15  for the opioid exposure.  There's too many to

16  name here.

17      Q.    Can you name me a single study?

18  I just want the name of one.

19      A.    I can go -- you know, if you

20  look through the Ecker study, that would have

21  a list -- because that's a pretty large

22  paper, that would have a list of studies

23  looking at opioid exposure and birth defects.

24      Q.    I don't want to look at the

25  Ecker study.  I want to know whether you,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   sitting here today, can name for me a single

 2   study for that proposition.

 3              MS. FUJIMOTO:  Object to form.

 4        She just named Ecker.

 5              MR. PENDELL:  No, I think she

 6        said that I could look at Ecker to

 7        find those studies.

 8   QUESTIONS BY MR. PENDELL:

 9        Q.     I'm wondering whether you can

10   name for me one of those studies.

11        A.     Through my --

12              MS. FUJIMOTO:  Object to form.

13              Go ahead.

14              THE WITNESS:  I'm looking

15        through the source materials to find

16        you something.

17              I would go with Beth Logan's

18        study.  I would go with Merhar's

19        study.

20   QUESTIONS BY MR. PENDELL:

21        Q.     I'm sorry, Doctor, are you

22   done?  I didn't know if you were still

23   thinking or --

24        A.     I was just looking at the --

25   and Jarlenski's study.
```

1          Q.     Okay.  Similarly on page 5 of

2    your report?

3          A.     Uh-huh.

4          Q.     First sentence of the second --

5    so you see the heading that says, "Women who

6    use opioids and other substances during

7    pregnancy are a diverse group"?

8          A.     Yes.

9          Q.     The first sentence of that

10   second paragraph where it says, "The majority

11   of women who use opioids during pregnancy

12   have polysubstance use or misuse, meaning

13   they use or misuse a number of different

14   substances during their pregnancy."

15                Do you see that?

16         A.     Yes.

17         Q.     Is there a particular study you

18   were getting that from, or is that based on

19   your clinical practice?

20                MS. FUJIMOTO:  Object to form.

21                THE WITNESS:  Again, my

22         clinical practice and many, many

23         studies, including looking at Loudin's

24         report.  He specifically, throughout

25         his report, states that the majority

Highly Confidential - Subject to Further Confidentiality Review

1    of women use polysubstances.

2    QUESTIONS BY MR. PENDELL:

3        Q.      Doctor, what is the MOTHER

4    study?  Are you familiar with the MOTHER

5    study?

6        A.      I am familiar with the MOTHER

7    study.

8        Q.      What can you tell me about that

9    study?

10       A.      It is a double-blinded,

11   randomized, controlled trial of methadone

12   versus buprenorphine for the treatment of

13   opioid use disorder and the relationship

14   that -- the primary outcome was the

15   occurrence of NAS and need for treatment for

16   NAS.

17       Q.      And you cited that study

18   because -- strike that.

19           Doctor, do you believe that

20   that study supports the opinions you're

21   offering in this case?

22       A.      I believe that, yes -- well,

23   the original study was just about the

24   incidence of NAS, but they have done

25   long-term outcomes based on that study, yes,

Highly Confidential - Subject to Further Confidentiality Review

1    which form some of the basis of my opinions.

2         Q.    So on page 6 of your report,

3    Doctor, there is -- I'm sorry, strike that.

4    I've lost my place.

5              On page 9 of your report, there

6    is a -- let me find that for you.  It's

7    the -- starting the very first full sentence

8    on the page where it says, "Because of the

9    variability of the symptoms."

10             Are you following me?

11        A.    Yes.

12        Q.    "In the largely unfounded fear

13   of severe consequences, the majority of

14   infants in this country have traditionally

15   been overtreated, usually in the neonatal

16   intensive care units, which is expensive and

17   in most cases unnecessary and

18   counterproductive."

19        A.    Yes.

20        Q.    "More recently, the protocols

21   for hospitals have been changing, leading to

22   a lot fewer infants needing treatment.  These

23   new protocols rely on keeping mothers and

24   infants together, which require a mom be

25   healthy enough to care for the infant and

1    thus being treated for her own medical

2    condition, either the chronic pain or the

3    opioid use disorder."

4            What materials are you relying

5    on for this statement or these series of

6    statements?

7        A.    Again, from my experience and

8    then also -- even in Loudin's report, he

9    talks about the different protocols that he

10   has been using in getting patients out of the

11   neonatal intensive care for the treatment of

12   NAS.  The studies out of Yale support this.

13   So it's not just one study; it's many

14   studies.

15       Q.    And, Doctor, isn't it true it's

16   not that these babies don't need treatment,

17   it's just that they -- that fewer of them

18   require medication?

19           MS. FUJIMOTO:  Object to form.

20           THE WITNESS:  Correct.  And the

21       treatment is keeping moms and babies

22       together and nonpharmacologic

23       treatment.

24   QUESTIONS BY MR. PENDELL:

25       Q.    Mom is the medicine in this

1    situation, right?

2         A.    Correct.

3         Q.    Have you heard that saying

4    before, mom is the medicine?

5         A.    Yes.

6         Q.    Doctor, in your clinical

7    practice, you keep medical records of your

8    patients, correct?

9         A.    Correct.

10        Q.    You practice to keep accurate

11   records, correct?

12        A.    Correct.

13        Q.    And you would never put

14   something in one of your patient's records

15   that you did not believe to be true, correct?

16        A.    Correct.

17        Q.    So if you wrote a diagnosis in

18   one of your patient's records, it's because

19   you believed, based on your medical

20   expertise, your training, your experience and

21   your personal integrity that it was an

22   accurate diagnosis; is that fair?

23        A.    That is fair.

24        Q.    And you'd have no reason to do

25   otherwise; isn't that right?

1       A.      That is correct.

2       Q.      You don't create records for

3   your patients for the purpose of future

4   litigation, correct?

5       A.      No, I keep records for my

6   patients for -- no.  Why would I do that?

7       Q.      You don't create records for

8   the purpose of some future medical study,

9   correct?

10      A.      No.

11      Q.      Your goal is to be accurate

12  because you're treating a human being and you

13  want to do the best job possible; isn't that

14  right?

15      A.      Correct.

16      Q.      And you agree with me that the

17  vast majority of treating physicians follow

18  those same standards and practices that we

19  just talked about, right?

20      A.      That is correct.

21      Q.      What's an ICD-9 or -- let me do

22  this.  What's an ICD-9/10 code?

23      A.      That is a billing code.

24      Q.      What -- and what is the purpose

25  of using the ICD-9 or 10 codes?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      That is a billing code so that

2   the physician or practitioner can be paid by

3   the insurance company.

4      Q.      Okay.  And do you treat

5   Medicare or Medicaid patients in your

6   practice ever?

7      A.      I do.

8      Q.      And you understand that when

9   treating a Medicare patient or a Medicaid

10   patient -- are you required by law to use the

11   ICD-9/10 code system?

12      A.      I am.

13      Q.      And you understand that

14   Medicare and Medicaid rely on the ICD-9/10

15   codes, correct?

16      A.      Yes.

17      Q.      And when you use those codes,

18   you try to be accurate when you use them; is

19   that correct?

20      A.      I try to be accurate as much as

21   possible.  Some of the codes don't match up

22   to the diagnosis, and I think I said that in

23   the report.

24              There is an obligation to be

25   accurate; however, if the code is not

Highly Confidential - Subject to Further Confidentiality Review

1    existent -- or some physicians don't put the

2    whole code in because of fatigue and other

3    reasons.

4              So there are a lot of reasons

5    not -- that they are not complete, and that

6    was my point when I made that in the -- in

7    the report.

8         Q.    In your experience, does

9    Medicare or Medicaid reimburse for doctors

10   when their ICD-9 or 10 codes are not

11   complete?

12        A.    There are some ICD-9 codes and

13   10 codes that are not reimbursed, correct.

14        Q.    So in order to get reimbursed,

15   a doctor would have to complete that portion

16   of the paperwork, correct?

17        A.    That is correct.

18             MR. PENDELL:  I'm getting

19        pretty close to the end, Ms. Fujimoto,

20        if you want to just keep going.  I

21        figure we can be done in ten minutes

22        unless you want to take a break.  Or,

23        Doctor, if you would like to take a

24        break, we can do that, but we're

25        getting pretty close.

```
 1                    THE WITNESS:  Okay.

 2                    MS. FUJIMOTO:  Dr. Wright, if

 3            you're good to finish it up, I am,

 4            too.

 5                    THE WITNESS:  Yeah, I'm fine.

 6    QUESTIONS BY MR. PENDELL:

 7            Q.      Doctor, have you ever

 8    personally ever taken a prescription opioid?

 9                    MS. FUJIMOTO:  Object to form.

10                    THE WITNESS:  I have been

11            prescribed opioids.  I have taken them

12            for -- after a surgery.

13    QUESTIONS BY MR. PENDELL:

14            Q.      Have you ever taken them for a

15    chronic condition?

16            A.      No.

17            Q.      Have you ever known anyone who

18    became addicted to opioids that started on a

19    prescription opioid?

20                    MS. FUJIMOTO:  Object.  Form.

21                    THE WITNESS:  I mean, I've

22            treated patients that have started

23            misusing prescription opioids, but

24            generally not something that I have

25            prescribed them for.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Yes, it is something that is --
 2          it happens.
 3    QUESTIONS BY MR. PENDELL:
 4          Q.      And have you ever spoken to a
 5    patient that you've treated who was using
 6    heroin that told you they started down the
 7    road to heroin first from prescription
 8    opioids?
 9                    MS. FUJIMOTO:  Object.  Form.
10                    THE WITNESS:  Again, usually
11          they start with something else besides
12          prescription opioids.
13    QUESTIONS BY MR. PENDELL:
14          Q.      Okay.  Like what?
15          A.      Like alcohol.
16          Q.      Have any of them ever tied
17    their use of heroin to their use of
18    prescription opioids?
19                    MS. FUJIMOTO:  Object to form.
20                    THE WITNESS:  Yes.
21    QUESTIONS BY MR. PENDELL:
22          Q.      You've heard that before?
23          A.      I have heard that from a few
24    patients, not the majority.  The majority use
25    other substances first, including alcohol and
```

Highly Confidential - Subject to Further Confidentiality Review

1   tobacco.

2        Q.      And with regards to that

3   majority you're talking about that have used

4   alcohol or tobacco, have they gone from

5   alcohol or tobacco straight to heroin, or was

6   there prescription opioids in between?

7                MS. FUJIMOTO:  Object to form.

8                THE WITNESS:  There has been

9        both.

10  QUESTIONS BY MR. PENDELL:

11       Q.      And what's the percentage of

12  folks who went straight to heroin after using

13  tobacco that -- that -- versus the amount of

14  folks that went from tobacco to prescription

15  opioids to heroin?

16               MS. FUJIMOTO:  Object to form.

17               THE WITNESS:  I don't know off

18       the top of my head.

19  QUESTIONS BY MR. PENDELL:

20       Q.      Pretty unusual, Doctor, for

21  someone to wake up one morning and just

22  decide they're going to shoot heroin, isn't

23  it?

24       A.      It's not unheard of.

25       Q.      It may not be unheard it, but

Highly Confidential - Subject to Further Confidentiality Review

```
 1   it's pretty unusual, isn't it?

 2        A.     It's not -- not where I am now,

 3   no.

 4        Q.     So how many patients do you

 5   have that have OUD that had never touched an

 6   opioid in their life and just started

 7   shooting heroin?

 8             MS. FUJIMOTO:  Object to form.

 9             THE WITNESS:  Again, I don't

10        know off the top of my head, but there

11        is a percentage that go from alcohol,

12        tobacco, cannabis and then heroin

13        without going to prescription opioids.

14   QUESTIONS BY MR. PENDELL:

15        Q.     Do you keep track of that

16   number?

17        A.     I do not keep track of that

18   number, no.

19        Q.     Does anyone associated with the

20   University of California that you know of

21   keep track of that number?

22        A.     I'm sure someone does.  It's a

23   very big institution.

24        Q.     Have you ever read any studies

25   regarding the correlation of pills to heroin?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I have seen some studies, yes.

2       Q.      Let me ask you:  When you say

3   you've seen some studies, what do you mean by

4   that?

5       A.      I've read some studies, yes.

6   I've read some studies otherwise, too.

7       Q.      Is that -- what area of

8   medicine would you consider that?  Is that

9   epidemiology?

10              MS. FUJIMOTO:  Object.  Form.

11              THE WITNESS:  I mean, there's

12          studies in -- that use epidemiology in

13          medicine.  I would say there are

14          studies in other areas of medicine

15          that -- yeah, restate the question,

16          please.

17  QUESTIONS BY MR. PENDELL:

18      Q.      Sure.

19              I was just wondering -- I was

20  asking you questions about whether you've

21  seen any studies related to the correlation

22  between prescription opioids and heroin.

23              You said yes, you'd seen some.

24  We talked about that.

25              And then I was asking you

1   what area of specialty would be involved in a

2   study like that, whether it was

3   epidemiologists.

4               MS. FUJIMOTO:  Object to form.

5               THE WITNESS:  Yes,

6          epidemiologists are usually involved

7          in kind of -- in that sort of studies.

8               But my point, and I was getting

9          lost in it, is that other medical

10         specialties besides epidemiology do

11         those kind of studies, and not

12         necessarily with the scientific rigor

13         of an epidemiologist.

14   QUESTIONS BY MR. PENDELL:

15         Q.    Have you ever done one of those

16   studies?

17         A.    Not on prescription opioids,

18   but I have done studies looking at some of

19   the incidence of opioid use disorders -- or

20   not opioid use, of substance use disorders.

21         Q.    But none specifically focused

22   on the correlation between prescription

23   opioids and heroin?

24         A.    No.  I have not myself.

25         Q.    Doctor, do you believe that

1    there is an opioid addiction crisis in the

2    country right now?

3                    MS. FUJIMOTO:  Object to form.

4                    THE WITNESS:  There is a --

5            there is a current -- I mean,

6            addiction is a constant throughout our

7            country.  Currently, there is more

8            opioids than other substances.

9            However, you know, the great majority

10           of people with addiction use alcohol

11           and tobacco and cannabis.

12                   So to say that it's all a

13           crisis of opioids when it's

14           multi-substances -- and various

15           substances throughout the course of

16           history have gone up and down.

17                   Where I was in Hawaii, it was

18           more methamphetamines, and same with

19           here in California.

20   QUESTIONS BY MR. PENDELL:

21           Q.    Are there more people abusing

22   opioids today than there were 20 years ago?

23                   MS. FUJIMOTO:  Object to form.

24                   THE WITNESS:  I think that's

25           debatable because it's gone down and

1           up.  And I think the current attention

2           being forced on it, I would actually

3           say, is a form of racism because it's

4           affected white people, whereas before

5           it was affecting communities of color.

6   QUESTIONS BY MR. PENDELL:

7           Q.    So is it your position that the

8   opioid crisis in America right now is only

9   affecting white people?

10              MS. FUJIMOTO:  Object to form.

11              THE WITNESS:  I didn't say

12          that.

13  QUESTIONS BY MR. PENDELL:

14          Q.    And I'm just trying to

15  understand --

16          A.    I said that it was getting

17  attention because it was affecting white

18  people.

19          Q.    I'm just trying to understand

20  what it is you're saying.  So I'm not trying

21  to imply anything, Doctor; I'm just trying to

22  understand what it is you're trying to say.

23              So to summarize, so I

24  understand I -- so that I understand what

25  you're saying is that the reason it's getting

Highly Confidential - Subject to Further Confidentiality Review

1    attention is because it's also affecting

2    white communities; is that fair?

3         A.    Correct.

4         Q.    Do you believe that the

5    pharmaceutical industry is at least partly to

6    blame for the opioid crisis of the last

7    decade or so?

8              MS. FUJIMOTO:  Object to form.

9              THE WITNESS:  Again, it's

10             multifactorial.  I think there was

11             many things contributing to what we

12             look in retrospect as an

13             overprescription, including the drug

14             manufacturers, including JCO,

15             including the loss of jobs in West

16             Virginia and other places.

17             So I don't think it's one

18             person or one company or one industry

19             to blame.

20    QUESTIONS BY MR. PENDELL:

21         Q.    Do you believe that the opioid

22    distributors played any part?

23             MS. FUJIMOTO:  Object to form.

24             THE WITNESS:  Again, it's

25             multifactorial and it's hard to say,

Highly Confidential - Subject to Further Confidentiality Review

1          you know.

2                  Distributors, I don't think,

3          have any say in who gets prescribed

4          opioids, and they are just doing

5          their -- you know, like I said,

6          opioids are -- distributors have no

7          say in who gets prescribed it.

8     QUESTIONS BY MR. PENDELL:

9          Q.     They have a saying where the

10    opioids get shipped though, don't they?

11         A.     I think they have --

12                MS. FUJIMOTO:  Object to form.

13                THE WITNESS:  -- an obligation

14         to ship the opioids to where they're

15         requested.

16    QUESTIONS BY MR. PENDELL:

17         Q.     Do you believe they have an

18    obligation to follow the law?

19         A.     I think everybody has the

20    obligation to follow the law.  So I don't

21    have any comment on the specifics of that in

22    regards to this case because I'm not a

23    lawyer.

24         Q.     And you've not done any

25    research into what specifically McKesson was

1    alleged to have done in West Virginia,

2    correct?

3         A.    That is correct.

4         Q.    You've never been to

5    Huntington, West Virginia, have you?

6         A.    I have not been to Huntington,

7    West Virginia.

8         Q.    How about Cabell County, have

9    you ever been there?

10        A.    Not to my knowledge.  I drove

11   through West Virginia.

12        Q.    How long ago was that?

13        A.    Oh, about 20, 25 years ago.

14        Q.    Do you know whether there is an

15   opioid addiction crisis in Huntington, West

16   Virginia, sitting here today?

17        A.    Well, I've -- from what I've

18   read from the -- Dr. Loudin's report and from

19   what I've seen, there's a perceived opioid

20   crisis there.

21        Q.    Do you have any knowledge or

22   information to refute that position or that

23   statement?

24              MS. FUJIMOTO:  Object to form.

25              THE WITNESS:  I'm sorry, I

Highly Confidential - Subject to Further Confidentiality Review

1    don't -- I don't understand.

2   QUESTIONS BY MR. PENDELL:

3        Q.    Sure.

4             I think you had said something

5   along the lines that based on what you read

6   in Dr. Loudin's report, that's the assertion

7   that's being made, that there's an opioid

8   crisis in Huntington, West Virginia.

9             And my question is, do you have

10  any specific information to refute that

11  assertion?

12            MS. FUJIMOTO:  Object to form.

13            THE WITNESS:  Again, I can only

14        go with what I've read from

15        Dr. Loudin's report and the facts that

16        have been given there.

17  QUESTIONS BY MR. PENDELL:

18       Q.    Same answer for Cabell County?

19       A.    Yes.

20       Q.    Doctor, do you use Twitter?

21       A.    I do.

22       Q.    What's your Twitter handle?

23       A.    TRICIAEWRIGHTMD.

24       Q.    And do you ever re-tweet other

25  people's posts?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     I do.

2     Q.     What's the purpose of doing

3   that?

4     A.     Usually to amplify, not always

5   to agree, but to amplify what they've said.

6     Q.     What does that mean, amplify?

7     A.     Just to get it out to a broader

8   audience.

9     Q.     And if you re-tweet another

10  person's post without comment, does that mean

11  you're agreeing with the post or endorsing

12  the post or --

13    A.     Generally, yes.  Sometimes I

14  hit the wrong button, and you can't un --

15    Q.     Yeah.

16           Do you use Instagram for

17  professional reasons?

18    A.     No, not professionally.  I have

19  an account, but I rarely go on it.

20           MR. PENDELL:  Ms. Fujimoto, if

21        we could just take five minutes, I

22        just want to consult with my

23        colleagues, and we may be done.

24           MS. FUJIMOTO:  Sure.  Sure.

25           VIDEOGRAPHER:  1:24, we are off

Highly Confidential - Subject to Further Confidentiality Review

```
1        the video record.
2         (Off the record at 1:24 p.m.)
3              VIDEOGRAPHER:  1:32.  We are on
4        the video record.
5              MR. PENDELL:  Dr. Wright, if,
6        after this deposition is over, you
7        change your mind about any of your
8        opinions, or you look at or consider
9        additional documents or information
10       that you have not already looked at,
11       regardless of whether or not they
12       change any of your opinions, I just
13       ask that you let Ms. Fujimoto know so
14       that she can take the necessary steps
15       to let me know.
16             But other than, Doctor, I want
17       to thank you very much for your time.
18       I know that you're very busy, and I've
19       enjoyed speaking with you and I
20       appreciate your time.
21             THE WITNESS:  Well, thank you.
22             MS. FUJIMOTO:  Thanks so much.
23       No questions here.
24             VIDEOGRAPHER:  Okay.  1:32 p.m.
25       We are off the video record.
```

```
 1                    This concludes the video

 2          deposition of Dr. Tricia Wright.

 3        (Deposition concluded at 1:32 p.m.)

 4                  - - - - - - -

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2
 3          I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
 4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Tricia Wright, M.D., was
    duly sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth.
 7          I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
            I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
16
    _____
17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    Notary Public
19
20
21
22
23  Dated:  September 22, 2020
24
25
```

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8           After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13           It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1          ACKNOWLEDGMENT OF DEPONENT

2

3

4          I,_____, do

   hereby certify that I have read the foregoing

5  pages and that the same is a correct

   transcription of the answers given by me to

6  the questions therein propounded, except for

   the corrections or changes in form or

7  substance, if any, noted in the attached

   Errata Sheet.

8

9

10

11

12  _____

   Tricia Wright, M.D.              Date

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - - -

                        ERRATA

 2                  - - - - - - -

 3      PAGE     LINE    CHANGE/REASON

 4      _____    _____   _____

 5      _____    _____   _____

 6      _____    _____   _____

 7      _____    _____   _____

 8      _____    _____   _____

 9      _____    _____   _____

10      _____    _____   _____

11      _____    _____   _____

12      _____    _____   _____

13      _____    _____   _____

14      _____    _____   _____

15      _____    _____   _____

16      _____    _____   _____

17      _____    _____   _____

18      _____    _____   _____

19      _____    _____   _____

20      _____    _____   _____

21      _____    _____   _____

22      _____    _____   _____

23      _____    _____   _____

24      _____    _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                       - - - - - - -

                        LAWYER'S NOTES

2                       - - - - - - -

3       PAGE    LINE

4       _____   _____   _____

5       _____   _____   _____

6       _____   _____   _____

7       _____   _____   _____

8       _____   _____   _____

9       _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25