# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CITY OF HUNTINGTON
    Plaintiff,
v.
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

Civil Action No. 3:17-cv-01362

―――――――――――――――――――――

CABELL COUNTY COMMISSION,
    Plaintiff,
v.
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

*Consolidated Case*:
Civil Action No. 3:17-cv-01665

―――――――――――――――――――――

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MCKESSON CORPORATION'S MOTION TO DISMISS ON DERIVATIVE SOVEREIGN IMMUNITY GROUNDS

## TABLE OF CONTENTS

INTRODUCTION.........................................................................................1

STATEMENT OF FACTS.............................................................................4

    A.    McKesson's Distribution to Private Pharmacy Dispensers..................5

    B.    McKesson's Promotional and Conspiracy Conduct to
        Increase Demand for Opioids.............................................................6

    C.    McKesson's PPV Contract with the Department of
        Veterans Affairs.................................................................................8

    D.    McKesson's Distribution to VA Medical Center in Huntington...........9

LEGAL STANDARD..................................................................................10

ARGUMENT................................................................................................11

    A.    McKesson's Opioid Shipments to Non-Government Dispensers in
        Cabell/ Huntington are not Covered by the PPV Contract and are
        not *De Minimis*.................................................................................11

    B.    McKesson's Promotional and Conspiracy Conduct to Increase
        Demand for Opioids Likewise is not Addressed or Authorized
        by the PPV Contract.........................................................................14

    C.    McKesson's Shipments of Suspicious Orders of Opioids to the VA's
        Huntington Facility are not Authorized by the PPV Contract...........15

CONCLUSION............................................................................................17

# TABLE OF AUTHORITIES

### Cases

*Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516 (4th Cir. 2014)...................4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................11

*Cunningham v. Gen. Dynamics Info. Techs., Inc.*, 888 F.3d 640
(4th Cir. 2018) ...............................................................................2, 11

*In re KBR, Inc.*, 744 F.3d 326, 342 (4th Cir. 2014) ......................................2, 11

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Sept. 3, 2019)
(Doc. 2559) (Ex. 1).....................................................................2-3, 12

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Sept. 3, 2019)
(Doc. 2562) (Ex. 1)..........................................................................15

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jan. 27, 2020)
(Doc. 3098) (Ex. 1) ......................................................................3, 13

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jan. 27, 2020)
(Doc. 3099) (Ex. 1) ......................................................................3, 13

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jan. 27, 2020)
(Doc. 3100) (Ex. 1) ......................................................................3, 13

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jan. 27, 2020)
(Doc. 3101) (Ex. 1) ......................................................................3, 13

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jan. 27, 2020)
(Doc. 3102) (Ex. 1) ......................................................................3, 13

*Kessel v. Leavitt*, 204 W. Va. 95, 129, 511 S.E.2d 720 (1998)..............................15

*Knapp v. Americredit Fin. Servs., Inc.*, 245 F. Supp. 2d 841 (S.D. W. Va. 2003).....15

*Lovern v. Edwards*, 190 F.3d 648 (4th Cir. 1999)...............................................10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........11

**Court Rules**

Fed. R. Civ. P. 12(b)(1)...............................................................................4, 10

Fed. R. Civ. P. 12(b)(6)...................................................................................10

Fed. R. Civ. P. 12(h)(3)....................................................................................4

Fed. R. Civ. P. 56(c) .......................................................................................10

Plaintiffs the City of Huntington and Cabell County Commission hereby submit this Memorandum of Law in Opposition to Defendant McKesson Corporation's Motion to Dismiss on Derivative Sovereign Immunity Grounds (Doc. 1012). Plaintiffs state in opposition as follows.

## INTRODUCTION

Plaintiffs filed this action alleging that McKesson and its co-Defendants created a public nuisance by engaging in unlawful conduct that resulted in them distributing or dumping tens of millions of prescription opioid pills into their jurisdictions, causing an epidemic of opioid use and abuse that is an immediate, immense, and ongoing public health and safety hazard. *See* Corrected Joint and Third Amended Complaint (3AC) (Doc. 80), ¶¶ 1-12. Plaintiffs allege three categories of unlawful conduct relevant to McKesson's motion to dismiss. First, McKesson unlawfully shipped thousands of suspicious orders of prescription opioids into Cabell County and Huntington that were placed by non-government dispensers. *See id.*, ¶¶ 144, 862-863, 1421-1422. Second, McKesson engaged in unlawful promotional conduct to increase the demand for opioids, which contributed substantially to the oversupply of pills in Cabell County and Huntington. *See id.*, ¶¶ 126, 864, 1421-1422, 1434. Third, McKesson also unlawfully distributed thousands of suspicious orders of prescription opioids into Cabell County and Huntington that were placed by United States Department of Veterans Affairs ("VA") facilities. *See id.*, ¶¶ 126, 864, 1421-1422, 1434.

1

McKesson moved to dismiss on the grounds that Plaintiffs' claims are barred by the doctrine of derivative sovereign immunity because its shipments of suspicious orders to the VA were made pursuant to a contract with the U.S. Government. *See* Memo of Law (Doc. 1013) at 1-2; *see also* McKesson Ex. 4-Pharmaceutical Prime Vendor Contract ("PPV Contract") (Doc. 1012-4). This is incorrect. Derivative sovereign immunity applies so that "'a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government validly conferred that authorization . . . .'" *Cunningham v. Gen. Dynamics Info. Techs., Inc.*, 888 F.3d 640, 646 (4th Cir. 2018) (quoting *In re KBR, Inc.*, 744 F.3d 326, 342 (4th Cir. 2014)). Here, McKesson cannot satisfy the first requirement because the PPV Contract does not authorize any of the above conduct.

First, McKesson does not even argue that the PPV Contract authorizes its shipments to non-VA dispensers. Instead, it contends that these shipments cannot support liability because they were "*de minimis*," constituting "**only five percent**" of total opioid shipments to Cabell County and Huntington. Memo of Law at 3 (emphasis in original). The Court should reject this argument, as the MDL Court did when made by distributor defendants with far smaller market shares and shipment volumes in the jurisdiction of Case Track One (CT1) Plaintiff Summit County, Ohio. *See, e.g., In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Sept. 3, 2019) (Doc. 2559) (Ex. 1) at 3-5 (rejecting defendant Henry Schein, Inc.'s argument that its 0.03% market share was *de minimis*; noting evidence that Schein shipped 81,170 opioid dosage units to Summit County; holding that "the

evidence presents [a] contested issue of fact that must be resolved by the trier of fact."); *see also id.* (Doc's 3098-3102) (Ex. 1) (Opinions and Orders rejecting *de minimis* arguments by four other distributor defendants).  Here, McKesson's own evidence shows that it shipped *over nine-million* opioid dosage units to non-VA dispensers in Cabell County and Huntington (*population 96,319*) between 2004 and 2018.  *See* McKesson Ex. 6 (Boberg Rpt.) (Doc. 1012-6), ¶ 76 and Table 6.  This is orders of magnitude greater than what the MDL Court found to present a triable issue of fact.  There is thus no basis to dismiss Plaintiffs' claims based on McKesson's non-VA shipments as somehow being *de minimis*.

Second, McKesson also does not and cannot argue that the PPV Contract authorizes its promotional and conspiracy conduct that Plaintiffs allege contributed to the public nuisance by increasing demand for and the supply of opioid pills.  *See* 3AC, ¶¶ 126, 864, 1245-1371, 1421-1422, 1434, 1584-98.  McKesson ignores these allegations and Plaintiffs' evidence altogether, which is wise since the PPV Contract neither mentions nor authorizes this conduct.  There is thus no basis whatsoever to dismiss Plaintiffs' claims based on McKesson's promotional and conspiracy conduct.

Finally, the PPV Contract also does not authorize McKesson's shipments of suspicious orders to VA.  The contract provides that "Pharmaceutical products ordered under Federal contracts are *intended solely* for the use of authorized ordering activities in carrying out their federal missions," so that "[a]ny transfer of Federal contract-priced items that does not service the ordering activity's defined mission . . . *is an improper diversion of Federal supplies.*"  PPV Contract (Doc. 1012-

4) at 6 (emphasis added).  It further states that "*[t]he contractor is not required to fill an FSS order (or that portion of an order) that investigational facts suggest will be diverted* into the commercial market or will otherwise be diverted from usage by authorized FSS ordering activities." *Id.* at 79 (emphasis added).  Since the PPV Contract prohibits diversion and does not require shipment of suspicious orders, derivative sovereign immunity does not apply to Plaintiffs' claims based on McKesson's shipment of suspicious orders to VA.  McKesson's motion to dismiss thus should be denied.

## STATEMENT OF FACTS[1]

Plaintiffs allege that the opioid epidemic that is an immediate hazard to the public health and safety of their communities was fueled by McKesson's and other Defendants' unlawful distribution and marketing practices.  *See* 3AC, ¶¶ 1-3.  From 2006 to 2014, more than 86 million dosage units of hydrocodone and oxycodone were shipped to Cabell County, with a population of just 96,319.  *Id.*, ¶¶ 19, 31.  McKesson shipped over 5.5 million dosage units just of hydrocodone and oxycodone into Cabell County during this period.  *Id.*, ¶ 144.  McKesson's own evidence shows that the company shipped almost *45 million* dosage units of 12 enumerated opioids to Cabell County from 2004 to 2018.  *See* McKesson Ex. 6 (Boberg Rpt.) (Doc. 1012-6), ¶ 76 and Table 6.

---

[1] Unlike Defendants' concurrently-filed motions for summary judgment, McKesson's motion is one for dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3).  *See* McKesson Motion (Doc. 1012) at 1.  "[W]hen a defendant challenges subject matter jurisdiction under [Rule] 12(b)(1), a court may evaluate the pleadings as evidence on the issue . . . ." *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 531 (4th Cir. 2014).

A.   **McKesson's Distribution to Private Pharmacy Dispensers**

Plaintiffs allege that McKesson utterly failed to meet its duty under applicable West Virginia and federal law to develop and maintain effective controls against diversion of the highly addictive opioid pills it distributed.  *See* 3AC, ¶¶ 861-884.  This duty includes, but is not limited to, the requirement that McKesson identify, report, and stop shipment of suspicious orders.  *Id.*, ¶¶ 692-749.  Plaintiffs' evidence shows that McKesson failed to stop shipment of between 4,566 and 17,387 suspicious orders of prescription opioids by private pharmacy dispensers in Cabell County and Huntington between 1996 and 2018.  *See* Ex. 2 (Expert Report of Craig J. McCann, Ph.D., CFA (McCann Rpt.), ¶¶ 104-128.

Plaintiffs' evidence also shows that the opioid pills that fueled the epidemic in Cabell/ Huntington also came from sales elsewhere.  One source was the "Oxy Express" or "Blue Highway," by which opioid pills migrated from at least as far away as Florida to Appalachian communities like Cabell/Huntington, a phenomenon with which McKesson's expert witness Lydia Y. Bagley professed familiarity.  *See* Ex. 3 (Bagley Dep.) at 94:18-95:23.

Another source of diversion of opioid pills into Cabell/Huntington was the "pill mill" pharmacies in neighboring West Virginia counties.  For example, in 2006-2007, McKesson distributed *4,836,310 hydrocodone pills* to Sav-Rite Pharmacy in Kermit, West Virginia, a town of just *406 people*.  *See* Ex. 4 (Feb. 15, 2018 Congressional Letter).  Despite its sparse surrounding population, Sav-Rite in

5

Kermit was the 22nd ranked retail pharmacy in the entire country for hydrocodone pills received in 2006. *Id.* Kermit is just 58 miles from Huntington. McKesson's shipments of enormous quantities of opioid pills to other nearby pharmacies tell a similar story:

- Family Discount Pharmacy, Mt. Gay-Shamrock, WV, *population 1,779*; 67 miles from Huntington; McKesson distributed *5,818,020 hydrocodone and oxycodone pills*, 2006-16; *id.*;[2]

- Family Discount Pharmacy, Stollings, WV, *population 316*; 69 miles from Huntington; McKesson distributed *2,395,580 hydrocodone and oxycodone pills*, 2006-16; *id.*;

- Tug Valley Pharmacy and Hurley Drug Company, Williamson, WV, *population 3,000*; 78 miles from Huntington; McKesson distributed *over 20.8 million dosage units of hydrocodone and oxycodone pills*, 2006-16; *see id.*

## B. McKesson's Promotional and Conspiracy Conduct to Increase Demand for Opioids

Plaintiffs also allege that McKesson engaged in unlawful promotional and conspiracy conduct aimed at increasing demand for opioids, which contributed substantially to the oversupply of pills in Cabell/Huntington. *See* 3AC, ¶¶ 144, 862-863, 1245-1371, 1421-1422, 1584-98. Plaintiffs' evidence demonstrates that McKesson and the opioid manufacturers recognized that they were key "trade partners, controlling 80% of the drug market" and that collaboration was necessary to achieve the goal of increased sales for all. Ex. 5 (MCKMDL00536290, MCKMDL00634412). Opioid distributors, including McKesson, "were financially

---

[2] After terminating its relationship with Family Discount for "compliance reasons" and then reinstating it, McKesson in 2010 set its hydrocodone threshold for this customer at 155,000 dosage units per month—"a level 31 times more than what McKesson determined warranted supplementary documentation on its new customer questionnaire." *Id.*

incentivized and worked with opioid manufacturers to expand the market for opioids and sell more drugs." Ex. 6 (Plaintiffs' Expert Report on Role of Distributors in Opioid Marketing by Jakki J. Mohr, Ph.D.) (Mohr Rpt.) at 66; Ex. 7 (Plaintiffs' Expert Report of Andrew Kolodny, M.D.) (Kolodny Rpt.) at 42-43, 48.

These efforts date back to early marketing of OxyContin by Purdue Pharma. In May 1996, Purdue initiated 19 "OxyContin Wholesaler Special Programs," in which McKesson participated and was, along with Defendants AmerisourceBergen Drug Corporation (ABDC) and Cardinal Health, to receive "over 82 percent of Purdue's initial expenditure for rebates, telemarketing, and screen-saver advertising. *See* Ex. 7 (Kolodny Rpt.) at 13. This was right at the time that the rate of prescription opioid use began to rapidly increase. *Id.*

McKesson thus has a long history of engaging in opioid use promotions, which also includes:

- running banner ads for opioids on its "One Stop, order site"; *see id.* at 40; Ex. 8 (ACTAVIS0620245);

- internal marketing systems that the company used to market opioids to its established customer base through mail, email, and direct product shipment; *see* Ex. 7 (Kolodny Rpt.) at 41; Ex. 9 (MCKMDL00353282-283);

- telemarketing services to drug makers to sell opioid products to pharmacies; *see* Ex. 7 (Kolodny Rpt.) at 41; Ex. 10 (ACTAVIS0623269);

- patient voucher and savings programs offering free and discounted opioid products to patients; *see* Ex. 7 (Kolodny Rpt.) at 42; Ex. 11 (MCKMDL00334317-318, MCKMDL00334328-329);

- various "educational" programs to drive sales for its products, including opioids; *see* Ex. 7 (Kolodny Rpt.) at 45; Ex. 12 (MCKMDL00464066, MCKMDL00473378, MCKMDL00484449,

MCKMDL00474152);

- continuing education courses for pharmacists at the McKesson Trade Show that was paid for by a "grant" from Purdue Pharma; *see* Ex. 13 (PPLPC008000022314); and

- "financial incentives" to pharmacies such as rebates of $25 for each bottle of Oxymorphone sold; *see* Ex. 14 (ACTAVIS0623776).

The marketing activities that McKesson performed for the opioid manufacturers were highly effective. McKesson provided solid evidence of the return on investment (ROI) of these services, showing that they increased demand for opioids, including by changing physician prescribing practices. *See* Ex. 6 (Mohr Rpt.) at 64; Ex. 7 (Kolodny Rpt.) at 41-43, 48. Ultimately, the conduct was so pervasive that McKesson employees internally recognized that they were engaged in improper marketing activities regarding opioid products. *See* Ex. 15 (MCKMDL00543462, MCKMDL00539021).

## C.   McKesson's PPV Contract with the Department of Veterans Affairs

The PPV Contract between VA and McKesson contains a statement of purpose setting forth that the contract is intended "to provide VA facilities and participating Other Government Agencies (OGA) facilities with an efficient method of obtaining Government contract pharmaceutical and medical/surgical products with 'just-in-time' deliveries." McKesson Ex. 4 (PPV Contract) (Doc. 1012-4) at 2. The PPV then separately identifies and defines "diversion" in reference to activity falling outside of this purpose, as follows:

> Diversion – Pharmaceutical products ordered under Federal contracts are intended solely for the use of authorized ordering activities in carrying out their Federal missions; they are not intended for resale or

8

barter.  Any transfer of Federal contract-priced items that does not service the ordering activity's defined mission . . . is an improper diversion of Federal supplies.

*Id.* at 6.

In light of this clearly defined purpose, the PPV Contract specifies that

McKesson *is not required to fill orders that show signs of diversion*, as follows:

> The Contractor is not required to fill an FSS order (or that portion of an order) that investigational facts suggest will be diverted into the commercial market or will otherwise be diverted from usage by authorized FSS ordering activities.  (An example of such facts might be the tripling of usual ordered quantities by an activity, coupled with its failure to demonstrate a corresponding increase in its institutional size or patient base.)  However, the Contractor may not unreasonably delay filling an FSS order, pending its investigation of the intended use of the items ordered.  Based on investigational facts that suggest that a pattern of diversion has occurred, a Contractor may elect not to fill indirect orders of an activity through an authorized Government PPV and, instead, to accept only direct orders.

*Id.* at 79; *see also id.* at 64 ("Product Diversion Alert-Report" is to be used when McKesson, the PPV, "has determined that a participating facility has exceeded its normal purchasing thresholds by a significant amount such as the tripling of usual ordered quantities by an activity, coupled with its failure to demonstrate a corresponding increase in its institutional size or patient base . . . , which in some cases may be a sign of possible product diversion").

### D.   McKesson's Distribution to VA Medical Center in Huntington

McKesson's own evidence shows that its shipments of opioid dosage units to the VA Medical Center in Huntington increased by *458%* from 2004 to 2005.  *See* McKesson Ex. 6 (Boberg Rpt.) (Doc. 1012-6), ¶ 76 and Table 6 (increase from 612,689 dosage units in 2004 to 2,808,359 dosage units in 2005).  This sharp rate of

increase from one year to the next is a red flag under the PPV Contract's above-referenced "tripling" example of evidence of possible diversion.  *See* McKesson Ex. 4 (PPV Contract) (Doc. 1012-4) at 64, 79; *cf.* Ex. 2 (McCann Rpt.) at 68-71 ("Three Times Trailing Twelve-Month Average Pharmacy Dosage Units" as one of six red flag criteria). Other years also saw notable, though not as stark, increases in McKesson's shipments to the Huntington VA facility. *Id.* (over 25% increase in 2014; over 50% in 2015).

## LEGAL STANDARD

In addressing McKesson's derivative sovereign immunity argument for dismissal based on the PPV Contract, the Court may assess alleged lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) in either of two ways.  It "may find insufficient allegations in the pleadings, viewing the facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).  "Alternatively, after an evidentiary hearing, the court may weigh the evidence in determining whether the facts support the jurisdictional allegations." *Id.*

In addressing McKesson's argument for summary judgment based on its allegedly *de minimis* opioid shipments to non-VA dispensers, McKesson bears the burden to demonstrate that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court may not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, it must draw any permissible

inference from the underlying facts in the light most favorable to Plaintiffs as the non-moving parties. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## ARGUMENT

The doctrine of derivative sovereign immunity provides that "'a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government validly conferred that authorization, meaning it acted within its constitutional power.'" *Cunningham*, 888 F.3d at 646 (quoting *In re KBR*, 744 F.3d at 142). Here, McKesson cannot satisfy the first requirement because its PPV Contract with VA does not authorize any of the categories of unlawful conduct Plaintiffs allege, and McKesson's only remaining arguments are equally without merit, as set forth below.

A.   **McKesson's Opioid Shipments to Non-Government Dispensers in Cabell/Huntington are not Covered by the PPV Contract and are not *De Minimis*.**

McKesson does not argue that Plaintiffs' claims based on its shipments to non-government dispensers in Cabell/Huntington are barred by derivative sovereign immunity. Nor can it, since the PPV contract covers and authorizes activity related *only* to orders placed by VA facilities or other federal government agencies. *See* McKesson Ex. 4 (PPV Contract) (Doc. 1012-4) at 2, 6.

Instead, McKesson argues for dismissal of Plaintiffs' claims based on this part of its unlawful conduct on the grounds that its shipments to non-government

dispensers in Cabell/Huntington were *de minimis*.  *See* Memo of Law at 3, 16-17. The Court should reject this argument.

McKesson acknowledges, as it must, that it shipped *over nine-million dosage units* of opioids to non-VA dispensers in Cabell/Huntington, *population 96,319*, from 2004 to 2018 and that these shipments constitute approximately five percent of all opioids shipped to Cabell/Huntington during this period.  *See* Memo of Law at 2-3; McKesson Ex. 6 (Boberg Rpt.) (Doc. 1012-6), ¶¶ 76-77, Tables 6-7.  McKesson also does not dispute that Plaintiffs' experts identify thousands of suspicious orders among these opioid shipments it made to Cabell/Huntington.  *See* Ex. 2 (McCann Rpt.), ¶¶ 104-128 (identifying between 4,566 and 17,387 shipments of suspicious orders that McKesson failed to stop).  This evidence is more than sufficient for the Court to hold that it is a triable question of fact whether these shipments substantially contributed to the public nuisance in Cabell/Huntington.

The MDL Court has denied multiple motions for summary judgment by distributor defendants making the same "*de minimis*" argument based on far smaller market shares or shipment volumes, both in absolute and *per capita* terms, than McKesson's shipments represent here.  *See In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Sept. 3, 2019) (Doc. 2559) (Ex. 1) at 3-5 (rejecting Schein's argument that its 0.03% market share was *de minimis*; noting evidence that Schein shipped 81,170 opioid dosage units to Summit County); *see also*:

- *Id.* (N.D. Ohio Jan. 27, 2020) (Doc. 3098) (Ex. 1) at 2-4 (rejecting Discount Drug Mart's argument that its 0.9% market share was *de minimis*; noting evidence that it shipped over 15 million opioid dosage units to Summit and Cuyahoga Counties, Ohio, combined population

over 1.7 million);

- *Id.* (N.D. Ohio Jan. 27, 2020 (Doc. 3099) (Ex. 1) at 2-4 (rejecting CVS's argument that its 1.6% market share was *de minimis*);

- *Id.* (N.D. Ohio Jan. 27, 2020) (Doc. 3100) (Ex. 1) at 4 (rejecting Rite Aid's argument that its .048% market share was *de minimis*);

- *Id.* (N.D. Ohio Jan. 27, 2020) (Doc. 3101) (Ex. 1) at 5 (rejecting HBC's argument that its less-than 1% market share was *de minimis*);

- *Id.* (N.D. Ohio Jan. 27, 2020) (Doc. 3102) (Ex. 1) at 4-5 (rejecting Walmart's argument that its 1.3% market share was *de minimis*).

McKesson's shipment of over 9 million opioid dosage units to non-Government dispensers in Cabell/Huntington, representing approximately five percent of total shipments, far exceeds the shipments found by the MDL Court not to be *de minimis*. There is thus more than sufficient evidence to raise a triable issue of fact whether McKesson substantially contributed to the public nuisance through these non-VA shipments and the motion should be denied on this basis alone.

McKesson also argues that Plaintiffs' claims based on its non-government shipments must be dismissed because Plaintiffs allege an indivisible harm, and therefore "cannot sever the alleged abatement costs of responding to McKesson's PPV distribution from the costs of abating harms allegedly caused by McKesson's distribution to non-federal customers." Memo of Law at 15. McKesson cites no authority for this proposition, and Plaintiffs know of no doctrine of immunity that would extend immunity beyond its scope to unprotected tortious conduct. In any event, as explained below, McKesson's PPV distributions of suspicious orders are also not protected by derivative sovereign immunity, so the issue will not arise.

13

For each of the foregoing reasons, the Court should deny McKesson's motion to the extent it seeks dismissal or summary judgment on Plaintiffs' claims addressing non-government shipments.

### B. McKesson's Promotional and Conspiracy Conduct to Increase Demand for Opioids Likewise is not Addressed or Authorized by the PPV Contract.

McKesson also does not argue that Plaintiffs' claims based on its promotional conduct that Plaintiffs allege contributed to the public nuisance by increasing demand for and the supply of opioid pills, *see* 3AC, ¶¶ 126, 864, 1421-1422, 1434; Statement of Facts § B *supra*, involve conduct authorized by the PPV Contract. Nor can McKesson so argue.

The PPV Contract covers and authorizes activity related *only* to supplying VA facilities and other federal government agencies with pharmaceutical and surgical products. *See* McKesson Ex. 4 (PPV Contract) (Doc. 1012-4) at 2, 6. The PPV Contract does not authorize or even address marketing or promotional conduct by McKesson. Plaintiffs' claims against McKesson based upon this conduct engaged in with private manufacturer companies and other private distributor companies thus are not barred by derivative sovereign immunity based on the PPV contract.

For the foregoing reasons, and because McKesson has waived any argument for dismissal or summary judgment as to its promotional conduct by failing to address it in its motion, the Court should deny the motion with respect to this conduct as well.[3]

---

[3] McKesson also has wholly ignored Plaintiffs' civil conspiracy allegations. *See* 3AC, ¶¶ 1245-1371, 1584-98. Individuals who conspire with one another to orchestrate and/or carry

14

## C.   McKesson's Shipments of Suspicious Orders of Opioids to the VA's Huntington Facility are not Authorized by the PPV Contract.

The PPV Contract also does not authorize McKesson's shipments of suspicious orders of opioids to the Huntington VA facility.  The Contract by its express terms is intended "to provide VA facilities and participating Other Government Agencies (OGA) facilities with an efficient method of obtaining Government contract pharmaceutical and medical/surgical products with 'just-in-time' deliveries."  McKesson Ex. 4 (PPV Contract) (Doc. 1012-4) at 2.  Based on this defined purpose, the PPV Contract separately identifies and defines "diversion" as encompassing activity falling outside of this purpose.  *See id.* at 6 ("Any transfer of Federal contract-priced items that does not service the ordering activity's defined mission . . . is an improper diversion of Federal supplies.").

In light of the foregoing, the PPV Contract specifically provides that McKesson "is not required to fill an FSS order (or that portion of an order) that investigational facts suggest will be diverted into the commercial market or will otherwise be diverted from usage by authorized FSS ordering activities."  *Id.* at 79.

---

out a fraudulent or illegal scheme can be held liable for the conduct of their co-conspirators acting within the scope of the conspiracy.  *See, e.g., Kessel v. Leavitt*, 204 W. Va. 95, 129, 511 S.E.2d 720, 754 (1998).  Obviously, the conduct of McKesson's co-defendants has nothing to do with, and is wholly outside the scope of, the PPV contract. Plaintiffs' evidence supports these conspiracy allegations, *see, e.g.*, Ex. 16 (Dep. of John M. Gray), and no defendant has sought summary judgment on that claim, which would, in any event, be denied.  *See, e.g., Knapp v. Americredit Fin. Servs., Inc.*, 245 F. Supp. 2d 841, 853 (S.D. W. Va. 2003) (denying summary judgment on grounds that the existence of a conspiracy is a question of fact); *see also In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Sept. 3, 2019) (Doc. 2562) (Ex. 1) at 6-8 (denying summary judgment on civil conspiracy claims against distributor defendants). The conspiracy allegations provide yet another valid basis for denying the present motion.

Since the PPV Contract prohibits diversion and does not require McKesson to fill suspicious orders, Plaintiffs' claims based upon it doing so do not address conduct that the government authorized.  For this reason, McKesson's motion to dismiss based upon derivative sovereign immunity should be denied in its entirety.

Seeming to recognize the foregoing, McKesson falls back on arguing that Plaintiffs' experts excluded the Huntington VA facility from their suspicious orders shipments analysis.  *See* Memo of Law at 10 and n.8.  The Court should reject this argument because McKesson moved to dismiss pursuant to Fed. R. 12(b)(1) based on the pleadings and the PPV Contract, the terms of which clearly do not authorize shipments of suspicious orders.  Moreover, even if the Court were to consider evidence on this point, McKesson's own evidence shows that the company's shipments of opioid dosage units to the Huntington VA facility just for the year 2005 exceeded the PPV Contract's one express example of a red flag for suspicion of diversion.  The PPV Contract identifies as a red flag orders where "a participating facility has exceeded its normal purchasing thresholds by a significant amount such as the tripling of usual ordered quantities by an activity . . . ."  McKesson Ex. 4 (PPV Contract) (Doc. 1012-4) at 64; *see also id.* at 79 ("An example of such facts might be the tripling of usual ordered quantities by an activity . . . .").  McKesson's expert demonstrates that from 2004 to 2005, the company's shipments of opioid dosage units to the Huntington VA facility increased by *458%*, from 612,689 to 2,808,359 dosage units.  *See* McKesson Ex. 6 (Boberg Rpt.) (Doc. 1012-6), ¶ 76 and

16

Table 6; *see also* Ex. 2 (McCann Rpt.) at 68-71 ("Three Times Trailing Twelve-Month Average Pharmacy Dosage Units" as one of six red flag criteria).

Since the PPV Contract prohibits diversion and does not require shipment of suspicious orders, the doctrine of derivative sovereign immunity cannot and does not apply to this or any other category of Plaintiffs' claims, and Defendants' motion should be denied in its entirety.

<u>CONCLUSION</u>

For all of the reasons set forth, the Court should deny Defendant McKesson Corporation's Motion to Dismiss on Derivative Sovereign Immunity Grounds.

Dated:  October 6, 2020                                    Respectfully submitted,

**THE CITY OF HUNTINGTON**

/s/ *Anne McGinness Kearse*

Anne McGinness Kearse
WVSB No. 12547
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

**CABELL COUNTY COMMISSION**

/s/ *Paul T. Farrell, Jr.*

Paul T. Farrell, Jr.
WVSB Bar No. 7443
**FARRELL LAW**
422 Ninth Street, 3rd Floor (25701)
PO Box 1180
Huntington, West Virginia 25714-1180
Mobile: 304-654-8281
paul@farrell.law

/s/ *Anthony J. Majestro*

Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Michael A. Woelfel
WVSB No. 4106
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street

17

Charles R. "Rusty" Webb
WV No. 4782
**THE WEBB LAW CENTRE**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

On Brief:
Lou Bograd
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lbograd@motleyrice.com

Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Paulina do Amaral
**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  212-355-9500
Fax:  212-355-9592
pdoamaral@LCHB.com

Michael J. Quirk
**MOTLEY RICE LLC**
40 West Evergreen Avenue, Suite 104
Philadelphia, PA 19118
Tel:  610-679-9932
Fax:  856-667-5133
mquirk@motleyrice.com

Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

18

## CERTIFICATE OF SERVICE

I certify that on October 6, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to:

Track2OpioidDefendants@ReedSmith.com and CT2_Opioid_Team@mail-list.com.

/s/ *Anthony J. Majestro*