## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**THE CITY OF HUNTINGTON,**
     **Plaintiff,**

**v.**                                        **CIVIL ACTION NO. 3:17-01362**

**AMERISOURCEBERGEN**
     **DRUG CORPORATION, et al.,**
     **Defendants.**

---

**CABELL COUNTY COMMISSION,**
      **Plaintiff,**

**v.**                                        **CIVIL ACTION NO. 3:17-01665**

**AMERISOURCEBERGEN**
     **DRUG CORPORATION, et al.,**
     **Defendants.**

## PROPOSED PRE-TRIAL ORDER

COME NOW Plaintiffs, the City of Huntington and the Cabell County Commission, by counsel, and Defendants AmerisourceBergen, Cardinal Health, Inc., and McKesson Corp., by their respective counsels, and submit this Proposed Pre-Trial Order pursuant to the Scheduling Order. Pursuant to L.R. 16.7(b), the parties disclose as follows:

**1. Pre-Trial Disclosures Required by FR Civ. P 26(a)(3)**

    **a. Plaintiffs City of Huntington and Cabell County Commission's Disclosures**

        i. Plaintiffs' Witnesses:

            1. *See* Plaintiffs' Amended Witness List, attached hereto as <u>Appendix A.1</u>. Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for

Designation and Use of Deposition Testimony at Trial, filed 9/21/2020 as Doc. # 996.

2. Plaintiffs reserve the right to designate and call any fact witness or expert witness designated by any other party in this litigation.

3. Plaintiffs reserve the right to designate and call rebuttal witnesses.

ii. Plaintiffs' Proposed Exhibits:

1. *See* Plaintiffs' Exhibit list, attached hereto as <u>Appendix A.2</u>, provided October 2, 2020 pursuant to Parties' Joint Trial Exhibit Stipulation filed 9/24/2020 as Doc. #1029.  Plaintiffs incorporate by reference the procedure for exhibit objections set forth in the Parties' Joint Trial Exhibit Stipulation.

**b.  Defendants' Joint Disclosures**

i. Defendants' Joint Witnesses

1. *See* Defendants' Joint Witness list, attached hereto as <u>Appendix B,</u> provided on September 23, 2020.  Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for Designation and Use of Deposition Testimony at Trial, filed September 21, 2020 as Doc. # 996.

2. Defendants specifically reserve the right to amend, supplement, or otherwise modify these disclosures if new or modified information is provided at any point.

3. Defendants further reserve the right to amend or supplement this list to identify witnesses who are deposed after September 23, 2020.

4. Defendants further reserve the right to supplement and/or to amend this list with any witnesses identified on any party's witness lists, including any party who later settles or is severed or dismissed. Defendants further reserve the right to conduct a direct examination of any witness called by a Plaintiff and/or to call additional witnesses not identified on this list that are submitted as part of current or future deposition designations by any other party.

5. Defendants further reserve the right to supplement and/or to amend this witness list in response to rulings of the Court on pretrial motions.

ii. Defendants' Joint Proposed Exhibits

1. *See* Defendants' Joint Amended Proposed Exhibit List, attached hereto as <u>Appendix C</u>, provided on October 2, 2020 and amended on October 5, 2020.

2. Defendants incorporate by reference the procedure for exhibit objections set forth in the Parties' Joint Trial Exhibit Stipulation.

3. Defendants expressly reserve all rights afforded under the So-Ordered Joint Trial Exhibit Stipulation and Local Rules to amend, modify, withdraw, and supplement the Joint Exhibit List prior to and during trial.

4. Defendants hereby incorporate all reservations of rights set forth in Defendants' Joint Proposed Exhibit List.

**c. Defendant AmerisourceBergen Drug Corporation's Disclosures**

i. AmerisourceBergen Drug Corporation's Witnesses

1. *See* AmerisourceBergen Drug Corporation's Witness list, attached hereto as <u>Appendix D</u>, provided on September 23, 2020. Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for Designation and Use of Deposition Testimony at Trial, filed September 21, 2020 as Doc. # 996.

2. AmerisourceBergen Drug Corporation specifically reserves the right to amend, supplement, or otherwise modify these disclosures if new or modified information is provided at any point.

3. AmerisourceBergen Drug Corporation further reserves the right to amend or supplement this list to identify witnesses who are deposed after September 23, 2020.

4. AmerisourceBergen Drug Corporation also reserves the right to supplement and/or to amend its list with any witnesses identified on any party's witness list, including any party who settles or is severed or dismissed.

5. AmerisourceBergen Drug Corporation further reserves the right to conduct a direct examination of any witness called by the Plaintiff and/or to call additional witnesses not identified on this list that are submitted as part of current or future deposition designations by any other party.

6. AmerisourceBergen Drug Corporation further reserves the right to supplement and/or to amend this witness list in response to rulings of the Court on pretrial motions.

ii. AmerisourceBergen Drug Corporation's Witnesses to be Presented by Deposition

1. *See* AmerisourceBergen Drug Corporation's Witness list, attached hereto as <u>Appendix D</u>, provided on September 23, 2020. AmerisourceBergen reserves the right to designate and present by deposition any witness or expert witness designated by any other party in this litigation. Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for Designation and Use of Deposition Testimony at Trial, filed September 21, 2020 as Doc. # 996.

2. AmerisourceBergen Drug Corporation reserves the right to amend, supplement, or otherwise modify these disclosures if new or modified information is provided at any point.

iii. AmerisourceBergen Drug Corporation's Proposed Exhibits

1. *See* AmerisourceBergen Drug Corporation's Trial Exhibit List, attached hereto as <u>Appendix E</u>, provided on October 2, 2020.

2. AmerisourceBergen Drug Corporation incorporates by reference the procedure for exhibit objections set forth in the Parties' Joint Trial Exhibit Stipulation.

3. AmerisourceBergen Drug Corporation expressly reserves all rights afforded under the So-Ordered Joint Trial Exhibit Stipulation and Local Rules to amend, modify, withdraw, and supplement the Joint Exhibit List prior to and during trial.

4. AmerisourceBergen Drug Corporation hereby incorporates all reservations of rights set forth in AmerisourceBergen Drug Corporation's Trial Exhibit List.

5. AmerisourceBergen Drug Corporation does not waive by inclusion on the Exhibit List any prior confidentiality designation in this litigation.

6. AmerisourceBergen Drug Corporation further reserves the right to object to the introduction and/or admissibility of any document listed on any party's exhibit list.

7. AmerisourceBergen Drug Corporation further reserves the right to use any deposition transcripts and any exhibits to deposition

transcripts for any witnesses being called to testify at trial and/or use any deposition exhibits or other documents associated with any testimony that will be designated or counter designated by any party.

8. AmerisourceBergen Drug Corporation reserves the right to use any and all documents or materials listed by any other party, including any other defendant even if such defendant may later settle, be severed, or be otherwise dismissed from the City of Huntington and Cabell County Commission trial.

9. Certain exhibits that were previously produced during discovery are further identified by bates number or native file name. AmerisourceBergen Drug Corporation expressly reserves the right to use alternative copies of such exhibits where appropriate, including but not limited to physical, color, redacted, and/or native documents, or copies without deposition exhibit stickers.

10. AmerisourceBergen Drug Corporation reserves the right to use at trial summaries created in accordance with Federal Rule of Evidence 1006 and demonstrative exhibits, including without limitation: charts, graphs, photographs, animations, timelines, objects, models, PowerPoint slides, drawings, graphics, and other demonstrative aids.

11. AmerisourceBergen Drug Corporation reserves the right to offer enlargements of any exhibits on the list or on any party's exhibit list.

**d. Defendant Cardinal Health's Disclosures**

i. Cardinal Health's Witnesses

1. *See* Cardinal Health's Witness list, attached hereto as <u>Appendix F</u>, provided on September 23, 2020. Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for Designation and Use of Deposition Testimony at Trial, filed September 21, 2020 as Doc. # 996.

2. Cardinal Health reserves the right to call any of these witnesses in its case in chief.

3. Cardinal Health specifically reserves the right to amend, supplement, or otherwise modify these disclosures if new or modified information is provided at any point, as well as to identify witnesses who are deposed after September 23, 2020.

4. Cardinal Health further reserves the right to call any witnesses identified on any other party's witness list, including any party who later settles or is severed or dismissed.

5. Cardinal Health reserves the right to conduct an examination of any witness called by the Plaintiff. Cardinal Health also reserves the right to call witnesses who do not appear on this list to rebut the Plaintiffs' case, supplement and/or amend this witness list in response to rulings of the Court on pretrial motions, and supplement and/or amend this witness list in response to other new information.

6. Cardinal Health reserves the right to supplement or amend this list based on any ruling by the Court concerning the applicability of W. Va. Code 55-7-13a through 55-7-13d, including by adding witnesses disclosed at ECF No. 31 or ECF No. 99.

7. Cardinal Health further reserves the right to call by deposition designation additional witnesses not identified on this list that are submitted as part of current or future deposition designations.

ii. Witnesses to be Presented by Deposition

1. *See* Cardinal Health's Witness list, attached hereto as <u>Appendix F</u>, provided on September 23, 2020.  Cardinal Health reserves the right to designate and present by deposition any witness or expert witness designated by any other party in this litigation. Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for Designation and Use of Deposition Testimony at Trial, filed September 21, 2020 as Doc. # 996.

2. Cardinal Health reserves the right to amend, supplement, or otherwise modify these disclosures if new or modified information is provided at any point.

iii. Cardinal Health's Proposed Exhibits

1. *See* Cardinal Health's Joint Proposed Exhibit List, attached hereto as <u>Appendix G</u>, provided on October 2, 2020.

2. Cardinal Health incorporates by reference the procedure for exhibit objections set forth in the Parties' Joint Trial Exhibit Stipulation.

3. Cardinal Health expressly reserves all rights afforded under the So-Ordered Joint Trial Exhibit Stipulation and Local Rules to amend, modify, withdraw, and supplement the Joint Exhibit List prior to and during trial.

4. Cardinal Health hereby incorporates all reservations of rights set forth in Cardinal Health's Proposed Exhibit List.

5. Cardinal Health does not waive by inclusion on the Exhibit List any prior confidentiality designation in this litigation.

6. Cardinal Health further reserves the right to object to the introduction and/or admissibility of any document listed on any party's exhibit list.

7. Cardinal Health further reserves the right to use any deposition transcripts and any exhibits to deposition transcripts for any witnesses being called to testify at trial and/or use any deposition exhibits or other documents associated with any testimony that will be designated or counter designated by any party.

8. Cardinal Health reserves the right to use any and all documents or materials listed by any other party, including any other defendant even if such defendant may later settle, be severed, or be otherwise dismissed from the City of Huntington and Cabell County Commission trial.

9. Certain exhibits that were previously produced during discovery are further identified by bates number or native file name. Cardinal Health expressly reserves the right to use alternative copies of such exhibits where appropriate, including but not limited to physical, color, redacted, and/or native documents, or copies without deposition exhibit stickers.

10. Cardinal Health reserves the right to use at trial summaries created in accordance with Federal Rule of Evidence 1006 and demonstrative exhibits, including without limitation: charts, graphs, photographs, animations, timelines, objects, models, PowerPoint slides, drawings, graphics, and other demonstrative aids.

11. Cardinal Health reserves the right to offer enlargements of any exhibits on the list or on any party's exhibit list.

**e. Defendant McKesson Corporation's Disclosures**

    i. McKesson Corporation's Witnesses

        1. *See* McKesson Corporation's Witness list, attached hereto as <u>Appendix H</u>, provided on September 23, 2020. Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for Designation and Use of

Deposition Testimony at Trial, filed September 21, 2020 as Doc. # 996.

2.  McKesson specifically reserves the right to amend, supplement, or otherwise modify these disclosures if new or modified information is provided at any point.

3.  McKesson further reserves the right to amend or supplement this list to identify witnesses who are deposed September 23, 2020.

4.  McKesson further reserves the right to supplement and/or to amend this list with any witnesses identified on any party's witness lists, including any party who later settles or is severed or dismissed.

5.  McKesson further reserves the right to conduct a direct examination of any witness called by the Plaintiff and/or to call additional witnesses not identified on this list that are submitted as part of current or future deposition designations by any other party.

6.  McKesson further reserves the right to supplement and/or to amend this witness list in response to rulings of the Court on pretrial motions.

ii.   McKesson Corporation's Witnesses to be Presented by Deposition

1.  *See* McKesson Corporation's Witness list, attached hereto as Appendix H, provided on September 23, 2020.   McKesson Corporation reserves the right to designate and present by deposition any witness or expert witness designated by any other party in this litigation. Deposition designations and any objections thereto will be exchanged pursuant to the Order Establishing Procedure for Designation and Use of Deposition Testimony at Trial, filed September 21, 2020 as Doc. # 996.

2.  McKesson Corporation reserves the right to amend, supplement, or otherwise modify these disclosures if new or modified information is provided at any point.

iii.   McKesson Corporation's Proposed Exhibits

1.  *See* McKesson Corporation's Proposed Exhibit List, attached hereto as Appendix I, provided on October 2, 2020.

2.  McKesson Corporation incorporates by reference the procedure for exhibit objections set forth in the Parties' Joint Trial Exhibit Stipulation.

3.  McKesson Corporation expressly reserves all rights afforded under the So-Ordered Joint Trial Exhibit Stipulation and Local Rules to amend, modify, withdraw, and supplement the Joint Exhibit List prior to and during trial.

4.  McKesson Corporation hereby incorporates all reservations of rights set forth in McKesson Corporation's Proposed Exhibit List.

5.  McKesson Corporation does not waive by inclusion on the Exhibit List any prior confidentiality designation in this litigation.

6.  McKesson Corporation further reserves the right to object to the introduction and/or admissibility of any document listed on any party's exhibit list.

7.  McKesson Corporation further reserves the right to use any deposition transcripts and any exhibits to deposition transcripts for any witnesses being called to testify at trial and/or use any deposition exhibits or other documents associated with any testimony that will be designated or counter designated by any party.

8.  McKesson Corporation reserves the right to use any and all documents or materials listed by any other party, including any other defendant even if such defendant may later settle, be severed, or be otherwise dismissed from the City of Huntington and Cabell County Commission trial.

9.  Certain exhibits that were previously produced during discovery are further identified by bates number or native file name. McKesson Corporation expressly reserves the right to use alternative copies of such exhibits where appropriate, including but not limited to physical, color, redacted, and/or native documents, or copies without deposition exhibit stickers.

10. McKesson Corporation reserves the right to use at trial summaries created in accordance with Federal Rule of Evidence 1006 and demonstrative exhibits, including without limitation: charts, graphs, photographs, animations, timelines, objects, models, PowerPoint slides, drawings, graphics, and other demonstrative aids.

11. McKesson Corporation reserves the right to offer enlargements of any exhibits on the list or on any party's exhibit list.

2. **Contested Issues of Law Requiring a Ruling Before Trial**

   a. **Plaintiffs' Statement of Contested Issues of Law**

      i. Whether this Court should adopt the ruling in Case Track One of the Multidistrict Litigation finding that, as a matter of law, the Controlled Substances Act ("CSA") and its implementing regulations require defendants who are "registrants" to: (1) identify suspicious orders of controlled substances; (2) report to the Drug Enforcement Administration ("DEA") suspicious orders when discovered; and (3) decline to ship a suspicious order unless and until, through due diligence, the registrant can determine the order is not likely to be diverted into illegal channels, as set forth in: Plaintiffs' Motion to Adopt Multidistrict Litigation Court's Order on Defendants' Controlled Substances Act Duties (Doc. # 189-0).

      ii. Whether W.Va. Code § 55-7-13d(a)(2) and its predecessor, W.Va. Code § 55-7-24 ("2005 Act") (collectively "Apportionment Statutes") are inapplicable to Plaintiffs' claims, as set forth in: Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault (Doc. # 0224-0).

      iii. Whether Defendants' shipment of suspicious orders, without first clearing those orders through due diligence, constituted a violation of the Controlled Substances Act ("CSA") and the West Virginia Controlled Substances Act ("WVCSA") and Distributors' obligations under federal law as set forth in Plaintiffs' Motion for Partial Summary Judgment Holding that Cardinal Health Did Not Comply with Its Duties Under the Controlled substances Act (Doc. # 1016) and Plaintiffs' Motion for Partial Summary Judgment Concerning Defendants' Statutory and Regulatory Duties (Doc. # 189).

      iv. Whether Plaintiffs should be permitted to proffer for the record the evidentiary foundation for the national ARCOS database and IQVIA foundational testimony, as set forth in: Plaintiffs' Motion for a Bench Trial Management Order (Doc. # 230-0).

      v. Whether Plaintiffs' Claims are precluded by the doctrine of res judicata as set forth in: Cardinal Health's Motion for Summary Judgement: Res Judicata and Release of Claims (Doc. # 216-0).

      vi. Whether Plaintiffs' Claims are precluded by the doctrine of res judicata as set forth in: McKesson Corporation's Motion to Dismiss or for Summary Judgement on Res Judicata and Release Grounds (Doc. # 222-0).

      vii. Whether Plaintiffs' Claims are precluded by the doctrine of res judicata as set forth in: AmerisourceBergen Drug Corporation's Motion for Summary Judgement Based on Res Judicata (Doc. # 226-0).

viii.   Whether Plaintiffs' claims are precluded by the statute of limitations, as set forth in: Defendants' Motion for Summary Judgment: Standing (Doc. # 238-0).

ix.   Whether Plaintiffs' claims are precluded by the statute of limitations, as set forth in: Defendants' Motion for Summary Judgment: Statute of Limitations (240-0).

x.   Whether Cabell County Commission has authority to abate the public nuisance as set forth in "Defendants' Motion for Summary Judgment: No Right to Abatement"? (Doc. # 1005)

xi.   Whether Defendants should be precluded from introducing any evidence, testimony, statements or arguments pertaining to any payments the Plaintiffs received from collateral sources as set forth in: Plaintiffs' Motion In Limine Regarding Collateral Sources (Doc. # 1006)

xii.   Whether Plaintiffs City of Huntington and Cabell County Commission have a valid claim for public nuisance, as set forth in "Defendants' Motion for Summary Judgment Re Nuisance" (Doc. # 1003) and "Defendants' Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims" (Doc. # 1007).

xiii.   Whether Plaintiffs can prove that there is a direct connection between Defendants' wrongdoing and Plaintiffs' injuries as set forth in: Defendants' Motion for Summary Judgment on Proximate Causation Grounds (Doc. # 1014).

xiv.   Whether this Court should grant partial summary judgement and find that the Controlled Substances Act and the West Virginia Controlled Substances Act impose an obligation to maintain effective controls against diversion, and that in order to meet this obligation, distributors of controlled substances must design and operate a system to identify suspicious orders; must report suspicious order to the DEA; and must stop shipment of suspicious orders pending investigation, as set forth in Plaintiffs' Motion for Partial Summary Judgement Concerning Defendants' Statutory and Regulatory Duties. (Doc. # 1011)

xv.   Whether claims against McKesson should be dismissed on sovereign immunity grounds as set forth in: McKesson Corporation's Motion for Dismissal On Derivative Sovereign Immunity Grounds. (Doc. # 1012)

xvi.   Whether this Court should grant partial summary judgement and find that Dr. McCann's Processed ARCOS data accurately reflects the data provided by the DEA regarding the Defendants' shipments of opioids, as set forth in Plaintiffs' Motion for Partial Summary Judgment Regarding Transactions Reflected in Processed ARCOS Data. (Doc. # 1008)

xvii.   Whether this Court should order that the IQVIA XPONENT and XPONENT PLANKTRAK data produced in discovery in the MDL ("IQVIA Data") is admissible, as set forth in Plaintiffs' Motion In Limine for an Order Ruling IQVIA Data Admissible. (Doc. # 1066)

xviii.   Whether this Court should limit expert testimony of Defendants' expert witness, Tricia Wright, as set forth in the Daubert motion filed as Plaintiffs' Motion to Limit the Testimony of Defendants' Expert Tricia Wright, M.D. (Doc. # 1082).

**b.   Defendants' Statement of Contested Issues of Law**

i.   Whether Plaintiffs lack standing to bring their public nuisance claims, as set forth in Defendants' Motion for Summary Judgment:  Standing (Doc. # 238).

ii.   Whether Plaintiffs' public nuisance claims are partially barred by the statute of limitations, as set forth in Defendants' Motion for Summary Judgment: Statute of Limitations (Doc. # 240).

iii.   Whether Plaintiffs' public nuisance claims against Defendants are barred by *res judicata* and release, as set forth in McKesson Corporation's Motion to Dismiss or for Summary Judgement on Res Judicata and Release Grounds (Doc. # 222), Cardinal Health's Motion for Summary Judgement: Res Judicata and Release of Claims (Doc. # 216), and AmerisourceBergen Drug Corporation's Motion for Summary Judgement Based on Res Judicata (Doc. # 226).

iv.   Whether Plaintiffs' public nuisance claims fail because (1) West Virginia law does not recognize such a claim for product distribution, (2) Plaintiffs have failed to identify a public right with which Defendants interfered, (3) Plaintiffs have failed to establish the fault element of public nuisance, (4) Plaintiffs' claims are preempted by federal law, and (5) Plaintiffs have failed to demonstrate proximate causation, as set forth in Defendants' Motion for Summary Judgment Re Nuisance (Doc. # 1003), Defendants' Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claims (Doc. # 1007), and Defendants' Motion for Summary Judgment on Proximate Causation Grounds (Doc. # 1014).

v.   Whether Cabell County Commission lacks the authority to abate the alleged public nuisance, as set forth in Defendants' Joint Motion for Summary Judgment re Abatement (Doc. # 1005).

vi.   Whether the Court must dismiss Plaintiffs' public nuisance claims against McKesson because McKesson is protected by derivative sovereign immunity, as set forth in McKesson Corporation's Motion for Dismissal on Derivative Sovereign Immunity Grounds (Doc. # 1012).

vii.     Whether the CSA and/or the West Virginia Controlled Substances Act required distributors to identify suspicious orders, report suspicious orders to the DEA, and stop shipment of suspicious orders pending investigation, and, if so, when any such obligation first arose.  *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Defendants' Statutory and Regulatory Duties (Doc. # 1079).

viii.    Whether Plaintiffs have failed to establish that Cardinal Health failed to comply with its duties under the CSA.  *See* Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment Holding that Cardinal Health Did Not Comply with its Duties Under the Controlled Substances Act (Doc. # 1087).

ix.     Whether W.Va. Code § 55-7-13d(a)(2) and its predecessor, W.Va. Code § 55-7-24 apply to Plaintiffs' claims.  *See* Memorandum of Law in Opposition to Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault (Doc. # 256)

x.      Whether Defendants may introduce evidence, testimony, statements, or arguments pertaining to payments the Plaintiffs received from collateral sources.

xi.     Whether the Court should exclude any statement or letter Plaintiffs improperly obtain from the DEA, as set forth in Defendants' Motion to Exclude Plaintiffs' Improperly Obtained Statement or Letter from DEA (Doc. # 1038).

xii.    Whether the Court should exclude certain expert testimony of Plaintiffs' expert witness, Andrew Kolodny, as set forth in Defendants' Motion to Exclude the Expert Testimony of Andrew Kolodny (Doc. # 1041).

xiii.   Whether the Court should exclude testimony by Plaintiffs' expert witnesses about Defendants' corporate conduct, as set forth in Defendants' Motion to Exclude Expert Testimony Regarding Defendants' Corporate Conduct (Doc. # 1043).

xiv.    Whether the Court should exclude expert testimony of Plaintiffs' expert witness, James Geldhof, as set forth in Defendants' Daubert Motion to Exclude the Opinions of James Geldhof (Doc. # 1047).

xv.     Whether the Court should exclude expert testimony of Plaintiffs' expert witness, Thomas McGuire, as set forth in Defendants' Motion to Exclude Expert Testimony of Thomas McGuire (Doc. # 1050).

xvi.  Whether the Court should exclude opinions of Dr. Rahul Gupta, as set forth in Defendants' Motion to Exclude the Testimony of Dr. Rahul Gupta (Doc. # 1051).

xvii.  Whether the Court should exclude expert testimony of Plaintiffs' expert witness, James Rafalski, as set forth in Defendants' Daubert Motion to Exclude the Opinions of James E. Rafalski (Doc. # 1052).

xviii.  Whether the Court should exclude expert testimony of Plaintiffs' non-retained expert witnesses, as set forth in Defendants' Motion to Exclude Undisclosed Expert Testimony from Non-Retained Expert Witnesses (Doc. # 1055).

xix.  Whether the Court should exclude certain expert testimony of Plaintiffs' expert witness, Dr. Katherine Keyes, as set forth in Defendants' Motion to Exclude Certain Expert Testimony of Katherine Keyes (Doc. # 1056).

xx.  Whether the Court should exclude expert testimony of Joseph Rannazzisi, as set forth in Defendants' Motion to Exclude Expert Testimony Proffered by Joseph Rannazzisi (Doc. # 1057).

xxi.  Whether the Court should exclude certain expert testimony of Plaintiffs' expert witness, George Barrett, as set forth in Defendants' Motion to Exclude the Expert Testimony of George Barrett (Doc. # 1059).

xxii.  Whether the Court should exclude marketing opinions offered by certain of Plaintiffs' expert witnesses, as set forth in Defendants' Motion to Exclude the Marketing Opinions of Anna Lembke, Katherine Keyes, Andrew Kolodny, and Jakki Mohr (Doc. # 1063).

xxiii.  Whether the Court should exclude expert testimony of Plaintiffs' expert witness G. Caleb Alexander related to abatement costs and efforts, as set forth in Defendants' Motion to Exclude Expert Testimony from G. Caleb Alexander Purporting to Relate to Abatement Costs and Efforts (Doc. # 1068).

xxiv.  Whether the Court should exclude certain evidence relating to McKesson's former regulatory affairs employee, David Gustin, as set forth in McKesson Corporation's Motion in Limine to Exclude Evidence Regarding Former Employee's Misdemeanor Plea (Doc. # 1045).

xxv.  Whether the Court should exclude evidence by Plaintiffs regarding: individualized evidence of opioid misuse and diversion; lay testimony about the "gateway" theory; Defendants' prescription opioid shipments to places outside Cabell County and the City of Huntington; and

14

Defendants' settlements with the DEA or Track One MDL Plaintiffs, all as set forth in Defendants' Motions in Limine (Doc. # 1067).

xxvi.   Whether Plaintiffs' Motion for Partial Summary Judgment Regarding Transactions Reflected in Processed ARCOS Data (Doc. # 1008), and Plaintiffs' Motion in Limine for an Order Ruling IQVIA Data Admissible (Doc. # 1066) should be granted.

## 3. Summary of the Material Facts and Theories of Liability or Defenses

### a. Plaintiffs' Summary

This case concerns the immediate and ongoing hazard to public health and safety resulting from the opioid epidemic in Plaintiffs City of Huntington and Cabell County Commission's communities ("Cabell-Huntington Community").  Plaintiffs have brought a cause of action for public nuisance, in conjunction with civil conspiracy, and seek the remedy of abatement.

> A public nuisance is an act or condition *that unreasonably interferes with a right common to the general public*. Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
> (a)   Whether the conduct involves a *significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience*, or
>
> (b)   Whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>
> (c)   Whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B (emphasis added).

The Defendants in this case — AmerisourceBergen, Cardinal Health, Inc., and McKesson Corporation — are wholesale distributors of prescription opioids who, together, control approximately 90% of the national wholesale distribution market.  The undisputed facts in this case show that starting from at least the mid-1990s, Defendants sold services to opioid manufacturers

that aimed to dramatically increase the utilization of opioids.  Defendants' activities included, but were not limited to: direct promotions, patient education and adherence programs, education for health professionals, and advertising to pharmacists.  In conjunction with opioid manufacturers and trade organizations, Defendants helped to create a mass market for prescription opioids.  Once this market was created, Defendants flooded it with opioids, often shipping opioids in quantities that they knew or should have known exceeded any legitimate market.  Even in the face of other factors, Defendants had a fixed duty to detect and address diversion.  Arguments attempting to lay blame on other entities fail to recognize that another actor's actions does not excuse Defendants' own failures.  Not can Defendants fairly lay responsibility on law enforcement for failing to detect or address Defendants' own violations of law.  While other factors may have contributed to the opioid epidemic plaguing the Huntington-Cabell Community, Defendants played a significant and foreseeable role in creating, deepening, and extending this crisis.

> i.  <u>Defendants' Duties</u>

In 1970, Congress passed the Comprehensive Drug Abuse Prevention and Control Act; Title II of the Act contains the enforcement provisions and is known as the Controlled Substances Act ("CSA").  *See* 21 USC § 801-971.  The legislative history of the CSA explains that the bill was

> . . . designed to improve the administration and regulation of the manufacturing, distribution, and dispensing of controlled substances by providing for a 'closed' system of drug distribution for legitimate handlers of such drugs. Such a closed system should significantly reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

The CSA authorizes the Drug Enforcement Administration ("DEA") to establish a registration program for manufacturers, distributors, and dispensers of controlled substances designed to prevent the diversion of legally produced controlled substances into the illicit market.

16

H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970); see 21 U.S.C. § 801(2); 21 U.S.C. §§ 821-824, 827, 880. Any entity, including wholesale distributors such as Defendants, seeking to become involved in the supply chain of controlled substances must first register with the DEA. 21 U.S.C. § 822; 21 C.F.R. § 1301.11.

"Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." *United States v. Moore*, 423 U.S. 122, 135 (1975). The CSA is clear that "[t]he illegal importation, manufacture, distribution and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American People." 21 U.S.C.A. § 801(2). Thus, the foreseeable harm from failing to prevent the diversion of controlled substances such as prescription opioids to illicit channels, is damage to public health and safety.

As registrants under the CSA, and also pursuant to West Virginia state law, Defendants had a duty to monitor, identify, report and prevent the fulfillment of suspicious orders of opioids in order to ensure that licit drugs were not diverted into illicit channels. *See* 21 U.S.C. § 823 *et seq*., 21 CFR 1301.74; 15 CSR 2.4. Specifically, the implementing regulations for the CSA mandate that registrants:

> Shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 CFR 1301.74(b).

ii.  Defendants' Failure to Design and/or Implement Adequate Systems to Prevent Diversion

Despite their duties to prevent diversion, Defendants repeatedly and knowingly failed to implement adequate systems to detect, report and stop the diversion of prescription opioids and, instead, flooded the Cabell Huntington Community with an oversupply of highly dangerous and addictive narcotics.

Between 2005 and 2014, Defendants sent billions of morphine milligram equivalents ("MMEs") of opioids into the Cabell Huntington Community of less than 100,000 people. In fact, between 2006 and 2014, dispensers in the Cabell-Huntington Community received 127.9 million Dosage Units or 3.3 billion MME of opioids, enough opioids for every resident in Cabell County and the City of Huntington, WV to consume 142 Dosage Units or 3,650 MME every year from 2006 to 2014. Oxycodone and hydrocodone products, in particular, accounted for approximately 86% of all dosage units in Plaintiffs' community from 2006 to 2014.

       iii.   <u>Defendants' Actions Were a Contributing Factor in Harming Public Health and Safety in the Cabell-Huntington Community</u>

Defendants' actions in inflating and flooding the market for opioids in the Cabell-Huntington Community were a contributing cause of the diversion of prescription opioids into the illicit market. Defendants' actions were also a cause of opiate abuse, addiction, morbidity and mortality Cabell-Huntington Community. Opiate abuse, addiction, morbidity, and mortality are hazards to public health and safety in Cabell County and the City of Huntington. Thus, Defendants' actions in failing to prevent the diversion of prescription opioids has created an ongoing, abatable, public nuisance.

Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions. *See* Nora D. Volkow, M.D., and A. Thomas McLellan, Ph.D., *Opioid Abuse in Chronic Pain*, NEW ENG. J. MED., 374:1253-63 (March 31, 2016). The epidemic is "directly related to the increasingly

widespread misuse of powerful opioid pain medications." *See* Special Report, FDA Commissioner Robert M. Califf, M.D., *A Proactive Response to Prescription Opioid Abuse*, NEW ENGL. J. MED., 374;1480-85 (April 14, 2016). The increased use of prescription painkillers for nonmedical reasons (without a prescription for the high they cause), along with growing sales, has contributed to a large number of overdoses and deaths. *See* Press Release, *Prescription painkiller overdoses at epidemic levels*, U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention (November 1, 2011). There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes." *See* Richard C. Dart, MD, et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, NEW ENGL. J. MED., 372:241-248 (January 15, 2015). The public health dangers associated with the diversion and abuse of controlled prescription drugs have been well-recognized over the years by Congress, DEA, HDMA and its members, and public health authorities. *See* Brief for HDMA and NACDS, *Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.*, 2016 WL 1321983 (C.A.D.C.) (April 4, 2016); Amicus Curiae Brief of HDMA, *Cardinal Health, Inc. v. United States Dept. Justice*, 2012 WL 1637016, *2-3 (C.A.D.C.) (May 9, 2012).

The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are 40x more likely to be addicted to heroin. *See* CDC Vital Signs Fact Sheet, Today's Heroin Epidemic, U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention (July 2015). Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for

19

heroin use. *See* Wilson M. Compton, MPE, Relationship between Nonmedical Prescription Opioid Use and Heroin Use, NEW ENG. J. MED., 374:154-63 (January 14, 2016). The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use, specifically among persons who report past-year dependence or abuse.

### iv.  Plaintiffs Seek the Remedy of Abatement

The opioid epidemic in the Cabell-Huntington Community is a public nuisance that remains unabated.  In order to abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed." *See* Rose A. Rudd, MSPH, et al., *Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015*, Morbidity and Mortality Weekly Report (MMWR), Centers for Disease Control and Prevention, 65(50-51);1445–1452 (December 30, 2016).

### v.  Plaintiffs' Position as to the Legal Defenses Identified by Defendants

Plaintiffs also respond to each of the legal defenses raised below by Defendants as follows:

- ***First***, Plaintiffs have standing to bring a public nuisance suit under West Virginia law. Plaintiffs are authorized by West Virginia statute to bring this action to abate the public nuisance caused by Defendants.  Accordingly, Plaintiffs have both the power and the duty to seek abatement for Defendants.  Plaintiffs also incorporate by reference the

arguments made in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment Based on Standing. (Doc. # 287.)

- **Second**, because there is no statute of limitations for an unabated nuisance, Plaintiffs' claim is in no way partially barred on these grounds.  Plaintiffs also incorporate by their arguments in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment Regarding Statute of Limitations.  (Doc. # 288).

- **Third**, the doctrine of *res judicata* does not bar Plaintiffs' claim for public nuisance because, among other reasons: (1) Defendants cannot establish that Plaintiffs and the West Virginia Attorney General were in privity with each other (2) neither the State nor the West Virginia Attorney General has *parens patriae* power to bring Plaintiffs' claims as the Legislature has not expressly given *parents patriae* authority to abate the public nuisance at issue here and has impliedly supplanted whatever common law authority might otherwise exist; (3) the doctrine of virtual representation is inapplicable here (4) Plaintiffs' claims for abatement of a public nuisance are not the same as the damages claims previously raised by the State and the West Virginia Attorney General and (5) the plain language of the releases between Defendants and the West Virginia Attorney General confirms that Plaintiffs' claims were not released by the West Virginia Attorney General. Plaintiffs also incorporate by reference the arguments set forth in Plaintiffs' Opposition to Defendants' Motion to Dismiss or For Summary Judgment Based On *Res Judicata* and Release. (Doc. # 242).

- **Fourth**, Plaintiffs brought a valid public nuisance claim:  West Virginia law does not limit public nuisance to an interference with public property or resources, nor are Plaintiffs' claims excluded from nuisance law because they arise from the distribution

of products.   Further, the evidence in this case shows that the effects of the opioid epidemic are far-reaching, sparing no member of Plaintiffs' communities, giving rise to a substantial interference with public health and safety – rights which West Virginia law has recognized as common to the general public.   Plaintiffs also incorporate by reference the arguments set forth in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment Re Nuisance (Doc. # 1077).

- ***Fifth***, as set forth in greater detail in Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment for Failure to Prove Fault Element of Public Nuisance Claim (Doc. # 1075), Plaintiffs are able to satisfy the fault element of their public nuisance claim given: the substantial evidence of Defendants' intentional misconduct, the fact that, under West Virginia law, a public nuisance claim can be based upon a defendant's unlawful conduct, and the fact that, under West Virginia law, everyone owes an absolute duty not to create or maintain a public nuisance.

- ***Sixth***, because Defendants failed to maintain effective controls against the diversion of prescription opioids, massive quantities of opioids flooded the City of Huntington and Cabell County.   This massive increase in opioids caused a public nuisance and no intervening acts break the chain of causation.   Accordingly, Plaintiffs have raised triable issues of fact with respect to causation for their public nuisance claims. Plaintiffs further incorporate by reference the arguments set forth in their Opposition to Defendants' Motion for Summary Judgment on Proximate Causation. (Doc. # 1080).

- ***Seventh***, under West Virginia law, Plaintiff Cabell County Commission is specifically authorized to bring an action to abate a public nuisance.   Plaintiffs incorporate by reference the arguments set forth in Plaintiffs' Opposition to Defendants' Motion for

Summary Judgment on Plaintiff Cabell County Commission's Right to Abatement (Doc. # 1083).

- **Eighth**, West Virginia's contribution statute and its predecessor are inapplicable to Plaintiffs' claims because, by its very terms, W. Va. Code Ann. Sec. 55-7-13 and its predecessor, W.Va. Code § 55-7-24, only apply to actions at law seeking damages, not to this action in equity seeking abatement and also because the 2015 version of the contribution statute is not retroactive – therefore it would only apply to causes of action which accrued on or after its effective date of May 25, 2015 – a criteria that is not satisfied here.  Plaintiffs also incorporate, as if fully set forth herein, Plaintiffs' arguments in support of Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault. (Doc. #225).

- **Ninth**, for the reasons set forth in Plaintiffs' Motion *In Limine* to Preclude Evidence, Testimony, Statements, or Arguments Pertaining to Any Payments the Plaintiffs Received From Collateral Sources (Doc. # 1006), incorporated herein by reference, Defendants' arguments that the vast majority of the abatement relief sought by Plaintiffs involves programs paid for by the state and federal government are meritless as, a matter of substantive law, those payments are collateral sources which are irrelevant to this case.

### b.  Defendants' Summary

Plaintiffs' theory of liability against Defendants is fatally flawed.  As set forth more fully in Defendants' forthcoming Proposed Findings of Fact and Conclusions of Law, Defendants are wholesale distributors of a full line of medical products and supplies, including prescription opioid medications and other prescription and over-the-counter drugs.  Defendants purchase those

supplies and products from manufacturers, and sell them to State-licensed and DEA-registered pharmacies, hospitals, and healthcare facilities across the country and in Cabell/Huntington.  As wholesale distributors, Defendants do not (1) develop or manufacture prescription drugs, (2) prescribe medications, (3) assess patients' medical needs or have access to patients' medical histories (individually or in the aggregate), or (4) dispense prescription drugs.

Plaintiffs allege that Defendants flooded Cabell/Huntington with prescription opioids, thereby causing a public nuisance of abuse and addiction.  But Defendants only distributed prescription opioids in response to aggregate orders placed by pharmacies and hospitals, which in turn were based on prescriptions written by licensed doctors and other medical professionals based on the then-prevailing standard of care.  Put differently, Defendants did not determine the supply of prescription opioids dispensed in Cabell/Huntington, nor did they even have access to data that would permit them to learn the total supply in Cabell/Huntington.  Furthermore, the U.S. Drug Enforcement Administration (or "DEA") sets annual quotas on the permissible levels of prescription opioids that can be distributed in the U.S. in any given year, based on its assessment of the medical and scientific needs for these medicines.  Defendants' shipments of prescription opioids never exceeded the quotas authorized by the DEA.  Moreover, although Plaintiffs attempt to hold Defendants responsible for harms caused by illegal opioids like heroin and illicit fentanyl, Defendants play no role with respect to the distribution or sale of those illegal opioids; criminal drug trafficking organizations are responsible for those harms.  Indeed, Defendants only distributed legal prescription opioids that have been approved by the Food and Drug Administration ("FDA").

Plaintiffs' case against Defendants also is flawed as a matter of law for the reasons described more fully below and in Defendants' summary judgment briefing:

- ***First***, Plaintiffs lack standing to bring a public nuisance claim. Under West Virginia law, counties and municipalities may seek abatement of a public nuisance only where the nuisance has been (i) recognized as such *per se* or (ii) designated as such by a lawful statute or ordinance. Plaintiffs have not claimed—nor could they—that Defendants' alleged wrongful conduct constitutes a per se nuisance, nor has either Plaintiff enacted an ordinance of general applicability that defines the public nuisance about which it complains. *See infra* Part 4.b.i.

- ***Second***, Plaintiffs' claim is partially barred to the extent it is based on conduct outside the one-year statute of limitations for nuisance actions. Plaintiffs have admitted that their claims accrued before May 2015, and the factual record supports this conclusion. *See infra* Part 4.b.ii.

- ***Third***, Plaintiffs' public nuisance claim against each Defendant is barred by *res judicata* and release because the State of West Virginia, acting as *parens patriae*, previously brought and settled virtually identical claims against each Defendant. *See infra* Part 4.b.iii.

- ***Fourth***, Plaintiffs do not have a valid public nuisance claim: West Virginia has never recognized a public nuisance claim based on harm allegedly caused by a product. The *Erie* doctrine precludes this Court from expanding West Virginia common law to cover the circumstances here. Moreover, Plaintiffs cannot establish an unreasonable interference with a public right necessary to support a public nuisance claim. The injuries suffered by individuals who ingested prescription opioids are private rights,

and the accumulation of those private rights and private injuries does not establish an interference with a public right. *See infra* Part 4.b.iv.

- *Fifth*, even assuming Plaintiffs could surpass these threshold issues (they cannot), they cannot prove an essential element of their public nuisance claim against Defendants—fault. There is no evidence that Defendants intended to cause the opioid crisis, and Plaintiffs misread the CSA and WVCSA in arguing that those statutes or their implementing regulations impose legal "duties" on Defendants that can sustain a state-law tort claim. Moreover, insofar as Plaintiffs' claims are based on purported "duties" arising out of the federal CSA, Plaintiffs' claims are preempted by federal law. *See infra* Part 4.b.v.

- *Sixth*, Plaintiffs cannot prove that Defendants' distribution of FDA-approved prescription opioid medicines to State-licensed and DEA-registered dispensaries, standing alone, proximately caused them any harm—another essential element of a public nuisance claim. *See infra* Part 4.b.vi.

- *Seventh*, even if Defendants could be held liable on this record (they cannot), (i) the Cabell County Commission lacks authority to seek abatement of the nuisance and (ii) Plaintiffs' requested relief is not abatement at all, but rather a request for future damages based on past conduct. *See infra* Part 4.b.vii.

- *Eighth*, because Plaintiffs seek money damages in the form of future costs, West Virginia's contribution statute applies. *See* W. Va. Code Ann. Sec. 55-7-13(d)(1) ("In assessing percentages of fault, the trier of fact shall consider the fault of all persons who contributed to the alleged damages regardless of whether the person was or could have been named as a party to the suit."). This Court must therefore consider the fault

of nonparties to this case in assessing Defendants' share of liability for Plaintiffs' alleged injuries.  *See infra* Part 4.b.viii.

- ***Ninth***, even if Defendants could be held liable, and even if the Court were to find an abatement remedy appropriate, the vast majority of the abatement relief that Plaintiffs seek involves drug addiction and treatment programs that are paid for by the federal and state government and are not administered at the county or city level.  Thus, Plaintiffs' proposed remedy would grant them an improper windfall.  Because drug treatment and addiction programs and other efforts to address the opioid epidemic are statewide or multi-state in nature, the money actually spent by Plaintiffs on programs responding to the opioid abuse crisis, and that they would spend in the future, is modest.  *See infra* Part 4.b.ix.

Defendants respectfully submit that Plaintiffs' public nuisance claim should be dismissed before trial for any one of these independent reasons.

   i. <u>Plaintiffs Lack Standing To Pursue a Public Nuisance Claim.</u>

As more fully set forth in Defendants' Motion for Summary Judgment: Standing (Doc. #239), Cabell County and the City of Huntington lack standing to bring a public nuisance claim. Under West Virginia law, counties and municipalities may seek abatement of a public nuisance only where the nuisance has been (i) recognized as such per se or (ii) designated as such by a lawful statute or ordinance.  *Parker v. City of Fairmont*, 72 W. Va. 688, 79 S.E. 660 (1913).  Neither Plaintiff has alleged that Defendants' conduct constitutes a nuisance per se, meaning "an act, occupation, or structure which is a nuisance ***at all times and under all circumstances***, regardless of location or surroundings."  *Harless v. Workman*, 145 W. Va. 266, 114 S.E.2d 548, 552 (1960).

27

Nor could they; for obvious reasons, there is no authority that the distribution of FDA-approved prescription opioid medications is "always" a public nuisance.

Nor can either Plaintiff prove that Defendants violated an ordinance of general applicability that defined their alleged conduct as a public nuisance. *See* Doc. # 239 at 9–12. Although Cabell County passed a resolution in 2017 declaring that the unlawful distribution of prescription pain pills has created a public nuisance, the resolution does not have the force of law and was not passed until the same day on which it retained counsel to bring this action. The resolution also is not one of general applicability and therefore does not give the County standing to pursue its claim. Huntington failed to pass anything until almost a month *after* Defendants' filed their motion for summary judgment. What it did pass, a resolution and not an ordinance of general applicability, suffers from the same defects as the County's 2017 resolution, except that it is untimely by an additional three years. *See* Doc. # 357 at 8 n.7.

### ii.   Plaintiffs' Claim Is Barred by the Statue of Limitations.

As more fully set forth in Defendants' Motion for Summary Judgment: Statute of Limitations (Doc. # _____), Plaintiffs' claims are partially barred to the extent they are based on Defendants' conduct outside the applicable one-year statute of limitations. As laid out in that motion, there is ample evidence that Plaintiffs were on notice of their claims years before they filed suit. Indeed, Plaintiffs' opposition to the motion does not dispute these facts, and Plaintiffs now admit that their claims accrued before May 2015. Dkt. 225 at 10. Plaintiffs contend only that their claims are not time-barred because no statute of limitations applies to a suit to abate a public nuisance. For the reasons given in Defendants' Reply In Support of their Motion for Summary Judgment: Statute of Limitations, Doc. # 356, Plaintiffs are incorrect; there is no authority

permitting any claim based on conduct occurring prior to January 2016, regardless of whether Plaintiffs seek abatement or money damages.

iii.   Plaintiffs' Claim Is Barred by *Res Judicata* and Release.

As more fully set out Cardinal Health's Motion for Summary Judgement: Res Judicata and Release of Claims (Doc. # 216-0), McKesson Corporation's Motion to Dismiss or for Summary Judgement on Res Judicata and Release Grounds (Doc. # 222-0, and AmerisourceBergen Drug Corporation's Motion for Summary Judgement Based on Res Judicata (Doc. # 226-0), Plaintiffs' claims are precluded by the doctrine of res judicata and release. "[A] suit can be barred by the earlier settlement of another suit in either of two ways: res judicata or release." *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29, 31–32 (1st Cir. 1991).

Res judicata, or claim preclusion, bars a subsequent suit when (1) there was "a final adjudication on the merits in the prior action"; (2) "the two actions … involve either the same parties or persons in privity with those same parties"; and (3) "the cause of action identified for resolution in the subsequent proceeding either [is] identical to the cause of action determined in the prior action or [is] such that it could have been resolved, had it been presented, in the prior action." *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 239 W.Va. 549, 560, S.E.2d 519, 530 (2017).  Plaintiffs' claims against Defendants are barred by res judicata.

For release, "[w]hen a consent judgment entered upon settlement by the parties of an earlier suit is invoked by a defendant as preclusive of a later action, the preclusive effect of the earlier

judgment is determined by the intent of the [settling] parties." *Keith v. Aldridge*, 900 F.2d 736, 740 (4th Cir. 1990). The State of West Virginia released Plaintiffs' claims against Defendants.

iv.   <u>Plaintiffs Do Not Have a Valid Public Nuisance Claim.</u>

As more fully set forth in Defendants' Motion for Summary Judgment Re Nuisance (Doc. # 1004), West Virginia nuisance law historically has been confined to cases involving the misuse of, or interference with, public property or resources. West Virginia law has never recognized a public nuisance claim like this one, based on harm allegedly caused by a product. Indeed, the Restatement of Torts states that Plaintiffs' theory "has been rejected by most courts … because the common law of public nuisance is an inapt vehicle for addressing" such conduct. *See* Doc. # 1004 at 2–7. Moreover, even if public nuisance law did extend to the type of conduct alleged here, Plaintiffs' claim would fail because there is no evidence that Defendants interfered with a public, as opposed to a private, right. In West Virginia, the invasion of a public right is a defining element of a public nuisance claim. But the harm that Plaintiffs seek to abate—*i.e.*, the addiction, drug overdoses, and deaths of individual drug users and their attendant costs—implicate only the inherently private right that each individual has not to be injured by a product. *Id.* at 8–13.

v.   <u>Plaintiffs Cannot Prove Fault.</u>

As more fully set forth in Defendants' Motion for Summary Judgment For Failure To Prove Fault Element of Public Nuisance Claims (Doc. # 1007), Plaintiffs' public nuisance claim fails for an independent reason: Plaintiffs cannot prove the essential element of fault. It is well-established that, absent a narrow exception not present here, a plaintiff must prove culpable conduct on the part of the defendant to prevail on a public nuisance cause of action. Put differently, Plaintiffs must

30

prove either intentional conduct or negligence.  Here, the record shows that Plaintiffs can prove neither.

First, there is no evidence that Defendants intended to cause the opioid crisis or knew that their alleged conduct would cause a crisis of opioid use and abuse in Cabell/Huntington.  On the contrary, the evidence shows that Defendants only delivered FDA-approved medications to State-licensed pharmacies and hospitals who ordered them to fill prescriptions issued by State-licensed physicians.  *See* Doc. # 1007 at 3–4.

Second, Plaintiffs cannot prove negligence as a matter of law, and their attempt to use purported legal "duties" arising under the CSA and WVCSA is unavailing.  Neither the CSA nor the WVCSA establish any relationship between Defendants and Plaintiffs; rather, it is clear that any duties Defendants might have under those statutes may be enforced only by Defendants' regulators (DEA and the WV BOP), not by Plaintiffs in a private lawsuit.  Moreover, Plaintiffs misunderstand the statutes at issue—although the CSA and WVCSA establish a registration scheme for wholesale distributors and set forth certain criteria that regulators should consider in decided whether to grant, suspend, or revoke a registration, the statutes do not establish any independent legal "duties" that can be enforced through a state common law cause of action.  *Id.* at 5–20.   Furthermore, the statutory and regulatory framework for registration decisions never included the purported no-ship duty, and DEA long understood and accepted that distributors were not refusing to ship customer orders meeting the regulatory definition of "suspicious orders."  *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Defendants' Statutory and Regulatory Duties (Doc. # 1079) at 5–12.

Third, insofar as they are based on purported duties allegedly arising out of the CSA, Plaintiffs' claims are preempted by federal law.  *See id.* at 19–20; Doc. # 1007 at 13–17.

vi.   Plaintiffs Cannot Prove Causation.

As more fully set forth in Defendants' Motion for Summary Judgment on Proximate Causation Grounds (Doc. # 1015), Plaintiffs' claims fail because they cannot prove that Defendants' alleged misconduct proximately caused them any harm.

Proximate cause requires a "direct relation between the injury asserted and the injurious conduct alleged," and in assessing whether there is a direct relation, "[t]he general tendency of the law … is not to go beyond the first step." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268, 271–72 (1992). Here, at least four independent actions—including two exercises of professional judgment and two crimes—had to occur before Plaintiffs could be harmed by Defendants' alleged oversupply of prescription opioids in Cabell/Huntington. In particular, (1) a doctor had to have prescribed the medication, (2) a pharmacy had to have dispensed it, (3) someone had to have diverted the medication to illegal use, and (4) someone had to have illegally possessed and used the diverted medication. In other words, Plaintiffs could not even possibly be harmed by the diversion of prescription opioids in the absence of at least four additional steps—all of which occur after Defendants have surrendered custody and control of the FDA-approved medicines that they deliver to DEA-registered hospitals and pharmacies.[1] *See* Doc. # 1015 at 3–8; *see also City and County of San Francisco, et al. v. Purdue Pharma L.P., et al.*, No. 3:18-cv-07591 (N.D. Cal. Sept.

---

[1] While some opioid medicines are diverted to illicit use, others are used by patients as prescribed. If a patient becomes addicted after using prescription opioids as directed by her doctor, that is a tragedy, but there is no basis for holding Defendants liable for that addiction or for any negative, downstream consequences of that addiction.

30, 2020) at 42 ("The City's causal chain … involves too many links and depends on independent and intervening acts—including criminal conduct—by third and fourth parties.").

Despite having conducted extensive discovery in this litigation, Plaintiffs have no evidence that Defendants were the proximate cause of any harm in Cabell/Huntington. Although Plaintiffs allege that Defendants should have investigated, reported, and temporarily blocked some additional number of orders, they have no evidence that any orders shipped by Defendants were placed to fill prescriptions that were medically inappropriate based on the then-prevailing treatment guidelines. Defendants have no duty and no ability to prevent patients from receiving medicines prescribed in good faith by their doctors, and this remains so even if (in retrospect) Plaintiffs believe or show that a portion of those prescriptions were ill-advised. Plaintiffs also lack any evidence that any of the orders shipped by Defendants were actually diverted or caused any harm. Doc. # 1015 at 9–17. They also lack any evidence that Defendants caused any harm relating to the use of illegal "street" opioids such as heroin and illicit fentanyl—illegal drugs that Defendants do not distribute.

### vii.   Plaintiffs' Purported "Abatement" Remedy Is Unavailable.

As more fully set forth in Defendants' Motion for Summary Judgment: No Right to Abatement (Doc. # 1005), and as conceded in sworn testimony by Cabell County's designated 30(b)(6) witness, Cabell County lacks authority to actually abate the public nuisance alleged here. Cabell County has taken no steps to abate the alleged public nuisance other than filing this lawsuit (which it lacks standing to bring), and has no authority to take any actions in the future. *See generally* Doc. # 1005. Moreover, although Plaintiffs characterize their requested relief as "abatement," in reality they are seeking future damages for past harm. In particular, Plaintiffs are seeking future treatment and other costs relating to Cabell/Huntington residents who *currently* are

suffering from opioid use disorder.  Plaintiffs' attempt to mischaracterize their damage request as "abatement" should be rejected, and their claims should accordingly be dismissed.

viii.   Defendants Can, At Most, Be Liable Only for Their Proportionate Share of Any Proven Harm.

As explained more fully in Defendants' Opposition to Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault (Doc. # 0224-0), the Court should consider the fault of nonparties to this case in assessing Defendants' share of liability for Plaintiffs' alleged injuries.

Pursuant to West Virginia's contribution statute, "[i]n assessing percentages of fault, the trier of fact shall consider the fault of *all* persons who contributed to the alleged damages regardless of whether the person was or could have been named as a party to the suit."  W. Va. Code Ann. Sec. 55-7-13(d)(1) (emphasis added).  The statutory language is undeniably broad, applying "[i]n any action based on tort or any other legal theory seeking damages[.]" W. Va. Code § 55-7-13a(b). Either circumstance applies to Plaintiffs' claim here.

First, West Virginia law considers public nuisance a tort.  *State v. Kermit Lumber & Pressure Treating Co.*, 200 W.Va. 221, 245 n.29, 488 S.E.2d 901, 925 n.29 (1997).  Second, Plaintiffs are seeking money damages in the form of future costs.  Plaintiffs' description of its proposed remedy as "abatement damages," as opposed to "damages" does not remove Plaintiffs' claim from West Virginia's contribution statute.  Future damages are a component of overall compensatory damages.  *See, e.g.*, Syl. Pt. 9, *Jordan v. Bero*, 158 W. Va. 28, 210 S.E.2d 618 (1974) ("The permanency or future effect of any injury must be proven with reasonable certainty in order to permit a jury to award an injured party future damages.").

Plaintiffs' assertion that they seek "abatement" and not damages is unpersuasive. Abatement has only ever meant one thing in West Virginia law—the issuance of an injunction to halt the offending conduct or undo its consequences.  Plaintiffs do not seek injunctive relief—they

34

seek money.  Under West Virginia law, a request for money damages constitutes a legal remedy even if the underlying claim is historically one in equity.

Numerous nonparties contributed to Plaintiffs' alleged injuries, including the following:

- Manufacturers of prescription opioids, who developed these medicines and promoted them for the treatment of pain.

- Doctors who prescribed opioids for the treatment of pain.

- The U.S. Drug Enforcement Administration, which continually increased quotas for the manufacture of prescription opioids and thereby permitted significant increases in the supply of these opioids in Cabell/Huntington.

- The West Virginia Board of Medicine, which had all the information needed to detect "pill mill" doctors and permitted them to continue operating, sometimes for years after such information first came to light.

- The West Virginia Board of Pharmacy, which had all the information needed to detect "rogue" pharmacies or pharmacists and permitted them to continue operating, sometimes for years after such information first came to light.

- Local law enforcement in Cabell/Huntington, which was aware of extensive illegal trafficking of prescription opioids in the community yet did not take enforcement actions to address it.

- "Pill mill" doctors who engaged in illicit prescribing of opioids.

- "Rogue" pharmacies that knowingly dispensed prescription opioids without a legitimate prescription.

- The U.S. Food & Drug Administration, which approved a steady stream of prescription opioids as safe and effective for their intended use and thereby authorized a significant expansion of the supply of these medicines in Cabell/Huntington.

- Patients who were prescribed medicines for the treatment of pain and then deliberately or inadvertently permitted them to be diverted (e.g. by selling them, giving them away, or leaving them unsecured in a medicine cabinet).

- Persons who diverted prescription opioids and then either misused those opioids themselves or gave or sold them to others who misused them.

- Drug traffickers who illegally distributed prescription opioids in Cabell/Huntington.

- Residents of or visitors to Cabell/Huntington who used diverted prescription opioids.

- Illegal drug traffickers that distributed heroin and illicit fentanyl in Cabell/Huntington.

- Residents of or visitors to Cabell/Huntington who used illegal opioids like heroin and illicit fentanyl.

Additionally, liability under West Virginia's contribution statute is several and no defendant can be called upon to pay more than its proportionate share of fault, if any is proven. Plaintiffs cannot prove conspiracy between Defendants that would defeat several liability under the contribution statute.

ix.   <u>Plaintiffs' Purported "Abatement" Remedy Seeks Money for Programs Plaintiffs Have Never Funded and Will Not Fund in the Future.</u>

Plaintiffs' "Abatement Plan" ignores the fact that the County and City have not, do not, and will not administer or incur expenses for most all of the proposed programs.  More specifically:

- Of the total abatement costs calculated by Plaintiffs' experts, over 81% are comprised of costs to treat OUD, HIV, NAS, HCP and other purported co-morbidities, all of which costs have been and will continue in the future to be paid by non-party insurers, primarily Medicaid, to non-party healthcare providers.  None of those costs have been or ever will be borne by Plaintiffs.

- In addition to treatment costs paid by non-party payors to non-party healthcare providers, Plaintiffs' "abatement" costs also include significant costs for programs that Plaintiffs might participate in or administer, but the funding for which has been paid by grants from the federal or state governments, or other third-party sources.  This grant funding has been in the range of $1.9MM annually.  None of the grant-funded costs have ever been paid by Plaintiffs, and there is no evidence suggesting that existing grants will not be renewed.

- After those large irrelevant cost categories, what is left are minor costs that Plaintiffs have paid or contributed in-kind in responding to the opioid abuse crisis of about $136K annually. These are the only costs that potentially could be recovered by way of an abatement remedy, even if Plaintiffs could establish liability.

### 4. Statement of Contested Issues of Fact

#### a. Plaintiffs' Statement

    i. Whether Defendants' conduct set forth above constitutes a public nuisance?

    ii. Whether the opioid epidemic interferes with public health and public safety?

    iii. Whether Defendants' conduct is a contributing factor to Plaintiffs' injuries?

    iv. Whether the nuisance can be abated?

#### b. Defendants' Statement

Defendants incorporate by reference their forthcoming Proposed Findings of Fact and Conclusions of Law. In addition, and without waiver of any other disputed factual issue, Defendants identify the following contested issues of fact to be resolved at trial:

    i. Whether Defendants are responsible for the change in the standard of care for the treatment of chronic pain that began in the 1990s?

    ii. Whether the change in the standard of care for the treatment of pain led to a large increase in the medical use of prescription opioids for the treatment of chronic pain?

    iii. Whether doctors and other medical professionals determine the volume of supply of prescription opioids through their independent prescribing decisions?

    iv. Whether DEA determines the volume of supply of prescription opioids by setting quotas for the lawful manufacture of prescription opioids?

v.   Whether Defendants distributed any prescription opioids in excess of the aggregate volume of prescriptions written by doctors and other medical professionals in Cabell/Huntington?

vi.   Whether Defendants distributed any prescription opioids in excess of the annual quotas established by DEA?

vii.   Whether Defendants distributed any prescription opioids to pharmacies that lacked appropriate State licensing or DEA registration?

viii.   Whether two crimes must necessarily occur before Plaintiffs can incur any expense treating or otherwise responding to someone's misuse of diverted prescription opioids?

ix.   Whether Defendants have any control over the prescription opioids they ship after they are delivered to a pharmacy or hospital?

x.   Whether prescription opioids shipped by Defendants could be present in the community and able to cause harm absent an independent prescribing decision by a doctor or some illegal act of diversion?

xi.   Whether Defendants are able or authorized to second-guess any prescribing decisions made by doctors or other medical professionals in Cabell/Huntington?

xii.   Whether Defendants were better equipped than law enforcement to identify the activities of "pill mill" doctors or "rogue" pharmacies?

xiii.   Whether any "pill mill" doctors or "rogue" pharmacies are still operating in Cabell/Huntington?

xiv.   Whether and to what extent illegal drug trafficking has contributed to the supply of prescription opioids being misused in Cabell/Huntington?

xv.   Whether Defendants' suspicious order monitoring programs, as they evolved over time in response to shifting guidance from DEA, were in compliance with then-prevailing DEA guidance?

xvi.   Whether the majority of orders that meet the regulatory definition of "suspicious orders" are actually "suspicious" in the colloquial sense of the term?

xvii.   Whether and to what extent the prescription opioids shipped by Defendants were actually "suspicious" in the colloquial sense?

xviii.   Whether and to what extent the prescription opioids shipped by Defendants were actually diverted to illegal use?

    xix.    Whether and to what extent Defendants knew any prescription opioids shipped by Defendants would be actually diverted to illegal use?

    xx.    Whether and to what extent the prescription opioids shipped by Defendants actually caused Plaintiffs any harm?

    xxi.    Whether and to what extent illegal drug trafficking has contributed to the opioid epidemic in Cabell/Huntington?

    xxii.    Whether and to what extent other factors have contributed to the opioid epidemic in Cabell/Huntington?

    xxiii.    Whether and to what extent illegal opioids like heroin and illicit fentanyl are currently the drivers of Plaintiffs' opioid-related harm?

    xxiv.    Whether Defendants play any role in determining the price, purity, or availability of illegal opioids like heroin and illicit fentanyl?

    xxv.    Whether there is sufficient evidence to demonstrate that medical use of prescription opioids causes subsequent illegal drug use and abuse?

    xxvi.    Whether there is sufficient evidence to demonstrate that illegal drug users began their illegal drug use because of prior medical use of prescription opioids?

    xxvii.    Whether there is currently a prescription opioid epidemic in Cabell/Huntington?

    xxviii.    Whether and to what extent Plaintiffs are authorized to take abatement actions in the future?

    xxix.    Whether and to what extent the abatement remedies that Plaintiffs seek relate to treatment and other costs for Cabell/Huntington residents who currently are suffering from opioid use disorder?

    xxx.    Whether and to what extent the abatement remedies that Plaintiffs seek for services (such as drug addiction programs and treatment or medical education) that are not administered on a county-by-county basis but instead are funded and/or administered by the federal and state governments or non-governmental organizations?

**5. Contested Issues of Law, together with case and statutory citations.**

    **a.**    Plaintiffs and Defendants incorporate by reference the issues raised in the motions identified in Section 2 above and the case and statutory citations relied upon therein.

**6. Stipulations**

    **a.** The following stipulations have been entered by the parties and/or are currently being negotiated:

       i. Doc. 724 filed 7/13/2020 – Stipulation and Proposed Order Regarding Trial Witnesses

       ii. Doc. 828 filed 8/4/2020 – First Stipulation between Plaintiffs and AmerisourceBergen Drug Corporation

       iii. Doc. 835 filed 8/6/2020 – First Stipulation between Plaintiffs and Cardinal Health

       iv. Doc. 879 filed 8/21/2020 – First Stipulation between Plaintiffs and McKesson Corporation

       v. Doc. 1001 filed 9/22/2020 – Stipulated Order to File Under Seal between parties

       vi. Doc. 1025 filed 9/24/2020 – Second Stipulation between Plaintiffs and Cardinal Health

       vii. Doc. 1029 filed 9/24/2020 – Joint Trial Exhibit Stipulation between parties

       *viii. Doc. 1066-7 filed 10/2/2020 – Stipulation Regarding Authenticity of IQVIA Data between Plaintiffs and Allergan Finance, LLC*

    **b.** Additionally, the Parties are in the process of negotiating stipulations as to the authenticity of certain documents, including:

       i. Documents pertaining to the Energy & Commerce Committee's Investigation and Hearing on "Combatting the Opioid Epidemic: Examining Concerns about Distribution and Diversion," Subcommittee on Oversight and Investigations (May 8, 2018)

       ii. Documents from the Drug Enforcement Administration

       iii. Documents from other third-parties, including West Virginia state agencies and other defendants in the multi-district litigation who are non-parties here.

       iv. Documents from the Plaintiffs.

       v. Documents from AmerisourceBergen, Cardinal Health, and McKesson, respectively

       vi. Documents from the Healthcare Distribution Alliance and its predecessors

       vii. Documents from Deloitte

       viii. Dispensing data provided by the Drug Emporium

       ix. IQVIA data provided by Allergan in the multidistrict litigation

       x. ARCOS data

**7. Suggestions for the Avoidance of Unnecessary Proof and Cumulative Evidence**

    **a.** Plaintiffs incorporate by reference the suggestions set forth in Plaintiffs' Motion for a Bench Trial Management Order (Doc. # 230).

8. **Suggestions Concerning Any Need for Adopting Special Procedures for Managing Potentially Difficult or Protracted Aspects of the Trial that may Involve Complex Issues, Multiple Parties, Difficult Legal Questions, or Unusual Proof Problems**

   a. Plaintiffs propose that the Court allow witnesses who are unable to appear live due to COVID-19-related circumstances to testify via live video conference.

   b. Defendants' position is that Plaintiffs' apparent desire to utilize remote live video conferencing technology does not supersede the requirements of the Federal Rules of Civil Procedure, specifically Rule 45. Defendants object to any attempt to circumvent the governing rules.

9. **A list of Special *Voir Dire* Questions, if any, that counsel request be asked of the jury panel**

   a. N/A

10. **A statement setting forth a realistic estimate of the number of trial days required.**

    a. Plaintiffs estimate requiring approximately 31 days.

11. **Any Courtroom Technology Requested for Use at Trial**

    a. Plaintiffs will notify the court's technology staff concerning any courtroom technology they intend to use at least seven (7) days prior to the scheduled commencement of trial.

12. **Any Other Matters Relevant for Pretrial Discussion or Disposition**

    a. Pursuant to the scheduling order, the parties are developing proposed findings of fact and conclusions of law that will provide more detail.

Dated:  October 7, 2020                              Respectfully submitted,


THE CITY OF HUNTINGTON                    CABELL COUNTY COMMISSION

/s/ *Anne McGinness Kearse*                    /s/ *Paul T. Farrell, Jr.*
Anne McGinness Kearse (WVSB No. 12547)    Paul T. Farrell, Jr., Esq. (WVSB No. 7443)
**MOTLEY RICE LLC**                           **FARRELL LAW**
28 Bridgeside Blvd.                           P.O. Box 1180
Mount Pleasant, SC 29464                      Huntington, WV 25714-1180
Tel:  843-216-9000                            422 Ninth Street, 3rd Floor
Fax:  843-216-9450                            Huntington, West Virginia 25701
akearse@motleyrice.com                        office: 304.523.7285
                                              cell: 304.654.8281
                                              email: paul@farrell.law

**INSPECTED BY:**

**Defendant** *McKesson Corporation*
By Counsel:

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO
PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*/s/ Carol Dan Browning*
Carol Dan Browning
Stites & Harbison, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202
Tel: (502) 587-3400
cbrowning@stites.com

*/s/ Timothy C. Hester*
Timothy C. Hester
Mark H. Lynch
Christian J. Pistilli
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
mlynch@cov.com
cpistilli@cov.com
lflahivewu@cov.com

**INSPECTED BY:**

***Cardinal Health, Inc.***
By Counsel:

*/s/ Steven R. Ruby*
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
CAREY DOUGLAS KESSLER & RUBY PLLC
707 Virginia St., E., Ste. 901
Charleston, West Virginia 25301
Telephone: (304) 345-1234
Facsimile: (304) 342-1105

/s/ Enu Mainigi
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard @wc.com
ahardin@wc.com

**INSPECTED BY:**

***AmerisourceBergen Drug Corporation***
By Counsel:

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
Joseph J. Mahady
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com
jmahady@reedsmith.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 7, 2020, the foregoing *PROPOSED PRE-TRIAL ORDER* was filed electronically via the CM/ECF electronic filing system and served on all counsel via email to plaintiffs' listserv at mdl2804discovery@motleyrice.com and defendants' listservs at track2opioiddefendants@reedsmith.com.

/s/ Anthony J. Majestro
Anthony J. Majestro (WV Bar No. 5165)
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com