# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON,**
    Plaintiff,
v.
**AMERISOURCE BERGEN DRUG CORPORATION, et al.,**
    Defendants.

Civil Action No. 3:17-cv-01362

---

**CABELL COUNTY COMMISSION,**
    Plaintiff,
v.
**AMERISOURCE BERGEN DRUG CORPORATION, et al.,**
    Defendants.

*Consolidated case:*
Civil Action No. 3:17-cv-01665

**PLAINTIFFS' <u>UNDER SEAL</u> APPENDIX OF EXHIBIT A IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF DR. ANDREW KOLODNY**

This Appendix consists of the attached Exhibit A (excerpts from the deposition of Dr. Andrew Kolodny taken in the Ohio Attorney General's litigation). These materials are filed under seal.

Dated: October 23, 2020              Respectfully submitted,

| | |
|---|---|
| **THE CITY OF HUNTINGTON** | **CABELL COUNTY COMMISSION** |
| /s/ *Anne McGinness Kearse* | /s/ *Paul T. Farrell, Jr.* |
| Anne McGinness Kearse | Paul T. Farrell, Jr. |
| WVSB No. 12547 | WVSB Bar No. 7443 |
| Joseph F. Rice | **FARRELL LAW** |
| **MOTLEY RICE LLC** | 422 Ninth Street, 3rd Floor (25701) |
| 28 Bridgeside Blvd. | PO Box 1180 |
| Mount Pleasant, SC 29464 | Huntington, West Virginia 25714-1180 |
| Tel: 843-216-9000 | Mobile: 304-654-8281 |
| Fax: 843-216-9450 | paul@farrell.law |
| akearse@motleyrice.com | |
| jrice@motleyrice.com | /s/ *Anthony J. Majestro* |
| | Anthony J. Majestro |
| Linda Singer | WVSB No. 5165 |
| David I. Ackerman | **POWELL & MAJESTRO, PLLC** |
| **MOTLEY RICE LLC** | 405 Capitol Street, Suite P-1200 |
| 401 9th Street NW, Suite 1001 | Charleston, WV 25301 |
| Washington, DC 20004 | 304-346-2889 / 304-346-2895 (f) |
| Tel: 202-232-5504 | amajestro@powellmajestro.com |
| Fax: 202-386-9622 | |
| lsinger@motleyrice.com | Michael A. Woelfel |
| dackerman@motleyrice.com | WVSB No. 4106 |
| | **WOELFEL AND WOELFEL, LLP** |
| | 801 Eighth Street |
| Charles R. "Rusty" Webb | Huntington, West Virginia 25701 |
| WV No. 4782 | Tel. 304.522.6249 |
| **THE WEBB LAW CENTRE** | Fax. 304.522.9282 |
| 716 Lee Street, East | mikewoelfel3@gmail.com |
| Charleston, West Virginia 25301 | |
| Telephone: (304) 344-9322 | |
| Facsimile: (304) 344-1157 | |
| rusty@rustywebb.com | |

On Brief:

Jennifer Scullion
Nigel Halliday

**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, NJ 07305
(973) 639-9100

Andrea Bierstein
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
212-257-8482
abierstein@simmons.com

Paulina do Amaral
**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  212-355-9500
Fax:  212-355-9592
pdoamaral@LCHB.com

## CERTIFICATE OF SERVICE

    I certify that on October 23, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to:

Track2OpioidDefendants@ReedSmith.com and CT2_Opioid_Team@mail-list.com.


                                                                                      */s/ Anthony J. Majestro*

# Exhibit A

```
 1              IN THE COURT OF COMMON PLEAS
 2                 MADISON COUNTY, OHIO
 3
 4              ~~~~~~~~~~~~~~~~~~~~
 5
         STATE OF OHIO, Ex Rel.
 6       Dave Yost, in his Capacity
         as Attorney General of the
 7       State of Ohio,
 8
                 Plaintiff,
 9
10           vs.                Case No.
11                              CVH-20180055
12       MCKESSON CORPORATION,
         et al.,
13
14               Defendants.
15
16              ~~~~~~~~~~~~~~~~~~~~
17
              Remote videotaped deposition of
18                ANDREW J. KOLODNY, M.D.
19
20                   July 21, 2020
                      9:33 a.m.
21
22
23           Renee L. Pellegrino, RPR, CLR
24              (Appearing remotely from
25                Cuyahoga County, Ohio)
```

## Page 2

1  REMOTE APPEARANCES:
2
   On behalf of the Plaintiff:
3  Keating Muething & Klekamp PLL
   GREGORY M. UTTER, ESQ.
4  COLLIN L. RYAN, ESQ.
   One East 4th Street
5  Suite 1400
   Cincinnati, Ohio  45202
6  (513) 579-6400
   gmutter@kmklaw.com
7       - and -
   Gilbert LLP
8  MONIQUE ABRISHAMI, ESQ.
   1100 New York Avenue, N.W.
9  Suite 700
   Washington, D.C.  20005
10 (202) 772-2285
   neelym@gilbertlegal.com
11
12 On behalf of Cardinal Health:
   Williams & Connolly
13 COLLEEN McNAMARA, ESQ.
   J. ANDREW KEYES, ESQ.
14 STEVEN M. PYSER, ESQ.
   725 Twelfth Street NW
15 Washington, D.C.  20005
   (202) 434-5186
16 cmcnamara@wc.com
   jkeyes@wc.com
17
18         ~ ~ ~ ~
19
20
21
22
23
24
25

## Page 3

1  APPEARANCES, CONT'D:
2
   On behalf of AmerisourceBergen Drug Corporation:
3  Reed Smith LLP
   MELISSA A. GEIST, ESQ.
4  506 Carnegie Center
   Suite 300
5  Princeton, New Jersey  05840
   (609) 987-0050
6  mageist@reedsmith.com
        - and -
7  Reed Smith LLP
   CHRISTINA M. VITALE, ESQ.
8  811 Main Street
   Suite 1700
9  Houston, Texas  77002-6110
   (713) 469-3800
10 cmvitale@reedsmith.com
11 On behalf of McKesson Corporation:
   Covington & Burling
12 EMILY ULLMAN, ESQ.
   One CityCenter
13 850 Tenth Street, NW
   Washington, D.C.  20001-4956
14 (202) 662-5755
   eullman@cov.com
15
16 ALSO PRESENT:
17 BoB Jorisesen, Videographer
18
19         ~ ~ ~ ~
20
21
22
23
24
25

## Page 4

1         TRANSCRIPT INDEX
2
3  APPEARANCES ...................2
4  INDEX OF EXHIBITS ............5
5  INDEX OF OBJECTIONS ..........7
6
7  EXAMINATION OF ANDREW J. KOLODNY, M.D.:
8  BY MS. McNAMARA ..............10
9  BY MS. ULLMAN ..............227
10 BY MS. GEIST ................272
11
12 AFTERNOON SESSION ...........111
13
14 REPORTER'S CERTIFICATE ......304
15
16 EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

## Page 5

1         INDEX OF EXHIBITS
2
3  Number      Description         Marked
4
5  Exhibit 1   Dr. Andrew J. Kolodny Expert    14
               Report
6
   Exhibit 2   Letter from State to Defendants  17
7              Re:  Kolodny Supplement dated
               July 13, 2020
8
   Exhibit 3   Cardinal Health Service Flash    54
9              dated July 18, 2016
10 Exhibit 4   E-Mail String                    54
11 Exhibit 5   E-Mail String                    55
12 Exhibit 6   McKesson Manufacturer Marketing  55
               Contract Product Promotional
13             Agreement
14 Exhibit 7   Document Entitled "Introducing   55
               Making Connections Pain
15             Management Program"
16 Exhibit 8   McKesson Manufacturer Marketing  56
               Product Promotional Agreement
17
   Exhibit 9   E-Mail String                    56
18
   Exhibit 10  E-Mail String                    57
19
   Exhibit 11  AmerisourceBergen Statement of   58
20             Work Beginning Bates
               ABCDMDL00002141
21
   Exhibit 12  AmerisourceBergen Statement of   58
22             Work Beginning Bates
               ABCDMDL00002128
23
   Exhibit 13  Article Entitled "The Surprising  58
24             Morality of Opioid Distribution"
25

Page 78
1    A.   My expert opinion is informed by
2  what the clients failed to do by law.
3    Q.   I'll move to strike it again.
4         Are you offering an expert opinion
5  on what specifically the Ohio Controlled
6  Substances Act requires distributors to do?
7    A.   I'm not offering --
8         MR. UTTER:  Objection.  Excuse me.
9  Sorry, Dr. Kolodny.
10        Objection.  The question has been
11 repeatedly asked.
12        Go ahead, you can answer it one
13 more time, Doctor, and then we're going to move
14 on because I believe he's appropriately
15 answered your question.  I know you don't
16 believe that, but you can't continue to harass
17 the witness with the same question over and
18 over when he gives an answer you don't like.
19        Go ahead, Doctor.
20        MS. McNAMARA:  Mr. Utter, to be
21 clear, I have no problem with his answer except
22 that it doesn't answer my actual question.  So
23 if we want to mark it and raise it with Judge
24 McMonagle, that's fine, but, I mean, we spent
25 ten minutes on two of the simplest questions in

Page 79
1  the entire deposition.
2  BY MS. McNAMARA:
3    Q.   So I will ask it again, Doctor.
4         Are you offering an expert opinion
5  on what distributors are required to do under
6  the Ohio Controlled Substances Act?
7    A.   I'm not a lawyer.  I'm not an
8  expert on the Ohio Controlled Substances Act.
9  I'm offering an opinion informed by facts and
10 facts including the fact that your client did
11 not follow the law and was fined millions of
12 dollars for failing to do so.
13   Q.   In your professional career you've
14 never held a position focused on regulatory
15 compliance, correct?
16   A.   I have never had a position working
17 as a compliance officer, if that's what you're
18 asking.
19   Q.   Yes.
20        You've never worked for DEA,
21 correct?
22   A.   I've never been employed by the --
23 well, I think I -- no, I've never been an
24 employee of the DEA.
25   Q.   Have you done any consulting or --

Page 80
1  have you done any consulting work for DEA?
2    A.   I think they -- I don't think I've
3  done consulting work for them.  I appeared -- I
4  think they were doing prevention education
5  videos, and they were looking -- I think I was
6  an expert in a video produced by the DEA for
7  high school students.
8    Q.   And you've never worked for the Ohio
9  Board of Pharmacy, correct?
10   A.   Never been employed by the Ohio
11 Board of Pharmacy.
12   Q.   Prior to your expert work in opioid
13 litigation, were you aware of a federal
14 regulation requiring distributors to design and
15 operate a system to identify and report
16 suspicious orders of controlled substances?
17   A.   Prior to my work on this
18 litigation, was I --
19   Q.   Yes.
20   A.   -- aware that there were
21 requirements, yes, I was.
22   Q.   How did you become aware of that?
23   A.   I became aware of that when the
24 first lawsuits were filed against distributors,
25 and from media coverage.  And so I did

Page 81
1  ultimately become more familiar with
2  requirements for distributors.
3    Q.   Had you -- have you ever reviewed
4  that federal regulation relating to suspicious
5  orders, which is 21 CFR Section 1301.74(b)?
6  Have you ever reviewed the actual regulation?
7    A.   I'm familiar with it.  I have an
8  understanding of it.  And I've read parts of
9  it.  I don't recall ever printing it out from
10 beginning to end and reading through it and
11 might be -- some of it, I'm guessing, would be
12 not totally clear to someone who is not a
13 lawyer, but there's certainly parts of it that
14 I'm familiar with it, and I have a basic
15 understanding, which I don't think requires a
16 degree in law, of what the obligations are for
17 a DEA registrant.  And I am a DEA registrant so
18 I have some understanding of obligations of DEA
19 registrants.
20   Q.   Have you ever reviewed any Ohio
21 regulations relating to distributors designing
22 and operating a system to identify and report
23 suspicious orders to the Ohio Board of Pharmacy?
24   A.   I don't recall.  I don't recall
25 doing that.  I don't recall reading the Ohio

Page 82

```
 1  regulations.
 2      Q.  And you are not offering an expert
 3  opinion on the specific obligations of
 4  distributors under either the federal or state
 5  suspicious order regulations, correct?
 6      A.  I'm offering an expert opinion
 7  informed by facts, including the fact that your
 8  client and your co-Defendants failed in its
 9  obligations as DEA registrants and
10  understanding of the fact that your client
11  filled orders that it should not have filled.
12  So those facts influence my opinion.
13      Q.  So I think -- and I'll move to
14  strike that because it didn't respond to my
15  question.  But you mentioned you're relying on
16  facts that distributors failed.  Did I hear
17  you -- was that part of what you said?
18      A.  Yes, I think that's what I said.
19      Q.  Okay.  So when you say we failed,
20  what standard are you applying to assess whether
21  or not we were compliant?
22      A.  It's with a basic, not an expert,
23  but a basic understanding of the requirements
24  for distributors to have a system in place such
25  that a suspicious order would be reported to
```

Page 83

```
 1  the DEA and not filled.  And I am aware of the
 2  fact that your client and your co-Defendants
 3  filled orders it should not have filled, and
 4  I'm aware of the impact that that had on the
 5  people of the state of Ohio and that -- and I'm
 6  aware that people in Ohio have become addicted
 7  and lost their lives to opioid overdoses
 8  because of that behavior.
 9      Q.  You're not offering an expert
10  opinion on the regulations that govern
11  distributors, right?  All that is based on your
12  basic understanding?
13      A.  I have a basic understanding of the
14  legal requirements for DEA registrants, a basic
15  understanding of what those requirements are
16  for distributors of narcotics, an understanding
17  that distributors are required by law to have a
18  system in place that would accurately detect an
19  increase in volume or frequency or change, and
20  that at the lightest indication of something,
21  you know, that could represent a red flag, that
22  the order doesn't get filled and the DEA gets
23  notified and that that pharmacy gets
24  investigated.
25          And so I'm aware of those facts,
```

Page 84

```
 1  and I'm aware of the fact that your client and
 2  your co-Defendants fill those orders and orders
 3  that it should not have filled.  And I'm aware
 4  of the fact that the oversupply of opioids
 5  resulted in a public health catastrophe.
 6      Q.  So I'm going to move to strike your
 7  speech.
 8          What did you review to support your
 9  conclusion that distributors filled orders they
10  should not have filled?
11      A.  I mainly relied on the expert
12  report of Mr. Rannazzisi, but also just
13  knowledge from what's been reported in the
14  media on other cases.  So when literally
15  millions of pills flow into a pharmacy in a
16  small town in the middle of nowhere and those
17  pills are trucked in by your client and your
18  clients' co-Defendants, there's obviously
19  something very wrong with that.
20          So it doesn't require an expert or
21  a lawyer to recognize that your client and your
22  co-Defendants pumped millions of pills into
23  small towns that were devastated by opioids.
24  That's common knowledge.
25      Q.  And in terms of your general
```

Page 85

```
 1  understanding that, as you've been saying, that
 2  distributors failed in their regulatory
 3  obligations, is that also based on
 4  Mr. Rannazzisi's report and information you
 5  learned from the media?
 6      A.  Mr. Rannazzisi's report and reports
 7  in the media and newspaper articles have helped
 8  inform my decision -- my -- have helped inform
 9  my opinion.
10      Q.  You referred a few times to millions
11  of pills being pumped into small towns.  What
12  specific small towns are you referring to in
13  Ohio?
14      A.  I would have to -- off the top of
15  my head, I can't give you the names of those
16  small towns.
17      Q.  And they're not in your report,
18  correct?
19      A.  I don't believe my report mentions
20  any small towns in the state of Ohio that were
21  flooded with pills from your client.
22      Q.  You can't identify a single small
23  town in Ohio that was flooded with pills today,
24  correct?
25      A.  I think I could if you -- with some
```

22 (Pages 82 - 85)