**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| CITY OF HUNTINGTON, | Civil Action No. 3:17-cv-01362 |
| Plaintiff, | |
| v. | |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | |
| Defendants. | |
| CABELL COUNTY COMMISSION, | *Consolidated case:* |
| Plaintiff, | Civil Action No. 3:17-01665 |
| v. | |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | Hon. David A. Faber |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION EXCLUDE THE EXPERT TESTIMONY OF**
**<u>GEORGE BARRETT</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 1

II.     BACKGROUND ................................................................. 2

III.    LEGAL STANDARD ........................................................... 3

IV.     ARGUMENT ..................................................................... 4

        A.      Defendants Ignore the Scope of Mr. Barrett's Assignment
                and Opinions. .......................................................... 4

        B.      Defendants Cite No Authority Supporting Their Claimed
                Offsets. .................................................................. 6

        C.      The Collateral Source Rule Precludes Any Offset for
                Funding Received from Other Sources. ......................... 7

        D.      Even If Some Offsets Were Permissible, Defendants Have
                Not Provided Any Reason to Exclude Mr. Barrett's
                Opinions. ............................................................... 13

V.      CONCLUSION ................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                  **Page(s)**

*Bigelow v. RKO Radio Pictures,*
    327 U.S. 251 (1946) ........................................................................... 13

*Bouygues Telecom, S.A. v. Tekelec,*
    472 F. Supp. 2d 722 (E.D.N.C. 2007) .................................................. 15

*City of Milwaukee v. NL Indus.,*
    762 N.W.2d 757 (Wis. Ct. App. 2008) .................................................. 8

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ........................................................... 3, 4, 12, 14

*Duff v. Morgantown Energy Assocs. (M.E.A.),*
    421 S.E.2d 253 (W. Va. 1992) .............................................................. 9

*Grant Thornton, LLP v. Fed. Deposit Ins. Corp.,*
    Nos. 1:00-0655, 1:03-2129, 1:04-0043, 2007 WL 4591412
    (S.D. W. Va. May 6, 2007) ..................................................... 3, 12, 14, 15

*Hylind v. Xerox Corp.,*
    481 F. App'x 819 (4th Cir. 2012) ......................................................... 9

*Ilosky v. Michelin Tire Corp.,*
    307 S.E.2d 603 (W. Va. 1983) .............................................................. 8

*Kenney v. Liston,*
    760 S.E.2d 434 (W. Va. 2014) ...................................................... *passim*

*In re Nat'l Prescription Opiate Litig.,*
    No. 1:17-md-2804, 2019 WL 4043938 (N.D. Ohio Aug. 26, 2019) .................. 2, 13

*Rhodes v. E.I. du Pont de Nemours & Co.,*
    657 F. Supp. 2d 751 (S.D. W. Va. 2009) .............................................. 9

*State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.,*
    488 S.E.2d 901 (W. Va. 1997) ......................................................... 6, 9

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
    282 U.S. 555 (1931) ........................................................................... 13

*In re Taxotere (Docetaxel) Prods. Liab. Litig.,*
    MDL No. 16-2740, 2019 WL 3817658 (E.D. La. Aug. 14, 2019) ............ 15

*Town of E. Troy v. Soo Line R.R. Co.*,
653 F.2d 1123 (7th Cir. 1980) ................................................................. 8

*U.S. Equal Emp't Opportunity Comm'n v. CONSOL Energy, Inc.*,
No. 1:13CV215, 2016 WL 538478 (N.D. W. Va. Feb. 9, 2016),
*aff'd*, 860 F.3d 131 (4th Cir. 2017)...................................................... 9, 11

**Other Authorities**

*Restatement (Second) of Torts* § 920A........................................................ 8

# I.     INTRODUCTION

Plaintiffs' expert George Barrett, a forensic economist from Hurricane, West Virginia, offers opinions that quantify the total costs of implementing the Abatement Plan designed by Plaintiffs' abatement expert, Dr. Caleb Alexander.[1] Defendants' narrow motion to exclude Mr. Barrett's testimony is notable for what it does not do. It does not challenge Mr. Barrett's qualifications. It does not challenge the costs or other data inputs Mr. Barrett selected. It does not challenge Mr. Barrett's calculations or provide any basis to question the reliability of his conclusion that implementing Dr. Alexander's Abatement Plan would cost $2.589 billion between 2021 and 2035. In short, Defendants have not actually challenged the accuracy or reliability of any of Mr. Barrett's opinions.

Instead, Defendants use this motion to prematurely raise disputed issues of law and fact. Specifically, they argue they are entitled to offsets from the costs of abatement merely because other entities have already begun to bear the burden and cost of confronting the opioid epidemic Defendants created. While these claimed offsets are improper as a matter of law, the pertinent point here is that they have *nothing* to do with the reliability or admissibility of Mr. Barrett's opinions.

Mr. Barrett did not address existing abatement programs because they were irrelevant to his assignment. Mr. Barrett was asked to calculate the total cost of all components of Dr. Alexander's Abatement Plan, *regardless* of who would ultimately

---

[1] *See* Expert Report of George Barrett (Aug. 3, 2020) ("Barrett Report") ¶ 5, Expert App'x, Dkt. # 1097, Exh. 2.a.

1

perform the work or bear the cost. Moreover, even if the Court were to allow offsets for existing programs or funding, Mr. Barret's opinions still fit the case and would help the Court because the Court would need to understand the full cost of the Abatement Plan before it could determine Defendants' required contributions net of any offset. Judge Polster agreed in rejecting a virtually identical challenge to analogous expert opinions in the opioid MDL. *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4043938, at *3 (N.D. Ohio Aug. 26, 2019) ("The Court agrees with Plaintiffs that testimony regarding the 'full cost of abating the public nuisance' is relevant and will help the Court understand the scope of what it will take to remedy the opioid crisis."). Defendants' motion to exclude should be denied.

## II.    BACKGROUND

Mr. Barrett is a forensic economist from Hurricane, West Virginia, who focuses on calculations of economic damages and serves on the board of referees for the Journal of Forensic Economics and the Journal of Legal Economics. Barrett Report ¶¶ 6-10. He has provided expert testimony in numerous civil cases nationwide. *Id.* His research on incremental cost issues of life care planning, medical monitoring, punitive damages, and other aspects of forensic economics has been published in numerous peer-reviewed journals and textbooks. *Id.* ¶ 7.

Mr. Barrett was retained by Plaintiffs "to quantify the total cost of Dr. Alexander's Abatement Plan for a 15-year period, from 2021 to 2035." *Id.* ¶ 5. Dr. Alexander's Abatement Plan is a comprehensive plan to abate the opioid epidemic in the City of Huntington and Cabell County (the "Cabell Huntington Community"), and includes four major categories of needed services: (1) prevention; (2) treatment;

2

(3) recovery; and (4) addressing the needs of special populations. *Id.* ¶ 18. In calculating the costs of these services over a 15-year period, Mr. Barrett was asked to "precisely follow the interventions listed in Dr. Alexander's Abatement Plan, including his projections of target population needs and medical costs." *Id.* ¶ 14. Mr. Barrett drew on established principles of applied economics and used national and local cost data, together with inflationary rate data, to calculate the cost of each component of the Abatement Plan for each year between 2021 and 2035. *Id.* ¶¶ 14, 20-26. Mr. Barrett further had numerous conversations with government employees, professors, other experts, and local witnesses in Huntington to gather additional information and to confirm the reasonableness of his cost calculations. *Id.* ¶ 23. Mr. Barrett calculated the costs of each category of service, and each sub-component thereof, and found that the cost of implementing Dr. Alexander's Abatement Plan over the next 15 years would total $2,589,054,447. *Id.* ¶ 15.

### III.   LEGAL STANDARD

Plaintiffs incorporate the legal standard set forth in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion Exclude the Expert Testimony of Andrew Kolodny, filed contemporaneously herewith. Additionally, because abatement is an equitable remedy for which the Court, not the jury, is the ultimate trier of fact, the Court has particularly broad discretion when deciding whether to admit abatement-related experts. *See, e.g., Grant Thornton, LLP v. Fed. Deposit Ins. Corp.*, Nos. 1:00-0655, 1:03-2129, 1:04-0043, 2007 WL 4591412, at *1 (S.D. W. Va. May 6, 2007) (Faber, J.). Regardless, Mr. Barrett's opinions are fully admissible even under ordinary *Daubert* standards.

# IV.    ARGUMENT

Defendants criticize Mr. Barrett for failing to account for existing, third-party sources of funding for opioid-related abatement activities, including programs provided by third parties in the Cabell Huntington Community. This critique fails for numerous reasons, as detailed below. First, Defendants ignore the narrow scope of Mr. Barrett's assignment and opinions, which are limited to calculating the cost of Dr. Alexander's Abatement Plan, *regardless of who bears the cost of paying for abatement*. Second, Defendants cite no authority supporting their claim to offsets from the costs of abating the public nuisance they have caused. Third, the collateral source rule under West Virginia law precludes any such offset. Finally, even if Defendants were entitled to any offsets, they still have not provided any reason to exclude Mr. Barrett's opinions under applicable *Daubert* standards.

## A.    Defendants Ignore the Scope of Mr. Barrett's Assignment and Opinions.

Mr. Barrett was retained by Plaintiffs "to quantify the total costs of Dr. Alexander's Abatement Plan for a 15-year period, from 2021 to 2035." Barrett Report ¶ 5. He was not asked to opine on the appropriateness of Dr. Alexander's Abatement Plan or to provide his own opinions as to what an appropriate abatement plan would look like. Indeed, because he was "asked to precisely follow the interventions listed in Dr. Alexander's Abatement Plan," Mr. Barrett "did not alter any components of his plan or otherwise deviate from it." *Id.* ¶ 14.

As Defendants concede,[2] Mr. Barrett's report demonstrates he is aware of existing programs and existing sources of funding for programs addressing the opioid crisis in the Cabell Huntington Community, including government and private sector sources. *See* Barrett Report ¶ 25. However, the Abatement Plan proposed by Dr. Alexander is intended to present a complete picture of the effort necessary to abate the entire epidemic in the Cabell Huntington Community.[3] Accordingly, Mr. Barrett's opinion quantifies the complete cost of the effort necessary to abate the entire epidemic in the Cabell Huntington Community.

Mr. Barrett explains that his "cost calculations reflect the interventions identified by Dr. Alexander's Abatement Plan as necessary to serve the Cabell Huntington Community, regardless of which entity would be funding or delivering the services." Barrett Report ¶ 25. *See also* Barrett Dep. 46:6-17, 163:11-164:10, Sept. 21, 2020 (Exhibit 1) ("[T]hroughout the course of my work in this case, who has paid for and who is going to pay for is not my opinion. I don't have any conclusions or any say on that. These are simply the dollars that are necessary to pay for the things that have been identified by Doctor Alexander."). Because Mr. Barrett does not opine as to whether Defendants should bear the entire cost of

---

[2] *See* Mem. of Law in Supp. of Defs.' Mot. to Exclude the Expert Testimony of George Barrett ("Mem.") 7, Dkt. # 1060.

[3] As Dr. Alexander explained in his report: "Here and throughout, while I suggest remedies that should be included as part of a comprehensive abatement plan, and while I consider programs that are already underway, I leave it to the Community to determine the degree to which further investment should be undertaken." Expert App'x, Dkt. # 1097, Exh. 1.a at ¶ 36 (footnote omitted).

abatement, the fact that there exist third-party sources of funding for existing abatement activities simply has nothing to do with his opinions.

**B.    Defendants Cite No Authority Supporting Their Claimed Offsets.**

Under the abatement remedy, Defendants are liable, not for paying a particular dollar amount (i.e., damages), but for abating the public nuisance they created. Thus, Plaintiffs seek to have the Court create and supervise a trust—funded by Defendants—that would be used to abate the nuisance in the Cabell Huntington Community. Defendants nonetheless believe they are entitled to offsets from the amounts they must contribute to these abatement efforts merely because certain actors (the federal and state governments, private insurance, etc.) have already been forced to shoulder the costs of addressing the opioid epidemic. That is not the case, and Defendants cite no authority supporting their novel theory. Defendants' wrongdoing has already imposed massive externalized costs in the Cabell Huntington Community and indeed across the country. They should not be permitted to continue to force the Cabell Huntington Community to bear the costs of abating the public nuisance they created. Accordingly, there is nothing prejudicial (or irrelevant) about allowing testimony on the full cost of abating the public nuisance.

Defendants relatedly criticize Mr. Barrett for not considering "to what extent the Cabell Huntington Community has existing programs which may overlap with Dr. Alexander's 'Abatement Plan.'" Mem. 7 (quoting Barrett Report ¶ 25). They reference a number of current programs that are *presently* funded and/or administered by entities other than the City and County, including continuing

6

medical education programs, treatment of OUD, foster care services, the Women, Infants, and Children program, and special education. *Id.* at 8-9. But these programs are expending resources on opioid-related issues only because of Defendants' public nuisance. The opioid epidemic in Cabell Huntington Community has affected the general public. The burden of the epidemic has been borne by the community as a whole, including law enforcement, first responders, healthcare workers, employers, and local governments. The fact that the community has been forced to establish "existing programs" to address the epidemic is nothing more than further evidence of the public nuisance.

Plaintiffs may bring an action to abate this public nuisance. *See, e.g.*, *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 925 (W. Va. 1997). The fact that certain entities within Cabell Huntington Community have previously adopted programs to address the opioid epidemic does not reduce or otherwise alter the scope of the programs necessary to properly abate this public nuisance on an ongoing basis. Defendants cite no authority for the premise that they can avoid paying for abatement merely because certain abatement activity began prior to entry of judgment.

## C. The Collateral Source Rule Precludes Any Offset for Funding Received from Other Sources.

Defendants' attempts to avoid paying for abatement are also barred by the collateral source rule. Under West Virginia law, "payments made to or benefits conferred upon an injured party from sources other than the tortfeasor … do not reduce the tortfeasor's liability," even if such payments cover part or all of the harm

for which the tortfeasor is liable. *Kenney v. Liston*, 760 S.E.2d 434, 440 (W. Va. 2014) (citing *Restatement (Second) of Torts* § 920A (1979)).[4] But that is precisely what Defendants seek here. Defendants claim that Mr. Barrett should have deducted the value of funding and services provided by third parties from the cost of Dr. Alexander's Abatement Plan. For example, Defendants claim that treatment costs "will continue … to be paid by non-party insurers, primarily Medicaid," and that "costs for prevention and response programs that the County or City might participate in or administer … are funded by grants from the federal or state governments." Mem. 1-2. *See also id.* 4-5. These arguments are barred as a matter of law under the collateral source rule.

The third-party payments and programs addressed by Defendants are fully consistent with the types of third-party funding covered by the collateral source rule. The *Kenney* court set forth an extensive list of examples, including payments from "sources as diverse as life insurance, health insurance, accident insurance, … gratuitous nursing care by a relative, charity, … disability insurance, veteran's and military hospitals, tax savings, … or other government programs like Medicare and Medicaid." 760 S.E.2d at 442-44 (citations omitted). "This list is not absolute. … 'The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him.'" *Id.* at 441 n.25

---

[4] *See also* Pls.' Mot. in Limine to Preclude Evidence, Testimony, Statements, or Arguments Pertaining to Any Payments the Plaintiffs Received from Collateral Sources. Dkt. # 1006.

(quoting *Restatement (Second) of Torts* § 920A, cmt. b). And the rule applies to cash payments as well as to the provision of services. *Id.* at 442.

Although Defendants acknowledge the existence of the collateral source rule in a single footnote, Mem. 9 n.3, they offer only two cursory responses, both of which are meritless. First, they contend that the collateral source rule "is applicable only in actions for *damages*, and is inapplicable in this action seeking equitable relief." *Id.* But they do not cite any authority supporting this assertion. The sole case they cite explained that the collateral source rule precludes the reduction of damage awards, *Ilosky v. Michelin Tire Corp.*, 307 S.E.2d 603, 615 (W. Va. 1983), but it did not address whether the collateral source rule would apply to prevent reductions in the value of equitable relief. The Supreme Court of Appeals of West Virginia more recently made clear the broad applicability of the collateral source rule. Although it also addressed the rule in the context of damages, it described the general principles that "'[[b]enefits from collateral sources] do not have the effect of *reducing the recovery against the defendant*'" and that the purpose of the rule is to "requir[e] tortfeasors to make right their wrongful acts." *Kenney*, 760 S.E.2d at 440, 445 (first alteration in original) (emphasis added) (citations omitted). It relied heavily on the Restatement of Torts, which addresses how "[p]ayments made to or benefits conferred on the injured party from other sources are not credited *against the tortfeasor's liability*[.]" *Id.* at 440 n.11 (emphasis added) (quoting *Restatement (Second) of Torts* § 920A (1979)). These principles are just as applicable to the abatement of a public nuisance as they are to damages.

Accordingly, courts in jurisdictions with similarly robust collateral source rules have applied the rule in nuisance abatement actions to exclude evidence of collateral source payments, including government grants. *See, e.g.*, *Town of E. Troy v. Soo Line R.R. Co.*, 653 F.2d 1123, 1132 (7th Cir. 1980) (evidence of HUD grant barred by collateral source rule in public nuisance action); *City of Milwaukee v. NL Indus.*, 762 N.W.2d 757, 778 (Wis. Ct. App. 2008) (collateral source rule should have barred evidence of federal and state grants received by the Milwaukee Health Department to help finance its abatement and prevention programs). And still other courts have applied the collateral source rule in other actions seeking equitable monetary relief.[5]

For their second argument, Defendants contend that "the collateral source rule only applies to payments received *by plaintiffs*" and does not apply to collateral payments for opioid related medical treatment "paid directly from non-party insurers to non-party healthcare providers." Mem. 9 n.3 (emphasis added). As a preliminary matter, this argument on its face does not preclude the application of the collateral source rule to funds received directly by the City or County, including state and federal grants. In any event, Defendants' narrow reading of the collateral source rule ignores the nature of Plaintiffs' public nuisance claim.

---

[5] *See, e.g.*, *Hylind v. Xerox Corp.*, 481 F. App'x 819, 825 (4th Cir. 2012) (applying collateral source rule in the context of equitable back pay award under Title VII); *U.S. Equal Emp't Opportunity Comm'n v. CONSOL Energy, Inc.*, No. 1:13CV215 (STAMP), 2016 WL 538478, at *15 (N.D. W. Va. Feb. 9, 2016), *aff'd*, 860 F.3d 131 (4th Cir. 2017) (same).

A public nuisance is "'an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons,'" *Duff v. Morgantown Energy Assocs. (M.E.A.)*, 421 S.E.2d 253, 257 (W. Va. 1992) (citation omitted), including interference with the public health, *see, e.g.*, *Kermit Lumber*, 488 S.E.2d at 925; *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 768 (S.D. W. Va. 2009). The opioid epidemic has harmed the public health and imposed enormous personal and financial costs on the community at large, including on the healthcare providers and first responders who treat opioid-related illnesses.[6] Accordingly, Dr. Alexander's Abatement Plan will benefit the public at large by abating the public effects of the opioid epidemic in the Cabell Huntington Community.

In this setting, where relief is sought to benefit the community for harms to the community, the collateral source rule should preclude offsets for collateral benefits conveyed on the community. Defendants cite *no* authority rejecting the application of the collateral source rule in this setting. Instead, Defendants merely rely on general language in a treatise describing how, in the context of individual damage actions, the collateral source rule addresses collateral payments "received by plaintiffs." Mem. 9 n.3. Defendants' argument elevates form over substance. Because the public has been harmed, collateral benefits to the public should not relieve Defendants of the obligation of abating their public nuisance. Defendants offer no reason why the collateral source rule should *not* apply here. Stated otherwise, Defendants offer no reason why they should avoid paying for the

---

[6] *See* Pls. Mem. of Law in Opp. to Defs. Mot. for Summ. J. Re Nuisance, Dkt. # 1077.

abatement of the public nuisance they caused merely because other entities might

continue to provide services to address the opioid epidemic, services they would not

need to provide in the absence of Defendants' conduct creating a public nuisance,

and, indeed, catastrophe in the community.

Application of the collateral source rule in this context is fully consistent with

the principles underlying the rule. As the Supreme Court of Appeals of West

Virginia explained,

> The collateral source rule is a central part of the tort system's goal of
> "requiring tortfeasors to make right their wrongful acts." The primary
> unifying principle of tort law is one of corrective justice, that is, the law
> establishes a legal duty for a tortfeasor to repair any damage or losses
> carelessly inflicted upon a victim. As the drafters of the *Restatement
> (Second) of Torts* recognized, "it is the tortfeasor's responsibility to
> compensate for *all* harm that he causes," not merely the net loss to the
> injured party.

*Kenney*, 760 S.E.2d at 445 (citations omitted).

To allow Defendants an offset from the costs of abatement merely because of

the "fortuitous presence" of third-party insurance paid to healthcare providers

would result in a windfall to Defendants, allowing them to shift to other parties the

costs of abating the nuisance caused by their own conduct. *Id.* at 440 ("[A] benefit

that is directed to the injured party *should not be shifted so as to become a windfall

for the tortfeasor*.") (quoting *Restatement (Second) of Torts* § 920A, cmt. b). Although

collateral funding and services may inure to the benefit of the Cabell Huntington

Community, that result is a far more palatable one than a windfall to Defendants.

Indeed, West Virginia law expressly favors the victims of the wrongdoing in such

circumstances:

12

> A plaintiff who receives a double recovery for a single tort enjoys a windfall; a defendant who escapes, in whole or in part, liability for his wrong enjoys a windfall. *Because the law must sanction one windfall and deny the other, it favors the victim of the wrong rather than the wrongdoer.*

*Id.* at 445 (citations omitted).

As Mr. Barrett succinctly summarized, "typically we would not expect the defense to get a benefit … just because they were lucky enough to have trigged an opioid epidemic in a geographic area which was providing a syringe program in the first place." Barrett Dep. 116:18-117:6.

## D.   Even If Some Offsets Were Permissible, Defendants Have Not Provided Any Reason to Exclude Mr. Barrett's Opinions.

Even if Defendants were correct that some offsets were permissible and that the collateral source rule is inapplicable, Defendants still have failed to identify any reason to exclude Mr. Barrett's opinions. At most, this would mean Defendants could offer evidence in an attempt to prove that their contributions to the costs of abatement should be offset by specific amounts of collateral funding.[7] This is not a challenge to Mr. Barrett's methodology or opinions. It is simply a merits dispute for the Court to resolve regarding the proper share of abatement costs for which Defendants shall be liable. Particularly in the context of a bench trial regarding the equitable remedy of abatement, factual disputes regarding Defendants' liability for certain abatement costs may be addressed through "vigorous cross-examination, presentation of contrary evidence and careful weighing of the burden of proof."

---

[7] *See generally CONSOL Energy, Inc.*, 2016 WL 538478, at *13 ("the defendant bears the burden of showing that it is entitled to an offset to damages") (citing *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 389 (4th Cir. 2010)).

*Grant Thornton*, 2007 WL 4591412, at *1. *See also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

Defendants nonetheless portray their motion as presenting challenges to the "fit" of Mr. Barrett's opinions, the reasonableness of his assumptions, or the "exactness" of his opinions. All three arguments are without merit.

*First*, Defendant's "fit" critique, Mem. 4-10, is misplaced. Defendants contend that Mr. Barrett's opinions "cannot aid the court in crafting any abatement remedy" because it does not address potential funding from collateral sources. *Id.* at 6. This assertion is puzzling to say the least. Even if funding from collateral sources should be offset from Defendants' contributions to the abatement plan, the court still would need to understand the full scope of the abatement remedy and the full cost thereof—i.e., the total cost *from which any collateral funding might be deducted*. Mr. Barrett's opinions are essential to any such analysis. For this same reason, Defendants misplace their reliance on the basic principle that "expert testimony which does not relate to any issue in the case is not relevant [and] non-helpful." *Id.* (alteration in original) (quoting *Edwards v. Ethicon, Inc.*, No. 2:12-CV-09972, 2014 WL 3361923, at *2 (S.D. W. Va. July 8, 2014). Clearly an opinion about the total cost of the appropriate abatement plan is relevant and helpful to the process of crafting the appropriate abatement remedy, regardless of whether there should be offsets to account for collateral funding.

In the MDL, Judge Polster rejected the same arguments by defendants:

> As stated above, abatement is an equitable remedy. The [c]ourt agrees
> with [p]laintiffs that testimony regarding the "full cost of abating the

public nuisance" is relevant and will help the [c]ourt understand the
scope of what it will take to remedy the opioid crisis. To the extent the
[c]ourt determines this scope is narrowed by other programs already in
place in Summit and Cuyahoga County, and/or additional sources of
funding that may exist, the [c]ourt can exercise its equitable powers to
deviate from the full costs of abatement to a more just and appropriate
amount. Thus, [p]laintiffs' experts' failure to consider other sources of
funding and their consideration of national data does not make their
opinions any less relevant.

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043938, at *3.

This reasoning applies equally here.

It is also important for the Court to consider the full scope of Dr. Alexander's

Abatement Plan, and total cost thereof, because there is no guarantee that

collateral entities that *previously* paid money to address the opioid epidemic will

continue to do so in the *future*. Although Defendants argue that certain costs *in the*

*past* were funded or provided by third-parties, Mr. Barrett is opining as to the

*future* costs of *future* abatement activities detailed in Dr. Alexander's report. Thus,

for example, while Defendants note that the County and City have, in the past,

received $1.9 million annually in grant funding, Mem. 5 (citing Ex. 7), they make no

attempt to address what grant funding might exist in the future. As Mr. Barrett

expressly recognized in his report, "there is no guarantee that these funding sources

will remain available indefinitely." Barrett Report ¶ 25. Grants expire after a set

period of time and there is no guarantee they will remain available in the future or

that, even if available, the City and County will be successful in obtaining them.

Likewise, there is no guarantee that Medicaid coverage of medication-assisted

treatment or other opioid treatment services will remain at current levels.

The Cabell Huntington Community should not bear the risk that third-party funds will not be available in the future. Abatement is an equitable remedy, and as between the parties, the wrongdoer bears the risk of uncertainty. *Cf. Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principle is an ancient one, and is not restricted to proof of damage in antitrust suits[.]") (internal citations omitted); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (uncertainty in the amount of damages does not preclude recovery of damages, and "the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party").[8]

*Second*, contrary to Defendants' contentions, Mem. 6-7, the fact that Mr. Barrett did not address existing sources of funding for abatement activity does not relate to the reasonableness of his assumptions. Mr. Barrett does not make any assumptions, one way or the other, about whether collateral entities will continue to fund or provide abatement activity in the future. Nor does he assume that Defendants should be liable for the entire cost of Dr. Alexander's Abatement Plan. Rather, as Mr. Barrett explained, he calculated the full cost of the Abatement Plan, "*regardless of which entity would be funding or delivering the services.*" Barrett Report ¶ 25 (emphasis added). In any event, even if Defendants had challenged the

---

[8] Moreover, some third-party funds, but for the existence of the public nuisance, would be available to spend on other priorities in the Cabell Huntington Community.

reasonableness of his assumptions, disputes as to the reasonableness of assumptions are not a proper basis to exclude an expert's opinions, particularly in the context of a bench trial. *Grant Thornton*, 2007 WL 4591412, at *1; *Daubert*, 509 U.S. at 596.

*Third*, the fact that Dr. Alexander's Abatement Plan might overlap with existing programs to address the opioid epidemic does not raise an issue of the "exactness" of Mr. Barrett's opinions, *contra* Mem. 6 (citing *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137 (4th Cir. 1994)). Again, Mr. Barrett opines on the total cost of the Abatement Plan described in Dr. Alexander's report, "regardless of which entity would be funding or delivering the services." Barrett Report ¶ 25. Defendants do not challenge Mr. Barrett's math or raise any doubt as to the accuracy or precision of his projection of the total cost of that Abatement Plan.[9]

---

[9] Defendants note in their "Background" section that Mr. Barrett relied on cost inputs provided by two other experts, Dr. Alexander and Dr. Young, Mem. 2-3, but they do not move to exclude on this basis. Nor could they, as they do not offer any reason to doubt the reliability or accuracy of these cost inputs. *See generally In re Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL No. 16-2740, 2019 WL 3817658, at *2 (E.D. La. Aug. 14, 2019) ("experts are permitted to rely on analyses or studies conducted by others, provided such reliance is reasonable"); *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 728 (E.D.N.C. 2007) ("expert opinion which relies upon the information or opinion of others is acceptable, provided it is the sort of opinion reasonably relied on by experts in the relevant area of expertise"). Mr. Barrett testified to the reasonable due diligence he performed before relying on the inputs from Dr. Alexander and Dr. Young. *See, e.g.*, Barrett Dep. 255:6-256:18 (Explaining that proper "due diligence" when relying on the work of another expert means "understanding what that expert is giving me in their opinion. ... It's necessary so that I'll understand what that expert is talking about. And that's exactly what transpired in this case from the very beginning of my work in early spring in having routine, regular telephone conversations with Doctor Alexander and Doctor Alexander's staff so that I would understand the information that was presented to me. That is the necessary due diligence. It's not a matter of me

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to

Exclude the Expert Testimony of George Barrett in its entirety.


Dated: October 23, 2020                    Respectfully submitted,


**THE CITY OF HUNTINGTON**              **CABELL COUNTY COMMISSION**

/s/ *Anne McGinness Kearse*              /s/ *Paul T. Farrell, Jr.*
Anne McGinness Kearse                    Paul T. Farrell, Jr.
WVSB No. 12547                           WVSB Bar No. 7443
Joseph F. Rice                           **FARRELL LAW**
**MOTLEY RICE LLC**                      422 Ninth Street, 3rd Floor (25701)
28 Bridgeside Blvd.                      PO Box 1180
Mount Pleasant, SC 29464                 Huntington, West Virginia 25714-1180
Tel: 843-216-9000                        Mobile: 304-654-8281
Fax: 843-216-9450                        paul@farrell.law
akearse@motleyrice.com
jrice@motleyrice.com                     /s/ *Anthony J. Majestro*
                                         Anthony J. Majestro
                                         WVSB No. 5165
Linda Singer                             **POWELL & MAJESTRO, PLLC**
David I. Ackerman                        405 Capitol Street, Suite P-1200
**MOTLEY RICE LLC**                      Charleston, WV 25301
401 9th Street NW, Suite 1001            304-346-2889 / 304-346-2895 (f)
Washington, DC 20004                     amajestro@powellmajestro.com
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

---

questioning the integrity, qualifications, questioning the accuracy of Doctor Alexander's opinions. That's not my job and would be inappropriate for me to even attempt to do so. … I don't need to understand the nuts and bolts and the … intricate workings of how Doctor Alexander or how Doctor Young came up with their opinions, but I have to be able to understand that information so that I could interpret it and make the calculations that I need to make for my opinion."). In any event, if Defendants wish to challenge the "factual assumption underlying" Mr. Barrett's opinions, they "can point this out on cross examination." *Grant Thornton*, 2007 WL 4591412, at *1.

Charles R. "Rusty" Webb
WV No. 4782
**THE WEBB LAW CENTRE**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

Michael A. Woelfel
WVSB No. 4106
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

*On the Brief:*

Derek Loeser
Dean Kawamoto
David Ko
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900
dloeser@kellerrohrback.com
dkawamoto@kellerrohrback.com
dko@kellerrohrback.com

Andrea Bierstein
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
212-257-8482
abierstein@simmons.com

Paulina do Amaral
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  212-355-9500
Fax:  212-355-9592
pdoamaral@LCHB.com

**CERTIFICATE OF SERVICE**

I certify that on October 23, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

.

/s/ *Anthony J. Majestro*