Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

       Plaintiff,

vs.                                             CIVIL ACTION
                                                NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

       Defendants.
_____
CABELL COUNTY COMMISSION,

       Plaintiff,

vs.                                             CIVIL ACTION
                                                NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

       Defendants.

* * * * * * * * * * * * * * * * * * * * *


     Videotaped and videoconference deposition of GEORGE A. BARRETT taken by the Defendants under the Federal Rules of Civil Procedure in the above-entitled action, pursuant to notice, before Teresa S. Evans, a Registered Merit Reporter, all parties located remotely, on the 21st day of September, 2020.

Page 46

1  why didn't you look into whether or not there were
2  any costs that the County or City was paying in
3  connection with the abatement interventions that
4  were currently underway at the time you wrote your
5  report?
6      A.   Well, the scope of my work was limited to
7  calculating the future value of the costs which had
8  been identified in Doctor Alexander's redress
9  model, which is supplemented or augmented by Doctor
10 Young's opinions as well.
11           Whether or not programs currently
12 exist or don't exist in the Cabell/Huntington area
13 is really beyond the scope of my work in the case.
14 It just simply doesn't matter.
15           I was asked to calculate the future
16 value of all the items identified in the redress
17 model.
18     Q.   Well, if the County or City had currently
19 been incurring costs for an abatement program that
20 was in Doctor Alexander's plan, wouldn't you
21 consider that important evidence to determine what
22 the costs might be in the future for the same plan?
23     A.   I really can't speak to that because it's
24 outside of my field of expertise.  As a practical

Page 116

1  just like the previous, Doctor Alexander provided
2  the number of opioid injection drug users reached
3  by the syringe service program.  He also provided
4  with -- provided in the redress model the cost per
5  client for the syringe service program.
6      Q.   Did you make any effort to determine the
7  cost of existing syringe service programs in the
8  Cabell/Huntington community in connection with your
9  work?
10     A.   No.  Again, Doctor Alexander provided this
11  information, and I relied upon his opinion for
12  these calculations.
13     Q.   And with respect to existing syringe
14  service programs, do you know who has provided the
15  funding for those, whether it's come from the
16  County or City or alternatively, from some Federal
17  or State source?
18     A.   No.  But again, just like we've talked
19  about with these other costs, even if such a
20  program was being funded by another party, the
21  intention from this particular redress model is to
22  identify and effectively deal with the costs that
23  have been created by the opioid epidemic.
24              So if some other funding mechanism or

Page 117

1  some other agency was perhaps paying for this,
2  typically we would not expect the defense to get a
3  benefit from that just because they were lucky
4  enough to have triggered an opioid epidemic in a
5  geographic area which was providing a syringe
6  program in the first place.
7      Q.   Well, as far as you know, has the City or
8  County ever funded, in whole or in part, a syringe
9  service program using its own funds?
10     A.   I believe that there was - and have been -
11 some programs with regards to a syringe collection
12 effort.  I do recall that -- those types of
13 programs and those types of costs have existed.
14     Q.   So you are aware that -- of a syringe
15 collection program taking place within the
16 geographic boundaries of the City or County, but do
17 you know who funded any such program?
18     A.   No.  Again, I'm not familiar with that, and
19 I think that that would be irrelevant because it
20 would -- it would be in violation of the collateral
21 source rule as it relates to whether or not a
22 defendant gets the benefit of a third party
23 participating in and contributing toward the
24 funding of one of -- any of these types of

Page 163

1    A.   Which would be the federal government?
2    Q.   Be a combination of the Federal and the
3  State government.  Do you know whether or not
4  that's true that most people with opioid use
5  disorder in Cabell/Huntington, their treatment is
6  paid for by Medicaid?
7    A.   Well, given the income level of the local
8  area and Medicaid being a federal transfer payment
9  program, essentially welfare, that makes sense,
10 yes.
11   Q.   And -- just transitioning to a real world
12 -- and what does this mean in a real world, if
13 there were an -- if Doctor Alexander's abatement
14 program were put in place, do you -- is it your
15 understanding that Cabell/Huntington would begin to
16 run a public health system by which they themselves
17 would treat everyone with opioid use disorder in
18 their community rather than letting hospitals paid
19 for by Medicaid handle that?
20            MR. BURNETT:  Objection.
21   A.   I don't have an opinion on that.  I simply
22 valued the cost based upon the number of
23 individuals identified by Doctor Alexander and the
24 costs associated with those treatment sources.

Veritext Legal Solutions
www.veritext.com                                888-391-3376

Page 164

1    Q.   And you are agnostic as to who was actually
2    going to pay that cost in the future; is that
3    right?
4    A.   Yes, throughout the course of my work in
5    this case, who has paid for and who is going to pay
6    for is not my opinion.  I don't have any
7    conclusions or any say on that.  These are simply
8    the dollars that are necessary to pay for the
9    things that have been identified by Doctor
10   Alexander.
11   Q.   Okay.  Now, if you go to the Medications
12   tab, which is the next tab -- it's still 2B, but
13   it's 2B5, 6 and 7.
14   A.   Yes.
15   Q.   What does that reflect?  Does that reflect
16   the cost of the treatment drugs used for the people
17   who are getting treated with OUD?
18   A.   It's my understanding, yes, these are the
19   medications that would be prescribed as part of the
20   treatment protocols for individuals with opioid use
21   disorder.
22   Q.   Okay.  And similar to the treatment itself,
23   you know, the cost of treatment, you don't know who
24   has paid in the past or who will pay in the future

Page 255

1  another expert that you're relying on is an
2  important part of your process when that other
3  expert's work is a foundation for your own.  And
4  can you explain to me why that can be generally
5  true but not true in this instance?
6      A.   Absolutely.  When we speak about due
7  diligence in that newsletter, as that relates to
8  having a conversation with a related expert, what I
9  am referring to is understanding what that expert
10 is giving me in their opinion.  Understanding that
11 information is important.
12           The due diligence is not me
13 questioning the abilities or the opinions or the
14 accuracy or the validity of the opinions of what
15 that expert is saying.  It's necessary so that I'll
16 understand what that expert is talking about.
17           And that's exactly what transpired in
18 this case from the very beginning of my work in
19 early spring in having routine, regular telephone
20 conversations with Doctor Alexander and Doctor
21 Alexander's staff so that I would understand the
22 information that was being presented to me.
23           That is the necessary due diligence.
24 It's not a matter of me questioning the integrity,

Page 256

1  qualifications, questioning the accuracy of Doctor
2  Alexander's opinions.  That's not my job and would
3  be inappropriate for me to even attempt to do.
4              But it is very appropriate - and in my
5  opinion, a requirement - that me, as an expert -
6  and in this case, the expert at the very tail end
7  of this story that is being told about the
8  abatement costs that are necessary - it's important
9  for me to understand all the information that's
10 coming to me from the related experts sufficiently
11 enough so that I could do my job.
12             I don't need to understand the nuts
13 and bolts and the integral -- the intricate
14 workings of how Doctor Alexander or how Doctor
15 Young came up with their opinions, but I have to be
16 able to understand that information so that I could
17 interpret it and make the calculations that I need
18 to make for my opinion.
19      Q.   Okay.  Now, the rate you're charging for
20 the work you're doing in this case is $300 per
21 hour; is that right?
22      A.   Yes, sir, it is.
23      Q.   Okay.  And to date, approximately what have
24 your charges been so far?