## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON,**
 **Plaintiff,**
**v.**              **Civil Action No. 3:17-cv-01362**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
 **Defendants.**

_____

**CABELL COUNTY COMMISSION,**
 **Plaintiff,**        *Consolidated case:*
**v.**              **Civil Action No. 3:17-cv-01665**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
 **Defendants.**

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS MCGUIRE

TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................................................. II

INTRODUCTION ........................................................................................................................ 1

LEGAL STANDARD .................................................................................................................... 4

FACTUAL BACKGROUND .......................................................................................................... 5

Professor McGuire's Qualifications ...................................................................................... 5

Professor McGuire's Report ................................................................................................. 6

Professor McGuire's Deposition Testimony ........................................................................ 8

ARGUMENT ............................................................................................................................ 10

I.      JUDGE POLSTER PREVIOUSLY REJECTED DEFENDANTS' ARGUMENTS IN DENYING
        TWO MOTIONS TO EXCLUDE PROFESSOR MCGUIRE'S TESTIMONY ...................... 10

II.     PROFESSOR MCGUIRE'S REPORT FITS THIS CASE AND IS BOTH USEFUL AND
        RELEVANT TO THE COURT'S LIABILITY ANALYSIS ................................................ 11

III.    PROFESSOR MCGUIRE NEED NOT APPORTION COSTS OR APPLY DISCOUNTS FOR
        HIS REPORT TO BE RELEVANT ............................................................................... 13

IV.     PROFESSOR MCGUIRE HAS PROPERLY ACCOUNTED FOR THE PURPORTED BENEFITS
        OF PRESCRIPTION OPIOID USE ................................................................................ 16

CONCLUSION ......................................................................................................................... 18

**TABLE OF AUTHORITIES**

**Cases**                                                               *Page(s)*

*Baker v. City of Wheeling*,
    117 W. Va. 362, 185 S.E. 842 (1936) .................................................................. 15

*Barker v. Naik*,
    No. 2:17-CV-04387, 2018 WL 3824376 (S.D.W.Va. Aug. 10, 2018)
    (Johnston, C.J.) .................................................................................................. 12

*Callihan v. Surnaik Holdings of WV, LLC*,
    No. 2:17-CV-04386, 2018 WL 6313012 (S.D.W.Va. Dec. 3, 2018) ....................... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ........................................................................................ 4, 11

*Duff v. Morgantown Energy Assocs. (M.E.A.)*,
    421 S.E.2d 253 (W. Va. 1992) ............................................................................ 12

*Everly v. Columbia Gas of W.V., Inc.*,
    171 W. Va. 534, 301 S.E.2d 165 (1982) .............................................................. 15

*In re Asacol Antitrust Litig.*,
    323 F.R.D. 451 (D. Mass. 2017), *rev'd and remanded on other grounds*,
    907 F.3d 42 (1st Cir. 2018) ................................................................................. 6

*In re Nat'l Prescr. Opiate Litig.*,
    No. 1:17-md-2804, Order Denying Defendants' Abatement Motion,
    ECF. No. 2519 (N.D. Ohio Aug. 26, 2019) ........................................... *passim*

*In re Nat'l Prescr. Opiate Litig.*,
    No. 1:17-md-2804, Opinion and Order Denying Motion to Exclude McGuire,
    ECF No. 2577 (N.D. Ohio Sept. 9, 2019) ............................................. *passim*

*Mays v. Chang*,
    213 W. Va. 220, 579 S.E.2d 561 (2003) .............................................................. 15

*Rhodes v. E.I. du Pont de Nemours and Company*,
    657 F.Supp.2d 751 (S.D. W.Va. 2009) ................................................................ 12

*Sharon Steel Corp. v. City of Fairmont*,
    334 S.E.2d 616 (W. Va. 1985) ............................................................................ 12

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*,
    No. 12-C-141, 2014 WL 12814021 (W. Va. Cir. Ct. Dec. 12, 2014) ..................... 12

*U.S. ex rel. George v. Fresenius Medical Care Holdings, Inc.*,
    No. 12-cv-008877, 2016 WL 5361666 (N.D. Ala. Sept. 26, 2016) ................................. 6

*West v. National Mines Corp.*,
    168 W.Va. 578, 285 S.E.2d 670 (1981), *reh'g on appeal*,
    175 W.Va. 543, 336 S.E.2d 190 (1985) ......................................................... 12

*Wehner v. Weinstein*,
    191 W. Va. 149, 444 S.E.2d 27 (1994) ......................................................... 15

*Williams v. Illinois*,
    567 U.S.50 (2012) ......................................................................... 17

**Other Authorities**

Fed. R. Evid. 703 ............................................................................. 17

Restatement (Second) of Torts § 821B(2)(b) (1979) ................................................ 12

Plaintiffs the City of Huntington and Cabell County Commission respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Exclude Expert Testimony of Thomas McGuire [Ph.D.] (the "Motion") (Dkt. No. 1050).  Plaintiffs oppose the Motion for the reasons set forth below.

## INTRODUCTION

Plaintiffs' expert Thomas McGuire, Ph.D., a Professor of Health Economics at Harvard, was the subject of not one but *two Daubert* motions in the MDL.  Judge Polster rejected both motions, finding Prof. McGuire qualified and his opinions relevant and reliable.  *In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, Order Denying Defendants' Abatement Motion, ECF. No. 2519 (N.D. Ohio Aug. 26, 2019) ("MDL Abatement Op."); *id.*, Opinion and Order Denying Motion to Exclude McGuire, ECF No. 2577 (N.D. Ohio Sept. 9, 2019) ("MDL McGuire Op.").  Shockingly, Defendants *do not even mention the MDL decisions*, much less make any effort to distinguish them, as this Court recently ordered the parties to do in filing any *Daubert* motion.[1]  Regardless, this Court should deny Defendants' Motion for the same reasons the MDL Court did.

On August 3, 2020, Prof. McGuire submitted an expert report in this litigation titled "Regarding Public Nuisance in the Cabell Huntington Community in West Virginia" (the "Report").  His Report quantifies the societal cost of the opioid epidemic in the Cabell Huntington

---

[1] Pursuant to the Court's August 28, 2020 Order, because the Motion "touches on a ruling of the MDL court," Defendants were required to "incorporate a footnote on the first page of their motion," in bold and all caps, notifying the Court that the Motion "raises an issue similar or identical to one raised in the MDL court."  Their footnote should have taken this form: **PROF. THOMAS MCGUIRE WAS THE SUBJECT OF TWO *DAUBERT* MOTIONS FILED IN THE MDL COURT.  JUDGE POLSTER DENIED BOTH *DAUBERT* MOTIONS.**  Defendants were required to attach the MDL rulings "as the first exhibit[s] to the motion" and "explain why West Virginia (or some other law) counsels a different result in these cases."  ECF No. 898, ¶ 9(b).  Defendants did not comply with any of these requirements.  The MDL *Daubert* opinions are attached as Exhibits A-B (MDL Abatement Op. and MDL McGuire Op., respectively).

Community[2] over the time period 2006 to 2018, and concludes that, from an economic perspective, the magnitude of costs constitutes a public nuisance.  Report ¶¶ 12-15.  He uses the economic concept of "negative externalities" to calculate the costs to the Community from opioid-related excesses in mortality, morbidity, neonatal abstinence syndrome, crimes, loss of property values, and child maltreatment.[3]  He also concludes that the economic costs to the Community from the sale and distribution of prescription opioids "far exceed any benefits," relying on his own calculations and clinical input from epidemiologists and addiction experts.  *Id.* ¶ 13.

Defendants make three arguments in support of their Motion, but none provide any basis to exclude Prof. McGuire's testimony.  The underlying theme of Defendants' Motion is that factors other than Defendants' actions purportedly caused the harms analyzed by Prof. McGuire, and that he should have adopted Defendant-friendly legal presumptions about causation and liability and therefore discounted his cost calculations.  As Judge Polster held in denying the motion to exclude Prof. McGuire's testimony in CT1, Defendants are free to make such arguments in cross-examination or rebuttal reports (MDL McGuire Op. at 10, 13), but their challenges to his methodology and conclusions come nowhere near a successful *Daubert* challenge.

First, Defendants argue that Prof. McGuire's testimony does not "fit" the case because West Virginia law defines the action, not the economic concept of externalities.  But Prof. McGuire offers an *economic* analysis, not a legal analysis, in calculating the opioid epidemic's costs to the Cabell Huntington Community.  The issue for the Court is whether Prof. McGuire's economic analysis will be helpful to the Court in applying the law of West Virginia with respect to public

---

[2] As stated in the Report, the "'Cabell Huntington Community,' or 'Community' refers to the entire community of Cabell County and the City of Huntington, the Plaintiffs."  Plaintiffs' Appendix of Expert Reports ("Expert App'x"), Dkt. No. 1097-34, Exh. 8.a, Report of Professor Thomas McGuire "Regarding Public Nuisance in the Cabell Huntington Community in West Virginia" ("Report") at ¶ 6.

[3] *Id.* Table 1; Expert App'x, Dkt. No. 1097-36, Exh. 8.c at 1 (Thomas McGuire – Errata Sheet dated Sept. 23, 2020).

nuisance.  Under West Virginia law, liability for nuisance turns on whether the interference with a public right at issue is unreasonable.  Prof. McGuire's quantification of the burdens that Defendants' conduct have imposed on the Community will be helpful to the Court in assessing the reasonableness of their conduct and the resulting interference with public health and safety.  The magnitude of costs from prescription opioids that he calculates—$3.5 billion between 2006 and 2018—strongly suggests the existence of a public nuisance.  *Supra* fn. 3.  Because Prof. McGuire's economic analysis is relevant to one of the elements of nuisance under West Virginia law, liability, his analysis "fits" the law applicable to this case.

Second, Defendants argue that Prof. McGuire's testimony should be excluded because his Report does not isolate what portion of the $3.5 billion cost he calculates can be specifically attributed to the Defendants, individually or together.  But Prof. McGuire need not apportion costs by Defendant or apply various discounts suggested by Defendants.  Prof. McGuire's Report is not intended to calculate Plaintiffs' *damages*, or the amounts that Defendants should be required to pay.  Indeed, Plaintiffs are not seeking past damages at all, but rather a forward-looking abatement remedy.  The costs of abating the public nuisance are set forth in the expert reports of Dr. Caleb Alexander and George Barrett.  Rather, as already noted, the backward-looking costs computed by Prof. McGuire—the total costs of the sales and distribution of prescription opioids in the Community between 2006 and 2018—are relevant to assessing the reasonableness of the interference imposed by the Defendants' conduct, and thus relevant to whether a nuisance exists. Of course, the Court will need to determine that each Defendant played a sufficient role in causing the nuisance such that they should be held liable, but that inquiry is separate from the reasonableness question addressed by McGuire's Report.[4]

---

[4] Notably, Defendants' arguments regarding causation and apportionment were already rejected by Judge Polster in the context of a similar *Daubert* motion filed last year with respect to six abatement-related experts that Plaintiffs

Finally, Defendants argue that Prof. McGuire's analysis is flawed because, they contend, he failed to sufficiently consider the benefits of prescription opioids. But this is not so. Prof. McGuire *does* consider the benefits of prescription opioid use in his Report, in two ways. First, he analyzes opioid use relative to workplace productivity—a reliable proxy consistently used in health economics in general and in the context of the opioid crisis in particular—to identify the potential benefits of prescription opioid use. Second, as a complement and cross-check to his economic and empirical analysis, Prof. McGuire relies on the opinions of epidemiological and addiction experts who conclude that the costs of opioid use *far exceed* any benefits. Prof. McGuire regularly relies on clinicians for inputs into his economic modeling and it is commonplace for health economists to do so. Defendants may disagree with the weight Prof. McGuire assigned to the benefits of prescription opioids, or even with the metrics he chose to assess those benefits, but those are matters for cross-examination. They are not indicative of any methodological flaw in his analysis.

## LEGAL STANDARD

Plaintiffs incorporate herein the legal standards governing *Daubert* motions set forth in Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude the Expert Testimony of Andrew Kolodny, to which the Court is respectfully referred. Dkt. No. 1099 at 4-7. As set forth below, Defendants fall woefully short of satisfying their burden under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude Prof. McGuire's opinions.

---

retained for CT1. In denying Defendants' Motion to Exclude Expert Testimony Purporting to Relate to Abatement Costs and Efforts in the MDL, Judge Polster held that "Defendants argue at length that Plaintiffs' experts do not sufficiently address whether and to what extent Plaintiffs' alleged nuisance was caused by Defendants' alleged misconduct…. Causation is a central issue in this trial, and one that Plaintiffs will have to prove. However, neither Plaintiffs nor their experts need to prove their causation theories *before* the trial in order to present evidence on what programs, policies, and procedures will abate the opioid crisis, and what those programs, policies, and procedures will cost." MDL Abatement Op. at 4-5.

**FACTUAL BACKGROUND**

**Professor McGuire's Qualifications**

Defendants' Motion does not challenge Prof. McGuire's qualifications, likely because his credentials are unimpeachable.  Indeed, the *only* information Defendants provide about his qualifications, anywhere in the Motion, is that he is a "professor of health economics."  Mot. at 1. They fail to acknowledge that Dr. McGuire is a Professor of Health Economics in the Department of Health Care Policy at Harvard Medical School, with more than 40 years of experience researching, publishing, and teaching health economics and health policy.  Report ¶¶ 1-3; *see also* App'x A to Report (*Curriculum Vitae*).

Defendants did not challenge Prof. McGuire's credentials in the MDL, either, as Judge Polster noted in denying both *Daubert* motions in CT1.  MDL McGuire Op. at 2 ("Defendants do not challenge McGuire's qualifications."); MDL Abatement Op. at 1 ("Defendants do not assert any of the Challenged Experts [including McGuire] are unqualified to provide opinions….").  A brief review of Prof. McGuire's background is nonetheless useful as context for his testimony and Defendants' Motion.  Judge Polster summarized his qualifications:

> [Prof. McGuire] received his B.A. in economics from Princeton University in 1971, and his Ph.D. in economics from Yale University in 1976.  McGuire has received numerous honors for his work in the area of health economics.  In 2018, he was awarded a lifetime achievement award from the American Society of Health Economics.  McGuire has also authored books, monographs, and articles pertaining to health economics, including a recent article addressing reverse payment settlements in the drug industry.

MDL McGuire Op. at 2 (internal citations omitted).

Prof. McGuire is a member of the National Academy of Medicine and a researcher at the prestigious National Bureau of Economic Research.  He served for ten years as an editor of the leading journal in the field of health economics, the *Journal of Health Economics*, and co-edited the *Handbook of Health Economics, Volume II*.  Report ¶ 2; *see also* App'x A to Report.  For over

40 years, Prof. McGuire has "conducted research on the economics of managed care, health insurance, health care payment systems, pharmaceutical drug pricing and procurement, the economics of health care disparities by race and ethnicity, and the economics of mental health policy." Report ¶ 2. Of particular relevance to his Report, among his hundreds of peer-reviewed articles and papers, Prof. McGuire has published dozens of articles about *the costs of drug abuse*. *Id*. ¶ 3, fn. 2. Several economics experts retained by defendants in the MDL, including at least one expert retained by Defendants in this action, have acknowledged his substantial contributions to the field of health economics.[5]

In addition to providing two expert reports in CT1, one on public nuisance and one on damages, Prof. McGuire offered an opioids report on public nuisance for the State of Washington.[6] He has also provided expert reports in a dozen other lawsuits, including with respect to damages and remedies, and at least two courts have upheld his analyses.[7]

**Professor McGuire's Report**

Prof. McGuire's Report presents a straightforward economic analysis of the scope of the opioid crisis in the Cabell Huntington Community. His Report makes four broad conclusions.

---

[5] *See* Exh. C, James Hughes Dep. (6/20/19) at 110:2-11 (expressing respect for Prof. McGuire "as an economist;" noting his "great reputation regarding the economics of mental health"). Hughes has been retained by McKesson for CT1 and this case. *See also* Exh. D, Daniel P. Kessler Dep. (5/29/19) at 51:24-52:4 ("I think [Prof. McGuire is a] very smart academic researcher[]. I certainly have read many of the papers that [he has] written, and learned from them."); Exh. E, Anupam B. Jena Dep. (6/6/2019), MDL Dkt. No. 1978-17 at 152:6-154:1 (noting that Prof. McGuire and other economists retained by Plaintiffs in CT1 "are all very good health economists").

[6] Prof. McGuire's Washington report has not yet been challenged by Defendants.

[7] *See, e.g., In re Asacol Antitrust Litig.*, 323 F.R.D. 451, 474-75 (D. Mass. 2017), *rev'd and remanded on other grounds*, 907 F.3d 42 (1st Cir. 2018) (upholding McGuire's damage model; noting that certain objection "goes to the weight, rather than admissibility, of McGuire's testimony, and can be raised before a fact-finder in cross-examination"); *U.S. ex rel. George v. Fresenius Medical Care Holdings, Inc.*, No. 12-cv-008877, 2016 WL 5361666, at *8-10 (N.D. Ala. Sept. 26, 2016) (upholding McGuire's analysis and comparison of different kinds of company records to determine overuse/double billing; certain objection "goes to the weight of Dr. McGuire's testimony, not to its admissibility;" further objection is "fodder for cross examination, not for a finding that the foundation of Dr. McGuire's testimony is unreliable"). *See also* "Thomas McGuire: Litigation Experience, 2016-Present," App'x A to Report (*Curriculum Vitae*).

First, he finds that the economic concept of "negative externalities," which refers to "private behaviors imposing harms on others," "provides a natural parallel to the legal notion of public nuisance" as used in this litigation.  Report ¶ 12.[8]  Second, he concludes that "the economic costs incurred in the Cabell Huntington Community by the sales and distribution of prescription opioids far exceed any benefits."  *Id.* ¶ 13.  He calculates that "the net economic costs imposed by the sales and distribution of prescription opioid products over the period 2006-2018 is approximately $3.499 billion," a cost of "approximately $36 thousand per person in the Community."[9]

Third, based on the enormous scale of economic costs to the Community, Prof. McGuire concludes that "sales and distribution of prescription opioid products imposed and continue to impose net economic costs of sufficient magnitude to constitute a public nuisance."  Report ¶ 15. Fourth, he notes that his cost estimates "underestimate the harm suffered by the Cabell Huntington Community" because he did not quantify the cost of factors such as "the taxing of the local health care system and social safety net."   He explains that "Standard economic approaches using available data fail to capture the full long-term devastation – damage to families and children, risk of crime, loss of employment, among other harms – that has befallen the Cabell Huntington Community."  *Id.* ¶ 16.  And he further notes that while "Most of the economic costs are attributed to death and disease," "standard economic methods underestimate the costs of harms in [the] 'smaller' categories" of costs identified in his Report:  excess quantities of neonatal abstinence syndrome, crimes, property value loss, and child maltreatment.  *Id.* ¶ 13; Table 1; Table 10 ("Conservative Assumptions Applied in Estimating Costs in this Report").

---

[8] Defendants claim that Prof. McGuire's analysis does not squarely match the legal definition of a public nuisance. Mot. at 9-10.  His Report clearly and thoroughly shows the parallels between the economic concept of negative externalities and the legal concept of public nuisance, beginning with the Complaint and legal definitions.  Report ¶¶ 6-11.  Nothing further is required.

[9] Expert App'x, Dkt. # 1097-36, Exh. 8.c at 1 (Thomas McGuire – Errata Sheet dated Sept. 23, 2020); Report ¶ 13.

The body of Prof. McGuire's Report and Appendix C lay out his findings, step by step, including his detailed cost calculations.  Within the section on morbidity, he considers "potentially offsetting economic benefits of prescription opioids in terms of workforce participation" (*id.* ¶¶ 17, 56-66). Based on his analysis, he concludes that "the net effect of the sales and distribution of prescription opioids on labor productivity is negative: more prescriptions mean less work."  *Id.* ¶ 60.  His Report cites a number of studies on the topic.[10]  His workforce productivity analysis is complemented by Drs. Lembke and Waller's overall conclusion that the harms from prescription opioids far outweigh their benefits.  *Id.* ¶¶ 63-66.

**Professor McGuire's Deposition Testimony**

Prof. McGuire sat for a relatively short deposition in this case on September 9, 2020.  He explained his methodology in the Report and the reasonable limitations on the scope of his opinions, commensurate with his expertise.  He was asked dozens of questions about what his Report does *not* include.  Prof. McGuire said over and over that he focused on economic questions, not epidemiology or clinical questions, because he is not an epidemiologist or doctor.[11]  He relied on Drs. Keyes, Lembke, and Waller on topics such as the number of people with opioid use disorder in the Community,[12] the medical benefits of opioids,[13] and whether opioids are

---

[10] *Id.* ¶¶ 56-59; Report App'x C, page C-13, Table C.II.7 (listing "Empirical Studies on the Impact of Opioids on Unemployment").

[11] *See, e.g.,* Exh. F, McGuire Dep. (9/9/2020) at 63:12-18 (whether opioids help increase patient mobility is "outside my area of expertise" because it's a question of "clinical outcome"); 79:2-7 ("In this case, I relied on a very good epidemiologist, Professor Keyes, to provide those estimates" of deaths from the sale and distribution of prescription opioids); 95:20-96:2 ("Disease counts … is the bread and butter of epidemiology.  It's not the bread and butter of an economist, so I, you know, quite confidently could rely on a first rate epidemiologist to give me the information I needed to be able to do a disease count….").

[12] *See, e.g., id.* at 83:3-84:14 (relied on Prof. Keyes for the number of residents with OUD).

[13] *See, e.g., id.* at 59:22-60:19 (whether opioids are "medically indicated for severe pain" is "outside the scope of my expertise, but I think that they might be"); *id.* at 61:13-62:14 (whether opioids are more effective than other pain relievers is "way outside my area of expertise").

8

appropriate in various medical situations,[14] since those topics are beyond his expertise.  He also confirmed, without reservation, that his Report addresses the total costs of the opioid epidemic without subdividing the costs based on various criteria suggested by counsel for Defendants:  he did not apportion the total costs among Defendants,[15] nor assess which sales were based on suspicious orders,[16] which orders were based on clinical need or legitimate prescriptions,[17] nor which orders were diverted.[18]  As Prof. McGuire repeatedly explained, "my assignment was to compute the net economic costs of the total" volume of prescription opioids in the Community. *Id.* at 59:8-19.

Regarding his cost-benefit analysis of opioid morbidity, Prof. McGuire testified that workplace productivity is a reasonable proxy for the overall benefits of opioids, since productivity "is how potential benefits might manifest themselves."[19]  He also testified that secondarily, he reasonably relied on Drs. Lembke and Waller's clinical inputs for the high-level conclusion that costs outweigh benefits.[20]  Defendants cite Prof. McGuire's testimony on these topics at length, in an effort to show that his Report is too narrow.  Mot. at 5-8, 10, 13.  On the contrary, the subject matter of his Report is appropriate to his expertise as an economist, and he reasonably relied on other experts on topics beyond his qualifications, such as the purported benefits of opioids.

---

[14] *See, e.g., id.* at 66:4-70:8 (He "relied on clinical input" and "didn't attempt any independent determination" regarding the measurement of opioids' benefits in medical situations such as hospice, terminal cancer, Caesarian sections, root canals, or surgeries).

[15] *Id.* at 54:14-56:11.

[16] *Id.* at 55:22-56:20.

[17] *Id.* at 56:21-58:19.

[18] *Id.* at 58:20-59:2.

[19] *Id.* at 150:5-15; *see generally id.* at 148:6-151:9 (describing workplace productivity analysis).

[20] *Id.* at 70:21-75:13 (describing reliance on Dr. Lembke's conclusion that "the costs vastly exceeded the benefits"); 75:10-76:18 (noting reliance on Dr. Waller); 147:8-24 (confirming reliance on Drs. Waller and Lembke).

Prof. McGuire also answered questions about the cost calculations in his Report.  He explained how he gathered data, explained his calculations, and reiterated that he relied on Dr. Keyes for many data inputs.[21]  Defendants' questions did not imply serious methodological challenges, and to the extent they did Prof. McGuire negated them,[22] which is consistent with the absence of such challenges in Defendants' expert reports and their Motion.  Tellingly, Defendants did not even retain an expert to respond to Prof. McGuire's Report.

ARGUMENT

## I.   JUDGE POLSTER PREVIOUSLY REJECTED DEFENDANTS' ARGUMENTS IN DENYING TWO MOTIONS TO EXCLUDE PROFESSOR MCGUIRE'S TESTIMONY

As noted previously, Judge Polster evaluated Prof. McGuire's opinions in two *Daubert* motions in the MDL.  The decisions are highly persuasive and directly address and dispose of Defendants' arguments in this Motion.  Defendants do not acknowledge either decision, let alone confront and attempt to distinguish Judge Polster's holdings.

Prof. McGuire offered two separate expert reports in the MDL.  One report quantified the public nuisance of the local opioid epidemic, as his Report in this action does; the other report quantified damages.  In an August 26, 2019 ruling, Judge Polster denied Defendants' motion to exclude Plaintiffs' experts' opinions on abatement, finding the motion moot as to Prof. McGuire because his report did not "offer an opinion on the scope or costs of programs needed to abate this nuisance."  MDL Abatement Op. at 2.  Judge Polster subsequently evaluated Prof. McGuire's damages report in great detail, and denied Defendants' motion to exclude, in a September 9, 2019 decision.  MDL McGuire Op.  Prof. McGuire's assignment for the damages report in CT1, and the

---

[21] *See, e.g., id.* at 78:9-79:18 (relied on Prof. Keyes to "estimate the number of deaths that are due to the sale and distribution of prescription opioids"); 83:3-84:14 (relied on Prof. Keyes for the number of Cabell residents with OUD); 88:22-89:20 (relied on Prof. Keyes for number of babies with neonatal abstinence syndrome).

[22] *See, e.g., id*. at 86:20-88:8 (explaining choices among studies regarding excess health costs); 134:8-144:18 (explaining calculation of loss in property value and rejecting counsel's suggestion that loss of property value could be beneficial, 142:6-143:10).

10

report's content, differ from his public nuisance Report about the Cabell Huntington Community, but Judge Polster's opinion is nonetheless directly relevant here.

The court rejected all of Defendants' challenges to Prof. McGuire's analysis, citing *Daubert* in concluding that "Defendants can challenge McGuire's methodology through cross-examination and opposing opinion testimony from Defendants' experts." *Id.* at 10.[23] Judge Polster similarly found that McGuire's reliance on other experts' analysis "may provide fodder for cross-examination; however, it does do not render McGuire's opinions inadmissible." *Id.* Defendants also argued in CT1, just as they do here, that "McGuire's calculations do not fit the facts because they do not relate to the alleged misconduct of any particular Defendant," but the Court held that "McGuire's testimony will aid the jury," his subject matter is "pertinent," and his methodology is "sufficiently tailored to the facts of the case." *Id.* at 11. Finally, Judge Polster found Prof. McGuire's analysis to be reliable because he adequately explained his methodology, related it to his "regular work" outside of this case, relied on authoritative sources, and "testified that application of his judgment was based on his training as an economist." *Id.* at 13.

For the reasons explained by Judge Polster, this Court, too, should deny Defendants' Motion with respect to Prof. McGuire.

## II.   PROFESSOR MCGUIRE'S REPORT FITS THIS CASE AND IS BOTH USEFUL AND RELEVANT TO THE COURT'S LIABILITY ANALYSIS

Defendants argue Prof. McGuire's opinion does not "fit" the case because he analyzes Defendants' conduct from an economic perspective, while it is West Virginia law, and not the laws of economics, that determines Defendants' liability. Motion at 3, 8-10. Although Defendants are correct that this case is governed by West Virginia law, they are wrong that Prof. McGuire's

---

[23] *Citing Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Prof. McGuire's methodology differs between reports, as do Defendants' challenges, but the general principle applies here.

opinion has no relevance to the legal questions before this Court.  Although Prof. McGuire assesses the opioid crisis from an economic perspective, his opinion regarding the economic magnitude of the opioid crisis is relevant to the question of whether, under West Virginia law, a public nuisance exists in the Cabell Huntington Community for which distributors of opioids may be held liable. *Id.* ¶¶ 7, 13-15 (describing analysis of magnitude of harms).  Rather than seeking to substitute economics for the law, Prof. McGuire provides valuable evidence relevant to the legal elements of Plaintiffs' claims.

Plaintiffs allege that Defendants have oversupplied prescription opioids to the Cabell Huntington Community, creating a public nuisance, i.e. the opioid epidemic.  Restatement (Second) of Torts § 821B(2)(b) (1979) ["Restatement"] defines nuisance as "an unreasonable interference with a right common to the general public."  Courts in West Virginia have adopted § 821B's definition of "public nuisance."[24]  West Virginia law further makes clear that it is the reasonableness or unreasonableness of the conduct that may determine liability for nuisance.  *See, e.g., Duff*, 421 S.E.2d at 262 (reasonableness of conduct determines whether conduct constitutes a nuisance); *West v. National Mines Corp.*, 168 W.Va. 578, 285 S.E.2d 670 (1981), *reh'g on appeal*, 175 W.Va. 543, 336 S.E.2d 190 (1985) (activity must be reasonable to avoid liability for nuisance).

Prof. McGuire's Report is relevant and will be useful to the Court because it provides an economic framework to quantify the costs arising from the distribution of prescription opioids in the Community, which helps through quantification to judge whether Defendants' conduct was reasonable and whether a public nuisance exists.  Prof. McGuire uses the standard economic

---

[24] *See, e.g., Rhodes v. E.I. du Pont de Nemours and Company*, 657 F.Supp.2d 751, 768 (S.D. W.Va. 2009); *Callihan v. Surnaik Holdings of WV, LLC*, No. 2:17-CV-04386, 2018 WL 6313012, at *5 (S.D.W. Va. Dec. 3, 2018); *Barker v. Naik*, No. 2:17-CV-04387, 2018 WL 3824376, at *3 (S.D.W. Va. Aug. 10, 2018) (Johnston, C.J.); *Duff v. Morgantown Energy Assocs. (M.E.A.)*, 421 S.E.2d 253, 257 n.6 (W. Va. 1992); *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 620 (W. Va. 1985); *State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, No. 12-C-141, 2014 WL 12814021, at *9 (W. Va. Cir. Ct. Dec. 12, 2014).

concept of "negative externalities" and his reliable analysis to establish, through his calculations and expert opinion, the extent to which the costs that Defendants' activities impose on the community outweigh the benefit of those activities.[25]   He quantifies the cost of negative externalities arising from the opioid epidemic—excess deaths, morbidity, neonatal abstinence syndrome, crimes, loss of property values, and child maltreatment—and finds a total cost of approximately $3.499 billion between 2006 and 2018.[26]   That the economic costs far outweigh the benefits does not *necessarily* mean that Defendants' conduct is unreasonable—nor is the economic cost the only way to assess its reasonableness.   However, the Court may consider the huge disproportion between the costs and the benefits of Defendants' behavior, as calculated by Prof. McGuire, in determining whether, under West Virginia law, the distribution of prescription opioids has created a nuisance in the Cabell Huntington Community.   Prof. McGuire's analysis is thus not at odds with West Virginia law.   Rather, it provides a concrete means of addressing one of the basic elements of Plaintiffs' claims under that law.

## III.   PROFESSOR MCGUIRE NEED NOT APPORTION COSTS OR APPLY DISCOUNTS FOR HIS REPORT TO BE RELEVANT

Defendants fault Prof. McGuire for not apportioning costs among them, and for not discounting his cost calculations to account for various causation-related arguments suggested by Defendants.[27]   There are several problems with these arguments, beginning with the faulty assumption that Prof. McGuire's Report, or any other piece of evidence in this case, needs to be

---

[25] Report ¶¶ 12-13; *see generally id.* ¶¶ 18-21 (describing "The Economic Analysis of Public Nuisances" and citing studies).

[26] *Id.* ¶ 13, Table 1; Expert App'x, Dkt. # 1097-36, Exh. 8.c at 1 (Thomas McGuire – Errata Sheet dated Sept. 23, 2020).

[27] According to Defendants, Prof. McGuire should have determined a "*a subset* of all sales and distribution—namely, whether (i) the wrongful distribution (ii) by these Defendants, (iii) of prescription opioids that were prescribed contrary to the prevailing treatment guidelines and (iv) were diverted to illicit use imposed costs that exceeded the benefits of the medications." Mot. at 3-4 (emphasis in original).

even broader than it is—and Professor McGuire's Report is very comprehensive—to be relevant. As Judge Polster observed, "No one piece of evidence has to prove every element of the plaintiffs' case; it need only make the existence of 'any fact that is of consequence' more or less probable." Further, Plaintiffs' experts' opinions "are relevant even though they are not as broad in scope as Defendants insist they should be."  MDL Abatement Op. at 7.  For comparison, in denying Defendants' motion to exclude Dr. Alexander's abatement plan in the MDL, Judge Polster recognized that "testimony regarding the 'full cost of abating the public nuisance' is relevant and will help the Court understand the scope of what it will take to remedy the opioid crisis."  MDL Abatement Op. at 5.  Likewise, as discussed above, Prof. McGuire's analysis of the "full cost" of the sale and distribution of prescription opioids in the Community is relevant to the existence of a public nuisance in the Community, and "will help the Court understand the scope" of that nuisance. *Id.*  It does not require allocation among Defendants nor discounting based on Defendants' suggested criteria to be relevant and helpful.

Defendants' claim that Prof. McGuire should have apportioned costs among them fails for several reasons.  First, Plaintiffs are not seeking damages from past costs, but rather a forward-looking equitable abatement remedy, and Prof. McGuire's Report does not quantify damages.  His Report quantifies costs simply for purposes of answering the binary question of whether a public nuisance exists as a result of the distribution of opioids in the Cabell Huntington Community. Therefore there is no need to apportion costs among Defendants.  Second, McGuire's assignment was to provide the Court with an economic analysis of the magnitude of opioid epidemic in the Cabell Huntington Community, without regard to Defendants' wrongdoing.[28]   His Report

---

[28] Indeed, his Report only mentions Defendants twice, quoting the Complaint allegation that "Defendants have created and maintained a public nuisance" and noting that "It is my understanding that Plaintiffs will prove that the Defendants have unlawfully sold and distributed prescription opioids in the Cabell Huntington Community."  Report ¶¶ 6, 11.

intentionally focuses on the *total* economic impact of the opioid epidemic on the Community, as a whole; apportioning costs would be inconsistent with the Report's focus. It is within Prof. McGuire's discretion to choose the scope of his analysis, not Defendants'. Third, even assuming Plaintiffs wished to apportion past costs among Defendants, other experts who are more familiar with Defendants' practices and actions in the Cabell Huntington Community would be more appropriate to make such determinations. It is beyond the scope of Prof. McGuire's knowledge and expertise. Fourth, Defendants wrongly assume that apportioning costs would be appropriate, but it is not Plaintiffs' burden—nor, by extension, Prof. McGuire's—to do so.[29]

Defendants also claim that Prof. McGuire should have identified a "subset" of costs, should have "partitioned" the costs based on various criteria they propose, to make his Report relevant. Mot. at 3, 7-8. In effect, they demand that Prof. McGuire act not only as an expert, but also as the finder of fact, too.[30] Their position relies upon implicit and disputed legal assumptions, which in any case are Defendants' burden to raise, not Plaintiffs'. The analyses which Defendants would have Prof. McGuire include in his Report—whether opioid prescribing was legitimate or not, whether opioids were oversupplied, whether they were diverted, and the like—are most appropriate for Defendants' expert reports, rebuttals, or the Court's determination, not Plaintiffs'

---

[29] "[A] plaintiff's burden of proof is to show that a defendant's breach of a particular duty of care was *a* proximate cause of the plaintiff's injury, not the *sole* proximate cause." *Mays v. Chang*, 213 W. Va. 220, 224, 579 S.E.2d 561, 565 (2003) (emphasis by Court). What is required is that the plaintiff show that the action of a tortfeasor "contributes in any degree to the injury." *Wehner v. Weinstein*, 191 W. Va. 149, 155, 444 S.E.2d 27, 33 (1994); *see also Everly v. Columbia Gas of W.V., Inc.*, 171 W. Va. 534, 536, 301 S.E.2d 165, 167 (1982) (plaintiff merely required to show defendant's conduct is "a contributing cause of the plaintiff's injury"). When the tortious acts of multiple parties join together and combine to cause injury, each party "will be regarded as a proximate cause of the [injury]." *Wehner*, 191 W. Va. at 155, 444 S.E.2d at 33. In a nuisance case where the Plaintiff proves that the "concurrent neglect" of multiple parties results in injury, joint liability applies. *Baker v. City of Wheeling,* 117 W. Va. 362, 185 S.E. 842, 844 (1936).

[30] Defendants are correct that "The Court will decide" whether a public nuisance exists and Defendants' role in it; the Court will not end its analysis with "whether *all* sales and distributions imposed net economic costs" (emphasis in original). Motion at 10. However, Defendants then draw the wrong conclusion by suggesting that Prof. McGuire alone must prove Plaintiffs' case in his Report. Plaintiffs will prove their case based on the totality of evidence presented.

expert.[31]  Once Plaintiffs establish that a public nuisance exists as a result of the distribution of prescription opioids in the Community, the extent to which each Defendant is responsible, and the form and extent of abatement relief, will be left to the Court's discretion.  Prof. McGuire's Report does not address those issues and need not provide the Court guidance on those questions to be useful on the questions it does address.

## IV. PROFESSOR MCGUIRE HAS PROPERLY ACCOUNTED FOR THE PURPORTED BENEFITS OF PRESCRIPTION OPIOID USE.

There is also no basis for Defendants' claim that Prof. McGuire failed to account for the benefits of prescription opioid use.  To the contrary, he explicitly considered the benefits by using workplace productivity to determine what benefits and costs could result from prescription opioid use.  Report ¶¶ 56-66.  Contrary to Defendants' assertion, workplace productivity is frequently used as a common and reliable proxy for benefits in the field of health economics, and specifically is used by health economists in the context of examining harms and benefits of opioid use.[32]  Prof. McGuire routinely uses workplace productivity in his empirical work.[33]  To be conservative in analyzing workplace productivity, and notwithstanding the multitude of empirical studies suggesting that costs of opioid use outweigh any benefits in the workplace, Prof. McGuire actually assumed that the benefits for workplace productivity *equal* the costs, which renders Defendants'

---

[31] Similarly, Judge Polster rejected the argument that Dr. Alexander should have discounted his abatement plan based on current abatement programs and funding sources.  Judge Polster suggested that any such discounting is within the Court's scope of responsibility, not the expert's:  "To the extent the Court determines this scope [of abatement needs] is narrowed by other programs already in place in [the local area], and/or additional sources of funding that may exist, the Court can exercise its equitable powers to deviate from the full costs of abatement to a more just and appropriate amount.  Thus, Plaintiffs' experts' failure to consider other sources of funding … does not make their opinions any less relevant."  MDL Abatement Op. at 5.  In the same fashion, this Court can apportion Prof. McGuire's cost calculations if appropriate.

[32] *Id.* ¶¶ 57-59 (citing articles on the effect of opioid prescriptions on workplace productivity).

[33] *See* Report ¶ 3 fn. 2 (identifying articles on workplace drug abuse policies).

complaint moot.[34]

Furthermore, although Prof. McGuire relied primarily on his economic analysis of workplace productivity in assessing the benefits of prescription opioids, he supplemented that analysis by secondarily relying on the clinical expertise of addiction and epidemiological experts to confirm that indeed, the costs of opioid use far exceed any potential benefit.[35]  Prof. McGuire is not an epidemiologist, nor a doctor, and cannot personally opine on the medical benefits of prescription opioids because he lacks expertise.  However, he regularly relies on epidemiologists and other clinicians in his professional work, and such reliance is commonplace among economists.[36]  Unsurprisingly, in denying the motion to strike Prof. McGuire's testimony in the MDL, Judge Polster rejected Defendants' argument that reliance on other experts is a basis for disqualification.[37]  And for good reason – pursuant to Fed. R. Evid. 703, an expert's testimony may be based on data and conclusions of other experts.  *Williams v. Illinois*, 567 U.S. 50, 88, 132 S.Ct. 2221, 2246 (2012) (Breyer, J., concurring) ("Experts . . . regularly rely on the technical statements and results of other experts to form their own opinions.").

Finally, Defendants' argument applies to just one category of harms analyzed by Prof. McGuire.  His analysis of the net benefits of prescription opioids only applies to morbidity—there are no benefits of prescription opioids to offset the costs of excess mortality, neonatal abstinence

---

[34] "[E]ven though I believe costs to workforce productivity outweigh the benefits, when counting and valuing the effects of prescription opioids on workforce productivity, I will conservatively treat the positive and negative as approximately canceling out."  *Id.* ¶ 62.

[35] *Id.* ¶ 63 ("My opinion that the costs of prescription opioids in terms of workforce participation outweigh the potential benefits *is complemented by* the opinions of medical experts regarding the clinical costs and benefits.") (emphasis added); McGuire Dep. 151:4-8 ("Q. So would it also be fair to say that these clinical inputs that you discuss [in paragraph 63] supplement the primary economic analysis you performed regarding workplace productivity?  A. Yes, that's fair to say.").

[36] *Id.* ¶¶ 63-66 (citing Drs. Lembke and Waller); *supra* fn. 12-15 (testimony about his reliance on other experts).

[37] MDL McGuire Op. at 10 (McGuire's reliance on other experts' analysis "may provide fodder for cross-examination; however, it does do not render McGuire's opinions inadmissible.").

syndrome, crime, and property value loss. Defendants would no doubt agree there cannot be benefits in these categories, and indeed, they do not challenge Prof. McGuire's analysis in these categories.

### CONCLUSION

For the foregoing reasons, this Court should deny in its entirety Defendants' Motion to Exclude Expert Testimony of Prof. Thomas McGuire.

Dated: October 23, 2020                    Respectfully submitted,

**THE CITY OF HUNTINGTON**
/s/ *Anne McGinness Kearse*
Anne McGinness Kearse
WVSB No. 12547
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb
WV No. 4782
**THE WEBB LAW CENTRE**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

**CABELL COUNTY COMMISSION**
/s/ *Paul T. Farrell, Jr.*
Paul T. Farrell, Jr.
WVSB Bar No. 7443
**FARRELL LAW**
422 Ninth Street, 3rd Floor (25701)
PO Box 1180
Huntington, West Virginia 25714-1180
Mobile: 304-654-8281
paul@farrell.law

/s/ *Anthony J. Majestro*
Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Michael A. Woelfel
WVSB No. 4106
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

On Brief:

David D. Burnett
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-849-4976
Fax:  202-386-9622
dburnett@motleyrice.com

David Ko
**KELLER ROHRBACH L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Phone: (206) 428-0562
dko@kellerrohrback.com

Andrea Bierstein
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
212-257-8482
abierstein@simmons.com

Paulina do Amaral
**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  212-355-9500
Fax:  212-355-9592
pdoamaral@LCHB.com

## CERTIFICATE OF SERVICE

I certify that on October 23, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to: Track2OpioidDefendants@ReedSmith.com and mdl2804discovery@motleyrice.com.

/s/ *Moniq́ue Christenson*
Monique Christenson (SC Bar No. 104063)
**MOTLEY RICE LLC**