**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS MCGUIRE**

## EXHIBIT E

ANUPAM B. JENA DEPOSITION TRANSCRIPT (6/6/2019), MDL DKT. #1978-17 AT 152:6-154:1

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3       *************************
         IN RE:  NATIONAL
 4       PRESCRIPTION OPIATE        Case No.
         LITIGATION                 1:17-MD-2804
 5
         APPLIES TO ALL CASES
 6                                  Hon. Dan A. Polster
         *************************
 7
 8
 9                  HIGHLY CONFIDENTIAL
10       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12
13              Videotaped Deposition of ANUPAM
14       B. JENA, M.D., Ph.D., held at the offices of
15       Morgan, Lewis & Bockius, LLP, One Federal
16       Street, Boston, Massachusetts, commencing at
17       11:09 a.m., on the 6th of June, 2019, before
18       Maureen O'Connor Pollard, Registered
19       Diplomate Reporter, Realtime Systems
20       Administrator, Certified Shorthand Reporter.
21
22
                     GOLKOW LITIGATION SERVICES
23           877.370.3377 ph | 917.591.5672 fax
                      deps@golkow.com
24
```

Page 150

1  germane to mine.
2      For example, McCann's report I
3  read page to page multiple times because I
4  spent half of my report talking about his own
5  report.
6  BY MR. PIFKO:
7      Q.   Okay.  And let's just go
8  through them.
9      David Courtwright's report, did
10 you read that cover to cover?
11     A.   No.  The only report that I
12 would have read cover to cover would be
13 Mr. McCann's report.
14     Q.   Okay.  So you didn't --
15     A.   And possibly Mr. -- Professor
16 Cutler's report as well, though that was a
17 little bit further back, and I only allude to
18 it very briefly in my own report.
19     Q.   You said possibly David
20 Cutler's report.  Did you -- do you know one
21 way or another if you reviewed it cover to
22 cover?
23     A.   I reviewed the majority of
24 Mr. Cutler's report, and I reviewed the

Page 151

1  entirety of Mr. McCann's report, and I
2  directed my team to review in detail each one
3  of these reports.
4      Q.   So we have this list of these
5  21 names.  Do you know any of these
6  individuals professionally or personally?
7      A.   Some of these individuals I
8  would know professionally.
9      Q.   Okay.  Which ones do you know
10 professionally?
11     A.   So Number 3, Professor Caleb
12 Alexander; 4, Professor Cutler; 6,
13 Professor Gruber; 11, Professor McGuire; 13,
14 Professor Rosenthal.  And I believe that's
15 it.
16     Q.   Okay.  Do you know any of these
17 people personally?
18     A.   What do you mean by
19 "personally"?
20     Q.   Well, like you know someone in
21 a professional capacity, maybe you interact
22 with them in a working manner, but maybe some
23 people you know them socially is what I'm
24 asking.

Page 152

1      A.   No.  So I can -- the
2  individuals -- several of these individuals
3  are at Harvard and MIT, so one of them is a
4  collaborator of mine on some work.
5      Q.   Who is that?
6      A.   That's Professor Gruber.  We've
7  collaborated on projects.  I wasn't aware
8  that he was involved in the opioid litigation
9  until an expert report was filed.
10     David Cutler is a professor at
11 Harvard.
12     Thomas McGuire is a professor
13 at Harvard.
14     And Meredith Rosenthal is a
15 professor at Harvard.
16     If I were to look back in my
17 social calendar in the last six months to a
18 year, I don't think I've had dinner with any
19 of these individuals.  That would be one
20 proxy for your question.
21     Q.   Caleb Alexander, you said you
22 know him professionally.  How do you know
23 him?
24     A.   I know him in a limited way.  I

Page 153

1  think we had some overlap at the University
2  of Chicago.  He's now at Johns Hopkins, and
3  he's been there many years.  I probably saw
4  him last maybe six years ago, five or six
5  years.
6      Q.   We talked about David Cutler.
7  You know him from Harvard?
8      A.   Yes.
9      Q.   Jonathan Gruber?
10     A.   From MIT.
11     Q.   You know him from when you were
12 an undergrad there?
13     A.   No.  I do not know him from
14 undergrad.  I don't know if he was there when
15 I was an undergrad.  He may not -- that was a
16 long time ago.
17     Q.   Yeah.  So that's what I was
18 just clarifying for the record.
19     So you know him because you --
20 because you're both in Boston, you interact
21 with him?
22     A.   Exactly.  These are all very
23 good health economists.
24     Q.   Thomas McGuire?

Page 154

1   A.   Also at Harvard.
2   Q.   And Meredith Rosenthal, same
3   thing?
4   A.   Yes, also Harvard.
5        (Whereupon, Jena Exhibit
6   Number 7 was marked for
7   identification.)
8   BY MR. PIFKO:
9   Q.   Handing you what's marked as
10  Exhibit 7.  Take a minute to look at
11  Exhibit 7.  Let me know when you're done.
12  A.   I'm done.
13  Q.   Okay.  Can you tell me what
14  Exhibit 7 is?
15  A.   Sure.  Exhibit 7 is Appendix C
16  in my report.  It reports Materials
17  Considered.
18  Q.   This is a true and correct copy
19  of all the materials considered?
20  A.   I believe so.
21  Q.   To your knowledge, there's
22  nothing that you considered that's not in
23  here?
24  A.   That's correct.

Page 155

1   Q.   To your knowledge, is there
2   anything that you didn't consider that's in
3   here?
4   A.   No.
5   Q.   Partway through we have -- if
6   you'd go to C-5.  So C-5 through C-11 makes
7   reference to documents in the litigation.
8   A.   Yes.
9   Q.   Let me know when you're there.
10  A.   I'm there.
11  Q.   Okay.  How did you come to
12  obtain these specific documents?
13  A.   My team had full access to the
14  documents that are produced in litigation,
15  again, as well as my other research and
16  publicly available documents.  And in forming
17  my outline and in devising a strategy to
18  thinking about the quality of anti-diversion
19  at Rite Aid, as well as other related issues,
20  I asked my team to search through documents
21  specifically within Rite Aid, but also other
22  places, to document exactly what are the
23  different processes and structures that the
24  organization, Mid-Atlantic distribution

Page 156

1   facility, as well as the headquarter, had in
2   place to prevent the diversion of opioids.
3   Q.   And that's how this list was
4   created?
5   A.   That is correct.
6   Q.   Do you know how the team
7   obtained access to the documents?
8   A.   They had access to all the
9   documents that have been produced in the
10  litigation.
11  Q.   Okay.  Do you know physically
12  how they had that access?
13  A.   "Physically," can you clarify
14  what you mean?
15  Q.   How did they gain access to all
16  the documents in the litigation?
17  A.   How -- do you mean by computer
18  or what --
19  Q.   Whatever --
20  A.   -- legal authority gave them
21  that?
22  Q.   Whatever method they used.
23  A.   Oh, I would assume that most of
24  it is electronic, and maybe through servers,

Page 157

1   maybe through disks.  I'm not sure in each
2   one of these cases how the specific document
3   was obtained.
4   Q.   Okay.  Did you personally
5   review any of these documents?
6   A.   Yes, I have reviewed some of
7   these documents.
8   Q.   Do you know which ones?
9   A.   If we went through my report,
10  the specific documents that I call on in the
11  report itself as opposed to in the materials
12  considered, each one of those documents I
13  would have -- I would have reviewed
14  personally, as well as other documents that
15  are in the materials considered that I may
16  not have cited in the actual report itself.
17  Q.   How did you come to access the
18  documents?
19  A.   I would access them through a
20  computer provided to me as a PDF file.
21  Q.   Okay.  So the team would send
22  you a PDF of certain documents?
23  A.   That's correct.
24  Q.   Via e-mail or something?