**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS MCGUIRE**

## **EXHIBIT F**

THOMAS MCGUIRE DEPOSITION TRANSCRIPT (09/09/2020).

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

3

    * * * * * * * * * * * * * * * * * * * * * * *

4

THE CITY OF HUNTINGTON,

5

            Plaintiff,

6

vs.                                     CIVIL ACTION

7                               NO. 3:17-01362

AMERISOURCEBERGEN DRUG

8  CORPORATION, et al.,

9          Defendants.

10  _____

11  CABELL COUNTY COMMISSION,

12            Plaintiff,

13  vs.                                   CIVIL ACTION
                                NO. 3:17-01665

14  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,

15

            Defendants.

16

    * * * * * * * * * * * * * * * * * * * * * * *

17

18

19          Videotaped and videoconference deposition
    of THOMAS MCGUIRE taken by the Defendants under the

20  Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa

21  S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 9th day of September,

22  2020.

23

24

1                    APPEARANCES:
2

   APPEARING FOR THE PLAINTIFFS:
3

           Michael Pendell, Esquire
4          David D. Burnett, Esquire
           Anne McGinness Kearse, Esquire
5          John Hurst, Esquire
           MOTLEY RICE
6          28 Bridgeside Boulevard
           Mt. Pleasant, SC  29464
7

           David Ko, Esquire
8          KELLER ROHRBACK LLP
           1201 Third Avenue, Suite 3200
9          Seattle, WA 98101
10

   APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
11

            J. Andrew Keyes, Esquire
12         WILLIAMS & CONNOLLY
           725 Twelfth Street, N.W.
13         Washington, DC 20005
14          Raymond Franks, Esquire
            CAREY, DOUGLAS, KESSLER & RUBY
15          901 Chase Tower
            707 Virginia Street, East
16          Charleston, WV  25323
17

   APPEARING FOR THE DEFENDANT AMERISOURCEBERGEN:
18

           Cliff Breese, Esquire (morning)
19         Alyssa Conn, Esquire (afternoon)
           REED SMITH
20         Three Logan Square
           1717 Arch Street, Suite 3100
21         Philadelphia, PA, 19103
22
23
24

1          APPEARANCES (Contd.):

2

ALSO PRESENT:

3

         Adam Hager, Videographer

4        Justin Taylor, Esquire (via Zoom)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

EXAMINATION INDEX

BY MR. KEYES                                        8

BY MR. KO                                      146

1                    P R O C E E D I N G S

2               VIDEO OPERATOR:  Good morning.  We are

3        going on the record at 9:04 a.m. on September 9th,

4        2020.  Please note that the microphones are

5        sensitive and may pick up whispering, private

6        conversations and cellular interference.  Please

7        turn off all cell phones or place them away from

8        the microphones as they can interfere with the

9        deposition audio.

10               Audio and video recording will continue

11        to take place unless all parties agree to go off

12        the record.

13               This is Media Unit 1 of the video

14        recorded deposition of Tom McGuire taken by counsel

15        for the Defendant in the matter of the City of

16        Huntington and Cabell County Commission versus

17        AmerisourceBergen Drug Corporation, et al, filed in

18        the United States District Court for the Southern

19        District of West Virginia, being Civil Action Nos.

20        3:17-01362 and 3:17-01665.

21               This deposition is being conducted

22        remotely via Zoom conferencing.  My name is Adam

23        Hager from the firm Veritext and I'm the

24        videographer.  The court reporter is Teresa Evans

1 from the firm Veritext.

2           I am not authorized to administer an

3 oath; I am not related to any party in this action;

4 nor am I financially interested in the outcome.

5           Counsel and all present and everyone

6 attending remotely will now state their appearances

7 and affiliations for the record.

8           If there are any objections to

9 proceeding, please state them at the time of your

10 appearance, beginning with the noticing attorney.

11           MR. KEYES:  Andrew Keyes with the law

12 firm of Williams & Connolly on behalf of Cardinal

13 Health.

14           MR. PENDELL:  Go ahead.  The other

15 defendants want to go before I go or what?

16           MR. FRANKS:  Yeah, this is -- I'm

17 sorry, I'll go ahead.  I'm running a little slow

18 this morning.

19           Also on behalf of Cardinal Health as

20 local counsel in Charleston, West Virginia, for the

21 firm of Carey, Kessler -- Carey Douglas Kessler and

22 Ruby, this is Ray Franks.

23           MR. BREESE:  This is Cliff Breese from

24 Reed Smith on behalf of ABDC.

1          MR. KEYES:  Anyone for McKesson?

2          MR. PENDELL:  This is Mike Pendell,

3   Motley Rice, for the Plaintiffs.

4          MR. HURST:  This is John Hurst with

5   Motley Rice for the Plaintiffs.

6          MR. KO:  Oh, go ahead, John.  Good

7   morning everyone.  Bright and early from the West

8   Coast, this is David Ko, Keller Rohrback, also on

9   behalf of the Plaintiffs.

10          MR. BURNETT:  And David Burnett from

11  Motley Rice on behalf of Plaintiffs.

12          MR. KEYES:  Anyone else?

13          MS. KEARSE:  Anne Kearse is also on

14  for the Plaintiffs.

15          VIDEO OPERATOR:  If there are no

16  further appearances to be noted, would the court

17  reporter please swear the witness.

18              (A discussion was had off the record

19              regarding someone needing to mute

20              their audio after which the

21              proceedings continued as follows:)

22              (The witness was sworn.)

23          T H O M A S    M C G U I R E

24  was called as a witness by the Defendants, and

1  having been first duly sworn, testified as follows:

2                    EXAMINATION

3  BY MR. KEYES:

4      Q.   Good morning, Professor McGuire.  Would you

5  please state your full name for the record?

6      A.   Good morning.  My name is Thomas Gregory

7  McGuire.

8      Q.   And you are serving as a testifying expert

9  in this case, correct?

10     A.   Yes.

11     Q.   And you're serving as a testifying expert

12 for the plaintiffs in this case?

13     A.   That's right, for the plaintiffs.

14     Q.   And who do you understand to be the

15 plaintiffs in this case?

16     A.   I understand the plaintiffs to be the City

17 of Huntington and Cabell County.

18     Q.   And you've issued a written report setting

19 forth your opinions in this case?

20     A.   Yes, I have.

21     Q.   And that report is dated August 3rd, 2020?

22     A.   Yes, it is.

23     Q.   And then you submitted an errata sheet to

24 that report?

1      A.    Yes, I did.

2      Q.    And you submitted that errata sheet on

3  August 24th, 2020?

4      A.    Yeah, I believe that's correct.

5      Q.    And that errata sheet sets forth

6  corrections or modifications to your original

7  report, correct?

8      A.    Yes, it does.

9      Q.    Okay.  Other than your original report and

10  that errata sheet, have you prepared anything in

11  writing that sets forth your opinions in this case?

12      A.    No, I have not.

13      Q.    Okay.  I believe your report is titled the

14  professor -- the "Report of Professor Thomas

15  McGuire Regarding Public Nuisance in the Cabell

16  Huntington Community in West Virginia."

17              Did I get that title right?

18      A.    I'd have to check.  Should I look at it or

19  not?

20      Q.    It sounds right to you so far.

21      A.    It's -- I'll go with it.

22      Q.    Okay.  And that report sets forth your

23  opinions in this case?

24      A.    Yes, it does.

1    Q.   And the statements in that report are your

2    statements?

3    A.   Yes, they are.

4    Q.   And the calculations in that report are

5    your calculations?

6    A.   Yes, they are.

7         MR. PENDELL:  Objection.

8    Q.   And the work reflected in that report is

9    your work?

10   A.   Yes, it is.

11   Q.   And does that report include all of the

12   opinions that you intend to offer in this case as a

13   testifying expert for the plaintiffs?

14   A.   Unless I'm asked to do more, that's that.

15   Q.   Okay.  So at this point in time, have you

16   been asked to do more?

17   A.   No, I haven't.

18   Q.   When were you first engaged to work on this

19   case as a testifying expert?

20   A.   I went back and looked at my records, and I

21   began to record hours in January of this year.

22   Now, I -- it might have been an engagement prior to

23   that, but probably not very much farther than that

24   and --

1      Q.    Who --

2      A.    -- (Zoom audio glitch)

3      Q.    -- first approached you about serving as a

4   testifying expert in this case?

5      A.    It likely would have been Renee Rushnawitz

6   of Greylock McKinnon.

7      Q.    And why do you believe it's likely that it

8   was her?

9      A.    She's an officer of the company and tends

10  to field requests from counsel, and then would have

11  passed the request on to me.

12     Q.    And in your prior answer, you referenced

13  "the company."  Are you referring to Greylock

14  McKinnon Associates?

15     A.    Yes, that's it.

16     Q.    Did you write the report?

17     A.    Yes, I did.

18     Q.    Did anyone else write portions of the

19  report for you?

20     A.    No, I wouldn't say, no.

21     Q.    When you were first engaged as an expert in

22  this case, what did you understand the scope of

23  your assignment to be?

24     A.    Well, I understood it to -- to bear on the

1   subject of public nuisance, and then to -- with

2   respect to public nuisance, consider whether the

3   net costs of prescription opioids in the -- in what

4   I'll call "the community - by which I mean Cabell

5   County and Huntington - are sufficiently large to

6   support the conclusion that they were a public

7   nuisance.

8       Q.   Anything else?

9       A.   Well, my assignment is -- you know, in more

10  detail, is on the first couple pages of my report,

11  and has three pieces.  But that's the, you know,

12  general subject of what my assignment was.

13      Q.   In Paragraph 5 of your report, you say,

14  quote, "I have been assisted in this matter by

15  staff of Greylock McKinnon Associates working under

16  my direction."

17          Did anyone besides the staff of

18  Greylock McKinnon Associates provide any

19  assistance?

20          MR. PENDELL:  Hold on.  Andy, I don't

21  know if other people are, but we're having a hard

22  time hearing you.  You sort of sound like you're

23  underwater.

24          MR. KO:  Yeah, I have the same

1  problem.  I couldn't hear that last question, Andy.

2          MR. KEYES:  Did it change or did it

3  sound like this from the beginning?

4          VIDEO OPERATOR:  No, it changed.  You

5  did not sound like that at the beginning.

6          MR. PENDELL:  Right.

7          MR. KEYES:  Is this better?

8          MR. PENDELL:  No.

9          MR. KEYES:  How about now?

10         MR. PENDELL:  No.

11         VIDEO OPERATOR:  No.  Sounds the same.

12         MR. PENDELL:  It's weird, because in

13  the beginning, you were fine.

14         THE DEPONENT:  I would mute and

15  unmute.  That's my strategy for these things.

16         MR. KEYES:  Good strategy.  Is this

17  better?

18         THE DEPONENT:  No.

19         VIDEO OPERATOR:  No.  It still sounds

20  the same.

21              (A discussion was had regarding audio

22              issues off the record after which the

23              proceedings continued as follows:)

24         VIDEO OPERATOR:  Going off the record.

1  The time is 9:14 a.m.

2            VIDEO OPERATOR:  Now begins Media Unit

3  2 in the deposition of Tom McGuire.  We're back on

4  the record.  The time is 9:21 a.m.

5  BY MR. KEYES:

6     Q.  Professor McGuire, sorry for the delay.

7     A.  No problem.

8     Q.  In Paragraph 5 of your report, you say,

9  quote, "I have been assisted in this matter by

10  staff of Greylock McKinnon Associates working under

11  my direction."

12            Did anyone besides the staff of

13  Greylock McKinnon Associates provide any assistance

14  to you in this engagement?

15     A.  No, they didn't.

16     Q.  I believe that staff from Compass Lexecon

17  had assisted you in a prior engagement with

18  different plaintiffs in the opioid litigation.  Did

19  anyone from Compass Lexecon help you on this

20  engagement?

21     A.  No, they didn't.

22     Q.  Okay.  How many staff from Greylock

23  McKinnon Associates assisted on this engagement?

24     A.  Most of them would have been, you know, you

1   would say part-time.  But of the total number of

2   people who would have assisted, I -- my guess is

3   six, seven.

4       Q.   And who are they?

5       A.   My primary contact at Greylock McKinnon was

6   Adrian Garcia.  And also Renee Rushnawitz was very

7   helpful.  And then Adrian would have organized work

8   of analysts to, you know, conduct different tasks

9   with respect to the report.

10      Q.   How many different --

11      A.   I'm sorry.  Would you like names?

12      Q.   Yes.  Do you have names?

13      A.   Yes.  Travis Donahoe was one of the

14  analysts, and he happens to be from Huntington,

15  West Virginia, went to Marshall.

16           Then -- that's -- I'm sorry, that's the

17  only name I can recall at this point.

18      Q.   Okay.  So what was Renee Rushnawitz's role

19  in this engagement?

20      A.   I would say -- she's a kind of jack of all

21  trades and very experienced in litigation, so -- I

22  don't know.  She would, you know, help organize who

23  does what and help problem solve generally.

24      Q.   Did she work on any particular issue or

1    issues covered by your report?

2         A.   No, I don't think so.

3         Q.   What about Adrian Garcia?  You said that he

4    -- he coordinated the work of different analysts to

5    do different tasks.  But did Mr. Garcia work on any

6    particular issue or issues covered by your report?

7         A.   He worked on all the issues, I would say.

8         Q.   Okay.  And what did Travis Donahoe do?

9         A.   He mostly worked on the labor force

10   analysis and some on the -- mostly within the

11   morbidity section, I would say.  There's a couple

12   pieces there that he helped with.

13        Q.   And how much time did the staff of Greylock

14   McKinnon Associates spend on this engagement?

15        A.   Now, I never saw any record of that, so I

16   really wouldn't know.

17        Q.   Okay.  And do each of them charge an hourly

18   rate?

19        A.   Well, they -- they would be billed at an

20   hourly rate by Greylock McKinnon, but actually, I

21   don't know how that works, so sorry.  I can't tell

22   you.

23        Q.   Okay.  In the Summit County and Cuyahoga

24   County case in which you served as a testifying

1    expert, you testified that your report in that case

2    on nuisance was your first public nuisance venture.

3    Do you recall that testimony?

4        A.   Yes, I do.

5        Q.   And you testified in that Summit County and

6    Cuyahoga County case that you had never served as a

7    testifying expert offering opinions regarding a

8    public nuisance before that case.  Do you recall

9    that testimony?

10       A.   I do, yes.

11       Q.   Okay.  And in your report in this case, on

12    page 3 of your summary of litigation experience,

13    you say that you have prepared an expert report in

14    the case filed as State of Washington versus Purdue

15    Pharma in King County Superior Court in Washington.

16           Do you recall that?

17       A.   Yes, I do.

18       Q.   And so in that case, you've submitted an

19    expert report?

20       A.   I did, yes.

21       Q.   Have you been deposed in that case?

22       A.   It would be written there.

23       Q.   Yeah, you wrote here that you had an expert

24    report in July of 2019, and there's no reference to

1  being deposed.

2     A.   Yeah, I wasn't deposed then.

3     Q.   Okay.  And you describe the scope of your

4  assignment in that State of Washington case as,

5  quote, "identification and valuation of public

6  nuisance outcomes."  Do you see that?

7     A.   Yes.

8     Q.   Okay.  So other than the work you did in

9  the Summit County and Cuyahoga case and the State

10 of Washington case, and of course, this case, is

11 there any other case where you have served as a

12 testifying expert offering opinions regarding a

13 public nuisance case -- a public nuisance?

14    A.   That --

15         MR. PENDELL:  Go ahead, Tom.

16    A.   I'm sorry.  Do you mean by that a completed

17 report?

18

19         MR. PENDELL:  Yeah, I just wanted --

20 Professor McGuire, to the extent you've been --

21 you've been disclosed as an expert and provided a

22 report, you can answer that question, but you know,

23 if you've been retained in other cases and not yet

24 disclosed and -- or submitted an expert report,

1  then I would not talk about those engagements.

2          Does that make sense?

3          THE DEPONENT:  That was my -- that was

4  what my question was about.

5      A.   So with that clarification, there's nothing

6  else.

7      Q.   Okay.  So is it accurate to say that the

8  only cases that you have served as a testifying

9  expert offering opinions regarding a public

10 nuisance are the Summit County and Cuyahoga County

11 case, the State of Washington case and this case?

12          MR. PENDELL:  Objection to form.

13     A.   Yes.

14     Q.   And your report says you are paid $850.00

15 per hour?  Is that accurate?

16     A.   Yes, that's correct.

17     Q.   How many hours have you worked on this

18 case?

19     A.   I checked my records on this, so I can give

20 you a pretty good number.  I began recording hours

21 in January of 2020, and through August of 2020 -

22 which was the last accounting that I sent in to

23 Greylock McKinnon, the total was 180 hours.

24          And of course, there'd be some in

1  September, so there might be to this point 20 more
2  hours or so.
3      Q.    Okay.  So as of August of 2020, the total
4  was 180 hours, and you anticipate roughly another
5  20 hours since the end of August?
6      A.    Yes, that's correct.
7      Q.    And to whom do you submit your invoices?
8  Or your time records.
9      A.    I submit them to Renee Rushnawitz.
10     Q.    Okay.  And you say in your report that in
11 addition to the hourly rate you receive, you also
12 receive compensation from Greylock McKinnon
13 Associates based on the collected staff billings of
14 Greylock McKinnon Associates in support of your
15 work in this matter.
16          How is that compensation calculated?
17     A.    It's a little mysterious to me, but what I
18 know about it is that staff billings refer to a
19 subset of the people who have worked on this
20 report.  For example, Renee Rushnawitz's time is
21 not included in that calculation.
22          But then the billings of Adrian and the
23 analysts, I believe, would be included in that.
24 And then there's a percentage of that that's

1  figured and paid to me.

2      Q.   And how is that percentage calculated?

3      A.   That's the mysterious part to me.  It

4  varies according to my role.  And I -- I just don't

5  -- I don't focus on it.  It is what it is and I'm

6  happy when I get the money.

7      Q.   So what is the amount of the compensation

8  that you've received or will receive from Greylock

9  McKinnon Associates based on the collected staff

10  billings of staff in support of your work in this

11  matter?

12      A.   I have not received anything so far, and --

13  I don't know.  It tends to happen, you know, when

14  something is resolved, finished, end of story,

15  whatever -- whatever happens to a matter, and I --

16  I'm not sure.

17      Q.   So you don't know what the percentage is,

18  and you don't know what the payment will be?

19      A.   That's correct.

20      Q.   Do you have any estimate or expectation

21  what that amount will be?

22      A.   You want me to give an estimate of what it

23  -- in my experience, the payment might be?

24      Q.   Yes.

1          MR. PENDELL:  Hold on.  I just want to
2     object.  But you can answer.
3          A.   I'd say $20,000 to $25,000.
4          Q.   Okay.  And how are you arriving at that
5     estimate of $20,000 or $25,000?
6          A.   I've done other cases through GMA, and it
7     -- this is a guess.  You know, based on the kind of
8     level of effort in this case, and comparing that to
9     other cases, that's what I would expect the outcome
10    to be.
11         Q.   In past cases when you've received
12    compensation from Greylock McKinnon Associates
13    based on the work of staff in support of your
14    engagement, have you received some kind of
15    accounting that explains how that number was
16    derived?
17         A.   No, I haven't.
18         Q.   You haven't gotten a report that says
19    you're gonna receive X percent of Y hours spent by
20    the staff on the engagement?
21         A.   That's correct.  I receive no details of
22    the accounting.  I don't know -- that's why I don't
23    know the percentage.  And I -- in none of the
24    previous matters did I know either the total

1    billings by staff, nor did I know the percentage.

2         Q.   I take it you don't know the percentage or

3    the formula, but is there a -- an agreed-upon

4    formula?  Or is the amount that you receive for

5    this type of compensation discretionary?

6         A.   My understanding is that it's not

7    discretionary, that there is a formula.  It's just

8    I haven't focused on it.

9         Q.   In Appendix B of your report, you list a

10   series of meetings and calls in which you

11   participated with personnel from Cabell County or

12   Huntington.  Do you recall that?

13        A.   Yes, I do.

14        Q.   What was your purpose in participating in

15   those meetings and calls?

16        A.   Very generally to learn things about the

17   local situation.

18        Q.   And how much time did you spend in the

19   March 4th, 2020 in-person meeting that you list on

20   page Appendix B-18?

21        A.   It would have been part of two --

22             MR. PENDELL:  Mr. -- Andy, is he

23   allowed to look at the report?

24             MR. KEYES:  Sure.

1        MR. PENDELL:  I just didn't know --

2    Q.   If it's helpful, you can pull out the

3    report.  Yeah, if it's helpful, you can pull out

4    the report and you can look at that page.  It's

5    page Appendix B-18.

6    A.   Okay.  I don't need it for this one, but

7    I'll just get the report and bring it closer to me

8    which would give me a feeling of security.

9    Q.   Okay.

10    A.   That particular in-person meeting would

11   have been part of two days.  And so in the

12   afternoon of the first day, we had some meetings

13   and then a dinner with some of the local people,

14   and then the next day, there was another series of

15   meetings that ended I'm not sure when.  2:00 or

16   3:00 or something like that.

17            So I'm just going to move a little bit,

18   get my report, and I'll be like two seconds.

19    Q.   Okay.

20    A.   Okay.

21    Q.   Okay.  Well, why don't you turn to that

22   list on page Appendix B-18.

23    A.   Okay, I'm there.

24    Q.   Okay.  And do you see the section Titled

1  "Meetings and Calls"?

2      A.   I do, yes.

3      Q.   And then the first entry is for March 4th,

4  2020?

5      A.   Yes.

6      Q.   And it lists in-person meeting with counsel

7  and Dr. Lyn O'Connell, Chief Jan Rader, Mayor Steve

8  Williams, Captain Rocky Johnson, Dr. Zach Hansen,

9  Doctor Todd Davies and Dr. Chafin.  Do you see

10  that?

11      A.   I do, yes.

12      Q.   Okay.  And so you're saying that this

13  actually occurred over two days, March 4th and

14  March 5th?

15      A.   I'm not sure which -- which of the dates of

16  the two days, but there were some afternoon

17  meetings prior to the big meeting.

18      Q.   And did the in-person meeting described

19  here occur before or after you started writing your

20  report?

21      A.   Probably you would say after.

22      Q.   Okay.  So when did you write the report in

23  this case?

24      A.   Oh, I think I would have started, you know,

1    right at the beginning, you know, outlining what

2    it's gonna be, entering some of the material that I

3    could enter, you know, as soon as possible, setting

4    up the tables.

5        Q.   And when you say, "the beginning," are you

6    referring to January of 2020?

7        A.   I would say January of 2020, yeah.

8        Q.   Okay.  Did -- did your in-person meeting

9    with counsel and these individuals cause you to

10   change direction in how you were approaching your

11   assignment?

12       A.   I'm not sure what you mean by "change

13   direction".

14       Q.   Did it cause you to do something

15   differently than you had already started doing?

16       A.   Well, I would say it -- you know, the

17   in-person meetings were, I think, very helpful to

18   see -- you know, to move from the level of abstract

19   national statistics down to a real place with real

20   people and how these things are affecting

21   individuals in the community.

22            And it was quite -- you know, quite

23   effective.  So it -- it reinforced in my mind the

24   importance of not just, you know, doing the

1  national-based calculations, but to where I -- to

2  the extent I could, to relate that to the local

3  on-the-ground experience.

4      Q.   And where did these in-person meetings

5  occur?

6      A.   The in-person meetings were in the law

7  offices of somebody or other in Huntington.

8      Q.   In the law offices of one of the law firms

9  representing the plaintiffs?

10      A.   Well, I don't know that to be so, but it

11  was in law offices.

12      Q.   Okay.  And then on the same page of your

13  report, you list a series of calls with counsel and

14  various individuals between March 31st, 2020 and

15  July 31st, 2020.  Do you see that list?

16      A.   I do, yes.

17      Q.   Okay.  Did you take notes during any of

18  these calls or meetings?

19      A.   No, I did not take notes.

20      Q.   Did you take notes in any of your in-person

21  meetings or any of your calls that are listed on

22  this page?

23      A.   I did take some notes from the first

24  meeting, yes.

1      Q.   Okay.

2      A.   But subsequent to that, I -- it was always

3 -- you know, Adrian was on these calls, and I

4 relied upon him to, you know, note down anything

5 that would be -- we need to --

6      Q.   Okay.

7      A.   (Zoom audio glitch)

8      Q.   So let me make sure I understand.  For the

9 in-person meetings that occurred either on March

10 3rd or 4th or the 4th and 5th, you did take some

11 notes?

12     A.   Yes, that's correct.

13     Q.   Okay.  And did you -- were these

14 handwritten notes, or were these notes you took on

15 a laptop or a computer?

16     A.   I put them on a -- in a file on a computer.

17 I didn't put them originally on a laptop, no.

18     Q.   Okay.  So you took handwritten notes and

19 then you typed them up and saved them in a computer

20 file?

21     A.   It may have been that, or I may have just

22 noted down things I remembered.  I can't remember

23 whether I actually had handwritten notes.

24     Q.   Okay.  And did you share the notes - either

1  the handwritten version or the typed-up version -

2  with counsel for the plaintiffs?

3      A.   No, I did not.

4      Q.   Okay.  Where are those notes now?

5      A.   In the cloud somewhere.

6      Q.   Okay.  Do you know how to find them?

7      A.   I could probably find them, yes.

8      Q.   Okay.  And then turning to the calls you

9  had with counsel and these witnesses between the

10  end of March and the end of July, you did not take

11  any notes; is that correct?

12     A.   That's correct.

13     Q.   But I think you said Adrian from GMA did

14  take some notes?

15     A.   Yes.  That's -- yes.

16     Q.   And did he take notes at your direction, or

17  on his own initiative?

18     A.   I think I instructed him to take notes of

19  anything that we needed to remember after the

20  calls.

21     Q.   Anyone besides Adrian take notes of any of

22  these calls?

23           MR. PENDELL:  Objection.

24     A.   Well, he's the only one I know of.

1      Q.    Okay.  Did Adrian participate in all of

2   these calls with you and these individuals?  Or

3   just some of them?

4      A.    You know, I can't remember any he missed.

5   I think he was in all of them or virtually all of

6   them.

7      Q.    And when he took notes, did he take them by

8   hand, or did he type them up on a laptop or a

9   computer?

10     A.    I don't know.

11     Q.    After he took the notes, was there ever an

12  occasion where you looked at them as part of your

13  work in preparing your report?

14     A.    No, I did not.

15     Q.    Have you ever seen his notes of these

16  conversations?

17     A.    No, I have not.

18            MR. KEYES:  Mike, we received three

19  pages of typewritten notes that had redactions.

20  Are you able to tell me the basis for the

21  redactions?

22            MR. PENDELL:  I am -- I am not.

23            MR. KEYES:  Okay.  Would you make a

24  note to look into that and let us know whether the

1  redactions are based on a claim of privilege or for

2  some other reason?

3           MR. PENDELL:  Will do.

4           MR. KEYES:  Okay.

5      Q.   And did your calls with any of these listed

6  individuals cause you to change your approach?

7      A.   Oh, I -- again, I don't think it's a matter

8  of change of approach.  You know, I'm trying to --

9  just to do, you know, a standard economic analysis

10  here.  And these individuals were not there to, you

11  know, counsel me on the economic analysis.

12           It had to do with, you know, the nature

13  of the impacts in the community and, in some cases,

14  data sources.

15      Q.   Focusing on the in-person meeting with

16  counsel and the listed individuals, to what extent,

17  if any, are you relying on what you were told in

18  those meetings in offering your opinions in this

19  case?

20      A.   I have a hard time answering that other

21  than, you know, elaborating on what I said a few

22  minutes ago, that these individuals were various

23  public servants and medical people in the

24  Huntington area that could give concrete reports

1  about the kind of things that I was concerned with

2  in my public nuisance report, and it confirmed the

3  importance and --

4         I don't know.  That's -- that's more or

5  less how I, you know, would see these meetings.

6     Q.   Did -- did any of these individuals provide

7  any factual information that you relied on in terms

8  of structuring your analysis or performing your

9  calculations?

10    A.   I would say to that question, in terms of

11 structuring my analysis, I would say no.  That I

12 could -- I could bring that to the table.

13    Q.   Okay.  And returning to these calls you had

14 from the -- between the end of March and the end of

15 July, did you rely on any information from any of

16 these individuals in preparing your report?

17    A.   Well, I think you will see some in my

18 report.  The -- in some cases, there's, you know,

19 quotes from these people.  In some cases, there's

20 material provided by -- I don't know if he's here.

21         -- the fellow who provided the heat

22 maps.

23         These things all fed into -- fed into

24 my report.  But I think it's there in my report if

1  I relied upon it.

2      Q.   Did you rely on anything they said in

3  structuring your analysis or performing your

4  calculations?

5      A.   I mean, with respect to that, I would say

6  no.  I could structure the analysis based on my

7  expertise, and the calculations I could also figure

8  out how to do.

9      Q.   Would you turn to page Appendix B-3?

10     A.   Okay.

11     Q.   Are you there?

12     A.   Yes.

13     Q.   You list a number of deposition

14  transcripts.  Do you see that list?

15     A.   Yes, I do.

16     Q.   Did you read each of those deposition

17  transcripts?

18     A.   I read a lot of deposition transcripts.

19     Q.   Okay.  Well, is this -- I didn't mean to

20  cut you off.

21     A.   No, you go ahead.

22     Q.   Is this a complete list of deposition

23  transcripts that you read in whole or in part?

24     A.   Yes, I believe it is.

1    Q.   Okay.  So for the ones that are listed

2   here, did you read each one of them in its

3   entirety?

4    A.   Well, that would probably be going too far.

5   I didn't read each of them in their entirety.  What

6   I was interested in is if any part of the

7   deposition had to do with something relating to my

8   report.  And then I would slow down and read that

9   more carefully.

10             And you know, sometimes I would then

11   draw material from them.

12    Q.   Did anyone prepare summaries of these

13   deposition transcripts for you to read?

14    A.   No, they didn't.

15    Q.   And so how did you know what portions of

16   the deposition transcripts you should read because

17   they related to your work in this matter?

18    A.   Well, mostly it's looking at the

19   deposition, you know, seeing a subject that's being

20   discussed, and it takes pages and pages for some of

21   the subjects to be handled, and so then you flip,

22   flip, flip until you see something -- you know,

23   some key words maybe that look like something you

24   would be interested in, and then you stop and read

1    that.

2        Q.    You also list a number of expert reports.

3    I believe you list seven expert reports here.  Do

4    you see that?

5        A.    Yes.

6        Q.    Are those all of the expert reports that

7    you had read prior to submitting your report on

8    August 3rd?

9        A.    Yes, that's correct.

10       Q.    And did you read each of those reports in

11   its entirety?

12       A.    Well, I did read Keyes in its entirety.  I

13   think the others were in the same category of the

14   depositions.  There's some stuff I didn't focus on

15   and some other stuff I did.

16       Q.    And did you read the final version that was

17   submitted on August 3rd, the same day as your

18   report, or did you read an earlier version of those

19   reports?

20       A.    The Keyes report, I read the final version,

21   and I believe the other ones as well too.

22       Q.    Are these all of the expert reports that

23   have been submitted by the plaintiffs in this case?

24       A.    Hmm.  I don't know one way or the other.

1     Q.   So how did you come to review these reports

2   in particular?  Did you ask for them?  Or did

3   someone else suggest you read them?

4     A.   I know I asked for, you know, at least

5   three of these.  I -- Lembke, Keyes and Waller.  I

6   don't remember Thompson and Smith.

7     Q.   Just to make sure I understand, you -- you

8   recall asking to see the expert reports written by

9   Lembke, Keyes and Waller?

10     A.   That's what I recall.  And I don't recall

11   whether or not I did with respect to Smith or

12   Thompson.

13     Q.   Okay.  How about McCann?

14     A.   Same.  I mean, same in the sense that I

15   don't recall having asked one way or the other.

16     Q.   Okay.  Did you speak with Craig McCann

17   before he submitted his report?

18     A.   No, I didn't.

19     Q.   Have you spoken with Craig McCann since he

20   submitted his report?

21     A.   No, I haven't.

22     Q.   So have you ever spoken with Craig McCann?

23     A.   I don't think so.  I may have in another

24   matter, but I can't recall.

1    Q.   Did you speak with Doctor Waller before he

2  submitted his report?

3              MR. PENDELL:  Objection.

4    A.   No, I didn't.

5    Q.   Have you spoken with Doctor Waller since he

6  submitted his report?

7    A.   No, I haven't.

8    Q.   Have you ever spoken with Doctor Waller?

9    A.   No, I don't think so.

10   Q.   Did you speak with Doctor Thompson before

11 she submitted her report?

12   A.   Not that I recall, no.

13   Q.   Did you speak with Doctor Thompson since

14 she submitted her report?

15   A.   No, I haven't.

16   Q.   Have you ever spoken with Doctor Thompson?

17   A.   No, I don't think so.

18   Q.   Did you speak with Professor Keyes before

19 she submitted her report?

20   A.   Yes, I did.

21   Q.   How many times?

22   A.   Well, I first met Professor Keyes in the

23 March visit in 2020, and of course, we spoke there.

24 We were there, you know, for that time.  And then

1  Professor Keyes was on maybe all - or certainly

2  most - of the calls that are listed on page B-18 of

3  this.

4      Q.   Okay.  Separate from the March 2020 visit

5  and the calls that are listed on Appendix B-18, did

6  you speak with doc -- Professor Keyes before she

7  submitted her report?

8      A.   You know, I don't think so.

9      Q.   And have you spoken with Professor Keyes

10  since she submitted her report?

11      A.   No, I have not.

12      Q.   Did you speak with Doctor Lembke before she

13  submitted her report?

14      A.   No, I did not.

15      Q.   Did you speak with Doctor Lembke since she

16  submitted her report?

17      A.   No, I have not.

18      Q.   Have you ever spoken with Doctor Lembke?

19      A.   No, I don't think so.

20      Q.   And did you speak with Doctor Smith before

21  he submitted his report?

22      A.   Yes, I did.

23      Q.   How many times?

24      A.   Once, I believe.

1       Q.    When was that?

2       A.    That would have been on one of the calls.

3   I -- probably listed on B-18.

4             Do you want me to take a look?

5       Q.    Sure.

6       A.    All right.  I may be mixing him up with

7   someone.  So I --

8       Q.    Looking at --

9       A.    I'm sorry.

10      Q.    -- page B-18 --

11      A.    Yeah, I (Zoom audio glitch) --

12      Q.    -- refresh your recollection as to whether

13  you spoke with Doctor Smith at any time before he

14  submitted his report?

15      A.    Yeah, maybe I didn't.  I'm sorry if I got

16  that wrong.

17      Q.    Have you spoken with Doctor Smith since he

18  submitted his report?

19      A.    No, I haven't.

20      Q.    Okay.  And after looking at Appendix B-18,

21  do you believe you've ever spoken with Doctor

22  Smith?

23      A.    No, I don't think I have.

24      Q.    Okay.  I've gone through the experts whose

1   reports you list here on Appendix B-3.  Did you

2   speak with any other expert who submitted a report

3   for the plaintiffs at any time?

4       A.   No.

5            Oh, Caleb Alexander, I -- was on some

6   of the calls.  Now, if you consider that "speaking

7   with," but he was on some of the calls.

8       Q.   Anyone else besides Caleb Alexander?

9       A.   No.

10      Q.   Okay.  And you believe that Cal -- Caleb

11  Alexander was on some of the calls that are listed

12  on B-18?

13      A.   Yes.  He or --

14      Q.   Separate from those calls, did you speak

15  with Caleb Alexander?

16      A.   No, I did not.

17      Q.   So at this point, do you believe you've

18  identified for me every conversation you had with

19  any testifying expert for the plaintiffs in this

20  case?

21           MR. PENDELL:  Objection.

22           You can answer.  Go ahead.

23      A.   Well, to the best of my recollection, yes,

24  that I've told you everything I know.

1    Q.   When you spoke with Doctor Keyes, did you

2    discuss her methodology for the opinions and

3    calculations she offered in her report?

4    A.   Well, yes, in the sense that I needed to

5    know what she was doing so that I could be ready

6    for it when the time came.

7    Q.   Right.  You couldn't wait for her to finish

8    her report and then start your work.  Correct?

9    A.   That would have been extremely difficult.

10   Q.   Okay.  So when did you first discuss with

11   her her methodology?

12   A.   Oh, probably when we first met in March.

13   Q.   And what did she explain in that March

14   meeting about her methodology?

15   A.   Well, Professor Keyes is an epidemiologist,

16   as I'm sure you know.  And we would have discussed,

17   you know, the nature of the information she would

18   be able to provide to me for purposes of my report.

19        And you know, maybe how she would have

20   been going about it.  I don't remember any details

21   about that.

22   Q.   Okay.  Did she tell you that she would be

23   attempting to identify specific data points that

24   you intended to use in your quantification?

1            MR. PENDELL:  Object to the form.

2       A.   At some point, you know, that was covered.

3  I don't -- I don't -- we probably weren't so

4  specific in March.  Just to get a general sense of

5  what her role is, what my role is, how might it

6  work.

7            Probably the details were ironed out

8  mostly by staff, I would say, in the subsequent

9  months.

10      Q.   Did you have subsequent conversations with

11 Doctor Keyes?

12      A.   Now, you asked about this, and I don't -- I

13 don't recall that we spoke in person about this,

14 aside from the meetings we were in together.

15      Q.   So if I understand correctly, you said that

16 you did speak with her at the in-person meeting in

17 March of 2020, and that Doctor Keyes was on all of

18 the calls with you that you listed on Appendix

19 B-18, but you have not spoken with her since her

20 report was issued.

21            Did I get that right?

22      A.   I have not spoken with her since her report

23 was issued, that's -- I'm 100 percent sure of that.

24            I'm not sure if there was some other

1  Keyes/McGuire conversation outside of the ones that

2  you listed there.  There may have been.  I just --

3  I don't remember.

4      Q.   Who are the defendants in this case?

5      A.   Well, my understanding are there -- the --

6  what I would call the distributors.

7      Q.   Who are they?

8      A.   I'm not gonna get them all.  But Cardinal,

9  AmerisourceBergen, McKesson, and then some of the

10  -- you know, what an economist would refer to as

11  integrated firms like Wal-Mart, Rite Aid, CVS, that

12  ,you know, had multiple roles in the drug

13  distribution chain.  But I'm sure --

14      Q.   Anyone else -- I'm sorry to interrupt.  Go

15  ahead.

16      A.   No, I'm sure there are others.  I just

17  can't recall any more at this point.

18      Q.   Okay.  So have you listed for me all of the

19  entities that you believe are defendants in this

20  case?

21      A.   Well, I believe those are defendants.

22  There -- I also believe there are more of them that

23  I don't remember right now.

24      Q.   Okay.  So you've listed for me the

1  companies that you believe are defendants in this

2  case with the proviso that you believe there are

3  other defendants in this case that you can't name

4  off the top of your head.  Is that fair?

5      A.   That's very fair.  Thank you.

6      Q.   Okay.  On page 6 of your report, you say,

7  quote, "My Report addresses the economic harms

8  imposed by the sales and distribution of

9  prescription opioids from 2006 through 2018."

10          Do you see that?

11     A.   Yes, I do.

12     Q.   Okay.  It's the second sentence of

13  Paragraph 11 on page 6.

14     A.   I have it right here.

15     Q.   Okay.  What do you mean by "sales and

16  distribution of prescription opioids"?

17     A.   Well, I think these have just common

18  meanings, that the distribution of prescription

19  opioids is the, you know, movement from the

20  manufacturer through the -- to the retail.

21          And the sales are the -- the thing that

22  takes place when someone buys something.

23     Q.   So as you use the terms in your report, do

24  sales and distribution mean different things?

1    A.   You mean is sales different than
2  distribution?
3    Q.   Yes.  As you use the term in your report.
4    A.   Well, they're -- they, I think, refer to
5  somewhat different things as part of the process by
6  which prescription opioids move from the
7  manufacturer to the consumer.
8    Q.   Okay.  I'm just trying to understand
9  whether when you use the phrase "sales and
10  distribution," that's referring to one thing or
11  it's referring to two things.
12    A.   Oh.
13    Q.   And I believe what you've said is it means
14  two different things.  One is distribution means
15  the shipment of the goods from manufacturer to
16  retail; and the sales is when someone at the retail
17  level is -- is buying or selling something.
18         Is that a fair encapsulation of how you
19  mean the terms?
20         MR. PENDELL:  Objection.
21    A.   Well, I -- it's -- in response to your
22  question, I was answering -- attempting to give a
23  kind of definition of what distribution is and what
24  sales are.  It's one, you know, kind of process in

1  a way in which the drugs move from the manufacturer

2  to the retail.

3         I'm not sure what you're getting at in

4  your question.

5     Q.   Okay.  When you refer to "sales and

6  distribution of prescription opioids," you're

7  referring to distribution as going from

8  manufacturer to retail.  Is that accurate?

9         MR. PENDELL:  Object to the form.

10    A.   You know, I haven't thought of this as a

11  kind of a narrow issue.  I'm pausing to think about

12  your question.

13         So I would say, you know, sales and

14  distribution - you know, unless I'm missing

15  something subtle here that I just don't see - yes,

16  refers to the movement of opioids from, you know,

17  the manufacturer ultimately to -- ultimately to

18  retail, and from there, being sold to consumers.

19    Q.   And in this report, you are quantifying the

20  harms imposed by all sales and distribution of

21  prescription opioids from 2006 through 2018.

22  Correct?

23    A.   Well, yes.  These are net harms.  But yes.

24  Other than that, I agree with your statement.

1    Q.  And so in quantifying the harms resulting

2  from the sale or distribution of prescription

3  opioids, you didn't exclude any prescription opioid

4  sales or distributions during that time period,

5  2006 to 2018.  Correct?

6    A.  Didn't exclude.

7          MR. PENDELL:  I'm just going to object

8  to the form of that question.

9          But you can answer, Professor.

10    A.  Well, I considered, in total, the net harms

11  or net costs associated with the sale and

12  distribution of prescription opioids.  I didn't

13  think of myself as excluding anything.

14    Q.  Right.  But I'm trying to say, was there

15  some category of prescription opioids that were

16  sold and distributed that you excluded from your

17  quantification of the harms?

18    A.  No, I don't think so.  I think I included

19  everything.

20    Q.  Did you separate out the harms that were

21  imposed by the sales and distribution of

22  prescription opioids from 2006 through 2018 by

23  actors other than the defendants in this case?

24    A.  I'll get to that, but I want to be clear.

1  You -- I don't object to the word "harms," but

2  costs would be a more accurate phrase in what I

3  came up with.

4          MR. PENDELL:  I'll -- I'll object to

5  the word.

6          Go ahead.

7    A.   In response to your question, my assignment

8  was not to allocate responsibility for the costs

9  across, you know, different parties in the case.

10   Q.   Okay.  So did you separate out the economic

11  harms that were imposed by the sales and

12  distribution of prescription opioids from 2006

13  through 2018 by actors other than the defendants in

14  this case?

15          MR. PENDELL:  Objection to form.

16   A.   My -- my role was to estimate the total,

17  and I understand that not to have involved

18  separating out the contribution of different

19  actors.

20   Q.   During the time period covered by your

21  report - 2006 through 2018 - who did you understand

22  to be the whole -- wholesale distributors of

23  prescription opioids in Cabell County, West

24  Virginia?

1    A.   My understanding goes -- would be based on

2    the defendants in this case, and that would be the

3    basis of my understanding of who was doing the

4    distributing.

5    Q.   Can you list them then?  Who you believe

6    were wholesale distributors of prescription opioids

7    in Cabell County, West Virginia between 2006 and

8    2018?

9              MR. PENDELL:  Objection.

10   A.   Yeah, I don't know the market shares - if I

11   could use that term - in Cabell County of the role

12   of different distributors.  So I can't answer it

13   from that perspective.

14              The perspective I can answer it from is

15   who are listed defendants in the case.

16   Q.   Okay.  Were there sellers of prescription

17   opioids in Cabell County, West Virginia between

18   2006 and 2018 who did not get the prescription

19   opioids they sold from wholesale distributors?

20              MR. PENDELL:  Object to the form.

21   A.   I'm not sure.

22   Q.   Okay.  Are you able to identify whether

23   there were any sellers of prescription opioids in

24   Cabell County, West Virginia who did not get

1  prescription opioids they sold from wholesale

2  distributors?

3          MR. PENDELL:  Objection.

4     A.   No, I'm not able to identify any seller of

5  that category.

6     Q.   Okay.  Is it accurate to say that you

7  quantified the economic harms imposed by the sale

8  and distribution of all prescription opioids from

9  2006 through 2018 and not just the economic harms

10 of selling and distributing prescription opioids

11 above a certain threshold amount?

12         MR. PENDELL:  Objection to form.

13    A.   Yes.  My understanding of my assignment

14 would be to -- to, you know, account the net costs

15 of all prescription opioids, you know, without

16 attempting to segment them into various categories.

17    Q.   So did you -- did you segment the economic

18 harms imposed by the sale and distribution of

19 prescription -- prescription opioids between an

20 appropriate amount of sales and distribution versus

21 an inappropriate amount of sale and distribution?

22         MR. PENDELL:  Objection to form.

23    A.   My task was to consider the total, and

24 issues with respect to clinical appropriateness

1  were not within my purview in this report.

2         Those inputs came from elsewhere.

3     Q.   Okay.  So again, you quantified what you

4  call the net economic harm imposed by the sale and

5  distribution of all prescription opioids in Cabell

6  County, West Virginia from 2006 through 2018,

7  right?

8     A.   That's very close.  I would say, "net

9  cost," though.  But yes, it's the net cost over

10  that time period of the sale and distribution of

11  all prescription opioids.

12     Q.   So you think it should say, "net costs"

13  rather than "net economic harms"?

14     A.   I like "net costs" better, yes.

15     Q.   Okay.  And then you didn't do anything to

16  further separate out or segment or tease out the

17  economic harms based on an appropriate level of

18  sales and distribution versus an inappropriate

19  level of sales and distribution.

20         MR. PENDELL:  Objection to form.

21     Q.   Right?

22     A.   Well, that's, I think, the same question I

23  got a minute ago, and my answer is the same:  That

24  my job was to look at the total net -- the net

1  costs of -- of the sale and distribution of all

2  prescription opioids over that time period.

3       And issues with respect to clinical

4  appropriateness were not part of my assignment.

5  Q.   Okay.  Did you separate out or segment out

6  or tease out the net economic harms or costs

7  imposed by an excessive amount of sales and

8  distributions of all prescription opioids versus a

9  reasonable level of sale and distribution of

10  prescription opioids?

11       MR. PENDELL:  Objection.

12  A.   Well, "reasonable" and "excessive" in this

13  context, I think, are clinical terms.  At least I

14  understand them to be clinical terms.  Issues which

15  were addressed by other plaintiff experts.  I used

16  those opinion -- opinions as inputs, but my job was

17  to look at the total and look at the net.

18  Q.   Okay.  Without regarding to a dividing line

19  between appropriate and inappropriate.

20  A.   Well, that would have been factored in by

21  the clinical experts.

22  Q.   Okay.  Without regard to the dividing line

23  between reasonable and unreasonable.

24  A.   Again, that would have been factored in by

1  the clinical experts.

2      Q.   Without regard to the dividing line between

3  a reasonable amount of sale and distribution of

4  opioids versus an excessive amount of sale and

5  distribution of prescription opioids.

6      A.   I also hear that as a question about

7  clinical matters, which the clinical experts would

8  have taken into account and used -- and I would use

9  those inputs in my report.

10      Q.   And do you articulate the dividing line

11  between a tolerable level of sales and distribution

12  of prescription opioids versus an intolerable

13  level?

14            MR. PENDELL:  I'll object.

15      A.   Well, I don't know what "intolerable"

16  means, but I don't think I need to know the answer

17  to that in your question.

18            That if it's a clinical matter, then,

19  again, it was the clinical side of the expertise in

20  this case that would have made those

21  determinations.

22      Q.   And do you articulate the dividing line

23  between the amount of sale and distribution of

24  prescription opioids that constitutes a nuisance

1    versus the level of sale and distribution of

2    prescription opioids that does not constitute a

3    nuisance?

4        A.   You know, I wasn't asked that question.  I

5    was asked with respect --

6               Sorry, there's an insect trying to get

7    on the video.

8               No, I was asked the question of:  In

9    total, did sale and distribution of prescription

10   opioids constitute a public nuisance?  Not whether

11   there might have been, you know, some other

12   situation in which they could be divided into those

13   that were and those that were not.

14       Q.   And when you quantify the net economic

15   harms or the net economic costs imposed by the

16   sales and distribution of prescription opioids from

17   2006 through 2018 in Cabell County, West Virginia,

18   you're quantifying all of those, not the ones that

19   are attributable to conduct of particular actors.

20              Is that correct?

21       A.   Yes, I think that's correct.  My job was to

22   pick up the story at the point of assessing the net

23   costs of the sale and distribution.  Why that took

24   place was not part of my assignment.

1    Q.  So did you take any steps to eliminate from

2    your calculations the economic harms or the costs

3    of prescription opioids that were sold and

4    distributed by the defendants in this case without

5    breaching any duty?

6           MR. PENDELL:  Objection.

7    A.   I think the answer to that is I did not try

8    to segment the sale and distribution of

9    prescription opioids nor the economic costs

10   associated with them according to a categorization

11   of the nature of the sale and distribution.

12   Q.  And are you offering any opinion of what

13   portion of the net economic harms or costs you

14   quantified are due to the sale and distribution of

15   prescription opioids by the defendants in this

16   case?

17   A.   I've got the total in my report, and I --

18   and so I would say -- I also did not - as part of

19   my assignment - apportion that to particular

20   defendants.  Or non-defendants.  I just -- I didn't

21   do it.

22   Q.  And did you do any apportionment of the net

23   economic harms or costs that were imposed by the

24   sales and distribution of prescription opioids from

1    2006 through 2018 in Cabell County, West Virginia,

2    to the unlawful sale or the unlawful distribution

3    of prescription opioids by the defendants?

4              MR. PENDELL:  Objection.

5        A.   Well, I wouldn't be in a good position to

6    say what is lawful and unlawful, but I think I can

7    answer the question anyway.

8              My assignment dealt with the total, and

9    I didn't attempt to apportion it into a category of

10   lawful and unlawful, even if I were able to know

11   what that meant in this case.

12       Q.   Did you make any assessment of which sales

13   and distribution of prescription opioids by

14   defendants were the result of filling and shipping

15   a suspicious order?

16             MR. PENDELL:  Objection.

17       A.   My -- again, my emphasis was on the total,

18   and this would be a different way to think about a

19   partition of the shipments and sales, and I didn't

20   partition it in this way either.

21       Q.   Did you make any assessment of which of the

22   prescription opioids that were sold or distributed

23   by defendants in this case were justified by a

24   clinical need?

1          MR. PENDELL:  Objection.

2      A.   Well, certainly not at the individual level

3  did I attempt to determine whether individual

4  prescriptions were a result of medical need.  But

5  again, this is in the clinical realm and was

6  something that was considered by the clinical

7  experts in this case, and they provided helpful

8  input into my report regarding that.

9      Q.   Well, you didn't do it at the individual

10  level; you also didn't do it at the macro level,

11  correct?

12      A.   Well, I wanted to, you know, be clear what

13  I didn't do.  And, yes, I didn't do it at the

14  individual level.  And also, yes, I relied on

15  clinical inputs for the macro level.

16      Q.   Did you make any assessment of which of the

17  prescription opioids that were sold and distributed

18  by defendants were used for

19  scientifically-acceptable treatment?

20          MR. PENDELL:  Objection.

21      A.   This is a clinical question as I hear it,

22  and my assignment had to do with the total, and

23  issues that have to do with the clinical component

24  of which would be acceptable, which would be

1  unacceptable, were dealt with by clinical experts

2  in this case.

3      Q.   Did you make any assessment of which of the

4  prescription opioids that were sold and distributed

5  by defendants in this case were taken by people

6  pursuant to prescriptions written to them by their

7  treating physician?

8      A.   That's another partition of the total that

9  I did not undertake.

10     Q.   Did you make any assessment of which of the

11 prescription opioids that were sold and distributed

12 by defendants in this case were dispensed by

13 pharmacies to patients pursuant to legitimate

14 prescriptions written by licensed physicians?

15             MR. PENDELL:  I'll object.

16             Go ahead.

17     A.   Well, this is a new -- a different form of

18 partition, which I did not undertake.  My

19 assignment had to do with a total.

20     Q.   Did you make any assessment of which of the

21 prescriptions that were sold and distributed by

22 defendants were diverted long after they left the

23 closed distribution system?

24             MR. PENDELL:  Objection.

1      A.   No, I didn't make a quantification of

2    diversion in this case.

3      Q.   Is the work you did based on the premise

4    that all sales and all distribution of prescription

5    opioids by the defendants in this case was

6    unlawful?

7      A.   No.

8      Q.   Then did you differentiate at all between

9    the economic harms or costs that were imposed by

10   the unlawful sale and distribution of prescription

11   opioids versus the lawful sale and distribution of

12   prescription opioids?

13             MR. PENDELL:  Objection.

14     A.   I think this partition has been talked --

15   been asked about previously.

16             Again, I did not partition on this

17   basis.  I don't -- I wouldn't know how to do it.

18   It's not within my expertise.  And my assignment

19   was to compute the net economic costs of the total.

20     Q.   Does --

21             MR. KEYES:  Strike that.

22     Q.   Is reduction in pain a benefit of using

23   prescription opioids in accordance with like

24   scientifically acceptable clinical criteria?

1      A.   Yes, it might be.

2      Q.   Are opioids medically indicated for severe

3  pain associated with trauma?

4              MR. PENDELL:  Objection.

5      A.   This is, of course, outside the expertise

6  of an economist, but I've seen reports that would

7  support that.  And I believe some of the medical

8  experts in this case also would agree with that.

9      Q.   Are opioids medically indicated for severe

10  post-surgical pain?

11             MR. PENDELL:  Objection.

12     A.   This is outside the scope of my expertise,

13  but I think that they may be.

14     Q.   Are opioids medically indicated for severe

15  pain associated with cancer end-of-life care?

16             MR. PENDELL:  Objection.  Outside the

17  scope.

18     A.   This is outside the scope of my expertise.

19  But they may be.

20     Q.   Could you turn to Paragraph 56 of your

21  report?

22             MR. PENDELL:  Andy, at some point --

23  you can finish this up.  But I want to take a break

24  if we can.  We've been going for a while.

1          MR. KEYES:  Sure.  Just give me a few

2    more questions.

3          MR. PENDELL:  No problem.  No problem.

4    Q.   Professor, are you at Paragraph 56 of your

5    report?

6    A.   Yes.

7    Q.   Okay.

8    A.   What paragraph -- sorry, wait.  I was on

9    page -- hold on.

10   Q.   Yeah, paragraph 56.

11         MR. PENDELL:   Page 32, Professor.

12   A.   Yeah, I'm there.

13   Q.   Okay.  Do you see the sentence on the

14   fourth line that says, quote, "Opioids are

15   medically indicated for severe pain associated with

16   trauma, post-surgery and cancer end-of-life care"?

17   A.   Yes, I see that sentence.

18   Q.   And you included that in your report.

19   A.   There it is.

20   Q.   Okay.  Do you agree that opioid drugs are

21   more effective than other pain relievers for acute

22   traumatic pain?

23         MR. PENDELL:  Objection.

24   A.   No, that's way outside my area of

1  expertise.  I'm sorry, I can't give you an opinion

2  about that.

3      Q.   Okay.  Do you agree that opioid drugs can

4  be critical for short-term severe pain relief in

5  acute situations?

6           MR. PENDELL:  Objection.

7      A.   Oh, I don't know.  They might.  It's also

8  outside my area.

9      Q.   Do you agree that in short term acute pain

10  situations such as during surgery or immediately

11  post surgery, prescription opioids can be an

12  important mechanism of pain relief?

13           MR. PENDELL:  Objection.

14      A.   Outside the scope.  Maybe.

15           MR. KEYES:  Why don't we take a break.

16           MR. PENDELL:  Thanks.

17           MR. KEYES:  Ten minutes?  Go off the

18  record?

19           MR. PENDELL:  Sure.

20           VIDEO OPERATOR:  Going off the record.

21  The time is 10:28 a.m.

22           (A recess was taken after which the

23           proceedings continued as follows:)

24           VIDEO OPERATOR:  We're back on the

1    record.  The time is 10:38 a.m.  This begins Media

2    Unit 3 in the deposition of Tom McGuire.

3    BY MR. KEYES:

4        Q.   Professor McGuire, is improvement in

5    function a benefit of using prescription opioids in

6    accordance with scientifically acceptable clinical

7    criteria?

8                MR. PENDELL:  Objection.  Outside the

9    scope.

10       A.   That's really outside the scope of my

11   expertise.  It may be.

12       Q.   Do opioids help increase the mobility of

13   the patient?

14                MR. PENDELL:  Same objection.

15                MR. KO:  Also object to the form.

16       A.   They -- this is outside my area of

17   expertise.  It's kind of a clinical outcome sort of

18   question.  I'm not in a position to answer.

19       Q.   Can opioids increase a person's ability to

20   participate in life activities other than working a

21   job?

22                MR. PENDELL:  Objection.

23       A.   This is something else that's outside my

24   expertise.  I really wouldn't be in a good position

1   to say.

2       Q.   Can opioids be properly used to decrease a

3   patient's anxiety about a surgical procedure?

4               MR. PENDELL:  Objection to form.

5       A.   That's outside my area.  I really have no

6   idea.

7       Q.   Can opioids be used to decrease a patient's

8   anxiety about an injury?

9               MR. PENDELL:  Objection.

10      A.   That's outside my area.  I have no idea.

11      Q.   Can opioids help allow a patient to have a

12  future perspective that significant pain does not

13  allow?

14              MR. PENDELL:  Objection.

15      A.   Out -- I -- that's not my area.  I really

16  -- I have no idea.

17      Q.   Do you agree that the benefits of opioids

18  have been proven useful in palliative care

19  settings?

20              MR. PENDELL:  Objection to form.

21      A.   "Proven" sounds like a statement about

22  randomized controlled trials in these settings, and

23  I -- I'm really not directly familiar with that.

24      Q.   Can prescription opioids be appropriately

1    used in the palliative care setting?

2              MR. PENDELL:  Objection.  Outside the

3    scope.

4         A.   That's outside my area.  I really -- I

5    wouldn't be in a position to say.

6         Q.   Can prescription opioids be appropriately

7    used to address pain experienced by patients with

8    terminal cancer?

9              MR. PENDELL:  Objection to form.

10        A.   Could -- I'm sorry, I wasn't sure I got the

11   wording of that.  Would you please provide --

12        Q.   Sure.  Sure.  Can prescription opioids be

13   appropriately used to address pain experienced by

14   patients with terminal cancer?

15             MR. PENDELL:  Objection.

16        A.   This is outside my area, but they may be.

17        Q.   Can prescription opioids be appropriately

18   used in hospice?

19             MR. PENDELL:  Objection to form.

20        A.   Well, of course, they can -- actually, this

21   is outside my area.  I'm just gonna say I really --

22   I'm not in a position to say.

23        Q.   Did you conduct any research into the

24   benefit of using prescription opioids for hospice

1  patients?

2     A.   I would say, no, I did not conduct any such

3  research.

4     Q.   Did you attempt to measure the benefit of

5  using prescription opioids with hospice patients?

6     A.   Well, this is something that I relied on

7  input from clinical experts for.  I didn't make an

8  independent determination.

9     Q.   Okay.  But did you attempt to measure the

10  benefit of using prescription opioids with hospice

11  patients?

12            MR. KO:  Asked and answered.

13     A.   Well, as I said in the first time this was

14  asked, this was something that I relied on clinical

15  input for, and I didn't make an independent

16  determination.

17     Q.   Did you conduct any research into using

18  prescription opioids to address pain experienced by

19  patients with terminal cancer?

20     A.   I didn't conduct any of my own research on

21  that subject.

22     Q.   Did you attempt to measure the benefit of

23  using prescription opioids to address pain

24  experienced by patients with terminal cancer?

1      A.   This is -- my answer is similar to the

2   previous set of questions, which is that I relied

3   on clinical input for these matters, and I didn't

4   -- I didn't undertake any independent

5   determination.

6      Q.   Did you attempt to measure the benefit of

7   using opioids in palliative care settings?

8      A.   I also would -- in this context, would have

9   relied on input from clinical experts, and I didn't

10   make any independent determination.

11      Q.   Did you attempt to measure the benefit of

12   using prescription opioids to provide relief from

13   acute pain suffered by mothers who had Caesarean

14   sections?

15          MR. KO:   Object to the form.

16      A.   Could -- would you remind repeating that?

17   I want to make sure I understand the form of what

18   you just asked.

19      Q.   Sure.  Did you attempt to measure the

20   benefit from using prescription opioids to provide

21   relief from acute pain being suffered by mothers

22   who had undergone a Caesarean section?

23      A.   This is a clinical area that I relied on

24   inputs from clinicians for my purposes.  I didn't

1  attempt an independent determination.

2      Q.   Did you attempt to measure the benefit of

3  using prescription opioids to provide relief from

4  acute pain for people who had a root canal?

5      A.   This is the same.  Clinical input was what

6  I -- on this subject, is what I took into account.

7  I didn't investigate root canals on my own.

8      Q.   Did you attempt to measure the benefit of

9  using prescription opioids to provide relief from

10  acute pain being suffered by people who had their

11  wisdom teeth extracted?

12      A.   This is, again, an area in which I relied

13  on clinical input.  I didn't attempt any

14  independent determination.

15      Q.   Did you attempt to measure the benefit of

16  using prescription opioids to provide relief from

17  acute pain being suffered by people who had

18  orthopedic surgery?

19      A.   This is something I relied on clinical

20  input for.  I didn't attempt an independent

21  determination.

22      Q.   Did you attempt to quantify the benefit

23  from using prescription opioids to provide relief

24  from acute pain suffered by patients who had just

1  had surgery?

2          MR. PENDELL:  Object to the form.

3      A.   Again, this is a subject I would have

4  relied on clinical input for.  I didn't make an

5  independent determination.

6      Q.   Did you attempt to measure the benefit of

7  using prescription opioids to decrease patient

8  anxiety about their injury or a surgical procedure?

9          MR. PENDELL:  Objection to form.

10     A.   This is something I relied on clinical

11  input for.  I didn't attempt an independent

12  determination.

13     Q.   Did you attempt to measure the benefit of

14  using prescription opioids to increase a patient's

15  mobility?

16     A.   I relied on clinical input for matters like

17  this.  I didn't attempt an independent

18  determination.

19     Q.   Did you attempt to measure the benefit of

20  using prescription opioids to assess a patient's

21  function to improve?

22          MR. PENDELL:  Object to the form.

23  Asked and answered.

24     A.   You know, I don't -- I'm sorry, I don't

1  understand that question.

2     Q.   Yeah, so have you -- did you attempt to

3  measure the benefit of using prescription opioids

4  to help a patient's functional movement improve?

5              MR. PENDELL:  Objection.

6     A.   Sorry.  I would have relied on clinical

7  input here.  I didn't attempt an independent

8  determination.

9     Q.   And you've said many times now that you

10 would have relied on the judgment of clinical

11 experts.  Did I get that right?

12             MR. PENDELL:  Objection.

13    A.   Yeah, with respect to the last series of

14 questions, yes.

15    Q.   Okay.  What do you mean you "would have"

16 relied on the judgment of clinical experts?

17    A.   Maybe that conditional "would" could be

18 replaced by "I did rely."

19    Q.   Okay.  What do you mean, you did rely on

20 the judgment of the clinical experts?

21    A.   Well, there is a particular section of my

22 report that addresses the issue of net costs of

23 prescription opioids from a clinical point of view,

24 and my understanding is the clinical expert -

1  primarily Doctor Lembke - would have considered the

2  questions you asked me.

3          They would be much better directed to

4  her, and she provided a global answer to the

5  question of whether the net costs -- whether there

6  were net costs in relation to whatever potential

7  benefits there were, and the answer was

8  unequivocal, and the answer was the costs vastly

9  exceeded the benefits.

10    Q.   So you're relying on Doctor Lembke's

11  opinion that the costs vastly outweigh the

12  benefits?

13    A.   I am relying on that opinion, yes.

14    Q.   And does Doctor Lembke offer that opinion

15  on a macro level or on a patient-by-patient level?

16              MR. PENDELL:  To form.

17    A.   Well, the -- you know, the macro is the sum

18  of the patients, so I think she's -- my

19  understanding of what she's done is addressing that

20  for the -- at a macro level, at which is the -- you

21  know, it's the right way in this context to think

22  about the impact of prescription opioids.

23    Q.   Can you point me to where in your report

24  you rely on Doctor Lembke's judgment that the costs

1    of prescription opioids vastly outweigh the

2    benefits of prescription opioids?

3         A.   Well, I think beginning on Paragraph 63 of

4    my report, and particularly on Paragraph 64 where

5    it says, "far outweigh the benefits."  That's my

6    under -- that's pretty much the same thing.

7         Q.   And -- you just referenced Paragraph 64?

8         A.   Of my report, yes.

9         Q.   Okay.  And the excerpt from Doctor Lembke

10   that you're referring to expresses her view "that

11   at a population level, the risks of long-term

12   opioids for chronic pain far outweigh the

13   benefits"?

14        A.   Yes, that's what I'm talking about.

15        Q.   Okay.  And here, her view is at a

16   population level, correct?

17        A.   Yes.  That's at a population level.

18        Q.   And she's talking about the risks of

19   long-term opioids for chronic pain outweighing the

20   benefits.  Correct?

21        A.   That's correct.

22        Q.   Where does Doctor Lembke offer the opinion

23   that the costs of prescription opioids vastly

24   outweigh the benefits of prescription opioids when

1   used to treat acute pain rather than chronic pain?

2       A.   Well, I'd have to look back through the

3   quotes here.

4       Q.   Okay.  Are you doing that now?

5       A.   I can do that now.

6            Well, in -- all right.  You may not

7   find the word "vastly" in my report, but there's

8   several Lembke statements here that I believe

9   support that, beginning in Paragraph 63.

10           The Lembke quote, "The best available

11  evidence...found that non-opioid medications"

12  "provide equivalent or greater pain relief, while

13  opioids confer significantly greater risks."

14           Now, the way I would interpret that

15  statement is that there are less costly ways to get

16  the same benefits, but the cost of risks

17  significantly -- maybe that's not vastly, but

18  significantly exceed the benefits.

19           And then -- well, I could -- I'm not

20  sure what else you want me to do here, but she goes

21  on to say that in a clinical trial, that there's

22  very little difference between opioids and even a

23  placebo.

24           Then we talked about Paragraph 64,

1  which is that there's -- at the population level,

2  for a very -- at least a very large segment of

3  what's going on here, the risks far outweigh the

4  benefits.

5          And let me just remind myself what else

6  is going on here with Lembke for one sec.

7          Okay.  I think this paragraph in

8  contrast that I quote in my -- my Paragraph 65 is

9  pretty definitive with respect to the very

10 significant risks associated with prescription

11 opioids in relation to alternatives which are

12 equally effective.

13    Q.   Does Doctor Lembke offer the opinion that

14 opioids are not indicated for acute pain?

15    A.   I -- gosh.  Well, I'm -- I'm again looking

16 at this paragraph to refresh myself what I said

17 about Lembke, and there is a sentence in there that

18 said, "Although opioids are indicated for acute

19 pain" -- so she would --

20         My assumption based on that statement

21 is that she did not say they were not indicated in

22 all circumstances.

23    Q.   Okay.  Does -- based on your review and

24 your understanding of what Doctor Lembke has said,

1    does Doctor Lembke say that the costs of

2    prescription opioids outweighs the benefits of

3    prescription opioids when prescription opioids are

4    used to treat acute pain?

5                    MR. PENDELL:  Objection.

6        A.   Well, I did come to that conclusion from

7    this.  Equivalent relief from other less risky

8    alternatives, that would say to me the net benefits

9    are outweighed by the cost.

10       Q.   Are you relying on anything else in these

11   excerpts from Doctor Lembke for your conclusion?

12       A.   I'm relying on Lembke for this.  And I also

13   mentioned Waller.

14                And it's very consistent.  You know,

15   there's a -- according to my reading of Waller,

16   there's, you know, a small set of indications, you

17   know, in relation to a very large medical risk.

18       Q.   Are you relying on anyone besides what

19   Doctor Lembke said in her report and what Doctor

20   Waller said in his report?

21       A.   I'm relying on these two clinicians.

22       Q.   Okay.  And you are relying on those two

23   clinicians for the proposition that all of the

24   benefits I asked you questions about are outweighed

1    by the costs?

2              MR. PENDELL:  Objection.

3        A.   I'm relying on these clinical inputs for

4    the statement that the net costs are positive of

5    prescription opioids.

6        Q.   And did you do any calculation of the

7    benefits of these prescription opioids?  Or are

8    you, instead, just relying on what you understand

9    Doctor Lembke and Doctor Waller to have said?

10              MR. PENDELL:  Objection.

11       A.   I'm relying on their opinion that the net

12   -- that the costs outweigh the benefits and that

13   implies to me that the net costs are positive.

14       Q.   And are you relying on anything else

15   besides Doctor Lembke and Doctor Waller for that

16   proposition?

17       A.   No, I'm just relying on -- I'm just relying

18   on those two clinicians.

19       Q.   And therefore having relied on Doctor

20   Lembke and Doctor Waller for that proposition, you

21   did not undertake to try to quantify or measure any

22   of the benefits of using prescription opioids.

23              MR. PENDELL:  Objection, asked and

24   answered.

1           MR. KO:  Objection.

2       A.   Well, my -- my task here was to estimate

3   the net.  And the net is cost minus benefits.  So

4   if I know the net -- or I have reliable opinions

5   that the net is on the cost side, then that tells

6   me what I need to know as an economist, and I can

7   then conservatively - as I did in my report - treat

8   that as zero.

9       Q.   Right.  So to determine the net cost, you

10  need to determine the costs and the benefits.

11  Correct?

12      A.   Well, that's -- I mean, in a very general

13  way, that would be correct.  And there's different

14  realms in which that question is asked here, and

15  one of them is a clinical realm in which I relied

16  on Lembke and Waller.

17      Q.   And on the cost side, you purported to

18  independently measure and quantify those costs.

19      A.   In some case -- well, yes, in much of my

20  report, I did quantify those costs.

21      Q.   And on the benefits side, rather than

22  attempting to measure them, you are relying on

23  Doctors Lembke and Waller for what you understand

24  them to be saying, which is the costs outweigh the

1    benefits.

2         MR. PENDELL:  Objection.

3    A.   Well, I'm relying on the clinicians, Lembke

4    and Waller, to consider the clinical benefits and

5    costs of prescription opioids and to come to a

6    determination of - from their perspective - whether

7    the clinical costs outweigh the clinical benefits,

8    and that's how I read their reports.

9    Q.   Turning to the section of your report on

10   mortality, I think starts with Paragraph 38 --

11        Are you there?

12   A.   Yes.

13   Q.   Okay.  And you explain that you rely on

14   Doctor Keyes' estimate of the number of deaths that

15   are due to prescription opioids.  Correct?

16   A.   Yes, I see that.

17   Q.   And when you say, "due to prescription

18   opioids," do you mean due to the sale and

19   distribution of prescription opioids, or something

20   else?

21   A.   I mean by the sale and distribution of.

22   Q.   Okay.  So you're relying on Doctor Keyes'

23   estimate of the number of deaths that are due to

24   the sale and distribution of prescription opioids?

1      A.   Yes.

2      Q.   Did you do any independent work yourself to

3  estimate the number of deaths that are due to the

4  sale and distribution of prescription opioids?

5      A.   In this case, I relied on a very good

6  epidemiologist, Professor Keyes, to provide those

7  estimates.

8      Q.   Right.  But my question was whether you did

9  any independent work.

10     A.   Oh.

11     Q.   Did you do any independent work yourself to

12 estimate the number of deaths that are due to the

13 sale and distribution of prescription opioids.

14              MR. PENDELL:  Objection to form.

15     A.   Well, the numbers here are ones that

16 Professor Keyes provided.  I obviously worked in

17 this area to assess the costs, but the numbers are

18 from Professor Keyes.

19     Q.   Okay.  And the numbers that Professor Keyes

20 supplied are -- were originally set out in Table 2

21 of your report on page 20, correct?

22     A.   That's correct.

23     Q.   Okay.  And looking at the numbers in Table

24 2, when you got these numbers from Professor Keyes,

1   did you do anything to see if they seemed

2   reasonable to you?

3       A.   Yes.

4       Q.   What did you do to evaluate whether the

5   numbers that Professor Keyes had supplied seemed

6   reasonable to you?

7       A.   Well, I think I looked at the magnitude

8   overall in terms of what I would have expected for

9   a community of the size of the Cabell community,

10  and then roughly the timing of those.

11              I'm not surprised that they, you know,

12  peaked in the -- whatever it is, 2017, in

13  accordance with local reports.  And I'm also -- I

14  also would have looked at the composition in terms

15  of direct and indirect prescription opioids.

16              And this also makes sense to me.

17      Q.   So you -- when you got these numbers that

18  are reflected in Table 2 from Professor Keyes, you

19  did look at them, and you did --

20      A.   Yes.

21      Q.   -- some kind of reasonable evaluation

22  yourself?

23      A.   Well, I looked at them and I just, you

24  know, saw -- sort of mentally, you do this -- that

1  you get the table and you just, you know, see if it

2  makes sense to you.  You look at it, and you know,

3  if it doesn't, you would say something.

4        But this made sense to you.

5  Q.  Okay.  It made sense to you, and I take it

6  then you didn't say anything to Professor Keyes

7  about these numbers.  Is that correct?

8        MR. PENDELL:  Objection.

9  A.  Well, I don't know if I said anything about

10  the numbers, which is a more general question.  But

11  I don't recall any criticism of these numbers that

12  I had -- I conveyed to her.

13  Q.  And when you were looking at them to see if

14  the numbers made sense, did you consult any other

15  sources of information, or was it just on the face

16  of it, it looked reasonable to you?

17        MR. PENDELL:  Objection to the form.

18  A.  I think in this case, I looked at the table

19  and it was my own kind of review based on what I

20  know about the situation, you know, was what I

21  would have used to, you know, run a kind of mental

22  check on the numbers.

23  Q.  Okay.  When you were doing the mental check

24  and you were looking at Professor Keyes' numbers,

1  did it occur to you that it seemed wrong or odd

2  that under her calculations, in 2018, 100 percent

3  of all deaths due to opioids were due to

4  prescription opioids?

5        MR. PENDELL:  Objection to form.

6     A.   No, it didn't occur to me.

7     Q.   Okay.  How about the fact that under the

8  numbers that Professor Keyes supplied, 97 percent

9  of all deaths due to opioids were due to

10 prescription opioids, according to her?

11       MR. PENDELL:  Objection.

12    A.   Well, again, that doesn't -- it didn't

13 strike me at the time.  But I know there's a lot

14 that are directly due and then a big chunk are

15 indirectly due.  So it didn't -- didn't strike me

16 as odd at the time.

17    Q.   And for your valuation of deaths, you use

18 the value of a statistical life?

19    A.   Yes, I do.

20    Q.   Other than in the opioid cases in which

21 you've been a testifying expert, have you ever used

22 the value of a statistical life to quantify costs

23 in a lawsuit?

24    A.   No.  This -- this is the only -- these are

1  the only settings in the opioid cases in which I

2  had that as part of my assignment.

3      Q.   Turning to Morbidity, which is a section

4  that starts on page 22 of your report -- are you

5  there?

6      A.   Yes.

7      Q.   -- you explain that you calculate morbidity

8  costs by multiplying the number of OUD cases due to

9  prescription opioids by the excess health care

10  costs associated with the treatment of OUD and

11  sequelae.  Correct?

12      A.   That's basically correct, yes.

13      Q.   Did you independently research the number

14  of OUD cases that are due to prescription opioids?

15      A.   In Cabell?

16      Q.   Yes.

17      A.   Again, this is something that I relied on

18  Professor Keyes for with respect to these counts.

19  They are directly taken from her report.

20      Q.   Okay.  So did you do any independent

21  research regarding the number of OUD cases in

22  Cabell County that are due to prescription opioids?

23          MR. PENDELL:  Objection to form.

24      A.   Well, you know, I worked in this area and

1  used the numbers, but the numbers themselves came

2  directly from Keyes.

3      Q.   Okay.  So you took from the Keyes report

4  the number of residents of Cabell County with OUD?

5      A.   Yes.

6      Q.   And you took from the Keyes report the

7  number of OUD cases in Cabell County that she

8  attributes directly to prescription opioids.

9      A.   That's correct; yes, I did.

10     Q.   And you took from the Keyes report the

11  number of OUD cases in Cabell County that she says

12  are not directly due to prescription opioids but

13  are indirectly due to prescription opioids.

14     A.   That's also correct; I did.

15     Q.   Did you do anything to test any of those

16  numbers?

17          MR. PENDELL:  Objection.

18     A.   I read what she did.  I thought it was a

19  reasonable approach.  That's -- I'm not sure what

20  you mean by "test" other than kind of run it by

21  yourself.

22     Q.   Okay.  In Paragraph 48 of your report, you

23  say "In the later years, cases of OUD due to

24  non-prescription opioids attributable to

1  prescription opioids make up a larger share of the

2  total."

3            Do you see that?

4      A.   I do see that, yes.

5      Q.   What you do mean by that statement?

6      A.   I mean that the fourth row of Table 4

7  accounts for a larger share of the fifth row in the

8  later years.

9      Q.   Why is that, as you understand it?

10           MR. PENDELL:  Objection.

11     A.   I assume you're not asking a mathematical

12  question.

13     Q.   Correct.

14     A.   You're asking a question of what?

15     Q.   What explains the phenomenon that you say

16  the numbers reflect?

17     A.   What is the underlying kind of epidemiology

18  of disease that accounts for this?  Would that be

19  what you're trying to get at?

20     Q.   Sure.  What explains that?

21           MR. PENDELL:  Object.

22     Q.   As you understand it.  If you know.

23     A.   I'm waiting for my counsel to object, but

24  hearing none --

1           MR. PENDELL:  I did.  I object.  I
2      objected.  I'll be louder.
3      A.   Well, there's -- you know, mathematically,
4      that's not what you're asking about.  You -- one
5      level down, there's data.  This is epidemiologic
6      data that Professor Keyes is the expert in that
7      comes in different types here with respect to OUD,
8      that she classified as directly and potentially
9      indirectly due to prescription opioids, and then
10     she has an approach that - given that data - that
11     generates these numbers.
12               That's, you know, one level of
13     explanation -- that's -- the nature of her work in
14     this is what led to this.
15               There's -- I suppose you can go further
16     than that and ask what are the social processes
17     that account for this, and, you know, there, I
18     think it's stepping way outside my -- my expertise,
19     so I'll just stop right there.
20     Q.   Regarding the excess health costs
21     attributable to OUD, you cite three studies?
22     Correct?
23     A.   Where -- I'm sorry, where are you now?
24     Q.   Turn to Paragraph 53 of your report.

1    A.   Okay.  Well, that's correct.  But there's

2  more cited in Appendix C that are in the same

3  flavor.

4    Q.   Okay.  Well, you cite the Florence study,

5  right?

6    A.   Yes.

7    Q.   The Leslie study?

8    A.   Yes.

9    Q.   And what you describe as a recent study

10  sponsored by the Society of Actuaries?

11    A.   Yes.  That's Davenport, is the first author

12  of that, yes.

13    Q.   And then you say in your report that you

14  "primarily rely on these later two studies to

15  quantify excess health care costs due to OUD."

16    A.   That's --

17    Q.   Why -- why not rely on the Florence study?

18          MR. PENDELL:  Objection.

19    A.   Well, it's "primarily rely," and not just

20  the Florence, but you know, other studies have

21  looked at this with broadly the same methodology -

22  which I regard to be appropriate - of mass controls

23  and come up with pretty similar answers.

24          What I was -- the reason that I chose

1  Leslie and Davenport to be my primary sources of

2  reliance for this purpose was to take into account

3  as best I could the fact that this is occurring in

4  Cabell County, not nationally, and Cabell County is

5  different than the nation in some respects that are

6  -- will show up in data, and so I wanted to use

7  that if I could, and these studies allow me to do

8  that.

9       Q.   You discuss NAS or neonatal abstinence

10 syndrome in your report?  Right?

11      A.   Yes, I do.  May I just flip to that?

12      Q.   Sure.

13      A.   Okay, I'm there.

14      Q.   You acknowledge that neonatal abstinence

15 syndrome can be caused by in-utero exposure to

16 chemicals other than opioids, right?

17      A.   That's my understanding, yes.

18      Q.   So an infant can be diagnosed as having NAS

19 even if the birth mother did not take any opioids

20 during the pregnancy.  Correct?

21      A.   That's my understanding.

22      Q.   Okay.  Did you do any independent research

23 into the number of NAS births in Cabell County?

24      A.   Well, this is, again, a count area where I

1    was aware of your questions that you asked earlier,

2    and this was explicitly part of what Professor

3    Keyes was going to do.

4            So being this is a question of

5    epidemiology, it was left to her, and I relied on

6    her estimates of the number of NAS babies.

7        Q.   Okay.  So you get from Professor Keyes the

8    estimated number of NAS births in Cabell County?

9        A.   That's correct, I do.

10       Q.   Did you do any independent research into

11   what percentage of NAS births in Cabell County are

12   attributable to the fetus being exposed to opioids?

13           MR. PENDELL:  Object to the form.

14       A.   Well, I don't know if "independent

15   research" is the right term.  This was a subject of

16   discussion with some of the local medical experts

17   who thought it was predominantly an issue of

18   prescription opioids.  But again, I didn't attempt

19   to sort through the local and the national evidence

20   on this, but relied on Professor Keyes to do that.

21       Q.   You referred to "local medical experts" in

22   your prior answer.  Who are you referring to

23   specifically?

24       A.   You know, I don't remember.  You know, it's

1   nothing I relied on for my opinion, and if I had, I

2   would have, you know, done my best to write that

3   down.

4           But I remember discussion with a

5   pediatrician who thought NAS is increasing in

6   Cabell County.  It's extremely costly.  There's

7   follow-up stuff that happens that, you know, is

8   just terrible for the baby and family, and that

9   most of these are attributable to prescription

10  opioids, even if not 100 percent are.

11      Q.   For your calculations, you assume that 50

12  percent of the number of NAS births in Cabell

13  County are due to opioids.  Correct?

14      A.   Well, that's how I proceed here.  And I

15  believe I described the basis for that, which was

16  the opinion that a majority were and "majority" is

17  a word that doesn't have a percentage associated

18  with it, but majority is at least 50 percent in my

19  understanding.  So that's why I used 50 percent.

20      Q.   And in your report, you say that to support

21  your assumption, you're relying on Professor Keyes'

22  statement that, quote, "The majority of neonatal

23  abstinence syndrome among US infants is due to

24  opioid exposure in utero."  Correct?

1      A.   Yeah.  Well, you're reading somewhere.

2      Q.   I'm reading from Paragraph 72 of your

3  report --

4      A.   Yeah, that's --

5      Q.   -- first sentence.

6      A.   Yeah, that's -- that sounds accurate, yes.

7      Q.   Okay.  Do you know what Professor Keyes'

8  statement is based on?

9      A.   Well, I would have when I had read her

10  report, but right now, I'm -- I can't tell you.

11      Q.   And that statement that you quote from

12  Professor Keyes is about NAS cases among U.S.

13  infants, correct?

14      A.   Yes, that's correct.

15      Q.   So it's not specific to Cabell County,

16  right?

17      A.   Well, it's -- it's U.S.  Not -- it's not

18  specific to Cabell County.

19      Q.   For the other NAS cases that are not due to

20  in-utero exposure to opioids, what are the

21  chemicals that cause the NAS?

22            MR. PENDELL:  Objection to form.

23  Outside the scope.

24      A.   I really -- probably other drugs, but it's

1  outside the scope of my report.  I'm not in a

2  position to say.

3       Q.   Well, what other drugs?

4            MR. PENDELL:  Objection.

5       A.   Drugs that are potentially addictive, I

6  suppose.  But I -- again, it's outside my scope.

7  I'm not sure.

8       Q.   Okay.  So you started with the number of

9  NAS births in Cabell County, and you got that

10 number from Professor Keyes, and then you assumed

11 that 50 percent of those NAS births were due to

12 opioids.  Correct?

13      A.   That's correct.

14      Q.   And then you needed to determine of the NAS

15 cases that are attributable to the birth mother

16 using opioids during pregnancy, what share are due

17 to prescription opioids.  Right?

18      A.   That's right.  Correct.

19      Q.   What does "due to prescription opioids"

20 mean?

21      A.   It means here the same thing it meant in

22 the previous table with respect to morbidity.  That

23 "due to" would be either directly due to addiction

24 due to prescription opioids or indirectly due to

1   prescription opioids.  It's both of those together.

2       Q.   Okay.  So you're saying, "due to

3   prescription opioids" means directly due to

4   prescription opioids and indirectly due to

5   prescription opioids.

6       A.   Yes, that's a good summary.

7       Q.   Okay.  What does "directly due to

8   prescription opioids" mean?

9       A.   Well, it means in the context of morbidity,

10  where this estimate comes from, that the -- that

11  the opioid that the patient is addicted to is

12  prescription opioids.

13      Q.   And what does "indirectly due to" mean?

14      A.   It means if the -- the you know, person who

15  was ill may be addicted to some other substance -

16  for example, heroin - that the reason they are

17  addicted to heroin is due to prescription opioids.

18      Q.   And what does that mean "due to

19  prescription opioids?"

20      A.   It means but for their use of prescription

21  opioids, they would not have been addicted.

22      Q.   So when you are determining the share of

23  NAS cases that are attributable to using opioids

24  that are due to prescription opioids, does that

1    mean the percentage of NAS cases that are

2    attributable to the birth mother using prescription

3    opioids during pregnancy, or does it mean something

4    else?

5              MR. PENDELL:  Objection to form.

6        A.   Yes, it means something else.

7        Q.   What does it mean?

8        A.   It means the -- it's an estimate.  And it's

9    an estimate of the share of disease of opioid use

10   disorder that is due to prescription opioids.  So I

11   have a number, using this 50 percent conservative

12   assumption, of babies who are born with NAS due to

13   opioids.

14             The ultimate question I need an answer

15   to is how many of them are due to prescription

16   opioids, and so that is -- is estimated by the

17   share of morbidity in Cabell County that is due to

18   prescription opioids in the way that is discussed

19   around the morbidity tables.

20       Q.   Okay.  And again, those percentages are

21   derived from numbers that you receive from

22   Professor Keyes.

23       A.   That's correct.

24       Q.   You assume -- this is in Paragraph 72 of

1  your report.  You assume that the share of NAS

2  births due to prescription opioids is the same as

3  the share of OUD due to prescription opioids.

4      A.   That's correct.

5      Q.   And the share of OUD cases due to

6  prescription opioids is not something you

7  calculated.  Right?

8      A.   That's again -- I -- it's whatever table it

9  was previously.  Those numbers come from --

10  directly from Professor Keyes' report.

11      Q.   So you relied on Professor Keyes for the

12  share of OUD cases due to prescription opioids.

13      A.   Yes, I did.

14      Q.   So you are relying on Professor Keyes for

15  the share of NAS births attributable to opioids

16  that are attributable to prescription opioids in

17  particular.  Correct?

18          MR. PENDELL:  Objection to form.

19      A.   Well, this is a question of epidemiology

20  that we're discussing right now.  Disease counts,

21  which is -- which is the bread and butter of

22  epidemiology.  It's not the bread and butter of an

23  economist, so I, you know, quite confidently could

24  rely on a first rate epidemiologist to give me the

1  information I needed to be able to do a disease

2  count, which is what we're discussing here.

3         So I relied on a very good one,

4  Professor Keyes, to do that.

5    Q.   What is the basis for your assumption that

6  the share of NAS births due to prescription opioids

7  is the same as the share of OUD due to prescription

8  opioids?

9    A.   Well, the basis of that assumption is that

10  babies born with NAS are born to mothers who are --

11  have a opioid use problem.  And of those mothers --

12  if you wanted an estimate of what share of those

13  mothers with an opioid use problem are due to

14  prescription opioids, well, we just happen to have

15  a share estimate of that morbidity that we've

16  computed earlier.

17         So that's the basis.  I think it's

18  mother's disease causes NAS; what share of mother's

19  disease is prescription opioids.  We've estimated

20  that, so I think it's a pretty good assumption.

21    Q.   You acknowledge that NAS can be caused by

22  in-utero exposure to opioids that were taken by the

23  birth mother as prescribed.  Right?

24         MR. PENDELL:  Objection.

1     A.   I actually don't know the degree to which

2  -- you know, what level of risks are associated

3  with different things.  I -- it's not something I

4  can help you with.

5     Q.   Well, I'm not asking you to quantify

6  anything.  I'm -- my question is:  Do you

7  acknowledge that NAS can be caused by in-utero

8  exposure to opioids that were taken by the birth

9  mother as prescribed?

10          MR. PENDELL:  Objection to form.

11  Outside the scope.

12     A.   You know, I'm sorry, I don't really know.

13     Q.   Okay.  Would you look at page -- Paragraph

14  67 of your report?  Are you there?

15     A.   Yes.

16     Q.   Okay.  Second sentence of Paragraph 67 in

17  your report says, quote, "It" - meaning NAS - "can

18  occur due to any regular antenatal opioid use,

19  including whether opioids are taken as prescribed

20  or non-medically."  Do you see that?

21     A.   I see that.

22     Q.   Okay.  So NAS can result from a birth

23  mother's use of opioids pursuant to a prescription.

24     A.   Well, it looks like that there's at least

1   some reference to support that statement.

2       Q.   And so when you acknowledge that NAS can

3   occur due to any regular antenatal opioid use -

4   meaning use before birth - including when opioids

5   are taken as prescribed, you're acknowledging it

6   can result from opioid use taken pursuant to a

7   prescription written by a licensed physician.

8                Correct?

9       A.   Yeah, it looks like that's possible.

10              MR. PENDELL:  Objection.

11      Q.   How many of the NAS cases included in your

12  quantification involved the birth mother taking

13  opioids as prescribed by her licensed physician?

14              MR. PENDELL:  Objection.

15      A.   Well, this is -- you're coming back to

16  questions of epidemiology where I'm kind of on the

17  edge on this.  And again, this is something that

18  Professor Keyes would have considered and dealt

19  with, and I use her numbers.

20      Q.   Okay.  Does she address how many of the NAS

21  cases included in her count involved the birth

22  mother taking opioids as prescribed by her licensed

23  physician?

24              MR. PENDELL:  Objection to form.

1  A. I'm not sure how she went this -- about

2 this. So I'm -- I can't tell you right now.

3  Q. Do physicians on occasion prescribe an

4 opioid to a pregnant woman to help her manage a

5 preexisting addiction during pregnancy?

6     MR. PENDELL: Objection to form.

7  A. I'm not really in a position to say.

8  Q. You don't know one way or the other?

9  A. I don't know one way or the other.

10  Q. How many of the NAS cases included in your

11 quantification involved babies who are born to a

12 birth mother who was taking a prescription opioid

13 as prescribed by her licensed physician to help her

14 manage a preexisting addiction during pregnancy?

15     MR. KO: To the form.

16     MR. PENDELL: Objection, yeah.

17  A. Well, that's very far into the weeds. That

18 also would have been something that Professor Keyes

19 took into account. The epidemiologist, not the

20 economist.

21  Q. Did Professor Keyes' count of NAS cases

22 account for babies who were born to a birth mother

23 who was taking a prescription opioid as prescribed

24 by her licensed physician to help her manage a

1   preexisting addiction during pregnancy?

2           MR. KO:  Objection to form.

3           MR. PENDELL:  Objection.

4    A.   Well, again, I don't recall exactly what

5   Professor Keyes did, but her statement that the

6   majority of NAS cases are due to OUD is one that,

7   you know, allows for lots of other situations in

8   which a baby may be born with NAS.

9           So there's nothing inconsistent with

10  the statement that the majority are if you have

11  examples that sometimes it is not.

12           And I would have expected Professor

13  Keyes to, you know, be aware of the "sometimes they

14  are not" and I'm sure she was, so there's no reason

15  that what you're -- this -- sort of these

16  questions, are ones that would cause me to doubt

17  the reliability of the assumption that -- my

18  conservative assumption that 50 percent only of the

19  NAS cases are due to opioid use disorder.

20    Q.   Are you drawing a separation between

21  mothers who have opioid use disorder and mothers

22  who are taking a prescribed opioid to help manage a

23  preexisting condition?

24    A.   Well, that's again a question of

1    epidemiology.  And if the person -- if the mother

2    has opioid use disorder, then -- and you have a NAS

3    baby, that may well have been due to prescription

4    opioids.

5              But the distinction between who is

6    taking and who has OUD is one that is also squarely

7    within Professor Keyes' expertise, and I know she

8    addressed that in her report.

9         Q.   You purport to value the economic harm from

10   child maltreatment by multiplying the number of

11   victims where prescription opioids were involved by

12   the costs associated with this maltreatment.

13   Correct?

14        A.   That's broadly correct, but give me a hint

15   about where this paragraph is.

16        Q.   Sure.  Paragraph 100.

17        A.   Well, okay.  It's -- yes, I'm there.

18        Q.   Okay.  Do you see that sentence at the

19   beginning of Paragraph 100?

20        A.   Yes.

21        Q.   Okay.  What is the definition of

22   "maltreatment" when you're attempting to value the

23   economic harm from child maltreatment?

24        A.   This is a field of child welfare, and

1    "maltreatment" can be neglect or abuse.  And I

2    think we know what those mean.

3        Q.   Did you pull any data from any Cabell

4    County source about the number of children who are

5    maltreated in that county?

6        A.   Well, my methodology is here.  And I know I

7    had to use some West Virginia numbers for some

8    percentages, and then the data I used for Cabell

9    had to do with the number of kids in Cabell.

10       Q.   Right.  But my question is specific.  Did

11   you pull any data from any Cabell County source

12   about the number of children who are maltreated in

13   that county?

14              MR. PENDELL:  Objection to form.

15       A.   Well, the number is Cabell data; the number

16   of kids is Cabell data.  The share of kids who are

17   maltreated is a West Virginia number.

18       Q.   Okay.  Did you look for any data specific

19   to children in Cabell County who are maltreated?

20              MR. PENDELL:  Objection to form.

21       A.   I think I probably would have been

22   interested in that.  I don't remember -- I don't

23   remember the details.  But I know -- remember

24   asking that question and determining that this was

1  the best source of an estimate.

2     Q.   So what -- when you -- when you looked for

3  data specific to children in Cabell County who were

4  maltreated, what did you find?

5     A.   See, I don't remember the details of what

6  -- the limitations or availability of local data

7  would be with respect to maltreatment, so I'm

8  sorry, I don't remember.

9     Q.   So the analysis you did relied on data you

10  pulled from the Department of Health and Human

11  Services Administration for Children and Families?

12     A.   Well, that's some of the data, yes.

13     Q.   Okay.  And where does the Administration

14  for Children and Families get its data?

15          MR. PENDELL:  Objection to form.

16     A.   I believe from child welfare agencies.

17     Q.   In the various states?

18     A.   In the various states.

19     Q.   Did you --

20     A.   Sorry.  Excuse me.  There could be other --

21  there could be other sources.  I'm not 100 percent

22  familiar with it.

23     Q.   Okay.  Do you know where else, if anywhere,

24  the Administration for Children and Families gets

1   its data other than from child protective agencies

2   in the states?

3           MR. PENDELL:  Objection to form.

4       A.   I have to go -- I'd have to go back and

5   look.  I don't recall right now.

6       Q.   Okay.  Did you seek any data from any child

7   protective agency in West Virginia?

8       A.   I don't think I made any direct requests

9   that I remember.

10      Q.   Okay.  So you went to the Department of

11  Health and Human Services Administration for

12  Children and Families and you requested data for

13  West Virginia?

14      A.   Yes.

15      Q.   Okay.  And you say that you could -- you

16  could not get data from the Administration for

17  Children and Families for certain years.  Correct?

18      A.   That's also correct, yes.

19      Q.   So the Administration for Children and

20  Families was not able to provide West Virginia data

21  for 2006, 2007, 2008, 2009, 2013 and 2015.

22  Correct?

23      A.   Well, I'm -- if you don't mind pointing me

24  to where you're seeing that.

1      Q.   Sure.  Why don't you look at your Footnote
2   183.
3      A.   Yes, okay.  Your statement --
4      Q.   Okay.  And so for those years - 2006, 2007,
5   2008, 2009, 2013 and 2015 - you had to estimate
6   counts for those years, correct?
7      A.   That's correct, yes.
8      Q.   Okay.  So having gone to the Administration
9   for Children and Families and gotten its data for
10  West Virginia for certain years, but not all of
11  them, you then estimated counts for the missing
12  years.
13     A.   That's correct.
14          That's my phone.  Sorry.  I'm ignoring
15  it.
16     Q.   It is?  Okay.
17     A.   Yes.
18     Q.   I was checking my phone just in case.
19     A.   Yes, I could tell.  Everyone was probably,
20  "Oh my gawd, I got a call."
21     Q.   And then you -- based on the data you have
22  and extrapolating across the years for which you
23  did not have data, you estimated the number of
24  first-time victims of child maltreatment with a

1  drug abuse risk factor.  Correct?

2      A.   That's correct.

3      Q.   Did you assign the drug of use risk factor

4  to those first-time victims?

5      A.   That's in the data.

6      Q.   That's in the data you got from the

7  Administration for Children and Families?

8      A.   Yes.

9      Q.   Does the Administration for Children and

10  Families assign the drug abuse risk factor?

11          MR. PENDELL:  Objection to form.

12      A.   Well, it would have been from whatever data

13  source would have done that assignment.  I don't

14  think they did it at that level.

15      Q.   Okay.  So you didn't assign it, and you

16  don't think the Administration for Children and

17  Families assigned it?  Do you think it's in the

18  data that was reported to the administration for

19  child and families?

20      A.   That would be my assumption, yeah.

21      Q.   Okay.  And so for the West Virginia data,

22  you believed the drug abuse risk factor would have

23  been assigned by a child protective agency for West

24  Virginia?

1          MR. PENDELL:  Objection to form.

2      A.   Whatever the reporting agency is.  I'm --

3  that's really all I can say.

4      Q.   What child protective agency or agencies in

5  West Virginia provided the data that the

6  Administration for Children and Families has for

7  West Virginia?

8          MR. PENDELL:  Objection to form.

9      A.   I'd have to go back and look.  I can't tell

10  you off the top of my head.

11      Q.   Okay.  And what does a drug abuse risk

12  factor mean in the data for West Virginia?

13      A.   It means a caregiver - who is, in this

14  context, mostly parents, but not always parents -

15  uses drugs.

16      Q.   Who -- who assigns the drug abuse risk

17  factor to a particular case?

18          MR. PENDELL:  Objection to form.

19      A.   Now, here again, it's a little bit more

20  detailed than I can answer right now.  Caseworker,

21  but I'm not sure.

22      Q.   Okay.  And you believe it's a caseworker?

23          MR. PENDELL:  Objection.

24      A.   I said it could be a caseworker.  I'm not

1  sure who does the assignment of the data.

2      Q.  If not a caseworker, who would assign the

3  drug abuse risk factor to a particular case?

4            MR. PENDELL:  Objection.

5      A.  Well, it could be someone who gets a report

6  from a caseworker and then makes a determination.

7      Q.  And what are the criteria used for deciding

8  whether to assign a drug abuse risk factor to a

9  particular case?

10            MR. PENDELL:  Objection to form.

11      A.  That's, again, more detailed than I can

12  answer off the top of my head.

13      Q.  Does it require a finding that the

14  maltreatment was caused by drug abuse by a

15  caregiver?

16            MR. PENDELL:  Objection to form.

17      A.  Again, I'm not sure.  It's too much detail

18  for me to know sitting here.

19      Q.  Does it require a finding that there was

20  drug abuse by someone in the family?

21            MR. PENDELL:  Objection to form.

22      A.  This is too much detail.  I'm sorry.  I

23  can't answer that question now.

24      Q.  Can a drug abuse risk factor be assigned to

1   a case based on assess -- an assessment that there

2   was a risk of drug abuse by the caregiver or the

3   family?

4           MR. PENDELL:  Objection to form.

5       A.   I'm not sure I totally understand the

6   question, but I do -- I do think it's probably too

7   much detail for me to be able to answer.

8       Q.   Okay.  I'm trying to understand - based on

9   your understanding of this data - how is a drug

10  abuse risk factor assigned to a particular case?

11  Is it that someone has concluded that in fact there

12  was drug abuse?  Or is it that the child's home or

13  the child's caregivers are at risk of abusing

14  drugs?

15          MR. PENDELL:  Object to the form.

16      A.   My understanding, it's the former, not the

17  latter.

18      Q.   What is your understanding based on?

19      A.   It's reading the material that fed into

20  this analysis.

21      Q.   What material?

22      A.   The report that we've been referring to.

23      Q.   The report from the Administration for

24  Children and Families?

1      A.   Yes.

2      Q.   Okay.  What -- where is that report cited

3  in your report?

4      A.   Probably here, but certainly -- it's right

5  in 183 -- Footnote 183 but -- and Footnote 176 and

6  elsewhere.

7      Q.   You then estimated the percentage of

8  first-time victims with a drug risk factor who live

9  in Cabell County.  Correct?

10      A.   Correct.

11      Q.   And you did that by comparing the total

12  number of children in Cabell County to the total

13  number of children in West Virginia?

14      A.   Give me a paragraph, please, I'll -- then

15  I'll confirm.

16      Q.   It's Paragraph 103 again, if you need a

17  reference.

18      A.   Well, it just helps me to take a look.

19           Yes, that's what I did.

20      Q.   Okay.  So you -- you calculated a ratio of

21  the total number of children in Cabell County to

22  the total number of children in West Virginia and

23  then you applied that ratio to the total number of

24  first-time victims with a drug abuse risk factor to

1   identify the percentage of those victims who live

2   in Cabell County?

3       A.   That's basically correct.  And if I could

4   just editorialize a little bit on this method, it's

5   conservative.

6            Cabell has it worse than the state, so

7   I felt that (Zoom audio glitch) figures derived in

8   this way are probably a lower bound than what the

9   real numbers are.

10      Q.   You said Cabell county has it worse --

11  worse than the rest of the state --

12      A.   In terms of the impact of the opioid

13  crisis.

14      Q.   Okay.  Including with respect to child

15  maltreatment.

16      A.   Including with the things that the opioid

17  crisis causes, including child maltreatment.

18      Q.   So you -- you assume there's no variation

19  in the rate of child maltreatment across West

20  Virginia?

21           MR. PENDELL:  Objection to form.

22      A.   No, I didn't assume that.  I assumed that

23  the West Virginia numbers were a undercount of what

24  I was going to see in Cabell.  And so using the

1   West Virginia numbers, give a informative estimate,

2   and it's an informative -- I would call a lower

3   bound of what the numbers are.

4           So when I'm interested in computing a

5   net cost number or I'm counting children who are

6   maltreated and then assessing the cost to those

7   children, I come up with a number that is -- I

8   mean, the quote/unquote real number would be at

9   least as big as that.

10  Q.   So you now -- at this point in your

11  methodology, you've identified the number of

12  first-time victims with a drug abuse risk factor

13  who live in Cabell County.  Right?

14          And then the next step was to determine

15  the percentage of those victims where the drug

16  involved opioids?

17          MR. PENDELL:  Object to the form.

18  A.   That's correct.

19  Q.   And you did that by -- by applying the

20  percentage of drug seizures that involved opioids?

21  A.   Yes, that's also correct.

22  Q.   What is your basis for using that

23  percentage as a -- as a proxy for the drug abuse

24  risk factor involving opioids?

1          MR. PENDELL:  Objection.

2     A.   Well, it's a -- I think it's a reasonable

3 estimate of the share of overall drug.  So I have

4 from the West Virginia data drug abuse risk

5 factors, and I don't want to be, you know, overly

6 -- I don't want to count too much and attribute all

7 of that to opioids.  Even though in Cabell County,

8 I think it could be said with confidence that

9 opioids, in relation to drug abuse, are much higher

10 than it would be on the national level.

11          So that's sort of underlying thing

12 that's feeding into my thinking here.  And so if I

13 take a national number that is the ratio of opioid

14 to other drugs - which I can get through this

15 seizure reporting information - that, again, is a

16 -- an estimate I can be confident is a lower bound

17 on what that ratio would be in Cabell County.

18          So that's -- that's how I can

19 confidently use a national number.

20     Q.   And then you attempt to estimate the

21 percentage of first-time victims with a drug abuse

22 factor who live in Cabell County where the drug

23 involved opioids that are attributable to

24 prescription opioids.

1      A.    Yeah, I had to go through --

2      Q.    Is that correct?

3      A.    I had to do that too.

4      Q.    Okay.  And so you take the number of

5  first-time victims with a drug abuse risk factor

6  who live in Cabell County where you believe the

7  drug involved opioids, and you multiply it by the

8  opioid morbidity attributable to prescription

9  opioids, again using the numbers that you got from

10 Professor Keyes.

11     A.    That's what I did, yes.

12     Q.    Okay.  And as a result of this, your

13 calculations purport to show that 97.5 percent of

14 all child maltreatment cases in 2006 are

15 attributable to prescription opioids.

16     A.    I'm sorry, where are you now?

17     Q.    Well --

18     A.    That doesn't sound quite right, but let me

19 -- where are you finding those numbers?

20     Q.    Well, let's go back to --

21     A.    If you say it again, maybe I can figure

22 out --

23     Q.    Well, I'm trying to find table --

24     A.    I see that the numbers in Table 9, you have

1  to look back at Attachment C to figure out where

2  they came from.

3              Take a look at Table 9.

4     Q.   Yeah.

5     A.   3, 2, 2, 4.  This methodology doesn't lead

6  to - on the face - what seemed to me to be too

7  high.  If anything, I see 2011, four kids in Cabell

8  County maltreated because of prescription opioids?

9              I know that's kind of a impression, but

10  that's -- if you're trying to argue that that's an

11  overestimate, I don't know.  I just don't know

12  where you're coming from.

13    Q.   I'm not arguing anything.  I'm asking you

14  questions.

15    A.   I know.  But if you're trying to make that

16  point and you see four in 2011, I don't know.  I

17  just don't know.

18    Q.   So the number -- the figures in your Table

19  9, the first row, you're saying that's the number

20  of children who are maltreated by someone who was,

21  what, using prescription opioids?

22    A.   No, this is -- no.  It's -- it's analogous

23  to the questions I tried to address earlier.  It's

24  the maltreatment due to prescription opioids with

1  the kind of model or idea that prescription opioids

2  can cause disease, and it's people who are ill with

3  opioid use disorder - either directly or indirectly

4  due to prescriptions - who are those that provide

5  -- who that create a risk to a child.

6  And so it's prescriptions, to disease,

7  to risk of maltreatment.  And you know, the various

8  factoring down that we've been discussing -- you

9  factor down because not all drugs are opioids; you

10  factor down because not all opioids are

11  prescription opioids, then --

12  But with that factoring down of the

13  number of children who are maltreated, you come up

14  with these numbers.  That's -- that's the basic

15  idea here.

16  Q.   You submitted an errata sheet on August

17  24th, 2020, correct?

18  A.   Yes, I did.

19  Q.   Do you have a copy of that errata sheet in

20  front of you?

21  A.   I can put one in front of me.

22  Q.   Please do so.

23  A.   Okay.

24  Q.   Do you have it in front of you?

1     A.   I do, yes.

2     Q.   Okay.  And the errata sheet appears to have

3  two sections.  One section is titled "Harm

4  Valuation Changes."  Right?

5     A.   Yes.

6     Q.   And the other is titled "Typographical and

7  Citation Changes."  Right?

8     A.   That's correct.

9     Q.   Okay.  Is it accurate to say that all of

10  the harm valuation changes listed in this errata

11  sheet are the result of getting new numbers from

12  Professor Keyes?

13     A.   Well, I listed here the reason.  And in

14  every one of the cases in that Harm Valuation

15  Changes, it's due to an input change from Doctor

16  Keyes, Professor Keyes.

17     Q.   When did you get these input changes from

18  Professor Keyes?

19     A.   I think it was about a week later.  A week

20  after the submission of her original report.

21     Q.   Okay.  So roughly August 10th?

22     A.   Yeah.  I'm not sure exactly, but not long

23  after.

24     Q.   And what did you get on August 10th?  Did

1  you get a revised report that had new numbers?

2      A.   No.  I got a revised set of in -- what I

3  would call the input numbers.  In the form -- it

4  comes in an Excel spreadsheet.

5      Q.   Okay.  And who supplied that Excel

6  spreadsheet with the new numbers that were input

7  changes from Professor Keyes?

8      A.   Someone that works with Professor Keyes.

9      Q.   Okay.  And prior to receiving that

10  spreadsheet, had you received a heads-up that

11  Professor Keyes was revising the numbers in her

12  report?

13      A.   I don't think so.  But -- no, I didn't

14  receive a heads-up.

15      Q.   Prior to receiving the spreadsheet, were

16  you aware that the numbers in Professor Keyes'

17  original report were inaccurate?

18      A.   No, I was not.

19      Q.   When you got the spreadsheet, what did you

20  do with it?

21      A.   What my staff did with it was to substitute

22  the previous input numbers that we'd been using

23  from Professor Keyes that, you know, flow through

24  the report.  And I think you can see with all the

1    changes that are necessary from the change in

2    Professor Keyes' numbers that, you know, the inputs

3    change, and then there's a series of Excel files

4    that produce tables and figures that themselves

5    changed.

6              So thankfully, to the magic of Excel,

7    you know, one is able to do something like that

8    relatively quickly.

9        Q.   So did -- did someone on your team input

10   the updated corrected figures from Professor Keyes

11   into your -- your report?

12       A.   That -- I mean, that's -- it sounds a

13   little bit more by hand than it actually was.  But

14   yes.  The inputs came from Professor Keyes, and

15   then they were fed into the Excel spreadsheets that

16   produced the tables in my report.

17       Q.   When you got the spreadsheet from Professor

18   Keyes with the updated corrected numbers, did you

19   follow up with Professor Keyes to understand what

20   led to those changes or corrections?

21       A.   I asked my staff about this.  I didn't talk

22   to Professor Keyes directly.

23       Q.   Who on your staff did you ask?

24       A.   Adrian Garcia.

1      Q.   And what did Adrian tell you?

2      A.    Well, there was two kind of groups of -- if

3  I can call them corrections, to Professor Keyes'

4  report, one having to do with morbidity, and

5  there -- there was a year - a single year, 2010 -

6  where something was .053 and it should have been

7  .043.  I can't remember exactly what the entry

8  refers to.

9           But that, I understood to have been a

10  typo.  That someone on her end had entered in the

11  wrong number.

12           Then the other source of corrections

13  had to do with mortality, and it had to do with a

14  subset of the years of mortality from 2013 to 2018.

15  And my understanding of what happened there is that

16  on Professor Keyes' end, there was an inadvertent

17  inclusion of a table that wasn't -- or a figure

18  that wasn't the final figure, so it --

19           That -- it's kind of a mistake, but I

20  don't know beyond -- that's my understanding of

21  what -- that's what Adrian explained to me.

22      Q.   Okay.  So what you've offered is what you

23  heard from Adrian, not what you heard from

24  Professor Keyes.

1      A.    That's correct.

2      Q.    And there were two groups of corrections:

3   The first one involved morbidity and the second one

4   involved mortality?

5      A.    That's correct.

6      Q.    And for the second category, mortality, you

7   said there was an inadvertent inclusion of a

8   nonfinal figure in Professor Keyes' calculations

9   for Years 2013 through 20118?

10     A.    Some -- yeah, something like that.

11     Q.    And who -- who identified the error?

12            MR. PENDELL:  Objection to form.

13     A.    I'm not sure.

14     Q.    Who on Professor Keyes' team corrected it?

15            MR. PENDELL:  Objection to form.

16     A.    I'm also not sure about that.

17     Q.    Okay.  And then after Adrian Garcia told

18   you of these errors, did you give Adrian

19   instructions on how to revise and update and

20   correct your report?

21     A.    Yes.

22     Q.    And how long did it take for Adrian to

23   update your report based on the corrected figures

24   from Professor Keyes?

1      A.   An amazingly short period of time.  I don't

2   know in terms of days or hours, but not long.  You

3   know, once the inputs -- the input Excel files are

4   set up, the actual -- you know, producing the

5   actual Excel results happens, you know, very

6   quickly.

7           And then the report has to go in and be

8   modified, numbers changed and narrative changes.

9   That takes a little bit longer.

10          But I was in -- I guess I'm not

11  shocked, but I was impressed how quickly the whole

12  thing could get turned around.

13     Q.   So having received the spreadsheet from

14  Professor Keyes on August 10th or so, when was your

15  revised report finalized?

16     A.   Oh, gosh.  When it was submitted.  I don't

17  remember exactly the date.

18     Q.   Okay.

19          MR. PENDELL:  Andy, I didn't want to

20  interrupt this line of questioning, but at some

21  point, if we could think about lunch.  We've been

22  going for a while, and I don't know if Professor

23  McGuire is hungry, but I definitely am.

24          MR. KEYES:  Sure, sure, okay.

1    Q.   The second set of changes in the errata

2    sheet are corrections of citations and corrections

3    of typographical errors?

4    A.   Yes.

5    Q.   And who identified those errors as issues

6    that needed to be corrected?

7    A.   This was my staff at Greylock McKinnon.

8    Q.   I'm sorry, your staff and what?

9    A.   Some member of the staff at Greylock

10   McKinnon.  I don't know what individual actually

11   did it.

12   Q.   Okay.  And since submitting this errata

13   sheet on August 24th, have you identified any other

14   errors?

15   A.   No, I haven't.

16   Q.   Okay.

17          MR. KEYES:  Let's go off the record.

18          VIDEO OPERATOR:  Going off the record.

19   The time is 12:04 p.m.

20             (A recess was taken for lunch after

21             which the proceedings continued as

22             follows:)

23          VIDEO OPERATOR:  This begins Media

24   Unit 4 in the deposition of Tom McGuire.  We're

1    back on the record.  The time is 12:56 p.m.

2    BY MR. KEYES:

3         Q.    Professor McGuire, you have a section on

4    the economic harms that result from crime that are

5    attributable to or due to prescription opioids.

6    Can you walk us through how you estimated the

7    number of crimes in the Cabell/Huntington community

8    that are attributable to the sales and distribution

9    of prescription opioids?

10        A.    Okay.  I'm going to open my report to that

11   section, and I'll essentially step through the

12   analysis there.  So let me just get there first.

13        Q.    Sure.

14        A.    Okay.  So it begins at Paragraph 78.  And

15   I'll give you a high level overview, Counsel, and

16   then whatever you want to follow up on, then we can

17   talk about that.

18              So at a high level, the idea is similar

19   to the approaches that have been taken to the other

20   areas of harms and costs, and it's in two parts.

21   The first part is to do the count part, which is to

22   - in this case - estimate the number of crimes in

23   the Cabell/Huntington community that are

24   attributable to prescription opioids, and then to

1  value them in terms of dollars to get a net cost.

2           And I understand you're asking about

3  the first part.

4       Q.   Correct.

5       A.   So -- I can keep talking if you want.

6       Q.   No.  So my question is about the first

7  part.

8       A.   Okay.

9       Q.   How did you estimate the number?

10      A.   That's what I thought.  And with regard to

11  the number, the initial step is to obtain a count

12  of the total crimes in the Cabell/Huntington

13  community that -- from all the law enforcement

14  agencies over this time period.

15           And that involves a kind of national

16  incidence-based reporting system which is -- I

17  think it's maintained by the FBI.

18           -- that does that -- that collects that

19  information.  But the reporting to that is -- my

20  understanding is voluntary.  So not all the LEAs -

21  which are the law enforcement agencies - who would

22  have information about crimes in this community

23  would necessarily report to the FBI each year.

24           So I started with the national data

1  that's reported by the local agencies, and then I

2  noticed which agencies and which years were not

3  reported, and then I went to those agencies

4  directly - or my staff went to those agencies

5  directly - and requested the information.

6          And in a number of cases, we got that

7  information.  So that was added into the aggregate.

8          And as you know from my report, the

9  reporting of crimes is in various categories.  Even

10  after this follow-up, not all law enforcement

11  agencies were able to provide us with the data, so

12  there's -- we're missing some, which makes what

13  I've done undercount.

14          But what I have is the ones that

15  reported to the NIR -- NIBRS and then the ones that

16  reported to us directly.

17          So that gives kind of a total:  Here

18  are all the crimes that were in the Cabell

19  community during this time period.

20          And then the question I was interested

21  in is:  What share of those crimes can be

22  attributable to prescription drugs?  And here, I

23  treated the try -- crimes -- sorry -- in two

24  different categories.  One is drug-related crimes,

1  and the other is what you would call - I don't know

2  - nondrug-related crimes.

3            Or sorry, drug crimes and other crimes.

4            Drug crimes are all due to drugs.  Then

5  the -- I had to step down from all drugs to

6  opioids, then from opioids to attributable to

7  prescriptions.  So that was done in two steps.  And

8  we can talk about those if you'd like.

9            And then in the case of the nondrug

10  crimes, some of those will be due to drugs and some

11  of them to prescription opioids ultimately, and

12  there was three steps.

13            I had to go from the count -- crime

14  count itself and derive the share of those that was

15  attributable to drugs, and then among those

16  attributable to drugs, what share of those were

17  attributable to opioids, and then among those that

18  were opioids, what share were attributable to

19  prescription opioids.

20            So it's a -- I guess a two-step process

21  with respect to the drug crimes and a three-step

22  process with respect to the nondrug crimes.

23      Q.   Okay.  You said that you started with the

24  data from the National Incident-Based Reporting

1    System or NIBRS?

2         A.   Yes.  That was one of the sources.

3         Q.   And you started with the data from NIBRS

4    for Cabell County, but there were some gaps in that

5    information, and so your staff requested data

6    directly from certain law enforcement agencies?

7         A.   That's correct, yes.

8         Q.   Who on your staff made that request?

9         A.   I believe it was Adrian Garcia.

10        Q.   And what specifically did Adrian Garcia

11   request from those law enforcement agencies?

12        A.   He requested the information that would

13   have been reported to the NIBRS.

14        Q.   Okay.  And did the data that he received

15   from these law enforcement agencies identify which

16   of the crimes were drug-related?

17        A.   Well, some.  The -- and some are drug

18   crimes.  So to that degree that -- yes, this is the

19   same classification that the NIBRS uses.

20        Q.   But for the crimes that are reported

21   outside the category of drug crimes, did the data

22   show which of those crimes were drug-related?

23        A.   No.  The data at that level did not show

24   that, which was why the -- with respect to the

1  crimes in that category, there were three steps

2  instead of two and the methodology I described a

3  few minutes ago.

4      Q.   Okay.  And then for the data that you

5  received from NIBRS for Cabell County and the data

6  you received directly from the law enforcement

7  agencies in Cabell County, whatever drug crimes

8  were reported, you said they're 100 percent due to

9  drugs.

10     A.   That's right.

11     Q.   And for all the drug -- all of the crimes

12 in the other categories, you then needed to

13 estimate the percentage of crimes in each category

14 that could be attributable to any kind of drugs.

15 Right?

16     A.   That's correct.  That was the first step in

17 that last category, yes.

18     Q.   And to do that, you took the percentage of

19 all crimes in each category that are attributable

20 to drugs as provided by the U.S. Department of

21 Justice National Drug Intelligence Center?

22     A.   I believe that's correct.  If you want me

23 to confirm that precisely, I can do that if you

24 remind me where this is happening in the report.

1    Q.   Well, you say that in Paragraph 23 of

2  Section 4, Appendix C.

3    A.   Okay.

4    Q.   Tell me when you're there.

5    A.   I'm there.

6    Q.   Okay.  Are you in Appendix C --

7    A.   I'm sorry.

8    Q.   -- Section 4, Paragraph 23?

9    A.   Yeah, I'm looking at it now.

10    Q.   Okay.  And you say, "I adjust the number of

11  crimes identified in the NIBRS data and individual"

12  law enforcement agencies "to estimate crimes

13  attributable to prescription opioids in three

14  steps.  First, the percent of all crimes in each

15  category that can be attributable to drugs (opioids

16  and non-opioids) is taken from the" U.S. Department

17  of Justice National Drug Intelligence Center."

18              See that?

19    A.   Yeah, I'm following along.

20    Q.   Okay.  So is that statistic a national

21  statistic of what percentage of crimes in each

22  category are attributable to drugs?

23    A.   I think it is a national statistic, yes.

24    Q.   Okay.  Did you undertake to find any

1   similar statistic that was specific to West

2   Virginia?

3       A.   I don't remember.  I don't think so.  This,

4   again, would have been a lower bound, because West

5   Virginia and Cabell in particular are harder hit

6   than the rest of the country.

7       Q.   And did you undertake to review any Cabell

8   County-specific data to determine the percentage of

9   crimes in each category that are attributable to

10  drugs?

11      A.   Yeah, I think the same answer.  The -- I

12  wasn't aware of any such data, and the national

13  data, I'm very comfortable with as being a lower

14  bound on what's going on in Cabell.

15      Q.   And then having estimated the share of

16  crimes that are drug-related, you then wanted to

17  estimate the share that are opioid-related, right?

18      A.   That's also correct, yes.

19      Q.   And you say here in Paragraph 24 that you

20  followed the methodology in the Florence study.

21      A.   Yes.

22      Q.   Okay.  And what was that methodology?

23      A.   Well, I think the next sentence explains

24  that.  This is drug seizures.  The methodology was

1   from Florence.  The data come from LEAs in Cabell.

2      Q.   All right.  So what was the methodology?

3      A.   Well, the methodology is to look at drug

4   seizures and attribute to opioids the share that

5   they comprise of drug seizures.

6      Q.   Okay.  And so where did you look at the

7   Cabell-specific data to determine what percentage

8   of the drug seizures were seizures of opioids?

9      A.   Well, it has -- this -- the next sentence

10  describes that, in the National Forensic Laboratory

11  Information Service.

12     Q.   Okay.  And what does the National Forensic

13  Laboratory Information Service provide regarding

14  drug seizures in Cabell County?

15     A.   Well, I would have to go back and check

16  what level of aggregation this is, geographic.  I'm

17  not sure right now.

18     Q.   Okay.  Was it specific to Cabell County or

19  was it state-wide for West Virginia?

20     A.   I -- I'm doubtful that it was Cabell.  So

21  it's more likely to have been state.

22     Q.   Okay.  Was it state-wide data or was it

23  national data?

24     A.   You didn't tell me I was going to have

1    three choices.  I -- I'm actually not sure.  I'd

2    have to go back and look.

3        Q.   Okay.  But you did then estimate the

4    percentage of drug-related crimes that were

5    opioid-related, and your third step was then to

6    determine of the opioid-related crimes, what

7    percentage are attributable to prescription opioid

8    sales and distribution?

9        A.   That's -- that's the -- that's right.

10   That's the third step.

11       Q.   Okay.  And that third step then uses the

12   rate of OUD that's attributable to prescription

13   sales and distribution as calculated and reported

14   by Professor Keyes.  Correct?

15       A.   That's also correct, yes.

16       Q.   Okay.  So you undertook to identify the

17   number of crimes in each category.  You undertook

18   then to determine a percentage of the crimes in

19   each category that are drug-related.

20              You used some data from the National

21   Forensic Laboratory Information Service to

22   determine what percentage of the drug-related

23   crimes were opioid-related; and then of the

24   opioid-related crimes, you determined what

1  percentage were due to prescription opioid sales

2  and distribution by using the percentages that

3  Professor Keyes had derived.

4          Correct?

5          MR. KO:  Object to the form.

6      A.   I employed a three-step process that you've

7  summarized there pretty well.

8      Q.   In -- in the section on the impact of the

9  sale and distribution of prescription opioids on

10 property values, you offer the opinion that you had

11 already calculated that prescription opioids were

12 responsible for 7.2 percent of total crimes in the

13 Cabell/Huntington community over the period of 2006

14 to 2018.

15          Did I get that right?

16          MR. PENDELL:  Where's that in the

17 report?

18          MR. KEYES:  Paragraph 97.

19          MR. PENDELL:  Thank you.

20     A.   That's the right number.  I remember that

21 number.

22     Q.   Okay.  Tell me when you're at Paragraph 77

23 -- 97.

24     A.   I'm there.

1     Q.   And do you see in Paragraph 97, you say,

2  "The first causal link, between prescriptions and

3  crime, has already been covered in Section III.D.

4  Overall, I calculate that prescription opioids were

5  responsible for 7.2% of total crimes in the

6  Cabell/Huntington Community over the period of 2006

7  to 2018."

8     A.   Okay.

9     Q.   Did I read that correctly?

10     A.   I'm -- yes, you did.

11     Q.   Okay.  And then you make the assumption in

12  your analysis that 7.2 percent of total crimes

13  going forward will be prescription opioid-related.

14  Correct?

15     A.   That's correct, yes.

16     Q.   What is the basis for that assumption, that

17  7.2 percent of total crimes going forward will be

18  prescription opioid-related?

19     A.   Well, it's the -- I had the very good basis

20  of what the last 12 years have done.

21     Q.   Okay.  And --

22     A.   So sorry to --

23     Q.   -- you're saying that the next 12 years

24  will be the same as the last 12 years?

1      A.   Well, I -- the -- it's -- I think it's a
2   very reasonable assumption that the percent that's
3   been characterized in this community over the past
4   12 years is a reasonable estimate of what it will
5   be going forward.
6      Q.   And why did you choose that 12-year period?
7      A.   The 2006 to 2018?
8      Q.   Yes.  For this -- for this category of
9   alleged economic harm or cost.
10      A.   For the -- with respect to the property
11   values, you're asking?
12      Q.   Yes.
13      A.   Well, that was using all the data I had.
14      Q.   Okay.  You then estimate that for every 1
15   percent increase in total crimes, there's a quarter
16   of a percentage point decrease in property values?
17   Did I get that right?
18      A.   You did get that right.  This was not an
19   estimate I conducted; it was one that came from a
20   paper in the literature.
21      Q.   What paper was that?
22      A.   I don't know if it's here or in the
23   appendix.  Probably in the appendix.
24      Q.   Do you recall the study offhand, without

1  looking at your report?

2      A.   I remember what the study did.  It looked

3  at -- the county-level study.  And it -- multiple

4  years, and looked at crime rates and how they

5  correlated with property values.

6           But I --

7      Q.   You --

8      A.   -- my report to give you more than that.

9      Q.   It's referenced in Appendix C, Paragraph

10  37.

11     A.   Okay.

12     Q.   Are you there?

13     A.   Yeah, I'm there.

14     Q.   Okay.  Do you see in Paragraph 37, you

15  refer to the Pope and Pope study?

16     A.   Yes.

17     Q.   Do you rely on anything besides the Pope

18  and Pope study for your decision to estimate that

19  for every 1 percent increase in total crimes, there

20  is a quarter of a percentage point decrease in

21  property values?

22     A.   Well, yes, I had a brief discussion here of

23  other papers that fall in that literature that

24  establish a causal connection between crime and

1    property values.

2        Q.   Okay.

3        A.   And --

4        Q.   Let's --

5        A.   Just one more sentence.  The Pope and Pope

6    result was one that I could use in my analysis.

7        Q.   Okay.  You reference other studies.  But do

8    you reference any other studies that report or

9    quantify the relationship between a percentage

10   decline in crime and increased home values or a

11   percentage increase in crime and a decrease in home

12   value?

13            MR. PENDELL:  Objection to form.

14       A.   I'm just taking a quick look.

15       Q.   Please do.

16       A.   I mean, the other studies that I referenced

17   here don't build a percentage, as I recall them.  I

18   mean, I --

19       Q.   What other studies are you referring to

20   when you say you reference other studies?

21       A.   Well, the ones in Paragraph 36.  The effect

22   of crime on property values.  There's support for

23   that in the economic literature.

24       Q.   Okay.  And do any of those studies that are

1    referenced in Paragraph 36 quantify the link

2    between an increase in crime and a decrease in home

3    value or a decrease in crime and an increase in

4    home value?

5        A.   Well, they do, but they're specific to

6    particular kinds of crime, and the -- you know, my

7    task here was to not look at sex offender crimes,

8    but it was to look at in general if there was a

9    decrease in crime.

10       Q.   And the Pope and Pope study looked at

11   property values in certain zip codes in the 1990s,

12   correct?

13       A.   That's correct.

14       Q.   Did you look at any study since the Pope

15   and Pope study that looked at the relationship

16   between crime rates and property values?

17       A.   No.  If I had, I would have put it down

18   here.

19       Q.   Okay.  And your quantification here is

20   reflecting the depressed property values in the

21   Cabell County area that are the result of the

22   expectation that crime will continue in the future

23   at the same rate it's continued in the past.

24   Correct?

1    A.    No, I wouldn't say that.

2    Q.    What's wrong with that statement?

3    A.    What this -- it -- the statement is too

4    strong in terms of what the assumption is.  The

5    assumption is that this is a percentage.  So

6    whatever expectation there is about crime - which

7    could be that it's trending down, for example -

8    there would be the -- you know, withdrawing the

9    causal effect to prescription opioids would reduce

10   that by 7.2 percent.

11               Is that clear?

12   Q.    Say that again?  Please.

13   A.    The assumption is that the reduction in

14   prescription-related crimes, if those were

15   withdrawn, would reduce the level of crime by 7.2

16   percent.

17               It doesn't assume that the level of

18   crime is constant from the past.

19   Q.    It assumes that the share of total crimes

20   attributable to prescription opioids will be 7.2

21   percent in the future as it was between 2006 to

22   2018.

23   A.    That's the assumption that's necessary for

24   me to make that calculation, yes.

1    Q.   Right.  And you assume that because the

2  share of total crimes attributable to prescription

3  opioids will continue to be 7.2 percent, it will

4  continue to depress the market value of homes by a

5  quarter of a percentage point for each of those 7.2

6  percentage points.

7    A.   Yeah, that's basically correct, yes.

8    Q.   Okay.  And the reason the market values are

9  depressed is because of the expectation that crime

10  will continue at the same rate in the future.

11    A.   See, that's the part that's not correct.

12    Q.   Why not?

13    A.   Well, I explained that.  The formula that I

14  use to predict the effect on property values is

15  done in percents, so it's the percent reduction in

16  crime is what needs to be -- the percent reduction

17  due to prescription opioids, that I assume is the

18  same going forward.

19          But once I know that percent, then I'm

20  able to use the information from Pope and Pope to

21  yield a percent decrease in property values that's

22  caused by the prescription opioid property-related

23  crime.

24          So I don't need to know people's

1  overall level of crime expectations; it's just this

2  percent is all I need to be able to go forward.

3           You can just see the math there.

4  There's no overall level of expectation.  It's just

5  percent times percent times assessed value, bam.

6      Q.   Do you do anything to adjust for the fact

7  that the owners of the properties that are

8  experiencing the depressed market value benefited

9  from those lower property values when they

10 purchased the property?

11          MR. PENDELL:  Objection.

12     A.   Well, no, this, I think, would not be the

13 kind of thing that would be a correct calculation

14 here.  If something falls in value, it falls in

15 value.  If you're the buyer of that, maybe you're a

16 little better off; but if you're the seller, you're

17 way worse off.

18     Q.   Okay.  So is the answer that you did not do

19 anything to adjust for the fact that the -- that

20 some purchasers of the properties with what you say

21 is a depressed market value benefited from that

22 depressed market value when they bought the

23 properties in the first place?

24          MR. PENDELL:  Objection.

1          MR. KO:  Asked and answered.

2      A.    This is a -- sorry.  This is a wealth

3  destruction.  There are holdings in the -- if you

4  want to say portfolios of local people, that are

5  diminished by the expectation of crime.  It's -- I

6  don't know, it's a -- I don't even know how to say

7  it beyond that.  To construct this in some way to

8  benefit people is, I think, really an odd aspect of

9  economics -- would be an odd application of

10  economics.

11      Q.    Well, it's not to say they benefit from it,

12  but you're saying they're harmed by it without

13  measuring the countervailing consideration.

14          MR. KO:  Object to the form.

15      A.    No, here's the --

16      Q.    They may sell it for less, but they paid

17  for less at the same time.

18          MR. PENDELL:  Objection.

19          MR. KO:  I don't know if there's a

20  question pending, but object to the form.

21          THE DEPONENT:  I have a statement to

22  make even if there's not a question pending.

23          MR. KO:  Go for it.

24      A.    Okay, here's the thought experiment:  There

1  is residential property owned by people in the end

2  of 2019, and it is what it is, and one of the

3  factors that influence the market value of those

4  properties is the expectation of the, you know,

5  neighborhood safety.  Is my -- I'm going to go out

6  and walk the dog at night without worrying; is my

7  child not going to be exposed to, you know, needle

8  exchange at a park down the street.

9          Those things will affect the property

10  values.  And at the end of 2019, they have a

11  certain value.  And now the thought experiment is:

12  I'm going to wave an economic magic wand and take

13  away 7.2 percent of the future crime that you,

14  property owner, are worried about.

15          Bing, everyone's property value goes

16  up.  That's it.

17      Q.  Are you finished with your statement?

18      A.  Yes, I am.

19      Q.  Okay.  Could you turn to Paragraph 33 of

20  your report?

21      A.  Okay.

22      Q.  You say in your report, "From an economic

23  standpoint, the costs due to the sales and

24  distribution of prescription opioids include costs

1  for which prescription opioids are the proximate

2  cause" "and those for which prescription opioids

3  were the ultimate but not necessarily the proximate

4  cause."

5            Do you see that?

6     A.   Well, yeah, I was in the wrong paragraph in

7  the appendix.  So it will just take me one second,

8  but --

9     Q.   Sure.  It's page 17 of your report.

10    A.   Okay, I see that.

11    Q.   Okay.  So is it accurate to say that the

12 costs that you've calculated due -- as being due to

13 the sales and distribution of prescription opioids

14 include some costs for which prescription opioids

15 are the proximate cause and some costs for which

16 prescription opioids were not necessarily the

17 proximate cause?

18    A.   I think that's fair to say.

19            MR. KEYES:  I don't have any further

20 questions at this point.

21            Do any other counsel have questions?

22            MR. PENDELL:  Plaintiffs counsel may.

23 I would like to take a break, but I don't want to

24 interfere with any of the other defendants that may

1  have questions.

2          I mean, Andy, if I knew you were going

3  to be so short, we probably could have skipped

4  lunch.  But if I could have five minutes to talk to

5  David for a moment, David Ko, I'd appreciate it.

6          MR. KEYES:  Sure.

7          MR. KO:  And Tom, go ahead and -- if

8  you don't mind, Tom, why don't you just stay on the

9  Zoom.  And you don't have to mute if you mind

10  staying for a moment.  Okay?

11          VIDEO OPERATOR:  Going off the record,

12  the time is 1:25 p.m.

13          (A recess was taken after which the

14          proceedings continued as follows:)

15          VIDEO OPERATOR:  This begins Media

16  Unit 5 in the deposition of Tom McGuire.  We're

17  back on the record.  The time is 1:28 p.m.

18                    EXAMINATION

19  BY MR. KO:

20     Q.   Hey, Tom --

21          MR. KO:  And just for the record, this

22  is David Ko of Keller Rohrback on behalf of the

23  plaintiffs.

24     Q.   I just have a few follow-up questions

1 regarding some of the stuff that Andy Keyes asked

2 you this morning. And I'm going to call him "Andy"

3 just to not confuse him with the expert, the

4 plaintiff's expert, Kathy Keyes. (Zoom audio

5 glitch)

6     A. Yeah, her beard looks very different than

7 Andy's.

8     Q. So earlier today and this morning, I think

9 Andy had asked you whether you had measured the

10 benefits of treating patients with prescription

11 opioids. Do you recall that?

12     A. I do, yes.

13     Q. And in response to these questions, you

14 generally responded that you were relying on the

15 clinical inputs of other experts, and I believe in

16 particular Doctor Waller and Doctor Lembke. Do you

17 recall that?

18     A. I do, yes.

19     Q. And for context - and so the record is

20 clear - the sections of your report that you were

21 discussing these questions that Andy asked was in

22 the Morbidity/OUD or Opioid Use Disorder section of

23 your report, correct?

24     A. That's correct.

1    Q.   And just so the record is clear once again,

2  this is Section 3B of your report, I believe,

3  right?  And take your time to concretely confirm

4  that.

5    A.   That's correct.

6    Q.   Okay.  Now, in that section and with

7  respect to morbidity - and setting aside your

8  reliance on Doctors Lembke and Waller - did you do

9  any other economic analyses to quantify the

10  potential benefit and costs related to prescription

11  opioid use?

12    A.   Yes, I did.

13    Q.   And it appears that you performed an

14  economic analysis of the impact of prescription

15  opioids on workplace productivity; is that correct?

16    A.   That's generally correct, yes.

17    Q.   And can you describe to the Court briefly

18  why you performed this analysis?

19    A.   Well, I was attempting to address the issue

20  of what were the potential economic benefits to

21  prescription opioids, and weigh those against costs

22  in the same domain, the domain here being work

23  force productivity.

24             And in order to do that, I examined

1  literature, which has a number of studies of the

2  relationship between opioids and work, and came to

3  a determination that on balance, on net, the

4  negative effects on productivity outweigh the

5  positive effects.

6          And you know, there are some studies

7  that are very directly related to address that

8  question.

9      Q.   And is this analysis that you described a

10 reasonable economic analysis to measure net

11 benefits and costs?

12         MR. KEYES:  Objection to form.

13     A.   Well, it is.  The -- again, what I did in

14 this context was to review other papers that

15 established the net -- the net costs or positive

16 costs outweigh the benefits, but then going

17 forward, I treated them as zero.  I treated them as

18 balancing out just exactly.

19         Which, you know, is a kind of

20 measurement and it's a -- certainly a under -- an

21 undercount or a conservative measurement of the net

22 costs.

23     Q.   And with respect to the studies that you

24 just described, those studies, I presume, contain

1  data and evidence underlying those studies.  Is

2  that a fair assessment?

3      A.   Yeah, all of them are empirical studies,

4  yes.

5      Q.   Okay.  And so would you -- would it be fair

6  to say that workplace productivity is a reasonable

7  empirical proxy to measure benefits and costs for

8  an economic analysis?

9          MR. KEYES:  Objection to form.

10     A.   It's -- in this -- in this context, this is

11 where -- you know, from an economic standpoint,

12 this is how potential benefits might manifest

13 themselves.  So yes, I think it's a reasonable

14 approach to -- you know, figuring your -- of

15 benefits in relation to costs in economic terms.

16     Q.   And just a few more questions, Tom.  Turn

17 to Paragraph 63 of your report.

18     A.   Okay.

19     Q.   Okay.  In that paragraph -- let's see.  I

20 believe you identify and indicate that the primary

21 analysis you have performed regarding workplace

22 productivity is complemented by the clinical

23 opinions offered by other experts, including, as we

24 discussed earlier today, Doctors Lembke and Doctor

1  Waller.  Is that correct?

2      A.  Yes, I use the word "complemented" in the

3  first sentence there.

4      Q.  So would it also be fair to say that these

5  clinical inputs that you discuss here supplement

6  the primary economic analysis you performed

7  regarding workplace productivity?

8      A.  Yes, that's fair to say.

9      Q.  Okay.

10          MR. KO:  That's all I have.  Thank

11  you, Tom.

12          MR. KEYES:  Does anyone else have any

13  questions for Professor McGuire?

14          MR. PENDELL:  I just want to note that

15  we'll read and sign.  I want to make sure that I

16  don't forget to say that.

17          MR. KEYES:  Professor McGuire, thank

18  you for your time.

19          MR. KO:  Thanks everyone.

20          THE DEPONENT:  Thank you.

21          VIDEO OPERATOR:  We are off the record

22  at 1:34 p.m., and this concludes today's testimony

23  given by Tom McGuire.  The total number of media

24  units used was five and will be retained by

1  Veritext.

2                    (Having indicated he would like to

3                    read his deposition before filing,

4                    further this deponent saith not.)

5

6                          --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1    STATE OF WEST VIRGINIA,
2    COUNTY OF JACKSON, to wit;
3
4            I, Teresa S. Evans, a Notary Public within
     and for the County and State aforesaid, duly
5    commissioned and qualified, do hereby certify that
     the foregoing deposition of THOMAS McGUIRE was duly
6    taken by me and before me at the time and place and
     for the purpose specified in the caption hereof,
7    the said witness having been by me first duly
     sworn.
8
             I do further certify that the said
9    deposition was correctly taken by me in shorthand
     notes, and that the same were accurately written
10   out in full and reduced to typewriting and that the
     witness did request to read his transcript.
11
             I further certify that I am neither
12   attorney or counsel for, nor related to or employed
     by, any of the parties to the action in which this
13   deposition is taken, and further that I am not a
     relative or employee of any attorney or counsel
14   employed by the parties or financially interested
     in the action and that the attached transcript
15   meets the requirements set forth within article
     twenty-seven, chapter forty-seven of the West
16   Virginia Code.
17           My commission expires October 25, 2020.
     Given under my hand this 11th day of September,
18
19
20   Teresa S. Evans
     RMR, CRR, RPR, WV-CCR
21
22
23
24
```

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to wit;

    I, Teresa Evans, owner of Realtime Reporters,

LLC, do hereby certify that the attached deposition

transcript of THOMAS McGUIRE meets the requirements

set forth within article twenty-seven, chapter

forty-seven of the West Virginia Code to the best

of my ability.


    Given under my hand this 11th day of September,

2020.




Given under my har

                Registered Professional
        Reporter/Certified Realtime Reporter

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

September 14, 2020

To: Michael Pendell, Esquire

Case Name: City of Huntington v. Amerisourcebergen Drug Corporation

Veritext Reference Number: 4245440

Witness:  Thomas McGuire        Deposition Date:  9/9/2020

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness

review the transcript and note any changes or corrections on the

included errata sheet, indicating the page, line number, change, and

the reason for the change.  Have the witness' signature notarized and

forward the completed page(s) back to us at the Production address
shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 4245440
3         CASE NAME: City of Huntington v. Amerisourcebergen Drug
     Corporation, et al.
          DATE OF DEPOSITION: 9/9/2020
4         WITNESS' NAME: Thomas McGuire
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have made no changes to the testimony
     as transcribed by the court reporter.
8

     _____          _____
9    Date                     Thomas McGuire
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
               Statement; and
14        Their execution of this Statement is of
               their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4245440
CASE NAME: City of Huntington v. Amerisourcebergen Drug Corporation, et al.
DATE OF DEPOSITION: 9/9/2020
WITNESS' NAME: Thomas McGuire

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____          _____
Date                      Thomas McGuire

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections
        in the appended Errata Sheet;
They signed the foregoing Sworn
        Statement; and
Their execution of this Statement is of
        their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20____.

        _____
        Notary Public


        _____
        Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4245440

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



_____          _____

Date                     Thomas McGuire

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

          _____

          Notary Public


          _____

          Commission Expiration Date

| & |
| --- |
| **&** 2:12,14 6:12 |

| 0 |
| --- |
| **043** 120:7 |
| **053** 120:6 |

| 1 |
| --- |
| **1** 5:13 136:14 137:19 |
| **100** 42:23 82:2 90:10 101:16,19 103:21 129:8 |
| **103** 110:16 |
| **10538** 153:19 154:16 |
| **10:28** 62:21 |
| **10:38** 63:1 |
| **10th** 117:21,24 122:14 |
| **11** 44:13 |
| **1100** 155:1 |
| **11th** 153:17 154:10 |
| **12** 135:20,23,24 136:4,6 |
| **1201** 2:8 |
| **12:04** 123:19 |
| **12:56** 124:1 |
| **14** 155:4 |
| **146** 4:4 |
| **17** 145:9 |
| **1717** 2:20 |
| **176** 110:5 |
| **18** 23:20 24:5,22 38:2,5 39:3,10,20 40:12 42:19 |
| **180** 19:23 20:4 |
| **1820** 155:2 |
| **183** 105:2 110:5,5 |
| **19103** 2:21 |

| 1990s 139:11 |
| --- |
| **1:25** 146:12 |
| **1:28** 146:17 |
| **1:34** 151:22 |

| 2 |
| --- |
| **2** 14:3 79:20,24 80:18 115:5,5 |
| **20** 20:1,5 79:21 156:16 157:22 158:22 |
| **20,000** 22:3,5 |
| **20005** 2:13 |
| **2006** 44:9 46:21 47:5,22 48:12,21 49:7,18 50:9 51:6 54:17 56:1 104:21 105:4 114:14 134:13 135:6 136:7 140:21 |
| **2007** 104:21 105:4 |
| **2008** 104:21 105:5 |
| **2009** 104:21 105:5 |
| **2010** 120:5 |
| **2011** 115:7,16 |
| **20118** 121:9 |
| **2013** 104:21 105:5 120:14 121:9 |
| **2015** 104:21 105:5 |
| **2017** 80:12 |
| **2018** 44:9 46:21 47:5,22 48:13,21 49:8,18 50:9 51:6 54:17 56:1 82:2 120:14 134:14 135:7 136:7 140:22 |
| **2019** 17:24 144:2 144:10 |
| **2020** 1:22 5:4 8:21 9:3 19:21,21 20:3 23:19 25:4 26:6,7 |

| 27:14,15 37:23 38:4 42:17 116:17 153:17,18 154:11 155:4 |
| --- |
| **216-523-1313** 155:3 |
| **22** 83:4 |
| **23** 130:1,8 |
| **24** 131:19 |
| **24th** 9:3 116:17 123:13 |
| **25** 153:17 |
| **25,000** 22:3,5 |
| **25323** 2:16 |
| **28** 2:6 |
| **29464** 2:6 |
| **2:00** 24:15 |

| 3 |
| --- |
| **3** 17:12 33:9 40:1 63:2 115:5 |
| **3100** 2:20 |
| **31st** 27:14,15 |
| **32** 61:11 |
| **3200** 2:8 |
| **33** 144:19 |
| **36** 138:21 139:1 |
| **37** 137:10,14 |
| **38** 78:10 |
| **3:00** 24:16 |
| **3:17-01362** 1:7 5:20 |
| **3:17-01665** 1:13 5:20 |
| **3b** 148:2 |
| **3rd** 8:21 28:10 35:8,17 |

| 4 |
| --- |
| **4** 85:6 115:5 123:24 130:2,8 |

| 4245440 155:7 156:2 157:2 158:2 |
| --- |
| **44114** 155:2 |
| **48** 84:22 |
| **4th** 23:19 25:3,13 28:10,10 |

| 5 |
| --- |
| **5** 12:13 14:8 146:16 |
| **50** 90:11,18,19 92:11 94:11 100:18 |
| **53** 86:24 |
| **56** 60:20 61:4,10 |
| **5th** 25:14 28:10 |

| 6 |
| --- |
| **6** 44:6,13 |
| **63** 72:3 73:9 150:17 |
| **64** 72:4,7 73:24 |
| **65** 74:8 |
| **67** 97:14,16 |

| 7 |
| --- |
| **7.2** 134:12 135:5 135:12,17 140:10 140:15,20 141:3,5 144:13 |
| **707** 2:15 |
| **72** 91:2 94:24 |
| **725** 2:12 |
| **77** 134:22 |
| **78** 124:14 |

| 8 |
| --- |
| **8** 4:3 |
| **850.00** 19:14 |

| 9 |
| --- |
| **9** 114:24 115:3,19 |
| **9/9/2020** 155:8 156:3 157:3 |

**901** 2:15
**97** 82:8 134:18,23 135:1
**97.5** 114:13
**98101** 2:9
**9:04** 5:3
**9:14** 14:1
**9:21** 14:4
**9th** 1:21 5:3

**a**

**a.m.** 5:3 14:1,4 62:21 63:1
**abdc** 6:24
**ability** 63:19 154:8
**able** 30:20 41:18 49:22 50:4 56:10 96:1 104:20 109:7 119:7 126:11 141:20 142:2
**abstinence** 88:9,14 90:23
**abstract** 26:18
**abuse** 102:1 106:1 106:10,22 107:11 107:16 108:3,8,14 108:20,24 109:2 109:10,12 110:24 112:12,23 113:4,9 113:21 114:5
**abusing** 109:13
**acceptable** 57:19 57:24 59:24 63:6
**account** 50:14 53:8 68:6 86:17 88:2 99:19,22
**accounting** 19:22 22:15,22
**accounts** 85:7,18
**accurate** 19:7,15 46:8 48:2 50:6 91:6 117:9 145:11

**accurately** 153:9
**acknowledge** 88:14 96:21 97:7 98:2 156:11 157:16
**acknowledging** 98:5
**act** 156:14 157:20
**action** 1:6,13,20 5:19 6:3 153:12 153:14
**activities** 63:20
**actors** 47:23 48:13 48:19 54:19
**actual** 122:4,5
**actuaries** 87:10
**acute** 61:21 62:5,9 67:13,21 68:4,10 68:17,24 73:1 74:14,18 75:4
**adam** 3:3 5:22
**added** 126:7
**addicted** 93:11,15 93:17,21
**addiction** 92:23 99:5,14 100:1
**addictive** 92:5
**addition** 20:11
**address** 65:7,13 66:18,23 98:20 115:23 148:19 149:7 155:15
**addressed** 52:15 101:8
**addresses** 44:7 70:22
**addressing** 71:19
**adjust** 130:10 142:6,19
**administer** 6:2

**administration** 103:11,13,24 104:11,16,19 105:8 106:7,9,16 106:18 107:6 109:23
**adrian** 15:6,7 16:3 20:22 28:3 29:13 29:21 30:1 119:24 120:1,21,23 121:17,18,22 128:9,10
**affect** 144:9
**affiliations** 6:7
**affixed** 156:15 157:21
**aforesaid** 153:4
**afternoon** 2:19 24:12 25:16
**agencies** 103:16 104:1 107:4 125:14,21 126:1,2 126:3,4,11 128:6 128:11,15 129:7 130:12
**agency** 104:7 106:23 107:2,4
**aggregate** 126:7
**aggregation** 132:16
**ago** 31:22 51:23 129:3
**agree** 5:11 46:24 60:8 61:20 62:3,9 64:17
**agreed** 23:3
**ahead** 6:14,17 7:6 18:15 33:21 40:22 43:15 48:6 58:16 146:7

**aid** 43:11
**al** 1:8,14 5:17 156:3 157:3
**alexander** 40:5,8 40:11,15
**alleged** 136:9
**allocate** 48:8
**allow** 64:11,13 88:7
**allowed** 23:23
**allows** 100:7
**alternatives** 74:11 75:8
**alyssa** 2:19
**amazingly** 122:1
**amerisourceberg...** 1:7,14 2:17 5:17 43:9 155:6 156:3 157:3
**amount** 21:7,21 23:4 50:11,20,21 52:7 53:3,4,23
**analogous** 115:22
**analyses** 148:9
**analysis** 16:10 31:9,11 32:8,11 33:3,6 103:9 109:20 124:12 135:12 138:6 148:14,18 149:9 149:10 150:8,21 151:6
**analysts** 15:8,14 16:4 20:23
**andrew** 2:11 6:11
**andy** 12:20 13:1 23:22 60:22 122:19 146:2 147:1,2,9,21
**andy's** 147:7

anne 2:4 7:13
answer 11:12
18:22 22:2 40:22
47:9 49:12,14
51:23 53:16 55:7
56:7 63:18 67:1
71:4,7,8 89:22
94:14 107:20
108:12,23 109:7
131:11 142:18
answered 66:12
69:23 76:24 143:1
answering 31:20
45:22
answers 87:23
antenatal 97:18
98:3
anticipate 20:4
anxiety 64:3,8
69:8
anyway 56:7
appear 156:11
157:15
appearance 6:10
appearances 2:1
3:1 6:6 7:16
appearing 2:2,10
2:17
appears 117:2
148:13
appended 157:11
157:18
appendix 23:9,20
24:5,22 33:9 38:5
39:20 40:1 42:18
87:2 130:2,6
136:23,23 137:9
145:7
application 143:9
applied 110:23

applying 112:19
apportion 55:19
56:9
apportionment
55:22
appreciate 146:5
approach 31:6,8
84:19 86:10
150:14
approached 11:3
approaches
124:19
approaching
26:10
appropriate 50:20
51:17 52:19 87:22
appropriately
64:24 65:6,13,17
appropriateness
50:24 52:4
arch 2:20
area 31:24 61:24
62:8 63:16 64:5
64:10,15 65:4,16
65:21 67:23 68:12
79:17 83:24 88:24
139:21
areas 124:20
argue 115:10
arguing 115:13
arriving 22:4
article 153:15
154:6
articulate 53:10
53:22
aside 42:14 148:7
asked 10:14,16
36:4,15 42:12
54:4,5,8 59:15
66:12,14 67:18
69:23 71:2 75:24

76:23 77:14 89:1
119:21 143:1
147:1,9,21
asking 36:8 85:11
85:14 86:4 97:5
102:24 115:13
125:2 136:11
aspect 143:8
assess 69:20 79:17
109:1
assessed 142:5
assessing 54:22
112:6
assessment 56:12
56:21 57:16 58:3
58:10,20 109:1
150:2
assign 106:3,10,15
108:2,8
assigned 106:17
106:23 108:24
109:10
assignment 11:23
12:9,12 18:4
26:11 48:7 50:13
52:4 54:24 55:19
56:8 57:22 58:19
59:18 83:2 106:13
108:1 156:2 157:2
158:2
assigns 107:16
assistance 12:19
14:13
assisted 12:14
14:9,17,23 15:2
associated 47:11
55:10 60:3,15
61:15 74:10 83:10
90:17 97:2 101:12
associates 11:14
12:15,18 14:10,13

14:23 16:14 20:13
20:14 21:9 22:12
assume 85:11
90:11 94:24 95:1
111:18,22 140:17
141:1,17
assumed 92:10
111:22
assumes 140:19
assumption 74:20
90:21 94:12 96:5
96:9,20 100:17,18
106:20 135:11,16
136:2 140:4,5,13
140:23
attached 153:14
154:4 157:7
attachment 115:1
attempt 56:9 57:3
66:4,9,22 67:6,11
67:19 68:1,2,8,13
68:15,20,22 69:6
69:11,13,17,19
70:2,7 89:18
113:20
attempting 41:23
45:22 50:16 77:22
101:22 148:19
attending 6:6
attorney 6:10
153:12,13
attributable 54:19
84:24 86:21 89:12
90:9 92:15 93:23
94:2 95:15,16
113:23 114:8,15
124:5,8,24 126:22
127:6,15,16,17,18
129:14,19 130:13
130:15,22 131:9
133:7,12 140:20

141:2
**attribute** 113:6
132:4
**attributes** 84:8
**audio** 5:9,10 7:20
11:2 13:21 28:7
39:11 111:7 147:4
**august** 8:21 9:3
19:21 20:3,5 35:8
35:17 116:16
117:21,24 122:14
123:13
**author** 87:11
**authorize** 157:11
**authorized** 6:2
**availability** 103:6
**available** 73:10
**ave** 155:1
**avenue** 2:8
**aware** 89:1 100:13
118:16 131:12

**b**

**b** 23:9,20 24:5,22
33:9 38:2,5 39:3
39:10,20 40:1,12
42:19
**babies** 89:6 94:12
96:10 99:11,22
**baby** 90:8 100:8
101:3
**back** 10:20 14:3
62:24 73:2 98:15
104:4 107:9
114:20 115:1
124:1 132:15
133:2 146:17
155:15
**balance** 149:3
**balancing** 149:18
**bam** 142:5

**based** 20:13 21:9
22:7,13 27:1 31:1
33:6 49:1 51:17
59:3 74:20,23
81:19 91:8 105:21
109:1,8,18 121:23
125:16 127:24
**basic** 116:14
**basically** 83:12
111:3 141:7
**basis** 30:20 49:3
59:17 90:15 96:5
96:9,17 112:22
135:16,19
**bear** 11:24
**beard** 147:6
**began** 10:21 19:20
**beginning** 6:10
13:3,5,13 26:1,5
72:3 73:9 101:19
**begins** 14:2 63:1
123:23 124:14
146:15
**behalf** 6:12,19,24
7:9,11 146:22
**believe** 9:4,13 11:7
14:16 20:23 33:24
35:3,21 38:24
39:21 40:10,17
43:19,21,22 44:1,2
45:13 49:5 60:7
73:8 90:15 103:16
107:22 114:6
128:9 129:22
147:15 148:2
150:20
**believed** 106:22
**benefit** 59:22 63:5
65:24 66:4,10,22
67:6,11,20 68:2,8
68:15,22 69:6,13

69:19 70:3 143:8
143:11 148:10
**benefited** 142:8,21
**benefits** 64:17
71:7,9,12 72:2,5
72:13,20,24 73:16
73:18 74:4 75:2,8
75:24 76:7,12,22
77:3,10,21 78:1,4
78:7 147:10
148:20 149:11,16
150:7,12,15
**best** 40:23 73:10
88:3 90:2 103:1
154:7
**better** 13:7,17
51:14 71:3 142:16
**beyond** 120:20
143:7
**big** 25:17 82:14
112:9
**billed** 16:19
**billings** 20:13,18
20:22 21:10 23:1
**bing** 144:15
**birth** 88:19 92:15
94:2 96:23 97:8
97:22 98:4,12,21
99:12,22
**births** 88:23 89:8
89:11 90:12 92:9
92:11 95:2,15
96:6
**bit** 24:17 107:19
111:4 119:13
122:9
**born** 94:12 96:10
96:10 99:11,22
100:8
**bought** 142:22

**boulevard** 2:6
**bound** 111:8 112:3
113:16 131:4,14
**breaching** 55:5
**bread** 95:21,22
**break** 60:23 62:15
145:23
**breese** 2:18 6:23
6:23
**bridgeside** 2:6
**brief** 137:22
**briefly** 148:17
**bright** 7:7
**bring** 24:7 32:12
**broadly** 87:21
101:14
**build** 138:17
**burnett** 2:4 7:10
7:10
**butter** 95:21,22
**buyer** 142:15
**buying** 45:17
**buys** 44:22

**c**

**c** 5:1 7:23 87:2
115:1 130:2,6
137:9
**ca** 155:24
**cabell** 1:11 5:16
8:17 9:15 12:4
23:11 48:23 49:7
49:11,17,24 51:5
54:17 56:1 80:9
83:15,22 84:4,7,11
88:4,4,23 89:8,11
90:6,12 91:15,18
92:9 94:17 102:3
102:8,9,11,15,16
102:19 103:3
110:9,12,21 111:2
111:6,10,24

112:13 113:7,17
113:22 114:6
115:7 124:7,23
125:12 126:18
128:4 129:5,7
131:5,7,14 132:1,7
132:14,18,20
134:13 135:6
139:21
**caesarean** 67:13
67:22
**cal** 40:10
**calculate** 83:7
135:4
**calculated** 20:16
21:2 95:7 110:20
133:13 134:11
145:12
**calculation** 20:21
76:6 140:24
142:13
**calculations** 10:4
10:5 27:1 32:9
33:4,7 41:3 55:2
82:2 90:11 114:13
121:8
**caleb** 40:5,8,10,15
**call** 12:4 43:6 51:4
105:20 112:2
118:3 120:3 127:1
147:2
**called** 7:24
**calls** 23:10,15 25:1
27:13,18,21 28:3
29:8,20,22 30:2
31:5 32:13 38:2,5
39:2 40:6,7,11,14
42:18
**canal** 68:4
**canals** 68:7

**cancer** 60:15
61:16 65:8,14
66:19,24
**captain** 25:8
**caption** 153:6
**cardinal** 2:10 6:12
6:19 43:8
**care** 60:15 61:16
64:18 65:1 67:7
83:9 87:15
**carefully** 34:9
**caregiver** 107:13
108:15 109:2
**caregivers** 109:13
**carey** 2:14 6:21,21
**case** 8:9,12,15,19
9:11,23 10:12,19
11:4,22 16:24
17:1,6,8,11,14,18
17:21 18:4,9,10,10
18:11,13 19:11,11
19:11,18 22:8
25:23 31:19 35:23
40:20 43:4,20
44:2,3 47:23 48:9
48:14 49:2,15
53:20 55:4,16
56:11,23 57:7
58:2,5,12 59:2,5
60:8 77:19 79:5
81:18 105:18
107:17 108:3,9
109:1,10 124:22
127:9 155:6 156:3
157:3
**cases** 18:23 19:8
22:6,9,11 31:13
32:18,19 82:20
83:1,8,14,21 84:7
84:11,23 91:12,19
92:15 93:23 94:1

95:5,12 98:11,21
99:10,21 100:6,19
114:14 117:14
126:6
**caseworker**
107:20,22,24
108:2,6
**categories** 50:16
126:9,24 129:12
**categorization**
55:10
**category** 35:13
47:15 50:5 56:9
121:6 128:21
129:1,13,17,19
130:15,22 131:9
133:17,19 136:8
**causal** 135:2
137:24 140:9
**cause** 26:9,14 31:6
91:21 100:16
116:2 145:2,4,15
145:17
**caused** 88:15
96:21 97:7 108:14
141:22
**causes** 96:18
111:17
**ccr** 153:20
**cell** 5:7
**cellular** 5:6
**center** 129:21
130:17
**certain** 50:11
104:17 105:10
128:6 139:11
144:11
**certainly** 38:1
57:2 110:4 149:20
**certificate** 157:11

**certification** 156:1
157:1
**certified** 154:17
**certify** 153:5,8,11
154:4
**chafin** 25:9
**chain** 43:13
**change** 13:2 26:10
26:12 31:6,8
117:15 119:1,3
155:13,14 157:8
158:3
**changed** 13:4
119:5 122:8
**changes** 117:4,7
117:10,15,17
118:7 119:1,20
122:8 123:1
155:12 156:7
157:7,9
**chapter** 153:15
154:6
**characterized**
136:3
**charge** 16:17
**charleston** 2:16
6:20
**chase** 2:15
**check** 9:18 81:22
81:23 132:15
**checked** 19:19
**checking** 105:18
**chemicals** 88:16
91:21
**chief** 25:7
**child** 101:10,23,24
103:16 104:1,6
105:24 106:19,23
107:4 111:14,17
111:19 114:14
116:5 144:7

**child's** 109:12,13
**children** 102:4,12
  102:19 103:3,11
  103:14,24 104:12
  104:17,19 105:9
  106:7,9,16 107:6
  109:24 110:12,13
  110:21,22 112:5,7
  115:20 116:13
**choices** 133:1
**choose** 136:6
**chose** 87:24
**chronic** 72:12,19
  73:1
**chunk** 82:14
**circumstances**
  74:22
**citation** 117:7
**citations** 123:2
**cite** 86:21 87:4
**cited** 87:2 110:2
**city** 1:4 5:15 8:16
  155:6 156:3 157:3
**civil** 1:6,13,20
  5:19 156:5 157:5
**claim** 31:1
**clarification** 19:5
**classification**
  128:19
**classified** 86:8
**clear** 47:24 57:12
  140:11 147:20
  148:1
**cleveland** 155:2
**cliff** 2:18 6:23
**clinical** 50:24 52:3
  52:13,14,21 53:1,7
  53:7,18,19 56:24
  57:5,6,15,21,23
  58:1 59:24 63:6
  63:17 66:7,14

67:3,9,23 68:5,13
  68:19 69:4,10,16
  70:6,10,16,20,23
  70:24 73:21 76:3
  77:15 78:4,7,7
  147:15 150:22
  151:5
**clinicians** 67:24
  75:21,23 76:18
  78:3
**close** 51:8
**closed** 58:23
**closer** 24:7
**cloud** 29:5
**coast** 7:8
**code** 153:16 154:7
**codes** 139:11
**collected** 20:13
  21:9
**collects** 125:18
**come** 36:1 75:6
  78:5 87:23 95:9
  112:7 116:13
  132:1
**comes** 86:7 93:10
  118:4
**comfortable**
  131:13
**coming** 98:15
  115:12
**commission** 1:11
  5:16 153:17
  156:19 157:25
  158:25
**commissioned**
  153:5
**common** 44:17
**community** 9:16
  12:4 26:21 31:13
  80:9,9 124:7,23
  125:13,22 126:19

134:13 135:6
  136:3
**companies** 44:1
**company** 11:9,13
**comparing** 22:8
  110:11
**compass** 14:16,19
**compensation**
  20:12,16 21:7
  22:12 23:5
**complemented**
  150:22 151:2
**complete** 33:22
**completed** 18:16
  155:15
**component** 57:23
**composition** 80:14
**comprise** 132:5
**compute** 59:19
**computed** 96:16
**computer** 28:15
  28:16,19 30:9
**computing** 112:4
**concerned** 32:1
**concluded** 109:11
**concludes** 151:22
**conclusion** 12:6
  75:6,11
**concrete** 31:24
**concretely** 148:3
**condition** 100:23
**conditional** 70:17
**conduct** 15:8
  54:19 65:23 66:2
  66:17,20
**conducted** 5:21
  136:19
**confer** 73:13
**conferencing** 5:22
**confidence** 113:8

**confident** 113:16
**confidently** 95:23
  113:19
**confirm** 110:15
  129:23 148:3
**confirmed** 32:2
**confuse** 147:3
**conn** 2:19
**connection** 137:24
**connolly** 2:12 6:12
**conservative**
  94:11 100:18
  111:5 149:21
**conservatively**
  77:7
**consider** 12:2 40:6
  50:23 78:4
**consideration**
  143:13
**considered** 47:10
  57:6 71:1 98:18
**consistent** 75:14
**constant** 140:18
**constitute** 54:2,10
**constitutes** 53:24
**construct** 143:7
**consult** 81:14
**consumer** 45:7
**consumers** 46:18
**contact** 15:5
**contain** 149:24
**contd** 3:1
**context** 52:13 67:8
  71:21 93:9 107:14
  147:19 149:14
  150:10
**continue** 5:10
  139:22 141:3,4,10
**continued** 7:21
  13:23 62:23
  123:21 139:23

146:14
**contrast** 74:8
**contribution**
48:18
**controlled** 64:22
**controls** 87:22
**conversation**
40:18 43:1
**conversations** 5:6
30:16 42:10
**conveyed** 81:12
**coordinated** 16:4
**copy** 116:19
**corporation** 1:8
1:14 5:17 155:6
156:3 157:3
**correct** 8:9 9:4,7
19:16 20:6 21:19
22:21 28:12 29:11
29:12 35:9 41:8
46:22 47:5 54:20
54:21 57:11 72:16
72:20,21 77:11,13
78:15 79:21,22
81:7 83:11,12
84:9,14 85:13
86:22 87:1 88:20
89:9 90:13,24
91:13,14 92:12,13
92:18 94:23 95:4
95:17 98:8 101:13
101:14 104:17,18
104:22 105:6,7,13
106:1,2 110:9,10
111:3 112:18,21
114:2 116:17
117:8 121:1,5,20
125:4 128:7
129:16,22 131:18
133:14,15 134:4
135:14,15 139:12

139:13,24 141:7
141:11 142:13
147:23,24 148:5
148:15,16 151:1
**corrected** 119:10
119:18 121:14,23
123:6
**corrections** 9:6
119:20 120:3,12
121:2 123:2,2
155:12 157:17
**correctly** 42:15
135:9 153:9
**correlated** 137:5
**cost** 51:9,9 73:16
75:9 77:3,5,9,17
112:5,6 125:1
136:9
**costly** 73:15 90:6
**costs** 12:3 47:11
48:2,8 50:14
51:12,14 52:1,6
54:15,23 55:2,9,13
55:23 59:9,19
70:22 71:5,6,8,11
71:24 72:23 75:1
76:1,4,12,13 77:10
77:18,20,24 78:5,7
79:17 82:22 83:8
83:10 86:20 87:15
101:12 124:20
144:23,24 145:12
145:14,15 148:10
148:21 149:11,15
149:16,22 150:7
150:15
**counsel** 5:14 6:5
6:20 11:10 25:6
26:9 27:13 29:2,9
31:11,16 85:23
124:15 145:21,22

153:12,13
**count** 88:24 96:2
98:21 99:21 113:6
124:21 125:11
127:13,14
**countervailing**
143:13
**counting** 112:5
**country** 131:6
**counts** 83:18
95:20 105:6,11
**county** 1:11 5:16
8:17 12:5 16:23
16:24 17:5,6,15
18:9 19:10,10
23:11 48:23 49:7
49:11,17,24 51:6
54:17 56:1 83:22
84:4,7,11 88:4,4
88:23 89:8,11
90:6,13 91:15,18
92:9 94:17 102:4
102:5,11,13,19
103:3 110:9,12,21
111:2,10 112:13
113:7,17,22 114:6
115:8 128:4 129:5
129:7 131:8
132:14,18 137:3
139:21 153:2,4
154:2 156:10
157:15
**couple** 12:10
16:11
**course** 18:10
19:24 37:23 60:5
65:20
**court** 1:1 5:18,24
7:16 17:15 148:17
156:7

**covered** 16:1,6
42:2 48:20 135:3
**craig** 36:16,19,22
**create** 116:5
**crime** 124:4
127:13 135:3
137:4,24 138:10
138:11,22 139:2,3
139:6,9,16,22
140:6,15,18 141:9
141:16,23 142:1
143:5 144:13
**crimes** 124:7,22
125:12,22 126:9
126:18,21,23,24
127:2,3,3,4,10,21
127:22 128:16,18
128:20,21,22
129:1,7,11,13,19
130:11,12,14,21
131:9,16 133:4,6
133:17,18,23,24
134:12 135:5,12
135:17 136:15
137:19 139:7
140:14,19 141:2
**crisis** 111:13,17
**criteria** 59:24 63:7
108:7
**critical** 62:4
**criticism** 81:11
**crr** 153:20
**cut** 33:20
**cuyahoga** 16:23
17:6 18:9 19:10
**cvs** 43:11

**d**

**d** 2:4 5:1
**data** 31:14 41:23
86:5,6,10 88:6
102:3,8,11,15,16

102:18 103:3,6,9
103:12,14 104:1,6
104:12,16,20
105:9,21,23 106:5
106:6,12,18,21
107:5,12 108:1
109:9 113:4
125:24 126:11
127:24 128:3,5,14
128:21,23 129:4,5
130:11 131:8,12
131:13 132:1,7,22
132:23 133:20
136:13 150:1
**date** 122:17 155:8
156:3,9,19 157:3
157:13,25 158:20
158:25
**dated** 8:21
**dates** 25:15
**davenport** 87:11
88:1
**david** 2:4,7 7:8,10
146:5,5,22
**davies** 25:9
**day** 1:21 24:12,14
35:17 153:17
154:10 156:16
157:22 158:22
**days** 24:11 25:13
25:16 122:2
155:18
**dc** 2:13
**dealt** 56:8 58:1
98:18
**dear** 155:10
**deaths** 78:14,23
79:3,12 82:3,9,17
**deciding** 108:7
**decision** 137:18

**decline** 138:10
**decrease** 64:2,7
69:7 136:16
137:20 138:11
139:2,3,9 141:21
**deed** 156:14
157:20
**deemed** 155:19
**defendant** 2:10,17
5:15
**defendants** 1:9,15
1:19 6:15 7:24
43:4,19,21 44:1,3
47:23 48:13 49:2
49:15 55:4,15,20
55:20 56:3,14,23
57:18 58:5,12,22
59:5 145:24
**definitely** 122:23
**definition** 45:23
101:21
**definitive** 74:9
**degree** 97:1
128:18
**delay** 14:6
**department**
103:10 104:10
129:20 130:16
155:22
**deponent** 13:14,18
19:3 143:21
151:20 152:4
**deposed** 17:21
18:1,2
**deposition** 1:19
5:9,14,21 14:3
33:13,16,18,22
34:7,13,16,19 63:2
123:24 146:16
152:3 153:5,9,13
154:4 155:8,11

156:1,3 157:1,3
**depositions** 35:14
**depress** 141:4
**depressed** 139:20
141:9 142:8,21,22
**derive** 127:14
**derived** 22:16
94:21 111:7 134:3
**describe** 18:3 87:9
148:17
**described** 25:18
90:15 129:2 149:9
149:24
**describes** 132:10
**destruction** 143:3
**detail** 12:10
108:17,22 109:7
**detailed** 107:20
108:11
**details** 22:21
41:20 42:7 102:23
103:5
**determination**
66:8,16 67:5,10
68:1,14,21 69:5,12
69:18 70:8 78:6
108:6 149:3
**determinations**
53:21
**determine** 57:3
77:9,10 92:14
112:14 131:8
132:7 133:6,18,22
**determined**
133:24
**determining** 93:22
102:24
**diagnosed** 88:18
**difference** 73:22
**different** 14:18
15:8,10 16:4,5

44:24 45:1,5,14
48:9,18 49:12
56:18 58:17 77:13
86:7 88:5 97:3
126:24 147:6
**differentiate** 59:8
**differently** 26:15
**difficult** 41:9
**diminished** 143:5
**dinner** 24:13
**direct** 80:15 104:8
**directed** 71:3
**direction** 12:16
14:11 26:10,13
29:16
**directly** 64:23
82:14 83:19 84:2
84:8,12 86:8
92:23 93:3,7
95:10 116:3
119:22 126:4,5,16
128:6 129:6 149:7
**disclosed** 18:21,24
**discretionary** 23:5
23:7
**discuss** 41:2,10
88:9 151:5
**discussed** 34:20
41:16 94:18
150:24
**discussing** 95:20
96:2 116:8 147:21
**discussion** 7:18
13:21 89:16 90:4
137:22
**disease** 85:18 94:9
95:20 96:1,18,19
116:2,6
**disorder** 94:10
100:19,21 101:2
116:3 147:22

**dispensed** 58:12
**distinction** 101:5
**distributed** 47:16
55:4 56:22 57:17
58:4,11,21
**distributing** 49:4
50:10
**distribution** 43:13
44:8,16,18,24 45:2
45:10,14,23 46:6,7
46:14,20 47:2,12
47:21 48:12 50:8
50:18,20,21 51:5
51:10,18,19 52:1,9
53:3,5,11,23 54:1
54:9,16,23 55:8,11
55:14,24 56:2,13
58:23 59:4,10,11
78:19,21,24 79:4
79:13 124:8 133:8
133:13 134:2,9
144:24 145:13
**distributions** 47:4
52:8
**distributors** 43:6
48:22 49:6,12,19
50:2
**district** 1:1,1 5:18
5:19
**diversion** 59:2
**diverted** 58:22
**divided** 54:12
**dividing** 52:18,22
53:2,10,22
**doc** 38:6
**doctor** 25:9 37:1,5
37:8,10,13,16
38:12,15,18,20
39:13,17,21 41:1
42:11,17 71:1,10
71:14,24 72:9,22

74:13,24 75:1,11
75:19,19 76:9,9,15
76:15,19,20 78:14
78:22 117:15
147:16,16 150:24
**doctors** 77:23
148:8 150:24
**dog** 144:6
**doing** 26:15,24
41:5 49:3 73:4
81:23
**dollars** 125:1
**domain** 148:22,22
**donahoe** 15:13
16:8
**doubt** 100:16
**doubtful** 132:20
**douglas** 2:14 6:21
**dr** 25:7,8,9
**draw** 34:11
**drawing** 100:20
**drug** 1:7,14 5:17
43:12 106:1,3,10
106:22 107:11,16
108:3,8,14,20,24
109:2,9,12 110:8
110:24 112:12,15
112:20,23 113:3,4
113:9,21,22 114:5
114:7 126:24
127:3,4,21 128:16
128:17,21,22
129:7,11,21
130:17 131:16,24
132:3,5,8,14 133:4
133:19,22 155:6
156:3 157:3
**drugs** 46:1 61:20
62:3 91:24 92:3,5
107:15 109:14
113:14 116:9

126:22 127:4,5,10
127:15,16 129:9
129:14,20 130:15
130:22 131:10
**due** 55:14 78:15
78:17,18,23 79:3
79:12 82:3,3,9,9
82:14,15 83:8,14
83:22 84:12,13,23
86:9 87:15 90:13
90:23 91:19 92:11
92:16,19,23,23,24
92:24 93:2,3,4,7
93:13,17,18,24
94:10,12,15,17
95:2,3,5,12 96:6,7
96:13 97:18 98:3
100:6,19 101:3
115:24 116:4
117:15 124:5
127:4,10 129:8
134:1 141:17
144:23 145:12,12
**duly** 8:1 153:4,5,7
**duty** 55:5

**e**

**e** 5:1,1 7:23
**earlier** 35:18 89:1
96:16 115:23
147:8 150:24
**early** 7:7
**east** 2:15
**economic** 31:9,11
44:7 48:10 50:7,9
50:17 51:4,13,17
52:6 54:14,15
55:2,9,13,23 59:9
59:19 101:9,23
124:4 136:9
138:23 144:12,22
148:9,14,20

149:10 150:8,11
150:15 151:6
**economics** 143:9
143:10
**economist** 43:10
60:6 77:6 95:23
99:20
**edge** 98:17
**editorialize** 111:4
**effect** 138:21
140:9 141:14
**effective** 26:23
61:21 74:12
**effects** 149:4,5
**effort** 22:8
**either** 22:24 28:9
28:24 56:20 92:23
116:3
**elaborating** 31:21
**eliminate** 55:1
**email** 155:17
**emphasis** 56:17
**empirical** 150:3,7
**employed** 134:6
153:12,14
**employee** 153:13
**encapsulation**
45:18
**enclosed** 155:11
**ended** 24:15
**enforcement**
125:13,21 126:10
128:6,11,15 129:6
130:12
**engaged** 10:18
11:21
**engagement** 10:22
14:14,17,20,23
15:19 16:14 22:14
22:20

**engagements** 19:1
**enter** 26:3
**entered** 120:10
  157:9
**entering** 26:2
**entire** 156:5 157:5
**entirety** 34:3,5
  35:11,12
**entities** 43:19
**entitled** 1:20
**entry** 25:3 120:7
**epidemiologic**
  86:5
**epidemiologist**
  41:15 79:6 95:24
  99:19
**epidemiology**
  85:17 89:5 95:19
  95:22 98:16 101:1
**equally** 74:12
**equivalent** 73:12
  75:7
**errata** 8:23 9:2,5
  9:10 116:16,19
  117:2,10 123:1,12
  155:13,18 157:7
  157:10,18 158:1
**error** 121:11
**errors** 121:18
  123:3,5,14
**esquire** 2:3,4,4,5,7
  2:11,14,18,19 3:4
  155:5
**essentially** 124:11
**establish** 137:24
**established** 149:15
**estimate** 21:20,22
  22:5 48:16 77:2
  78:14,23 79:3,12
  93:10 94:8,9
  96:12,15 103:1

105:5 112:1 113:3
113:16,20 124:22
125:9 129:13
130:12 131:17
133:3 136:4,14,19
137:18
**estimated** 89:8
  94:16 96:19
  105:11,23 110:7
  124:6 131:15
**estimates** 79:7
  89:6
**et** 1:8,14 5:17
  156:3 157:3
**evaluate** 80:4
**evaluation** 80:21
**evans** 1:21 5:24
  153:4,20 154:3
**everyone's** 144:15
**evidence** 73:11
  89:19 150:1
**exactly** 100:4
  117:22 120:7
  122:17 149:18
**examination** 4:1
  8:2 146:18
**examined** 148:24
**example** 20:20
  93:16 140:7
**examples** 100:11
**exceed** 73:18
**exceeded** 71:9
**excel** 118:4,5
  119:3,6,15 122:3,5
**excerpt** 72:9
**excerpts** 75:11
**excess** 83:9 86:20
  87:15
**excessive** 52:7,12
  53:4

**exchange** 144:8
**exclude** 47:3,6
**excluded** 47:16
**excluding** 47:13
**excuse** 103:20
**executed** 157:10
**execution** 156:14
  157:19
**expect** 22:9
**expectation** 21:20
  139:22 140:6
  141:9 142:4 143:5
  144:4
**expectations**
  142:1
**expected** 80:8
  100:12
**experience** 17:12
  21:23 27:3
**experienced** 15:21
  65:7,13 66:18,24
**experiencing**
  142:8
**experiment**
  143:24 144:11
**expert** 8:8,11
  10:13,19 11:4,21
  17:1,7,13,19,23
  18:12,21,24 19:9
  35:2,3,6,22 36:8
  40:2,19 70:24
  82:21 86:6 147:3
  147:4
**expertise** 33:7
  53:19 59:18 60:5
  60:12,18 62:1
  63:11,17,24 86:18
  101:7
**experts** 39:24
  52:15,21 53:1,7
  57:7 58:1 60:8

66:7 67:9 70:11
70:16,20 89:16,21
147:15 150:23
**expiration** 156:19
  157:25 158:25
**expires** 153:17
**explain** 41:13
  78:13 83:7
**explained** 120:21
  141:13
**explains** 22:15
  85:15,20 131:23
**explanation** 86:13
**explicitly** 89:2
**exposed** 89:12
  144:7
**exposure** 88:15
  90:24 91:20 96:22
  97:8
**expresses** 72:10
**extent** 18:20 27:2
  31:16
**extracted** 68:11
**extrapolating**
  105:22
**extremely** 41:9
  90:6

**f**

**face** 81:15 115:6
**fact** 82:7 88:3
  109:11 142:6,19
**factor** 106:1,3,10
  106:22 107:12,17
  108:3,8,24 109:10
  110:8,24 112:12
  112:24 113:22
  114:5 116:9,10
**factored** 52:20,24
**factoring** 116:8,12
**factors** 113:5
  144:3

factual 32:7
fair 44:4,5 45:18
  145:18 150:2,5
  151:4,8
fall 137:23
falls 142:14,14
familiar 64:23
  103:22
families 103:11,14
  103:24 104:12,17
  104:20 105:9
  106:7,10,17,19
  107:6 109:24
family 90:8 108:20
  109:3
far 9:20 21:12
  34:4 72:5,12 74:3
  99:17
farther 10:23
fbi 125:17,23
fed 32:23,23
  109:19 119:15
federal 1:20
feeding 113:12
feeling 24:8
fellow 32:21
felt 111:7
fetus 89:12
field 11:10 101:24
fifth 85:7
figure 33:7 114:21
  115:1 120:17,18
  121:8
figured 21:1
figures 111:7
  115:18 119:4,10
  121:23
figuring 150:14
file 28:16,20
filed 5:17 17:14

files 119:3 122:3
filing 152:3
filling 56:14
final 35:16,20
  120:18
finalized 122:15
financially 6:4
  153:14
find 29:6,7 73:7
  103:4 114:23
  130:24 155:11
finding 108:13,19
  114:19
fine 13:13
finish 41:7 60:23
finished 21:14
  144:17
firm 5:23 6:1,12
  6:21
firms 27:8 43:11
first 8:1 10:18
  11:3,21 12:10
  17:2 24:12 25:3
  27:23 37:22 41:10
  41:12 66:13 87:11
  91:5 95:24 105:24
  106:4 110:8,24
  112:12 113:21
  114:5 115:19
  121:3 124:12,21
  125:3,6 129:16
  130:14 135:2
  142:23 151:3
  153:7
five 146:4 151:24
flavor 87:3
flip 34:21,22,22
  88:11
florence 87:4,17
  87:20 131:20
  132:1

flow 118:23
focus 21:5 35:14
focused 23:8
focusing 31:15
follow 90:7 119:19
  124:16 126:10
  146:24
followed 131:20
following 130:19
follows 7:21 8:1
  13:23 62:23
  123:22 146:14
footnote 105:1
  110:5,5
force 16:9 148:23
foregoing 153:5
  156:13 157:18
forensic 132:10,12
  133:21
forget 151:16
form 19:12 42:1
  46:9 47:8 48:15
  49:20 50:12,22
  51:20 58:17 63:15
  64:4,20 65:9,19
  67:15,17 69:2,9,22
  71:16 79:14 81:17
  82:5 83:23 89:13
  91:22 94:5 95:18
  97:10 98:24 99:6
  99:15 100:2
  102:14,20 103:15
  104:3 106:11
  107:1,8,18 108:10
  108:16,21 109:4
  109:15 111:21
  112:17 118:3
  121:12,15 134:5
  138:13 143:14,20
  149:12 150:9

former 109:16
formula 23:3,4,7
  141:13
forth 8:19 9:5,11
  9:22 153:15 154:6
forty 153:15 154:7
forward 135:13,17
  136:5 141:18
  142:2 149:17
  155:15
found 73:11
four 115:7,16
fourth 61:14 85:6
franks 2:14 6:16
  6:22
free 156:14 157:20
front 116:20,21,24
full 8:5 153:10
function 63:5
  69:21
functional 70:4
further 7:16 51:16
  86:15 145:19
  152:4 153:8,11,13
future 64:12
  139:22 140:21
  141:10 144:13

g

g 5:1 7:23
gaps 128:4
garcia 15:6 16:3,5
  119:24 121:17
  128:9,10
gawd 105:20
general 12:12 42:4
  77:12 81:10 139:8
generally 15:23
  23:16 147:14
  148:16
generates 86:11

**geographic** 132:16
**getting** 46:3
  117:11
**give** 19:19 21:22
  24:8 31:24 45:22
  61:1 62:1 95:24
  101:14 110:14
  112:1 121:18
  124:15 137:8
**given** 86:10
  151:23 153:17
  154:10
**gives** 126:17
**glitch** 11:2 28:7
  39:11 111:7 147:5
**global** 71:4
**gma** 22:6 29:13
**go** 5:11 6:14,15,15
  6:17 7:6 9:21
  18:15 33:21 40:22
  43:14 48:6 58:16
  62:17 86:15 104:4
  104:4 107:9 114:1
  114:20 122:7
  123:17 127:13
  132:15 133:2
  142:2 143:23
  144:5 146:7
**goes** 49:1 73:20
  144:15
**going** 5:3 13:24
  24:17 34:4 41:20
  46:7 47:7 60:24
  62:20 74:3,6 89:3
  111:24 122:22
  123:18 124:10
  131:14 132:24
  135:13,17 136:5
  141:18 144:5,7,12
  146:2,11 147:2
  149:16

**gonna** 22:19 26:2
  43:8 65:21
**good** 5:2 7:6 8:4,6
  13:16 19:20 56:5
  63:24 79:5 93:6
  96:3,20 135:19
**goods** 45:15
**gosh** 74:15 122:16
**gotten** 22:18 105:9
**greater** 73:12,13
**gregory** 8:6
**greylock** 11:6,13
  12:15,18 14:10,13
  14:22 15:5 16:13
  16:20 19:23 20:12
  20:14 21:8 22:12
  123:7,9
**ground** 27:3
**groups** 120:2
  121:2
**guess** 15:2 22:7
  122:10 127:20

**h**

**h** 7:23
**hager** 3:3 5:23
**hand** 30:8 119:13
  153:17 154:10
**handled** 34:21
**handwritten**
  28:14,18,23 29:1
**hansen** 25:8
**happen** 21:13
  96:14
**happened** 120:15
**happening** 129:24
**happens** 15:14
  21:15 90:7 122:5
**happy** 21:6
**hard** 12:21 31:20
**harder** 131:5

**harm** 51:4 101:9
  101:23 117:3,10
  117:14 136:9
**harmed** 143:12
**harms** 44:7 46:20
  46:23 47:1,10,17
  47:20 48:1,11
  50:7,9,18 51:13,17
  52:6 54:15 55:2
  55:13,23 59:9
  124:4,20
**head** 44:4 107:10
  108:12
**heads** 118:10,14
**health** 2:10 6:13
  6:19 83:9 86:20
  87:15 103:10
  104:11
**hear** 13:1 53:6
  57:21
**heard** 120:23,23
**hearing** 12:22
  85:24
**heat** 32:21
**help** 14:19 15:22
  15:23 63:12 64:11
  70:4 97:4 99:4,13
  99:24 100:22
**helped** 16:12
**helpful** 15:7 24:2,3
  26:17 57:7
**helps** 110:18
**hereof** 153:6
**heroin** 93:16,17
**hey** 146:20
**high** 115:7 124:15
  124:18
**higher** 113:9
**hint** 101:14
**hit** 131:5

**hmm** 35:24
**hold** 12:20 22:1
  61:9
**holdings** 143:3
**home** 109:12
  138:10,11 139:2,4
**homes** 141:4
**hospice** 65:18,24
  66:5,10
**hour** 19:15
**hourly** 16:17,20
  20:11
**hours** 10:21 19:17
  19:20,23 20:2,4,5
  22:19 122:2
**human** 103:10
  104:11
**hungry** 122:23
**huntington** 1:4
  5:16 8:17 9:16
  12:5 15:14 23:12
  27:7 31:24 124:7
  124:23 125:12
  134:13 135:6
  155:6 156:3 157:3
**hurst** 2:5 7:4,4

**i**

**idea** 64:6,10,16
  116:1,15 124:18
**identification** 18:5
**identified** 40:18
  112:11 121:11
  123:5,13 130:11
**identify** 41:23
  49:22 50:4 111:1
  128:15 133:16
  150:20
**ignoring** 105:14
**iii.d.** 135:3
**immediately** 62:10

**impact** 71:22 111:12 134:8 148:14
**impacts** 31:13
**implies** 76:13
**importance** 26:24 32:3
**important** 62:12
**imposed** 44:8 46:20 47:21 48:11 50:7,18 51:4 52:7 54:15 55:23 59:9
**impressed** 122:11
**impression** 115:9
**improve** 69:21 70:4
**improvement** 63:4
**inaccurate** 118:17
**inadvertent** 120:16 121:7
**inappropriate** 50:21 51:18 52:19
**incidence** 125:16
**incident** 127:24
**include** 10:11 144:24 145:14
**included** 20:21,23 47:18 61:18 98:11 98:21 99:10 155:13
**including** 97:19 98:4 111:14,16,17 150:23
**inclusion** 120:17 121:7
**inconsistent** 100:9
**incorporated** 157:12
**increase** 63:12,19 69:14 136:15 137:19 138:11

139:2,3
**increased** 138:10
**increasing** 90:5
**independent** 66:8 66:15 67:4,10 68:1,14,20 69:5,11 69:17 70:7 79:2,9 79:11 83:20 88:22 89:10,14
**independently** 77:18 83:13
**index** 4:1
**indicate** 150:20
**indicated** 60:2,9 60:14 61:15 74:14 74:18,21 152:2
**indicating** 155:13
**indications** 75:16
**indirect** 80:15
**indirectly** 82:15 84:13 86:9 92:24 93:4,13 116:3
**individual** 57:2,3 57:9,14 123:10 130:11
**individuals** 26:9 26:21 27:14 30:2 31:6,10,16,22 32:6 32:16
**infant** 88:18
**infants** 90:23 91:13
**influence** 144:3
**information** 32:7 32:15 41:17 81:15 96:1 113:15 125:19,22 126:5,7 128:5,12 132:11 132:13 133:21 141:20

**informative** 112:1 112:2
**initial** 125:11
**initiative** 29:17
**injury** 64:8 69:8
**input** 57:8 66:7,15 67:3,9 68:5,13,20 69:4,11,16 70:7 117:15,17 118:3,6 118:22 119:9 122:3
**inputs** 51:2 52:16 53:9 57:15 67:24 76:3 119:2,14 122:3 147:15 151:5
**insect** 54:6
**instructed** 29:18
**instructions** 121:19
**integrated** 43:11
**intelligence** 129:21 130:17
**intend** 10:12
**intended** 41:24
**interested** 6:4 34:6 34:24 102:22 112:4 126:20 153:14
**interfere** 5:8 145:24
**interference** 5:6
**interpret** 73:14
**interrupt** 43:14 122:20
**intolerable** 53:12 53:15
**investigate** 68:7
**invoices** 20:7
**involved** 48:17 98:12,21 99:11

101:11 112:16,20 113:23 114:7 121:3,4
**involves** 125:15
**involving** 112:24
**ironed** 42:7
**issue** 15:24 16:6 46:11 70:22 89:17 148:19
**issued** 8:18 42:20 42:23
**issues** 13:22 16:1,6 16:7 50:24 52:3 52:14 57:23 123:5

**j**

**j** 2:11
**jack** 15:20
**jackson** 153:2
**jan** 25:7
**january** 10:21 19:21 26:6,7
**job** 51:24 52:16 54:21 63:21
**john** 2:5 7:4,6
**johnson** 25:8
**judgment** 70:10 70:16,20 71:24
**july** 17:24 27:15 29:10 32:15
**justice** 129:21 130:17
**justified** 56:23
**justin** 3:4

**k**

**kanawha** 154:2
**kathy** 147:4
**kearse** 2:4 7:13,13
**keep** 125:5
**keller** 2:8 7:8 146:22

**kessler** 2:14 6:21 6:21
**key** 34:23
**keyes** 2:11 4:3 6:11,11 7:1,12 8:3 13:2,7,9,16 14:5 23:24 30:18,23 31:4 35:12,20 36:5,9 37:18,22 38:1,6,9 41:1,15 42:11,17 43:1 59:21 61:1 62:15 62:17 63:3 78:14 78:22 79:6,16,18 79:19,24 80:5,18 81:6,24 82:8 83:18 84:2,3,6,10 86:6 89:3,7,20 90:21 91:7,12 92:10 94:22 95:10 95:11,14 96:4 98:18 99:18,21 100:5,13 101:7 114:10 117:12,16 117:16,18 118:7,8 118:11,16,23 119:2,10,14,18,19 119:22 120:3,16 120:24 121:8,14 121:24 122:14,24 123:17 124:2 133:14 134:3,18 145:19 146:6 147:1,4 149:12 150:9 151:12,17
**kids** 102:9,16,16 115:7
**kind** 15:20 22:7,14 32:1 45:23,24 46:11 63:17 80:21 81:19,21 84:20

85:17 98:16 115:9 116:1 120:2,19 125:15 126:17 129:14 142:13 149:19
**kinds** 139:6
**king** 17:15
**knew** 146:2
**know** 12:9,11,21 14:24 15:8,22,22 16:16,21 18:22 20:18 21:13,13,17 21:18 22:7,22,23 22:24 23:1,2 24:1 25:24 26:1,3,16,18 26:22,24 27:10 28:3,4 29:6,24 30:4,10,24 31:8,9 31:11,12,21 32:4,5 32:18,20 34:10,15 34:19,22 35:24 36:4,4 37:24 38:8 40:24 41:5,16,17 41:19 42:2 43:10 43:12 44:19 45:24 46:10,13,14,16 48:9 49:10 50:14 50:15 53:15,16 54:4,11 56:10 57:12 59:17 62:7 69:24 71:17,21 75:14,16,17 77:4,6 80:11,24 81:1,2,9 81:20,20,21 82:13 83:24 85:22 86:3 86:12,17 87:20 89:14,24,24 90:2,7 91:7 93:14 95:23 97:1,2,12,12 99:8 99:9 100:7,13 101:7 102:2,6,23

103:23 108:18 113:5 115:9,11,11 115:15,16,17 116:7 118:23 119:2,7 120:20 122:2,3,4,5,22 123:10 126:8 127:1 136:22 139:6 140:8 141:19,24 143:6,6 143:19 144:4,7 149:6,19 150:11 150:14
**ko** 2:7 4:4 7:6,8 12:24 63:15 66:12 67:15 77:1 99:15 100:2 134:5 143:1 143:14,19,23 146:5,7,19,21,22 151:10,19

## l

**labor** 16:9
**laboratory** 132:10 132:13 133:21
**laptop** 28:15,17 30:8
**large** 12:5 74:2 75:17
**larger** 85:1,7
**law** 6:11 27:6,8,8 27:11 125:13,21 126:10 128:6,11 128:15 129:6 130:12
**lawful** 56:6,10 59:11
**lawsuit** 82:23
**lead** 115:5
**learn** 23:16
**leas** 125:20 132:1

**led** 86:14 119:20
**left** 58:22 89:5
**legal** 155:1 158:1
**legitimate** 58:13
**lembke** 36:5,9 38:12,15,18 71:1 71:14 72:9,22 73:8,10 74:6,13,17 74:24 75:1,11,12 75:19 76:9,15,20 77:16,23 78:3 147:16 148:8 150:24
**lembke's** 71:10,24
**leslie** 87:7 88:1
**letter** 155:19
**level** 22:8 26:18 45:17 51:17,19 52:9 53:11,13 54:1 57:2,10,10,14 57:15 71:15,15,20 72:11,16,17 74:1 86:5,12 97:2 106:14 113:10 124:15,18 128:23 132:16 137:3 140:15,17 142:1,4
**lexecon** 14:16,19
**licensed** 58:14 98:7,13,22 99:13 99:24
**life** 60:15 61:16 63:20 82:18,22
**limitations** 103:6
**line** 52:18,22 53:2 53:10,22 61:14 122:20 155:13 157:7 158:3
**link** 135:2 139:1
**list** 23:9,19 24:22 27:13,15 33:13,14

33:22 35:2,3 40:1
49:5
**listed** 27:21 31:5
31:16 34:1 38:2,5
39:3 40:11 42:18
43:2,18,24 49:15
117:10,13 157:7
157:17
**listing** 157:7
**lists** 25:6
**literature** 136:20
137:23 138:23
149:1
**litigation** 14:18
15:21 17:12
**little** 6:17 20:17
24:17 73:22
107:19 111:4
119:13 122:9
142:16
**live** 110:8 111:1
112:13 113:22
114:6
**llc** 154:4
**llp** 2:8
**local** 6:20 23:17
24:13 27:2 80:13
89:16,19,21 103:6
126:1 143:4
**located** 1:21
**logan** 2:20
**long** 58:22 72:11
72:19 117:22
121:22 122:2
**longer** 122:9
**look** 9:18 23:23
24:4 30:24 34:23
39:4 51:24 52:17
52:17 73:2 80:19
81:2 97:13 102:18
104:5 105:1 107:9

110:18 115:1,3
132:3,6 133:2
138:14 139:7,8,14
**looked** 10:20
30:12 80:7,14,23
81:16,18 87:21
103:2 137:2,4
139:10,15
**looking** 34:18 39:8
39:20 74:15 79:23
81:13,24 130:9
137:1
**looks** 97:24 98:9
147:6
**lot** 33:18 82:13
**lots** 100:7
**louder** 86:2
**lower** 111:8 112:2
113:16 131:4,13
142:9
**lunch** 122:21
123:20 146:4
**lyn** 25:7

**m**

**m** 7:23,23
**macro** 57:10,15
71:15,17,20
**madam** 155:10
**magic** 119:6
144:12
**magnitude** 80:7
**maintained**
125:17
**majority** 90:16,16
90:18,22 100:6,10
**maltreated** 102:5
102:12,17,19
103:4 112:6 115:8
115:20 116:13
**maltreatment**
101:10,12,22,23

102:1 103:7
105:24 108:14
111:15,17,19
114:14 115:24
116:7
**manage** 99:4,14
99:24 100:22
**manifest** 150:12
**manufacturer**
44:20 45:7,15
46:1,8,17
**maps** 32:22
**march** 23:19 25:3
25:13,14 27:14
28:9 29:10 32:14
37:23 38:4 41:12
41:13 42:4,17
**market** 49:10
141:4,8 142:8,21
142:22 144:3
**marshall** 15:15
**mart** 43:11
**mass** 87:22
**material** 26:2
32:20 34:11
109:19,21
**math** 142:3
**mathematical**
85:11
**mathematically**
86:3
**matter** 5:15 12:14
14:9 20:15 21:11
21:15 31:7 34:17
36:24 53:18
**matters** 22:24
53:7 67:3 69:16
**mayor** 25:7
**mccann** 36:13,16
36:19,22

**mcginness** 2:4
**mcguire** 1:19 5:14
8:4,7 9:15 14:3,6
18:20 43:1 63:2,4
122:23 123:24
124:3 146:16
151:13,17,23
153:5 154:5 155:8
156:4,9 157:4,13
158:20
**mckesson** 7:1 43:9
**mckinnon** 11:6,14
12:15,18 14:10,13
14:23 15:5 16:14
16:20 19:23 20:12
20:14 21:9 22:12
123:7,10
**mean** 12:4 18:16
26:12 33:5,19
36:14 44:15,24
45:1,19 70:15,19
77:12 78:18,21
84:20 85:5,6
92:20 93:8,13,18
94:1,3,7 102:2
107:12 112:8
119:12 138:16,18
146:2
**meaning** 97:17
98:4
**meanings** 44:18
**means** 45:13,14
53:16 92:21 93:3
93:9,14,20 94:6,8
107:13
**meant** 56:11 92:21
**measure** 66:4,9,22
67:6,11,19 68:2,8
68:15 69:6,13,19
70:3 76:21 77:18
77:22 149:10

150:7
**measured** 147:9
**measurement** 149:20,21
**measuring** 143:13
**mechanism** 62:12
**media** 5:13 14:2 63:1 123:23 146:15 151:23
**medical** 31:23 57:4 60:7 75:17 89:16,21
**medically** 60:2,9 60:14 61:15 97:20
**medications** 73:11
**meeting** 23:19 24:10 25:6,17,18 26:8 27:24 31:15 41:14 42:16
**meetings** 23:10,15 24:12,15 25:1,17 26:17 27:4,6,18,21 28:9 31:18 32:5 42:14
**meets** 153:15 154:5
**member** 123:9
**mental** 81:21,23
**mentally** 80:24
**mentioned** 75:13
**merit** 1:21
**met** 37:22 41:12
**method** 111:4
**methodology** 41:2 41:11,14 87:21 102:6 112:11 115:5 129:2 131:20,22,24 132:2,3
**michael** 2:3 155:5

**microphones** 5:4,8
**midwest** 155:17 158:1
**mike** 7:2 30:18
**mind** 26:23 104:23 146:8,9
**minus** 77:3
**minute** 51:23
**minutes** 31:22 62:17 129:3 146:4
**missed** 30:4
**missing** 46:14 105:11 126:12
**mistake** 120:19
**mixing** 39:6
**mobility** 63:12 69:15
**model** 116:1
**modifications** 9:6
**modified** 122:8
**moment** 146:5,10
**money** 21:6
**months** 42:9
**morbidity** 16:11 83:3,7 92:22 93:9 94:17,19 96:15 114:8 120:4 121:3 147:22 148:7
**morning** 2:18 5:2 6:18 7:7 8:4,6 147:2,8
**mortality** 78:10 120:13,14 121:4,6
**mother** 88:19 92:15 94:2 96:23 97:9 98:12,22 99:12,22 101:1
**mother's** 96:18,18 97:23
**mothers** 67:13,21 96:10,11,13

100:21,21
**motley** 2:5 7:3,5 7:11
**move** 24:17 26:18 45:6 46:1
**movement** 44:19 46:16 70:4
**mt** 2:6
**multiple** 43:12 137:3
**multiply** 114:7
**multiplying** 83:8 101:10
**mute** 7:19 13:14 146:9
**mysterious** 20:17 21:3

## n

**n** 5:1
**n.w.** 2:12
**name** 5:22 8:5,6 15:17 44:3 155:6 156:3,4,15 157:3,4 157:21
**names** 15:11,12
**narrative** 122:8
**narrow** 46:11
**nas** 88:9,18,23 89:6,8,11 90:5,12 91:12,19,21 92:9 92:11,14 93:23 94:1,12 95:1,15 96:6,10,18,21 97:7 97:17,22 98:2,11 98:20 99:10,21 100:6,8,19 101:2
**nation** 88:5
**national** 26:19 27:1 89:19 113:10 113:13,19 125:15 125:24 127:24

129:21 130:17,20 130:23 131:12 132:10,12,23 133:20
**nationally** 88:4
**nature** 31:12 41:17 55:11 86:13
**necessarily** 125:23 145:3,16
**necessary** 119:1 140:23
**need** 24:6 28:5 53:16 56:24 57:4 77:6,10 94:14 110:16 141:24 142:2
**needed** 29:19 41:4 92:14 96:1 123:6 129:12
**needing** 7:19
**needle** 144:7
**needs** 141:16
**negative** 149:4
**neglect** 102:1
**neighborhood** 144:5
**neither** 153:11
**neonatal** 88:9,14 90:22
**net** 12:3 46:23 47:10,11 50:14 51:4,8,9,12,13,14 51:24,24 52:6,17 54:14,15,22 55:13 55:22 59:19 70:22 71:5,6 75:8 76:4 76:11,13 77:3,3,4 77:5,9 112:5 125:1 149:3,10,15 149:15,21

never 16:15 17:6
new 58:17 117:11
  118:1,6
nibrs 126:15 128:1
  128:3,13,19 129:5
  130:11
night 144:6
nir 126:15
non 55:20 73:11
  84:24 97:20
  130:16
nondrug 127:2,9
  127:22
nonfinal 121:8
nos 5:19
notarized 155:14
notary 153:4
  155:24 156:10,18
  157:15,23 158:23
note 5:4 28:4
  30:24 151:14
  155:12
noted 7:16 28:22
notes 27:17,19,20
  27:23 28:11,14,14
  28:18,23,24 29:4
  29:11,14,16,18,21
  30:7,11,15,19
  153:9
notice 1:20
noticed 126:2
noticing 6:10
nuisance 9:15 12:1
  12:2,7 17:2,2,8
  18:6,13,13 19:10
  32:2 53:24 54:3
  54:10
number 15:1
  19:20 22:15 33:13
  35:2 78:14,23
  79:3,12 83:8,13,21

84:4,7,11 88:23
89:6,8 90:12 92:8
92:10 94:11
101:10 102:4,9,12
102:15,15,17
105:23 110:12,13
110:21,22,23
112:5,7,8,11
113:13,19 114:4
115:18,19 116:13
120:11 124:7,22
125:9,11 126:6
130:10 133:17
134:20,21 149:1
151:23 155:7,13
numbers 79:15,17
  79:19,23,24 80:5
  80:17 81:7,10,11
  81:14,22,24 82:8
  84:1,1,16 85:16
  86:11 94:21 95:9
  98:19 102:7 111:9
  111:23 112:1,3
  114:9,19,24
  116:14 117:11
  118:1,3,6,11,16,22
  119:2,18 122:8
  157:7

o

o 5:1 7:23
o'connell 25:7
oath 6:3
object 22:2 42:1
  46:9 47:7 48:1,4
  49:20 53:14 58:15
  63:15 67:15 69:2
  69:22 85:21,23
  86:1 89:13 109:15
  112:17 134:5
  143:14,20

objected 86:2
objection 10:7
  19:12 29:23 37:3
  40:21 45:20 48:15
  49:9 50:3,12,22
  51:20 52:11 55:6
  56:4,16 57:1,20
  58:24 59:13 60:4
  60:11,16 61:23
  62:6,13 63:8,14,22
  64:4,9,14,20 65:2
  65:9,15,19 69:9
  70:5,12 75:5 76:2
  76:10,23 77:1
  78:2 79:14 81:8
  81:17 82:5,11
  83:23 84:17 85:10
  87:18 91:22 92:4
  94:5 95:18 96:24
  97:10 98:10,14,24
  99:6,16 100:2,3
  102:14,20 103:15
  104:3 106:11
  107:1,8,18,23
  108:4,10,16,21
  109:4 111:21
  113:1 121:12,15
  138:13 142:11,24
  143:18 149:12
  150:9
objections 6:8
obtain 125:11
obviously 79:16
occasion 30:12
  99:3
occur 25:19 27:5
  82:1,6 97:18 98:3
occurred 25:13
  28:9
occurring 88:3

october 153:17
odd 82:1,16 143:8
  143:9
offender 139:7
offer 10:12 71:14
  72:22 74:13
  134:10
offered 41:3
  120:22 150:23
offering 17:7
  18:12 19:9 31:18
  55:12
offhand 136:24
officer 11:9
offices 27:7,8,11
official 156:15
  157:21
oh 7:6 25:24 31:7
  40:5 41:12 45:12
  62:7 79:10 105:20
  122:16
ohio 155:2
okay 9:9,13,22
  10:15 14:22 15:18
  16:8,17,23 17:11
  18:3,8 19:7 20:3
  20:10 22:4 24:6,9
  24:19,20,21,23,24
  25:12,22 26:8
  27:12,17 28:1,6,13
  28:18,24 29:4,6,8
  30:1,23 31:4
  32:13 33:10,19
  34:1 36:13,16
  38:4 39:20,24
  40:10 41:10,22
  43:18,24 44:6,12
  44:15 45:8 46:5
  48:10 49:16,22
  50:6 51:3,15 52:5
  52:18,22 61:7,13

61:20 62:3 66:9
70:15,19 72:9,15
73:4 74:7,23
75:22 78:13,22
79:19,23 81:5,23
82:7 83:20 84:3
84:22 87:1,4
88:13,22 89:7
91:7 92:8 93:2,7
94:20 97:13,16,22
98:20 101:17,18
101:21 102:18
103:13,23 104:6
104:10,15 105:3,4
105:8,16 106:15
106:21 107:11,22
109:8 110:2,20
111:14 114:4,12
116:23 117:2,9,21
118:5,9 120:22
121:17 122:18,24
123:12,16 124:10
124:14 125:8
127:23 128:14
129:4 130:3,6,10
130:20,24 131:22
132:6,12,18,22
133:3,11,16
134:22 135:8,11
135:21 136:14
137:11,14 138:2,7
138:24 139:19
141:8 142:18
143:24 144:19,21
145:10,11 146:10
148:6 150:5,18,19
151:9
**once** 38:24 122:3
141:19 148:1
**ones** 34:1 35:21
43:1 54:18 79:15

100:16 126:14,15
138:21
**ooo** 152:6
**open** 124:10
**operator** 5:2 7:15
13:4,11,19,24 14:2
62:20,24 123:18
123:23 146:11,15
151:21
**opinion** 52:16
55:12 62:1 71:11
71:13,14 72:22
74:13 76:11 90:1
90:16 134:10
**opinions** 8:19 9:11
9:23 10:12 17:7
18:12 19:9 31:18
41:2 52:16 77:4
150:23
**opioid** 14:18 47:3
61:20 62:3 73:11
82:20 83:1 90:24
93:11 94:9 96:11
96:13 97:18 98:3
98:6 99:4,12,23
100:19,21,22
101:2 111:12,16
113:13 114:8
116:3 131:17
133:5,6,7,23,24
134:1 135:13,18
141:22 147:22
148:11
**opioids** 12:3 44:9
44:16,19 45:6
46:6,16,21 47:3,12
47:15,22 48:12,23
49:6,17,19,23 50:1
50:8,10,15,19 51:5
51:11 52:2,8,10
53:4,5,12,24 54:2

54:10,16 55:3,9,15
55:24 56:3,13,22
57:17 58:4,11
59:5,11,12,23 60:2
60:9,14 61:14
62:11 63:5,12,19
64:2,7,11,17,24
65:6,12,17,24 66:5
66:10,18,23 67:7
67:12,20 68:3,9,16
68:23 69:7,14,20
70:3,23 71:22
72:1,2,12,19,23,24
73:13,22 74:11,14
74:18 75:2,3,3
76:5,7,22 78:5,15
78:18,19,24 79:4
79:13 80:15 82:3
82:4,9,10 83:9,14
83:22 84:8,12,13
84:24 85:1 86:9
88:16,19 89:12,18
90:10,13 91:20
92:12,16,17,19,24
93:1,3,4,5,8,12,17
93:19,21,23,24
94:3,10,13,16,18
95:2,3,6,12,15,16
96:6,8,14,19,22
97:8,19,23 98:4,13
98:22 101:4,11
112:16,20,24
113:7,9,23,24
114:7,9,15 115:8
115:21,24 116:1,9
116:10,11 124:5,9
124:24 127:6,6,11
127:17,18,19
130:13,15,16
132:4,8 134:9,11
135:4 140:9,20

141:3,17 144:24
145:1,2,13,14,16
147:11 148:15,21
149:2
**order** 56:15
148:24
**organize** 15:22
**organized** 15:7
**original** 9:6,9
117:20 118:17
**originally** 28:17
79:20
**orthopedic** 68:18
**oud** 83:8,10,14,21
84:4,7,11,23 86:7
86:21 87:15 95:3
95:5,12 96:7
100:6 101:6
133:12 147:22
**outcome** 6:4 22:9
63:17
**outcomes** 18:6
**outlining** 26:1
**outside** 43:1 60:5
60:12,16,18 61:24
62:8,14 63:8,10,16
63:23 64:5,10
65:2,4,16,21 86:18
91:23 92:1,6
97:11 128:21
**outweigh** 71:11
72:1,5,12,24 74:3
76:12 77:24 78:7
149:4,16
**outweighed** 75:9
75:24
**outweighing** 72:19
**outweighs** 75:2
**overall** 80:8 113:3
135:4 142:1,4

**overestimate**
115:11
**overly** 113:5
**overview** 124:15
**owned** 144:1
**owner** 144:14
154:3
**owners** 142:7

**p**

**p** 5:1
**p.m.** 123:19 124:1
146:12,17 151:22
**pa** 2:21
**page** 17:12 23:20
24:4,5,22 27:12,22
33:9 38:2 39:10
44:6,13 61:9,11
79:21 83:4 97:13
145:9 155:13,15
157:7 158:3
**pages** 12:10 30:19
34:20,20
**paid** 19:14 21:1
143:16
**pain** 59:22 60:3,10
60:15 61:15,21,22
62:4,9,12 64:12
65:7,13 66:18,23
67:13,21 68:4,10
68:17,24 72:12,19
73:1,1,12 74:14,19
75:4
**palliative** 64:18
65:1 67:7
**paper** 136:20,21
**papers** 137:23
149:14
**paragraph** 12:13
14:8 44:13 60:20
61:4,8,10 72:3,4,7
73:9,24 74:7,8,16

78:10 84:22 86:24
91:2 94:24 97:13
97:16 101:15,16
101:19 110:14,16
124:14 130:1,8
131:19 134:18,22
135:1 137:9,14
138:21 139:1
144:19 145:6
150:17,19
**parents** 107:14,14
**park** 144:8
**part** 15:1 21:3
23:21 24:11 30:12
33:23 34:6 45:5
52:4 54:24 55:18
83:2 89:2 124:21
124:21 125:3,7
141:11 157:9
**participate** 30:1
63:20
**participated** 23:11
**participating**
23:14
**particular** 15:24
16:6 24:10 36:2
54:19 55:19 70:21
95:17 107:17
108:3,9 109:10
131:5 139:6
147:16
**particularly** 72:4
**parties** 1:21 5:11
48:9 153:12,14
**partition** 56:19,20
58:8,18 59:14,16
**parts** 124:20
**party** 6:3
**passed** 11:11
**patient** 63:13
64:11 69:7 71:15

71:15 93:11
**patient's** 64:3,7
69:14,20 70:4
**patients** 58:13
65:7,14 66:1,5,11
66:19,24 68:24
71:18 147:10
**pausing** 46:11
**payment** 21:18,23
**peaked** 80:12
**pediatrician** 90:5
**pendell** 2:3 6:14
7:2,2 10:7 12:20
13:6,8,10,12 18:15
18:19 19:12 22:1
23:22 24:1 29:23
30:22 31:3 37:3
40:21 42:1 45:20
46:9 47:7 48:4,15
49:9,20 50:3,12,22
51:20 52:11 53:14
55:6 56:4,16 57:1
57:20 58:15,24
59:13 60:4,11,16
60:22 61:3,11,23
62:6,13,16,19 63:8
63:14,22 64:4,9,14
64:20 65:2,9,15,19
69:2,9,22 70:5,12
71:16 75:5 76:2
76:10,23 78:2
79:14 81:8,17
82:5,11 83:23
84:17 85:10,21
86:1 87:18 89:13
91:22 92:4 94:5
95:18 96:24 97:10
98:10,14,24 99:6
99:16 100:3
102:14,20 103:15
104:3 106:11

107:1,8,18,23
108:4,10,16,21
109:4,15 111:21
112:17 113:1
121:12,15 122:19
134:16,19 138:13
142:11,24 143:18
145:22 151:14
155:5
**pending** 143:20,22
**people** 12:21 15:2
20:19 24:13 26:20
31:23 32:19 58:5
68:4,10,17 116:2
143:4,8 144:1
**people's** 141:24
**percent** 22:19
42:23 82:2,8
90:10,12,18,19
92:11 94:11
100:18 103:21
114:13 129:8
130:14 134:12
135:12,17 136:2
136:15 137:19
140:10,16,21
141:3,15,16,19,21
142:2,5,5 144:13
**percentage** 20:24
21:2,17 22:23
23:1,2 89:11
90:17 94:1 110:7
111:1 112:15,20
112:23 113:21
129:13,18 130:21
131:8 132:7 133:4
133:7,18,22 134:1
136:16 137:20
138:9,11,17 140:5
141:5,6

percentages 94:20
102:8 134:2
percents 141:15
performed 148:13
148:18 150:21
151:6
performing 32:8
33:3
period 47:4 48:20
51:10 52:2 122:1
125:14 126:19
134:13 135:6
136:6
person 23:19
24:10 25:6,18
26:8,17 27:4,6,20
28:9 31:15 42:13
42:16 93:14 101:1
person's 63:19
personally 156:11
157:15
personnel 23:11
perspective 49:13
49:14 64:12 78:6
pharma 17:15
pharmacies 58:13
phenomenon
85:15
philadelphia 2:21
phone 105:14,18
155:3
phones 5:7
phrase 45:9 48:2
physician 58:7
98:7,13,23 99:13
99:24
physicians 58:14
99:3
pick 5:5 54:22
pieces 12:11 16:12

place 5:7,11 26:19
44:22 54:24
142:23 153:6
placebo 73:23
plaintiff 1:5,12
52:15
plaintiff's 147:4
plaintiffs 2:2 7:3,5
7:9,11,14 8:12,13
8:15,16 10:13
14:18 27:9 29:2
35:23 40:3,19
145:22 146:23
pleasant 2:6
please 5:4,6 6:9
7:17 8:5 65:11
110:14 116:22
138:15 140:12
155:11,11
point 10:15 15:17
20:1 40:17 42:2
43:17 54:22 60:22
70:23 71:23
112:10 115:16
122:21 136:16
137:20 141:5
145:20
pointing 104:23
points 41:23 141:6
pope 137:15,15,17
137:18 138:5,5
139:10,10,14,15
141:20,20
population 72:11
72:16,17 74:1
portfolios 143:4
portion 55:13
portions 11:18
34:15
position 56:5
63:18,24 65:5,22

92:2 99:7
positive 76:4,13
149:5,15
possible 26:3 98:9
post 60:10 61:16
62:11
potential 71:6
148:10,20 150:12
potentially 86:8
92:5
precisely 129:23
predict 141:14
predominantly
89:17
preexisting 99:5
99:14 100:1,23
pregnancy 88:20
92:16 94:3 99:5
99:14 100:1
pregnant 99:4
premise 59:3
prepare 34:12
prepared 9:10
17:13
preparing 30:13
32:16
prescribe 99:3
prescribed 96:23
97:9,19 98:5,13,22
99:13,23 100:22
prescription 12:3
44:9,16,18 45:6
46:6,21 47:2,3,12
47:15,22 48:12,23
49:6,16,18,23 50:1
50:8,10,15,19,19
51:5,11 52:2,8,10
53:5,12,24 54:2,9
54:16 55:3,9,15,24
56:3,13,22 57:17
58:4,11 59:4,10,12

59:23 62:11 63:5
64:24 65:6,12,17
65:24 66:5,10,18
66:23 67:12,20
68:3,9,16,23 69:7
69:14,20 70:3,23
71:22 72:1,2,23,24
74:10 75:2,3,3
76:5,7,22 78:5,15
78:17,19,24 79:4
79:13 80:15 82:4
82:10 83:9,14,22
84:8,12,13,24 85:1
86:9 89:18 90:9
92:17,19,24 93:1,3
93:4,5,8,12,17,19
93:20,24 94:2,10
94:15,18 95:2,3,6
95:12,16 96:6,7,14
96:19 97:23 98:7
99:12,23 101:3,11
113:24 114:8,15
115:8,21,24 116:1
116:11 124:5,9,24
126:22 127:11,19
130:13 133:7,12
134:1,9,11 135:4
135:13,18 140:9
140:14,20 141:2
141:17,22 144:24
145:1,2,13,14,16
147:10 148:10,14
148:21
prescriptions 57:4
58:6,14,21 116:4,6
127:7 135:2
present 3:2 6:5
presume 149:24
pretty 19:20 72:6
74:9 87:23 96:20
134:7

**previous** 22:24
67:2 92:22 118:22
**previously** 59:15
95:9
**primarily** 71:1
87:14,19
**primary** 15:5 88:1
150:20 151:6
**prior** 10:22 11:12
14:17 25:17 35:7
89:22 118:9,15
**private** 5:5
**privilege** 31:1
**probably** 10:23
25:21 29:7 34:4
39:3 41:12 42:3,7
91:24 102:21
105:19 109:6
110:4 111:8
136:23 146:3
**problem** 13:1 14:7
15:23 61:3,3
96:11,13
**procedure** 1:20
64:3 69:8 156:5
157:5
**proceed** 90:14
**proceeding** 6:9
**proceedings** 7:21
13:23 62:23
123:21 146:14
**process** 45:5,24
127:20,22 134:6
**processes** 86:16
**produce** 119:4
**produced** 119:16
**producing** 122:4
**production** 155:15
155:17,22
**productivity**
148:15,23 149:4

150:6,22 151:7
**professional**
154:17
**professor** 8:4 9:14
9:14 14:6 18:20
37:18,22 38:1,6,9
41:15 47:9 61:4
61:11 63:4 79:6
79:16,18,19,24
80:5,18 81:6,24
82:8 83:18 86:6
89:2,7,20 90:21
91:7,12 92:10
94:22 95:10,11,14
96:4 98:18 99:18
99:21 100:5,12
101:7 114:10
117:12,16,18
118:7,8,11,16,23
119:2,10,14,17,19
119:22 120:3,16
120:24 121:8,14
121:24 122:14,22
124:3 133:14
134:3 151:13,17
**properly** 64:2
**properties** 142:7
142:20,23 144:4
**property** 134:10
136:10,16 137:5
137:21 138:1,22
139:11,16,20
141:14,21,22
142:9,10 144:1,9
144:14,15
**proposition** 75:23
76:16,20
**protective** 104:1,7
106:23 107:4
**proven** 64:18,21

**provide** 12:18
14:13 32:6 41:18
65:11 67:12,20
68:3,9,16,23 73:12
79:6 104:20 116:4
126:11 132:13
**provided** 18:21
32:20,21 57:7
71:4 79:16 107:5
129:20
**proviso** 44:2
**proximate** 145:1,3
145:15,17
**proxy** 112:23
150:7
**public** 9:15 12:1,2
12:6 17:2,8 18:5
18:13,13 19:9
31:23 32:2 54:10
153:4 156:10,18
157:15,23 158:23
**pull** 24:2,3 102:3
102:11
**pulled** 103:10
**purchased** 142:10
**purchasers** 142:20
**purdue** 17:14
**purport** 101:9
114:13
**purported** 77:17
**purpose** 23:14
88:2 153:6
**purposes** 41:18
67:24
**pursuant** 1:20
58:6,13 97:23
98:6
**purview** 51:1
**put** 28:16,17
116:21 139:17

**q**

**qualified** 153:5
**quantification**
41:24 47:17 59:1
98:12 99:11
139:19
**quantified** 50:7
51:3 55:14
**quantify** 54:14
68:22 76:21 77:18
77:20 82:22 87:15
97:5 138:9 139:1
148:9
**quantifying** 46:19
47:1 54:18
**quarter** 136:15
137:20 141:5
**question** 13:1
18:22 19:4 32:10
45:22 46:4,12
47:8 48:7 51:22
53:6,17 54:4,8
56:7 57:21 63:18
70:1 71:5 77:14
79:8 81:10 85:12
85:14 89:4 94:14
95:19 97:6 100:24
102:10,24 108:23
109:6 125:6
126:20 143:20,22
149:8
**questioning**
122:20
**questions** 61:2
67:2 70:14 71:2
75:24 89:1 98:16
100:16 115:14,23
145:20,21 146:1
146:24 147:13,21
150:16 151:13

quick 138:14
quickly 119:8
 122:6,11
quite 26:22,22
 95:23 114:18
quote 12:14 14:9
 18:5 44:7 61:14
 73:10 74:8 90:22
 91:11 97:17 112:8
quotes 32:19 73:3

**r**

r 5:1 7:23
rader 25:7
randomized 64:22
rate 16:18,20
 20:11 95:24
 111:19 133:12
 139:23 141:10
rates 137:4 139:16
ratio 110:20,23
 113:13,17
ray 6:22
raymond 2:14
read 33:16,18,23
 34:2,5,8,13,16,24
 35:7,10,12,16,18
 35:20 36:3 78:8
 84:18 91:9 135:9
 151:15 152:3
 153:10 156:5,6,12
 157:5,6,17
reading 75:15
 91:1,2 109:19
 155:19
ready 41:5
real 26:19,19
 111:9 112:8
really 16:16 63:10
 63:24 64:5,15,23
 65:4,21 91:24
 97:12 99:7 107:3

143:8
realm 57:5 77:15
realms 77:14
realtime 154:3,17
reason 31:2 87:24
 93:16 100:14
 117:13 141:8
 155:14 157:8
 158:3
reasonable 52:9
 52:12,23 53:3
 80:2,6,21 81:16
 84:19 113:2 136:2
 136:4 149:10
 150:6,13
recall 15:17 17:3,8
 17:16 23:12 36:8
 36:10,10,15,24
 37:12 42:13 43:17
 81:11 100:4 104:5
 136:24 138:17
 147:11,17
receipt 155:18
receive 20:11,12
 21:8 22:19,21
 23:4 94:21 118:14
received 21:8,12
 22:11,14 30:18
 118:10 122:13
 128:14 129:5,6
receiving 118:9,15
recess 62:22
 123:20 146:13
recollection 39:12
 40:23
record 5:3,12 6:7
 7:18 8:5 10:21
 13:22,24 14:4
 16:15 62:18,20
 63:1 123:17,18
 124:1 146:11,17

146:21 147:19
 148:1 151:21
 157:9
recorded 5:14
recording 5:10
 19:20
records 10:20
 19:19 20:8
redactions 30:19
 30:21 31:1
reduce 140:9,15
reduced 153:10
reduction 59:22
 140:13 141:15,16
reed 2:19 6:24
refer 20:18 43:10
 45:4 46:5 137:15
reference 17:24
 98:1 110:17 138:7
 138:8,20 155:7
 156:2 157:2
referenced 11:12
 72:7 137:9 138:16
 139:1 156:11
 157:15
referred 89:21
referring 11:13
 26:6 45:10,11
 46:7 72:10 89:22
 109:22 138:19
refers 46:16 120:8
reflect 85:16
reflected 10:8
 80:18
reflecting 139:20
refresh 39:12
 74:16
regard 52:22 53:2
 87:22 125:10
regarding 7:19
 9:15 13:21 17:7

18:12 19:9 52:18
 57:8 83:21 86:20
 132:13 147:1
 150:21 151:7
registered 1:21
 154:17
regular 97:18 98:3
reinforced 26:23
relate 27:2
related 6:3 34:17
 126:24 127:2
 128:16,22 131:16
 131:17 133:4,5,6
 133:19,22,23,24
 135:13,18 140:14
 141:22 148:10
 149:7 153:12
relating 34:7
relation 71:6
 74:11 75:17 113:9
 150:15
relationship 138:9
 139:15 149:2
relative 153:13
relatively 119:8
reliability 100:17
reliable 77:4
reliance 88:2
 148:8
relied 28:4 32:7
 33:1 57:14 66:6
 66:14 67:2,9,23
 68:12,19 69:4,10
 69:16 70:6,10,16
 76:19 77:15 79:5
 83:17 89:5,20
 90:1 95:11 96:3
 103:9
relief 62:4,12
 67:12,21 68:3,9,16
 68:23 73:12 75:7

relievers 61:21
rely 32:15 33:2
  70:18,19 71:24
  78:13 87:14,17,19
  95:24 137:17
relying 31:17
  71:10,13 75:10,12
  75:18,21,22 76:3,8
  76:11,14,17,17
  77:22 78:3,22
  90:21 95:14
  147:14
remember 28:22
  29:19 30:4 36:6
  41:20 43:3,23
  89:24 90:4 102:22
  102:23,23 103:5,8
  104:9 120:7
  122:17 131:3
  134:20 137:2
remembered
  28:22
remind 67:16 74:5
  129:24
remotely 1:21
  5:22 6:6
renee 11:5 15:6,18
  20:9,20
repeating 67:16
replaced 70:18
report 8:18,21,24
  9:7,9,13,14,22
  10:1,4,8,11 11:16
  11:19 12:10,13
  14:8 15:9 16:1,6
  17:1,11,13,19,24
  18:17,22,24 19:14
  20:10,20 22:18
  23:9,23 24:3,4,7
  24:18 25:20,22
  27:13 30:13 32:2

32:16,18,24,24
  34:8 35:7,18,20
  36:17,20 37:2,6,11
  37:14,19 38:7,10
  38:13,16,21 39:14
  39:18 40:2 41:3,8
  41:18 42:20,22
  44:6,7,23 45:3
  46:19 48:21 51:1
  53:9 55:17 57:8
  60:21 61:5,18
  70:22 71:23 72:4
  72:8 73:7 75:19
  75:20 77:7,20
  78:9 79:21 83:4
  83:19 84:3,6,10,22
  86:24 87:13 88:10
  90:20 91:3,10
  92:1 95:1,10
  97:14,17 101:8
  108:5 109:22,23
  110:2,3 117:20
  118:1,12,17,24
  119:11,16 120:4
  121:20,23 122:7
  122:15 124:10
  125:23 126:8
  129:24 134:17
  137:1,8 138:8
  144:20,22 145:9
  147:20,23 148:2
  150:17
reported 106:18
  126:1,3,15,16
  128:13,20 129:8
  133:13
reporter 1:21 5:24
  7:17 154:17,17
  156:7
reporters 154:3

reporting 107:2
  113:15 125:16,19
  126:9 127:24
reports 31:24 35:2
  35:3,6,10,19,22
  36:1,8 40:1 60:6
  78:8 80:13
representing 27:9
request 11:11
  128:8,11 153:10
  157:9,11
requested 104:12
  126:5 128:5,12
requests 11:10
  104:8
require 108:13,19
required 155:24
requirements
  153:15 154:5
research 65:23
  66:3,17,20 83:13
  83:21 88:22 89:10
  89:15
residential 144:1
residents 84:4
resolved 21:14
respect 12:2 15:9
  33:5 36:11 50:24
  52:3 54:5 70:13
  74:9 83:18 86:7
  92:22 103:7
  111:14 127:21,22
  128:24 136:10
  148:7 149:23
respects 88:5
responded 147:14
response 45:21
  48:7 147:13
responsibility
  48:8

responsible
  134:12 135:5
rest 111:11 131:6
result 56:14 57:4
  97:22 98:6 114:12
  117:11 124:4
  138:6 139:21
resulting 47:1
results 122:5
retail 44:20 45:16
  45:16 46:2,8,18
retained 18:23
  151:24
returned 155:18
returning 32:13
review 36:1 74:23
  81:19 131:7
  149:14 155:12
  156:1 157:1
revise 121:19
revised 118:1,2
  122:15
revising 118:11
rice 2:5 7:3,5,11
right 8:13 9:17,20
  13:6 26:1 39:6
  41:7 42:21 43:23
  44:14 47:14 51:7
  51:21 70:11 71:21
  73:6 77:9 79:8
  86:19 87:5 88:10
  88:16 89:15 91:10
  91:16 92:17,18
  95:7,20 96:23
  99:2 102:10 104:5
  107:20 110:4
  112:13 114:18
  117:4,7 129:10,15
  131:17 132:2,17
  133:9 134:15,20
  136:17,18 141:1

148:3

**risk** 75:17 106:1,3
106:10,22 107:11
107:16 108:3,8,24
109:2,10,13 110:8
110:24 112:12,24
113:4 114:5 116:5
116:7
**risks** 72:11,18
73:13,16 74:3,10
97:2
**risky** 75:7
**rite** 43:11
**rmr** 153:20
**rocky** 25:8
**rohrback** 2:8 7:8
146:22
**role** 15:18 21:4
42:5,5 48:16
49:11
**roles** 43:12
**root** 68:4,7
**roughly** 20:4
80:10 117:21
**row** 85:6,7 115:19
**rpr** 153:20
**ruby** 2:14 6:22
**rules** 1:20 156:5
157:5
**run** 81:21 84:20
**running** 6:17
**rushnawitz** 11:5
15:6 20:9
**rushnawitz's**
15:18 20:20

**s**

**s** 1:21 5:1 7:23
153:4,20 155:15
157:8,8 158:3
**safety** 144:5

**saith** 152:4
**sale** 47:2,11 50:7
50:18,21 51:4,10
52:1,9 53:3,4,23
54:1,9,23 55:8,11
55:14 56:2 59:10
59:11 78:18,21,24
79:4,13 134:9
**sales** 44:8,15,21,24
45:1,9,16,24 46:5
46:13,20 47:4,21
48:11 50:20 51:18
51:19 52:7 53:11
54:16 55:24 56:12
56:19 59:4 124:8
133:8,13 134:1
144:23 145:13
**saved** 28:19
**saw** 16:15 80:24
**saying** 25:12 77:24
93:2 115:19
135:23 143:12
**says** 19:14 22:18
61:14 72:5 84:11
97:17
**sc** 2:6
**scientifically**
57:19 59:24 63:6
**scope** 11:22 18:3
60:12,17,18 62:14
63:9,10 65:3
91:23 92:1,6
97:11
**seal** 156:15 157:21
**seattle** 2:9
**sec** 74:6
**second** 44:12
97:16 121:3,6
123:1 145:7
**seconds** 24:18

**section** 16:11
24:24 67:22 70:21
78:9 83:3 117:3
124:3,11 130:2,8
134:8 135:3
147:22 148:2,6
**sections** 67:14
117:3 147:20
**security** 24:8
**see** 18:6 24:24
25:9 26:18 27:15
32:5,17 33:14
34:22 35:4 36:8
44:10 46:15 61:13
61:17 78:16 80:1
81:1,13 85:3,4
97:20,21 101:18
103:5 111:24
114:24 115:7,16
118:24 130:18
135:1 137:14
141:11 142:3
145:5,10 150:19
**seeing** 34:19
104:24
**seek** 104:6
**seen** 30:15 60:6
**segment** 50:16,17
51:16 52:5 55:8
74:2
**seizure** 113:15
**seizures** 112:20
131:24 132:4,5,8,8
132:14
**sell** 143:16
**seller** 50:4 142:16
**sellers** 49:16,23
**selling** 45:17 50:10
**sense** 19:2 36:14
41:4 42:4 80:16
81:2,4,5,14

**sensitive** 5:5
**sent** 19:22
**sentence** 44:12
61:13,17 74:17
91:5 97:16 101:18
131:23 132:9
138:5 151:3
**separate** 38:4
40:14 47:20 48:10
51:16 52:5
**separating** 48:18
**separation** 100:20
**september** 1:21
5:3 20:1 153:17
154:10 155:4
**sequelae** 83:11
**series** 23:10 24:14
27:13 70:13 119:3
**servants** 31:23
**served** 16:24 17:6
18:11 19:8
**service** 132:11,13
133:21
**services** 103:11
104:11
**serving** 8:8,11
11:3
**set** 67:2 75:16
79:20 118:2 122:4
123:1 153:15
154:6
**sets** 9:5,11,22
**setting** 8:18 26:3
65:1 148:7
**settings** 64:19,22
67:7 83:1
**seven** 15:3 35:3
153:15,15 154:6,7
**severe** 60:2,9,14
61:15 62:4

sex 139:7
share 28:24 85:1,7
92:16 93:22 94:9
94:17 95:1,3,5,12
95:15 96:6,7,12,15
96:18 102:16
113:3 126:21
127:14,16,18
131:15,17 132:4
140:19 141:2
shares 49:10
sheet 8:23 9:2,5,10
116:16,19 117:2
117:11 123:2,13
155:13 157:7,10
157:18 158:1
shipment 45:15
shipments 56:19
shipping 56:14
shocked 122:11
short 62:4,9 122:1
146:3
shorthand 153:9
show 88:6 114:13
128:22,23
shown 155:16
side 53:19 77:5,17
77:21
sign 151:15
signature 153:19
154:16 155:14
signed 156:13
157:18
significant 64:12
74:10
significantly 73:13
73:17,18
signing 155:19
similar 67:1 87:23
124:18 131:1

sincerely 155:21
single 120:5
sir 155:10
sitting 108:18
situation 23:17
54:12 81:20
situations 62:5,10
100:7
six 15:3
size 80:9
skipped 146:3
slow 6:17 34:8
small 75:16
smith 2:19 6:24
36:6,11 38:20
39:13,17,22
social 86:16
society 87:10
sold 46:18 47:16
49:19 50:1 55:3
56:22 57:17 58:4
58:11,21
solutions 155:1
158:1
solve 15:23
somebody 27:7
somewhat 45:5
soon 26:3
sorry 6:17 14:6
15:11,16 16:21
18:16 39:9,15
43:14 54:6 61:8
62:1 65:10 69:24
70:6 86:23 97:12
103:8,20 105:14
108:22 114:16
123:8 126:23
127:3 130:7
135:22 143:2
sort 12:22 63:17
80:24 89:19

100:15 113:11
sound 12:22 13:3
13:5 114:18
sounds 9:20 13:11
13:19 64:21 91:6
119:12
source 102:4,11
103:1 106:13
120:12
sources 31:14
81:15 88:1 103:21
128:2
southern 1:1 5:18
speak 36:16 37:1
37:10,13,18 38:6
38:12,15,20 40:2
40:14 42:16
speaking 40:6
specific 41:23 42:4
91:15,18 102:10
102:18 103:3
131:1,8 132:7,18
139:5
specifically 89:23
128:10
specified 153:6
spend 16:14 23:18
spent 22:19
spoke 37:23 39:13
41:1 42:13
spoken 36:19,22
37:5,8,16 38:9,18
39:17,21 42:19,22
sponsored 87:10
spreadsheet 118:4
118:6,10,15,19
119:17 122:13
spreadsheets
119:15
square 2:20

squarely 101:6
staff 12:15,17
14:10,12,16,22
16:13 20:13,18
21:9,10 22:13,20
23:1 42:8 118:21
119:21,23 123:7,8
123:9 126:4 128:5
128:8
standard 31:9
standpoint 144:23
150:11
start 41:8
started 25:19,24
26:15 92:8 125:24
127:23 128:3
starts 78:10 83:4
state 6:6,9 8:5
17:14 18:4,9
19:11 111:6,11
132:19,21,22
153:1,4 154:1
156:10 157:15
statement 46:24
64:21 73:15 74:20
76:4 85:5 90:22
91:8,11 98:1
100:5,10 105:3
140:2,3 143:21
144:17 156:13,14
157:19,19
statements 10:1,2
73:8
states 1:1 5:18
103:17,18 104:2
statistic 130:20,21
130:23 131:1
statistical 82:18
82:22
statistics 26:19

stay 146:8
staying 146:10
step 112:14 124:11
  125:11 127:5,20
  127:21 129:16
  133:5,10,11 134:6
stepping 86:18
steps 55:1 127:7
  127:12 129:1
  130:14
steve 25:7
stop 34:24 86:19
story 21:14 54:22
strategy 13:15,16
street 2:12,15,20
  144:8
strike 59:21 82:13
  82:15
strong 140:4
structure 33:6
structuring 32:8
  32:11 33:3
studies 86:21
  87:14,20 88:7
  138:7,8,16,19,20
  138:24 149:1,6,23
  149:24 150:1,3
study 87:4,7,9,17
  131:20 136:24
  137:2,3,15,18
  139:10,14,15
stuff 35:14,15 90:7
  147:1
subject 12:1,12
  34:19 66:21 68:6
  69:3 89:15
subjects 34:21
submission 117:20
submit 20:7,9
submitted 8:23
  9:2 17:18 18:24

35:17,23 36:17,20
  37:2,6,11,14,19
  38:7,10,13,16,21
  39:14,18 40:2
  116:16 122:16
submitting 35:7
  123:12
subscribed 156:10
  157:14 158:21
subsequent 28:2
  42:8,10
subset 20:19
  120:14
substance 93:15
substitute 118:21
subtle 46:15
suffered 67:13,21
  68:10,17,24
sufficiently 12:5
suggest 36:3
suite 2:8,20 155:2
sum 71:17
summaries 34:12
summarized 134:7
summary 17:12
  93:6
summit 16:23 17:5
  18:9 19:10
superior 17:15
  155:1
supplement 151:5
supplied 79:20
  80:5 82:8 118:5
support 12:6
  20:14 21:10 22:13
  60:7 73:9 90:20
  98:1 138:22
suppose 86:15
  92:6
sure 21:16 23:24
  24:15 25:15 26:12

28:8 36:7 39:5
  41:16 42:23,24
  43:13,16 46:3
  49:21 61:1 62:19
  65:10,12,12 67:17
  67:19 73:20 84:19
  85:20 88:12 92:7
  99:1 100:14
  101:16 105:1
  107:21 108:1,17
  109:5 117:22
  121:13,16 122:24
  122:24 124:13
  132:17 133:1
  145:9 146:6
  151:15
surgery 61:16
  62:10,11 68:18
  69:1
surgical 60:10
  64:3 69:8
surprised 80:11
suspicious 56:15
swear 7:17
sworn 7:22 8:1
  153:7 156:10,13
  157:14,18 158:21
syndrome 88:10
  88:15 90:23
system 58:23
  125:16 128:1

**t**

t 7:23
table 32:12 79:20
  79:23 80:18 81:1
  81:18 85:6 92:22
  95:8 114:23,24
  115:3,18 120:17
tables 26:4 94:19
  119:4,16

take 5:11 23:2
  27:17,19,20,23
  28:10 29:10,14,16
  29:18,21 30:7
  39:4 55:1 60:23
  62:15 81:5 88:2
  88:19 110:18
  113:13 114:4
  115:3 121:22
  144:12 145:7,23
  148:3
taken 1:19 5:14
  53:8 58:5 62:22
  83:19 96:22 97:8
  97:19 98:5,6
  123:20 124:19
  130:16 146:13
  153:6,9,13
takes 34:20 44:22
  122:9
talk 19:1 119:21
  124:17 127:8
  146:4
talked 59:14 73:24
talking 72:14,18
  125:5
task 50:23 77:2
  139:7
tasks 15:8 16:5
taylor 3:4
team 119:9 121:14
tease 51:16 52:6
teeth 68:11
tell 16:21 30:20
  41:22 91:10 99:2
  105:19 107:9
  120:1 130:4
  132:24 134:22
tells 77:5
ten 62:17

tends 11:9 21:13
teresa 1:20 5:24
  153:4,20 154:3
term 45:3 49:11
  62:4,9 72:11,19
  89:15
terminal 65:8,14
  66:19,24
terms 32:7,10
  44:23 45:19 52:13
  52:14 80:8,14
  111:12 122:2
  125:1 140:4
  150:15
terrible 90:8
test 84:15,20
testified 8:1 17:1,5
testifying 8:8,11
  10:13,19 11:4
  16:24 17:7 18:12
  19:8 40:19 82:21
testimony 17:3,9
  151:22 156:6,7
  157:6,9,12
thank 44:5 134:19
  151:10,17,20
thankfully 119:6
thanks 62:16
  151:19
thing 44:21 45:10
  72:6 92:21 113:11
  122:12 142:13
things 13:15 23:16
  26:20 28:22 32:1
  32:23 44:24 45:5
  45:11,14 97:3
  111:16 144:9
think 16:2 25:24
  26:17 29:13,18
  30:5 31:7 32:17
  32:24 35:13 36:23

37:9,17 38:8,19
  39:23 44:17 45:4
  46:11 47:13,18,18
  51:12,22 52:13
  53:16 54:21 55:7
  56:6,18 59:14
  60:13 71:18,21
  72:3 74:7 78:10
  80:7 81:18 86:18
  96:17,20 102:2,21
  104:8 106:14,16
  106:17 109:6
  113:2,8 117:19
  118:13,24 122:21
  125:17 130:23
  131:3,11,23 136:1
  142:12 143:8
  145:18 147:8
  150:13
thinking 113:12
third 2:8 133:5,10
  133:11
thirty 155:18
thomas 1:19 8:6
  9:14 153:5 154:5
  155:8 156:4,9
  157:4,13 158:20
thompson 36:6,12
  37:10,13,16
thought 46:10
  84:18 89:17 90:5
  125:10 143:24
  144:11
three 2:20 12:11
  30:18 36:5 86:21
  127:12,21 129:1
  130:13 133:1
  134:6
threshold 50:11
time 6:9 10:15
  12:22 14:1,4 15:1

16:13 20:8,20
  23:18 31:20 37:24
  39:13 40:3 41:6
  47:4 48:20 51:10
  52:2 62:21 63:1
  66:13 82:13,16
  105:24 106:4
  110:8,24 112:12
  113:21 114:5
  122:1 123:19
  124:1 125:14
  126:19 143:17
  146:12,17 148:3
  151:18 153:6
times 37:21 38:23
  70:9 142:5,5
timing 80:10
title 9:17
titled 9:13 24:24
  117:3,6
today 147:8
  150:24
today's 151:22
todd 25:9
told 31:17 40:24
  121:17
tolerable 53:11
tom 5:14 14:3
  18:15 63:2 123:24
  146:7,8,16,20
  150:16 151:11,23
top 44:4 107:10
  108:12
total 15:1 19:23
  20:3 22:24 47:10
  48:16 50:23 51:24
  52:17 54:9 55:17
  56:8,17 57:22
  58:8,19 59:19
  85:2 110:11,12,21
  110:22,23 125:12

126:17 134:12
  135:5,12,17
  136:15 137:19
  140:19 141:2
  151:23
totally 109:5
tower 2:15
trades 15:21
transcribed 156:7
transcript 153:10
  153:14 154:5
  155:11,12 156:5
  156:12 157:5,11
  157:17
transcripts 33:14
  33:17,18,23 34:13
  34:16
trauma 60:3 61:16
traumatic 61:22
travis 15:13 16:8
treat 73:1 75:4
  77:7
treated 126:23
  149:17,17
treating 58:7
  147:10
treatment 57:19
  83:10
trending 140:7
trial 73:21
trials 64:22
tried 115:23
try 55:7 76:21
  126:23
trying 31:8 45:8
  47:14 54:6 85:19
  109:8 114:23
  115:10,15
turn 5:7 24:21
  33:9 60:20 86:24
  144:19 150:16

**turned** 122:12
**turning** 29:8 78:9
  83:3
**twelfth** 2:12
**twenty** 153:15
  154:6
**two** 23:21 24:11
  24:18 25:13,16
  45:11,14 75:21,22
  76:18 87:14 117:3
  120:2 121:2
  124:20 126:23
  127:7,20 129:2
**type** 23:5 30:8
**typed** 28:19 29:1
**types** 86:7
**typewriting**
  153:10
**typewritten** 30:19
**typo** 120:10
**typographical**
  117:6 123:3

**u**

**u** 7:23
**u.s.** 91:12,17
  129:20 130:16
**ultimate** 94:14
  145:3
**ultimately** 46:17
  46:17 127:11
**unacceptable** 58:1
**undercount**
  111:23 126:13
  149:21
**undergone** 67:22
**underlying** 85:17
  113:11 150:1
**understand** 8:14
  8:16 11:22 28:8
  36:7 42:15 45:8
  48:17,21 52:14

67:17 70:1 76:8
  77:23 85:9,22
  109:5,8 119:19
  125:2
**understanding**
  23:6 43:5 49:1,3
  50:13 70:24 71:19
  74:24 88:17,21
  90:19 109:9,16,18
  120:15,20 125:20
**understood** 11:24
  120:9
**undertake** 58:9,18
  67:4 76:21 130:24
  131:7
**undertook** 133:16
  133:17
**underwater** 12:23
**unequivocal** 71:8
**unit** 5:13 14:2 63:2
  123:24 146:16
**united** 1:1 5:18
**units** 151:24
**unlawful** 56:2,2,6
  56:10 59:6,10
**unmute** 13:15
**unquote** 112:8
**unreasonable**
  52:23
**update** 121:19,23
**updated** 119:10,18
**use** 41:24 44:23
  45:3,9 49:11 53:8
  82:17 88:6 93:20
  94:9 96:11,13
  97:18,23 98:3,4,6
  98:19 100:19,21
  101:2 102:7 106:3
  113:19 116:3
  138:6 141:14,20
  147:22 148:11

151:2
**useful** 64:18
**uses** 107:15
  128:19 133:11
**utero** 88:15 90:24
  91:20 96:22 97:7

**v**

**v** 155:6 156:3
  157:3
**valuation** 18:5
  82:17 117:4,10,14
**value** 82:18,22
  101:9,22 125:1
  138:12 139:3,4
  141:4 142:5,8,14
  142:15,21,22
  144:3,11,15
**values** 134:10
  136:11,16 137:5
  137:21 138:1,10
  138:22 139:11,16
  139:20 141:8,14
  141:21 142:9
  144:10
**variation** 111:18
**varies** 21:4
**various** 27:14
  31:22 50:16
  103:17,18 116:7
  126:9
**vastly** 71:8,11
  72:1,23 73:7,17
**venture** 17:2
**veritext** 5:23 6:1
  152:1 155:1,7
  158:1
**veritext.com.**
  155:17
**version** 29:1,1
  35:16,18,20

**versus** 5:16 17:14
  50:20 51:18 52:8
  53:4,12 54:1
  59:11
**victims** 101:11
  105:24 106:4
  110:8,24 111:1
  112:12,15 113:21
  114:5
**video** 5:2,10,13
  7:15 13:4,11,19,24
  14:2 54:7 62:20
  62:24 123:18,23
  146:11,15 151:21
**videoconference**
  1:19
**videographer** 3:3
  5:24
**videotaped** 1:19
**view** 70:23 72:10
  72:15
**virginia** 1:1 2:15
  5:19 6:20 9:16
  15:15 48:24 49:7
  49:17,24 51:6
  54:17 56:1 102:7
  102:17 104:7,13
  104:20 105:10
  106:21,24 107:5,7
  107:12 110:13,22
  111:20,23 112:1
  113:4 131:2,5
  132:19 153:1,16
  154:1,7
**virtually** 30:5
**visit** 37:23 38:4
**voluntary** 125:20
**vs** 1:6,13

## w

**wa** 2:9
**wait** 41:7 61:8
**waiting** 85:23
**waived** 155:19
**wal** 43:11
**walk** 124:6 144:6
**waller** 36:5,9 37:1
37:5,8 75:13,15,20
76:9,15,20 77:16
77:23 78:4 147:16
148:8 151:1
**wand** 144:12
**want** 6:15 21:22
22:1 39:4 47:24
60:23 67:17 73:20
113:5,6 122:19
124:16 125:5
129:22 143:4
145:23 151:14,15
**wanted** 18:19
57:12 88:6 96:12
131:16
**washington** 2:13
17:14,15 18:4,10
19:11
**wave** 144:12
**way** 35:24 36:15
46:1 56:18,20
61:24 71:21 73:14
77:13 86:18 94:18
99:8,9 111:8
142:17 143:7
**ways** 73:15
**we've** 60:24 96:15
96:19 109:22
116:8 122:21
**wealth** 143:2
**weeds** 99:17
**week** 117:19,19

**weigh** 148:21
**weird** 13:12
**welfare** 101:24
103:16
**went** 10:20 15:15
99:1 104:10 126:3
126:4
**west** 1:1 5:19 6:20
7:7 9:16 15:15
48:23 49:7,17,24
51:6 54:17 56:1
102:7,17 104:7,13
104:20 105:10
106:21,23 107:5,7
107:12 110:13,22
111:19,23 112:1
113:4 131:1,4
132:19 153:1,15
154:1,7
**whispering** 5:5
**wholesale** 48:22
49:6,19 50:1
**wide** 132:19,22
**williams** 2:12 6:12
25:8
**wisdom** 68:11
**wit** 153:2 154:2
**withdrawing**
140:8
**withdrawn** 140:15
**witness** 7:17,22,24
153:7,10 155:8,11
156:1,4,11 157:1,4
157:15
**witnesses** 29:9
**witness'** 155:14
**woman** 99:4
**word** 48:1,5 73:7
90:17 151:2
**wording** 65:11

**words** 34:23
**work** 10:8,9,18
15:7,24 16:4,5
18:8 20:15 21:10
22:13 30:13 34:17
41:8 42:6 59:3
79:2,9,11 86:13
148:22 149:2
**worked** 16:7,9
19:17 20:19 79:16
83:24
**working** 12:15
14:10 63:20
**workplace** 148:15
150:6,21 151:7
**works** 16:21 118:8
**worried** 144:14
**worrying** 144:6
**worse** 111:6,10,11
142:17
**write** 11:16,18
25:22 90:2
**writing** 9:11 25:19
**written** 8:18 17:22
36:8 58:6,14 98:7
153:9
**wrong** 39:16 82:1
120:11 140:2
145:6
**wrote** 17:23
**wv** 2:16 153:20

## x

**x** 22:19

## y

**y** 22:19
**yeah** 6:16 9:4
12:24 17:23 18:2
18:19 24:3 26:7
39:11,15 49:10
61:10,12 70:2,13

91:1,4,6 98:9
99:16 106:20
114:1 115:4
117:22 121:10
130:9,19 131:11
137:13 141:7
145:6 147:6 150:3
**year** 10:21 120:5,5
125:23 136:6
**years** 84:23 85:8
104:17 105:4,6,10
105:12,22 120:14
121:9 126:2
135:20,23,24
136:4 137:4
**yield** 141:21

## z

**zach** 25:8
**zero** 77:8 149:17
**zip** 139:11
**zoom** 3:4 5:22
11:2 28:7 39:11
111:7 146:9 147:4

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.