# Exhibit 9

```
 1       IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                       - - -
 5
     IN RE:  NATIONAL           :   HON. DAN A.
 6   PRESCRIPTION OPIATE        :   POLSTER
     LITIGATION                 :
 7                              :
     APPLIES TO ALL CASES       :   NO.
 8                              :   1:17-MD-2804
                                :
 9
              - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       VOLUME II
12
                        - - -
13
                    April 18, 2019
14
                        - - -
15
16              Continued videotaped
     deposition of THOMAS PREVOZNIK, taken
17   pursuant to notice, was held at the law
     offices of Williams & Connolly, 725 12th
18   Street, Washington, D.C., beginning at
     8:16 a.m., on the above date, before
19   Michelle L. Gray, a Registered
     Professional Reporter, Certified
20   Shorthand Reporter, Certified Realtime
     Reporter, and Notary Public.
21
                        - - -
22
            GOLKOW LITIGATION SERVICES
23     877.370.3377 ph │ 917.591.5672 fax
                 deps@golkow.com
24
```

1  terminate controlled substance sales to

2  the customer and report the termination

3  to the DEA."

4           Do you understand what I

5  just read to you?

6           MS. MAINIGI:  Objection.

7       Form.  Objection.  Scope.

8           THE WITNESS:  Can I get the

9       first -- the first part of the

10      question?

11 BY MR. FARRELL:

12      Q.   Yes.  So specifically what

13 I'm referencing is Cardinal Health's

14 reply brief, in Cardinal Health versus

15 Eric Holder, which was a preliminary

16 injunction filed by Cardinal Health in a

17 DC District Court.  And in it -- in the

18 reply brief there's a provision in here

19 that I read to you.  And in essence what

20 it says is that if you get a suspicious

21 order, and you block it, that Cardinal

22 Health would terminate that customer and

23 not sell to it anymore.

24           Do you agree that if a

1  wholesale distributor gets a flag of a
2  suspicious order, that they've determined
3  to be a suspicious order, and that they
4  block that shipment, that they should
5  terminate all future sales to that same
6  customer until they can rule out that
7  diversion is occurring?
8             MS. MAINIGI:  Objection.
9      Form.  Objection.  Scope.  Calls
10     for a hypothetical.
11            MR. EPPICH:  Objection to
12     the foundation.  Calls for
13     speculation.
14            THE WITNESS:  Yes, I would
15     agree.
16 BY MR. FARRELL:
17     Q.    The same thing applies to a
18 document involving McKesson.
19            On August 13, 2014, the
20 United States Department of Justice was
21 communicating with the lawyer for
22 McKesson which ended up resulting in a
23 $150 million fine.
24            And in this discussion, the

1       it's also comparing against the
2       other registrants in that area.
3  BY MR. FARRELL:
4       Q.   So if you take an average of
5  the registrants in the area and you
6  calculate that, if a customer exceeds
7  that average, is that a red flag for a
8  wholesale distributor that the order may
9  be suspicious?
10           MS. MAINIGI:  Objection.
11      Calls for speculation.  Objection
12      to form.
13           THE WITNESS:  Yes.
14 BY MR. FARRELL:
15      Q.   And is that consistent with
16 the directives the DEA has given to
17 registrants since at least 1996?
18           MS. MAINIGI:  Objection to
19      form.
20           THE WITNESS:  Yes.
21 BY MR. FARRELL:
22      Q.   The next sentence, would you
23 read, please.
24      A.   I forgot where I stopped.

```
 1         Q.    "This activity."
 2         A.    "This activity, over
 3   extended periods of time, would lead a
 4   reasonable person to believe that
 5   controlled substances possibly are being
 6   diverted.
 7         Q.    Now, so what I'm asking you
 8   is, when you read this, is it fair to
 9   assume that this is consistent with the
10   DEA's guidance to industry since at least
11   1996?
12               MR. FINKELSTEIN:  Objection.
13         Vague.
14               MS. MAINIGI:  Objection to
15         form.
16               THE WITNESS:  Yes.
17   BY MR. FARRELL:
18         Q.    Would you read the next
19   sentence, please.
20         A.    "An investigation will be
21   conducted for possible violation of the
22   CSA and regulations upon determining that
23   the reporting registrant, as a general
24   practice, does not voluntarily halt
```

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3
      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____   )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES    )   Hon. Dan A.
 7    TO ALL CASES             )   Polster
 8
                 FRIDAY, MAY 17, 2019
 9
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW
11                        - - -
12          Videotaped deposition of Thomas
13    Prevoznik, Volume III, held at the offices of
14    WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
15    NW, Washington, DC, commencing at 8:10 a.m.,
16    on the above date, before Carrie A. Campbell,
17    Registered Diplomate Reporter and Certified
18    Realtime Reporter.
19
20
21                        - - -
22
                GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
24
25
```

1  their suspicion, and then go ahead and ship
2  it so that it could be sold or used?
3             MR. EPPICH:  Object to form.
4        Calls for a legal conclusion.
5             MS. MAINIGI:  Incomplete
6        hypothetical.  Outside the scope.
7             THE WITNESS:  No, it would not
8        be correct.
9  QUESTIONS BY MS. SINGER:
10       Q.    Why?
11       A.    Because they're not maintaining
12 effective controls over diversion.
13            MS. MAINIGI:  Same objections.
14 QUESTIONS BY MS. SINGER:
15       Q.    And what happens if they go
16 ahead and just ship that suspicious order?
17            MS. MAINIGI:  Same objections.
18            MR. EPPICH:  Object to the
19       form.  Calls for speculation.
20            THE WITNESS:  Well, it's --
21       there was a -- there was a reason it
22       triggered the suspicion, so the
23       possibility or potential for it to be
24       diverted into the illicit market is
25       enhanced because it triggered a

```
 1         suspicious order within their system.
 2              So that being the underlying
 3         cause for it to be triggered, that --
 4         the potential for it to be diverted,
 5         now it's going -- the potential now is
 6         greater that it's going into the
 7         public and is going to affect the
 8         public health and safety.
 9   QUESTIONS BY MS. SINGER:
10        Q.    Okay.  And would going ahead
11   and shipping suspicious orders demonstrate an
12   attitude of irresponsibility, which I think
13   is the language of the Diversion
14   Investigators Manual, to the detriment of the
15   public health?
16              MS. MAINIGI:  Objection.
17         Outside the scope of Touhy
18         authorization.  Form.
19              MR. EPPICH:  Objection.
20              THE WITNESS:  Yes.
21   QUESTIONS BY MS. SINGER:
22        Q.    And has that always been true,
23   that shipping a suspicious order is a failure
24   of effective controls to prevent diversion?
25              MR. MAHADY:  Objection to form.
```

1      THE WITNESS:  Yes.
2  QUESTIONS BY MS. SINGER:
3      Q.    And so it's not that the DEA
4  has some answer on what the threshold should
5  be and isn't telling industry; it's that the
6  DEA is actually saying that industry knows
7  better from its own customers, correct?
8           MR. EPPICH:  Object to the
9      form.  Calls for speculation.
10          THE WITNESS:  They're in a
11     better position than we are.
12          (Prevoznik Plaintiff's Exhibit
13     P54 marked for identification.)
14 QUESTIONS BY MS. SINGER:
15     Q.    Okay.  So let's go to -- I'm
16 showing you Exhibit 54.
17          So do you recognize
18 MNK-T1_0008504654?
19     A.    I recognize the names.
20     Q.    Okay.  Which names do you
21 recognize?
22     A.    Mark Caverly and James
23 Crawford.
24     Q.    And who are they?
25     A.    Former employees of DEA.

 1        Q.    Okay.  And it says -- if you
 2   look down this document, you see
 3   Mr. Crawford, I think, three paragraphs from
 4   the bottom.  Okay.  I'm sorry, let's go up
 5   from that to the question.
 6              "During the distributor
 7   breakout session, suspicious order monitoring
 8   was certainly a hotbed of discussion.  Are
 9   there any plans for DEA to publicize
10   information to implement SOM, or suspicious
11   order monitoring, incorporate algorithms
12   where products are more likely to be
13   diverted?"
14              Do you see where I'm reading?
15        A.    Yes.
16        Q.    Okay.  And then can you read
17   Mr. Crawford's response?
18        A.    "Whatever we put out will be
19   outdated by the time we put it out.  You're
20   looking at a number.  Tell me how much --
21   tell me how much that we can't exceed.  DEA
22   can't do that.  It's part of your due
23   diligence, knowing your customer."
24        Q.    And does that reflect what you
25   just testified to in the guidance that DEA

```
 1    gave industry?
 2         A.    Yes.
 3               MR. MAHADY:  Objection.  Form.
 4               THE WITNESS:  Yes.
 5    QUESTIONS BY MS. SINGER:
 6         Q.    And then can you read
 7    Mr. Caverly's comment at the bottom of the
 8    page?
 9         A.    From the question "What does
10    the DEA expect?"
11         Q.    That's right.
12         A.    "Previously, DEA sat down with
13    the National Drug Association with an
14    algorithm DEA standpoint - you know your
15    customers better than we do.  DEA stepped
16    away from providing guidelines.  It's not
17    going to happen."
18         Q.    Does that also reflect DEA's
19    view as to why it wouldn't provide a
20    threshold to industry?
21               MR. EPPICH:  Object to the
22         form.  Foundation.  Calls for
23         speculation.
24               THE WITNESS:  Yes.
25               (Prevoznik Plaintiff's Exhibit
```

```
 1    the registrate -- does the statute or the
 2    implementing regulations say that a
 3    suspicious order must be reported prior to
 4    shipment?
 5              MR. FINKELSTEIN:  Asked and
 6         answered.
 7              MR. MAHADY:  I don't believe he
 8         answered the question, that specific
 9         question.
10              MR. FINKELSTEIN:  I believe he
11         did.
12              You can answer again.
13              THE WITNESS:  I thought I did,
14         too.
15              The statute requires to have
16         effective control to guard against
17         diversion.
18    QUESTIONS BY MR. MAHADY:
19         Q.    I appreciate that.
20         A.    So if you have a suspicious
21    order, which is prior to shipping, you have a
22    reason or reason to believe that that -- that
23    is going to be diverted into the illicit
24    market, right?  So your system is designed to
25    give -- to find that reason or reasons why
```

 1    this shipment -- or why this order is to be
 2    suspicious.  That is prior to shipping.
 3         Q.    Okay.
 4         A.    So in order to maintain
 5    effective controls, you would then have to
 6    look at the suspicion.  What triggered the
 7    suspicion -- we're in Bergen Brunswig.  Let's
 8    go with Bergen.  What triggered Bergen to
 9    say, "Wait a minute, something's not right
10    with this order."
11         Q.    Okay.
12         A.    So then they should halt and
13    try to figure out, what can we alleviate
14    that.
15         Q.    Okay.
16         A.    What can we alleviate to that
17    suspicion.
18              So if you're just giving us
19    summary reports at the end where we've
20    already shipped it and say, "these are all
21    suspicious orders," well, what did you -- how
22    did you maintain any effective controls?
23    That would be my question.
24         Q.    Okay.  I have a very specific
25    question --