# Exhibit 12

```
                                                           Page 1

 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2

 3   *************************************************************

     THE CITY OF HUNTINGTON,
 4

                    Plaintiff,
 5

     v.                          CIVIL ACTION NO 3:17-01362
 6

     AMERISOURCEBERGEN DRUG
 7   CORPORATION, et al,

 8              Defendants.

 9

10   CABELL COUNTY COMMISSION,

11              Plaintiff,

12   vs.

13

     AMERISOURCEBERGEN DRUG
14   CORPORATION, et al,

15              Defendants.

16   *************************************************************

17        Videotaped and videoconference deposition of

18   DAVID POTTERS, taken by the Defendants pursuant to the

19   West Virginia Federal Rules of Civil Procedure, in the

20   above-entitled action, pursuant to notice, before Twyla

21   Donathan, Registered Professional Reporter and Notary

22   Public, at the Law Offices of Jackson Kelly, 500 Lee

23   Street, East, Suite 1600, Charleston, West Virginia, on

24   the 14th day of August, 2020.
```

Page 34
1  assume anyone who is distributing controlled
2  substances in West Virginia -- into West Virginia.
3      A   Okay.  There were roughly a thousand
4  wholesalers distributing into West Virginia with one
5  major location located in West Virginia, in Wheeling,
6  with Cardinal Health.  And if they had been sending
7  them off from 2007 to 2012, it would have been -- if
8  it was the same volume as we received from 2012
9  forward, it would have been a large volume.
10         But I can only speculate as to what the
11 volume would be before, because the lawsuit obviously
12 triggered a change in behavior with regard to sending
13 them to us, and I don't know what they were sending
14 to DEA, if anything, to send a copy to us.  Because
15 we got the same thing DEA would get, is my
16 understanding.
17     Q   Again, did you have any data that you
18 collected or pulled out of the suspicious order
19 reports you did receive?
20     A   Just to look at them and see that they were
21 all small volumes.  There were no large numbers to
22 jump out at you and say we need to go look at this.
23     Q   As of July of 2016, had the board taken any
24 action in connection with suspicious order reports

Page 35
1  that they had received?
2      A   We were working on making sure that the
3  reporting was received, that we were filing it,
4  logging it, filing it, and sharing it with the
5  Attorney General's Office.  But based upon our prior
6  inquiry into the first few we got, and then the later
7  ones all being similar, we had already determined
8  that they were not useful for an investigative tool
9  for us without ARCOS data, et cetera.  So if that
10 answers your question.
11     Q   Yeah.  Did you have the resources in July
12 of 2016 to deal with the suspicious order reports you
13 were receiving?
14     A   If we had to investigate every one of them,
15 no.  Even just calling every one of them, no.  But it
16 wasn't necessary to call on every one of them either
17 because, again, based upon just calling on the first
18 few and then all the rest being similar, very small
19 numbers, no large numbers to jump out at you, then we
20 handled them as described.
21     Q   Did the Attorney General, the DHHR, or --
22 it's the Department of Military Affairs and Public
23 Safety, prior to the lawsuit that they did bring in
24 the 2012 time frame against some distributors, ever

Page 36
1  file any complaint with the Board of Pharmacy
2  concerning a failure by a wholesale distributor to
3  file suspicious order reports?
4      A   No such complaint was ever filed with the
5  Board of Pharmacy from any entity, including those
6  named during my tenure.
7      Q   Can the Board of Pharmacy initiate a
8  complaint?
9      A   Yes.
10     Q   And did the Board of Pharmacy ever initiate
11 a complaint with respect to the Attorney General's
12 lawsuit that the wholesale drug distributors had
13 failed to file or submit suspicious order reports?
14     A   No.
15     Q   During your tenure at the Board of
16 Pharmacy, did the board ever do anything to try to
17 confirm that a registrant had actually designed and
18 was operating a system to disclose the suspicious
19 orders?
20     A   Yes, but I would have to clarify that
21 answer.  The wholesale drug distributors that were
22 distributing controlled substances had to get a
23 West Virginia Controlled Substances Handling Permit
24 and had to have, in order to get that, a DEA

Page 37
1  Controlled Substances Registration.  In order to get
2  that DEA Controlled Substances Registration, they
3  would have to have the system that was required by
4  the DEA rule.
5          Our rule, as I researched it, is pretty
6  much an exact copy of the DEA rule displaced in the
7  West Virginia law, when you're looking at Exhibits 1
8  and 2, subsection 4.4.
9          So given that the DEA required them to have
10 a system in place, and they had a DEA registration,
11 we relied upon that fact to say that, yes, they do
12 comply, and issued them the West Virginia Controlled
13 Substances Handling Permit.  We did not actually go
14 out and inspect the wholesalers with regard to out of
15 state to see if they had a system.
16         With regard to the one in-state wholesaler
17 location in Wheeling with Cardinal Health, we did
18 inspect that generally for its safety, cleanliness,
19 et cetera, but I don't know that we ever looked to
20 see if they had this type of program in place because
21 that would have been at corporate.
22     Q   And I guess I'll go back, but you've stated
23 that by virtue of having the DEA -- permit?
24     A   Yeah.

Page 38

1  Q   -- you would have relied upon that to
2  conclude that the wholesaler distributor had a
3  program in place; is that correct?
4  A   Yes.
5  Q   Okay. So the Board of Pharmacy did not do
6  anything independently to confirm that a distributor
7  actually had designed a system that would comply with
8  the regulation?
9  A   Correct.
10  Q   So is it fair to say that the Board of
11  Pharmacy ceded to the DEA responsibility to the
12  extent there is responsibility to review and approve
13  a system that that distributor put in place to
14  identify and report suspicious orders?
15  A   Yes, we relied upon the DEA.
16  Q   While you were at the Board of Pharmacy,
17  would it have been difficult for you to monitor the
18  anti-diversion programs of various distributors?
19  A   I believe, yes, it would have been very
20  difficult, because we did not have the type of staff
21  that would know how they compute those algorithms.
22  They're very complex systems, as I understand it from
23  discussions with one particular person named Michael
24  Mone, who used to be at Cardinal Health. They're

Page 39

1  very complex systems that have algorithms built in to
2  look at the numbers in a way that I and my staff
3  would not have understood it. And so we relied upon
4  the DEA, as stated, to make sure that those systems
5  were appropriate and in place.
6  Q   During your tenure, the Board of Pharmacy
7  never asked for, looked at, or levied any requirement
8  or suggested anything that should be contained
9  specifically in a distributor's system to disclose or
10  detect suspicious orders; is that right?
11  A   Other than what's stated in 4.4, that is a
12  carbon copy of the DEA regulation, no, we did not
13  have anything else.
14  Q   Along those lines, the Board of Pharmacy
15  did not do anything to offer a definition or pour
16  content into the language that we see in the
17  regulation, including what is meant by unusual size
18  or what is meant by deviating substantially from a
19  normal pattern; is that right?
20  A   No, we did not define those terms.
21  Q   Are you aware of anyone at the Board of
22  Pharmacy who was asked to and did offer content or
23  description of what is meant by "unusual size,"
24  deviating substantially from a normal pattern, or

Page 40

1  what is meant by a normal pattern or unusual
2  frequency of an order?
3  A   Not to my personal knowledge, nothing like
4  that ever came to my attention.
5  Q   With regard to those terms, David, "unusual
6  size, orders of unusual size," have you given any
7  thought during your time at the Board of Pharmacy
8  about what number an order might need to be to be of
9  an unusual size, or how to establish a parameter of
10  what might be unusual?
11  A   That would be beyond my capability and my
12  knowledge. That would depend on the contracts --
13  private contracts that the wholesaler had with the
14  pharmacy, what their volume was, what they allowed on
15  an annual or monthly -- semi-monthly, annual basis,
16  however their contract worked, as to what would be
17  unusual or out of the ordinary to them. It was left
18  to the wholesaler to determine, as I understand the
19  DEA's law, which we had in our law.
20  Q   Are you aware of any definition of these
21  terms "unusual size"?
22  A   I don't know if anything has changed since
23  I left the Board of Pharmacy, but I'm not aware of
24  any during my tenure or since.

Page 41

1  Q   So let me ask you a specific example. You
2  were asked this in your prior deposition. If there
3  was an order of 157,000 hydrocodone tablets from a
4  distributor in one month to a pharmacy in a town of
5  3,000 people, would you view that as an unusual size
6  order?
7  A   It would all depend.
8      MR. FITZSIMMONS:  Gretchen, would you
9  give me the citation of the deposition that you
10  allege that he testified to?
11      MS. CALLAS:  It's page 282. And that
12  was the --
13      MR. FITZSIMMONS:  First day?
14      MS. CALLAS:  Yes, sir. That was the
15  question.
16      THE DEPONENT:  And whatever my answer
17  was on that day would be the truth as I knew it.
18  I've been away from this for quite some time. I
19  don't put thought into that job anymore. I have
20  other duties.
21      So I believe my answer at that time
22  would be consistent with the fact that the Board of
23  Pharmacy would not have known the incoming numbers
24  prior to that, would not know the patient population

11 (Pages 38 - 41)