# EXHIBIT D

Exhibit D – SEALED Excerpts of Plaintiffs' Expert Witness A. Lembke
Transcript of Deposition (Sept. 17, 2020)


PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE MARKETING
OPINIONS OF DRS. ANNA LEMBKE, KATHERINE KEYES, ANDREW KOLODNY, AND JAKKI
MOHR

1              IN THE UNITED STATES DISTRICT COURT

          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

          ********************************************************

3

      THE CITY OF HUNTINGTON,

4

                  Plaintiff,

5

      v.                        CIVIL ACTION NO. 3:17-01362

6

      AMERISOURCEBERGEN DRUG

7     CORPORATION, et al,

8                  Defendants.

9

10    CABELL COUNTY COMMISSION,

11                  Plaintiff,

12    vs.

13

      AMERISOURCEBERGEN DRUG

14    CORPORATION, et al,

15                  Defendants.

16    ********************************************************

17

18         Videotaped and videoconference deposition of ANNE

19    LEMBKE, M.D., taken by the Defendants pursuant to the

20    West Virginia Federal Rules of Civil Procedure, in the

21    above-entitled action, pursuant to notice, conducted

22    virtually via Zoom, before Twyla Donathan, Registered

23    Professional Reporter and Notary Public, on the 17th day

24    of September, 2020.

```
 1              A P P E A R A N C E S
 2              (All appearing via Zoom)
 3       APPEARING FOR THE PLAINTIFFS:
 4       DON C. ARBITBLIT, ESQUIRE
         BRITT CIBULKA, ESQUIRE
 5       LIEFF, CABRASER, HEIMANN & BERNSTEIN
         275 Battery Street, 29th Floor
 6       San Francisco, CA 94111
         Phone: 415-956-1000
 7
         PAUL T. FARRELL, ESQUIRE
 8       ANNE KEARSE, ESQUIRE
         FARRELL LAW
 9       422 Ninth Street, 3rd Floor
         Huntington, West Virginia  25701
10       (304)523-7285
         paul@farrell.law
11
         APPEARING FOR DEFENDANT CARDINAL HEALTH:
12
         STEVEN PYSER, ESQUIRE
13       BRAD MASTERS, ESQUIRE
         WILLIAMS & CONNOLLY
14       725 Twelfth Street, N.W.
         Washington, DC 20005
15       (202)434-5000
16       APPEARING FOR DEFENDANT AMERISOURCEBERGEN:
17
18       JEFFREY M. WEIMER, ESQUIRE
19       REED SMITH, LLP
20       7900 Tysons One Place
21       Suite 500
22       McLean, Virginia  22102
23       (703) 641-4338
24       jweimer@reedsmith.com
```

Page 3

1        APPEARING FOR DEFENDANT MCKESSON CORPORATION:

2

3        MEGAN RODGERS, ESQUIRE

4        CLAYTON L. BAILEY, ESQUIRE

5        COVINGTON & BURLING, LLP

6        One City Center

7        850 Tenth Street, NW

8        Washington, DC 20001-4956

9        (202)662-5815

10       mrodgers@cov.com

11

12

13       ALSO PRESENT:

14

15

16       Justin Ebiling, Videographer

17

18

19

20

21

22

23

24

Page 4

1                         C O N T E N T S
2       EXAMINATION OF ANNE LEMBKE, MD                     PAGE
3       By Mr. Pyser                                          8
        By Ms. Rodgers                                      258
4
5
6                         E X H I B I T S
7                  (Attached to the transcript)
8       DESCRIPTION OF EXHIBITS                            PAGE
9       Exhibit No. 1    Export Report, Anne Lembke, MD,     11
                         August 1, 2020
10      Exhibit No. 32   Complaint, City of Huntington vs.   92
                         The Joint Commission
11      Exhibit No. 7    Marketing Contract Review/Signoff,  126
                         Bates CAH MDL2804_00132726
12      Exhibit No. 9    Email, 10/24/12, Actavis            129
                         E-Connection Proof for Campaign
13                       Kardian
        Exhibit No. 10   Email, 4/12/2013, Cardinal          132
14                       Communications Approved, Bates
                         MNK-T1 0007819281
15      Exhibit No. 6    Cardinal Health, Service Flash,     138
                         July 18, 2016
16      Exhibit No. 8    Email/Service Flash, November 22,   145
                         2013 Bates CAH
17                       MDL2804n_00013350
        Exhibit No. 35   DHHR Warning Letter to Purdue       152
18                       Pharma
        Exhibit No. 30   Book:  Drug Dealer MD, by Anne      155
19                       Lembke, MD
20      Exhibit No. 14   NASEM National Academis Press       192
21                       Article:  Pain Management and
22                       the Opioid Epidemic
23      Exhibit No. 15   CDC Guidelines for Prescribing      202
24                       Opioids for Chroic Pain

Page 5

DESCRIPTION OF EXHIBITS                                          PAGE

Exhibit No. 18  State of West Virginia Board of        217
                Medicine, Policy on the Use of
                Opioid Analgesics

Exhibit No. 19  Coalition on Chronic Pain              219
                Management 2019 Report to the
                Legislature

Exhibit No. 33  Persuading the Prescribers:            228
                Pharmaceutical Industry
                Marketing

Exhibit No. 21  New York Times:  When the Cure is      241
                Worse Than the Disease

Exhibit No. 25  Voucher 0 Duragesic Fentanyl           259
                Transdermal

Exhibit No. 29  Purdue Pharma September 2011           276
                Butrans Patient Savings Program

Exhibit No. 26  McKesson Manufacturer Marketing        282
                Contract

Exhibit No. 27  McKesson Manufacturer Marketing,       285
                January 19, 2012, Bates
                MCKMDL00353374

Exhibit No. 28  McKesson Pharmacy Intervention         293
                Program Butrans, Bates
                PPLPC002000140782

Exhibit No. 24  Nucynta and Nucynta ER 2012            297
                Program Data Review


Document not referenced by exhibit number            280


Document not referenced by exhibit number            293

1                    P R O C E E D I N G S

2                    VIDEOGRAPHER:  Good morning.  We're

3    going on the record at 10:31 a.m. on

4    September 17th, 2020.

5                    Please note that the microphones are

6    sensitive and may pick up whispering, private

7    conversations, cellular interference.  Please turn

8    off all cell phones and place them away from

9    microphones as they can interfere with deposition

10   audio.  Audio and video recording will continue

11   unless all parties agree to go off the record.

12                   This is Media Unit One of the video

13   recorded deposition of Anne Lembke, M.D., taken by

14   the Defendant in the matter of City of Huntington vs.

15   AmerisourceBergen Drug Corporation, et al, and Cabell

16   County Commission vs. AmerisourceBergen Drug

17   Corporation, et al, filed in the U.S. District Court

18   for the Southern District of West Virginia, Case Nos.

19   3:17-01362 and 3:17-01665.

20                   This deposition is being held remotely

21   via Zoom conference.  My name is Justin Ebiling.  I'm

22   from Veritext.  I'm the videographer.  The court

23   reporter is Twyla Donathan, from Veritext.

24                   I'm not authorized to administer an

Page 7

1   oath.  I'm not related to any party to this action,

2   nor am I financially interested in this outcome.

3                    Counsel and all present please state

4   your appearance for the record.

5                    MR. PYSER:  I'll kick it off.  This

6   Steven Pyser, from Williams & Connolly, appearing on

7   behalf of Cardinal Health, Inc., and with me today is

8   Brad Masters, also from Williams & Connolly.

9                    MS. RODGERS:  My name is Megan

10  Rodgers.  I'm with Covington and Burling, on behalf

11  of McKesson, and with me today is my colleague,

12  Clayton Bailey.

13                   MR. WEIMER:  Good morning.  This is

14  Jeffrey Weimer, with Reed Smith, on behalf of the

15  AmerisourceBergen Drug Corporation.

16                   MR. ARBITBLIT:  Good morning.  Don

17  Arbitblit, Lieff, Cabraser, Heimann & Bernstein, with

18  Britt Cibulka for Plaintiffs.

19                   MR. FARRELL:  Good morning.  Paul

20  Farrell, Jr., and Anne Kearse, on behalf of the

21  Plaintiffs.

22                   VIDEOGRAPHER:  Are there any

23  objections to the court reporter administering the

24  oath remotely?

Page 8

1              MR. PYSER:  No objections.

2                   (Witness duly sworn)

3              A N N E    L E M B K E

4       having been duly sworn, testified as follows:

5         EXAMINATION BY COUNSEL FOR CARDINAL HEALTH:

6    BY MR. PYSER:

7         Q    Good morning, Dr. Lembke.

8         A    Good morning.

9         Q    Just to start off, I know you have been

10   deposed before in the MDL proceedings and the New

11   York proceedings, and then we had some court

12   testimony in the New York proceedings a week ago.  Do

13   you recall that?

14        A    Yes.

15        Q    And you know that even though there is no

16   court reporter with you, or judge with you, you're

17   under oath today, just as if you were in a courtroom

18   in front of a judge and a jury.  Do you understand

19   that?

20        A    Yes.

21              VIDEOGRAPHER:  Dr. Lembke, your audio

22   is breaking up a little bit.  Is there any way you

23   can call in as well?

24              Let's go off the record.  The time is

Page 9

1   10:34.  We're now going off the record.

2                    (Pause in proceedings)

3                    VIDEOGRAPHER:   The time is 10:37.

4   We're now back on the record.

5   BY MR. PYSER:

6        Q    All right.  Dr. Lembke, well, that was

7   actually a good example, perhaps, of the issue that I

8   was just going to address with you, which is

9   especially in this remote environment, you and I will

10  just have to both work really hard not to speak over

11  each other.  So I will try to let you answer the

12  question before I speak again, and if you could just

13  let me finish the question before you answer.

14  Hopefully that will help Twyla, our court reporter,

15  out.  Make sense?

16       A    Yes.

17       Q    All right.  And you may recall during the

18  hearing about a week ago with Judge Gargiulo that

19  there was at least one instance where he stepped in

20  and he instructed you to answer the question yes or

21  no.  I'll do my best to ask you clear questions.  If

22  you don't understand the question, just let me know,

23  but I would ask that you answer my questions as

24  they've been asked.  Does that make sense?

1      A     I will try my best to do that.

2      Q     Okay.  And I'm going to assume that if you

3  do answer my question, you understood the question or

4  you would have told me so.  Does that make sense?

5      A     Yes.

6      Q     All right, Doctor.  We're going to be

7  concentrating today on your work for Cabell and

8  Huntington in West Virginia.  Are you familiar with

9  those two places?

10     A     Yes, I am.

11     Q     Okay.  And were you hired by the plaintiffs

12  in a case filed against Cardinal Health,

13  AmerisourceBergen, and McKesson Corporation to

14  provide an expert report in litigation filed by

15  Cabell and Huntington?

16     A     Yes, I was.

17     Q     Okay.  And did you create such a report?

18     A     Yes, I did.

19     Q     Well, let's try the other thing we've got

20  to work with in this remote environment.  Do you have

21  a box of documents with you today that was delivered

22  to your office or maybe your home?

23     A     Yes, I do.

24     Q     Okay.  There should be in that box one

1   that's marked Exhibit 1 or have a 1 on it somehow.

2   Do you see that?

3            All right.  Can you pop that one open for

4   me.  And once you have done so, can you identify

5   Exhibit 1.

6       A    This is my report.

7       Q    Okay.  Does that report contain the

8   opinions you intend to offer in this litigation?

9       A    Yes, it does.

10      Q    And does it contain a comprehensive

11  explanation of the opinions you intend to offer?

12      A    Yes, it does.

13      Q    When did the plaintiffs in this case, in

14  the West Virginia case, retain you as an expert?

15      A    I believe it was December 2019.

16      Q    And at that time in December 2019 you had

17  already been working for the plaintiffs in other

18  opioid litigation; is that right?

19      A    That is correct.

20      Q    And that included plaintiffs in what we

21  sometimes call Track One in the MDL, so the

22  plaintiffs in Ohio?

23      A    Yes, for the plaintiffs in Ohio.

24      Q    And the plaintiffs in New York as well?

1      A     That is correct.

2      Q     Okay.  Any other plaintiff groups you were

3  working with in December 2019?

4                   MR. ARBITBLIT:  Objection.  Instruct

5  not to answer as to any retentions in which you have

6  not been disclosed as an expert.  And I don't think

7  there are any others.

8  BY MR. PYSER:

9      Q     Are you going to follow your counsel's

10  advice?

11     A     I'm going to follow my counsel's advice.

12     Q     Are you paid in this case, the

13  West Virginia version of the litigation?

14     A     Yes, I am.

15     Q     And just throughout the day, to allow us to

16  use shorthand, even though we're really only talking

17  about one county and one city, sometimes I will say

18  the West Virginia litigation.  You understand that

19  when I say that, I mean this case, correct?

20     A     Yes, I do.  And thank you for clarifying.

21     Q     Do you know how many hours you've spent on

22  work for the West Virginia litigation?

23     A     I do know.  They're in my invoice -- my

24  invoices.  I didn't add them up for today, but I do

Page 13

1    have that information and I could get it for you.

2         Q    Do you know approximately how many hours

3    you've worked on the West Virginia litigation?

4         A    I didn't add up the hours.

5         Q    Okay.  Could you do that, and through your

6    counsel provide me that total number of hours?

7         A    Yes.

8              MR. ARBITBLIT:  That's agreeable.

9              MR. PYSER:  Thank you, counsel.

10        Q    And how much are you paid per hour for your

11   work in the West Virginia case?

12        A    Five hundred dollars per hour for report

13   preparation, and $800 per hour for court testimony.

14        Q    And are you getting the extra $300 an hour

15   that you charge for court testimony for being here

16   today in a deposition?

17             MR. ARBITBLIT:  Objection.

18        A    I assume so.

19        Q    Do you know how much money in total you've

20   earned from your work on opioid cases?

21             MR. ARBITBLIT:  Objection.  Instruct

22   not to answer.

23             Steve, I don't know if you're on the

24   same page with other defense counsel.  I've seen

Page 14

1    back-and-forth, that appears to me to agree that that

2    question is off limits for both sides, and that

3    Dr. Lembke is -- has already provided what has been

4    agreed, which is the number of hours on this case and

5    the hourly rate.

6              If you have a different understanding,

7    I'd like to see the documentation of it.  I'm not

8    trying to be an obstructionist in any way.  I am just

9    trying to follow the ground rules that I understand

10   have been agreed to by counsel for both sides.  So

11   for the moment, I'm going to instruct her not to

12   answer that.

13             MR. PYSER:  Dr. Lembke, I'm assuming,

14   again, you're going to follow your counsel's advice?

15             THE DEPONENT:  Yes, I am.

16             MR. PYSER:  Okay.  And Counsel, that's

17   fine, if that's the agreement.  You know, in the

18   event that there is some breakdown in the agreement,

19   we reserve the right to come back and get an answer

20   to the question.  But if that's consistent with the

21   agreement, that will be fine.

22   BY MR. PYSER:

23     Q    Dr. Lembke, in the prior cases where you

24   provided an expert report in Ohio and New York, you

1   understand there were different groups of defendants,

2   manufacturers, pharmacies, distributors; is that

3   right?

4           A    Yes, I understand that.

5           Q    But here in this case, are you aware that

6   there is only distributors?

7           A    Yes.  I am aware of that.

8           Q    And there's three distributors, Cardinal

9   Health, AmerisourceBergen, and McKesson?  Do you

10  understand that?

11          A    Yes, I do.

12          Q    So here in this case, when we talk about

13  the distributors, you understand we're talking about

14  those three, right?

15          A    I understand that, yes.

16          Q    You reviewed documents in preparing your

17  report, correct?

18          A    Yes.

19          Q    And you're aware that in the litigation,

20  more generally, including this case in West Virginia,

21  the case in Ohio, the case in New York,

22  manufacturers, distributors, pharmacies, they

23  produced millions of pages; do you understand that?

24          A    Yes, I do.

Page 16

1      Q    Okay.  In order to select the documents you

2   reviewed for purposes of this case, the West Virginia

3   case, did attorneys provide you with documents that

4   might be relevant to your report?

5      A    I asked attorneys for documents that I

6   wanted to see that I thought would be relevant.

7              MR. ARBITBLIT:  Instruct her not to

8   answer further about communications with counsel.

9      Q    And are you going to follow your counsel's

10  advice?

11     A    (Deponent nods)

12     Q    In your report you cited more than 600

13  articles that helped to form the basis of your

14  West Virginia report; is that right?

15     A    That is correct.

16     Q    For each of those articles, did you read

17  the full article?

18     A    Yes.

19     Q    So you never just stopped at the abstract,

20  you read every word of every article?

21     A    Yes.

22     Q    And how about the documents that were

23  produced in this case and that are cited in your

24  report, did you read every page of those as well?

Page 17

1      A     Yes.

2      Q     And the deposition transcripts that you

3   cite in your report, did you read every page of the

4   depositions you were provided as well?

5      A     These are the deposition transcripts from

6   other witnesses?

7      Q     Correct.

8      A     No, I did not always read every word of

9   those.  I often skimmed those.

10     Q     In order to know what was the important

11  material, how did you figure out when you were

12  skimming what you should read and shouldn't read?

13               MR. ARBITBLIT:  Objection.  Instruct

14  not to answer as to any discussions with counsel.

15               MR. PYSER:  Can you answer that

16  question without divulging your conversations with

17  counsel?

18     A     So after many decades of reviewing

19  documents, I think I'm pretty good at being able to

20  speed-read some sections, look for relevant material

21  that I need to know and then to read that material

22  more closely.

23     Q     Before your work in this litigation, had

24  you ever reviewed legal transcripts of depositions?

Page 18

1        A    No.

2        Q    Because you were deposed twice before, I

3    just want to make sure we're on the same page about

4    those depositions.  And I guess there is two

5    depositions, and we talked earlier about the third

6    time you gave testimony, which was in court before

7    Judge Gargiulo, right?

8        A    Yes.

9        Q    Okay.  So in those three prior instances of

10   testimony, if you think back to those, have your

11   answers to the questions you were asked in those

12   three prior instances of testimony changed in any

13   way?

14              MR. ARBITBLIT:  Objection.

15       A    Sometimes, because the circumstances were

16   changed.  The truthful answer was different or I

17   understood the question differently (...trailing).

18              (Court reporter asked for clarification; poor

19   audio transmission by witness.)

20              MR. PYSER:  Let's go off the record.

21              VIDEOGRAPHER:  The time is 10:49.

22   We're now going off the record.

23              (Pause in proceedings)

24              VIDEOGRAPHER:  The time is 10:56.

Page 19

1    We're now back on the record.

2                    THE DEPONENT:  Can I -- Can we strike

3    that, and can I try to answer it again?  Because I

4    don't think you got exactly what I said.

5                    MR. PYSER:  You can answer again.  Go

6    ahead.

7                    THE DEPONENT:  Can you ask it again,

8    actually?  We'll just rewind.  Can you ask it again?

9                    (The reporter read back the following

10   as requested:  "Okay.  So in those three prior

11   instances of testimony, if you think back to those,

12   have your answers to the questions you were asked in

13   those three prior instances of testimony changed in

14   any way?")

15                    THE DEPONENT:  Yes, they have, but I

16   was always telling the truth as I understood it.

17   BY MR. PYSER:

18       Q    Can you provide for me a list of the

19   answers that have changed?

20                    MR. ARBITBLIT:  Objection.  That's

21   your job, Counsel.  You've got all the transcripts.

22   I'm not going to have the witness go through

23   transcripts to answer that question.  You've got the

24   transcripts.

Page 20

1    BY MR. PYSER:

2        Q    You can answer the question, Dr. Lembke.

3    Are you able -- and if the answer is no, the answer

4    is no.  Are you able to give me, sitting here today,

5    a list of the answers that have changed in your

6    testimony from the Ohio deposition and the New York

7    deposition and the New York examination?

8        A    No, I'm not able to give you that list.

9        Q    All right, Dr. Lembke.

10            Dr. Lembke, I want to just let you know,

11   and for the record, note that at 6:39 p.m. last night

12   I received an email, as did the other counsel for

13   defendants, with 54 new documents on it that was

14   described as "Materials Considered."

15            And so between 6:39 p.m. last night -- and

16   here we are at 10:59 a.m. this morning, I will

17   represent to you that at 6:39 last night, personally

18   I was coaching a little league team, and my paralegal

19   had left for the day.

20            So I'm trying to -- We're scrambling a

21   little bit to understand those documents.  So my

22   question to you is:  One of those documents, for

23   example, was the label for OxyContin, the FDA

24   approved label.  And that was listed as a material

Page 21

1   considered for this case.  When was the first time

2   you reviewed that label for purposes of this case?

3                    MR. ARBITBLIT:  Objection.

4        A    I don't remember.

5        Q    Okay.  Was it yesterday?

6        A    No.

7        Q    Was it within the last week?

8        A    I don't remember exactly.  I certainly

9   reviewed it multiple times over a longer period.

10       Q    So the first time you looked at it was

11  likely more than a month ago; is that fair?

12       A    Yes.

13       Q    And were you the person who decided not to

14  notify the defendants of that until 6:39 p.m. last

15  night?

16                    MR. ARBITBLIT:  Objection.

17       A    I'm not involved in notifying defendants

18  about that.  My job is to review the material and to

19  generate the report and to defend my opinion.

20       Q    Okay.  And is it possible -- Do you know

21  what I'm talking about when I say a list of 54

22  materials considered that was sent last night?  Have

23  you seen that document?

24       A    I haven't seen the document, but I do know

Page 22

1   that it was sent.

2        Q    So you've never -- the actual document with

3   54 documents listed on it, you've never seen that,

4   correct?

5        A    I've not seen the list.  I've seen the

6   document.

7        Q    And Dr. Lembke, I'm also going to represent

8   to you that some of those documents, they have Bates

9   numbers on them.  Do you know what that means?

10       A    Yes, I do.

11       Q    And some of those documents aren't even

12  available to defendants.  So Dr. Lembke, I just want

13  to be fair to you and let you know that as a result

14  of that, we might need to come back and ask you

15  additional questions at a later deposition about

16  those documents.  Understand?

17       A    I understand.

18                 MR. ARBITBLIT:  And we'll just state

19  for the record, Counsel, that those are provided with

20  a letter that said that they don't -- they're not

21  offered to alter in any way the opinions or add to

22  the opinions stated in the report.  They're provided

23  simply to comply with the rule as to anything the

24  witness has reviewed.

Page 23

```
 1            So as far as coming back for a further
 2   deposition, our position is everything you need is in
 3   the report and the documents previously provided.  We
 4   have an obligation under the rule --
 5                    MR. PYSER:  Counsel, enough.  You can
 6   send us a letter and state your position.  That's
 7   fine.  I'm going to ask the witness questions now.
 8                    MR. ARBITBLIT:  You've already
 9   received that letter, Steve.  You've already received
10   that letter, the one you talked about, said exactly
11   what I just said.
12                    MR. PYSER:  Great.  So I don't need to
13   hear it again.
14                    MR. ARBITBLIT:  You apparently didn't
15   read it the first time.
16   BY MR. PYSER:
17       Q    Dr. Lembke, is it possible that in
18   answering a question here today or at trial you may
19   rely on one of those 54 documents that was sent along
20   last night?
21       A    Yes.
22       Q    Okay.  Dr. Lembke, you also sent last
23   night -- or counsel sent last night something that
24   was described as an errata.  Are you familiar with
```

Page 24

1    that?

2         A    Yes.

3         Q    Okay.  And that changed a chart that was at

4    page 127 of Exhibit 1.  Are you familiar with that?

5         A    Yes, I am.  It was a very minor correction,

6    and the correct answer was, in fact, there.

7         Q    Okay.

8         A    Yes, I am aware.

9         Q    So that's helpful, because maybe we're on

10   the same page, because maybe it was late and my eyes

11   were bleary, but I couldn't actually see the change.

12   So can you tell me what the change is on page 127?

13        A    Sure.  Can you show it, or would you like

14   me to just walk you through it?

15        Q    Tell me, if you look at page 127 of Exhibit

16   1, in your own words, what's changed, in a general

17   fashion?

18        A    Okay.  So you see that on the right-hand

19   side of the graph, there's medium dose and low dose.

20        Q    Yes.

21        A    And there are values under medium dose on

22   the graph, it says 28.26.  But if you look below,

23   where it lists medium dose in the text, it says

24   28.69.

Page 25

1           The correct value is the 28.69, but for

2    some reason, it was mistyped.  So it's essentially a

3    typo.

4           Q    Okay.

5           A    And the same things for low dose.  On the

6    graph it says 17.42, below it says 14.92.  The

7    correct is 14.92.  Again, it's just a small typo in

8    the actual graph.  We try to be as accurate as

9    possible.

10          Q    I appreciate that.  When did you realize

11   that that -- when did you first recognize that

12   typo -- or that issue?

13          A    Yesterday.

14          Q    Okay.  Thank you.

15          Dr. Lembke, you received your medical

16   degree from Stanford in 1995, correct?

17          A    Yes.

18          Q    And did you receive offers to attend

19   medical schools other than Stanford?

20          A    Well, that's going way back.  Yes, I did.

21          Q    Why did you choose Stanford?

22          A    I chose Stanford because my sister was here

23   as an undergraduate and really liked it.  I came out

24   to visit her.  Seemed like a great place.  The

1   program at Stanford Medical School seemed like an

2   excellent program.  I thought moving to California

3   seemed good.  Those types of things that one makes

4   those decisions on when one is young.

5       Q    Fair enough.  And you've been teaching at

6   Stanford since 2003; is that right?

7       A    I really have been teaching here since I

8   was a medical student.  I was a TA as a medical

9   student.  I did teaching in my fellowship and

10  residency, but I joined the faculty in 2003.  So then

11  it became official.

12      Q    So an official teacher or professor at

13  Stanford for 17 years, right?

14      A    Yes.

15      Q    About.  Are you familiar with the process

16  by which Stanford Medical School determines the

17  curriculum that it's going to teach its medical

18  students?

19      A    Yes.

20      Q    How does that work?  I'm not asking about

21  anything in particular, just as a general matter, how

22  is it decided?  What are we going to teach the next

23  generation of doctors?

24      A    It's based largely on doctors coming

1   together and deciding as a group what the priorities

2   are for medical students in a given era, but that's

3   not the only source of decision-making.  It's also

4   become increasingly a reciprocal process, where

5   students themselves are vocal about what they think

6   they need to learn.  There are also national measures

7   and national guidelines that influence what is taught

8   at a given time.  So it's multifactorial.

9       Q    And do the individual professors obviously

10  help decide what is going to be taught in their

11  particular classes?

12      A    They do help decide, but it's also embedded

13  by other groups of educators.  There has been a shift

14  in medical education over the last 20 years to become

15  more clinical, more clinically oriented for a number

16  of reasons.

17      Q    Are you part -- personally, are you part of

18  the group that helps design the curriculum at

19  Stanford?

20      A    I have been involved for at least the last

21  five years in creating an addiction medicine

22  curriculum at Stanford, as well as revising parts of

23  the pain curriculum at Stanford, yes.

24      Q    And is it fair to say that the doctors who

Page 28

1    over the years that you've been at Stanford have

2    worked on the curriculum are smart doctors?  I mean,

3    they're Stanford professors, right?

4                    MR. ARBITBLIT:  Objection.

5         A    Yeah, you can be a Stanford professor and

6    be really smart and also be misinformed.

7         Q    Fair enough.  The doctors designing the

8    curriculum at Stanford, in your view have they been

9    operating in good faith when they've designed the

10   curriculum for Stanford medical students?

11                   MR. ARBITBLIT:  Objection.

12        A    What do you mean by "in good faith"?

13        Q    Trying to do the right thing.

14                   MR. ARBITBLIT:  Objection.

15        A    I think that Stanford professors, like all

16   humans, are motivated by a complex mix of factors.

17   Some, in trying to do the right thing, is what

18   motivates some people, and other people have other

19   motivations, or there are other motivations in the

20   mix.  So it really depends on the person.

21        Q    Well, if -- As a member of the faculty for

22   the last 13 years at Stanford, can you name for me

23   any of your colleagues on the faculty who in the

24   design of the Stanford Medical School curriculum you

Page 29

```
 1  believe were operating in bad faith when they worked

 2  on the curriculum?

 3                    MR. ARBITBLIT:  Objection.

 4      A    Yeah, I wouldn't want to name names, but I

 5  do think there have been individuals who have been

 6  heavily influenced by the pharmaceutical industry.

 7      Q    And by pharmaceutical industry, do you mean

 8  manufacturers of pharmaceuticals?

 9      A    I mean the opioid pharma more broadly.

10      Q    Can you, sitting here today, point me to

11  any interaction between a professor at Stanford and

12  Cardinal Health?

13      A    No.

14      Q    How about AmerisourceBergen?

15      A    No.

16      Q    And McKesson Corporation?

17      A    No.

18      Q    And I'll ask you again.  Are you willing to

19  name the professors at Stanford, who, in your view,

20  have been improperly influenced by the pharmaceutical

21  industry?

22                    MR. ARBITBLIT:  Objection.

23      A    I would be reluctant to do that.

24      Q    I'm not asking if you're reluctant.  Will
```

```
                                              Page 30
```

 1   you do it or not?

 2        A    Not at this time.

 3        Q    So you're refusing to answer my question?

 4        A    I feel like that was an answer.

 5        Q    Well, just so we're clear.  Sitting today,

 6   you're not going to give me the names of the

 7   professors I asked you for?

 8              MR. ARBITBLIT:  Objection.

 9        A    Not today.

10        Q    We've been through your background before,

11   so I'm not going to repeat it, but one area we

12   haven't covered is economics.  And I want to make

13   sure we're clear.  Do you have a degree in economics?

14        A    No.

15        Q    Okay.  Have you ever authored any peer

16   reviewed papers in the field of economics?

17        A    No, but I have spoken at an economics

18   conference.

19        Q    What was the subject of your speech?

20        A    The opioid problem.

21        Q    Do you consider yourself an expert on

22   economics?

23        A    No.

24        Q    Have you ever been to West Virginia,

                                                    Page 31

1    Doctor?

2         A    No.

3         Q    And I'm going to go out on a limb and say

4    that if you've never been there, you're not licensed

5    to practice medicine in West Virginia either?

6         A    That's correct.

7         Q    Are you familiar with the term standard of

8    care in the context of the practice of medicine?

9         A    Yes, I am.

10        Q    What does that mean, standard of care?

11        A    It basically means that you're practicing

12   in the way that people around you are also

13   practicing.

14        Q    Is standard of care synonymous with best

15   practices?

16             MR. ARBITBLIT:   Objection.

17        A    Not always.

18        Q    So what does best practices mean, if it's

19   different than standard of care?

20        A    In its idealized form, best practices would

21   be the height of evidence-based medicine.

22        Q    And are there organizations and entities

23   that set standards for doctors?

24        A    Yes.

Page 32

1      Q    And do they do so under the standard of

2   care or do they try to set best practices?

3                   MR. ARBITBLIT:  Objection.

4                   MR. PYSER:  You can answer, Doctor.

5      A    It really depends on the organization and

6   what they've been influenced by.

7      Q    Well, I'm not asking your opinion of the

8   eventual standards they set, okay?  I'm just asking

9   when an organization -- let's say a board of

10  medicine, all right?  Do boards of medicine set

11  standards of care?

12                  MR. ARBITBLIT:  Objection.

13     A    They can.  They have done.

14     Q    And do they also set best practices?  How

15  would you describe what a board of medicine for an

16  individual state sets?  Is it a standard of care or

17  is it best practice?

18                  MR. ARBITBLIT:  Objection.

19     A    It seems to me that you're kind of creating

20  a false dichotomy between standard of care and best

21  practices, which is making it hard for me to answer.

22  For example, the standard of care in opioid

23  prescribing in the 1990 (distorted audio), which was

24  also touted as best practices, which was put forward

Page 33

1   by organizations like the drug commission and the

2   federation of state medical boards, was indeed what

3   everybody was doing, because they were told to do

4   that, but it wasn't evidence-based medicine.

5        Q    Okay.  So at the time, in the 1990s when it

6   comes to the prescribing of opioids, doctors thought

7   what they were doing was best practices and in

8   accordance with the standard of care, correct?

9                MR. ARBITBLIT:  Objection.

10       A    Doctors were taught that prescribing

11  opioids for chronic pain was evidence-based medicine

12  even though there was no evidence to support it.

13       Q    That wasn't my question.  My question was:

14  At the time, did doctors believe that their opioid

15  prescribing was both best practices and consistent

16  with the standard of care?

17               MR. ARBITBLIT:  Objection.

18       A    I don't think that most doctors are even

19  familiar with the term standard of care, so I don't

20  think they would have thought about it in those

21  terms.

22       Q    It's your position that most doctors aren't

23  familiar even with the concept of standard of care;

24  is that right?

Page 34

1      A    That's right.

2      Q    Is that a failure by the medical community?

3              MR. ARBITBLIT:  Objection.

4      A    My understanding is that standard of care

5  is a term that mainly comes up in legal proceedings.

6  It's not something that doctors talk about.  We don't

7  talk about standard of care in medical school.  We

8  don't talk about that in residency.  It's not a term

9  that doctors -- it's not our language.

10     Q    Well, having now spent some time in our

11  legal world here, what's the closest equivalent in

12  the medical world -- how do doctors know what they

13  should be doing, how they should be prescribing?

14  Where do they turn?

15             MR. ARBITBLIT:  Objection.

16     A    Doctors base their decisions on a

17  combination of what they learned in medical school,

18  what they learned in residency, what they see their

19  attending professor doing during their training.

20  Medicine works very much like an apprenticeship.

21  There is a saying in medicine, do one, see one, teach

22  one.  So there is this sense of going along with the

23  herd, whatever people are doing.

24     Q    So when it comes to the prescription of

1  opioids, do you have views -- yes or no, do you have

2  views as to whether certain prescribing habits of

3  doctors are appropriate or not?

4      A    Yes.

5      Q    And today, in 2020, do you believe it's

6  appropriate for a doctor to prescribe opioids to

7  treat chronic non-cancer pain?

8      A    In some very rare instances, yes.

9      Q    And has your view of that changed over the

10 years?  Have you always believed that, or has that

11 view changed?

12     A    My view on that has changed since my

13 education in medical school in the 1990s, and my

14 early residency training, yes, my view has changed.

15     Q    Are you able to put a date on when your

16 view changed as to the appropriateness of prescribing

17 opioids to treat chronic non-cancer pain?

18     A    My view evolved over years, so I cannot put

19 a single date on it.  It was the accumulation of

20 evidence after I graduated from medical school and

21 the accumulation of my experiences with my patients,

22 what I read in the medical literature.  I arrived at

23 it slowly.  It wasn't that I woke up, you know, one

24 day and it changed my opinion.  It was the

Page 36

1    accumulation of the evidence that led me to change my

2    opinion.

3        Q     And that accumulation, just so we put some

4    concrete years on it, it happened between 2003, I

5    believe, when you graduated from medical school?  Do

6    I have that right?

7        A     It probably started more like the year

8    2000, 2001, where I began to wonder about what I had

9    been taught in medical school regarding the use of

10   opioids in the treatment of pain.

11       Q     And that evolved over the next 20 years

12   until today, correct?

13       A     Well, I would say that the primary

14   evolution occurred in the first decade, which led me

15   to want to write a book about it to inform other

16   doctors, as well as the lay public, culminating in

17   the publication of my book in 2016.

18             I think since that time, my essential views

19   have not changed substantially.  I have learned more,

20   reviewed more, seen more, but my opinion, in essence,

21   has remained the same since the publication of my

22   book.

23       Q     Doctor, do you know whether under current

24   medical guidelines it's appropriate for a doctor to

1    prescribe a 30-day supply of opioids to treat acute

2    pain?

3              MR. ARBITBLIT:  Objection.

4       A    So there are many different guidelines, so

5    I can't answer that question as if there were only

6    one guideline.  Also, guidelines are quickly changing

7    as the medical community realizes that they were

8    duped.  So it's hard for me -- you really have to

9    point to one specific guideline.

10      Q    Let me ask it this way, Doctor.  Do you

11   know whether for a doctor in West Virginia it's, in

12   your view, appropriate medical practice to prescribe

13   a 30-day supply of opioids to treat acute pain?

14             MR. ARBITBLIT:  Objection.

15      A    I'm trying to remember the various

16   guidelines that I've reviewed for West Virginia.  I

17   have reviewed some guidelines.  I cannot remember the

18   specifics about the limits on opioid prescribing, but

19   I am aware that there are more recent guidelines that

20   are strongly urging doctors to cut back on opioid

21   prescribing because of the harm that they've caused.

22   But I don't remember the exact number of days.

23      Q    When we talk about these guidelines, and

24   best practices, and standard of care, all the words

Page 38

1    we've been using, are you aware of any mandatory

2    guidelines on doctors in West Virginia that dictates

3    how they can prescribe opioids?

4              MR. ARBITBLIT:  Objection.

5         A    Right now I'm not recalling any mandatory

6    guidelines.  There may be.  I'm not recalling that

7    there are any.  There are certainly a lot of

8    recommended guidelines.  I recall recommended

9    guidelines to doctors in West Virginia.  And then, of

10   course, there are the CDC guidelines.

11        Q    When we talk about these recommended and

12   CDC guidelines, they rely on doctors to use their

13   professional judgment to decide what is appropriate

14   for an individual patient, correct?

15             MR. ARBITBLIT:  Objection.

16        A    That's incorrect.

17        Q    So do doctors not have to exercise their

18   judgment to decide what prescription is appropriate

19   for a patient?

20             MR. ARBITBLIT:  Objection.

21        A    I guess I'm having a little trouble

22   understanding the line of questioning.  So in

23   creating guidelines, clinical experience matters but

24   it's not the only thing that informs guidelines.  And

Page 39

1    I felt like your question implied that it was only

2    clinical experience that informs guidelines.  So I

3    wanted --

4         Q    I'm sorry, Doctor.  I'm actually moving

5    beyond guidelines.  I now want to ask about an

6    individual doctor practicing medicine, let's say, in

7    Huntington, West Virginia.

8         A    Yes.

9         Q    That doctor has available to them a range

10   of guidelines, correct?  CDC guidelines, for example?

11        A    It really depends on the clinic setting and

12   that individual's education.  Not every doctor has

13   access to every single guideline.  There are a lot of

14   guidelines out there.  Doctors are incredibly busy.

15   They often will rely on the algorithm or guidelines

16   that their specific treatment setting has said to

17   them they need to follow.

18        Q    Okay.  So if --

19        A    So doctors -- you know, doctors are super

20   busy seeing patients.  They don't have time to read

21   every single guideline and digest it.  They rely on

22   opinion leaders, the last continuing medical

23   education course they went to, the hospital quality

24   measures.  They're mostly trying to do the right

Page 40

1    thing but also follow the rules, and the rules are

2    often the guidelines that somebody, who manages their

3    hospital and manages their clinic settings, says,

4    here, you got to follow these.  That's -- honest to

5    goodness, that's the real world.  That's the real

6    world.

7         Q    Doctor, when you write a prescription, you

8    sign your name on the bottom of it, correct?

9         A    Yes, I do.

10        Q    And is that normal practice for doctors

11   when they write a prescription, they sign their own

12   name, correct?

13        A    (Nods.)  Yes, there are circumstances where

14   nurse practitioners are working under doctors'

15   licenses, so technically the nurse practitioner is

16   signing, but it's still under the doctor's name.  But

17   yes.

18        Q    So we'll make this simple.  This is a

19   doctor talking to a patient, going to prescribe

20   something, the doctor signs their name to the

21   prescription, correct?

22        A    That's correct.

23        Q    And by signing their name, that doctor is

24   exercising their medical judgment as to what's

Page 41

1    appropriate for that patient, correct?

2                    MR. ARBITBLIT:  Objection.

3        A    Not always.

4        Q    In what circumstance is a doctor not

5    exercising their own medical judgment when they write

6    a prescription for a patient?

7        A    Many different circumstances.

8        Q    Okay.  So doctors -- Can you name a

9    circumstance where a doctor is not responsible for

10   their own prescribing decisions?

11                   MR. ARBITBLIT:  Objection.

12       A    Well, now you said being responsible.

13   Ultimately, we're responsible, which puts a big legal

14   burden on us, but that's different from what informed

15   their decision to write the prescription.

16            My light just went out.  I have one of

17   these motion sensor things.

18       Q    So, Dr. Lembke, doctors are ultimately

19   responsible for their own prescribing decisions,

20   correct?

21                   MR. ARBITBLIT:  Objection.

22       A    Doctors are medically/legally responsible

23   for their prescribing decisions.

24       Q    Is that a yes?

Page 42

1        A    Yes.

2        Q    In your practice, do you regularly

3    prescribe controlled substances?

4        A    Yes.

5        Q    And your patient population, is it

6    primarily people who are dealing with addiction?

7        A    Yes, but they also have other

8    co-morbidities, like chronic pain.

9        Q    But the patients you're seeing, maybe they

10   have chronic pain, maybe they have other

11   co-morbidities, a consistent threat throughout most

12   of the patients you're seeing is that they suffer

13   from some type of addictive disease; is that right?

14       A    I have a large percentage of patients who

15   don't, in fact, meet criteria for addiction.  They

16   meet criteria for dependence.  But the majority of my

17   patients have some kind of chemical

18   dependency/addiction.  So those are distinct

19   phenomena.

20       Q    And in your practice, do you adapt your

21   practice of medicine to new research as it comes out?

22       A    Yes.

23       Q    What questions do you believe a physician

24   needs to answer before prescribing opioids to a

Page 43

1   patient?
2           MR. ARBITBLIT:  Objection.
3       A   That's a very long list.  I don't think
4   that I could encapsulate that in a succinct answer.
5       Q   It's a complicated question?  Is that fair?
6   Let me rephrase that.  Strike that.
7           Is it a complicated question for a
8   physician to make a determination as to whether
9   opioids are appropriate for a particular patient?
10          MR. ARBITBLIT:  Objection.
11      A   Some aspects of it are very simple.  For
12  example, the fact that opioids don't work for chronic
13  pain.  So that wouldn't be complicated.  But other
14  aspects of the rare instances in which opioids might
15  be helpful for a patient, that requires a lot of
16  stewardship and due diligence.
17      Q   And, Dr. Lembke, to your knowledge, do all
18  doctors agree with your view that opioids don't work
19  for chronic pain?
20      A   When I first started talking about this
21  problem, the fact that the way that we are
22  prescribing opioids was not evidence-based, and the
23  risk of addiction was extremely high, there were very
24  few doctors who agreed with me.  I was really

Page 44

1    swimming upstream.  I think in the last five years or

2    so, there's been a change as more doctors come to

3    recognize the opioid crisis and the role that they

4    have played in it, and we've seen a change in

5    prescribing as a result.  But there are still doctors

6    who may not share my opinion.

7         Q    You keep part of your answer off the time

8    when you first started talking about your belief that

9    opioids don't work for chronic pain.  Can you help me

10   understand, when was that when you first started

11   talking about your belief that opioids don't work for

12   chronic pain?

13        A    I became aware of the problem in the early

14   off, because I was seeing more and more patients

15   addicted to --

16        Q    That wasn't my question.  My question is

17   when did you first start talking about that in a

18   public setting and transmitting that information to

19   other doctors, your belief?

20              MR. ARBITBLIT:  Objection.

21        A    It's hard for me to remember exactly, but

22   probably sometime in the first decade of this

23   millennium, somewhere between the year 2000 and 2010.

24   Because I do a lot of teaching, you know, so I guess

Page 45

1    if you think of that as a public forum, I'm always

2    teaching medical school students and residents,

3    talking to colleagues.

4         Q    How about outside Stanford Medical School?

5    When did you first start talking about your belief

6    that opioids don't work for chronic pain?

7         A    Probably 2012.

8         Q    We talked in a prior deposition -- or I

9    actually wasn't answering the question, but you

10   talked about what you would do if a pharmacy couldn't

11   fill a patient's prescription.  Do you recall some

12   conversation about that?

13        A    Yes, I do.

14        Q    Okay.  And you were asked -- this is the

15   question.  I'll read it to you.

16             And, Counsel, this is from page 49,

17   line 18, of the New York deposition.

18             "And so if one of your patients said that

19   they couldn't fill a prescription for opioids because

20   the distributor wouldn't ship to that pharmacy, and

21   you went through all the circumstances of the patient

22   and you determined that this patient needed opioids,

23   what would you tell the patient to do?"

24             And your answer was:  "Probably the first

Page 46

1   thing I would do would be to contact the pharmacy

2   directly and try to figure out what the circumstances

3   were of their not having a particular medication."

4          Okay?  I just want to follow up a little

5   bit on that subject.  Putting yourself back in that

6   position where you have now called the pharmacy, if

7   the pharmacy told you that they didn't have a

8   medication in stock at that pharmacy because a

9   distributor, like the defendants here, had declined

10  to ship that medication that you prescribed, what

11  would you tell your patient to do?

12                 MR. ARBITBLIT:  Objection.

13      A    Well, first, I would ask the pharmacist why

14  the distributor had declined to ship the medication.

15  I would try to understand if there was some

16  compelling reason why it wasn't shipped.

17      Q    If at the end of those conversations the

18  pharmacy said "We can't get that medicine in stock,"

19  would you instruct your patient to go to another

20  pharmacy?

21                 MR. ARBITBLIT:  Objection.

22      A    I'm not really sure.  That's never happened

23  before where, you know, it was a great mystery.  You

24  know, usually I could get some information on why it

1   wasn't there and then use that information to decide

2   what to do in the absence of that.

3        Q    Do you in your medical practice -- do you

4   ask your patients where they plan to fill the

5   prescriptions that you write for them?

6        A    I have to do that to know where to send the

7   prescription.

8        Q    So as a general matter, you ask each

9   patient who you write a prescription for where they

10  plan to fill it?

11       A    I have to look up the pharmacy in the

12  computer in order to send it to that pharmacy.  Now,

13  that's really quite new.  When I went to medical

14  school and early in my training, I gave patients a

15  piece of paper and they took it wherever they wanted

16  to go.  I didn't know where they went.  I didn't have

17  control of them where they went.  It's really only in

18  the last five to ten years with the advent of

19  electronic medical records that I input the pharmacy

20  to electronically send the prescription, so that I

21  have some awareness.

22            But truthfully I don't know where many of

23  these pharmacies are.  I'm not particularly, you

24  know, aware of where the pharmacy is or exactly which

Page 48

1    pharmacy.  I'm just trying to get what address they

2    tell me.

3         Q    So beyond putting a pharmacy name or an

4    address into the computer system, when you write a

5    prescription, do you talk to the pharmacist who's

6    going to fill that prescription as a regular

7    practice?

8                   MR. ARBITBLIT:  Objection.

9         A    Often.  Yes.  Especially controlled

10   substances.

11        Q    And approximately what percentage of your

12   prescription writing today do you talk to the

13   pharmacist who's going to fill the prescription?

14        A    Probably more than 50 percent.

15        Q    But not every time?

16        A    Not every time.

17        Q    Dr. Lembke, I know you've never been to

18   West Virginia, but I want to try to talk a little bit

19   about what you may know and not know about opioid

20   prescribing in Cabell County and Huntington,

21   West Virginia.  Okay?

22             Do you agree with me that at least some of

23   the opioid prescriptions in Cabell County and

24   Huntington were appropriate prescriptions, even under

Page 49

1    your belief and standards?

2         A    Yes.

3         Q    Okay.  So fair if we call that category the

4    Dr. Lembke-approved prescriptions, Category 1?

5         A    Yes.

6         Q    Is that fair?

7         A    That's okay.

8         Q    Thank you, Doctor.  So let's think about

9    another category -- well, actually let's stay with

10   the Dr. Lembke-approved category.  Do you have any

11   idea what percentage of prescriptions in Cabell

12   County and Huntington fall into the Dr. Lembke-

13   approved category?

14        A    So I don't really want to weigh in on like

15   percentages and quantities.  In my report I do have

16   an appendix where I talk about what appropriate

17   prescribing is, and I'm happy to go to my report and

18   talk more about that.  But I don't --

19        Q    I'm asking you sitting here today,

20   Dr. Lembke, if you can give me a percentage.  And if

21   you can't, that's okay.  So what I'm asking you is:

22   Dr. Lembke, can you give me a percentage of the total

23   prescriptions for opioids in Cabell County and

24   Huntington, West Virginia, that you believe were

Page 50

1    appropriate medical treatment?

2                    MR. ARBITBLIT:  I would just say

3    before you answer, that's a fair question, but I

4    would just ask, Steve, that when she's in the middle

5    of an answer, give her the courtesy of finishing

6    before you go to the next question.  That will make

7    it easier for you and the witness and the court

8    reporter.

9    BY MR. PYSER:

10        Q    Absolutely.  Dr. Lembke, if I ever cut you

11   off, just let me know, and I'll do my best to stop

12   that, okay?  Do you need the question read back to

13   you?

14        A    No.

15        Q    Okay.  Go ahead then.

16        A    Okay.  So to quantify it, I would look at

17   the way that prescribing nationally has quadrupled in

18   the last -- since the 1990s in the United States,

19   which roughly estimated means we are currently

20   prescribing more -- say in the peak of 2012, we were

21   prescribing four times more opioids than we should

22   have been, because there was no increase in the need

23   for analgesia in the population at that time.

24                    Likewise, if you look at West Virginia,

Page 51

1   there was a similar and maybe even a higher increase

2   in opioid prescribing in West Virginia without any

3   increase during that span of time in the need for

4   analgesia.  In my report, which I am happy to go to,

5   you know, I have numbers showing the number of

6   prescriptions written per 100 persons in

7   West Virginia, which especially if you're looking at

8   Cabell County are more than twice the national

9   average.

10          So already you have an increase over time,

11   a quadrupling over time since the 1990s to 2012, and

12   then you have in Cabell County a real outlier

13   situation where at peak prescribing, people in Cabell

14   County were getting twice as many opioids as in the

15   rest of the United States.  So that is how I would

16   quantify that.

17     Q    So is it fair to say that approximately --

18   strike that.  If nationwide there has been a

19   quadrupling in your view of prescriptions for

20   opioids, and the appropriate level is the level

21   before that multiplication by four, that the

22   appropriate level is something like one quarter of

23   the current level nationwide; is that a fair

24   extrapolation of your view?

Page 52

1              MR. ARBITBLIT:  Objection.  Misstates

2       the record.

3          A     Yeah, I think that what I was saying was

4       that on top of that quadrupling nationally there was

5       an even bigger disproportionate overprescribing

6       problem in Cabell County.  So, again, hard for me to

7       put, you know, a number on it.  But suffice it to

8       say, way too many opioids have been prescribed in

9       Cabell County than were medically necessary.

10         Q     When you compare Cabell County to the rest

11      of the nation, have you done any analysis yourself to

12      see if Cabell County has different or higher rates of

13      certain health concerns than the rest of the country?

14         A     I do understand that Cabell County is a

15      working community of people who may have higher rates

16      of obesity-related arthritis, mechanical injuries

17      from manual labor.  I am aware of that.  I haven't

18      done my own calculations, however.

19         Q     So you haven't done any analysis to

20      determine how the fact that Cabell County has higher

21      rates of, for example, obesity-related arthritis or

22      working injuries may impact the needs for opioids

23      within the community?

24              MR. ARBITBLIT:  Objection.

Page 53

1     A     No, but regardless of the pain levels in

2     Cabell County, they don't justify the increased

3     opioid prescribing in that county.

4         Q     Dr. Lembke, you didn't answer my

5     question --

6         A     --

7         Q     No, well -- look, we want to get through

8     this day as fast as possible, and I think it can be a

9     short day, but you're going to have to answer the

10    questions that I'm asking, okay?  So my question was

11    just simply:  Have you done an analysis of Cabell

12    County versus the rest of the country to determine

13    whether health differences in the population in

14    Cabell County may have impacted the prescribing rate

15    in Cabell County versus the nation, and if so, by how

16    much?  Have you done that analysis, yes or no?

17                    MR. ARBITBLIT:  Objection.  Vague --

18    Let me state the objection.  Objection.  It's vague,

19    ambiguous, not the same question.

20                    You may answer.

21        A     Yes.  So I'm having problems with the way

22    that you're framing the question.  I'm not trying to

23    be obstructionistic, but the frame of your question

24    implies that if Cabell County has higher rates of

Page 54

1    pain, that would justify higher rates of prescribing.

2    And that I cannot agree with.

3        Q    Okay.  Let's take out the prescribing from

4    it.  Have you done an analysis, yes or no, to

5    determine whether Cabell County has higher rates of

6    pain than the national average?

7        A    I have not done my own analysis on that.

8        Q    Are you familiar with any studies or other

9    analyses that compares the rate of pain in Cabell

10   County to the rest of the nation?

11       A    I'm not recalling specific articles, but I

12   can tell you that I have read articles and reports

13   that attest to Cabell County possibly having higher

14   rates of some pain conditions.

15       Q    Thank you, Doctor.  So we talked about the

16   first category, the Dr. Lembke-approved

17   prescriptions.  And we haven't quantified it, and

18   that's fine.  I want to move on to a second category.

19            Is it fair to say that some of the opioid

20   prescriptions in Cabell County were written for what

21   doctors believed in good faith, based on what they

22   were taught in medical school, was for a legitimate

23   medical purpose, even though you might disagree with

24   that?  Is that a fair category of prescriptions that

Page 55

1    we might encounter in Cabell County?

2                   MR. ARBITBLIT:   Objection.

3        A    Yes.  I mean, it's hard to answer that

4    without, you know, a specific patient example, but

5    yes, I would say that that's fair.

6        Q    In your MDL report you opined that that

7    category, doctors who wrote in good faith opioid

8    prescriptions but shouldn't have, accounted for the

9    vast majority of opioid prescriptions.  Is that true

10   for Cabell County and Huntington as well?

11       A    By that answer what I meant was really that

12   there's been a paradigm shift in opioid prescribing

13   such that all doctors were prescribing more opioids

14   based on misleading statements by the defendants.

15   So -- and that pill mill doctors are a real problem,

16   but they're a minority of the problem.  And I think

17   that that conceptualization also applies to Cabell

18   County.

19       Q    So again, Doctor, we'll just try to keep it

20   simple.  So my question was:  Is it true that in

21   Cabell and Huntington the majority of prescriptions

22   written were written by doctors who were operating in

23   good faith, but shouldn't have written the opioid

24   prescriptions that they did, in your view?

Page 56

1      A     Yes.

2      Q     So now we've got two categories.  We've got

3  the Dr. Lembke category, and we've got the doctors we

4  just talked about.

5            Let's talk about a third category, okay?

6  These are unlawful prescriptions.  Are you aware of

7  any unlawful prescriptions for opioids in Cabell

8  County or Huntington?

9      A     I'm aware that that generally occurred.  I

10  don't have specific examples.

11      Q     What would you need to know in order to

12  make a determination of what percentage of

13  prescriptions in Cabell County were unlawful or in

14  bad faith by the doctors?

15      A     Part of what I would look at is just the

16  sheer volume of prescribing and dispensing in a given

17  area.

18      Q     I'm talking about the prescribing now.  So

19  in order to know if an individual doctor's

20  prescription was unlawful or written in bad faith,

21  what would you need to know in order to make that

22  determination?

23      A     Well, one of the first things and one of

24  the sentinel things that I would need to know was the

Page 57

1   number of prescriptions being written, because I have

2   a very good idea, being a clinician myself, of what

3   it takes to really evaluate a patient and decide

4   whether or not opioids are indicated, as well as

5   monitor and steward that prescription.  And it takes

6   time.

7          So if there were a prescriber who were

8   prescribing very large volumes of opioids, and a

9   pharmacy that was dispensing very high volumes of

10  opioids, that would be one of the first things that I

11  would look for.

12     Q    And in order to make a judgment about that,

13  Doctor, would you need to see the medical records of

14  the patients for whom they were prescribing?

15     A    It would really depend on the degree to

16  which the volumes were egregious.  I mean, if the

17  volumes were just astronomically high, I almost

18  wouldn't need to see anything else, because I know

19  what one person can do in the span of, you know, a

20  given workday.  Obviously, I would want to look --

21  obviously I would want to look at all the material,

22  but it would be much less important if that data

23  point were a huge outlier.

24     Q    So we can agree that it would be helpful in

Page 58

1   your analysis of whether a prescription is

2   appropriate or not to see the medical records of the

3   patients for whom the prescriptions were written,

4   fair?

5       A    You know, I can imagine a scenario where I

6   would not need to look at the medical records.

7       Q    I'm asking you as a general matter, Doctor,

8   if you were trying to make a determination as to

9   whether prescribing by a physician was appropriate or

10  not, would it be helpful for you to see the medical

11  records of that doctor's patients?

12                  MR. ARBITBLIT:  Objection.

13      A    Again, I feel like I've answered this

14  question and given, you know, a scenario that I think

15  answers the question.

16      Q    Doctor, is it your view that medical

17  records are irrelevant to a determination of whether

18  or not a doctor's prescribing practices are

19  appropriate?

20                  MR. ARBITBLIT:  Objection.

21      A    There are scenarios in which medical

22  records could be irrelevant.

23      Q    And that would only be in a scenario where

24  the volume written by a particular doctor was so high

Page 59

```
 1    that it's your belief that it has to be illegitimate

 2    prescribing; is that fair?

 3        A    That's not the only scenario, but I think

 4    that's one scenario.

 5        Q    Is that the most common scenario for an

 6    instance where you don't think the medical records

 7    would be useful to your analysis of prescribing?

 8                   MR. ARBITBLIT:  Objection.

 9        A    I'm not going to quantify that -- that

10    example.  There are many, many different types of

11    circumstances.

12        Q    Okay.  What are the other circumstances in

13    which medical records would be irrelevant to your

14    review of whether a prescription was appropriate or

15    not?

16        A    If the physician, him or herself, was

17    obviously impaired, would be an example.

18        Q    What else?

19        A    Those are the two that I can think of now.

20        Q    So if the physician was impaired, or if the

21    sheer volume is so high for a particular doctor,

22    those are the two scenarios under which medical

23    records would not be needed to analyze whether the

24    doctor was prescribing appropriately, correct?
```

Page 60

1          MR. ARBITBLIT:  Objection.

2     A    Those are two that I can think of now.

3     Q    Can you think of any other now?

4     A    Pardon me?

5     Q    Can you think of any others, sitting here

6  today, can you think of any other scenarios?

7     A    No.  I've never been presented with this

8  particular narrow question.  I could think on it more

9  and get back to you.

10    Q    Sitting here today, can you think of any

11 others?

12    A    I cannot.

13    Q    Dr. Lembke, can you name for me any doctor

14 in Cabell or Huntington who you believe prescribed

15 opioids improperly or illegally?

16    A    No.

17    Q    Do you know the percentage of opioid

18 prescriptions written in Cabell County that were

19 written for the purpose of treating acute pain?

20    A    No.

21    Q    Do you know the percentage of opioid

22 prescriptions written in Cabell County and Huntington

23 that were written for the purpose of treating chronic

24 non-cancer pain?

Page 61

1          A     No.

2          Q     Do you know the percentage of opioid

3    prescriptions written in Cabell County and Huntington

4    that were written for the purpose of treating cancer?

5          A     No.

6          Q     How about end-of-life or hospice care?

7          A     No.

8          Q     Dr. Lembke, can you name for me, sitting

9    here today, any doctor or pharmacy in Cabell County

10   or Huntington that you would describe as a pill mill?

11         A     No, I'm not aware of a specific pill mill

12   in Cabell County or Huntington.

13         Q     Doctor, I want to return for a moment to

14   something you talked about in your MDL deposition so

15   that I can ask you a couple of follow-up questions

16   about it, all right?

17               Do you recall -- and this is, for counsel,

18   at page 241 of the MDL deposition.  You stated -- you

19   were -- strike that.  In your MDL deposition, we

20   referred to some notes that you had taken.  Do you

21   recall those notes?  They were handwritten notes of

22   yours?

23         A     You mean on the report itself?

24         Q     Yes.  It actually wasn't on the report.  It

Page 62

1    was a series of notes that were introduced as an

2    exhibit to your MDL deposition.

3         A    From my book?

4         Q    Yes.

5         A    Yes, I do remember.

6         Q    And one of those notes said, quote:

7              "Some colleagues' goal is just to keep the

8    ED moving, just get them out the door, time and

9    space.  One trusted colleague said:  Just give them

10   what they want."

11             Do you recall that?

12        A    I do recall that, yes.

13        Q    And those were from notes you had taken

14   when you were preparing your book, correct?

15        A    Yes, from my qualitative interviews, which

16   was the research for my book.

17        Q    And what does "keep the ED moving" mean?

18        A    So that was an interview with a young woman

19   who had just graduated from her training, who was an

20   emergency medicine doctor who was working in an

21   emergency department.  And she expressed to me how

22   demoralized she was that she had to base her clinical

23   practice, in part, on not just -- not necessarily

24   explicit rules, but implicit expectations around

Page 63

1    seeing large numbers of patients quickly in that

2    emergency room.  So that was the context for that.

3        Q    Thank you for that.  The line, "One trusted

4    colleague said 'just give them what they want,'" is

5    that a colleague of yours or was that a colleague of

6    the woman you interviewed?

7        A    Yes, so that was a colleague of mine.

8        Q    What's the name of the colleague of yours

9    who told you, quote, "just give them what they want"

10   in reference to patients who were asking for opioids?

11              MR. ARBITBLIT:  Objection.

12       A    I don't know the name of that person.

13       Q    You told me it was one of your colleagues,

14   correct?

15       A    I'm sorry.  I think -- So the person I

16   interviewed who told me that, she said that one of

17   her colleagues told her that.  Does that make sense?

18       Q    It does.  I think we got our signals

19   crossed.  So not a colleague of yours, a colleague of

20   the woman you interviewed?

21       A    That's right.

22       Q    And did you ask your interviewee the name

23   of the colleague who stated "just give them what they

24   want" in reference to people asking for opioid

Page 64

1   prescriptions?

2       A    I don't remember if I asked her.  If I did,

3   she probably didn't disclose it.

4       Q    Do you believe that kind of practice of

5   medicine, just giving patients what they want when

6   they ask for opioids, is appropriate?

7       A    No.

8       Q    Do you believe it puts patients' welfare at

9   risk?

10      A    Yes.

11      Q    Does it pose an immediate threat to the

12  health and safety of patients for a doctor to

13  prescribe opioids in that manner?

14              MR. ARBITBLIT:  Objection.

15      A    Generally speaking, I guess the answer is

16  yes.

17      Q    Do you believe a doctor who, when a patient

18  presents at the emergency department and asks for

19  opioids, just gives them what they want, is violating

20  state licensing provisions?

21              MR. ARBITBLIT:  Objection.

22      A    I wouldn't simplify it to that degree, no.

23  I think that's an oversimplification.

24      Q    Did you report this incident where you

Page 65

1   learned of a doctor whose approach to prescribing

2   opioids in an emergency department was to just give

3   patients what they want, did you report that to any

4   medical board or any conduct-setting organization?

5        A    No, because I think what that comment gets

6   at is the culture of the place where she was working,

7   rather than --

8        Q    --

9             MR. ARBITBLIT:  Let her finish.

10            MR. PYSER:  Understood.  Finish your

11  answer, Dr. Lembke.  I apologize.

12       A    So, to me, that captured a culture in

13  medicine where that kind of behavior was -- became

14  acceptable, even when doctors knew that what they

15  were doing maybe wasn't the best thing for patients.

16  There were so many pressures on them to see patients,

17  to prescribe opioids, to have satisfied customers, to

18  meet Joint Commission quality measures.  Have you

19  done quote/unquote everything in your power to

20  eradicate this patient's pain -- unquote, from, you

21  know, closed quote, anyway.

22            So that speaks to that culture, such that

23  it became what was expected of doctors, which again

24  is why the subtitle of my book is that doctors were

Page 66

1    duped.  And as I do elaborate on in my book, "caught

2    in the system," which made it very difficult for them

3    to use their clinical judgment, right?  And to make

4    clinical decisions that would have been best for

5    patients.

6        Q    So you spoke about the culture at the place

7    where this interviewee was working.  Where was she

8    working?

9        A    I don't remember the name of the hospital.

10   I probably have it somewhere in my notes.  But in my

11   book I wasn't going to name specific individuals or

12   hospital settings per se.

13       Q    So fair to say you didn't report the

14   hospital to the state medical board or any other

15   standard setting organization?

16       A    That's fair to say.

17       Q    Do you have a duty as a doctor to report

18   incompetent or unethical behavior by colleagues?

19            MR. ARBITBLIT:  Objection.

20       A    So, you know, there are lots of incompetent

21   and unethical things that go on in the workplace.  It

22   really matters, the degree of the incompetence and

23   the lack of integrity, and the certainty with which I

24   have that it occurred.  So.

1      Q     Doctor, so, yes or no, do you have an

2    obligation if you are aware of incompetent or

3    unethical behavior by colleagues, do you believe you

4    have a reporting obligation when you observe that?

5                    MR. ARBITBLIT:  Objection.

6      A     It totally depends on the circumstance.

7    There are many degrees of being unethical and

8    incompetent.

9      Q     Dr. Lembke, have you ever reported a

10   physician to a state medical board?

11     A     I don't believe so.

12                   MR. ARBITBLIT:  Dave, we've been going

13   for just over an hour since the break.  Do you want

14   to take ten minutes?

15                   MR. PYSER:  Let me take another two

16   minutes or so, and then we'll be at a decent stopping

17   point, if that's all right with you.

18                   MR. ARBITBLIT:  Okay.

19                   THE DEPONENT:  I just -- I guess I

20   want to add --

21                   MR. PYSER:  We're at a good stopping

22   point.  It's fine.

23                   THE DEPONENT:  Okay.

24                   MR. PYSER:  We can cut some questions.

Page 68

1    All right.  Let's go off the record.

2                   VIDEOGRAPHER:  The time is 12:02.

3    We're now going off the record.

4                   (A recess was taken.)

5                   VIDEOGRAPHER:  The time is 12:12.  We

6    are now back on the record.

7    BY MR. PYSER:

8        Q    Dr. Lembke, in prior reports and in your

9    report here in West Virginia, you used the term

10   "pharmaceutical opioid industry."  Do you recall

11   using that word in your reports?

12       A    Yes, I do.

13       Q    Does the term pharmaceutical opioid

14   industry have the same meaning in your West Virginia

15   report as it did in your report and testimony in New

16   York and Ohio?

17       A    Yes.

18       Q    So on page 180 of your report, Exhibit 1,

19   you state that:  "Today's opioid crisis would not

20   have occurred without the paradigm shift encouraged

21   by the pharmaceutical opioid industry, whose actions

22   resulted in the overprescribing and excessive

23   distribution of prescription opioids."

24                   That's toward the bottom of page 180.  Did

Page 69

1    I read that correctly?

2        A    Yes.

3        Q    And the paradigm shift you're referring to

4    there, did it begin in the 1980s with the advent of

5    the hospice movement?

6                   MR. ARBITBLIT:   Objection.

7        A    As I've written before, the 1980s was the

8    beginning of the change in thinking and culture

9    around opioids, and then the real increase in

10   prescribing happened in the 1990s.  So, you know,

11   medicine moves slowly and changes slowly, and the

12   thinking began to change in the 1980s.

13       Q    And the thinking that began to change in

14   the 1980s, was it related to something known as the

15   hospice movement?

16       A    I believe so, yes.

17       Q    What was the hospice movement?

18       A    The hospice movement was the awareness that

19   we had an aging population, that more and more people

20   were struggling at the very end of life, and that we

21   as health care providers had a responsibility to ease

22   their passage and to make people more comfortable at

23   the very end of life, the last two weeks or so.

24       Q    And was part of the hospice movement's goal

Page 70

1    to make people more comfortable at the end of their

2    life, was part of the way that they accomplished that

3    goal the use of opioids to treat pain at the end of

4    life?

5         A    To treat pain, but also frankly to speed up

6    death, to, you know -- opioids, as you know, slow

7    down breathing, slow down the heart rates.  So it was

8    kind of an -- almost a form of sanctioned euthanasia

9    at the very end of life.

10        Q    Is it your view that the hospice movement

11   is a form of sanctioned euthanasia?

12                    MR. ARBITBLIT:  Objection.

13        A    Well, that language is perhaps too strong,

14   but I do stand by the view that the goal of hospice

15   is to make people more comfortable as they are dying,

16   which, you know, de facto can mean to help them die.

17        Q    Can we agree, Dr. Lembke, that making

18   patients comfortable at the end of their life is a

19   good thing?

20                    MR. ARBITBLIT:  Objection.

21        A    We can agree on that, yes, if the

22   intervention that's used actually accomplishes that

23   goal.

24        Q    And are there patients for whom opioids

Page 71

1    assist in relieving pain at the end of their life?

2        A    Yes.  Not just relieving pain, but also

3    helping them to die.

4        Q    All right.  I'm going to ask you, yes or

5    no -- and, you know, you said you wanted to end the

6    day early.  That's fair.  Dr. Lembke, we're moving at

7    a snail's pace because when you answer questions and

8    you go on and on, that's what happens.  And you might

9    recall Judge Gargiulo instructing you, just answer

10   the question, in a little bit of an exasperated way.

11   So, you know, I don't have the robe --

12       A    I don't recall him being exasperated with

13   me.

14            MR. ARBITBLIT:  Steve, you're the one

15   that's acting in an exasperated way.  So just answer

16   the questions and keep it moving.  Ask the question

17   and keep it moving.  We don't need a lecture.  We do

18   not need your lectures.  The witness doesn't need

19   your lectures.  Just ask your question.

20   BY MR. PYSER:

21       Q    Let's proceed.  So, Dr. Lembke, do you

22   agree that opioids can assist in relieving pain of

23   patients at the end of their lives, yes or no?

24       A    I agree with that statement only in a

Page 72

1  qualified way, which is to say that if the opioids

2  are used for no longer than two to four weeks, I

3  agree.  If the use is prolonged, I do not agree.  And

4  I'm happy to explain why that is if you would like.

5      Q    So, Dr. Lembke, do you agree that it's

6  appropriate to use opioids to relieve pain at the end

7  of life for a two- to four-week period?

8                  MR. ARBITBLIT:  Objection.

9      A    In patients for whom it appears to do just

10 that for no more than approximately two to four

11 weeks, I agree that that's appropriate, yes.  Because

12 again, it's not just relieving pain, it's actually

13 helping them to die.

14     Q    Doctor, is that a mainstream medical view

15 that doctors who are prescribing opioids in the

16 hospice care are helping patients die?

17                 MR. ARBITBLIT:  Objection.

18     A    I think that it's a mainstream view that

19 hospice is there to assist with the process of death.

20     Q    And is it your understanding that doctors

21 who specialize in hospice care are hastening their

22 patients' death by prescribing opioids?  Is that your

23 position?

24     A    I think that's perhaps stated too strongly.

Page 73

1  But I have worked in hospice settings, I have been at

2  the bedside of relatives who have died at hospice,

3  and it was clearly communicated by my attending

4  physician and my training, as well as by the hospice

5  nurse in my personal circumstance, that the opioids

6  would make the patient both more comfortable and also

7  help them die.

8       Q    And is that an appropriate or an

9  inappropriate use of opioid medication?

10                 MR. ARBITBLIT:  Objection.

11      A    I believe that opioids in the last couple

12  of weeks of life to help the passage to death is an

13  appropriate use, if done under the supervision of a

14  trained health professional.

15      Q    Doctor, I'd like to turn with you in

16  Exhibit 1 of your report to Appendix III --

17  Exhibit 1, which is your report, I should say.  And

18  this is a section of your report in which you look at

19  case specific data for Cabell County and the City of

20  Huntington, correct?

21      A    Can you tell me what page you're on?

22      Q    Sure.  It's page 237, which is Appendix III

23  of Exhibit 1 to this deposition.

24      A    Yes.  That's the cover page, right?  But is

Page 74

1    there a specific --

2        Q    Well, as you look at the next page, it says

3    "case specific data and information."  Correct?

4        A    Yes.

5        Q    And it looks at -- specifically at Cabell

6    County and the City of Huntington, correct?

7        A    Yes.

8        Q    And in that analysis you look at -- you

9    rely upon the report of Craig McCann.  He's the first

10   citation.  It's footnote 641 to your report.

11       A    Yes.

12       Q    Okay.  And Dr. McCann, are you aware that

13   he was relying on ARCOS data?

14       A    I am not specifically recalling that, but

15   I'll take your word for it.

16       Q    Okay.  Do you know what ARCOS data is?

17       A    Yes.

18       Q    So it's data submitted by distributors and

19   other entities reflecting the number of pills that

20   are supplied to a given either distributor or

21   pharmacy.  Is that a fair description of what lies

22   within ARCOS?

23       A    Yes, it is.

24       Q    On page 241, paragraph 3, you state that:

Page 75

1            "Opioid prescribing in Cabell County and

2    West Virginia significantly exceeded the rate for the

3    United States generally."  Do you see that?

4        A    Yes.

5        Q    And is it your opinion that that's a

6    reliable conclusion that you've reached?

7        A    Yes.

8        Q    And the way you reached this opinion on

9    prescribing is based on the distributions that were

10   shipped to West Virginia and to Cabell County and

11   recorded in ARCOS, correct?

12       A    Yes.

13       Q    And that's because the number of pills that

14   a distributor ships to a particular place, such as

15   West Virginia, is closely correlated with the number

16   of pills prescribed to patients in that jurisdiction,

17   true?

18       A    Yes.

19       Q    So if prescriptions increase, then

20   distributions increase, correct?

21       A    Yes.

22       Q    And by the same token, if prescriptions

23   written in a particular geographic location decrease,

24   then distributions to that geographic location will

Page 76

1   typically decrease, true?

2       A    Yes.

3       Q    Can you point me to any study, academic

4   study, in which the authors found that opioid

5   prescribing increased because of a distributor's

6   shipments of opioids to pharmacies in a region?

7                   MR. ARBITBLIT:  Objection.

8       A    I can't think of any study that answers

9   that specific question.

10      Q    Well, have you conducted any -- have you

11  personally conducted any analysis to demonstrate a

12  causal relationship where opioid supply from

13  distributors to pharmacies in a specific region

14  causes more prescribing of opioids in that region?

15                  MR. ARBITBLIT:  Objection.

16      A    Yes, I have.

17      Q    What is your analysis?  Can you point to me

18  a particular page or area of your report where you

19  conduct that analysis?

20      A    So that analysis is the qualitative

21  research that I did for my book, showing how the

22  increased supply and increased access and increased

23  exposure to prescription opioids actually sped

24  demand.

Page 77

1      Q     Have you done any quantitative research to

2   demonstrate a relationship -- a causal relationship

3   between distributors' supply to a particular

4   geographic region and the prescribing practices of

5   doctors?

6      A     I have not done my own quantitative

7   analysis.  Except for -- sorry, except for a study of

8   Medicare Part D, which is only indirectly related to

9   your question.

10     Q     And the study of Medicare Part D that you

11  refer to, is that included in your report?

12     A     Yes.

13     Q     And does it cover Cabell County and

14  Huntington, West Virginia?

15     A     Yes.

16     Q     And do you provide a confidence interval

17  that shows the relationship that you claim runs

18  between distribution of opioids and subsequent

19  prescribing?

20               MR. ARBITBLIT:  Objection.

21     A     No.

22     Q     So we're on the same page, a confidence

23  interval, can you tell me what that is in an academic

24  paper?

1      A    It's the likelihood that the finding is

2   reliable.  It's a range of confidence that the value

3   found actually falls within that range.

4      Q    And are you familiar with the term an

5   econometric analysis?  Do you know what that is?

6      A    Yes.

7      Q    And an econometric analysis is an analysis

8   that tries to limit external variables so one can

9   track the impact of one particular action on the

10   outcome of a particular other variable.  Is that a

11   fair description of econometric analysis?

12                    MR. ARBITBLIT:  Objection.

13      A    I would qualify that a little bit to say

14   that in order to do that type of econometric

15   analysis, the economist has to sort of simulate the

16   universe, in which that event is occurring by trying

17   to determine all the different variables and what

18   might predict them, and then within that closed

19   system that they've created using their equations and

20   numbers, they try to prove various things.

21           So one of the major flaws of those types of

22   analyses is that that simulated universe doesn't

23   actually represent the real world.

24      Q    Your analysis that you referred to a minute

Page 79

1   ago of Medicare Part D data, was that an econometric

2   analysis or something else?

3        A    No.  That was not an econometric analysis.

4        Q    During your testimony in the New York Frye

5   hearing about a week back, you talked about something

6   you described as a, quote, "feed forward cycle"

7   between opioid distributions and opioid prescribing.

8   Do you recall that?

9        A    Yes, I do.

10       Q    And you stated that as a result of the,

11  quote, feed forward cycle, the more opioids shipped

12  by a distributor, the more patients become dependent

13  on them, and then you said that doctors were then in

14  a position to have to continue to prescribe them.

15            Do you recall that testimony?

16       A    Yes, I do.

17       Q    Can you explain to me how it occurs that

18  doctors, quote, were in a position to have to

19  continue to prescribe opioids?

20       A    Yes.  And this is not a unique perspective.

21  This is a much discussed medical problem that we now

22  face.  Having spent the last three decades putting

23  two or three generations of patients on opioids at

24  ever higher doses, we now have more than 10 million

Page 80

1    Americans who are on opioids daily who cannot get

2    off.  And when they try to stop them, they go into

3    serious, painful and even life-threatening

4    withdrawal.

5           So it is on the medical community now to

6    have to manage this population, which means that we

7    have to keep prescribing the opioids.  We can't

8    abandon these opioid dependent patients that we have

9    created.  And it presents a very difficult medical

10   situation, requiring a lot of resources to slowly

11   taper these patients down to safer doses or get them

12   off completely.

13          Doctors can't abandon these patients.

14   Often young physicians now are inheriting these

15   patients from doctors who are retiring, and they have

16   to keep prescribing the opioids, because given the

17   circumstance of an opioid dependent patient, it's the

18   only medically humane thing to do.  But it doesn't

19   mean that they believe in the use of opioids for that

20   patient.

21      Q    So let's talk about the root of the

22   feed-forward cycle you just described.  There are

23   patients today who have been taking opioids for a

24   long period of time.  Correct?

Page 81

1      A     Yes.

2      Q     And the way those patients receive those

3  opioids is from a doctor's prescription, correct?

4                    MR. ARBITBLIT:   Objection.

5      A     That is correct.

6      Q     And it would be inhumane from a medical

7  perspective, I believe you just said, for doctors to

8  just cut those patients off and refuse to prescribe

9  them further opioids, correct?

10     A     Yes.  But doctors can subscribe to that

11  idea without believing that the opioids are helping

12  the patient.  So it's what's called a harm reduction

13  strategy.  Once they're already dependent, doctors

14  are now put in this difficult situation of having to

15  continue a treatment and then ameliorate a treatment

16  that's actually harming patients.

17     Q     All very interesting, Doctor, but my

18  question was just the simple first step, okay, which

19  is that you agree that it would be inhumane of a

20  doctor, treating a patient who has been taking

21  opioids for many years to manage pain, to just cut

22  that patient off opioids; is that correct?

23     A     Yes.  That's correct.  Although, it

24  wouldn't mean that the doctor should just continue

Page 82

1    them indefinitely.  The doctor needs to continue them

2    with a plan of getting them off.

3         Q    The second part of your answer I'll move to

4    strike.  Just answer the question that you're being

5    asked Doctor, okay?  Mr. Arbitblit will have plenty

6    of time to ask you questions if he wants to.

7              Dr. Lembke, do you believe that when a

8    doctor prescribes opioids to a patient who's been on

9    them for many years, that a distributor should make

10   those medications available at pharmacies?

11                  MR. ARBITBLIT:  Objection.

12        A    Again, so the frame of your question

13   doesn't encompass the scenario that I'm -- isn't

14   exclusive to the scenario that I'm talking about, so

15   which is why I can't answer it just yes or no.  So

16   I'm happy to answer it --

17        Q    --

18        A    -- I'm happy to answer it, but I cannot

19   answer it yes or no.

20        Q    Well, I think I can simplify it.  When a

21   doctor makes a medical judgment to continue opioid

22   treatment for a patient because it is the humane

23   treatment option, should that patient be able to fill

24   that prescription?

Page 83

1           MR. ARBITBLIT:  Objection.

2      A    Only if the doctor's decision-making was

3  informed by the evidence.

4      Q    And the evidence, as you are referring to

5  there, would include an examination of the patient?

6           MR. ARBITBLIT:  Objection.

7      A    The evidence is largely the medical

8  literature and the public health crisis that we're

9  now facing called the opioid epidemic.

10     Q    But, Doctor, in order to make a prescribing

11  decision for an individual patient, should the doctor

12  also examine the patient?

13           MR. ARBITBLIT:  Objection.

14     A    Yes.

15     Q    And should the doctor talk to the patient?

16     A    Yes.

17     Q    And should the doctor learn the patient's

18  medical history?

19     A    That should be part of the medical

20  decision-making, but again, the doctor cannot

21  exercise their clinical judgment based on that narrow

22  focus because most doctors have been duped about what

23  the appropriate action is.

24     Q    Again, Doctor, not my question.  My

Page 84

1    question was simply:  Should a doctor consider the

2    medical history of a patient in making a prescribing

3    decision?  Yes or no.

4         A    Yes, but I'm answering your question as it

5    follows from the other one, so I just want to make

6    sure I'm really answering what you're asking.

7         Q    Dr. Lembke, earlier today you testified

8    that in your prescribing practices when you're

9    working with a patient and making a prescribing

10   decision related to opioids, approximately 50 percent

11   of the time you'll speak to the pharmacist involved

12   with that patient as well.  Do you recall that

13   testimony?

14        A    Yes.

15        Q    Typically, do you speak to the pharmacist

16   before or after you've written the prescription in

17   that scenario?

18        A    All of the above.  I think the best way for

19   me to answer this question is to tell you that I have

20   frequent interactions with pharmacists about patients

21   that I have.

22        Q    And in your practice, after you've

23   interacted with the pharmacist, does the ultimate

24   prescribing decision still rest with you as the

Page 85

1   doctor?

2        A    It does.  I'm the one who signs the

3   prescription.  But again, there are many factors that

4   influence that signing.

5        Q    Tell me, Doctor, in your experience, what

6   are the types of information that you learn from

7   pharmacists when you call about a particular patient?

8                    MR. ARBITBLIT:  Objection.

9        A    I will learn things like whether or not the

10  patient has seemed impaired when they've come to get

11  their prescription.  I will learn things like whether

12  or not the patient is taking another medicine that

13  when combined with the medicine that I'm prescribing

14  could be dangerous.  I will learn things like whether

15  or not the patient has a medication allergy that I

16  wasn't previously aware of, because maybe it's new or

17  maybe the patient forgot about it and didn't tell me

18  when I asked them about medication.  I will learn

19  things like prior authorization and other third-party

20  payer issues that may come up.

21            So, you know, a lot.  A lot of things are

22  mixed in that is exchanged in order to be able to

23  steward and monitor, you know, safe prescribing.

24        Q    And you're comfortable sharing this

Page 86

1  information with a pharmacist because a pharmacist is

2  part of the care that's provided to a patient as

3  well, correct?  They're part of the chain of people

4  who help care for patients?

5       A    Yes.

6       Q    And can you share personal health

7  information with a pharmacist about a patient of

8  yours?

9       A    No.

10      Q    When you call a pharmacist, are you able to

11 give them the patient name?

12      A    Yes.

13      Q    Are you able to tell a pharmacist the

14 prescription that you have either written or are

15 considering writing for a particular patient?

16      A    Yes.

17      Q    Dr. Lembke, have you ever provided a

18 distributor, like one of the defendants here, the

19 name of one of your patients?

20      A    No, but my understanding is that the

21 distributor defendants also function in part as

22 dispensers.

23      Q    Dr. Lembke, I'm going to ask you to answer

24 my question.  Have you personally ever provided the

Page 87

1   name of one of your patients to a distributor,

2   Cardinal Health, McKesson, or AmerisourceBergen?

3       A    No.

4       Q    Have you ever provided any personal health

5   information about one of your patients to a

6   distributor?

7       A    No.

8       Q    Dr. Lembke, you just claimed that your

9   understanding is that distributors also function as

10  dispensers.  By dispenser, do you mean as a pharmacy?

11      A    Yes.

12      Q    Dr. Lembke, you're aware that some

13  distributors also function as a pharmacy, for

14  example, CVS or Rite Aid or Walmart or Walgreens; is

15  that right?

16      A    Yes.

17      Q    And those distributors were in the New York

18  case, correct?

19      A    Yes.

20      Q    But they're not here in West Virginia -- in

21  this case, correct?

22      A    No -- I mean, yes, that's correct.  No,

23  they're not.

24      Q    Dr. Lembke, are you aware of any of the

Page 88

1  three distributor defendants in this case dispensing

2  opioids direct to a patient in Cabell County or

3  Huntington, West Virginia?

4      A    I am aware of McKesson collaborating with

5  Janssen to dispense Nucynta, using coupons.  So in

6  that sense, yes, I am aware of one of the defendants

7  in this case working very closely with pharmacies to

8  provide patients with discounts on opioids.

9      Q    We'll return to McKesson in a second.  As

10  for AmerisourceBergen and Cardinal Health, are you

11  aware of either AmerisourceBergen or Cardinal Health

12  dispensing opioids in Cabell County or Huntington,

13  West Virginia?

14      A    I'm just going to look at my report so that

15  I can answer this.

16      Q    Well, sitting here today, without looking

17  at your report, can you answer my question?  Do you

18  know the answer?

19           MR. ARBITBLIT:  You're entitled to

20  look at your report.

21      A    Yeah, I think I know the answer, but I

22  would really like to make sure that I get it right.

23  So I would like to take a moment to look at my

24  report.

Page 89

1              MR. PYSER:  All right.  Let's go off

2     the record.  You can look at your report.

3              MR. ARBITBLIT:  Stay on the record.

4     She has a right of a reasonable time to look at the

5     report.  We're on the record.

6              MR. PYSER:  We'll see how long we take

7     here.

8              MR. ARBITBLIT:  It won't be long,

9     Steve.

10              THE DEPONENT:  Okay.  I'm ready.

11              MR. PYSER:  Madam Court Reporter, can

12     you read back the question?  It might not have been

13     the immediate last question.  I think it was one

14     prior.

15              (The reporter read back the following

16     as requested: "QUESTION.  We'll return to McKesson in

17     a second.  As for AmerisourceBergen and Cardinal

18     Health, are you aware of either AmerisourceBergen or

19     Cardinal Health dispensing opioids in Cabell County or

20     Huntington, West Virginia?)

21        A    So, I am aware of campaigns involving

22     Cardinal Health and AmerisourceBergen to promote

23     opioids at the pharmacy, and that is related to

24     dispensing, because it drives demand.

Page 90

1          Q     Dr. Lembke, that was not even close to my

2     question.  My question was about dispensing.  Are we

3     agreed that dispensing is what a pharmacist does when

4     a pharmacist dispenses a medication to a patient,

5     correct?

6          A     Yes.

7          Q     Are you aware of any dispensing by Cardinal

8     Health or AmerisourceBergen in Cabell County or

9     Huntington, West Virginia?

10         A     Not Cardinal Health or AmerisourceBergen,

11    no.

12         Q     Okay.  Now, as to McKesson Corporation, are

13    you aware of McKesson Corporation dispensing an

14    opioid to a patient in the role of a pharmacist in

15    Cabell County or Huntington, West Virginia?

16         A     Yes, I believe so.

17         Q     And what pharmacy do you believe McKesson

18    dispenses that in Cabell County or Huntington,

19    West Virginia?

20         A     So I'm speaking of McKesson's pharmacy

21    intervention program more broadly.

22         Q     And do you know whether that's present in

23    Cabell County?

24         A     I assume that it is, since it's a national

Page 91

1    campaign.

2         Q    Can you name a pharmacy where that program

3    occurs in Cabell County?

4         A    No.

5         Q    You mentioned earlier today in one of your

6    responses something called The Joint Commission.

7    What is The Joint Commission?

8         A    The Joint Commission is an accreditation

9    body that gives hospitals a kind of seal of approval

10   based on whether or not they're meeting certain

11   quality measures.  And it carries considerable weight

12   in the medical community.

13        Q    And are you aware of any relationship

14   between The Joint Commission and the Distributor

15   Defendants here?

16        A    No.

17        Q    Dr. Lembke, are you aware that the City of

18   Huntington sued The Joint Commission?

19        A    No.

20        Q    You've never seen a copy of that complaint

21   filed by the City of Huntington?

22        A    Not that I'm recalling.

23        Q    Okay.  Unfortunately, we didn't get that

24   one into the box.  So we're going to show you

Page 92

1    Exhibit 32.

2                    MR. PYSER:  Brad, do you have the

3    ability to put that on the screen?

4                    MR. MASTERS:  Yes, one second.

5                    MR. ARBITBLIT:  I'm just going to

6    register an objection to introducing documents that

7    weren't provided.  I don't think that's pursuant to

8    the protocol of the Court.  I object to any testimony

9    on the exhibit as well.

10                   MR. PYSER:  While we're getting that

11   up -- oh, here we go.  Brad, if you could go to

12   paragraph 32 -- excuse me, paragraph 8.

13                   MR. ARBITBLIT:  Counsel, can you just

14   acknowledge a standing objection to questions on a

15   document that wasn't produced so I don't have to

16   object to every question?

17                   MR. PYSER:  Sure.

18                   THE DEPONENT:  Can you make it a

19   little bigger, too, with that plus sign?

20                   Great, thanks.

21   BY MR. PYSER:

22      Q    Paragraph 8 of this complaint filed by the

23   City of Huntington says:  "JCAHO," which stands for

24   The Joint Commission, "enforcement of its pain

Page 93

1   management standard and JCR's widespread

2   misinformation campaign about the safety of opioids

3   has also led to an overprescribing of opioids, not

4   only in terms of doses and necessity, but also in

5   terms of quantity."

6           Do you agree with that statement?

7   A   Yes, I do.

8   Q   If you go to paragraph 52 on page 16, says:

9           "The Joint Commission's pain management

10  standards provided opioid manufacturers with a golden

11  opportunity to promote their products, seizing on

12  this opportunity with particular vigor was Purdue,

13  the manufacturer of OxyContin."

14          Do you agree with that statement?

15  A   Yes, I do.

16  Q   All right.  Let's go to paragraph 68.

17          "The Joint Commission's endorsement and

18  promotion of the free-of-pain goal contributed not

19  only to the widespread prescription of opioids, but

20  also to opioid doses strong enough to deliver freedom

21  from pain."

22          Do you agree with that statement?

23  A   Yes, I do.

24  Q   And if we go to paragraph 80.  The Joint

Page 94

1   Commission -- excuse me.  Strike that.

2         If we go to paragraph 80:  "The Joint

3   Commission's enforcement of the pain management

4   standards has also been reckless and negligent.  To

5   this day, despite the mountain of evidence

6   demonstrating the dangers of opioids, The Joint

7   Commission continues to emphasize the zealous and

8   aggressive identification and management of pain in

9   prescribing of opioids as a solution."

10        Do you agree with that statement?

11     A    Well, when was this written?  Because the

12   "to this day" --

13              MR. PYSER:  Sure.

14              Brad, if you go to the signature page,

15   it should have a date on it -- or the first page

16   actually does as well.

17     Q    This is filed on November 2nd, 2017.

18     A    Yes, I agree with that statement.

19     Q    And if we go to paragraph 89, do you agree

20   with the claim by the City of Huntington that, quote:

21        "Because of the Joint Commission's conduct,

22   the municipalities have suffered significant and

23   ongoing harm."  Do you agree with that?

24     A    Yes, I do.

Page 95

1      Q     Let's go to page 83 of Exhibit 1, your

2   report.  And if you look at the bottom of page 83,

3   there is No. 7.  That's your seventh opinion.  Do you

4   see that, in bold?

5      A     Yes.

6      Q     And you wrote that:

7            "The pharmaceutical opioid industry

8   misrepresented that the risk of addiction to

9   prescription opioids is rare or less than 1 percent,

10  when, in fact, prescription opioids are as addictive

11  as heroin and the risk of addiction is far higher

12  than that stated by the industry.  The best

13  conservative data show an opioid addiction prevalence

14  of 10 to 30 percent among chronic pain patients

15  prescribed opioids."

16            Do you see that statement?

17     A     Yes, I do.

18     Q     And there, when you're talking about the

19  pharmaceutical opioid industry misrepresenting the

20  risk of addiction, you're talking about opioid

21  manufacturers, correct?

22     A     I'm talking about primarily opioid

23  manufacturers, but distributors also played a role.

24     Q     Okay.  Can you point me to a statement by a

Page 96

1    distributor in which a distributor stated that

2    addiction to prescription opioids is rare or less

3    than 1 percent?

4         A     Well, I can point you to a statement and

5    document that distributors were involved in

6    disseminating to providers and patients that

7    communicated that, yes.

8         Q     Okay.  So just to be clear what we're

9    talking about, the statements that you're referring

10   to are statements of manufacturers that you claim

11   were communicated through distributors, correct?

12        A     That distributors either through

13   distributors or facilitated by a partnership between

14   manufacturers and distributors.

15        Q     Can you point me to a statement by someone

16   who works for a distributor that the risk of

17   addiction to prescription opioids is rare or less

18   than 1 percent?

19        A     I can point you to statements by

20   individuals who work for distributors which clearly

21   communicated that those individuals understood that

22   opioids are highly addictive and illegal.

23        Q     Is that a statement in your report?

24        A     Yes.

Page 97

1        Q     Under paragraph 7?  Can you point me to

2    that?

3        A     Under paragraph 7?

4        Q     I'm sorry.  Opinion 7 on page 83.

5        A     Well, I'll find where it is and then I'll

6    tell you where it is.  How about that?

7              Okay.  So on page 94.  On July 2nd,

8    2012 -- well, first of all, starting on page 93.

9              "On April 22, 2011, Joseph Tomkiewicz,

10   Corporate Investigator at AmerisourceBergen, sent an

11   email to colleagues under the subject, 'Saw This and

12   Had to Share It.'  It was a parody written to the

13   tune of Beverly Hillbillies.  'Come and listen to a

14   story about a man named Jed, a poor mountaineer,

15   barely kept his habit fed...Said sunny Florida is the

16   place you ought to be, so they loaded up the truck

17   and they drove speedily, South, that is, Pain

18   Clinics, cash-and-carry, a Bevy of Pillbillies, Pill

19   Mills, that is buy some, take a load home.'"

20       Q     Dr. Lembke, I see where you're reading on

21   page 93, item (g)(1).  Dr. Lembke, that email was not

22   sent outside AmerisourceBergen, was it?

23       A     Well, no, but I think in answer to your

24   question, that is -- I did have an accurate response

Page 98

1    to your specific question.  You asked me if anybody

2    who worked for the Distributor Defendants.

3         Q    Okay.

4         A    Yeah.

5         Q    Did anyone who worked for a distributor

6    defendant communicate to a doctor or pharmacist that

7    the risk of addiction to prescription opioids is rare

8    or less than 1 percent?

9         A    Yes.

10        Q    And where are you getting that answer from?

11        A    This is in the additional material that I

12   reviewed yesterday.

13        Q    Okay.  And what particular document that

14   you reviewed yesterday showed that?

15        A    It was another expert witness's report on

16   AmerisourceBergen -- I believe it was

17   AmerisourceBergen, creating an educational series to

18   combat, quote/unquote, opioid phobia, opioid phobia

19   being the idea that doctors are afraid to prescribe

20   opioids when they shouldn't be.

21        Q    And other than that expert report by

22   another expert you reviewed yesterday, are you aware

23   of any other instance in which a distributor,

24   Cardinal Health, AmerisourceBergen, or McKesson

Page 99

1   Corporation, communicated to a doctor or a pharmacist

2   that the risk of addiction to prescription opioids is

3   rare or less than 1 percent?

4        A    Yes, in the pharmacy intervention program.

5        Q    That's McKesson?

6        A    Yes.

7        Q    That's the McKesson program?

8        A    Yes.

9        Q    And do you speak of the pharmacy

10  intervention program in your report?

11       A    Yes, I do.

12       Q    Okay.  How about for Cardinal Health?  Are

13  you aware of any Cardinal Health employee informing a

14  doctor or a pharmacist that the risk of addiction to

15  prescription opioids is rare or less than 1 percent?

16       A    Yes.  So on page 57 of my report, Cardinal

17  Health partnered with Teva to promote Teva products,

18  and they distributed 105,000 email communications to

19  retail pharmacists.  And that --

20       Q    Dr. Lembke, I typically --

21                 -- hold on.  I typically don't stop

22  you, but you're actually not reading your report

23  correctly.

24       A    Okay.

Page 100

1      Q     What page 57 states is that:

2            Cardinal Health agreed to distribute at

3      Teva's request one email communication to 105,000

4      retail pharmacists.

5            Do you see that?

6      A     Yes.  I'm sorry.  You're right.  Thank you

7      for the correction.

8                  MR. ARBITBLIT:  I apologize.  My

9      mistake.

10                 THE DEPONENT:  I just wanted to say

11     that, "The content stated," quote, "may include

12     product benefits, ordering information, and website

13     links."

14                 I think that's important, because in

15     my review of these communications within the pharmacy

16     intervention program that risks including --

17     especially the risk of opioid addiction, is left out.

18     So I think those are serious errors of omission.

19     BY MR. PYSER:

20     Q     And it's your position that in the

21     materials you reviewed, there is not information

22     about the risks of opioids?

23     A     There's information about the risks, but

24     specifically the pharmacists are not coached to

Page 101

1  convey information about the risks of addiction in my

2  review of documents.  In fact, they're coached to

3  emphasize the benefits and encourage adherence to

4  take higher doses.

5      Q    You said that pharmacists are coached.  Who

6  are you alleging coached pharmacists?

7      A    McKesson's pharmacy intervention program is

8  a whole program designed to coach pharmacists on how

9  to talk to patients when they come to get their

10  medication in order to promote sales.

11      Q    Are you making any allegation of such

12  coaching of pharmacists by AmerisourceBergen?

13      A    No.

14      Q    How about Cardinal Health?

15      A    Not that I'm aware of.

16      Q    On Appendix I of your report, and let me

17  try to find that page for you, Dr. Lembke.  That's at

18  page 183 of Exhibit 1.

19      A    Yes.

20      Q    Okay.  And Appendix I, if you just look at

21  the title, is called "Misleading Promotional

22  Messages," correct?

23      A    Yes.

24      Q    Okay.  And you list five companies there?

Page 102

1        A     Yes.

2        Q     Purdue Pharma, Teva/Cephalon, Janssen, Endo

3    and Allergan?

4        A     Yes.

5        Q     To your knowledge, none of those companies

6    are defendants in this particular litigation in

7    West Virginia, correct?

8        A     That is correct.

9        Q     Can you identify any false or misleading

10   claim about the safety and efficacy of opioids by one

11   of the Distributor Defendants here to a doctor in

12   West Virginia, Cabell or Huntington County?

13       A     As in my report, I understand that there

14   were national -- are national campaigns wherein the

15   distributor defendants collaborated with the

16   manufacturers and in that process promoted and

17   disseminated those misleading messages.  So they were

18   party to that.

19       Q     Can you name for me a single doctor in

20   Cabell County or Huntington who received from a

21   distributor defendant one of these messages you claim

22   is misleading?

23       A     No.

24       Q     Dr. Lembke, do you believe that the FDA

Page 103

1    approved labels for opioids were misleading?

2                   MR. ARBITBLIT:  Objection.

3         A    Yes.

4         Q    Which ones?

5                   MR. ARBITBLIT:  Objection.

6         A    Well, I believe that the FDA label didn't

7    adequately communicate the degree of risk of

8    addiction.  And, in general, also, you know, endorsed

9    the use of opioids in the treatment of chronic pain

10   without evidence to support it.

11        Q    Are you familiar with the labeling process

12   that a manufacturer goes through before they can sell

13   a medicine, such as an opioid?

14        A    I'm broadly familiar with the process.  I

15   know it's a complex, multistage process.  I'm not

16   familiar with the specifics.

17        Q    Are you familiar with the fact that the

18   manufacturer interacts directly with the FDA to gain

19   approval of a label before a medication can be sold

20   in the United States?

21        A    Yes, I am aware of that.

22        Q    Are you aware of any role by the

23   Distributor Defendants in the FDA approval process

24   for labels of opioids in the United States?

Page 104

1          A     No.

2          Q     Dr. Lembke, you have reviewed hundreds,

3     probably thousands of pages of opioid related

4     promotional materials; is that right?

5          A     Yes.

6          Q     Fair to say that the vast, vast majority of

7     that material was written and promulgated by opioid

8     manufacturers?

9          A     Yes.

10         Q     And it's your opinion that those

11    promotional messages from opioid manufacturers

12    contained many misleading or false statements about

13    safety and efficacy of opioids; is that right?

14         A     Yes.

15         Q     And is it your opinion that opioid

16    manufacturers created those misleading marketing

17    materials to sell more of their products?

18         A     Yes.

19         Q     And is your opinion that the opioid

20    manufacturers were wildly successful in duping

21    doctors into prescribing large quantities of opioids

22    to patients?

23         A     Yes.

24         Q     And, in fact, earlier in your career, you

Page 105

1    were duped into prescribing opioids by opioid

2    manufacturers, correct?

3         A    Yes.

4         Q    Were your actions, when you prescribed

5    opioids, evil?  Did you intend to harm patients?

6         A    No.

7         Q    Do you think that the opioid manufacturers

8    intended to harm patients?

9                   MR. ARBITBLIT:  Objection.

10        A    I think -- I believe there was a willful

11   disregard of patients in their actions.

12        Q    By the opioid manufacturers?

13        A    Yes.

14                  MR. ARBITBLIT:  Objection.

15                  THE DEPONENT:  And distributors.

16        Q    What's the basis for your claim that

17   distributors acted with willful disregard of

18   patients?

19        A    They pumped billions of pills all over the

20   United States, without taking into consideration the

21   public health crisis that would ensue, even though

22   they had access to the information that everybody

23   else had access to.  I believe they were profit

24   driven with -- and disregarding patient's safety.

Page 106

1      Q    Did you have access to information when you
2    were a doctor after graduating from Stanford?
3                    MR. ARBITBLIT:  Objection.
4      A    I'm sorry, access to what information?
5      Q    Information about the safety and efficacy
6    of opioids.
7                    MR. ARBITBLIT:  Objection.
8      A    Can you rephrase the question?  I'm not
9    sure I'm understanding it.
10     Q    At the time in your career when you were
11   prescribing opioids and you stated earlier you were
12   duped, did you have access to information about the
13   safety and efficacy of opioids?
14                    MR. ARBITBLIT:  Objection.
15     A    Well, I was a medical student and I was a
16   resident, and I didn't really have access to that
17   information, no.
18     Q    Okay.  Do you believe -- Did you do your
19   residency at Stanford, Doctor?
20     A    Yes.
21     Q    So as a resident at Stanford, you had
22   already had four years of medical school, correct?
23     A    Yes.
24     Q    And you had access at the time to attending

Page 107

1    physicians?

2        A    Yes, I did.

3        Q    And you could ask questions?

4        A    Yes.

5        Q    Dr. Lembke, is there any requirement that

6    you're aware of by the DEA or state regulatory bodies

7    that distributors of medication have people on staff

8    who have gone to medical school?

9        A    I don't know about any requirements.  I

10   would hope they have some people on staff who have

11   gone to medical school, but I don't know.

12       Q    Dr. Lembke, are you aware of any

13   requirement by the DEA or state regulatory agencies

14   that distributors are required to have people on

15   staff with the same medical training that you have?

16                   MR. ARBITBLIT:  Objection.

17       A    I'm not aware of the requirements of

18   distributors' staff, no.

19       Q    Is it possible that if you, a Stanford

20   trained physician, were duped by marketing messages

21   that convinced you that opioid prescription was

22   appropriate care, that distributors also believed the

23   same message at the time, that opioids were

24   appropriate medical care?

Page 108

1                    MR. ARBITBLIT:  Objection.

2        A    I think the difference is that I, you know,

3    was trying to eke out a living, and I wasn't making

4    the massive profits of having the huge impact as an

5    individual prescriber.  I think the distributors had

6    a much bigger responsibility.

7        Q    Dr. Lembke, is it possible that the

8    distributors understood the standard of care to be

9    the same as you understood it to be at the time you

10   testified you were duped by manufacturer marketing?

11                   MR. ARBITBLIT:  Objection.

12       A    It's hard for me to imagine that

13   distributors were duped when they had access to the

14   whole picture, what was happening across the whole

15   country, in terms of shipping their pills.

16       Q    I'm not asking about shipping their pills.

17   I'm asking about the standard of care.  So is it

18   possible that distributors' understanding of the

19   standard of care was the same as yours, a Stanford

20   trained doctor?

21                   MR. ARBITBLIT:  Objection.

22       A    I do not believe the distributors were

23   duped.

24       Q    Is it possible that the distributors'

Page 109

1  understanding of the standard of care was the same as

2  yours, a Stanford trained doctor?

3      A    I do not believe the distributors'

4  understanding of the standard of care was the same as

5  mine, a Stanford doctor.

6      Q    So, Dr. Lembke, do you believe the

7  distributors knew more about the standard of care

8  than you, a Stanford trained physician?

9                MR. ARBITBLIT:  Objection.

10     A    I think the distributors had access to data

11 about the opioid epidemic that I could not have seen

12 as an individual clinician.

13     Q    Again, I'm talking strictly about the

14 standard of care, Doctor.  Do you believe the

15 distributors had access to the same information you

16 did about the standard of care, you, a Stanford

17 trained physician?

18                MR. ARBITBLIT:  Objection.  Asked and

19 answered.  Vague.

20     A    I think I answered it.  I don't really have

21 another answer.

22     Q    Please answer the question.

23                MR. ARBITBLIT:  Asked and answered.

24                MR. PYSER:  You can answer.

Page 110

1        A     I feel like I've given you my answer.

2        Q     Well, give me the answer then, Dr. Lembke.

3   What is the answer?

4                MR. ARBITBLIT:  If you have anything

5   further to add, you may.  If you don't, you don't

6   have to.

7                MR. PYSER:  Dr. Lembke --

8                Your objection is noted, Counsel --

9   Counselor, your objection is noted.  If the Court

10  agrees with your objection to form, so be it.  But

11  she still has to answer the question.

12  BY MR. PYSER:

13       Q     Dr. Lembke, please answer the question.

14       A     So the way you phrased the question makes

15  me -- makes it difficult for me to answer

16  differently.  You know, as I said before, standard of

17  care is not a term that doctors -- that's not our

18  language, that's language that lawyers use.

19                If you could carefully define standard of

20  care for me, then, you know -- or use different

21  language than that, maybe I could try to answer it

22  again.

23       Q     Dr. Lembke, do you believe the Distributor

24  Defendants in this case had access to the same

Page 111

1    information that you had about appropriate medical

2    treatment?

3        A    I believe they had access to more

4    information than I had.

5                    MR. ARBITBLIT:  Objection.

6        Q    So it's your position that Distributor

7    Defendants have more information about medical care

8    than a Stanford trained physician, correct?

9                    MR. ARBITBLIT:  Objection.

10       A    They had more information about opioid

11   prescribing than I did.

12       Q    Not asking -- Dr. Lembke, we're going

13   around in circles.  I'm not asking about prescribing.

14   I'm asking about medical practice.  Sometimes it's

15   called standard of care, sometimes best practices.

16              Dr. Lembke, I'm asking:  Did the

17   Distributor Defendants have access to the same

18   information about patient treatment that you, a

19   Stanford trained physician, had access to?

20                    MR. ARBITBLIT:  Objection.  Asked and

21   answered.  Badgering the witness.

22       A    Yeah, so I feel like you have now changed

23   the question.  You know, the original question was --

24   I mean, really --

1                    -- CROSSTALK --

2                    MR. ARBITBLIT:  Don't interrupt her.

3    Don't interrupt her.  She's answering.  You can make

4    your point when she is done, not in the middle of her

5    statement.

6                    MR. PYSER:  Doctor, if you feel that I

7    have changed the question, that's fine.  Answer the

8    question that was just asked instead of just talking

9    about things that have nothing to do with the

10   question.

11                   Madam Court Reporter, can you read

12   back the question that Dr. Lembke just acknowledged

13   is a new question.

14                   And Dr. Lembke, can you please answer

15   the question.

16                   (The reporter read back the following

17   as requested:  "Question:  Dr. Lembke, we're going

18   around in circles.  I'm not asking about prescribing.

19   I'm asking about medical practice.  Sometimes it's

20   called standard of care, sometimes best practices.

21                   Dr. Lembke, I'm asking:  Did the

22   Distributor Defendants have access to the same

23   information about patient treatment that you, a

24   Stanford trained physician, had access to?"

Page 113

1              MR. ARBITBLIT:  Objection.  Asked and

2    answered.  Object to the prelude to the question.

3    That wasn't a question.  Fifty percent of what was

4    just read is counsel's statement rather than a

5    question.

6              If you have anything to add to

7    previous answers, you may do so.

8              THE DEPONENT:  Well, I really, really

9    believe I answered that.  I really did answer that.

10   And it's in the record.

11             MR. PYSER:  Madam Court Reporter, can

12   you please read just the question.  Per counsel's

13   request, we'll strike the prelude.  Just the

14   question.

15             And Dr. Lembke, I'm going to ask you,

16   please answer the question.

17             (The reporter read back the following

18   as requested:  "Did the Distributor Defendants have

19   access to the same information about patient treatment

20   that you, a Stanford trained physician, had access

21   to?")

22             MR. ARBITBLIT:  That has been asked

23   and answered multiple times.

24             THE DEPONENT:  My answer -- again, my

Page 114

1    answer is not going to change.

2    BY MR. PYSER:

3        Q    Go ahead and answer the question that was

4    asked, please.

5        A    I believe the Distributor Defendants had

6    access to more information than I had.

7        Q    And that additional information is the

8    distributions of the distributors, correct?

9        A    That's right.  The number of pills going

10   into all different geographic regions, which

11   pharmacies, you know, alerts on possible diversion.

12   They had the 30,000-foot view that I could never

13   have.

14       Q    Dr. Lembke, are you aware that the

15   distributors report all of their distributions to the

16   DEA?

17               MR. ARBITBLIT:  Objection.

18       A    Okay.  Yes.

19       Q    Dr. Lembke, are you aware of any medical

20   literature that was hidden from you as a Stanford

21   educated physician, but was made available to

22   Distributor Defendants?

23               MR. ARBITBLIT:  Objection.

24       A    It's not a matter of it being hidden.  It's

Page 115

1   a matter of what I, as a clinician, need to spend my
2   time on and focus on and what are the greatest
3   influences on my decision-making.  And I've written
4   at length about what those influences are, and they
5   are things like pads and pens presented by sales
6   reps; CME where, you know, the benefits are
7   overstated and the risks are understated; what the
8   pharmacist tells me; the pharmacist's interaction
9   with my patients; my patient bringing in a coupon
10  card and saying will you prescribe this for me
11  because I get a rebate.
12          So there are lots of influences, as I've
13  talked about.
14      Q    Dr. Lembke, are you aware of any pads or
15  pens provided by the Distributor Defendants to
16  doctors encouraging opioid prescribing?
17      A    No.
18      Q    Dr. Lembke, are you aware of any CME
19  courses sponsored by the Distributor Defendants
20  talking about opioid prescribing?
21      A    Yes.
22      Q    What is the CME course you claim to be
23  aware of sponsored by a distributor defendant?
24      A    This is material that I reviewed recently

Page 116

1    showing that, I believe, McKesson hired Aselsa, which

2    was a separate institution or company that was --

3    retained by distributors to promote opioid sales.

4         Q     What -- I apologize, Dr. Lembke.  If that

5    was on the list of materials that was provided last

6    night, we have not had a chance to look at it.  That

7    was a -- you're claiming there's a McKesson program

8    that sponsored CMEs about opioids?

9         A     I can't remember if it was

10   AmerisourceBergen or Cardinal or McKesson, but I

11   remember reading about doing focus groups with

12   patients, doing CME for providers.

13        Q     Is that discussed in your report or that's

14   something you learned about after your report?

15        A     That's something I learned about after my

16   report.

17        Q     And you haven't supplemented your report to

18   describe that in any way, shape, or form, have you?

19        A     No.

20        Q     What is the Federation of State Medical

21   Boards?

22        A     It's an organization that oversees state

23   medical boards.  State medical boards are entrusted

24   with ensuring that doctors are practicing in a safe

1   way and sanctioning them.  If they are not practicing

2   safely, state boards can produce guidelines and

3   quality standards.

4        Q    Was the Federation of State Medical Boards,

5   the FSMB, were they duped by the manufacturers?

6        A    Yes.  I believe so.

7        Q    Are you aware of any communications between

8   Distributor Defendants and the Federation of State

9   Medical Boards?

10       A    No.

11       Q    How about Stanford Medical School?  Was

12   Stanford Medical School duped by the manufacturers?

13                    MR. ARBITBLIT:  Objection.

14       A    Yes.

15       Q    And are you aware of any communications

16   between the Distributor Defendants and Stanford

17   Medical School?

18       A    No.

19       Q    How about the FDA?  Was the FDA duped by

20   the manufacturers?

21       A    Yes, I believe so.

22       Q    And are you aware of any communications

23   about opioids between the distributors and the FDA?

24       A    No.

Page 118

1    Q    How about the DEA?  Was the DEA duped by

2  the manufacturers?

3    A    Yes.

4    Q    And are you aware of any communications

5  between the distributors and the DEA about

6  appropriate prescribing of opioids?

7    A    No.

8    Q    How about the World Health Organization?

9  Was the World Health Organization duped by

10  manufacturers?

11    A    Yes.

12    Q    And are you aware of any communications

13  between distributors and the World Health

14  Organization about appropriate prescribing of

15  opioids?

16    A    No.

17    Q    You're aware that many states across the

18  country issued reports in the 1990s and into the

19  2000s recommending what was described as removal of

20  barriers to the treatment of pain?

21    A    Yes.

22    Q    And by removal of barriers to the treatment

23  of pain, that means, in part, making opioids more

24  available to patients, correct?

Page 119

1          A     Yes.

2          Q     And among the states where barriers to

3     treatment of pain were removed, included New York?

4     Correct?

5          A     Yes.

6          Q     West Virginia?

7          A     Yes.

8          Q     And were those states that acted to remove

9     barriers to using controlled substances for the

10    treatment of pain, were they duped by the

11    manufacturers?

12         A     Yes.

13         Q     Are you aware of any communications between

14    distributors and the State of West Virginia about

15    removing barriers to using controlled substances for

16    the treatment of pain?

17         A     Can I check my report?  There is one thing

18    I want to look at to answer that.

19         Q     Sure.  Go ahead.

20         A     Won't take me very long.

21                    MR. ARBITBLIT:  While she's doing

22    that, Steve, can you say when you might want to take

23    that 15, 20-minute, half an hour, whatever you need

24    for lunch break?

Page 120

1             MR. PYSER:  Yeah, we can do it soon.

2    I don't know, Don, if you're on the West Coast or

3    East Coast, but I'm guessing my East Coast friends

4    would appreciate --

5             MR. ARBITBLIT:  -- I don't need much

6    of a break.  I'm on the witness's schedule, as far as

7    getting her done in the time frame she would like.

8    So if your team is willing to have a short lunch,

9    we'd be fine with that.

10       A    My answer is no.

11            MR. PYSER:  Madam Court Reporter,

12   there was a lot of lunch talk in between that.  Can

13   you just read back the question so we make sure we

14   have --

15            (The reporter read back the following

16   as requested:  "Are you aware of any communications

17   between distributors and the State of West Virginia

18   about removing barriers to using controlled substances

19   for the treatment of pain?")

20   BY MR. PYSER:

21       Q    And your answer, Dr. Lembke?

22       A    It was:  No.

23       Q    How about the American Medical Association,

24   was the American Medical Association duped by the

Page 121

1    manufacturers?

2         A    I'm not aware of any communications between

3    the American Medical Association and -- oh, sorry,

4    yes.

5         Q    Okay.  Let's --

6         A    I was jumping ahead to your next question.

7         Q    So let's strike that last one, because I

8    think it was pretty confusing, and I'll ask it again.

9    Was the American Medical Association duped by the

10   manufacturers about the treatment of pain through

11   opioids?

12        A    Yes.

13        Q    And are you aware of any communications

14   between distributors and the American Medical

15   Association about the treatment of pain and use of

16   opioids?

17        A    No.

18                  MR. PYSER:  Okay.  Why don't we take

19   that lunch break now.  We can go off the record.

20                  VIDEOGRAPHER:  The time is 1:26.

21   We're now going off the record.

22                  (A recess was taken.)

23                  VIDEOGRAPHER:  The time is 2:05.

24   We're now back on the record.

Page 122

1    BY MR. PYSER:

2        Q    Welcome back, Dr. Lembke.  You understand

3    you're still under oath, correct?

4        A    Yes.

5        Q    All right.  Dr. Lembke, I want to return

6    briefly to your experience and a particular category

7    that I want to ask you about.  Do you have a degree

8    in marketing?

9        A    No.

10       Q    Have you published any studies on the

11   impact of marketing?

12       A    Yes.

13       Q    What are the studies you've published that

14   concern the impact of marketing?

15       A    That would be my book, Drug Dealer, M.D.

16       Q    Is your book peer reviewed?

17       A    Yes.

18       Q    Okay.  And it was peer reviewed in the same

19   way an article would have been published if, let's

20   say, you published in the New England Journal of

21   Medicine?

22       A    Similar.

23       Q    Okay.  But your book wasn't published in a

24   journal, it was published by a publishing company,

Page 123

1    correct?

2         A     By an academic publishing house.   Johns

3    Hopkins University Press.

4         Q     In addition to your book, have you

5    published any other materials on marketing and the

6    impact of marketing on doctor prescribing?

7         A     No.

8         Q     Do you teach any classes at Stanford on

9    marketing?

10        A     As pertains to the opioid epidemic, yes.

11        Q     Anything beyond the opioid epidemic?

12        A     No.

13        Q     And when you say you teach a class on

14   marketing as it pertains to the opioid epidemic, is

15   that a stand-alone class or is it one day of class

16   within a larger curriculum?

17        A     It's within a larger curriculum.

18        Q     And do you hold yourself out in the medical

19   community as an expert on marketing?

20        A     To some extent, yes.

21        Q     And is that limited to the impact of

22   marketing on the opioid epidemic?

23        A     Yes.

24        Q     And are you aware if your book has been

Page 124

1  cited by any experts in marketing as an authoritative

2  document about marketing and the impact of marketing

3  on opioid medications?

4       A    It has been cited, but I can't remember --

5  I can't name the specific article.

6       Q    Do you know how many times it's been cited?

7       A    No.

8       Q    Prior to looking at marketing in your book,

9  did you take any marketing classes?

10      A    No.

11      Q    So I want to look at an opinion you have in

12  your report, Exhibit 1 at page 8.  It's Opinion

13  No. 5.

14           Are you with me, Doctor?

15      A    Yes.

16      Q    And this opinion claims that:  "Opioid

17  distributors collaborated with opioid manufacturers

18  and pharmacies to promote sales of opioid pain

19  pills," correct?

20      A    Yes.

21      Q    This opinion, Opinion No. 5, did not appear

22  in your two previous reports, the Ohio Federal Report

23  or the New York Litigation Report, did it?

24      A    No, it did not.

Page 125

1      Q    Did you form this opinion sometime after

2   you submitted your New York report?

3      A    No, but I was able to provide more detail

4   about this opinion than I already had.

5      Q    In the prior reports, you had talked about

6   promotion of opioid pain pills by manufacturers,

7   correct?

8      A    Yes.

9      Q    And in your report now, where you've added

10   this opinion, did you include in your report the

11   materials and references you relied on to form your

12   opinion, Opinion No. 5?

13      A    Yes.

14      Q    I'd like to ask you some questions in

15   particular about how this opinion relates to my

16   client, Cardinal Health.  And the other distributors

17   might ask some specific questions later on today

18   about their clients.

19           So I'm going to take you first in Exhibit 1

20   to page 57, and at Item (c)(3) -- excuse me, yeah,

21   (c)(3), you state that:  "Cardinal Health partnered

22   with Teva to promote Teva products."

23           Do you see that?

24      A    Yes.

Page 126

1       Q     Now, I want to go beyond your citations to

2    the actual documents that you're purporting to

3    examine here, okay?

4       A     Okay.

5       Q     So let's take a look, if you could -- this

6    is going to be Exhibit 7.  It's going to be in the

7    box.

8             Do you have Exhibit 7 now?

9       A     Yes, I do.

10      Q     It's a two-page document, correct?  And

11   it's got the same Bates number as that cited in

12   footnote 173, 174, and 175 of your report, correct?

13      A     Yes.

14      Q     Okay.  And this is the only document you

15   cite to support what you say in roman numerette iii

16   on page 57, correct?

17      A     That's right.

18      Q     Okay.  So as to this supposed partnership,

19   this document, Exhibit 7, is a Marketing Contract

20   Review/Signoff, correct?

21             MR. ARBITBLIT:  Object to form.

22   Argumentative.

23      A     Yes, that's what it says at the top,

24   uh-huh.

1      Q    Okay.  And it describes the scope of the

2  project as being, quote, "E-Blast to reach 105,000

3  pharmacists with key info at launch, stocking NDC

4  numbers," et cetera.  Do you see that?

5      A    Yes.

6      Q    Okay.  And the total dollar amount spent

7  here is $18,000.  That's in the third line, right?

8      A    Yes.

9      Q    Okay.  Have you ever seen the invoice for

10  $18,000, to show that this was actually consummated

11  and done?

12      A    No.

13      Q    And, in fact, if you turn to the next page,

14  in the third paragraph it reads, quote:

15  "Notwithstanding the foregoing, Teva is under no

16  obligation to request that any communication be

17  distributed, and Cardinal Health will only invoice

18  Teva once a requested communication is actually

19  distributed by Cardinal Health."

20          Did I read that correctly?

21      A    Yes.

22      Q    Okay.  And you don't cite in your report

23  any actual document promoting a Teva product

24  distributed by Cardinal Health pursuant to this

Page 128

1    agreement, do you?

2         A    No.

3         Q    And you're not aware of any pharmacist in

4    Cabell County or the City of Huntington who received

5    marketing material from Cardinal Health or Teva

6    pursuant to this agreement, are you?

7         A    No.

8         Q    Let's look at the next claimed marketing

9    document related to Cardinal Health.  On page 57, the

10   next item you say is:  "Cardinal Health partnered

11   with Actavis to promote Kadian."

12             Do you see that?

13        A    Yes.

14        Q    And there's a footnote to that single note.

15   It's at footnote 176.  Do you see that?

16        A    Yes, I do.

17        Q    Are you aware of any documents other than

18   that footnote to support your opinion on page 57 in

19   roman numerette No. 4?

20        A    No, except that I will just add that I'm

21   looking at all of these documents in aggregate to

22   support my conclusions that the distributors were

23   more than, quote/unquote, just the trucks.

24        Q    We're going to go through each of the

Page 129

1    Cardinal Health documents that you cite.  I'm going

2    to ask you to open up, if you could, Exhibit 9.

3                 And this is an email communication between

4    Cardinal Health and employees of Actavis about a

5    medication called Kadian, correct?

6        A     Uh-huh.  Yes.

7        Q     And are you aware of any false statements

8    in the Kadian campaign that was part of the

9    E-connection material distributed by Cardinal Health?

10       A     I'm not aware of specific false statements,

11   but I am aware broadly that Cardinal Health

12   collaborated to promote Kadian products.

13       Q     You have one document cited in support of

14   that, correct?

15       A     Well, no, I have more than one document.

16   There is the document we just reviewed, and then

17   there's this document, and --

18       Q     Dr. Lembke, I hate to correct you about

19   your own report, but the first document we reviewed

20   in roman numerette No. 3 concerned Teva.  The one --

21   the next one concerns Actavis; is that right?

22       A     Yes, that's true, but it was both --

23   they're Cardinal Health, is my point.

24       Q     Okay.  So we've got the one we looked at

Page 130

1    before, and now we've got this one we're looking at

2    in Exhibit 9.  I'll represent to you that the Actavis

3    Bates number 0220239 is the same as the Bates number

4    that's given here, Allergan MDL 00016836, and if

5    that --

6        A    Yes.  Thank you for that.

7        Q    If that's incorrect, I'll rely on one of my

8    colleagues to correct me, but I believe that's true.

9             So, again here we have an email between

10   Cardinal Health and a manufacturer, and you describe

11   that as having partnered, correct?

12       A    Well, it's not just the email that's an

13   example of the partnering, it's the fact that they

14   were working together to think about ways --

15       Q    Dr. Lembke, in your report the only thing

16   you cite in support of this partnership is this

17   email, correct?

18       A    Yes.

19       Q    Okay.  And what we have here is an email,

20   but we don't actually have an e-connection

21   distribution showing Kadian being marketed in any

22   way, do we?

23       A    No, but what we have, which I think is also

24   important, is a conversation between opioid

Page 131

1    manufacturers and distributors about promoting the

2    product.

3         Q    Dr. Lembke, you don't point in your report

4    to any actual promotion that resulted from this

5    communication here in Exhibit 9, do you?

6         A    No, I didn't pursue it to see the outcome

7    of this conversation.

8         Q    So you don't know whether any such

9    promotional email was ever actually sent?

10        A    No.  I assume that it was, but even

11   separate from that, even if it wasn't sent, this

12   represents to me evidence of an active dialogue

13   around promoting.

14        Q    Dr. Lembke, do you know whether as a result

15   of this conversation or this dialogue there was ever

16   any marketing material sent by Actavis through the

17   Cardinal Health e-connection program?

18        A    No.

19        Q    And you don't know whether anyone, any

20   pharmacist or doctor in Cabell or Huntington, ever

21   received any materials about Kadian from Cardinal

22   Health, do you?

23        A    No, but these were national campaigns, and

24   I assume that West Virginia was not an exception.

Page 132

1      Q    But, Doctor, we just established you don't

2    know whether this national campaign ever resulted in

3    anything being sent, do you?

4      A    I don't, no.

5      Q    You don't know?

6      A    (Deponent shakes head.)  No.

7      Q    Just to be clear, when you say "no," what

8    you mean is "correct," you don't know whether

9    anything was actually sent; is that correct?

10     A    That is correct.

11     Q    There's a third instance that you cite in

12   your report, and again, you claim it's a partnership

13   on page 61.  Do you see that on page 61, romanette

14   vii?

15     A    Yes.  Yes, I do.  I see that.

16     Q    Okay.  And here, again, you have a citation

17   to a document, and I'm going to ask you to turn to

18   Exhibit 10.

19     A    Okay.

20     Q    So again, Exhibit 10, which is the only

21   document that supports your description of an

22   exchange between Cardinal and Covidien, is another

23   email exchange between Cardinal employees and

24   manufacturer employees, correct?

Page 133

1      A    Yes.

2      Q    Okay.  And in this email exchange, Cardinal

3   Health actually informs Covidien that it could not

4   display a banner ad on Cardinal's ordering platform

5   for pharmacists except in the case where pharmacists

6   had already searched for the product name, in this

7   case Exalgo.  Do you see that?

8      A    Yes.

9      Q    So.  Pursuant to this email, the only time

10  a pharmacist would see anything that could be

11  construed as marketing for Covidien's medication

12  Exalgo is that the pharmacist had already taken a

13  step to type into Cardinal Health's search bar

14  "Exalgo."  Is that right?

15     A    Well, yes, but I would draw attention to

16  the statement in this document that says, quote:

17  "While we can feature Exalgo on the ordering

18  platform."

19          So there was manipulation in the sense that

20  Exalgo was featured on an ordering platform.

21     Q    Dr. Lembke, that is a striking statement

22  you just made, since you dropped the second half of

23  the sentence.  Isn't it true that the sentence that

24  you just read is:  "While we can feature Exalgo on

Page 134

1    the ordering platform, it was deemed that it could

2    only be prompted by a search key word of 'Exalgo.'"

3                      MR. ARBITBLIT:  Objection.

4    Argumentative.

5         A    I don't think that was a striking

6    statement.  You had already said the second half

7    without saying the first half, so I am completing

8    your incomplete statement of that.

9         Q    So let's see if we can reach agreement.

10   Dr. Lembke, is it true that under this email,

11   Cardinal Health's position was that the only way a

12   pharmacist placing an order could see the banner ad

13   from Covidien was if that pharmacist had already done

14   a key word search for the medication, quote,

15   "Exalgo," end quote?

16        A    Yes.  That is true, but even without the

17   pharmacist putting in Exalgo as a key word, Exalgo

18   was featured on the ordering platform.  Also, I think

19   this email is striking for its tacit agreement that

20   this kind of collaboration between manufacturers and

21   defendants is, in fact, evidence of pushing a

22   controlled substance, which is why the (audio

23   indiscernible) removed it.

24        Q    Move to strike everything the witness has

Page 135

1  answered after the agreement.

2          Dr. Lembke, is it improper to provide

3  information to pharmacists about a new product?

4                  MR. ARBITBLIT:  Objection.

5      A    If the information is accurate, it's not

6  improper.

7      Q    Okay.  And is there anything in your report

8  which indicates that information provided about

9  Exalgo by Cardinal Health was inaccurate?

10     A    No.

11     Q    Are you aware of any evidence that the

12  banner ad being discussed in Exhibit 10 ever actually

13  ran on Cardinal Health's ordering platform?

14     A    I'm sorry.  Is Exhibit 10 this last one,

15  "Good evening, Connie"?

16     Q    Yes.

17     A    Okay.  No, I'm not aware of whether it ever

18  ran.

19     Q    So it's true that in each of the three

20  instances we just looked at in your report where

21  you've claimed Cardinal Health worked with a

22  manufacturer, you don't have any proof in your report

23  that those marketing or advertisements ever were

24  actually enacted or that any pharmacist in

Page 136

1   West Virginia ever saw them, do you?

2       A    Again, I will say that the statement "We

3   can feature Exalgo on the ordering platform," to me

4   the word "feature" means they're going to make Exalgo

5   pop out on the ordering platform, where other opioid

6   products may not pop out, or where non-opioid

7   products may not pop out.

8       Q    Dr. Lembke, do you know if that ever

9   actually happened?

10      A    I have no reason to believe that it didn't

11  happen.

12      Q    Not my question.  Dr. Lembke, do you have

13  any proof that this banner ad ever actually happened

14  on Cardinal Health's platform?

15              MR. ARBITBLIT:  Objection.

16      A    Yes.

17      Q    And Dr. Lembke, you're using the term

18  "popped out."  Do you know what a banner ad is?

19      A    I think so.

20      Q    What do you believe a banner ad is?

21      A    I believe it shows up in whatever is

22  featured on the screen.

23      Q    So, Dr. Lembke, if a person searches for

24  something, let's say, in Google, they might get an

Page 137

1    advertisement for something else based on a key word

2    that they've run; is that right?

3         A    Yes.

4         Q    And if the information that they receive is

5    truthful, is there any violation of FDA regulations,

6    to your knowledge?

7                   MR. ARBITBLIT:   Objection.

8         A    Even if the information is truthful, it's

9    still directing the consumer's attention to that

10   product and influencing their behavior.  I don't know

11   what the FDA's regulations on that are, but I do have

12   an opinion about whether or not that matters or that

13   has an impact.

14        Q    Well, let's talk about who -- You're using

15   the term "consumer."  Cardinal Health's ordering

16   platform, which is being discussed in these emails,

17   are you aware, Dr. Lembke, that that is used by

18   pharmacists placing orders for their pharmacies?

19        A    I am very aware, and in using the word

20   "consumer," I was speaking of the pharmacist.

21        Q    Okay.  And pharmacists can't prescribe

22   medications, can they?

23        A    They have an impact on what is prescribed.

24        Q    Dr. Lembke, can pharmacists prescribe

Page 138

1    medications?

2         A    No.

3         Q    And Dr. Lembke, to your knowledge, are

4    patients in the general public able to access

5    Cardinal Health's ordering platform?

6         A    No.

7         Q    In any of the three instances that we just

8    reviewed that are cited in your report, can you

9    identify any false or misleading statement?

10        A    No.

11        Q    Okay.  I want to move on, Doctor, to your

12   Materials Considered.  And in your Materials

13   Considered, you cited three Cardinal Health documents

14   that I would like to discuss with you.  One we

15   already discussed, that's Exhibit 7.  I'd like to

16   also ask you to look at Exhibit 6.

17             So this was cited in your Materials

18   Considered and it's dated July 18th, 2016.  Do you

19   see it?

20        A    Yes.

21        Q    Okay.  And at the top it's described as a

22   Service Flash.  Do you see that?

23        A    Yes.

24        Q    Okay.  And it's:  "A weekly product and

Page 139

1    service update to assist in your distribution needs."

2             Do you see that statement?

3        A    Yes.

4        Q    And do you understand that this was sent

5    exclusively to pharmacy customers of Cardinal Health?

6        A    Yes.

7        Q    And the first thing it says is it

8    highlights existing products with NDC changes,

9    manufacturer mergers, et cetera.  Do you see that?

10       A    Yes.

11       Q    Is there anything wrong with informing

12   customers of changes to NDC numbers?

13       A    Not that I know of.

14       Q    Anything wrong with informing customers

15   about manufacturer mergers?

16       A    No.

17       Q    Okay.  And the first item in this Service

18   Flash is something called Theophylline ER 300 mg and

19   450 mg.  Do you see that?

20       A    Yes.

21       Q    Is this an opioid?

22       A    No.

23       Q    So --

24       A    The opioid is on the next page.

Page 140

1     Q     Let's concentrate on the first page first.

2  Do you have any criticism of Cardinal Health for

3  distributing this information from a manufacturer

4  about a launch of a new medication to treat chronic

5  obstructive pulmonary disease?

6     A     I would say it was -- I was surprised when

7  I reviewed these materials, the extent to which

8  Cardinal is communicating with pharmacists about

9  their products and putting that communication in

10  front of pharmacists.

11     Q     Okay.  Do you see that in this announcement

12  there are quotation marks on the first page

13  discussing the announcement by Alembic

14  Pharmaceuticals?

15     A     I only -- oh, yes.  I see that.  Yes.

16     Q     So Cardinal Health is providing a statement

17  from a manufacturer about a new product to

18  pharmacists, correct?

19     A     Yes.

20     Q     And manufacturers make statements about

21  their products on all sorts of forums, correct?

22     A     Yes.  Correct.

23     Q     Some do so on TV and direct consumer

24  advertising, correct?

Page 141

1      A    Yes.

2      Q    Some run ads in medical journals; is that

3  right?

4      A    Yes.

5      Q    And, in fact, some manufacturers have run

6  ads in prestigious medical journals, like JAMA,

7  correct?

8      A    Yes.

9      Q    What does JAMA stand for?

10     A    The Journal of the American Medical

11  Association.

12     Q    Is the Journal of the Medical Association

13  responsible for the content of each ad that runs in

14  it, in your view as a doctor?

15               MR. ARBITBLIT:  Objection.

16     A    I think they're responsible to some degree

17  about the fact that they're running ads in the first

18  place.  I don't think that they have the bandwidth to

19  vet every single ad, but I think the fact that

20  they're even running ads means that they're somewhat

21  involved in promoting the product.

22     Q    So if JAMA ran an advertisement about an

23  opioid, are they also responsible for any harm that

24  might have come from that opioid if a doctor then

Page 142

1   subsequently prescribed in reliance on that

2   advertisement?

3        A    To a very, very small degree, yes.

4        Q    And same thing for, let's say, NBC.  If NBC

5   runs an advertisement for a medical product, is NBC

6   responsible for people who may buy that medical

7   product in reliance on that advertisement?

8                    MR. ARBITBLIT:  Objection.

9        A    I think it's important to make a

10  distinction between medical products broadly and

11  opioids, which are highly addictive and highly

12  lethal.

13       Q    So as to my question, if we're talking

14  about opioids, if NBC ran an ad for opioids, would it

15  be responsible for any sales that resulted from those

16  advertisements?

17                   MR. ARBITBLIT:  Objection.

18       A    I do think that the regulations around

19  opioid advertisements and promotions should be

20  scrutinized and considered as part of, you know, the

21  abatement process for this opioid epidemic.

22       Q    Not an answer to my question.  In your

23  view, is NBC responsible for any sales that occur as

24  a result of it having run an ad for an opioid

Page 143

1    product?

2                    MR. ARBITBLIT:  Objection.

3        A    Well, what I can tell you is my opinion is

4    that advertising opioid products in any venue has

5    contributed to the problem.  That's my opinion --

6        Q    Sorry.  I didn't mean to cut you off.  And

7    you believe then a prestigious medical journal like

8    JAMA is also responsible for any sales that result

9    from its running of advertisements for opioids,

10   correct?

11                   MR. ARBITBLIT:  Objection.

12       A    Yes, I already answered that.  I think they

13   bear some small part of the broader responsibility.

14       Q    Okay.  Well, let's look -- turn the page of

15   Exhibit 6 to the next page.  So the second

16   announcement in this Service Flash sent to

17   pharmacists states:  "Now available from Depomed."

18            Correct?  Do you see in bold at the top, it

19   says, "Now available from Depomed"?

20       A    Yes.  Thank you.  I do see that.

21       Q    And then it says, "Dear Pharmacy Buyer,"

22   correct?

23       A    Yes.

24       Q    So this is directed to pharmacists, not

Page 144

1    doctors, correct?

2         A    That's correct.

3         Q    And the full text reads:

4         A    "Depomed announces the availability of

5    Lazanda 300 mcg fentanyl nasal spray, CII, in

6    addition to Lazanda 100 mcg fentanyl nasal spray,

7    CII, and Lazanda 400 mcg fentanyl nasal spray CII,

8    which are currently available."

9              Did I read that correctly?

10        A    Yes.

11        Q    And then it lists the three products,

12   correct?

13        A    Yes.

14        Q    Okay.  To your knowledge, is anything in

15   this Service Flash that incorporates information from

16   Depomed untrue?

17        A    No.  But did you say milligrams or

18   micrograms?  Sorry.

19        Q    I said "MCG," because I wasn't sure what

20   MCG stands for.  So MCG stands for micrograms; is

21   that right?

22        A    Yes.

23        Q    Is anything in this Service Flash sent by

24   Cardinal Health misleading?

Page 145

1        A     Not as far as I know.

2        Q     Okay.  Let's take a look at Exhibit 8 in

3    your box.  And Exhibit 8 is the last of the five

4    Cardinal Health related documents you rely on for

5    your marketing opinion, correct, Doctor?

6        A     Yes.

7        Q     Okay.  Let's look at Exhibit 8.  And it

8    starts with an email, correct?

9        A     Yes, it does.

10       Q     Okay.  And the second page is another

11   Service Flash, correct?

12       A     Yes.

13       Q     And this service flash is dated

14   November 22nd, 2013?

15       A     Yes.

16       Q     And, again, to your understanding, it's

17   sent to pharmacists; is that right?

18       A     Yes.

19       Q     And it states:  "Introducing Abstral from

20   Galena Biopharma."  Correct?

21       A     Yes.

22       Q     And it announces that:

23             "Galena Biopharma, Inc., is pleased to

24   announce the availability of Abstral fentanyl

Page 146

1    sublingual tablets.  Abstral is an opioid agonist

2    indicated for the management of breakthrough pain in

3    cancer patients 18 years of age or older who are

4    already receiving and who are tolerant to opioid

5    therapy for their underlying persistent cancer pain."

6            Did I read that correctly?

7        A    Yes.

8        Q    To your knowledge, is there anything untrue

9    about that statement?

10       A    The use of the language "breakthrough pain"

11   perpetuates a false concept.

12       Q    Does the FDA allow use of the term

13   "breakthrough pain"?

14       A    I believe the FDA has used that term as

15   well.

16       Q    Other than your disagreement with the use

17   of the term breakthrough pain, is there anything in

18   that paragraph that is false?

19       A    Not false per se, but I think the statement

20   proceeds this that "Galena Biopharma is pleased to

21   announce the availability of Abstral fentanyl

22   sublingual tablets," exclamation point, is a subtle

23   form of promotion.

24       Q    Are you aware of any doctor in Cabell

Page 147

1    County or the City of Huntington who received this

2    document?

3        A    No.  But these are national campaigns

4    typically.

5        Q    Well, in fact, it only went to pharmacists,

6    not any doctors, correct?  Is that your

7    understanding?

8        A    That's my understanding.

9        Q    Okay.  And this Service Flash doesn't

10   just -- well, let's go back to the top.  Other than

11   your disagreement with the use of the term

12   breakthrough pain that the FDA also uses, and your

13   disagreement with the use of an exclamation point, is

14   there anything in that paragraph that you believe is

15   untrue?

16       A    No.

17       Q    Okay.  And it's true that not only do we

18   have that introductory paragraph in Exhibit 8, but we

19   then have some ordering information that provides NDC

20   numbers for pharmacists; is that right?

21       A    Yes.

22       Q    And then there's also a statement below

23   that states, and I quote:  "Abstral carries a Black

24   Box warning with important information regarding the

Page 148

1    adverse effects of this Class II, CII, opioid agonist

2    and can cause serious breathing problems which can

3    lead to death, namely in patients not experienced

4    with opioid therapy.  For complete prescribing

5    information and details on the Patient Assistance

6    Program, please visit www.abstral.com."

7            Do you see that statement?

8        A    Yes, I do.  And right below it are the

9    words paid advertisement.

10       Q    Yes, they are.  That's correct.  Is there

11   anything untrue about the statement made about

12   Abstral and its Black Box warning?

13       A    I don't see anything untrue in the

14   statement that you just read about the Black Box

15   warning.

16       Q    And there is no further information

17   provided by Cardinal Health about Abstral to its

18   pharmacist customers that you're aware of, is there?

19       A    No, but there is a website here.  "Please

20   visit www.abstral.com.

21       Q    True.  Did Cardinal Health send the

22   contents of that website to its pharmacy customers?

23       A    No, but they did highlight the link in

24   bold.

Page 149

1      Q     Well, actually it says paid advertisement.

2   So anyone reading this understands that it's not

3   actually Cardinal Health speaking, it's Galena

4   Biopharma; is that right?

5      A     I don't think people reading -- first of

6   all, paid advertising is like in a two-point font, so

7   it's really hard to see on this piece of paper, which

8   is relevant.  And I actually don't think that most

9   people know who pays for these things.  It's quite a

10  mystery.  It's all behind the scenes.

11     Q     You don't think that when people see an

12  advertisement, they understand that the manufacturer

13  of that product is the one advertising it?"

14               MR. ARBITBLIT:  Objection.

15     A     I think if you ask the average person who

16  was advertising, they wouldn't necessarily be able to

17  tell you, nor would it be obvious looking at this

18  that it is a paid advertisement.

19     Q     Even though it says on it "paid

20  advertisement"?

21     A     Yeah, but the font is like five times

22  smaller.

23     Q     So your objection is to the font size here?

24               MR. ARBITBLIT:  Objection.

Page 150

1      A    Yes, and that's a legitimate objection.

2   Because what -- everybody knows, especially in this

3   distracted age, that images matter, font size

4   matters, flashing lights matter.

5      Q    Who is responsible for the content on the

6   Abstral.com website, in your view?

7              MR. ARBITBLIT:  Objection.

8      A    Well, Galena Biopharma, Inc.  But, again

9   there's such a shell game with the various opioid

10   companies that it's hard to know who's -- who really

11   owns what.  I found it difficult to track that.

12      Q    Do any of the Distributor Defendants to

13   your knowledge have any financial interests or

14   ownership interests of Galena Biopharma?

15      A    I don't know.

16      Q    Dr. Lembke, you talk a little bit about

17   font size and the way people perceive things.  Do you

18   have any qualifications, any degrees that give you an

19   expertise in marketing and the impact of imagery on

20   pharmacists?

21              MR. ARBITBLIT:  Objection.

22      A    Well, I am a psychiatrist.  So, I guess, I

23   qualify in the sense that I studied the brain.

24      Q    And Dr. Lembke, beyond your psychiatry

Page 151

1    degree, do you have any advance degrees or

2    certifications in marketing?

3         A    No, but some of this really is common sense

4    too.

5         Q    Dr. Lembke, other than the five documents

6    we just discussed, you didn't cite to any other

7    documents distributed by Cardinal Health in support

8    of your marketing opinion, did you?

9         A    I don't believe so.

10        Q    And you in your report don't point to any

11   evidence that Cardinal Health participated in any

12   programs related to free samples or coupons?

13        A    That is correct.

14        Q    And we talked earlier about advertisements

15   in JAMA.  Do you recall that?

16        A    Yes.

17        Q    Well, are you aware that Purdue Pharma

18   advertised in the journal of -- the Journal of the

19   American Medical Association, JAMA?

20        A    Yes.

21        Q    And are you aware that the FDA sent a

22   warning letter to Purdue about its promotional

23   materials that appeared in JAMA?

24        A    I'm not recalling a specific document to

Page 152

1    that effect, but it could be that I reviewed that.  I

2    reviewed many documents along those lines.

3                    MR. PYSER:  Brad, can you show

4    Exhibit 35, please.

5                    That one is not in the box.  My

6    apologies, Don.

7                    MR. ARBITBLIT:  That's okay.

8                    MR. PYSER:  You can register your

9    objection as a standing objection if you'd like.

10                    MR. ARBITBLIT:  Yeah, same standing

11   objection to the documents that weren't provided and

12   testimony based on it.

13                    MR. FARRELL:  Steve, can I have a

14   standing objection too?

15                    MR. PYSER:  They're being given away

16   cheap here, Paul.

17   BY MR. PYSER:

18        Q    All right.  Dr. Lembke, I'm showing what's

19   been marked as Exhibit 35.  This is a warning letter

20   from the Department of Health and Human Services to

21   the executive vice president and chief operating

22   officer of Purdue Pharma.  Do you see Exhibit 35?

23        A    Yes, I do see it.

24        Q    Okay.  And if we go down to the first

Page 153

1    paragraph, the warning letter concerns dissemination

2    of promotional materials for the marketing of

3    OxyContin tablets by Purdue, and then it says:

4           "Specifically, we refer to two Journal

5    advertisements for OxyContin that recently appeared

6    in the Journal of American Medical Association JAMA.

7    One October 2nd, 2002, and one November 13th,

8    2002."  Do you see that?

9       A    Yes.

10      Q    Okay.  And the FDA found, and I'm quoting

11   now from the second paragraph, that these, quote:

12   "Journal advertisements omit and minimize the serious

13   safety risks associated with OxyContin."

14           Do you see that?

15      A    I do.  Yep.

16      Q    Okay.  And do you regularly read JAMA, the

17   Journal of the American Medical Association?

18      A    Yes.

19      Q    Okay.  Do you recall seeing a Purdue

20   OxyContin ad in JAMA?

21              MR. ARBITBLIT:  Objection.

22      A    No, I don't specifically recall, but I

23   probably was a recipient of such an ad.

24      Q    In your opinion, did JAMA wrongfully

Page 154

1    partner with Purdue to promote the sale of opioid

2    pain pills?

3                    MR. ARBITBLIT:   Objection.

4        A    Yeah, as stated before, I think the

5    promotion of opioids to the extent that it has been

6    pursued in the last 30 years has contributed to the

7    problem, but the degree to which the JAMA is

8    responsible pales in comparison to the degree to

9    which the defendants in this case are responsible.

10                   MR. PYSER:  Brad, you can take the

11   document down.  We're seeing your email right now,

12   Brad.  There you go.

13   BY MR. PYSER:

14       Q    Are you aware of any FDA warning letter

15   concerning any material that was passed from a drug

16   manufacturer through Cardinal Health?

17       A    Not specifically.

18       Q    How about AmerisourceBergen?  Are you aware

19   of any FDA warning letter concerning any material

20   that was passed on to pharmacists or others by

21   Amerisource?

22       A    Not that I can recall, no.

23       Q    And finally, McKesson.  Are you aware of

24   any FDA warning letter concerning any material that

Page 155

1    was passed on to pharmacists or others -- excuse me,

2    I think I misspoke.  Strike that.  Finally, McKesson.

3    Are you aware of any FDA warning letter concerning

4    any material that was passed on to pharmacists or

5    others by McKesson?

6         A    Not that I recall.

7         Q    You published your book, Drug Dealer, MD,

8    in 2016, correct?

9         A    Yes.

10        Q    At the time you published, had you been

11   hired by plaintiff's lawyers as an expert witness for

12   opioid litigation?

13        A    No.  I had no awareness of the opioid

14   litigation and no contact with lawyers.

15        Q    So on page 6 of your book -- and if you

16   want to see a copy of it, we have it at Exhibit 30.

17   On page 6 you wrote, quote:

18             "To every patient who has been addicted to

19   prescription drugs, to their loved ones, and to all

20   the doctors who went into medicine to do good but

21   feel trapped by a system gone awry."

22             Is that your language?

23        A    Yes.

24        Q    Prior to the time you published that book,

Page 156

1   how long had you been researching and writing about

2   the opioid epidemic?

3       A    I would say informally for, you know, about

4   16 years, and formally for about 6 years.

5       Q    And did you try to be complete and thorough

6   in your book?

7       A    I tried, yes.

8       Q    Fair to say you spent thousands of hours

9   researching and writing?

10      A    I don't know how many hours I spent.  It

11  was a lot of time.

12      Q    Let me ask you, Doctor, a little bit of

13  background.  What drove your interest in this area of

14  addiction medicine?

15      A    The harm that I was seeing -- the harm that

16  I saw being done to patients due to overprescribing.

17      Q    And Doctor, I want to explore an area --

18           And Counsel, you're free to mark it

19  confidential if you want.

20           Do you have any personal experience within

21  your family of opioid addiction or opioid use?

22                MR. ARBITBLIT:  Objection.

23      A    Not really.

24      Q    How did you decide who to interview for

Page 157

1    your book?

2         A    I used a method called qualitative

3    research, where interviews are conducted until themes

4    are saturated.  And then based on those interviews,

5    more questions are raised, which then indicates

6    interviewing other individuals in order to answer

7    questions that come along.  So it's an inductive

8    rather than a deductive process.

9         Q    And did you, in choosing the people you

10   interviewed, did you try to choose to interview

11   people who you believe possessed an understanding of

12   the factors that led to the opioid epidemic?

13        A    No, not necessarily.  I wanted a broad

14   swath of representation.  I wanted to interview

15   health care providers, wondering how they viewed

16   opioids, what their influence was, what their

17   experience was.  I interviewed a diverse set of

18   patients, patients who had become addicted, patients

19   who hadn't become addicted, patients who said that

20   opioids were the only thing that helped their pain,

21   other patients who said opioids were unhelpful.  So I

22   tried to get a very broad range of -- a broad sample.

23        Q    And was your goal for you in your writing

24   to gain an understanding of the factors that led to

Page 158

1    the opioid epidemic?

2         A    Yes.

3         Q    And one of the chapters in your book is

4    called, "Big Pharma Joins Big Medicine Collecting

5    Medical Science to Promote Pill Taking."  Is that

6    right?

7         A    Yes.

8         Q    And that chapter is about opioid

9    manufacturers, correct?

10        A    Primarily, not just opioid manufacturers,

11   also some various regulatory bodies that I was aware

12   of and had had an influence and an impact.  Because

13   primarily they were influenced by opioid

14   manufacturers.

15        Q    And you also concentrated a lot in that

16   chapter on Purdue Pharma, correct?

17        A    Yes.

18        Q    There is nothing in your book that mentions

19   Cardinal Health, is there?

20        A    No.

21        Q    And there is nothing in your book that

22   mentions McKesson, is there?

23        A    No.  I really only became aware of the role

24   of the distributors around 2015 or so.

1      Q     Not my question, Doctor.  My question is:

2    Is McKesson Corporation mentioned in your book?

3      A     No.

4      Q     And finally, is AmerisourceBergen

5    Corporation mentioned in your book?

6      A     No.

7      Q     And, in fact, there is nothing in your book

8    about the role of pharmaceutical distributors, is

9    there?

10                   MR. ARBITBLIT:  Objection.

11     A     Not focused on distributors, no.  I think

12   more broadly what I do talk about in my book, which

13   is the major theme of my book, is how increased

14   supply led to the epidemic.  And certainly the

15   distributors have had a role in increasing the

16   supply, but I don't specifically mention

17   distributors.

18     Q     Okay.  Let's just be clear.  You don't

19   mention pharmaceutical distributors anywhere in your

20   book, do you?

21                   MR. ARBITBLIT:  Objection.

22     A     No.

23     Q     And prior to the time you were retained as

24   an expert in the opioid litigation, had you ever

```
                                          Page 160
 1    published anything in which you mentioned the role of

 2    Cardinal Health, McKesson, or AmerisourceBergen in

 3    creating or contributing to the opioid epidemic?

 4         A    No.

 5         Q    In 20 years of clinical experience prior to

 6    this litigation, had you ever interacted with a

 7    pharmaceutical distributor?

 8         A    No.

 9         Q    Okay.  Dr. Lembke, are you familiar with

10    the term "suspicious orders" in the context of

11    distributors' shipments to pharmacies?

12         A    Yes.

13         Q    Have you reviewed any DEA documents

14    regarding what the DEA considers to be a suspicious

15    order?

16         A    I believe I reviewed some DEA documents,

17    broadly detailing that, and I reviewed the Controlled

18    Substances Act, which I think might be a DEA

19    document.  I'm not exactly sure if it came from the

20    DEA.

21         Q    Have you reviewed any deposition

22    transcripts taken of DEA witnesses in this

23    litigation?

24         A    Not that I recall.
```

Page 161

1      Q     Have you undertaken a review of any of the

2  distributors in this litigation, their suspicious

3  order monitoring systems?

4      A     Not specifically.

5      Q     Have you reviewed any specific orders that

6  the distributors in this case shipped to pharmacies

7  in Cabell County or Huntington?

8      A     No.

9      Q     Did you review the report of a man named

10 James Rafalski in forming your opinions?

11     A     No.

12     Q     I want to return to something you said at

13 your New York deposition.  You testified there that

14 you had never designed a suspicious order monitoring

15 system.  Do you recall that in your deposition?

16     A     Yes, I do.

17     Q     But then last week at the New York Frye

18 hearing, I asked you the same question, have you ever

19 designed a suspicious order monitoring system, and

20 you said yes.  Do you recall that?

21     A     Yes.

22     Q     Okay.  So were you being truthful last week

23 when you testified that you have, in fact, designed a

24 suspicious order monitoring system?

Page 162

1      A     Yes, I was being truthful.  In that moment,

2   the way that that question occurred to me was whether

3   or not I had overseen designing a suspicious order

4   monitoring system from the perspective of a

5   clinician, which I have done.  I have implemented a

6   system here in our department.  So that was how I was

7   answering that.

8      Q     So a suspicious order monitoring system at

9   Stanford -- Is it Stanford Hospital, I'm sorry,

10   Doctor?

11      A     Yes, Stanford Hospital.  Stanford Health

12   Care.  Yes.  I also, just in the academic detailing,

13   I've done a lot of teaching on what health care

14   providers can do to help steward and monitor opioid

15   pain pills.

16      Q     Okay.

17      A     So in a broad sense -- in a very broad

18   sense, for clinicians I've been involved in that.

19   I've not been involved in advising distributors on

20   their suspicious monitoring systems.

21      Q     So when we're talking about the suspicious

22   order monitoring system at Stanford, that's talking

23   about physician prescribing that you're monitoring;

24   is that right?

Page 163

1      A     That's right.

2      Q     And what does your system at Stanford do?

3   Can you describe that to me?

4      A     Well, we check the prescription drug

5   monitoring database.  We give a limited supply at

6   once of opioids.  We try to get as much collateral

7   information beyond just what the patient tells us,

8   because we recognize that the patient may not be the

9   most reliable source in every instance.

10          So we talk to others -- there are other

11  providers.  We check the medical record.  We talk to

12  pharmacists.  We talk to their members.  We're also

13  looking more broadly hospital wise at how we can

14  intervene at the prescriber level to alert people to

15  the real science about opioids and safe prescribing.

16     Q     Anything else?  Any other major features of

17  the system you've designed?

18     A     That's what I can think of now.  There may

19  be some other things, but that's what I can think of

20  now.

21     Q     Okay.  So I've got four factors.  The first

22  one that's part of your system at Stanford is

23  checking the PDMP, the prescription drug monitoring

24  program, correct?

Page 164

1       A     Yes.

2       Q     And that's a system -- there is one in

3  California, correct?

4       A     Yes.

5       Q     Do you know if there is one in

6  West Virginia as well?

7       A     Yes, there is.

8       Q     Okay.  And it's run by the State, right?

9       A     Typically.

10      Q     And doctors have access to it, correct?

11  Prescribing physicians?

12      A     In some states they do, and in some states

13  they don't.  It depends on the state.

14      Q     How about West Virginia, do you know?

15      A     I believe they have mandatory -- it's

16  mandatory for them to check it, I believe.

17      Q     Do you know when that changed?  When that

18  happened?

19      A     I don't recall the exact date.

20      Q     Do you know approximately?  Is it within

21  the last five years, the last ten years?

22      A     In the last five to ten years.

23      Q     So PDMP, doctors have to check it.  And in

24  the PDMP, what can doctors see?

Page 165

1     A    They can see all the prescriptions for a

2   controlled substance that that patient has received

3   within a given amount of time, within a given

4   geographic region, typically the state.

5     Q    And do pharmacists have access to it as

6   well in West Virginia?

7     A    I believe so, yes.

8     Q    And do state enforcement bodies, law

9   enforcement, have access to the prescription drug

10   monitoring program in West Virginia?

11     A    It varies state to state what access they

12   have and what kind of access, but I believe so, yes.

13   In West Virginia.

14     Q    And to your knowledge, in West Virginia do

15   distributors have access to the PDMP system?

16     A    I don't know.

17     Q    How about in California, do you know if

18   distributors have access to the PDMP there?

19     A    I don't know.

20     Q    Can we agree the PDMP is an incredibly

21   valuable tool for doctors and pharmacists to make

22   appropriate decisions about prescribing and

23   dispensing medication?

24     A    It is a valuable tool, yes.  We can agree

1    on that.

2         Q    And the other thing -- So that was factor

3    number one.  Factor number two in your monitoring

4    system at Stanford is limiting supply; is that right?

5         A    Yes.  I would say -- I would phrase it

6    differently.  I would say helping to steward the

7    supply.

8         Q    Meaning smaller prescription amounts, so

9    instead of a 30-day supply, asking doctors to

10   prescribe seven days; is that right?

11        A    Yes.

12        Q    And the point of doing so is to limit the

13   number of opioids that doctors prescribe and

14   therefore the number of opioids that are available,

15   correct?

16                  MR. ARBITBLIT:  Objection.

17        A    Yes.

18        Q    And then the third element that you

19   described is collateral information, and by that you

20   meant learning more about your patients than what

21   they'll tell you themselves; is that right?

22        A    Yes.

23        Q    And that's helpful in limiting the misuse

24   of opioids, because patients may not always be honest

Page 167

1   with their doctors; is that right?

2        A    That's correct.

3        Q    And so you're asking doctors to do extra

4   work to find out whether patients are telling the

5   truth based on their medical records and any other

6   information they can locate; is that right?

7        A    Yes.  I'm asking doctors to do what is

8   within the limits of their capabilities to steward

9   opioids.  Every person in the supply chain has a

10  different capability to do that, and I'm encouraging

11  doctors in their specific role to do what they can

12  do.

13       Q    And the capability of each portion of the

14  supply chain is constrained by what information is

15  available to that individual or entity; is that

16  right?

17                 MR. ARBITBLIT:  Objection.

18       A    Yes, it's constrained by -- yes.

19       Q    And the last element you mentioned is how

20  we can intervene to alert doctors to the real dangers

21  of opioids.  That's a continuing medical education?

22  Is that part of that?

23       A    Yes.

24       Q    What are some of the other elements of how

Page 168

1    you in your monitoring program at Stanford alert

2    doctors to information about opioids?

3        A    We educate doctors about the way in which

4    the opioid pharmaceutical industry has created the

5    paradigm shift that led to increased prescribing,

6    contrary to the evidence.  And we really tried to

7    bring home that even when a doctor thinks they're not

8    being influenced by various promotional material,

9    that there is an influence and that physicians need

10   to be very aware of that influence.

11       Q    And it's your view that the paradigm shift

12   in opioid prescribing led to increased prescribing by

13   doctors of opioids; is that right?

14       A    It's my view, that the increased supply led

15   to the epidemic, and that that was driven by opioid

16   prescribing, which was in turn driven by the

17   misrepresentations of the science and the massive

18   distribution.

19       Q    Okay.  And the information on which doctors

20   base their decisions, it's your belief that there was

21   a paradigm shift in the information that was being

22   provided to doctors about opioid prescribing,

23   correct?

24       A    I believe that doctors were duped about the

Page 169

1   safety and benefits of opioids.

2        Q    And that was -- I'm not trying to fight

3   with you here, Doctor.  That was something you have

4   described repeatedly as a paradigm shift, correct?

5        A    Yes.

6        Q    Okay.  In your report you make reference

7   several times -- actually, let's return to this

8   Stanford program again.  Would you describe the

9   Stanford monitoring program for opioids?  Does it

10  have a title?

11       A    I think it would be an overstatement to say

12  that this is a Stanford-wide program.  This is a

13  program that I implemented, you know, in my addiction

14  medicine chemical dependence purview, and that I am

15  working with others in other departments to try to

16  work on similar types of interventions.

17       Q    So even here today in 2020, your program

18  has not been fully adopted at your school, Stanford

19  Medical?

20       A    Well, you know -- yeah.  So fully adopted,

21  I mean, medicine changes very slowly, and it happens

22  in an IN-ER-TIVE (inaudible) fashion, and it's a very

23  slow-turning ship.  So I would say I have had a huge

24  impact on the thinking in this area, not just at

Page 170

1   Stanford, but nationwide, and that some of the

2   protocols and recommendations that I created have

3   been adopted nationwide and at Stanford.

4          But, you know, it's a slow-turning ship.  I

5   mean, the subtitle of my book is "How Doctors Were

6   duped, Patients Were Hooked, and Why It's so Hard to

7   Stop."  It's hard to stop because there's a whole

8   infrastructure that's in place that intensifies

9   opioid prescribing, that includes the influence of

10  the defendants.  And you cannot do that overnight.

11      Q    Doctor, when you use "the defendants"

12  there, do you intend to include manufacturers in that

13  as well?

14      A    Yes.

15      Q    You know that the manufacturers are not, in

16  fact, defendants in this case, right?

17      A    Yes.

18      Q    Doctor, do you know if any hospital or

19  doctors in Cabell County or Huntington have adopted

20  your -- the elements of your program that you just

21  described, those four elements?

22      A    Can I check my report?  That would help me

23  to do that.

24          So, yes.  On page 46 of my report, I cite

1   the West Virginia Best Practices Tool Kit adopted in

2   2016.  Quote:  "One of our goals with these

3   guidelines is to dramatically reduce the use of

4   opioids in the first-line treatment options for

5   patients with pain and significantly increase the use

6   of non-opioid alternatives for these patients."

7        Q    And do you know whether --

8        A    Sorry.  There is more.  Could I just finish

9   it?

10       Q    You are reading from page 46, correct?

11       A    Yes.

12       Q    Okay.  Do you know whether the

13  West Virginia Attorney General's best practices for

14  prescribing opioids in West Virginia is followed by

15  doctors within Cabell and Huntington?

16       A    No, but I assume that it is based on the

17  decrease in opioid prescribing in West Virginia over

18  the last couple of years.

19       Q    Have you done any studies or interviews to

20  find out whether doctors in Cabell or Huntington are

21  following the best practices for prescribing opioids

22  in West Virginia?

23       A    I have not done any interviews with

24  individual doctors, but again, the prescribing rates

Page 172

1    speak for themselves.

2        Q    Okay.  I'm not asking about the prescribing

3    rate.  Again, Doctor, you have got to just answer the

4    question, okay?  What I asked is whether you're aware

5    of whether -- and whether you have done any studies

6    or any interviews to determine whether doctors in

7    Cabell and Huntington are following the best

8    practices for prescribing opioids in West Virginia.

9    Have you done any studies?

10                   MR. ARBITBLIT:  Objection.

11       A    Well, my method, you know, which I outlined

12   in the Frye hearing -- and you were there -- is to

13   look at the best science available, and that includes

14   looking at prescribing rates in Cabell County, which

15   have gone down by about 50 percent since their peak.

16   So I interpret that as evidence that they are

17   following some of these best practices.  It's time to

18   get opioid prescribing more in line with what it

19   should be.

20       Q    And have you interviewed any doctors in

21   Cabell or Huntington to discuss with them their

22   practices for prescribing opioids?

23       A    No.

24       Q    In your report you make several

                                        Page 173

1    references -- or you reference several times

2    something you call the efficient supply chain.  Do

3    you recall saying that in your report?

4         A    Yes.

5         Q    Is there anything inherently wrong with a

6    supply chain being efficient and providing medication

7    to pharmacies quickly when they order it?

8                   MR. ARBITBLIT:  Objection.

9         A    If that supply change is supplying opioids,

10   yes, there's something wrong with that.

11        Q    Okay.  So if a pharmacy orders diabetes

12   medication and it gets there the next day, that's

13   okay, right?

14                  MR. ARBITBLIT:  Objection.

15        A    Yep.

16        Q    And if a pharmacy orders medication to

17   fight cholesterol and it gets there the next day,

18   that's a good thing, right?

19        A    Okay.  Yes.

20        Q    But it's your belief that when a pharmacy

21   orders opioid medication -- well, let me strike that.

22   When a pharmacy orders opioid medication, do you

23   object to that medication arriving the next day?

24                  MR. ARBITBLIT:  Objection.

Page 174

1      A     The frame of your question, I think, is not

2   really capturing my opinion, and I think my opinion

3   is really well echoed on page 95 of my report, where

4   the Healthcare Distribution Management Association,

5   which is a distributor organization, said, quote:

6           "The fact is that 200 million pills over a

7   four-year period is a significant problem.  The story

8   is made worse given the following:  The distributors

9   do not want to make their sales date public."

10          So --

11     Q     Dr. Lembke --

12     A     It's the volume of the pills that's really

13  concerning, if you have an efficient distribution

14  supply chain that's oversupplying the population.

15     Q     Dr. Lembke, do you agree with me there are

16  times when patients need opioids?  We talked about

17  this before.

18                MR. ARBITBLIT:  Objection.  Asked and

19  answered.

20     A     Yes, I agree.

21     Q     And when a patient needs opioids, do you

22  agree that it should be available to that patient and

23  their doctor?

24                MR. ARBITBLIT:  Objection.

Page 175

1    A    As long as the judgment that determines

2   opioids were necessary was not influenced by fake

3   news.

4    Q    Dr. Lembke, yes or no.  When opioids are in

5   fact necessary, do you agree it is of societal good

6   that they be made available for patients?

7                    MR. ARBITBLIT:  Objection.

8    A    Yes, if they are, in fact, necessary and if

9   the benefits to the individual and to the public

10  outweigh the risk.

11   Q    Are you aware that the DEA's Office of

12  Diversion Control has described their mission as

13  preventing diversion of controlled substances while

14  ensuring a, quote, "adequate and uninterrupted supply

15  for legitimate medical, commercial, and scientific

16  needs"?  Do you agree that that is a worthy goal?

17                    MR. ARBITBLIT:  Objection.

18   A    Yes.

19   Q    Do you agree that it's important that

20  individuals are able to receive medication that is

21  necessary and appropriately prescribed?

22                    MR. ARBITBLIT:  Objection.

23   A    Again, it depends on whether or not the

24  medical necessity is based on science.

Page 176

1       Q    And that's an individualized decision based

2   on each patient and each doctor, correct?

3                   MR. ARBITBLIT:  Objection.

4       A    No.

5       Q    Well, Dr. Lembke, in order to make a

6   decision as to whether a particular prescription is

7   appropriate, would you have to know something about

8   the patient involved?

9                   MR. ARBITBLIT:  Objection.

10      A    Yes.

11      Q    Okay.  So the decision as to whether a

12  prescription is appropriate is, in fact, an

13  individualized decision, correct?

14                  MR. ARBITBLIT:  Objection.

15      A    No.

16      Q    Dr. Lembke, if you need to know something

17  about the patient, how is it not an individualized

18  decision?

19      A    Because the information about the patient

20  has to go through the filter of the doctor's brain of

21  all of the things that they've learned about that

22  medication, and if they've learned things that aren't

23  true, they can't make an informed judgment.

24      Q    I'm not disputing that, Doctor.  The

Page 177

1    question is simply:  Isn't it an individualized

2    decision that a doctor makes for each patient as to

3    what medication is appropriate for that patient?

4                     MR. ARBITBLIT:  Objection.  Asked and

5    answered.

6         A    Yes, it's not individualized, because we

7    have guidelines and we have algorithms, and we know

8    that there are certain types of patients that should

9    receive medications and certain doses and others that

10   don't.

11             So it's not individualized to the extent

12   that any doctor can decide any medication for any

13   patient.  You have to base it on, you know, real

14   evidence.  And you have to acknowledge that there are

15   a lot of other factors that are not real evidence

16   that influence doctors' decisions.

17        Q    So you mentioned guidelines and algorithms.

18   Should doctors consider guidelines and algorithms as

19   to opioid prescribing when they make a decision as to

20   whether or not to prescribe a medication?

21                     MR. ARBITBLIT:  Objection.

22        A    Yes.  They are typically influenced by

23   guidelines and algorithms.

24        Q    Do you agree that it's critical to make

1    sure that legitimate medical need for all types of

2    medications is met?

3                    MR. ARBITBLIT:  Objection.  Overbroad.

4        A    Yes.

5        Q    And if patients can't get medication, there

6    will be human suffering?  Do you agree with that

7    concept?

8                    MR. ARBITBLIT:  Objection.  Overbroad.

9        A    Yeah, I agree that it's overbroad, because

10   there may be more suffering by prescribing the

11   medication, and that's what you need to weigh into

12   the mix.  It's always a cost benefit or risk benefit.

13   And it's also not just short term, but also long

14   term.

15       Q    And who is it who makes that weighing

16   decision, weighing human suffering if patients can't

17   receive medication versus the possible negative

18   impacts of medication?  Who makes that decision

19   weighing those?

20       A    So in today's health care system, that

21   decision is often made collectively by the people who

22   run the hospital, by The Joint Commission which

23   creates quality measures, by -- you know, systemic

24   issues that have to do with third-party payers.

Page 179

1        So there are lots of different factors.
2   And I really described this in my book.  This is not,
3   you know, a new opinion on my part.
4                MR. ARBITBLIT:  Steve, can we take a
5   break?  We've been going for about an hour and 20
6   minutes.
7                MR. PYSER:  Sure.  We'll take one
8   really soon.
9   BY MR. ARBITBLIT:
10      Q    So weighing the risks and benefits of a
11  medication, in your view -- I just want to create a
12  list of the people who have responsibility for doing
13  that.  Doctors are involved with that decision, fair?
14               MR. ARBITBLIT:  Objection.
15      A    Yes.
16      Q    Are pharmacists involved in that decision?
17      A    I think so.  They have a role, yeah.
18      Q    You mentioned third-party payers.  Are they
19  involved in the decision?
20      A    Yes.
21      Q    People who run hospitals you mentioned.
22  Are they involved in the decision?
23      A    Yes.
24      Q    Anyone else?

Page 180

1       A    The Joint Commission, the Federation of

2    State Medical Boards, the FDA, the DEA, and also,

3    importantly, opioid manufacturers, distributors, and

4    pharmacies.

5       Q    What is distributors' role in your view in

6    balancing the legitimate need for medication versus

7    the dangers of certain medications?

8       A    Distributors have a role in monitoring and

9    alerting for suspicious orders.  And the distributors

10   have a role in terms of their collaboration with

11   manufacturers to promote opioid products.  And some

12   distributors have been involved in direct to

13   pharmacists, direct to patients, and promotional

14   material.

15                   MR. PYSER:  We can take a break now,

16   Doc.

17                   THE VIDEOGRAPHER:  The time is 3:27.

18   We're now going off the record.

19                   (A recess was taken.)

20                   VIDEOGRAPHER:  The time is 3:33.

21   We're now back on the record.

22   BY MR. PYSER:

23      Q    Welcome back, Dr. Lembke.  I'd like you to

24   turn to page 131 of your report, Exhibit 1.

Page 181

```
 1              MR. ARBITBLIT:  Page again, please,
 2    Steve?
 3              MR. PYSER:  131.
 4              MR. ARBITBLIT:  Thank you.
 5    BY MR. PYSER:
 6         Q    Dr. Lembke, in paragraph A under Opinion 8,
 7    you write:  "There's a clear causal link between
 8    prescription opioid exposure, prescription opioid
 9    misuse, and opioid addiction."
10              Do you see that?
11         A    Yes.
12         Q    Okay.  And that word "causal" was not in
13    your Ohio or New York reports; is that right?
14         A    To be 100 percent sure, you know, I would
15    have to look at those other reports.  I believe you,
16    but I don't specifically remember.
17         Q    What is the causal link between opioid
18    exposure, misuse, and addiction, in your own words?
19         A    Okay.  So opioids change the brain.  They
20    work on the (inaudible/indiscernible) reward pathway
21    such that there is a process called neuroadaptation,
22    where over time the individual needs more and more to
23    get the same effect.  And they become physically
24    dependent on opioids.  And they experience withdrawal
```

Page 182

1   when the opioids are stopped.  And they can also

2   develop the disease of addiction, which is the

3   continued compulsive use of a substance despite harm

4   to self and/or others.

5           One of the biggest risk factors for

6   developing addiction is simple access to that drug,

7   and exposure to that drug, and the brain changes

8   wrought by that drug.  In addition to addiction,

9   opioids are highly lethal and they can kill.  And so

10  even people who are not addicted and not misusing can

11  die from opioids.

12      Q    And do you have a percentage on, of all

13  patients who take opioids, how many suffer lethal

14  consequences among those who are not addicted or

15  suffering from opioid use disorder?  So people who

16  are prescribed opioids using them legitimately, do

17  you know a percentage of death rate on that?

18               MR. ARBITBLIT:  Objection.

19      A    I don't have a specific number for that,

20  but that occurs.  It is well-known and documented in

21  the medical literature.

22      Q    And when you say prescription opioid

23  exposure, exposure could mean -- just going to give

24  you one example, and I'll give you additional.  One

Page 183

1   example of exposure could be a patient prescribed by

2   a doctor who fills their own prescription and takes

3   as directed.  That's one version of exposure,

4   correct?

5       A    Yes.

6       Q    And a different version of exposure, you

7   could -- an individual could become exposed to

8   opioids by taking prescription opioids that were not

9   prescribed for them, correct?

10      A    Yes.

11      Q    And when you say prescription opioid

12  exposure, do you mean both of those scenarios, people

13  taking opioids as prescribed and people taking

14  opioids outside of a prescription for them?

15      A    Yes.

16      Q    Are you aware that the DEA establishes

17  production quotas for controlled substances every

18  year?

19      A    Yes.

20      Q    Have you ever participated in the DEA's

21  quota process to determine the medical, scientific,

22  research and industrial needs of the United States?

23      A    No.

24      Q    Have you ever written a letter to the DEA

Page 184

1    through the regulatory process and argued that the

2    quota for opioids in the United States is too high?

3         A    I have testified at a REMS hearing, so I

4    believe there were DEA representatives there.

5         Q    That wasn't my question.  My question was:

6    Have you ever written a letter or otherwise

7    petitioned the DEA to tell them that you believe the

8    quota is set too high?

9                   MR. ARBITBLIT:  Objection.

10        A    Well, I did testify at that REMS hearing

11   about the quota being too high, about there being an

12   oversupply.

13        Q    When was that?

14        A    I'd have to look at my CV.

15        Q    Is it -- You don't need to get the exact

16   date.  Is it more than five years ago or less than

17   five years ago?

18        A    I would say approximately five years ago.

19        Q    And in the four years or so -- four to five

20   years that have gone by since then, have you

21   petitioned the DEA in any way to argue that the quota

22   today for opioids is too high in the United States?

23        A    No.

24        Q    On pages 18 and 19 of your report, you

Page 185

1    describe -- this starts at the bottom of page 18,

2    numerette iii.  You give three separate ways

3    prescription drugs can be diverted.  Do you see that?

4        A    Yes, I do.

5        Q    And the first is diversion before a

6    prescription is even filled.  For example, by theft

7    from a production facility or theft from a retail

8    pharmacy?

9        A    Yes.

10        Q    And as to that first category, are you

11    offering any opinions about theft from distributors?

12        A    I'm sorry.  Could you -- I didn't quite

13    hear one of the words.

14        Q    Sure.  It's in that first category, theft.

15    Are you offering any opinion about any theft from a

16    distributor defendant in this case?

17        A    No.

18        Q    Is it your understanding that actual theft

19    from distributors is exceedingly rare?

20        A    I don't know about -- I don't have an

21    opinion on how rare or not rare that is.

22        Q    The second category of diversion you

23    discussed is the filling of a prescription, and you

24    say, "e.g., pursuant to doctor shopping and high

Page 186

1    frequency prescribers."  Do you see that?

2         A    Yes.

3         Q    In terms of frequency of diversion, do you

4    know what percentage of diversion that example makes

5    up?

6         A    I don't have a specific percentage, no.

7         Q    How about the third, diversion after a

8    prescription has been filled?

9         A    What's your question about that?  Sorry.

10        Q    Do you know of all diversion, what

11   percentage of diversion is prescription after a

12   prescription has been filled, for example, by

13   transfer or sale to a third party?

14        A    No, but my sense is that that is high.

15        Q    That is the most common of the three that

16   you list there on pages 18 and 19 of your report?

17                   MR. ARBITBLIT:  Objection.

18        A    I would say that's the aspect of diversion

19   that I'm most familiar with.  In my experience,

20   common, but I don't really have a sense of

21   quantifying it.

22        Q    As to this third type of diversion, do you

23   agree that after a prescription for an opioid has

24   been shipped to a pharmacy, the distributor is unable

Page 187

1    to control what happens to it?

2       A    I think the distributor has upstream

3    responsibility to prevent diversion after it's been

4    filled.

5                MR. ARBITBLIT:  Steve, I'm going to

6    interpose another objection.  This precise line of

7    questioning has been gone over at previous

8    depositions, and according to Judge Wilkes' ruling on

9    Tuesday, we should not be plowing old ground.

10               MR. PYSER:  I've gone to great pains

11   not to plow old grounds.  I don't think that's

12   correct.  If you want to point me to a page and line

13   cite, I'm happy to look at it.  But we'll continue on

14   briefly on this.

15      Q    Dr. Lembke, do you agree with me that

16   distributors don't know the identities of patients

17   who receive prescription opioids from pharmacies?

18      A    I don't really know what they know

19   regarding patients.

20      Q    You just don't know one way or the other?

21      A    No.

22      Q    Do you know from your experience as a

23   doctor whether any prescription that you have written

24   has been diverted?

Page 188

1    A    I don't have confirmation of any specific

2 prescription that I've written being diverted.

3    Q    Are you aware of any of your patients

4 misusing opioids that you prescribe for them?

5    A    How are you defining "misuse" in this

6 context?

7    Q    Used to get high for a nonmedical purpose.

8              MR. ARBITBLIT:  Objection.

9    A    I don't have a specific incidence in a

10 patient to whom I was prescribing.

11    Q    Are you aware of misuse of opioids by

12 patients who are under your care?

13    A    I am aware of historical misuse, not linked

14 to any named prescriber.  So I'm very aware of

15 pattern in general among my patients.

16    Q    Have you attempted to find the name of any

17 prescriber for your patients who have prescribed

18 opioids that have been misused, so you could warn

19 them about the misuse?

20    A    My patients did not present the information

21 in a way that I would be capable of warning anybody.

22 They were -- They were understandably reluctant --

23 sorry, let me just finish -- they were understandably

24 reluctant to provide the specifics about the

Page 189

1    prescribers in that situation.

2         Q    Have you ever --

3         A    Sorry, and just so I can fully answer the

4    question.  And it was often historical, meaning part

5    of what led up to their becoming addicted and then

6    presenting to me.

7         Q    Have you ever asked one of your patients

8    the name of the physician who prescribed opioids that

9    they misused?

10                   MR. ARBITBLIT:  Objection.

11        A    I can't recall a specific incident when I

12   asked that, no.

13        Q    Let's talk briefly about rates of

14   diversion.  Do you understand what I mean by that?

15   How often opioid medication is diverted?

16        A    Okay.

17        Q    If you wanted to calculate or measure the

18   rate of diversion, would speculation be an acceptable

19   way to measure the rate of diversion?

20        A    I don't know.  Could you give me a specific

21   example?

22        Q    Well, Doctor, you publish in medical

23   journals, correct?

24        A    Yes.

Page 190

1      Q    And if you wanted to say something about

2  the rate of diversion, would it be acceptable in a

3  peer reviewed medical journal to offer as your basis

4  for rate of diversion nothing more than pure

5  speculation?

6                   MR. ARBITBLIT:  Objection.

7      A    Well, I mean, pure speculation implies that

8  that individual had no idea at all what formed that

9  speculation.  I do think that -- I mean, you know,

10  you asked about econometric modeling.  Econometric

11  modeling is, to some extent, based on speculation,

12  based on a model that's created.

13            So I think that the question is, you know,

14  hard to answer.  You know, what -- how are you

15  defining "speculation."

16      Q    So Dr. Lembke, in putting together your

17  report, you tried to find concrete, supportable

18  information, correct?

19      A    Yes.

20      Q    You tried not to speculate, you tried to

21  find proof for the things that you said in your

22  report, true?

23      A    Yes.

24      Q    Okay.  And one of the documents you quote

Page 191

1   from in your report is an NASEM report.  Do you know

2   what an NASEM is?  Or what the NASEM is?

3        A    Yes.

4        Q    What is it?

5        A    The National Academy for Science

6   Engineering and Medicine.

7        Q    Okay.  And let's look at page 18 and 19 of

8   your report, same paragraph we were just looking at.

9   It talks about the NASEM report, right?

10       A    Yes.

11       Q    Okay.  And at -- towards the end of the

12  paragraph, it states:

13            "The DEA reports that in recent years

14  distributors in the United States disbursed 12 to 15

15  billion dosage units of opioid narcotics to retail

16  level purchasers, suggesting that total diversion is

17  on the order of 2.5 to 4 billion dosage units."

18            Do you see that?

19       A    Yes.

20       Q    Okay.  So that would be a rate of diversion

21  roughly 20 to 25 percent, correct?

22       A    Yes.

23       Q    Other than the NASEM, do you have any other

24  basis for proffering an opinion on the rate of

Page 192

1    diversion?

2         A    No.

3         Q    Do you know the basis for an NASEM's

4    estimation that between 2.5 and 4 billion dosage

5    units were diverted?

6         A    I believe they used ARCOS data.

7         Q    And do you know how they calculated the

8    rate of diversion?

9         A    No.

10        Q    Is it your understanding that their

11   methodology is generally accepted and reliable,

12   that's why you used it?

13        A    Yes.

14        Q    Let's take a look at Exhibit 14, if you

15   could.  And this is an excerpt of the NASEM article

16   you cited.  And it's a long excerpt, so we have the

17   full section.  It was a multihundred page document,

18   so we (---) some trees here.

19             If you look at Exhibit 14, there's a

20   page 223, and the paragraph in the center of that

21   page begins "Surveys moreover"?

22        A    Yeah.

23        Q    Okay.  So about halfway through that

24   paragraph it states:

Page 193

1          "Thus, the 564 million self-reported days

2     in the NSDUH may correspond to more like 1 billion

3     actual days.  If the average dose per day for NSDUH

4     respondents," and can you tell us what NSDUH

5     respondents means?

6          A    The National Survey for Drug Use and

7     Health.

8          Q    "Equals the DDDs."  What's DDDs?

9          A    I don't know.  You would have to go to

10    wherever it's mentioned.  Daily doses or ...

11         Q    If you turn to the page before, at the

12    bottom it's:  Defined daily doses?

13         A    Right.  Okay.

14         Q    So the defined daily doses:

15         "Underpinning the 39,487 DDD's per million

16    figure, then dividing that 1 billion by the

17    4.6 billion DDDs posited, one might speculate that

18    very roughly 20 to 25 percent of prescription opioids

19    in the United States are used nonmedically."

20         Do you see that?

21         A    Yes.

22         Q    Is that where we got this 25 to 25 percent

23    figure?

24         A    Yeah.

Page 194

1      Q    Okay.  And in order to get there, this
2  article takes the actual reporting of 564 million and
3  doubles it -- or close to doubles it to 1 billion.
4  Do you see that?
5      A    Yes.
6      Q    Okay.  So what this survey report is doing
7  is taking a statistic that would lead to a roughly 10
8  to 12 percent figure, and because it's assuming that
9  reporting is inadequate, it just doubles it; is that
10  right?
11      A    That's right.  And there is a good basis in
12  the medical literature for doing that in this
13  instance.
14      Q    But there is no basis in the survey data to
15  actually find 20 to 25 percent of prescription
16  opioids in the United States are used nonmedically,
17  correct?
18                 MR. ARBITBLIT:  Objection.
19      A    Again, I think that because it's well-known
20  that people underreport the highly stigmatized
21  behavior of misuse and addiction, that it's
22  reasonable -- and that's established in literature
23  and a number of different studies -- it's reasonable
24  to double the 546 million to 1 billion.

Page 195

1     Q     But even the NASEM in describing its figure

2   states that it might speculate that very roughly 20

3   to 25 percent of prescription opioids are used

4   nonmedically, correct?

5                 MR. ARBITBLIT:  Objection.

6     A     That's what it says, yes.

7     Q     Okay.  But when you report that in your

8   report, you don't report that it's based on, quote,

9   "very rough speculation," you take that figure and

10  apply it as an absolute; is that right?

11                MR. ARBITBLIT:  Objection.

12    A     I don't think that that's a fair

13  representation of what I've done in my report.  I

14  simply, at the same rate of diversion reported by say

15  NASEM for the period reviewed, I'm just saying for

16  their statement, this would represent diversion on

17  this order.  And NASEM, furthermore, is a highly

18  respected group of scientists that I believe to be

19  reliable, and I'm not alone in that.

20    Q     And is it true, Dr. Lembke, that your

21  statistics are based on this 20 to 25 percent figure

22  in the NASEM report, correct?

23    A     Yes.

24    Q     Is it your opinion, Dr. Lembke, that

Page 196

1    opioids are not effective to treat chronic pain?

2        A    In the vast majority of people with chronic

3    pain, opioids are not effective treatment.  And carry

4    significant risks.

5        Q    And your view is that opioids should not be

6    prescribed to treat chronic pain patients, even after

7    non-opioid alternatives fail to relieve pain,

8    correct?

9        A    Yes.  In the vast majority of cases.

10       Q    And to support that in your report at pages

11   82 and 83, you cite a fairly new position by the

12   Department of Veteran Affairs and the Department of

13   Defense that opioids should not be prescribed for

14   chronic pain; is that right?

15       A    Yes.  But what page numbers were those?

16       Q    Sure.  Page 82 and 83.

17       A    Right.  Yes, that's right.

18       Q    Okay.  Other than this VA/DoD guideline

19   that you cite, can you name another federal or state

20   agency that recommends against long-term opioid

21   therapy for chronic pain after non-opioid

22   alternatives have failed?

23       A    I'm not aware of any other guideline that

24   states it that explicitly, but there are other

1    guidelines in which that is implied, for example, the

2    CDC guidelines from 2016, as well as the

3    West Virginia Best Practices Tool Kit.

4         Q    So it's your understanding that the

5    West Virginia Best Practices Tool Kit recommends

6    against use of opioids as a long-term therapy for

7    chronic pain after non-opioid alternatives have

8    failed?

9         A    I'm not saying that the Best Practices Tool

10   Kit explicitly says that, but that is certainly the

11   spirit of the Tool Kit.  It's on page 46 of my

12   report.  Their goal is to "dramatically reduce the

13   use of opioids as a first-line treatment option for

14   pain -- for patients with pain," and, quote,

15   "significantly increase the use of non-opioid

16   alternatives for these patients," unquote.

17        Q    Okay.

18        A    "Take every possible step to utilize

19   non-opioid options first."

20        Q    Correct.  When we're talking about

21   first-line treatment, they're recommending as a first

22   step try something that's non-opioid, correct?

23        A    Yes.  They are recommending that, along

24   with dramatically reducing the use of opioids.

Page 198

1      Q     But the VA and DoD go a step further and

2   they recommend against long-term opioid therapy, even

3   after non-opioid alternatives have failed, correct?

4      A     Yes.

5      Q     And you mentioned the CDC before.  The

6   VA/DoD guideline is stronger than the CDC guidelines

7   about use of opioid therapy for long-term chronic

8   pain, correct?

9      A     I would agree with that, yes.

10     Q     In fact, in your report, you say -- you

11  quote the CDC guidelines, and that states that:

12  "Nonpharmacologic therapy and non-opioid

13  pharmacologic therapy are preferred for chronic

14  opioid, and clinicians should consider opioid therapy

15  only if expected benefits for pain and function are

16  anticipated to outweigh risks to the patients."

17          Correct?

18     A     Yes.

19     Q     Would it be fair to say that your hope is

20  that one day your opinion that opioids should not be

21  used to treat chronic pain at all will become more

22  common in the medical community?

23     A     Unless some other evidence comes to light,

24  yes.

Page 199

1      Q     But today, that's an outlier opinion.  Most

2   doctors use opioids more frequently than you would

3   recommend, correct?

4                 MR. ARBITBLIT:  Objection.

5      A     The fact that many doctors use opioids more

6   frequently than I and many others would recommend

7   does not mean that my opinion is outlier.  Those are

8   two separate things.

9      Q     Dr. Lembke, do most doctors prescribe

10  opioids more frequently than you would recommend?

11                MR. ARBITBLIT:  Objection.

12     A     It really depends on the patient population

13  that you're talking about.

14     Q     For chronic pain patients, do you believe

15  doctors prescribe too many opioids today for chronic

16  pain patients?

17                MR. ARBITBLIT:  Objection.

18     A     There are instances with chronic pain where

19  opioids -- where patients have become physiologically

20  dependent on those opioids and need somebody to

21  prescribe for them and can't find anybody.  So

22  they've been referred to as opioid refugees.

23           In those cases, I think that doctors are

24  underprescribing opioids, because we have a

1    professional responsibility to take care of the

2    patients that we've harmed by putting them on opioids

3    in the first place, and that includes helping them

4    to -- taking them off more slowly and in a humane

5    way.  So the answer depends on the circumstance.

6        Q    You said as part of your answer the

7    patients that we've harmed.  You're speaking there of

8    the medical community that you believe has

9    overprescribed opioids, correct?

10       A    Well, the medical community as to the

11   defendants.

12       Q    Are you familiar with any distributor

13   defendant ever having prescribed an opioid?

14               MR. ARBITBLIT:  Objection.

15       A    No.

16       Q    Now, the VA/DoD position that we were just

17   discussing, that came out in 2017, correct?

18       A    I'll take your word for it.  I can't see

19   the date here.

20       Q    Do you agree with me that it's a recent

21   change in position?

22               MR. ARBITBLIT:  Objection.

23       A    Well, I mean, I don't think -- I mean, it

24   was three years ago.  So 2017, 2018 -- yeah, a couple

Page 201

1    of years ago.

2        Q    And before that, the VA and the Department

3    of Defense had different guidelines for treatment of

4    pain, correct?

5        A    Yes, because they were also duped.

6        Q    So we'll add them to your list of people

7    who were duped.  The Department of Veteran Affairs

8    and the entire Department of Defense was also duped

9    as to the effectiveness of opioids; is that your

10   testimony?

11                   MR. ARBITBLIT:  Objection.

12       A    The VA health care system.  I don't think

13   you have to include the whole Department of Defense.

14       Q    The VA health care system was duped as to

15   the effectiveness of opioids, correct?

16       A    Yes, which is why they're changing their

17   guidelines, drastically revising them.

18       Q    And sitting here today, are you aware of

19   any communication from a distributor defendant to the

20   VA about the appropriate use of opioid medications?

21       A    No.

22       Q    It's true, Doctor, that the CDC still

23   advises opioids may be prescribed to treat chronic

24   pain, correct?

Page 202

1      A    Can you show me the specific language that

2   you're referring to?

3      Q    Sure.  If you look at Exhibit 15 in your

4   binder.

5           And I'm looking at the third page of

6   Exhibit 15.  And Exhibit 15 is titled "CDC Guidelines

7   for Prescribing Opioids for Chronic Pain."  Is that

8   right?

9      A    I'm sorry.  Where are you seeing that?

10     Q    Yeah, if we look at the title of Exhibit

11  15, it's titled "CDC Guidelines for Prescribing

12  Opioids for Chronic Pain," correct?

13     A    Yes, it is.

14     Q    And given just the title, is it fair -- can

15  we agree that the CDC Guidelines do include

16  prescribing opioids for chronic pain?

17     A    No.  I wouldn't -- I wouldn't assume that,

18  based on the title.

19     Q    Okay.  Well, if we look at CDC

20  recommendations on page 3, Item No. 1 says:  "Opioids

21  are not a first-line therapy."  Correct?

22     A    Yes.

23     Q    So before using opioids for chronic pain,

24  this is saying doctors should try something else,

Page 203

1      correct?

2           A    Yes.

3           Q    And this is a new policy recommendation

4      from the CDC within the last three years or so,

5      correct?

6                     MR. ARBITBLIT:  Objection.

7           A    Do you have a date on the document?

8           Q    Unfortunately, I don't -- actually -- yeah,

9      I don't on this one.

10          A    Okay.

11          Q    Are you familiar with when the CDC

12     recommendations on chronic pain and opioid use

13     changed?

14          A    I'm not familiar with the specific date,

15     and I wouldn't say that their original

16     recommendations substantively changed.

17          Q    Okay.

18          A    I mean, they came out in 2016.  I don't

19     think it was substantively changed.

20          Q    As part of the current recommendations

21     we're looking at here in Exhibit 15, Item No. 2 under

22     CDC recommendations on page 3 states:

23               "Before starting opioid therapy for chronic

24     pain, clinicians should establish treatment goals

Page 204

1   with all patients, including realistic goals for pain

2   and function, and should consider how opioid therapy

3   will be discontinued if benefits do not outweigh

4   risks."

5           Do you see that?

6       A   Yes.

7       Q   So for some patients, the CDC is saying

8   that if you've gone through these steps, opioid

9   therapy for chronic pain may still be the best

10  course, correct?

11              MR. ARBITBLIT:  Objection.

12      A   That's not how I interpret this.  I think

13  if you have a designation for a patient that they

14  have chronic pain, and you prescribe opioids to them,

15  that doesn't mean that you're prescribing them

16  chronically.  So even here, the CDC states that:

17              "The plan of initiating opioids to somebody

18  who has chronic pain should include discontinuing

19  those opioids if benefits do not outweigh risks.  And

20  that they should continue only if there is clinically

21  meaningful improvement in pain and function that

22  outweighs risks to patient safety."

23              Which means you would have to have a very

24  good way of measuring whether that was true.

Page 205

1      Q    Doctor, despite all the words you just

2    used, I don't think we're disagreeing at all.  My

3    question is simply:  Is the CDC recommendation that

4    opioid therapy is one of the potential therapies for

5    chronic pain, isn't that part of this recommendation?

6                   MR. ARBITBLIT:  Objection.  Object to

7    the prelude.

8                   MR. PYSER:  You can strike the

9    prelude.  The question stands.

10     A    I think the CDC recommendations have to be

11   looked at in the broader context of tens of millions

12   of Americans with chronic pain already being

13   prescribed opioids.

14     Q    Well, this is -- Doctor, aren't we talking

15   about here before starting opioid therapy?  So these

16   are new opioid therapies for chronic pain, correct?

17     A    Yes, and I think the CDC --

18     Q    Let me ask you the question.  The CDC

19   states what clinicians should do before starting

20   opioid therapy for chronic pain, correct?

21     A    Yes.

22     Q    Okay.  And, Doctor, I'll represent to you

23   that this document, the CDC recommendations, are

24   dated from 2016.  Just so we have a record on it.

Page 206

1       A    Okay.  Great.  If I could just add one

2    thing that, you know, when you say does the CDC

3    recommend opioids for chronic pain, I would disagree

4    with that.  Recommend implies that they think that

5    opioids are a good treatment for chronic pain, and I

6    don't believe that this is what these guidelines are

7    saying.

8       Q    Are you familiar with a letter from the

9    American Medical Association criticizing the CDC's

10   Guidelines on opioid therapy?

11      A    Yes.

12      Q    Okay.  And you discussed that in your

13   report at pages 82 and 83, correct?

14      A    Yes.

15      Q    And the AMA position is that patients

16   suffering from chronic pain can benefit from taking

17   opioids in dosages that may be greater than the CDC

18   Guidelines; is that right?

19      A    Yes, that is what they assert.

20      Q    Okay.  And do you disagree with the

21   position of the American Medical Association?

22      A    Yes, because they provide no evidence to

23   support that claim, contrary to the voluminous

24   evidence that are contrary to that claim.

Page 207

1     Q    Dr. Lembke, the letter that was submitted

2  by the American Medical Association to the CDC on

3  June 15th, 2020, advocating revisions to their

4  CDC -- 2016 guidelines for opioid use, are you

5  familiar with the authors of that letter?

6     A    I probably know some of them, yes, but I

7  can't recall any specific names.

8     Q    Do you know who James Madara is, a doctor

9  for the American Medical Association?

10    A    No.

11    Q    Is the American Medical Association a well

12  respected organization in the medical community?

13              MR. ARBITBLIT:  Objection.

14    A    I would say it's mixed.

15    Q    Are you a member of the American Medical

16  Association?

17    A    No.

18    Q    So we've got the AMA taking one position,

19  the CDC taking a different position, you have your

20  position about which of them is correct, the VA has a

21  position.  Is it fair to say there's some debate

22  within the medical community as to the appropriate

23  prescribing of opioids?

24              MR. ARBITBLIT:  Objection.

1      A    I think that the debate is really more

2   around what to do now, given the iatrogenic harm

3   that's already been done.  I don't think there's

4   debate about whether or not opioids really work for

5   chronic pain.  I think there is consensus that they

6   don't for the vast majority of people.  And I don't

7   think there is debate about whether or not opioids

8   are highly addictive, even when prescribed by a

9   doctor.  There is consensus that we have a huge

10  public health problem, an opioid addiction and

11  overdose problem caused by overprescribing.

12          The debate is around what to do with the

13  tens of millions of people who are already dependent

14  and addicted and how to solve that problem.

15     Q    Do you agree that the nation no longer has

16  a prescription opioid driven epidemic?

17               MR. ARBITBLIT:  Objection.

18     A    I disagree.  I disagree.

19     Q    Okay.  So if the AMA stated that, you

20  disagree with that, correct?

21     A    Yes, I would disagree with that.

22     Q    Do you agree that the CDC's approach fails

23  to balance needs for a comprehensive pain management

24  service, including access to non-opioid care, as well

Page 209

1   as opioid analgesics when clinically appropriate?

2               MR. ARBITBLIT:   Objection.

3       A    I agree that the CDC guidelines did not

4   address that in their original guidelines, those

5   issues raised, and those are real issues and worth

6   debating.

7       Q    And those issues are still being debated,

8   appropriate use of opioids, correct?

9       A    No, the issues I was referring to that are

10  still being actively debated are what to do with the

11  population of individuals already opioid dependent

12  who can't get off; and also, what to do -- sorry.  I

13  lost my train of thought.  I had another important

14  point.  But it will come back to me.

15      Q    I want to make sure we're clear --

16      A    Oh, yeah.  Sorry.  Sorry.  I remembered.

17  And also what to do about, you know, the millions of

18  Americans who struggle with excruciating,

19  debilitating pain, which is also something that I

20  really care about.

21            Opioids are not the answer, but we need to

22  address that problem as well.  And so there's concern

23  and debate, which is appropriate and justified about

24  how to do that currently.

Page 210

1    Q   Does the rate of suicide among patients who

2  were taking opioids but can no longer fill their

3  prescriptions concern you?

4             MR. ARBITBLIT:  Objection.  Assumes

5  facts not in evidence.

6    A   My understanding is that one of the biggest

7  risk factors for suicide in this country is

8  possession of an opioid prescription, because it's a

9  direct lethal means.

10    Q   And are you familiar with cases where

11  doctors or pharmacies refuse to fill prescriptions

12  and patients then committed suicide?

13             MR. ARBITBLIT:  Objection.

14    A   I have read about that in the lay press,

15  and I think that's terrible, you know, and we need to

16  be concerned about that as well.  But continuing to

17  dispense opioids in high volume to individuals who

18  have developed opioid related problems is not, you

19  know, not the answer.  We need to think about other

20  ways to help those individuals.

21    Q   So balancing all of these issues, would you

22  agree that cutting off the supply of opioids today is

23  not a reasonable step to take?

24             MR. ARBITBLIT:  Objection.

Page 211

1      A      Again, it depends on the case circumstance.

2   But I would agree, I would agree, that cutting off

3   the supply immediately to individuals who have become

4   physiologically dependent and need to be tapered

5   slowly is not the answer.

6           And to that end, I have created a protocol

7   called the BRAVO Protocol to educate physicians about

8   how to humanely and compassionately taper

9   opioid-dependent patients down to safer doses or off

10  altogether.  So I've been active in that arena trying

11  to help solve that problem.

12     Q     Move to strike as nonresponsive.

13          Dr. Lembke, do you believe there is a

14  percentage reduction in opioid shipment today that

15  would be appropriate?

16     A      As I said before, I think we need to at

17  least return to early 1990s levels of prescribing.

18  And even then, I think we should look at what other

19  countries are doing.  We're prescribing far more

20  opioids than any other country in the world, and I

21  think we could look at how they're managing pain in

22  order to figure --

23     Q     Dr. Lembke, you're now talking about

24  prescribing.  My question was:  Do you believe there

Page 212

1    is a percentage reduction in the distribution of

2    opioids that should be enacted today?

3                    MR. ARBITBLIT:  Objection.  Object to

4    cutting off the witness during her answer.

5         A    I think that those distribution rates

6    should go down to the rates at least of distribution

7    in the early 1990s and maybe even further based on --

8         Q       --

9                    MR. ARBITBLIT:  You're doing it again.

10   Just be a little patient.

11   BY MR. PYSER:

12        Q    So that would be 20 to 25 percent of

13   current distribution rates; is that right?

14        A    I don't really see it as my role to put a

15   specific percentage on it.  What I can relay is from

16   an historical experience that spans my career.  I

17   think other experts will give you numbers, if that's

18   what you're looking for.

19        Q    So, Dr. Lembke, if we returned to the rates

20   of distribution in the early 1990s, you've testified

21   earlier that that's approximately 20 to 25 percent of

22   current distribution rates.  So that would mean that

23   for every four pills shipped today, a distributor

24   would only ship one; is that right?

Page 213

1      A     I really don't want to give a specific

2    number, because I think it involves calculating

3    variables like growth in the population, you know, an

4    aging population.  But the bottom line is, we're

5    shipping too many opioids and we need to ship less.

6      Q     Well, Doctor Lembke, if someone who teaches

7    an addiction medicine at Stanford and has been paid

8    hundreds of thousands of dollars by the plaintiffs in

9    this case can't say what the appropriate level of

10   opioid distribution in this country today is, who

11   can?

12               MR. ARBITBLIT:  Objection.  Instruct

13   you not to answer.  Argumentative.  Frame a proper

14   question and I'll let her answer.

15               I'm instructing you not to answer.

16   BY MR. PYSER:

17     Q     Dr. Lembke, are you going to follow your

18   counsel's advice?

19     A     Yes, I am.

20     Q     Dr. Lembke, who would you recommend makes

21   the determination of what the appropriate level of

22   shipment of opioids should be in the United States?

23     A     I don't really know specifically.  I think

24   it should be people who have thought long and deep

Page 214

1   about this problem, who have reviewed the best

2   evidence, who are aware of the public health crisis

3   wrought by distributors' actions, taking all of that

4   into account.

5        Q    And, Dr. Lembke, have you thought at all

6   about what would happen if distributors only shipped

7   at the level of the early 1990s, if beginning

8   tomorrow distributors refused to ship more than

9   25 percent of today's shipments?

10                  MR. ARBITBLIT:  Objection.

11       A    So I have never said that it should happen

12  beginning tomorrow.  That would be as bad as cutting

13  off opioid dependent patients and not helping them

14  taper.  We have to help distributors taper as well.

15  They're also dependent, and we have to help them with

16  their dependency.

17       Q    How long do you believe it should take for

18  this country to get to what you claim is the

19  appropriate level of 20 to 25 percent of today's

20  opioid prescribing?

21                  MR. ARBITBLIT:  Objection.

22       A    I think it's on the order of years.  It

23  will take time.  It's not something that's going to

24  happen tomorrow.

Page 215

1      Q    Dr. Lembke, again, to ask you a personal

2   question -- and counsel is free to mark it

3   confidential, have you ever personally taken opioids?

4                  MR. ARBITBLIT:  Objection.

5      A    I have taken opioids -- I've been

6   prescribed or received opioids in the context of a

7   vocal chord surgery, so administered in the hospital,

8   which is why my voice is scratchy.

9      Q    And you were prescribed them.  Did you take

10   the opioids as part of your surgical treatment?

11      A    They were administered to me.  It wasn't

12   that I voluntarily took them.  I can tell you more

13   about that conversation if you want to hear it.

14      Q    So was it intravenous opioid administration

15   during a surgery; is that right?

16      A    That's correct.

17      Q    Was it fentanyl, the substance that was

18   administered?

19      A    Yes.

20      Q    Were you also prescribed any pills after

21   the surgery to take home with you?

22      A    No.

23                  MR. ARBITBLIT:  No need to mark it

24   then.

1    Q    Any other time that you've been prescribed

2  opioids, other than that surgical procedure?

3    A    Well, I've given birth many times, and I

4  have received opioids in the context of delivering.

5    Q    When you say in the context of delivering,

6  do you mean during birth, as in a local anesthetic?

7    A    I have received a small dose of opioids

8  while delivering a baby.  Just in the context of

9  delivering a baby, and not before and not after.

10    Q    Okay.  You have not been prescribed opioids

11  to take home with you after delivery?

12    A    No.

13    Q    And are you familiar with the fact that

14  many women are prescribed opioids after C-section

15  procedures in a pill form to take home?

16    A    Yes.

17    Q    Do you believe that's appropriate medical

18  treatment, to prescribe opioids following a

19  C-section?

20    A    Not without very careful monitoring

21  stewardship and limited doses for short duration.

22    Q    Do you believe under current guidelines for

23  obstetrics and gynecology appropriate procedures are

24  followed, or do you believe that opioids are

Page 217

1  overprescribed for Caesarean sections today?

2                    MR. ARBITBLIT:  Objection.  Compound.

3       A    I don't think I've looked specifically at

4  the data on opioid prescribing for Caesarean section

5  per se.  I have looked at data on opioid prescribing

6  in gynecologic surgery more broadly.  The evidence is

7  clear that they are overprescribed in that context,

8  and that when doctors have cut back on prescribing in

9  that context, they've seen improved outcomes.  And

10  also, importantly, patients have not reported having

11  more trouble with post-operative pain.

12       Q    And do you believe opioids are

13  overprescribed in obstetrics through today?  Is that

14  true today?

15       A    I think that's still true today.  Not in

16  all instances, but in many instances.  I think there

17  is an active movement to try to pull back on

18  prescribing, which is appropriate.

19       Q    Let's take a look, if we could, at

20  Exhibit 18.

21             And I'd like you to look in particular --

22  Exhibit 18 is the State of West Virginia Board of

23  Medicine Policy on Chronic Use of Opioid Analgesics.

24  Do you see that?

Page 218

1      A     Yes.

2      Q     And it was adopted on September 11th, 2017?

3      A     Okay.  Yes.  I see that.

4      Q     Okay.  Let's go to page 15, in the

5   conclusion.

6      A     Yes.

7      Q     And the third bullet point of the

8   conclusion reads:

9           "Adequate attention to patient education

10   and informed consent:  The decision to begin opioid

11   therapy for chronic pain is a shared decision of the

12   clinician and patient after a discussion of the risks

13   and a clear understanding that the clinical basis for

14   the use of these medications for chronic pain is

15   limited, that some pain may worsen with opioids, and

16   taking opioids with other substances, such as

17   benzodiazepine, alcohol, cannabis, or other central

18   nervous system depressants; or certain conditions

19   such as sleep apnea, mental illness, pre-existing

20   substance use disorder, may increase risks."

21           Did I read that correctly?

22      A     Yes, you did.

23      Q     Do you agree or disagree with that policy

24   of the West Virginia Board of Medicine?

1            MR. ARBITBLIT:  Objection.

2      A     As long as the decision-making is informed

3  by real evidence, I think it seems reasonable.

4      Q     Are you familiar with the West Virginia

5  Legislature's creation of the Coalition on Chronic

6  Pain Management?

7      A     Yes.

8      Q     Take a look at Exhibit 19.  And if you look

9  at Exhibit 19 on the first page, there's a section,

10  Overview of the Legislation.  Do you see that?

11      A     Which page?

12      Q     The very first one.

13      A     Yes, I see that.

14      Q     And it states in the third line:

15            "The coalition shall review the State's

16  chronic pain regulations and attempt to strike a

17  balance between regulation patient needs and clinical

18  judgment of physicians."  Do you see that?

19      A     Yes.

20      Q     And I want to look now at page 4 of this

21  document, the recommendations of the coalition on

22  chronic pain management.  And this is a document you

23  may recall you cited in your report.

24            Do you recall that?

Page 220

1        A     I'm sorry.  Could you repeat that?  Where

2    are we in this document?

3        Q     Sure.  We're looking at page 4.  I was

4    directing you there.  But separate question.  Do you

5    recall citing this document in your report?

6        A     Yes, I do.

7        Q     Okay.  And among the findings of the

8    coalition was a recommendation to the West Virginia

9    Legislature, that's SB-273, that's:

10             "Senate Bill 273 has inadvertently and

11   inappropriately interfered with the

12   patient/practitioner relationship, unnecessarily

13   regulating the evidence-based practice of medicine,

14   and in some cases even dissuade physicians who

15   deliver safe, legal, and necessary medical care to

16   patients suffering from pain.  In addition, in some

17   cases pharmacists have been dissuaded to dispense

18   safe, legal, and necessary medications to patients as

19   part of proper medication therapy management."

20             Do you agree with that finding of the

21   Coalition on Chronic Pain Management?

22                  MR. ARBITBLIT:  Objection.

23       A     I don't agree with all of it, no.

24       Q     Do you have concerns that some of the laws

Page 221

1    restricting prescribing and dispensing of opioids

2    have, as the Coalition found -- excuse me -- yeah,

3    the Coalition found, quote, "Inadvertently and

4    inappropriately interfered with the

5    patient/practitioner relationship"?

6              MR. ARBITBLIT:  Objection.

7         A    No.

8         Q    What about that statement do you disagree

9    with?

10        A    I disagree with that part of it.  I don't

11   think that it inappropriately interfered with the

12   patient practitioner relationship.  I think that was

13   appropriate.

14        Q    And on the front page of the Coalition on

15   Chronic Pain Management's report to the legislature,

16   there's a listing of individuals who made up the

17   Coalition.  Do you see that membership?

18        A    Yes, I do.

19        Q    And have you spoken to any of the

20   individuals who were part of the Coalition on Chronic

21   Pain Management?

22        A    No.

23        Q    Are you aware that the Stanford Pain

24   Management Center developed a free online course in

Page 222

1    conjunction with the American Academy of Pain

2    Medicine?

3         A    Yes, I was aware of that.

4         Q    Have you reviewed that course?

5         A    Parts of it, yes.

6         Q    Are you familiar with the content of the

7    course?

8         A    I think so, yeah.

9         Q    Is the Stanford Pain Management Center's

10   course reliable?

11                  MR. ARBITBLIT:  Objection.

12        A    So I would want to rereview it more

13   carefully, but -- in order to be able to answer that,

14   but my recollection is that some of the same

15   misleading messages were in that course -- some of

16   the same misleading messages that I talk about in my

17   report were in that course.

18        Q    Okay.  And what steps did you take to

19   correct what you believe are misleading messages that

20   are being disseminated by the Stanford Pain

21   Management Center?

22        A    Well, I wrote a book about it.

23        Q    Did you go to the Stanford Pain Management

24   Center and say, "As your colleague, I think you're

Page 223

1    making a mistake"?

2         A    Yes, I have done that many times.  I talk

3    frequently with my colleagues.  I have a courtesy

4    appointment in that department.  I debated my

5    colleagues in public forums on this issue.

6         Q    And who are the colleagues with whom you've

7    debated about this issue who disagree with you?

8         A    Sean Mackey.

9         Q    And is that Dr. Mackey?

10        A    Yes.  We don't disagree on all issues.  But

11   we do disagree on some.

12        Q    What do you and Dr. Mackey disagree about?

13        A    At this point it's been some time since

14   I've spoken to him about it, so I would probably have

15   to go back.  I wouldn't want to misrepresent his

16   views.

17        Q    Sitting here today, can you recall any of

18   the subjects on which you and Dr. Mackey disagree?

19        A    I would really want to review.  You could

20   also review a panel discussion that he and I had.

21   It's available to be viewed online.  You can see

22   that.

23        Q    Can you help me out?  Where is that

24   available to view online, if you recall?

Page 224

1       A    Stanford's Public Health Policy Forum.

2    It's in my CV.  I could look at my CV and find the

3    exact date.  I believe those are available for

4    viewing online.

5       Q    We'll take a look at that.

6            Back when you were a medical student at

7    Stanford, did your professors teach you that opioids

8    should be prescribed to treat pain?

9       A    Yes.

10      Q    Do you believe your professors were acting

11   in bad faith when they made that recommendation to

12   you?

13               MR. ARBITBLIT:  Objection.

14      A    What do you mean by "in bad faith"?

15      Q    Do you think that they had bad motives, or

16   do you think they were just expressing what their

17   understanding of best practices was at the time?

18               MR. ARBITBLIT:  Objection.

19      A    I think they were mostly well-intentioned

20   expressions, what they had been taught themselves.

21      Q    Does the Stanford University Medical School

22   still teach that opioids are indicated for the

23   treatment of chronic pain?

24      A    There is ongoing discussions and changing

Page 225

1    of the way that we're teaching opioid prescribing to

2    enlighten students about the fact that benefits were

3    overstated, and that the risks are significant.  And

4    I and my pain colleagues have collaborated together

5    to do that.  We have consensus on that material.

6        Q    Has that change been enacted as of today,

7    September 17, 2020?

8        A    Yes.

9        Q    When was that change enacted, to change the

10   way that Stanford University Medical School students

11   are taught about the treatment of chronic pain with

12   opioids?

13       A    So I was appointed along with one of my

14   pain colleagues to a task force -- I'm not

15   remembering the exact year, it is in the report -- to

16   look at that very problem and to do a better job

17   educating our students about responsible opioid

18   prescribing.

19       Q    Do you remember --

20       A    I have led that task force with colleagues

21   since that time.  And the curriculum continues to be

22   improved upon.

23       Q    Do you recall approximately when you

24   started that process of improving the curriculum as

Page 226

1    to treatment of chronic pain with opioids?

2        A    I'm looking at my CV now.  Here we go.

3            "Since 2016," this is page 2 of my report,

4    "I have chaired the Addiction Medicine Task Force.

5    The goal of the task force is to reevaluate and

6    recreate the medical school curriculum on addiction

7    and safe prescribing."

8        Q    So these changes to the curriculum to

9    educate medical students to prescribe less opioids,

10   would you say that began in 2016 with your

11   appointment there?

12       A    I think that's when they really gained

13   momentum.  I would say I have been making efforts

14   well before then to educate students, trainees,

15   colleagues.  And I wasn't alone in that, obviously.

16   There are many other people who have been, you know,

17   working on that project.

18       Q    Is it true that, let's say, in 2015 and

19   before, Stanford University medical students were

20   likely taught that opioids were indicated as a

21   treatment for chronic pain?

22       A    Yes.

23       Q    So going back to your report at page 62,

24   you have an Opinion No. 6. -- sorry, Doctor.  Bear

```
                                              Page 227

 1   with me one minute.

 2                  MR. PYSER:  You know what, we've been

 3   going about an hour.  Why don't we take a break now.

 4                  THE DEPONENT:  Okay.

 5                  MR. PYSER:  Can we go off the record,

 6   please?

 7                  VIDEOGRAPHER:  The time is 4:41.

 8   We're now going off the record.

 9                  (A recess was taken.)

10                  VIDEOGRAPHER:  The time is 4:51.

11   We're now back on the record.

12   BY MR. PYSER:

13      Q    Dr. Lembke, in your prior reports when you

14   spoke about manufacturer marketing, did you quantify

15   how much money was spent on manufacturer marketing?

16      A    No.

17      Q    Did you look at all about how much money

18   was being spent on marketing by manufacturers for

19   opioids?

20      A    My understanding is it's billions of

21   dollars.

22      Q    And do you think one way to measure part of

23   the influence on prescribing would be to look at how

24   much money individual companies are spending on
```

Page 228

1    marketing efforts?

2        A    That might be one direct method of looking

3    at it.

4        Q    I'm going to show you, Dr. Lembke, a

5    document that we just received from your counsel last

6    night as one of your materials considered.  So

7    obviously we couldn't put it in your box, because we

8    didn't have it yet.

9            So, Brad, if you could bring up Exhibit 33.

10              MR. MASTERS:  One second.  My machine

11   is a little slow.

12              MR. PYSER:  No problem.

13       Q    If it's going to take a while, Brad, we can

14   move on and come back to it -- oh.  There it is.

15   Okay.

16   BY MR. PYSER:

17       Q    Dr. Lembke, is this one of the studies that

18   you looked at recently?

19       A    Yes.

20       Q    Do you recall when you first looked at this

21   document for purposes of its inclusion in your

22   Materials Considered for this case?

23       A    It was some time ago.

24       Q    Approximately how long ago?  Six months,

Page 229

1   more, less?

2        A     Probably more.

3        Q     A year ago?

4        A     When did it come out?

5        Q     Let's see if we can zoom in on it.

6   November 11, 2013.

7        A     Yeah, I think it's been years ago since I

8   looked at this.  And then I've looked at it again

9   since I'll go back to an article multiple times.

10       Q     And you think you looked at it for purposes

11  of this case about six months ago; is that right?

12                    MR. ARBITBLIT:  Objection.

13       A     I don't remember exactly when I looked at

14  it.

15       Q     Do you think you looked at it more than a

16  month ago?  Just rough approximation for me, if you

17  could, Dr. Lembke.

18                    MR. ARBITBLIT:  Objection.

19       A     I know I have looked at this and I have

20  read this article.  And I don't remember the last

21  time that I reviewed it.  I'm sorry.

22       Q     Do you think it was more than a week ago

23  when you last reviewed it?

24                    MR. ARBITBLIT:  Objection.

Page 230

1          A     Yes.

2          Q     Dr. Lembke, I want to direct your attention

3    to that pie chart on the first page that looks at the

4    expenditures by type of pharmaceutical marketing in

5    2012.  Do you see that?

6          A     Yes.

7          Q     And in 2012 overall, this article or study

8    finds that there were $27 billion spent in

9    pharmaceutical marketing.  Do you recall that?

10         A     Yes.

11         Q     Okay.  Do you know how much, if any, of

12   that $27 million was spent by the three Distributor

13   Defendants here?

14         A     No.

15         Q     Did you review any of the references at the

16   end of the article to see if the source material

17   included distributors at all in its calculation of

18   marketing?

19         A     I may well have done that.  I don't

20   remember specifics.

21         Q     Sitting here today, do you know if a single

22   penny of that $27 billion came from any of the

23   defendants here?

24         A     I don't know.

Page 231

1      Q     Do you know what detailing is, in terms of

2   doctors, when a pharmaceutical marketer -- excuse me.

3   Strike that.  When a pharmaceutical manufacturer

4   details a doctor, do you know what that means?

5      A     Yes.

6      Q     What is detailing of a doctor?

7      A     Detailing is when representatives of the

8   opioid industry go to doctors' offices, or the places

9   where doctors work and target both doctors and their

10  staff with promotional material to promote

11  prescribing of their products.

12     Q     Didn't mean to cut you off there, Doctor.

13  I want to be clear about who we're talking about

14  here.  Are you aware of any doctor detailing

15  performed by any of the three distributor defendants

16  that are in this case?

17     A     I am aware of a collaboration between

18  McKesson and Janssen that involved the promotion of

19  Nucynta coupons, that involved also direct detailing

20  to promote those coupons.  Those coupons are being

21  disseminated by McKesson.

22     Q     Are you aware of any employee of McKesson

23  who detailed any doctor in the United States as part

24  of that program?

Page 232

1     A     Well, those detailers who were promoting

2  those coupons were effectively working for McKesson.

3     Q     Doctor, can you name any McKesson employee

4  who visited a doctor's office?

5     A     Well, I think I just answered that.

6     Q     No, I don't think you did, Doctor.

7  Dr. Lembke, are you aware of any visiting of doctors'

8  offices by McKesson employees?

9     A     I'm aware of employees of Janssen visiting

10  doctors' offices around a coupon that was created by

11  McKesson.

12     Q     Okay.  Again, are you aware of any McKesson

13  employee visiting doctors' offices?

14     A     No.

15     Q     And are you aware of any AmerisourceBergen

16  Drug Corporation employee visiting doctors' offices

17  as part of an effort to detail doctors?

18     A     No.

19     Q     And are you aware of any Cardinal Health

20  employee visiting doctors' offices as part of an

21  effort to detail doctors?

22     A     No.

23     Q     Dr. Lembke, I want to direct your attention

24  to page 78 of your report, and in particular,

1    paragraph G on page 78.  Are you with me, Doctor?

2         A    Yes.

3         Q    Okay.  And in paragraph G on page 78 of

4    your report, Exhibit 1, you refer to the SPACE

5    Randomized Clinical Trial?

6         A    Yes.

7         Q    And the SPACE Randomized Clinical Trial

8    published in 2018 was the first long-term randomized

9    controlled trial of opioids for the treatment of

10   moderate to severe pain; is that right?

11        A    Yes.

12        Q    And, in fact, you don't cite any studies

13   published prior to 2013 that suggest that opioids are

14   not more effective than non-opioids for treating

15   pain, correct?

16             MR. ARBITBLIT:  Objection.  Vague.

17   Confusing.  Double negatives.

18             MR. PYSER:  -- double negatives, so

19   I'll rephrase the question.

20   BY MR. PYSER:

21        Q    Dr. Lembke, are you aware of any studies

22   published prior to 2013 that suggest that non-opioid

23   treatment is more effective than opioids for treating

24   pain?

Page 234

1    A    I'm aware of studies showing that

2    non-opioids and opioids are comparable, and opioids

3    have significantly more harm, but I can't right now

4    recall a study specifically addressing what you just

5    said.

6    Q    Okay.  And the SPACE trial, as a long-term

7    randomized controlled trial, is that the gold

8    standard for study design to test effectiveness?

9    A    Yes.

10    Q    Dr. Lembke, in your opinion, by what year

11    did it become clear to a reasonable degree of medical

12    certainty that opioids were not more effective than

13    non-opioid treatments for treating chronic pain?

14    A    I think that -- I think that's been known

15    for probably a hundred years.

16    Q    So it's your view that for a hundred years,

17    doctors have known that non-opioid treatments are

18    more effective for treating chronic pain than opioid

19    treatments?

20              MR. ARBITBLIT:  Objection.

21    A    I'm sorry.  Could you rephrase the

22    question?

23    Q    Let's go back to the original, to make sure

24    we're on the same page.

Page 235

1      A     Okay.

2      Q     By what year would you say in your opinion

3   it became clear to a reasonable degree of medical

4   certainty that -- strike that.  Let me rephrase the

5   question, because I think we've got some double

6   negatives that are catching us up a little bit.

7           So, Dr. Lembke, by what year would you say

8   it became clear to a reasonable degree of medical

9   certainty that non-opioid alternatives were more

10  effective than opioids for treating chronic pain?

11                MR. ARBITBLIT:  Objection.

12     A     I'm not -- I think that most of the data

13  show that medications in general, whether opioids or

14  non-opioids, are not particularly effective at

15  treating chronic pain.  So I think I disagree with

16  the premise of your question.

17     Q     So the SPACE Randomized Controlled Trial

18  found no benefit of opioids over non-opioid

19  medication in 2018, correct?

20     A     That's correct.

21     Q     And up until that point --

22     A     Actually, let me qualify that.  Sorry.  I

23  think that non-opioids performed slightly better than

24  opioids in terms of pain intensity for the SPACE

Page 236

1   trial.

2       Q    So in the SPACE trial, non-opioids

3   prescribed -- strike that.  So in the SPACE trial,

4   non-opioids performed better than opioid medication

5   in the treatment of moderate to severe pain, correct?

6       A    Yes.

7       Q    And was that a new finding in 2018?

8              MR. ARBITBLIT:  Objection.

9       A    I can't recall right now whether there was

10  other head-to-head studies.  Certainly, there are no

11  other studies that went out for a whole year in a

12  sample population that was very similar to the types

13  of patients we actually see in the real world.

14      Q    So in what year did it become clear that

15  non-opioids were as effective as opioids in the

16  treatment of moderate to severe pain?

17             MR. ARBITBLIT:  Objection.

18      A    Yes, so I guess I'm not comfortable with

19  the way you framed the question, because it implies

20  that non-opioids are effective, it potentially

21  implies that opioids are effective, and that one is

22  better than the other.  The truth is, neither one

23  works very well in the treatment of chronic pain.

24      Q    But if we're just comparing the two,

Page 237

1   non-opioid pain treatment -- and to be clear, when

2   we're talking about non-opioids, we're talking about

3   acetaminophen, correct?  Is one?

4           You have to speak so the court reporter can

5   take down your words.

6       A    Yes.  Yes, I'm sorry.  Yes.  That's right.

7   Acetaminophen is one.

8       Q    Ibuprofen would be another example?

9       A    Yes.

10      Q    Can you name for me some other non-opioid

11  pain treatment medications?

12      A    Ox2 inhibitors, duloxetine, gabapentin.

13      Q    There is an array of non-opioid pain

14  treatments available, correct?

15      A    Yes.  Uh-huh.  Yes.

16      Q    And prior to the SPACE Randomized Clinical

17  Trial study, have there been any other randomized

18  clinical trial study that had compared opioids versus

19  non-opioids for the treatment of moderate to severe

20  pain that you're aware of?

21      A    I'm not aware of any other studies that

22  compare non-opioids and opioids that went out 12

23  months.

24      Q    Dr. Lembke, today, do you know what

Page 238

```
 1   percentage of opioid prescriptions are written for
 2   pain related to cancer?
 3        A    I think you asked me this already, and I
 4   said no.
 5        Q    You don't know?
 6        A    That's right.
 7        Q    Okay.  My apologies if I asked it already.
 8            Do you know what percentage of opioid
 9   prescriptions today are written for post surgical
10   pain?
11        A    No.
12        Q    Do you know what percentage of opioid
13   prescriptions today are written for chronic pain
14   conditions?
15        A    No, although I do know that that percentage
16   has been steadily increasing over the past three
17   decades.
18        Q    And has the percentage of prescriptions
19   written for chronic pain continued to increase more
20   recently, say over the last five years?
21        A    I think over the last five years there is
22   some decrement, but it really depends on where in the
23   United States you are talking about.  It varies
24   county to county.
```

Page 239

1    Q    Do you know, Doctor, what percentage of

2    opioid prescriptions are written for dental

3    procedures, like tooth extractions?

4    A    No.

5    Q    Doctor, do you have an opinion one way or

6    the other whether Medicaid should pay for opioid

7    prescriptions?

8                MR. ARBITBLIT:  Objection.

9    A    Medicaid is, you know, an insurance

10   company.  They should pay for treatment once it's

11   medically indicated to do so.

12   Q    And how should an insurance company, like

13   Medicaid decide whether a particular opioid

14   prescription is medically indicated?

15               MR. ARBITBLIT:  Objection.

16   A    They should weigh the evidence.

17   Q    And when looking at an individual opioid

18   prescription, how should an insurance company weigh

19   the evidence to decide whether to pay for that

20   prescription or not?

21               MR. ARBITBLIT:  Objection.

22   A    One of the factors would be what the

23   indication was, how much opioids were being

24   prescribed, in what context.

Page 240

1     Q     Any other information that would be useful

2  that you can think of?

3     A     That's sort of what I can think of now.

4  It's been a long day.

5     Q     Fair enough.  Are you aware that one

6  recommendation to limit the use of opioids has been

7  to limit payment by insurance companies for opioid

8  use?

9     A     Yes.

10     Q     Do you support that recommendation?

11     A     I support that recommendation with caveats.

12     Q     What are those caveats?

13     A     Making sure that patients who are dependent

14  on prescription opioids have enough time to taper

15  down to lower, safer doses, and making sure that

16  patients have at least some access to other

17  treatments for pain.  And that patients who have

18  become addicted to prescription opioids have access

19  to treatment for opioid addiction.

20     Q     Dr. Lembke, you mentioned earlier today

21  having read in the popular press some stories about

22  patients struggling with limited access to opioids.

23  Do you recall that?

24     A     Yes.

Page 241

1          Q     Take a look at Exhibit 21, if you could.

2                So taking a look at your copy of

3     Exhibit 21, is that a New York Times story?

4          A     Yes, it is.

5          Q     And it's titled "When the Cure is Worse

6     Than the Disease," and the subtitle is, "In an effort

7     to reduce opioid addiction, doctors are cutting back

8     on pain medication and sometimes leaving patients to

9     suffer."

10               Did I read that correctly?

11         A     Yes.

12         Q     Do you agree with the premise of the

13    article that -- phone interruption noise --

14         (Court reporter asked for clarification)

15               Dr. Lembke, do you agree with the premise

16    of the article that in an effort to reduce opioid

17    addiction, doctors are cutting back on pain

18    medication and sometimes leaving patients to suffer?

19         A     So I have spoken on this issue.  My BRAVO

20    Protocol, which is in the appendix, intended to

21    address this issue, which is that patients who have

22    become psychiatrically dependent on opioids should

23    not be abruptly cut off from those opioids, but

24    rather helped to taper to safer doses, or to get off

Page 242

1  entirely.  And that the phenomenon of patients having

2  difficulty finding doctors to help them with that is

3  a real phenomenon.

4       Q    And it's not just patients who need to

5  taper off.  Isn't it true there are also certain

6  diseases, like interstitial cystitis -- I'm going to

7  say this wrong --

8       A    Interstitial cystitis.

9       Q    Thank you.  Isn't it the case that there

10  are conditions, like the one you just mentioned,

11  interstitial cystitis, that require pain management

12  treatment from doctors?

13            MR. ARBITBLIT:  Objection.

14       A    Yes.  Let's go to -- in order to be able to

15  answer that, I'd like to go to Appendix IV on the

16  Proper Indications for Opioids.  This is a document

17  that I wrote, addressing the question when opioids

18  should be used.

19       Q    Okay.  I'm with you at page 253 of

20  Exhibit 1?

21       A    Yes.

22       Q    Okay.

23            So, Madam Court Reporter --

24       A    If you go to page 260, you will see the

                                        Page 243

1    section Opioid Use for Specific Painful Disease

2    States.

3         Q    Okay.

4         A    I'm reading from my report:

5              "Opioids are indicated for treatment of

6    certain painful diseases, for example, sickle cell

7    crisis and post-herpetic neuralgia, end-of-life

8    suffering, and hospice care.  Opioids are indicated

9    for cancer pain based in significant part on the

10   expectation that cancer patients have a limited life

11   expectancy, and that the risk of opioid use disorder

12   and mortality are outweighed by the benefits of pain

13   relief.

14             "However, with advance treatment methods,

15   more cancer patients are surviving for longer periods

16   of time, and the risk of addiction and overdose

17   mortality among cancer patients have been identified

18   in the peer-reviewed medical literature.  Thus, even

19   in the setting of cancer pain, caution should be

20   exercised to treat with the lowest dose for the

21   shortest time and to treat with low dose opioids

22   intermittently rather than continuously to reduce the

23   risks of opioid use disorder and mortality."

24        Q    Okay.  So, Dr. Lembke, returning to my

Page 244

1   question, which I think may be answered by just the

2   very first clause of the first sentence you read,

3   which is:  Are there diseases, like interstitial

4   cystitis --

5        A    I love that you can't say that.  That makes

6   my day.

7        Q    -- for which opioids are indicated for

8   treatment?

9                    MR. ARBITBLIT:  Objection.

10       A    So I think taking that first sentence out

11  of context is not an entirely accurate

12  representation, because it's -- certainly you want to

13  add the later sentences, in which I say that caution

14  should be exercised to treat with the lowest dose for

15  the shortest time and to treat with low dose opioids

16  intermittently rather than continuously.

17              So when we talk about using opioids in the

18  treatment of pain, the key there is to use them

19  short-term and at low doses, not at high doses for

20  long duration, because that's really when the risks

21  outweigh the benefits.

22       Q    Okay.  But there are certain painful

23  diseases that you list in your report at Exhibit 1,

24  page 260, sickle cell crisis and post herpetic

Page 245

1   neuralgia, where opioids are indicated for treatment,

2   correct?

3        A    Yes.

4        Q    Okay.  Is the disorder for which I cannot

5   say the name -- interstitial cystitis -- one of those

6   disorders for which opioids are indicated?

7        A    I'm not that familiar with that particular

8   disorder and the kinds of pain that people see with

9   that disorder.

10       Q    How about patients with spinal cord

11  injuries who, even after multiple surgeries, have

12  chronic pain, is that a situation in which opioids

13  may be indicated?

14       A    You know, unfortunately, the data are

15  pretty (indiscernible), that failed back syndrome,

16  which is a term for what you're describing, is a

17  situation in which opioid therapy long-term is not a

18  good idea.

19            And, again, I just want to emphasize, you

20  know, it's devastating, the pain that patients have

21  to experience.  If opioids were the solution, I would

22  be more than happy to prescribe them, but they're

23  not.  I think that's the problem.

24       Q    How about systemic lupus, is that a disease

Page 246

1    for which opioids can be indicated?

2         A    So systemic lupus is an autoimmune disease

3    which manifests variably across patients.  Some

4    people have very mild forms for which there is little

5    or no pain, and other people have severe,

6    debilitating, life-threatening forms.  Those would

7    depend on the individual case.  But, yes, there are

8    conditions in which opioids are indicated.  I make

9    that very clear in my report.  My point is that we

10   need to stop prescribing high doses for months to

11   years to decades.  That's the harm.

12        Q    Dr. Lembke, in your report, you refer to

13   something as The Gateway Effect.  Do you recall that

14   term?

15        A    Yes.

16        Q    Are your opinions as to the Gateway theory

17   the same as those you offered in New York and Ohio?

18        A    Yes.

19        Q    Do you know, Dr. Lembke, what percentage of

20   people who are prescribed opioids become addicted to

21   prescription opioids?

22        A    I think the Vowels study addresses that.

23   And that's in my report.  The Vowels study estimates

24   that approximately 10 percent of patients receiving

Page 247

1  opioids for a medical condition will go on to develop

2  a severe opioid use disorder and approximately 20 to

3  25 percent will develop what Vowels calls opioid

4  misuse, but which is effectively the equivalent to a

5  mild opioid use disorder.

6      Q     And do you believe those statistics from

7  that study are accurate and reliable?

8      A     Yes.

9      Q     And when we talk about those prescribed

10 opioids, are you limiting that universe of people,

11 those prescribed opioids, if we go back to earlier in

12 the day when we put opioid prescriptions in three

13 categories -- we had the Lembke approved category;

14 the doctors operating in good faith, Category 2; and

15 Category 3 was instances where it's a pill mill, a

16 doctor is breaking the law.  So the instances that

17 are being looked at there in the study you just

18 quoted, is that across all three categories, or is it

19 limited to people who received a legitimate

20 prescription?  And by "legitimate," I mean in

21 Category 1 or 2?

22              MR. ARBITBLIT:  Objection.

23     A     Yes.  So the VOLE (phonetic) study, there's

24 also the Boscarino study, those all look at patients

Page 248

1    who are receiving legitimate opioid prescriptions for

2    a medical condition, and both of those studies

3    estimate that between 10 and 30 percent of the

4    patients will become addicted through a medical

5    prescription.  And I think those are reliable

6    sources.

7         Q    Do you know what percentage of people who

8    develop an opioid use disorder later begin using

9    heroin?

10        A    So I cite -- I'm sorry.  Can you just

11   rephrase the question?  Can you restate the question?

12   Not rephrase, just restate.

13        Q    I'll do my best.  Dr. Lembke, do you know

14   what percentage of people with an opioid use disorder

15   based on prescription opioids later begin using

16   heroin?

17        A    So the Lankenau study that I cite notes

18   that two-fifths of patients who began with a medical

19   prescription ended up as injection drug users,

20   primarily heroin.

21        Q    I'm sorry, two-fifths of patients with

22   opioid use disorder?  So --

23        A    Yes, two-fifths of patients who were

24   injection drug users started with their own medical

Page 249

1    prescription.

2        Q    Okay.  And do you know, of the patients who

3    are intravenous drug users, or heroin users, what

4    percentage of those individuals used alcohol before

5    they used heroin?

6        A    Are you talking about using alcohol

7    recreationally, having alcohol use disorder -- I

8    mean, that's a broad category.

9        Q    Alcohol use disorder.

10       A    So what percentage -- If you could restate

11   the question.

12       Q    What percentage of patients who later

13   develop a heroin use disorder had previously suffered

14   from an alcohol use disorder?

15       A    I don't have specific numbers on that, no.

16       Q    Do you have specific numbers on what

17   percentage of heroin users had previously used

18   alcohol in a recreational manner?

19       A    No.

20       Q    Do you have a percentage on what percentage

21   of heroin users had previously used marijuana in a

22   recreational manner?

23       A    No.

24       Q    Do you have a percentage of heroin users

Page 250

1    who previously used methamphetamine in a recreational

2    manner?

3        A    Could you describe what you mean by

4    recreational manner?  I mean, Americans use alcohol

5    in a recreational manner.  Many Americans use

6    cannabis in a recreational manner.

7        Q    Let's go to methamphetamine.  Would you

8    agree with me that any use of methamphetamine is

9    contrary to medical advice?

10       A    No.

11       Q    Would you agree with me that -- Are there

12   methamphetamines that are prescribed by doctors?

13       A    Yes.

14       Q    Would you agree with me that

15   methamphetamine not prescribed by a doctor is

16   contrary to medical advice, people shouldn't be using

17   methamphetamine unless prescribed?

18       A    Yes.

19            MR. ARBITBLIT:  Objection.

20       Q    Do you know -- And would it be fair to say

21   that if you're using methamphetamine without a

22   doctor's prescription, would you call that illegal

23   use of methamphetamine?  Can we agree on that term?

24       A    Okay.

1      Q     Do you know what percentage of heroin users

2    previously were illegal users of methamphetamine?

3      A     No.

4      Q     Doctor, I want to return briefly to the

5    last topic we were talking about where we were

6    talking about the percentage of patients prescribed

7    opioids who later develop an addiction or opioid use

8    disorder, okay?

9      A     Okay.

10     Q     And please correct me if I'm

11   misremembering.  I believe you said that 10 to

12   30 percent of all patients who were prescribed

13   opioids later develop opioid use disorder; is that

14   right?

15     A     Yes.

16     Q     Okay.  I just want to clarify.  The patient

17   population you're talking about there, is that

18   limited to chronic pain patients?

19     A     For the Boscarino study, the sample that

20   they took was a patient population sample who had

21   received, I believe, five or more prescriptions

22   within the year.  I don't know whether or not they

23   specified chronic pain diagnosis, but they

24   extrapolated, given that number of prescriptions,

Page 252

1    that the individual had chronic pain, because they

2    were given opioids chronically.

3           In the Vowels study, I believe that they

4    did limit it to a chronic pain population -- chronic

5    non-cancer pain population.

6       Q    Okay.  So your statistic that 10 to

7    30 percent of patients who develop opioid use

8    disorder -- excuse me.  Strike that.

9           So your assessment that 10 to 30 percent of

10   patients prescribed opioids develop opioid use

11   disorder is based on one of two populations, either

12   chronic pain patients or those who received more than

13   five prescriptions for opioids within a single year,

14   correct?

15      A    I believe it was five or more, but yes.

16      Q    Okay.  So in that 10 to 30 percent study,

17   it would not capture someone who, for example,

18   received a single prescription for opioids after a

19   Cesarean section, correct?

20      A    It would not capture that, but I have in my

21   report other data regarding single exposure, for

22   example, the Schroeder study --

23           (Audio distortion ringtone alert

24   interference; court reporter asked for clarification)

Page 253

1          -- yeah, other data looking at -- So first

2     of all, let me just say in response, it is possible

3     to become addicted to opioids after a single medical

4     prescription.  I have seen that clinically, and there

5     are data in the literature to support that.  And

6     those are in my report.

7          Q    So, Dr. Lembke, do you have a percentage to

8     offer of the percentage of patients who suffer from

9     opioid use disorder after a single prescription for

10    opioids?

11         A    I think that the data shows that it's about

12    6 to 10 percent of people will go on to develop an

13    opioid use disorder with a single exposure.

14         Q    Okay.  And where are you basing that 6 to

15    10 percent figure, from what?

16         A    So that's based on Schroeder, et al -- I

17    can find it in my report -- as well as other studies

18    by Brummett, et al, and Delgado, showing persistent

19    opioid use after being treated with opioids for an

20    acute self-limiting injury.

21              Now, persistent opioid use is not the same

22    as addiction, but it certainly increases the risk of

23    addiction.

24         Q    Okay.  So in those studies are we limiting

1    the population to just those who have received a

2    single prescription, or is it a wider population,

3    including those who received a single prescription or

4    those who received many opioid prescriptions?

5        A    The vast population, since you asked about

6    a single prescription, is limited to people who have

7    received a single prescription.

8        Q    And it's not calculating those who end up

9    with opioid addiction or opioid use disorder.  What

10   is the outcome that it's calculating?  You just said

11   it.  I want to make sure I'm clear?

12       A    Well, for the Schroder study, it was

13   calculating how many people ended up with an opioid

14   use disorder, documenting in the medical record

15   within a year of being prescribed an opioid as part

16   of a dental procedure.  The other studies are looking

17   at persistent opioid use, which is the scenario in

18   which a patient has an acute injury, is prescribed an

19   opioid, and a year later, or three years later in

20   some cases, is still being prescribed an opioid

21   presumably for the acute injury.

22       Q    Do you know what year the Schroeder study

23   was published?  I don't have it handy in your report.

24                 MR. ARBITBLIT:  Want my help, Steve?

Page 255

1          MR. PYSER:  In this rare instance,

2     yes, sir.

3          MR. ARBITBLIT:  That's why I waited so

4     long to ask.  If you look at page 53 of the Materials

5     Considered, Item 679 is the Schroeder study, 2018.

6          MR. PYSER:  Thank you.

7          MR. ARBITBLIT:  The first one is free.

8          MR. PYSER:  Why don't we take about

9     five minutes.  I'll likely be able to pass the

10    witness when we come back.  I just want to check my

11    notes real quick.

12          VIDEOGRAPHER:  The time is 5:34.

13    We're now going off the record.

14          (A recess was taken.)

15          VIDEOGRAPHER:  The time is 5:40.

16    We're now back on the record.

17          MR. PYSER:  Before passing the

18    witness, I just wanted to make the point that we're

19    going to hold this deposition open because of last

20    night's disclosure of new material.  There's many

21    documents on that list that we haven't been able to

22    open yet, and certainly with a document delivered at

23    6:39 p.m. the night before a deposition, haven't been

24    able to analyze.

Page 256

1            So with that on the record and

2    reserving our rights to come back to Dr. Lembke with

3    any questions on those, I'll pass the witness.

4                 MR. ARBITBLIT:  Before you go, I'll

5    just state, Steve, you're entitled to your position.

6    But I think in fairness, as we stated, the

7    witnesses -- the witness is under an obligation to

8    produce materials she's seen, and she met that

9    obligation, and so did we.  And that with the

10   exception of one question when you asked her

11   specifically if she had knowledge of something, and

12   she offered that in response to a question, the

13   circumstances are, as we've stated, opinions are as

14   stated in the report and the materials provided and

15   listed, along with the report, are those that she

16   would rely on for her testimony.  She was entitled to

17   answer honestly when you asked her a question about

18   knowledge of something that was in those new

19   documents.

20            So we represent to you that the

21   opinions she plans to offer at trial will not go

22   beyond the report, nor will it go beyond the

23   materials stated and the materials considered.  So I

24   just want to make the record clear on that.

Page 257

1          MR. PYSER:  Well, I just want to

2     clarify what you just said, Counsel.  When you say

3     the opinion won't go beyond the materials, maybe I

4     misunderstood your language.  The materials stated.

5     Are you referring to the materials in the report, or

6     are you including the materials that we received last

7     night at 6:39 p.m. amongst the materials she may use

8     to form her opinions at trial?

9          MR. ARBITBLIT:  I'm excluding the

10    materials that were on the list you received last

11    night.  I'm limiting -- and the witness' testimony

12    will be limited, unless someone asks her a question

13    that's open-ended and calls for something that she

14    has to answer honestly, based on knowledge, which I'm

15    sure you would agree would be appropriate, but as

16    good lawyers you will be careful to ask her questions

17    that are within the bounds of the report.

18          And that's what she's planning to

19    testify to, the August 3rd report and the

20    August 3rd list of Materials Considered in support

21    of those opinions, not the documents that you

22    received last night.

23          MR. PYSER:  I appreciate that

24    clarification, Counsel.  I think we still have an

Page 258

1    issue, and we reserve our right if we decide to go to

2    the judge and Special Master Wilkes to request more

3    time.

4              Okay.  I believe Ms. Rodgers is up

5    next.

6              MS. RODGERS:  Thank you.

7         EXAMINATION BY COUNSEL FOR MCKESSON:

8    BY MS. RODGERS:

9       Q    Hi, Doctor.  My name is Megan Rogers.  I'm

10   with the law firm Covington and Burling and I'm

11   representing McKesson.  I just want to --

12        (Audio distortions; court reporter asked for

13   clarification.)

14             VIDEOGRAPHER:  The time is 5:44.

15   We're now going off the record.

16                   (Pause )

17             VIDEOGRAPHER:  The time is 5:45.

18   We're now back on the record.

19             MS. RODGERS:  Okay.  I was just saying

20   that at the outset, I wanted to join in Mr. Pyser's

21   reservation of rights before I forget at the end,

22   based on the -- (audio distortion) list of materials

23   preserved -- or Materials Considered.  I understand

24   (audio distortion) Materials Considered -- I

Page 259

1   understand your counsel's position on those, but

2   we're going to join with Pyser as to our rights to

3   that issue.

4   BY MS. RODGERS:

5       Q    I want to turn back to your fifth opinion

6   in your report, and I'm not going to retread old

7   ground, but I want to start on page 53 and walk

8   through the seven specific instances in your report

9   where you allege that McKesson collaborated with

10  manufacturers.

11          So starting with romanette i, page 54, if

12  we could.  The first such program is an alleged

13  partnership between McKesson and Janssen, related to

14  Duragesic.  Do you see that in your report?

15      A    Yes.

16      Q    Thank you.  And with respect to this

17  romanette i, you cite one document in support of this

18  paragraph, and that document is in Envelope No. 25

19  that you have with you.  Could you go ahead and open

20  that?

21          And this program relates to a voucher,

22  correct?

23      A    Yes.

24      Q    And it's for Duragesic, which is a patch,

Page 260

1   not a pill, right?

2        A    Yes.

3        Q    And you understand that even with this

4   voucher, a patient still needed to obtain a

5   prescription before obtaining the medication from a

6   pharmacy?

7        A    Yes.

8        Q    If a doctor has written the prescription

9   for Duragesic, the doctor should have made the

10  decision that that opioid is an appropriate

11  medication for treatment of pain in that patient,

12  right?

13                 MR. ARBITBLIT:  Objection.

14       A    Again, the doctor can only make that

15  determination if they have the information necessary

16  to make that determination.

17       Q    You would expect the doctor to endeavor to

18  make this decision that the opioid is an appropriate

19  medication for treatment of pain before writing this

20  prescription, right?

21                 MR. ARBITBLIT:  Objection.

22       A    Yes.

23       Q    In fact, the doctor is legally obligated to

24  do so, right?

1          MR. ARBITBLIT:  Objection.

2     A    Yes.  But the doctor cannot fulfill that

3  legal obligation if they're being fed false

4  information about the product.

5     Q    I understand that's your position.  My

6  question was just a yes or no.  A doctor is legally

7  obligated to exercise their judgment and determine

8  that an opioid is an appropriate medication for

9  treatment of pain before writing this prescription,

10 correct?

11          MR. ARBITBLIT:  Objection.  Asked and

12 answered.

13    A    To me, that's not yes or no without

14 qualifying that.  In order to exercise judgment, you

15 have to know what the signs show.

16    Q    -- doctors are not legally obligated to do

17 that?

18          MR. ARBITBLIT:  Objection.

19    A    I think you would have to say your question

20 again for me.  I feel like I have answered it.

21    Q    I'm not trying to trick you.  It's a pretty

22 simple question.  I'm sure you teach it to your

23 students all the time.  The question is:  Are doctors

24 required to exercise their medical judgment before

Page 262

1    writing a prescription?

2              MR. ARBITBLIT:  Object to the prelude.

3    Objection.  Asked and answered.

4        A    As I stated repeatedly, it is impossible to

5    exercise medical judgment if you don't have accurate

6    information.

7        Q    I'm going to try it one more time, because

8    my question (audio distortion) -- it's just --

9    (distortion) simple question.  Are doctors required

10   to exercise their medical judgment when writing a

11   prescription for a patient?

12             MR. ARBITBLIT:  Objection.  Asked and

13   answered.  Object to the prelude.

14       A    I feel like I answered it already.  I want

15   to give you as truthful an answer as I can, as

16   complete an answer as I can.  I'm trying to give you

17   the answer that represents my true opinion so you can

18   know what that is, and I have answered it.

19       Q    Okay.  We'll let the judge decide if you

20   have answered it.

21             Do you know how many doctors, if any, in

22   Huntington and Cabell County saw this voucher that

23   you're looking at?

24       A    No.

Page 263

1      Q    Do you know how many patients, if any, in

2   Huntington and Cabell County saw this voucher?

3      A    No.

4      Q    Do you know if the voucher was ever used

5   for a prescription of Duragesic in Huntington and

6   Cabell County?

7      A    No.

8      Q    And if you look at this voucher, can you

9   identify any false or misleading claims contained

10  within it?

11     A    So the voucher in the middle has a

12  question, what type of chronic pain do you have, with

13  four boxes that can be checked, including lower back

14  pain and arthritis pain, as well as an option for

15  filling in whatever you want.

16          Which I think is misleading, because it

17  implies that opioids, like fentanyl, are effective

18  treatment for low back pain and arthritis pain, when,

19  in fact, there is a consensus agreement now in the

20  medical profession that opioids are not good

21  treatment for chronic low back pain or chronic

22  musculoskeletal pain.  So that is misleading in my

23  opinion.

24     Q    Is that the only thing on this voucher?

Page 264

1        A     I'm reading the backside now.

2              I think it's misleading.   The statement on

3    the backside is in extremely small print, that says

4    that this should be used to relieve severe pain that

5    will last more than three months.   That suggests

6    there is evidence to support the use of fentanyl for

7    the treatment of pain lasting more than three months.

8    There is no such evidence.

9        Q     And that's actually a statement of

10   limitation, right?   It's saying it should not be used

11   for longer than three months?   You're taking issue

12   with that?

13       A     Well, no, that's not what the statement

14   says.   The statement says it should only be used to

15   relieve severe pain that will last more than three

16   months.

17       Q     Okay.

18       A     So it's proffering Duragesic as a treatment

19   for pain that lasts three -- more than three months,

20   even though there is no evidence to support that.   So

21   that is misleading.

22       Q     Okay.

23       A     The other thing that is misleading -- yeah,

24   there's one more misleading thing, would you like me

Page 265

```
 1   to share that?
 2        Q    Sure.
 3        A    It does mention side effects, but not the
 4   side effects with a risk of addiction, which I think
 5   is misleading by having omitted it.
 6        Q    Okay.  So taking these one at a time, the
 7   first thing that you say is misleading is the
 8   question on the front which says:  What type of
 9   chronic pain do you have?
10             Right?
11        A    Yes, with specific check boxes suggesting
12   that fentanyl is effective treatment for something
13   like lower back pain, chronic low back pain --
14        Q    This question, though, is not actually
15   making a claim about the product, correct?
16                  MR. ARBITBLIT:  Objection.
17        A    Well, my point is I think that it is making
18   such a claim by suggesting that there are certain
19   types of chronic back pain that could be treated with
20   fentanyl, including the statement on the back that
21   "This is for people who have pain for longer than
22   three months."
23             So I think it's common sense to infer that
24   that's promoting the use of Duragesic in pain that
```

Page 266

1    lasts longer than three months, which is the

2    definition for chronic pain.

3        Q    Okay.  I guess I'm just wondering, I mean,

4    this is -- it's your opinion that -- First of all, do

5    you know if this drug was FDA approved for these

6    indications?

7                    MR. ARBITBLIT:  Objection.

8        A    So you would probably have to refresh my

9    memory, because each label is slightly different, and

10   I can't exactly remember Duragesic's label, but I am

11   happy to review it.

12       Q    So you don't know one way or the other

13   whether it is FDA indicated for these conditions,

14   it's just your opinion that it's misleading?

15                   MR. ARBITBLIT:  Objection.  Multiple

16   questions.  Compound.  Prelude.

17       A    It is my opinion that it is misleading.

18   That's correct.

19       Q    And that's your opinion without knowing

20   whether it's FDA approved for the condition?

21                   MR. ARBITBLIT:  Objection.

22       A    Even if it were FDA approved for this

23   condition, that would be my opinion.

24       Q    And then on the back, you mention the

Page 267

1    statement:  It should only be used to relieve severe

2    pain that will last more than three months.

3            The next sentence there is:  "It should

4    only be used when other less strong medicines have

5    not been effective and when pain needs to be

6    controlled around the clock."

7            Did I read that correctly?

8    A    Yes.

9    Q    Thank you.  And then you also mention the

10   third reason that you find this to be misleading is

11   that it does not mention addiction as a side effect.

12   When a patient picks up their prescription for

13   Duragesic, is there a warning about addiction on that

14   prescription?

15            MR. ARBITBLIT:  Objection.

16   A    On which part of the prescription?

17   Q    In the box.

18            MR. ARBITBLIT:  Objection.

19   A    The FDA insert?

20   Q    Yes.

21   A    Yes, there is.

22   Q    Thank you.  Now, you've seen evidence that

23   McKesson conceptualized, designed, or bore the cost

24   for this voucher program, right?

Page 268

1      A     I'm sorry.  I didn't quite understand.  It

2   was a little garbled.  Can you say it again?

3      Q     Sure.  You saw no evidence that McKesson

4   conceptualized this voucher program, right?

5      A     That is incorrect.

6      Q     So point me to that, because this is the

7   one document that you cited in your report.  Where on

8   this document does it show that McKesson

9   conceptualized this voucher program?

10                  MR. ARBITBLIT:  Objection.

11     A     Well, I'm not sure if it's on this actual

12  document, but I did see other material that made it

13  clear that McKesson was collaborating with Janssen

14  around this Duragesic patch.

15     Q     Dr. Lembke, this is the only document

16  you've cited.  I'm struggling to understand what the

17  evidence is for that statement.  Can you help me?

18     A     I don't see it here in my report, but I am

19  recalling that there was other evidence, that this

20  was a collaboration.  I'm sorry.  I can't find it

21  right now.

22                  I do see at the bottom the words MTK, which

23  refer to McKesson, but I'm assuming --

24     Q     -- Bates stamp -- got it.

Page 269

1          So when you say collaboration, the ones

2     that I see on this card is on the back under pharmacy

3     processing, it says "Submit claim to McKesson, using

4     Bin No. 610500."  Do you see that?

5          A     Thank you.  Yes.  Great.

6          Q     So when you say McKesson is collaborating

7     with Janssen, what you mean is at the back of this

8     voucher says that, says:  "Submit claim to McKesson"?

9          A     Yes.

10         Q     Okay.  You have no evidence that McKesson

11    designed this program, for example?

12         A     I don't have evidence that McKesson

13    necessarily designed this program, but I assume that

14    they worked in collaboration with Janssen since they

15    are the ones who made the voucher and are passing out

16    the voucher.

17         Q     You have no evidence that McKesson bore the

18    cost of this program?

19         A     I'm not recalling the details of the

20    payment agreement on this particular product.  If I

21    reviewed them, I can't remember them now.

22         Q     You're not recalling them because this is

23    the one document you cited about this program, and

24    there's no indication of that, correct?

Page 270

1      A     Well, this is not the only document I cited

2   about this program.   I also cited some sales training

3   materials from Janssen on this program.

4      Q     You cited an internal Janssen document,

5   correct?   In addition to this voucher?

6      A     Yes.

7      Q     And there is no indication on that internal

8   Janssen document, by the way, that McKesson had ever

9   seen that document?

10     A     Well, it does say "Submit claims to

11  McKesson."   So I'm assuming that they saw the

12  voucher.   Is that what document you're talking about?

13     Q     Yes.   You were just referring, though, to

14  the internal sales document from Janssen that you

15  cited in romanette ii, and my question is:   You have

16  no evidence -- there is no indication that McKesson

17  ever saw that document, correct?

18     A     I have no evidence that they ever saw that

19  document.

20     Q     Okay.   And earlier today you were asked

21  some questions about whether distributors dispensed.

22  Do you remember that?

23     A     Yes.

24     Q     And I believe you testified earlier that

Page 271

1    McKesson collaborated with Janssen, and you said to

2    dispense coupons.  This is the program to which you

3    were referring, correct?

4        A    Yes, among others.  There was also the

5    McKesson/Janssen incentive program.  And the

6    McKesson/Purdue saving card program.

7        Q    Okay.  Let's talk about just this one for

8    the time being.  You don't mean -- You didn't mean to

9    testify that McKesson dispensed actual medication to

10    a patient, correct?

11                MR. ARBITBLIT:   Objection.

12        A    The physical act of dispensing is the

13    pharmacist.

14        Q    Right.  McKesson has never dispensed actual

15    medication to a patient in Huntington and Cabell

16    County, correct?

17        A    Not physically dispensing, no.

18        Q    Thank you.

19             Okay.  The second program that you discuss

20    is an alleged partnership with Janssen for Nucynta.

21    You just mentioned that.  It's on page 56 of your

22    report, romanette iii?

23        A    Yes.

24        Q    Okay.  And this is also a savings card,

Page 272

1    correct?  That would -- Nucynta?

2        A    It's both a savings card program and ten

3    free pills, which is a little different from a

4    savings card.

5        Q    And it offered co-pay assistance for the

6    cost of the prescription?

7        A    Yes.

8        Q    You understand that even with a coupon for

9    co-pay assistance, a patient still needed to obtain a

10   prescription before obtaining the medication?

11       A    Yes.

12       Q    Would you agree that it's a good thing for

13   patients to be able to afford medicine that they

14   need?

15              MR. ARBITBLIT:  Objection.

16       A    It really depends on the circumstance and

17   the type of medicine and who's judging whether or not

18   they really need it.

19       Q    If a doctor has made an informed decision

20   that a patient needs a medical prescription, would

21   you agree that it's a good thing for that patient to

22   be able to afford it?

23              MR. ARBITBLIT:  Objection.

24       A    If that clinical judgment was based on real

Page 273

1    evidence and whether the patient's best interests,

2    both short- and long-term, then it would be good for

3    that patient to get that medicine, yes.

4        Q    Okay.  Do you know how many doctors in

5    Huntington and Cabell County, if any, saw this

6    savings card?

7        A    No, but I do -- I have seen materials

8    showing that this savings card was disseminated in

9    West Virginia.

10       Q    Where is that?

11       A    That was the additional materials

12   considered, I believe.

13       Q    Okay.  Again, we haven't had a chance to

14   fully digest those materials.  We are holding open

15   this deposition to ask you further questions about

16   that.

17            Can you identify the Bates number or any

18   other information about that document?

19       A    No.

20       Q    Okay.  So it's your testimony that you've

21   seen some indication that this card, this savings

22   card, was distributed and -- tell me again?

23       A    In West Virginia.

24       Q    Okay.  Do you know how many doctors in

```
                                              Page 274
```

1    Huntington and Cabell County saw it?

2         A    No.

3         Q    Do you know how many patients in Huntington

4    and Cabell County saw it?

5         A    No.

6         Q    Do you know if it was ever used for a

7    prescription of Nucynta in Huntington and Cabell

8    County?

9         A    No, but I assumed that it was.

10        Q    And what is that assumption based on, the

11   fact that you think it was distributed?

12        A    On the fact that it was a national program

13   which was also deployed in West Virginia.

14        Q    Okay.  So you practice evidence-based

15   medicine, right?  You said that earlier.

16        A    Yes.

17        Q    And I assume you endeavor to apply that

18   same rigor to your expert opinions here, right?

19        A    Yes.

20        Q    So when you say that you assumed that the

21   savings card was used in West Virginia, tell me what

22   evidence you have?  Do you know how many times it was

23   used in West Virginia?

24              MR. ARBITBLIT:  Objection.  Compound.

Page 275

1       A    Could you rephrase your question one at a

2    time?

3       Q    Sure.  Can you tell me how many times the

4    savings card was used in Huntington and Cabell

5    County?

6       A    No.

7       Q    Okay.  And have you conducted any (audio

8    distortion/garbled) to determine the impact of the

9    savings card on opioid prescribing in Huntington and

10   Cabell County?

11      A    One of your words dropped out.  Can you

12   repeat the question?

13      Q    Have you conducted any studies to determine

14   the impact of this savings card on opioid prescribing

15   in Huntington and Cabell County?

16      A    No, but McKesson conducted such studies in

17   other states where the program was first deployed and

18   it showed that average monthly claims went up by

19   198 percent when they promoted this card.

20      Q    That wasn't an answer to my question, which

21   was:  Have you conducted any study to determine the

22   impact of this savings card on opioid prescribing in

23   Huntington and Cabell County?

24      A    Well, I was trying to answer your question

Page 276

1    in a complete way, and that was my answer.

2        Q    My question is whether you, Dr. Lembke,

3    have conducted a study to determine the impact of

4    this savings card on opioid prescribing in Huntington

5    and Cabell County?

6                    MR. ARBITBLIT:  Objection.

7        A    No.

8        Q    Thank you.  The third program is also on

9    page 56, and it's at romanette iv.  And you cite one

10   document.  It's actually -- let's see, in the

11   envelope marked 29 that you have in front of you.

12   And it's an alleged partnership with Purdue for

13   Butrans.  Do you have that in front of you?

14       A    Yes.

15       Q    Okay.  And this is a savings card program

16   for Butrans Transdermal.  Does that sound right?

17       A    Yes.

18       Q    This is a patch again, not a pill, right?

19       A    Yes.

20       Q    And the savings card offers co-pay

21   assistance for the cost of the prescription?

22       A    Yes.

23       Q    You understand that Butrans is brand name

24   Buprenorphine?

Page 277

1          A     Yes.

2          Q     And Buprenorphine can be used to treat

3     opioid addiction, right?

4          A     Yes.

5          Q     In your opinion --

6          A     Although this particular product is not FDA

7     approved to treat opioid addiction.

8          Q     Have you ever prescribed this product to

9     treat opioid addiction?

10         A     No.

11         Q     Are you aware of other doctors prescribing

12    this to treat opioid addiction?

13         A     No.

14         Q     Okay.  And you understand, again, that even

15    with this savings card, a patient still needed to

16    obtain a prescription before obtaining the

17    medication?

18         A     Yes.

19         Q     This letter that we're looking at is (audio

20    distortion) by Purdue, not McKesson, right?

21                    MR. ARBITBLIT:  Objection.

22    BY MS. RODGERS:

23         Q     It's not a trick question --

24         A     Yes, it says Purdue at the bottom of the

Page 278

1   letter, so I'll take your word for it.  But that

2   particular item was not drafted by Purdue, although

3   more broadly, this was clearly a collaboration

4   between McKesson and Purdue.

5        Q    And I think you just mixed up some words.

6   You said this particular document, this letter, was

7   not drafted by McKesson.  That's what you meant,

8   right?

9        A    Just this very front piece.  I can't see

10  McKesson's imprint on here, so I really don't want to

11  assume that I know who wrote this, one way or

12  another.

13       Q    Okay.  And on that first page there is a

14  boxed warning, correct?

15       A    Yes.

16       Q    It's bold and underlined, and there is a

17  note about the potential for abuse of this product.

18  Do you see that?

19       A    Yes.

20       Q    And also, if you flip to the fifth page of

21  this document -- unfortunately they're not

22  numbered -- do you see another black box warning,

23  right?

24       A    Yes, I do.

Page 279

1      Q     And that's also a warning about the

2    potential for abuse of the product, correct?

3      A     Yes.

4      Q     Do you know how many doctors in Huntington

5    and Cabell County, if any, saw this savings card?

6      A     No.

7      Q     Do you know how many patients in Huntington

8    and Cabell County, if any, saw this savings card?

9      A     No.

10     Q     Do you know if it was ever used for

11   prescription of Butrans in Huntington and Cabell

12   County?

13     A     No.

14     Q     Okay.  Let's look at the (audio

15   distortion) --

16     A     Sorry.  Your words dropped off.

17     Q     Can we look at --

18            MS. RODGERS:  I think somebody with an

19   area code of 650 is not on mute.  If they could go on

20   mute, it might help the sound quality.

21            Or is that you, Dr. Lembke?

22            THE DEPONENT:  I don't think it's me,

23   but...

24            MS. RODGERS:  Well, if everyone could

1   go on mute except for (audio distortion), that would

2   be helpful.

3   BY MS. RODGERS:

4        Q    And so the fourth program is on (audio

5   distortion) your report on page 57 --

6        A    Sorry.  Your words dropped.

7        Q    Okay.  Can you turn to page 57 of your

8   report, romanette v, and this is about an alleged

9   partnership with Purdue regarding Butrans.

10            Do you see that?

11       A    Yes.

12       Q    Okay.  And you cited one document in

13   support of this paragraph.  And, fortunately, it's

14   not in your set.  I think I emailed it to plaintiff's

15   counsel yesterday.  I don't know if you received it.

16            But maybe, Clayton, if you could pull it

17   up?

18   BY MS. RODGERS:

19       Q    So, again, this is for Butrans, the patch,

20   correct?

21       A    Yes.

22       Q    And this program was to involve, as you

23   noted in your report, an advertisement that linked

24   Butrans website, an online ordering portal that

Page 281

1    McKesson hosted for pharmacies, right?

2         A    Yes.

3         Q    It's not a platform for patients?

4         A    Yes, that's correct.  That's my

5    understanding.

6         Q    Do you know how many pharmacies in

7    Huntington and Cabell County, if any, saw this ad on

8    the online ordering portal?

9         A    No.

10        Q    And is there anything in your report that

11   indicates that the information in this advertisement

12   was false or misleading?

13        A    Well, you don't have the ad there, right?

14   You have the agreement.

15        Q    Right.  You haven't cited the ad.  Have you

16   seen the ad, Dr. Lembke?

17        A    I don't believe I've seen the ad.

18        Q    Okay.  You didn't ask to see it -- or did

19   you?

20        A    Yes, I did.

21        Q    You weren't provided with it?

22        A    No.

23        Q    Okay.  So is there any evidence that you

24   have that anything in this advertisement was false or

Page 282

1    misleading?

2         A    Well, I don't have it so I can't evaluate

3    it.

4         Q    Okay.  And I'm just trying to get a clear

5    answer to that.  You don't have the ad so you have no

6    evidence that anything here was false or misleading,

7    correct?

8         A    Because I didn't see it.

9         Q    Is that correct?

10        A    Yes.  Because I didn't see it, I can't

11   evaluate it.

12        Q    Okay.  And you haven't conducted any study

13   to determine the impact of this ad, which was

14   directed at pharmacists, on opioid prescribing in

15   Huntington and Cabell County?

16        A    That's correct.

17        Q    Okay.  Now, the fifth program is an alleged

18   partnership with Teva regarding Actiq and Fentora.

19   It's on page 56 at romanette ii.

20             And if you could open No. 26, the envelope

21   you have.  And this is a contract that you cite in

22   your report.  Again, it's the only document for this

23   program, correct?

24        A    Yes.

1      Q     Okay.  And the contract covers services

2   related to Actiq and Fentora, one called RxBulletin

3   and then one called RxMail.

4          Do you see that?

5      A     Yes.

6      Q     And the RxBulletin was to involve three

7   emails.  Do you see that?

8      A     Yes, that's also how I'm reading it, yes.

9      Q     Okay.  And do you understand that those

10   emails were to be directed at pharmacists?

11      A     Yes, I do.

12      Q     And then RxMail is the second service, and

13   that service included mailings to top independent

14   pharmacies; is that your understanding?

15      A     Yes.

16      Q     Okay.  And I just want to direct your

17   attention to the bottom of that first page.  Do you

18   see where it says:  "The content of any document,

19   material, or information provided by Teva to McKesson

20   for inclusion in the program, supplier content, under

21   this agreement is the sole responsibility of Teva,

22   and Teva represents and warrants that the supplier

23   content complies with applicable law -- all

24   applicable laws."

1          Did I read that correctly?

2      A    Yes.

3      Q    Do you know how many pharmacies, if any, in

4  Huntington and Cabell County saw the RxBulletin or

5  RxMail referred to in this document?

6      A    No.

7      Q    And do you have any evidence that there

8  were any false or misleading claims contained in

9  those RxBulletin or RxMail offerings?

10     A    I wasn't able to evaluate the actual

11 mailing.  I would be happy to do that.

12     Q    You asked for it and did not receive those

13 documents?

14     A    Yes.

15     Q    Okay.  Are you familiar with REMS?

16     A    Yes.

17     Q    REMS is a risk management tool, right?

18     A    Risk Evaluation and Mitigation Strategy.

19     Q    It's intended to help reduce improper usage

20 of opioids; is that right?

21     A    That was the intent, yes.

22     Q    Do you think it's important for a

23 pharmacist to know about REMs requirements?

24               MR. ARBITBLIT:  Objection.

Page 285

1    A    REMS is directed toward physician

2  prescribers.  I think it's important for a pharmacist

3  broadly to know about the addictive risk of opioids.

4  I don't know if they specifically need to know what

5  mechanisms are being used to educate physicians.

6    Q    Do you think it's good for pharmacists to

7  know about REMs requirements?

8                  MR. ARBITBLIT:  Objection.

9    A    Again, pharmacists are asked to know a lot

10  of things, just like doctors are.  I'm not sure I

11  would prioritize their knowing about REMs above other

12  important aspects of opioids.

13    Q    Okay.  Interesting.  You understand that

14  these messages were to let pharmacists know about

15  REMs requirements?

16    A    I didn't know that.

17    Q    Okay.  If you look at document in the

18  folder No. 27 that you have.

19              Have you seen this document before?

20    A    I may have done -- I've reviewed a lot of

21  documents, including documents regarding REMs

22  specifically for Actiq, but I don't know if I've seen

23  this exact document.

24    Q    And on the front page here it says Actiq

Page 286

1    and Fentora, the two drugs that we had just been

2    talking about.  And if you look at the page ending in

3    3378, you'll see it looks very familiar to what we

4    just saw, right?  This is the same program?

5         A    Yes.

6         Q    Okay.  And if you turn back to the first

7    page of this document, which ends in 3375?

8         A    Yes.

9         Q    You see that the objective is (audio

10   distortion) pharmacists regarding new REMS

11   requirements for Actiq and Fentora.  Do you see that?

12        A    Yes.

13        Q    Put that document away.

14             I want to turn to the sixth and seventh

15   programs that you talk about in your report, and they

16   relate to pharmacy intervention programs.  There is

17   one with Purdue for Butrans that you reference on

18   page 60 of your report.

19             But before we get to that, I just want to

20   ask some background questions about these programs.

21   A pharmacy intervention program is a program in which

22   participating pharmacists provide certain educational

23   information about a prescription medicine, correct?

24        A    I wouldn't characterize it in that way.  I

1    think that's too limited a characterization.

2         Q    How would you characterize it?

3         A    As a promotional activity.

4         Q    Is a component of what you are

5    characterizing this promotional activity that a

6    pharmacist provides certain educational information

7    to a patient?

8                   MR. ARBITBLIT:  Objection.

9         A    I wouldn't characterize it that way, no.

10        Q    What are you taking issue with?

11        A    My impression is that this pharmacy

12   intervention program is a way to covertly promote

13   certain opioid products and encourage patients to go

14   on to higher doses, or to continue on those

15   medications instead of other alternatives.

16        Q    Okay.  And that impression that you've just

17   stated is based on the documents that you cited in

18   your report, correct?

19        A    Yes.

20        Q    Okay.  We're going to look at those.  This

21   conversation between pharmacists and patients occurs

22   when the patient shows up at the pharmacy to pick up

23   their prescription, right?

24        A    Yes.

1      Q    Okay.  So before anything -- any coaching

2  session or anything related to these programs would

3  occur, several things would have had to happen.

4  First, a physician would have had to consult with the

5  patient, correct?

6      A    Yes.

7      Q    And that physician would have had to decide

8  to prescribe a medicine to the patient, right?

9      A    Yes.

10     Q    The patient would have had to choose to

11 fill the prescription, right?

12     A    Yes.

13     Q    And the patient would have had to choose to

14 go to a pharmacy to pick up that prescription, right?

15     A    Yes.

16     Q    Only then, when the patient went to the

17 pharmacy, could any conversation occur under these

18 programs that you're citing in your report, correct?

19              MR. ARBITBLIT:  Objection.

20     A    Yes.

21     Q    Would you agree that some educational

22 conversations between pharmacists and patients could

23 be helpful for certain medications?

24              MR. ARBITBLIT:  Objection.

Page 289

1    A    It would really depend on how the

2   pharmacist was coached, what they were coached to

3   say, whether or not that was based on legitimate

4   medical science.

5    Q    Okay.  But it could be helpful for some

6   medications?

7             MR. ARBITBLIT:  Objection.

8    A    Hypothetically, yes.  It would depend on

9   the medicine, and it would depend on what they said.

10    Q    And would you agree that it's important for

11   patients to take prescription medications as directed

12   by their doctor?

13    A    It's the doctor's decision to prescribe

14   that medication if the claims were based on science

15   and medical necessity, then it would be good for the

16   patient to take it.  But if it wasn't, then it

17   wouldn't be good for the patient to take it.

18    Q    So -- Thank you.  I appreciate that.

19             If one of your patients, for example, was

20   taking buprenorphine for addiction treatment, you

21   wouldn't want that patient to stop taking it without

22   consulting you, right?

23             MR. ARBITBLIT:  Objection.

24    A    It would depend on the reason why they

Page 290

1   stopped taking it.

2        Q    So you would be comfortable with them

3   terminating that medication without consulting you?

4   Wouldn't you want to know why?

5        A    Yes, if they had good reason, yes, I would

6   be okay with that.

7        Q    Okay.

8        A    And I would want to know why, and I would

9   ask them.

10       Q    Would you want to know about it before they

11   stopped taking it or after?

12       A    Ideally before, but after is okay too, if

13   the circumstances warranted them stopping, before

14   consulting me.

15       Q    If a patient is taking buprenorphine for

16   addiction treatment and they're not ready to stop

17   taking that, but they stopped taking it suddenly,

18   that could actually increase the chances of relapse,

19   correct?

20            MR. ARBITBLIT:  Objection.

21       A    It would depend on the patient.

22       Q    You're saying if someone needs to take

23   buprenorphine for addiction treatment, and they stop

24   taking it suddenly, that would not increase their

Page 291

1    chances of relapse?

2              MR. ARBITBLIT:  Objection.

3         A    So it's all about weighing the risks and

4    benefits.  And if the risks outweigh the benefits

5    such that a patient needed to abruptly stop a

6    medication I was prescribing them, that would be the

7    right thing to do, even without consulting.

8         Q    That didn't answer my question, which was:

9    Would it increase the chance of relapse?

10        A    Yeah, I already answered that.

11        Q    Can you answer it again?

12             MR. ARBITBLIT:  Objection.

13        A    It would depend on the circumstance.

14        Q    If a patient is taking buprenorphine for

15   addiction treatment and they need it, under what

16   circumstance would it not increase the chance for

17   relapse if they stopped taking it suddenly?

18        A    If, for example, they were overdosing on

19   that medication.

20        Q    So if they weren't taking it as prescribed?

21        A    No.  Overdose can happen even when patients

22   are taking their opioids just as prescribed.

23        Q    Have you ever had a patient overdose when

24   they were taking an opioid as you have prescribed it

Page 292

1    under your care?

2        A    I know of patients that have been under my

3    care who have overdosed when taking therapeutic

4    medications just as prescribed.

5        Q    Okay.  So the Purdue program that you

6    reference on page 61 here was for Butrans, and again,

7    that's brand name buprenorphine, correct?

8        A    Yes, it is.

9        Q    And you testified earlier today that this

10   program was evidence that McKesson communicated to a

11   doctor or a pharmacist that the risk of addiction to

12   prescription opioids is rare or less than 1 percent.

13   Do you remember that?

14       A    I'm sorry.  Can you repeat that?

15       Q    Sure.  You testified earlier today that

16   this program, this pharmacy intervention program, was

17   evidence that McKesson, quote, "communicated to a

18   doctor or a pharmacist that the risk of addiction to

19   prescription opioids is rare or less than 1 percent."

20            Do you remember that?

21       A    Yes.

22       Q    And you cite one document (audio

23   distortion) to this program.  It's in Envelope

24   No. 28.

Page 293

1          Do you have that in front of you?

2      A    Yes.

3      Q    This document appears to be on a type of

4   summary of the program, correct?

5      A    Yes.  However, this document lacks the

6   actual coaching that went on.

7      Q    Right.  I'm glad you mention that.  So the

8   second page, under "Pharmacy Brand Kit," there is a

9   reference to the coaching guide.  And I think that's

10  what you're talking about, right?

11     A    Yes.

12     Q    Did you ask to see that coaching guide?

13     A    Yes.

14     Q    And you weren't provided with it?

15     A    I was provided with it.

16     Q    You didn't cite it in your report.  Is

17  there a reason why you didn't cite it?

18     A    Because I was provided with it just

19  yesterday.

20     Q    Okay.  So let's look at the coaching guide.

21  Clayton is going to pull it up.  It's Bates No.

22  PPLP003299959.  And again, does this appear to be the

23  coaching guide that you were referring to for the

24  Butrans thermal system?

Page 294

1      A      Can you scroll through the whole thing so

2   that I can see if it looks like what I reviewed?

3            Yes.

4      Q      Okay.  So on the first page, there is again

5   a black box.  And it's underlined and bolded and

6   says:  Addiction abuse and misuse.

7            Do you see that warning?

8      A      Yes.

9      Q      Okay.  And if you turn to --

10           Clayton, the second page.  Right there.

11  That's perfect.

12           Do you see here that the pharmacist (audio

13  distortion) Do you see that it says under No. 3:

14  "May I share some important information with you

15  around using the Butrans patch."

16           Do you understand that's what the

17  pharmacist is supposed to say?

18     A      I do understand that, yes.

19     Q      Okay.  And then it goes on.  "This is a

20  strong prescription pain medicine that contains an

21  opioid narcotic that is used to manage pain severe

22  enough to require daily around-the-clock treatment

23  with an opioid when other pain treatments, such as

24  non-opioid pain medicine or immediate-relief opioid

Page 295

1   medicine, do not treat your pain well enough or you

2   cannot tolerate them.  Butrans is a long-acting

3   extended-release opioid medicine that can put you at

4   risk for overdose and death.  Take your dose

5   correctly as prescribed (audio distortion) at risk

6   for opioid addiction, abuse, and misuse that can lead

7   to death."

8           Do you see that?

9       A   Yes.

10      Q   So the pharmacist under this training

11  program warns the patients about the risk of

12  addiction, correct?

13      A   Yes.

14      Q   Can you point to any evidence in this

15  program that McKesson communicated to a doctor or a

16  pharmacist a risk of addiction to prescription

17  opioids is rare or less than 1 percent?

18          That was your testimony earlier this

19  morning.

20      A   No.

21      Q   Okay.  Can you point to any evidence that

22  as part of any program McKesson communicated to a

23  doctor or a pharmacist that the risk of addiction to

24  prescription opioids is rare or less than 1 percent?

Page 296

1      A    So I do believe that McKesson's

2    collaboration with Janssen, that involves giving out

3    five free fentanyl patches, that that promotional

4    campaign, based on material I saw, understated the

5    risks.

6      Q    You're talking about one of the programs

7    that we already looked at today; is that right?

8      A    Yes.

9      Q    And was there anything in that document

10   that said that McKesson communicated to a doctor or a

11   pharmacist that the risk of addiction to prescription

12   opioids is rare or less than 1 percent?

13     A    Not McKesson directly, but the sales rep

14   promoting the patches.

15     Q    Was that on the internal Janssen document

16   that you (audio distortion) in your report?

17     A    Yes.

18     Q    Okay.  And, again, you testified that

19   you're not -- you have no evidence that McKesson ever

20   saw that document or was involved in the preparation

21   of that document, correct?

22     A    That's correct.

23     Q    Okay.  Turning back to this Butrans

24   program, can you identify any pharmacy in Huntington

Page 297

1    and Cabell County that was part of this pharmacy

2    intervention program?

3         A    No.

4         Q    And can you identify any patients in

5    Huntington and Cabell County that received a

6    behavioral interview regarding their prescription

7    opioid treatment as a result of this pharmacy

8    intervention program?

9         A    No.

10        Q    Okay.  Now, on page 58 of your report you

11   discuss an alleged pharmacy intervention program with

12   Janssen for Nucynta.  Do you recall that?

13        A    Yes.

14        Q    If you could open up document No. 24.

15             MR. ARBITBLIT:  Before you do that,

16   can we find out how much time is left?

17             VIDEOGRAPHER:  I'm at 6 hours, 52

18   minutes.  Let me double-check when we take a break.

19             MR. ARBITBLIT:  We've got eight

20   minutes left, so we don't need a break.

21   BY MS. RODGERS:

22        Q    If you could turn to page 1414.  Are you

23   there?

24        A    Yes.

Page 298

1    Q    And I believe this is what you cite in your

2    report, correct?

3    A    Yes.  This entire document, yes.

4    Q    Yes.  This document provides a general

5    description of what a pharmacy intervention program

6    for Janssen could entail, right?

7    A    Yes.

8    Q    Not a signed contract though, right?

9    A    No.

10    Q    Can you identify any evidence that this

11    program actually occurred at all?

12         I'm going to ask to go off the record if

13    you're going to flip through the whole document.

14    A    No.

15    Q    Okay.  Can you identify any evidence that

16    the program occurred in Huntington and Cabell, yes or

17    no?

18              THE DEPONENT:  Actually can we go off

19    the record so I can actually flip through the

20    document?

21              VIDEOGRAPHER:  The time is 6:44.

22    We're now going off the record.

23              (Pause in proceedings)

24              VIDEOGRAPHER:  The time is 6:46.

Page 299

1    We're now back on the record.

2         A     So in answer to your question is there any

3    evidence that the pharmacy intervention program was

4    ever implemented, I direct you to page 1415.

5              The headline there is "McKesson Has Built

6    one of the largest adherence networks, the sponsored

7    clinical services networks."

8              And then they proceed to talk about that

9    they have 1500 independents and 1300 chain

10   pharmacies, and growing each month.  That leads me to

11   believe that this is an established program.

12        Q     And I understand that this page is

13   referring to McKesson's services generally.  My

14   question was whether you have any evidence that this

15   PIP program with -- about Nucynta actually occurred.

16        A     I'm sorry.  I think your actual question

17   before was whether or not the PIP program actually

18   occurred.  So the answer to that is yes.

19              I don't have any specific information on

20   Nucynta and the PIP program.  So the answer to that

21   is no.

22        Q     Okay.  So you can't identify any patient in

23   Huntington and Cabell County who received a

24   behavioral interview regarding their prescription

1    opioid treatment as a result of this PIP program?

2         A    No.

3         Q    At the top of page 58 of your report, you

4    said:  "It is ironic that the Opioid Pharmaceutic

5    Industry used, parentheses, (is using) these

6    techniques to get patients to continue to take

7    opioids under the guise of promoting medications

8    adherence."

9              Do you see that?

10        A    Yes.

11        Q    And aside from the key programs that we

12   just looked at, the Butrans one and the Nucynta one,

13   what is your basis for saying that distributors are

14   still conducting programs related to prescription

15   opioids?

16        A    I don't have any reason to believe that

17   these programs have been terminated, so I believe

18   them to be ongoing.  If there is information that

19   these programs have been terminated, I'm happy to

20   look at that.

21        Q    Well, you don't even know if the Nucynta

22   one ever started, right?  That's what you testified

23   to earlier.

24        A    I don't know specifically if the Nucynta

Page 301

1    adherence motivational interviewing program is

2    ongoing.  That's true.

3        Q    That wasn't my question.  You don't know if

4    the Nucynta program ever started, right?

5        A    No, that's not true.  There's evidence

6    showing that the Nucynta coupon program was

7    implemented in many states.

8        Q    And I'm talking now about this behavioral

9    interview program that's referenced on page 58, and

10   it's -- you're saying that the Opioid Pharmaceutic

11   Industry is using these techniques.  I'm asking what

12   your evidence is of that.

13       A    Well, you showed me the coaching plan for

14   Butrans patch.  So that's a piece of evidence.  And

15   then this document makes it clear that the pharmacy

16   intervention program has been built and is active.

17       Q    Okay.  But as for the Butrans, you don't

18   know if that program is still going, correct?

19       A    I don't know if it's still going, no.

20       Q    Okay.  And as to the Nucynta PIP program

21   that we just looked at, you don't know if that ever

22   started, correct?

23       A    That's correct.

24       Q    And are you aware of any other behavioral

Page 302

1   interview programs related to prescription opioids

2   that any distributor is currently running?

3        A    No.

4        Q    Okay.  Thank you.  So we just talked about

5   all seven of the programs that are contained in your

6   report that relate to McKesson.  I just have a couple

7   of final questions for you.

8             The first is that pharmacists don't

9   prescribe opioids, right?

10       A    That's correct.

11       Q    And there is no evidence that McKesson

12   sends any of the communications that we just looked

13   at to patients, right?

14       A    No.

15       Q    No, that's correct?

16       A    No, that's correct.  So in my report I cite

17   the McKesson call campaign, behavioral call campaign,

18   wherein McKesson representatives directly outreach to

19   patients with phone calls.  I don't know what was

20   discussed at that phone call, but I think it's

21   relevant that --

22       Q    Where is that in your report?

23       A    Page 61.  They describe it as

24   patient-centric behavioral coaching.  "Agents make

Page 303

1   outbound calls to patients in order to uncover

2   personal barrier and provide appropriate messaging

3   content to help overcome those barriers.  And these

4   efforts are, quote, aligned to address Janssen's

5   needs," unquote.

6       Q    And I think that's the document that we

7   were just looking at, right?  That's No. 24?

8       A    I'm sorry.  I don't know which document is

9   No. 24.

10      Q    It's this document (indicating to camera)?

11      A    Right.  Yes.

12      Q    Okay.  And you're citing for this paragraph

13  that McKesson is directly -- the proposition that

14  McKesson directly targets patients, that PIP program

15  that we just looked at, correct?

16      A    Yes.

17      Q    And that -- and that's the program that you

18  testified you're not sure it ever started, correct?

19      A    No.  I corrected that testimony regarding

20  the PIP program itself.  I said that I thought there

21  was evidence that it had started, so -- and I think

22  there's evidence in that document that the behavioral

23  call campaign was also underway.

24              Your question was regarding whether or not

Page 304

1   behavioral coaching occurred around Nucynta, and to

2   that I said I wasn't aware of specific evidence

3   saying whether or not that had started.  But the PIP

4   program had clearly started.

5        Q    What is your evidence -- and again, we can

6   go off the record -- that the PIP program for Nucynta

7   started?

8                  MR. ARBITBLIT:  I think we're over

9   seven hours now, aren't we?

10                  MS. RODGERS:  I think this testimony

11   is conflicting.  If you would allow me to just

12   clarify here, it would be helpful.

13                  MR. ARBITBLIT:  Well, if we're over

14   seven hours --

15        A    At page 1415:  "McKesson has built one of

16   the largest adherence networks."  And then they

17   describe it.  And this is under the section

18   describing their PIP program.  "1500 independents,

19   1300 chain pharmacies, and growing each month."

20        Q    Understood.  So this is, again, you're

21   referring to the general description of McKesson

22   services, not a specific program that McKesson had

23   related to prescription opioids where McKesson sent

24   communications to patients, correct?

Page 305

1      A     There was a specific coaching program

2    around Butrans.

3      Q     Correct.  Yes.

4      A     Okay.  And there was a specific direct

5    patient call program.  I don't have evidence that

6    that involved opioids necessarily, but the call

7    program did exist.

8      Q     Okay.

9            Just three more questions.  We talked

10   about, you know, whether you had evidence that these

11   programs ran in Huntington and Cabell County, and I

12   won't go back over that again.  But even assuming

13   that McKesson carried through with any of these

14   programs in Huntington and Cabell County, you didn't

15   conduct any analysis to show what effect, if any,

16   those programs had on the population of opioid users

17   in Cabell County and Huntington, right?

18     A     That is correct.

19     Q     Thank you.  And you did not conduct any

20   analysis to show what effect, if any, McKesson's

21   programs had on the dose and duration of opioid use

22   in Cabell County and Huntington, correct?

23     A     That is correct.

24     Q     And one more question:  You did not (audio

Page 306

1    distortion) conduct any analysis to show what effect,

2    if any, McKesson's programs had on the risk of opioid

3    misuse, addiction, dependence, and death in

4    Huntington and Cabell County, correct?

5         A    For the first part of that question you

6    dropped out.  Could you repeat the question?

7         Q    Yes.  You did not conduct any analysis to

8    show what effect, if any, McKesson's programs had on

9    the risk of opioid misuse, addiction, dependence, and

10   death in Huntington and Cabell County, correct?

11        A    No quantitative analysis, no.

12             MS. RODGERS:  Thank you.  I have no

13   further questions.

14             MR. ARBITBLIT:  I have just a couple.

15        EXAMINATION BY COUNSEL FOR PLAINTIFFS:

16   BY MR. ARBITBLIT:

17        Q    Doctor, could you take a look at your

18   report at page -- starting with 195, Appendix I.B,

19   referring to Teva/Cephalon Misleading Messaging.

20        A    Yes.  I'm looking at it.

21        Q    Do you include from pages 195 through 206

22   on what you consider to be misleading messaging from

23   Teva/Cephalon, including about Actiq and Fentora,

24   that you were not asked about today?

Page 307

1      A    Yes.

2      Q    And if you could take a look at Exhibit 24,

3  which is the McKesson Manufacturer Marketing --

4  excuse me, it's No. 27.  No. 27, McKesson

5  Manufacturer Marketing Documents prepared for

6  Cephalon, Actiq and Fentora proposal, dated

7  January 19, 2012.  Do you have that?

8      A    Is it this one?

9      Q    Yes.  If you could take a look at the page

10  that ends in -- it's page 3 of 6 and ending 3376 in

11  the lower right.

12     A    Okay.

13     Q    And if you could look at the third

14  paragraph from the bottom of the page, I'll just read

15  what it says:

16          "McKesson partners," actually, I'll start

17  one paragraph above.

18          "Delivering an unmatched combination of

19  communication, promotion, distribution options, plus

20  targeted analytics of exclusive data, McKesson will

21  enable Cephalon to set strategies that prioritize

22  opportunities, optimize resources, and maximize

23  profitability."

24          Did I read that correctly?

Page 308

1        A     Yes.

2        Q     And if you look at the next paragraph, it

3    says:  "McKesson partners with pharmaceutical

4    manufacturers, such as Cephalon, to define and

5    execute customized strategies, targeting key

6    awareness, sales, and distribution goals at all

7    stages of the product life cycle."

8             Did I read that correctly?

9        A     Yes.

10             MR. ARBITBLIT:  That's all I have.

11   Thank you.  Thank you for your time, Doctor.

12             THE DEPONENT:  You're welcome.

13             VIDEOGRAPHER:  The time is

14   7:00 o'clock.  We're now going off the record.  This

15   concludes the deposition.

16        (Signature having not been waived, the deposition

17   of ANNE LEMBKE, MD, was concluded at 7:00 p.m.)

18

19

20

21

22

23

24

Page 309

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:


            I, Twyla Donathan, RPR, a duly commissioned
Notary Public for the County and State herein, do hereby
certify that the foregoing deposition of ANNE LEMBKE, MD,
was duly taken by and before me via Zoom video
conferencing  at the time and for the purpose specified
in the caption hereof, the said witness having been by me
first duly sworn.
            That the foregoing is a true, correct, and
full transcript of the testimony adduced to the best of my
ability, given the challenges of Zoom video-conferencing
audio/sound interferences, as taken by me in shorthand
notes and thereafter accurately transcribed;
            I further certify that I am neither attorney
or counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken;
and further, that I am not a relative or employee of any
attorney or counsel employed by the parties or financially
interested in the action; and that the attached transcript
meets the requirements set forth within Article 27,
Chapter 47 of the West Virginia Code.


            IN WITNESS WHEREOF, I have hereunto set
my hand this 21s


                    TWYLA DONATHAN
            Registered Professional Reporter
        My commission expires September 11, 2022.

```
                                                      Page 310
 1                     Veritext Legal Solutions
                          1100 Superior Ave
 2                           Suite 1820
                       Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4

     September 22, 2020
 5

     To: Don C. Arbitblit, Esq.
 6

     Case Name: City Of Huntington v. Amerisourcebergen Drug Corporation
 7

     Veritext Reference Number: 4255516
 8

     Witness:  Anne Lembke, M.D.       Deposition Date:  9/17/2020
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24   NO NOTARY REQUIRED IN CA
```

Page 311

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 4255516
3         CASE NAME: City Of Huntington v. Amerisourcebergen Drug
    Corporation, Et Al.
          DATE OF DEPOSITION: 9/17/2020
4         WITNESS' NAME: Anne Lembke, M.D.
5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7         I have made no changes to the testimony
      as transcribed by the court reporter.

8
      _____            _____
9     Date                       Anne Lembke, M.D.
10        Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
              Statement; and
14        Their execution of this Statement is of
              their free act and deed.
15
          I have affixed my name and official seal
16
      this _____ day of_____, 20_____.
17
                       _____
18                     Notary Public
19                     _____
                       Commission Expiration Date
20
21
22
23
24
25

Page 312

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 4255516
 3       CASE NAME: City Of Huntington v. Amerisourcebergen Drug
     Corporation, Et Al.
         DATE OF DEPOSITION: 9/17/2020
 4       WITNESS' NAME: Anne Lembke, M.D.
 5       In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7       I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9       I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Anne Lembke, M.D.
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18           in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20           their free act and deed.
21       I have affixed my name and official seal
22   this _____ day of_____, 20____.
23           _____
             Notary Public
24
             _____
25           Commission Expiration Date
```

Page 313

1                    ERRATA SHEET

             VERITEXT LEGAL SOLUTIONS MIDWEST

2                   ASSIGNMENT NO: 4255516

3        PAGE/LINE(S) /        CHANGE        /REASON

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19

         _____        _____

20       Date                     Anne Lembke, M.D.

21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22       DAY OF _____, 20_____ .

23                       _____
                         Notary Public

24

25                       _____
                         Commission Expiration Date

**&**

**&**   2:5,13 3:5 7:6,8
  7:17

**0**

**0**   5:7
**00013350**   4:17
**00016836**   130:4
**0007819281**   4:14
**00132726**   4:11
**0220239**   130:3

**1**

**1**   4:9,9 11:1,1,5
  24:4,16 49:4
  68:18 73:16,17,23
  95:1,9 96:3,18
  97:21 98:8 99:3
  99:15 101:18
  124:12 125:19
  180:24 193:2,16
  194:3,24 202:20
  233:4 242:20
  244:23 247:21
  292:12,19 295:17
  295:24 296:12
**10**   4:13 79:24
  95:14 132:18,20
  135:12,14 194:7
  246:24 248:3
  251:11 252:6,9,16
  253:12,15
**10/24/12**   4:12
**100**   51:6 144:6
  181:14
**105,000**   99:18
  100:3 127:2
**10538**   309:17
**10:31**   6:3
**10:34**   9:1
**10:37**   9:3

**10:49**   18:21
**10:56**   18:24
**10:59**   20:16
**11**   4:9 229:6
  309:19
**1100**   310:1
**11th**   218:2
**12**   191:14 194:8
  237:22
**126**   4:11
**127**   24:4,12,15
**129**   4:12
**12:02**   68:2
**12:12**   68:5
**13**   28:22
**1300**   299:9 304:19
**131**   180:24 181:3
**132**   4:13
**138**   4:15
**13th**   153:7
**14**   4:20 192:14,19
**14.92.**   25:6,7
**1414**   297:22
**1415**   299:4 304:15
**145**   4:16
**15**   4:23 119:23
  191:14 202:3,6,6
  202:11 203:21
  218:4
**1500**   299:9 304:18
**152**   4:17
**155**   4:18
**15th**   207:3
**16**   93:8 156:4
**17**   26:13 225:7
**17.42**   25:6
**173**   126:12
**174**   126:12
**175**   126:12
**176**   128:15

**17th**   1:23 6:4
**18**   4:15 5:2 45:17
  146:3 184:24
  185:1 186:16
  191:7 217:20,22
**18,000**   127:7,10
**180**   68:18,24
**1820**   310:2
**183**   101:18
**18th**   138:18
**19**   5:3,14 184:24
  186:16 191:7
  219:8,9 307:7
**192**   4:20
**195**   306:18,21
**198**   275:19
**1980s**   69:4,7,12,14
**1990**   32:23
**1990s**   33:5 35:13
  50:18 51:11 69:10
  118:18 211:17
  212:7,20 214:7
**1995**   25:16
**1:26**   121:20

**2**

**2**   203:21 226:3
  247:14,21
**2.5**   191:17 192:4
**20**   27:14 36:11
  119:23 160:5
  179:5 191:21
  193:18 194:15
  195:2,21 212:12
  212:21 214:19
  247:2 311:16
  312:22 313:22
**200**   174:6
**2000**   36:8 44:23
**20001-4956**   3:8
**20005**   2:14

**2000s**   118:19
**2001**   36:8
**2002**   153:7,8
**2003**   26:6,10 36:4
**2010**   44:23
**2011**   5:9 97:9
**2012**   5:14,19 45:7
  50:20 51:11 97:8
  230:5,7 307:7
**2013**   4:16 145:14
  229:6 233:13,22
**2015**   158:24
  226:18
**2016**   4:15 36:17
  138:18 155:8
  171:2 197:2
  203:18 205:24
  207:4 226:3,10
**2017**   94:17 200:17
  200:24 218:2
**2018**   200:24 233:8
  235:19 236:7
  255:5
**2019**   5:4 11:15,16
  12:3
**202**   2:15 3:9 4:23
**2020**   1:24 4:9 6:4
  35:5 169:17 207:3
  225:7 309:16
  310:4
**2022**   309:19
**206**   306:21
**21**   5:6 241:1,3
**216-523-1313**
  310:3
**217**   5:2
**219**   5:3
**21st**   309:16
**22**   4:16 97:9 310:4
**22102**   2:22

**223**   192:20
**228**   5:5
**22nd**   145:14
**237**   73:22
**24**   5:19 297:14
  303:7,9 307:2
**241**   5:6 61:18
  74:24
**25**   5:7 191:21
  193:18,22,22
  194:15 195:3,21
  212:12,21 214:9
  214:19 247:3
  259:18
**253**   242:19
**25701**   2:9
**258**   4:3
**259**   5:7
**26**   5:11 282:20
**260**   242:24 244:24
**27**   5:13 230:8,12
  230:22 285:18
  307:4,4 309:13
**273**   220:9,10
**275**   2:5
**276**   5:9
**28**   5:16 292:24
**28.26.**   24:22
**28.69**   25:1
**28.69.**   24:24
**280**   5:22
**282**   5:11
**285**   5:13
**29**   5:9 276:11
**293**   5:16,24
**297**   5:19
**29th**   2:5
**2:05**   121:23
**2nd**   94:17 97:7
  153:7

**3**

**3**   74:24 125:20,21
  129:20 202:20
  203:22 247:15
  294:13 307:10
**30**   4:18 37:1,13
  95:14 154:6
  155:16 166:9
  248:3 251:12
  252:7,9,16
**30,000**   114:12
**300**   13:14 139:18
  144:5
**304**   2:10
**32**   4:10 92:1,12
**33**   5:5 228:9
**3375**   286:7
**3376**   307:10
**3378**   286:3
**35**   4:17 152:4,19
  152:22
**39,487**   193:15
**3:17-01362**   1:5
  6:19
**3:17-01665**   6:19
**3:27**   180:17
**3:33**   180:20
**3rd**   2:9 257:19,20

**4**

**4**   128:19 191:17
  192:4 219:20
  220:3
**4.6**   193:17
**4/12/2013**   4:13
**400**   144:7
**415-956-1000**   2:6
**422**   2:9
**4255516**   310:7
  311:2 312:2 313:2

**434-5000**   2:15
**44114**   310:2
**450**   139:19
**46**   170:24 171:10
  197:11
**47**   309:13
**49**   45:16
**4:41**   227:7
**4:51**   227:10

**5**

**5**   124:13,21 125:12
**50**   48:14 84:10
  172:15
**500**   2:21
**52**   93:8 297:17
**523-7285**   2:10
**53**   255:4 259:7
**54**   20:13 21:21
  22:3 23:19 259:11
**546**   194:24
**56**   271:21 276:9
  282:19
**564**   193:1 194:2
**57**   99:16 100:1
  125:20 126:16
  128:9,18 280:5,7
**58**   297:10 300:3
  301:9
**5:34**   255:12
**5:40**   255:15
**5:44**   258:14
**5:45**   258:17

**6**

**6**   4:15 138:16
  143:15 155:15,17
  156:4 226:24
  253:12,14 297:17
  307:10
**60**   286:18

**600**   16:12
**61**   132:13,13 292:6
  302:23
**610500**   269:4
**62**   226:23
**641**   74:10
**641-4338**   2:23
**650**   279:19
**662-5815**   3:9
**679**   255:5
**68**   93:16
**6:39**   20:11,15,17
  21:14 255:23
  257:7
**6:44**   298:21
**6:46**   298:24

**7**

**7**   4:11 95:3 97:1,3
  97:4 126:6,8,19
  138:15
**703**   2:23
**725**   2:14
**78**   232:24 233:1,3
**7900**   2:20
**7:00**   308:14,17

**8**

**8**   4:3,16 92:12,22
  124:12 145:2,3,7
  147:18 181:6
**80**   93:24 94:2
**800**   13:13
**82**   196:11,16
  206:13
**83**   95:1,2 97:4
  196:11,16 206:13
**850**   3:7
**89**   94:19

**9**

**9**   4:12 129:2 130:2
  131:5
**9/17/2020**   310:8
  311:3 312:3
**92**   4:10
**93**   97:8,21
**94**   97:7
**94111**   2:6
**95**   174:3

**a**

**a.m.**   6:3 20:16
**abandon**   80:8,13
**abatement**   142:21
**ability**   92:3 309:8
**able**   17:19 20:3,4
  20:8 35:15 82:23
  85:22 86:10,13
  125:3 138:4
  149:16 175:20
  222:13 242:14
  255:9,21,24
  272:13,22 284:10
**abruptly**   241:23
  291:5
**absence**   47:2
**absolute**   195:10
**absolutely**   50:10
**abstract**   16:19
**abstral**   145:19,24
  146:1,21 147:23
  148:12,17
**abstral.com**   150:6
**abuse**   278:17
  279:2 294:6 295:6
**academic**   76:3
  77:23 123:2
  162:12
**academis**   4:20

**academy**   191:5
  222:1
**acceptable**   65:14
  189:18 190:2
**accepted**   192:11
**access**   39:13 76:22
  105:22,23 106:1,4
  106:12,16,24
  108:13 109:10,15
  110:24 111:3,17
  111:19 112:22,24
  113:19,20 114:6
  138:4 164:10
  165:5,9,11,12,15
  165:18 182:6
  208:24 240:16,18
  240:22
**accomplished**   70:2
**accomplishes**
  70:22
**account**   214:4
**accounted**   55:8
**accreditation**   91:8
**accumulation**
  35:19,21 36:1,3
**accurate**   25:8
  97:24 135:5
  244:11 247:7
  262:5
**accurately**   309:9
**acetaminophen**
  237:3,7
**acknowledge**
  92:14 177:14
  311:11 312:16
**acknowledged**
  112:12
**act**   160:18 271:12
  311:14 312:20
**actavis**   4:12
  128:11 129:4,21

  130:2 131:16
**acted**   105:17
  119:8
**acting**   71:15
  224:10 295:2
**action**   1:5,21 7:1
  78:9 83:23 309:11
  309:12
**actions**   68:21
  105:4,11 214:3
**actiq**   282:18 283:2
  285:22,24 286:11
  306:23 307:6
**active**   131:12
  211:10 217:17
  301:16
**actively**   209:10
**activity**   287:3,5
**actual**   22:2 25:8
  126:2 127:23
  131:4 185:18
  193:3 194:2
  268:11 271:9,14
  284:10 293:6
  299:16
**acute**   37:1,13
  60:19 253:20
  254:18,21
**ad**   133:4 134:12
  135:12 136:13,18
  136:20 141:13,19
  142:14,24 153:20
  153:23 281:7,13
  281:15,16,17
  282:5,13
**adapt**   42:20
**add**   12:24 13:4
  22:21 67:20 110:5
  113:6 128:20
  201:6 206:1
  244:13

**added**   125:9
**addicted**   44:15
  155:18 157:18,19
  182:10,14 189:5
  208:14 240:18
  246:20 248:4
  253:3
**addiction**   27:21
  42:6,15,18 43:23
  95:8,11,13,20 96:2
  96:17 98:7 99:2
  99:14 100:17
  101:1 103:8
  156:14,21 169:13
  181:9,18 182:2,6,8
  194:21 208:10
  213:7 226:4,6
  240:19 241:7,17
  243:16 251:7
  253:22,23 254:9
  265:4 267:11,13
  277:3,7,9,12
  289:20 290:16,23
  291:15 292:11,18
  294:6 295:6,12,16
  295:23 296:11
  306:3,9
**addictive**   42:13
  95:10 96:22
  142:11 208:8
  285:3
**addition**   123:4
  144:6 182:8
  220:16 270:5
**additional**   22:15
  98:11 114:7
  182:24 273:12
**address**   9:8 48:1,4
  209:4,22 241:21
  303:4 310:15

addresses 246:22
addressing 234:4
  242:17
adduced 309:8
adequate 175:14
  218:9
adequately 103:7
adherence 101:3
  299:6 300:8 301:1
  304:16
administer 6:24
administered
  215:7,11,18
administering
  7:23
administration
  215:14
adopted 169:18,20
  170:3,19 171:1
  218:2
ads 141:2,6,17,20
advance 151:1
  243:14
advent 47:18 69:4
adverse 148:1
advertised 151:18
advertisement
  137:1 141:22
  142:2,5,7 148:9
  149:1,12,18,20
  280:23 281:11,24
advertisements
  135:23 142:16,19
  143:9 151:14
  153:5,12
advertising 140:24
  143:4 149:6,13,16
advice 12:10,11
  14:14 16:10
  213:18 250:9,16

advises 201:23
advising 162:19
advocating 207:3
affairs 196:12
  201:7
affixed 311:15
  312:21
afford 272:13,22
afraid 98:19
age 146:3 150:3
agencies 107:13
agency 196:20
agents 302:24
aggregate 128:21
aggressive 94:8
aging 69:19 213:4
ago 8:12 9:18
  21:11 79:1 184:16
  184:17,18 200:24
  201:1 228:23,24
  229:3,7,11,16,22
agonist 146:1
  148:1
agree 6:11 14:1
  43:18 48:22 54:2
  57:24 70:17,21
  71:22,24 72:3,3,5
  72:11 81:19 93:6
  93:14,22 94:10,18
  94:19,23 165:20
  165:24 174:15,20
  174:22 175:5,16
  175:19 177:24
  178:6,9 186:23
  187:15 198:9
  200:20 202:15
  208:15,22 209:3
  210:22 211:2,2
  218:23 220:20,23
  241:12,15 250:8
  250:11,14,23

257:15 272:12,21
  288:21 289:10
agreeable 13:8
agreed 14:4,10
  43:24 90:3 100:2
agreement 14:17
  14:18,21 128:1,6
  134:9,19 135:1
  263:19 269:20
  281:14 283:21
agrees 110:10
ahead 19:6 50:15
  114:3 119:19
  121:6 259:19
aid 87:14
al 1:7,14 6:15,17
  253:16,18 311:3
  312:3
alcohol 218:17
  249:4,6,7,9,14,18
  250:4
alembic 140:13
alert 163:14
  167:20 168:1
  252:23
alerting 180:9
alerts 114:11
algorithm 39:15
algorithms 177:7
  177:17,18,23
aligned 303:4
allegation 101:11
allege 259:9
alleged 259:12
  271:20 276:12
  280:8 282:17
  297:11
alleging 101:6
allergan 102:3
  130:4

allergy 85:15
allow 12:15
  146:12 304:11
alter 22:21
alternatives 171:6
  196:7,22 197:7,16
  198:3 235:9
  287:15
altogether 211:10
ama 206:15
  207:18 208:19
ambiguous 53:19
ameliorate 81:15
american 120:23
  120:24 121:3,9,14
  141:10 151:19
  153:6,17 206:9,21
  207:2,9,11,15
  222:1
americans 80:1
  205:12 209:18
  250:4,5
amerisource
  154:21
amerisourceberg...
  1:6,13 2:16 6:15
  6:16 7:15 10:13
  15:9 29:14 87:2
  88:10,11 89:17,18
  89:22 90:8,10
  97:10,22 98:16,17
  98:24 101:12
  116:10 154:18
  159:4 160:2
  232:15 310:6
  311:3 312:3
amount 127:6
  165:3
amounts 166:8
analgesia 50:23
  51:4

**analgesics** 5:3 209:1 217:23

**analyses** 54:9 78:22

**analysis** 52:11,19 53:11,16 54:4,7 58:1 59:7 74:8 76:11,17,19,20 77:7 78:5,7,7,11 78:15,24 79:2,3 305:15,20 306:1,7 306:11

**analytics** 307:20

**analyze** 59:23 255:24

**anesthetic** 216:6

**anne** 1:18 2:8 4:2 4:9,18 6:13 7:20 308:17 309:5 310:8 311:4,9 312:4,13 313:20

**announce** 145:24 146:21

**announcement** 140:11,13 143:16

**announces** 144:4 145:22

**answer** 9:11,13,20 9:23 10:3 12:5 13:22 14:12,19 16:8 17:14,15 18:16 19:3,5,23 20:2,3,3 24:6 30:3 30:4 32:4,21 37:5 42:24 43:4 44:7 45:24 50:3,5 53:4 53:9,20 55:3,11 64:15 65:11 71:7 71:9,15 82:3,4,15 82:16,18,19 84:19 86:23 88:15,17,18

88:21 97:23 98:10 109:21,22,24 110:1,2,3,11,13,15 110:21 112:7,14 113:9,16,24 114:1 114:3 119:18 120:10,21 142:22 157:6 172:3 189:3 190:14 200:5,6 209:21 210:19 211:5 212:4 213:13,14,15 222:13 242:15 256:17 257:14 262:15,16,17 275:20,24 276:1 282:5 291:8,11 299:2,18,20

**answered** 58:13 109:19,20,23 111:21 113:2,9,23 135:1 143:12 174:19 177:5 232:5 244:1 261:12,20 262:3 262:13,14,18,20 291:10

**answering** 23:18 45:9 84:4,6 112:3 162:7

**answers** 18:11 19:12,19 20:5 58:15 76:8 113:7

**anticipated** 198:16

**anybody** 98:1 188:21 199:21

**anyway** 65:21

**apnea** 218:19

**apologies** 152:6 238:7

**apologize** 65:11 100:8 116:4

**apparently** 23:14

**appear** 124:21 293:22 311:11 312:15

**appearance** 7:4

**appeared** 151:23 153:5

**appearing** 2:2,3 2:11,16 3:1 7:6

**appears** 14:1 72:9 293:3

**appended** 312:11 312:18

**appendix** 49:16 73:16,22 101:16 101:20 241:20 242:15 306:18

**applicable** 283:23 283:24

**applies** 55:17

**apply** 195:10 274:17

**appointed** 225:13

**appointment** 223:4 226:11

**appreciate** 25:10 120:4 257:23 289:18

**apprenticeship** 34:20

**approach** 65:1 208:22

**appropriate** 35:3 35:6 36:24 37:12 38:13,18 41:1 43:9 48:24 49:16 50:1 51:20,22 58:2,9,19 59:14 64:6 72:6,11 73:8

73:13 83:23 107:22,24 111:1 118:6,14 165:22 176:7,12 177:3 201:20 207:22 209:1,8,23 211:15 213:9,21 214:19 216:17,23 217:18 221:13 257:15 260:10,18 261:8 303:2

**appropriately** 59:24 175:21

**appropriateness** 35:16

**approval** 91:9 103:19,23

**approved** 4:14 20:24 49:4,10,13 54:16 103:1 247:13 266:5,20 266:22 277:7

**approximately** 13:2 48:11 51:17 72:10 84:10 164:20 184:18 212:21 225:23 228:24 246:24 247:2

**approximation** 229:16

**april** 97:9

**arbitblit** 2:4 7:16 7:17 12:4 13:8,17 13:21 16:7 17:13 18:14 19:20 21:3 21:16 22:18 23:8 23:14 28:4,11,14 29:3,22 30:8 31:16 32:3,12,18 33:9,17 34:3,15

[arbitblit - attached]                                                      Page 6

37:3,14 38:4,15,20
41:2,11,21 43:2,10
44:20 46:12,21
48:8 50:2 52:1,24
53:17 55:2 58:12
58:20 59:8 60:1
63:11 64:14,21
65:9 66:19 67:5
67:12,18 69:6
70:12,20 71:14
72:8,17 73:10
76:7,15 77:20
78:12 81:4 82:5
82:11 83:1,6,13
85:8 88:19 89:3,8
92:5,13 100:8
103:2,5 105:9,14
106:3,7,14 107:16
108:1,11,21 109:9
109:18,23 110:4
111:5,9,20 112:2
113:1,22 114:17
114:23 117:13
119:21 120:5
126:21 134:3
135:4 136:15
137:7 141:15
142:8,17 143:2,11
149:14,24 150:7
150:21 152:7,10
153:21 154:3
156:22 159:10,21
166:16 167:17
172:10 173:8,14
173:24 174:18,24
175:7,17,22 176:3
176:9,14 177:4,21
178:3,8 179:4,9,14
181:1,4 182:18
184:9 186:17
187:5 188:8

189:10 190:6
194:18 195:5,11
199:4,11,17
200:14,22 201:11
203:6 204:11
205:6 207:13,24
208:17 209:2
210:4,13,24 212:3
212:9 213:12
214:10,21 215:4
215:23 217:2
219:1 220:22
221:6 222:11
224:13,18 229:12
229:18,24 233:16
234:20 235:11
236:8,17 239:8,15
239:21 242:13
244:9 247:22
250:19 254:24
255:3,7 256:4
257:9 260:13,21
261:1,11,18 262:2
262:12 265:16
266:7,15,21
267:15,18 268:10
271:11 272:15,23
274:24 276:6
277:21 284:24
285:8 287:8
288:19,24 289:7
289:23 290:20
291:2,12 297:15
297:19 304:8,13
306:14,16 308:10
310:5
**arcos**  74:13,16,22
75:11 192:6
**area**   30:11 56:17
76:18 156:13,17
169:24 279:19

**arena**   211:10
**argue**   184:21
**argued**   184:1
**argumentative**
126:22 134:4
213:13
**array**   237:13
**arrived**   35:22
**arriving**   173:23
**arthritis**   52:16,21
263:14,18
**article**   4:21 16:17
16:20 122:19
124:5 192:15
194:2 229:9,20
230:7,16 241:13
241:16 309:13
**articles**   16:13,16
54:11,12
**aselsa**   116:1
**aside**   300:11
**asked**   9:24 16:5
18:11,18 19:12
30:7 45:14 64:2
82:5 85:18 98:1
109:18,23 111:20
112:8 113:1,22
114:4 161:18
172:4 174:18
177:4 189:7,12
190:10 238:3,7
241:14 252:24
254:5 256:10,17
258:12 261:11
262:3,12 270:20
284:12 285:9
306:24
**asking**   26:20
29:24 32:7,8
49:19,21 53:10
58:7 63:10,24

84:6 108:16,17
111:12,13,14,16
112:18,19,21
166:9 167:3,7
172:2 301:11
**asks**   64:18 257:12
**aspect**   186:18
**aspects**   43:11,14
285:12
**assert**   206:19
**assessment**   252:9
**assignment**   311:2
312:2 313:2
**assist**   71:1,22
72:19 139:1
**assistance**   148:5
272:5,9 276:21
**associated**   153:13
**association**   120:23
120:24 121:3,9,15
141:11,12 151:19
153:6,17 174:4
206:9,21 207:2,9
207:11,16
**assume**   10:2 13:18
90:24 131:10,24
171:16 202:17
269:13 274:17
278:11
**assumed**   274:9,20
**assumes**   210:4
**assuming**   14:13
194:8 268:23
270:11 305:12
**assumption**
274:10
**astronomically**
57:17
**attached**   4:7
309:12 312:7

**attempt** 219:16
**attempted** 188:16
**attend** 25:18
**attending** 34:19
73:3 106:24
**attention** 133:15
137:9 218:9 230:2
232:23 283:17
**attest** 54:13
**attorney** 171:13
309:10,12
**attorneys** 16:3,5
**audio** 6:10,10 8:21
18:19 32:23
134:22 252:23
258:12,22,24
262:8 275:7
277:19 279:14
280:1,4 286:9
292:22 294:12
295:5 296:16
305:24 309:9
**august** 4:9 257:19
257:20
**authored** 30:15
**authoritative**
124:1
**authorization**
85:19
**authorize** 312:11
**authorized** 6:24
**authors** 76:4
207:5
**autoimmune**
246:2
**availability** 144:4
145:24 146:21
**available** 22:12
39:9 82:10 114:21
118:24 143:17,19
144:8 166:14

167:15 172:13
174:22 175:6
223:21,24 224:3
237:14
**ave** 310:1
**average** 51:9 54:6
149:15 193:3
275:18
**aware** 15:5,7,19
24:8 37:19 38:1
44:13 47:24 52:17
56:6,9 61:11 67:2
74:12 85:16 87:12
87:24 88:4,6,11
89:18,21 90:7,13
91:13,17 98:22
99:13 101:15
103:21,22 107:6
107:12,17 114:14
114:19 115:14,18
115:23 117:7,15
117:22 118:4,12
118:17 119:13
120:16 121:2,13
123:24 128:3,17
129:7,10,11
135:11,17 137:17
137:19 146:24
148:18 151:17,21
154:14,18,23
155:3 158:11,23
168:10 172:4
175:11 183:16
188:3,11,13,14
196:23 201:18
214:2 221:23
222:3 231:14,17
231:22 232:7,9,12
232:15,19 233:21
234:1 237:20,21
240:5 277:11

301:24 304:2
**awareness** 47:21
69:18 155:13
308:6
**awry** 155:21

**b**

**b** 4:6 8:3
**baby** 216:8,9
**back** 9:4 14:1,19
18:10 19:1,9,11
22:14 23:1 25:20
37:20 46:5 50:12
60:9 68:6 79:5
89:12,15 112:12
112:16 113:17
120:13,15 121:24
122:2 147:10
180:21,23 209:14
217:8,17 223:15
224:6 226:23
227:11 228:14
229:9 234:23
241:7,17 245:15
247:11 255:10,16
256:2 258:18
259:5 263:13,18
263:21 265:13,13
265:19,20 266:24
269:2,7 286:6
296:23 299:1
305:12 310:15
**background** 30:10
156:13 286:20
**backside** 264:1,3
**bad** 29:1 56:14,20
214:12 224:11,14
224:15
**badgering** 111:21
**bailey** 3:4 7:12
**balance** 208:23
219:17

**balancing** 180:6
210:21
**bandwidth** 141:18
**banner** 133:4
134:12 135:12
136:13,18,20
**bar** 133:13
**barely** 97:15
**barrier** 303:2
**barriers** 118:20,22
119:2,9,15 120:18
303:3
**base** 34:16 62:22
168:20 177:13
**based** 26:24 31:21
33:4,11 43:22
54:21 55:14 75:9
83:21 91:10 137:1
152:12 157:4
167:5 171:16
175:24 176:1
190:11,12 195:8
195:21 202:18
212:7 220:13
243:9 248:15
252:11 253:16
257:14 258:22
272:24 274:10,14
287:17 289:3,14
296:4
**basically** 31:11
**basing** 253:14
**basis** 16:13 105:16
190:3 191:24
192:3 194:11,14
218:13 300:13
**bates** 4:11,14,16
5:14,17 22:8
126:11 130:3,3
268:24 273:17
293:21

**battery** 2:5
**bear** 143:13
  226:24
**becoming** 189:5
**bedside** 73:2
**began** 36:8 69:12
  69:13 226:10
  248:18
**beginning** 69:8
  214:7,12
**begins** 192:21
**behalf** 7:7,10,14
  7:20
**behavior** 65:13
  66:18 67:3 137:10
  194:21
**behavioral** 297:6
  299:24 301:8,24
  302:17,24 303:22
  304:1
**belief** 44:8,11,19
  45:5 49:1 59:1
  168:20 173:20
**believe** 11:15 29:1
  33:14 35:5 36:5
  42:23 49:24 60:14
  64:4,8,17 67:3,11
  69:16 73:11 80:19
  81:7 82:7 90:16
  90:17 98:16
  102:24 103:6
  105:10,23 106:18
  108:22 109:3,6,14
  110:23 111:3
  113:9 114:5 116:1
  117:6,21 130:8
  136:10,20,21
  143:7 146:14
  147:14 151:9
  157:11 160:16
  164:15,16 165:7

165:12 168:24
181:15 184:4,7
192:6 195:18
199:14 200:8
206:6 211:13,24
214:17 216:17,22
216:24 217:12
222:19 224:3,10
247:6 251:11,21
252:3,15 258:4
270:24 273:12
281:17 296:1
298:1 299:11
300:16,17
**believed** 35:10
  54:21 107:22
**believing** 81:11
**benefit** 178:12,12
  206:16 235:18
**benefits** 100:12
  101:3 115:6 169:1
  175:9 179:10
  198:15 204:3,19
  225:2 243:12
  244:21 291:4,4
**benzodiazepine**
  218:17
**bernstein** 2:5 7:17
**best** 9:21 10:1
  31:14,18,20 32:2
  32:14,17,20,24
  33:7,15 37:24
  50:11 65:15 66:4
  84:18 95:12
  111:15 112:20
  171:1,13,21 172:7
  172:13,17 197:3,5
  197:9 204:9 214:1
  224:17 248:13
  273:1 309:8

**better** 225:16
  235:23 236:4,22
**beverly** 97:13
**bevy** 97:18
**beyond** 39:5 48:3
  123:11 126:1
  150:24 163:7
  256:22,22 257:3
**big** 41:13 158:4,4
**bigger** 52:5 92:19
  108:6
**biggest** 182:5
  210:6
**bill** 220:10
**billion** 191:15,17
  192:4 193:2,16,17
  194:3,24 230:8,22
**billions** 105:19
  227:20
**bin** 269:4
**binder** 202:4
**biopharma** 145:20
  145:23 146:20
  149:4 150:8,14
**birth** 216:3,6
**bit** 8:22 20:21 46:5
  48:18 71:10 78:13
  150:16 156:12
  235:6
**black** 147:23
  148:12,14 278:22
  294:5
**blast** 127:2
**bleary** 24:11
**board** 5:2 32:9,15
  65:4 66:14 67:10
  217:22 218:24
**boards** 32:10 33:2
  116:21,23,23
  117:2,4,9 180:2

**bodies** 107:6
  158:11 165:8
**body** 91:9
**bold** 95:4 143:18
  148:24 278:16
**bolded** 294:5
**book** 4:18 36:15
  36:17,22 62:3,14
  62:16 65:24 66:1
  66:11 76:21
  122:15,16,23
  123:4,24 124:8
  155:7,15,24 156:6
  157:1 158:3,18,21
  159:2,5,7,12,13,20
  170:5 179:2
  222:22
**bore** 267:23
  269:17
**boscarino** 247:24
  251:19
**bottom** 40:8 68:24
  95:2 185:1 193:12
  213:4 268:22
  277:24 283:17
  307:14
**bounds** 257:17
**box** 10:21,24
  91:24 126:7 145:3
  147:24 148:12,14
  152:5 228:7
  267:17 278:22
  294:5
**boxed** 278:14
**boxes** 263:13
  265:11
**brad** 2:13 7:8 92:2
  92:11 94:14 152:3
  154:10,12 228:9
  228:13

**brain** 150:23
176:20 181:19
182:7
**brand** 276:23
292:7 293:8
**bravo** 211:7
241:19
**break** 67:13
119:24 120:6
121:19 179:5
180:15 227:3
297:18,20
**breakdown** 14:18
**breaking** 8:22
247:16
**breakthrough**
146:2,10,13,17
147:12
**breathing** 70:7
148:2
**briefly** 122:6
187:14 189:13
251:4
**bring** 168:7 228:9
**bringing** 115:9
**britt** 2:4 7:18
**broad** 157:13,22
157:22 162:17,17
249:8
**broader** 143:13
205:11
**broadly** 29:9
90:21 103:14
129:11 142:10
159:12 160:17
163:13 217:6
278:3 285:3
**brummett** 253:18
**built** 299:5 301:16
304:15

**bullet** 218:7
**buprenorphine**
276:24 277:2
289:20 290:15,23
291:14 292:7
**burden** 41:14
**burling** 3:5 7:10
258:10
**busy** 39:14,20
**butrans** 5:10,17
276:13,16,23
279:11 280:9,19
280:24 286:17
292:6 293:24
294:15 295:2
296:23 300:12
301:14,17 305:2
**buy** 97:19 142:6
**buyer** 143:21

───── c ─────

**c** 2:1,4 4:1 6:1
125:20,21 216:14
216:19 310:5
**ca** 2:6 310:24
**cabell** 1:10 6:15
10:7,15 48:20,23
49:11,23 51:8,12
51:13 52:6,9,10,12
52:14,20 53:2,11
53:14,15,24 54:5,9
54:13,20 55:1,10
55:17,21 56:7,13
60:14,18,22 61:3,9
61:12 73:19 74:5
75:1,10 77:13
88:2,12 89:19
90:8,15,18,23 91:3
102:12,20 128:4
131:20 146:24
161:7 170:19
171:15,20 172:7

172:14,21 262:22
263:2,6 271:15
273:5 274:1,4,7
275:4,10,15,23
276:5 279:5,8,11
281:7 282:15
284:4 297:1,5
298:16 299:23
305:11,14,17,22
306:4,10
**cabraser** 2:5 7:17
**caesarean** 217:1,4
**cah** 4:11,16
**calculate** 189:17
**calculated** 192:7
**calculating** 213:2
254:8,10,13
**calculation** 230:17
**calculations** 52:18
**california** 26:2
164:3 165:17
**call** 8:23 11:21
49:3 85:7 86:10
173:2 250:22
302:17,17,20
303:23 305:5,6
**called** 46:6 81:12
83:9 91:6 101:21
111:15 112:20
129:5 139:18
157:2 158:4
181:21 211:7
283:2,3
**calls** 247:3 257:13
302:19 303:1
**camera** 303:10
**campaign** 4:12
91:1 93:2 129:8
132:2 296:4
302:17,17 303:23

**campaigns** 89:21
102:14 131:23
147:3
**cancer** 35:7,17
60:24 61:4 146:3
146:5 238:2 243:9
243:10,15,17,19
252:5
**cannabis** 218:17
250:6
**capabilities** 167:8
**capability** 167:10
167:13
**capable** 188:21
**caption** 309:6
**capture** 252:17,20
**captured** 65:12
**capturing** 174:2
**card** 115:10 269:2
271:6,24 272:2,4
273:6,8,21,22
274:21 275:4,9,14
275:19,22 276:4
276:15,20 277:15
279:5,8
**cardinal** 2:11 4:13
4:15 7:7 8:5 10:12
15:8 29:12 87:2
88:10,11 89:17,19
89:22 90:7,10
98:24 99:12,13,16
100:2 101:14
116:10 125:16,21
127:17,19,24
128:5,9,10 129:1,4
129:9,11,23
130:10 131:17,21
132:22,23 133:2
133:13 134:11
135:9,13,21
136:14 137:15

138:5,13 139:5
140:2,8,16 144:24
145:4 148:17,21
149:3 151:7,11
154:16 158:19
160:2 232:19
**cardinal's**  133:4
**care**  31:8,10,14,19
32:2,11,16,20,22
33:8,16,19,23 34:4
34:7 37:24 61:6
69:21 72:16,21
86:2,4 107:22,24
108:8,17,19 109:1
109:4,7,14,16
110:17,20 111:7
111:15 112:20
157:15 162:12,13
178:20 188:12
200:1 201:12,14
208:24 209:20
220:15 243:8
292:1,3
**career**  104:24
106:10 212:16
**careful**  216:20
257:16
**carefully**  110:19
222:13
**carried**  305:13
**carries**  91:11
147:23
**carry**  97:18 196:3
**case**  6:18 10:12
11:13,14 12:12,19
13:11 14:4 15:5
15:12,20,21,21
16:2,3,23 21:1,2
73:19 74:3 87:18
87:21 88:1,7
110:24 133:5,7

154:9 161:6
170:16 185:16
211:1 213:9
228:22 229:11
231:16 242:9
246:7 310:6 311:3
312:3
**cases**  13:20 14:23
196:9 199:23
210:10 220:14,17
254:20
**cash**  97:18
**catching**  235:6
**categories**  56:2
247:13,18
**category**  49:3,4,9
49:10,13 54:16,18
54:24 55:7 56:3,5
122:6 185:10,14
185:22 247:13,14
247:15,21 249:8
**caught**  66:1
**causal**  76:12 77:2
181:7,12,17
**cause**  148:2
**caused**  37:21
208:11
**causes**  76:14
**caution**  243:19
244:13
**caveats**  240:11,12
**cdc**  4:23 38:10,12
39:10 197:2 198:5
198:6,11 201:22
202:6,11,15,19
203:4,11,22 204:7
204:16 205:3,10
205:17,18,23
206:2,17 207:2,4
207:19 209:3

**cdc's**  206:9 208:22
**cell**  6:8 243:6
244:24
**cellular**  6:7
**center**  3:6 192:20
221:24 222:21,24
**center's**  222:9
**central**  218:17
**centric**  302:24
**cephalon**  102:2
306:19,23 307:6
307:21 308:4
**certain**  35:2 52:13
91:10 177:8,9
180:7 218:18
242:5 243:6
244:22 265:18
286:22 287:6,13
288:23
**certainly**  21:8
38:7 159:14
197:10 236:10
244:12 253:22
255:22
**certainty**  66:23
234:12 235:4,9
**certificate**  312:11
**certification**  311:1
312:1
**certifications**
151:2
**certify**  309:5,10
**cesarean**  252:19
**cetera**  127:4 139:9
**chain**  86:3 167:9
167:14 173:2,6
174:14 299:9
304:19
**chaired**  226:4
**challenges**  309:8

**chance**  116:6
273:13 291:9,16
**chances**  290:18
291:1
**change**  24:11,12
36:1 44:2,4 69:8
69:12,13 114:1
173:9 181:19
200:21 225:6,9,9
310:13,14 312:8
313:3
**changed**  18:12,16
19:13,19 20:5
24:3,16 35:9,11,12
35:14,16,24 36:19
111:22 112:7
164:17 203:13,16
203:19
**changes**  69:11
139:8,12 169:21
182:7 226:8
310:12 311:7
312:7,9
**changing**  37:6
201:16 224:24
**chapter**  158:8,16
309:13
**chapters**  158:3
**characterization**
287:1
**characterize**
286:24 287:2,9
**characterizing**
287:5
**charge**  13:15
**chart**  24:3 230:3
**cheap**  152:16
**check**  119:17
163:4,11 164:16
164:23 170:22
255:10 265:11

297:18
**checked** 263:13
**checking** 163:23
**chemical** 42:17
169:14
**chief** 152:21
**cholesterol** 173:17
**choose** 25:21
157:10 288:10,13
**choosing** 157:9
**chord** 215:7
**chose** 25:22
**chroic** 4:24
**chronic** 5:3 33:11
35:7,17 42:8,10
43:12,19 44:9,12
45:6 60:23 95:14
103:9 140:4 196:1
196:2,6,14,21
197:7 198:7,13,21
199:14,15,18
201:23 202:7,12
202:16,23 203:12
203:23 204:9,14
204:18 205:5,12
205:16,20 206:3,5
206:16 208:5
217:23 218:11,14
219:5,16,22
220:21 221:15,20
224:23 225:11
226:1,21 234:13
234:18 235:10,15
236:23 238:13,19
245:12 251:18,23
252:1,4,4,12
263:12,21,21
265:9,13,19 266:2
**chronically**
204:16 252:2

**cibulka** 2:4 7:18
**cii** 144:5,7,7 148:1
**circles** 111:13
112:18
**circumstance** 41:4
41:9 67:6 73:5
80:17 200:5 211:1
272:16 291:13,16
**circumstances**
18:15 40:13 41:7
45:21 46:2 59:11
59:12 256:13
290:13
**citation** 74:10
132:16
**citations** 126:1
**cite** 17:3 126:15
127:22 129:1
130:16 132:11
151:6 170:24
187:13 196:11,19
233:12 248:10,17
259:17 276:9
282:21 292:22
293:16,17 298:1
302:16
**cited** 16:12,23
124:1,4,6 126:11
129:13 138:8,13
138:17 192:16
219:23 268:7,16
269:23 270:1,2,4
270:15 280:12
281:15 287:17
**citing** 220:5
288:18 303:12
**city** 1:3 3:6 4:10
6:14 12:17 73:19
74:6 91:17,21
92:23 94:20 128:4
147:1 310:6 311:3

312:3
**civil** 1:5,20 311:5
312:5
**claim** 77:17 94:20
96:10 102:10,21
105:16 115:22
132:12 206:23,24
214:18 265:15,18
269:3,8
**claimed** 87:8
128:8 135:21
**claiming** 116:7
**claims** 124:16
263:9 270:10
275:18 284:8
289:14
**clarification** 18:18
241:14 252:24
257:24 258:13
**clarify** 251:16
257:2 304:12
**clarifying** 12:20
**class** 123:13,15,15
148:1
**classes** 27:11
123:8 124:9
**clause** 244:2
**clayton** 3:4 7:12
280:16 293:21
294:10
**clear** 9:21 30:5,13
96:8 132:7 159:18
181:7 209:15
217:7 218:13
231:13 234:11
235:3,8 236:14
237:1 246:9
254:11 256:24
268:13 282:4
301:15

**clearly** 73:3 96:20
278:3 304:4
**cleveland** 310:2
**client** 125:16
**clients** 125:18
**clinic** 39:11 40:3
**clinical** 27:15
38:23 39:2 62:22
66:3,4 83:21
160:5 218:13
219:17 233:5,7
237:16,18 272:24
299:7
**clinically** 27:15
204:20 209:1
253:4
**clinician** 57:2
109:12 115:1
162:5 218:12
**clinicians** 162:18
198:14 203:24
205:19
**clinics** 97:18
**clock** 267:6 294:22
**close** 90:1 194:3
**closed** 65:21 78:18
**closely** 17:22
75:15 88:7
**closest** 34:11
**cme** 115:6,18,22
116:12
**cmes** 116:8
**coach** 101:8
**coached** 100:24
101:2,5,6 289:2,2
**coaching** 20:18
101:12 288:1
293:6,9,12,20,23
301:13 302:24
304:1 305:1

coalition   5:3 219:5
219:15,21 220:8
220:21 221:2,3,14
221:17,20
coast   120:2,3,3
code   279:19
309:13
collaborated
102:15 124:17
129:12 225:4
259:9 271:1
collaborating   88:4
268:13 269:6
collaboration
134:20 180:10
231:17 268:20
269:1,14 278:3
296:2
collateral   163:6
166:19
colleague   7:11
62:9 63:4,5,5,7,8
63:19,19,23
222:24
colleagues   28:23
45:3 62:7 63:13
63:17 66:18 67:3
97:11 130:8 223:3
223:5,6 225:4,14
225:20 226:15
collecting   158:4
collectively   178:21
combat   98:18
combination
34:17 307:18
combined   85:13
come   14:19 22:14
44:2 85:10,20
97:13 101:9
141:24 157:7
209:14 228:14

229:4 255:10
256:2
comes   33:6 34:5
34:24 42:21
198:23
comfortable   69:22
70:1,15,18 73:6
85:24 236:18
290:2
coming   23:1 26:24
comment   65:5
commercial
175:15
commission   1:10
4:10 6:16 33:1
65:18 91:6,7,8,14
91:18 92:24 94:1
94:7 178:22 180:1
309:19 311:19
312:25 313:25
commission's   93:9
93:17 94:3,21
commissioned
309:4
committed   210:12
common   59:5
151:3 186:15,20
198:22 265:23
communicate   98:6
103:7
communicated
73:3 96:7,11,21
99:1 292:10,17
295:15,22 296:10
communicating
140:8
communication
100:3 127:16,18
129:3 131:5 140:9
201:19 307:19

communications
4:14 16:8 99:18
100:15 117:7,15
117:22 118:4,12
119:13 120:16
121:2,13 302:12
304:24
community   34:2
37:7 52:15,23
80:5 91:12 123:19
198:22 200:8,10
207:12,22
companies   101:24
102:5 150:10
227:24 240:7
company   116:2
122:24 239:10,12
239:18
comparable   234:2
compare   52:10
237:22
compared   237:18
compares   54:9
comparing   236:24
comparison   154:8
compassionately
211:8
compelling   46:16
complaint   4:10
91:20 92:22
complete   148:4
156:5 262:16
276:1
completed   310:15
completely   80:12
completing   134:7
complex   28:16
103:15
complicated   43:5
43:7,13

complies   283:23
comply   22:23
component   287:4
compound   217:2
266:16 274:24
comprehensive
11:10 208:23
compulsive   182:3
computer   47:12
48:4
concentrate   140:1
concentrated
158:15
concentrating
10:7
concept   33:23
146:11 178:7
conceptualization
55:17
conceptualized
267:23 268:4,9
concern   122:14
209:22 210:3
concerned   129:20
210:16
concerning   154:15
154:19,24 155:3
174:13
concerns   52:13
129:21 153:1
220:24
concluded   308:17
concludes   308:15
conclusion   75:6
218:5,8
conclusions
128:22
concrete   36:4
190:17
condition   247:1
248:2 266:20,23

conditions   54:14
218:18 238:14
242:10 246:8
266:13
conduct   65:4
76:19 94:21
305:15,19 306:1,7
conducted   1:21
76:10,11 157:3
275:7,13,16,21
276:3 282:12
conducting   300:14
conference   6:21
30:18
conferencing
309:6,8
confidence   77:16
77:22 78:2
confidential
156:19 215:3
confirmation
188:1
conflicting   304:11
confusing   121:8
233:17
conjunction   222:1
connection   4:12
129:9 130:20
131:17
connie   135:15
connolly   2:13 7:6
7:8
consensus   208:5,9
225:5 263:19
consent   218:10
consequences
182:14
conservative
95:13
consider   30:21
84:1 177:18

198:14 204:2
306:22
considerable
91:11
consideration
105:20
considered   20:14
21:1,22 138:12,13
138:18 142:20
228:6,22 255:5
256:23 257:20
258:23,24 273:12
considering   86:15
considers   160:14
consistent   14:20
33:15 42:11
constrained
167:14,18
construed   133:11
consult   288:4
consulting   289:22
290:3,14 291:7
consumer   137:15
137:20 140:23
consumer's   137:9
consummated
127:10
contact   46:1
155:14
contain   11:7,10
contained   104:12
263:9 284:8 302:5
contains   294:20
content   100:11
141:13 150:5
222:6 283:18,20
283:23 303:3
contents   148:22
context   31:8 63:2
160:10 188:6
205:11 215:6

216:4,5,8 217:7,9
239:24 244:11
continue   6:10
79:14,19 81:15,24
82:1,21 187:13
204:20 287:14
300:6
continued   182:3
238:19
continues   94:7
225:21
continuing   39:22
167:21 210:16
continuously
243:22 244:16
contract   4:11 5:12
126:19 282:21
283:1 298:8
contrary   168:6
206:23,24 250:9
250:16
contributed   93:18
143:5 154:6
contributing
160:3
control   47:17
175:12 187:1
controlled   42:3
48:9 119:9,15
120:18 134:22
160:17 165:2
175:13 183:17
233:9 234:7
235:17 267:6
conversation
45:12 130:24
131:7,15 215:13
287:21 288:17
conversations   6:7
17:16 46:17
288:22

convey   101:1
convinced   107:21
copy   91:20 155:16
241:2
cord   245:10
corporate   97:10
corporation   1:7
1:14 3:1 6:15,17
7:15 10:13 29:16
90:12,13 99:1
159:2,5 232:16
310:6 311:3 312:3
correct   11:19 12:1
12:19 15:17 16:15
17:7 22:4 24:6
25:1,7,16 31:6
33:8 36:12 38:14
39:10 40:8,12,21
40:22 41:1,20
59:24 62:14 63:14
73:20 74:3,6
75:11,20 80:24
81:3,5,9,22,23
86:3 87:18,21,22
90:5 95:21 96:11
101:22 102:7,8
105:2 106:22
111:8 114:8
118:24 119:4
122:3 123:1
124:19 125:7
126:10,12,16,20
129:5,14,18 130:8
130:11,17 132:8,9
132:10,24 140:18
140:21,22,24
141:7 143:10,18
143:22 144:1,2,12
145:5,8,11,20
147:6 148:10
151:13 155:8

| | | | |
|---|---|---|---|
| 158:9,16 163:24 | **corrections** 310:12 | 55:10,18 56:8,13 | 113:11 120:11 |
| 164:3,10 166:15 | 312:17 | 60:18,22 61:3,9,12 | 237:4 241:14 |
| 167:2 168:23 | **correctly** 69:1 | 73:19 74:6 75:1 | 242:23 252:24 |
| 169:4 171:10 | 99:23 127:20 | 75:10 77:13 88:2 | 258:12 311:7 |
| 176:2,13 183:4,9 | 144:9 146:6 | 88:12 89:19 90:8 | **courtesy** 50:5 |
| 187:12 189:23 | 218:21 241:10 | 90:15,18,23 91:3 | 223:3 |
| 190:18 191:21 | 267:7 284:1 295:5 | 102:12,20 128:4 | **courtroom** 8:17 |
| 194:17 195:4,22 | 307:24 308:8 | 147:1 161:7 | **cov.com** 3:10 |
| 196:8 197:20,22 | **correlated** 75:15 | 170:19 172:14 | **cover** 73:24 77:13 |
| 198:3,8,17 199:3 | **correspond** 193:2 | 238:24,24 262:22 | **covered** 30:12 |
| 200:9,17 201:4,15 | **cost** 178:12 267:23 | 263:2,6 271:16 | **covers** 283:1 |
| 201:24 202:12,21 | 269:18 272:6 | 273:5 274:1,4,8 | **covertly** 287:12 |
| 203:1,5 204:10 | 276:21 | 275:5,10,15,23 | **covidien** 132:22 |
| 205:16,20 206:13 | **counsel** 7:3 8:5 | 276:5 279:5,8,12 | 133:3 134:13 |
| 207:20 208:20 | 13:6,9,24 14:10,16 | 281:7 282:15 | **covidien's** 133:11 |
| 209:8 215:16 | 16:8 17:14,17 | 284:4 297:1,5 | **covington** 3:5 7:10 |
| 222:19 233:15 | 19:21 20:12 22:19 | 299:23 305:11,14 | 258:10 |
| 235:19,20 236:5 | 23:5,23 45:16 | 305:17,22 306:4 | **craig** 74:9 |
| 237:3,14 245:2 | 61:17 92:13 110:8 | 306:10 309:2,4 | **create** 10:17 |
| 251:10 252:14,19 | 156:18 215:2 | 311:10 312:15 | 179:11 |
| 259:22 261:10 | 228:5 257:2,24 | **couple** 61:15 | **created** 78:19 80:9 |
| 265:15 266:18 | 258:7 280:15 | 73:11 171:18 | 104:16 168:4 |
| 269:24 270:5,17 | 306:15 309:10,12 | 200:24 302:6 | 170:2 190:12 |
| 271:3,10,16 272:1 | **counsel's** 12:9,11 | 306:14 | 211:6 232:10 |
| 278:14 279:2 | 14:14 16:9 113:4 | **coupon** 115:9 | **creates** 178:23 |
| 280:20 281:4 | 113:12 213:18 | 232:10 272:8 | **creating** 27:21 |
| 282:7,9,16,23 | 259:1 | 301:6 | 32:19 38:23 98:17 |
| 286:23 287:18 | **counselor** 110:9 | **coupons** 88:5 | 160:3 |
| 288:5,18 290:19 | **countries** 211:19 | 151:12 231:19,20 | **creation** 219:5 |
| 292:7 293:4 | **country** 52:13 | 231:20 232:2 | **crisis** 44:3 68:19 |
| 295:12 296:21,22 | 53:12 108:15 | 271:2 | 83:8 105:21 214:2 |
| 298:2 301:18,22 | 118:18 210:7 | **course** 38:10 | 243:7 244:24 |
| 301:23 302:10,15 | 211:20 213:10 | 39:23 115:22 | **criteria** 42:15,16 |
| 302:16 303:15,18 | 214:18 | 204:10 221:24 | **critical** 177:24 |
| 304:24 305:3,18 | **county** 1:10 6:16 | 222:4,7,10,15,17 | **criticism** 140:2 |
| 305:22,23 306:4 | 12:17 48:20,23 | **courses** 115:19 | **criticizing** 206:9 |
| 306:10 309:7 | 49:12,23 51:8,12 | **court** 1:1 6:17,22 | **crossed** 63:19 |
| **corrected** 303:19 | 51:14 52:6,9,10,12 | 7:23 8:11,16 9:14 | **crosstalk** 112:1 |
| **correction** 24:5 | 52:14,20 53:2,3,12 | 13:13,15 18:6,18 | **culminating** 36:16 |
| 100:7 | 53:14,15,24 54:5 | 50:7 89:11 92:8 | **culture** 65:6,12,22 |
| | 54:10,13,20 55:1 | 110:9 112:11 | 66:6 69:8 |

**cure** 5:6 241:5
**current** 36:23
  51:23 203:20
  212:13,22 216:22
**currently** 50:19
  144:8 209:24
  302:2
**curriculum** 26:17
  27:18,22,23 28:2,8
  28:10,24 29:2
  123:16,17 225:21
  225:24 226:6,8
**customers** 65:17
  139:5,12,14
  148:18,22
**customized** 308:5
**cut** 37:20 50:10
  67:24 81:8,21
  143:6 217:8
  231:12 241:23
**cutting** 210:22
  211:2 212:4
  214:12 241:7,17
**cv** 184:14 224:2,2
  226:2
**cvs** 87:14
**cycle** 79:6,11
  80:22 308:7
**cystitis** 242:6,8,11
  244:4 245:5

**d**

**d** 6:1 77:8,10 79:1
**daily** 80:1 193:10
  193:12,14 294:22
**dangerous** 85:14
**dangers** 94:6
  167:20 180:7
**data** 5:20 57:22
  73:19 74:3,13,16
  74:18 79:1 95:13
  109:10 192:6

194:14 217:4,5
  235:12 245:14
  252:21 253:1,5,11
  307:20
**database** 163:5
**date** 35:15,19
  94:15 164:19
  174:9 184:16
  200:19 203:7,14
  224:3 310:8 311:3
  311:9,19 312:3,13
  312:25 313:20,25
**dated** 138:18
  145:13 205:24
  307:6
**dave** 67:12
**day** 1:23 12:15
  20:19 35:24 37:1
  37:13 53:8,9 71:6
  94:5,12 123:15
  166:9 173:12,17
  173:23 193:3
  198:20 240:4
  244:6 247:12
  309:16 311:16
  312:22 313:22
**days** 37:22 166:10
  193:1,3 310:18
**dc** 2:14 3:8
**ddd's** 193:15
**ddds** 193:8,8,17
**de** 70:16
**dea** 107:6,13
  114:16 118:1,1,5
  160:13,14,16,18
  160:20,22 180:2
  183:16,24 184:4,7
  184:21 191:13
**dea's** 175:11
  183:20

**dealer** 4:18 122:15
  155:7
**dealing** 42:6
**dear** 143:21
  310:10
**death** 70:6 72:19
  72:22 73:12 148:3
  182:17 295:4,7
  306:3,10
**debate** 207:21
  208:1,4,7,12
  209:23
**debated** 209:7,10
  223:4,7
**debating** 209:6
**debilitating**
  209:19 246:6
**decade** 36:14
  44:22
**decades** 17:18
  79:22 238:17
  246:11
**december** 11:15
  11:16 12:3
**decent** 67:16
**decide** 27:10,12
  38:13,18 47:1
  57:3 156:24
  177:12 239:13,19
  258:1 262:19
  288:7
**decided** 21:13
  26:22
**deciding** 27:1
**decision** 27:3
  41:15 83:2,11,20
  84:3,10,24 115:3
  176:1,6,11,13,18
  177:2,19 178:16
  178:18,21 179:13
  179:16,19,22

218:10,11 219:2
  260:10,18 272:19
  289:13
**decisions** 26:4
  34:16 41:10,19,23
  66:4 165:22
  168:20 177:16
**declined** 46:9,14
**decrease** 75:23
  76:1 171:17
**decrement** 238:22
**deductive** 157:8
**deed** 311:14
  312:20
**deemed** 134:1
  310:19
**deep** 213:24
**defend** 21:19
**defendant** 2:11,16
  3:1 6:14 98:6
  102:21 115:23
  185:16 200:13
  201:19
**defendants** 1:8,15
  1:19 15:1 20:13
  21:14,17 22:12
  46:9 55:14 86:18
  86:21 88:1,6
  91:15 98:2 102:6
  102:11,15 103:23
  110:24 111:7,17
  112:22 113:18
  114:5,22 115:15
  115:19 117:8,16
  134:21 150:12
  154:9 170:10,11
  170:16 200:11
  230:13,23 231:15
**defense** 13:24
  196:13 201:3,8,13

define   110:19
  308:4
defined   193:12,14
defining   188:5
  190:15
definition   266:2
degree   25:16
  30:13 57:15 64:22
  66:22 103:7 122:7
  141:16 142:3
  151:1 154:7,8
  234:11 235:3,8
degrees   67:7
  150:18 151:1
delgado   253:18
deliver   93:20
  220:15
delivered   10:21
  255:22
delivering   216:4,5
  216:8,9 307:18
delivery   216:11
demand   76:24
  89:24
demonstrate
  76:11 77:2
demonstrating
  94:6
demoralized   62:22
dental   239:2
  254:16
department   62:21
  64:18 65:2 152:20
  162:6 196:12,12
  201:2,7,8,13 223:4
  310:22
departments
  169:15
depend   57:15
  246:7 289:1,8,9,24
  290:21 291:13

dependence   42:16
  169:14 306:3,9
dependency   42:18
  214:16
dependent   79:12
  80:8,17 81:13
  181:24 199:20
  208:13 209:11
  211:4,9 214:13,15
  240:13 241:22
depends   28:20
  32:5 39:11 67:6
  164:13 175:23
  199:12 200:5
  211:1 238:22
  272:16
deployed   274:13
  275:17
depomed   143:17
  143:19 144:4,16
deponent   14:15
  16:11 19:2,7,15
  67:19,23 89:10
  92:18 100:10
  105:15 113:8,24
  132:6 227:4
  279:22 298:18
  308:12
deposed   8:10 18:2
deposition   1:18
  6:9,13,20 13:16
  17:2,5 20:6,7
  22:15 23:2 45:8
  45:17 61:14,18,19
  62:2 73:23 160:21
  161:13,15 255:19
  255:23 273:15
  308:15,16 309:5
  309:11 310:8,11
  311:1,3 312:1,3

depositions   17:4
  17:24 18:4,5
  187:8
depressants
  218:18
describe   32:15
  61:10 116:18
  130:10 163:3
  169:8 185:1 250:3
  302:23 304:17
described   20:14
  23:24 79:6 80:22
  118:19 138:21
  166:19 169:4
  170:21 175:12
  179:2
describes   127:1
describing   195:1
  245:16 304:18
description   4:8
  5:1 74:21 78:11
  132:21 298:5
  304:21
design   27:18 28:24
  234:8
designation
  204:13
designed   28:9
  101:8 161:14,19
  161:23 163:17
  267:23 269:11,13
designing   28:7
  162:3
despite   94:5 182:3
  205:1
detail   125:3
  232:17,21
detailed   231:23
detailers   232:1
detailing   160:17
  162:12 231:1,6,7

231:14,19
details   148:5
  231:4 269:19
determination
  43:8 56:12,22
  58:8,17 213:21
  260:15,16
determine   52:20
  53:12 54:5 78:17
  172:6 183:21
  261:7 275:8,13,21
  276:3 282:13
determined   45:22
determines   26:16
  175:1
devastating
  245:20
develop   182:2
  247:1,3 248:8
  249:13 251:7,13
  252:7,10 253:12
developed   210:18
  221:24
developing   182:6
dhhr   4:17
diabetes   173:11
diagnosis   251:23
dialogue   131:12
  131:15
dichotomy   32:20
dictates   38:2
die   70:16 71:3
  72:13,16 73:7
  182:11
died   73:2
difference   108:2
differences   53:13
different   14:6 15:1
  18:16 31:19 37:4
  41:7,14 52:12
  59:10 78:17

110:20 114:10
167:10 179:1
183:6 194:23
201:3 207:19
266:9 272:3
**differently** 18:17
110:16 166:6
**difficult** 66:2 80:9
81:14 110:15
150:11
**difficulty** 242:2
**digest** 39:21
273:14
**diligence** 43:16
**direct** 88:2 140:23
180:12,13 210:9
228:2 230:2
231:19 232:23
283:16 299:4
305:4
**directed** 143:24
183:3 282:14
283:10 285:1
289:11
**directing** 137:9
220:4
**directly** 46:2
103:18 296:13
302:18 303:13,14
**disagree** 54:23
206:3,20 208:18
208:18,20,21
218:23 221:8,10
223:7,10,11,12,18
235:15
**disagreeing** 205:2
**disagreement**
146:16 147:11,13
**disbursed** 191:14
**disclose** 64:3

**disclosed** 12:6
**disclosure** 255:20
**discontinued**
204:3
**discontinuing**
204:18
**discounts** 88:8
**discuss** 138:14
172:21 271:19
297:11
**discussed** 79:21
116:13 135:12
137:16 138:15
151:6 185:23
206:12 302:20
**discussing** 140:13
200:17
**discussion** 218:12
223:20
**discussions** 17:14
224:24
**disease** 5:7 42:13
140:5 182:2 241:6
243:1 245:24
246:2
**diseases** 242:6
243:6 244:3,23
**disorder** 182:15
218:20 243:11,23
245:4,8,9 247:2,5
248:8,14,22 249:7
249:9,13,14 251:8
251:13 252:8,11
253:9,13 254:9,14
**disorders** 245:6
**dispense** 88:5
210:17 220:17
271:2
**dispensed** 270:21
271:9,14

**dispenser** 87:10
**dispensers** 86:22
87:10
**dispenses** 90:4,18
**dispensing** 56:16
57:9 88:1,12
89:19,24 90:2,3,7
90:13 165:23
221:1 271:12,17
**display** 133:4
**disproportionate**
52:5
**disputing** 176:24
**disregard** 105:11
105:17
**disregarding**
105:24
**disseminated**
102:17 222:20
231:21 273:8
**disseminating**
96:6
**dissemination**
153:1
**dissuade** 220:14
**dissuaded** 220:17
**distinct** 42:18
**distinction** 142:10
**distorted** 32:23
**distortion** 252:23
258:22,24 262:8,9
275:8 277:20
279:15 280:1,5
286:10 292:23
294:13 295:5
296:16 306:1
**distortions** 258:12
**distracted** 150:3
**distribute** 100:2
**distributed** 99:18
127:17,19,24

129:9 151:7
273:22 274:11
**distributing** 140:3
**distribution** 68:23
77:18 130:21
139:1 168:18
174:4,13 212:1,5,6
212:13,20,22
213:10 307:19
308:6
**distributions** 75:9
75:20,24 79:7
114:8,15
**distributor** 45:20
46:9,14 74:20
75:14 79:12 82:9
86:18,21 87:1,6
88:1 91:14 96:1,1
96:16 98:2,5,23
102:11,15,21
103:23 110:23
111:6,17 112:22
113:18 114:5,22
115:15,19,23
117:8,16 150:12
160:7 174:5
185:16 186:24
187:2 200:12
201:19 212:23
230:12 231:15
302:2
**distributor's** 76:5
**distributors** 15:2
15:6,8,13,22 74:18
76:13 77:3 87:9
87:13,17 95:23
96:5,11,12,13,14
96:20 105:15,17
107:7,14,18,22
108:5,8,13,18,22
108:24 109:3,7,10

109:15 114:8,15
116:3 117:23
118:5,13 119:14
120:17 121:14
124:17 125:16
128:22 131:1
158:24 159:8,11
159:15,17,19
160:11 161:2,6
162:19 165:15,18
174:8 180:3,5,8,9
180:12 185:11,19
187:16 191:14
214:3,6,8,14
230:17 270:21
300:13
**district**   1:1,1 6:17
6:18
**diverse**   157:17
**diversion**   114:11
175:12,13 185:5
185:22 186:3,4,7
186:10,11,18,22
187:3 189:14,18
189:19 190:2,4
191:16,20 192:1,8
195:14,16
**diverted**   185:3
187:24 188:2
189:15 192:5
**dividing**   193:16
**divulging**   17:16
**doc**   180:16
**doctor**   10:6 31:1
32:4 35:6 36:23
36:24 37:10,11
39:4,6,9,12 40:7
40:19,20,23 41:4,9
49:8 54:15 55:19
57:13 58:7,16,24
59:21,24 60:13

61:9,13 62:20
64:12,17 65:1
66:17 67:1 72:14
73:15 81:17,20,24
82:1,5,8,21 83:10
83:11,15,17,20,24
84:1 85:1,5 98:6
99:1,14 102:11,19
106:2,19 108:20
109:2,5,14 112:6
123:6 124:14
131:20 132:1
138:11 141:14,24
145:5 146:24
156:12,17 159:1
162:10 168:7
169:3 170:11,18
172:3 174:23
176:2,24 177:2,12
183:2 185:24
187:23 189:22
201:22 205:1,14
205:22 207:8
208:9 213:6
226:24 231:4,6,12
231:14,23 232:3,6
233:1 239:1,5
247:16 250:15
251:4 258:9 260:8
260:9,14,17,23
261:2,6 272:19
289:12 292:11,18
295:15,23 296:10
306:17 308:11
**doctor's**   40:16
56:19 58:11,18
81:3 83:2 176:20
232:4 250:22
289:13
**doctors**   26:23,24
27:24 28:2,7

31:23 33:6,10,14
33:18,22 34:6,9,12
34:16 35:3 36:16
37:20 38:2,9,12,17
39:14,19,19 40:10
40:14 41:8,18,22
43:18,24 44:2,5,19
54:21 55:7,13,15
55:22 56:3,14
65:14,23,24 72:15
72:20 77:5 79:13
79:18 80:13,15
81:7,10,13 83:22
98:19 104:21
110:17 115:16
116:24 144:1
147:6 155:20
164:10,23,24
165:21 166:9,13
167:1,3,7,11,20
168:2,3,13,19,22
168:24 170:5,19
171:15,20,24
172:6,20 177:16
177:18 179:13
199:2,5,9,15,23
202:24 210:11
217:8 231:2,8,9,9
232:7,10,13,16,17
232:20,21 234:17
241:7,17 242:2,12
247:14 250:12
261:16,23 262:9
262:21 273:4,24
277:11 279:4
285:10
**document**   5:22,24
21:23,24 22:2,6
92:15 96:5 98:13
124:2 126:10,14
126:19 127:23

128:9 129:13,15
129:16,17,19
132:17,21 133:16
147:2 151:24
154:11 160:19
192:17 203:7
205:23 219:21,22
220:2,5 228:5,21
242:16 255:22
259:17,18 268:7,8
268:12,15 269:23
270:1,4,8,9,12,14
270:17,19 273:18
276:10 278:6,21
280:12 282:22
283:18 284:5
285:17,19,23
286:7,13 292:22
293:3,5 296:9,15
296:20,21 297:14
298:3,4,13,20
301:15 303:6,8,10
303:22
**documentation**
14:7
**documented**
182:20
**documenting**
254:14
**documents**   10:21
15:16 16:1,3,5,22
17:19 20:13,21,22
22:3,8,11,16 23:3
23:19 92:6 101:2
126:2 128:17,21
129:1 138:13
145:4 151:5,7
152:2,11 160:13
160:16 190:24
255:21 256:19
257:21 284:13

285:21,21 287:17
307:5
**dod** 196:18 198:1
198:6 200:16
**doing** 33:3,7 34:13
34:19,23 65:15
116:11,12 119:21
166:12 179:12
194:6,12 211:19
212:9
**dollar** 127:6
**dollars** 13:12
213:8 227:21
**don** 2:4 7:16 120:2
152:6 310:5
**donathan** 1:22
6:23 309:4,18
**door** 62:8
**dosage** 191:15,17
192:4
**dosages** 206:17
**dose** 24:19,19,21
24:23 25:5 193:3
216:7 243:20,21
244:14,15 295:4
305:21
**doses** 79:24 80:11
93:4,20 101:4
177:9 193:10,12
193:14 211:9
216:21 240:15
241:24 244:19,19
246:10 287:14
**double** 194:24
233:17,18 235:5
297:18
**doubles** 194:3,3,9
**dr** 8:7,21 9:6 14:3
14:13,23 20:2,9,10
22:7,12 23:17,22
25:15 41:18 43:17

48:17 49:4,10,12
49:20,22 50:10
53:4 54:16 56:3
60:13 61:8 65:11
67:9 68:8 70:17
71:6,21 72:5
74:12 82:7 84:7
86:17,23 87:8,12
87:24 90:1 91:17
97:20,21 99:20
101:17 102:24
104:2 107:5,12
108:7 109:6 110:2
110:7,13,23
111:12,16 112:12
112:14,17,21
113:15 114:14,19
115:14,18 116:4
120:21 122:2,5
129:18 130:15
131:3,14 133:21
134:10 135:2
136:8,12,17,23
137:17,24 138:3
150:16,24 151:5
152:18 160:9
174:11,15 175:4
176:5,16 180:23
181:6 187:15
190:16 195:20,24
199:9 207:1
211:13,23 212:19
213:17,20 214:5
215:1 223:9,12,18
227:13 228:4,17
229:17 230:2
232:7,23 233:21
234:10 235:7
237:24 240:20
241:15 243:24
246:12,19 248:13

253:7 256:2
268:15 276:2
279:21 281:16
**drafted** 278:2,7
**dramatically**
171:3 197:12,24
**drastically** 201:17
**draw** 133:15
**driven** 105:24
168:15,16 208:16
**drives** 89:24
**dropped** 133:22
275:11 279:16
280:6 306:6
**drove** 97:17
156:13
**drug** 1:6,13 4:18
6:15,16 7:15 33:1
122:15 154:15
155:7 163:4,23
165:9 182:6,7,8
193:6 232:16
248:19,24 249:3
266:5 310:6 311:3
312:3
**drugs** 155:19
185:3 286:1
**due** 43:16 156:16
**duloxetine** 237:12
**duly** 8:2,4 309:4,5
309:7
**duped** 37:8 66:1
83:22 105:1
106:12 107:20
108:10,13,23
117:5,12,19 118:1
118:9 119:10
120:24 121:9
168:24 170:6
201:5,7,8,14

**duping** 104:20
**duragesic** 5:7
259:14,24 260:9
263:5 264:18
265:24 267:13
268:14
**duragesic's** 266:10
**duration** 216:21
244:20 305:21
**duty** 66:17
**dying** 70:15

**e**

**e** 2:1,1 4:1,6,12 6:1
6:1 8:3,3,3 127:2
129:9 130:20
131:17
**e.g.** 185:24
**earlier** 18:5 84:7
91:5 104:24
106:11 151:14
212:21 240:20
247:11 270:20,24
274:15 292:9,15
295:18 300:23
**early** 35:14 44:13
47:14 71:6 211:17
212:7,20 214:7
**earned** 13:20
**ease** 69:21
**easier** 50:7
**east** 120:3,3
**ebiling** 3:16 6:21
**echoed** 174:3
**econometric** 78:5
78:7,11,14 79:1,3
190:10,10
**economics** 30:12
30:13,16,17,22
**economist** 78:15
**ed** 62:8,17

educate  168:3
  211:7 226:9,14
  285:5
educated  114:21
educating  225:17
education  27:14
  35:13 39:12,23
  167:21 218:9
educational  98:17
  286:22 287:6
  288:21
educators  27:13
effect  152:1
  181:23 246:13
  267:11 305:15,20
  306:1,8
effective  196:1,3
  233:14,23 234:12
  234:18 235:10,14
  236:15,20,21
  263:17 265:12
  267:5
effectively  232:2
  247:4
effectiveness
  201:9,15 234:8
effects  148:1 265:3
  265:4
efficacy  102:10
  104:13 106:5,13
efficient  173:2,6
  174:13
effort  232:17,21
  241:6,16
efforts  226:13
  228:1 303:4
egregious  57:16
eight  297:19
either  31:5 74:20
  86:14 88:11 89:18
  96:12 252:11

eke  108:3
elaborate  66:1
electronic  47:19
electronically
  47:20
element  166:18
  167:19
elements  167:24
  170:20,21
email  4:12,13,16
  20:12 97:11,21
  99:18 100:3 129:3
  130:9,12,17,19
  131:9 132:23
  133:2,9 134:10,19
  145:8 154:11
  310:17
emailed  280:14
emails  137:16
  283:7,10
embedded  27:12
emergency  62:20
  62:21 63:2 64:18
  65:2
emphasize  94:7
  101:3 245:19
employed  309:10
  309:12
employee  99:13
  231:22 232:3,13
  232:16,20 309:11
employees  129:4
  132:23,24 232:8,9
enable  307:21
enacted  135:24
  212:2 225:6,9
encapsulate  43:4
enclosed  310:11
encompass  82:13
encounter  55:1

encourage  101:3
  287:13
encouraged  68:20
encouraging
  115:16 167:10
endeavor  260:17
  274:17
ended  248:19
  254:13 257:13
endo  102:2
endorsed  103:8
endorsement
  93:17
ends  286:7 307:10
enforcement
  92:24 94:3 165:8
  165:9
engineering  191:6
england  122:20
enlighten  225:2
ensue  105:21
ensuring  116:24
  175:14
entail  298:6
entered  312:9
entire  201:8 298:3
  311:5 312:5
entirely  242:1
  244:11
entities  31:22
  74:19
entitled  1:21 88:19
  256:5,16
entity  167:15
entrusted  116:23
envelope  259:18
  276:11 282:20
  292:23
environment  9:9
  10:20

epidemic  4:22
  83:9 109:11
  123:10,11,14,22
  142:21 156:2
  157:12 158:1
  159:14 160:3
  168:15 208:16
equals  193:8
equations  78:19
equivalent  34:11
  247:4
er  5:19 139:18
  169:22
era  27:2
eradicate  65:20
errata  23:24
  310:13,18 312:7
  312:10,18 313:1
errors  100:18
especially  9:9 48:9
  51:7 100:17 150:2
esq  310:5
esquire  2:4,4,7,8
  2:12,13,18 3:3,4
essence  36:20
essential  36:18
essentially  25:2
establish  203:24
established  132:1
  194:22 299:11
establishes  183:16
estimate  248:3
estimated  50:19
estimates  246:23
estimation  192:4
et  1:7,14 6:15,17
  127:4 139:9
  253:16,18 311:3
  312:3
euthanasia  70:8
  70:11

evaluate  57:3
  282:2,11 284:10
evaluation  284:18
evening  135:15
event  14:18 78:16
eventual  32:8
everybody  33:3
  105:22 150:2
evidence  31:21
  33:4,11,12 35:20
  36:1 43:22 83:3,4
  83:7 94:5 103:10
  131:12 134:21
  135:11 151:11
  168:6 172:16
  177:14,15 198:23
  206:22,24 210:5
  214:2 217:6 219:3
  220:13 239:16,19
  264:6,8,20 267:22
  268:3,17,19
  269:10,12,17
  270:16,18 273:1
  274:14,22 281:23
  282:6 284:7
  292:10,17 295:14
  295:21 296:19
  298:10,15 299:3
  299:14 301:5,12
  301:14 302:11
  303:21,22 304:2,5
  305:5,10
evil  105:5
evolution  36:14
evolved  35:18
  36:11
exact  37:22 164:19
  184:15 224:3
  225:15 285:23
exactly  19:4 21:8
  23:10 44:21 47:24

160:19 229:13
  266:10
exalgo  133:7,12,14
  133:17,20,24
  134:2,15,17,17
  135:9 136:3,4
examination  4:2
  8:5 20:7 83:5
  258:7 306:15
examine  83:12
  126:3
example  9:7 20:23
  32:22 39:10 43:12
  52:21 55:4 59:10
  59:17 87:14
  130:13 182:24
  183:1 185:6 186:4
  186:12 189:21
  197:1 237:8 243:6
  252:17,22 269:11
  289:19 291:18
examples  56:10
exasperated  71:10
  71:12,15
exceeded  75:2
exceedingly
  185:19
excellent  26:2
exception  131:24
  256:10
excerpt  192:15,16
excessive  68:22
exchange  132:22
  132:23 133:2
exchanged  85:22
exclamation
  146:22 147:13
excluding  257:9
exclusive  82:14
  307:20

exclusively  139:5
excruciating
  209:18
excuse  92:12 94:1
  125:20 155:1
  221:2 231:2 252:8
  307:4
execute  308:5
executed  312:10
execution  311:14
  312:19
executive  152:21
exercise  38:17
  83:21 261:7,14,24
  262:5,10
exercised  243:20
  244:14
exercising  40:24
  41:5
exhibit  4:9,10,11
  4:12,13,15,16,17
  4:18,20,23 5:2,3,5
  5:6,7,9,11,13,16
  5:19,22,24 11:1,5
  24:4,15 62:2
  68:18 73:16,17,23
  92:1,9 95:1
  101:18 124:12
  125:19 126:6,8,19
  129:2 130:2 131:5
  132:18,20 135:12
  135:14 138:15,16
  143:15 145:2,3,7
  147:18 152:4,19
  152:22 155:16
  180:24 192:14,19
  202:3,6,6,10
  203:21 217:20,22
  219:8,9 228:9
  233:4 241:1,3
  242:20 244:23

307:2
exhibits  4:8 5:1
exist  305:7
existing  139:8
  218:19
expect  260:17
expectancy  243:11
expectation
  243:10
expectations
  62:24
expected  65:23
  198:15
expenditures
  230:4
experience  38:23
  39:2 85:5 122:6
  156:20 157:17
  160:5 181:24
  186:19 187:22
  212:16 245:21
experienced  148:3
experiences  35:21
expert  10:14 11:14
  12:6 14:24 30:21
  98:15,21,22
  123:19 155:11
  159:24 274:18
expertise  150:19
experts  124:1
  212:17
expiration  311:19
  312:25 313:25
expires  309:19
explain  72:4 79:17
explanation  11:11
explicit  62:24
explicitly  196:24
  197:10
explore  156:17

export   4:9
exposed   183:7
exposure   76:23
181:8,18 182:7,23
182:23 183:1,3,6
183:12 252:21
253:13
expressed   62:21
expressing   224:16
expressions
224:20
extended   295:3
extent   123:20
140:7 154:5
177:11 190:11
external   78:8
extra   13:14 167:3
extractions   239:3
extrapolated
251:24
extrapolation
51:24
extremely   43:23
264:3
eyes   24:10

**f**

face   79:22
facilitated   96:13
facility   185:7
facing   83:9
fact   24:6 42:15
43:12,21 52:20
95:10 101:2
103:17 104:24
127:13 130:13
134:21 141:5,17
141:19 147:5
159:7 161:23
170:16 174:6
175:5,8 176:12
198:10 199:5

216:13 225:2
233:12 260:23
263:19 274:11,12
facto   70:16
factor   166:2,3
factors   28:16 85:3
157:12,24 163:21
177:15 179:1
182:5 210:7
239:22
facts   210:5
faculty   26:10
28:21,23
fail   196:7
failed   196:22
197:8 198:3
245:15
fails   208:22
failure   34:2
fair   21:11 22:13
26:5 27:24 28:7
43:5 49:3,6 50:3
51:17,23 54:19,24
55:5 58:4 59:2
66:13,16 71:6
74:21 78:11 104:6
156:8 179:13
195:12 198:19
202:14 207:21
240:5 250:20
fairly   196:11
fairness   256:6
faith   28:9,12 29:1
54:21 55:7,23
56:14,20 224:11
224:14 247:14
fake   175:2
fall   49:12
falls   78:3
false   32:20 102:9
104:12 129:7,10

138:9 146:11,18
146:19 261:3
263:9 281:12,24
282:6 284:8
familiar   10:8
23:24 24:4 26:15
31:7 33:19,23
54:8 78:4 103:11
103:14,16,17
160:9 186:19
200:12 203:11,14
206:8 207:5
210:10 216:13
219:4 222:6 245:7
284:15 286:3
family   156:21
far   23:1 95:11
120:6 145:1
211:19
farrell   2:7,8 7:19
7:20 152:13
farrell.law   2:10
fashion   24:17
169:22
fast   53:8
fda   20:23 102:24
103:6,18,23
117:19,19,23
137:5 146:12,14
147:12 151:21
153:10 154:14,19
154:24 155:3
180:2 266:5,13,20
266:22 267:19
277:6
fda's   137:11
feature   133:17,24
136:3,4
featured   133:20
134:18 136:22

features   163:16
fed   97:15 261:3
federal   1:20
124:22 196:19
federation   33:2
116:20 117:4,8
180:1
feed   79:6,11 80:22
feel   30:4 58:13
110:1 111:22
112:6 155:21
261:20 262:14
fellowship   26:9
felt   39:1
fentanyl   5:7 144:5
144:6,7 145:24
146:21 215:17
263:17 264:6
265:12,20 296:3
fentora   282:18
283:2 286:1,11
306:23 307:6
field   30:16
fifth   259:5 278:20
282:17
fifths   248:18,21,23
fifty   113:3
fight   169:2 173:17
figure   17:11 46:2
193:16,23 194:8
195:1,9,21 211:22
253:15
filed   6:17 10:12,14
91:21 92:22 94:17
fill   45:11,19 47:4
47:10 48:6,13
82:23 210:2,11
288:11
filled   185:6 186:8
186:12 187:4

filling 185:23
263:15
fills 183:2
filter 176:20
final 302:7
finally 154:23
155:2 159:4
financial 150:13
financially 7:2
309:12
find 97:5 101:17
167:4 171:20
188:16 190:17,21
194:15 199:21
224:2 253:17
267:10 268:20
297:16 310:11
finding 78:1
220:20 236:7
242:2
findings 220:7
finds 230:8
fine 14:17,21 23:7
54:18 67:22 112:7
120:9
finish 9:13 65:9,10
171:8 188:23
finishing 50:5
firm 258:10
first 21:1,10 23:15
25:11 36:14 43:20
44:8,10,17,22 45:5
45:24 46:13 54:16
56:23 57:10 74:9
81:18 94:15 97:8
125:19 129:19
134:7 139:7,17
140:1,1,12 141:17
149:5 152:24
163:21 171:4
185:5,10,14

197:13,19,21,21
200:3 202:21
219:9,12 228:20
230:3 233:8 244:2
244:2,10 253:1
255:7 259:12
265:7 266:4
275:17 278:13
283:17 286:6
288:4 294:4 302:8
306:5 309:7
five 13:12 27:21
44:1 47:18 101:24
145:3 149:21
151:5 164:21,22
184:16,17,18,19
238:20,21 251:21
252:13,15 255:9
296:3
flash 4:15,16
138:22 139:18
143:16 144:15,23
145:11,13 147:9
flashing 150:4
flaws 78:21
flip 278:20 298:13
298:19
floor 2:5,9
florida 97:15
focus 83:22 115:2
116:11
focused 159:11
folder 285:18
follow 12:9,11
14:9,14 16:9
39:17 40:1,4 46:4
61:15 213:17
followed 171:14
216:24
following 19:9
89:15 112:16

113:17 120:15
171:21 172:7,17
174:8 216:18
follows 8:4 84:5
font 149:6,21,23
150:3,17
foot 114:12
footnote 74:10
126:12 128:14,15
128:18
force 225:14,20
226:4,5
foregoing 127:15
309:5,7 311:13
312:18
forget 258:21
forgot 85:17
form 16:13 31:20
70:8,11 110:10
116:18 125:1,11
126:21 146:23
216:15 257:8
formally 156:4
formed 190:8
forming 161:10
forms 246:4,6
forth 14:1 309:13
fortunately
280:13
forum 45:1 224:1
forums 140:21
223:5
forward 32:24
79:6,11 80:22
310:15
found 76:4 78:3
150:11 153:10
221:2,3 235:18
four 50:21 51:21
72:2,7,10 106:22
163:21 170:21

174:7 184:19,19
212:23 263:13
fourth 280:4
frame 53:23 82:12
120:7 174:1
213:13
framed 236:19
framing 53:22
francisco 2:6
frankly 70:5
free 93:18 151:12
156:18 215:2
221:24 255:7
272:3 296:3
311:14 312:20
freedom 93:20
frequency 186:1,3
frequent 84:20
frequently 199:2,6
199:10 223:3
friends 120:3
front 8:18 140:10
221:14 265:8
276:11,13 278:9
285:24 293:1
frye 79:4 161:17
172:12
fsmb 117:5
fulfill 261:2
full 16:17 144:3
192:17 309:8
fully 169:18,20
189:3 273:14
function 86:21
87:9,13 198:15
204:2,21
further 16:8 23:1
81:9 110:5 148:16
198:1 212:7
273:15 306:13
309:10,11

**furthermore**
195:17

**g**

**g**   6:1 97:21 233:1
233:3
**gabapentin**   237:12
**gain**   103:18
157:24
**gained**   226:12
**galena**   145:20,23
146:20 149:3
150:8,14
**game**   150:9
**garbled**   268:2
275:8
**gargiulo**   9:18 18:7
71:9
**gateway**   246:13,16
**general**   24:16
26:21 47:8 58:7
103:8 138:4
188:15 235:13
298:4 304:21
**general's**   171:13
**generally**   15:20
56:9 64:15 75:3
192:11 299:13
**generate**   21:19
**generation**   26:23
**generations**   79:23
**geographic**   75:23
75:24 77:4 114:10
165:4
**getting**   13:14
51:14 82:2 92:10
98:10 120:7
**give**   20:4,8 30:6
49:20,22 50:5
62:9 63:4,9,23
65:2 86:11 110:2
150:18 163:5

182:23,24 185:2
189:20 212:17
213:1 262:15,16
**given**   27:2,8 56:16
57:20 58:14 74:20
80:16 110:1 130:4
152:15 165:3,3
174:8 202:14
208:2 216:3
251:24 252:2
309:8
**gives**   64:19 91:9
**giving**   64:5 296:2
**glad**   293:7
**go**   6:11 8:24 18:20
19:5,22 31:3
46:19 47:16 49:17
50:6,15 51:4
66:21 68:1 71:8
80:2 89:1 92:11
92:11 93:8,16,24
94:2,14,19 95:1
114:3 119:19
121:19 126:1
128:24 147:10
152:24 154:12
176:20 193:9
198:1 212:6 218:4
222:23 223:15
226:2 227:5 229:9
231:8 234:23
242:14,15,24
247:1,11 250:7
253:12 256:4,21
256:22 257:3
258:1 259:19
279:19 280:1
287:13 288:14
298:12,18 304:6
305:12

**goal**   62:7 69:24
70:3,14,23 93:18
157:23 175:16
197:12 226:5
**goals**   171:2 203:24
204:1 308:6
**goes**   103:12
294:19
**going**   6:3 9:1,8
10:2,6 12:9,11
14:11,14 16:9
18:22 19:22 22:7
23:7 25:20 26:17
26:22 27:10 30:6
30:11 31:3 34:22
40:19 48:6,13
53:9 59:9 66:11
67:12 68:3 71:4
86:23 88:14 91:24
92:5 111:12
112:17 113:15
114:1,9 121:21
125:19 126:6,6
128:24 129:1
132:17 136:4
179:5 180:18
182:23 187:5
213:17 214:23
226:23 227:3,8
228:4,13 242:6
255:13,19 258:15
259:2,6 262:7
287:20 293:21
298:12,13,22
301:18,19 308:14
**gold**   234:7
**golden**   93:10
**good**   6:2 7:13,16
7:19 8:7,8 9:7
17:19 26:3 28:9
28:12 54:21 55:7

55:23 57:2 67:21
70:19 135:15
155:20 173:18
175:5 194:11
204:24 206:5
245:18 247:14
257:16 263:20
272:12,21 273:2
285:6 289:15,17
290:5
**goodness**   40:5
**google**   136:24
**graduated**   35:20
36:5 62:19
**graduating**   106:2
**graph**   24:19,22
25:6,8
**great**   23:12 25:24
46:23 92:20
187:10 206:1
269:5
**greater**   206:17
**greatest**   115:2
**ground**   14:9 187:9
259:7
**grounds**   187:11
**group**   27:1,18
195:18
**groups**   12:2 15:1
27:13 116:11
**growing**   299:10
304:19
**growth**   213:3
**guess**   18:4 38:21
44:24 64:15 67:19
150:22 236:18
266:3
**guessing**   120:3
**guide**   293:9,12,20
293:23

**guideline**  37:6,9
   39:13,21 196:18
   196:23 198:6
**guidelines**  4:23
   27:7 36:24 37:4,6
   37:16,17,19,23
   38:2,6,8,9,10,12
   38:23,24 39:2,5,10
   39:10,14,15 40:2
   117:2 171:3 177:7
   177:17,18,23
   197:1,2 198:6,11
   201:3,17 202:6,11
   202:15 206:6,10
   206:18 207:4
   209:3,4 216:22
**guise**  300:7
**gynecologic**  217:6
**gynecology**  216:23

**h**

**h**  4:6
**habit**  97:15
**habits**  35:2
**half**  119:23 133:22
   134:6,7
**halfway**  192:23
**hand**  24:18 309:16
**handwritten**
   61:21
**handy**  254:23
**happen**  136:11
   214:6,11,24 288:3
   291:21
**happened**  36:4
   46:22 69:10 136:9
   136:13 164:18
**happening**  108:14
**happens**  71:8
   169:21 187:1
**happy**  49:17 51:4
   72:4 82:16,18

187:13 245:22
   266:11 284:11
   300:19
**hard**  9:10 32:21
   37:8 44:21 52:6
   55:3 108:12 149:7
   150:10 170:6,7
   190:14
**harm**  37:21 81:12
   94:23 105:5,8
   141:23 156:15,15
   182:3 208:2 234:3
   246:11
**harmed**  200:2,7
**harming**  81:16
**hastening**  72:21
**hate**  129:18
**head**  132:6 236:10
   236:10
**headline**  299:5
**health**  2:11 4:15
   7:7 8:5 10:12 15:9
   29:12 52:13 53:13
   64:12 69:21 73:14
   83:8 86:6 87:2,4
   88:10,11 89:18,19
   89:22 90:8,10
   98:24 99:12,13,17
   100:2 101:14
   105:21 118:8,9,13
   125:16,21 127:17
   127:19,24 128:5,9
   128:10 129:1,4,9
   129:11,23 130:10
   131:17,22 133:3
   135:9,21 138:13
   139:5 140:2,16
   144:24 145:4
   148:17,21 149:3
   151:7,11 152:20
   154:16 157:15

158:19 160:2
   162:11,13 178:20
   193:7 201:12,14
   208:10 214:2
   224:1 232:19
**health's**  133:13
   134:11 135:13
   136:14 137:15
   138:5
**healthcare**  174:4
**hear**  23:13 185:13
   215:13
**hearing**  9:18 79:5
   161:18 172:12
   184:3,10
**heart**  70:7
**heavily**  29:6
**height**  31:21
**heimann**  2:5 7:17
**held**  6:20
**help**  9:14 27:10,12
   44:9 70:16 73:7
   73:12 86:4 162:14
   170:22 210:20
   211:11 214:14,15
   223:23 242:2
   254:24 268:17
   279:20 284:19
   303:3
**helped**  16:13
   157:20 241:24
**helpful**  24:9 43:15
   57:24 58:10
   166:23 280:2
   288:23 289:5
   304:12
**helping**  71:3 72:13
   72:16 81:11 166:6
   200:3 214:13
**helps**  27:18

**herd**  34:23
**hereof**  309:6
**hereunto**  309:15
**heroin**  95:11
   248:9,16,20 249:3
   249:5,13,17,21,24
   251:1
**herpetic**  243:7
   244:24
**hi**  258:9
**hidden**  114:20,24
**high**  43:23 57:9,17
   58:24 59:21 184:2
   184:8,11,22
   185:24 186:14
   188:7 210:17
   244:19 246:10
**higher**  51:1 52:12
   52:15,20 53:24
   54:1,5,13 79:24
   95:11 101:4
   287:14
**highlight**  148:23
**highlights**  139:8
**highly**  96:22
   142:11,11 182:9
   194:20 195:17
   208:8
**hillbillies**  97:13
**hired**  10:11 116:1
   155:11
**historical**  188:13
   189:4 212:16
**history**  83:18 84:2
**hold**  99:21 123:18
   255:19
**holding**  273:14
**home**  10:22 97:19
   168:7 215:21
   216:11,15

**honest** 40:4
166:24
**honestly** 256:17
257:14
**hooked** 170:6
**hope** 107:10
198:19
**hopefully** 9:14
**hopkins** 123:3
**hospice** 61:6 69:5
69:15,17,18,24
70:10,14 72:16,19
72:21 73:1,2,4
243:8
**hospital** 39:23
40:3 66:9,12,14
162:9,11 163:13
170:18 178:22
215:7
**hospitals** 91:9
179:21
**hosted** 281:1
**hour** 13:10,12,13
13:14 67:13
119:23 179:5
227:3
**hourly** 14:5
**hours** 12:21 13:2,4
13:6 14:4 156:8
156:10 297:17
304:9,14
**house** 123:2
**huge** 57:23 108:4
169:23 208:9
**huh** 126:24 129:6
237:15
**human** 152:20
178:6,16
**humane** 80:18
82:22 200:4

**humanely** 211:8
**humans** 28:16
**hundred** 13:12
234:15,16
**hundreds** 104:2
213:8
**huntington** 1:3 2:9
4:10 6:14 10:8,15
39:7 48:20,24
49:12,24 55:10,21
56:8 60:14,22
61:3,10,12 73:20
74:6 77:14 88:3
88:12 89:20 90:9
90:15,18 91:18,21
92:23 94:20
102:12,20 128:4
131:20 147:1
161:7 170:19
171:15,20 172:7
172:21 262:22
263:2,5 271:15
273:5 274:1,3,7
275:4,9,15,23
276:4 279:4,7,11
281:7 282:15
284:4 296:24
297:5 298:16
299:23 305:11,14
305:17,22 306:4
306:10 310:6
311:3 312:3
**hypothetically**
289:8

**i**

**i.b** 306:18
**iatrogenic** 208:2
**ibuprofen** 237:8
**idea** 49:11 57:2
81:11 98:19 190:8
245:18

**idealized** 31:20
**ideally** 290:12
**identification** 94:8
**identified** 243:17
**identify** 11:4
102:9 138:9 263:9
273:17 296:24
297:4 298:10,15
299:22
**identities** 187:16
**ii** 148:1 270:15
282:19
**iii** 73:16,22 126:15
185:2 271:22
**illegal** 96:22
250:22 251:2
**illegally** 60:15
**illegitimate** 59:1
**illness** 218:19
**imagery** 150:19
**images** 150:3
**imagine** 58:5
108:12
**immediate** 64:11
89:13 294:24
**immediately** 211:3
**impact** 52:22 78:9
108:4 122:11,14
123:6,21 124:2
137:13,23 150:19
158:12 169:24
275:8,14,22 276:3
282:13
**impacted** 53:14
**impacts** 178:18
**impaired** 59:17,20
85:10
**implemented**
162:5 169:13
299:4 301:7

**implicit** 62:24
**implied** 39:1 197:1
**implies** 53:24
190:7 206:4
236:19,21 263:17
**important** 17:10
57:22 100:14
130:24 142:9
147:24 175:19
209:13 284:22
285:2,12 289:10
294:14
**importantly** 180:3
217:10
**impossible** 262:4
**impression** 287:11
287:16
**imprint** 278:10
**improper** 135:2,6
284:19
**improperly** 29:20
60:15
**improved** 217:9
225:22
**improvement**
204:21
**improving** 225:24
**inaccurate** 135:9
**inadequate** 194:9
**inadvertently**
220:10 221:3
**inappropriate**
73:9
**inappropriately**
220:11 221:4,11
**inaudible** 169:22
181:20
**incentive** 271:5
**incidence** 188:9
**incident** 64:24
189:11

include  83:5
  100:11 125:10
  170:12 201:13
  202:15 204:18
  306:21
included  11:20
  77:11 119:3
  230:17 283:13
  310:13
includes  170:9
  172:13 200:3
including  15:20
  100:16 204:1
  208:24 254:3
  257:6 263:13
  265:20 285:21
  306:23
inclusion  228:21
  283:20
incompetence
  66:22
incompetent  66:18
  66:20 67:2,8
incomplete  134:8
incorporated
  312:12
incorporates
  144:15
incorrect  38:16
  130:7 268:5
increase  50:22
  51:1,3,10 69:9
  75:19,20 171:5
  197:15 218:20
  238:19 290:18,24
  291:9,16
increased  53:2
  76:5,22,22,22
  159:13 168:5,12
  168:14

increases  253:22
increasing  159:15
  238:16
increasingly  27:4
incredibly  39:14
  165:20
indefinitely  82:1
independent
  283:13
independents
  299:9 304:18
indicated  57:4
  146:2 224:22
  226:20 239:11,14
  243:5,8 244:7
  245:1,6,13 246:1,8
  266:13
indicates  135:8
  157:5 281:11
indicating  303:10
  310:13
indication  239:23
  269:24 270:7,16
  273:21
indications  242:16
  266:6
indirectly  77:8
indiscernible
  134:23 181:20
  245:15
individual  27:9
  32:16 38:14 39:6
  56:19 83:11 108:5
  109:12 167:15
  171:24 175:9
  181:22 183:7
  190:8 227:24
  239:17 246:7
  252:1
individual's  39:12

individualized
  176:1,13,17 177:1
  177:6,11
individuals  29:5
  66:11 96:20,21
  157:6 175:20
  209:11 210:17,20
  211:3 221:16,20
  249:4
inductive  157:7
industrial  183:22
industry  5:5 29:6
  29:7,21 68:10,14
  68:21 95:7,12,19
  168:4 231:8 300:5
  301:11
infer  265:23
influence  27:7
  85:4 157:16
  158:12 168:9,10
  170:9 177:16
  227:23
influenced  29:6,20
  32:6 158:13 168:8
  175:2 177:22
influences  115:3,4
  115:12
influencing  137:10
info  127:3
inform  36:15
informally  156:3
information  13:1
  44:18 46:24 47:1
  74:3 85:6 86:1,7
  87:5 100:12,21,23
  101:1 105:22
  106:1,4,5,12,17
  109:15 111:1,4,7
  111:10,18 112:23
  113:19 114:6,7
  135:3,5,8 137:4,8

140:3 144:15
  147:19,24 148:5
  148:16 163:7
  166:19 167:6,14
  168:2,19,21
  176:19 188:20
  190:18 240:1
  260:15 261:4
  262:6 273:18
  281:11 283:19
  286:23 287:6
  294:14 299:19
  300:18
informed  41:14
  83:3 176:23
  218:10 219:2
  272:19
informing  99:13
  139:11,14
informs  38:24
  39:2 133:3
infrastructure
  170:8
inherently  173:5
inheriting  80:14
inhibitors  237:12
inhumane  81:6,19
initiating  204:17
injection  248:19
  248:24
injuries  52:16,22
  245:11
injury  253:20
  254:18,21
input  47:19
insert  267:19
instance  9:19 59:6
  98:23 132:11
  163:9 194:13
  255:1

**instances** 18:9,12
19:11,13 35:8
43:14 135:20
138:7 199:18
217:16,16 247:15
247:16 259:8
**institution** 116:2
**instruct** 12:4
13:21 14:11 16:7
17:13 46:19
213:12
**instructed** 9:20
**instructing** 71:9
213:15
**insurance** 239:9
239:12,18 240:7
**integrity** 66:23
**intend** 11:8,11
105:5 170:12
**intended** 105:8
241:20 284:19
**intensifies** 170:8
**intensity** 235:24
**intent** 284:21
**intentioned**
224:19
**interacted** 84:23
160:6
**interaction** 29:11
115:8
**interactions** 84:20
**interacts** 103:18
**interest** 156:13
**interested** 7:2
309:12
**interesting** 81:17
285:13
**interests** 150:13
150:14 273:1
**interfere** 6:9

**interfered** 220:11
221:4,11
**interference** 6:7
252:24
**interferences**
309:9
**intermittently**
243:22 244:16
**internal** 270:4,7
270:14 296:15
**interpose** 187:6
**interpret** 172:16
204:12
**interrupt** 112:2,3
**interruption**
241:13
**interstitial** 242:6,8
242:11 244:3
245:5
**interval** 77:16,23
**intervene** 163:14
167:20
**intervention** 5:16
70:22 90:21 99:4
99:10 100:16
101:7 286:16,21
287:12 292:16
297:2,8,11 298:5
299:3 301:16
**interventions**
169:16
**interview** 62:18
156:24 157:10,14
297:6 299:24
301:9 302:1
**interviewed** 63:6
63:16,20 157:10
157:17 172:20
**interviewee** 63:22
66:7

**interviewing**
157:6 301:1
**interviews** 62:15
157:3,4 171:19,23
172:6
**intravenous**
215:14 249:3
**introduced** 62:1
**introducing** 92:6
145:19
**introductory**
147:18
**investigator** 97:10
**invoice** 12:23
127:9,17
**invoices** 12:24
**involve** 280:22
283:6
**involved** 21:17
27:20 84:11 96:5
141:21 162:18,19
176:8 179:13,16
179:19,22 180:12
231:18,19 296:20
305:6
**involves** 213:2
296:2
**involving** 89:21
**ironic** 300:4
**irrelevant** 58:17
58:22 59:13
**issue** 9:7 25:12
223:5,7 241:19,21
258:1 259:3
264:11 287:10
**issued** 118:18
**issues** 85:20
178:24 209:5,5,7,9
210:21 223:10
**item** 97:21 125:20
128:10 139:17

202:20 203:21
255:5 278:2
**iv** 242:15 276:9

**j**

**jama** 141:6,9,22
143:8 151:15,19
151:23 153:6,16
153:20,24 154:7
**james** 161:10
207:8
**janssen** 88:5 102:2
231:18 232:9
259:13 268:13
269:7,14 270:3,4,8
270:14 271:1,5,20
296:2,15 297:12
298:6
**janssen's** 303:4
**january** 5:14
307:7
**jcaho** 92:23
**jcr's** 93:1
**jed** 97:14
**jeffrey** 2:18 7:14
**job** 19:21 21:18
225:16
**johns** 123:2
**join** 258:20 259:2
**joined** 26:10
**joins** 158:4
**joint** 4:10 65:18
91:6,7,8,14,18
92:24 93:9,17,24
94:2,6,21 178:22
180:1
**joseph** 97:9
**journal** 122:20,24
141:10,12 143:7
151:18,18 153:4,6
153:12,17 190:3

**journals** 141:2,6
  189:23
**jr** 7:20
**judge** 8:16,18 9:18
  18:7 71:9 187:8
  258:2 262:19
**judging** 272:17
**judgment** 38:13
  38:18 40:24 41:5
  57:12 66:3 82:21
  83:21 175:1
  176:23 219:18
  261:7,14,24 262:5
  262:10 272:24
**july** 4:15 97:7
  138:18
**jumping** 121:6
**june** 207:3
**jurisdiction** 75:16
**jury** 8:18
**justified** 209:23
**justify** 53:2 54:1
**justin** 3:16 6:21
**jweimer** 2:24

**k**

**k** 8:3
**kadian** 128:11
  129:5,8,12 130:21
  131:21
**kanawha** 309:2
**kardian** 4:13
**kearse** 2:8 7:20
**keep** 44:7 55:19
  62:7,17 71:16,17
  80:7,16
**kept** 97:15
**key** 127:3 134:2
  134:14,17 137:1
  244:18 300:11
  308:5

**kick** 7:5
**kill** 182:9
**kind** 32:19 42:17
  64:4 65:13 70:8
  91:9 134:20
  165:12
**kinds** 245:8
**kit** 171:1 197:3,5
  197:10,11 293:8
**knew** 65:14 109:7
**know** 8:9,15 9:22
  12:21,23 13:2,19
  13:23 14:17 17:10
  17:21 20:10 21:20
  21:24 22:9,13
  34:12 35:23 36:23
  37:11 39:19 44:24
  46:23,24 47:6,16
  47:22,24 48:17,19
  48:19 50:11 51:5
  52:7 55:4 56:11
  56:19,21,24 57:18
  57:19 58:5,14
  60:17,21 61:2
  63:12 65:21 66:20
  69:10 70:6,6,16
  71:5,11 74:16
  78:5 85:21,23
  88:18,21 90:22
  103:8,15 107:9,11
  108:2 110:16,20
  111:23 114:11
  115:6 120:2 124:6
  131:8,14,19 132:2
  132:5,8 136:8,18
  137:10 139:13
  142:20 145:1
  149:9 150:10,15
  156:3,10 164:5,14
  164:17,20 165:16
  165:17,19 169:13

169:20 170:4,15
170:18 171:7,12
172:11 176:7,16
177:7,13 178:23
179:3 181:14
182:17 185:20
186:4,10 187:16
187:18,18,20,22
189:20 190:9,13
190:14 191:1
192:3,7 193:9
206:2 207:6,8
209:17 210:15,19
213:3,23 226:16
227:2 229:19
230:11,21,24
231:1,4 237:24
238:5,8,12,15
239:1,9 245:14,20
246:19 248:7,13
249:2 250:20
251:1,22 254:22
261:15 262:18,21
263:1,4 266:5,12
273:4,24 274:3,6
274:22 278:11
279:4,7,10 280:15
281:6 284:3,23
285:3,4,4,7,9,14
285:16,22 290:4,8
290:10 292:2
300:21,24 301:3
301:18,19,21
302:19 303:8
305:10
**knowing** 266:19
  285:11
**knowledge** 43:17
  102:5 137:6 138:3
  144:14 146:8
  150:13 165:14

256:11,18 257:14
**known** 69:14
  182:20 194:19
  234:14,17
**knows** 150:2

**l**

**l** 3:4 8:3
**label** 20:23,24
  21:2 103:6,19
  266:9,10
**labeling** 103:11
**labels** 103:1,24
**labor** 52:17
**lack** 66:23
**lacks** 293:5
**language** 34:9
  70:13 110:18,18
  110:21 146:10
  155:22 202:1
  257:4
**lankenau** 248:17
**large** 42:14 57:8
  63:1 104:21
**largely** 26:24 83:7
**larger** 123:16,17
**largest** 299:6
  304:16
**lasting** 264:7
**lasts** 264:19 266:1
**late** 24:10
**launch** 127:3
  140:4
**law** 2:8 165:8
  247:16 258:10
  283:23
**laws** 220:24
  283:24
**lawyers** 110:18
  155:11,14 257:16
**lay** 36:16 210:14

| | | | |
|---|---|---|---|
| **lazanda** 144:5,6,7 | 23:17,22 25:15 | 247:13 248:13 | **limitation** 264:10 |
| **lead** 148:3 194:7 | 41:18 43:17 48:17 | 253:7 256:2 | **limited** 123:21 |
| 295:6 | 49:4,10,12,20,22 | 268:15 276:2 | 163:5 216:21 |
| **leaders** 39:22 | 50:10 53:4 54:16 | 279:21 281:16 | 218:15 240:22 |
| **leads** 299:10 | 56:3 60:13 61:8 | 308:17 309:5 | 243:10 247:19 |
| **league** 20:18 | 65:11 67:9 68:8 | 310:8 311:4,9 | 251:18 254:6 |
| **learn** 27:6 83:17 | 70:17 71:6,21 | 312:4,13 313:20 | 257:12 287:1 |
| 85:6,9,11,14,18 | 72:5 82:7 84:7 | **length** 115:4 | **limiting** 166:4,23 |
| **learned** 34:17,18 | 86:17,23 87:8,12 | **lethal** 142:12 | 247:10 253:20,24 |
| 36:19 65:1 116:14 | 87:24 90:1 91:17 | 182:9,13 210:9 | 257:11 |
| 116:15 176:21,22 | 97:20,21 99:20 | **letter** 4:17 22:20 | **limits** 14:2 37:18 |
| **learning** 166:20 | 101:17 102:24 | 23:6,9,10 151:22 | 167:8 |
| **leaving** 241:8,18 | 104:2 107:5,12 | 152:19 153:1 | **line** 38:22 45:17 |
| **lecture** 71:17 | 108:7 109:6 110:2 | 154:14,19,24 | 63:3 127:7 171:4 |
| **lectures** 71:18,19 | 110:7,13,23 | 155:3 183:24 | 172:18 187:6,12 |
| **led** 36:1,14 93:3 | 111:12,16 112:12 | 184:6 206:8 207:1 | 197:13,21 202:21 |
| 157:12,24 159:14 | 112:14,17,21 | 207:5 277:19 | 213:4 219:14 |
| 168:5,12,14 189:5 | 113:15 114:14,19 | 278:1,6 310:19 | 310:13 312:7 |
| 225:20 | 115:14,18 116:4 | **level** 51:20,20,22 | 313:3 |
| **left** 20:19 100:17 | 120:21 122:2,5 | 51:23 163:14 | **lines** 152:2 |
| 297:16,20 | 129:18 130:15 | 191:16 213:9,21 | **link** 148:23 181:7 |
| **legal** 17:24 34:5,11 | 131:3,14 133:21 | 214:7,19 | 181:17 |
| 41:13 220:15,18 | 134:10 135:2 | **levels** 53:1 211:17 | **linked** 188:13 |
| 261:3 310:1 313:1 | 136:8,12,17,23 | **licensed** 31:4 | 280:23 |
| **legally** 41:22 | 137:17,24 138:3 | **licenses** 40:15 | **links** 100:13 |
| 260:23 261:6,16 | 150:16,24 151:5 | **licensing** 64:20 | **list** 19:18 20:5,8 |
| **legislation** 219:10 | 152:18 160:9 | **lieff** 2:5 7:17 | 21:21 22:5 43:3 |
| **legislature** 5:4 | 174:11,15 175:4 | **lies** 74:21 | 101:24 116:5 |
| 220:9 221:15 | 176:5,16 180:23 | **life** 61:6 69:20,23 | 179:12 186:16 |
| **legislature's** 219:5 | 181:6 187:15 | 70:2,4,9,18 71:1 | 201:6 244:23 |
| **legitimate** 54:22 | 190:16 195:20,24 | 72:7 73:12 80:3 | 255:21 257:10,20 |
| 150:1 175:15 | 199:9 207:1 | 243:7,10 246:6 | 258:22 |
| 178:1 180:6 | 211:13,23 212:19 | 308:7 | **listed** 20:24 22:3 |
| 247:19,20 248:1 | 213:6,17,20 214:5 | **light** 41:16 198:23 | 256:15 312:7,17 |
| 289:3 | 215:1 227:13 | **lights** 150:4 | **listen** 97:13 |
| **legitimately** | 228:4,17 229:17 | **liked** 25:23 | **listing** 221:16 |
| 182:16 | 230:2 232:7,23 | **likelihood** 78:1 | 312:7 |
| **lembke** 1:19 4:2,9 | 233:21 234:10 | **likewise** 50:24 | **lists** 24:23 144:11 |
| 4:19 6:13 8:7,21 | 235:7 237:24 | **limb** 31:3 | **literature** 35:22 |
| 9:6 14:3,13,23 | 240:20 241:15 | **limit** 78:8 166:12 | 83:8 114:20 |
| 20:2,9,10 22:7,12 | 243:24 246:12,19 | 240:6,7 252:4 | 182:21 194:12,22 |

243:18 253:5
**litigation**   10:14
   11:8,18 12:13,18
   12:22 13:3 15:19
   17:23 102:6
   124:23 155:12,14
   159:24 160:6,23
   161:2
**little**   8:22 20:18,21
   38:21 46:4 48:18
   71:10 78:13 92:19
   150:16 156:12
   212:10 228:11
   235:6 246:4 268:2
   272:3
**lives**   71:23
**living**   108:3
**llp**   2:19 3:5
**load**   97:19
**loaded**   97:16
**local**   216:6
**locate**   167:6
**location**   75:23,24
**long**   43:3 80:24
   89:6,8 119:20
   156:1 175:1
   178:13 192:16
   196:20 197:6
   198:2,7 213:24
   214:17 219:2
   228:24 233:8
   234:6 240:4
   244:20 245:17
   255:4 273:2 295:2
**longer**   21:9 72:2
   208:15 210:2
   243:15 264:11
   265:21 266:1
**look**   17:20 24:15
   24:22 47:11 50:16
   50:24 53:7 56:15

57:11,20,21 58:6
73:18 74:2,8
88:14,20,23 89:2,4
95:2 101:20 116:6
119:18 124:11
126:5 128:8
138:16 143:14
145:2,7 172:13
181:15 184:14
187:13 191:7
192:14,19 202:3
202:10,19 211:18
211:21 217:19,21
219:8,8,20 224:2,5
225:16 227:17,23
241:1,2 247:24
255:4 263:8
279:14,17 285:17
286:2 287:20
293:20 300:20
306:17 307:2,9,13
308:2
**looked**   21:10
129:24 135:20
205:11 217:3,5
228:18,20 229:8,8
229:10,13,15,19
247:17 296:7
300:12 301:21
302:12 303:15
**looking**   51:7 88:16
124:8 128:21
130:1 149:17
163:13 172:14
191:8 202:5
203:21 212:18
220:3 226:2 228:2
239:17 253:1
254:16 262:23
277:19 303:7
306:20

**looks**   74:5 230:3
   286:3 294:2
**lost**   209:13
**lot**   38:7 39:13
   43:15 44:24 80:10
   85:21,21 120:12
   156:11 158:15
   162:13 177:15
   285:9,20
**lots**   66:20 115:12
   179:1
**love**   244:5
**loved**   155:19
**low**   24:19 25:5
   243:21 244:15,19
   263:18,21 265:13
**lower**   240:15
   263:13 265:13
   307:11
**lowest**   243:20
   244:14
**lunch**   119:24
   120:8,12 121:19
**lupus**   245:24
   246:2

**m**

**m**   2:18 8:3
**m.d.**   1:19 6:13
   122:15 310:8
   311:4,9 312:4,13
   313:20
**machine**   228:10
**mackey**   223:8,9,12
   223:18
**madam**   89:11
   112:11 113:11
   120:11 242:23
   310:10
**madara**   207:8
**mailing**   284:11

**mailings**   283:13
**mainstream**   72:14
   72:18
**major**   78:21
   159:13 163:16
**majority**   42:16
   55:9,21 104:6
   196:2,9 208:6
**making**   27:3 32:21
   70:17 83:2,20
   84:2,9 101:11
   108:3 115:3
   118:23 219:2
   223:1 226:13
   240:13,15 265:15
   265:17
**man**   97:14 161:9
**manage**   80:6
   81:21 294:21
**management**   4:21
   5:4 93:1,9 94:3,8
   146:2 174:4
   208:23 219:6,22
   220:19,21 221:21
   221:24 222:9,21
   222:23 242:11
   284:17
**management's**
   221:15
**manages**   40:2,3
**managing**   211:21
**mandatory**   38:1,5
   164:15,16
**manifests**   246:3
**manipulation**
   133:19
**manner**   64:13
   249:18,22 250:2,4
   250:5,6
**manual**   52:17

**manufacturer**
5:11,13 93:13
103:12,18 108:10
130:10 132:24
135:22 139:9,15
140:3,17 149:12
154:16 227:14,15
231:3 307:3,5
**manufacturers**
15:2,22 29:8
93:10 95:21,23
96:10,14 102:16
104:8,11,16,20
105:2,7,12 117:5
117:12,20 118:2
118:10 119:11
121:1,10 124:17
125:6 131:1
134:20 140:20
141:5 158:9,10,14
170:12,15 180:3
180:11 227:18
259:10 308:4
**marijuana** 249:21
**mark** 156:18
215:2,23
**marked** 11:1
152:19 276:11
**marketed** 130:21
**marketer** 231:2
**marketing** 4:11
5:6,11,13 104:16
107:20 108:10
122:8,11,14 123:5
123:6,9,14,19,22
124:1,2,2,8,9
126:19 128:5,8
131:16 133:11
135:23 145:5
150:19 151:2,8
153:2 227:14,15

227:18 228:1
230:4,9,18 307:3,5
**marks** 140:12
**massive** 108:4
168:17
**master** 258:2
**masters** 2:13 7:8
92:4 228:10
**material** 17:11,20
17:21 20:24 21:18
57:21 98:11 104:7
115:24 128:5
129:9 131:16
154:15,19,24
155:4 168:8
180:14 225:5
230:16 231:10
255:20 268:12
283:19 296:4
**materials** 20:14
21:22 100:21
104:4,17 116:5
123:5 125:11
131:21 138:12,12
138:17 140:7
151:23 153:2
228:6,22 255:4
256:8,14,23,23
257:3,4,5,6,7,10
257:20 258:22,23
258:24 270:3
273:7,11,14
**matter** 6:14 26:21
47:8 58:7 114:24
115:1 150:3,4
**matters** 38:23
66:22 137:12
150:4
**maximize** 307:22
**mccann** 74:9,12

**mcg** 144:5,6,7,19
144:20,20
**mckesson** 3:1 5:11
5:13,16 7:11
10:13 15:9 29:16
87:2 88:4,9 89:16
90:12,13,17 98:24
99:5,7 116:1,7,10
154:23 155:2,5
158:22 159:2
160:2 231:18,21
231:22 232:2,3,8
232:11,12 258:7
258:11 259:9,13
267:23 268:3,8,13
268:23 269:3,6,8
269:10,12,17
270:8,11,16 271:1
271:5,6,9,14
275:16 277:20
278:4,7 281:1
283:19 292:10,17
295:15,22 296:10
296:13,19 299:5
302:6,11,17,18
303:13,14 304:15
304:21,22,23
305:13 307:3,4,16
307:20 308:3
**mckesson's** 90:20
101:7 278:10
296:1 299:13
305:20 306:2,8
**mckmdl00353374**
5:15
**mclean** 2:22
**md** 4:2,9,18,19
155:7 308:17
309:5
**mdl** 8:10 11:21
55:6 61:14,18,19

62:2 130:4
**mdl2804** 4:11
**mdl2804n** 4:17
**mean** 12:19 28:2
28:12 29:7,9
31:10,18 55:3
57:16 61:23 62:17
70:16 80:19 81:24
87:10,22 111:24
132:8 143:6
169:21 170:5
182:23 183:12
189:14 190:7,9
199:7 200:23,23
203:18 204:15
212:22 216:6
224:14 231:12
247:20 249:8
250:3,4 266:3
269:7 271:8,8
**meaning** 68:14
166:8 189:4
**meaningful**
204:21
**means** 22:9 31:11
50:19 80:6 118:23
136:4 141:20
193:5 204:23
210:9 231:4
**meant** 55:11
166:20 278:7
**measure** 189:17
189:19 227:22
**measures** 27:6
39:24 65:18 91:11
178:23
**measuring** 204:24
**mechanical** 52:16
**mechanisms** 285:5
**media** 6:12

**medicaid** 239:6,9
239:13
**medical** 25:15,19
26:1,8,8,16,17
27:2,14 28:10,24
33:2 34:2,7,12,17
35:13,20,22 36:5,9
36:24 37:7,12
39:22 40:24 41:5
45:2,4 47:3,13,19
50:1 54:22,23
57:13 58:2,6,10,16
58:21 59:6,13,22
65:4 66:14 67:10
72:14 79:21 80:5
80:9 81:6 82:21
83:7,18,19 84:2
91:12 106:15,22
107:8,11,15,24
111:1,7,14 112:19
114:19 116:20,23
116:23 117:4,9,11
117:12,17 120:23
120:24 121:3,9,14
123:18 141:2,6,10
141:12 142:5,6,10
143:7 151:19
153:6,17 158:5
163:11 167:5,21
169:19 175:15,24
178:1 180:2
182:21 183:21
189:22 190:3
194:12 198:22
200:8,10 206:9,21
207:2,9,11,12,15
207:22 216:17
220:15 224:6,21
225:10 226:6,9,19
234:11 235:3,8
243:18 247:1

248:2,4,18,24
250:9,16 253:3
254:14 261:24
262:5,10 263:20
272:20 289:4,15
**medically** 41:22
52:9 80:18 239:11
239:14
**medicare** 77:8,10
79:1
**medication** 46:3,8
46:10,14 73:9
85:15,18 90:4
101:10 103:19
107:7 129:5
133:11 134:14
140:4 165:23
173:6,12,16,21,22
173:23 175:20
176:22 177:3,12
177:20 178:5,11
178:17,18 179:11
180:6 189:15
220:19 235:19
236:4 241:8,18
260:5,11,19 261:8
271:9,15 272:10
277:17 289:14
290:3 291:6,19
**medications** 82:10
124:3 137:22
138:1 177:9 178:2
180:7 201:20
218:14 220:18
235:13 237:11
287:15 288:23
289:6,11 292:4
300:7
**medicine** 5:2
27:21 31:5,8,21
32:10,10,15 33:4

33:11 34:20,21
39:6 42:21 46:18
62:20 64:5 65:13
69:11 85:12,13
103:13 122:21
155:20 156:14
158:4 169:14,21
191:6 213:7
217:23 218:24
220:13 222:2
226:4 272:13,17
273:3 274:15
286:23 288:8
289:9 294:20,24
295:1,3
**medicines** 267:4
**medium** 24:19,21
24:23
**meet** 42:15,16
65:18
**meeting** 91:10
**meets** 309:13
**megan** 3:3 7:9
258:9
**member** 28:21
207:15
**members** 163:12
**membership**
221:17
**memory** 266:9
**mental** 218:19
**mention** 159:16,19
265:3 266:24
267:9,11 293:7
**mentioned** 91:5
159:2,5 160:1
167:19 177:17
179:18,21 193:10
198:5 240:20
242:10 271:21

**mentions** 158:18
158:22
**mergers** 139:9,15
**message** 107:23
**messages** 101:22
102:17,21 104:11
107:20 222:15,16
222:19 285:14
**messaging** 303:2
306:19,22
**met** 178:2 256:8
**methamphetamine**
250:1,7,8,15,17,21
250:23 251:2
**methamphetami...**
250:12
**method** 157:2
172:11 228:2
**methodology**
192:11
**methods** 243:14
**mg** 139:18,19
**micrograms**
144:18,20
**microphones** 6:5,9
**middle** 50:4 112:4
263:11
**midwest** 310:17
313:1
**mild** 246:4 247:5
**mill** 55:15 61:10
61:11 247:15
**millennium** 44:23
**milligrams** 144:17
**million** 79:24
174:6 193:1,15
194:2,24 230:12
**millions** 15:23
205:11 208:13
209:17

**mills** 97:19
**mine** 63:7 109:5
**minimize** 153:12
**minor** 24:5
**minority** 55:16
**minute** 78:24
  119:23 227:1
**minutes** 67:14,16
  179:6 255:9
  297:18,20
**misinformation**
  93:2
**misinformed** 28:6
**misleading** 55:14
  101:21 102:9,17
  102:22 103:1
  104:12,16 138:9
  144:24 222:15,16
  222:19 263:9,16
  263:22 264:2,21
  264:23,24 265:5,7
  266:14,17 267:10
  281:12 282:1,6
  284:8 306:19,22
**misremembering**
  251:11
**misrepresent**
  223:15
**misrepresentatio...**
  168:17
**misrepresented**
  95:8
**misrepresenting**
  95:19
**mission** 175:12
**misspoke** 155:2
**misstates** 52:1
**mistake** 100:9
  223:1
**mistyped** 25:2

**misunderstood**
  257:4
**misuse** 166:23
  181:9,18 188:5,11
  188:13,19 194:21
  247:4 294:6 295:6
  306:3,9
**misused** 188:18
  189:9
**misusing** 182:10
  188:4
**mitigation** 284:18
**mix** 28:16,20
  178:12
**mixed** 85:22
  207:14 278:5
**mnk** 4:14
**model** 190:12
**modeling** 190:10
  190:11
**moderate** 233:10
  236:5,16 237:19
**moment** 14:11
  61:13 88:23 162:1
**momentum**
  226:13
**money** 13:19
  227:15,17,24
**monitor** 57:5
  85:23 162:14
**monitoring** 161:3
  161:14,19,24
  162:4,8,20,22,23
  163:5,23 165:10
  166:3 168:1 169:9
  180:8 216:20
**month** 21:11
  229:16 299:10
  304:19
**monthly** 275:18

**months** 228:24
  229:11 237:23
  246:10 264:5,7,11
  264:16,19 265:22
  266:1 267:2
**morbidities** 42:8
  42:11
**morning** 6:2 7:13
  7:16,19 8:7,8
  20:16 295:19
**mortality** 243:12
  243:17,23
**motion** 41:17
**motivated** 28:16
**motivates** 28:18
**motivational**
  301:1
**motivations** 28:19
  28:19
**motives** 224:15
**mountain** 94:5
**mountaineer**
  97:14
**move** 54:18 82:3
  134:24 138:11
  211:12 228:14
**movement** 69:5,15
  69:17,18 70:10
  217:17
**movement's** 69:24
**moves** 69:11
**moving** 26:2 39:4
  62:8,17 71:6,16,17
**mrodgers** 3:10
**mtk** 268:22
**multifactorial**
  27:8
**multihundred**
  192:17
**multiple** 21:9
  113:23 229:9

  245:11 266:15
**multiplication**
  51:21
**multistage** 103:15
**municipalities**
  94:22
**musculoskeletal**
  263:22
**mute** 279:19,20
  280:1
**mystery** 46:23
  149:10

| n |
|---|

**n** 2:1 4:1,1 6:1 8:3
  8:3
**n.w.** 2:14
**name** 6:21 7:9
  28:22 29:4,19
  40:8,12,16,20,23
  41:8 48:3 60:13
  61:8 63:8,12,22
  66:9,11 86:11,19
  87:1 91:2 102:19
  124:5 133:6
  188:16 189:8
  196:19 232:3
  237:10 245:5
  258:9 276:23
  292:7 310:6 311:3
  311:4,15 312:3,4
  312:21
**named** 97:14
  161:9 188:14
**names** 29:4 30:6
  207:7
**narcotic** 294:21
**narcotics** 191:15
**narrow** 60:8 83:21
**nasal** 144:5,6,7
**nasem** 4:20 191:1
  191:2,2,9,23

192:15 195:1,15
195:17,22
**nasem's** 192:3
**nation** 52:11 53:15
54:10 208:15
**national** 4:20 27:6
27:7 51:8 54:6
90:24 102:14,14
131:23 132:2
147:3 191:5 193:6
274:12
**nationally** 50:17
52:4
**nationwide** 51:18
51:23 170:1,3
**nbc** 142:4,4,5,14
142:23
**ndc** 127:3 139:8
139:12 147:19
**necessarily** 62:23
149:16 157:13
269:13 305:6
**necessary** 52:9
175:2,5,8,21
220:15,18 260:15
**necessity** 93:4
175:24 289:15
**need** 17:21 22:14
23:2,12 27:6
39:17 50:12,22
51:3 56:11,21,24
57:13,18 58:6
71:17,18,18 115:1
119:23 120:5
168:9 174:16
176:16 178:1,11
180:6 184:15
199:20 209:21
210:15,19 211:4
211:16 213:5
215:23 242:4

246:10 272:14,18
285:4 291:15
297:20
**needed** 45:22
59:23 260:4 272:9
277:15 291:5
**needs** 42:24 52:22
82:1 139:1 174:21
175:16 181:22
183:22 208:23
219:17 267:5
272:20 290:22
303:5
**negative** 178:17
**negatives** 233:17
233:18 235:6
**negligent** 94:4
**neither** 236:22
309:10
**nervous** 218:18
**networks** 299:6,7
304:16
**neuralgia** 243:7
245:1
**neuroadaptation**
181:21
**never** 16:19 22:2,3
31:4 46:22 48:17
60:7 91:20 114:12
161:14 214:11
271:14
**new** 5:6 8:10,12
11:24 14:24 15:21
20:6,7,13 42:21
45:17 47:13 68:15
79:4 85:16 87:17
112:13 119:3
122:20 124:23
125:2 135:3 140:4
140:17 161:13,17
179:3 181:13

196:11 203:3
205:16 236:7
241:3 246:17
255:20 256:18
286:10
**news** 175:3
**night** 20:11,15,17
21:15,22 23:20,23
23:23 116:6 228:6
255:23 257:7,11
257:22
**night's** 255:20
**ninth** 2:9
**nods** 16:11 40:13
**noise** 241:13
**non** 35:7,17 60:24
136:6 171:6 196:7
196:21 197:7,15
197:19,22 198:3
198:12 208:24
233:14,22 234:2
234:13,17 235:9
235:14,18,23
236:2,4,15,20
237:1,2,10,13,19
237:22 252:5
294:24
**nonmedical** 188:7
**nonmedically**
193:19 194:16
195:4
**nonpharmacologic**
198:12
**nonresponsive**
211:12
**normal** 40:10
**nos** 6:18
**notarized** 310:14
**notary** 1:23 309:4
310:24 311:10,18
312:15,23 313:23

**note** 6:5 20:11
128:14 278:17
310:12
**noted** 110:8,9
280:23
**notes** 61:20,21,21
62:1,6,13 66:10
248:17 255:11
309:9
**notice** 1:21
**notify** 21:14
**notifying** 21:17
**notwithstanding**
127:15
**november** 4:16
94:17 145:14
153:7 229:6
**nsduh** 193:2,3,4
**nucynta** 5:19,19
88:5 231:19
271:20 272:1
274:7 297:12
299:15,20 300:12
300:21,24 301:4,6
301:20 304:1,6
**number** 5:22,24
13:6 14:4 27:15
37:22 51:5 52:7
57:1 74:19 75:13
75:15 114:9
126:11 130:3,3
166:3,3,13,14
182:19 194:23
213:2 251:24
273:17 310:7,13
**numbered** 278:22
**numbers** 22:9
51:5 63:1 78:20
127:4 139:12
147:20 196:15
212:17 249:15,16

312:7
**numerette** 126:15
128:19 129:20
185:2
**nurse** 40:14,15
73:5
**nw** 3:7

### o

**o** 4:1 6:1
**o'clock** 308:14
**oath** 7:1,24 8:17
122:3
**obesity** 52:16,21
**object** 92:8,16
113:2 126:21
173:23 205:6
212:3 262:2,13
**objection** 12:4
13:17,21 17:13
18:14 19:20 21:3
21:16 28:4,11,14
29:3,22 30:8
31:16 32:3,12,18
33:9,17 34:3,15
37:3,14 38:4,15,20
41:2,11,21 43:2,10
44:20 46:12,21
48:8 52:1,24
53:17,18,18 55:2
58:12,20 59:8
60:1 63:11 64:14
64:21 66:19 67:5
69:6 70:12,20
72:8,17 73:10
76:7,15 77:20
78:12 81:4 82:11
83:1,6,13 85:8
92:6,14 103:2,5
105:9,14 106:3,7
106:14 107:16
108:1,11,21 109:9

109:18 110:8,9,10
111:5,9,20 113:1
114:17,23 117:13
134:3 135:4
136:15 137:7
141:15 142:8,17
143:2,11 149:14
149:23,24 150:1,7
150:21 152:9,9,11
152:14 153:21
154:3 156:22
159:10,21 166:16
167:17 172:10
173:8,14,24
174:18,24 175:7
175:17,22 176:3,9
176:14 177:4,21
178:3,8 179:14
182:18 184:9
186:17 187:6
188:8 189:10
190:6 194:18
195:5,11 199:4,11
199:17 200:14,22
201:11 203:6
204:11 205:6
207:13,24 208:17
209:2 210:4,13,24
212:3 213:12
214:10,21 215:4
217:2 219:1
220:22 221:6
222:11 224:13,18
229:12,18,24
233:16 234:20
235:11 236:8,17
239:8,15,21
242:13 244:9
247:22 250:19
260:13,21 261:1
261:11,18 262:3

262:12 265:16
266:7,15,21
267:15,18 268:10
271:11 272:15,23
274:24 276:6
277:21 284:24
285:8 287:8
288:19,24 289:7
289:23 290:20
291:2,12
**objections** 7:23
8:1
**objective** 286:9
**obligated** 260:23
261:7,16
**obligation** 23:4
67:2,4 127:16
256:7,9 261:3
**observe** 67:4
**obstetrics** 216:23
217:13
**obstructionist**
14:8
**obstructionistic**
53:23
**obstructive** 140:5
**obtain** 260:4 272:9
277:16
**obtaining** 260:5
272:10 277:16
**obvious** 149:17
**obviously** 27:9
57:20,21 59:17
226:15 228:7
**occur** 142:23
288:3,17
**occurred** 36:14
56:9 66:24 68:20
162:2 298:11,16
299:15,18 304:1

**occurring** 78:16
**occurs** 79:17 91:3
182:20 287:21
**october** 153:7
**offer** 11:8,11
190:3 253:8
256:21
**offered** 22:21
246:17 256:12
272:5
**offering** 185:11,15
**offerings** 284:9
**offers** 25:18
276:20
**office** 10:22
175:11 232:4
**officer** 152:22
**offices** 231:8 232:8
232:10,13,16,20
**official** 26:11,12
311:15 312:21
**oh** 92:11 121:3
140:15 209:16
228:14
**ohio** 11:22,23
14:24 15:21 20:6
68:16 124:22
181:13 246:17
310:2
**okay** 10:2,11,17
10:24 11:7 12:2
13:5 14:16 16:1
18:9 19:10 21:5
21:20 23:22 24:3
24:7,18 25:4,14
30:15 32:8 33:5
39:18 41:8 45:14
46:4 48:21 49:3,7
49:21 50:12,15,16
53:10 54:3 56:5
59:12 67:18,23

74:12,16 81:18
82:5 89:10 90:12
91:23 95:24 96:8
97:7 98:3,13
99:12,24 101:20
101:24 106:18
114:18 121:5,18
122:18,23 126:3,4
126:14,18 127:1,6
127:9,22 129:24
130:19 132:16,19
133:2 135:7,17
137:21 138:11,21
138:24 139:17
140:11 143:14
144:14 145:2,7,10
147:9,17 152:7,24
153:10,16,19
159:18 160:9
161:22 162:16
163:21 164:8
168:19 169:6
171:12 172:2,4
173:11,13,19
176:11 181:12,19
189:16 190:24
191:7,11,20
192:23 193:13
194:1,6 195:7
196:18 197:17
202:19 203:10,17
205:22 206:1,12
206:20 208:19
216:10 218:3,4
220:7 222:18
227:4 228:15
230:11 232:12
233:3 234:6 235:1
238:7 242:19,22
243:3,24 244:22
245:4 249:2

250:24 251:8,9,16
252:6,16 253:14
253:24 258:4,19
262:19 264:17,22
265:6 266:3
269:10 270:20
271:7,19,24 273:4
273:13,20,24
274:14 275:7
276:15 277:14
278:13 279:14
280:7,12 281:18
281:23 282:4,12
282:17 283:1,9,16
284:15 285:13,17
286:6 287:16,20
288:1 289:5 290:6
290:7,12 292:5
293:20 294:4,9,19
295:21 296:18,23
297:10 298:15
299:22 301:17,20
302:4 303:12
305:4,8 307:12
**old**  187:9,11 259:6
**older**  146:3
**omission**  100:18
**omit**  153:12
**omitted**  265:5
**once**  11:4 81:13
127:18 163:6
239:10
**ones**  103:4 155:19
269:1,15
**ongoing**  94:23
224:24 300:18
301:2
**online**  221:24
223:21,24 224:4
280:24 281:8

**open**  11:3 129:2
255:19,22 257:13
259:19 273:14
282:20 297:14
**operating**  28:9
29:1 55:22 152:21
247:14
**operative**  217:11
**opined**  55:6
**opinion**  21:19 32:7
35:24 36:2,20
39:22 44:6 75:5,8
95:3 97:4 104:10
104:15,19 124:11
124:12,16,21,21
125:1,4,10,12,12
125:15 128:18
137:12 143:3,5
145:5 151:8
153:24 174:2,2
179:3 181:6
185:15,21 191:24
195:24 198:20
199:1,7 226:24
234:10 235:2
239:5 257:3 259:5
262:17 263:23
266:4,14,17,19,23
277:5
**opinions**  11:8,11
22:21,22 161:10
185:11 246:16
256:13,21 257:8
257:21 274:18
**opioid**  4:22 5:3
11:18 13:20 29:9
30:20 32:22 33:14
37:18,20 44:3
48:19,23 51:2
53:3 54:19 55:7,9
55:12,23 60:17,21

61:2 63:24 68:10
68:13,19,21 73:9
75:1 76:4,12 79:7
79:7 80:8,17
82:21 83:9 90:14
93:10,20 95:7,13
95:19,20,22 98:18
98:18 100:17
103:13 104:3,7,11
104:15,19 105:1,7
105:12 107:21
109:11 111:10
115:16,20 116:3
123:10,11,14,22
124:3,16,17,18
125:6 130:24
136:5,6 139:21,24
141:23,24 142:19
142:21,24 143:4
146:1,4 148:1,4
150:9 154:1
155:12,13 156:2
156:21,21 157:12
158:1,8,10,13
159:24 160:3
162:14 168:4,12
168:15,22 170:9
171:6,17 172:18
173:21,22 177:19
180:3,11 181:8,8,9
181:17 182:15,22
183:11 186:23
189:15 191:15
196:7,20,21 197:7
197:15,19,22
198:2,3,7,12,14,14
199:22 200:13
201:20 203:12,23
204:2,8 205:4,15
205:16,20 206:10
207:4 208:10,16

208:24 209:1,11
210:8,18 211:9,14
213:10 214:13,20
215:14 217:4,5,23
218:10 225:1,17
231:8 233:22
234:13,17,18
235:9,18 236:4
237:1,10,13 238:1
238:8,12 239:2,6
239:13,17 240:7
240:19 241:7,16
243:1,11,23
245:17 247:2,3,5
247:12 248:1,8,14
248:22 251:7,13
252:7,10 253:9,13
253:19,21 254:4,9
254:9,13,15,17,19
254:20 260:10,18
261:8 275:9,14,22
276:4 277:3,7,9,12
282:14 287:13
291:24 294:21,23
294:24,24 295:3,6
297:7 300:1,4
301:10 305:16,21
306:2,9
**opioids** 4:24 33:6
33:11 35:1,6,17
36:10 37:1,13
38:3 42:24 43:9
43:12,14,18,22
44:9,11 45:6,19,22
49:23 50:21 51:14
51:20 52:8,22
55:13 56:7 57:4,8
57:10 60:15 63:10
64:6,13,19 65:2,17
68:23 69:9 70:3,6
70:24 71:22 72:1

72:6,15,22 73:5,11
76:6,14,23 77:18
79:11,19,23 80:1,7
80:16,19,23 81:3,9
81:11,21,22 82:8
84:10 88:2,8,12
89:19,23 93:2,3,19
94:6,9 95:9,10,15
96:2,17,22 98:7,20
99:2,15 100:22
102:10 103:1,9,24
104:13,21 105:1,5
106:6,11,13
107:23 116:8
117:23 118:6,15
118:23 121:11,16
142:11,14,14
143:9 154:5
157:16,20,21
163:6,15 166:13
166:14,24 167:9
167:21 168:2,13
169:1,9 171:4,14
171:21 172:8,22
173:9 174:16,21
175:2,4 181:19,24
182:1,9,11,13,16
183:8,8,13,14
184:2,22 187:17
188:4,11,18 189:8
193:18 194:16
195:3 196:1,3,5,13
197:6,13,24
198:20 199:2,5,10
199:15,19,20,24
200:2,9 201:9,15
201:23 202:7,12
202:16,20,23
204:14,17,19
205:13 206:3,5,17
207:23 208:4,7

209:8,21 210:2,17
210:22 211:20
212:2 213:5,22
215:3,5,6,10 216:2
216:4,7,10,14,18
216:24 217:12
218:15,16 221:1
224:7,22 225:12
226:1,9,20 227:19
233:9,13,14,23
234:2,2,2,12
235:10,13,14,18
235:23,24 236:2,4
236:15,15,20,21
237:2,18,19,22,22
239:23 240:6,14
240:18,22 241:22
241:23 242:16,17
243:5,8,21 244:7
244:15,17 245:1,6
245:12,21 246:1,8
246:20,21 247:1
247:10,11 248:15
251:7,13 252:2,10
252:13,18 253:3
253:10,19 263:17
263:20 284:20
285:3,12 291:22
292:12,19 295:17
295:24 296:12
300:7,15 302:1,9
304:23 305:6
**opportunities**
307:22
**opportunity** 93:11
93:12
**optimize** 307:22
**option** 82:23
197:13 263:14
**options** 171:4
197:19 307:19

**order** 16:1 17:10
47:12 56:11,19,21
57:12 78:14 83:10
85:22 101:10
134:12 157:6
160:15 161:3,14
161:19,24 162:3,8
162:22 173:7
176:5 191:17
194:1 195:17
211:22 214:22
222:13 242:14
261:14 303:1
**ordering** 100:12
133:4,17,20 134:1
134:18 135:13
136:3,5 137:15
138:5 147:19
280:24 281:8
**orders** 137:18
160:10 161:5
173:11,16,21,22
180:9
**organization** 32:5
32:9 65:4 66:15
116:22 118:8,9,14
174:5 207:12
**organizations**
31:22 33:1
**oriented** 27:15
**original** 111:23
203:15 209:4
234:23
**ought** 97:16
**outbound** 303:1
**outcome** 7:2 78:10
131:6 254:10
**outcomes** 217:9
**outlier** 51:12
57:23 199:1,7

**outlined**  172:11
**outreach**  302:18
**outset**  258:20
**outside**  45:4 97:22
 183:14
**outweigh**  175:10
 198:16 204:3,19
 244:21 291:4
**outweighed**
 243:12
**outweighs**  204:22
**overall**  230:7
**overbroad**  178:3,8
 178:9
**overcome**  303:3
**overdose**  208:11
 243:16 291:21,23
 295:4
**overdosed**  292:3
**overdosing**  291:18
**overnight**  170:10
**overprescribed**
 200:9 217:1,7,13
**overprescribing**
 52:5 68:22 93:3
 156:16 208:11
**overseen**  162:3
**oversees**  116:22
**oversimplification**
 64:23
**overstated**  115:7
 225:3
**overstatement**
 169:11
**oversupply**  184:12
**oversupplying**
 174:14
**overview**  219:10
**ownership**  150:14
**owns**  150:11

**ox2**  237:12
**oxycontin**  20:23
 93:13 153:3,5,13
 153:20

**p**

**p**  2:1,1 6:1
**p.m.**  20:11,15
 21:14 255:23
 257:7 308:17
**pace**  71:7
**pads**  115:5,14
**page**  4:2,8 5:1
 13:24 16:24 17:3
 18:3 24:4,10,12,15
 45:16 61:18 68:18
 68:24 73:21,22,24
 74:2,24 76:18
 77:22 93:8 94:14
 94:15 95:1,2 97:4
 97:7,8,21 99:16
 100:1 101:17,18
 124:12 125:20
 126:10,16 127:13
 128:9,18 132:13
 132:13 139:24
 140:1,12 143:14
 143:15 145:10
 155:15,17 170:24
 171:10 174:3
 180:24 181:1
 185:1 187:12
 191:7 192:17,20
 192:21 193:11
 196:15,16 197:11
 202:5,20 203:22
 218:4 219:9,11,20
 220:3 221:14
 226:3,23 230:3
 232:24 233:1,3
 234:24 242:19,24
 244:24 255:4

259:7,11 271:21
 276:9 278:13,20
 280:5,7 282:19
 283:17 285:24
 286:2,7,18 292:6
 293:8 294:4,10
 297:10,22 299:4
 299:12 300:3
 301:9 302:23
 304:15 306:18
 307:9,10,14
 310:13,15 312:7
 313:3
**pages**  15:23 104:3
 184:24 186:16
 196:10 206:13
 306:21
**paid**  12:12 13:10
 148:9 149:1,6,18
 149:19 213:7
**pain**  4:21,24 5:3
 27:23 33:11 35:7
 35:17 36:10 37:2
 37:13 42:8,10
 43:13,19 44:9,12
 45:6 53:1 54:1,6,9
 54:14 60:19,24
 65:20 70:3,5 71:1
 71:2,22 72:6,12
 81:21 92:24 93:9
 93:18,21 94:3,8
 95:14 97:17 103:9
 118:20,23 119:3
 119:10,16 120:19
 121:10,15 124:18
 125:6 146:2,5,10
 146:13,17 147:12
 154:2 157:20
 162:15 171:5
 196:1,3,6,7,14,21
 197:7,14,14 198:8

198:15,21 199:14
 199:16,18 201:4
 201:24 202:7,12
 202:16,23 203:12
 203:24 204:1,9,14
 204:18,21 205:5
 205:12,16,20
 206:3,5,16 208:5
 208:23 209:19
 211:21 217:11
 218:11,14,15
 219:6,16,22
 220:16,21 221:15
 221:21,23 222:1,9
 222:20,23 224:8
 224:23 225:4,11
 225:14 226:1,21
 233:10,15,24
 234:13,18 235:10
 235:15,24 236:5
 236:16,23 237:1
 237:11,13,20
 238:2,10,13,19
 240:17 241:8,17
 242:11 243:9,12
 243:19 244:18
 245:8,12,20 246:5
 251:18,23 252:1,4
 252:5,12 260:11
 260:19 261:9
 263:12,14,14,18
 263:18,21,22
 264:4,7,15,19
 265:9,13,13,19,21
 265:24 266:2
 267:2,5 294:20,21
 294:23,24 295:1
**painful**  80:3 243:1
 243:6 244:22
**pains**  187:10

**pales** 154:8
**panel** 223:20
**paper** 47:15 77:24
  149:7
**papers** 30:16
**paradigm** 55:12
  68:20 69:3 168:5
  168:11,21 169:4
**paragraph** 74:24
  92:12,12,22 93:8
  93:16,24 94:2,19
  97:1,3 127:14
  146:18 147:14,18
  153:1,11 181:6
  191:8,12 192:20
  192:24 233:1,3
  259:18 280:13
  303:12 307:14,17
  308:2
**paralegal** 20:18
**pardon** 60:4
**parentheses** 300:5
**parody** 97:12
**part** 27:17,17 44:7
  56:15 62:23 69:24
  70:2 77:8,10 79:1
  82:3 83:19 86:2,3
  86:21 118:23
  129:8 142:20
  143:13 163:22
  167:22 179:3
  189:4 200:6
  203:20 205:5
  215:10 220:19
  221:10,20 227:22
  231:23 232:17,20
  243:9 254:15
  267:16 295:22
  297:1 306:5 312:9
**participated**
  151:11 183:20

**participating**
  286:22
**particular** 26:21
  27:11 43:9 46:3
  58:24 59:21 60:8
  75:14,23 76:18
  77:3 78:9,10 85:7
  86:15 93:12 98:13
  102:6 122:6
  125:15 176:6
  217:21 232:24
  239:13 245:7
  269:20 277:6
  278:2,6
**particularly** 47:23
  235:14
**parties** 6:11
  309:11,12
**partner** 154:1
**partnered** 99:17
  125:21 128:10
  130:11
**partnering** 130:13
**partners** 307:16
  308:3
**partnership** 96:13
  126:18 130:16
  132:12 259:13
  271:20 276:12
  280:9 282:18
**parts** 27:22 222:5
**party** 7:1 85:19
  102:18 178:24
  179:18 186:13
**pass** 255:9 256:3
**passage** 69:22
  73:12
**passed** 154:15,20
  155:1,4
**passing** 255:17
  269:15

**patch** 259:24
  268:14 276:18
  280:19 294:15
  301:14
**patches** 296:3,14
**pathway** 181:20
**patient** 5:10 38:14
  38:19 40:19 41:1
  41:6 42:5 43:1,9
  43:15 45:21,22,23
  46:11,19 47:9
  55:4 57:3 64:17
  73:6 80:17,20
  81:12,20,22 82:8
  82:22,23 83:5,11
  83:12,15 84:2,9,12
  85:7,10,12,15,17
  86:2,7,11,15 88:2
  90:4,14 111:18
  112:23 113:19
  115:9 148:5
  155:18 163:7,8
  165:2 174:21,22
  176:2,8,17,19
  177:2,3,13 183:1
  188:10 199:12
  204:13,22 212:10
  218:9,12 219:17
  220:12 221:5,12
  251:16,20 254:18
  260:4,11 262:11
  267:12 271:10,15
  272:9,20,21 273:3
  277:15 287:7,22
  288:5,8,10,13,16
  289:16,17,21
  290:15,21 291:5
  291:14,23 299:22
  302:24 305:5
**patient's** 45:11
  65:20 83:17

105:24 273:1
**patients** 35:21
  39:20 42:9,12,14
  42:17 44:14 45:18
  47:4,14 57:14
  58:3,11 63:1,10
  64:5,8,12 65:3,15
  65:16 66:5 70:18
  70:24 71:23 72:9
  72:16,22 75:16
  79:12,23 80:8,11
  80:13,15,23 81:2,8
  81:16 84:20 86:4
  86:19 87:1,5 88:8
  95:14 96:6 101:9
  104:22 105:5,8,11
  105:18 115:9
  116:12 118:24
  138:4 146:3 148:3
  156:16 157:18,18
  157:18,19,21
  166:20,24 167:4
  170:6 171:5,6
  174:16 175:6
  177:8 178:5,16
  180:13 182:13
  187:16,19 188:3
  188:12,15,17,20
  189:7 196:6
  197:14,16 198:16
  199:14,16,19
  200:2,7 204:1,7
  206:15 210:1,12
  211:9 214:13
  217:10 220:16,18
  236:13 240:13,16
  240:17,22 241:8
  241:18,21 242:1,4
  243:10,15,17
  245:10,20 246:3
  246:24 247:24

248:4,18,21,23
249:2,12 251:6,12
251:18 252:7,10
252:12 253:8
263:1 272:13
274:3 279:7 281:3
287:13,21 288:22
289:11,19 291:21
292:2 295:11
297:4 300:6
302:13,19 303:1
303:14 304:24
**pattern**  188:15
**paul**  2:7,10 7:19
152:16
**pause**  9:2 18:23
258:16 298:23
**pay**  239:6,10,19
272:5,9 276:20
**payer**  85:20
**payers**  178:24
179:18
**payment**  240:7
269:20
**pays**  149:9
**pdmp**  163:23
164:23,24 165:15
165:18,20
**peak**  50:20 51:13
172:15
**peer**  30:15 122:16
122:18 190:3
243:18
**penny**  230:22
**pens**  115:5,15
**people**  28:18,18
31:12 34:23 42:6
51:13 52:15 63:24
69:19,22 70:1,15
86:3 107:7,10,14
142:6 149:5,9,11

150:17 157:9,11
163:14 178:21
179:12,21 182:10
182:15 183:12,13
194:20 196:2
201:6 208:6,13
213:24 226:16
245:8 246:4,5,20
247:10,19 248:7
248:14 250:16
253:12 254:6,13
265:21
**perceive**  150:17
**percent**  48:14
84:10 95:9,14
96:3,18 98:8 99:3
99:15 113:3
172:15 181:14
191:21 193:18,22
194:8,15 195:3,21
212:12,21 214:9
214:19 246:24
247:3 248:3
251:12 252:7,9,16
253:12,15 275:19
292:12,19 295:17
295:24 296:12
**percentage**  42:14
48:11 49:11,20,22
56:12 60:17,21
61:2 182:12,17
186:4,6,11 211:14
212:1,15 238:1,8
238:12,15,18
239:1 246:19
248:7,14 249:4,10
249:12,17,20,20
249:24 251:1,6
253:7,8
**percentages**  49:15

**perfect**  294:11
**performed**  231:15
235:23 236:4
**period**  21:9 72:7
80:24 174:7
195:15
**periods**  243:15
**perpetuates**
146:11
**persistent**  146:5
253:18,21 254:17
**person**  21:13
28:20 57:19 63:12
63:15 136:23
149:15 167:9
**personal**  73:5 86:6
87:4 156:20 215:1
303:2
**personally**  20:17
27:17 76:11 86:24
215:3 311:11
312:15
**persons**  51:6
**perspective**  79:20
81:7 162:4
**persuading**  5:5
**pertains**  123:10,14
**petitioned**  184:7
184:21
**pharma**  4:18 5:9
29:9 102:2 151:17
152:22 158:4,16
**pharmaceutic**
300:4 301:10
**pharmaceutical**
5:5 29:6,7,20
68:10,13,21 95:7
95:19 159:8,19
160:7 168:4 230:4
230:9 231:2,3
308:3

**pharmaceuticals**
29:8 140:14
**pharmacies**  15:2
15:22 47:23 76:6
76:13 82:10 88:7
114:11 124:18
137:18 160:11
161:6 173:7 180:4
187:17 210:11
281:1,6 283:14
284:3 299:10
304:19
**pharmacist**  46:13
48:5,13 84:11,15
84:23 86:1,1,7,10
86:13 90:3,4,14
98:6 99:1,14
115:8 128:3
131:20 133:10,12
134:12,13,17
135:24 137:20
148:18 271:13
284:23 285:2
287:6 289:2
292:11,18 294:12
294:17 295:10,16
295:23 296:11
**pharmacist's**
115:8
**pharmacists**  84:20
85:7 99:19 100:4
100:24 101:5,6,8
101:12 127:3
133:5,5 135:3
137:18,21,24
140:8,10,18
143:17,24 145:17
147:5,20 150:20
154:20 155:1,4
163:12 165:5,21
179:16 180:13

220:17 282:14
283:10 285:6,9,14
286:10,22 287:21
288:22 302:8
**pharmacologic**
198:13
**pharmacy** 5:16
45:10,20 46:1,6,7
46:8,18,20 47:11
47:12,19,24 48:1,3
57:9 61:9 74:21
87:10,13 89:23
90:17,20 91:2
99:4,9 100:15
101:7 139:5
143:21 148:22
173:11,16,20,22
185:8 186:24
260:6 269:2
286:16,21 287:11
287:22 288:14,17
292:16 293:8
296:24 297:1,7,11
298:5 299:3
301:15
**phenomena** 42:19
**phenomenon**
242:1,3
**phobia** 98:18,18
**phone** 2:6 241:13
302:19,20 310:3
**phones** 6:8
**phonetic** 247:23
**phrase** 166:5
**phrased** 110:14
**physical** 271:12
**physically** 181:23
271:17
**physician** 42:23
43:8 58:9 59:16
59:20 67:10 73:4

107:20 109:8,17
111:8,19 112:24
113:20 114:21
162:23 189:8
285:1 288:4,7
**physicians** 80:14
107:1 164:11
168:9 211:7
219:18 220:14
285:5
**physiologically**
199:19 211:4
**pick** 6:6 287:22
288:14
**picks** 267:12
**picture** 108:14
**pie** 230:3
**piece** 47:15 149:7
278:9 301:14
**pill** 55:15 61:10,11
97:18 158:5
216:15 247:15
260:1 276:18
**pillbillies** 97:18
**pills** 74:19 75:13
75:16 105:19
108:15,16 114:9
124:19 125:6
154:2 162:15
174:6,12 212:23
215:20 272:3
**pip** 299:15,17,20
300:1 301:20
303:14,20 304:3,6
304:18
**place** 2:20 6:8
25:24 65:6 66:6
75:14 97:16
141:18 170:8
200:3

**places** 10:9 231:8
**placing** 134:12
137:18
**plaintiff** 1:4,11
12:2
**plaintiff's** 155:11
280:14
**plaintiffs** 2:3 7:18
7:21 10:11 11:13
11:17,20,22,23,24
213:8 306:15
**plan** 47:4,10 82:2
204:17 301:13
**planning** 257:18
**plans** 256:21
**platform** 133:4,18
133:20 134:1,18
135:13 136:3,5,14
137:16 138:5
281:3
**played** 44:4 95:23
**please** 6:5,7 7:3
109:22 110:13
112:14 113:12,16
114:4 148:6,19
152:4 181:1 227:6
251:10 310:11,11
**pleased** 145:23
146:20
**plenty** 82:5
**plow** 187:11
**plowing** 187:9
**plus** 92:19 307:19
**point** 29:10 37:9
57:23 67:17,22
76:3,17 95:24
96:4,15,19 97:1
112:4 129:23
131:3 146:22
147:13 149:6
151:10 166:12

187:12 209:14
218:7 223:13
235:21 246:9
255:18 265:17
268:6 295:14,21
**policy** 5:2 203:3
217:23 218:23
224:1
**poor** 18:18 97:14
**pop** 11:3 136:5,6,7
**popped** 136:18
**popular** 240:21
**population** 42:5
50:23 53:13 69:19
80:6 174:14
199:12 209:11
213:3,4 236:12
251:17,20 252:4,5
254:1,2,5 305:16
**populations**
252:11
**portal** 280:24
281:8
**portion** 167:13
**pose** 64:11
**posited** 193:17
**position** 23:2,6
33:22 46:6 72:23
79:14,18 100:20
111:6 134:11
196:11 200:16,21
206:15,21 207:18
207:19,20,21
256:5 259:1 261:5
**possessed** 157:11
**possession** 210:8
**possible** 21:20
23:17 25:9 53:8
107:19 108:7,18
108:24 114:11
178:17 197:18

253:2
**possibly** 54:13
**post** 217:11 238:9
243:7 244:24
**potential** 205:4
278:17 279:2
**potentially** 236:20
**power** 65:19
**pplp003299959**
293:22
**pplpc00200014...**
5:18
**practice** 31:5,8
32:17 37:12 40:10
42:2,20,21 47:3
48:7 62:23 64:4
84:22 111:14
112:19 220:13
274:14
**practices** 31:15,18
31:20 32:2,14,21
32:24 33:7,15
37:24 58:18 77:4
84:8 111:15
112:20 171:1,13
171:21 172:8,17
172:22 197:3,5,9
224:17
**practicing** 31:11
31:13 39:6 116:24
117:1
**practitioner** 40:15
220:12 221:5,12
**practitioners**
40:14
**pre** 218:19
**precise** 187:6
**predict** 78:18
**preferred** 198:13
**prelude** 113:2,13
205:7,9 262:2,13

266:16
**premise** 235:16
241:12,15
**preparation** 13:13
296:20
**prepared** 307:5
**preparing** 15:16
62:14
**prescribe** 35:6
37:1,12 38:3
40:19 42:3 64:13
65:17 79:14,19
81:8 98:19 115:10
137:21,24 166:10
166:13 177:20
188:4 199:9,15,21
204:14 216:18
226:9 245:22
288:8 289:13
302:9
**prescribed** 46:10
52:8 60:14 75:16
95:15 105:4
137:23 142:1
175:21 182:16
183:1,9,13 188:17
189:8 196:6,13
200:13 201:23
205:13 208:8
215:6,9,20 216:1
216:10,14 224:8
236:3 239:24
246:20 247:9,11
250:12,15,17
251:6,12 252:10
254:15,18,20
277:8 291:20,22
291:24 292:4
295:5
**prescriber** 57:7
108:5 163:14

188:14,17
**prescribers** 5:5
186:1 189:1 285:2
**prescribes** 82:8
**prescribing** 4:23
32:23 33:6,10,15
34:13 35:2,16
37:18,21 41:10,19
41:23 42:24 43:22
44:5 48:20 49:17
50:17,20,21 51:2
51:13 53:3,14
54:1,3 55:12,13
56:16,18 57:8,14
58:9,18 59:2,7,24
65:1 69:10 72:15
72:22 75:1,9 76:5
76:14 77:4,19
79:7 80:7,16
83:10 84:2,8,9,24
85:13,23 94:9
104:21 105:1
106:11 111:11,13
112:18 115:16,20
118:6,14 123:6
148:4 162:23
163:15 164:11
165:22 168:5,12
168:12,16,22
170:9 171:14,17
171:21,24 172:2,8
172:14,18,22
177:19 178:10
188:10 202:7,11
202:16 204:15
207:23 211:17,19
211:24 214:20
217:4,5,8,18 221:1
225:1,18 226:7
227:23 231:11
246:10 275:9,14

275:22 276:4
277:11 282:14
291:6
**prescription** 34:24
38:18 40:7,11,21
41:6,15 45:11,19
47:7,9,20 48:5,6
48:12,13 56:20
57:5 58:1 59:14
68:23 76:23 81:3
82:24 84:16 85:3
85:11 86:14 93:19
95:9,10 96:2,17
98:7 99:2,15
107:21 155:19
163:4,23 165:9
166:8 176:6,12
181:8,8 182:22
183:2,8,11,14
185:3,6,23 186:8
186:11,12,23
187:17,23 188:2
193:18 194:15
195:3 208:16
210:8 239:14,18
239:20 240:14,18
246:21 247:20
248:5,15,19 249:1
250:22 252:18
253:4,9 254:2,3,6
254:7 260:5,8,20
261:9 262:1,11
263:5 267:12,14
267:16 272:6,10
272:20 274:7
276:21 277:16
279:11 286:23
287:23 288:11,14
289:11 292:12,19
294:20 295:16,24
296:11 297:6

299:24 300:14
302:1 304:23
**prescriptions** 47:5
48:23,24 49:4,11
49:23 51:6,19
54:17,20,24 55:8,9
55:21,24 56:6,7,13
57:1 58:3 60:18
60:22 61:3 64:1
75:19,22 165:1
210:3,11 238:1,9
238:13,18 239:2,7
247:12 248:1
251:21,24 252:13
254:4
**present** 3:13 7:3
90:22 188:20
**presented** 60:7
115:5
**presenting** 189:6
**presents** 64:18
80:9
**preserved** 258:23
**president** 152:21
**press** 4:20 123:3
210:14 240:21
**pressures** 65:16
**prestigious** 141:6
143:7
**presumably**
254:21
**pretty** 17:19 121:8
245:15 261:21
**prevalence** 95:13
**prevent** 187:3
**preventing** 175:13
**previous** 113:7
124:22 187:7
**previously** 23:3
85:16 249:13,17
249:21 250:1

251:2
**primarily** 42:6
95:22 158:10,13
248:20
**primary** 36:13
**print** 264:3
**prior** 14:23 18:9
18:12 19:10,13
45:8 68:8 85:19
89:14 124:8 125:5
155:24 159:23
160:5 227:13
233:13,22 237:16
**priorities** 27:1
**prioritize** 285:11
307:21
**private** 6:6
**probably** 36:7
44:22 45:7,24
48:14 64:3 66:10
104:3 153:23
207:6 223:14
229:2 234:15
266:8
**problem** 30:20
43:21 44:13 52:6
55:15,16 79:21
143:5 154:7 174:7
208:10,11,14
209:22 211:11
214:1 225:16
228:12 245:23
**problems** 53:21
148:2 210:18
**procedure** 1:20
216:2 254:16
311:5 312:5
**procedures** 216:15
216:23 239:3
**proceed** 71:21
299:8

**proceedings** 8:10
8:11,12 9:2 18:23
34:5 298:23
**proceeds** 146:20
**process** 26:15 27:4
72:19 102:16
103:11,14,15,23
142:21 157:8
181:21 183:21
184:1 225:24
**processing** 269:3
**produce** 117:2
256:8
**produced** 15:23
16:23 92:15
**product** 100:12
127:23 131:2
133:6 135:3
137:10 138:24
140:17 141:21
142:5,7 143:1
149:13 261:4
265:15 269:20
277:6,8 278:17
279:2 308:7
**production** 183:17
185:7 310:15,17
310:22
**products** 93:11
99:17 104:17
125:22 129:12
136:6,7 139:8
140:9,21 142:10
143:4 144:11
180:11 231:11
287:13
**profession** 263:20
**professional** 1:23
38:13 73:14 200:1
309:18

**professor** 26:12
28:5 29:11 34:19
**professors** 27:9
28:3,15 29:19
30:7 224:7,10
**proffering** 191:24
264:18
**profit** 105:23
**profitability**
307:23
**profits** 108:4
**program** 5:10,17
5:20 26:1,2 90:21
91:2 99:4,7,10
100:16 101:7,8
116:7 131:17
148:6 163:24
165:10 168:1
169:8,9,12,13,17
170:20 231:24
259:12,21 267:24
268:4,9 269:11,13
269:18,23 270:2,3
271:2,5,6,19 272:2
274:12 275:17
276:8,15 280:4,22
282:17,23 283:20
286:4,21,21
287:12 292:5,10
292:16,16,23
293:4 295:11,15
295:22 296:24
297:2,8,11 298:5
298:11,16 299:3
299:11,15,17,20
300:1 301:1,4,6,9
301:16,18,20
303:14,17,20
304:4,6,18,22
305:1,5,7

programs 151:12
286:15,16,20
288:2,18 296:6
300:11,14,17,19
302:1,5 305:11,14
305:16,21 306:2,8
project 127:2
226:17
prolonged 72:3
promote 89:22
93:11 99:17
101:10 116:3
124:18 125:22
128:11 129:12
154:1 158:5
180:11 231:10,20
287:12
promoted 102:16
275:19
promoting 127:23
131:1,13 141:21
232:1 265:24
296:14 300:7
promotion 93:18
125:6 131:4
146:23 154:5
231:18 307:19
promotional
101:21 104:4,11
131:9 151:22
153:2 168:8
180:13 231:10
287:3,5 296:3
promotions
142:19
prompted 134:2
promulgated
104:7
proof 4:12 135:22
136:13 190:21

proper 213:13
220:19 242:16
proposal 307:6
proposition
303:13
protocol 92:8
211:6,7 241:20
protocols 170:2
prove 78:20
provide 10:14
13:6 16:3 19:18
77:16 88:8 125:3
135:2 188:24
206:22 286:22
303:2
provided 14:3,24
17:4 22:19,22
23:3 86:2,17,24
87:4 92:7 93:10
115:15 116:5
135:8 148:17
152:11 168:22
256:14 281:21
283:19 293:14,15
293:18
providers 69:21
96:6 116:12
157:15 162:14
163:11
provides 147:19
287:6 298:4
providing 140:16
173:6
provisions 64:20
psychiatrically
241:22
psychiatrist
150:22
psychiatry 150:24
public 1:23 36:16
44:18 45:1 83:8

105:21 138:4
174:9 175:9
208:10 214:2
223:5 224:1 309:4
311:10,18 312:15
312:23 313:23
publication 36:17
36:21
publish 189:22
published 122:10
122:13,19,20,23
122:24 123:5
155:7,10,24 160:1
233:8,13,22
254:23
publishing 122:24
123:2
pull 217:17 280:16
293:21
pulmonary 140:5
pumped 105:19
purchasers 191:16
purdue 4:17 5:9
93:12 102:2
151:17,22 152:22
153:3,19 154:1
158:16 271:6
276:12 277:20,24
278:2,4 280:9
286:17 292:5
pure 190:4,7
purporting 126:2
purpose 54:23
60:19,23 61:4
188:7 309:6
purposes 16:2
21:2 228:21
229:10
pursuant 1:19,21
92:7 127:24 128:6
133:9 185:24

pursue 131:6
pursued 154:6
purview 169:14
pushing 134:21
put 32:24 35:15,18
36:3 52:7 81:14
92:3 212:14 228:7
247:12 286:13
295:3
puts 41:13 64:8
putting 46:5 48:3
79:22 134:17
140:9 190:16
200:2
pyser 2:12 4:3 7:5
7:6 8:1,6 9:5 12:8
13:9 14:13,16,22
17:15 18:20 19:5
19:17 20:1 23:5
23:12,16 32:4
50:9 65:10 67:15
67:21,24 68:7
71:20 89:1,6,11
92:2,10,17,21
94:13 100:19
109:24 110:7,12
112:6 113:11
114:2 120:1,11,20
121:18 122:1
152:3,8,15,17
154:10,13 179:7
180:15,22 181:3,5
187:10 205:8
212:11 213:16
227:2,5,12 228:12
228:16 233:18,20
255:1,6,8,17 257:1
257:23 259:2
pyser's 258:20

**q**

quadrupled 50:17
quadrupling
  51:11,19 52:4
qualifications
  150:18
qualified 72:1
qualify 78:13
  150:23 235:22
qualifying 261:14
qualitative 62:15
  76:20 157:2
quality 39:23
  65:18 91:11 117:3
  178:23 279:20
quantified 54:17
quantify 50:16
  51:16 59:9 227:14
quantifying
  186:21
quantitative 77:1
  77:6 306:11
quantities 49:15
  104:21
quantity 93:5
quarter 51:22
question 9:12,13
  9:20,22 10:3,3
  14:2,20 17:16
  18:17 19:23 20:2
  20:22 23:18 30:3
  33:13,13 37:5
  39:1 43:5,7 44:16
  44:16 45:9,15
  50:3,6,12 53:5,10
  53:19,22,23 55:20
  58:14,15 60:8
  71:10,16,19 76:9
  77:9 81:18 82:4
  82:12 83:24 84:1
  84:4,19 86:24

88:17 89:12,13,16
90:2,2 92:16
97:24 98:1 106:8
109:22 110:11,13
110:14 111:23,23
112:7,8,10,12,13
112:15,17 113:2,3
113:5,12,14,16
114:3 120:13
121:6 136:12
142:13,22 159:1,1
161:18 162:2
172:4 174:1 177:1
184:5,5 186:9
189:4 190:13
205:3,9,18 211:24
213:14 215:2
220:4 233:19
234:22 235:5,16
236:19 242:17
244:1 248:11,11
249:11 256:10,12
256:17 257:12
261:6,19,22,23
262:8,9 263:12
265:8,14 270:15
275:1,12,20,24
276:2 277:23
291:8 299:2,14,16
301:3 303:24
305:24 306:5,6
questioning 38:22
187:7
questions 9:21,23
  18:11 19:12 22:15
  23:7 42:23 53:10
  61:15 67:24 71:7
  71:16 82:6 92:14
  107:3 125:14,17
  157:5,7 256:3
  257:16 266:16

270:21 273:15
286:20 302:7
305:9 306:13
quick 255:11
quickly 37:6 63:1
173:7
quite 47:13 149:9
185:12 268:1
quota 183:21
184:2,8,11,21
quotas 183:17
quotation 140:12
quote 62:6 63:9
65:19,21 79:6,11
79:18 94:20 98:18
100:11 127:2,14
128:23 133:16
134:14,15 147:23
153:11 155:17
171:2 174:5
175:14 190:24
195:8 197:14
198:11 221:3
292:17 303:4
quoted 247:18
quoting 153:10

**r**

r 2:1 6:1
rafalski 161:10
raised 157:5 209:5
ran 135:13,18
141:22 142:14
305:11
randomized 233:5
233:7,8 234:7
235:17 237:16,17
range 39:9 78:2,3
157:22
rare 35:8 43:14
95:9 96:2,17 98:7
99:3,15 185:19,21

185:21 255:1
292:12,19 295:17
295:24 296:12
rate 14:5 53:14
54:9 75:2 172:3
182:17 189:18,19
190:2,4 191:20,24
192:8 195:14
210:1
rates 52:12,15,21
53:24 54:1,5,14
70:7 171:24
172:14 189:13
212:5,6,13,19,22
reach 127:2 134:9
reached 75:6,8
read 16:16,20,24
17:3,8,12,12,20,21
19:9 23:15 35:22
39:20 45:15 50:12
54:12 69:1 89:12
89:15 112:11,16
113:4,12,17
120:13,15 127:20
133:24 144:9
146:6 148:14
153:16 210:14
218:21 229:20
240:21 241:10
244:2 267:7 284:1
307:14,24 308:8
311:5,6,12 312:5,6
312:17
reading 97:20
99:22 116:11
149:2,5 171:10
243:4 264:1 283:8
310:19
reads 127:14
144:3 218:8

**ready** 89:10
290:16
**real** 40:5,5 51:12
55:15 69:9 78:23
163:15 167:20
177:13,15 209:5
219:3 236:13
242:3 255:11
272:24
**realistic** 204:1
**realize** 25:10
**realizes** 37:7
**really** 9:10 12:16
25:23 26:7 28:6
28:20 32:5 37:8
39:11 43:24 46:22
47:13,17 49:14
55:11 57:3,15
66:22 84:6 88:22
106:16 109:20
111:24 113:8,8,9
149:7 150:10
151:3 156:23
158:23 168:6
174:2,3,12 179:2,8
186:20 187:18
199:12 208:1,4
209:20 212:14
213:1,23 223:19
226:12 238:22
244:20 272:16,18
278:10 289:1
**reason** 25:2 46:16
136:10 267:10
289:24 290:5
293:17 300:16
310:14 312:8
313:3
**reasonable** 89:4
194:22,23 210:23
219:3 234:11

235:3,8
**reasons** 27:16
**rebate** 115:11
**recall** 8:13 9:17
38:8 45:11 61:17
61:21 62:11,12
68:10 71:9,12
79:8,15 84:12
151:15 153:19,22
154:22 155:6
160:24 161:15,20
164:19 173:3
189:11 207:7
219:23,24 220:5
223:17,24 225:23
228:20 230:9
234:4 236:9
240:23 246:13
297:12
**recalling** 38:5,6
54:11 74:14 91:22
151:24 268:19
269:19,22
**receipt** 310:18
**receive** 25:18 81:2
137:4 175:20
177:9 178:17
187:17 284:12
**received** 20:12
23:9,9 25:15
102:20 128:4
131:21 147:1
165:2 215:6 216:4
216:7 228:5
247:19 251:21
252:12,18 254:1,3
254:4,7 257:6,10
257:22 280:15
297:5 299:23
**receiving** 146:4
246:24 248:1

**recess** 68:4 121:22
180:19 227:9
255:14
**recipient** 153:23
**reciprocal** 27:4
**reckless** 94:4
**recognize** 25:11
44:3 163:8
**recollection**
222:14
**recommend** 198:2
199:3,6,10 206:3,4
213:20
**recommendation**
203:3 205:3,5
220:8 224:11
240:6,10,11
**recommendations**
170:2 202:20
203:12,16,20,22
205:10,23 219:21
**recommended**
38:8,8,11
**recommending**
118:19 197:21,23
**recommends**
196:20 197:5
**record** 6:3,11 7:4
8:24 9:1,4 18:20
18:22 19:1 20:11
22:19 52:2 68:1,3
68:6 89:2,3,5
113:10 121:19,21
121:24 163:11
180:18,21 205:24
227:5,8,11 254:14
255:13,16 256:1
256:24 258:15,18
298:12,19,22
299:1 304:6
308:14 312:9

**recorded** 6:13
75:11
**recording** 6:10
**records** 47:19
57:13 58:2,6,11,17
58:22 59:6,13,23
167:5
**recreate** 226:6
**recreational**
249:18,22 250:1,4
250:5,6
**recreationally**
249:7
**reduce** 171:3
197:12 241:7,16
243:22 284:19
**reducing** 197:24
**reduction** 81:12
211:14 212:1
**reed** 2:19 7:14
**reedsmith.com**
2:24
**reevaluate** 226:5
**refer** 77:11 153:4
233:4 246:12
268:23
**reference** 63:10,24
169:6 173:1
286:17 292:6
293:9 310:7 311:2
312:2
**referenced** 5:22
5:24 301:9 311:11
312:15
**references** 125:11
173:1 230:15
**referred** 61:20
78:24 199:22
284:5
**referring** 69:3
83:4 96:9 202:2

209:9 257:5 270:13 271:3 293:23 299:13 304:21 306:19
**reflecting** 74:19
**refresh** 266:8
**refugees** 199:22
**refuse** 81:8 210:11
**refused** 214:8
**refusing** 30:3
**regarding** 36:9 147:24 160:14 187:19 252:21 280:9 282:18 285:21 286:10 297:6 299:24 303:19,24
**regardless** 53:1
**region** 76:6,13,14 77:4 165:4
**regions** 114:10
**register** 92:6 152:8
**registered** 1:22 309:18
**regular** 48:6
**regularly** 42:2 153:16
**regulating** 220:13
**regulation** 219:17
**regulations** 137:5 137:11 142:18 219:16
**regulatory** 107:6 107:13 158:11 184:1
**relapse** 290:18 291:1,9,17
**relate** 286:16 302:6

**related** 7:1 52:16 52:21 69:14 77:8 84:10 89:23 104:3 128:9 145:4 151:12 210:18 238:2 259:13 283:2 288:2 300:14 302:1 304:23 309:10
**relates** 125:15 259:21
**relationship** 76:12 77:2,2,17 91:13 220:12 221:5,12
**relative** 309:11
**relatives** 73:2
**relay** 212:15
**release** 295:3
**relevant** 16:4,6 17:20 149:8 302:21
**reliable** 75:6 78:2 163:9 192:11 195:19 222:10 247:7 248:5
**reliance** 142:1,7
**relied** 125:11
**relief** 243:13 294:24
**relieve** 72:6 196:7 264:4,15 267:1
**relieving** 71:1,2,22 72:12
**reluctant** 29:23,24 188:22,24
**rely** 23:19 38:12 39:15,21 74:9 130:7 145:4 256:16
**relying** 74:13

**remained** 36:21
**remember** 21:4,8 37:15,17,22 44:21 62:5 64:2 66:9 116:9,11 124:4 181:16 225:19 229:13,20 230:20 266:10 269:21 270:22 292:13,20
**remembered** 209:16
**remembering** 225:15
**remote** 9:9 10:20
**remotely** 6:20 7:24
**removal** 118:19,22
**remove** 119:8
**removed** 119:3 134:23
**removing** 119:15 120:18
**rems** 184:3,10 284:15,17,23 285:1,7,11,15,21 286:10
**rep** 296:13
**repeat** 30:11 220:1 275:12 292:14 306:6
**repeatedly** 169:4 262:4
**rephrase** 43:6 106:8 233:19 234:21 235:4 248:11,12 275:1
**report** 4:9 5:4 10:14,17 11:6,7 13:12 14:24 15:17 16:4,12,14,24 17:3 21:19 22:22 23:3

49:15,17 51:4 55:6 61:23,24 64:24 65:3 66:13 66:17 68:9,15,15 68:18 73:16,17,18 74:9,10 76:18 77:11 88:14,17,20 88:24 89:2,5 95:2 96:23 98:15,21 99:10,16,22 101:16 102:13 114:15 116:13,14 116:16,17 119:17 124:12,22,23 125:2,9,10 126:12 127:22 129:19 130:15 131:3 132:12 135:7,20 135:22 138:8 151:10 161:9 169:6 170:22,24 172:24 173:3 174:3 180:24 184:24 186:16 190:17,22 191:1,1 191:8,9 194:6 195:7,8,8,13,22 196:10 197:12 198:10 206:13 219:23 220:5 221:15 222:17 225:15 226:3,23 232:24 233:4 243:4 244:23 246:9,12,23 252:21 253:6,17 254:23 256:14,15 256:22 257:5,17 257:19 259:6,8,14 268:7,18 271:22 280:5,8,23 281:10

282:22 286:15,18
287:18 288:18
293:16 296:16
297:10 298:2
300:3 302:6,16,22
306:18
**reported** 67:9
193:1 195:14
217:10
**reporter** 1:23 6:23
7:23 8:16 9:14
18:18 19:9 50:8
89:11,15 112:11
112:16 113:11,17
120:11,15 237:4
241:14 242:23
252:24 258:12
309:18 311:7
**reporting** 67:4
194:2,9
**reports** 54:12 68:8
68:11 118:18
124:22 125:5
181:13,15 191:13
227:13
**represent** 20:17
22:7 78:23 130:2
195:16 205:22
256:20
**representation**
157:14 195:13
244:12
**representatives**
184:4 231:7
302:18
**representing**
258:11
**represents** 131:12
262:17 283:22
**reps** 115:6

**request** 100:3
113:13 127:16
258:2 312:9,11
**requested** 19:10
89:16 112:17
113:18 120:16
127:18
**require** 242:11
294:22
**required** 107:14
261:24 262:9
310:24
**requirement**
107:5,13
**requirements**
107:9,17 284:23
285:7,15 286:11
309:13
**requires** 43:15
**requiring** 80:10
**rereview** 222:12
**research** 42:21
62:16 76:21 77:1
157:3 183:22
**researching** 156:1
156:9
**reservation**
258:21
**reserve** 14:19
258:1
**reserving** 256:2
**residency** 26:10
34:8,18 35:14
106:19
**resident** 106:16,21
**residents** 45:2
**resources** 80:10
307:22
**respect** 259:16
**respected** 195:18
207:12

**respondents** 193:4
193:5
**response** 97:24
253:2 256:12
**responses** 91:6
**responsibility**
69:21 108:6
143:13 179:12
187:3 200:1
283:21
**responsible** 41:9
41:12,13,19,22
141:13,16,23
142:6,15,23 143:8
150:5 154:8,9
225:17
**rest** 51:15 52:10
52:13 53:12 54:10
84:24
**restate** 248:11,12
249:10
**restricting** 221:1
**result** 22:13 44:5
79:10 131:14
142:24 143:8
297:7 300:1
**resulted** 68:22
131:4 132:2
142:15
**retail** 99:19 100:4
185:7 191:15
**retain** 11:14
**retained** 116:3
159:23
**retentions** 12:5
**retiring** 80:15
**retread** 259:6
**return** 61:13 88:9
89:16 122:5
161:12 169:7
211:17 251:4

**returned** 212:19
310:18
**returning** 243:24
**review** 4:11 5:20
21:18 59:14
100:15 101:2
126:20 161:1,9
219:15 223:19,20
230:15 266:11
310:12 311:1
312:1
**reviewed** 15:16
16:2 17:24 21:2,9
22:24 30:16 36:20
37:16,17 98:12,14
98:22 100:21
104:2 115:24
122:16,18 129:16
129:19 138:8
140:7 152:1,2
160:13,16,17,21
161:5 190:3
195:15 214:1
222:4 229:21,23
243:18 269:21
285:20 294:2
**reviewing** 17:18
**revising** 27:22
201:17
**revisions** 207:3
**reward** 181:20
**rewind** 19:8
**right** 9:6,17 10:6
11:3,18 14:19
15:3,14 16:14
18:7 20:9 24:18
26:6,13 28:3,13,17
32:10 33:24 34:1
36:6 38:5 39:24
42:13 61:16 63:21
66:3 67:17 68:1

71:4 73:24 87:15
88:22 89:1,4
93:16 100:6 104:4
104:13 114:9
122:5 126:17
127:7 129:21
133:14 137:2
141:3 144:21
145:17 147:20
148:8 149:4
152:18 154:11
158:6 162:24
163:1 164:8 166:4
166:10,21 167:1,6
167:16 168:13
170:16 173:13,18
181:13 191:9
193:13 194:10,11
195:10 196:14,17
196:17 202:8
206:18 212:13,24
215:15 229:11
233:10 234:3
236:9 237:6 238:6
251:14 258:1
260:1,12,20,24
264:10 265:10
267:24 268:4,21
271:14 274:15,18
276:16,18 277:3
277:20 278:8,23
281:1,13,15
284:17,20 286:4
287:23 288:8,11
288:14 289:22
291:7 293:7,10
294:10 296:7
298:6,8 300:22
301:4 302:9,13
303:7,11 305:17
307:11

**rights** 256:2
  258:21 259:2
**rigor** 274:18
**ringtone** 252:23
**risk** 43:23 64:9
  95:8,11,20 96:16
  98:7 99:2,14
  100:17 103:7
  175:10 178:12
  182:5 210:7
  243:11,16 253:22
  265:4 284:17,18
  285:3 292:11,18
  295:4,5,11,16,23
  296:11 306:2,9
**risks** 100:16,22,23
  101:1 115:7
  153:13 179:10
  196:4 198:16
  204:4,19,22
  218:12,20 225:3
  243:23 244:20
  291:3,4 296:5
**rite** 87:14
**robe** 71:11
**rodgers** 3:3 4:3
  7:9,10 258:4,6,8
  258:19 259:4
  277:22 279:18,24
  280:3,18 297:21
  304:10 306:12
**rogers** 258:9
**role** 44:3 90:14
  95:23 103:22
  158:23 159:8,15
  160:1 167:11
  179:17 180:5,8,10
  212:14
**roman** 126:15
  128:19 129:20

**romanette** 132:13
  259:11,17 270:15
  271:22 276:9
  280:8 282:19
**room** 63:2
**root** 80:21
**rough** 195:9
  229:16
**roughly** 50:19
  191:21 193:18
  194:7 195:2
**rpr** 309:4
**rule** 22:23 23:4
**rules** 1:20 14:9
  40:1,1 62:24
  311:5 312:5
**ruling** 187:8
**run** 137:2 141:2,5
  142:24 164:8
  178:22 179:21
**running** 141:17,20
  143:9 302:2
**runs** 77:17 141:13
  142:5
**rxbulletin** 283:2,6
  284:4,9
**rxmail** 283:3,12
  284:5,9

---

**s**

**s** 2:1 4:1,6 6:1
  310:15 312:8,8
  313:3
**safe** 85:23 116:24
  163:15 220:15,18
  226:7
**safely** 117:2
**safer** 80:11 211:9
  240:15 241:24
**safety** 64:12 93:2
  102:10 104:13
  105:24 106:5,13

153:13 169:1
  204:22
**sale** 154:1 186:13
**sales** 101:10 115:5
  116:3 124:18
  142:15,23 143:8
  174:9 270:2,14
  296:13 308:6
**sample** 157:22
  236:12 251:19,20
**samples** 151:12
**san** 2:6
**sanctioned** 70:8
  70:11
**sanctioning** 117:1
**satisfied** 65:17
**saturated** 157:4
**saving** 271:6
**savings** 5:10
  271:24 272:2,4
  273:6,8,21 274:21
  275:4,9,14,22
  276:4,15,20
  277:15 279:5,8
**saw** 97:11 136:1
  156:16 262:22
  263:2 268:3
  270:11,17,18
  273:5 274:1,4
  279:5,8 281:7
  284:4 286:4 296:4
  296:20
**saying** 34:21 52:3
  115:10 134:7
  173:3 195:15
  197:9 202:24
  204:7 206:7
  258:19 264:10
  290:22 300:13
  301:10 304:3

**says** 24:22,23 25:6
  25:6 40:3 74:2
  92:23 93:8 126:23
  133:16 139:7
  143:19,21 149:1
  149:19 153:3
  195:6 197:10
  202:20 264:3,14
  264:14 265:8
  269:3,8,8 277:24
  283:18 285:24
  294:6,13 307:15
  308:3
**sb** 220:9
**scenario** 58:5,14
  58:23 59:3,4,5
  82:13,14 84:17
  254:17
**scenarios** 58:21
  59:22 60:6 183:12
**scenes** 149:10
**schedule** 120:6
**school** 26:1,16
  28:24 34:7,17
  35:13,20 36:5,9
  45:2,4 47:14
  54:22 106:22
  107:8,11 117:11
  117:12,17 169:18
  224:21 225:10
  226:6
**schools** 25:19
**schroder** 254:12
**schroeder** 252:22
  253:16 254:22
  255:5
**science** 158:5
  163:15 168:17
  172:13 175:24
  191:5 289:4,14

**scientific** 175:15
  183:21
**scientists** 195:18
**scope** 127:1
**scrambling** 20:20
**scratchy** 215:8
**screen** 92:3 136:22
**scroll** 294:1
**scrutinized** 142:20
**se** 66:12 146:19
  217:5
**seal** 91:9 311:15
  312:21
**sean** 223:8
**search** 133:13
  134:2,14
**searched** 133:6
**searches** 136:23
**second** 54:18 82:3
  88:9 89:17 92:4
  133:22 134:6
  143:15 145:10
  153:11 185:22
  228:10 271:19
  283:12 293:8
  294:10
**section** 73:18
  192:17 216:14,19
  217:4 219:9 243:1
  252:19 304:17
**sections** 17:20
  217:1
**see** 11:2 14:7 16:6
  24:11,18 34:18,21
  52:12 57:13,18
  58:2,10 65:16
  75:3 89:6 95:4,16
  97:20 100:5
  125:23 127:4
  128:12,15 131:6
  132:13,15 133:7

133:10 134:9,12
  138:19,22 139:2,9
  139:19 140:11,15
  143:18,20 148:7
  148:13 149:7,11
  152:22,23 153:8
  153:14 155:16
  164:24 165:1
  181:10 185:3
  186:1 191:18
  193:20 194:4
  200:18 204:5
  212:14 217:24
  218:3 219:10,13
  219:18 221:17
  223:21 229:5
  230:5,16 236:13
  242:24 245:8
  259:14 268:12,18
  268:22 269:2,4
  276:10 278:9,18
  278:22 280:10
  281:18 282:8,10
  283:4,7,18 286:3,9
  286:11 293:12
  294:2,7,12,13
  295:8 300:9
**seeing** 39:20 42:9
  42:12 44:14 63:1
  153:19 154:11
  156:15 202:9
**seen** 13:24 21:23
  21:24 22:3,5,5
  36:20 44:4 91:20
  109:11 127:9
  217:9 253:4 256:8
  267:22 270:9
  273:7,21 281:16
  281:17 285:19,22
**seizing** 93:11

**select** 16:1
**self** 182:4 193:1
  253:20
**sell** 103:12 104:17
**senate** 220:10
**send** 23:6 47:6,12
  47:20 148:21
**sends** 302:12
**sense** 9:15,24 10:4
  34:22 63:17 88:6
  133:19 150:23
  151:3 162:17,18
  186:14,20 265:23
**sensitive** 6:6
**sensor** 41:17
**sent** 21:22 22:1
  23:19,22,23 97:10
  97:22 131:9,11,16
  132:3,9 139:4
  143:16 144:23
  145:17 151:21
  304:23
**sentence** 133:23
  133:23 244:2,10
  267:3
**sentences** 244:13
**sentinel** 56:24
**separate** 116:2
  131:11 185:2
  199:8 220:4
**september** 1:24
  5:9 6:4 218:2
  225:7 309:16,19
  310:4
**series** 62:1 98:17
**serious** 80:3
  100:18 148:2
  153:12
**service** 4:15,16
  138:22 139:1,17
  143:16 144:15,23

145:11,13 147:9
208:24 283:12,13
**services** 152:20
283:1 299:7,13
304:22
**session** 288:2
**set** 31:23 32:2,8,10
32:14 157:17
184:8 280:14
307:21 309:13,15
**sets** 32:16
**setting** 39:11,16
44:18 65:4 66:15
243:19
**settings** 40:3 66:12
73:1
**seven** 166:10
259:8 302:5 304:9
304:14
**seventh** 95:3
286:14
**severe** 233:10
236:5,16 237:19
246:5 247:2 264:4
264:15 267:1
294:21
**shakes** 132:6
**shape** 116:18
**share** 44:6 86:6
97:12 265:1
294:14
**shared** 218:11
**sharing** 85:24
**sheer** 56:16 59:21
**sheet** 310:13 312:7
312:10,18 313:1
**shell** 150:9
**shift** 27:13 55:12
68:20 69:3 168:5
168:11,21 169:4

**ship** 45:20 46:10
46:14 169:23
170:4 212:24
213:5 214:8
**shipment** 211:14
213:22
**shipments** 76:6
160:11 214:9
**shipped** 46:16
75:10 79:11 161:6
186:24 212:23
214:6
**shipping** 108:15
108:16 213:5
**ships** 75:14
**shopping** 185:24
**short** 53:9 120:8
178:13 216:21
244:19 273:2
**shortest** 243:21
244:15
**shorthand** 12:16
309:9
**show** 24:13 91:24
95:13 127:10
152:3 202:1 228:4
235:13 261:15
268:8 305:15,20
306:1,8
**showed** 98:14
275:18 301:13
**showing** 51:5
76:21 116:1
130:21 152:18
234:1 253:18
273:8 301:6
**shown** 310:16
**shows** 77:17
136:21 253:11
287:22

**sickle** 243:6
244:24
**side** 24:19 265:3,4
267:11
**sides** 14:2,10
**sign** 40:8,11 92:19
**signals** 63:18
**signature** 94:14
308:16 309:17
310:14
**signed** 298:8
311:13 312:18
**significant** 94:22
174:7 196:4 225:3
243:9
**significantly** 75:2
171:5 197:15
234:3
**signing** 40:16,23
85:4 310:19
**signoff** 4:11
126:20
**signs** 40:20 85:2
261:15
**similar** 51:1
122:22 169:16
236:12
**simple** 40:18
43:11 55:20 81:18
182:6 261:22
262:9
**simplify** 64:22
82:20
**simply** 22:23
53:11 84:1 177:1
195:14 205:3
**simulate** 78:15
**simulated** 78:22
**sincerely** 310:21
**single** 35:19 39:13
39:21 102:19

128:14 141:19
230:21 252:13,18
252:21 253:3,9,13
254:2,3,6,7
**sir** 255:2 310:10
**sister** 25:22
**sitting** 20:4 29:10
30:5 49:19 60:5
60:10 61:8 88:16
201:18 223:17
230:21
**situation** 51:13
80:10 81:14 189:1
245:12,17
**six** 228:24 229:11
**sixth** 286:14
**size** 149:23 150:3
150:17
**skimmed** 17:9
**skimming** 17:12
**sleep** 218:19
**slightly** 235:23
266:9
**slow** 70:6,7 169:23
170:4 228:11
**slowly** 35:23 69:11
69:11 80:10
169:21 200:4
211:5
**small** 25:7 142:3
143:13 216:7
264:3
**smaller** 149:22
166:8
**smart** 28:2,6
**smith** 2:19 7:14
**snail's** 71:7
**societal** 175:5
**sold** 103:19
**sole** 283:21

**solution**  94:9
  245:21
**solutions**  310:1
  313:1
**solve**  208:14
  211:11
**somebody**  40:2
  199:20 204:17
  279:18
**somewhat**  141:20
**soon**  120:1 179:8
**sorry**  39:4 63:15
  77:7 97:4 100:6
  106:4 121:3
  135:14 143:6
  144:18 162:9
  171:8 185:12
  186:9 188:23
  189:3 202:9
  209:12,16,16
  220:1 226:24
  229:21 234:21
  235:22 237:6
  248:10,21 268:1
  268:20 279:16
  280:6 292:14
  299:16 303:8
**sort**  78:15 240:3
**sorts**  140:21
**sound**  276:16
  279:20 309:9
**source**  27:3 163:9
  230:16
**sources**  248:6
**south**  97:17
**southern**  1:1 6:18
**space**  62:9 233:4,7
  234:6 235:17,24
  236:2,3 237:16
**span**  51:3 57:19

**spans**  212:16
**speak**  9:10,12
  84:11,15 99:9
  172:1 237:4
**speaking**  64:15
  90:20 137:20
  149:3 200:7
**speaks**  65:22
**special**  258:2
**specialize**  72:21
**specific**  37:9 39:16
  54:11 55:4 56:10
  61:11 66:11 73:19
  74:1,3 76:9,13
  98:1 124:5 125:17
  129:10 151:24
  161:5 167:11
  182:19 186:6
  188:1,9 189:11,20
  202:1 203:14
  207:7 212:15
  213:1 243:1
  249:15,16 259:8
  265:11 299:19
  304:2,22 305:1,4
**specifically**  74:5
  74:14 100:24
  153:4,22 154:17
  159:16 161:4
  181:16 213:23
  217:3 234:4
  256:11 285:4,22
  300:24
**specifics**  37:18
  103:16 188:24
  230:20
**specified**  251:23
  309:6
**speculate**  190:20
  193:17 195:2

**speculation**
  189:18 190:5,7,9
  190:11,15 195:9
**sped**  76:23
**speech**  30:19
**speed**  17:20 70:5
**speedily**  97:17
**spend**  115:1
**spending**  227:24
**spent**  12:21 34:10
  79:22 127:6 156:8
  156:10 227:15,18
  230:8,12
**spinal**  245:10
**spirit**  197:11
**spoke**  66:6 227:14
**spoken**  30:17
  221:19 223:14
  241:19
**sponsored**  115:19
  115:23 116:8
  299:6
**spray**  144:5,6,7
**staff**  107:7,10,15
  107:18 231:10
**stages**  308:7
**stamp**  268:24
**stand**  70:14
  123:15 141:9
**standard**  31:7,10
  31:14,19 32:1,16
  32:20,22 33:8,16
  33:19,23 34:4,7
  37:24 66:15 93:1
  108:8,17,19 109:1
  109:4,7,14,16
  110:16,19 111:15
  112:20 234:8
**standards**  31:23
  32:8,11 49:1
  93:10 94:4 117:3

**standing**  92:14
  152:9,10,14
**stands**  92:23
  144:20,20 205:9
**stanford**  25:16,19
  25:21,22 26:1,6,13
  26:16 27:19,22,23
  28:1,3,5,8,10,15
  28:22,24 29:11,19
  45:4 106:2,19,21
  107:19 108:19
  109:2,5,8,16 111:8
  111:19 112:24
  113:20 114:20
  117:11,12,16
  123:8 162:9,9,11
  162:11,22 163:2
  163:22 166:4
  168:1 169:8,9,12
  169:18 170:1,3
  213:7 221:23
  222:9,20,23 224:7
  224:21 225:10
  226:19
**stanford's**  224:1
**start**  8:9 44:17
  45:5 259:7 307:16
**started**  36:7 43:20
  44:8,10 225:24
  248:24 300:22
  301:4,22 303:18
  303:21 304:3,4,7
**starting**  97:8
  203:23 205:15,19
  259:11 306:18
**starts**  145:8 185:1
**state**  5:2 7:3 22:18
  23:6 32:16 33:2
  53:18 64:20 66:14
  67:10 68:19 74:24
  107:6,13 116:20

116:22,23 117:2,4
117:8 119:14
120:17 125:21
164:8,13 165:4,8
165:11,11 180:2
196:19 217:22
256:5 309:1,4
311:10 312:15
**state's** 219:15
**stated** 22:22 61:18
63:23 72:24 79:10
95:12 96:1 100:11
106:11 154:4
208:19 256:6,13
256:14,23 257:4
262:4 287:17
**statement** 71:24
93:6,14,22 94:10
94:18 95:16,24
96:4,15,23 112:5
113:4 133:16,21
134:6,8 136:2
138:9 139:2
140:16 146:9,19
147:22 148:7,11
148:14 195:16
221:8 264:2,9,13
264:14 265:20
267:1 268:17
311:13,14 312:19
312:19
**statements** 55:14
96:9,10,19 104:12
129:7,10 140:20
**states** 1:1 50:18
51:15 75:3 100:1
103:20,24 105:20
118:17 119:2,8
143:17 145:19
147:23 164:12,12
183:22 184:2,22

191:12,14 192:24
193:19 194:16
195:2 196:24
198:11 203:22
204:16 205:19
213:22 219:14
231:23 238:23
243:2 275:17
301:7
**statistic** 194:7
252:6
**statistics** 195:21
247:6
**stay** 49:9 89:3
**steadily** 238:16
**step** 81:18 133:13
197:18,22 198:1
210:23
**stepped** 9:19
**steps** 204:8 222:18
**steve** 13:23 23:9
50:4 71:14 89:9
119:22 152:13
179:4 181:2 187:5
254:24 256:5
**steven** 2:12 7:6
**steward** 57:5
85:23 162:14
166:6 167:8
**stewardship** 43:16
216:21
**stigmatized**
194:20
**stock** 46:8,18
**stocking** 127:3
**stop** 50:11 80:2
99:21 170:7,7
246:10 289:21
290:16,23 291:5
**stopped** 16:19
182:1 290:1,11,17

291:17
**stopping** 67:16,21
290:13
**stories** 240:21
**story** 97:14 174:7
241:3
**strategies** 307:21
308:5
**strategy** 81:13
284:18
**street** 2:5,9,14 3:7
**strictly** 109:13
**strike** 19:2 43:6
51:18 61:19 82:4
94:1 113:13 121:7
134:24 155:2
173:21 205:8
211:12 219:16
231:3 235:4 236:3
252:8
**striking** 133:21
134:5,19
**strong** 70:13 93:20
267:4 294:20
**stronger** 198:6
**strongly** 37:20
72:24
**struggle** 209:18
**struggling** 69:20
240:22 268:16
**student** 26:8,9
106:15 224:6
**students** 26:18
27:2,5 28:10 45:2
225:2,10,17 226:9
226:14,19 261:23
**studied** 150:23
**studies** 54:8
122:10,13 171:19
172:5,9 194:23
228:17 233:12,21

234:1 236:10,11
237:21 248:2
253:17,24 254:16
275:13,16
**study** 76:3,4,8
77:7,10 230:7
234:4,8 237:17,18
246:22,23 247:7
247:17,23,24
248:17 251:19
252:3,16,22
254:12,22 255:5
275:21 276:3
282:12
**subject** 30:19 46:5
97:11
**subjects** 223:18
**sublingual** 146:1
146:22
**submit** 269:3,8
270:10
**submitted** 74:18
125:2 207:1
**subscribe** 81:10
**subscribed** 311:10
312:14 313:21
**subsequent** 77:18
**subsequently**
142:1
**substance** 134:22
165:2 182:3
215:17 218:20
**substances** 42:3
48:10 119:9,15
120:18 160:18
175:13 183:17
218:16
**substantially**
36:19
**substantively**
203:16,19

subtitle   65:24
  170:5 241:6
subtle   146:22
successful   104:20
succinct   43:4
suddenly   290:17
  290:24 291:17
sued   91:18
suffer   42:12
  182:13 241:9,18
  253:8
suffered   94:22
  249:13
suffering   178:6,10
  178:16 182:15
  206:16 220:16
  243:8
suffice   52:7
suggest   233:13,22
suggesting   191:16
  265:11,18
suggests   264:5
suicide   210:1,7,12
suite   2:21 310:2
summary   293:4
sunny   97:15
super   39:19
superior   310:1
supervision   73:13
supplemented
  116:17
supplied   74:20
supplier   283:20,22
supply   37:1,13
  76:12,22 77:3
  159:14,16 163:5
  166:4,7,9 167:9,14
  168:14 173:2,6,9
  174:14 175:14
  210:22 211:3

supplying   173:9
support   33:12
  103:10 126:15
  128:18,22 129:13
  130:16 151:7
  196:10 206:23
  240:10,11 253:5
  257:20 259:17
  264:6,20 280:13
supportable
  190:17
supports   132:21
supposed   126:18
  294:17
sure   18:3 24:13
  30:13 46:22 73:22
  84:6 88:22 92:17
  94:13 106:9
  119:19 120:13
  144:19 160:19
  178:1 179:7
  181:14 185:14
  196:16 202:3
  209:15 220:3
  234:23 240:13,15
  254:11 257:15
  261:22 265:2
  268:3,11 275:3
  285:10 292:15
  303:18
surgeries   245:11
surgery   215:7,15
  215:21 217:6
surgical   215:10
  216:2 238:9
surprised   140:6
survey   193:6
  194:6,14
surveys   192:21
surviving   243:15

suspicious   160:10
  160:14 161:2,14
  161:19,24 162:3,8
  162:20,21 180:9
swath   157:14
swimming   44:1
sworn   8:2,4 309:7
  311:10,13 312:14
  312:18 313:21
syndrome   245:15
synonymous
  31:14
system   48:4 66:2
  78:19 155:21
  161:15,19,24
  162:4,6,8,22 163:2
  163:17,22 164:2
  165:15 166:4
  178:20 201:12,14
  218:18 293:24
systemic   178:23
  245:24 246:2
systems   161:3
  162:20

**t**

t   2:7 4:1,1,6
t1   4:14
ta   26:8
tablets   146:1,22
  153:3
tacit   134:19
take   54:3 67:14,15
  74:15 88:23 89:6
  97:19 101:4
  119:20,22 121:18
  124:9 125:19
  126:5 145:2
  154:10 179:4,7
  180:15 182:13
  192:14 195:9
  197:18 200:1,18

210:23 214:17,23
  215:9,21 216:11
  216:15 217:19
  219:8 222:18
  224:5 227:3
  228:13 237:5
  241:1 255:8 278:1
  289:11,16,17
  290:22 295:4
  297:18 300:6
  306:17 307:2,9
taken   1:19 6:13
  61:20 62:13 68:4
  121:22 133:12
  160:22 180:19
  215:3,5 227:9
  255:14 309:5,9,11
takes   57:3,5 183:2
  194:2
talk   15:12 34:6,7,8
  37:23 38:11 48:5
  48:12,18 49:16,18
  56:5 80:21 83:15
  101:9 120:12
  137:14 150:16
  159:12 163:10,11
  163:12 189:13
  222:16 223:2
  244:17 247:9
  271:7 286:15
  299:8
talked   18:5 23:10
  45:8,10 54:15
  56:4 61:14 79:5
  115:13 125:5
  151:14 174:16
  302:4 305:9
talking   12:16
  15:13 21:21 40:19
  43:20 44:8,11,17
  45:3,5 56:18

82:14 95:18,20,22
96:9 109:13 112:8
115:20 142:13
162:21,22 197:20
199:13 205:14
211:23 231:13
237:2,2 238:23
249:6 251:5,6,17
270:12 286:2
293:10 296:6
301:8
**talks** 191:9
**taper** 80:11 211:8
214:14,14 240:14
241:24 242:5
**tapered** 211:4
**target** 231:9
**targeted** 307:20
**targeting** 308:5
**targets** 303:14
**task** 225:14,20
226:4,5
**taught** 27:7,10
33:10 36:9 54:22
224:20 225:11
226:20
**teach** 26:17,22
34:21 123:8,13
224:7,22 261:22
**teacher** 26:12
**teaches** 213:6
**teaching** 26:5,7,9
44:24 45:2 162:13
225:1
**team** 20:18 120:8
**technically** 40:15
**techniques** 300:6
301:11
**tell** 24:12,15 45:23
46:11 48:2 54:12
73:21 77:23 84:19

85:5,17 86:13
97:6 143:3 149:17
166:21 184:7
193:4 215:12
273:22 274:21
275:3
**telling** 19:16 167:4
**tells** 115:8 163:7
**ten** 47:18 67:14
164:21,22 272:2
**tens** 205:11 208:13
**tenth** 3:7
**term** 31:7 33:19
34:5,8 68:9,13
78:4 110:17
136:17 137:15
146:12,14,17
147:11 160:10
178:13,14 196:20
197:6 198:2,7
233:8 234:6
244:19 245:16,17
246:14 250:23
273:2
**terminated** 300:17
300:19
**terminating** 290:3
**terms** 33:21 93:4,5
108:15 180:10
186:3 231:1
235:24
**terrible** 210:15
**test** 234:8
**testified** 8:4 84:7
108:10 161:13,23
184:3 212:20
270:24 292:9,15
296:18 300:22
303:18
**testify** 184:10
257:19 271:9

**testimony** 8:12
13:13,15 18:6,10
18:12 19:11,13
20:6 68:15 79:4
79:15 84:13 92:8
152:12 201:10
256:16 257:11
273:20 295:18
303:19 304:10
309:8 311:6,7
312:6,9,12
**teva** 99:17,17
102:2 125:22,22
127:15,18,23
128:5 129:20
282:18 283:19,21
283:22 306:19,23
**teva's** 100:3
**text** 24:23 144:3
**thank** 12:20 13:9
25:14 49:8 54:15
63:3 100:6 130:6
143:20 181:4
242:9 255:6 258:6
259:16 267:9,22
269:5 271:18
276:8 289:18
302:4 305:19
306:12 308:11,11
**thanks** 92:20
**theft** 185:6,7,11,14
185:15,18
**theme** 159:13
**themes** 157:3
**theophylline**
139:18
**theory** 246:16
**therapeutic** 292:3
**therapies** 205:4,16
**therapy** 146:5
148:4 196:21

197:6 198:2,7,12
198:13,14 202:21
203:23 204:2,9
205:4,15,20
206:10 218:11
220:19 245:17
**thermal** 293:24
**thing** 10:19 28:13
28:17 38:24 40:1
46:1 65:15 70:19
80:18 119:17
130:15 139:7
142:4 157:20
166:2 173:18
206:2 263:24
264:23,24 265:7
272:12,21 291:7
294:1
**things** 25:5 26:3
41:17 56:23,24
57:10 66:21 78:20
85:9,11,14,19,21
112:9 115:5 149:9
150:17 163:19
176:21,22 190:21
199:8 285:10
288:3
**think** 12:6 17:19
18:10 19:4,11
27:5 28:15 29:5
33:18,20 36:18
43:3 44:1 45:1
49:8 52:3 53:8
55:16 58:14 59:3
59:6,19 60:2,3,5,6
60:8,10 63:15,18
64:23 65:5 72:18
72:24 76:8 82:20
84:18 88:21 89:13
92:7 97:23 100:14
100:18 105:7,10

108:2,5 109:10,20
121:8 130:14,23
134:5,18 136:19
141:16,18,19
142:9,18 143:12
146:19 149:5,8,11
149:15 154:4
155:2 159:11
160:18 163:18,19
169:11 174:1,2
179:17 187:2,11
190:9,13 194:19
195:12 199:23
200:23 201:12
203:19 204:12
205:2,10,17 206:4
208:1,3,5,7 210:15
210:19 211:16,18
211:21 212:5,17
213:2,23 214:22
217:3,15,16 219:3
221:11,12 222:8
222:24 224:15,16
224:19 226:12
227:22 229:7,10
229:15,22 232:5,6
234:14,14 235:5
235:12,15,23
238:3,21 240:2,3
244:1,10 245:23
246:22 248:5
253:11 256:6
257:24 261:19
263:16 264:2
265:4,17,23
274:11 278:5
279:18,22 280:14
284:22 285:2,6
287:1 293:9
299:16 302:20
303:6,21 304:8,10

**thinking**  69:8,12
69:13 169:24
**thinks**  168:7
**third**  18:5 56:5
85:19 127:7,14
132:11 166:18
178:24 179:18
186:7,13,22 202:5
218:7 219:14
267:10 276:8
307:13
**thirty**  310:18
**thorough**  156:5
**thought**  16:6 26:2
33:6,20 209:13
213:24 214:5
303:20
**thousands**  104:3
156:8 213:8
**threat**  42:11 64:11
**threatening**  80:3
246:6
**three**  15:8,14 18:9
18:12 19:10,13
79:22,23 88:1
135:19 138:7,13
144:11 185:2
186:15 200:24
203:4 230:12
231:15 238:16
247:12,18 254:19
264:5,7,11,15,19
264:19 265:22
266:1 267:2 283:6
305:9
**time**  8:24 9:3
11:16 18:6,21,24
21:1,10 23:15
27:8 30:2 33:5,14
34:10 36:18 39:20
44:7 48:15,16

50:23 51:3,10,11
57:6 62:8 68:2,5
80:24 82:6 84:11
89:4 106:10,24
107:23 108:9
115:2 120:7
121:20,23 133:9
155:10,24 156:11
159:23 165:3
172:17 180:17,20
181:22 214:23
216:1 223:13
224:17 225:21
227:7,10 228:23
229:21 240:14
243:16,21 244:15
255:12,15 258:3
258:14,17 261:23
262:7 265:6 271:8
275:2 297:16
298:21,24 308:11
308:13 309:6
**times**  5:6 21:9
50:21 113:23
124:6 149:21
169:7 173:1
174:16 216:3
223:2 229:9 241:3
274:22 275:3
**title**  101:21 169:10
202:10,14,18
**titled**  202:6,11
241:5
**tive**  169:22
**today**  7:7,11 8:17
10:7,21 12:24
13:16 20:4 23:18
29:10 30:5,9 35:5
36:12 48:12 49:19
60:6,10 61:9
80:23 84:7 88:16

91:5 125:17
169:17 184:22
199:1,15 201:18
210:22 211:14
212:2,23 213:10
217:1,13,14,15
223:17 225:6
230:21 237:24
238:9,13 240:20
270:20 292:9,15
296:7 306:24
**today's**  68:19
178:20 214:9,19
**token**  75:22
**told**  10:4 33:3 46:7
63:9,13,16,17
**tolerant**  146:4
**tolerate**  295:2
**tomkiewicz**  97:9
**tomorrow**  214:8
214:12,24
**tool**  165:21,24
171:1 197:3,5,9,11
284:17
**tooth**  239:3
**top**  52:4 126:23
138:21 143:18
147:10 283:13
300:3
**topic**  251:5
**total**  13:6,19 49:22
127:6 191:16
**totally**  67:6
**touted**  32:24
**track**  11:21 78:9
150:11
**trailing**  18:17
**train**  209:13
**trained**  73:14
107:20 108:20
109:2,8,17 111:8

111:19 112:24
113:20
**trainees** 226:14
**training** 34:19
35:14 47:14 62:19
73:4 107:15 270:2
295:10
**transcribed** 309:9
311:7
**transcript** 4:7
309:8,12 310:11
310:12 311:5,12
312:5,11,17
**transcripts** 17:2,5
17:24 19:21,23,24
160:22
**transdermal** 5:8
276:16
**transfer** 186:13
**transmission**
18:19
**transmitting**
44:18
**trapped** 155:21
**treat** 35:7,17 37:1
37:13 70:3,5
140:4 196:1,6
198:21 201:23
224:8 243:20,21
244:14,15 277:2,7
277:9,12 295:1
**treated** 253:19
265:19
**treating** 60:19,23
61:4 81:20 233:14
233:23 234:13,18
235:10,15
**treatment** 36:10
39:16 50:1 81:15
81:15 82:22,23
103:9 111:2,18

112:23 113:19
118:20,22 119:3
119:10,16 120:19
121:10,15 171:4
196:3 197:13,21
201:3 203:24
206:5 215:10
216:18 224:23
225:11 226:1,21
233:9,23 236:5,16
236:23 237:1,11
237:19 239:10
240:19 242:12
243:5,14 244:8,18
245:1 260:11,19
261:9 263:18,21
264:7,18 265:12
289:20 290:16,23
291:15 294:22
297:7 300:1
**treatments** 234:13
234:17,19 237:14
240:17 294:23
**trees** 192:18
**trial** 23:18 233:5,7
233:9 234:6,7
235:17 236:1,2,3
237:17,18 256:21
257:8
**trick** 261:21
277:23
**tried** 156:7 157:22
168:6 190:17,20
190:20
**tries** 78:8
**trouble** 38:21
217:11
**truck** 97:16
**trucks** 128:23
**true** 55:9,20 75:17
76:1 129:22 130:8

133:23 134:10,16
135:19 147:17
148:21 176:23
190:22 195:20
201:22 204:24
217:14,15 226:18
242:5 262:17
301:2,5 309:7
**trusted** 62:9 63:3
**truth** 19:16 167:5
236:22
**truthful** 18:16
137:5,8 161:22
162:1 262:15
**truthfully** 47:22
**try** 9:11 10:1,19
19:3 25:8 32:2
46:2,15 48:18
55:19 78:20 80:2
101:17 110:21
156:5 157:10
163:6 169:15
197:22 202:24
217:17 262:7
**trying** 14:8,9
20:20 28:13,17
37:15 39:24 48:1
53:22 58:8 78:16
108:3 169:2
211:10 261:21
262:16 275:24
282:4
**tuesday** 187:9
**tune** 97:13
**turn** 6:7 34:14
73:15 127:13
132:17 143:14
168:16 180:24
193:11 259:5
280:7 286:6,14
294:9 297:22

**turning** 169:23
170:4 296:23
**tv** 140:23
**twelfth** 2:14
**twice** 18:2 51:8,14
**two** 10:9 18:4 56:2
59:19,22 60:2
67:15 69:23 72:2
72:7,10 79:23
124:22 126:10
149:6 153:4 166:3
199:8 236:24
248:18,21,23
252:11 286:1
**twyla** 1:22 6:23
9:14 309:4,18
**type** 42:13 78:14
133:13 186:22
230:4 263:12
265:8 272:17
293:3
**types** 26:3 59:10
78:21 85:6 169:16
177:8 178:1
236:12 265:19
**typically** 76:1
84:15 99:20,21
147:4 164:9 165:4
177:22
**typo** 25:3,7,12
**tysons** 2:20

| u |
| --- |

**u.s.** 6:17
**uh** 126:24 129:6
237:15
**ultimate** 84:23
**ultimately** 41:13
41:18
**unable** 186:24
**uncover** 303:1

**undergraduate**
  25:23
**underlined**  278:16
  294:5
**underlying**  146:5
**underpinning**
  193:15
**underprescribing**
  199:24
**underreport**
  194:20
**understand**  8:18
  9:22 12:18 14:9
  15:1,4,10,13,15,23
  20:21 22:16,17
  44:10 46:15 52:14
  102:13 122:2
  139:4 149:12
  189:14 258:23
  259:1 260:3 261:5
  268:1,16 272:8
  276:23 277:14
  283:9 285:13
  294:16,18 299:12
**understandably**
  188:22,23
**understanding**
  14:6 34:4 38:22
  72:20 86:20 87:9
  106:9 108:18
  109:1,4 145:16
  147:7,8 157:11,24
  185:18 192:10
  197:4 210:6
  218:13 224:17
  227:20 281:5
  283:14
**understands**  149:2
**understated**  115:7
  296:4

**understood**  10:3
  18:17 19:16 65:10
  96:21 108:8,9
  304:20
**undertaken**  161:1
**underway**  303:23
**unethical**  66:18,21
  67:3,7
**unfortunately**
  91:23 203:8
  245:14 278:21
**unhelpful**  157:21
**uninterrupted**
  175:14
**unique**  79:20
**unit**  6:12
**united**  1:1 50:18
  51:15 75:3 103:20
  103:24 105:20
  183:22 184:2,22
  191:14 193:19
  194:16 213:22
  231:23 238:23
**units**  191:15,17
  192:5
**universe**  78:16,22
  247:10
**university**  123:3
  224:21 225:10
  226:19
**unlawful**  56:6,7
  56:13,20
**unmatched**  307:18
**unnecessarily**
  220:12
**unquote**  65:19,20
  98:18 128:23
  197:16 303:5
**untrue**  144:16
  146:8 147:15
  148:11,13

**update**  139:1
**upstream**  44:1
  187:2
**urging**  37:20
**usage**  284:19
**use**  5:2 12:16 36:9
  38:12 47:1 66:3
  70:3 72:3,6 73:9
  73:13 80:19 103:9
  110:18,20 121:15
  146:10,12,16
  147:11,13 156:21
  170:11 171:3,5
  182:3,15 193:6
  197:6,13,15,24
  198:7 199:2,5
  201:20 203:12
  207:4 209:8
  217:23 218:14,20
  240:6,8 243:1,11
  243:23 244:18
  247:2,5 248:8,14
  248:22 249:7,9,13
  249:14 250:4,5,8
  250:23 251:7,13
  252:7,10 253:9,13
  253:19,21 254:9
  254:14,17 257:7
  264:6 265:24
  305:21
**useful**  59:7 240:1
**users**  248:19,24
  249:3,3,17,21,24
  251:1,2 305:16
**uses**  147:12
**usually**  46:24
**utilize**  197:18

                    **v**

**v**  1:5 280:8 310:6
  311:3 312:3

**va**  196:18 198:1,6
  200:16 201:2,12
  201:14,20 207:20
**vague**  53:17,18
  109:19 233:16
**valuable**  165:21
  165:24
**value**  25:1 78:2
**values**  24:21
**variable**  78:10
**variables**  78:8,17
  213:3
**variably**  246:3
**varies**  165:11
  238:23
**various**  37:15
  78:20 150:9
  158:11 168:8
**vast**  55:9 104:6,6
  196:2,9 208:6
  254:5
**venue**  143:4
**veritext**  6:22,23
  310:1,7 313:1
**veritext.com.**
  310:17
**version**  12:13
  183:3,6
**versus**  53:12,15
  178:17 180:6
  237:18
**vet**  141:19
**veteran**  196:12
  201:7
**vice**  152:21
**video**  6:10,12
  309:5,8
**videoconference**
  1:18
**videographer**  3:16
  6:2,22 7:22 8:21

9:3 18:21,24 68:2
68:5 121:20,23
180:17,20 227:7
227:10 255:12,15
258:14,17 297:17
298:21,24 308:13
**videotaped**   1:18
**view**   28:8 29:19
35:9,11,12,14,16
35:18 37:12 43:18
51:19,24 55:24
58:16 70:10,14
72:14,18 114:12
141:14 142:23
150:6 168:11,14
179:11 180:5
196:5 223:24
234:16
**viewed**   157:15
223:21
**viewing**   224:4
**views**   35:1,2 36:18
223:16
**vigor**   93:12
**vii**   132:14
**violating**   64:19
**violation**   137:5
**virginia**   1:1,20 2:9
2:22 5:2 6:18 10:8
11:14 12:13,18,22
13:3,11 15:20
16:2,14 30:24
31:5 37:11,16
38:2,9 39:7 48:18
48:21 49:24 50:24
51:2,7 68:9,14
75:2,10,15 77:14
87:20 88:3,13
89:20 90:9,15,19
102:7,12 119:6,14
120:17 131:24

136:1 164:6,14
165:6,10,13,14
171:1,13,14,17,22
172:8 197:3,5
217:22 218:24
219:4 220:8 273:9
273:23 274:13,21
274:23 309:1,13
**virtually**   1:22
**visit**   25:24 148:6
148:20
**visited**   232:4
**visiting**   232:7,9,13
232:16,20
**vocal**   27:5 215:7
**voice**   215:8
**vole**   247:23
**volume**   56:16
58:24 59:21
174:12 210:17
**volumes**   57:8,9,16
57:17
**voluminous**
206:23
**voluntarily**   215:12
**voucher**   5:7
259:21 260:4
262:22 263:2,4,8
263:11,24 267:24
268:4,9 269:8,15
269:16 270:5,12
**vowels**   246:22,23
247:3 252:3
**vs**   1:12 4:10 6:14
6:16

| w |
| --- |

**waited**   255:3
**waived**   308:16
310:19
**walgreens**   87:14

**walk**   24:14 259:7
**walmart**   87:14
**want**   18:3 20:10
22:12 29:4 30:12
36:15 39:5 46:4
48:18 49:14 53:7
54:18 57:20,21
61:13 62:10 63:4
63:9,24 64:5,19
65:3 67:13,20
84:5 119:18,22
122:5,7 124:11
126:1 138:11
155:16 156:17,19
161:12 174:9
179:11 187:12
209:15 213:1
215:13 219:20
222:12 223:15,19
230:2 231:13
232:23 244:12
245:19 251:4,16
254:11,24 255:10
256:24 257:1
258:11 259:5,7
262:14 263:15
278:10 283:16
286:14,19 289:21
290:4,8,10
**wanted**   16:6 39:3
47:15 71:5 100:10
157:13,14 189:17
190:1 255:18
258:20
**wants**   82:6
**warn**   188:18
**warning**   4:17
147:24 148:12,15
151:22 152:19
153:1 154:14,19
154:24 155:3

188:21 267:13
278:14,22 279:1
294:7
**warns**   295:11
**warranted**   290:13
**warrants**   283:22
**washington**   2:14
3:8
**way**   8:22 14:8
18:13 19:14 22:21
25:20 31:12 37:10
43:21 50:17 52:8
53:21 70:2 71:10
71:15 72:1 75:8
81:2 84:18 110:14
116:18 117:1
122:19 130:22
134:11 150:17
162:2 168:3
184:21 187:20
188:21 189:19
200:5 204:24
225:1,10 227:22
236:19 239:5
266:12 270:8
276:1 278:11
286:24 287:9,12
**ways**   130:14 185:2
210:20
**we've**   10:19 30:10
38:1 44:4 56:2,2,3
67:12 129:24
130:1 179:5 200:2
200:7 207:18
227:2 235:5
256:13 297:19
**website**   100:12
148:19,22 150:6
280:24
**week**   8:12 9:18
21:7 72:7 79:5

161:17,22 229:22
**weekly** 138:24
**weeks** 69:23 72:2
72:11 73:12
**weigh** 49:14
178:11 239:16,18
**weighing** 178:15
178:16,19 179:10
291:3
**weight** 91:11
**weimer** 2:18 7:13
7:14
**welcome** 122:2
180:23 308:12
**welfare** 64:8
**went** 39:23 41:16
45:21 47:13,16,17
147:5 155:20
236:11 237:22
275:18 288:16
293:6
**west** 1:1,20 2:9 5:2
6:18 10:8 11:14
12:13,18,22 13:3
13:11 15:20 16:2
16:14 30:24 31:5
37:11,16 38:2,9
39:7 48:18,21
49:24 50:24 51:2
51:7 68:9,14 75:2
75:10,15 77:14
87:20 88:3,13
89:20 90:9,15,19
102:7,12 119:6,14
120:2,17 131:24
136:1 164:6,14
165:6,10,13,14
171:1,13,14,17,22
172:8 197:3,5
217:22 218:24
219:4 220:8 273:9

273:23 274:13,21
274:23 309:1,13
**whereof** 309:15
**whispering** 6:6
**wide** 169:12
**wider** 254:2
**widespread** 93:1
93:19
**wildly** 104:20
**wilkes** 187:8 258:2
**willful** 105:10,17
**williams** 2:13 7:6
7:8
**willing** 29:18
120:8
**wise** 163:13
**wit** 309:2
**withdrawal** 80:4
181:24
**witness** 8:2 18:19
19:22 22:24 23:7
50:7 71:18 111:21
134:24 155:11
212:4 255:10,18
256:3,7 257:11
309:6,15 310:8,11
311:1,4,11 312:1,4
312:15
**witness's** 98:15
120:6
**witnesses** 17:6
160:22 256:7
**witness'** 310:14
**woke** 35:23
**woman** 62:18 63:6
63:20
**women** 216:14
**wonder** 36:8
**wondering** 157:15
266:3

**word** 16:20 17:8
68:11 74:15 134:2
134:14,17 136:4
137:1,19 181:12
200:18 278:1
**words** 24:16 37:24
148:9 181:18
185:13 205:1
237:5 268:22
275:11 278:5
279:16 280:6
**work** 9:10 10:7,20
12:22 13:11,20
17:23 26:20 43:12
43:18 44:9,11
45:6 96:20 167:4
169:16 181:20
208:4 231:9
**workday** 57:20
**worked** 13:3 28:2
29:1 73:1 98:2,5
135:21 269:14
**working** 11:17
12:3 40:14 52:15
52:22 62:20 65:6
66:7,8 84:9 88:7
130:14 169:15
226:17 232:2
**workplace** 66:21
**works** 34:20 96:16
236:23
**world** 34:11,12
40:5,6 78:23
118:8,9,13 211:20
236:13
**worse** 5:7 174:8
241:5
**worsen** 218:15
**worth** 209:5
**worthy** 175:16

**write** 36:15 40:7
40:11 41:5,15
47:5,9 48:4 181:7
**writing** 48:12
86:15 156:1,9
157:23 260:19
261:9 262:1,10
**written** 51:6 54:20
55:22,22,23 56:20
57:1 58:3,24
60:18,19,22,23
61:3,4 69:7 75:23
84:16 86:14 94:11
97:12 104:7 115:3
183:24 184:6
187:23 188:2
238:1,9,13,19
239:2 260:8
**wrong** 139:11,14
173:5,10 242:7
**wrongfully** 153:24
**wrote** 55:7 95:6
155:17 222:22
242:17 278:11
**wrought** 182:8
214:3
**www.abstral.com.**
148:6,20

| x |
| --- |
**x** 4:6

| y |
| --- |
**yeah** 28:5 29:4
52:3 88:21 98:4
111:22 120:1
125:20 149:21
152:10 154:4
169:20 178:9
179:17 192:22
193:24 200:24
202:10 203:8

| 209:16 221:2 | **z** |
|---|---|
| 222:8 229:7 253:1 | **zealous** 94:7 |
| 264:23 291:10 | **zoom** 1:22 2:2 |
| **year** 36:7 44:23 | 6:21 229:5 309:5 |
| 174:7 183:18 | 309:8 |
| 225:15 229:3 | |
| 234:10 235:2,7 | |
| 236:11,14 251:22 | |
| 252:13 254:15,19 | |
| 254:22 | |
| **years** 26:13 27:14 | |
| 27:21 28:1,22 | |
| 35:10,18 36:4,11 | |
| 44:1 47:18 81:21 | |
| 82:9 106:22 146:3 | |
| 154:6 156:4,4 | |
| 160:5 164:21,21 | |
| 164:22 171:18 | |
| 184:16,17,18,19 | |
| 184:20 191:13 | |
| 200:24 201:1 | |
| 203:4 214:22 | |
| 229:7 234:15,16 | |
| 238:20,21 246:11 | |
| 254:19 | |
| **yep** 153:15 173:15 | |
| **yesterday** 21:5 | |
| 25:13 98:12,14,22 | |
| 280:15 293:19 | |
| **york** 5:6 8:11,12 | |
| 11:24 14:24 15:21 | |
| 20:6,7 45:17 | |
| 68:16 79:4 87:17 | |
| 119:3 124:23 | |
| 125:2 161:13,17 | |
| 181:13 241:3 | |
| 246:17 | |
| **young** 26:4 62:18 | |
| 80:14 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.