# EXHIBIT G

Exhibit G – SEALED excerpts of Plaintiffs' Expert Witness K. Keyes
Transcript of Deposition (Sept. 15, 2020)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE MARKETING
OPINIONS OF DRS. ANNA LEMBKE, KATHERINE KEYES, ANDREW KOLODNY, AND JAKKI
MOHR

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2

3

     * * * * * * * * * * * * * * * * * * * * * * *
4

   THE CITY OF HUNTINGTON,
5

              Plaintiff,
6

   vs.                                CIVIL ACTION
7                                   NO. 3:17-01362

   AMERISOURCEBERGEN DRUG
8  CORPORATION, et al.,
9             Defendants.
10 _____
11 CABELL COUNTY COMMISSION,
12            Plaintiff,
13 vs.                                CIVIL ACTION
                                    NO. 3:17-01665
14 AMERISOURCEBERGEN DRUG
   CORPORATION, et al.,
15

              Defendants.
16

     * * * * * * * * * * * * * * * * * * * * * * *
17

18

19        Videotaped and videoconference deposition
   of KATHERINE KEYES taken by the Defendants under
20 the Federal Rules of Civil Procedure in the above-
   entitled action, pursuant to notice, before Teresa
21 S. Evans, a Registered Merit Reporter, all parties
   located remotely, on the 15th day of September,
22 2020.

23

24

Page 2

```
 1                    APPEARANCES:
 2
    APPEARING FOR THE PLAINTIFFS:
 3
            Don Arbitblit, Esquire
 4          Paulina do Amaral, Esquire
            Britt Cibulka, Esquire
 5          Kelly McNabb, Esquire
            LIEFF CABRASER HEIMAN & BERNSTEIN
 6          250 Hudson Street
            8th Floor
 7          New York, NY  10013-1413
 8          Christina Smith, Esquire
            POWELL & MAJESTRO
 9          405 Capitol Street, Suite P1200
            Charleston, WV  25301
10
11  APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
12          Carl Metz, Esquire
            WILLIAMS & CONNOLLY
13          725 Twelfth Street, N.W.
            Washington, DC 20005
14
            Steven R. Ruby, Esquire
15          Raymond S. Franks, II, Esquire
            CAREY, DOUGLAS, KESSLER & RUBY
16          901 Chase Tower
            707 Virginia Street, East
17          Charleston, WV  25323
18
    APPEARING FOR THE DEFENDANT AMERISOURCEBERGEN:
19
            Molly Campbell, Esquire
20          REED SMITH
            Three Logan Square
21          1717 Arch Street, Suite 3100
            Philadelphia, PA, 19103
22
23
24
```

Page 3

1              APPEARANCES (Contd.):

2

    APPEARING FOR THE DEFENDANT McKESSON CORPORATION:

3

           Tim Hester, Esquire
4          Stephen Petkis, Esquire
           Paul Schmidt, Esquire
5          COVINGTON & BURLING
           One City Center
6          850 Tenth Street NW
           Washington, DC  20001

7

8   ALSO PRESENT:
9           Adam Hager, Videographer
            Justin Taylor, Esquire
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                    EXAMINATION INDEX

2

3        BY MR. HESTER                                    9

4        BY MR. METZ                                    304

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    EXHIBIT INDEX
2
3                                                    MAR
    Exhibit 2    Expert Report of Katherine        10
4                Keyes, PhD dated August 3, 2020
5   Exhibit 4    CDC Guideline for Prescribing     134
                 Opioids for Chronic Pain -
6                United States, 2016
7   Exhibit 9    "Opioid Abuse in Chronic Pain -   102
                 Misconceptions and Mitigation
8                Strategies" by Volkow and
                 McLellan dated 3-31-16
9
    Exhibit 10   "The Role of Opioid               47
10               Prescription in Incident Opioid
                 Abuse and Dependence Among
11               Individuals With Chronic
                 Noncancer Pain" by Edlund, et
12               al. dated July 2014
13  Exhibit 18   "Rates of opioid misuse, abuse,   20
                 and addiction in chronic pain:
14               A systematic review and data
                 synthesis" by Vowles, et al.
15               dated April 2015
16  Exhibit 27   "Increased use of heroin as an    217
                 initiating opioid of abuse" by
17               Cicero, et al. dated 2017
18  Exhibit 28   "Relationship between Nonmedial   223
                 Prescription-Opioid Use and
19               Heroin Use" by Compton, et al.
                 dated 1-14-16
20
    Exhibit 34   "Association of Nonmedical Pain   209
21               Reliever Use and Initiation of
                 Heroin Use in the United
22               States" by Muhuri, et al. dated
                 August 2013
23
24

Page 6

1                    EXHIBIT INDEX (Contd.)
2

    Exhibit 37  "Psychoactive substance use        208
3                prior to the development of
                 iatrogenic opioid abuse:   A
4                descriptive analysis of
                 treatment-seeking opioid
5                abusers" by Cicero, et al.
                 dated 2017
6

    Exhibit 46  "A prospective study of             99
7                nonmedical use of prescription
                 opioids during adolescence and
8                subsequent use disorder
                 symptoms in early midlife" by
9                McCabe, et al. dated 1-1-19

10  Exhibit 86  "Underlying Factors in Drug         324
                 Overdose Deaths" by Dowell, et
11               al. dated 12-19-17

12  Exhibit 96  "The Comparative Safety of          287
                 Analgesics in Older Adults With
13               Arthritis" by Solomon, et al.
                 dated Dec. 13/27, 2010
14

    Exhibit 98  "The Prescription Opioid and         38
15               Heroin Crisis: A Public Health
                 Approach to an Epidemic of
16               Addition" by Kolodny, et al.
                 dated 1-12-15
17

    Exhibit 104 "Opioids - CT2 (WV) - Dr.           12
18               Katherine Keyes Expert Report,
                 Errata Sheet (August 24, 2020)
19

    Exhibit 106 "Understanding the Rural-Urban      41
20               Differences in Nonmedical
                 Prescription Opioid Use and
21               Abuse in the United States" by
                 Keyes, et al. dated February
22               2014
23
24

Page 7

1               EXHIBIT INDEX (Contd.)

2

Exhibit 108  "Prescription opioid use           288

3                disorder and heroin use among

                 youth nonmedical prescription

4                opioid users from 2002 to 2014"

                 by Martins, et al. dated 2-1-18

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 8

1               P R O C E E D I N G S

2               VIDEO OPERATOR:  Good morning.  We are

3      going on the record at 8:59 a.m. on September the

4      15th, 2020.  Please note that microphones are

5      sensitive and may pick up whispering, private

6      conversations and cellular interference.  Please

7      turn off all cell phones or place them away from

8      the microphones as they can interfere with the

9      deposition audio.

10              Audio and video recording will continue

11     to take place unless all parties agree to go off

12     the record.  This is Media Unit 1 of the video

13     recorded deposition of Katherine Keyes taken by

14     counsel for the defendant in the matter of City of

15     Huntington and Cabell County Commission versus

16     AmerisourceBergen Drug Corporation, et al, filed in

17     the United States District Court for the Southern

18     District of West Virginia, being Civil Action Nos.

19     3:17-01362 and 3:17-01665.

20              This deposition is being conducted

21     remotely via Zoom conferencing.  My name is Adam

22     Hager from the firm Veritext, and I'm the

23     videographer.  The court reporter is Teresa Evans

24     from the firm Veritext.

Page 9

1              I'm not authorized to administer an

2    oath; I am not related to any party in this action;

3    nor am I financially interested in the outcome.

4              Counsel and all present in the room and

5    everyone attending remotely will now state their

6    appearances and affiliations for the record.

7              If there are any objections to

8    proceeding, please state them at the time of your

9    appearance, beginning with the noticing attorney.

10             MR. HESTER:  This is Tim Hester,

11   counsel for Defendant McKesson of the law firm of

12   Covington & Burling, and with me on the video is my

13   colleague, Stephen Petkis.

14             MR. ARBITBLIT:  This is Don Arbitblit

15   with Paulina do Amaral and Britt Cibulka, Lieff

16   Cabraser Heiman & Bernstein, for the Plaintiffs.

17             MS. CAMPBELL:  Molly Campbell from

18   Reed Smith on behalf of AmerisourceBergen.

19             MR. METZ:  Carl Metz, Williams &

20   Connolly, on behalf of Cardinal Health.

21             MS. SMITH:  Christina Smith, Powell &

22   Majestro, on behalf of the Plaintiffs.

23             VIDEO OPERATOR:  If there are no

24   further appearances to be noted, would the court

```
 1    reporter please swear the witness.

 2              (The witness was sworn.)

 3            K A T H E R I N E    K E Y E S

 4    was called as a witness by the Defendant, and

 5    having been first duly sworn, testified as follows:

 6                         EXAMINATION

 7    BY MR. HESTER:

 8       Q.   Good morning, Doctor Keyes.  My name is Tim

 9    Hester, and I'll be taking your deposition today.

10    Since this is a Zoom deposition, let me just begin

11    by setting the stage.  Where are you right now?

12       A.   I am in the law offices of Lieff Cabraser

13    in New York.

14       Q.   Is there anyone else with you in the room?

15       A.   Yes.

16       Q.   Who else is with you in the room?

17       A.   Paulina do Amaral.

18       Q.   And do you have a box that we -- that we

19    sent to you?  Is that box there somewhere in the

20    room with you?

21       A.   Yes.

22       Q.   And are there any other papers that you're

23    going to be consulting aside from papers that we'll

24    ask you to open up out of that box?
```

Page 11

1     A.   No.

2     Q.   Okay.  Let me ask you, if you could, open

3  up the box and let's have you pull out Exhibit 2,

4  please.

5          KEYES DEPOSITION EXHIBIT NO. 2

6            (Expert Report of Katherine Keyes, PhD

7            dated August 3, 2020 was marked for

8            identification purposes as Keyes

9            Deposition Exhibit No. 2.)

10    A.   And I should open it?

11    Q.   Yes.  Yes.  Sorry for these mechanics --

12    A.   Quite all right.

13    Q.   -- but yes.  Doctor Keyes, do you recognize

14  Exhibit 2?

15    A.   I do.

16    Q.   And this is the report you submitted in

17  this litigation; is that correct?

18    A.   Yes.

19    Q.   And you're stating the opinions that are

20  set forth in that report?

21    A.   I am.

22    Q.   Are you stating any opinions in this

23  litigation that are not set out in the report?

24    A.   No.

1     Q.   And I understand that you are relying on

2   the studies and the facts that you specifically

3   cite in the report; is that correct?

4     A.   Yes.

5     Q.   Are there any other specific studies or

6   specific facts that you are relying on to support

7   your opinions that are not stated in the report?

8     A.   Not specifically.  I mean, I have

9   considered other materials since the report has

10   been submitted, so to the extent that there are new

11   materials on the Materials Considered list, I may

12   use those as well.

13     Q.   Are you relying on any of these other

14   materials that you've reviewed since you submitted

15   your report to support your opinions?

16     A.   The materials I've considered support my

17   opinions, and so to the extent that I have

18   considered them since submitting the report, I -- I

19   rely on them.

20     Q.   What materials are you referring to?

21     A.   I believe there is a Supplemental Materials

22   Considered List that has been submitted.

23     Q.   Yes, and we've seen that.  So we've seen

24   the Supplemental Materials List.  Is there anything

Page 13

1    else aside from what's listed in those supplemental

2    materials that you are relying on to support your

3    opinions?

4         A.   No.

5         Q.   Could you open up Exhibit 104, please?

6              KEYES DEPOSITION EXHIBIT NO. 104

7                   ("Opioids - CT2 (WV) - Dr. Katherine

8                   Keyes Expert Report, Errata Sheet

9                   (August 24, 2020) was marked for

10                  identification purposes as Keyes

11                  Deposition Exhibit No. 104.)

12        A.   I have something that says "Exhibit 1."

13        Q.   Yeah, Exhibit 1 is not very interesting.

14   It's just the notice of your deposition.  We

15   probably don't need to spend time with it.

16        A.   Oh, Exhibit 104 as in --

17        Q.   104.

18        A.   Okay.

19        Q.   Yeah.  There's no real logic to the

20   numbering, I'll tell you that.

21        A.   Okay.  Good to know.  It's going to take me

22   a minute.

23              MS. DO AMARAL:  Mr. Hess, is Exhibit

24   104 one of the exhibits that you sent to us

Page 14

1    electronically last night?

2              MR. HESTER:  Oh, sorry.  Yes, it may

3    well be.  It's the report errata that we received

4    from Doctor Keyes.

5         A.   I have it.

6         Q.   Is it in there, Doctor Keyes?

7         A.   It is.

8         Q.   Okay, great.  Could you open that one up?

9    And these are the errata that you submitted with

10   respect to your report; is that correct?

11        A.   Yes.

12        Q.   And just for the record, this is marked as

13   Exhibit 104.  Are these changes, Doctor Keyes, that

14   you discovered after you submitted your report?

15        A.   Yes.

16        Q.   How did you discover them?

17             MR. ARBITBLIT:  Time out.  Tim, I'm

18   just going to instruct the witness that she cannot

19   -- I'll instruct her not to answer about any

20   discussions with counsel which are confidential and

21   privileged.

22        Q.   Well, what I wanted to ask, Doctor Keyes,

23   is:  Did you discover them upon your review of the

24   report?  Did you see some errors that needed to be

Page 15

1    corrected?

2        A.   Yes.

3        Q.   And do you have any other corrections to

4    your report aside from those that are reflected in

5    Exhibit 104?

6        A.   Not at this time.

7        Q.   Doctor Keyes, I wanted to ask what your

8    hourly rate is for your testimony in this matter?

9        A.   $550 per hour.

10       Q.   And is there any different rate that you're

11   paid for testifying either in a deposition or at

12   trial?

13       A.   That is my rate for testimony, $550.

14       Q.   So it's your rate for all your work in the

15   case?

16       A.   No, for preparation, I charge $400 per

17   hour.

18       Q.   And do you know -- and I take it you have

19   testified now in the opioid litigation in Ohio and

20   in New York and now this litigation in West

21   Virginia.  Correct?

22       A.   Yes.

23       Q.   Do you know roughly how much you've been

24   paid in total for all of your work in these opioid

Page 16

1   litigation matters?

2        A.   Yes.   Roughly $175 --

3               MR. ARBITBLIT:   Time out.   Tim, I

4   don't want to interrupt your flow.   I just want to

5   mention that there's been back and forth which I

6   don't know whether you're following the back and

7   forth about billing.   I understand from seeing back

8   and forth -- this is what I saw that the two sides

9   agreed to.   Neither side produces invoices, provide

10  hourly rate, number of hours and amount billed in

11  this case, not overall opioid litigation billing.

12              Is that your understanding?   Or do you

13  have a different understanding?

14              MR. HESTER:   I haven't really been

15  following the back and forth, Don.   I -- it's just

16  one question I wanted to ask which seems like a

17  legitimate question, which is:   How much has Doctor

18  Keyes been paid for her work in all the opioid

19  litigation?

20              MR. ARBITBLIT:   Tim, I agree that it's

21  a legitimate question.   However, if it's going to

22  be legitimate on one side, it has to be legitimate

23  on both sides, and from what I've seen -- I'm happy

24  to have her answer the questions that I just read

Page 17

1    to you that I've seen agreed and leave it for later

2    in the deposition if you want to consult with your

3    team and have a basis to add to what's been agreed.

4              I don't -- I'm not trying to be an

5    obstructionist; I'm just trying to be the team

6    player that follows the rules that my team and your

7    team seem to have agreed on.

8              MR. HESTER:  All right.

9       Q.   Well, Doctor Keyes, how much have you been

10   paid to date for your work in this West Virginia

11   litigation?

12      A.   And I apologize.  Just before answering --

13   I have a technical problem, which is that I lost

14   the realtime, so --

15      Q.   Okay.  Can you --

16      A.   Yeah.  I can answer while that's being

17   pulled up.  I just wanted to --

18      Q.   All right.  Okay.

19      A.   So --

20      Q.   Do you know how much you've been paid to

21   date for your work testifying in this West Virginia

22   litigation?

23      A.   In the West Virginia litigation?

24      Q.   Yes.

```
                                                Page 18
 1        A.    I have been paid approximately $60,000, I
 2   believe.
 3        Q.    And that reflects -- is that the reflection
 4   of the hours you've worked thus far in the West
 5   Virginia litigation?  In other words, the payments
 6   are up to date?
 7        A.    I -- what do you -- by "up to date," you
 8   mean like as of yesterday or --
 9        Q.    Well, when you said you've been --
10        A.    That's how much I've invoiced.
11        Q.    Excuse me?
12        A.    I'm sorry, that's how much I've invoiced.
13        Q.    Okay.  All right.  Thank you.
14              I -- do you have any stake in the
15   outcome of the litigation?  In other words, do you
16   receive any bonus or extra payment depending on the
17   outcome?
18        A.    No.
19        Q.    Let me ask you, Doctor Keyes, just a few
20   background questions so we have a common
21   understanding here.  You understand that the
22   defendants in this West Virginia litigation are
23   distributors of controlled substances, including
24   prescription opioids, right?
```

Page 19

1    A.   Yes.

2    Q.   And they're licensed by the federal and

3  state government to distribute those opioids; is

4  that right?

5    A.   Yes.

6    Q.   And do you also understand that these

7  distributors distribute a wide range of other

8  medical products in addition to prescription

9  opioids?

10    A.   Yes.

11    Q.   Do you understand that these distributors

12  buy prescription opioids from drug manufacturers

13  and then sell them to pharmacies?

14    A.   Yes.

15    Q.   And you understand that the pharmacies then

16  dispense prescription opioids to patients based on

17  prescriptions written by doctors; is that right?

18    A.   That's right.

19    Q.   And do you have any knowledge of the

20  customers served by these three distributors?

21    A.   I have general knowledge about kind of

22  different pharmacy chains and different pharmacies

23  that would be served by the distributors.  But it's

24  not my specific area of expertise.

1    Q.   So your general knowledge is that they --

2    is that they deal with pharmacies, both chains and

3    smaller pharmacies?

4    A.   That's my general knowledge, yes.

5    Q.   Do you have any knowledge of their market

6    shares?

7    A.   I don't.

8    Q.   Do you have any knowledge in relation to

9    their operations specifically in Cabell County and

10   Huntington?

11   A.   No.

12   Q.   And I take it that your opinions are not

13   dependent on knowledge of these distributors'

14   operations in Cabell and Huntington.  That's not

15   something that you studied for purposes of your

16   opinions?

17   A.   The -- I have opinions that include the

18   distribution of opioids in Cabell County.  So to

19   the extent that the distributors distributed in

20   Cabell County, that is included in my opinions.

21   Q.   But you haven't undertaken to develop any

22   knowledge about their operations in Cabell County

23   for purposes of providing your opinions, correct?

24              MR. ARBITBLIT:  Objection.

Page 21

1      A.   I -- perhaps you could clarify what you

2   mean by "operations."

3      Q.   Well, you didn't -- you didn't study what

4   -- what their market shares or distribution

5   patterns are in Cabell and Huntington, did you?

6      A.   I studied the distribution patterns of

7   opioid distribution in Cabell.  I did not study

8   market shares.

9      Q.   What did you study about distribution

10   patterns?

11      A.   The amount of opioids that are distributed

12   in the counties.

13      Q.   In the aggregate by these three

14   distributors and others?  That's what you were

15   looking at, is the aggregate distribution?

16      A.   That's -- that's correct.

17      Q.   Let me ask you to pull out Exhibit 18,

18   please.

19           KEYES DEPOSITION EXHIBIT NO. 18

20             ("Rates of opioid misuse, abuse, and

21             addiction in chronic pain: A

22             systematic review and data synthesis"

23             by Vowles, et al. dated April 2015 was

24             marked for identification purposes as

Page 22

1              Keyes Deposition Exhibit No. 18.)

2      Q.    And for the record, Exhibit 18 is a

3   document written by Kevin Vowles and others

4   entitled "Rates of opioid misuse, abuse and

5   addiction in chronic pain:  a systematic review and

6   data synthesis."

7              Doctor Keyes, I take it you're familiar

8   with this document?

9      A.    I am.

10     Q.    And you cite -- you cite this report, or

11  this document, in your report.  Is that correct?

12     A.    Yes.

13     Q.    Well, let me ask you if you could turn to

14  your report.  I think if we go to page 17 of your

15  report, Exhibit 2.

16              MR. ARBITBLIT:  Counsel, before you

17  ask your next question, I just want to interpose an

18  objection based on Rule 26 that this deposition

19  should not be duplicative of past depositions, and

20  in particular, the Court must limit the frequency

21  or extent of discovery otherwise allowed by these

22  rules if it determines that the discovery sought is

23  unreasonably cumulative or duplicative, and the

24  Vowles study has been the subject of prior

1    questioning and opportunity to question thoroughly

2    at previous depositions of this witness.

3              I will allow the question, but we'll

4    see where it goes, and if it is going to be

5    redundant or duplicative, then I will object and

6    we'll have to address that.

7              MR. HESTER:  Well, we don't need to

8    spend time on that right now.  I mean, I would just

9    say that she's -- Doctor Keyes has submitted a new

10   report in the -- in the West Virginia litigation,

11   and I'm asking her about the contents of her report

12   as submitted in West Virginia.

13             So I think --

14             MR. ARBITBLIT:  I understand that.  I

15   understand that.

16             MR. HESTER:  I think it's fair play.

17   But I'm not going to -- I'm not going back over --

18   my plan is not to go back over ground that's been

19   covered before.  My plan is to focus on questions

20   that relate to the expert report Doctor Keyes

21   submitted in this case.

22             MR. ARBITBLIT:  I understand that's

23   the plan, and I appreciate your position.  I would

24   just say that the Vowles article does not deal

Page 24

1   specifically with West Virginia, and to the extent

2   that it has been the subject of prior discussion,

3   if you have something new to ask about it that

4   hasn't been covered or the opportunity for it

5   hasn't been covered, that would not be duplicative.

6            MR. HESTER:  Well, you are right --

7   you are right that you're interfering with the

8   deposition.

9            Let's keep going, and we'll come back

10  to it if we need to.

11           MR. ARBITBLIT:  I did not say that I

12  am interfering with the deposition, Counselor, and

13  I am not.

14           MR. HESTER:  So you are.  Let's --

15  let's keep going.  I understand your position.

16  Let's keep going.

17  BY MR. HESTER:

18      Q.   Doctor Keyes, you cite the Vowles study at

19  page 17 of your report.  That's the basis for this

20  chart that you submitted; is that correct?

21      A.   That's correct.

22      Q.   And --

23      A.   I'm sorry, can I correct that?  I'm sorry.

24  Can you repeat the question?

Page 25

1        Q.   Yes.  Is the -- is the chart at Exhibit 17

2   of your report, that's the source for the -- the

3   Vowles study is the source for that chart.

4   Correct?

5        A.   It is one source.  I've also corroborated

6   the numbers in Figure 1 with other sources as well.

7        Q.   But the numbers you cite in that chart are

8   from the Vowles study?

9        A.   That's one study that has this range of

10  numbers.

11       Q.   But the numbers you pulled out are taken

12  out of the document -- out of the Vowles document;

13  is that right?

14       A.   That's correct.  I just want to -- to amend

15  my -- the answer to acknowledge that it's not just

16  the one study that reports this range of numbers.

17       Q.   And -- and your reliance on Vowles is based

18  on your review of the literature; is that correct?

19       A.   Yes.

20       Q.   And you have not undertaken any studies

21  yourself.  You reviewed other studies in the

22  literature to decide that you would rely on Vowles.

23  Is that right?

24       A.   I have -- I have undertaken studies of

Page 26

1    opioid use disorder myself.  So --

2        Q.   But for purposes of what you've set out in

3    your report here, it's based on a review of

4    literature.  Is that right?  At pages 16 and 17 of

5    the report, it's based on a review of literature?

6        A.   Yes.  Page 16 and 17 is based on a review

7    of the literature.

8        Q.   And am I right that the Vowles paper is

9    focused solely on chronic noncancer pain treatment?

10       A.   The inclusion criteria for studies in the

11   -- in the Vowles review is chronic pain.  So --

12       Q.   And --

13       A.   -- it could have other conditions as well,

14   but the focus is chronic pain.

15       Q.   Right.  So patients who are taking opioids

16   for chronic pain, noncancer chronic pain, that was

17   the inclusion criteria for the Vowles study?

18       A.   That's correct.

19       Q.   And are you aware that there are other uses

20   for opioids, other medical uses, for opioids aside

21   from chronic noncancer pain?

22       A.   Yes, I am.

23       Q.   And I take it that prescription opioids

24   have a legitimate medical use for the treatment of

Page 27

1    acute pain and acute injury.  Do you agree with

2    that?

3                    MR. ARBITBLIT:  Objection.

4        A.   I wouldn't make a blanket statement about

5    the legitimate medical use of opioids, no.

6        Q.   Do you have knowledge about the legitimate

7    medical use of opioids?

8        A.   Yes.

9        Q.   And what's your knowledge about the

10   legitimate medical use of opioids?

11       A.   I rely on -- the literature that I cite in

12   this report indicates that, in general, the use of

13   opioids for pain relief is -- should be limited and

14   -- to, you know, certain conditions.  I don't think

15   "legitimate use" is a blanket term that I would

16   use.

17       Q.   Do you have any knowledge of the legitimate

18   medical uses for opioids?  Do you have knowledge of

19   that?

20                   MR. ARBITBLIT:  Objection.

21       A.   Yes.

22       Q.   And what's -- and -- what -- can you

23   describe for me a legitimate medical use of a

24   prescription opioid?

1              MR. ARBITBLIT:  Objection.

2      A.   Not as a -- not as a blanket statement, no.

3      Q.   Let me ask you to --

4      A.   It's a case-by-case basis.

5      Q.   Let me ask you to look at Exhibit 106,

6  please.

7              MR. ARBITBLIT:  Are those the

8  supplement --

9              MR. HESTER:  Those may be the ones we

10  sent overnight.  Sorry.

11     Q.   Doctor Keyes, let me ask you -- on the ones

12  we --

13             MR. HESTER:  We sent several studies

14  that we were going to use today -- or documents

15  that we were going to use today by e-mail.  Did you

16  have a chance to print those out or -- ?

17             MS. DO AMARAL:  We did -- we did have

18  a chance -- I'm sorry.

19             MR. HESTER:  Sorry, Paulina, there's

20  feedback.

21             MS. DO AMARAL:  We did have a chance

22  to print them out.  We haven't had a chance to

23  collate them.  We had some difficulties with the

24  connection this morning, but I have them here.  It

Page 29

1    will take just a moment to get my hand on that.

2              MR. HESTER:   Okay.   And what I wanted

3    to show to Doctor Keyes is Exhibit 106.

4    BY MR. HESTER:

5         Q.   While we're doing that, just one more

6    threshold question, Doctor Keyes:   I take it that

7    Vowles itself is a review of other studies in the

8    literature; is that right?

9         A.   That's correct.

10              MS. DO AMARAL:   Counsel, we need a

11   couple minutes.   It might make sense to move --

12              MR. HESTER:   Okay, all right, so it

13   will take you a little bit.   I'll circle back to

14   that.

15        Q.   Doctor Keyes, we spoke a minute ago about

16   the fact that the Vowles study is focused on

17   chronic use of opioids; is that right?

18        A.   I think there is information on the range

19   of duration.   I don't mean to hesitate; it's just I

20   don't know that -- I don't know -- I guess, what do

21   you mean by "chronic use"?

22        Q.   Well, we spoke before that the criteria for

23   inclusion of studies in this survey was treatment

24   of chronic noncancer pain.   Correct?

Page 30

1       A.    That's correct.

2       Q.    And I just wanted to ask you then:  What's

3    your understanding of the word "chronic"?

4       A.    I'm trying to see what -- I don't believe

5    that there's a definition in terms of -- aah.

6    "Persistent pain lasting longer than three months"

7    is the definition that's used in this.

8       Q.    And the --

9       A.    The inclusion criteria did not include that

10   the opioids were used for longer than three months,

11   for example.

12      Q.    That was my question, whether this -- the

13   inclusion criteria were people with chronic pain or

14   people who used opioids chronically?

15      A.    In terms of the inclusion criteria, I think

16   the focus was on people with chronic pain.

17      Q.    Do -- let me ask you to look at page 16 of

18   your report, please.  Do you have it there?

19      A.    Yes.

20      Q.    And in the middle of the full paragraph on

21   that page, there's a sentence almost exactly

22   halfway through.  It says, "Individuals in the

23   study had been using opioids for an average of 5"

24   to "six years."

Page 31

1                    Do you see that?

2          A.    Just give me a moment.

3          Q.    It's about halfway through your paragraph.

4          A.    So that's referring to the Jamison, et al

5     study, 2010.

6          Q.    Oh, that's a reference to Jamison, et al;

7     it's not a reference to Vowles?

8          A.    That's correct.

9          Q.    Do you know -- do you know the average use

10    of use -- sorry.

11                MR. HESTER:  Let me strike that.

12         Q.    Do you know the average period of use in

13    the studies that are covered by the Vowles study?

14         A.    No, not -- not off the top of my head.

15         Q.    Do you --

16         A.    Sorry.

17         Q.    I take it also -- let me ask you about

18    dosing levels.  You're familiar with this concept

19    of dosing levels; is that correct?

20         A.    I am.

21         Q.    And dosing levels refers to the -- to the

22    level of dose of a prescription opioid that the

23    patient is taking, correct?

24         A.    Yes.

Page 32

1    Q.   And there's no reference in Vowles to

2   dosing levels, is there?

3    A.   There is in the underlying studies that are

4   part of Vowles.  But in terms of what Vowles, et al

5   report, I do not believe that there is reference to

6   the dosing levels in the underlying studies.

7    Q.   And in the chart at page 17 of your report,

8   there's no reference to dosing levels, correct?

9    A.   In Figure 1?

10    Q.   Yes.

11    A.   There's no dose information in Figure 1.

12    Q.   And let me ask you to look at page 19 of

13   your report, please.

14          And again, I -- I'll point you about

15   halfway through the bottom paragraph on the page.

16   There's a sentence that reads in your report, "It

17   is well-documented that risks of opioid-related

18   adverse outcomes are heterogeneous by dose and

19   duration of use."

20          Do you see that?

21    A.   I do.

22    Q.   What do you mean by the risks of "adverse

23   outcomes are heterogeneous by dose and duration of

24   use"?

Page 33

1      A.    Typically that means that adverse outcomes

2   increase with an increase in dose and duration.

3   There's a dose response relationship between harm

4   and opioid use.

5      Q.    And so when you say "heterogenous" in that

6   setting, you mean that the risks are going to be

7   different depending on the level of the dose, as

8   well as the duration.   Right?

9      A.    They're going to increase with dose and

10  duration, yes.

11     Q.    Well, they'll be different with different

12  doses and different duration, correct?

13              MR. ARBITBLIT:   Objection.

14     Q.    Now, Vowles is only measuring the

15  percentage of chronic noncancer pain patients who

16  engage in misuse of prescription opioids, right?

17              MR. ARBITBLIT:   Objection.

18     A.    Sorry, I'm just waiting for the realtime so

19  I can read this.

20              MS. DO AMARAL:   Counsel --

21     A.    Vowles is measuring the percentage of

22  misuse, abuse and addiction identified in these 38

23  studies.

24     Q.    And so misuse is using prescription opioids

Page 34

1   without a prescription or not as directed by a

2   doctor; is that correct?

3            MR. ARBITBLIT:  Objection.  Asked and

4   answered at length in the New York deposition.

5       Q.   You can go ahead.

6       A.   That is included in the definition of

7   "misuse," but the underlying studies that have

8   measured misuse in the Vowles study have a more

9   inclusive definition that includes other symptoms

10  of opioid use disorder.

11      Q.   So the -- Vowles also reports a figure for

12  addiction which you reflect in your chart on page

13  17 of opioid use disorder from moderate to severe

14  of 8 to 12 percent.  Correct?

15      A.   Yes.

16      Q.   And that's an 8 to 12 percent that flows

17  out of the misuse of prescription opioids, right?

18      A.   I'm not sure I understand what that means.

19      Q.   Well, the 8 to 12 percent is a subset of

20  people who are misusing the prescription opioids,

21  correct?

22            MR. ARBITBLIT:  Objection.

23      A.   It's people who meet criteria for opioid

24  use disorder at that level.  I guess I'm not -- I'm

Page 35

1   not quite sure what you mean by "subset."

2       Q.   Well, what I meant is that the way you've

3   drawn your Venn diagram here on page 17, there's an

4   opioid use disorder from moderate to severe of 8 to

5   12 percent.  Those are people who are engaged in

6   misuse of opioids.  Is that right?

7       A.   Generally speaking, yes.

8       Q.   Now, these two figures - the 22 to 29

9   percent figure in the Vowles report that you show

10  on Figure 1 and the 8 to 12 percent figure - those

11  are both measuring prevalence and not incidences;

12  is that correct?

13      A.   That is correct.

14      Q.   And that would mean it could include people

15  who had either moderate or severe opioid use

16  disorder before they began taking prescription

17  opioids.  Is that right?

18      A.   I mean, to get moderate to severe opioid

19  use disorder, you have to be exposed to opioids.

20      Q.   But not necessarily pursuant to a doctor's

21  prescription.  Is that right?

22      A.   There is generally a substantial overlap

23  between nonmedical and medical use, although it's

24  not -- I mean, I would agree with you that in terms

Page 36

1    of the prevalent case, we don't know the entire

2    history of prescription opioid use.

3        Q.   And so I'm -- I think this is a point that

4    we can probably readily agree on, that when you're

5    looking at, let's say, this 22 to 29 percent figure

6    of misuse, that's going to include people who are

7    engaged in misuse of prescription opioids before

8    they received a prescription from a doctor.

9              MR. ARBITBLIT:   Objection.   Assumes

10   facts not in evidence.

11       A.   Yeah, I don't have any knowledge of that.

12   I mean --

13       Q.   Well --

14       A.   -- that's --

15       Q.   -- prevalence -- prevalence captures a

16   point that people have a certain characteristic at

17   a certain point in time in a study.   Is that right?

18       A.   It can.

19       Q.   Well, when you -- when you distinguish

20   between prevalence and incidence in your prior

21   answer, prevalence is measuring the attributes of

22   opioid disuse -- opioid use disorder in a

23   population, correct?

24              MR. ARBITBLIT:   Objection.

Page 37

1      A.    Prevalence is measuring opioid use disorder

2    in a population, correct.

3      Q.    And so that could include people who had an

4    opioid use disorder before they took a doctor's

5    prescription for opioids, correct?

6      A.    It could.

7      Q.    And likely does, correct?

8              MR. ARBITBLIT:   Objection.

9      A.    I don't have any information on how likely

10   it is.

11     Q.    Okay.  This is not measuring the incidence

12   of opioid use disorder among patients who followed

13   doctor's directions in taking prescription opioids,

14   correct?

15             MR. ARBITBLIT:   Objection.

16     A.    Those incident cases would likely be

17   included in this assessment.  It's not exclusive to

18   that number.  That's another number that we would

19   use for public health.

20     Q.    But it does -- but this study, this Vowles

21   study, is not -- is not identifying the percentage

22   of opioid use disorder among patients who followed

23   a doctor's prescription, correct?

24     A.    It is identifying the percentage of opioid

Page 38

1   use disorder among patients using a doctor's

2   prescription.  It doesn't provide information on

3   how closely it was followed.

4       Q.   No, but it does -- it's capturing the

5   incidence of opioid use disorder among those who

6   are engaged in misuse of opioids, correct?

7               MR. ARBITBLIT:  Objection, asked and

8   answered.

9       A.   So it's prevalence of opioid use disorder,

10  and it's among those with noncancer chronic pain.

11      Q.   But it doesn't get -- Vowles does not give

12  us a percentage of misuse or addiction arising

13  among patients who followed doctors' prescriptions.

14              MR. ARBITBLIT:  Objection, asked and

15  answered.

16      A.   I would say that the study includes people

17  who are -- we don't have any information on whether

18  they're following a doctor's prescriptions or not.

19  So that's included in the --

20      Q.   Well, we know -- we know that the patients

21  that -- the 21 to 29 percent are people who are

22  engaged in misuse, correct?

23      A.   People who have symptoms of opioid use

24  disorder.

Page 39

1      Q.   And have engaged in misuse, correct?

2           MR. ARBITBLIT:  Objection.

3      A.   Generally speaking, yes.

4      Q.   And let me ask you to look at Exhibit 98,

5  please.

6           MS. DO AMARAL:  Counsel, we have

7  Exhibit 106 when you need it.

8           MR. HESTER:  Oh, thank you.  I'll

9  circle back to that in a minute.

10          MS. DO AMARAL:  I will need to take a

11  break to get 105, however.

12          MR. HESTER:  Okay.

13          KEYES DEPOSITION EXHIBIT NO. 98

14               ("The Prescription Opioid and Heroin

15               Crisis: A Public Health Approach to an

16               Epidemic of Addition" by Kolodny, et

17               al. dated 1-12-15 was marked for

18               identification purposes as Keyes

19               Deposition Exhibit No. 98.)

20     A.   98, yes?

21     Q.   Yes, thank you.  You have that one there,

22  Doctor Keyes?

23     A.   I do.

24     Q.   And for the record, Exhibit 98 is a paper

Page 40

1  written by Andrew Kolodny and others entitled "The

2  Prescription Opioid and Heroin Crisis:  A Public

3  health Approach to an Epidemic of Addiction."

4           Doctor Keyes, have you seen this

5  document before?

6      A.   I have.

7      Q.   And let me ask you to look at page 566,

8  please.  And it -- at the very top of the page -

9  it's the first sentence of text - it says, "The

10  incidence of iatrogenic opioid addiction in

11  patients treated with long-term OPRs is unknown

12  because adequately-designed prospective studies

13  have not been conducted."

14           Do you see that?

15      A.   I do.

16      Q.   And do you agree with that?

17      A.   I think there have been studies published

18  that speak to this percentage that I've cited in my

19  report.  It's possible they were published since

20  2015.  You know, this article is five years old.

21      Q.   I want to ask you specifically, though, not

22  about the numbers stated in your report.  I'm

23  asking about the "incidence of iatrogenic opioid

24  addiction in patients treated with long-term OPRs."

1              Are you aware of any study that

2  measures the incidence of iatrogenic opioid

3  addiction in patients treated with long-term OPRs?

4      A.   Yes, they're cited in my report.

5      Q.   Which study?

6      A.   I believe the Edlund study speaks to that,

7  in the claims data.

8      Q.   Any others?

9      A.   I believe there are other studies that

10  measure incidence in the report.  I could go

11  through them more carefully, but there's a number

12  of reviews that are cited that speak to incidence.

13      Q.   The Edlund study is the one that you have

14  in mind?

15      A.   I have -- yeah, I'm thinking about the

16  Edlund study, but I believe there are others as

17  well.

18      Q.   When you say --

19      A.   -- for example --

20      Q.   Well, when we say "the incidence of

21  iatrogenic opioid addiction," that means --

22  iatrogenic opioid addiction means opioid addiction

23  arising out of -- out of treatment under a doctor's

24  care and pursuant to a doctor's prescriptions?

Page 42

1      A.   Yes.

2      Q.   Let me ask you now to go back to Exhibit

3   106.  That's the one we tried to get a minute ago.

4           KEYES DEPOSITION EXHIBIT NO. 106

5               ("Understanding the Rural-Urban

6               Differences in Nonmedical Prescription

7               Opioid Use and Abuse in the United

8               States" by Keyes, et al. dated

9               February 2014 was marked for

10               identification purposes as Keyes

11               Deposition Exhibit No. 106.)

12      Q.   Do you have it there, Doctor Keyes?

13      A.   I do.

14      Q.   And Exhibit 106, for the record, is a paper

15   written by Doctor Keyes and others entitled

16   "Understanding the Rural-Urban Differences in

17   Nonmedical Prescription Opioid Use and Abuse in the

18   United States."

19           I take it you're well familiar with

20   this document?

21      A.   Yes.

22      Q.   Let me ask you to look at page E-54,

23   please.  And on the left hand column under the

24   heading for Self Medicating for Pain, there's a

Page 43

1   sentence that reads, "When used as prescribed under

2   medical supervision, opioid analgesics are

3   effective and used as standard practice in managing

4   acute and chronic pain."

5                    Do you see that?

6                    MR. ARBITBLIT:  Objection.  We're

7   going over old ground.  This is the second article

8   that's going over old ground that's been asked and

9   answered at length in the New York deposition.

10                   On the third strike, Counselor, I'm

11  going to get in touch with Judge Wilkes, and we'll

12  see if he thinks this is proper or not.

13      Q.   This is a study --

14                   MR. HESTER:  It would be quite ironic

15  to take the position asking Doctor Keyes about a

16  study involving rural populations is not something

17  we can ask about.  But I understand.  I mean, you

18  --

19                   MR. ARBITBLIT:  It's not about ironic,

20  Counselor; it's about duplicative.  The article's

21  been the subject of prior questioning.  Rule 26

22  says duplicative depositions are harassment and not

23  allowed.

24                   MR. HESTER:  So --

Page 44

1              MR. ARBITBLIT:  I do -- you can

2     disagree, and we do disagree.  This is the second

3     one.  I'm allowing it.  I'm not going to allow it a

4     third time.

5              MR. HESTER:  We can -- we can argue --

6     I don't want to take time arguing about it.  I

7     would just say when an expert report is submitted

8     in a case, I'm not sure that the concepts you're

9     relying on apply.

10             But let's go ahead.

11    BY MR. HESTER:

12    Q.    Doctor Keyes, do you stand by that

13    sentence?

14    A.    I think that sentence reflected the same,

15    you know, deceptive information that the

16    pharmaceutical companies and distributors released.

17    Q.    So you don't stand by that sentence?

18    A.    I think if I were to write that sentence

19    today, I would provide a lot more nuance to that

20    sentence.

21    Q.    What did you mean when you wrote "opioid

22    analgesics are effective"?

23             MR. ARBITBLIT:  Objection.

24    A.    It was not the topic of the paper, the

Page 45

1    efficacy of opioid analgesics, and I think that,

2    again, were I to write that sentence today, I would

3    qualify that statement more.

4              But what I meant by that at the time

5    was that there are some indications for which

6    opioids control pain.

7         Q.   And you just don't know what those

8    indications are?

9              MR. ARBITBLIT:  Object to form.

10        A.   I do know the -- I know what the

11   indications are.

12        Q.   And what are those?

13        A.   I don't want to make a blanket statement

14   about the appropriateness of opioids.  It would

15   have to be handled on a case-by-case basis.

16        Q.   Oh, I just -- but when you said they --

17   they control pain for certain indications, what

18   indications did you have in mind?

19              MR. ARBITBLIT:  Objection.

20        A.   Again, I don't want to make a blanket

21   statement about all -- all uses of opioids.  It

22   would be on a case-by-case basis.

23        Q.   Let's go back to -- let's go back to your

24   report, Exhibit 2, and page 17 again.  So Doctor

Page 46

1   Keyes, looking at this Figure 1, does it reflect

2   that, from among these patients treated for chronic

3   noncancer pain with opioids, there were in the

4   range of 80 -- 70 to 80 percent who did not develop

5   an opioid use disorder?

6       A.   I just -- let me read this.  70 to 80

7   percent do not have a prevalent opioid use

8   disorder, just to be clear about the language.

9       Q.   And when you say "prevalent," you mean it's

10  not -- you're distinguishing that from incidence.

11  So it would include incidence but it would be

12  broader than incidence.

13              MR. ARBITBLIT:  Objection.

14      A.   I wouldn't conflate those two in that way.

15  Incidence is not subsumed in prevalence in that

16  way.  They're two different measures.  Incidence in

17  this case is --

18      Q.   What did you mean -- I didn't mean to

19  interrupt.  I'm sorry.  What did you mean by

20  "prevalence," that you're saying that this is

21  "reflecting prevalence"?

22              MR. ARBITBLIT:  Objection.

23      A.   It means that the study design was that

24  opioid use disorder was assessed among people with

Page 47

1   chronic noncancer pain, an overall percentage was

2   estimated.

3        Q.   And we don't know how long they were taking

4   the opioids for their chronic noncancer pain?

5                  MR. ARBITBLIT:  Objection.

6        A.   I believe that information is in the

7   underlying studies, so we could go to the

8   underlying studies if that would be helpful.

9        Q.   How would -- is that the way you would

10  figure out the duration of treatment for chronic

11  noncancer pain patients in the Vowles study?  You'd

12  go and look at the underlying studies to figure out

13  the periods of time that people were being treated

14  with opioids?

15       A.   I think that would be one way to estimate

16  duration.

17       Q.   Is there any other way you could think of?

18  You don't see it in the body of the Vowles report?

19       A.   I don't see it in the body of the Vowles

20  report.

21       Q.   And we also don't know the dosing levels

22  for these patients being treated with chronic

23  noncancer pain, correct?

24                  MR. ARBITBLIT:  Objection, asked and

Page 48

1    answered.

2        A.   I believe that information is in the

3    underlying studies.

4        Q.   And again, you'd have to go back then to

5    look at the underlying studies to figure out what

6    the dosing levels were?

7        A.   Yes.

8        Q.   You mentioned -- let's turn to Exhibit 10,

9    please.

10            KEYES DEPOSITION EXHIBIT NO. 10

11                ("The Role of Opioid Prescription in

12                Incident Opioid Abuse and Dependence

13                Among Individuals With Chronic

14                Noncancer Pain" by Edlund, et al.

15                dated July 2014 was marked for

16                identification purposes as Keyes

17                Deposition Exhibit No. 10.)

18        Q.   For the record, Exhibit 10 is a paper

19    written by Mark Edlund and others entitled "The

20    Role of Opioid Prescription in Incident of Opioid

21    Abuse and Dependence Among Individuals with Chronic

22    Noncancer Pain."

23            Doctor Keyes, you've seen this document

24    before?

Page 49

1      A.   Yes.

2              MR. ARBITBLIT:  Objection.  Counselor,

3   this was addressed at the New York deposition at

4   page 310.  Do you have any new questions about it?

5   Or are we replowing old ground?

6              MR. HESTER:  I think I have new

7   questions.  I think I'm -- I'm questioning based on

8   what Doctor Keyes says in her report.

9              MR. ARBITBLIT:  Did you say anything

10  new in this report about Edlund that you didn't say

11  in the New York report?

12             MR. HESTER:  I haven't -- I haven't

13  prepared to go back to the New York report.  I'm

14  focusing on what's in the West Virginia report

15  that's been submitted in this litigation and asking

16  questions about the scope of Doctor Keyes' opinions

17  in this litigation.  And she talks about the Edlund

18  paper.

19      Q.   So Doctor Keyes, at page 19 of your report,

20  the bottom paragraph and then over to 20, this is

21  where you refer to the Edlund paper.  Is that

22  right?

23      A.   I just want to confirm, there are several

24  different Edlund papers that are cited, and I just

Page 50

1   want to make sure that we're --

2       Q.   I hope I've got the -- I hope I've got the

3   right one.  I thought I did, but confirm me on

4   that.

5       A.   So -- yes, I believe that's correct.

6       Q.   Can you -- I mean, if you look at -- let's

7   see, the footnote -- Footnote 60 -- Footnote 60 in

8   your report, you can see that you're citing to this

9   paper that we've got as Exhibit 10.  Correct?

10      A.   Yes.

11      Q.   And so this is a study that involves

12  exposure to differing levels of prescribed opioids.

13  Is that right?

14      A.   That's correct.

15      Q.   And if you could look at page 562 --

16          MR. ARBITBLIT:  Counsel, I'm going to

17  stop the deposition now, and we're going to try to

18  reach Judge Wilkes.  You're asking the same

19  questions about the same articles, and I think it's

20  not okay.

21          If Judge Wilkes says it's okay, then I

22  will withdraw the objections, but I don't want to

23  just proceed as if you can do this, which I

24  disagree with.

1          So let's stop the deposition and see if

2     we can reach Judge Wilkes.

3               MR. HESTER:  Okay.  And I take it this

4     doesn't count against our seven hours of time,

5     correct?

6               MR. ARBITBLIT:  That is correct, it

7     does not.  So let's --

8               MR. HESTER:  All right.  Doctor Keyes,

9     you can probably take a rest if you want.

10              VIDEO OPERATOR:  Going off the record.

11    The time is 9:53 a.m.

12                   (A discussion was had off the record

13                   after which the proceedings continued

14                   as follows:)

15              VIDEO OPERATOR:  This begins Media

16    Unit 2 in the deposition of Katherine Keyes.  We're

17    back on the record.  The time is 9:54 a.m.

18              MS. DO AMARAL:  I can -- I can get him

19    on my cell phone and just hold it next to the

20    microphone.  I don't know if that's going to work.

21    Let's give it a try.

22              MR. HESTER:  I guess we could also

23    call into a dial-in if you want.

24              MS. DO AMARAL:  That may work better.

Page 52

1              MR. HESTER:  Well, let's see if we can

2    get him first, and then we'll figure out mechanics.

3              MS. DO AMARAL:  Okay.

4              (A phone call was made to Judge

5    Wilkes.)

6              MS. DO AMARAL:  I didn't reach him.  I

7    did leave a message.

8              MR. ARBITBLIT:  Is there someone at

9    his office who could be reached to find out whether

10   he's available?  I don't want to keep counsel

11   waiting unreasonably if he's not going to be

12   available to get back to us shortly.

13             MS. DO AMARAL:  I am not aware of

14   another way to contact him other than --

15             MR. ARBITBLIT:  Maybe try calling

16   those on the ground in West Virginia to see if they

17   have any insight on how to reach him.

18             MS. DO AMARAL:  Okay.

19             MR. ARBITBLIT:  Tim, we'll give this

20   about five or ten minutes.  Is that all right?

21             MR. HESTER:  Yeah.

22             MR. ARBITBLIT:  And it's not counting

23   against your time.

24             MR. HESTER:  Okay.

Page 53

1                MR. ARBITBLIT:  And I understand

2     you're doing what you think is your job; I'm just

3     doing what I think is mine.

4                MR. HESTER:  The -- I take it a

5     corollary in your position, Don, is you would agree

6     that we can use everything that's been done in

7     relation to Doctor Keyes, any of her examinations,

8     in New York, for instance, are available to us in

9     this case?

10               MR. ARBITBLIT:  I would have assumed

11    that would be the case.  I don't think that my

12    position on it matters.  I think she was under

13    oath, her testimony could be used for the purposes

14    that deposition testimony could be used in general.

15               Paulina, are you there?

16               THE DEPONENT:  She's on the phone.

17               MR. HESTER:  Don, I have -- I have

18    only a few more questions on this.  I also want you

19    to have in mind, she submitted a new expert report

20    in West Virginia.

21               I mean, she didn't stand on her New

22    York report; she submitted a new report.  And it

23    would --

24               MR. ARBITBLIT:  I -- sorry.

Page 54

1          MR. HESTER:  -- it seems -- it seems

2     that the position that you can't examine an expert

3     on a new report is really surprising to me.  I --

4     it hadn't even occurred to me that you'd take this

5     position.

6          MR. ARBITBLIT:  Well, Tim, it's a

7     little overbroad to say she submitted a new report.

8     I agree with you that there's a report signed

9     August 3rd, but if you compare certain sections of

10    the report, they're identical, and I haven't seen

11    any different description of either the Edlund

12    study or the Vowles study, and certainly not the

13    study that she wrote in 2014 which isn't even in

14    her report.

15          It's something that your partner, Paul

16    Schmidt, brought up on his own.

17          So Rule 26 is specifically about

18    experts, and the rule that I read earlier about

19    duplicative testimony arises in that context.

20          Yes, she submitted a new report, but

21    parts of it are identical, and there's no new

22    report about Edlund, Vowles or the Keyes 2014

23    study.  They're identical; they were the subject of

24    prior discussion.

1            If we can't get Judge Wilkes, what I

2   suggest is that we go back on but that I have a --

3   if you would agree to a standing objection to the

4   use of testimony gathered in this deposition based

5   on documents that have been the subject of prior

6   deposition, we could continue on that basis.

7            MR. HESTER:  I have no -- yeah.  I

8   mean, I understand your objection.  I just think

9   when she submits a new report in a new case and

10  she's purporting to offer opinions as to a new

11  jurisdiction - namely West Virginia as compared to

12  New York - I think we're entitled to examine her

13  about it.

14            I really have very little -- I have

15  very little more that's going over this Edlund

16  issue.

17            MR. ARBITBLIT:  Well, you know, I

18  think --

19            MR. HESTER:  I think -- and then I

20  think we transition on to stuff that's much more

21  directly targeted on West Virginia issues.

22            MR. ARBITBLIT:  Okay.  I have a list

23  of articles that were the subject of prior inquiry.

24  If you can tell me that they're not going to be

Page 56

1    part of today's inquiry, that would solve the

2    problem.

3            MR. HESTER:  I don't think I -- I

4    don't think I can tell you that articles aren't the

5    subject of inquiry.  I can't -- I can't give you

6    that broad a commitment.  I think what I can tell

7    you is I'm focusing on what she's written in this

8    report.  That's all I focused on.

9            But I --

10           MR. ARBITBLIT:  Okay.  Well, I

11   understand your position, and if you're agreeable

12   to the standing objection and we can't get Judge

13   Wilkes promptly, then that's how I suggest we would

14   proceed.

15           MR. HESTER:  All right.

16           MS. DO AMARAL:  Gentlemen, I tried

17   other avenues and was not able to reach Judge

18   Wilkes.  I have left him a message and left him my

19   cell phone number to return the call.

20           As I understand it, he is prompt in

21   doing so unless there is some other matter that

22   he's working on at that precise moment.  So as we

23   hear from him, I'll certainly let everyone know.

24           But at the moment, we are not able to

Page 57

1    reach him.

2              MR. ARBITBLIT:  Tim, are you willing

3    to hold this Edlund topic in abeyance and go on to

4    the other points that you said were not referring

5    to previous articles so that when Judge Wilkes

6    calls back, we can advise him of the status as of

7    the time we're having this discussion?

8              MR. HESTER:  Yeah, I think I can hold

9    this in abeyance.

10              MR. ARBITBLIT:  I appreciate that

11    courtesy.

12              Can we get the witness back in and if

13    you want to put something on the record about this

14    now, we can, or we can wait until we have Judge

15    Wilkes.

16              MR. HESTER:  Why don't we just wait

17    until we have Judge Wilkes.

18              VIDEO OPERATOR:  Okay.  We've stayed

19    on the video record.  Teresa, I'm not sure if

20    you've stayed on the record as well.

21              MS. DO AMARAL:  We have Judge Wilkes.

22              THE COURT REPORTER:  Yes, I've been on

23    the record the whole time.

24              VIDEO OPERATOR:  Okay.

Page 58

1                    MR. ARBITBLIT:  Do we have Judge

2      Wilkes on the phone now?

3                    MS. DO AMARAL:  Yes, we do have Judge

4      Wilkes.  I'm putting him on speaker.

5                    Judge Wilkes, can you hear me?

6                    SPECIAL MASTER WILKES:  I can.

7                    MS. DO AMARAL:  Counsel, can you hear

8      him?

9                    MR. ARBITBLIT:  Yes.

10                    MR. HESTER:  Yes, we can.

11                    MR. ARBITBLIT:  Judge, this is Don

12     Arbitblit of Lieff Cabraser, one of attorneys for

13     plaintiffs in the MDL.  Good morning.  I'm sorry to

14     disturb your day.

15                    Counsel for defendants and I are

16     having a disagreement about the proper scope of

17     this deposition, and we'd just like a moment of

18     your time to state our positions and see whether we

19     can get some resolution.

20                    Briefly, our position is that a Rule

21     26(b)(2)(C) in the context of expert depositions

22     states, "On motion or on its own, the Court must

23     limit the frequency or extent of discovery

24     otherwise allowed by these rules if it determines

Page 59

1   that the discovery sought is unreasonably

2   cumulative or duplicative."

3            In this case, the witness is Katherine

4   Keyes, an epidemiologist who has already been

5   deposed in the MDL and in the New York case for a

6   total of 14 hours.

7            The same firm, the same defendant, the

8   same witness.  We've had 50 minutes of testimony in

9   which three of the four articles introduced on the

10  examination were subject to inquiry in previous

11  deposition testimony.

12           It is our position that this amounts to

13  different answers about the same studies, that

14  there was a full opportunity to depose on those

15  subjects and the questions themselves are

16  identical, and certainly the studies being asked

17  about are identical, and we don't think that that's

18  appropriate under Rule 26(b)(2)(C) to be going over

19  old ground and seeking new answers to the same --

20  on the same studies.

21           That's our position.  We would ask that

22  -- certainly the witness has submitted a new

23  report.  However, as to these particular items,

24  there's been nothing new in the report, and

Page 60

1   particular studies by the Vowles, V-O-W-L-E-S,

2   Edlund, E-D-L-U-N-D and a study the witness herself

3   wrote that was not in her report but was used for

4   impeachment by Mr. Hester's co-counsel at

5   Covington.  None of those have changed.

6            It's the same material, different

7   questions, and we think it's not appropriate.

8            MR. HESTER:  Judge Wilkes, this is Tim

9   Hester, Counsel for McKesson from the firm of

10  Covington & Burling.  Doctor Keyes has submitted a

11  new expert report in the West Virginia litigation.

12  She's admittedly submitted expert reports in New

13  York and in the Ohio litigation as well, but she's

14  given -- she's given a separate expert report in

15  the West Virginia litigation, and we are seeking to

16  inquire into those opinions she stated in the West

17  Virginia litigation, and there's not an intent to

18  cover old ground, but we're focusing not on the New

19  York litigation; we're focusing on the expert

20  report she gave in this West Virginia case, and it

21  seems to me we should be entitled to ask her a full

22  range of questions about the opinions that she has

23  given in the West Virginia litigation.

24            Some of those opinions involve

Page 61

1    documents that were cited and relied on by her in

2    the New York litigation as well, but here, we're

3    seeking to develop testimony for purposes of the

4    West Virginia litigation and the trial that's

5    upcoming.

6           The standard articulated by counsel,

7    "unreasonably cumulative or duplicative" is not

8    applicable here in the sense that we're asking a

9    few questions about several documents that were the

10   subject of questioning in other -- in other

11   examinations previously of Doctor Keyes, but we're

12   not -- we're not engaged in unreasonably

13   duplicative or cumulative questioning.

14          We're asking about a new expert report

15   and her opinions that she's providing in this

16   litigation which should be viewed as distinct from

17   what she has done previously in the New York or the

18   Ohio litigation.

19          MR. ARBITBLIT:  Judge, if I could just

20   respond very briefly.  The specific articles that

21   are in question have nothing to do with West

22   Virginia at all.  They are generic to opioid use

23   and there are public -- there are new opinions in

24   the West Virginia report that we believe are fair

Page 62

1    game for inquiry.

2              What we don't agree are fair game is

3    going back to places in the previous reports where

4    identical documents were addressed on a generic

5    basis and were the subject of full inquiry.

6              There's plenty of new material that

7    could -- could be the proper focus of discovery and

8    inquiry, and we're not objecting to that.  The mere

9    fact that she submitted a new report does not mean

10   that every sentence of it - when in fact, the vast

11   majority of it - is the same as it was in the

12   previous two, including the three articles that I

13   just mentioned.

14              No changes.

15              SPECIAL MASTER WILKES:  Okay.  Well, I

16   think one thing -- does someone want to add to

17   that?

18              MR. RUBY:  Judge, this is -- this is

19   Steve Ruby for Cardinal Health.  I know this has

20   come up before with fact witnesses, a couple of

21   questions in that regard one -- in that situation

22   where there was a desire on the part of a party not

23   to have its fact witnesses redeposed, and I know

24   this may be something that's on your mind as this

Page 63

1    issue comes up.

2              That was all handled well in advance of

3    the deposition.  The issue was raised, an order was

4    entered by you that dealt with this ahead of time.

5    And everybody had an opportunity to prepare for the

6    deposition accordingly.

7              That hasn't been done here, and so it

8    seems to me that the appropriate thing to do is to

9    -- is to proceed with the deposition.  If there are

10   issues that need to be raised with Judge Faber

11   relating to this testimony at trial, they can be

12   raised then.

13             The other point that I would note is

14   that the witness here is a -- is a retained expert

15   witness, and so I think the calculation with

16   respect to burden is a different calculation.

17             So as we sit here right now with

18   Mr. Hester ready to take the deposition and having

19   prepared for the deposition, it -- again, and

20   having had no notice of these issues with respect

21   to this witness - unlike the other situations that

22   you've dealt with - I don't see -- I don't see any

23   good reason not to be able to explore the studies

24   that have been provided in her report, by -- she's

Page 64

1   provided in this --

2              SPECIAL MASTER WILKES:  I'm losing you

3   there a little bit, Mr. Ruby.  I'm sorry.  Could

4   you repeat what you said?

5              MR. RUBY:  Yes, Judge, I -- I was just

6   summarizing there at the end, given the fact that

7   these -- this hasn't been raised in advance of the

8   deposition, Mr. Hester has prepared to take the

9   deposition based on the fact that the witness has

10  submitted an expert report in this West Virginia

11  litigation that cites these studies, and this is a

12  -- a retained expert who has proffered her opinions

13  specific to this West Virginia litigation.

14              It seems to me that this is different

15  from the situations where you have imposed

16  limitations in the past, and the appropriate thing

17  to do is to let the deposition go forward and to

18  address -- to let Mr. Hester address the studies

19  that, as I said, have been cited in the report that

20  was produced specifically in this West Virginia

21  litigation.

22              MR. ARBITBLIT:  May I briefly be

23  heard, Your Honor?

24              SPECIAL MASTER WILKES:  Sure.

Page 65

1           MR. ARBITBLIT:  I think that the

2    Federal Rules of Civil Procedure provide all the

3    notice that any party could ever ask for, and the

4    -- what they specifically say in the context of

5    experts, under Rule 26, is that duplicative --

6    "unreasonably cumulative or duplicative discovery

7    must be foreclosed."

8           "The Court must limit."  It's not

9    "shall" -- it's not "may."  It's "must."  So I

10   don't know what further notice could be required.

11          I didn't -- I certainly didn't come

12   into the deposition thinking that Mr. Hester was

13   going to plow old ground and try to elicit new

14   answers.  And I don't think -- certainly Mr. Hester

15   during the break has said that he has other

16   subjects that are not cumulative and duplicative of

17   previous depositions, and the witness has a report

18   that includes quite a bit of West Virginia-specific

19   information which is a fair target for his inquiry:

20          SPECIAL MASTER WILKES:  Okay.  Go

21   ahead.  Were you cut off?

22          MR. ARBITBLIT:  No, I'm done, Your

23   Honor.  Thank you.

24          SPECIAL MASTER WILKES:  Okay.  Well,

Page 66

1    two things.  I think that we need to -- we need to

2    keep in mind here.  Number one, we have an overall

3    limit as to the time of the deposition, so how --

4    how a party wants to use that time - whether they

5    feel, you know, it's more fruitful to use it

6    rehashing some other stuff - is one consideration

7    and anticipating that you guys, you know, your

8    seven hours is going to be used discussing

9    something.

10              I think in prior -- prior instances,

11   we've had similar issues and, you know, it's

12   limited to the quality of the time used in the

13   limited quantity of time, number one.

14              Number two -- and I am mindful of

15   plaintiff's concerns because we have direction from

16   the Court that discovery is to be limited to unique

17   issues to this case, because of the vast majority

18   of discovery having already been done in the large

19   MDL that's seeking to be limited to unique

20   jurisdictional issues.

21              I don't think that because it's a

22   report submitted in this case that automatically

23   opens up that -- all inquiry to the same issues

24   that may have been gone over previously, so the

Page 67

1    ruling for today will be that in such ways as the

2    expert's opinion differs -- her testimony today

3    differs from previously-given testimony, it's fair

4    game and can be inquired into.

5             So you have to do a little bit of

6    inquiry on certain issues:  "Does your opinion

7    differ" or "How does it apply to the West Virginia

8    case?"  And then that's fair game.

9             But I think we have an overriding Court

10   Order limiting discovery that's unique to the

11   jurisdiction -- jurisdictional issues.  So

12   hopefully that will narrow it down some in that the

13   general subjects that have already been inquired

14   into in the MDL should not be rehashed unless there

15   is some difference unique to the Cabell

16   County/Huntington jurisdictional issues.

17            Does that make it clear?

18            MR. HESTER:  Judge, this is Tim

19   Hester, counsel for McKesson.  Let me just ask for

20   a clarification, though, on one point.  I

21   understand -- I understand Your Honor's ruling in

22   relation to a particular document that may have

23   been discussed or the subject of examination in a

24   prior deposition of this witness.

Page 68

1            But there are a number of opinions that

2     this witness is expressing that relate to

3     activities in West Virginia that might also relate

4     to activities in other jurisdictions.  For

5     instance, the supply of opioids.  She's providing

6     opinions about supply of opioids in West Virginia.

7     There's parallels to things she has said about New

8     York or Ohio, but it does seem to me we need to be

9     able to inquire into her opinions on issues that

10    relate to West Virginia, even if there's a parallel

11    or analogous set of opinions she's provided as to

12    New York or Ohio.

13            I wanted to understand if the Court has

14    that in mind, as you state your ruling here.

15            SPECIAL MASTER WILKES:  Yes,

16    absolutely, you're entitled to inquire as to that

17    which goes into West Virginia, even if it's the

18    same opinion as in the others, because I think the

19    burden -- plaintiffs still bear the burden of

20    proving the nuisance in West Virginia, and these

21    are events that are fact-specific to West Virginia

22    so certainly you're entitled to inquire into that.

23            MR. ARBITBLIT:  Can I ask, Your Honor,

24    whether it would be appropriate to have -- in the

Page 69

1   case of material or questioning that's been raised

2   in prior cases as a preliminary question from

3   defense counsel, "Does your opinion concerning this

4   have any different impact or meaning for the West

5   Virginia case compared to the Ohio case or the New

6   York case?"

7              And I would submit that in the three

8   instances we're talking about, the language of the

9   report is identical; the cases -- they don't have

10  any bearing on West Virginia or Ohio or New York or

11  any specific jurisdiction; they don't have a

12  bearing on Mr. Hester's concern about the opioid

13  supply to Cabell/Huntington, and the answer would

14  be no, they don't have any different meaning in

15  this case than they had in the previous.

16             So rather than allowing a blanket

17  "Let's just inquire and see what we find out how it

18  applies to West Virginia," if there's a preliminary

19  question to the witness, "Does your opinion in the

20  West Virginia case change based on this particular

21  article, does it have any bearing on West Virginia

22  specifically, and if so, what," I think that would

23  address both concerns.

24             We wouldn't get a rehash of things that

Page 70

1    are generic to opioids nationwide or data analysis

2    of rates of OUD nationwide, and we would allow

3    defense counsel to inquire as to anything that's

4    jurisdiction-specific.

5                    MR. HESTER:  Well, Your Honor, this is

6    Tim Hester.  If I could be heard on that point.

7    It's a little hard -- it's a little hard to be that

8    precise, to articulate a point that the witness

9    then agrees or disagrees is different or not

10   different from what she said in New York or Ohio.

11                   It seems to me we need to be able to

12   inquire into certain topics and ask questions that

13   allow us to explore the basis for her opinions on

14   issues that relate specifically to activities in

15   West Virginia.

16                   She's talking about things such as

17   supply of opioids in West Virginia; she's talking

18   about issues involving heroin and fentanyl use in

19   West Virginia.  We should be able to ask her about

20   those subjects, whether or not she gives a

21   generalized answer that she has a parallel view on

22   New York and Ohio, because she's providing

23   testimony that relates specifically to the

24   circumstances in West Virginia, even if there's

Page 71

1    parallel or analogous views that she has in other

2    jurisdictions.

3                MR. ARBITBLIT:  And with all due

4    respect, Your Honor, that would be an exception

5    that swallows the rule that Your Honor just stated.

6    There's nothing in what Mr. Hester just stated

7    generically that applies to the articles that have

8    come up.  There were no questions about how this

9    bears on Cabell County or Huntington; they were

10   generic questions about rates of OUD or misuse in

11   general.  They had --

12               There wasn't -- if you look through the

13   transcript, there wasn't a mention of West Virginia

14   once in those questions about these articles.  So

15   basically he's trying to make up an exception that

16   would allow him to do exactly what he was planning

17   to do all along.

18               SPECIAL MASTER WILKES:  Well, we're

19   moving forward.  I don't have the transcript in

20   front of me.  I don't know what those questions

21   were.  But moving forward, they are going to be --

22   they have to be jurisdictionally-specific.

23               And I -- I surmise that the opinions --

24   the expert's opinion is not going to change in

Page 72

1   regards to the cause and effect or remedial aspects

2   from any of the jurisdictions.  But defendants are

3   entitled to inquire specifically as to that cause

4   and effect in West Virginia, because they have to

5   defend against proving what have -- you know, that

6   their actions were the cause of, contributed to

7   what plaintiffs allege in Cabell/Huntington.

8            So what he asked previously, I can't --

9   I'm not going to comment on.  But moving forward,

10  it is going to have to be somewhat premised with

11  the inquiry as to "How did this affect, or how did

12  this apply in Cabell/Huntington, and does it differ

13  from the testimony previously given on any other

14  points."

15           MR. ARBITBLIT:  And just to -- go

16  ahead, Your Honor.

17           SPECIAL MASTER WILKES:  --

18  jurisdictionally specific.

19           MR. HESTER:  But -- Your Honor, this

20  is Tim Hester again for McKesson.  And just to go

21  back to a point that Mr. Ruby had made that I do

22  want to reiterate:  This was -- if the plaintiffs

23  were taking this position - which frankly is a

24  surprise to us - we have expert -- we have expert

Page 73

1   reports submitted in West Virginia that obviously

2   have overlaps with expert reports submitted in New

3   York or Ohio.

4          We were not aware until the midst of

5   this deposition that the plaintiffs were taking the

6   position that if there's some duplication - in

7   other words, if the witness copied something out of

8   her New York report and put it into West Virginia -

9   that somehow we -- we're not entitled to inquire

10  into it because it's, quote, the same.

11         We were not put on notice of this.

12  We're being put into a position in the midst of a

13  deposition, having to sift out what is new or what

14  is different from what was previously submitted by

15  this witness.  That seems too high a burden for an

16  expert report, that we have to go back and figure

17  out what she previously said in other jurisdictions

18  and then parse through how we differentiate.

19         This -- as Mr. Ruby pointed out, when

20  this has come up previously, it was in the context

21  of fact witnesses, but it was done in advance of

22  the deposition so there could be an opportunity to

23  plan.

24         If the plaintiffs were taking this

Page 74

1   position, we were certainly not apprised of it.

2   And so we're really put in a -- in a very difficult

3   - and I think prejudicial - situation here, Your

4   Honor.

5              SPECIAL MASTER WILKES:  Well, I think

6   you should have been on notice of it because of the

7   order that said discovery is going to be limited to

8   fact-specific and not duplicative of what took

9   place in the other MDL actions.  So -- you know,

10  that's just been the general trend through the

11  whole matter.

12             I understand it's an expert and there's

13  more leeway there, but it is still discovery.  So

14  -- you know, I think everyone has been cognizant --

15  or should have been cognizant of that limitation.

16             And in the fact witnesses -- in fact,

17  all that was done is reiteration, the fact that

18  it's going to be oftentimes geographically limited.

19  Some, I think -- and I'm thinking back, even

20  geographically limited as to the facts and

21  discovery occurring into West Virginia.

22             So I don't think you're prejudiced by

23  the fact because you have that information that

24  you're inquiring again.  If there's something new

Page 75

1   that's specific to West -- to this case, then

2   you're entitled to inquire that way.

3            I'm not in any way saying you're

4   precluded from asking how the application of that

5   opinion applies to West Virginia or applies to this

6   case, but if the -- if the witness says, you know,

7   "I opined X and Y equals Z in the New York case" or

8   "on another case" and then the next question is,

9   "Well, is there any -- does it have any different

10  application to West Virginia?"

11           If they say, "No," then you live with

12  that opinion because it's -- you previously had the

13  opportunity to flesh it out.

14           So I don't think it's prejudicial

15  whatsoever, and you know, I just think that we have

16  to be cognizant of the fact that we're -- we're

17  looking at a specific jurisdiction for the elements

18  of proof here, and that's what the discovery - even

19  experts - should be limited to.

20           MR. HESTER:  Well, Your Honor, I mean,

21  I understand your position, and just to state our

22  position on the record so it's clear, we understood

23  the limitations on fact discovery, but to our

24  knowledge, those have not been applied to expert

1    opinions.

2              This is an opinion she's stating in

3    this litigation, and we're not being permitted to

4    inquire fully into it.  It's not the same principle

5    as -- as fact discovery where there was an effort

6    to avoid duplication of facts.

7              This is the expert opinion that's being

8    offered in West Virginia, and we're now being told

9    in the midst of the deposition that we have to sift

10   through and figure out what -- what she copied from

11   her report out of New York or Ohio and what is new.

12             That's a -- that's a quite difficult

13   standard to abide by, and it puts us in a

14   prejudicial position that's different from a fact

15   witness who's not subject to redeposition on the

16   same facts.

17             This is an expert opinion being offered

18   by a retained expert, and we had not understood

19   that there would be this suggestion that somehow if

20   she had a passage in her report in New York that

21   she has copied into her West Virginia report that

22   somehow we're precluded or limited in what we can

23   ask about that opinion in West Virginia.

24             So with respect, Your Honor, I would

Page 77

```
 1   view this as -- or would submit it should be viewed
 2   as different from the -- from the way in which the
 3   Court has handled fact witnesses.
 4               SPECIAL MASTER WILKES:  Well, on that
 5   subject, explain to me why it is different
 6   information that you've not already had the
 7   opportunity to inquire into.
 8               MR. HESTER:  Because her opinions
 9   relate -- they may be a generalized opinion that
10   has a general background or predicate that is
11   comparable to what she said in New York or
12   comparable to what she said in Ohio, but it has
13   applications to this community that are different.
14               The implications --
15               SPECIAL MASTER WILKES:  Well --
16               MR. HESTER:  Go ahead.
17               SPECIAL MASTER WILKES:  I think you're
18   not -- you're not understanding me.  You're
19   entitled to inquire to that, how it is different in
20   -- to this litigation.  You're entitled to make
21   that inquiry.
22               MR. ARBITBLIT:  And if the witness
23   says it's not different, then the inquiry is
24   foreclosed.  Correct, Your Honor?
```

Page 78

1            MR. HESTER:  Well, Your Honor, that's
2   -- we need -- we need to have some leeway here to
3   be able to ask her threshold questions to build up
4   to the West Virginia-specific pieces.  We can't be
5   precluded from a subject just because she says, "I
6   have a general view that is the same."
7            Because the general view needs to be
8   applied in relation to the West Virginia-specific
9   facts.
10           SPECIAL MASTER WILKES:  So ask her
11  that.  Ask her how her general view applies to West
12  Virginia facts.  But that general view, you've
13  already had the opportunity to inquire into.
14           MR. HESTER:  Well, but, Your Honor,
15  I'll give you a specific example.  She was asked
16  about -- she was asked about a paper that she wrote
17  on -- on the use of opioids in rural communities,
18  and she was asked about that in New York.  It's one
19  of the papers that counsel objected to my asking
20  her about today.
21           In the New York litigation, she said,
22  "Well, I don't know whether this is really a rural
23  area to which this would apply."
24           I mean, we need to be able to have a

Page 79

1    little room to maneuver, is all I'm suggesting, to

2    build some basic questioning about elements of her

3    opinion that then allow us to get to West

4    Virginia-specific facts.

5              What I'm concerned about is we're gonna

6    be put in a posture where we have to ask her a

7    generalized question, "Is your view on a certain

8    subject the same or different in West Virginia?"

9    You -- we need to be able to ask her the general

10   questions about the subject in order to get to the

11   specific questions about West Virginia.

12             I -- we shouldn't be precluded from an

13   area of inquiry simply because her view on the

14   general topic is the same as in New York or Ohio

15   because we need to ask the general questions to get

16   to the specific new West Virginia questions.

17             MR. ARBITBLIT:  Your Honor, that's a

18   very misleading reference to the article that

19   Mr. Hester just made.

20             MS. DO AMARAL:  Hang on, Don.

21             SPECIAL MASTER WILKES:  Hold on.  Why

22   do you have to ask the general questions if the

23   inquiry is, "No, my view's not different"?

24             MR. HESTER:  Your Honor, because --

Page 80

1    because it's more nuanced than that.  It's not as

2    simple as, "Did the car go through the red light?"

3    It -- these are very subtle points that she's

4    testifying to.

5              We have to have a common understanding

6    on the general points to -- in order then to be

7    able to ask her specific questions about how that

8    applies to West Virginia.

9              What I'm concerned about is that we'll

10   be put in a posture where in the midst of this

11   examination, she says, "Well, my general view" on

12   X, Y, Z subject --

13             (Random overtalk from someone with

14   their sound not muted.)

15             MR. HESTER:  I think somebody is on

16   the line --

17             MR. RUBY:  I think somebody is on the

18   call --

19             MS. DO AMARAL:  Mr. Ruby?  I think you

20   may need to mute your phone.

21             MR. RUBY:  No, not me.  I was pointing

22   out that somebody was on a call on the other line.

23             MS. DO AMARAL:  Apologies.

24             MR. ARBITBLIT:  Your Honor, if I may,

Page 81

1    the article that Mr. Hester referred to about

2    rural/urban differences, his question had nothing

3    to do with the aspects of that article.  Instead,

4    it was the identical question that was raised by

5    his partner Paul Schmidt in a previous deposition

6    about whether opioids are effective for chronic

7    pain based on one sentence that the witness has

8    written in 2014.

9             It was the identical question, seeking

10   a different answer, and it had nothing to do with

11   West Virginia.  The sentence is, "When used as

12   prescribed under medical supervision, opioid

13   analgesics are effective and used as standard

14   practice in managing acute and chronic pain."

15            That was the sentence that counsel read

16   to her.  Had nothing to do with West Virginia or

17   rural/urban differences.  It's the same quote that

18   his partner pulled out of this six-year-old article

19   less than six months -- or eight months ago in

20   another deposition and it -- that's a perfect

21   example of why they shouldn't be allowed to plow

22   old ground.

23            MR. RUBY:  Judge, this is Steve Ruby

24   again.  I think -- and I don't want to put words in

Page 82

1  Mr. Hester's mouth, but I think what he is saying

2  is there will be situations in the course of this

3  deposition where he needs to lay foundation for

4  West Virginia-specific questions, where it's not

5  possible to simply jump in and say, "Do you agree

6  that -- that this applies to West Virginia" where

7  in other words, there will need to be some

8  foundation laid as to what this is.  So you can

9  imagine a series of questions along the lines of

10  "You agree" -- or "It is your opinion that the

11  supply of opioids functions in X manner, and the

12  basis for that opinion is Y, and" so on and so on,

13  leading up to what I think everyone agrees would be

14  a necessary and appropriate question, which is "Do

15  you -- is it your opinion that the supply of

16  prescription opioids functions in the same manner

17  in West Virginia and that it functioned in the same

18  manner with respect to Cabell County/Huntington,

19  how is it that you've reached that conclusion and

20  what do you base that on?"

21            And correct me if I'm wrong, but I

22  don't take your ruling to be so broad as to

23  preclude good faith foundational questions that are

24  necessary in order to -- in order to establish or

Page 83

1    permit the asking of the West Virginia-specific

2    questions.

3                    MS. DO AMARAL:  Mr. Ruby, it's getting

4    harder to hear you.

5                    MR. RUBY:  Judge, does that -- did you

6    catch all that?

7                    SPECIAL MASTER WILKES:  I caught most

8    of it, and actually, Mr. Ruby, as you often do, you

9    put it in better words than I do.  That's exactly

10   right.  I understand you're going to have to make

11   some inquiry to make the determination as to

12   whether or not it is jurisdictionally unique, and

13   that's allowable.

14                   What is not is just to go back and

15   knock out -- attempt again to rehash the general

16   basis of the opinions that have been subject to

17   inquiry at previous depositions.

18                   That's the duplicative part.  I

19   understand that you have to lay a foundation, you

20   have to lay a basis to get into whether or not

21   there is a difference, and that is correct, and I

22   think there can be -- and that's fair game.

23                   Because there could be an inquiry as to

24   the knowledge of the jurisdiction and why the

Page 84

1   expert opines that that previous opinion they hold,

2   why it's applicable to this jurisdiction that's a

3   part of this lawsuit.

4            So yes, I understand that.  What I want

5   to get away from is just a rehashing and reinquiry

6   of the previous depositions.  But yeah, there has

7   to be some leeway in setting the foundation, and

8   it's only fair to the witness also to let them have

9   an opportunity to explain how they feel it's

10  applicable or not to this jurisdiction.

11           So I think Mr. Ruby gets -- gets it.

12           MR. ARBITBLIT:  Your Honor, if I may,

13  this is Don Arbitblit again responding to that.

14  Again, I don't want the foundation exception to

15  swallow up the rule and have Mr. Hester asking all

16  the questions he planned to ask and then at the end

17  of his sequence of questioning ask, "How does this

18  apply to West Virginia?"

19           We're talking about articles that, by

20  and large, the literature that the witness -- if

21  the witness relied on something that's specific to

22  West Virginia, it's fair game.  But if the

23  witness -- as is the case with what's been raised

24  previously and as is the case with the vast

                                                            Page 85

1    majority of her references in her report, they're

2    national studies.  They're studies of populations

3    that -- that inform her opinions.

4                   If the initial foundational question

5    should be, "Do you have any opinions about this

6    study that are specific to West Virginia?"  That

7    would abide by Judge Faber's order and with Your

8    Honor's formulation of the question that this needs

9    to be jurisdiction-specific.

10                  The foundation isn't, "Did this study

11   say X, Y and Z and did this study relate to

12   incidence or prevalence or did this study relate to

13   the misuse or opioid use disorder," which are all

14   generic questions that have been asked in this

15   deposition about materials that are not specific to

16   West Virginia.

17                  So to the extent foundation is that

18   question, do you have any opinions about this

19   article that are specific to West Virginia" as

20   opposed to generic to your overall opinion, then

21   fine, ask the question and the witness can answer

22   it.  And if the answer is "Yes," then you can

23   proceed with further questioning.

24                  But if the answer is "No," it's the

Page 86

1   same as it would have been in the previous

2   litigation at the time of the previous deposition,

3   then, I -- I don't see how that type of inquiry

4   would abide by Judge Faber's ruling or your own.

5                MR. RUBY:  But Judge, I think that --

6   with due respect to opposing counsel --

7                MR. ARBITBLIT:  The judge is speaking,

8   Steve.

9                SPECIAL MASTER WILKES:  I'm not far

10  off on that at all.  But there also has to be the

11  ability to inquire as to why you don't think it is,

12  just as if there is the urban/rural difference or

13  something else.

14               There has to be -- there has to be the

15  ability to inquire in regard to -- to some

16  hypothetical that may be posed as to, "Well, why do

17  you not think it's applicable here because we have

18  a rural community or we have an urban community,"

19  so I can't limit it just to -- to a "No," but they

20  also have to have the opportunity to inquire as to

21  why they don't think it's applicable or why it is.

22               But besides that, I agree with you.

23  The foundation can be very limited in regards to

24  these studies.

1           MR. HESTER:  But yet, Your Honor --

2    this is Tim Hester again.  Just to make sure I

3    understand the scope of what you're saying, that

4    setting the foundation about her opinion on a

5    subject requires some questioning about her views

6    that may be general, but then lead to the West

7    Virginia-specific points.

8           And I just want to make sure I've got

9    the ability to ask her questions about her general

10   view on certain points and then to turn to West

11   Virginia.

12          I don't want to have to cut off the

13   entire inquiry simply because her general view is

14   the same as her general view in New York and Ohio.

15          I need to be able to set that

16   foundation before I then ask her the West

17   Virginia-specific pieces of it.

18           MR. ARBITBLIT:  That is exactly the

19   opposite of what is necessary.  That is exactly the

20   exception trying to swallow the rule.  That is

21   exactly trying to ask the same questions about the

22   substance of the article in question rather than

23   asking whether it has any bearing on West Virginia.

24           SPECIAL MASTER WILKES:  Have you guys

Page 88

1    -- have you guys ever heard of the old phrase about
2    choking on a gnat and swallowing a camel?  Because
3    I -- because I think that's where we've gotten.
4                 Whether the substance swallows the
5    rule or not, you know, the law's a wonderful thing
6    and it's a search for the truth, and you scratch
7    your head and wonder why there are a thousand and
8    one exceptions to this ability.
9                 But -- here's the general thing:  You
10   guys know what I'm saying.  It has to be fact --
11   you have to be able to map it into
12   jurisdictionally-specific continued discovery and
13   inquiry.
14                 Now, whether you want to call it
15   foundational or whether you want to call it at the
16   end of, you know, the witness saying, "Yes, I think
17   it applies" or "No, I don't," then asking the
18   question after that, that's fine.  I don't care.
19                 But the premise of it is:  You don't
20   have to rehash the validity and the formulation of
21   the opinion, but you can inquire as to the
22   application of that opinion to West Virginia, and
23   you could inquire as to the expert's reasoning for
24   maintaining that opinion in this case or not

Page 89

1   maintaining it.

2            But the opinion has been inquired into

3   previously.  That's been the subject of previous

4   depositions.  So that -- it then becomes cumulative

5   in this case.

6            So we have to hone it down to be a

7   little more to its application to this specific

8   jurisdiction, this specific case.

9            So if there's a report as to the

10  number or frequency of opioids distributed in

11  Cabell/Huntington and you can say, "Does that

12  opinion that you formed from this national report"

13  or "you've taken from this, does that apply here in

14  Cabell/Huntington in this case?"

15           "Yes."

16           "Well, why?"

17           And then they can explain specifically,

18  jurisdictionally-specifically.

19           Or if they say, "No," you can say,

20  "Well, why," and then you can inquire as to the

21  difference.

22           That's what I'm saying.  So we don't

23  need to -- let's not get too formed up into the

24  rule and all.  But if it's been inquired into and

Page 90

1  it's a basic opinion, then that's off limits.

2  That's duplicative.

3            If it can be specifically inquired

4  into, yes, and its application in this case.  And

5  that's as clear as I can make it.

6            MR. ARBITBLIT:  Thank you, Your Honor.

7  May I assume that the same ruling applies to the

8  deposition of another witness who's also been

9  subjected to 14 hours of deposition testimony

10  that's coming up on Thursday?

11            SPECIAL MASTER WILKES:  I would hope

12  so, but you know -- it's not -- it's not unique to

13  these.  It's been a trend that's gone on through

14  the discovery, whether it be written or deposition

15  discovery, and I think it needs to continue

16  through.

17            If there's specific problems, give me a

18  call, I'll do my best to try to resolve them.  But

19  basically, yes.

20            And it goes to both plaintiffs and

21  defendants.  If it's been inquired into -- and it's

22  what I'm going to call a "general opinion," then we

23  should gloss over it and move into

24  jurisdictionally- specific application of those

Page 91

1    opinions.

2              MR. ARBITBLIT:  Your Honor, there's an

3    article pending at the time of this call by Edlund,

4    which was a study that wasn't West Virginia-

5    specific.  It was a study of the incidence of

6    various degrees of exposure and duration to opioids

7    and what incidence of OUD resulted.

8              I would assume based on this discussion

9    that the next question that Mr. Hester asks of the

10   witness should be "Does your opinion about the

11   Edlund study change based on the fact that this

12   case is in West Virginia as opposed to New York or

13   Ohio?"

14             And if she says, "No," then that should

15   be the end of it.  And I'm assuming also that

16   Mr. Hester disagrees with me, and I'd rather hash

17   this out now than have to get back on the phone

18   with you.

19             SPECIAL MASTER WILKES:  Well, let me

20   ask this question, because the answer -- it will

21   quickly maybe resolve it.  Was that study published

22   prior to any of the -- this expert's depositions

23   previously?

24             MR. ARBITBLIT:  Yes.  It's a 2014

Page 92

1    study.

2                    SPECIAL MASTER WILKES:  Okay.  So why

3    would that change?

4                    MR. ARBITBLIT:  I'm sure -- I'm sure

5    it hasn't.  That's the whole --

6                    MR. RUBY:  Judge --

7                    SPECIAL MASTER WILKES:  Okay.

8                    MR. RUBY:  Judge, it seems to me that

9    it doesn't need to be -- based on the ruling that

10   you've made, it doesn't need to be that

11   restrictive.  And I think as you said at the

12   beginning, we have a limited amount of time, and if

13   Mr. Hester wants to ask 50 questions about various

14   variables that are related to West Virginia, "Did

15   you consider this aspect of the situation in West

16   Virginia," "Did you consider that aspect," I don't

17   think there'd be any prohibition on asking those

18   questions simply because the witness is a very high

19   level know as to whether she has any different

20   opinion relating to West Virginia.

21                    I think we're absolutely entitled.  I

22   think I heard you say that we're entitled to probe

23   the bases for the witness' conclusion or the

24   witness' rendering of the same opinion with respect

Page 93

1    to West Virginia.

2              And I think that is important here, and

3    it's important to recognize that plaintiffs --

4    there's some substantive advocacy here just beyond

5    the procedural point that we're address, because

6    plaintiffs want to take the position that -- that

7    -- and are in this discussion, taking the position

8    that all these national studies apply with complete

9    force and validity to West Virginia.

10             We don't take that position at all.  We

11   think that there are important aspects, important

12   facts and variables specific to West Virginia and

13   specific to Cabell and Huntington that have to be

14   addressed, and I did not understand at all your

15   ruling to be that if Mr. Hester asks the question,

16   "Is there any difference in your opinion on this

17   study because this case is in West Virginia" and

18   the witness says, "No," that we don't get to

19   further probe the basis for that answer.

20             MR. ARBITBLIT:  That's just so

21   disingenuous, Steve.  I mean, you were on the

22   deposition.  Not one word was mentioned about West

23   Virginia in relation to Vowles, Edlund or Doctor

24   Keyes' prior article, the three that we're talking

Page 94

1    about, and so it's -- it's making up a reason after

2    the fact.

3              There was no discussion of West

4    Virginia in relation to those articles because

5    there -- their discussions of whether opioids lead

6    to misuse, opioid use disorder and how much of a

7    dose and duration will lead to what levels of

8    opioid use disorder, which are the same for people

9    whether they're in West Virginia, Montana, Ohio,

10   wherever it happens to be.

11             And to say that their questions should

12   go on about West Virginia ignores what just

13   happened.  These are not West Virginia-specific.

14   To the extent there's West Virginia-specific

15   material - which is extensive - in the witness'

16   report, why not ask your questions about that?

17             SPECIAL MASTER WILKES:  Well, they get

18   to ask their questions -- they get to ask their

19   questions and use their allotted time the way they

20   want, like I -- like I said earlier.

21             If they choose to use it in a way

22   that's not advantageous to them, then let them fall

23   on their sword.  You're gonna be there for seven

24   hours no matter what.  I don't care -- you know, we

Page 95

1   -- we know that's what's going to take place, so I

2   have to give them some leeway as to ask questions

3   they want, and if it is specific as to West

4   Virginia and they want to -- they want to know why

5   it is or is not applicable to West Virginia,

6   they're entitled to ask that, that side of it.

7            That's, I think, what Mr. Ruby is

8   saying, and I have to agree with him there.  But

9   what I -- what I won't allow is inquiry in regards

10  to that which has previously been testified to on

11  -- on a defendant.  But once it's -- once the that

12  threshold that it's not applicable to West Virginia

13  or why isn't it, then that's where the questioning

14  has to stop -- or it is and why is it.

15           Call it foundational or call it

16  subsequent questioning -- you know, this report has

17  -- the premise of this report is X.  "Is it

18  applicable to West Virginia?"

19           "Yes."

20           "Well, why is this applicable to

21  Cabell/Huntington"?  You know, or "The premise of

22  this report is Y, is it applicable to West

23  Virginia?"

24           "No."

Page 96

1          "Well, then why isn't it applicable to

2     West Virginia?"

3          And then I think they're entitled to

4     make that inquiry.  Because --

5               MR.ARBITBLIT:  I agree with Your

6     Honor.  I agree.  I wasn't challenging that aspect.

7     I just don't want a substantive reexamination of

8     the witness on the details or cherry-picked quotes

9     from articles that have been the subject of prior

10    inquiry before we get to the jurisdictional

11    question, and that's --

12              That's what I think is improper.  I

13    think -- I agree with you if the -- if the witness

14    says "It does apply for the same reasons as

15    previously stated" or "It doesn't apply and here's

16    why," let them ask those questions.

17              But what's improper is going through -

18    as they've done so far - the substance of the

19    articles that have been the subject of prior

20    inquiry and eliciting new testimony on things that

21    have been inquired about before without any

22    reference at all to West Virginia in the questions

23    or the answers.

24              SPECIAL MASTER WILKES:  Well, I think

Page 97

1   it's clear -- I've made clear that, you know, we're

2   not gonna have just duplicative examination of

3   opinion previously tested by deposition.  But the

4   application to West Virginia and why or why not it

5   applies is fair game.

6                I don't know how to make it any clearer

7   than that.

8                MR. RUBY:  Judge, I -- thank you,

9   Judge.  And I don't want to beat a dead horse, but

10  I think -- and I can assure you that we will -- I

11  think I understand what you are saying.  I can

12  assure you - and I think I can speak for Mr. Hester

13  in saying - that we will certainly proceed in good

14  faith reliance on the ruling.

15               I think what -- may be one way of

16  expressing what the Court is saying is that there

17  are going to be general attacks on general opinions

18  on which the witness has been previously

19  questioned, but we can discuss those previous

20  general opinions to lay foundation for West

21  Virginia-specific questions and make sure that we

22  have an understanding of what the previous opinion

23  is so that we can ask the West Virginia-specific

24  question and we can make West Virginia-specific

Page 98

1    attacks or ask probing West Virginia-specific

2    questions to challenge previously-expressed general

3    opinions.

4              Is that all fair to say, Judge?

5              SPECIAL MASTER WILKES:  I think so.

6    It's a lot to digest, but I think that is correct,

7    in that -- you know, it ties it into being

8    jurisdictionally-specific in its application in

9    this case in this jurisdiction, yes.

10             And if there's a question, call me.  I

11   understand both sides' position on it.  I think

12   I've been clear, but if -- you know, I understand

13   there also may be some -- some testing of it that

14   has a -- may have some objectionable sides, and if

15   that's the case, just give me a call.

16             And I think it would be easier to put

17   out the brush fires now that we've put out the main

18   one.

19             MR. HESTER:  Thank you, Your Honor.

20             MR. ARBITBLIT:  Thank you, Your Honor.

21             MR. RUBY:  Thank you, Judge.

22             SPECIAL MASTER WILKES:  Uh-huh.

23   Bye-bye.

24             (Phone call with Judge Wilkes ended.)

1             MR. HESTER:  Should we take a break?

2             MR. ARBITBLIT:  If you need one, take

3    one.

4             MR. HESTER:  I know we've had the

5    witness sitting for a while.  Can we just take a

6    five-minute break, Don, and then we'll -- let's

7    resume at five past 11:00.  Okay?

8             MR. ARBITBLIT:  Okay.

9             VIDEO OPERATOR:  Going off the record.

10   The time is 10:58 a.m.

11             (A recess was taken after which the

12             proceedings continued as follows:)

13             VIDEO OPERATOR:  Now begins Media Unit

14   3 in the deposition of Katherine Keyes.  We're back

15   on the record.  The time is 11:07 a.m.

16   BY MR. HESTER:

17        Q.   Doctor Keyes, before we took -- excused you

18   from the deposition for a while, I had been asking

19   you about the Edlund study, Exhibit 10.  Do you

20   have it there in front of you?

21        A.   This is Edlund 2014.

22        Q.   Yes.  Yeah, Exhibit 10.

23        A.   Yes.

24        Q.   And do the -- do the findings of that study

```
                                              Page 100
 1   apply to West Virginia, in your view?

 2        A.   Yes.

 3        Q.   Okay.  Let me ask you to look at Exhibit

 4   46, please.  And for the record, Exhibit 46 is a

 5   paper by Sean McCabe and others, A prospective

 6   study of nonmedical use, prescription opioids

 7   during adolescence and substance use disorder

 8   symptoms in early mid life.

 9             KEYES DEPOSITION EXHIBIT NO. 46

10                  ("A prospective study of nonmedical

11                  use of prescription opioids during

12                  adolescence and subsequent use

13                  disorder symptoms in early midlife" by

14                  McCabe, et al. dated 1-1-19 was marked

15                  for identification purposes as Keyes

16                  Deposition Exhibit No. 46.)

17        Q.   Doctor Keyes, have you seen this study

18   before?

19        A.   Yes.

20        Q.   And let me ask you to look at page 7 of the

21   document.  And under Heading 3.2 - I guess it's the

22   fifth paragraph down - there's a statement,

23   "Adolescents who indicated medical use without a

24   history of NMUPO did not differ from adolescents
```

Page 101

1    with no history of medical use of prescription

2    opioids or NMUPO in the odds of AUD, CUD, ODUD and

3    any SUD symptoms."

4                    Do you see that sentence?

5                    MR. ARBITBLIT:  Objection.  That's the

6    identical question asked about a non-West Virginia

7    study in a prior deposition.  Can you just ask the

8    witness whether opinions on --

9                    MR. HESTER:  That's my next question,

10   Don.  I'm just going to ask her one question, which

11   is whether they apply -- I can't ask her the

12   question unless I can point her to a place that I'm

13   asking her about.

14                   MR. ARBITBLIT:  Thank you.

15      Q.   Do you see that sentence, Doctor Keyes?

16      A.   I do.

17      Q.   Does that apply to West Virginia, in your

18   view?

19                   MR. ARBITBLIT:  Objection.  Vague.

20      A.   Yeah, I -- can I just request a bit more

21   clarification?

22      Q.   Yes.  Does that -- does that statement

23   apply to West Virginia, in your view?

24                   MR. ARBITBLIT:  Objection.

Page 102

1     A.   Does the statement apply to West Virginia?
2  I mean, I would -- I would take issue with the
3  statement.
4     Q.   Excuse me?  I'm sorry.  I didn't understand
5  what you said.  You said you'd take issue with the
6  statement?
7     A.   Well, the -- I believe that the study
8  results generalized West Virginia.
9     Q.   Okay.  Maybe that's a better way to put it.
10  Do you agree that the findings stated in this
11  sentence generalized to West Virginia?
12     A.   Actually, I'm sorry, can I -- I -- can you
13  repeat the question?
14     Q.   Yes.  Do you agree that the findings stated
15  here generalizes to the population of West
16  Virginia?
17                MR. ARBITBLIT:  Object to form.
18     A.   Find -- I'm sorry, I'm just having trouble
19  with --
20     Q.   -- the word "generalized?"  Maybe I can ask
21  it another way.  Do you agree that this finding
22  applies to the population of West Virginia?
23                MR. ARBITBLIT:  Object to form.
24     A.   I don't -- I don't agree with the author's

```
                                        Page 103
 1    -- as I've stated in other depositions, I don't

 2    agree with the author's general description of the

 3    results, so I wouldn't want to say that the

 4    findings -- that this statement generalizes to West

 5    Virginia.

 6         Q.   You don't agree with the statement, you

 7    mean?

 8         A.   That's correct.

 9         Q.   Let me ask you to look at Exhibit 9,

10    please.  Do you have Exhibit 9 there?

11         A.   I do.

12         Q.   For the record, Exhibit 9 is a paper

13    written by Nora Volkow and Thomas McLellan, Opioid

14    Abuse and Chronic Pain - Misconceptions and

15    Mitigation Strategies from the New England Journal

16    of Medicine.

17              KEYES DEPOSITION EXHIBIT NO. 9

18                 ("Opioid Abuse in Chronic Pain -

19                 Misconceptions and Mitigation

20                 Strategies" by Volkow and McLellan

21                 dated 3-31-16 was marked for

22                 identification purposes as Keyes

23                 Deposition Exhibit No. 9.)

24         Q.   Doctor Keyes, have you seen this document
```

Page 104

1    before?

2        A.   Yes.

3        Q.   And I wanted to point you in the first

4    paragraph under SOURCE OF THE OPIOID EPIDEMIC, I

5    wanted to point you to the third and fourth

6    sentences.  It says, "In 2014 alone, U.S. retail

7    pharmacies dispensed 245 million prescriptions for

8    opioid pain relievers," and then it goes on to say,

9    "Of these prescriptions, 65% were for short-term

10   therapy (less than 3 weeks)."

11              Do you see that?

12       A.   I do.

13       Q.   Do you have an understanding that that

14   percentage, 65 percent of prescriptions for

15   short-term therapy, applies to the West Virginia

16   community?

17       A.   I don't have data on that topic.

18       Q.   So you don't know one way or the other what

19   the percentage is in West Virginia of prescriptions

20   written for short-term therapy?

21       A.   No.

22       Q.   Okay.  Let me ask you to look at page 22 of

23   your report, please.  And in your report, at page

24   22 and elsewhere, you describe the way that

Page 105

1  exposure leads to diversion of opioid pills.  Is

2  that correct?

3      A.   Are you referring to a specific sentence or

4  opinion?

5      Q.   I was -- I -- let me ask you -- it's the

6  last sentence under -- before heading C on page 22.

7      A.   Okay.

8      Q.   And there's a reference to "causal

9  relationship between prescription opioid exposure

10  and opioid use disorder."  Do you see that?

11      A.   Yes.

12      Q.   That's what I wanted to ask you about.  So

13  when you use the phrase "exposure" there, are you

14  talking about exposure of the community to opioid

15  pills?

16              MR. ARBITBLIT:  Objection.

17      A.   Can you describe what you mean by

18  "community exposure?"

19      Q.   Well, maybe I should put it the other way

20  around.  What do you mean when you say

21  "prescription opioid exposure"?

22      A.   I am referring to individuals who use

23  prescription opioids.

24      Q.   So that means -- that means people who had

Page 106

1   access to opioids once they were in the community?

2           MR. ARBITBLIT:  Objection.

3       A.   I don't think I mean anything other than

4   people who take opioids.

5       Q.   Okay.  And so when you use the phrase

6   "exposure" there, you're referring to pills that

7   have been dispensed into the marketplace and that

8   are available for use?

9       A.   No.  I mean people who consume opioids.

10      Q.   Okay.  And so your point is that people who

11  consume opioids, some number of them engage in

12  misuse of opioids?  Is that right?

13          MR. ARBITBLIT:  Objection.

14      A.   I mean that when people consume opioids,

15  there is a risk of opioid use disorder.

16              And opioid use disorder can include

17  misuse.

18      Q.   So opioid use disorder can include both

19  misuse or use pursuant to a doctor's prescription?

20  Is that right?

21      A.   It depends on which definition in -- which

22  definition of opioid use disorder we're -- what

23  we're referring to.

24      Q.   And could you just explain what you mean by

1  that point, which definition of opioid use disorder

2  we're referring to?

3       A.   In DSM-V, there was a change in the

4  definition to -- to exclude opioid use disorder

5  diagnoses based on tolerance and withdrawal as sole

6  criteria for diagnosis.

7             So based on DSM-V, those people would

8  -- who presumably could be medical users of opioids

9  would be excluded from the diagnosis.

10      Q.   So let me ask you to look at page 6 of your

11  report, please.  And I wanted to ask you about

12  Point 5 on this page.

13      A.   Okay.

14      Q.   Where you say - and it's the first sentence

15  of that Point 5 - "The expansion of non-medical

16  prescription opioid use would not have occurred

17  without the widespread availability of prescription

18  opioids."  You see that?

19      A.   Yes.

20      Q.   And so is the point you're making there

21  that nonmedical use of prescription opioids was

22  expanded because prescription opioids were more

23  widely available in the community?

24      A.   I think the point that I'm making there is

Page 108

1  that the expansion of nonmedical prescription

2  opioid use occurred in part due to the widespread

3  availability based on opioids that were originally

4  dispensed for supposedly medical uses.

5              So I think the statement you made is a

6  little broader than what the opinion is.

7       Q.   And is your opinion that there was an

8  oversupply that was diverted to opioid misuse?

9       A.   Yes.

10      Q.   And so the diversion you're describing is

11 pills that made their way into the community and

12 led to misuse; is that right?

13      A.   I would just refer to my definition of

14 diversion that I'm using in the report for

15 specificity, and so my definition of "diversion"

16 includes the transfer of opioids obtained through

17 legal medical sources to the illicit marketplace

18 overall.

19             So I think it's a bit broader than your

20 definition here, which is "pills that made their

21 way into the community and led to misuse."  That's

22 more limited.

23      Q.   But the pills that made their way into the

24 community and led to misuse, in your view, are

Page 109

1   often diverted from a medical use to a nonmedical

2   use?

3       A.   They can be diverted.

4       Q.   And so --

5       A.   I would --

6       Q.   -- at page -- sorry.  Sorry.

7       A.   No, I'm finished with my answer.

8       Q.   At page 7, if you look at page 7 of your

9   report, Point 12, and it's the last sentence of

10  that point, you say, "The driving force in

11  increasing opioid-related morbidity and mortality

12  was, and continues to be, access to and wide-spread

13  availability to opioids."

14          Is that right?  Do you see that?

15      A.   I do.

16      Q.   So access means access to people in the

17  community after pills have left a pharmacy.  Is

18  that right?

19      A.   Not necessarily.

20      Q.   How does -- how does the community get

21  access to the pills?

22      A.   Through a physician, for example.

23      Q.   How else would the community have access to

24  pills?

1       A.    I'm sorry, I'm -- I don't think I'm

2    understanding the question.  Is the question, what

3    are all the sources of opioids?

4       Q.    No.  Well, I guess what I'm -- what I'm

5    trying to get to is this:  When you're talking

6    about access, you're talking about access to pills

7    after they leave pharmacies.  Is that right?

8       A.    That's one source of opioids.

9       Q.    And what are other sources of opioids that

10   get into the community and create this access

11   you're describing?

12      A.    I think in my report, I review data

13   specific to that topic and a modal source, for

14   example, is obtaining opioid medications from

15   family, for example.  You know, there's a leftover

16   bottle in the medicine cabinet because too many

17   opioids were prescribed and someone gets access to

18   them through their parents' medicine cabinet.  That

19   would be one example.

20      Q.    And so that example, after too many opioids

21   were prescribed and somebody obtains them from the

22   medicine cabinet, that would be after the pills

23   left the pharmacy?

24      A.    That would be after the pills left the

Page 111

1    pharmacy.

2        Q.    Your focus is on diversion of pills after

3    they leave the pharmacy.  Is that correct?

4        A.    I don't know that I would make that blanket

5    statement.

6        Q.    Do you have any evidence of diversion

7    between the time that pills are shipped by

8    distributors and they're delivered to pharmacies?

9        A.    I don't -- I don't have -- I don't offer a

10   specific opinion on that topic.  That could be the

11   case.

12       Q.    The diversion you discuss is diversion of

13   pills after they have left pharmacies.  Is that

14   right?

15            MR. ARBITBLIT:  Objection.

16       A.    The diversion that I discuss is any

17   transfer of opioids to the illicit marketplace.

18       Q.    And that -- that's after they've left the

19   pharmacy?

20            MR. ARBITBLIT:  Objection.

21       A.    It could be after they leave the pharmacy.

22   I'm not -- I'm not exclusively limiting my opinion

23   to -- on the harms of opioids to opioids that leave

24   the pharmacy.

Page 112

1      Q.    There could also be opioids there illegally

2    trafficked into a community?

3      A.    Sure.  Yes.

4      Q.    That never leave the pharmacy at all,

5    right?

6      A.    That's possible.

7      Q.    But what I wanted to be clear on is:

8    You're not offering an opinion on diversion of

9    pills between the time a distributor ships them and

10   delivers them to a pharmacy, are you?

11     A.    My definition of "diversion" would include

12   that type of activity.

13     Q.    Do you have any evidence of that occurring

14   in Cabell/Huntington?

15     A.    I -- my report focuses on opioid-related

16   harms overall.  I don't offer an opinion on any

17   specific -- any specific -- what is it?  Illegal

18   shipments of opioids.

19     Q.    And you're not offering any opinions on the

20   diversion of shipments between the time they leave

21   a distributor's warehouse and the time they arrive

22   at a pharmacy?

23     A.    My opinion on diversion would be inclusive

24   of that type of activity.

Page 113

1      Q.   But you don't have any evidence of that

2   activity occurring, do you, in Cabell/Huntington?

3      A.   I think my report offers evidence about

4   overall sources of opioids that would be inclusive

5   of any illegal -- any way that opioids are

6   illegally-obtained.

7              I don't offer any opinions or have

8   evidence about specific illegal shipments.  But to

9   the extent that that occurs, that would be included

10  in my report on harms.

11     Q.   Right.  But I wanted to just be clear that

12  -- and I think we're talking the same language

13  here.  I want to be clear that you're not

14  identifying any sources of diversion in relation to

15  shipments between distributors and pharmacies?

16             You haven't identified any such

17  evidence?

18     A.   Right.

19     Q.   And when you talk about -- let's look at

20  your report, page 27.  And I wanted to point you to

21  the last paragraph before Subpart E.  And you refer

22  to "a surplus of opioids that could be diverted for

23  nonmedical uses."  Do you see that?  Sort of in the

24  middle of that paragraph.

1      A.   I do.

2      Q.   And that's a -- that's a surplus that is in

3   the community after it's left the -- after it's

4   left pharmacies; is that right?

5      A.   Not necessarily.

6      Q.   Are you aware of any surplus that's created

7   except after the pills leave pharmacies?

8      A.   I'm not identifying any particular

9   shipments.  But any -- any surplus that occurred in

10  the community would be a surplus regardless of

11  where the surplus originated.

12     Q.   I believe you've expressed the opinion in

13  your report that diversion between family and

14  friends is the most common pathway for diversion.

15  Is that right?

16     A.   It is a common pathway.

17     Q.   And do you agree that distributors do not

18  have a way to prevent family members from sharing

19  pills once they receive them?

20     A.   I wouldn't agree with that as a blanket

21  statement.

22     Q.   How would distributors prevent family

23  members from sharing pills once they receive them?

24     A.   I can't identify any particular ways of --

Page 115

1    that distributors would do that, but I -- I'm not

2    aware -- I don't offer an opinion either way.  I

3    just wouldn't make the blanket statement that

4    distributors can and cannot prevent any activity.

5         Q.   You understand that prescription opioids

6    can't leave a pharmacy unless the doctor writes a

7    prescription?

8         A.   There are other ways that opioids could

9    leave a pharmacy.

10        Q.   Are you thinking of theft from the

11   pharmacy?

12        A.   For example.

13        Q.   What other ways?

14        A.   Other sources of diversion, you know,

15   selling, illegal selling, for example.

16        Q.   So I -- just to be clear, the -- when pills

17   are at a pharmacy, one way pills leave the pharmacy

18   and reach the community is through prescriptions

19   written by doctors, right?

20        A.   That's correct.

21        Q.   Another way is if pills were sold illegally

22   out of a pharmacy; is that right?

23        A.   That is another way, yes.

24        Q.   And another way would be theft from

Page 116

1   pharmacies?

2        A.   That's another way.

3        Q.   Are there others that occur to you that --

4   ways that pills leave pharmacies and get into the

5   community?

6        A.   None come to mind.

7        Q.   And do you have any evidence of any theft

8   from pharmacies occurring in Cabell/Huntington?

9        A.   I haven't reviewed that type of data for

10  this report.

11       Q.   And do you have any evidence of pills being

12  sold illegally from pharmacies in

13  Cabell/Huntington?

14       A.   Again, I'm -- I haven't reviewed that

15  evidence.

16       Q.   You agree that -- that doctors decide on

17  the prescriptions that they believe are warranted

18  for the treatment of pain?

19       A.   I wouldn't make that as a blanket

20  statement.

21       Q.   Do you have an understanding that when a

22  doctor writes a prescription for a medical purpose

23  for prescription opioids, the doctor's exercising

24  his or her judgment that the medical use is

Page 117

1    warranted?

2                MR. ARBITBLIT:  Objection.

3        A.    The doctor's judgment is based on the

4    information that's available.  So in some cases,

5    the doctor is using their -- the judgment that they

6    have based on potentially misleading information,

7    and also there are doctors that prescribe with no

8    medical purpose at all.

9        Q.    So for -- but for doctors who are

10   prescribing for medical purpose, they're making a

11   judgment that the prescription opioids are

12   warranted for that purpose.  That's your

13   understanding?

14               MR. ARBITBLIT:  Objection.

15       A.    I wouldn't say that's a -- that's true

16   across the board.  It can be true, but I wouldn't

17   say that that's always true.

18       Q.    They -- you think that doctors are not

19   making medical judgments when they write a

20   prescription for opioids?

21               MR. ARBITBLIT:  Objection.

22       A.    I think some doctors prescribe with --

23   without medical judgment, and I think the opinion

24   that I'm offering is that -- I think that's the

Page 118

1    opinion that I'm offering, that there are -- I
2    wouldn't make a blanket statement about all types
3    of judgments that physicians use when they're
4    prescribing opioids.
5              Those judgments are oftentimes based on
6    misleading information.
7        Q.   I was -- I was trying to separate the
8    information that the doctor has from the good faith
9    judgment that the doctor is making.  Is it your
10   understanding that when a doctor writes a
11   prescription, the doctor is undertaking to make a
12   good faith judgment that the prescription is
13   warranted?
14             MR. ARBITBLIT:  Objection.
15       A.   Some doctors are; and some are not.  So I
16   can't make a blanket statement about that.
17       Q.   Do you know the percentage of doctors that
18   are or are not making a good faith judgment when
19   they write prescriptions?
20       A.   Yes, there's a section in my report on that
21   topic.
22       Q.   Where?  Can you easily find that?
23       A.   Section C.
24       Q.   What page are you on?

Page 119

1      A.   Page 24.  I think there's a couple

2  different data sources that I would use to inform

3  an opinion about that.  One is that among people

4  with OUD, more than 50 percent obtain prescriptions

5  from a doctor.

6           And second, there are numerous data

7  sources on multiple providers that could be

8  recklessly prescribing, and there's data on

9  prevalence of that.  So I would point to those

10  papers.

11      Q.   So that the people with OUD who obtain

12  prescriptions from doctors, those are not

13  necessarily people who are receiving a prescription

14  written by a doctor in bad faith, are they?

15           MR. ARBITBLIT:  Objection.

16      A.   Not necessarily.

17      Q.   But in any event, the pills can't leave the

18  pharmacy under a prescription unless the doctor

19  writes one.  Correct?

20      A.   Again, I don't -- I don't think I would

21  make that blanket statement.  There could be other

22  ways that people with a prescription could obtain

23  opioids.  One way is someone has a prescription and

24  they walk into a pharmacy and they fill it.  There

Page 120

1   are other ways as well.

2        Q.   Do you understand that distributors shipped

3   the volumes of prescription opioids that were

4   needed to meet the levels that doctors prescribed?

5                  MR. ARBITBLIT:   Objection.

6        A.   I wouldn't make that blanket statement.   I

7   wouldn't agree with that statement as a blanket

8   statement.

9        Q.   Do you -- do you have any evidence that

10   distributors shipped more than what doctors

11   prescribed?

12        A.   I'm not offering an opinion on specific

13   shipments.   I know the overall amount that was

14   shipped was more than was needed.

15        Q.   No, I'm not asking about what was needed.

16   I'm asking about whether doctors -- I'm sorry.

17                  MR. HESTER:   Let me strike that.

18        Q.   I'm asking whether distributors shipped

19   more than what doctors prescribed.  Do you have an

20   understanding that distributors only shipped what

21   doctors prescribed?

22        A.   I have an understanding generally of -- of

23   the distribution process, but I'm not offering an

24   opinion about -- about the relationship between

Page 121

1   prescription and distribution specifically.

2       Q.   Okay.  At the -- at the --

3            MR. HESTER:  Let me strike -- sorry.

4   Let me strike that.

5       Q.   Let's turn to page 6 of your report,

6   please.  And it -- I wanted to point you to

7   Paragraph 5.  You refer to a "widespread

8   availability of prescription opioids that were

9   originally dispensed supposedly" "for medical uses,

10  uses, often in greater quantities and doses than

11  needed."

12           Do you see that?

13      A.   Well, just to quote it accurately, it's

14  "originally dispensed supposedly (but not always

15  actually) for medical uses."  Just to --

16      Q.   Fair enough.  Fair enough.  I omitted that

17  because I didn't want to ask you about that part; I

18  wanted to ask you about another part, which was:

19  How do you decide on what is a surplus or an

20  oversupply?

21      A.   My opinion about that was based on the

22  epidemiological literature that indicated that

23  there's often more opioids dispensed than are

24  medically needed.

Page 122

1      Q.    And that's dispensed from pharmacies?

2      A.    Again, that's one source of oversupply.

3      Q.    But when you say -- when you say "more

4  opioids dispensed than what is needed," you're

5  saying more opioids dispensed from pharmacies than

6  was needed?

7      A.    That specific clause refers to that -- that

8  realm.

9      Q.    And --

10     A.    But there are others.

11     Q.    Sorry.  And the -- what methodology you're

12  -- is applicable there?  You're relying on

13  epidemiological studies on that?

14     A.    That's correct.

15     Q.    And can you -- can you point me to where

16  you're doing that in your report?  I think maybe it

17  could be at page 23.  See if we get to the right

18  place.

19     A.    Yes, that's correct.

20     Q.    And so what are the -- what are the

21  epidemiological studies that you're referring to

22  there?

23     A.    So for example, "Available estimates

24  indicate that 90% of patients prescribed opioids

                                          Page 123

1   after a surgery have unused medication."  That

2   would are one -- and there are three studies

3   supporting that.

4        Q.   So that would be -- that would be an

5   example where a doctor prescribed prescription

6   opioids and there were unused opioids left after

7   the course of treatment?  Is that right?

8        A.   That's right.

9        Q.   And is there anything else you're relying

10  on aside from those epidemiological studies to make

11  a conclusion about what was a surplus or an

12  oversupply?

13       A.   Yes.

14       Q.   What else?

15       A.   So the next study that is described in this

16  section is on nonmedical opioid users being

17  interviewed about where they obtained opioids.  For

18  example, 50% "received from a friend or a

19  relative."  That's not necessarily a pharmacy

20  source, but could be.

21            And then the next section is peers or

22  family, the most common source of opioids for

23  college students, and there's two studies cited

24  there.

Page 124

1              And again, that's not necessarily a

2      pharmacy source.  But it could be.

3              Then the next one is a study that

4      showed that opioid dispensing to family members is

5      associated with three times the risk of a

6      prospective individual hospitalized overdose.  And

7      so those presumably would be pharmacy sources.

8              And then the next section goes into

9      detail about individuals receiving opioids from

10     multiple prescribers and high-volume prescribers.

11        Q.   So -- okay.  So when you're saying that

12     there's a surplus or an oversupply, do you base

13     that on the fact that there's excess medication

14     that family and friends have available to divert to

15     others?  Is that the basis on which you

16     characterize it as an oversupply?

17        A.   That's one source of oversupply.

18        Q.   I'm trying to get at the question of how

19     you conclude it's an oversupply.  How do you -- how

20     do you decide that it's an oversupply?

21        A.   So based on the totality of the literature,

22     that there is a lot of excess opioids that were not

23     used medical -- not needed medically.  So that

24     includes --

Page 125

1      Q.    And --

2      A.    -- family, friends.   That includes

3   prescriptions.   That includes other sources of

4   diversion.

5      Q.    Have you evaluated the medical needs for

6   prescription opioids in West Virginia?

7      A.    Can you say what you mean by "medical

8   needs"?

9      Q.    Well, do you agree that there are

10  legitimate medical needs for opioids?

11            MR. ARBITBLIT:   Objection.

12     A.    I think that -- sure, there are -- there

13  are uses for opioids, and there are uses for

14  opioids in the Cabell/Huntington community.   But I

15  think what the evidence shows is that there was --

16  the distribution of opioids into the

17  Cabell/Huntington community is clearly well over

18  what is needed.

19     Q.    But let me -- let me then just drill into

20  that question.   Have you undertaken any study to

21  evaluate what level of opioids are needed in the

22  Cabell/Huntington community?

23     A.    There is literature on -- on guidance

24  regarding opioid prescribing that is relatively up

Page 126

1    to date, and so I would rely on that guidance to

2    answer that question.

3              I have not applied current high rigor

4    guidance specifically to the Cabell/Huntington

5    community.

6        Q.   So you've not undertaken any evaluation of

7    how many pills are needed in Cabell/Huntington?

8              MR. ARBITBLIT:  Objection.

9        A.   I -- no, I have not taken -- I've not

10   undertaken that.

11       Q.   And the guidance you referred to, is that

12   the CDC guidance on prescription opioid

13   prescribing?

14       A.   That's one source.

15       Q.   What other guidance are you referring to?

16       A.   There's been a number of other guidance

17   sources that I cited in the report.

18       Q.   Okay.  So I may circle back to that.

19   You're not an expert in pain management, I take it?

20              MR. ARBITBLIT:  Objection.

21       A.   I think part of having epidemiological

22   expertise on opioid use disorder is a general

23   knowledge of that literature.

24       Q.   But you don't treat patients for pain?

Page 127

1      A.    I don't treat patients for pain.

2      Q.    And have you evaluated the medical need for

3  opioids in West Virginia?

4      A.    I've generally evaluated medical needs for

5  opioids, and I would say that those findings

6  generalize to West Virginia.

7      Q.    And what have you done to evaluate the

8  medical needs for opioids?

9      A.    I've reviewed literature.

10     Q.    What literature have you seen evaluating

11 the medical needs for opioids?

12     A.    I think there's a number of studies that

13 have discussed appropriate uses of opioids.

14     Q.    Yeah, but I'm talking about -- well, maybe

15 let's back up to make sure we're on the same page.

16 The overall supply of opioids in the community

17 reflects an aggregation of judgments by doctors

18 about what's medically needed, right?

19             MR. ARBITBLIT:  Objection.

20     A.    I wouldn't make that blanket statement.

21     Q.    Well, let's focus on prescriptions written

22 by doctors for legitimate medical need.  The

23 prescriptions written by doctors for medical -- for

24 legitimate medical need, those would aggregated to

1   a judgment by doctors about the medical need.

2   Correct?

3              MR. ARBITBLIT:  Objection.

4      A.   I don't think that most doctors -

5   especially during this time period - had sufficient

6   guidance on what is a legitimate medical need in

7   order to suggest that -- that the entire supply of

8   opioids to the Cabell/Huntington community that is

9   written by doctors would be based on legitimate

10  medical need.

11     Q.   But doctors make that judgment about what's

12  needed?

13             MR. ARBITBLIT:  Objection.

14     A.   Do doctors make a judgment about what's

15  needed?  I think some doctors make judgments in

16  good faith; other doctors do not.

17     Q.   But for those judgments who make -- I'm

18  sorry.

19             MR. HESTER:  Strike that.

20     Q.   For those doctors who make judgments in

21  good faith, they're making judgments about what

22  they believe is medically needed.  Right?

23             MR. ARBITBLIT:  Objection.

24     A.   They are making judgments based on a set of

Page 129

1   evidence that might be tainted by not sufficient

2   rigor.  They might not be up to date on current

3   trainings.  I mean, to suggest that all doctors

4   were writing prescriptions in good faith or making

5   medically-legitimate decisions, I think would be a

6   mischaracterization of what we've seen in the

7   opioid epidemic.

8       Q.   You have not evaluated, though, what the

9   level of medical need is in West Virginia?

10              MR. ARBITBLIT:  Objection, asked and

11  answered.

12      A.   I have evaluated literature about medical

13  uses of opioids and I believe that those findings

14  are generalized to West Virginia.

15      Q.   I think there's a difference though.  Your

16  answer referred to medical uses.  I'm talking about

17  the aggregate medical need, and what I wanted to

18  ask you about is -- is any literature dealing with

19  the aggregate medical need for opioids.  Have you

20  evaluated that question?

21              MR. ARBITBLIT:  Objection.

22      A.   No.

23      Q.   When you refer to quantities and doses at

24  page 6 of your report, you refer to "prescription

Page 130

1    opioids that were" "dispensed" "in greater

2    quantities and doses than needed."  Do you see

3    that?  It's again on -- that Point 5 on page 6.

4        A.   Yes.

5        Q.   The doctors are the ones who decide on a

6    quantity and dose for a given prescription, right?

7                 MR. ARBITBLIT:  Objection.

8        A.   In this specific context.  In this specific

9    opinion.  I'm specifically referring to "dispensed"

10   opioids in "quantities and doses greater than

11   needed."  And in that case, the physician would be

12   writing a prescription, in most cases.  Although

13   not necessarily all.

14       Q.   But the prescription -- the prescription

15   with the quantity and the dose, that's something

16   that the doctor decides on?

17                 MR. ARBITBLIT:  Objection.

18       A.   When there is a prescription written by a

19   doctor.

20       Q.   And the distributors don't decide on the

21   quantity and dose for particular prescriptions,

22   right?

23       A.   Distributors don't write prescriptions,

24   that's correct.

Page 131

1    Q.   Do you agree or understand that the

2  expansion of nonmedical use of prescription opioids

3  would not have occurred without the increase in

4  supply caused by doctors' prescriptions?

5    A.   I agree that that is one source of the

6  increase in supply.

7    Q.   And we've talked about some of the other

8  sources of increased supply as well, right?

9    A.   We've talked about some of them.

10    Q.   What are -- what are the other sources you

11  have in mind, aside from doctor prescribing?  What

12  are the other sources for increases in supply?

13    A.   Your question is:  What are the sources of

14  prescription opioid supply?

15    Q.   Yes.  You said one source is doctors'

16  prescriptions.  What are other sources?

17    A.   I think the amount of product that is made

18  and distributed in the United States that could be

19  diverted at any point along the chain from the

20  making of the product to it arriving in a

21  community.

22    Q.   Well, let's -- maybe let's focus more

23  specifically so we don't make it too cosmic.  Let's

24  focus specifically on Huntington/Cabell.  I take it

1    you do have evidence of prescribing behavior in

2    Huntington/Cabell that led to an increase in supply

3    of prescription opioids?

4              MR. ARBITBLIT:  Object to form.

5         A.   I have evidence of the distribution of

6    prescription opioids in the Cabell/Huntington

7    community.

8         Q.   You have evidence of an increase in supply

9    that was caused by doctor prescribing behavior,

10   correct?

11        A.   I have evidence of the distribution.  Some

12   of that could have arrived -- become disseminated

13   into the community through a prescription, and

14   there might be other sources as well.

15        Q.   Well, that's what I want to focus on, ways,

16   to your understand, that prescription opioids were

17   disseminated into the Huntington/Cabell community.

18   One way, I take it, is by prescriptions written by

19   doctors.  Right?

20        A.   Yes.

21        Q.   What other ways are you aware of that

22   prescription -- that prescription opioid supply

23   increased in Huntington/Cabell into the community?

24        A.   I don't -- I think I've answered the

Page 133

1    question.  I'm not sure -- what are other ways that

2    -- so you're asking one way that prescription

3    opioids be -- get into a community is because a

4    doctor writes a prescription for them?

5         Q.   Right.

6         A.   Other ways are through other sources of

7    diversion that we've mentioned:  You know, family,

8    friend, peer, drug dealer, you know, anyone who has

9    access to opioids through the way that they access

10   them.

11             Maybe through informal social networks

12   of sharing medication.  Maybe it was through

13   counterfeit medication.  I mean, there's other ways

14   that prescription opioids can be in a community.

15        Q.   The -- but your view is that the expansion

16   of nonmedical use would not have occurred without

17   an increase in the supply of prescription opioids

18   in the community?

19             MR. ARBITBLIT:  Objection.

20        A.   That's correct.

21        Q.   Have you performed any analysis as to

22   whether the opioid crisis would have occurred or

23   occurred in the same way if doctors had not

24   increased their prescribing of prescription

Page 134

1  opioids?

2          MR. ARBITBLIT:  Asked and answered.

3      A.  Yes, I think there is literature on that

4  topic, that doctors writing prescriptions is one

5  way that contributed to the opioid crisis.

6      Q.  Yeah, I was asking really the other side of

7  it.  I was asking, have you done an analysis as to

8  whether the opioid epidemic would have occurred in

9  the same way if doctors had not increased their

10  level of prescribing?

11          MR. ARBITBLIT:  Objection.

12      A.  I think that it would not have occurred in

13  the same way if doctors had not increased their

14  prescribing, based on the studies that were done.

15  So I think my analysis is the review of the

16  literature, and I think the opioid epidemic would

17  not have occurred in the same way if doctors had

18  not increased their level of prescribing.

19      Q.  We talked a minute ago about the

20  prescribing beyond recommended guidelines, and let

21  me point you to Exhibit 4.  I don't think we've

22  opened that up yet.

23          KEYES DEPOSITION EXHIBIT NO. 4

24              (CDC Guideline for Prescribing Opioids

```
                                          Page 135

 1              for Chronic Pain - United States, 2016

 2              was marked for identification purposes

 3              as Keyes Deposition Exhibit No. 4.)

 4      Q.   Do you have that one there?

 5      A.   I do.

 6      Q.   So Exhibit 4 is the CDC Guideline for

 7   Prescribing Opioids for Chronic Pain - United

 8   States, 2016.

 9              Are these the guidelines you are

10   referring to when you said you saw evidence of

11   prescribing beyond guidelines?

12      A.   One set of guidelines.  There are --

13      Q.   There are -- sorry.  Are there others you

14   had in mind?

15      A.   I believe there are several others that are

16   cited in my report.

17      Q.   Can you point me to those?  I couldn't

18   figure out when I saw a reference to guidelines, I

19   wasn't sure what you were referring to.

20      A.   I'm sorry, I'm just looking through my

21   reference list.  I believe that there are other

22   guidelines that have been published, for example,

23   by NIDA.

24      Q.   Are those cited in your report?
```

Page 136

1      A.    I think so, but I could double-check.

2      Q.    Any other guidelines that you had in mind?

3      A.    I believe that the Association of Schools

4  and Programs of Public Health published in 2019

5  also has prescribing guidelines in it.  That's

6  Reference 45.

7      Q.    Okay.  Thank you.  Let's just look at the

8  CDC Guidelines for a minute, Exhibit 4.  Is it your

9  understanding that these guidelines are not meant

10  to prevent physicians from prescribing in excess of

11  the guidelines?

12            MR. ARBITBLIT:  Objection.

13      A.    Can you rephrase?  I don't think I

14  understand the question.

15      Q.    Do you have an understanding that these

16  guidelines were intended to set recommendations but

17  not to prevent prescribing in excess of the

18  guidelines?

19            MR. ARBITBLIT:  Objection.

20      A.    My understanding is that these guidelines

21  do not prevent prescribing in excess of them.

22      Q.    And that's reflected -- I -- I'm not trying

23  to play a game with you on that.  I think that's

24  reflected - but let me see if you agree - on page

Page 137

1    2.  The -- in the right-hand column of page 2,

2    before Rationale, there's a statement three

3    sentences up.  It says, "The recommendations in the

4    guideline are voluntary, rather than prescriptive

5    standards."

6              Do you see that?

7      A.   I see that.

8      Q.   And so that reflects the point that these

9    were meant to be voluntary -- voluntary

10   recommendations and not to prevent doctors from

11   prescribing in excess when they believe that was

12   medically warranted?

13     A.   I think the guidelines do not prevent

14   people from prescribing excessive amounts of

15   opioids.

16     Q.   And it was left to doctors to decide on the

17   risks and the benefits of what they would

18   prescribe?

19              MR. ARBITBLIT:  Objection.

20     A.   I think -- I think the guidelines don't

21   prevent doctors from prescribing levels of opioids

22   beyond that which is recommended.  Whether they're

23   prescribing those above the level that are

24   recommended, what are -- what is driving those

Page 138

1    decisions, I'm -- I don't think risks and benefits

2    are among the only factors.

3        Q.   Correct.

4        A.   They also have to take into account the

5    information they've been given.

6        Q.   And -- but those -- those risks and

7    benefits are weighed by doctors and not

8    distributors.  Correct?

9              MR. ARBITBLIT:  Objection.

10       A.   I think that a doctor's knowledge of the

11   risks and benefits are based on the information

12   that they've been given.  I don't think

13   distributors prescribe opioids.  But I don't think

14   it would be accurate to say that the distributors

15   don't have a role here.

16       Q.   The doctors formulate their judgments about

17   the risks and benefits of medicines based on a wide

18   range of inputs.  Do you agree?

19              MR. ARBITBLIT:  Objection.

20       A.   It would depend on the medication.  I

21   wouldn't make a blanket statement.

22       Q.   Do you understand that doctors form

23   judgments about particular -- prescribing of

24   particular medicines based on their clinical

Page 139

1   experience with other patients?

2       A.   I think that can be one source of

3   information, among others.

4       Q.   Another source would be whatever they're

5   taught in medical school?

6       A.   Again, I think that can be a source of

7   information, and it would depend on how the

8   information that's being taught in medical school

9   was derived.  Not derived de novo, as I've

10  testified before.

11      Q.   Let me ask you to look at your report, page

12  22.  At the bottom of the page, the very last

13  sentence, you refer to "pervasive oversupply from

14  high volume facilities."

15          Do you see that?

16      A.   I do.  "...facilities and pharmacies

17  distributing extraordinary quantities of opioids."

18      Q.   Right, right, okay, good.  What do you mean

19  there by "high volume"?

20      A.   That has been defined in the literature.

21  Let's see.  I just want to make sure that I'm

22  giving the correct -- I think I would need to go to

23  these specific studies to know exactly how most of

24  the literature defines it.

Page 140

1          I mean, generally it's a very high

2     quantity of opioids.  But the specific number

3     that's used, I would need to look at the studies

4     again to know that for sure.

5          Q.   What's the basis for your knowledge about

6     high volume facilities?  Is it based on a review of

7     the literature?

8          A.   Yes.

9          Q.   Have you done any independent study

10    yourself of what a high volume facility is?

11         A.   No.

12              MR. ARBITBLIT:  Objection.

13         A.   I've reviewed the literature.  That -- the

14    analysis that I've done is a review of the

15    literature.

16         Q.   Have you evaluated any high volume

17    facilities in Cabell/Huntington?

18         A.   Yes.  That's included in here through the

19    IQVIA data in terms of what's been published in the

20    literature.

21         Q.   Do you know what page you're on when you

22    refer to that?

23         A.   25.  I'm fairly clear that -- I'm fairly

24    certain that those rates have been published.

1      Q.   So I see on page 25, you're referring to

2   prescribers with a high volume or extraordinary

3   volume of prescriptions.   I was asking about high

4   volume facilities.

5              Do you -- is that synonymous for you,

6   or is it -- is there a difference between a high

7   volume facility and a high volume prescriber?

8      A.   Those would be the -- it depends.   They can

9   be similar; they can be different.

10     Q.   So if a high volume --

11     A.   The literature --

12     Q.   Sorry.

13     A.   -- when they talk about high volume

14   providers, those are often referred to as pill

15   mills, and so within a specific high volume

16   facility, there might be -- the high volume

17   facility would be made up of high volume

18   prescribers.

19     Q.   But a high volume facility -- just to make

20   sure we're talking the same language, a high volume

21   facility could include a pain clinic?

22              MR. ARBITBLIT:   Objection.

23     Q.   Is that one of the ways -- one of the types

24   of facilities you might consider a high volume

Page 142

1   facility?

2            MR. ARBITBLIT:  Objection.

3       A.   Sorry, let me just look at the -- what do

4   you mean by a "pain clinic?"

5       Q.   Well, do you know what pain clinics are?

6            MR. ARBITBLIT:  Objection.

7       Q.   In other words, a clinic that is

8   specifically focused on treating pain.  Are you

9   aware of those?

10      A.   I'm aware that there are clinics that focus

11  on -- on -- that supposedly focus on the treatment

12  of pain.

13      Q.   And --

14      A.   -- under many conditions.

15      Q.   Sorry.  I didn't mean to interrupt you.

16  Have you evaluated any pain clinics in

17  Cabell/Huntington?

18           MR. ARBITBLIT:  Objection.

19      A.   I've evaluated the overall distribution of

20  opioids.  I don't know that I would -- I haven't

21  evaluated any specific clinics.

22           I've looked at high volume prescribers

23  and high volume prescribing.

24      Q.   You're aware that doctors today are still

Page 143

1    prescribing in West Virginia a meaningful volume of

2    prescription opioids, right?

3         A.   Yes.

4         Q.   And to -- do you have an understanding as

5    to whether doctors in West Virginia today have been

6    apprised of the addiction risks of prescription

7    opioids?

8              MR. ARBITBLIT:   Objection.

9         A.   I don't know what any one particular doctor

10   has been informed of.

11        Q.   Do you believe the population of doctors in

12   West Virginia have been informed of the addiction

13   risks associated with opioids?

14             MR. ARBITBLIT:   Objection.

15        A.   I don't have any data on that topic.

16        Q.   So you don't have an understanding one way

17   or the other as to whether doctors in West Virginia

18   have been apprised of the addiction risks of

19   opioids?

20        A.   That's correct.

21        Q.   Have you undertaken any evaluation of the

22   standard of care for treating pain?

23        A.   I have reviewed guidelines that have been

24   published in the literature on pain.

Page 144

1      Q.    Is that the CDC guidelines or other things
2  you're thinking of?
3      A.    The same documents that I had mentioned in
4  our previous conversation.
5      Q.    Okay.
6      A.    Well, there's other literature as well
7  cited in the report about pain treatment efficacy.
8      Q.    And have you undertaken any analysis of
9  pain needs specifically in Cabell/Huntington
10  community?
11              MR. ARBITBLIT:   Objection.   Asked and
12  answered.
13      A.    No.
14      Q.    And have you undertaken any specific
15  evaluation of pain needs in West Virginia?
16      A.    I would only say to the extent that, you
17  know, the available literature has characterized
18  overall levels of pain that I would say generalized
19  to that area.   But beyond review of the general
20  literature, I have not done any specific analysis
21  of West Virginia.
22      Q.    And is the literature you're thinking of
23  literature that evaluates the standard of pain in
24  West Virginia, or is it really more nationwide?

Page 145

1      A.   I would say that it's more general.

2      Q.   And have you seen any studies reflecting

3  that there may be higher pain needs in West

4  Virginia?

5      A.   I seen some literature on that.

6      Q.   And do you have an understanding that one

7  of the factors that may lead to higher needs for

8  pain treatment in West Virginia is the nature of

9  the physical work engaged in in the state?

10     A.   Yes, I've seen literature on that.

11     Q.   And do you have an understanding as well

12  that the higher levels of obesity in West Virginia

13  may be another factor that leads to higher needs

14  for pain treatment in the state?

15     A.   That -- that could lead to pain, yes.

16     Q.   And you've seen studies or documents to

17  that effect?

18     A.   Generally, yes.

19     Q.   Are -- we've talked about obesity and

20  physical labor.  Are there other factors you've

21  seen that are specific to West Virginia that may

22  lead to higher needs for pain treatment?

23     A.   I would need to review the literature

24  again.  Nothing comes to mind.

Page 146

1      Q.    Nothing comes to mind?

2      A.    (Nodded affirmatively).

3      Q.    Have you evaluated the changes in the

4   standard of care for the treatment of pain?

5      A.    I'm generally familiar with the fact that

6   there have been changes.  But I didn't -- I didn't

7   review that literature in order to form opinions of

8   it.  I'm just generally aware of it.

9      Q.    And what's your general understanding of

10  the changes in the standard of care for the

11  treatment of pain?

12     A.    I think the most recent changes, is that

13  there has been widespread recognition that opioid

14  prescribing has too many risks and too many

15  benefits to be -- to be of use in widespread

16  treatment of pain.

17     Q.    You're talking there about chronic pain or

18  acute pain?

19     A.    I think both.

20     Q.    Do you believe that opioids are widely used

21  for the treatment of acute pain?

22     A.    I think that there is literature to that

23  effect.

24     Q.    I wanted to focus really on -- on the

Page 147

1    treatment of pain as a concept.  You're aware that

2    there have been changes in the standard for the

3    treatment of pain.

4                    MR. ARBITBLIT:  Objection.

5        A.   I guess I'm not sure what you mean by "pain

6    as a concept."

7        Q.   Well, you understand there's a -- there's a

8    focus on the need to enhance the treatment of pain.

9    This has been a focus in the medical community?

10                   MR. ARBITBLIT:  Objection.

11       A.   I think that there -- I have seen

12   literature on -- for example, pain as the fifth

13   vital sign, that is largely industry-supported.  So

14   to the extent that there is a general feeling in

15   the medical community that hasn't been influenced

16   by industry, I'm not sure about that.

17                   And certainly not in recent years.

18       Q.   So you don't have -- beyond what you just

19   said, do you have any further information or

20   understanding on the changes in standard of care

21   for the treatment of pain?

22                   MR. ARBITBLIT:  Objection.

23       A.   I -- if you have specific questions, I

24   could answer them.  But in terms of general

Page 148

1    understanding, I'm generally familiar about that

2    there have been changes.

3        Q.    Have you evaluated any statements that were

4    made by the state of West Virginia government about

5    the use of opioids for the treatment of pain?

6        A.    No.

7              Oh, actually, I have reviewed.  I think

8    in the course of writing my report, I have reviewed

9    State Department of Health and other governmental

10   body reports, and some of those might have had

11   statements.

12             And so I might have reviewed some of

13   that material.

14       Q.    Is that -- is that something you factored

15   into your opinions, the statements made by the West

16   Virginia government on the use of opioids in the

17   treatment of pain?

18       A.    I factored it in.  I evaluated it, the

19   materials that I reviewed.

20       Q.    So when you speak about appropriate levels

21   of prescription opioids in West Virginia, have you

22   evaluated the standards of care in making those

23   statements?

24       A.    I have evaluated the general literature on

Page 149

1    opioid risks and benefits when forming my opinions.
2    And so if you have a specific standard of care in
3    mind, I could see how it comports with my opinions.
4        Q.   Do you have an understanding that there was
5    an increase in the desire to treat pain in this
6    country?
7                MR. ARBITBLIT:   Objection.
8        A.   I would say that's a little bit too vague
9    for me to agree or disagree with.
10       Q.   The -- how did the standard of care for the
11   treatment of pain factor into your evaluation of
12   the excess supply of prescription opioids?
13       A.   I would say in general, I evaluated -- as I
14   said, I evaluated the literature, the medical
15   literature, on risks and benefits when forming my
16   opinion.
17                And so -- and so that's what formed my
18   opinion.   Rather than any particular standard.
19       Q.   Let me ask you -- I know you were
20   questioned previously in other depositions about
21   the DEA annual production quotas.   Do you remember
22   that?
23       A.   I do.
24       Q.   And is it your understanding that the

Page 150

1    quotas set by the DEA apply to the supply of

2    opioids in West Virginia?

3        A.   Yes.

4        Q.   And is it your understanding that the

5    supply of opioids in West Virginia was within the

6    quotas set by DEA?

7        A.   I haven't evaluated that.

8        Q.   Do you have any knowledge one way or the

9    other as to whether the pills distributed by the

10   distributors in West Virginia were within the DEA

11   quotas?

12       A.   I have not evaluated the DEA quotas for

13   West Virginia, so I don't have an opinion on that.

14       Q.   Do you know anything about the information

15   that distributors reported to the DEA about their

16   distribution of prescription opioids in West

17   Virginia?

18       A.   I have not evaluated any communication with

19   the DEA.

20       Q.   And do you know anything about the

21   information the distributors reported to State

22   regulators about their distribution of prescription

23   opioids in West Virginia?

24       A.   I have not evaluated that information.

Page 151

1      Q.   And do you know anything about the systems

2   any of the distributors had in place to prevent

3   diversion of prescription opioids in West Virginia?

4                 MR. ARBITBLIT:   Objection.

5      A.   I've seen some literature on that -- on

6   that topic.

7      Q.   Is that part of your opinions in this case?

8                 MR. ARBITBLIT:   Objection.

9      A.   I have not -- I have not formed any

10  opinions in the report on that, but if asked about

11  that, you know, I do know something about it.  So

12  that was -- that was forming my answer to your

13  question.

14     Q.   Okay.

15                MR. HESTER:   Let's go off the record a

16  second, if we could.

17                VIDEO OPERATOR:   Going off the record.

18  The time is 12:22 p.m.

19                (A discussion was had off the record

20                after which the proceedings continued

21                as follows:)

22                VIDEO OPERATOR:   Now begins Media Unit

23  4 in the deposition of Katherine Keyes.  We're back

24  on the record.  The time is 12:23 p.m.

Page 152

1    BY MR. HESTER:

2        Q.    Doctor Keyes, let me point you to twenty --

3    page 28 of your report, please.  And on page 28, in

4    the second full paragraph, starts "The empirical

5    literature demonstrates a strong and statistically

6    significant association between the opioid supply

7    and increase in prescription opioid deaths."

8              Do you see that?

9        A.    I do.

10       Q.    And is -- is that a point that applies to

11   prescription opioid deaths in West Virginia?

12       A.    Yes.

13       Q.    When you say "association," what do you

14   mean by that?

15       A.    In this particular case, I think that the

16   increase in the supply caused an increase in

17   prescription opioid deaths.

18       Q.    And that -- that cause was supply that led

19   to diversion that led to misuse that led to deaths?

20   Is that the sequence that you're -- that you're

21   referring to?

22             MR. ARBITBLIT:  Objection.

23       A.    That's one sequence.  But there are also

24   harms among people who took their medication as

Page 153

1   prescribed.

2        Q.    Do you have any evidence of prescription

3   opioid deaths in West Virginia due to patients who

4   are taking their prescriptions as prescribed?

5        A.    Yes.  I -- that's been documented in the

6   literature, and I have no reason to think it --

7   that would not generalize to West Virginia.

8        Q.    Prescription opioid deaths or misuse?

9        A.    Deaths.

10                 MR. ARBITBLIT:  Objection.

11       Q.    What do -- what are you referring to in the

12   literature on that?

13       A.    There's a study by Bohnert, and there's two

14   other studies, I believe, that they are in the

15   reference list.

16       Q.    The association that you refer to here is

17   the association between the opioid supply and the

18   increase in prescription opioid deaths, right?

19       A.    Yes.  But that's --

20       Q.    And --

21       A.    Are you asking me what's written?

22       Q.    Yes.  And my question is this:  Is the

23   supply that you describe here, leads to misuse of

24   prescription opioids?  Is that one of the factors

Page 154

1   you cite?

2                 MR. ARBITBLIT:  Objection, asked and

3   answered.

4        A.   That is one, and there are others as well.

5        Q.   And is there empirical literature that

6   demonstrates a strong and statistically-significant

7   association between opioid supply and the increase

8   in prescription opioid deaths when opioids were

9   taken pursuant to a doctor's instructions?

10       A.   Yes.

11       Q.   And that's the Bohnert study that you

12   referred to?

13       A.   I believe there's three studies that have

14   evaluated that, Bohnert, and there's two others

15   that I couldn't find.

16       Q.   And those are all cited in your report?

17       A.   Yes.

18       Q.   When literature speaks about an

19   association, that's -- that has a meaning that's

20   different from cause and effect.

21                 MR. ARBITBLIT:  Objection.

22       A.   Not necessarily.  Not in all circumstances.

23       Q.   But in some circumstances, an association

24   is different from cause and effect.  Right?

1              MR. ARBITBLIT:  Objection.

2       A.   It would depend on the circumstance.  There

3  are -- there are associations.  Some of those

4  associations are causal.

5       Q.   Let me ask you to look back at Exhibit 106,

6  please.

7       A.   Which one is 106?

8       Q.   Oh, Exhibit 106, it's in your stack

9  already.  It's your paper on the urban --

10      A.   I see.

11      Q.   -- versus rural divide.  And I wanted to

12 point you to E-54 of the paper, please.  And

13 there's a sentence in the middle column just before

14 the "Outmigration of Young People" reference, and

15 it says, "A higher density of available opioids may

16 create opportunities for illegal markets in rural

17 areas because family and friends are a primary

18 distribution source of nonmedical prescription

19 opioids."

20              Do you see that?

21      A.   Yes.

22      Q.   And is that point applicable to West

23 Virginia, in your view?

24      A.   Yes.

Page 156

1     Q.   And when you refer there to "illegal

2   markets," what are you referring to?

3     A.   I would refer to, for example, drug

4   selling.  Selling an opioid to a friend for money.

5     Q.   And why -- why -- well, maybe --

6          MR. HESTER:  Let me strike that.

7     Q.   You refer there to "illegal markets in

8   rural areas."  So you're highlighting this as

9   something that is particularly relevant to rural

10  areas; is that right?

11    A.   It occurs in urban areas as well.  That

12  statement is in the general context of describing

13  the increase in prescription opioid harms in rural

14  communities, but not every factor is specific to

15  rural communities.

16         It's kind of considered as a whole.

17    Q.   But you called this out as something that

18  you saw, illegal markets in rural areas, as

19  something that you had seen?

20    A.   In the literature.  Yes.

21    Q.   You hadn't studied it yourself.  You were

22  looking at literature?

23         MR. ARBITBLIT:  Objection.

24    A.   Let me --

1      Q.   That's probably not a fair question to an

2   epidemiologist.  I'll strike that.

3           The -- is there something about rural

4   areas that creates unusual opportunities for

5   illegal markets in prescription opioids to arise?

6      A.   No.

7      Q.   So -- so to discuss this a little bit more,

8   this observation that you're making, when you say

9   "a higher density of available opioids," is that a

10  higher density of available opioids that arises out

11  of prescribing by doctors?

12           MR. ARBITBLIT:  Objection.

13     A.   I think that it would not be exclusive to

14  prescribing by doctors.  It would be availability

15  through other sources as well.

16     Q.   And when you say "availability," you mean

17  that the opioids are available in the community?

18     A.   Yes.

19     Q.   And so what is the reference to "higher

20  density of available opioids" mean?  What is higher

21  density?

22     A.   That would mean that per capita, there are

23  more opioids available to an individual in these --

24  some of these rural areas, especially in West

Page 158

1    Virginia.

2         Q.   And so -- and so that -- that per capita

3    density of opioids created opportunities for misuse

4    of opioids?

5         A.   Yes.

6         Q.   And that misuse led to harm in some

7    percentage of cases?

8         A.   In some percentage of cases.  That's not

9    the only source of harm, but it is one.

10        Q.   Is it analogous to saying that when there's

11   a greater density of liquor stores on street

12   corners, there's a higher incidence of alcoholism?

13        A.   I wouldn't say it's a one-to-one analogy.

14   But in general, the kind of availability principle

15   is that harms will arise when addictive substances

16   are more available, however that availability comes

17   to be.

18              One way could be through licensed

19   alcohol outlets; and another way could be through

20   bootleg alcohol that someone makes in their house.

21        Q.   And in your report at page 12, you refer to

22   addiction and related harms as multi-factorial.  I

23   can point you to the reference, but I may have it

24   in your head.  This kind -- I wanted to ask you

Page 159

1    about the phrase "multi-factorial."

2         A.   Sure.

3         Q.   What does "multi-factorial" mean?

4         A.   That generally refers to risk factors.

5    Risk factors generally in epidemiology are causal

6    exposures that may be alone, insufficient and

7    alone, unnecessary to cause an outcome.

8              So many health outcomes have multiple

9    risk factors.

10        Q.   And so in your report at page 21, you refer

11   to "individual risk factors" in the second

12   paragraph.  Right?

13        A.   Yes.

14        Q.   And one -- one that you identify is a

15   lifetime history of psychoactive illicit drug use?

16        A.   That's right.

17        Q.   And another one is lifetime psychiatric or

18   substance use disorder?

19        A.   Yes.

20        Q.   And so those are factors that are separate

21   from the supply of opioids that would be risk

22   factors for OUD, correct?

23              MR. ARBITBLIT:  Objection.

24        A.   I don't think they would be separate.  We

Page 160

1  would consider them together in sort of a

2  multi-factorial framework.

3      Q.   But so when we talk --

4      A.   And --

5      Q.   Sorry, go ahead.

6      A.   I was going to say, there's only one

7  necessary factor for the opioid use disorder, which

8  is the supply of opioids.

9      Q.   Because if you have no supply, you have no

10  OUD, right?

11     A.   Yes.  And so these other factors kind of

12  potentiate the effect of that supply.

13     Q.   So the other factors that you're describing

14  here interact or work together with the supply to

15  create the OUD incidence?

16     A.   Or some individuals.  But a real Hallmark

17  of the risk factor framework is that none of these

18  factors - except the opioid supply - are necessary,

19  so you know, having an illicit drug use disorder

20  certainly increases your risk of having problems

21  with opioids, but there are people who don't have a

22  risk of illicit drug history who have a lot of

23  problems with opioids.

24          So all of these things increase risk.

Page 161

1    Q.   And they work --

2            MR. ARBITBLIT:  Objection.

3    Q.   -- they work together to --

4    A.   I'm sorry, there --

5            MR. ARBITBLIT:  I need to interject,

6    Counsel.  The same principle of duplicative

7    questioning applies not only to the articles, but

8    the fact that this witness answered the identical

9    line of questioning in the New York deposition at

10   length about risk factors that are part of this

11   multi-factorial analysis several times through your

12   own partner and other counsel.

13           I know -- I don't know whether you're

14   aware of this and asking the questions anyway or

15   whether you're not aware of it.  But it's not

16   appropriate, and I don't want to have to bother the

17   special master again, but if we keep going through

18   things that have been asked and answered that are

19   not unique to West Virginia - like what are risk

20   factors and what's multi-factorial - then we'll

21   call him during the lunch break.

22           MR. HESTER:  Well, you know, I'm -- I

23   was -- I was, I think, behaving completely

24   consistently with what the special master

Page 162

1   contemplated, because I was setting up a general

2   point and then I was going to turn to a discussion

3   of West Virginia.

4                    MR. ARBITBLIT:  Well --

5                    MR. HESTER:  I can't -- it's very hard

6   -- it's very hard to set up the specific questions

7   on West Virginia unless I can ask for a baseline

8   understanding and get to a point where the witness

9   and I are speaking on the same language about the

10  basic point.  That's all I was doing.

11                   MR. ARBITBLIT:  And you can ask one

12  question, and that is:  Are any of the risk factors

13  that you described in your testimony and previous

14  depositions inapplicable to West Virginia, or would

15  those same risk factors be applicable?

16                   She can answer "yes" or "no", and you

17  don't have to repeat at length the same question

18  and answer that extends the deposition.

19                   Now you're going to say I'm extending

20  it by arguing.  Well, I'm only arguing because

21  you're repeating questions that are word for word

22  the same as other depositions of this witness.

23                   MR. HESTER:  Let's just -- let's just

24  keep going.  I was -- I was immediately

Page 163

1    transitioning to West Virginia.

2    BY MR. HESTER:

3        Q.   So let's -- Doctor Keyes, let's look back

4    at Exhibit 106.  And I wanted to point you to page

5    E-52.  And I -- it's the middle column on page

6    E-52, really in almost exactly in the middle of the

7    page.  Sur -- "These surveys also report that

8    factors such as polydrug use and depression are

9    associated with nonmedical opioid use in rural

10   areas."

11             Do you see that?

12       A.   In the middle column on -- wait, I'm sorry,

13   page 52.

14       Q.   Yeah.  E-52, it's the end of the first

15   paragraph in the middle column.

16       A.   Oh, I see.  "These surveys also report."

17   Yes, I see it.

18       Q.   And when it refers to poly drug use and

19   depression being associated with nonmedical opioid

20   use in rural areas, is it your understanding that

21   there's something particular about rural areas that

22   makes these factors more relevant for nonmedical

23   opioid use?

24       A.   No.  Again, this was -- I would consider

Page 164

1    those risk factors kind of holistically with the

2    rest of the argument of the paper.

3        Q.   Do you see that poly drug use and

4    depression are two factors that are associated with

5    nonmedical use of prescription opioids in West

6    Virginia?

7        A.   I don't know -- there may be studies

8    specific to West Virginia that would correlate

9    those exposures.

10       Q.   Do you have an understanding of that one

11   way or the other?

12       A.   I believe that the Jennifer -- yeah,

13   Reference 20, Jennifer Haven, that might be

14   actually Kentucky.

15            I can't name a study off the top of my

16   head, but I believe that risk factors for

17   prescription opioid use have been studied in West

18   Virginia.

19       Q.   And do you believe that poly drug use and

20   depression are two of the risk factors for opioid

21   misuse in West Virginia?

22       A.   I believe so.

23       Q.   Do you also -- if you look over at the

24   right-hand column where it refers to "stressors at

Page 165

1    a macro level such as economic deprivation,

2    inequality, structural" determination "and other

3    pervasive stressors in the environment" --

4        A.   It's discrimination, just so --

5        Q.   Oh, sorry.  Structural discrimination.

6    Thanks.  Is that -- is that observation -- are

7    those stressors at a macro level factors that apply

8    in West Virginia:

9        A.   Yes.

10       Q.   And then the reference in the next

11   paragraph to family dynamics, the local context,

12   which includes "family dynamics," "family

13   composition" "and family stress," are those factors

14   that apply to opioid misuse in West Virginia?

15       A.   I would assume that they do.

16       Q.   And then there's a reference to a micro

17   level.  There's reference to "genetic

18   vulnerability, neurobiological factors,

19   pharmacological reactivity, personality traits such

20   as sensation-seeking," "psychiatric morbidity."

21   Are those factors that would apply to opioid misuse

22   in West Virginia?

23       A.   Yes.

24       Q.   Do you know --

Page 166

1      A.   There's also the pharmacological property

2  of the drug to make sure that we're inclusive.

3      Q.   So those factors in West Virginia would

4  interrelate with the supply to produce a level of

5  OUD incidence?

6      A.   Right.  The supply of opioids, and then the

7  supply causes harm, and that harm might be

8  potentiated based on individual community and macro

9  risk factors.

10     Q.   Okay.  We're just about at 12:45.  So why

11  don't we -- why don't we go off the record.

12                VIDEO OPERATOR:  Going off the record.

13  The time is 12:42 p.m.

14                (A recess was taken for lunch after

15                which the proceedings continued as

16                follows:)

17                VIDEO OPERATOR:  Now begins Media Unit

18  5 in the deposition of Katherine Keyes.  We're back

19  on the record.  The time is 1:22 p.m.

20  BY MR. HESTER:

21     Q.   Doctor Keyes, are you aware that a

22  significant volume of prescription opioids comes

23  into Cabell/Huntington illegally via drug

24  trafficking?

Page 167

1         MR. ARBITBLIT:  Objection.

2     A.   By "drug trafficking," just so we're using

3 the term terminology, can you just describe what

4 you mean by that?

5     Q.   Sure.  What I mean is people who are

6 bringing prescription opioids into the

7 Cabell/Huntington area who do not have authority to

8 distribute prescription opioids.

9     A.   I'm aware that there is -- that there is

10 drug trafficking.  And I think -- I guess my next

11 question would be, what do you mean by

12 "significant?"

13     Q.   Well, it's a fair question, and I was going

14 to ask you.  Do you have any understanding as to

15 the share of prescription opioids that come into

16 the Cabell/Huntington community through drug

17 trafficking as contrasted with lawful distribution?

18     A.   The data that I have that would speak to

19 that issue that is cited in the report come from

20 national studies on where people obtain opioids who

21 use them, for example, nonmedically.

22          And so I would look to those sources to

23 see, for example, who -- what proportion of people

24 obtain nonmedical prescription opioids from a drug

Page 168

1    dealer, and I believe that it is between 10 and 20

2    percent, I would say.

3                 That would be my estimate.

4        Q.    And that's based on the published

5    literature?

6        A.    Yes.

7        Q.    And do you have an understanding as to who

8    is engaged in this illegal distribution of

9    prescription opioids in Huntington/Cabell?

10       A.    I don't know specific individuals.

11       Q.    Do you have an understanding that there are

12   drug trafficking organizations that are engaged in

13   the distribution of prescription opioids in

14   Huntington/Cabell?

15       A.    That drug trafficking organizations exist?

16   I would say I'm not -- I don't have expertise in

17   the local drug markets of the Huntington/Cabell

18   community specifically, but I would not dispute the

19   likely scenario that such organizations either, you

20   know, informally or more complex organizations --

21   that they do exist in the Cabell/Huntington

22   community.

23       Q.    You gave the reference before to an

24   estimate of between 10 and 20 percent of the

Page 169

1   prescription opioids in the community you thought

2   would be sourced from illegal drug trafficking.

3       A.   No, I'm sorry, that's -- just if I could

4   correct you, that's not what -- that's not what the

5   10 to 20 percent was.

6       Q.   What's the 10 to 20 percent?

7       A.   That's the proportion of people in -- in

8   these other studies who report that they receive

9   prescription opioids from a drug dealer.

10      Q.   I see.

11      A.   That's not the total share of prescription

12  opioids that are obtained in that way.  I just want

13  to make sure I clarify that point.

14      Q.   Could you explain what you mean then?  If

15  they're not obtained from a drug dealer, they might

16  be obtained indirectly from somebody else who

17  obtained them from a drug dealer?  Is that what you

18  mean?

19           MR. ARBITBLIT:  Objection.

20      A.   The 10 to 20 percent figure that I cited is

21  what my memory is of the literature on where people

22  who use nonmedically -- use prescription opioids

23  nonmedically obtain their opioids.  And so people

24  who don't obtain their opioids from a drug dealer

1  might obtain from family or friends or a physician,

2  etc.

3      Q.   And so getting to this question of what

4  percentage of prescription opioids available in the

5  community of Huntington/Cabell are sourced from

6  illegal drug trafficking, do you have an estimate

7  of what percentage that is?

8      A.   I have not seen a study on that topic.

9      Q.   But you do have an understanding that not

10  all of the prescription opioids that are available

11  in the community were lawfully distributed there?

12      A.   I would accept that.

13      Q.   And do you know the percentage of lawfully

14  distributed versus unlawfully distributed

15  prescription opioids in West Virginia?

16      A.   "Distributed" meaning how many are

17  available -- I guess my question is:  When you say

18  "distributed," how would one obtain those kind

19  data?

20      Q.   Yeah, maybe that's what I'm trying to ask

21  you.  But, well, maybe we can back up.

22          You have talked about a total supply

23  that, in your opinion, is excessive in the

24  Cabell/Huntington community.  Correct?

Page 171

1    A.   Correct.

2    Q.   And that total supply consists of

3 prescription opioids that were distributed from

4 pharmacies to the -- out into the community plus

5 drugs that were illegally distributed into the

6 community?  Are those the two sources of the

7 supply?

8    A.   I think those are two sources of supply.

9    Q.   Are there any others?

10    A.   I would say -- I mean, if you're saying

11 kind of pharmacy distribution versus all other, you

12 know, there are prescriptions, for example, that

13 are -- that are lawfully obtained that are not

14 through a pharmacy that they might be, you know,

15 obtained from a doctor in another way, for example.

16         You know, so I just don't want to be --

17    Q.   So --

18    A.   -- too --

19    Q.   Fair enough.  So there would be some --

20 some --

21    A.   There are legal and illegal.  I would say

22 those are two.

23    Q.   Some portion of the -- some portion of the

24 supply of prescription opioids in Cabell/Huntington

1  comes from medical sources, whether from pharmacies

2  -- a person went through a prescription or

3  otherwise coming from medical providers.  Correct?

4       A.   Yes.

5       Q.   And then another portion of the supply

6  comes from illegal distribution into the community.

7  Correct?

8       A.   Correct.

9       Q.   Is there any other supply that gives rise

10  to the harms you are describing?

11       A.   No.  I mean, I think what you're saying is

12  there are legal and illegal sources of prescription

13  opioids, and I would agree with that.

14       Q.   And those two together create the total

15  supply that gives rise to the harms that you've

16  identified?

17       A.   Yes.

18       Q.   And -- but you don't know the percentage of

19  illegally distributed versus legally distributed in

20  Cabell?

21       A.   My opinion would be that the illegally

22  distributed sources represent a minority of the

23  total drug supply.

24       Q.   And what -- what's your -- when you say

Page 173

1    "minority," do you have a number in mind?  Are you

2    thinking one third, one quarter, one half?  I don't

3    know what you're thinking.

4         A.   Sure.  Again, I'm drawing on studies that

5    -- that -- where people report how often, for

6    example, they receive medication from a drug

7    dealer, which is 10 to 20 percent.

8              So I would say that the ballpark for

9    the illegal versus legal supply is somewhere in the

10   same range.

11        Q.   And so the illegal -- the illegal

12   distribution expands the total supply of

13   prescription opioids in Cabell/Huntington, right?

14        A.   Yes.

15        Q.   And it expands then the availability of

16   prescription opioids to people in the community,

17   right?

18        A.   Yes.  Anything that increases the supply

19   increases the availability.

20        Q.   And that availability is what leads to

21   misuse and some percentage of harm among misusers,

22   correct?

23              MR. ARBITBLIT:  Objection.

24        A.   All -- I would say all availability leads

Page 174

1    to harm.

2        Q.   And in your report at page 48, you refer to

3    counterfeit prescription opioids.  I can point you

4    to it.  But I just wanted to ask you about that

5    point that you make.

6             You recall that you refer at page 48 to

7    illicitly-manufactured prescription opioids?

8        A.   I just want to find the section of the

9    report.

10       Q.   Yeah, sorry, I should have pointed you

11   there.  It's the next to the last paragraph on page

12   48.  It's the fourth line down in the paragraph

13   that begins "Finally."

14       A.   Sure.  "...fentanyl and other high-potency

15   opioids have been adulterating the supply of both

16   heroin and illicitly manufactured opioids."

17       Q.   Right.

18       A.   Yes.

19       Q.   So I wanted to ask you about this reference

20   to illicitly manufactured prescription opioids.

21   What engages in that illicit manufacturing of

22   prescription opioids?

23       A.   Who does the manufacturing?

24       Q.   Yes.  Is that illegal drug traffickers?

1      A.    I would imagine.  I don't know the sources

2   of illicitly manufactured opioids.

3      Q.    And what's the basis for your knowledge

4   about these illicitly manufactured prescription

5   opioids?

6      A.    There have been reports in the literature

7   of opioids that are not -- are manufactured not

8   from the -- the drug company that makes them.

9      Q.    So what -- when they're illicitly

10  manufactured, it means that they're being made by a

11  drug dealer or somebody else who does not have the

12  authority to manufacture them?

13     A.    That would be my -- yes.

14     Q.    And what substances are included in these

15  illicitly manufactured prescription opioids?

16     A.    Can you describe what you mean by

17  "substances?"

18     Q.    Well, yes, I mean, so prescription opioids

19  have certain chemicals in them.  Are these

20  illicitly manufactured opioids different from or

21  the same as the lawfully manufactured prescription

22  opioids?

23     A.    I don't know the specifics of that.

24     Q.    You are aware that they're - at least on

Page 176

1  some occasions - are being adulterated with

2  fentanyl?

3      A.   Yes.

4      Q.   And you understand that if a prescription

5  opioid is illicitly manufactured and is adulterated

6  with fentanyl, it would be more deadly than taking

7  a prescription opioid that's not adulterated?

8      A.   It would depend on the dose and duration of

9  use of the opioid.

10     Q.   Well, all things the same, would --

11     A.   Sure.

12     Q.   -- would --

13     A.   Right.  Two pills that are exactly the

14  same, one has fentanyl and one has not, the one

15  with fentanyl will be associated with increased

16  harm.

17     Q.   And how long has this activity of illicitly

18  manufactured prescription opioids been going on?

19     A.   I'm not aware.

20     Q.   Are these distributed by drug traffickers,

21  I assume?

22     A.   Among other distributors.

23     Q.   Who else aside from drug traffickers

24  distributes illicitly manufactured prescription

Page 177

1    opioids to your knowledge?

2        A.    I mean, I would imagine that they're used

3    in the same informal networks that licitly

4    manufactured prescription opioids would be

5    distributed.

6        Q.    In other words, once -- when you say

7    "licitly manufactured prescription opioids," you

8    mean once those licitly manufactured prescription

9    opioids leave the pharmacies and go out into the

10   community, they may fall into the network of people

11   who are distributing those illicit -- those lawful

12   prescription opioids?

13               Is that what you mean?

14       A.    I mean that once the -- once the

15   prescription opioid has been created, one way that

16   it gets out into the community is it gets released

17   from a pharmacy.  But any way that the licitly

18   manufactured opioid gets into the community, it may

19   be distributed in the same types of networks for

20   which illicitly manufactured opioids are

21   distributed.

22       Q.    I was just trying to make sure we were

23   talking about the same word when we used

24   "distributed" there.  You're talking about

Page 178

1    distributed after the lawful pills have left the

2    pharmacy when you're --

3        A.    That's one way in which pills are

4    distributed.  I'm just saying that however the

5    pills get into the community.

6        Q.    And so are you aware of any particular

7    marketplace in Cabell/Huntington for illicitly

8    manufactured prescription opioids?

9        A.    No.

10       Q.    Do you know how long this practice of

11   illicitly manufactured prescription opioids has

12   been going on?

13       A.    No.

14       Q.    Do you know whether it's increased in

15   recent years, the phenomenon of illicitly

16   manufactured prescription opioids?

17       A.    There may be literature on that topic.

18             MR. ARBITBLIT:  I'll just interpose an

19   objection.  That's an identical question to the New

20   York deposition.  You're doing -- I'm not objecting

21   to the general area.  The questions are

22   sufficiently different.

23             But if the questions are absolutely

24   identical, I have to object.

1    Q.   What percentage of illicitly -- I'm sorry,

2  let me back up.  In the Cabell/Huntington

3  community, am I right that these illicitly

4  manufactured prescription opioids would add to the

5  total supply?

6    A.   Yes.

7    Q.   And do you know what percentage of

8  prescription opioids in Cabell/Huntington are

9  illicitly manufactured?

10    A.   Again, just based on inference, general

11  inference from existing studies, I would -- my

12  opinion would be that it's a -- it's a small

13  minority.

14    Q.   Have you seen any studies on that?

15    A.   Well, to the extent that, you know, the

16  vast majority of people who receive prescription

17  opioids are doing -- are doing so not from drug

18  dealers or other drug trafficking networks, I would

19  infer that the majority of the prescription opioids

20  that are being supplied are being supplied through

21  one of these other distribution sources.

22    Q.   And your point is that the vast majority of

23  people who have access to prescription opioids in

24  Cabell/Huntington have gotten them via a

```
                                            Page 180
 1   prescription from a doctor or other medical

 2   provider?

 3                   MR. ARBITBLIT:  Objection.

 4       A.    No.  What I meant was that the vast

 5   minority of the prescription opioids that are

 6   consumed are illicitly manufactured prescription

 7   opioids.

 8              It would be a different question what

 9   the rest of the sources are.

10       Q.   But you reason into that by -- by reasoning

11   that the vast majority of prescription opioids in

12   Cabell/Huntington are in that community because

13   there was a prescription for them?

14                   MR. ARBITBLIT:  Objection.

15       A.   No.  I reason into it based on the existing

16   data of where people who used nonmedically received

17   their prescription opioids.

18       Q.   Do you agree that this -- these illicitly

19   manufactured prescription opioids are another

20   source of potential harm in Cabell/Huntington?

21       A.   Yes.

22       Q.   And do you know what percentage of opioid

23   use disorder from prescription opioids in

24   Cabell/Huntington is attributable to counterfeit
```

Page 181

1   pills?

2        A.   Again, I would -- my opinion would be that

3   it's a small percentage and that most people who

4   use counterfeit pills are probably using

5   noncounterfeit pills as well.

6        Q.   But you don't have --

7        A.   My knowledge of opiate use disorder, it

8   would be difficult to maintain an addiction solely

9   on illicitly manufactured opioids.  I would imag --

10  there -- people are using both licitly manufactured

11  and illicitly manufactured who have an opioid use

12  disorder on prescription opioids.

13       Q.   Would you agree that if somebody took a

14  illicitly manufactured prescription opioid that was

15  laced with fentanyl, it would increase the risk of

16  death?

17       A.   Compared to an ill -- compared to a

18  prescription of --

19       Q.   All other -- all other things equal,

20  somebody takes a prescription opioid or a number of

21  prescription opioids and in one scenario, they take

22  them without them being lawfully manufactured.  In

23  the other scenario, they're illicitly manufactured

24  and laced with fentanyl, that in the second case,

Page 182

1    there's a higher risk of death?

2        A.   Right.  Well, what I would say is that if

3    you had two identical pills that were identical in

4    all other ways except the one had fentanyl in it,

5    the one that had fentanyl in it would be more

6    likely to result in harm.

7        Q.   Let me ask you to switch subjects a little

8    bit with me.  I wanted to ask about your estimates

9    of opioid deaths in Cabell and in West Virginia.

10   First of all, let's just set the table.  You're not

11   a medical examiner, right?

12       A.   I am not a medical examiner.

13       Q.   And you don't have any expertise yourself

14   in determining causes of death?

15       A.   I would say that --

16            MR. ARBITBLIT:  Objection.

17       A.   -- I do have.  That's what epidemiologists

18   do.

19       Q.   Okay.  So you -- you determine causes of

20   death by looking at aggregate populations, but you

21   don't have expertise in determining the cause of

22   death of an individual?

23            MR. ARBITBLIT:  Objection.

24       A.   I would say that that's part of my

Page 183

1    expertise, is evaluating the reliability and

2    validity of those types of assessments.

3         Q.   Let me ask you to look at page 50 of the

4    report.  And this is where you develop an estimate

5    of overdoses directly and indirectly attributable

6    to prescription opioids in West Virginia and Cabell

7    County, right?

8         A.   Yes.  However, just as a point of

9    clarification, this report does not have the

10   updated numbers in it.

11        Q.   Right.  So I was going to ask you about

12   that.

13        A.   Okay.

14        Q.   So that's -- your corrected --

15        A.   Yeah.

16        Q.   -- your corrected tables, which is that

17   Exhibit 104, you have that there?

18        A.   Yes.

19        Q.   So that's what I thought we should work off

20   of when I ask some of these questions.

21        A.   Fair.

22        Q.   So -- but I wanted to ask you first about

23   the methodology.  So there's two types of death

24   that you attribute to prescription opioids.  One is

Page 184

1  deaths that you directly attribute to prescription

2  opioids, and the other is those you indirectly

3  attribute.  Is that right?

4      A.   That's right.

5      Q.   And you -- you do this based on a review of

6  death certificates?  Is that right?

7      A.   In part.  That's one of the methodologies

8  used.

9      Q.   What else did you look at aside from death

10 certificates?

11     A.   We also looked at the proportion of people

12 who don't have a prescription op -- well, we look

13 -- among those who don't have a prescription opioid

14 listed on their death certificate, we used the

15 literature to estimate the portion that are

16 indirectly attributable based on inference from the

17 literature.

18     Q.   Where did you get the base data for the

19 information listed on the death certificates?

20     A.   The CDC.  The National Vital Statistics

21 system.

22     Q.   And the death certificates list all of the

23 substances found in the body at the time of death.

24 Is that right?

Page 185

1       A.   They list the substances contributing to

2    the death, I believe.

3       Q.   Is it substances contributing to the death

4    or substances found in the body?

5       A.   Based on the T codes that I used, I believe

6    that they are contributing to the death.

7       Q.   And that judgment is made by whom?

8       A.   Usually a medical examiner.

9       Q.   And so there can be circumstances where

10   somebody at the time of death has multiple drugs in

11   their body and -- first of all, let me ask you

12   that.  I take it that's true, right?  At the time

13   of death, you could have people with multiple drugs

14   in their body?

15      A.   That's right.

16      Q.   And there are occasions where the medical

17   examiner lists the factors that contribute to death

18   as more than one drug?

19      A.   That's right.

20      Q.   And your judgment and your methodology was

21   that if -- if prescription opioids were listed as

22   one of the contributing factors, you directly

23   attributed the death to prescription opioids even

24   if there were other drugs also identified as

Page 186

1    contributing causes?

2        A.   That's right.

3        Q.   And so you could have somebody who had a

4    mix of substances that was 99 percent fentanyl and

5    1 percent prescription opioid at the time of death.

6    Right?

7                  MR. ARBITBLIT:  Objection. .

8        Q.   I'm saying 99 and 1 percent as a fraction

9    of the drugs in their body.

10                 MR. ARBITBLIT:  Objection.

11       A.   That's a hypothetical.  I haven't seen data

12   from the Hunt -- Cabell/Huntington community that

13   would list the percentages of each drug that were

14   --

15       Q.   I'll agree.  Maybe I'll ask it a different

16   way that may be better.

17                 So you could have a circumstance where

18   the medical examiner identifies fentanyl and

19   prescription opioid as contributing causes of

20   death, right?

21       A.   That's correct.

22       Q.   And the medical examiner doesn't list which

23   one is primary or which one is secondary, right?

24                 MR. ARBITBLIT:  Objection.

Page 187

1     A.   Yeah, in that example, it -- if the

2  fentanyl was in a prescription pill, then both were

3  necessary for the death.

4     Q.   Well, I was just asking about fentanyl --

5  let's talk about illicit fentanyl, illegal

6  fentanyl.  And --

7          MR. ARBITBLIT:  Sorry.

8     Q.   -- after 2015 or so, you're aware that

9  there has been a significant spike in illegal

10  fentanyl use in Cabell/Huntington?

11     A.   Yes.

12     Q.   And so let's -- I just wanted -- it is

13  hypothetical, but to help illustrate what we're

14  talking about, you could have a death certificate

15  that lists fentanyl and heroin as causes of death

16  in the -- without the medical examiner deciding

17  which was primary and which was secondary.

18  Correct?

19          MR. ARBITBLIT:  Objection.

20     A.   Based on the T codes, you know, I think the

21  T codes are all just listed as contributing causes.

22  The idea is that they interact with each other, so

23  that each one was necessary for the death to occur.

24     Q.   And --

Page 188

1      A.   So if opioids and fentanyl were listed,

2  then both were necessary for the death to occur.

3      Q.   Well, if they're both contributing causes,

4  one could -- one could be sufficient for the death

5  to occur even if -- even if they're both listed as

6  contributing causes, right?

7                  MR. ARBITBLIT:   Objection.

8      A.   I don't think that would be an accurate

9  representation of what occurs at an opioid overdose

10  death, given that -- unless the individual was

11  taking fentanyl alone, they're taking fentanyl

12  that's been mixed with heroin, and so both were

13  used at the same time, you know.

14             An individual's not using fentanyl

15  alone -- do you know -- if that makes sense.

16      Q.   So -- so you're saying that the medical

17  examiner identifies, let's say, the scenario of

18  heroin and fentanyl together, the medical examiner

19  would identify them both as contributing causes and

20  so you would see both as causes that were required

21  for the death?

22      A.   Yes.

23      Q.   And the same for prescription opioids?  If

24  the medical examiner lists a prescription opioid as

Page 189

1    a contributing cause along with fentanyl, you would

2    see the prescription opioid as a cause of the

3    death?

4        A.   Yes.

5        Q.   Even though it's not the only cause, right?

6        A.   Right.

7        Q.   And so you could have a death that is due

8    to multiple causes beyond prescription opioids?

9        A.   The question is whether the death would

10   have occurred without the prescription opioid.  So

11   if someone is using prescription opioids and

12   benzodiazepines, for example, which is a common

13   combination, it's unlikely that if the person took

14   benzodiazepines alone, they would have died.  But

15   the opioid and the benzodiazepine together

16   interacted to cause the death.

17       Q.   But you could have a circumstance where

18   somebody could take a prescription opioid and

19   fentanyl together and the fentanyl might be a

20   sufficient cause of death, but heroin was also

21   identified as a -- I'm sorry, prescription opioids

22   is also identified as a cause of death.  Right?

23            MR. ARBITBLIT:  Objection.

24       A.   Usually that would happen because they were

Page 190

1    taken together.  So again, I would say that the

2    person would not have taken fentanyl had the

3    prescription opioid not been there.

4               Do you know what I'm saying?  So I

5    would say when the prescription opioid is listed as

6    a cause of death, it's a reliable methodology to

7    consider it a cause of death.

8        Q.   Well, when you -- when you talk about

9    "cause" in this -- in this circumstance, you're not

10   talking about sole cause or the only cause.  You're

11   talking about one among potentially a number of

12   causes.  Correct?

13              MR. ARBITBLIT:  Objection.

14       A.   The definition of "cause" is a factor

15   without which the outcome would not have occurred.

16       Q.   So --

17       A.   So there could be multiple causes.

18       Q.   There could be multiple causes for a

19   certain event, correct?

20       A.   There can be multiple causes, but it's not

21   a cause unless the outcome would not have occurred

22   without it.

23       Q.   But the medical examiner doesn't decide

24   whether an outcome would have occurred without the

Page 191

1    individual cause, right?

2              MR. ARBITBLIT:  Objection.

3        A.   I think that's probably what the medical

4    examiner is doing with the contributing causes

5    list.

6        Q.   And what's the basis for your knowledge of

7    that?

8        A.   My experience working with death

9    certificates.

10       Q.   So if you have a death certificate that

11   lists prescription opioids and fentanyl as

12   contributing causes, you attribute that death

13   directly to prescription opioids, right?

14       A.   Yes.

15       Q.   Do you also attribute that death directly

16   to fentanyl?

17       A.   If I were to do a different analysis than

18   the one that I did, sure.

19       Q.   Because -- because you would also see the

20   fentanyl as a cause of the death?

21       A.   Both substances caused the death.

22       Q.   Now, let's talk about indirect attribution.

23   So where you have a death where the sole cause is

24   listed as fentanyl, you indirectly attribute a

Page 192

1    percentage of those deaths to prescription opioids?

2        A.    Yes.

3        Q.    And what's the methodology by which you do

4    that?

5        A.    I tried to be conservative in my estimate

6    and used the NSDUH data, the National Household

7    Survey on Drug Use and Health, and estimated the

8    portion of nonprescription opioid users who used a

9    prescription opioid prior to the nonprescription

10   opioid as an estimate of the transition from

11   prescription opioid to nonprescription opioid.

12       Q.    So your assumption in your methodology is

13   that somebody would not have transitioned to

14   fentanyl without a prescription opioid as a prior

15   sequence?

16             MR. ARBITBLIT:   Objection.

17       A.    I don't think I have to make that

18   assumption for the -- in the methodology.  It's an

19   estimate of indirect -- indirect proportion, a

20   conservative estimate of the indirect proportion

21   that would be attributable based on that

22   association.

23       Q.    Is there -- is there any study in the

24   published literature that has done this, that has

1    engaged in that indirect attribution of fentanyl

2    test for prescription opioids?

3         A.   Certainly.  If you look at the opioid

4    simulation literature, these kinds of estimates are

5    used routinely and reliably.

6         Q.   So when we talk about causes for a death

7    from fentanyl, I take it you would agree that

8    prescription opioids are not the only cause of a

9    death from fentanyl.  Right?

10        A.   Prescription opioids were necessary for the

11   death to occur, and it interacted with other drugs.

12        Q.   Prescription opioids -- I'm sorry, go

13   ahead.

14        A.   So that is how I would frame the causation

15   piece of that.

16        Q.   I'm talking about indirect, though, where

17   the --

18        A.   Oh.

19        Q.   -- where the only cause of death is listed

20   as fentanyl.

21        A.   Okay.  I'm -- I apologize.  Cause of death

22   from fentanyl -- right.  I would say --

23        Q.   So there's other -- there's other causes of

24   the death from fentanyl aside from prescription

Page 194

1   opioids, right?

2        A.   In terms of indirect attri -- the deaths

3   that are indirectly attributed?

4        Q.   Yes.

5        A.   Those would be the multi-factorial deaths,

6   yes.

7        Q.   So the multi-factorial deaths of somebody

8   from fentanyl would include the social factors and

9   individual factors and environmental factors we

10  discussed before?

11       A.   Yeah, depending on the -- on the person,

12  there are -- there's only one necessary cause of

13  death, and that's opioid exposure.

14            And whatever factors also potentiated

15  the risk after the exposure to opioids, there are a

16  number, including fentanyl exposure.

17       Q.   But you're assuming then that the opioid

18  exposure is the necessary cause that leads somebody

19  to fentanyl?

20       A.   Opioid exposure is a necessary cause of

21  opioid overdose death.

22       Q.   But opioid exposure is not a necessary

23  cause of fentanyl, is it?

24            MR. ARBITBLIT:   Objection.

Page 195

1      A.    Fentanyl is an opioid.

2      Q.    Okay.  So I -- maybe back up.  Prescription

3  opioid exposure is not a necessary cause of

4  fentanyl -- of deaths from fentanyl, right?

5      A.    That's correct.

6      Q.    And there are other factors that contribute

7  to a death from fentanyl, including individual

8  factors and social factors and economic factors,

9  right?

10              MR. ARBITBLIT:  Objection.

11     A.    There certainly could be other factors

12  involved.

13     Q.    And also you have a drug dealer that's

14  lacing heroin with fentanyl, that's part of the

15  causation chain, too, right?

16     A.    It would depend on the death.

17     Q.    Do you know how fentanyl typically gets

18  into the supply chain?  Is it typically by

19  adulteration of heroin?

20     A.    Yes.

21     Q.    Typically users are not seeking out

22  fentanyl by -- on its own, correct?

23     A.    Typically.

24     Q.    So that in a typical case where a drug

1  dealer laces heroin with fentanyl, the user isn't

2  even aware of that, correct?

3      A.   I don't think I would make that blanket

4  statement just based on what we know about drug

5  use.  Sometimes users are unaware.

6      Q.   But users don't --

7      A.   Sometimes users are aware, and they seek it

8  out.

9      Q.   But is it your understanding that the

10 general case is that users don't seek out fentanyl?

11     A.   I don't think that's my understanding.  I

12 think it depends on -- on the individual and the

13 drug market.  I mean, there's certainly a lot of

14 literature about heroin users who prefer stronger

15 heroin.

16     Q.   So these other causes that we've been

17 discussing, your methodology isn't undertaking to

18 control for the other causes that might also

19 contribute to fentanyl deaths, right?

20              MR. ARBITBLIT:  Objection.

21     A.   The methodology in assigning attributable

22 and -- directly attributable and indirectly

23 attributable, these factors would not be

24 confounders.  There would not be a statistical

Page 197

1    control for them.  That would not be appropriate

2    based on my methodology.

3        Q.   But you're not -- you're not trying to

4    measure or figure out the other factors that might

5    also be attributable to the death.

6              MR. ARBITBLIT:  Objection.

7        A.   My methodology was to assign direct and

8    indirect attribution, and so these other factors

9    would not be relevant to that particular analysis.

10       Q.   But you would agree these other factors

11   that we've been discussing are other factors that

12   would be contributory causes to fentanyl deaths.

13             MR. ARBITBLIT:  Objection.

14       A.   Again, the only necessary factor is the

15   exposure to the opioid, and that's what I was

16   focused on.

17       Q.   Well, when you say "exposure to the

18   opioid," because fentanyl is an opioid?

19       A.   My analysis was to assign direct and

20   indirect attribution to prescription opioid.

21       Q.   But the prescription opioid is not -- is

22   not necessary or sufficient for a fentanyl

23   overdose, is it?

24       A.   Not for a fentanyl overdose, no.

Page 198

1       Q.   Because -- because somebody might be taking

2    -- might be overdosing on fentanyl without ever

3    having taken a prescription opioid, correct?

4       A.   That's -- that's generally consistent with

5    a risk factor.  They -- in general, there can be --

6    you know, the same as smoking and lung cancer.

7    There are lots of people who get lung cancer and

8    never smoked.  And there's lots of people who die

9    of fentanyl and other opioid overdose who don't use

10   prescription opioids, and that doesn't make

11   prescription opioids less of a cause.

12      Q.   But they're -- they're not the only cause?

13      A.   Prescription opioids are not the only cause

14   of opioid overdose.

15      Q.   And they're not the only cause of heroin

16   overdoses?

17      A.   That's correct.

18      Q.   Let me ask you to look at your report, page

19   49, please.  At the very bottom of the page, you

20   refer to a "prevalence estimate that ranged from

21   45.5 in 2006 to 62.8 in 2014." Do you see that?

22      A.   I do.

23      Q.   What's a prevalence estimate?

24      A.   So that is the -- that's the proportion of

Page 199

1   people in that subgroup who experienced the outcome

2   of interest.

3        Q.   Okay.  So to tie that to these specific

4   circumstances, are -- is that stating that in 2006,

5   for instance, 45.5 percent of those who ended up

6   with a fentanyl overdose began their opioid use

7   with prescription opioids?

8        A.   That estimate refers to the proportion of

9   heroin users in the NSDUH data in 2006 who began

10  with nonmedical prescription opioid use.

11       Q.   Okay.  So that it's NSDUH data focusing on

12  heroin users; is that right?

13       A.   Yes.

14       Q.   And so it's NSDUH data that reflects that

15  heroin users were -- sorry.  It's NSDUH data that

16  reflects that 45.5 percent of heroin users in 2006

17  initiated their opioid exposure with prescription

18  opioids?

19       A.   Yes.

20       Q.   And the -- for the 2014 number, same

21  question.  Does that reflect that 62.8 percent of

22  the heroin users initiated their use of opioids

23  with prescription opioids?

24       A.   Yes.

Page 200

1 Q. And it's measuring prevalence, not instant

2 -- incident. So it's measuring the community of

3 people in a given point in time who gave that

4 answer, correct?

5 A. Well, in this circumstance, it's measuring

6 incidence and prevalence, because we're looking at

7 lifetime heroin use and lifetime initiation of

8 nonmedical prescription opioid use.

9  So it's an incidence measure --

10 Q. So --

11 A. -- versus a prevalence measure.

12 Q. In your report at 48, page 48, you say -

13 toward the bottom of the page - "that approximately

14 70" to "80% of individuals who use heroin began

15 their opioid-using trajectories with prescription

16 opioids." Do you see that?

17 A. Yes.

18 Q. And so these numbers are lower than that 70

19 to 80 percent figure, correct?

20 A. That's correct.

21 Q. And these -- these numbers are the ones you

22 applied in estimating the indirect attribution of

23 fentanyl deaths?

24  MR. ARBITBLIT: Objection.

Page 201

1      A.   Yes.  I wanted to apply the most reliable

2   methodology based on my field of expertise in

3   opioid simulation, and we often try to apply

4   conservative estimates in these circumstances.

5           And given that I know that the NSDUH

6   data underestimates heroin use and would thus

7   provide me with the most conservative estimate of

8   this -- this parameter that I was looking to

9   essentially simulate, I relied on -- on a

10  conservative approach, as I outlined in the report.

11     Q.   So looking back at Exhibit 104, which is

12  your corrections, and looking at the table here,

13  you ended up -- and maybe -- I'm looking at the

14  first page of Exhibit 104.

15          You ended up with an estimate for --

16  well, I'm sorry.  This is -- this table is dealing

17  with opioid use disorder; it's not dealing with

18  death estimates.  Right?

19     A.   Figure 13 is opioid use disorder.

20     Q.   Okay, sorry, we'll go back to that.

21     A.   Figure 16 is the deaths.

22     Q.   Right, okay, sorry.  All right.  I'm with

23  you.

24          So you're not able to tell, looking at

1    Figure 16, what percentage of those deaths involved

2    illegally-trafficked prescription opioids, right?

3         A.    No.

4         Q.    And you don't know the percentage -- so you

5    don't know the percentage of the deaths that are

6    attributable to illegally-trafficked prescription

7    opioids?

8         A.    Again, as I testified, I think it would be

9    small.  But the WONDER data does not distinguish

10   illegal from legal.  But based on other data, I

11   think we can infer that it's a minority.

12        Q.    But putting it another way, the death

13   certificates that are the basis for this analysis

14   that you've done, they don't distinguish between

15   somebody who has, at the time of death, an

16   illegally-distributed prescription opioid in them

17   as compared to a legally-distributed?

18        A.    No.

19        Q.    And is it your understanding that the vast

20   majority of these deaths of -- that you attribute

21   to prescription opioids arise out of misuse?

22              MR. ARBITBLIT:  Objection.

23        A.    There's such overlap between medical and

24   nonmedical prescription opioid use that I think

1   that it would be inappropriate to characterize the

2   vast majority as misuse.

3        Q.   Do you know what percentage of these deaths

4   that you attribute to prescription opioids are due

5   to misuse as contrasted with the percentage due to

6   use under legitimate doctor prescriptions?

7                  MR. ARBITBLIT:   Objection.

8        A.   Given the overlap of medical and nonmedical

9   use, I would say that very few would be

10  attributable only to misuse.

11       Q.   Now, but my question is a little different.

12  Do you know the percentage of deaths in this chart

13  that are attributable to people who took

14  prescription opioids solely as prescribed?

15       A.   No.

16       Q.   Do you know how many of the deaths that you

17  show here on Figure 16 involved counterfeit

18  prescription opioids?

19       A.   Again, I would estimate that do be a small

20  number.  But it -- but the death certificate does

21  not provide that information.

22       Q.   So putting it another way, the death

23  certificate doesn't reflect whether the

24  prescription opioid that's listed as a cause of

Page 204

1    death was a counterfeit or illegally-manufactured

2    prescription opioid?

3         A.    To be honest, I don't know a single case of

4    someone with an opioid use disorder who solely used

5    counterfeit prescription opioids.  I mean, as far

6    as I know, the -- everyone who uses counterfeit

7    prescription opioids has also used noncounterfeit

8    prescription opioids, so I don't think there would

9    be --

10                I think it would be highly unlikely

11   that there would be any case of someone for whom a

12   prescription opioid overdose death was not

13   attributable to prescription opioids, whether

14   counterfeit or not.

15                I don't think that distinction would be

16   highly relevant, from me forming my opinions.

17        Q.    Now, I wasn't asking whether it would be

18   relevant.  I was just asking whether you knew.  And

19   I take it you don't know whether the deaths

20   attributed here to prescription opioids, you don't

21   know what percentage of those involved

22   counterfeits.

23        A.    No.

24        Q.    Doctor Keyes, let me ask you about your

Page 205

1    opinion on the transition from prescription opioids

2    to heroin and it's -- I think it probably starts

3    around page 46-47.  And I guess maybe I'll point

4    you to page 47, at the bottom of that page.

5              And there's a paragraph with a second

6    sentence that says, "A small but significant

7    proportion of individuals who use prescription

8    opioids progress to heroin use."  And then over on

9    the next page, 48, you say at the end of that first

10   carryover paragraph, you say, "it is reasonable to

11   conclude that there is a causal relationship

12   between prescription opioid use and heroin use."  .

13             Do you see that?

14       A.   I do.

15       Q.   And are these opinions you also stated in

16   the New York litigation and in the Ohio litigation?

17       A.   Yes.

18       Q.   Are there any different opinions that

19   you're stating here than those you've stated in

20   those other litigations?

21       A.   No.

22       Q.   Are there any answers that you gave to any

23   questions in the New York litigation or in the Ohio

24   litigation that would differ from the questions I

Page 206

1   could ask you here that would be on the same

2   points?

3        A.   Nothing comes to mind.

4        Q.   Let me ask you -- well, let me ask you

5   first:  Have you done any specific study related to

6   West Virginia of the transition from prescription

7   opioid use to heroin use?

8        A.   I've reviewed studies that are specific to

9   West Virginia.  But I have not myself collected

10  data in West Virginia.

11       Q.   Which ones do you have in mind that are

12  specific to West Virginia?

13       A.   I believe the Allen study is specific to

14  West Virginia.  And I may cite others in here as

15  well.

16       Q.   Well, let me be a little more concrete on

17  this just to make sure we're on the same page.

18            At page 46, you refer to -- it's the

19  second paragraph under Sub I, and you refer to

20  "Cross-sectional studies of samples recruited based

21  on nonmedical prescription opioid use"

22  "consistently find strong signals of a

23  relationship."  Do you see that?

24       A.   I do.

Page 207

1      Q.   And you're referring there to 16 studies
2  that you looked at on this question of the
3  transition from prescription opioids to heroin?
4      A.   Not exactly.  I reviewed 16 studies.  Not
5  all of those were cross-sectional studies.
6      Q.   Okay.
7      A.   So there were longitudinal, cross-
8  sectional, ethnographic, kind of mixed in those 16.
9      Q.   But those 16 studies are the basis for your
10  opinion on this transition from prescription
11  opioids to heroin?
12      A.   Yes.
13      Q.   And did any of those 16 studies
14  specifically address West Virginia?
15      A.   I don't believe so.
16      Q.   And --
17      A.   Well, I'm sorry.  I guess I would qualify
18  that by saying that some of the studies included
19  West Virginia data.  A fair number of the studies
20  included West Virginia data.  But --
21      Q.   Fair enough.
22      A.   But not exclusively.
23      Q.   But none of them looked specifically at the
24  West Virginia population specifically on this

Page 208

1    question of transition from prescription opioid to

2    heroin?

3        A.   No.

4        Q.   And I take it none of them look at the

5    transitions from prescription opioid use to heroin

6    in Cabell/Huntington?

7        A.   That's correct.  Although the Allen study,

8    I think, is specific to Cabell.

9        Q.   Let's see.  The Allen study that you refer

10   to, I didn't have that in my list of 16.

11       A.   It's not in the 16.

12       Q.   Okay.

13       A.   It's some data that helped me form my

14   opinions.  That study --

15       Q.   What is -- what is the Allen study?  Do you

16   know?  Do you have that cite handy?

17       A.   It -- I can find it in my -- in the list.

18       Q.   Maybe you can just point me to that so I

19   have it.

20       A.   I'm looking at the reference list to find

21   it.

22            I'd have to go over it in more detail,

23   but I'm sure I could send it to you.  It's on my

24   Materials Considered list.

Page 209

1      Q.   I'm sorry, Doctor, could you -- my computer

2   froze for a minute.  Could you say that again?

3      A.   I'm not seeing it in the reference list,

4   but I don't have time to carefully go through it.

5   It's on my Materials Considered list.  I'm sure we

6   can send it to you.  It's a paper on injection drug

7   use in Cabell.

8      Q.   Okay.  And just to be clear, it's not one

9   of the 16 that you cite at page 46.

10      A.   That's right.

11      Q.   Okay.  Let me ask you to look, please, at

12   Exhibit 37.

13           KEYES DEPOSITION EXHIBIT NO. 37

14                ("Psychoactive substance use prior to

15                the development of iatrogenic opioid

16                abuse:  A descriptive analysis of

17                treatment-seeking opioid abusers" by

18                Cicero, et al. dated 2017 was marked

19                for identification purposes as Keyes

20                Deposition Exhibit No. 37.)

21      Q.   And actually, before we get to that one,

22   let's also have you pull out Exhibit 47.

23      A.   Okay.

24      Q.   Let me ask you about Exhibit -- no, I'm

Page 210

1    sorry, it's not Exhibit 47 at all.  Sorry.  My

2    apologies.  Exhibit 34.  Could you pull that one

3    out, please?  Sorry for the confusion.

4         A.   All right.

5              KEYES DEPOSITION EXHIBIT NO. 34

6                   ("Association of Nonmedical Pain

7                   Reliever Use and Initiation of Heroin

8                   Use in the United States" by Muhuri,

9                   et al. dated August 2013 was marked

10                  for identification purposes as Keyes

11                  Deposition Exhibit No. 34.)

12        Q.   Exhibit 34, just for the record, is a paper

13   by Pradip Muhuri and others entitled "Associations

14   of Nonmedical Pain Reliever Use and Initiation of

15   Heroin Use in the United States."

16        A.   Yes.

17        Q.   And Doctor Keyes, you're familiar with this

18   study?

19        A.   I am.

20        Q.   And to your understanding, did the findings

21   of this study apply fully to West Virginia?

22        A.   Generally.  You know, the specific

23   percentages may vary a bit.

24        Q.   But the basic findings are ones that you

Page 211

1    would agree apply to West Virginia?

2        A.    Yeah.   I mean, I would say they have --

3    they have estimates of heroin initiation here that

4    I think would be higher in West Virginia than what

5    they report here.

6        Q.    What's your basis for saying that?

7        A.    My own estimate of the prevalence of OUD in

8    the Cabell/Huntington community.

9        Q.    And is that stated in your report

10   somewhere?

11       A.    Yes.

12       Q.    Where is that stated?

13       A.    Page 41, the number of individuals with

14   OUD.   I estimated that for each year.

15       Q.    This is -- let me point you to page 47 of

16   your report.   And it's -- it's the conclusion I

17   pointed you -- or the sentence I pointed you to

18   before, I think, on page 47 toward the bottom where

19   you say, "A small but significant proportion of

20   individuals who use prescription opioids progress

21   to heroin use."

22              Do you see that?

23       A.    I do.

24       Q.    And you cite the Muhuri paper, Exhibit 34,

Page 212

1    is the basis for that statement?

2        A.   Yes.

3        Q.   And so does the Muhuri report reflect what

4    you mean when you say "a small but significant

5    proportion of individuals progress" -- progress "to

6    heroin use"?

7        A.   Yes.

8        Q.   Okay.  And so you would see that

9    as applicable to West Virginia?

10       A.   I think the sentence, "A small but

11   significant portion of individuals who use

12   prescription opioids progress to heroin use" would

13   be applicable to West Virginia.

14       Q.   And let me ask you to look at Muhuri,

15   please, page 13.

16            Sorry, I noticed when looking at this

17   yesterday, it has no page numbers, of all things.

18   At least on my copy.  You might be lucky --

19       A.   It has page numbers.

20       Q.   Oh, you have page numbers?

21       A.   Uh-huh.

22       Q.   Wow.  You're living better than I am then.

23            So go to page 13.  I think it's page

24   13.  It's under the heading "Pattern of Heroin

Page 213

1    Initiation During the 5-year Period after NMPR

2    Initiation" --

3         A.   That's not my page 13.

4         Q.   Is that 12?

5         A.   Are you referring to the text or table?

6         Q.   I'm in the text.

7         A.   Okay.

8         Q.   And there's a heading for "Pattern of

9    Heroin Initiation During the 5-year Period after

10   NMPR Initiation."  It's toward the back of the

11   paper.  It's above Table 5.

12        A.   I see.  I'm here.

13        Q.   And you see the section, the small section,

14   that's headed "Pattern of Heroin Initiation" --

15        A.   Yes.

16        Q.   And the sentence that I wanted to ask you

17   about is:  "Accumulation of these estimates

18   indicates that, only 3.6 percent of NMPR initiates"

19   "had initiated heroin in first 5 years following

20   first NMPR use."  Do you see that?

21        A.   I do.

22        Q.   The first question is:  To your

23   understanding, does that finding apply to West

24   Virginia, the population of West Virginia?

Page 214

1        A.    I would imagine it would be slightly higher

2   because the rate of heroin initiation is generally

3   higher.

4        Q.    And you would say "slightly higher."  How

5   much higher?

6        A.    I mean, hard to know for sure, but I would

7   -- I would guess at least twice as high.

8        Q.    Not higher --

9        A.    Somewhere between -- somewhere between this

10  estimate and twice as high would be my -- my

11  reasonable estimate.

12       Q.    Have you seen any study that reflects that?

13       A.    The Allen study estimated at least the

14  number of injection drug users, of which 60 percent

15  would be heroin users, and I think had a higher

16  proportion than this.  And that's --

17       Q.    But I'm asking specifically about this

18  question of initiation of heroin following

19  nonmedical prescription drug use.  And do you have

20  any studies aside from this one that reflects an

21  initiation rate for heroin use following NMPR

22  initiation?

23       A.    No.  This is -- this is my -- my reasonable

24  estimate based on the data that I've seen.  But I

Page 215

1    don't have any specific studies of this question.

2    I'm inferring from other literature.

3       Q.   And you cite Muhuri in your report for the

4    proportion of individuals who used prescription

5    opioids who progressed to heroin.  Right?

6       A.   Yes.

7       Q.   And when you say "use," in that sentence,

8    you're talking about misuse, right?

9              MR. ARBITBLIT:  Objection.

10      A.   There's a -- there is a lot of overlap

11   between medical and nonmedical use, and so I -- I

12   think just general prescription opioid use in terms

13   of heroin use.

14      Q.   But Muhuri's is focused on progression from

15   nonmedical use --

16      A.   A large portion of those users are also

17   medical users, based on the literature.

18      Q.   But Muhuri is studying the progression of

19   nonmedical use to heroin use, right?

20             MR. ARBITBLIT:  Objection.  Counsel,

21   now we're off West Virginia and you're repeating

22   the Muhuri questions that have been asked at two

23   different depositions.

24             I'd ask that you move on.

Page 216

1              MR. HESTER:  I'm just -- I'm really

2     just trying to tie it back to the point the witness

3     made about West Virginia.

4              MR. ARBITBLIT:  No.  No, you're not.

5     If you --

6              MR. HESTER:  Yes, I am.

7              MR. ARBITBLIT:  Well, there was

8     nothing about West Virginia in that question,

9     Counselor.

10              MR. HESTER:  I -- I'm only responding

11     to what she said.  I had expected her to agree.  I

12     mean --

13     BY MR. HESTER:

14        Q.   Doctor Keyes, maybe just a simple point.

15     You're agreeing, I believe, that the statement --

16     that the finding in here, in the Muhuri report that

17     we just looked at, you would agree that that's the

18     only study that you've seen that reflects that

19     progression that applies to West Virginia?

20              MR. ARBITBLIT:  Objection.  Asked and

21     answered.  Misstates the record.

22        A.   Yeah, I think I -- there are other studies

23     cited in my report about this progression.

24        Q.   No, I'm asking you, have you seen -- have

Page 217

1    you seen any other report that reflects the same

2    measurement here that applies to West Virginia?

3              I'm trying to ask specifically about

4    West Virginia.  Does the -- does the Muhuri finding

5    here that we've just been looking at, does that

6    apply to West Virginia?

7              MR. ARBITBLIT:  Asked and answered.

8      A.   I would estimate that the initiation of

9    heroin use would be slightly higher.  It would be

10   somewhat higher in West Virginia based on

11   well-accepted patterns of use.

12     Q.   And your point is, it may be in the range

13   of 5 percent instead of the 3.6 that Muhuri states?

14             MR. ARBITBLIT:  Objection.

15     A.   3.6 times 2 would be higher than 5 percent.

16     Q.   Okay.  So that would be on the upper bound

17   of what you think it would be, in the range of 7

18   percent?

19     A.   I would say, yeah, about 7 -- yes.  That's

20   my opinion.

21     Q.   And let me ask you to look at -- now at

22   Exhibit 27, please.

23     A.   I haven't opened that one, right?

24     Q.   I think I may have asked you just to open

Page 218

1  it.  It's entitled Increased use of heroin as an

2  initiating opioid of use by Cicero.  Did I ask you

3  to open that one?

4       A.   That was an exhibit -- there was a Cicero

5  article that was Exhibit 37 that was "Psychoactive

6  substance use prior to the development of

7  iatrogenic opioid abuse?"

8       Q.   Yeah, this is another one then.

9       A.   27.  Okay.

10          KEYES DEPOSITION EXHIBIT NO. 27

11               ("Increased use of heroin as an

12               initiating opioid of abuse" by Cicero,

13               et al. dated 2017 was marked for

14               identification purposes as Keyes

15               Deposition Exhibit No. 27.)

16       Q.   So Exhibit 27, just for the record, is a

17  paper by Cicero, Ellis and Casper entitled

18  "Increased use of heroin as an initiating opioid of

19  abuse."  Doctor Keyes, have you seen this study

20  before?

21       A.   Yes.

22       Q.   And do you see -- let me point you to page

23  64, which is the second page of the document.  And

24  I wanted to point you to the right-hand column, the

```
                                              Page 219
 1   second sentence.  It says, "Only 8.7% of opioid
 2   initiates who began regular use in 2005 started
 3   with heroin, but its use sharply increased
 4   thereafter to the point where in 2015, heroin as an
 5   initiating opioid was at its highest point, 33.3%."
 6                 Do you see that?
 7       A.   I do.
 8       Q.   And do you know, or do you have an
 9   understanding that this finding applies to the West
10   Virginia population?
11       A.   I wouldn't -- I wouldn't disagree that the
12   results would generalize.
13       Q.   And there's also a further reference just
14   after what I read to you.  It says, "with no
15   evidence of stabilization."  Do you see that?
16       A.   I do.
17       Q.   Do you have an understanding that the use
18   of heroin as an initiating opioid has increased in
19   West Virginia since 2015?
20                 MR. ARBITBLIT:  Objection.
21       A.   My understanding is that, you know, even
22   based on this, it's still 70 percent of people who
23   start with prescription opioids, which is what my
24   report stated.  That has increased.  I don't know
```

Page 220

1  of any particular data in West Virginia, although I

2  would imagine that similar trends are emerging in

3  that area.

4      Q.   I was asking -- there's a -- your -- I

5  believe you said that you believe -- or you have no

6  reason to disbelieve that these results reported

7  here - heroin as an initiating opioid increasing to

8  33 percent by 2015 - you would expect those results

9  would apply to the West Virginia population?

10     A.   That's right.

11     Q.   And my question is:  Do you have any

12 information as to whether the percentage of heroin

13 as an initiating opioid has increased since 2015 in

14 the U.S. population?

15     A.   I don't.

16     Q.   And do you have any knowledge as to whether

17 the use of heroin as an initiating opioid has

18 increased in West Virginia?

19     A.   No.

20          MR. ARBITBLIT:  We've been going about

21 an hour and 15.  You want to take about a

22 five-minute break?

23          MR. HESTER:  Sure.  Sure, that's fine.

24          MR. ARBITBLIT:  Thank you.

Page 221

1    VIDEO OPERATOR:  Going off the record.

2    The time is 2:32 p.m.

3              (A recess was taken after which the

4              proceedings continued as follows:)

5              VIDEO OPERATOR:  Now begins Media Unit

6    6 in the deposition of Katherine Keyes.  We are

7    back on the record.  The time is 2:46 p.m.

8    BY MR. HESTER:

9        Q.   Doctor Keyes, let me ask you to look at

10   Exhibit No. 37.  This is a paper by Cicero, Ellis

11   and Casper entitled "Psychoactive substance use

12   prior to the development of iatrogenic opioid use."

13              Do you have that one there?

14       A.   I do.

15       Q.   And let me ask you to look at page 2 --

16   well, I should ask you first, have you seen this

17   study before?

18       A.   I have.

19       Q.   Let me ask you to look at page 243, which

20   is the second page of the paper.  And there's a --

21   it's under Discussion and Conclusions, and it says,

22   "The results of this study indicate that only 4% of

23   those who experience their first opioid via a

24   physician's prescription were truly drug naive.

Page 222

1   Rather, more than 95% had significant psychoactive

2   drug experience prior to being prescribed their

3   first opioid."

4              Do you see that?

5      A.   I do.

6      Q.   Do you understand that that finding, as

7   stated here, applies to the West Virginia

8   community?

9      A.   I would take that -- I would -- I think we

10  can proceed with that assumption.

11     Q.   And at -- later on in the same paragraph,

12  it says, "70% had experience with other types of

13  drugs; and, second, on average, four to five

14  different types of drugs were used prior to initial

15  opioid exposure from a prescription."

16             Do you see that?

17     A.   I do.

18     Q.   And to your understanding, does that

19  finding also apply to the West Virginia population?

20     A.   To my understanding.

21     Q.   Let me ask you to look at Exhibit 46,

22  please.

23             Let me see if this is one we've already

24  opened?

Page 223

1       A.    I believe it is.  I don't have 46.

2       Q.    Yes, I believe we have looked at 46 before.

3    This is -- for you to find this one, it's by

4    McCabe, and it's called "A prospective study of

5    nonmedical use of prescription opioids during

6    adolescence."

7       A.    I have it.  Can you just tell me again what

8    Exhibit No. this is?  I'm just going to write it at

9    the top.

10      Q.    Yeah, 46.

11             MS. DO AMARAL:  And we'll just note

12   for the record that the exhibits, once they come

13   out of their pouches, don't have exhibit numbers on

14   them, so we're having some difficulty identifying

15   which one we're looking for.

16             MR. HESTER:  Right.

17      Q.    So just feel free, Doctor Keyes, to write

18   the numbers on there.

19      A.    Thank you.

20      Q.    And I wanted to point you to page 6 of this

21   paper.  And it's the start of the second paragraph.

22   It says, "Among adolescents who engaged in

23   past-year NMUPO, approximately 95% also used other

24   substances and the majority simultaneously

Page 224

1    co-ingested prescription opioids with other

2    substances."

3              Do you see that?

4        A.   I do.

5        Q.   And to your understanding, does that

6    finding apply to the West Virginia community?

7        A.   I would -- I would assume that it

8    generalizes.

9        Q.   Let me ask you to look at Exhibit 28,

10   please.  This is, again, another new one, I think.

11       A.   This is new.

12            KEYES DEPOSITION EXHIBIT NO. 28

13               ("Relationship between Nonmedial

14               Prescription-Opioid Use and Heroin

15               Use" by Compton, et al. dated 1-14-16

16               was marked for identification purposes

17               as Keyes Deposition Exhibit No. 28.)

18       A.   Okay.

19       Q.   For the record, Exhibit 28 is by -- a paper

20   by Compton -- Wilson Compton and others entitled

21   "Relationship between Nonmedical Prescription-

22   Opioid Use and Heroin use."  Have you seen this

23   paper before?

24       A.   Yes.

1      Q.   And let me ask you to look at page 160 of

2   the document, please.  And there's a statement at

3   the -- under Conclusions -- well, maybe before I

4   ask you about the specifics, who is Wilson Compton?

5   Do you know?

6      A.   He's the deputy director of the National

7   Institute of Drug Abuse.

8      Q.   And is he still in that position?

9      A.   As far as I know.  But I could be wrong

10   about that.

11      Q.   And under Conclusions at the end of the

12   first -- first paragraph, he says, "heroin use

13   among people who use prescription opioids for

14   nonmedical reasons is rare and the transition to

15   heroin use appears to occur at a low rate."  Do you

16   see that?

17      A.   I do.

18      Q.   And to your understanding, does that

19   conclusion apply to West Virginia?

20           MR. ARBITBLIT:  I'm just going to

21   object to the reading of the partial sentence.

22      A.   Yes, that's a good point.  Could we read

23   the entire sentence?

24      Q.   Yeah.  Why don't we read the whole thing?

Page 226

1    "Yet, although the majority of current heroin users

2    report having used prescription opioids

3    nonmedically before they initiated heroin use,

4    heroin use among people who use prescription

5    opioids for nonmedical reasons is rare, and the

6    transition to heroin use appears to occur at a low

7    rate."

8              Do you see that?

9      A.   I do.

10     Q.   And does that conclusion stated here apply

11   to the West Virginia population, to your

12   understanding?

13             MR. ARBITBLIT:  Objection.

14     A.   Again, as I stated, I think the rate of

15   heroin use is -- is higher in West Virginia than in

16   other areas.

17     Q.   And so you would say it's somewhat higher

18   than you would see in the entire U.S.?

19     A.   That's right.

20     Q.   What are the reasons that the rate of

21   heroin use is higher in West Virginia?

22     A.   I mean, in my opinion, it's because the

23   supply of prescription opioids in the 1990s set the

24   stage for a lot of people who had opioid use

Page 227

1   disorder.

2       Q.   There's also -- there's also been an

3   increase in the supply of heroin in West Virginia;

4   is that right?

5       A.   There have been increases in the supply of

6   heroin nationally.  I haven't seen data that's

7   specific to West Virginia.

8       Q.   Have you analyzed that question of how much

9   the supply of heroin has increased in West

10  Virginia?

11      A.   My opinion is that people don't use heroin

12  on a lark.  It is due to the supply of prescription

13  opioids that set the stage for a whole population

14  of people to be vulnerable to opioid use disorder.

15           So once that stage was set, any

16  increase in the supply of heroin had an active

17  market to supply to.

18      Q.   I think I asked you a different question.

19      A.   All right, I apologize.

20      Q.   My question was, have you looked -- have

21  you looked at the question of how much the heroin

22  supply has increased in West Virginia?

23      A.   No.

24      Q.   And have you looked at the question of how

Page 228

1   much the price of heroin has dropped in West

2   Virginia?

3       A.   Again, I am aware of data on that

4   nationally, but I have not seen West

5   Virginia-specific data on price.

6       Q.   Let me ask you to look -- so -- so we spoke

7   about this one sentence in the -- in the Compton

8   report, and your view is that heroin use is higher

9   in West Virginia than in the rest of the country?

10      A.   Yes.

11      Q.   And subject to that point, do you agree

12  that this conclusion as stated here applies to West

13  Virginia?

14           MR. ARBITBLIT:   Objection.

15      A.   I think that -- I don't know -- I can't --

16  I can't say whether -- that it applies.

17      Q.   Do you agree with the statement in this

18  paper that "heroin use among people who use

19  prescription opioids for nonmedical reasons is

20  rare"?

21      A.   Yes, I agree with that.

22      Q.   Further down in the third paragraph,

23  there's a first sentence that reads, "In the

24  majority of studies, the increase in the rates of

Page 229

1   heroin use preceded changes in prescription-opioid

2   policies, and there is no consistent evidence of an

3   association between the implementation of policies

4   related to prescription opioids and increase in the

5   rate of heroin use or deaths, although the data are

6   relatively sparse."

7            Do you see that?

8       A.   I do.

9       Q.   Does that conclusion apply to West

10  Virginia, to your understanding?

11           MR. ARBITBLIT:  Objection --

12      A.   No, I think there is sufficient -- I'm

13  sorry, did I miss something?

14           MR. ARBITBLIT:  Go ahead.

15      A.   I think that there is sufficient data

16  post-2016 that would -- I think that that

17  conclusion -- as noted by Compton, there was

18  insufficient data, but I think now any reasonable

19  epidemiologist would conclude that there is more

20  sufficient data.

21      Q.   And what data are you referring to that

22  came out after 2016?

23      A.   There is a number of studies, including

24  some systematic reviews on, for example,

Page 230

1   prescription drug monitoring programs and how

2   restricting the opioid supply directly led to

3   people who had opioid use disorder transitioning to

4   heroin use.

5       Q.   The 16 studies that you rely on in your --

6   in your report, all of them are dated 2015 or

7   before.  Correct?  Sorry, 2016 or before.

8       A.   So in forming my conclusion, I also discuss

9   in that section the PDMP studies that I just

10  mentioned.  But the 16 studies on nonmedical -- I'm

11  sorry, prescription opioid use and heroin use, I

12  haven't looked at the dates, but if you have looked

13  and that is -- I would -- I would trust that you

14  know the date.

15      Q.   One -- to be clear, one was dated 2016, and

16  all of the rest are before.  Does that sound right

17  to you?

18      A.   I haven't looked, but I -- I trust you.

19      Q.   And so -- so those studies would have been

20  available to Compton at the time he wrote this

21  paper, correct?

22      A.   Compton was writing about prescription

23  opioid policies.  None of those 16 studies dealt

24  with prescription opioid policies.  So those --

Page 231

1   those 16 studies wouldn't be a specific citation

2   for that statement.

3       Q.   Compton goes on in the next sentence to

4   say, "heroin market forces, including increased

5   accessibility, reduced price, and high purity of

6   heroin appear to be major drivers of the recent

7   increases in rates of heroin use."

8               Do you see that?

9       A.   I do.

10      Q.   And does that conclusion apply to West

11  Virginia?

12      A.   The conclusion that would apply to West

13  Virginia here are that there are heroin market

14  forces that have increased accessibility and

15  reduced price, I believe.  I would assume.

16      Q.   And heroin market forces have increased the

17  accessibility of heroin?

18      A.   That's correct.

19      Q.   And then the increased accessibility is one

20  factor that leads to increased abuse?

21      A.   Of heroin?

22      Q.   Yes.

23      A.   Yes.

24      Q.   Doctor Keyes, are you aware that the supply

Page 232

1    of prescription opioids in West Virginia has been

2    reducing in the past five years?

3        A.   Yes.

4        Q.   And your conclusion that you've stated in

5    your report is that when there's an increase in

6    supply of prescription opioids, that leads to an

7    increased incidence of heroin use.  Right?

8        A.   I'm sorry, let me just read that again.

9             Yes.

10       Q.   And so would you also expect that when

11   there is a decline in prescription opioids in West

12   Virginia, there would be a decline in the use of

13   heroin?

14       A.   No.  Not when there has been a systematic

15   effort to create a population of people who have

16   opioid use disorder and would be vulnerable to

17   additional opioids being introduced into the

18   market.

19       Q.   And that vulnerability is based on factors

20   that would include the increased supply of heroin?

21       A.   No.  That --

22       Q.   The --

23       A.   The vulnerability to heroin would not be

24   the cause of the supply; it would be -- I'm sorry,

Page 233

1   it would be the cause of the supply, not the

2   result.

3        Q.   Well, but another cause would be an

4   increase in the supply of heroin.  That would be

5   another factor that would lead to an increased use

6   of heroin in West Virginia?

7        A.   I mean, as I said, I don't know of -- of

8   people who take heroin, you know, randomly, right?

9   You need some vulnerability factors.  And the most

10  significant vulnerability factor is access to

11  prescription opioids.

12       Q.   There's also vulnerability factors in the

13  West Virginia population that are individual and

14  social and economic, correct?

15       A.   That's correct.

16       Q.   And so those are also contributing causes

17  to increases in the uses of heroin?

18       A.   I would say they all interact with the

19  supply of prescription opioids.

20       Q.   And --

21       A.   The largest determinant of creating that

22  vulnerability to addiction, to heroin addiction in

23  particular.

24       Q.   And then but in West Virginia, you see that

Page 234

1    there are a number of factors that contribute to

2    the use of heroin?

3         A.   Yes.

4              MR. ARBITBLIT:  Objection.

5         Q.   And that includes -- that includes, as one

6    factor, the increased supply of heroin?

7         A.   Yes.  To use heroin, you need access to

8    heroin.

9         Q.   And so as we spoke about before, the

10   increase in supply creates more availability and

11   creates more risk?

12        A.   Yes.  That's true.

13        Q.   And then individual and social factors are

14   also contributing causes to the use of heroin,

15   right?

16        A.   I would say that they interact with opioid

17   access.  Because with opioid use disorder, the one

18   necessary cause is access to an opioid.

19        Q.   You're aware in West Virginia there has

20   been a spike in the use of heroin?

21        A.   I'm generally aware.

22        Q.   And there's also been a spike in the use of

23   fentanyl?

24        A.   Yes.

1    Q.   During the time when prescription opioid

2   levels have declined by about half?

3             MR. ARBITBLIT:  Objection.

4    A.   The concurrent decline in prescription

5   opioids that coincides with an increase in heroin

6   use is not the comparison that is probably most

7   apt; it is people who were using prescription

8   opioids several years before.

9    Q.   No, but I just wanted to -- I understand

10   you're making that point.  I'm trying to ask just a

11   factual point about West Virginia.

12    A.   I see.

13    Q.   Which is, there has been a decline of about

14   50 percent in the level of prescribing of opioids

15   in West Virginia, correct?

16             MR. ARBITBLIT:  Objection.

17    A.   I'm not familiar with the 50 percent

18   number.  I would have to look at the distribution

19   data on that specifically.

20             I know there has been a decline.  But

21   I'm not sure if it's been 50 percent.  It would

22   really depend on which medication we're talking

23   about.

24    Q.   Okay.  I'll take you back later and we can

Page 236

1    look at some of that.

2        A.    Okay.

3        Q.    Let me ask you to look at page 42 of your

4    report, please.  And at page 42, you say that - at

5    the next to the last paragraph on that page - you

6    say, "In 2018 in Cabell County," "84% of" overdose

7    -- "overdose deaths were due to synthetic opioids."

8             Do you see that?

9        A.    I do.

10       Q.    And that's -- and you compare it, to

11   example -- for example, to "just 10% in 2013."  Do

12   you see that?

13       A.    Yes.

14       Q.    And do you have an understanding as to why

15   there has been this increase in the percentage of

16   overdose deaths due to fentanyl?

17       A.    Yes.

18       Q.    And what's your understanding of it?

19       A.    As I said, I think that the population of

20   people in West Virginia have had a longstanding

21   crisis with opioid use disorder that began with

22   what everyone recognizes as Phase 1 of the opioid

23   crisis, which is prescription opioid addiction, and

24   then people transitioned to heroin use disorder,

Page 237

1   and that heroin market became adulterated with
2   fentanyl, which is a highly potent synthetic opioid
3   that is more likely to result in overdose.
4       Q.   And so the adulteration, as we discussed
5   before, that's being done by drug dealers?
6               MR. ARBITBLIT:  Asked and answered.
7       A.   Yes, I think we can general -- it's being
8   done in the sort of illicit marketplace.
9       Q.   And has there been, to your understanding,
10  an increase in the fraction of heroin that is being
11  adulterated with fentanyl?
12      A.   I'm -- I don't know that -- an answer to
13  that.
14      Q.   And so if there were a higher fraction of
15  adulterated heroin, that would be a contributor to
16  the increase in fentanyl deaths, right?
17              MR. ARBITBLIT:  Objection.
18      A.   I don't -- I don't know whether there's a
19  higher fraction of adulterated heroin, but the
20  availability of fentanyl will be correlated with
21  fentanyl deaths.
22      Q.   Yeah.
23      A.   So to the extent that the availability of
24  fentanyl has increased, for example, via heroin,

Page 238

```
 1    that would result in more fentanyl deaths.
 2              I think that's where I would be in
 3    agreement with your question.
 4       Q.   And you haven't measured the percentage of
 5    heroin that's being adulterated by fentanyl over
 6    time to figure out whether there's been a change in
 7    that level -- that proportion of adulterated
 8    heroin?
 9       A.   I'm not aware of data on that topic.
10       Q.   Are you aware of any people who take
11    illicit fentanyl straight up, or is fentanyl,
12    illicit fentanyl, invariably taken as a form of
13    adulterated heroin?
14       A.   Fentanyl can be taken as a prescription
15    given to you by your doctor.  So there are
16    certainly people --
17       Q.   Not illicit fentanyl, right?
18       A.   Not illicit fentanyl.
19       Q.   Yeah.  So I wanted to ask you about illicit
20    fentanyl.
21       A.   Yes.
22       Q.   You're aware of many people who take
23    illicit fentanyl straight up, or is it your
24    understanding that it's typically an adulterant in
```

Page 239

1    heroin?

2        A.   I believe there are people who take

3    fentanyl, illicit fentanyl, alone.

4        Q.   What percentage?

5        A.   But the majority of fentanyl use would be

6    fentanyl that is mixed with heroin.

7        Q.   Do you know what percentage of people in

8    Cabell/Huntington are taking fentanyl by itself as

9    compared to an adulterant in heroin?

10       A.   I don't.  No.

11       Q.   Do you have an understanding as to why drug

12   dealers in Cabell/Huntington are adulterating

13   heroin with fentanyl?

14       A.   I believe as a cost-saving measure.

15       Q.   And why does it save costs?

16       A.   It makes the drug stronger with less

17   heroin.

18       Q.   So it saves on the cost of heroin, and

19   fentanyl is relatively cheaper?

20       A.   Right.  You could give someone a smaller

21   amount of heroin and mix it with fentanyl, and it

22   would be as strong as a larger amount of heroin.

23       Q.   You don't have any studies that have looked

24   at transitions from heroin to fentanyl in West

Page 240

1   Virginia, do you?

2        A.   I don't.

3        Q.   And do you have any studies that have

4   looked at transitions from heroin to fentanyl

5   across the U.S.?

6        A.   I have seen literature on that topic.  I

7   haven't relied on that literature for this report,

8   but just based on my own knowledge, there is

9   literature in that area.  Actually from Maryland, I

10  believe.

11       Q.   Do you have -- do you have in mind any

12  studies that show a direct transition from a

13  prescription opioid to fentanyl?

14       A.   I would have to review those studies.

15       Q.   You don't have any in mind today?

16       A.   Today, I do not.

17       Q.   Is there any published paper finding that

18  prescription opioid misuse causes fentanyl deaths?

19       A.   I guess I -- I think there's a -- quite a

20  wide literature on -- on fentanyl deaths, and

21  fentanyl use, and drug use histories of people who

22  use these types of products.

23       Q.   I was --

24       A.   So I think --

Page 241

1      Q.   I was asking about ones that find causation

2   between prescription opioid misuse and fentanyl

3   deaths.  I take it there's no study that finds

4   that, is there?

5      A.   I believe there is in that prescription

6   opioids, illicitly manufactured prescription

7   opioids, can contain fentanyl, which would directly

8   cause death.  So that would be a direct causal

9   relationship.

10     Q.   I was thinking of a study finding a causal

11  relationship between the use of a

12  legitimately-manufactured prescription opioid and a

13  -- and fentanyl deaths.  There's no -- there's no

14  study finding that, is there?

15                MR. ARBITBLIT:  Objection.

16     A.   No such study would be ethical.  So no.

17     Q.   Let me ask you to look at page 41 of your

18  report, please.  And at the bottom of page 41 of

19  your report, this is where you're talking about the

20  number of people with OUD in Cabell/Huntington,

21  right?

22     A.   Yes.

23     Q.   By the way, when you use the phrase

24  "Cabell/Huntington community," on this page and

Page 242

1   elsewhere in your report, what are you referring

2   to?  Is it the geographic area that embraces Cabell

3   County and the City of Huntington?

4        A.   That's correct.

5        Q.   Okay.  And you said that there's no

6   systematic way to count the population of people

7   with OUD in Cabell/Huntington; is that right?

8        A.   That's right.

9        Q.   And you say at page 42 that in the middle

10  of the page -- middle of that carryover paragraph

11  at the top, you say, "The common linkage was

12  history of nonmedical opioid use or dependent use

13  of opioids."  Do you see that?

14             You're trying to come up with an

15  estimate of the OUD population in Cabell/Huntington

16  and you say, "The common linkage was history of

17  nonmedical opioids use."

18        A.   I'm just trying to find that sentence so I

19  can see --

20        Q.   Sorry.

21        A.   -- where it -- where does it start?

22        Q.   It starts with, "The common linkage" --

23        A.   Oh, I'm sorry.  I see.  I found it.

24        Q.   So -- so you're saying here that the common

Page 243

1    linkage among people in Cabell/Huntington who have
2    OUD symptoms is that they engaged in nonmedical use
3    of opioids?
4         A.   No.  I'm -- the -- that sentence was about
5    the Larney study, so in the Larney study, it
6    includes different studies in the meta analysis, so
7    the inclusion criteria include people who are in
8    detox for OUD and other services for OUD, but the
9    common linkage among the studies included in Larney
10   is a history of nonmedical opioid use or dependent
11   use of opioids, such as opioid use disorder.
12        Q.   So you come up here on pages 42 and 43 with
13   an estimate of the percentage of the population in
14   Cabell/Huntington that has OUD.  Correct?
15        A.   Yes.  Yes.
16        Q.   And what -- what -- what is your
17   understanding of the more recent trends?  You've
18   done this analysis through 2018.  Is that right?
19        A.   Yes, through 2018.
20        Q.   Have you done any analysis of 2019 or into
21   2020?
22        A.   Well, from the CDC, only provisional data
23   from 2019 has been released, so there's not
24   available data yet for 2019 and 2020.

1     Q.   Let me ask you to look at your errata sheet

2   which is Exhibit 104.  And this is -- this first

3   table is your Figure 13 which is, I think, your

4   corrected figure from what appears on page 43.

5   Right?  Of your report.

6     A.   Yes.

7     Q.   So we should -- we should rely on this

8   corrected Figure 13 that's in Exhibit 104, right?

9     A.   Yes.

10     Q.   Okay.  And so you come up with a prevalence

11   figure for opioid use disorder in West Virginia,

12   Cabell County and nationally, right?

13     A.   Yes.

14     Q.   And when you say "prevalence" here, it

15   doesn't mean incidence in a given year; it means

16   the prevalence over time of --

17     A.   It means prevalence in that year.

18     Q.   In that year.  So it would be looking at

19   everybody who's got opioid use disorder in that

20   year?

21     A.   That's correct.

22     Q.   And so you could be -- in between years -

23   maybe to state the obvious - you could have people

24   who have opioid use disorder in both years and

Page 245

1    they're going to be counted in both of the figures,

2    right?

3        A.   In each data point.

4        Q.   Right.  Right.  And so you don't know the

5    percentage of people shown -- the percent -- I'm

6    sorry, maybe --

7                MR. HESTER:  Let me strike that.

8        Q.   It shows in Figure 13 for 2018 for Cabell

9    County 8.9 percent of the -- of the population has

10   opioid use disorder?  Is that correct?

11       A.   That's right.

12       Q.   And is that 8.9 percent of the adult

13   population, total population?  What is that?

14       A.   That is the total population.

15       Q.   So it would include little babies as part

16   of your percentage?

17       A.   That's right.

18       Q.   Okay.  And you're showing 4 percent OUD

19   disorder in West Virginia, correct?

20       A.   Yes.  For 2018.

21       Q.   And 2 percent in the United States as a

22   whole?

23       A.   Yes.

24       Q.   So you're coming up with an estimated OUD

Page 246

1    rate for Cabell/Huntington that is more than twice

2    the level of West Virginia?

3        A.   That's right.

4        Q.   And have you evaluated the basis for the

5    conclusion that the OUD rate in Cabell

6    County/Huntington would be more than double the

7    level of the State?

8        A.   What do you mean, "the basis?"

9        Q.   Well, maybe I should back up.  I take it in

10   epidemiology, you don't just run numbers; you also

11   try to figure out if they make sense.  Right?

12       A.   I do.

13       Q.   And did you figure out whether it made

14   sense that the OUD rate in Cabell County/Huntington

15   would be more than double the rate across West

16   Virginia?

17       A.   Yes.  I spoke to people on the ground in

18   the Cabell/Huntington community as well as relied

19   on the report of Todd Davies, which is cited in the

20   report.

21       Q.   Okay.  So let me just make sure I've got

22   that.  So you spoke to people on the ground, and

23   then you looked at the expert report of Todd

24   Davies?

1    A.   It was a -- I think a deposition that had

2  some attachments to it that were reports from

3  various -- to various -- reports that were

4  generated for various purposes.

5    Q.   Who were the people you spoke to on the

6  ground?

7    A.   I spoke to people from EMS; I spoke to

8  people in the school community; I spoke to people

9  in the fire department; I spoke to people in

10  addiction services.  Other government officials.

11    Q.   And did you keep notes of those

12  discussions?

13    A.   Yes.

14    Q.   And were those notes included as materials

15  you're relying on?

16    A.   I don't know where the notes are at this

17  point.

18    Q.   You still have them?

19    A.   Uh-huh.  Yes.

20    Q.   And did you type them up?

21    A.   They were handwritten.

22    Q.   Keep them, if you could, please.

23         And what did you ask the people in the

24  community?

Page 248

1      A.   I spoke to people in the community about a

2   wide range of topics.  Mostly how the opioid crisis

3   has affected people in the community.  One thing I

4   talked to them about was how many more people are

5   living longer with OUD, though people are,

6   fortunately, recovering from overdose -- so you've

7   got a bigger proportion of people who have ongoing

8   OUD.

9               In the schools, for example, there is a

10   lot of problems with kids who have a lot of trauma

11   due to parental drug use, and so we talked about

12   that quite a bit.

13               And I also certainly said, you know,

14   I'm seeing - based on my estimates - that, you

15   know, for example, in 2018, upwards of 8-9 percent

16   of people in the Cabell/Huntington community might

17   have OUD; does that seem reasonable?

18               And by and large -- or across the

19   board, people said "Yes."

20      Q.   Aside from talking to people in the

21   community, did you look at any structural factors

22   that would explain an OUD level that's twice the

23   level of the state?  Did you look at any structural

24   factors in Cabell/Huntington that would explain --

Page 249

1      A.   Could you give me an example of a

2  structural factor?

3      Q.   Well, maybe I can put it back to you.

4  We've talked before about individual and social and

5  economic factors that can be drivers of OUD,

6  correct?

7      A.   That's right.

8      Q.   And those can all be causes that contribute

9  to levels of OUD in a community?

10     A.   Certainly.

11     Q.   And did you look at any factors - whether

12 individual, social, economic - related to

13 Cabell/Huntington to evaluate whether it made sense

14 that the level of OUD was higher there than in

15 other parts of West Virginia?

16     A.   I considered all of those factors in

17 forming my opinion.

18     Q.   And what factors did you identify in

19 Cabell/Huntington that, in your view, contributed

20 to this high level of OUD?

21     A.   Well, I mean, the one thing that

22 contributes to the high level of OUD is opioids.

23 People don't -- cannot develop or maintain an

24 opioid use disorder without opioid use, so that

```
                                           Page 250
 1   certainly is front and center in my opinion.

 2              But there is a lot of other issues in

 3   the Cabell/Huntington community as well that help

 4   maintain, you know, people in -- in addiction,

 5   including individual risk factors, financial

 6   insecurity, trauma.

 7              You know, certainly people in the

 8   community who have addiction have a lot of other

 9   stressful life events.

10     Q.   And those are all contributors to the

11   levels of OUD?

12     A.   Sure, yeah, absolutely.

13     Q.   And did you -- did you look at any data

14   suggesting that the level of prescription opioid

15   use is different in Cabell County as compared to

16   other parts of the state?

17     A.   I believe it's higher, based on my review

18   of the literature.

19     Q.   And is that a -- when you say "higher," are

20   you talking about the level of opioid misuse is

21   higher in Cabell County?

22     A.   That -- opioid misuse is higher in Cabell

23   -- or opioid use disorder, I should say, is higher

24   in Cabell County based on my methodology.  And I
```

Page 251

1   believe --

2       Q.   And -- go ahead.

3       A.   I believe prescription opioid use is higher

4   as well.

5       Q.   Is the level of prescription opioid misuse

6   higher in Cabell County than in other parts of the

7   state?

8       A.   Based on -- oh, prescription opioid misuse?

9   I have not evaluated that.

10      Q.   Do you have some reason to think that the

11  level of opioid misuse in Cabell County would be

12  higher than in other parts of the state?

13      A.   I would imagine that it is given that the

14  rate of OUD is twice as high than the rest of the

15  state.

16      Q.   And the factors that would contribute to a

17  higher level of opioid misuse in Cabell County

18  would include the ones you mentioned, the

19  individual, social and economic factors that would

20  contribute to a higher level of OUD -- of misuse

21  incidence?

22      A.   Well, again, and I think opioid use would

23  be the principle driver of opioid misuse.  But

24  certainly, other factors interact with opioid use,

Page 252

1    and so again, these you know, other risk factors
2    certainly would potentiate exposure to opioids.
3        Q.   And when you say "potentiate," you mean
4    they would be contributing causes?
5        A.   Yes, they would interact with opioid
6    exposure.
7        Q.   What I'm trying to get at is whether you
8    have any evidence that the level of opioid use is
9    higher in Cabell/Huntington than in other parts of
10   the state?
11       A.   I believe that it is.
12       Q.   And what's the basis for that?
13       A.   I believe there is data on shipments of
14   opioids, for example.  And when you look at
15   overdose, for example, you know, that would all
16   indicate a higher burden.
17       Q.   So you would see shipments as a proxy for
18   use because the pills shipped would be then
19   dispensed by pharmacies into the community?
20       A.   I would -- I'm not making a judgment about
21   how the opioids are distributed in the community.
22       Q.   Well, there can't -- there can't be use
23   unless they get to the community.  So when -- so
24   I'm trying to under --

Page 253

1    A.   The pharmacy is one way that that would

2    happen.

3    Q.   So I'm trying to understand, when you say

4    you've seen relevant shipment data, you're assuming

5    that the shipments then are dispensed by pharmacies

6    into the community?

7    A.   I'm not making that assumption.

8    Q.   You don't know one way or the other?

9    A.   I think, as we've talked about, there are

10   various ways that opioids that are shipped to a

11   community would get into the community.  One way is

12   by walking into a pharmacy with a prescription, but

13   there's other ways as well.

14   Q.   Going back to look at this -- this table,

15   this -- sorry, Figure 13.  So some percentage of

16   the people with opioid use disorder are going to

17   have misused illegally-trafficked drugs, right?

18   A.   Yes.

19   Q.   And you don't know what that percentage is?

20   A.   Most of the people who've used

21   illegally-trafficked drugs use medically as well.

22   So I would say that given the strong overlap

23   between illegal and legal use of opioids, I would

24   say the majority of people with opioid use disorder

Page 254

1   - based on available data - have used illegal

2   opioids and legal opioids.

3        Q.   So when you're -- when you're measuring

4   opioid use disorder here, this is including people

5   who are abusing heroin and have opioid use disorder

6   from that source.  Right?

7        A.   That's right.

8        Q.   And it would include people who are abusing

9   fentanyl and have opioid use disorder from that

10  source?

11       A.   Only to the extent that it overlaps with

12  other opioids.

13       Q.   Fentanyl -- I thought you said fentanyl was

14  an opioid.

15       A.   Fentanyl is an opioid.  But the Larney

16  article that I relied on for forming the basis of

17  this number, there were no studies in which there

18  were fentanyl-only users or users of fentanyl that

19  was laced with cocaine, for example, or another

20  drug.

21       Q.   I see.  The people who are reflected here,

22  the percentage of people who are reflected as

23  having opioid use disorder, would include people

24  who have misused prescription opioids, right?

Page 255

1      A.    Yes.

2      Q.    Do you know what percent -- what the

3 percentage is of substance use disorders in the

4 U.S. population?

5      A.    Any substance use disorder?

6      Q.    Yes.

7      A.    Would you include nicotine dependence in

8 that?

9      Q.    We can do it either way.

10     A.    Would you -- I -- so including alcohol and

11 nicotine use disorders - which are the most

12 prevalent - I believe past year prevalence would be

13 about 30-35 percent.

14     Q.    For -- and that would -- you would

15 characterize 35 percent --

16     A.    Yeah, that might be -- lifetime would be

17 30-35 percent.

18     Q.    So you would characterize in the U.S.

19 population a lifetime substance use disorder in the

20 range of 35 percent?

21     A.    I would imagine so.  I -- for alcohol use

22 disorders alone, it would be, I think, in the high

23 20 percents.  And that's total population,

24 including the little babies.  And so if you include

Page 256

1    nicotine dependence in that as well, my opinion is

2    you would probably get to 30 or 35 percent.

3        Q.   So alcohol use -- so a substance use

4    disorder based on alcohol, you would say, would be

5    about 20 percent of the U.S. population?

6        A.   Probably more than 20 percent.  Upwards of

7    30 percent.

8        Q.   And -- and substance use disorder based on

9    tobacco, doesn't sound like you would put that as a

10   high percentage then.

11       A.   How many people have nicotine dependence in

12   the U.S.?

13       Q.   I was just trying to get to your number of

14   35 percent or so of the population having substance

15   use --

16       A.   Well, that would be -- there's comorbidity,

17   for example, between alcohol disorders and nicotine

18   dependence.  So you can't just add the two

19   together, is what I'm saying.

20       Q.   I see what you mean.  Okay.  I'm learning

21   the lingo.  So when you say "comorbidity," that

22   means people that might be using both at the same

23   time.

24       A.   That's right.

Page 257

1    Q.   What percentage of the U.S. population, to
2    your understanding, has a substance use disorder
3    related to drugs?
4              MR. ARBITBLIT:   Objection.   What
5    drugs?
6    A.   Yeah, I guess -- cannabis?
7    Q.   Any drugs.   Cocaine, marijuana, heroin,
8    misuse of prescription opioids.   The whole gamut.
9    A.   So just to be very specific, I mean,
10   cannabis is actually one that we might want to
11   talk, because it is now legal in many states.   So
12   would you include that in terms of a drug use
13   disorder?
14   Q.   Okay.   Fair enough.   What percentage of the
15   U.S. population has a substance use disorder
16   associated with cocaine?
17   A.   I don't know that off the top of my head.
18   Q.   And what percentage of the U.S. population
19   has a substance use disorder associated with
20   methamphetamines?
21   A.   Again, for those specific drugs, I don't --
22   I don't -- I -- there is literature in that area,
23   but I don't know it off the top of my head.
24   Q.   But in the aggregate, your understanding is

Page 258

1    that there is a level of substance use disorder

2    across the population that's associated with a

3    number of drugs:  Cocaine, methamphetamine and so

4    forth.

5         A.   Yes.

6         Q.   And that those numbers are ascertainable, I

7    take it?

8         A.   I'm sorry?  Say that again?

9         Q.   That --

10        A.   Ascertainable, yes.

11        Q.   Yeah.

12        A.   There are surveys.  They are subject to

13   limitations.  But there are regular surveys that

14   are done in the United States on disorders like

15   cannabis use disorder and cocaine disorder and --

16        Q.   Would you agree that the level of substance

17   use disorders associated with cocaine and

18   methamphetamine together is 10 percent or more in

19   the U.S. population?

20        A.   I don't want to speculate without having

21   the data.

22        Q.   Let me ask you to look at page 45 of your

23   report, please.  At the top of the page, I wanted

24   to ask you about an assumption.  You say, "if 61%

Page 259

1   of the 8,252 adults are parents" -- do you see

2   that?

3        A.   Yes.

4        Q.   What's your basis of concluding that 61

5   percent of that group of adults are parents --

6        A.   We used the estimate -- or I used the

7   estimate of the Cabell County residents that are

8   between 18 and 64, which is the general age that

9   people use for parent -- for parenthood.  That's

10  been used in other studies.

11       Q.   Did you think to look at the census data on

12  the percentage of households with children in

13  Cabell County or in West Virginia?

14       A.   That could be on underestimate.  Based on

15  the work I've done in opioid simulation models,

16  this is the way that other methodologies have done

17  this, so I used a similar methodology.

18       Q.   But you didn't look at the census data to

19  check whether it was consistent with 61 percent of

20  the adults?

21       A.   I may have checked the census data.  I'm

22  not sure.  I'd have to go back and look.

23       Q.   Let me ask you to look at page 15 of your

24  report.  This is where I wanted to ask you about

Page 260

1    the -- the recent trends in -- in West Virginia and

2    in Cabell County on levels of prescription opioids.

3              So in the paragraph immediately before

4    heading B, you say that opioid prescriptions were

5    at 186 prescriptions per 100 persons as of 2011.

6    Do you see that?

7        A.   Yes.

8        Q.   And then you say that there's -- there's a

9    rate of 100 person -- I'm sorry, a rate of 92.1

10   prescriptions per 100 persons in the most recent

11   year data available, 2018.  Do you see that?

12       A.   Yes.  Just to note that the prescribing --

13   the 186.6 prescriptions per 100 persons in 2011 was

14   an increase from 175.3 in 2006, and then in 2018,

15   was 92.1 per 100 persons, just so --

16       Q.   Right.  Right.  And where did you get this

17   data?

18       A.   The IQVIA data published by county by the

19   CDC.

20       Q.   So it reflects -- just looking at these

21   numbers, it shows 186 prescriptions per 100 persons

22   as of 2011, right?

23       A.   That's right.

24       Q.   And it shows a rate of 92.1 prescriptions

Page 261

1   per 100 persons as of 2018, right?

2       A.   Yes.

3       Q.   So that's a 50 percent reduction in the

4   level of prescriptions in Cabell County?

5       A.   Approximately.

6       Q.   Right.  I mean, it's actually a little bit

7   more than 50 percent, right?

8       A.   Right.

9       Q.   And so -- and that's from 2011 to 2018?

10      A.   That's right.

11      Q.   Do you know what the trend has been since

12  2018?

13      A.   I do not.

14      Q.   And this is just counting numbers of

15  prescriptions, right?

16      A.   What do you mean by "numbers of

17  prescriptions"?

18      Q.   Well, in other words, it's not -- it's not

19  reflecting -- it's not reflecting the duration of

20  the prescriptions.  It just reflects the number of

21  prescriptions written for prescription opioids,

22  right?

23      A.   That's right.

24      Q.   And so -- so we don't know whether there

1  was also a decline in the dose per prescription, do

2  we?

3              MR. ARBITBLIT:  Objection.

4      A.   I believe those data are available.

5  They're not cited in this paragraph.

6      Q.   Do you know what has led to this reduction

7  in the level of prescriptions in Cabell County?

8      A.   I believe I would characterize it as

9  multi-factorial.

10     Q.   And what are -- what are the factors when

11 you characterize it as multi-factorial?

12     A.   Based on the evidence, there have been a

13 number of policies that reduce inappropriate

14 prescribing and other programmatic efforts to

15 reduce the oversupply of opioids.

16     Q.   And what are some of the policies you have

17 in mind?

18     A.   I believe there's data in West Virginia on

19 their prescription drug monitoring program that I

20 cite in this report which had kind of variable

21 efficacy, but I think there were some parts of the

22 prescription drug monitoring program that were

23 effective in reducing the oversupply.

24     Q.   There was also CDC guidance that we

Page 263

1    discussed before and other guidance?

2         A.   Yes.

3         Q.   Was there also guidance from the state of

4    West Virginia?

5         A.   I have not specifically evaluated guidance

6    from the state of West Virginia.

7         Q.   And you also understand, though - as you

8    state here - that doctors are continuing to

9    prescribe opioids at the rate of "almost 1

10   prescription for every person in Cabell County,"

11   correct?

12        A.   Yes.  Yes.

13        Q.   And that reflects -- again, as we've

14   discussed, that reflects doctors' judgments that

15   are being made in 2018 about --

16        A.   I think that would be a simplistic --

17             MR. ARBITBLIT:  Objection, asked and

18   answered.

19        Q.   The -- let's look up higher on the page.

20   There is also a reference to the "MME per person in

21   West Virginia."  Do you see that?  It's at the

22   paragraph at the end of the paragraph above the one

23   we were just looking at.

24        A.   Yes.

Page 264

1      Q.   You don't state those data for Cabell

2    County.  Did you only have those data available for

3    West Virginia?

4      A.   I believe that the paper that I cite in

5    this paragraph reported at the state level.

6      Q.   Did you look at the county level?

7      A.   I did, in the next paragraph that we've

8    discussed.

9      Q.   Well, but the next paragraph is dealing

10   with numbers of prescriptions, whereas this

11   paragraph above is dealing with MME per person.

12     A.   I see.  No, I have not looked at the MME

13   per person in Cabell.

14     Q.   Do you know that the MME per person has

15   declined in Cabell County?

16     A.   I have not seen that data.

17     Q.   I take it that the figures you cite here

18   reflect a decline in MME per person of prescription

19   opioids in West Virginia statewide?

20     A.   That's right.

21     Q.   And have you seen more recent data on that

22   trend in reductions in MME per person?

23     A.   I have not.

24     Q.   There's -- let me ask you to look at page

Page 265

1    40, please, of your report.  At the very top of the
2    page, you say - first full sentence - "With that
3    caveat, available evidence indicates that
4    non-medical pain reliever use (which is primarily
5    opioids) is declining among non-institutionalized
6    mostly household populations in West Virginia
7    overall."
8                    Do you see that?
9        A.   I do.
10       Q.   What's the basis for your statement there
11   that the nonmedical pain reliever use is declining?
12       A.   These are based on the NSDUH data.
13       Q.   And did the NSDUH data collect nonmedical
14   pain reliever use?
15       A.   Yes.
16       Q.   And so -- so this reflects two percentages
17   you report.  You report a percentage of 1.20
18   percent to .9 percent.  Do you see that?
19       A.   I do.
20       Q.   What does 1.20 percent in that sentence
21   refer to?  Are you saying percentage of households
22   in West Virginia that are engaged in nonmedical
23   pain reliever use?
24       A.   That is the percentage of the NSDUH sample,

1   which is noninstitutionalized, mostly households,

2   so generally much lower risk than the general

3   population.

4        Q.   But it -- so it's -- when we say

5   "noninstitutionalized household population," that

6   means people who aren't in prison or in a mental

7   facility?

8        A.   Substance use treatment, for example.

9        Q.   Okay.

10        A.   Your highest risk populations are not

11   included in that.

12        Q.   Okay.  So -- I understand what you're

13   saying.  So it's looking at the population that's

14   not in substance abuse treatment, in prison, in a

15   mental facility.  And among that population, that's

16   the population that they were referring to as the

17   noninstitutionalized mostly household population?

18        A.   Yes.

19        Q.   What does "mostly household population"

20   refer to?

21        A.   I believe that there are some nonhouseholds

22   that are included in the NSDUH sampling frame.  And

23   I would need to go back to the methodology.  But,

24   for example, I think that they do attempt to go to

Page 267

1    college dormitories and some other kind of group

2    quarters.

3         Q.   So children in college are considered

4    outside the mostly household population, or they

5    are in?

6         A.   I would have to check the methodology to be

7    sure because it's changed somewhat over time.  But

8    the reason I said "mostly household" is because I

9    do believe there are some group quarters that are

10   included in this -- attempt to be included in the

11   sampling frame.

12        Q.   So when we say "1.2 percent," we're saying

13   of that population, 1.2 percent reported past month

14   nonmedical pain reliever use?

15        A.   That's right.

16        Q.   And nonmedical pain reliever use would

17   include things other than opioids?

18        A.   Typically that estimate from the NSDUH is

19   -- is interpreted as opioid -- nonmedicine

20   prescription opioid use disorder.  The examples

21   that are given are opioids, I believe.

22        Q.   So if we look at this -- this data, it

23   shows us in 2015-2016, 1.2 percent of this

24   population - the noninstitutionalized population -

Page 268

1    1.2 percent reported nonmedical use in the prior

2    month?

3        A.   That's right.

4        Q.   And then that dropped to .9 percent in

5    2017-18 for that same population?

6        A.   That's right.

7        Q.   And do you have an understanding of what

8    the reason is for the drop in the nonmedical use?

9        A.   No.  I'm not sure with that particular

10   population why that --

11              I mean, a change from 1.2 to .9 is not

12   that substantial of a change.  It could be sampling

13   error.

14       Q.   And so another way to put this is that in

15   2017-2018, 99 percent of this population did not

16   report nonmedical use in the last month?

17       A.   The sample, yes.

18       Q.   Let me ask you to look at page 26 of your

19   report.  And at the bottom of the page, the last

20   paragraph, you say that "More recent data generally

21   show that the prevalence of non-medical

22   prescription opioid use is stabilizing or beginning

23   to decline."

24              Do you see that?

Page 269

1       A.    It says "depending on the population and

2    the outcome."

3       Q.    Right.

4       A.    "And that the burden remains substantial."

5       Q.    Right.  Totally fair.  Totally fair.  And

6    that's the whole sentence.  I wasn't cutting it

7    off.  I wanted to just focus you on the fact "that

8    the prevalence of nonmedical prescription opioid

9    use is stabilizing or beginning to decline."

10              What's your basis for that?

11      A.    That, I used the NSDUH data for that

12   statement.  Yeah, I used the NSDUH data.

13      Q.    Now, this NSDUH data that you report only

14   shows through 2013, right?

15      A.    That's correct.

16      Q.    Is there more recent data available?

17      A.    Yes.

18      Q.    And did you look at that more recent data?

19      A.    In this paragraph, I did not include the

20   more recent data.  But it could be updated to be

21   more recent.

22      Q.    Do you know what the data reflect?

23      A.    Off the top of my head, I do not.

24      Q.    When you say that data from NSDUH indicate

1    that among those 18 through 64, prevalence of

2    nonmedical prescription opioid use decreased from

3    5.4 percent in 2003 to 4.9 percent in 2013, when

4    you refer to 18 through 64, is that the entire

5    population, or is that the noninstitutionalized

6    population again?

7        A.   Noninstitutionalized.

8        Q.   As NSDUH doesn't include institutionalized

9    in its study --

10       A.   That's right.

11       Q.   -- or its sampling.  And so this -- this

12   number is higher than the figure you showed on page

13   40.  On page 40, you showed a decline from 1.2

14   percent to .9 percent, whereas here on page 26, you

15   report 5.4 to 4.9.  Now, I know those are different

16   years, but are you reporting some different

17   population in those two figures?

18       A.   I would imagine that these are different

19   outcomes:  Past month use versus past year uses

20   versus lifetime use.  All of those would be

21   different.

22       Q.   Oh, so --

23       A.   The higher prevalence, it's either past

24   year or lifetime.

Page 271

1      Q.   Okay.  So this is looking at a different

2  measurement than the measurement on page 40 which

3  is prior month use.

4      A.   That's right.

5      Q.   All right.

6           MR. HESTER:  Okay.  Why don't we take

7  a quick break, if we can, maybe ten minutes or so?

8  Can we come back at 4:00?

9           VIDEO OPERATOR:  Going off the record.

10 The time is 3:52 p.m.

11           (A recess was taken after which the

12           proceedings continued as follows:)

13           VIDEO OPERATOR:  Now begins Media Unit

14 7 in the deposition of Katherine Keyes.  We're back

15 on the record.  The time is 4:01 p.m.

16 BY MR. HESTER:

17     Q.   Doctor Keyes, let me go back quickly to

18 your errata sheet.  And we're talking about Figure

19 13.

20     A.   Okay.

21     Q.   And so in this figure, the 8.9 percent of

22 the population in Cabell County that you've

23 estimated as having opioid use disorder, that --

24 that includes people who have engaged in misuse of

Page 272

1   prescription opioids, right?

2        A.   Yes.

3        Q.   And some of the people who have engaged in

4   misuse of prescription opioids at one time or

5   another had a legitimate prescription for opioids,

6   right?

7        A.   Correct.

8        Q.   But at the time they were engaged in misuse

9   of opioids, that's not a legitimate medical use,

10  correct?

11            MR. ARBITBLIT:   Objection.

12       A.   They might be legitimately medically using

13  as well, but typically, the definition of "misuse"

14  includes outside of a doctor's prescription.

15       Q.   So the way -- the way you've used misuse in

16  your report is people who are using opioids outside

17  the scope of a doctor's prescription?

18       A.   Yeah.   Yes.

19       Q.   And so for any -- any particular person

20  who's engaged in misuse, if they had a legitimate

21  prescription at one time but they're engaged in

22  misuse later, when you talk about misuse, are you

23  talking about the time in which they were engaged

24  in misuse or the prior time when they were engaged

Page 273

1    in legitimate use?

2              MR. ARBITBLIT:  Objection.

3        A.   You can -- people can have a legitimate

4    prescription and concurrently be misusing.  So I

5    don't think I would differentiate those two time

6    scales the way that you have.

7        Q.   And when they're concurrently misusing

8    prescription opioids, the pills that they're

9    misusing are not covered by a legitimate

10   prescription, right?

11       A.   The -- sorry.  The misuse definition would

12   be outside of -- so taking more than the doctor

13   prescribed or without a prescription.

14       Q.   So the pills that they're misusing are not

15   ones that would be covered by a legitimate

16   prescription?

17       A.   That's right.

18       Q.   Let me ask you to turn to page 29 of your

19   report, please.  And at the bottom of the page, you

20   say that "The supply of opioids was also

21   facilitated by pharmaceutical promotional activity

22   to physicians."

23              Do you see that?

24       A.   I do.

Page 274

1      Q.   And when you talk about "pharmaceutical

2   promotional activity to physicians," you're talking

3   about activity by pharmaceutical companies; is that

4   right?

5            MR. ARBITBLIT:   Objection.

6      A.   This particular sentence refers to

7   pharmaceutical companies, but there's other

8   marketing activities as well.  It doesn't preclude

9   other kinds of marketing activities.

10     Q.   But here in your report, in this sentence

11   and in this paragraph, you're talking about

12   promotional activity by pharmaceutical companies?

13     A.   I'm just not aware -- I think for the most

14   part, the studies that I talk about in this section

15   refer to marketing activities from pharmaceutical

16   companies.

17     Q.   And those would also be referred to as

18   manufacturers of pharmaceuticals?

19     A.   That's right.

20     Q.   Not distributors, correct?

21     A.   I'm aware that distributors also engaged in

22   opioid marketing.  So I don't preclude that from

23   occurring or contributing to oversupply.  But in

24   these sections, I believe I'm referring to

Page 275

1    specifically monetary value paid to physicians for

2    opioid products, which I believe are a majority of

3    pharmaceutical companies, manufacturing companies.

4        Q.   So the activities that you're discussing in

5    this paragraph from 29 over to 30, that's dealing

6    with activities engaged in by manufacturers.

7        A.   I believe so.

8        Q.   And the reference -- you're talking, in

9    particular, on this paragraph on 29 and 30, you're

10   talking about outreach by pharmaceutical companies

11   to doctors, correct?

12       A.   I'm referring to payments to physicians for

13   -- with regard to opioid products.  And so it could

14   include outreach, but also includes other types of

15   marketing activities.

16       Q.   Okay.

17       A.   For example --

18       Q.   But my point is that insofar as somebody's

19   reaching out directly to doctors, that's activity

20   engaged in by manufacturers, correct?

21       A.   In this section.  There may be other

22   activities that distributors did to reach out to

23   doctors.  I'm evaluating the specific information

24   that's in this open payments database.

Page 276

1    Q.   Are you aware of -- of any activities

2    engaged in by distributors to reach to doctors

3    about the risks and benefits of particular drugs?

4    A.   I know that the distributors engaged in

5    marketing activities with regard to opioid

6    products.  But I'm not -- I haven't evaluated the

7    specifics of those marketing activities.

8    Q.   So you're not familiar with what

9    distributors have done in relation to promoting --

10   A.   I'm generally familiar, but I'm not aware

11   of specific outreaches to doctors.

12   Q.   And --

13   A.   It could have occurred.  I just don't know

14   -- I'm not aware of it.

15   Q.   And is your understanding that the outreach

16   to doctors about the risks and benefits of

17   particular drugs is something that's engaged in by

18   manufacturers?

19            MR. ARBITBLIT:  Objection, misstates

20   the record and the testimony.

21   A.   Yeah, I'm not -- I am specifically in this

22   paragraph talking about a particular data source,

23   this open payments database, which I believe

24   catalogs primarily pharmaceutical manufacturer

```
                                          Page 277
```

1   marketing, but I don't preclude other types of

2   marketing to physicians.

3        Q.   But I was asking you a different question.

4        A.   All right, I'm sorry, I'm not understanding

5   the question.

6        Q.   Are you -- are you aware that manufacturers

7   are the ones who reach out to doctors with -- to

8   describe the risks and the benefits of particular

9   drug products?

10            MR. ARBITBLIT:  Objection, vague.

11       A.   I'm not aware that manufacturers would be

12  the only ones who would reach out --

13       Q.   I didn't ask if they were the only ones.  I

14  said are you aware --

15       A.   Oh -- I --

16       Q.   -- if manufacturers reach out to doctors to

17  describe the risks and the attributes of drug

18  products?

19            MR. ARBITBLIT:  Objection to the

20  prelude.  And "The ones" was part of your last

21  question, so it did --

22            MR. HESTER:  Oh, okay.  Dan you're

23  really -- you're engaged in speaking objections

24  now, and you're coaching the witness.  Now, please.

Page 278

1    I think you can state -- you can state your

2    objection to form, and then we'll go on.

3                MR. ARBITBLIT:  And it's Don, not Dan.

4    And you're misleading the witness.

5                MR. HESTER:  Don.  Sorry, Don.

6                MR. ARBITBLIT:  You're

7    mischaracterizing your previous question.  That's

8    misleading.

9                MR. HESTER:  State the objection to

10   form and then me go on, please.

11               MR. ARBITBLIT:  Objection to form.

12               MR. HESTER:  You're going beyond what

13   you're entitled to be doing.

14               MR. ARBITBLIT:  Object to form.

15   Please go on.

16   BY MR. HESTER:

17       Q.   So I wanted to ask one question, which is:

18   You're aware that manufacturers engage in outreach

19   to doctors to describe the risks and benefits of

20   particular drugs?

21       A.   Yes.

22       Q.   Do you have any evidence or information

23   that distributors reach out to doctors directly to

24   describe the risks and the attributes of drugs?

1            MR. ARBITBLIT:  Objection.

2      A.    I am aware that distributors engage in

3  opioid marketing in general, and I don't preclude

4  that from occurring.  But I'm -- that's not what I

5  evaluate in my report, and I don't offer an opinion

6  on it.

7      Q.    And so -- and are you aware of activity by

8  distributors to reach out to doctors to describe

9  the risks and the attributes of prescription

10  opioids?

11      A.    I haven't evaluated any information on

12  that, so no, I'm not aware of that.

13      Q.    And when you talk about promotional

14  activity by distributors in a couple of your

15  answers, Doctor Keyes, are you referring to

16  promotional activity involving outreach by

17  distributors to pharmacies?

18      A.    I believe that's part of the marketing

19  activities of the distributors.

20      Q.    Let me ask you to look at page 14 of your

21  report, please.  At the -- at the bottom of page

22  14, you say, "The increase in opioid prescribing

23  was driven by a multitude of factors, including

24  direct marketing to physician using data that

1    understated opioid use disorder risk in patients."

2             Do you see that?

3        A.   I do.

4        Q.   And there you're talking about direct

5    marketing to physicians, and the reference you're

6    making there is to direct marketing to physicians

7    by manufacturers; is that right?

8        A.   I don't specify who's doing the direct

9    marketing.  So any direct marketing that occurred

10   to doctors that underestimated opioid use disorder

11   risks would be included in that statement,

12   regardless of who did the marketing.

13       Q.   But the -- I -- so is it your understanding

14   that the direct marketing to physicians using data

15   that underestimated opioid use disorder risks, was

16   that done by manufacturers?

17       A.   I am aware of marketing that was done by

18   manufacturers, and there may have been other

19   marketing by other companies as well.

20       Q.   What you're specifically discussing in your

21   report is direct marketing by manufacturers to

22   physicians?

23       A.    No.  I would say that I'm specifically

24   talking about direct marketing by whomever did the

Page 281

1   marketing.

2       Q.   Do you know of any direct marketing by

3   anyone other than manufacturers?

4       A.   I know of direct marketing by

5   manufacturers, and I have reviewed some material

6   related to marketing from other companies as well.

7   I don't preclude there being direct marketing to

8   physicians.  I haven't evaluated all the marketing

9   materials.

10      Q.   And I'll --

11              MR. ARBITBLIT:  I'm -- I just need to

12  interpose an objection, Tim, that this is subject

13  matter that's been gone over and you're not asking

14  any questions about a West Virginia nexus.

15              That's my objection.  It's based on our

16  previous discussion with the special master.

17              MR. HESTER:  I wasn't aware -- I

18  wasn't aware that there had been prior questioning

19  on this.  I mean -- I wasn't aware -- I wasn't

20  aware that that was true, Don.  Is that --

21              Do you say -- are you telling me

22  there's been prior questioning on -- on these

23  marketing issues in New York or in Ohio?

24              MR. ARBITBLIT:  Yes.

1          MR. HESTER:  I wasn't aware of it.

2          MR. ARBITBLIT:  I appreciate your

3    honesty.

4    BY MR. HESTER:

5      Q.   Are you aware of any direct marketing to

6    physicians by distributors in West Virginia?

7      A.   I haven't evaluated that.  So no, I'm not

8    aware.

9      Q.   Are you aware of any direct marketing to

10   physicians by distributors in Cabell or Huntington?

11     A.   The same answer.  I haven't evaluated any

12   material related to that, so I'm not aware of it.

13     Q.   Are you aware -- what -- you had mentioned

14   before marketing activities by distributors.  Are

15   you aware of any marketing activities by

16   distributors to any pharmacies in West Virginia?

17     A.   I believe that that's been detailed in

18   other reports.  I -- from my understanding, is that

19   the distributors do market to pharmacies and do

20   market opioids.  So I'm generally aware that that

21   occurs.

22     Q.   And you're basing that on other expert

23   reports?

24     A.   And the materials therein, yes.

Page 283

1      Q.   Have you -- have you yourself looked at

2  those issues of marketing to pharmacies by

3  distributors in West Virginia?

4           MR. ARBITBLIT:   Objection.

5      A.   Not beyond what I've read.

6      Q.   What you've read in other expert reports?

7      A.   And the materials therein.

8      Q.   In those other expert reports, you mean?

9      A.   That's correct.

10     Q.   Are you aware that information on the risks

11  and benefits of prescription opioids was conveyed

12  to doctors in West Virginia by drug manufacturers?

13     A.   Yes.

14     Q.   And what's your -- what's your

15  understanding of that?

16     A.   My understanding of it is that

17  manufacturers understated the risks and overstated

18  the benefits.

19     Q.   And have you seen indications that this

20  occurred in West Virginia?

21     A.   I believe that there are materials related

22  to that, the Van Zee article, I think, in

23  particular, talks about the West Virginia area.

24     Q.   So the materials that you have seen on

Page 284

1    marketing related to descriptions of the risks and

2    benefits to doctors in West Virginia, that involves

3    materials disseminated or promoted by

4    manufacturers?

5         A.   Generally, the materials that I have seen

6    on marketing to physicians has been -- has been

7    with regard to manufacturers.  Although again, I

8    don't preclude any other types of companies from

9    marketing opioids.

10        Q.   But the only ones you've seen have involved

11   materials developed or used by manufacturers?

12        A.   In general, yes.  But I've reviewed other

13   material that indicates that there's other kinds of

14   marketing activities as well.

15        Q.   Let me -- let me ask you to turn to page 53

16   of your report.  And this is where you discuss

17   mortality rates from prescription NSAIDS, right?

18        A.   As compared to opioids, yes.

19        Q.   And what are prescription NSAIDS?

20        A.   Nonsteroidal anti-inflammatories, in

21   general.  And they're a prescription medication

22   that is another medication that's used for pain

23   relief.

24        Q.   And do you have an understanding that

Page 285

1   NSAIDS are used as a form of pain treatment in West

2   Virginia?

3        A.   I would have no reason to think that they

4   are not used in West Virginia.

5        Q.   And do you believe that the statements here

6   on NSAIDS that you lay out apply to the population

7   of West Virginia?

8        A.   I would imagine so.

9        Q.   So you state here a mortality rate among

10  prescription NSAID users of "47 per 1000 patient

11  years."  Is that right?

12            Sorry, it's in the middle of the page.

13  It's about six lines up from the bottom of the

14  page.

15       A.   Yes, I see that.  The "mortality rate among

16  opioid users is 75 per" 100,000 and among NSAID

17  users is "47 per" 100,000 -- I mean, per thousand.

18       Q.   Right.  So both of them are per thousand,

19  right?  So you found the mortality among opioid

20  users of 75 per 1000 patient years and 47 per 1000

21  patient years among prescription NSAID users.  Is

22  that right?

23       A.   That's right.

24       Q.   And those statistics, in your view, are

Page 286

1  applicable to the West Virginia population?

2       A.   Yes.

3       Q.   And the reference to opioid users would

4  include opioid misusers or people engaged in opioid

5  misuse?

6       A.   I think this is Medicare beneficiaries who

7  are prescribed opioids.

8       Q.   But would it also --

9       A.   Or -- they were all medical users.

10      Q.   But they could also be nonmedical users?

11           MR. ARBITBLIT:  Objection.

12      Q.   I'm trying to understand what you're

13  saying.  Doctor, can you --

14      A.   In addition to medical use, they could also

15  use nonmedically.

16      Q.   Right.  So the statistic you cite here

17  which you indicated applies to West Virginia could

18  include opioid users who are using them

19  nonmedically?

20      A.   The NSAID number could include opioid users

21  who are using nonmedically as well.  The comparison

22  is medical users to medical users.  Certainly there

23  could be nonmedical users in both groups as well.

24      Q.   The -- are you aware of any meaningful

Page 287

1    level of nonmedical use prescription NSAIDS in West

2    Virginia?

3        A.   No, I'm saying the NSAID users could be

4    using prescription opioids nonmedically.

5        Q.   Well, let's just first focus on the

6    mortality rate you cite for opioid users.  That

7    mortality rate could include people who are engaged

8    in opioid misuse as well as people who have a

9    legitimate prescription, correct?

10       A.   That's correct.

11                MR. ARBITBLIT:  Object.

12       Q.   And the -- the level of death rate you show

13   for prescription NSAID users in West Virginia, what

14   are the factors that contribute to prescription

15   NSAID deaths in West Virginia?

16       A.   Can we pull out the study and take a look

17   at it?  And we can see exactly what they have in

18   the study.

19       Q.   Yeah.  I can't promise you I've got that

20   one, actually.  I'll see.  Let me see if I've got

21   it.

22       A.   I just don't want to mischaracterize what

23   the authors wrote.

24       Q.   Let me see if I've got that one.

Page 288

1          Yes, it's Exhibit 96.

2          KEYES DEPOSITION EXHIBIT NO. 96

3              ("The Comparative Safety of Analgesics

4               in Older Adults With Arthritis" by

5               Solomon, et al. dated Dec. 13/27, 2010

6               was marked for identification purposes

7               as Keyes Deposition Exhibit No. 96.)

8     A.   And so again the question is, what factors

9  contributed to NSAID mortality?

10    Q.   Yes.

11    A.   I don't know that they -- the study

12  describes mortality.  Let's see.

13         I don't think it describes the specific

14  causes of deaths for the mortality events unless

15  I'm overlooking that.

16    Q.   Do you have reason to believe the mortality

17  rate arising out of NSAID use would be any higher

18  in West Virginia, given the population?

19    A.   It's possible.  There's more -- as we've

20  talked about, there's an increased level of

21  indications for which pain could be a contributing

22  factor.

23    Q.   Have you looked at that, whether the level

24  of NSAID mortality in West Virginia is higher than

```
                                              Page 289

 1   for the country as a whole?

 2       A.   I have not.

 3       Q.   Let me ask you, please, to look at Exhibit

 4   108.

 5            KEYES DEPOSITION EXHIBIT NO. 108

 6                 ("Prescription opioid use disorder and

 7                 heroin use among youth nonmedical

 8                 prescription opioid users from 2002 to

 9                 2014" by Martins, et al. dated 2-1-18

10                 was marked for identification purposes

11                 as Keyes Deposition Exhibit No. 108.)

12       A.   That's going to be one of the ones that was

13   sent --

14       Q.   Yeah.  Oh, yea, sorry.  It probably was one

15   that was just sent.

16       A.   That's okay.

17       Q.   Do you have it there?

18       A.   I do.

19       Q.   So Exhibit 108 is a paper written by Silvia

20   Martins and others, including Doctor Keyes,

21   entitled "Prescription opioid use disorder and

22   heroin use among youth nonmedical prescription

23   opioid users from 2002 to 2014."

24            Doctor Keyes, I take it you're familiar
```

Page 290

1    with this paper.

2        A.   Yes.

3        Q.   Let me ask you -- let me ask you to look at

4    page 7.  And I wanted to ask you about the first

5    full paragraph on the page where it says, "Although

6    our study does not assess underlying causes, the

7    increasing trend in prescription opioid use

8    disorder observed in young adults might be at least

9    partially explained by historical factors described

10   elsewhere in the literature."

11            Do you see that?

12       A.   Yes.

13       Q.   And I wanted to ask you:  When you refer to

14   "historical factors described elsewhere in the

15   literature," you're referring to other papers that

16   had previously identified these as factors that

17   might be contributing to prescription opioid use

18   disorder?

19       A.   Yes.

20       Q.   And let me ask you -- I want to -- I want

21   to go through these ones that you list here and ask

22   if they apply to West Virginia, to your

23   understanding.  The first one listed is "a shift in

24   medical practice of prescribing opioids from

Page 291

1    end-of-life pain and cancer to chronic non-cancer

2    pain, particularly in young adults."

3              Do you see that?

4         A.   I do.

5         Q.   And is that a factor that you would see as

6    contributing to increases in opioid use disorder in

7    West Virginia?

8         A.   Yes.

9         Q.   The next one is "an increased rate of

10   opioid prescription by physicians due to a higher

11   sensitivity to patient's pain."  Is that a factor

12   you'd see as applying to an increasing trend in

13   prescription opioid use disorder in West Virginia?

14        A.   Yes.

15        Q.   Next one is "the endorsement of pain as a

16   'fifth vital sign' by the Joint Commission with a

17   controverted pain metric."  Do you see that?

18        A.   I do.

19        Q.   Is that a factor that you would see as

20   contributing to the increasing trend in opioid use

21   disorder in West Virginia?

22        A.   Yes.

23        Q.   What do you mean there by "controverted

24   pain metric?"

Page 292

1    A.   I'll have to go to that Franklin article,

2  because I'm not exactly sure what "controverted"

3  means in that context.

4    Q.   I can tell you I'm not that well prepared.

5  I don't have that one handy, so we can keep going.

6          The next one is "an increased

7  distribution of opioids by the pharmaceutical

8  industry and creation of an opioid rich

9  environment."  That's what we've been discussing

10  today, correct?

11    A.   Part of what we've been discussing today.

12    Q.   Right.  The next one is "state lobbying by

13  pain advocates for prescription opioid use."

14          Do you see that as a factor that

15  contributed to the increasing trend for

16  prescription opioid use disorder in West Virginia?

17    A.   Yes.

18    Q.   Do you see a reference to "'doctor

19  shopping' by patients"?

20    A.   Yes.

21    Q.   Is that a factor that contributed to the

22  increasing trend to prescription opioid use

23  disorder in West Virginia?

24    A.   Yes.

1      Q.   Do you see the reference "physician

2   sensitivity to pain exploitation by opioid users"?

3      A.   Yes.

4      Q.   What does that mean?

5      A.   I think that generally means patients who

6   overstate their medical need for opioids in order

7   to obtain the medication from physicians.

8      Q.   So that would be something that you would

9   see as contributing to the increase in trend in

10   prescription opioid use disorder in West Virginia?

11      A.   Yes.

12      Q.   And then there's a reference to

13   "overprescribing," "which leaves excess medications

14   available for misuse or redistribution by a

15   nonmedical-sanctioned venues."  Do you see that?

16      A.   Yes.

17      Q.   And that's a factor that you see as

18   contributing to the increasing trend of

19   prescription opioid use disorder in West Virginia?

20      A.   Yes.

21      Q.   And the overprescribing there is

22   overprescribing by doctors and the medical

23   community, correct?

24      A.   When we're talking about prescribing, yes,

Page 294

1    that would -- that would refer to the people who

2    are prescribing, the doctors.

3        Q.   Doctor Keyes, do you agree that the opioid

4    crisis in Huntington/Cabell is caused, at least in

5    part, by criminal drug trafficking organizations?

6        A.   I'm sorry, I'm just going to read the

7    question.

8             I think that drug trafficking

9    contributes to opioid-related harms, yes.

10       Q.   And do you believe that people who leave

11   prescriptions lying around in their medicine

12   cabinet where teenagers or others can easily take

13   them contributed to opioid-related harms in

14   Cabell/Huntington?

15            MR. ARBITBLIT:   Objection,

16   argumentative.

17       A.   They had to get the opioids to begin with,

18   so you know, to the extent that there are opioids

19   that are oversupplied and end up in people's homes

20   that can then be distributed nonmedically, sure.

21            You know, again, availability - kind of

22   what we talk about in this paper, an opioid rich

23   environment due to excess supply of opioids -

24   contributes, and the way in which that excess

Page 295

1   supply gets funneled into the community, one of

2   those routes is prescriptions sitting around in

3   people's cabinets.

4       Q.   Do you agree that the actions of the DEA in

5   increasing the quotas for prescription opioids

6   contributed, in part, to the opioid crisis in

7   Cabell/Huntington?

8           MR. ARBITBLIT:  Objection, asked and

9   answered.

10      A.   Yes.  I think anything that increases the

11  supply.  All of the suppliers.  So if something

12  contributed to the increase in the supply, then it

13  contributed to the increase in harm.

14      Q.   Do you have an understanding that medical

15  insurers encouraged the use of prescription opioids

16  over other alternatives for the treatment of pain?

17          MR. ARBITBLIT:  Objection.

18      A.   I'm not aware of specific material related

19  to specific insurers.  I do know that rates of

20  prescription do correlate with what are on the

21  formularies for different insurance companies.

22  That's been documented in the literature.

23      Q.   And do you have an understanding that the

24  policies of insurers contribute to the supply of

Page 296

1  opioids in West Virginia?

2       A.   To the -- yes, to the extent that they made

3  opioids more available.

4       Q.   Do you have an understanding that pharmacy

5  benefit managers, with their formulary policies,

6  contributed to the expansion of the supply of

7  opioids in West Virginia?

8       A.   I have not evaluated any literature on that

9  topic.

10       Q.   Do you have an understanding one way or the

11  other that the West Virginia Board of Medicine was

12  slow in revoking licenses or otherwise shutting

13  down doctors who were engaged in overprescribing?

14       A.   Again, I have not seen any literature

15  that's associated that practice with opioid

16  prescribing.

17       Q.   Do you have an understanding that the West

18  Virginia Board of Pharmacy was slow in revoking

19  licenses of certain pharmacies and thereby

20  contributed to the supply of opioids in West

21  Virginia?

22       A.   I have not evaluated any literature with

23  regard to that.

24       Q.   Let me ask you to turn to page 46 of your

Page 297

1   report, please.  Do you have any expertise

2   yourself, Doctor Keyes, in addiction -- addiction

3   abatement or treatment programs?

4        A.   I generally have expertise in -- in

5   studying the effectiveness of abatement and

6   treatment programs.

7        Q.   So that's -- that's something you engage in

8   through reviewing epidemiological studies?

9        A.   For example, yes.

10       Q.   And --

11       A.   And I've participated in treatment studies

12   as well.

13       Q.   Have you -- have you been involved in

14   designing treatment studies?

15       A.   Generally, yeah, as an epidemiological

16   study design consultant, yeah.

17       Q.   Where have you done that?

18       A.   At Columbia.

19       Q.   And for what communities?

20       A.   Most specifically communities in New York.

21       Q.   Have you been engaged in any of the design

22   around abatement programs or treatment programs for

23   Cabell/Huntington?

24       A.   No.  I have reviewed literature.

Page 298

1     Q.   Let me ask you to look at page 41, please.

2  And I wanted to ask you, at the end of the first

3  full paragraph on that page, you refer to a dis --

4  your discussions with local officials and experts

5  about needs for the community?

6     A.   Yes.

7     Q.   What -- can you tell me about these

8  discussions with local officials and experts?  Who

9  were they?

10    A.   My -- I have listed their names here.  I

11 can read -- I can read you their names.

12    Q.   Okay.  The people -- the people you spoke

13 to are the ones who are listed in that paragraph?

14    A.   That's right.

15    Q.   Are there others you spoke to aside from

16 these folks?

17    A.   There are others that I list in other

18 sections of the report.  But the people that I

19 spoke with are listed in the report.

20    Q.   And in relation to this particular issue,

21 the people you spoke with are the ones who are

22 listed here on these -- on these needs for the

23 community?

24    A.   That's right.

Page 299

1    Q.   Did you keep notes of those discussions?

2    A.   I did.

3    Q.   And are those handwritten notes?

4    A.   That's right.

5    Q.   You still have them?

6    A.   Yes.

7    Q.   Okay.  I would ask you to keep those too,

8  and we'll pursue that afterwards.

9    A.   Sure.

10   Q.   Doctor Keyes, I take it you have not

11 yourself been to Cabell County or the City of

12 Huntington?

13   A.   I have been to --

14   Q.   You have?

15   A.   -- both Cabell County and the City of

16 Huntington.

17   Q.   Oh, because you've met with these folks.

18   A.   I did.

19   Q.   That's where you had the meetings?

20   A.   Yes.

21   Q.   Are you -- do you have expertise in the

22 laws and regulations governing the distribution of

23 controlled substances?

24   A.   I've generally reviewed epidemiological

Page 300

1    literature with regard to opioid policy.  So to the

2    extent that the policies have been evaluated in the

3    epidemiological literature, I have expertise in

4    that.

5        Q.   Do you have any particular expertise on

6    suspicious order monitoring activities?

7        A.   I do not.

8        Q.   Have you reviewed any of the orders that

9    were submitted by pharmacies in Cabell/Huntington

10   for prescription opioids?

11       A.   No.

12       Q.   Have you reviewed any of the diligence

13   files or investigative documents prepared by

14   distributors with respect to customers in

15   Cabell/Huntington?

16       A.   I have not.

17       Q.   Just looking here at my notes, Doctor

18   Keyes.  I may be done.

19            Doctor Keyes, I take it you -- that you

20   have not focused your opinions on any of the

21   individual specific distributors who are defendants

22   in this case?

23       A.   My opinions apply to all of the

24   distributors in the case.

Page 301

1      Q.   But you've not reviewed specific documents

2    related to their individual activities?

3      A.   Generally, no.

4      Q.   Okay.

5            MR. HESTER:  I think that's all I

6    have, so I will pass -- pass you along to my

7    colleagues.  Thank you, Doctor Keyes.

8            THE DEPONENT:  Thank you very much.

9            MR. ARBITBLIT:  So to the extent

10   others plan on inquiring, the protocol requires a

11   video feed, which we don't see.  Perhaps you have

12   video feed that's not turned on, but to the extent

13   that there is no video feed, we would object that

14   that's not permitted under the protocol.

15           MR. METZ:  I've had my video off for

16   most of the day, but it's on now.

17           MR. HESTER:  Actually, before you

18   start, Carl, I do -- I did want to state one thing

19   for the record -- and I know that we have a

20   difference of agreement, but -- difference of view

21   on this point.

22           But we -- we have been surprised today

23   by the position taken by the plaintiffs that we

24   could not inquire fully into all aspects of Doctor

```
                                            Page 302
 1    Keyes' West Virginia report.  We had understood it
 2    was a stand-alone report and we could inquire into
 3    it fully.
 4              I understand the ruling by Judge
 5    Wilkes, and we undertook as best we could to comply
 6    with it during the day.  But I did want to state
 7    our objection that we continue to believe that we
 8    should have been permitted to inquire fully into
 9    this report without -- without limitation based on
10    examination on other reports in other
11    jurisdictions, and we have not been able to pursue
12    some lines of inquiry that we have -- we had
13    intended to pursue today with Doctor Keyes.
14              Doctor Keyes, it's no fault of yours,
15    but there's a ruling that was made today that we
16    believe has prejudiced us in relation to our
17    ability to take a full and complete deposition
18    today.
19              MR. ARBITBLIT:  And I'll just state
20    briefly for the record that I feel Special Master
21    Wilkes addressed the lack of surprise due to the
22    previous rulings of the Court and that we addressed
23    it with Rule 26 and that his ruling was fair and
24    that we have generally been very accommodating with
```

Page 303

1    your questions, and you have covered a lot of

2    ground with articles and subject matter that was

3    the subject of previous depositions, to which we

4    have not objected because you were careful to

5    relate it to West Virginia, which is appropriate

6    under the special master's ruling.

7              So we don't think there's been any

8    surprise, nor any prejudice, nor any reason to be

9    concerned about today's proceedings.

10             MR. HESTER:  And just to -- just to

11   follow up very briefly, my point - which I did want

12   to preserve - is that I forewent lines of inquiry I

13   had planned on today that related to Doctor Keyes'

14   West Virginia report, and I had not anticipated

15   that we would be precluded by reports submitted in

16   separate litigation and other jurisdictions, and

17   you know, I understand we have a difference of view

18   on this, and I understand that Judge Wilkes ruled,

19   so we undertook as best we could to comply with the

20   ruling, but I want it to be clear that we do feel

21   surprised.

22             There have been other depositions that

23   have been taken in this West Virginia litigation,

24   other expert depositions, where this objection has

Page 304

1    not been made.  This is the first time this

2    objection has been raised, and it's -- and there

3    have been depositions taken of other experts who

4    have also testified in other cases.

5              So we -- we did forego lines of inquiry

6    that we thought were important and that we had

7    planned to cover today, but we did not.

8              MR. ARBITBLIT:  Your position is

9    stated.  Let's move on.

10              MR. METZ:  Okay.  I would suggest --

11   this is Carl Metz.  I'd like to go off the record

12   briefly just for a routine break.  I'm happy to

13   come back in five minutes or less.  I'd also ask if

14   the videographer could give us a current on-record

15   tally, so I know where I'm starting from.

16              VIDEO OPERATOR:  Sure, currently.

17   Right now, we've been on the record for - double-

18   check here - 5 hours and 6 minutes, approximately.

19              MR. METZ:  Okay.  We can go off the

20   record.

21              VIDEO OPERATOR:  Going off the record.

22   The time is 4:48 p.m.

23              (A recess was taken after which the

24              proceedings continued as follows:)

Page 305

1          VIDEO OPERATOR:   Now begins Media Unit

2     8 in the deposition of Katherine Keyes.   We're back

3     on the record.   The time is 4:57 p.m.

4                         EXAMINATION

5     BY MR. METZ:

6          Q.   Good afternoon, Doctor Keyes.   My name is

7     Carl Metz.   I represent Cardinal Health.   I don't

8     believe we've met before.

9          A.   No.

10         Q.   And I apologize that I appear to be

11    questioning you from deep in some shadows.   I have

12    a choice to my office between a place that has good

13    lighting but unreliable Internet or a place that

14    has good Internet but bad lighting, so I made the

15    obvious choice.

16         A.   These are COVID-era tradeoffs we have to

17    make routinely.   So I completely understand.

18         Q.   I'd like to begin by asking some follow-up

19    questions about two of your earlier answers that

20    I've noted from the realtime.   Do you recall

21    testifying about a study by a Doctor Compton, and

22    you were speaking about the availability of

23    additional data subsequent to the time that that

24    study came out.   Do you recall that?

Page 306

1    A.   I do.

2    Q.   Okay.  And as reflected in the realtime

3  around page 201, you had an answer that was along

4  the lines of, "There was insufficient data, but I

5  think now any reasonable epidemiologist would

6  conclude that there was more than sufficient

7  evidence."

8         Do you recall giving that answer?

9    A.   You know, I can't quite hear you.  You're

10  coming in and out a little bit.  I wonder if you

11  could get closer.  I apologize.

12   Q.   No problem.  Let me see if I can figure out

13  the source of that.

14   A.   I think I would say my answer is that I --

15  I understand Compton's -- Compton's, you know,

16  reading of the literature, that it was insufficient

17  at that time.

18         And there certainly has been more

19  literature on opioid policy since then.  It was

20  specific to his statement on opioid policy.

21   Q.   I see.  And can you explain why you used

22  the phrase "reasonable epidemiologist" would --

23         THE COURT REPORTER:  I'm sorry, I'm

24  having a hard time as well.

Page 307

1      A.    Right.   Could you repeat the question?

2      Q.    Well, I can.   But I want to figure out the

3  systemic issue first.   Why don't we go briefly off

4  the record?

5            VIDEO OPERATOR:   Going off the record.

6  The time is 5:00 o'clock p.m.

7                 (A discussion was had off the record

8                 after which the proceedings continued

9                 as follows:)

10           VIDEO OPERATOR:   Now begins Media Unit

11 9 in the deposition of Katherine Keyes.   We're back

12 on the record.   The time is 5:02 p.m.

13 BY MR. METZ:

14     Q.    Doctor Keyes, thank you for bearing with me

15 with the audio issues I was having.   Let me read

16 the quote back to you that I was trying to ask you

17 about before, and I saw that you grabbed the

18 Compton study.   My question is not going to be

19 about the Compton study; it's going to be about a

20 particular phrase you used in your answer.

21                 You said around -- somewhere around

22 page 201 of the realtime that there was

23 insufficient data, "but I think now any reasonable

24 epidemiologist would conclude that there is more

Page 308

1   than sufficient data."

2           Do you recall giving that answer?

3       A.   I do.

4       Q.   Why did you use the phrase "reasonable

5   epidemiologist" in reference to this data issue?

6       A.   I just -- I simply meant that anyone who is

7   trained to read this literature, I think, would --

8   would conclude that there is more data at this

9   point for which sufficient conclusions can be

10  drawn.

11      Q.   And do you consider yourself to be a

12  reasonable epidemiologist?

13      A.   I do.

14      Q.   And in another of your answers today -

15  specifically, I think, this was around page 175 of

16  the realtime - and you were testifying in reference

17  to your direct and indirect attribution, and in

18  your answer at several -- in several places, you

19  mention the concept of trying to provide

20  conservative estimates.

21          Do you recall that?

22      A.   I do.

23      Q.   And in context of epidemiology, what does

24  it mean to offer a conservative estimate?

1      A.   Specifically, I -- it depends on the

2    context, and certainly it's not across the board

3    that we would want to provide, quote/unquote,

4    conservative estimates.  But for the purpose of

5    what I was engaged in in a section of the report -

6    which was this attribution of deaths to

7    prescription opioids, both directly and indirectly

8    - I felt that a conservative approach would be --

9    would be the most reasonable approach to use for

10   that section.

11             I do a lot of opioid simulation

12   modeling, and that type of approach is -- is a very

13   well-accepted methodology in my field, where when

14   we -- when there is uncertainty around a certain

15   percentage, then we'll use a conservative indicator

16   so that we don't kind of overestimate a certain

17   parameter.

18      Q.   Okay, thank you.  And I believe

19   specifically your answer - at least according to

20   the realtime - was, "I wanted to apply the most

21   reliable methodology based on my field of expertise

22   in opioid simulation and we often try to" - and I

23   think there might be a typo here, it might be -

24   apply, "conservative estimates in these

Page 310

1    circumstances."

2              Does that sound correct to you?

3        A.   It really depends on what the specific

4    question that we're trying to answer and what the

5    specific parameter that we're trying to estimate

6    is, whether we want a quote/unquote conservative

7    estimate or not, but in many cases, in my

8    experience doing a lot of these similar types of

9    analyses in my field, when there is uncertainty,

10   you know, applying a conservative parameter gives

11   you some assurance that you're not overestimating

12   the -- the harm.

13       Q.   And to be clear on this point, you regard

14   your own calculation of the deaths that you say are

15   directly and indirectly attributable to

16   prescription opioids, you regard that to be a

17   conservative estimate?  Is that correct?

18       A.   That was specifically with regard to the

19   indirect attribution parameter.

20       Q.   So my question --

21       A.   -- conservative estimate.

22       Q.   Okay.  So what my question as to the

23   exercise as a whole, do you regard that exercise as

24   a whole - what's ultimately reflected in Figure 16

1   of your errata - do you consider that to be a

2   conservative estimate?

3        A.   I wouldn't -- I wouldn't say across the

4   board that every estimate is conservative.  I think

5   for that particular parameter, because there was

6   uncertainty around the percentage, I felt that a

7   conservative estimate was a reliable way to apply

8   my methodology.

9             But I wouldn't apply that same logic to

10  every parameter that I estimated in that section of

11  the report.

12       Q.   Okay, I see.  So if -- if you thought you

13  had more concrete numbers, for example, you might

14  not feel as constrained to apply a conservative

15  approach; you might just apply whatever you think

16  is the most -- the most accurate based on the

17  numbers you have.  Would that be fair?

18       A.   That would be one example, yes.

19       Q.   Is there uncertainty about the OUD

20  population in Cabell County?

21       A.   Yes.

22       Q.   And I take it then you would have applied a

23  conservative approach to try and to estimate that

24  uncertain number.  Is that fair?

Page 312

1      A.   I tried to apply the most reasonable and

2   reliable numbers that I could.

3      Q.   The most reasonable and reliable numbers

4   that you could apply.  Is that your testimony?

5      A.   That's my testimony.  That I felt were

6   reasonable and reliable based on my -- my knowledge

7   of the field.

8      Q.   Do you consider that OUD estimate to be

9   conservative?

10      A.   Yes.

11      Q.   Now, would you turn to page 42 of your

12   report?  Which I believe is Exhibit 2.

13      A.   Yes.

14      Q.   Are you there?

15      A.   Yes.

16      Q.   And about, I think, three-quarters of the

17   way down, you have a paragraph where you're --

18   where you're describing the Larney paper and how

19   you applied the methodology from the Larney paper

20   to -- as part of calculating what you consider to

21   be the OUD population in Cabell County; is that

22   correct?

23      A.   That's right.

24      Q.   And you describe here at page 42 the need

1  to make an adjustment to a mortality estimate that

2  is found in the Larney paper in order to account

3  for the greater lethality of illicit fentanyl.

4         Is that correct?

5     A.   That's correct.

6     Q.   Okay.  And specifically -- well, before I

7  ask that, why does the greater lethality of

8  fentanyl require you to make an adjustment to the

9  figure that's in Larney?

10    A.   Because I would estimate that after 2015,

11  the death rate -- the overdose death rate for

12  individuals with OUD would be higher than .52 per

13  100,000.

14    Q.   And just to explain the logic of this, am I

15  correct, the point is:  Since fentanyl is much more

16  lethal, the number of overdose deaths attributed to

17  fentanyl implies a smaller population that's

18  encountering fentanyl for --

19    A.   (Inaudible).

20    Q.   Okay.  And so in the logic of that

21  approach, the more lethal your estimate of

22  fentanyl, the smaller the OUD population you would

23  -- you would calculate as a result.  Correct?

24    A.   That's not exactly correct.  It's not the

Page 314

1    -- it's not the direct lethality comparison.  It's

2    the total drug overdose death rate that I'm trying

3    to estimate.

4                So fentanyl -- whatever -- however more

5    lethal fentanyl is than heroin, it wouldn't be a

6    direct multiplier to the death rate, because we're

7    -- what we're trying to estimate is the probability

8    of overdose given OUD, not per use, you know, in a

9    direct comparison of heroin with fentanyl and

10   heroin without fentanyl.  That would be --

11       Q.   Let me ask that question a little bit

12   better.  All else being equal, the greater the

13   lethality of fentanyl as compared to the substances

14   that are studied in Larney, the smaller the OUD

15   population you would infer based on the number of

16   overdose deaths that have occurred, correct?

17       A.   Sorry, that -- can you perhaps where we

18   need to come to consensus is your definition of the

19   word "lethality."

20       Q.   Sure.  I'm using that term in reference to

21   the information contained inside the parentheticals

22   on page 42, specifically where you write, "(the

23   overdose rate due to heroin and synthetic

24   non-methadone opioids increased by a factor of

Page 315

1    three from 2011 to 2015)."

2         A.    Okay.

3         Q.    So with that understanding, if -- well, let

4    me back -- let me back up.  You multiplied it by

5    three in the belief that fentanyl is more lethal

6    than heroin, and so the number of deaths that are

7    coded as fentanyl contributed to implies a smaller

8    population that is encountering fentanyl relative

9    to what would be the same if you had that many

10   deaths attributed to heroin.  Right?

11        A.    That's right.

12        Q.    Okay.  And so just keeping that

13   number three in reference, if your estimate was

14   that fentanyl was six times more lethal, right, it

15   would result in -- from this calculation, it would

16   result in a smaller OUD population, correct?

17        A.    So again, I -- you're using the term "more

18   lethal," and that's not exactly the method -- it

19   doesn't really -- in order to apply the

20   methodology, at least epidemiologically the way we

21   use the term "more lethal" --

22              I guess what you do mean by "six times

23   more lethal?"  If the drug overdose rate is six

24   times -- the way I would use it -- the way I would

1    use the multiplier of three is my estimate is that

2    the drug overdose rate is now three times higher

3    than it was before fentanyl, which is what I

4    observed in the data.

5        Q.   Okay.

6        A.   If that number had been six times higher,

7    then I would have used a multiplier of six.  But

8    the fact that fentanyl might be six times more

9    lethal is not how you apply that methodology.  Does

10   that make sense?

11       Q.   Yeah, you've now answered it in the way I

12   thought I was asking it.

13       A.   Okay.  I apologize.

14       Q.   My terminology wasn't aligning with yours,

15   but now I understand how you've used it.  And just

16   to follow through with that last point, if all else

17   remained equal in the table but you'd used the

18   multiplier of six rather than the multiplier of

19   three, the OUD population you would have calculated

20   would have been smaller than the one you in fact

21   calculated; is that right?

22       A.   That's correct.

23       Q.   And if that number was - I don't know -

24   twelve, it would be smaller still, right?

Page 317

```
 1      A.    Correct.
 2             MR. ARBITBLIT:   Objection.
 3      Q.    Now, you cite here two sources as the basis
 4   for that multiplier of three, correct?
 5      A.    I do.
 6      Q.    And those -- those sources are what you
 7   were basing that multiplier on, right?
 8      A.    Yes.
 9      Q.    And if you look in your citations list -- I
10   want to ask you first about one of them.
11             At No. 195, that's the Dowell paper,
12   right.
13      A.    That's right.
14      Q.    And that paper was published in 2017?
15      A.    That's right.
16      Q.    And the data contained within the paper
17   only goes through 2015, correct?
18      A.    Do you have it as an exhibit?
19      Q.    I do.
20      A.    May I --
21      Q.    Let me -- before I go there, let me first
22   ask this -- in your report, you reference the
23   increase in the overdose rate from 2011 through
24   2015, correct?
```

Page 318

1      A.    That's right.

2      Q.    And do you believe that's because of any

3   relevant time period in the Dowell paper?

4      A.    -- the paper --

5      Q.    Well, let me ask this -- if the Dowell

6   paper had the same statistics through 2018, would

7   you have stopped at 2015?

8      A.    Yeah.

9            MR. ARBITBLIT:   Objection.

10     Q.    You would have?

11     A.    I would have stopped at 2015.   That was the

12  relevant time period I was interested in.   The 2011

13  to 2015 time period.   Because that covers the

14  direct pre- and post-fentanyl introduction.   And so

15  that small window was the correct window to

16  estimate the factor of three.

17           If you went through 2018, you would get

18  a much bigger factor, but that wouldn't be relevant

19  to the multiplier that I was interested in.

20     Q.    It wouldn't be relevant?

21     A.    Correct.

22     Q.    Did you -- did you consider applying your

23  multiplier based on data through 2018?

24     A.    I considered it and rejected it as

Page 319

1    nonreliable.

2         Q.   Okay.  Did you -- had there been any

3    changes in the availability of fentanyl since 2015?

4    And by "fentanyl," I mean illicit fentanyl.

5         A.   Have there been any changes in the

6    availability of fentanyl?  I'm not quite sure what

7    you mean.

8         Q.   It's -- sticking with West Virginia, is

9    illicit fentanyl today available as readily as it

10   was in 2015?  Or more or less?

11              MR. ARBITBLIT:  Objection.

12        A.   I don't have data to speak to that topic.

13        Q.   You didn't look at that?

14        A.   The availability of fentanyl in 2018?

15        Q.   Sorry.

16        A.   I don't know of data that would -- that

17   would tell us how more available fentanyl was in

18   2018 than in 2015.  We can -- there's synthetic

19   overdose death rates, but not -- I don't know of

20   any data on the availability of fentanyl.  Illicit

21   fentanyl.

22        Q.   Are there forms of illicit fentanyl

23   available today different in any way from the forms

24   of illicit fentanyl that was available in 2015?

Page 320

1      A.    Could you give me an example of a form?

2      Q.    Sure.  Fentanyl versus analogs like

3  carfentanil.

4      A.    I don't know with respect to West Virginia.

5      Q.    Did you look at that in connection with

6  attempting your OUD population estimate?

7      A.    That would not be relevant to my OUD

8  population estimate.  So no, I didn't.

9      Q.    It would -- it -- if a more potent form of

10  fentanyl was available -- a fentanyl analog was

11  available in 2018 that wasn't available in 2015 and

12  that contributed to a higher overdose per 100,000

13  people -- population, that wouldn't be relevant at

14  all to an attempt at conservatively estimating the

15  OUD population based on overdose deaths?

16          Is that your testimony?

17      A.    My testimony is that it -- I felt that it

18  was a reliable methodology to use the time period

19  directly pre and directly post the introduction of

20  fentanyl to estimate the total overall increase in

21  the death rate for those years and apply it there

22  forward to all synthetic opioid death rates with

23  the -- with the estimate that the overall drug

24  overdose death rate is approximately three times

Page 321

1    higher.

2              I think that that's a reliable

3    methodology to use.  It's a methodology that's

4    commonly used in my field.

5        Q.   Is a methodology that's commonly used in

6    your field when you have unstable patterns?

7                   MR. ARBITBLIT:  Objection.

8        A.   That's right.

9        Q.   It is -- your testimony is it is commonly

10   used even when you have unstable underlying

11   patterns that you're trying to use as the basis for

12   the prediction?

13       A.   The correction is due to the unstable

14   patterns.

15       Q.   But I guess my question -- sorry, it would

16   have been a little more clear.  If the pattern

17   continues to be unstable after the period in which

18   you used to select your multiplier, is that an

19   accepted methodology within the field of

20   epidemiology to ignore that further changes in the

21   pat -- in the -- in the underlying number and just

22   stick with the number you would pick from 20 --

23   from a prior year, when there's continued change?

24                   MR. ARBITBLIT:  Objection.

Page 322

1      A.   I don't have any evidence of a -- of a

2   continued change.

3      Q.   Did you investigate whether or not there

4   was evidence of a continued change?

5      A.   It did not come up in my literature review.

6      Q.   Okay.  Do the sources you cite on this page

7   reflect a continued change?

8      A.   I'm sorry, what do you mean by "continued

9   change"?

10     Q.   I mean, your multiplier is based on the

11  increase in the mortality rate for overdose deaths

12  with synthetic opioids present from 2011 to 2015.

13  Did that number continue to increase from 2015

14  through 2018?

15          MR. ARBITBLIT:  Objection.

16     A.   I believe that I've explained the

17  methodology.  So even if the synthetic opioid

18  overdose at -- I -- even if the synthetic opioid

19  overdose rate continues to increase, the correct

20  multiplier would be the one that's -- that's

21  directly pre and post the introduction of the cause

22  of the change that we're trying to estimate.

23          It would be incorrect to apply a change

24  from, for example, 2011 to 2018.  And that's why I

Page 323

1   didn't do that.

2       Q.   And again, that's because you're assuming

3   there were not any changes in what was causing the

4   increased mortality over that period of time.

5   Correct?

6               MR. ARBITBLIT:  Objection.

7       A.   I am assuming that the contribution of

8   synthetic opioids in terms of the percentage

9   increase in drug overdose death was similar after

10  2015 than pre-- 2013, essentially.

11      Q.   Have there been any changes since 2015 in

12  the ways in which illicit fentanyl is -- is sold on

13  the streets or the forms in which it appears?

14      A.   Can you give an example of that?

15      Q.   Sure.  An example would be -- you

16  testified, I think, earlier fentanyl being

17  available as an adulterant in heroin.  Are you

18  aware that there are also prescription -- sorry,

19  excuse me.

20               -- that there are counterfeit

21  prescription pills made to resemble a prescription

22  opioid that are often laced with fentanyl and cause

23  death?

24      A.   I am aware that there are counterfeit

Page 324

1    prescription opioids and that some of them have
2    fentanyl in them.
3        Q.   And are you aware that people have
4    overdosed and died from pills like that?
5        A.   Yes, I have -- I'm aware that that occurs.
6        Q.   In forming your conservative estimate of
7    the OUD population in Cabell/Huntington, did you
8    investigate whether or not these types of
9    counterfeit pills were more -- more available after
10   2015 than they were in 2015?
11       A.   Again, that -- that wouldn't change my
12   estimate if they were more available versus less
13   available, as long as the pre/post fentanyl
14   introduction multiplier is -- is the accurate
15   multiplier, which is the one that I've used.
16            So because there are more fentanyl
17   deaths, what matters in terms of the validity of
18   the estimation, is the probability of death
19   per use.
20       Q.   And is carfentanil more potent than what
21   was generally referred to as synthetic fentanyl
22   when fentanyl first appeared?
23       A.   I would need to look at -- there are a
24   number of different synthetic opioids.  I was

Page 325

1    assuming kind of an average of them.

2        Q.   Okay.  Well, I've already asked whether you

3    know if carfentanil is -- is present and available

4    in 2015.  But my question more specifically was:

5    Do you know whether or not carfentanil is more

6    potent and therefore considered more dangerous than

7    other synthetic fentanyls?

8        A.   I would have to look at the range of all

9    synthetic fentanyls.  Carfentanil is very potent.

10   But you know, if you want to show me some data on

11   the potency of various synthetic opioids, I can

12   answer your question.  But just carfentanil

13   compared to a random synthetic opioid, I don't have

14   -- I can't -- that's not sufficiently specific to

15   answer your question.

16       Q.   Okay.  Can you open -- let me just make

17   sure I have the number correct.

18                 -- Exhibit 86?

19             KEYES DEPOSITION EXHIBIT NO. 86

20                 ("Underlying Factors in Drug Overdose

21                 Deaths" by Dowell, et al. dated

22                 12-19-17 was marked for identification

23                 purposes as Keyes Deposition Exhibit

24                 No. 86.)

Page 326

1      Q.   This is the Dowell paper that we were
2  speaking of a moment ago, Exhibit 86?
3      A.   Yes.
4      Q.   And that's the paper that -- you list it at
5  No. 195 in your reference material; is that
6  correct?
7      A.   That's right.
8      Q.   And if you turn to the fourth page, am I
9  right that the basis for your multiplier is an
10  approximation of the information that's presented
11  at -- in the first draft on page 4 of this paper.
12  Is that right?
13      A.   That's part of it.  I have another citation
14  as well.
15      Q.   Your Citation 194, correct?
16      A.   Let me -- that's right.
17      Q.   Okay.  So just so I understand first, so
18  the basis for this multiplier of three is that as
19  you see the calculation of illicit opiate overdose
20  deaths from 2011 through 2015 increased in the
21  neighborhood of two deaths per 100,000 up to around
22  but a little bit above six deaths per 100,000,
23  correct?
24      A.   That's right.

Page 327

1     Q.   Okay.  I take it based on some of your

2  prior answers, you are aware that that metric,

3  deaths per 100,000, increased from 2015 to 2016.

4  Correct?

5     A.   Again, I'm aware of that.  But the correct

6  calculation is the comparison of 2011 to 2015.  I

7  mean, the other reference I cite here, the

8  synthetic opioid overdose data, also goes up to

9  2018.  But it would be incorrect to use a

10  multiplier comparing 2018 to 2011.  That's why I

11  did not do that.

12     Q.   That wasn't my question.  My question was:

13  You are aware that from 2015 to 2016, it increased,

14  correct?

15     A.   Yes.

16     Q.   And you're also aware that that same metric

17  increased from 2016 to 2017, correct?

18     A.   Yes.  It increased 2016 to 2017.

19     Q.   And it further increased from 2017 to 2018,

20  correct?

21     A.   For illicit opioid overdose deaths?  I

22  would need to check the data to confirm that.

23     Q.   Okay.  Well, we can find information on

24  that at the web page you've listed on -- as

Page 328

1    Reference No. 194, correct?

2        A.   That information would be on Reference 194.

3        Q.   As you sit here, do you recall what that

4    resource says was the West Virginia-specific

5    mortality -- or deaths per 100,000 in 2018?

6        A.   I don't recall sitting here.

7        Q.   As you sit here today, do you believe that

8    number to be higher or lower than the six per

9    100,000 that's reflected in the Dowell paper?

10       A.   I would need to review the data.

11       Q.   Okay.  Do you know where within the ranking

12   of states that figure for West Virginia ranks as

13   among -- among all states?

14       A.   I don't recall.  I'm sorry.

15       Q.   And is it your testimony that the higher

16   rate of deaths per 100,000 as of 2018, that is not

17   in any way the result of differences in the

18   availability and frequency with which fentanyl is

19   present in various drugs of abuse?

20            MR. ARBITBLIT:  Objection.

21       A.   That's not my testimony.

22       Q.   Okay.  Is your testimony that if there had

23   been differences and changes in the availability

24   and frequency with which fentanyl is present in

Page 329

1  various drugs of abuse, that that wouldn't be

2  relevant to your calculation of OUD population

3  based on the number of deaths occurring?

4       A.   That's also not my testimony.

5       Q.   Well, then what is your testimony as to why

6  the higher rate of death per 100,000 as of 2018 --

7  why that is not apparently considered at all in the

8  calculation?

9       A.   So I can --

10            MR. ARBITBLIT:  Objection. Asked and

11  answered.

12            THE DEPONENT:  Right.

13      A.   I -- my testimony is not -- so you said

14  that my testimony is that had there been any

15  differences or any changes in the availability and

16  frequency with which fentanyl was present, it

17  wouldn't be relevant.  That's not what I'm saying.

18            I'm saying that based on the

19  information that I have, I don't -- I didn't find

20  any changes in or differences in availability or

21  frequency that were relevant.  Not that there were

22  no changes that could have been relevant.

23            I did not find any changes that were

24  relevant to my calculation.  Had I found such

Page 330

1    changes, I would have changed my calculation.

2         Q.   Okay.  I think what you testified was, you

3    used the multiplier of three ending in 2015 because

4    that was the period immediately before and after

5    the change.  Right?

6         A.   That's right.

7         Q.   Okay.  And so my question is:  If there

8    were further changes after 2015, wouldn't that mean

9    that your multiplier is not capturing the

10   relevant --

11        A.   No.

12        Q.   -- changes?

13        A.   I feel that I've answered this question now

14   a number of times.

15        Q.   Well, I --

16        A.   No.

17        Q.   -- respect -- I think you may have

18   misunderstood.  That's why I clarified the nature

19   of my question.  So can you answer that question

20   now?

21             MR. ARBITBLIT:  Objection, asked and

22   answered multiple times.

23             If you have anything additional to say

24   about it, you can.

Page 331

1      A.   Can you ask your question again?

2      Q.   Sure.  You had told me that the reason you

3   stuck with 2015 deaths per 100,000 even though you

4   knew that there were higher estimates for later

5   years and even though you fully understand that

6   using those higher estimates would reduce your OUD

7   population, that the reason for that is you wanted

8   to have a multiplier to capture the period of the

9   year before and after the change.

10           So my question was:  If there were

11   further changes in the availability, the potency,

12   the number of ways in which it appeared, the

13   transparency with which it appeared, if any or all

14   of those things changed subsequent to 2015, would

15   your multiplier really be picking up, as you put

16   it, the change?

17           MR. ARBITBLIT:  Objection, vague,

18   ambiguous, argumentative, compound, asked and

19   answered.

20      A.   No.  That's the short answer to your

21   question, is no.  The correct calculation would be

22   2011 to 2015 because the calculation is not

23   capturing -- the purpose of the calculation is not

24   to capture the change from one time to another;

Page 332

1   it's to estimate the change in the probability of

2   drug overdose death, given a change in the

3   underlying death rate.

4             And so the appropriate way to calculate

5   that using the methodology that is reliable in my

6   field would be to use a pre/post comparison in an

7   interrupted time series, which is what I did.

8             If there are further changes after

9   2015, it would be biased to include that as part of

10   my interrupted time series.

11            So the way you are describing the

12   methodology would be incorrect.  The way I'm

13   describing the methodology is correct under the

14   reliable methods of my field.

15      Q.   So let me just make sure I understand that.

16   If there were further changes in how dangerous

17   illicit fentanyl was as measured by the number of

18   deaths it caused per 100,000, that would not be

19   relevant to your estimate of the OUD population

20   based upon the number of deaths attributed to

21   fentanyl?

22            MR. ARBITBLIT:  Objection.

23      A.   I don't know how to describe this

24   methodology again.  Changes in --

Page 333

1      Q.   That's not what I asked you to do.  I asked

2   you a question.  I'd like you to answer my

3   question.

4      A.   Okay.

5           MR. ARBITBLIT:  Asked and answered

6   multiple times.  You're badgering at this point.

7           You want an answer to a question,

8   you've got the answer several times.

9      A.   Could you rephrase the question?

10     Q.   Can you --

11     A.   I don't understand the question.

12     Q.   If there had been changes subsequent to

13  2015 in the dangerous nature of illicit fentanyl

14  such that it is more dangerous today than it was in

15  2015, then for purposes of estimating the OUD

16  population based on the number of deaths attributed

17  to fentanyl, don't you need to take into account

18  those changes subsequent to 2015?

19          MR. ARBITBLIT:  Objection.

20     A.   No.

21          MR. ARBITBLIT:  Asked and answered.

22     Q.   Okay.  I want to ask you some questions

23  that relate to your calculation of deaths that you

24  say are directly and indirectly attributable to

Page 334

1    prescription opioids.  And first, I just want to

2    understand something -- a few things about the

3    mechanics of this -- this calculation.

4              So you've described in earlier

5    testimony, if a prescription opioid was noted at

6    all being present, then for purposes of your

7    methodology, you coded that death as either T40.2

8    or T40.3, depending on which substance was found to

9    be present.  Is that fair?

10   A.    That's right.

11   Q.    And so what about when there were T40.1 and

12   T40.4 -- and just for purposes of this, I will --

13   I'll confine my questions to after 2013.

14             If both T40.1 and T40.4 were present

15   but T40.2 and T40.3 were not present, did you

16   choose one or the other as between T40.1 and T40.4?

17   A.    Can you refer me to the section of the

18   report where this is described?

19   Q.    Sure.  I'm on page 32.  Sorry, 33.

20   A.    Page 33?

21   Q.    I am on page 33 where at the top you

22   describe all the various ICD-10 codes and how you

23   use them, but I'm also referring to testimony you

24   gave earlier here today.  I'm not suggesting that

```
                                            Page 335
 1   all of this is disclosed in your report.  That's
 2   partly why I'm asking the question.
 3        A.   Okay.  Okay, so your -- so -- let me just
 4   go back to your question.
 5        Q.   Let me back you, because I think I may have
 6   lost you in my question.  We established in your
 7   earlier testimony - and I think you just
 8   reconfirmed for me - if a prescription opioid was
 9   present at all, then for purposes of the
10   calculation you are doing here for Figure 8 and
11   Figure 16, you classified that by the prescription
12   opioid rather than by other opioids that were
13   present.  Correct?
14        A.   That's correct.
15        Q.   Okay.  So my question is:  If there were
16   multiple substances but not T40.2 and T40.3, it was
17   heroin and fentanyl that were present -- which I
18   think you've testified, that is a circumstance at
19   which people have overdosed and died, from the
20   combination of heroin and fentanyl.  Correct?
21        A.   That's right.
22        Q.   Okay.  So for those deaths, the death
23   certificate would say, T40.1, heroin and T40.4,
24   fentanyl.  And my question is:  Did you put those
```

1   deaths into one column or the other?  And if so,

2   which one?

3       A.   One column -- which -- which two columns am

4   I considering?

5       Q.   As between heroin and fentanyl, T40.1 and

6   T40.4.  If both were noted as present but no

7   prescription opioid.

8       A.   I see.  So for T40.4 -- oh, when they both

9   were present, we used a -- I used a correction for

10  fentanyl.  Most likely that was in -- that was in

11  the bucket of not prescription opioids, although

12  some portion of fentanyl deaths are due to

13  prescription fentanyl, and so I estimated that

14  based on the available literature.

15      Q.   Okay.  I'm going to -- I'm going to ask you

16  all about that estimation in a minute.  I just

17  meant in terms of where you were coding the result.

18  Is it correct that if both heroin and fentanyl were

19  present and therefore you had both T40.1 and

20  T40.4 --

21      A.   Uh-huh.

22      Q.   -- did you choose one of those or the other

23  in order -- for categorizing those, or did you use

24  -- did you include them under both columns?

Page 337

1      A.    Which columns?  Is there a specific figure

2  that you're referring to?

3      Q.    I --

4      A.    The direct and indirect attribution?

5      Q.    I'm referring, in part, to -- let me back

6  this up.  You performed -- I think disclosed in

7  your work papers, various calculations that are

8  based upon how you have categorized deaths

9  available through the CDC WONDER data, correct?

10      A.    Yes.

11      Q.    And some of those calculations are

12  dependent upon ratios of who -- of deaths that you

13  put in the T40.2 versus T40.3 versus T40.4,

14  correct?

15      A.    No.

16      Q.    There's not a calculation that is a ratio

17  of that?

18      A.    I'm sorry, what's the ratio?  Ratio to --

19  no, T40.2 and 3, I included together to estimate

20  the rate of prescription opioid overdose.

21      Q.    Right.  I'm asking you --

22      A.    The rest of the opioid overdoses were not

23  prescription opioid --

24      Q.    You're way ahead of me.  I'm asking a more

Page 338

1    foundational question of:  In building up the data

2    that is then going to be the product of these

3    calculations, you have deaths that you put into the

4    different categories.  Some you coded at T40.1;

5    some you coded at T40.2.

6         A.   No, these not how it works, because they

7    are not mutually exclusive.  You are raising the

8    exact reason why that would not be a reliable

9    methodology.

10        Q.   I want to make sure I understand you.

11   They're not mutually exclusive, because if -- I

12   think I missed -- I think your earlier testimony on

13   this is different.  If prescription opioids were

14   present - you have T40.2 or T40.3 - but also heroin

15   is present --

16        A.   Right.

17        Q.   -- does that result in multiple entries, or

18   does that result in a single entry that's in just

19   one column?

20        A.   I'm -- I'm having a hard time with the

21   column concept.  I wonder if you can point me to a

22   figure or a -- in terms of how this resulted in the

23   -- I'm truly just confused.  I'm not trying to be

24   obstructionist in any way.

                                                        Page 339

1              But I don't think that the way you're

2      describing it reflects how I did it.

3          Q.   Okay.  Do you recall producing an Excel

4      workbook as part of your backup material?

5          A.   Yes.

6          Q.   Okay.  Do you recall that that workbook has

7      a tab titled "Figure 8" and "Figure 16"?

8          A.   Yes.

9          Q.   And that tab further has various rows and

10     columns of information, right?

11         A.   Yes.

12         Q.   And do you recall that there is a row -- a

13     Column J that is in the descriptive part, it's

14     populated as "T40.2 through T40.4 minus T40.2 and

15     T40.3," which really just means it's T40.4.

16         A.   Right.

17              MR. ARBITBLIT:  I'm going to object to

18     the line of questioning without a document that the

19     witness can look at.  It's very unfair.  If you

20     wanted to question on this, it should be in the box

21     of exhibits.

22              You're asking her to testify from

23     memory about a document with many tables and

24     figures, and it's just not appropriate.

Page 340

1      Q.    Doctor Keyes, did you perform your own
2   calculations in this matter?
3      A.    I worked with my research assistant.
4      Q.    Did you review the calculations that were
5   performed in this matter?
6      A.    I did.
7      Q.    Do you have a working understanding of how
8   the calculations were performed?
9      A.    No, to be honest with you, I don't.  If
10   there's a specific subtraction that -- in a
11   specific column of one specific Excel spreadsheet
12   -- I performed a lot of analyses to come up with
13   these estimates, and I would need to see what
14   specifically you're referring to.
15      Q.    Well, I'd be happy to provide it, I'm not
16   trying to do it by ambush.  I knew that there were
17   a lot of exhibits that had been -- had been sent
18   out.  I wasn't aware until today that this Excel
19   spreadsheet was not one of them.
20            If you'd like, I can e-mail the
21   spreadsheet.  But I'm asking you about what was
22   disclosed to us as your -- your backup Excel file,
23   with your calculations, and I just -- I have some
24   questions --

Page 341

1    A.   I know but you're asking me about specific

2    columns and I'm -- I need something to go off of.

3    Q.   Sure.  I'd be happy to show you the Excel

4    file, and -- why don't we briefly go off the

5    record.  It's something --

6              MR. ARBITBLIT:  We're not doing that.

7    You're --

8              MR. METZ:  Okay, then I'll continue to

9    ask her questions about her calculations.

10             MR. ARBITBLIT:  But did you read the

11   protocol about providing exhibits 48 hours ahead of

12   the deposition?  It doesn't say anything about

13   e-mailing them during a deposition.  If you find --

14   if you find authority for what you're proposing,

15   then I'd be happy to -- to consider it.

16             But the authority I've seen says you're

17   two days late.

18             MR. METZ:  Don, I'm only proposing to

19   do what you've asked for.  I'm perfectly content to

20   continue finding out whether this witness knows how

21   these calculation were put together just by asking

22   her working knowledge of them.

23             You and she both requested to see the

24   file I'm looking at.  And if you'd like, I can send

Page 342

1   that to you.  If you're going to complain about me

2   offering to do that, I won't send it to you and

3   I'll continue asking my questions.

4               MR. ARBITBLIT:  You can ask your

5   questions, but the witness is within her rights not

6   to be able to not answer them without seeing what

7   you're talking about.

8               MR. METZ:  Okay, you and I have a

9   different view about what experts can be asked

10  about.

11              MR. ARBITBLIT:  I didn't say you

12  couldn't ask.

13  BY MR. METZ:

14      Q.   Doctor Keyes, do you have a working

15  knowledge of the calculations that you produced for

16  your Figure 8, how they were put together?

17      A.   Yes.

18      Q.   Does that calculation at any point include

19  a -- the creation of a percentage that is the

20  percentage of deaths coded T40.4 as a share of

21  deaths coded T40.2, T40.3 and T40.4 combined.  Yes

22  or no.

23              MR. ARBITBLIT:  Objection.

24      A.   The Figure 8?

Page 343

1    Q.   Yes.

2    A.   So what we did for Figure 8 was T40.2,

3  T40.3 and a portion of T40.4.

4    Q.   Do you know how you arrived at the portion?

5    A.   Yes, I do.

6    Q.   How did you arrive at the portion?

7    A.   We estimated the pre-illicit fentanyl share

8  of prescription opioid overdose deaths that were

9  due to T40.4 and applied that share thereafter.  I

10  attributed those deaths to prescription opioids.

11    Q.   Okay.  In coming up with that share, are

12  deaths that are coded T40.4, are they exclusive of

13  -- that same death can't appear as T40.2 or T40.3,

14  can it?

15            MR. ARBITBLIT:  Objection.

16    A.   That's right.

17    Q.   Okay.  And so getting back to the question

18  I was trying to ask before, you've described the

19  default rule that you would use if T40.2 or T40.3

20  was present, you would code that death as one or

21  the other of those.

22          But my question was:  If they are not

23  present, you only have T40.1 and you only have

24  T40.4.  Did you have a default rule that you

Page 344

1    applied as to which way that death would be coded

2    the one time that it's coded?

3                  MR. ARBITBLIT:  Objection.

4        A.   T40.4 is not in Figure 8.  That's what I'm

5    confused about.

6        Q.   Well --

7        A.   I mean, T40.1 is not in Figure 8.

8        Q.   Right.

9        A.   So if it's coded T40.1 and T40.4, it's

10   coded T40.4, so the same rule that's described in

11   the report was applied.

12       Q.   Okay.  And you have a Figure 16, correct?

13       A.   Do you want me to go to Figure 16?

14       Q.   I'm asking, do you know that you have a

15   Figure 16?

16       A.   I do know that I have a Figure 16.

17       Q.   Okay.  Does the calculation that produces

18   your Figure 16 include T40.1?

19       A.   Yes, Figure 16 does include T40.1.

20       Q.   Okay.  So just going back to my prior

21   answer -- my prior question:  For purposes of your

22   Figure 16, when you were deciding whether something

23   belonged in the bucket of T40.1 versus T40.4, if

24   both were present - which again, there is a

Page 345

1   circumstance in which there was heroin and fentanyl

2   both present - did you have a default rule that you

3   used in order to decide whether that death would be

4   coded as fentanyl versus coded as heroin?

5        A.   I would need to look at the spreadsheet to

6   know exactly what mathematical formula that we

7   applied.

8        Q.   Okay.  I don't believe that information is

9   available in the spreadsheet.  So my question is

10  simply:  As you sit here, you do not know whether a

11  death certificate that was coded as both heroin and

12  fentanyl, whether that - for purposes of your

13  analytics - was listed as a heroin death or a

14  fentanyl death?

15       A.   I believe I've been very transparent with

16  my methodology, so if a -- if a death has T40.1 and

17  T40.4, then the share of the T40.4 deaths that were

18  the pre-2013 deaths would be applied to that.  That

19  death could only be -- that death could be

20  considered directly or indirectly attributable to

21  prescription opioids based on a proportionate share

22  from the pre-2013 T40.4 deaths.

23            So it's -- I think the question is a

24  little bit too simplistic of which bucket did T40.1

Page 346

1    and T40.4 deaths go, because it was based on this

2    mathematical calculation.

3         Q.   Is that true, what you just told me, for

4    time periods prior to 2012?

5                    MR. ARBITBLIT:  Objection.

6         A.   Prior to 20 -- prior to 2012, T40.4 deaths

7    were considered prescription opioid deaths.

8         Q.   And if it was a T40.1 and a T40.4 both

9    present, you would call that a T40.4 death, a

10   fentanyl death, rather than a heroin death.  Is

11   that fair?

12                   MR. ARBITBLIT:  Objection.

13        A.   I didn't call anything a fentanyl death.  I

14   attributed that death to prescription opioids.

15        Q.   Well, but specifically for purposes of your

16   calculation, you attributed it as a T40.4; is that

17   right?

18                   MR. ARBITBLIT:  Objection.

19        A.   I --

20                   MR. ARBITBLIT:  Vague.

21        A.   I didn't do that.  I didn't attribute

22   anything to T40.4.  I attributed things to

23   prescription opioids or not prescription opioids.

24        Q.   Okay.  I'll move on.

Page 347

1            Now, you've described for purposes of

2    calculating your Figure 8 that that is the before

3    2013 share of overdose deaths that was attributable

4    to -- to -- to what you would understand to be

5    prescription fentanyl.  Is that a fair summation of

6    what Figure 8 represents?

7        A.   I considered T40.4 deaths to be

8    prescription opioid deaths prior to 2013.

9        Q.   Okay.  And sorry I wasn't clear.  So then

10   for 2013 forward, you've not just been able to take

11   the total that is coded T40.4 because you

12   understand some number of those are illicit

13   fentanyl deaths, they're not prescription fentanyl

14   deaths, right?

15       A.   That's right.

16       Q.   Sorry, I couldn't hear you.  Was that a

17   yes?

18       A.   Yes, that's right.  That's right.

19       Q.   And so you were starting to describe this

20   calculation that you perform in order to attribute

21   going forward some number of those -- that T40.4

22   category to -- to prescription opioids, and so my

23   questions are going to relate to that.  I want to

24   understand better the logic of the calculation.

Page 348

1      A.   Sure.

2      Q.   So when you calc -- first of all, is it

3   correct that in order to come up with the share

4   that you're attributing to prescription fentanyl,

5   your first step is to calculate a ratio of T40.4

6   deaths as a function of T40.2, T40.3 and T40.4

7   combined.

8      A.   That's right. .

9      Q.   And --

10     A.   Wait, I'm sorry, actually, I don't think

11  that's quite right.  I would have to look at the

12  spreadsheet.  I'm sorry.  I think that we did some

13  manipulation to the -- to account for deaths that

14  had T40.2 and T40.3 as well as T40.4, so I don't

15  think the way you've described it as exactly what

16  we did.

17     Q.   Okay.  If you'll accept -- well, let me

18  just ask it a different way.  However you would

19  more precisely phrase that, there is a step in your

20  calculation in which you come up with a percentage

21  that T40.4 represented as a function of some other

22  prescription opioids.  You may have made some

23  adjustment to it.

24           But isn't that correct, that that is

Page 349

1   one step in your calculation?

2        A.   Yes.

3        Q.   Is that correct?

4        A.   That's correct.

5        Q.   Okay.  And if it would help -- I think this

6   is described in text on page 33 of your report --

7        A.   Yeah, I was referring to that.

8        Q.   -- where you say -- right, "I estimated the

9   rate of synthetic opioid deaths from 1999 to 2012,

10  and applied that rate to synthetic opioids over

11  those deaths from 2013 and onwards as a estimate of

12  the number of synthetic" "deaths."  Correct?

13       A.   That's correct.

14       Q.   Okay.  So then when you -- and do you

15  recall -- do you recall what that rate was,

16  approximately?

17            MR. ARBITBLIT:  Objection.

18       A.   Not off the top of my head.

19       Q.   Okay.  Off the top of your head, do you

20  know whether in calculating that rate you took a

21  weighted average of the deaths?

22       A.   I considered doing a year-to-year average,

23  but the numbers were unreliable for on a

24  year-to-year basis, and so I summed the total

Page 350

1    period from 1999 to 2012 to get a more

2    statistically reliable estimate.

3        Q.   It's more statistically reliable to sum all

4    the deaths and then take the percentage, correct?

5               MR. ARBITBLIT:   Objection.

6        Q.   Maybe I misunderstood.  I just wanted to

7    make sure I understood correctly what you said you

8    did to get a more reliable estimate.

9        A.   Maybe you could be more clear what you mean

10   by a "weighted average."

11       Q.   Yeah, all I meant was to calculate what you

12   described in your -- the text of your report as a

13   rate, you took -- you formed that rate as a

14   function of all deaths from 1999 through 2012

15   rather than doing it, as you described, year by

16   year.  Is that fair?

17       A.   (Nodded affirmatively).

18       Q.   Okay.  And that approach is taking them all

19   together, as opposed to doing it year by year, I

20   think you just testified that's the more reliable

21   way to do that, correct?

22       A.   I did it both ways, and it didn't make a

23   difference in my final calculation, and I felt that

24   the overall period provided a more reliable

Page 351

1    estimate.

2         Q.    Yeah.   Would it surprise you to know that

3    in fact you did the opposite?

4         A.    I'm sorry, I -- I'm not understanding.

5         Q.    Okay.   Now, you then used this rate that

6    you calculated to estimate going forward the number

7    of deaths coded as T40.4 that are -- that continue

8    to be attributable to prescription opioids, in your

9    opinion.   Is that correct?

10        A.    As an estimate, yes.

11        Q.    Okay.   And you do that for the years 2013

12   through 2018; is that right?

13        A.    That's right.

14        Q.    And explain to me why -- or how is the rate

15   of -- at which prescription opioids -- the rate

16   that that made up of all -- sorry, back this up.

17            Explain to me how the percentage share

18   of prescription opioid deaths that was attributable

19   to prescription fentanyl prior to 2012, how that

20   statistic in any way predictive of the share of

21   T40.4 deaths, so synthetic only, that were the

22   result of prescription fentanyl.

23            Can you explain the logic of that to

24   me?

1      A.   Sure.  Well, to back up, I did the

2   calculations several ways, including estimating

3   post-2013, using the same sort of denominator, if

4   you will, of all prescription opioid deaths that

5   were T40.4 and estimated that as a function of the

6   number that would potentially be attributable to

7   prescription opioids, and then estimated the total

8   number of T40.4 deaths - which is the number of

9   deaths that I was interested - how many of those

10  would be attributable to prescription opioids, and

11  the results were similar no matter how you applied

12  that estimate post-2013, but my interest was in the

13  fentanyl deaths, and so I applied the percentage to

14  the -- to the fentanyl deaths specifically, because

15  those are the deaths that I was interested in

16  identifying an estimate of the number that would be

17  due to prescriptions.

18      Q.   But how -- given the manner in which you

19  calculated the percentage, how was it informative

20  of the share of T40.4 deaths that are prescription

21  fentanyl versus illicit fentanyl?  Is it your

22  testimony that the ratio you calculated is somehow

23  informative of that question?  And if so, how?

24      A.   So as an example, if prior to 2013 there

Page 353

1    were 100 prescription opioid deaths and two of them

2    were prescription fentanyl deaths, if there were

3    100 fentanyl deaths after 2013, I would estimate

4    that two of those would be prescription fentanyl

5    deaths.

6         Q.   And if there were 400 fentanyl deaths, you

7    would -- you would estimate that eight were

8    prescription fentanyl, correct?

9         A.   I'm sorry?

10        Q.   Under that same logic you just described,

11   if there were 400 prescription fentanyl deaths, you

12   -- your logic would lead you to conclude to eight

13   were the result of prescription deaths.

14        A.   Using that calculation, that would be the

15   -- that would be the estimate.

16        Q.   Okay.  And if there were -- and if we

17   doubled the number of deaths again, solely within

18   the category of synthetic -- synthetic opioids, you

19   would continue to calculate that that ratio would

20   hold, no matter --

21        A.   Yes.

22        Q.   -- how many additional deaths there were --

23        A.   It stays the same.

24        Q.   -- a certain percentage will always be the

Page 354

1   result of prescription opioids versus illicit --

2   prescription fentanyl versus illicit fentanyl?

3       A.   It's a relatively moot point, because I did

4   it a number of different ways, and the results were

5   robust to the type of correction that you did.

6            But I applied the correction to the

7   T40.4 deaths overall.

8       Q.   What sensitivity tests did you perform on

9   this calculation?

10      A.   As I mentioned, I looked at the T40.4

11  deaths as a function of overall prescription opioid

12  deaths as well.

13      Q.   Are you relying on that calculation for the

14  robustness that you just testified to?

15      A.   I don't -- I guess I don't understand what

16  you mean by that.

17      Q.   Well, that calculation hasn't been

18  disclosed to us, so my question is:  Are you

19  relying on that for purposes of what you just

20  explained was your belief that this is a -- the

21  issue I'm describing -- discussing doesn't matter

22  because you got the same results no matter how you

23  did it so --

24      A.   So --

Page 355

1      Q.   -- are you relying on that other

2   calculation to support that statement?

3      A.   In the course of due diligence in

4   epidemiology, we routinely do a range of different

5   sensitivity analyses on the robustness of our

6   results.  That's just what we do in the course of

7   our calculations.

8           So I rely on the estimate that I

9   provided in the report, and I also - because I'm an

10  epidemiologist - I tested the robustness of it

11  using multiple different approaches.

12     Q.   And did you retain --

13     A.   So I --

14     Q.   And did you retain those robustness and

15  sensitivity analyses?

16     A.   We were -- I'm sure I did.

17     Q.   And have they been produced to the

18  defendants in this litigation?

19     A.   I was asked to produce the calculations

20  that went into the report.  I routinely do

21  sensitivity analyses on my estimates.  So no, I

22  have not produced the sensitivity analyses.

23     Q.   Okay.  Back to my original question:  How

24  is the rate at which T40.4 was present among T40.2,

Page 356

1    T40.3 and T40.4, how does that rate inform at all

2    the question of how much of T40.4 is then made up

3    of prescription fentanyl versus illicit fentanyl?

4              How is the one informative of the

5    other?

6    A.   I would answer it the same way as when you

7    previously asked it:  That that is the population

8    that we're interested in estimating this percentage

9    within, and that's routinely done in epidemiology.

10   Q.   Well, I understand that that's the question

11   you want to answer.  But why does that ratio

12   provide you that answer?

13             MR. ARBITBLIT:  Objection,

14   argumentative, asked and answered.

15   A.   I think I've explained it.  It's the T40 --

16   the T40.4 deaths, we wanted the share of those that

17   were due to prescription opioids.  We knew the

18   share of prescription opioid deaths that were due

19   to fentanyl in a prior period, and so applied that

20   share to the T40.4 deaths, which was the subgroup

21   that we were specifically interested in.

22   Q.   And -- but you understand that after 2013

23   that the subgroup of prescription fentanyl and

24   illicit fentanyl -- you understand that, correct?

Page 357

1    A.   I understand that T40.4 is synthetic opioid

2   death.

3    Q.   And that after 2013, it's inclusive of

4   illicit fentanyl as well as you assumed some

5   prescription fentanyl.  Correct?

6    A.   I would say synthetic opioids.  But yes,

7   it's going to be a mix of illicit and licit.

8    Q.   And it's your testimony, as a reasonable

9   epidemiologist, that you can look at the population

10   at which prescription fentanyl was present, among

11   other prescription opioids, and that will tell you

12   how much prescription fentanyl was present among

13   prescription fentanyl and illicit fentanyl.  That's

14   your testimony?

15    A.   That's one way to estimate that portion.  I

16   did it a number of different ways.  None of them

17   made a difference in terms of my opinion or

18   materially to the calculation, and I think it's

19   routine in epidemiology to, for example, apply an

20   estimate of risk to the subgroup at risk to try to

21   get an estimate of the total number.

22    Q.   Is it routine in epidemiology to have a

23   hypothesis in mind when using statistical analysis,

24   as to how one number might be determinative of some

Page 358

1    other number?  Is that routine?

2                MR. ARBITBLIT:  Objection.

3        A.   I'm not understanding what the question

4    means.  To have a hypothesis -- what do you mean by

5    "a hypothesis"?

6        Q.   Do you ever use the term "hypothesis" in

7    connection with statistical analysis?

8        A.   I do.

9        Q.   And what do you use it to mean?

10       A.   I would hypothesize that prescription

11   opioid use causes heroin use, for example.  It's

12   usually -- a hypothesis is about a cause or a

13   causal connection.

14       Q.   And is it important to have a hypothesis

15   when interpreting statistical information?  To then

16   base further conclusions on.

17                MR. ARBITBLIT:  Objection.

18       A.   I wouldn't make a blanket statement like

19   that.

20       Q.   Okay.  Would you agree or disagree with the

21   statement that "One must infer that a causal

22   relationship exists on the basis of an underlying

23   causal theory that explains the relationship

24   between two variables?"

Page 359

1          MR. ARBITBLIT:  Objection.

2     Q.   Would you agree with that as a blanket

3  statement?

4          MR. ARBITBLIT:  Objection.

5     A.   No, I wouldn't agree with that as a blanket

6  statement.

7     Q.   And certainly that's not consistent with

8  the principles you applied in performing this

9  calculation, right?

10          MR. ARBITBLIT:  Objection.

11     A.   I don't --

12          MR. ARBITBLIT:  Vague.

13     A.   It's not consistent or inconsistent.  I

14  don't see the relevance.

15     Q.   Back to your calculation that you used to

16  produce Figure 8 - and also, then, therefore Figure

17  16 - am I correct that you used West Virginia

18  statewide death totals as the basis for the

19  calculation that you performed?

20     A.   For the West Virginia rates, yes.

21     Q.   Well, and am I correct that you then

22  applied that West Virginia rate to -- within Cabell

23  and Huntington, but you didn't estimate a separate

24  Cabell and Huntington rate, correct?

Page 360

1      A.    For the death rates, we had data on Cabell

2  for a number of years.

3      Q.    Right.  I'm just asking you if you used it

4  for purposes of calculating the rate that you

5  attributed to prescription fentanyl.  Is that how

6  you performed the calculation?

7      A.    Can you just be specific about what rate

8  you mean?  Because there's a lot of rates in Figure

9  8.

10     Q.    The rates we've been talking about that are

11  discussed at page 33 of your report.  It's the rate

12  of prescription fentanyl and the share of other

13  prescription opioids.

14     A.    Yes.

15     Q.    Do you recall whether you calculated that

16  rate on the basis of West Virginia-specific data or

17  Cabell and -- Cabell County-specific data?

18     A.    I would need to look at the spreadsheet.

19     Q.    Okay.  Sticking with the West Virginia

20  piece of it, do you recall approximately how many

21  deaths you attributed to prescription -- to

22  prescription fentanyl in the last year for which

23  you were using actual data, not estimated data?  Do

24  you recall approximately how many deaths that was?

1      A.    No.

2      Q.    Would you believe me if I told you that in

3   the West Virginia portion of your calculation, you

4   -- for 2012, you had 41 deaths?

5      A.    I really would need to see the -- the

6   spreadsheet.

7      Q.    That's fine.  You can treat this as a

8   hypothetical.  I am asking about your calculation,

9   but if you want to treat it as a hypothetical, be

10  my guest.  I'd like you to assume that for 2012,

11  you had 41 deaths in that category, and then you

12  begin projecting --

13     A.    Could you just slow down a minute?  Which

14  category?  The 20 -- 2012 -- I'm sorry, just go a

15  little bit slowly so I can keep up.

16     Q.    No problem.  2012, the deaths that had only

17  T40.4 as a contributing opioid.  Okay?  You with

18  me?  The death that you --

19     A.    So 2012 -- I'm assuming a hypothetical that

20  in 2012, there were 41 deaths with T40.4 --

21     Q.    Correct.

22     A.    -- only.  No other T codes.

23     Q.    Well, you've told us a little bit how

24  you've categorized things.  But that's the number

Page 362

1    represented in -- we'll call it hypothetically.

2    But that's in Column J, Row 36 of your

3    calculations, as deaths that had only T40.4 as a

4    contributing opioid, is how you describe it there.

5        A.   I find it very difficult to follow this

6    when I'm not allowed to see the spreadsheet.

7        Q.   You're more than allowed.  I offered to

8    provide it.  Your counsel complained about that

9    offer, and so I've not provided it.  If you'd like

10   me to provide it, I'd be willing to provide it

11   right now.  I suspect Mr. Arbitblit will just

12   complain again.

13              So you can have it one way or the

14   other, but you can't have it both ways.

15       A.   This is difficult to --

16       Q.   That's fine.  Why don't I continue my

17   question.  I would like for you to assume for 2012,

18   the deaths that you attributed to prescription

19   fentanyl --

20              MS. DO AMARAL:  I'm sorry, Counsel,

21   can we take a moment?  I don't see that

22   Mr. Arbitblit is still on --

23              MR. ARBITBLIT:  I'm still on.

24              MS. DO AMARAL:  We need to stop the

Page 363

1    deposition for a minute?  Can we take a few

2    minutes?

3                MR. ARBITBLIT:  No, no, no, no I'm

4    still on.

5                MS. DO AMARAL:  I'm sorry, Don, I

6    didn't see you:

7                MR. ARBITBLIT:  I am still on.

8        Q.   Okay, let me ask this again.  For the last

9    year for which you had actual data, you had 41

10   deaths in the category of T40.4 as the contributing

11   opioid, that's the prescription fentanyl.  Okay?

12       A.   I had actual data on all years.

13       Q.   Well, you don't for 2013 and 20-- I'm using

14   data in contrast to the years for which you

15   provided an estimate of the T40.4.  Do you

16   understand my meaning now?

17       A.   Sure.

18       Q.   Okay.  For the last year for which you only

19   used actual data, no estimated or projection, there

20   were 41 deaths in that category.  Do you recall

21   approximately how many deaths your estimate put in

22   that category for the year 2017?

23                MR. ARBITBLIT:  Objection.

24       A.   No.

Page 364

1      Q.   You do not recall?

2      A.   No.

3      Q.   If -- I'll ask you just to assume, as a

4   hypothetical - but for the record, this is in

5   Column J, Row 41 - it's 491 deaths.  So it's 450

6   more than in the last year for which you were using

7   data alone rather than a projection.

8           My question is --

9      A.   I don't know that that's accurate.

10     Q.   Well, I -- you can fight me on whether or

11  not it's accurate.  I'm staring it at in the face.

12  I'd be happy to show it to you.  But if you don't

13  believe me, take it as a hypothetical, and then

14  answer this question:

15          Do you have a theory that would explain

16  why prescription fentanyl went from killing 41

17  people in 2012 to killing 491 people five years

18  later?  Do you have a theory as to why that would

19  be the case?

20     A.   Prescription overdose deaths are --

21  overdose deaths are going up overall, so I would

22  need to look at the specific underlying data in

23  order to answer that question.

24     Q.   Do you know whether the availability of

Page 365

1    prescription fentanyl specifically increased or

2    decreased over that time period?

3        A.   It decreased slightly.

4        Q.   Okay.  Do you know whether the potency of

5    prescription fentanyl increased, decreased or

6    stayed the same over that time period?

7        A.   I don't know.

8        Q.   And at least under your calculation,

9    prescription fentanyl specifically was present in

10   ten times as many overdose deaths as a result of

11   your projection and --

12       A.   Again, I did the projections several

13   different ways.

14       Q.   And my question is:  If it's not because

15   there was more prescription fentanyl available and

16   if it's not because prescription fentanyl was more

17   potent all the sudden, is there a theory that would

18   explain why prescription fentanyl specifically was

19   now causing 12 times as many deaths as before per

20   year?

21       A.   I am not offering any opinions with respect

22   to that.  My only opinion is that the reliability

23   of my estimates was verified as much as I could.

24   And so this is the most reasonable and reliable

Page 366

1   approach that I could -- that I decided to use.

2       Q.   And some of those methods that you've just

3   described, validating the reliability of your

4   analysis, you performed additional statistical

5   calculations that lead you to that conclusion,

6   correct?

7       A.   Yes.   Routinely we perform many different

8   statistical calculations when we're estimating

9   trends like this.

10      Q.   Now, earlier today you made reference to a

11  study that you refer to as the Allen paper?  Do you

12  recall that?

13      A.   I do.

14      Q.   I just want to confirm.  Is the title of

15  that paper "Estimating the number of people who

16  inject drugs in a rural county in Appalachia?"

17      A.   Is it -- is it one of the exhibits?

18      Q.   It is not one of the exhibits.  Do you

19  recall that title?

20      A.   Yeah, I think that that's the title.

21      Q.   Okay.  Do you recall whether one of the

22  co-authors of the paper was a Michael Kilkenny,

23  who's affiliated or employed by the Cabell-

24  Huntington Health Department?

1    A.   I don't recall all of the co-authors of the

2    article.

3    Q.   Okay.  Have you ever spoken to

4    Mr. Kilkenny?

5    A.   I don't recall.

6    Q.   Okay.  If you'll just give me one second.

7         Could you turn to page 8 of your

8    Exhibit B within your report?  I have it at -- the

9    PDF, the 125th page of your report, if that will

10   help.  You were testifying about this list earlier.

11   A.   So -- I don't have those page numbers.

12   Exhibit B, I'm looking for?

13   Q.   Well, it's your report, but then you have a

14   Materials Considered list which you titled --

15   A.   Exhibit B, yes.

16   Q.   Okay.  And the eighth numbered page of

17   that.

18   A.   I see.  Yes.

19   Q.   And if you look at Entry No. 134, does that

20   refresh your recollection that you spoke with

21   Mr. Kilkenny, Doctor Kilkenny?

22   A.   I don't remember the conversation, to be

23   honest with you.  I talked to a lot of people in

24   that community.  So I don't recall the specifics of

Page 368

1  the conversation, but maybe I spoke with him.

2       Q.   Okay.  Do you recall raising with Doctor

3  Kilkenny any criticisms of the paper, the Allen

4  paper, that he co-authored?

5       A.   No.

6       Q.   As you sit here today, do you have any

7  criticisms?

8       A.   Yes, I -- there's a number of limitation to

9  that study.

10      Q.   Okay.  What --

11      A.   I think it -- it's a study for some things,

12 but it's not a -- you know, it's not the end all-be

13 all of all studies.

14      Q.   What are the most important limitations

15 that you can describe as you sit here today?

16      A.   I would need to look at the paper.  I can't

17 be -- I can't be asked about one paper of hundreds.

18      Q.   Well, you just referenced "a number of

19 limitations."  Are there any that stand out in your

20 mind or you simply recall believing it has

21 limitations?

22      A.   I know that it's a study with limitation.

23 If I had a moment to look at the study, I could

24 tell you what the most important limitations are,

Page 369

1    but I don't have it in front of me.

2        Q.   Okay.  Why don't we go off the record.  I

3    just want to talk to my colleagues, but I think I

4    may be done.

5                   VIDEO OPERATOR:  Going off the record.

6    The time is 6:20 p.m.

7                        (A recess was taken after which the

8                        proceedings continued as follows:)

9                   VIDEO OPERATOR:  Now begins Media Unit

10   10 in the deposition of Katherine Keyes.  We're

11   back on the record.  The time is 6:27 p.m.

12                   MR. METZ:  Doctor Keyes, thank you for

13   your time and your testimony today.  I have no

14   further questions.

15                   THE DEPONENT:  Thank you.

16                   MR. ARBITBLIT:  No questions.  Are we

17   done?

18                   MR. METZ:  Yeah.

19                   MR. HESTER:  Yes, I think so. Thank

20   you Doctor Keyes.

21                   THE DEPONENT:  Thank you very much.

22                   VIDEO OPERATOR:  If there are no

23   further questions, we're off the record at

24   6:27 p.m., and this concludes today's testimony

Page 370

1  given by Katherine Keyes.   The total number of

2  media units used was ten and will be retained by

3  Veritext.

4                      (Having indicated she would like to

5                      read her deposition before filing,

6                      further this deponent saith not.)

7

8                      --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 371

1   STATE OF WEST VIRGINIA,

2   COUNTY OF JACKSON, to wit;

3

4           I, Teresa S. Evans, a Notary Public within
    and for the County and State aforesaid, duly
5   commissioned and qualified, do hereby certify that
    the foregoing deposition of KATHERINE KEYES was
6   duly taken by me and before me at the time and
    place and for the purpose specified in the caption
7   hereof, the said witness having been by me first
    duly sworn.

8

9           I do further certify that the said
    deposition was correctly taken by me in shorthand
    notes, and that the same were accurately written
10  out in full and reduced to typewriting and that the
    witness did request to read his transcript.

11

12          I further certify that I am neither
    attorney or counsel for, nor related to or employed
13  by, any of the parties to the action in which this
    deposition is taken, and further that I am not a
14  relative or employee of any attorney or counsel
    employed by the parties or financially interested
15  in the action and that the attached transcript
    meets the requirements set forth within article
16  twenty-seven, chapter forty-seven of the West
    Virginia Code.

17          My commission expires October 25, 2020.
    Given under my hand this 18th day of September,
18  2020.

19

    <%10538,Signature%>
20  Teresa S. Evans
    RMR, CRR, RPR, WV-CCR

21

22

23

24

Page 372

1                          Veritext Legal Solutions

                                1100 Superior Ave

2                                  Suite 1820

                             Cleveland, Ohio 44114

3                          Phone: 216-523-1313

4

     September 18, 2020

5

     To: Don Arbitblit

6

     Case Name: City Of Huntington v. Amerisourcebergen Drug Corporation,

7    Et Al.

8    Veritext Reference Number: 4241600

9    Witness:  Katherine Keyes       Deposition Date:  9/15/2020

10

     Dear Sir/Madam:

11

12   Enclosed please find a deposition transcript.  Please have the witness

13   review the transcript and note any changes or corrections on the

14   included errata sheet, indicating the page, line number, change, and

15   the reason for the change.  Have the witness' signature notarized and

16   forward the completed page(s) back to us at the Production address

     shown

17

     above, or email to production-midwest@veritext.com.

18

19   If the errata is not returned within thirty days of your receipt of

20   this letter, the reading and signing will be deemed waived.

21

     Sincerely,

22

     Production Department

23

24   NO NOTARY REQUIRED IN CA

```
 1                DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 4241600
 3    City Of Huntington v. Amerisourcebergen Drug Corp, Et Al.
      DATE OF DEPOSITION: 9/15/2020
 4    WITNESS' NAME: Katherine Keyes
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8

      _____        _____
 9    Date                          Katherine Keyes
10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
      this _____ day of_____, 20_____.
17
                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25
```

Page 374

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 4241600
3   City Of Huntington v. Amerisourcebergen Drug Corp, Et Al.
    DATE OF DEPOSITION: 9/15/2020
4   WITNESS' NAME: Katherine Keyes
5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7         I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9         I request that these changes be entered
    as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____          _____
    Date                              Katherine Keyes
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23        _____
                  Notary Public
24
          _____
25                Commission Expiration Date

Page 375

1                         ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                    ASSIGNMENT NO: 4241600
3        PAGE/LINE(S) /        CHANGE        /REASON
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19

         _____       _____

20       Date                     Katherine Keyes
21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22       DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

**[& - 2015]**                                                    Page 1

**&**

**&**  2:5,8,12,15 3:5
  9:12,16,19,21
  60:10

**1**

**1**  8:12 13:12,13
  25:6 32:9,11
  35:10 46:1 186:5
  186:8 236:22
  263:9
**1-1-19**  6:9 100:14
**1-12-15**  6:16 39:17
**1-14-16**  5:19
  224:15
**1.2**  267:12,13,23
  268:1,11 270:13
**1.20**  265:17,20
**10**  5:3,9 48:8,10,17
  48:18 50:9 99:19
  99:22 168:1,24
  169:5,6,20 173:7
  236:11 258:18
  334:22 369:10
**100**  260:5,9,10,13
  260:15,21 261:1
  353:1,3
**100,000**  285:16,17
  313:13 320:12
  326:21,22 327:3
  328:5,9,16 329:6
  331:3 332:18
**1000**  285:10,20,20
**10013-1413**  2:7
**102**  5:7
**104**  6:17 13:5,6,11
  13:16,17,24 14:13
  15:5 183:17
  201:11,14 244:2,8
**105**  39:11

**10538**  371:19
**106**  6:19 28:5 29:3
  39:7 42:3,4,11,14
  155:5,7,8 163:4
**108**  7:2 289:4,5,11
  289:19
**10:58**  99:10
**1100**  372:1
**11:00**  99:7
**11:07**  99:15
**12**  6:17 34:14,16
  34:19 35:5,10
  109:9 158:21
  213:4 365:19
**12-19-17**  6:11
  325:22
**125th**  367:9
**12:22**  151:18
**12:23**  151:24
**12:42**  166:13
**12:45**  166:10
**13**  201:19 212:15
  212:23,24 213:3
  244:3,8 245:8
  253:15 271:19
**13/27**  6:13 288:5
**134**  5:5 367:19
**14**  59:6 90:9
  279:20,22
**15**  220:21 259:23
**15th**  1:21 8:4
**16**  26:4,6 30:17
  201:21 202:1
  203:17 207:1,4,8,9
  207:13 208:10,11
  209:9 230:5,10,23
  231:1 310:24
  335:11 339:7
  344:12,13,15,16
  344:18,19,22
  359:17

**160**  225:1
**17**  22:14 24:19
  25:1 26:4,6 32:7
  34:13 35:3 45:24
**1717**  2:21
**175**  16:2 308:15
**175.3**  260:14
**18**  5:13 21:17,19
  22:1,2 259:8
  270:1,4 372:4
**1820**  372:2
**186**  260:5,21
**186.6**  260:13
**18th**  371:17
**19**  32:12 49:19
**19103**  2:21
**194**  326:15 328:1,2
**195**  317:11 326:5
**1990s**  226:23
**1999**  349:9 350:1
  350:14
**1:22**  166:19

**2**

**2**  5:3 11:3,5,9,14
  22:15 45:24 51:16
  58:21 59:18 137:1
  137:1 217:15
  221:15 245:21
  312:12
**2-1-18**  7:4 289:9
**20**  5:13 49:20
  164:13 168:1,24
  169:5,6,20 173:7
  255:23 256:5,6
  321:22 346:6
  361:14 363:13
  373:16 374:22
  375:22
**20001**  3:6
**20005**  2:13

**2002**  7:4 289:8,23
**2003**  270:3
**2005**  219:2
**2006**  198:21 199:4
  199:9,16 260:14
**201**  306:3 307:22
**2010**  6:13 31:5
  288:5
**2011**  260:5,13,22
  261:9 315:1
  317:23 318:12
  322:12,24 326:20
  327:6,10 331:22
**2012**  346:4,6 349:9
  350:1,14 351:19
  361:4,10,14,16,19
  361:20 362:17
  364:17
**2013**  5:22 210:9
  236:11 269:14
  270:3 323:10
  334:13 345:18,22
  347:3,8,10 349:11
  351:11 352:3,12
  352:24 353:3
  356:22 357:3
  363:13
**2014**  5:12 6:22 7:4
  42:9 48:15 54:13
  54:22 81:8 91:24
  99:21 104:6
  198:21 199:20
  289:9,23
**2015**  5:15 21:23
  40:20 187:8 219:4
  219:19 220:8,13
  230:6 313:10
  315:1 317:17,24
  318:7,11,13 319:3
  319:10,18,24
  320:11 322:12,13

**[2015 - 562]**                                        Page 2

323:10,11 324:10
324:10 325:4
326:20 327:3,6,13
330:3,8 331:3,14
331:22 332:9
333:13,15,18
**2015-2016** 267:23
**2016** 5:6 135:1,8
229:16,22 230:7
230:15 327:3,13
327:17,18
**2017** 5:17 6:5
209:18 218:13
317:14 327:17,18
327:19 363:22
**2017-18** 268:5
**2017-2018** 268:15
**2018** 236:6 243:18
243:19 245:8,20
248:15 260:11,14
261:1,9,12 263:15
318:6,17,23
319:14,18 320:11
322:14,24 327:9
327:10,19 328:5
328:16 329:6
351:12
**2019** 136:4 243:20
243:23,24
**2020** 1:22 5:4 6:18
8:4 11:7 13:9
243:21,24 371:17
371:18 372:4
**208** 6:2
**209** 5:20
**21** 38:21 159:10
**216-523-1313**
372:3
**217** 5:16
**22** 35:8 36:5
104:22,24 105:6

139:12
**223** 5:18
**23** 122:17
**24** 6:18 13:9 119:1
**243** 221:19
**245** 104:7
**25** 140:23 141:1
371:17
**250** 2:6
**25301** 2:9
**25323** 2:17
**26** 22:18 43:21
54:17 58:21 59:18
65:5 268:18
270:14 302:23
**27** 5:16 113:20
217:22 218:9,10
218:15,16
**28** 5:18 152:3,3
224:9,12,17,19
**287** 6:12
**288** 7:2
**29** 35:8 36:5 38:21
273:18 275:5,9
**2:32** 221:2
**2:46** 221:7

**3**

**3** 5:4 11:7 99:14
104:10 337:19
**3-31-16** 5:8 103:21
**3.2** 100:21
**3.6** 213:18 217:13
217:15
**30** 256:2,7 275:5,9
**30-35** 255:13,17
**304** 4:4
**310** 49:4
**3100** 2:21
**32** 334:19
**324** 6:10

**33** 220:8 334:19,20
334:21 349:6
360:11
**33.3** 219:5
**34** 5:20 210:2,5,11
210:12 211:24
**35** 255:15,20 256:2
256:14
**36** 362:2
**37** 6:2 209:12,13
209:20 218:5
221:10
**38** 6:14 33:22
**3:17-01362** 1:7
8:19
**3:17-01665** 1:13
8:19
**3:52** 271:10
**3rd** 54:9

**4**

**4** 5:5 134:21,23
135:3,6 136:8
151:23 221:22
245:18 326:11
**4.9** 270:3
**4.9.** 270:15
**40** 265:1 270:13,13
271:2
**400** 15:16 353:6,11
**405** 2:9
**41** 6:19 211:13
241:17,18 298:1
361:4,11,20 363:9
363:20 364:5,16
**42** 236:3,4 242:9
243:12 312:11,24
314:22
**4241600** 372:8
373:2 374:2 375:2
**43** 243:12 244:4

**44114** 372:2
**45** 136:6 258:22
**45.5** 198:21 199:5
199:16
**450** 364:5
**46** 6:6 100:4,4,9,16
206:18 209:9
222:21 223:1,2,10
296:24
**46-47** 205:3
**47** 5:9 205:4
209:22 210:1
211:15,18 285:10
285:17,20
**48** 174:2,6,12
200:12,12 205:9
341:11
**49** 198:19
**491** 364:5,17
**4:00** 271:8
**4:01** 271:15
**4:48** 304:22
**4:57** 305:3

**5**

**5** 30:23 107:12,15
121:7 130:3
166:18 213:1,9,11
213:19 217:13,15
304:18
**5.4** 270:3,15
**50** 59:8 92:13
119:4 123:18
183:3 235:14,17
235:21 261:3,7
**52** 163:5,6,13,14
313:12
**53** 284:15
**54** 42:22 155:12
**550** 15:9,13
**562** 50:15

**566** 40:7
**5:00** 307:6
**5:02** 307:12

**6**

**6** 107:10 121:5
  129:24 130:3
  221:6 223:20
  304:18
**60** 50:7,7 214:14
**60,000** 18:1
**61** 258:24 259:4,19
**62.8** 198:21 199:21
**64** 218:23 259:8
  270:1,4
**65** 104:9,14
**6:20** 369:6
**6:27** 369:11,24

**7**

**7** 100:20 109:8,8
  217:17,19 271:14
  290:4
**70** 46:4,6 200:14
  200:18 219:22
  222:12
**707** 2:16
**725** 2:13
**75** 285:16,20

**8**

**8** 34:14,16,19 35:4
  35:10 305:2
  335:10 339:7
  342:16,24 343:2
  344:4,7 347:2,6
  359:16 360:9
  367:7
**8,252** 259:1
**8-9** 248:15
**8.7** 219:1
**8.9** 245:9,12
  271:21

**80** 46:4,4,6 200:14
  200:19
**84** 236:6
**850** 3:6
**86** 6:10 325:18,19
  325:24 326:2
**8:59** 8:3
**8th** 2:6

**9**

**9** 4:3 5:7 103:9,10
  103:12,17,23
  265:18 268:4,11
  270:14 307:11
**9/15/2020** 372:9
  373:3 374:3
**90** 122:24
**901** 2:16
**92.1** 260:9,15,24
**95** 222:1 223:23
**96** 6:12 288:1,2,7
**98** 6:14 39:4,13,19
  39:20,24
**99** 6:6 186:4,8
  268:15
**9:53** 51:11
**9:54** 51:17

**a**

**a.m.** 8:3 51:11,17
  99:10,15
**aah** 30:5
**abatement** 297:3,5
  297:22
**abeyance** 57:3,9
**abide** 76:13 85:7
  86:4
**ability** 86:11,15
  87:9 88:8 302:17
**able** 56:17,24
  63:23 68:9 70:11
  70:19 78:3,24

79:9 80:7 87:15
  88:11 201:24
  302:11 342:6
  347:10
**absolutely** 68:16
  92:21 178:23
  250:12
**abuse** 5:7,10,13,16
  6:3,21 21:20 22:4
  33:22 42:7,17
  48:12,21 103:14
  103:18 209:16
  218:7,12,19 225:7
  231:20 266:14
  328:19 329:1
**abusers** 6:5
  209:17
**abusing** 254:5,8
**accept** 170:12
  348:17
**accepted** 217:11
  309:13 321:19
**access** 106:1
  109:12,16,16,21
  109:23 110:6,6,10
  110:17 133:9,9
  179:23 233:10
  234:7,17,18
**accessibility** 231:5
  231:14,17,19
**accommodating**
  302:24
**account** 138:4
  313:2 333:17
  348:13
**accumulation**
  213:17
**accurate** 138:14
  188:8 311:16
  324:14 364:9,11

**accurately** 121:13
  371:9
**acknowledge**
  25:15 373:11
  374:16
**act** 373:14 374:20
**action** 1:6,13,20
  8:18 9:2 371:12
  371:14
**actions** 72:6 74:9
  295:4
**active** 227:16
**activities** 68:3,4
  70:14 274:8,9,15
  275:4,6,15,22
  276:1,5,7 279:19
  282:14,15 284:14
  300:6 301:2
**activity** 112:12,24
  113:2 115:4
  176:17 273:21
  274:2,3,12 275:19
  279:7,14,16
**actual** 360:23
  363:9,12,19
**acute** 27:1,1 43:4
  81:14 146:18,21
**adam** 3:9 8:21
**add** 17:3 62:16
  179:4 256:18
**addiction** 5:13
  21:21 22:5 33:22
  34:12 38:12 40:3
  40:10,24 41:3,21
  41:22,22 143:6,12
  143:18 158:22
  181:8 233:22,22
  236:23 247:10
  250:4,8 297:2,2
**addictive** 158:15

[addition - analysis]

**addition** 6:16 19:8 39:16 286:14

**additional** 232:17 305:23 330:23 353:22 366:4

**address** 23:6 64:18,18 69:23 93:5 207:14 372:16

**addressed** 49:3 62:4 93:14 302:21 302:22

**adequately** 40:12

**adjustment** 313:1 313:8 348:23

**administer** 9:1

**admittedly** 60:12

**adolescence** 6:7 100:7,12 223:6

**adolescents** 100:23,24 223:22

**adult** 245:12

**adulterant** 238:24 239:9 323:17

**adulterated** 176:1 176:5,7 237:1,11 237:15,19 238:5,7 238:13

**adulterating** 174:15 239:12

**adulteration** 195:19 237:4

**adults** 6:12 259:1 259:5,20 288:4 290:8 291:2

**advance** 63:2 64:7 73:21

**advantageous** 94:22

**adverse** 32:18,22 33:1

**advise** 57:6

**advocacy** 93:4

**advocates** 292:13

**affect** 72:11

**affiliated** 366:23

**affiliations** 9:6

**affirmatively** 146:2 350:17

**affixed** 373:15 374:21

**aforesaid** 371:4

**afternoon** 305:6

**age** 259:8

**aggregate** 21:13 21:15 129:17,19 182:20 257:24

**aggregated** 127:24

**aggregation** 127:17

**ago** 29:15 42:3 81:19 134:19 326:2

**agree** 8:11 16:20 27:1 35:24 36:4 40:16 53:5 54:8 55:3 62:2 82:5,10 86:22 95:8 96:5,6 96:13 102:10,14 102:21,24 103:2,6 114:17,20 116:16 120:7 125:9 131:1 131:5 136:24 138:18 149:9 172:13 180:18 181:13 186:15 193:7 197:10 211:1 216:11,17 228:11,17,21 258:16 294:3 295:4 358:20 359:2,5

**agreeable** 56:11

**agreed** 16:9 17:1,3 17:7

**agreeing** 216:15

**agreement** 238:3 301:20

**agrees** 70:9 82:13

**ahead** 34:5 44:10 63:4 65:21 72:16 77:16 160:5 193:13 229:14 251:2 337:24 341:11

**al** 1:8,14 5:12,14 5:17,19,22 6:5,9 6:11,13,16,21 7:4 8:16 21:23 31:4,6 32:4 39:17 42:8 48:14 100:14 209:18 210:9 218:13 224:15 288:5 289:9 325:21 372:7 373:3 374:3

**alcohol** 158:19,20 255:10,21 256:3,4 256:17

**alcoholism** 158:12

**aligning** 316:14

**allege** 72:7

**allen** 206:13 208:7 208:9,15 214:13 366:11 368:3

**allotted** 94:19

**allow** 23:3 44:3 70:2,13 71:16 79:3 95:9

**allowable** 83:13

**allowed** 22:21 43:23 58:24 81:21 362:6,7

**allowing** 44:3 69:16

**alternatives** 295:16

**amaral** 2:4 9:15 10:17 13:23 28:17 28:21 29:10 33:20 39:6,10 51:18,24 52:3,6,13,18 56:16 57:21 58:3,7 79:20 80:19,23 83:3 223:11 362:20,24 363:5

**ambiguous** 331:18

**ambush** 340:16

**amend** 25:14

**amerisourceberg...** 1:7,14 2:18 8:16 9:18 372:6 373:3 374:3

**amount** 16:10 21:11 92:12 120:13 131:17 239:21,22

**amounts** 59:12 137:14

**analgesics** 6:12 43:2 44:22 45:1 81:13 288:3

**analog** 320:10

**analogous** 68:11 71:1 158:10

**analogs** 320:2

**analogy** 158:13

**analyses** 310:9 340:12 355:5,15 355:21,22

**analysis** 6:4 70:1 133:21 134:7,15 140:14 144:8,20 161:11 191:17

197:9,19 202:13
209:16 243:6,18
243:20 357:23
358:7 366:4
**analytics** 345:13
**analyzed** 227:8
**andrew** 40:1
**annual** 149:21
**answer** 14:19
16:24 17:16 25:15
36:21 69:13 70:21
81:10 85:21,22,24
91:20 93:19 109:7
126:2 129:16
147:24 151:12
162:16,18 200:4
237:12 282:11
306:3,8,14 307:20
308:2,18 309:19
310:4 325:12,15
330:19 331:20
333:2,7,8 342:6
344:21 356:6,11
356:12 364:14,23
**answered** 34:4
38:8,15 43:9 48:1
129:11 132:24
134:2 144:12
154:3 161:8,18
216:21 217:7
237:6 263:18
295:9 316:11
329:11 330:13,22
331:19 333:5,21
356:14
**answering** 17:12
**answers** 59:13,19
65:14 96:23
205:22 279:15
305:19 308:14
327:2

**anti** 284:20
**anticipated** 303:14
**anticipating** 66:7
**anyway** 161:14
**apologies** 80:23
210:2
**apologize** 17:12
193:21 227:19
305:10 306:11
316:13
**appalachia** 366:16
**apparently** 329:7
**appear** 231:6
305:10 343:13
373:11 374:15
**appearance** 9:9
**appearances** 2:1
3:1 9:6,24
**appeared** 324:22
331:12,13
**appearing** 2:2,11
2:18 3:2
**appears** 225:15
226:6 244:4
323:13
**appended** 374:11
374:18
**applicable** 61:8
84:2,10 86:17,21
95:5,12,18,20,22
96:1 122:12
155:22 162:15
212:9,13 286:1
**application** 75:4
75:10 88:22 89:7
90:4,24 97:4 98:8
**applications** 77:13
**applied** 75:24 78:8
126:3 200:22
311:22 312:19
343:9 344:1,11

345:7,18 349:10
352:11,13 354:6
356:19 359:8,22
**applies** 69:18 71:7
75:5,5 78:11 80:8
82:6 88:17 90:7
97:5 102:22
104:15 152:10
161:7 216:19
217:2 219:9 222:7
228:12,16 286:17
**apply** 44:9 67:7
72:12 78:23 84:18
89:13 93:8 96:14
96:15 100:1
101:11,17,23
102:1 150:1 165:7
165:14,21 201:1,3
210:21 211:1
213:23 217:6
220:9 222:19
224:6 225:19
226:10 229:9
231:10,12 285:6
290:22 300:23
309:20,24 311:7,9
311:14,15 312:1,4
315:19 316:9
320:21 322:23
357:19
**applying** 291:12
310:10 318:22
**appreciate** 23:23
57:10 282:2
**apprised** 74:1
143:6,18
**approach** 6:15
39:15 40:3 201:10
309:8,9,12 311:15
311:23 313:21
350:18 366:1

**approaches**
355:11
**appropriate** 59:18
60:7 63:8 64:16
68:24 82:14
127:13 148:20
161:16 197:1
303:5 332:4
339:24
**appropriateness**
45:14
**approximately**
18:1 200:13
223:23 261:5
304:18 320:24
349:16 360:20,24
363:21
**approximation**
326:10
**april** 5:15 21:23
**apt** 235:7
**arbitblit** 2:3 9:14
9:14 14:17 16:3
16:20 20:24 22:16
23:14,22 24:11
27:3,20 28:1,7
33:13,17 34:3,22
36:9,24 37:8,15
38:7,14 39:2 43:6
43:19 44:1,23
45:9,19 46:13,22
47:5,24 49:2,9
50:16 51:6 52:8
52:15,19,22 53:1
53:10,24 54:6
55:17,22 56:10
57:2,10 58:1,9,11
58:12 61:19 64:22
65:1,22 68:23
71:3 72:15 77:22
79:17 80:24 84:12

84:13 86:7 87:18
90:6 91:2,24 92:4
93:20 98:20 99:2
99:8 101:5,14,19
101:24 102:17,23
105:16 106:2,13
111:15,20 117:2
117:14,21 118:14
119:15 120:5
125:11 126:8,20
127:19 128:3,13
128:23 129:10,21
130:7,17 132:4
133:19 134:2,11
136:12,19 137:19
138:9,19 140:12
141:22 142:2,6,18
143:8,14 144:11
147:4,10,22 149:7
151:4,8 152:22
153:10 154:2,21
155:1 156:23
157:12 159:23
161:2,5 162:4,11
167:1 169:19
173:23 178:18
180:3,14 182:16
182:23 186:7,10
186:24 187:7,19
188:7 189:23
190:13 191:2
192:16 194:24
195:10 196:20
197:6,13 200:24
202:22 203:7
215:9,20 216:4,7
216:20 217:7,14
219:20 220:20,24
225:20 226:13
228:14 229:11,14
234:4 235:3,16

237:6,17 241:15
257:4 262:3
263:17 272:11
273:2 274:5
276:19 277:10,19
278:3,6,11,14
279:1 281:11,24
282:2 283:4
286:11 287:11
294:15 295:8,17
301:9 302:19
304:8 317:2 318:9
319:11 321:7,24
322:15 323:6
328:20 329:10
330:21 331:17
332:22 333:5,19
333:21 339:17
341:6,10 342:4,11
342:23 343:15
344:3 346:5,12,18
346:20 349:17
350:5 356:13
358:2,17 359:1,4
359:10,12 362:11
362:22,23 363:3,7
363:23 369:16
372:5
**arch** 2:21
**area** 19:24 78:23
79:13 144:19
167:7 178:21
220:3 240:9 242:2
257:22 283:23
**areas** 155:17
156:8,10,11,18
157:4,24 163:10
163:20,21 226:16
**argue** 44:5
**arguing** 44:6
162:20,20

**argument** 164:2
**argumentative**
294:16 331:18
356:14
**arises** 54:19
157:10
**arising** 38:12
41:23 288:17
**arrive** 112:21
343:6
**arrived** 132:12
343:4
**arriving** 131:20
**arthritis** 6:13
288:4
**article** 23:24 40:20
43:7 69:21 79:18
81:1,3,18 85:19
87:22 91:3 93:24
218:5 254:16
283:22 292:1
367:2 371:15
**article's** 43:20
**articles** 50:19
55:23 56:4 57:5
59:9 61:20 62:12
71:7,14 84:19
94:4 96:9,19
161:7 303:2
**articulate** 70:8
**articulated** 61:6
**ascertainable**
258:6,10
**aside** 10:23 13:1
15:4 26:20 123:10
131:11 176:23
184:9 193:24
214:20 248:20
298:15
**asked** 34:3 38:7,14
43:8 47:24 59:16

72:8 78:15,16,18
85:14 101:6
129:10 134:2
144:11 151:10
154:2 161:18
215:22 216:20
217:7,24 227:18
237:6 263:17
295:8 325:2
329:10 330:21
331:18 333:1,1,5
333:21 341:19
342:9 355:19
356:7,14 368:17
**asking** 23:11
40:23 43:15 49:15
50:18 61:8,14
75:4 78:19 83:1
84:15 87:23 88:17
92:17 99:18
101:13 120:15,16
120:18 133:2
134:6,7 141:3
153:21 161:14
187:4 204:17,18
214:17 216:24
220:4 241:1 277:3
281:13 305:18
316:12 335:2
337:21,24 339:22
340:21 341:1,21
342:3 344:14
360:3 361:8
**asks** 91:9 93:15
**aspect** 92:15,16
96:6
**aspects** 72:1 81:3
93:11 301:24
**assess** 290:6
**assessed** 46:24

**assessment**  37:17
**assessments**  183:2
**assign**  197:7,19
**assigning**  196:21
**assignment**  373:2
  374:2 375:2
**assistant**  340:3
**associated**  124:5
  143:13 163:9,19
  164:4 176:15
  257:16,19 258:2
  258:17 296:15
**association**  5:20
  136:3 152:6,13
  153:16,17 154:7
  154:19,23 192:22
  210:6 229:3
**associations**  155:3
  155:4 210:13
**assume**  90:7 91:8
  165:15 176:21
  224:7 231:15
  361:10 362:17
  364:3
**assumed**  53:10
  357:4
**assumes**  36:9
**assuming**  91:15
  194:17 253:4
  323:2,7 325:1
  361:19
**assumption**
  192:12,18 222:10
  253:7 258:24
**assurance**  310:11
**assure**  97:10,12
**attached**  371:14
  374:7
**attachments**  247:2
**attacks**  97:17 98:1

**attempt**  83:15
  266:24 267:10
  320:14
**attempting**  320:6
**attending**  9:5
**attorney**  9:9
  371:12,13
**attorneys**  58:12
**attri**  194:2
**attributable**
  180:24 183:5
  184:16 192:21
  196:21,22,23
  197:5 202:6
  203:10,13 204:13
  310:15 333:24
  345:20 347:3
  351:8,18 352:6,10
**attribute**  183:24
  184:1,3 191:12,15
  191:24 202:20
  203:4 346:21
  347:20
**attributed**  185:23
  194:3 204:20
  313:16 315:10
  332:20 333:16
  343:10 346:14,16
  346:22 360:5,21
  362:18
**attributes**  36:21
  277:17 278:24
  279:9
**attributing**  348:4
**attribution**  191:22
  193:1 197:8,20
  200:22 308:17
  309:6 310:19
  337:4
**aud**  101:2

**audio**  8:9,10
  307:15
**august**  5:4,22 6:18
  11:7 13:9 54:9
  210:9
**author's**  102:24
  103:2
**authored**  368:4
**authority**  167:7
  175:12 341:14,16
**authorize**  374:11
**authorized**  9:1
**authors**  287:23
  366:22 367:1
**automatically**
  66:22
**availability**
  107:17 108:3
  109:13 121:8
  157:14,16 158:14
  158:16 173:15,19
  173:20,24 234:10
  237:20,23 294:21
  305:22 319:3,6,14
  319:20 328:18,23
  329:15,20 331:11
  364:24
**available**  52:10,12
  53:8 106:8 107:23
  117:4 122:23
  124:14 144:17
  155:15 157:9,10
  157:17,20,23
  158:16 170:4,10
  170:17 230:20
  243:24 254:1
  260:11 262:4
  264:2 265:3
  269:16 293:14
  296:3 319:9,17,23
  319:24 320:10,11

  320:11 323:17
  324:9,12,13 325:3
  336:14 337:9
  345:9 365:15
**ave**  372:1
**avenues**  56:17
**average**  30:23
  31:9,12 222:13
  325:1 349:21,22
  350:10
**avoid**  76:6
**aware**  26:19 41:1
  52:13 73:4 114:6
  115:2 132:21
  142:9,10,24 146:8
  147:1 161:14,15
  166:21 167:9
  175:24 176:19
  178:6 187:8 196:2
  196:7 228:3
  231:24 234:19,21
  238:9,10,22
  274:13,21 276:1
  276:10,14 277:6
  277:11,14 278:18
  279:2,7,12 280:17
  281:17,18,19,20
  282:1,5,8,9,12,13
  282:15,20 283:10
  286:24 295:18
  323:18,24 324:3,5
  327:2,5,13,16
  340:18

**b**

**b**  58:21 59:18
  260:4 367:8,12,15
**babies**  245:15
  255:24
**back**  16:5,6,7,15
  23:17,18 24:9
  29:13 39:9 42:2

45:23,23 48:4
49:13 51:17 52:12
55:2 57:6,12 62:3
72:21 73:16 74:19
83:14 91:17 99:14
126:18 127:15
151:23 155:5
163:3 166:18
170:21 179:2
195:2 201:11,20
213:10 216:2
221:7 235:24
246:9 249:3
253:14 259:22
266:23 271:8,14
271:17 304:13
305:2 307:11,16
315:4,4 335:4,5
337:5 343:17
344:20 351:16
352:1 355:23
359:15 369:11
372:16

**background** 18:20
77:10

**backup** 339:4
340:22

**bad** 119:14 305:14

**badgering** 333:6

**ballpark** 173:8

**base** 82:20 124:12
184:18 358:16

**based** 19:16 22:18
25:17 26:3,5,6
49:7 55:4 64:9
69:20 81:7 91:8
91:11 92:9 107:5
107:7 108:3 117:3
117:6 118:5
121:21 124:21
128:9,24 134:14

138:11,17,24
140:6 166:8 168:4
179:10 180:15
184:5,16 185:5
187:20 192:21
196:4 197:2 201:2
202:10 206:20
214:24 215:17
217:10 219:22
232:19 240:8
248:14 250:17,24
251:8 254:1 256:4
256:8 259:14
262:12 265:12
281:15 302:9
309:21 311:16
312:6 314:15
318:23 320:15
322:10 327:1
329:3,18 332:20
333:16 336:14
337:8 345:21
346:1

**baseline** 162:7

**bases** 92:23

**basic** 79:2 90:1
162:10 210:24

**basically** 71:15
90:19

**basing** 282:22
317:7

**basis** 17:3 24:19
28:4 45:15,22
55:6 62:5 70:13
82:12 83:16,20
93:19 124:15
140:5 175:3 191:6
202:13 207:9
211:6 212:1 246:4
246:8 252:12
254:16 259:4

265:10 269:10
317:3 321:11
326:9,18 349:24
358:22 359:18
360:16

**bear** 68:19

**bearing** 69:10,12
69:21 87:23
307:14

**bears** 71:9

**beat** 97:9

**began** 35:16 199:6
199:9 200:14
219:2 236:21

**beginning** 9:9
92:12 268:22
269:9

**begins** 51:15 99:13
151:22 166:17
174:13 221:5
271:13 305:1
307:10 369:9

**behalf** 9:18,20,22

**behaving** 161:23

**behavior** 132:1,9

**belief** 315:5
354:20

**believe** 12:21 18:2
30:4 32:5 41:6,9
41:16 47:6 48:2
50:5 61:24 102:7
114:12 116:17
128:22 129:13
135:15,21 136:3
137:11 143:11
146:20 153:14
154:13 164:12,16
164:19,22 168:1
185:2,5 206:13
207:15 216:15
220:5,5 223:1,2

231:15 239:2,14
240:10 241:5
250:17 251:1,3
252:11,13 255:12
262:4,8,18 264:4
266:21 267:9,21
274:24 275:2,7
276:23 279:18
282:17 283:21
285:5 288:16
294:10 302:7,16
305:8 309:18
312:12 318:2
322:16 328:7
345:8,15 361:2
364:13

**believing** 368:20

**belonged** 344:23

**beneficiaries**
286:6

**benefit** 296:5

**benefits** 137:17
138:1,7,11,17
146:15 149:1,15
276:3,16 277:8
278:19 283:11,18
284:2

**benzodiazepine**
189:15

**benzodiazepines**
189:12,14

**bernstein** 2:5 9:16

**best** 90:18 302:5
303:19

**better** 51:24 83:9
102:9 186:16
212:22 314:12
347:24

**beyond** 93:4
134:20 135:11
137:22 144:19

147:18 189:8
278:12 283:5
**biased** 332:9
**bigger** 248:7
318:18
**billed** 16:10
**billing** 16:7,11
**bit** 29:13 64:3
65:18 67:5 101:20
108:19 149:8
157:7 182:8
210:23 248:12
261:6 306:10
314:11 326:22
345:24 361:15,23
**blanket** 27:4,15
28:2 45:13,20
69:16 111:4
114:20 115:3
116:19 118:2,16
119:21 120:6,7
127:20 138:21
196:3 358:18
359:2,5
**board** 117:16
248:19 296:11,18
309:2 311:4
**body** 47:18,19
148:10 184:23
185:4,11,14 186:9
**bohnert** 153:13
154:11,14
**bonus** 18:16
**bootleg** 158:20
**bother** 161:16
**bottle** 110:16
**bottom** 32:15
49:20 139:12
198:19 200:13
205:4 211:18
241:18 268:19

273:19 279:21
285:13
**bound** 217:16
**box** 10:18,19,24
11:3 339:20
**break** 39:11 65:15
99:1,6 161:21
220:22 271:7
304:12
**briefly** 58:20
61:20 64:22
302:20 303:11
304:12 307:3
341:4
**bringing** 167:6
**britt** 2:4 9:15
**broad** 56:6 82:22
**broader** 46:12
108:6,19
**brought** 54:16
**brush** 98:17
**bucket** 336:11
344:23 345:24
**build** 78:3 79:2
**building** 338:1
**burden** 63:16
68:19,19 73:15
252:16 269:4
**burling** 3:5 9:12
60:10
**buy** 19:12
**bye** 98:23,23

| c |
| --- |

**c** 8:1 58:21 59:18
105:6 118:23
**ca** 372:24
**cabell** 1:11 8:15
20:9,14,18,20,22
21:5,7 67:15
69:13 71:9 72:7
72:12 82:18 89:11

89:14 93:13 95:21
112:14 113:2
116:8,13 125:14
125:17,22 126:4,7
128:8 131:24
132:2,6,17,23
140:17 142:17
144:9 166:23
167:7,16 168:9,14
168:17,21 170:5
170:24 171:24
172:20 173:13
178:7 179:2,8,24
180:12,20,24
182:9 183:6
186:12 187:10
208:6,8 209:7
211:8 236:6 239:8
239:12 241:20,24
242:2,7,15 243:1
243:14 244:12
245:8 246:1,5,14
246:18 248:16,24
249:13,19 250:3
250:15,21,22,24
251:6,11,17 252:9
259:7,13 260:2
261:4 262:7
263:10 264:1,13
264:15 271:22
282:10 294:4,14
295:7 297:23
299:11,15 300:9
300:15 311:20
312:21 324:7
359:22,24 360:1
360:17,17 366:23
**cabinet** 110:16,18
110:22 294:12
**cabinets** 295:3

**cabraser** 2:5 9:16
10:12 58:12
**calc** 348:2
**calculate** 313:23
332:4 348:5
350:11 353:19
**calculated** 316:19
316:21 351:6
352:19,22 360:15
**calculating** 312:20
347:2 349:20
360:4
**calculation** 63:15
63:16 310:14
315:15 326:19
327:6 329:2,8,24
330:1 331:21,22
331:23 333:23
334:3 335:10
337:16 341:21
342:18 344:17
346:2,16 347:20
347:24 348:20
349:1 350:23
353:14 354:9,13
354:17 355:2
357:18 359:9,15
359:19 360:6
361:3,8 365:8
**calculations** 337:7
337:11 338:3
340:2,4,8,23 341:9
342:15 352:2
355:7,19 362:3
366:5,8
**call** 51:23 52:4
56:19 80:18,22
88:14,15 90:18,22
91:3 95:15,15
98:10,15,24
161:21 346:9,13

362:1
**called** 10:4 156:17
223:4
**calling** 52:15
**calls** 57:6
**camel** 88:2
**campbell** 2:19
9:17,17
**cancer** 198:6,7
291:1,1
**cannabis** 257:6,10
258:15
**capita** 157:22
158:2
**capitol** 2:9
**caption** 371:6
**capture** 331:8,24
**captures** 36:15
**capturing** 38:4
330:9 331:23
**car** 80:2
**cardinal** 2:11 9:20
62:19 305:7
**care** 41:24 88:18
94:24 143:22
146:4,10 147:20
148:22 149:2,10
**careful** 303:4
**carefully** 41:11
209:4
**carey** 2:15
**carfentanil** 320:3
324:20 325:3,5,9
325:12
**carl** 2:12 9:19
301:18 304:11
305:7
**carryover** 205:10
242:10
**case** 15:15 16:11
23:21 28:4,4 36:1

44:8 45:15,15,22
45:22 46:17 53:9
53:11 55:9 59:3,5
60:20 66:17,22
67:8 69:1,5,5,6,15
69:20 75:1,6,7,8
84:23,24 88:24
89:5,8,14 90:4
91:12 93:17 98:9
98:15 111:11
130:11 151:7
152:15 181:24
195:24 196:10
204:3,11 300:22
300:24 364:19
372:6
**cases** 37:16 69:2,9
117:4 130:12
158:7,8 304:4
310:7
**casper** 218:17
221:11
**catalogs** 276:24
**catch** 83:6
**categories** 338:4
**categorized** 337:8
361:24
**categorizing**
336:23
**category** 347:22
353:18 361:11,14
363:10,20,22
**caught** 83:7
**causal** 105:8 155:4
159:5 205:11
241:8,10 358:13
358:21,23
**causation** 193:14
195:15 241:1
**cause** 72:1,3,6
152:18 154:20,24

159:7 182:21
189:1,2,5,16,20,22
190:6,7,9,10,10,14
190:21 191:1,20
191:23 193:8,19
193:21 194:12,18
194:20,23 195:3
198:11,12,13,15
203:24 232:24
233:1,3 234:18
241:8 322:21
323:22 358:12
**caused** 131:4
132:9 152:16
191:21 294:4
332:18
**causes** 166:7
182:14,19 186:1
186:19 187:15,21
188:3,6,19,20
189:8 190:12,17
190:18,20 191:4
191:12 193:6,23
196:16,18 197:12
233:16 234:14
240:18 249:8
252:4 288:14
290:6 358:11
**causing** 323:3
365:19
**caveat** 265:3
**ccr** 371:20
**cdc** 5:5 126:12
134:24 135:6
136:8 144:1
184:20 243:22
260:19 262:24
337:9
**cell** 8:7 51:19
56:19

**cellular** 8:6
**census** 259:11,18
259:21
**center** 3:5 250:1
**certain** 27:14
36:16,17 45:17
54:9 67:6 70:12
79:7 87:10 140:24
175:19 190:19
296:19 309:14,16
353:24
**certainly** 54:12
56:23 59:16,22
65:11,14 68:22
74:1 97:13 147:17
160:20 193:3
195:11 196:13
238:16 248:13
249:10 250:1,7
251:24 252:2
286:22 306:18
309:2 359:7
**certificate** 184:14
187:14 191:10
203:20,23 335:23
345:11 374:11
**certificates** 184:6
184:10,19,22
191:9 202:13
**certification** 373:1
374:1
**certify** 371:5,8,11
**chain** 131:19
195:15,18
**chains** 19:22 20:2
**challenge** 98:2
**challenging** 96:6
**chance** 28:16,18
28:21,22
**change** 69:20
71:24 91:11 92:3

107:3 238:6
268:11,12 321:23
322:2,4,7,9,22,23
324:11 330:5
331:9,16,24 332:1
332:2 372:14,15
374:8 375:3
**changed** 60:5
267:7 330:1
331:14
**changes** 14:13
62:14 146:3,6,10
146:12 147:2,20
148:2 229:1 319:3
319:5 321:20
323:3,11 328:23
329:15,20,22,23
330:1,8,12 331:11
332:8,16,24
333:12,18 372:13
373:7 374:7,9
**chapter** 371:15
**characteristic**
36:16
**characterize**
124:16 203:1
255:15,18 262:8
262:11
**characterized**
144:17
**charge** 15:16
**charleston** 2:9,17
**chart** 24:20 25:1,3
25:7 32:7 34:12
203:12
**chase** 2:16
**cheaper** 239:19
**check** 136:1
259:19 267:6
304:18 327:22

**checked** 259:21
**chemicals** 175:19
**cherry** 96:8
**children** 259:12
267:3
**choice** 305:12,15
**choking** 88:2
**choose** 94:21
334:16 336:22
**christina** 2:8 9:21
**chronic** 5:5,7,11
5:13 21:21 22:5
26:9,11,14,16,16
26:21 29:17,21,24
30:3,13,16 33:15
38:10 43:4 46:2
47:1,4,10,22 48:13
48:21 81:6,14
103:14,18 135:1,7
146:17 291:1
**chronically** 30:14
**cibulka** 2:4 9:15
**cicero** 5:17 6:5
209:18 218:2,4,12
218:17 221:10
**circle** 29:13 39:9
126:18
**circumstance**
155:2 186:17
189:17 190:9
200:5 335:18
345:1
**circumstances**
70:24 154:22,23
185:9 199:4 201:4
310:1
**citation** 231:1
326:13,15
**citations** 317:9
**cite** 12:3 22:10,10
24:18 25:7 27:11

154:1 206:14
208:16 209:9
211:24 215:3
262:20 264:4,17
286:16 287:6
317:3 322:6 327:7
**cited** 40:18 41:4
41:12 49:24 61:1
64:19 123:23
126:17 135:16,24
144:7 154:16
167:19 169:20
216:23 246:19
262:5
**cites** 64:11
**citing** 50:8
**city** 1:4 3:5 8:14
242:3 299:11,15
372:6 373:3 374:3
**civil** 1:6,13,20
8:18 65:2 373:5
374:5
**claims** 41:7
**clarification** 67:20
101:21 183:9
**clarified** 330:18
**clarify** 21:1
169:13
**classified** 335:11
**clause** 122:7
**clear** 46:8 67:17
75:22 90:5 97:1,1
98:12 112:7
113:11,13 115:16
140:23 209:8
230:15 303:20
310:13 321:16
347:9 350:9
**clearer** 97:6
**clearly** 125:17

**cleveland** 372:2
**clinic** 141:21
142:4,7
**clinical** 138:24
**clinics** 142:5,10,16
142:21
**closely** 38:3
**closer** 306:11
**coaching** 277:24
**cocaine** 254:19
257:7,16 258:3,15
258:17
**code** 343:20
371:16
**coded** 315:7 334:7
338:4,5 342:20,21
343:12 344:1,2,9
344:10 345:4,4,11
347:11 351:7
**codes** 185:5
187:20,21 334:22
361:22
**coding** 336:17
**cognizant** 74:14
74:15 75:16
**coincides** 235:5
**collate** 28:23
**colleague** 9:13
**colleagues** 301:7
369:3
**collect** 265:13
**collected** 206:9
**college** 123:23
267:1,3
**columbia** 297:18
**column** 42:23
137:1 155:13
163:5,12,15
164:24 218:24
336:1,3 338:19,21
339:13 340:11

[column - confirm]

362:2 364:5
**columns**  336:3,24
  337:1 339:10
  341:2
**combination**
  189:13 335:20
**combined**  342:21
  348:7
**come**  24:9 62:20
  65:11 71:8 73:20
  116:6 167:15,19
  223:12 242:14
  243:12 244:10
  271:8 304:13
  314:18 322:5
  340:12 348:3,20
**comes**  63:1 145:24
  146:1 158:16
  166:22 172:1,6
  206:3
**coming**  90:10
  172:3 245:24
  306:10 343:11
**comment**  72:9
**commission**  1:11
  8:15 291:16
  371:17 373:19
  374:25 375:25
**commissioned**
  371:5
**commitment**  56:6
**common**  18:20
  80:5 114:14,16
  123:22 189:12
  242:11,16,22,24
  243:9
**commonly**  321:4,5
  321:9
**communication**
  150:18

**communities**
  78:17 156:14,15
  297:19,20
**community**  77:13
  86:18,18 104:16
  105:14,18 106:1
  107:23 108:11,21
  108:24 109:17,20
  109:23 110:10
  112:2 114:3,10
  115:18 116:5
  125:14,17,22
  126:5 127:16
  128:8 131:21
  132:7,13,17,23
  133:3,14,18
  144:10 147:9,15
  157:17 166:8
  167:16 168:18,22
  169:1 170:5,11,24
  171:4,6 172:6
  173:16 177:10,16
  177:18 178:5
  179:3 180:12
  186:12 200:2
  211:8 222:8 224:6
  241:24 246:18
  247:8,24 248:1,3
  248:16,21 249:9
  250:3,8 252:19,21
  252:23 253:6,11
  253:11 293:23
  295:1 298:5,23
  367:24
**comorbidity**
  256:16,21
**companies**  44:16
  274:3,7,12,16
  275:3,3,10 280:19
  281:6 284:8
  295:21

**company**  175:8
**comparable**  77:11
  77:12
**comparative**  6:12
  288:3
**compare**  54:9
  236:10
**compared**  55:11
  69:5 181:17,17
  202:17 239:9
  250:15 284:18
  314:13 325:13
**comparing**  327:10
**comparison**  235:6
  286:21 314:1,9
  327:6 332:6
**complain**  342:1
  362:12
**complained**  362:8
**complete**  93:8
  302:17
**completed**  372:16
**completely**  161:23
  305:17
**complex**  168:20
**comply**  302:5
  303:19
**comports**  149:3
**composition**
  165:13
**compound**  331:18
**compton**  5:19
  224:15,20,20
  225:4 228:7
  229:17 230:20,22
  231:3 305:21
  307:18,19
**compton's**  306:15
  306:15
**computer**  209:1

**concept**  31:18
  147:1,6 308:19
  338:21
**concepts**  44:8
**concern**  69:12
**concerned**  79:5
  80:9 303:9
**concerning**  69:3
**concerns**  66:15
  69:23
**conclude**  124:19
  205:11 229:19
  306:6 307:24
  308:8 353:12
**concludes**  369:24
**concluding**  259:4
**conclusion**  82:19
  92:23 123:11
  211:16 225:19
  226:10 228:12
  229:9,17 230:8
  231:10,12 232:4
  246:5 366:5
**conclusions**
  221:21 225:3,11
  308:9 358:16
**concrete**  206:16
  311:13
**concurrent**  235:4
**concurrently**
  273:4,7
**conditions**  26:13
  27:14 142:14
**conducted**  8:20
  40:13
**conferencing**  8:21
**confidential**  14:20
**confine**  334:13
**confirm**  49:23
  50:3 327:22
  366:14

conflate 46:14
confounders 196:24
confused 338:23 344:5
confusion 210:3
connection 28:24 320:5 358:7,13
connolly 2:12 9:20
consensus 314:18
conservative 192:5,20 201:4,7 201:10 308:20,24 309:4,8,15,24 310:6,10,17,21 311:2,4,7,14,23 312:9 324:6
conservatively 320:14
consider 92:15,16 141:24 160:1 163:24 190:7 308:11 311:1 312:8,20 318:22 341:15
consideration 66:6
considered 12:9 12:11,16,18,22 156:16 208:24 209:5 249:16 267:3 318:24 325:6 329:7 345:20 346:7 347:7 349:22 367:14
considering 336:4
consistent 198:4 229:2 259:19 359:7,13
consistently 161:24 206:22

consists 171:2
constrained 311:14
consult 17:2
consultant 297:16
consulting 10:23
consume 106:9,11 106:14
consumed 180:6
contact 52:14
contain 241:7
contained 314:21 317:16
contd 3:1 6:1 7:1
contemplated 162:1
content 341:19
contents 23:11
context 54:19 58:21 65:4 73:20 130:8 156:12 165:11 292:3 308:23 309:2
continue 8:10 55:6 90:15 302:7 322:13 341:8,20 342:3 351:7 353:19 362:16
continued 51:13 88:12 99:12 151:20 166:15 221:4 271:12 304:24 307:8 321:23 322:2,4,7,8 369:8
continues 109:12 321:17 322:19
continuing 263:8
contrast 363:14
contrasted 167:17 203:5

contribute 185:17 195:6 196:19 234:1 249:8 251:16,20 287:14 295:24
contributed 72:6 134:5 249:19 288:9 292:15,21 294:13 295:6,12 295:13 296:6,20 315:7 320:12
contributes 249:22 294:9,24
contributing 185:1,3,6,22 186:1 186:19 187:21 188:3,6,19 189:1 191:4,12 233:16 234:14 252:4 274:23 288:21 290:17 291:6,20 293:9,18 361:17 362:4 363:10
contribution 323:7
contributor 237:15
contributors 250:10
contributory 197:12
control 45:6,17 196:18 197:1
controlled 18:23 299:23
controverted 291:17,23 292:2
conversation 144:4 367:22 368:1

conversations 8:6
conveyed 283:11
copied 73:7 76:10 76:21
copy 212:18
corners 158:12
corollary 53:5
corp 373:3 374:3
corporation 1:8 1:14 3:2 8:16 372:6
correct 11:17 12:3 14:10 15:21 20:23 21:16 22:11 24:20 24:21,23 25:4,14 25:18 26:18 29:9 29:24 30:1 31:8 31:19,23 32:8 33:12 34:2,14,21 35:12,13 36:23 37:2,5,7,14,23 38:6,22 39:1 47:23 50:5,9,14 51:5,6 77:24 82:21 83:21 98:6 103:8 105:2 111:3 115:20 119:19 122:14,19 128:2 130:24 132:10 133:20 138:3,8 139:22 143:20 159:22 169:4 170:24 171:1 172:3,7,8 173:22 186:21 187:18 190:12,19 195:5 195:22 196:2 198:3,17 200:4,19 200:20 208:7 230:7,21 231:18 233:14,15 235:15

242:4 243:14
244:21 245:10,19
249:6 263:11
269:15 272:7,10
274:20 275:11,20
283:9 287:9,10
292:10 293:23
310:2,17 312:22
313:4,5,15,23,24
314:16 315:16
316:22 317:1,4,17
317:24 318:15,21
322:19 323:5
325:17 326:6,15
326:23 327:4,5,14
327:17,20 328:1
331:21 332:13
335:13,14,20
336:18 337:9,14
344:12 348:3,24
349:3,4,12,13
350:4,21 351:9
353:8 356:24
357:5 359:17,21
359:24 361:21
366:6
**corrected**   15:1
183:14,16 244:4,8
**correction**   321:13
336:9 354:5,6
**corrections**   15:3
201:12 372:13
374:17
**correctly**   350:7
371:9
**correlate**   164:8
295:20
**correlated**   237:20
**corroborated**   25:5
**cosmic**   131:23

**cost**   239:14,18
**costs**   239:15
**counsel**   8:14 9:4
9:11 14:20 22:16
29:10 33:20 39:6
50:16 52:10 58:7
58:15 60:4,9 61:6
67:19 69:3 70:3
78:19 81:15 86:6
161:6,12 215:20
362:8,20 371:12
371:13
**counselor**   24:12
43:10,20 49:2
216:9
**count**   51:4 242:6
**counted**   245:1
**counterfeit**   133:13
174:3 180:24
181:4 203:17
204:1,5,6,14
323:20,24 324:9
**counterfeits**
204:22
**counties**   21:12
**counting**   52:22
261:14
**country**   149:6
228:9 289:1
**county**   1:11 8:15
20:9,18,20,22
67:16 71:9 82:18
183:7 236:6 242:3
244:12 245:9
246:6,14 250:15
250:21,24 251:6
251:11,17 259:7
259:13 260:2,18
261:4 262:7
263:10 264:2,6,15
271:22 299:11,15

311:20 312:21
360:17 366:16
371:2,4 373:10
374:15
**couple**   29:11
62:20 119:1
279:14
**course**   82:2 123:7
148:8 355:3,6
**court**   1:1 8:17,23
9:24 22:20 57:22
58:22 65:8 66:16
67:9 68:13 77:3
97:16 302:22
306:23 373:7
**courtesy**   57:11
**cover**   60:18 304:7
**covered**   23:19
24:4,5 31:13
273:9,15 303:1
**covers**   318:13
**covid**   305:16
**covington**   3:5 9:12
60:5,10
**create**   110:10
155:16 160:15
172:14 232:15
**created**   114:6
158:3 177:15
**creates**   157:4
234:10,11
**creating**   233:21
**creation**   292:8
342:19
**criminal**   294:5
**crisis**   6:15 39:15
40:2 133:22 134:5
236:21,23 248:2
294:4 295:6
**criteria**   26:10,17
29:22 30:9,13,15

34:23 107:6 243:7
**criticisms**   368:3,7
**cross**   206:20 207:5
207:7
**crr**   371:20
**ct2**   6:17 13:7
**cud**   101:2
**cumulative**   22:23
59:2 61:7,13 65:6
65:16 89:4
**current**   126:3
129:2 226:1
304:14
**currently**   304:16
**customers**   19:20
300:14
**cut**   65:21 87:12
**cutting**   269:6

|       d       |
|---------------|

**d**   8:1 60:2,2
**dan**   277:22 278:3
**dangerous**   325:6
332:16 333:13,14
**data**   5:14 21:22
22:6 41:7 70:1
104:17 110:12
116:9 119:2,6,8
140:19 143:15
167:18 170:19
180:16 184:18
186:11 192:6
199:9,11,14,15
201:6 202:9,10
206:10 207:19,20
208:13 214:24
220:1 227:6 228:3
228:5 229:5,15,18
229:20,21 235:19
238:9 243:22,24
245:3 250:13
252:13 253:4

[data - decreased]

254:1 258:21
259:11,18,21
260:11,17,18
262:4,18 264:1,2
264:16,21 265:12
265:13 267:22
268:20 269:11,12
269:13,16,18,20
269:22,24 276:22
279:24 280:14
305:23 306:4
307:23 308:1,5,8
316:4 317:16
318:23 319:12,16
319:20 325:10
327:8,22 328:10
337:9 338:1 360:1
360:16,17,23,23
363:9,12,14,19
364:7,22
**database** 275:24
276:23
**date** 17:10,21 18:6
18:7 126:1 129:2
230:14 372:9
373:3,9,19 374:3
374:13,25 375:20
375:25
**dated** 5:4,8,12,15
5:17,19,22 6:5,9
6:11,13,16,21 7:4
11:7 21:23 39:17
42:8 48:15 100:14
103:21 209:18
210:9 218:13
224:15 230:6,15
288:5 289:9
325:21
**dates** 230:12
**davies** 246:19,24

**day** 1:21 58:14
301:16 302:6
371:17 373:16
374:22 375:22
**days** 341:17
372:19
**dc** 2:13 3:6
**de** 139:9
**dea** 149:21 150:1,6
150:10,12,15,19
295:4
**dead** 97:9
**deadly** 176:6
**deal** 20:2 23:24
**dealer** 133:8 168:1
169:9,15,17,24
173:7 175:11
195:13 196:1
**dealers** 179:18
237:5 239:12
**dealing** 129:18
201:16,17 264:9
264:11 275:5
**dealt** 63:4,22
230:23
**dear** 372:10
**death** 181:16
182:1,14,20,22
183:23 184:6,9,14
184:19,22,23
185:2,3,6,10,13,17
185:23 186:5,20
187:3,14,15,23
188:2,4,10,21
189:3,7,9,16,20,22
190:6,7 191:8,10
191:12,15,20,21
191:23 193:6,9,11
193:19,21,24
194:13,21 195:7
195:16 197:5

201:18 202:12,15
203:20,22 204:1
204:12 241:8
287:12 313:11,11
314:2,6 319:19
320:21,22,24
323:9,23 324:18
329:6 332:2,3
334:7 335:22
343:13,20 344:1
345:3,11,13,14,16
345:19,19 346:9
346:10,10,13,14
357:2 359:18
360:1 361:18
**deaths** 6:10 152:7
152:11,17,19
153:3,8,9,18 154:8
182:9 184:1 192:1
194:2,5,7 195:4
196:19 197:12
200:23 201:21
202:1,5,20 203:3
203:12,16 204:19
229:5 236:7,16
237:16,21 238:1
240:18,20 241:3
241:13 287:15
288:14 309:6
310:14 313:16
314:16 315:6,10
320:15 322:11
324:17 325:21
326:20,21,22
327:3,21 328:5,16
329:3 331:3
332:18,20 333:16
333:23 335:22
336:1,12 337:8,12
338:3 342:20,21
343:8,10,12

345:17,18,22
346:1,6,7 347:3,7
347:8,13,14 348:6
348:13 349:9,11
349:12,21 350:4
350:14 351:7,18
351:21 352:4,8,9
352:13,14,15,20
353:1,2,3,5,6,11
353:13,17,22
354:7,11,12
356:16,18,20
360:21,24 361:4
361:11,16,20
362:3,18 363:10
363:20,21 364:5
364:20,21 365:10
365:19
**dec** 6:13 288:5
**deceptive** 44:15
**decide** 25:22
116:16 121:19
124:20 130:5,20
137:16 190:23
345:3
**decided** 366:1
**decides** 130:16
**deciding** 187:16
344:22
**decisions** 129:5
138:1
**decline** 232:11,12
235:4,13,20 262:1
264:18 268:23
269:9 270:13
**declined** 235:2
264:15
**declining** 265:5,11
**decreased** 270:2
365:2,3,5

**deed** 373:14
374:20
**deemed** 372:20
**deep** 305:11
**default** 343:19,24
345:2
**defend** 72:5
**defendant** 2:11,18
3:2 8:14 9:11 10:4
59:7 95:11
**defendants** 1:9,15
1:19 18:22 58:15
72:2 90:21 300:21
355:18
**defense** 69:3 70:3
**defined** 139:20
**defines** 139:24
**definition** 30:5,7
34:6,9 106:21,22
107:1,4 108:13,15
108:20 112:11
190:14 272:13
273:11 314:18
**degrees** 91:6
**delivered** 111:8
**delivers** 112:10
**demonstrates**
152:5 154:6
**denominator**
352:3
**density** 155:15
157:9,10,20,21
158:3,11
**department** 148:9
247:9 366:24
372:22
**depend** 138:20
139:7 155:2 176:8
195:16 235:22
**dependence** 5:10
48:12,21 255:7

256:1,11,18
**dependent** 20:13
242:12 243:10
337:12
**depending** 18:16
33:7 194:11 269:1
334:8
**depends** 106:21
141:8 196:12
309:1 310:3
**deponent** 53:16
301:8 329:12
369:15,21 370:6
**depose** 59:14
**deposed** 59:5
**deposition** 1:19
8:9,13,20 10:9,10
11:5,9 13:6,11,14
15:11 17:2 21:19
22:1,18 24:8,12
34:4 39:13,19
42:4,11 43:9
48:10,17 49:3
50:17 51:1,16
53:14 55:4,6
58:17 59:11 63:3
63:6,9,18,19 64:8
64:9,17 65:12
66:3 67:24 73:5
73:13,22 76:9
81:5,20 82:3
85:15 86:2 90:8,9
90:14 93:22 97:3
99:14,18 100:9,16
101:7 103:17,23
134:23 135:3
151:23 161:9
162:18 166:18
178:20 209:13,20
210:5,11 218:10
218:15 221:6

224:12,17 247:1
271:14 288:2,7
289:5,11 302:17
305:2 307:11
325:19,23 341:12
341:13 363:1
369:10 370:5
371:5,9,13 372:9
372:12 373:1,3
374:1,3
**depositions** 22:19
23:2 43:22 58:21
65:17 83:17 84:6
89:4 91:22 103:1
149:20 162:14,22
215:23 303:3,22
303:24 304:3
**depression** 163:8
163:19 164:4,20
**deprivation** 165:1
**deputy** 225:6
**derived** 139:9,9
**describe** 27:23
104:24 105:17
153:23 167:3
175:16 277:8,17
278:19,24 279:8
312:24 332:23
334:22 347:19
362:4 368:15
**described** 123:15
162:13 290:9,14
334:4,18 343:18
344:10 347:1
348:15 349:6
350:12,15 353:10
366:3
**describes** 288:12
288:13
**describing** 108:10
110:11 156:12

160:13 172:10
312:18 332:11,13
339:2 354:21
**description** 54:11
103:2
**descriptions** 284:1
**descriptive** 6:4
209:16 339:13
**design** 46:23
297:16,21
**designed** 40:12
**designing** 297:14
**desire** 62:22 149:5
**detail** 124:9
208:22
**detailed** 282:17
**details** 96:8
**determinant**
233:21
**determination**
83:11 165:2
**determinative**
357:24
**determine** 182:19
**determines** 22:22
58:24
**determining**
182:14,21
**detox** 243:8
**develop** 20:21
46:4 61:3 183:4
249:23
**developed** 284:11
**development** 6:3
209:15 218:6
221:12
**diagnoses** 107:5
**diagnosis** 107:6,9
**diagram** 35:3
**dial** 51:23

die  198:8
died  189:14 324:4
  335:19
differ  67:7 72:12
  100:24 205:24
difference  67:15
  83:21 86:12 89:21
  93:16 129:15
  141:6 301:20,20
  303:17 350:23
  357:17
differences  6:20
  42:6,16 81:2,17
  328:17,23 329:15
  329:20
different  15:10
  16:13 19:22,22
  33:7,11,11,12
  46:16 49:24 54:11
  59:13 60:6 63:16
  64:14 69:4,14
  70:9,10 73:14
  75:9 76:14 77:2,5
  77:13,19,23 79:8
  79:23 81:10 92:19
  119:2 141:9
  154:20,24 175:20
  178:22 180:8
  186:15 191:17
  203:11 205:18
  215:23 222:14
  227:18 243:6
  250:15 270:15,16
  270:18,21 271:1
  277:3 295:21
  319:23 324:24
  338:4,13 342:9
  348:18 354:4
  355:4,11 357:16
  365:13 366:7

differentiate  73:18
  273:5
differing  50:12
differs  67:2,3
difficult  74:2
  76:12 181:8 362:5
  362:15
difficulties  28:23
difficulty  223:14
digest  98:6
diligence  300:12
  355:3
direct  197:7,19
  240:12 241:8
  279:24 280:4,6,8,9
  280:14,21,24
  281:2,4,7 282:5,9
  308:17 314:1,6,9
  318:14 337:4
directed  34:1
direction  66:15
directions  37:13
directly  55:21
  183:5 184:1
  185:22 191:13,15
  196:22 230:2
  241:7 275:19
  278:23 309:7
  310:15 320:19,19
  322:21 333:24
  345:20
director  225:6
dis  298:3
disagree  44:2,2
  50:24 149:9
  219:11 358:20
disagreement
  58:16
disagrees  70:9
  91:16

disbelieve  220:6
disclosed  335:1
  337:6 340:22
  354:18
discover  14:16,23
discovered  14:14
discovery  22:21
  22:22 58:23 59:1
  62:7 65:6 66:16
  66:18 67:10 74:7
  74:13,21 75:18,23
  76:5 88:12 90:14
  90:15
discrimination
  165:4,5
discuss  97:19
  111:12,16 157:7
  230:8 284:16
discussed  67:23
  127:13 194:10
  237:4 263:1,14
  264:8 360:11
discussing  66:8
  196:17 197:11
  275:4 280:20
  292:9,11 354:21
discussion  24:2
  51:12 54:24 57:7
  91:8 93:7 94:3
  151:19 162:2
  221:21 281:16
  307:7
discussions  14:20
  94:5 247:12 298:4
  298:8 299:1
disingenuous
  93:21
disorder  6:8 7:3
  26:1 34:10,13,24
  35:4,16,19 36:22
  37:1,4,12,22 38:1

38:5,9,24 46:5,8
  46:24 85:13 94:6
  94:8 100:7,13
  105:10 106:15,16
  106:18,22 107:1,4
  126:22 159:18
  160:7,19 180:23
  181:7,12 201:17
  201:19 204:4
  227:1,14 230:3
  232:16 234:17
  236:21,24 243:11
  244:11,19,24
  245:10,19 249:24
  250:23 253:16,24
  254:4,5,9,23 255:5
  255:19 256:4,8
  257:2,13,15,19
  258:1,15,15
  267:20 271:23
  280:1,10,15 289:6
  289:21 290:8,18
  291:6,13,21
  292:16,23 293:10
  293:19
disorders  255:3,11
  255:22 256:17
  258:14,17
dispense  19:16
dispensed  104:7
  106:7 108:4 121:9
  121:14,23 122:1,4
  122:5 130:1,9
  252:19 253:5
dispensing  124:4
dispute  168:18
disseminated
  132:12,17 284:3
distinct  61:16
distinction  204:15

**distinguish** 36:19
202:9,14
**distinguishing**
46:10
**distribute** 19:3,7
167:8
**distributed** 20:19
21:11 89:10
131:18 150:9
170:11,14,14,16
170:18 171:3,5
172:19,19,22
176:20 177:5,19
177:21,24 178:1,4
202:16,17 252:21
294:20
**distributes** 176:24
**distributing**
139:17 177:11
**distribution** 20:18
21:4,6,7,9,15
120:23 121:1
125:16 132:5,11
142:19 150:16,22
155:18 167:17
168:8,13 171:11
172:6 173:12
179:21 235:18
292:7 299:22
**distributor** 112:9
**distributor's**
112:21
**distributors** 18:23
19:7,11,20,23
20:13,19 21:14
44:16 111:8
113:15 114:17,22
115:1,4 120:2,10
120:18,20 130:20
130:23 138:8,13
138:14 150:10,15

150:21 151:2
176:22 274:20,21
275:22 276:2,4,9
278:23 279:2,8,14
279:17,19 282:6
282:10,14,16,19
283:3 300:14,21
300:24
**district** 1:1,1 8:17
8:18
**disturb** 58:14
**disuse** 36:22
**diversion** 105:1
108:10,14,15
111:2,6,12,12,16
112:8,11,20,23
113:14 114:13,14
115:14 125:4
133:7 151:3
152:19
**divert** 124:14
**diverted** 108:8
109:1,3 113:22
131:19
**divide** 155:11
**doctor** 10:8 11:13
14:4,6,13,22 15:7
16:17 17:9 18:19
22:7 23:9,20
24:18 28:11 29:3
29:6,15 34:2 36:8
39:22 40:4 42:12
42:15 43:15 44:12
45:24 48:23 49:8
49:16,19 51:8
53:7 60:10 61:11
93:23 99:17
100:17 101:15
103:24 115:6
116:22 117:5
118:8,9,10,11

119:5,14,18 123:5
130:16,19 131:11
132:9 133:4 143:9
152:2 163:3
166:21 171:15
180:1 203:6
204:24 209:1
210:17 216:14
218:19 221:9
223:17 231:24
238:15 271:17
273:12 279:15
286:13 289:20,24
292:18 294:3
297:2 299:10
300:17,19 301:7
301:24 302:13,14
303:13 305:6,21
307:14 340:1
342:14 367:21
368:2 369:12,20
**doctor's** 35:20
37:4,13,23 38:1,18
41:23,24 106:19
116:23 117:3
138:10 154:9
272:14,17
**doctors** 19:17
38:13 115:19
116:16 117:7,9,18
117:22 118:15,17
119:12 120:4,10
120:16,19,21
127:17,22,23
128:1,4,9,11,14,15
128:16,20 129:3
130:5 131:4,15
132:19 133:23
134:4,9,13,17
137:10,16,21
138:7,16,22

142:24 143:5,11
143:17 157:11,14
263:8,14 275:11
275:19,23 276:2
276:11,16 277:7
277:16 278:19,23
279:8 280:10
283:12 284:2
293:22 294:2
296:13
**document** 22:3,8
22:11 25:12,12
40:5 42:20 48:23
67:22 100:21
103:24 218:23
225:2 339:18,23
**documented** 32:17
153:5 295:22
**documents** 28:14
55:5 61:1,9 62:4
144:3 145:16
300:13 301:1
**doing** 29:5 53:2,3
56:21 122:16
162:10 178:20
179:17,17 191:4
278:13 280:8
310:8 335:10
341:6 349:22
350:15,19
**don** 2:3 9:14 16:15
53:5,17 58:11
79:20 84:13 99:6
101:10 278:3,5,5
281:20 341:18
363:5 372:5
**dormitories** 267:1
**dose** 31:22 32:11
32:18,23 33:2,3,7
33:9 94:7 130:6
130:15,21 176:8

262:1

**doses**  33:12
  121:10 129:23
  130:2,10

**dosing**  31:18,19,21
  32:2,6,8 47:21
  48:6

**double**  136:1
  246:6,15 304:17

**doubled**  353:17

**douglas**  2:15

**dowell**  6:10
  317:11 318:3,5
  325:21 326:1
  328:9

**dr**  6:17 13:7

**draft**  326:11

**drawing**  173:4

**drawn**  35:3
  308:10

**drill**  125:19

**driven**  279:23

**driver**  251:23

**drivers**  231:6
  249:5

**driving**  109:10
  137:24

**drop**  268:8

**dropped**  228:1
  268:4

**drug**  1:7,14 6:10
  8:16 19:12 133:8
  156:3 159:15
  160:19,22 163:18
  164:3,19 166:2,23
  167:2,10,16,24
  168:12,15,17
  169:2,9,15,17,24
  170:6 172:23
  173:6 174:24
  175:8,11 176:20

176:23 179:17,18
  185:18 186:13
  192:7 195:13,24
  196:4,13 209:6
  214:14,19 221:24
  222:2 225:7 230:1
  237:5 239:11,16
  240:21 248:11
  254:20 257:12
  262:19,22 277:9
  277:17 283:12
  294:5,8 314:2
  315:23 316:2
  320:23 323:9
  325:20 332:2
  372:6 373:3 374:3

**drugs**  171:5
  185:10,13,24
  186:9 193:11
  222:13,14 253:17
  253:21 257:3,5,7
  257:21 258:3
  276:3,17 278:20
  278:24 328:19
  329:1 366:16

**dsm**  107:3,7

**due**  71:3 86:6
  108:2 153:3 189:7
  203:4,5 227:12
  236:7,16 248:11
  291:10 294:23
  302:21 314:23
  321:13 336:12
  343:9 352:17
  355:3 356:17,18

**duly**  10:5 371:4,6
  371:7

**duplication**  73:6
  76:6

**duplicative**  22:19
  22:23 23:5 24:5

43:20,22 54:19
  59:2 61:7,13 65:5
  65:6,16 74:8
  83:18 90:2 97:2
  161:6

**duration**  29:19
  32:19,23 33:2,8,10
  33:12 47:10,16
  91:6 94:7 176:8
  261:19

**dynamics**  165:11
  165:12

### e

**e**  8:1,1 10:3,3,3,3
  28:15 42:22 60:1
  60:2 113:21
  155:12 163:5,6,14
  340:20 341:13

**earlier**  54:18
  94:20 305:19
  323:16 334:4,24
  335:7 338:12
  366:10 367:10

**early**  6:8 100:8,13

**easier**  98:16

**easily**  118:22
  294:12

**east**  2:16

**economic**  165:1
  195:8 233:14
  249:5,12 251:19

**edlund**  5:11 41:6
  41:13,16 48:14,19
  49:10,17,21,24
  54:11,22 55:15
  57:3 60:2 91:3,11
  93:23 99:19,21

**effect**  72:1,4
  145:17 146:23
  154:20,24 160:12

**effective**  43:3
  44:22 81:6,13
  262:23

**effectiveness**
  297:5

**efficacy**  45:1
  144:7 262:21

**effort**  76:5 232:15

**efforts**  262:14

**eight**  81:19 353:7
  353:12

**eighth**  367:16

**either**  15:11 35:15
  54:11 115:2
  168:19 255:9
  270:23 334:7

**electronically**  14:1

**elements**  75:17
  79:2

**elicit**  65:13

**eliciting**  96:20

**ellis**  218:17 221:10

**email**  372:17

**embraces**  242:2

**emerging**  220:2

**empirical**  152:4
  154:5

**employed**  366:23
  371:12,14

**employee**  371:13

**ems**  247:7

**enclosed**  372:12

**encountering**
  313:18 315:8

**encouraged**
  295:15

**ended**  98:24 199:5
  201:13,15

**endorsement**
  291:15

engage  33:16
  106:11 278:18
  279:2 297:7
engaged  35:5 36:7
  38:6,22 39:1
  61:12 145:9 168:8
  168:12 193:1
  223:22 243:2
  265:22 271:24
  272:3,8,20,21,23
  272:24 274:21
  275:6,20 276:2,4
  276:17 277:23
  286:4 287:7
  296:13 297:21
  309:5
engages  174:21
england  103:15
enhance  147:8
entered  63:4 374:9
entire  36:1 87:13
  128:7 225:23
  226:18 270:4
  373:5 374:5
entitled  1:20 22:4
  40:1 42:15 48:19
  55:12 60:21 68:16
  68:22 72:3 73:9
  75:2 77:19,20
  92:21,22 95:6
  96:3 210:13 218:1
  218:17 221:11
  224:20 278:13
  289:21
entries  338:17
entry  338:18
  367:19
environment
  165:3 292:9
  294:23

environmental
  194:9
epidemic  6:15
  39:16 40:3 104:4
  129:7 134:8,16
epidemiological
  121:22 122:13,21
  123:10 126:21
  297:8,15 299:24
  300:3
epidemiologically
  315:20
epidemiologist
  59:4 157:2 229:19
  306:5,22 307:24
  308:5,12 355:10
  357:9
epidemiologists
  182:17
epidemiology
  159:5 246:10
  308:23 321:20
  355:4 356:9
  357:19,22
equal  181:19
  314:12 316:17
equals  75:7
era  305:16
errata  6:18 13:8
  14:3,9 244:1
  271:18 311:1
  372:14,19 374:7
  374:10,18 375:1
error  268:13
errors  14:24
especially  128:5
  157:24
esquire  2:3,4,4,5,8
  2:12,14,15,19 3:3
  3:4,4,9

essentially  201:9
  323:10
establish  82:24
established  335:6
estimate  47:15
  168:3,24 170:6
  183:4 184:15
  192:5,10,19,20
  198:20,23 199:8
  201:7,15 203:19
  211:7 214:10,11
  214:24 217:8
  242:15 243:13
  259:6,7 267:18
  308:24 310:5,7,17
  310:21 311:2,4,7
  311:23 312:8
  313:1,10,21 314:3
  314:7 315:13
  316:1 318:16
  320:6,8,20,23
  322:22 324:6,12
  332:1,19 337:19
  349:11 350:2,8
  351:1,6,10 352:12
  352:16 353:3,7,15
  355:8 357:15,20
  357:21 359:23
  363:15,21
estimated  47:2
  192:7 211:14
  214:13 245:24
  271:23 311:10
  336:13 343:7
  349:8 352:5,7
  360:23 363:19
estimates  122:23
  182:8 193:4 201:4
  201:18 211:3
  213:17 248:14
  308:20 309:4,24

331:4,6 340:13
  355:21 365:23
estimating  200:22
  320:14 333:15
  352:2 356:8 366:8
  366:15
estimation  324:18
  336:16
et  1:8,14 5:11,14
  5:17,19,22 6:5,9
  6:10,13,16,21 7:4
  8:16 21:23 31:4,6
  32:4 39:16 42:8
  48:14 100:14
  209:18 210:9
  218:13 224:15
  288:5 289:9
  325:21 372:7
  373:3 374:3
ethical  241:16
ethnographic
  207:8
evaluate  125:21
  127:7 249:13
  279:5
evaluated  125:5
  127:2,4 129:8,12
  129:20 140:16
  142:16,19,21
  146:3 148:3,18,22
  148:24 149:13,14
  150:7,12,18,24
  154:14 246:4
  251:9 263:5 276:6
  279:11 281:8
  282:7,11 296:8,22
  300:2
evaluates  144:23
evaluating  127:10
  183:1 275:23

evaluation 126:6
143:21 144:15
149:11
evans 1:21 8:23
371:4,20
event 119:17
190:19
events 68:21 250:9
288:14
everybody 63:5
244:19
evidence 36:10
111:6 112:13
113:1,3,8,17 116:7
116:11,15 120:9
125:15 129:1
132:1,5,8,11
135:10 153:2
219:15 229:2
252:8 262:12
265:3 278:22
306:7 322:1,4
exact 338:8
exactly 30:21
71:16 83:9 87:18
87:19,21 139:23
163:6 176:13
207:4 287:17
292:2 313:24
315:18 345:6
348:15
examination 4:1
10:6 59:10 67:23
80:11 97:2 302:10
305:4
examinations 53:7
61:11
examine 54:2
55:12
examiner 182:11
182:12 185:8,17

186:18,22 187:16
188:17,18,24
190:23 191:4
example 30:11
41:19 78:15 81:21
109:22 110:14,15
110:19,20 115:12
115:15 122:23
123:5,18 135:22
147:12 156:3
167:21,23 171:12
171:15 173:6
187:1 189:12
229:24 236:11,11
237:24 248:9,15
249:1 252:14,15
254:19 256:17
266:8,24 275:17
297:9 311:13,18
320:1 322:24
323:14,15 352:24
357:19 358:11
examples 267:20
excel 339:3 340:11
340:18,22 341:3
exception 71:4,15
84:14 87:20
exceptions 88:8
excess 124:13,22
136:10,17,21
137:11 149:12
293:13 294:23,24
excessive 137:14
170:23
exclude 107:4
excluded 107:9
exclusive 37:17
157:13 338:7,11
343:12
exclusively 111:22
207:22

excuse 18:11
102:4 323:19
excused 99:17
executed 374:10
execution 373:14
374:19
exercise 310:23,23
exercising 116:23
exhibit 5:1,3,5,7,9
5:13,16,18,20 6:1
6:2,6,10,12,14,17
6:19 7:1,2 11:3,5
11:9,14 13:5,6,11
13:12,13,16,23
14:13 15:5 21:17
21:19 22:1,2,15
25:1 28:5 29:3
39:4,7,13,19,24
42:2,4,11,14 45:24
48:8,10,17,18 50:9
99:19,22 100:3,4,9
100:16 103:9,10
103:12,17,23
134:21,23 135:3,6
136:8 155:5,8
163:4 183:17
201:11,14 209:12
209:13,20,22,24
210:1,2,5,11,12
211:24 217:22
218:4,5,10,15,16
221:10 222:21
223:8,13 224:9,12
224:17,19 244:2,8
288:1,2,7 289:3,5
289:11,19 312:12
317:18 325:18,19
325:23 326:2
367:8,12,15
exhibits 13:24
223:12 339:21

340:17 341:11
366:17,18
exist 168:15,21
existing 179:11
180:15
exists 358:22
expanded 107:22
expands 173:12,15
expansion 107:15
108:1 131:2
133:15 296:6
expect 220:8
232:10
expected 216:11
experience 139:1
191:8 221:23
222:2,12 310:8
experienced 199:1
expert 5:3 6:18
11:6 13:8 23:20
44:7 53:19 54:2
58:21 60:11,12,14
60:19 61:14 63:14
64:10,12 72:24,24
73:2,16 74:12
75:24 76:7,17,18
84:1 126:19
246:23 282:22
283:6,8 303:24
expert's 67:2
71:24 88:23 91:22
expertise 19:24
126:22 168:16
182:13,21 183:1
201:2 297:1,4
299:21 300:3,5
309:21
experts 54:18 65:5
75:19 298:4,8
304:3 342:9

**expiration** 373:19
374:25 375:25
**expires** 371:17
**explain** 77:5 84:9
89:17 106:24
169:14 248:22,24
306:21 313:14
351:14,17,23
364:15 365:18
**explained** 290:9
322:16 354:20
356:15
**explains** 358:23
**exploitation** 293:2
**explore** 63:23
70:13
**exposed** 35:19
**exposure** 50:12
91:6 105:1,9,13,14
105:18,21 106:6
194:13,15,16,18
194:20,22 195:3
197:15,17 199:17
222:15 252:2,6
**exposures** 159:6
164:9
**expressed** 98:2
114:12
**expressing** 68:2
97:16
**extending** 162:19
**extends** 162:18
**extensive** 94:15
**extent** 12:10,17
20:19 22:21 24:1
58:23 85:17 94:14
113:9 144:16
147:14 179:15
237:23 254:11
294:18 296:2
300:2 301:9,12

**extra** 18:16
**extraordinary**
139:17 141:2

**f**

**faber** 63:10
**faber's** 85:7 86:4
**face** 364:11
**facilitated** 273:21
**facilities** 139:14
139:16 140:6,17
141:4,24
**facility** 140:10
141:7,16,17,19,21
142:1 266:7,15
**fact** 29:16 62:9,10
62:20,23 64:6,9
68:21 73:21 74:8
74:16,16,17,23
75:16,23 76:5,14
77:3 88:10 91:11
94:2 124:13 146:5
161:8 269:7 316:8
316:20 351:3
**factor** 145:13
149:11 156:14
160:7,17 190:14
197:14 198:5
231:20 233:5,10
234:6 249:2
288:22 291:5,11
291:19 292:14,21
293:17 314:24
318:16,18
**factored** 148:14
148:18
**factorial** 158:22
159:1,3 160:2
161:11,20 194:5,7
262:9,11
**factors** 6:10 138:2
145:7,20 153:24

159:4,5,9,11,20,22
160:11,13,18
161:10,20 162:12
162:15 163:8,22
164:1,4,16,20
165:7,13,18,21
166:3,9 185:17,22
194:8,9,9,14 195:6
195:8,8,8,11
196:23 197:4,8,10
197:11 232:19
233:9,12 234:1,13
248:21,24 249:5
249:11,16,18
250:5 251:16,19
251:24 252:1
262:10 279:23
287:14 288:8
290:9,14,16
325:20
**facts** 12:2,6 36:10
74:20 76:6,16
78:9,12 79:4
93:12
**factual** 235:11
**fair** 23:16 61:24
62:2 65:19 67:3,8
83:22 84:8,22
97:5 98:4 121:16
121:16 157:1
167:13 171:19
183:21 207:19,21
257:14 269:5,5
302:23 311:17,24
334:9 346:11
347:5 350:16
**fairly** 140:23,23
**faith** 82:23 97:14
118:8,12,18
119:14 128:16,21
129:4

**fall** 94:22 177:10
**familiar** 22:7
31:18 42:19 146:5
148:1 210:17
235:17 276:8,10
289:24
**family** 110:15
114:13,18,22
123:22 124:4,14
125:2 133:7
155:17 165:11,12
165:12,13 170:1
**far** 18:4 86:9
96:18 204:5 225:9
**fault** 302:14
**february** 6:21
42:9
**federal** 1:20 19:2
65:2
**feed** 301:11,12,13
**feedback** 28:20
**feel** 66:5 84:9
223:17 302:20
303:20 311:14
330:13
**feeling** 147:14
**felt** 309:8 311:6
312:5 320:17
350:23
**fentanyl** 70:18
174:14 176:2,6,14
176:15 181:15,24
182:4,5 186:4,18
187:2,4,5,6,10,15
188:1,11,11,14,18
189:1,19,19 190:2
191:11,16,20,24
192:14 193:1,7,9
193:20,22,24
194:8,16,19,23
195:1,4,4,7,14,17

195:22 196:1,10
196:19 197:12,18
197:22,24 198:2,9
199:6 200:23
234:23 236:16
237:2,11,16,20,21
237:24 238:1,5,11
238:11,12,14,17
238:18,20,23
239:3,3,5,6,8,13
239:19,21,24
240:4,13,18,20,21
241:2,7,13 254:9
254:13,15,18
254:18 313:3,8,15
313:17,18,22
314:4,5,9,10,13
315:5,7,8,14 316:3
316:8 318:14
319:3,4,4,6,9,14
319:17,20,21,22
319:24 320:2,10
320:10,20 323:12
323:16,22 324:2
324:13,16,21,22
328:18,24 329:16
332:17,21 333:13
333:17 335:17,20
335:24 336:5,10
336:12,13,18
343:7 345:1,4,12
345:14 346:10,13
347:5,13,13 348:4
351:19,22 352:13
352:14,21,21
353:2,3,4,6,8,11
354:2,2 356:3,3,19
356:23,24 357:4,5
357:10,12,13,13
360:5,12,22
362:19 363:11

364:16 365:1,5,9
365:15,16,18
**fentanyls** 325:7,9
**field** 201:2 309:13
309:21 310:9
312:7 321:4,6,19
332:6,14
**fifth** 100:22
147:12 291:16
**fight** 364:10
**figure** 25:6 32:9
32:11 34:11 35:9
35:10,10 36:5
46:1 47:10,12
48:5 52:2 73:16
76:10 135:18
169:20 197:4
200:19 201:19,21
202:1 203:17
238:6 244:3,4,8,11
245:8 246:11,13
253:15 270:12
271:18,21 306:12
307:2 310:24
313:9 328:12
335:10,11 337:1
338:22 339:7,7
342:16,24 343:2
344:4,7,12,13,15
344:16,18,19,22
347:2,6 359:16,16
360:8
**figures** 35:8 245:1
264:17 270:17
339:24
**file** 340:22 341:4
341:24
**filed** 8:16
**files** 300:13
**filing** 370:5

**fill** 119:24
**final** 350:23
**finally** 174:13
**financial** 250:5
**financially** 9:3
371:14
**find** 52:9 69:17
102:18 118:22
154:15 174:8
206:22 208:17,20
223:3 241:1
242:18 327:23
329:19,23 341:13
341:14 362:5
372:12
**finding** 102:21
213:23 216:16
217:4 219:9 222:6
222:19 224:6
240:17 241:10,14
341:20
**findings** 99:24
102:10,14 103:4
127:5 129:13
210:20,24
**finds** 241:3
**fine** 85:21 88:18
220:23 361:7
362:16
**finished** 109:7
**fire** 247:9
**fires** 98:17
**firm** 8:22,24 9:11
59:7 60:9
**first** 10:5 40:9
52:2 104:3 107:14
163:14 182:10
183:22 185:11
201:14 205:9
206:5 213:19,20
213:22 221:16,23

222:3 225:12,12
228:23 244:2
265:2 287:5 290:4
290:23 298:2
304:1 307:3
317:10,21 324:22
326:11,17 334:1
348:2,5 371:7
**five** 40:20 52:20
99:6,7 220:22
222:13 232:2
304:13 364:17
**flesh** 75:13
**floor** 2:6
**flow** 16:4
**flows** 34:16
**focus** 23:19 26:14
30:16 62:7 111:2
127:21 131:22,24
132:15 142:10,11
146:24 147:8,9
269:7 287:5
**focused** 26:9 29:16
56:8 142:8 197:16
215:14 300:20
**focuses** 112:15
**focusing** 49:14
56:7 60:18,19
199:11
**folks** 298:16
299:17
**follow** 303:11
305:18 316:16
362:5
**followed** 37:12,22
38:3,13
**following** 16:6,15
38:18 213:19
214:18,21
**follows** 10:5 17:6
51:14 99:12

151:21 166:16
221:4 271:12
304:24 307:9
369:8
**footnote**  50:7,7,7
**force**  93:9 109:10
**forces**  231:4,14,16
**foreclosed**  65:7
77:24
**forego**  304:5
**foregoing**  371:5
373:13 374:18
**forewent**  303:12
**form**  45:9 102:17
102:23 132:4
138:22 146:7
208:13 238:12
278:2,10,11,14
285:1 320:1,9
**formed**  89:12,23
149:17 151:9
350:13
**forming**  149:1,15
151:12 204:16
230:8 249:17
254:16 324:6
**forms**  319:22,23
323:13
**formula**  345:6
**formularies**
295:21
**formulary**  296:5
**formulate**  138:16
**formulation**  85:8
88:20
**forth**  11:20 16:5,7
16:8,15 258:4
371:15
**fortunately**  248:6
**forty**  371:15

**forward**  64:17
71:19,21 72:9
320:22 347:10,21
351:6 372:16
**found**  184:23
185:4 242:23
285:19 313:2
329:24 334:8
**foundation**  82:3,8
83:19 84:7,14
85:10,17 86:23
87:4,16 97:20
**foundational**
82:23 85:4 88:15
95:15 338:1
**four**  59:9 222:13
**fourth**  104:5
174:12 326:8
**fraction**  186:8
237:10,14,19
**frame**  193:14
266:22 267:11
**framework**  160:2
160:17
**franklin**  292:1
**frankly**  72:23
**franks**  2:15
**free**  223:17 373:14
374:20
**frequency**  22:20
58:23 89:10
328:18,24 329:16
329:21
**friend**  123:18
133:8 156:4
**friends**  114:14
124:14 125:2
155:17 170:1
**front**  71:20 99:20
250:1 369:1

**froze**  209:2
**fruitful**  66:5
**full**  30:20 59:14
60:21 62:5 152:4
265:2 290:5 298:3
302:17 371:10
**fully**  76:4 210:21
301:24 302:3,8
331:5
**function**  348:6,21
350:14 352:5
354:11
**functioned**  82:17
**functions**  82:11,16
**funneled**  295:1
**further**  9:24 65:10
85:23 93:19
147:19 219:13
228:22 321:20
327:19 330:8
331:11 332:8,16
339:9 358:16
369:14,23 370:6
371:8,11,13

**g**

**g**  8:1
**game**  62:1,2 67:4
67:8 83:22 84:22
97:5 136:23
**gamut**  257:8
**gathered**  55:4
**general**  19:21 20:1
20:4 27:12 53:14
67:13 71:11 74:10
77:10 78:6,7,11,12
79:9,14,15,22 80:6
80:11 83:15 87:6
87:9,13,14 88:9
90:22 97:17,17,20
98:2 103:2 126:22
144:19 145:1

146:9 147:14,24
148:24 149:13
156:12 158:14
162:1 178:21
179:10 196:10
198:5 215:12
237:7 259:8 266:2
279:3 284:12,21
**generalize**  127:6
153:7 219:12
**generalized**  70:21
77:9 79:7 102:8
102:11,20 129:14
144:18
**generalizes**  102:15
103:4 224:8
**generally**  35:7,22
39:3 120:22 127:4
140:1 145:18
146:5,8 148:1
159:4,5 198:4
210:22 214:2
234:21 266:2
268:20 276:10
282:20 284:5
293:5 297:4,15
299:24 301:3
302:24 324:21
**generated**  247:4
**generic**  61:22 62:4
70:1 71:10 85:14
85:20
**generically**  71:7
**genetic**  165:17
**gentlemen**  56:16
**geographic**  242:2
**geographically**
74:18,20
**getting**  83:3 170:3
343:17

**give**   31:2 38:11
    51:21 52:19 56:5
    78:15 90:17 95:2
    98:15 239:20
    249:1 304:14
    320:1 323:14
    367:6
**given**   60:14,14,23
    64:6 67:3 72:13
    130:6 138:5,12
    188:10 200:3
    201:5 203:8
    238:15 244:15
    251:13 253:22
    267:21 288:18
    314:8 332:2
    352:18 370:1
    371:17
**gives**   70:20 172:9
    172:15 310:10
**giving**   139:22
    306:8 308:2
**gloss**   90:23
**gnat**   88:2
**go**   8:11 22:14
    23:18 34:5 41:10
    42:2 44:10 45:23
    45:23 47:7,12
    48:4 49:13 55:2
    57:3 64:17 65:20
    72:15,20 73:16
    77:16 80:2 83:14
    94:12 139:22
    151:15 160:5
    166:11 177:9
    193:12 201:20
    208:22 209:4
    212:23 229:14
    251:2 259:22
    266:23,24 271:17
    278:2,10,15

290:21 292:1
    304:11,19 307:3
    317:21 335:4
    341:2,4 344:13
    346:1 361:14
    369:2
**goes**   23:4 68:17
    90:20 104:8 124:8
    231:3 317:17
    327:8
**going**   8:3 10:23
    13:21 14:18 16:21
    23:4,17,17 24:9,15
    24:16 28:14,15
    33:6,9 36:6 43:7,8
    43:11 44:3 50:16
    50:17 51:10,20
    52:11 55:15,24
    59:18 62:3 65:13
    66:8 71:21,24
    72:9,10 74:7,18
    83:10 90:22 95:1
    96:17 97:17 99:9
    101:10 151:17
    160:6 161:17
    162:2,19,24
    166:12 167:13
    176:18 178:12
    183:11 220:20
    221:1 223:8
    225:20 245:1
    253:14,16 271:9
    278:12 289:12
    292:5 294:6
    304:21 307:5,18
    307:19 336:15,15
    338:2 339:17
    342:1 344:20
    347:21,23 351:6
    357:7 364:21
    369:5

**gonna**   79:5 94:23
    97:2
**good**   8:2 10:8
    13:21 58:13 63:23
    82:23 97:13 118:8
    118:12,18 128:16
    128:21 129:4
    139:18 225:22
    305:6,12,14
**gotten**   88:3 179:24
**governing**   299:22
**government**   19:3
    148:4,16 247:10
**governmental**
    148:9
**grabbed**   307:17
**great**   14:8
**greater**   121:10
    130:1,10 158:11
    313:3,7 314:12
**ground**   23:18 43:7
    43:8 49:5 52:16
    59:19 60:18 65:13
    81:22 246:17,22
    247:6 303:2
**group**   259:5 267:1
    267:9
**groups**   286:23
**guess**   29:20 34:24
    51:22 100:21
    110:4 147:5
    167:10 170:17
    205:3 207:17
    214:7 240:19
    257:6 315:22
    321:15 354:15
**guest**   361:10
**guidance**   125:23
    126:1,4,11,12,15
    126:16 128:6
    262:24 263:1,3,5

**guideline**   5:5
    134:24 135:6
    137:4
**guidelines**   134:20
    135:9,11,12,18,22
    136:2,5,8,9,11,16
    136:18,20 137:13
    137:20 143:23
    144:1
**guys**   66:7 87:24
    88:1,10

---

### h

**h**   10:3
**hager**   3:9 8:22
**half**   173:2 235:2
**halfway**   30:22
    31:3 32:15
**hallmark**   160:16
**hand**   29:1 42:23
    137:1 164:24
    218:24 371:17
**handled**   45:15
    63:2 77:3
**handwritten**
    247:21 299:3
**handy**   208:16
    292:5
**hang**   79:20
**happen**   189:24
    253:2
**happened**   94:13
**happens**   94:10
**happy**   16:23
    304:12 340:15
    341:3,15 364:12
**harassment**   43:22
**hard**   70:7,7 162:5
    162:6 214:6
    306:24 338:20
**harder**   83:4

**harm** 33:3 158:6,9
166:7,7 173:21
174:1 176:16
180:20 182:6
295:13 310:12
**harms** 111:23
112:16 113:10
152:24 156:13
158:15,22 172:10
172:15 294:9,13
**hash** 91:16
**haven** 164:13
**head** 31:14 88:7
158:24 164:16
257:17,23 269:23
349:18,19
**headed** 213:14
**heading** 42:24
100:21 105:6
212:24 213:8
260:4
**health** 2:11 6:15
9:20 37:19 39:15
40:3 62:19 136:4
148:9 159:8 192:7
305:7 366:24
**hear** 56:23 58:5,7
83:4 306:9 347:16
**heard** 64:23 70:6
88:1 92:22
**heiman** 2:5 9:16
**help** 187:13 250:3
349:5 367:10
**helped** 208:13
**helpful** 47:8
**hereof** 371:7
**heroin** 5:16,19,21
6:15 7:3 39:14
40:2 70:18 174:16
187:15 188:12,18
189:20 195:14,19

196:1,14,15
198:15 199:9,12
199:15,16,22
200:7,14 201:6
205:2,8,12 206:7
207:3,11 208:2,5
210:7,15 211:3,21
212:6,12,24 213:9
213:14,19 214:2
214:15,18,21
215:5,13,19 217:9
218:1,11,18 219:3
219:4,18 220:7,12
220:17 224:14,22
225:12,15 226:1,3
226:4,6,15,21
227:3,6,9,11,16,21
228:1,8,18 229:1,5
230:4,11 231:4,6,7
231:13,16,17,21
232:7,13,20,23
233:4,6,8,17,22
234:2,6,7,8,14,20
235:5 236:24
237:1,10,15,19,24
238:5,8,13 239:1,6
239:9,13,17,18,21
239:22,24 240:4
254:5 257:7 289:7
289:22 314:5,9,10
314:23 315:6,10
323:17 335:17,20
335:23 336:5,18
338:14 345:1,4,11
345:13 346:10
358:11
**hesitate** 29:19
**hess** 13:23
**hester** 3:3 4:3 9:10
9:10 10:7,9 14:2
16:14 17:8 23:7

23:16 24:6,14,17
28:9,13,19 29:2,4
29:12 31:11 39:8
39:12 43:14,24
44:5,11 49:6,12
51:3,8,22 52:1,21
52:24 53:4,17
54:1 55:7,19 56:3
56:15 57:8,16
58:10 60:8,9
63:18 64:8,18
65:12,14 67:18,19
70:5,6 71:6 72:19
72:20 75:20 77:8
77:16 78:1,14
79:19,24 80:15
81:1 84:15 87:1,2
91:9,16 92:13
93:15 97:12 98:19
99:1,4,16 101:9
120:17 121:3
128:19 151:15
152:1 156:6
161:22 162:5,23
163:2 166:20
216:1,6,10,13
220:23 221:8
223:16 245:7
271:6,16 277:22
278:5,9,12,16
281:17 282:1,4
301:5,17 303:10
369:19
**hester's** 60:4
69:12 82:1
**heterogeneous**
32:18,23
**heterogenous** 33:5
**high** 73:15 92:18
124:10 126:3
139:14,19 140:1,6

140:10,16 141:2,3
141:6,7,10,13,15
141:16,17,19,20
141:24 142:22,23
174:14 214:7,10
231:5 249:20,22
251:14 255:22
256:10
**higher** 145:3,7,12
145:13,22 155:15
157:9,10,19,20
158:12 182:1
211:4 214:1,3,4,5
214:8,15 217:9,10
217:15 226:15,17
226:21 228:8
237:14,19 249:14
250:17,19,21,22
250:23 251:3,6,12
251:17,20 252:9
252:16 263:19
270:12,23 288:17
288:24 291:10
313:12 316:2,6
320:12 321:1
328:8,15 329:6
331:4,6
**highest** 219:5
266:10
**highlighting** 156:8
**highly** 204:10,16
237:2
**historical** 290:9,14
**histories** 240:21
**history** 36:2
100:24 101:1
159:15 160:22
242:12,16 243:10
**hold** 51:19 57:3,8
79:21 84:1 353:20

**holistically** 164:1
**homes** 294:19
**hone** 89:6
**honest** 204:3
  340:9 367:23
**honesty** 282:3
**honor** 64:23 65:23
  68:23 70:5 71:4,5
  72:16,19 74:4
  75:20 76:24 77:24
  78:1,14 79:17,24
  80:24 84:12 87:1
  90:6 91:2 96:6
  98:19,20
**honor's** 67:21 85:8
**hope** 50:2,2 90:11
**hopefully** 67:12
**horse** 97:9
**hospitalized** 124:6
**hour** 15:9,17
  220:21
**hourly** 15:8 16:10
**hours** 16:10 18:4
  51:4 59:6 66:8
  90:9 94:24 304:18
  341:11
**house** 158:20
**household** 192:6
  265:6 266:5,17,19
  267:4,8
**households** 259:12
  265:21 266:1
**hudson** 2:6
**huh** 98:22 212:21
  247:19 336:21
**hundreds** 368:17
**hunt** 186:12
**huntington** 1:4
  8:15 20:10,14
  21:5 67:16 69:13
  71:9 72:7,12

82:18 89:11,14
93:13 95:21
112:14 113:2
116:8,13 125:14
125:17,22 126:4,7
128:8 131:24
132:2,6,17,23
140:17 142:17
144:9 166:23
167:7,16 168:9,14
168:17,21 170:5
170:24 171:24
173:13 178:7
179:2,8,24 180:12
180:20,24 186:12
187:10 208:6
211:8 239:8,12
241:20,24 242:3,7
242:15 243:1,14
246:1,6,14,18
248:16,24 249:13
249:19 250:3
252:9 282:10
294:4,14 295:7
297:23 299:12,16
300:9,15 324:7
359:23,24 366:24
372:6 373:3 374:3
**hypothesis** 357:23
358:4,5,6,12,14
**hypothesize**
358:10
**hypothetical**
86:16 186:11
187:13 361:8,9,19
364:4,13
**hypothetically**
362:1

# i

**iatrogenic** 6:3
  40:10,23 41:2,21
  41:22 209:15
  218:7 221:12
**icd** 334:22
**idea** 187:22
**identical** 54:10,21
  54:23 59:16,17
  62:4 69:9 81:4,9
  101:6 161:8
  178:19,24 182:3,3
**identification** 11:8
  13:10 21:24 39:18
  42:10 48:16
  100:15 103:22
  135:2 209:19
  210:10 218:14
  224:16 288:6
  289:10 325:22
**identified** 33:22
  113:16 172:16
  185:24 189:21,22
  290:16
**identifies** 186:18
  188:17
**identify** 114:24
  159:14 188:19
  249:18
**identifying** 37:21
  37:24 113:14
  114:8 223:14
  352:16
**ignore** 321:20
**ignores** 94:12
**ii** 2:15
**illegal** 112:17
  113:5,8 115:15
  155:16 156:1,7,18
  157:5 168:8 169:2
  170:6 171:21

172:6,12 173:9,11
173:11 174:24
187:5,9 202:10
253:23 254:1
**illegally** 112:1
  113:6 115:21
  116:12 166:23
  171:5 172:19,21
  202:2,6,16 204:1
  253:17,21
**illicit** 108:17
  111:17 159:15
  160:19,22 174:21
  177:11 187:5
  237:8 238:11,12
  238:17,18,19,23
  239:3 313:3 319:4
  319:9,20,22,24
  323:12 326:19
  327:21 332:17
  333:13 343:7
  347:12 352:21
  354:1,2 356:3,24
  357:4,7,13
**illicitly** 174:7,16
  174:20 175:2,4,9
  175:15,20 176:5
  176:17,24 177:20
  178:7,11,15 179:1
  179:3,9 180:6,18
  181:9,11,14,23
  241:6
**illustrate** 187:13
**imag** 181:9
**imagine** 82:9
  175:1 177:2 214:1
  220:2 251:13
  255:21 270:18
  285:8
**immediately**
  162:24 260:3

330:4
**impact**  69:4
**impeachment**  60:4
**implementation**
  229:3
**implications**  77:14
**implies**  313:17
  315:7
**important**  93:2,3
  93:11,11 304:6
  358:14 368:14,24
**imposed**  64:15
**improper**  96:12
  96:17
**inapplicable**
  162:14
**inappropriate**
  203:1 262:13
**inaudible**  313:19
**incidence**  36:20
  37:11 38:5 40:10
  40:23 41:2,10,12
  41:20 46:10,11,12
  46:15,16 85:12
  91:5,7 158:12
  160:15 166:5
  200:6,9 232:7
  244:15 251:21
**incidences**  35:11
**incident**  5:10
  37:16 48:12,20
  200:2
**include**  20:17 30:9
  35:14 36:6 37:3
  46:11 106:16,18
  112:11 141:21
  194:8 232:20
  243:7 245:15
  251:18 254:8,23
  255:7,24 257:12
  267:17 269:19

270:8 275:14
286:4,18,20 287:7
332:9 336:24
342:18 344:18,19
**included**  20:20
34:6 37:17 38:19
113:9 140:18
175:14 207:18,20
243:9 247:14
266:11,22 267:10
267:10 280:11
337:19 372:14
**includes**  34:9
38:16 65:18
108:16 124:24
125:2,3 165:12
234:5,5 243:6
271:24 272:14
275:14
**including**  18:23
62:12 194:16
195:7 229:23
231:4 250:5 254:4
255:10,24 279:23
289:20 352:2
**inclusion**  26:10,17
29:23 30:9,13,15
243:7
**inclusive**  34:9
112:23 113:4
166:2 357:3
**inconsistent**
359:13
**incorporated**
374:12
**incorrect**  322:23
327:9 332:12
**increase**  33:2,2,9
131:3,6 132:2,8
133:17 149:5
152:7,16,16

153:18 154:7
156:13 160:24
181:15 227:3,16
228:24 229:4
232:5 233:4
234:10 235:5
236:15 237:10,16
260:14 279:22
293:9 295:12,13
317:23 320:20
322:11,13,19
323:9
**increased**  5:16
131:8 132:23
133:24 134:9,13
134:18 176:15
178:14 218:1,11
218:18 219:3,18
219:24 220:13,18
227:9,22 231:4,14
231:16,19,20
232:7,20 233:5
234:6 237:24
288:20 291:9
292:6 314:24
323:4 326:20
327:3,13,17,18,19
365:1,5
**increases**  131:12
160:20 173:18,19
227:5 231:7
233:17 291:6
295:10
**increasing**  109:11
220:7 290:7
291:12,20 292:15
292:22 293:18
295:5
**independent**  140:9
**index**  4:1 5:1 6:1
7:1

**indicate**  122:24
221:22 252:16
269:24
**indicated**  100:23
121:22 286:17
370:4
**indicates**  27:12
213:18 265:3
284:13
**indicating**  372:14
**indications**  45:5,8
45:11,17,18
283:19 288:21
**indicator**  309:15
**indirect**  191:22
192:19,19,20
193:1,16 194:2
197:8,20 200:22
308:17 310:19
337:4
**indirectly**  169:16
183:5 184:2,16
191:24 194:3
196:22 309:7
310:15 333:24
345:20
**individual**  124:6
157:23 159:11
166:8 182:22
188:10 191:1
194:9 195:7
196:12 233:13
234:13 249:4,12
250:5 251:19
300:21 301:2
**individual's**
188:14
**individuals**  5:11
30:22 48:13,21
105:22 124:9
160:16 168:10

200:14 205:7
211:13,20 212:5
212:11 215:4
313:12
**industry** 147:13
147:16 292:8
**inequality** 165:2
**infer** 179:19
202:11 314:15
358:21
**inference** 179:10
179:11 184:16
**inferring** 215:2
**inflammatories**
284:20
**influenced** 147:15
**inform** 85:3 119:2
356:1
**informal** 133:11
177:3
**informally** 168:20
**information** 29:18
32:11 37:9 38:2
38:17 44:15 47:6
48:2 65:19 74:23
77:6 117:4,6
118:6,8 138:5,11
139:3,7,8 147:19
150:14,21,24
184:19 203:21
220:12 275:23
278:22 279:11
283:10 314:21
326:10 327:23
328:2 329:19
339:10 345:8
358:15
**informative**
352:19,23 356:4
**informed** 143:10
143:12

**ingested** 224:1
**initial** 85:4 222:14
**initiated** 199:17
199:22 213:19
226:3
**initiates** 213:18
219:2
**initiating** 5:16
218:2,12,18 219:5
219:18 220:7,13
220:17
**initiation** 5:21
200:7 210:7,14
211:3 213:1,2,9,10
213:14 214:2,18
214:21,22 217:8
**inject** 366:16
**injection** 209:6
214:14
**injury** 27:1
**inputs** 138:18
**inquire** 60:16 68:9
68:16,22 69:17
70:3,12 72:3 73:9
75:2 76:4 77:7,19
78:13 86:11,15,20
88:21,23 89:20
301:24 302:2,8
**inquired** 67:4,13
89:2,24 90:3,21
96:21
**inquiring** 74:24
301:10
**inquiry** 55:23 56:1
56:5 59:10 62:1,5
62:8 65:19 66:23
67:6 72:11 77:21
77:23 79:13,23
83:11,17,23 86:3
87:13 88:13 95:9
96:4,10,20 302:12

303:12 304:5
**insecurity** 250:6
**inside** 314:21
**insight** 52:17
**insofar** 275:18
**instance** 53:8 68:5
199:5
**instances** 66:10
69:8
**instant** 200:1
**institute** 225:7
**institutionalized**
265:5 270:8
**instruct** 14:18,19
**instructions** 154:9
**insufficient** 159:6
229:18 306:4,16
307:23
**insurance** 295:21
**insurers** 295:15,19
295:24
**intended** 136:16
302:13
**intent** 60:17
**interact** 160:14
187:22 233:18
234:16 251:24
252:5
**interacted** 189:16
193:11
**interest** 199:2
352:12
**interested** 9:3
318:12,19 352:9
352:15 356:8,21
371:14
**interesting** 13:13
**interfere** 8:8
**interference** 8:6
**interfering** 24:7
24:12

**interject** 161:5
**internet** 305:13,14
**interpose** 22:17
178:18 281:12
**interpreted**
267:19
**interpreting**
358:15
**interrelate** 166:4
**interrupt** 16:4
46:19 142:15
**interrupted** 332:7
332:10
**interviewed**
123:17
**introduced** 59:9
232:17
**introduction**
318:14 320:19
322:21 324:14
**invariably** 238:12
**investigate** 322:3
324:8
**investigative**
300:13
**invoiced** 18:10,12
**invoices** 16:9
**involve** 60:24
**involved** 195:12
202:1 203:17
204:21 284:10
297:13
**involves** 50:11
284:2
**involving** 43:16
70:18 279:16
**iqvia** 140:19
260:18
**ironic** 43:14,19
**issue** 55:16 63:1,3
102:2,5 167:19

298:20 307:3
308:5 354:21
**issues** 55:21 63:10
63:20 66:11,17,20
66:23 67:6,11,16
68:9 70:14,18
250:2 281:23
283:2 307:15
**items** 59:23

**j**

**j** 339:13 362:2
364:5
**jackson** 371:2
**jamison** 31:4,6
**jennifer** 164:12,13
**job** 53:2
**joint** 291:16
**journal** 103:15
**judge** 43:11 50:18
50:21 51:2 52:4
55:1 56:12,17
57:5,14,17,21 58:1
58:3,5,11 60:8
61:19 62:18 63:10
64:5 67:18 81:23
83:5 85:7 86:4,5,7
92:6,8 97:8,9 98:4
98:21,24 302:4
303:18
**judgment** 116:24
117:3,5,11,23
118:9,12,18 128:1
128:11,14 185:7
185:20 252:20
**judgments** 117:19
118:3,5 127:17
128:15,17,20,21
128:24 138:16,23
263:14
**july** 5:12 48:15

**jump** 82:5
**jurisdiction** 55:11
67:11 69:11 70:4
75:17 83:24 84:2
84:10 85:9 89:8
98:9
**jurisdictional**
66:20 67:11,16
96:10
**jurisdictionally**
71:22 72:18 83:12
88:12 89:18 90:24
98:8
**jurisdictions** 68:4
71:2 72:2 73:17
302:11 303:16
**justin** 3:9

**k**

**k** 10:3,3
**katherine** 1:19 5:3
6:18 8:13 11:6
13:7 51:16 59:3
99:14 151:23
166:18 221:6
271:14 305:2
307:11 369:10
370:1 371:5 372:9
373:4,9 374:4,13
375:20
**keep** 24:9,15,16
52:10 66:2 161:17
162:24 247:11,22
292:5 299:1,7
361:15
**keeping** 315:12
**kelly** 2:5
**kentucky** 164:14
**kessler** 2:15
**kevin** 22:3
**keyes** 1:19 5:4
6:18,21 8:13 10:8

11:5,6,8,13 13:6,8
13:10 14:4,6,13,22
15:7 16:18 17:9
18:19 21:19 22:1
22:7 23:9,20
24:18 28:11 29:3
29:6,15 39:13,18
39:22 40:4 42:4,8
42:10,12,15 43:15
44:12 46:1 48:10
48:16,23 49:8,16
49:19 51:8,16
53:7 54:22 59:4
60:10 61:11 93:24
99:14,17 100:9,15
100:17 101:15
103:17,22,24
134:23 135:3
151:23 152:2
163:3 166:18,21
204:24 209:13,19
210:5,10,17
216:14 218:10,14
218:19 221:6,9
223:17 224:12,17
231:24 271:14,17
279:15 288:2,7
289:5,11,20,24
294:3 297:2
299:10 300:18,19
301:7 302:1,13,14
303:13 305:2,6
307:11,14 325:19
325:23 340:1
342:14 369:10,12
369:20 370:1
371:5 372:9 373:4
373:9 374:4,13
375:20
**kids** 248:10

**kilkenny** 366:22
367:4,21,21 368:3
**killing** 364:16,17
**kind** 19:21 156:16
158:14,24 160:11
164:1 170:18
171:11 207:8
262:20 267:1
294:21 309:16
325:1
**kinds** 193:4 274:9
284:13
**knew** 204:18
331:4 340:16
356:17
**knock** 83:15
**know** 13:21 15:18
15:23 16:6 17:20
27:14 29:20,20
31:9,9,12 36:1
38:20,20 40:20
44:15 45:7,10,10
47:3,21 51:20
55:17 56:23 62:19
62:23 65:10 66:5
66:7,11 71:20
72:5 74:9,14 75:6
75:15 78:22 88:5
88:10,16 90:12
92:19 94:24 95:1
95:4,16,21 97:1,6
98:7,12 99:4
104:18 110:15
111:4 115:14
118:17 120:13
133:7,8 139:23
140:4,21 142:5,20
143:9 144:17
149:19 150:14,20
151:1,11,11
160:19 161:13,13

**[know - licensed]**  Page 31

161:22 164:7
165:24 168:10,20
170:13 171:12,14
171:16 172:18
173:3 175:1,23
178:10,14 179:7
179:15 180:22
187:20 188:13,15
190:4 195:17
196:4 198:6 201:5
202:4,5 203:3,12
203:16 204:3,6,19
204:21 208:16
210:22 214:6
219:8,21,24 225:5
225:9 228:15
230:14 233:7,8
235:20 237:12,18
239:7 245:4
247:16 248:13,15
250:4,7 252:1,15
253:8,19 255:2
257:17,23 261:11
261:24 262:6
264:14 269:22
270:15 276:4,13
281:2,4 288:11
294:18,21 295:19
301:19 303:17
304:15 306:9,15
310:10 314:8
316:23 319:16,19
320:4 325:3,5,10
328:11 332:23
341:1 343:4
344:14,16 345:6
345:10 349:20
351:2 364:9,24
365:4,7 368:12,22
**knowledge**  19:19
19:21 20:1,4,5,8

20:13,22 27:6,9,17
27:18 36:11 75:24
83:24 126:23
138:10 140:5
150:8 175:3 177:1
181:7 191:6
220:16 240:8
312:6 341:22
342:15
**knows**  341:20
**kolodny**  6:16
39:16 40:1

**l**

**l**  60:1,2
**labor**  145:20
**laced**  181:15,24
254:19 323:22
**laces**  196:1
**lacing**  195:14
**lack**  302:21
**laid**  82:8
**language**  46:8
69:8 113:12
141:20 162:9
**large**  66:18 84:20
215:16 248:18
**largely**  147:13
**larger**  239:22
**largest**  233:21
**lark**  227:12
**larney**  243:5,5,9
254:15 312:18,19
313:2,9 314:14
**lasting**  30:6
**late**  341:17
**law**  9:11 10:12
**law's**  88:5
**lawful**  167:17
177:11 178:1
**lawfully**  170:11,13
171:13 175:21

181:22
**laws**  299:22
**lawsuit**  84:3
**lay**  82:3 83:19,20
97:20 285:6
**lead**  87:6 94:5,7
145:7,15,22 233:5
353:12 366:5
**leading**  82:13
**leads**  105:1 145:13
153:23 173:20,24
194:18 231:20
232:6
**learning**  256:20
**leave**  17:1 52:7
110:7 111:3,21,23
112:4,20 114:7
115:6,9,17 116:4
119:17 177:9
294:10
**leaves**  293:13
**led**  108:12,21,24
132:2 152:18,19
152:19 158:6
230:2 262:6
**leeway**  74:13 78:2
84:7 95:2
**left**  42:23 56:18,18
109:17 110:23,24
111:13,18 114:3,4
123:6 137:16
178:1
**leftover**  110:15
**legal**  108:17
171:21 172:12
173:9 202:10
253:23 254:2
257:11 372:1
375:1
**legally**  172:19
202:17

**legitimate**  16:17
16:21,22,22 26:24
27:5,6,10,15,17,23
125:10 127:22,24
128:6,9 129:5
203:6 272:5,9,20
273:1,3,9,15 287:9
**legitimately**
241:12 272:12
**length**  34:4 43:9
161:10 162:17
**lethal**  313:16,21
314:5 315:5,14,18
315:21,23 316:9
**lethality**  313:3,7
314:1,13,19
**letter**  372:20
**level**  31:22 33:7
34:24 92:19
125:21 129:9
134:10,18 137:23
165:1,7,17 166:4
235:14 238:7
246:2,7 248:22,23
249:14,20,22
250:14,20 251:5
251:11,17,20
252:8 258:1,16
261:4 262:7 264:5
264:6 287:1,12
288:20,23
**levels**  31:18,19,21
32:2,6,8 47:21
48:6 50:12 94:7
120:4 137:21
144:18 145:12
148:20 235:2
249:9 250:11
260:2
**licensed**  19:2
158:18

**licenses** 296:12,19
**licit** 357:7
**licitly** 177:3,7,8,17
  181:10
**lieff** 2:5 9:15 10:12
  58:12
**life** 100:8 250:9
  291:1
**lifetime** 159:15,17
  200:7,7 255:16,19
  270:20,24
**light** 80:2
**lighting** 305:13,14
**limit** 22:20 58:23
  65:8 66:3 86:19
**limitation** 74:15
  302:9 368:8,22
**limitations** 64:16
  75:23 258:13
  368:14,19,21,24
**limited** 27:13
  66:12,13,16,19
  74:7,18,20 75:19
  76:22 86:23 92:12
  108:22
**limiting** 67:10
  111:22
**limits** 90:1
**line** 80:16,22
  161:9 174:12
  339:18 372:14
  374:7 375:3
**lines** 82:9 285:13
  302:12 303:12
  304:5 306:4
**lingo** 256:21
**linkage** 242:11,16
  242:22 243:1,9
**liquor** 158:11
**list** 12:11,22,24
  55:22 135:21

153:15 184:22
185:1 186:13,22
191:5 208:10,17
208:20,24 209:3,5
290:21 298:17
317:9 326:4
367:10,14
**listed** 13:1 184:14
184:19 185:21
187:21 188:1,5
190:5 191:24
193:19 203:24
290:23 298:10,13
298:19,22 327:24
345:13 374:7,17
**listing** 374:7
**lists** 185:17 187:15
188:24 191:11
**literature** 25:18
25:22 26:4,5,7
27:11 29:8 84:20
121:22 124:21
125:23 126:23
127:9,10 129:12
129:18 134:3,16
139:20,24 140:7
140:13,15,20
141:11 143:24
144:6,17,20,22,23
145:5,10,23 146:7
146:22 147:12
148:24 149:14,15
151:5 152:5 153:6
153:12 154:5,18
156:20,22 168:5
169:21 175:6
178:17 184:15,17
192:24 193:4
196:14 215:2,17
240:6,7,9,20
250:18 257:22

290:10,15 295:22
296:8,14,22
297:24 300:1,3
306:16,19 308:7
322:5 336:14
**litigation** 11:17,23
15:19,20 16:1,11
16:19 17:11,22,23
18:5,15,22 23:10
49:15,17 60:11,13
60:15,17,19,23
61:2,4,16,18 64:11
64:13,21 76:3
77:20 78:21 86:2
205:16,16,23,24
303:16,23 355:18
**litigations** 205:20
**little** 29:13 54:7
55:14,15 64:3
67:5 70:7,7 79:1
89:7 108:6 149:8
157:7 182:7
203:11 206:16
245:15 255:24
261:6 306:10
314:11 321:16
326:22 345:24
361:15,23
**live** 75:11
**living** 212:22
248:5
**lobbying** 292:12
**local** 165:11
168:17 298:4,8
**located** 1:21
**logan** 2:20
**logic** 13:19 311:9
313:14,20 347:24
351:23 353:10,12
**long** 40:11,24 41:3
47:3 176:17

178:10 324:13
**longer** 30:6,10
248:5
**longitudinal** 207:7
**longstanding**
236:20
**look** 28:5 30:17
32:12 39:4 40:7
42:22 47:12 48:5
50:6,15 71:12
100:3,20 103:9
104:22 107:10
109:8 113:19
136:7 139:11
140:3 142:3 155:5
163:3 164:23
167:22 183:3
184:9,12 193:3
198:18 208:4
209:11 212:14
217:21 221:9,15
221:19 222:21
224:9 225:1 228:6
235:18 236:1,3
241:17 244:1
248:21,23 249:11
250:13 252:14
253:14 258:22
259:11,18,22,23
263:19 264:6,24
267:22 268:18
269:18 279:20
287:16 289:3
290:3 298:1 317:9
319:13 320:5
324:23 325:8
339:19 345:5
348:11 357:9
360:18 364:22
367:19 368:16,23

**looked**   142:22
  184:11 207:2,23
  216:17 223:2
  227:20,21,24
  230:12,12,18
  239:23 240:4
  246:23 264:12
  283:1 288:23
  354:10
**looking**   21:15 36:5
  46:1 75:17 135:20
  156:22 182:20
  200:6 201:8,11,12
  201:13,24 208:20
  212:16 217:5
  223:15 244:18
  260:20 263:23
  266:13 271:1
  300:17 341:24
  367:12
**losing**   64:2
**lost**   17:13 335:6
**lot**   44:19 98:6
  124:22 160:22
  196:13 215:10
  226:24 248:10,10
  250:2,8 303:1
  309:11 310:8
  340:12,17 360:8
  367:23
**lots**   198:7,8
**low**   225:15 226:6
**lower**   200:18
  266:2 328:8
**lucky**   212:18
**lunch**   161:21
  166:14
**lung**   198:6,7
**lying**   294:11

**m**

**macro**   165:1,7
  166:8
**madam**   372:10
**mail**   28:15 340:20
**mailing**   341:13
**main**   98:17
**maintain**   181:8
  249:23 250:4
**maintaining**   88:24
  89:1
**majestro**   2:8 9:22
**major**   231:6
**majority**   62:11
  66:17 85:1 179:16
  179:19,22 180:11
  202:20 203:2
  223:24 226:1
  228:24 239:5
  253:24 275:2
**making**   94:1
  107:20,24 117:10
  117:19 118:9,18
  128:21,24 129:4
  131:20 148:22
  157:8 235:10
  252:20 253:7
  280:6
**management**
  126:19
**managers**   296:5
**managing**   43:3
  81:14
**maneuver**   79:1
**manipulation**
  348:13
**manner**   82:11,16
  82:18 352:18
**manufacture**
  175:12

**manufactured**
  174:7,16,20 175:2
  175:4,7,10,15,20
  175:21 176:5,18
  176:24 177:4,7,8
  177:18,20 178:8
  178:11,16 179:4,9
  180:6,19 181:9,10
  181:11,14,22,23
  204:1 241:6,12
**manufacturer**
  276:24
**manufacturers**
  19:12 274:18
  275:6,20 276:18
  277:6,11,16
  278:18 280:7,16
  280:18,21 281:3,5
  283:12,17 284:4,7
  284:11
**manufacturing**
  174:21,23 275:3
**map**   88:11
**mar**   5:3
**marijuana**   257:7
**mark**   48:19
**marked**   11:7 13:9
  14:12 21:24 39:17
  42:9 48:15 100:14
  103:21 135:2
  209:18 210:9
  218:13 224:16
  288:6 289:10
  325:22
**market**   20:5 21:4
  21:8 196:13
  227:17 231:4,13
  231:16 232:18
  237:1 282:19,20
**marketing**   274:8,9
  274:15,22 275:15

**276:5,7 277:1,2**
  279:3,18,24 280:5
  280:6,9,9,12,14,17
  280:19,21,24
  281:1,2,4,6,7,8,23
  282:5,9,14,15
  283:2 284:1,6,9,14
**marketplace**
  106:7 108:17
  111:17 178:7
  237:8
**markets**   155:16
  156:2,7,18 157:5
  168:17
**martins**   7:4 289:9
  289:20
**maryland**   240:9
**master**   58:6 62:15
  64:2,24 65:20,24
  68:15 71:18 72:17
  74:5 77:4,15,17
  78:10 79:21 83:7
  86:9 87:24 90:11
  91:19 92:2,7
  94:17 96:24 98:5
  98:22 161:17,24
  281:16 302:20
**master's**   303:6
**material**   60:6 62:6
  69:1 94:15 148:13
  281:5 282:12
  284:13 295:18
  326:5 339:4
**materially**   357:18
**materials**   12:9,11
  12:11,14,16,20,21
  12:24 13:2 85:15
  148:19 208:24
  209:5 247:14
  281:9 282:24
  283:7,21,24 284:3

284:5,11 367:14
**mathematical**
345:6 346:2
**matter**  8:14 15:8
56:21 74:11 94:24
281:13 303:2
340:2,5 352:11
353:20 354:21,22
**matters**  16:1
53:12 324:17
**mccabe**  6:9 100:5
100:14 223:4
**mckesson**  3:2 9:11
60:9 67:19 72:20
**mclellan**  5:8
103:13,20
**mcnabb**  2:5
**mdl**  58:13 59:5
66:19 67:14 74:9
**mean**  12:8 18:8
21:2 23:8 29:19
29:21 32:22 33:6
35:1,14,18,24
36:12 43:17 44:21
46:9,18,18,19 50:6
53:21 55:8 62:9
75:20 78:24 93:21
102:2 103:7
105:17,20 106:3,9
106:14,24 125:7
129:3 133:13
139:18 140:1
142:4,15 147:5
152:14 157:16,20
157:22 159:3
167:4,5,11 169:14
169:18 171:10
172:11 175:16,18
177:2,8,13,14
196:13 204:5
211:2 212:4 214:6

216:12 226:22
233:7 244:15
246:8 249:21
252:3 256:20
257:9 261:6,16
268:11 281:19
283:8 285:17
291:23 293:4
308:24 315:22
319:4,7 322:8,10
327:7 330:8 344:7
350:9 354:16
358:4,9 360:8
**meaning**  69:4,14
154:19 170:16
363:16
**meaningful**  143:1
286:24
**means**  33:1 34:18
41:21,22 46:23
105:24,24 109:16
175:10 244:15,17
256:22 266:6
292:3 293:5
339:15 358:4
**meant**  35:2 45:4
136:9 137:9 180:4
308:6 336:17
350:11
**measure**  41:10
197:4 200:9,11
239:14
**measured**  34:8
238:4 332:17
**measurement**
217:2 271:2,2
**measures**  41:2
46:16
**measuring**  33:14
33:21 35:11 36:21
37:1,11 200:1,2,5

254:3
**mechanics**  11:11
52:2 334:3
**media**  8:12 51:15
99:13 151:22
166:17 221:5
271:13 305:1
307:10 369:9
370:2
**medical**  19:8
26:20,24 27:5,7,10
27:18,23 35:23
43:2 81:12 100:23
101:1 107:8,15
108:4,17 109:1
116:22,24 117:8
117:10,19,23
121:9,15 124:23
125:5,7,10 127:2,4
127:8,11,22,23,24
128:1,6,10 129:9
129:12,16,17,19
139:5,8 147:9,15
149:14 172:1,3
180:1 182:11,12
185:8,16 186:18
186:22 187:16
188:16,18,24
190:23 191:3
202:23 203:8
215:11,17 265:4
268:21 272:9
286:9,14,22,22
290:24 293:6,22
295:14
**medically**  121:24
124:23 127:18
128:22 129:5
137:12 253:21
272:12

**medicare**  286:6
**medicating**  42:24
**medication**  123:1
124:13 133:12,13
138:20 152:24
173:6 235:22
284:21,22 293:7
**medications**
110:14 293:13
**medicine**  103:16
110:16,18,22
294:11 296:11
**medicines**  138:17
138:24
**meet**  34:23 120:4
**meetings**  299:19
**meets**  371:15
**members**  114:18
114:23 124:4
**memory**  169:21
339:23
**mental**  266:6,15
**mention**  16:5
71:13 308:19
**mentioned**  48:8
62:13 93:22 133:7
144:3 230:10
251:18 282:13
354:10
**mere**  62:8
**merit**  1:21
**message**  52:7
56:18
**met**  299:17 305:8
**meta**  243:6
**methadone**  314:24
**methamphetamine**
258:3,18
**methamphetami...**
257:20

**method** 315:18
**methodologies**
184:7 259:16
**methodology**
122:11 183:23
185:20 190:6
192:3,12,18
196:17,21 197:2,7
201:2 250:24
259:17 266:23
267:6 309:13,21
311:8 312:19
315:20 316:9
320:18 321:3,3,5
321:19 322:17
332:5,12,13,24
334:7 338:9
345:16
**methods** 332:14
366:2
**metric** 291:17,24
327:2,16
**metz** 2:12 4:4 9:19
9:19 301:15
304:10,11,19
305:5,7 307:13
341:8,18 342:8,13
369:12,18
**michael** 366:22
**micro** 165:16
**microphone** 51:20
**microphones** 8:4,8
**mid** 100:8
**middle** 30:20
113:24 155:13
163:5,6,12,15
242:9,10 285:12
**midlife** 6:8 100:13
**midst** 73:4,12 76:9
80:10

**midwest** 372:17
375:1
**million** 104:7
**mills** 141:15
**mind** 41:14 45:18
53:19 62:24 66:2
68:14 116:6
131:11 135:14
136:2 145:24
146:1 149:3 173:1
206:3,11 240:11
240:15 262:17
357:23 368:20
**mindful** 66:14
**mine** 53:3
**minority** 172:22
173:1 179:13
180:5 202:11
**minus** 339:14
**minute** 13:22
29:15 39:9 42:3
99:6 134:19 136:8
209:2 220:22
336:16 361:13
363:1
**minutes** 29:11
52:20 59:8 271:7
304:13,18 363:2
**mischaracterizat...**
129:6
**mischaracterize**
287:22
**mischaracterizing**
278:7
**misconceptions**
5:7 103:14,19
**misleading** 79:18
117:6 118:6 278:4
278:8
**missed** 338:12

**misstates** 216:21
276:19
**misunderstood**
330:18 350:6
**misuse** 5:13 21:20
22:4 33:16,22,24
34:7,8,17 35:6
36:6,7 38:6,12,22
39:1 71:10 85:13
94:6 106:12,17,19
108:8,12,21,24
152:19 153:8,23
158:3,6 164:21
165:14,21 173:21
202:21 203:2,5,10
215:8 240:18
241:2 250:20,22
251:5,8,11,17,20
251:23 257:8
271:24 272:4,8,13
272:15,20,22,22
272:24 273:11
286:5 287:8
293:14
**misused** 253:17
254:24
**misusers** 173:21
286:4
**misusing** 34:20
273:4,7,9,14
**mitigation** 5:7
103:15,19
**mix** 186:4 239:21
357:7
**mixed** 188:12
207:8 239:6
**mme** 263:20
264:11,12,14,18
264:22
**modal** 110:13

**modeling** 309:12
**models** 259:15
**moderate** 34:13
35:4,15,18
**molly** 2:19 9:17
**moment** 29:1 31:2
56:22,24 58:17
326:2 362:21
368:23
**monetary** 275:1
**money** 156:4
**monitoring** 230:1
262:19,22 300:6
**montana** 94:9
**month** 267:13
268:2,16 270:19
271:3
**months** 30:6,10
81:19,19
**moot** 354:3
**morbidity** 109:11
165:20
**morning** 8:2 10:8
28:24 58:13
**mortality** 109:11
284:17 285:9,15
285:19 287:6,7
288:9,12,14,16,24
313:1 322:11
323:4 328:5
**motion** 58:22
**mouth** 82:1
**move** 29:11 90:23
215:24 304:9
346:24
**moving** 71:19,21
72:9
**mr.arbitblit** 96:5
**muhuri** 5:22 210:8
210:13 211:24
212:3,14 215:3,18

215:22 216:16 217:4,13
**muhuri's** 215:14
**multi** 158:22 159:1,3 160:2 161:11,20 194:5,7 262:9,11
**multiple** 119:7 124:10 159:8 185:10,13 189:8 190:17,18,20 330:22 333:6 335:16 338:17 355:11
**multiplied** 315:4
**multiplier** 314:6 316:1,7,18,18 317:4,7 318:19,23 321:18 322:10,20 324:14,15 326:9 326:18 327:10 330:3,9 331:8,15
**multitude** 279:23
**mute** 80:20
**muted** 80:14
**mutually** 338:7,11

**n**

**n** 8:1 10:3 60:2
**n.w.** 2:13
**naive** 221:24
**name** 8:21 10:8 164:15 305:6 372:6 373:4,15 374:4,21
**names** 298:10,11
**narrow** 67:12
**national** 85:2 89:12 93:8 167:20 184:20 192:6 225:6

**nationally** 227:6 228:4 244:12
**nationwide** 70:1,2 144:24
**nature** 145:8 330:18 333:13
**necessarily** 35:20 109:19 114:5 119:13,16 123:19 124:1 130:13 154:22
**necessary** 82:14 82:24 87:19 160:7 160:18 187:3,23 188:2 193:10 194:12,18,20,22 195:3 197:14,22 234:18
**need** 13:15 23:7 24:10 29:10 39:7 39:10 63:10 66:1 66:1 68:8 70:11 78:2,2,24 79:9,15 80:20 82:7 87:15 89:23 92:9,10 99:2 127:2,22,24 128:1,6,10 129:9 129:17,19 139:22 140:3 145:23 147:8 161:5 233:9 234:7 266:23 281:11 293:6 312:24 314:18 324:23 327:22 328:10 333:17 340:13 341:2 345:5 360:18 361:5 362:24 364:22 368:16
**needed** 14:24 120:4,14,15

121:11,24 122:4,6 124:23 125:18,21 126:7 127:18 128:12,15,22 130:2,11
**needs** 78:7 82:3 85:8 90:15 125:5 125:8,10 127:4,8 127:11 144:9,15 145:3,7,13,22 298:5,22
**neighborhood** 326:21
**neither** 16:9 371:11
**network** 177:10
**networks** 133:11 177:3,19 179:18
**neurobiological** 165:18
**never** 112:4 198:8
**new** 2:7 10:13 12:10 15:20 23:9 24:3 34:4 43:9 49:3,4,6,10,11,13 53:8,19,21,22 54:3 54:7,20,21 55:9,9 55:10,12 59:5,19 59:22,24 60:11,12 60:18 61:2,14,17 61:23 62:6,9 65:13 68:7,12 69:5,10 70:10,22 73:2,8,13 74:24 75:7 76:11,11,20 77:11 78:18,21 79:14,16 87:14 91:12 96:20 103:15 161:9 178:19 205:16,23 224:10,11 281:23

297:20
**nexus** 281:14
**nicotine** 255:7,11 256:1,11,17
**nida** 135:23
**night** 14:1
**nmpr** 213:1,10,18 213:20 214:21
**nmupo** 100:24 101:2 223:23
**nodded** 146:2 350:17
**non** 101:6 107:15 265:4,5 268:21 291:1 314:24
**noncancer** 5:11 26:9,16,21 29:24 33:15 38:10 46:3 47:1,4,11,23 48:14 48:22
**noncounterfeit** 181:5 204:7
**nonhouseholds** 266:21
**noninstitutionali...** 266:1,5,17 267:24 270:5,7
**nonmedial** 5:18 224:13
**nonmedical** 5:20 6:7,20 7:3 35:23 42:6,17 100:6,10 107:21 108:1 109:1 113:23 123:16 131:2 133:16 155:18 163:9,19,22 164:5 167:24 199:10 200:8 202:24 203:8 206:21 210:6,14 214:19

215:11,15,19
223:5 224:21
225:14 226:5
228:19 230:10
242:12,17 243:2
243:10 265:11,13
265:22 267:14,16
268:1,8,16 269:8
270:2 286:10,23
287:1 289:7,22
293:15
**nonmedically**
  167:21 169:22,23
  180:16 226:3
  286:15,19,21
  287:4 294:20
**nonmedicine**
  267:19
**nonprescription**
  192:8,9,11
**nonreliable**  319:1
**nonsteroidal**
  284:20
**nora**  103:13
**nos**  8:18
**notarized**  372:15
**notary**  371:4
  372:24 373:10,18
  374:15,23 375:23
**note**  8:4 63:13
  223:11 260:12
  372:13
**noted**  9:24 229:17
  305:20 334:5
  336:6
**notes**  247:11,14,16
  299:1,3 300:17
  371:9
**notice**  1:20 13:14
  63:20 65:3,10
  73:11 74:6

**noticed**  212:16
**noticing**  9:9
**novo**  139:9
**nsaid**  285:10,16,21
  286:20 287:3,13
  287:15 288:9,17
  288:24
**nsaids**  284:17,19
  285:1,6 287:1
**nsduh**  192:6 199:9
  199:11,14,15
  201:5 265:12,13
  265:24 266:22
  267:18 269:11,12
  269:13,24 270:8
**nuance**  44:19
**nuanced**  80:1
**nuisance**  68:20
**number**  16:10
  37:18,18 41:11
  56:19 66:2,13,14
  68:1 89:10 106:11
  126:16 127:12
  140:2 173:1
  181:20 190:11
  194:16 199:20
  203:20 207:19
  211:13 214:14
  229:23 234:1
  235:18 241:20
  254:17 256:13
  258:3 261:20
  262:13 270:12
  286:20 311:24
  313:16 314:15
  315:6,13 316:6,23
  321:21,22 322:13
  324:24 325:17
  328:8 329:3
  330:14 331:12
  332:17,20 333:16

347:12,21 349:12
351:6 352:6,8,8,16
353:17 354:4
357:16,21,24
358:1 360:2
361:24 366:15
368:8,18 370:1
372:8,14
**numbered**  367:16
**numbering**  13:20
**numbers**  25:6,7,10
  25:11,16 40:22
  183:10 200:18,21
  212:17,19,20
  223:13,18 246:10
  258:6 260:21
  261:14,16 264:10
  311:13,17 312:2,3
  349:23 367:11
  374:7
**numerous**  119:6
**nw**  3:6
**ny**  2:7

**o**

**o**  8:1 60:1
**o'clock**  307:6
**oath**  9:2 53:13
**obesity**  145:12,19
**object**  23:5 45:9
  102:17,23 132:4
  178:24 225:21
  278:14 287:11
  301:13 339:17
**objected**  78:19
  303:4
**objecting**  62:8
  178:20
**objection**  20:24
  22:18 27:3,20
  28:1 33:13,17
  34:3,22 36:9,24

37:8,15 38:7,14
39:2 43:6 44:23
45:19 46:13,22
47:5,24 49:2 55:3
55:8 56:12 101:5
101:19,24 105:16
106:2,13 111:15
111:20 117:2,14
117:21 118:14
119:15 120:5
125:11 126:8,20
127:19 128:3,13
128:23 129:10,21
130:7,17 133:19
134:11 136:12,19
137:19 138:9,19
140:12 141:22
142:2,6,18 143:8
143:14 144:11
147:4,10,22 149:7
151:4,8 152:22
153:10 154:2,21
155:1 156:23
157:12 159:23
161:2 167:1
169:19 173:23
178:19 180:3,14
182:16,23 186:7
186:10,24 187:19
188:7 189:23
190:13 191:2
192:16 194:24
195:10 196:20
197:6,13 200:24
202:22 203:7
215:9,20 216:20
217:14 219:20
226:13 228:14
229:11 234:4
235:3,16 237:17
241:15 257:4

262:3 263:17
272:11 273:2
274:5 276:19
277:10,19 278:2,9
278:11 279:1
281:12,15 283:4
286:11 294:15
295:8,17 302:7
303:24 304:2
317:2 318:9
319:11 321:7,24
322:15 323:6
328:20 329:10
330:21 331:17
332:22 333:19
342:23 343:15
344:3 346:5,12,18
349:17 350:5
356:13 358:2,17
359:1,4,10 363:23
**objectionable**
98:14
**objections**  9:7
50:22 277:23
**observation**  157:8
165:6
**observed**  290:8
316:4
**obstructionist**
17:5 338:24
**obtain**  119:4,11,22
167:20,24 169:23
169:24 170:1,18
293:7
**obtained**  108:16
113:6 123:17
169:12,15,16,17
171:13,15
**obtaining**  110:14
**obtains**  110:21

**obvious**  244:23
305:15
**obviously**  73:1
**occasions**  176:1
185:16
**occur**  116:3
187:23 188:2,5
193:11 225:15
226:6
**occurred**  54:4
107:16 108:2
114:9 131:3
133:16,22,23
134:8,12,17
189:10 190:15,21
190:24 276:13
280:9 283:20
314:16
**occurring**  74:21
112:13 113:2
116:8 274:23
279:4 329:3
**occurs**  113:9
156:11 188:9
282:21 324:5
**october**  371:17
**odds**  101:2
**odud**  101:2
**offer**  55:10 111:9
112:16 113:7
115:2 279:5
308:24 362:9
**offered**  76:8,17
362:7
**offering**  112:8,19
117:24 118:1
120:12,23 342:2
365:21
**offers**  113:3
**office**  52:9 305:12

**offices**  10:12
**official**  373:15
374:21
**officials**  247:10
298:4,8
**oftentimes**  74:18
118:5
**oh**  13:16 14:2 31:6
39:8 45:16 148:7
155:8 163:16
165:5 193:18
212:20 242:23
251:8 270:22
277:15,22 289:14
299:17 336:8
**ohio**  15:19 60:13
61:18 68:8,12
69:5,10 70:10,22
73:3 76:11 77:12
79:14 87:14 91:13
94:9 205:16,23
281:23 372:2
**okay**  11:2 13:18
13:21 14:8 17:15
17:18 18:13 29:2
29:12 37:11 39:12
50:20,21 51:3
52:3,18,24 55:22
56:10 57:18,24
62:15 65:20,24
92:2,7 99:7,8
100:3 102:9
104:22 105:7
106:5,10 107:13
121:2 124:11
126:18 136:7
139:18 144:5
151:14 166:10
182:19 183:13
193:21 195:2
199:3,11 201:20

201:22 207:6
208:12 209:8,11
209:23 212:8
213:7 217:16
218:9 224:18
235:24 236:2
242:5 244:10
245:18 246:21
256:20 257:14
266:9,12 271:1,6
271:20 275:16
277:22 289:16
298:12 299:7
301:4 304:10,19
306:2 309:18
310:22 311:12
313:6,20 315:2,12
316:5,13 319:2
322:6 325:2,16
326:17 327:1,23
328:11,22 330:2,7
333:4,22 335:3,3
335:15,22 336:15
339:3,6 341:8
342:8 343:11,17
344:12,17,20
345:8 346:24
347:9 348:17
349:5,14,19
350:18 351:5,11
353:16 355:23
358:20 360:19
361:17 363:8,11
363:18 365:4
366:21 367:3,6,16
368:2,10 369:2
**old**  40:20 43:7,8
49:5 59:19 60:18
65:13 81:18,22
88:1

older   6:12 288:4
omitted   121:16
once   71:14 95:11
  95:11 106:1
  114:19,23 177:6,8
  177:14,14 223:12
  227:15
ones   28:9,11 130:5
  200:21 206:11
  210:24 241:1
  251:18 273:15
  277:7,12,13,20
  284:10 289:12
  290:21 298:13,21
ongoing   248:7
onwards   349:11
ooo   370:8
op   184:12
open   10:24 11:2
  11:10 13:5 14:8
  217:24 218:3
  275:24 276:23
  325:16
opened   134:22
  217:23 222:24
opens   66:23
operations   20:9,14
  20:22 21:2
operator   8:2 9:23
  51:10,15 57:18,24
  99:9,13 151:17,22
  166:12,17 221:1,5
  271:9,13 304:16
  304:21 305:1
  307:5,10 369:5,9
  369:22
opiate   181:7
  326:19
opined   75:7
opines   84:1

opinion   67:2,6
  68:18 69:3,19
  71:24 75:5,12
  76:2,7,17,23 77:9
  79:3 82:10,12,15
  84:1 85:20 87:4
  88:21,22,24 89:2
  89:12 90:1,22
  91:10 92:20,24
  93:16 97:3,22
  105:4 108:6,7
  111:10,22 112:8
  112:16,23 114:12
  115:2 117:23
  118:1 119:3
  120:12,24 121:21
  130:9 149:16,18
  150:13 170:23
  172:21 179:12
  181:2 205:1
  207:10 217:20
  226:22 227:11
  249:17 250:1
  256:1 279:5 351:9
  357:17 365:22
opinions   11:19,22
  12:7,15,17 13:3
  20:12,16,17,20,23
  49:16 55:10 60:16
  60:22,24 61:15,23
  64:12 68:1,6,9,11
  70:13 71:23 76:1
  77:8 83:16 85:3,5
  85:18 91:1 97:17
  97:20 98:3 101:8
  112:19 113:7
  146:7 148:15
  149:1,3 151:7,10
  204:16 205:15,18
  208:14 300:20,23
  365:21

opioid   5:7,9,10,13
  5:16,18 6:3,4,14
  6:20 7:2,4 15:19
  15:24 16:11,18
  21:7,20 22:4 26:1
  27:24 31:22 32:17
  33:4 34:10,13,23
  35:4,15,18 36:2,22
  36:22 37:1,4,12,22
  37:24 38:5,9,23
  39:14 40:2,10,23
  41:2,21,22,22 42:7
  42:17 43:2 44:21
  45:1 46:5,7,24
  48:11,12,20,20
  61:22 69:12 81:12
  85:13 94:6,8
  103:13,18 104:4,8
  105:1,9,10,14,21
  106:15,16,18,22
  107:1,4,16 108:2,8
  109:11 110:14
  112:15 123:16
  124:4 125:24
  126:12,22 129:7
  131:14 132:22
  133:22 134:5,8,16
  146:13 149:1
  152:6,7,11,17
  153:3,8,17,18
  154:7,8 156:4,13
  160:7,18 163:9,19
  163:23 164:17,20
  165:14,21 176:5,7
  176:9 177:15,18
  180:22 181:11,14
  181:20 182:9
  184:13 186:5,19
  188:9,24 189:2,10
  189:15,18 190:3,5
  192:8,9,10,11,11

192:14 193:3
194:13,17,20,21
194:22 195:1,3
197:15,18,18,20
197:21 198:3,9,14
199:6,10,17 200:8
200:15 201:3,17
201:19 202:16,24
203:24 204:2,4,12
205:12 206:7,21
208:1,5 209:15,17
215:12 218:2,7,12
218:18 219:1,5,18
220:7,13,17
221:12,23 222:3
222:15 224:14,22
226:24 227:14
229:1 230:2,3,11
230:23,24 232:16
234:16,17,18
235:1 236:21,22
236:23 237:2
240:13,18 241:2
241:12 242:12
243:10,11 244:11
244:19,24 245:10
248:2 249:24,24
250:14,20,22,23
251:3,5,8,11,17,22
251:23,24 252:5,8
253:16,24 254:4,5
254:9,14,15,23
259:15 260:4
267:19,20 268:22
269:8 270:2
271:23 274:22
275:2,13 276:5
279:3,22 280:1,10
280:15 285:16,19
286:3,4,4,18,20
287:6,8 289:6,8,21

289:23 290:7,17
291:6,10,13,20
292:8,13,16,22
293:2,10,19 294:3
294:9,13,22 295:6
296:15 300:1
306:19,20 309:11
309:22 320:22
322:17,18 323:22
325:13 327:8,21
334:5 335:8,12
336:7 337:20,22
337:23 343:8
346:7 347:8 349:9
351:18 352:4
353:1 354:11
356:18 357:1
358:11 361:17
362:4 363:11
**opioids**   5:5 6:7,17
13:7 18:24 19:3,9
19:12,16 20:18
21:11 26:15,20,20
26:23 27:5,7,10,13
27:18 29:17 30:10
30:14,23 33:16,24
34:17,20 35:6,17
35:19 36:7 37:5
37:13 38:6 45:6
45:14,21 46:3
47:4,14 50:12
68:5,6 70:1,17
78:17 81:6 82:11
82:16 89:10 91:6
94:5 100:6,11
101:2 105:23
106:1,4,9,11,12,14
107:8,18,21,22
108:3,16 109:13
110:3,8,9,17,20
111:17,23,23

112:1,18 113:4,5
113:22 115:5,8
116:23 117:11,20
118:4 119:23
120:3 121:8,23
122:4,5,24 123:6,6
123:17,22 124:9
124:22 125:6,10
125:13,14,16,21
127:3,5,8,11,13,16
128:8 129:13,19
130:1,10 131:2
132:3,6,16 133:3,9
133:14,17 134:1
134:24 135:7
137:15,21 138:13
139:17 140:2
142:20 143:2,7,13
143:19 146:20
148:5,16,21
149:12 150:2,5,16
150:23 151:3
153:24 154:8
155:15,19 157:5,9
157:10,17,20,23
158:3,4 159:21
160:8,21,23 164:5
166:6,22 167:6,8
167:15,20,24
168:9,13 169:1,9
169:12,22,23,24
170:4,10,15 171:3
171:24 172:13
173:13,16 174:3,7
174:15,16,20,22
175:2,5,7,15,18,20
175:22 176:18
177:1,4,7,9,12,20
178:8,11,16 179:4
179:8,17,19,23
180:5,7,11,17,19

180:23 181:9,12
181:21 183:6,24
184:2 185:21,23
188:1,23 189:8,11
189:21 191:11,13
192:1 193:2,8,10
193:12 194:1,15
198:10,11,13
199:7,18,22,23
200:16 202:2,7,21
203:4,14,18 204:5
204:7,8,13,20
205:1,8 207:3,11
211:20 212:12
215:5 219:23
223:5 224:1
225:13 226:2,5,23
227:13 228:19
229:4 232:1,6,11
232:17 233:11,19
235:5,8,14 236:7
241:6,7 242:13,17
243:3,11 249:22
252:2,14,21
253:10,23 254:2,2
254:12,24 257:8
260:2 261:21
262:15 263:9
264:19 265:5
267:17,21 272:1,4
272:5,9,16 273:8
273:20 279:10
282:20 283:11
284:9,18 286:7
287:4 290:24
292:7 293:6
294:17,18,23
295:5,15 296:1,3,7
296:20 300:10
309:7 310:16
314:24 322:12

323:8 324:1,24
325:11 334:1
335:12 336:11
338:13 343:10
345:21 346:14,23
346:23 347:22
348:22 349:10
351:8,15 352:7,10
353:18 354:1
356:17 357:6,11
360:13
**opportunities**
155:16 157:4
158:3
**opportunity**   23:1
24:4 59:14 63:5
73:22 75:13 77:7
78:13 84:9 86:20
**opposed**   85:20
91:12 350:19
**opposing**   86:6
**opposite**   87:19
351:3
**oprs**   40:11,24 41:3
**order**   63:3 67:10
74:7 79:10 80:6
82:24,24 85:7
128:7 146:7 293:6
300:6 313:2
315:19 336:11
345:3 347:20
348:3 364:23
**orders**   300:8
**organizations**
168:12,15,19,20
294:5
**original**   355:23
**originally**   108:3
121:9,14
**originated**   114:11

**oud** 70:2 71:10
91:7 119:4,11
159:22 160:10,15
166:5 211:7,14
241:20 242:7,15
243:2,8,8,14
245:18,24 246:5
246:14 248:5,8,17
248:22 249:5,9,14
249:20,22 250:11
251:14,20 311:19
312:8,21 313:12
313:22 314:8,14
315:16 316:19
320:6,7,15 324:7
329:2 331:6
332:19 333:15
**outcome** 9:3 18:15
18:17 159:7
190:15,21,24
199:1 269:2
**outcomes** 32:18,23
33:1 159:8 270:19
**outlets** 158:19
**outlined** 201:10
**outmigration**
155:14
**outreach** 275:10
275:14 276:15
278:18 279:16
**outreaches** 276:11
**outside** 267:4
272:14,16 273:12
**overall** 16:11 47:1
66:2 85:20 108:18
112:16 113:4
120:13 127:16
142:19 144:18
265:7 320:20,23
350:24 354:7,11
364:21

**overbroad** 54:7
**overdose** 6:10
124:6 188:9
194:21 197:23,24
198:9,14 199:6
204:12 236:6,7,16
237:3 248:6
252:15 313:11,16
314:2,8,16,23
315:23 316:2
317:23 319:19
320:12,15,24
322:11,18,19
323:9 325:20
326:19 327:8,21
332:2 337:20
343:8 347:3
364:20,21 365:10
**overdosed** 324:4
335:19
**overdoses** 183:5
198:16 337:22
**overdosing** 198:2
**overestimate**
309:16
**overestimating**
310:11
**overlap** 35:22
202:23 203:8
215:10 253:22
**overlaps** 73:2
254:11
**overlooking**
288:15
**overnight** 28:10
**overprescribing**
293:13,21,22
296:13
**overriding** 67:9
**overstate** 293:6

**overstated** 283:17
**oversupplied**
294:19
**oversupply** 108:8
121:20 122:2
123:12 124:12,16
124:17,19,20
139:13 262:15,23
274:23
**overtalk** 80:13

**p**

**p** 8:1
**p.m.** 151:18,24
166:13,19 221:2,7
271:10,15 304:22
305:3 307:6,12
369:6,11,24
**p1200** 2:9
**pa** 2:21
**page** 22:14 24:19
26:6 30:17,21
32:7,12,15 34:12
35:3 40:7,8 42:22
45:24 49:4,19
50:15 100:20
104:22,23 105:6
107:10,12 109:6,8
109:8 113:20
118:24 119:1
121:5 122:17
127:15 129:24
130:3 136:24
137:1 139:11,12
140:21 141:1
152:3,3 158:21
159:10 163:4,5,7
163:13 174:2,6,11
183:3 198:18,19
200:12,13 201:14
205:3,4,4,9 206:17
206:18 209:9

211:13,15,18
212:15,17,19,20
212:23,23 213:3
218:22,23 221:15
221:19,20 223:20
225:1 236:3,4,5
241:17,18,24
242:9,10 244:4
258:22,23 259:23
263:19 264:24
265:2 268:18,19
270:12,13,14
271:2 273:18,19
279:20,21 284:15
285:12,14 290:4,5
296:24 298:1,3
306:3 307:22
308:15 312:11,24
314:22 322:6
326:8,11 327:24
334:19,20,21
349:6 360:11
367:7,9,11,16
372:14,16 374:7
375:3
**pages** 26:4 243:12
**paid** 15:11,24
16:18 17:10,20
18:1 275:1
**pain** 5:5,7,11,13
5:20 21:21 22:5
26:9,11,14,16,16
26:21 27:1,13
29:24 30:6,13,16
33:15 38:10 42:24
43:4 45:6,17 46:3
47:1,4,11,23 48:14
48:22 81:7,14
103:14,18 104:8
116:18 126:19,24
127:1 135:1,7

141:21 142:4,5,8
142:12,16 143:22
143:24 144:7,9,15
144:18,23 145:3,8
145:14,15,22
146:4,11,16,17,18
146:21 147:1,3,5,8
147:12,21 148:5
148:17 149:5,11
210:6,14 265:4,11
265:14,23 267:14
267:16 284:22
285:1 288:21
291:1,2,11,15,17
291:24 292:13
293:2 295:16
**paper** 26:8 39:24
42:14 44:24 48:18
49:18,21 50:9
78:16 100:5
103:12 155:9,12
164:2 209:6
210:12 211:24
213:11 218:17
221:10,20 223:21
224:19,23 228:18
230:21 240:17
264:4 289:19
290:1 294:22
312:18,19 313:2
317:11,14,16
318:3,4,6 326:1,4
326:11 328:9
366:11,15,22
368:3,4,16,17
**papers** 10:22,23
49:24 78:19
119:10 290:15
337:7
**paragraph** 30:20
31:3 32:15 49:20

100:22 104:4
113:21,24 121:7
152:4 159:12
163:15 165:11
174:11,12 205:5
205:10 206:19
222:11 223:21
225:12 228:22
236:5 242:10
260:3 262:5
263:22,22 264:5,7
264:9,11 268:20
269:19 274:11
275:5,9 276:22
290:5 298:3,13
312:17
**parallel** 68:10
70:21 71:1
**parallels** 68:7
**parameter** 201:8
309:17 310:5,10
310:19 311:5,10
**parent** 259:9
**parental** 248:11
**parentheticals**
314:21
**parenthood** 259:9
**parents** 110:18
259:1,5
**parse** 73:18
**part** 32:4 56:1
62:22 83:18 84:3
108:2 121:17,18
126:21 151:7
161:10 182:24
184:7 195:14
245:15 274:14
277:20 279:18
292:11 294:5
295:6 312:20
326:13 332:9

337:5 339:4,13
374:9
**partial** 225:21
**partially** 290:9
**participated**
297:11
**particular** 22:20
59:23 60:1 67:22
69:20 114:8,24
130:21 138:23,24
143:9 149:18
152:15 163:21
178:6 197:9 220:1
233:23 268:9
272:19 274:6
275:9 276:3,17,22
277:8 278:20
283:23 298:20
300:5 307:20
311:5
**particularly** 156:9
291:2
**parties** 1:21 8:11
371:12,14
**partly** 335:2
**partner** 54:15
81:5,18 161:12
**parts** 54:21 249:15
250:16 251:6,12
252:9 262:21
**party** 9:2 62:22
65:3 66:4
**pass** 301:6,6
**passage** 76:20
**pat** 321:21
**pathway** 114:14
114:16
**patient** 31:23
285:10,20,21
**patient's** 291:11

**patients** 19:16
26:15 33:15 37:12
37:22 38:1,13,20
40:11,24 41:3
46:2 47:11,22
122:24 126:24
127:1 139:1 153:3
280:1 292:19
293:5
**pattern** 212:24
213:8,14 321:16
**patterns** 21:5,6,10
217:11 321:6,11
321:14
**paul** 3:4 54:15
81:5
**paulina** 2:4 9:15
10:17 28:19 53:15
**payment** 18:16
**payments** 18:5
275:12,24 276:23
**pdf** 367:9
**pdmp** 230:9
**peer** 133:8
**peers** 123:21
**pending** 91:3
**people** 30:13,14,16
34:20,23 35:5,14
36:6,16 37:3
38:16,21,23 46:24
47:13 94:8 105:24
106:4,9,10,14
107:7 109:16
119:3,11,13,22
137:14 152:24
155:14 160:21
167:5,20,23 169:7
169:21,23 173:5
173:16 177:10
179:16,23 180:16
181:3,10 184:11

185:13 198:7,8
199:1 200:3
203:13 219:22
225:13 226:4,24
227:11,14 228:18
230:3 232:15
233:8 235:7
236:20,24 238:10
238:16,22 239:2,7
240:21 241:20
242:6 243:1,7
244:23 245:5
246:17,22 247:5,7
247:8,8,9,23 248:1
248:3,4,5,7,16,19
248:20 249:23
250:4,7 253:16,20
253:24 254:4,8,21
254:22,23 256:11
256:22 259:9
266:6 271:24
272:3,16 273:3
286:4 287:7,8
294:1,10 298:12
298:12,18,21
320:13 324:3
335:19 364:17,17
366:15 367:23
**people's** 294:19
295:3
**percent** 34:14,16
34:19 35:5,9,10
36:5 38:21 46:4,7
104:14 119:4
168:2,24 169:5,6
169:20 173:7
186:4,5,8 199:5,16
199:21 200:19
213:18 214:14
217:13,15,18
219:22 220:8

235:14,17,21
245:5,9,12,18,21
248:15 255:2,13
255:15,17,20
256:2,5,6,7,14
258:18 259:5,19
261:3,7 265:18,18
265:20 267:12,13
267:23 268:1,4,15
270:3,3,14,14
271:21
**percentage** 33:15
33:21 37:21,24
38:12 40:18 47:1
104:14,19 118:17
158:7,8 170:4,7,13
172:18 173:21
179:1,7 180:22
181:3 192:1 202:1
202:4,5 203:3,5,12
204:21 220:12
236:15 238:4
239:4,7 243:13
245:5,16 253:15
253:19 254:22
255:3 256:10
257:1,14,18
259:12 265:17,21
265:24 309:15
311:6 323:8
342:19,20 348:20
350:4 351:17
352:13,19 353:24
356:8
**percentages**
186:13 210:23
265:16
**percents** 255:23
**perfect** 81:20
**perfectly** 341:19

**perform** 340:1
347:20 354:8
366:7
**performed** 133:21
337:6 340:5,8,12
359:19 360:6
366:4
**performing** 359:8
**period** 31:12
128:5 213:1,9
318:3,12,13
320:18 321:17
323:4 330:4 331:8
350:1,24 356:19
365:2,6
**periods** 47:13
346:4
**permit** 83:1
**permitted** 76:3
301:14 302:8
**persistent** 30:6
**person** 172:2
189:13 190:2
194:11 260:9
263:10,20 264:11
264:13,14,18,22
272:19
**personality**
165:19
**personally** 373:11
374:15
**persons** 260:5,10
260:13,15,21
261:1
**pervasive** 139:13
165:3
**petkis** 3:4 9:13
**pharmaceutical**
44:16 273:21
274:1,3,7,12,15
275:3,10 276:24

292:7
**pharmaceuticals**
274:18
**pharmacies** 19:13
19:15,22 20:2,3
104:7 110:7 111:8
111:13 113:15
114:4,7 116:1,4,8
116:12 122:1,5
139:16 171:4
172:1 177:9
252:19 253:5
279:17 282:16,19
283:2 296:19
300:9
**pharmacological**
165:19 166:1
**pharmacy** 19:22
109:17 110:23
111:1,3,19,21,24
112:4,10,22 115:6
115:9,11,17,17,22
119:18,24 123:19
124:2,7 171:11,14
177:17 178:2
253:1,12 296:4,18
**phase** 236:22
**phd** 5:4 11:6
**phenomenon**
178:15
**philadelphia** 2:21
**phone** 51:19 52:4
53:16 56:19 58:2
80:20 91:17 98:24
372:3
**phones** 8:7
**phrase** 88:1
105:13 106:5
159:1 241:23
306:22 307:20
308:4 348:19

physical  145:9,20
physician  109:22
  130:11 170:1
  279:24 293:1
physician's  221:24
physicians  118:3
  136:10 273:22
  274:2 275:1,12
  277:2 280:5,6,14
  280:22 281:8
  282:6,10 284:6
  291:10 293:7
pick  8:5 321:22
picked  96:8
picking  331:15
piece  193:15
  360:20
pieces  78:4 87:17
pill  141:14 187:2
pills  105:1,15
  106:6 108:11,20
  108:23 109:17,21
  109:24 110:6,22
  110:24 111:2,7,13
  112:9 114:7,19,23
  115:16,17,21
  116:4,11 119:17
  126:7 150:9
  176:13 178:1,3,5
  181:1,4,5 182:3
  252:18 273:8,14
  323:21 324:4,9
place  8:7,11 74:9
  95:1 101:12
  122:18 151:2
  305:12,13 371:6
places  62:3 308:18
plaintiff  1:5,12
plaintiff's  66:15
plaintiffs  2:2 9:16
  9:22 58:13 68:19

72:7,22 73:5,24
  90:20 93:3,6
  301:23
plan  23:18,19,23
  73:23 301:10
planned  84:16
  303:13 304:7
planning  71:16
play  23:16 136:23
player  17:6
please  8:4,6 9:8
  10:1 11:4 13:5
  21:18 28:6 30:18
  32:13 39:5 40:8
  42:23 48:9 100:4
  103:10 104:23
  107:11 121:6
  152:3 155:6,12
  198:19 209:11
  210:3 212:15
  217:22 222:22
  224:10 225:2
  236:4 241:18
  247:22 258:23
  265:1 273:19
  277:24 278:10,15
  279:21 289:3
  297:1 298:1
  372:12,12
plenty  62:6
plow  65:13 81:21
plus  171:4
point  32:14 36:3
  36:16,17 63:13
  67:20 70:6,8
  72:21 93:5 101:12
  104:3,5 106:10
  107:1,12,15,20,24
  109:9,10 113:20
  119:9 121:6
  122:15 130:3

131:19 134:21
  135:17 137:8
  152:2,10 155:12
  155:22 158:23
  162:2,8,10 163:4
  169:13 174:3,5
  179:22 183:8
  200:3 205:3
  208:18 211:15
  216:2,14 217:12
  218:22,24 219:4,5
  223:20 225:22
  228:11 235:10,11
  245:3 247:17
  275:18 301:21
  303:11 308:9
  310:13 313:15
  316:16 333:6
  338:21 342:18
  354:3
pointed  73:19
  174:10 211:17,17
pointing  80:21
points  57:4 72:14
  80:3,6 87:7,10
  206:2
policies  229:2,3
  230:23,24 262:13
  262:16 295:24
  296:5 300:2
policy  300:1
  306:19,20
poly  163:18 164:3
  164:19
polydrug  163:8
populated  339:14
population  36:23
  37:2 102:15,22
  143:11 207:24
  213:24 219:10
  220:9,14 222:19

226:11 227:13
  232:15 233:13
  236:19 242:6,15
  243:13 245:9,13
  245:13,14 255:4
  255:19,23 256:5
  256:14 257:1,15
  257:18 258:2,19
  266:3,5,13,15,16
  266:17,19 267:4
  267:13,24,24
  268:5,10,15 269:1
  270:5,6,17 271:22
  285:6 286:1
  288:18 311:20
  312:21 313:17,22
  314:15 315:8,16
  316:19 320:6,8,13
  320:15 324:7
  329:2 331:7
  332:19 333:16
  356:7 357:9
populations  43:16
  85:2 182:20 265:6
  266:10
portion  171:23,23
  172:5 184:15
  192:8 212:11
  215:16 336:12
  343:3,4,6 357:15
  361:3
posed  86:16
position  23:23
  24:15 43:15 53:5
  53:12 54:2,5
  56:11 58:20 59:12
  59:21 72:23 73:6
  73:12 74:1 75:21
  75:22 76:14 93:6
  93:7,10 98:11
  225:8 301:23

304:8
positions 58:18
possible 40:19
  82:5 112:6 288:19
post 229:16
  318:14 320:19
  322:21 324:13
  332:6 352:3,12
posture 79:6 80:10
potency 174:14
  325:11 331:11
  365:4
potent 237:2 320:9
  324:20 325:6,9
  365:17
potential 180:20
potentially 117:6
  190:11 352:6
potentiate 160:12
  252:2,3
potentiated 166:8
  194:14
pouches 223:13
powell 2:8 9:21
practice 43:3
  81:14 178:10
  290:24 296:15
pradip 210:13
pre 318:14 320:19
  322:21 323:10
  324:13 332:6
  343:7 345:18,22
preceded 229:1
precise 56:22 70:8
precisely 348:19
preclude 82:23
  274:8,22 277:1
  279:3 281:7 284:8
precluded 75:4
  76:22 78:5 79:12
  303:15

predicate 77:10
prediction 321:12
predictive 351:20
prefer 196:14
prejudice 303:8
prejudiced 74:22
  302:16
prejudicial 74:3
  75:14 76:14
preliminary 69:2
  69:18
prelude 277:20
premise 88:19
  95:17,21
premised 72:10
preparation 15:16
prepare 63:5
prepared 49:13
  63:19 64:8 292:4
  300:13
prescribe 117:7,22
  137:18 138:13
  263:9
prescribed 43:1
  50:12 81:12
  110:17,21 120:4
  120:11,19,21
  122:24 123:5
  153:1,4 203:14
  222:2 273:13
  286:7
prescriber 141:7
prescribers
  124:10,10 141:2
  141:18 142:22
prescribing 5:5
  117:10 118:4
  119:8 125:24
  126:13 131:11
  132:1,9 133:24
  134:10,14,18,20

134:24 135:7,11
136:5,10,17,21
137:11,14,21,23
138:23 142:23
143:1 146:14
157:11,14 235:14
260:12 262:14
279:22 290:24
293:24 294:2
296:16
prescription 5:10
  5:18 6:7,14,20 7:2
  7:3 18:24 19:8,12
  19:16 26:23 27:24
  31:22 33:16,24
  34:1,17,20 35:16
  35:21 36:2,7,8
  37:5,13,23 38:2
  39:14 40:2 42:6
  42:17 48:11,20
  82:16 100:6,11
  101:1 105:9,21,23
  106:19 107:16,17
  107:21,22 108:1
  115:5,7 116:22,23
  117:11,20 118:11
  118:12 119:13,18
  119:22,23 120:3
  121:1,8 123:5
  125:6 126:12
  129:24 130:6,12
  130:14,14,18
  131:2,14 132:3,6
  132:13,16,22,22
  133:2,4,14,17,24
  143:6 148:21
  149:12 150:16,22
  151:3 152:7,11,17
  153:2,8,18,24
  154:8 155:18
  156:13 157:5

164:5,17 166:22
167:6,8,15,24
168:9,13 169:1,9
169:11,22 170:4
170:10,15 171:3
171:24 172:2,12
173:13,16 174:3,7
174:20,22 175:4
175:15,18,21
176:4,7,18,24
177:4,7,8,12,15
178:8,11,16 179:4
179:8,16,19,23
180:1,5,6,11,13,17
180:19,23 181:12
181:14,18,20,21
183:6,24 184:1,12
184:13 185:21,23
186:5,19 187:2
188:23,24 189:2,8
189:10,11,18,21
190:3,5 191:11,13
192:1,9,11,14
193:2,8,10,12,24
195:2 197:20,21
198:3,10,11,13
199:7,10,17,23
200:8,15 202:2,6
202:16,21,24
203:4,14,18,24
204:2,5,7,8,12,13
204:20 205:1,7,12
206:6,21 207:3,10
208:1,5 211:20
212:12 214:19
215:4,12 219:23
221:24 222:15
223:5 224:1,14,21
225:13 226:2,4,23
227:12 228:19
229:1,4 230:1,11

230:22,24 232:1,6
232:11 233:11,19
235:1,4,7 236:23
238:14 240:13,18
241:2,5,6,12
250:14 251:3,5,8
253:12 254:24
257:8 260:2
261:21 262:1,19
262:22 263:10
264:18 267:20
268:22 269:8
270:2 272:1,4,5,14
272:17,21 273:4,8
273:10,13,16
279:9 283:11
284:17,19,21
285:10,21 287:1,4
287:9,13,14 289:6
289:8,21,22 290:7
290:17 291:10,13
292:13,16,22
293:10,19 295:5
295:15,20 300:10
309:7 310:16
323:18,21,21
324:1 334:1,5
335:8,11 336:7,11
336:13 337:20,23
338:13 343:8,10
345:21 346:7,14
346:23,23 347:5,8
347:13,22 348:4
348:22 351:8,15
351:18,19,22
352:4,7,10,20
353:1,2,4,8,11,13
354:1,2,11 356:3
356:17,18,23
357:5,10,11,12,13
358:10 360:5,12

360:13,21,22
362:18 363:11
364:16,20 365:1,5
365:9,15,16,18
**prescriptions**
19:17 38:13,18
41:24 104:7,9,14
104:19 115:18
116:17 118:19
119:4,12 125:3
127:21,23 129:4
130:21,23 131:4
131:16 132:18
134:4 141:3 153:4
171:12 203:6
260:4,5,10,13,21
260:24 261:4,15
261:17,20,21
262:7 264:10
294:11 295:2
352:17
**prescriptive** 137:4
**present** 3:8 9:4
322:12 325:3
328:19,24 329:16
334:6,9,14,15
335:9,13,17 336:6
336:9,19 338:14
338:15 343:20,23
344:24 345:2
346:9 355:24
357:10,12 365:9
**presented** 326:10
**preserve** 303:12
**presumably** 107:8
124:7
**prevalence** 35:11
36:15,15,20,21
37:1 38:9 46:15
46:20,21 85:12
119:9 198:20,23

200:1,6,11 211:7
244:10,14,16,17
255:12 268:21
269:8 270:1,23
**prevalent** 36:1
46:7,9 255:12
**prevent** 114:18,22
115:4 136:10,17
136:21 137:10,13
137:21 151:2
**previous** 23:2 57:5
59:10 62:3,12
65:17 69:15 81:5
83:17 84:1,6 86:1
86:2 89:3 97:19
97:22 144:4
162:13 278:7
281:16 302:22
303:3
**previously** 61:11
61:17 66:24 67:3
72:8,13 73:14,17
73:20 75:12 84:24
89:3 91:23 95:10
96:15 97:3,18
98:2 149:20
290:16 356:7
**price** 228:1,5
231:5,15
**primarily** 265:4
276:24
**primary** 155:17
186:23 187:17
**principle** 76:4
158:14 161:6
251:23
**principles** 359:8
**print** 28:16,22
**prior** 6:3 22:24
24:2 36:20 43:21
54:24 55:5,23

66:10,10 67:24
69:2 91:22 93:24
96:9,19 101:7
192:9,14 209:14
218:6 221:12
222:2,14 268:1
271:3 272:24
281:18,22 321:23
327:2 344:20,21
346:4,6,6 347:8
351:19 352:24
356:19
**prison** 266:6,14
**private** 8:5
**privileged** 14:21
**probability** 314:7
324:18 332:1
**probably** 13:15
36:4 51:9 157:1
181:4 191:3 205:2
235:6 256:2,6
289:14
**probe** 92:22 93:19
**probing** 98:1
**problem** 17:13
56:2 306:12
361:16
**problems** 90:17
160:20,23 248:10
**procedural** 93:5
**procedure** 1:20
65:2 373:5 374:5
**proceed** 50:23
56:14 63:9 85:23
97:13 222:10
**proceeding** 9:8
**proceedings** 51:13
99:12 151:20
166:15 221:4
271:12 303:9
304:24 307:8

369:8

process   120:23

produce   166:4
355:19 359:16

produced   64:20
342:15 355:17,22

produces   16:9
344:17

producing   339:3

product   131:17,20
338:2

production   149:21
372:16,17,22

products   19:8
240:22 275:2,13
276:6 277:9,18

proffered   64:12

program   262:19
262:22

programmatic
262:14

programs   136:4
230:1 297:3,6,22
297:22

progress   205:8
211:20 212:5,5,12

progressed   215:5

progression
215:14,18 216:19
216:23

prohibition   92:17

projecting   361:12

projection   363:19
364:7 365:11

projections   365:12

promise   287:19

promoted   284:3

promoting   276:9

promotional
273:21 274:2,12
279:13,16

prompt   56:20

promptly   56:13

proof   75:18

proper   43:12
58:16 62:7

property   166:1

proportion   167:23
169:7 184:11
192:19,20 198:24
199:8 205:7
211:19 212:5
214:16 215:4
238:7 248:7

proportionate
345:21

proposing   341:14
341:18

prospective   6:6
40:12 100:5,10
124:6 223:4

protocol   301:10
301:14 341:11

provide   16:9 38:2
44:19 65:2 201:7
203:21 308:19
309:3 340:15
356:12 362:8,10
362:10

provided   63:24
64:1 68:11 350:24
355:9 362:9
363:15

provider   180:2

providers   119:7
141:14 172:3

providing   20:23
61:15 68:5 70:22
341:11

proving   68:20
72:5

provisional   243:22

proxy   252:17

psychiatric   159:17
165:20

psychoactive   6:2
159:15 209:14
218:5 221:11
222:1

public   6:15 37:19
39:15 40:2 61:23
136:4 371:4
373:10,18 374:15
374:23 375:23

published   40:17
40:19 91:21
135:22 136:4
140:19,24 143:24
168:4 192:24
240:17 260:18
317:14

pull   11:3 21:17
209:22 210:2
287:16

pulled   17:17 25:11
81:18

purity   231:5

purporting   55:10

purpose   116:22
117:8,10,12 309:4
331:23 371:6

purposes   11:8
13:10 20:15,23
21:24 26:2 39:18
42:10 48:16 53:13
61:3 100:15
103:22 135:2
209:19 210:10
218:14 224:16
247:4 288:6
289:10 325:23
333:15 334:6,12

335:9 344:21
345:12 346:15
347:1 354:19
360:4

pursuant   1:20
35:20 41:24
106:19 154:9

pursue   299:8
302:11,13

put   57:13 73:8,11
73:12 74:2 79:6
80:10 81:24 83:9
98:16,17 102:9
105:19 249:3
256:9 268:14
331:15 335:24
337:13 338:3
341:21 342:16
363:21

puts   76:13

putting   58:4
202:12 203:22

| q |
| --- |

qualified   371:5

qualify   45:3
207:17

quality   66:12

quantities   121:10
129:23 130:2,10
139:17

quantity   66:13
130:6,15,21 140:2

quarter   173:2

quarters   267:2,9
312:16

question   16:16,17
16:21 22:17 23:1
23:3 24:24 29:6
30:12 61:21 69:2
69:19 75:8 79:7
81:2,4,9 82:14

85:4,8,18,21 87:22
88:18 91:9,20
93:15 96:11 97:24
98:10 101:6,9,10
101:12 102:13
110:2,2 124:18
125:20 126:2
129:20 131:13
133:1 136:14
151:13 153:22
157:1 162:12,17
167:11,13 170:3
170:17 178:19
180:8 189:9
199:21 203:11
207:2 208:1
213:22 214:18
215:1 216:8
220:11 227:8,18
227:20,21,24
238:3 277:3,5,21
278:7,17 288:8
294:7 307:1,18
310:4,20,22
314:11 321:15
325:4,12,15
327:12,12 330:7
330:13,19,19
331:1,10,21 333:2
333:3,7,9,11 335:2
335:4,6,15,24
338:1 339:20
343:17,22 344:21
345:9,23 352:23
354:18 355:23
356:2,10 358:3
362:17 364:8,14
364:23 365:14
**questioned** 97:19
149:20

**questioning** 23:1
43:21 49:7 61:10
61:13 69:1 79:2
84:17 85:23 87:5
95:13,16 161:7,9
281:18,22 305:11
339:18
**questions** 16:24
18:20 23:19 49:4
49:7,16 50:19
53:18 59:15 60:7
60:22 61:9 62:21
70:12 71:8,10,14
71:20 78:3 79:10
79:11,15,16,22
80:7 82:4,9,23
83:2 84:16 85:14
87:9,21 92:13,18
94:11,16,18,19
95:2 96:16,22
97:21 98:2 147:23
161:14 162:6,21
178:21,23 183:20
205:23,24 215:22
281:14 303:1
305:19 333:22
334:13 340:24
341:9 342:3,5
347:23 369:14,16
369:23
**quick** 271:7
**quickly** 91:21
271:17
**quite** 11:12 35:1
43:14 65:18 76:12
240:19 248:12
306:9 319:6
348:11
**quotas** 149:21
150:1,6,11,12
295:5

**quote** 73:10 81:17
121:13 307:16
309:3 310:6
**quotes** 96:8

**r**

**r** 2:14 8:1 10:3
**raised** 63:3,10,12
64:7 69:1 81:4
84:23 304:2
**raising** 338:7
368:2
**random** 80:13
325:13
**randomly** 233:8
**range** 19:7 25:9,16
29:18 46:4 60:22
138:18 173:10
217:12,17 248:2
255:20 325:8
355:4
**ranged** 198:20
**ranking** 328:11
**ranks** 328:12
**rare** 225:14 226:5
228:20
**rate** 15:8,10,13,14
16:10 214:2,21
225:15 226:7,14
226:20 229:5
246:1,5,14,15
251:14 260:9,9,24
263:9 285:9,15
287:6,7,12 288:17
291:9 313:11,11
314:2,6,23 315:23
316:2 317:23
320:21,24 322:11
322:19 328:16
329:6 332:3
337:20 349:9,10
349:15,20 350:13

350:13 351:5,14
351:15 355:24
356:1 359:22,24
360:4,7,11,16
**rates** 5:13 21:20
22:4 70:2 71:10
140:24 228:24
231:7 284:17
295:19 319:19
320:22 359:20
360:1,8,10
**ratio** 337:16,18,18
348:5 352:22
353:19 356:11
**rationale** 137:2
**ratios** 337:12
**raymond** 2:15
**reach** 50:18 51:2
52:6,17 56:17
57:1 115:18
275:22 276:2
277:7,12,16
278:23 279:8
**reached** 52:9
82:19
**reaching** 275:19
**reactivity** 165:19
**read** 16:24 33:19
46:6 54:18 81:15
219:14 225:22,24
232:8 283:5,6
294:6 298:11,11
307:15 308:7
341:10 370:5
371:10 373:5,6,12
374:5,6,17
**readily** 36:4 319:9
**reading** 225:21
306:16 372:20
**reads** 32:16 43:1
228:23

ready   63:18
real   13:19 160:16
really   16:14 54:3
  55:14 74:2 78:22
  134:6 144:24
  146:24 163:6
  216:1 235:22
  277:23 310:3
  315:19 331:15
  339:15 361:5
realm   122:8
realtime   17:14
  33:18 305:20
  306:2 307:22
  308:16 309:20
reason   63:23 94:1
  153:6 180:10,15
  220:6 251:10
  267:8 268:8 285:3
  288:16 303:8
  331:2,7 338:8
  372:15 374:8
  375:3
reasonable   205:10
  214:11,23 229:18
  248:17 306:5,22
  307:23 308:4,12
  309:9 312:1,3,6
  357:8 365:24
reasoning   88:23
  180:10
reasons   96:14
  225:14 226:5,20
  228:19
recall   174:6
  305:20,24 306:8
  308:2,21 328:3,6
  328:14 339:3,6,12
  349:15,15 360:15
  360:20,24 363:20
  364:1 366:12,19

366:21 367:1,5,24
  368:2,20
receipt   372:19
receive   18:16
  114:19,23 169:8
  173:6 179:16
received   14:3 36:8
  123:18 180:16
receiving   119:13
  124:9
recess   99:11
  166:14 221:3
  271:11 304:23
  369:7
recklessly   119:8
recognition
  146:13
recognize   11:13
  93:3
recognizes   236:22
recollection
  367:20
recommendations
  136:16 137:3,10
recommended
  134:20 137:22,24
reconfirmed   335:8
record   8:3,12 9:6
  14:12 22:2 39:24
  42:14 48:18 51:10
  51:12,17 57:13,19
  57:20,23 75:22
  99:9,15 100:4
  103:12 151:15,17
  151:19,24 166:11
  166:12,19 210:12
  216:21 218:16
  221:1,7 223:12
  224:19 271:9,15
  276:20 301:19
  302:20 304:11,14

304:17,20,21
  305:3 307:4,5,7,12
  341:5 364:4 369:2
  369:5,11,23 374:9
recorded   8:13
recording   8:10
recovering   248:6
recruited   206:20
red   80:2
redeposed   62:23
redeposition   76:15
redistribution
  293:14
reduce   262:13,15
  331:6
reduced   231:5,15
  371:10
reducing   232:2
  262:23
reduction   261:3
  262:6
reductions   264:22
redundant   23:5
reed   2:20 9:18
reexamination
  96:7
refer   49:21 108:13
  113:21 121:7
  129:23,24 139:13
  140:22 153:16
  156:1,3,7 158:21
  159:10 174:2,6
  198:20 206:18,19
  208:9 265:21
  266:20 270:4
  274:15 290:13
  294:1 298:3
  334:17 366:11
reference   31:6,7
  32:1,5,8 79:18
  96:22 105:8

135:18,21 136:6
  153:15 155:14
  157:19 158:23
  164:13 165:10,16
  165:17 168:23
  174:19 208:20
  209:3 219:13
  263:20 275:8
  280:5 286:3
  292:18 293:1,12
  308:5,16 314:20
  315:13 317:22
  326:5 327:7 328:1
  328:2 366:10
  372:8 373:2 374:2
referenced   368:18
  373:11 374:15
references   85:1
referred   81:1
  126:11 129:16
  141:14 154:12
  274:17 324:21
referring   12:20
  31:4 57:4 105:3
  105:22 106:6,23
  107:2 122:21
  126:15 130:9
  135:10,19 141:1
  152:21 153:11
  156:2 207:1 213:5
  229:21 242:1
  266:16 274:24
  275:12 279:15
  290:15 334:23
  337:2,5 340:14
  349:7
refers   31:21 122:7
  159:4 163:18
  164:24 199:8
  274:6

**reflect**  34:12 46:1
   199:21 203:23
   212:3 264:18
   269:22 322:7
**reflected**  15:4
   44:14 136:22,24
   254:21,22 306:2
   310:24 328:9
**reflecting**  46:21
   145:2 261:19,19
**reflection**  18:3
**reflects**  18:3
   127:17 137:8
   199:14,16 214:12
   214:20 216:18
   217:1 260:20
   261:20 263:13,14
   265:16 339:2
**refresh**  367:20
**regard**  62:21
   86:15 275:13
   276:5 284:7
   296:23 300:1
   310:13,16,18,23
**regarding**  125:24
**regardless**  114:10
   280:12
**regards**  72:1
   86:23 95:9
**registered**  1:21
**regular**  219:2
   258:13
**regulations**  299:22
**regulators**  150:22
**rehash**  69:24
   83:15 88:20
**rehashed**  67:14
**rehashing**  66:6
   84:5
**reinquiry**  84:5

**reiterate**  72:22
**reiteration**  74:17
**rejected**  318:24
**relate**  23:20 68:2,3
   68:10 70:14 77:9
   85:11,12 303:5
   333:23 347:23
**related**  9:2 32:17
   92:14 109:11
   112:15 158:22
   206:5 229:4
   249:12 257:3
   281:6 282:12
   283:21 284:1
   294:9,13 295:18
   301:2 303:13
   371:12
**relates**  70:23
**relating**  63:11
   92:20
**relation**  20:8 53:7
   67:22 78:8 93:23
   94:4 113:14 276:9
   298:20 302:16
**relationship**  5:18
   33:3 105:9 120:24
   205:11 206:23
   224:13,21 241:9
   241:11 358:22,23
**relative**  123:19
   315:8 371:13
**relatively**  125:24
   229:6 239:19
   354:3
**released**  44:16
   177:16 243:23
**relevance**  359:14
**relevant**  156:9
   163:22 197:9
   204:16,18 253:4
   318:3,12,18,20

320:7,13 329:2,17
   329:21,22,24
   330:10 332:19
**reliability**  183:1
   365:22 366:3
**reliable**  190:6
   201:1 309:21
   311:7 312:2,3,6
   320:18 321:2
   332:5,14 338:8
   350:2,3,8,20,24
   365:24
**reliably**  193:5
**reliance**  25:17
   97:14
**relied**  61:1 84:21
   201:9 240:7
   246:18 254:16
**relief**  27:13 284:23
**reliever**  5:21
   210:7,14 265:4,11
   265:14,23 267:14
   267:16
**relievers**  104:8
**rely**  12:19 25:22
   27:11 126:1 230:5
   244:7 355:8
**relying**  12:1,6,13
   13:2 44:9 122:12
   123:9 247:15
   354:13,19 355:1
**remained**  316:17
**remains**  269:4
**remedial**  72:1
**remember**  149:21
   367:22
**remotely**  1:21
   8:21 9:5
**rendering**  92:24
**repeat**  24:24 64:4
   102:13 162:17

307:1
**repeating**  162:21
   215:21
**rephrase**  136:13
   333:9
**replowing**  49:5
**report**  5:3 6:18
   11:6,16,20,23 12:3
   12:7,9,15,18 13:8
   14:3,10,14,24 15:4
   22:10,11,14,15
   23:10,11,20 24:19
   25:2 26:3,5 27:12
   30:18 32:5,7,13,16
   35:9 40:19,22
   41:4,10 44:7
   45:24 47:18,20
   49:8,10,11,13,14
   49:19 50:8 53:19
   53:22,22 54:3,7,8
   54:10,14,20,22
   55:9 56:8 59:23
   59:24 60:3,11,14
   60:20 61:14,24
   62:9 63:24 64:10
   64:19 65:17 66:22
   69:9 73:8,16
   76:11,20,21 85:1
   89:9,12 94:16
   95:16,17,22
   104:23,23 107:11
   108:14 109:9
   110:12 112:15
   113:3,10,20
   114:13 116:10
   118:20 121:5
   122:16 126:17
   129:24 135:16,24
   139:11 144:7
   148:8 151:10
   152:3 154:16

158:21 159:10
163:7,16 167:19
169:8 173:5 174:2
174:9 183:4,9
198:18 200:12
201:10 211:5,9,16
212:3 215:3
216:16,23 217:1
219:24 226:2
228:8 230:6 232:5
236:4 240:7
241:18,19 242:1
244:5 246:19,20
246:23 258:23
259:24 262:20
265:1,17,17
268:16,19 269:13
270:15 272:16
273:19 274:10
279:5,21 280:21
284:16 297:1
298:18,19 302:1,2
302:9 303:14
309:5 311:11
312:12 317:22
334:18 335:1
344:11 349:6
350:12 355:9,20
360:11 367:8,9,13
**reported** 150:15
150:21 220:6
264:5 267:13
268:1
**reporter** 1:21 8:23
10:1 57:22 306:23
373:7
**reporting** 270:16
**reports** 25:16
34:11 60:12 62:3
73:1,2 148:10
175:6 247:2,3

282:18,23 283:6,8
302:10 303:15
**represent** 172:22
305:7
**representation**
188:9
**represented**
348:21 362:1
**represents** 347:6
**request** 101:20
371:10 374:9,11
**requested** 341:23
**require** 313:8
**required** 65:10
188:20 372:24
**requirements**
371:15
**requires** 87:5
301:10
**research** 340:3
**resemble** 323:21
**residents** 259:7
**resolution** 58:19
**resolve** 90:18
91:21
**resource** 328:4
**respect** 14:10
63:16,20 71:4
76:24 82:18 86:6
92:24 300:14
320:4 330:17
365:21
**respond** 61:20
**responding** 84:13
216:10
**response** 33:3
**rest** 51:9 164:2
180:9 228:9
230:16 251:14
337:22

**restricting** 230:2
**restrictive** 92:11
**result** 182:6 233:2
237:3 238:1
313:23 315:15,16
328:17 336:17
338:17,18 351:22
353:13 354:1
365:10
**resulted** 91:7
338:22
**results** 102:8
103:3 219:12
220:6,8 221:22
352:11 354:4,22
355:6
**resume** 99:7
**retail** 104:6
**retain** 355:12,14
**retained** 63:14
64:12 76:18 370:2
**return** 56:19
**returned** 372:19
**review** 5:14 14:23
21:22 22:5 25:18
26:3,5,6,11 29:7
110:12 134:15
140:6,14 144:19
145:23 146:7
184:5 240:14
250:17 322:5
328:10 340:4
372:13 373:1
374:1
**reviewed** 12:14
25:21 116:9,14
127:9 140:13
143:23 148:7,8,12
148:19 206:8
207:4 281:5
284:12 297:24

299:24 300:8,12
301:1
**reviewing** 297:8
**reviews** 41:12
229:24
**revoking** 296:12
296:18
**rich** 292:8 294:22
**right** 10:11 11:12
17:8,18 18:13,24
19:4,17,18 23:8
24:6,7 25:13,23
26:4,8,15 29:8,12
29:17 33:8,16
34:17 35:6,17,21
36:17 49:22 50:3
50:13 51:8 52:20
56:15 63:17 83:10
106:12,20 108:12
109:14,18 110:7
111:14 112:5
113:11,18 114:4
114:15 115:19,22
122:17 123:7,8
127:18 128:22
130:6,22 131:8
132:19 133:5
137:1 139:18,18
143:2 153:18
154:24 156:10
159:12,16 160:10
164:24 166:6
173:13,17 174:17
176:13 179:3
182:2,11 183:7,11
184:3,4,6,24
185:12,15,19
186:2,6,20,23
188:6 189:5,6,22
191:1,13 193:9,22
194:1 195:4,9,15

196:19 199:12
201:18,22,22
202:2 209:10
210:4 215:5,8,19
217:23 218:24
220:10 223:16
226:19 227:4,19
230:16 232:7
233:8 234:15
237:16 238:17
239:20 241:21
242:7,8 243:18
244:5,8,12 245:2,4
245:4,11,17 246:3
246:11 249:7
253:17 254:6,7,24
256:24 260:16,16
260:22,23 261:1,6
261:7,8,10,15,22
261:23 264:20
267:15 268:3,6
269:3,5,14 270:10
271:4,5 272:1,6
273:10,17 274:4
274:19 277:4
280:7 284:17
285:11,18,19,22
285:23 286:16
292:12 298:14,24
299:4 304:17
307:1 312:23
315:10,11,14
316:21,24 317:7
317:12,13,15
318:1 321:8 326:7
326:9,12,16,24
329:12 330:5,6
334:10 335:21
337:21 338:16
339:10,16 343:16
344:8 346:17

347:14,15,18,18
348:8,11 349:8
351:12,13 359:9
360:3 362:11
**rights**  342:5
**rigor**  126:3 129:2
**rise**  172:9,15
**risk**  106:15 124:5
159:4,5,9,11,21
160:17,20,22,24
161:10,19 162:12
162:15 164:1,16
164:20 166:9
181:15 182:1
194:15 198:5
234:11 250:5
252:1 266:2,10
280:1 357:20,20
**risks**  32:17,22
33:6 137:17 138:1
138:6,11,17 143:6
143:13,18 146:14
149:1,15 276:3,16
277:8,17 278:19
278:24 279:9
280:11,15 283:10
283:17 284:1
**rmr**  371:20
**robust**  354:5
**robustness**  354:14
355:5,10,14
**role**  5:9 48:11,20
138:15
**room**  9:4 10:14,16
10:20 79:1
**roughly**  15:23
16:2
**routes**  295:2
**routine**  304:12
357:19,22 358:1

**routinely**  193:5
305:17 355:4,20
356:9 366:7
**row**  339:12 362:2
364:5
**rows**  339:9
**rpr**  371:20
**ruby**  2:14,15
62:18,19 64:3,5
72:21 73:19 80:17
80:19,21 81:23,23
83:3,5,8 84:11
86:5 92:6,8 95:7
97:8 98:21
**rule**  22:18 43:21
54:17,18 58:20
59:18 65:5 71:5
84:15 87:20 88:5
89:24 302:23
343:19,24 344:10
345:2
**ruled**  303:18
**rules**  1:20 17:6
22:22 58:24 65:2
373:5 374:5
**ruling**  67:1,21
68:14 82:22 86:4
90:7 92:9 93:15
97:14 302:4,15,23
303:6,20
**rulings**  302:22
**run**  246:10
**rural**  6:19 42:5,16
43:16 78:17,22
81:2,17 86:12,18
155:11,16 156:8,9
156:13,15,18
157:3,24 163:9,20
163:21 366:16

**s**

**s**  1:21 2:15 8:1
10:3 60:1 371:4
371:20 372:16
374:8,8 375:3
**safety**  6:12 288:3
**saith**  370:6
**sample**  265:24
268:17
**samples**  206:20
**sampling**  266:22
267:11 268:12
270:11
**sanctioned**  293:15
**save**  239:15
**saves**  239:18
**saving**  239:14
**saw**  16:8 135:10
135:18 156:18
307:17
**saying**  46:20 75:3
82:1 87:3 88:10
88:16 89:22 95:8
97:11,13,16 122:5
124:11 158:10
171:10 172:11
178:4 186:8
188:16 190:4
207:18 211:6
242:24 256:19
265:21 266:13
267:12 286:13
287:3 329:17,18
**says**  13:12 30:22
40:9 43:22 49:8
50:21 75:6 77:23
78:5 80:11 91:14
93:18 96:14 104:6
137:3 155:15
205:6 219:1,14
221:21 222:12

223:22 225:12
269:1 290:5 328:4
341:16
**scales** 273:6
**scenario** 168:19
181:21,23 188:17
**schmidt** 3:4 54:16
81:5
**school** 139:5,8
247:8
**schools** 136:3
248:9
**scope** 49:16 58:16
87:3 272:17
**scratch** 88:6
**seal** 373:15 374:21
**sean** 100:5
**search** 88:6
**second** 43:7 44:2
119:6 151:16
152:4 159:11
181:24 205:5
206:19 218:23
219:1 221:20
222:13 223:21
367:6
**secondary** 186:23
187:17
**section** 118:20,23
123:16,21 124:8
174:8 213:13,13
230:9 274:14
275:21 309:5,10
311:10 334:17
**sectional** 206:20
207:5,8
**sections** 54:9
274:24 298:18
**see** 14:24 23:4
30:4 31:1 32:20
40:14 43:5,12

47:18,19 50:7,8
51:1 52:1,16
58:18 63:22,22
69:17 86:3 101:4
101:15 104:11
105:10 107:18
109:14 113:23
121:12 122:17
130:2 136:24
137:6,7 139:15,21
141:1 149:3 152:8
155:10,20 163:11
163:16,17 164:3
167:23 169:10
188:20 189:2
191:19 198:21
200:16 205:13
206:23 208:9
211:22 212:8
213:12,13,20
218:22 219:6,15
222:4,16,23 224:3
225:16 226:8,18
229:7 231:8
233:24 235:12
236:8,12 242:13
242:19,23 252:17
254:21 256:20
259:1 260:6,11
263:21 264:12
265:8,18 268:24
273:23 280:2
285:15 287:17,20
287:20,24 288:12
290:11 291:3,5,12
291:17,19 292:14
292:18 293:1,9,15
293:17 301:11
306:12,21 311:12
326:19 336:8
340:13 341:23

359:14 361:5
362:6,21 363:6
367:18
**seeing** 16:7 209:3
248:14 342:6
**seek** 196:7,10
**seeking** 6:4 59:19
60:15 61:3 66:19
81:9 165:20
195:21 209:17
**seen** 12:23,23
16:23 17:1 40:4
48:23 54:10
100:17 103:24
127:10 129:6
145:2,5,10,16,21
147:11 151:5
156:19 170:8
179:14 186:11
214:12,24 216:18
216:24 217:1
218:19 221:16
224:22 227:6
228:4 240:6 253:4
264:16,21 283:19
283:24 284:5,10
296:14 341:16
**select** 321:18
**self** 42:24
**sell** 19:13
**selling** 115:15,15
156:4,4
**send** 208:23 209:6
341:24 342:2
**sensation** 165:20
**sense** 29:11 61:8
188:15 246:11,14
249:13 316:10
**sensitive** 8:5
**sensitivity** 291:11
293:2 354:8 355:5

355:15,21,22
**sent** 10:19 13:24
28:10,13 289:13
289:15 340:17
**sentence** 30:21
32:16 40:9 43:1
44:13,14,17,18,20
45:2 62:10 81:7
81:11,15 101:4,15
102:11 105:3,6
107:14 109:9
139:13 155:13
205:6 211:17
212:10 213:16
215:7 219:1
225:21,23 228:7
228:23 231:3
242:18 243:4
265:2,20 269:6
274:6,10
**sentences** 104:6
137:3
**separate** 60:14
118:7 159:20,24
303:16 359:23
**september** 1:21
8:3 371:17 372:4
**sequence** 84:17
152:20,23 192:15
**series** 82:9 332:7
332:10
**served** 19:20,23
**services** 243:8
247:10
**set** 11:20,23 26:2
68:11 87:15
128:24 135:12
136:16 150:1,6
162:6 182:10
226:23 227:13,15
371:15

setting 10:11 33:6
84:7 87:4 162:1
seven 51:4 66:8
94:23 371:15,15
severe 34:13 35:4
35:15,18
shadows 305:11
share 167:15
169:11 342:20
343:7,9,11 345:17
345:21 347:3
348:3 351:17,20
352:20 356:16,18
356:20 360:12
shares 20:6 21:4,8
sharing 114:18,23
133:12
sharply 219:3
sheet 6:18 13:8
244:1 271:18
372:14 374:7,10
374:18 375:1
shift 290:23
shipment 253:4
shipments 112:18
112:20 113:8,15
114:9 120:13
252:13,17 253:5
shipped 111:7
120:2,10,14,18,20
252:18 253:10
ships 112:9
shopping 292:19
short 104:9,15,20
331:20
shorthand 371:9
shortly 52:12
show 29:3 35:9
203:17 240:12
268:21 287:12
325:10 341:3

364:12
showed 124:4
270:12,13
showing 245:18
shown 245:5
372:16
shows 125:15
245:8 260:21,24
267:23 269:14
shutting 296:12
side 16:9,22 95:6
134:6
sides 16:8,23
98:11,14
sift 73:13 76:9
sign 147:13 291:16
signals 206:22
signature 371:19
372:15
signed 54:8 373:13
374:18
significant 152:6
154:6 166:22
167:12 187:9
205:6 211:19
212:4,11 222:1
233:10
signing 372:20
silvia 289:19
similar 66:11
141:9 220:2
259:17 310:8
323:9 352:11
simple 80:2
216:14
simplistic 263:16
345:24
simply 79:13 82:5
87:13 92:18 308:6
345:10 368:20

simulate 201:9
simulation 193:4
201:3 259:15
309:11,22
simultaneously
223:24
sincerely 372:21
single 204:3
338:18
sir 372:10
sit 63:17 328:3,7
345:10 368:6,15
sitting 99:5 295:2
328:6
situation 62:21
74:3 92:15
situations 63:21
64:15 82:2
six 30:24 81:18,19
285:13 315:14,22
315:23 316:6,7,8
316:18 326:22
328:8
slightly 214:1,4
217:9 365:3
slow 296:12,18
361:13
slowly 361:15
small 179:12
181:3 202:9
203:19 205:6
211:19 212:4,10
213:13 318:15
smaller 20:3
239:20 313:17,22
314:14 315:7,16
316:20,24
smith 2:8,20 9:18
9:21,21
smoked 198:8

smoking 198:6
social 133:11
194:8 195:8
233:14 234:13
249:4,12 251:19
sold 115:21 116:12
323:12
sole 107:5 190:10
191:23
solely 26:9 181:8
203:14 204:4
353:17
solomon 6:13
288:5
solutions 372:1
375:1
solve 56:1
somebody 80:15
80:17,22 110:21
169:16 175:11
181:13,20 185:10
186:3 189:18
192:13 194:7,18
198:1 202:15
somebody's
275:18
somewhat 72:10
217:10 226:17
267:7
sorry 11:11 14:2
18:12 24:23,23
28:10,18,19 31:10
31:16 33:18 46:19
53:24 58:13 64:3
102:4,12,18 109:6
109:6 110:1
120:16 121:3
122:11 128:18
135:13,20 141:12
142:3,15 160:5
161:4 163:12

165:5 169:3
174:10 179:1
187:7 189:21
193:12 199:15
201:16,20,22
207:17 209:1
210:1,1,3 212:16
229:13 230:7,11
232:8,24 242:20
242:23 245:6
253:15 258:8
260:9 273:11
277:4 278:5
285:12 289:14
294:6 306:23
314:17 319:15
321:15 322:8
323:18 328:14
334:19 337:18
347:9,16 348:10
348:12 351:4,16
353:9 361:14
362:20 363:5
**sort** 113:23 160:1
237:8 352:3
**sought** 22:22 59:1
**sound** 80:14
230:16 256:9
310:2
**source** 25:2,3,5
104:4 110:8,13
122:2 123:20,22
124:2,17 126:14
131:5,15 139:2,4,6
155:18 158:9
180:20 254:6,10
276:22 306:13
**sourced** 169:2
170:5
**sources** 25:6
108:17 110:3,9

113:4,14 115:14
119:2,7 124:7
125:3 126:17
131:8,10,12,13,16
132:14 133:6
157:15 167:22
171:6,8 172:1,12
172:22 175:1
179:21 180:9
317:3,6 322:6
**southern** 1:1 8:17
**sparse** 229:6
**speak** 40:18 41:12
97:12 148:20
167:18 319:12
**speaker** 58:4
**speaking** 35:7
39:3 86:7 162:9
277:23 305:22
326:2
**speaks** 41:6
154:18
**special** 58:6 62:15
64:2,24 65:20,24
68:15 71:18 72:17
74:5 77:4,15,17
78:10 79:21 83:7
86:9 87:24 90:11
91:19 92:2,7
94:17 96:24 98:5
98:22 161:17,24
281:16 302:20
303:6
**specific** 12:5,6
19:24 61:20 64:13
65:18 68:21 69:11
70:4 71:22 72:18
74:8 75:1,17 78:4
78:8,15 79:4,11,16
80:7 82:4 83:1
84:21 85:6,9,15,19

87:7,17 88:12
89:7,8 90:17,24
91:5 93:12,13
94:13,14 95:3
97:21,23,24 98:1,8
105:3 110:13
111:10 112:17,17
113:8 120:12
122:7 130:8,8
139:23 140:2
141:15 142:21
144:14,20 145:21
147:23 149:2
156:14 162:6
164:8 168:10
199:3 206:5,8,12
206:13 208:8
210:22 215:1
227:7 228:5 231:1
257:9,21 275:23
276:11 288:13
295:18,19 300:21
301:1 306:20
310:3,5 325:14
328:4 337:1
340:10,11,11
341:1 360:7,16,17
364:22
**specifically** 12:2,8
20:9 24:1 40:21
54:17 64:20 65:4
69:22 70:14,23
72:3 89:17,18
90:3 121:1 126:4
130:9 131:23,24
142:8 144:9
168:18 207:14,23
207:24 214:17
217:3 235:19
263:5 275:1
276:21 280:20,23

297:20 308:15
309:1,19 310:18
313:6 314:22
325:4 340:14
346:15 352:14
356:21 365:1,9,18
**specificity** 108:15
**specifics** 175:23
225:4 276:7
367:24
**specified** 371:6
**specify** 280:8
**speculate** 258:20
**spend** 13:15 23:8
**spike** 187:9 234:20
234:22
**spoke** 29:15,22
228:6 234:9
246:17,22 247:5,7
247:7,8,9 248:1
298:12,15,19,21
367:20 368:1
**spoken** 367:3
**spread** 109:12
**spreadsheet**
340:11,19,21
345:5,9 348:12
360:18 361:6
362:6
**square** 2:20
**stabilization**
219:15
**stabilizing** 268:22
269:9
**stack** 155:8
**stage** 10:11 226:24
227:13,15
**stake** 18:14
**stand** 44:12,17
53:21 302:2
368:19

**standard** 43:3
61:6 76:13 81:13
143:22 144:23
146:4,10 147:2,20
149:2,10,18
**standards** 137:5
148:22
**standing** 55:3
56:12
**staring** 364:11
**start** 219:23
223:21 242:21
301:18
**started** 219:2
**starting** 304:15
347:19
**starts** 152:4 205:2
242:22
**state** 9:5,8 19:3
58:18 68:14 75:21
145:9,14 148:4,9
150:21 244:23
246:7 248:23
250:16 251:7,12
251:15 252:10
263:3,6,8 264:1,5
278:1,1,9 285:9
292:12 301:18
302:6,19 371:1,4
373:10 374:15
**stated** 12:7 40:22
60:16 71:5,6
96:15 102:10,14
103:1 205:15,19
211:9,12 219:24
222:7 226:10,14
228:12 232:4
304:9
**statement** 27:4
28:2 45:3,13,21
100:22 101:22

102:1,3,6 103:4,6
108:5 111:5
114:21 115:3
116:20 118:2,16
119:21 120:6,7,8
127:20 137:2
138:21 156:12
196:4 212:1
216:15 225:2
228:17 231:2
265:10 269:12
280:11 306:20
355:2 358:18,21
359:3,6 373:13,14
374:19,19
**statements** 148:3
148:11,15,23
285:5
**states** 1:1 5:6,22
6:21 8:17 42:8,18
58:22 131:18
135:1,8 210:8,15
217:13 245:21
257:11 258:14
328:12,13
**statewide** 264:19
359:18
**stating** 11:19,22
76:2 199:4 205:19
**statistic** 286:16
351:20
**statistical** 196:24
357:23 358:7,15
366:4,8
**statistically** 152:5
154:6 350:2,3
**statistics** 184:20
285:24 318:6
**status** 57:6
**stayed** 57:18,20
365:6

**stays** 353:23
**step** 348:5,19
349:1
**stephen** 3:4 9:13
**steve** 62:19 81:23
86:8 93:21
**steven** 2:14
**stick** 321:22
**sticking** 319:8
360:19
**stop** 50:17 51:1
95:14 362:24
**stopped** 318:7,11
**stores** 158:11
**straight** 238:11,23
**strategies** 5:8
103:15,20
**street** 2:6,9,13,16
2:21 3:6 158:11
**streets** 323:13
**stress** 165:13
**stressful** 250:9
**stressors** 164:24
165:3,7
**strike** 31:11 43:10
120:17 121:3,4
128:19 156:6
157:2 245:7
**strong** 152:5 154:6
206:22 239:22
253:22
**stronger** 196:14
239:16
**structural** 165:2,5
248:21,23 249:2
**stuck** 331:3
**students** 123:23
**studied** 20:15 21:6
156:21 164:17
314:14

**studies** 12:2,5
25:20,21,24 26:10
28:13 29:7,23
31:13 32:3,6
33:23 34:7 40:12
40:17 41:9 47:7,8
47:12 48:3,5
59:13,16,20 60:1
63:23 64:11,18
85:2,2 86:24 93:8
122:13,21 123:2
123:10,23 127:12
134:14 139:23
140:3 145:2,16
153:14 154:13
164:7 167:20
169:8 173:4
179:11,14 206:8
206:20 207:1,4,5,9
207:13,18,19
214:20 215:1
216:22 228:24
229:23 230:5,9,10
230:19,23 231:1
239:23 240:3,12
240:14 243:6,9
254:17 259:10
274:14 297:8,11
297:14 368:13
**study** 6:6 21:3,7,9
22:24 24:18 25:3
25:8,9,16 26:17
29:16 30:23 31:5
31:13 34:8 36:17
37:20,21 38:16
41:1,5,6,13,16
43:13,16 46:23
47:11 50:11 54:12
54:12,13,23 60:2
85:6,10,11,12 91:4
91:5,11,21 92:1

93:17 99:19,24
100:6,10,17 101:7
102:7 123:15
124:3 125:20
140:9 153:13
154:11 164:15
170:8 192:23
206:5,13 208:7,9
208:14,15 210:18
210:21 214:12,13
216:18 218:19
221:17,22 223:4
241:3,10,14,16
243:5,5 270:9
287:16,18 288:11
290:6 297:16
305:21,24 307:18
307:19 366:11
368:9,11,22,23
**studying** 215:18
297:5
**stuff** 55:20 66:6
**sub** 206:19
**subgroup** 199:1
356:20,23 357:20
**subject** 22:24 24:2
43:21 54:23 55:5
55:23 56:5 59:10
61:10 62:5 67:23
76:15 77:5 78:5
79:8,10 80:12
83:16 87:5 89:3
96:9,19 228:11
258:12 281:12
303:2,3
**subjected** 90:9
**subjects** 59:15
65:16 67:13 70:20
182:7
**submit** 69:7 77:1

**submits** 55:9
**submitted** 11:16
12:10,14,22 14:9
14:14 23:9,12,21
24:20 44:7 49:15
53:19,22 54:7,20
59:22 60:10,12
62:9 64:10 66:22
73:1,2,14 300:9
303:15
**submitting** 12:18
**subpart** 113:21
**subscribed** 373:10
374:14 375:21
**subsequent** 6:8
95:16 100:12
305:23 331:14
333:12,18
**subset** 34:19 35:1
**substance** 6:2
87:22 88:4 96:18
100:7 159:18
209:14 218:6
221:11 255:3,5,19
256:3,8,14 257:2
257:15,19 258:1
258:16 266:8,14
334:8
**substances** 18:23
158:15 175:14,17
184:23 185:1,3,4
186:4 191:21
223:24 224:2
299:23 314:13
335:16
**substantial** 35:22
268:12 269:4
**substantive** 93:4
96:7
**subsumed** 46:15

**subtle** 80:3
**subtraction**
340:10
**sud** 101:3
**sudden** 365:17
**sufficient** 128:5
129:1 188:4
189:20 197:22
229:12,15,20
306:6 308:1,9
**sufficiently** 178:22
325:14
**suggest** 55:2 56:13
128:7 129:3
304:10
**suggesting** 79:1
250:14 334:24
**suggestion** 76:19
**suite** 2:9,21 372:2
**sum** 350:3
**summarizing** 64:6
**summation** 347:5
**summed** 349:24
**superior** 372:1
**supervision** 43:2
81:12
**supplement** 28:8
**supplemental**
12:21,24 13:1
**supplied** 179:20
179:20
**suppliers** 295:11
**supply** 68:5,6
69:13 70:17 82:11
82:15 127:16
128:7 131:4,6,8,12
131:14 132:2,8,22
133:17 149:12
150:1,5 152:6,16
152:18 153:17,23
154:7 159:21

160:8,9,12,14,18
166:4,6,7 170:22
171:2,7,8,24 172:5
172:9,15,23 173:9
173:12,18 174:15
179:5 195:18
226:23 227:3,5,9
227:12,16,17,22
230:2 231:24
232:6,20,24 233:1
233:4,19 234:6,10
273:20 294:23
295:1,11,12,24
296:6,20
**support** 12:6,15
12:16 13:2 355:2
**supported** 147:13
**supporting** 123:3
**supposedly** 108:4
121:9,14 142:11
**sur** 163:7
**sure** 34:18 35:1
44:8 50:1 57:19
64:24 87:2,8 92:4
92:4 97:21 112:3
125:12 127:15
133:1 135:19
139:21 140:4
141:20 147:5,16
159:2 166:2 167:5
169:13 173:4
174:14 176:11
177:22 191:18
206:17 208:23
209:5 214:6
220:23,23 235:21
246:21 250:12
259:22 267:7
268:9 292:2
294:20 299:9
304:16 314:20

319:6 320:2
323:15 325:17
331:2 332:15
334:19 338:10
341:3 348:1 350:7
352:1 355:16
363:17
**surgery** 123:1
**surmise** 71:23
**surplus** 113:22
114:2,6,9,10,11
121:19 123:11
124:12
**surprise** 72:24
302:21 303:8
351:2
**surprised** 301:22
303:21
**surprising** 54:3
**survey** 29:23
192:7
**surveys** 163:7,16
258:12,13
**suspect** 362:11
**suspicious** 300:6
**swallow** 84:15
87:20
**swallowing** 88:2
**swallows** 71:5
88:4
**swear** 10:1
**switch** 182:7
**sword** 94:23
**sworn** 10:2,5
371:7 373:10,13
374:14,18 375:21
**symptoms** 6:8
34:9 38:23 100:8
100:13 101:3
243:2

**synonymous**
141:5
**synthesis** 5:14
21:22 22:6
**synthetic** 236:7
237:2 314:23
319:18 320:22
322:12,17,18
323:8 324:21,24
325:7,9,11,13
327:8 349:9,10,12
351:21 353:18,18
357:1,6
**system** 184:21
**systematic** 5:14
21:22 22:5 229:24
232:14 242:6
**systemic** 307:3
**systems** 151:1

**t**

**t** 10:3 185:5
187:20,21 361:22
**t40** 356:15
**t40.1** 334:11,14,16
335:23 336:5,19
338:4 343:23
344:7,9,18,23
345:16,24 346:8
**t40.1.** 344:19
**t40.2** 334:7,15
335:16 337:13,19
338:14 339:14,14
342:21 343:2,13
343:19 348:6,14
355:24
**t40.2.** 338:5
**t40.3** 334:8,15
335:16 337:13
338:14 339:15
342:21 343:3,13
343:19 348:6,14

356:1
**t40.4** 334:12,14,16
335:23 336:8,20
337:13 339:14
342:20,21 343:9
343:12 344:4,9,10
344:23 345:17,17
345:22 346:1,6,8,9
346:16 347:7,11
347:21 348:5,6,14
348:21 351:7,21
352:5,8,20 354:7
354:10 355:24
356:1,2,16,20
357:1 361:17,20
362:3 363:10
**t40.4.** 336:6
339:15 343:3,24
346:22 363:15
**tab** 339:7,9
**table** 182:10
201:12,16 213:5
213:11 244:3
253:14 316:17
**tables** 183:16
339:23
**tainted** 129:1
**take** 8:11 13:21
15:18 20:12 22:7
26:23 29:1,6,13
31:17 39:10 42:19
43:15 44:6 51:3,9
53:4 54:4 63:18
64:8 82:22 93:6
93:10 95:1 99:1,2
99:5 102:2,5
106:4 126:19
131:24 132:18
138:4 181:21
185:12 189:18
193:7 204:19

208:4 220:21
222:9 233:8
235:24 238:10,22
239:2 241:3 246:9
258:7 264:17
271:6 287:16
289:24 294:12
299:10 300:19
302:17 311:22
327:1 333:17
347:10 350:4
362:21 363:1
364:13
**taken** 1:19 8:13
25:11 89:13 99:11
126:9 154:9
166:14 190:1,2
198:3 221:3
238:12,14 271:11
301:23 303:23
304:3,23 369:7
371:6,9,13
**takes** 181:20
**talk** 113:19 141:13
160:3 187:5 190:8
191:22 193:6
257:11 272:22
274:1,14 279:13
294:22 369:3
**talked** 131:7,9
134:19 145:19
170:22 248:4,11
249:4 253:9
288:20 367:23
**talking** 69:8 70:16
70:17 84:19 93:24
105:14 110:5,6
113:12 127:14
129:16 141:20
146:17 177:23,24
187:14 190:10,11

193:16 215:8
235:22 241:19
248:20 250:20
271:18 272:23
274:2,11 275:8,10
276:22 280:4,24
293:24 342:7
360:10
**talks** 49:17 283:23
**tally** 304:15
**target** 65:19
**targeted** 55:21
**taught** 139:5,8
**taylor** 3:9
**team** 17:3,5,6,7
**technical** 17:13
**teenagers** 294:12
**tell** 13:20 55:24
56:4,6 201:24
223:7 292:4 298:7
319:17 357:11
368:24
**telling** 281:21
**ten** 52:20 271:7
365:10 370:2
**tenth** 3:6
**teresa** 1:20 8:23
57:19 371:4,20
**term** 27:15 40:11
40:24 41:3 104:9
104:15,20 167:3
314:20 315:17,21
358:6
**terminology** 167:3
316:14
**terms** 30:5,15 32:4
35:24 140:19
147:24 194:2
215:12 257:12
323:8 324:17
336:17 338:22

357:17
**test** 193:2
**tested** 97:3 355:10
**testified** 10:5
15:19 95:10
139:10 202:8
304:4 323:16
330:2 335:18
350:20 354:14
**testify** 339:22
**testifying** 15:11
17:21 80:4 305:21
308:16 367:10
**testimony** 15:8,13
53:13,14 54:19
55:4 59:8,11 61:3
63:11 67:2,3
70:23 72:13 90:9
96:20 162:13
276:20 312:4,5
320:16,17 321:9
328:15,21,22
329:4,5,13,14
334:5,23 335:7
338:12 352:22
357:8,14 369:13
369:24 373:6,7
374:6,9,12
**testing** 98:13
**tests** 354:8
**text** 40:9 213:5,6
349:6 350:12
**thank** 18:13 39:8
39:21 65:23 90:6
97:8 98:19,20,21
101:14 136:7
220:24 223:19
301:7,8 307:14
309:18 369:12,15
369:19,21

**thanks** 165:6
**theft** 115:10,24
116:7
**theory** 358:23
364:15,18 365:17
**therapy** 104:10,15
104:20
**thing** 62:16 63:8
64:16 88:5,9
225:24 248:3
249:21 301:18
**things** 66:1 68:7
69:24 70:16 96:20
144:1 160:24
161:18 176:10
181:19 212:17
267:17 331:14
334:2 346:22
361:24 368:11
**think** 22:14 23:13
23:16 27:14 29:18
30:15 36:3 40:17
44:14,18 45:1
47:15,17 49:6,7
50:19 53:2,3,11,12
55:8,12,18,19,20
56:3,4,6 57:8
59:17 60:7 62:16
63:15 65:1,14
66:1,10,21 67:9
68:18 69:22 74:3
74:5,14,19,22
75:14,15 77:17
80:15,17,19 81:24
82:1,13 83:22
84:11 86:5,11,17
86:21 88:3,16
90:15 92:11,17,21
92:22 93:2,11
95:7 96:3,12,13,24
97:10,11,12,15

98:5,6,11,16 106:3
107:24 108:5,19
110:1,12 113:3,12
117:18,22,23,24
119:1,20 122:16
125:12,15 126:21
127:12 128:4,15
129:5,15 131:17
132:24 134:3,12
134:15,16,21
136:1,13,23
137:13,20,20
138:1,10,12,13
139:2,6,22 146:12
146:19,22 147:11
148:7 152:15
153:6 157:13
159:24 161:23
167:10 171:8
172:11 187:20
188:8 191:3
192:17 196:3,11
196:12 202:8,11
202:24 204:8,10
204:15 205:2
208:8 211:4,18
212:10,23 214:15
215:12 216:22
217:17,24 222:9
224:10 226:14
227:18 228:15
229:12,15,16,18
236:19 237:7
238:2 240:19,24
244:3 247:1
251:10,22 253:9
255:22 259:11
262:21 263:16
266:24 273:5
274:13 278:1
283:22 285:3

**[think - transition]**

286:6 288:13
293:5 294:8
295:10 301:5
303:7 306:5,14
307:23 308:7,15
309:23 311:4,15
312:16 321:2
323:16 330:2,17
335:5,7,18 337:6
338:12,12 339:1
345:23 348:10,12
348:15 349:5
350:20 356:15
357:18 366:20
368:11 369:3,19
**thinking** 41:15
65:12 74:19
115:10 144:2,22
173:2,3 241:10
**thinks** 43:12
**third** 43:10 44:4
104:5 173:2
228:22
**thirty** 372:19
**thomas** 103:13
**thoroughly** 23:1
**thought** 50:3
169:1 183:19
254:13 304:6
311:12 316:12
**thousand** 88:7
285:17,18
**three** 2:20 19:20
21:13 30:6,10
59:9 62:12 69:7
93:24 123:2 124:5
137:2 154:13
312:16 315:1,5,13
316:1,2,19 317:4
318:16 320:24
326:18 330:3

**threshold** 29:6
78:3 95:12
**thursday** 90:10
**tie** 199:3 216:2
**ties** 98:7
**tim** 3:3 9:10 10:8
14:17 16:3,20
52:19 54:6 57:2
60:8 67:18 70:6
72:20 87:2 281:12
**time** 9:8 13:15
14:17 15:6 16:3
23:8 36:17 44:4,6
45:4 47:13 51:4
51:11,17 52:23
57:7,23 58:18
63:4 66:3,4,12,13
86:2 91:3 92:12
94:19 99:10,15
111:7 112:9,20,21
128:5 151:18,24
166:13,19 184:23
185:10,12 186:5
188:13 200:3
202:15 209:4
221:2,7 230:20
235:1 238:6
244:16 256:23
267:7 271:10,15
272:4,8,21,23,24
273:5 304:1,22
305:3,23 306:17
306:24 307:6,12
318:3,12,13
320:18 323:4
331:24 332:7,10
338:20 342:2
346:4 365:2,6
369:6,11,13 371:6
**times** 124:5
161:11 217:15

315:14,22,24
316:2,6,8 320:24
330:14,22 333:6,8
365:10,19
**title** 366:14,19,20
**titled** 339:7 367:14
**tobacco** 256:9
**today** 10:9 28:14
28:15 44:19 45:2
67:1,2 78:20
142:24 143:5
240:15,16 292:10
292:11 301:22
302:13,15,18
303:13 304:7
308:14 319:9,23
328:7 333:14
334:24 340:18
366:10 368:6,15
369:13
**today's** 56:1 303:9
369:24
**todd** 246:19,23
**told** 76:8 331:2
346:3 361:2,23
**tolerance** 107:5
**top** 31:14 40:8
164:15 223:9
242:11 257:17,23
258:23 265:1
269:23 334:21
349:18,19
**topic** 44:24 57:3
79:14 104:17
110:13 111:10
118:21 134:4
143:15 151:6
170:8 178:17
238:9 240:6 296:9
319:12

**topics** 70:12 248:2
**total** 15:24 59:6
169:11 170:22
171:2 172:14,23
173:12 179:5
245:13,14 255:23
314:2 320:20
347:11 349:2
352:7 357:21
370:1
**totality** 124:21
**totally** 269:5,5
**totals** 359:18
**touch** 43:11
**tower** 2:16
**tradeoffs** 305:16
**trafficked** 112:2
202:2,6 253:17,21
**traffickers** 174:24
176:20,23
**trafficking** 166:24
167:2,10,17
168:12,15 169:2
170:6 179:18
294:5,8
**trained** 308:7
**trainings** 129:3
**traits** 165:19
**trajectories**
200:15
**transcribed** 373:7
**transcript** 71:13
71:19 371:10,14
372:12,13 373:5
373:12 374:5,11
374:17
**transfer** 108:16
111:17
**transition** 55:20
192:10 205:1
206:6 207:3,10

208:1 225:14
226:6 240:12
**transitioned**
192:13 236:24
**transitioning**
163:1 230:3
**transitions**  208:5
239:24 240:4
**transparency**
331:13
**transparent**
345:15
**trauma**  248:10
250:6
**treat**  126:24 127:1
149:5 361:7,9
**treated**  40:11,24
41:3 46:2 47:13
47:22
**treating**  142:8
143:22
**treatment**  6:4 26:9
26:24 29:23 41:23
47:10 116:18
123:7 142:11
144:7 145:8,14,22
146:4,11,16,21
147:1,3,8,21 148:5
148:17 149:11
209:17 266:8,14
285:1 295:16
297:3,6,11,14,22
**trend**  74:10 90:13
261:11 264:22
290:7 291:12,20
292:15,22 293:9
293:18
**trends**  220:2
243:17 260:1
366:9

**trial**  15:12 61:4
63:11
**tried**  42:3 56:16
192:5 312:1
**trouble**  102:18
**true**  117:15,16,17
185:12 234:12
281:20 346:3
**truly**  221:24
338:23
**trust**  230:13,18
**truth**  88:6
**try**  50:17 51:21
52:15 65:13 90:18
201:3 246:11
309:22 311:23
357:20
**trying**  17:4,5 30:4
71:15 87:20,21
110:5 118:7
124:18 136:22
170:20 177:22
197:3 216:2 217:3
235:10 242:14,18
252:7,24 253:3
256:13 286:12
307:16 308:19
310:4,5 314:2,7
321:11 322:22
338:23 340:16
343:18
**turn**  8:7 22:13
48:8 87:10 121:5
162:2 273:18
284:15 296:24
312:11 326:8
367:7
**turned**  301:12
**twelfth**  2:13
**twelve**  316:24

**twenty**  152:2
371:15
**twice**  214:7,10
246:1 248:22
251:14
**two**  16:8 35:8
46:14,16 62:12
66:1,14 123:23
153:13 154:14
164:4,20 171:6,8
171:22 172:14
176:13 182:3
183:23 215:22
256:18 265:16
270:17 273:5
305:19 317:3
326:21 336:3
341:17 353:1,4
358:24
**type**  86:3 112:12
112:24 116:9
247:20 309:12
354:5
**types**  118:2 141:23
177:19 183:2,23
222:12,14 240:22
275:14 277:1
284:8 310:8 324:8
**typewriting**
371:10
**typical**  195:24
**typically**  33:1
195:17,18,21,23
238:24 267:18
272:13
**typo**  309:23

**u**

**u**  60:2
**u.s.**  104:6 220:14
226:18 240:5
255:4,18 256:5,12

257:1,15,18
258:19
**uh**  98:22 212:21
247:19 336:21
**ultimately**  310:24
**unaware**  196:5
**uncertain**  311:24
**uncertainty**
309:14 310:9
311:6,19
**underestimate**
259:14
**underestimated**
280:10,15
**underestimates**
201:6
**underlying**  6:10
32:3,6 34:7 47:7,8
47:12 48:3,5
290:6 321:10,21
325:20 332:3
358:22 364:22
**understand**  12:1
16:7 18:21 19:6
19:11,15 23:14,15
23:22 24:15 34:18
43:17 53:1 55:8
56:11,20 67:21,21
68:13 74:12 75:21
83:10,19 84:4
87:3 93:14 97:11
98:11,12 102:4
115:5 120:2 131:1
132:16 136:14
138:22 147:7
176:4 222:6 235:9
253:3 263:7
266:12 286:12
302:4 303:17,18
305:17 306:15
316:15 326:17

331:5 332:15
333:11 334:2
338:10 347:4,12
347:24 354:15
356:10,22,24
357:1 363:16
**understanding**
6:19 16:12,13
18:21 30:3 42:5
42:16 77:18 80:5
97:22 104:13
110:2 116:21
117:13 118:10
120:20,22 136:9
136:15,20 143:4
143:16 145:6,11
146:9 147:20
148:1 149:4,24
150:4 162:8
163:20 164:10
167:14 168:7,11
170:9 196:9,11
202:19 210:20
213:23 219:9,17
219:21 222:18,20
224:5 225:18
226:12 229:10
236:14,18 237:9
238:24 239:11
243:17 257:2,24
268:7 276:15
277:4 280:13
282:18 283:15,16
284:24 290:23
295:14,23 296:4
296:10,17 315:3
340:7 351:4 358:3
**understated** 280:1
283:17
**understood** 75:22
76:18 302:1 350:7

**undertaken** 20:21
25:20,24 125:20
126:6,10 143:21
144:8,14
**undertaking**
118:11 196:17
**undertook** 302:5
303:19
**unfair** 339:19
**unique** 66:16,19
67:10,15 83:12
90:12 161:19
**unit** 8:12 51:16
99:13 151:22
166:17 221:5
271:13 305:1
307:10 369:9
**united** 1:1 5:6,21
6:21 8:17 42:7,18
131:18 135:1,7
210:8,15 245:21
258:14
**units** 370:2
**unknown** 40:11
**unlawfully** 170:14
**unnecessary** 159:7
**unquote** 309:3
310:6
**unreasonably**
22:23 52:11 59:1
61:7,12 65:6
**unreliable** 305:13
349:23
**unstable** 321:6,10
321:13,17
**unused** 123:1,6
**unusual** 157:4
**upcoming** 61:5
**updated** 183:10
269:20

**upper** 217:16
**upwards** 248:15
256:6
**urban** 6:19 42:5
42:16 81:2,17
86:12,18 155:9
156:11
**use** 5:16,18,19,21
5:21 6:2,7,8,20
7:2,3 12:12 26:1
26:24 27:5,7,10,12
27:15,16,23 28:14
28:15 29:17,21
31:9,10,12 32:19
32:24 33:4 34:10
34:13,24 35:4,15
35:19,23 36:2,22
37:1,4,12,19,22
38:1,5,9,23 42:7
42:17 46:5,7,24
53:6 55:4 61:22
66:4,5 70:18
78:17 85:13 94:6
94:8,19,21 100:6,7
100:11,12,23
101:1 105:10,13
105:22 106:5,8,15
106:16,18,19,22
107:1,4,16,21
108:2 109:1,2
116:24 118:3
119:2 126:22
131:2 133:16
146:15 148:5,16
159:15,18 160:7
160:19 163:8,9,18
163:20,23 164:3,5
164:17,19 167:21
169:22,22 176:9
180:23 181:4,7,11
187:10 192:7

196:5 198:9 199:6
199:10,22 200:7,8
200:14 201:6,17
201:19 202:24
203:6,9 204:4
205:7,8,12,12
206:7,7,21 208:5
209:7,14 210:7,8
210:14,15 211:20
211:21 212:6,11
212:12 213:20
214:19,21 215:7
215:11,12,13,15
215:19,19 217:9
217:11 218:1,2,6
218:11,18 219:2,3
219:17 220:17
221:11,12 223:5
224:14,15,22,22
225:12,13,15
226:3,4,4,6,15,21
226:24 227:11,14
228:8,18,18 229:1
229:5 230:3,4,11
230:11 231:7
232:7,12,16 233:5
234:2,7,14,17,20
234:22 235:6
236:21,24 239:5
240:21,21,22
241:11,23 242:12
242:12,17 243:2
243:10,11,11
244:11,19,24
245:10 248:11
249:24,24 250:15
250:23 251:3,22
251:24 252:8,18
252:22 253:16,21
253:23,24 254:4,5
254:9,23 255:3,5

255:11,19,21
256:3,3,8,15 257:2
257:12,15,19
258:1,15,17 259:9
265:4,11,14,23
266:8 267:14,16
267:20 268:1,8,16
268:22 269:9
270:2,19,20 271:3
271:23 272:9
273:1 280:1,10,15
286:14,15 287:1
288:17 289:6,7,21
289:22 290:7,17
291:6,13,20
292:13,16,22
293:10,19 295:15
308:4 309:9,15
314:8 315:21,24
316:1 320:18
321:3,11 324:19
327:9 332:6
334:23 336:23
343:19 358:6,9,11
358:11 366:1
**user**   196:1
**users**   7:4 107:8
123:16 192:8
195:21 196:5,6,7
196:10,14 199:9
199:12,15,16,22
214:14,15 215:16
215:17 226:1
254:18,18 285:10
285:16,17,20,21
286:3,9,10,18,20
286:22,22,23
287:3,6,13 289:8
289:23 293:2
**uses**   26:19,20
27:18 45:21 108:4

113:23 121:9,10
121:15 125:13,13
127:13 129:13,16
204:6 233:17
270:19
**usually**   185:8
189:24 358:12

**v**

**v**   60:1 107:3,7
372:6 373:3 374:3
**vague**   101:19
149:8 277:10
331:17 346:20
359:12
**validating**   366:3
**validity**   88:20 93:9
183:2 324:17
**value**   275:1
**van**   283:22
**variable**   262:20
**variables**   92:14
93:12 358:24
**various**   91:6 92:13
247:3,3,4 253:10
325:11 328:19
329:1 334:22
337:7 339:9
**vary**   210:23
**vast**   62:10 66:17
84:24 179:16,22
180:4,11 202:19
203:2
**venn**   35:3
**venues**   293:15
**verified**   365:23
**veritext**   8:22,24
370:3 372:1,8
375:1
**veritext.com.**
372:17

**versus**   8:15 155:11
170:14 171:11
172:19 173:9
200:11 270:19,20
320:2 324:12
337:13,13 344:23
345:4 352:21
354:1,2 356:3
**video**   8:2,10,12
9:12,23 51:10,15
57:18,19,24 99:9
99:13 151:17,22
166:12,17 221:1,5
271:9,13 301:11
301:12,13,15
304:16,21 305:1
307:5,10 369:5,9
369:22
**videoconference**
1:19
**videographer**   3:9
8:23 304:14
**videotaped**   1:19
**view**   70:21 77:1
78:6,7,11,12 79:7
79:13 80:11 87:10
87:13,14 100:1
101:18,23 108:24
133:15 155:23
228:8 249:19
285:24 301:20
303:17 342:9
**view's**   79:23
**viewed**   61:16 77:1
**views**   71:1 87:5
**virginia**   1:1 2:16
8:18 15:21 17:10
17:21,23 18:5,22
23:10,12 24:1
49:14 52:16 53:20
55:11,21 60:11,15

60:17,20,23 61:4
61:22,24 64:10,13
64:20 65:18 67:7
68:3,6,10,17,20,21
69:5,10,18,20,21
70:15,17,19,24
71:13 72:4 73:1,8
74:21 75:5,10
76:8,21,23 78:4,8
78:12 79:4,8,11,16
80:8 81:11,16
82:4,6,17 83:1
84:18,22 85:6,16
85:19 87:7,11,17
87:23 88:22 91:4
91:12 92:14,16,20
93:1,9,12,17,23
94:4,9,12,13,14
95:4,5,12,18,23
96:2,22 97:4,21,23
97:24 98:1 100:1
101:6,17,23 102:1
102:8,11,16,22
103:5 104:15,19
125:6 127:3,6
129:9,14 143:1,5
143:12,17 144:15
144:21,24 145:4,8
145:12,21 148:4
148:16,21 150:2,5
150:10,13,17,23
151:3 152:11
153:3,7 155:23
158:1 161:19
162:3,7,14 163:1
164:6,8,18,21
165:8,14,22 166:3
170:15 182:9
183:6 206:6,9,10
206:12,14 207:14
207:19,20,24

210:21 211:1,4
212:9,13 213:24
213:24 215:21
216:3,8,19 217:2,4
217:6,10 219:10
219:19 220:1,9,18
222:7,19 224:6
225:19 226:11,15
226:21 227:3,7,10
227:22 228:2,5,9
228:13 229:10
231:11,13 232:1
232:12 233:6,13
233:24 234:19
235:11,15 236:20
240:1 244:11
245:19 246:2,16
249:15 259:13
260:1 262:18
263:4,6,21 264:3
264:19 265:6,22
281:14 282:6,16
283:3,12,20,23
284:2 285:2,4,7
286:1,17 287:2,13
287:15 288:18,24
290:22 291:7,13
291:21 292:16,23
293:10,19 296:1,7
296:11,18,21
302:1 303:5,14,23
319:8 320:4 328:4
328:12 359:17,20
359:22 360:16,19
361:3 371:1,16
**vital**   147:13
184:20 291:16
**volkow**   5:8 103:13
103:20
**volume**   124:10
139:14,19 140:6

140:10,16 141:2,3
141:4,7,7,10,13,15
141:16,17,19,20
141:24 142:22,23
143:1 166:22
**volumes**   120:3
**voluntary**   137:4,9
137:9
**vowles**   5:14 21:23
22:3,24 23:24
24:18 25:3,8,12,17
25:22 26:8,11,17
29:7,16 31:7,13
32:1,4,4 33:14,21
34:8,11 35:9
37:20 38:11 47:11
47:18,19 54:12,22
60:1 93:23
**vs**   1:6,13
**vulnerability**
165:18 232:19,23
233:9,10,12,22
**vulnerable**   227:14
232:16

| **w** |
| --- |

**w**   60:1
**wait**   57:14,16
163:12 348:10
**waiting**   33:18
52:11
**waived**   372:20
**walk**   119:24
**walking**   253:12
**want**   16:4,4 17:2
22:17 25:14 40:21
44:6 45:13,20
49:23 50:1,22
51:9,23 52:10
53:18 57:13 62:16
72:22 81:24 84:4
84:14 87:8,12

88:14,15 93:6
94:20 95:3,4,4
96:7 97:9 103:3
113:13 121:17
132:15 139:21
161:16 169:12
171:16 174:8
220:21 257:10
258:20 287:22
290:20,20 301:18
302:6 303:11,20
307:2 309:3 310:6
317:10 325:10
333:7,22 334:1
338:10 344:13
347:23 356:11
361:9 366:14
369:3
**wanted**   14:22 15:7
16:16 17:17 29:2
30:2 68:13 104:3
104:5 105:12
107:11 112:7
113:11,20 121:6
121:18 129:17
146:24 155:11
158:24 163:4
174:4,19 182:8
183:22 187:12
201:1 213:16
218:24 223:20
235:9 238:19
258:23 259:24
269:7 278:17
290:4,13 298:2
309:20 331:7
339:20 350:6
356:16
**wants**   66:4 92:13
**warehouse**   112:21

**warranted**   116:17
117:1,12 118:13
137:12
**washington**   2:13
3:6
**way**   35:2 46:14,16
47:9,15,17 52:14
75:2,3 77:2 94:19
94:21 97:15 102:9
102:21 104:18,24
105:19 108:11,21
108:23 113:5
114:18 115:2,17
115:21,23,24
116:2 119:23
132:18 133:2,9,23
134:5,9,13,17
143:16 150:8
158:18,19 164:11
169:12 171:15
177:15,17 178:3
186:16 202:12
203:22 241:23
242:6 253:1,8,11
255:9 259:16
268:14 272:15,15
273:6 294:24
296:10 311:7
312:17 315:20,24
315:24 316:11
319:23 328:17
332:4,11,12
337:24 338:24
339:1 344:1
348:15,18 350:21
351:20 356:6
357:15 362:13
**ways**   67:1 114:24
115:8,13 116:4
119:22 120:1
132:15,21 133:1,6

133:13 141:23
182:4 253:10,13
323:12 331:12
350:22 352:2
354:4 357:16
362:14 365:13
**we've** 12:23,23
  50:9 57:18 59:8
  66:11 88:3 98:17
  99:4 129:6 131:7
  131:9 133:7
  134:21 145:19
  196:16 197:11
  217:5 220:20
  222:23 249:4
  253:9 263:13
  264:7 288:19
  292:9,11 304:17
  305:8 360:10
**web** 327:24
**weeks** 104:10
**weighed** 138:7
**weighted** 349:21
  350:10
**went** 172:2 318:17
  355:20 364:16
**west** 1:1 8:18
  15:20 17:10,21,23
  18:4,22 23:10,12
  24:1 49:14 52:16
  53:20 55:11,21
  60:11,15,16,20,23
  61:4,21,24 64:10
  64:13,20 65:18
  67:7 68:3,6,10,17
  68:20,21 69:4,10
  69:18,20,21 70:15
  70:17,19,24 71:13
  72:4 73:1,8 74:21
  75:1,5,10 76:8,21
  76:23 78:4,8,11

79:3,8,11,16 80:8
81:11,16 82:4,6,17
83:1 84:18,22
85:6,16,19 87:6,10
87:16,23 88:22
91:4,12 92:14,15
92:20 93:1,9,12,17
93:22 94:3,9,12,13
94:14 95:3,5,12,18
95:22 96:2,22
97:4,20,23,24 98:1
100:1 101:6,17,23
102:1,8,11,15,22
103:4 104:15,19
125:6 127:3,6
129:9,14 143:1,5
143:12,17 144:15
144:21,24 145:3,8
145:12,21 148:4
148:15,21 150:2,5
150:10,13,16,23
151:3 152:11
153:3,7 155:22
157:24 161:19
162:3,7,14 163:1
164:5,8,17,21
165:8,14,22 166:3
170:15 182:9
183:6 206:6,9,10
206:12,14 207:14
207:19,20,24
210:21 211:1,4
212:9,13 213:23
213:24 215:21
216:3,8,19 217:2,4
217:6,10 219:9,19
220:1,9,18 222:7
222:19 224:6
225:19 226:11,15
226:21 227:3,7,9
227:22 228:1,4,9

228:12 229:9
231:10,12 232:1
232:11 233:6,13
233:24 234:19
235:11,15 236:20
239:24 244:11
245:19 246:2,15
249:15 259:13
260:1 262:18
263:4,6,21 264:3
264:19 265:6,22
281:14 282:6,16
283:3,12,20,23
284:2 285:1,4,7
286:1,17 287:1,13
287:15 288:18,24
290:22 291:7,13
291:21 292:16,23
293:10,19 296:1,7
296:11,17,20
302:1 303:5,14,23
319:8 320:4 328:4
328:12 359:17,20
359:22 360:16,19
361:3 371:1,15
**whatsoever** 75:15
**whispering** 8:5
**who've** 253:20
**wide** 19:7 109:12
  138:17 240:20
  248:2
**widely** 107:23
  146:20
**widespread**
  107:17 108:2
  121:7 146:13,15
**wilkes** 43:11 50:18
  50:21 51:2 52:5
  55:1 56:13,18
  57:5,15,17,21 58:2
  58:4,5,6 60:8

62:15 64:2,24
65:20,24 68:15
71:18 72:17 74:5
77:4,15,17 78:10
79:21 83:7 86:9
87:24 90:11 91:19
92:2,7 94:17
96:24 98:5,22,24
302:5,21 303:18
**williams** 2:12 9:19
**willing** 57:2
  362:10
**wilson** 224:20
  225:4
**window** 318:15,15
**wit** 371:2
**withdraw** 50:22
**withdrawal** 107:5
**witness** 10:1,2,4
  14:18 23:2 57:12
  59:3,8,22 60:2
  63:14,15,21 64:9
  65:17 67:24 68:2
  69:19 70:8 73:7
  73:15 75:6 76:15
  77:22 81:7 84:8
  84:20,21,23 85:21
  88:16 90:8 91:10
  92:18,23,24 93:18
  94:15 96:8,13
  97:18 99:5 101:8
  161:8 162:8,22
  216:2 277:24
  278:4 339:19
  341:20 342:5
  371:7,10 372:9,12
  373:1,4,11 374:1,4
  374:15
**witnesses** 62:20,23
  73:21 74:16 77:3

witness'   372:15
wonder   88:7 202:9
  306:10 337:9
  338:21
wonderful   88:5
word   30:3 93:22
  102:20 162:21,21
  177:23 314:19
words   18:5,15
  73:7 81:24 82:7
  83:9 142:7 177:6
  261:18
work   15:14,24
  16:18 17:10,21
  51:20,24 145:9
  160:14 161:1,3
  183:19 259:15
  337:7
workbook   339:4,6
worked   18:4 340:3
working   56:22
  191:8 340:7
  341:22 342:14
works   338:6
wow   212:22
write   44:18 45:2
  117:19 118:19
  130:23 223:8,17
  314:22
writes   115:6
  116:22 118:10
  119:19 133:4
writing   129:4
  130:12 134:4
  148:8 230:22
written   19:17 22:3
  40:1 42:15 48:19
  56:7 81:8 90:14
  103:13 104:20
  115:19 119:14
  127:21,23 128:9

  130:18 132:18
  153:21 261:21
  289:19 371:9
wrong   82:21 225:9
wrote   44:21 54:13
  60:3 78:16 230:20
  287:23
wv   2:9,17 6:17
  13:7 371:20

**x**

x   75:7 80:12 82:11
  85:11 95:17

**y**

y   10:3 75:7 80:12
  82:12 85:11 95:22
yea   289:14
yeah   13:13,19
  17:16 36:11 41:15
  52:21 55:7 57:8
  84:6 99:22 101:20
  127:14 134:6
  163:14 164:12
  170:20 174:10
  183:15 187:1
  194:11 211:2
  216:22 217:19
  218:8 223:10
  225:24 237:22
  238:19 250:12
  255:16 257:6
  258:11 269:12
  272:18 276:21
  287:19 289:14
  297:15,16 316:11
  318:8 349:7
  350:11 351:2
  366:20 369:18
year   81:18 211:14
  213:1,9 223:23
  244:15,17,18,20

  255:12 260:11
  270:19,24 321:23
  331:9 349:22,22
  349:24,24 350:15
  350:16,19,19
  360:22 363:9,18
  363:22 364:6
  365:20
years   30:24 40:20
  147:17 178:15
  213:19 232:2
  235:8 244:22,24
  270:16 285:11,20
  285:21 320:21
  331:5 351:11
  360:2 363:12,14
  364:17
yesterday   18:8
  212:17
york   2:7 10:13
  15:20 34:4 43:9
  49:3,11,13 53:8,22
  55:12 59:5 60:13
  60:19 61:2,17
  68:8,12 69:6,10
  70:10,22 73:3,8
  75:7 76:11,20
  77:11 78:18,21
  79:14 87:14 91:12
  161:9 178:20
  205:16,23 281:23
  297:20
young   155:14
  290:8 291:2
youth   7:3 289:7,22

**z**

z   75:7 80:12 85:11
zee   283:22
zoom   8:21 10:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.