# EXHIBIT L

Exhibit L – SEALED excerpts of Plaintiffs' Expert Witness G. Smith Transcript of Deposition (Sept. 22, 2020)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE MARKETING OPINIONS OF DRS. ANNA LEMBKE, KATHERINE KEYES, ANDREW KOLODNY, AND JAKKI MOHR

2053716.1

Page 1

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2

3

    * * * * * * * * * * * * * * * * * * * * * * *
4

    THE CITY OF HUNTINGTON,
5

              Plaintiff,
6

    vs.                              CIVIL ACTION
7                                 NO. 3:17-01362

    AMERISOURCEBERGEN DRUG
8   CORPORATION, et al.,
9            Defendants.
10  _____
11  CABELL COUNTY COMMISSION,
12            Plaintiff,
13  vs.                              CIVIL ACTION
                                  NO. 3:17-01665
14  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
15

              Defendants.
16

    * * * * * * * * * * * * * * * * * * * * * * *
17

18

19        Videotaped and videoconference deposition
    of DR. GORDON SMITH taken by the Defendants under
20  the Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa
21  S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 22nd day of September,
22  2020.

23

24

Page 2

```
 1                       APPEARANCES:
 2
    APPEARING FOR THE PLAINTIFFS:
 3
            David D. Burnett, Esquire
 4          Anne McGinness Kearse, Esquire
            Jacob R. Stout, Esquire
 5          MOTLEY RICE
            28 Bridgeside Boulevard
 6          Mt. Pleasant, SC  29464
 7
    APPEARING FOR THE WV MLP PLAINTIFFS:
 8
            Rachel Shkolnik, Esquire
 9          NAPOLI SHKOLNIK
            400 Broadhollow Road, Suite 305
10          Melville, NY  11747
11
    APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
12
            Danielle Sochaczevski, Esquire
13          WILLIAMS & CONNOLLY
            725 Twelfth Street, N.W.
14          Washington, DC 20005
15          Raymond S. Franks, II, Esquire
            CAREY, DOUGLAS, KESSLER & RUBY
16          901 Chase Tower
            707 Virginia Street, East
17          Charleston, WV  25323
18
    APPEARING FOR THE DEFENDANT AMERISOURCEBERGEN:
19
            Christina Vitale, Esquire
20          REED SMITH
            811 Main Street, Suite 1700
21          Houston, TX, 77002-6110
22
23
24
```

Page 3

1                    APPEARANCES (Contd.)

2

   APPEARING FOR THE DEFENDANT McKESSON CORPORATION:

3

            Laura Flahive Wu, Esquire
4           Samuel Howe, Esquire
            COVINGTON & BURLING
5           One CityCenter
            850 Tenth Street, NW
6           Washington, DC 20001-4956

7

   ALSO PRESENT:

8

             Adam Hager, Videographer
9            Samuel Bloom, Esquire

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                EXAMINATION INDEX

2


3       BY MS. WU                                    8

4       BY MR. BURNETT                              253

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1                     EXHIBIT INDEX
2

   Exhibit 3   Expert Report of Gordon Smith          19
3                M.B., CH.B. (MD Equivalent Otago
                 University), MPH dated August 3,
4                2020

5   Exhibit 4   Appendix B, List of Materials         51
                 Considered for Expert Report of
6                Gordon Smith, M.B., CH.B. (MD
                 Equivalent Otago University),
7                MPH

8   Exhibit 5   Curriculum Vitae of Gordon           236
                 Smith, M.B., CH.B. (MD
9                Equivalent Otago University),
                 MPH, Appendix A to Expert Report
10

11  Exhibit 8   "BRINGING SCIENCE TO BEAR ON          86
                 OPIOIDS" Report and
12               Recommendations from the ASPPH
                 Task Force on Public Health
13               Initiatives to Address the
                 Opioid Crisis dated November
14               2019

15  Exhibit 13  "Fentanyl and fentanyl-analog        228
                 involvement in drug-related
16               deaths" by Smith, et al. dated
                 3-1-19
17

    Exhibit 15  "Fentanyl A Briefing Guide for       169
18               First Responders" from the U.S.
                 Department of Justice, Drug
19               Enforcement Administration dated
                 6-6-17 (HUNT_01800002-021)
20

    Exhibit 17  Copy of Amended WV Death             194
21               Certificate dated 1-22-09
                 (CCCLERK_0009216)
22

23

24

Page 6

1               P R O C E E D I N G S

2               VIDEO OPERATOR:  Good morning.  We are

3     going on the record at 9:04 a.m. on September 22nd,

4     2020.  Please note that the microphones are

5     sensitive and may pick up whispering, private

6     conversations and cellular interference.  Please

7     turn off all cell phones or place them away from

8     the microphones, as they can interfere with the

9     deposition audio.

10              Audio and video recording will

11    continue to take place unless all parties agree to

12    go off the record.

13              This is Media Unit 1 of the video

14    recorded deposition of Gordon Smith taken Counsel

15    for the Defendant in the matter of City of

16    Huntington and Cabell County Commission versus

17    AmerisourceBergen Drug Corporation, et al, filed in

18    the United States District Court for the Southern

19    District of West Virginia, being Civil Action Nos.

20    3:17-01362 and 3:17-01665.

21              This deposition is being conducted

22    remotely via Zoom conferencing.  My name is Adam

23    Hager from the firm Veritext, and I'm the

24    videographer.  The court reporter is Teresa Evans

Page 7

1    from the firm Veritext.

2                   I'm not authorized to administer an

3    oath; I'm not related to any party in this action;

4    nor am I financially interested in the outcome.

5                   Counsel and all present in the room

6    and everyone attending remotely will now state

7    their appearances and affiliations for the record.

8                   If there are any objections to

9    proceeding, please state them at the time of your

10   appearance, beginning with the noticing attorney.

11                  MS. WU:  Good morning.  My name is

12   Laura Flahive Wu of Covington & Burling, and I

13   represent McKesson Corporation.

14                  MR. HOWE:  My name is Sam Howe of

15   Covington & Burling, and I also represent McKesson

16   Corporation.

17                  MS. VITALE:  Good morning.  This is

18   Christina Vitale with Reed Smith, and I represent

19   AmerisourceBergen Drug Corporation.

20                  MS. SOCHACZEVSKI:  Good morning,

21   Danielle Sochaczevski for Cardinal Health.

22                  MR. FRANKS:  Good morning.  Ray

23   Franks, local counsel for Cardinal Health.

24                  MR. BURNETT:  Good morning.  This is

Page 8

1  David Burnett from Motley Rice for the Plaintiffs.

2  I'm joined by Anne Kearse for the Plaintiffs.

3              MR. STOUT:  Jake Stout, Motley Rice,

4  Plaintiffs.

5              MS. SHKOLNIK:  Rachel Shkolnik, Napoli

6  Shkolnik, on behalf of West Virginia MLP

7  Plaintiffs.

8              VIDEO OPERATOR:  If there are no

9  further appearances to be noted -- I'm sorry, say

10 that again?

11             If there are no further appearances to

12 be noted, would the court reporter please swear the

13 witness.

14             (The witness was sworn.)

15             G O R D O N    S M I T H

16 was called as a witness by the Defendants, and

17 having been first duly sworn, testified as follows:

18                    EXAMINATION

19 BY MS. WU:

20    Q.   Good morning, Doctor.

21    A.   Good morning.

22    Q.   As you just heard, my name is Laura Flahive

23 Wu.  I'm with the law firm of Covington & Burling,

24 and I represent one of the defendants in this

Page 9

1    lawsuit, McKesson Corporation.

2                   Can you hear me okay?  I just want to

3    make sure that the technology is working --

4         A.   Yep, no, it seems to be working quite well.

5         Q.   Okay.  If at any point today it's difficult

6    for you to hear or see me, please let me know so

7    that we can pause and reset our technology.

8                   MS. WU:  That goes for everyone on the

9    line.  Let's work together to make sure this goes

10   smoothly.  We've been doing that well so far in

11   other depositions.

12        Q.   Doctor, thank you for being with us

13   virtually today.  We appreciate your time.  To

14   start us off, can you state your name and business

15   address for the record?

16        A.   Yes.  My name is Gordon Stephen Smith, and

17   my business address is West Virginia University

18   School of Public Health, Medical Center Drive,

19   Morgantown, West Virginia.

20        Q.   And I'm going to ask a few questions which

21   are about your physical location today, and that's

22   simply to set the scene for the transcript since we

23   are participating in this deposition virtually.

24                   Where are you physically located for

1   purposes of your deposition today?

2        A.   At the Hyatt in the Harbor Hotel in

3   downtown Baltimore.

4        Q.   What type of room are you in for purposes

5   of your deposition?

6        A.   I think it's the Calvert Room.  On the

7   third floor.

8        Q.   Is it -- is it a private room?  It's not

9   open to the public, sir?

10       A.   It's a private conference room with the

11  doors closed.

12       Q.   Thank you.  Is anyone in the room with you,

13  Doctor?

14       A.   Yes.  David Burnett is with me, the

15  counsel.

16       Q.   Is there anyone else present with you?

17       A.   No, there's not.

18       Q.   You're participating in this deposition via

19  a computer, correct?

20       A.   Correct.

21       Q.   Are there any -- is there any other

22  technology that you're using to assist you during

23  your deposition today?

24       A.   I have a camera mounted on top of my

Page 11

1    computer, but that's it.

2         Q.   Okay.

3         A.   And a computer mounted --

4         Q.   Okay.  And I would just ask if you would

5    take your cell phone and put it away from you just

6    because that could cause sound issues as we

7    continue today.

8              Doctor, do you have a set of hard copy

9    deposition exhibits?

10        A.   Yes, I do.

11        Q.   Okay.  Just want to make sure that we're

12   all set before we get started.  We're going to go

13   over just a few ground rules for your deposition.

14   Have you been deposed before, Doctor?

15        A.   No, I haven't.

16        Q.   Have you ever testified at trial before?

17        A.   No, I haven't.

18        Q.   Have you ever testified under oath in any

19   other type of legal proceeding?

20        A.   No.

21        Q.   Have you ever served as a consulting expert

22   in any other litigation?

23        A.   Yes, probably 30 years ago in Papua, New

24   Guinea.

Page 12

1      Q.   What was the nature of the litigation in

2   which you served as a consulting expert?

3      A.   It was to determine cause of death, but I

4   can't remember the details.

5      Q.   Were you serving as a consulting physician

6   in the context of that litigation?

7      A.   Yes.

8      Q.   Thank you, Doctor.  So I'll briefly go over

9   some of the ground rules for the deposition today,

10  and then we'll move more into the substance.

11           Since you haven't been deposed before,

12  I just want to make sure that we are on the same

13  page so this goes smoothly.  You understand that

14  you're testifying under oath today, correct,

15  Doctor?

16     A.   Correct.

17     Q.   And the oath you've taken obligates you to

18  testify truthfully as if you were in a courtroom.

19  Do you understand that?

20     A.   Yes.

21     Q.   Today, your counsel, Mr. Burnett, is there

22  with you in person, correct?

23     A.   Yes.

24     Q.   During the deposition, Mr. Burnett may

1    lodge certain objections to my questions.  If he

2    lodges an objection, you may answer the question

3    absent an instruction not to answer.  Do you

4    understand that?

5        A.   I do.

6        Q.   Now, also you understand that Teresa Evans,

7    the court reporter, is taking a stenographic record

8    of this deposition.  Do you understand that?

9        A.   Yes, I do.

10       Q.   So it's important that we try not to talk

11   over each other.  I'll do my best.  It is a little

12   more difficult in this virtual setting, so I

13   apologize in advance if we step over each other.

14   But we'll try our best to have one speaker at a

15   time.  Can we agree to that, Doctor?

16       A.   Yes.

17       Q.   Okay.  Is there any reason you cannot give

18   truthful testimony today?

19       A.   No.

20       Q.   Are you taking any medications or subject

21   to any illness that may interfere with your

22   testimony today?

23       A.   No, I'm not.

24       Q.   Doctor, who is your current employer?

Page 14

1      A.    West Virginia University.

2      Q.    What is your current title?

3      A.    Professor, Epidemiology.

4      Q.    How long have you held that position?

5      A.    Just over three years.

6      Q.    Doctor, you plan to offer expert opinions

7  in this case, correct?

8      A.    Yes.

9      Q.    When were you first approached by counsel

10  about becoming an expert in this case?

11      A.    Sometime in June if I remember correctly.

12      Q.    And that's June of 2020, correct, Doctor?

13      A.    Correct.

14      Q.    Who approached you?

15      A.    Anne Kearse.

16      Q.    What did plaintiffs' counsel ask you to do?

17          MR. BURNETT:  Let me just interject

18  here.  As you know, you can answer that question as

19  it pertains to your assignment, but you should not

20  otherwise disclose your conversations with counsel.

21      A.    She asked me to -- about the causes of

22  death data and the drug overdose deaths, because

23  she knew that I'd be working in this area.

24      Q.    Doctor, how would you describe the

Page 15

1    assignment that plaintiffs' counsel gave you for

2    purposes of your testimony in this case?

3         A.    Was to provide a longitudinal study of the

4    drug overdose death patterns, both in Cabell

5    County, in the Huntington area, and in West

6    Virginia as a whole.

7         Q.    Doctor, how much are you being paid for

8    your expert work in this case?

9         A.    I'm being paid at $500 an hour.

10        Q.    Are you being paid the same amount for your

11   testimony in this case?

12        A.    Yes.

13        Q.    How much have you billed to plaintiffs'

14   counsel for your work in this case so far?

15        A.    I haven't billed anything so far.

16        Q.    How many hours have you worked on this case

17   thus far?

18        A.    Approximately about 55.

19        Q.    And you said you haven't billed any of that

20   time to plaintiffs?

21        A.    No, I haven't.

22        Q.    Do you expect to bill that time to

23   plaintiffs?

24        A.    Yes, I do.

Page 16

1     Q.   Do you expect to get paid for that work,

2  Doctor?

3     A.   Yes, I do.

4     Q.   Do you have an agreement with plaintiffs'

5  counsel in writing?

6     A.   I have not -- at this stage, no.

7     Q.   Do you have any previous work experience

8  for plaintiffs' counsel specifically, including

9  Motley Rice?

10     A.   No, I don't.

11     Q.   How about any of the other plaintiffs' law

12  firms in this case?

13     A.   So I just put -- when you're asking about a

14  contract, I have a contract, but I have not sent it

15  off and signed it.  So I'm not sure what exactly

16  you are meaning with that.

17     Q.   Certainly.  So just to clarify the record,

18  Doctor, that's very helpful.  Is it the case that

19  you have received a draft engagement letter from

20  counsel for the plaintiffs in this case?

21     A.   What do you mean by "a draft engagement

22  letter"?

23     Q.   Have plaintiffs' counsel provided you any

24  written agreement for your services in this case?

1      A.   Yeah, they've given me an agreement which I

2  am supposed to sign and send off, but I haven't

3  done that yet.

4      Q.   Certainly.  So you have an agreement in

5  place; you simply need to execute the agreement.

6  Correct?

7      A.   That's correct.

8      Q.   Thank you, Doctor.  Could you describe how

9  you prepared for your deposition today?

10     A.   I read over my report, read over the origin

11  of the data for the report, looked at documents

12  that I referred to and had discussions with

13  counsel.

14     Q.   And when you refer to "counsel," are you

15  referring to Mr. Burnett?

16     A.   Yes.

17     Q.   Was there any other counsel for plaintiffs

18  involved in your preparation for today?

19     A.   Yes.

20     Q.   Who else?

21     A.   Anne Kearse and Teresa -- I can't remember

22  her last name.

23     Q.   Thank you, Doctor.  Did you speak to anyone

24  else in anticipation of your deposition today?

Page 18

1      A.   No, I did not.  Except to let my wife know
2  where I was going.
3      Q.   Fair enough.  How about anyone who works
4  with you?  Did any members of your team assist you
5  in preparing for your deposition today?
6      A.   No, they did not.
7      Q.   Now, you said a short while ago that you've
8  billed about 55 hours for your work in this case.
9  Is that right?
10     A.   Yes.
11     Q.   Did any other members of your academic or
12 professional team assist you in preparing your work
13 for this case?
14     A.   No, they did not.  Not -- not over and
15 above what was available before we started this.
16     Q.   You -- all of the work product you've
17 generated is your own work.  No other assistants
18 provided support.  Correct?
19     A.   If you mean for the preparation of the
20 report, yes.  But not for my publications or other
21 things.
22     Q.   Certainly.  So for the work that you did
23 specific to this case, you did not use any
24 assistants to provide additional support, correct?

Page 19

1      A.    That's correct.

2      Q.    Thank you, Doctor.  Now, I want to turn to

3  talk to your report -- about your report a bit, and

4  just to make it a little bit easier, if you can

5  pull out -- in the documents that we sent to you,

6  it's Document No. 3 is a copy of your expert

7  report.

8            And Doctor, we'll be using that

9  document a good deal today, so you might want to

10  keep it close at hand.

11            SMITH DEPOSITION EXHIBIT NO. 3

12                 (Expert Report of Gordon Smith M.B.,

13                 CH.B., (MD Equivalent Otago

14                 University), MPH dated August 3, 2020

15                 was marked for identification purposes

16                 as Smith Deposition Exhibit No. 3.)

17                 MS. WU:  And for the record, we're

18  marking as Gordon Deposition Exhibit 1 a copy of

19  Doctor Gordon's expert report dated August 3rd,

20  2020.

21      Q.    Doctor, do you have a copy of your expert

22  report which is Exhibit 1 in front of you now?

23      A.    Yes, I do.  That's labeled Exhibit 3.  You

24  told me to pick up Exhibit 3.  You said "Exhibit

Page 20

1    1."

2        Q.   Oh, my apologies.  I have defaulted to an

3    old way of marking exhibits.

4                MS. WU:  For purposes of the record,

5    let me clarify.  We will refer to the expert report

6    of Doctor Gordon as Deposition Exhibit 3.  That is

7    what we've been doing in this case.  My apologies.

8        Q.   And thank you, Doctor Gordon.  There will

9    be gaps in our exhibits, but hopefully we'll be

10   less confused this way.  So thank you, Doctor.

11               So Doctor, do you have a copy of your

12   report which is Deposition Exhibit No. 3 in front

13   of you now?

14       A.   Yes, I do.

15       Q.   Thank you, Doctor.  Doctor, does your

16   report accurately describe the work that you did in

17   order to prepare for testimony in this case?

18       A.   Yes, it does.

19       Q.   The 55 hours that you have billed -- or

20   that you have worked for plaintiffs include time

21   that you spent reviewing data to identify the

22   numbers of drug overdose deaths in Cabell County

23   and West Virginia, correct?

24       A.   Yes, it did.

1     Q.   The 55 hours that you have spent working

2   for plaintiffs' counsel in this case include time

3   you spent reviewing the Vital Statistics overdose

4   fatality data for West Virginia from 2001 onwards,

5   correct.

6     A.   Correct.

7     Q.   The 55 hours that you have spent working

8   for plaintiffs' counsel in this case include the

9   time that you spent obtaining fatal overdose data

10   from the Vital Statistics for Cabell County from

11   2001 through 2018, correct?

12     A.   Correct.

13     Q.   And the 55 hours that you billed in your --

14   or that you have worked for plaintiffs' counsel

15   included time you spent reviewing data from the

16   West Virginia Medical Examiner's Office, correct?

17     A.   Correct.

18     Q.   That 55 hours that you spent working on

19   this case also includes time that you spent time

20   meeting with counsel for plaintiffs, correct?

21     A.   Correct.

22     Q.   It also includes time that you spent

23   writing an 18-page report and reviewing the 27

24   pages of exhibits that were attached to your

```
                                            Page 22
 1    report.  Correct?

 2         A.   Correct.

 3         Q.   That is everything that you've done for

 4    purposes of your work in connection with this

 5    litigation, correct?

 6         A.   If you will look in my report, I also spent

 7    time to determine the drug overdoses prior to 2001

 8    when that one data source was not available and

 9    that data is included in my report.

10         Q.   Thank you, Doctor.  What work did you

11    undertake in order to identify overdoses that

12    predate 2001 in West Virginia?

13         A.   This was -- talk -- much more work than was

14    mutually anticipated because the data were not --

15    were so readily available.  And so what I undertook

16    was to do a detailed study of the National Center

17    for Health Statistics available data and then I had

18    to search through multiple documents looking for

19    historical data, which is much harder to obtain.

20         Q.   Other than reviewing data in order to

21    identify pre-2001 overdoses, is there any other

22    category of work that I've missed in reviewing your

23    work in connection with this case?

24         A.   Did you already mention reviewing
```

Page 23

1   background material?

2       Q.   I did not mention reviewing background

3   material.

4       A.   I guess the background was the items that I

5   cite in the re -- in the report.

6       Q.   Is there anything else in addition to your

7   review of data for pre-2001 overdoses and reviewing

8   background materials, specifically those cited in

9   your report, that you undertook in order to

10  complete your work in connection with this case?

11      A.   Not that I can remember.

12      Q.   Thank you, Doctor.  Approximately how many

13  hours did you spend reviewing the pre-2001 data in

14  order to generate your opinions as to the rate of

15  overdoses prior to 2001?

16      A.   I really can't remember.  I would think it

17  took probably at least a day.  It was much more

18  time consuming than I thought.

19      Q.   So it took about a day in order to review

20  data in order to identify or estimate the number of

21  overdoses that occurred in West Virginia prior to

22  2001.  Correct?

23      A.   That's correct.  Maybe a day and a bit.

24  But yes.

1      Q.   Thank you.   Approximately how many hours

2   did you spend reviewing data in order to identify

3   the number of overdoses that occurred in Cabell

4   County and West Virginia from 2001 to 2018?

5      A.   That probably took another day and a half,

6   and between the two of them, was probably about

7   three days, I would say.

8      Q.   When you say "between the two of them," do

9   you mean for the pre-2001 period and then the

10   period 2001 to 2018, Doctor?

11     A.   Yes.   It might have even taken me -- it

12   depends on whether -- are you talking about just

13   reviewing the data, or are you talking about

14   writing it up and analyzing it?

15     Q.   Just reviewing the data, Doctor.

16     A.   Okay.   It was probably, I would say, two

17   days.

18     Q.   Okay.   Doctor, about how many hours did you

19   spend reviewing the fatal overdose data from Vital

20   Statistics for Cabell County specifically?

21     A.   I would say probably a day.

22              So do you -- by what do you mean by

23   "reviewing"?

24     Q.   Well, Doctor, could you describe the

Page 25

1    process that you undertook when you worked with the

2    data sets cited in your report?

3         A.   Yes.  What it involved was making sure that

4    I had the most recent data available from the

5    reports, and then looking at the data and then

6    putting it together into a graph or the tables that

7    were prepared.

8         Q.   Doctor, just for use -- if I use the term

9    "reviewing data" today, could we use that as a

10   shorthand for the process that you've just

11   described?

12        A.   Yes.

13        Q.   Okay.  Thank you.  That will save us a few

14   words.

15             Doctor, approximately how many hours

16   did you spend reviewing the database of overdose

17   fatalities from the West Virginia Medical

18   Examiner's Office?

19        A.   I would say probably about five or six

20   hours from the Medical Examiner's Office.

21             MR. BURNETT:  Let me just interject.

22   Counsel, you have his final report with all the

23   data in it.  I'm not sure why you need to know how

24   many hours he spent in the process of preparing

Page 26

1    each component of the report.  I would suggest we

2    just talk about the report itself.

3              MS. WU:  Thank you, Counsel.

4       Q.   Doctor, approximately how many hours did

5    you spend drafting your report?

6              MR. BURNETT:  And I will interject

7    here, I am directing you not to answer questions

8    about the drafting process, because they're not

9    entitled to drafts and they're not entitled to know

10   about the drafting process.

11             THE DEPONENT:  Okay.

12             MS. WU:  Counsel -- Counsel, it's my

13   understanding that witnesses, expert witnesses, are

14   to be prepared to answer questions about the hours

15   and billings for the case.  I'm not asking about

16   the process; simply the number of hours, similar to

17   what would be recorded in an invoice.

18             And it's my understanding that the

19   parties reached this agreement to avoid the need to

20   produce invoices.

21             MR. BURNETT:  Right.  So my

22   understanding is that counsel have an agreement as

23   to disclosing billing rate and a total number of

24   hours.  It's not my understanding that there's any

Page 27

1    agreement on discussion of how many hours spent

2    drafting or the drafting process.

3              So I'm directing him not to answer.

4    You know, I'll circle up at the break and see if

5    that's something we can disclose, but for now, I'm

6    going to direct him not to answer.

7              MS. WU:  Okay.  I don't think that is

8    worth delaying progress here.  But just to be

9    clear, Counsel, for clarity of the record, you are

10   instructing the witness not to testify concerning

11   the total number of hours that he spent drafting

12   the report which is identified as Deposition

13   Exhibit No. 3, correct?

14             MR. BURNETT:  At the moment, subject

15   to checking with other people, yes.

16             MS. WU:  Okay.  Thank you.

17   BY MS. WU:

18       Q.   Doctor, you still have in front of you a

19   copy of your report which is Exhibit No. 3,

20   correct?

21       A.   Correct.

22       Q.   Now, if we turn to page 1 of your report,

23   you -- it states that you are "currently involved

24   in multiple academic projects studying drug

1    overdoses in West Virginia, including Cabell

2    County."  Do you see that?

3        A.   Yes.

4        Q.   Doctor, could you identify each of the

5    academic projects that are cited here on page 1 of

6    your report?

7        A.   Okay.  The -- if I can just look at what's

8    on this report.  I don't list them on the -- on

9    this report.  Let me just check here.

10              No.  On page 1, I don't list -- I list

11   my previous work before that, and I don't see any

12   mention of the studies that I've done in West

13   Virginia.

14       Q.   I'm sorry, Doctor, could you -- could you

15   describe for us the multiple academic projects

16   studying drug overdoses in West Virginia that you

17   cite?

18       A.   Okay.  I will look.  Here we go.  On page

19   2, I first describe my detailed work studying

20   injury mortality that I've been working in the area

21   for many, many years.  And then I state that I was

22   recruited in 2016 to West Virginia because of my

23   expertise in substance abuse and in injury data.

24              I was offered the endowed chair, and

Page 29

1   I'm a part of a group documenting substance abuse

2   problems in West Virginia.  I've been looking at

3   the overdose autopsy data; we've been looking at

4   hospital data for nonfatal overdoses; and

5   conducting drug surveys in rural parts of the

6   state.

7            And I'm currently funded to conduct a

8   field study of opioid problems in the eight

9   southernmost counties of West Virginia that are

10  directly adjacent to Cabell County and Wayne County

11  where the City of Huntington lies.

12           In addition, my statewide studies of

13  drug overdoses include both Cabell County and Wayne

14  Counties.

15      Q.   Thank you, Doctor.  So you're looking --

16  just for clarity in the record, you are now

17  referencing page 2 of your report, the last

18  paragraph on that page.  Correct?

19      A.   Correct.

20      Q.   Okay.  Let's walk through this.  So if we

21  look back to what you just said, it says, "I am

22  part of a group documenting substance abuse

23  documents in West Virginia, looking at information

24  such as autopsies (for fatal overdoses), hospital

Page 30

1    discharge data (for nonfatal overdoses), and

2    conducting drug surveys in rural parts of the

3    state."

4              Do you see that, Doctor?

5        A.   On page 2?

6        Q.   Yes.

7        A.   Sorry if I was -- so could you just tell me

8    -- where was -- I was looking at the other page,

9    because there's some more detail on the other page

10   of the studies that I've been working on.

11       Q.   Certainly, Doctor.  I was referencing the

12   last paragraph on page 2 of your report, which is

13   what you had just read a portion of into the

14   record.

15       A.   And which were you seeking clarification

16   on?

17       Q.   The -- "I am part of a group documenting

18   substance abuse problems in West Virginia, looking

19   at information such as autopsies (for fatal

20   overdoses)" --

21       A.   Yes.

22       Q.   -- "discharge data (for nonfatal overdoses)

23   and conducting drug surveys in rural parts of the

24   state."

1          Do you see that, Doctor?

2     A.   Yes, I do.

3     Q.   What is the group that you reference in

4  that portion of your report?

5     A.   There are several groups, actually, one of

6  which is the colleagues that I -- the co-authors on

7  my paper that are working on the autopsy data and

8  the medical examiner data, and then separately, the

9  other group that I'm -- big group that I'm working

10  with is on page 3, the SUPPORT project where we're

11  looking at all of the different data sources on

12  drug problems in the state, across the state as a

13  whole, all counties, and then specifically

14  identifying problems in individual counties.

15     Q.   Doctor, what is the first group that you

16  mentioned related to the medical examiner data?

17  Does it have a name?

18     A.   Yes, this is our drug toxicology Forensic

19  Drug Database.

20     Q.   Doctor, you mentioned the drug toxicology

21  forensic database group and the SUPPORT program

22  group.  Are there any other academic groups

23  included in those that are referenced in Paragraph

24  1 on page 1 of your report?

Page 32

1      A.   Not referenced in that -- not referenced

2  here, no.

3      Q.   Doctor, are you currently a part of any

4  other academic groups or memberships which are

5  engaged in the study of overdoses in Cabell County

6  or West Virginia, more broadly?

7      A.   I guess my teaching -- I have students who

8  occasionally work on different projects.  I'm not

9  quite sure exactly what you're meaning by "groups."

10          I have advised students that have done

11  analyses of drug problems in West Virginia.  But

12  those are probably the two major projects.

13          The other project is the studies in

14  the eight -- in the counties in the southern part

15  of the state, which was a NIDA-funded study that I

16  am the co-PI on with Doctor Judith Feinberg.

17      Q.   Thank you, Doctor.  Let's talk about the

18  drug toxicology forensic group.  That's the first

19  one that you identified.  When did that work begin?

20      A.   My colleagues started work on that in 2005

21  as described in our articles that were published,

22  and I started working with them as soon as I came

23  to West Virginia.

24      Q.   And you came to West Virginia in 2016,

Page 33

1    correct, Doctor?

2        A.   Correct.

3        Q.   Has the drug toxicology forensic group

4    published findings since you joined the group in

5    2016?

6        A.   Yes, we have, one of which is the article

7    that I referred to in the -- in my paper, which is

8    the analysis of the fentanyl data.  And I've been

9    funding --

10       Q.   And the --

11       A.   -- the doctoral students who have been

12   working on that, and working with us on it.

13       Q.   Thank you, Doctor.  Other than the fentanyl

14   article which is referenced in your report, are

15   there any additional findings of the drug

16   toxicology forensic group which have been published

17   since you joined that group in 2016?

18       A.   Yes, there's a new article that's just come

19   out that is not on my CV - because it's just come

20   out - on looking at the relationship of

21   polysubstance abuse deaths in the state and

22   relating it to alcohol.

23       Q.   Did you cite that article in your report?

24       A.   No.  As I said, it's just come out, and so

1    I didn't.  In academia, we tend to only cite

2    reports once they're published and been peer

3    reviewed.

4        Q.   Doctor, did that polysubstance abuse

5    article contribute to the opinions that you've put

6    forward in your report marked as Exhibit 3?

7        A.   No, it didn't at all contribute to my

8    opinion; it just reinforced it.

9        Q.   Thank you, Doctor.  Does the drug

10   toxicology forensic group have any additional

11   forthcoming findings or opinions that you expect to

12   be published?

13       A.   We're always looking at analyzing data.

14   We're probably about to look at some of the other

15   long-term trends in the data.  I have my doctoral

16   students be working on some projects.

17            But like any academic project, there

18   will be things come up, and one of the things we're

19   particularly interested in is the long-term trends,

20   so we'll probably be doing more data on looking at

21   the trends as the newest data comes out.  And also

22   --

23       Q.   There's -- I'm sorry, Doctor.  Please go

24   ahead.

Page 35

1      A.    No, that's all.  Thanks.

2      Q.    Doctor, there's not any paper which is

3  slated for publication now, correct?

4      A.    Correct.

5      Q.    Okay.  How is the drug toxicology forensic

6  group funded?

7      A.    At the moment, it's been funded over the

8  years with some funding -- you mean funded now, or

9  in the past?

10      Q.    Let's start with now.  How is it funded

11  now?

12      A.    Currently, it is funded by my endowed

13  professorship.

14      Q.    How -- and what is the source of funding

15  for your endowed professorship?

16      A.    This is the Robbins Endowment Fund from the

17  Robbins family who endowed my professorship and

18  provides also some of my salary and also provides

19  some research funds with which I've been able to

20  hire the doctoral students to work with me.

21      Q.    Thank you, Doctor.  When did your endowed

22  funding start to provide resources for the drug

23  toxicology forensic group?

24      A.    As soon as I started working there in 2016,

Page 36

1   end of 2016.

2        Q.   Doctor, do you have knowledge of the

3   funding sources for that group prior to your

4   engagement with it in 2016?

5        A.   I don't have the exact details, but some of

6   it came from the National Institute of Justice, and

7   also NIH through the Clinical and Translational

8   Research Institute and some CDC funding through the

9   Injury Prevention Center.

10       Q.   Doctor, does the drug toxicology forensics

11  group focus specifically on Cabell County, West

12  Virginia?

13       A.   No, it does not.  But it clearly identifies

14  each county and which county the data comes from.

15       Q.   Does the drug toxicology forensics group

16  have any service component?  That is, does it

17  provide any services to communities in West

18  Virginia other than the data it publishes?

19       A.   We provide -- the analysis of the data

20  comes from the medical examiner's office, but we

21  provide them with data and when they want it, and

22  when they want to do some analyses, when they're

23  doing testimony in the state and contributing to

24  State policy, and local government policy when

Page 37

1   needed.

2       Q.   Other than the evaluation and findings

3   which you provide to the communities in West

4   Virginia, are there any additional services the

5   drug toxicology forensics group provides to West

6   Virginia's communities?

7       A.   Yes, we have been providing data to

8   individual counties in the southern states so that

9   they can understand better their drug problems and

10  have fed it up in community meetings to the group,

11  and they're using it as part of their planning

12  process.

13      Q.   Doctor, to the best of your knowledge, has

14  the drug toxicology forensics group provided data

15  or analysis to Cabell County?

16      A.   I think they have provided some data to the

17  local -- I'm not 100 percent sure.  I would assume

18  they have over time.  I haven't been -- I've only

19  been involved with it since 2016.  Goes right back

20  to 2005, and they have provided data to the local

21  people, because this is the best compiled data of

22  all of the -- the actual drugs found in people.

23      Q.   Doctor, during your tenure working with the

24  drug toxicology forensic group starting in 2016, to

1   your knowledge, has Cabell County requested

2   analysis from your working group?

3        A.   Not that I'm aware of.

4        Q.   How about Huntington, the City of

5   Huntington?  Has it requested evaluation or

6   information from the drug toxicology forensic

7   group?

8        A.   I'm not 100 percent sure.  I don't -- I'm

9   not -- I'm very involved in it, and I've been

10   providing support for it, but it has a long history

11   and there may well have been some local inquiries.

12   I'm not -- I'm not doing it myself personally, so I

13   don't know everything that my colleagues are doing.

14        Q.   Okay.  But you're not aware of any

15   inquiries from Cabell or Huntington, correct?

16        A.   Correct.

17        Q.   Thank you, Doctor.  So then the next

18   program that you mentioned is the SUPPORT program,

19   correct, Doctor?

20        A.   Yes.

21        Q.   And the SUPPORT program is referenced in a

22   number of places in your report, including on page

23   3, correct?

24        A.   Correct.

1     Q.    Doctor, could you describe the SUPPORT

2  program for us?

3     A.    This is funded by the Center for Medicaid

4  Services, through the State Health Department,

5  Department of Health and Human Services, and the

6  Medicaid office, to provide a comprehensive plan on

7  drug problems in West Virginia, and specifically to

8  look at counties and county needs.

9             And we're in the process of working on

10  it now.  We don't have any report, but we have been

11  analyzing both hospital data and the Medicaid data

12  and we will be producing reports on individual

13  counties, but we haven't completed that yet.

14             But the goal is --

15     Q.    Doctor --

16     A.    -- to be able to document the total drug

17  problem and what the burden of drugs are in the

18  state.

19     Q.    Thank you, Doctor.  When did you begin your

20  work with the SUPPORT program?

21     A.    At about the beginning of this year.

22     Q.    Beginning of --

23     A.    -- 2020.  And probably I've been giving

24  them some -- I've been giving them some advice and

Page 40

1    consultation because of my expertise in data and

2    the statistics and health statistics.  But I wasn't

3    funded by them specifically until the beginning of

4    this year.

5         Q.   Okay.  Do you know when the SUPPORT project

6    began its work prior to your involvement?

7         A.   Yes, I understand the funding started at

8    about October last year.

9         Q.   To the best of your knowledge, is federal

10   money provided by CMS the only source of funding to

11   the SUPPORT project?

12        A.   That's what I understand, yes.  It comes

13   from -- through -- to the state and then to us.

14        Q.   Doctor, when do you expect to submit your

15   findings or the findings of the SUPPORT project?

16        A.   There's a series -- it's a sequential

17   process, but we would expect to have a report out

18   by the end of this year.

19        Q.   Could you describe at a high level what you

20   expect the report to include in terms of findings?

21        A.   It will report drug overdose deaths, drug

22   overdose hospitalizations, drug overdose emergency

23   department visits.  It will include other mental

24   health problems as well.  It's not just drug

1   overdoses.

2           It will include use of treatment

3   services, basically a comprehensive look at what

4   the -- what the current burden -- the part we're

5   looking at is the current burden on the population,

6   and then to be able to separate it out by county.

7           And colleagues of mine are looking at

8   the provision of services and what services are

9   provided and whether they meet the needs.

10      Q.   Doctor, the SUPPORT project is not specific

11  to opioids, correct?

12      A.   It's -- a major component of it is

13  substance abuse, and that includes opioids.  But it

14  also includes other related mental health

15  conditions, behavioral health conditions.

16      Q.   And to ask the same question for the drug

17  toxicology forensic group:  The work of that group

18  is not specific to opioids, correct?

19      A.   It is specific to drugs of which opioids

20  are the major component.

21      Q.   It includes other drugs like

22  methamphetamine, for example, correct?

23      A.   Correct.

24      Q.   Okay.  Does the SUPPORT project that we've

Page 42

1    been discussing provide any services to communities

2    in West Virginia?

3         A.   No, it does not provide direct services.

4    It's providing planning data for the provision --

5    to help the state provide better services.

6         Q.   Okay.  Doctor, you described findings which

7    will be published sometime in the near term by the

8    SUPPORT project.  Are any of those findings

9    specific to Cabell County?

10        A.   Very definitely.  It's specific to multiple

11   counties.  It would have Wayne, Cabell and we

12   envisage having maps with each county with the

13   particular services and data for that county.

14        Q.   Doctor, have you relied on any of the

15   SUPPORT project analysis related to Cabell County

16   in formulating your opinions in connection with

17   this case?

18        A.   Not the data from the SUPPORT program, no.

19   But from my own --

20        Q.   Okay.

21        A.   -- analysis.

22        Q.   Thank you, Doctor.  The third, and I

23   believe final, project that you cited is the

24   NIDA-funded study of the eight southern counties

Page 43

1    which is referenced in your report.  Correct?

2        A.   Correct.

3        Q.   Cabell County is not one of the eight

4    southern counties that you referenced in your

5    report in connection with the NIDA study, correct?

6        A.   That's correct.

7        Q.   When did the NIDA-funded study begin?

8        A.   About two years ago.

9        Q.   In 2018?

10       A.   Yes.  It maybe started at the beginning of

11   2017 -- end of 2017.  I can't remember the exact

12   date.

13       Q.   And that -- the NIDA-funded study was, of

14   course, funded by NIDA, correct?

15       A.   Yes, National Institute of Drug Abuse.

16       Q.   And did it have any additional funding

17   sources?

18       A.   No, it did not.

19       Q.   Did the NIDA study have any findings which

20   were specific to Cabell County?

21       A.   No, it did not.

22       Q.   And did the NIDA study provide any --

23   include any service component for communities in

24   West Virginia?

Page 44

1      A.   Yes, it did.  It provided advice and

2   consultation and working with them on delivery and

3   improving services.  And I would also note that

4   these counties are very much adjacent to Cabell

5   County and have very similar drug problems.

6      Q.   What do you mean, that they have "similar

7   drug problems?"

8      A.   The drug overdose rates are relatively

9   comparable.

10     Q.   What's the basis for your opinion that the

11  drug overdose rates in Cabell County and the eight

12  southern counties are comparable?

13     A.   Because I've got the data -- I don't have

14  it by individual county with me.  It wasn't part of

15  my report.  But I looked at the data year-by-year

16  at the rates specific by county, and they are --

17  they are similar problems.  Often Cabell County is

18  higher.  But I don't have that data in front of me.

19     Q.   Doctor, have you conducted any comparative

20  analysis of overdose rates in Cabell as compared to

21  other West Virginia counties in connection with

22  this case?

23     A.   Not in conjunction with this case, no.

24     Q.   Doctor, do you intend to offer any opinions

Page 45

1   as to the comparison of overdose rates or data in

2   Cabell County as compared with other counties in

3   West Virginia?

4        A.   It's not part of my report.  I'm only

5   preparing -- comparing to the state.  And I do

6   include state data in my report.

7        Q.   That's right.  So in your report, Doctor,

8   you compare the overdose rates in Cabell County to

9   the state of West Virginia as a whole, correct?

10        A.   I'm not sure whether I actually -- maybe

11   you could identify if I do, the exact page that I

12   do that on.  But the issue is that sometimes we

13   only have state data and sometimes we can drill

14   down to the county level.

15        Q.   So in short, your analysis is limited by

16   the data available, correct?

17        A.   All studies are limited by the data

18   available, not specifically my study.

19        Q.   Thank you.  Okay.  So staying with your

20   report, which is Deposition Exhibit No. 3, I'd like

21   to go to page 4 where you will find the heading

22   "Summary of Opinions."  Do you see that, Doctor?

23        A.   Page 3, page 4.  Yes, Summary of Opinions.

24   Yes.

1    Q.   Now, following this heading, Doctor, there

2  are three paragraphs which summarize your opinions

3  in this case.  Do you see those?

4    A.   Yes.

5    Q.   Doctor, do these three paragraphs provide a

6  full and accurate description of your expert

7  opinions in this case?

8    A.   Again -- yes -- yes, they do.  That was

9  based on my analysis, and that's what I wrote.

10    Q.   Doctor, do you intend to offer any expert

11  opinions today or at trial that are not identified

12  and summarized on pages 4 and 5 of your report?

13         MR. BURNETT:  And Doctor, if you need

14  to read the paragraphs to be sure, feel free to.

15    A.   The -- my report has more extensive data

16  than are contained in those paragraphs.  It refers

17  to other articles and my interpretation of them and

18  -- so I would say that those paragraphs on top of

19  page 5 cannot summarize the entire report.  It's to

20  the best of my ability to be able to summarize the

21  main points, but there's clearly other data;

22  otherwise, there wouldn't be another X number of

23  pages.

24    Q.   Certainly, Doctor.  The underlying data is

Page 47

1    -- forms the basis for your opinions which are

2    summarized here on pages 4 and 5 of your report,

3    correct?

4         A.   Correct, they're summarized.

5         Q.   Doctor, are there any other opinions beyond

6    those that are summarized on pages 4 and 5 of your

7    report that you expect to offer in connection with

8    this case?

9         A.   Yes, if you go to the back of the report,

10   there's a summary at the end which is a more

11   accurate finding of the opinions.  Yes, on pages

12   18, 17.  There are opinions throughout it in terms

13   of opinions.  Page 15.

14              So they're not word for word in the

15   summary, but there are opinions throughout the

16   report.  My interpretation --

17        Q.   Do you know --

18        A.   -- of a particular data or particular

19   problem that can't be summarized in a new

20   sentences.

21        Q.   Thank you, Doctor.  But generally, those

22   opinions which are cited throughout your report are

23   summarized on pages 4 and 5 in the Summary of

24   Opinions, correct?

Page 48

1      A.    Correct.

2            MR. BURNETT:   Objection.

3      Q.    Doctor, are there any opinions which are

4   not reflected in your report marked as Deposition

5   Exhibit No. 3 which you intend to present at trial

6   in this case?

7      A.    No.  It's based on my report.

8      Q.    Now, Doctor, we've been - just for the last

9   few minutes - talking about your Summary of

10  Opinions.  And for the benefit of the record, could

11  you briefly summarize the expert opinions that

12  you've generated in connection with this case?

13     A.    Yep.  Then I will go back and look at my --

14            So the Summary of Opinions are "that

15  between 2001 and 2018 at least 1151 people died of

16  a drug overdose in Cabell County" based on the data

17  that I had, "and 1,002" or "(87.1%) fatally

18  overdosed on prescription or illicit opioids in the

19  County."

20            The rates increased sharply over this

21  period of time from a low of 16.6 per 100,000 in

22  2001 to a high of 2013, .9 per 100,000 in 2017, and

23  the "fatal overdoses due to prescription opioids

24  such as" OxyContin "and hydrocodone significantly

Page 49

1    exceeded the rate of fatal overdoses due to illicit

2    opioids, as described more further in the Report."

3                    And I "further found that for West

4    Virginia the drug poisoning rates, which are mostly

5    due to drugs, had very low rates" -- actually,

6    these -- had very low rates "from 1979" to "2000

7    and began to increase dramatically from" 2000 "on

8    when they exceeded the rate for the US as a whole."

9                    I would like to point out, there is an

10   error in my report that I picked up.  This -- where

11   I say, "I have further found that for West

12   Virginia, the drug poisoning rates," that is

13   actually the "accidental poisoning rates" and I

14   later discuss the comments on that.

15       Q.   Okay.

16       A.   So that should be "accidental poisoning

17   rates" which I explain very fully on in that

18   section of the report.

19                    And there's actually one tiny little

20   typo also in the -- one, two -- third page of the

21   third paragraph.  Instead of "case," it should be

22   "cases."

23       Q.   Fair enough, Doctor.

24       A.   And the only --

Page 50

1    Q.   I'm sorry, Doctor.  I didn't mean to step

2    over you.  You just described that you wanted to

3    amend your report on page 5, the second full

4    paragraph, to reference "accidental drug poisoning

5    rates" rather than "drug poisoning rates."  Is that

6    correct?

7    A.   Yeah, it's just "accidental" -- remove

8    "drug" and put "accidental."

9    Q.   Okay.  Doctor, what is the difference

10   between an accidental poisoning rate and a drug

11   poisoning rate?

12   A.   In the accidental poisoning -- the drug

13   poisoning rates are part of the drug -- the drug

14   poisonings are part of the accidental poisonings,

15   and as discussed and as shown in my graph which is

16   on page 15, we could only get the data going back

17   for these older periods of time for accidental

18   poisonings that includes all of the drug

19   poisonings.

20           And if you go back to page 14, there's

21   a good article referred to by a former student of

22   mine which shows the relation -- clear relationship

23   of poisonings and drug poisonings as part of that.

24   Q.   Thank you, Doctor.  Doctor, I'm going to

Page 51

1    ask you to take out another document which is

2    Document No. 4.

3                    MS. WU:  And for the record, I'd like

4    to mark as Smith Deposition Exhibit No. 4, Appendix

5    B to Doctor Smith's report, which is a list of

6    materials considered.

7                    SMITH DEPOSITION EXHIBIT NO. 4

8                    (Appendix B, List of Materials

9                    Considered for Expert Report of Gordon

10                   Smith, M.B., CH.B. (MD Equivalent

11                   Otago University), MPH was marked for

12                   identification purposes as Smith

13                   Deposition Exhibit No. 4.)

14       Q.   Doctor, do you have Exhibit 4 in front of

15   you now?

16       A.   Yes, I do.

17       Q.   Do you recognize this document?

18       A.   Yes, I do.

19       Q.   And it's a list of materials you considered

20   in preparing your report which is Deposition

21   Exhibit No. 3, correct?

22       A.   Correct.

23       Q.   The List of Materials Considered identifies

24   all documents referenced in your expert witness

Page 52

1    report, correct?

2        A.   Correct.  There's footnotes on each page.

3        Q.   Okay.  Is this list of materials considered

4    accurate?

5        A.   Yes, it is.

6        Q.   So you did not consider any materials other

7    than those cited in your report, correct?

8        A.   Not in the preparation of my report, no.

9        Q.   Doctor, have your opinions changed since

10   you submitted your report on August 3rd?

11       A.   No.

12       Q.   Have you acquired any additional

13   information since that time?

14       A.   What do you mean by "additional

15   information"?

16       Q.   Has any new data or analysis come to your

17   attention which has changed the opinions that you

18   intend to offer in this case?

19       A.   Certainly has not changed it.  There's

20   always new data coming in.  But no, nothing has

21   changed my opinion.

22            MR. BURNETT:  Objection.

23       Q.   Is there any new data on which you intend

24   to rely in order to offer testimony in this case?

Page 53

1                    MR. BURNETT:  Ms. Wu, sorry to

2       interrupt.  My computer's about to die.  We can

3       keep going --

4                    MS. WU:  Oh, okay.

5                    MR. BURNETT:  -- but I'll just need 30

6       seconds to plug it in using this charger over here.

7       Hold on.

8                    MS. WU:  Sure.  Counsel, did you say

9       to keep going?  I don't want to --

10                    MR. BURNETT:  We don't have to go off

11       the record.  Just give me 20 more seconds.

12                    MS. WU:  Sure, certainly.  Yea.  No

13       rush.

14                    MR. BURNETT:  Okay, I'm good.

15                    MS. WU:  Okay, wonderful.

16       BY MS. WU:

17           Q.   Doctor, are there any new sources of

18       information or data on which you intend to rely in

19       order to offer opinions and testimony in this case?

20           A.   No, there's not.

21           Q.   Thank you.  So Doctor, I'd like to go back

22       to your report, which is Deposition Exhibit 3, and

23       look back at page 5 in the Summary of Opinions.

24       And I'd like to call your attention to the first

Page 54

1    paragraph on the top of page 5 beginning "I have

2    found."

3                    This is the paragraph which you read

4    into the record a short while ago.  Correct?

5        A.    Correct.

6        Q.    And I'd like to march through the opinions

7    summarized in this paragraph on page 5.  Doctor,

8    the sources of data you identified, what was the

9    source of data for the statistics summarized here?

10       A.    This is --

11       Q.    -- in the first paragraph on page 5?

12       A.    This is the data from the Vital Statistics

13   data.

14       Q.    Is there anything beyond the Vital

15   Statistics data that you used in order to generate

16   the analysis which is summarized in the first

17   paragraph on page 5?

18       A.    Yes, there are -- there are the Vital

19   Statistics data that comes from this database from

20   2000 onward, so it has very detailed data by

21   county.

22                    But then the last of those -- the

23   second paragraph, that was not using the same

24   database; that was using data that is being given

Page 55

1    to the -- by the National Center for Health

2    Statistics because of the problem of being able to

3    go back and get the archival data to be able to

4    demonstrate that the poisoning rates of which drug

5    poisonings are a part are very low until that

6    period of time.

7        Q.   Okay.  So Doctor, just to clarify, the

8    pre-2001 accidental poisoning rate data that you're

9    referencing is summarized in the second paragraph

10   on page 5, correct?

11       A.   That second paragraph -- yes.  That's the

12   summarize --

13       Q.   Okay.

14       A.   -- summary -- summarizing the graph that is

15   produced on page 15.

16       Q.   Okay.  So Doctor, just to make sure that

17   we're level set in terms of our terminology before

18   we march ahead today, could you tell us what you

19   mean when you use the term "drug overdose?"

20       A.   Okay.  It's probably easier if I start off

21   with accidental -- accidental poisonings are all

22   poisonings that are not -- that are not accidents

23   -- in other words, someone tried to poison someone

24   as a homicide or someone took the poisoning as a

Page 56

1   suicide.

2               And that's -- that's accidental

3   poisonings.

4               And then the vast bulk of those are

5   due to a drug.  And by that, I mean a drug being a

6   legal drug or a illegal drug that's considered a

7   standard terminology as to what a drug is.

8               And then separately to that, we then

9   break it down to an opioid-related drug, which the

10  vast bulk of them are opioid -- involve opioids.

11      Q.   So doctor, I'm -- before we march -- we

12  march further into your opinions, let's stay on

13  drug overdoses just for clarity.

14      A.   Yeah.

15      Q.   When you refer to "drug overdoses" in the

16  context of your report, you always mean drug

17  overdoses to mean accidental poisonings.  Correct?

18      A.   Yes, accidental drug overdoses.

19      Q.   Okay.  Thank you.  Now, Doctor, you just

20  referenced opioids, and again, I just want to level

21  set in our terminology.  When you use the phrase

22  "prescription opioids" in the context of your

23  opinions in this case, what do you mean?

24      A.   By "prescription drugs," I am meaning drugs

1    that can be obtained from prescription and the

2    molecules -- the drug molecules -- the drug is a

3    manufactured -- initially as a prescription drug.

4    And it's a broad class of drugs.  And when we're

5    looking at all of the toxicology, it's basically

6    that drug class.

7         Q.   And when you refer to the class of

8    prescription opioids, you're referring to drugs

9    which have been approved by the FDA for sale in the

10   United States.  Correct?

11        A.   Correct.

12        Q.   Also in your report, you used the term or

13   phrase "illicit opioids."  Could you just clarify

14   for us what you mean when you use the phrase

15   "illicit opioids".

16        A.   I refer to -- and I'll go back -- refer to

17   -- I think I put it as a footnote somewhere.

18             -- that essentially, these are drugs

19   that are on the DEA schedule, not considered to be

20   prescription drugs, prescribable drugs, in the

21   U.S., and as a result, they are declared to be

22   illicit drugs.

23             So it's based on the DEA

24   classification, Schedule I drugs:  Substance or

Page 58

1   chemicals -- this is on page 8, footnote.

2   "Schedule I drugs, substance or chemicals are

3   defined as drugs" not "currently accepted medical

4   use and a high potential for abuse.  Some examples"

5   are heroin, LSD, marijuana, ecstasy, peyote.

6               So that's what I consider to be

7   illicit drugs.

8       Q.   Illicit drugs are drugs that are not

9   approved by the FDA for medical use in the United

10  States.  Correct?

11      A.   Correct.

12      Q.   Now, I'd like to turn back to page 5 of

13  your report, again in your Summary of Opinions, and

14  in the first paragraph, you say - near the end of

15  it - that "overdoses" from "prescription opioids"

16  "significantly exceeded the rate of fatal overdoses

17  due to illicit opioids."

18               Do you see that, Doctor?

19      A.   Yes.  During that -- years up until 2011,

20  yes.

21      Q.   Doctor, can you quantify the rate at which

22  the overdoses associated with prescription opioids

23  exceeded those associated with illicit opioids?

24      A.   That is contained in my report.  If you go

Page 59

1   back to the graph on page 11 of my report, you can

2   see that heroin was the illicit drug, and

3   prescription opioids, quite obviously from looking

4   at -- I don't have the ratio.  I could do that at

5   another time, if needed.

6              But it's clearly -- visually, you can

7   see that the opioid deaths --

8              And I would add that these are the

9   drugs that were found.  And up until 2011, they

10  just weren't finding much heroin in the people that

11  died of an overdose in West Virginia.

12     Q.   Doctor, we're going to talk much more about

13  these figures, but just for clarity in the context

14  of this portion of the transcript, the -- what is

15  the source of data which is used to generate Figure

16  1 on page 11 that you just referenced?

17     A.   Okay.  I'll go back -- it's a sequential

18  process.  Essentially, the -- all injury deaths,

19  all overdoses - which are included in injuries -

20  which are accidental deaths, suicides and

21  homicides, are reported to the medical examiner.

22  They then do an examination of the case; they

23  decide if it needs an autopsy.

24              And in most of -- and in almost all of

Page 60

1   the drug overdose deaths, they end up doing an

2   autopsy.  They then test the blood.  They then

3   determine which of the drugs that they found were

4   causally related, contributed to the death - is the

5   official term that they use - so in the opinion of

6   the medical examiner, this -- the drug found

7   contributed to the death.

8            And that is then required to be listed

9   on the death certificate, and they list in no

10   particular order necessarily, because you can't

11   tell which drug necessarily -- they're all

12   combined.

13            They list the drugs on the death

14   certificate.  That data -- and I would also add

15   that the West Virginia Medical Examiner data is

16   considered some of the top data in the country in

17   terms of the compilation of this data onto the

18   death certificate.

19            And then they -- from 2001 onwards,

20   because of the problems that we were talking about

21   earlier, about getting the actual accidental, which

22   ones are drugs, what drugs were involved, the state

23   set up a separate system where they listed every

24   single drug that was believed to be contributing.

Page 61

1          That's actually in what they call Part

2    I of the death certificate, which are drugs that

3    are believed to have contributed to the death.  And

4    that is what this data is based upon.

5          So it's a sequential from a detailed

6    toxicology coming down to being written on a death

7    certificate, being then written into a database at

8    the Vital Statistics office.

9      Q.   In short, it's medical examiner data which

10   is used in order to generate the information

11   summarized in Figure 1.  Correct?

12     A.   Exactly.

13     Q.   Now, turning back to the summary on -- in

14   the first paragraph on page 5 of your report, and

15   turning back to the opinion we've been discussing

16   that "fatal overdoses due to prescription opioids"

17   "significantly exceeded the rate of fatal overdoses

18   due to illicit opioids," Doctor, is that opinion

19   specific to Cabell County?

20     A.   It is -- the figure on page 11 is very

21   specific to Cabell County.  It also -- it also

22   occurred in the state, but that's -- the data there

23   is very specific to Cabell County.

24     Q.   Do you have the same opinion as with regard

Page 62

1   to West Virginia as a whole?

2       A.   Generally, yes.

3       Q.   And what is the basis for your opinion with

4   regard to the state of West Virginia as a whole?

5       A.   That is looking at that same database that

6   we have.  Actually, I don't -- I don't think I

7   included that, but we have access and we have

8   looked at the data.  It's the same database.

9               There's a total for the state, and

10  then it's broken out for which county.

11      Q.   And so you just said you don't think you

12  included it.  Do you mean that you didn't cite it

13  in your report?

14      A.   I'm honestly not sure.  I would have to go

15  back and look.  I may do --

16              But the report was concentrating on

17  Cabell County, and where we didn't have data, we

18  would include it.

19              I think we're only talking Cabell

20  County, is what's presented in the report.  I would

21  have to go back and check.

22      Q.   Doctor, to the best of your knowledge as

23  you sit here today, you are not offering an opinion

24  as to the comparative rates that prescription

Page 63

1    opioid overdoses and illicit opioid overdoses in

2    the state of West Virginia for the period of 2001

3    to 2011; is that right?

4         A.   No, to the best of my knowledge, at the

5    moment, we don't report the data for the state,

6    because it was not --

7         Q.   Okay.  It's not cited in your report,

8    right?

9         A.   That -- as far as I know at the moment.  I

10   can't remember whether we would have cited it.  The

11   --

12        Q.   Okay.

13        A.   What we do cite is the accidental poisoning

14   as a whole, of which the opioids are part of.  In

15   that, we look at the state, because that was the

16   only data that we had available.

17        Q.   Okay.  Now, Doctor, again, this is just for

18   clarity.  When you say "we," do you mean you

19   personally or --

20        A.   Me.  I --

21        Q.   Okay.

22        A.   I'm originally from New Zealand, and we use

23   the "we" as a personal we sometimes.

24        Q.   In my family, that's what we say "the royal

Page 64

1   we."

2       A.    "The royal we."

3       Q.    Okay.

4       A.    Exactly what my -- same thing.

5       Q.    Fair enough.  I just wanted to make sure

6   the record was clear on our pronouns.

7              Okay.  So if we stick on page 5 and we

8   go to the second paragraph on that page, it says,

9   "I have further found that for West Virginia, the"

10  - and I'm going to say - "accidental," as amended,

11  "poisoning rates, which are mostly due to drugs,

12  had very low rates from 1979 until 2000 and began

13  to increase dramatically from 2001 on, when they

14  began to exceed the rate for the US as a whole."

15             Do you see that, Doctor?

16      A.    Yes.

17      Q.    What is the basis for your opinion that's

18  summarized in this second paragraph?

19      A.    It's from looking at the U.S. rates as a

20  whole.  For example -- and I think it's -- at this

21  stage, it's my opinion.  But if you look at Figure

22  3, you could estimate what the rates were for

23  poisoning and drug poisoning, and then you could

24  look at the rates for West Virginia and compare it

Page 65

1    as a whole.

2              So that would -- it's visually

3    comparing that and I -- I think it was also

4    mentioned - I'm pretty sure - in the report that's

5    Appendix -- I'm just going to get the name.

6              Yes.  West Virginia -- Appendix --

7    oops it's here.  Exhibit C.  Exhibit C is West

8    Virginia Historical Drug Overdoses.   I suspect

9    that's where I saw this mentioned.

10             I would have to look --

11   Q.   Now, that --

12   A.   -- at the exact page, but they do talk

13   about the increase -- in fact that was when they

14   began to realize -- aah, here you can see.  On page

15   5 of that Exhibit C, you can see West Virginia

16   compared to the U.S.  And they go back to 2001.

17   But you could see how the West Virginia rates are

18   clearly exceeding the U.S.

19   Q.   Okay.  So Doctor, if we look back at page 5

20   of your report, the second paragraph which we were

21   just reviewing, accidental poisoning rates as

22   referenced here, is broader than opioid overdoses.

23   Correct?

24   A.   Correct.

Page 66

1      Q.   It includes, for example, alcohol

2   poisoning.   Correct?

3      A.   Yes.

4      Q.   Or cocaine poisoning, correct?

5      A.   Correct.

6      Q.   And the opinion which is set forth here in

7   the second paragraph relates to the state of West

8   Virginia as a whole.   Correct?

9      A.   Correct.

10     Q.   It is not specific to Cabell County,

11   correct?

12     A.   We were not able to get the data for Cabell

13   County.   Because the rates were so low that they

14   suppressed them and -- if the rates of -- or the

15   cases that count is very low, the National Center

16   for Health Statistics suppress the rate.

17     Q.   So you have not conducted a similar

18   analysis that is specific to Cabell County,

19   correct?

20     A.   I would dis -- I tried.   I tried to the

21   best of the available data.   I spent a lot of time

22   trying to get specific Cabell County data.   But as

23   I suggested, the rates were so low - and I state

24   that in my report - that the C -- that the National

Page 67

1    Center for Health Statistics has a policy of

2    suppressing the data if the rates are too low

3    because they're concerned about being able to

4    identify individuals.

5        Q.   Doctor, do you know if Cabell County

6    maintained that sort of data for the period prior

7    to 2001?

8        A.   They must have, because if it was higher,

9    it would have been reflected in the rate for West

10   Virginia, West -- it would have caused the West

11   Virginia rate to have increased.

12       Q.   Do you know if the state of West Virginia

13   actually maintained data sourced from Cabell County

14   for the period prior to 2001?

15       A.   They did.  They compiled data from all

16   counties and -- as probably originally, that's

17   where I spent quite a bit of time when you were

18   going over the individual time, because I was

19   trying to find data for Cabell County directly.

20   But the best I could do was to look at the total

21   class, that was the accidental poisoning rates.

22            And the thing that impressed me was

23   the rates were so low that it would be impossible

24   no matter the rates were high or low, for

Page 68

1    Cabell/Huntington to make much difference in that.

2         Q.   Doctor, are you aware that Cabell County

3    has made no effort to identify the type of drug

4    involved in an overdose until at least 2015?  Are

5    you aware of that?

6         A.   No, I was not.

7         Q.   Did you undertake any investigation in

8    order to interview officials from Cabell County in

9    order to determine what data they maintained prior

10   to 2001 with regard to accidental poisoning rates?

11        A.   No.

12        Q.   Okay.

13        A.   I talked at length with people in Cabell

14   County and worked with them and met them a number

15   of times.  But no, I haven't.

16        Q.   Okay.  Thank you, Doctor.  Who have you

17   talked to from Cabell County in connection with

18   your work in this case?

19        A.   Not with this case.  I have not talked with

20   any of the officials in regard to the work on this

21   case.

22        Q.   Okay.  And just the same question for the

23   City of Huntington.  Have you consulted with any

24   officials from the City of Huntington in connection

Page 69

1    with your work in this case?

2         A.   Not with this work in the case, but I've

3    met them at various times --

4         Q.   Okay.

5         A.   -- as part of my other work.

6         Q.   Okay.  So as part of your work outside of

7    this case, who are the individuals from Cabell

8    County that you consulted?

9         A.   I have met the former -- one of the former

10   police who was -- chiefs who was head of the Drug

11   Task Force there before he became the drug czar for

12   the State.

13              I've met with Jan Rader, who's the EMS

14   director there.  I've talked over the phone to

15   some of the people doing -- they have a very --

16   because their rates of drug overdoses were so high,

17   they developed a model program called quick

18   response grants where they investigated the

19   overdoses and got people into treatment.  So I've

20   talked to people about that.

21              They've been very proactive in

22   prevention, and so in the course of understanding

23   the drug problem, in fact, I've met with them.

24              MR. BURNETT:  Doctor Smith, I assume

Page 70

1    none of those were in context with the litigation.

2    But if they were, let us know, and we'll act

3    accordingly.

4              THE DEPONENT:  Absolutely not.  It was

5    in the course of me being new to the state and

6    wanting to understand the problem, and clearly that

7    was where the -- some of the heart of the problem

8    was -- there was clearly a problem there, and they

9    were doing a lot about it, so as part of me

10   understanding, I made a point of talking to people

11   there.

12   BY MS. WU:

13       Q.   Doctor, you mentioned that you spoke with

14   Huntington Fire Chief Jan Rader.  Is that right?

15       A.   Yes.

16       Q.   You spoke to her about the Quick Response

17   Team, correct?

18       A.   I think I -- yes, I -- I think I might have

19   mentioned it.  I honestly can't remember what the

20   conversation was, but I've talked to members of her

21   team that do the quick response grant, yes, and I

22   found out details, because I've been working on a

23   similar program in one of the other counties

24   nearby.

Page 71

1      Q.   Understood.  Doctor, to the best of your

2   knowledge, what is the QRT program in place in

3   Huntington?

4      A.   It's a quick response grant, quick response

5   program where essentially when the EMS are called

6   to an overdose, a couple -- a day or so later, what

7   they do is they go back -- these are nonfatal

8   overdoses, obviously.

9               -- and then they go back to the same

10   place and identify the individual, along with

11   people that are skilled in getting people into

12   treatment and know how to get people access to

13   treatment, and so it's a way of engaging people in

14   treatment.  And I suspect they -- and they're also

15   giving them naloxone so that they can prevent drug

16   overdoses from occurring or they can treat them

17   themselves.

18               That's part of an outreach --

19      Q.   Do you know when -- I'm sorry, Doctor.

20   Please go ahead.

21      A.   No, it's just part of an outreach program

22   they have to try and reduce their problem.

23      Q.   Doctor, do you know when Cabell County

24   instituted the QRT program?

Page 72

1      A.   No, I don't.  I probably -- I have some

2   documents back in my office that might be able to

3   give me when it started.  But I don't.

4      Q.   And do you know how the QRT program in

5   Huntington is funded?

6      A.   As I understand it, they've got some grants

7   and are funded by the County itself.  I'm not 100

8   percent sure how it's funded.

9      Q.   Are you aware that the QRT program is

10  funded by Federal grant money?

11     A.   Yes, I -- I am.  That's -- I'm not sure

12  what agency, but I know there is some federal money

13  involved.

14     Q.   Doctor, based on your earlier testimony,

15  you believe that the QRT program in Huntington has

16  been successful in reducing the number of

17  overdoses.  Is that right?

18          MR. BURNETT:  Objection.

19     Q.   You can answer.

20     A.   It's not really my -- I don't know the full

21  data.  I've seen reports, but I don't know and --

22  it -- basically, I'm not in a position to really

23  analyze the data at all.

24     Q.   From your conversations with Jan Rader and

Page 73

1    others from the City of Huntington, do you

2    understand that the City of Huntington believes

3    that the QRT program has been successful in

4    reducing overdoses?

5        A.   It --

6             MR. BURNETT:  Objection.

7             THE DEPONENT:  Okay, I won't answer

8    that.

9        Q.   Oh, you can answer, Doctor.

10       A.   No, I won't answer, yeah.

11            MR. BURNETT:  Well, when I object like

12   that, you can answer.

13            THE DEPONENT:  Yeah.

14            MR. BURNETT:  If I say something about

15   privilege or something else -- I'll explicitly tell

16   you --

17            THE DEPONENT:  Okay, yeah.

18       A.   Certainly they claim that it has been

19   effective, and I've seen newspaper articles

20   describing that.

21       Q.   Okay.  Thank you, Doctor.  So you mention

22   that you also spoke with a number of Cabell County

23   law enforcement.  Is that right?

24       A.   I think it was former law enforcement at

Page 74

1    the time, yes.  Jim Johnson was his name.

2       Q.   Okay.  What was the context of your

3    conversation with Jim Johnson?

4       A.   I had just arrived in the state and a

5    colleague of mine who worked on drug problems took

6    me on a little bit of a tour to where the hot spots

7    of the drug problems in the area were, and they

8    took me down to Huntington, and where we met with

9    the people there so I -- so I could understand the

10   drug problem, because I was new to the state, and

11   we also went down to Portsmouth in Ohio which is

12   another area that's --

13            So that was the reason that I went

14   down there.

15      Q.   In what year did you make that visit,

16   Doctor?

17      A.   It probably was 2017.  I'd have to look at

18   records as to when exactly it was.

19      Q.   Do you recall anyone else in addition to

20   Jim Johnson that you met during your visit to

21   Huntington?

22      A.   He had a data analyst with him who did

23   analyst work, and I think that was probably the

24   only other time.  But I've met with people at

Page 75

1    Marshall University that have been working on the

2    drug problem at other times.

3                    MR. BURNETT:  Counsel --

4        Q.   Who are the people --

5                    MR. BURNETT:  Counsel, I don't mean to

6    interrupt your flow, but we've been going about an

7    hour and a half, so when there's a good time, I

8    think we would appreciate a break.

9                    MS. WU:  Oh, sure, certainly.  Let me

10   just -- let me just get this question in and then

11   we can break.

12       A.   So who have I met at Marshall?  I guess

13   there's a number of different people.  The person

14   who's the current drug czar there.  I've met with

15   Doctor Baker there.  I've been to meetings down

16   there.

17                    I guess it's hard -- I -- I'd have to

18   look at my names.  I'm that particularly good at

19   remembering specific names, but there are a number

20   of people.

21       Q.   Fair enough, Doctor.  Have you spoken with

22   any individuals from Marshall University in

23   connection with your work in this case, Doctor?

24       A.   Absolutely not.

Page 76

1      Q.   Okay.  And I'm sorry, I don't want to delay

2   you from a break; I just don't want to lose track.

3   Doctor, you were -- in the context of our

4   conversation about Huntington's QRT team, you used

5   the term "nonfatal overdoses."  Could you tell us

6   what you mean there and in your report when you use

7   the term "nonfatal overdoses"?

8      A.   Actually, I don't think I mentioned a lot

9   about nonfatal overdoses in my report, but these

10  are ones where -- which would not be covered in our

11  database whereby the person survived the overdose

12  and didn't make it to the medical examiner's

13  office.

14           So that's what I mean by a "nonfatal

15  overdose."

16     Q.   Thank you, Doctor.  The nonfatal overdoses

17  are referenced in terms of the data available to

18  you in Paragraph 1 of your report which is

19  Deposition Exhibit No. 3.  Doctor, can you identify

20  any source that you considered in connection with

21  your opinions in this case that relate to nonfatal

22  overdoses?

23     A.   No, it was not the charge.  My charge was

24  to look at -- for this report, was to look at

Page 77

1    documenting the fatalities and the trend in the

2    fatalities.  Because that was what my particular

3    expertise was.

4         Q.   Thank you, Doctor.  So the opinions that

5    you're offering in this case are limited to fatal

6    overdoses and do not account for information

7    related to nonfatal overdoses.  Correct?

8                   MR. BURNETT:  Objection.

9         A.   Yeah, I would have to check my report.  I

10   -- in the context of understanding the problem.

11   I'm not sure.  I'd have to spend about 15-20

12   minutes reading every single line in my report to

13   make sure that I didn't make a mention of it.

14        Q.   Okay.  So the opinions that you're offering

15   with regard to overdose rates in Cabell County and

16   West Virginia as a whole are limited to fatal

17   overdoses.  Correct?

18        A.   Correct.

19                   MR. BURNETT:  Objection.

20        Q.   You haven't considered data which reflects

21   overdose information for nonfatal overdoses in

22   connection with your opinions in this case.

23   Correct?

24                   MR. BURNETT:  Objection.

Page 78

1              THE DEPONENT:  So does that mean that

2    I don't need to answer or --

3              MR. BURNETT:  You can answer.

4              THE DEPONENT:  Just answer.

5         A.   Yeah, no, I haven't.  That was not my

6    charge.

7         Q.   Okay.  Thank you, Doctor.

8              MS. WU:  And why don't we go on a

9    break.

10             MR. BURNETT:  Yeah.

11             MS. WU:  Doctor and David, how long do

12   you want to take?

13             MR. BURNETT:  Perhaps 10:45?

14             THE DEPONENT:  Yeah, sounds good.

15             MS. WU:  Okay, 10:45.  Thanks,

16   everyone.  See you soon.

17             VIDEO OPERATOR:  Going off the record.

18   The time is 10:33 a.m.

19                  (A recess was taken after which the

20                  proceedings continued as follows:)

21             VIDEO OPERATOR:  Now begins Media Unit

22   2 in the deposition of Gordon Smith.  We're back on

23   the record.  The time is 10:50 a.m.

24   BY MS. WU:

Page 79

1      Q.   Doctor, we just took a short break.  You

2  know that you're still under oath, correct?

3      A.   Correct.

4      Q.   Okay.  So we spent a little time before the

5  break talking about your opinions, and now I want

6  to talk about the boundaries of those opinions.

7  Doctor, you aren't offering any opinions about the

8  conduct of any defendant in this case, correct?

9      A.   Not any individual defendant, no.

10     Q.   You're not offering any opinions about when

11  -- whether the conduct of any individual defendant

12  caused any particular outcome in Cabell County,

13  correct?

14     A.   Not -- not a specific individual defendant,

15  no.

16     Q.   Now, when you say "not a specific

17  individual defendant," what do you mean by that?

18     A.   On page 18 of my report, I referred to the

19  American Public Health Association comment saying

20  that "I concur with the Task Force," and as that's

21  "the industry's credibility is near zero and major

22  changes in its practices are essential."

23           That was a quote directly from their

24  report.

Page 80

1             So I do make some comment because that

2     is an expert report prepared by people I know and

3     trust their opinions, but not specifically.  That's

4     why I was being very explicit with you about the

5     individual defendants, I have -- I've made no

6     comment whatsoever anywhere in the report.

7         Q.   Okay.  Let me try to go through this for

8     clarity, then we'll return to the statement on page

9     18.  Doctor, you aren't offering any opinions about

10    McKesson in this lawsuit, correct?

11        A.   Correct.

12        Q.   Doctor, you aren't offering any opinions

13    about Cardinal Health, correct?

14        A.   Correct.

15        Q.   You aren't offering any opinions about

16    AmerisourceBergen, correct?

17        A.   Correct.

18        Q.   Doctor, you aren't offering any opinions

19    about whether the conduct of any of those

20    defendants - McKesson, Cardinal or

21    AmerisourceBergen - caused any particular outcome

22    in Cabell County, correct?

23        A.   Correct.

24        Q.   Doctor, you also are not offering any

1    opinion about the legal duties of the defendants

2    I've named, McKesson, AmerisourceBergen and

3    Cardinal, correct?

4        A.    Correct.

5        Q.    So Doctor, just a moment ago, you

6    referenced page 18 of your report.  And you

7    specifically quoted a passage on page 18 of your

8    report which is Deposition Exhibit 3 that says,

9    "The opioid crisis can be directly tied to

10   practices adopted and encouraged by opioid

11   manufacturers and distributors.  As such, the

12   industry credibility is near zero and major changes

13   in its practices are essential."

14               Have I read that correctly?

15       A.    That's correct.

16       Q.    Doctor, what is the source of this

17   quotation?

18       A.    The source is the Association of -- it's

19   Footnote 18 on page 17, "Association of Schools and

20   Programs of Public Health.  BRINGING SCIENCE TO

21   BEAR ON OPIOIDS Report and Recommendations" of "the

22   ASPPH Task Force on Public Health Initiatives to

23   Address the Opioid Crisis" dated November" 19, "p.

24   32," and I cite the web link for it.

Page 82

1      Q.   Doctor, do you concur with this passage

2   which you've quoted on page 18 of your report?

3      A.   That's what I say.  I say, "The more I work

4   on opioids in West Virginia the more I concur with

5   the Task Forces conclusion."

6      Q.   What is the basis for your concurrence with

7   the statement on page 18 of your report?

8      A.   Having read this report and understanding

9   the literature from -- in the field, I very much

10   agreed with their report.  I rely a lot on my

11   opinion.  They're people that I trust, people that

12   I know.  Some of them I worked with -- one of them,

13   I've worked with.

14           And I -- the conclusions that they

15   came to made a whole lot of sense to me.  But I

16   haven't done the original research on that myself.

17      Q.   Have you -- what expertise, if any, have

18   you used in order to confirm or test the statement

19   that you've quoted on page 18?

20      A.   I first started my scientific career in the

21   1970s.  I've been working as a scientist, as a

22   researcher in the field, understanding, reading,

23   being able to interpret that literature makes sense

24   or not makes sense, and I've read a number of other

Page 83

1  articles in the past about the drug problems.

2              My own research has been more geared

3  to the actual specific data with regard to the

4  mortality and those things, but the conclusions

5  that these experts in the specific field came to

6  made sense to me.  Otherwise, I would not have made

7  that opinion.

8    Q.   Have you done any work in connection with

9  your opinions in this case in order to test that

10 statement?

11   A.   My work has been understanding the drug

12 problem and the -- and the -- and its impact on the

13 people of West Virginia.  And so in that respect, I

14 have -- everything that I saw in that report,

15 fitted in and concurred with things that I had read

16 and people I had talked to over the years.

17   Q.   All right.  And what expertise, if any,

18 could you bring to bear in order to test that

19 statement?

20   A.   I'm a scientist, and there are other people

21 who are contributing specifically even in this case

22 for the -- that are basically saying -- and they

23 define it clearly, as I understand it.  But

24 essentially, I myself, in terms of doing research,

Page 84

1    haven't done all of the components there.  I've

2    done pieces that are referred to.

3              They very clearly talk about the data,

4    the trends in the drugs that were found in people,

5    the fact that there were increases in supply.  So

6    that's all consistent with what I've heard.  But I

7    myself have not done research in that area

8    specifically.

9        Q.   You yourself aren't an expert in the

10   pharmaceutical distribution chain, correct?

11       A.   I'm an expert in the whole area of

12   substance abuse in general, and so it's part of the

13   whole understanding of the drug problem.  So while

14   I admitted I haven't done on that specific thing,

15   I'm a scientist; I can read the literature; I can

16   make my own judgment based on -- as scientists, we

17   can't do every -- all the research in the world,

18   one person.

19             We have to rely on experts, and I

20   relied on them with my understanding of the field

21   and my experience.

22       Q.   Certainly, Doctor.  Do you claim any

23   expertise in the pharmaceutical distribution supply

24   chain?

Page 85

1          MR. BURNETT:  Objection.

2     A.   I understand the way it works.  I can

3  understand the reports and read the literature.  So

4  I haven't done research specifically in that area,

5  but I can very much interpret their report -- the

6  studies that have been done in that area.

7     Q.   What expertise, if any, do you bring to

8  your review of reports related to the

9  pharmaceutical supply chain?

10     A.   I bring a -- training as a scientist, many

11  years of training, experience as a scientist,

12  reading reports, reading, being able to sort out

13  which reports make sense to me, which ones don't

14  make sense, which seems a valid claim, which does

15  not seem a valid claim.

16          And that's the basis upon which I made

17  that decision.

18     Q.   You think your general knowledge and not a

19  specific expertise related to the pharmaceutical

20  supply chain?

21     A.   General knowledge to a -- as a medical

22  physician and as a public health researcher and

23  understanding the field, it is consistent with the

24  medical literature.

Page 86

1            MR. BURNETT:  And I'll just --

2      Q.   So now --

3            MR. BURNETT:  Reminder to give me an

4    opportunity to object to the question.

5            THE DEPONENT:  Yes.

6            MR. BURNETT:  I object to that

7    question.

8      Q.   Doctor, I'd like to ask you to take out

9    another document, hopefully to make this segment of

10   Q and A more concrete.  It's Document No. 8 which

11   is the study we've been talking about, "BRINGING

12   SCIENCE TO BEAR ON OPIOIDS" dated November 2019.

13           SMITH DEPOSITION EXHIBIT NO. 8

14               ("BRINGING SCIENCE TO BEAR ON OPIOIDS"

15               Report and Recommendations from the

16               ASPPH Task Force on Public Health

17               Initiatives to Address the Opioid

18               Crisis dated November 2019 was marked

19               for identification purposes as Smith

20               Deposition Exhibit No. 8.)

21     A.   So what number is this again?

22     Q.   Number 8.

23     A.   Number 8. So I'll just check it here. Yep.

24     Q.   Okay.

Page 87

1      A.    Okay.

2      Q.    Doctor, you reviewed the publication marked

3   as Exhibit 8 in connection with your report,

4   correct?

5      A.    That's correct.

6      Q.    And you cited --

7      A.    Sometime ago.

8      Q.    And you cited it in Footnote 19 of your

9   report.   Correct?

10     A.    I think it's Footnote 18 in my report.

11  Page 17?

12     Q.    Page 17, and then again Footnote 19 which

13  hangs off the statement that we discussed --

14     A.    Yes, I see it.  Yes.

15     Q.    Okay.  Thank you, Doctor.  What practices

16  adopted and encouraged by opioid distributors

17  identified in Exhibit 8 do you refer to in your

18  report on page 18?

19     A.    I referred to the general Gestalt.  I

20  haven't read this in a while.  I was -- other than

21  recommending -- reading the report and making some

22  comment because I believed in it.  And Judith

23  Feinberg, someone I worked very closely with, I --

24            It would take me a while.  If you'd

Page 88

1   like me to, I could take some time, but it would

2   take me time to find that exact place in the

3   report.  Maybe you could --

4        Q.   Certainly, Doctor.  As you sit here today,

5   what, if any, conduct by pharmaceutical

6   distributors can you identify as encouraging

7   prescription or use of opioids?

8        A.   That essentially there was -- okay.  Based

9   on the report and other readings, that there were

10  excessive amounts of opioids distributed in West

11  Virginia, including Cabell County as a whole.

12  There was no -- little good evidence that they were

13  effective for the management of chronic pain, and

14  that the risks were understated of addiction for

15  long-term use.

16            And that's the type of opinion that's

17  in this report.  I would need a little bit of time

18  to completely nail down exactly what page it was

19  in.  But essentially, the issue is that oversupply

20  of opioids above what seemed to be needed,

21  distributing and marketed that they were more

22  efficacious than they actually turned out to be

23  from studies who were not done by me, but experts

24  and referred to in this report, and that there were

Page 89

1   claims that they were nonaddictive, and based on

2   the reports and the other experts, that this was --

3              I concurred they made -- the data made

4   sense to me in the report's conclusions.  That was

5   what made me make that conclusion.

6      Q.   Doctor, in your last answer, you described

7   changes in prescribing practices.  Did I hear that

8   correctly?

9      A.   Yeah, there were -- from the -- in the

10  report and in other literature, there have been --

11  there was an increase, considerable increase, in

12  prescribing of opioids, yes.

13     Q.   As you sit here today, can you identify any

14  practices or actions of pharmaceutical distributors

15  that caused increases in the rates of prescribing

16  opioid medications?

17     A.   I know in the report, they talk about

18  increased marketing of drugs, that they were

19  marketed as being safe and less addictive or

20  nonaddictive, particularly for people with chronic

21  pain.

22              That would be -- that's one practice

23  that I know is in the report.

24              I would have trouble -- and if you

Page 90

1   want -- I could take a long time to find the
2   specific point.
3              And that they were considered safer
4   than -- they were marketed as being safer than
5   other drugs.
6      Q.   Doctor, do you know if pharmaceutical
7   distributors such as McKesson, Cardinal and
8   AmerisourceBergen market prescription drugs?
9      A.   They distribute -- as -- you quoted that
10  they are actually distributors.  Much of the
11  marketing is done by the individual drug companies,
12  and they are the ones that distribute.
13     Q.   So the marketing behavior that you've just
14  referenced is conducted by pharmaceutical
15  manufacturers as opposed to distributors, correct?
16     A.   Correct.  The manufacturer -- as I
17  understand the process, the manufacturers make the
18  drug and were marketing it, but then the
19  distributors are the people that distribute the
20  drug, and they have certain legal obligations that
21  they have to follow that they distribute -- when
22  they distribute to individual pharmacies, whether
23  these seem reasonable or should have been red
24  flags.

Page 91

1          And that's the -- in terms of the

2     distributing, that's the -- what I understand to be

3     the issue, is that they should have known that

4     there were these vast quantities of drugs being

5     sold to people far in excess of what would normally

6     have been prescribed.

7          Q.   Thank you, Doctor.  My question is:  Is

8     there any marketing practice of the distributors -

9     including McKesson, Cardinal and ABDC - that you

10    can identify today that you attribute as having

11    caused or increased prescribing rates of

12    prescription opioids?

13              MR. BURNETT:  Objection.

14         A.   Yeah, I do not know how they market the

15    drugs to individual pharmacies, how they're

16    involved in the marketing their services as a

17    distributor.  That's not an area that I've studied

18    in great detail.

19         Q.   That's not an area in which you have

20    expertise, correct, Doctor?

21         A.   I would say I have expertise to be able to

22    evaluate the reports and what is read, and as a

23    general person in the whole area of substance

24    abuse, epidemiology, it's an important part of

Page 92

1   understanding the problem.

2       Q.   But you yourself have never studied the

3   conduct of distributors, correct?

4       A.   I have not conducted an individual study of

5   distributors.  As a scientist, I've read the

6   literature and interpreted the reports and have

7   come to a conclusion based on the literature and

8   the science that's being presented to me as a

9   scientist.

10      Q.   And the marketing activity that you

11  referenced a short while ago is marketing engaged

12  in by pharmaceutical manufacturers, correct?

13      A.   As I understand it.  But I do not know to

14  the -- any -- the extent to which a distributor is

15  also involved in marketing their services to

16  individual pharmacies.

17      Q.   You have no --

18      A.   Everybody --

19      Q.   -- opinion on --

20      A.   Most people selling a product do some

21  marketing, and I do not know the exact details.

22      Q.   Thank you, Doctor.  You don't have an

23  opinion on whether or not pharmaceutical

24  distributors market prescription opioid products,

Page 93

1   correct?

2       A.   I don't know enough about it.  The issue is

3   that I -- to me, every retailer or distributor that

4   I've dealt with has marketed their services, and so

5   this -- I assume there is some marketing of it, but

6   I do not have exact details of that.

7       Q.   It's just an assumption, correct, Doc --

8       A.   A supplier with market their services, we

9   can provide the reliable supply, that's why we

10  choose, you know, one supplier over another,

11  whenever we go whatever we're looking for.

12      Q.   Okay.  But you don't actually have

13  knowledge of pharmaceutical distributor practices,

14  correct?

15              MR. BURNETT:  Objection.

16      A.   I have knowledge because I read the

17  literature and I interpret the literature and I

18  trust the judgment of scientists who have read

19  their work, and as a result of that, that's how I

20  can form an opinion.

21              But it's a -- I have not studied that

22  area specifically other than studying it in the

23  literature and reading the opinions of experts.

24      Q.   Now, Doctor, turning back to this segment

Page 94

1    of your report on page 18 which quotes the ASPPH

2    Task Force report, you write, "the industry's

3    credibility is near zero."  What's "the industry"

4    that you've referenced there on page 18 of your

5    report?

6        A.    My understanding of what they were saying

7    there in that report is the industry as a whole,

8    and they're talking about -- "the industry" is a

9    very broad concept going all the way from the

10   manufacturer of the drug itself, and presumably the

11   industry goes back to the people that make the

12   chemicals that the individual drug company makes

13   its things, and then to the drug distribution

14   system and the way it's distributed to pharmacies,

15   and then I assume that they're talking of the

16   pharmacy as part of the broad issue of the

17   pharmaceutical industry.

18              I think they're taking a broad

19   interpretation of it.

20       Q.    Is that your interpretation of the term

21   "industry" as used in your report on page 18?

22       A.    That was my understanding, that it was part

23   of a broad, all the way from the manufacturer to

24   the ultimate retailer in the distribution chain.

Page 95

1     Q.   Doctor, you just referenced pharmacies

2  dispense prescription opioids, correct?

3     A.   Correct.

4     Q.   In your opinion, are pharmacies part of the

5  opioid industry that you've just described?

6     A.   I don't -- that part of the whole

7  pharmaceutical industry, yeah, they are part of the

8  chain of delivering of the product to the consumer.

9     Q.   Is it your opinion, Doctor, that pharmacies

10  have zero credibility?

11              MR. BURNETT:  Objection.

12     A.   I think pharmacies differ.  They're all

13  individuals.  Some pharmacies may have very poor

14  credibility; and other pharmacies may have very

15  good credibility.  And I think there's a big

16  variation between pharmacies.

17              Once you get to the individual

18  pharmacy level, it's impossible to generalize, I

19  think.

20     Q.   It's impossible to create general

21  statements about the industry of pharmacies as a

22  whole, correct?

23              MR. BURNETT:  Object.

24     A.   I think there were individual pharmacies

Page 96

1     that clearly were part of the irresponsibility and

2     the lacking of credibility that I referred to.

3          Q.   Doctor, "yes" or "no"?  It is impossible to

4     make determinations as to the credibility of the

5     pharmacy industry as a whole.  Correct?

6               MR. BURNETT:  Objection.

7          A.   I can't really say that, because it is a --

8     the report parcels out individual pieces, but the

9     general conclusion they came to, that the whole

10    industry chain as a whole, lacked credibility.

11         Q.   Doctor, I'm asking for your opinion.

12    Doctor, is it your opinion that the pharmacy

13    industry as a whole lacks credibility?

14              MR. BURNETT:  Objection.

15         A.   My opinion is that I concur with the Task

16    Force's conclusion as stated.

17         Q.   Doctor, "yes" or "no."  Is it your opinion

18    that the pharmacy industry as a whole lacks

19    credibility?

20              MR. BURNETT:  Objection, asked and

21    answered, and really outside the scope of his

22    report.

23              MS. WU:  Counsel, this is a quotation

24    in his report.

Page 97

1     Q.   Doctor, please answer yes or no.

2     A.   What are you meaning by the pharmaceutical

3  industry?  Are you meaning the manufacturer?  Are

4  you meaning the whole chain?  At which point are

5  you talking about?

6     Q.   Doctor, let me clarify.  The objection

7  seems to have thrown you.  A few moments ago, we

8  talked about the pharmacy industry, meaning

9  pharmacies that dispense opioids.  Do you recall

10  that?

11     A.   So you're talking about local pharmacies as

12  against the pharmaceutical industry.

13     Q.   Doctor, is it your opinion that pharmacies

14  that dispense prescription opioids have almost zero

15  credibility?

16               MR. BURNETT:  Objection, asked and

17  answered.

18               You can answer.

19     A.   Yeah, as I say, some pharmacies certainly

20  lacked credibility, but I think at the individual

21  pharmacy level, it's a -- as a group, there clearly

22  were people that lacked credibility.

23     Q.   You can't make a --

24     A.   To blanket the whole industry as a whole is

1    impossible, because there are good players and bad

2    players, and I think that's clearly documented.

3         Q.   Doctors prescribe prescription opioids,

4    correct?

5         A.   Correct.

6         Q.   Are doctors part of the prescription opioid

7    industry that you've referenced on page 18 of your

8    report?

9         A.   Clearly there were some prescriptions --

10   there are physicians that have been prescribing

11   probably more than they should have.

12        Q.   That's not my question, Doctor.  My

13   question is:  Are doctors part of "the industry"

14   that you've referenced on page 18 of your report?

15        A.   I would say so, but I'm not 100 percent

16   sure.  I'd have to go back and look at the report

17   its a while -- it's a long time since I read the

18   report, so I -- I can't say that.  I would have to

19   spend some time looking to -- because I agree with

20   the general statement, but I have -- I did not --

21   you'll notice I did not break it down by what parts

22   of the industry I agreed with.

23              I think that the overall system -- and

24   I think that's what they're meaning there.  I would

Page 99

1    have to look at that.

2        Q.   Certainly.  Doctor, I'm only asking for

3    your opinions today.  I'm not asking for the

4    opinions of other authors or individuals.  Doctor,

5    is it your opinion that doctors are part of "the

6    industry" which you've included in the quotation in

7    your report on page 18?

8                MR. BURNETT:  Objection, asked and

9    answered.

10               THE DEPONENT:  Yeah.  Yeah.

11       A.   I would say that -- that clearly the

12   doctors were part of the chain of the industry --

13   the chain of command -- the chain here, and I would

14   have to check whether they included doctors as part

15   of their industry -- under their industry

16   association.

17               I certainly know that there were

18   doctors that were overprescribing, but there were

19   also doctors that were underprescribing opioids.

20       Q.   Doctor, it's your opinion in this case that

21   fatal overdoses were caused by prescription opioids

22   that were the subject of legitimate prescriptions

23   in some cases.  Correct?

24               MR. BURNETT:  Objection.

Page 100

1      A.   In our analysis of the data, we found

2   prescription opioids in many of the drug -- most of

3   the drug overdose cases.

4      Q.   Is it your opinion that the doctors

5   responsible for those prescription opioids -- for

6   those prescriptions for those prescription opioids

7   have zero credibility?

8              MR. BURNETT:  Objection.

9      A.   That was not part of my report, and I -- I

10  didn't include that in any analysis.

11     Q.   Doctor, as you sit here today, you don't

12  have knowledge of the sum and substance of the

13  quotation included on page 18 of your report taken

14  from the ASPPH report; is that correct?

15             MR. BURNETT:  Objection,

16  mischaracterizes the testimony.

17     A.   Yeah, that is not at all what I have said.

18  I have read the report sometime ago.  I took a

19  quick look at the conclusions the other day again,

20  and I realized that I completely agreed with them,

21  and my opinion has not changed since I read it, and

22  that was why I quoted it in the report, because I'm

23  a public health physician; I work at a public

24  health school.

Page 101

1           This was the major attempt by experts

2    in the field to understand the drug problem and, as

3    they say, bring science to bear on opioids and

4    understand the problem, and having read it and

5    knowing the people that were on it, I felt very

6    comfortable with their concluding statement, which

7    really summarized it up.

8       Q.   But you don't have an understanding of what

9    those authors meant by "the industry's

10   credibility."  Is that right?

11           MR. BURNETT:  Objection,

12   mischaracterizes the testimony.

13      A.   Yes, as I've commented before, by "the

14   industry," we're talking about the whole supply

15   chain as a whole, from manufacturer, to the

16   distributor, to the pharmacist, and probably that's

17   why I would have to go back and read the report,

18   because certainly some doctors were

19   overprescribing.

20      Q.   As you sit here today, can you identify any

21   practices of the pharmaceutical distributors that

22   encouraged the use of prescription opioids in a way

23   inconsistent with the standard of care?

24           MR. BURNETT:  Objection.

Page 102

1      A.   The standard of care as I understand it

2   from reading the literature, my understanding

3   there's a -- there are a duty to report to the DEA

4   on when there seemed to be excessive supply to

5   individual pharmacies or to particular areas, that

6   they're under a duty to report that.

7              And it probably wasn't done.  From

8   what I read in this report, it was not done to the

9   extent to which it probably should -- which it

10  should have been.

11     Q.   Doctor, that wasn't my question.  But let's

12  -- let's refine that.  In the scope of your

13  testimony in this case, you are not offering any

14  opinions about the legal duties of pharmaceutical

15  distributors, correct?

16     A.   That was never contained in my report, no,

17  as one of my opinions.

18     Q.   And you are not an expert in the legal or

19  compliance duties of pharmaceutical distributors,

20  correct?

21     A.   I'm an expert in substance abuse; I

22  understand the field.  I read the literature and

23  the legal regulatory part of the process is part of

24  the things that I --

```
1              THE COURT REPORTER:  I've lost him.  I
2    don't know --
3              MS. WU:  Same here.
4              MR. BURNETT:  His computer just died,
5    so we're going to switch cables.  Hold on.
6              MS. WU:  Okay.
7              VIDEO OPERATOR:  This is the
8    videographer.  I'm sorry, I didn't realize I was
9    muted.  I went ahead and went off the record.
10   Teresa, I went off the record at 11:21.
11                  (A recess was taken after which the
12                  proceedings continued as follows:)
13             VIDEO OPERATOR:  Now begins Media Unit
14   3 in the deposition of Gordon Smith.  We're back on
15   the record.  The time is 11:24 a.m.
16   BY MS. WU:
17      Q.   Doctor, we had a technical issue, and I
18   believe you may have been speaking when we lost
19   you.  So I'm going to try to go back and retread
20   the same ground, so I ask for your patience here.
21             Doctor, we were talking about the
22   standard of care just before our technical issue
23   arose.  Do you recall that?
24      A.   Yes, I do.
```

1    Q.   Doctor, in the context of this case, you

2  aren't offering any expert opinion about the

3  appropriate medical use of prescription opioids,

4  correct?

5    A.   I am -- my opinion was based on -- based on

6  reading the literature.  I don't fully understand

7  that question, because I --

8            Could you repeat the question?

9    Q.   Certainly.  sure.  Let me try it again.

10 Doctor, do you anticipate offering any expert

11 testimony in this case related to the appropriate

12 use of prescription opioids?

13   A.   Only in the context of prescription -- the

14 -- when I refer to the report, as to what

15 encouraged and what -- the -- the crisis can be

16 tied directly to practices adopted by manufacturers

17 and distributors.  Is that -- actually, they only

18 talk about opioid manufacturers and distributors.

19           So I think I myself hasn't studied it,

20 but I've read the literature, and I fully

21 understand the literature and the arguments on both

22 sides and came to that conclusion.

23   Q.   Okay.  So just to make it a little more

24 narrow, my question relates to the testimony that

Page 105

1   you will give in this case.  Doctor, do you plan to

2   offer any expert opinions about the appropriate

3   medical use of prescription opioids?

4       A.   Not -- not -- it was not part of the report

5   that I was asked to do, and the only opinion is

6   regarding the issue -- the statement that I make

7   there.  Other than that, no.

8       Q.   Okay.  And Doctor, again, just to -- for

9   clarity, you aren't offering - and you do not plan

10  to offer - any expert opinions concerning the

11  marketing of prescription opioids.  Correct?

12      A.   Correct.

13           MR. BURNETT:  Objection.

14      Q.   Doctor, you aren't offering any expert

15  opinion - and you don't plan to offer any expert

16  opinion - about whether prescription opioids were

17  diverted for nonmedical use.  Correct?

18      A.   That was not a subject of my report.

19      Q.   And you don't plan to offer testimony on

20  that subject at trial, correct?

21      A.   No.  I make -- I make no distinction in my

22  report with regard to the illegally-diverted

23  prescription drugs and prescription drugs.  We rely

24  on the molecule that's found on the people when

Page 106

1  they die, irregardless of the origin.

2       Q.    That's not a distinction that you've made

3  in forming your opinions in the context of this

4  case, correct?

5       A.    Correct.

6       Q.    Doctor, you also aren't offering any expert

7  opinion on the source of prescription opioids that

8  were involved in any of the fatal overdoses that

9  are cited and recorded in your report in this case.

10  Correct?

11       A.    In the data that I talk about in the

12  report, we don't talk about the origin of them.   I

13  do make a comment and refer to several studies that

14  did do an in-depth study based on the same medical

15  examiner data where they did look at the -- either

16  origin of that drug or whether people had a

17  prescription.

18       Q.    Doctor, you yourself -- and I'll use the

19  term "origin" for clarity.   You yourself are not

20  offering expert opinions about the origin of the

21  opioids cited in your report.   Correct?

22       A.    That -- I'm not offering it with regard to

23  the -- the actual data on the overdoses that come.

24  I do refer to several other studies that did, but

Page 107

1   not in the specific study that I did.

2        Q.   And you haven't conducted any independent

3   analysis of the origin of opioids involved in the

4   fatal overdoses that is in your report, correct?

5        A.   Other than reading the literature, other

6   studies, no.

7        Q.   Doctor, you aren't offering any expert

8   opinion about what caused opioids to become drugs

9   of abuse in Cabell County, correct?

10       A.   Only to the extent that I am citing the

11  report from the Association of Schools of Public

12  Health as to the origin of the drug crisis and

13  agreeing with their report.

14            But I specifically -- did not talk in

15  any more detail than that.

16       Q.   And as you sit here today, you can't

17  identify any practices of distributors that are

18  part of the origin referenced on page 18 of your

19  report.  Correct?

20            MR. BURNETT:  Objection.

21       A.   I'm not quite -- could you -- I'm not quite

22  sure exactly what you're getting at here.

23       Q.   Sure.  As you -- you referenced in your

24  last answer a quotation on page 18 of your report.

Page 108

1    Correct?

2         A.   Correct.

3         Q.   And the quotation that you reference is

4    from the Association of Schools and Programs of

5    Public Health's publication dating from November

6    2019, correct?

7         A.   Correct.

8         Q.   That report refers to certain practices of

9    opioid manufacturers and distributors, correct?

10        A.   Correct.

11        Q.   As you sit here today, you can't identify

12   any practices of distributors that are referenced

13   in your report on page 18.  Correct?

14                  MR. BURNETT:  Objection.

15        A.   What I do reference is the discussion from

16   the expert report that -- that there was oversupply

17   -- overpromotion and marketing by the opioid

18   manufacturers, and that the distributors

19   overdistributed, I guess -- basically distributed

20   higher quantities of drug than would be expected,

21   and from reading the reports --

22                  And that report -- that should have

23   been reported to the DEA.

24        Q.   Doctor, are you offering any opinions as to

1   what amount of prescription opioids should have

2   been distributed to Cabell County?

3       A.   I'm relying on the experts who wrote the

4   report, and in their opinion, it was excessive.   I

5   do not have an opinion -- other than reading the

6   expert and that I agree -- my opinion is that I

7   agree with the report.

8       Q.   Doctor, do you know if that report itself

9   identifies any amount of prescription opioid

10  distribution to Cabell County that would have been

11  proper?

12      A.   Not to my -- I would have to go through and

13  do a search for the word "Cabell" to make 100

14  percent sure.   But I'm not aware of that.

15      Q.   And as you sit here today, you are not

16  aware of what interval of oversupply that report

17  attributes to the distributors, correct?

18      A.   That's correct.

19      Q.   All right.   Doctor, earlier you testified

20  that the overdoses reported or reflected in your

21  report, Exhibit 3, are limited to fatal overdoses.

22  Is that correct?

23      A.   Correct.

24      Q.   Doctor, do you know what percentage of

Page 110

1   overdoses in Cabell County for the period 2001 to

2   2018 were fatal?

3       A.   That, I do not know, and I think it's a

4   very difficult answer.  There are different levels

5   that you could look at, but I'm not aware of the

6   data.  Some people have looked at emergency

7   department visits, but then once they distributed

8   naloxone, you can't rely on emergency department

9   visits because many people are giving naloxone to

10  friends and colleagues in the field.

11              So it's a difficult -- and I do not

12  know.

13      Q.   You do not know.  Do you know what

14  percentage of overdoses are addressed in your

15  report for Cabell County?

16      A.    In terms of fatal overdoses, the general

17  feeling of the literature and the quality of the

18  medical examiner data and the Vital Statistics in

19  West Virginia is that we're capturing as close as

20  we can to 100 percent of all of the overdose

21  fatalities in the state -- in Cabell County and in

22  the State.  But I make no reference to the nonfatal

23  ones.

24      Q.   Doctor, so you don't know what proportion

1   of all overdoses in Cabell County are fatal

2   overdoses, correct?

3       A.   That's -- that's correct.  And I think

4   there -- any attempt to get it would be a

5   guesstimate, because it's so difficult to know at

6   what stage of a -- of a very minor overdose might

7   not need treatment.

8       Q.   Doctor, are you familiar with ARCOS data?

9       A.   I've seen reference to it, but I have --

10  and -- in reports, but I haven't looked at it in

11  detail myself, no.

12      Q.   And you haven't looked at ARCOS data in

13  connection with your work for this case, correct?

14      A.   No, I have not.

15      Q.   Doctor, do you know the market share of

16  McKesson in Cabell County?

17      A.   No, I do not.

18      Q.   Doctor, did you attempt to identify whether

19  any fatal overdoses which were included in the data

20  that you summarized in your report were linked to

21  McKesson?

22      A.   It's impossible to tell from the data that

23  we have the actual origin of either the

24  manufacturer of the drug or of the person that

Page 112

1    delivered it to the state.  Or the county.

2         Q.   So your answer would be the same for

3    AmerisourceBergen, correct?  You haven't attempted

4    to identify whether any fatal overdose referenced

5    in your report could be linked to

6    AmerisourceBergen, correct?

7         A.   No.  Basically the drugs have to get into

8    there somehow, but I cannot tell how they got

9    there.

10        Q.   And same answer for Cardinal, correct?

11        A.   Correct.

12        Q.   Have you undertaken that exercise with

13   regard to any pharmacy?

14        A.   No, I have not personally.

15        Q.   Have you undertaken that exercise with

16   regard to any manufacturer?

17        A.   No, I have -- no, I have not, only to the

18   point - and I would have to go and check - some of

19   the drugs were under patent at the time, and so I

20   -- you could potentially go back and identify a

21   manufacturer, but it would be dependent on which

22   drugs were under patent and which were not under

23   patent and were made by the other drug companies.

24                  So that would be complicated to work

Page 113

1    out, but some of it would be possible, but not all

2    of it.

3        Q.   Doctor, do you know if the toxicology

4    reports generated by the West Virginia Medical

5    Examiner are sufficiently detailed in order to

6    identify specific manufacturer of pharmaceutical

7    products?

8        A.   They cannot identify specific manufacturer

9    of the product.  They can identify the specific

10   drug, and if that drug were under patent and the

11   only ones -- one manufacturer, they could identify

12   a manufacturer.  But only through that mechanism.

13       Q.   And have you done that analysis for

14   manufacturers potentially tied to fatal overdoses

15   cited to your report in this case?

16       A.   I have not done to individual

17   manufacturers, but if you look at -- they name

18   specific drugs such as OxyContin and various other

19   drugs like that, that for a period of time - and

20   I'm not sure when it came off patent - was

21   certainly patented drugs and were only made by a

22   particular manufacturer.

23       Q.   But you haven't done that analysis in the

24   context of this case, correct?

Page 114

1    A.   The specific drugs are listed in my opinion

2    -- in my exhibits as to what drugs, so that if you

3    wanted to look up which drugs were made by which

4    manufacturer and which drugs were under patent, you

5    would be able to do that.

6    Q.   So Doctor, it would be possible, for

7    example, to identify the number of fatal overdoses

8    reflected in the data you report which are linked

9    to a product manufactured by Purdue.

10   A.   If you wanted to go back and study the

11   period that Purdue was the only manufacturer of

12   OxyContin and then look at when other manufacturers

13   started manufacturing it.  So it would be possible

14   if you wanted to do that directly from the data.

15   Q.   Now I want to move on to doctors.  Doctor,

16   have you attempted to identify whether any of the

17   fatal doses -- overdoses which are identified in

18   your report in this case can be linked to a

19   particular prescribing physician?

20   A.   No, I have not.  And the PDMP is

21   restrictive and you can't get that.

22   Q.   Doctor, when you say "PDMP," what are you

23   referring to?

24   A.   Prescription Drug Monitoring Program.

Page 115

1      Q.   Are you referring to the West Virginia

2   PDMP?

3      A.   Yeah, that's called the controlled

4   substances monitoring board.

5      Q.   Did you review PDMP data in connection with

6   preparing your report in this case?

7      A.   Not directly, I did not.  The only

8   reference I make is in the two specific studies

9   that did do some linkage with the PDMP data.

10      Q.   You yourself haven't tested those findings

11   by doing your own analysis of the PDMP data,

12   correct?

13      A.   That's correct.  I relied on other reports.

14      Q.   Doctor, we've talked a little bit about the

15   role of distributors over the last few minutes.

16   Doctor, if McKesson ceased distributing opioid

17   medications in Cabell County, would the opioid

18   crisis in Cabell County be any different than it is

19   today?

20           MR. BURNETT:  Objection, calls for a

21   legal conclusion.

22      A.   Now, I'm honestly not sure.  It would -- it

23   would depend on what proportion of the market share

24   -- I honestly don't know.

1     Q.   And so your answer would be the same for

2  ABDC and Cardinal.  You don't know what impact

3  distribution by ABDC, Cardinal and McKesson would

4  have on the rates of overdose in Cabell County,

5  correct?

6              MR. BURNETT:  Objection, calls for a

7  legal conclusion.

8     A.   Yes, I -- I don't think I could do that

9  because -- and it would depend -- if they hadn't

10  distributed in the first place, then maybe it may

11  have had an impact.  But I don't know.

12     Q.   That's not something on which you have an

13  opinion in this case?

14     A.   That's correct.

15     Q.   Doctor, you're not an expert in assessing

16  criminal organizations that traffic drugs into

17  Cabell County in West Virginia, correct?

18     A.   I have read reports and I have a knowledge

19  of the DEA reports and the way that these things

20  are done, but I haven't done individual studies

21  myself.

22     Q.   Do you claim expertise in criminal drug

23  trafficking organizations?

24     A.   I have a good knowledge as a researcher

Page 117

1    because it's part of the field of drug abuse, but I

2    haven't done specific studies in that area myself.

3         Q.   And you haven't published any peer review

4    articles which analyze or review the role of drug

5    trafficking organizations, correct?

6         A.   That is correct.

7         Q.   Doctor, you did not consider the effect of

8    criminal drug trafficking organizations in forming

9    your opinions in the context of this case, correct?

10        A.   Did -- no.   No.

11        Q.   However, you are aware that criminal drug

12   trafficking organizations sell opioids in Cabell

13   County, correct?

14             MR. BURNETT:   Objection.

15        A.   I -- I guess criminal drugs are selling

16   opioids anywhere in the country and I see a risk --

17   data -- I've seen a risk for it, yes.   So the

18   answer is yes.

19        Q.   Your report, Doctor, doesn't address the

20   extent to which the activity of drug trafficking

21   organizations has contributed to the opioid crisis

22   in Cabell County, correct?

23        A.   That's correct.

24        Q.   And so it follows that you didn't attempt

Page 118

1    to determine whether any specific fatal overdose

2    referenced in your report can be traced to the

3    activity of a criminal drug trafficking

4    organization, correct?

5        A.   No, my report can only determine that it

6    was a prescription drug versus the illegal drugs

7    that were not part of the DEA's Schedule I.

8        Q.   Now, Doctor, I'd like to turn back to your

9    report which is Exhibit 3 and look at page 10 of

10   the report.

11       A.   Yes.

12       Q.   And I can call your attention to -- I guess

13   it's one paragraph that we're looking at here on

14   page 10.  Let's see -- the seventh line from the

15   bottom, there's a sentence that reads, "The data

16   therefore support the recognized transition from

17   prescription to illicit opioid use, which has been

18   documented in numerous peer-review studies at the

19   US population in general."

20            Do you see what I've read?

21       A.   Yes.

22       Q.   Doctor, you -- in this portion of your

23   report on page 10, you are not offering opinions

24   about what caused the transition from prescription

Page 119

1    to illicit opioid use, correct?

2         A.   No, I'm not.  I'm relying on the studies

3    that -- and -- that -- my finding of the changes

4    support the recognized transition from prescription

5    to illicit opioids.

6         Q.   And you just mentioned the sources that you

7    cite.  If we look down at -- still on page 10, at

8    Footnote 9, you cite two academic articles.  Do you

9    see that?

10        A.   Yes, I do.

11        Q.   All right.  Doctor, neither of those

12   articles find a causal relationship between

13   prescription opioids and illicit opioids; is that

14   right?

15        A.   I -- it's a while since I read them.  All I

16   can say at this stage is that what I wrote in my

17   report, that they support this recognized

18   transition from prescription to illicit opioids,

19   and you're seeing that in my report, whereby -- on

20   page 11, the next page over, Figure 2, you will see

21   an increase in the illicit drugs, but still the

22   prescription drugs maintained.

23             We're still finding prescription drugs

24   even in those people.

Page 120

1      Q.   Right.  But you aren't offering an opinion

2   as to the causal relationship between prescription

3   opioids and illicit opioids, correct?

4      A.   I'm not offering a causal relationship.

5   I'm just saying that we find -- continue to find

6   prescription drugs even when the illicit drugs were

7   -- began to be a problem.

8      Q.   Okay.  And then if we continue, it says -

9   back on page 10 - "and in Erik Eyre's recent book

10  which describes how the same thing occurred

11  throughout WV, including in Cabell County."

12           Do you see where I've read that?

13     A.   Yes.

14     Q.   And at Footnote 10, it cites Erik Eyre's

15  book "Death in Mud Lick."  Do you see that?

16     A.   Yes, I do.

17     Q.   Doctor, who is Erik Eyre?

18     A.   Erik Ayers was a reporter for the capital

19  Gazette -- I think that's the Charleston -- the

20  main Charleston newspaper.

21     Q.   He's not an epidemiologist, is he?

22     A.   That's correct.

23     Q.   And his book hasn't been peer reviewed,

24  correct?

```
                                                    Page 121

 1      A.    No, it has not.

 2      Q.    Doctor, now I'd like to --

 3      A.    But -- he -- yeah, yes.  Okay, yeah.

 4      Q.    Doctor, I'd now like to ask you to take out

 5   another document, which is Exhibit 5, which is a

 6   copy of your CV.

 7                 MR. BURNETT:  Ms. Wu, I'd note we've

 8   gone about an hour, so you know, whenever is a good

 9   time for a break, I would suggest one.

10                 MS. WU:  Sure.  I'm happy to break now

11   if you'd like to break now.

12                 MR. BURNETT:  What do you think, do

13   you like to break now?

14                 THE DEPONENT:  Yeah, I wouldn't mind a

15   little break now -- yes.

16                 MR. BURNETT:  Yeah, you want to break

17   now?  It doesn't have to be a lunch break.  We're

18   still waiting on lunch for us.  Why don't you go

19   off the record.

20                 MS. WU:  Okay.  Sure.

21                 VIDEO OPERATOR:  Going off the record.

22   The time is 11:47 a.m.

23                 (A recess was taken after which the

24                 proceedings continued as follows:)
```

```
                                        Page 122

 1              VIDEO OPERATOR:  Now begins Media Unit

 2    4 in the deposition of Gordon Smith.  We're back on

 3    the record.  The time is 12:35 p.m.

 4    BY MS. WU:

 5         Q.   Good afternoon, Doctor.  We just took a

 6    break.  You understand that you're still under

 7    oath, correct?

 8         A.   Yes, that's correct.

 9         Q.   Okay.  Thank you, Doctor.  I'd like to pick

10    up where we left right before the break.  Before

11    the break, you testified that -- I asked you when

12    you look at overdose deaths, whether it's possible

13    to determine the origin of the drugs involved in

14    the fatal overdose.  Do you recall that?

15         A.   Yes, I do.

16         Q.   You stated that you can only determine

17    whether it's prescription drugs on the one hand,

18    versus illegal drugs not part of the PDMP.  Do you

19    recall that testimony?

20         A.   Yes, I do.

21         Q.   Doctor, simply because someone has a

22    prescription drug found in his system at the time

23    of death does not indicate that the prescription

24    drug was legally obtained.  Correct?
```

Page 123

1      A.    That's correct.

2      Q.    It doesn't tell you either way, correct?

3      A.    Yes, that's correct.

4      Q.    In fact, the study that you cite, the Smith

5    study, found that in the vast majority of fatal

6    overdose deaths, more than 63 percent had

7    prescription opioids in their system at the time of

8    death, but the decedent did not have a prescription

9    from a physician.  Correct?

10     A.    That was, I think, the distinction we made

11   between the males and females.  I'll go back and

12   look at that.  Let me see that here.

13             MR. BURNETT:  Ms. Wu, are you quoting

14   something from his report that I could look at?

15             MS. WU:  I'm asking a question based

16   on his testimony earlier.  Actually, the witness

17   can answer based on his knowledge and his report.

18     A.    Yeah, it was in my report.

19             Yeah, that's right, 63.1 percent were

20   found to not have a documented prescription for the

21   actual drug found.  But the important part was that

22   36.9 percent had active prescriptions at least for

23   some of the drugs and -- when they died.  And --

24   yep.

Page 124

1    Q.   So --

2    A.   That was the 2006 study.  Yes, exactly.

3  But then the more recent one --

4    Q.   Doctor --

5    A.   Carry on.

6    Q.   Doctor, based on the data indicating that

7  63 percent of decedents did not have a valid

8  prescription for prescription opioids, you found

9  that those -- that data suggested diversion,

10 correct?

11   A.   That's suggesting it, yes.

12   Q.   And diversion is criminal activity,

13 correct?

14   A.   Correct.

15        MR. BURNETT:  Objection.

16   A.   It may be criminal activity; it may be

17 someone taking -- a son or a partner taking the

18 drug of somebody else in the same household, which

19 probably doesn't involve criminal activity.

20        In fact, there's some evidence in a

21 lot of younger people, that's actually what happens

22 in some of them, but --

23   Q.   Doctor, do you know if it's illegal to take

24 the -- a prescription medication prescribed to

Page 125

1    another individual?

2        A.   That's a legal opinion.  I'm not 100

3    percent -- I'm not 100 percent sure of the actual

4    legality of that, to be honest.

5        Q.   Okay, fair enough.  Doctor, a few minutes

6    ago, you also referenced the statistic that 36 -- I

7    think you said 36.9 percent of the decedents

8    studied in the 2006 study cited in your report had

9    a prescription for at least one of the drugs found

10   in their system at the time of death.  Correct?

11       A.   That's correct.

12       Q.   It's not the case that the decedents had a

13   prescription for all of the drugs found in their

14   system at the time of death.  Correct?

15       A.   Correct.

16       Q.   A prescription for controlled substances

17   isn't valid for a full year, correct?

18              MR. BURNETT:  Objection.

19       A.   I'm not sure about the legality of that.

20   It's not an area I've studied.

21       Q.   Doctor, do you know that prescriptions for

22   Schedule II substances are not valid beyond 90

23   days?

24       A.   I'm -- I'm not 100 percent sure that.  That

Page 126

1    sounds reasonable, but I don't know for sure.

2        Q.   You don't know.  If we assume that it is

3    the case that Schedule II substances are only valid

4    -- prescriptions for Schedule II substances are

5    only for -- only valid for 90 days, it follows that

6    a person who is prescribed a controlled substance

7    more than 90 days prior to the time of death used

8    the prescription in a criminal way.  Correct?

9            MR. BURNETT:  Objection, calls for

10   speculation.

11       A.   Yeah, no, I don't know that for sure at

12   all.  I -- it's hard to say.

13           MR. BURNETT:  Again -- Doctor --

14   Doctor Smith, when -- in a case like that where I'm

15   objecting, as with Ms. Wu, just make sure that you

16   let me say the full objection --

17           THE DEPONENT:  Yes.

18           MR. BURNETT:  -- before you answer so

19   that we don't overlap each other.

20           THE DEPONENT:  Thank you.

21           MR. BURNETT:  Thanks.

22       Q.   Okay, Doctor, maybe we can simplify this

23   and take it outside of criminal terms.  The 2006

24   study that we're discussing, the Hall study, didn't

Page 127

1  identify the number of individuals cited in the

2  study who had a valid prescription for an opioid

3  medication at the time of death when drugs were

4  found in their system.  Correct?

5      A.   Yes.  I must say - and I didn't put it in

6  my report - I'm not sure how far back they looked

7  for their prescription.  I know in the latest

8  study, they only looked at controlled substances

9  prescriptions 30 days prior to death.

10             They may have done the same thing with

11  this, and I don't know.  I would have to go back

12  and check the article - and I don't have it with me

13  - to determine how far back they looked for the

14  prescription.

15      Q.   You don't have any --

16      A.   Because your suggestion --

17      Q.   You're talking about the Hall study

18  published in 2006.

19      A.   Yes.

20      Q.   You don't know if that study identified the

21  number of individuals who had a valid prescription

22  at the time of their death.  Correct?

23      A.   That's what I don't know.  But it says

24  here, 39 -- 36.9 had active prescriptions, and I'm

                                                    Page 128

1    guessing that's probably a quotation from their

2    study, meaning that probably it was within the

3    valid prescription.

4                   I would have to check that with the

5    original article, and I'm not sure.  And you can --

6        Q.   And you don't know that one way or the

7    other?

8                   MR. BURNETT:  Objection.

9        A.   Yeah, because they do say "active

10   prescription."  And to me, an active prescription

11   would be one that was legal.  But I don't know for

12   sure.

13       Q.   You don't know that?

14                  MR. BURNETT:  Objection.

15       A.   Agreed.  I don't know.  I would have --

16   would not have put "active" down after having read

17   it if I didn't think that it was a valid

18   prescription at the time, but I don't know for

19   sure.

20                  I would have to check that.  And I do

21   know that the -- the two thousand and -- the more

22   recent study, they probably followed the same

23   methodology, and they talk about 30 days prior to

24   death.

1          But I don't know.

2     Q.   You -- as you sit here today, you don't

3     know one way or another?

4     A.   No.  But you could easily check that by

5     looking at the article.

6     Q.   Right.  I'm looking for your knowledge as

7     you sit here today.

8     A.   Yep.

9     Q.   Doctor, if we say we're talking about the

10    2006 study, the Hall study, you also -- it also has

11    a finding that 21.4 percent of all decedents had

12    obtained prescriptions from five or more doctors.

13    Do you recall that?

14    A.   Exactly, yes.

15    Q.   Are you familiar with the term "doctor

16    shopping"?

17    A.   Yes, I am.  I put the term down in my

18    report.

19    Q.   Doctor shopping is a form of diversion,

20    correct?

21    A.   I --

22              MR. BURNETT:  Objection.

23    A.   I'm not sure whether it's considered

24    diversion because it's to the same person.  I don't

Page 130

1    understand the legal -- legality whether it's

2    considered diversion or not.

3        Q.   Fair enough.  You understand that doctor

4    shopping means seeking prescriptions in a way

5    inconsistent with the standard of care.  Correct?

6                MR. BURNETT:  Objection.

7        A.   Probably.  It's generally considered to be

8    not a good practice.

9        Q.   And therefore, prescriptions obtained

10   through doctor shopping would be taken in the form

11   of nonmedical use, correct?

12               MR. BURNETT:  Objection.

13       A.   I honestly don't know.  Because many of

14   these people have valid pain and they seek -- and

15   also looking at this, I don't know, and I don't

16   have all the details in front of me.

17               It's five clinicians in the past year.

18   They could have just moved.  That doesn't prove

19   doctor shopping, but I think it suggested it.

20       Q.   And you have no opinion on whether or not

21   doctor shopping is criminal activity, correct?

22       A.   I don't know the legality of it, the strict

23   legality of it.

24       Q.   Okay.  Now, a few moments ago, you cited "a

Page 131

1    more recent report."  Were you referring to the

2    2017 report published by the West Virginia

3    Department of Health and Human Services?

4         A.   Yes, that's correct.

5         Q.   Doctor, that report assessed 830 overdose

6    deaths across the state of West Virginia in 2016,

7    correct?

8         A.   Yes.

9         Q.   That report was --

10        A.   2016, yes.

11        Q.   That report, the 2017 report, was not

12   limited to Cabell County, correct?

13        A.   Correct.

14        Q.   So Doctor, I now want to go back to talk a

15   little bit more about the data that you relied on.

16   And if you have handy -- sorry, we've been moving

17   around to some of your other sources.

18             -- Exhibit 3, your report.  And if you

19   turn to page 5 --

20        A.   Exhibit 3, page 5.  Yep.

21        Q.   Doctor, on page 5 of your report, you state

22   that "West Virginia has some of the highest

23   quality" and -- I'm sorry.  The medical examiner

24   data in West Virginia is, quote, "some of the

```
 1   highest quality in the country, especially for drug
 2   overdoses and information on actual drugs
 3   involved."
 4              Do you see that?
 5      A.   That's page 5 of my report or of the --
 6      Q.   Of your -- of your report.
 7      A.   Of my report, okay.  Yes, I do.  That's
 8   correct.  I'll go back to page 5 of my report.  I'm
 9   a little --
10              Yes.
11      Q.   Doctor, are you familiar with the National
12   Association of Medical Examiners?
13      A.   Yes, I am.
14      Q.   Are you aware that the National Association
15   of Medical Examiners accredits state medical
16   examiners?
17      A.   Yes, I am.
18      Q.   Are you aware that West Virginia -- the
19   West Virginia Office of the Medical Examiner is not
20   accredited?
21      A.   I'm not aware of that, but I am aware that
22   the laboratory upon which the toxicology is an
23   accredited -- the last time I looked, was an
24   accredited laboratory for the toxicology testing.
```

Page 133

1    Q.   And as you sit here, Doctor, you don't know

2   whether the West Virginia Office of the Chief

3   Medical Examiner is accredited by the National

4   Association of Medical Examiners, correct?

5    A.   I'm not aware of that.  I do know -- yes,

6   I'm not aware.

7    Q.   Doctor, you didn't personally conduct any

8   of the autopsy or toxicology screens for the

9   individuals who died of drug overdoses discussed in

10  your report, correct?

11   A.   I did not, but I'm very familiar with the

12  procedures.  I've been working with medical

13  examiner data and been part of observing autopsies

14  probably 25 years in terms of work I did in

15  Maryland and work here, so I'm very familiar with

16  the practices and the way in which they do things.

17   Q.   Doctor, but you don't personally conduct

18  the autopsies or tox screens yourself, correct?

19   A.   I didn't conduct them, no, but I'm very

20  well aware and understand fully the procedures

21  involved.

22   Q.   Doctor, did you review the procedures by

23  which medical examiners in West Virginia conduct

24  autopsies and toxicology screens which are

Page 134

1    referenced in your report?

2         A.   To the extent that I have co-published

3    articles with them, both the toxicologists and the

4    medical examiner, where we have written up

5    procedures that have passed peer review -- reviewed

6    by other people and their procedures, all of the

7    documentation that I had seen, looked to be very

8    appropriate and also were considered to be adequate

9    by peer reviewers to allow our articles to be

10   published.

11        Q.   Doctor, in West Virginia, medical examiners

12   that provide data to the State Office of the Chief

13   Medical Examiner do not need to be licensed

14   physicians, correct?

15        A.   The -- could you just repeat that again?

16   So who --

17        Q.   Certainly.  The local medical examiners who

18   report --

19        A.   Oh, yes.

20        Q.   -- data to the state do not have to be

21   licensed physicians, correct?

22        A.   That's correct.

23        Q.   Do you know what individuals reported

24   medical examiner data for Cabell County to the

Page 135

1  state?

2      A.   It's a matter of what you're talking about

3  by the report.  From the procedures that I know, is

4  that they have a locally-appointed medical examiner

5  that's often a nurse, a emergency medical

6  physician, someone who's taken a course in how to

7  do the technical field work, and then that case is

8  then reported to the medical examiner himself who

9  is a licensed forensic pathologist, and they are

10  the ones who do the autopsy and the toxicology.

11             Whereas the field work at the -- in

12  the county is not done necessarily by a licensed

13  physician.  Sometimes it is.

14      Q.   Doctor, do you investigate who was

15  responsible for the field work, as you've referred

16  to it, for Cabell County?

17      A.   I am -- I do not know, haven't investigated

18  myself, but it would be part of the team, and they

19  are under the supervision of the medical examiner.

20      Q.   But that's not something you've

21  investigated for purposes of forming your opinions

22  in this case, correct?

23      A.   That's -- that's correct, because most of

24  my data is based on actual toxicology that is

Page 136

1    performed at the medical examiner's office where I

2    do know much more about the procedures.

3        Q.    Okay.   Doctor, a few minutes ago, you

4    referenced the chief medical examiner that you

5    co-authored an article with.   Are you referring to

6    Doctor Mock?

7        A.    That's correct.

8        Q.    Have -- are you aware that Doctor Mock was

9    deposed in this litigation?

10       A.    I think I remember hearing that, yes.   I

11   don't know any details.

12       Q.    Did you review his deposition transcript --

13       A.    No, I --

14       Q.    -- in order to form your opinions?

15       A.    No, I --

16       Q.    In order to form your opinions in this

17   case?

18       A.    My opinion for this case was based entirely

19   on the -- the discussions regarding our

20   publications, our peer reviewed publications, and

21   the documentation that they provided when we have

22   written the article and where there would have been

23   errors, they would correct it.

24       Q.    So Doctor, earlier today you referenced

1   West Virginia's Controlled Substances Monitoring

2   Program or CSMP, correct?

3       A.   Correct.

4       Q.   Doctor, are you aware that the West

5   Virginia Office of the Chief Medical Examiner does

6   not require doctors conducting autopsies to record

7   information obtained from the CSMP?

8       A.   I am not aware that -- I'm not sure.  There

9   was this original study done, and I'm not sure

10  whether they kept the procedures up.

11      Q.   Okay.  Doctor, do you know if individuals

12  conducting autopsies -- autopsies on behalf of the

13  West Virginia chief medical examiner are required

14  to consult CSMP data?

15      A.   I am not aware of that exact procedure, and

16  I've not included that in my own original research.

17  We've just been interested in the toxicology.

18      Q.   And the CSMP data could be used to identify

19  prescription drug histories for decedents, correct?

20      A.   It has been done, and that's why I made a

21  point of using the data from these two separate

22  reports and two separate time periods, which I

23  quoted in my report.

24      Q.   But as -- but as you sit here today, you

Page 138

1  don't know if consultation of the CSMP is required

2  by the chief medical examiner's autopsy protocols,

3  correct?

4      A.   I do not know that.

5      Q.   Doctor, do you know the extent of the data

6  which is input into the CSMP?

7      A.   By "extent," inputted -- put in by whom?

8  Because it comes from different places.  The

9  pharmacy and the physicians are also required to

10  check it.

11     Q.   Sure.  Let me try to make this more

12  concrete.  Doctor, are you aware that the Veterans

13  affairs system did not report prescriptions to the

14  CSMP for many years?

15     A.   Yes, I -- I am aware that there have been

16  problems with the federal system -- some of the

17  federal health care systems reporting.  I don't

18  know the period of time, and I'm -- but I have the

19  impression that they have fixed that, but I'm not

20  sure.

21     Q.   Have you done any work to test the

22  reliability of West Virginia's CSMP system?

23     A.   You know, it's not been the subject of this

24  report.  It was not something I was asked to do.

Page 139

1    And I have not done that.

2        Q.   Doctor, are you aware that West Virginia

3    first established its forensic drug database in

4    2005?

5        A.   Yes, I am.

6        Q.   So prior to that year, 2005, the

7    information in the forensic drug database might not

8    have been collected in any centralized fashion.

9    Correct?

10       A.   I would disagree.  It was -- the database

11   was set up specifically originally to actually look

12   at the multiple drug combinations.  But prior to

13   that, the medical examiners continued -- have been

14   doing the exact same procedure, doing their tests,

15   reporting the results out and writing them on the

16   death certificate.

17              So it's more that there was a separate

18   reporting system established in 2005 for their

19   toxicology, and the original purpose behind it was

20   to -- because they were concerned that no one drug

21   was high enough concentration to kill a person, and

22   it was a combination of drugs that resulted in it.

23              And -- but before that, they were

24   doing the standard procedures.  The same data would

Page 140

1    make it on to the death certificates.

2                    So prior to 2005, the same data would

3    make it on to the death certificate which would

4    then make it down to Vital Statistics, and then we

5    also have been paying people since 2005 to abstract

6    that same data and put it into the forensic drug

7    database.

8        Q.   So prior to 2005, the data currently

9    contained the forensic drug database was not

10   centralized in the same manner it began being

11   centralized in 2005, correct?

12       A.   I don't know about "centralized."

13                   MR. BURNETT:  Yeah, I object.

14       A.   I don't know about being centralized.  I

15   think it's more that the data was part of the

16   process, and this was an add-on, an additional step

17   to capture the multiple drug.  And in particular,

18   it captures the concentration of the drugs, which

19   is not listed on the death certificate.

20       Q.   Do you have any understanding of the

21   incremental benefit of implementing the forensic

22   drug database in 2005?

23                   MR. BURNETT:  Objection.

24       A.   Yes, I don't know what you're -- what

Page 141

1    you're trying to get -- certainly not been the

2    subject of my report, and it would -- I would have

3    to go back and check with my colleagues on that.

4              I don't think it has affected at all

5    the quality of data that makes it to the death

6    certificate.

7    Q.   Have you done any testing of the

8    reliability of forensic drug data available prior

9    to 2005 and after 2005?

10   A.   No, I have not done -- the -- perhaps the

11   best source was that detailed study that the CDC

12   did, the Hall study.  They did a detailed study of

13   the medical examiner data, and as I understand it,

14   the reason that they did that study back in -- what

15   was that -- when was the Hall study done?

16             Anyway, the reason they did that study

17   was because the medical examiner data was of good

18   quality, and they did some of this validation and

19   did not document any problem.

20   Q.   And you yourself have not conducted any of

21   that type of data analysis, correct?

22   A.   No, I have relied on both those two -- the

23   -- those two evaluations and they have determined

24   to me -- it looked good to me, and there'd be no

Page 142

1    change in procedures.

2        Q.   What benchmarks did you use in order to

3    determine whether that data was valid?

4        A.   I do know that the forensic -- that the --

5    that the forensic toxicology laboratory has been

6    certified and accredited and has remained to be

7    accredited, as far as I know.  I haven't checked

8    every single month of every single year to know

9    that, but it has been documented as being an

10   accredited laboratory.

11       Q.   So you relied on the accreditation of the

12   toxicology lab, correct?

13            MR. BURNETT:  Objection.

14       A.   I relied mostly on the opinion of the --

15   Doctor Kraner, who is the top -- chief

16   toxicologist.

17       Q.   So you didn't create any reliability

18   testing on your own, correct?

19       A.   No, I've relied on the -- oh, we check --

20   the data is regularly checked.  If it doesn't make

21   sense, we do go back to the medical examiner if we

22   see something that doesn't make sense or if a drug

23   level doesn't make sense, we go back and check and

24   check whether there could have been a minor

Page 143

1  extraction error.

2      Q.   And have you personally done that in

3  connection with forming your opinions in this case?

4      A.   It hasn't altered my case, because my case

5  relied on the Vital Statistics data which is the

6  recording of the actual drugs on the death

7  certificates.

8      Q.   But you yourself have not conducted any

9  reliability testing for the data that you've

10 referenced in your report, correct?

11             MR. BURNETT:   Objection.

12     A.   In -- not -- we relied when we checked the

13 data, and the Vital Statistics data is checked and

14 double-checked by the people that do it, but we

15 rely -- like most things, you can't check

16 absolutely everything, and so we do rely on what's

17 generally considered to have been a high-quality

18 Vital Statistics program.

19     Q.   And so you haven't checked that data

20 personally, correct?

21             MR. BURNETT:   Objection.

22     A.   What do you mean by "checked?"  At what

23 level do you mean checking?

24     Q.   Have you run -- have you tested the

Page 144

1   reliability of the data personally?  It's a "yes"

2   or "no" question.

3       A.   In terms of reliability, we do checks.  If

4   it doesn't make sense, or if it seems clearly

5   errors, we would pick those up.

6               So I don't quite know at what level of

7   checking that you mean.  To the -- if you mean that

8   I -- have I personally looked at every toxicology

9   report in the state and looked at every death

10  certificate to make sure that they wrote it down in

11  exactly the right way and then went back and

12  checked that every person entered the data in the

13  same way, I have not.

14      Q.   So let's try to make this more concrete.

15  One of the major sources of data cited in your

16  report is the data compiled by the West Virginia

17  Office of the Chief Medical Examiner.  Correct?

18      A.   Yes.

19      Q.   What, if anything, did you do to test the

20  reliability of the data from the Office of the

21  Chief Medical Examiner that you cited in your

22  report?

23      A.   I didn't cite anything in my report about

24  that, checking that quality.

Page 145

1      Q.   Okay.  Did you do anything to check the
2  reliability of that data?
3      A.   I relied on the discussions with the people
4  doing the testing as to what our -- where the data
5  comes from.  But otherwise, no.
6      Q.   Okay.  So you relied on the Office of the
7  Chief Medical Examiner in order to produce the data
8  that you've relied on without checking it.
9  Correct?
10              MR. BURNETT:  Objection.
11      A.   To the point that we check it to make sure
12  that the data -- we do internal checks, but it's a
13  matter of at what level you're checking.  Is it
14  every single spelling mistake when they write
15  something down or whatever -- you can't check
16  everything.
17      Q.   At what level did you check the data
18  provided by the Office of the Chief Medical
19  Examiner?
20      A.   If we see inconsistencies that don't make
21  sense or a drug name that's written -- would be
22  written down -- that actually would be done, I
23  know, by the Vital Statistics office.  Something
24  that's written down as a wrong name or something

Page 146

1   like that, that would be picked up.

2           But I didn't check it, no.

3       Q.   Okay.  You didn't check it yourself?

4       A.   That's correct.

5       Q.   Given the -- we've talked about toxicology

6   screens, correct, Doctor?

7       A.   Yeah, we talked about doing toxicology

8   testing, yes.

9       Q.   Can a medical examiner determine a cause of

10  death on a toxicology screen alone?

11      A.   No.  It's a process by looking at the

12  toxicology results, looking at the autopsy result,

13  and it's up to the -- the final decision that's

14  made is the expert opinion of the medical examiner

15  based on the preponderance -- as I understand the

16  legal term, the preponderance of evidence presented

17  to them, along which with they have toxicology, and

18  they make a determination that if a drug was -- was

19  found -- drug was responsible -- at least partially

20  responsible for the death, they would include it on

21  the death certificate, and then it would have been

22  in the data that I used.

23      Q.   Doctor --

24      A.   Contributed --

1    Q.   -- so --

2    A.   The term they use is "contributed to the

3  death."  Whether that particular drug contributed

4  to the death.

5    Q.   Doctor, I'll represent to you that in the

6  context of this case, Doctor Mock has testified

7  that it would be irresponsible to claim to identify

8  the cause and manner of death based on a toxicology

9  screen.  Do you agree with that statement?

10    A.   I would agree definitely with that.

11    Q.   More information beyond the toxicology

12  screen is needed to determine the cause of death,

13  correct?

14    A.   Correct.

15    Q.   For example, evidence from the place where

16  a death occurred might be important.  Correct?

17    A.   Often is, yes.

18    Q.   Drug paraphernalia at the scene of an

19  overdose might be important to determining the

20  cause of death, correct?

21    A.   It can provide valuable evidence, yes.

22    Q.   Other evidence such as illicit drugs at the

23  scene of an overdose might also be important to

24  determining the cause of the death, correct?

Page 148

1      A.   Yes, that's used as part of their process,

2  yes.

3      Q.   Photographs of the overdose scene could be

4  important to determining the cause of death,

5  correct?

6      A.   They can provide valuable supplemental

7  information in some cases.

8      Q.   Those sources of supplemental information

9  that we've just reviewed are collected by law

10  enforcement rather than the medical examiner,

11  correct?

12      A.   It's often done in collaboration together,

13  as I understand it.

14      Q.   Is the medical -- to the best of your

15  knowledge, is the medical examiner responsible for

16  collecting those types of supplemental information

17  that we've just discussed?

18      A.   I think a lot of it is done on a

19  case-by-case basis if they feel it is needed.

20      Q.   Doctor, are you aware that the West

21  Virginia State Crime Lab performed toxicology tests

22  on evidence found at suspected -- on the scene of

23  suspected drug overdoses?

24      A.   I would expect that they would do that,

Page 149

1    yes.  It's common procedure.

2         Q.   Doctor, are you aware that the State Crime

3    Lab has a significant backlog?

4              MR. BURNETT:   Objection.

5         A.   I'm not aware.  I could understand it did.

6    But that's not really relevant, because the data

7    that I use comes from our medical examiner lab, and

8    it's what's actually found inside the person as

9    against what was found at the scene.

10             So none of that information is

11   necessarily used.

12        Q.   But as you said, you agree that toxicology

13   results alone are insufficient to determine the

14   cause of death, correct?

15        A.   In most cases.

16        Q.   Doctor, I'll represent to you that Doctor

17   Mock has testified that in most instances, the

18   medical examiner determines a cause of death before

19   results from the State Crime Lab are available.

20   Were you aware of that when you relied on the

21   medical examiner data in order to form your

22   opinion --

23        A.   You know, I --

24        Q.   Were you aware of that?  "Yes" or "no,"

Page 150

1   sir.

2       A.   I wasn't aware of that, but it's not

3   relevant.  Because they have got the -- you could

4   find a drug at the scene, but it might be a whole

5   different drug to actually the drug that that

6   particular person had consumed at the time and were

7   responsible for killing them.

8            They're not necessary just because the

9   drug -- one drug was found at the scene and tested.

10  I don't see that as being that relevant to the

11  toxicology that we actually find inside somebody

12  when they die.

13      Q.   But you weren't aware of that information,

14  correct?

15           MR. BURNETT:  Objection.

16      A.   I wasn't aware of it, but I don't see the

17  relevance.

18      Q.   Doctor, your report assessed accidental

19  poisonings, correct?

20      A.   That's correct.

21      Q.   So it excluded suicides from its analysis,

22  correct?

23      A.   Yes, correct.

24      Q.   And differentiating between suicides and

Page 151

1    accidental poisonings, you relied on the

2    determinations of the medical examiner, correct?

3        A.   That's correct.

4        Q.   And as we just determined, the medical

5    examiner did not have the benefit of law

6    enforcement input prior to making most of its

7    determinations, correct?

8              MR. BURNETT:   Objection.

9        A.   I think you would have to check on that

10   with the medical examiner.  I'm not -- in some --

11   at times, they do, in my experience, but I don't

12   know for sure with the West Virginia Medical

13   Examiner.

14       Q.   That's something that you don't know about,

15   correct?

16       A.   I don't know the full details.  I could

17   imagine that it's missing in some, but I don't

18   know.

19       Q.   Doctor, do you know the criteria that the

20   West Virginia Medical Examiner's Office uses to

21   distinguish between suicides and accidental

22   poisonings?

23       A.   There are some well-established guidelines

24   that people use, but I -- I don't know their exact

Page 152

1    criteria.

2        Q.   And you didn't consider the criteria used

3    by the medical examiner's office before relying on

4    its data in forming your opinions in this case,

5    correct?

6        A.   What I would say is that the medical exam

7    -- the distribution of -- I have looked in the past

8    that suicides versus accidents, and in West

9    Virginia - in common with most other places - the

10   vast bulk of the drug poisoning deaths are

11   considered to be accident -- are classified as

12   accidental.

13       Q.   Did you undertake any inquiry in order to

14   determine the protocol that the West Virginia

15   Office of the Chief Medical Examiner uses in order

16   to classify suicide?

17            MR. BURNETT:   Objection.

18       A.   I did not, but the find -- but the

19   reporting of the ratio of suicide to accident is

20   very consistent with national standards, the ratio.

21       Q.   But you didn't undertake any independent

22   inquiry, correct?

23       A.   No.

24       Q.   Doctor, heroin can be difficult to detect

Page 153

1   in fatal overdoses, correct?

2        A.    Correct.

3        Q.    Your report separately lists deaths related

4   to heroin and deaths related to morphine, correct?

5        A.    Yes.  Well, it lists them out, yes,

6   exactly.

7        Q.    Doctor, heroin metabolizes into morphine,

8   correct?

9        A.    Yes.

10       Q.    Heroin also metabolizes into another

11   chemical, 6-monoacetylmorphine, correct?

12       A.    Yes.

13       Q.    And if I refer to 6-MAM, you'll know that

14   I'm referring to 6-monoacetylmorphine because it's

15   very difficult to say.

16       A.    Yep.

17       Q.    Correct?

18       A.    Yep.

19       Q.    Okay.  Thank you, I appreciate that.

20   Doctor, both morphine and 6-MAM are present in the

21   body when heroin is metabolized, correct?

22       A.    Yes.

23       Q.    Is there --

24       A.    Sometimes you may not get each of them.  As

1    I understand it, it's quite difficult to determine.

2         Q.   Is that -- that's because 6-MAM is very

3    difficult to identify in small amounts, correct?

4         A.   I think that's the reason.

5         Q.   If the West Virginia Office of the Chief

6    Medical Examiner detects morphine by no 6-MAM, the

7    office categorizes the death as related to morphine

8    but not heroin, correct?

9         A.   I'm not sure about that in every single

10   case.  As in our discussions with that, we've

11   clearly -- there are difficulties in determining

12   whether heroin was involved.

13        Q.   And did you undertake any inquiry to

14   determine the protocol pursuant to which the Office

15   of the Chief Medical Examiner identifies heroin

16   deaths?

17        A.   We've had some discussion about that over

18   the years with regard to papers and how to prevent

19   it, and as I understand it, they are probably a

20   little cautious about calling it a heroin if

21   there's -- if they don't have any other evidence.

22        Q.   And when you're --

23        A.   Because sometimes you just find the

24   morphine.

Page 155

1    Q.   And when you're talking about -- when you

2    reference discussions, with whom did you have these

3    discussions?

4    A.   These would be in e-mail discussions and

5    papers -- comments on papers as we're trying to

6    write our paper and make sure that it's as

7    scientifically as correct as possible.

8    Q.   Are those conversations that you had with

9    Doctor Mock?

10   A.   I will say it wasn't with myself

11   personally; it was with my colleague Maria Abate

12   who would have been having most of the discussions

13   about that.  She's the pharmacist/toxicologist who

14   is a part of our team.

15   Q.   Okay.  Doctor, the difficulty in

16   identifying heroin as metabolized in overdose may

17   result in an underreporting of heroin deaths,

18   correct?

19            MR. BURNETT:  Objection.

20   A.   That -- there certainly is described in the

21   literature that there can be underreporting of

22   these deaths.

23   Q.   And do you have any reason to disagree with

24   the literature which reports an undercounting of

Page 156

1    heroin deaths?

2        A.   No, I don't.

3        Q.   Doctor, do you still have Exhibit 3 handy?

4    It's a copy of your report.

5        A.   Yes, I do.  It's in front of me.

6        Q.   Okay.  So if we turn to Exhibit A of your

7    report, which follows right after page 18 of the

8    numbered pages --

9        A.   Got it.

10        Q.   -- Exhibit A includes a list of deaths

11    related to -- associated with drugs by year.

12    Correct?

13        A.   Yes.

14        Q.   And if we look at the drugs included in

15    your Exhibit A, we see that you included morphine

16    as a category of drugs separate from heroin.

17    Correct?

18        A.   That's correct.

19        Q.   Doctor, you didn't perform any independent

20    assessment of the toxicology screens that formed

21    the basis of your opinion, correct?  That's what

22    you said earlier.

23        A.   No, but we --

24             MR. BURNETT:  Objection.

1    A.   Yeah.  Did not.  But we had considerable

2   discussion of the issues relating to the morphine

3   and the heroin, and I think if you read our paper

4   on this, it mentions that specifically.

5    Q.   Doctor, which paper are you referencing,

6   just for clarity of the record?

7    A.   That was the fentanyl paper that we -- I

8   talked about -- the "Fentanyl and fentanyl-analog

9   involvement in drug-related deaths" that I cite in

10   my report.

11    Q.   Thank you.  Doctor, so if the medical

12   examiner -- the West Virginia medical examiner,

13   failed to detect small amounts of 6-MAM and

14   erroneously categorized a heroin overdose as

15   related to morphine, you wouldn't have identified

16   that error in preparing Exhibit A.  Correct?

17         MR. BURNETT:  Objection, calls for

18   speculation.

19    A.   Yeah, I would not, and if you look at it,

20   the heroin deaths exceed the morphine deaths quite

21   considerably.

22    Q.   In the case that the chief medical examiner

23   was unable to detect 6-MAM and categorized heroin

24   deaths erroneously as a morphine death, that

                                        Page 158

1    categorization would carry through to the chart

2    which you've presented as Exhibit A.  Correct?

3                 MR. BURNETT:  Objection.

4        A.    They possibly could do.

5        Q.    And as it follows, Doctor, you would have

6    categorized that erroneous morphine death as

7    related to prescription opioids, correct?

8                 MR. BURNETT:  Objection.

9        A.    Possibly.  But I would have to look at the

10   ratio -- yeah, the -- if you were to look at that,

11   are you talking about the -- on page 11, the figure

12   on page 11?

13       Q.    Well, if we -- we can do that.  So let's go

14   to page 11 of your report, which is Exhibit 3.  And

15   I think, Doctor, you were calling out Figure 1.  Do

16   you have that in front of you?

17       A.    Yep.  Because if you look at it, the

18   morphine deaths are about three times the overall

19   -- more than three times the heroin.  So even if

20   you were to bring down some of those, you would

21   only be, at best, bringing those figures up a very

22   small -- a small amount.

23                 You would bring them up by a third, if

24   that was the case.  Well, by about a quarter,

Page 159

1   actually.

2        Q.   So Doctor, let me ask a question.  So we've

3   now just turned to page 11 in your report, and

4   we're looking together at Figure 1.  If we look at

5   your Figure 1, you'll see that morphine deaths are

6   included in the red line that represents deaths

7   from prescription opiates -- opioids from the

8   period 2001 to 2011.

9             Do you see that?

10       A.   That's correct.

11       Q.   Doctor, you don't know how many deaths that

12  were caused by heroin might have been incorrectly

13  included in the count for morphine deaths, correct?

14             MR. BURNETT:  Objection.

15       A.   I do not know, but if you go back and look

16  at the exhibit that you --

17       Q.   You don't --

18       A.   -- cited --

19       Q.   You do not know.  It -- Doctor, it's just a

20  "yes" or "no" question.  You don't -- you don't

21  know, correct?

22             MR. BURNETT:  Ms. Wu, you interrupted

23  the witness.  He was in the process of answering

24  your question.

Page 160

1              MS. WU:  It was a "yes" or "no"

2    question.

3        A.   What we normally do in studies, we don't

4    have "yes" or "no" answers.  We have an error bar

5    around it, so if you were to create an error bar

6    around it to be able to estimate, you would find

7    that overall, there were 330 heroins and there were

8    108 morphine, and you probably could find -- and so

9    at best, there would be only a third more, even if

10   you were to bring all of the morphine down into the

11   heroin, you would only go up about 25 percent.

12              So it would not greatly change the

13   scope of those curves.  And so that's what we would

14   do in -- we're never 100 percent sure about --

15   certainly with regard to the heroin.

16              But if it was, it would not

17   dramatically change the shape of those curves.

18       Q.   Okay.

19       A.   It might change the actual number.

20       Q.   Doctor, my question was more narrow than

21   that.  Doctor, you don't know how many deaths that

22   were caused by heroin may have been incorrectly

23   included in the number of deaths represented by the

24   red line in Figure 1, correct?

Page 161

1          MR. BURNETT:  Objection, asked and

2    answered.

3       A.   Yeah.  I do know that if -- that the -- the

4    difference would be relatively small, but the

5    extent to which, I do not know.

6       Q.   Doctor, Figure 2 also has -- also on page

7    11, Figure 2, has a red line that indicates the

8    number of deaths associated with prescription

9    opioids between 2001 and 2018.  Do you see that?

10      A.   Yes.

11      Q.   Once again, fatal overdoses associated with

12   morphine are included in the red line which shows

13   prescription opioid overdose deaths.  Correct?

14      A.   Correct.

15      Q.   Once again, Doctor, you don't know how many

16   deaths caused by heroin were incorrectly reported

17   as caused by morphine for the period 2001 to 2018?

18          MR. BURNETT:  Objection.

19      A.   No, I do not.  I would say that there's a

20   error -- and if I look at the data, actually, it's

21   even a lessor proportion -- would have relatively

22   less impact in recent years, looking at that.

23      Q.   Doctor, any deaths caused by heroin that

24   were incorrectly recorded as caused by morphine

Page 162

```
 1    would be shown as having been caused by a
 2    prescription opioid in Figure 2, correct?
 3         A.    The --
 4                    MR. BURNETT:  Objection.
 5         A.    There might have been some
 6    misclassification, but the effect would be minimal.
 7         Q.    And that type -- that's the same type of
 8    miscategorization which you referenced in your 2019
 9    article, correct?
10         A.    Correct.
11         Q.    Doctor, I'd like to talk a little bit about
12    fentanyl.  In your report, you categorize fentanyl
13    as a prescription opioid for the period 2001
14    through 2011.  Correct?
15         A.    Yes, I think it was based on the C -- as we
16    -- as I under -- the best source of that was the
17    Centers for Disease Control, which if I remember
18    correctly, stated that after a certain year - which
19    I think is 2017 - that the vast bulk of the
20    fentanyl was illicit at that period of time.
21         Q.    And then you characterized fentanyl as an
22    illicit opioid for the time period 2011 for {sic}
23    2018, correct?
24         A.    That's correct.  And you can see that
```

Page 163

1    there's very little in 2014.  That was including

2    all of them.  Yes.

3        Q.   Now, if we look at Exhibit A to your

4    report, which is Exhibit 3 --

5                   MR. BURNETT:  Exhibit A?

6                   MS. WU:  Yes, Exhibit A to the report

7    which is Exhibit 3.

8        A.   Exhibit --

9                   MR. BURNETT:  Yeah, right, right.

10                  THE DEPONENT:  Is that the exhibit on

11   my report, Exhibit A?

12                  MR. BURNETT:  Yes, Exhibit A on your

13   report which she has marked as Exhibit 3.

14       A.   Oh, good, yes.

15       Q.   Thank you, Doctor.

16                  MS. WU:  Thank you, David.

17       Q.   So if we look at Exhibit A to your report,

18   there was at least one death associated with

19   fentanyl for each year, 2001 through 2011.

20   Correct?

21       A.   Yes, that's correct.

22       Q.   And none of those deaths are categorized as

23   associated with illicit opioids in your Figure 2,

24   correct?

Page 164

1      A.    That's correct.

2      Q.    But you didn't review the medical records

3  for each of the individuals associated with those

4  overdoses reported here, correct?

5      A.    No.   We re -- I relied on evidence from the

6  literature as to when illicit fentanyl came into --

7  started coming into widespread availability.

8      Q.    Doctor, are you aware that the West

9  Virginia Office of the Chief Medical Examiner did

10  not consistently distinguish between prescription

11  fentanyl and illicit fentanyl prior to 2010?

12      A.    I would be aware of that.   But as I

13  understand the literature, does not docu -- and I

14  think drug seizures probably -- basically the

15  Centers for Disease Control has suggested in their

16  literature that from 2013 on, the vast bulk of --

17  that was the period that the dramatic increase in

18  the availability of illicit heroin began.

19      Q.    And so again, you don't know how the

20  fentanyl deaths were reported in the medical

21  examiner data on which you relied.   Correct?

22              MR. BURNETT:   Objection.

23      A.    It's the same chemical.   And I don't think

24  -- other than looking for contaminants in it, it's

Page 165

1   a drug -- it's a molecule, and it would be the same

2   molecule.  If it's called fentanyl, it would be the

3   same drug, and there would be no way of

4   distinguishing between them.

5       Q.   And that would be how you would distinguish

6   based on a toxicology screen alone, correct?

7       A.   That's correct, you would best be relying

8   on what molecule they find.

9       Q.   And as Doctor Mock testified - and you

10  agreed - it is improper to categorize a cause of

11  death based on a toxicology screen alone.  Correct?

12              MR. BURNETT:  Objection.

13      A.   I'm relying on his judgment.  But it sounds

14  like it.

15      Q.   Okay.

16              MS. WU:  So we've been going almost an

17  hour, and I apologize.  I've got to go get my power

18  cord this time.  Could we go off the record and

19  just take ten minutes?

20              MR. BURNETT:  Sure.

21              MS. WU:  Take it now?  Okay.  Okay,

22  so --

23              VIDEO OPERATOR:  Going off the record.

24  The time is 1:27 p.m.

```
                                            Page 166

 1              (A recess was taken after which the

 2              proceedings continued as follows:)

 3              VIDEO OPERATOR:  Now begins Media Unit

 4    5 in the deposition of Gordon Smith.  We're back on

 5    the record.  The time is 1:54 p.m.

 6    BY MS. WU:

 7        Q.   Doctor, we just took a brief break.  You

 8    understand that you're still under oath, correct?

 9        A.   Correct.  Yes.

10        Q.   Before our break, we were talking about

11    fentanyl, and I want to pick up where we left off.

12    Do you have Exhibit 3, which is your report, in

13    front of you?

14        A.   Yes, I do.

15        Q.   Doctor, if we turn to page 10 of your

16    report, you state that "fentanyl overdoses began to

17    rise steeply in 2015, with the growing presence of

18    illicit fentanyl."

19              Do you see that?

20        A.   Yes.

21        Q.   What is the source for that statement?

22        A.   Began to rise -- that is -- this is the

23    Vital Statistics data, and that's what's shown on

24    Figure 2 on page 11.
```

Page 167

1       Q.   And now if we look at your -- back a few

2    pages to page 7 of your report -- I'm sorry, it's

3    Footnote 7 on page 8 of your report.  I apologize.

4       A.   Yes.

5       Q.   You cite CDC analysis -- and quote it.  It

6    says, "The third wave began in 2013, with

7    significant increases in overdose deaths involving

8    synthetic opioids," specifically, "those involving

9    illicitly manufactured fentanyl."  Do you see that?

10      A.   Yes.

11      Q.   So illicit fentanyl is listed as a problem

12   as far back as 2013, correct?

13      A.   At a national level.  It took a little

14   longer to come to West Virginia, yes.

15      Q.   Do you have an opinion as to when illicit

16   fentanyl first became available nationally?

17      A.   I'm relying -- my opinion is based on what

18   the Centers for Disease Control report, that felt

19   that -- that this really became a problem in --

20   beginning in 2013, and that their general

21   understanding is that before that, they weren't

22   bringing in the -- I guess the Chinese hadn't

23   learned how to make it or whatever, but anyway,

24   they created a market for it.

Page 168

1      Q.   Doctor, do you know if there were domestic

2    sources for illicit fentanyl prior to 2013?

3      A.   There were prescription as a source.  There

4    was a -- there was a patch, Duragesic patch, that

5    was available.

6      Q.   Was there illicitly -- I should say

7    illicitly-manufactured fentanyl available in the

8    United States prior to 2013?

9      A.   Not that I know of in any quantity, based

10   on the reports that I've seen.

11     Q.   So Doctor, I'd like to show you another

12   exhibit, Exhibit 15 --

13          MS. WU:  And Counsel, we're going to

14   do this one by screen share.  We sent it last

15   night.  I'm not sure if you have hard copies with

16   you.

17          MR. BURNETT:  Yeah, I have the hard

18   copy.  Remind me what the name of the document is.

19          MS. WU:  Sure.  It's fentanyl briefing

20   sheet for first responders.

21          MR. BURNETT:  Yeah, okay.

22          MS. WU:  We're also happy to put it up

23   on the screen if that's helpful.

24          MR. BURNETT:  Let's ask the witness.

Page 169

1    This is -- so this is Exhibit 15.  She sent this

2    separate from the envelopes.

3              THE DEPONENT:  Oh, okay.  Yes.  All

4    right.  Yes.

5         SMITH DEPOSITION EXHIBIT NO. 15

6              ("Fentanyl A Briefing Guide for First

7              Responders" from the U.S. Department

8              of Justice, Drug Enforcement

9              Administration dated 6-6-17

10             (HUNT_01800002-021) was marked for

11             identification purposes as Smith

12             Deposition Exhibit No. 15.)

13    Q.   Doctor, for the record, you're now looking

14    at a document, Deposition Exhibit 15, which is

15    titled Fentanyl briefing sheet for first

16    responders.  Do you have that in front of you?

17    A.   Yes, I do.

18    Q.   You didn't rely on this document in writing

19    your report, correct?

20    A.    No, I relied on the Centers for Disease

21    Control document.

22    Q.   Okay.  Doctor, in looking at the document,

23    you see it was prepared by the Drug Enforcement

24    Administration, correct?

Page 170

1      A.   Correct, yes.

2      Q.   And at the top of the first page of Exhibit

3   15, someone has written "June 6th, 2017" by hand.

4   Do you see that?

5      A.   Correct.  Yes, I do.

6      Q.   In the bottom right, you see the word

7   "HUNT," followed by a series of numbers.  Do you

8   see that?

9      A.   Correct.  The first page ends in 2.  Yes.

10      Q.   Okay.  If I refer to that number as the

11   Bates number, will you understand what I'm

12   referring to?  That's the Huntington production

13   prefix, also known as a Bates number.

14      A.   The Bate -- B-A-T-E-or --

15      Q.   B-A-T-E, yes.  Bates number.

16      A.   Bates number.  What's the origin of Bates?

17   Is that the name of the person who did it?

18      Q.   Very good question.  Perhaps other counsel

19   on the line can help me out here.  I don't know.

20           MR. BURNETT:  Yeah, I think there was

21   a Mr. Bates that came up with the numbering system.

22    It's used across --

23           THE DEPONENT:  Oh, okay.

24           MR. BURNETT:  -- in --

Page 171

1              THE DEPONENT:  Oh, okay.  All

2       government things?  Oh, okay.  Yes.  Good.

3          Q.   Okay.  So if we turn to page 3 of the

4       document which has the Bates stamp ending in a

5       Number 5 in the bottom right-hand corner, do you

6       see that?

7          A.   Yes.

8          Q.   Now, if we go to the paragraph that begins

9       at the bottom of the left column of the page --

10         A.   Yes.

11         Q.   -- DEA report -- it reads, the DEA reports

12      indicate that there were multiple clandestine labs

13      producing illicit fentanyl in the U.S. between 2000

14      and 2005.

15              Do you see that, Doctor?

16         A.   Yes.

17         Q.   You weren't aware of that when you produced

18      your report, were you?

19         A.   No, I wasn't.

20         Q.   That's the same time frame when you have

21      fentanyl listed as a prescription opioid in your

22      report, correct?

23         A.   That is correct.

24         Q.   And between 2005 and 2007, according to

Page 172

1    this report, law enforcement attributed more than

2    1,000 deaths between Chicago and New Jersey to

3    illicit fentanyl.  You weren't aware of that when

4    you prepared your report, correct?

5        A.   No, I wasn't.  I was much more aware of the

6    statement at the bottom in the last -- in the

7    second to the last paragraph.  "Beginning in 2013,

8    the DEA, along with" "law enforcement, began

9    noticing an alarming" overdose -- "number of

10   overdose incidents throughout the nations," and

11   that's when they felt that it was illicit opioids.

12             But you're right.  There seems to be

13   some documentation prior to that.

14       Q.   And West Virginia lies -- geographically

15   lies between Chicago and New Jersey, correct?

16       A.   Yes.

17       Q.   If we turn to Exhibit A of your report,

18   which is Deposition Exhibit 3 -- and look at the

19   numbers for fentanyl.

20       A.   Uh-huh.

21       Q.   Your Exhibit A reports that there were 15

22   deaths related to fentanyl in Cabell County between

23   2005 and 2007.  Correct?

24       A.   Yes.

Page 173

1              MR. BURNETT:  You said 15 or 16?

2       Q.   You attributed --

3       A.   2004, 2005 and 2006, is that what you're

4    counting?

5       Q.   2005, 2006 and 2007.

6       A.   Yes.

7       Q.   16.

8       A.   16, yes.

9       Q.   I'm sorry.  I said "15" before.  So if we

10   turn to Exhibit A of your report, it indicates --

11   it reports that there were 16 deaths related to

12   fentanyl in Cabell County between 2005 and 2007.

13   Correct?

14      A.   Correct.

15      Q.   Doctor, you attributed each of those deaths

16   to prescription fentanyl, correct?

17      A.   Based on the CDC reports, that was correct.

18      Q.   Doctor, you didn't consider the law

19   enforcement reports such as the document marked as

20   Exhibit 15 which report the prevalence of illicit

21   fentanyl during that same time period, 2005 to

22   2007.  Correct?

23              MR. BURNETT:  Objection,

24   mischaracterizes the document.

Page 174

1      A.   Yeah.  No, we did not, but we were not

2   aware that it was much of a problem, and certainly

3   the number of -- compared to the most recent time

4   period where we do know that there were large

5   amounts of illicit opioids and -- I'm not sure --

6           People were -- certainly were dying

7   from the prescribed patches, so I don't know.

8      Q.   But you didn't consider the law enforcement

9   reports such as the DEA document identified as

10  Exhibit 15 in preparing your report.  Correct?

11          MR. BURNETT:  Objection.

12     A.   No.  And it says here that they closed --

13  they started closing it down in 2005.  So those --

14     Q.   And Doctor --

15          MR. BURNETT:  Wait.

16     Q.   Doctor, my question was --

17          MR. BURNETT:  He was answering.

18     Q.   -- did you consider --

19          MR. BURNETT:  He was --

20          MS. WU:  Counsel, do you have an

21  objection?  I don't have a question pending.

22     Q.   Doctor, my question was:  You did not

23  consider law enforcement reports such as the DEA

24  report marked as Deposition Exhibit 15 in preparing

Page 175

1    your report in connection with this case, correct?

2        A.   I did not have access to that report.

3             MR. BURNETT:  Objection, asked and

4    answered.

5        Q.   Okay.  So Doctor, earlier today, you

6    mentioned the concept of polypharmacy.  Could you

7    explain for us what you mean when you use the term

8    "polypharmacy"?

9        A.   Polypharmacy is people taking more than one

10   drug at the same time to get -- to get high off of

11   their drug problem.

12       Q.   Doctor, the presence of multiple drugs in

13   toxicology screens can indicate polypharmacy,

14   correct?

15       A.   Correct.

16       Q.   Polypharmacy is common among fatal

17   overdoses in West Virginia, correct?

18       A.   That's correct.

19       Q.   More than three-quarters of fatal overdoses

20   between 2005 and 2017 involved multiple drugs,

21   correct?

22       A.   I don't know which paper -- I presume

23   that's from my report.  Yes?  I don't know the

24   exact number.

Page 176

1      Q.   Doctor, you cited the Smith study for that

2   proposition, correct?

3      A.   Where was that, on which page was that?

4   I'd have to remember.

5      Q.   Well, let me try it in a simpler way.

6   Doctor, do you agree that three-quarters of fatal

7   drug overdoses in West Virginia for the period 2005

8   to 2017 involve multiple drugs or polypharmacy?

9      A.   That would be very consistent with our --

10   our analyses of data.

11      Q.   Doctor, when multiple drugs are present in

12   a toxicology screen, each drug is included in the

13   autopsy report, correct?

14      A.   Only if in the opinion of the medical

15   examiner that drug contributed to the death.  For

16   example --

17      Q.   Are you aware --

18      A.   -- if marijuana was found in the

19   toxicology, they would not list it as having

20   contributed to the death.

21      Q.   Have you considered circumstances in which

22   the West Virginia Office of the Chief Medical

23   Examiner determined to exclude a drug identified in

24   a toxicology screen from the autopsy report?

Page 177

1    A.   Yes.   In discussions with them, if they

2  found a very, very low level of a drug, they would

3  not consider it -- they would find the drug, but

4  they would not consider it as having contributed to

5  the death, and therefore they would not write it on

6  the death certificate.

7    Q.   And what is the source for your knowledge

8  of that practice of the West Virginia Office of the

9  Chief Medical Examiner?

10    A.   That's based on our correspondence and

11  e-mails and correspondence with my colleague with

12  the medical examiner as to how they determined

13  whether they list the drug on the death certificate

14  and whether they list it as having contributed to

15  the death.

16    Q.   When you refer to "the medical examiner,"

17  are you referring to Doctor Mock?

18    A.   Yes, Doctor Mock.  And also my colleague

19  worked with the medical examiner prior to Doctor

20  Mock.  I can't remember his name offhand.

21    Q.   Okay.  Did you work with any medical

22  examiner other than Doctor Mock in West Virginia?

23    A.   No, I have not myself personally, but I

24  know my colleague has.

Page 178

1      Q.   Doctor, there isn't a limit to the number

2   of drugs that could be present on a toxicology

3   screen, correct?

4      A.   That's correct.

5      Q.   In cases where multiple drugs are present

6   in a toxicology screen, it may be difficult to

7   determine which drug caused the death.  Correct?

8      A.   Exactly.  That's why what they do is:  They

9   just list drugs that contrib -- they believe

10  contributed to the death.  If they didn't believe

11  the drug contributed to the death, then they

12  wouldn't list it.

13     Q.   And more information beyond the toxicology

14  screen results would be required to determine which

15  drug actually caused the death.  Correct?

16     A.   For the drug -- and generally, as I

17  understand it, for the drug to have contributed to

18  the death, it would be based on the levels of the

19  drug, that they were of a significant level.

20          So if they found just an absolute

21  trace of morphine, for example, or a -- or a trace

22  of OxyContin and no other -- no other symptom, then

23  they would not consider that -- might not consider

24  that drug to have contributed to the death.

Page 179

1    Q.   So it's the general practice -- it is your

2    understanding that it is the practice of the West

3    Virginia Office of the Chief Medical Examiner to

4    list each drug detected in a toxicology screen at

5    more than a minimal level.  Correct?

6    A.   At more than a level that they considered

7    to have contributed to the death.  And it's

8    entirely up to the opinion of the medical examiner,

9    and then when they have these team meetings to

10   decide on difficult cases, which one -- which drugs

11   they feel would have contributed.

12   Q.   And have you inquired into the standards

13   that the medical examiner uses in order to

14   determine when a drug detected in a toxicology

15   screen is present in a substantial enough amount to

16   have contributed -- to be listed as contributing to

17   an overdose?

18   A.   I'm not sure.  The -- basically it's up --

19   many of these things, it's a matter of the judgment

20   based on the experience of a trained board

21   certified pathologist who's gone through a standard

22   training program, and I am not aware of every

23   single criteria that they use.

24        And it may even vary between trained

Page 180

1    -- training programs as to how they consider it.

2    But I certainly know that if a insignificant amount

3    of a drug were found, it would not be listed on the

4    death signi -- death certificate.

5         Q.   Doctor, based on your understanding of the

6    practices of the Office of the Chief Medical

7    Examiner in West Virginia, the fact that a drug is

8    listed on an autopsy report does not mean that the

9    medical examiner determined the drug caused the

10   overdose death.   Correct?

11        A.   Yes.   And I think I would make a

12   distinction between the autopsy report, which is an

13   individual report which might list all of the drugs

14   that were found, as against the drugs that make it

15   on to the death certificate on what they call "Part

16   a" of the death certificate where they list the

17   significant factors that contributed to the death.

18             So there may be a difference between

19   the medical examiner report -- they could list --

20   they may -- in the report, there may be the

21   toxicology report that lists all the drugs they

22   found, but then it is up to his certified -- his

23   opinion as a professional to decide which of the

24   drugs contributed to the death, and those are the

Page 181

1   ones that are put on the death certificate, and

2   they are the ones that make it into the Vital

3   Statistics data that we've been using for this

4   report.

5        Q.   Okay.  Let me reframe that with that

6   clarification.  So the fact that a drug is listed

7   on "Part a" of a death certificate does not mean

8   that the Office of the Chief Medical Examiner in

9   West Virginia has found that the drug caused the

10   overdose death.

11       A.   They believe it contributed, and I -- it's

12   very difficult to say what cause -- which inde --

13   in polydrugs, the whole point of the polydrugs,

14   there's never one drug that contributed.

15            For example, opioids depress the

16   respiration and people stop breathing.  So if you

17   have three opioids, none of them alone may have a

18   concentration enough to normally kill someone; but

19   if you add the respiratory depressant to one drug

20   to the respiratory depressant of the other opioid

21   to the other opioid, then you can get enough

22   respiratory depression to kill you.

23       Q.   Doctor, you followed the practices of the

24   Office of the Chief Medical Examiner and -- in the

Page 182

1    way that you compiled the data in your report for

2    polypharmacy overdose deaths, correct?

3        A.   Yeah, we're relying on the data that we --

4    that we get people to extract from their records,

5    yes.

6        Q.   So if multiple drugs were present on the

7    toxicology screen of a decedent in West Virginia

8    during the time frame covered in your report, that

9    would count against the total for each of the drugs

10   detected in the toxicology screen for that overdose

11   event.   Correct?

12       A.   That's correct.   The data -- and the data

13   that's in the -- in that Exhibit A, they're not

14   mutually exclusive, but because they can't --

15   excuse me.

16       Q.   Bless you.

17       A.   -- that they -- it's almost impossible to

18   determine which single drug caused it, but what's

19   listed here are all of the drugs that they believe

20   contributed.

21            And so they add up to more than the

22   total number of overdose deaths.

23       Q.   Doctor, according to Exhibit A of your

24   report, which is Exhibit 3 -- I'm going to pause

Page 183

1  for a second, sir.

2       A.   That's okay.

3       Q.   Okay.  So do you have Exhibit 3 in front of

4  you, Doctor?

5       A.   Exhibit 3.  Yes.  Exhibit 3.

6       Q.   So if we look at -- yes.  Your -- the copy

7  of your report.

8       A.   My report, yes, I do, of course, I do, yes.

9       Q.   And if we look at Exhibit A of your

10 report --

11      A.   Yep.

12      Q.   -- I just want to make this more concrete

13 by going through an example.  If we look at the

14 first year reported of 2001, there's a total of 16

15 fatal overdoses reported, correct?

16      A.   Yes, that's correct.

17      Q.   And then if we go through the exercise of

18 adding horizontally across the drugs attributed to

19 each type of drug in the chart, we tally 32 deaths.

20 Is that right?

21      A.   I guess so, yes.  That would -- that would

22 make sense.

23      Q.   And that's because - just to illustrate

24 your point - that the counting -- the counting of

```
 1    the drugs in a tox screen results in counting an

 2    overdose death into multiple categories.  Correct?

 3         A.   That's correct, yes.

 4         Q.   Doctor, we were talking about fentanyl a

 5    short while ago.  Do you recall that?

 6         A.   Yes.

 7         Q.   Doctor, you are aware that fentanyl is

 8    often mixed with other drugs, correct?

 9         A.   That's correct.

10         Q.   Doctor, you -- would you agree that

11    fentanyl can cause a fatal overdose at lower

12    concentrations than other opioids?

13         A.   Yes, it can.

14         Q.   Doctor, you are also aware that the

15    concentration of fentanyl can vary widely across

16    different parts of the body in postmortem

17    examinations, correct?

18         A.   Yes.

19         Q.   Most fatal overdoses related to fentanyl

20    involved more than one drug.  Correct?

21         A.   That -- that's what we are finding, yes.

22         Q.   And in addition to fentanyl, you are

23    familiar with a number of fentanyl analogs,

24    correct?
```

Page 185

1      A.   That's correct.

2      Q.   Fentanyl analogs are examples of illicit

3  fentanyl, correct?

4      A.   Yes.

5      Q.   Fentanyl analogs require specific chemical

6  tests in order to identify them in a toxicology

7  screen, correct?

8      A.   Correct.

9      Q.   If the examiner doesn't conduct one -- if

10  the medical examiner doesn't conduct one of these

11  tests, he could not identify fentanyl analogs,

12  correct?

13           MR. BURNETT:   Objection.

14      A.   That -- if they didn't include the test for

15  it, they wouldn't pick it up, yes.

16      Q.   Doctor, do you know when the Office of the

17  Chief Medical Examiner in West Virginia first

18  implemented tests to identify fentanyl analogs?

19      A.   I would have to go back and check my

20  records.  I am aware we -- that was something I

21  remember we inquired about as to when it -- when

22  they first started testing.  And it's also a

23  sequential thing, because they ask for individual

24  tests here.

Page 186

1      Q.   You didn't take account of when those

2   testing capacities became available to the Chief

3   Medical Examiner's Office in West Virginia in

4   connection with your report for this case, correct?

5                 MR. BURNETT:  Objection.

6      A.   Not for this Exhibit A, we didn't, no.

7      Q.   Okay.  Do you know if those testing

8   capabilities became available prior to 2001?

9      A.   I do not know.  As I say, I don't know the

10   date, and I -- I've got it recorded somewhere in my

11   office, but I don't know when.

12      Q.   So Doctor, do you still have your report in

13   front of you?

14      A.   Yes, I do.

15      Q.   So let's turn to page 8 of your report.

16      A.   Yep.

17      Q.   Doctor, in the first full paragraph on page

18   8, it starts, "Among the individual drugs listed in

19   Exhibit A, heroin has no legal use," it "is not

20   prescribed, and is always illicit.  The other

21   drugs, including fentanyl, are sometimes prescribed

22   but sometimes misused or used illicitly."

23                 Do you see that?

24      A.   Is it page 8?

Page 187

1       Q.   Yes.

2       A.   Could you start off with the sentence again

3   just to -- I was --

4       Q.   Yes, certainly.  I'm looking on your report

5   on page 8, the first full paragraph on the page.

6       A.   Yep.

7       Q.   And reads, "Among the individual drugs

8   listed" --

9       A.   Yep, I know exactly where you are now.

10  Yeah.

11      Q.   -- "heroin has no legal use, is not

12  prescribed and is always illicit.  The other drugs,

13  including fentanyl, are sometimes prescribed but

14  sometimes misused or used illicitly."

15              Do you see that, Doctor?

16      A.   Yes.

17      Q.   So all of the drugs are sometimes

18  prescribed but sometimes misused or used illicitly.

19  Is that right?

20      A.   Yes, I guess, yes.

21      Q.   So now if we toggle back to Exhibit A which

22  is referenced there --

23              I'll wait till we're together.

24              Are you at Exhibit A, Doctor?

Page 188

1      A.    Yes.

2      Q.    So if we look at the second table on this

3   -- I guess it's the lower half of the page on page

4   1 of Exhibit A, do you see the column for cocaine

5   overdose deaths?

6      A.    Yes.  Yes, cocaine, yes.

7      Q.    Doctor, do you have any reason to believe

8   that a single one of the individuals who died of a

9   fatal overdose with cocaine in their system had a

10   prescription for cocaine at the time they died?

11              MR. BURNETT:   Objection.

12      A.    I -- that was not subject to my

13   investigation.

14      Q.    Did you make any inquiry into the cocaine

15   data which is listed in Exhibit A of your report?

16      A.    With regard to what?

17      Q.    With regard to the prescription drug

18   histories for the individuals --

19      A.    No, we did not --

20      Q.    -- who overdosed --

21      A.    -- examine prescription drug histories.

22      Q.    Now, if we go over two columns and -- we

23   see meth -- a column for methamphetamine.  And I'm

24   still looking at the same chart in Exhibit A.  Do

Page 189

1    you see that, Doctor?

2         A.    Yes.

3         Q.    Doctor, methamphetamine is a Schedule II

4    controlled substance, correct?

5         A.    Correct.

6         Q.    Illicit methamphetamine is considered one

7    of the most dangerous drug threats in the

8    Appalachian drug -- Appalachian region today.

9    Correct?

10        A.    That's correct.

11        Q.    Do you have any reason to believe that the

12   overdose fatalities associated with methamphetamine

13   in Exhibit A refer to prescribed methamphetamine?

14        A.    I don't have any evidence of that.

15        Q.    And you haven't investigated the origin of

16   the methamphetamine associated with the overdoses

17   listed on Exhibit A, correct?

18        A.    I would reiterate, the way this data is

19   collected, it's based on the chemical nature of the

20   molecule of the drug and whether they were

21   considered to be a prescribable drug, is probably

22   the best way to think about it, and whether they

23   were Schedule II or below.

24              And Schedule I drugs were generally

Page 190

1    considered, for the vast bulk of this report, as

2    being those that were illicit.

3                    MR. BURNETT:  Counsel, I don't mean to

4    interrupt.  When you have a good moment, I'd like

5    to take a quick break.

6                    MS. WU:  Certainly.  Let me just --

7    I'm almost done with this.  I'm happy to take a

8    break.

9    BY MS. WU:

10       Q.   Doctor, you didn't undertake any

11   investigation into the origin of the

12   methamphetamine, whether it be illicit or

13   prescription methamphetamine associated with the

14   overdose incidence reported in your Exhibit A,

15   correct?

16       A.   That was beyond the scope of my

17   investigation.

18       Q.   Doctor, just finally - and then we'll take

19   a break - I'd like to call your attention to the

20   last column, U-47700.  Do you see that?

21       A.   Yes.

22       Q.   U-47700 is commonly referred to as pink

23   heroin, correct?

24       A.   I think so.  I'm not sure of the popular

Page 191

1   name for it.  I'd have to look it up.

2        Q.   Are you aware that U-47700 is a Schedule I

3   drug?

4        A.   I'm fairly sure it is.  Or was --

5        Q.   And that means --

6        A.   Yep.

7        Q.   I'm sorry, Doctor.  I didn't mean to

8   interrupt.

9        A.   I presume so.  Many of these synthetic

10  drugs get scheduled as they get discovered.

11       Q.   Okay.  And a Schedule I drug has no

12  FDA-approved medical purpose, correct?

13       A.   Correct.

14       Q.   Contrary to what we looked at in your

15  report, heroin is not the only drug in this table

16  that has no legal use and is always illicit,

17  correct?

18            MR. BURNETT:  Objection.

19       A.   Yeah.  The trouble is, it becomes legal

20  when they discover it and when the DEA make it

21  illegal, and it's a bit of a moving -- it's a bit

22  of a moving target with drugs.

23       Q.   You recognize that heroin is not the only

24  illicit drug listed in your Exhibit A, correct?

Page 192

1      A.   I guess so, yes.

2              MS. WU:  Counsel, I'm happy to take a

3      break now.  How long do you want to take?

4              MR. BURNETT:  Yeah, let's take ten

5      minutes.

6              MS. WU:  Sure.

7              MR. BURNETT:  Okay.

8              VIDEO OPERATOR:  Going off the record.

9      The time is 2:26 p.m.

10              (A recess was taken after which the

11              proceedings continued as follows:)

12              VIDEO OPERATOR:  Now begins Media Unit

13      6 in the deposition of Gordon Smith.  We're back on

14      the record.  The time is 2:50 p.m.

15      BY MS. WU:

16      Q.   Doctor, we just took a break, a snack

17      break, and now we're back on.  Do you understand

18      that you're still under oath?

19      A.   Yes.

20      Q.   Thank you, Doctor.  Before the break, we

21      spent some time talking about fentanyl, and I'd

22      like to just close out that subject matter before

23      moving on to new terrain.

24              When you prepared your report, as you

Page 193

1  said earlier, you did not consider the prescription

2  drug histories for the individuals that fatally

3  overdosed.  Correct?

4       A.   Not for the cases for the whole state, only

5  looking at a couple of studies that had done that,

6  yes.

7       Q.   So your report does not reflect work done

8  in order to consider the prescription drug

9  histories of the individuals who were involved in

10  fatal overdose incidents, correct?

11       A.   Correct.

12       Q.   And if you had wanted to look at

13  prescription drug histories, one way you could have

14  done that was to look at the CSMP data available in

15  West Virginia.  Correct?

16       A.   I could do -- I could have looked at that.

17  It's difficult to get ahold of.

18       Q.   But in fact, you didn't look at the CSMP

19  data, correct?

20       A.   Correct.

21       Q.   You also didn't undertake an exercise to

22  look at the death certificates for the overdose

23  fatalities reflected in the data in your report.

24  Correct?

Page 194

1        A.   And consistent with all of the studies that
2     are done using death certificate data, I did not
3     myself, and many, many studies that rely -- there's
4     intensive checking on the Vital Statistics, so I
5     did not feel it necessary.
6        Q.   For the overdose fatalities for which you
7     identify prescription opioids, did you consider
8     whether the prescription opioids detected in the
9     toxicology report were used consistent with the
10    physician's prescribing instructions?
11       A.   We did not examine that as part of my
12    report.
13       Q.   Now, Counsel and Doctor, we're going to
14    show a document which we're going to identify as
15    Deposition Exhibit 16, and my colleague, Sam Howe,
16    is going to help me put it up on the screen.  So
17    please bear with us.
18            SMITH DEPOSITION EXHIBIT NO. 17
19               (Copy of Amended WV Death Certificate
20               dated 1-22-09 (CCCLERK_0009216) was
21               marked for identification purposes as
22               Smith Deposition Exhibit No. 17.)
23               MS. WU:  And for the record, this is a
24    death certificate which is identified with the

Page 195

1   Bates stamp CCCLERK_0009216.

2             MR. BURNETT:  Wait, sorry.  Is this --

3   do we have a paper copy of this?

4             MS. WU:  No, you don't.

5             MR. BURNETT:  Oh, you said this is 16.

6   And the two paper copies you sent me were -- I

7   thought they were 15 and 16.

8             MS. WU:  Well, then to avoid confusion

9   - thank you, Counsel - let's call this Deposition

10  Exhibit 17.  I apologize.  My virtual exhibit

11  tracking is lacking today.

12            So again, for the -- just for clarity

13  in the record, we are now marking as Smith

14  Deposition Exhibit No. 17 a death certificate which

15  we have pulled up and it's identified with a Bates

16  stamp CCCLERK_0009216.

17  BY MS. WU:

18     Q.   Doctor, can you see that on the screen in

19  front of you?

20     A.   Yeah, it was a little easier to read

21  before.  You had a bigger -- that's better.

22     Q.   Here we go.  Okay.  Great.  Can you read it

23  okay now?

24     A.   Yes.

1    Q.   We are now looking at Deposition Exhibit

2  No. 17, which is a copy of a death certificate.  Do

3  you see that?

4    A.   Yes.

5    Q.   And the location for the overdose is

6  Huntington, West Virginia.  Do you see that?

7    A.   Yes.

8    Q.   And the amended date of the death

9  certificate stamped at the top is January 22, 2009.

10  Do you see that?

11    A.   Yes, I do.

12    Q.   So this is a fatal overdose incident which

13  would be reflected in the data reported in your

14  expert report for this case.  Correct?

15         MR. BURNETT:  Objection.

16    A.   Could you repeat that again?  I didn't get

17  --

18    Q.   Doctor, we're now looking at a death

19  certificate from 2009.  Do you see that?

20    A.   That's correct.  Yes, I am looking at it.

21  Yes.

22    Q.   Fatal overdoses from 2009 are reflected in

23  the overdose data reported in Exhibit 3, which is

24  your expert report in this case.  Correct?

1      A.   Correct.

2      Q.   Now, if we could scroll down -- and I want

3   to give the witness a chance to review the

4   document, so let's do this slowly.  It's just a

5   one-page document, so we don't have to rush.

6            If we could scroll down a little bit

7   further, there is a section -- it's Section 27,

8   Part 1.  It says, "IMMEDIATE CAUSE (Final disease

9   or condition resulting in death)."

10           Do you see that, Doctor?

11     A.   Yes, I do.

12     Q.   And it says, "Combined fentanyl and

13  diazepam intoxication."  Do you see that?

14     A.   Correct, yes.

15     Q.   Now, I'd like to go down a little bit

16  further in the document.  And I'm now looking at

17  Box 29.  It says, "MANNER OF DEATH."  It says,

18  "Accident."  Do you see that?

19     A.   Yes, I -- yes, yes, the check box, yes.

20     Q.   And so an accidental death, again, would be

21  included in the overdose -- the fatal overdose

22  reports that are set forth in your report in this

23  case, correct?

24     A.   That's correct.

Page 198

1      Q.   Now, if we follow that row across to Box 30

2   -- 30D, it says, "DESCRIBE HOW INJURY OCCURRED."

3   Do you see that, Doctor?

4      A.   Yes, I do.

5      Q.   And that box reads, "Ingested prescribed

6   transdermal fentanyl patch."  Do you see that?

7      A.   Correct.

8      Q.   Doctor, ingesting a fentanyl patch is

9   inconsistent with the medical use of that product.

10  Correct?

11     A.   It's not the normal way to use, yes, that's

12  correct.

13     Q.   Are you aware of any situation in which a

14  fentanyl patch has been prescribed for ingestion?

15     A.   Not that I'm aware of.

16     Q.   Are you aware of an FDA approval for a

17  fentanyl patch for ingestion?

18     A.   I don't think it's an approved mode of use.

19     Q.   Are you -- can you identify any conduct of

20  distributor defendants in this case that could have

21  prevented the death reflected in Exhibit 17, which

22  is -- was caused by an ingested fentanyl patch?

23              MR. BURNETT:  Objection, calls for

24  speculation.

Page 199

1      A.   Yes, I don't know.  I can't see any --

2   there's no name of anybody, distributor, on the

3   death certificate.

4      Q.   Is there anything any distributor could

5   have done to stop an individual from eating a

6   prescribed fentanyl patch?

7           MR. BURNETT:  Objection.  Calls for

8   speculation.

9      A.   I don't know.  I think it's purely

10  speculation.  There may be some theoretical thing

11  they could have done, but I don't know.

12     Q.   As a prescribing physician, Doctor, would

13  you foresee that an individual prescribed a

14  fentanyl patch would eat it?

15     A.   The only -- it would depend if I knew the

16  person was an addict, there could be some under --

17  there could -- we might get concerned about that.

18           But there's nothing reflected on the

19  death certificate to indicate that.

20     Q.   That type of patient evaluation is specific

21  to the province of the prescribing physician,

22  correct?

23     A.   Generally, yes.

24     Q.   Because the prescribing physician is

Page 200

1  uniquely able to weigh the risks and benefits of a

2  prescription medication, correct?

3            MR. BURNETT:  Objection.

4     A.   Maybe that's standard practice, but it

5  wasn't part of what I was called upon to examine.

6     Q.   In your -- in your view as a prescribing

7  physician yourself, do you agree that the

8  prescribing physician is best positioned to

9  evaluate the risks and benefits of a prescription

10 medication?

11    A.   That's standard medical practice.

12    Q.   So you agree that the physician is in the

13 best position to weigh the risks and benefits of a

14 prescription medication.  Correct?

15            MR. BURNETT:  Objection, asked and

16 answered.

17            THE DEPONENT:  What's asked and --

18            MR. BURNETT:  You can answer.

19            THE DEPONENT:  Can answer this?

20    A.   I would say probably so, yes.

21    Q.   And addiction may be a risk of certain

22 prescription medications, correct?

23    A.   It can be.  It is.

24    Q.   Distributors such as McKesson are not able

Page 201

1    to evaluate a patient's risk of addiction, correct?

2              MR. BURNETT:  Objection.

3         A.   They -- they don't have any -- they don't

4    provide medications to individual patients; they

5    provide them to the pharmacy.

6         Q.   So they don't have the -- distributors do

7    not have the opportunity to assess the addiction

8    profile of a patient receiving prescription

9    opioids, correct?

10             MR. BURNETT:  Objection.

11        A.   It's individual patients, but they -- no,

12   they don't.

13        Q.   Thank you, Doctor.

14             MS. WU:  And Sam, thank you.  We can

15   take down the Exhibit 17.

16        Q.   Okay, Doctor, I'm now going to leave

17   fentanyl and move on to another subject.  Doctor,

18   state and local officials in West Virginia have

19   worked for years to decrease the abuse of opioids,

20   correct?

21        A.   That's what I understand.

22        Q.   Do you think that those efforts of the

23   state and local communities have been effective?

24             MR. BURNETT:  Objection.

Page 202

1     A.   I think it's such a difficult problem.   In

2   some hand, yes; in some ways, no.

3     Q.   In what ways do you believe that West

4   Virginia has been successful in decreasing the

5   abuse of opioids?

6              MR. BURNETT:  Objection.

7     A.   It was not a subject of my investigation.

8   I don't know -- my report.

9     Q.   A few moments ago, Doctor, you said that

10   you believe in some ways, West Virginia has been

11   successful in decreasing abuse of opioids.

12   Correct?

13     A.   I'm looking -- based on the report and my

14   data, I would see that in recent years, this -- in

15   the most recent year, there's been a decrease in

16   fatalities.  So to that extent, I can testify on

17   that, that there seems to have been.

18     Q.   To what do you attribute the decrease in

19   overdose fatalities that you've identify in the

20   data?

21              MR. BURNETT:  Objection, calls for

22   speculation.

23     A.   Yes, there's no data to -- in my report

24   that has any indication of that.  But based on

Page 203

1   reports in the literature, the general feeling is

2   that provision of better treatment services and

3   naloxone and Emergency Medical Services has been

4   responsible for declining in its fatality.  But

5   that's not based on --

6       Q.   Doctor, is -- Doctor, the data which you

7   cite in your report reflects that abuse of

8   prescription opioids has declined significantly.

9   Correct?

10              MR. BURNETT:  Objection.

11      A.   I didn't do a significance test on it,

12  statistical significance.  But if you look at my

13  figure, there certainly has been a decline in the

14  last year.

15      Q.   And the same is true for the abuse of

16  heroin and fentanyl, correct?

17      A.   They all declined together, as represented

18  in the fatalities.

19      Q.   If we look at Exhibit A to your report,

20  which is Deposition Exhibit 3, if we look at the

21  top chart and look at 2017, we see that there were

22  184 total opioid-related overdose deaths as

23  reported in Exhibit A.  Do you see that?

24      A.   Yes.

Page 204

1      Q.   And then if we go down just one line to

2   Figure 2018, we see that there were 134

3   opioid-related overdose deaths as recorded in your

4   Exhibit A.  Do you see that?

5      A.   Yes.  And in my report, I do note that the

6   data for 2018 were not necessarily completely

7   closed.  Sometimes it takes time for the deaths to

8   be closed.

9      Q.   Doctor, for the data as reported in your

10  Exhibit A, it reflects approximately a 27 percent

11  decrease in opioid-related overdose deaths for the

12  period 2017 to 2018.  Correct?

13     A.   That's correct.

14          MR. BURNETT:  Objection.

15     Q.   Doctor, the West Virginia Department of

16  Health and Human Resources has not yet released its

17  2019 overdose statistics, correct?

18     A.   To the best of my knowledge.  I haven't

19  checked re -- checked recently.

20     Q.   Are you aware that media reports suggest

21  that the total number of fatal overdoses in Cabell

22  County declined again in 2019?

23     A.   I'm not sure.  I haven't read the report --

24  any reports.

Page 205

1        Q.   And you did not include any data from 2019,

2    including preliminary data, in your report.

3    Correct?

4        A.   That's correct, for exactly the reason you

5    stated, that the data has not been finalized and

6    it's not been made available.

7        Q.   And the data would be maintained by the

8    West Virginia Department of Health and Human

9    Resources, correct?

10       A.   That's correct.

11       Q.   Now, do you have your report in front of

12   you still, Doctor?

13       A.   Yes, I do.

14       Q.   Could we go to page 6 of your report?  And

15   page 6 of your report states that -- states, "I

16   have accessed" -- I'm sorry.  You note that you

17   worked closely with the State Department of Health

18   and Human Resources.  Do you see that?

19       A.   Yes.

20       Q.   And then you go on to say, "I have access

21   to detailed state Vital Statistics overdose

22   fatality data for West Virginia from 2001 onwards."

23               Do you see that?

24       A.   That's correct.

Page 206

1      Q.   A few sentences later, you continue:  "This

2   database is maintained by the Health Statistics

3   Center" "and is continually updated."  Correct?

4      A.   Yes.

5      Q.   You were referring to data that is not

6   publicly available, correct?

7      A.   Correct, yes.

8      Q.   "Continually updated" as used in your

9   report, implies that the data available in the

10   system is more current than the data that has been

11   periodically released to the public.  Correct?

12      A.   My guess is that the date they release the

13   data to the public, the data that they have on hand

14   was current.  That's the way I understand it.  And

15   then after they release it, there may be other

16   deaths that are cleared by the medical examiner and

17   they -- then they update the numbers.

18      Q.   To the best of your knowledge, Doctor, does

19   the state currently have data available for 2019

20   which has not been released to the public?

21      A.   They may have it internally, but they also

22   don't release it to investigators like myself until

23   they feel confident that -- that they have reached

24   -- it's a reasonable -- and they may issue a

Page 207

1    preliminary, like as the data that I noticed up to

2    2018 was not necessarily the final number, but

3    there are often cases that dribble into their

4    system, and with the very high overdose rates, the

5    system has been a bit overwhelmed.

6        Q.   What efforts, if any, did you undertake in

7    order to obtain fatal overdose data from 2019?

8               MR. BURNETT:  Objection.

9        A.   At the time of my report, I was advised

10   that it would -- this was the most recent data

11   available.

12       Q.   Who advised you of that?

13       A.   A colleague of mine who work -- in the

14   Vital -- in a series of e-mails from the Vital

15   Statistics department.

16       Q.   Cabell County is one of the plaintiffs in

17   this lawsuit, correct?

18       A.   Correct.

19       Q.   Did you make any inquiry as to your clients

20   in this case as to whether or not it could provide

21   you with fatal overdose data for the year 2019?

22       A.   I did not, because it's not my -- it's not

23   my -- my understanding is that the data is all kept

24   centrally and -- with respect to the fatalities and

Page 208

1    they're unlikely to have it.

2       Q.   You are not aware of any overdose

3    information maintained by Cabell County, correct?

4              MR. BURNETT:  Objection.

5       A.   Often the local jurisdictions do keep track

6    themselves of the ones they know of.

7       Q.   What inquiry, if any, did you make to

8    Cabell County in order to obtain overdose data for

9    2019?

10             MR. BURNETT:  Objection, asked and

11   answered.

12      A.   I did not do that.

13      Q.   Now, earlier, Doctor, you stated that you

14   are directing the West Virginia SUPPORT Needs

15   Assessment.  Do you recall that?

16      A.   Correct.

17      Q.   You wrote in your report that the SUPPORT

18   project is funded by the Federal Centers for

19   Medicare and Medicaid Services.  Correct?

20      A.   Correct.

21      Q.   Do you anticipate that any services will be

22   provided to Cabell County in connection with the

23   SUPPORT project?

24      A.   The SUPPORT project itself may not, but it

Page 209

1  will be used to plan central allocation of services

2  by the State Department of Health and Human

3  Services.

4      Q.   What type of services will the state

5  provide as an outgrowth of the SUPPORT project?

6      A.   The state funds programs for prevention.

7  The exact detail, I'm not 100 percent sure of.  But

8  they provide funding for people to get treatment.

9            They provide grants to programs such

10  as the QRT program that go out and investigate

11  overdose deaths -- or over -- nonfatal overdoses,

12  and then enroll and get people into treatment.

13            They fund prevention activities in the

14  schools.

15            They fund a cross-section of

16  activities to provide services for the treatment of

17  opioid addiction.

18      Q.   Do you know what -- over what period of

19  time those services would be available to

20  communities in West Virginia?

21      A.   They're constantly -- the state gets

22  prevention grants on an annual basis to the state,

23  so the services are always available, but they're

24  constrained by the amount of money that's

Page 210

1    available.

2        Q.   Doctor, your report includes data

3    identifying the number of fatal overdoses

4    associated with a variety of drugs in Cabell County

5    between 2001 and 2018.  Correct?

6        A.   Correct.

7        Q.   You did not review the underlying death

8    certificates for those fatal overdoses, correct?

9                MR. BURNETT:  Objection, asked and

10   answered.

11       A.   I think I answered that earlier by stating

12   that the vast bulk of people doing analyses and

13   death certificate data rely on the quality that we

14   know that they -- that is done by Vital Statistics,

15   and that's standard procedure.

16               MS. WU:  Counsel, my earlier question

17   was for the general West Virginia data which was

18   studied in the report.  I want to make sure it's

19   the same for Cabell County.

20       Q.   So Doctor, did you review death

21   certificates associated with the data reported --

22   that you have reported for fatal overdoses in

23   Cabell County?

24               MR. BURNETT:  I believe he just

```
                                              Page 211

 1   answered that.

 2        A.   My answer is the same, that we would just

 3   rely - as would everybody, all the other

 4   researchers and program, public policy people -

 5   rely on the data provided by the Vital Statistics

 6   office.

 7        Q.   So the answer is no, you did not review

 8   death certificates, correct?

 9              MR. BURNETT:  Objection.

10        A.   I did not.

11        Q.   And for the fatal overdoses in Cabell

12   County, you also did not review records in order to

13   identify which decedents had valid prescriptions

14   for opioids.  Correct?

15              MR. BURNETT:  Objection.

16        A.   As I answered earlier, yes, I did not.

17        Q.   And Doctor, selling or giving away

18   prescription drugs - other than by a prescriber

19   with a prescription - is one form of diversion,

20   correct?

21              MR. BURNETT:  Objection.

22        A.   As I understand, I'm -- it depends on

23   whether it's illegal, and I explained earlier that

24   I was not sure whether it was legal or not.
```

Page 212

1      Q.   Do you know if stealing drugs is a form of
2   criminal diversion?
3      A.   I would assume it's a criminal offense.
4      Q.   Are you aware that local and federal law
5   enforcement officials who have testified in this
6   case have provided testimony that all types of
7   diversion are crimes?
8              MR. BURNETT:  Objection.
9      A.   I'm not aware of that.
10      Q.   And your report did not take into account
11   criminal activity by the decedent, correct?
12      A.   My report was based on the finding of drugs
13   that were considered to be prescription in Schedule
14   II and below, and the illicit drugs that I
15   considered for my report were both to be considered
16   to be in Schedule I of the DEA.
17      Q.   Okay.  So now I'd like to ask you:  Do you
18   have your report in front of you still, Doctor?
19      A.   Yes.
20      Q.   I'd like to ask you to turn to Exhibit C?
21              MR. BURNETT:  Exhibit C?
22              MS. WU:  Yes.
23      Q.   Do you see that, Doctor?
24      A.   Yes.

Page 213

1      Q.   Exhibit C is a document which you

2   incorporate into your report, the "West Virginia

3   Drug Overdose Death Historical Overview for 2001"

4   to "2015."  Do you see that?

5      A.   Yes, I do.

6      Q.   Now, Doctor, I'd like to ask you to turn to

7   page 19 of Exhibit C.  Do you see that, Doctor?

8      A.   Yes, I do.

9      Q.   Now, I'd like to ask you to look at Figure

10   31 in the middle of the page.

11      A.   I can see that, yes.

12      Q.   Do you see that?

13      A.   Yes.

14      Q.   And in the narrative accompanying Figure

15   31, it says, "Figure 31 shows that 192 amphetamine-

16   related deaths were detected from 2001 through

17   2015, with 74% of the overdose deaths occurring in

18   the last three years, 2013" to "2015."

19              Do you see that?

20      A.   Yes, I do.

21      Q.   And in your report, you stated that meth --

22   that amphetamine was not recorded during that

23   period.  Is that correct?

24      A.   I would have to go back and just check 100

Page 214

1    percent.

2              MR. BURNETT:   Take the time you need

3    to find it.

4         A.   Yea.   2017.

5         Q.   I'm happy to expedite this if you'd like to

6    look at your report, Doctor --

7         A.   I have on record that they stopped

8    reporting in 2012, and I would need to go back and

9    discover why they stopped reporting on that then.

10        Q.   So if I can direct your attention --

11        A.   Some special study they did, but it -- it

12   wasn't in the data that was given to me.

13        Q.   So I'd like to call your attention, Doctor,

14   to Exhibit A to your report, which is Deposition

15   Exhibit No. 3.   Do you have that, Doctor?

16        A.   Exhibit A.

17        Q.   To your report, which is Deposition Exhibit

18   3.

19        A.   Yes, I do.   Yes.

20        Q.   If we look at the second page, Note 1 to

21   Exhibit A reads, "amphetamine was stopped reporting

22   in the year 2012."   Correct?

23        A.   Yes, that's correct.

24        Q.   Based on our review of Exhibit C to your

Page 215

1    report - which is incorporated into your report -
2    the state was in fact tracking amphetamine during
3    that period, correct?  2012 forward.
4         A.   In exhibit -- which exhibit?
5         Q.   Exhibit C to your report.
6         A.   Oh, it does seem -- does seem so, yes.
7    Now, that, I do not know, and I would need to
8    investigate that further.
9         Q.   So Doctor, Note 1 to Exhibit A to your
10   report is inaccurate, correct?
11        A.   I would not say -- may have been some
12   reason as to why it was not reported, and that
13   would require further investigation.
14        Q.   Doctor, do you agree that Exhibit C to your
15   report includes state data for methamphetamine for
16   the period that post-dates 2012?
17        A.   If you -- sorry, let me just look at that.
18   Yeah, I recorded that -- and the cases that get
19   reported here are for the whole state anyway, but I
20   don't know.  I will have to investigate that
21   further.
22        Q.   Doctor, are you aware of any other
23   inaccuracies in Exhibit A to your report?
24             MR. BURNETT:  Objection.  Misstates

Page 216

1    his testimony.

2              THE DEPONENT:  Yeah.

3              MR. BURNETT:  You can answer.

4         A.   No, I'm not aware of any other problems.

5         Q.   Are you aware of any other data that you

6    failed to consider in assembling Exhibit A, or your

7    report, more broadly?

8              MR. BURNETT:  Objection.

9         A.   No, I was aware of the data that was

10   provided -- this is the way the data was provided

11   to me by the Vital Statistics office.

12        Q.   Doctor, are you aware based on press

13   reports or other data sources that methamphetamine

14   is considered the greatest threat in terms of drugs

15   used in the Appalachia region?

16        A.   It certainly --

17             MR. BURNETT:  Objection.

18        A.   -- has become an increasing threat.

19        Q.   Do you take account of that information in

20   assembling your report for this case?

21             MR. BURNETT:  Objection.

22        A.   Yes, but it's quite clear that we include

23   the methamphetamine data in our report.

24        Q.   But according to your Exhibit A, it

                                              Page 217

1    misstates that methamphetamine data is not

2    available for the period following 2012, correct?

3              MR. BURNETT:  Objection, misstates the

4    testimony.

5        A.   I just stated that the amphetamine was

6    stopped reporting.  That was the footnote to the

7    table that I was provided by Vital Statistics.

8        Q.   And what work, if any, did you do to test

9    the data provided to you by Vital Statistics?

10             MR. BURNETT:  Objection, asked and

11   answered.

12       A.   I think I answered that earlier.  We relied

13   on the data they provide, they are considered to be

14   reliable, widely used by people and standardly used

15   in the reports and research.

16       Q.   Did you check it against the data reported

17   in your Exhibit C, the West Virginia Drug Overdose

18   Deaths Historical Overview?

19       A.   I did not check it against that report.

20       Q.   Doctor, you're aware that --

21       A.   I was using the same source.

22       Q.   I'm sorry.  Doctor, what did you mean by

23   "the same source?"  I'm sorry, I might have missed

24   what you said.

Page 218

1      A.   I'm sorry.  It comes from the same database

2  in the Vital Statistics office.

3      Q.   Doctor, I'd like to return to some of our

4  discussion that we had earlier about drug

5  trafficking organizations and criminal enterprises.

6  Doctor, were you aware that local law enforcement

7  in the City of Huntington and Cabell had identified

8  drug trafficking organizations based in Detroit

9  that were engaged in trafficking prescription

10 opioids in Cabell County in the mid 2000s?

11              MR. BURNETT:  Objection, beyond the

12 scope.

13     A.   Yeah, it was not something that I examined

14 for my report.

15     Q.   Same question for detection of criminal

16 organizations trafficking prescription opioids from

17 Columbus, Ohio.  Were you aware of that, Doctor?

18     A.   No, the type -- my report was based just on

19 the drug chemicals found in dead people when they

20 died.

21              MR. BURNETT:  And I'll lodge an

22 objection, and just a reminder, Doctor Smith,

23 again, give a pause for me to object, okay?

24              THE DEPONENT:  Certainly.

Page 219

1    Q.   You didn't review any law enforcement

2  reporting from the period 2001 to 2018 regarding

3  the trafficking of prescription opioids into Cabell

4  County, correct?

5                  MR. BURNETT:   Objection.

6    A.   It was not the subject of my investigation

7  for my report.

8    Q.   So you didn't undertake that work, correct?

9    A.   That's correct.

10   Q.   And you didn't attempt to determine which

11 of the fatal overdoses reflected in your report

12 resulted from diverted prescription opioids,

13 correct?

14                 MR. BURNETT:   Objection, asked and

15 answered.

16   A.   To me, the most important -- my entire

17 report is based on finding the chemical,

18 irregardless of -- basically identifying what

19 chemicals, what molecules were consumed by the

20 people that died.

21   Q.   And the origin of the drugs consumed is not

22 reported in your opinions, correct?

23                 MR. BURNETT:   Objection.

24   A.   It was not the subject of my report.

1     Q.   And the origin of the report is not

2   reflected in your opinions for this case, correct?

3             MR. BURNETT:  Objection.

4     A.   I don't quite understand what you're --

5   what you're --

6     Q.   Let me try that again.  The origin of the

7   drugs involved in the fatal overdoses are not part

8   of your opinions in this case, correct?

9     A.   That's correct.

10    Q.   And therefore, it follows that any drugs

11  distributed by the defendants in this case have not

12  been analyzed as part of your opinions in this

13  case.  Correct?

14    A.   I --

15            MR. BURNETT:  Objection.

16    A.   I would say that these drugs are all drugs

17  that are prescription, and the only way they would

18  have got in -- other than the counterfeit drugs

19  coming in with fentanyl, the only way they would

20  have got into the state is by having been brought

21  in by somebody.

22    Q.   Are you aware --

23    A.   -- and it doesn't matter how they were

24  brought in or not.

                                        Page 221

1       Q.   Are you aware of pharmaceutical

2    distributors other than McKesson, AmerisourceBergen

3    and Cardinal?

4       A.   I am not familiar -- very familiar with who

5    -- what drug distributors there are in West

6    Virginia.

7       Q.   And you have not considered whether any of

8    the substances identified in the toxicology screens

9    you've referenced can be traced back to McKesson,

10   Cardinal or AmerisourceBergen, correct?

11              MR. BURNETT:  Objection, asked and

12   answered.

13      A.   Yeah, as stated, that was not the subject

14   of my report and my investigation.

15      Q.   You haven't done that work, correct?

16              MR. BURNETT:  Objection.

17      A.   It was not the subject of my investigation.

18      Q.   And the toxicology data on which you relied

19   would not allow you to undertake that exercise,

20   correct?

21      A.   The toxicology is based entirely on the

22   molecules found and does not indicate the origin of

23   the -- of the molecules and where they came from.

24      Q.   Doctor, earlier, you referenced the Hall

Page 222

1    study from 2008 which reviewed fatal overdoses in

2    West Virginia.  Do you recall that?

3        A.   Yes, I do.

4        Q.   And you also referred to a 2017 study, the

5    Sanders study, correct?

6        A.   Yes, correct.

7        Q.   Neither the Hall study nor the Sanders

8    study broke down their findings by county, correct?

9        A.   Not that I know of.  I would have to go

10   back and look at the -- I certainly know the Hall

11   one didn't, and I'm not sure whether there was

12   mention of county in the Sanders study.

13       Q.   The findings in the Hall and Sanders

14   studies are statewide, correct?

15              MR. BURNETT:  Objection.

16       A.   As I understand it, the bulk of it would be

17   statewide.  There may be some mention of county

18   data, but I don't remember.

19       Q.   Doctor, are you familiar with the High

20   Intensity Drug Trafficking program, also referred

21   to as HIDTA?

22       A.   Yes, I am.

23       Q.   In preparing your report, do you consider

24   that HIDTA has determined that the rates of drug

Page 223

1    abuse in Cabell County are higher than elsewhere in

2    West Virginia?

3        A.   I've read several HIDTA reports.  The

4    earliest one that I read, they were most concerned

5    about marijuana rather than opioids or other

6    concerns back in the very early investigations, and

7    then they became concerned about opioids.

8        Q.   I think I've lost Doctor Smith.

9        A.   I'm sorry, I just accidentally pulled out.

10   I put my foot on the cord.  I'm sorry.

11       Q.   No problem.

12       A.   Get back -- there we go.  Good.

13       Q.   Great.  I can see you.  Can you see me as

14   well, Doctor?

15       A.   Yep, I can see fine.

16       Q.   Wonderful.  Okay.  So a moment ago, we were

17   talking about HIDTA, and you referenced reviewing a

18   number of HIDTA reports.  Did you review those

19   HIDTA reports in connection with your work for this

20   case?

21       A.   I looked up -- I was given a report from

22   Hollister, and I did look at one of the reports

23   that he cited, and the one that he cited documented

24   that marijuana was the majority of the problem back

Page 224

1   in the earlier times when they first started

2   there --

3       Q.   Are those reports that you've just

4   referenced including -- included in the materials

5   considered for your report?

6       A.   No, I have reviewed those after my report

7   was written.

8       Q.   How --

9       A.   -- not relevant to the case of my report.

10      Q.   You don't plan to rely on those HIDTA

11  reports in any way?

12      A.   They are not part of my report, and so I

13  won't be reporting on them.

14      Q.   But you did consider them in connection

15  with your report in this case, correct?

16              MR. BURNETT:  Objection.

17      A.   The reason I looked at them is because I

18  saw the report from Hollister, and so as a good

19  scientist, I decided to check on the references,

20  and that's where I discovered that the concern that

21  was quoted initially was actually regarding

22  marijuana.

23      Q.   You reference Hollister.  Are you referring

24  to a report by Larry Holifield?

Page 225

1       A.   Yes, Holifield, I apologize.  Holifield.

2       Q.   Larry Holifield is an expert retained by

3    defendants in this case.  Are you aware of that?

4       A.   Yes.

5       Q.   You reviewed Mr. Holifield's report, expert

6    report, in this case?

7       A.   Correct.

8       Q.   Are you relying on your review of that

9    report in connection with your opinions in this

10   case?

11            MR. BURNETT:  Objection.

12       A.   It was not -- was not at all relative to

13   the opinions.  I did not have access to it when I

14   wrote my opinions for this report, and my opinions

15   are restricted to the report.

16       Q.   What other expert reports have you been

17   provided by counsel?

18       A.   I saw a draft of the Keyes report, and

19   that's the other one that I've read.

20       Q.   Were you provided any other materials that

21   are not cited in your materials considered list?

22            MR. BURNETT:  Objection.

23       A.   They were -- no, they were not -- what was

24   in my materials considered was the materials that

Page 226

1    were considered for the -- for the preparation of

2    my report.  There's been no relation -- they bore

3    no value in terms of the preparation of my report.

4         Q.   And are there any other expert reports or

5    depositions that plaintiffs' counsel provided to

6    you in connection with this case?

7         A.   Oh, yes, there was one double-barrelled

8    Tierney name.  I can't remember the last -- Ra --

9    Terry -- Tierney.

10        Q.   Catherine Rahilly-Tierney.

11        A.   Yeah, that's the one, yes.

12        Q.   Doctor Rahilly-Tierney is an epidemiologist

13   retained by the defendants in this case, correct?

14        A.   Correct.

15        Q.   And you were -- plaintiffs provided you

16   with a copy of her expert report?

17        A.   Yes.

18        Q.   Did you review that expert report?

19        A.   I read it over, yes.

20             MS. WU:  Counsel, we request that you

21   provide a list of -- a supplemental list of

22   materials considered.

23             MR. BURNETT:  Noting the request.

24             MS. WU:  We'll leave the deposition

Page 227

1    open in case we need to ask further questions

2    related to those materials which were not provided

3    in advance of today's deposition.

4              MR. BURNETT:  Well, Counsel, as the

5    witness said, he did not rely on these materials in

6    preparing his report, and he also said they weren't

7    relevant to preparation of the report.

8              THE DEPONENT:  They were given to me

9    as background because they referred to the data

10   that I had used in my report.  They were not at all

11   used in the preparation of my report or in my

12   opinions since then.

13      Q.   Understood, Doctor.  Doctor, will you agree

14   that the vast majority of prescription opioids --

15   prescriptions for opioids are written in good

16   faith?

17             MR. BURNETT:  Objection.  Beyond the

18   scope.

19             THE DEPONENT:  Exactly.

20      A.   I don't really have an opinion -- it's not

21   something that I've studied and was not contained

22   in my report.

23      Q.   Do you know who Mr. Joseph Rannazzisi is?

24      A.   No, I do not.

Page 228

1      Q.   Doctor, in 2017, three-quarters of overdose

2   deaths in Cabell County were related to illicit

3   fentanyl, correct?

4      A.   I'd have to go back and check, but that's

5   probably -- they included fentanyl as part of the

6   -- the spectrum of drugs found.

7           MR. BURNETT:  If you need to check

8   your report, please do so.

9      A.   So what years are you talking about?

10     Q.   I'm talking about 2017.  But perhaps we can

11  make this a little easier.  Doctor, I'd like to ask

12  you to -- you can pull up Exhibit 13, which will be

13  in a separate envelope.  And it's your publication,

14  "Fentanyl and fentanyl-analog involvement in

15  drug-related deaths."

16     A.   I found it.  13, yes.

17          SMITH DEPOSITION EXHIBIT NO. 13

18              ("Fentanyl and fentanyl-analog

19              involvement in drug-related deaths" by

20              Smith, et al. dated 3-1-19 was marked

21              for identification purposes as Smith

22              Deposition Exhibit No. 13.)

23     A.   13.  Yes, I have it in front of me.

24     Q.   Do you recognize this document, Exhibit 13?

Page 229

1     A.   Yes, I do.

2     Q.   What is it?

3     A.   It's a article of mine, that I was involved

4  with, published in the Alcohol and Drug Dependence,

5  2019.

6     Q.   Based on this publication and the work you

7  did in connection with it, will you agree that for

8  the 75 percent of overdose deaths that occurred in

9  Cabell County in 2017, almost all of those deaths

10  were related to fentanyl that was illicit and

11  obtained without a prescription?

12     A.   That's beyond the scope of the article.  I

13  don't have -- this article, in particular, did not

14  look at any specific county.  It looked at the

15  state as a whole.

16     Q.   Based on your work for the state as a

17  whole, would it -- would it -- would you agree that

18  there's been a decline in the number of fatal

19  overdose incidents that involve any form of

20  prescription fentanyl?

21          MR. BURNETT:  Objection.

22     A.   We did not examine prescription -- we never

23  examined with this whether there was prescription

24  fentanyl involved, but based on the proportion and

Page 230

1   the CDC reports and the DEA reports, the vast bulk

2   of the fentanyl in recent years was illicit.

3       Q.   Doctor, I'd like to ask you to look to page

4   6 of Exhibit 13.

5                MR. BURNETT:  What was that, page 6?

6                THE DEPONENT:  Page 6, yes.

7                MS. WU:  Page 6.

8       Q.   Doctor, you co-authored the article which

9   we're looking at as Exhibit 13, correct?

10      A.   Correct.

11      Q.   At the top of page 6, the last sentence of

12  the paragraph that carries over from page 5 reads

13  "Most notable was the recent decline in the

14  percentage of decedents who had a prescription

15  identified fentanyl."  Do you see that?

16      A.   Yes.

17      Q.   Is that accurate?

18      A.   That was part of the finding, yes.  Yes.

19      Q.   Do you have any explanation for the

20  decrease in overdoses associated with prescription

21  fentanyl which is reported in your 2019 paper?

22      A.   Yeah, I think the primary reason is the

23  vast surge of illicit fentanyl that was brought

24  into the country -- brought in which is very well

Page 231

1    documented in DEA and CDC and other reports, and

2    that's what's responsible for the much higher

3    proportion of them.

4              For example, even if the number of

5    people with a prescription remained the same in

6    both overdoses, if you brought in a much larger --

7    a huge increase of fentanyl deaths from illicit

8    fentanyl, that's what you would expect.

9    Q.    This shift in abuse patterns reported in

10   your 2019 paper is driven by illicit drug cartels,

11   correct?

12             MR. BURNETT:  Objection.

13   A.    I have no evidence to say that.  The drugs

14   are certainly known to be brought in by illicit

15   drug people.

16   Q.    The availability of illicit drugs drives

17   the abuse patterns which are referenced here on

18   page 6 of your 2019 report.  Correct?

19             MR. BURNETT:  Objection.

20   A.    What do you mean by "driving the abuse

21   patterns?"  Certainly we're finding both

22   prescription drugs and fentanyl in the cases up

23   till now.

24   Q.    So a short while ago, we referenced that

1    three-quarters of all overdose deaths in Cabell

2    County for the year 2017 related to illicit

3    fentanyl.  Do you recall that?

4         A.   They involved illicit fentanyl, yes.  But

5    by no means, they're the only cause.  There's other

6    drugs involved as well.

7         Q.   Pharmaceutical distributors do not

8    distribute illicit fentanyl, correct?

9         A.   Correct.

10        Q.   Pharmaceutical distributors also do not

11   distribute heroin.  Correct?

12        A.   Correct.

13        Q.   And as you've just described in explaining

14   the abuse patterns reported in page 6 of your 2019

15   report, market factors play a role in contributing

16   to patterns of drug abuse.  Correct?

17        A.   Is that what I -- is that 6 here?  Market

18   factors?  What --

19             MR. BURNETT:  Yeah, if you're quoting,

20   can you please point us to it?

21             MS. WU:  I'm not.  I'm referring to

22   the doctor's earlier testimony that the

23   availability of illicit drugs contributed to the

24   patterns of abuse in West Virginia.

Page 233

1      A.   They contributed to the deaths, certainly.

2   The deaths are not necessarily abuse.  If illicit

3   fentanyl came in, there could still be the

4   underlying abuse, but then the people die at a

5   higher rate because of the fentanyl.

6      Q.   So Doctor, the fatal overdoses which are

7   referenced in your report do not necessarily

8   indicate patterns of drug abuse in Cabell County,

9   do they?

10              MR. BURNETT:  Objection.

11      A.   They are -- you can't have a drug-related

12   death unless there's abuse going on in the

13   community, but if you bring in a drug like

14   fentanyl, you can get more deaths for the same

15   number of people that are using.

16      Q.   And you don't know what proportion of

17   overdoses in Cabell County for the period 2001 to

18   2018 were fatal, correct?

19      A.   No, I've made no comment on that, and I

20   don't have any data to support anything on that.

21      Q.   Doctor, are you aware that heroin is not

22   produced in the United States?

23      A.   I don't have any evidence one way or the

24   other, but I had understood it that it wasn't.

                                                    Page 234

1      Q.   Would you agree, Doctor, that illicit drug

2  cartels are responsible for the distribution of

3  heroin which eventually reaches Cabell County?

4            MR. BURNETT:  Objection, calls for

5  speculation.

6      A.   Yeah, it has to come in somehow.  I don't

7  know.  I don't have direct evidence myself except

8  for looking at arrests in the newspaper and those

9  type of things.

10     Q.   And that's because you haven't undertaken

11 any analysis of the origin of drugs identified in

12 the toxicology screens referenced in your expert

13 report.  Correct?

14     A.   The origin of the drugs was not a focus of

15 my investigation.  My focus was to identify the

16 actual individual drugs and molecules that were

17 found in people that died.

18     Q.   And the molecules involved in people who

19 died tell you nothing about what caused that person

20 to overdose.  They just --

21            MR. BURNETT:  Objection.

22     Q.   -- tell you the molecules that are present

23 in the body.

24     A.   What you get in the data that we're

Page 235

1   presenting is you get drugs that were considered to

2   have contributed to the death and the multiple

3   drugs that were considered to have contributed to

4   the death based on what the medical examiner found,

5   the toxicology report that may have consider -- had

6   other drugs.

7                But then based on their expert

8   opinion, they determined which of the drugs was

9   considered to be part of or contributing.

10      Q.   And the origin of those drugs is not part

11  of the analysis that you've conducted for this

12  case, correct?

13                MR. BURNETT:  Objection, asked and

14  answered.

15      A.   That's correct.

16      Q.   Okay.  So Doctor, I'd like to ask you to

17  pull out another document, which is Exhibit 5,

18  which is a copy of your CV.  Do you have that in

19  front of you, Doctor?

20      A.   Yes, I do.

21                MR. BURNETT:  Yeah, you opened that

22  earlier.

23                SMITH DEPOSITION EXHIBIT NO. 5

24                (Curriculum Vitae of Gordon Smith,

```
                                              Page 236

 1                M.B., CH.B. (MD Equivalent Otago

 2                University), MPH, Appendix A to Expert

 3                Report was marked for identification

 4                purposes as Smith Deposition Exhibit

 5                No. 5.)

 6                MS. WU:  That's right, we did before a

 7      break.  Thank you, Counsel.

 8         Q.  So I'm quickly going to review some of your

 9      professional history, and we'll use the CV as

10      reference, and feel free to reference it as we walk

11      through this.

12                MR. BURNETT:  Actually --

13         Q.  Doctor, have you --

14                MR. BURNETT:  Sorry.  Before we get

15      into this, we've been going about an hour.  We

16      don't have to break now, but, you know, this is one

17      place we could break --

18                MS. WU:  That's fine.  Before we dive

19      in, why don't take ten minutes, if that's okay with

20      you.

21                MR. BURNETT:  Sure.

22                VIDEO OPERATOR:  Going off the record.

23      The time is 3:44 p.m.

24                (A recess was taken after which the
```

Page 237

1              proceedings continued as follows:)

2              VIDEO OPERATOR:  Now begins Media Unit

3    7 in the deposition of Gordon Smith.  We're back on

4    the record.  The time is 4:01 p.m.

5    BY MS. WU:

6         Q.   Doctor, we just took a break.  You

7    understand that you're still under oath, correct?

8         A.   Yes, correct.

9         Q.   Okay.  Doctor, do you have in front of you

10   Exhibit 5, a copy of your CV?

11        A.   Yes, I do.

12        Q.   And as I said just before the break, we're

13   going to walk through some of your professional

14   background, and we can use your CV for reference as

15   we go through this exercise.  Feel free to look at

16   it as we review your history.

17              Doctor, you reviewed -- you received

18   an MB, ChB from the University of Otago Medical

19   School in 1975; is that correct?

20        A.   That's correct.

21        Q.   That's equivalent of an M.D. in the United

22   States, correct?

23        A.   Correct.

24        Q.   You received a master's in public health

Page 238

1   from Harvard in 1981?

2        A.   Yes.

3        Q.   From 1975 to 1977, you were a medical

4   intern in New Zealand?

5        A.   Yes.

6        Q.   In 1977, you worked at the Children's

7   Hospital in Brisbane, Australia, correct?

8        A.   Correct.

9        Q.   From 1975 through 1978, you also served as

10  a medical officer in the Cook Islands and in Papua,

11  New Guinea, correct?

12       A.   That's correct. .

13       Q.   From 1978 to 1980, you supervised

14  epidemiological research for the World Bank in

15  Papua, New Guinea, correct?

16       A.   That's correct, yes.

17       Q.   You then attended Harvard, correct?

18       A.   Right.

19       Q.   After graduating from Harvard, you held a

20  research fellowship at Brigham Women's Hospital in

21  Boston, correct?

22       A.   Correct.

23       Q.   From 1982 until 1984, you worked as a

24  preventive medicine resident, correct?

Page 239

1      A.    Yes.

2      Q.    Could you briefly tell us what your

3    responsibilities were during that period?

4      A.    Which period of time is this?

5      Q.    At 1982 to 1984 when you worked as a

6    preventive medicine resident.

7      A.    Oh, okay, yes.  So I started off -- this

8    was working for the Centers for Disease Control,

9    and they have a two-year field epidemiology

10   training program called the Epidemic Intelligence

11   Service, and with that, I was assigned to the State

12   Health Department in Colorado for two years where I

13   did general field epidemiology, investigations,

14   food-borne outbreaks, diarrheal diseases, and then

15   also studied some injuries and death certificate

16   data for ski injuries, which got me interested in

17   looking at the whole mortality data which later

18   became a big focus of mine -- my work after that.

19             And so I did that for about a year and

20   three-quarters, and then I got asked to take a --

21   take a -- to come and work at the Centers for

22   Disease Control to help them develop a injury

23   section of a big report -- because at the time, the

24   Centers for Disease Control did not have a

Page 240

1    full-time injury epidemiologist on a report for the

2    Carter Center the CDC was doing, and I was doing

3    general epidemiologic investigations of injuries,

4    and we include poisonings under injuries, under the

5    broad category of injury.

6              And then I -- I then was working in

7    the injury group as one of the first -- their first

8    full-time injury epidemiologist, and that's what I

9    did my preventive medicine residency on.  And also

10   during that time, I spent three months in Nigeria

11   working on getting (Zoom audio glitch) disease for

12   the UNICEF on assignment.

13       Q.   Thank you, Doctor.  From 1985 through

14   present, you've been affiliated with Johns Hopkins,

15   correct?

16       A.   Not all the time.  From '85 to 2002, I was

17   -- I've had affiliations with them, and I've been

18   on advisory boards and things like that with them.

19   But I left Johns Hopkins and then went to -- if you

20   look at my employment history, to the Liberty

21   Mutual Research Institute, and then went to the

22   University of Maryland, and then was offered this

23   endowed chair here at West Virginia.

24       Q.   So you just referenced your kind of

Page 241

1    academic posts, correct?

2         A.   Yes.

3         Q.   From 2006 -- '07 until 2016, you were

4    professor of epidemiology and public health at the

5    University of Maryland, correct?

6         A.   Correct, yes.  That's right.

7         Q.   And then from 2016 through present, you've

8    been a professor at West Virginia University,

9    correct?

10        A.   That's correct, yes.

11        Q.   And you're a professor in the School of

12   Public Health, correct?

13        A.   That's correct, yes.

14        Q.   You also serve as an adjunct professor of

15   medicine, correct?

16        A.   That's correct.  Emergency medicine.

17        Q.   Do you hold those -- both those posts

18   today?

19        A.   Yes, I do.

20        Q.   At -- Doctor, you are employed by West

21   Virginia University, correct?

22        A.   That's correct.

23        Q.   West Virginia University is a public

24   institution, correct?

Page 242

1      A.   Yes.

2      Q.   So you're an employee of the state of West

3   Virginia?

4      A.   Yes.

5      Q.   Doctor, could you briefly describe the

6   areas in which you consider yourself to be an

7   expert?

8      A.   I consider myself to be an expert in the

9   area of injury statistics, injury data -- under

10  injury, I would include poisoning.  I've looked at

11  a variety of the classifications -- the way we code

12  injuries, the way we collect them in Vital

13  Statistics.

14            I was a member of the WHO commission

15  that designed the external cause codes, which

16  include the poisoning codes, for the current

17  revision of the International Disease

18  Classification Code, which is what we use to be

19  able to understand and code the statistics

20  currently at the moment.  We're using the 10th

21  revision.

22            So this whole use of health data for

23  research and to understand health problems.  I have

24  analyzed hospital data with regard to a variety of

Page 243

1  injuries, from alcohol-related injuries, to motor

2  vehicle crashes.

3              And then in more recent years, I -- my

4  expertise has been looking at trauma and alcohol

5  and trauma and then substance abuse and trauma and

6  the role of drugs and trauma and because of that

7  work and because of my expertise in this whole area

8  of injury - which would include the poisoning under

9  - and the ability to analyze the kind of medical

10 examiner data, I've been working with the medical

11 examiner data in Maryland, and I expect I was the

12 first person to computerize the medical examiner

13 data in Maryland.

14              When I first started there, we were

15 studying drownings, and we had to look just at code

16 books, and we developed the first computer system

17 there, data system.

18              So I've been looking at substance

19 abuse relationship to injuries a lot -- for most of

20 my career, and then most recently being in West

21 Virginia, I've particularly concentrated just on

22 the poisoning aspect of it because the drug

23 overdose problem is so great, you can't not look at

24 that when you come to West Virginia.

Page 244

1      Q.   And Doctor, you've published over 200 peer

2    reviewed articles over the course of your career,

3    correct?

4      A.   Correct.

5      Q.   Of those 200 art -- plus articles, can you

6    identify the articles you published that are

7    specific to opioids?

8      A.   The specific, as I mentioned, I've been

9    working in the area of substance abuse, and the --

10   that general area.  Let me just look over --

11              Oh, good, you have -- so you do have

12   my most recent one that includes --

13              Okay, my -- this is on page 28.  No.

14   207, the "Quantifying enhanced risk from alcohol

15   and other factors in polysubstance-related deaths."

16   So I don't have to add that.  That is on there,

17   good.

18              No. 202, looking at nonfatal overdoses

19   in emergency room -- emergency department --

20   Emergency Medical Services data.

21              The others mostly all related to

22   alcohol.  No. 2000 {sic}, which is the "Fentanyl

23   and fentanyl-analog" "and drug-related abuse."

24              And the bulk of my other ones have all

Page 245

1    been related to alcohol and substance abuse and

2    generally in the area of injuries.

3              But particularly a lot of them would

4    involve using data and the whole coding and how we

5    track diseases, including tracking opioid poisoning

6    and being able to work on that.

7              And I've been part of an international

8    group of injury statistics that analyzes problems

9    and injury statistics, including poisoning deaths.

10   Q.   Thank you, Doctor.  So Publication No. 200

11   is the 2019 fentanyl study which we discussed

12   earlier today, correct?

13   A.   That's correct, yes.

14   Q.   And that is one of the two opioid-specific

15   publications that you just referenced.  Correct?

16   A.   One of three.  Because the 2002 {sic},

17   which is opioid overdose -- overdoses from the EMS

18   run data, and the other one is 2007 {sic},

19   "Quantifying" "risk from alcohol and other factors

20   in" polysubstance deaths."

21              And there's also a number of other

22   publications that are working on submitting for

23   publication that we've been working on.

24              But they -- it always takes time when

Page 246

1    you move from one university to the other to get

2    things published.

3         Q.   Doctor, Article 207 relates to alcohol and

4    polysubstance related deaths.  Correct?

5         A.   Yes, that's drug deaths, yes.

6         Q.   It's not limited to opioid-related deaths,

7    correct?

8         A.   But it's looking at, in particular, how --

9    and the vast bulk of the drugs that we examine are

10   opioids, and we find out, for example, that the --

11   if alcohol -- look at the alcohol involvement in

12   these polysubstances are part of the general drug

13   deaths.

14        Q.   So you first published a peer reviewed

15   article related specifically to opioids in 2019,

16   correct?

17             MR. BURNETT:  Objection.

18        A.   With particularly to opioids.  But I think

19   I would emphasize that my expertise has been more

20   on how we classify causes of death and how medical

21   examiner data is used, and so it's a natural jump

22   to include opioids.

23        Q.   But in terms of your publications, the

24   first one specific to opioids was in 2019, correct?

Page 247

1      A.    That's probably correct.

2      Q.    Doctor, you also have a number of grants

3  listed in your CV.  Just to try to short-circuit

4  this review, am I correct that the first grant you

5  received which is specifically related to opioids

6  began in 2017?

7      A.    Yeah, that was the one we wrote when I

8  first came to West Virginia, yes.

9      Q.    Are there any grants that you received

10  prior to 2017 that specifically relates to opioids?

11      A.    There's a grant we're working on now with

12  one of my doctoral students, and she did her

13  analysis -- published the -- she's published her

14  thesis on it, is related to the drug toxicology

15  from the -- from the center data and looking at the

16  risk of people dying -- was included in it alcohol

17  and other drugs.

18            And we specifically are looking at --

19  and she's done all the analysis and published and

20  successfully defended her thesis, but we're still

21  working on drafts of the papers to get those out

22  looking at the drugs and the role of drugs in

23  trauma-related deaths.

24      Q.    You didn't receive any grant money specific

Page 248

1    to opioid research prior to your arrival in West

2    Virginia, correct?

3         A.   It wasn't specific.  It was related to

4    alcohol and drugs prior to coming to West Virginia,

5    one of the drugs.

6         Q.   Doctor, and now I just want to turn quickly

7    to your personal background.  Have you ever been

8    convicted of a crime?

9         A.   No, I haven't.

10        Q.   Have you ever been arrested?

11        A.   Nope.

12        Q.   Have you ever been disciplined by your

13   employer?

14        A.   No.

15        Q.   Have you ever been disciplined by a

16   professional board, such as the medical board?

17        A.   No, I haven't.

18        Q.   Have you ever personally used illegal

19   drugs?

20        A.   No, I haven't.

21        Q.   Do you currently use prescription opioids?

22        A.   No, I do not.

23             MR. BURNETT:  Counsel, I'm going to

24   interject here.  What is the relevance of this line

Page 249

1    of questions - they're highly personal - about his
2    personal life?
3                    MS. WU:  Goes to bias.
4                    MR. BURNETT:  I find the questions
5    problematic.  I haven't heard any other expert
6    being asked these sorts of questions.  I don't know
7    if you have any reason to think his answer would be
8    affirmative to any of these.
9                    MS. WU:  These are questions that
10   plaintiffs have asked defense testifying witnesses,
11   and we simply seek symmetry in this proceeding,
12   Counsel.
13                   MR. BURNETT:  Again, that's not one
14   way or the other, but --
15                   MS. WU:  That's fine.
16       Q.   Doctor, have you ever used prescription
17   opioids?
18       A.   I presume so.  I fractured my femur when I
19   was about 19 years old, and so I presumably was
20   given -- I certainly hope I was given some opioids
21   when I fractured my femur, run over by a car.
22                   And then I also had a ski injury and
23   fractured my tibia -- fibula when I was at
24   university.

1          So high school and -- I think I
2     probably got one dose of opioids when they were
3     bringing me down the mountain on a stretcher and
4     then put in the ambulance and taken to the
5     hospital.
6          Q.   Thank you, Doctor.  Following those
7     incidents of prescription for opioid-class
8     medications, did you struggle with addiction?
9          A.   No, I did not.  They were very short
10    courses.
11         Q.   Doctor, earlier today - just before our
12    last break - you testified that prescription pills
13    came into Cabell County somehow.  And I just want
14    to return to that statement.  You're aware that
15    prescription pills were trafficked by drug
16    trafficking organizations into Cabell County,
17    correct?
18              MR. BURNETT:  Objection.
19         A.   I -- yes, I said that they -- that they are
20    -- that some are, yes.
21         Q.   Doctor, are you also aware that law
22    enforcement in Cabell County has testified that a
23    substantial portion of opioids abused in Cabell
24    County -- prescription opioids abused in Cabell

Page 251

1    County were trafficked by drug trafficking

2    organizations?

3              MR. BURNETT:  Objection.

4       A.   Not particularly.  I don't know what

5    proportion.  There were an awful lot of opiates

6    prescribed --

7       Q.   Doctor --

8       A.   -- as well.

9       Q.   Doctor, are you aware that Cabell County

10   and the City of Huntington are often referred to as

11   "Little Detroit"?

12             MR. BURNETT:  Objection.

13      A.   Actually, I haven't heard that term.

14   That's interesting.

15      Q.   I thought you might have read it in the

16   HIDTA reports you referenced earlier.

17      A.   Yeah, I probably have.

18      Q.   I'd recommend them to you.

19             MS. WU:  Thank you, Doctor.  I

20   appreciate your time today.  I have no further

21   questions.

22             Pass the witness.

23             THE DEPONENT:  Okay.

24             MR. BURNETT:  Do counsel for the other

Page 252

1    defendants have any questions?

2              MS. VITALE:  No questions at this

3    time.  Thank you.

4              MR. BURNETT:  So that was two -- I

5    can't remember which -- who the third defendant is,

6    but not hearing any other --

7              I may have a few questions for

8    redirect, so if we could take a break, say, until

9    4:30.  If I do, it will be short.

10             MR. FRANKS:  This is -- this is Ray

11   Franks, local counsel for Cardinal.  I defer to

12   Danielle, who's national counsel, as to whether she

13   has any questions for Cardinal.

14             MS. SOCHACZEVSKI:  No questions here.

15   Thank you.

16             MR. BURNETT:  I didn't hear the male

17   voice before that.

18             MR. FRANKS:  Well, it's moot now.

19   This is Ray Franks, I'm local counsel for Cardinal.

20   I was going to defer to Danielle as to whether

21   Cardinal had any questions for the witness, but she

22   piped up right after that and said that they don't.

23             MR. BURNETT:  All right.  So it sounds

24   like none of the defendants have any further

Page 253

1    questions.  Let's come back in about ten minutes

2    for a possible redirect.

3                    VIDEO OPERATOR:  Going off the record,

4    the time is 4:20 p.m.

5                    (A recess was taken after which the

6                    proceedings continued as follows:)

7                    VIDEO OPERATOR:  Now begins Media Unit

8    8 in the deposition of Gordon Smith.  We're back on

9    the record.  The time is 4:34 p.m.

10                         EXAMINATION

11   BY MR. BURNETT:

12       Q.   Good afternoon, Doctor Smith.

13       A.   Good afternoon.

14       Q.   In your professional work, it is common for

15   you to rely on other sources as the basis for your

16   opinions; is that right?

17       A.   Very common.  In fact, much of the research

18   that's done relies on different data sources from

19   different origins, particular studies.

20       Q.   And in this case, among other sources of

21   data, you've relied on Vital Statistics data that

22   came from the West Virginia Medical Examiner's

23   Office; is that right?

24       A.   That's correct.

Page 254

1    Q.   And you have relied on that Vital

2  Statistics data in the past in your academic and

3  other professional work, right?

4    A.   In both I have, and it's widely used in

5  research -- the Vital Statistics data, either

6  specific state studies or national data or

7  comparing data from one country -- state to the

8  next, widely used in both academic publications and

9  peer-reviewed journals.

10         The Centers for Disease Control use it

11  very widely to decide disease priorities, and the

12  state uses it in West Virginia to look and

13  understand the problems and where their risky areas

14  are.

15    Q.   And you use that Vital Statistics data in

16  prior publications in academic journals, right?

17    A.   Exactly.  And that's been one of my area of

18  expertise, is this whole coding and the

19  International Disease Classification Codes, which

20  is the way that we analyze the data.

21    Q.   And you consider that Vital Statistics data

22  to be reliable?

23    A.   I would consider it to be very reliable.

24  It's particularly reliable in a numb -- in limited

Page 255

1   number of states that have a good medical examiner

2   system, and the published articles stating that

3   West Virginia is a group of five or six or seven

4   states with the best quality drug overdose data in

5   the country.

6       Q.    And the work that you did in preparing this

7   report for this litigation is similar to the type

8   of work that you do in preparing academic articles,

9   right?

10      A.    Exactly, yes.

11      Q.    And the data that you used for this report,

12  you believe is the most authoritative, accurate and

13  complete source of overdose data for Cabell County?

14      A.    That's the most accurate that anybody could

15  get.

16      Q.    Okay.

17              MR. BURNETT:   I have no further

18  questions.   Thank you.

19              MS. WU:   Thank you, Doctor.   I have no

20  further questions for McKesson.

21              THE DEPONENT:   Thank you.

22              VIDEO OPERATOR:   If there are no

23  further questions, we are off the record at

24  4:37 p.m., and this concludes today's testimony

Page 256

1    given by Gordon Smith.

2              The total number of media units used

3    was eight and will be retained by Veritext.

4              (Having indicated he would like to

5              read his deposition before filing,

6              further this deponent saith not.)

7

8              --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 257

1   STATE OF WEST VIRGINIA,

2   COUNTY OF JACKSON, to wit;

3

4         I, Teresa S. Evans, a Notary Public within
  and for the County and State aforesaid, duly

5   commissioned and qualified, do hereby certify that
  the foregoing deposition of GORDON SMITH was duly

6   taken by me and before me at the time and place and
  for the purpose specified in the caption hereof,

7   the said witness having been by me first duly
  sworn.

8

9         I do further certify that the said
  deposition was correctly taken by me in shorthand
  notes, and that the same were accurately written

10   out in full and reduced to typewriting and that the
  witness did request to read his transcript.

11

12         I further certify that I am neither
  attorney or counsel for, nor related to or employed

13   by, any of the parties to the action in which this
  deposition is taken, and further that I am not a

14   relative or employee of any attorney or counsel
  employed by the parties or financially interested

15   in the action and that the attached transcript
  meets the requirements set forth within article

16   twenty-seven, chapter forty-seven of the West
  Virginia Code.

17         My commission expires October 25, 2020.
  Given under my hand this 25th day of October, 2020.

18

19   <%10538,Signature%>
  Teresa S. Evans

20   RMR, CRR, RPR, WV-CCR

21

22

23

24

Page 258

1              Veritext Legal Solutions
                  1100 Superior Ave
2                     Suite 1820
                 Cleveland, Ohio 44114
3                Phone: 216-523-1313
4

     September 25, 2020
5

     To: David D. Burnett
6

     Case Name: City Of Huntington v. Amerisourcebergen Drug Corporation,
7    Et Al.
8    Veritext Reference Number: 4241613
9    Witness:  Gordon Smith        Deposition Date:  9/22/2020
10

     Dear Sir/Madam:
11
12   Enclosed please find a deposition transcript.  Please have the witness
13   review the transcript and note any changes or corrections on the
14   included errata sheet, indicating the page, line number, change, and
15   the reason for the change.  Have the witness' signature notarized and
16   forward the completed page(s) back to us at the Production address
     shown
17
     above, or email to production-midwest@veritext.com.
18
19   If the errata is not returned within thirty days of your receipt of
20   this letter, the reading and signing will be deemed waived.
21
     Sincerely,
22
     Production Department
23
24   NO NOTARY REQUIRED IN CA

Page 259

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 4241613
 3   City Of Huntington v. Amerisourcebergen Drug Corp, Et Al.
     DATE OF DEPOSITION: 9/22/2020
 4   WITNESS' NAME: Gordon Smith
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have made no changes to the testimony
     as transcribed by the court reporter.
 8
     _____        _____
 9   Date                          Gordon Smith
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

Veritext Legal Solutions
www.veritext.com                                        888-391-3376

Page 260

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 4241613
 3    City Of Huntington v. Amerisourcebergen Drug Corp, Et Al.
      DATE OF DEPOSITION: 9/22/2020
 4    WITNESS' NAME: Gordon Smith
 5          In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7          I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9          I request that these changes be entered
      as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____        _____
      Date                          Gordon Smith
14
            Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18          in the appended Errata Sheet;
            They signed the foregoing Sworn
19          Statement; and
            Their execution of this Statement is of
20          their free act and deed.
21          I have affixed my name and official seal
22    this _____ day of_____, 20____.
23          _____
                  Notary Public
24
            _____
25                Commission Expiration Date
```

Veritext Legal Solutions

Page 261

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4241613

PAGE/LINE(S) /          CHANGE          /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____        _____

Date                         Gordon Smith

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                 _____

                 Notary Public


                 _____

                 Commission Expiration Date

**[& - 2016]** Page 1

| & | | |
|---|---|---|

**&** 2:13,15 3:4 7:12
 7:15 8:23

| 0 | | |
|---|---|---|

**0009216** 5:21
 194:20 195:1,16
**01800002-021**
 5:19 169:10
**07** 241:3

| 1 | | |
|---|---|---|

**1** 6:13 19:18,22
 20:1 27:22 28:5
 28:10 31:24,24
 59:16 61:11 76:18
 158:15 159:4,5
 160:24 188:4
 197:8 214:20
 215:9
**1,000** 172:2
**1,002** 48:17
**1-22-09** 5:21
 194:20
**10** 118:9,14,23
 119:7 120:9,14
 166:15
**100** 37:17 38:8
 72:7 98:15 109:13
 110:20 125:2,3,24
 160:14 209:7
 213:24
**100,000** 48:21,22
**10538** 257:19
**108** 160:8
**10:33** 78:18
**10:45** 78:13,15
**10:50** 78:23
**10th** 242:20
**11** 59:1,16 61:20
 119:20 158:11,12
 158:14 159:3

161:7 166:24
**1100** 258:1
**1151** 48:15
**11747** 2:10
**11:21** 103:10
**11:24** 103:15
**11:47** 121:22
**12:35** 122:3
**13** 5:15 228:12,16
 228:17,22,23,24
 230:4,9
**134** 204:2
**14** 50:20
**15** 5:17 47:13
 50:16 55:15
 168:12 169:1,5,12
 169:14 170:3
 172:21 173:1,9,20
 174:10,24 195:7
**15-20** 77:11
**16** 173:1,7,8,11
 183:14 194:15
 195:5,7
**16.6** 48:21
**169** 5:17
**17** 5:20 47:12
 81:19 87:11,12
 194:18,22 195:10
 195:14 196:2
 198:21 201:15
**1700** 2:20
**18** 21:23 47:12
 79:18 80:9 81:6,7
 81:19 82:2,7,19
 87:10,18 94:1,4,21
 98:7,14 99:7
 100:13 107:18,24
 108:13 156:7
**1820** 258:2
**184** 203:22

**19** 5:2 81:23 87:8
 87:12 213:7
 249:19
**192** 213:15
**194** 5:20
**1970s** 82:21
**1975** 237:19 238:3
 238:9
**1977** 238:3,6
**1978** 238:9,13
**1979** 49:6 64:12
**1980** 238:13
**1981** 238:1
**1982** 238:23 239:5
**1984** 238:23 239:5
**1985** 240:13
**1:27** 165:24
**1:54** 166:5

| 2 | | |
|---|---|---|

**2** 28:19 29:17 30:5
 30:12 78:22
 119:20 161:6,7
 162:2 163:23
 166:24 170:9
**20** 53:11 259:16
 260:22 261:22
**200** 244:1,5 245:10
**2000** 49:6,7 54:20
 64:12 171:13
 244:22
**20001-4956** 3:6
**20005** 2:14
**2000s** 218:10
**2001** 21:4,11 22:7
 22:12,21 23:7,13
 23:15,22 24:4,9,10
 48:15,22 55:8
 60:19 63:2 64:13
 65:16 67:7,14
 68:10 110:1 159:8
 161:9,17 162:13

163:19 183:14
 186:8 205:22
 210:5 213:3,16
 219:2 233:17
**2002** 240:16
 245:16
**2004** 173:3
**2005** 32:20 37:20
 139:4,6,18 140:2,5
 140:8,11,22 141:9
 141:9 171:14,24
 172:23 173:3,5,12
 173:21 174:13
 175:20 176:7
**2006** 124:2 125:8
 126:23 127:18
 129:10 173:3,5
 241:3
**2007** 171:24
 172:23 173:5,12
 173:22 245:18
**2008** 222:1
**2009** 196:9,19,22
**2010** 164:11
**2011** 58:19 59:9
 63:3 159:8 162:14
 162:22 163:19
**2012** 214:8,22
 215:3,16 217:2
**2013** 48:22 164:16
 167:6,12,20 168:2
 168:8 172:7
 213:18
**2014** 163:1
**2015** 68:4 166:17
 213:4,17,18
**2016** 28:22 32:24
 33:5,17 35:24
 36:1,4 37:19,24
 131:6,10 241:3,7

**[2017 - able]**

**2017**  43:11,11
48:22 74:17 131:2
131:11 162:19
170:3 175:20
176:8 203:21
204:12 214:4
222:4 228:1,10
229:9 232:2 247:6
247:10

**2018**  21:11 24:4,10
43:9 48:15 110:2
161:9,17 162:23
204:2,6,12 207:2
210:5 219:2
233:18

**2019**  5:14 86:12,18
108:6 162:8
204:17,22 205:1
206:19 207:7,21
208:9 229:5
230:21 231:10,18
232:14 245:11
246:15,24

**202**  244:18

**2020**  1:22 5:4 6:4
14:12 19:14,20
39:23 257:17,17
258:4

**207**  244:14 246:3

**21.4**  129:11

**216-523-1313**
258:3

**22**  196:9

**228**  5:15

**22nd**  1:21 6:3

**236**  5:8

**25**  133:14 160:11
257:17 258:4

**253**  4:4

**25323**  2:17

**25th**  257:17

**27**  21:23 197:7
204:10

**28**  2:5 244:13

**29**  197:17

**29464**  2:6

**2:26**  192:9

**2:50**  192:14

**3**

**3**  5:2,3 19:6,11,14
19:16,23,24 20:6
20:12 27:13,19
31:10 34:6 38:23
45:20,23 48:5
51:21 53:22 64:22
76:19 81:8 103:14
109:21 118:9
131:18,20 156:3
158:14 163:4,7,13
166:12 171:3
172:18 182:24
183:3,5,5 196:23
203:20 214:15,18

**3-1-19**  5:16 228:20

**30**  11:23 53:5
127:9 128:23
198:1

**305**  2:9

**30d**  198:2

**31**  213:10,15,15

**32**  81:24 183:19

**330**  160:7

**36**  125:6

**36.9**  123:22 125:7
127:24

**39**  127:24

**3:17-01362**  1:7
6:20

**3:17-01665**  1:13
6:20

**3:44**  236:23

**3rd**  19:19 52:10

**4**

**4**  5:5 45:21,23
46:12 47:2,6,23
51:2,4,7,13,14
122:2

**400**  2:9

**4241613**  258:8
259:2 260:2 261:2

**44114**  258:2

**47700**  190:20,22
191:2

**4:01**  237:4

**4:20**  253:4

**4:30**  252:9

**4:34**  253:9

**4:37**  255:24

**5**

**5**  5:8 46:12,19
47:2,6,23 50:3
53:23 54:1,7,11,17
55:10 58:12 61:14
64:7 65:15,19
121:5 131:19,20
131:21 132:5,8
166:4 171:5
230:12 235:17,23
236:5 237:10

**500**  15:9

**51**  5:5

**55**  15:18 18:8
20:19 21:1,7,13,18

**6**

**6**  153:11,13,14,20
154:2,6 157:13,23
192:13 205:14,15
230:4,5,6,7,11
231:18 232:14,17

**6-6-17**  5:19 169:9

**63**  123:6 124:7

**63.1**  123:19

**6th**  170:3

**7**

**7**  167:2,3 237:3

**707**  2:16

**725**  2:13

**74**  213:17

**75**  229:8

**77002-6110**  2:21

**8**

**8**  4:3 5:11 58:1
86:10,13,20,22,23
87:3,17 167:3
186:15,18,24
187:5 253:8

**811**  2:20

**830**  131:5

**85**  240:16

**850**  3:5

**86**  5:11

**87.1**  48:17

**9**

**9**  48:22 119:8

**9/22/2020**  258:9
259:3 260:3

**90**  125:22 126:5,7

**901**  2:16

**9:04**  6:3

**a**

**a.m.**  6:3 78:18,23
103:15 121:22

**aah**  65:14

**abate**  155:11

**abdc**  91:9 116:2,3

**ability**  46:20 243:9

**able**  35:19 39:16
41:6 46:20 55:2,3

66:12 67:3 72:2
82:23 85:12 91:21
114:5 160:6 200:1
200:24 242:19
245:6
**absent**  13:3
**absolute**  178:20
**absolutely**  70:4
75:24 143:16
**abstract**  140:5
**abuse**  28:23 29:1
29:22 30:18 33:21
34:4 41:13 43:15
58:4 84:12 91:24
102:21 107:9
117:1 201:19
202:5,11 203:7,15
223:1 231:9,17,20
232:14,16,24
233:2,4,8,12 243:5
243:19 244:9,23
245:1
**abused**  250:23,24
**academia**  34:1
**academic**  18:11
27:24 28:5,15
31:22 32:4 34:17
119:8 241:1 254:2
254:8,16 255:8
**accepted**  58:3
**access**  62:7 71:12
175:2 205:20
225:13
**accessed**  205:16
**accident**  152:11
152:19 197:18
**accidental**  49:13
49:16 50:4,7,8,10
50:12,14,17 55:8
55:21,21 56:2,17
56:18 59:20 60:21

63:13 64:10 65:21
67:21 68:10
150:18 151:1,21
152:12 197:20
**accidentally**  223:9
**accidents**  55:22
152:8
**accompanying**
213:14
**account**  77:6
186:1 212:10
216:19
**accreditation**
142:11
**accredited**  132:20
132:23,24 133:3
142:6,7,10
**accredits**  132:15
**accurate**  46:6
47:11 52:4 230:17
255:12,14
**accurately**  20:16
257:9
**acknowledge**
259:11 260:16
**acquired**  52:12
**act**  70:2 259:14
260:20
**action**  1:6,13,20
6:19 7:3 257:12
257:14
**actions**  89:14
**active**  123:22
127:24 128:9,10
128:16
**activities**  209:13
209:16
**activity**  92:10
117:20 118:3
124:12,16,19
130:21 212:11

**actual**  37:22 60:21
83:3 106:23
111:23 123:21
125:3 132:2
135:24 143:6
160:19 234:16
**adam**  3:8 6:22
**add**  59:8 60:14
140:16 181:19
182:21 244:16
**addict**  199:16
**addiction**  88:14
200:21 201:1,7
209:17 250:8
**addictive**  89:19
**adding**  183:18
**addition**  23:6
29:12 74:19
184:22
**additional**  18:24
33:15 34:10 37:4
43:16 52:12,14
140:16
**address**  5:13 9:15
9:17 81:23 86:17
117:19 258:16
**addressed**  110:14
**adequate**  134:8
**adjacent**  29:10
44:4
**adjunct**  241:14
**administer**  7:2
**administration**
5:19 169:9,24
**admitted**  84:14
**adopted**  81:10
87:16 104:16
**advance**  13:13
227:3
**advice**  39:24 44:1

**advised**  32:10
207:9,12
**advisory**  240:18
**affairs**  138:13
**affiliated**  240:14
**affiliations**  7:7
240:17
**affirmative**  249:8
**affixed**  259:15
260:21
**aforesaid**  257:4
**afternoon**  122:5
253:12,13
**agency**  72:12
**ago**  11:23 18:7
43:8 54:4 81:5
87:7 92:11 97:7
100:18 125:6
130:24 136:3
184:5 202:9
223:16 231:24
**agree**  6:11 13:15
98:19 109:6,7
147:9,10 149:12
176:6 184:10
200:7,12 215:14
227:13 229:7,17
234:1
**agreed**  82:10
98:22 100:20
128:15 165:10
**agreeing**  107:13
**agreement**  16:4,24
17:1,4,5 26:19,22
27:1
**ahead**  34:24 55:18
71:20 103:9
**ahold**  193:17
**al**  1:8,14 5:16 6:17
228:20 258:7
259:3 260:3

**alarming** 172:9
**alcohol** 33:22 66:1
229:4 243:1,4
244:14,22 245:1
245:19 246:3,11
246:11 247:16
248:4
**allocation** 209:1
**allow** 134:9
221:19
**altered** 143:4
**ambulance** 250:4
**amend** 50:3
**amended** 5:20
64:10 194:19
196:8
**american** 79:19
**amerisourceberg...**
1:7,14 2:18 6:17
7:19 80:16,21
81:2 90:8 112:3,6
221:2,10 258:6
259:3 260:3
**amount** 15:10
109:1,9 158:22
179:15 180:2
209:24
**amounts** 88:10
154:3 157:13
174:5
**amphetamine**
213:15,22 214:21
215:2 217:5
**analog** 5:15 157:8
228:14,18 244:23
**analogs** 184:23
185:2,5,11,18
**analyses** 32:11
36:22 176:10
210:12

**analysis** 33:8
36:19 37:15 38:2
42:15,21 44:20
45:15 46:9 52:16
54:16 66:18 100:1
100:10 107:3
113:13,23 115:11
141:21 150:21
167:5 234:11
235:11 247:13,19
**analyst** 74:22,23
**analyze** 72:23
117:4 243:9
254:20
**analyzed** 220:12
242:24
**analyzes** 245:8
**analyzing** 24:14
34:13 39:11
**anne** 2:4 8:2 14:15
17:21
**annual** 209:22
**answer** 13:2,3
14:18 26:7,14
27:3,6 72:19 73:7
73:9,10,12 78:2,3
78:4 89:6 97:1,18
107:24 110:4
112:2,10 116:1
117:18 123:17
126:18 200:18,19
211:2,7 216:3
249:7
**answered** 96:21
97:17 99:9 161:2
175:4 200:16
208:11 210:10,11
211:1,16 217:11
217:12 219:15
221:12 235:14

**answering** 159:23
174:17
**answers** 160:4
**anticipate** 104:10
208:21
**anticipated** 22:14
**anticipation** 17:24
**anybody** 199:2
255:14
**anyway** 141:16
167:23 215:19
**apologies** 20:2,7
**apologize** 13:13
165:17 167:3
195:10 225:1
**appalachia** 216:15
**appalachian** 189:8
189:8
**appear** 259:11
260:15
**appearance** 7:10
**appearances** 2:1
3:1 7:7 8:9,11
**appearing** 2:2,7
2:11,18 3:2
**appended** 260:11
260:18
**appendix** 5:5,9
51:4,8 65:5,6
236:2
**appointed** 135:4
**appreciate** 9:13
75:8 153:19
251:20
**approached** 14:9
14:14
**appropriate** 104:3
104:11 105:2
134:8
**approval** 198:16

**approved** 57:9
58:9 191:12
198:18
**approximately**
15:18 23:12 24:1
25:15 26:4 204:10
**archival** 55:3
**arcos** 111:8,12
**area** 14:23 15:5
28:20 74:7,12
84:7,11 85:4,6
91:17,19,23 93:22
117:2 125:20
242:9 243:7 244:9
244:10 245:2
254:17
**areas** 102:5 242:6
254:13
**arguments** 104:21
**arose** 103:23
**arrested** 248:10
**arrests** 234:8
**arrival** 248:1
**arrived** 74:4
**art** 244:5
**article** 33:6,14,18
33:23 34:5 50:21
127:12 128:5
129:5 136:5,22
162:9 229:3,12,13
230:8 246:3,15
257:15
**articles** 32:21
46:17 73:19 83:1
117:4 119:8,12
134:3,9 244:2,5,6
255:2,8
**asked** 14:21 96:20
97:16 99:8 105:5
122:11 138:24
161:1 175:3

200:15,17 208:10
210:9 217:10
219:14 221:11
235:13 239:20
249:6,10
**asking**   16:13
26:15 96:11 99:2
99:3 123:15
**aspect**   243:22
**aspph**   5:12 81:22
86:16 94:1 100:14
**assembling**   216:6
216:20
**assess**   201:7
**assessed**   131:5
150:18
**assessing**   116:15
**assessment**   156:20
208:15
**assigned**   239:11
**assignment**   14:19
15:1 240:12 259:2
260:2 261:2
**assist**   10:22 18:4
18:12
**assistants**   18:17
18:24
**associated**   58:22
58:23 156:11
161:8,11 163:18
163:23 164:3
189:12,16 190:13
210:4,21 230:20
**association**   79:19
81:18,19 99:16
107:11 108:4
132:12,14 133:4
**assume**   37:17
69:24 93:5 94:15
126:2 212:3

**assumption**   93:7
**attached**   21:24
257:14 260:7
**attempt**   101:1
111:4,18 117:24
219:10
**attempted**   112:3
114:16
**attended**   238:17
**attending**   7:6
**attention**   52:17
53:24 118:12
190:19 214:10,13
**attorney**   7:10
257:12,13
**attribute**   91:10
202:18
**attributed**   172:1
173:2,15 183:18
**attributes**   109:17
**audio**   6:9,10
240:11
**august**   5:3 19:14
19:19 52:10
**australia**   238:7
**authored**   136:5
230:8
**authoritative**
255:12
**authorize**   260:11
**authorized**   7:2
**authors**   31:6 99:4
101:9
**autopsies**   29:24
30:19 133:13,18
133:24 137:6,12
137:12
**autopsy**   29:3 31:7
59:23 60:2 133:8
135:10 138:2
146:12 176:13,24

180:8,12
**availability**   164:7
164:18 231:16
232:23
**available**   18:15
22:8,15,17 25:4
45:16,18 63:16
66:21 76:17 141:8
149:19 167:16
168:5,7 186:2,8
193:14 205:6
206:6,9,19 207:11
209:19,23 210:1
217:2
**ave**   258:1
**avoid**   26:19 195:8
**aware**   38:3,14
68:2,5 72:9
109:14,16 110:5
117:11 132:14,18
132:21,21 133:5,6
133:20 136:8
137:4,8,15 138:12
138:15 139:2
148:20 149:2,5,20
149:24 150:2,13
150:16 164:8,12
171:17 172:3,5
174:2 176:17
179:22 184:7,14
185:20 191:2
198:13,15,16
204:20 208:2
212:4,9 215:22
216:4,5,9,12
217:20 218:6,17
220:22 221:1
225:3 233:21
250:14,21 251:9
**awful**   251:5

**ayers**   120:18

**b**

**b**   5:5 51:5,8
170:14,15
**back**   29:21 37:19
47:9 48:13 50:16
50:20 53:21,23
55:3 57:16 58:12
59:1,17 61:13,15
62:15,21 65:16,19
71:7,9 72:2 78:22
93:24 94:11 98:16
101:17 103:14,19
112:20 114:10
118:8 120:9 122:2
123:11 127:6,11
127:13 131:14
132:8 141:3,14
142:21,23 144:11
159:15 166:4
167:1,12 185:19
187:21 192:13,17
213:24 214:8
221:9 222:10
223:6,12,24 228:4
237:3 253:1,8
258:16
**background**   23:1
23:2,4,8 227:9
237:14 248:7
**backlog**   149:3
**bad**   98:1
**baker**   75:15
**baltimore**   10:3
**bank**   238:14
**bar**   160:4,5
**barrelled**   226:7
**based**   46:9 48:7,16
57:23 61:4 72:14
84:16 88:8 89:1
92:7 104:5,5

106:14 123:15,17
124:6 135:24
136:18 146:15
147:8 162:15
165:6,11 167:17
168:9 173:17
177:10 178:18
179:20 180:5
189:19 202:13,24
203:5 212:12
214:24 216:12
218:8,18 219:17
221:21 229:6,16
229:24 235:4,7
**basically**  41:3 57:5
72:22 83:22
108:19 112:7
164:14 179:18
219:18
**basis**  44:10 47:1
62:3 64:17 82:6
85:16 148:19
156:21 209:22
253:15
**bate**  170:14
**bates**  170:11,13,15
170:16,16,21
171:4 195:1,15
**bear**  5:11 81:21
83:18 86:12,14
101:3 194:17
**becoming**  14:10
**began**  40:6 49:7
64:12,14 65:14
120:7 140:10
164:18 166:16,22
167:6 172:8 247:6
**beginning**  7:10
39:21,22 40:3
43:10 54:1 167:20
172:7

**begins**  78:21
103:13 122:1
166:3 171:8
192:12 237:2
253:7
**behalf**  8:6 137:12
**behavior**  90:13
**behavioral**  41:15
**believe**  42:23
72:15 103:18
178:9,10 181:11
182:19 188:7
189:11 202:3,10
210:24 255:12
**believed**  60:24
61:3 87:22
**believes**  73:2
**benchmarks**  142:2
**benefit**  48:10
140:21 151:5
**benefits**  200:1,9
200:13
**best**  13:11,14
37:13,21 40:9
46:20 62:22 63:4
66:21 67:20 71:1
141:11 148:14
158:21 160:9
162:16 165:7
189:22 200:8,13
204:18 206:18
255:4
**better**  37:9 42:5
195:21 203:2
**beyond**  47:5 54:14
125:22 147:11
178:13 190:16
218:11 227:17
229:12
**bias**  249:3

**big**  31:9 95:15
239:18,23
**bigger**  195:21
**bill**  15:22
**billed**  15:13,15,19
18:8 20:19 21:13
**billing**  26:23
**billings**  26:15
**bit**  19:3,4 23:23
67:17 74:6 88:17
115:14 131:15
162:11 191:21,21
197:6,15 207:5
**blanket**  97:24
**bless**  182:16
**blood**  60:2
**bloom**  3:9
**board**  115:4
179:20 248:16,16
**boards**  240:18
**body**  153:21
184:16 234:23
**book**  120:9,15,23
**books**  243:16
**bore**  226:2
**borne**  239:14
**boston**  238:21
**bottom**  118:15
170:6 171:5,9
172:6
**boulevard**  2:5
**boundaries**  79:6
**box**  197:17,19
198:1,5
**break**  27:4 56:9
75:8,11 76:2 78:9
79:1,5 98:21
121:9,10,11,13,15
121:16,17 122:6
122:10,11 166:7
166:10 190:5,8,19

192:3,16,17,20
236:7,16,17 237:6
237:12 250:12
252:8
**breathing**  181:16
**bridgeside**  2:5
**brief**  166:7
**briefing**  5:17
168:19 169:6,15
**briefly**  12:8 48:11
239:2 242:5
**brigham**  238:20
**bring**  83:18 85:7
85:10 101:3
158:20,23 160:10
233:13
**bringing**  5:11
81:20 86:11,14
158:21 167:22
250:3
**brisbane**  238:7
**broad**  57:4 94:9
94:16,18,23 240:5
**broader**  65:22
**broadhollow**  2:9
**broadly**  32:6
216:7
**broke**  222:8
**broken**  62:10
**brought**  220:20,24
230:23,24 231:6
231:14
**bulk**  56:4,10
152:10 162:19
164:16 190:1
210:12 222:16
230:1 244:24
246:9
**burden**  39:17 41:4
41:5

**burling** 3:4 7:12
7:15 8:23
**burnett** 2:3 4:4
7:24 8:1 10:14
12:21,24 14:17
17:15 25:21 26:6
26:21 27:14 46:13
48:2 52:22 53:1,5
53:10,14 69:24
72:18 73:6,11,14
75:3,5 77:8,19,24
78:3,10,13 85:1
86:1,3,6 91:13
93:15 95:11,23
96:6,14,20 97:16
99:8,24 100:8,15
101:11,24 103:4
105:13 107:20
108:14 115:20
116:6 117:14
121:7,12,16
123:13 124:15
125:18 126:9,13
126:18,21 128:8
128:14 129:22
130:6,12 140:13
140:23 142:13
143:11,21 145:10
149:4 150:15
151:8 152:17
155:19 156:24
157:17 158:3,8
159:14,22 161:1
161:18 162:4
163:5,9,12 164:22
165:12,20 168:17
168:21,24 170:20
170:24 173:1,23
174:11,15,17,19
175:3 185:13
186:5 188:11

190:3 191:18
192:4,7 195:2,5
196:15 198:23
199:7 200:3,15,18
201:2,10,24 202:6
202:21 203:10
204:14 207:8
208:4,10 210:9,24
211:9,15,21 212:8
212:21 214:2
215:24 216:3,8,17
216:21 217:3,10
218:11,21 219:5
219:14,23 220:3
220:15 221:11,16
222:15 224:16
225:11,22 226:23
227:4,17 228:7
229:21 230:5
231:12,19 232:19
233:10 234:4,21
235:13,21 236:12
236:14,21 246:17
248:23 249:4,13
250:18 251:3,12
251:24 252:4,16
252:23 253:11
255:17 258:5
**business** 9:14,17

**c**

**c** 6:1 65:7,7,15
66:24 162:15
212:20,21 213:1,7
214:24 215:5,14
217:17
**ca** 258:24
**cabell** 1:11 6:16
15:4 20:22 21:10
24:3,20 28:1
29:10,13 32:5
36:11 37:15 38:1

38:15 42:9,11,15
43:3,20 44:4,11,17
44:20 45:2,8
48:16 61:19,21,23
62:17,19 66:10,12
66:18,22 67:5,13
67:19 68:1,2,8,13
68:17 69:7 71:23
73:22 77:15 79:12
80:22 88:11 107:9
109:2,10,13 110:1
110:15,21 111:1
111:16 115:17,18
116:4,17 117:12
117:22 120:11
131:12 134:24
135:16 172:22
173:12 204:21
207:16 208:3,8,22
210:4,19,23
211:11 218:7,10
219:3 223:1 228:2
229:9 232:1 233:8
233:17 234:3
250:13,16,22,23
250:24 251:9
255:13
**cables** 103:5
**call** 53:24 61:1
118:12 180:15
190:19 195:9
214:13
**called** 8:16 69:17
71:5 115:3 165:2
200:5 239:10
**calling** 154:20
158:15
**calls** 115:20 116:6
126:9 157:17
198:23 199:7
202:21 234:4

**calvert** 10:6
**camera** 10:24
**capabilities** 186:8
**capacities** 186:2
**capital** 120:18
**caption** 257:6
**capture** 140:17
**captures** 140:18
**capturing** 110:19
**car** 249:21
**cardinal** 2:11 7:21
7:23 80:13,20
81:3 90:7 91:9
112:10 116:2,3
221:3,10 252:11
252:13,19,21
**care** 101:23 102:1
103:22 130:5
138:17
**career** 82:20
243:20 244:2
**carey** 2:15
**carries** 230:12
**carry** 124:5 158:1
**cartels** 231:10
234:2
**carter** 240:2
**case** 14:7,10 15:2
15:8,11,14,16
16:12,18,20,24
18:8,13,23 20:7,17
21:2,8,19 22:23
23:10 26:15 42:17
44:22,23 46:3,7
47:8 48:6,12
49:21 52:18,24
53:19 56:23 59:22
68:18,19,21 69:1,2
69:7 75:23 76:21
77:5,22 79:8 83:9
83:21 99:20

102:13 104:1,11
105:1 106:4,9
111:13 113:15,24
114:18 115:6
116:13 117:9
125:12 126:3,14
135:7,22 136:17
136:18 143:3,4,4
147:6 148:19,19
152:4 154:10
157:22 158:24
175:1 186:4
196:14,24 197:23
198:20 207:20
212:6 216:20
220:2,8,11,13
223:20 224:9,15
225:3,6,10 226:6
226:13 227:1
235:12 253:20
258:6
cases 49:22 66:15
99:23 100:3 148:7
149:15 178:5
179:10 193:4
207:3 215:18
231:22
categories 184:2
categorization
158:1
categorize 162:12
165:10
categorized
157:14,23 158:6
163:22
categorizes 154:7
category 22:22
156:16 240:5
catherine 226:10
causal 119:12
120:2,4

causally 60:4
cause 11:6 12:3
146:9 147:8,12,20
147:24 148:4
149:14,18 165:10
181:12 184:11
197:8 232:5
242:15
caused 67:10
79:12 80:21 89:15
91:11 99:21 107:8
118:24 159:12
160:22 161:16,17
161:23,24 162:1
178:7,15 180:9
181:9 182:18
198:22 234:19
causes 14:21
246:20
cautious 154:20
ccclerk 5:21
194:20 195:1,16
ccr 257:20
cdc 36:8 141:11
167:5 173:17
230:1 231:1 240:2
ceased 115:16
cell 6:7 11:5
cellular 6:6
center 9:18 22:16
36:9 39:3 55:1
66:15 67:1 206:3
240:2 247:15
centers 162:17
164:15 167:18
169:20 208:18
239:8,21,24
254:10
central 209:1
centralized 139:8
140:10,11,12,14

centrally 207:24
certain 13:1 90:20
108:8 162:18
200:21
certainly 16:17
17:4 18:22 30:11
46:24 52:19 53:12
73:18 75:9 84:22
88:4 97:19 99:2
99:17 101:18
104:9 113:21
134:17 141:1
155:20 160:15
174:2,6 180:2
187:4 190:6
203:13 216:16
218:24 222:10
231:14,21 233:1
249:20
certificate 5:21
60:9,14,18 61:2,7
139:16 140:3,19
141:6 144:10
146:21 177:6,13
180:4,15,16 181:1
181:7 194:2,19,24
195:14 196:2,9,19
199:3,19 210:13
239:15 260:11
certificates 140:1
143:7 193:22
210:8,21 211:8
certification 259:1
260:1
certified 142:6
179:21 180:22
certify 257:5,8,11
ch.b. 5:3,6,8 19:13
51:10 236:1
chain 84:10,24
85:9,20 94:24

95:8 96:10 97:4
99:12,13,13
101:15
chair 28:24 240:23
chance 197:3
change 142:1
160:12,17,19
258:14,15 260:8
261:3
changed 52:9,17
52:19,21 100:21
changes 79:22
81:12 89:7 119:3
258:13 259:7
260:7,9
chapter 257:15
characterized
162:21
charge 76:23,23
78:6
charger 53:6
charleston 2:17
120:19,20
chart 158:1
183:19 188:24
203:21
chase 2:16
chb 237:18
check 28:9 62:21
77:9 86:23 99:14
112:18 127:12
128:4,20 129:4
138:10 141:3
142:19,23,24
143:15 145:1,11
145:15,17 146:2,3
151:9 185:19
197:19 213:24
217:16,19 224:19
228:4,7

checked   142:7,20
143:12,13,14,19
143:22 144:12
204:19,19
checking   27:15
143:23 144:7,24
145:8,13 194:4
checks   144:3
145:12
chemical   153:11
164:23 185:5
189:19 219:17
chemicals   58:1,2
94:12 218:19
219:19
chicago   172:2,15
chief   70:14 133:2
134:12 136:4
137:5,13 138:2
142:15 144:17,21
145:7,18 152:15
154:5,15 157:22
164:9 176:22
177:9 179:3 180:6
181:8,24 185:17
186:2
chiefs   69:10
children's   238:6
chinese   167:22
choose   93:10
christina   2:19
7:18
chronic   88:13
89:20
circle   27:4
circuit   247:3
circumstances
176:21
cite   23:5 28:17
33:23 34:1 62:12
63:13 81:24 119:7

119:8 123:4
144:23 157:9
167:5 203:7
cited   23:8 25:2
28:5 42:23 47:22
52:7 63:7,10 87:6
87:8 106:9,21
113:15 125:8
127:1 130:24
144:15,21 159:18
176:1 223:23,23
225:21
cites   120:14
citing   107:10
city   1:4 6:15 29:11
38:4 68:23,24
73:1,2 218:7
251:10 258:6
259:3 260:3
citycenter   3:5
civil   1:6,13,20
6:19 259:5 260:5
claim   73:18 84:22
85:14,15 116:22
147:7
claims   89:1
clandestine   171:12
clarification   30:15
181:6
clarify   16:17 20:5
55:7 57:13 97:6
clarity   27:9 29:16
56:13 59:13 63:18
80:8 105:9 106:19
157:6 195:12
class   57:4,6,7
67:21 250:7
classification
57:24 242:18
254:19

classifications
242:11
classified   152:11
classify   152:16
246:20
clear   27:9 50:22
64:6 216:22
cleared   206:16
clearly   36:13
46:21 59:6 65:18
70:6,8 83:23 84:3
96:1 97:21 98:2,9
99:11 144:4
154:11
cleveland   258:2
clients   207:19
clinical   36:7
clinicians   130:17
close   19:10 110:19
192:22
closed   10:11
174:12 204:7,8
closely   87:23
205:17
closing   174:13
cms   40:10
cocaine   66:4 188:4
188:6,9,10,14
code   242:11,18,19
243:15 257:16
codes   242:15,16
254:19
coding   245:4
254:18
collaboration
148:12
colleague   74:5
155:11 177:11,18
177:24 194:15
207:13

colleagues   31:6
32:20 38:13 41:7
110:10 141:3
collect   242:12
collected   139:8
148:9 189:19
collecting   148:16
colorado   239:12
columbus   218:17
column   171:9
188:4,23 190:20
columns   188:22
combination
139:22
combinations
139:12
combined   60:12
197:12
come   33:18,19,24
34:18 52:16 92:7
106:23 167:14
234:6 239:21
243:24 253:1
comes   34:21 36:14
36:20 40:12 54:19
138:8 145:5 149:7
218:1
comfortable   101:6
coming   52:20 61:6
164:7 220:19
248:4
command   99:13
comment   79:19
80:1,6 87:22
106:13 233:19
commented
101:13
comments   49:14
155:5
commission   1:11
6:16 242:14

257:17 259:19 260:25 261:25
**commissioned** 257:5
**common** 149:1 152:9 175:16 253:14,17
**commonly** 190:22
**communities** 36:17 37:3,6 42:1 43:23 201:23 209:20
**community** 37:10 233:13
**companies** 90:11 112:23
**company** 94:12
**comparable** 44:9 44:12
**comparative** 44:19 62:24
**compare** 45:8 64:24
**compared** 44:20 45:2 65:16 174:3
**comparing** 45:5 65:3 254:7
**comparison** 45:1
**compilation** 60:17
**compiled** 37:21 67:15 144:16 182:1
**complete** 23:10 255:13
**completed** 39:13 258:16
**completely** 88:18 100:20 204:6
**compliance** 102:19

**complicated** 112:24
**component** 26:1 36:16 41:12,20 43:23
**components** 84:1
**comprehensive** 39:6 41:3
**computer** 10:19 11:1,3 103:4 243:16
**computer's** 53:2
**computerize** 243:12
**concentrated** 243:21
**concentrating** 62:16
**concentration** 139:21 140:18 181:18 184:15
**concentrations** 184:12
**concept** 94:9 175:6
**concern** 224:20
**concerned** 67:3 139:20 199:17 223:4,7
**concerning** 27:10 105:10
**concerns** 223:6
**concludes** 255:24
**concluding** 101:6
**conclusion** 82:5 89:5 92:7 96:9,16 104:22 115:21 116:7
**conclusions** 82:14 83:4 89:4 100:19

**concrete** 86:10 138:12 144:14 183:12
**concur** 79:20 82:1 82:4 96:15
**concurred** 83:15 89:3
**concurrence** 82:6
**condition** 197:9
**conditions** 41:15 41:15
**conduct** 29:7 79:8 79:11 80:19 88:5 92:3 133:7,17,19 133:23 185:9,10 198:19
**conducted** 6:21 44:19 66:17 90:14 92:4 107:2 141:20 143:8 235:11
**conducting** 29:5 30:2,23 137:6,12
**conference** 10:10
**conferencing** 6:22
**confident** 206:23
**confirm** 82:18
**confused** 20:10
**confusion** 195:8
**conjunction** 44:23
**connection** 22:4 22:23 23:10 42:16 43:5 44:21 47:7 48:12 68:17,24 75:23 76:20 77:22 83:8 87:3 111:13 115:5 143:3 175:1 186:4 208:22 223:19 224:14 225:9 226:6 229:7
**connolly** 2:13

**consider** 52:6 58:6 117:7 152:2 173:18 174:8,18 174:23 177:3,4 178:23,23 180:1 193:1,8 194:7 216:6 222:23 224:14 235:5 242:6,8 254:21,23
**considerable** 89:11 157:1
**considerably** 157:21
**considered** 5:5 51:6,9,19,23 52:3 56:6 57:19 60:16 76:20 77:20 90:3 129:23 130:2,7 134:8 143:17 152:11 176:21 179:6 189:6,21 190:1 212:13,15 212:15 216:14 217:13 221:7 224:5 225:21,24 226:1,22 235:1,3,9
**consistent** 84:6 85:23 152:20 176:9 194:1,9
**consistently** 164:10
**constantly** 209:21
**constrained** 209:24
**consult** 137:14
**consultation** 40:1 44:2 138:1
**consulted** 68:23 69:8
**consulting** 11:21 12:2,5

consumed 150:6
219:19,21
consumer 95:8
consuming 23:18
contained 46:16
58:24 102:16
140:9 227:21
contaminants
164:24
contd 3:1
context 12:6 56:16
56:22 59:13 70:1
74:2 76:3 77:10
104:1,13 106:3
113:24 117:9
147:6
continually 206:3
206:8
continue 6:11 11:7
120:5,8 206:1
continued 78:20
103:12 121:24
139:13 166:2
192:11 237:1
253:6
contract 16:14,14
contrary 191:14
contrib 178:9
contribute 34:5,7
contributed 60:4,7
61:3 117:21
146:24 147:2,3
176:15,20 177:4
177:14 178:10,11
178:17,24 179:7
179:11,16 180:17
180:24 181:11,14
182:20 232:23
233:1 235:2,3
contributing
36:23 60:24 83:21

179:16 232:15
235:9
control 162:17
164:15 167:18
169:21 239:8,22
239:24 254:10
controlled 115:3
125:16 126:6
127:8 137:1 189:4
conversation
70:20 74:3 76:4
conversations 6:6
14:20 72:24 155:8
convicted 248:8
cook 238:10
copies 168:15
195:6
copy 5:20 11:8
19:6,18,21 20:11
27:19 121:6 156:4
168:18 183:6
194:19 195:3
196:2 226:16
235:18 237:10
cord 165:18
223:10
corner 171:5
corp 259:3 260:3
corporation 1:8
1:14 3:2 6:17 7:13
7:16,19 9:1 258:6
correct 10:19,20
12:14,16,22 14:7
14:12,13 17:6,7
18:18,24 19:1
20:23 21:5,6,11,12
21:16,17,20,21
22:1,2,5 23:22,23
27:13,20,21 29:18
29:19 33:1,2 35:3
35:4 38:15,16,19

38:23,24 41:11,18
41:22,23 43:1,2,5
43:6,14 45:9,16
47:3,4,24 48:1
50:6 51:21,22
52:1,2,7 54:4,5
55:10 56:17 57:10
57:11 58:10,11
61:11 65:23,24
66:2,4,5,8,9,11,19
70:17 77:7,17,18
77:23 79:2,3,8,13
80:10,11,13,14,16
80:17,22,23 81:3,4
81:15 84:10 87:4
87:5,9 90:15,16
91:20 92:3,12
93:1,7,14 95:2,3
95:22 96:5 98:4,5
99:23 100:14
102:15,20 104:4
105:11,12,17,20
106:4,5,10,21
107:4,9,19 108:1,2
108:6,7,9,10,13
109:17,18,22,23
111:2,3,13 112:3,6
112:10,11 113:24
115:12,13 116:5
116:14,17 117:5,6
117:9,13,22,23
118:4 119:1 120:3
120:22,24 122:7,8
122:24 123:1,2,3,9
124:10,13,14
125:10,11,14,15
125:17 126:8
127:4,22 129:20
130:5,11,21 131:4
131:7,12,13 132:8
133:4,10,18

134:14,21,22
135:22,23 136:7
136:23 137:2,3,19
138:3 139:9
140:11 141:21
142:12,18 143:10
143:20 144:17
145:9 146:4,6
147:13,14,16,20
147:24 148:5,11
149:14 150:14,19
150:20,22,23
151:2,3,7,15 152:5
152:22 153:1,2,4,8
153:11,17,21
154:3,8 155:7,18
156:12,17,18,21
157:16 158:2,7
159:10,13,21
160:24 161:13,14
162:2,9,10,14,23
162:24 163:20,21
163:24 164:1,4,21
165:6,7,11 166:8,9
167:12 169:19,24
170:1,5,9 171:22
171:23 172:4,15
172:23 173:13,14
173:16,17,22
174:10 175:1,14
175:15,17,18,21
176:2,13 178:3,4,7
178:15 179:5
180:10 182:2,11
182:12 183:15,16
184:2,3,8,9,17,20
184:24 185:1,3,7,8
185:12 186:4
189:4,5,9,10,17
190:15,23 191:12
191:13,17,24

193:3,10,11,15,19
193:20,24 196:14
196:20,24 197:1
197:14,23,24
198:7,10,12
199:22 200:2,14
200:22 201:1,9,20
202:12 203:9,16
204:12,13,17
205:3,4,9,10,24
206:3,6,7,11
207:17,18 208:3
208:16,19,20
210:5,6,8 211:8,14
211:20 212:11
213:23 214:22,23
215:3,10 217:2
219:4,8,9,13,22
220:2,8,9,13
221:10,15,20
222:5,6,8,14
224:15 225:7
226:13,14 228:3
230:9,10 231:11
231:18 232:8,9,11
232:12,16 233:18
234:13 235:12,15
237:7,8,19,20,22
237:23 238:7,8,11
238:12,15,16,17
238:21,22,24
240:15 241:1,5,6,9
241:10,12,13,15
241:16,21,22,24
244:3,4 245:12,13
245:15 246:4,7,16
246:24 247:1,4
248:2 250:17
253:24
**corrections**  258:13
260:17

**correctly**  14:11
81:14 89:8 162:18
257:9
**correspondence**
177:10,11
**counsel**  6:14 7:5
7:23 10:15 12:21
14:9,16,20 15:1,14
16:5,8,20,23 17:13
17:14,17 21:2,8,14
21:20 25:22 26:3
26:12,12,22 27:9
53:8 75:3,5 96:23
168:13 170:18
174:20 190:3
192:2 194:13
195:9 210:16
225:17 226:5,20
227:4 236:7
248:23 249:12
251:24 252:11,12
252:19 257:12,13
**count**  66:15
159:13 182:9
**counterfeit**  220:18
**counties**  29:9,14
31:13,14 32:14
37:8 39:8,13
42:11,24 43:4
44:4,12,21 45:2
67:16 70:23
**counting**  173:4
183:24,24 184:1
**country**  60:16
117:16 132:1
230:24 254:7
255:5
**county**  1:11 6:16
15:5 20:22 21:10
24:4,20 28:2
29:10,10,13 32:5

36:11,14,14 37:15
38:1 39:8 41:6
42:9,12,13,15 43:3
43:20 44:5,11,14
44:16,17 45:2,8,14
48:16,19 54:21
61:19,21,23 62:10
62:17,20 66:10,13
66:18,22 67:5,13
67:19 68:2,8,14,17
69:8 71:23 72:7
73:22 77:15 79:12
80:22 88:11 107:9
109:2,10 110:1,15
110:21 111:1,16
112:1 115:17,18
116:4,17 117:13
117:22 120:11
131:12 134:24
135:12,16 172:22
173:12 204:22
207:16 208:3,8,22
210:4,19,23
211:12 218:10
219:4 222:8,12,17
223:1 228:2 229:9
229:14 232:2
233:8,17 234:3
250:13,16,22,24
251:1,9 255:13
257:2,4 259:10
260:15
**couple**  71:6 193:5
**course**  43:14
69:22 70:5 135:6
183:8 244:2
**courses**  250:10
**court**  1:1 6:18,24
8:12 13:7 103:1
259:7

**courtroom**  12:18
**covered**  76:10
182:8
**covington**  3:4 7:12
7:15 8:23
**crashes**  243:2
**create**  95:20
142:17 160:5
**created**  167:24
**credibility**  79:21
81:12 94:3 95:10
95:14,15 96:2,4,10
96:13,19 97:15,20
97:22 100:7
101:10
**crime**  148:21
149:2,19 248:8
**crimes**  212:7
**criminal**  116:16
116:22 117:8,11
117:15 118:3
124:12,16,19
126:8,23 130:21
212:2,3,11 218:5
218:15
**crisis**  5:13 81:9,23
86:18 104:15
107:12 115:18
117:21
**criteria**  151:19
152:1,2 179:23
**cross**  209:15
**crr**  257:20
**csmp**  137:2,7,14
137:18 138:1,6,14
138:22 193:14,18
**current**  13:24 14:2
41:4,5 75:14
206:10,14 242:16
**currently**  27:23
29:7 32:3 35:12

58:3 140:8 206:19
242:20 248:21
**curriculum**  5:8
235:24
**curves**  160:13,17
**cv**  33:19 121:6
235:18 236:9
237:10,14 247:3
**czar**  69:11 75:14

**d**

**d**  2:3 6:1 8:15
258:5
**dangerous**  189:7
**danielle**  2:12 7:21
252:12,20
**data**  14:22 17:11
20:21 21:4,9,15
22:8,9,14,17,19,20
23:7,13,20 24:2,13
24:15,19 25:2,4,5
25:9,23 28:23
29:3,4 30:1,22
31:7,8,11,16 33:8
34:13,15,20,21
36:14,18,19,21
37:7,14,16,20,21
39:11,11 40:1
42:4,13,18 44:13
44:15,18 45:1,6,13
45:16,17 46:15,21
46:24 47:18 48:16
50:16 52:16,20,23
53:18 54:8,9,12,13
54:15,19,20,24
55:3,8 59:15
60:14,15,16,17
61:4,9,22 62:8,17
63:5,16 66:12,21
66:22 67:2,6,13,15
67:19 68:9 72:21
72:23 74:22 76:17

77:20 83:3 84:3
89:3 100:1 106:11
106:15,23 110:6
110:18 111:8,12
111:19,22 114:8
114:14 115:5,9,11
117:17 118:15
124:6,9 131:15,24
133:13 134:12,20
134:24 135:24
137:14,18,21
138:5 139:24
140:2,6,8,15 141:5
141:8,13,17,21
142:3,20 143:5,9
143:13,13,19
144:1,12,15,16,20
145:2,4,7,12,17
146:22 149:6,21
152:4 161:20
164:21 166:23
176:10 181:3
182:1,3,12,12
188:15 189:18
193:14,19,23
194:2 196:13,23
202:14,20,23
203:6 204:6,9
205:1,2,5,7,22
206:5,9,10,13,13
206:19 207:1,7,10
207:21,23 208:8
210:2,13,17,21
211:5 214:12
215:15 216:5,9,10
216:13,23 217:1,9
217:13,16 221:18
222:18 227:9
233:20 234:24
239:16,17 242:9
242:22,24 243:10

243:11,13,17
244:20 245:4,18
246:21 247:15
253:18,21,21
254:2,5,6,7,15,20
254:21 255:4,11
255:13
**database**  25:16
31:19,21 54:19,24
61:7 62:5,8 76:11
139:3,7,10 140:7,9
140:22 206:2
218:1
**date**  43:12 186:10
196:8 206:12
258:9 259:3,9,19
260:3,13,25
261:20,25
**dated**  5:3,13,16,19
5:21 19:14,19
81:23 86:12,18
169:9 194:20
228:20
**dates**  215:16
**dating**  108:5
**david**  2:3 8:1
10:14 78:11
163:16 258:5
**day**  1:21 23:17,19
23:23 24:5,21
71:6 100:19
257:17 259:16
260:22 261:22
**days**  24:7,17
125:23 126:5,7
127:9 128:23
258:19
**dc**  2:14 3:6
**dea**  57:19,23 102:3
108:23 116:19
171:11,11 172:8

174:9,23 191:20
212:16 230:1
231:1
**dea's**  118:7
**dead**  218:19
**deal**  19:9
**dealt**  93:4
**dear**  258:10
**death**  5:20 12:3
14:22 15:4 60:4,7
60:9,13,18 61:2,3
61:6 120:15
122:23 123:8
125:10,14 126:7
127:3,9,22 128:24
139:16 140:1,3,19
141:5 143:6 144:9
146:10,20,21
147:3,4,8,12,16,20
147:24 148:4
149:14,18 154:7
157:24 158:6
163:18 165:11
176:15,20 177:5,6
177:13,15 178:7
178:10,11,15,18
178:24 179:7
180:4,4,10,15,16
180:17,24 181:1,7
181:10 184:2
193:22 194:2,19
194:24 195:14
196:2,8,18 197:9
197:17,20 198:21
199:3,19 210:7,13
210:20 211:8
213:3 233:12
235:2,4 239:15
246:20
**deaths**  5:16 14:22
20:22 33:21 40:21

**[deaths - determinations]**

59:7,18,20 60:1
122:12 123:6
131:6 152:10
153:3,4 154:16
155:17,22 156:1
156:10 157:9,20
157:20,24 158:18
159:5,6,11,13
160:21,23 161:8
161:13,16,23
163:22 164:20
167:7 172:2,22
173:11,15 182:2
182:22 183:19
188:5 203:22
204:3,7,11 206:16
209:11 213:16,17
217:18 228:2,15
228:19 229:8,9
231:7 232:1 233:1
233:2,14 244:15
245:9,20 246:4,5,6
246:13 247:23
**decedent** 123:8
182:7 212:11
**decedents** 124:7
125:7,12 129:11
137:19 211:13
230:14
**decide** 59:23
179:10 180:23
254:11
**decided** 224:19
**decision** 85:17
146:13
**declared** 57:21
**decline** 203:13
229:18 230:13
**declined** 203:8,17
204:22

**declining** 203:4
**decrease** 201:19
202:15,18 204:11
230:20
**decreasing** 202:4
202:11
**deed** 259:14
260:20
**deemed** 258:20
**defaulted** 20:2
**defendant** 2:11,18
3:2 6:15 79:8,9,11
79:14,17 252:5
**defendants** 1:9,15
1:19 8:16,24 80:5
80:20 81:1 198:20
220:11 225:3
226:13 252:1,24
**defended** 247:20
**defense** 249:10
**defer** 252:11,20
**define** 83:23
**defined** 58:3
**definitely** 42:10
147:10
**delay** 76:1
**delaying** 27:8
**delivered** 112:1
**delivering** 95:8
**delivery** 44:2
**demonstrate** 55:4
**department** 5:18
39:4,5 40:23
110:7,8 131:3
169:7 204:15
205:8,17 207:15
209:2 239:12
244:19 258:22
**depend** 115:23
116:9 199:15

**dependence** 229:4
**dependent** 112:21
**depends** 24:12
211:22
**deponent** 26:11
70:4 73:7,13,17
78:1,4,14 86:5
99:10 121:14
126:17,20 163:10
169:3 170:23
171:1 200:17,19
216:2 218:24
227:8,19 230:6
251:23 255:21
256:6
**deposed** 11:14
12:11 136:9
**deposition** 1:19
6:9,14,21 9:23
10:1,5,18,23 11:9
11:13 12:9,24
13:8 17:9,24 18:5
19:11,16,18 20:6
20:12 27:12 45:20
48:4 51:4,7,13,20
53:22 76:19 78:22
81:8 86:13,20
103:14 122:2
136:12 166:4
169:5,12,14
172:18 174:24
192:13 194:15,18
194:22 195:9,14
196:1 203:20
214:14,17 226:24
227:3 228:17,22
235:23 236:4
237:3 253:8 256:5
257:5,9,13 258:9
258:12 259:1,3
260:1,3

**depositions** 9:11
226:5
**depress** 181:15
**depressant** 181:19
181:20
**depression** 181:22
**depth** 106:14
**describe** 14:24
17:8 20:16 24:24
28:15,19 39:1
40:19 198:2 242:5
**described** 25:11
32:21 42:6 49:2
50:2 89:6 95:5
155:20 232:13
**describes** 120:10
**describing** 73:20
**description** 46:6
**designed** 242:15
**detail** 30:9 91:18
107:15 111:11
209:7
**detailed** 22:16
28:19 54:20 61:5
113:5 141:11,12
205:21
**details** 12:4 36:5
70:22 92:21 93:6
130:16 136:11
151:16
**detect** 152:24
157:13,23
**detected** 179:4,14
182:10 194:8
213:16
**detection** 218:15
**detects** 154:6
**determination**
146:18
**determinations**
96:4 151:2,7

**determine** 12:3
22:7 60:3 68:9
118:1,5 122:13,16
127:13 142:3
146:9 147:12
149:13 152:14
154:1,14 178:7,14
179:14 182:18
219:10
**determined**
141:23 151:4
176:23 177:12
180:9 222:24
235:8
**determines** 149:18
**determining**
147:19,24 148:4
154:11
**detroit** 218:8
251:11
**develop** 239:22
**developed** 69:17
243:16
**diarrheal** 239:14
**diazepam** 197:13
**die** 53:2 106:1
150:12 233:4
**died** 48:15 59:11
103:4 123:23
133:9 188:8,10
218:20 219:20
234:17,19
**differ** 95:12
**difference** 50:9
68:1 161:4 180:18
**different** 31:11
32:8 75:13 110:4
115:18 138:8
150:5 184:16
253:18,19

**differentiating**
150:24
**difficult** 9:5 13:12
110:4,11 111:5
152:24 153:15
154:1,3 178:6
179:10 181:12
193:17 202:1
**difficulties** 154:11
**difficulty** 155:15
**direct** 27:6 42:3
214:10 234:7
**directing** 26:7
27:3 208:14
**directly** 29:10
67:19 79:23 81:9
104:16 114:14
115:7
**director** 69:14
**dis** 66:20
**disagree** 139:10
155:23
**discharge** 30:1,22
**disciplined** 248:12
248:15
**disclose** 14:20
27:5
**disclosing** 26:23
**discover** 191:20
214:9
**discovered** 191:10
224:20
**discuss** 49:14
**discussed** 50:15
87:13 133:9
148:17 245:11
**discussing** 42:1
61:15 126:24
**discussion** 27:1
108:15 154:17
157:2 218:4

**discussions** 17:12
136:19 145:3
154:10 155:2,3,4
155:12 177:1
**disease** 162:17
164:15 167:18
169:20 197:8
239:8,22,24
240:11 242:17
254:10,11,19
**diseases** 239:14
245:5
**dispense** 95:2 97:9
97:14
**distinction** 105:21
106:2 123:10
180:12
**distinguish** 151:21
164:10 165:5
**distinguishing**
165:4
**distribute** 90:9,12
90:19,21,22 232:8
232:11
**distributed** 88:10
94:14 108:19
109:2 110:7
116:10 220:11
**distributing** 88:21
91:2 115:16
**distribution** 84:10
84:23 94:13,24
109:10 116:3
152:7 234:2
**distributor** 91:17
92:14 93:3,13
101:16 198:20
199:2,4
**distributors** 81:11
87:16 88:6 89:14
90:7,10,15,19 91:8

92:3,5,24 101:21
102:15,19 104:17
104:18 107:17
108:9,12,18
109:17 115:15
200:24 201:6
221:2,5 232:7,10
**district** 1:1,1 6:18
6:19
**dive** 236:18
**diversion** 124:9,12
129:19,24 130:2
211:19 212:2,7
**diverted** 105:17
105:22 219:12
**doc** 93:7
**doctor** 8:20 9:12
10:13 11:8,14
12:8,15 13:15,24
14:6,12,24 15:7
16:2,18 17:8,23
19:2,8,19,21 20:6
20:8,10,11,15,15
22:10 23:12 24:10
24:15,18,24 25:8
25:15 26:4 27:18
28:4,14 29:15
30:4,11 31:1,15,20
32:3,16,17 33:1,13
34:4,9,23 35:2,21
36:2,10 37:13,23
38:17,19 39:1,15
39:19 40:14 41:10
42:6,14,22 44:19
44:24 45:7,22
46:1,5,10,13,24
47:5,21 48:3,8
49:23 50:1,9,24,24
51:5,14 52:9
53:17,21 54:7
55:7,16 56:11,19

58:18,21 59:12
61:18 62:22 63:17
64:15 65:19 67:5
68:2,16 69:24
70:13 71:1,19,23
72:14 73:9,21
74:16 75:15,21,23
76:3,16,19 77:4
78:7,11 79:1,7
80:9,12,18,24 81:5
81:16 82:1 84:22
86:8 87:2,15 88:4
89:6 90:6 91:7,20
92:22 93:24 95:1
95:9 96:3,11,12,17
97:1,6,13 98:12
99:2,4,20 100:11
102:11 103:17,21
104:1,10 105:1,8
105:14 106:6,18
107:7 108:24
109:8,19,24
110:24 111:8,15
111:18 113:3
114:6,15,22
115:14,16 116:15
117:7,19 118:8,22
119:11 120:17
121:2,4 122:5,9,21
124:4,6,23 125:5
125:21 126:13,14
126:22 129:9,15
129:19 130:3,10
130:19,21 131:5
131:14,21 132:11
133:1,7,17,22
134:11 135:14
136:3,6,8,24 137:4
137:11 138:5,12
139:2 142:15
146:6,23 147:5,6

148:20 149:2,16
149:16 150:18
151:19 152:24
153:7,20 155:9,15
156:3,19 157:5,11
158:5,15 159:2,11
159:19 160:20,21
161:6,15,23
162:11 163:15
164:8 165:9 166:7
166:15 168:1,11
169:13,22 171:15
173:15,18 174:14
174:16,22 175:5
175:12 176:1,6,11
177:17,18,19,22
178:1 180:5
181:23 182:23
183:4 184:4,7,10
184:14 185:16
186:12,17 187:15
187:24 188:7
189:1,3 190:10,18
191:7 192:16,20
194:13 195:18
196:18 197:10
198:3,8 199:12
201:13,16,17
202:9 203:6,6
204:9,15 205:12
206:18 208:13
210:2,20 211:17
212:18,23 213:6,7
214:6,13,15 215:9
215:14,22 216:12
217:20,22 218:3,6
218:17,22 221:24
222:19 223:8,14
226:12 227:13,13
228:1,11 230:3,8
233:6,21 234:1

235:16,19 236:13
237:6,9,17 240:13
241:20 242:5
244:1 245:10
246:3 247:2 248:6
249:16 250:6,11
250:21 251:7,9,19
253:12 255:19
**doctor's** 232:22
**doctoral** 33:11
34:15 35:20
247:12
**doctors** 98:3,6,13
99:5,12,14,18,19
100:4 101:18
114:15 129:12
137:6
**docu** 164:13
**document** 19:6,9
39:16 51:1,2,17
86:9,10 121:5
141:19 168:18
169:14,18,21,22
171:4 173:19,24
174:9 194:14
197:4,5,16 213:1
228:24 235:17
**documentation**
134:7 136:21
172:13
**documented** 98:2
118:18 123:20
142:9 223:23
231:1
**documenting** 29:1
29:22 30:17 77:1
**documents** 17:11
19:5 22:18 29:23
51:24 72:2
**doing** 9:10 20:7
34:20 36:23 38:12

38:13 60:1 69:15
70:9 83:24 115:11
139:14,14,24
145:4 146:7
210:12 240:2,2
**domestic** 168:1
**doors** 10:11
**dose** 250:2
**doses** 114:17
**double** 143:14
226:7
**douglas** 2:15
**downtown** 10:3
**dr** 1:19
**draft** 16:19,21
225:18
**drafting** 26:5,8,10
27:2,2,11
**drafts** 26:9 247:21
**dramatic** 164:17
**dramatically** 49:7
64:13 160:17
**dribble** 207:3
**drill** 45:13
**drive** 9:18
**driven** 231:10
**drives** 231:16
**driving** 231:20
**drownings** 243:15
**drug** 1:7,14 5:15
5:18 6:17 7:19
14:22 15:4 20:22
22:7 27:24 28:16
29:5,13 30:2,23
31:12,18,19,20
32:11,18 33:3,15
34:9 35:5,22
36:10,15 37:5,9,14
37:24 38:6 39:7
39:16 40:21,21,22
40:24 41:16 43:15

44:5,7,8,11 48:16
49:4,12 50:4,5,8
50:10,12,13,13,18
50:23 55:4,19
56:5,5,6,6,7,9,13
56:15,16,18 57:2,2
57:3,6 59:2 60:1,6
60:11,24 64:23
65:8 68:3 69:10
69:11,16,23 71:15
74:5,7,10 75:2,14
83:1,11 84:13
90:11,18,20 94:10
94:12,13 100:2,3
101:2 106:16
107:12 108:20
111:24 112:23
113:10,10 114:24
116:22 117:1,4,8
117:11,20 118:3,6
122:22,24 123:21
124:18 132:1
133:9 137:19
139:3,7,12,20
140:6,9,17,22
141:8 142:22
145:21 146:18,19
147:3,18 148:23
150:4,5,5,9,9
152:10 157:9
164:14 165:1,3
169:8,23 175:10
175:11 176:7,12
176:15,23 177:2,3
177:13 178:7,11
178:15,16,17,19
178:24 179:4,14
180:3,7,9 181:6,9
181:14,19 182:18
183:19 184:20
188:17,21 189:7,8

189:20,21 191:3
191:11,15,24
193:2,8,13 213:3
217:17 218:4,8,19
221:5 222:20,24
228:15,19 229:4
231:10,15 232:16
233:8,11,13 234:1
243:22 244:23
246:5,12 247:14
250:15 251:1
255:4 258:6 259:3
260:3
**drugs**   37:22 39:17
41:19,21 49:5
56:24,24 57:4,8,18
57:20,20,22,24
58:2,3,7,8,8 59:9
60:3,13,22,22 61:2
64:11 84:4 89:18
90:5,8 91:4,15
105:23,23 107:8
112:7,19,22
113:18,19,21
114:1,2,3,4 116:16
117:15 118:6
119:21,22,23
120:6,6 122:13,17
122:18 123:23
125:9,13 127:3
132:2 139:22
140:18 143:6
147:22 156:11,14
156:16 175:12,20
176:8,11 178:2,5,9
179:10 180:13,14
180:21,24 182:6,9
182:19 183:18
184:1,8 186:18,21
187:7,12,17
189:24 191:10,22

210:4 211:18
212:1,12,14
216:14 219:21
220:7,10,16,16,18
228:6 231:13,16
231:22 232:6,23
234:11,14,16
235:1,3,6,8,10
243:6 246:9
247:17,22,22
248:4,5,19
**due**   48:23 49:1,5
56:5 58:17 61:16
61:18 64:11
**duly**   8:17 257:4,5
257:7
**duragesic**   168:4
**duties**   81:1 102:14
102:19
**duty**   102:3,6
**dying**   174:6
247:16

**e**

**e**   6:1,1 155:4
170:14,15 177:11
207:14
**earlier**   60:21
72:14 109:19
123:16 136:24
156:22 175:5
193:1 208:13
210:11,16 211:16
211:23 217:12
218:4 221:24
224:1 232:22
235:22 245:12
250:11 251:16
**earliest**   223:4
**early**   223:6
**easier**   19:4 55:20
195:20 228:11

**easily**   129:4
**east**   2:16
**eat**   199:14
**eating**   199:5
**ecstasy**   58:5
**effect**   117:7 162:6
**effective**   73:19
88:13 201:23
**efficacious**   88:22
**effort**   68:3
**efforts**   201:22
207:6
**eight**   29:8 32:14
42:24 43:3 44:11
256:3
**either**   106:15
111:23 123:2
254:5
**email**   258:17
**emergency**   40:22
110:6,8 135:5
203:3 241:16
244:19,19,20
**emphasize**   246:19
**employed**   241:20
257:12,14
**employee**   242:2
257:13
**employer**   13:24
248:13
**employment**
240:20
**ems**   69:13 71:5
245:17
**enclosed**   258:12
**encouraged**   81:10
87:16 101:22
104:15
**encouraging**   88:6
**endowed**   28:24
35:12,15,17,21

240:23
**endowment** 35:16
**ends** 170:9
**enforcement** 5:19
73:23,24 148:10
151:6 169:8,23
172:1,8 173:19
174:8,23 212:5
218:6 219:1
250:22
**engaged** 32:5
92:11 218:9
**engagement** 16:19
16:21 36:4
**engaging** 71:13
**enhanced** 244:14
**enroll** 209:12
**entered** 144:12
260:9
**enterprises** 218:5
**entire** 46:19
219:16 259:5
260:5
**entirely** 136:18
179:8 221:21
**entitled** 1:20 26:9
26:9
**envelope** 228:13
**envelopes** 169:2
**envisage** 42:12
**epidemic** 239:10
**epidemiologic**
240:3
**epidemiological**
238:14
**epidemiologist**
120:21 226:12
240:1,8
**epidemiology** 14:3
91:24 239:9,13
241:4

**equivalent** 5:3,6,9
19:13 51:10 236:1
237:21
**erik** 120:9,14,17
120:18
**errata** 258:14,19
260:7,10,18 261:1
**erroneous** 158:6
**erroneously**
157:14,24
**error** 49:10 143:1
157:16 160:4,5
161:20
**errors** 136:23
144:5
**especially** 132:1
**esquire** 2:3,4,4,8
2:12,15,19 3:3,4,9
**essential** 79:22
81:13
**essentially** 57:18
59:18 71:5 83:24
88:8,19
**established** 139:3
139:18 151:23
**estimate** 23:20
64:22 160:6
**et** 1:8,14 5:16 6:17
228:20 258:7
259:3 260:3
**evaluate** 91:22
200:9 201:1
**evaluation** 37:2
38:5 199:20
**evaluations**
141:23
**evans** 1:21 6:24
13:6 257:4,19
**event** 182:11
**eventually** 234:3

**everybody** 92:18
211:3
**evidence** 88:12
124:20 146:16
147:15,21,22
148:22 154:21
164:5 189:14
231:13 233:23
234:7
**exact** 36:5 43:11
45:11 65:12 88:2
92:21 93:6 137:15
139:14 151:24
175:24 209:7
**exactly** 16:15 32:9
61:12 64:4 74:18
88:18 107:22
124:2 129:14
144:11 153:6
178:8 187:9 205:4
227:19 254:17
255:10
**exam** 152:6
**examination** 4:1
8:18 59:22 253:10
**examinations**
184:17
**examine** 188:21
194:11 200:5
229:22 246:9
**examined** 218:13
229:23
**examiner** 31:8,16
59:21 60:6,15
61:9 106:15
110:18 113:5
131:23 132:19
133:3,13 134:4,13
134:24 135:4,8,19
136:4 137:5,13
141:13,17 142:21

144:17,21 145:7
145:19 146:9,14
148:10,15 149:7
149:18,21 151:2,5
151:10,13 152:15
154:6,15 157:12
157:12,22 164:9
164:21 176:15,23
177:9,12,16,19,22
179:3,8,13 180:7,9
180:19 181:8,24
185:9,10,17
206:16 235:4
243:10,11,12
246:21 255:1
**examiner's** 21:16
25:18,20 36:20
76:12 136:1 138:2
151:20 152:3
186:3 253:22
**examiners** 132:12
132:15,16 133:4
133:23 134:11,17
139:13
**example** 41:22
64:20 66:1 114:7
147:15 176:16
178:21 181:15
183:13 231:4
246:10
**examples** 58:4
185:2
**exceed** 64:14
157:20
**exceeded** 49:1,8
58:16,23 61:17
**exceeding** 65:18
**excess** 91:5
**excessive** 88:10
102:4 109:4

**exclude** 176:23
**excluded** 150:21
**exclusive** 182:14
**excuse** 182:15
**execute** 17:5
**executed** 260:10
**execution** 259:14
  260:19
**exercise** 112:12,15
  183:17 193:21
  221:19 237:15
**exhibit** 5:1,2,5,8
  5:11,15,17,20
  19:11,16,18,22,23
  19:24,24 20:6,12
  27:13,19 34:6
  45:20 48:5 51:4,7
  51:13,14,21 53:22
  65:7,7,15 76:19
  81:8 86:13,20
  87:3,17 109:21
  118:9 121:5
  131:18,20 156:3,6
  156:10,15 157:16
  158:2,14 159:16
  163:3,4,5,6,7,8,10
  163:11,12,13,17
  166:12 168:12,12
  169:1,5,12,14
  170:2 172:17,18
  172:21 173:10,20
  174:10,24 182:13
  182:23,24 183:3,5
  183:5,9 186:6,19
  187:21,24 188:4
  188:15,24 189:13
  189:17 190:14
  191:24 194:15,18
  194:22 195:10,10
  195:14 196:1,23
  198:21 201:15

203:19,20,23
204:4,10 212:20
212:21 213:1,7
214:14,15,16,17
214:21,24 215:4,4
215:5,9,14,23
216:6,24 217:17
228:12,17,22,24
230:4,9 235:17,23
236:4 237:10
**exhibits** 11:9 20:3
  20:9 21:24 114:2
**expect** 15:22 16:1
  34:11 40:14,17,20
  47:7 148:24 231:8
  243:11
**expected** 108:20
**expedite** 214:5
**experience** 16:7
  84:21 85:11
  151:11 179:20
**expert** 5:2,5,9
  11:21 12:2 14:6
  14:10 15:8 19:6
  19:12,19,21 20:5
  26:13 46:6,10
  48:11 51:9,24
  80:2 84:9,11
  102:18,21 104:2
  104:10 105:2,10
  105:14,15 106:6
  106:20 107:7
  108:16 109:6
  116:15 146:14
  196:14,24 225:2,5
  225:16 226:4,16
  226:18 234:12
  235:7 236:2 242:7
  242:8 249:5
**expertise** 28:23
  40:1 77:3 82:17

83:17 84:23 85:7
85:19 91:20,21
116:22 243:4,7
246:19 254:18
**experts** 83:5 84:19
  88:23 89:2 93:23
  101:1 109:3
**expiration** 259:19
  260:25 261:25
**expires** 257:17
**explain** 49:17
  175:7
**explained** 211:23
**explaining** 232:13
**explanation**
  230:19
**explicit** 80:4
**explicitly** 73:15
**extensive** 46:15
**extent** 92:14 102:9
  107:10 117:20
  134:2 138:5,7
  161:5 202:16
**external** 242:15
**extract** 182:4
**extraction** 143:1
**eyre** 120:17
**eyre's** 120:9,14

**f**

**fact** 65:13 69:23
  84:5 123:4 124:20
  180:7 181:6
  193:18 215:2
  253:17
**factors** 180:17
  232:15,18 244:15
  245:19
**failed** 157:13
  216:6
**fair** 18:3 49:23
  64:5 75:21 125:5

130:3
**fairly** 191:4
**faith** 227:16
**familiar** 111:8
  129:15 132:11
  133:11,15 184:23
  221:4,4 222:19
**family** 35:17 63:24
**far** 9:10 15:14,15
  15:17 63:9 91:5
  127:6,13 142:7
  167:12
**fashion** 139:8
**fatal** 21:9 24:19
  29:24 30:19 48:23
  49:1 58:16 61:16
  61:17 77:5,16
  99:21 106:8 107:4
  109:21 110:2,16
  111:1,19 112:4
  113:14 114:7,17
  118:1 122:14
  123:5 153:1
  161:11 175:16,19
  176:6 183:15
  184:11,19 188:9
  193:10 196:12,22
  197:21 204:21
  207:7,21 210:3,8
  210:22 211:11
  219:11 220:7
  222:1 229:18
  233:6,18
**fatalities** 25:17
  77:1,2 110:21
  189:12 193:23
  194:6 202:16,19
  203:18 207:24
**fatality** 21:4 203:4
  205:22

**fatally** 48:17 193:2
**fda** 57:9 58:9
  191:12 198:16
**fed** 37:10
**federal** 1:20 40:9
  72:10,12 138:16
  138:17 208:18
  212:4
**feel** 46:14 148:19
  179:11 194:5
  206:23 236:10
  237:15
**feeling** 110:17
  203:1
**feinberg** 32:16
  87:23
**fellowship** 238:20
**felt** 101:5 167:18
  172:11
**females** 123:11
**femur** 249:18,21
**fentanyl** 5:15,15
  5:17 33:8,13
  157:7,8,8 162:12
  162:12,20,21
  163:19 164:6,11
  164:11,20 165:2
  166:11,16,18
  167:9,11,16 168:2
  168:7,19 169:6,15
  171:13,21 172:3
  172:19,22 173:12
  173:16,21 184:4,7
  184:11,15,19,22
  184:23 185:2,3,5
  185:11,18 186:21
  187:13 192:21
  197:12 198:6,8,14
  198:17,22 199:6
  199:14 201:17
  203:16 220:19

228:3,5,14,14,18
228:18 229:10,20
229:24 230:2,15
230:21,23 231:7,8
231:22 232:3,4,8
233:3,5,14 244:22
244:23 245:11
**fibula** 249:23
**field** 29:8 82:9,22
  83:5 84:20 85:23
  101:2 102:22
  110:10 117:1
  135:7,11,15 239:9
  239:13
**figure** 59:15 61:11
  61:20 64:21
  119:20 158:11,15
  159:4,5 160:24
  161:6,7 162:2
  163:23 166:24
  203:13 204:2
  213:9,14,15
**figures** 59:13
  158:21
**filed** 6:17
**filing** 256:5
**final** 25:22 42:23
  146:13 197:8
  207:2
**finalized** 205:5
**finally** 190:18
**financially** 7:4
  257:14
**find** 45:21 67:19
  88:2 90:1 119:12
  120:5,5 150:4,11
  152:18 154:23
  160:6,8 165:8
  177:3 214:3
  246:10 249:4
  258:12

**finding** 47:11
  59:10 119:3,23
  129:11 184:21
  212:12 219:17
  230:18 231:21
**findings** 33:4,15
  34:11 37:2 40:15
  40:15,20 42:6,8
  43:19 115:10
  222:8,13
**fine** 223:15 236:18
  249:15
**fire** 70:14
**firm** 6:23 7:1 8:23
**firms** 16:12
**first** 5:18 8:17
  14:9 28:19 31:15
  32:18 53:24 54:11
  54:16 58:14 61:14
  82:20 116:10
  139:3 167:16
  168:20 169:6,15
  170:2,9 183:14
  185:17,22 186:17
  187:5 224:1 240:7
  240:7 243:12,14
  243:16 246:14,24
  247:4,8 257:7
**fitted** 83:15
**five** 25:19 129:12
  130:17 255:3
**fixed** 138:19
**flags** 90:24
**flahive** 3:3 7:12
  8:22
**floor** 10:7
**flow** 75:6
**focus** 36:11 234:14
  234:15 239:18
**follow** 90:21 198:1

**followed** 128:22
  170:7 181:23
**following** 46:1
  217:2 250:6
**follows** 8:17 78:20
  103:12 117:24
  121:24 126:5
  156:7 158:5 166:2
  192:11 220:10
  237:1 253:6
**food** 239:14
**foot** 223:10
**footnote** 57:17
  58:1 81:19 87:8
  87:10,12 119:8
  120:14 167:3
  217:6
**footnotes** 52:2
**force** 5:12 69:11
  79:20 81:22 86:16
  94:2
**force's** 96:16
**forces** 82:5
**foregoing** 257:5
  259:13 260:18
**forensic** 31:18,21
  32:18 33:3,16
  34:10 35:5,23
  37:24 38:6 41:17
  135:9 139:3,7
  140:6,9,21 141:8
  142:4,5
**forensics** 36:10,15
  37:5,14
**foresee** 199:13
**form** 93:20 129:19
  130:10 136:14,16
  149:21 211:19
  212:1 229:19
**formed** 156:20

**former** 50:21 69:9
  69:9 73:24
**forming** 106:3
  117:8 135:21
  143:3 152:4
**forms** 47:1
**formulating** 42:16
**forth** 66:6 197:22
  257:15
**forthcoming** 34:11
**forty** 257:15
**forward** 34:6
  215:3 258:16
**found** 37:22 49:3
  49:11 54:2 59:9
  60:3,6 64:9 70:22
  84:4 100:1 105:24
  122:22 123:5,20
  123:21 124:8
  125:9,13 127:4
  146:19 148:22
  149:8,9 150:9
  176:18 177:2
  178:20 180:3,14
  180:22 181:9
  218:19 221:22
  228:6,16 234:17
  235:4
**fractured** 249:18
  249:21,23
**frame** 171:20
  182:8
**franks** 2:15 7:22
  7:23 252:10,11,18
  252:19
**free** 46:14 236:10
  237:15 259:14
  260:20
**friends** 110:10
**front** 19:22 20:12
  27:18 44:18 51:14

130:16 156:5
158:16 166:13
169:16 183:3
186:13 195:19
205:11 212:18
228:23 235:19
237:9
**full** 46:6 50:3
  72:20 125:17
  126:16 151:16
  186:17 187:5
  240:1,8 257:10
**fully** 49:17 104:6
  104:20 133:20
**fund** 35:16 209:13
  209:15
**funded** 29:7 32:15
  35:6,7,8,10,12
  39:3 40:3 42:24
  43:7,13,14 72:5,7
  72:8,10 208:18
**funding** 33:9 35:8
  35:14,22 36:3,8
  40:7,10 43:16
  209:8
**funds** 35:19 209:6
**further** 8:9,11
  49:2,3,11 56:12
  64:9 197:7,16
  215:8,13,21 227:1
  251:20 252:24
  255:17,20,23
  256:6 257:8,11,13

**g**

**g** 6:1 8:15
**gaps** 20:9
**gazette** 120:19
**geared** 83:2
**general** 84:12
  85:18,21 87:19
  91:23 95:20 96:9

98:20 110:16
118:19 167:20
179:1 203:1
210:17 239:13
240:3 244:10
246:12
**generalize** 95:18
**generally** 47:21
  62:2 130:7 143:17
  178:16 189:24
  199:23 245:2
**generate** 23:14
  54:15 59:15 61:10
**generated** 18:17
  48:12 113:4
**geographically**
  172:14
**gestalt** 87:19
**getting** 60:21
  71:11 107:22
  240:11
**give** 13:17 53:11
  72:3 86:3 105:1
  197:3 218:23
**given** 17:1 54:24
  146:5 214:12
  223:21 227:8
  249:20,20 256:1
  257:17
**giving** 39:23,24
  71:15 110:9
  211:17
**glitch** 240:11
**go** 6:12 11:12 12:8
  28:18 34:23 45:21
  47:9 48:13 50:20
  53:10,21 55:3
  57:16 58:24 59:17
  62:14,21 64:8
  65:16 71:7,9,20
  78:8 80:7 93:11

98:16 101:17
103:19 109:12
112:18,20 114:10
121:18 123:11
127:11 131:14
132:8 141:3
142:21,23 158:13
159:15 160:11
165:17,18 171:8
183:17 185:19
188:22 195:22
197:15 204:1
205:14,20 209:10
213:24 214:8
222:9 223:12
228:4 237:15
**goal** 39:14
**goes** 9:8,9 12:13
  37:19 94:11 249:3
**going** 6:3 9:20
  11:12 18:2 27:6
  50:16,24 53:3,9
  59:12 64:10 65:5
  67:18 75:6 78:17
  94:9 103:5,19
  121:21 165:16,23
  168:13 182:24
  183:13 192:8
  194:13,14,16
  201:16 233:12
  236:8,15,22
  237:13 248:23
  252:20 253:3
**good** 6:2 7:11,17
  7:20,22,24 8:20,21
  19:9 50:21 53:14
  75:7,18 78:14
  88:12 95:15 98:1
  116:24 121:8
  122:5 130:8
  141:17,24 163:14

[good - honestly]

170:18 171:2
190:4 223:12
224:18 227:15
244:11,17 253:12
253:13 255:1
**gordon**  1:19 5:2,6
5:8 6:14 9:16
19:12,18 20:6,8
51:9 78:22 103:14
122:2 166:4
192:13 235:24
237:3 253:8 256:1
257:5 258:9 259:4
259:9 260:4,13
261:20
**gordon's**  19:19
**government**  36:24
171:2
**graduating**  238:19
**grant**  70:21 71:4
72:10 247:4,11,24
**grants**  69:18 72:6
209:9,22 247:2,9
**graph**  25:6 50:15
55:14 59:1
**great**  91:18 195:22
223:13 243:23
**greatest**  216:14
**greatly**  160:12
**ground**  11:13 12:9
103:20
**group**  29:1,22
30:17 31:3,9,9,15
31:21,22 32:18
33:3,4,16,17 34:10
35:6,23 36:3,11,15
37:5,10,14,24 38:2
38:7 41:17,17
97:21 240:7 245:8
255:3

**groups**  31:5,22
32:4,9
**growing**  166:17
**guess**  23:4 32:7
75:12,17 108:19
117:15 118:12
167:22 183:21
187:20 188:3
192:1 206:12
**guessing**  128:1
**guesstimate**  111:5
**guide**  5:17 169:6
**guidelines**  151:23
**guinea**  11:24
238:11,15

**h**

**h**  8:15
**hager**  3:8 6:23
**half**  24:5 75:7
188:3
**hall**  126:24 127:17
129:10 141:12,15
221:24 222:7,10
222:13
**hand**  19:10 122:17
170:3 171:5 202:2
206:13 257:17
**handy**  131:16
156:3
**hangs**  87:13
**happens**  124:21
**happy**  121:10
168:22 190:7
192:2 214:5
**harbor**  10:2
**hard**  11:8 75:17
126:12 168:15,17
**harder**  22:19
**harvard**  238:1,17
238:19

**head**  69:10
**heading**  45:21
46:1
**health**  2:11 5:12
7:21,23 9:18
22:17 39:4,5 40:2
40:24 41:14,15
55:1 66:16 67:1
79:19 80:13 81:20
81:22 85:22 86:16
100:23,24 107:12
131:3 138:17
204:16 205:8,17
206:2 209:2
237:24 239:12
241:4,12 242:22
242:23
**health's**  108:5
**hear**  9:2,6 89:7
252:16
**heard**  8:22 84:6
249:5 251:13
**hearing**  136:10
252:6
**heart**  70:7
**held**  14:4 238:19
**help**  42:5 170:19
194:16 239:22
**helpful**  16:18
168:23
**hereof**  257:6
**heroin**  58:5 59:2
59:10 152:24
153:4,7,10,21
154:8,12,15,20
155:16,17 156:1
156:16 157:3,14
157:20,23 158:19
159:12 160:11,15
160:22 161:16,23
164:18 186:19

187:11 190:23
191:15,23 203:16
232:11 233:21
234:3
**heroins**  160:7
**hidta**  222:21,24
223:3,17,18,19
224:10 251:16
**high**  40:19 48:22
58:4 67:24 69:16
139:21 143:17
175:10 207:4
222:19 250:1
**higher**  44:18 67:8
108:20 223:1
231:2 233:5
**highest**  131:22
132:1
**highly**  249:1
**hire**  35:20
**historical**  22:19
65:8 213:3 217:18
**histories**  137:19
188:18,21 193:2,9
193:13
**history**  38:10
236:9 237:16
240:20
**hold**  53:7 103:5
241:17
**holifield**  224:24
225:1,1,2
**holifield's**  225:5
**hollister**  223:22
224:18,23
**homicide**  55:24
**homicides**  59:21
**honest**  125:4
**honestly**  62:14
70:19 115:22,24
130:13

hope 249:20
hopefully 20:9
  86:9
hopkins 240:14,19
horizontally
  183:18
hospital 29:4,24
  39:11 238:7,20
  242:24 250:5
hospitalizations
  40:22
hot 74:6
hotel 10:2
hour 15:9 75:7
  121:8 165:17
  236:15
hours 15:16 18:8
  20:19 21:1,7,13,18
  23:13 24:1,18
  25:15,20,24 26:4
  26:14,16,24 27:1
  27:11
household 124:18
houston 2:21
howe 3:4 7:14,14
  194:15
huge 231:7
huh 172:20
human 39:5 131:3
  204:16 205:8,18
  209:2
hunt 5:19 169:10
  170:7
huntington 1:4
  6:16 15:5 29:11
  38:4,5,15 68:1,23
  68:24 70:14 71:3
  72:5,15 73:1,2
  74:8,21 170:12
  196:6 218:7
  251:10 258:6

259:3 260:3
huntington's 76:4
hyatt 10:2
hydrocodone
  48:24

**i**

identification
  19:15 51:12 86:19
  169:11 194:21
  228:21 236:3
identified 27:12
  32:19 46:11 54:8
  87:17 114:17
  127:20 157:15
  174:9 176:23
  194:24 195:15
  218:7 221:8
  230:15 234:11
identifies 36:13
  51:23 109:9
  154:15
identify 20:21
  22:11,21 23:20
  24:2 28:4 45:11
  67:4 68:3 71:10
  76:19 88:6 89:13
  91:10 101:20
  107:17 108:11
  111:18 112:4,20
  113:6,8,9,11 114:7
  114:16 127:1
  137:18 147:7
  154:3 185:6,11,18
  194:7,14 198:19
  202:19 211:13
  234:15 244:6
identifying 31:14
  155:16 210:3
  219:18
ii 2:15 125:22
  126:3,4 189:3,23

212:14
illegal 56:6 118:6
  122:18 124:23
  191:21 211:23
  248:18
illegally 105:22
illicit 48:18 49:1
  57:13,15,22 58:7,8
  58:17,23 59:2
  61:18 63:1 118:17
  119:1,5,13,18,21
  120:3,6 147:22
  162:20,22 163:23
  164:6,11,18
  166:18 167:11,15
  168:2 171:13
  172:3,11 173:20
  174:5 185:2
  186:20 187:12
  189:6 190:2,12
  191:16,24 212:14
  228:2 229:10
  230:2,23 231:7,10
  231:14,16 232:2,4
  232:8,23 233:2
  234:1
illicitly 167:9
  168:6,7 186:22
  187:14,18
illness 13:21
illustrate 183:23
imagine 151:17
immediate 197:8
impact 83:12
  116:2,11 161:22
implemented
  185:18
implementing
  140:21
implies 206:9

important 13:10
  91:24 123:21
  147:16,19,23
  148:4 219:16
impossible 67:23
  95:18,20 96:3
  98:1 111:22
  182:17
impressed 67:22
impression 138:19
improper 165:10
improving 44:3
inaccuracies
  215:23
inaccurate 215:10
incidence 190:14
incident 196:12
incidents 172:10
  193:10 229:19
  250:7
include 20:20 21:2
  21:8 29:13 40:20
  40:23 41:2 43:23
  45:6 62:18 100:10
  146:20 185:14
  205:1 216:22
  240:4 242:10,16
  243:8 246:22
included 21:15
  22:9 31:23 59:19
  62:7,12 99:6,14
  100:13 111:19
  137:16 156:14,15
  159:6,13 160:23
  161:12 176:12
  197:21 224:4
  228:5 247:16
  258:14
includes 21:19,22
  41:13,14,21 50:18
  66:1 156:10 210:2

215:15 244:12

**including** 16:8
28:1 38:22 88:11
91:9 120:11 163:1
186:21 187:13
205:2 224:4 245:5
245:9

**inconsistencies**
145:20

**inconsistent**
101:23 130:5
198:9

**incorporate** 213:2

**incorporated**
215:1 260:12

**incorrectly** 159:12
160:22 161:16,24

**increase** 49:7
64:13 65:13 89:11
89:11 119:21
164:17 231:7

**increased** 48:20
67:11 89:18 91:11

**increases** 84:5
89:15 167:7

**increasing** 216:18

**incremental**
140:21

**inde** 181:12

**independent** 107:2
152:21 156:19

**index** 4:1 5:1

**indicate** 122:23
171:12 175:13
199:19 221:22
233:8

**indicated** 256:4

**indicates** 161:7
173:10

**indicating** 124:6
258:14

**indication** 202:24

**individual** 31:14
37:8 39:12 44:14
67:18 71:10 79:9
79:11,14,17 80:5
90:11,22 91:15
92:4,16 94:12
95:17,24 96:8
97:20 102:5
113:16 116:20
125:1 180:13
185:23 186:18
187:7 199:5,13
201:4,11 234:16

**individuals** 67:4
69:7 75:22 95:13
99:4 127:1,21
133:9 134:23
137:11 164:3
188:8,18 193:2,9

**industry** 81:12
94:3,7,8,11,17,21
95:5,7,21 96:5,10
96:13,18 97:3,8,12
97:24 98:7,13,22
99:6,12,15,15
101:14

**industry's** 79:21
94:2 101:9

**information** 29:23
30:19 38:6 52:13
52:15 53:18 61:10
77:6,21 132:2
137:7 139:7
147:11 148:7,8,16
149:10 150:13
178:13 208:3
216:19

**ingested** 198:5,22

**ingesting** 198:8

**ingestion** 198:14
198:17

**initially** 57:3
224:21

**initiatives** 5:13
81:22 86:17

**injuries** 59:19
239:15,16 240:3,4
242:12 243:1,1,19
245:2

**injury** 28:20,23
36:9 59:18 198:2
239:22 240:1,5,7,8
242:9,9,10 243:8
245:8,9 249:22

**input** 138:6 151:6

**inputted** 138:7

**inquired** 179:12
185:21

**inquiries** 38:11,15

**inquiry** 152:13,22
154:13 188:14
207:19 208:7

**inside** 149:8
150:11

**insignificant** 180:2

**instances** 149:17

**institute** 36:6,8
43:15 240:21

**instituted** 71:24

**institution** 241:24

**instructing** 27:10

**instruction** 13:3

**instructions**
194:10

**insufficient** 149:13

**intelligence**
239:10

**intend** 44:24 46:10
48:5 52:18,23
53:18

**intensity** 222:20

**intensive** 194:4

**interested** 7:4
34:19 137:17
239:16 257:14

**interesting** 251:14

**interfere** 6:8 13:21

**interference** 6:6

**interject** 14:17
25:21 26:6 248:24

**intern** 238:4

**internal** 145:12

**internally** 206:21

**international**
242:17 245:7
254:19

**interpret** 82:23
85:5 93:17

**interpretation**
46:17 47:16 94:19
94:20

**interpreted** 92:6

**interrupt** 53:2
75:6 190:4 191:8

**interrupted**
159:22

**interval** 109:16

**interview** 68:8

**intoxication**
197:13

**investigate** 135:14
209:10 215:8,20

**investigated** 69:18
135:17,21 189:15

**investigation** 68:7
188:13 190:11,17
202:7 215:13
219:6 221:14,17
234:15

**investigations**
223:6 239:13

240:3
**investigators**
  206:22
**invoice**  26:17
**invoices**  26:20
**involve**  56:10
  124:19 176:8
  229:19 245:4
**involved**  17:18
  25:3 27:23 37:19
  38:9 60:22 68:4
  72:13 91:16 92:15
  106:8 107:3
  122:13 132:3
  133:21 154:12
  175:20 184:20
  193:9 220:7 229:3
  229:24 232:4,6
  234:18
**involvement**  5:15
  40:6 157:9 228:14
  228:19 246:11
**involving**  167:7,8
**irregardless**  106:1
  219:18
**irresponsibility**
  96:1
**irresponsible**
  147:7
**islands**  238:10
**issue**  45:12 88:19
  91:3 93:2 94:16
  103:17,22 105:6
  206:24
**issues**  11:6 157:2
**items**  23:4

**j**

**jackson**  257:2
**jacob**  2:4
**jake**  8:3

**jan**  69:13 70:14
  72:24
**january**  196:9
**jersey**  172:2,15
**jim**  74:1,3,20
**johns**  240:14,19
**johnson**  74:1,3,20
**joined**  8:2 33:4,17
**joseph**  227:23
**journals**  254:9,16
**judgment**  84:16
  93:18 165:13
  179:19
**judith**  32:16 87:22
**jump**  246:21
**june**  14:11,12
  170:3
**jurisdictions**
  208:5
**justice**  5:18 36:6
  169:8

**k**

**kearse**  2:4 8:2
  14:15 17:21
**keep**  19:10 53:3,9
  208:5
**kept**  137:10
  207:23
**kessler**  2:15
**keyes**  225:18
**kill**  139:21 181:18
  181:22
**killing**  150:7
**kind**  240:24 243:9
**knew**  14:23
  199:15
**know**  9:6 14:18
  18:1 25:23 26:9
  27:4 38:13 40:5
  47:17 63:9 67:5
  67:12 70:2 71:12

71:19,23 72:4,12
72:20,21 79:2
80:2 82:12 89:17
89:23 90:6 91:14
92:13,21 93:2,10
99:17 103:2 109:8
109:24 110:3,12
110:13,13,24
111:5,15 113:3
115:24 116:2,11
121:8 124:23
125:21 126:1,2,11
127:7,11,20,23
128:6,11,13,15,18
128:21 129:1,3
130:13,15,22
133:1,5 134:23
135:3,17 136:2,11
137:11 138:1,4,5
138:18,23 140:12
140:14,24 142:4,7
142:8 144:6
145:23 149:23
151:12,14,16,18
151:19,24 153:13
159:11,15,19,21
160:21 161:3,5,15
164:19 168:1,9
170:19 174:4,7
175:22,23 177:24
180:2 185:16
186:7,9,9,11 187:9
199:1,9,11 202:8
208:6 209:18
210:14 212:1
215:7,20 222:9,10
227:23 233:16
234:7 236:16
249:6 251:4
**knowing**  101:5

**knowledge**  36:2
  37:13 38:1 40:9
  62:22 63:4 71:2
  85:18,21 93:13,16
  100:12 116:18,24
  123:17 129:6
  148:15 177:7
  204:18 206:18
**known**  91:3
  170:13 231:14
**kraner**  142:15

**l**

**lab**  142:12 148:21
  149:3,7,19
**labeled**  19:23
**laboratory**  132:22
  132:24 142:5,10
**labs**  171:12
**lacked**  96:10
  97:20,22
**lacking**  96:2
  195:11
**lacks**  96:13,18
**large**  174:4
**larger**  231:6
**larry**  224:24 225:2
**latest**  127:7
**laura**  3:3 7:12
  8:22
**law**  8:23 16:11
  73:23,24 148:9
  151:5 172:1,8
  173:18 174:8,23
  212:4 218:6 219:1
  250:21
**lawsuit**  9:1 80:10
  207:17
**learned**  167:23
**leave**  201:16
  226:24

**left**  122:10 166:11
171:9 240:19
**legal**  11:19 56:6
81:1 90:20 102:14
102:18,23 115:21
116:7 125:2
128:11 130:1
146:16 186:19
187:11 191:16,19
211:24 258:1
261:1
**legality**  125:4,19
130:1,22,23
**legally**  122:24
**legitimate**  99:22
**length**  68:13
**lessor**  161:21
**letter**  16:19,22
258:20
**level**  40:19 45:14
55:17 56:20 95:18
97:21 142:23
143:23 144:6
145:13,17 167:13
177:2 178:19
179:5,6
**levels**  110:4
178:18
**liberty**  240:20
**licensed**  134:13,21
135:9,12
**lick**  120:15
**lies**  29:11 172:14
172:15
**life**  249:2
**limit**  178:1
**limited**  45:15,17
77:5,16 109:21
131:12 246:6
254:24

**line**  9:9 77:12
118:14 159:6
160:24 161:7,12
170:19 204:1
248:24 258:14
260:7 261:3
**link**  81:24
**linkage**  115:9
**linked**  111:20
112:5 114:8,18
**list**  5:5 28:8,10,10
51:5,8,19,23 52:3
60:9,13 156:10
176:19 177:13,14
178:9,12 179:4
180:13,16,19
225:21 226:21,21
**listed**  60:8,23
114:1 140:19
167:11 171:21
179:16 180:3,8
181:6 182:19
186:18 187:8
188:15 189:17
191:24 247:3
260:7,17
**listing**  260:7
**lists**  153:3,5
180:21
**literature**  82:9,23
84:15 85:3,24
89:10 92:6,7
93:17,17,23 102:2
102:22 104:6,20
104:21 107:5
110:17 155:21,24
164:6,13,16 203:1
**litigation**  11:22
12:1,6 22:5 70:1
136:9 255:7

**little**  13:11 19:4
49:19 74:6 79:4
88:12,17 104:23
115:14 121:15
131:15 132:9
154:20 162:11
163:1 167:13
195:20 197:6,15
228:11 251:11
**local**  7:23 36:24
37:17,20 38:11
97:11 134:17
201:18,23 208:5
212:4 218:6
252:11,19
**locally**  135:4
**located**  1:21 9:24
**location**  9:21
196:5
**lodge**  13:1 218:21
**lodges**  13:2
**long**  14:4 34:15,19
38:10 78:11 88:15
90:1 98:17 192:3
**longer**  167:14
**longitudinal**  15:3
**look**  22:6 28:7,18
29:21 34:14 39:8
41:3 48:13 53:23
62:15 63:15 64:21
64:24 65:10,19
67:20 74:17 75:18
76:24,24 98:16
99:1 100:19
106:15 110:5
113:17 114:3,12
118:9 119:7
122:12 123:12,14
139:11 156:14
157:19 158:9,10
158:17 159:4,15

161:20 163:3,17
167:1 172:18
183:6,9,13 188:2
191:1 193:12,14
193:18,22 203:12
203:19,20,21
213:9 214:6,20
215:17 222:10
223:22 229:14
230:3 237:15
240:20 243:15,23
244:10 246:11
254:12
**looked**  17:11
44:15 62:8 110:6
111:10,12 127:6,8
127:13 132:23
134:7 141:24
144:8,9 152:7
191:14 193:16
223:21 224:17
229:14 242:10
**looking**  22:18 25:5
29:2,3,15,23 30:8
30:18 31:11 33:20
34:13,20 41:5,7
57:5 59:3 62:5
64:19 93:11 98:19
118:13 129:5,6
130:15 146:11,12
159:4 161:22
164:24 169:13,22
187:4 188:24
193:5 196:1,18,20
197:16 202:13
230:9 234:8
239:17 243:4,18
244:18 246:8
247:15,18,22
**lose**  76:2

**lost** 103:1,18 223:8
**lot** 66:21 70:9 76:8
  82:10,15 124:21
  148:18 243:19
  245:3 251:5
**low** 48:21 49:5,6
  55:5 64:12 66:13
  66:15,23 67:2,23
  67:24 177:2
**lower** 184:11
  188:3
**lsd** 58:5
**lunch** 121:17,18

**m**

**m** 8:15
**m.b.** 5:3,6,8 19:12
  51:10 236:1
**m.d.** 237:21
**madam** 258:10
**mail** 155:4
**mails** 177:11
  207:14
**main** 2:20 46:21
  120:20
**maintained** 67:6
  67:13 68:9 119:22
  205:7 206:2 208:3
**major** 32:12 41:12
  41:20 79:21 81:12
  101:1 144:15
**majority** 123:5
  223:24 227:14
**making** 25:3 87:21
  151:6
**male** 252:16
**males** 123:11
**mam** 153:13,20
  154:2,6 157:13,23
**management**
  88:13

**manner** 140:10
  147:8 197:17
**manufactured**
  57:3 114:9 167:9
  168:7
**manufacturer**
  90:16 94:10,23
  97:3 101:15
  111:24 112:16,21
  113:6,8,11,12,22
  114:4,11
**manufacturers**
  81:11 90:15,17
  92:12 104:16,18
  108:9,18 113:14
  113:17 114:12
**manufacturing**
  114:13
**maps** 42:12
**march** 54:6 55:18
  56:11,12
**maria** 155:11
**marijuana** 58:5
  176:18 223:5,24
  224:22
**mark** 51:4
**marked** 19:15
  34:6 48:4 51:11
  86:18 87:2 163:13
  169:10 173:19
  174:24 194:21
  228:20 236:3
**market** 90:8 91:14
  92:24 93:8 111:15
  115:23 167:24
  232:15,17
**marketed** 88:21
  89:19 90:4 93:4
**marketing** 89:18
  90:11,13,18 91:8
  91:16 92:10,11,15

92:21 93:5 105:11
  108:17
**marking** 19:18
  20:3 195:13
**marshall** 75:1,12
  75:22
**maryland** 133:15
  240:22 241:5
  243:11,13
**master's** 237:24
**material** 23:1,3
**materials** 5:5 23:8
  51:6,8,19,23 52:3
  52:6 224:4 225:20
  225:21,24,24
  226:22 227:2,5
**matter** 6:15 67:24
  135:2 145:13
  179:19 192:22
  220:23
**mb** 237:18
**mcginness** 2:4
**mckesson** 3:2 7:13
  7:15 9:1 80:10,20
  81:2 90:7 91:9
  111:16,21 115:16
  116:3 200:24
  221:2,9 255:20
**md** 5:3,6,8 19:13
  51:10 236:1
**mean** 16:21 18:19
  24:9,22 35:8 44:6
  50:1 52:14 55:19
  56:5,16,17,23
  57:14 62:12 63:18
  75:5 76:6,14 78:1
  79:17 143:22,23
  144:7,7 175:7
  180:8 181:7 190:3
  191:7 217:22
  231:20

**meaning** 16:16
  32:9 56:24 97:2,3
  97:4,8 98:24
  128:2
**means** 130:4 191:5
  232:5
**meant** 101:9
**mechanism**
  113:12
**media** 6:13 78:21
  103:13 122:1
  166:3 192:12
  204:20 237:2
  253:7 256:2
**medicaid** 39:3,6
  39:11 208:19
**medical** 9:18
  21:16 25:17,20
  31:8,16 36:20
  58:3,9 59:21 60:6
  60:15 61:9 76:12
  85:21,24 104:3
  105:3 106:14
  110:18 113:4
  131:23 132:12,15
  132:15,19 133:3,4
  133:12,23 134:4
  134:11,13,17,24
  135:4,5,8,19 136:1
  136:4 137:5,13
  138:2 139:13
  141:13,17 142:21
  144:17,21 145:7
  145:18 146:9,14
  148:10,14,15
  149:7,18,21 151:2
  151:4,10,12,20
  152:3,6,15 154:6
  154:15 157:11,12
  157:22 164:2,9,20
  176:14,22 177:9

177:12,16,19,21
179:3,8,13 180:6,9
180:19 181:8,24
185:10,17 186:3
191:12 198:9
200:11 203:3
206:16 235:4
237:18 238:3,10
243:9,10,12
244:20 246:20
248:16 253:22
255:1
**medicare** 208:19
**medication** 124:24
127:3 200:2,10,14
**medications** 13:20
89:16 115:17
200:22 201:4
250:8
**medicine** 238:24
239:6 240:9
241:15,16
**meet** 41:9
**meeting** 21:20
**meetings** 37:10
75:15 179:9
**meets** 257:15
**melville** 2:10
**member** 242:14
**members** 18:4,11
70:20
**memberships** 32:4
**mental** 40:23
41:14
**mention** 22:24
23:2 28:12 73:21
77:13 222:12,17
**mentioned** 31:16
31:20 38:18 65:4
65:9 70:13,19
76:8 119:6 175:6

244:8
**mentions** 157:4
**merit** 1:21
**met** 68:14 69:3,9
69:13,23 74:8,20
74:24 75:12,14
**metabolized**
153:21 155:16
**metabolizes** 153:7
153:10
**meth** 188:23
213:21
**methamphetamine**
41:22 188:23
189:3,6,12,13,16
190:12,13 215:15
216:13,23 217:1
**methodology**
128:23
**microphones** 6:4,8
**mid** 218:10
**middle** 213:10
**midwest** 258:17
261:1
**mind** 121:14
**mine** 41:7 50:22
74:5 207:13 229:3
239:18
**minimal** 162:6
179:5
**minor** 111:6
142:24
**minutes** 48:9
77:12 115:15
125:5 136:3
165:19 192:5
236:19 253:1
**miscategorization**
162:8
**mischaracterizes**
100:16 101:12

173:24
**misclassification**
162:6
**missed** 22:22
217:23
**missing** 151:17
**misstates** 215:24
217:1,3
**mistake** 145:14
**misused** 186:22
187:14,18
**mixed** 184:8
**mlp** 2:7 8:6
**mock** 136:6,8
147:6 149:17
155:9 165:9
177:17,18,20,22
**mode** 198:18
**model** 69:17
**molecule** 105:24
165:1,2,8 189:20
**molecules** 57:2,2
219:19 221:22,23
234:16,18,22
**moment** 27:14
35:7 63:5,9 81:5
190:4 223:16
242:20
**moments** 97:7
130:24 202:9
**money** 40:10
72:10,12 209:24
247:24
**monitoring** 114:24
115:4 137:1
**monoacetylmor...**
153:11,14
**month** 142:8
**months** 240:10
**moot** 252:18

**morgantown** 9:19
**morning** 6:2 7:11
7:17,20,22,24 8:20
8:21
**morphine** 153:4,7
153:20 154:6,7,24
156:15 157:2,15
157:20,24 158:6
158:18 159:5,13
160:8,10 161:12
161:17,24 178:21
**mortality** 28:20
83:4 239:17
**motley** 2:5 8:1,3
16:9
**motor** 243:1
**mountain** 250:3
**mounted** 10:24
11:3
**move** 12:10
114:15 201:17
246:1
**moved** 130:18
**moving** 131:16
191:21,22 192:23
**mph** 5:3,7,9 19:14
51:11 236:2
**mt** 2:6
**mud** 120:15
**multiple** 22:18
27:24 28:15 42:10
139:12 140:17
171:12 175:12,20
176:8,11 178:5
182:6 184:2 235:2
**muted** 103:9
**mutual** 240:21
**mutually** 22:14
182:14

| n | | | |
|---|---|---|---|
| **n**  6:1 8:15 | **need**  17:5 25:23 | **normally**  91:5 | 258:8,14 |
| **n.w.**  2:13 | 26:19 46:13 53:5 | 160:3 181:18 | **numbered**  156:8 |
| **nail**  88:18 | 78:2 88:17 111:7 | **nos**  6:19 | **numbering**  170:21 |
| **naloxone**  71:15 | 134:13 214:2,8 | **notable**  230:13 | **numbers**  20:22 |
| 110:8,9 203:3 | 215:7 227:1 228:7 | **notarized**  258:15 | 170:7 172:19 |
| **name**  6:22 7:11,14 | **needed**  37:1 59:5 | **notary**  257:4 | 206:17 260:7 |
| 8:22 9:14,16 | 88:20 147:12 | 258:24 259:10,18 | **numerous**  118:18 |
| 17:22 31:17 65:5 | 148:19 | 260:15,23 261:23 | **nurse**  135:5 |
| 74:1 113:17 | **needs**  39:8 41:9 | **note**  6:4 44:3 | **nw**  3:5 |
| 145:21,24 168:18 | 59:23 208:14 | 121:7 204:5 | **ny**  2:10 |
| 170:17 177:20 | **neither**  119:11 | 205:16 214:20 | o |
| 191:1 199:2 226:8 | 222:7 257:11 | 215:9 258:13 | **o**  6:1 8:15,15 |
| 258:6 259:4,15 | **never**  92:2 102:16 | **noted**  8:9,12 | **oath**  7:3 11:18 |
| 260:4,21 | 160:14 181:14 | **notes**  257:9 | 12:14,17 79:2 |
| **named**  81:2 | 229:22 | **notice**  1:20 98:21 | 122:7 166:8 |
| **names**  75:18,19 | **new**  11:23 33:18 | **noticed**  207:1 | 192:18 237:7 |
| **napoli**  2:9 8:5 | 47:19 52:16,20,23 | **noticing**  7:10 | **object**  73:11 86:4 |
| **narrative**  213:14 | 53:17 63:22 70:5 | 172:9 | 86:6 95:23 140:13 |
| **narrow**  104:24 | 74:10 172:2,15 | **noting**  226:23 | 218:23 |
| 160:20 | 192:23 238:4,11 | **november**  5:13 | **objecting**  126:15 |
| **national**  22:16 | 238:15 | 81:23 86:12,18 | **objection**  13:2 |
| 36:6 43:15 55:1 | **newest**  34:21 | 108:5 | 48:2 52:22 72:18 |
| 66:15,24 132:11 | **newspaper**  73:19 | **numb**  254:24 | 73:6 77:8,19,24 |
| 132:14 133:3 | 120:20 234:8 | **number**  23:20 | 85:1 91:13 93:15 |
| 152:20 167:13 | **nida**  32:15 42:24 | 24:3 26:16,23 | 95:11 96:6,14,20 |
| 252:12 254:6 | 43:5,7,13,14,19,22 | 27:11 38:22 46:22 | 97:6,16 99:8,24 |
| **nationally**  167:16 | **nigeria**  240:10 | 68:14 72:16 73:22 | 100:8,15 101:11 |
| **nations**  172:10 | **night**  168:15 | 75:13,19 82:24 | 101:24 105:13 |
| **natural**  246:21 | **nih**  36:7 | 86:21,22,23 114:7 | 107:20 108:14 |
| **nature**  12:1 | **nonaddictive**  89:1 | 127:1,21 160:19 | 115:20 116:6 |
| 189:19 | 89:20 | 160:23 161:8 | 117:14 124:15 |
| **near**  42:7 58:14 | **nonfatal**  29:4 30:1 | 170:10,11,13,15 | 125:18 126:9,16 |
| 79:21 81:12 94:3 | 30:22 71:7 76:5,7 | 170:16 171:5 | 128:8,14 129:22 |
| **nearby**  70:24 | 76:9,14,16,21 77:7 | 172:9 174:3 | 130:6,12 140:23 |
| **necessarily**  60:10 | 77:21 110:22 | 175:24 178:1 | 142:13 143:11,21 |
| 60:11 135:12 | 209:11 244:18 | 182:22 184:23 | 145:10 149:4 |
| 149:11 204:6 | **nonmedical** | 204:21 207:2 | 150:15 151:8 |
| 207:2 233:2,7 | 105:17 130:11 | 210:3 223:18 | 152:17 155:19 |
| **necessary**  150:8 | **nope**  248:11 | 229:18 231:4 | 156:24 157:17 |
| 194:5 | **normal**  198:11 | 233:15 245:21 | 158:3,8 159:14 |
| | | 247:2 255:1 256:2 | 161:1,18 162:4 |

164:22 165:12
173:23 174:11,21
175:3 185:13
186:5 188:11
191:18 196:15
198:23 199:7
200:3,15 201:2,10
201:24 202:6,21
203:10 204:14
207:8 208:4,10
210:9 211:9,15,21
212:8 215:24
216:8,17,21 217:3
217:10 218:11,22
219:5,14,23 220:3
220:15 221:11,16
222:15 224:16
225:11,22 227:17
229:21 231:12,19
233:10 234:4,21
235:13 246:17
250:18 251:3,12
**objections** 7:8
 13:1
**obligates** 12:17
**obligations** 90:20
**observing** 133:13
**obtain** 22:19 207:7
 208:8
**obtained** 57:1
 122:24 129:12
 130:9 137:7
 229:11
**obtaining** 21:9
**obviously** 59:3
 71:8
**occasionally** 32:8
**occurred** 23:21
 24:3 61:22 120:10
 147:16 198:2
 229:8

**occurring** 71:16
 213:17
**october** 40:8
 257:17,17
**offense** 212:3
**offer** 14:6 44:24
 46:10 47:7 52:18
 52:24 53:19 105:2
 105:10,15,19
**offered** 28:24
 240:22
**offering** 62:23
 77:5,14 79:7,10
 80:9,12,15,18,24
 102:13 104:2,10
 105:9,14 106:6,20
 106:22 107:7
 108:24 118:23
 120:1,4
**offhand** 177:20
**office** 21:16 25:18
 25:20 36:20 39:6
 61:8 72:2 76:13
 132:19 133:2
 134:12 136:1
 137:5 144:17,20
 145:6,18,23
 151:20 152:3,15
 154:5,7,14 164:9
 176:22 177:8
 179:3 180:6 181:8
 181:24 185:16
 186:3,11 211:6
 216:11 218:2
 253:23
**officer** 238:10
**official** 60:5
 259:15 260:21
**officials** 68:8,20
 68:24 201:18
 212:5

**oh** 20:2 53:4 73:9
 75:9 134:19
 142:19 163:14
 169:3 170:23
 171:1,2 195:5
 215:6 226:7 239:7
 244:11
**ohio** 74:11 218:17
 258:2
**okay** 9:2,5 11:2,4
 11:11 13:17 24:16
 24:18 25:13 26:11
 27:7,16 28:7,18
 29:20 35:5 38:14
 40:5 41:24 42:6
 42:20 45:19 49:15
 50:9 52:3 53:4,14
 53:15 55:7,13,16
 55:20 56:19 59:17
 63:7,12,17,21 64:3
 64:7 65:19 68:12
 68:16,22 69:4,6
 73:7,17,21 74:2
 76:1 77:14 78:7
 78:15 79:4 80:7
 86:24 87:1,15
 88:8 93:12 103:6
 104:23 105:8
 108:20 121:3,20
 122:9 125:5
 126:22 130:24
 132:7 136:3
 137:11 145:1,6
 146:3 153:19
 155:15 156:6
 160:18 165:15,21
 165:21 168:21
 169:3,22 170:10
 170:23 171:1,2,3
 175:5 177:21
 181:5 183:2,3

186:7 191:11
 192:7 195:22,23
 201:16 212:17
 218:23 223:16
 235:16 236:19
 237:9 239:7
 244:13 251:23
 255:16
**old** 20:3 249:19
**older** 50:17
**once** 34:2 95:17
 110:7 161:11,15
**ones** 60:22 76:10
 85:13 90:12
 110:23 113:11
 135:10 181:1,2
 208:6 244:24
**onward** 54:20
**onwards** 21:4
 60:19 205:22
**ooo** 256:8
**oops** 65:7
**open** 10:9 227:1
**opened** 235:21
**operator** 6:2 8:8
 78:17,21 103:7,13
 121:21 122:1
 165:23 166:3
 192:8,12 236:22
 237:2 253:3,7
 255:22
**opiates** 159:7
 251:5
**opinion** 34:8 44:10
 52:21 60:5 61:15
 61:18,24 62:3,23
 64:17,21 66:6
 81:1 82:11 83:7
 88:16 92:19,23
 93:20 95:4,9
 96:11,12,15,17

97:13 99:5,20
100:4,21 104:2,5
105:5,15,16 106:7
107:8 109:4,5,6
114:1 116:13
120:1 125:2
130:20 136:18
142:14 146:14
149:22 156:21
167:15,17 176:14
179:8 180:23
227:20 235:8
**opinions** 14:6
23:14 34:5,11
42:16 44:24 45:22
45:23 46:2,7,11
47:1,5,11,12,13,15
47:22,24 48:3,10
48:11,14 52:9,17
53:19,23 54:6
56:12,23 58:13
76:21 77:4,14,22
79:5,6,7,10 80:3,9
80:12,15,18 83:9
93:23 99:3,4
102:14,17 105:2
105:10 106:3,20
108:24 117:9
118:23 135:21
136:14,16 143:3
152:4 219:22
220:2,8,12 225:9
225:13,14,14
227:12 253:16
**opioid** 5:13 29:8
56:9,10 59:7 63:1
63:1 65:22 81:9
81:10,23 86:17
87:16 89:16 92:24
95:5 98:6 104:18
108:9,17 109:9

115:16,17 117:21
118:17 119:1
127:2 161:13
162:2,13,22
171:21 181:20,21
203:22 204:3,11
209:17 245:5,14
245:17 246:6
248:1 250:7
**opioids** 5:11 41:11
41:13,18,19 48:18
48:23 49:2 56:10
56:20,22 57:8,13
57:15 58:15,17,22
58:23 59:3 61:16
61:18 63:14 81:21
82:4 86:12,14
88:7,10,20 89:12
91:12 95:2 97:9
97:14 98:3 99:19
99:21 100:2,5,6
101:3,22 104:3,12
105:3,11,16 106:7
106:21 107:3,8
109:1 117:12,16
119:5,13,13,18
120:3,3 123:7
124:8 158:7 159:7
161:9 163:23
167:8 172:11
174:5 181:15,17
184:12 194:7,8
201:9,19 202:5,11
203:8 211:14
218:10,16 219:3
219:12 223:5,7
227:14,15 244:7
246:10,15,18,22
246:24 247:5,10
248:21 249:17,20
250:2,23,24

**opportunity** 86:4
201:7
**opposed** 90:15
**order** 20:17 22:11
22:20 23:9,14,19
23:20 24:2 52:24
53:19 54:15 60:10
61:10 68:8,9
82:18 83:9,18
113:5 136:14,16
142:2 145:7
149:21 152:13,15
179:13 185:6
193:8 207:7 208:8
211:12
**organization**
118:4
**organizations**
116:16,23 117:5,8
117:12,21 218:5,8
218:16 250:16
251:2
**origin** 17:10 106:1
106:12,16,19,20
107:3,12,18
111:23 122:13
170:16 189:15
190:11 219:21
220:1,6 221:22
234:11,14 235:10
**original** 82:16
128:5 137:9,16
139:19
**originally** 63:22
67:16 139:11
**origins** 253:19
**otago** 5:3,6,9
19:13 51:11 236:1
237:18
**outbreaks** 239:14

**outcome** 7:4 79:12
80:21
**outgrowth** 209:5
**outreach** 71:18,21
**outside** 69:6 96:21
126:23
**overall** 98:23
158:18 160:7
**overdistributed**
108:19
**overdose** 14:22
15:4 20:22 21:3,9
24:19 25:16 29:3
40:21,22,22 44:8
44:11,20 45:1,8
48:16 55:19 59:11
60:1 68:4 71:6
76:11,15 77:15,21
100:3 110:20
111:6 112:4 116:4
118:1 122:12,14
123:6 131:5
147:19,23 148:3
155:16 157:14
161:13 167:7
172:9,10 179:17
180:10 181:10
182:2,10,22 184:2
184:11 188:5,9
189:12 190:14
193:10,22 194:6
196:5,12,23
197:21,21 202:19
203:22 204:3,11
204:17 205:21
207:4,7,21 208:2,8
209:11 213:3,17
217:17 228:1
229:8,19 232:1
234:20 243:23
245:17 255:4,13

**overdosed** 48:18
188:20 193:3
**overdoses** 22:7,11
22:21 23:7,15,21
24:3 28:1,16 29:4
29:13,24 30:1,20
30:22 32:5 41:1
48:23 49:1 56:13
56:15,17,18 58:15
58:16,22 59:19
61:16,17 63:1,1
65:8,22 69:16,19
71:8,16 72:17
73:4 76:5,7,9,16
76:22 77:6,7,17,21
99:21 106:8,23
107:4 109:20,21
110:1,14,16 111:1
111:2,19 113:14
114:7,17 132:2
133:9 148:23
153:1 161:11
164:4 166:16
175:17,19 176:7
183:15 184:19
189:16 196:22
204:21 209:11
210:3,8,22 211:11
219:11 220:7
222:1 230:20
231:6 233:6,17
244:18 245:17
**overlap** 126:19
**overprescribing**
99:18 101:19
**overpromotion**
108:17
**oversupply** 88:19
108:16 109:16
**overview** 213:3
217:18

**overwhelmed**
207:5
**oxycontin** 48:24
113:18 114:12
178:22

**p**

**p** 6:1 81:23
**p.m.** 122:3 165:24
166:5 192:9,14
236:23 237:4
253:4,9 255:24
**page** 12:13 21:23
27:22 28:5,10,18
29:17,18 30:5,8,9
30:12 31:10,24
38:22 45:11,21,23
45:23 46:19 47:13
49:20 50:3,16,20
52:2 53:23 54:1,7
54:11,17 55:10,15
58:1,12 59:1,16
61:14,20 64:7,8
65:12,14,19 79:18
80:8 81:6,7,19
82:2,7,19 87:11,12
87:18 88:18 94:1
94:4,21 98:7,14
99:7 100:13
107:18,24 108:13
118:9,14,23 119:7
119:20,20 120:9
131:19,20,21
132:5,8 156:7
158:11,12,14
159:3 161:6
166:15,24 167:2,3
170:2,9 171:3,9
176:3 186:15,17
186:24 187:5,5
188:3,3 197:5
205:14,15 213:7

213:10 214:20
230:3,5,6,7,11,12
231:18 232:14
244:13 258:14,16
260:7 261:3
**pages** 21:24 46:12
46:23 47:2,6,11,23
156:8 167:2
**paid** 15:7,9,10
16:1
**pain** 88:13 89:21
130:14
**paper** 31:7 33:7
35:2 155:6 157:3
157:5,7 175:22
195:3,6 230:21
231:10
**papers** 154:18
155:5,5 247:21
**papua** 11:23
238:10,15
**paragraph** 29:18
30:12 31:23 49:21
50:4 54:1,3,7,11
54:17,23 55:9,11
58:14 61:14 64:8
64:18 65:20 66:7
76:18 118:13
171:8 172:7
186:17 187:5
230:12
**paragraphs** 46:2,5
46:14,16,18
**paraphernalia**
147:18
**parcels** 96:8
**part** 29:1,22 30:17
32:3,14 37:11
41:4 44:14 45:4
50:13,14,23 55:5
61:1 63:14 69:5,6

70:9 71:18,21
84:12 91:24 94:16
94:22 95:4,6,7
96:1 98:6,13 99:5
99:12,14 100:9
102:23,23 105:4
107:18 117:1
118:7 122:18
123:21 133:13
135:18 140:15
148:1 155:14
180:15 181:7
194:11 197:8
200:5 220:7,12
224:12 228:5
230:18 235:9,10
245:7 246:12
260:9
**partially** 146:19
**participating** 9:23
10:18
**particular** 42:13
47:18,18 60:10
77:2 79:12 80:21
102:5 113:22
114:19 140:17
147:3 150:6
229:13 246:8
253:19
**particularly** 34:19
75:18 89:20
243:21 245:3
246:18 251:4
254:24
**parties** 1:21 6:11
26:19 257:12,14
**partner** 124:17
**parts** 29:5 30:2,23
98:21 184:16
**party** 7:3

pass 251:22
passage 81:7 82:1
passed 134:5
patch 168:4,4
198:6,8,14,17,22
199:6,14
patches 174:7
patent 112:19,22
112:23 113:10,20
114:4
patented 113:21
pathologist 135:9
179:21
patience 103:20
patient 199:20
201:8
patient's 201:1
patients 201:4,11
patterns 15:4
231:9,17,21
232:14,16,24
233:8
pause 9:7 182:24
218:23
paying 140:5
pdmp 114:20,22
115:2,5,9,11
122:18
peer 34:2 117:3
118:18 120:23
134:5,9 136:20
244:1 246:14
254:9
pending 174:21
people 27:15
37:21,22 48:15
59:10 68:13 69:15
69:19,20 70:10
71:11,11,12,13
74:9,24 75:4,13,20
80:2 82:11,11

83:13,16,20 84:4
89:20 90:19 91:5
92:20 94:11 97:22
101:5 105:24
106:16 110:6,9
119:24 124:21
130:14 134:6
140:5 143:14
145:3 151:24
174:6 175:9
181:16 182:4
209:8,12 210:12
211:4 217:14
218:19 219:20
231:5,15 233:4,15
234:17,18 247:16
percent 37:17 38:8
72:8 98:15 109:14
110:20 123:6,19
123:22 124:7
125:3,3,7,24
129:11 160:11,14
204:10 209:7
214:1 229:8
percentage 109:24
110:14 230:14
perform 156:19
performed 136:1
148:21
period 24:9,10
48:21 55:6 63:2
67:6,14 110:1
113:19 114:11
138:18 159:8
161:17 162:13,20
162:22 164:17
173:21 174:4
176:7 204:12
209:18 213:23
215:3,16 217:2
219:2 233:17

239:3,4
periodically
206:11
periods 50:17
137:22
person 12:22
75:13 76:11 84:18
91:23 111:24
126:6 129:24
139:21 144:12
149:8 150:6
170:17 199:16
234:19 243:12
personal 63:23
248:7 249:1,2
personally 38:12
63:19 112:14
133:7,17 143:2,20
144:1,8 155:11
177:23 248:18
259:11 260:15
pertains 14:19
peyote 58:5
pharmaceutical
84:10,23 85:9,19
88:5 89:14 90:6
90:14 92:12,23
93:13 94:17 95:7
97:2,12 101:21
102:14,19 113:6
221:1 232:7,10
pharmacies 90:22
91:15 92:16 94:14
95:1,4,9,12,13,14
95:16,21,24 97:9
97:11,13,19 102:5
pharmacist
101:16 155:13
pharmacy 94:16
95:18 96:5,12,18
97:8,21 112:13

138:9 201:5
phone 11:5 69:14
258:3
phones 6:7
photographs
148:3
phrase 56:21
57:13,14
physical 9:21
physically 9:24
physician 12:5
85:22 100:23
114:19 123:9
135:6,13 199:12
199:21,24 200:7,8
200:12
physician's 194:10
physicians 98:10
134:14,21 138:9
pi 32:16
pick 6:5 19:24
122:9 144:5
166:11 185:15
picked 49:10
146:1
pieces 84:2 96:8
pills 250:12,15
pink 190:22
piped 252:22
place 6:7,11 17:5
71:2,10 88:2
116:10 147:15
236:17 257:6
places 38:22 138:8
152:9
plaintiff 1:5,12
plaintiffs 2:2,7 8:1
8:2,4,7 14:16 15:1
15:13,20,23 16:4,8
16:11,20,23 17:17
20:20 21:2,8,14,20

207:16 226:5,15
249:10
**plan** 14:6 39:6
105:1,9,15,19
209:1 224:10
**planning** 37:11
42:4
**play** 232:15
**players** 98:1,2
**pleasant** 2:6
**please** 6:4,6 7:9
8:12 9:6 34:23
71:20 97:1 194:17
228:8 232:20
258:12,12
**plug** 53:6
**plus** 244:5
**point** 9:5 49:9
70:10 90:2 97:4
112:18 137:21
145:11 181:13
183:24 232:20
**points** 46:21
**poison** 55:23
**poisoning** 49:4,12
49:13,16 50:4,5,10
50:11,12,13 55:4,8
55:24 63:13 64:11
64:23,23 65:21
66:2,4 67:21
68:10 152:10
242:10,16 243:8
243:22 245:5,9
**poisonings** 50:14
50:14,18,19,23,23
55:5,21,22 56:3,17
150:19 151:1,22
240:4
**police** 69:10
**policy** 36:24,24
67:1 211:4

**polydrugs** 181:13
181:13
**polypharmacy**
175:6,8,9,13,16
176:8 182:2
**polysubstance**
33:21 34:4 244:15
245:20 246:4
**polysubstances**
246:12
**poor** 95:13
**popular** 190:24
**population** 41:5
118:19
**portion** 30:13 31:4
59:14 118:22
250:23
**portsmouth** 74:11
**position** 14:4
72:22 200:13
**positioned** 200:8
**possible** 113:1
114:6,13 122:12
155:7 253:2
**possibly** 158:4,9
**post** 215:16
**postmortem**
184:16
**posts** 241:1,17
**potential** 58:4
**potentially** 112:20
113:14
**power** 165:17
**practice** 89:22
91:8 130:8 177:8
179:1,2 200:4,11
**practices** 79:22
81:10,13 87:15
89:7,14 93:13
101:21 104:16
107:17 108:8,12

133:16 180:6
181:23
**pre** 22:21 23:7,13
24:9 55:8
**predate** 22:12
**prefix** 170:13
**preliminary** 205:2
207:1
**preparation** 17:18
18:19 52:8 226:1
226:3 227:7,11
**prepare** 20:17
**prepared** 17:9
25:7 26:14 80:2
169:23 172:4
192:24
**preparing** 18:5,12
25:24 45:5 51:20
115:6 157:16
174:10,24 222:23
227:6 255:6,8
**preponderance**
146:15,16
**prescribable**
57:20 189:21
**prescribe** 98:3
**prescribed** 91:6
124:24 126:6
174:7 186:20,21
187:12,13,18
189:13 198:5,14
199:6,13 251:6
**prescriber** 211:18
**prescribing** 89:7
89:12,15 91:11
98:10 114:19
194:10 199:12,21
199:24 200:6,8
**prescription** 48:18
48:23 56:22,24
57:1,3,8,20 58:15

58:22 59:3 61:16
62:24 88:7 90:8
91:12 92:24 95:2
97:14 98:3,6
99:21 100:2,5,6
101:22 104:3,12
104:13 105:3,11
105:16,23,23
106:7,17 109:1,9
114:24 118:6,17
118:24 119:4,13
119:18,22,23
120:2,6 122:17,22
122:23 123:7,8,20
124:8,8,24 125:9
125:13,16 126:8
127:2,7,14,21
128:3,10,10,18
137:19 158:7
159:7 161:8,13
162:2,13 164:10
168:3 171:21
173:16 188:10,17
188:21 190:13
193:1,8,13 194:7,8
200:2,9,14,22
201:8 203:8
211:18,19 212:13
218:9,16 219:3,12
220:17 227:14
229:11,20,22,23
230:14,20 231:5
231:22 248:21
249:16 250:7,12
250:15,24
**prescriptions** 98:9
99:22 100:6
123:22 125:21
126:4 127:9,24
129:12 130:4,9
138:13 211:13

**[prescriptions - provide]**

227:15
**presence** 166:17
175:12
**present** 3:7 7:5
10:16 48:5 153:20
176:11 178:2,5
179:15 182:6
234:22 240:14
241:7
**presented** 62:20
92:8 146:16 158:2
**presenting** 235:1
**press** 216:12
**presumably** 94:10
249:19
**presume** 175:22
191:9 249:18
**pretty** 65:4
**prevalence** 173:20
**prevent** 71:15
154:18
**prevented** 198:21
**prevention** 36:9
69:22 209:6,13,22
**preventive** 238:24
239:6 240:9
**previous** 16:7
28:11
**primary** 230:22
**prior** 22:7 23:15
23:21 36:3 40:6
67:6,14 68:9
126:7 127:9
128:23 139:6,12
140:2,8 141:8
151:6 164:11
168:2,8 172:13
177:19 186:8
247:10 248:1,4
254:16

**priorities** 254:11
**private** 6:5 10:8
10:10
**privilege** 73:15
**proactive** 69:21
**probably** 11:23
23:17 24:5,6,16,21
25:19 32:12 34:14
34:20 39:23 55:20
67:16 72:1 74:17
74:23 98:11
101:16 102:7,9
124:19 128:1,2,22
130:7 133:14
154:19 160:8
164:14 189:21
200:20 228:5
247:1 250:2
251:17
**problem** 39:17
47:19 55:2 69:23
70:6,7,8 71:22
74:10 75:2 77:10
83:12 84:13 92:1
101:2,4 120:7
141:19 167:11,19
174:2 175:11
202:1 223:11,24
243:23
**problematic** 249:5
**problems** 29:2,8
30:18 31:12,14
32:11 37:9 39:7
40:24 44:5,7,17
60:20 74:5,7 83:1
138:16 216:4
242:23 245:8
254:13
**procedure** 1:20
137:15 139:14
149:1 210:15

259:5 260:5
**procedures** 133:12
133:20,22 134:5,6
135:3 136:2
137:10 139:24
142:1
**proceeding** 7:9
11:19 249:11
**proceedings** 78:20
103:12 121:24
166:2 192:11
237:1 253:6
**process** 25:1,10,24
26:8,10,16 27:2
37:12 39:9 40:17
59:18 90:17
102:23 140:16
146:11 148:1
159:23
**produce** 26:20
145:7
**produced** 55:15
171:17 233:22
**producing** 39:12
171:13
**product** 18:16
92:20 95:8 113:9
114:9 198:9
**production** 170:12
258:16,17,22
**products** 92:24
113:7
**professional** 18:12
180:23 236:9
237:13 248:16
253:14 254:3
**professor** 14:3
241:4,8,11,14
**professorship**
35:13,15,17

**profile** 201:8
**program** 31:21
38:18,18,21 39:2
39:20 42:18 69:17
70:23 71:2,5,21,24
72:4,9,15 73:3
114:24 137:2
143:18 179:22
209:10 211:4
222:20 239:10
**programs** 81:20
108:4 180:1 209:6
209:9
**progress** 27:8
**project** 31:10
32:13 34:17 40:5
40:11,15 41:10,24
42:8,15,23 208:18
208:23,24 209:5
**projects** 27:24
28:5,15 32:8,12
34:16
**pronouns** 64:6
**proper** 109:11
**proportion** 110:24
115:23 161:21
229:24 231:3
233:16 251:5
**proposition** 176:2
**protocol** 152:14
154:14
**protocols** 138:2
**prove** 130:18
**provide** 15:3
18:24 35:22 36:17
36:19,21 37:3
39:6 42:1,3,5
43:22 46:5 93:9
134:12 147:21
148:6 201:4,5
207:20 209:5,8,9

209:16 217:13
226:21
**provided** 16:23
18:18 37:14,16,20
40:10 41:9 44:1
136:21 145:18
208:22 211:5
212:6 216:10,10
217:7,9 225:17,20
226:5,15 227:2
**provides** 35:18,18
37:5
**providing** 37:7
38:10 42:4
**province** 199:21
**provision** 41:8
42:4 203:2
**public** 5:12 9:18
10:9 79:19 81:20
81:22 85:22 86:16
100:23,23 107:11
108:5 206:11,13
206:20 211:4
237:24 241:4,12
241:23 257:4
259:10,18 260:15
260:23 261:23
**publication** 35:3
87:2 108:5 228:13
229:6 245:10,23
**publications** 18:20
136:20,20 245:15
245:22 246:23
254:8,16
**publicly** 206:6
**published** 32:21
33:4,16 34:2,12
42:7 117:3 127:18
131:2 134:2,10
229:4 244:1,6
246:2,14 247:13

247:13,19 255:2
**publishes** 36:18
**pull** 19:5 228:12
235:17
**pulled** 195:15
223:9
**purdue** 114:9,11
**purely** 199:9
**purpose** 139:19
191:12 257:6
**purposes** 10:1,4
15:2 19:15 20:4
22:4 51:12 86:19
135:21 169:11
194:21 228:21
236:4
**pursuant** 1:20
154:14
**put** 11:5 16:13
34:5 50:8 57:17
127:5 128:16
129:17 138:7
140:6 168:22
181:1 194:16
223:10 250:4
**putting** 25:6

**q**

**qrt** 71:2,24 72:4,9
72:15 73:3 76:4
209:10
**qualified** 257:5
**quality** 110:17
131:23 132:1
141:5,18 143:17
144:24 210:13
255:4
**quantify** 58:21
**quantifying**
244:14 245:19
**quantities** 91:4
108:20

**quantity** 168:9
**quarter** 158:24
**quarters** 175:19
176:6 228:1 232:1
239:20
**question** 13:2
14:18 41:16 68:22
75:10 86:4,7 91:7
98:12,13 102:11
104:7,8,24 123:15
144:2 159:2,20,24
160:2,20 170:18
174:16,21,22
210:16 218:15
**questions** 9:20
13:1 26:7,14
227:1 249:1,4,6,9
251:21 252:1,2,7
252:13,14,21
253:1 255:18,20
255:23
**quick** 69:17 70:16
70:21 71:4,4
100:19 190:5
**quickly** 236:8
248:6
**quite** 9:4 32:9 59:3
67:17 107:21,21
144:6 154:1
157:20 216:22
220:4
**quotation** 81:17
96:23 99:6 100:13
107:24 108:3
128:1
**quote** 79:23
131:24 167:5
**quoted** 81:7 82:2
82:19 90:9 100:22
137:23 224:21

**quotes** 94:1
**quoting** 123:13
232:19

**r**

**r** 2:4 6:1 8:15
**ra** 226:8
**rachel** 2:8 8:5
**rader** 69:13 70:14
72:24
**rahilly** 226:10,12
**rannazzisi** 227:23
**rate** 23:14 26:23
49:1,8 50:10,11
55:8 58:16,21
61:17 64:14 66:16
67:9,11 233:5
**rates** 44:8,11,16
44:20 45:1,8
48:20 49:4,5,6,12
49:13,17 50:5,5,13
55:4 62:24 64:11
64:12,19,22,24
65:17,21 66:13,14
66:23 67:2,21,23
67:24 68:10 69:16
77:15 89:15 91:11
116:4 207:4
222:24
**ratio** 59:4 152:19
152:20 158:10
**ray** 7:22 252:10,19
**raymond** 2:15
**reached** 26:19
206:23
**reaches** 234:3
**read** 17:10,10
30:13 46:14 54:3
81:14 82:8,24
83:15 84:15 85:3
87:20 91:22 92:5
93:16,18 98:17

100:18,21 101:4
101:17 102:8,22
104:20 116:18
118:20 119:15
120:12 128:16
157:3 195:20,22
204:23 223:3,4
225:19 226:19
251:15 256:5
257:10 259:5,6,12
260:5,6,17
**readily** 22:15
**reading** 77:12
82:22 85:12,12
87:21 93:23 102:2
104:6 107:5
108:21 109:5
258:20
**readings** 88:9
**reads** 118:15
171:11 187:7
198:5 214:21
230:12
**realize** 65:14
103:8
**realized** 100:20
**really** 23:16 72:20
72:22 96:7,21
101:7 149:6
167:19 227:20
**reason** 13:17
74:13 141:14,16
154:4 155:23
188:7 189:11
205:4 215:12
224:17 230:22
249:7 258:15
260:8 261:3
**reasonable** 90:23
126:1 206:24

**recall** 74:19 97:9
103:23 122:14,19
129:13 184:5
208:15 222:2
232:3
**receipt** 258:19
**receive** 247:24
**received** 16:19
237:17,24 247:5,9
**receiving** 201:8
**recess** 78:19
103:11 121:23
166:1 192:10
236:24 253:5
**recognize** 51:17
191:23 228:24
**recognized** 118:16
119:4,17
**recommend**
251:18
**recommendations**
5:12 81:21 86:15
**recommending**
87:21
**record** 6:3,12 7:7
9:15 13:7 16:17
19:17 20:4 27:9
29:16 30:14 48:10
51:3 53:11 54:4
64:6 78:17,23
103:9,10,15
121:19,21 122:3
137:6 157:6
165:18,23 166:5
169:13 192:8,14
194:23 195:13
214:7 236:22
237:4 253:3,9
255:23 260:9
**recorded** 6:14
26:17 106:9

161:24 186:10
204:3 213:22
215:18
**recording** 6:10
143:6
**records** 74:18
164:2 182:4
185:20 211:12
**recruited** 28:22
**red** 90:23 159:6
160:24 161:7,12
**redirect** 252:8
253:2
**reduce** 71:22
**reduced** 257:10
**reducing** 72:16
73:4
**reed** 2:20 7:18
**refer** 17:14 20:5
56:15 57:7,16,16
87:17 104:14
106:13,24 153:13
170:10 177:16
189:13
**reference** 31:3
50:4 108:3,15
110:22 111:9
115:8 155:2
224:23 236:10,10
237:14 258:8
259:2 260:2
**referenced** 31:23
32:1,1 33:14
38:21 43:1,4
51:24 56:20 59:16
65:22 76:17 81:6
90:14 92:11 94:4
95:1 98:7,14
107:18,23 108:12
112:4 118:2 125:6
134:1 136:4,24

143:10 162:8
187:22 221:9,24
223:17 224:4
231:17,24 233:7
234:12 240:24
245:15 251:16
259:11 260:15
**references** 224:19
**referencing** 29:17
30:11 55:9 157:5
**referred** 17:12
33:7 50:21 79:18
84:2 87:19 88:24
96:2 135:15
190:22 222:4,20
227:9 251:10
**referring** 17:15
57:8 114:23 115:1
131:1 136:5
153:14 170:12
177:17 206:5
224:23 232:21
**refers** 46:16 108:8
**refine** 102:12
**reflect** 193:7
**reflected** 48:4 67:9
109:20 114:8
193:23 196:13,22
198:21 199:18
219:11 220:2
**reflects** 77:20
203:7 204:10
**reframe** 181:5
**regard** 61:24 62:4
68:10,20 77:15
83:3 105:22
106:22 112:13,16
154:18 160:15
188:16,17 242:24
**regarding** 105:6
136:19 219:2

224:21
**region** 189:8
  216:15
**registered** 1:21
**regularly** 142:20
**regulatory** 102:23
**reinforced** 34:8
**reiterate** 189:18
**relate** 76:21
**related** 5:15 7:3
  31:16 41:14 42:15
  56:9 60:4 77:7
  85:8,19 104:11
  153:3,4 154:7
  156:11 157:9,15
  158:7 172:22
  173:11 184:19
  203:22 204:3,11
  213:16 227:2
  228:2,15,19
  229:10 232:2
  233:11 243:1
  244:15,21,23
  245:1 246:4,6,15
  247:5,14,23 248:3
  257:12
**relates** 66:7
  104:24 246:3
  247:10
**relating** 33:22
  157:2
**relation** 50:22
  226:2
**relationship** 33:20
  50:22 119:12
  120:2,4 243:19
**relative** 225:12
  257:13
**relatively** 44:8
  161:4,21

**release** 206:12,15
  206:22
**released** 204:16
  206:11,20
**relevance** 150:17
  248:24
**relevant** 149:6
  150:3,10 224:9
  227:7
**reliability** 138:22
  141:8 142:17
  143:9 144:1,3,20
  145:2
**reliable** 93:9
  217:14 254:22,23
  254:24
**relied** 42:14 84:20
  115:13 131:15
  141:22 142:11,14
  142:19 143:5,12
  145:3,6,8 149:20
  151:1 164:5,21
  169:20 217:12
  221:18 253:21
  254:1
**relies** 253:18
**rely** 52:24 53:18
  82:10 84:19
  105:23 110:8
  143:15,16 169:18
  194:3 210:13
  211:3,5 224:10
  227:5 253:15
**relying** 109:3
  119:2 152:3 165:7
  165:13 167:17
  182:3 225:8
**remained** 142:6
  231:5
**remember** 12:4
  14:11 17:21 23:11

23:16 43:11 63:10
  70:19 136:10
  162:17 176:4
  177:20 185:21
  222:18 226:8
  252:5
**remembering**
  75:19
**remind** 168:18
**reminder** 86:3
  218:22
**remotely** 1:21
  6:22 7:6
**remove** 50:7
**repeat** 104:8
  134:15 196:16
**report** 5:2,5,9,11
  17:10,11 18:20
  19:3,3,7,12,19,22
  20:5,12,16 21:23
  22:1,6,9 23:5,9
  25:2,22 26:1,2,5
  27:12,19,22 28:6,8
  28:9 29:17 30:12
  31:4,24 33:14,23
  34:6 38:22 39:10
  40:17,20,21 43:1,5
  44:15 45:4,6,7,20
  46:12,15,19 47:2,7
  47:9,16,22 48:4,7
  49:2,10,18 50:3
  51:5,9,20 52:1,7,8
  52:10 53:22 56:16
  57:12 58:13,24
  59:1 61:14 62:13
  62:16,20 63:5,7
  65:4,20 66:24
  76:6,9,18,24 77:9
  77:12 79:18,24
  80:2,6 81:6,8,21
  82:2,7,8,10 83:14

85:5 86:15 87:3,9
  87:10,18,21 88:3,9
  88:17,24 89:10,17
  89:23 94:1,2,5,7
  94:21 96:8,22,24
  98:8,14,16,18 99:7
  100:9,13,14,18,22
  101:17 102:3,6,8
  102:16 104:14
  105:4,18,22 106:9
  106:12,21 107:4
  107:11,13,19,24
  108:8,13,16,22
  109:4,7,8,16,21
  110:15 111:20
  112:5 113:15
  114:8,18 115:6
  117:19 118:2,5,9
  118:10,23 119:17
  119:19 123:14,17
  123:18 125:8
  127:6 129:18
  131:1,2,5,9,11,11
  131:18,21 132:5,6
  132:7,8 133:10
  134:1,18 135:3
  137:23 138:13,24
  141:2 143:10
  144:9,16,22,23
  150:18 153:3
  156:4,7 157:10
  158:14 159:3
  162:12 163:4,6,11
  163:13,17 166:12
  166:16 167:2,3,18
  169:19 171:11,18
  171:22 172:1,4,17
  173:10,20 174:10
  174:24 175:1,2,23
  176:13,24 180:8
  180:12,13,19,20

180:21 181:4
182:1,8,24 183:7,8
183:10 186:4,12
186:15 187:4
188:15 190:1
191:15 192:24
193:7,23 194:9,12
196:14,24 197:22
202:8,13,23 203:7
203:19 204:5,23
205:2,11,14,15
206:9 207:9
208:17 210:2,18
212:10,12,15,18
213:2,21 214:6,14
214:17 215:1,1,5
215:10,15,23
216:7,20,23
217:19 218:14,18
219:7,11,17,24
220:1 221:14
222:23 223:21
224:5,6,9,12,15,18
224:24 225:5,6,9
225:14,15,18
226:2,3,16,18
227:6,7,10,11,22
228:8 231:18
232:15 233:7
234:13 235:5
236:3 239:23
240:1 255:7,11
**report's** 89:4
**reported** 59:21
108:23 109:20
134:23 135:8
161:16 164:4,20
183:14,15 190:14
196:13,23 203:23
204:9 210:21,22
215:12,19 217:16

219:22 230:21
231:9 232:14
**reporter** 1:21 6:24
8:12 13:7 103:1
120:18 259:7
**reporting** 138:17
139:15,18 152:19
214:8,9,21 217:6
219:2 224:13
**reports** 25:5 34:2
39:12 72:21 85:3
85:8,12,13 89:2
91:22 92:6 108:21
111:10 113:4
115:13 116:18,19
137:22 155:24
168:10 171:11
172:21 173:11,17
173:19 174:9,23
197:22 203:1
204:20,24 216:13
217:15 223:3,18
223:19,22 224:3
224:11 225:16
226:4 230:1,1
231:1 251:16
**represent** 7:13,15
7:18 8:24 147:5
149:16
**represented**
160:23 203:17
**represents** 159:6
**request** 226:20,23
257:10 260:9,11
**requested** 38:1,5
**require** 137:6
185:5 215:13
**required** 60:8
137:13 138:1,9
178:14 258:24

**requirements**
257:15
**research** 35:19
36:8 82:16 83:2
83:24 84:7,17
85:4 137:16
217:15 238:14,20
240:21 242:23
248:1 253:17
254:5
**researcher** 82:22
85:22 116:24
**researchers** 211:4
**reset** 9:7
**residency** 240:9
**resident** 238:24
239:6
**resources** 35:22
204:16 205:9,18
**respect** 83:13
207:24
**respiration** 181:16
**respiratory**
181:19,20,22
**responders** 5:18
168:20 169:7,16
**response** 69:18
70:16,21 71:4,4
**responsibilities**
239:3
**responsible** 100:5
135:15 146:19,20
148:15 150:7
203:4 231:2 234:2
**restricted** 225:15
**restrictive** 114:21
**result** 57:21 93:19
146:12 155:17
**resulted** 139:22
219:12

**resulting** 197:9
**results** 139:15
146:12 149:13,19
178:14 184:1
**retailer** 93:3 94:24
**retained** 225:2
226:13 256:3
**retread** 103:19
**return** 80:8 218:3
250:14
**returned** 258:19
**review** 23:7,19
85:8 115:5 117:3
117:4 118:18
133:22 134:5
136:12 164:2
197:3 210:7,20
211:7,12 214:24
219:1 223:18
225:8 226:18
236:8 237:16
247:4 258:13
259:1 260:1
**reviewed** 34:3
87:2 120:23 134:5
136:20 148:9
222:1 224:6 225:5
237:17 244:2
246:14 254:9
**reviewers** 134:9
**reviewing** 20:21
21:3,15,23 22:20
22:22,24 23:2,7,13
24:2,13,15,19,23
25:9,16 65:21
223:17
**revision** 242:17,21
**rice** 2:5 8:1,3 16:9
**right** 18:9 26:21
37:19 45:7 63:3,8
70:14 72:17 73:23

83:17 101:10
109:19 119:11,14
120:1 122:10
123:19 129:6
144:11 156:7
163:9,9 169:4
170:6 171:5
172:12 183:20
187:19 236:6
238:18 241:6
252:22,23 253:16
253:23 254:3,16
255:9
**rise** 166:17,22
**risk** 117:16,17
200:21 201:1
244:14 245:19
247:16
**risks** 88:14 200:1
200:9,13
**risky** 254:13
**rmr** 257:20
**road** 2:9
**robbins** 35:16,17
**role** 115:15 117:4
232:15 243:6
247:22
**room** 7:5 10:4,6,8
10:10,12 244:19
**row** 198:1
**royal** 63:24 64:2
**rpr** 257:20
**ruby** 2:15
**rules** 1:20 11:13
12:9 259:5 260:5
**run** 143:24 245:18
249:21
**rural** 29:5 30:2,23
**rush** 53:13 197:5

**s**

**s** 1:21 2:15 6:1
8:15 257:4,19
258:16 260:8,8
261:3
**safe** 89:19
**safer** 90:3,4
**saith** 256:6
**salary** 35:18
**sale** 57:9
**sam** 7:14 194:15
201:14
**samuel** 3:4,9
**sanders** 222:5,7,12
222:13
**save** 25:13
**saw** 65:9 83:14
224:18 225:18
**saying** 79:19 83:22
94:6 120:5
**says** 29:21 64:8
81:8 120:8 127:23
167:6 174:12
197:8,12,17,17
198:2 213:15
**sc** 2:6
**scene** 9:22 147:18
147:23 148:3,22
149:9 150:4,9
**schedule** 57:19,24
58:2 118:7 125:22
126:3,4 189:3,23
189:24 191:2,11
212:13,16
**scheduled** 191:10
**school** 9:18 100:24
237:19 241:11
250:1
**schools** 81:19
107:11 108:4
209:14

**science** 5:11 81:20
86:12,14 92:8
101:3
**scientific** 82:20
**scientifically**
155:7
**scientist** 82:21
83:20 84:15 85:10
85:11 92:5,9
224:19
**scientists** 84:16
93:18
**scope** 96:21
102:12 160:13
190:16 218:12
227:18 229:12
**screen** 146:10
147:9,12 165:6,11
168:14,23 176:12
176:24 178:3,6,14
179:4,15 182:7,10
184:1 185:7
194:16 195:18
**screens** 133:8,18
133:24 146:6
156:20 175:13
221:8 234:12
**scroll** 197:2,6
**seal** 259:15 260:21
**search** 22:18
109:13
**second** 50:3 54:23
55:9,11 64:8,18
65:20 66:7 172:7
183:1 188:2
214:20
**seconds** 53:6,11
**section** 49:18
197:7,7 209:15
239:23

**see** 9:6 27:4 28:2
28:11 30:4 31:1
45:22 46:3 58:18
59:2,7 64:15
65:14,15,17 78:16
87:14 117:16
118:14,20 119:9
119:20 120:12,15
123:12 132:4
142:22 145:20
150:10,16 156:15
159:5,9 161:9
162:24 166:19
167:9 169:23
170:4,6,8 171:6,15
186:23 187:15
188:4,23 189:1
190:20 195:18
196:3,6,10,19
197:10,13,18
198:3,6 199:1
202:14 203:21,23
204:2,4 205:18,23
212:23 213:4,7,11
213:12,19 223:13
223:13,15 230:15
**seeing** 119:19
**seek** 130:14
249:11
**seeking** 30:15
130:4
**seen** 72:21 73:19
111:9 117:17
134:7 168:10
**segment** 86:9
93:24
**seizures** 164:14
**sell** 117:12
**selling** 92:20
117:15 211:17

**[send - sorry]**

**send** 17:2

**sense** 82:15,23,24
83:6 85:13,14
89:4 142:21,22,23
144:4 145:21
183:22

**sensitive** 6:5

**sent** 16:14 19:5
168:14 169:1
195:6

**sentence** 118:15
187:2 230:11

**sentences** 47:20
206:1

**separate** 41:6
60:23 137:21,22
139:17 156:16
169:2 228:13

**separately** 31:8
56:8 153:3

**september** 1:21
6:3 258:4

**sequential** 40:16
59:17 61:5 185:23

**series** 40:16 170:7
207:14

**serve** 241:14

**served** 11:21 12:2
238:9

**service** 36:16
43:23 239:11

**services** 16:24
36:17 37:4 39:4,5
41:3,8,8 42:1,3,5
42:13 44:3 91:16
92:15 93:4,8
131:3 203:2,3
208:19,21 209:1,3
209:4,16,19,23
244:20

**serving** 12:5

**set** 9:22 11:8,12
55:17 56:21 60:23
66:6 139:11
197:22 257:15

**sets** 25:2

**setting** 13:12

**seven** 255:3
257:15,15

**seventh** 118:14

**shape** 160:17

**share** 111:15
115:23 168:14

**sharply** 48:20

**sheet** 168:20
169:15 258:14
260:7,10,18 261:1

**shift** 231:9

**shkolnik** 2:8,9 8:5
8:5,6

**shopping** 129:16
129:19 130:4,10
130:19,21

**short** 18:7 45:15
54:4 61:9 79:1
92:11 184:5
231:24 247:3
250:9 252:9

**shorthand** 25:10
257:9

**show** 168:11
194:14

**shown** 50:15 162:1
166:23 258:16

**shows** 50:22
161:12 213:15

**sic** 162:22 244:22
245:16,18

**sides** 104:22

**sign** 17:2

**signature** 257:19
258:15

**signed** 16:15
259:13 260:18

**signi** 180:4

**significance**
203:11,12

**significant** 149:3
167:7 178:19
180:17

**significantly** 48:24
58:16 61:17 203:8

**signing** 258:20

**similar** 26:16 44:5
44:6,17 66:17
70:23 255:7

**simpler** 176:5

**simplify** 126:22

**simply** 9:22 17:5
26:16 122:21
249:11

**sincerely** 258:21

**single** 60:24 77:12
142:8,8 145:14
154:9 179:23
182:18 188:8

**sir** 10:9 150:1
183:1 258:10

**sit** 62:23 88:4
89:13 100:11
101:20 107:16
108:11 109:15
129:2,7 133:1
137:24

**situation** 198:13

**six** 25:19 255:3

**ski** 239:16 249:22

**skilled** 71:11

**slated** 35:3

**slowly** 197:4

**small** 154:3
157:13 158:22,22
161:4

**smith** 1:19 2:20
5:2,6,8,16 6:14
7:18 9:16 19:11
19:12,16 51:4,7,10
51:12 69:24 78:22
86:13,19 103:14
122:2 123:4
126:14 166:4
169:5,11 176:1
192:13 194:18,22
195:13 218:22
223:8 228:17,20
228:21 235:23,24
236:4 237:3 253:8
253:12 256:1
257:5 258:9 259:4
259:9 260:4,13
261:20

**smith's** 51:5

**smoothly** 9:10
12:13

**snack** 192:16

**sochaczevski** 2:12
7:20,21 252:14

**sold** 91:5

**solutions** 258:1
261:1

**somebody** 124:18
150:11 220:21

**son** 124:17

**soon** 32:22 35:24
78:16

**sorry** 8:9 28:14
30:7 34:23 50:1
53:1 71:19 76:1
103:8 131:16,23
167:2 173:9 191:7
195:2 205:16

215:17 217:22,23
218:1 223:9,10
236:14
**sort** 67:6 85:12
**sorts** 249:6
**sound** 11:6
**sounds** 78:14
126:1 165:13
252:23
**source** 22:8 35:14
40:10 54:9 59:15
76:20 81:16,18
106:7 141:11
162:16 166:21
168:3 177:7
217:21,23 255:13
**sourced** 67:13
**sources** 31:11 36:3
43:17 53:17 54:8
119:6 131:17
144:15 148:8
168:2 216:13
253:15,18,20
**southern** 1:1 6:18
32:14 37:8 42:24
43:4 44:12
**southernmost**
29:9
**speak** 17:23
**speaker** 13:14
**speaking** 103:18
**special** 214:11
**specific** 18:23
41:10,18,19 42:9
42:10 43:20 44:16
61:19,21,23 66:10
66:18,22 75:19
79:14,16 83:3,5
84:14 85:19 90:2
107:1 113:6,8,9,18
114:1 115:8 117:2

118:1 185:5
199:20 229:14
244:7,8 245:14
246:24 247:24
248:3 254:6
**specifically** 16:8
23:8 24:20 31:13
36:11 39:7 40:3
45:18 80:3 81:7
83:21 84:8 85:4
93:22 107:14
139:11 157:4
167:8 246:15
247:5,10,18
**specified** 257:6
**spectrum** 228:6
**speculation**
126:10 157:18
198:24 199:8,10
202:22 234:5
**spelling** 145:14
**spend** 23:13 24:2
24:19 25:16 26:5
77:11 98:19
**spent** 20:21 21:1,3
21:7,9,15,18,19,22
22:6 25:24 27:1
27:11 66:21 67:17
79:4 192:21
240:10
**spoke** 70:13,16
73:22
**spoken** 75:21
**spots** 74:6
**stage** 16:6 64:21
111:6 119:16
**stamp** 171:4 195:1
195:16
**stamped** 196:9
**standard** 56:7
101:23 102:1

103:22 130:5
139:24 179:21
200:4,11 210:15
**standardly** 217:14
**standards** 152:20
179:12
**start** 9:14 35:10,22
55:20 187:2
**started** 11:12
18:15 32:20,22
35:24 40:7 43:10
72:3 82:20 114:13
164:7 174:13
185:22 224:1
239:7 243:14
**starting** 37:24
**starts** 186:18
**state** 7:6,9 9:14
28:21 29:6 30:3
30:24 31:12,12
32:15 33:21 36:23
36:24 39:4,18
40:13 42:5 45:5,6
45:9,13 60:22
61:22 62:4,9 63:2
63:5,15 66:7,23
67:12 69:12 70:5
74:4,10 110:21,22
112:1 131:6,21
132:15 134:12,20
135:1 144:9
148:21 149:2,19
166:16 193:4
201:18,23 205:17
205:21 206:19
209:2,4,6,21,22
215:2,15,19
220:20 229:15,16
239:11 242:2
254:6,7,12 257:1,4
259:10 260:15

**stated** 96:16
122:16 162:18
205:5 208:13
213:21 217:5
221:13
**statement** 80:8
82:7,18 83:10,19
87:13 98:20 101:6
105:6 147:9
166:21 172:6
250:14 259:13,14
260:19,19
**statements** 95:21
**states** 1:1 6:18
27:23 37:8 57:10
58:10 168:8
205:15,15 233:22
237:22 255:1,4
**statewide** 29:12
222:14,17
**stating** 210:11
255:2
**statistic** 125:6
**statistical** 203:12
**statistics** 21:3,10
22:17 24:20 40:2
40:2 54:9,12,15,19
55:2 61:8 66:16
67:1 110:18 140:4
143:5,13,18
145:23 166:23
181:3 194:4
204:17 205:21
206:2 207:15
210:14 211:5
216:11 217:7,9
218:2 242:9,13,19
245:8,9 253:21
254:2,5,15,21
**stay** 56:12

staying   45:19
stealing   212:1
steeply   166:17
stenographic   13:7
step   13:13 50:1
   140:16
stephen   9:16
stick   64:7
stop   181:16 199:5
stopped   214:7,9
   214:21 217:6
stout   2:4 8:3,3
street   2:13,16,20
   3:5
stretcher   250:3
strict   130:22
struggle   250:8
student   50:21
students   32:7,10
   33:11 34:16 35:20
   247:12
studied   91:17 92:2
   93:21 104:19
   125:8,20 210:18
   227:21 239:15
studies   28:12
   29:12 30:10 32:13
   45:17 85:6 88:23
   106:13,24 107:6
   115:8 116:20
   117:2 118:18
   119:2 160:3 193:5
   194:1,3 222:14
   253:19 254:6
study   15:3 22:16
   29:8 32:5,15
   42:24 43:5,7,13,19
   43:22 45:18 86:11
   92:4 106:14 107:1
   114:10 123:4,5
   124:2 125:8

126:24,24 127:2,8
127:17,20 128:2
128:22 129:10,10
137:9 141:11,12
141:12,14,15,16
176:1 214:11
222:1,4,5,7,8,12
245:11
studying   27:24
28:16,19 93:22
243:15
subject   13:20
27:14 99:22
105:18,20 138:23
141:2 188:12
192:22 201:17
202:7 219:6,24
221:13,17
submit   40:14
submitted   52:10
submitting   245:22
subscribed   259:10
260:14 261:21
substance   12:10
28:23 29:1,22
30:18 41:13 57:24
58:2 84:12 91:23
100:12 102:21
126:6 189:4 243:5
243:18 244:9
245:1
substances   115:4
125:16,22 126:3,4
127:8 137:1 221:8
substantial   179:15
250:23
successful   72:16
73:3 202:4,11
successfully
247:20

sufficiently   113:5
suggest   26:1 121:9
204:20
suggested   66:23
124:9 130:19
164:15
suggesting   124:11
suggestion   127:16
suicide   56:1
152:16,19
suicides   59:20
150:21,24 151:21
152:8
suite   2:9,20 258:2
sum   100:12
summarize   46:2
46:19,20 48:11
55:12
summarized   46:12
47:2,4,6,19,23
54:7,9,16 55:9
61:1 64:18 101:7
111:20
summarizing
55:14
summary   45:22
45:23 47:10,15,23
48:9,14 53:23
55:14 58:13 61:13
superior   258:1
supervised   238:13
supervision
135:19
supplemental
148:6,8,16 226:21
supplier   93:8,10
supply   84:5,23
85:9,20 93:9
101:14 102:4
support   18:18,24
31:10,21 38:10,18

38:21 39:1,20
40:5,11,15 41:10
41:24 42:8,15,18
118:16 119:4,17
208:14,17,23,24
209:5 233:20
supposed   17:2
suppress   66:16
suppressed   66:14
suppressing   67:2
sure   9:3,9 11:11
12:12 16:15 25:3
25:23 32:9 37:17
38:8 45:10 46:14
53:8,12 55:16
62:14 64:5 65:4
72:8,11 75:9
77:11,13 98:16
104:9 107:22,23
109:14 113:20
115:22 121:10,20
125:3,19,24 126:1
126:11,15 127:6
128:5,12,19
129:23 137:8,9
138:11,20 144:10
145:11 151:12
154:9 155:6
160:14 165:20
168:15,19 174:5
179:18 190:24
191:4 192:6
204:23 209:7
210:18 211:24
222:11 236:21
surge   230:23
surveys   29:5 30:2
30:23
survived   76:11
suspect   65:8 71:14

**suspected**   148:22
148:23
**swear**   8:12
**switch**   103:5
**sworn**   8:14,17
257:7 259:10,13
260:14,18 261:21
**symmetry**   249:11
**symptom**   178:22
**synthetic**   167:8
191:9
**system**   60:23
94:14 98:23
122:22 123:7
125:10,14 127:4
138:13,16,22
139:18 170:21
188:9 206:10
207:4,5 243:16,17
255:2
**systems**   138:17

**t**

**t**   8:15 170:14,15
**table**   188:2 191:15
217:7
**tables**   25:6
**take**   6:11 11:5
51:1 78:12 86:8
87:24 88:1,2 90:1
121:4 124:23
126:23 165:19,21
186:1 190:5,7,18
192:2,3,4 201:15
212:10 214:2
216:19 236:19
239:20,21 252:8
**taken**   1:19 6:14
12:17 24:11 78:19
100:13 103:11
121:23 130:10
135:6 166:1

192:10 236:24
250:4 253:5 257:6
257:9,13
**takes**   204:7 245:24
**talk**   13:10 19:3
22:13 26:2 32:17
59:12 65:12 79:6
84:3 89:17 104:18
106:11,12 107:14
128:23 131:14
162:11
**talked**   68:13,17,19
69:14,20 70:20
83:16 97:8 115:14
146:5,7 157:8
**talking**   24:12,13
48:9 60:20 62:19
70:10 79:5 86:11
94:8,15 97:5,11
101:14 103:21
127:17 129:9
135:2 155:1
158:11 166:10
184:4 192:21
223:17 228:9,10
**tally**   183:19
**target**   191:22
**task**   5:12 69:11
79:20 81:22 82:5
86:16 94:2 96:15
**teaching**   32:7
**team**   18:4,12
70:17,21 76:4
135:18 155:14
179:9
**technical**   103:17
103:22 135:7
**technology**   9:3,7
10:22
**tell**   30:7 55:18
60:11 73:15 76:5

111:22 112:8
123:2 234:19,22
239:2
**ten**   165:19 192:4
236:19 253:1
**tend**   34:1
**tenth**   3:5
**tenure**   37:23
**teresa**   1:20 6:24
13:6 17:21 103:10
257:4,19
**term**   25:8 34:15
34:19 42:7 55:19
57:12 60:5 76:5,7
88:15 94:20
106:19 129:15,17
146:16 147:2
175:7 251:13
**terminology**   55:17
56:7,21
**terms**   40:20 47:12
55:17 60:17 76:17
83:24 91:1 110:16
126:23 133:14
144:3 216:14
226:3 246:23
**terrain**   192:23
**terry**   226:9
**test**   60:2 82:18
83:9,18 138:21
144:19 185:14
203:11 217:8
**tested**   115:10
143:24 150:9
**testified**   8:17
11:16,18 109:19
122:11 147:6
149:17 165:9
212:5 250:12,22
**testify**   12:18 27:10
202:16

**testifying**   12:14
249:10
**testimony**   13:18
13:22 15:2,11
20:17 36:23 52:24
53:19 72:14
100:16 101:12
102:13 104:11,24
105:19 122:19
123:16 212:6
216:1 217:4
232:22 255:24
259:6,7 260:6,9,12
**testing**   132:24
141:7 142:18
143:9 145:4 146:8
185:22 186:2,7
**tests**   139:14
148:21 185:6,11
185:18,24
**thank**   9:12 10:12
12:8 17:8,23 19:2
20:8,10,15 22:10
23:12 24:1 25:13
26:3 27:16 29:15
32:17 33:13 34:9
35:21 38:17 39:19
42:22 45:19 47:21
50:24 53:21 56:19
68:16 73:21 76:16
77:4 78:7 87:15
91:7 92:22 122:9
126:20 153:19
157:11 163:15,16
192:20 195:9
201:13,14 236:7
240:13 245:10
250:6 251:19
252:3,15 255:18
255:19,21

**[thanks - tracking]**

| | | | |
|---|---|---|---|
| **thanks** 35:1 78:15 126:21 | **third** 10:7 42:22 49:20,21 158:23 160:9 167:6 252:5 | 162:20,22 165:18 165:24 166:5 171:20 173:21 | 203:21 230:11 **total** 26:23 27:11 39:16 62:9 67:20 |
| **theoretical** 199:10 | **thirty** 258:19 | 174:3 175:10 | 182:9,22 183:14 |
| **thesis** 247:14,20 | **thought** 23:18 | 182:8 188:10 | 203:22 204:21 |
| **thing** 64:4 67:22 | 195:7 251:15 | 192:9,14,21 204:7 | 256:2 |
| 84:14 120:10 | **thousand** 128:21 | 207:9 209:19 | **tour** 74:6 |
| 127:11 185:23 | **threat** 216:14,18 | 214:2 236:23 | **tower** 2:16 |
| 199:10 | **threats** 189:7 | 237:4 239:4,23 | **tox** 133:18 184:1 |
| **things** 18:21 34:18 | **three** 14:5 24:7 | 240:1,8,10,16 | **toxicologist** |
| 34:18 83:4,15 | 46:2,5 158:18,19 | 245:24 251:20 | 142:16 155:13 |
| 94:13 102:24 | 175:19 176:6 | 252:3 253:4,9 | **toxicologists** 134:3 |
| 116:19 133:16 | 181:17 213:18 | 257:6 | **toxicology** 31:18 |
| 143:15 171:2 | 228:1 232:1 | **times** 68:15 69:3 | 31:20 32:18 33:3 |
| 179:19 234:9 | 239:20 240:10 | 75:2 151:11 | 33:16 34:10 35:5 |
| 240:18 246:2 | 245:16 | 158:18,19 224:1 | 35:23 36:10,15 |
| **think** 10:6 23:16 | **thrown** 97:7 | **tiny** 49:19 | 37:5,14,24 38:6 |
| 27:7 37:16 57:17 | **tibia** 249:23 | **title** 14:2 | 41:17 57:5 61:6 |
| 62:6,11,19 64:20 | **tied** 81:9 104:16 | **titled** 169:15 | 113:3 132:22,24 |
| 65:3 70:18,18 | 113:14 | **today** 9:5,13,21 | 133:8,24 135:10 |
| 73:24 74:23 75:8 | **tierney** 226:8,9,10 | 10:1,23 11:7 12:9 | 135:24 137:17 |
| 76:8 85:18 87:10 | 226:12 | 12:14,21 13:18,22 | 139:19 142:5,12 |
| 94:18 95:12,15,19 | **till** 187:23 231:23 | 17:9,18,24 18:5 | 144:8 146:5,7,10 |
| 95:24 97:20 98:2 | **time** 7:9 9:13 | 19:9 25:9 46:11 | 146:12,17 147:8 |
| 98:23,24 104:19 | 13:15 15:20,22 | 55:18 62:23 88:4 | 147:11 148:21 |
| 110:3 111:3 116:8 | 20:20 21:2,9,15,19 | 89:13 91:10 99:3 | 149:12 150:11 |
| 120:19 121:12 | 21:19,22 22:7 | 100:11 101:20 | 156:20 165:6,11 |
| 123:10 125:7 | 23:18 37:18 48:21 | 107:16 108:11 | 175:13 176:12,19 |
| 128:17 130:19 | 50:17 52:13 55:6 | 109:15 115:19 | 176:24 178:2,6,13 |
| 136:10 140:15 | 59:5 66:21 67:17 | 129:2,7 136:24 | 179:4,14 180:21 |
| 141:4 148:18 | 67:18 74:1,24 | 137:24 175:5 | 182:7,10 185:6 |
| 151:9 154:4 157:3 | 75:7 78:18,23 | 189:8 195:11 | 194:9 221:8,18,21 |
| 158:15 162:15,19 | 79:4 88:1,2,17 | 241:18 245:12 | 234:12 235:5 |
| 164:14,23 170:20 | 90:1 98:17,19 | 250:11 251:20 | 247:14 |
| 180:11 189:22 | 103:15 112:19 | **today's** 227:3 | **trace** 178:21,21 |
| 190:24 198:18 | 113:19 121:9,22 | 255:24 | **traced** 118:2 221:9 |
| 199:9 201:22 | 122:3,22 123:7 | **toggle** 187:21 | **track** 76:2 208:5 |
| 202:1 210:11 | 125:10,14 126:7 | **told** 19:24 | 245:5 |
| 217:12 223:8 | 127:3,22 128:18 | **top** 10:24 46:18 | **tracking** 195:11 |
| 230:22 246:18 | 132:23 137:22 | 54:1 60:16 142:15 | 215:2 245:5 |
| 249:7 250:1 | 138:18 150:6 | 170:2 196:9 | |

**traffic** 116:16
**trafficked** 250:15
251:1
**trafficking** 116:23
117:5,8,12,20
118:3 218:5,8,9,16
219:3 222:20
250:16 251:1
**trained** 179:20,24
**training** 85:10,11
179:22 180:1
239:10
**transcribed** 259:7
**transcript** 9:22
59:14 136:12
257:10,14 258:12
258:13 259:5,12
260:5,11,17
**transdermal** 198:6
**transition** 118:16
118:24 119:4,18
**translational** 36:7
**trauma** 243:4,5,5
243:6 247:23
**treat** 71:16
**treatment** 41:2
69:19 71:12,13,14
111:7 203:2 209:8
209:12,16
**trend** 77:1
**trends** 34:15,19,21
84:4
**trial** 11:16 46:11
48:5 105:20
**tried** 55:23 66:20
66:20
**trouble** 89:24
191:19
**true** 203:15
**trust** 80:3 82:11
93:18

**truthful** 13:18
**truthfully** 12:18
**try** 13:10,14 71:22
80:7 103:19 104:9
138:11 144:14
176:5 220:6 247:3
**trying** 66:22 67:19
141:1 155:5
**turn** 6:7 19:2
27:22 58:12 118:8
131:19 156:6
166:15 171:3
172:17 173:10
186:15 212:20
213:6 248:6
**turned** 88:22
159:3
**turning** 61:13,15
93:24
**twelfth** 2:13
**twenty** 257:15
**two** 24:6,8,16
32:12 43:8 49:20
115:8 119:8
128:21 137:21,22
141:22,23 188:22
195:6 239:9,12
245:14 252:4
**tx** 2:21
**type** 10:4 11:19
68:3 88:16 141:21
162:7,7 183:19
199:20 209:4
218:18 234:9
255:7
**types** 148:16 212:6
**typewriting**
257:10
**typo** 49:20

**u**

**u** 190:20,22 191:2
**u.s.** 5:18 57:21
64:19 65:16,18
169:7 171:13
**uh** 172:20
**ultimate** 94:24
**unable** 157:23
**undercounting**
155:24
**underlying** 46:24
210:7 233:4
**underprescribing**
99:19
**underreporting**
155:17,21
**understand** 12:13
12:19 13:4,6,8
37:9 40:7,12 70:6
72:6 73:2 74:9
83:23 85:2,3
90:17 91:2 92:13
101:2,4 102:1,22
104:6,21 122:6
130:1,3 133:20
141:13 146:15
148:13 149:5
154:1,19 164:13
166:8 170:11
178:17 192:17
201:21 206:14
211:22 220:4
222:16 237:7
242:19,23 254:13
**understanding**
26:13,18,22,24
69:22 70:10 77:10
82:8,22 83:11
84:13,20 85:23
92:1 94:6,22
101:8 102:2

140:20 167:21
179:2 180:5
207:23
**understated** 88:14
**understood** 71:1
227:13 233:24
**undertake** 22:11
68:7 152:13,21
154:13 190:10
193:21 207:6
219:8 221:19
**undertaken**
112:12,15 234:10
**undertook** 22:15
23:9 25:1
**unicef** 240:12
**uniquely** 200:1
**unit** 6:13 78:21
103:13 122:1
166:3 192:12
237:2 253:7
**united** 1:1 6:18
57:10 58:9 168:8
233:22 237:21
**units** 256:2
**university** 5:3,6,9
9:17 14:1 19:14
51:11 75:1,22
236:2 237:18
240:22 241:5,8,21
241:23 246:1
249:24
**update** 206:17
**updated** 206:3,8
**use** 18:23 25:8,8,9
41:2 55:19 56:21
57:14 58:4,9 60:5
63:22 76:6 88:7
88:15 101:22
104:3,12 105:3,17
106:18 118:17

119:1 130:11
142:2 147:2 149:7
151:24 175:7
179:23 186:19
187:11 191:16
198:9,11,18 236:9
237:14 242:18,22
248:21 254:10,15
**uses** 151:20
152:15 179:13
254:12

**v**

**v** 258:6 259:3
260:3
**valid** 85:14,15
124:7 125:17,22
126:3,5 127:2,21
128:3,17 130:14
142:3 211:13
**validation** 141:18
**valuable** 147:21
148:6
**value** 226:3
**variation** 95:16
**variety** 210:4
242:11,24
**various** 69:3
113:18
**vary** 179:24
184:15
**vast** 56:4,10 91:4
123:5 152:10
162:19 164:16
190:1 210:12
227:14 230:1,23
246:9
**vehicle** 243:2
**veritext** 6:23 7:1
256:3 258:1,8
261:1

**veritext.com.**
258:17
**versus** 6:16 118:6
122:18 152:8
**veterans** 138:12
**video** 6:2,10,13
8:8 78:17,21
103:7,13 121:21
122:1 165:23
166:3 192:8,12
236:22 237:2
253:3,7 255:22
**videoconference**
1:19
**videographer** 3:8
6:24 103:8
**videotaped** 1:19
**view** 200:6
**virginia** 1:1 2:16
6:19 8:6 9:17,19
14:1 15:6 20:23
21:4,16 22:12
23:21 24:4 25:17
28:1,13,16,22 29:2
29:9,23 30:18
32:6,11,23,24
36:12,18 37:4
39:7 42:2 43:24
44:21 45:3,9 49:4
49:12 59:11 60:15
62:1,4 63:2 64:9
64:24 65:6,8,15,17
66:8 67:10,11,12
77:16 82:4 83:13
88:11 110:19
113:4 115:1
116:17 131:2,6,22
131:24 132:18,19
133:2,23 134:11
137:5,13 139:2
144:16 148:21

151:12,20 152:9
152:14 154:5
157:12 164:9
167:14 172:14
175:17 176:7,22
177:8,22 179:3
180:7 181:9 182:7
185:17 186:3
193:15 196:6
201:18 202:4,10
204:15 205:8,22
208:14 209:20
210:17 213:2
217:17 221:6
222:2 223:2
232:24 240:23
241:8,21,23 242:3
243:21,24 247:8
248:2,4 253:22
254:12 255:3
257:1,16
**virginia's** 37:6
137:1 138:22
**virtual** 13:12
195:10
**virtually** 9:13,23
**visit** 74:15,20
**visits** 40:23 110:7
110:9
**visually** 59:6 65:2
**vitae** 5:8 235:24
**vital** 21:3,10 24:19
54:12,14,18 61:8
110:18 140:4
143:5,13,18
145:23 166:23
181:2 194:4
205:21 207:14,14
210:14 211:5
216:11 217:7,9
218:2 242:12

253:21 254:1,5,15
254:21
**vitale** 2:19 7:17,18
252:2
**voice** 252:17
**vs** 1:6,13

**w**

**wait** 174:15
187:23 195:2
**waiting** 121:18
**waived** 258:20
**walk** 29:20 236:10
237:13
**want** 9:2 11:11
12:12 19:2,9
36:21,22 53:9
56:20 76:1,2
78:12 79:5 90:1
114:15 121:16
131:14 166:11
183:12 192:3
197:2 210:18
248:6 250:13
**wanted** 50:2 64:5
114:3,10,14
193:12
**wanting** 70:6
**washington** 2:14
3:6
**wave** 167:6
**way** 20:3,10 71:13
85:2 94:9,14,23
101:22 116:19
123:2 126:8 128:6
129:3 130:4
133:16 144:11,13
165:3 176:5 182:1
189:18,22 193:13
198:11 206:14
216:10 220:17,19
224:11 233:23

242:11,12 249:14
254:20
**wayne**  29:10,13
42:11
**ways**  202:2,3,10
**we've**  9:10 20:7
29:3 41:24 48:8
61:15 75:6 86:11
115:14 121:7
131:16 137:17
146:5 148:9,17
154:10,17 159:2
165:16 181:3
236:15 245:23
**web**  81:24
**weigh**  200:1,13
**went**  74:11,13
103:9,9,10 144:11
240:19,21
**west**  1:1 6:19 8:6
9:17,19 14:1 15:5
20:23 21:4,16
22:12 23:21 24:4
25:17 28:1,12,16
28:22 29:2,9,23
30:18 32:6,11,23
32:24 36:11,17
37:3,5 39:7 42:2
43:24 44:21 45:3
45:9 49:3,11
59:11 60:15 62:1
62:4 63:2 64:9,24
65:6,7,15,17 66:7
67:9,10,10,12
77:16 82:4 83:13
88:10 110:19
113:4 115:1
116:17 131:2,6,22
131:24 132:18,19
133:2,23 134:11
137:1,4,13 138:22

139:2 144:16
148:20 151:12,20
152:8,14 154:5
157:12 164:8
167:14 172:14
175:17 176:7,22
177:8,22 179:2
180:7 181:9 182:7
185:17 186:3
193:15 196:6
201:18 202:3,10
204:15 205:8,22
208:14 209:20
210:17 213:2
217:17 221:5
222:2 223:2
232:24 240:23
241:8,20,23 242:2
243:20,24 247:8
248:1,4 253:22
254:12 255:3
257:1,15
**whatsoever**  80:6
**whispering**  6:5
**widely**  184:15
217:14 254:4,8,11
**widespread**  164:7
**wife**  18:1
**williams**  2:13
**wit**  257:2
**witness**  8:13,14,16
27:10 51:24
123:16 159:23
168:24 197:3
227:5 251:22
252:21 257:7,10
258:9,12 259:1,4
259:11 260:1,4,15
**witnesses**  26:13,13
249:10

**witness'**  258:15
**women's**  238:20
**wonderful**  53:15
223:16
**word**  47:14,14
109:13 170:6
**words**  25:14 55:23
**work**  9:9 15:8,14
16:1,7 18:8,12,16
18:17,22 20:16
22:4,10,13,22,23
23:10 28:11,19
32:8,19,20 35:20
39:20 40:6 41:17
68:18,20 69:1,2,5
69:6 74:23 75:23
82:3 83:8,11
93:19 100:23
111:13 112:24
133:14,15 135:7
135:11,15 138:21
177:21 193:7
207:13 217:8
219:8 221:15
223:19 229:6,16
239:18,21 243:7
245:6 253:14
254:3 255:6,8
**worked**  15:16
20:20 21:14 25:1
68:14 74:5 82:12
82:13 87:23
177:19 201:19
205:17 238:6,23
239:5
**working**  9:3,4
14:23 21:1,7,18
28:20 30:10 31:7
31:9 32:22 33:12
33:12 34:16 35:24
37:23 38:2 39:9

44:2 70:22 75:1
82:21 133:12
239:8 240:6,11
243:10 244:9
245:22,23 247:11
247:21
**works**  18:3 85:2
**world**  84:17
238:14
**worth**  27:8
**write**  94:2 145:14
155:6 177:5
**writing**  16:5 21:23
24:14 139:15
169:18
**written**  16:24 61:6
61:7 134:4 136:22
145:21,22,24
170:3 224:7
227:15 257:9
**wrong**  145:24
**wrote**  46:9 109:3
119:16 144:10
208:17 225:14
247:7
**wu**  3:3 4:3 7:11,12
8:19,23 9:8 19:17
20:4 26:3,12 27:7
27:16,17 51:3
53:1,4,8,12,15,16
70:12 75:9 78:8
78:11,15,24 96:23
103:3,6,16 121:7
121:10,20 122:4
123:13,15 126:15
159:22 160:1
163:6,16 165:16
165:21 166:6
168:13,19,22
174:20 190:6,9
192:2,6,15 194:23

## x

**x** 46:22

## y

**yea** 53:12 214:4
**yeah** 17:1 50:7
56:14 73:10,13,17
77:9 78:5,10,14
89:9 91:14 95:7
97:19 99:10,10
100:17 115:3
121:3,3,14,16
123:18,19 126:11
128:9 140:13
146:7 157:1,19
158:10 161:3
163:9 168:17,21
170:20 174:1
182:3 187:10
191:19 192:4
195:20 215:18
216:2 218:13
221:13 226:11
230:22 232:19
234:6 235:21
247:7 251:17
**year** 39:21 40:4,8
40:18 44:15,15
74:15 125:17
130:17 139:6
142:8 156:11
162:18 163:19

195:4,8,17 201:14
210:16 212:22
226:20,24 230:7
232:21 236:6,18
237:5 249:3,9,15
251:19 255:19
**wv** 2:7,17 5:20
120:11 194:19
257:20

183:14 202:15
203:14 207:21
214:22 232:2
239:9,19
**years** 11:23 14:5
28:21 35:8 43:8
58:19 83:16 85:11
133:14 138:14
154:18 161:22
201:19 202:14
213:18 228:9
230:2 239:12
243:3 249:19
**yep** 9:4 48:13
86:23 123:24
129:8 131:20
153:16,18 158:17
183:11 186:16
187:6,9 191:6
223:15
**younger** 124:21

## z

**zealand** 63:22
238:4
**zero** 79:21 81:12
94:3 95:10 97:14
100:7
**zoom** 6:22 240:11

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
              VERITEXT LEGAL SOLUTIONS
      COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.