# EXHIBIT Q

Exhibit Q – SEALED excerpts of Plaintiffs' Expert Witness J. Mohr Transcript of Deposition (Sept. 21, 2020)


PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE MARKETING OPINIONS OF DRS. ANNA LEMBKE, KATHERINE KEYES, ANDREW KOLODNY, AND JAKKI MOHR

Page 1

1         IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3

- - - - - - - - - - - - - - - - - - - - - - - - x

4    THE CITY OF HUNTINGTON,

5                          Plaintiff,

6          vs.                Civil Action No.

                                3:17-01362

7    AMERISOURCEBERGEN DRUG

     CORPORATION, et al.,

8

                          Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - x

     CABELL COUNTY COMMISSION,

10

                          Plaintiff,

11

12          vs.                Civil Action No.

                                3:17-01665

13   AMERISOURCEBERGEN DRUG

     CORPORATION, et al.,

14

                          Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - - x

16                       September 4, 2020

                         9:00 a.m.

17

18       VIDEO RECORDED DEPOSITION of ANDREW KOLODNY, M.D., an

19   Expert Witness for the Plaintiff herein, held remotely via

20   Zoom before Sara K. Killian, a Registered Professional

21   Reporter, Certified Court Reporter and Notary Public of

22   the State of New York.

23

24

25

Page 2

1    A P P E A R A N C E S :

2

3

4    APPEARING FOR THE PLAINTIFFS:

5

6

7    CRUEGER DICKINSON LLC
     4532 N. Oakland Avenue
8    Whitefish Bay, Wisconsin  53211
9    BY: ERIN DICKINSON, ESQ.
         ANTHONY MAJESTRO, ESQ.
10

11

12

13

14   FARRELL LAW
     422 Ninth Street, 3rd Floor
15   Huntington, West Virginia  25701
16   BY: PAUL FARRELL, JR.

17

18

19

20   (Continued on following page)

21

22

23

24

25

1    A P P E A R A N C E S: (cont'd)

2

3

4    APPEARING FOR THE DEFENDANT McKESSON:

5

6    COVINGTON & BURLING, LLP
     850 10th St NW
7    Washington, DC  20001
8    BY: TIMOTHY C. HESTER, ESQ.
         EMILY ULLMAN, ESQ.
9        JAMES GOOLD, ESQ.

10

11

12

13   APPEARING FOR THE DEFENDANT CARDINAL HEALTH:

14

15   WILLIAMS & CONNOLLY, LLP
     725 12th Avenue NW
16   Washington, DC  20005
17   BY: COLLEEN McNAMARA, ESQ.

18

19

20   CAREY DOUGLAS KESSLER & RUBY, PLLC
     901 Chase Tower
21   707 Virginia Street, East
     Charleston, South Carolina  25353
22
     BY: RAYMOND FRANKS, ESQ.
23

24

25   (Continued on following page)

Page 4

1    A P P E A R A N C E S: (cont'd)

2

3

4    APPEARING FOR DEFENDANT AMERISOURCEBERGEN DRUG
     CORPORATION:

5

6    REED SMITH, LLP
     1717 Arch Street

7    Three Logan Square, Suite 3100
     Philadelphia, Pennsylvania  19103

8
     BY: CHRISTINA VITALE, ESQ.

9        ALYSSA CONN, ESQ.

10

11

12   ALSO PRESENT:

13       GEOFFREY BASSETT, Veritext Videographer

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                        I N D E X
 2     WITNESS              EXAMINATION BY          PAGE
 3     Dr. Kolodny          Mr. Hester             9
 4                          Ms. McNamara           250
 5                          Ms. Vitale             288
 6
 7                        E X H I B I T S
 8     EXHIBITS             DESCRIPTION             PAGE
 9     Exhibit 1            Expert report of Dr.    10
                            Andrew Kolodny, August 3,
10                          2020
11     Exhibit 3            Center for Disease      15
                            Control and Prevention
12                          Morbidity and Mortality
                            Weekly Report, March 18,
13                          2016, "CDC Guideline for
                            Prescribing Opioids for
14                          Chronic Pain - United
                            States, 2016"
15
       Exhibit 4            "Opioid Abuse in Chronic  27
16                          Pain - Misconceptions and
                            Mitigation Strategies" by
17                          Nora D. Volkow, M.D. and
                            A. Thomas McLellan, Ph.D.
18
       Exhibit 5            The Journal of Pain, Vol  33
19                          12, No 2, February 2011,
                            "A Randomized Trial of 2
20                          Prescription Strategies
                            for Opioid Treatment of
21                          Chronic Nonmalignant
                            Pain" by Bruce D.
22                          Naliboff and others
23
24
25     (Continued on following page)
```

Page 6

```
 1                    E X H I B I T S (cont'd)
 2    EXHIBITS        DESCRIPTION                  PAGE
 3    Exhibit 9       "The Role of Opioid          42
                      Prescription in Incident
 4                    Opioid Abuse and
                      Dependence Among
 5                    Individuals with Chronic
                      Noncancer Pain, The Role
 6                    of Opioid Prescription"
                      by Mark J. Edlund, M.D.,
 7                    Ph.D., and others
 8    Exhibit 2       NIH Public Access Author     68
                      Manuscript, "Opioid
 9                    Therapy for Chronic Pain
                      in the US: promises and
10                    perils" by Mark D.
                      Sullivan, M.D., Ph.D. and
11                    Catherine Q. Howe, M.D.,
                      Ph.D.
12
      Exhibit 13      "Prevalence of              97
13                    Prescription Opioid-Use
                      Disorder Among Chronic
14                    Pain Patients:
                      Comparison of the DSM-5
15                    vs. DSM-4 Diagnostic
                      Criteria" by Joseph
16                    Boscarino, PhD, MPH, and
                      others
17
      Exhibit 7       Letter to Deborah Dowell,   156
18                    Chief Medical Officer of
                      National Center for
19                    Injury Prevention and
                      Control from American
20                    Medical Association, June
                      16, 2020
21
      Exhibit 14      "Association Between        167
22                    Opioid Prescribing
                      Patterns and Opioid
23                    Overdose-Related Deaths"
                      by Amy S. Bohnert, Ph.D.
24                    and others
```

25    (Continued on following page)

Page 7

```
 1                     E X H I B I T S (cont'd)
 2    EXHIBITS         DESCRIPTION                PAGE
 3    Exhibit 20       Report from Attorney       194
                       General Patrick Morrisey,
 4                     June 4, 2020, "DEA's
                       Failure to Combat
 5                     Diversion Cost Lives:
                       Results from the West
 6                     Virginia Attorney
                       General's Investigation
 7                     into the DEA's
                       Catastrophic Failure to
 8                     Manage the National Drug
                       Quota System from
 9                     2010-2016"
10    Exhibit 21       AMA Journal of Ethics,     201
                       August 2020, Volume 22,
11                     Number 8, "How FDA
                       Failures Contributed to
12                     the Opioid Crisis" by
                       Andrew Kolodny, M.D.
13
      Exhibit 15       Article from JAMA          208
14                     Network, "Association of
                       Pharmaceutical Industry
15                     Marketing of Opioid
                       Products With Mortality
16                     From Opioid-Related
                       Overdoses" by Scott E.
17                     Hadland, M.D. and others
18    Exhibit 22       CAH_MDL2804_00133350-0013  277
                       3353
19
      Exhibit 23       West Virginia Code §       289
20                     30-5-12b
21    Exhibit 24       PDD 8801142910-8801142911  296
22    Exhibit 25       PPLPC029000022136          303
23    Exhibit 26       ABDC-INCID00000192-000001  307
                       95
24
      Exhibit 27       West Virginia Board of     313
25                     Medicine Quarterly
                       Newsletter
```

Page 8

1              THE VIDEOGRAPHER:  I am now

2       recording.  The time is 9:06 and we are on

3       the record.  This is the videographer

4       speaking, Geoffrey C. Bassett, with Veritext

5       Legal Solutions -- sorry guys, my

6       apologies -- with Veritext Legal Solutions.

7              Today's date is September 4th, 2020

8       and the time is 9:06 a.m.  We're here to take

9       the remote video deposition of Dr. Andrew

10      Kolodny in the matter of City of Huntington

11      versus AmerisourceBergen Drug Corporation, et

12      al.

13             Would counsel please introduce

14      themselves for the record?

15             MS. DICKINSON:  Sure.  Erin Dickinson

16      at Crueger Dickinson for the plaintiffs and

17      along with me is Anthony Majestro, also for

18      the plaintiffs.

19             MR. HESTER:  This is Timothy Hester.

20      I represent McKesson for the defendant

21      McKesson and with me are Emily Ullman and

22      James Goold from Covington & Burling.

23             MR. FRANKS:  Ray Franks.  I'm local

24      counsel in Charleston, West Virginia for

25      Cardinal Health with the law firm of Carey

```
                                                    Page 9

 1        Douglas Kessler & Ruby.

 2              MS. MCNAMARA:  And this is Colleen

 3        McNamara from Williams & Connelly, also on

 4        behalf of Cardinal Health.

 5              MS. VITALE:  This is Christina Vitale

 6        with Reed Smith on behalf of defendant

 7        AmerisourceBergen Drug Corporation and along

 8        with me is Alyssa Conn.

 9              MR. HESTER:  Good morning, Dr.

10        Kolodny.  I introduced myself already, but

11        again, my name is --

12              THE COURT REPORTER:  I have to swear

13        in the witness still.

14              MR. HESTER:  Oh, sorry.

15              THE VIDEOGRAPHER:  So if everyone has

16        been introduced, will the court reporter,

17        Sara Killian, please swear in the witness.

18        Thank you.

19     A N D R E W   K O L O D N Y, M. D., after having

20     first been duly sworn by a Notary Public, was

21     examined and testified as follows:

22              THE COURT REPORTER:  Please state

23        your name and address for the record.

24              THE WITNESS:  Dr. Andrew Kolodny,

25        4658 Hanford Street, Douglaston, New York.
```

Page 10

```
 1    EXAMINATION BY
 2    MR. HESTER:
 3         Q.     Good morning, Dr. Kolodny.  I
 4    introduced myself before.  My name is Tim Hester.
 5    I represent McKesson.
 6                Let me just set a few ground rules.
 7    Since we're doing this deposition remotely, it's a
 8    little bit more unusual than if we were face to
 9    face.
10                Are you in your office now?
11         A.     I am.
12         Q.     And is there anybody else there with
13    you?
14         A.     No.  Not in my office.
15         Q.     We had sent you exhibits previously
16    in a box that you opened this morning, correct?
17         A.     That's correct.
18         Q.     Are there any other papers that you
19    have with you that you are going to be consulting
20    today, aside from the exhibits I show you?
21         A.     Not in the office with me.
22                (Whereupon, Exhibit 1 was marked for
23         identification.)
24         Q.     Okay.
25                Dr. Kolodny, let me ask you to open
```

Page 11

1    up Exhibit 1, which is in the envelopes, I think,

2    behind you.

3                    Do you recognize this document?

4         A.      I do.

5         Q.      It's a copy of your report that

6    you've submitted in this litigation; is that

7    right?

8         A.      That's correct.

9         Q.      And we've premarked that as Exhibit 1

10   for the record.

11                   Dr. Kolodny, let me ask you first are

12   you stating -- the opinions that are reflected in

13   this report, are those the opinions you're

14   offering in this litigation?

15        A.      This report contains opinions that I

16   will be offering in this litigation or that I am

17   offering in this litigation.

18        Q.      Are there any opinions that you're

19   intending to offer in the litigation that are not

20   set out in the report?

21        A.      It's possible.  Not that I can

22   immediately think of.

23        Q.      Okay.

24                   And I recognize you've been working

25   in this field for a long time, but I wanted to ask

1    you about any specific studies or specific facts

2    you're relying on for purposes of your opinions.

3                 Are there any specific facts or

4    specific studies you're relying on that are not

5    set out in the report?

6         A.      Probably.

7         Q.      Do you have those in mind?

8         A.      I don't know that it would be

9    possible for me to think of them in advance.  I've

10   been working on the opioid crisis for 17 years.

11   I've been studying it, writing about it, reading

12   about it and I think it's very likely there are

13   many specific facts that are important but that I

14   didn't wind up getting included.  It's impossible

15   to really think of everything in advance that

16   might inform my opinion.

17        Q.      Are there any specific studies you're

18   planning to rely on to support your opinions that

19   are not cited or referred to in the report?

20        A.      It's possible, but none that I

21   thought of in advance of writing the report and

22   didn't include, but it's very likely there are

23   many specific studies that inform my opinion that

24   didn't make it into this report.

25        Q.      You don't have any in mind as you sit

Page 13

1    here that you would intend to rely on?

2         A.     No, I don't.  If you were to -- if

3    you start asking me about different subjects, I

4    could probably at that point think of articles,

5    you know, research that's been done that would be

6    relevant to my opinion that didn't make it into

7    this report, but there's nothing I could think of

8    right now off the top of my head that didn't make

9    it into the report.

10        Q.     Okay.

11               Do you have any corrections to make

12   to the report?

13        A.     There -- yeah.  I think Ms. Dickinson

14   sent a correction to the report I believe

15   yesterday.  It might have been a missing citation.

16               And as I've gone through the report,

17   just in preparation, I've found typos in different

18   places.  For example, there was a -- in one place

19   where I used the word Oxycontin and I meant the

20   word -- I meant to say Oxycodone.

21               MS. DICKINSON:  For the record, just

22          for the record, the correction that we sent

23          over, the errata, was to footnote 318 and it

24          was missing a citation and we provided that

25          citation and so that correspondence should be

1          deemed an errata to his actual report.

2                    MR. HESTER:  We did receive that.

3          Q.        Are there any other errata you intend

4     to make at this stage?  I understand there may be

5     typos.  I'm asking about substantive changes.

6          A.        I don't think so.

7          Q.        Okay.

8                    Do you know roughly the amount that

9     you've been paid to date for testifying in these

10    various opioid litigations?

11         A.        I don't have a number off the top of

12    my head.  I would -- yeah.  So, I mean, are you

13    talking about since -- do you have a time frame

14    that you're referring to?

15         Q.        Well, I believe you've been an expert

16    in three of the opioid litigations -- is that

17    right? -- in Ohio, in Oklahoma and now this matter

18    in West Virginia.

19         A.        Yes, that's correct.

20         Q.        And I was just trying to get a range

21    of magnitude.  Roughly speaking, what's the range

22    of magnitude of the total amount you've been paid

23    as a testifying expert in those three cases?

24         A.        I think I started working for -- I

25    think I worked for Oklahoma about two years, more

Page 15

1    or less, and I can't really remember the exact

2    date, but I would estimate over a three- to

3    four-year period of working on the opioid

4    litigation -- it would be a three-year period --

5    total revenue earned would probably -- ballpark

6    500,000, more or less.  Maybe more.  Probably 500

7    to 600 I would say over a three-year period.

8         Q.      Is your compensation in any way

9    dependent on the outcome of this litigation?

10        A.      No.

11        Q.      So there's no bonus or extra

12   compensation you receive depending on the outcome?

13        A.      That's correct.

14        Q.      Let me ask you first to discuss the

15   issue of pain treatment.

16              Dr. Kolodny, do you agree that the

17   treatment of pain in a legitimate medical issue?

18              MS. DICKINSON:  Object to the form.

19        A.      Yes.

20              (Whereupon, Exhibit 3 was marked for

21        identification.)

22        Q.      And let me ask you to look at

23   Exhibit 3, please, if you could open that.  Sorry

24   for the mechanics of having to do this.

25        A.      That's okay.  I've got it.

Page 16

1          Q.      Okay.

2                  Exhibit 3, which we premarked, is

3     entitled "CDC Guideline for Prescribing Opioids

4     for Chronic Pain, United States, 2016."

5                  Dr. Kolodny, have you seen this

6     document before?

7          A.      I have.

8          Q.      And you cite it in your report,

9     correct?

10         A.      I do.

11         Q.      Let me ask you to look at page one,

12    please, of the guidelines and it's in the

13    paragraph on page one on the right-hand side, the

14    first full sentence, which reads "Patients can

15    experience persistent pain that is not well

16    controlled."

17                 Do you agree with that as a doctor?

18         A.      I'm sorry.  Where are you?

19         Q.      I'm sorry.  It's the right-hand

20    column on the first page and it's the first

21    sentence.

22                 Do you see where it says "Patients

23    can experience persistent pain that is not well

24    controlled"?

25         A.      So the -- I'm sorry.  The first

1    page -- do you mean the page marked one or do you

2    mean the actual first page?

3         Q.    Oh, sorry.  I didn't realize you had

4    an extra page there.  So it would be the first

5    substantive page of text under the heading

6    "Introduction."

7         A.    Yes.  I've got that now.  Okay.

8         Q.    Okay.  It's page one of the document.

9               Do you see that?

10        A.    Yes.

11        Q.    And I wanted to point you to the

12   right-hand column --

13        A.    Yes.

14        Q.    -- the first full sentence.  It says

15   "Patients can experience persistent pain that is

16   not well controlled."

17               Do you see that?

18        A.    I do.

19        Q.    Do you agree with that?

20        A.    Yes, I do.

21        Q.    Do you see the next sentence:  "There

22   are clinical psychological and social consequences

23   associated with chronic pain"?

24               Do you see that?

25        A.    I do.

Page 18

1      Q.      Do you agree with that?

2      A.      I do.

3      Q.      And let me ask you to turn to page

4  two of the document.  At the top of the left-hand

5  column, the first full sentence says "Most

6  recently, analysis of data from the 2012 National

7  Health interview studies showed that 11.2% of

8  adults report having daily pain."

9              Do you see that?

10     A.      I do.

11     Q.      Do you agree with that?

12     A.      I would want to look at the citation.

13  I do believe that experiencing pain on a regular

14  basis is very common.  Feeling aches and pains is

15  part of being alive and I do -- I wouldn't -- the

16  estimate of 11.2% wouldn't surprise me, that 11.2%

17  of adults on a routine basis have daily pain.

18     Q.      Right.

19              Let me ask you next do you agree that

20  prescription opioids can address legitimate

21  medical needs in treating pain?

22     A.      You know, I think that opioids can be

23  effective for treating pain at the end of life

24  when you're able to continue increasing the dose

25  because someone is near the end of life and I

Page 19

1    think opioids can be effective for pain when used

2    intermittently, low doses.  But I do not believe

3    opioids are effective for pain when they're taken

4    around the clock for weeks and months and years

5    unless the dose keeps going up.

6         Q.    Okay.  Let me ask you to look at your

7    report, please, Exhibit 1, page nine.

8              Do you have that there, page nine?

9         A.    I do.

10        Q.    Do you see the second full paragraph

11   begins "Opioids are essential medicines for

12   palliative care"?

13        A.    Yes.

14        Q.    Why are they essential medicines for

15   that purpose?

16        A.    Because near the end of life, when

17   you're able to continue increasing the dose

18   because someone is near the end of life and you

19   don't have to worry so much about addiction or

20   respiratory depression or even the opioid

21   potentially shortening the life span for someone

22   who is near the end of life and suffering, they

23   can be effective and they can provide relief and

24   not only do opioids relieve the physical pain, but

25   they can also provide a sense of wellbeing for

Page 20

1   someone who is scared and suffering near the end

2   of life.

3         Q.      Let me ask you to look at page 11,

4   please, of your report.

5         A.      Yes.

6         Q.      Do you see the third paragraph?  The

7   first sentence refers to the legitimate use of

8   opioids -- and I'm now going to quote -- for acute

9   pain, cancer pain, palliative care and

10  catastrophic injury.

11               Do you see that?

12        A.      You're at the third paragraph --

13        Q.      Yes.  I wanted to ask you about this

14  phraseology that you used where you refer to the

15  legitimate use of --

16        A.      Can you just -- I'm on page 11.

17        Q.      Sorry.  It's the third paragraph.  It

18  begins "Industry joined together ..."

19               Do you see that paragraph?

20        A.      I see that first sentence.

21        Q.      Yes.

22               Do you see where you use the phrase

23  "legitimate use"?  It's in the second line of that

24  paragraph.

25        A.      I do.

Page 21

```
 1        Q.      And you refer in there to the
 2   legitimate use for prescription opioids.
 3        A.      Yes.
 4        Q.      And you say the legitimate use for
 5   prescription opioids is for acute pain, cancer
 6   pain, palliative care and catastrophic injury; is
 7   that correct?
 8        A.      That's correct.
 9        Q.      And why do you say those are
10   legitimate uses?
11        A.      I think -- and let me just clarify
12   that, you know, when I say legitimate, I'm
13   really -- what I'm referring to is appropriate
14   uses, so these are appropriate uses because for
15   these different conditions, the benefits of an
16   opioid can outweigh the risks and so with any
17   medical treatment, if the benefits outweigh the
18   risks for that individual patient, then the
19   treatment generally would be considered
20   appropriate.
21        Q.      Do you know what share of
22   prescription opioids are used for these legitimate
23   uses or appropriate uses?
24        A.      Yes, I do and it really depends on
25   how you're measuring the share for consumption.
```

Page 22

1    If you're measuring consumption by numbers of

2    prescriptions written, acute pain constitutes a

3    large percentage of the number of prescriptions

4    written.  If you're measuring consumption in terms

5    of morphine milligram equivalents, chronic pain,

6    chronic non-cancer pain, conditions for which the

7    risks of opioids outweigh the benefit constitute

8    the bulk of consumption.

9           When it comes to cancer pain, at

10   least for Hydrocodone combination products, my

11   understanding -- the data I've seen on this is

12   that cancer constitutes about 2%, neoplasms

13   constitute about 2% of opioid prescriptions

14   written.

15        Q.     So when you said that the largest

16   share of prescriptions written is for acute pain,

17   do you have in mind a number on that or a

18   percentage?

19        A.     Not off the top of my head.  I want

20   to have some real data in front of me.

21        Q.     I mean, is it two-thirds?

22        A.     I don't really want to guess, but

23   it's a very large percentage are written in a

24   small quantity for acute pain.

25        Q.     When you say large percentage, do you

Page 23

1    mean more than 50% of prescriptions are written

2    for acute pain?

3         A.     I believe that's correct.  I think

4    more than half of prescriptions are written for

5    acute pain.

6         Q.     And you said roughly 2% of

7    prescriptions you believe are written for cancer

8    pain?

9         A.     I've seen data on Hydrocodone

10   combination products that show that about 2% are

11   for cancer.

12        Q.     And for catastrophic injury that you

13   refer to here, are you putting that in the

14   category of acute pain or is that something

15   different?

16        A.     Acute pain would include hospital

17   use, during surgery or immediately after surgery

18   or someone who has arrived in an emergency room,

19   experiencing a catastrophic injury.  Those are

20   circumstances in which opioids are appropriate for

21   acute pain.

22               I should point out, though, that when

23   we talk about acute pain and the percentage of

24   prescriptions written, I'm not suggesting that

25   because more than half of prescriptions are

Page 24

1    written for acute pain that acute -- that more

2    than half of prescriptions were appropriate

3    because -- just because the patient has acute pain

4    doesn't mean they should have an opioid, doesn't

5    mean people should be sent home from hospitals or

6    minor procedures with acute pain with opioids.

7         Q.      But that judgment would be made in an

8    individual case by a doctor who would decide what

9    to write as a prescription for acute pain, right?

10        A.      Not necessarily.  So, I mean -- the

11   doctor -- just because a doctor made the decision

12   doesn't mean that the prescription was

13   appropriate.  We are in a situation where we have

14   a medical community that was misinformed about the

15   risks and benefits.  So just because -- a doctor

16   may have believed that this was the right thing to

17   do for their patient, but that doesn't mean it was

18   appropriate.

19        Q.      Now, I understand the point you're --

20   the distinction you're drawing, but what I wanted

21   to focus on in particular was if a doctor is

22   writing a prescription for acute pain, that's a

23   category that you see as legitimate?  The

24   individual prescriptions you might --

25             MR. MAJESTRO:  Hey Tim --

Page 25

1                    MR. HESTER:  Yes?

2                    MR. MAJESTRO:  Erin got kicked off,

3         so let's wait a minute for her to get back

4         on.

5                    MR. HESTER:  Okay.  I.

6                    MR. MAJESTRO:  Got kicked off too,

7         but I'm obviously back on.

8                    THE VIDEOGRAPHER:  Would you like to

9         temporarily go off the record?

10                    MR. HESTER:  Sure.  Sure.

11                    Have you done these video depositions

12         before, Dr. Kolodny?

13                    THE WITNESS:  Just one.

14                    THE VIDEOGRAPHER:  The time is 9:28

15         and we're off the record.

16                    (Recess taken)

17                    THE VIDEOGRAPHER:  The time is 9:32.

18                    We are back on the record.

19         Q.     Dr. Kolodny, before the break, we

20    were talking about the share of prescriptions that

21    are written for acute pain circumstances and I

22    understand your point to be that in your view, not

23    all such prescriptions are appropriate for acute

24    pain, right?

25         A.     I would say that many -- maybe

1   most -- acute pain prescriptions aren't necessary.

2   So then if you, for example, compare opioid

3   prescribing in the United States to other

4   countries with really good health care systems,

5   like in western Europe, opioids are not really

6   used outpatient for acute pain.  Patients aren't

7   sent home from the hospital with acute pain

8   prescriptions.

9        Q.     But I wanted to ask you a slightly

10  different question, which is a doctor who writes a

11  prescription for acute pain is making a judgment

12  that the prescription is appropriate for that

13  circumstance, correct?

14       A.     That's correct.

15       Q.     Okay.

16              And we talked before about the share

17  of prescriptions that are written for acute pain

18  and I believe you said that you understood it was

19  greater than 50%, although you didn't have the

20  specific number in your head, right?

21       A.     Correct.

22       Q.     Do you know what share of

23  prescriptions in West Virginia are written for

24  acute pain?

25       A.     I don't know if I've seen data on

1    that.  No, I don't believe I can answer that

2    question.

3         Q.     You've not seen any data on that?

4         A.     I don't believe I've seen data on

5    opioid prescribing and the diagnosis of the

6    patients receiving the opioid prescription in the

7    State of West Virginia.

8         Q.     Do you have any reason to believe

9    that the share of prescriptions written for cancer

10   pain would be higher in West Virginia?

11        A.     I believe because -- I don't think

12   West Virginia could be that different from the

13   rest of the United States, so I believe that

14   prescriptions written for cancer in the State of

15   West Virginia constitute a small percentage of

16   opioid prescriptions.

17        Q.     Do you know the percentage?

18        A.     I have not seen that data, I don't

19   believe.

20               (Whereupon, Exhibit 4 was marked for

21        identification.)

22        Q.     Let me ask you if you could open up

23   Exhibit 4, please.

24               Do you have it there?

25        A.     I do.

Page 28

1      Q.      So Exhibit 4, which we premarked, is

2   written by Nora Volkow entitled "Opioid Abuse in

3   Chronic Pain - Misconceptions and Mitigation

4   Strategies."

5              Do you see that, Dr. Kolodny?

6      A.      I do.

7      Q.      And this is a document that you cite

8   in your report; is that right?

9      A.      I believe I do.

10     Q.      Yes.  If you need to confirm, I know

11  it's cited in your report in note 17, page ten.

12     A.      Okay.

13     Q.      You're familiar with this document?

14     A.      I am familiar with this paper.

15     Q.      Okay.  And let me ask you to look at

16  the first page.  It's 1253.

17              Do you see under the heading "Source

18  of the Opioid Epidemic," there's a first sentence

19  that reads "More than 30% of Americans have some

20  form of acute or chronic pain"?

21              Do you see that?

22     A.      Yes.

23     Q.      Is that a statement you agree with?

24     A.      I would like to look at what they're

25  citing for that, but as I mentioned before, part

Page 29

1    of feeling pain -- you know, part of being alive

2    involves feeling pain.  So many Americans very

3    frequently and many humans very frequently feel

4    pain.  That's not necessarily an indication that

5    30% of Americans need opioids or even need a pill

6    for their pain of any sort.

7         Q.      That wasn't what I asked you, though.

8              I just asked whether you agree with

9    this statement:  "More than 30% of Americans have

10   some form of acute or chronic pain."

11        A.      I'm not sure.  I want to look at the

12   studies and many of the studies on that topic have

13   been influenced by the opioid industry, including

14   opioid distributors, so I globally look closely at

15   what was being cited there.

16        Q.      I really need you to answer my

17   questions, though.  That was a narrow question.

18              Do you agree with this statement --

19   do you agree with this statement:  "More than 30%

20   of Americans have some sort of acute or chronic

21   pain"?

22              If you do or don't, you can say yes

23   or no.

24              MS. DICKINSON:  Objection to form.

25              Argumentative.

Page 30

1          He's answered the question two or

2      three times.  He's going to answer it with

3      completeness in the way that he needs to to

4      be accurate.

5          Go ahead, Doctor, if you want to

6      answer again.

7      A.     It's not a yes or no question.  I

8  can't really answer whether I agree with it or

9  disagree with it without looking at who they

10  cited.

11      Q.     Okay.

12          Do you know what the numbers are on

13  the percentage of Americans who have acute or

14  chronic pain?

15      A.     I have seen estimates all over the

16  place and many of the studies on this topic are

17  not reliable because they've been influenced by

18  the opioid industry.

19      Q.     Do you see the next sentence:  "Among

20  older adults the prevalence of chronic pain is

21  more than 40%"?

22          Do you agree with that statement?

23      A.     I don't agree or disagree with it.  I

24  really want to look at the support for that

25  statement.

1      Q.      Do you know the statistics in West

2  Virginia for the prevalence of chronic pain among

3  older adults?

4      A.      I do not --

5              MS. DICKINSON:  Objection to form.

6      A.      -- know what percentage of people in

7  West Virginia -- older adults -- have chronic pain

8  and I would be suspicious of any study that claims

9  to have that data.  That's something that's very

10  difficult to assess.

11      Q.      Let me ask you to look further down

12  in the page.  Do you see at the end of the first

13  paragraph that we've just been looking at, there's

14  a sentence that reads "Although opioid analgesics

15  rapidly relieve many types of acute pain and

16  improve function" -- I want to focus on that

17  phrase.

18              Do you see that phrase?

19      A.      Yes.

20      Q.      Do you agree with that?

21              MS. DICKINSON:  Objection to form and

22          misstates the document in terms of it's only

23          half of the sentence you're reading from.

24              MR. HESTER:  I think that's a

25          speaking objection, Erin.  You can object to

1          the form.  I'm asking Dr. Kolodny about

2          one-half of the sentence.

3          Q.     I understand there's a second half of

4     the sentence, Dr. Kolodny, but the first half is

5     what I wanted to ask you about.

6          A.     I can't really agree or disagree with

7     it.  I think the authors might have gotten a

8     little ahead of the evidence on that because I'm

9     not aware of studies on opioid use and function

10    for acute pain.  I'm aware of studies on opioid

11    use and function for chronic pain, which have

12    shown that they really don't improve function, but

13    I'm not aware of studies -- so I think it's

14    possible that the authors may have gotten a little

15    ahead of the data on this.

16         Q.     Have you seen studies that are

17    contrary to this point, the point being that

18    opioid analgesics rapidly relieve many types of

19    acute pain and improve function?

20         A.     So it is -- opioids are effective for

21    acute pain and there are many studies that show

22    that.  I'm not aware of studies that show that

23    opioids improve function in people with acute pain

24    because function is generally a concern in people

25    with chronic pain, not acute pain.  We don't

Page 33

1    really think about function in somebody who just

2    had surgery.

3                    (Whereupon, Exhibit 5 was marked for

4         identification.)

5         Q.       Let me ask you to look, please, at

6    Exhibit 5.  I may come back to some of these, so

7    you can keep a stack of them, but the new one to

8    open is Exhibit 5.

9         A.       I have it.

10        Q.       Exhibit 5, which we premarked, is

11   written by Bruce Naliboff and others and it's

12   entitled "A Randomized Trial of Two Prescription

13   Strategies for Opioid Treatment of Chronic

14   Nonmalignant Pain."

15                   Do you see that?

16        A.       I do.

17        Q.       Is this a document you've seen

18   before?

19        A.       I'm not -- I'm not certain.

20        Q.       It's cited -- it's cited in your

21   report.  I don't mean to make this a memory

22   contest.  It is cited in your report at note 12.

23        A.       Okay.

24        Q.       So do you see -- let me ask you to

25   look at page 288, which is the first page, and I

1   want to direct you to the right-hand column.

2   There's a reference to -- in the first sentence on

3   that right-hand column, there's a reference to a

4   study by Kalso, et al, concluded that opioids led

5   to a consistent reduction of at least 30% in pain

6   severity in short-term trials.

7             Do you see that?

8       A.      Yes, I see that.

9       Q.      Is that consistent with your

10  understanding of the data on reductions in pain

11  severity in short-term trials of prescription

12  opioids?

13      A.      Yes.  Opioids can be effective on a

14  short-term basis.

15      Q.      Let me ask you to look back at the

16  CDC guidelines, please, which is Exhibit 3.  It

17  should be in your stack.  Happily, you don't have

18  to open this one.  You already have it.

19      A.      I have it.

20      Q.      Do you see in the second package --

21  let me point you to page two of the CDC

22  guidelines, Exhibit 3.

23             There's a sentence in the left-hand

24  column, about three or four sentences down,

25  there's a sentence that reads "Evidence supports

Page 35

1    short-term efficacy of opioids for reducing pain

2    and improving function in non-cancer, no

3    susceptive and neuropathic pain in randomized

4    clinical trials lasting primarily less than 12

5    weeks."

6                    Do you see that?

7        A.       I do.

8        Q.       You don't see that?

9        A.       I said I do see that.

10       Q.       Okay.

11                    Is that consistent with your

12   understanding of the science?

13       A.       It's my --

14                    MS. DICKINSON:  Objection to form.

15       A.       It's my -- consistent with my

16   understanding of the published studies on this

17   topic.  Most of these short-term trials were

18   studies done by drug companies to have opioids

19   approved and they were short-term trials in people

20   with chronic pain and in those short-term trials,

21   some of those studies showed benefit.  There are

22   problems with the methodology used in some of

23   those studies, so I don't know that I'd say that

24   it's consistent with the science.  I'd say it's

25   consistent with the published literature on the

Page 36

1    topic, which is what the CDC is citing.

2         Q.      Okay.

3                 Have you seen published literature

4    that contradicts this point?

5                 MS. DICKINSON:  Objection to form.

6         A.      I've seen -- yes, I have seen some

7    data that would contradict this finding.  I've

8    seen, for example, evidence of clinical trials

9    that were short term for patients with chronic

10   pain that really didn't show much improvement at

11   all.

12                But in general, I think the --

13   there's clearer science that shows that when you

14   take an opioid acutely, even for a chronic pain

15   problem, the opioid works.  The problem is when

16   you're taking consistently -- and even for 12

17   weeks, if you're taking consistently for 12 weeks,

18   there are studies that would contradict, there's

19   evidence that contradicts that finding.  But

20   almost -- most of what's been published on this is

21   part of clinical trials used for drug approval and

22   that's what the CDC is reporting on.

23        Q.      So they're reporting that in general

24   the studies reflect benefits in these shorter term

25   trials?

Page 37

1                MS. DICKINSON:  Objection to form.

2        A.       They're trying to indicate what the

3    published literature shows on this subject and

4    that's what they found.

5        Q.       And you would consider this an

6    accurate characterization of what the published

7    literature is?

8        A.       Yes, I do.

9        Q.       Okay.

10                Dr. Kolodny, let me ask you to look

11   at page 68 of your report, please.

12                Do you have it there?

13       A.       Yes.

14       Q.       Do you see the -- it's the first full

15   paragraph on that page and you say "Since 2008,

16   the public health crisis precipitated by

17   prescription opioids was summarized in numerous

18   news articles, books and media stories and

19   governmental bodies and task force groups have

20   reported on these issues."

21                Do you see that?

22       A.       I do.

23       Q.       What I wanted to ask you is do you

24   believe today that the medical community has

25   become broadly aware of the risks and benefits

Page 38

1   associated with longer term use of prescription

2   opioids?

3                   MS. DICKINSON:  Objection to form.

4        A.        That's a good question.  I think that

5   the medical community is much more aware today

6   that we have an opioid crisis.  I think that --

7   and many of the medical community have

8   increasingly recognized that a lot of what we

9   learned was incorrect.

10                  But I'd say that the evidence

11  suggests we have a very long way to go because we

12  still prescribe opioids much more aggressively in

13  the United States than in other countries, which

14  suggests that many clinicians are still not

15  accurately weighing the risks versus the benefits.

16       Q.        The clinicians are engaged in that

17  process of weighing risks and benefits?  You would

18  agree with that?  That's what the clinicians do?

19       A.        A clinician is supposed to weigh the

20  risks versus benefits for any treatment for any

21  patient.

22       Q.        And clinicians have become more

23  broadly aware in recent years of the risks

24  associated with long term use of opioids; is that

25  right?

Page 39

1          A.        The trends suggest that the medical

2     community is starting to get it.  They're starting

3     to better weigh risks versus benefits, but that we

4     have a very long way to go.

5          Q.        Let me ask you to look back at the

6     CDC guidance again, Exhibit 3.  Let me ask you to

7     look at page three of this document and I wanted

8     to point you to the bottom of the left-hand column

9     over to the top of the right-hand column.  It's

10    the last sentence on the left-hand column.

11               It says "Although the transition from

12    use of opioid therapy for acute pain to use for

13    chronic pain is harder to predict and identify,

14    the guideline is intended to inform clinicians who

15    are considering prescribing opioid pain medication

16    for painful conditions that can or have become

17    chronic."

18               Do you see that?

19         A.        Yes.

20         Q.        You're aware that was one purpose of

21    these guidelines was to give clinicians this

22    information on the risks associated with longer

23    term use of opioids as compared to the benefits?

24               MS. DICKINSON:  Objection to form.

25               Foundation.

1      A.      I believe that the CDC drafted these

2   guidelines because of concern that there was a

3   massive overprescribing of opioids for chronic

4   pain and they wanted to try and address that

5   problem by providing better information about

6   risks, but also by communicating to the medical

7   community that evidence of effectiveness is

8   lacking.

9      Q.      And yet you're also aware that

10  doctors continue to prescribe opioids at certain

11  levels for a number of purposes, right?

12     A.      I'm aware that doctors, especially in

13  the United States, continue to prescribe a lot of

14  opioids.

15     Q.      And so doctors are making individual

16  judgments about the benefit and the risk, correct?

17     A.      That's correct.  For -- and not just

18  doctors, but any health care professional, any

19  clinician is supposed to weigh risks versus

20  benefits for any treatment.  The problem with

21  opioids is that to this day, many are not weighing

22  risks versus benefits well because they were

23  misinformed and if you underestimate the risks

24  and/or overestimate the benefit of any treatment,

25  you may be likely to inappropriately prescribe

Page 41

1    that treatment.

2         Q.      And over the last ten years, there's

3    been much more focus on risks associated with

4    opioids and much broader dissemination of

5    knowledge about risks associated with opioids; is

6    that right?

7                   MS. DICKINSON:  Objection to form.

8         A.      I would say there's over -- I would

9    say maybe since around 2010, 2011 is when we

10   started to see an effort made to communicate to

11   the medical community that risks had been

12   inappropriately minimized and the benefits have

13   been exaggerated and that effort to get the word

14   out to the medical community has had a positive

15   impact, but we have a very long way to go.

16        Q.      But the medical community today is

17   still making a judgment about prescribing opioids

18   based on the weighing of risks and benefits based

19   on the further knowledge that's been disseminated,

20   right?

21                   MS. DICKINSON:  Objection to form.

22                   Foundation.

23        A.      For any treatment prescribed by any

24   clinician, you weigh -- the clinician is supposed

25   to weigh the risk versus benefits for the patient

Page 42

1    in front of them, whether it's opioids or whether

2    it's surgery.

3                    (Whereupon, Exhibit 9 was marked for

4          identification.)

5          Q.      Let me ask you to look at Exhibit 9,

6    please.

7                    Do you have that one there, Dr.

8    Kolodny?

9          A.      I do.

10         Q.      Exhibit 9, which we premarked, is by

11   Mark Edlund and others entitled "The Role of

12   Opioid Prescription in Incident Opioid Abuse and

13   Dependence Amongst Individuals with Chronic

14   Noncancer Pain."

15                   Have you seen this document before?

16         A.      I have.

17         Q.      This is cited in your report, right?

18         A.      It is.

19         Q.      Let me ask you to look at the first

20   page of the document please, 557.

21         A.      Yes.

22         Q.      Do you see in the -- let me point you

23   to the right-hand column -- the first full

24   paragraph in the right-hand column, the last few

25   sentences.   There's a sentence that begins "A key

1    clinical issue facing clinicians is how to balance

2    the potential benefits of opioid therapy with

3    risks of addiction in CNCP patients for who

4    they're contemplating initiating opioid therapy."

5              Do you see that?

6    A.    I'm sorry.  Which paragraph are you

7    reading from?

8    Q.    It's the first full paragraph on the

9    right-hand side.

10   A.    Yes.

11   Q.    Sorry.  This remote work is a little

12   harder to point you to pieces of the document, but

13   it's the right-hand side, the first full

14   paragraph.

15   A.    I do see that, yes.

16   Q.    And the sentence I wanted to point

17   you to is "A key clinical issue facing clinicians

18   is how to balance the potential benefits of opioid

19   therapy with risks of addiction in CNCP patients

20   for whom they're contemplating initiating opioid

21   therapy."

22             Do you see that?

23   A.    I do.

24   Q.    And CNCP refers to chronic non-cancer

25   pain, right?

Page 44

1        A.        Yes, it does.

2        Q.        And do you agree with the statement

3   there?

4                  MS. DICKINSON:  Objection to form.

5        A.        Yes.

6        Q.        Let me ask you to look at the next

7   sentence where it says "The clinical importance of

8   this issue is heightened by the fact that in some

9   patients, opioids are the only viable option for

10   managing their pain."

11                  Do you see that?

12        A.        Yes.

13        Q.        Do you agree that for some patients,

14   opioids are the only viable option for managing

15   pain?

16                  MS. DICKINSON:  Objection to form.

17        A.        Yes.  Palliative care would be a good

18   example.

19        Q.        Here, he's talking about chronic

20   non-cancer pain.

21                  Do you agree that for some patients,

22   opioids are the only viable option for managing

23   chronic non-cancer pain?

24                  MS. DICKINSON:  Objection to form.

25                  Foundation.

Page 45

1        A.      It's a good question.  I'd have to

2    really think that through.  I think -- you know,

3    it's possible there are patients with pain that's

4    chronic and so severe that you're basically going

5    to give them massive amounts of opioids and

6    probably other drugs so as to put them almost into

7    a narcotic stupor because there's nothing else you

8    can do for them, but -- you know, I think that

9    that would be uncommon.  It's a good question.

10   I'd have to think about it a bit more.  I wasn't

11   really asked to opine on that specifically.

12       Q.      Do you disagree with what Dr. Edlund

13   writes here?

14              MS. DICKINSON:  Objection to form.

15       A.      If Dr. Edlund had written that for

16   some people with low back pain, opioids are the

17   only thing that can give them relief, I would

18   disagree.  He didn't write that and so what he

19   wrote here is vague and difficult for me to say

20   whether I agree with it or not.

21       Q.      Let me ask you to turn to page eight

22   of your report, please.  I wanted to ask you about

23   a sentence on the very top of page eight.  It's

24   the second full sentence on the page:  "Studies

25   have found that many patients on long-term opioids

Page 46

1    for chronic pain meet criteria for DSM-V" -- or 5

2    -- "Opioid Use Disorder."

3                    Do you see that?

4        A.      I do.

5        Q.      How many?  When you use the word

6    "many" in that sentence, do you have in mind a

7    number?

8        A.      Yes.  I believe in that study when

9    you included mild Opioid Use Disorder, it was more

10   than a third of patients that met criteria for

11   Opioid Use Disorder using DSM-5 criteria.

12                   I think for DSM-IV criteria where the

13   term "dependence" is used to mean addiction rather

14   than Opioid Use Disorder, they found about 25% met

15   criteria for addiction and so that -- that's a

16   very high prevalence.

17       Q.      But I guess flipping it around the

18   other way then, if I understood what you just

19   said, Dr. Kolodny, that would mean about

20   two-thirds of the patients on long-term opioids

21   for chronic pain would not meet the criteria for

22   OUD?

23                   MS. DICKINSON:  Objection to form.

24       A.      I don't know if I would say that it

25   means two-thirds don't meet criteria.  It would

1   mean that in this particular study that two-thirds

2   of the patients that were assessed didn't give --

3   the folks doing the study didn't acknowledge

4   evidence of addiction and studies like this are

5   very difficult to do because if somebody has

6   Opioid Use Disorder and they're participating in a

7   study and they indicate to the people performing

8   the study that they meet criteria, they're at risk

9   of being cut off from their opioid supply and for

10  people that are addicted, that's a very

11  frightening prospect.  It means they might have to

12  line up at a methadone clinic, it means they might

13  wind up buying drugs on the street.

14          So all of these studies are difficult

15  to perform.  What they found was that a third did

16  report -- did indicate criteria that indicated

17  Opioid Use Disorder or addiction.  That doesn't

18  mean that the two-thirds didn't have the

19  condition.

20      Q.      No, but in terms of the study,

21  two-thirds did not end up reporting

22  characteristics that led to the conclusion that

23  they met the criteria, right?

24      A.      That's correct.

25      Q.      The other number you reference, which

Page 48

1    is the DSM-IV standards, I believe you said 25%

2    met the DSM-IV standards for OUD?

3         A.      I believe in the study by Boscarino

4    that was cited here, I believe they found 25% met

5    criteria for Opioid Use Disorder.  That is

6    correct.

7         Q.      So again, they found that 75% in that

8    study did not mean that criteria?

9              MS. DICKINSON:  Objection to form.

10        A.      No, they didn't find that 75% didn't

11   meet criteria.  They only had 25% that reported

12   the criteria.

13        Q.      I understand.

14             But that would also mean that they

15   didn't find, from among that population they were

16   looking at, there were 75% of the population they

17   looked that that did not meet the criteria as they

18   were measuring it?

19             MS. DICKINSON:  Objection to form.

20        A.      Twenty-five percent of the patients

21   provided evidence that they have DSM-IV opioid

22   dependence.  That evidence wasn't elicited from

23   75% of the people that they surveyed.

24        Q.      The sentence that we were just

25   looking at refers to patients on long-term

Page 49

1   opioids.

2           Do you see that in your report?

3       A.      Yes.

4       Q.      What does long term mean there?

5       A.      In general, long-term opioid therapy,

6   that term is used interchangeably with chronic

7   opioid therapy and most studies usually use 90

8   days of continuous use as the marker.

9       Q.      So most studies would view use of 90

10  days or less as short term or acute use versus

11  chronic use?

12      A.      Much of what's in the literature uses

13  90 days or more as the -- as a cut off for --

14  really, for defining chronic opioid therapy

15  or long-term opioid therapy, but much of the more

16  recent literature would really define long term as

17  even more than seven days after acute pain.

18      Q.      You think there's literature that

19  defines use of opioids for more than seven days as

20  long term?

21      A.      Well, I think -- I don't know.  Yes,

22  I think there's literature right now that would

23  define more than seven days as being long and

24  inappropriate for acute pain.

25      Q.      Now, what I'm trying to get to is the

Page 50

1    phraseology you're using of "long term."

2              When you used it in your report.

3    Were you referring to use for more than 90 days?

4        A.    I think that I'd have to look at the

5    specific use in my report.  I think in many cases

6    where I used the term "long-term opioid therapy,"

7    especially if I'm referring to what's in the

8    literature, I'm using the term interchangeably

9    with "chronic opioid therapy."  Those studies

10   generally are for people on opioids 90 days or

11   more.

12       Q.    Do you know what percentage of

13   prescriptions are written for shorter-term

14   therapy, less than 90 days?

15       A.    The majority of prescriptions -- as I

16   mentioned earlier, most prescriptions that are

17   written, more than half -- and maybe even

18   significantly more than that -- are written for

19   acute pain and typically, they -- it's a pill

20   bottle that has 20 pills of five-milligram

21   Hydrocodone.  So if you're talking about the share

22   of prescribing in terms of numbers of

23   prescriptions written, acute pain is a large piece

24   of it.

25              If you're talking about consumption

1    of opioids in morphine equivalence, chronic opioid

2    therapy, chronic non-cancer pain is a -- probably

3    a very large percentage of the overall

4    consumption.

5         Q.      I really wanted to focus on number of

6    prescriptions in my question here.

7              So in terms of number prescriptions,

8    well more than half of the total prescriptions for

9    opioids would be for less than 90 days?

10             MS. DICKINSON:  Objection.

11             Form.

12        A.      Well, a prescription can only be

13   written for 30 days.  So if you are getting

14   repeated prescriptions every 30 days, once you've

15   done that for more than three months, we start to

16   define the treatment you're getting as -- as

17   chronic opioid therapy.

18             It's difficult, though, to really

19   answer your question because there are also

20   studies showing us that patients who wind up on

21   chronic opioid therapy overwhelmingly began their

22   opioid career with an acute pain prescription and

23   never got off.

24             MS. DICKINSON:  Tim, could I ask

25        just -- I don't want to interrupt this line

Page 52

1              of questions, but when you get to a breaking
2              place, can we take a break?  It's been a -- I
3              know we hopped off because of technical
4              difficulties, but it's been about an hour and
5              ten minutes and we just need a five- or
6              ten-minute break.
7                        MR. HESTER:  Yeah.  I could stop now
8              if you want me to.  Do you want to stop now
9              or should we go a little longer?
10                       MS. DICKINSON:  It's totally up to
11             you.  If you've got, you know, three minutes
12             in this line of questions, certainly go
13             ahead.  I don't want to break up your flow.
14             But I do think that we're probably -- we've
15             gone over an hour.  I'd kind of like to take
16             just a short one if we can when if you're at
17             a stopping point.
18                       MR. HESTER:  We can take a break now.
19                       MS. DICKINSON:  Okay.
20                       MR. HESTER:  How should we work the
21             mechanics?  We're not all in the same place,
22             we don't know when we're coming back.  Should
23             we come back around 10:15?
24                       MS. DICKINSON:  Yes.  It's 9:09 here,
25             10:09 there.  Let's just make sure we're all

1        back in the room roughly around 10:15 and as

2        soon as we see you, me and Dr. Kolodny.  We

3        certainly could start.

4             MR. HESTER:  Okay.  Thanks.

5             MS. DICKINSON:  Dr. Kolodny, is that

6        okay with you?  Do you need a longer break

7        than that?

8             THE WITNESS:  Sounds good.  We're

9        going to tune back in at what time?

10            MS. DICKINSON:  In five minutes at

11       10:15 your time.

12            MR. HESTER:  Is that okay?

13            THE WITNESS:  Yes, sounds great.

14            THE VIDEOGRAPHER:  The time is 10:10

15       and we're now off the record.

16            (Recess taken)

17            THE VIDEOGRAPHER:  The time is 10:18

18       and now we are back on the record.

19       Q.     Dr. Kolodny, before the break, I was

20  asking you about this statement in your report

21  about patients on long-term opioids for chronic

22  pain and I was trying to understand your view on

23  the percentage of prescriptions written for

24  patients on long-term opioids as compared to the

25  percentage of prescriptions written for patients

1    who are using opioids on a shorter term basis,

2    less than 90 days.

3                    MS. DICKINSON:  Objection to form.

4         A.       It's a difficult question to answer.

5    Evidence -- national data on prescribing suggests

6    that a large majority of prescriptions have -- are

7    meant for less than a month and have less than a

8    month's worth of pills in them.

9                    West Virginia, though, may be unique.

10   Some of the data that I reviewed showed a massive

11   amount of Oxycodone 30 milligrams that were

12   dispensed or even Oxycodone 15 milligrams.  Those

13   pills are very high dosage and generally would not

14   be given to someone who didn't already have a

15   tolerance to opioids.  So sometimes by looking at

16   the dose, you can get a sense that maybe this was

17   for someone who was on opioids long term.

18        Q.       Those doses can also be used for

19   someone who is at end of life or has cancer pain,

20   correct?

21        A.       Correct.  A 30-milligram Oxycodone is

22   equal to about nine five-milligram Vicodin in one

23   pill.  Imagine nine Vicodin in a single pill.

24   Most people who would take that who don't have an

25   opioid tolerance would get very sick and maybe it

Page 55

1     could be potentially even be fatal, just one pill.

2     So those should only be for people who have built

3     up quite a tolerance to opioids.

4          Q.     Or who are in acute pain or cancer

5     pain?

6          A.     Anyone who has built up a tolerance

7     to opioids, whether it's cancer pain, whether it's

8     addiction.  Someone who is tolerant to opioids.

9               And I believe for some of the data I

10    reviewed, there were pharmacies in West Virginia,

11    in Cabell County and Huntington, where it looked

12    like a very large percentage of the pills that

13    were sold to these pharmacies were for these very

14    high-strength dosages.

15         Q.     What studies are you referring to?

16    What data are you referring to?

17         A.     I'm referring to data I believe from

18    the expert report of Craig McCann. *

19         Q.     Have you done any independent looking

20    or is it based on the report from Mr. McCann?

21         A.     This has his analysis.

22         Q.     Okay.  Let me ask you to look at your

23    report, page nine.

24               In the second full paragraph, there's

25    a sentence that says "The bulk of opioid

Page 56

1    consumption in the US is for common chronic

2    conditions."

3              Do you see that?

4         A.    Yes, I do.

5         Q.    And when you say bulk, what do you

6    mean there?  Do you mean number of prescriptions

7    or do you mean MME?

8         A.    Well, I think the most accurate way

9    to measure opioid consumption is not by counting

10   the number of prescriptions.  I think that can be

11   very misleading.  That's typically how the opioid

12   industry likes to measure consumption.  I'm

13   talking about weight of opioids consumed and yes,

14   MME is a way of standardizing opioids of different

15   potency.  So when you measure the amount of

16   opioids consumed in terms of weight and kilograms,

17   the consumption -- the bulk of that consumption --

18   and by bulk is not really a scientific term; I

19   guess I could have been more precise -- but I

20   believe more than half of that weight of opioid

21   consumed is for conditions where opioids are

22   probably not appropriate.

23        Q.    I wanted to ask you about a different

24   question, though.

25              In terms of the number of

Page 57

1   prescriptions, I take it that the point is

2   different from the point you make there.  In terms

3   of number of prescriptions, the bulk of

4   prescriptions written would not be for common

5   chronic conditions; is that right?

6               MS. DICKINSON:  Objection to form.

7        A.      Yes.  I would say that more than half

8   of the prescriptions are not for chronic pain.

9   They may still be inappropriate, though, because

10  we are still overprescribing for acute pain.  But

11  yes, to answer your question, I believe if you

12  were measuring consumption in terms of numbers of

13  prescriptions written, which I don't think is a

14  good way to measure consumption, yes, more than

15  half would be probably be for acute pain.

16       Q.      And when you say here that the bulk

17  of opioid consumption is for common chronic

18  conditions -- and I understand you're referring to

19  weight or MME -- what's the basis for your

20  statement?

21       A.      Data that I've reviewed on opioid

22  consumption in the United States using MME.

23       Q.      Did those data tie to particular

24  uses?

25               MS. DICKINSON:  Objection to form.

Page 58

1        A.        Yes.  These were studies done where
2    it used the indication of -- the patient's
3    diagnosis was used.
4        Q.        Do you have any particular studies in
5    mind?
6        A.        I've got a slide that I could think
7    of that I've shown, but I can't remember in that
8    slide who I cited.  So I'd have to really go back
9    and look for that.  But it's -- you don't
10   necessarily need a study to show you that
11   consumption for chronic pain by weight is going to
12   be a pretty huge number because if you look at the
13   average prescription that's written for acute
14   pain, there might be 10 five-milligram pills in
15   it, so the total weight might be 50 MME, whereas
16   if you were to look at an oxycodone 30-milligram
17   prescription that -- especially some of the
18   prescriptions that were likely dispensed in West
19   Virginia -- each pill could be for 30 milligrams,
20   so each pill would be similar to nine Vicodin and
21   I have 240 of those pills in the container, so
22   it's just a lot heavier.  It's apples and oranges.
23       Q.        Let me ask you where you're talking
24   here about the bulk of opioid consumption for
25   common chronic conditions.  I wanted to understand

Page 59

1    whether you're talking about chronic use of

2    opioids or chronic conditions that might be

3    treated in a short-term basis.

4         A.      When I say common chronic conditions,

5    I'm referring to -- generally to low back pain

6    with a normal spine, also called neurostructural

7    low back pain or axial low back pain.  I'm

8    referring to fibromyalgia and I'm referring to

9    headache, chronic headache conditions.  Those are

10   generally what comes to my mind when I write

11   chronic conditions with regard to opioids, those

12   three.

13        Q.      And do you agree that some of those

14   chronic conditions might be treated with a

15   short-term burst of opioids?

16             MS. DICKINSON:  Objection to form.

17        A.      Not really.  There are chronic

18   conditions where intermittent use of an opioid

19   would be appropriate, like rheumatoid arthritis or

20   gout where the person who is taking the opioid on

21   an intermittent basis really for an acute flare up

22   of a chronic condition, so that could be

23   appropriate.  But low back pain with a normal

24   spine, fibromyalgia and chronic headache are

25   conditions where opioids really shouldn't be used.

Page 60

1       Q.      When you say the intermittent use for

2   a chronic condition could be appropriate, what's

3   the reason for that?

4       A.      The opioids, when you take them

5   intermittently, they provide pain relief.  When

6   you take an opioid every day for weeks and months

7   and years, the opioid will no longer continue to

8   provide pain relief unless the dose keeps going

9   higher because of tolerance.  So tolerance sets in

10  rapidly when you're taking the opioid every day.

11          And so as the -- say you have to keep

12  increasing the dose and as the doses get higher,

13  you'll generally see that the patient's level of

14  function starts to decline.  The patient becomes

15  more sedated and of course as the dose gets

16  higher, the patient is more likely to experience

17  side effects, including addiction and overdose.

18      Q.      You would distinguish between that

19  sort of steady use and an intermittent use of an

20  opioid for a chronic condition?

21      A.      That's correct.  If you take an

22  opioid intermittently, for example, the patient

23  who takes a five-milligram Vicodin a couple times

24  a month on a really bad day, that can be an

25  effective strategy for using an opioid in a

Page 61

1    patient who may not be able to tolerate other pain

2    treatments.   But when they are taking it every day

3    around the clock, that's generally a recipe for

4    disaster.

5         Q.     Let me ask you to look back at

6    Exhibit 4, which is the Volkow paper.

7               Do you have that there?

8         A.     Yes.

9         Q.     Do you see in the first full

10   paragraph under the heading she's got a statement

11   that says "In 2014 alone, US retail pharmacies

12   dispensed 245 million prescriptions" and then she

13   says "Of these prescriptions, 65% were for

14   short-term therapy, less than three weeks."

15              Do you see that?

16        A.     Yes.

17        Q.     Is that consistent with your

18   understanding of what the data shows?

19        A.     As I mentioned, I thought it was more

20   than half.   I think that's probably accurate.

21   Sixty-five percent for short term makes sense to

22   me.

23        Q.     Let me ask you to look at Exhibit 9,

24   please.   This is the Edlund study.   I wanted to

25   point you to page 562.   It's in the left-hand

Page 62

1    column on page 562, the last paragraph.

2                    It's the third sentence that begins

3    with however and it says "Among the 35% who

4    received opioids, only 5% proceeded to chronic

5    use" --

6         A.      Yes.

7         Q.      -- "and only 3% of these proceeded to

8    chronic use of high daily doses."

9                    Do you see that?

10        A.      Yes.

11        Q.      Is that consistent with your

12   understanding of the science?

13                   MS. DICKINSON:  Objection to form.

14                   Foundation.

15        A.      To really understand what they're

16   referring to here -- I know this study well, but I

17   do need just a moment to read the preceding

18   paragraph or two, if that's okay.

19        Q.      Sure.

20        A.      Okay.

21        Q.      So maybe to set the table a little

22   bit on this study, this was a study of patients

23   with chronic non-cancer pain?

24        A.      I believe this was a study of

25   patients exposed to opioids.  I don't --

Page 63

1              Q.      And it was individuals with new

2      onsets of chronic non-cancer pain?

3                      MS. DICKINSON:  Objection.

4                      Form.

5                      Foundation.

6              A.      That's correct, yes.

7              Q.      In the paragraph we're looking at on

8      562, it says "Among the 35% who received opioids"

9      -- so they're talking about among the 35% who

10     received opioids for new onset of chronic

11     non-cancer pain, right?

12                     MS. DICKINSON:  Objection.

13                     Form.

14                     Foundation.

15             A.      Correct.

16             Q.      Then 5% of those proceeded to chronic

17     use?

18             A.      Correct.

19             Q.      And only 3% of those proceeded to

20     chronic use of high daily doses, correct?

21             A.      Correct.

22             Q.      And is that -- have you seen other

23     studies of this same proposition?  In other words,

24     chronic non-cancer pain patients who receive

25     opioids and then how many of them progress to

Page 64

1    longer term therapy and how many progressed to

2    higher doses?

3                    MS. DICKINSON:  Objection to form.

4         A.       I've seen studies showing that about

5    half of patients exposed to an opioid don't like

6    it and stop, so studies where they -- of opioid

7    use for chronic pain where you see about a 50%

8    drop off rate.  Early on, patients just do not

9    tolerate being on an opioid.  I'm not aware of

10   other studies that found some of the other -- that

11   had some of these other findings which I think are

12   important.

13        Q.       And you said you're familiar with

14   this study?  You've looked carefully at this one?

15        A.       Yes.

16        Q.       If you could look back at your report

17   at page nine again, you have a sentence in the

18   second full paragraph where you say "There is not

19   and has never been strong evidence to support the

20   effectiveness of using opioids long term to treat

21   chronic pain."

22                    Do you see that?

23        A.       I do.

24                    MS. DICKINSON:  Objection to form.

25        Q.       When you say long term there, you're

Page 65

1    referring to more than 90 days?

2         A.       Probably.

3         Q.       And do you agree there is evidence

4    for the efficacy of shorter term use of opioids in

5    treating chronic non-cancer pain?

6                  MS. DICKINSON:  Objection to form.

7         A.       It says, as we've discussed, if

8    someone with a chronic pain condition takes an

9    opioid acutely or intermittently, opioids can be

10   effective and there's evidence of that.

11        Q.       Let me ask you to look at page ten of

12   your report, please.

13                 You say that, at the very top of the

14   page, "Many patients on long term opioids are not

15   doing well."

16                 Do you see that?

17        A.       I do.

18        Q.       Again, when you're using that phrase,

19   long term, you're referring to more than 90 days?

20        A.       In this case, yes.

21        Q.       When you use the word "many," what

22   percentage do you have in mind?

23        A.       I don't think when I used the word

24   "many" I have a percentage in mind.  It just means

25   many.  It's not -- it's not very precise.  I

Page 66

1     didn't use a statistic.  That it's common for

2     patients on long-term opioids to not be doing

3     well.  I'd have to take a look at the study here I

4     cited.  I know it's reference 15 -- oh, I think I

5     may explain it here.

6               Yeah.  So by "many," what I was

7     referring to here is in the next sentence, "A

8     large observational study of long-term opioids

9     found that four out of five chronic pain patients

10    taking opioids continued to experience significant

11    pain and dysfunction."

12              So "many" was referring to four out

13    of five.

14        Q.      The incidence of opioid addiction in

15    patients treating with long-term opioids is

16    unknown if they're treated pursuant to doctor's

17    orders, right?

18              MS. DICKINSON:  Objection to form.

19        A.      To assess the incidence rate, you'd

20    have to perform a study where you took lots of

21    patients who've never had opioids, put them on

22    opioids for 90 days and then assessed how many

23    became addicted and I don't think a prospective

24    study like that has ever been performed.

25        Q.      And your report at page 107, I

Page 67

1    believe, makes this point.  If you look at page

2    107, it's the last paragraph on the page, the

3    second sentence where you say "The incidence of

4    iatrogenic opioid addiction in patients treated

5    with long-term opioids is unknown."

6                   Do you see that?

7         A.       Yes.

8         Q.       Again, where you're talking there

9    about long term, you're talking about more than 90

10   days?  That's what you mean?

11        A.       Yes.

12        Q.       Do you agree that there are

13   beneficial uses -- beneficial long-term uses -- of

14   opioids for some patients in pain?

15                 MS. DICKINSON:  Objection to form.

16        A.       So if someone is near the end of life

17   and you have the opportunity to escalate the dose

18   and the increasing side effects and dangerousness

19   as you go higher on the dose because you're in a

20   palliative care setting are less concerning.  Yes,

21   there are examples where having someone taking an

22   opioid every day like palliative care, where it

23   can make sense where the benefits might outweigh

24   the risks.  So yes, I can think of some

25   circumstances.

```
                                              Page 68

 1                (Whereupon, Exhibit 2 was marked for

 2         identification.)

 3         Q.     Let me ask you to look at Exhibit 2,

 4    please.  This is one we'll need to open up.

 5         A.     I'm sorry.  Which one is Exhibit 2?

 6         Q.     Exhibit 2 --

 7                MS. DICKINSON:  We haven't yet opened

 8         it, Doctor.

 9                MR. HESTER:  Sorry.  That's a new

10         one.

11         Q.     Exhibit 2 is a document we marked.

12    That exhibit number is by Dr. Mark Sullivan is

13    entitled "Opioid Therapy for Chronic Pain in the

14    US:  Promises and perils."

15         A.     Yes.

16         Q.     Have you seen this study before?

17         A.     Yes.

18         Q.     If you could look at page five, the

19    second sentence under the heading on page five

20    where he says "Generally, LtOT is recommended only

21    for patients with intractable pain and no history

22    of substance abuse."

23                Do you see that?

24         A.     Yes, I see where it says that.

25         Q.     When he uses LtOT, that's an
```

Page 69

1    abbreviation for long-term opioid therapy?

2         A.      Correct.

3         Q.      Do you agree with that statement?

4                 MS. DICKINSON:  Objection to form.

5         A.      The way it's written, it's hard to

6    agree or disagree with it.  I think if he wrote

7    that -- he's writing that it -- it's commonly

8    recommended.  If he -- if they had written "We are

9    recommending it," I might disagree.  It would be

10   tricky because intractable pain is a very vague

11   term, but I think they're saying generally it's

12   recommended.  I don't know that they're

13   necessarily saying they agree with that.

14        Q.      As I had read this -- and you tell me

15   if this is not the way you understand it -- the

16   point was you would recommend long-term opioid

17   therapy only with a person who has no history of

18   substance abuse and if they have intractable pain.

19                Is that your understanding of what

20   the study is saying?

21                MS. DICKINSON:  Objection to form.

22        A.      I would probably want to re-read the

23   study.  What they're describing here and what the

24   author of this -- the first author on this paper,

25   Mark Sullivan -- one of his contributions to the

Page 70

1    literature on opioid therapy was his documentation

2    of the adverse selection process.  I think that

3    what he's kind of getting at here, which is that

4    if -- what they found is that the patients who are

5    most likely to wind up staying on opioids long

6    term are the patients one would predict would be

7    the worst candidates for long-term opioid therapy,

8    the ones more likely to be at risk for addiction

9    and overdose.

10             So it's really, I think, describing

11   the adverse selection process where the lower-risk

12   patients say I don't really like taking this and

13   are more likely to drop off.

14        Q.      And part of his analysis was that

15   longer term users of opioids tended to be people

16   who had a history of substance abuse or other

17   problems that would lead to higher incidence of

18   OUD?

19             MS. DICKINSON:  Objection to form.

20        A.      Yes, so then he's demonstrated that

21   the patients that are more likely to wind up on

22   long-term opioids are patients with mental health

23   problems and patients with a history of drug or

24   alcohol problems are the ones who are more likely

25   wind up on long-term opioids.

Page 71

1      Q.    Let me ask you to look at page nine

2  of this document, Exhibit 2.  Dr. Sullivan's

3  report or study.

4      A.    I'm sorry.  Page nine of the same

5  document that's in front of me?

6      Q.    Yes.  Thanks.

7          I wanted to point you to the last

8  sentence or two of the first paragraph under the

9  heading.  There's a sentence that reads "There are

10  patients who do well with improved function and

11  quality of life on opioid therapy.  These are

12  often older adults with low-dose intermittent

13  use."

14          Do you see that?

15      A.    I'm sorry.  You were in the middle of

16  the page under the heading?

17      Q.    Yes.  On page nine, it's the third

18  sentence at the bottom, at the end of that

19  paragraph.  It begins "There are patients" -- do

20  you see that?

21      A.    Yes.

22      Q.    It reads "There are patients who do

23  well with improved function and quality of life on

24  opioid therapy.  These are often older adults with

25  low-dose intermittent use."

1                Do you see that?

2         A.      I do.

3         Q.      Do you agree with that?

4                MS. DICKINSON:  Objection to form.

5         A.      Let me just take a look at -- I'd

6    really to have to take a look at -- I don't know

7    if I agree with that or not.  I'd have to take a

8    look at the reference and much of what's in the

9    literature on this topic is not accurate and so

10   it's possible they were citing an inaccurate

11   paper.  I don't know.

12        Q.      The literature that is published is

13   often what doctors rely on in making their

14   judgments in particular clinical settings,

15   correct?

16        A.      I don't know.  It's a good question.

17   I don't -- I don't know if your average practicing

18   clinician is regularly reading medical journals

19   once they're in practice.  So I think they're

20   prescribing practices, for example, could be

21   influenced by CME activities, could be influenced

22   by a sales rep, could be influenced by what a

23   pharmacist tells them when they call the pharmacy

24   and say "What do you think about XYZ drug for this

25   patient?"

Page 73

1            So I think we'd all like to think

2    that all of our doctors are -- spent the weekend

3    with a stack of medical journals, but I doubt that

4    that's really the case.

5        Q.      You would also agree that doctors'

6    judgments are influenced by their own experience

7    with their own base of patients, correct?

8        A.      Yes, absolutely.  Clinical experience

9    influences the way we practice.

10       Q.      So doctors gain experience and

11   judgment from treatment patterns they followed

12   with particular patients, correct?

13       A.      That's correct, yes.

14       Q.      Let me ask you to look back at the

15   Edlund study, Exhibit 9, please.

16            On page 562, the second paragraph, do

17   you see the first sentence of the second paragraph

18   where he says "Our findings have important

19   clinical implications, as they suggest that the

20   risk of an incident OUD is relatively small for an

21   acute trial of opioids."

22            Do you see that?

23       A.      No.

24       Q.      Do you see that?

25       A.      I do.

Page 74

1          Q.     Do you agree with that?

2                 MS. DICKINSON:  Objection to form.

3          A.     I think there's recent evidence

4     that's been published that might call that

5     statement into question.  I would say the

6     comparative risk of incident OUD for acute pain

7     versus chronic pain or for an acute trial versus a

8     long-term trial is comparatively low, but we're

9     finding studies that show even with acute pain

10    treatment, high rates -- and some of this, you

11    know, depends on how you -- one would define the

12    risk of OUD, whether it's low or high.

13                So some people might say three

14    people -- 3% of people becoming addicted is high

15    when you think about how severe an addiction is,

16    so it's very difficult to answer that.  But more

17    recent trials are -- studies are showing us that

18    even an acute trial of opioids can have a fairly

19    high risk of addiction developing.

20         Q.     That risk versus the benefits of

21    treatment, that's something doctors have to gauge?

22         A.     Correct.

23         Q.     Let me ask you about the next

24    sentence that says "If chronic opioid therapy is

25    being used, low dose poses much less risk of OUDs

Page 75

1    than medium dose and medium dose is much less
2    risky than high dose."
3              Do you see that?
4    A.      Yes.
5    Q.      Do you agree with that?
6    A.      Yes.  So -- when we have no choice
7    but to prescribe an opioid, we should prescribe
8    the lowest possible dose for the shortest duration
9    possible, largely to prevent people from becoming
10   addicted.
11   Q.      Do you also agree -- let me point you
12   to the next sentence down where he says "Our data
13   suggests it's almost meaningless to talk of a
14   single rate of OUDs."
15             Do you agree with that?
16   A.      I do.
17             MS. DICKINSON:  Objection to form.
18   Q.      And that's because OUDs are the
19   result of a number of factors including dosage and
20   duration and a number of other issues?
21   A.      Mainly dose and duration, yes, so
22   that -- yes, to talk about what percent of people
23   were going to become addicted without taking into
24   consideration duration of use and dose is almost
25   meaningless.

Page 76

1     Q.     Let me ask you to look back at the
2  Volkow study, which is Exhibit 4.
3     A.     Yes.
4     Q.     Let me ask you to look at page 1256.
5     A.     Yes.
6     Q.     I wanted to point you to the
7  left-hand column and it's the third sentence down
8  where he says "In contrast, addiction will occur
9  in only a small percentage of patients exposed to
10  opioids."
11            Do you see that?
12     A.     Yes.
13     Q.     Do you agree with that statement?
14            MS. DICKINSON:  Objection to form.
15     A.     It depends on how one would define
16  small.  If you're talking about a condition as
17  severe as addiction, even a small number could be
18  considered a high risk.  For example, if you were
19  talking about a side effect of a medicine causing
20  blindness, if two out of 100 people went blind
21  from a particular medicine, some people might say
22  that's a high risk, some people might say oh, it's
23  only 2%.  It's sort of a judgment call.
24            But it is true that a very large
25  percentage of Americans are exposed to opioids in

Page 77

1    the course of a single year and the number of

2    people who wind up getting addicted is generally

3    pretty low compared to the number of people that

4    are exposed because a lot of people take one

5    opioid and hated it and don't want to take another

6    and much of the prescribing is as we've talked

7    about, a few pills for acute pain where the risk

8    is a lot lower.

9        Q.    So here, where he's talking not about

10   risk, but about small percentage, you would agree

11   that addiction will occur in only a small

12   percentage of patients exposed to opioids?

13           MS. DICKINSON:  Objection to form.

14       A.    It really -- it's hard to answer that

15   question because some people might say that 2% of

16   people developing severe side effect is a high

17   percentage.  So it's really difficult to say.

18       Q.    Let me ask you to look at the Volkow

19   study, Exhibit 4.  Oh, we're on it.  Sorry.  We're

20   on Exhibit 4.

21           Let me ask you to turn to page

22   1557 --

23       A.    If I could correct you, though, this

24   isn't a study.  This is an editorial or review

25   article.  I don't think they've done any

Page 78

1    independent -- it's a review of literature.  It's

2    not a study that they're reporting on.

3         Q.       Fair enough.

4              So in other words, this is a paper

5    that has reviewed other studies and then reports

6    conclusions based on the conglomeration of the

7    studies?

8              MS. DICKINSON:  Objection to form.

9         Q.       Correct?

10        A.       Yes, correct.  They're reviewing the

11   literature, not really reporting on a study they

12   performed.

13        Q.       And it's published in the New England

14   Journal of Medicine, which is a reputable journal?

15        A.       It is.

16        Q.       Let me ask you to look at page 1257,

17   please.  It's in the left-hand column, the first

18   full paragraph on the left-hand column.  I'm about

19   probably eight or nine sentences in.

20              There's a sentence that begins

21   "However, we do know that the risk of opioid

22   addiction varies substantially among persons, that

23   genetic vulnerability accounts for at least 35 to

24   40% of the risk associated with addiction and that

25   adolescents are at increased risk."

1              Do you see that?

2       A.      Do you mind if I just read that

3    paragraph?

4       Q.      Sure.  That's fine.

5       A.      Yes.

6       Q.      Was your yes that you've seen it now

7    or should I ask you the question?

8       A.      Yes, I've seen it now.  You can ask

9    me the question.

10      Q.      Okay.

11              So there's a sentence that reads "We

12   do know that the risk of opioid addiction varies

13   substantially among persons, that genetic

14   vulnerable accounts for at least 35 to 40% of the

15   risk associated with addiction and that

16   adolescents are at increased risk."

17              Do you see that?

18              MS. DICKINSON:  Objection to form.

19      A.      Yes.

20      Q.      Do you agree with that statement?

21      A.      I am familiar with evidence that

22   adolescents are at increased risk.  I haven't

23   seen -- I haven't seen the studies that they're

24   citing.  I would like to look at them.  A lot of

25   what is in the literature about opioids and risk,

Page 80

1    especially what's in the literature on risk of

2    addiction I know is incorrect and was influenced

3    by defendants in opioid litigation.

4              So I would want to take a look at

5    those studies and make sure that Drs. Volkow and

6    McLellan weren't mislead on that statistic.  So I

7    don't know about that 35 to 40% estimate.  I do

8    know that adolescents are at high risk for

9    development of addiction when exposed to highly

10   addicted drugs.  There are studies that do show us

11   that.

12        Q.     Do you understand generally that

13   genetic variability accounts for at least some of

14   the risk associated with addiction arising out of

15   opioids?

16              MS. DICKINSON:  Objection to form.

17        A.     So genetics play an important role

18   when it comes to addiction to alcohol and the

19   literature there is good.  It's not great.  We

20   haven't identified the alcohol gene or genes, but

21   we know that alcohol addiction runs in families.

22              When it comes to highly addictive

23   drugs, like nicotine, heroin, methamphetamine,

24   with highly addictive drugs, repeated exposure in

25   almost anyone puts that individual at high risk

Page 81

1    for becoming addicted.

2                I think the Sullivan paper that we

3    left a moment ago does a nice job of showing that

4    dose and duration may be more significant when it

5    comes to exposure to a highly addictive drug than

6    what was commonly believed, which is that the

7    individual vulnerabilities are what lead to

8    addiction.

9        Q.    But I want to ask a narrow question,

10   which is do you understand that genetic

11   variability plays a role in addiction risk

12   associated with opioids?

13               MS. DICKINSON:  Objection to form.

14       A.    I have not seen studies demonstrating

15   with opioids what they're indicating here, so I'd

16   want to look at those studies before I answer your

17   question.  I wasn't really asked to opine on that.

18       Q.    Okay.

19               So when you look at this statement

20   referring to risk of opioid addiction varies

21   substantially among persons and the genetic

22   vulnerability accounts for a share of risk

23   associated with addiction, you don't know one way

24   or another on that point?

25               MS. DICKINSON:  Objection.

Page 82

1                Misstates the document.

2        A.       I think we just reviewed a study

3    which I think helps debunk the popular narrative

4    that was promoted by the opioid industry that

5    opioids are not inherently addictive or inherently

6    risky, that there are individuals who are

7    vulnerable and that genetics are largely

8    determinative.

9                I think that we've got good evidence

10   to suggest that that estimate there might be an

11   overstatement, but I would like to review a study

12   of their citing before I really give you a firm

13   opinion about whether or not I agree with that

14   estimate.

15       Q.       Whether or not you know the specific

16   numbers, have you -- do you have a general

17   understanding that genetic variability has an

18   impact on risk of opioid addiction?

19               MS. DICKINSON:  Objection to form.

20               Asked and answered.

21       A.       So with highly addictive drugs, dose

22   and duration become much more important than

23   genetic vulnerabilities.  I think that genetics

24   can play a role.  So, for example, genetics play a

25   role in our personalities and certainly an

1    individual who may be genetically prone to have

2    poor impulse control might be someone more likely

3    to repeat use of a highly addictive drug and

4    therefore become addicted to it.

5              So I do believe that genetics play a

6    role in development of addition to opioids, but

7    with highly addictive drugs, I believe that the

8    inherent effect of the drug on the brain is more

9    important than these genetic differences.  It's

10   the repeat use that becomes much more important

11   than genetic vulnerabilities when you talk about a

12   highly addictive drug.

13             If you talk about a less addictive

14   drug like alcohol, that's where genetic

15   differences become more important.

16   Q.        Are you aware of studies showing that

17   a history of substance abuse is often associated

18   with opioid addiction?

19             MS. DICKINSON:  Objection to form.

20   A.        If you abuse -- I mean, there are

21   studies that -- you don't really need a study.  If

22   someone abuses opioids, they're going to be at

23   greater risk of becoming addicted to opioids,

24   similar -- opioid addiction generally develops

25   from repeated use.  If you're repeating use

Page 84

1   because it's fun and you like the effect, you're

2   abusing it and you're someone who abuses drugs and

3   takes them for fun, yes, that's going to make you

4   at high risk of becoming addicted.

5            If you're taking opioids repeatedly

6   because the doctor prescribed them, you'll be at

7   high risk for becoming addicted.  If you're taking

8   them repeatedly because you're self medicating

9   some dysphoric feelings, you'll be at high risk

10  for becoming addicted.

11           So again, as demonstrated in the

12  Sullivan paper, what I believe is most determinant

13  is duration of use and dose is also very

14  important.

15       Q.    I was asking you a slightly different

16  question about substance abuse, though, which is a

17  history of prior substance abuse, are you aware of

18  studies showing that a history of prior substance

19  abuse of other substances is a predictive factor

20  in relation to developing an addiction to opioids?

21       A.    I'm aware of published papers with

22  more or less that statement, published papers that

23  discuss risk factors for becoming addicted where a

24  history of substance abuse is considered a risk

25  factor.

Page 85

1          Q.      Okay.

2                  Let me ask you to -- we'll switch

3     gears a little bit here.  I wanted to talk about

4     opioid misuse or non-medical use.

5                  Are you familiar with those terms?

6          A.      Yes.

7          Q.      How do you use "non-medical use"?

8     What does that term mean to you?

9          A.      Taking an opioid in a way other than

10    prescribed.  Non-medical was the terminology that

11    was more commonly used until maybe around 2014

12    when the National Survey starts using the term

13    "misuse" instead of "non-medical use."

14         Q.      Either misuse or non-medical use

15    contemplates taking an opioid for a purpose other

16    than as prescribed?

17         A.      It's a little -- I think it's taking

18    it in a way not prescribed.  So if you have it for

19    your knee pain and you're told to take it three

20    times a day but you take it four times a day, that

21    would be considered misuse.

22         Q.      It would be misuse if a teenager took

23    opioids out of a medicine cabinet without a

24    prescription and started taking them, right?

25                 MS. DICKINSON:  Objection to form.

Page 86

1          A.          Right.

2          Q.          So when we talk about non-medical use

3     or misuse, we're talking about somebody who is

4     taking a prescription opioid who has not been told

5     pursuant to a prescription to take them, right?

6          A.          Not exactly.  It's someone who is

7     taking an opioid in a way that was not prescribed

8     to them.

9          Q.          And it includes somebody who never

10    had a prescription at all, right?

11         A.          Correct.

12         Q.          It includes somebody who buys from a

13    street dealer?

14         A.          Well, actually, I'm sorry.  To just

15    go back to it includes someone who was never

16    prescribed them at all, I suppose it could, but in

17    many cases, it involves someone who had received a

18    legitimate prescription at some prior point in

19    time.

20                    So we have studies that show us, for

21    example, with adolescents, that an adolescent who

22    is prescribed an opioid medically and who uses it

23    medically is much more likely to later on misuse.

24    So yeah, so misuse doesn't mean that there wasn't

25    prior legitimate medical use.

Page 87

1      Q.      When somebody is misusing, they are

2    not taking it pursuant to a doctor's prescription,

3    correct?

4              MS. DICKINSON:  Objection to form.

5      A.      An episode of misuse would mean that

6    the opioid is being taken in a way that was not

7    prescribed to them.

8      Q.      Do you know of the percentage of

9    opioid use disorder that arises from misuse of

10   opioids as contrasted with iatrogenic use?

11             MS. DICKINSON:  Objection to form.

12     A.      I'm not aware of studies that have

13   really looked at that.  What we have are specialty

14   data from the National Survey on Drug Use and

15   Health that look at the source of an opioid for

16   individuals who report non-medical use or misuse,

17   but for people who ultimately become opioid

18   addicted, I don't know that there are -- there's

19   good data -- I don't think there's good data out

20   there to tell about their first episode of use,

21   was the first time they ever used an opioid

22   medical or non-medical.  I'm not aware of that

23   type of published literature.

24     Q.      I wanted to not focus so much on

25   first use, I wanted to ask you about people who

Page 88

1    become opioid addicted to prescription opioids.

2              Is it your understanding that most

3    people who become addicted to prescription opioids

4    have engaged in misuse?  Is that your

5    understanding?

6              MS. DICKINSON:  Objection to form.

7         A.    It's a very difficult question to

8    answer because for some people who become

9    addicted, once their addiction develops, they

10   start to misuse opioids and take them in ways that

11   weren't prescribed, which is actually very common

12   in people who become addicted.

13             There are people who are addicted to

14   opioids who actually take them exactly as

15   prescribed by doctors.  We would still consider

16   them addicted because the opioids are having a

17   harmful effect on them and they're kind of stuck

18   on them, but it's hard to tease that out

19   because -- the way you're asking the question, I

20   think you're asking me did their addiction develop

21   from misuse and that's tricky to know.

22             So, you know, was the misuse a

23   consequence of their addiction or was the misuse

24   what led to their addiction?  If you'd like, I

25   could try to answer your question based on my

Page 89

1    clinical experience.

2         Q.      Why don't you tell me what your

3    clinical experience is?

4         A.      In my clinical experience, most of my

5    older patients have given me histories that their

6    addiction developed through medical use and I've

7    treated many older adults who had never even

8    smoked a cigarette in their life, but were

9    prescribed opioids and became addicted through

10   medical use.

11              So I would say the majority of my

12   older patients, people middle-aged and up, it was

13   medical use that led to their addiction.  I would

14   say in my younger patients -- my patients who are

15   mostly in their 20s, early 30s -- there, it was

16   more of a mix.  I treated many patients who their

17   opioid addiction -- the history I got was really

18   opioid addiction that developed largely through

19   non-medical use, but I've also treated plenty of

20   young people who had chronic medical problems --

21   Crohn's disease, for example -- and their

22   addiction also was iatrogenic caused by medical

23   use.

24              I would say, though, for the patients

25   who gave me a very clear history of addiction that

Page 90

1    began through recreational use, even for those

2    patients I don't know that I asked them

3    consistently, but I believe based on the

4    literature that many of those people where their

5    addiction developed from misuse or non-medical

6    use, I think many of them had a prior medical

7    exposure which increased the risk.

8              They basically -- many of them, I

9    believe, had their first taste of the drug from a

10   doctor or a dentist and they may have liked the

11   effect, they certainly weren't afraid of it, so

12   that made them at greater risk to misuse and

13   ultimately, they became addicted from their

14   misuse.

15       Q.     So a substantial proportion of the

16   younger patients you see have addiction that in

17   your judgment has arisen out of misuse?

18              MS. DICKINSON:   Objection to form.

19       A.     I would say more or less yes, I think

20   yes to your -- to what you're asking.  But many of

21   the individuals where that -- these young people

22   where their addiction began through really much an

23   episode of prolonged misuse and that's how they

24   got hooked, many of those individuals, I believe,

25   had some prior medical exposure that made them at

Page 91

```
 1    greater risk of misuse.
 2         Q.      But then your judgment is that their
 3    addiction arose out of misuse, subsequent misuse?
 4              MS. DICKINSON:  Objection.
 5         A.      What I'm really saying is that that
 6    initial medical exposure played a role, so it's
 7    difficult to tease this out, but the period that
 8    led to their really becoming severely addicted, it
 9    was not from doctor -- taking doctor's
10    prescriptions repeatedly.  It was through
11    diversion.
12         Q.      Which is a form of misuse?
13         A.      Yes.
14         Q.      Your practice is an addiction
15    practice; is that right?
16         A.      Yes.  My specialty is treating opioid
17    addiction.
18         Q.      So when you're seeing older patients
19    who are addicted to opioids and you said your
20    judgment was a number of them or many of them had
21    become addicted to opioids through iatrogenic
22    use?
23              MS. DICKINSON:  Objection to form.
24         A.      Yes, iatrogenic addiction.
25         Q.      But from among the entirety of
```

1    patients treated with opioids by doctors for

2    iatrogenic use of opioids by patients, you don't

3    know the percentage that end up with an opioid

4    addiction?

5         A.    As we have discussed, we don't have

6    good data to inform us on the incidence rate, to

7    tell us what percentage will become addicted when

8    they're put on opioids long term and since we

9    don't have that data, what we rely on -- all we're

10   left to rely on is prevalence data and studies

11   like the studies we have discussed -- Boscarino --

12   that have looked at the prevalence of opioid

13   addiction or Opioid Use Disorder in patients on

14   long-term opioids, you find an extremely high

15   prevalence of more than 25%.

16              MS. DICKINSON:  Tim and Dr. Kolodny,

17        we've been going a little over an hour.

18        Again, Tim, when you get to a stopping point,

19        I think it's a good time for a break.

20              MR. HESTER:  Okay.  Let me just go a

21        little bit longer.

22              MS. DICKINSON:  Sure.  Of course.

23        Q.    When you said -- well, actually, I

24   just got -- I lost my train of thought from that.

25              MS. DICKINSON:  I'm sorry.  I didn't

Page 93

1          mean to interrupt you.

2          Q.          Your phrase was 25%.

3                      Could you explain what you just said,

4     Doctor?

5          A.          Twenty-five percent or more of

6     patients on chronic opioid therapy will meet

7     criteria for opioid addiction or Opioid Use

8     Disorder and so these are studies that are looking

9     at patients already on opioids and you find that

10    Opioid Use Disorder among patients on long-term

11    opioids for pain and that condition is common.

12    And so even though we don't have good incidence

13    studies, the fact that the prevalence is so high

14    suggests that many of these patients develop their

15    addiction through -- suggests that the incidence

16    rate if we did the study would be very high.

17         Q.          But when you distinguish between

18    incidence and prevalence, you're saying you don't

19    have a cause and effect relationship?

20                     MS. DICKINSON:  Objection to form.

21                     Lacks foundation.

22         A.          It's a good question.  It's really

23    important here.  So the incidence of a disease or

24    the incidence rate of a disease is generally

25    reported as the number of new cases of that

Page 94

1      disease in a one-year period, so new development

2      of a disease is the incidence of the disease.

3                  The prevalence is when you're looking

4      at how many people in a population have a disease

5      and so that's the difference.

6          Q.     So when you're looking at prevalence,

7      you can observe factors in the population that has

8      a disease, but it's often difficult to separate

9      cause and effect because there may be numerous

10     factors in the population that already has the

11     disease, correct?

12                 MS. DICKINSON:  Objection to form.

13         A.     So finding that a disease is highly

14     prevalent in a population doesn't necessarily give

15     you much information about the specific causes of

16     the disease, but when you see that this disease is

17     highly prevalent in a population that's taking

18     this particular medicine repeatedly, that's pretty

19     good evidence that that medicine may have

20     something to do with why that disease is so

21     prevalent.

22         Q.     But there could be other factors as

23     well beyond taking of the medicine, correct?

24                 MS. DICKINSON:  Objection to form.

25         A.     In terms of a prevalence study, a

Page 95

1    prevalence study doesn't really get at all of the

2    factors.  It's a study of a population to inform

3    us about potential causes.

4                 MR. HESTER:  All right.  Okay.

5                 I think this is an okay time for a

6         break, Erin.

7                 MS. DICKINSON:  Okay.  Sounds good.

8                 It is 11:20 your time.  Do we want to

9         come back in just like five minutes and then

10        try to do a shorter segment and take a lunch

11        break?

12                Tim, I don't want to -- I don't know

13        how long you're going today and where a good

14        lunch break time is.  I also don't want to

15        make Dr. Kolodny starve, so --

16                MR. HESTER:  What's your typical

17        lunch break, Dr. Kolodny?

18                THE WITNESS:  12:15, 12:30 for lunch,

19        Eastern time.

20                MR. HESTER:  How about if we aim

21        for -- if we come back in ten and then we aim

22        to stop for lunch around 12:30?  Is that okay

23        by you?

24                THE WITNESS:  That works great.

25                MR. HESTER:  I hope you brought a

Page 96

1      sandwich -- I hope you brought a sandwich to

2      the office.

3              THE WITNESS:  I'm at my home office

4      today, so --

5              MR. HESTER:  Oh, good.  Okay.  All

6      right.  Thanks.

7              So let's come back at 11:30.

8              MS. DICKINSON:  Sounds great.

9              THE VIDEOGRAPHER:  The time is 11:21

10     and we are now off the record.

11              (Recess taken)

12              THE VIDEOGRAPHER:  The time is now

13     11:32 and we are back on the record.

14     Q.      Dr. Kolodny, let me go back on one

15     point.

16              We talked a little bit before about

17     this Volkow paper from the New England Journal of

18     Medicine, Exhibit 4.

19              Who is Nora Volkow?

20     A.      The director of NIDA, National

21     Institute of Drug Abuse.

22     Q.      Is she a well-regarded professional

23     in this field?

24     A.      She has tremendous expertise in the

25     neurobiological basis of addiction.  Particularly

1    methamphetamine addiction is her expertise.

2         Q.      You know her personally?

3         A.      Yes, I do.

4         Q.      Have you worked with her on projects?

5         A.      Not really.  I don't think we've ever

6    collaborated together.

7         Q.      Are her opinions -- in this area of

8    opioid addiction, is she well regarded for her

9    thinking on these issues?

10               MS. DICKINSON:  Objection.

11               Form.

12               Lacks foundation.

13        A.      She's well regarded in the subject of

14   the neurobiology of addiction in general and her

15   research is on methamphetamine addiction.  She's

16   not known as an opioid addiction expert.

17               (Whereupon, Exhibit 13 was marked for

18        identification.)

19        Q.      Let me go back to the Boscarino study

20   which you mentioned and I don't think we've marked

21   this one yet.  It's Exhibit 13.  Could you open

22   that, please?  Do you have that one there?  We

23   premarked as Exhibit 13 a paper by Joseph

24   Boscarino and others entitled "Prevalence of

25   Prescription Opioid Use Disorder Among Chronic

Page 98

1    Pain Patients:  Comparison of the DSM-5 versus

2    DSM-4 Diagnostic Criteria."

3                   Dr. Kolodny, have you seen this

4    before?

5          A.      Yes.

6          Q.      This is the Boscarino report you

7    mentioned before our break?

8          A.      I was discussing two reports, but by

9    Boscarino, this is -- and I think I cite both of

10   them -- but yes, this is one of the reports I was

11   referring to.

12         Q.      Let me ask you to look at page 191,

13   please.

14         A.      Got it.

15         Q.      Maybe to set the table this is a --

16   this is a study looking at prevalence of Opioid

17   Use Disorder among chronic pain patients; is that

18   right?

19         A.      I believe so, yes, in primary care

20   settings.

21         Q.      And at page 191, in the left-hand

22   column, there's a statement:  "The best predictors

23   of higher Opioid Use Disorder severity are age

24   younger than 65 years, history of opioid use,

25   history of high opioid withdrawal symptoms and

1    history of substance abuse treatment."

2              Do you see that?

3       A.      You're reading from the bottom of the

4    page?

5       Q.      Yes.

6       A.      So he's referring to predictors of

7    Opioid Use Disorder severity and yeah, those

8    were -- that's what he listed there.

9       Q.      To your understanding, what is this

10   meaning of predictors?  What does that mean to

11   you?

12      A.      Factors that could potentially

13   predict the likelihood of something happening.

14      Q.      They're not necessarily cause and

15   effect factors?

16              MS. DICKINSON:  Objection to form.

17      A.      That's correct.

18      Q.      And why are they not cause and effect

19   factors?

20              MS. DICKINSON:  Objection to form.

21      A.      Because what's being reported on is

22   an association, not necessarily a cause.  And

23   you're looking at, you know, relative risks among

24   different factors and so -- and certainly none of

25   these factors can result in Opioid Use Disorder or

1    severe Opioid Use Disorder without an opioid.  The

2    exposure that has to be there.

3         Q.     When we say association and when you

4    say that phrase association means something

5    different from cause and effect, can you just

6    explain that?

7         A.     Yes.  You can have two variables that

8    are associated with each other, but not

9    necessarily one causing the other.  In some cases,

10   the association is causal.  In other cases, there

11   can just be an association.

12        Q.     So an association is an observation

13   of characteristics in a population?

14        A.     Yes.

15        Q.     And so this population is chronic

16   pain patients with Opioid Use Disorder?  That's

17   the population they're looking at?

18        A.     Yes.  I guess the population that

19   they're looking at would be individuals on

20   opioids, long-term opioids for chronic pain.

21   That's the population.  And then they're trying to

22   compare those who did or did not develop Opioid

23   Use Disorder or even compare among the people who

24   developed Opioid Use Disorder variables that could

25   have helped predict how severe their Opioid Use

Page 101

1    Disorder would become.

2         Q.        If you look over at the next page,

3    please, 192, at the bottom of the right-hand

4    column, there's the last sentence on the page

5    which carries over to the next.  It says "Lifetime

6    DSM-5 Opioid Use Disorder was also associated with

7    lifetime alcohol dependence, tobacco dependence,

8    major depression, Generalized Anxiety Disorder,

9    lifetime PTSD, history of childhood adversities,

10   exposure to psychological trauma, illicit drug

11   use, substance use, substance abuse treatment,

12   psychotropic medication use and a history of

13   Antisocial Personality Disorder."

14             Do you see that?

15        A.        Yes.

16        Q.        And again, when they're talking there

17   about associations, are they talking about factors

18   that are not necessarily causal, but are

19   associated with the population of chronic pain

20   patients who had on Opioid Use Disorder?

21        A.        Yes.

22             MS. DICKINSON:  Objection to form.

23        Q.        Let me ask you to look at the Edlund

24   study, please, Exhibit 9.  Do you have that there?

25   Exhibit 9 is in your stack we already opened.

Page 102

1       A.       Yes, I have it.

2       Q.       Let me point you to the right hand

3   column on the first page, 557.  There's a sentence

4   down at the bottom of the right-hand page --

5   right-hand column.  Towards the bottom, it says

6   "Studies suggest that individuals with a past

7   history of substance abuse disorders have a higher

8   likelihood of developing OUDs."

9               Do you see that?

10      A.       Yes.

11      Q.       Do you agree with that?

12              MS. DICKINSON:  Objection to form.

13      A.       I would agree that there are studies

14   that suggest that, yes.

15      Q.       Then it goes on to say "Although

16   other risk factors remain to be identified" -- do

17   you see that?  It's the next clause in that same

18   sentence?

19      A.       Yes.

20      Q.       When they refer to risk factors

21   there, what's your understanding of that term?

22      A.       A factor that could potentially

23   influence the risk of a particular outcome.

24      Q.       We'll turn topics a little bit.

25              Do you agree that prescription

Page 103

1    opioids do not come into a community or not out in

2    a community unless they leave pharmacies after

3    doctors have written prescriptions for them?

4                    MS. DICKINSON:  Objection to form.

5                    Lacks foundation.

6        A.        No, I wouldn't agree with that.

7        Q.        Is your understanding that

8    prescription opioids cannot be sold to the public

9    and cannot be dispensed to the public without a

10   prescription?

11                   MS. DICKINSON:  Objection to form.

12       A.        Yes.  My understanding is that a

13   prescription -- that for a pharmacy to sell a

14   prescription to a patient, there needs to be a

15   prescription written.

16       Q.        In particular, with respect to a

17   prescription opioid, a prescription opioid can't

18   leave a pharmacy unless a prescription has been

19   provided?

20       A.        Well, unfortunately, it can --

21                   MS. DICKINSON:  Objection to form.

22                   Go ahead, Doctor.

23       A.        Unfortunately, it can, but it's not

24   supposed to.

25       Q.        And when you say it can, are you

Page 104

1    talking about circumstances where there's theft

2    from a pharmacy?

3         A.      Theft or pharmacies selling the pills

4    out the back door.

5         Q.      Okay.

6              Do you -- so let's talk about the

7    ways that prescription opioids can come into a

8    community.

9              One way is a prescription is written

10   by a doctor and the patients are given a

11   prescription for opioids, right?  That's one way

12   they come into the community?

13        A.      Yes.

14        Q.      A second way is a pharmacy sells

15   prescription drugs out the back door without a

16   legitimate prescription?

17        A.      That would be another way.

18        Q.      The third way is there's theft --

19        A.      I'm sorry.  Or a pharmacy staff

20   person -- I mean, I wouldn't take selling out the

21   back door that literally.

22        Q.      Fair enough.

23              So it would be some circumstance

24   where a pharmacy employee sells or gives

25   prescription opioids to somebody without a

Page 105

1    legitimate prescription?

2         A.      Yes.

3         Q.      And then a third circumstance would

4    be where somebody steals prescription opioids from

5    a pharmacy?

6              MS. DICKINSON:  Objection to form.

7         A.      Yes, that can happen, too.  I

8    wouldn't limit the universe to those three, but

9    yes.

10        Q.      Well, are there other ways that

11   prescription opioids can get into a community

12   aside from the three we've just discussed?

13        A.      Yes.

14        Q.      What are they?

15        A.      Diversion from a hospital is one way.

16   Diversion from the supply chain before the drug

17   makes it to a hospital or to a pharmacy and there

18   are probably other ways as well.

19        Q.      Okay.

20              What other ways do you have in mind?

21        A.      It could come into a community from

22   diversion that happens outside that community as

23   well.  So if you're talking within a particular

24   community, there are lots of different ways that

25   opioids can wind up in that environment.

Page 106

1      Q.      Do you have any evidence with respect

2  to Cabell, Huntington, do you have any evidence of

3  prescription opioids being diverted from

4  hospitals?

5              MS. DICKINSON:  Objection to form.

6      A.      There's evidence of diversion from a

7  hospital pharmacy.  I don't know that that --

8  there might be some other explanation for why one

9  of the hospital pharmacies had massive amounts of

10  opioids that were sold by -- there's evidence --

11  it's possible those opioids went to patients, but

12  it is also possible that there was diversion from

13  that pharmacy.  What we have is a serious red

14  flag.

15     Q.      Now, I wanted to ask you a very

16  specific question, though.

17              When you're using the term

18  "diversion," you're saying pills that left a

19  hospital pharmacy without a legitimate

20  prescription, right?

21              MS. DICKINSON:  Objection to form.

22              Foundation.

23     A.      That would be one form of diversion.

24     Q.      I'm asking for that case do you have

25  any evidence of pills leaving any hospital

Page 107

1    pharmacy in Huntington, Cabell without a

2    prescription?

3          A.     I wasn't asked to opine on diversion

4    from hospitals in Cabell County.  It's certainly

5    possible that there's good evidence out there.

6                What I am familiar with is data on

7    the opioids that the defendants sold to a variety

8    of customers, including outpatient pharmacies at a

9    hospital.

10          Q.     Right.

11                Do you have -- so I take it you have

12    no evidence and you've not been asked to look at

13    the question of any pills that were diverted

14    without a prescription from hospital pharmacies?

15    You don't have evidence of that?

16          A.     No, I think I have seen some

17    potential evidence of that.  I've seen a red flag.

18    But I did not explore that and I was not asked to

19    opine on that.

20          Q.     And do you have any evidence of

21    prescription opioids leaving pharmacies in the

22    Huntington/Cabell community without a legitimate

23    prescription?  In other words, some mechanism by

24    which they left the pharmacy without a legitimate

25    prescription?

1              MS. DICKINSON:  Objection to form.

2       A.      I've seen evidence in the form of

3   data on sales to pharmacies that suggest

4   diversion.  From the data that I've reviewed, I'm

5   not really able to opine on the type of diversion,

6   whether it was a pharmacy employee selling the

7   drug or pharmacy employee filling a prescription

8   from a pill mill.  From the data that I looked at,

9   I can't really answer your question.

10      Q.      You've not been asked to provide an

11  opinion on the amount of such diversion?

12              MS. DICKINSON:  Objection to form.

13              Lacks foundation.

14      A.      I was not asked to investigate or

15  opine on the specific forms of diversion that

16  occurred.

17      Q.      Do you have any evidence of

18  prescription opioids being diverted from the

19  supply chain before the opioids reached a

20  pharmacy?

21              MS. DICKINSON:  Objection to form.

22      A.      I'm not sure.  I can't recall whether

23  or not I've come across documents.  I know I have

24  certainly seen evidence that the defendants in

25  this case were cited and had their DEA

Page 109

1    registrations suspended for activities that

2    occurred at distribution centers and so, you

3    know -- but exactly what happened at those

4    distribution centers, was it simply a failure to

5    report suspicious orders at these distribution

6    centers or was there also diversion directly from

7    the distribution centers, I can't recall.

8         Q.    And you've not been asked to opine on

9    the question of whether there was diversion from

10   distribution centers before prescription opioids

11   reached the pharmacies?

12        A.    That's correct.  I wasn't asked to

13   opine on that.

14        Q.    So you're not aware yourself of any

15   prescription opioids that were in the

16   Huntington/Cabell community that were in that

17   community other than because of a legitimate

18   prescription?

19             MS. DICKINSON:  Objection to form.

20             Lacks foundation.

21        Q.    It's a convoluted question.  If you

22   want me to ask again, I can try a little better.

23        A.    Okay.

24        Q.    I wanted to ask you about the supply

25   of prescription opioids in Huntington/Cabell.

1              Are you aware yourself of any

2      evidence that the supply in Huntington/Cabell was

3      in that community for any reason other than

4      because of prescriptions written by doctors?

5                   MS. DICKINSON:  Objection to form.

6          A.      Your previous question you asked --

7      you used the term "legitimate" and I am aware that

8      there were pill mill doctors in Cabell County and

9      so I wouldn't consider their

10     prescriptions legitimate.  If you are asking about

11     supply that came through routes other than a

12     prescription filled at a pharmacy, off the top of

13     my head, I wasn't asked to opine on that, so I'd

14     really have to go back and look more closely at

15     some of the data that I did have access to, but --

16     so it's very hard for me to answer that question.

17         Q.      It's not something you're being asked

18     to opine on, what percentage of pills in the

19     community were there because of prescriptions that

20     were legitimate versus illegitimate versus

21     diversion?  That's not something you're opining

22     on?

23         A.      I think I can opine on that.  I can

24     certainly opine on the fact that there were

25     literally millions of pills sold by the

Page 111

1    defendants, billions of MMEs sold by the

2    defendants in the county and so that's clear

3    evidence of prescriptions that were written or

4    pills that left pharmacies for illegitimate

5    reasons.

6              There's no way that Cabell County

7    could have had a legitimate need for billions of

8    MMEs, so that is evidence of a serious problem.

9        Q.      Now, but I wanted to ask a slightly

10   more specific question, which is have you been

11   asked to opine -- I'm asking what you were asked

12   to opine on.

13             Have you been asked to opine on the

14   mix of pills -- prescription opioids -- that were

15   in Cabell/Huntington because of legitimate

16   prescriptions written by doctors as compared to

17   diversion from various sources?  Have you been

18   asked to opine on that?

19             MS. DICKINSON:  Objection to form.

20             Lacks foundation.

21       A.      I was asked to -- I think that the

22   subjects that I was asked to opine on would

23   broadly include that.  I was not asked to try and

24   estimate what percentage of the prescriptions

25   could be legitimate versus illegitimate or

Page 112

1    specific -- what percentage of diversion might

2    have been from a specific route.

3          Q.     And again, just to make it clear, you

4    understand that there's a closed system of

5    distribution when a distributor distributes

6    prescription opioids to a pharmacy?  That's a

7    closed system.  You understand that?

8          A.     Yes, I understand that there is

9    supposed to be a closed system and that the

10   defendants in this case were responsible for

11   ensuring where they could that that system would

12   remain closed, but that there was not a closed

13   system.

14         Q.     Are you aware of any instance where a

15   distributor -- where pills were diverted between a

16   distributor and the time they reached a pharmacy?

17   Do you have any evidence of that?

18              MS. DICKINSON:  Objection to form.

19         A.     I have clear evidence that there was

20   not a closed system.  Where the exact leaks

21   occurred in the system, I was not asked to opine

22   on.

23         Q.     Okay.

24              Again, you don't have any evidence of

25   distributors failing to deliver prescription

Page 113

1    opioids to a pharmacy that was entitled to receive

2    them?

3               MS. DICKINSON:  Objection to form.

4         A.    I'm sorry.  Could you ask that

5    question again?

6         Q.    Yes.  It's backwards.

7               Do you have any evidence of instances

8    where there was a diversion of pills from a

9    distributor before they reached a pharmacy that

10   was entitled to receive them?

11              MS. DICKINSON:  Objection to form.

12        A.    I might have evidence.  Off the top

13   of my head, I don't recall seeing specific

14   examples of diversion between the distribution

15   center and the pharmacy.

16        Q.    Let me ask you to look at page 86 of

17   your report, please.  At the very bottom of the

18   page, you refer to prescription opioids flowing

19   into West Virginia communities at levels that

20   could never be considered clinically warranted.

21              Do you see that?

22        A.    I do.

23        Q.    And when you say clinically

24   warranted, how do you make that judgment?

25        A.    So as we talked about previously,

Page 114

1    many of the pills that flowed into Cabell and

2    Huntington were written for 30-milligram immediate

3    release oxycodone tablets.  There were other

4    high-strength opioids that the defendants sold,

5    but there were massive amounts of 30-milligram

6    immediate release oxycodone.

7              As I mentioned previously, that's --

8    one 30-milligram immediate release oxycodone is

9    equal to nine Vicodin in a single pill.  We've

10   talked about the appropriate uses of opioids where

11   for someone maybe near the end of life with

12   metastatic cancer who's been on opioids for maybe

13   several months or for a year as their cancer

14   progressed, there could be cases where they might

15   be on very high doses of opioids because of the

16   tolerance and you had to keep going up on the

17   dose.

18             It makes no sense that in Cabell

19   County you would have so many individuals with

20   metastatic cancer requiring 30-milligram

21   oxycodone.  The amount of those pills is clear

22   evidence that either inappropriate prescriptions

23   were written or there was diversion.  It could not

24   have been clinically needed, that amount of

25   oxycodone.

Page 115

1              You know, maybe I'd give one caveat:

2      If the world's largest hospice center moved into

3      the county, treating patients from around the

4      planet, you know, maybe you could justify it based

5      on those numbers.

6          Q.     Are you focusing particularly on the

7      30 mg Oxycontin?  Is that the particular point

8      you're making?

9          A.     Thirty and 50-milligram oxycodone are

10     extremely high dosage products and it's not really

11     just that.  It's also the quantity of the lower

12     dosage pills, like Hydrocodone.  How much acute

13     pain could there really have been?  If you look at

14     the appropriate use of opioids even for acute pain

15     in other countries, opioids are really not given

16     to patients when they go home from the hospital.

17     They're not using even the low dose in those

18     quantities.

19              So again, even the massive amount of

20     Hydrocodone in lower dosage pills suggests that

21     the pills flooding into the county could not have

22     been clinically warranted.

23         Q.     You refer to the lower doses being in

24     excess of what would be seen in other countries.

25              Were the lower dose pills going into

Page 116

1    the community comparable to levels that you'd see

2    in other communities in the United States?

3         A.        No.  Higher.  So we know that West

4    Virginia is not just an outlier for opioid-related

5    morbidity and mortality.  We know that West

6    Virginia is also a state where there's been much

7    greater amounts of opioids that have flooded into

8    the state and a pretty consistent finding when you

9    compare geographic areas where the opioid crisis

10   may be more severe than -- it's just exactly what

11   I've said:  Where there are more opioids, you see

12   more opioid-related morbidity and mortality.

13        Q.        Have you done a study of how many

14   pills would be clinically warranted?

15        A.        I haven't performed a study, but I

16   have studied that subject and I've published on

17   appropriate use of opioids and if you're asking

18   me, I would say that the level of consumption in

19   the United States in the 1980s was appropriate and

20   by the early 90s, we start -- it starts to go up

21   and it really takes off in the mid 90s.

22             So if I had to really draw a line

23   somewhere, I would -- the most conservative place

24   to draw that line would be levels of consumption

25   after 1996 when it starts soaring up.  What you're

1    adding on to what we were consuming before 1996

2    was clinically unwarranted.

3         Q.     And so your judgment is any levels

4    higher than 1996 are clinically unwarranted?

5         A.     That's a conservative estimate

6    because even in 1996, we had already had some

7    significant growth in opioid consumption and in

8    the early 90s, international comparisons would

9    suggest we were overconsuming opioids in the

10   United States, but 1996 is really an inflection

11   point where the consumption takes off dramatically

12   and so I think it's a conservative place to draw

13   the line.

14        Q.     So you would agree that the levels in

15   1996 would be a clinically warranted basis,

16   clinically warranted levels?

17        A.     I would say that if I'm going to be

18   really conservative and try and define where the

19   consumption is likely to be clinically

20   unwarranted, I would draw that line in 1996 and

21   say what came into the county after 1996 -- if you

22   use 1996 as a benchmark -- would be inappropriate,

23   but that would be a very conservative estimate

24   because consumption was already pretty high in

25   1996.

                                                    Page 118

1          Q.      Were there -- in your view -- any

2     subsequent evolution in the -- was there a

3     subsequent evolution in thinking about the need

4     for better treatment of pain in the United States

5     since 1996?

6                    THE COURT REPORTER:  Erin, you're

7          muted.  Are you objecting?

8                    MS. DICKINSON:  I was.  That's okay.

9                    Objection to form.

10                   Thank you, Sara.

11                   MR. HESTER:  Nice catch.

12                   THE COURT REPORTER:  I saw your lips

13         moving.  I just wasn't sure.

14         Q.      My question is was there a change in

15    thinking about the need for better treatment of

16    pain in the United States in 1996.

17                   MS. DICKINSON:  Objection to form.

18         A.      I would say there was a change in the

19    thinking about opioid use for pain that was --

20    resulted from a deceptive industry campaign to

21    change the way the medical community thought about

22    opioids for pain and that campaign was very

23    effective and is why we started to see -- one of

24    the main reasons we started to see this dramatic

25    shift in opioid prescribing that starts to happen

Page 119

1    in 1996.

2         Q.     I understand your opinion about the

3    engagement of manufacturers in the industry in

4    relation to thinking on pain.

5              I want to separate that out and I

6    want to ask you a separate question, which is put

7    aside the influences of Purdue, other opioid

8    manufacturers or what have you.

9              I want to ask is it your view that

10   there was an appropriate enhanced focus on pain

11   treatment after the mid 90s?

12             MS. DICKINSON:  Objection to form.

13        A.     No, I don't think so.  I think in the

14   80s there was evidence that we needed to do a

15   better job with palliative care and not even

16   necessarily prescribing more opioids to people who

17   were near the end of life from cancer, but just

18   that there were ways to help people die with more

19   dignity and be more comfortable.

20             But I don't believe that from 1996

21   onward that all this -- the messaging that we had

22   an epidemic of chronic pain in America or that

23   millions of Americans were suffering needlessly

24   because doctors don't adequately address pain, I

25   believe that was part of this manufactured

Page 120

1     campaign by the opioid industry.  And not just

2     opioid manufacturers.  When I say opioid industry,

3     I'm really talking about all of the players.

4          Q.     Do you also agree there was an

5     evolution in thinking among the medical community

6     separate and apart from the influence of the

7     industry of opioid manufacturers?  Was there an

8     evolution in thinking separate and apart about the

9     importance of pain treatment?

10               MS. DICKINSON:  Objection to form.

11         A.     It's not really possible because when

12    the medical community is hearing from professional

13    societies that are promoting opioids and key

14    opinion leaders that are promoting opioids and

15    accreditation agencies, when all of these messages

16    are coming to the medical community about opioids

17    and behind all of these messages are organizations

18    with financial ties to the opioid industry,

19    organizations that are sitting at the table with

20    opioid manufacturers and distributors, I don't

21    know how you can really tease that out.

22               I will say that there are many

23    individuals out there and possibly organizations

24    promoting these messages because they believed it

25    was the right thing to do and --

Page 121

1      Q.      I'm sorry.

2      A.      -- I think they were being

3   influenced.

4      Q.      But you agree there were doctors who

5   are making their own judgment that pain treatment

6   was something that needed to be improved?

7              MS. DICKINSON:  Objection to form.

8      A.      There were doctors who were making

9   that judgment based on information that's coming

10  to them from every direction.  From every

11  direction we're hearing that patients are

12  suffering needlessly because of an irrational fear

13  of opioids and that the risk of addiction is

14  extremely low and that it's normal and appropriate

15  to put people with backaches on long-term opioids.

16     Q.      I'm not asking about -- I'm not

17  asking about the appropriate treatment.  I'm

18  asking about the importance of treating pain and

19  was there an increased recognition that it was

20  important to treat pain.

21             MS. DICKINSON:  Objection to form.

22     A.      But not really separate from this

23  whole campaign.  Part of this push to increase

24  prescribing involved creating a perception that

25  we're not doing a good job of treating pain and

Page 122

1    millions of patients are suffering.

2            I don't believe that that perception

3    was based on evidence.  I believe that you had a

4    manufactured need and that's what doctors are

5    hearing, that if you're a compassionate doctor in

6    the know, you're going to recognize that people

7    with pain haven't been getting their pain treated

8    adequately and you can do a better job.  I don't

9    believe that the medical community was failing to

10   treat pain appropriately, though, before 1996.

11       Q.     The prevailing view in the medical

12   community after 1996 was that there was a need to

13   put more emphasis on pain treatment, right?

14       A.     And it's happening a little bit

15   before 1996, but it really takes off after 1996.

16   The medical community is hearing from every

17   direction that we need to do this and many

18   well-meaning clinicians are buying into this and

19   teaching it to younger doctors and there are a lot

20   of people who are genuinely falling for these

21   messages, but I don't believe that there was a

22   real need.

23       Q.     Let me ask you to look at the

24   Sullivan paper, Exhibit 2.  That's not a new one.

25   It's one we've opened before.

Page 123

1        A.        I got it.

2        Q.        So let me -- at the very bottom of

3    the first page, he says "The ethical mandate for

4    pain relief as basic care has been extended from

5    end of life to all cancer pain."

6                  Do you see that?

7                  MS. DICKINSON:  I'm sorry.

8                  Tim, what page?

9                  MR. HESTER:  Page one.  I'm sorry.

10                 MS. DICKINSON:  Okay.

11                 MR. HESTER:  Bottom of that first

12       page.

13       Q.        Do you see that statement?

14       A.        I'm on the first page of the paper,

15    the cover --

16       Q.        It's under the heading of

17    "Introduction."

18       A.        Yes, okay.

19       Q.        It's the last sentence on the page:

20    "In subsequent years, the ethical mandate for pain

21    relief is basic care has been extended from end of

22    life to all cancer pain."

23       A.        Yes.

24       Q.        Is that a reflection of what you

25    called the well-meaning or well-intentioned view

Page 124

1    that there needed to be increased emphasis on pain

2    treatment?

3                   MS. DICKINSON:   Objection to form.

4         A.      I'd kind of have to read through the

5    whole paragraph.  Let me get a better sense of

6    what he's trying to communicate in that sentence.

7                   Is that okay?

8         Q.      Sure.

9         A.      Yes.

10        Q.      Then, if you look over on page two,

11   the second full paragraph begins "The above

12   arguments for pain management as a fundamental

13   human right have addressed pain treatment

14   broadly."

15                  Do you see that?

16        A.      Where on page two are you?

17        Q.      It's the start of the second full

18   paragraph.  They refer to pain management as a

19   fundamental human right.

20        A.      Okay.

21        Q.      Do you see that?

22        A.      Yes, I see that sentence.

23        Q.      So again, does this reflect what you

24   were referring to as the evolution of well-meaning

25   doctors in thinking more about pain as something

Page 125

1    that needed to be managed?

2               MS. DICKINSON:  Objection to form.

3         A.     I'm sorry.  I'm not following your

4    question.

5         Q.     So you had referred to the fact that

6    doctors were hearing from every corner about the

7    need to increase pain treatment and that this was

8    something that many well-meaning doctors

9    assimilated into their thinking and into the

10   medical school courses they were teaching, etc.

11        A.     Yes.

12        Q.     And so my question is is this a

13   reflection of the point that there was an

14   evolution -- a well-meaning evolution -- in

15   thinking about the fundamental right of pain

16   treatment?

17               MS. DICKINSON:  Objection to form.

18        A.     I'm not really sure if this is a good

19   example of that.

20        Q.     Would you put Sullivan in this

21   category of people you were talking about,

22   well-meaning doctors who thought it was important

23   to focus more on pain treatment?

24        A.     I might put him in a little bit of a

25   different category.  He's -- so many doctors who

Page 126

1    work in a particular specialty generally see

2    themselves as advocates for people with that

3    condition and so if you ask a psychiatrist, you

4    know, what are the most urgent public health

5    problems in America, they'll tell you untreated

6    depression and so part of that is just a bias we

7    all have of seeing our own clinical field as being

8    something that's exceptionally important and

9    doesn't get enough attention and we have to do

10   better in it.  We advocate for it for the

11   conditions that we treat.

12             Dr. Sullivan is a psychiatrist whose

13   focus has been on improving care for people with

14   chronic pain, which is why he's also done work to

15   highlight how much -- the extent to which patients

16   with chronic pain are harmed by aggressive opioid

17   prescribing, but a lot of his career has focused

18   on improving treatment of pain, especially

19   reducing opioid use.

20        Q.     But he's focusing here on this

21   growing importance of putting more emphasis on

22   treating pain?

23        A.     I think a lot of -- you know,

24   certainly if you -- my comments earlier were

25   really referring to what the medical community was

Page 127

1    hearing, the primary care community.

2              If you were someone working in the

3    field of pain, your research grants are for pain

4    research, this is what you've dedicated your

5    career to, you're going to view this all probably

6    in a more positive light.

7              Yes, what we're working on is getting

8    more attention, but objectively, were people with

9    chronic pain better off in the early 90s?  I think

10   if you asked Dr. Sullivan, he'd say yes, that we

11   have harmed many people by promoting this concept

12   that we were under treating pain, particularly

13   opioids.

14       Q.    But there was a change in the medical

15   community in thinking about the need to be more

16   effective in treating pain?  There was that change

17   in thinking?

18       A.    The thinking about pain and treatment

19   of pain and opioids in particular did change

20   dramatically.

21       Q.    After 1996?

22       A.    Yes.

23       Q.    And you had mentioned before that

24   your judgment about how many prescription opioids

25   are clinically warranted could be affected by

Page 128

1    clinics and so forth that were in a particular

2    community, right?

3                    MS. DICKINSON:  Objection to form.

4                    Lacks foundation.

5                    MR. HESTER:  I'll ask it a slightly

6         different way if it's cleaner.

7         Q.        Do you agree with me that the

8    judgment about how many prescriptions could be

9    medically warranted in a community could be

10   influenced by the nature of the hospitals and

11   clinics operating in that community?

12                   MS. DICKINSON:  Objection to form.

13        A.        I'm still struggling with your

14   question.

15        Q.        Well, if you had -- I believe you had

16   said before that if there were an extremely large

17   facility dealing with end-of-life care in

18   Huntington/Cabell, that could affect the level of

19   pills that would be clinically warranted in that

20   community, correct?

21                   MS. DICKINSON:  Objection to form.

22                   Lacks foundation.

23        A.        Yeah, but I did give an example of if

24   the world's largest hospice moved into the

25   community and patients from around the planet were

Page 129

1   traveling into the community to have their

2   end-of-life cancer pain treated, it could

3   potentially be clinically warranted.  But I was

4   really -- the point I was trying to communicate is

5   that it's not feasible that the amount of -- that

6   the billions of MME flowing into the county, the

7   millions of pills could have been clinically

8   warranted.

9        Q.     Have you done the study of what the

10  facilities were in the community?  What kind of

11  pain clinics, hospices and other facilities there

12  are in the Huntington/Cabell community?  Have you

13  looked at that?

14       A.     Again, it's not -- it wouldn't make a

15  difference.  It's not feasible that there are

16  types of treatment, hospitals or settings where

17  this -- that could explain all of those

18  30-milligram immediate release oxycodone tablets

19  or the vast quantity, the dosage of those

20  Hydrocodone pills.

21              It's just not feasible, so it

22  wouldn't require study.  The --

23       Q.     I asked you a simple question.

24              Have you done that study?

25       A.     I wouldn't study something that

Page 130

1    doesn't really make sense to study.  It's on

2    the -- it's just -- it's not feasible.

3         Q.       Yeah, but you haven't done the study

4    of what the facilities are in that community?

5         A.       I wouldn't do a study on whether or

6    not parachutes are effective.

7         Q.       Well, it's a little bit different,

8    right?

9                  If there are five large hospice

10   facilities in a community, you might think there

11   would be more clinically warranted pills than if

12   there were none, correct?

13        A.       It's possible that the type of

14   treatment symptoms in a particular community could

15   influence consumption in that community.  That's

16   possible.  But the amount that flowed into the

17   county could not be explained by having more

18   hospices.  The numbers are astronomical.

19        Q.       Do you know the share of

20   prescriptions that were for the 30 mg oxycodone

21   and the 50 mg oxycodone?

22                 MS. DICKINSON:  Objection to form.

23        A.       I have data in my report on the

24   amount of -- on the different dosage units that

25   were prescribed that I could -- I'd be happy to

Page 131

1    consult that.

2         Q.      Okay.

3                 And that includes the share, the

4    share of those -- a share of the dosages at that

5    level versus others?

6                 MS. DICKINSON:  Objection to form.

7         A.      The data on consumption or on dosage

8    units on MMEs sold by the distributors in the

9    county came in different formats and so I would

10   just want to -- it's a pretty long report.  I'd

11   want to consult that before answering your

12   question.

13        Q.      Well, I may look for it over lunch

14   and see if I could find it.

15                Individual judgments are made by

16   individual doctors about the prescriptions they

17   believe are clinically warranted for their

18   patients, correct?

19        A.      Yes.

20        Q.      And the total number of prescriptions

21   that are written in a particular community reflect

22   the amalgamation of the judgments of those

23   individual doctors about the prescriptions that

24   they believe are clinically warranted for their

25   patients, correct?

Page 132

1          MS. DICKINSON:  Objection to form.

2     A.        Not necessarily.

3     Q.        Well, if for one doctor -- when one

4  doctor writes prescriptions for the patients he or

5  she is serving, those prescriptions reflect that

6  judgment -- that doctor's judgment about what's

7  clinically warranted, right?

8          MS. DICKINSON:  Objection to form.

9     A.        Not necessarily.

10    Q.        The doctors are not making the

11  judgments about what's clinically warranted?

12         MS. DICKINSON:  Objection to form.

13    A.        Not necessarily.

14    Q.        You think doctors don't make -- when

15  a doctor writes a prescription, you think the

16  doctor is not making a personal judgment about

17  what is clinically warranted?

18    A.        I would hope that all doctors would,

19  but that's not always the case.

20    Q.        Well, but that's what doctors are

21  charged with doing, correct?  They're charged with

22  writing prescriptions that are clinically

23  warranted?

24    A.        Correct.  That's what we're all

25  supposed to do, but unfortunately, there are

1    doctors who become drug dealers and they're not

2    necessarily prescribing what they believe is in a

3    patient's best interest.

4         Q.    So I want to put aside -- I want to

5    put aside a doctor who is a drug dealer or a

6    doctor who would be a pill mill.  I want to ask

7    about doctors who are running legitimate practices

8    and making legitimate prescription decisions.

9              For those doctors, you agree they're

10   making their own judgments about what's clinically

11   warranted?

12             MS. DICKINSON:  Objection to form.

13        A.    Not necessarily.

14        Q.    The doctors are not making their own

15   judgments about what's clinically warranted?

16             MS. DICKINSON:  Objection to form.

17        A.    Not necessarily.  Would you like me

18   to give you an example?

19        Q.    Yes.

20        A.    So a doctor may be unclear about

21   what's in a patient's best interest, so that

22   doctor may contact a pharmacist or may consult

23   colleagues and unfortunately, if that doctor is

24   consulting someone with bad judgment or someone

25   with a financial incentive to give that advice, it

1    could influence what's done for that patient.

2         Q.      Are you aware of any circumstances

3    where doctors call pharmacists to get advice on

4    what to prescribe?

5         A.      Yes.  Extremely common.  I've done it

6    in my clinical practice.  If there's a medication

7    I need to prescribe -- I generally treat

8    addiction.  If I have a patient with a rash and

9    I'm -- they need a steroid cream and I want to

10   help the patient, I may contact the pharmacist and

11   say "Hey, what's a high potency topical steroid

12   for my patient with poison ivy?"

13             So it's extremely common for doctors

14   and hospitals to work with the hospital pharmacist

15   and doctors who work in the community to

16   communicate and take advice from the pharmacist in

17   that community.

18        Q.      But the doctor isn't calling to ask

19   whether the highest steroidal cream should be

20   prescribed, but is asking what cream would be the

21   right one, correct?

22             MS. DICKINSON:  Objection to form.

23        A.      In the example I gave you for myself,

24   I might have an idea that the patient with poison

25   ivy needs a topical steroid and I might ask what's

Page 135

1    a good high potency topical steroid, but a doctor

2    could easily call a pharmacist and say "I have a

3    patient with a rash, a patient with bad poison ivy

4    and the over-the-counter stuff is not working.

5    What would you suggest I prescribe?"

6              That, I believe, is probably a very

7    common conversation and it could also similarly be

8    "I have a patient with terrible back pain who

9    tried the over-the-counter stuff.  What would you

10   recommend?"

11        Q.    You think doctors are making

12   judgments about controlled -- prescription of

13   controlled substances by calling pharmacies?

14        A.    I know that doctors consult

15   pharmacists frequently and if you -- and I believe

16   if you were to ask your own pharmacist experts

17   whether or not that happens routinely, I think

18   your experts will tell you it does.

19        Q.    You think that a doctor would call a

20   pharmacy to get a recommendation on prescribing --

21   on whether to prescribe a controlled substance?

22              That's your testimony?

23        A.    I believe that doctors frequently

24   talk with pharmacists about what to prescribe,

25   that pharmacists can influence physician

Page 136

1    prescribing practices, including controlled

2    substances.

3                    You can send a patient to the

4    pharmacy and they don't have what you prescribed

5    because it wasn't stocked.  You could send your

6    patient to the pharmacy, you wrote a prescription

7    for Oxycontin, the pharmacy doesn't have Oxycontin

8    and they tell the doctor "Look, we've got Vicodin,

9    but we don't have Oxycontin."

10                   That happens all of the time and I

11   believe your own experts will acknowledge that.

12        Q.        But the doctor makes the initial

13   judgment about whether or not the patient should

14   be prescribed a controlled substance, right?

15        A.        Not necessarily.

16        Q.        You think doctors are not making

17   those judgments?

18        A.        I think that doctors consult

19   pharmacists about -- frequently -- about what to

20   prescribe, including controlled substances.  Even

21   the dose.  A doctor may not know what doses a

22   particular medication comes in.  They call the

23   pharmacy and they say "Hey, what's the starting

24   dose for XYZ drug?" and the pharmacist will tell

25   them or they'll say "What's the frequency for this

1    drug?  Is it every 12 hours?"

2              When a doctor has to write a

3    prescription for a drug that they're not familiar

4    with that they don't write frequently, they very

5    often will talk to a pharmacist.

6         Q.     But the doctor is ultimately charged

7    with deciding whether the prescription is

8    clinically warranted, right?

9         A.     The doctor and the pharmacist.  The

10   pharmacist is not supposed to dispense a drug that

11   is not clinically warranted.

12        Q.     But the prescription is supposed to

13   be written by the doctor who makes the judgment

14   that is clinically warranted, right?

15        A.     That's correct.

16        Q.     So when the doctor makes the judgment

17   that it's clinically warranted for the patient,

18   that's when the prescription can be written,

19   correct?

20        A.     The prescription should reflect what

21   a doctor believes is clinically warranted.

22        Q.     Then you have a collection of doctors

23   who write prescriptions.  The total volume of

24   prescriptions across that collection of doctors

25   reflects the combination of judgments by all those

Page 138

1   doctors about the prescriptions that are

2   clinically warranted, right?

3       A.      Not necessarily.

4       Q.      Because you think they're not

5   adhering to what they are obliged to do?

6               MS. DICKINSON:  Objection to form.

7       A.      In some cases, you've got a very

8   large percentage of prescriptions being written by

9   doctors who aren't doing what's in the best

10  interest of their patient.

11              Particularly with opioids, we've got

12  good evidence that something like 20% of

13  prescribers in a given area are prescribing 80% of

14  the opioids and so the way that you're asking the

15  question, it's as if the total amount of opioids

16  reflects the view of all of the doctors in a given

17  community.

18              When it comes to opioids, just a

19  handful of doctors that are operating pill mills

20  or a pain management practice that's in a gray

21  area -- is it really a pill mill or not -- can it

22  have a tremendous impact on consumption in a given

23  community.

24      Q.      Yes, but if a doctor is running a

25  legitimate pain clinic, the doctor is going to be

Page 139

1    more likely to write more treatments -- more

2    prescriptions for pain treatment, correct?

3                    MS. DICKINSON:  Objection to form.

4         A.       No, not really.  I think a doctor who

5    is running a legitimate pain clinic is doing

6    everything they can to try and help get patients

7    off of opioids and address their pain with other

8    modalities.

9         Q.       But you would agree with me that a

10   doctor who runs a pain clinic -- a legitimate pain

11   clinic -- is more likely than a doctor who is in a

12   different kind of practice to be writing more pain

13   prescriptions?

14                    MS. DICKINSON:  Objection to form.

15        A.       That's hard to say.  I do think that

16   there are doctors with legitimate pain clinics who

17   are writing prescriptions for opioids because the

18   patients come to them hooked on the opioids and

19   they can't just stop them.  So yeah, maybe you

20   would see a fair amount of opioid prescribing in a

21   legitimate pain clinic.

22                    But if it's really a legitimate pain

23   clinic, you're seeing a reduction in opioid use in

24   a given patient.

25        Q.       But you agree with me over time that

Page 140

1    what you are seeing is doctors are prescribing

2    fewer opioids, right?

3              MS. DICKINSON:  Objection to form.

4         A.     Yes.  So fortunately, the -- we're

5    trending in the right direction.  Doctors are

6    beginning to get the message and we're still

7    unfortunately massively overprescribing, but the

8    trend is in the right direction, which is

9    positive.

10        Q.     And that trend reflects judgments

11   being made by doctors about when opioids are

12   clinical warranted, correct?

13             MS. DICKINSON:  Objection to form.

14        A.     That would be a part of it, maybe

15   even a small part of it.  Taking a license away

16   from a doctor like Anita Dawson, who was

17   prescribing massive amounts, also changes.

18             So when I talk about the prescribing

19   trending in the right direction, I'm really basing

20   that on consumption trends in the United States

21   and where we first saw the biggest dip in

22   consumption trends is when there was a crackdown

23   on pill mills in Florida.  Oxycodone for the

24   United States dropped when we started closing down

25   pill mills.

Page 141

1              So a lot of that change is not

2      necessarily a change due to doctors making better

3      judgments.  Some of it is to putting doctors who

4      were drug dealers out of business.  So it's a

5      variety of factors, but there is --

6          Q.      But one factor is doctors making

7      clinical judgments about when opioids are

8      warranted, right?  That's a factor in the decline

9      of prescription opioid use?

10         A.      Doctors being better able to weigh

11     risks versus benefits is one of the factors, yes.

12         Q.      Let me ask you --

13              MS. DICKINSON:  We're a little over

14         where we were going to stop.  I don't want to

15         exhaust Dr. Kolodny and/or starve him, but,

16         again, if you have a few questions that you

17         want to finish up, certainly go ahead and

18         then we'll break.

19              MR. HESTER:  No, I think this is

20         probably a good time to take a break.

21              MS. DICKINSON:  Okay.  Sounds good.

22              When do you all want to come back?

23         Dr. Kolodny is in his home, so I think we

24         could be back relatively quickly, but Tim,

25         what do you need?

```
                                         Page 142
```

1          MR. HESTER:  Same for me.  I'm in my

2    house, too.  Life in the pandemic.  I could

3    come back in half an hour, but if you want

4    more time, we could do that too.

5          It's a little bit your schedule, Dr.

6    Kolodny, what you want to do.

7          THE WITNESS:  I'm good with whatever

8    works best for everybody.

9          MR. HESTER:  Erin, what do you want

10   to do?

11         MS. DICKINSON:  Why don't we try to

12   come back in a half an hour, give or take.

13   You know, if Dr. Kolodny is not in the chair,

14   we will wait five minutes, but let's give it

15   a shot.

16         It's 12:35 Eastern, so let's try for

17   1:05 and if we get back a few minutes later

18   than that, we're all fine.

19         THE VIDEOGRAPHER:  The time is 12:35

20   and we're now off the record.

21         (Recess taken)

22         THE VIDEOGRAPHER:  The time is 1:06

23   p.m.

24         We are now back on the record.

25   Q.    Dr. Kolodny, let me ask you to look

Page 143

1    at page 53 in your report, please.

2         A.      Got it.

3         Q.      So this is data on pharmacies in

4    Cabell and Huntington, right?

5                 MS. DICKINSON:  Objection to form.

6         A.      Yes.

7         Q.      I'm sorry.

8                 Shipments to pharmacies in Cabell and

9    Huntington, right?

10        A.      Yes.

11        Q.      It's based on ARCOS data?

12        A.      I believe so, yes.

13        Q.      You know that the three distributor

14   defendants in this case didn't have access to the

15   ARCOS data?  Do you know that?

16                MS. DICKINSON:  Objection to form.

17                Lacks foundation.

18        A.      I know that the DEA wasn't routinely

19   sharing ARCOS data, but ARCOS data was available

20   to researchers and could be FOIA'd.

21                The type of the data that was

22   available through ARCOS -- actually, even better

23   data than ARCOS -- was certainly available to the

24   defendants through IMS, which is now IQVIA, so --

25   I don't know that it's totally accurate to say

Page 144

1    they didn't have access to ARCOS data.

2         Q.      Do you know whether distributors were

3    permitted to have access to ARCOS data?

4         A.      There's ARCOS data that could be

5    FOIA'd and there have been research publications

6    using ARCOS data.  So I don't know that -- so some

7    ARCOS data may have been available to

8    distributors.  I'm not certain.

9              I am aware, though, that the

10   distributors have argued that they didn't have

11   access to ARCOS data and therefore they

12   couldn't -- they didn't have a complete picture of

13   what was happening.  I'm aware of that argument

14   that they made, which I don't give much credence

15   to.

16        Q.      Do you know whether there were any

17   other distributors aside from McKesson, Cardinal

18   and ABDC operating in Cabell and Huntington?

19        A.      Yes, I believe there were other

20   distributors.

21        Q.      And do you know whether the three

22   defendants in this case -- Cardinal, ABDC and

23   McKesson -- supplied all of these pharmacies you

24   listed?

25        A.      I don't know that they supplied all

Page 145

1    these pharmacies.  I believe that the big three

2    were responsible for the bulk of what was -- what

3    came into the State of West Virginia and into

4    Cabell County.

5         Q.      But you don't know about these

6    pharmacies in particular?

7         A.      I don't know the breakdown for each

8    of these pharmacies for their suppliers and I

9    would imagine some might have changed over time

10   where one distributor would stop supplying them

11   and they'd get filled through another distributor.

12        Q.      Do you know anything about these

13   pharmacies other than what you read in the

14   Rafowski report?

15        A.      You know, I read about this from the

16   McCann report and also the Rafowski report.  I

17   don't know if I'm aware of information about these

18   specific pharmacies from sources other than those

19   reports.  I don't think I am.

20        Q.      Do you know whether any of the

21   pharmacies on this list served hospice patients?

22        A.      I don't know if any of the pharmacies

23   on this list had as a -- had a hospice or hospice

24   patients as customers.  No, I don't know.  But it

25   wouldn't -- certainly wouldn't change my opinion

Page 146

1    unless, of course, they were serving the enormous

2    hospice or an enormous number of hospices.

3          Q.      Do you know whether any of these

4    pharmacies served long-term care facilities like

5    nursing homes?

6          A.      I don't know, but I don't think it

7    would have changed my opinion because I'm looking

8    at the dosage unit, the MME and so -- but I

9    haven't really looked at lists of clients.

10   Certainly if that information was available, I'd

11   be happy to look at it and opine on it.  I don't

12   think it would change my opinion.

13         Q.      But you haven't looked?

14                 MS. DICKINSON:  Objection to form.

15         A.      I have not opined on or looked at the

16   breakdown or the customers, but I don't -- I don't

17   believe it would affect my opinion because, as we

18   discussed previously, the number of pills --

19   hundreds of millions of opioids that came into the

20   county, billions of MMEs that came into the

21   county -- I can't see how that -- how you could

22   have had long-term care facilities or hospices

23   that could account for this.

24                 And even in a long-term care

25   facility, those are generally nursing homes.

Page 147

1   Nursing homes would not -- should not require lots

2   of opioids.  You don't want to give patients with

3   dementia or patients who are frail lots of

4   opioids.  That's generally a very bad idea.

5               So the only potential explanation

6   would be the world's largest hospice has just

7   moved to Cabell County.

8       Q.      I was asking a narrow question,

9   whether you looked at it.  I wasn't asking whether

10  it changed your opinion, just to be clear on that.

11  Because it will take us too long to get through it

12  if we don't focus on the questions I'm asking.

13              Let me ask you to look at 57 to 58 of

14  your report.  This is where you are discussing two

15  doctors who issued lots of opioid prescriptions,

16  right?

17      A.      Yes.

18      Q.      I take it you don't know where these

19  doctors' patients filled their prescriptions?  You

20  don't know where or which pharmacy they went to?

21      A.      I'm not -- I don't know with

22  certainty and don't have that data in front of me,

23  but I could -- pill mill doctors, their patients

24  went to -- a legitimate pharmacy wouldn't have

25  been filling their prescriptions, so in all

Page 148

1    likelihood, the pill mill doctors prescriptions

2    were filled at some of the pharmacies that

3    accounted for the highest amount of opioids

4    dispensed.

5          Q.      But you don't know that?  You're just

6    assuming that?

7                  MS. DICKINSON:  Objection to form.

8          A.      I don't have a list of these doctors'

9    patients and where they're -- I should say

10   customers, rather than patients.

11                 I don't have a list of where they

12   filled their prescriptions.

13         Q.      Do you know if Cardinal, ABDC or

14   McKesson supplied any of the pharmacies where

15   those prescriptions were filled?

16         A.      I do know --

17                 MS. DICKINSON:  Objection to form.

18         A.      I do know that the big three sold

19   Hydrocodone and oxycodone to some -- to outlier

20   pharmacies in the county and pill mill doctors,

21   their patients or customers have prescriptions

22   that are filled at outlier pharmacies because

23   legitimate pharmacies won't fill prescriptions of

24   pill mill doctors.

25                 So although I don't have the direct

1    evidence in front of me, I believe it's very

2    likely that the big three sold pills to pharmacies

3    that filled these prescriptions.

4         Q.     But you already said you don't know

5    which pharmacies these patients filled their

6    prescriptions at, right?

7         A.     I do not have a list of all of the

8    pharmacies that the customers of these pill mills

9    went to to have their prescriptions filled.

10        Q.     So you also can't know whether

11   Cardinal or ABDC or McKesson supplied any of those

12   pharmacies because you don't know which ones they

13   were?

14               MS. DICKINSON:  Objection to form.

15               Asked and answered.

16        A.     I have a report here and I have seen

17   data showing that the big three supplied outlier

18   pharmacies in the county and it was outlier

19   pharmacies where customers of pill mills went to

20   have their prescriptions filled, so I believe it

21   is very likely that the big three sold pills to

22   outlier pharmacies that filled prescriptions for

23   these doctors and I believe --

24        Q.     Sorry.  Go ahead.

25        A.     Go ahead.  I'm sorry.

Page 150

1      Q.      Well, you're just reasoning that

2   through.  You don't -- I'm just trying to nail

3   down a specific question.

4              You don't know whether the doctors --

5   these two doctors were writing prescriptions that

6   were being filled at pharmacies that were supplied

7   by Cardinal, ABDC or McKesson.  You don't know

8   that.

9              MS. DICKINSON:  Objection to form.

10             Asked and answered now several times.

11             MR. HESTER:  No, I don't think he's

12        answered it, so --

13             MS. DICKINSON:  You're not liking his

14        answer, but he is answering it.

15             Dr. Kolodny, you could try again.

16     Q.      I mean, you don't know.  You're

17   drawing a logical assumption, but you don't know.

18             MS. DICKINSON:  Objection to form.

19             Argumentative.

20     A.      So I do know that legitimate

21   pharmacies were not filling prescriptions written

22   by pill mill doctors and so patients or customers

23   of pill mills, they received -- they got their

24   pills from outlier pharmacies and I do know that

25   the defendants in this case supplied outlier

Page 151

1    pharmacies in the county.  So that's the

2    information I have available.

3               And it is possible that there's more

4    data available that I don't recall seeing, but

5    basically that's my best answer at this time.

6         Q.    What's your basis for your statement

7    that pill mill doctors would not have the

8    prescriptions they wrote filled at legitimate

9    pharmacies?

10        A.    So I've been treating opioid

11   addiction for many years and some of my patients,

12   before they were in treatment or when they were in

13   treatment and remained in touch with friends who

14   were not in treatment, were getting opioids from

15   pill mills and I learned from my patients, even

16   before there was data available to support this,

17   that when you had a prescription written by a pill

18   mill doctor, it was hard to get that prescription

19   filled at a legitimate pharmacy.

20               When a healthy looking 25-year-old

21   walked into a pharmacy with cash and a

22   prescription for 240 tablets of 30-milligram

23   immediate release oxycodone, most pharmacists

24   would say "Get the hell out of here."  So these

25   individual patients or even sometimes professional

Page 152

 1   rings would have to find the pharmacies that were
 2   willing to fill these prescriptions.
 3             I've learned from my patients that
 4   often the pill mill would say "Hey, go to this
 5   particular pharmacy.  That's where you won't have
 6   trouble."
 7             And so the pharmacies that were
 8   willing to fill these outrageous prescriptions
 9   would very quickly start to become outlier
10   pharmacies and so that's part of the basis for my
11   opinion.
12       Q.    Any other basis?
13             MS. DICKINSON:  Objection to form.
14       Q.    Do you have other information aside
15   from what you've learned from your patient base --
16             MS. DICKINSON:  Objection to form.
17       Q.    -- to support the proposition that
18   pill mill doctors would have prescriptions filled
19   only at rogue pharmacies?
20             MS. DICKINSON:  Objection to form.
21             Foundation.
22       A.    Just to be clear, that wasn't my
23   position, that they would only have them filled.
24   It was that they would generally only be able to
25   get these prescriptions filled out outlier

Page 153

1  pharmacies.

2          In the example that I gave you of a

3  healthy looking young person with a wad of cash,

4  those patients generally had a hard time getting

5  prescriptions filled at legitimate pharmacies.

6          I can't say always or never, but I'm

7  telling you what I believe happened routinely and

8  there's evidence that came out I believe in the

9  trial against -- was it SafeScript? -- where the

10  owner of pharmacy was convicted in part for

11  filling prescriptions for pill mill doctors.

12          There have been reports in the media,

13  law enforcement investigations.  So it's not just

14  based on my clinical experience.  It's based on

15  other available evidence.

16      Q.      And the available evidence is things

17  you've read in the media or the testimony from

18  SafeScript?

19      A.      I would say work by investigative

20  journalists, I believe part of this was covered in

21  an investigation by the House Energy and Commerce

22  Committee and from my knowledge from working on

23  the opioid crisis for many years as an expert.

24          So from a variety of sources, my

25  opinion that outlier pharmacies were filling

Page 154

1    prescriptions from pill mill doctors, I think it

2    is based on lots of information.

3         Q.      The patient base that you serve in

4    your practice is based around New York City; is

5    that right?

6         A.      That's correct.

7         Q.      So you haven't worked with patients

8    in the -- in West Virginia who may have been

9    receiving prescriptions from pill mill doctors,

10   right?

11        A.      I haven't treated patients in West

12   Virginia, but I've talked with patients in West

13   Virginia, I've talked with doctors in West

14   Virginia, I've been to West Virginia on multiple

15   occasions and a part of West Virginia adjacent, I

16   believe, to Cabell County and so no, I didn't

17   treat patients in West Virginia, but I have had

18   firsthand experience learning about the opioid

19   crisis in West Virginia.

20        Q.      Are you aware of the fact that

21   patients who get prescriptions from pill mill

22   doctors often went to different pharmacies to

23   disguise the volumes they were getting?  Are you

24   aware of that?

25        A.      I'm aware of the fact that a patient

Page 155

1    or an individual who has opioid addiction and is

2    receiving prescriptions for multiple prescribers

3    will often visit multiple legitimate pharmacies,

4    so -- and pay cash usually for the second or third

5    prescription, use their insurance for the first

6    prescription -- that is common.

7                     But if a patient is visiting a pill

8    mill, there may not be a need for what's often

9    termed doctor shopping.  If you're visiting one

10   doctor and you're paying that doctor for an

11   extremely large and inappropriate prescription,

12   you don't have to shop around.

13       Q.     Let me turn you to page 25 of your

14   report.

15                     Do you have that?

16       A.     It's in front of me.

17       Q.     The chart at the bottom of the page

18   shows a line for West Virginia oxycodone sales and

19   US oxycodone sales per hundred thousand people,

20   right?

21       A.     That's correct.

22       Q.     It reflects that there's been a drop

23   of more than 50% -- I'm sorry -- roughly a drop of

24   50% in oxycodone sales in West Virginia?

25                     MS. DICKINSON:  Objection to form.

Page 156

1          Lacks foundation.

2     A.     It looks like -- what you're saying

3 looks about right from the graph, but I haven't

4 done the math.

5     Q.     I was doing the math by seeing that

6 it was more than -- it was above 30 in 2014 and

7 2013 and 2012 and then it's below 15 by 2019.

8 That's how I was getting the math of a 50% drop.

9          Is that right?  Is that your

10 understanding?

11     A.     It looks about right.

12     Q.     And now, your chart is showing that

13 the sales for oxycodone in West Virginia are about

14 the same level as they are nationally in the

15 United States, right?

16     A.     That's correct.

17     Q.     Let me ask you the same question on

18 26 of your report, page 26.

19          It shows more than a 50% drop in

20 Hydrocodone sales in West Virginia; is that right?

21     A.     Yes, from the peak.

22          (Whereupon, Exhibit 7 was marked for

23     identification.)

24     Q.     Right.

25          Let me ask you to look please at

Page 157

1    Exhibit 7, which is a new one for you.

2          A.      Got it.

3          Q.      Have you seen this letter from the

4    AMA before?

5                  I should maybe just set the

6    foundation.  This is a document we premarked as

7    Exhibit 7, a letter from the American Medical

8    Association to Deborah Dowell of the National

9    Center for Injury Prevention and Control dated

10   June 2020.

11                 Have you seen this document before?

12         A.      I may have.

13         Q.      Let me ask you to look at page two of

14   the document, please.

15                 Do you see the first bullet on the

16   page?  It says "Opioid prescriptions decreased 33%

17   between 2013 and 2018, including more than 12%

18   between 2017 and 2018 alone."

19                 Do you see that?

20         A.      Yes, I do.

21         Q.      Is that consistent with your

22   understanding of the decline in opioid

23   prescriptions across the country?

24                 MS. DICKINSON:  Objection to form.

25         A.      I think so, yes.

Page 158

1      Q.      Are you aware of any more recent

2  trends -- here we are in 2020.  Are you aware of

3  any more recent trends in declines in opioid

4  prescriptions in the US since 2018, 2019?  Are you

5  aware of anything more recent?

6            MS. DICKINSON:  Objection to form.

7      A.      I'm not sure if I've seen anything

8  published with more current data on prescribing.

9  I'm not certain.  Off the top of my head, I can't

10  think of any more current data.

11            The opioid prescribing trends -- I'm

12  just trying to think on the slides that I show --

13  I think generally ends around 2018.

14      Q.      Is it your understanding that the

15  trend is continuing to go down?

16      A.      I don't know.  I'm concerned that

17  it's not.  It's hard to say.  There's been an

18  effort to preserve the status quo of aggressive

19  prescribing and how successful that effort has

20  been recently, I'm not sure.

21            It's also hard to say what is

22  happening in the context of COVID.  Is that

23  causing an increase in opioid prescribing, a

24  decrease.  There's been some deregulation of

25  opioid prescribing in the context of COVID, so I

1    wouldn't want to speculate on what's happening

2    currently with opioid prescribing trends.

3         Q.     Have you looked at any more recent

4    trends in opioid prescribing in West Virginia in

5    particular?

6         A.     I don't think I've seen any very

7    current data on opioid prescribing trends in West

8    Virginia.  I certainly hope that it's continuing

9    to trend in the right direction.

10        Q.     This trend that we've been discussing

11   that's reflected in your charts, in your report

12   and in this data out of the AMA letter, that trend

13   reflects a greater focus on judgments being made

14   by doctors about risks and benefits of opioids.

15             Is that your understanding of it?

16             MS. DICKINSON:  Objection to form.

17        A.     I think that the trend is related to

18   better clinical decision making and possibly law

19   enforcement efforts and medical board efforts that

20   have put criminals -- it's probably both factors.

21        Q.     You would attribute at least some of

22   this decline to decision making by individual

23   doctors that lead to this decline?

24        A.     I think increasingly the medical

25   community is better weighing risks versus benefits

Page 160

1    when it comes to opioid prescribing.

2         Q.      But the medical community, at the

3    same time, is continuing to engage in a

4    substantial level of opioid prescribing, right?

5              MS. DICKINSON:  Objection to form.

6         A.      Yes.  There continues to be massive

7    overprescribing in the United States.  We continue

8    to prescribe far more than any other country on

9    earth and there are current papers published with

10   data, I think, from maybe even as recent as 2019.

11   International comparisons -- I wouldn't call it a

12   trend because it's more of a snapshot or a

13   six-month period and it's not trying to trend it,

14   but it's trying to do an international comparison

15   and there still are no other countries that come

16   even close.

17        Q.      Would you also agree with me that

18   there's quite meaningful differences between US

19   medical care and other countries in relation to

20   prescription medicines generally?

21             MS. DICKINSON:  Objection to form.

22        A.      Opioids are not the only medicines

23   that are overprescribed in the United States.  So

24   there are definitely differences.  I'm talking

25   about countries that are doing -- where evidence

Page 161

1    would suggest that they may be doing a better job

2    of treating pain and these are countries that

3    prescribe much less opioids.

4          Q.    Let me ask you to look at the first

5    page of the AMA letter, please.

6                So the third paragraph, the statement

7    by the AMA is "The nation no longer had a

8    prescription opioid-driven epidemic."

9                Do you see that?

10         A.    I do.

11         Q.    Do you understand the basis for the

12   AMA's conclusion on that point?

13         A.    I think if you think about the opioid

14   crisis as being all about the deaths involving

15   opioids and if you sum up the national data on

16   deaths in the past few years involving

17   prescription opioids have come down a little bit.

18   It's hard to, again, know what's happening right

19   now, but what's really caused a surge in

20   opioid-related overdose deaths has been illicitly

21   synthesized fentanyl.  Prescription opioids are

22   heroin are about neck and neck.

23               So if you think the opioid crisis is

24   really all about people dying from opioids, you

25   might say well illicit opioids are now worse than

Page 162

1    prescription opioids.  But if you understand that

2    the opioid crisis is really an epidemic of opioid

3    addiction fueled by overexposing the population to

4    prescription opioids, if you understand that the

5    reason we have record high levels of

6    opioid-related overdose deaths is because of the

7    prevalence of opioid addiction increased and that

8    many of the people now with opioid addiction have

9    transitioned to illicit use, then you really

10   wouldn't use this kind of terminology.

11        Q.    Have you taken issue with the

12   statement by the AMA that the nation no longer has

13   a prescription-driven opioid epidemic?

14              MS. DICKINSON:  Objection to form.

15        A.    I think it's sloppy language.

16        Q.    So you wouldn't agree with it?

17        A.    The United States -- the United

18   States is in the midst of a severe epidemic of

19   opioid addiction caused by overexposing the

20   population to prescription opioids.  If you were

21   to ask me whether or not nationally illicit opioid

22   deaths outnumber prescription opioid deaths, I

23   would agree with you.

24              But if you look at people who have

25   become opioid addicted post 1996, the vast

                                                     Page 163

1    majority of them developed their addiction taking

2    prescription opioids, so if you frame the problem

3    as all about the deaths, then that language can

4    maybe make some sense.

5              But if you understand that the opioid

6    crisis is an epidemic of opioid addiction, you

7    recognize that the epidemic of opioid addiction

8    was fueled and continues to be fueled by

9    prescription opioids.

10        Q.    So this statement, though, the nation

11   no longer has a prescription opioid-driven

12   epidemic, this statement by the AMA, you don't

13   agree?

14        A.    I don't like that language.  I think

15   that's -- and it suggests -- whoever is using that

16   language, it suggests that they don't have a good

17   understanding of the opioid crisis.  I don't

18   believe experts who study the opioid crisis would

19   use that type of language.

20        Q.    So this is written by the CEO of the

21   AMA on behalf -- on behalf of AMA, right?

22        A.    Yes.  And Dr. Madara has written

23   other letters on opioids which similarly reflect a

24   misunderstanding of the opioid crisis and that

25   don't necessarily jive with what many of AMA

Page 164

1    members believe or doesn't necessarily jive with

2    some of the work that AMA has done on this issue.

3    Dr. Madara's positions on opioids in the past have

4    been more in line with the opioid industry.

5              And I would also point out that the

6    AMA opioid task force, which I think has had some

7    influence here, includes the American Academy of

8    Pain Medicine, which I think is fairly

9    characterized as an opioid industry front group

10   which even your experts have pointed to that

11   organization's consensus statement as one of the

12   reasons that opioid prescribing improperly took

13   off and that group has some real influence on

14   letters like this that the AMA will contribute.

15        Q.    Yeah.  I was just asking a narrow

16   question, though.

17              You disagree with this statement?

18        A.    I think it -- I don't believe that

19   that statement would be supported by experts who

20   study the opioid crisis.  It reflects a

21   misunderstanding of the problem.

22        Q.    Okay.

23              Let me ask you to look at your

24   report, page 20, please.

25              Do you have that?

Page 165

1        A.        It's in front of me, yes.

2        Q.        This chart -- this is kind of a

3    simple question, I hope.

4                  This chart, on the middle of the page

5    that shows drug overdose deaths, that's not

6    limited to prescription opioid deaths, right?  It

7    includes all drug overdose deaths?

8        A.        I believe that's all drugs, not just

9    prescription opioids and not just opioids.  I

10   believe that's just drug overdose deaths.  I think

11   it would include methamphetamine.

12       Q.        Then look over at page 21, please.

13                 Again, similar question:  The chart

14   you show here, opioid drug overdose, that includes

15   illicit opioids such as heroin and fentanyl,

16   right?

17       A.        I believe it does.  I have to go back

18   to the source that I was citing, but I believe

19   this -- I believe this is all opioids, not just

20   prescription opioids.  I was citing a report

21   focused on prescription opioids.  I'm not really

22   certain.

23       Q.        Okay.

24                 But you also understand a little more

25   broadly that, as we just discussed, the rate of

Page 166

1   deaths from prescription opioid overdoses has been

2   declining somewhat and the increase has been

3   fueled by overdose deaths from heroin and illicit

4   fentanyl, right?

5            MS. DICKINSON:  Objection to form.

6            Lacks foundation.

7       A.      I think that I may have the data.  I

8   can't say with certainty the extent to which

9   prescription opioid deaths are declining or where

10  prescription opioid heroin and illicit fentanyl --

11  off the top of my head, I can't really say how

12  they compare to each other, but I would agree with

13  you that in the past few years, the soaring

14  increase in opioid-related overdose deaths in the

15  State of West Virginia have largely been driven by

16  illicitly synthesized fentanyl.

17      Q.      Right.  Okay.

18           Then over on page two, I think,

19  again, it's a similar clean up question.

20           At the end of the top paragraph, it

21  says in 2018, Cabell County had the highest opiate

22  overdose death rate of any county in the nation.

23           That, again, is including all opiate

24  overdose deaths, including illicit fentanyl and

25  heroin, right?

Page 167

1       A.      I believe so, because I think if I

2   meant prescription opioids, I would have written

3   prescription opioids.  If I write opioid, I'm

4   referring to all three.

5               (Whereupon, Exhibit 14 was marked for

6       identification.)

7       Q.      Right.  That was my assumption, too.

8   I just wanted to confirm that.

9               Could you look at Exhibit 14?  This

10  is another one we need to open.  Let me -- maybe

11  let me pause, just to set the table.  This is a

12  document we premarked.  It's Exhibit 14.

13              It's a document written by Amy

14  Bohnert and others, "Association Between Opioid

15  Prescribing Patterns and Opioid Overdose-Related

16  Deaths."

17              Is this a document you've seen

18  before?

19      A.      I have to open it up.  The one in

20  this envelope?

21      Q.      Yes.  Sorry.  I didn't know you

22  hasn't opened it yet.  Sorry.

23      A.      I thought you were referring me to

24  page 14 before, not exhibit --

25      Q.      I'm with you.

Page 168

1            So is this Exhibit 14 something

2    you've seen before, Dr. Kolodny?  I can say that

3    it's cited in your report.

4         A.      Yes, I'm familiar with this paper.

5         Q.      Who is Amy Bohnert?

6         A.      Amy Bohnert is a researcher.  She's

7    done some good work on the opioid crisis

8    prescribing.

9         Q.      Let me ask you to look at page 1317,

10   please.

11        A.      Yes.

12        Q.      At the very bottom, she writes "We

13   therefore approximated the rate of overdose among

14   individuals treated with opioids to be 0.04%."

15            Do you see that?

16        A.      No.  So I'm on page 1317 --

17        Q.      The bottom of the right column.

18        A.      Okay.  We therefore approximated the

19   rate of overdose among individuals treated with

20   opioids to be 0.04%.  Yes.

21        Q.      She's reporting here on a study of

22   individuals who died of a prescription opioid

23   overdose during the years 2004 to 2008, correct?

24        A.      I know this paper, I've cited this

25   paper, not just in support, but in other papers

Page 169

1    that I've written, but it's been a little while

2    since I've read it, so I would -- I really would

3    need just maybe a moment to skim through this.

4         Q.      Yeah.  The place where I could point

5    you probably -- I mean, look at whatever you need,

6    but the top of the results is what I was

7    paraphrasing.

8         A.      Okay.  Let me just -- let me just

9    have a few minutes to refresh my memory on this

10   paper.

11               Okay.

12        Q.      So this is a study of opioid overdose

13   deaths among patients who were treated with

14   opioids?

15        A.      Yes.

16        Q.      And she concluded that the rate of

17   overdose deaths among patients treated with

18   opioids was 0.04%; is that right?

19        A.      Yes.

20               MS. DICKINSON:  Objection to form.

21        Q.      And is that consistent with your

22   understanding of what the rates are of overdose

23   deaths among patients treated with opioids?

24               MS. DICKINSON:  Objection to form.

25        A.      No, not really.  I think there are --

1    this study wasn't really designed to answer that

2    question.  The objective of this question was

3    really to examine the risk of high doses of

4    opioids on an ultimate death and they found in

5    this study -- they found that of the 752 deaths,

6    11 -- of the 1,136 individuals who died, 752 of

7    them received prescription opioids during this

8    period of time.

9               So I don't think they report on that

10   incidence rate, but that's not -- that wasn't the

11   objective of this paper and there are other

12   studies that give -- I think that were designed to

13   answer the question.

14               In general, though, if you look at

15   the percentage of people exposed to opioids that

16   ultimately died of an opioid overdose, it tends to

17   be a very low number because most -- we're

18   exposing millions of Americans on an annual basis

19   to opioids.  The percentages that wind up dying

20   ultimately of an opioid-related overdose at some

21   point compared to the number that got prescribed

22   an opioid does tend to be very low.

23               But when you have studies that have

24   compared a population exposed to opioids versus

25   the patients that never got an opioid, to look at

1   what was the risk of ultimately dying of an opioid

2   overdose if you had been prescribed opioids, you

3   see a dramatic increase in someone who received a

4   legitimate opioid prescription compared to someone

5   who never did and ultimately died of an opioid

6   overdose.

7           So I think they're reporting on the

8   finding, I think this is good research, but you're

9   picking out a percent here that has nothing to do

10  really with the objective of this study, which was

11  to look at the impact of high doses ultimately on

12  opioid-related deaths.

13      Q.      They did report this particular

14  finding about this percentage, correct?

15      A.      They did, but that doesn't really

16  inform us on the percent of people that ultimately

17  die of an opioid overdose after having been

18  exposed to an opioid.

19      Q.      Well, she was looking at that

20  population, right?  She was looking at a

21  population that was exposed to opioids and

22  measuring the percent of those people that ended

23  up dying of an opioid overdose, right?

24      A.      She looked at people who were treated

25  during a particular period of time and looked at

Page 172

1    another point of time when deaths might have

2    occurred.  That really, though, doesn't answer a

3    question about how many people that got a

4    legitimate prescription wound up losing their life

5    from an overdose.

6         Q.     Okay.  Let me switch topics a bit.

7                I wanted to ask you about suspicious

8    order monitoring programs, which is something you

9    discuss in your report.

10               I take it you're not an expert in

11   suspicious order monitoring programs, are you?

12               MS. DICKINSON:  Objection to form.

13        A.     So I have expertise in the opioid

14   crisis and some expertise in diversion of opioids,

15   both from my research and from my clinical

16   experience, as we talked about, so I do believe I

17   have expertise in this area and can comment on

18   suspicious ordering.

19        Q.     Do you have any expertise in the

20   federal rules and regulations that govern the

21   distribution of controlled substances?

22        A.     Yes, I do have some expertise in the

23   requirements for distributors to have systems in

24   place that would allow them to identify an outlier

25   pharmacy, to immediately flag that pharmacy, to

Page 173

1    report that pharmacy and not fill the order.

2              So I do have an understanding of the

3    law and the impact that the failure of opioid

4    distributors to follow the law, what has happened

5    from that.

6         Q.    Sorry.

7              You are not a lawyer?

8         A.    I am not a lawyer.

9         Q.    And when did you first look at the

10   rules and regulations that govern the distribution

11   of controlled substances?

12        A.    I -- probably going back to 2003 from

13   the first work I was doing on the opioid crisis,

14   on expanding access to opioid addiction treatment

15   with buprenorphine and advocacy work on up

16   scheduling of Hydrocodone combination products, so

17   I've had familiarity with the Controlled

18   Substances Act for the past years.

19        Q.    Have you ever done any work on

20   compliance issues for the distribution of

21   controlled substances?

22        A.    I've never worked for an opioid

23   distributor in their compliance division.

24        Q.    And you've never worked in developing

25   a suspicious order monitoring system, have you?

1      A.      I have worked on the development of

2   red flags for opioid -- risky opioid prescribing

3   and the development of monitoring systems on

4   prescribing based on PDMP data, which is related,

5   but I have not ever worked for a distributor or

6   been consulted by a distributor on how they should

7   go about complying with the requirement by law

8   that they have a system in place to identify

9   inappropriate orders.

10      Q.      And I take it for the same reason

11  you've never audited a suspicious order monitoring

12  program to evaluate whether it complies with

13  federal laws and regulations?

14      A.      I've never audited the systems that

15  distributors are required to have by law that

16  those systems that clearly failed.

17      Q.      Have you ever been consulted about a

18  distributor's suspicious order monitoring program

19  outside the context of being an expert in this

20  litigation?

21      A.      No.

22      Q.      I take it you've never worked for a

23  manufacturer of controlled substances, right?

24      A.      No.

25      Q.      You said you never worked for a

Page 175

1    distributor of controlled substances?

2         A.      Correct.

3         Q.      Have you worked for any company that

4    was in the distribution chain for controlled

5    substance?

6         A.      I mean, I've been a -- I've worked in

7    hospitals and hospitals are DEA registrants,

8    hospitals that have pharmacies, work closely with

9    hospital pharmacists, even the hospital

10   pharmacists involved in ordering the drugs.

11              So I think that's a yes.

12        Q.      Have you ever worked for a pharmacy?

13        A.      I've never been an employee of a

14   pharmacy.

15        Q.      When did you first learn about the

16   suspicious order monitoring programs of Cardinal,

17   ABDC and McKesson?  When did you first learn about

18   them?

19              MS. DICKINSON:  Objection to form.

20        A.      I think I first learned about them in

21   2011 maybe.  I think it was when action was taken

22   by the DEA against Cardinal Health and CVS for two

23   Florida pharmacies where literally millions of

24   pills were flowing out of those pharmacies and I

25   think that was maybe the first time I started to

1    learn about the requirements for distributors to

2    have a system in place that would detect a

3    suspicious order instead of fill it and DEA took

4    action against Cardinal Health.

5          Q.      Have you ever read a specific

6    suspicious order monitoring program of Cardinal,

7    ABDC or McKesson?  Have you ever read any of their

8    program documents?

9          A.      I've seen in discovery a

10   communication about these systems.

11         Q.      Have you read any of them?

12         A.      I've read internal communications

13   about these systems.  For example, your client had

14   an internal communication about the monitoring

15   system where the communication was basically we're

16   in the business to sell -- to sell products and so

17   let's come up with a way that we don't have to

18   report a suspicious order.  Let's increase the

19   thresholds --

20         Q.      I think that wasn't my question.

21                 My question was have you read their

22   specific program documents?

23                 MS. DICKINSON:  Objection.

24                 Form.

25         A.      I believe that I have.  I've

Page 177

1    certainly read public communications about these

2    systems which were deceptive communications about

3    these systems that would suggest they were

4    effective when the distributors knew very

5    well that they were ineffective, so --

6         Q.      I think you know you're not answering

7    my question.

8                 My question is have you read their

9    specific programs?

10                MS. DICKINSON:  Objection to form.

11        Q.      It's a yes or no.

12                MS. DICKINSON:  Objection to form.

13                You asked if he read the specific

14        program documents and he is mentioning --

15                MR. HESTER:  Then he's answering --

16        Erin, he's answering about public

17        communications about the documents.  That's

18        not my question.

19        Q.      My question, Doctor, is have you read

20    the documents -- the program documents --

21    themselves?

22                MS. DICKINSON:  Objection to form.

23        A.      So I have reviewed probably thousands

24    of pages of documents in the course of offering

25    opinions on this case and I believe that those

1    pages included descriptions of these systems.

2    What comes more readily to my mind is -- are the

3    internal communications about these systems and

4    the public communications about these systems, but

5    I do believe I've seen the descriptions of these

6    systems themselves.

7         Q.     Are you aware that the suspicious

8    order monitoring programs changed over time?

9              MS. DICKINSON:  Objection to form.

10        A.     Yes, I'm aware that over time --

11   well, I don't know how much they really changed,

12   but I'm aware that the defendants in this case

13   claim that they were changing.

14        Q.     Do you know what the changes were?

15             MS. DICKINSON:  Objection to form.

16        A.     Well, I know what's been claimed

17   about the changes.  What was claimed is that they

18   had previously been in some cases relying on

19   subjective judgment of staff who had probably a

20   financial incentive to fill orders and that they

21   had moved to more objective mechanisms for

22   detecting suspicious orders.

23        Q.     Do you know what any of those

24   objective mechanisms are?

25        A.     I know by law that there are some

1    requirements that -- for coming up with those

2    mechanisms based on thresholds, based on changes

3    in threshold, based on what's happening in a given

4    community, so I have some knowledge about what

5    they are required to be based on.

6              But from the internal communications

7    that I've read, I'm suspicious that these

8    mechanisms were really put in place effectively

9    when staff were saying we're in the business to

10   sell, let's find ways of changing the threshold so

11   we could continue to sell.

12        Q.    I understand you want to add that

13   point.  I want to ask you something very specific,

14   though, about what you looked, which is do you

15   know what the changes were that were made in the

16   programs?

17              MS. DICKINSON:  Objection to form.

18        A.    So I am aware that the defendants in

19   this case have claimed that their systems were

20   previously too subjective and have become

21   objective.  I am not sure if -- I don't really

22   think one can trust what they're saying about

23   these systems, considering their track record.

24        Q.    Do you know whether there were

25   changes to make the standards more objective?

Page 180

1              MS. DICKINSON:  Objection to form.

2       A.       I believe that changes were made.

3   Certainly your client has claimed it made changes,

4   but your client hasn't really been honest to the

5   public or even to Congress about its role, so I

6   don't know what they've actually done.  I know

7   only what they're really saying that they've done.

8       Q.       Okay.

9              So you've not reviewed the different

10  program documents to figure out whether objective

11  measures were put in place over time in the

12  programs?

13             MS. DICKINSON:  Objection to form.

14      A.       I understand what the defendants in

15  this case are communicating.  The defendants in

16  this case are saying that they now have better

17  systems in place, they have acknowledged

18  publically and even apologized to the people of

19  West Virginia for the failure of their systems in

20  the past.  They say they've fixed them.  I hope

21  that they're not lying.

22      Q.       And you don't know one way or the

23  other?

24      A.       I don't know if anyone would really

25  know for certain what's happening, particularly

Page 181

1    when we're talking about companies that have been

2    dishonest in their public communications on this

3    topic.

4         Q.      And how do you decide that a company

5    has been dishonest?  What have you looked at to

6    decide that the companies were dishonest about

7    their suspicious order monitoring programs?  What

8    are you looking at to make that judgment?

9         A.      Testimony before Congress.  Your

10   client, the CEO of McKesson, testified before

11   Congress that we drive the truck, we do nothing to

12   influence prescribing or demand or we don't market

13   or promote.

14              That's a blatant lie and we -- we

15   know that for years the defendants in this case

16   and their trade association were communicating to

17   the public that they have effective systems in

18   place and yet we're getting cited and paying

19   million dollar fines after making those

20   communications because they didn't have systems in

21   place.

22        Q.      So your conclusion about

23   misrepresentations is based on reading statements

24   that were made and concluding that they can't have

25   been right?

Page 182

1              MS. DICKINSON:  Objection to form.

2              Lacks foundation.

3         A.      So the CEO of McKesson testifies

4    before Congress that McKesson doesn't promote or

5    market drugs --

6         Q.      I'm asking about suspicious order

7    monitoring programs.

8         A.      I'm talking about why I can't

9    necessarily trust what the defendants in this case

10   are saying about their systems.

11             When the CEO of McKesson is lying

12   before Congress about what its company does and

13   the role that it played, it's very difficult to

14   trust their communication.

15             So I do know, to answer your

16   question, that the defendants in this case claim

17   that they have fixed their broken systems.  I

18   don't know if that can be trusted or not.

19        Q.      And you don't know if it's true or

20   not?

21        A.      I don't know how we can tell whether

22   or not they're telling the truth this time.

23        Q.      And what do you say was false in the

24   statement by the McKesson CEO?

25        A.      The McKesson CEO lied to Congress,

Page 183

1    told Congress that McKesson does logistics.

2    Basically communicated we drive the truck, we do

3    nothing to influence demand, we do not promote or

4    market.  More or less, those were his words and

5    that is an absolutely false statement.

6              We know that McKesson and the other

7    defendants in this case marketed and promoted

8    opioids.  They all had an array of services that

9    they sold to manufacturers to help them market and

10   promote, so that is just one example of a false

11   statement and I think it's an especially important

12   example because if a CEO of one of these companies

13   is going to perjure himself before Congress, how

14   can we really trust what's being communicated

15   today about the effectiveness of these systems.

16      Q.     Well, Dr. Kolodny, you're making a

17   serious charge and you're basing that on

18   reading -- reading testimony and making a judgment

19   that it's not correct.

20             Is that true?  That's the way you're

21   making that judgment?

22             MS. DICKINSON:  Objection to form.

23      A.     I'm making a judgment that a false

24   statement was made before Congress, that McKesson

25   doesn't market or promote and that's a false

Page 184

1    statement.  That's not true.  McKesson has

2    marketed and promoted opioids.

3        Q.      And your assertion is that the CEO --

4    you've read the CEO's testimony and your

5    conclusion is it's incorrect?

6        A.      Incorrect is a bit of an

7    understatement.

8        Q.      So let me go back to asking you about

9    suspicious order monitoring.

10                You're saying you don't know whether

11    or not the companies have put in place more

12    objective standards for their suspicious order

13    monitoring programs?

14                MS. DICKINSON:  Objection to form.

15        A.      What I know is that the defendants in

16    this case are communicating publically that they

17    have fixed their broken systems.  I hope that

18    that's true.  I would like to think that in the

19    context of certainly the litigation against them

20    and the hundreds of millions of dollars in fines

21    that they've paid in the past for failing to have

22    systems in place that maybe right now they really

23    have fixed these systems, but I don't think we

24    could necessarily take them at their word.

25        Q.      So -- and you haven't looked for the

Page 185

1    underlying facts to evaluate whether it's correct

2    or not, what they said about the suspicious order

3    monitoring programs?

4                    MS. DICKINSON:  Objection to form.

5         A.        I think -- I have not reviewed an

6    independent evaluation by a regulator of the

7    current systems that are in place.  Maybe such

8    a -- maybe there is a recent evaluation by the DEA

9    of the systems that are currently in place.  I

10   haven't seen that.  That would help me, you know,

11   if -- that would help me make a decision about the

12   effectiveness today of these systems.

13        Q.        Let me ask you to look at page 78 of

14   your report.  At page 78, in the middle, you cite

15   the CSA and you say each distributor owes a duty

16   to protect the public health and safety by

17   maintaining effective goals against diversion.

18                   Do you see that?

19        A.        I do.

20        Q.        The diversion you're talking about

21   there is diversion between the distributor and the

22   delivery to a pharmacy that's authorized to

23   receive the drugs; is that right?

24                   MS. DICKINSON:  Objection to form.

25        A.        Just give me a moment.  Okay.  Yes.

1          Can you ask the question again?

2     Q.     Is the diversion that you're talking

3 about in that sentence diversion of prescription

4 opioids between the time that the distributor has

5 them in its possession and delivers them to a

6 pharmacy that's entitled to receive them?  Is that

7 the diversion you're talking about?

8          MS. DICKINSON:  Objection to form.

9     A.     No.  I think that it's broader.  So

10 the requirement of the law is that there's a

11 closed system and that DEA registrants all have

12 their part to play in ensuring that there's a

13 closed system and so I don't believe that the

14 distributor's responsibilities end at where they

15 drop off the pills at the pharmacy and that

16 they're only required to ensure that the system is

17 closed from point A to point B.  I think their

18 responsibility is broader than that.

19     Q.     And it includes what kind of

20 diversion?

21          MS. DICKINSON:  Objection to form.

22     A.     Dirty pharmacies -- that once they

23 get that shipment diverting from pharmacies that

24 are filling pill mill prescriptions, I believe

25 that the distributors are required by law not to

Page 187

1      supply narcotics to DEA registrants who on their

2      end are not helping to keep the system closed.

3           Q.      That's your understanding of what

4      their obligation is?  That they cannot deliver to

5      a DEA registrant?

6           A.      My understanding --

7                   MS. DICKINSON:  Objection to form.

8           A.      My understanding is that there's a

9      requirement for there to be a closed system and

10     that DEA registrants across that closed system are

11     all responsible for ensuring that that system

12     stays closed and it's my understanding that the

13     responsibility of the distributors to help ensure

14     that that system remains closed doesn't end at

15     dropping off the narcotics at the pharmacy, that

16     their responsibilities are broader than that.

17          Q.      Are you aware of another use of the

18     term "diversion" which includes, for instance,

19     circumstances where a family member or a friend

20     gives prescription opioids to somebody else who

21     doesn't have a prescription?  You're aware of that

22     use of the term?

23          A.      The term "diversion" would apply to

24     borrowing pills from a friend of family member.

25          Q.      And I take it that the distributors

1    don't have the obligation to present -- prevent

2    that kind of diversion, right?

3              MS. DICKINSON:  Objection to form.

4         A.     No.  I think that a prudent

5    distributor of narcotics can have an impact on

6    reducing the possibility of that type of diversion

7    as well.

8         Q.     A distributor couldn't control drugs

9    once they're in somebody's medicine cabinet,

10   right?

11        A.     Staff person for McKesson can't go

12   into someone's home and prevent them from sharing

13   pills, but when you have a very aggressive

14   prescriber of opioids who is prescribing far more

15   than necessary and you're putting all of these

16   excess pills in someone's home, you're increasing

17   the opportunity for diversion and a distributor

18   can absolutely request from a pharmacy that's an

19   outlier who are the doctors writing these

20   aggressive prescriptions and explain to that

21   pharmacy that we will not continue to supply you

22   if you're going to fill prescriptions for these

23   very aggressive prescribers and by doing so, we'll

24   be able to limit the -- that type of diversion

25   that you're asking me about.

Page 189

1       Q.      But you understand there's also
2   diversion that occurs when a legitimate
3   prescription is written for a legitimate purpose
4   by a legitimate doctor, it ends up in a medicine
5   cabinet and could be diverted to family or
6   friends.
7               You agree with that?
8               MS. DICKINSON:  Objection.
9       A.      It can happen.  But if you've got a
10  well-informed clinician, they're going to know not
11  to prescribe an opioid when an opioid isn't
12  necessary, which for much of the acute pain
13  prescribing where opioids are given out, opioids
14  are not necessary.  So if you've got a
15  well-informed clinician, they're not going to give
16  an opioid if they don't have to and when they do
17  have to give an opioid, they're going to give a
18  very small amount, just enough for that patient so
19  that there shouldn't be excess pills.
20      Q.      But that's a judgment the doctor
21  makes about how many pills, right?
22              MS. DICKINSON:  Objection to form.
23      A.      Not just a doctor, no.  A pharmacist
24  who is doing their job well can call the doctor
25  and say "Did you really want to give 20 tablets of

Page 190

1    Vicodin when the patient only needed two?  Do you

2    want me to change this, Dr. Kolodny?" and the

3    doctor could give permission.

4                    Certainly up until 2014, on

5    Hydrocodone, that could have very easily been

6    done.

7         Q.       So there's two levels of diversion

8    we're talking about.  One level of diversion is

9    within the closed system that you described.

10   Another level of diversion is when pills are in

11   medicine cabinets or otherwise are being

12   transferred to people without prescriptions.

13                   You agree they're different?

14                   MS. DICKINSON:  Objection to form.

15        A.       They're both -- they're both leaks in

16   the closed system.  The closed system includes the

17   patient as part of that closed system and if

18   someone other than that patient takes the pill, it

19   leaked out of the closed system.

20        Q.       So the closed system -- you think the

21   closed system extends to the time that a patient

22   receives the prescription and has the prescription

23   at home?

24                   MS. DICKINSON:  Objection to form.

25        A.       I think that -- my understanding of

Page 191

1    the closed system includes the patient as the end

2    user in this closed system and if that patient's

3    pills are used by somebody else, that's diversion

4    and that's where the leak occurred.

5          Q.      And is it your understanding that the

6    diversion obligations of distributors extend to

7    controlling what individual patients do with

8    prescriptions?

9          A.      My understanding is that a prudent

10   distributor of narcotics has the ability to

11   influence even this type of diversion that you're

12   asking me about because aggressive opioid

13   prescriber's prescriptions won't get filled if a

14   prudent distributor of narcotics is doing their

15   job well.

16         Q.      There's other people who could also

17   assist with that kind of -- addressing that kind

18   of diversion; am I right?  For instance, the

19   doctor or the pharmacist who limits the number of

20   pills that are being prescribed.

21         A.      Absolutely the distributor is not the

22   only DEA registrant in the system that has

23   responsibilities for preventing diversion.  The

24   dispenser has responsibilities to prevent

25   diversion and the prescriber has responsibilities

Page 192

1    to prevent the diversion and patients, even though

2    they're not DEA registrants, have some

3    responsibilities as well.

4         Q.     So in terms of looking at reasons for

5    diversion, you'd been looking at judgments made by

6    doctors, judgments made by pharmacies, judgments

7    made by patients.  You're looking at reasons for

8    diversion in addition to the conduct of

9    distributors, right?

10        A.      And judgments made by distributors,

11   yes.

12        Q.      But you would include -- when you're

13   looking at factors that cause diversion, you would

14   look at the judgments made by doctors and the

15   judgments made by pharmacies about the decisions

16   to prescribe and the volume of pills, right?

17        A.      Yes.  It's a factor, but a prudent

18   distributor of narcotics could nip that in the

19   bud.  It wouldn't happen.  If an aggressive

20   prescriber's prescriptions can't get filled

21   because the pharmacy won't supply a -- the

22   distributor won't supply the pharmacy who is

23   filling those prescriptions, it ends there.

24               So yes, you know, the leak can happen

25   in different parts of the system, but if a

Page 193

1    distributor does its job effectively, there's very

2    little leakage.

3         Q.     You're saying that the distributor

4    would end up not filling orders from the

5    pharmacies, right?

6         A.     So if the pharmacist does their job

7    well, they're not going to fill an inappropriate

8    prescription and if they do fill inappropriate

9    prescriptions, they're going to likely be

10   detectable if you've got a good system in place,

11   an effective system in place.  So that pharmacy

12   then gets investigated or cut off and you're

13   reducing opportunities for diversion.

14        Q.     So pharmacies and doctors are also

15   responsible for addressing these issues of

16   diversion in your opinion?

17        A.     Yeah.  There's a lot of

18   responsibility that, you know, can go around.

19   Yes, doctors need to prescribe appropriately.

20        Q.     And pharmacies, in your view, also

21   need to be limiting the volume of pills and

22   prescriptions?

23        A.     Pharmacists are health care

24   professionals and they're not vending machines.

25   When they see a prescription that looks

Page 194

1    inappropriate, they shouldn't fill it.

2                    (Whereupon, Exhibit 20 was marked for

3         identification.)

4         Q.      Let me ask you to look at Exhibit 4.

5    Do we have this yet?  I'm sorry.  Sorry.  Not 4.

6    Exhibit 20.  We need to open this up.

7                    THE WITNESS:  Excuse me.  I just

8         spilled my coffee.  Can we take a break?

9                    MS. DICKINSON:  Why don't we take a

10        break?  Let's salvage the documents.  Let's

11        go off for five minutes, how about?

12                    MR. HESTER:  So we'll take a

13        five-minute break.  So let's come back at

14        2:25.

15                    MS. DICKINSON:  Yes, thank you.

16                    THE VIDEOGRAPHER:  The time is 2:21.

17        So a three-minute break?  The time is 2:21.

18                    We're off the record.

19                    (Recess taken)

20                    THE VIDEOGRAPHER:  The time is 2:31.

21                    We are now back on the record.

22        Q.      Dr. Kolodny, right before the break,

23   I was asking you to open up Exhibit 20.  Have you

24   been able to open that up?  We premarked this

25   Exhibit 20.  It's a report by the Attorney General

Page 195

1    of West Virginia entitled "DEA's Failure to Combat

2    Diversion Costs Lives" dated June 4, 2020.

3                    Have you seen this document before?

4         A.       It looks familiar.

5         Q.       Let me ask you to look at the top of

6    page four of the document, please?

7         A.       Okay.

8         Q.       I want to ask you about the sentence

9    that begins at the very bottom of page three and

10   over to the top of four.  It's a sentence that

11   reads "Of the five million Americans who reported

12   having recently abused opioids, 71% obtained those

13   drugs through diversion, not prescriptions."

14                   Do you see that?

15        A.       I do see that.  I just want to -- if

16   you'll give me a second, I just want to read the

17   full sentence.

18        Q.       Sure.

19        A.       I do.

20        Q.       Does that accord with your

21   understanding that of Americans who recently

22   abused opioids 71% obtained these drugs through

23   diversion, not prescriptions?

24        A.       It really depends on who is misusing

25   the opioid.  So for a casual non-medical user,

Page 196

1   misuser, someone who reports on the National

2   Survey -- I'm assuming the source of that

3   statistic is National Survey of Drug Use and

4   Health, even though what's cited here is something

5   a little different.

6              But usually, that comes from a survey

7   question on the National Survey of Drug Use and

8   Health where people who do indicate non-medical

9   use or misuse are then asked what was the source

10  for that opioid that you misused and on that

11  survey, people answer the question -- about 71%

12  will generally say it was from a friend or family

13  who borrowed it.

14             But if you ask the question a little

15  differently or if you look at people who have

16  frequent non-medical use, for example, more than

17  150 days of the year, they used opioids

18  non-medically, in other words, people likely to be

19  addicted, the source changes and if you're looking

20  at people who are frequent non-medical users,

21  which is a proxy for being addicted to opioids,

22  the number one source is usually a doctor or a

23  drug dealer.

24        Q.      That would be a doctor who is

25  prescribing illicitly?  In other words,

Page 197

1    prescribing more than is appropriate?

2         A.      We don't know.  We know that when you

3    ask people who indicate on the survey that they

4    misuse opioids frequently, more than half of the

5    year they're doing it, people, again, who are

6    likely to be addicted, you ask them "What's your

7    source," the number one source is from a

8    physician's prescription.  Whether these are drug

9    dealing doctors or whether these are well-meaning

10   doctors, you can't really tell from that survey.

11   And drug dealers, I believe, are number two.

12              In other words, if you're going to

13   misuse an opioid occasionally -- and misuse

14   includes taking an opioid, borrowing somebody's

15   opioid because you have a headache.  When you do

16   that, you're taking what's around, what's

17   available.  Once you're hooked and you need a

18   regular supply, you can't rely on borrowing pills

19   from friends or family.  You need a regular source

20   and that's where doctors and drug dealers begin to

21   play a bigger role.

22        Q.      Is that scenario, the first source

23   would be doctors, second source would be --

24              MS. DICKINSON:  Objection to form.

25        A.      My recollection of the survey data

Page 198

1    from 2015 was that, number one, I think it was --

2    actually it might have been based on 2014 data, a

3    paper by Christopher Jones -- when you look at

4    frequent non-medical users, the number one source,

5    I believe, was a physician.

6         Q.     And there could be, I take it, two

7    kinds of physicians.  One, a physician who is

8    legitimately prescribing, thinking it's

9    appropriate and the second kind being a physician

10   who is illegitimately prescribing, not thinking

11   it's legitimate?

12        A.     Yes.  And maybe a third where, you

13   know, you've got the well-meaning doctor, you've

14   got the drug dealing doctor, then there are

15   doctors who are in a gray area where they're not

16   necessarily selling a prescription to anybody who

17   walks in the door, but their prescribing practices

18   don't look all that different from the ones that

19   are selling prescriptions.

20        Q.     Okay.  Let me change gears to talk

21   about marketing issues.

22               First, do you have any education in

23   pharmaceutical marketing?

24        A.     Yes, I do.

25        Q.     What's your education in

Page 199

1    pharmaceutical marketing?

2         A.      So I've been researching the role of

3    marketing on the prescription opioid crisis for

4    many years, probably going back to 2006.

5         Q.      So it's not a formal education, but

6    rather it's something you -- you've studied

7    pharmaceutical marketing?

8         A.      That's correct.  I haven't attended

9    business school for studying the marketing of

10   pharmaceutical products, but I have experience in

11   marketing pharmaceutical products.

12        Q.      What experience do you have in

13   marketing pharmaceutical products?

14        A.      For New York City's Health

15   Department, some of the first work I did on the

16   opioid crisis was to expand access to

17   buprenorphine treatment of opioid addiction in New

18   York City and being that we tried to increase the

19   number of doctors eligible to prescribe

20   buprenorphine and we actually conducted a Health

21   Department detailing program, very similar to the

22   type of detailing program a pharmaceutical company

23   would do where we came up with our own materials

24   and had Health Department staff, visiting doctors,

25   trying to get them to take the trading and get

1    them more engaged in prescribing buprenorphine for

2    the treatment of opioid addiction.  A term for

3    that might be academic detailing.  So I led an

4    academic detailing campaign of a pharmaceutical

5    product.

6         Q.    So you were calling on doctors to try

7    to explain the attributes and characteristics

8    of buprenorphine?

9         A.    Yeah.  Not myself.  I led the

10   initiative.  It was Health Department staff that

11   was -- visiting doctors.  I gave talks on the

12   topic for medical clinics and medical groups in

13   the City.  So yeah, it was individuals and it was

14   also communities and clinics that we tried to get

15   the medical community engaged in treating opioid

16   addiction with buprenorphine.

17        Q.    Was the idea that by calling on the

18   doctors and explaining the attributes of the

19   products that you would be able to increase the

20   prescribing behavior by doctors?

21        A.    That was part of it.  But really, the

22   first thing we had to do was get them interested

23   in treating addiction and getting -- for

24   buprenorphine, you've got this barrier in that

25   doctors need to take an eight-hour class and then

Page 201

1    apply to the federal government for a waiver in

2    order to treat opioid addiction with

3    buprenorphine.  So we had to try to get them all

4    the way through that process so that we could

5    increase capacity for treating opioid addiction.

6                    (Whereupon, Exhibit 21 was marked for

7         identification.)

8         Q.     Let me ask you to look at Exhibit 21

9    in your stack.  This is another one you need to

10   open.  So this is a document we've premarked as

11   Exhibit 21.  It's from the AMA Journal of Ethics,

12   August 2020, written by none other than Andrew

13   Kolodny, M.D.

14                  I assume you are familiar with this?

15        A.     Yes.

16        Q.     Let me ask you to turn to page 744.

17   It's the second page of the document, I think.

18                  You say, at the top of the page, the

19   first full sentence, "Opioid manufacturers

20   disseminated false claims regarding the risks and

21   benefits of opioids."

22                  Do you see that?

23        A.     Which page are you on?

24        Q.     Second page of the document.  I

25   believe it's 744.

Page 202

1          A.       The first full sentence starts with

2     the word "but."

3          Q.       Right, right, right and I was taking

4     a -- I'm happy to read the whole thing.

5                   "But the fact that opioid

6     manufacturers disseminated false claims regarding

7     the risks and benefits" -- that's what I wanted to

8     focus you on.

9          A.       Yes.

10         Q.       So here, you're talking about opioid

11    manufacturers that disseminated false claims

12    regarding the risks and benefits of opioids,

13    right?

14         A.       That's correct.

15         Q.       And what were the opioid

16    manufacturers doing to disseminate false claims

17    regarding risks and benefits?

18                  MS. DICKINSON:  Objection to form.

19         A.       Well, the opioid industry, which

20    includes the distributors, really communicated in

21    a variety of ways to health professionals that

22    opioids are normal and acceptable for long-term

23    use for conditions where we shouldn't use them.

24    Some of the false messages were to downplay the

25    risk of addiction, to exaggerate the effectiveness

Page 203

1    of long-term use, to promote the notion that there

2    should be no ceiling on the dose and you should

3    prescribe as much as people could possibly want,

4    to promote the idea that if a patient looked like

5    they were addicted, that you should -- that

6    they're probably not addicted, it's something

7    called pseudoaddiction, you should give them an

8    even higher dose.

9              There were a variety of

10   misrepresentations and these were communicated to

11   the medical community, to health professionals,

12   including pharmacists, from many different

13   avenues, from professional societies to front

14   groups to -- even government bodies that had been

15   influenced by this campaign often communicated

16   some of these messages, so that from every

17   direction, we're hearing we need to prescribe more

18   opioids.

19        Q.      And your point is that it, in your

20   view, understated the risks and overstated the

21   benefits of opioids; is that right?

22        A.      Yes.

23        Q.      And in your letter here or in your

24   paper here, you refer to opioid manufacturers,

25   correct?

Page 204

1        A.       Yes.

2        Q.       And then later in the same page you

3    refer to false marketing claims by opioid

4    manufacturers.

5                 If you look into the third paragraph

6    under regulatory failures, you're referring to --

7        A.       Yes.

8        Q.       So these, again, you're referring

9    there to marketing claims by opioid manufacturers?

10       A.       That is correct.

11       Q.       And are those marketing claims

12   involving the risks and benefits of opioids?  Is

13   that what the false marketing claims are?

14       A.       Mostly, yes.

15       Q.       And were those false marketing claims

16   being made to prescribers?  In other words,

17   doctors and others involved in the prescribing

18   activities?  Is that your point?

19       A.       It represents pharmacists and nurses

20   and the public.  Every possible way of influencing

21   or increasing the likelihood that a patient would

22   wind up taking an opioid was part of this

23   campaign.

24                 I just want to point out that this

25   paper was published August 1st, I think, but I

1    wrote it earlier in the year and I wrote this

2    before I was aware of the role that distributors

3    were playing in promoting and marketing.  That was

4    something that I've only recently learned about.

5         Q.      When did you learn about activities

6    by distributors?

7         A.      I began learning about their failures

8    as DEA registrants going back a while.  But in

9    terms of learning that they sold a suite of

10   services to manufacturers to help them market and

11   promote opioids, that was information I learned

12   through working on the litigation and documents

13   that initially became available to me from

14   attorneys working on the case.

15        Q.      So attorneys working on this

16   litigation supplied you with documents that

17   caused you to develop a view about distributor

18   marketing?

19        A.      Yes, documents that really, in some

20   case, caused my jaw to draw.  Because again, while

21   I had been very aware that distributors were

22   failing in their responsibilities as DEA

23   registrants and contributing substantially to the

24   opioid crisis because of that failure, I didn't --

25   I was more or less falling for the argument that

Page 206

1    all the distributors do is drive the truck which I

2    knew was not a reasonable argument, but I thought,

3    you know, they supplied the pharmacies, they

4    supplied pharmacy they shouldn't supply, but I

5    didn't realize that they also promoted and

6    marketed and that was information that was made

7    available to me by attorneys working on this case.

8        Q.    You said you wrote this paper earlier

9    in 2020?

10       A.    Yes.

11       Q.    When did you write it?

12       A.    I probably began working on it maybe

13   even late 2019.  Maybe December of last year,

14   January of this year.

15       Q.    So this knowledge about distributor's

16   activity in relation to marketing that you're

17   referring to is information you learned in the

18   past year from reading documents?

19       A.    Yes.  From documents that were made

20   available to me and to -- yes.

21       Q.    Before those documents were made

22   available to you, you had no knowledge about

23   distributors marketing?

24       A.    Correct.  I didn't know that

25   distributors promoted and marketed and advertised.

Page 207

1    I didn't -- yes, that's correct.

2         Q.      So in this letter, you're talking

3    only about marketing claims made by opioid

4    manufacturers, right?

5         A.      So this is an article focused on the

6    FDA and its failure to properly regulate opioid

7    manufacturers, so that's what this is focused on.

8    So I don't believe it really regulates distributor

9    marketing.  I could be wrong about that.  But that

10   it what this -- this is focused on and so it's not

11   really so much about marketing as it is about

12   regulation of claims of safety and efficacy.

13        Q.      Your point is you didn't learn

14   anything about distributor marketing related to

15   opioids until after you wrote this paper?

16        A.      That's correct.

17        Q.      And what you have learned came has

18   from documents that were supplied to you by

19   counsel?

20        A.      And documents that I found on my own

21   going into the discovery database.

22        Q.      So you went into the discovery

23   database and searched for documents?

24        A.      Yes, I did.

25        Q.      You had no knowledge of any of this

Page 208

1    before you became an expert in the litigation?

2              MS. DICKINSON:  Objection to form.

3         A.    That's correct.  I had no idea that

4    distributors marketed, promoted, advertised

5    opioids before the litigation.

6         Q.    Let me ask you to look at Exhibit 15,

7    please.

8         A.    I'm sorry?

9         Q.    Exhibit 15.  This one we have to

10   open.

11        A.    Got it.

12              (Whereupon, Exhibit 15 was marked for

13        identification.)

14        Q.    This is a document we premarked as

15   Exhibit 15.  It's written by Scott Hadland and

16   others, entitled "Association of Pharmaceutical

17   Industry Marketing of Opioid Products with

18   Mortality from Opioid-Related Overdoses."

19        A.    Yes.

20        Q.    Have you seen this before?

21        A.    I have.

22        Q.    Let me ask you to look at page two,

23   please, of the document, which is -- yeah, it is

24   page two of the document.

25        A.    Got it.

Page 209

1      Q.      Do you see the statement in the

2   middle of the second paragraph is what I wanted to

3   focus you on, under "Introduction."

4              There's a sentence that reads

5   "Direct-to-physician marketing by pharmaceutical

6   companies is widespread in the United States."

7              Do you see that?

8      A.      I do.

9      Q.      What's your understanding of

10  direct-to-physician marketing?

11     A.      That would be communications from

12  manufacturers directly to physicians through sales

13  representatives or materials that are sent

14  directly to a physician.

15     Q.      And the example you gave a few

16  minutes ago of a project you were involved in with

17  buprenorphine -- sorry, I have trouble pronouncing

18  that -- but the example you gave was a form of

19  direct-to-physician marketing, correct?

20     A.      Yes, it was part of -- yes, a very

21  big part of our initiative was direct-to-physician

22  marketing.  Academic detailing is the term when

23  you're not trying to make a profit off of a

24  product, but trying to improve public health.

25     Q.      Is it your understanding that

Page 210

1    pharmaceutical manufacturers are the entities that

2    engage in direct-to-physician marketing?

3                 MS. DICKINSON:  Objection to form.

4         A.      I don't know whether one might

5    consider placing journal articles for physicians

6    to read direct-to-physician, so that -- or CME

7    events could, in theory, be considered direct -- I

8    guess that would be considered indirect because

9    usually there's a CME provider.  But

10   direct-to-physician could include more than a

11   sales rep visiting a doctor or a material mailed

12   directly to a doctor.

13        Q.      Well, let's talk about sales reps

14   calling directly on doctors to prescribe

15   particular products.

16                Am I right that that's typically

17   engaged in by pharmaceutical manufacturers?

18        A.      Sometimes jointly with distributors.

19   So for example, there's evidence that I reviewed

20   from discovery indicating that -- with regard to

21   opioids -- that the campaign in the community

22   increased prescribing would involve telemarketing

23   or sales reps for the companies also visiting the

24   pharmacies while distributors are calling those

25   pharmacies or sending materials to those

Page 211

1    pharmacies.

2              It's a coordinated campaign that

3    involves the distributors, not just the

4    manufacturers.

5         Q.        I'm sorry.  Go ahead.

6         A.        To answer your question, on this

7    team, to increase prescribing, the staff for the

8    manufacturer are the ones visiting the doctor.

9    That's the role played by the staff.  But on that

10   team, meaning engaged in an effort to directly

11   market to prescribers, distributors are on that

12   team.

13        Q.        What I wanted to focus on is calling

14   doctors directly.

15             Is it your understanding that that's

16   done by manufacturers?  Manufacturers call on

17   doctors to prescribe particular products?

18        A.        So on this team, to increase the

19   sales to sell more opioids, different players on

20   the team have their role.  The role of visiting

21   doctors, the staff who do that, they work for the

22   manufacturer.

23        Q.        And is it that staff that is

24   responsible for describing the attributes and

25   characteristics of the product to individual

Page 212

1    doctors?

2              MS. DICKINSON:  Objection to form.

3         A.     The player on this team to increase

4    sales that talks to the doctors and promotes the

5    product directly in a conversation with the

6    doctor, that would be a staff person working for a

7    manufacturer.

8         Q.     Am I right that in the industry

9    manufacturers are the ones who provide the

10   information to individual doctors about the

11   attributes and characteristics of particular

12   drugs?

13             MS. DICKINSON:  Objection to form.

14        A.     Manufacturers can do that directly

15   through sales reps or those messages can be

16   communicated indirectly to prescribers through a

17   variety of mechanisms that in some cases involve

18   distributors, like distributors running services

19   to publish journal articles that a doctor wants to

20   read that can have deceptive information in them.

21   But the visiting of the doctor -- again, the

22   marketing to the doctor involves more than just a

23   sales rep visiting that doctor.  Much more.

24             But when we're talking about somebody

25   visiting that doctor in their office, that role is

Page 213

1  played by somebody who works for a manufacturer.

2      Q.      And it's the manufacturer or their

3  representatives that provide the specific

4  information to the doctor about the risks and

5  benefits of particular drugs, correct?

6              MS. DICKINSON:  Objection to form.

7      A.      If we're talking about one way in

8  which there is marketing to doctors, that way that

9  it involves a sales rep visiting the doctor, yes,

10  but there are other ways of communicating

11  misinformation about opioids to prescribers that

12  are not necessarily a manufacturer, but are

13  actually a distributor.

14      Q.      The information that was developed

15  about the risks and benefits of opioids through

16  clinical study, that was developed by

17  manufacturers, right?

18              MS. DICKINSON:  Objection to form.

19      A.      I'm sorry.  Could you ask that

20  question one more time please?

21      Q.      Yes.  I didn't ask it that well.

22              The information that was developed

23  about the addictive properties and the risks and

24  benefits of opioids was developed by manufacturers

25  through clinical trials, correct?

Page 214

1      A.      Not really.  What we know about the
2  addictive nature of opioids, what really -- what
3  we -- the scientific understanding about opioids,
4  their risks and benefits, hasn't really come from
5  the clinical trials that were conducted by drug
6  companies.  It's come from medical research going
7  back decades.
8      Q.      So if you look back at your Exhibit
9  21, which is the paper you wrote, if you look at
10  the second page, 744, where you refer to false
11  claims regarding the risks and benefits of
12  opioid -- sorry, I don't mean to rush you.
13      A.      I found it.  Okay.  I got it.
14      Q.      I'm on that second page again.  It's
15  744.
16          Where you refer to false claims
17  regarding the risks and benefits of opioids, I
18  take it that information had to be developed on
19  the risks and benefits of opioids?  Somebody
20  developed a body of knowledge?  Whether it was
21  correct knowledge or incorrect knowledge, somebody
22  developed a body of knowledge on that, right?
23      A.      Not really.
24      Q.      How did they disseminate false claims
25  regarding the risks and benefits?  Did they have

Page 215

1   any data to support it?

2                   MS. DICKINSON:  Objection to form.

3        A.       In many cases, no, that's --

4        Q.       Let me take you back to the

5   discussion about Purdue.  Let's look at the bottom

6   of 744 and the top of 745.

7                   There's a reference at the very

8   bottom of 744 to the label on oxycodone that had a

9   broad indication, allowing Purdue to promote the

10  drugs used for common conditions.  Do you see

11  that?  Purdue developed the claims for the label

12  for Oxycontin, right?

13                  MS. DICKINSON:  Objection to form.

14       A.       Purdue wrote the label and it was

15  ultimately approved by FDA.  It would be changed

16  many times over the years, but Purdue wrote that

17  label.  That's correct.

18       Q.       And then that label then became the

19  basis for claims about the risks and benefits of

20  opioids, right?

21                  MS. DICKINSON:  Objection to form.

22       A.       Some of the claims came from that

23  label, but there were false claims made or

24  misrepresentations made that were unrelated to the

25  language on the label.

Page 216

1          Q.       That was conduct that Purdue engaged

2      in?

3          A.       Purdue engaged in that conduct, as

4      did others and --

5          Q.       Sorry.  Go ahead.

6          A.       Purdue did engage in that conduct, as

7      did other companies, as did third parties, as did

8      key opinion leaders, as did many well-meaning

9      clinicians and teachers who were believing these

10     messages.

11         Q.       And the -- when we talk about --

12     strike that.

13                  One of the points you had made is

14     your view that the medical community was misled by

15     representations about the risks and the benefits

16     of opioids.

17                  Is that a fair characterization of

18     your view?

19         A.       Yes.

20         Q.       And in particular, individual

21     doctors, in your view, were misled about the risks

22     and benefits of opioids, right?

23         A.       Yes.

24         Q.       And that information about the risks

25     and the benefits of opioids was conveyed to

Page 217

1    doctors through this direct-to-physician marketing

2    by manufacturers, right?

3         A.      One way in which it was communicated.

4    There were many ways in which communications were

5    communicated and not just to doctors, but to the

6    medical community, including pharmacists.

7         Q.      The distributors -- the customers for

8    distributors are pharmacies, right?

9                 MS. DICKINSON:  Objection to form.

10        A.      Yes.  Well, I mean customers of

11   distributors include pharmacies.  Hospitals are

12   also customers of distributors.  In some cases,

13   physician practices order products directly from

14   distributors, but the customers of distributors

15   include pharmacies.

16        Q.      And pharmacies do not engage in

17   direct-to-physician marketing; is that right?

18                MS. DICKINSON:  Objection to form.

19        A.      That's a hard one.  I'm not -- I'm

20   not sure.  There could be some marketing to

21   prescribers by pharmacies.  I'm not certain about

22   that.  I'd have to think more about it.

23        Q.      Distributors do not engage in

24   direct-to-physician marketing; is that right?

25                MS. DICKINSON:  Objection to form.

Page 218

```
 1        A.      It depends a little bit on how you
 2   would define direct to physician.  If you would
 3   include in that definition journal articles or CME
 4   events, then the answer would be yes because
 5   distributors have been involved in producing
 6   deceptive journal articles as well as sponsoring
 7   medical education for clinicians.
 8        Q.      I was talking about calling directly
 9   on physicians.
10              Distributors don't do that, right?
11        A.      I don't believe that distributors
12   visit doctors in their offices and encourage them
13   to prescribe specific products.  On the team to
14   increase sales, that position is played by
15   manufacturers.
16        Q.      Let me ask you -- let's switch gears
17   a little bit.
18              Your report starts off with a
19   reference to a definition out of the restatement
20   of torts, right?
21        A.      Yes, it does.
22        Q.      And I take it -- again, we've
23   discussed this already -- your field of expertise
24   is not law practice?
25        A.      Correct.  I'm not a lawyer.
```

Page 219

1        Q.        You may be happy about that.

2                  Have you read the restatement second

3    of torts or the restatement third of torts?

4                  MS. DICKINSON:  Objection to form.

5        A.        I read the legal definition of public

6    nuisance that's in my report.

7        Q.        Who supplied that to you?

8        A.        Attorneys that I've been working

9    with, I asked them for that.

10       Q.        Had you ever seen that definition

11   before it was supplied to you?

12       A.        I'm not sure.  I had an understanding

13   of public nuisance before this was supplied to me.

14       Q.        I'm sorry.  Go ahead.

15       A.        I'm not sure if I had seen that

16   definition.

17       Q.        Have you looked at any case law that

18   defines the nature of public rights for purposes

19   of evaluating a public nuisance?

20       A.        I have not studied case law.

21       Q.        So you haven't looked at any cases on

22   the scope of public nuisance law?

23       A.        My familiarity with a particular case

24   involving application of public nuisance to opioid

25   litigation, but I haven't studied case law on this

Page 220

1    topic.

2         Q.      That's the Jansen case where you

3    testified as a witness?

4         A.      Correct.

5         Q.      Have you looked at any examples under

6    West Virginia law involving the application of

7    public nuisance to the distribution of a product?

8         A.      I haven't studied cases of public

9    nuisance.

10                MR. HESTER:  Okay.  Let me pause for

11        a second.

12                Am I just about at five hours of my

13        time?

14                THE VIDEOGRAPHER:  Yes.  I wanted to

15        say, Tim, you are at four hours and 56

16        minutes.

17                MR. HESTER:  How about that?  That's

18        pretty good.

19                Okay.  Let me just check one more

20        thing.

21                THE VIDEOGRAPHER:  We'll go off the

22        record for a second?

23                MR. HESTER:  Yes.  Why don't we go

24        off the record for a minute?

25                Could I just consult with my

1      colleagues briefly, Dr. Kolodny?  Maybe we

2      could take a five-minute break?  Is that okay

3      by you?

4              MS. DICKINSON:  Yes.  Why don't we

5      take a break if we're going to do that?

6              MR. HESTER:  Yes, let's do that.

7              MS. DICKINSON:  All right.  Let's

8      take five.

9              MR. HESTER:  Can we come back --

10      let's come back -- we'll even be more

11      generous than five.  We'll come back at 3:15.

12              Is that okay?

13              THE WITNESS:  That's fine.  That

14      sounds good.

15              MR. HESTER:  Okay.  Thank you.

16              THE VIDEOGRAPHER:  The time is 3:07.

17              We are now off the record.

18              (Recess taken)

19              THE VIDEOGRAPHER:  The time is 3:18.

20              We are now back on the record.

21      Q.      Dr. Kolodny, are there any particular

22  false claims that were made by distributors in

23  relation to marketing of prescription opioids that

24  you have identified?

25              MS. DICKINSON:  Objection to form.

Page 222

1      A.      Yes.

2      Q.      What are those?

3              MS. DICKINSON:  Objection to form.

4      A.      So I'd have to go through my report

5    to come up with multiple examples, but I'll give

6    you just one example off the top of my head was

7    part of a promotion by a distributor to pharmacies

8    for a hydrocodone combination product.  I think

9    this was advertising a rebate and it was for

10   hydrocodone -- a generic hydrocodone product, but

11   I guess it had a name called Stagesic and it said

12   on that promotional material "Has no street value!

13   Drug dealers and abusers don't trust capsules."

14           I've been working on the opioid

15   crisis for many years.  I've treated many people

16   who are opioid addicted.  The idea that by putting

17   hydrocodone in a capsule form that it has no

18   street value is just a -- totally false, but that

19   was on a communication to a pharmacy by a drug

20   distributor as part of a promotion.  That's one

21   example.

22           I can actually think of some other

23   examples off the top of my head, if you'd like.

24     Q.      What other ones do you have in mind?

25     A.      Another example would be journal

Page 223

1   articles that had misrepresentations about opioids

2   in them that overstated opioid benefits --

3   basically, exactly what we've described -- and

4   this was an article that was placed in a medical

5   journal by a subsidiary of a distributor after

6   receiving a payment from Teva Pharmaceuticals and

7   in fact, this distributor company staff

8   co-authored and were first author on that article.

9            And there are many examples of

10  distributors involvement in the normalization of

11  using opioids for conditions where we shouldn't

12  use opioids and examples of communications to

13  pharmacists that would have suggested that being

14  on opioids chronically is something appropriate.

15           Many distributors -- not many, but I

16  think all of the big three had promotions where or

17  participated in free drugs for patients where

18  there's no co-pay for opioids long term, which I

19  think sends a message that it's normal to be on

20  opioids long term and there are others like

21  patient adherence programs.

22           Patience adherence programs that

23  distributors were involved in suggest that

24  patients should be adhering to opioids long term

25  when the message for patients who are on opioids

Page 224

1     is really take the lowest possibly dose for the

2     shortest period of time.  The idea that a

3     distributor would promote adherence to chronic

4     opioid therapy is really sending a message of

5     normalizing a practice that's not normal.  It's

6     not okay to be on opioids long term for low back

7     pain or chronic headache.

8                    There are other examples, if you give

9     me a moment to -- I'm sure I can come up with

10    them.

11         Q.     So let me ask you about a few of the

12    examples you gave.

13                    So the journal article that you said

14    overstated the benefits or understated the

15    addiction risk, you said that was placed in a

16    journal after a payment by Teva Pharmaceuticals?

17         A.      That's correct.  I don't know that

18    that -- I'd have to look at that article again to

19    see if it minimized risk of addiction.  It had

20    misinformation about opioids.  It exaggerated

21    their benefit.  It implied that -- actually, maybe

22    even explicitly stated that opioids

23    are appropriate for long term care.

24         Q.     Do you know whether the content of

25    those statements -- the content in those

Page 225

1    statements -- came from Teva?

2         A.      Teva -- in part, Teva was -- staff

3    for Teva were a co-author of this paper.  Another

4    co-author of that paper was staff for a

5    distributor.

6         Q.      But do you know who supplied the

7    content about those statements on the addictive

8    risks of the opioids?

9                 MS. DICKINSON:  Objection.

10        A.      The journal article had authors and I

11   believe the authors of the journal article are

12   responsible for the content of that article and

13   among the authors included staff for Teva, staff

14   for a distributor and an academic who works for

15   opioid manufacturers.

16        Q.      When was that journal article

17   published roughly?

18                MS. DICKINSON:  Objection to form.

19        A.      I'd have to look.  I'd rather not

20   guess.  We have the article somewhere here, so ...

21        Q.      So the first one that you mentioned,

22   the promotion to pharmacies for hydrocodone about

23   whether the product had street value, do you know

24   who supplied that content?  Who had that content

25   that was then disseminated to the pharmacy?

Page 226

1          A.      I don't know.  I don't know who came

2      up with that content.  What I know is that a

3      distributor disseminated a blatantly false

4      statement about hydrocodone, stating it has no --

5      this particular formulation of hydrocodone has "no

6      street value!"

7          Q.      Do you know what that was done,

8      roughly what year?

9                  MS. DICKINSON:  Objection to form.

10         A.      I don't recall the date.  I could

11     probably figure it out if I went through my expert

12     report.

13         Q.      You mentioned the patience adherence

14     programs.

15                 Do you understand that those apply

16     broadly across all prescriptions that are serviced

17     at a particular pharmacy?

18                 MS. DICKINSON:  Objection to form.

19         A.      Yes, I do and I think for some

20     classes of drug an adherence program could

21     potentially be a thing.  For example, if there are

22     patients with serious mental illness who have poor

23     adherence to their medication for schizophrenia, a

24     program that improves adherence is potentially

25     very helpful.

Page 227

1              There are medical problems where if

2      patients don't adhere, they can have a serious

3      medical condition, like a stroke.  So you want

4      good adherence to anti-hypertensives.

5              Opioids are not a drug that for which

6      we should have an adherence program.  The message

7      that should be communicated to a patient on

8      opioids is don't take this opioid if you don't

9      absolutely need to take it, take the lowest

10     possibly dose for the shortest period of time.

11             Any kind of coaching or adherence

12     program designed to get that patient to continue

13     taking the opioid is likely to be harmful for the

14     patient.

15        Q.     The adherence program only applies if

16     the patient had a prescription from a doctor,

17     right?

18        A.     I would imagine so.

19        Q.     Let me ask you to turn to your

20     report, page 50.

21        A.     Yes.

22        Q.     Here, you're discussing some lobbying

23     activities, right?  Do you see this?

24             You're talking about the HDA and --

25        A.     Yes.

Page 228

1      Q.      Have you had any involvement in

2  lobbying work yourself?

3      A.      I've been involved in advocacy work,

4  which I don't think is generally considered

5  lobbying because the advocacy that I've been

6  involved in has been for federal regulation of

7  manufacturers.  So I would call that advocacy, not

8  lobbying.  Lobbying, I think, is when you're

9  trying to -- I think the definition would apply to

10 legislation and I think I maybe had a little bit

11 of experience with lobbying for legislation, but

12 not much.

13     Q.      And you're not generally familiar

14 with the way lobbying takes place in Washington,

15 are you?

16     A.      Oh, I'm very familiar with the way

17 lobbying actively takes place in Washington.

18     Q.      How do you know about that?

19     A.      Because I've had staff from

20 congressional offices contact me because of

21 lobbying activities.  I've had actually even a

22 staff person for the DEA contact me when

23 distributors were trying to get the Insuring

24 Patient Access Act passed, the Blackburn Marino

25 bill and I've -- in terms of my work on the opioid

Page 229

1    crisis and the role that the opioid industry has

2    played in trying to preserve a status quo of

3    aggressive prescribing, I've been very familiar

4    for many years with their activities, including

5    opioid distributors.

6         Q.    The knowledge that you have of the

7    Pain Care Forum, where does that come from?

8         A.    Some of that comes firsthand.  I met

9    with the Pain Care Forum.

10        Q.    You met because they wanted you to be

11   a speaker once?

12        A.    No, I wanted to talk with them.  I

13   was involved in an effort that I believe that

14   would result in much more cautious opioid

15   prescribing and we were at the height of opioid

16   prescribing in the United States and I was

17   concerned that the forum and its members were

18   going to try and interfere with this effort, so I

19   reached out to a Pain Care Forum member for an

20   opportunity to speak with the group.

21             I didn't think that I would be able

22   to convince all of the members of Pain Care Forum

23   to not fight against this.  I thought maybe I

24   could get some to at least sit on the sidelines

25   and not work against our effort.  I knew none

1    would support it.  So that's why I reached out and

2    requested an opportunity to meet with the Pain

3    Care Forum.

4         Q.     So you had one meeting with them?

5         A.     That's correct.  I had one meeting

6    with them.  I was aware of them before that

7    meeting and I've certainly been aware of them

8    since.

9         Q.     And how have you learned of their

10   activities?

11        A.     I first learned about the Pain Care

12   Forum from federal employees who had been invited

13   to meet with the Pain Care Forum because the Pain

14   Care Forum was attempting to lobby them.

15        Q.     Have you read deposition testimony or

16   documents about the Pain Care Forum?

17        A.     I have.

18        Q.     Do you have knowledge about the Pain

19   Care Forum based on any other interactions with

20   them aside from what you've described?

21        A.     My knowledge of the Pain Care Forum,

22   besides my personal direct interaction with them,

23   comes from what I learned about the Pain Care

24   Forum through discovery documents, through

25   conversations with federal employees who met with

Page 231

1    the Pain Care Forum and through the work of

2    investigative journalists on the role of the Pain

3    Care Forum, playing both on a federal and state

4    level and possibly other sources.

5           Q.    Let me ask you to look at page 96 of

6    your report, please.

7                 Do you have it there?

8           A.    I do.

9           Q.    So in the top paragraph on the page,

10   you refer to the Marino Bill.

11                Do you see that?

12          A.    I do.

13          Q.    Did you read the bill as it was

14   ultimately enacted?

15          A.    I have read that bill.

16          Q.    And have you read the amendments?

17          A.    Probably.  I can't remember them at

18   this point, but I believe I have.

19          Q.    Do you remember when you read them?

20          A.    No.

21          Q.    Was it within the past year?  Was it

22   for purposes of this work?

23          A.    Yes.  It would have been in the past

24   year that I would have looked at it.

25          Q.    And you would have looked at it for

Page 232

1    purposes of this expert work you're doing in the

2    litigation?

3         A.      Well, I was interested in the Marino

4    Bill before there was -- before I was involved in

5    any litigation.  My interests and the first time I

6    began learning about it was when I got a call from

7    a DEA staffer, who I believe at the time was

8    working in a congressional office as a liaison to

9    that congressional office, and informed me about

10   this bill and was very concerned that it could

11   pass.  I didn't think it possibly could.

12              At a time when Congress was really

13   beginning to pay attention finally to the opioid

14   crisis, the idea that legislation could be

15   introduced that would weaken the DEA, I never

16   believed that could be possible.  That's when I

17   first learned about it, that's when I first read

18   the bill.  I think more recently, during the

19   course of my work on the litigation, I looked at

20   the legislation again.

21        Q.      Okay.

22              Let me ask you about one of your

23   opinions, which is summarized, I think, at the

24   front end where you talk about the refusal of

25   defendants to take responsibility for the opioid

Page 233

1    epidemic.

2                Are you generally familiar with your

3    opinions on that?

4         A.      Yes.

5         Q.      This idea of refusal to take

6    responsibility, would you apply that to others who

7    have been involved in the opioid epidemic?

8                MS. DICKINSON:  Objection to form.

9         A.      Yes, I think there are other opioid

10   industry players that haven't taken

11   responsibility.  It's not just distributors.

12        Q.      That would include the FDA?

13        A.      It's interesting.  For some of the

14   government failures, I see it a little

15   differently, but there's -- yes, I think that the

16   FDA has made mistakes that have contributed to the

17   epidemic that they haven't taken responsibility

18   for.  So I do think there's a fair amount of blame

19   to go around.

20        Q.      That would include DEA as another

21   player?

22                MS. DICKINSON:  Objection to form.

23        A.      I think that the DEA could have done

24   a better job.  I don't know -- you know, if you're

25   asking me to apportion blame, that's very

Page 234

1    difficult to do.  I think that in terms of federal

2    agencies, I think some of the FDA's failures were

3    more significant than the DEA's failures, but both

4    in the case of DEA and FDA, it's very difficult

5    when you're a regulator with limited staff

6    regulating powerful industries.

7                  In the case of the DEA, there are

8    millions of DEA registrants that they're required

9    to regulate and so I think with better funding,

10   richer staffing, the agencies may have been

11   able to -- would have been able to do a better

12   job.  So I do think there's blame to go around.

13                  I think one of the differences here

14   is that I wouldn't say that the FDA or DEA's

15   failures were driven by greed, which I would say

16   is true for the opioid --

17        Q.       When you talk about blame going

18   around, I take it you would include manufacturers

19   of opioids as some of the players that you would

20   see as blameworthy for the opioid epidemic?

21        A.       Yes.  And I think the opioid

22   industry, which included -- includes distributors

23   and manufacturers.

24        Q.       So you would specifically say

25   manufacturers would be one set of players that you

Page 235

1    would see as worthy of blame in relation to the

2    opioid epidemic?

3                    MS. DICKINSON:  Objection to form.

4        A.      Yes.

5        Q.      Would you agree that pharmacies are

6    worthy of blame for the opioid epidemic?

7                    MS. DICKINSON:  Objection to form.

8        A.      I think there are bad actors.  There

9    were dirty pharmacies, dirty doctors and because

10   they failed or because they were greedy, many

11   people were harmed.  In terms of apportioning

12   blame, I just see them as small fish.  The big

13   fish were the companies that were selling millions

14   of pills, billions of MMEs, that were really

15   responsible for flooding communities with opioids

16   and that wasn't the pharmacies and/or the dirty

17   doctors.

18       Q.      You speak about this idea of refusing

19   to take responsibility.

20                   I take it you're not an expert in

21   corporate social responsibility, right?

22                   MS. DICKINSON:  Objection to form.

23       A.      You know, I have an interest and I

24   think some expertise in the field of corporate

25   determinants of health, which I think ties in

Page 236

1    with -- is related to the field of corporate

2    responsibility.

3         Q.      But you're not an expert in corporate

4    social responsibility, are you?

5                 MS. DICKINSON:  Objection to form.

6         A.      I have not published on that topic or

7    researched corporate responsibility.  I have

8    researched the way in which corporations, through

9    their pursuit of profit, have been responsible for

10   public health catastrophe.

11        Q.      So this point that you make about

12   failure to take social responsibility or personal

13   responsibility, this is based on your personal

14   view of what you think they should have done,

15   right?

16                MS. DICKINSON:  Objection to form.

17        A.      I'm sorry.  Are you asking me what my

18   personal view is?

19        Q.      No, I'm asking what's your basis for

20   saying that companies failed to take

21   responsibility for their actions?  How do you form

22   your view?

23        A.      Look at what happened in West

24   Virginia.  Read the deposition of the mayor, the

25   fire chief or the police officer from Huntington

Page 237

1    or Cabell.  The devastation that occurred in these

2    communities where millions of pills flowed into

3    these communities, billions of MMEs.  You have

4    corporations that reaped enormous profits while a

5    public health catastrophe was occurring in these

6    communities.

7              So that -- there's overwhelming

8    evidence that these companies could have done the

9    right thing, could have prevented this from

10   happening and instead profited enormously off of

11   what was occurring and they were aware of what was

12   happening.  The whole country was aware of what

13   was happening in Appalachia with prescription

14   opioids and yet they continued to flood these

15   communities.  So I don't think that -- I don't

16   think any special expertise is required to say

17   that what happened here was awful and should never

18   happen again.

19        Q.      And when you say that no special

20   expertise is required, what benchmarks are you

21   looking at to decide that they should have taken

22   responsibility?  What benchmarks are you applying?

23              MS. DICKINSON:  Objection to form.

24        A.      Death toll.  I'm looking at the -- in

25   the State of West Virginia, probably tens of

Page 238

1    thousands or hundreds of thousands of people

2    became addicted.  I'm talking about parents who

3    lost children, children who lost parents.  We have

4    testimony from, I believe, an EMS worker about

5    coming to the scene of an overdose where a child

6    was crying because the parents have overdosed and

7    the child doesn't understand what's going on.

8              There's overwhelming evidence that

9    West Virginia has suffered at the hands of these

10   corporations that could have prevented this and

11   the CEOs for the defendants in this case really

12   apologized before Congress.

13        Q.    So you're reading -- you're reading

14   the deposition testimony and the CEO statements

15   and forming this view?

16              MS. DICKINSON:  Objection to form.

17              Lacks foundation.

18        A.    My view is, in part, informed by the

19   testimony from people in the county and from the

20   testimony of the defending CEOs and from my own

21   firsthand clinical experience, experience working

22   in West Virginia or speaking in West Virginia, my

23   research on the opioid crisis.

24              All of these factors informed my

25   opinion that the defendants in this case and that

Page 239

1    the opioid industry in their pursuit of profit is

2    responsible for millions of cases of addiction and

3    thousands of deaths.

4         Q.       Are you taking account also, Dr.

5    Kolodny, in your views of benefits achieved from

6    reduction of pain for people who are in pain?  Do

7    you take that into account?

8         A.       I appreciate the question, but

9    despite the enormous public health harms that

10   resulted from flooding communities with opioids,

11   we don't have one good piece of evidence that this

12   flood of opioids had led to improvements and

13   treatment of pain.

14             In fact, it's the opposite.  We're

15   doing a worse job of treating pain by

16   overprescribing opioids.  In fact, patients with

17   chronic pain have been disproportionately harmed

18   by aggressive prescribing of opioids, so you'd

19   like to think that with this enormous public

20   health price that we paid, maybe there was some

21   benefit.  No evidence that I'm aware of of America

22   doing a better job of treating pain than in

23   countries where opioids are prescribed cautiously.

24        Q.       Have you consulted any standards on

25   corporate social responsibility in forming your

Page 240

1   views or it's really based on these judgments you

2   just described?

3                MS. DICKINSON:  Objection to form.

4        A.       I reviewed corporate integrity

5   statements for defendants in opioid litigation.  I

6   have seen statements in some of these documents to

7   the effect that as responsible corporate citizens,

8   we don't do business with criminals.  That's not

9   what I've seen.

10                I've seen that the defendants in this

11  case continued to do business with manufacturers

12  that were convicted of felonies for lying about

13  their products, continued to help them sell more

14  of their opioids.  So I've seen some of these

15  documents, but I haven't really seen the companies

16  that have these documents live up to what's in

17  them.

18       Q.       And that's -- I'm just trying to

19  understand the standards you're applying in

20  formulating your view that they had some

21  obligation to do more in terms of taking

22  responsibility.

23                What standards are you applying?

24       A.       I think I'm applying the standard of

25  what a prudent distributor of narcotics should

Page 241

1    have done.

2        Q.      And where do you develop that

3    standard on prudent distributors?  Where do you

4    get that?

5        A.      Well, I don't think you need to take

6    a class or go to -- or earn a degree on what a

7    prudent distributor of narcotics should do.

8        Q.      So when you talk about doing business

9    with companies that were cited for illegal

10   conduct -- which is another factor you mention in

11   your report, right?

12       A.      Yes.

13       Q.      Do you agree with me that -- I take

14   it one of the examples that you give is Purdue,

15   that pled guilty and that distributors continued

16   to work with; is that right?

17       A.      That's one example.

18       Q.      Teva is another?

19       A.      Yes, that's another example.

20       Q.      Do you agree with me that all of the

21   conduct for which they pled guilty was past

22   conduct?

23               MS. DICKINSON:  Objection to form.

24       Q.      In other words, at the time they pled

25   guilty, they were pleading guilty to crimes in the

Page 242

1    past?  Do you agree with me?

2         A.      I don't see how you can plead guilty

3    to crimes you haven't yet committed.

4         Q.      Yeah.  Maybe it's a truism, but I

5    want you to confirm.  It was past conduct that

6    they were pleading guilty to.  They weren't found

7    to be engaged in a current criminal activity, were

8    they?

9              MS. DICKINSON:  Objection to form.

10        A.      The cases that were built up against

11   them were based on evidence of crimes that they

12   had committed I guess when files were -- as

13   they're building the case.  What we do know is

14   that both in the case of Teva, which had Cephalon,

15   or Purdue, they were continuing to commit crimes,

16   even while pleading guilty to past crimes.

17        Q.      But the guilty pleas that were known

18   were in relation to past activities, right?

19        A.      These cases were focused on evidence

20   of crimes that had been committed in the past.

21        Q.      Am I right that the DEA and the FDA

22   and the West Virginia regulators permitted these

23   manufacturers to continue to do business after

24   their guilty pleas?

25        A.      I don't know.  Your question suggests

Page 243

1    or implies that the DEA or the FDA had the
2    authority to put them out of business after they
3    pled guilty.  I'm not sure that they have that
4    legal authority to put them out of business.
5         Q.      Are you unaware that they are
6    registrants under the DEA that have to have
7    continuing registration in order to continue to
8    distribute controlled substances?
9               MS. DICKINSON:  Objection to form.
10        A.      I understand that you -- yes, you
11   need a DEA registration.
12        Q.      And if they didn't have a DEA
13   registration, they could not have continued to
14   manufacture controlled substances, right?
15        A.      Yes, that's correct.
16        Q.      And DEA did not withdraw their
17   registrations, did it?
18        A.      I don't know that DEA would have had
19   the ability to put them out of business, out of
20   the narcotics business permanently.  I don't know
21   whether or not they had the legal ability to do
22   that.
23        Q.      Do you know whether the Justice
24   Department had the ability, if it so chose, to
25   require them to cease selling controlled

Page 244

1    substances as a condition of their guilty pleas?

2         A.        So when we talk about the DEA, I'm

3    really answering about the Department of Justice.

4    I do not know whether or not the Department of

5    Justice could have put an end to their work in the

6    narcotics business.

7         Q.        Is it your understanding they

8    continued to have the authority to sell products

9    in the United States after these guilty pleas?

10                  MS. DICKINSON:  Objection to form.

11        A.        Yes.

12        Q.        You've published, Dr. Kolodny, a

13   number of papers on the opioid crisis; is that

14   right?

15        A.        I have.

16        Q.        And have you ever published a paper

17   stating that the distributors caused the opioid

18   crisis?

19        A.        I'm not sure.  I know that I

20   testified before Congress, I think in 2018 or

21   2017.  In my testimony, I discussed both the

22   manufacturers and the distributors.

23                  But much of my work has really

24   focused on the manufacturers because it really

25   wasn't until recently in this whole crisis that

Page 245

1    the role that distributors were playing became

2    clearer.

3         Q.     And in particular, when you say more

4    recently that the role became clearer with respect

5    to distributors, that's through work you did in

6    this case during 2020?

7         A.     No.  It became clearer when

8    investigative journalists started to publish

9    Pulitzer-winning stories about West Virginia being

10   flooded with opioids and with Congress conducting

11   an investigation, so -- and that certainly was

12   when I began to pay more attention and through my

13   work on the litigation, that's when I learned a

14   whole new role that distributors had played that I

15   had been previously unaware of.

16        Q.     Let me ask you -- but going back to

17   my question about whether you published a paper

18   stating that the distributors were the cause of

19   the opioid crisis, you have not published such a

20   paper, have you?

21        A.     I have never written a paper saying

22   that the distributors caused the ultimate crisis.

23        Q.     If you were writing a paper about who

24   caused the opioid crisis, you would not identify

25   the distributors as the sole cause, would you?

1      A.      I don't think I would write a paper
2   saying that any particular entity or party was a
3   sole cause.
4      Q.      Have you done any -- have you engaged
5   in any effort to allocate the causes among
6   different sources?
7              MS. DICKINSON:  Objection to form.
8      A.      I haven't done research to try and
9   apportion blame, but if you ask me for my opinion
10  based on my understanding of the available
11  evidence, I believe the opioid industry, including
12  the distributors, bears the bulk of responsibility
13  for the opioid crisis, that the opioid industry
14  was really a primary substantial cause of the
15  epidemic and certainly -- I'm sorry.
16              Certainly if distributors had acted
17  appropriately, there would be no opioid crisis.
18  From day one, had the distributors told Purdue
19  they were not going to flood communities with
20  Oxycontin, from day one, had they done their job,
21  I don't believe we would have an opioid addiction
22  epidemic.
23     Q.      And your view is -- when you say
24  "done their job," that would have been not selling
25  Purdue products?

Page 247

1          MS. DICKINSON:  Objection to form.

2     A.        Certainly going back to 2003, when

3     the GAO publishes a report about how Purdue Pharma

4     is deceptively promoting Oxycontin for conditions

5     that it shouldn't have been prescribed, they could

6     have said at that point we're not going to carry

7     Oxycontin, we're not going to stock it.

8               Imagine how things would look

9     differently.

10    Q.        So when you say you would assign the

11    bulk of the causation or the blame to the opioid

12    industry, that includes manufacturers as well as

13    distributors in your view?

14    A.        Yes.

15    Q.        And I take it you'd also assign blame

16    or causal obligations to the medical community

17    itself?

18              MS. DICKINSON:  Objection to form.

19    A.        That's a little trickier.  I'd say

20    there are doctors who, like the corporations, were

21    driven by greed, but I think that many -- it's

22    hard to blame your average clinician who was

23    hearing from every different direction because of

24    the opioid industry's efforts that they need to be

25    prescribing much more if they're going to do the

Page 248

```
1    right thing, that if you're an enlightened
2    clinician, you'll know that addiction is extremely
3    rare, this is the compassionate way to treat just
4    about any complaint of pain.  It's hard to fault
5    the medical community when millions of dollars
6    were invested in deceiving them.
7         Q.     And the medical community believed at
8    the time that it was doing the right thing?
9                MS. DICKINSON:  Objection to form.
10        A.     I think to this day there are many
11   aggressive prescribers who think they're doing the
12   right thing because they were deceived.
13        Q.     And would you also agree with me that
14   drug cartels and criminals dealing in heroin and
15   illicit fentanyl contributed to the opioid crisis?
16               MS. DICKINSON:  Objection to form.
17        A.     I would say that they contributed to
18   the death toll.  I think that the very sharp
19   increase in the prevalence of opioid addiction in
20   the United States and in West Virginia was really
21   driven by prescription opioids, but among people
22   with the condition of opioid addiction, illicit
23   fentanyl is responsible for a sharp increase in
24   the death toll among people who have the disease.
25               But I don't really think the cartels
```

Page 249

1    are responsible for this sharp increase in the

2    number of people with this disease.  That I

3    believe the opioid industry bears the bulk of the

4    blame.

5         Q.     If you were to write a paper about

6    the opioid epidemic, I take it you would include

7    this whole mosaic that we've been talking about,

8    this whole range of factors that you would say

9    contributed to the crisis?

10             MS. DICKINSON:  Objection to form.

11        A.     Not necessarily.  It would depend

12   what the focus of the paper was.  If I'm writing a

13   paper where the focus is to critique the FDA, you

14   know, and it's going to focus on probably

15   manufacturers and what FDA could have done

16   differently, depends on what I'm focusing on.

17             MR. HESTER:  Okay.  Dr. Kolodny,

18        you've been very patient.  Thank you.  I'm

19        going to pass my time now to my colleagues.

20             Thank you.

21             MS. DICKINSON:  Sara or the

22        videographer, can we get a time estimate as

23        to how much time we have left?

24             MS. McNAMARA:  Let's take a break

25        now.

Page 250

1                    Can we go off record, please?

2                    MS. DICKINSON:  Sure.

3                    THE VIDEOGRAPHER:  The time is 3:56

4        and we're now off the record.

5                    (Recess taken)

6                    THE VIDEOGRAPHER:  The time is

7        4:05 p.m.

8                    We are back on the record.

9     EXAMINATION BY

10    MS. McNAMARA:

11         Q.     Hi, Dr. Kolodny.  Welcome back.

12         A.     Hi there.

13         Q.     My name is Colleen McNamara.  I

14    represent Cardinal Health.

15                    We actually had the opportunity to

16    speak a few weeks ago, right?

17         A.     Yes.

18         Q.     Right.

19                    So in the interest of not retreading

20    the ground that Tim covered, I'm going to jump

21    around a little bit across different topics, so

22    let me know if anything is not clear as I'm moving

23    through this.

24                    I first want to turn back to your

25    discussion about doctors consulting pharmacists.

Page 251

1          A.        Yes.

2          Q.        So just so I'm clear, is it your

3     opinion that it's common for doctors to consult

4     with pharmacists about whether to prescribe an

5     opioid medication versus a non-opioid medication?

6                    MS. DICKINSON:  Objection to form.

7          A.        I don't know that I would say that

8     it's common.  I would say that clinicians

9     frequently consult pharmacists about what they're

10    going to prescribe.  Whether it's a recommendation

11    for a class of drug or a specific product or a

12    dose or how the prescription is written, I believe

13    that that's very common.

14                    I don't think it's common for a

15    clinician to call a pharmacist and say "Should I

16    prescribe Advil or Vicodin?"  I don't think that

17    happens commonly, but I think that clinicians

18    frequently consult pharmacists.

19         Q.        Okay.

20                    For purposes of this deposition and

21    this case, I really want to focus on the

22    consultations about opioid prescriptions

23    specifically.

24                    Would you say that doctors frequently

25    consult pharmacists about opioid prescriptions?

Page 252

1          A.       I would say that doctors frequently

2     consult pharmacists about what they prescribe and

3     I don't think that opioids would be -- I think

4     that opioids would be part of what they might

5     consult a pharmacist about.

6                   I don't believe that because an

7     opioid is a controlled drug that would make a

8     clinician less likely to ask a pharmacist about

9     it.  I think that we consult pharmacists about

10    what we prescribe and opioids are drugs that we

11    prescribe.

12         Q.       Have you personally in the course of

13    your research ever attempted to quantify the

14    frequency at which doctors consult pharmacists

15    about opioid prescriptions?

16         A.       No.  I haven't studied that.  I'm not

17    familiar with published literature on that topic.

18    I wouldn't be surprised if there is published

19    literature on doctors consulting pharmacists in

20    general.  I think it's unlikely that anyone has

21    ever specifically studied opioid consultations

22    with pharmacists.  I don't know.

23                  But again, it is very common and I

24    think your experts will acknowledge this -- your

25    pharmacist experts will acknowledge -- that

Page 253

1   pharmacists are members of a health care team and

2   that when treating a patient with regard to what

3   might be prescribed to the patient as part of

4   their treatment, it's common to consult a

5   pharmacist.

6        Q.      So help me understand what "common"

7   means.

8               So out of every ten prescriptions,

9   say, how many times does a doctor call a

10  pharmacist to ask about that prescription?

11              MS. DICKINSON:  Objection to form.

12       A.      I don't really think it's possible to

13  come up with a number.  I think it really depends.

14  If it's a medicine that the doctor prescribes

15  frequently, they know this drug, they know the

16  dose, they prescribe it a lot, they're not calling

17  a pharmacist.  But if it's a medication that the

18  doctor doesn't typically prescribe, if the patient

19  comes in and says Doctor, I heard about this or

20  that drug and the doctor has never prescribed it

21  before, they might -- they might actually ask a

22  pharmacist about the drug.  They might want to

23  know -- they might call the pharmacist and say

24  "Hey, do you have this in stock?"  They might --

25  if the pharmacist says yes, they may say "Hey,

Page 254

1    what's the starting dose on this?  How is it

2    typically prescribed?"

3              I think those types of conversations

4    are common when it's a drug that a clinician

5    doesn't frequently prescribe.

6         Q.    The conversation about whether a

7    medication is in stock or what the available

8    dosage is, you'd agree that those are different

9    conversations than calling up a pharmacist and

10   asking whether a particular medication is

11   appropriate to treat a particular medical

12   condition, right?  Those are two different types

13   of conversations?

14        A.    Different, but not that different.

15   But different.

16        Q.    Okay.

17              And so you mentioned that if a

18   medication is something that a doctor frequently

19   prescribes, they wouldn't have to call a

20   pharmacist.

21              Is it also true that if a medication

22   is used to treat a common medical condition

23   suffered by 50 million Americans, say, and the

24   medication has been the subject of a lot of

25   marketing and discussion among the medical

Page 255

1    community, then the doctor is unlikely to have to

2    call the pharmacist?

3                    MS. DICKINSON:  Objection to form.

4                    Lacks foundation.

5        A.      I'm sorry.  Could you repeat the

6    question?

7        Q.      Well, I'm going to back to your

8    testimony about -- I think you said a number of

9    times that doctors were hearing from every

10   direction that opioids are safe and effective to

11   treat chronic pain.

12                   Was that your testimony, part of your

13   testimony?

14       A.      Yes, that was my part of my

15   testimony.

16       Q.      And do you agree that chronic

17   non-cancer pain is a condition that's suffered by

18   many millions of Americans?

19                   MS. DICKINSON:  Objection to form.

20       A.      I think that chronic pain is very

21   frequently experienced.  I pulled my hamstring.

22   If it continues to bug me, I'll meet the criteria

23   for chronic pain.  It's been about two weeks.

24   It's part of being alive.  We frequently

25   experience pain and millions of Americans will

Page 256

1    experience chronic pain.  That doesn't mean that

2    millions of patients are visiting doctors with a

3    complaint of -- tens of millions are visiting

4    doctors disabled because of chronic pain, seeking

5    medicines for chronic pain or for treatment for

6    chronic pain.  Most of us grin and bear it.  We'll

7    buy something over the counter.  That's very

8    common.

9         Q.      But in a situation where doctors are

10   hearing from every direction from across the

11   medical community that opioids are safe and

12   effective, where they perhaps are being detailed

13   by pharmaceutical companies, would you say it's

14   less likely that a doctor would have to call and

15   consult a pharmacist about an opioid medication

16   than about some other type of medication that is

17   less frequently prescribed?

18             MS. DICKINSON:  Objection to form.

19             Calls for speculation.

20        A.      Not necessarily.  If the physician is

21   being detailed about a specific product and

22   they're being detailed effectively, they're

23   probably not going to call the pharmacist.  But

24   much of what I was referring to was the unbranded

25   campaign to change the way the medical community

1    thought about opioids as a class of drug and being

2    led to believe that opioids as a class of drug

3    that rarely lead to addiction, that they're

4    appropriate for long-term use for common, chronic

5    conditions would make that doctor more apt to

6    prescribe an opioid, but not necessarily make that

7    doctor less likely to consult a pharmacist.

8         Q.    So we talked about the two different

9    types of conversations, right?  Are you referring

10   to not necessarily less likely to consult a

11   pharmacist about something like a dosage strength

12   or stock?  That conversation might still happen,

13   right?

14              MS. DICKINSON:  Objection to form.

15        A.    Correct.  Or -- yeah, that could

16   happen.

17        Q.    But you are not able to identify for

18   me any studies or any data that quantify the

19   frequency at which doctors consult with

20   pharmacists about opioid prescriptions, correct?

21        A.    I'm not aware of a study that's been

22   done on that subject.  I'm aware that doctors and

23   other health care providers frequently consult

24   pharmacists.  Pharmacists are seen as the experts

25   about medicines that we prescribe and I don't

Page 258

1    believe that opioids are an exception to the

2    medical community frequently asking pharmacists

3    about drugs and what to prescribe.

4              And I think that your pharmacist

5    experts -- the defense experts -- would

6    acknowledge that clinicians frequently ask

7    pharmacists about medications that they prescribe.

8         Q.    Can you identify a single instance in

9    Cabell County or Huntington, West Virginia where a

10   doctor consulted a pharmacist about an opioid

11   prescription?

12        A.    You're asking me do I have the name

13   of a doctor or pharmacist in Cabell County where

14   this happened?

15        Q.    Yes.  Or any evidence that it

16   actually happened in Cabell County or in

17   Huntington, that a conversation with a pharmacist

18   influenced a doctor's decision to prescribe an

19   opioid?

20              MS. DICKINSON:  Objection to form.

21              Go ahead.

22        A.    I didn't see it happen, I didn't

23   listen in on a phone conversation between a doctor

24   and a pharmacist.  I know that it happens

25   frequently in the United States and the last time

Page 259

1    I checked, Cabell County is in the United States.

2    This is a common way that health care is practiced

3    in the United States.

4                    Pharmacists are health care

5    professionals.  They are members of a clinical

6    team and hospitals, they round with doctors on

7    patients.  So did I witness this firsthand

8    happening in Cabell County?  I didn't.  Do I

9    believe -- is it my opinion that this happened in

10   Cabell County?  That's my opinion.

11       Q.      I know you described earlier your own

12   experience consulting pharmacists about

13   medications.

14                    Did any of those consultations of

15   yours relate to opioid medications used to treat

16   pain?

17       A.      I very rarely prescribe opioids for

18   the treatment of pain.  I prescribe opioids for

19   treating an opioid addiction and I actually have

20   had -- so I prescribe buprenorphine for the

21   treatment of opioid addiction and I have had

22   instances where a patient might need a form of

23   buprenorphine that I don't typically prescribe

24   that's in a dose I don't typically prescribe and

25   I've had conversations with pharmacists about

Page 260

1    that.

2              More often where I might consult a

3    pharmacist is if I'm prescribing a drug that I

4    don't routinely prescribe or treating a condition

5    that I don't routinely treat.

6              Like I gave as an example, this is a

7    real example of a patient with poison ivy.  I

8    understand that topical steroids are appropriate

9    and would give that patient relief, but I don't

10   routinely prescribe topical steroids.  If I go

11   online to try to figure out which type of topical

12   steroid, there are just tons of them and a range

13   of different potencies.  I don't know which one a

14   pharmacist is even going to stock.  So I would

15   call the pharmacist and I would say "I would like

16   to prescribe a mid-potency or a high-potency

17   topical steroid.  What do you got?"  That has

18   happened.  That's happened in my clinical

19   practice.

20        Q.        Understood.  But again, I'm trying to

21   focus on opioid prescriptions because that's the

22   subject of this case and the subject of your

23   opinion.

24              Do you have -- what is the basis for

25   your opinion that doctors consult with pharmacists

Page 261

1    about opioid medications other than your -- about

2    the treatment of -- strike that.

3              So what is the basis for your opinion

4    that doctors consult with pharmacists about

5    prescribing opioids for the treatment of pain

6    other than your own experience consulting

7    pharmacists regarding other medications or opioids

8    used to treat addiction?

9              MS. DICKINSON:  Objection to form.

10             Asked and answered.

11        A.      I haven't performed a survey study of

12   pharmacists or physicians to find out how often

13   you call pharmacists or ask pharmacists how often

14   you get calls from doctors.  I know that it's

15   common from my own clinical experience, from

16   conversations with colleagues, from presentations

17   I've given to pharmacists about the opioid crisis

18   where pharmacists will ask questions and

19   communicate with me.  I believe that it is common.

20   It is my opinion that it is common for clinicians

21   to consult pharmacists who are members of that

22   health care team about the drugs that they

23   prescribe and that opioids are not an exception.

24        Q.      Okay.

25              Earlier, you testified that you

Page 262

1    reviewed data from sales to pharmacies that

2    suggested diversion.

3              Do you recall discussing that?

4    A.      I believe, yes.

5    Q.      So outside of your work for opioid

6    plaintiff's lawyers, have you ever been asked to

7    review data showing opioid sales to pharmacies?

8              MS. DICKINSON:  Objection to form.

9    A.      Yes.

10   Q.      In what context?

11   A.      Journalists who had data that they

12   wanted to share with me data that they may have

13   obtained from a FOYA request or from an

14   investigation.  So yes, I have seen data and

15   OMINUS that was presented to me from sources other

16   than attorneys.

17   Q.      What journalists were those?

18   A.      I believe The Washington Post reached

19   out to me about ARCOS data which they collected

20   and I believe a journalist in Poughkeepsie, New

21   York may have reached out to me about data on

22   opioid prescribing.  It's difficult to remember

23   exactly.

24   Q.      Approximately what year did The

25   Washington Post reach out to you about ARCOS data?

Page 263

1        A.        I believe 2019 when -- actually,

2    there were other journalists.  I remember The

3    Washington Post, but I can't remember necessarily

4    the other outlets that had reached out to me.  But

5    I think it was when ARCOS data became available

6    from the litigation.

7        Q.        Was it is same time frame for the

8    Poughkeepsie journalist?

9        A.        Poughkeepsie reaching out to me about

10   data that was -- I can't remember exactly what the

11   data was.  I believe it involved -- it might have

12   been -- I don't remember what the data set was,

13   but that would have been a few years ago.

14       Q.        Was it data relating to sales by

15   pharmaceutical distributors?

16       A.        No.  I don't -- it may not have been

17   distributor data.

18       Q.        What year were you first retained as

19   an expert in opioid litigation?

20       A.        I think it was 2018.  Maybe the end

21   of 2017.  I'm not exactly sure.  I was helping out

22   in litigation on a voluntary basis prior to my

23   becoming an expert.  The volunteer work I was

24   doing probably goes back to maybe 2013, 2014.

25       Q.        Did that volunteer work relate to

1    sales by distributors to dispensers of opioids?

2         A.      No.

3         Q.      Prior to 2018, had you ever been

4    asked to determine whether a distributor's sales

5    were indicative of diversion?

6                 MS. DICKINSON:  Objection to form.

7         A.      I don't think so, no.

8         Q.      In preparing your report in this

9    case, what type of data did you review?  Were you

10   looking at aggregate data or were you looking at

11   shipments to specific pharmacies or both?

12                MS. DICKINSON:  Objection to form.

13        A.      I think it was both and it was -- I

14   relied on expert reports that provided the data,

15   the tables and comments on the data.

16        Q.      What standards did you apply to

17   determine whether the data suggested diversion or

18   not?

19                MS. DICKINSON:  Objection to form.

20        A.      I guess -- I don't know if there's a

21   name for the standard except reasonable judgment

22   that in a county in West Virginia that hundreds of

23   millions of pills -- hundreds of millions of pills

24   coming to the State of West Virginia would not --

25   would be inappropriate and so -- I don't know that

Page 265

1    there are -- I consulted any published baseline on

2    what the dispensing or supplying should be, but I

3    do know based on my work on the opioid crisis on

4    opioid prescribing that products like the

5    30-milligram immediate release oxycodone -- again,

6    that's just one example -- that there's a very

7    limited appropriate use for that product and if

8    there are large numbers of dosage units of that

9    product coming into a pharmacy in Cabell County,

10   that suggests that there's a problem because the

11   genuine clinical need for a 30-milligram immediate

12   release oxycodone is extremely limited.

13        Q.      So in preparing your opinions in this

14   case, were you looking at shipments by

15   distributors of oxycodone 30 milligrams to

16   specific pharmacies?

17              MS. DICKINSON:  Objection to form.

18        A.      If you're going to ask me questions

19   about this, I'd like to be able to review the

20   report and the tables that I looked at rather than

21   try and answer these questions based on memory.

22   My report is more than 100 pages long.  I relied

23   upon multiple experts and their data sets.

24              If you're going to ask me specific

25   questions about what's in my report, I'd like an

1    opportunity to look at the sections that you're

2    asking me about.

3        Q.    Well, I'm running -- I don't have

4    much time, so I'll just ask you off the top of

5    your head, do you recall as part of your analysis

6    looking at distributor shipments of oxycodone

7    30 milligrams to individual pharmacies in Cabell

8    or Huntington?

9              MS. DICKINSON:  Counsel, objection.

10             I mean, he said he needs to look at

11        his report to accurately answer that

12        question.

13             Are you asking him not to look at it?

14        I mean, he just answered he needs to look at

15        it.

16             So Doctor, if you need to look at

17        your report to accurately answer the

18        question, go ahead.  I understand we're

19        running short on time, but you all allocated

20        in your time in the way you desired to.

21             So Doctor, go ahead.

22             MS. McNAMARA:  I'm sure you

23        understand, Ms. Dickinson, that I've gotten a

24        few pretty long speeches to very narrow

25        questions, so that is why I'm particularly

1      sensitive to time and when I rephrase my

2      question so that --

3               MS. DICKINSON:  You're asking him a

4      question that's been asked a couple times

5      today and he's given you his best answers,

6      whether you like the length of not.  If he

7      needs to look at his report to answer the

8      question, he needs to look at his report.

9               So Doctor, go ahead and look at your

10     report.

11              Otherwise, if you want to withdraw

12     the question, go ahead and withdraw the

13     question.

14    Q.     Doctor, have you had an opportunity

15  to look at your report?

16    A.     Yes.

17    Q.     I'll just re-ask the question again

18  so we're on the same page.

19           In preparing your report, did you

20  look at distributor's shipments of oxycodone

21  30 milligrams to individual pharmacies within

22  Cabell or Huntington?

23          MS. DICKINSON:  Objection to form.

24    A.     I did.

25    Q.     Earlier, when you were briefly

Page 268

1    discussing the ARCOS data, I heard you say that

2    distributors had access to better data than ARCOS

3    through IQVIA and IMS Health.

4                 Did I hear that correctly?

5         A.      Yes.  More detailed data, prescriber

6    data.

7         Q.      Got it.

8                 Okay.

9                 So what specific data could

10   distributors purchased from IQVIA or IMS Health

11   that was better than ARCOS?

12        A.      The same data the manufacturers were

13   purchasing.  So that if a distributor had wanted,

14   they could purchase IQVIA data and they would be

15   able to see within a community who the outlier

16   prescribers are and could have communicated to the

17   pharmacies in the county that if you dispense

18   prescriptions written by these aggressive

19   prescribers, we will not continue to supply you

20   with narcotics.

21                So very detailed information, the

22   same information that manufacturers use to figure

23   out which doctors they're going to detail, the

24   same data that they use to figure out how to

25   compensate sales reps for getting a prescriber to

Page 269

1    prescribe more, that data could have been

2    purchased by the defendants in this case.

3         Q.     Have you personally ever looked at

4    that data that's available for purchase from IQVIA

5    or IMS Health?

6         A.     I have.

7         Q.     When did you do that?

8         A.     In the course of work on litigation

9    work, documents that were obtained from discovery

10   or data that was requested, so I've seen the data

11   that was available.

12        Q.     Have you reviewed the data that was

13   available at different points in time or did you

14   just review, like, a single snapshot of it?

15               MS. DICKINSON:  Objection to form.

16        A.     I believe I reviewed snapshots.  I

17   don't think I've seen IQVIA data trended, so it

18   would have been snapshots.  It could have been

19   data that covered a period of time cumulative, but

20   it wasn't trended out.

21        Q.     What was the earliest version of

22   IQVIA or IMS data you that you recall looking at?

23        A.     I don't recall it.  I don't recall

24   the date of the data that I was looking at.  I

25   would have been looking at that data probably in

Page 270

1    2019, maybe 2018 would have been the first time I

2    would have been looking at IQVIA data firsthand.

3              I'm certainly familiar with studies

4    that have been published using IQVIA data and have

5    done research using PDMP data and understand some

6    of the differences between what's available from

7    PDMP data and what's available from IQVIA data and

8    there are limitations to both.

9         Q.     What are the limitations to IQVIA

10   data?

11        A.     IQVIA data doesn't include 100% of

12   pharmacies, so IQVIA data is collected from

13   pharmacies that I believe agree to sell their data

14   to IQVIA and not every pharmacy will participate

15   in that.

16             For the pharmacies that do

17   participate, it's very good data and where data

18   from IQVIA indicates a doctor may be a very

19   aggressive prescriber, motivation by not all

20   pharmacies participating would, if anything, just

21   maybe give -- minimize how aggressive that

22   particular prescriber is if you don't have all of

23   pharmacies, but with the pharmacies is that do

24   participate -- and I think it's upward of 80% of

25   pharmacies nationally that participate -- the pill

Page 271

1    mills can be spotted.

2         Q.     Have you ever done any research of

3    your own that involved spotting those pill mills

4    using IQVIA data?

5         A.     I've done some work and I'm familiar

6    with research that involves identifying doctors

7    likely to be operating pill mills through PDMP

8    data, not IQVIA data.  IQVIA data is generally

9    purchased by industry.  It's very expensive for

10   researchers to access it.  I've reached out to

11   IQVIA for their data and it was very expensive.

12        Q.     And distributors don't have access to

13   PDMP data, correct?

14        A.     Not necessarily.  PDMP data can be

15   made available and identified.  PDMP data in some

16   states can be FOYA'd, so certainly if a

17   distributor reached out to a state bureau of

18   narcotic enforcement and said "Hey, can we

19   collaborate on identifying pill mills?"  I think

20   that could have happened.

21        Q.     So can PDMP data be FOYA'd in West

22   Virginia?

23        A.     I don't know.

24        Q.     What is your basis for believing that

25   if distributors had reached out to the State of

Page 272

1    West Virginia that the State of West Virginia

2    would have handed over some form of its PDMP data?

3                    MS. DICKINSON:  Objection to form.

4                    Lacks foundation.

5         A.        I don't know.  I believe that a state

6    bureau of narcotic enforcement and a prudent

7    distributor of narcotics could be working together

8    collaboratively so as to address a public health

9    catastrophe happening in the State of West

10   Virginia.  So I don't know for certain, but I

11   believe that they could have worked together to

12   address this.

13        Q.        And that's just based on your belief,

14   right?  Not based on any evidence you've seen of

15   West Virginia being willing to turn over PDMP data

16   to distributors?

17        A.        I'm saying that I believe it was

18   feasible that they could have worked together and

19   that a distributor that really wanted to ensure

20   that its products weren't getting diverted, that

21   recognized that there are communities in West

22   Virginia that have been devastated, that there's

23   been a massive loss of life, I want to do

24   everything I can to make sure that no pills are

25   diverted, that there's a lot a distributor could

1    have done from purchasing IQVIA data and telling

2    every pharmacy in the state "Do not fill

3    prescriptions written by these doctors" to

4    reaching out and working collaboratively with law

5    enforcement.

6         Q.    Do you know whether distributors ever

7    asked DEA to provide the identified ARCOS data to

8    help them in their anti-diversion efforts?

9         A.    I'm aware that distributors have made

10   a case that the DEA should have shared more

11   information with them and if the DEA had shared

12   more information with them, they would have been

13   able to prevent diversion, that they weren't able

14   to get data on what other distributors were

15   supplying and have attempted, I think, to shift

16   blame for their failures to the DEA and that's one

17   of the arguments -- I think a bogus argument --

18   that they make.

19        Q.    I think my question was a little

20   different and maybe a little narrower.

21              Do you know whether distributors

22   actually asked DEA to provide them with the

23   identified ARCOS data?

24        A.    I believe that distributors asked the

25   DEA -- have complained that the DEA has not given

Page 274

1    them ARCOS data that could be helpful to them in

2    preventing diversion.  I've heard them make that

3    argument.

4         Q.    Do you know whether they asked?

5         A.    They're making the argument -- I

6    think they made the argument that they wanted it

7    from the DEA and the DEA didn't give it to them.

8         Q.    Okay.

9               And does that indicate to you that

10   they asked and DEA said no?

11              MS. DICKINSON:  Objection to form.

12              Calls for speculation.

13        A.    No.  It indicates to me that they're

14   attempting to shift blame and, as I mentioned, I

15   think it's a bogus argument.  They didn't need --

16   if they had just worried about themselves, if they

17   had not shipped orders that were suspicious, if

18   they had stopped supplying outlier pharmacies, we

19   could prevented diversion.

20              If they had called their distributor

21   colleagues from the other companies and said "Hey,

22   we just stopped shipping to this pharmacy because

23   it's a dirty pharmacy, you shouldn't ship to them

24   either," we could have put those pharmacies out of

25   business.

Page 275

1        Q.      There's a medical board in West

2    Virginia, correct?

3        A.      Yes.

4        Q.      Are you aware of any evidence that

5    any of the distributors' customers were filling

6    prescriptions for doctors who are not licensed by

7    the State of West Virginia Medical Board?

8                MS. DICKINSON:  Objection to form.

9        A.      I'm sorry.  Can you ask that again?

10       Q.      Yeah, sure.

11               Are you aware of any evidence showing

12   that distributors' customers were filling

13   prescriptions written by doctors who were not

14   licensed by the State of West Virginia?

15       A.      I don't know if that happened.  It

16   could have -- I'm not aware of evidence that said

17   prescriptions were filled by doctors that didn't

18   have a license or DEA registration.

19       Q.      I'd like to turn to the distributor

20   marketing services for a few minutes.

21               Now, you understand that the

22   marketing services offered by distributors were

23   not just limited to opioids, right?

24       A.      Yes.

25       Q.      Do you know what percentage of the

Page 276

1    marketing services provided by Cardinal Health

2    went towards opioid products as opposed to

3    non-opioid products?

4         A.     No.

5         Q.     Do you know that for either McKesson

6    or ABDC?

7         A.     I don't know what percentage, but the

8    percentage wouldn't affect my opinion that it's

9    inappropriate.

10        Q.     Approximately how many instances did

11   you see in your review of thousands of documents

12   of Cardinal Health marketing opioids?

13             MS. DICKINSON:  Objection to form.

14        A.     You're asking me how many documents I

15   saw out of the thousands?

16        Q.     Yes.

17             How many instances did you see of

18   Cardinal Health marketing an opioid product?

19             MS. DICKINSON:  Objection to form.

20        A.     I can't really remember how many

21   examples.  I saw multiple examples, but how many,

22   I didn't count and even if I had counted, I don't

23   know that I'd be able to remember.

24        Q.     Did you cite them in your report?

25             MS. DICKINSON:  Objection to form.

Page 277

1          A.      I did cite in my report, I believe,

2     examples of Cardinal Health promoting and

3     marketing opioids, yes.

4          Q.      Okay.

5                  Among the number of boxes that you

6     received, did you receive one of them that had a

7     set of documents starting with CAH?

8          A.      I believe I did.  Should I --

9          Q.      Yes, please.

10                 MS. DICKINSON:  Just while he's

11              looking for that, from the videographer, how

12              much more time do we have?

13                 THE VIDEOGRAPHER:  We are at six

14              hours and 13 minutes.

15                 MS. DICKINSON:  Okay.

16                 MS. McNAMARA:  So can you pull out

17              the document called CAH Exhibit 4?  I marked

18              this on Exhibit Share as Exhibit 22.

19                 (Whereupon, Exhibit 22 was marked for

20              identification.)

21                 MS. DICKINSON:  Dr. Kolodny, don't

22              hurt yourself.  That looks a little scary

23              with those scissors.

24                 THE WITNESS:  Got it.

25          Q.      All right.  Great.

Page 278

1            Does the document in front of you

2    have the Bates label in the lower right-hand

3    corner ending in 133350?

4            A.      Yes.

5            Q.      Okay.  Great.

6                    So Exhibit 22 is an email with an

7    attached service flash from Cardinal Health.

8                    Is that correct?

9            A.      Yes.

10           Q.      This service flash in Exhibit 22 is

11   an announcement of some new items, correct?

12           A.      Yes.

13           Q.      And is this an example of a

14   distributor marketing, advertising or promoting

15   opioids as you've been referring to it today?

16                   MS. DICKINSON:  Objection to form.

17           A.      Yes.

18           Q.      Now, one of the products in this

19   announcement is a fentanyl sublingual tablet.

20                   Do you see that?

21           A.      I do.

22           Q.      And that's an opioid product,

23   correct?

24           A.      An exceptionally dangerous opioid

25   product with an exceptionally limited indication.

Page 279

1      Q.      If you look at the document, next to

2  the Abstral logo on the right; there's a heading

3  that says "Introducing Abstral from Galena."

4              Do you see that?

5      A.      I do.

6      Q.      On the second line, about halfway

7  over, it says that -- I'll read from the document

8  -- "Abstral is an opioid agonist indicated for the

9  management of breakthrough pain in cancer patients

10  18 years of age and older who are already

11  receiving and who are tolerant to opioid therapy

12  for their underlying persistent cancer pain."

13              Did I read that correctly?

14      A.      You read that correctly.

15      Q.      Is that the very narrow indication

16  that you're referring to?

17      A.      It is.

18      Q.      And then below the ordering

19  information, the document notes that Abstral

20  carries a black box warning.

21              Do you see that?

22      A.      I do.

23      Q.      In your view, is there anything false

24  or deceptive about the information provided here

25  about Abstral?

1       A.      No, not on this particular promotion.

2   On Cardinal Health promotions that I can give you

3   as examples, there is deceptive information.  This

4   is -- what's listed here is not deceptive.  It

5   looks it's -- like they're printing the FDA

6   indication.

7       Q.      And in your opinion, is it

8   inappropriate for a distributor to send a

9   notification like this that contains information

10  about the indication of the product?

11      A.      Yes.

12      Q.      Why is that?

13      A.      Because I don't believe that opioid

14  distributors should have been helping promote

15  opioids, particularly when we couldn't handle the

16  opioids that we already have in the United States.

17  There's an oversupply of opioids.  Your client is

18  getting paid to send out this announcement for a

19  reason.  The reason is that the manufacturer --

20  Abstral believes it will make more money if

21  pharmacists or pharmacies see this promotion and

22  then stop the drug.

23              And what generally would happen,

24  based on knowledge I learned through reviewing

25  discovery, is that this isn't done in a vacuum.

Page 281

1  That while this service flash is being sent by

2  your client to pharmacies, sales reps are visiting

3  doctors in these communities.  The idea being that

4  whether a doctor writes a prescription for Abstral

5  that the pharmacy will have it because if the

6  patient gets to the pharmacy and they don't have

7  Abstral, the patient could wind up getting a

8  different product, maybe not even an opioid, maybe

9  not such a dangerous opioid.

10          And what we do know is that even

11  though the indication here is the FDA indication,

12  we know that when you look at the patients that

13  wound up getting transmucosal fentanyl products, a

14  very tiny sliver of those patients actually were

15  patients with cancer who had breakthrough pain and

16  were already opioid tolerant.  The large majority

17  of the patients who received this class of drug

18  were patients who didn't even have cancer and

19  that's why the products were being promoted.

20          So this is part of an overall

21  campaign for the manufacturer and the distributor

22  to make money off of an extremely dangerous

23  opioid.  It shouldn't have happened and there are

24  points at which distributors, based on

25  communications I've seen in the discovery, where

Page 282

1    it's clear that the distributors recognized they

2    shouldn't be doing this anymore.

3              So yes, I think this is

4    inappropriate.  They should not be promoting

5    opioids.

6    Q.       Have you attempted to quantify or

7    otherwise evaluate the impact of distributors

8    marketing to pharmacies purchases of opioid

9    products?

10             MS. DICKINSON:  Objection to form.

11   A.       So I have very good evidence that

12   these promotions were effective because

13   manufacturers continued paying distributors to do

14   this.  If it didn't work, if it didn't make more

15   money for the manufacturers and the distributors,

16   it would have stopped.

17             So there's very good evidence that

18   this did increase sales of opioids in the United

19   States, in West Virginia, in Cabell County at a

20   time when we couldn't handle the opioids that we

21   already had.

22   Q.       And as I understand it, as you just

23   described it, the evidence is the manufacturers

24   kept paying for this service?

25             MS. DICKINSON:  Objection to form.

Page 283

1          Lacks foundation.

2     A.     Yes.   The good evidence that these

3 advertisements, that these promotions, worked is

4 that they just kept happening and happening and

5 happening.

6     Q.     Have you ever looked at the effect on

7 purchases by the pharmacies or distributor sales

8 to the pharmacies before and after these marketing

9 materials were sent to the pharmacies to determine

10 their impact?

11     A.     I am aware -- I think I cite in my

12 report evidence that these were effective.   I

13 think there's communication cited in my report of

14 a distributor -- I believe communicating to

15 Purdue -- on how effective one of these promotions

16 were.

17          I think it might have been a patient

18 adherence program -- maybe for the Butrans

19 patch -- where this type of marketing activity

20 that a service sold by a distributor had an

21 increase, had a positive impact on sales of that

22 opioid.   So there is some data out there, some of

23 which I've cited in my report.

24     Q.     You have not done that analysis

25 yourself, correct?

Page 284

1      A.      These were analyses, I believe, that

2   were done by manufacturers and/or distributors to

3   show that this works.

4      Q.      And you've identified one to me right

5   now.

6              Was that one that you described an

7   analysis of Cabell County or Huntington, West

8   Virginia?

9              MS. DICKINSON:  Objection to form.

10     A.      I don't believe it was.  I think it

11  was national data is my understanding, but the

12  last time I checked, Cabell County is in the

13  United States.

14     Q.      Have you seen any evidence showing

15  that any of these marketing materials were

16  actually disseminated to any pharmacies in Cabell

17  County or West Virginia?  Have you seen the

18  transmissions to the pharmacies?

19             MS. DICKINSON:  Objection to form.

20     A.      I have seen samples of what was

21  transmitted.  Many of these promotions are done

22  over the internet, like glimmer buttons or pop ups

23  if you use the right search term.  And the last

24  time I checked, Cabell County uses the same

25  internet that the rest of the United States uses,

Page 285

1    so I have every reason to believe these were

2    promotions were disseminated in Cabell County.

3         Q.      You can't point to any evidence that

4    any pharmacist in Cabell County or Huntington ever

5    received or considered these materials in deciding

6    whether to purchase, correct?

7                     MS. DICKINSON:  Objection to form.

8                     Lacks foundation.

9         A.      So some of these promotions ran on

10   the order systems that the defendants operated and

11   so if you were a pharmacy in Cabell County and a

12   customer of one of the defendants, to order their

13   products would have required you to use their

14   ordering system where you would have been exposed

15   to these promotions.  So it doesn't make sense to

16   me that there would have been some firewall around

17   Cabell County that it wouldn't have seen these

18   promotions.

19        Q.      But you haven't seen any evidence

20   indicating that these promotions had any influence

21   on purchasing decisions in Cabell County or

22   Huntington, correct?

23                    MS. DICKINSON:  Objection to form.

24                    Asked and answered.

25        A.      I've seen evidence that it had an

Page 286

1    impact.  I believe that was national data and the

2    last time I checked, Cabell County is in the

3    United States.

4         Q.       And you have not conducted any survey

5    or some other study of whether pharmacists

6    consider these types of materials in deciding

7    whether or not to purchase, correct?

8              MS. DICKINSON:  Objection to form.

9         A.       It wouldn't influence my opinion,

10   even if there was a survey of pharmacists saying

11   this doesn't affect them because many targets of

12   marketing don't recognize that they're marketing.

13   If you ask physicians whether or not a sales rep

14   detailing them on a pharmaceutical product

15   influences their prescribing, many physicians will

16   say it has no influence on what I do, maybe it

17   influences my colleagues, but not me.

18              But of course it does have an

19   influence because that's why drug companies keep

20   sending sales reps to doctors.  They know that it

21   works.  The evidence that it works is that your

22   client and the defendants in this case continued

23   to sell these services to manufacturers.

24        Q.       The distributor defendants in this

25   case submitted ARCOS data to DEA throughout the

Page 287

1    relevant time period for this litigation, correct?

2              MS. DICKINSON:  Objection to form.

3        A.      I believe that's correct.

4        Q.      So DEA always had data showing which

5    pharmacies each distributor was shipping to and

6    the quantity that was being shipped, correct?

7              MS. DICKINSON:  Objection to form.

8              Lacks foundation.

9        A.      I believe that the DEA had access to

10   shipment data.

11             MS. McNAMARA:  Can we take a short

12        break?

13             MS. DICKINSON:  Sure.

14             MS. McNAMARA:  I'm done.  I'm going

15        to pass.

16             MS. DICKINSON:  Okay.  All right.

17             MS. McNAMARA:  Thank you, Dr.

18        Kolodny.

19             MS. DICKINSON:  Why don't we take

20        less than five minutes or just five minutes,

21        Dr. Kolodny, because I think we only have 20

22        minutes or so --

23             MS. McNAMARA:  Can we go off the

24        record, please?

25             MS. DICKINSON:  Sure.

Page 288

1          THE VIDEOGRAPHER:  The time is

2     4:57 p.m. and we are now off the record.

3               (Recess taken)

4          THE VIDEOGRAPHER:  The time is 5:04

5     p.m.  We are now back on the record.

6  EXAMINATION BY

7  MS. VITALE:

8     Q.     Good afternoon, Dr. Kolodny.  This is

9  Christina Vitals and I represent defendants

10  AmerisourceBergen Drug Corporation or ABDC.

11     A.     Hi there.

12     Q.     So I wanted to follow up on something

13  you said with prior counsel regarding the fact

14  sheet that you just covered.

15          You said "These things are not done

16  in a vacuum.  When the doctor writes a

17  prescription for Abstral, the pharmacy may not

18  have it.  If the pharmacy doesn't have it, the

19  patient could end up getting a different product."

20          Do you remember that testimony you

21  just gave?

22     A.     I do.

23     Q.     Could you go to ABDC document tab 32?

24  It should be in one of smaller boxes.

25     A.     Which exhibit?

Page 289

1          Q.       ABDC 32.  I'm going to mark this on

2      the record as ABDC 23.

3          A.       Okay.

4                   (Whereupon, Exhibit 23 was marked for

5          identification.)

6          Q.       Great.  You will see this is West

7      Virginia Code Section 30-5-12b.  It states

8      "Equivalent means drugs or drug products which are

9      the same amounts of identical active ingredients

10     and same dosage form and which will provide the

11     same therapeutic efficacy and toxicity if

12     administered to an individual and is approved by

13     the United States Food and Drug Administration."

14                  That was Section 6.

15                  Did I read that correctly?

16         A.       Yes.

17         Q.       Then if you go down to the paragraph

18     below that's b, it says "A pharmacist who receives

19     a prescription for a brand name drug or drug

20     product shall substitute a less expensive

21     equivalent generic name drug or drug product

22     unless in the exercise of his or her professional

23     judgment, the pharmacist believes that the less

24     expensive drug is not suitable for the particular

25     patient.  Provided that a substitution may not be

1    made by the pharmacist where the prescribing

2    practitioner indicates that in his or her

3    professional judgment, a specific brand name drug

4    is medically necessary for a particular patient."

5              Did I read that correctly?

6       A.    Yes.

7       Q.    I'm sorry.  Was that a yes?

8       A.    That was yes.

9       Q.    So in fact, the patient could not end

10   up getting a different product, but can only get

11   an equivalent product as prescribed by the West

12   Virginia code; isn't that accurate?

13             MS. DICKINSON:  Objection to form.

14             Lacks foundation.

15             Calls for a legal conclusion.

16             Go ahead and answer if you can,

17        Doctor.

18       A.    No, it's not accurate.

19       Q.    And why is it not accurate?

20       A.    You're referring to my prior

21   testimony with regard to Abstral.  I don't believe

22   that there is an equivalent product to Abstral.

23       Q.    Right.

24             So then the patient could not get a

25   different product without the prescriber being

Page 291

1    contacted and writing a different prescription,

2    correct?

3                    MS. DICKINSON:  Objection to form.

4        A.       No, not necessarily correct.

5        Q.       So you're saying the pharmacist could

6    substitute his own judgment for a patient he's

7    never seen or medical records that he's never

8    reviewed and give the patient a different product?

9                    MS. DICKINSON:  Objection to form.

10                   Lacks foundation.

11                   Compound.

12       A.       No, that's not what I'm saying.

13       Q.       So what are you saying?

14                   MS. DICKINSON:  Objection to form.

15       A.       I'm saying that if the pharmacy

16   didn't have Abstral, there's a good chance that

17   the patient would have walked out of that pharmacy

18   without receiving a prescription for a

19   transmucosal fentanyl product that potentially

20   would have saved that patient's life because these

21   are exceptionally dangerous -- that were

22   overwhelmingly prescribed to patients who should

23   not have received them.

24                   So a promotion that increases the

25   likelihood that the pharmacy will stock Abstral is

Page 292

```
 1    a promotion that also includes the likelihood that

 2    the patient will receive Abstral, which is the

 3    intent, which is why the manufacturer of Abstral

 4    is paying the distributor to promote the drug.

 5          Q.    So you were not saying before that

 6    the pharmacist could substitute a different drug?

 7                MS. DICKINSON:  Objection to form.

 8          A.    No, I was saying that the patient

 9    might not get that drug.

10          Q.    Thank you.

11                All right.  You can put that aside.

12                You state that in your report

13    defendants, and ABDC in particular, used "various

14    marketing tools to promote opioid analgesics and

15    the revisionist message of liberalized prescribed

16    that fostered sales and addiction."

17                Correct?

18          A.    Correct.

19          Q.    And one example for your claim that

20    distributors sold services to increase the demand

21    of opioids that you cite is ABDC "placing in

22    pharmacy digital advertisements to appeal to

23    customers."

24                Correct?

25                MS. DICKINSON:  Counsel, what page
```

Page 293

1       are you at?

2                   MS. VITALE:  Page 15 of his report.

3                   MS. DICKINSON:  Okay.  Thanks.

4       Q.      Did I state that correctly?

5       A.      Let me --

6                   MS. DICKINSON:  You've got to give

7       him a minute to get there.

8                   MS. VITALE:  Sure.

9       A.      You're on page 15 of my report?

10      Q.      Correct.

11      A.      Where on the page?

12      Q.      Second paragraph, it starts with as

13      "As a result of these activities ..."  Go to the

14      last sentence.  So I'll state it again.

15                  You state in your report that

16      distributors sold services to increase the demand

17      of opioids and one of the examples you gave is

18      ABDC placing in-pharmacy digital advertisements to

19      appeal to customers.

20                  Is that correct?

21      A.      That is correct.  I believe that's

22      correct.  I'm just not following where you are on

23      the report.

24                  MS. DICKINSON:  I'm not seeing it

25      either.  I'm sorry, Christina.  Can you check

1      your page number?  I don't think you're

2      reading from the right page.

3                MS. VITALE:  Sorry.  Page 14.  My

4      apologies.

5      A.      Okay.  I see the paragraph that

6  begins "As a result ..."

7      Q.      Okay.

8                The customers that you're referring

9  to here are licensed pharmacies and pharmacists?

10               MS. DICKINSON:  Objection to form.

11               Where?  Referring to where?

12     Q.       In the sentence that says "Placing

13  in-pharmacy digital advertisements to appeal to

14  customers," the customers you're referring to in

15  the last sentence in the second paragraph on page

16  14 of your report are licensed pharmacies and

17  pharmacists, correct?

18     A.      The last sentence?  The sentence that

19  begins "Distributors did more than simply ship

20  orders ..."?

21     Q.      Correct.

22               Are the customers that you're

23  referring to in the last sentences that you

24  literally end the paragraph with, are those

25  licenses pharmacies and pharmacists?

Page 295

1      A.      They include licensed pharmacies and

2   pharmacists.

3      Q.      So you're saying that digital

4   advertisements are going to other customers that

5   are not pharmacies or licensed pharmacists with

6   this sentence?

7      A.      I believe that customers of

8   distributors were not limited to pharmacies, that

9   there were other customers.  In some cases,

10  clinics purchased drugs directly from distributors

11  and hospitals, so I would say that it includes

12  pharmacies and pharmacists, but may include other

13  customers.

14     Q.      Okay.

15             And you cite the glimmer button.

16  You've cited that today in your testimony on

17  Bergen's Accusource computer program.

18             That would be an example in your mind

19  of these placing in-pharmacy digital

20  advertisements to appeal to customers, correct?

21     A.      Yes, that's an example.

22             MS. VITALE:  Can you go to ABDC tab

23      three?  I'm going to mark this as ABDC

24      Exhibit 24.

25             THE WITNESS:  Got it.

```
                                                        Page 296

 1                  (Whereupon, Exhibit 24 was marked for

 2          identification.)

 3          Q.      This document states "During the

 4   month of January, we will have a glimmer button on

 5   Bergen's Accusource system.  This glimmer button

 6   will show up when a pharmacist calls for a

 7   targeted competitor.  Pushing the button will then

 8   reveal information on Oxycontin to the

 9   pharmacist."

10                  Did I read that correctly?

11          A.      Yes.

12          Q.      It goes on to say "During January, we

13   have targeted 25 competitors, including Vicodin"

14   and then it lists the 24 other drugs.

15          A.      Yes.

16          Q.      Did I read that correctly?

17          A.      Yes.

18          Q.      Okay.

19                  Is Vicodin an opioid?

20          A.      It is.

21          Q.      Is Percocet an opioid?

22          A.      It is.

23          Q.      Is Duragesic an opioid?

24          A.      Yes.

25          Q.      Is MS Contin an opioid?
```

Page 297

1     A.     It is.

2     Q.     So you would agree with me then all

3  of these 25 listed drugs are brand name opioids,

4  correct?

5              MS. DICKINSON:  Objection to form.

6     A.     Yes.

7     Q.     And all of these are FDA approved

8  drugs, correct?

9     A.     I'm not sure what Anexsia is.  I've

10  never heard of that one.  I would agree that

11  almost -- certainly almost all, if not all of

12  these, are opioids.

13     Q.     And all of these are FDA approved

14  drugs, correct?

15     A.     I believe so, yes.

16     Q.     The document goes on to say "During

17  January, every pharmacist ordering the above

18  products on the Bergen system will be encouraged

19  to consider Oxycontin instead because of this

20  glimmer button."

21              Did I read that correctly?

22     A.     Yes.

23     Q.     So isn't the demand already there if

24  the licensed pharmacist is calling in to order an

25  opioid?

1    A.      I'm sorry?  What's your question?

2    Q.      Isn't the demand already there if the

3    licensed pharmacist is calling in to order an

4    opioid?

5            MS. DICKINSON:  Objection to form.

6    A.      Not exactly.

7    Q.      Why is that?

8    A.      Because Oxycontin is a very different

9    drug from Tylenol with codeine.  Tylenol with

10   codeine is acetaminophen with a low dosage of the

11   opioid.  Oxycontin, one Oxycontin pill could have

12   50 -- the equivalent of 50 Tylenol with codeine in

13   it.  Similarly for Ultram, another weak low dosage

14   opioid.

15           This idea that Oxycontin, this

16   extended release opioid that packs an enormous

17   dose of opioid, could be -- should be prescribed

18   instead of one of these competitor products, if

19   that happened, it was very likely this promotion

20   harmed people.  It's much more likely to harm a

21   patient if you prescribe them Oxycontin than if

22   you prescribe them Tylenol with codeine.

23   Q.      Oxycontin is oxycodone, correct?

24   A.      Oxycontin is extended release

25   oxycodone.  It comes in enormous doses and it's

Page 299

1    meant to be taken around the clock.  A patient who

2    takes Oxycontin can very quickly become dependent

3    or addicted.

4         Q.     And Percocet is an oxycodone,

5    correct?

6         A.     Correct.  So the average Percocet

7    would have five milligrams of oxycodone in it.

8    Oxycontin comes in a dose with 80 milligrams of

9    oxycodone.  They're not equivalent products.

10        Q.     But they are all opioids, correct,

11   Doctor?

12               MS. DICKINSON:  Counsel, he's not

13        finished with his answer.  You guys are

14        talking over each other.

15               Doctor, please finish your answer and

16        counsel, can you give him a minute?  You're

17        talking over him a lot.

18        A.     Promoting Oxycontin where it's a

19   low-dosage opioid product that might have been

20   prescribed might have harmed patients.  This is a

21   good example of marketing by a distributor that

22   had a harmful impact.

23        Q.     But you do agree with me that all of

24   these drugs or at least most of these drugs are

25   opioids, correct?

1      A.      To just say yes to that would be

2    misleading.  They are not -- these drugs are not

3    all equivalent to Oxycontin.  Oxycontin is an

4    extended relief oxycodone product that comes in an

5    extremely high dosage.  Most of these or all

6    almost of them are immediate relief opioid

7    products that come in low dosages.

8      Q.      You don't know if this was ever

9    implemented, correct?

10            MS. DICKINSON:  Objection to form.

11     A.      Based on the two pages that you

12   handed -- that you're asking me to comment on, I

13   can't say.  I would hope that it wasn't, but I

14   think it's very likely that it was.  And I --

15   maybe elsewhere in my report I cite examples -- I

16   do cite examples of promotions like this that were

17   implemented where there's a statement of work and

18   an invoice.

19     Q.      But you're guessing that this was

20   implemented, correct?  You don't have any

21   knowledge?

22            MS. DICKINSON:  Objection to form.

23            Misstates his testimony.

24     A.      Based on the two pages you're asking

25   me to give you an opinion about, it doesn't say

Page 301

1    here.  I believe that in my report I cite

2    examples -- and maybe this example -- of

3    promotions like this that were -- that I do know

4    were executed.  I know they were executed because

5    there's data on their effectiveness commented on

6    internally.

7         Q.     And you don't know how many West

8    Virginia pharmacists pushed on this glimmer button

9    and then ordered Oxycontin, correct?

10        A.     I don't have data to tell me how

11   often that happened in the State of West Virginia.

12        Q.     You cut put that aside, Doctor.

13               You state also in your report that

14   distributors sold services designed to increase

15   opioid use and another way that they did this was

16   by establishing programs on how pharmacists could

17   advise and reassure patients about opioids.

18        A.     I'm sorry.  Where are you reading

19   from?

20        Q.     Page 14 of your report.

21        A.     I'm sorry.  Where on the page are

22   you?

23        Q.     Right in the same sentence we were

24   just at, establishing programs on how pharmacists

25   could advise and reassure patients on opioids.

Page 302

```
 1              That's one more example that you give
 2    that distributors sold services designed to
 3    increase opioid use, correct?
 4         A.      I'm sorry.  The example we just went
 5    over was an example of a promotion.  I'm not sure
 6    what -- I'm sorry.  Your question is --
 7         Q.      I'm simply asking you what you stated
 8    your report, sir.
 9              You stated that distributors sold
10    services designed to increase --
11         A.      I'm sorry.  I'm having --
12         Q.      -- and one of the -- that's one of
13    your overall themes, is it not?
14              MS. DICKINSON:  Objection to form.
15         A.      Yes.  I'm trying to see where exactly
16    you're reading from.
17         Q.      Page 14 --
18         A.      I'm on page 14.
19         Q.      Same sentence that we were just at
20    before:  Distributors did more than simply ship
21    orders, but rather culled services designed to
22    increase demand, including drafting template
23    letters, establishing programs on how pharmacists
24    could advise and reassure patients about opioids.
25              Correct?
```

```
                                                  Page 303
 1          A.      Yes.
 2          Q.      Then you cite on page 15 ABDC's Plus
 3    Care and Good Neighbor programs as examples of
 4    this claim, correct?
 5                  MS. DICKINSON:  Objection to form.
 6                  Lacks foundation.
 7          A.      I believe so.  I'm not seeing where
 8    it says that, but I -- that sounds right.
 9                  MS. VITALE:  Can you please go to tab
10          ABDC eight?  I'm going to mark as this
11          Exhibit ABDC 25.
12                  (Whereupon, Exhibit 25 was marked for
13          identification.)
14          Q.      This document shows that Bergen's
15    Plus Care involved Bergen Brunswick mailing a
16    packet to information to 1,800 community
17    pharmacists.  The educational pieces designated
18    should include both the Plus Care logo and Good
19    Neighbor pharmacy logo.
20                  Did I read that correctly?
21          A.      Yes.
22          Q.      Doctor, do you see where I read that?
23    Did I read it correctly?
24          A.      Yes, you did.
25          Q.      You do not know whether any West
```

1    Virginia pharmacist received these pamphlets

2    sitting here today, do you?

3              MS. DICKINSON:  Objection to form.

4        A.    I don't have the list of the 1,800

5    pharmacies that were targeted in front of me.  The

6    answer is I don't know.

7        Q.    And sitting here today, you do not

8    have any evidence of West Virginia pharmacists who

9    read and then reassured patients about opioids,

10    correct?

11              MS. DICKINSON:  Objection to form.

12        A.    I do have evidence that West Virginia

13    pharmacies and pharmacists were exposed to these

14    messages.

15        Q.    So are you changing your testimony

16    that you just gave that you said you did not know

17    whether any West Virginia pharmacists received

18    these pamphlets?

19        A.    I'm sorry.  I thought you were asking

20    in general.  You're talking about --

21        Q.    No, I'm asking --

22              MS. DICKINSON:  Counsel, counsel,

23        you've got to slow down.  He's not even able

24        to get out his answer when you're asking the

25        next question.  I know you don't have a lot

Page 305

```
 1          of time, but that's not his fault, so let him

 2          answer the question.

 3                    Go ahead, Doctor.  Try to finish your

 4          answer.

 5          A.        So I'm sorry.  I thought you were

 6     asking me about in general.

 7                    On this specific promotion that

 8     you're asking me about, I believe there's more --

 9     I may have cited other examples of this Plus Care

10     promotion in my report.  I think there's more to

11     the email exchange than this single page, if I

12     remember correctly.  But based on this particular

13     page, what I can tell is that 1,800 pharmacies in

14     the United States were targeted and don't have the

15     list of pharmacies, so I can't say how many of

16     those 1,800 or if any of those 1,800 were in West

17     Virginia, but I do have evidence that West

18     Virginia pharmacies were exposed to these

19     promotions.

20          Q.        When you say these promotions, you

21     mean these types of promotions?  You don't have

22     evidence they were exposed to this particular

23     promotion, correct?

24          A.        I may in my report, but you're right,

25     I am speaking about these types of promotions.
```

Page 306

1      Q.      Okay.  You can put that aside.  Thank

2   you.

3              You're aware that ABDC distributes

4   insulin, flu vaccine, blood pressure medication

5   and other non-opioid prescription medication to

6   its pharmacy customers, correct?

7              MS. DICKINSON:  Objection to form.

8      A.      Correct.

9      Q.      You have no idea what percentage of

10  the company's distribution relates to other

11  life-saving medication, correct?

12             MS. DICKINSON:  Objection to form.

13             Lacks foundation.

14     A.      I'm sure I don't have a full

15  accounting of all of the different products that

16  AmerisourceBergen distributes.

17     Q.      Now, you also claim in your report

18  that -- excuse me -- defendants promoted opioids

19  through core marketing techniques such as email

20  and fax blast, direct mail promotion, web

21  promotion, banner advertising, home page

22  advertising on defendant's home pages and even

23  telemarketing.

24             Could you go to page 40 of your

25  report, footnote 138, so you have the reference?

```
                                                Page 307
 1              And you cite as an example of this

 2      a --

 3              MS. DICKINSON:  Counsel, I don't know

 4          if he's there yet.  I'm certainly not.  Can

 5          you give us a second?

 6              MS. VITALE:  Page 40, footnote 138.

 7              MS. DICKINSON:  Okay.  I'm there.

 8              Doctor, have you found that?

 9      A.      Yes.  I just want to see -- I can see

10      where it says footnote 138.  I just want to read

11      the sentence that cites 138.

12              Okay.  I'm with you.

13      Q.      You cite a sell sheet for

14      Mallinckrodt's generic fentanyl patch provided to

15      Amerisource customers in the footnote.

16              Do you see that?

17      A.      Yes, I do.

18              MS. VITALE:  Can you go to tab ABDC

19          12, please?  I'm going to mark this as ABDC

20          Exhibit 26.

21              (Whereupon, Exhibit 26 was marked for

22          identification.)

23              THE WITNESS:  Got it.

24      Q.      On page one of this sell sheet that

25      was provided to Amerisource customers, under
```

1    Indications and Usage, it reads "Because of the

2    risk of addiction, abuse and misuse with opioids,

3    even at recommended doses, and because of the

4    greater risks of overdose and death with extended

5    release opioid formulations, reserve fentanyl

6    transdermal system for use in patients for whom

7    alternative treatment options, for example,

8    non-opioid analgesics or immediate-release

9    opioids, are ineffective, not tolerated or would

10   be otherwise inadequate to provide sufficient

11   management of pain."

12              Did I read that correctly?

13       A.    Yes.

14       Q.    Then it says "Warning:  Addiction,

15   abuse and misuse, life-threatening respiratory

16   depression, accidental exposure, neonatal opioid

17   withdrawal syndrome."

18              Did I read that correctly?

19       A.    You did.

20       Q.    Then it says "Addiction, Abuse and

21   Misuse:  Fentanyl transdermal system exposes

22   patients and other users to the risk of opioid

23   addiction, abuse and misuse, which can lead to

24   overdose and death.  Assess each patient's risk

25   prior to prescribing fentanyl transdermal system

Page 309

1    and monitor all patients regularly."

2                    Did I read that correctly?

3         A.        Yes, I believe you did.

4         Q.        You can put that aside, Doctor.

5                    Do you know who Dr. Yingling is?

6         A.        Say that name again.

7         Q.        Dr. Kevin Yingling.

8         A.        It sounds familiar.

9         Q.        Are you aware that Dr. Yingling, who

10   is the Chairman of the Board of Director at Cabell

11   Huntington Hospital testified in this litigation

12   that he prescribed opioids and even increased the

13   rate at which he prescribed opioid medications

14   when he was in private practice?

15                   Are you aware of that?

16        A.        I'm not sure.  I mean, I reviewed

17   thousands of pages of documents.  Off the top of

18   my head, I can't recall whether or not I reviewed

19   his testimony.

20        Q.        So are you saying that Dr. Yingling

21   was duped or easily manipulated into prescribing

22   opioids to his patients?

23                   MS. DICKINSON:  Objection to form.

24                   Lacks foundation.

25        A.        Can you read me his testimony again?

1    Q.      He testified that he prescribed

2  opioids and increased the rate at which he

3  prescribed opioid medications when he was in

4  private practice.

5              MS. DICKINSON:  Objection to form.

6              Lacks foundation.

7    A.      I can't answer your question based on

8  I don't know who he treated.  Was he working in

9  palliative care?  If he was prescribing opioids to

10  patients who shouldn't have been getting opioids

11  and assuming he intended to be helping these

12  patients, then I would say he was influenced by

13  this campaign that resulted in the dramatic change

14  in opioid prescribing.  I don't know him, but I

15  know many smart and well-meaning clinicians who

16  were influenced by this campaign.

17    Q.      Do you know Dr. Kilkenny?

18    A.      The name is familiar.

19    Q.      Are you aware that Dr. Kilkenny, a

20  Physician Director of Cabell Huntington Hospital,

21  testified he prescribed opioids to his patients in

22  private practice?

23              MS. DICKINSON:  Objection to form.

24              Lacks foundation.

25    A.      I don't recall his specific

Page 311

1    testimony.

2        Q.      He also testified that he prescribed

3    opioids because he felt the benefit of opioid

4    medication outweighed the risk for that particular

5    patient.

6                    Are you aware of that?

7                    MS. DICKINSON:  Objection to form.

8                    Lacks foundation.

9                    Counsel, he just testified he hasn't

10        reviewed his testimony.

11                    It calls for speculation.

12                    MS. VITALE:  You can answer.

13        A.      I haven't reviewed his testimony.

14    What I can tell you is that I would expect that

15    any clinician who is well intended is only going

16    to prescribe a medicine or recommend a surgical

17    intervention or any treatment if they believe that

18    the benefits outweigh the risks to the patient

19    that they're treating.

20                    Unfortunately, when it comes to

21    opioids, in many cases, clinicians don't weigh the

22    risk versus benefit appropriately because they

23    are misinformed.

24        Q.      So do you think Dr. Kilkenny was

25    writing these prescriptions because a pharmacist

Page 312

1    who had a pamphlet told him to do so?

2              MS. DICKINSON:  Objection to form.

3              Lacks foundation.

4              Calls for speculation.

5              Counsel, I don't know where you're

6         going with this, but you haven't laid a

7         foundation that he's even seen the testimony,

8         so you can maybe ask this one more question

9         about Kilkenny, but I don't know it's going

10        to get you and you've got three minutes.

11             So go ahead, Doctor, if you can even

12        begin to answer that question.

13   A.     You were asking me about why a doctor

14   prescribed in a particular way.  It's a doctor who

15   I don't believe I ever met.  I don't recall

16   reviewing this doctor's testimony, I can't

17   really --

18             THE COURT REPORTER:  Doctor, I'm

19        sorry, but I can't hear you.

20   A.     I'm sorry.  I can't -- I'm being

21   asked -- you're asking me why a particular doctor

22   prescribed a particular medication.  I don't know

23   this doctor, I don't know who -- this doctor

24   patients, I don't recall reviewing this doctor's

25   testimony.  I have absolutely no idea why this

Page 313

1    doctor did or didn't do anything with any

2    particular patient or whether or not it was

3    appropriate or inappropriate.  I don't know

4    anything about the doctor's patients.

5            MS. VITALE:  Can you go to ABDC tab

6       25, please?  I'm going to mark this as ABDC

7       Exhibit 27.

8            (Whereupon, Exhibit 27 was marked for

9       identification.)

10   Q.      Doctor, my question is are you aware

11   in 2005 the West Virginia Board of Medicine

12   encouraged doctors to use prescription opioids to

13   treat chronic non-cancer pain?

14   A.      Yes.

15   Q.      If you go to the document -- It says

16   under the preamble, Section 1, last sentence, "For

17   the purposes of this policy, the inappropriate

18   treatment of pain includes nontreatment, under

19   treatment, over treatment and the continued use of

20   ineffective treatments."

21            Did I read that correctly?

22   A.      I believe you did.

23   Q.      On the second page, it says "The

24   Board recognizes that controlled substances,

25   including opioid analgesics, may be essential in

1    the treatment of acute pain due to trauma or

2    surgery and chronic pain whether due to cancer or

3    non-cancer origins."

4              Did I read that correctly?

5         A.    You read it correctly.

6         Q.    The last sentence in that same

7    paragraph says "Physicians should recognize that

8    tolerance and physical dependence are normal

9    consequences of sustained use of opioid analgesics

10   and are not the same as addiction."

11             Did I read that correctly?

12        A.    I believe you are reading this

13   document correctly.

14        Q.    Shouldn't the Board of Medicine be

15   held responsible for this pronouncement, since

16   this is a direct communication for physicians?

17             MS. DICKINSON:  Objection to form.

18             Lacks foundation.

19             Counsel, I believe we just hit seven

20        hours, so if you need to ask one more

21        question or something that's fine, but

22        Doctor, go ahead and then we could wrap it

23        up.

24        A.    That's a hard question to answer.  I

25   would say I don't really hold the Board

Page 315

1    responsible for being deceived.  I believe the
2    Board was deceived.  There are other statements
3    you didn't include.

4              For example, in this document is the
5    term "pseudoaddiction" and it lists as the
6    definition for pseudoaddiction the iatrogenic
7    syndrome relating from the misinterpretation of
8    relief seeking behaviors as though they are
9    drug-seeking behaviors that are commonly seen with
10   addiction.  The relief seeking behaviors resolve
11   upon institution of effective analgesic therapy."

12             Where you see the word
13   "pseudoaddiction," it's like a fingerprint for the
14   opioids industries influence campaign, which was
15   extensive and influenced state medical boards,
16   largely through their trade association, the
17   federation of state medical boards.

18             Pseudoaddiction is a made up concept.
19   It was a term coined by David Haddox, Purdue
20   Pharma's medical director.  It's a term that tells
21   prescribers to do exactly the opposite of what
22   they should do if they think a patient is
23   addicted.

24             What this is really saying is if your
25   patient looks like they might be addicted, give

1    them a higher dose.  They look addicted because

2    you are under prescribing pain.  This is a really

3    dangerous concept and it's a shame that the West

4    Virginia Medical Board helped disseminate that

5    concept, but I don't really blame them.

6              I think, like many in the medical

7    community, they believe that they were doing the

8    right thing, but they were influenced by an

9    industry funded campaign that the included the

10   distributors, your client.

11      Q.      So just final question.

12              You believe the West Virginia Board

13   of Medicine was duped?

14      A.      I believe that state medical boards

15   across the country were influenced by a campaign

16   that encouraged aggressive and inappropriate

17   prescribing.  State medical boards across the

18   country were hearing that they were part of a

19   chilling effect in America.  They were hearing

20   that patients were suffering needlessly because

21   doctors are too fearful of prescribing opioids

22   because of overblown fear of addiction and that we

23   could be much more compassionate if we prescribe

24   opioids more liberally.  Eight medical boards fell

25   for it across the company.  The opioid crisis

Page 317

1    happened for a reason and this is one of the

2    reasons it happened.  Yes.  Eight medical boards

3    for influenced by the campaign that promoted

4    inappropriate prescribing.

5              MS. VITALE:  Thank you, Doctor.

6              I appreciate your time.

7              No more questions.

8              MS. DICKINSON:  I think we're out of

9         time, if the videographer and court reporter

10        want to close the record.

11             THE VIDEOGRAPHER:  The time is

12        5:40 p.m. and we are off the record.

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATION

2          I, SARA K. KILLIAN, RPR, CCR, do

3      hereby certify that ANDREW KOLODNY, M.D.,

4      the witness whose examination under oath

5      is hereinbefore set forth, was duly sworn,

6      and that such deposition is a true record

7      of the testimony given by such witness.

8          I FURTHER CERTIFY that I am not

9      related to any of the parties to this

10     action by blood or marriage, and that

11     I am in no way interested in the

12     outcome of this matter.

13          IN WITNESS WHEREOF, I have hereunto

14     set my hand this 4th day of September, 2020.

15

16

17

18          SARA K. KILLIAN, RPR, CCR

19     Notary Public of the State of New York

20

21

22

23

24

25

```
                                                    Page 319
 1                      Veritext Legal Solutions

                            1100 Superior Ave

 2                             Suite 1820

                          Cleveland, Ohio 44114

 3                       Phone: 216-523-1313

 4     September 10, 2020

 5     Andrew Kolodny

       andrewjkolodny@gmail.com

 6

       Case Name: City Of Huntington v. Amerisourcebergen Drug Corporation,

 7     Et Al.

 8     Veritext Reference Number: 4241088   Deposition Date:  9/4/2020

 9     Dear Sir/Madam:

10     Enclosed you will find a transcript of your deposition.

11     As the reading and signing have not been expressly

12     waived, please review the transcript and note any

13     changes or corrections on the errata sheet

14     included, indicating the page, line number, change and

15     reason for the change. Sign at the bottom of the sheet

16     in the presence of a notary and forward the errata sheet

17     back to us at the address shown above or email to

18     production-midwest@veritext.com.

19     If the errata is not returned within thirty days of your receipt of

20     this letter, the reading and signing will be deemed waived.

21     Sincerely,

22

23     Production Department

24

25     NO NOTARY REQUIRED IN CA
```

```
 1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4241088
 3  City Of Huntington v. Amerisourcebergen Drug Corp, Et Al.
    DATE OF DEPOSITION: 9/4/2020
 4  WITNESS' NAME: Andrew Kolodny
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have made no changes to the testimony
    as transcribed by the court reporter.
 8

    _____          _____
 9  Date                         Andrew Kolodny
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

Page 321

```
 1                  DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4241088
 3  City Of Huntington v. Amerisourcebergen Drug Corp, Et Al.
    DATE OF DEPOSITION: 9/4/2020
 4  WITNESS' NAME: Andrew Kolodny
 5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9        I request that these changes be entered
    as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                          Andrew Kolodny
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 322

1                      ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2             ASSIGNMENT NO: 4241088
3    PAGE/LINE(S) /        CHANGE         /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                      Andrew Kolodny
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

[& - 30]

**&**

**&**   3:6,15,20 8:22
9:1,3

**0**

**0.04**   168:14,20
169:18
**00133350-0013**
7:18

**1**

**1**   5:9 10:22 11:1,9
19:7 313:16
**1,136**   170:6
**1,800**   303:16 304:4
305:13,16,16
**10**   5:9 58:14 319:4
**100**   76:20 265:22
270:11
**107**   66:25 67:2
**10:09**   52:25
**10:15**   52:23 53:1
53:11
**10th**   3:6
**11**   20:3,16 170:6
**11.2**   18:7,16,16
**1100**   319:1
**11:20**   95:8
**11:30**   96:7
**11:32**   96:13
**12**   5:19 33:22 35:4
36:16,17 137:1
157:17 307:19
**1253**   28:16
**1256**   76:4
**1257**   78:16
**12:15**   95:18
**12:30**   95:18,22
**12th**   3:15
**13**   6:12 97:17,21
97:23 277:14

**1317**   168:9,16
**133350**   278:3
**138**   306:25 307:6
307:10,11
**14**   6:21 167:5,9,12
167:24 168:1
294:3,16 301:20
302:17,18
**15**   5:11 7:13 54:12
66:4 156:7 208:6
208:9,12,15 293:2
293:9 303:2
**150**   196:17
**1557**   77:22
**156**   6:17
**16**   6:20
**167**   6:21
**17**   12:10 28:11
**1717**   4:6
**18**   5:12 279:10
**1820**   319:2
**191**   98:12,21
**19103**   4:7
**192**   101:3
**194**   7:3
**1980s**   116:19
**1996**   116:25 117:1
117:4,6,10,15,20
117:21,22,25
118:5,16 119:1,20
122:10,12,15,15
127:21 162:25
**1:05**   142:17
**1st**   204:25

**2**

**2**   5:19,19 6:8
22:12,13 23:6,10
68:1,3,5,6,11 71:2
76:23 77:15
122:24

**20**   7:3 50:20
138:12 164:24
189:25 194:2,6,23
194:25 287:21
320:16 321:22
322:22
**20001**   3:7
**20005**   3:16
**2003**   173:12 247:2
**2004**   168:23
**2005**   313:11
**2006**   199:4
**2008**   37:15 168:23
**201**   7:10
**2010**   41:9
**2010-2016**   7:9
**2011**   5:19 41:9
175:21
**2012**   18:6 156:7
**2013**   156:7 157:17
263:24
**2014**   61:11 85:11
156:6 190:4 198:2
263:24
**2015**   198:1
**2016**   5:13,14 16:4
**2017**   157:18
244:21 263:21
**2018**   157:17,18
158:4,13 166:21
244:20 263:20
264:3 270:1
**2019**   156:7 158:4
160:10 206:13
263:1 270:1
**2020**   1:16 5:10
6:20 7:4,10 8:7
157:10 158:2
195:2 201:12
206:9 245:6
318:14 319:4

**208**   7:13
**20s**   89:15
**21**   7:10 165:12
201:6,8,11 214:9
**216-523-1313**
319:3
**22**   7:10,18 277:18
277:19 278:6,10
**23**   7:19 289:2,4
**24**   7:21 295:24
296:1,14
**240**   58:21 151:22
**245**   61:12
**25**   7:22 46:14 48:1
48:4,11 92:15
93:2 151:20
155:13 296:13
297:3 303:11,12
313:6
**250**   5:4
**25353**   3:21
**25701**   2:15
**26**   7:23 156:18,18
307:20,21
**27**   5:15 7:24 313:7
313:8
**277**   7:18
**288**   5:5 33:25
**289**   7:19
**296**   7:21
**2:21**   194:16,17
**2:25**   194:14
**2:31**   194:20

**3**

**3**   5:9,11 15:20,23
16:2 34:16,22
39:6 62:7 63:19
74:14
**30**   28:19 29:5,9,19
34:5 51:13,14
54:11,21 58:16,19

114:2,5,8,20 115:7
129:18 130:20
151:22 156:6
265:5,11,15 266:7
267:21
**30-5-12b** 7:20
289:7
**303** 7:22
**307** 7:23
**30s** 89:15
**3100** 4:7
**313** 7:24
**318** 13:23
**32** 288:23 289:1
**33** 5:18 157:16
**3353** 7:18
**35** 62:3 63:8,9
78:23 79:14 80:7
**3:07** 221:16
**3:15** 221:11
**3:17-01362** 1:6
**3:17-01665** 1:12
**3:18** 221:19
**3rd** 2:14

**4**

**4** 1:16 5:15 6:15
7:4 27:20,23 28:1
61:6 76:2 77:19
77:20 96:18 98:2
194:4,5 195:2
277:17
**40** 30:21 78:24
79:14 80:7 306:24
307:6
**42** 6:3
**422** 2:14
**4241088** 319:8
320:2 321:2 322:2
**4268** 318:17
**44114** 319:2

**4532** 2:7
**4658** 9:25
**4:05** 250:7
**4:57** 288:2
**4th** 8:7 318:14

**5**

**5** 5:18 6:14 33:3,6
33:8,10 46:1,11
62:4 63:16 98:1
101:6
**50** 23:1 26:19
58:15 64:7 115:9
130:21 155:23,24
156:8,19 227:20
254:23 298:12,12
**500** 15:6
**500,000** 15:6
**53** 143:1
**53211** 2:8
**557** 42:20 102:3
**56** 220:15
**562** 61:25 62:1
63:8 73:16
**57** 147:13
**58** 147:13
**5:40** 317:12

**6**

**6** 289:14
**600** 15:7
**65** 61:13 98:24
**68** 6:8 37:11

**7**

**7** 6:17 156:22
157:1,7
**707** 3:21
**71** 195:12,22
196:11
**725** 3:15
**744** 201:16,25
214:10,15 215:6,8

**745** 215:6
**75** 48:7,10,16,23
**752** 170:5,6
**78** 185:13,14

**8**

**8** 7:11
**80** 138:13 270:24
299:8
**80s** 119:14
**850** 3:6
**86** 113:16
**8801142910-88...**
7:21

**9**

**9** 5:3 6:3 42:3,5,10
61:23 73:15
101:24,25
**9/4/2020** 319:8
320:3 321:3
**90** 49:7,9,13 50:3
50:10,14 51:9
54:2 65:1,19
66:22 67:9
**901** 3:20
**90s** 116:20,21
117:8 119:11
127:9
**95** 7:23
**96** 231:5
**97** 6:12
**9:00** 1:16
**9:06** 8:2,8
**9:09** 52:24
**9:32** 25:17

**a**

**a.m.** 1:16 8:8
**abbreviation** 69:1
**abdc** 7:23 144:18
144:22 148:13
149:11 150:7

175:17 176:7
276:6 288:10,23
289:1,2 292:13,21
293:18 295:22,23
303:10,11 306:3
307:18,19 313:5,6
**abdc's** 303:2
**ability** 191:10
243:19,21,24
**able** 18:24 19:17
61:1 108:5 141:10
152:24 188:24
194:24 200:19
229:21 234:11,11
257:17 265:19
268:15 273:13,13
276:23 304:23
**absolutely** 73:8
183:5 188:18
191:21 227:9
312:25
**abstral** 279:2,3,8
279:19,25 280:20
281:4,7 288:17
290:21,22 291:16
291:25 292:2,3
**abuse** 5:15 6:4
28:2 42:12 68:22
69:18 70:16 83:17
83:20 84:16,17,19
84:24 96:21 99:1
101:11 102:7
308:2,15,20,23
**abused** 195:12,22
**abusers** 222:13
**abuses** 83:22 84:2
**abusing** 84:2
**academic** 200:3,4
209:22 225:14
**academy** 164:7

**acceptable** 202:22

**access** 6:8 110:15
143:14 144:1,3,11
173:14 199:16
228:24 268:2
271:10,12 287:9

**accidental** 308:16

**accord** 195:20

**account** 146:23
239:4,7

**accounted** 148:3

**accounting** 306:15

**accounts** 78:23
79:14 80:13 81:22

**accreditation**
120:15

**accurate** 30:4 37:6
56:8 61:20 72:9
143:25 290:12,18
290:19

**accurately** 38:15
266:11,17

**accusource** 295:17
296:5

**acetaminophen**
298:10

**aches** 18:14

**achieved** 239:5

**acknowledge** 47:3
136:11 252:24,25
258:6 320:11
321:16

**acknowledged**
180:17

**act** 173:18 228:24
320:14 321:20

**acted** 246:16

**action** 1:6,11
175:21 176:4
318:10

**actions** 236:21

**active** 289:9

**actively** 228:17

**activities** 72:21
109:1 204:18
205:5 227:23
228:21 229:4
230:10 242:18
293:13

**activity** 206:16
242:7 283:19

**actors** 235:8

**actual** 14:1 17:2

**acute** 20:8 21:5
22:2,16,24 23:2,5
23:14,16,21,23
24:1,1,3,6,9,22
25:21,23 26:1,6,7
26:11,17,24 28:20
29:10,20 30:13
31:15 32:10,19,21
32:23,25 39:12
49:10,17,24 50:19
50:23 51:22 55:4
57:10,15 58:13
59:21 73:21 74:6
74:7,9,18 77:7
115:12,14 189:12
314:1

**acutely** 36:14 65:9

**add** 179:12

**addicted** 47:10
66:23 74:14 75:10
75:23 77:2 80:10
81:1 83:4,23 84:4
84:7,10,23 87:18
88:1,3,9,12,13,16
89:9 90:13 91:8
91:19,21 92:7
162:25 196:19,21
197:6 203:5,6

222:16 238:2
299:3 315:23,25
316:1

**addiction** 19:19
43:3,19 46:13,15
47:4,17 55:8
60:17 66:14 67:4
70:8 74:15,19
76:8,17 77:11
78:22,24 79:12,15
80:2,9,14,18,21
81:8,11,20,23
82:18 83:18,24
84:20 88:9,20,23
88:24 89:6,13,17
89:18,22,25 90:5
90:16,22 91:3,14
91:17,24 92:4,13
93:7,15 96:25
97:1,8,14,15,16
121:13 134:8
151:11 155:1
162:3,7,8,19 163:1
163:6,7 173:14
199:17 200:2,16
200:23 201:2,5
202:25 224:15,19
239:2 246:21
248:2,19,22 257:3
259:19,21 261:8
292:16 308:2,14
308:20,23 314:10
315:10 316:22

**addictive** 80:22,24
81:5 82:5,21 83:3
83:7,12,13 213:23
214:2 225:7

**adding** 117:1

**addition** 83:6
192:8

**address** 9:23
18:20 40:4 119:24
139:7 272:8,12
319:17

**addressed** 124:13

**addressing** 191:17
193:15

**adequately** 119:24
122:8

**adhere** 227:2

**adherence** 223:21
223:22 224:3
226:13,20,23,24
227:4,6,11,15
283:18

**adhering** 138:5
223:24

**adjacent** 154:15

**administered**
289:12

**administration**
289:13

**adolescent** 86:21

**adolescents** 78:25
79:16,22 80:8
86:21

**adults** 18:8,17
30:20 31:3,7
71:12,24 89:7

**advance** 12:9,15
12:21

**adverse** 70:2,11

**adversities** 101:9

**advertised** 206:25
208:4

**advertisements**
283:3 292:22
293:18 294:13
295:4,20

**advertising** 222:9
278:14 306:21,22

advice 133:25
134:3,16
advil 251:16
advise 301:17,25
302:24
advocacy 173:15
228:3,5,7
advocate 126:10
advocates 126:2
affect 128:18
146:17 276:8
286:11
affixed 320:15
321:21
afraid 90:11
afternoon 288:8
age 98:23 279:10
aged 89:12
agencies 120:15
234:2,10
aggregate 264:10
aggressive 126:16
158:18 188:13,20
188:23 191:12
192:19 229:3
239:18 248:11
268:18 270:19,21
316:16
aggressively 38:12
ago 81:3 209:16
250:16 263:13
agonist 279:8
agree 15:16 16:17
17:19 18:1,11,19
28:23 29:8,18,19
30:8,22,23 31:20
32:6 38:18 44:2
44:13,21 45:20
59:13 65:3 67:12
69:3,6,13 72:3,7
73:5 74:1 75:5,11

75:15 76:13 77:10
79:20 82:13
102:11,13,25
103:6 117:14
120:4 121:4 128:7
133:9 139:9,25
160:17 162:16,23
163:13 166:12
189:7 190:13
235:5 241:13,20
242:1 248:13
254:8 255:16
270:13 297:2,10
299:23
ahead 30:5 32:8
32:15 52:13
103:22 141:17
149:24,25 211:5
216:5 219:14
258:21 266:18,21
267:9,12 290:16
305:3 312:11
314:22
aim 95:20,21
al 1:7,13 8:12 34:4
319:7 320:3 321:3
alcohol 70:24
80:18,20,21 83:14
101:7
alive 18:15 29:1
255:24
allocate 246:5
allocated 266:19
allow 172:24
allowing 215:9
alternative 308:7
alyssa 4:9 9:8
ama 7:10 157:4
159:12 161:5,7
162:12 163:12,21
163:21,25 164:2,6

164:14 201:11
ama's 161:12
amalgamation
131:22
amendments
231:16
america 119:22
126:5 239:21
316:19
american 6:19
157:7 164:7
americans 28:19
29:2,5,9,20 30:13
76:25 119:23
170:18 195:11,21
254:23 255:18,25
amerisource
307:15,25
amerisourceberg...
1:7,13 4:4 8:11
9:7 288:10 306:16
319:6 320:3 321:3
amount 14:8,22
54:11 56:15
108:11 114:21,24
115:19 129:5
130:16,24 138:15
139:20 148:3
189:18 233:18
amounts 45:5
106:9 114:5 116:7
140:17 289:9
amy 6:23 167:13
168:5,6
analgesic 315:11
analgesics 31:14
32:18 292:14
308:8 313:25
314:9
analyses 284:1

analysis 18:6
55:21 70:14 266:5
283:24 284:7
andrew 1:18 5:9
7:12 8:9 9:24
201:12 318:3
319:5 320:4,9
321:4,13 322:20
andrewjkolodny
319:5
anexsia 297:9
anita 140:16
announcement
278:11,19 280:18
annual 170:18
answer 27:1 29:16
30:2,6,8 51:19
54:4 57:11 74:16
77:14 81:16 88:8
88:25 108:9
110:16 150:14
151:5 170:1,13
172:2 182:15
196:11 211:6
218:4 265:21
266:11,17 267:7
290:16 299:13,15
304:6,24 305:2,4
310:7 311:12
312:12 314:24
answered 30:1
82:20 149:15
150:10,12 261:10
266:14 285:24
answering 131:11
150:14 177:6,15
177:16 244:3
answers 267:5
anthony 2:9 8:17
anti 227:4 273:8

[antisocial - assumption]                                              Page 5

antisocial 101:13
anxiety 101:8
anybody 10:12
  198:16
anymore 282:2
apart 120:6,8
apologies 8:6
  294:4
apologized 180:18
  238:12
appalachia 237:13
appeal 292:22
  293:19 294:13
  295:20
appear 320:11
  321:15
appearing 2:4 3:4
  3:13 4:4
appended 321:11
  321:18
apples 58:22
application 219:24
  220:6
applies 227:15
apply 187:23
  201:1 226:15
  228:9 233:6
  264:16
applying 237:22
  240:19,23,24
apportion 233:25
  246:9
apportioning
  235:11
appreciate 239:8
  317:6
appropriate 21:13
  21:14,20,23 23:20
  24:2,13,18 25:23
  26:12 56:22 59:19
  59:23 60:2 114:10

115:14 116:17,19
119:10 121:14,17
197:1 198:9
223:14 224:23
254:11 257:4
260:8 265:7 313:3
appropriately
  122:10 193:19
  246:17 311:22
approval 36:21
approved 35:19
  215:15 289:12
  297:7,13
approximated
  168:13,18
approximately
  262:24 276:10
apt 257:5
arch 4:6
arcos 143:11,15,19
  143:19,22,23
  144:1,3,4,6,7,11
  262:19,25 263:5
  268:1,2,11 273:7
  273:23 274:1
  286:25
area 97:7 138:13
  138:21 172:17
  198:15
areas 116:9
argued 144:10
argument 144:13
  205:25 206:2
  273:17 274:3,5,6
  274:15
argumentative
  29:25 150:19
arguments 124:12
  273:17
arisen 90:17

arises 87:9
arising 80:14
arose 91:3
array 183:8
arrived 23:18
arthritis 59:19
article 7:13 77:25
  207:5 223:4,8
  224:13,18 225:10
  225:11,12,16,20
articles 13:4 37:18
  210:5 212:19
  218:3,6 223:1
aside 10:20 105:12
  119:7 133:4,5
  144:17 152:14
  230:20 292:11
  301:12 306:1
  309:4
asked 29:7,8 45:11
  81:17 82:20 90:2
  107:3,12,18
  108:10,14 109:8
  109:12 110:6,13
  110:17 111:11,11
  111:13,18,21,22
  111:23 112:21
  127:10 129:23
  149:15 150:10
  177:13 196:9
  219:9 261:10
  262:6 264:4 267:4
  273:7,22,24 274:4
  274:10 285:24
  312:21
asking 13:3 14:5
  32:1 53:20 84:15
  88:19,20 90:20
  106:24 110:10
  111:11 116:17
  121:16,17,18

134:20 138:14
147:8,9,12 164:15
182:6 184:8
188:25 191:12
194:23 233:25
236:17,19 254:10
258:2,12 266:2,13
267:3 276:14
300:12,24 302:7
304:19,21,24
305:6,8 312:13,21
assertion 184:3
assess 31:10 66:19
  308:24
assessed 47:2
  66:22
assign 247:10,15
assignment 320:2
  321:2 322:2
assimilated 125:9
assist 191:17
associated 17:23
  38:1,24 39:22
  41:3,5 78:24
  79:15 80:14 81:12
  81:23 83:17 100:8
  101:6,19
association 6:20
  6:21 7:14 99:22
  100:3,4,10,11,12
  157:8 167:14
  181:16 208:16
  315:16
associations
  101:17
assume 201:14
assuming 148:6
  196:2 310:11
assumption
  150:17 167:7

**astronomical** 130:18

**attached** 278:7 321:7

**attempted** 252:13 273:15 282:6

**attempting** 230:14 274:14

**attended** 199:8

**attention** 126:9 127:8 232:13 245:12

**attorney** 7:3,6 194:25

**attorneys** 205:14 205:15 206:7 219:8 262:16

**attribute** 159:21

**attributes** 200:7 200:18 211:24 212:11

**audited** 174:11,14

**august** 5:9 7:10 201:12 204:25

**author** 6:8 69:24 69:24 223:8 225:3 225:4

**authored** 223:8

**authority** 243:2,4 244:8

**authorize** 321:11

**authorized** 185:22

**authors** 32:7,14 225:10,11,13

**available** 143:19 143:22,23 144:7 146:10 151:2,4,16 153:15,16 197:17 205:13 206:7,20 206:22 246:10 254:7 263:5 269:4

269:11,13 270:6,7 271:15

**ave** 319:1

**avenue** 2:7 3:15

**avenues** 203:13

**average** 58:13 72:17 247:22 299:6

**aware** 32:9,10,13 32:22 37:25 38:5 38:23 39:20 40:9 40:12 64:9 83:16 84:17,21 87:12,22 109:14 110:1,7 112:14 134:2 144:9,13 145:17 154:20,24,25 158:1,2,5 178:7,10 178:12 179:18 187:17,21 205:2 205:21 230:6,7 237:11,12 239:21 257:21,22 273:9 275:4,11,16 283:11 306:3 309:9,15 310:19 311:6 313:10

**awful** 237:17

**axial** 59:7

**b**

**b** 5:7 6:1 7:1 186:17 289:18

**back** 25:3,7,18 33:6 34:15 39:5 45:16 52:22,23 53:1,9,18 58:8 59:5,7,7,23 61:5 64:16 73:14 76:1 86:15 95:9,21 96:7,13,14 97:19 104:4,15,21

110:14 135:8 141:22,24 142:3 142:12,17,24 165:17 173:12 184:8 194:13,21 199:4 205:8 214:7 214:8 215:4 221:9 221:10,11,20 224:6 245:16 247:2 250:8,11,24 255:7 263:24 288:5 319:17

**backaches** 121:15

**backwards** 113:6

**bad** 60:24 133:24 135:3 147:4 235:8

**balance** 43:1,18

**ballpark** 15:5

**banner** 306:21

**barrier** 200:24

**base** 73:7 152:15 154:3

**based** 41:18,18 55:20 78:6 88:25 90:3 115:4 121:9 122:3 143:11 153:14,14 154:2,4 174:4 179:2,2,3,5 181:23 198:2 230:19 236:13 240:1 242:11 246:10 265:3,21 272:13,14 280:24 281:24 300:11,24 305:12 310:7

**baseline** 265:1

**basic** 123:4,21

**basically** 45:4 90:8 151:5 176:15 183:2 223:3

**basing** 140:19 183:17

**basis** 18:14,17 34:14 54:1 57:19 59:3,21 96:25 117:15 151:6 152:10,12 161:11 170:18 215:19 236:19 260:24 261:3 263:22 271:24

**bassett** 4:13 8:4

**bates** 278:2

**bay** 2:8

**bear** 256:6

**bears** 246:12 249:3

**becoming** 74:14 75:9 81:1 83:23 84:4,7,10,23 91:8 263:23

**began** 51:21 90:1 90:22 205:7 206:12 232:6 245:12

**beginning** 140:6 232:13

**begins** 19:11 20:18 42:25 62:2 71:19 78:20 124:11 195:9 294:6,19

**behalf** 9:4,6 163:21,21

**behavior** 200:20

**behaviors** 315:8,9 315:10

**belief** 272:13

**believe** 13:14 14:15 18:13 19:2 23:3,7 26:18 27:1 27:4,8,11,13,19

28:9 37:24 40:1
46:8 48:1,3,4 55:9
55:17 56:20 57:11
62:24 67:1 83:5,7
84:12 90:3,9,24
98:19 119:20,25
122:2,3,9,21
128:15 131:17,24
133:2 135:6,15,23
136:11 143:12
144:19 145:1
146:17 149:1,20
149:23 153:7,8,20
154:16 163:18
164:1,18 165:8,10
165:17,18,19
167:1 172:16
176:25 177:25
178:5 180:2
186:13,24 197:11
198:5 201:25
207:8 218:11
225:11 229:13
231:18 232:7
238:4 246:11,21
249:3 251:12
252:6 257:2 258:1
259:9 261:19
262:4,18,20 263:1
263:11 269:16
270:13 272:5,11
272:17 273:24
277:1,8 280:13
283:14 284:1,10
285:1 286:1 287:3
287:9 290:21
293:21 295:7
297:15 301:1
303:7 305:8 309:3
311:17 312:15
313:22 314:12,19

315:1 316:7,12,14
**believed** 24:16
81:6 120:24
232:16 248:7
**believes** 137:21
280:20 289:23
**believing** 216:9
271:24
**benchmark**
117:22
**benchmarks**
237:20,22
**beneficial** 67:13
67:13
**benefit** 22:7 35:21
40:16,24 224:21
239:21 311:3,22
**benefits** 21:15,17
24:15 36:24 37:25
38:15,17,20 39:3
39:23 40:20,22
41:12,18,25 43:2
43:18 67:23 74:20
141:11 159:14,25
201:21 202:7,12
202:17 203:21
204:12 213:5,15
213:24 214:4,11
214:17,19,25
215:19 216:15,22
216:25 223:2
224:14 239:5
311:18
**bergen** 297:18
303:15
**bergen's** 295:17
296:5 303:14
**best** 98:22 133:3
133:21 138:9
142:8 151:5 267:5

**better** 39:3 40:5
109:22 118:4,15
119:15 122:8
124:5 126:10
127:9 141:2,10
143:22 159:18,25
161:1 180:16
233:24 234:9,11
239:22 268:2,11
**beyond** 94:23
**bias** 126:6
**big** 145:1 148:18
149:2,17,21
209:21 223:16
235:12
**bigger** 197:21
**biggest** 140:21
**bill** 228:25 231:10
231:13,15 232:4
232:10,18
**billions** 111:1,7
129:6 146:20
235:14 237:3
**bit** 10:8 45:10
62:22 85:3 92:21
96:16 102:24
122:14 125:24
130:7 142:5
161:17 172:6
184:6 218:1,17
228:10 250:21
**black** 279:20
**blackburn** 228:24
**blame** 233:18,25
234:12,17 235:1,6
235:12 246:9
247:11,15,22
249:4 273:16
274:14 316:5
**blameworthy**
234:20

**blast** 306:20
**blatant** 181:14
**blatantly** 226:3
**blind** 76:20
**blindness** 76:20
**blood** 306:4
318:10
**board** 7:24 159:19
275:1,7 309:10
313:11,24 314:14
314:25 315:2
316:4,12
**boards** 315:15,17
316:14,17,24
317:2
**bodies** 37:19
203:14
**body** 214:20,22
**bogus** 273:17
274:15
**bohnert** 6:23
167:14 168:5,6
**bonus** 15:11
**books** 37:18
**borrowed** 196:13
**borrowing** 187:24
197:14,18
**boscarino** 6:16
48:3 92:11 97:19
97:24 98:6,9
**bottle** 50:20
**bottom** 39:8 71:18
99:3 101:3 102:4
102:5 113:17
123:2,11 155:17
168:12,17 195:9
215:5,8 319:15
**box** 10:16 279:20
**boxes** 277:5
288:24

**brain** 83:8
**brand** 289:19
  290:3 297:3
**break** 25:19 52:2,6
  52:13,18 53:6,19
  92:19 95:6,11,14
  95:17 98:7 141:18
  141:20 194:8,10
  194:13,17,22
  221:2,5 249:24
  287:12
**breakdown** 145:7
  146:16
**breaking** 52:1
**breakthrough**
  279:9 281:15
**briefly** 221:1
  267:25
**broad** 215:9
**broader** 41:4
  186:9,18 187:16
**broadly** 37:25
  38:23 111:23
  124:14 165:25
  226:16
**broken** 182:17
  184:17
**brought** 95:25
  96:1
**bruce** 5:21 33:11
**brunswick** 303:15
**bud** 192:19
**bug** 255:22
**building** 242:13
**built** 55:2,6 242:10
**bulk** 22:8 55:25
  56:5,17,18 57:3,16
  58:24 145:2
  246:12 247:11
  249:3

**bullet** 157:15
**buprenorphine**
  173:15 199:17,20
  200:1,8,16,24
  201:3 209:17
  259:20,23
**bureau** 271:17
  272:6
**burling** 3:6 8:22
**burst** 59:15
**business** 141:4
  176:16 179:9
  199:9 240:8,11
  241:8 242:23
  243:2,4,19,20
  244:6 274:25
**butrans** 283:18
**button** 295:15
  296:4,5,7 297:20
  301:8
**buttons** 284:22
**buy** 256:7
**buying** 47:13
  122:18
**buys** 86:12

---

**c**

**c** 2:1 3:1,8 4:1 8:4
**ca** 319:25
**cabell** 1:9 55:11
  106:2 107:1,4,22
  109:16,25 110:2,8
  111:6,15 114:1,18
  128:18 129:12
  143:4,8 144:18
  145:4 147:7
  154:16 166:21
  237:1 258:9,13,16
  259:1,8,10 265:9
  266:7 267:22
  282:19 284:7,12
  284:16,24 285:2,4

285:11,17,21
  286:2 309:10
  310:20
**cabinet** 85:23
  188:9 189:5
**cabinets** 190:11
**cah** 7:18 277:7,17
**call** 72:23 74:4
  76:23 134:3 135:2
  135:19 136:22
  160:11 189:24
  211:16 228:7
  232:6 251:15
  253:9,23 254:19
  255:2 256:14,23
  260:15 261:13
**called** 59:6 123:25
  203:7 222:11
  274:20 277:17
**calling** 134:18
  135:13 200:6,17
  210:14,24 211:13
  218:8 253:16
  254:9 297:24
  298:3
**calls** 256:19
  261:14 274:12
  290:15 296:6
  311:11 312:4
**campaign** 118:20
  118:22 120:1
  121:23 200:4
  203:15 204:23
  210:21 211:2
  256:25 281:21
  310:13,16 315:14
  316:9,15 317:3
**cancer** 20:9 21:5
  22:6,9,12 23:7,11
  27:9,14 35:2
  43:24 44:20,23

51:2 54:19 55:4,7
  62:23 63:2,11,24
  65:5 114:12,13,20
  119:17 123:5,22
  129:2 255:17
  279:9,12 281:15
  281:18 313:13
  314:2,3
**candidates** 70:7
**capacity** 201:5
**capsule** 222:17
**capsules** 222:13
**cardinal** 3:13 8:25
  9:4 144:17,22
  148:13 149:11
  150:7 175:16,22
  176:4,6 250:14
  276:1,12,18 277:2
  278:7 280:2
**care** 19:12 20:9
  21:6 26:4 40:18
  44:17 67:20,22
  98:19 119:15
  123:4,21 126:13
  127:1 128:17
  146:4,22,24
  160:19 193:23
  224:23 229:7,9,19
  229:22 230:3,11
  230:13,14,16,19
  230:21,23 231:1,3
  253:1 257:23
  259:2,4 261:22
  303:3,15,18 305:9
  310:9
**career** 51:22
  126:17 127:5
**carefully** 64:14
**carey** 3:20 8:25
**carolina** 3:21

**carries** 101:5
  279:20
**carry** 247:6
**cartels** 248:14,25
**case** 24:8 65:20
  73:4 106:24
  108:25 112:10
  132:19 143:14
  144:22 150:25
  177:25 178:12
  179:19 180:15,16
  181:15 182:9,16
  183:7 184:16
  205:14,20 206:7
  219:17,20,23,25
  220:2 234:4,7
  238:11,25 240:11
  242:13,14 245:6
  251:21 260:22
  264:9 265:14
  269:2 273:10
  286:22,25 319:6
**cases** 14:23 50:5
  86:17 93:25 100:9
  100:10 114:14
  138:7 178:18
  212:17 215:3
  217:12 219:21
  220:8 239:2
  242:10,19 295:9
  311:21
**cash** 151:21 153:3
  155:4
**casual** 195:25
**catastrophe**
  236:10 237:5
  272:9
**catastrophic** 7:7
  20:10 21:6 23:12
  23:19

**catch** 118:11
**category** 23:14
  24:23 125:21,25
**catherine** 6:11
**causal** 100:10
  101:18 247:16
**causation** 247:11
**cause** 93:19 94:9
  99:14,18,22 100:5
  192:13 245:18,25
  246:3,14
**caused** 89:22
  161:19 162:19
  205:17,20 244:17
  245:22,24
**causes** 94:15 95:3
  246:5
**causing** 76:19
  100:9 158:23
**cautious** 229:14
**cautiously** 239:23
**caveat** 115:1
**ccr** 318:2,18
**cdc** 5:13 16:3
  34:16,21 36:1,22
  39:6 40:1
**cease** 243:25
**ceiling** 203:2
**center** 5:11 6:18
  113:15 115:2
  157:9
**centers** 109:2,4,6
  109:7,10
**ceo** 163:20 181:10
  182:3,11,24,25
  183:12 184:3
  238:14
**ceo's** 184:4
**ceos** 238:11,20
**cephalon** 242:14

**certain** 33:19
  40:10 144:8 158:9
  165:22 180:25
  217:21 272:10
**certainly** 52:12
  53:3 82:25 90:11
  99:24 107:4
  108:24 110:24
  126:24 141:17
  143:23 145:25
  146:10 159:8
  177:1 180:3
  184:19 190:4
  230:7 245:11
  246:15,16 247:2
  270:3 271:16
  297:11 307:4
**certainty** 147:22
  166:8
**certificate** 321:11
**certification** 318:1
  320:1 321:1
**certified** 1:21
**certify** 318:3,8
**chain** 105:16
  108:19 175:4
**chair** 142:13
**chairman** 309:10
**chance** 291:16
**change** 118:14,18
  118:21 127:14,16
  127:19 141:1,2
  145:25 146:12
  190:2 198:20
  256:25 310:13
  319:14,15 321:8
  322:3
**changed** 145:9
  146:7 147:10
  178:8,11 215:15

**changes** 14:5
  140:17 178:14,17
  179:2,15,25 180:2
  180:3 196:19
  319:13 320:7
  321:7,9
**changing** 178:13
  179:10 304:15
**characteristics**
  47:22 100:13
  200:7 211:25
  212:11
**characterization**
  37:6 216:17
**characterized**
  164:9
**charge** 183:17
**charged** 132:21,21
  137:6
**charleston** 3:21
  8:24
**chart** 155:17
  156:12 165:2,4,13
**charts** 159:11
**chase** 3:20
**check** 220:19
  293:25
**checked** 259:1
  284:12,24 286:2
**chief** 6:18 236:25
**child** 238:5,7
**childhood** 101:9
**children** 238:3,3
**chilling** 316:19
**choice** 75:6
**chose** 243:24
**christina** 4:8 9:5
  288:9 293:25
**christopher** 198:3
**chronic** 5:14,15,21
  6:5,9,13 16:4

17:23 22:5,6 28:3
28:20 29:10,20
30:14,20 31:2,7
32:11,25 33:13
35:20 36:9,14
39:13,17 40:3
42:13 43:24 44:19
44:23 45:4 46:1
46:21 49:6,11,14
50:9 51:1,2,17,21
53:21 56:1 57:5,8
57:17 58:11,25
59:1,2,4,9,11,14
59:17,22,24 60:2
60:20 62:4,8,23
63:2,10,16,20,24
64:7,21 65:5,8
66:9 68:13 74:7
74:24 89:20 93:6
97:25 98:17
100:15,20 101:19
119:22 126:14,16
127:9 224:3,7
239:17 255:11,16
255:20,23 256:1,4
256:5,6 257:4
313:13 314:2
**chronically**
223:14
**cigarette** 89:8
**circumstance**
26:13 104:23
105:3
**circumstances**
23:20 25:21 67:25
104:1 134:2
187:19
**citation** 13:15,24
13:25 18:12
**cite** 16:8 28:7 98:9
185:14 276:24

277:1 283:11
292:21 295:15
300:15,16 301:1
303:2 307:1,13
**cited** 12:19 28:11
29:15 30:10 33:20
33:20,22 42:17
48:4 58:8 66:4
108:25 168:3,24
181:18 196:4
241:9 283:13,23
295:16 305:9
**cites** 307:11
**citing** 28:25 36:1
72:10 79:24 82:12
165:18,20
**citizens** 240:7
**city** 1:4 8:10 154:4
199:18 200:13
319:6 320:3 321:3
**city's** 199:14
**civil** 1:6,11 320:5
321:5
**claim** 178:13
182:16 292:19
303:4 306:17
**claimed** 178:16,17
179:19 180:3
**claims** 31:8 201:20
202:6,11,16 204:3
204:9,11,13,15
207:3,12 214:11
214:16,24 215:11
215:19,22,23
221:22
**clarify** 21:11
**class** 200:25 241:6
251:11 257:1,2
281:17
**classes** 226:20

**clause** 102:17
**clean** 166:19
**cleaner** 128:6
**clear** 89:25 111:2
112:3,19 114:21
147:10 152:22
250:22 251:2
282:1
**clearer** 36:13
245:2,4,7
**clearly** 174:16
**cleveland** 319:2
**client** 176:13
180:3,4 181:10
280:17 281:2
286:22 316:10
**clients** 146:9
**clinic** 47:12
138:25 139:5,10
139:11,21,23
**clinical** 17:22 35:4
36:8,21 43:1,17
44:7 72:14 73:8
73:19 89:1,3,4
126:7 134:6
140:12 141:7
153:14 159:18
172:15 213:16,25
214:5 238:21
259:5 260:18
261:15 265:11
**clinically** 113:20
113:23 114:24
115:22 116:14
117:2,4,15,16,19
127:25 128:19
129:3,7 130:11
131:17,24 132:7
132:11,17,22
133:10,15 137:8
137:11,14,17,21

138:2
**clinician** 38:19
40:19 41:24,24
72:18 189:10,15
247:22 248:2
251:15 252:8
254:4 311:15
**clinicians** 38:14,16
38:18,22 39:14,21
43:1,17 122:18
216:9 218:7 251:8
251:17 258:6
261:20 310:15
311:21
**clinics** 128:1,11
129:11 139:16
200:12,14 295:10
**clock** 19:4 61:3
299:1
**close** 160:16
317:10
**closed** 112:4,7,9
112:12,12,20
186:11,13,17
187:2,9,10,12,14
190:9,16,16,17,19
190:20,21 191:1,2
**closely** 29:14
110:14 175:8
**closing** 140:24
**cme** 72:21 210:6,9
218:3
**cncp** 43:3,19,24
**coaching** 227:11
**code** 7:19 289:7
290:12
**codeine** 298:9,10
298:12,22
**coffee** 194:8
**coined** 315:19

**collaborate** 271:19
**collaborated** 97:6
**collaboratively**
272:8 273:4
**colleagues** 133:23
221:1 249:19
261:16 274:21
286:17
**collected** 262:19
270:12
**collection** 137:22
137:24
**colleen** 3:17 9:2
250:13
**column** 16:20
17:12 18:5 34:1,3
34:24 39:8,9,10
42:23,24 62:1
76:7 78:17,18
98:22 101:4 102:3
102:5 168:17
**combat** 7:4 195:1
**combination**
22:10 23:10
137:25 173:16
222:8
**come** 33:6 52:23
95:9,21 96:7
103:1 104:7,12
105:21 108:23
139:18 141:22
142:3,12 160:15
161:17 176:17
194:13 214:4,6
221:9,10,11 222:5
224:9 229:7
253:13 300:7
**comes** 22:9 59:10
80:18,22 81:5
136:22 138:18
160:1 178:2 196:6

229:8 230:23
253:19 298:25
299:8 300:4
311:20
**comfortable**
119:19
**coming** 52:22
120:16 121:9
179:1 238:5
264:24 265:9
**comment** 172:17
300:12
**commented** 301:5
**comments** 126:24
264:15
**commerce** 153:21
**commission** 1:9
320:19 321:25
322:25
**commit** 242:15
**committed** 242:3
242:12,20
**committee** 153:22
**common** 18:14
56:1 57:4,17
58:25 59:4 66:1
88:11 93:11 134:5
134:13 135:7
155:6 215:10
251:3,8,13,14
252:23 253:4,6
254:4,22 256:8
257:4 259:2
261:15,19,20
**commonly** 69:7
81:6 85:11 251:17
315:9
**communicate**
41:10 124:6 129:4
134:16 261:19

**communicated**
183:2,14 202:20
203:10,15 212:16
217:3,5 227:7
268:16
**communicating**
40:6 180:15
181:16 184:16
213:10 283:14
**communication**
176:10,14,15
182:14 222:19
283:13 314:16
**communications**
176:12 177:1,2,17
178:3,4 179:6
181:2,20 209:11
217:4 223:12
281:25
**communities**
113:19 116:2
200:14 235:15
237:2,3,6,15
239:10 246:19
272:21 281:3
**community** 24:14
37:24 38:5,7 39:2
40:7 41:11,14,16
103:1,2 104:8,12
105:11,21,22,24
107:22 109:16,17
110:3,19 116:1
118:21 120:5,12
120:16 122:9,12
122:16 126:25
127:1,15 128:2,9
128:11,20,25
129:1,10,12 130:4
130:10,14,15
131:21 134:15,17
138:17,23 159:25

160:2 179:4
200:15 203:11
210:21 216:14
217:6 247:16
248:5,7 255:1
256:11,25 258:2
268:15 303:16
316:7
**companies** 35:18
181:1,6 183:12
184:11 209:6
210:23 214:6
216:7 235:13
236:20 237:8
240:15 241:9
256:13 274:21
286:19
**company** 175:3
181:4 182:12
199:22 223:7
316:25
**company's** 306:10
**comparable** 116:1
**comparative** 74:6
**comparatively**
74:8
**compare** 26:2
100:22,23 116:9
166:12
**compared** 39:23
53:24 77:3 111:16
170:21,24 171:4
**comparison** 6:14
98:1 160:14
**comparisons**
117:8 160:11
**compassionate**
122:5 248:3
316:23
**compensate**
268:25

**[compensation - continuing]** Page 12

compensation
15:8,12
competitor 296:7
298:18
competitors
296:13
complained
273:25
complaint 248:4
256:3
complete 144:12
completeness 30:3
compliance
173:20,23
complies 174:12
complying 174:7
compound 291:11
computer 295:17
concept 127:11
315:18 316:3,5
concern 32:24
40:2
concerned 158:16
229:17 232:10
concerning 67:20
concluded 34:4
169:16
concluding 181:24
conclusion 47:22
161:12 181:22
184:5 290:15
conclusions 78:6
condition 47:19
59:22 60:2,20
65:8 76:16 93:11
126:3 227:3 244:1
248:22 254:12,22
255:17 260:4
conditions 21:15
22:6 39:16 56:2
56:21 57:5,18

58:25 59:2,4,9,11
59:14,18,25
126:11 202:23
215:10 223:11
247:4 257:5
conduct 192:8
216:1,3,6 241:10
241:21,22 242:5
conducted 199:20
214:5 286:4
conducting 245:10
confirm 28:10
167:8 242:5
conglomeration
78:6
congress 180:5
181:9,11 182:4,12
182:25 183:1,13
183:24 232:12
238:12 244:20
245:10
congressional
228:20 232:8,9
conn 4:9 9:8
connelly 9:3
connolly 3:15
consensus 164:11
consequence
88:23
consequences
17:22 314:9
conservative
116:23 117:5,12
117:18,23
consider 37:5
88:15 110:9 210:5
286:6 297:19
consideration
75:24
considered 21:19
76:18 84:24 85:21

113:20 210:7,8
228:4 285:5
considering 39:15
179:23
consistent 34:5,9
35:11,15,24,25
61:17 62:11 116:8
157:21 169:21
consistently 36:16
36:17 90:3
constitute 22:7,13
27:15
constitutes 22:2
22:12
consult 131:1,11
133:22 135:14
136:18 220:25
251:3,9,18,25
252:2,5,9,14 253:4
256:15 257:7,10
257:19,23 260:2
260:25 261:4,21
consultations
251:22 252:21
259:14
consulted 174:6
174:17 239:24
258:10 265:1
consulting 10:19
133:24 250:25
252:19 259:12
261:6
consumed 56:13
56:16,21
consuming 117:1
consumption
21:25 22:1,4,8
50:25 51:4 56:1,9
56:12,17,17 57:12
57:14,17,22 58:11
58:24 116:18,24

117:7,11,19,24
130:15 131:7
138:22 140:20,22
cont'd 3:1 4:1 6:1
7:1
contact 133:22
134:10 228:20,22
contacted 291:1
container 58:21
contains 11:15
280:9
contemplates
85:15
contemplating
43:4,20
content 224:24,25
225:7,12,24,24
226:2
contest 33:22
context 158:22,25
174:19 184:19
262:10
contin 296:25
continue 18:24
19:17 40:10,13
60:7 160:7 179:11
188:21 227:12
242:23 243:7
268:19
continued 2:20
3:25 5:25 6:25
66:10 237:14
240:11,13 241:15
243:13 244:8
282:13 286:22
313:19
continues 160:6
163:8 255:22
continuing 158:15
159:8 160:3
242:15 243:7

**continuous** 49:8
**contradict** 36:7,18
**contradicts** 36:4
  36:19
**contrary** 32:17
**contrast** 76:8
**contrasted** 87:10
**contribute** 164:14
**contributed** 7:11
  233:16 248:15,17
  249:9
**contributing**
  205:23
**contributions**
  69:25
**control** 5:11 6:19
  83:2 157:9 188:8
**controlled** 16:16
  16:24 17:16
  135:12,13,21
  136:1,14,20
  172:21 173:11,17
  173:21 174:23
  175:1,4 243:8,14
  243:25 252:7
  313:24
**controlling** 191:7
**conversation**
  135:7 212:5 254:6
  257:12 258:17,23
**conversations**
  230:25 254:3,9,13
  257:9 259:25
  261:16
**conveyed** 216:25
**convicted** 153:10
  240:12
**convince** 229:22
**convoluted** 109:21
**coordinated** 211:2

**copy** 11:5
**core** 306:19
**corner** 125:6
  278:3
**corp** 320:3 321:3
**corporate** 235:21
  235:24 236:1,3,7
  239:25 240:4,7
**corporation** 1:7
  1:13 4:4 8:11 9:7
  288:10 319:6
**corporations**
  236:8 237:4
  238:10 247:20
**correct** 10:16,17
  11:8 14:19 15:13
  16:9 21:7,8 23:3
  26:13,14,21 40:16
  40:17 47:24 48:6
  54:20,21 60:21
  63:6,15,18,20,21
  69:2 72:15 73:7
  73:12,13 74:22
  77:23 78:9,10
  86:11 87:3 94:11
  94:23 99:17
  109:12 128:20
  130:12 131:18,25
  132:21,24 134:21
  137:15,19 139:2
  140:12 154:6
  155:21 156:16
  168:23 171:14
  175:2 183:19
  185:1 199:8
  202:14 203:25
  204:10 206:24
  207:1,16 208:3
  209:19 213:5,25
  214:21 215:17
  218:25 220:4

224:17 230:5
  243:15 257:15,20
  271:13 275:2
  278:8,11,23
  283:25 285:6,22
  286:7 287:1,3,6
  291:2,4 292:17,18
  292:24 293:10,20
  293:21,22 294:17
  294:21 295:20
  297:4,8,14 298:23
  299:5,6,10,25
  300:9,20 301:9
  302:3,25 303:4
  304:10 305:23
  306:6,8,11
**correction** 13:14
  13:22
**corrections** 13:11
  319:13 321:17
**correctly** 268:4
  279:13,14 289:15
  290:5 293:4
  296:10,16 297:21
  303:20,23 305:12
  308:12,18 309:2
  313:21 314:4,5,11
  314:13
**correspondence**
  13:25
**cost** 7:5
**costs** 195:2
**counsel** 8:13,24
  207:19 266:9
  288:13 292:25
  299:12,16 304:22
  304:22 307:3
  311:9 312:5
  314:19
**count** 276:22

**counted** 276:22
**counter** 135:4,9
  256:7
**counting** 56:9
**countries** 26:4
  38:13 115:15,24
  160:15,19,25
  161:2 239:23
**country** 157:23
  160:8 237:12
  316:15,18
**county** 1:9 55:11
  107:4 110:8 111:2
  111:6 114:19
  115:3,21 117:21
  129:6 130:17
  131:9 145:4
  146:20,21 147:7
  148:20 149:18
  151:1 154:16
  166:21,22 238:19
  258:9,13,16 259:1
  259:8,10 264:22
  265:9 268:17
  282:19 284:7,12
  284:17,24 285:2,4
  285:11,17,21
  286:2 320:10
  321:15
**couple** 60:23
  267:4
**course** 60:15 77:1
  92:22 146:1
  177:24 232:19
  252:12 269:8
  286:18
**courses** 125:10
**court** 1:1,21 9:12
  9:16,22 118:6,12
  312:18 317:9
  320:7

cover 123:15
covered 153:20
  250:20 269:19
  288:14
covid 158:22,25
covington 3:6 8:22
crackdown 140:22
craig 55:18
cream 134:9,19,20
creating 121:24
credence 144:14
crimes 241:25
  242:3,11,15,16,20
criminal 242:7
criminals 159:20
  240:8 248:14
crisis 7:12 12:10
  37:16 38:6 116:9
  153:23 154:19
  161:14,23 162:2
  163:6,17,18,24
  164:20 168:7
  172:14 173:13
  199:3,16 205:24
  222:15 229:1
  232:14 238:23
  244:13,18,25
  245:19,22,24
  246:13,17 248:15
  249:9 261:17
  265:3 316:25
criteria 6:15 46:1
  46:10,11,12,15,21
  46:25 47:8,16,23
  48:5,8,11,12,17
  93:7 98:2 255:22
critique 249:13
crohn's 89:21
crueger 2:7 8:16
crying 238:6

csa 185:15
culled 302:21
cumulative 269:19
current 158:8,10
  159:7 160:9 185:7
  242:7
currently 159:2
  185:9
customer 285:12
customers 107:8
  145:24 146:16
  148:10,21 149:8
  149:19 150:22
  217:7,10,12,14
  275:5,12 292:23
  293:19 294:8,14
  294:14,22 295:4,7
  295:9,13,20 306:6
  307:15,25
cut 47:9 49:13
  193:12 301:12
cvs 175:22

**d**

d 5:1,17,21 6:10
  9:19,19,19
daily 18:8,17 62:8
  63:20
dangerous 278:24
  281:9,22 291:21
  316:3
dangerousness
  67:18
data 18:6 22:11,20
  23:9 26:25 27:3,4
  27:18 31:9 32:15
  34:10 36:7 54:5
  54:10 55:9,16,17
  57:21,23 61:18
  75:12 87:14,19,19
  92:6,9,10 107:6
  108:3,4,8 110:15

130:23 131:7
143:3,11,15,19,19
143:21,23 144:1,3
144:4,6,7,11
147:22 149:17
151:4,16 158:8,10
159:7,12 160:10
161:15 166:7
174:4 197:25
198:2 215:1
257:18 262:1,7,11
262:12,14,19,21
262:25 263:5,10
263:11,12,14,17
264:9,10,14,15,17
265:23 268:1,2,5,6
268:9,12,14,24
269:1,4,10,10,12
269:17,19,22,24
269:25 270:2,4,5,7
270:7,10,11,12,13
270:17,17 271:4,8
271:8,8,11,13,14
271:15,21 272:2
272:15 273:1,7,14
273:23 274:1
283:22 284:11
286:1,25 287:4,10
301:5,10
database 207:21
  207:23
date 8:7 14:9 15:2
  226:10 269:24
  319:8 320:3,9,19
  321:3,13,25
  322:20,25
dated 157:9 195:2
david 315:19
dawson 140:16
day 40:21 60:6,10
  60:24 61:2 67:22

85:20,20 246:18
246:20 248:10
318:14 320:16
321:22 322:22
days 49:8,10,13,17
  49:19,23 50:3,10
  50:14 51:9,13,14
  54:2 65:1,19
  66:22 67:10
  196:17 319:19
dc 3:7,16
dea 108:25 143:18
  175:7,22 176:3
  185:8 186:11
  187:1,5,10 191:22
  192:2 205:8,22
  228:22 232:7,15
  233:20,23 234:4,7
  234:8 242:21
  243:1,6,11,12,16
  243:18 244:2
  273:7,10,11,16,22
  273:25,25 274:7,7
  274:10 275:18
  286:25 287:4,9
dea's 7:4,7 195:1
  234:3,14
dealer 86:13 133:5
  196:23
dealers 133:1
  141:4 197:11,20
  222:13
dealing 128:17
  197:9 198:14
  248:14
dear 319:9
death 166:22
  170:4 237:24
  248:18,24 308:4
  308:24

deaths  6:23
  161:14,16,20
  162:6,22,22 163:3
  165:5,6,7,10 166:1
  166:3,9,14,24
  167:16 169:13,17
  169:23 170:5
  171:12 172:1
  239:3
deborah  6:17
  157:8
debunk  82:3
decades  214:7
deceived  248:12
  315:1,2
deceiving  248:6
december  206:13
deceptive  118:20
  177:2 212:20
  218:6 279:24
  280:3,4
deceptively  247:4
decide  24:8 181:4
  181:6 237:21
deciding  137:7
  285:5 286:6
decision  24:11
  159:18,22 185:11
  258:18
decisions  133:8
  192:15 285:21
decline  60:14
  141:8 157:22
  159:22,23
declines  158:3
declining  166:2,9
decrease  158:24
decreased  157:16
dedicated  127:4
deed  320:14
  321:20

deemed  14:1
  319:20
defendant  3:4,13
  4:4 8:20 9:6
defendant's
  306:22
defendants  1:8,14
  80:3 107:7 108:24
  111:1,2 112:10
  114:4 143:14,24
  144:22 150:25
  178:12 179:18
  180:14,15 181:15
  182:9,16 183:7
  184:15 232:25
  238:11,25 240:5
  240:10 269:2
  285:10,12 286:22
  286:24 288:9
  292:13 306:18
defending  238:20
defense  258:5
define  49:16,23
  51:16 74:11 76:15
  117:18 218:2
defines  49:19
  219:18
defining  49:14
definitely  160:24
definition  218:3
  218:19 219:5,10
  219:16 228:9
  315:6
degree  241:6
deliver  112:25
  187:4
delivers  186:5
delivery  185:22
demand  181:12
  183:3 292:20
  293:16 297:23

298:2 302:22
dementia  147:3
demonstrated
  70:20 84:11
demonstrating
  81:14
dentist  90:10
department
  199:15,21,24
  200:10 243:24
  244:3,4 319:23
depend  249:11
dependence  6:4
  42:13 46:13 48:22
  101:7,7 314:8
dependent  15:9
  299:2
depending  15:12
depends  21:24
  74:11 76:15
  195:24 218:1
  249:16 253:13
deposition  1:18
  8:9 10:7 230:15
  236:24 238:14
  251:20 318:6
  319:8,10 320:1,3
  321:1,3
depositions  25:11
depression  19:20
  101:8 126:6
  308:16
deregulation
  158:24
described  190:9
  223:3 230:20
  240:2 259:11
  282:23 284:6
describing  69:23
  70:10 211:24

description  5:8
  6:2 7:2
descriptions  178:1
  178:5
designated  303:17
designed  170:1,12
  227:12 301:14
  302:2,10,21
desired  266:20
despite  239:9
detail  268:23
detailed  256:12,21
  256:22 268:5,21
detailing  199:21
  199:22 200:3,4
  209:22 286:14
detect  176:2
detectable  193:10
detecting  178:22
determinant  84:12
determinants
  235:25
determinative
  82:8
determine  264:4
  264:17 283:9
devastated  272:22
devastation  237:1
develop  88:20
  93:14 100:22
  205:17 241:2
developed  89:6,18
  90:5 100:24 163:1
  213:14,16,22,24
  214:18,20,22
  215:11
developing  74:19
  77:16 84:20 102:8
  173:24
development  80:9
  83:6 94:1 174:1,3

develops   83:24
  88:9
diagnosis   27:5
  58:3
diagnostic   6:15
  98:2
dickinson   2:7,9
  8:15,15,16 13:13
  13:21 15:18 29:24
  31:5,21 35:14
  36:5 37:1 38:3
  39:24 41:7,21
  44:4,16,24 45:14
  46:23 48:9,19
  51:10,24 52:10,19
  52:24 53:5,10
  54:3 57:6,25
  59:16 62:13 63:3
  63:12 64:3,24
  65:6 66:18 67:15
  68:7 69:4,21
  70:19 72:4 74:2
  75:17 76:14 77:13
  78:8 79:18 80:16
  81:13,25 82:19
  83:19 85:25 87:4
  87:11 88:6 90:18
  91:4,23 92:16,22
  92:25 93:20 94:12
  94:24 95:7 96:8
  97:10 99:16,20
  101:22 102:12
  103:4,11,21 105:6
  106:5,21 108:1,12
  108:21 109:19
  110:5 111:19
  112:18 113:3,11
  118:8,17 119:12
  120:10 121:7,21
  123:7,10 124:3
  125:2,17 128:3,12

128:21 130:22
131:6 132:1,8,12
133:12,16 134:22
138:6 139:3,14
140:3,13 141:13
141:21 142:11
143:5,16 146:14
148:7,17 149:14
150:9,13,18
152:13,16,20
155:25 157:24
158:6 159:16
160:5,21 162:14
166:5 169:20,24
172:12 175:19
176:23 177:10,12
177:22 178:9,15
179:17 180:1,13
182:1 183:22
184:14 185:4,24
186:8,21 187:7
188:3 189:8,22
190:14,24 194:9
194:15 197:24
202:18 208:2
210:3 212:2,13
213:6,18 215:2,13
215:21 217:9,18
217:25 219:4
221:4,7,25 222:3
225:9,18 226:9,18
233:8,22 235:3,7
235:22 236:5,16
237:23 238:16
240:3 241:23
242:9 243:9
244:10 246:7
247:1,18 248:9,16
249:10,21 250:2
251:6 253:11
255:3,19 256:18

257:14 258:20
261:9 262:8 264:6
264:12,19 265:17
266:9,23 267:3,23
269:15 272:3
274:11 275:8
276:13,19,25
277:10,15,21
278:16 282:10,25
284:9,19 285:7,23
286:8 287:2,7,13
287:16,19,25
290:13 291:3,9,14
292:7,25 293:3,6
293:24 294:10
297:5 298:5
299:12 300:10,22
302:14 303:5
304:3,11,22 306:7
306:12 307:3,7
309:23 310:5,23
311:7 312:2
314:17 317:8
die   119:18 171:17
died   168:22 170:6
  170:16 171:5
difference   94:5
  129:15
differences   83:9
  83:15 160:18,24
  234:13 270:6
different   13:3,17
  21:15 23:15 26:10
  27:12 56:14,23
  57:2 84:15 99:24
  100:5 105:24
  125:25 128:6
  130:7,24 131:9
  139:12 154:22
  180:9 190:13
  192:25 196:5

198:18 203:12
211:19 246:6
247:23 250:21
254:8,12,14,14,15
257:8 260:13
269:13 273:20
281:8 288:19
290:10,25 291:1,8
292:6 298:8
306:15
differently   196:15
  233:15 247:9
  249:16
difficult   31:10
  45:19 47:5,14
  51:18 54:4 74:16
  77:17 88:7 91:7
  94:8 182:13 234:1
  234:4 262:22
difficulties   52:4
digital   292:22
  293:18 294:13
  295:3,19
dignity   119:19
dip   140:21
direct   34:1 148:25
  209:5,10,19,21
  210:2,6,7,10 217:1
  217:17,24 218:2
  230:22 306:20
  314:16
direction   121:10
  121:11 122:17
  140:5,8,19 159:9
  203:17 247:23
  255:10 256:10
directly   109:6
  209:12,14 210:12
  210:14 211:10,14
  212:5,14 217:13
  218:8 295:10

**director** 96:20
309:10 310:20
315:20
**dirty** 186:22 235:9
235:9,16 274:23
**disabled** 256:4
**disagree** 30:9,23
32:6 45:12,18
69:6,9 164:17
**disaster** 61:4
**discovery** 176:9
207:21,22 210:20
230:24 269:9
280:25 281:25
**discuss** 15:14
84:23 172:9
**discussed** 65:7
92:5,11 105:12
146:18 165:25
218:23 244:21
**discussing** 98:8
147:14 159:10
227:22 262:3
268:1
**discussion** 215:5
250:25 254:25
**disease** 5:11 89:21
93:23,24 94:1,2,2
94:4,8,11,13,16,16
94:20 248:24
249:2
**disguise** 154:23
**dishonest** 181:2,5
181:6
**disorder** 6:13 46:2
46:9,11,14 47:6,17
48:5 87:9 92:13
93:8,10 97:25
98:17,23 99:7,25
100:1,16,23,24
101:1,6,8,13,20

**disorders** 102:7
**dispense** 137:10
268:17
**dispensed** 54:12
58:18 61:12 103:9
148:4
**dispenser** 191:24
**dispensers** 264:1
**dispensing** 265:2
**disproportionately**
239:17
**disseminate**
202:16 214:24
316:4
**disseminated**
41:19 201:20
202:6,11 225:25
226:3 284:16
285:2
**dissemination**
41:4
**distinction** 24:20
**distinguish** 60:18
93:17
**distribute** 243:8
**distributes** 112:5
306:3,16
**distribution** 109:2
109:4,5,7,10 112:5
113:14 172:21
173:10,20 175:4
220:7 306:10
**distributor** 112:5
112:15,16 113:9
143:13 145:10,11
173:23 174:5,6
175:1 185:15,21
186:4 188:5,8,17
191:10,14,21
192:18,22 193:1,3
205:17 207:8,14

213:13 222:7,20
223:5,7 224:3
225:5,14 226:3
240:25 241:7
263:17 266:6
268:13 271:17
272:7,19,25
274:20 275:19
278:14 280:8
281:21 283:7,14
283:20 286:24
287:5 292:4
299:21
**distributor's**
174:18 186:14
206:15 264:4
267:20
**distributors** 29:14
112:25 120:20
131:8 144:2,8,10
144:17,20 172:23
173:4 174:15
176:1 177:4
186:25 187:13,25
191:6 192:9,10
202:20 205:2,6,21
206:1,23,25 208:4
210:18,24 211:3
211:11 212:18,18
217:7,8,11,12,14
217:14,23 218:5
218:10,11 221:22
223:10,15,23
228:23 229:5
233:11 234:22
241:3,15 244:17
244:22 245:1,5,14
245:18,22,25
246:12,16,18
247:13 263:15
264:1 265:15

268:2,10 271:12
271:25 272:16
273:6,9,14,21,24
275:5,12,22
280:14 281:24
282:1,7,13,15
284:2 292:20
293:16 294:19
295:8,10 301:14
302:2,9,20 316:10
**district** 1:1,2
**diversion** 7:5
91:11 105:15,16
105:22 106:6,12
106:18,23 107:3
108:4,5,11,15
109:6,9 110:21
111:17 112:1
113:8,14 114:23
172:14 185:17,20
185:21 186:2,3,7
186:20 187:18,23
188:2,6,17,24
189:2 190:7,8,10
191:3,6,11,18,23
191:25 192:1,5,8
192:13 193:13,16
195:2,13,23 262:2
264:5,17 273:8,13
274:2,19
**diverted** 106:3
107:13 108:18
112:15 189:5
272:20,25
**diverting** 186:23
**division** 173:23
**doctor** 16:17 24:8
24:11,11,15,21
26:10 30:5 68:8
84:6 90:10 91:9
93:4 103:22

104:10 122:5
132:3,4,15,16
133:5,6,20,22,23
134:18 135:1,19
136:8,12,21 137:2
137:6,9,13,16,21
138:24,25 139:4
139:10,11 140:16
151:18 155:9,10
155:10 177:19
189:4,20,23,24
190:3 191:19
196:22,24 198:13
198:14 210:11,12
211:8 212:6,19,21
212:22,23,25
213:4,9 227:16
253:9,14,18,19,20
254:18 255:1
256:14 257:5,7
258:10,13,23
266:16,21 267:9
267:14 270:18
281:4 288:16
290:17 299:11,15
301:12 303:22
305:3 307:8 309:4
312:11,13,14,18
312:21,23,23
313:1,10 314:22
317:5
**doctor's** 66:16
87:2 91:9 132:6
258:18 312:16,24
313:4
**doctors** 40:10,12
40:15,18 72:13
73:2,5,10 74:21
88:15 92:1 103:3
110:4,8 111:16
119:24 121:4,8

122:4,19 124:25
125:6,8,22,25
131:16,23 132:10
132:14,18,20
133:1,7,9,14 134:3
134:13,15 135:11
135:14,23 136:16
136:18 137:22,24
138:1,9,16,19
139:16 140:1,5,11
141:2,3,6,10
147:15,19,23
148:1,8,20,24
149:23 150:4,5,22
151:7 152:18
153:11 154:1,9,13
154:22 159:14,23
188:19 192:6,14
193:14,19 197:9
197:10,20,23
198:15 199:19,24
200:6,11,18,20,25
204:17 210:14
211:14,17,21
212:1,4,10 213:8
216:21 217:1,5
218:12 235:9,17
247:20 250:25
251:3,24 252:1,14
252:19 255:9
256:2,4,9 257:19
257:22 259:6
260:25 261:4,14
268:23 271:6
273:3 275:6,13,17
281:3 286:20
313:12 316:21
**document** 11:3
16:6 17:8 18:4
28:7,13 31:22
33:17 39:7 42:15

42:20 43:12 68:11
71:2,5 82:1 157:6
157:11,14 167:12
167:13,17 195:3,6
201:10,17,24
208:14,23,24
277:17 278:1
279:1,7,19 288:23
296:3 297:16
303:14 313:15
314:13 315:4
**documentation**
70:1
**documents** 108:23
176:8,22 177:14
177:17,20,20,24
180:10 194:10
205:12,16,19
206:18,19,21
207:18,20,23
230:16,24 240:6
240:15,16 269:9
276:11,14 277:7
309:17
**doing** 10:7 47:3
65:15 66:2 121:25
132:21 138:9
139:5 156:5
160:25 161:1
173:13 188:23
189:24 191:14
197:5 202:16
232:1 239:15,22
241:8 248:8,11
263:24 282:2
316:7
**dollar** 181:19
**dollars** 184:20
248:5
**door** 104:4,15,21
198:17

**dosage** 54:13
75:19 115:10,12
115:20 129:19
130:24 131:7
146:8 254:8
257:11 265:8
289:10 298:10,13
299:19 300:5
**dosages** 55:14
131:4 300:7
**dose** 18:24 19:5,17
54:16 60:8,12,15
67:17,19 71:12,25
74:25 75:1,1,2,8
75:21,24 81:4
82:21 84:13
114:17 115:17,25
136:21,24 203:2,8
224:1 227:10
251:12 253:16
254:1 259:24
298:17 299:8
316:1
**doses** 19:2 54:18
60:12 62:8 63:20
64:2 114:15
115:23 136:21
170:3 171:11
298:25 308:3
**doubt** 73:3
**douglas** 3:20 9:1
**douglaston** 9:25
**dowell** 6:17 157:8
**downplay** 202:24
**dr** 5:3,9 8:9 9:9,24
10:3,25 11:11
15:16 16:5 25:12
25:19 28:5 32:1,4
37:10 42:7 45:12
45:15 46:19 53:2
53:5,19 68:12

71:2 92:16 95:15
95:17 96:14 98:3
126:12 127:10
141:15,23 142:5
142:13,25 150:15
163:22 164:3
168:2 183:16
190:2 194:22
221:1,21 239:4
244:12 249:17
250:11 277:21
287:17,21 288:8
309:5,7,9,20
310:17,19 311:24
**drafted** 40:1
**drafting** 302:22
**dramatic** 118:24
171:3 310:13
**dramatically**
117:11 127:20
**draw** 116:22,24
117:12,20 205:20
**drawing** 24:20
150:17
**drive** 181:11 183:2
206:1
**driven** 161:8
162:13 163:11
166:15 234:15
247:21 248:21
**drop** 64:8 70:13
155:22,23 156:8
156:19 186:15
**dropped** 140:24
**dropping** 187:15
**drs** 80:5
**drug** 1:7,13 4:4
7:8 8:11 9:7 35:18
36:21 70:23 72:24
81:5 83:3,8,12,14
87:14 90:9 96:21

101:10 105:16
108:7 133:1,5
136:24 137:1,3,10
141:4 165:5,7,10
165:14 196:3,7,23
197:8,11,20
198:14 214:5
222:13,19 226:20
227:5 248:14
251:11 252:7
253:15,20,22
254:4 257:1,2
260:3 280:22
281:17 286:19
288:10 289:8,13
289:19,19,21,21
289:24 290:3
292:4,6,9 298:9
315:9 319:6 320:3
321:3
**drugs** 45:6 47:13
80:10,23,24 82:21
83:7 84:2 104:15
165:8 175:10
182:5 185:23
188:8 195:13,22
212:12 213:5
215:10 223:17
252:10 258:3
261:22 289:8
295:10 296:14
297:3,8,14 299:24
299:24 300:2
**dsm** 6:14,15 46:1
46:11,12 48:1,2,21
98:1,2 101:6
**due** 141:2 314:1,2
**duly** 9:20 318:5
**duped** 309:21
316:13

**duragesic** 296:23
**duration** 75:8,20
75:21,24 81:4
82:22 84:13
**duty** 185:15
**dying** 161:24
170:19 171:1,23
**dysfunction** 66:11
**dysphoric** 84:9

**e**

**e** 2:1,1 3:1,1 4:1,1
5:1,7 6:1 7:1,16
9:19
**earlier** 50:16
126:24 205:1
206:8 259:11
261:25 267:25
**earliest** 269:21
**early** 64:8 89:15
116:20 117:8
127:9
**earn** 241:6
**earned** 15:5
**earth** 160:9
**easily** 135:2 190:5
309:21
**east** 3:21
**eastern** 95:19
142:16
**editorial** 77:24
**edlund** 6:6 42:11
45:12,15 61:24
73:15 101:23
**education** 198:22
198:25 199:5
218:7
**educational**
303:17
**effect** 76:19 77:16
83:8 84:1 88:17
90:11 93:19 94:9

99:15,18 100:5
240:7 283:6
316:19
**effective** 18:23
19:1,3,23 32:20
34:13 60:25 65:10
118:23 127:16
130:6 177:4
181:17 185:17
193:11 255:10
256:12 282:12
283:12,15 315:11
**effectively** 179:8
193:1 256:22
**effectiveness** 40:7
64:20 183:15
185:12 202:25
301:5
**effects** 60:17 67:18
**efficacy** 35:1 65:4
207:12 289:11
**effort** 41:10,13
158:18,19 211:10
229:13,18,25
246:5
**efforts** 159:19,19
247:24 273:8
**eight** 45:21,23
78:19 200:25
303:10 316:24
317:2
**either** 85:14
114:22 274:24
276:5 293:25
**elicited** 48:22
**eligible** 199:19
**email** 278:6
305:11 306:19
319:17
**emergency** 23:18

emily 3:8 8:21
emphasis 122:13
   124:1 126:21
employee 104:24
   108:6,7 175:13
employees 230:12
   230:25
ems 238:4
enacted 231:14
enclosed 319:10
encourage 218:12
encouraged
   297:18 313:12
   316:22
ended 171:22
ends 158:13 189:4
   192:23
energy 153:21
enforcement
   153:13 159:19
   271:18 272:6
   273:5
engage 160:3
   210:2 216:6
   217:16,23
engaged 38:16
   88:4 200:1,15
   210:17 211:10
   216:1,3 242:7
   246:4
engagement 119:3
england 78:13
   96:17
enhanced 119:10
enlightened 248:1
enormous 146:1,2
   237:4 239:9,19
   298:16,25
enormously
   237:10

ensure 186:16
   187:13 272:19
ensuring 112:11
   186:12 187:11
entered 321:9
entire 320:5 321:5
entirety 91:25
entities 210:1
entitled 16:3 28:2
   33:12 42:11 68:13
   97:24 113:1,10
   186:6 195:1
   208:16
entity 246:2
envelope 167:20
envelopes 11:1
environment
   105:25
epidemic 28:18
   119:22 161:8
   162:2,13,18 163:6
   163:7,12 233:1,7
   233:17 234:20
   235:2,6 246:15,22
   249:6
episode 87:5,20
   90:23
equal 54:22 114:9
equivalence 51:1
equivalent 289:8
   289:21 290:11,22
   298:12 299:9
   300:3
equivalents 22:5
erin 2:9 8:15 25:2
   31:25 95:6 118:6
   142:9 177:16
errata 13:23 14:1
   14:3 319:13,16,19
   321:7,10,18 322:1

escalate 67:17
especially 40:12
   50:7 58:17 80:1
   126:18 183:11
esq 2:9,9 3:8,8,9
   3:17,22 4:8,9
essential 19:11,14
   313:25
establishing
   301:16,24 302:23
estimate 15:2
   18:16 80:7 82:10
   82:14 111:24
   117:5,23 249:22
estimates 30:15
et 1:7,13 8:11 34:4
   319:7 320:3 321:3
ethical 123:3,20
ethics 7:10 201:11
europe 26:5
evaluate 174:12
   185:1 282:7
evaluating 219:19
evaluation 185:6,8
events 210:7 218:4
everybody 142:8
evidence 32:8
   34:25 36:8,19
   38:10 40:7 47:4
   48:21,22 54:5
   64:19 65:3,10
   74:3 79:21 82:9
   94:19 106:1,2,6,10
   106:25 107:5,12
   107:15,17,20
   108:2,17,24 110:2
   111:3,8 112:17,19
   112:24 113:7,12
   114:22 119:14
   122:3 138:12
   149:1 153:8,15,16

160:25 210:19
   237:8 238:8
   239:11,21 242:11
   242:19 246:11
   258:15 272:14
   275:4,11,16
   282:11,17,23
   283:2,12 284:14
   285:3,19,25
   286:21 304:8,12
   305:17,22
evolution 118:2,3
   120:5,8 124:24
   125:14,14
exact 15:1 112:20
exactly 86:6 88:14
   109:3 116:10
   223:3 262:23
   263:10,21 298:6
   302:15 315:21
exaggerate 202:25
exaggerated 41:13
   224:20
examination 5:2
   10:1 250:9 288:6
   318:4
examine 170:3
examined 9:21
example 13:18
   26:2 36:8 44:18
   60:22 72:20 76:18
   82:24 86:21 89:21
   125:19 128:23
   133:18 134:23
   153:2 176:13
   183:10,12 196:16
   209:15,18 210:19
   222:6,21,25
   226:21 241:17,19
   260:6,7 265:6
   278:13 292:19

**[example - failure]**

295:18,21 299:21
301:2 302:1,4,5
307:1 308:7 315:4
**examples**  67:21
113:14 220:5
222:5,23 223:9,12
224:8,12 241:14
276:21,21 277:2
280:3 293:17
300:15,16 301:2
303:3 305:9
**exception**  258:1
261:23
**exceptionally**
126:8 278:24,25
291:21
**excess**  115:24
188:16 189:19
**exchange**  305:11
**excuse**  194:7
306:18
**executed**  301:4,4
321:10
**execution**  320:14
321:19
**exercise**  289:22
**exhaust**  141:15
**exhibit**  5:9,11,15
5:18 6:3,8,12,17
6:21 7:3,10,13,18
7:19,21,22,23,24
10:22 11:1,9
15:20,23 16:2
19:7 27:20,23
28:1 33:3,6,8,10
34:16,22 39:6
42:3,5,10 61:6,23
68:1,3,5,6,11,12
71:2 73:15 76:2
77:19,20 96:18
97:17,21,23

101:24,25 122:24
156:22 157:1,7
167:5,9,12,24
168:1 194:2,4,6,23
194:25 201:6,8,11
208:6,9,12,15
214:8 277:17,18
277:18,19 278:6
278:10 288:25
289:4 295:24
296:1 303:11,12
307:20,21 313:7,8
**exhibits**  5:8 6:2
7:2 10:15,20
**expand**  199:16
**expanding**  173:14
**expect**  311:14
**expensive**  271:9
271:11 289:20,24
**experience**  16:15
16:23 17:15 60:16
66:10 73:6,8,10
89:1,3,4 153:14
154:18 172:16
199:10,12 228:11
238:21,21 255:25
256:1 259:12
261:6,15
**experienced**
255:21
**experiencing**
18:13 23:19
**expert**  1:19 5:9
14:15,23 55:18
97:16 153:23
172:10 174:19
208:1 226:11
232:1 235:20
236:3 263:19,23
264:14

**expertise**  96:24
97:1 172:13,14,17
172:19,22 218:23
235:24 237:16,20
**experts**  135:16,18
136:11 163:18
164:10,19 252:24
252:25 257:24
258:5,5 265:23
**expiration**  320:19
321:25 322:25
**explain**  66:5 93:3
100:6 129:17
188:20 200:7
**explained**  130:17
**explaining**  200:18
**explanation**  106:8
147:5
**explicitly**  224:22
**explore**  107:18
**exposed**  62:25
64:5 76:9,25 77:4
77:12 80:9 170:15
170:24 171:18,21
285:14 304:13
305:18,22
**exposes**  308:21
**exposing**  170:18
**exposure**  80:24
81:5 90:7,25 91:6
100:2 101:10
308:16
**expressly**  319:11
**extend**  191:6
**extended**  123:4,21
298:16,24 300:4
308:4
**extends**  190:21
**extensive**  315:15
**extent**  126:15
166:8

**extra**  15:11 17:4
**extremely**  92:14
115:10 121:14
128:16 134:5,13
155:11 248:2
265:12 281:22
300:5

**f**

**face**  10:8,9
**facilities**  129:10
129:11 130:4,10
146:4,22
**facility**  128:17
146:25
**facing**  43:1,17
**fact**  44:8 93:13
110:24 125:5
154:20,25 202:5
223:7 239:14,16
288:13 290:9
**factor**  84:19,25
102:22 141:6,8
192:17 241:10
**factors**  75:19
84:23 94:7,10,22
95:2 99:12,15,19
99:24,25 101:17
102:16,20 141:5
141:11 159:20
192:13 238:24
249:8
**facts**  12:1,3,13
185:1
**failed**  174:16
235:10 236:20
**failing**  112:25
122:9 184:21
205:22
**failure**  7:4,7 109:4
173:3 180:19
195:1 205:24

207:6 236:12
**failures** 7:11 204:6
  205:7 233:14
  234:2,3,15 273:16
**fair** 78:3 104:22
  139:20 216:17
  233:18
**fairly** 74:18 164:8
**falling** 122:20
  205:25
**false** 182:23 183:5
  183:10,23,25
  201:20 202:6,11
  202:16,24 204:3
  204:13,15 214:10
  214:16,24 215:23
  221:22 222:18
  226:3 279:23
**familiar** 28:13,14
  64:13 79:21 85:5
  107:6 137:3 168:4
  195:4 201:14
  228:13,16 229:3
  233:2 252:17
  270:3 271:5 309:8
  310:18
**familiarity** 173:17
  219:23
**families** 80:21
**family** 187:19,24
  189:5 196:12
  197:19
**far** 160:8 188:14
**farrell** 2:14,16
**fatal** 55:1
**fault** 248:4 305:1
**fax** 306:20
**fda** 7:11 207:6
  215:15 233:12,16
  234:4,14 242:21
  243:1 249:13,15

280:5 281:11
  297:7,13
**fda's** 234:2
**fear** 121:12 316:22
**fearful** 316:21
**feasible** 129:5,15
  129:21 130:2
  272:18
**february** 5:19
**federal** 172:20
  174:13 201:1
  228:6 230:12,25
  231:3 234:1
**federation** 315:17
**feel** 29:3
**feeling** 18:14 29:1
  29:2
**feelings** 84:9
**fell** 316:24
**felonies** 240:12
**felt** 311:3
**fentanyl** 161:21
  165:15 166:4,10
  166:16,24 248:15
  248:23 278:19
  281:13 291:19
  307:14 308:5,21
  308:25
**fewer** 140:2
**fibromyalgia** 59:8
  59:24
**field** 11:25 96:23
  126:7 127:3
  218:23 235:24
  236:1
**fight** 229:23
**figure** 180:10
  226:11 260:11
  268:22,24
**files** 242:12

**fill** 148:23 152:2,8
  173:1 176:3
  178:20 188:22
  193:7,8 194:1
  273:2
**filled** 110:12
  145:11 147:19
  148:2,12,15,22
  149:3,5,9,20,22
  150:6 151:8,19
  152:18,23,25
  153:5 191:13
  192:20 275:17
**filling** 108:7
  147:25 150:21
  153:11,25 186:24
  192:23 193:4
  275:5,12
**final** 316:11
**finally** 232:13
**financial** 120:18
  133:25 178:20
**find** 48:10,15
  92:14 93:9 131:14
  152:1 179:10
  261:12 319:10
**finding** 36:7,19
  74:9 94:13 116:8
  171:8,14
**findings** 64:11
  73:18
**fine** 79:4 142:18
  221:13 314:21
**fines** 181:19
  184:20
**fingerprint** 315:13
**finish** 141:17
  299:15 305:3
**finished** 299:13
**fire** 236:25

**firewall** 285:16
**firm** 8:25 82:12
**first** 9:20 11:11
  15:14 16:14,20,20
  16:25 17:2,4,14
  18:5 20:7,20
  28:16,18 31:12
  32:4 33:25 34:2
  37:14 42:19,23
  43:8,13 61:9
  69:24 71:8 73:17
  78:17 87:20,21,25
  90:9 102:3 123:3
  123:11,14 140:21
  155:5 157:15
  161:4 173:9,13
  175:15,17,20,25
  197:22 198:22
  199:15 200:22
  201:19 202:1
  223:8 225:21
  230:11 232:5,17
  232:17 250:24
  263:18 270:1
**firsthand** 154:18
  229:8 238:21
  259:7 270:2
**fish** 235:12,13
**five** 48:20 50:20
  52:5 53:10 54:22
  58:14 60:23 61:21
  66:9,13 68:18,19
  93:5 95:9 130:9
  142:14 194:11,13
  195:11 220:12
  221:2,8,11 287:20
  287:20 299:7
**fixed** 180:20
  182:17 184:17,23
**flag** 106:14 107:17
  172:25

**flags**   174:2
**flare**   59:21
**flash**   278:7,10
  281:1
**flipping**   46:17
**flood**   237:14
  239:12 246:19
**flooded**   116:7
  245:10
**flooding**   115:21
  235:15 239:10
**floor**   2:14
**florida**   140:23
  175:23
**flow**   52:13
**flowed**   114:1
  130:16 237:2
**flowing**   113:18
  129:6 175:24
**flu**   306:4
**focus**   24:21 31:16
  41:3 51:5 87:24
  119:10 125:23
  126:13 147:12
  159:13 202:8
  209:3 211:13
  249:12,13,14
  251:21 260:21
**focused**   126:17
  165:21 207:5,7,10
  242:19 244:24
**focusing**   115:6
  126:20 249:16
**foia'd**   143:20
  144:5
**folks**   47:3
**follow**   173:4
  288:12
**followed**   73:11
**following**   2:20
  3:25 5:25 6:25

125:3 293:22
**follows**   9:21
**food**   289:13
**footnote**   13:23
  306:25 307:6,10
  307:15
**force**   37:19 164:6
**foregoing**   320:13
  321:18
**form**   15:18 28:20
  29:10,24 31:5,21
  32:1 35:14 36:5
  37:1 38:3 39:24
  41:7,21 44:4,16,24
  45:14 46:23 48:9
  48:19 51:11 54:3
  57:6,25 59:16
  62:13 63:4,13
  64:3,24 65:6
  66:18 67:15 69:4
  69:21 70:19 72:4
  74:2 75:17 76:14
  77:13 78:8 79:18
  80:16 81:13 82:19
  83:19 85:25 87:4
  87:11 88:6 90:18
  91:12,23 93:20
  94:12,24 97:11
  99:16,20 101:22
  102:12 103:4,11
  103:21 105:6
  106:5,21,23 108:1
  108:2,12,21
  109:19 110:5
  111:19 112:18
  113:3,11 118:9,17
  119:12 120:10
  121:7,21 124:3
  125:2,17 128:3,12
  128:21 130:22
  131:6 132:1,8,12

133:12,16 134:22
  138:6 139:3,14
  140:3,13 143:5,16
  146:14 148:7,17
  149:14 150:9,18
  152:13,16,20
  155:25 157:24
  158:6 159:16
  160:5,21 162:14
  166:5 169:20,24
  172:12 175:19
  176:24 177:10,12
  177:22 178:9,15
  179:17 180:1,13
  182:1 183:22
  184:14 185:4,24
  186:8,21 187:7
  188:3 189:22
  190:14,24 197:24
  202:18 208:2
  209:18 210:3
  212:2,13 213:6,18
  215:2,13,21 217:9
  217:18,25 219:4
  221:25 222:3,17
  225:18 226:9,18
  233:8,22 235:3,7
  235:22 236:5,16
  236:21 237:23
  238:16 240:3
  241:23 242:9
  243:9 244:10
  246:7 247:1,18
  248:9,16 249:10
  251:6 253:11
  255:3,19 256:18
  257:14 258:20
  259:22 261:9
  262:8 264:6,12,19
  265:17 267:23
  269:15 272:2,3

274:11 275:8
  276:13,19,25
  278:16 282:10,25
  284:9,19 285:7,23
  286:8 287:2,7
  289:10 290:13
  291:3,9,14 292:7
  294:10 297:5
  298:5 300:10,22
  302:14 303:5
  304:3,11 306:7,12
  309:23 310:5,23
  311:7 312:2
  314:17
**formal**   199:5
**formats**   131:9
**forming**   238:15
  239:25
**forms**   108:15
**formulating**
  240:20
**formulation**   226:5
**formulations**
  308:5
**forth**   128:1 318:5
**fortunately**   140:4
**forum**   229:7,9,17
  229:19,22 230:3
  230:12,13,14,16
  230:19,21,24
  231:1,3
**forward**   319:16
**fostered**   292:16
**found**   13:17 37:4
  45:25 46:14 47:15
  48:4,7 64:10 66:9
  70:4 170:4,5
  207:20 214:13
  242:6 307:8
**foundation**   39:25
  41:22 44:25 62:14

63:5,14 93:21
97:12 103:5
106:22 108:13
109:20 111:20
128:4,22 143:17
152:21 156:1
157:7,6 166:6 182:2
238:17 255:4
272:4 283:1 285:8
287:8 290:14
291:10 303:6
306:13 309:24
310:6,24 311:8
312:3,7 314:18

**four** 15:3 34:24
66:9,12 85:20
195:6,10 220:15

**foya** 262:13

**foya'd** 271:16,21

**frail** 147:3

**frame** 14:13 163:2
263:7

**franks** 3:22 8:23
8:23

**free** 223:17 320:14
321:20

**frequency** 136:25
252:14 257:19

**frequent** 196:16
196:20 198:4

**frequently** 29:3,3
135:15,23 136:19
137:4 197:4 251:9
251:18,24 252:1
253:15 254:5,18
255:21,24 256:17
257:23 258:2,6,25

**friend** 187:19,24
196:12

**friends** 151:13
189:6 197:19

**frightening** 47:11

**front** 22:20 42:1
71:5 147:22 149:1
155:16 164:9
165:1 203:13
232:24 278:1
304:5

**fueled** 162:3 163:8
163:8 166:3

**full** 16:14 17:14
18:5 19:10 37:14
42:23 43:8,13
45:24 55:24 61:9
64:18 78:18
124:11,17 195:17
201:19 202:1
306:14

**fun** 84:1,3

**function** 31:16
32:9,11,12,19,23
32:24 33:1 35:2
60:14 71:10,23

**fundamental**
124:12,19 125:15

**funded** 316:9

**funding** 234:9

**further** 31:11
41:19 318:8

**g**

**gain** 73:10

**galena** 279:3

**gao** 247:3

**gauge** 74:21

**gears** 85:3 198:20
218:16

**gene** 80:20

**general** 7:3 36:12
36:23 49:5 82:16
97:14 170:14
194:25 252:20
304:20 305:6

**general's** 7:6

**generalized** 101:8

**generally** 21:19
32:24 50:10 54:13
59:5,10 60:13
61:3 68:20 69:11
77:2 80:12 83:24
93:24 126:1 134:7
146:25 147:4
152:24 153:4
158:13 160:20
196:12 228:4,13
233:2 271:8
280:23

**generic** 222:10
289:21 307:14

**generous** 221:11

**genes** 80:20

**genetic** 78:23
79:13 80:13 81:10
81:21 82:17,23
83:9,11,14

**genetically** 83:1

**genetics** 80:17
82:7,23,24 83:5

**genuine** 265:11

**genuinely** 122:20

**geoffrey** 4:13 8:4

**geographic** 116:9

**getting** 12:14
51:13,16 70:3
77:2 122:7 127:7
151:14 153:4
154:23 156:8
181:18 200:23
268:25 272:20
280:18 281:7,13
288:19 290:10
310:10

**give** 39:21 45:5,17
47:2 82:12 94:14

115:1 128:23
133:18,25 142:12
142:14 144:14
147:2 170:12
185:25 189:15,17
189:17,25 190:3
195:16 203:7
222:5 224:8
241:14 260:9
270:21 274:7
280:2 291:8 293:6
299:16 300:25
302:1 307:5
315:25

**given** 54:14 89:5
104:10 115:15
138:13,16,22
139:24 179:3
189:13 261:17
267:5 273:25
318:7

**gives** 104:24
187:20

**glimmer** 284:22
295:15 296:4,5
297:20 301:8

**globally** 29:14

**gmail.com** 319:5

**go** 25:9 30:5 38:11
39:4 41:15 52:9
52:12 58:8 67:19
86:15 92:20 96:14
97:19 103:22
110:14 115:16
116:20 141:17
149:24,25 152:4
158:15 165:17
174:7 184:8
188:11 193:18
194:11 211:5
216:5 219:14

220:21,23 222:4
233:19 234:12
241:6 250:1
258:21 260:10
266:18,21 267:9
267:12 287:23
288:23 289:17
290:16 293:13
295:22 303:9
305:3 306:24
307:18 312:11
313:5,15 314:22
**goals**   185:17
**goes**   102:15
263:24 296:12
297:16
**going**   10:19 19:5
20:8 30:2 45:4
53:9 58:11 60:8
92:17 95:13
114:16 115:25
117:17 122:6
127:5 138:25
141:14 173:12
183:13 188:22
189:10,15,17
193:7,9 197:12
199:4 205:8
207:21 214:6
221:5 229:18
234:17 238:7
245:16 246:19
247:2,6,7,25
249:14,19 250:20
251:10 255:7
256:23 260:14
265:18,24 268:23
287:14 289:1
295:4,23 303:10
307:19 311:15

312:6,9 313:6
**good**   9:9 10:3 26:4
38:4 44:17 45:1,9
53:8 57:14 72:16
80:19 82:9 87:19
87:19 92:6,19
93:12,22 94:19
95:7,13 96:5
107:5 121:25
125:18 135:1
138:12 141:20,21
142:7 163:16
168:7 171:8
193:10 220:18
221:14 227:4
239:11 270:17
282:11,17 283:2
288:8 291:16
299:21 303:3,18
**goold**   3:9 8:22
**gotten**   32:7,14
266:23
**gout**   59:20
**govern**   172:20
173:10
**government**   201:1
203:14 233:14
**governmental**
37:19
**grants**   127:3
**graph**   156:3
**gray**   138:20
198:15
**great**   53:13 80:19
95:24 96:8 277:25
278:5 289:6
**greater**   26:19
83:23 90:12 91:1
116:7 159:13
308:4

**greed**   234:15
247:21
**greedy**   235:10
**grin**   256:6
**ground**   10:6
250:20
**group**   164:9,13
229:20
**groups**   37:19
200:12 203:14
**growing**   126:21
**growth**   117:7
**guess**   22:22 46:17
56:19 100:18
210:8 222:11
225:20 242:12
264:20
**guessing**   300:19
**guidance**   39:6
**guideline**   5:13
16:3 39:14
**guidelines**   16:12
34:16,22 39:21
40:2
**guilty**   241:15,21
241:25,25 242:2,6
242:16,17,24
243:3 244:1,9
**guys**   8:5 299:13

## h

**h**   5:7 6:1 7:1
**haddox**   315:19
**hadland**   7:17
208:15
**half**   23:4,25 24:2
31:23 32:2,3,4
50:17 51:8 56:20
57:7,15 61:20
64:5 142:3,12
197:4

**halfway**   279:6
**hamstring**   255:21
**hand**   16:13,19
17:12 18:4 34:1,3
34:23 39:8,9,10
42:23,24 43:9,13
61:25 76:7 78:17
78:18 98:21 101:3
102:2,4,5 278:2
318:14
**handed**   272:2
300:12
**handful**   138:19
**handle**   280:15
282:20
**hands**   238:9
**hanford**   9:25
**happen**   105:7
118:25 189:9
192:19,24 237:18
257:12,16 258:22
280:23
**happened**   109:3
153:7 173:4
236:23 237:17
258:14,16 259:9
260:18,18 271:20
275:15 281:23
298:19 301:11
317:1,2
**happening**   99:13
122:14 144:13
158:22 159:1
161:18 179:3
180:25 237:10,12
237:13 259:8
272:9 283:4,4,5
**happens**   105:22
135:17 136:10
251:17 258:24

**happily** 34:17
**happy** 130:25
  146:11 202:4
  219:1
**hard** 69:5 77:14
  88:18 110:16
  139:15 151:18
  153:4 158:17,21
  161:18 217:19
  247:22 248:4
  314:24
**harder** 39:13
  43:12
**harm** 298:20
**harmed** 126:16
  127:11 235:11
  239:17 298:20
  299:20
**harmful** 88:17
  227:13 299:22
**harms** 239:9
**hated** 77:5
**hda** 227:24
**head** 13:8 14:12
  22:19 26:20
  110:13 113:13
  158:9 166:11
  222:6,23 266:5
  309:18
**headache** 59:9,9
  59:24 197:15
  224:7
**heading** 17:5
  28:17 61:10 68:19
  71:9,16 123:16
  279:2
**health** 3:13 8:25
  9:4 18:7 26:4
  37:16 40:18 70:22
  87:15 126:4
  175:22 176:4

185:16 193:23
196:4,8 199:14,20
199:24 200:10
202:21 203:11
209:24 235:25
236:10 237:5
239:9,20 250:14
253:1 257:23
259:2,4 261:22
268:3,10 269:5
272:8 276:1,12,18
277:2 278:7 280:2
**healthy** 151:20
  153:3
**hear** 268:4 312:19
**heard** 253:19
  268:1 274:2
  297:10
**hearing** 120:12
  121:11 122:5,16
  125:6 127:1
  203:17 247:23
  255:9 256:10
  316:18,19
**heavier** 58:22
**height** 229:15
**heightened** 44:8
**held** 1:19 314:15
**hell** 151:24
**help** 119:18
  134:10 139:6
  183:9 185:10,11
  187:13 205:10
  240:13 253:6
  273:8
**helped** 100:25
  316:4
**helpful** 226:25
  274:1
**helping** 187:2
  263:21 280:14

310:11
**helps** 82:3
**hereinbefore**
  318:5
**hereunto** 318:13
**heroin** 80:23
  161:22 165:15
  166:3,10,25
  248:14
**hester** 3:8 5:3 8:19
  8:19 9:9,14 10:2,4
  14:2 25:1,5,10
  31:24 52:7,18,20
  53:4,12 68:9
  92:20 95:4,16,20
  95:25 96:5 118:11
  123:9,11 128:5
  141:19 142:1,9
  150:11 177:15
  194:12 220:10,17
  220:23 221:6,9,15
  249:17
**hey** 24:25 134:11
  136:23 152:4
  253:24,25 271:18
  274:21
**hi** 250:11,12
  288:11
**high** 46:16 54:13
  55:14 62:8 63:20
  74:10,12,14,19
  75:2 76:18,22
  77:16 80:8,25
  84:4,7,9 92:14
  93:13,16 98:25
  114:4,15 115:10
  117:24 134:11
  135:1 162:5 170:3
  171:11 260:16
  300:5

**higher** 27:10 60:9
  60:12,16 64:2
  67:19 70:17 98:23
  102:7 116:3 117:4
  203:8 316:1
**highest** 134:19
  148:3 166:21
**highlight** 126:15
**highly** 80:9,22,24
  81:5 82:21 83:3,7
  83:12 94:13,17
**histories** 89:5
**history** 68:21
  69:17 70:16,23
  83:17 84:17,18,24
  89:17,25 98:24,25
  99:1 101:9,12
  102:7
**hit** 314:19
**hold** 314:25
**home** 24:5 26:7
  96:3 115:16
  141:23 188:12,16
  190:23 306:21,22
**homes** 146:5,25
  147:1
**honest** 180:4
**hooked** 90:24
  139:18 197:17
**hope** 95:25 96:1
  132:18 159:8
  165:3 180:20
  184:17 300:13
**hopped** 52:3
**hospice** 115:2
  128:24 130:9
  145:21,23,23
  146:2 147:6
**hospices** 129:11
  130:18 146:2,22

hospital   23:16
  26:7 105:15,17
  106:7,9,19,25
  107:9,14 115:16
  134:14 175:9,9
  309:11 310:20
hospitals   24:5
  106:4 107:4
  128:10 129:16
  134:14 175:7,7,8
  217:11 259:6
  295:11
hour   52:4,15
  92:17 142:3,12
  200:25
hours   137:1
  220:12,15 277:14
  314:20
house   142:2
  153:21
howe   6:11
huge   58:12
human   124:13,19
humans   29:3
hundred   155:19
hundreds   146:19
  184:20 238:1
  264:22,23
huntington   1:4
  2:15 8:10 55:11
  106:2 107:1,22
  109:16,25 110:2
  111:15 114:2
  128:18 129:12
  143:4,9 144:18
  236:25 258:9,17
  266:8 267:22
  284:7 285:4,22
  309:11 310:20
  319:6 320:3 321:3

hurt   277:22
hydrocodone
  22:10 23:9 50:21
  115:12,20 129:20
  148:19 156:20
  173:16 190:5
  222:8,10,10,17
  225:22 226:4,5
hypertensives
  227:4

**i**

iatrogenic   67:4
  87:10 89:22 91:21
  91:24 92:2 315:6
idea   134:24 147:4
  200:17 203:4
  208:3 222:16
  224:2 232:14
  233:5 235:18
  281:3 298:15
  306:9 312:25
identical   289:9
identification
  10:23 15:21 27:21
  33:4 42:4 68:2
  97:18 156:23
  167:6 194:3 201:7
  208:13 277:20
  289:5 296:2
  303:13 307:22
  313:9
identified   80:20
  102:16 221:24
  271:15 273:7,23
  284:4
identify   39:13
  172:24 174:8
  245:24 257:17
  258:8
identifying   271:6
  271:19

illegal   241:9
illegitimate   110:20
  111:4,25
illegitimately
  198:10
illicit   101:10
  161:25 162:9,21
  165:15 166:3,10
  166:24 248:15,22
illicitly   161:20
  166:16 196:25
illness   226:22
imagine   54:23
  145:9 227:18
  247:8
immediate   114:2,6
  114:8 129:18
  151:23 265:5,11
  300:6 308:8
immediately   11:22
  23:17 172:25
impact   41:15
  82:18 138:22
  171:11 173:3
  188:5 282:7
  283:10,21 286:1
  299:22
implemented
  300:9,17,20
implications   73:19
implied   224:21
implies   243:1
importance   44:7
  120:9 121:18
  126:21
important   12:13
  64:12 73:18 80:17
  82:22 83:9,10,15
  84:14 93:23
  121:20 125:22
  126:8 183:11

impossible   12:14
improperly
  164:12
improve   31:16
  32:12,19,23
  209:24
improved   71:10
  71:23 121:6
improvement
  36:10
improvements
  239:12
improves   226:24
improving   35:2
  126:13,18
impulse   83:2
ims   143:24 268:3
  268:10 269:5,22
inaccurate   72:10
inadequate   308:10
inappropriate
  49:24 57:9 114:22
  117:22 155:11
  174:9 193:7,8
  194:1 264:25
  276:9 280:8 282:4
  313:3,17 316:16
  317:4
inappropriately
  40:25 41:12
incentive   133:25
  178:20
incid00000192-...
  7:23
incidence   66:14,19
  67:3 70:17 92:6
  93:12,15,18,23,24
  94:2 170:10
incident   6:3 42:12
  73:20 74:6

**include** 12:22
23:16 111:23
165:11 192:12
210:10 217:11,15
218:3 233:12,20
234:18 249:6
270:11 295:1,12
303:18 315:3
**included** 12:14
46:9 178:1 225:13
234:22 316:9
319:14
**includes** 86:9,12
86:15 131:3 164:7
165:7,14 186:19
187:18 190:16
191:1 197:14
202:20 234:22
247:12 292:1
295:11 313:18
**including** 29:13
60:17 75:19 107:8
136:1,20 157:17
166:23,24 203:12
217:6 229:4
246:11 296:13
302:22 313:25
**incorporated**
321:12
**incorrect** 38:9
80:2 184:5,6
214:21
**increase** 121:23
125:7 158:23
166:2,14 171:3
176:18 199:18
200:19 201:5
211:7,18 212:3
218:14 248:19,23
249:1 282:18
283:21 292:20

293:16 301:14
302:3,10,22
**increased** 78:25
79:16,22 90:7
121:19 124:1
162:7 210:22
309:12 310:2
**increases** 291:24
**increasing** 18:24
19:17 60:12 67:18
188:16 204:21
**increasingly** 38:8
159:24
**independent** 55:19
78:1 185:6
**indicate** 37:2 47:7
47:16 196:8 197:3
274:9
**indicated** 47:16
279:8
**indicates** 270:18
274:13 290:2
**indicating** 81:15
210:20 285:20
319:14
**indication** 29:4
58:2 215:9 278:25
279:15 280:6,10
281:11,11
**indications** 308:1
**indicative** 264:5
**indirect** 210:8
**indirectly** 212:16
**individual** 21:18
24:8,24 40:15
80:25 81:7 83:1
131:15,16,23
151:25 155:1
159:22 191:7
211:25 212:10
216:20 266:7

267:21 289:12
**individuals** 6:5
42:13 63:1 82:6
87:16 90:21,24
100:19 102:6
114:19 120:23
168:14,19,22
170:6 200:13
**industries** 234:6
315:14
**industry** 7:14
20:18 29:13 30:18
56:12 82:4 118:20
119:3 120:1,2,7,18
164:4,9 202:19
208:17 212:8
229:1 233:10
234:22 239:1
246:11,13 247:12
249:3 271:9 316:9
**industry's** 247:24
**ineffective** 177:5
308:9 313:20
**inflection** 117:10
**influence** 102:23
120:6 130:15
134:1 135:25
164:7,13 181:12
183:3 191:11
285:20 286:9,16
286:19 315:14
**influenced** 29:13
30:17 72:21,21,22
73:6 80:2 121:3
128:10 203:15
258:18 310:12,16
315:15 316:8,15
317:3
**influences** 73:9
119:7 286:15,17

**influencing** 204:20
**inform** 12:16,23
39:14 92:6 95:2
171:16
**information** 39:22
40:5 94:15 121:9
145:17 146:10
151:2 152:14
154:2 205:11
206:6,17 212:10
212:20 213:4,14
213:22 214:18
216:24 268:21,22
273:11,12 279:19
279:24 280:3,9
296:8 303:16
**informed** 189:10
189:15 232:9
238:18,24
**ingredients** 289:9
**inherent** 83:8
**inherently** 82:5,5
**initial** 91:6 136:12
**initially** 205:13
**initiating** 43:4,20
**initiative** 200:10
209:21
**injury** 6:19 20:10
21:6 23:12,19
157:9
**instance** 112:14
187:18 191:18
258:8
**instances** 113:7
259:22 276:10,17
**institute** 96:21
**institution** 315:11
**insulin** 306:4
**insurance** 155:5
**insuring** 228:23

**integrity** 240:4
**intend** 13:1 14:3
**intended** 39:14
310:11 311:15
**intending** 11:19
**intent** 292:3
**intentioned** 123:25
**interaction** 230:22
**interactions** 230:19
**interchangeably** 49:6 50:8
**interest** 133:3,21
138:10 235:23
250:19
**interested** 200:22
232:3 318:11
**interesting** 233:13
**interests** 232:5
**interfere** 229:18
**intermittent** 59:18
59:21 60:1,19
71:12,25
**intermittently** 19:2 60:5,22 65:9
**internal** 176:12,14
178:3 179:6
**internally** 301:6
**international** 117:8 160:11,14
**internet** 284:22,25
**interrupt** 51:25
93:1
**intervention** 311:17
**interview** 18:7
**intractable** 68:21
69:10,18
**introduce** 8:13

**introduced** 9:10
9:16 10:4 232:15
**introducing** 279:3
**introduction** 17:6
123:17 209:3
**invested** 248:6
**investigate** 108:14
**investigated** 193:12
**investigation** 7:6
153:21 245:11
262:14
**investigations** 153:13
**investigative** 153:19 231:2
245:8
**invited** 230:12
**invoice** 300:18
**involve** 210:22
212:17
**involved** 121:24
175:10 204:17
209:16 218:5
223:23 228:3,6
229:13 232:4
233:7 263:11
271:3 303:15
**involvement** 223:10 228:1
**involves** 29:2
86:17 211:3
212:22 213:9
271:6
**involving** 161:14
161:16 204:12
219:24 220:6
**iqvia** 143:24 268:3
268:10,14 269:4
269:17,22 270:2,4
270:7,9,11,12,14

270:18 271:4,8,8
271:11 273:1
**irrational** 121:12
**issue** 15:15,17
43:1,17 44:8
162:11 164:2
**issued** 147:15
**issues** 37:20 75:20
97:9 173:20
193:15 198:21
**items** 278:11
**iv** 46:12 48:1,2,21
**ivy** 134:12,25
135:3 260:7

**j**

**j** 6:6
**jama** 7:13
**james** 3:9 8:22
**jansen** 220:2
**january** 206:14
296:4,12 297:17
**jaw** 205:20
**jive** 163:25 164:1
**job** 81:3 119:15
121:25 122:8
161:1 189:24
191:15 193:1,6
233:24 234:12
239:15,22 246:20
246:24
**joined** 20:18
**jointly** 210:18
**jones** 198:3
**joseph** 6:15 97:23
**journal** 5:18 7:10
78:14,14 96:17
201:11 210:5
212:19 218:3,6
222:25 223:5
224:13,16 225:10
225:11,16

**journalist** 262:20
263:8
**journalists** 153:20
231:2 245:8
262:11,17 263:2
**journals** 72:18
73:3
**jr** 2:16
**judgment** 24:7
26:11 41:17 73:11
76:23 90:17 91:2
91:20 113:24
117:3 121:5,9
127:24 128:8
132:6,6,16 133:24
136:13 137:13,16
178:19 181:8
183:18,21,23
189:20 264:21
289:23 290:3
291:6
**judgments** 40:16
72:14 73:6 131:15
131:22 132:11
133:10,15 135:12
136:17 137:25
140:10 141:3,7
159:13 192:5,6,6
192:10,14,15
240:1
**jump** 250:20
**june** 6:20 7:4
157:10 195:2
**justice** 243:23
244:3,5
**justify** 115:4

**k**

**k** 1:20 9:19 318:2
318:18
**kalso** 34:4

| | | | **l** |
|---|---|---|---|
| **keep**   33:7 60:11 114:16 187:2 286:19 | 92:3 95:12 97:2 99:23 106:7 108:23 109:3 | 264:20,25 265:3 271:23 272:5,10 273:6,21 274:4 | **l**   9:19 |
| **keeps**   19:5 60:8 | 115:1,4 116:3,5 | 275:15,25 276:5,7 | **label**   215:8,11,14 215:17,18,23,25 278:2 |
| **kept**   282:24 283:4 | 120:21 122:6 | 276:23 281:10,12 | |
| **kessler**   3:20 9:1 | 126:4,23 130:19 | 286:20 300:8 | **lacking**   40:8 |
| **kevin**   309:7 | 135:14 136:21 | 301:3,4,7 303:25 | **lacks**   93:21 97:12 103:5 108:13 109:20 111:20 128:4,22 143:17 156:1 166:6 182:2 238:17 255:4 272:4 283:1 285:8 287:8 290:14 291:10 303:6 306:13 309:24 310:6,24 311:8 312:3 314:18 |
| **key**   42:25 43:17 120:13 216:8 | 142:13 143:13,15 143:18,25 144:2,6 | 304:6,16,25 307:3 309:5 310:8,14,15 | |
| **kicked**   25:2,6 | 144:16,21,25 | 310:17 312:5,9,22 | |
| **kilkenny**   310:17 310:19 311:24 312:9 | 145:5,7,12,15,17 145:20,22,24 146:3,6 147:18,20 | 312:23 313:3 | |
| | | **knowledge**   41:5 41:19 153:22 179:4 206:15,22 207:25 214:20,21 214:21,22 229:6 230:18,21 280:24 300:21 | |
| **killian**   1:20 9:17 318:2,18 | 147:21 148:5,13 148:16,18 149:4 | | |
| **kilograms**   56:16 | 149:10,12 150:4,7 | | |
| **kind**   52:15 70:3 88:17 124:4 129:10 139:12 162:10 165:2 186:19 188:2 191:17,17 198:9 227:11 | 150:16,17,20,24 158:16 161:18 167:21 168:24 177:6 178:11,14 178:16,23,25 179:15,24 180:6,6 180:22,24,25 | | **laid**   312:6 |
| | | **known**   97:16 242:17 | **language**   162:15 163:3,14,16,19 215:25 |
| | | **kolodny**   1:18 5:3,9 7:12 8:10 9:10,24 10:3,25 11:11 15:16 16:5 25:12 25:19 28:5 32:1,4 37:10 42:8 46:19 53:2,5,19 92:16 95:15,17 96:14 98:3 141:15,23 142:6,13,25 150:15 168:2 183:16 190:2 194:22 201:13 221:1,21 239:5 244:12 249:17 250:11 277:21 287:18,21 288:8 318:3 319:5 320:4 320:9 321:4,13 322:20 | **large**   22:3,23,25 50:23 51:3 54:6 55:12 66:8 76:24 128:16 130:9 138:8 155:11 265:8 281:16 |
| **kinds**   198:7 | 181:15 182:15,18 | | |
| **knee**   85:19 | 182:19,21 183:6 | | |
| **knew**   177:4 206:2 229:25 | 184:10,15 185:10 189:10 192:24 | | **largely**   75:9 82:7 89:18 166:15 315:16 |
| **know**   12:8 13:5 14:8 18:22 21:12 21:21 26:22,25 27:17 28:10 29:1 30:12 31:1,6 35:23 45:2,8 46:24 49:21 50:12 52:3,11,22 62:16 66:4 69:12 72:6 72:11,16,17 74:11 78:21 79:12 80:2 80:7,8,21 81:23 82:15 87:8,18 88:21,22 90:2 | 193:18 197:2,2 198:13 206:3,24 210:4 214:1 224:17,24 225:6 225:23 226:1,1,2,7 228:18 233:24,24 235:23 242:13,25 243:18,20,23 244:4,19 248:2 249:14 250:22 251:7 252:22 253:15,15,23 258:24 259:11 260:13 261:14 | | **largest**   22:15 115:2 128:24 147:6 |
| | | | **lasting**   35:4 |
| | | | **late**   206:13 |
| | | | **law**   2:14 8:25 153:13 159:18 173:3,4 174:7,15 178:25 186:10,25 218:24 219:17,20 |

219:22,25 220:6
273:4
**laws** 174:13
**lawyer** 173:7,8
218:25
**lawyers** 262:6
**lead** 70:17 81:7
159:23 257:3
308:23
**leaders** 120:14
216:8
**leak** 191:4 192:24
**leakage** 193:2
**leaked** 190:19
**leaks** 112:20
190:15
**learn** 175:15,17
176:1 205:5
207:13
**learned** 38:9
151:15 152:3,15
175:20 205:4,11
206:17 207:17
230:9,11,23
232:17 245:13
280:24
**learning** 154:18
205:7,9 232:6
**leave** 103:2,18
**leaving** 106:25
107:21
**led** 34:4 47:22
88:24 89:13 91:8
200:3,9 239:12
257:2
**left** 18:4 34:23
39:8,10 61:25
76:7 78:17,18
81:3 92:10 98:21
106:18 107:24
111:4 249:23

**legal** 8:5,6 219:5
243:4,21 290:15
319:1 322:1
**legislation** 228:10
228:11 232:14,20
**legitimate** 15:17
18:20 20:7,15,23
21:2,4,10,12,22
24:23 86:18,25
104:16 105:1
106:19 107:22,24
109:17 110:7,10
110:20 111:7,15
111:25 133:7,8
138:25 139:5,10
139:16,21,22
147:24 148:23
150:20 151:8,19
153:5 155:3 171:4
172:4 189:2,3,4
198:11
**legitimately** 198:8
**length** 267:6
**letter** 6:17 157:3,7
159:12 161:5
203:23 207:2
319:20
**letters** 163:23
164:14 302:23
**level** 60:13 116:18
128:18 131:5
156:14 160:4
190:8,10 231:4
**levels** 40:11
113:19 116:1,24
117:3,14,16 162:5
190:7
**liaison** 232:8
**liberalized** 292:15
**liberally** 316:24

**license** 140:15
275:18
**licensed** 275:6,14
294:9,16 295:1,5
297:24 298:3
**licenses** 294:25
**lie** 181:14
**lied** 182:25
**life** 18:23,25 19:16
19:18,21,22 20:2
54:19 67:16 71:11
71:23 89:8 114:11
119:17 123:5,22
128:17 129:2
142:2 172:4
272:23 291:20
306:11 308:15
**lifetime** 101:5,7,9
**light** 127:6
**liked** 90:10
**likelihood** 99:13
102:8 148:1
204:21 291:25
292:1
**likes** 56:12
**liking** 150:13
**limit** 105:8 188:24
**limitations** 270:8
270:9
**limited** 165:6
234:5 265:7,12
275:23 278:25
295:8
**limiting** 193:21
**limits** 191:19
**line** 20:23 47:12
51:25 52:12
116:22,24 117:13
117:20 155:18
164:4 279:6
319:14 321:7

322:3
**lips** 118:12
**list** 145:21,23
148:8,11 149:7
304:4 305:15
**listed** 99:8 144:24
280:4 297:3 321:7
321:17
**listen** 258:23
**listing** 321:7
**lists** 146:9 296:14
315:5
**literally** 104:21
110:25 175:23
294:24
**literature** 35:25
36:3 37:3,7 49:12
49:16,18,22 50:8
70:1 72:9,12 78:1
78:11 79:25 80:1
80:19 87:23 90:4
252:17,19
**litigation** 11:6,14
11:16,17,19 15:4,9
80:3 174:20
184:19 205:12,16
208:1,5 219:25
232:2,5,19 240:5
245:13 263:6,19
263:22 269:8
287:1 309:11
**litigations** 14:10
14:16
**little** 10:8 32:8,14
43:11 52:9 62:21
85:3,17 92:17,21
96:16 102:24
109:22 122:14
125:24 130:7
141:13 142:5
161:17 165:24

169:1 193:2 196:5
196:14 218:1,17
228:10 233:14
247:19 250:21
273:19,20 277:22
**live** 240:16
**lives** 7:5 195:2
**llc** 2:7
**llp** 3:6,15 4:6
**lobby** 230:14
**lobbying** 227:22
228:2,5,8,8,11,14
228:17,21
**local** 8:23
**logan** 4:7
**logical** 150:17
**logistics** 183:1
**logo** 279:2 303:18
303:19
**long** 11:25 38:11
38:24 39:4 41:15
45:25 46:20 48:25
49:4,5,15,16,20,23
50:1,6 53:21,24
54:17 64:20,25
65:14,19 66:2,8,15
67:5,9,13 69:1,16
70:5,7,22,25 74:8
92:8,14 93:10
95:13 100:20
121:15 131:10
146:4,22,24
147:11 202:22
203:1 223:18,20
223:24 224:6,23
257:4 265:22
266:24
**longer** 38:1 39:22
52:9 53:6 60:7
64:1 70:15 92:21
161:7 162:12

163:11
**look** 15:22 16:11
18:12 19:6 20:3
28:15,24 29:11,14
30:24 31:11 33:5
33:25 34:15 37:10
39:5,7 42:5,19
44:6 50:4 55:22
58:9,12,16 61:5,23
64:16 65:11 66:3
67:1 68:3,18 71:1
72:5,6,8 73:14
76:1,4 77:18
78:16 79:24 80:4
81:16,19 87:15
98:12 101:2,23
107:12 110:14
113:16 115:13
122:23 124:10
131:13 136:8
142:25 146:11
147:13 156:25
157:13 161:4
162:24 164:23
165:12 167:9
168:9 169:5
170:14,25 171:11
173:9 185:13
192:14 194:4
195:5 196:15
198:3,18 201:8
204:5 208:6,22
214:8,9 215:5
224:18 225:19
231:5 236:23
247:8 266:1,10,13
266:14,16 267:7,8
267:9,15,20 279:1
281:12 316:1
**looked** 48:17
55:11 64:14 87:13

92:12 108:8
129:13 146:9,13
146:15 147:9
159:3 171:24,25
179:14 181:5
184:25 203:4
219:17,21 220:5
231:24,25 232:19
265:20 269:3
283:6
**looking** 30:9 31:13
48:16,25 54:15
55:19 63:7 93:8
94:3,6 98:16
99:23 100:17,19
146:7 151:20
153:3 171:19,20
181:8 192:4,5,7,13
196:19 237:21,24
264:10,10 265:14
266:6 269:22,24
269:25 270:2
277:11
**looks** 156:2,3,11
193:25 195:4
277:22 280:5
315:25
**losing** 172:4
**loss** 272:23
**lost** 92:24 238:3,3
**lot** 38:8 40:13
58:22 77:4,8
79:24 122:19
126:17,23 141:1
193:17 253:16
254:24 272:25
299:17 304:25
**lots** 66:20 105:24
147:1,3,15 154:2
**low** 19:2 45:16
59:5,7,7,23 71:12

71:25 74:8,12,25
77:3 115:17
121:14 170:17,22
224:6 298:10,13
299:19 300:7
**lower** 70:11 77:8
115:11,20,23,25
278:2
**lowest** 75:8 224:1
227:9
**ltot** 68:20,25
**lunch** 95:10,14,17
95:18,22 131:13
**lying** 180:21
182:11 240:12

**m**

**m** 9:19
**m.d.** 1:18 5:17 6:6
6:10,11 7:12,17
201:13 318:3
**machines** 193:24
**madam** 319:9
**madara** 163:22
**madara's** 164:3
**magnitude** 14:21
14:22
**mail** 306:20
**mailed** 210:11
**mailing** 303:15
**main** 118:24
**maintaining**
185:17
**majestro** 2:9 8:17
24:25 25:2,6
**major** 101:8
**majority** 50:15
54:6 89:11 163:1
281:16
**making** 26:11
40:15 41:17 72:13
115:8 121:5,8

132:10,16 133:8
133:10,14 135:11
136:16 141:2,6
159:18,22 181:19
183:16,18,21,23
274:5
**mallinckrodt's**
307:14
**manage** 7:8
**managed** 125:1
**management**
124:12,18 138:20
279:9 308:11
**managing** 44:10
44:14,22
**mandate** 123:3,20
**manipulated**
309:21
**manufacture**
243:14
**manufactured**
119:25 122:4
**manufacturer**
174:23 211:8,22
212:7 213:1,2,12
280:19 281:21
292:3
**manufacturers**
119:3,8 120:2,7,20
183:9 201:19
202:6,11,16
203:24 204:4,9
205:10 207:4,7
209:12 210:1,17
211:4,16,16 212:9
212:14 213:17,24
217:2 218:15
225:15 228:7
234:18,23,25
240:11 242:23
244:22,24 247:12

249:15 268:12,22
282:13,15,23
284:2 286:23
**manuscript** 6:8
**march** 5:12
**marino** 228:24
231:10 232:3
**mark** 6:6,10 42:11
68:12 69:25 289:1
295:23 303:10
307:19 313:6
**marked** 10:22
15:20 17:1 27:20
33:3 42:3 68:1,11
97:17,20 156:22
167:5 194:2 201:6
208:12 277:17,19
289:4 296:1
303:12 307:21
313:8
**marker** 49:8
**market** 181:12
182:5 183:4,9,25
205:10 211:11
**marketed** 183:7
184:2 206:6,25
208:4
**marketing** 7:15
198:21,23 199:1,3
199:7,9,11,13
204:3,9,11,13,15
205:3,18 206:16
206:23 207:3,9,11
207:14 208:17
209:5,10,19,22
210:2 212:22
213:8 217:1,17,20
217:24 221:23
254:25 275:20,22
276:1,12,18 277:3
278:14 282:8

283:8,19 284:15
286:12,12 292:14
299:21 306:19
**marriage** 318:10
**massive** 40:3 45:5
54:10 106:9 114:5
115:19 140:17
160:6 272:23
**massively** 140:7
**material** 210:11
222:12
**materials** 199:23
209:13 210:25
283:9 284:15
285:5 286:6
**math** 156:4,5,8
**matter** 8:10 14:17
318:12
**mayor** 236:24
**mccann** 55:18,20
145:16
**mckesson** 3:4 8:20
8:21 10:5 144:17
144:23 148:14
149:11 150:7
175:17 176:7
181:10 182:3,4,11
182:24,25 183:1,6
183:24 184:1
188:11 276:5
**mclellan** 5:17 80:6
**mcnamara** 3:17
5:4 9:2,3 249:24
250:10,13 266:22
277:16 287:11,14
287:17,23
**mdl2804** 7:18
**mean** 14:12 17:1,2
22:21 23:1 24:4,5
24:10,12,17 33:21
46:13,19 47:1,18

48:8,14 49:4 56:6
56:6,7 67:10
83:20 85:8 86:24
87:5 93:1 99:10
104:20 150:16
169:5 175:6
214:12 217:10
256:1 266:10,14
305:21 309:16
**meaning** 99:10
122:18 123:25
124:24 125:8,14
125:22 197:9
198:13 211:10
216:8 310:15
**meaningful**
160:18
**meaningless** 75:13
75:25
**means** 46:25 47:11
47:12 65:24 100:4
253:7 289:8
**meant** 13:19,20
54:7 167:2 299:1
**measure** 56:9,12
56:15 57:14
**measures** 180:11
**measuring** 21:25
22:1,4 48:18
57:12 171:22
**mechanics** 15:24
52:21
**mechanism**
107:23
**mechanisms**
178:21,24 179:2,8
212:17
**media** 37:18
153:12,17
**medical** 6:18,20
15:17 18:21 21:17

24:14 37:24 38:5
38:7 39:1 40:6
41:11,14,16 72:18
73:3 85:4,7,10,13
85:14 86:2,25
87:16,22,22 89:6
89:10,13,19,20,22
90:5,6,25 91:6
118:21 120:5,12
120:16 122:9,11
122:16 125:10
126:25 127:14
157:7 159:19,24
160:2,19 195:25
196:8,16,20 198:4
200:12,12,15
203:11 214:6
216:14 217:6
218:7 223:4 227:1
227:3 247:16
248:5,7 254:11,22
254:25 256:11,25
258:2 275:1,7
291:7 315:15,17
315:20 316:4,6,14
316:17,24 317:2
**medically**  86:22
86:23 128:9
196:18 290:4
**medicating**  84:8
**medication**  39:15
101:12 134:6
136:22 226:23
251:5,5 253:17
254:7,10,18,21,24
256:15,16 306:4,5
306:11 311:4
312:22
**medications**  258:7
259:13,15 261:1,7
309:13 310:3

**medicine**  7:25
76:19,21 78:14
85:23 94:18,19,23
96:18 164:8 188:9
189:4 190:11
253:14 311:16
313:11 314:14
316:13
**medicines**  19:11
19:14 160:20,22
256:5 257:25
**medium**  75:1,1
**meet**  46:1,21,25
47:8 48:11,17
93:6 230:2,13
255:22
**meeting**  230:4,5,7
**member**  187:19
187:24 229:19
**members**  164:1
229:17,22 253:1
259:5 261:21
**memory**  33:21
169:9 265:21
**mental**  70:22
226:22
**mention**  241:10
**mentioned**  28:25
50:16 61:19 97:20
98:7 114:7 127:23
225:21 226:13
254:17 274:14
**mentioning**
177:14
**message**  140:6
223:19,25 224:4
227:6 292:15
**messages**  120:15
120:17,24 122:21
202:24 203:16
212:15 216:10

304:14
**messaging**  119:21
**met**  46:10,14
47:23 48:2,4
229:8,10 230:25
312:15
**metastatic**  114:12
114:20
**methadone**  47:12
**methamphetamine**
80:23 97:1,15
165:11
**methodology**
35:22
**mg**  115:7 130:20
130:21
**mid**  116:21 119:11
260:16
**middle**  71:15
89:12 165:4
185:14 209:2
**midst**  162:18
**midwest**  319:18
322:1
**mild**  46:9
**mill**  108:8 110:8
133:6 138:21
147:23 148:1,20
148:24 150:22
151:7,18 152:4,18
153:11 154:1,9,21
155:8 186:24
**milligram**  22:5
50:20 54:21,22
58:14,16 60:23
114:2,5,8,20 115:9
129:18 151:22
265:5,11
**milligrams**  54:11
54:12 58:19
265:15 266:7

267:21 299:7,8
**million**  61:12
181:19 195:11
254:23
**millions**  110:25
119:23 122:1
129:7 146:19
170:18 175:23
184:20 234:8
235:13 237:2
239:2 248:5
255:18,25 256:2,3
264:23,23
**mills**  138:19
140:23,25 149:8
149:19 150:23
151:15 271:1,3,7
271:19
**mind**  12:7,25
22:17 46:6 58:5
59:10 65:22,24
79:2 105:20 178:2
222:24 295:18
**minimize**  270:21
**minimized**  41:12
224:19
**minor**  24:6
**minute**  25:3 52:6
194:13,17 220:24
221:2 293:7
299:16
**minutes**  52:5,11
53:10 95:9 142:14
142:17 169:9
194:11 209:16
220:16 275:20
277:14 287:20,20
287:22 312:10
**misconceptions**
5:16 28:3

**misinformation** 213:11 224:20
**misinformed** 24:14 40:23 311:23
**misinterpretation** 315:7
**mislead** 80:6
**misleading** 56:11 300:2
**misled** 216:14,21
**misrepresentatio...** 181:23 203:10 215:24 223:1
**missing** 13:15,24
**misstates** 31:22 82:1 300:23
**mistakes** 233:16
**misunderstanding** 163:24 164:21
**misuse** 85:4,13,14 85:21,22 86:3,23 86:24 87:5,9,16 88:4,10,21,22,23 90:5,12,14,17,23 91:1,3,3,12 196:9 197:4,13,13 308:2 308:15,21,23
**misused** 196:10
**misuser** 196:1
**misusing** 87:1 195:24
**mitigation** 5:16 28:3
**mix** 89:16 111:14
**mme** 56:7,14 57:19,22 58:15 129:6 146:8
**mmes** 111:1,8 131:8 146:20 235:14 237:3

**modalities** 139:8
**moment** 62:17 81:3 169:3 185:25 224:9
**money** 280:20 281:22 282:15
**monitor** 309:1
**monitoring** 172:8 172:11 173:25 174:3,11,18 175:16 176:6,14 178:8 181:7 182:7 184:9,13 185:3
**month** 54:7 60:24 160:13 296:4
**month's** 54:8
**months** 19:4 51:15 60:6 114:13
**morbidity** 5:12 116:5,12
**morning** 9:9 10:3 10:16
**morphine** 22:5 51:1
**morrisey** 7:3
**mortality** 5:12 7:15 116:5,12 208:18
**mosaic** 249:7
**motivation** 270:19
**moved** 115:2 128:24 147:7 178:21
**moving** 118:13 250:22
**mph** 6:16
**multiple** 154:14 155:2,3 222:5 265:23 276:21
**muted** 118:7

**n**

**n** 2:1,7 3:1 4:1 5:1 9:19,19
**nail** 150:2
**naliboff** 5:22 33:11
**name** 9:11,23 10:4 222:11 250:13 258:12 264:21 289:19,21 290:3 297:3 309:6 310:18 319:6 320:4,15 321:4,21
**narcotic** 45:7 271:18 272:6
**narcotics** 187:1,15 188:5 191:10,14 192:18 240:25 241:7 243:20 244:6 268:20 272:7
**narrative** 82:3
**narrow** 29:17 81:9 147:8 164:15 266:24 279:15
**narrower** 273:20
**nation** 161:7 162:12 163:10 166:22
**national** 6:18 7:8 18:6 54:5 85:12 87:14 96:20 157:8 161:15 196:1,3,7 284:11 286:1
**nationally** 156:14 162:21 270:25
**nature** 128:10 214:2 219:18
**near** 18:25 19:16 19:18,22 20:1 67:16 114:11

119:17
**necessarily** 24:10 29:4 58:10 69:13 94:14 99:14,22 100:9 101:18 119:16 132:2,9,13 133:2,13,17 136:15 138:3 141:2 163:25 164:1 182:9 184:24 198:16 213:12 249:11 256:20 257:6,10 263:3 271:14 291:4
**necessary** 26:1 188:15 189:12,14 290:4
**neck** 161:22,22
**need** 28:10 29:5,5 29:16 52:5 53:6 58:10 62:17 68:4 83:21 111:7 118:3 118:15 122:4,12 122:17,22 125:7 127:15 134:7,9 141:25 155:8 167:10 169:3,5 193:19,21 194:6 197:17,19 200:25 201:9 203:17 227:9 241:5 243:11 247:24 259:22 265:11 266:16 274:15 314:20
**needed** 114:24 119:14 121:6 124:1 125:1 190:1
**needlessly** 119:23 121:12 316:20

**needs** 18:21 30:3
103:14 134:25
266:10,14 267:7,8
**neighbor** 303:3,19
**neonatal** 308:16
**neoplasms** 22:12
**network** 7:14
**neurobiological**
96:25
**neurobiology**
97:14
**neuropathic** 35:3
**neurostructural**
59:6
**never** 51:23 64:19
66:21 86:9,15
89:7 113:20 153:6
170:25 171:5
173:22,24 174:11
174:14,22,25
175:13 232:15
237:17 245:21
253:20 291:7,7
297:10
**new** 1:22 9:25
33:7 63:1,10 68:9
78:13 93:25 94:1
96:17 122:24
154:4 157:1
199:14,17 245:14
262:20 278:11
318:19
**news** 37:18
**newsletter** 7:25
**nice** 81:3 118:11
**nicotine** 80:23
**nida** 96:20
**nih** 6:8
**nine** 19:7,8 54:22
54:23 55:23 58:20
64:17 71:1,4,17

78:19 114:9
**ninth** 2:14
**nip** 192:18
**non** 22:6 35:2
43:24 44:20,23
51:2 62:13 63:2
63:11,24 65:5
85:4,7,10,13,14
86:2 87:16,22
89:19 90:5 195:25
196:8,16,18,20
198:4 251:5
255:17 276:3
306:5 308:8
313:13 314:3
**noncancer** 6:5
42:14
**nonmalignant**
5:21 33:14
**nontreatment**
313:18
**nora** 5:17 28:2
96:19
**normal** 59:6,23
121:14 202:22
223:19 224:5
314:8
**normalization**
223:10
**normalizing** 224:5
**notary** 1:21 9:20
318:19 319:16,25
320:10,18 321:15
321:23 322:23
**note** 28:11 33:22
319:12
**notes** 279:19
**notification** 280:9
**notion** 203:1
**nuisance** 219:6,13
219:19,22,24

220:7,9
**number** 7:11
14:11 22:3,17
26:20 40:11 46:7
47:25 51:5,7 56:6
56:10,25 57:3
58:12 68:12 75:19
75:20 76:17 77:1
77:3 91:20 93:25
131:20 146:2,18
170:17,21 191:19
196:22 197:7,11
198:1,4 199:19
244:13 249:2
253:13 255:8
277:5 294:1 319:8
319:14
**numbers** 22:1
30:12 50:22 57:12
82:16 115:5
130:18 265:8
321:7
**numerous** 37:17
94:9
**nurses** 204:19
**nursing** 146:5,25
147:1
**nw** 3:6,15

**o**

**o** 9:19,19
**oakland** 2:7
**oath** 318:4
**object** 15:18 31:25
**objecting** 118:7
**objection** 29:24
31:5,21,25 35:14
36:5 37:1 38:3
39:24 41:7,21
44:4,16,24 45:14
46:23 48:9,19
51:10 54:3 57:6

57:25 59:16 62:13
63:3,12 64:3,24
65:6 66:18 67:15
69:4,21 70:19
72:4 74:2 75:17
76:14 77:13 78:8
79:18 80:16 81:13
81:25 82:19 83:19
85:25 87:4,11
88:6 90:18 91:4
91:23 93:20 94:12
94:24 97:10 99:16
99:20 101:22
102:12 103:4,11
103:21 105:6
106:5,21 108:1,12
108:21 109:19
110:5 111:19
112:18 113:3,11
118:9,17 119:12
120:10 121:7,21
124:3 125:2,17
128:3,12,21
130:22 131:6
132:1,8,12 133:12
133:16 134:22
138:6 139:3,14
140:3,13 143:5,16
146:14 148:7,17
149:14 150:9,18
152:13,16,20
155:25 157:24
158:6 159:16
160:5,21 162:14
166:5 169:20,24
172:12 175:19
176:23 177:10,12
177:22 178:9,15
179:17 180:1,13
182:1 183:22
184:14 185:4,24

186:8,21 187:7
188:3 189:8,22
190:14,24 197:24
202:18 208:2
210:3 212:2,13
213:6,18 215:2,13
215:21 217:9,18
217:25 219:4
221:25 222:3
225:9,18 226:9,18
233:8,22 235:3,7
235:22 236:5,16
237:23 238:16
240:3 241:23
242:9 243:9
244:10 246:7
247:1,18 248:9,16
249:10 251:6
253:11 255:3,19
256:18 257:14
258:20 261:9
262:8 264:6,12,19
265:17 266:9
267:23 269:15
272:3 274:11
275:8 276:13,19
276:25 278:16
282:10,25 284:9
284:19 285:7,23
286:8 287:2,7
290:13 291:3,9,14
292:7 294:10
297:5 298:5
300:10,22 302:14
303:5 304:3,11
306:7,12 309:23
310:5,23 311:7
312:2 314:17
**objective** 170:2,11
171:10 178:21,24
179:21,25 180:10

184:12
**objectively** 127:8
**obligation** 187:4
188:1 240:21
**obligations** 191:6
247:16
**obliged** 138:5
**observation**
100:12
**observational** 66:8
**observe** 94:7
**obtained** 195:12
195:22 262:13
269:9
**obviously** 25:7
**occasionally**
197:13
**occasions** 154:15
**occur** 76:8 77:11
**occurred** 108:16
109:2 112:21
172:2 191:4 237:1
**occurring** 237:5
237:11
**occurs** 189:2
**offer** 11:19
**offered** 275:22
**offering** 11:14,16
11:17 177:24
**office** 10:10,14,21
96:2,3 212:25
232:8,9
**officer** 6:18
236:25
**offices** 218:12
228:20
**official** 320:15
321:21
**oh** 9:14 17:3 66:4
76:22 77:19 96:5
228:16

**ohio** 14:17 319:2
**okay** 10:24 11:23
13:10 14:7 15:25
16:1 17:7,8 19:6
25:5 26:15 28:12
28:15 30:11 33:23
35:10 36:2 37:9
52:19 53:4,6,12
55:22 62:18,20
79:10 81:18 85:1
92:20 95:4,5,7,22
96:5 104:5 105:19
109:23 112:23
118:8 123:10,18
124:7,20 131:2
141:21 164:22
165:23 166:17
168:18 169:8,11
172:6 180:8
185:25 195:7
198:20 214:13
220:10,19 221:2
221:12,15 224:6
232:21 249:17
251:19 254:16
261:24 268:8
274:8 277:4,15
278:5 287:16
289:3 293:3 294:5
294:7 295:14
296:18 306:1
307:7,12
**oklahoma** 14:17
14:25
**old** 151:20
**older** 30:20 31:3,7
71:12,24 89:5,7,12
91:18 279:10
**ominus** 262:15
**once** 51:14 72:19
88:9 186:22 188:9

197:17 229:11
**ones** 70:8,24
149:12 198:18
211:8 212:9
222:24
**online** 260:11
**onset** 63:10
**onsets** 63:2
**onward** 119:21
**open** 10:25 15:23
27:22 33:8 34:18
68:4 97:21 167:10
167:19 194:6,23
194:24 201:10
208:10
**opened** 10:16 68:7
101:25 122:25
167:22
**operated** 285:10
**operating** 128:11
138:19 144:18
271:7
**opiate** 166:21,23
**opine** 45:11 81:17
107:3,19 108:5,15
109:8,13 110:13
110:18,23,24
111:11,12,13,18
111:22 112:21
146:11
**opined** 146:15
**opining** 110:21
**opinion** 12:16,23
13:6 82:13 108:11
119:2 120:14
145:25 146:7,12
146:17 147:10
152:11 153:25
193:16 216:8
238:25 246:9
251:3 259:9,10

260:23,25 261:3
261:20 276:8
280:7 286:9
300:25
**opinions**   11:12,13
11:15,18 12:2,18
97:7 177:25
232:23 233:3
265:13
**opioid**   5:15,20 6:3
6:4,6,8,13,22,22
7:12,15,16 12:10
14:10,16 15:3
19:20 21:16 22:13
24:4 26:2 27:5,6
27:16 28:2,18
29:13,14 30:18
31:14 32:9,10,18
33:13 36:14,15
38:6 39:12,15
42:12,12 43:2,4,18
43:20 46:2,9,11,14
47:6,9,17 48:5,21
49:5,7,14,15 50:6
50:9 51:1,17,21,22
54:25 55:25 56:9
56:11,20 57:17,21
58:24 59:18,20
60:6,7,10,20,22,25
64:5,6,9 65:9
66:14 67:4,22
68:13 69:1,16
70:1,7 71:11,24
74:24 75:7 77:5
78:21 79:12 80:3
81:20 82:4,18
83:18,24 85:4,9,15
86:4,7,22 87:6,9
87:15,17,21 88:1
89:17,18 91:16
92:3,12,13 93:6,7

93:7,10 97:8,16,25
98:16,23,24,25
99:7,25 100:1,1,16
100:22,24,25
101:6,20 103:17
103:17 116:4,9,12
117:7 118:19,25
119:7 120:1,2,2,7
120:18,20 126:16
126:19 139:20,23
141:9 147:15
151:10 153:23
154:18 155:1
157:16,22 158:3
158:11,23,25
159:2,4,7 160:1,4
161:8,13,20,23
162:2,2,6,7,8,13
162:19,21,22,25
163:5,6,7,11,17,18
163:24 164:4,6,9
164:12,20 165:6
165:14 166:1,9,10
166:14 167:3,14
167:15 168:7,22
169:12 170:16,20
170:22,25 171:1,4
171:5,12,17,18,23
172:13 173:3,13
173:14,22 174:2,2
189:11,11,16,17
191:12 195:25
196:10 197:13,14
197:15 199:3,16
199:17 200:2,15
201:2,5,19 202:5
202:10,15,19
203:24 204:3,9,22
205:24 207:3,6
208:17,18 214:12
219:24 222:14,16

223:2 224:4
225:15 227:8,13
228:25 229:1,5,14
229:15 232:13,25
233:7,9 234:16,20
234:21 235:2,6
238:23 239:1
240:5 244:13,17
245:19,24 246:11
246:13,13,17,21
247:11,24 248:15
248:19,22 249:3,6
251:5,5,22,25
252:7,15,21
256:15 257:6,20
258:10,19 259:15
259:19,21 260:21
261:1,17 262:5,7
262:22 263:19
265:3,4 276:2,3,18
278:22,24 279:8
279:11 280:13
281:8,9,16,23
282:8 283:22
292:14 296:19,21
296:23,25 297:25
298:4,11,14,16,17
299:19 300:6
301:15 302:3
306:5 308:5,8,16
308:22 309:13
310:3,14 311:3
313:25 314:9
316:25
**opioids**   5:13 16:3
18:20,22 19:1,3,11
19:24 20:8 21:2,5
21:22 22:7 23:20
24:6 26:5 29:5
32:20,23 34:4,12
34:13 35:1,18

37:17 38:2,12,24
39:23 40:3,10,14
40:21 41:4,5,17
42:1 44:9,14,22
45:5,16,25 46:20
49:1,19 50:10
51:1,9 53:21,24
54:1,15,17 55:3,7
55:8 56:13,14,16
56:21 59:2,11,15
59:25 60:4 62:4
62:25 63:8,10,25
64:20 65:4,9,14
66:2,8,10,15,21,22
67:5,14 70:5,15,22
70:25 73:21 74:18
76:10,25 77:12
79:25 80:15 81:12
81:15 82:5 83:6
83:22,23 84:5,20
85:23 87:10 88:1
88:3,10,14,16 89:9
91:19,21 92:1,2,8
92:14 93:9,11
100:20,20 103:1,8
104:7,11,25 105:4
105:11,25 106:3
106:10,11 107:7
107:21 108:18,19
109:10,15,25
111:14 112:6
113:1,18 114:4,10
114:12,15 115:14
115:15 116:7,11
116:17 117:9
118:22 119:16
120:13,14,16
121:13,15 127:13
127:19,24 138:11
138:14,15,18
139:7,17,18 140:2

140:11 141:7
146:19 147:2,4
148:3 151:14
159:14 160:22
161:3,15,17,21,24
161:25 162:1,4,20
163:2,9,23 164:3
165:9,9,15,19,20
165:21 167:2,3
168:14,20 169:14
169:18,23 170:4,7
170:15,19,24
171:2,21 172:14
183:8 184:2 186:4
187:20 188:14
189:13,13 195:12
195:22 196:17,21
197:4 201:21
202:12,22 203:18
203:21 204:12
205:11 207:15
208:5 210:21
211:19 213:11,15
213:24 214:2,3,17
214:19 215:20
216:16,22,25
221:23 223:1,11
223:12,14,18,20
223:24,25 224:6
224:20,22 225:8
227:5,8 234:19
235:15 237:14
239:10,12,16,18
239:23 240:14
245:10 248:21
252:3,4,10 255:10
256:11 257:1,2
258:1 259:17,18
261:5,7,23 264:1
275:23 276:12
277:3 278:15

280:15,16,17
282:5,18,20
292:21 293:17
297:3,12 299:10
299:25 301:17,25
302:24 304:9
306:18 308:2,9
309:12,22 310:2,9
310:10,21 311:3
311:21 313:12
315:14 316:21,24
**opportunities**
193:13
**opportunity** 67:17
188:17 229:20
230:2 250:15
266:1 267:14
**opposed** 276:2
**opposite** 239:14
315:21
**option** 44:9,14,22
**options** 308:7
**oranges** 58:22
**order** 172:8,11
173:1,25 174:11
174:18 175:16
176:3,6,18 178:8
181:7 182:6 184:9
184:12 185:2
201:2 217:13
243:7 285:10,12
297:24 298:3
**ordered** 301:9
**ordering** 172:18
175:10 279:18
285:14 297:17
**orders** 66:17
109:5 174:9
178:20,22 193:4
274:17 294:20
302:21

**organization's**
164:11
**organizations**
120:17,19,23
**origins** 314:3
**oud** 46:22 48:2
70:18 73:20 74:6
74:12
**ouds** 74:25 75:14
75:18 102:8
**outcome** 15:9,12
102:23 318:12
**outlets** 263:4
**outlier** 116:4
148:19,22 149:17
149:18,22 150:24
150:25 152:9,25
153:25 172:24
188:19 268:15
274:18
**outnumber** 162:22
**outpatient** 26:6
107:8
**outrageous** 152:8
**outside** 105:22
174:19 262:5
**outweigh** 21:16,17
22:7 67:23 311:18
**outweighed** 311:4
**overall** 51:3
281:20 302:13
**overblown** 316:22
**overconsuming**
117:9
**overdose** 6:23
60:17 70:9 161:20
162:6 165:5,7,10
165:14 166:3,14
166:22,24 167:15
168:13,19,23
169:12,17,22

170:16,20 171:2,6
171:17,23 172:5
238:5 308:4,24
**overdosed** 238:6
**overdoses** 7:16
166:1 208:18
**overestimate**
40:24
**overexposing**
162:3,19
**overprescribed**
160:23
**overprescribing**
40:3 57:10 140:7
160:7 239:16
**overstated** 203:20
223:2 224:14
**overstatement**
82:11
**oversupply** 280:17
**overwhelming**
237:7 238:8
**overwhelmingly**
51:21 291:22
**owes** 185:15
**owner** 153:10
**oxycodone** 13:20
54:11,12,21 58:16
114:3,6,8,21,25
115:9 129:18
130:20,21 140:23
148:19 151:23
155:18,19,24
156:13 215:8
265:5,12,15 266:6
267:20 298:23,25
299:4,7,9 300:4
**oxycontin** 13:19
115:7 136:7,7,9
215:12 246:20
247:4,7 296:8

297:19 298:8,11
298:11,15,21,23
298:24 299:2,8,18
300:3,3 301:9

**p**

**p** 2:1,1 3:1,1 4:1,1
**p.m.** 142:23 250:7
288:2,5 317:12
**package** 34:20
**packet** 303:16
**packs** 298:16
**page** 2:20 3:25 5:2
5:8,25 6:2,25 7:2
16:11,13,20 17:1,1
17:2,4,5,8 18:3
19:7,8 20:3,16
28:11,16 31:12
33:25,25 34:21
37:11,15 39:7
42:20 45:21,23,24
55:23 61:25 62:1
64:17 65:11,14
66:25 67:1,2
68:18,19 71:1,4,16
71:17 73:16 76:4
77:21 78:16 98:12
98:21 99:4 101:2
101:4 102:3,4
113:16,18 123:3,8
123:9,12,14,19
124:10,16 143:1
155:13,17 156:18
157:13,16 161:5
164:24 165:4,12
166:18 167:24
168:9,16 185:13
185:14 195:6,9
201:16,17,18,23
201:24 204:2
208:22,24 214:10
214:14 227:20

231:5,9 267:18
292:25 293:2,9,11
294:1,2,3,15
301:20,21 302:17
302:18 303:2
305:11,13 306:21
306:24 307:6,24
313:23 319:14
321:7 322:3
**pages** 177:24
178:1 265:22
300:11,24 306:22
309:17
**paid** 14:9,22
184:21 239:20
280:18
**pain** 5:14,16,18,21
6:5,9,14 15:15,17
16:4,15,23 17:15
17:23 18:8,13,17
18:21,23 19:1,3,24
20:9,9 21:5,6 22:2
22:5,6,9,16,24
23:2,5,8,14,16,21
23:23 24:1,3,6,9
24:22 25:21,24
26:1,6,7,11,17,24
27:10 28:3,20
29:1,2,4,6,10,21
30:14,20 31:2,7,15
32:10,11,19,21,23
32:25,25 33:14
34:5,10 35:1,3,20
36:10,14 39:12,13
39:15 40:4 42:14
43:25 44:10,15,20
44:23 45:3,16
46:1,21 49:17,24
50:19,23 51:2,22
53:22 54:19 55:4
55:5,7 57:8,10,15

58:11,14 59:5,7,7
59:23 60:5,8 61:1
62:23 63:2,11,24
64:7,21 65:5,8
66:9,11 67:14
68:13,21 69:10,18
74:6,7,9 77:7
85:19 93:11 98:1
98:17 100:16,20
101:19 115:13,14
118:4,16,19,22
119:4,10,22,24
120:9 121:5,18,20
121:25 122:7,7,10
122:13 123:4,5,20
123:22 124:1,12
124:13,18,25
125:7,15,23
126:14,16,18,22
127:3,3,9,12,16,18
127:19 129:2,11
135:8 138:20,25
139:2,5,7,10,10,12
139:16,21,22
161:2 164:8
189:12 224:7
229:7,9,19,22
230:2,11,13,13,16
230:18,21,23
231:1,2 239:6,6,13
239:15,17,22
248:4 255:11,17
255:20,23,25
256:1,4,5,6 259:16
259:18 261:5
279:9,12 281:15
308:11 313:13,18
314:1,2 316:2
**painful** 39:16
**pains** 18:14

**palliative** 19:12
20:9 21:6 44:17
67:20,22 119:15
310:9
**pamphlet** 312:1
**pamphlets** 304:1
304:18
**pandemic** 142:2
**paper** 28:14 61:6
69:24 72:11 78:4
81:2 84:12 96:17
97:23 122:24
123:14 168:4,24
168:25 169:10
170:11 198:3
203:24 204:25
206:8 207:15
214:9 225:3,4
244:16 245:17,20
245:21,23 246:1
249:5,12,13
**papers** 10:18
84:21,22 160:9
168:25 244:13
**parachutes** 130:6
**paragraph** 16:13
19:10 20:6,12,17
20:19,24 31:13
37:15 42:24 43:6
43:8,14 55:24
61:10 62:1,18
63:7 64:18 67:2
71:8,19 73:16,17
78:18 79:3 124:5
124:11,18 161:6
166:20 204:5
209:2 231:9
289:17 293:12
294:5,15,24 314:7
**paraphrasing**
169:7

parents 238:2,3,6
part 18:15 28:25
  29:1 36:21 70:14
  119:25 121:23
  126:6 140:14,15
  152:10 153:10,20
  154:15 186:12
  190:17 200:21
  204:22 209:20,21
  222:7,20 225:2
  238:18 252:4
  253:3 255:12,14
  255:24 266:5
  281:20 316:18
  321:9
participate 270:14
  270:17,24,25
participated
  223:17
participating 47:6
  270:20
particular 24:21
  47:1 57:23 58:4
  72:14 73:12 76:21
  94:18 102:23
  103:16 105:23
  115:7 126:1
  127:19 128:1
  130:14 131:21
  136:22 145:6
  152:5 159:5
  171:13,25 210:15
  211:17 212:11
  213:5 216:20
  219:23 221:21
  226:5,17 245:3
  246:2 254:10,11
  270:22 280:1
  289:24 290:4
  292:13 305:12,22
  311:4 312:14,21

312:22 313:2
particularly 96:25
  115:6 127:12
  138:11 180:25
  266:25 280:15
parties 216:7
  318:9
parts 192:25
party 246:2
pass 232:11
  249:19 287:15
passed 228:24
patch 283:19
  307:14
patience 223:22
  226:13
patient 21:18 24:3
  24:17 38:21 41:25
  60:14,16,22 61:1
  72:25 103:14
  134:1,8,10,12,24
  135:3,3,8 136:3,6
  136:13 137:17
  138:10 139:24
  152:15 154:3,25
  155:7 189:18
  190:1,17,18,21
  191:1 203:4
  204:21 223:21
  227:7,12,14,16
  228:24 249:18
  253:2,3,18 259:22
  260:7,9 281:6,7
  283:17 288:19
  289:25 290:4,9,24
  291:6,8,17 292:2,8
  298:21 299:1
  311:5,18 313:2
  315:22,25
patient's 58:2
  60:13 133:3,21

191:2 291:20
  308:24
patients 6:14
  16:14,22 17:15
  26:6 27:6 36:9
  43:3,19 44:9,13,21
  45:3,25 46:10,20
  47:2 48:20,25
  51:20 53:21,24,25
  62:22,25 63:24
  64:5,8 65:14 66:2
  66:9,15,21 67:4,14
  68:21 70:4,6,12,21
  70:22,23 71:10,19
  71:22 73:7,12
  76:9 77:12 89:5
  89:12,14,14,16,24
  90:2,16 91:18
  92:1,2,13 93:6,9
  93:10,14 98:1,17
  100:16 101:20
  104:10 106:11
  115:3,16 121:11
  122:1 126:15
  128:25 131:18,25
  132:4 139:6,18
  145:21,24 147:2,3
  147:19,23 148:9
  148:10,21 149:5
  150:22 151:11,15
  151:25 152:3
  153:4 154:7,11,12
  154:17,21 169:13
  169:17,23 170:25
  191:7 192:1,7
  223:17,24,25
  226:22 227:2
  239:16 256:2
  259:7 279:9
  281:12,14,15,17
  281:18 291:22

299:20 301:17,25
  302:24 304:9
  308:6,22 309:1,22
  310:10,12,21
  312:24 313:4
  316:20
patrick 7:3
patterns 6:22
  73:11 167:15
paul 2:16
pause 167:11
  220:10
pay 155:4 223:18
  232:13 245:12
paying 155:10
  181:18 282:13,24
  292:4
payment 223:6
  224:16
pdd 7:21
pdmp 174:4 270:5
  270:7 271:7,13,14
  271:15,21 272:2
  272:15
peak 156:21
pennsylvania 4:7
people 24:5 31:6
  32:23,24 35:19
  45:16 47:7,10
  48:23 50:10 54:24
  55:2 70:15 74:13
  74:14,14 75:9,22
  76:20,21,22 77:2,3
  77:4,15,16 87:17
  87:25 88:3,8,12,13
  89:12,20 90:4,21
  94:4 100:23
  119:16,18 121:15
  122:6,20 125:21
  126:2,13 127:8,11
  155:19 161:24

162:8,24 170:15
171:16,22,24
172:3 180:18
190:12 191:16
196:8,11,15,18,20
197:3,5 203:3
222:15 235:11
238:1,19 239:6
248:21,24 249:2
298:20
**percent** 48:20
61:21 75:22 93:5
171:9,16,22
**percentage** 22:3
22:18,23,25 23:23
27:15,17 30:13
31:6 50:12 51:3
53:23,25 55:12
65:22,24 76:9,25
77:10,12,17 87:8
92:3,7 110:18
111:24 112:1
138:8 170:15
171:14 275:25
276:7,8 306:9
**percentages**
170:19
**perception** 121:24
122:2
**percocet** 296:21
299:4,6
**perform** 47:15
66:20
**performed** 66:24
78:12 116:15
261:11
**performing** 47:7
**perils** 6:10 68:14
**period** 15:3,4,7
91:7 94:1 160:13
170:8 171:25

224:2 227:10
269:19 287:1
**perjure** 183:13
**permanently**
243:20
**permission** 190:3
**permitted** 144:3
242:22
**persistent** 16:15
16:23 17:15
279:12
**person** 59:20
69:17 104:20
153:3 188:11
212:6 228:22
**personal** 132:16
230:22 236:12,13
236:18
**personalities**
82:25
**personality**
101:13
**personally** 97:2
252:12 269:3
320:11 321:15
**persons** 78:22
79:13 81:21
**ph.d.** 5:17 6:7,10
6:11,23
**pharma** 247:3
**pharma's** 315:20
**pharmaceutical**
7:14 198:23 199:1
199:7,10,11,13,22
200:4 208:16
209:5 210:1,17
256:13 263:15
286:14
**pharmaceuticals**
223:6 224:16

**pharmacies** 55:10
55:13 61:11 103:2
104:3 106:9 107:8
107:14,21 108:3
109:11 111:4
135:13 143:3,8
144:23 145:1,6,8
145:13,18,21,22
146:4 148:2,14,20
148:22,23 149:2,5
149:8,12,18,19,22
150:6,21,24 151:1
151:9 152:1,7,10
152:19 153:1,5,25
154:22 155:3
175:8,23,24
186:22,23 192:6
192:15 193:5,14
193:20 206:3
210:24,25 211:1
217:8,11,15,16,21
222:7 225:22
235:5,9,16 262:1,7
264:11 265:16
266:7 267:21
268:17 270:12,13
270:16,20,23,23
270:25 274:18,24
280:21 281:2
282:8 283:7,8,9
284:16,18 287:5
294:9,16,25 295:1
295:5,8,12 304:5
304:13 305:13,15
305:18
**pharmacist** 72:23
133:22 134:10,14
134:16 135:2,16
136:24 137:5,9,10
189:23 191:19
193:6 251:15

252:5,8,25 253:5
253:10,17,22,23
253:25 254:9,20
255:2 256:15,23
257:7,11 258:4,10
258:13,17,24
260:3,14,15 285:4
289:18,23 290:1
291:5 292:6 296:6
296:9 297:17,24
298:3 304:1
311:25
**pharmacists** 134:3
135:15,24,25
136:19 151:23
175:9,10 193:23
203:12 204:19
217:6 223:13
250:25 251:4,9,18
251:25 252:2,9,14
252:19,22 253:1
257:20,24,24
258:2,7 259:4,12
259:25 260:25
261:4,7,12,13,13
261:17,18,21
280:21 286:5,10
294:9,17,25 295:2
295:5,12 301:8,16
301:24 302:23
303:17 304:8,13
304:17
**pharmacy** 72:23
103:13,18 104:2
104:14,19,24
105:5,17 106:7,13
106:19 107:1,24
108:6,7,20 110:12
112:6,16 113:1,9
113:15 135:20
136:4,6,7,23

147:20,24 151:19
151:21 152:5
153:10 172:25,25
173:1 175:12,14
185:22 186:6,15
187:15 188:18,21
192:21,22 193:11
206:4 222:19
225:25 226:17
265:9 270:14
273:2 274:22,23
281:5,6 285:11
288:17,18 291:15
291:17,25 292:22
293:18 294:13
295:19 303:19
306:6
**phd** 6:16
**philadelphia** 4:7
**phone** 258:23
319:3
**phrase** 20:22
31:17,18 65:18
93:2 100:4
**phraseology** 20:14
50:1
**physical** 19:24
314:8
**physician** 135:25
198:5,7,9 209:5,10
209:14,19,21
210:2,6,10 217:1
217:13,17,24
218:2 256:20
310:20
**physician's** 197:8
**physicians** 198:7
209:12 210:5
218:9 261:12
286:13,15 314:7
314:16

**picking** 171:9
**picture** 144:12
**piece** 50:23 239:11
**pieces** 43:12
303:17
**pill** 29:5 50:19
54:23,23 55:1
58:19,20 108:8
110:8 114:9 133:6
138:19,21 140:23
140:25 147:23
148:1,20,24 149:8
149:19 150:22,23
151:7,15,17 152:4
152:18 153:11
154:1,9,21 155:7
186:24 190:18
270:25 271:3,7,19
298:11
**pills** 50:20 54:8,13
55:12 58:14,21
77:7 104:3 106:18
106:25 107:13
110:18,25 111:4
111:14 112:15
113:8 114:1,21
115:12,20,21,25
116:14 128:19
129:7,20 130:11
146:18 149:2,21
150:24 175:24
186:15 187:24
188:13,16 189:19
189:21 190:10
191:3,20 192:16
193:21 197:18
235:14 237:2
264:23,23 272:24
**place** 13:18 30:16
52:2,21 116:23
117:12 169:4

172:24 174:8
176:2 179:8
180:11,17 181:18
181:21 184:11,22
185:7,9 193:10,11
228:14,17
**placed** 223:4
224:15
**places** 13:18
**placing** 210:5
292:21 293:18
294:12 295:19
**plaintiff** 1:5,10,19
**plaintiff's** 262:6
**plaintiffs** 2:4 8:16
8:18
**planet** 115:4
128:25
**planning** 12:18
**play** 80:17 82:24
82:24 83:5 186:12
197:21
**played** 91:6
182:13 211:9
213:1 218:14
229:2 245:14
**player** 212:3
233:21
**players** 120:3
211:19 233:10
234:19,25
**playing** 205:3
231:3 245:1
**plays** 81:11
**plead** 242:2
**pleading** 241:25
242:6,16
**pleas** 242:17,24
244:1,9
**please** 8:13 9:17
9:22 15:23 16:12

19:7 20:4 27:23
33:5 34:16 37:11
42:6,20 45:22
61:24 65:12 68:4
73:15 78:17 97:22
98:13 101:3,24
113:17 143:1
156:25 157:14
161:5 164:24
165:12 168:10
195:6 208:7,23
213:20 231:6
250:1 277:9
287:24 299:15
303:9 307:19
313:6 319:12
**pled** 241:15,21,24
243:3
**plenty** 89:19
**pllc** 3:20
**plus** 303:2,15,18
305:9
**point** 13:4 17:11
23:22 24:19 25:22
32:17,17 34:21
36:4 39:8 42:22
43:12,16 52:17
57:1,2 61:25 67:1
69:16 71:7 75:11
76:6 81:24 86:18
92:18 96:15 102:2
115:7 117:11
125:13 129:4
161:12 164:5
169:4 170:21
172:1 179:13
186:17,17 203:19
204:18,24 207:13
231:18 236:11
247:6 285:3

pointed  164:10
points  216:13
269:13 281:24
poison  134:12,24
135:3 260:7
police  236:25
policy  313:17
poor  83:2 226:22
pop  284:22
popular  82:3
population  48:15
48:16 94:4,7,10,14
94:17 95:2 100:13
100:15,17,18,21
101:19 162:3,20
170:24 171:20,21
poses  74:25
position  152:23
218:14
positions  164:3
positive  41:14
127:6 140:9
283:21
possession  186:5
possibility  188:6
possible  11:21
12:9,20 32:14
45:3 72:10 75:8,9
106:11,12 107:5
120:11 130:13,16
151:3 204:20
232:16 253:12
possibly  120:23
159:18 203:3
224:1 227:10
231:4 232:11
post  162:25
262:18,25 263:3
potencies  260:13
potency  56:15
134:11 135:1

260:16,16
potential  43:2,18
95:3 107:17 147:5
potentially  19:21
55:1 99:12 102:22
129:3 226:21,24
291:19
poughkeepsie
262:20 263:8,9
powerful  234:6
pplpc02900002...
7:22
practice  72:19
73:9 91:14,15
134:6 138:20
139:12 154:4
218:24 224:5
260:19 309:14
310:4,22
practiced  259:2
practices  72:20
133:7 136:1
198:17 217:13
practicing  72:17
practitioner  290:2
preamble  313:16
preceding  62:17
precipitated  37:16
precise  56:19
65:25
predict  39:13 70:6
99:13 100:25
predictive  84:19
predictors  98:22
99:6,10
premarked  11:9
16:2 28:1 33:10
42:10 97:23 157:6
167:12 194:24
201:10 208:14

preparation  13:17
preparing  264:8
265:13 267:19
prescribe  38:12
40:10,13,25 75:7,7
134:4,7 135:5,21
135:24 136:20
160:8 161:3
189:11 192:16
193:19 199:19
203:3,17 210:14
211:17 218:13
251:4,10,16 252:2
252:10,11 253:16
253:18 254:5
257:6,25 258:3,7
258:18 259:17,18
259:20,23,24
260:4,10,16
261:23 269:1
298:21,22 311:16
316:23
prescribed  41:23
84:6 85:10,16,18
86:7,16,22 87:7
88:11,15 89:9
130:25 134:20
136:4,14 170:21
171:2 191:20
239:23 247:5
253:3,20 254:2
256:17 290:11
291:22 292:15
298:17 299:20
309:12,13 310:1,3
310:21 311:2
312:14,22
prescriber  188:14
191:25 268:5,25
270:19,22 290:25

prescriber's
191:13 192:20
prescribers
138:13 155:2
188:23 204:16
211:11 212:16
213:11 217:21
248:11 268:16,19
315:21
prescribes  253:14
254:19
prescribing  5:13
6:22 16:3 26:3
27:5 39:15 41:17
50:22 54:5 72:20
77:6 118:25
119:16 121:24
126:17 133:2
135:20 136:1
138:13 139:20
140:1,17,18 158:8
158:11,19,23,25
159:2,4,7 160:1,4
164:12 167:15
168:8 174:2,4
181:12 188:14
189:13 196:25
197:1 198:8,10,17
200:1,20 204:17
210:22 211:7
229:3,15,16
239:18 247:25
260:3 261:5
262:22 265:4
286:15 290:1
308:25 309:21
310:9,14 316:2,17
316:21 317:4
prescription  5:20
6:3,6,13 18:20
21:2,5,22 24:9,12

24:22 26:11,12
27:6 33:12 34:11
37:17 38:1 42:12
51:12,22 58:13,17
85:24 86:4,5,10,18
87:2 88:1,3 97:25
102:25 103:8,10
103:13,14,15,17
103:17,18 104:7,9
104:11,15,16,25
105:1,4,11 106:3
106:20 107:2,14
107:21,23,25
108:7,18 109:10
109:15,18,25
110:12 111:14
112:6,25 113:18
127:24 132:15
133:8 135:12
136:6 137:3,7,12
137:18,20 141:9
151:17,18,22
155:5,6,11 160:20
161:8,17,21 162:1
162:4,13,20,22
163:2,9,11 165:6,9
165:20,21 166:1,9
166:10 167:2,3
168:22 170:7
171:4 172:4 186:3
187:20,21 189:3
190:22,22 193:8
193:25 197:8
198:16 199:3
221:23 227:16
237:13 248:21
251:12 253:10
258:11 281:4
288:17 289:19
291:1,18 306:5
313:12

prescriptions   22:2
22:3,13,16 23:1,4
23:7,24,25 24:2,24
25:20,23 26:1,8,17
26:23 27:9,14,16
50:13,15,16,23
51:6,7,8,14 53:23
53:25 54:6 56:6
56:10 57:1,3,4,8
57:13 58:18 61:12
61:13 91:10 103:3
110:4,10,19 111:3
111:16,24 114:22
128:8 130:20
131:16,20,23
132:4,5,22 137:23
137:24 138:1,8
139:2,13,17
147:15,19,25
148:1,12,15,21,23
149:3,6,9,20,22
150:5,21 151:8
152:2,8,18,25
153:5,11 154:1,9
154:21 155:2
157:16,23 158:4
186:24 188:20,22
190:12 191:8,13
192:20,23 193:9
193:22 195:13,23
198:19 226:16
251:22,25 252:15
253:8 257:20
260:21 268:18
273:3 275:6,13,17
311:25
presence   319:16
present   4:12 188:1
presentations
261:16

presented   262:15
preserve   158:18
229:2
pressure   306:4
pretty   58:12 77:3
94:18 116:8
117:24 131:10
220:18 266:24
prevailing   122:11
prevalence   6:12
30:20 31:2 46:16
92:10,12,15 93:13
93:18 94:3,6,25
95:1 97:24 98:16
162:7 248:19
prevalent   94:14
94:17,21
prevent   75:9
188:1,12 191:24
192:1 273:13
prevented   237:9
238:10 274:19
preventing   191:23
274:2
prevention   5:11
6:19 157:9
previous   110:6
previously   10:15
113:25 114:7
146:18 178:18
179:20 245:15
price   239:20
primarily   35:4
primary   98:19
127:1 246:14
printing   280:5
prior   84:17,18
86:18,25 90:6,25
263:22 264:3
288:13 290:20
308:25

private   309:16
310:4,22
probably   12:6
13:4 15:5,6 45:6
51:2 52:14 56:22
57:15 61:20 65:2
69:22 78:19
105:18 127:5
135:6 141:20
159:20 169:5
173:12 177:23
178:19 199:4
203:6 206:12
226:11 231:17
237:25 249:14
256:23 263:24
269:25
problem   36:15,15
40:5,20 111:8
163:2 164:21
265:10
problems   35:22
70:17,23,24 89:20
126:5 227:1
procedure   320:5
321:5
procedures   24:6
proceeded   62:4,7
63:16,19
process   38:17 70:2
70:11 201:4
producing   218:5
product   200:5
209:24 211:25
212:5 220:7 222:8
222:10 225:23
251:11 256:21
265:7,9 276:18
278:22,25 280:10
281:8 286:14
288:19 289:20,21

[product - pulled]                                                        Page 46

290:10,11,22,25
291:8,19 299:19
300:4
**production**   319:18
319:23
**products**   7:15
22:10 23:10
115:10 173:16
176:16 199:10,11
199:13 200:19
208:17 210:15
211:17 217:13
218:13 240:13
244:8 246:25
265:4 272:20
276:2,3 278:18
281:13,19 282:9
285:13 289:8
297:18 298:18
299:9 300:7
306:15
**professional**   1:20
40:18 96:22
120:12 151:25
203:13 289:22
290:3
**professionals**
193:24 202:21
203:11 259:5
**profit**   209:23
236:9 239:1
**profited**   237:10
**profits**   237:4
**program**   174:12
174:18 176:6,8,22
177:14,20 180:10
199:21,22 226:20
226:24 227:6,12
227:15 283:18
295:17

**programs**   172:8
172:11 175:16
177:9 178:8
179:16 180:12
181:7 182:7
184:13 185:3
223:21,22 226:14
301:16,24 302:23
303:3
**progress**   63:25
**progressed**   64:1
114:14
**project**   209:16
**projects**   97:4
**prolonged**   90:23
**promises**   6:9
68:14
**promote**   181:13
182:4 183:3,10,25
203:1,4 205:11
215:9 224:3
280:14 292:4,14
**promoted**   82:4
183:7 184:2 206:5
206:25 208:4
281:19 306:18
317:3
**promotes**   212:4
**promoting**   120:13
120:14,24 127:11
205:3 247:4 277:2
278:14 282:4
299:18
**promotion**   222:7
222:20 225:22
280:1,21 291:24
292:1 298:19
302:5 305:7,10,23
306:20,21
**promotional**
222:12

**promotions**
223:16 280:2
282:12 283:3,15
284:21 285:2,9,15
285:18,20 300:16
301:3 305:19,20
305:21,25
**prone**   83:1
**pronouncement**
314:15
**pronouncing**
209:17
**properly**   207:6
**properties**   213:23
**proportion**   90:15
**proposition**   63:23
152:17
**prospect**   47:11
**prospective**   66:23
**protect**   185:16
**provide**   19:23,25
60:5,8 108:10
212:9 213:3 273:7
273:22 289:10
308:10
**provided**   13:24
48:21 103:19
264:14 276:1
279:24 289:25
307:14,25
**provider**   210:9
**providers**   257:23
**providing**   40:5
**proxy**   196:21
**prudent**   188:4
191:9,14 192:17
240:25 241:3,7
272:6
**pseudoaddiction**
203:7 315:5,6,13
315:18

**psychiatrist**   126:3
126:12
**psychological**
17:22 101:10
**psychotropic**
101:12
**ptsd**   101:9
**public**   1:21 6:8
9:20 37:16 103:8
103:9 126:4 177:1
177:16 178:4
180:5 181:2,17
185:16 204:20
209:24 219:5,13
219:18,19,22,24
220:7,8 236:10
237:5 239:9,19
272:8 318:19
320:10,18 321:15
321:23 322:23
**publically**   180:18
184:16
**publications**   144:5
**publish**   212:19
245:8
**published**   35:16
35:25 36:3,20
37:3,6 72:12 74:4
78:13 84:21,22
87:23 116:16
158:8 160:9
204:25 225:17
236:6 244:12,16
245:17,19 252:17
252:18 265:1
270:4
**publishes**   247:3
**pulitzer**   245:9
**pull**   277:16
**pulled**   255:21

| | | | |
|---|---|---|---|
| **purchase** 268:14 269:4 285:6 286:7 | **q** | **questions** 29:17 52:1,12 141:16 147:12 261:18 | 271:25 |
| **purchased** 268:10 | **quality** 71:11,23 | 265:18,21,25 | **reaching** 263:9 273:4 |
| 269:2 271:9 295:10 | **quantify** 252:13 257:18 282:6 | 266:25 317:7 | **read** 62:17 69:14 69:22 79:2 124:4 |
| **purchases** 282:8 | **quantities** 115:18 | **quickly** 141:24 152:9 299:2 | 145:13,15 153:17 |
| 283:7 | **quantity** 22:24 | **quite** 55:3 160:18 | 169:2 176:5,7,11 |
| **purchasing** 268:13 | 115:11 129:19 | **quo** 158:18 229:2 | 176:12,21 177:1,8 |
| 273:1 285:21 | 287:6 | **quota** 7:8 | 177:13,19 179:7 |
| **purdue** 119:7 | **quarterly** 7:25 | **quote** 20:8 | 184:4 195:16 |
| 215:5,9,11,14,16 | **question** 26:10 | | 202:4 210:6 |
| 216:1,3,6 241:14 | 27:2 29:17 30:1,7 | **r** | 212:20 219:2,5 |
| 242:15 246:18,25 | 38:4 45:1,9 51:6 | **r** 2:1 3:1 4:1 9:19 | 230:15 231:13,15 |
| 247:3 283:15 | 51:19 54:4 56:24 | **rafowski** 145:14 | 231:16,19 232:17 |
| 315:19 | 57:11 72:16 74:5 | 145:16 | 236:24 279:7,13 |
| **purpose** 19:15 | 77:15 79:7,9 81:9 | **ran** 285:9 | 279:14 289:15 |
| 39:20 85:15 189:3 | 81:17 84:16 88:7 | **randomized** 5:19 | 290:5 296:10,16 |
| **purposes** 12:2 | 88:19,25 93:22 | 33:12 35:3 | 297:21 303:20,22 |
| 40:11 219:18 | 106:16 107:13 | **range** 14:20,21 | 303:23 304:9 |
| 231:22 232:1 | 108:9 109:9,21 | 249:8 260:12 | 307:10 308:12,18 |
| 251:20 313:17 | 110:6,16 111:10 | **rapidly** 31:15 | 309:2,25 313:21 |
| **pursuant** 66:16 | 113:5 118:14 | 32:18 60:10 | 314:4,5,11 320:5,6 |
| 86:5 87:2 | 119:6 125:4,12 | **rare** 248:3 | 320:12 321:5,6,17 |
| **pursuit** 236:9 | 128:14 129:23 | **rarely** 257:3 | **readily** 178:2 |
| 239:1 | 131:12 138:15 | 259:17 | **reading** 12:11 |
| **push** 121:23 | 147:8 150:3 | **rash** 134:8 135:3 | 31:23 43:7 72:18 |
| **pushed** 301:8 | 156:17 164:16 | **rate** 64:8 66:19 | 99:3 181:23 |
| **pushing** 296:7 | 165:3,13 166:19 | 75:14 92:6 93:16 | 183:18,18 206:18 |
| **put** 45:6 66:21 | 170:2,2,13 172:3 | 93:24 165:25 | 238:13,13 294:2 |
| 92:8 119:6 121:15 | 176:20,21 177:7,8 | 166:22 168:13,19 | 301:18 302:16 |
| 122:13 125:20,24 | 177:18,19 182:16 | 169:16 170:10 | 314:12 319:11,20 |
| 133:4,5 159:20 | 186:1 196:7,11,14 | 309:13 310:2 | **reads** 16:14 28:19 |
| 179:8 180:11 | 211:6 213:20 | **rates** 74:10 169:22 | 31:14 34:25 71:9 |
| 184:11 243:2,4,19 | 239:8 242:25 | **ray** 8:23 | 71:22 79:11 |
| 244:5 274:24 | 245:17 255:6 | **raymond** 3:22 | 195:11 209:4 |
| 292:11 301:12 | 266:12,18 267:2,4 | **reach** 262:25 | 308:1 |
| 306:1 309:4 | 267:8,12,13,17 | **reached** 108:19 | **real** 22:20 122:22 |
| **puts** 80:25 | 273:19 298:1 | 109:11 112:16 | 164:13 260:7 |
| **putting** 23:13 | 302:6 304:25 | 113:9 229:19 | **realize** 17:3 206:5 |
| 126:21 141:3 | 305:2 310:7 312:8 | 230:1 262:18,21 | **really** 12:15 15:1 |
| 188:15 222:16 | 312:12 313:10 | 263:4 271:10,17 | 21:13,24 22:22 |
| | 314:21,24 316:11 | | |

26:4,5 29:16 30:8
30:24 32:6,12
33:1 36:10 45:2
45:11 49:14,16
51:5,18 56:18
58:8 59:17,21,25
60:24 62:15 70:10
70:12 72:6 73:4
77:14,17 78:11
81:17 82:12 83:21
87:13 89:17 90:22
91:5,8 93:22 95:1
97:5 108:5,9
110:14 115:10,13
115:15 116:21,22
117:10,18 120:3
120:11,21 121:22
122:15 125:18
126:25 129:4
130:1 138:21
139:4,22 140:19
146:9 161:19,24
162:2,9 165:21
166:11 169:2,25
170:1,3 171:10,15
172:2 178:11
179:8,21 180:4,7
180:24 183:14
184:22 189:25
195:24 197:10
200:21 202:20
205:19 207:8,11
214:1,2,4,23 224:1
224:4 232:12
235:14 238:11
240:1,15 244:3,23
244:24 246:14
248:20,25 251:21
253:12,13 272:19
276:20 312:17
314:25 315:24

316:2,5
**reaped**   237:4
**reason**   27:8 60:3
  110:3 162:5
  174:10 280:19,19
  285:1 317:1
  319:15 321:8
  322:3
**reasonable**   206:2
  264:21
**reasoning**   150:1
**reasons**   111:5
  118:24 164:12
  192:4,7 317:2
**reassure**   301:17
  301:25 302:24
**reassured**   304:9
**rebate**   222:9
**recall**   108:22
  109:7 113:13
  151:4 226:10
  262:3 266:5
  269:22,23,23
  309:18 310:25
  312:15,24
**receipt**   319:19
**receive**   14:2 15:12
  63:24 113:1,10
  185:23 186:6
  277:6 292:2
**received**   62:4 63:8
  63:10 86:17
  150:23 170:7
  171:3 277:6
  281:17 285:5
  291:23 304:1,17
**receives**   190:22
  289:18
**receiving**   27:6
  154:9 155:2 223:6
  279:11 291:18

**recess**   25:16 53:16
  96:11 142:21
  194:19 221:18
  250:5 288:3
**recipe**   61:3
**recognition**
  121:19
**recognize**   11:3,24
  122:6 163:7
  286:12 314:7
**recognized**   38:8
  272:21 282:1
**recognizes**   313:24
**recollection**
  197:25
**recommend**   69:16
  135:10 311:16
**recommendation**
  135:20 251:10
**recommended**
  68:20 69:8,12
  308:3
**recommending**
  69:9
**record**   8:3,14 9:23
  11:10 13:21,22
  25:9,15,18 53:15
  53:18 96:10,13
  142:20,24 162:5
  179:23 194:18,21
  220:22,24 221:17
  221:20 250:1,4,8
  287:24 288:2,5
  289:2 317:10,12
  318:6 321:9
**recorded**   1:18
**recording**   8:2
**records**   291:7
**recreational**   90:1
**red**   106:13 107:17
  174:2

**reducing**   35:1
  126:19 188:6
  193:13
**reduction**   34:5
  139:23 239:6
**reductions**   34:10
**reed**   4:6 9:6
**refer**   20:14 21:1
  23:13 102:20
  113:18 115:23
  124:18 203:24
  204:3 214:10,16
  231:10
**reference**   34:2,3
  47:25 66:4 72:8
  215:7 218:19
  306:25 319:8
  320:2 321:2
**referenced**   320:11
  321:15
**referred**   12:19
  125:5
**referring**   14:14
  21:13 50:3,7
  55:15,16,17 57:18
  59:5,8,8 62:16
  65:1,19 66:7,12
  81:20 98:11 99:6
  124:24 126:25
  167:4,23 204:6,8
  206:17 256:24
  257:9 278:15
  279:16 290:20
  294:8,11,14,23
**refers**   20:7 43:24
  48:25
**reflect**   36:24
  124:23 131:21
  132:5 137:20
  163:23

**reflected** 11:12
159:11
**reflection** 123:24
125:13
**reflects** 137:25
138:16 140:10
155:22 159:13
164:20
**refresh** 169:9
**refusal** 232:24
233:5
**refusing** 235:18
**regard** 59:11
210:22 253:2
290:21
**regarded** 96:22
97:8,13
**regarding** 201:20
202:6,12,17
214:11,17,25
261:7 288:13
**registered** 1:20
**registrant** 187:5
191:22
**registrants** 175:7
186:11 187:1,10
192:2 205:8,23
234:8 243:6
**registration** 243:7
243:11,13 275:18
**registrations**
109:1 243:17
**regular** 18:13
197:18,19
**regularly** 72:18
309:1
**regulate** 207:6
234:9
**regulates** 207:8
**regulating** 234:6

**regulation** 207:12
228:6
**regulations** 172:20
173:10 174:13
**regulator** 185:6
234:5
**regulators** 242:22
**regulatory** 204:6
**relate** 259:15
263:25
**related** 6:23 7:16
116:4,12 159:17
161:20 162:6
166:14 167:15
170:20 171:12
174:4 207:14
208:18 236:1
318:9
**relates** 306:10
**relating** 263:14
315:7
**relation** 84:20
119:4 160:19
206:16 221:23
235:1 242:18
**relationship** 93:19
**relative** 99:23
**relatively** 73:20
141:24
**release** 114:3,6,8
129:18 151:23
265:5,12 298:16
298:24 308:5,8
**relevant** 13:6
287:1
**reliable** 30:17
**relied** 264:14
265:22
**relief** 19:23 45:17
60:5,8 123:4,21
260:9 300:4,6

315:8,10
**relieve** 19:24
31:15 32:18
**rely** 12:18 13:1
72:13 92:9,10
197:18
**relying** 12:2,4
178:18
**remain** 102:16
112:12
**remained** 151:13
**remains** 187:14
**remember** 15:1
58:7 231:17,19
262:22 263:2,3,10
263:12 276:20,23
288:20 305:12
**remote** 8:9 43:11
**remotely** 1:19
10:7
**rep** 72:22 210:11
212:23 213:9
286:13
**repeat** 83:3,10
255:5
**repeated** 51:14
80:24 83:25
**repeatedly** 84:5,8
91:10 94:18
**repeating** 83:25
**rephrase** 267:1
**report** 5:9,12 7:3
11:5,13,15,20 12:5
12:19,21,24 13:7,9
13:12,14,16 14:1
16:8 18:8 19:7
20:4 28:8,11
33:21,22 37:11
42:17 45:22 47:16
49:2 50:2,5 53:20
55:18,20,23 64:16

65:12 66:25 71:3
87:16 98:6 109:5
113:17 130:23
131:10 143:1
145:14,16,16
147:14 149:16
155:14 156:18
159:11 164:24
165:20 168:3
170:9 171:13
172:9 173:1
176:18 185:14
194:25 218:18
219:6 222:4
226:12 227:20
231:6 241:11
247:3 264:8
265:20,22,25
266:11,17 267:7,8
267:10,15,19
276:24 277:1
283:12,13,23
292:12 293:2,9,15
293:23 294:16
300:15 301:1,13
301:20 302:8
305:10,24 306:17
306:25
**reported** 37:20
48:11 93:25 99:21
195:11
**reporter** 1:21,21
9:12,16,22 118:6
118:12 312:18
317:9 320:7
**reporting** 36:22
36:23 47:21 78:2
78:11 168:21
171:7
**reports** 78:5 98:8
98:10 145:19

153:12 196:1 264:14
**represent** 8:20 10:5 250:14 288:9
**representations** 216:15
**representatives** 209:13 213:3
**represents** 204:19
**reps** 210:13,23 212:15 268:25 281:2 286:20
**reputable** 78:14
**request** 188:18 262:13 321:9,11
**requested** 230:2 269:10
**require** 129:22 147:1 243:25
**required** 174:15 179:5 186:16,25 234:8 237:16,20 285:13 319:25
**requirement** 174:7 186:10 187:9
**requirements** 172:23 176:1 179:1
**requiring** 114:20
**research** 13:5 97:15 127:3,4 144:5 171:8 172:15 214:6 238:23 246:8 252:13 270:5 271:2,6
**researched** 236:7 236:8
**researcher** 168:6

**researchers** 143:20 271:10
**researching** 199:2
**reserve** 308:5
**resolve** 315:10
**respect** 103:16 106:1 245:4
**respiratory** 19:20 308:15
**responsibilities** 186:14 187:16 191:23,24,25 192:3 205:22
**responsibility** 186:18 187:13 193:18 232:25 233:6,11,17 235:19,21 236:2,4 236:7,12,13,21 237:22 239:25 240:22 246:12
**responsible** 112:10 145:2 187:11 193:15 211:24 225:12 235:15 236:9 239:2 240:7 248:23 249:1 314:15 315:1
**rest** 27:13 284:25
**restatement** 218:19 219:2,3
**result** 75:19 99:25 229:14 293:13 294:6
**resulted** 118:20 239:10 310:13
**results** 7:5 169:6
**retail** 61:11
**retained** 263:18

**retreading** 250:19
**returned** 319:19
**reveal** 296:8
**revenue** 15:5
**review** 77:24 78:1 82:11 262:7 264:9 265:19 269:14 276:11 319:12 320:1 321:1
**reviewed** 54:10 55:10 57:21 78:5 82:2 108:4 177:23 180:9 185:5 210:19 240:4 262:1 269:12,16 291:8 309:16,18 311:10,13
**reviewing** 78:10 280:24 312:16,24
**revisionist** 292:15
**rheumatoid** 59:19
**richer** 234:10
**right** 11:7 13:8 14:17 16:13,19 17:12 18:18 24:9 24:16 25:24 26:20 28:8 34:1,3 38:25 39:9 40:11 41:6 41:20 42:17,23,24 43:9,13,25 47:23 49:22 57:5 63:11 66:17 85:24 86:1 86:5,10 91:15 95:4 96:6 98:18 101:3 102:2,4,5 104:11 106:20 107:10 120:25 122:13 124:13,19 125:15 128:2 130:8 132:7 134:21 136:14

137:8,14 138:2 140:2,5,8,19 141:8 143:4,9 147:16 149:6 154:5,10 155:20 156:3,9,11 156:15,20,24 159:9 160:4 161:18 163:21 165:6,16 166:4,17 166:25 167:7 168:17 169:18 171:20,23 174:23 181:25 184:22 185:23 188:2,10 189:21 191:18 192:9,16 193:5 194:22 202:3,3,3 202:13 203:21 207:4 210:16 212:8 213:17 214:22 215:12,20 216:22 217:2,8,17 217:24 218:10,20 221:7 227:17,23 235:21 236:15 237:9 241:11,16 242:18,21 243:14 244:14 248:1,8,12 250:16,18 254:12 257:9,13 272:14 275:23 277:25 278:2 279:2 284:4 284:23 287:16 290:23 292:11 294:2 301:23 303:8 305:24 316:8
**rights** 219:18
**rings** 152:1
**risk** 40:16 41:25 47:8 70:8,11

73:20 74:6,12,19
74:20,25 76:18,22
77:7,10 78:21,24
78:25 79:12,15,16
79:22,25 80:1,8,14
80:25 81:11,20,22
82:18 83:23 84:4
84:7,9,23,24 90:7
90:12 91:1 102:16
102:20,23 121:13
170:3 171:1
202:25 224:15,19
308:2,22,24 311:4
311:22
**risks** 21:16,18
22:7 24:15 37:25
38:15,17,20,23
39:3,22 40:6,19,22
40:23 41:3,5,11,18
43:3,19 67:24
99:23 141:11
159:14,25 201:20
202:7,12,17
203:20 204:12
213:4,15,23 214:4
214:11,17,19,25
215:19 216:15,21
216:24 225:8
308:4 311:18
**risky** 75:2 82:6
174:2
**rogue** 152:19
**role** 6:3,5 42:11
80:17 81:11 82:24
82:25 83:6 91:6
180:5 182:13
197:21 199:2
205:2 211:9,20,20
212:25 229:1
231:2 245:1,4,14

**room** 23:18 53:1
**roughly** 14:8,21
23:6 53:1 155:23
225:17 226:8
**round** 259:6
**route** 112:2
**routes** 110:11
**routine** 18:17
**routinely** 135:17
143:18 153:7
260:4,5,10
**rpr** 318:2,18
**ruby** 3:20 9:1
**rules** 10:6 172:20
173:10 320:5
321:5
**running** 133:7
138:24 139:5
212:18 266:3,19
**runs** 80:21 139:10
**rush** 214:12

**s**

**s** 2:1 3:1 4:1 5:7
6:1,23 7:1 321:8,8
322:3
**safe** 255:10 256:11
**safescript** 153:9
153:18
**safety** 185:16
207:12
**sales** 72:22 108:3
155:18,19,24
156:13,20 209:12
210:11,13,23
211:19 212:4,15
212:23 213:9
218:14 262:1,7
263:14 264:1,4
268:25 281:2
282:18 283:7,21
286:13,20 292:16

**salvage** 194:10
**samples** 284:20
**sandwich** 96:1,1
**sara** 1:20 9:17
118:10 249:21
318:2,18
**saved** 291:20
**saving** 306:11
**saw** 118:12 140:21
276:15,21
**saying** 69:11,13,20
91:5 93:18 106:18
156:2 179:9,22
180:7,16 182:10
184:10 193:3
236:20 245:21
246:2 272:17
286:10 291:5,12
291:13,15 292:5,8
295:3 309:20
315:24
**says** 16:22 17:14
18:5 39:11 44:7
55:25 61:11,13
62:3 63:8 65:7
68:20,24 73:18
74:24 75:12 76:8
101:5 102:5 123:3
157:16 166:21
253:19,25 279:3,7
289:18 294:12
303:8 307:10
308:14,20 313:15
313:23 314:7
**scared** 20:1
**scary** 277:22
**scenario** 197:22
**scene** 238:5
**schedule** 142:5
**scheduling** 173:16

**schizophrenia**
226:23
**school** 125:10
199:9
**science** 35:12,24
36:13 62:12
**scientific** 56:18
214:3
**scissors** 277:23
**scope** 219:22
**scott** 7:16 208:15
**seal** 320:15 321:21
**search** 284:23
**searched** 207:23
**second** 19:10
20:23 32:3 34:20
45:24 55:24 64:18
67:3 68:19 73:16
73:17 104:14
124:11,17 155:4
195:16 197:23
198:9 201:17,24
209:2 214:10,14
219:2 220:11,22
279:6 293:12
294:15 307:5
313:23
**section** 289:7,14
313:16
**sections** 266:1
**sedated** 60:15
**see** 16:22 17:9,17
17:21,24 18:9
19:10 20:6,11,19
20:20,22 24:23
28:5,17,21 30:19
31:12,18 33:15,24
34:7,8,20 35:6,8,9
37:14,21 39:18
41:10 42:22 43:5
43:15,22 44:11

46:3 49:2 53:2
56:3 60:13 61:9
61:15 62:9 64:7
64:22 65:16 67:6
68:23,24 71:14,20
72:1 73:17,22,24
75:3 76:11 79:1
79:17 90:16 94:16
99:2 101:14 102:9
102:17 113:21
116:1,11 118:23
118:24 123:6,13
124:15,21,22
126:1 131:14
139:20 146:21
157:15,19 161:9
168:15 171:3
185:18 193:25
195:14,15 201:22
209:1,7 215:10
224:19 227:23
231:11 233:14
234:20 235:1,12
242:2 258:22
268:15 276:11,17
278:20 279:4,21
280:21 289:6
294:5 302:15
303:22 307:9,9,16
315:12
**seeing**  91:18
113:13 126:7
139:23 140:1
151:4 156:5
293:24 303:7
**seeking**  256:4
315:8,9,10
**seen**  16:5 22:11
23:9 26:25 27:3,4
27:18 30:15 32:16
33:17 36:3,6,6,8

42:15 63:22 64:4
68:16 79:6,8,23,23
81:14 98:3 107:16
107:17 108:2,24
115:24 149:16
157:3,11 158:7
159:6 167:17
168:2 176:9 178:5
185:10 195:3
208:20 219:10,15
240:6,9,10,14,15
257:24 262:14
269:10,17 272:14
281:25 284:14,17
284:20 285:17,19
285:25 291:7
312:7 315:9
**segment**  95:10
**selection**  70:2,11
**self**  84:8
**sell**  103:13 176:16
176:16 179:10,11
211:19 240:13
244:8 270:13
286:23 307:13,24
**selling**  104:3,20
108:6 198:16,19
235:13 243:25
246:24
**sells**  104:14,24
**send**  136:3,5 280:8
280:18
**sending**  210:25
224:4 286:20
**sends**  223:19
**sense**  19:25 54:16
61:21 67:23
114:18 124:5
130:1 163:4
285:15

**sensitive**  267:1
**sent**  10:15 13:14
13:22 24:5 26:7
209:13 281:1
283:9
**sentence**  16:14,21
17:14,21 18:5
20:7,20 28:18
30:19 31:14,23
32:2,4 34:2,23,25
39:10 42:25 43:16
44:7 45:23,24
46:6 48:24 55:25
62:2 64:17 66:7
67:3 68:19 71:8,9
71:18 73:17 74:24
75:12 76:7 78:20
79:11 101:4 102:3
102:18 123:19
124:6,22 186:3
195:8,10,17
201:19 202:1
209:4 293:14
294:12,15,18,18
295:6 301:23
302:19 307:11
313:16 314:6
**sentences**  34:24
42:25 78:19
294:23
**separate**  94:8
119:5,6 120:6,8
121:22
**september**  1:16
8:7 318:14 319:4
**serious**  106:13
111:8 183:17
226:22 227:2
**serve**  154:3
**served**  145:21
146:4

**service**  278:7,10
281:1 282:24
283:20
**serviced**  226:16
**services**  183:8
205:10 212:18
275:20,22 276:1
286:23 292:20
293:16 301:14
302:2,10,21
**serving**  132:5
146:1
**set**  10:6 11:20 12:5
62:21 98:15 157:5
167:11 234:25
263:12 277:7
318:5,14
**sets**  60:9 265:23
**setting**  67:20
**settings**  72:14
98:20 129:16
**seven**  49:17,19,23
314:19
**severe**  45:4 74:15
76:17 77:16 100:1
100:25 116:10
162:18
**severely**  91:8
**severity**  34:6,11
98:23 99:7
**shame**  316:3
**share**  21:21,25
22:16 25:20 26:16
26:22 27:9 50:21
81:22 130:19
131:3,4,4 262:12
277:18
**shared**  273:10,11
**sharing**  143:19
188:12

sharp 248:18,23
249:1
sheet 288:14
307:13,24 319:13
319:15,16 321:7
321:10,18 322:1
shift 118:25
273:15 274:14
ship 274:23
294:19 302:20
shipment 186:23
287:10
shipments 143:8
264:11 265:14
266:6 267:20
shipped 274:17
287:6
shipping 274:22
287:5
shop 155:12
shopping 155:9
short 34:6,11,14
35:1,17,19,20 36:9
49:10 52:16 59:3
59:15 61:14,21
266:19 287:11
shortening 19:21
shorter 36:24
50:13 54:1 65:4
95:10
shortest 75:8
224:2 227:10
shot 142:15
show 10:20 23:10
32:21,22 36:10
58:10 74:9 80:10
86:20 158:12
165:14 284:3
296:6
showed 18:7 35:21
54:10

showing 51:20
64:4 74:17 81:3
83:16 84:18
149:17 156:12
262:7 275:11
284:14 287:4
shown 32:12 58:7
319:17
shows 36:13 37:3
61:18 155:18
156:19 165:5
303:14
sick 54:25
side 16:13 43:9,13
60:17 67:18 76:19
77:16
sidelines 229:24
sign 319:15
signature 318:17
signed 320:13
321:18
significant 66:10
81:4 117:7 234:3
significantly 50:18
signing 319:11,20
similar 58:20
83:24 165:13
166:19 199:21
similarly 135:7
163:23 298:13
simple 129:23
165:3
simply 109:4
294:19 302:7,20
sincerely 319:21
single 54:23 75:14
77:1 114:9 258:8
269:14 305:11
sir 302:8 319:9
sit 12:25 229:24

sitting 120:19
304:2,7
situation 24:13
256:9
six 160:13 277:13
sixty 61:21
skim 169:3
slide 58:6,8
slides 158:12
slightly 26:9 84:15
111:9 128:5
sliver 281:14
sloppy 162:15
slow 304:23
small 22:24 27:15
73:20 76:9,16,17
77:10,11 140:15
189:18 235:12
smaller 288:24
smart 310:15
smith 4:6 9:6
smoked 89:8
snapshot 160:12
269:14
snapshots 269:16
269:18
soaring 116:25
166:13
social 17:22
235:21 236:4,12
239:25
societies 120:13
203:13
sold 55:13 103:8
106:10 107:7
110:25 111:1
114:4 131:8
148:18 149:2,21
183:9 205:9
283:20 292:20
293:16 301:14

302:2,9
sole 245:25 246:3
solutions 8:5,6
319:1 322:1
somebody 33:1
47:5 86:3,9,12
87:1 104:25 105:4
187:20 191:3
212:24 213:1
214:19,21
somebody's 188:9
197:14
someone's 188:12
188:16
somewhat 166:2
soon 53:2
sorry 8:5 9:14
15:23 16:18,19,25
17:3 20:17 43:6
43:11 68:5,9 71:4
71:15 77:19 86:14
92:25 104:19
113:4 121:1 123:7
123:9 125:3 143:7
149:24,25 155:23
167:21,22 173:6
194:5,5 208:8
209:17 211:5
213:19 214:12
216:5 219:14
236:17 246:15
255:5 275:9 290:7
293:25 294:3
298:1 301:18,21
302:4,6,11 304:19
305:5 312:19,20
sort 29:6,20 60:19
76:23
sounds 53:8,13
95:7 96:8 141:21
221:14 303:8

309:8
source   28:17
   87:15 165:18
   196:2,9,19,22
   197:7,7,19,22,23
   198:4
sources   111:17
   145:18 153:24
   231:4 246:6
   262:15
south   3:21
southern   1:2
span   19:21
speak   229:20
   235:18 250:16
speaker   229:11
speaking   8:4
   14:21 31:25
   238:22 305:25
special   237:16,19
specialty   87:13
   91:16 126:1
specific   12:1,1,3,4
   12:13,17,23 26:20
   50:5 82:15 94:15
   106:16 108:15
   111:10 112:1,2
   113:13 145:18
   150:3 176:5,22
   177:9,13 179:13
   213:3 218:13
   251:11 256:21
   264:11 265:16,24
   268:9 290:3 305:7
   310:25
specifically   45:11
   234:24 251:23
   252:21
speculate   159:1
speculation
   256:19 274:12

311:11 312:4
speeches   266:24
spent   73:2
spilled   194:8
spine   59:6,24
sponsoring   218:6
spotted   271:1
spotting   271:3
square   4:7
st   3:6
stack   33:7 34:17
   73:3 101:25 201:9
staff   104:19
   178:19 179:9
   188:11 199:24
   200:10 211:7,9,21
   211:23 212:6
   223:7 225:2,4,13
   225:13 228:19,22
   234:5
staffer   232:7
staffing   234:10
stage   14:4
stagesic   222:11
standard   240:24
   241:3 264:21
standardizing
   56:14
standards   48:1,2
   179:25 184:12
   239:24 240:19,23
   264:16
start   13:3 51:15
   53:3 88:10 116:20
   124:17 152:9
started   14:24
   41:10 85:24
   118:23,24 140:24
   175:25 245:8
starting   39:2,2
   136:23 254:1

277:7
starts   60:14 85:12
   116:20,25 118:25
   202:1 218:18
   293:12
starve   95:15
   141:15
state   1:22 9:22
   27:7,14 116:6,8
   145:3 166:15
   231:3 237:25
   264:24 271:17,25
   272:1,5,9 273:2
   275:7,14 292:12
   293:4,14,15
   301:11,13 315:15
   315:17 316:14,17
   318:19 320:10
   321:15
stated   224:22
   302:7,9
statement   28:23
   29:9,18,19 30:22
   30:25 44:2 53:20
   57:20 61:10 69:3
   74:5 76:13 79:20
   81:19 84:22 98:22
   123:13 151:6
   161:6 162:12
   163:10,12 164:11
   164:17,19 182:24
   183:5,11,24 184:1
   209:1 226:4
   300:17 320:13,14
   321:19,19
statements   181:23
   224:25 225:1,7
   238:14 240:5,6
   315:2
states   1:1 5:14
   16:4 26:3 27:13

38:13 40:13 57:22
   116:2,19 117:10
   118:4,16 140:20
   140:24 156:15
   160:7,23 162:17
   162:18 209:6
   229:16 244:9
   248:20 258:25
   259:1,3 271:16
   280:16 282:19
   284:13,25 286:3
   289:7,13 296:3
   305:14
stating   11:12
   226:4 244:17
   245:18
statistic   66:1 80:6
   196:3
statistics   31:1
status   158:18
   229:2
staying   70:5
stays   187:12
steady   60:19
steals   105:4
steroid   134:9,11
   134:25 135:1
   260:12,17
steroidal   134:19
steroids   260:8,10
stock   247:7 253:24
   254:7 257:12
   260:14 291:25
stocked   136:5
stop   52:7,8 64:6
   95:22 139:19
   141:14 145:10
   280:22
stopped   274:18,22
   282:16

stopping   52:17
92:18
stories   37:18
245:9
strategies   5:16,20
28:4 33:13
strategy   60:25
street   2:14 3:21
4:6 9:25 47:13
86:13 222:12,18
225:23 226:6
strength   55:14
114:4 257:11
strike   216:12
261:2
stroke   227:3
strong   64:19
struggling   128:13
stuck   88:17
studied   116:16
199:6 219:20,25
220:8 252:16,21
studies   12:1,4,17
12:23 18:7 29:12
29:12 30:16 32:9
32:10,13,16,21,22
35:16,18,21,23
36:18,24 45:24
47:4,14 49:7,9
50:9 51:20 55:15
58:1,4 63:23 64:4
64:6,10 74:9,17
78:5,7 79:23 80:5
80:10 81:14,16
83:16,21 84:18
86:20 87:12 92:10
92:11 93:8,13
102:6,13 170:12
170:23 257:18
270:3

study   31:8 34:4
46:8 47:1,3,7,8,20
48:3,8 58:10
61:24 62:16,22,22
62:24 64:14 66:3
66:8,20,24 68:16
69:20,23 71:3
73:15 76:2 77:19
77:24 78:2,11
82:2,11 83:21
93:16 94:25 95:1
95:2 97:19 98:16
101:24 116:13,15
129:9,22,24,25
130:1,3,5 163:18
164:20 168:21
169:12 170:1,5
171:10 213:16
257:21 261:11
286:5
studying   12:11
199:9
stuff   135:4,9
stupor   45:7
subject   37:3 97:13
116:16 254:24
257:22 260:22,22
subjective   178:19
179:20
subjects   13:3
111:22
sublingual   278:19
submitted   11:6
286:25
subscribed   320:10
321:14 322:21
subsequent   91:3
118:2,3 123:20
subsidiary   223:5
substance   68:22
69:18 70:16 83:17

84:16,17,18,24
99:1 101:11,11
102:7 135:21
136:14 175:5
substances   84:19
135:13 136:2,20
172:21 173:11,18
173:21 174:23
175:1 243:8,14
244:1 313:24
substantial   90:15
160:4 246:14
substantially
78:22 79:13 81:21
205:23
substantive   14:5
17:5
substitute   289:20
291:6 292:6
substitution
289:25
successful   158:19
suffered   238:9
254:23 255:17
suffering   19:22
20:1 119:23
121:12 122:1
316:20
sufficient   308:10
suggest   39:1 73:19
82:10 102:6,14
108:3 117:9 135:5
161:1 177:3
223:23
suggested   223:13
262:2 264:17
suggesting   23:24
suggests   38:11,14
54:5 75:13 93:14
93:15 115:20
163:15,16 242:25

265:10
suitable   289:24
suite   4:7 205:9
319:2
sullivan   6:10
68:12 69:25 81:2
84:12 122:24
125:20 126:12
127:10
sullivan's   71:2
sum   161:15
summarized   37:17
232:23
superior   319:1
supplied   144:23
144:25 148:14
149:11,17 150:6
150:25 205:16
206:3,4 207:18
219:7,11,13 225:6
225:24
suppliers   145:8
supply   47:9
105:16 108:19
109:24 110:2,11
187:1 188:21
192:21,22 197:18
206:4 268:19
supplying   145:10
265:2 273:15
274:18
support   12:18
30:24 64:19
151:16 152:17
168:25 215:1
230:1
supported   164:19
supports   34:25
suppose   86:16
supposed   38:19
40:19 41:24

103:24 112:9
132:25 137:10,12
**sure**   8:15 25:10,10
29:11 52:25 62:19
79:4 80:5 92:22
108:22 118:13
124:8 125:18
158:7,20 179:21
195:18 217:20
219:12,15 224:9
243:3 244:19
250:2 263:21
266:22 272:24
275:10 287:13,25
293:8 297:9 302:5
306:14 309:16
**surge**   161:19
**surgery**   23:17,17
33:2 42:2 314:2
**surgical**   311:16
**surprise**   18:16
**surprised**   252:18
**survey**   85:12
87:14 196:2,3,6,7
196:11 197:3,10
197:25 261:11
286:4,10
**surveyed**   48:23
**susceptive**   35:3
**suspended**   109:1
**suspicious**   31:8
109:5 172:7,11,18
173:25 174:11,18
175:16 176:3,6,18
178:7,22 179:7
181:7 182:6 184:9
184:12 185:2
274:17
**sustained**   314:9
**swear**   9:12,17

**switch**   85:2 172:6
218:16
**sworn**   9:20 318:5
320:10,13 321:14
321:18 322:21
**symptoms**   98:25
130:14
**syndrome**   308:17
315:7
**synthesized**
161:21 166:16
**system**   7:8 112:4,7
112:9,11,13,20,21
173:25 174:8
176:2,15 186:11
186:13,16 187:2,9
187:10,11,14
190:9,16,16,17,19
190:20,21 191:1,2
191:22 192:25
193:10,11 285:14
296:5 297:18
308:6,21,25
**systems**   26:4
172:23 174:3,14
174:16 176:10,13
177:2,3 178:1,3,4
178:6 179:19,23
180:17,19 181:17
181:20 182:10,17
183:15 184:17,22
184:23 185:7,9,12
285:10

**t**

**t**   5:7 6:1 7:1
**tab**   288:23 295:22
303:9 307:18
313:5
**table**   62:21 98:15
120:19 167:11

**tables**   264:15
265:20
**tablet**   278:19
**tablets**   114:3
129:18 151:22
189:25
**take**   8:8 36:14
52:2,15,18 54:24
57:1 60:4,6,21
66:3 72:5,6,7 77:4
77:5 80:4 85:19
85:20 86:5 88:10
88:14 95:10
104:20 107:11
134:16 141:20
142:12 147:11,18
172:10 174:10,22
184:24 187:25
194:8,9,12 198:6
199:25 200:25
214:18 215:4
218:22 221:2,5,8
224:1 227:8,9,9
232:25 233:5
234:18 235:19,20
236:12,20 239:7
241:5,13 247:15
249:6,24 287:11
287:19
**taken**   19:3 25:16
53:16 87:6 96:11
142:21 162:11
175:21 194:19
221:18 233:10,17
237:21 250:5
288:3 299:1
**takes**   60:23 65:8
84:3 116:21
117:11 122:15
190:18 228:14,17
299:2

**talk**   23:23 75:13
75:22 83:11,13
85:3 86:2 104:6
135:24 137:5
140:18 198:20
210:13 216:11
229:12 232:24
234:17 241:8
244:2
**talked**   26:16 77:6
96:16 113:25
114:10 154:12,13
172:16 257:8
**talking**   14:13
25:20 44:19 50:21
50:25 56:13 58:23
59:1 63:9 67:8,9
76:16,19 77:9
86:3 101:16,17
104:1 105:23
120:3 125:21
160:24 181:1
182:8 185:20
186:2,7 190:8
202:10 207:2
212:24 213:7
218:8 227:24
238:2 249:7
299:14,17 304:20
**talks**   200:11 212:4
**targeted**   296:7,13
304:5 305:14
**targets**   286:11
**task**   37:19 164:6
**taste**   90:9
**teachers**   216:9
**teaching**   122:19
125:10
**team**   211:7,10,12
211:18,20 212:3
218:13 253:1

259:6 261:22
**tease** 88:18 91:7
  120:21
**technical** 52:3
**techniques** 306:19
**teenager** 85:22
**telemarketing**
  210:22 306:23
**tell** 69:14 87:20
  89:2 92:7 126:5
  135:18 136:8,24
  182:21 197:10
  301:10 305:13
  311:14
**telling** 153:7
  182:22 273:1
**tells** 72:23 315:20
**template** 302:22
**temporarily** 25:9
**ten** 28:11 41:2
  52:5,6 65:11
  95:21 253:8
**tend** 170:22
**tended** 70:15
**tends** 170:16
**tens** 237:25 256:3
**term** 34:6,11,14
  35:1,17,19,20 36:9
  36:24 38:1,24
  39:23 45:25 46:13
  46:20 48:25 49:4
  49:5,6,10,15,16,20
  50:1,6,6,8,13
  53:21,24 54:1,17
  56:18 59:3,15
  61:14,21 64:1,20
  64:25 65:4,14,19
  66:2,8,15 67:5,9
  67:13 69:1,11,16
  70:6,7,15,22,25
  74:8 85:8,12 92:8

92:14 93:10
100:20 102:21
106:17 110:7
121:15 146:4,22
146:24 187:18,22
187:23 200:2
202:22 203:1
209:22 223:18,20
223:24 224:6,23
257:4 284:23
315:5,19,20
**termed** 155:9
**terminology** 85:10
  162:10
**terms** 22:4 31:22
  47:20 50:22 51:7
  56:16,25 57:2,12
  85:5 94:25 192:4
  205:9 228:25
  234:1 235:11
  240:21
**terrible** 135:8
**testified** 9:21
  181:10 220:3
  244:20 261:25
  309:11 310:1,21
  311:2,9
**testifies** 182:3
**testifying** 14:9,23
**testimony** 135:22
  153:17 181:9
  183:18 184:4
  230:15 238:4,14
  238:19,20 244:21
  255:8,12,13,15
  288:20 290:21
  295:16 300:23
  304:15 309:19,25
  311:1,10,13 312:7
  312:16,25 318:7
  320:6,7 321:6,9,12

**teva** 223:6 224:16
  225:1,2,2,3,13
  241:18 242:14
**text** 17:5
**thank** 9:18 118:10
  194:15 221:15
  249:18,20 287:17
  292:10 306:1
  317:5
**thanks** 53:4 71:6
  96:6 293:3
**theft** 104:1,3,18
**themes** 302:13
**theory** 210:7
**therapeutic**
  289:11
**therapy** 6:9 39:12
  43:2,4,19,21 49:5
  49:7,14,15 50:6,9
  50:14 51:2,17,21
  61:14 64:1 68:13
  69:1,17 70:1,7
  71:11,24 74:24
  93:6 224:4 279:11
  315:11
**thing** 24:16 45:17
  120:25 200:22
  202:4 220:20
  226:21 237:9
  248:1,8,12 316:8
**things** 153:16
  247:8 288:15
**think** 11:1,22 12:9
  12:12,15 13:4,7,13
  14:6,24,25 18:22
  19:1 21:11 23:3
  27:11 31:24 32:7
  32:13 33:1 36:12
  38:4,6 45:2,2,8,10
  46:12 49:18,21,22
  50:4,5 52:14 56:8

56:10 57:13 58:6
61:20 64:11 65:23
66:4,23 67:24
69:6,11 70:2,10
72:19,24 73:1,1
74:3,15 77:25
81:2 82:2,3,9,23
85:17 87:19 88:20
90:6,19 92:19
95:5 97:5,20 98:9
107:16 110:23
111:21 117:12
119:13,13 121:2
126:23 127:9
130:10 132:14,15
135:11,17,19
136:16,18 138:4
139:4,15 141:19
141:23 145:19
146:6,12 150:11
154:1 157:25
158:10,12,13
159:6,17,24
160:10 161:13,13
161:23 162:15
163:14 164:6,8,18
165:10 166:7,18
167:1 169:25
170:9,12 171:7,8
175:11,20,21,25
176:20 177:6
179:22 183:11
184:18,23 185:5
186:9,17 188:4
190:20,25 198:1
201:17 204:25
217:22 222:8,22
223:16,19 226:19
228:4,8,9,10
229:21 232:11,18
232:23 233:9,15

233:18,23 234:1,2
234:9,12,13,21
235:8,24,25
236:14 237:15,16
239:19 240:24
241:5 244:20
246:1 247:21
248:10,11,18,25
251:14,16,17
252:3,3,9,20,24
253:12,13 254:3
255:8,20 258:4
263:5,20 264:7,13
269:17 270:24
271:19 273:15,17
273:19 274:6,15
282:3 283:11,13
283:17 284:10
287:21 294:1
300:14 305:10
311:24 315:22
316:6 317:8
**thinking**   97:9
118:3,15,19 119:4
120:5,8 124:25
125:9,15 127:15
127:17,18 198:8
198:10
**third**   20:6,12,17
46:10 47:15 62:2
71:17 76:7 104:18
105:3 155:4 161:6
198:12 204:5
216:7 219:3
**thirds**   22:21 46:20
46:25 47:1,18,21
**thirty**   115:9
319:19
**thomas**   5:17
**thought**   12:21
61:19 92:24

118:21 125:22
167:23 206:2
229:23 257:1
304:19 305:5
**thousand**   155:19
**thousands**   177:23
238:1,1 239:3
276:11,15 309:17
**threatening**
308:15
**three**   4:7 14:16,23
15:2,4,7 30:2
34:24 39:7 51:15
52:11 59:12 61:14
74:13 85:19 105:8
105:12 143:13
144:21 145:1
148:18 149:2,17
149:21 167:4
194:17 195:9
223:16 295:23
312:10
**threshold**   179:3
179:10
**thresholds**   176:19
179:2
**tie**   57:23
**ties**   120:18 235:25
**tim**   10:4 24:25
51:24 92:16,18
95:12 123:8
141:24 220:15
250:20
**time**   8:2,8 11:25
14:13 25:14,17
53:9,11,14,17
86:19 87:21 92:19
95:5,8,14,19 96:9
96:12 112:16
136:10 139:25
141:20 142:4,19

142:22 145:9
151:5 153:4 160:3
170:8 171:25
172:1 175:25
178:8,10 180:11
182:22 186:4
190:21 194:16,17
194:20 213:20
220:13 221:16,19
224:2 227:10
232:5,7,12 241:24
248:8 249:19,22
249:23 250:3,6
258:25 263:7
266:4,19,20 267:1
269:13,19 270:1
277:12 282:20
284:12,24 286:2
287:1 288:1,4
305:1 317:6,9,11
**times**   30:2 60:23
85:20,20 150:10
215:16 253:9
255:9 267:4
**timothy**   3:8 8:19
**tiny**   281:14
**tobacco**   101:7
**today**   10:20 37:24
38:5 41:16 95:13
96:4 183:15
185:12 267:5
278:15 295:16
304:2,7
**today's**   8:7
**told**   85:19 86:4
183:1 246:18
312:1
**tolerance**   54:15,25
55:3,6 60:9,9
114:16 314:8

**tolerant**   55:8
279:11 281:16
**tolerate**   61:1 64:9
**tolerated**   308:9
**toll**   237:24 248:18
248:24
**tons**   260:12
**tools**   292:14
**top**   13:8 14:11
18:4 22:19 39:9
45:23 65:13
110:12 113:12
158:9 166:11,20
169:6 195:5,10
201:18 215:6
222:6,23 231:9
266:4 309:17
**topic**   29:12 30:16
35:17 36:1 72:9
181:3 200:12
220:1 236:6
252:17
**topical**   134:11,25
135:1 260:8,10,11
260:17
**topics**   102:24
172:6 250:21
**torts**   218:20 219:3
219:3
**total**   14:22 15:5
51:8 58:15 131:20
137:23 138:15
**totally**   52:10
143:25 222:18
**touch**   151:13
**tower**   3:20
**toxicity**   289:11
**track**   179:23
**trade**   181:16
315:16

**trading**  199:25
**train**  92:24
**transcribed**  320:7
**transcript**  319:10
319:12 320:5,12
321:5,11,17
**transdermal**  308:6
308:21,25
**transferred**
190:12
**transition**  39:11
**transitioned**  162:9
**transmissions**
284:18
**transmitted**
284:21
**transmucosal**
281:13 291:19
**trauma**  101:10
314:1
**traveling**  129:1
**treat**  64:20 121:20
122:10 126:11
134:7 154:17
201:2 248:3
254:11,22 255:11
259:15 260:5
261:8 313:13
**treated**  59:3,14
66:16 67:4 89:7
89:16,19 92:1
122:7 129:2
154:11 168:14,19
169:13,17,23
171:24 222:15
310:8
**treating**  18:21,23
65:5 66:15 91:16
115:3 121:18,25
126:22 127:12,16
151:10 161:2

200:15,23 201:5
239:15,22 253:2
259:19 260:4
311:19
**treatment**  5:20
15:15,17 21:17,19
33:13 38:20 40:20
40:24 41:1,23
51:16 73:11 74:10
74:21 99:1 101:11
118:4,15 119:11
120:9 121:5,17
122:13 124:2,13
125:7,16,23
126:18 127:18
129:16 130:14
139:2 151:12,13
151:14 173:14
199:17 200:2
239:13 253:4
256:5 259:18,21
261:2,5 308:7
311:17 313:18,19
313:19 314:1
**treatments**  61:2
139:1 313:20
**tremendous**  96:24
138:22
**trend**  140:8,10
158:15 159:9,10
159:12,17 160:12
160:13
**trended**  269:17,20
**trending**  140:5,19
**trends**  39:1 140:20
140:22 158:2,3,11
159:2,4,7
**trial**  5:19 33:12
73:21 74:7,8,18
153:9

**trials**  34:6,11 35:4
35:17,19,20 36:8
36:21,25 74:17
213:25 214:5
**trickier**  247:19
**tricky**  69:10 88:21
**tried**  135:9 199:18
200:14
**trouble**  152:6
209:17
**truck**  181:11
183:2 206:1
**true**  76:24 182:19
183:20 184:1,18
234:16 254:21
318:6
**truism**  242:4
**trust**  179:22 182:9
182:14 183:14
222:13
**trusted**  182:18
**truth**  182:22
**try**  40:4 88:25
95:10 109:22
111:23 117:18
139:6 142:11,16
150:15 200:6
201:3 229:18
246:8 260:11
265:21 305:3
**trying**  14:20 37:2
49:25 53:22
100:21 124:6
129:4 150:2
158:12 160:13,14
199:25 209:23,24
228:9,23 229:2
240:18 260:20
302:15
**tune**  53:9

**turn**  18:3 45:21
77:21 102:24
155:13 201:16
227:19 250:24
272:15 275:19
**twenty**  48:20 93:5
**two**  14:25 18:4
22:21 30:1 33:12
34:21 46:20,25
47:1,18,21 62:18
71:8 76:20 98:8
100:7 124:10,16
147:14 150:5
157:13 166:18
175:22 190:1,7
197:11 198:6
208:22,24 254:12
255:23 257:8
300:11,24
**tylenol**  298:9,9,12
298:22
**type**  87:23 108:5
130:13 143:21
163:19 188:6,24
191:11 199:22
256:16 260:11
264:9 283:19
**types**  31:15 32:18
129:16 254:3,12
257:9 286:6
305:21,25
**typical**  95:16
**typically**  50:19
56:11 210:16
253:18 254:2
259:23,24
**typos**  13:17 14:5

**u**

**ullman**  3:8 8:21
**ultimate**  170:4
245:22

**ultimately** 87:17 90:13 137:6 170:16,20 171:1,5 171:11,16 215:15 231:14
**ultram** 298:13
**unaware** 243:5 245:15
**unbranded** 256:24
**unclear** 133:20
**uncommon** 45:9
**underestimate** 40:23
**underlying** 185:1 279:12
**understand** 14:4 24:19 25:22 32:3 48:13 53:22 57:18 58:25 62:15 69:15 80:12 81:10 112:4 112:7,8 119:2 161:11 162:1,4 163:5 165:24 179:12 180:14 189:1 226:15 238:7 240:19 243:10 253:6 260:8 266:18,23 270:5 275:21 282:22
**understanding** 22:11 34:10 35:12 35:16 61:18 62:12 69:19 82:17 88:2 88:5 99:9 102:21 103:7,12 156:10 157:22 158:14 159:15 163:17 169:22 173:2 187:3,6,8,12 190:25 191:5,9

195:21 209:9,25 211:15 214:3 219:12 244:7 246:10 284:11
**understated** 203:20 224:14
**understatement** 184:7
**understood** 26:18 46:18 260:20
**unfortunately** 103:20,23 132:25 133:23 140:7 311:20
**unique** 54:9
**unit** 146:8
**united** 1:1 5:14 16:4 26:3 27:13 38:13 40:13 57:22 116:2,19 117:10 118:4,16 140:20 140:24 156:15 160:7,23 162:17 162:17 209:6 229:16 244:9 248:20 258:25 259:1,3 280:16 282:18 284:13,25 286:3 289:13 305:14
**units** 130:24 131:8 265:8
**universe** 105:8
**unknown** 66:16 67:5
**unrelated** 215:24
**untreated** 126:5
**unusual** 10:8
**unwarranted** 117:2,4,20

**ups** 284:22
**upward** 270:24
**urgent** 126:4
**usage** 308:1
**use** 6:13 20:7,15 20:22,23 21:2,4 23:17 32:9,11 38:1,24 39:12,12 39:23 46:2,5,9,11 46:14 47:6,17 48:5 49:7,8,9,10 49:11,19 50:3,5 59:1,18 60:1,19,19 62:5,8 63:17,20 64:7 65:4,21 66:1 71:13,25 75:24 83:3,10,25,25 84:13 85:4,7,7,13 85:14 86:2,25 87:9,10,14,16,20 87:25 89:6,10,13 89:19,23 90:1,6 91:22 92:2,13 93:7,10 97:25 98:17,23,24 99:7 99:25 100:1,16,23 100:24,25 101:6 101:11,11,12,20 115:14 116:17 117:22 118:19 126:19 139:23 141:9 155:5 162:9 162:10 163:19 187:17,22 196:3,7 196:9,16 202:23 202:23 203:1 223:12 257:4 265:7 268:22,24 284:23 285:13 301:15 302:3 308:6 313:12,19

314:9
**user** 191:2 195:25
**users** 70:15 196:20 198:4 308:22
**uses** 21:10,14,14 21:23,23 49:12 57:24 67:13,13 68:25 86:22 114:10 284:24,25
**usually** 49:7 155:4 196:6,22 210:9

**v**

**v** 46:1 319:6 320:3 321:3
**vaccine** 306:4
**vacuum** 280:25 288:16
**vague** 45:19 69:10
**value** 222:12,18 225:23 226:6
**variability** 80:13 81:11 82:17
**variables** 100:7,24
**varies** 78:22 79:12 81:20
**variety** 107:7 141:5 153:24 202:21 203:9 212:17
**various** 14:10 111:17 292:13
**vast** 129:19 162:25
**vending** 193:24
**veritext** 4:13 8:4,6 319:1,8 322:1
**veritext.com.** 319:18
**version** 269:21
**versus** 8:11 38:15 38:20 39:3 40:19 40:22 41:25 49:10

74:7,7,20 98:1
110:20,20 111:25
131:5 141:11
159:25 170:24
251:5 311:22
**viable** 44:9,14,22
**vicodin** 54:22,23
58:20 60:23 114:9
136:8 190:1
251:16 296:13,19
**video** 1:18 8:9
25:11
**videographer** 4:13
8:1,3 9:15 25:8,14
25:17 53:14,17
96:9,12 142:19,22
194:16,20 220:14
220:21 221:16,19
249:22 250:3,6
277:11,13 288:1,4
317:9,11
**view** 25:22 49:9
53:22 118:1 119:9
122:11 123:25
127:5 138:16
193:20 203:20
205:17 216:14,18
216:21 236:14,18
236:22 238:15,18
240:20 246:23
247:13 279:23
**views** 239:5 240:1
**virginia** 1:2 2:15
3:21 7:6,19,24
8:24 14:18 26:23
27:7,10,12,15 31:2
31:7 54:9 55:10
58:19 113:19
116:4,6 145:3
154:8,12,13,14,14
154:15,17,19

155:18,24 156:13
156:20 159:4,8
166:15 180:19
195:1 220:6
236:24 237:25
238:9,22,22
242:22 245:9
248:20 258:9
264:22,24 271:22
272:1,1,10,15,22
275:2,7,14 282:19
284:8,17 289:7
290:12 301:8,11
304:1,8,12,17
305:17,18 313:11
316:4,12
**visit** 155:3 218:12
**visiting** 155:7,9
199:24 200:11
210:11,23 211:8
211:20 212:21,23
212:25 213:9
256:2,3 281:2
**vitale** 4:8 5:5 9:5,5
288:7 293:2,8
294:3 295:22
303:9 307:6,18
311:12 313:5
317:5
**vitals** 288:9
**vol** 5:18
**volkow** 5:17 28:2
61:6 76:2 77:18
80:5 96:17,19
**volume** 7:10
137:23 192:16
193:21
**volumes** 154:23
**voluntary** 263:22
**volunteer** 263:23
263:25

**vs** 1:6,11 6:15
**vulnerabilities**
81:7 82:23 83:11
**vulnerability**
78:23 81:22
**vulnerable** 79:14
82:7

---

**w**

**w** 9:19
**wad** 153:3
**wait** 25:3 142:14
**waived** 319:12,20
**waiver** 201:1
**walked** 151:21
291:17
**walks** 198:17
**want** 18:12 22:19
22:22 29:11 30:5
30:24 31:16 34:1
51:25 52:8,8,13
69:22 77:5 80:4
81:9,16 95:8,12,14
109:22 119:5,6,9
131:10,11 133:4,4
133:6 134:9
141:14,17,22
142:3,6,9 147:2
159:1 179:12,13
189:25 190:2
195:8,15,16 203:3
204:24 227:3
242:5 250:24
251:21 253:22
267:11 272:23
307:9,10 317:10
**wanted** 11:25
17:11 20:13 24:20
26:9 32:5 37:23
39:7 40:4 43:16
45:22 51:5 56:23
58:25 61:24 71:7

76:6 85:3 87:24
87:25 106:15
109:24 111:9
167:8 172:7 202:7
209:2 211:13
220:14 229:10,12
262:12 268:13
272:19 274:6
288:12
**wants** 212:19
**warning** 279:20
308:14
**warranted** 113:20
113:24 115:22
116:14 117:15,16
127:25 128:9,19
129:3,8 130:11
131:17,24 132:7
132:11,17,23
133:11,15 137:8
137:11,14,17,21
138:2 140:12
141:8
**washington** 3:7,16
228:14,17 262:18
262:25 263:3
**way** 15:8 30:3
38:11 39:4 41:15
46:18 56:8,14
57:14 69:5,15
73:9 81:23 85:9
85:18 86:7 87:6
88:19 104:9,11,14
104:17,18 105:15
111:6 118:21
128:6 138:14
176:17 180:22
183:20 201:4
204:20 213:7,8
217:3 228:14,16
236:8 248:3

256:25 259:2
266:20 301:15
312:14 318:11
**ways** 88:10 104:7
105:10,18,20,24
119:18 179:10
202:21 213:10
217:4
**we've** 11:9 31:13
52:14 65:7 77:6
82:9 92:17 97:5
97:20 105:12
114:9 122:25
136:8 138:11
159:10 201:10
218:22 223:3
249:7
**weak** 298:13
**weaken** 232:15
**web** 306:20
**weekend** 73:2
**weekly** 5:12
**weeks** 19:4 35:5
36:17,17 60:6
61:14 250:16
255:23
**weigh** 38:19 39:3
40:19 41:24,25
141:10 311:21
**weighing** 38:15,17
40:21 41:18
159:25
**weight** 56:13,16
56:20 57:19 58:11
58:15
**welcome** 250:11
**wellbeing** 19:25
**went** 76:20 106:11
147:20,24 149:9
149:19 154:22
207:22 226:11

276:2 302:4
**west** 1:2 2:15 7:5
7:19,24 8:24
14:18 26:23 27:7
27:10,12,15 31:1,7
54:9 55:10 58:18
113:19 116:3,5
145:3 154:8,11,12
154:13,14,15,17
154:19 155:18,24
156:13,20 159:4,7
166:15 180:19
195:1 220:6
236:23 237:25
238:9,22,22
242:22 245:9
248:20 258:9
264:22,24 271:21
272:1,1,9,15,21
275:1,7,14 282:19
284:7,17 289:6
290:11 301:7,11
303:25 304:8,12
304:17 305:16,17
313:11 316:3,12
**western** 26:5
**whereof** 318:13
**whitefish** 2:8
**who've** 66:21
**widespread** 209:6
**williams** 3:15 9:3
**willing** 152:2,8
272:15
**wind** 12:14 47:13
51:20 70:5,21,25
77:2 105:25
170:19 204:22
281:7
**winning** 245:9
**wisconsin** 2:8

**withdraw** 243:16
267:11,12
**withdrawal** 98:25
308:17
**witness** 1:19 5:2
9:13,17,24 25:13
53:8,13 95:18,24
96:3 142:7 194:7
220:3 221:13
259:7 277:24
295:25 307:23
318:4,7,13 320:1,4
320:11 321:1,4,15
**word** 13:19,20
41:13 46:5 65:21
65:23 184:24
202:2 315:12
**words** 63:23 78:4
107:23 183:4
196:18,25 197:12
204:16 241:24
**work** 43:11 52:20
126:1,14 134:14
134:15 153:19
164:2 168:7
173:13,15,19
175:8 199:15
211:21 228:2,3,25
229:25 231:1,22
232:1,19 241:16
244:5,23 245:5,13
262:5 263:23,25
265:3 269:8,9
271:5 282:14
300:17
**worked** 14:25 97:4
154:7 173:22,24
174:1,5,22,25
175:3,6,12 272:11
272:18 283:3

**worker** 238:4
**working** 11:24
12:10 14:24 15:3
127:2,7 135:4
153:22 205:12,14
205:15 206:7,12
212:6 219:8
222:14 232:8
238:21 272:7
273:4 310:8
**works** 36:15 95:24
142:8 213:1
225:14 284:3
286:21,21
**world's** 115:2
128:24 147:6
**worried** 274:16
**worry** 19:19
**worse** 161:25
239:15
**worst** 70:7
**worth** 54:8
**worthy** 235:1,6
**wound** 172:4
281:13
**wrap** 314:22
**write** 24:9 45:18
59:10 137:2,4,23
139:1 167:3
206:11 246:1
249:5
**writes** 26:10 45:13
132:4,15 168:12
281:4 288:16
**writing** 12:11,21
24:22 69:7 132:22
139:12,17 150:5
188:19 245:23
249:12 291:1
311:25

**written** 22:2,4,14
22:16,23 23:1,4,7
23:24 24:1 25:21
26:17,23 27:9,14
28:2 33:11 45:15
50:13,17,18,23
51:13 53:23,25
57:4,13 58:13
69:5,8 103:3,15
104:9 110:4 111:3
111:16 114:2,23
131:21 137:13,18
138:8 150:21
151:17 163:20,22
167:2,13 169:1
189:3 201:12
208:15 245:21
251:12 268:18
273:3 275:13
**wrong** 207:9
**wrote** 45:19 69:6
136:6 151:8 205:1
205:1 206:8
207:15 214:9
215:14,16

| x |
| --- |

**x** 1:3,9,15 5:1,7
6:1 7:1
**xyz** 72:24 136:24

| y |
| --- |

**y** 9:19
**yeah** 13:13 14:12
52:7 66:6 86:24
99:7 128:23 130:3
139:19 164:15
169:4 193:17
200:9,13 208:23
242:4 257:15
275:10

**year** 15:3,4,7 77:1
94:1 114:13
151:20 196:17
197:5 205:1
206:13,14,18
226:8 231:21,24
262:24 263:18
**years** 12:10 14:25
19:4 38:23 41:2
60:7 98:24 123:20
151:11 153:23
161:16 166:13
168:23 173:18
181:15 199:4
215:16 222:15
229:4 263:13
279:10
**yesterday** 13:15
**yingling** 309:5,7,9
309:20
**york** 1:22 9:25
154:4 199:14,18
262:21 318:19
**young** 89:20 90:21
153:3
**younger** 89:14
90:16 98:24
122:19

| z |
| --- |

**zoom** 1:20

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.