# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON,**
     **Plaintiff,**
**v.**                                   **Civil Action No. 3:17-cv-01362**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
     **Defendants.**

_____

**CABELL COUNTY COMMISSION,**
     **Plaintiff,**                        *Consolidated case:*
**v.**                                   **Civil Action No. 3:17-cv-01665**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
     **Defendants.**

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM G. CALEB ALEXANDER

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................... II

INTRODUCTION .................................................................................................................. 1

LEGAL STANDARD ............................................................................................................. 4

FACTUAL BACKGROUND .................................................................................................... 4

   Dr. Alexander's Qualifications ......................................................................................4

   Dr. Alexander's Report ................................................................................................5

   Dr. Alexander's Deposition Testimony .........................................................................7

ARGUMENT ....................................................................................................................... 9

   I.     IN THE MDL, JUDGE POLSTER REJECTED THE SAME ARGUMENTS DEFENDANTS MAKE HERE ............................................................................................................... 9

   II.    DR. ALEXANDER'S TESTIMONY IS HELPFUL AND HIGHLY RELEVANT ................... 10

       A.    Defendants Do Not Challenge the Contents of Dr. Alexander's Plan...... 10

       B.    Dr. Alexander's Plan Fits the Facts of this Case ..................................... 11

       C.    Dr. Alexander Is Not Required to Conduct the Additional Analyses Demanded by Defendants to Make His Testimony Relevant ................... 13

CONCLUSION.................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**                                                                                      *Page(s)*

*Alliance v. Baker*,
    959 N.E.2d 538 (Ohio Ct. App. 2011) ...................................................................14

*County of Erie, New York v. Colgan Air, Inc*.,
    711 F.3d 147, 153 (2d Cir. 2013) ......................................................................14

*Daubert v. Merrell Dow Pharm., Inc*.,
    509 U.S. 579 (1993) ........................................................................................ 4

*Grant Thornton LLP v. Fed. Deposit Ins. Corp*.,
    No. CIV.A. 1:00-0655, 2007 WL 4591412, at *1 (S.D.W. Va. May 6, 2007) (Faber,
    Chief J.) ...................................................................................................... 4

*In re: Nat'l Prescr. Opiate Litig.*,
    No. 1:17-md-2804, Order Denying Defendants' Abatement Motion,
    ECF. No. 2519 (N.D. Ohio Aug. 26, 2019) ...................................................... 1

*In re: Opioid Litig.*,
    No. 19-C-9000, Order Regarding Plaintiffs' Motion to Strike Defendants'
    Notices of Non-Party Fault (W.V. Cir. Ct. Kanawha Cnty. July 29, 2020) .................... 14

*Maryland Cas. Co. v. Therm-O-Disc, Inc.*,
    137 F.3d 780 (4th Cir. 1998) .......................................................................... 8

*State ex rel. Smith v. Kermit Lumber*,
    200 W. Va. 221, 245, 488 S.E. 2d 901, 925 (1997) ......................................... 14

*Ypsilanti Charter Twp. v. Kircher*,
    761 N.W.2d 761 (Mich. App. 2008) ...............................................................14

Plaintiffs the City of Huntington and Cabell County Commission submit this Memorandum of Law in Opposition to Defendants' Motion to Exclude Expert Testimony From G. Caleb Alexander (the "Motion") (Dkt. No. 1069). Plaintiffs oppose the Motion for the reasons set forth below.

## INTRODUCTION

Dr. Alexander is a preeminent epidemiologist and primary-care doctor at the Johns Hopkins Bloomberg School of Public Health. He has published dozens of peer-reviewed articles about opioid prescribing and the opioid epidemic; he has testified before Congress and federal agencies about prescription opioids and the epidemic; he co-edited a Johns Hopkins report that includes recommendations to abate the opioid epidemic; and he has prepared opioid abatement plans in other lawsuits. Judge Polster denied Defendants' *Daubert* motion in the federal opioids multidistrict litigation (the "MDL"), finding Dr. Alexander qualified to testify about opioid abatement plans and finding his opinions to be relevant, helpful, and reliable. *In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, Order Denying Defendants' Abatement Motion, ECF. No. 2519 (N.D. Ohio Aug. 26, 2019) ("MDL Op.").[1]

Dr. Alexander's assignment in this case was similar to his assignment in the MDL. He was asked to prepare a comprehensive evidence-based plan to abate the opioid epidemic in the Cabell Huntington Community, just as he prepared such a plan for Cuyahoga and Summit Counties in the

---

[1] The MDL Op. is attached as Exhibit A. Pursuant to the Court's August 28, 2020 Order, because the Motion "touches on a ruling of the MDL court," Defendants were required to "incorporate a footnote on the first page of their motion," in bold and all caps, notifying the Court that the Motion "raises an issue similar or identical to one raised in the MDL court." Their footnote should have taken this form: **DR. CALEB ALEXANDER WAS THE SUBJECT OF A *DAUBERT* MOTION FILED IN THE MDL COURT.  JUDGE POLSTER DENIED THE MOTION.** Defendants did not comply with this requirement. They were also required to "explain why West Virginia (or some other law) counsels a different result in these cases." ECF No. 898, ¶ 9(b). Their explanation of Judge Polster's decision (Motion at 1 fn. 1) does not adequately address its holdings.

MDL.[2]  He has done so, recommending dozens of specific programs.  His abatement plan is tailored to the Community's population and commensurate with the severity of the local epidemic, and it reflects extensive research about the Community.  Appendix D to his Report is a "Redress Model," a detailed spreadsheet which specifies the population sizes and program needs for each component of his abatement plan, based on governmental data and other sources.  The Redress Model also includes medical-related cost data for the programs.[3]

Defendants' Motion *does not challenge* the contents of Dr. Alexander's abatement plan. Defendants do not argue that any of his recommended programs would be ineffective, they do not dispute that the programs are necessary to abate the epidemic, and they have not retained an epidemiologist to suggest a different abatement plan.  They do not dispute any of the population or cost data in Dr. Alexander's Redress Model.  The only defense expert who responded to his Report is Robert Rufus, a CPA, who admitted that he is unqualified to challenge Dr. Alexander's opinions.

The primary argument of Defendants' Motion is that some of the programs recommended in Dr. Alexander's abatement plan already exist and are currently funded.  Defendants contend that he should have discounted his plan to account for that.  But the question of whether Defendants are entitled to any discount is an issue for the Court, and the amount of any such discount is a matter for Defendants to prove.[4]  As he did in the MDL, Dr. Alexander provides a comprehensive

---

[2] As used in Dr. Alexander's report, "the Cabell-Huntington Community" or "the Community" refers to "the entire community of Cabell County and the City of Huntington."  Plaintiffs' Appendix of Expert Reports ("Expert App'x"), Dkt. No. 1097-1, Exh. 1.a, G. Caleb Alexander, MD, MS  Expert Witness Report entitled "Abatement Plan for Addressing the Opioid Crisis in Cabell County and the City of Huntington," dated August 3, 2020 ("Report"), ¶ 1.

[3] Expert App'x, Dkt. No. 1097-5, Exh. 1.e, Alexander Report Appendix D – Redress Model, dated Aug. 3, 2020; *id.*, Dkt. No. 1097-6, Exh. 1.f, Alexander Report Revised Appendix D – Redress Model, dated Aug. 26, 2020.

[4] Plaintiffs have briefed the question of accounting for money from "collateral sources," and explained why the existence of such funding, even if it could be presumed to continue, would not affect Plaintiffs' right to recover the costs of abatement.  *See* Plaintiffs' Motion *In Limine* to Preclude Evidence, Testimony, Statements, or Arguments

survey of the *total* abatement needs in the Community, inclusive of current programs.  That analysis of the "full cost" of abatement is relevant and helpful to the Court in fashioning the equitable remedy of abatement.  The Court can discount the plan to account for current programs and funding if evidence and equities support doing so.  Judge Polster reached that conclusion in denying Defendants' very similar *Daubert* motion in Ohio.  *See* MDL Op. at 5.

That Dr. Alexander's plan does not reflect the discounts that Defendants think they are entitled to does not mean it does not "fit" the facts of this case.  On the contrary, Dr. Alexander's abatement report is highly customized to the Cabell Huntington Community.  His plan draws on facts provided by local leaders, fact depositions in this case, local reports, news articles, local data, and other local sources, in addition to national academic studies.  The plan's components reflect local needs based on the opioid epidemic in the Community.

Defendants also claim that Dr. Alexander should have somehow differentiated his recommended abatement programs between prescription and illicit opioids, but as he (and Plaintiffs' other experts) explain, the opioid epidemic for which Defendants are responsible involves all opioids, not just prescription opioids.  The widespread availability of prescription opioids is causally connected to use of illicit opioids, as individuals who become addicted to prescription medications shift to more readily available and, often, cheaper, illegal drugs.  *See, e.g.,* Report ¶¶ 22-23.  As Dr. Alexander testified, the abatement measures cannot be differentiated and should not as a matter of public health policy.[5]  It is therefore appropriate for Dr. Alexander to provide an abatement plan that addresses both prescription and illicit opioids.

---

Pertaining to Any Payments the Plaintiffs Received From Collateral Sources ("Collateral Source Motion"), ECF No. 1006-0 (Sept. 22, 2020).

[5] Exh. B, Transcript of Dr. G. Caleb Alexander Deposition ("Alexander Tr.") (Sept. 18, 2020) at 242:16-243:7.

## LEGAL STANDARD

Plaintiffs incorporate herein the legal standards governing *Daubert* motions set forth in Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude the Expert Testimony of Andrew Kolodny, to which the Court is respectfully referred.  Dkt. No. 1099 at 4-7.  Denying Defendants' Motion is particularly appropriate here, as this Court has recognized, given that this case is a bench trial.  "Under *Daubert*, the court concludes the better approach in this bench trial is to admit the testimony of all of the recognized experts that it permitted to testify and, in the words of the Supreme Court, allow '[v]igorous cross-examination, presentation of contrary evidence' and careful weighing of the burden of proof to test 'shaky but admissible evidence.'" *Grant Thornton LLP v. Fed. Deposit Ins. Corp.*, No. CIV.A. 1:00-0655, 2007 WL 4591412, at *1 (S.D.W. Va. May 6, 2007) (Faber, J.) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).

## FACTUAL BACKGROUND

### Dr. Alexander's Qualifications

Dr. Alexander is a practicing general internist and Professor of Epidemiology and Medicine at the Johns Hopkins Bloomberg School of Public Health.  He is a primary care doctor with approximately 250 patients, including patients with opioid use disorder ("OUD") and patients who have lost family members to fatal opioid overdoses.  Report ¶¶ 1-3.  He has authored nearly 300 peer-reviewed journal articles, including dozens of articles on opioids.[6]  He has testified about opioids before the U.S. Senate and House of Representatives, the Food and Drug Administration, the Centers for Disease Control and Prevention, and the National Academy of Sciences. *Curriculum Vitae* at 3.  He has spoken about opioids at dozens of conferences and seminars.  *Id.*

---

[6] Expert App'x, Dkt. No. 1097-3, Exh. 1.c, Alexander Report Appendix B –*Curriculum Vitae* of G. Caleb Alexander, MD, MS ("*Curriculum Vitae*") at 6-28.

at 42-47.  Roughly 75% of his scholarship in the last five years has been devoted to studying the opioid epidemic.[7]  Dr. Alexander co-authored a Johns Hopkins report on the opioid epidemic, which includes recommendations for evidence-based abatement measures.[8]  He prepared an abatement plan for Cuyahoga and Summit Counties, Ohio, in the MDL, and for the State of Washington.  Report ¶ 8.  Judge Polster denied a motion to exclude his testimony, finding him "qualified to testify on the topics regarding which [he has] opined."  MDL Op. at 1-2.  Defendants hardly dispute his qualifications.[9]

**Dr. Alexander's Report**

Dr. Alexander's assignment was "to discuss ways to abate or reduce the harms caused by the oversupply of opioids into the Community."  Report ¶ 1.  He does so in his Report, which provides "evidence-based and evidence-informed measures and approaches …. to reduce opioid-related harms" in the Community.  *Id.* ¶ 17.  The Report is 125 pages and includes more than 650 footnotes with sources supporting his opinions, including evidence for the efficacy of the abatement programs he recommends.  His abatement plan is "based on my experience in epidemiology, clinical medicine, and public health, my extensive application of these fields to the opioid epidemic and my analysis in this case, including review of the Resiliency Plan and other Community materials."  *Id.*  Dr. Alexander was also asked "to estimate the size of specific populations that may require abatement interventions within the Community over a 15-year period, from 2021 to 2035."  *Id.* ¶ 1.  He does so in his Redress Model, Appendix D to the Report, which

---

[7] Alexander Tr. at 26:2-18.
[8] Expert App'x, Dkt. No. 1097-2, Exh. 1.b, Alexander Report Appendix A – John Hopkins Report: "From Evidence to Impact," prepared by Johns Hopkins Bloomberg School of Public Health and the Clinton Foundation (Oct. 2017).

[9] Defendants chip at Dr. Alexander's qualifications on the ground that he does not *specialize* in the care of patients with OUD (Motion at 4), but that is of no significance, because he *treats* patients with OUD and he is deeply familiar with the opioid epidemic from his academic work as well as his clinical experience.  Defendants also challenge his qualifications on the ground that he performed no research specific to the Cabell Huntington Community *prior to being retained* (Motion at 4), but they fail to explain why that matters, since Dr. Alexander became familiar with the opioid epidemic in the Community prior to preparing his Report.

contains detailed population data for each category, subcategory, and program of his abatement plan. Finally, Dr. Alexander was asked to "provide recommended cost estimates for certain abatement interventions (generally medical costs)," which he also does in his Redress Model. *Id.*[10]

Dr. Alexander offers four high-level conclusions. First, "There is widespread consensus in both clinical and public health communities that the abatement measures identified in this report are effective in reversing opioid-related morbidity and mortality." He notes that his recommended programs "are consistent with the [Cabell County] Resiliency Plan, the Mayor's Office plans, and the State's Opioid and Substance Response Plans." *Id.* ¶ 16. Second, he concludes that "an opioid epidemic currently exists within the Community," which "continues to result in high levels of opioid-related morbidity and mortality." *Id.* ¶ 17. Third, he concludes that based on his experience and his research for this case, "I am able to determine what additional evidence-based and evidence-informed measures and approaches should be used to reduce opioid-related harms" in the Community. *Id.* Fourth, he concludes that "coordinated, all-encompassing efforts that respond to the evolving epidemic could reduce cumulative opioid overdoses and opioid-related harms by 50% over fifteen years" in the Community. *Id.* ¶ 18.

Dr. Alexander recommends specific abatement programs in four general categories: "Prevention – Reducing Opioid Oversupply and Improving Safe Use,"[11] "Treatment – Supporting

---

[10] At trial, Plaintiffs will also rely on additional cost data supplied by Plaintiffs' experts George Barrett—whose report calculates the total cost of Dr. Alexander's plan using the data in the Redress Model—and Dr. Nancy K. Young. Contrary to Defendants' argument, Dr. Alexander does not "leave [costs] to others with local knowledge" (Motion at 4); rather, he defers to Mr. Barrett and Dr. Young for certain costs based on their respective expertise. The cost data supplied by Dr. Alexander draws on local data where appropriate, but many of his abatement measures are not found locally and necessarily draw on examples from other jurisdictions that have implemented the recommended programs.

[11] Prevention includes Health Professional Education, Patient and Public Education, Safe Storage and Drug Disposal, Community Prevention and Resiliency, Harm Reduction, and Surveillance, Evaluation, and Leadership.

Individuals Affected by the Epidemic,"[12] "Recovery – Enhancing Public Safety and Reintegration,"[13] and "Addressing Needs of Special Populations."[14]

**Dr. Alexander's Deposition Testimony**

Dr. Alexander testified for seven hours about his abatement plan.  He demonstrated a strong familiarity with the opioid epidemic in the Community and local abatement programs.[15]  He testified that the local epidemic is ongoing, noting a recent uptick in overdoses,[16] and said new cases of OUD will continue to arise given the lag in onset of harms from the oversupply of opioids.[17]  Although he was not explicitly retained to opine on the causes of the opioid epidemic, in his Report and testimony he attributes the epidemic to the oversupply of prescription opioids,[18]

---

[12] Treatment includes Connecting Individuals to Care, Treating Opioid Use Disorder, Managing Complications Attributable to the Epidemic, Workforce Expansion and Resiliency, and Distributing Naloxone and Providing Training.

[13] Recovery includes Public Safety, Criminal Justice System, Vocational Training and Job Placement, Reengineering the Workplace, and Mental Health Counseling and Grief Support.

[14] Addressing Needs of Special Populations includes Pregnant Women, New Mothers, and Infants; Adolescents and Young Adults; Families and Children; Homeless and Housing Insecure Individuals; and Individuals with Opioid Misuse.

[15] Defendants argue that in his deposition Dr. Alexander was not familiar with all the details of the Community's local programs.  *See, e.g.,* Motion at 9 fn. 8.  In fact, Dr. Alexander's Report cites to hundreds of local sources and he is very familiar with the Cabell Huntington Community and its programs, as demonstrated throughout his deposition. To the extent he was unable to fully answer unreasonably granular, "gotcha" questions such as "[D]o you know how they came about getting the vehicle that the Quick Response Team uses?" Alexander Tr. at 227:1-2, that goes to the weight of his opinions, not their admissibility.

[16] Alexander Tr. at 111:2-11:  "Cabell County EMS reported that the number of overdoses that they responded [to] in May 2020 were two to three times higher than in the prior nine months.  But we also know that the – the COVID pandemic has significantly threatened gains that have been made in reversing opioid-related morbidity and mortality and many, many communities have reported strong upticks in overdose deaths from opioids during the pandemic."

[17] *Id.* at 129:23-130:15:  "[T]here are immediate effects of the oversupply of prescription opioids, but there are also lag effects.  Just as if … you take a community and 60 percent of the people in the community start smoking cigarettes, they're not going to drop dead tomorrow….  [T]here are similar lag effects that take place with an oversupply of prescription opioids.  And so I wouldn't necessarily expect to see the effects of an oversupply of opioids" right away.

[18] *See, e.g.,* Report ¶1 ("I have been asked to discuss ways to abate or reduce the harms caused by the oversupply of opioids into the Community."); Alexander Tr. at 51:22-52:8:  "I mean, if you consider a community that had, I believe - what - 40 million prescriptions for opioids in a given year that were enough to supply every adult with 400 tablets, I mean, implicitly, when I design an abatement program, there is implicitly some notion about what caused the epidemic. Otherwise, I wouldn't have, as part of my abatement plan, interventions targeting the oversupply of opioids, for example."

an opinion Defendants have not sought to exclude in their Motion.[19]

Dr. Alexander was asked repeatedly why various programs in his abatement plan were necessary for the Community, given that in some cases similar programs already exist, to which he explained that he was not asked to capture only incremental abatement needs that are not currently satisfied.[20]  He also explained that he was not retained to conduct a needs assessment in the Community,[21] to judge the success of current abatement programs in the Community,[22] to identify current funding sources,[23] or to assign liability among Defendants.[24]  None of those are weaknesses in his Report; they simply reflect methodological choices.

Dr. Alexander testified that he "didn't try to disaggregate my plan based on whether or not someone was currently using prescription opioids or heroin or fentanyl."  As he explained, "It's just not the way—from a public health perspective—that one tackles this type of problem in a community."  That is partly because "many people that use heroin and fentanyl illicitly, they started with prescription opioids, the majority."  *Id.* at 242:1-243:7.[25]

---

[19] Defendants refer to "oversupply" in passing in their Motion (at 6-7), but they do not directly dispute Dr. Alexander's testimony about the causal relationship between prescription opioid oversupply and the opioid epidemic, beyond characterizing the epidemic's public nuisance as "alleged."

[20] *See, e.g., id.* at 256:3-10:  "I carefully considered existing programs and services within the community as I developed my recommendations, but I … was not asked to perform a needs assessment *per se*, so I [did] not attempt in my abatement plan to net out current levels of care and only propose the margin, essentially only propose … what additional should be provided."  *See also id.* at 329:13-16:  "I was not asked to … figure out what exactly is being done and then to add on exactly what I thought was necessary to reach an adequate program."

[21] *See, e.g., id.* at 259:12-17:  "I wasn't asked to do a needs assessment of specifically how many beds are currently occupied or how many people are currently in treatment that are being paid for by the City or State or County and how many additional people should be treated."

[22] *See, e.g., id.* at 212:17-20:  "I was asked to look forward, not look backwards, and I did not conduct any comprehensive sort of program evaluation of the performance of the interventions to date."  *See also id.* at 246:20-23: "I wasn't asked to perform a comprehensive review or evaluation or … give a grade to any specific program."

[23] *See, e.g., id.* at 222:12-15:  "I wasn't asked to identify who pays the bills….  I was simply asked to identify what I thought would be an evidence-based abatement program for this community."

[24] *See, e.g., id.* at 279:18-19:  "I wasn't asked to opine on the role of … a specific party such as distributors."

[25] *See also id.* at 91:7-11:  I was not "asked to disaggregate or design one abatement plan for people that were still using prescription opioids non-medically or addicted to them and a second abatement plan for people using heroin or illicit fentanyl."

**ARGUMENT**

"All *Daubert* demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable and helpful."  *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).  Dr. Alexander's opinions are both reliable and helpful.  He is a preeminent expert, he relies on reliable sources, his Report is tailored to the local community, and his comprehensive evidence-based abatement plan will help the Court by identifying what programs to include in the equitable remedy of abatement sought by Plaintiffs.

**I.   IN THE MDL, JUDGE POLSTER REJECTED THE SAME ARGUMENTS DEFENDANTS MAKE HERE**

In the MDL, Defendants raised the same arguments against Dr. Alexander's testimony that they make here, claiming that his opinions "are not relevant to the facts of this case because [he] failed to 'distinguish between the effects of prescription opioid medications and illegal street drugs,' failed to 'exclude other sources of funding,' and improperly relied on nationwide data." MDL Op. at 4-5.  Judge Polster rejected every argument.  His decision is on point and highly persuasive.

Judge Polster concluded that Dr. Alexander's comprehensive abatement plan is relevant and helpful:  "The Court agrees with Plaintiffs that testimony regarding the 'full cost of abating the public nuisance' is relevant and will help the Court understand the scope of what it will take to remedy the opioid crisis."  *Id.* at 5.  The Court rejected the argument that Dr. Alexander should have discounted his abatement plan based on current abatement programs and funding sources:

> To the extent the Court determines this scope [of abatement needs] is narrowed by other programs already in place in [the local area], and/or additional sources of funding that may exist, the Court can exercise its equitable powers to deviate from the full costs of abatement to a more just and appropriate amount.  Thus, Plaintiffs' experts' failure to consider other sources of funding and their consideration of national data does not make their opinions any less relevant.

*Id*.  This Court should follow Judge Polster's opinion and his reasoning and should deny

9

Defendants' Motion to preclude Dr. Alexander's testimony.[26]

## II.   DR. ALEXANDER'S TESTIMONY IS HELPFUL AND HIGHLY RELEVANT

Dr. Alexander's abatement plan is highly relevant to the Court's ultimate task of fashioning an equitable remedy for Plaintiffs.  Defendants do not challenge the substance of his abatement plan.  Instead, they fault him for not performing additional layers of analysis which are beyond the scope of his assignment and more appropriate, if at all, for Defendants' experts or the Court's final judgment.

### A.   Defendants Do Not Challenge the Contents of Dr. Alexander's Plan

Defendants do not dispute that the programs Dr. Alexander recommends are important components of a comprehensive abatement plan.  They do not claim that the specific abatement measures included in his plan would be ineffective to abate the opioid epidemic or that his cost assessments are miscalculated.  They do not claim that any of the sources relied on by Dr. Alexander in his Report are unreliable or irrelevant.  They do not ask the Court to consider different academic studies, governmental data sources, or abatement measures.  They do not suggest a different time frame for the abatement plan.  Nor do they challenge Dr. Alexander's conclusion that the interventions will reduce the indicia of the epidemic by 50%.  Report ¶¶ 13, 18. [27]  Their Motion says nothing about his Redress Model, which contains granular population estimates and cost data for the abatement plan.

Defendants have not disclosed any epidemiologists or physicians to challenge Dr. Alexander's abatement plan or to offer a competing plan.  The only defense expert who responded

---

[26] Defendants strain to distinguish this case from the MDL (Motion at 1 fn.1), but their reasoning is unpersuasive.  The issues that overlap between the MDL and this case, particularly whether Dr. Alexander's abatement plan must factor in current programs and funding, are unaffected by the points Defendants raise about causation and whether abatement is an equitable remedy.

[27] Defendants note that Dr. Alexander's MDL report had a ten-year timeframe, but they do not have a substantive argument for why ten years would be preferable to 15.  Motion at 7 fn. 5.

to his Report is Robert Rufus, a CPA who admitted in his Report that "I am not a public health expert, and thus I take no position on the reasonableness or efficacy of Dr. Alexander's recommended 'abatement' responses and interventions."[28]   Dr. Rufus did not challenge the contents of the abatement plan, only raising the obvious point, repeated in Defendants' Motion, that certain programs recommended by Dr. Alexander currently exist in the Community.[29]

### B.      Dr. Alexander's Plan Fits the Facts of this Case

Defendants claim that Dr. Alexander's abatement plan does not "fit the facts of this case," Motion at 18, and that his plan is "generic" and "untethered" to the local environment.  *Id.* at 2, 12.  On the contrary, Dr. Alexander's plan is customized to the Community and grounded in local sources and data.  He surveys the local epidemic with detailed data, noting that the epidemic "is especially severe in the Cabell-Huntington Community, which has been referred to as the 'overdose capital of the world.'"  Report ¶ 21; *see generally id.* ¶¶ 20-30.  His opinions draw on conversations with dozens of local stakeholders,[30] deposition testimony by Community leaders such as Mayor Steve Williams and Fire Chief Jan Rader,[31] local abatement plans such as the City of Solutions,[32] local news articles,[33] and data from local government.[34]  His plan is filled with references to local and state abatement programs.[35]  The population data in his Redress Model is

---

[28] Exh. C, Expert Report of Robert J. Rufus ("Rufus Report") at 46.

[29] Rufus Report at 19-33.

[30] *Id.* ¶ 11 (identifying 21 people with whom Dr. Alexander or his team members spoke).

[31] *See, e.g., id.* ¶¶ 24, 29, 86 (citing depositions of Todd Davies, Gordon Merry, and Mayor Williams).

[32] *See, e.g., id.* ¶¶ 12-13 (citing the West Virginia 2020-2022 Substance Use Response Plan, City of Solutions Guide, 2015 and 2017 Mayor's Strategic Plans, and the Cabell County Resiliency Plan).

[33] *See, e.g., id.* ¶¶ 22, 29, 63 (citing the Huntington *Herald-Dispatch* newspaper).

[34] *See, e.g., id.* ¶¶ 12-13 (referencing data from the Cabell Huntington Health Department, Cabell County Emergency Medical Services, and local police and sheriff's departments).

[35] *See, e.g., id.* ¶ 26 (describing PROACT treatment center), ¶ 63 (describing local drug-takeback efforts), ¶¶ 69-70 (describing local community coalitions), ¶¶ 77-78 (describing Cabell Huntington Health Department syringe services program), ¶ 86 (describing Opioid Data Dashboard maintained by the West Virginia Office of Drug Control Policy), ¶ 97 (describing Huntington Quick Response Team), ¶ 130 (describing Lily's Place center for infants with neonatal

based on local data.[36]  The cost data in his redress model is also local, where possible, such as the cost of the Compass program for compassion fatigue.  *Id.*, 2D. Workforce Expansion.  His narrative Report contains more than 650 footnotes and his Redress Model contains hundreds more, many from local sources.  Throughout his Report, Dr. Alexander addresses the unique circumstances of the Cabell Huntington Community, such as the economic hardships of its Appalachian setting, and he shows how those considerations affect his specific program recommendations.[37]

Dr. Alexander's abatement plan for the Cabell Huntington Community is different from both the plan he created in the MDL and the one he prepared for Washington State.  In each case, he tailored his plan to local needs and updated it based on the most current research, evidence, and best practices.  The differences between the plans underscore that each plan is tailored to the geographic area and not "generic."  Motion at 2.[38]  For example, the population assumptions reflected in the Redress Model reflect the severity of the local opioid epidemic and resulting abatement needs.[39]

---

[36] abstinence syndrome and Healthy Connections program for women in recovery), ¶ 132 (describing Compass stigma reduction program for first responders), ¶ 138 (describing local naloxone training), ¶ 152 (describing Cabell County Drug Court), ¶ 180 (describing Drug Free Moms and Babies Project).

[36] Local data includes the number of local medical providers (for academic detailing) (Redress Model, Appendix D, 1A. Health Professional Education), the population of Cabell County (for purposes of the mass media campaign) (*id.*, 1B. Patient and Public Education), the local heroin use population (for syringe service programs) (*id.*, 1E. Harm Reduction), the caseload of quick response teams (for QRT needs) (*id.*, 2A. Connecting Individuals to Care), and the local OUD population estimated by Dr. Keyes (for OUD treatment and other programs) (*id.*, 2B. Treating Opioid Use Disorder).

[37] *See, e.g.,* Report ¶ 156 (recommending vocational training because "The opioid epidemic has been particularly profound in many parts of America that have simultaneously experienced significant economic decline, including Appalachian communities such as Cabell County and the City of Huntington.").

[38] In a footnote, Defendants suggest that Dr. Alexander's failure to recommend the exact same plan for the Community as he did in the MDL is somehow a flaw. *See* Motion at 7 fn. 5.  They likewise suggested during his deposition that his plans are inconsistent:  "I am asking Doctor Alexander if he had—as he testified—put in a comprehensive plan for abatement last year, why does he have additional categories for abatement here a year later in the Cabell County/Huntington jurisdiction."  Alexander Tr. at 168:20-24.  But Defendants cannot have it both ways.  The plans are different for the simple reason that each plan is tailored to fit the needs of the particular jurisdiction.

[39] Dr. Alexander relies on Dr. Katherine Keyes's estimate that more than 8,000 people in the Community have OUD, a staggering number given the Community's modest size.  *See* Redress Model (Appendix D), 2B.

Defendants argue that Dr. Alexander's Report "fails to address unmet needs *today*, as opposed to prognosticating about future need." Motion at 2 (emphasis in original). But that argument makes no sense. The opioid epidemic is ongoing and will continue to cause harms. Indeed, the epidemic will result in future cases of OUD, as Dr. Alexander testified, "even if the abatement plan is deployed." Alexander Tr. at 238:20-240:6. The year-by-year population assumptions in the Redress Model reflect the predicted fluctuations in OUD population over time and are therefore entirely appropriate.

### C.   Dr. Alexander Is Not Required to Conduct the Additional Analyses Demanded by Defendants to Make His Testimony Relevant

Dr. Alexander's Report presents an exhaustively researched, evidence-based, comprehensive plan to abate the opioid epidemic in the Community. The interventions fit the facts of the Community, as described above. Defendants nonetheless argue that Dr. Alexander should have discounted his abatement plan based on existing programs and current funding (Motion at 8-15). But discounting is intentionally outside the scope of his plan, which is comprehensive and thus includes abatement programs whether or not they currently exist in the Community. He also does not calculate the total cost of his plan—George Barrett does so—much less discount that cost based on collateral funding sources. As Judge Polster recognized, Plaintiffs seek an equitable remedy from this Court, and therefore understanding the "full cost" of abatement is highly relevant to the Court's analysis. MDL Op. at 5. Without it, the Court is deprived of his expert opinions regarding what abatement measures have been proven effective, what programs are needed to abate the epidemic in the Community, and how much they will cost. The Court can use Dr. Alexander's abatement plan as the basis for an equitable abatement remedy, either adopting it in

full or with modifications.  *Id.*[40]

Defendants' argument is based on a faulty legal premise.  By law, they are charged with paying the costs of abating the nuisance they have created.[41]  That others have, in the interim, assumed some of those costs in order to stem the tide of overdose deaths and related ills provides no justification for allowing Defendants to avoid paying the full costs going forward.  It certainly provides no basis to exclude Plaintiffs' expert from explaining what the full costs would be.[42]

This is particularly true because, as Plaintiffs have explained elsewhere, under West Virginia law, it is not appropriate to discount Plaintiffs' remedy to reflect collateral source payments.[43]  Defendants may disagree with Plaintiffs' legal analysis, but there is no reason Plaintiffs' expert should voluntarily adopt Defendants' position.  The Court may conclude that

---

[40] The Court might conclude, based on the totality of the evidence, that the abatement plan should actually be broader or last longer.  For comparison, the West Virginia Mass Litigation Panel held that costs to abate the opioid epidemic "are in the nature of equitable relief, not past damages," and suggested specific costs that could be included in an abatement plan:

> For example, the cost of providing opioid education programs or treatment centers might be part of the equitable relief to abate Plaintiffs' alleged public nuisance – the opioid crisis…. The Court further concludes that prospective costs for addiction treatment and services may be sought as part of the necessary measures to abate or remediate the alleged public nuisance of the opioid epidemic. Such costs are akin to the "clean up" costs that were assumed to be recoverable to remediate the public nuisance in *[State ex rel. Smith v.] Kermit Lumber*, 200 W. Va. 221, 245, 488 S.E. 2d 901, 925 (1997).

*In re: Opioid Litig.*, No. 19-C-9000, Order Regarding Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault (W.V. Cir. Ct. Kanawha Cnty. July 29, 2020), ¶¶ 13-14.

[41] *See, e.g., County of Erie, New York v. Colgan Air, Inc*., 711 F.3d 147, 153 (2d Cir. 2013) (where local government abates nuisance, it is "performing not its own duty, but the duty of another"); *Alliance v. Baker*, 959 N.E.2d 538, 540 (Ohio Ct. App. 2011) (allocating among adjoining property owners cost of nuisance abatement); *Ypsilanti Charter Twp. v. Kircher*, 761 N.W.2d 761, 780 (Mich. App. 2008) (court may abate a public nuisance at the expense of the property owner).

[42] Although it is outside the scope of Dr. Alexander's plan and this Motion, Defendants are also grossly mistaken in implying that the Community does not need funding for abatement measures.  They characterize Christina Mullins, Commissioner of the West Virginia Department of Health and Human Resources, as testifying that "West Virginia has more than sufficient funding in place" to address the opioid epidemic.  Motion at 9 fn. 7.  But during her deposition in this case, Commissioner Mullins testified that "There is still a lot of work to do" to address the current opioid crisis.  "We still have people who need to access treatment.  We have children and families who are impacted by the crisis and we have kids that we want to make sure don't follow that same path of addiction."  Exh. E, Transcript of Christina Mullins Deposition (July 14, 2020) at 141:15-22.  She also testified that more financial resources are needed.  *Id.* at 148:6-151:11.

[43] *See* Collateral Source Motion, ECF No. 1006-0 (Sept. 22, 2020).

Defendants are liable for the full cost of Dr. Alexander's abatement plan, regardless of current programs and funding, and that Defendants must reimburse third parties for the cost of any existing abatement programs within the scope of the abatement plan.[44]  After all, why should third parties—whether government, insurance companies, non-profits, or others—pay to abate a public health epidemic caused by Defendants?  And why should Defendants pay less because other parties have stepped in to address the harms Defendants caused?[45]

In effect, Defendants want Dr. Alexander to do their work for them, adopting their legal premise that discounting the scope and cost of his abatement plan is appropriate and therefore narrowing his plan in Defendants' favor.  But if Defendants think they are entitled to a discount from Dr. Alexander's abatement plan, then it is up to them to prove, through expert opinion, both that a discount is justified and the amount of any discount.  If they believed the abatement plan should be narrowed based on current programs or current funding, or if they believed it should be narrowed to exclude illicit opioids, they were free to offer expert testimony to specify how and why the plan should be narrowed.  They chose not to do so.  Defendants' expert Robert Rufus identified some local programs, but he did not attempt to quantify to what extent Dr. Alexander's abatement plan should be reduced in scope and he admitted he is not qualified to challenge Dr. Alexander's plan.  Dr. Alexander's comprehensive, evidence-based abatement plan is both useful and relevant as is.

---

[44] The additional analyses demanded by Defendants call for legal conclusions about causation and liability, and are thus best handled by the Court in fashioning a judgment.  As Judge Polster observed, "To the extent the Court determines [the abatement plan's] scope is narrowed by other programs already in place in [the local area], and/or additional sources of funding that may exist, the Court can exercise its equitable powers to deviate from the full costs of abatement to a more just and appropriate amount."  MDL Op. at 5.

[45] As George Barrett testified, "[I]f some funding mechanism or some other agency was perhaps paying for [an abatement program], typically we would not expect the defense to get a benefit from that just because they were lucky enough to have triggered an opioid epidemic in a geographic area which was providing a syringe program" or other abatement programs.  Exh. D, Transcript of George A. Barrett Deposition (Sept. 21, 2020) at 116:24-117:6.

As for Defendants' argument that Dr. Alexander's plan is flawed because it is not limited to harm "allegedly caused by Defendants' misconduct" (Motion at 2, 15-18), because the OUD treatment and other abatement programs he recommends would encompass individuals who use illegal opioids like heroin and fentanyl, that is an issue of causation which is addressed by other experts. *See* MDL Op. at 7 ("Plaintiffs are entitled to utilize different experts to support different portions of their case.").  As Plaintiffs other experts opine, the harms "caused by Defendants' misconduct" (Motion at 1) extend to those associated with illicit drugs such as heroin and fentanyl.[46]  Dr. Alexander's Report also briefly touches on causation, noting that both prescription and illicit opioids contribute to the epidemic,[47] and that prescription opioid use often leads to illicit opioid use.[48]  As Dr. Alexander testified, an effective abatement plan must address all kinds of opioids, and there would be no practical way to differentiate abatement programs between prescription and illicit opioids.  *Supra* fn. 25.

## CONCLUSION

For the foregoing reasons, this Court should deny in its entirety Defendants' Motion to Exclude Dr. Alexander's testimony.

---

[46] *See, e.g.,* Expert App'x, Dkt. No. 1097-18, Exh. 5.a, Expert Report of Katherine Keyes, Ph.D., Aug. 3, 2020, pp. 27-37 ("The increase in the prescription opioid supply, coupled with opioid use disorders and increases in non-medical use and non-medical opioid use disorder, resulted in an exponential increase in prescription opioid overdose as well as many other non-fatal consequences."); pp. 46-50 ("Prescription opioid use is causally related to heroin use").

[47] *See, e.g.,* Report ¶ 22 ("Though the sharp rise in opioid deaths in West Virginia has largely been driven by heroin and fentanyl since 2014, between 2014 and 2016, deaths due to prescription opioids increased by 42%.").

[48] *See, e.g., id.* ¶ 23 ("There is a clear link between non-medical use of prescription opioids and subsequent heroin or illicit fentanyl use....  In addition, several studies suggest[] that 70-80% of current heroin users report non-medical prescription opioid use prior to initiating heroin.").

Dated: October 23, 2020                          Respectfully submitted,

**THE CITY OF HUNTINGTON**                       **CABELL COUNTY COMMISSION**
*/s/ Anne McGinness Kearse*                      */s/ Paul T. Farrell, Jr.*
Anne McGinness Kearse                            Paul T. Farrell, Jr.
WVSB No. 12547                                   WVSB Bar No. 7443
Joseph F. Rice                                   **FARRELL LAW**
**MOTLEY RICE LLC**                              422 Ninth Street, 3rd Floor (25701)
28 Bridgeside Blvd.                              PO Box 1180
Mount Pleasant, SC 29464                         Huntington, West Virginia 25714-1180
Tel: 843-216-9000                                Mobile: 304-654-8281
Fax: 843-216-9450                                paul@farrell.law
akearse@motleyrice.com
jrice@motleyrice.com

Linda Singer                                     */s/ Anthony J. Majestro*
David I. Ackerman                                Anthony J. Majestro
**MOTLEY RICE LLC**                              WVSB No. 5165
401 9th Street NW, Suite 1001                    **POWELL & MAJESTRO, PLLC**
Washington, DC 20004                             405 Capitol Street, Suite P-1200
Tel:  202-232-5504                               Charleston, WV 25301
Fax:  202-386-9622                               304-346-2889 / 304-346-2895 (f)
lsinger@motleyrice.com                           amajestro@powellmajestro.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb                          Michael A. Woelfel
WV No. 4782                                      WVSB No. 4106
**THE WEBB LAW CENTRE**                          **WOELFEL AND WOELFEL, LLP**
716 Lee Street, East                             801 Eighth Street
Charleston, West Virginia 25301                  Huntington, West Virginia 25701
Telephone: (304) 344-9322                        Tel. 304.522.6249
Facsimile: (304) 344-1157                        Fax. 304.522.9282
rusty@rustywebb.com                              mikewoelfel3@gmail.com

On Brief:

David D. Burnett
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-849-4976
Fax:  202-386-9622
dburnett@motleyrice.com

Andrea Bierstein
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
212-257-8482
abierstein@simmons.com

Paulina do Amaral
**LIEFF, CABRASER, HEIMANN &**
**BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  212-355-9500
Fax:  212-355-9592
pdoamaral@LCHB.com

## CERTIFICATE OF SERVICE

I certify that on October 23, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to: Track2OpioidDefendants@ReedSmith.com and mdl2804discovery@motleyrice.com.

/s/ <em>Moniqúe Christenson</em>
Monique Christenson (SC Bar No. 104063)
**MOTLEY RICE LLC**
