# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,
      Plaintiff,

v.

                                      CIVIL ACTION NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
      Defendants.

_____

CABELL COUNTY COMMISSION,
      Plaintiff,

v.

                                        CIVIL ACTION NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
      Defendants.

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE MARKETING OPINIONS OF DRS. ANNA LEMBKE, KATHERINE KEYES, ANDREW KOLODNY, AND JAKKI MOHR

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................... 1

LEGAL STANDARD................................................................................................................. 6

ARGUMENT .............................................................................................................................. 6

I.      Plaintiffs' Experts Are Qualified to Offer the Opinions in Their Reports......................... 6

II.     Plaintiffs' Experts Applied a Reliable Methodology to Support Opinions that Defendants' Activities that Increased Opioid Availability, Sales, and Exposure Are Causes of the Opioid Epidemic................................................................................ 12

      A.     The Experts' opinions are based on a reliable methodology and supported by peer-reviewed literature and the Big Three's internal company documents. ..................................................................................................... 12

            1.     The Experts' review and assessment of scientific literature is a reliable methodology ........................................................................ 13

            2.     Plaintiffs' Experts are not required to show physician reliance on specific marketing materials received by certain physicians. .................. 19

            3.     Plaintiffs' Experts considered alternative causes and are not required to weigh Defendants' causal role in creation of the opioids epidemic. ................................................................................................ 21

      B.     Plaintiffs' Experts' opinions "fit" this case. ........................................................ 23

      C.     The Court should disregard Defendants' attempt to exclude opinions not being offered. ...................................................................................................... 24

CONCLUSION......................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Baker v. City of Wheeling*,
   117 W. Va. 362, 185 S.E. 842 (1936)..................................................................................... 22

*Cook v. Ormsby*,
   45 Ind.App. 352 (1909)........................................................................................................... 22

*Everly v. Columbia Gas of West Virginia, Inc.*,
   171 W.Va. 534, 301 S.E.2d 165 (1982).................................................................................. 22

*Ferguson v. Lear Siegler Servs., Inc.*,
   No. 1:09cv635-MHT, 2012 WL 1058983 (M.D. Ala. Mar. 28, 2012)..................................... 13

*In re Actos® (Pioglitazone) Products Liability Litigation*,
   No. 6:11-MD-2299, 2014 WL 12653759 (W.D. La. Jan. 14, 2014) ........................................ 21

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
   No. 2007-MD-1871, 2011 WL 13576 (E.D. Pa. Jan. 4, 2011) ................................................. 13

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*,
   No. MDL 1203, 2000 WL 876900 (E.D. Pa. June 20, 2000) .................................................. 21

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 21 (1st Cir. 2013)..................................................................................................... 20

*In re Welding Fume Prod. Liab. Litig.*,
   No. 1:03-cv-17000, MDL 1535, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005)...................... 17

*In re Zyprexa Prods. Liab. Litig.*
   No. 04-MD-1596, 2008 WL 2696916 (E.D.N.Y. July 2, 2008), *opinion clarified,* No. 04-
   MD-1596, 2008 WL 2705475 (E.D.N.Y. July 9, 2008) ......................................................... 19

*Kopf v. Skyrm*,
   993 F.2d 374 (4th Cir. 1993) .................................................................................................. 9

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)............................................................................................................... 8

*Mays v. Chang*,
   213 W. Va. 220, 579 S.E.2d 561 (2003)................................................................................. 22

*SMD Software, Inc. v. EMove, Inc.*,
   945 F. Supp. 2d 628 (E.D.N.C. 2013) .................................................................................... 9

*Smith v. Pfizer Inc.*,
   714 F. Supp. 2d 845 (M.D. Tenn. 2010).................................................................................. 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Tressler v. BNSF Ry. Co.*,
No. CV-10-188-RMP, 2012 WL 315402 (E.D. Wash. Feb. 1, 2012) ...................................... 13

*Tyree v. Bos. Sci. Corp.*,
54 F. Supp. 3d 501 (S.D.W. Va. 2014), *as amended* (Oct. 29, 2014) ...................................... 13

*Wehner v. Weinstein*,
191 W. Va. 149, 444 S.E.2d 27 (1994) ..................................................................................... 22

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) ..................................................................................................... 17

*Wise v. C. R. Bard, Inc.*,
2:12-cv-01378, 2015 WL 521202 (S.D.W. Va. Feb. 7, 2015) .................................................. 18

**Rules**

Fed. R. Evid. 702 ............................................................................................................................. 6

**Treatises**

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Fed. Jud. Center 3d ed. 2011) .......................... 16

-iii-

## INTRODUCTION

In this very narrow motion, Defendants seek to preclude four of Plaintiffs' experts from opining that Defendants' "marketing" activities, and that of the drug manufacturers with whom they collaborated, caused or contributed to the dramatic increase in opioid prescribing, prescription opioids sales, and opioid availability in the City of Huntington and Cabell County that led to the opioid epidemic that plagues this community.[1] Defendants rely on a ruling from Judge Polster in the MDL but, as discussed below, that ruling does not apply here because the factual record in this case is significantly different from the record before Judge Polster.

No community has been more profoundly affected by the opioid epidemic than Cabell-Huntington. Plaintiffs allege that this epidemic was the direct result of the over-supply of prescription opioids into the Cabell Huntington area and that, through their collaboration with drug manufacturers to increase prescriptions and through their failure to control the supply chain and prevent diversion, Defendants (among others) were responsible for the flood of opioids that inundated the community. *See, e.g.*, Corrected Joint and Third Amended Complaint at ¶¶ 670, 671, 1095, 1100, 1125, 1128-1130, 1245-1367. The role of over-supply in causing the epidemic has been extensively studied and documented. In particular, doctors, epidemiologists, and public health professionals have sought to understand how the volume of opioids could have increased so dramatically and have focused, in particular, on the role of pharmaceutical marketing in contributing this crisis

Defendants seek to preclude Plaintiffs from offering expert testimony about the causal

---

[1] Defendants' motion asks for "an order excluding the opinions of Plaintiffs' purported marketing *causation* experts Anna Lembke, Katherine Keyes, Andrew Kolodny, and Jakki Mohr." *See* Dkt. No. 1063, Mot. at 2 (emphasis added). Plaintiffs take Defendants at their word as to the scope of their motion. To the extent that Plaintiffs' experts offer opinions about topics that touch on, and describe, Defendants' marketing efforts and that of the manufacturers with whom they collaborated, but do not address the question of the extent to which that marketing actually caused or contributed increased prescribing and sales, Plaintiffs understand such opinions to be beyond the scope of this motion.

role that drug marketing played in creating this crisis. They contend that only those experts with degrees in marketing have sufficient expertise to address whether Defendants' efforts to increase opioid prescribing succeeded in flooding the United States, and in particular West Virginia, with an unprecedented volume of dangerously addictive narcotics. Defendants are wrong: "marketing" professionals are not the only ones with expertise to address the causes of the opioid epidemic and the role that drug marketing played in over-saturating the Cabell Huntington area with opioids.

Plaintiffs offer four experts whose opinions address "marketing causation": (1) Dr. Anna Lembke, an addiction specialist who teaches about marketing of opioids at Stanford University, and who, before becoming an expert witness, published a book on how drug marketing contributed to the opioid epidemic; (2) Dr. Katherine Keyes, an epidemiologist specializing in the epidemiology of substance use and substance use disorders; (3) Dr. Andrew Kolodny, a board-certified physician in addiction medicine and long-time public health professional whose practice, research, teaching, and policy advocacy focuses on the prescription opioid and heroin crisis, and who was permitted to testify on this very topic in the Oklahoma trial; and (4) Dr. Jakki Mohr, a professor of marketing at the University of Montana who specializes in distribution channel management and strategies as a form of marketing. Defendants seek to exclude all of these experts from testifying about the causative effect of Defendants' marketing.[2] These experts explain how Defendants, along with the opioid manufacturers, contributed substantially to a "paradigm shift in opioid prescribing through misleading messages about the safety and efficacy of prescription opioids." Expert App'x, Dkt. # 1097, at Exh. 7.a, at 8 (Lembke Rpt.). They explain how various participants in the opioid supply chain joined together to dramatically

---

[2] Defendants have separately moved to exclude additional opinions offered by Dr. Keyes and Dr. Kolodny. *See* Dkt. Nos. 1042, 1044, 1056. This memorandum only addresses Defendants' motion to exclude "marketing opinions."

expand the overall market for opioids far beyond its legitimate use for acute pain, cancer pain, palliative care and catastrophic injury and how the industry "orchestrated a multi-faceted misinformation campaign that included false medical 'consensus' through paid and co-opted 'experts' and specialty 'professional' groups to give the medical community at large the impression that 'the experts' endorsed widespread opioid use and to create doubt regarding what science and evidence had shown for centuries." Expert App'x, Dkt. # 1097, at Exh. 6.a, at 11 (Kolodny Rpt.). It was the orchestration of this paradigm shift that these experts opine sparked the massive exposure to dangerous opioid.

Drs. Lembke, Keyes, Kolodny, and Mohr are exceedingly well-qualified to offer the opinions at issue. Drs. Lembke, Keyes, and Kolodny have the expertise to assess the truthfulness of Defendants' marketing, which they have each previously studied outside of their engagement as expert witnesses; the means by which Defendants (and others) were able to manufacture the appearance of a medical consensus; and the role that drug marketing played in causing the opioid crisis. They further have the expertise to assess the extent to which the marketing efforts of Defendants and the manufacturers worked and thus caused or contributed to the epidemic. Defendants' attacks on the methodology and reliability of the experts' opinions are similarly unfounded. The opinions of these experts are supported by epidemiological and scientific evidence, including a substantial body of independent research that predates this litigation, and Defendants' internal documents. The conclusions of these experts—that Defendants' efforts to increase the supply and use of opioids led to increased opioid sales, and that the increased supply of opioids was a cause of the opioid epidemic—are well-supported and widely accepted.

As Defendants note, Drs. Keyes and Lembke were the subject of motions filed in the MDL court. Judge Polster denied in part and granted in part the motion seeking to exclude

-3-

"causation opinions . . .  as they relate to Defendants' marketing." *See* Ex. A, MDL Dkt. No. 2549 at 2. Defendants argue that this Court should follow Judge Polster's ruling, but fail to note the narrowness of Judge Polster's ruling. *See* Ex. A, MDL Dkt. No. 2549 at 2. Dr. Lembke, for example, was permitted to testify about the "inaccuracy of statements and representations in Defendants' marketing materials and other promotional and/or educational efforts" and the "misleading nature of the materials [the] Manufacturers disseminated to prescribers and how doctors, in general, rely on such information in making prescribing decisions." *Id.* at 12-13. She was precluded only from "testify[ing] regarding the effect that Defendants' marketing and promotional efforts had on doctors' prescribing practices." *Id.* at 12. Judge Polster noted that this ruling applied "only to the portions of Lembke's . . . opinions . . . that purport to find Defendants' marketing efforts resulted in or caused increased sales and/or increased prescriptions of opioids." *Id.* He reiterated the narrowness of his ruling, explaining that "this ruling applies only to Lembke's opinion regarding a causal connection with respect to pharmaceutical marketing, i.e. that Defendants' marketing efforts resulted in increased sales and/or increased supply of prescription opioids." *Id.* at 12-13.

Judge Polster's ruling with respect to Dr. Keyes was similarly narrow; he held only that "Keyes may not testify regarding the effect that Defendants' marketing efforts had on the sales and/or supply of prescription opioids." *Id.* at 21. Judge Polster specifically held that his ruling precluding these narrow portions of testimony from Drs. Lembke and Keyes "does not impact the remainder of their opinions in any way." *Id.* at 22. Even if Judge Polster's rulings excluding portions of Drs. Keyes' and Lembke's testimony applied here, those rulings are so narrow that nearly all of the testimony discussed by Defendants in their Memorandum would be admitted.

More importantly, however, Judge Polster's ruling with respect to the portions of

testimony he did exclude does not apply here because the factual record in the MDL court was substantially different from the record presented here. In particular, in reaching his conclusion about the qualifications of Drs. Lembke and Keyes, Judge Polster did not have before him evidence that: (1) Dr. Lembke teaches marketing as it relates to the opioid epidemic at Stanford and thus is considered by that university sufficiently expert on opioid-related marketing; (2) Dr. Lembke has conducted substantial original research, including her own interviews, and investigation into the issue of opioid marketing and its role in the opioid epidemic prior to this litigation; (3) that the scientific literature about the causes of the opioid epidemic includes publications in respected scientific journals concerning the effects of marketing increased opioid prescribing include papers authored by researchers who, like Drs. Lembke, Keyes, and Kolodny, are experts in medicine, epidemiology, and/or public health, rather than in "marketing" itself,[3] demonstrating that in the field, such expertise has been deemed sufficient to opine on this issue;[4] (4) Dr. Keyes is an investigator in a study analyzing, among other things, the effect of detailing (face-to-face meetings with doctors, either by pharmaceutical representatives as part of their marketing efforts, or by academic or public health doctors in an effort to combat the effects of drug-company marketing) on opioid prescribing habits; and (5) Dr. Keyes has, in her opinions in this case, used her epidemiological expertise and applied epidemiological methods to the

---

[3] *See, e.g.*, Ex. B, L. Manchikanti, *et al.*, *Reframing the Prevention Strategies of the Opioid Crisis*, 29 Pain Physician 309-326 (2018) (discussing evidence of drug distributors' activities causally related to the opioids epidemic authored by several influential medical doctors affiliated with pain management centers, none of whom identified as "marketing" experts); Ex. C, Hadland SE, Rivera-Aguirre A, Marshall BDL, Cerda M. *Association of pharmaceutical industry marketing of opioid products with mortality from opioid-related overdoses. JAMA Netw Open.* 2019;2(1):e186007 (evaluating the association between physician payment marketing efforts and the increased opioid supply authored by epidemiologists and public health scholars, not marketing professors).

[4] In Plaintiffs' prior briefing before Judge Polster, Plaintiffs mentioned in passing that one of the articles (Ex. B, Manchikanti) on which Dr. Lembke relied to support her opinion that Defendants' activities are causally related to the epidemic was written by a medical doctor, not a "marketing" expert. It does not appear from Judge Polster's marketing-causation order that he considered that many of the peer-reviewed articles relied on by Plaintiffs' experts were not in fact written by "marketing" experts. Moreover, Plaintiffs mentioned this fact in discussing the reliability of their experts' opinions, not their qualifications. Judge Polster specifically noted in his opinion that, because he found the experts not qualified to offer the opinions at issue, he saw no need to address the issue of reliability.

analysis of epidemiologic studies of marketing effects in order to form her causation opinions. And, of course, the opinions of Drs. Kolodny and Mohr were never reviewed by Judge Polster. Judge Polster thus ruled on a different record with respect to different opinions.

Based on *this* record, in *this* case, it is clear Drs. Lembke, Keyes, Kolodny, and Mohr are qualified to offer their testimony on the causes of the opioid epidemic, regardless of Defendants' attempts to characterize this wide array of expertise under the singular heading of "marketing opinions." Moreover, as discussed below, the opinions of all these experts are grounded in reliable science, apply reliable methodology, and will assist the trier of fact. The motion to exclude this testimony should be denied in its entirety.

## LEGAL STANDARD

The legal standards applicable to this motion are set forth in Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude the Expert Testimony of Andrew Kolodny, Dkt. No. 1099, at 4-7, to which the Court is respectfully referred.

## ARGUMENT

### I.   Plaintiffs' Experts Are Qualified to Offer the Opinions in Their Reports.

Defendants argue that Drs. Lembke, Keyes, and Kolodny[5] are not qualified to offer the opinions in their reports, but this argument rests on mischaracterizations about their expertise and the opinions offered. Each of these experts is qualified to offer the opinions at issue.

*Anna Lembke, M.D.*: Dr. Lembke is qualified by experience and her own pre-litigation research to offer opinions about the causes of the opioid epidemic. *See* Fed. R. Evid. 702. Dr. Lembke is Chief of the Addiction Medicine Dual Diagnosis Clinic, Medical Director of Addiction Medicine, and Program Director of the Addiction Medicine Fellowship, in the Department of Psychiatry and Behavioral Sciences at Stanford University School of Medicine.

---

[5] Defendants do not challenge Dr. Mohr's qualifications.

*See* Expert App'x, Dkt. # 1097, at Exh. 7.a, at 1 (Lembke Rpt.). She is board-certified in psychiatry and neurology, and in addiction medicine. In addition, she teaches marketing in classes at Stanford specifically pertaining to the opioid epidemic. *See* Ex. D, Lembke Dep. 123:8-10 (Sept. 17, 2020). In short, within the medical community, Dr. Lembke holds herself out as an expert on the impact of marketing on the opioid epidemic, s*ee id.* at 123:18-23, and this expertise is supported by her University-approved course curriculum.

Dr. Lembke also has longstanding familiarity with pharmaceutical marketing to healthcare providers based on the research she conducted for her influential book, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop*, published in 2016 (before she had any connection to this litigation). In order to write that book, Dr. Lembke conducted her own original research and investigation into opioid marketing, and conducted qualitative interviews with doctors regarding what they relied upon in their opioid prescribing. Ex. E, Lembke NY Hr'g Tr. 32:5-20, 121:2-10, 130.12-22, 193:17-194:12 (Sept. 9, 2020); Ex. D, Lembke Dep. 61:17-62:16; 156:24-158:2.

In her book Dr. Lembke described the "misconceptions" promoted by Defendants through their financial support for Key Opinion Leaders and professional medical societies like the American Pain Foundation (principally, unsupported claims of efficacy for chronic pain, and purportedly low risk of addiction) that gave rise to the opioid epidemic.[6] Dr. Lembke's report cites the same misconceptions and in reviewing Defendants' internal documents, she found that the Distributors' collaborative work with the Manufacturers to increase opioid sales—such as offering free samples or discount coupons—provided the classic model of getting patients hooked on the addictive drugs. *See* Expert App'x, Dkt. # 1097, at Exh. 7.a, at 54-57 (Lembke

---

[6] Ex. F, Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked and Why It's So Hard to Stop* 57-64 (Johns Hopkins Univ. Press 2016).

Rpt.).

Although Judge Polster found that publication of *Drug Dealer, MD* alone did not qualify Dr. Lembke to opine on marketing causation, he did not have before him information about the extensive original research, interviews, and investigation she conducted in writing it. *See, e.g.*, Ex. D, Lembke Dep. 61:17-62:16; 156:24-158:2 (discussing the qualitative research methodology she used to determine which physicians and patients to interview as part of her research for *Drug Dealer MD*). Nor was he aware that Dr. Lembke is deemed sufficiently qualified to teach on marketing as it pertains to the opioid epidemic at Stanford University or that she has made more than 100 presentations to doctors, legislators, and the public regarding the causes of the opioid epidemic, including the false and misleading messages promoted by the pharmaceutical opioid industry that led to the increased supply of opioid drugs. *See* Expert App'x, Dkt. # 1097, at Exh. 7.a, at ¶ 26; Ex. D, Lembke Dep. 123:8-10; Ex. E, Lembke NY Hr'g Tr. 34:4-35:10.

Nor does it appear that Judge Polster was aware that, as noted above, physicians with credentials similar to Dr. Lembke's have published peer-reviewed articles in scientific publications assessing the causes of the opioid epidemic, including the role of pharmaceutical marketing in changing prescribing habits and increasing sales. If Dr. Lembke has sufficient marketing expertise to teach about opioid marketing at Stanford, to explain to doctors and legislators the role that such marketing played in causing the opioid epidemic, and, if others with her credentials have sufficient qualification to publish in scientific journals about it, she has sufficient expertise to testify on these matters in this Court.[7] *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (purpose of *Daubert* inquiry is to ensure "that an expert,

---

[7] Indeed, based on her expertise, Dr. Lembke was recently asked to speak on market-driven epidemics at Duke University's Global Health Institute.

whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").[8]

*Katherine Keyes, Ph.D.*: Dr. Keyes is an Associate Professor of Epidemiology at Columbia University. *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 11 (Keyes Rpt.). Epidemiology is the "science of understanding the causes and distributions of population health" and "epidemiologists examine the dynamic nature of populations and how health and disease arises within them." *Id.* By definition, epidemiology plays a role in describing the opioid epidemic and its causes. *See* Ex. G, Keyes Dep. 190:8-22 (Sept. 15, 2020) (explaining the "definition of 'cause' is a factor without which the outcome would not have occurred."). Specifically, "[e]pidemiological evidence using statistical methods is routinely used to assess the association between exposure to pharmaceutical marketing and sales efforts with changes in prescribing, and has reliably found across many studies in many populations that exposure to pharmaceutical marketing and sales is significantly associated with increases in prescribing of the marketed drugs." *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 29-30 (Keyes Rpt.).

Dr. Keyes is a faculty member of the Policy and Health Initiatives on Opioids and Other Substances center at Columbia University and a steering committee member of the Substance Abuse Epidemiology Training Programs, by which she trains and mentors doctoral and post-doctoral scholars in substance abuse epidemiology. *Id.* at 5. Dr. Keyes also is an investigator on the HEALing Committees Study, a large NIH grant-funded initiative aiming to reduce opioid overdose by 40 percent in New York, Ohio, Kentucky, and Massachusetts. *Id.* She has conducted

---

[8] *See also Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("[W]itness' qualifications to render an expert opinion are . . . liberally judged by Rule 702. Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or education."); *SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 644 (E.D.N.C. 2013) ("A party may qualify as an expert on the basis of experience alone.").

large scale survey data and vital statistics analyses, as well as the development of theories, hypotheses, and published findings concerning the role of macro-social factors in producing the opioid epidemic, including 21 peer-reviewed journal articles on opioid use and related harms.[9] Dr. Keyes is, accordingly, qualified to opine about the causes of the opioid epidemic. In order to assess methods of reducing opioid overdose, it is part of Dr. Keyes' job, as an epidemiologist, to understand the causes of opioid use and misuse.

Although Judge Polster found that Dr. Keyes was not qualified to offer marketing opioids, he did so based on his view that she did not apply her epidemiological expertise in forming those opinions. *See* Ex. A, MDL Dkt. No. 2549, at 21 (noting that plaintiffs had not shown that "in formulating her opinions on marketing causation, Keyes performed the methodology that is standard in the scientific field of epidemiology"). He did not consider that, as discussed above, epidemiologists with the same credentials as Dr. Keyes have published studies about the role opioid marketing in causing the opioid epidemic, making clear that marketing credentials are not required in order to offer the opinions at issue here. Moreover, her report in this case is different from the report she submitted in the cases before Judge Polster. In her current report, Dr. Keyes clearly and explicitly applies standard and accepted epidemiological methods in analyzing multiple studies that address the effects of marketing on opioid prescribing. *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 29-30 (Keyes Rpt.). To the extent that Judge Polster believed that the marketing causation opinion submitted by Dr. Keyes in the MDL was not an epidemiological one (and thus not within Dr. Keyes' expertise as an epidemiologist), her current opinion has addressed that concern and now clarifies it is squarely

---

[9] *See, e.g.*, Ex. H, M. Cerda, *et al.*, *Prescription Opioid Mortality Trends in NYC, 1990-2006*, 132 Drug Alcohol Dependency 1-21, 10 (2013) (reporting "steps in the 1990s to increase the availability and use of analgesics, including aggressive marketing of potent formulations such as oxycodone hydrochloride and efforts to encourage clinicians to be more proactive in identifying and treating chronic pain," contributed to the opioid epidemic).

based on epidemiological principles and methods.

*Andrew Kolodny, M.D.*: Dr. Kolodny has studied the marketing and promotion of opioids over the past 17 years. Dr. Kolodny is a physician specializing in addiction treatment; he is also a long-time public health professional and advocate who opines that Defendants' conduct was a substantial factor in causing the flood of prescription opioids into the United States, West Virginia, and the Cabell-Huntington community. *See* Expert App'x, Dkt. # 1097, at Exh. 6.a, at 2-3 (Kolodny Rpt.). Dr. Kolodny has been working on the opioid epidemic "initially as a public health official for New York City, then as a clinician, researcher and advocate." *Id.* at 3. He currently serves "as the Medical Director of the Opioid Policy Research Collaborative at the Heller School for Social Policy and Management at Brandeis University in New York," where he works to educate and advise stakeholders regarding evidence-based solutions to the opioid crisis. *Id.* at 3-4. Dr. Kolodny also teaches about the Opioid Epidemic at Columbia University, specifically about the *origin of the crisis*. *Id.* at 4 (emphasis added).

Recognizing that the opioid industry (including Defendants), were interfering with efforts to understand and respond to the crisis, Dr. Kolodny began researching the industry-funded campaign to increase prescribing and the relationship between the opioid industry and pain organizations. *Id.* at 5. In 2010 (prior to involvement in this litigation), Dr. Kolodny and several of his colleague founded Physicians for Responsible Opioid Prescribing (PROP), a group focused on educating the medical community to correct past misinformation that can result in improper opioid prescribing. *Id.* "PROP's leadership has conducted research, published papers, petitioned federal agencies and communicated with state and federal policymakers about the role of improper and deceptive marketing of opioids, about the devastation the oversupply of opioids has caused and the potential solutions for repairing the damage that was done to communities

-11-

around the United States." *Id.* Dr. Kolodny's focus on the role of marketing and his efforts to combat the misrepresentations promoted by drug manufacturers and distributors demonstrate his qualification to offer opinions about how Defendants' conduct contributed to the opioid epidemic. Significantly, Dr. Kolodny testified as an expert in the opioid trial in Oklahoma, on topics that included the role of pharmaceutical marketing in causing the opioid epidemic. *See* Ex. I, *State of OK v. Purdue Pharma, LP et al.*, District Court of Cleveland Cnty, State of Oklahoma, Case No. CL-2017-816 TB, Summary Order (Apr. 26, 2019) (denying Defendants' Motion to Exclude Kolodny); Ex. J, The State's Omnibus Response to Defendants' Motions to Exclude, at 6-11 (Apr. 23, 2019) (detailing his qualifications). Just as he was found to have sufficient expertise to offer testimony there, so, too, this Court should find him sufficiently qualified here.

## II. <u>Plaintiffs' Experts Applied a Reliable Methodology to Support Opinions that Defendants' Activities that Increased Opioid Availability, Sales, and Exposure Are Causes of the Opioid Epidemic.</u>

Defendants attack the methodology used by Drs. Lembke, Keyes, Kolodny, and Mohr on two grounds: (1) they claim these opinions are not based on a reliable methodology; and (2) they claim the opinions are not specific to the City of Huntington or Cabell County. Defendants contend that Plaintiffs' methodologies are flawed because they cannot show that the doctors in the Cabell-Huntington community relied on the marketing materials at issue; that the experts have not identified specific marketing activities engaged in by Defendants; and that the experts failed to weigh the causal role or quantify Defendants' conduct in causing the epidemic. None of these criticisms holds up. Moreover, Defendants' motion ignores entirely the substantial indicia of reliability that establish the admissibility of these opinions.

### A. <u>The Experts' opinions are based on a reliable methodology and supported by peer-reviewed literature and the Big Three's internal company documents.</u>

As demonstrated in Plaintiffs' experts' reports, there has been widespread, authoritative

and peer-reviewed endorsement of the conclusion that Defendants' aggressive and misleading promotion and distribution of prescription opioids is the root cause of the opioid epidemic. To counter this, Defendants seek to impose their own specific requirements on what constitutes a reliable methodology for Plaintiffs' experts' testimony. However, experts are "permitted wide latitude to offer opinions," and there is no prescribed methodology that experts must follow to develop their opinions. *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 552 (S.D.W. Va. 2014), *as amended* (Oct. 29, 2014) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). Defendants are not empowered to dictate the methodology to be employed by Plaintiffs' experts, and their critiques do not withstand scrutiny. Rather, as shown below, each of these experts applied a reliable methodology to reach his or her conclusion.

### 1.    The Experts' review and assessment of scientific literature is a reliable methodology

The opinions at issue here were formed through a reliable methodology: review and assessment of relevant scientific literature and the facts of the case, in light of the witness's training and experience. It is well-established that this kind of review and assessment of scientific literature is a reliable methodology. *See, e.g.*, *Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 856 (M.D. Tenn. 2010) (finding expert's reliance on and frequent cites to scholarly articles and studies to be a reliable methodology).[10] Plaintiffs' experts reviewed the evidence and the literature applicable to the increased availability, sale, and exposure to opioid drugs and opined that Defendants' activities that contributed to this increased supply was a cause of the opioid

---

[10] *Ferguson v. Lear Siegler Servs., Inc.*, No. 1:09cv635-MHT, 2012 WL 1058983, at *6 (M.D. Ala. Mar. 28, 2012) (finding the evidence the expert relied on in reaching his conclusion (a combination of peer-reviewed articles and experimentation conducted by others) is reliable and he applied it in a manner consistent with scientific principles); *Tressler v. BNSF Ry. Co.*, No. CV-10-188-RMP, 2012 WL 315402, at *6 (E.D. Wash. Feb. 1, 2012) (finding medical and scientific literature review and evaluation of available epidemiological data is reliable methodology); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, No. 2007-MD-1871, 2011 WL 13576, at *9 (E.D. Pa. Jan. 4, 2011) ("[The expert's] opinions expressed in this case are based on reliable scientific methodology (the review of peer-reviewed, published studies and data using well established statistical and scientific principles).").

epidemic.

Multiple scientific articles, written over a period of many years, support Plaintiffs' expert opinions that Defendants' activities related to the supply of prescription opioids was causally related to the epidemic of opioid-induced addiction and mortality. For example, the authors of the 2018 peer-reviewed article published in *Pain Physician* referenced above cited "*overwhelming evidence of misinformation and misdeeds by* drug manufacturers, drug dealers, *drug distributors*, and multiple agencies overseeing controlled substance activities" among the causes of the opioid epidemic. Ex. B, Manchikanti, at 313 (emphasis added). This lengthy review described the factors that contributed to the opioid crisis, including "corporate greed," a "supply chain without checks and balances," and the pharmaceutical industry's marketing efforts. *Id.* at 318, Table 3. The history recounted by these independent authors in a scientific journal closely mirrors the opinions stated by Plaintiffs' experts, based on the same set of facts, and their article is among the materials relied upon by Dr. Lembke. *See* Expert App'x, Dkt. # 1097, at Exh. 7.a, at Ex. B, Materials Considered # 480 at 38 (Lembke Rpt.).

Additionally, the Association of Schools and Programs of Public Health (ASPPH) 2019 report, titled *Bringing Science to Bear on Opioids: Report and Recommendation from the ASPPH Task Force on Public Health Initiatives to Address the Opioid Crisis*, concluded "[t]he opioid crisis can be directly tied to practices adopted and encouraged by opioid manufacturers and distributors. As such, the industry's credibility is near zero and major changes in its practices are essential." Ex. K, ASPPH Report (2019), at 32; *see also See* Expert App'x, Dkt. # 1097, at 7.a, at 49 (Lembke Rpt.) (relying on ASPPH Report).[11] The Task Force urged the industry,

---

[11] Although Defendants' are correct that Plaintiffs' expert Dr. Gordon Smith does not opine on the marketing practices of the distributors, his reliance on the ASPPH report and opinion that there was an "oversupply of opioids above what seemed to be needed" in West Virginia supports the totality of the evidence that Defendants' conduct was a substantial factor in the opioids epidemic. *See* Expert App'x, Dkt. # 1097, at Exh. 12.a, at 17-18 (Smith Rpt.), Ex. L, Smith Dep. 88:4-89:12 (Sept. 22, 2020). Dr. Smith testified that he concurs with the ASPPH report's

including the distributors, "to voluntarily end all lobbying and marketing activities related to opioids and other drugs of potential abuse." Ex. K, ASPPH, at 32.

Since her work on Case Track One before Judge Polster, and in response to his criticisms, Dr. Keyes applied epidemiological principles in a reliable methodology that support her opinions and has reviewed numerous peer-reviewed studies, not just one. *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 29 (Keyes Rpt.);[12] Ex. A, MDL Dkt. No. 2549, at 20). In her report, Dr. Keyes explained how she applied epidemiological methods to conclude that these additional studies support her opinion that marketing causes prescribing:

> Indeed, available epidemiological evidence using rigorous quasi-experimental designs, such as difference-in-difference models, as well as controlling for numerous potential confounders, has consistently documented an association between the industry payments, meals, sales outreach to physicians, as well a pharmaceutical promotions, with increases in requests to add specific products to hospital formularies as well as increases in rates of prescribing the market[ing] produce.

*See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 30 (Keyes Rpt.) (footnotes omitted). In particular, Dr. Keyes examined a 2017 study published in the *Journal of the American Medical Association* that concluded that policies restricting pharmaceutical representative sales visits to physicians at academic medical centers were associated with modest but significant reductions in prescribing of marketed drugs.[13] This further reinforces her conclusion that pharmaceutical marketing drives prescribing.

---

conclusion (Expert App'x, Dkt. # 1097, at Exh. 12.a, at 18 (Smith Rpt.)) based on his review of the report, his experience with the authors, and his general research and expertise. Ex. L, Smith Dep. 81:5-85:24.

[12] *See* Ex. M, Keyes NY Hr'g Tr. 272:5-12 (Sept. 10, 2020) (explaining the same analysis conducted here: "I looked at these epidemiological studies and I evaluated those responses. I evaluated the strengths of the association. I looked to see whether they ruled out alternative causes. I looked at analogy, consistency, plausibility and other factors and determined that they do meet those benchmarks that are common in the epidemiological literature.").

[13] Ex. N, Larkin I, Ang D, Steinhart J, et al. *Association between academic medical center pharmaceutical detailing policies and physician prescribing*. JAMA. 2017;317(17):1785-1795.

The Hadland (2019)[14] peer-reviewed study that Dr. Keyes previously relied on built on the 2017 and 2018 Hadland studies, which concluded that industry payments to physicians as part of the marketing of prescription opioids were associated with increased opioid prescribing and opioid-related harms. *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 30 (Keyes Rpt.). The authors conducted a regression analysis, which ruled out alternative causes, and found an association between the amount of money that doctors received from the pharmaceutical industry and subsequent opioid prescribing.[15] The authors used numerous of the factors that are standard in epidemiology for assessing causation (e.g. temporality, consistency, and biological gradient) to explain the strength of the association.[16]

Dr. Keyes, like the researchers in the Hadland studies, did not evaluate the specific marketing materials of any manufacturer or distributor because this is not part of the epidemiological science on which she relied. *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 29 (Keyes Rpt.). She looked at the totality of the evidence contained in the scientific literature to reach her conclusion regarding marketing causation. *Id.* The factors cited by Dr. Keyes that she considered, similar to the Hadland authors, are precisely those used by epidemiologists—and acknowledged by courts—to determine whether an association is causal. *See* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Fed. Jud. Center 3d ed. 2011) at 597-606 (describing factors used by epidemiologists to assess causation, including consideration of alternative causes,

---

[14] Ex. C, Hadland SE, Rivera-Aguirre A, Marshall BDL, Cerda M. *Association of pharmaceutical industry marketing of opioid products with mortality from opioid-related overdoses*. JAMA Netw Open. 2019;2(1):e186007.

[15] Ex. O, Hadland SE, Marshall BDL, Cerda M. Reply. *Reduced Opioid Marketing Could Limit Prescribing Information for Physicians—Reply*. JAMA Intern Med. 2018;178(10):1426-27.

[16] *Id.* (addressing numerous epidemiological factors to explain the strength of the association: "First, to establish temporality between exposure and outcome, we lagged physician opioid prescribing from marketing by 1 year. This allows us to ensure that prescribing changes occurred after marketing was received, thus reducing the likelihood of reverse causality. Analyses also adjusted for prior prescribing behaviors, which likely confound the relationship between marketing and subsequent opioid prescribing. Second, our findings are consistent with other research showing that physicians who receive pharmaceutical industry payments prescribe more of the medications being marketed. Third, like other studies, we found a "dose-response" association between marketing and prescribing, with each additional industry-sponsored meal associated with greater subsequent prescribing.").

-16-

consistency, plausibility and strength of association); *see also In re Welding Fume Prod. Liab. Litig.*, No. 1:03-cv-17000, MDL 1535, 2005 WL 1868046, at *32 n.75 (N.D. Ohio Aug. 8, 2005) (noting factors that "guide epidemiologists in making judgments about whether a cause-effect relationship may be inferred from an association"). In short, Dr. Keyes applied standard epidemiological methods to a body of epidemiological evidence in order to conclude that there is a cause-and-effect relationship between opioid marketing and increased availability of opioids. Her opinion arises from her expertise and is reliable and admissible.

Dr. Kolodny and Dr. Mohr likewise used reliable methodologies, including their review of Defendants' own documents. Dr. Kolodny drew on his years of experience and research into the role of marketing and "education" initiatives in fueling the opioids epidemic and on the evidence produced in this case (Defendants' internal documents and communications) to support his opinion that the Defendants' activities increased the supply of opioids and were a cause of the opioid epidemic. *See* Expert App'x, Dkt. # 1097, at Exh. 6.a, at 38-49 (Kolodny Rpt.); Ex. P, Kolodny Dep. 205:5-206:5 (Sept. 4, 2020) (explaining the internal documents show that distributors were not just driving the truck, but also promoted and marketed the drugs).[17] Courts routinely allow experts to rely on internal documents of a party-opponent to support causation, especially in multi-district product liability cases. For example, in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263-64 (4th Cir. 1999), involving allegations that talcum powder caused sinus injury, the Fourth Circuit rejected a challenge to plaintiff's expert, noting that the expert had relied upon sufficient evidence, including the defendant's own data sheet, for evidence to support

---

[17] *See also* Ex. P, Kolodny Dep. at 210:13-211:12 (describing evidence that the distributors were part of a coordinated campaign with the manufacturers); 212:8-213:13, 217:23-218:7 (explaining various ways the pharmaceutical industry, including distributors, convey marketing messaging to physicians); 221:21-225:15 (providing examples of false claims made by distributors in the marketing of prescription opioids); 280:7-282:5 (discussing an example of the "overall campaign for the manufacturer and the distributor to make money off an extremely dangerous opioid"); 283:6-286:23 (explaining distributor internal analyses of the marketing efforts finding them effective at increasing sales).

causation. In the Bard trans-vaginal mesh MDL, Judge Goodwin likewise found that while an expert cannot simply narrate corporate documents to a jury "he may rely on such information in forming and supporting his opinions." *Wise v. C. R. Bard, Inc.*, 2:12-cv-01378, 2015 WL 521202, at *15 (S.D.W. Va. Feb. 7, 2015). The court also noted that "many of the internal documents . . . could stand alone as medical research and literature." *Id*. At bottom, it is well-accepted that reliance on internal company documents is reliable and relevant to consideration of causation.

In arguing that Dr. Mohr employed an unreliable methodology, Defendants ignore Dr. Mohr's testimony that Defendants admit their marketing efforts were effective to increase the sale of opioids. *See* Expert App'x, Dkt. # 1097, at Exh. 9.a, at 4-5, 28-66, Schedule V (listing the specific evidence for the basis of her marketing opinion) (Mohr Rpt.); Ex. Q, Mohr Dep. 124:17-128:17 (Sept. 21, 2020). The Defendants' activities that provide easy access to the drugs helped normalize the use of opioids. *Id.* at 110:4-113:23. Defendants' criticism that Dr. Mohr did not distinguish their marketing of opioids from their marketing of non-opioid drugs, Defs.' Br. at 16, is not well-taken. Dr. Mohr laid out in detail how Defendants specifically used their services to support the sale, supply, and use of opioids.[18] Dr. Mohr found that the distributors' marketing for opioids was strikingly similar to what would be expected for any other product, despite opioids being controlled substances. Ex. Q, Mohr Dep. 205:23-206:12. In any event, Defendants' marketing initiatives related to non-opioid drugs, and the percentage of their marketing efforts on each of the drugs they market, is not germane to this litigation. What matters is that the

---

[18] *See, e.g.*, Expert App'x, Dkt. # 1097, at Exh. 9.a, at 21 (ABDC use of "Glimmer" button to promote OxyContin), 32 (ABDC work with Purdue to promote the use of opioids in connection with launch of OxyContin), 38 (multiple manufacturers using ABDC Imedex service for pro-opioid CMEs), 43-46 (McKesson and ABDC's Xcenda undertaking marketing research on opioids for multiple manufacturers), 49-50 (McKesson and Cardinal offers of vouchers and cards for free or discounted opioids), 50-51 (McKesson stocking promotions for oxycodone), 52-53 (Defendants implementing patient "adherence" programs to "coach" patients and ensure they continued taking their opioid prescriptions), and 54-55 (Defendants' education programs on addiction, controlled substances, and treatment of chronic pain) (Mohr Rpt.).

Defendants used their services to market opioids and generated return-on-investment of these services provided to the manufacturers, showing that their efforts increased demand for opioids. *Id*. at 124:12-125:12. At best, Defendants' claim that Dr. Mohr did not evaluate their non-opioid marketing practices goes to the weight, not the admissibility, of her opinion.

### 2.       Plaintiffs' Experts are not required to show physician reliance on specific marketing materials received by certain physicians.

It is axiomatic that the purpose of pharmaceutical companies' marketing initiatives is to increase prescriptions and sales. *See In re Zyprexa Prods. Liab. Litig.* No. 04-MD-1596, 2008 WL 2696916, at *33 (E.D.N.Y. July 2, 2008), *opinion clarified,* No. 04-MD-1596, 2008 WL 2705475 (E.D.N.Y. July 9, 2008) ("It is undisputable that expenditures for drug marketing increase sales. The billions spent by the pharmaceutical industry attests to that. Physicians, despite what most claim, *are* influenced both consciously and unconsciously by commercial promotional messages."). Dr. Mohr explains that generally in marketing, the way to measure the effectiveness of the marketing initiatives is to look at the sales. Ex. Q, Mohr Dep. 125:1-125:12; Expert App'x, Dkt. # 1097, at Exh. 9.a, at 15-20 (Mohr Rpt.) (explaining distribution channels and sales as a common metric to evaluate channel performance). The "distributors themselves provided evidence to the manufacturers that their marketing services increased demand for opioids." Ex. Q, Mohr Dep. 126:20-128:3; Expert App'x, Dkt. # 1097, at Exh. 9.a, at 64-65 (Mohr Rept).

Dr. Keyes, on the other hand, was not tasked with evaluating specific distributor marketing materials, but instead from an epidemiological standpoint, evaluated peer-reviewed epidemiological studies that document the association between opioid marketing with sales. *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 29 (Keyes Rpt.). She found "[e]vidence shows that pharmaceutical marketing of prescription drugs increases prescribers' likelihood of prescribing

the marketed drug in the future . . . ."[19] Here, in collaboration with the manufacturing defendants, Defendants' successful marketing campaigns increased distribution of prescription opioids from 1997 to 2007 by more than 600%.[20] This increased supply resulted in "the widespread availability of prescription opioids that were originally dispensed supposedly (but not always actually) for medical uses, often in greater quantities and doses than needed, leaving a surplus of opioids that could be diverted for non-medical uses."[21] Dr. Keyes explains that this is not a new phenomenon and that the "relationship between supply of an addictive substance and subsequent rates of substance use disorder has been well established in the public health literature for years through principles of  availability.'"[22] This relationship has been "extensively documented for decades for alcohol and tobacco, and is one reason that alcohol and cigarette taxes, minimum pricing, and other public health efforts aimed at availability and price are among the most effective population-level interventions to reduce" harm.[23]

Moreover, it is well-recognized that asking doctors individually what influenced their prescribing is unreliable. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 30 (1st Cir. 2013). This is especially true in the context of controversial prescribing patterns where "self-reporting from physicians . . . shows both conscious reluctance and unconscious bias, which lead them to deny being influenced." *Id.* Aggregate data, such as that relied on in the articles reviewed by the experts at issue here, and the Defendants own evidence of the return-on-

---

[19] *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 144 (Keyes Rpt.) (*citing* Ex. R, F. Fickweiler, *et al.*, *Interactions Between Physicians and the Pharmaceutical Industry Generally and Sales Representatives Specifically and Their Association with Physicians' Attitudes and Prescribing Habits: a Systematic Review*, 7 BMJ Open. 1-12 (2017); Ex. S, C. DeJong C, *et al.*, *Pharmaceutical Industry– Sponsored Meals and Physician Prescribing Patterns for Medicare Beneficiaries*, 176 JAMA Intern Med. 1114-22 (2016)).

[20] *Id.* at 14 (*citing* Ex. T, L.J. Paulozzi, *et al.*, *CDC Grand Rounds: Prescription Drug Overdoses—a U.S. Epidemic*. 61 Morb Mortal Wkly Rep. 10-13 (2012); Ex. U, US Dep't of Justice; Drug Enforcement Admin., Automation of Reports and Consolidated Orders Sys. (ARCOS), https://www.deadiversion.usdoj.gov/arcos/index.html (last visited July 28, 2019)).

[21] *Id.* at 6.

[22] *Id.* at 52.

[23] *Id*.

investment of their marketing services provided to the manufacturers showing that their efforts increased demand for opioids provides a more reliable indication than individual physician anecdotes. *See* Expert App'x, Dkt. # 1097, at Exh. 9.a, at 64 (Mohr Rpt.).

Thus, Defendants' reliance on *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at *11-12 (E.D. Pa. June 20, 2000) and *In re Actos® (Pioglitazone) Products Liability Litigation*, No. 6:11-MD-2299, 2014 WL 12653759, at *13 (W.D. La. Jan. 14, 2014), for the proposition that Plaintiffs' experts cannot know how Defendants' marketing scheme affected physician prescribing, is misplaced. Plaintiffs' experts are not opining "about what all doctors generally consider in making prescription decisions" (*Diet Drugs*, 2000 WL 876900, at *11), but instead rely on objective data and peer-reviewed literature that show a substantial increase in prescription opioid distribution and sales, accompanied by proportionately increased mortality, as summarized above.[24] No similar evidence was present in the *In re Diet Drugs* or *Actos* cases. Moreover, both *Diet Drugs* and *Actos* involved individual personal injury cases, where each plaintiff was required to show that the defendants' misrepresentations caused his or her injuries. Here, by contrast, Plaintiffs need only show that Defendants' conduct increased the supply of opioids within their jurisdictions; it makes no difference *which* doctors relied on what with respect to which prescriptions, so long as the conduct as a whole produced an aggregate increase that caused harm to the Plaintiffs.

### 3. Plaintiffs' Experts considered alternative causes and are not required to weigh Defendants' causal role in creation of the opioids epidemic.

Defendants acknowledge that Plaintiffs' experts considered alternative possible causes of the prescription opioid epidemic, but take issue with the fact that the experts did not quantify

---

[24] *Id*. at 14 (citing Ex. T, Paulozzi, *supra*, note 20; Ex. U, U.S. Dep't of Justice, *supra*, note 20).

Defendants' causal role in the epidemic. Dkt. No. 1064, Defs.' Br. 11-12. Defendants' arguments are based on an incorrect view of Plaintiffs' causation burden. Plaintiffs' burden of proof is to show that Defendants' "breach of a particular duty of care was *a* proximate cause of the plaintiff's injury, not the *sole* proximate cause." *Mays v. Chang*, 213 W. Va. 220, 224, 579 S.E.2d 561, 565 (2003). What is required is that the plaintiff show that the action of a tortfeasor "contributes in any degree to the injury." *Wehner v. Weinstein*, 191 W. Va. 149, 155, 444 S.E.2d 27, 33 (1994); *see also Everly v. Columbia Gas of West Virginia, Inc*., 171 W.Va. 534, 301 S.E.2d 165, 167 (1982) (plaintiff merely required to show defendant's conduct is "a contributing cause of the plaintiff's injury"). And, when the tortious acts of multiple parties join together and combine to cause injury, each party "will be regarded as a proximate cause of the injury." *Cook v. Ormsby*, 45 Ind.App. 352, 527 (1909); *see also Everly,* 171 W. Va. at 536, 301 S.E.2d at 167 (plaintiff merely required to show defendant's conduct is "a contributing cause of the plaintiff's injury"). In a nuisance case where the plaintiff proves that the "concurrent neglect" of multiple parties results in injury, joint liability applies. *Baker v. City of Wheeling*, 117 W. Va. 362, 185 S.E. 842, 844 (1936); *see also* Plaintiffs' Memorandum in Support of Motion to Strike Defendants' Notices of Non-Party Fault, Dkt. No. 225 at p.8 & nn.31, 32. Thus, once Plaintiffs' experts determined that Defendants' conduct contributed to the opioid epidemic, there was no need for them to quantify the extent of that contribution.

With regard to allocating blame among the manufacturers and distributors, Dr. Mohr specifically explained that distribution channels in the pharmaceutical industry, including the distribution channels for prescription opioids, are highly integrated and involve a close collaboration between the manufacturer and distributor on marketing strategy and implementation to create a well-oiled machine. *See* Expert App'x, Dkt. # 1097, at Exh. 9.a, at

15-27 (Mohr Rpt.); Ex. Q. Mohr Dep. 124:12-24. Dr. Mohr then explicitly detailed how each of the Big Three played a significant role in opioid marketing. *See* Expert App'x, Dkt. # 1097, at Exh. 9.a, § VI. McKesson, for example, admits that in "[d]elivering an unmatched combination of communication, promotion, distribution options, plus targeted analytics of exclusive data, McKesson [enabled] Cephalon to set strategies that prioritize opportunities, optimize resources, and maximize profitability." Ex. D, Lembke Dep. 307:2-308:1 (quoting Ex. V, MCKMDL00353376). Indeed, "McKesson partner[ed] with pharmaceutical manufacturers . . . to define and execute customized strategies targeting key awareness, sales, and distribution goals at all stages of the product life cycle." *Id.* at 308:2-9. It is neither necessary nor appropriate for Dr. Mohr, or any other expert, to attempt to disentangle Defendants' marketing activities from those of their manufacturer collaborators.

At bottom, Defendants' critique goes to the sufficiency of this evidence to establish causation, not to its reliability or admissibility. The opinions of these experts are not Plaintiffs' sole evidence of causation. As described in Plaintiffs' responses to Defendants' summary judgment motions on this issue, including Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment on Proximate Cause (Dkt. No. 1080), to which the Court is respectfully referred, the opinions of these experts, combined with other evidence, demonstrates Defendants' role in causing the opioid epidemic.

**B.    Plaintiffs' Experts' opinions "fit" this case.**

Defendants' argument that Plaintiffs' experts' opinions do not "fit" the case because they are not specific to Cabell-Huntington community is demonstrably false. To be sure, Defendants' marketing activities were nationwide in scope and, as explained above, Plaintiffs' experts opine that this marketing led to increased opioid availability, sales, and exposure that caused the epidemic. Dr. Lembke, for example, studied data specific to West Virginia and found that the

data supports that "Cabell County/City of Huntington in particular, were among the hardest hit by the oversupply of opioid pain relievers, igniting the opioid wildfire that continues to the present." *See* Expert App'x, Dkt. # 1097, at Exh. 7.a (Lembke Rpt.) (Appendix III, 237-251 analyzing the West Virginia data).

Dr. Kolodny recognized that "West Virginia has been accurately characterized as 'ground zero' in the opioid crisis" citing to the United States House of Representatives Energy and Commerce Committee report finding "the sudden influx of prescription opioids, leading to the resulting increases in abuse and addiction, has had profound effects on West Virginia." *See* Expert App'x, Dkt. # 1097, at Exh. 6.a, at 20 (citations omitted) (Kolodny Rpt.). Dr. Keyes' review of the localized data found that as the volume of prescription opioids flooded into Plaintiffs' communities, the overdose deaths substantially increased. *See* Expert App'x, Dkt. # 1097, at Exh. 5.a, at 35 (Keyes Rpt.);[25] *see also* Expert App'x, Dkt. # 1097, at Exh. 6.a, at 21 (Kolodny Rpt.) (finding the rate of drug overdose deaths in Cabell County exceeds the state average); App'x at Exh. 12.a, Smith Rpt. at 4-18 (finding the localized data supports that prescription opioids were the primary cause of death in West Virginia between the years 2001-2011 and continue to play a major role in the opioid epidemic in West Virginia). As explained in more detail in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Proximate Causation Grounds (Dkt. No. 1080, at 4-5, 12-18), nowhere is the opioid epidemic more severe than in Huntington and Cabell County.

### C.   The Court should disregard Defendants' attempt to exclude opinions not being offered.

Defendants' final argument seeks to exclude expert opinions not offered. Instead, Defendants seek to exclude certain statements made by unidentified experts elicited by

---

[25] Dr. Keyes' analysis of this data is further addressed in Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude Certain Expert Testimony of Dr. Katherine Keyes.

Defendants during the experts' depositions. By way of example, Defendants reference Plaintiffs' experts Drs. David Courtwright and Gordon Smith.[26] Dr. Smith is not offering a distributor "marketing causation" opinion.[27]

Defendants, however, erroneously claim that Dr. Courtwright did not offer an opinion about distributor marketing causation in his report. Dr. Courtwright's report explains historically how manufacturers "undermine[d] narcotic conservatism, the principal barrier to expanding the market for their opioid products . . . with the help of marketing and information services supplied by the Big Three drug wholesalers, which played more than a distributional role in the prescription opioid addiction and overdose crises that emerged at the end of the twentieth and the beginning of the twenty-first centuries." *See* Expert App'x, Dkt. # 1097, at Exh. 3.a, at 8 (Courtwright Rpt.). Dr. Courtwright details the history of wholesale drug business in the United States and how these wholesale distributors collaborated with the manufacturers in the revisionist marketing campaign against narcotic conservatism. *Id.* at 98-107.[28]

Dr. Courtwright is well-qualified to offer this opinion. He is an internationally recognized authority on the history of drug use and drug policy, an area in which he has published since 1978. He has researched and published extensively on drug marketing and, specifically, the marketing of opiates.[29] Dr. Courtwright's substantial experience as a historian of medicine and

---

[26] Drs. Courtwright's and Smith's opinions related to Defendants' conduct are also discussed in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Expert Testimony Regarding Defendants' Corporate Conduct.

[27] *See* Ex. L, Smith Dep. 90:6-93:23.

[28] *See also* Ex. W, Courtwright Dep. 77:8-78:18, 89:15-90:8 (explaining AmerisourceBergen's continuing education programs); 82:22-83:17 (finding for a "century and a half, [distributors] have been involved in marketing. And that marketing continued in this new era of opioid revisionism."); 83:19-85:5, 86:13-87:21, 94:14-96:15, 98:13-100:8, 105:17-107:22, 110:24-111, 137:20-138:14, 153:20-154:19 (detailing the services provided by distributors to manufacturers, "[n]ot just the delivery of drugs," and "they continue[d] to do that in the late 20th and the early 21st century with respect to opioid analgesics").

[29] *See* Ex. X. *Dark Paradise: A History of Opiate Addiction in America* (Harvard University Press, 1982, revised 2001); Ex. Y, *Forces of Habit: Drugs and the Making of the Modern World* (Harvard University Press, 2001); Ex. Z, *The Age of Addition: How Bad Habits Became Big Business* (Belknap Press of Harvard University Press, 2019);

drugs, including his own pre-litigation research, qualify him to offer opinions about the causes of the opioid epidemic and Defendants role in the revisionist campaign against narcotic conservatism.

## CONCLUSION

For the foregoing reasons, this Court should deny the Defendants' motion in its entirety.[30]

Dated: October 23, 2020

THE CITY OF HUNTINGTON

/s/ *Anne McGinness Kearse*
Anne McGinness Kearse (WVSB No. 12547)
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

Charles R. "Rusty" Webb (WVSB No. 4782)
THE WEBB LAW CENTRE, PLLC
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

CABELL COUNTY COMMISSION

/s/ *Anthony J. Majestro*
Anthony J. Majestro (WVSB No. 5165)
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

/s/ *Paul T. Farrell, Jr.*
Paul T. Farrell, Jr. (WVSB No. 7443)
FARRELL LAW
422 Ninth Street, 3rd Floor
Huntington, WV 25701
Tel: (304) 654-8281
paul@farrell.law

Michael A. Woelfel (WVSB No. 4106)
WOELFEL AND WOELFEL, LLP
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

---

Ex. AA, "The Roads to H: The Emergence of the American Heroin Complex, 1898-1956," *100 Years of Heroin*, ed. David F. Musto et al. (Westport, Conn.: Auburn House, 2002), 3-19; Ex. BB, "'Carry on Smoking': Public Relations and Advertising Strategies of American and British Tobacco Companies since 1950," *Business History* 47 (2005): 421-432; Ex. CC, "The Rise and Fall and Rise of Cocaine in the United States," *Consuming Habits: Drugs in History and Anthropology*, ed. Jordan Goodman, Paul E. Lovejoy, and Andrew Sherratt (London: Routledge, 1995), 206-228, revised and republished in 2nd ed., 2007; Ex. DD, "The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction," *Ann. Rev. of Public Health* 36 (March 2015): 559-574.

[30] Plaintiffs respectfully note that the Parties agreed to a brief page extension for this Memorandum.

*On Brief:*

/s/ *Donald C. Arbitblit*
Donald C. Arbitblit
Paulina do Amaral
Kelly McNabb
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
212-355-9500
Fax: 212-355-9592
pdoamaral@lchb.com

Andrea Bierstein
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
212-784-6404
212-257-8482
abierstein@simmonsfirm.com

## CERTIFICATE OF SERVICE

I certify that on October 23, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to:

Track2OpioidDefendants@ReedSmith.com and mdl2804discovery@motleyrice.com.

*/s/ Donald Arbitblit*

-28-