**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE EXPERT TESTIMONY FROM G. CALEB
ALEXANDER**

## EXHIBIT B

G. CALEB ALEXANDER DEPOSITION TRANSCRIPT (09-18-2020)

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2

3
     * * * * * * * * * * * * * * * * * * * * * * *
4

     THE CITY OF HUNTINGTON,
5
               Plaintiff,
6
     vs.                                CIVIL ACTION
7                                       NO. 3:17-01362
     AMERISOURCEBERGEN DRUG
8    CORPORATION, et al.,
9          Defendants.
10   _____
11   CABELL COUNTY COMMISSION,
12             Plaintiff,
13   vs.                                CIVIL ACTION
                                        NO. 3:17-01665
14   AMERISOURCEBERGEN DRUG
     CORPORATION, et al.,
15
               Defendants.
16
     * * * * * * * * * * * * * * * * * * * * * * *
17

18

19          Videotaped and videoconference deposition
     of DR. G. CALEB ALEXANDER taken by the Defendants
20   under the Federal Rules of Civil Procedure in the
     above-entitled action, pursuant to notice, before
21   Teresa S. Evans, a Registered Merit Reporter, all
     parties located remotely, on the 18th day of
22   September, 2020.
23

24

Page 2

1                    APPEARANCES:
2

APPEARING FOR THE PLAINTIFFS:
3
            David D. Burnett, Esquire
4           Anne McGinness Kearse, Esquire
            Jacob R. Stout, Esquire
5           Andrew Arnold, Esquire
            Monique Christenson, Esquire
6           MOTLEY RICE
            28 Bridgeside Boulevard
7           Mt. Pleasant, SC  29464
8           Paul T. Farrell, Jr., Esquire
            FARRELL LAW
9           422 Ninth Street
            3rd Floor
10          Huntington, WV  25714-1180
11

APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
12
            Steven R. Ruby, Esquire
13          Raymond S. Franks, II, Esquire
             CAREY, DOUGLAS, KESSLER & RUBY
14           901 Chase Tower
             707 Virginia Street, East
15           Charleston, WV  25323
16

APPEARING FOR THE DEFENDANT AMERISOURCEBERGEN:
17
             Melissa A. Geist, Esquire
18           REED SMITH
             506 Carnegie Center, Suite 300
19           Princeton, NJ, 08540
20          Kim M. Watterson, Esquire, Esquire
            REED SMITH
21          355 South Grand Avenue, Suite 2900
            Los Angeles, CA, 90071
22
23
24

Page 3

1                  APPEARANCES (Contd.):

2

   APPEARING FOR THE DEFENDANT McKESSON CORPORATION:

3

4           David W. Haller, Esquire
            COVINGTON & BURLING
5           The New York Times Building
            620 Eighth Avenue
6           New York, NY 10018-1405

7

   ALSO PRESENT:

8

            Justin Ebeling, Videographer
9           Justin Taylor, Esquire
            Jonathan Matthews, Veritext Tech

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                    EXAMINATION INDEX

2

      BY MS. GEIST                                              9

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1                          EXHIBIT INDEX
2
      Exhibit 1      Amended Notice of Remote              18
3                    Deposition of Dr. G. Caleb
                     Alexander dated 9-2-20
4
      Exhibit 2      Deposition transcript of G.           40
5                    Caleb Alexander, USDC, Northern
                     District of Ohio, MDL No. 2803
6                    dated 4-26-19
7     Exhibit 3      WV DHHR publication, "Gov.           105
                     Justice - DHHR Data Suggests
8                    West Virginia Overdose Deaths
                     Appear to be Declining" dated
9                    9-5-19
10    Exhibit 4      "Abatement Plan for Addressing        48
                     the Opioid Crisis in Cabell
11                   County and the City of
                     Huntington," Expert Report of
12                   G. Caleb Alexander, MD, MS
                     dated 8-3-20
13
      Exhibit 5      Expert Witness Report of G.           48
14                   Caleb Alexander, MD, MS,
                     Appendix A - Johns Hopkins
15                   Report:  "From Evidence to
                     Impact"
16
      Exhibit 7      Expert Witness Report of G.           49
17                   Caleb Alexander, MD, MS,
                     Appendix C - List of sources
18
      Exhibit 7.1 Alexander Appendix D - Redress          292
19                 Model FINAL
20    Exhibit 8      "The City of Solutions               208
                     Huntington, WV - A Guide to
21                   What Works (and what does not)
                     in Reducing the Impact of
22                   Substance Use on Local
                     Communities" dated September
23                   2019 (HUNT_00365846-6015)
24

1                    EXHIBIT INDEX (Contd.)

2

Exhibit 32   G. Caleb Alexander, MD, MS,          158

3            Expert Witness Report, prepared
             for USDC, Northern District of

4            Ohio, MDL No. 2803 dated
             3-24-19

5

Exhibit 33   G. Caleb Alexander, MD, MS,          179

6            Supplemental Expert Report -
             Update, April 17, 2019 (MDL

7            Ohio litigation)

8   Exhibit 34   G. Caleb Alexander, MD, MS,       179

             Supplemental Expert Report

9            Update. October 8, 2019 (MDL
             Ohio litigation)

10

Exhibit 52   Alexander notes taken from           203

11           telephonic meetings with people
             within Cabell County/City of

12           Huntington

13

14

15

16

17

18

19

20

21

22

23

24

1              P R O C E E D I N G S

2              VIDEO OPERATOR:  Good morning.  We are

3    going on the record at 9:32 a.m. on September 18th,

4    2020.  Please note that the microphones are

5    sensitive and may pick up whispering, private

6    conversation and cellular interference.  Please

7    turn off all cell phones and place them away from

8    the microphones, as they can interfere with

9    deposition audio.

10             Audio and video recording will

11   continue unless all parties agree to go off the

12   record.

13             This is Media Unit 1 of the video

14   recorded deposition of Doctor G. Caleb Alexander

15   taken by the Defendant in the matter of the City of

16   Huntington versus AmerisourceBergen Drug

17   Corporation, et al and Cabell County Commission

18   versus AmerisourceBergen Drug Corporation, et al,

19   filed in the U.S. District Court for the Southern

20   District of West Virginia, Case Nos. 3:17-01362 and

21   3:17-01665.

22             This deposition is being held remotely

23   via Zoom conference.  My name is Justin Ebeling

24   from the firm Veritext.  I'm the videographer.  The

Page 8

```
 1    court reporter is Teresa Evans from the firm

 2    Veritext.

 3               I'm not authorized to administer an

 4    oath; I'm not related to the parties in this

 5    action; nor am I financially interested in the

 6    outcome.

 7               Counsel and all present in the room

 8    and everyone attending remotely will now state

 9    their appearance and affiliations for the record.

10               MR. BURNETT:  I'll start.  This is

11    David Burnett from Motley Rice on behalf of the

12    plaintiffs, and I'm joined by Andrew Arnold from

13    Motley Rice for the Plaintiffs.

14               MS. GEIST:  Mel --

15               MR. STOUT:  Jacob Stout, Motley Rice,

16    Plaintiffs.

17               MS. GEIST:  Sorry about that.  Is that

18    it for the plaintiffs today?

19               MR. BURNETT:  I see Anne Kearse is

20    logged in.  I'm not sure if she's -- I'm not sure

21    if she's there, but someone logged in for her.

22               MS. GEIST:  Okay, great.

23               MR. FARRELL:  Yeah, Anne Kearse and

24    Paul Farrell.
```

Page 9

1            MS. GEIST:  Good morning.  Melissa

2    Geist from Reed Smith for the Defendant

3    AmerisourceBergen Drug Corporation.

4            MR. FRANKS:  I'm Ray Franks, local

5    counsel in Charleston, West Virginia for Cardinal

6    Health with the law firm of Carey, Douglas, Kessler

7    & Ruby.  We expect that Steve Ruby will be along

8    directly.

9            VIDEO OPERATOR:  Any objection to the

10   reporter administering the oath remotely?

11           MS. BURNETT:  No objection.

12           THE DEPONENT:  No objection.

13           VIDEO OPERATOR:  Will the court

14   reporter please swear the witness.

15           (The witness was sworn.)

16        G.  C A L E B   A L E X A N D E R

17   was called as a witness by the Defendants, and

18   having been first duly sworn, testified as follows:

19                  EXAMINATION

20   BY MS. GEIST:

21      Q.   Good morning, Doctor Alexander.

22      A.   Good morning.

23      Q.   How are you today?

24      A.   Fine, thank you.

Page 10

1      Q.   You get to take your mask off.  Doctor

2    Alexander, would you just please state your full

3    name for the record?

4      A.   George Caleb Alexander.

5      Q.   And you have been retained by the

6    Plaintiffs, Cabell County and the City of

7    Huntington, in a case pending in West Virginia; is

8    that correct?

9      A.   Yes, ma'am.

10     Q.   And you intend to give expert testimony if

11   this case proceeds to trial next month, October

12   2020; is that correct?

13     A.   It is.

14     Q.   And do you anticipate providing trial

15   testimony, Doctor, live or via some remote means?

16     A.   I've indicated to the plaintiffs that if

17   it's helpful for me to be there in person that I'm

18   willing to do so.

19     Q.   Have you brought any materials with you to

20   your deposition today?

21     A.   I have -- yes, ma'am.

22     Q.   And what have you brought?

23     A.   I have copies of two or three reports, as

24   well as a copy of my own report.

Page 11

1      Q.   And when you say "two or three reports,"
2   are you talking about other expert reports that
3   have been submitted in this case?
4      A.   Yes, I am.
5      Q.   Okay.  And whose expert reports are those?
6      A.   I have an expert report from George
7   Barrett, and I have an expert report from Nancy
8   Young.
9      Q.   And you said, Doctor Alexander, you also
10  brought a copy of your own expert report?
11     A.   Yes.  Yes, I did.
12     Q.   Did you mark up that expert report or
13  highlight it or tab it in any way?
14     A.   No, I did not.
15     Q.   For the record, can you tell me, please --
16  I see a grey background, but other than that, I
17  have no idea where you're physically located.
18  Would you please tell me where you are today for
19  your deposition?
20     A.   Of course.  I'm in a hotel in downtown
21  Baltimore.  I believe it's the Hyatt Regency.
22     Q.   And are you by yourself in the room?
23     A.   Yes, I am.
24     Q.   And plaintiffs' counsel is with you there

Page 12

1   today as well, but not in same room; is that

2   correct?

3       A.   Yes, that's correct.  They're -- David

4   Burnett is in a room directly behind me.

5       Q.   Are there any other plaintiffs' counsel -

6   either from Motley Rice or another law firm - there

7   at the hotel in Baltimore today?

8       A.   No.  Not that I'm aware of, no.  I don't

9   believe so.

10      Q.   Doctor Alexander, because this is an odd

11  setting necessitated due to the COVID pandemic, I

12  just want to ask you some specific questions before

13  we begin.  And the first is:  Do you have with you

14  a computer screen, an iPad, a laptop or any type of

15  device such as an iPhone to where you could access

16  the Internet?

17      A.   Yes, I do.

18      Q.   Okay.  And what do you have there with you?

19      A.   Well, I have an iPhone next to me, although

20  I've turned it off as I was requested to do, and

21  then I'm speaking to you through an Apple MacBook

22  Pro that I can use to access the Internet.

23      Q.   Can you agree with me that for purposes of

24  this deposition today, that you will not send or

1    receive or review any text messages or other

2    messages on your iPhone?

3        A.   Well, pertaining to the case, I presume?  I

4    mean, I'm also a practicing internist, and actually

5    on call - although I have coverage for most of the

6    day - so do you mean just pertaining to this?

7        Q.   I do.  What I'm trying to -- and I

8    understand, Doctor Alexander, you're a practicing

9    physician, and if you need to call back a patient

10   or there's some type of emergency, I can appreciate

11   that, and of course, we will accommodate that.

12       A.   Okay.

13       Q.   So can you let me know if that comes up

14   during the deposition?

15       A.   Absolutely.

16       Q.   Okay.  So let me be more precise in my

17   question.  Can you agree with me that you will not

18   communicate with counsel for the plaintiffs

19   regarding this case via e-mail, text message,

20   instant messenger or any other form of

21   communication during your deposition?

22            MR. BURNETT:  Let me just interject.

23   Counsel, what is the basis for the question?  Is

24   there a legal principle that you're founding that

Page 14

1    request on?

2                    MS. GEIST:  Counsel --

3                    MR. BURNETT:  Just seems unusual to

4    ask that.

5                    MS. GEIST:  Well, I've heard it asked

6    in a number of different depositions.  I think it's

7    fair to ask that the witness agree not to

8    communicate with counsel during the

9    question-and-answer period of the deposition.

10                   Communications other than objections

11   are prohibited by the rules, so I'm asking if

12   Doctor Alexander will agree not to look at or send

13   any text messages, e-mails or other communications

14   that may come between him and counsel for

15   plaintiffs.

16                   I think that's fair.

17       Q.   Would you agree to do that, Doctor

18   Alexander?

19       A.   If that's an expectation of -- of the

20   attorneys, then I'm happy to agree to do so, yes.

21                   MR. BURNETT:  Yeah, I'm not aware of

22   such a request in the past, so I'm going to reserve

23   rights on that issue.  I mean, in principle, I

24   don't have an objection to doing that, but I'm just

Page 15

1   -- I -- that's the first time ever hearing of that

2   sort of request.

3              MS. GEIST:  Understood.  I hear your

4   position.

5      Q.   And similarly, Doctor Alexander, while your

6   deposition is being conducted, can you agree with

7   me that you will not be looking for information or

8   responses to questions by surfing the Internet?

9      A.   Again, I'm happy to agree to such if that's

10  an expectation of the -- the Court's and these

11  proceedings, yes, I'm happy to agree to do -- to

12  avoid doing so.

13     Q.   Again, like a regular deposition, though,

14  we will take breaks.  We -- I expect we will be

15  together most of today, so it's not a marathon

16  session.  I typically take a break every hour.  If

17  I fail to do so and you would like to take a break,

18  would you please let me know, and I'm happy to

19  accommodate that at any time?

20     A.   Absolutely, and I appreciate your noting

21  that.

22     Q.   Sometimes I tend to just talk and talk and

23  talk and two hours will have gone by, so I will try

24  to take breaks every hour or so.

Page 16

1              Similarly, Doctor Alexander, because
2      we're not together in the same room, I think it is
3      easier to speak over one another.
4              You are doing an excellent job right
5      now waiting for me to ask my question before you
6      begin responding.  Can you please just have a
7      heightened awareness of the importance of that in
8      this Zoom remote setting?
9          A.   Of course.
10         Q.   Thank you.  Anything at all, Doctor
11     Alexander, that would prevent you from providing
12     full and accurate and truthful testimony today?
13         A.   No.
14         Q.   And this is not your first deposition,
15     Doctor Alexander.  Is that correct?
16         A.   Yes, that's correct.
17         Q.   You gave a deposition in a case on behalf
18     of plaintiffs that was in Ohio and the plaintiffs
19     were Cuyahoga and Summit Counties.  Do you recall
20     that?
21         A.   Yes, I do.
22         Q.   Have you given any depositions as an expert
23     since that Ohio, Cuyahoga/Summit County deposition?
24         A.   No, I have not.

Page 17

1       Q.   And was that the only expert deposition

2   that you have given in the opioids litigation on

3   behalf of plaintiffs?

4       A.   Yes, it was.

5       Q.   Now Doctor Alexander, I asked you

6   informally before we began on the record if you

7   have a box of documents or a box filled with sealed

8   envelopes there in the room with you, and you

9   indicated to me that you do?

10      A.   Yes, I do.  They're right next to me.

11      Q.   Okay.  And I will preface my question by

12  letting you know that I do not anticipate we're

13  going to go through every single document.  So I'm

14  not sure how large your box looks, but we may not

15  go over every single document in there.

16              We're going to be jumping around a

17  little bit, so I do apologize in advance for that.

18              Did you open any of the envelopes in

19  the box or look at the documents in the box before

20  your deposition?

21      A.   No, I have not.

22      Q.   Why don't you go ahead, Doctor Alexander,

23  and find what should be an envelope marked as

24  either Exhibit 1 or Tab 1?

Page 18

1              MR. BURNETT:  It's Tab 1.

2              MS. GEIST:  Thank you.

3       A.   Okay, I have that in my possession.

4       Q.   Great.  Would you please open it for me?

5           ALEXANDER DEPOSITION EXHIBIT NO. 1

6               (Amended Notice of Remote Deposition

7               of Dr. G. Caleb Alexander dated 9-2-20

8               was marked for identification purposes

9               as Alexander Deposition Exhibit No.

10              1.)

11             VIDEO TECH:  Tab 1 has been introduced

12   as Exhibit 1 on Exhibit Share.

13      Q.   Okay.  And hopefully -- and good, there it

14   is.  Hopefully Exhibit 1 is the Amended Notice of

15   your remote deposition in this case brought by the

16   City of Huntington and Cabell County Commission.

17             And you have that in front of you,

18   Doctor?

19      A.   Yes, ma'am, I do.

20      Q.   And had you seen this notice before today?

21      A.   I believe a copy of it was e-mailed to me

22   notifying me about this -- this event.

23      Q.   And that was e-mailed to you, I presume, by

24   plaintiffs' counsel, correct?

1     A.   I presume so.  I suppose it's possible it

2   could have come from the -- that seems most likely.

3   I don't know if it's possible, it could have come

4   from -- is it Veritext or our colleagues that are

5   involved in recording and transcribing this, but it

6   may well have come from plaintiffs, yes.

7     Q.   Okay.  It doesn't really matter.  Just the

8   fact that you have seen it before today.  And did

9   you take a quick look and review it?

10     A.   Very briefly.

11     Q.   Okay.  One of the things that the notice

12   does besides ask you to appear today for your

13   deposition in the case is ask you for an

14   itemization of the hours spent and expected to be

15   spent, compensation paid, in connection for your

16   expert work in this case.

17          So Doctor Alexander, can you -- can

18   you let me know, when were you retained, first of

19   all, by plaintiffs' counsel?

20     A.   I don't know the date, the exact date,

21   offhand, but I would guess it was -- regarding this

22   particular case, I would guess it was possibly 12

23   to 18 months ago.

24     Q.   So sometime in early to middle of 2019; is

Page 20

1    that fair?

2         A.    I mean, that -- that is a guess.  I've been

3    involved in a lot of different opioid litigation

4    cases and I don't recall the precise date when I

5    was retained for this -- this track, but as you

6    know, this is Track 2 of the MDL, and I was

7    involved in the first case as well, etc.

8                   MR. BURNETT:  And Doctor Alexander,

9    let me just interject here.  You should not enclose

10   any engagements of yours in any opioid litigation

11   except to the extent you've been disclosed as a

12   witness in that case.

13                   And if you're not sure, because that's

14   -- if you're not sure, don't -- don't disclose and

15   we can discuss.

16                   THE DEPONENT:  Thank you.

17        Q.    And Doctor Alexander, subject to your

18   counsel's instruction, my understanding is that you

19   are obviously retained and disclosed as an expert

20   witness for the plaintiffs in this case, City of

21   Huntington and Cabell County, correct?

22        A.    Yes, ma'am.

23        Q.    And you were also retained and disclosed as

24   an expert in what you referred to as the MDL case,

Page 21

1   and that was brought by Cuyahoga and Summit

2   Counties in Ohio, correct?

3       A.   Yes, ma'am.

4       Q.   And you were also retained and disclosed in

5   connection with a case in Washington State.  Is

6   that also correct?

7       A.   I report in my report where I've been

8   retained and disclosed, so I would want to look

9   briefly at my report for that information --

10      Q.   Okay.

11      A.   -- in order to confirm that.

12      Q.   And we can do that when we get to your

13  report.

14           Sitting here today, to the best of

15  your knowledge, have you been disclosed as an

16  expert witness for plaintiffs in any other

17  opioid-related case?

18           MR. BURNETT:  And again, Doctor

19  Alexander, please only answer "Yes" and disclose

20  anything if you're sure that you have been

21  disclosed.

22           THE DEPONENT:  Thank you.

23      A.   So I -- I would want to look at my report,

24  which indicates the cases for which I've been

Page 22

1    retained and disclosed.

2        Q.   And that's fine, and we'll do that in a few

3    minutes just so we have accuracy.  Is that fair?

4        A.   Sure.

5        Q.   When were you first retained by plaintiffs'

6    counsel in connection with expert work for the

7    opioids litigation?

8                MR. BURNETT:  Objection.

9        A.   I --

10               THE DEPONENT:  Go ahead, David.

11               MR. BURNETT:  Go ahead.

12       A.   I presume you would be asking or I would be

13   replying regarding cases that I've been retained

14   and disclosed, and I believe the first of these

15   cases was the MDL case in Cuyahoga and Summit

16   Counties, and again, I don't have a precise

17   recollection of the -- of the month and year that I

18   was retained, but my guess would be that it was 24

19   months ago, plus or minus.

20               About two years ago.  Possibly a bit

21   more.

22       Q.   Now, it -- specifically for this case, can

23   you tell me how much total time you have spent in

24   connection with your expert work for plaintiffs in

Page 23

1    this particular case?

2        A.   Yes, I believe so.

3        Q.   And what is that?

4        A.   I believe I've spent about 75 hours devoted

5    to this case, but it's also important to underscore

6    that -- that I work extensively - and have worked

7    extensively - for years focusing on the opioid

8    epidemic, and so while that may represent the

9    number of hours that I've directly logged, so to

10   speak, working directly on my report, it rests upon

11   an enormous amount -- an enormous number of hours.

12              I don't know if it's, you know,

13   10,000, 15,000.  I don't know how many hours.  But

14   the point is that there's a lot of additional work

15   that I've done that I use to -- and incorporate

16   into the hours that I've committed to this case.

17       Q.   Understood.  And just by way of summary,

18   you have been very active and outspoken in terms of

19   researching, writing and speaking with respect to

20   the opioids abuse epidemic in the U.S. generally;

21   is that fair?

22              MR. BURNETT:  Objection.

23       A.   Well, I --

24       Q.   You can answer.

Page 24

1              MR. BURNETT:  Go ahead.

2      A.   I mean, I don't -- I have a bit of a

3  concern about framing the epidemic as one of

4  "abuse."  It's really an epidemic of addiction, and

5  a lot of my work and work of others has

6  demonstrated that, so I'm happy to return to that

7  point, but I would not characterize the epidemic as

8  -- as an epidemic of abuse.

9              With that being said, it is correct

10  that -- that I've spent a lot of time working on

11  identifying evidence-based approaches to abate

12  harms that continue to accrue from opioids.

13              I don't think of myself really as

14  outspoken or -- or -- I don't recall if you used

15  the word "activist" or something like that.

16              I don't really consider myself in that

17  light, but I certainly have focused a lot of my

18  scholarship as a professor of epidemiology on

19  examining the contours of the epidemic and how we

20  can best prevent additional harms from occurring.

21      Q.   And in terms of your speaking, I didn't use

22  the term "activist."

23      A.   Okay.

24      Q.   If I did, I didn't mean to.  But fair to

Page 25

1   say, you know, you have spoken at rallies, on radio

2   programs, on media programs.  Is that fair?

3       A.   Yes, I certainly -- I mean, I -- I think

4   that it's important that -- to disseminate the

5   scholarship that -- that originates from Johns

6   Hopkins or other academic institutions, and so

7   generally when asked, I have sought opportunities

8   to try to communicate my concerns or my beliefs

9   about where we need to go.

10              And that has included infrequently

11  speaking at conferences or rallies, but I certainly

12  have communicated with the media extensively around

13  the opioid epidemic because I believe that the

14  media plays such an important role in helping to

15  correct misunderstandings and, frankly,

16  misconceptions that have been propagated about the

17  epidemic.

18              So I certainly do look for

19  opportunities to extend my scholarship through

20  those forums.

21      Q.   And in addition to speaking with the media

22  frequently on the topic, you have also published

23  quite a bit on the opioids epidemic.  Is that

24  correct?

Page 26

1     A.   Yes, it is.

2     Q.   How much of a focus of your research in the

3  last, say, five years has been devoted to the

4  opioid epidemic?

5     A.   Huh.  I would guess -- I mean, it's an

6  interesting question.  I would guess 75 percent,

7  plus or minus.

8     Q.   And is that the same percentage every year

9  for the last five years?

10     A.   No.  I mean, it -- I'm sure it waxes and

11  wanes.  And I'm not suggesting that 75 percent of

12  my papers are epidemic-related or, you know, that

13  there's some definitive quantitative measure of

14  output that's opioid-related to gauge this.

15          It's just a Gestalt that I believe

16  about three-quarters of my scholarship has focused

17  one way or another over the past five years on

18  opioid-related matters.

19     Q.   Now, you told me earlier you spent

20  approximately 75 hours on your expert work in this

21  case.  Can you break out for me how many hours you

22  spent preparing your report?

23          MR. BURNETT:  Counsel, I'm going to --

24  I'm going to object.  You know, as you know, you're

1   -- parties are not entitled to drafts of reports,

2   and by extension, I believe you don't need to know

3   anything more than that about his process of

4   preparing his report, including, you know, how much

5   time is spent.

6                MS. GEIST:  So I understand the rule

7   about drafts, Counsel, and of course, we're going

8   to abide by that rule.  But I do not think I'm

9   prohibited from asking Doctor Alexander how many of

10  his 75 hours he spent actually preparing his

11  report.

12               MR. BURNETT:  I'm -- I'm going to --

13  I'm going to instruct him not to answer that.  And

14  we can circle back to that.

15  BY MS. GEIST:

16      Q.   And I assume, Doctor Alexander, you're

17  going to heed Mr. Burnett's instruction?

18      A.   Well, I mean, I -- I'm just trying to help.

19  So you know, I would prefer for you to reach

20  consensus about any matters where there's

21  disagreement, and then I am happy to go with the

22  flow.

23      Q.   How much time have you spent preparing for

24  your deposition in this case?

1      A.    Probably ten hours.

2      Q.    And can you just explain to me generally,

3    what did you do to prepare for your deposition

4    today?

5      A.    I reviewed my report and the information

6    that I've provided to the courts, and I briefly

7    reviewed other materials that are relevant to my

8    testimony, and I spoke with counsel -- with

9    plaintiffs' counsel and colleagues at Monument

10   Analytics.

11     Q.    And Monument Analytics, is that your

12   consulting business, Doctor?

13     A.    Yes, ma'am.  I mean, it's not -- yes,

14   ma'am.

15     Q.    And in terms of materials relevant to your

16   report, sitting here today, can you tell me

17   specifically what materials you reviewed in advance

18   of your deposition?

19     A.    Yes, I can.

20     Q.    Will you, please?

21     A.    I reviewed -- briefly reviewed

22   Mr. Barrett's report and Doctor Young's report and

23   the reports from -- two reports from defendants, in

24   particular.  Is it a Mr. Rufus perhaps?  And

1    Ms. Colson?

2              And I watched the documentary

3    Heroin(e), which is a Netflix documentary about

4    Cabell County and the City of Huntington.  And

5    those are the -- those are the materials that I

6    reviewed in preparing for this deposition.

7        Q.   Okay.  So just to make sure I -- and did

8    you also meet with counsel, by the way, either by

9    phone or in person?

10       A.   I did.  I'm sorry, I thought that I

11   included that in -- in my last reply.  But yet, I

12   met and had conversations with counsel and with

13   colleagues from Monument Analytics.

14       Q.   And with respect to counsel, who did you

15   meet with, and when did you have the meeting?

16       A.   David Burnett and Andrew Arnold.  And we

17   met yesterday.

18       Q.   And in terms of speaking with your

19   colleagues at Analytics, who did you speak with?

20   I'm sorry, Monument Analytics.  Who did you speak

21   with at Monument Analytics in advance of your

22   deposition?

23       A.   Omar Mansour and Katherine Ozenberger.

24   Mansour is M, like Mary, A-N, S like Sam, O-U-R;

1    and Katherine Ozenberger.  I believe her last name

2    is spelled O like Oscar, Z like zebra, E-N like

3    Nancy, B like boy, E like Edward, R like Robert, G,

4    E like Edward, R like Robert.

5        Q.   When you spoke with Mr. Mansour and

6    Ms. Kozenberger --

7        A.   Ozenberger.

8        Q.   -- I'm sorry, Ozenberger.  When you spoke

9    with Mr. Mansour and Ms. Ozenberger, did you do

10   that in the presence of plaintiffs' counsel?

11       A.   Yes and no.  In other words, I had

12   conversations with them when plaintiffs' counsel

13   weren't present, and I had conversations with them

14   when plaintiffs' counsel was present.

15       Q.   And this was in preparation for your

16   deposition; is that right?

17       A.   Yes, ma'am.

18       Q.   Okay.  What was the substance of your

19   conversations with them, Ms. Ozenberger and

20   Mr. Mansour, in preparation your deposition where

21   counsel was not present?

22       A.   We discussed the reports from Mr. Rufus and

23   Ms. Colson, is it, and we discussed those reports,

24   as well as reviewed my -- my report.

1    Q.   And how long did -- was that --

2         MS. GEIST:  Strike that.

3    Q.   Was that one meeting, or multiple meetings?

4    A.   I believe it was two meetings.

5    Q.   And do you know how long those meetings

6    lasted?

7    A.   I believe both were approximately two

8    hours.

9    Q.   Two hours each?

10   A.   Yes, ma'am.

11   Q.   And did you take any notes during those

12   meetings?

13   A.   I did, yes.

14   Q.   And did you bring those notes with you

15   today?

16   A.   I mean, they're on my hard drive, but I

17   didn't -- I don't have printouts of them.

18   Q.   And what was the purpose of speaking with

19   Mr. Mansour and Ms. Ozenberger regarding the

20   reports from Mr. Rufus and Ms. Colson?

21        MR. BURNETT:  Counsel, let me just

22   interject here.  You know, it -- Doctor Alexander

23   's preparation for this deposition, the whole thing

24   is sort of -- you know, even if he wasn't

1    explicitly talking with counsel on a particular

2    conversation, the whole process is suffused with

3    our, you know, privilege and work product concerns,

4    so I'm a little concerned about you asking so much

5    detail about his preparation for this deposition,

6    given that a lot of it did involve counsel.

7              MS. GEIST:  So Mr. Burnett, I think

8    that Doctor Alexander was very clear.  He indicated

9    that some of his preparation involved discussions

10   with counsel; some of his preparation involved

11   discussions with two individuals from Monument

12   Analytics that were with counsel present; and there

13   were also discussions with the individuals at

14   Monument Analytics where counsel was not present.

15             So I'm entitled to explore the

16   substance and discussions that occurred during

17   those meetings.

18             MR. BURNETT:  I understand that.  I'm

19   just saying that there may be an argument that even

20   for those conversations, there's still some

21   implication of -- of work product or privileged

22   information.

23             MS. GEIST:  Well --

24             MR. BURNETT:  So I'm just preserving

Page 33

1   an objection on that -- on that basis.

2              MS. GEIST:  You're not instructing him

3   not to answer?  Is that correct?

4              MR. BURNETT:  I would have to hear the

5   question again.

6              MS. GEIST:  Okay.

7       Q.   So the question is:  You met with

8   Mr. Mansour and Ms. Ozenberger to discuss the

9   reports that have been submitted on behalf of the

10  defendants, Mr. Rufus and Ms. Colson without

11  counsel present.

12              Is that correct, Doctor Alexander?

13      A.   Yes, it is.

14      Q.   And why did you do that?

15      A.   For the same reason that I met with counsel

16  yesterday, which is -- I'm sorry.

17              -- which is to ensure that --

18              MR. BURNETT:  Again -- sorry, let me

19  just interject.  With regard to the conversation

20  that you had with me and counsel yesterday, don't

21  -- you should not disclose the content of that

22  discussion.

23              THE DEPONENT:  Okay.

24  BY MS. GEIST:

1      Q.   Doctor Alexander, just so you're clear, I

2   do not want to know what you discussed with

3   plaintiffs' counsel, whether that's Mr. Burnett or

4   anybody else from Motley Rice or the other law

5   firms representing the plaintiffs.  I'm not

6   entitled to know about that and I'm not asking you

7   about that.

8           I am asking you about discussions that

9   you had with your colleagues at Monument Analytics

10  why you had those discussions without counsel to

11  prepare for your deposition, and what did you talk

12  about?

13     A.   Yeah, they -- I'm sorry, I'm being

14  interrupted.  Just one minute.

15          They were the same conversations,

16  essentially.  In other words, they were all focused

17  on the same stuff, so I will look to you, again,

18  through a process of consensus, to instruct me how

19  I should proceed.

20          But there was no strong material

21  difference between the types of conversations or

22  the types of content in the conversations that I

23  had with my colleagues from Monument Analytics and

24  the content and conversations of the conversations

Page 35

1    that I had yesterday.

2              They were part and parcel --

3              MR. BURNETT:  So --

4       A.    -- you know, the same content.

5              MR. BURNETT:  So Doctor Alexander --

6              MS. GEIST:  Just hold on, Mr. Burnett.

7    I'm not going to go down this road.  If the witness

8    is telling me essentially that these are the same

9    conversations, I'm going to reserve my right for

10   the record to request his notes from these meetings

11   that he indicated were on his hard drive, meetings

12   with individuals at Monument Analytics to prepare

13   for the deposition.

14             And again, I'm limiting our right to

15   ask for those notes that reflect meetings where

16   counsel was not present.

17             MR. BURNETT:  Right, and I -- given

18   that Doctor Alexander has said he can't

19   differentiate the subject matter of those meetings

20   between counsel and not counsel, I will instruct

21   him not to answer further and I think we should all

22   move on.

23             MS. GEIST:  Yeah, well, that's why I

24   said to you, "I'm not going down this road."

Page 36

1              I know the rules.

2     BY MS. GEIST:

3         Q.   So Doctor Alexander, you also indicated to

4     me that you watched the Netflix documentary

5     Heroin(e); is that correct?

6         A.   Yes, but may I make one comment prior,

7     please?  Which is the notes that I have is a single

8     document.  I don't have two sets of notes.  I have

9     a one to two-page document that reflects, again,

10    the conversations that I've had with counsel and

11    the like.

12             So I just want to be clear for the

13    record that I don't have two parallel sets --

14             MR. BURNETT:  Okay.

15        A.   -- sets of notes.

16             MR. BURNETT:  So Doctor Alexander, we

17    can get into the notes later.

18             THE DEPONENT:  Okay, that's fine.

19             MR. BURNETT:  We're moving on.

20             THE DEPONENT:  Fair enough.

21        Q.   I'm going to ask one follow-up question.  I

22    just need to be clear.  Doctor Alexander, do you

23    have notes that reflect your meetings with

24    individuals at Monument Analytics where counsel was

Page 37

1  not present?

2       A.   Again, I have one -- I'm not quite sure how

3  to answer because I have one -- you know, I have

4  one document that reflects the -- the aggregate of

5  my meetings and conversations with counsel and with

6  colleagues, and so in my mind, it's -- it's one

7  document.

8       Q.   Understood.  And again, we can revisit this

9  after the deposition, we reserve our right to

10  request those notes, and I understand counsel's

11  objection.

12            But we can deal with it after the

13  deposition.

14            That -- my question to you, I think,

15  that was not answered yet was:  Why did you watch

16  the Netflix documentary Heroin(e)?

17       A.   Well, I rewatched it, and I did so because

18  it is -- because I recalled from the first time

19  that I watched it that it's a -- you know, it's a

20  -- it's one compelling window through which to

21  understand the way that the opioid epidemic has --

22  has ripped this rural Appalachian community apart,

23  and so I felt that it would be helpful to have that

24  top of mind as I -- as I have conversation and --

Page 38

1    with you.

2        Q.   Doctor Alexander, I think you indicated

3    earlier you spent 75 hours total for your time on

4    this particular case.  Is your -- is your billing

5    rate $900 an hour?

6        A.   Yes, it is.

7        Q.   So you expect to be paid - if you haven't

8    been compensated yet - 900 times 75?  Is that

9    right?

10       A.   Well, I'm not -- I'm not paid -- I mean,

11   that payment goes to Monument Analytics.  That

12   payment doesn't come directly to me.

13       Q.   Understood.  In terms of additional work,

14   sitting here today, do you plan on doing any

15   additional work in this case in preparation for

16   trial?

17       A.   I mean, I will do whatever I'm asked to do

18   by plaintiffs that is consistent with what I can do

19   and what I can offer.  So I'm sorry that I don't

20   have a direct answer for you, but the bottom line

21   is:  I'm here to serve the courts and to serve the

22   community and if I'm asked to do more work, if it

23   fits in with my family and my professional needs

24   and my work/life balance, I'm happy to take that

1  on.

2      Q.   I guess -- let me ask my question

3  differently.  As of this day, this point in time,

4  do you have any additional work on your plate now,

5  any action items that you need to address before

6  trial?

7                MR. BURNETT:  And Doctor Alexander,

8  when you answer, you know, answer only to the

9  extent that would not disclose, you know,

10 communications with counsel or trial strategy or

11 anything like that.

12     A.   I do not.  The answer to your question,

13 Ms. Geist, is that I do not.

14     Q.   Thank you.  And you can put Exhibit 1 to

15 the side for now, Doctor Alexander.  Thank you.

16     A.   Will -- may I ask, just a point of order,

17 will these be shredded or should I organize them

18 sort of neatly in some fashion?

19     Q.   You can -- you can toss it on the floor.

20 Or you could put them in a neat pile for -- for

21 Mr. Burnett.  I think we have an official copy

22 given the Zoom deposition, which makes things

23 actually kind of easy.

24                MR. BURNETT:  Although, I would say

Page 40

1   it's possible that we'll go back to exhibits, so

2   you probably want to leave them in a stacked pile

3   so that you can refer back during the deposition as

4   needed.

5              THE DEPONENT:  Okay, thank you.

6        Q.   Did you review your prior deposition

7   transcript to prepare for today?  And when I say

8   "prior deposition transcript," I'm talking about

9   the only other time you provided expert testimony

10  on behalf of plaintiffs in the opioids litigation

11  in the MDL Ohio case?

12       A.   No, I did not.

13       Q.   Doctor Alexander, you can go ahead and open

14  up what we have marked as Tab 2 or Exhibit 2, and

15  this will be Exhibit 2 to your deposition.

16              VIDEO TECH:  Exhibit 2 has been

17  introduced on Exhibit Share.

18         ALEXANDER DEPOSITION EXHIBIT NO. 2

19              (Deposition transcript of G. Caleb

20              Alexander, USDC, Northern District of

21              Ohio, MDL No. 2803 dated 4-26-19 was

22              marked for identification purposes as

23              Alexander Deposition Exhibit No. 2.)

24       A.   Okay, I have it in front of me.

Page 41

1      Q.   Great.  And just for the record, Doctor

2    Alexander, this is the transcript from the

3    deposition that you provided in the In

4    Re:  National Prescription Opiate Litigation

5    pending in the Northern District of Ohio, and that

6    deposition was provided on April 26, 2019.

7                    Is this familiar to you, Doctor

8    Alexander, this document, this transcript?

9      A.   I've -- yes, I've seen it before.  Again, I

10   did not look at it recently, so it's been, you

11   know, six months, nine months, twelve months since

12   I've looked at it.

13                   But yes, I do -- I have seen this

14   before.

15     Q.   Okay.  And during this deposition, were you

16   under oath and you swore to tell the truth?

17     A.   Of course, yes.

18     Q.   And I assume you did that?

19     A.   Of course, yes.

20     Q.   Now, did you have an opportunity to review

21   - what we call a read and sign - of your deposition

22   transcript after the deposition was concluded?

23     A.   Yes, I did.

24     Q.   Okay.  So you looked through it, you made

Page 42

1    sure it was free from error and then you signed off

2    on it.  Is that a fair summary?

3        A.   Yes.

4        Q.   Okay.  This is not relevant really to you,

5    Doctor Alexander, but the parties in the case

6    received instruction from the Court who is

7    presiding over the West Virginia matter brought by

8    Cabell County/City of Huntington that we are not to

9    engage in what would be considered duplicative

10   testimony.

11               So in other words, we have received

12   instruction from the Court that we are not to,

13   essentially, ask you the same questions that have

14   been asked in the past.

15               So my question to you is:  May I rely

16   on your -- your responses and answers in this

17   deposition transcript that we've marked as Exhibit

18   2 as truthful and accurate to the best of your

19   ability in the case?

20       A.   Well, only -- only at that time.  I mean,

21   this -- the deposition, it takes place at a moment

22   in time, and I -- in my report, I make it clear

23   that I reserve my right to update my opinions based

24   on new information that I may have.

Page 43

1            So it could well be the case that

2    there are questions that I was asked then that I

3    answered one way that if asked again, I would

4    answer another.

5            But in all cases, I'll answer to the

6    best of my ability and I'll answer truthfully and

7    I'll answer as a practicing internist and

8    epidemiologist and public health expert.

9        Q.    Now, this deposition that you provided in

10   the Ohio case was about a year and a half ago,

11   April 26, 2019.  Is that right?

12       A.    Yes, ma'am.

13       Q.    And if you look with me, Doctor Alexander,

14   at some of what I will call general questions -- I

15   just want to give you a sense of what I'm referring

16   to.  Starting on page 24 and going through really

17   page 36, these appear to me to be general questions

18   relating to your views as a physician regarding the

19   treatment of chronic pain with opioids and the

20   obligations of a physician with respect to

21   prescription medications.

22            Do you want to just flip through pages

23   24 to 36 for me briefly and just let me know if I

24   can rely on the testimony that you provided about a

Page 44

1    year and a half ago in the MDL case?

2        A.   Well, I'm -- I'm happy to look at the

3    pages, but unless I spend a -- so I'm happy to do

4    so, but unless I spend a significant amount of time

5    -- I mean, I -- I will want to look carefully at

6    each question if indeed we're trying to confirm

7    that my views on any given question haven't

8    changed.

9             But let me -- just give me a minute,

10   please, and let me see whether I can give you some

11   sort of global sense that my feelings are the same

12   and my answers would be the same.

13            So --

14       Q.   Let me -- Doctor Alexander, let me

15   interrupt you for one minute.  I don't want to

16   waste time, because we have a lot to get through

17   today.

18       A.   Okay.

19       Q.   So let me ask it this way --

20       A.   Okay.

21       Q.   -- on April 26, 2019 when you provided this

22   deposition, you did so truthfully and you were

23   under oath, and at that moment in time, you were

24   providing answers accurately, truthfully to the

Page 45

1   best of your ability on that date.  Correct?

2       A.   Absolutely.

3       Q.   Okay.  So I am going to set this aside,

4   because I am cognizant of the judge's ruling, so I

5   don't want to go through the same questions with

6   you again today, because I think that's contrary to

7   the -- to the order.

8       A.   Okay.

9            MR. BURNETT:  Counsel, let me just

10  interject also that you asked him to look at

11  questions starting at page 24.  24, line 10 to 12,

12  makes exclusive reference to some accounting in

13  Cuyahoga County, so that's consistent with what he

14  said, which is that, you know, it would depend on

15  that point in time and it would depend on the

16  content.

17           So you can't ask him whether questions

18  that were about Ohio would apply equally to West

19  Virginia.

20           MS. GEIST:  Well, all right.

21      Q.   So with that instruction, Counsel -- Doctor

22  Alexander, let's take a look at this transcript.

23      A.   Okay.

24      Q.   Beginning on twenty -- page 24, there's

Page 46

1    some general questions relating to your agreement

2    that chronic pain is a serious medical condition.

3    That's the first question.  And then there are some

4    questions that are general and then there are some

5    questions that are specific to Summit County/

6    Cuyahoga County, Ohio.  So --

7        A.   I'm sorry to interrupt.  One question.  So

8    I see four small pages on the piece of paper, but

9    then the piece of paper has a separate page.

10               So when you say "page 24," are you

11   referring to at the bottom of the document, page

12   24, or are you referring to one of those four

13   quadrants where there's four pages on a given piece

14   of paper?

15       Q.   One of the four quadrants.

16       A.   Okay.  So page 24 begins - just to be

17   clear; perhaps it could be displayed - with "Yes, I

18   am."  Is that correct?  "So let's see if there are

19   some things we can actually agree on."

20       Q.   That is correct.  This is what we call a

21   mini script --

22       A.   Okay.

23       Q.   -- it's more green and environmentally

24   better --

Page 47

1      A.   Gotcha.

2      Q.   -- to not have so many pages.  So page 24,

3   Doctor Alexander, on April 26, 2019, you were

4   asked, "Do you agree that chronic pain affects

5   people in Summit County, Ohio and Cuyahoga County,

6   Ohio" at Line 10 through 12, and you answered, "I

7   do."

8           Do you see that?

9      A.   Yes, I do.

10     Q.   Okay.  Do you agree that chronic pain

11  affects people in Cabell County and in the City of

12  Huntington?

13     A.   Yes, I do.

14     Q.   For now, you can put the transcript aside,

15  Doctor Alexander.  We might have to go back to it.

16     A.   Of course, of course.

17     Q.   So if you could just put it aside.  Thank

18  you.

19     A.   Yeah.

20     Q.   Why don't we now, Doctor Alexander, take a

21  look at your expert report and some of the

22  accompanying attachments that you provided with

23  your report?

24           So you can open up Envelope 4.

```
                                          Page 48
 1      A.    Okay.

 2      Q.    And then I might go ahead -- while you're

 3  getting that envelope out of the box, Doctor

 4  Alexander, and take out 5, Tab 5 or Exhibit 5, and

 5  then Tab 7 or Exhibit 7.

 6              MR. BURNETT:  They're all tabs, not

 7  exhibits.

 8              MS. GEIST:  Yeah, well, sorry.

 9  They're going to be marked as exhibits according to

10  the tab numbers.

11              MR. BURNETT:  Oh, okay.

12              VIDEO TECH:  Exhibits -- Tabs 4, 5 and

13  7 have been marked as Exhibits 4, 5 and 7?

14              MS. GEIST:  Thank you, John.

15    ALEXANDER DEPOSITION EXHIBIT NOS. 4, 5 and 7

16                  ("Abatement Plan for Addressing the

17                  Opioid Crisis in Cabell County and the

18                  City of Huntington," Expert Report of

19                  G. Caleb Alexander, MD, MS dated

20                  8-3-20; Expert Witness Report of G.

21                  Caleb Alexander, MD, MS, Appendix A -

22                  Johns Hopkins Report:  "From Evidence

23                  to Impact" and Expert Witness Report

24                  of G. Caleb Alexander, MD, MS,
```

www.veritext.com                                      888-391-3376

Page 49

```
 1              Appendix C - List of sources that were
 2              consulted was marked for
 3              identification purposes as Alexander
 4              Deposition Exhibit Nos. 4,-- 5 and 7.)
 5      A.   Okay, I have those available.
 6      Q.   Okay.  Great.  Let's go ahead, Doctor
 7   Alexander, and take a look at Exhibit 4, which is
 8   entitled "Abatement Plan for Addressing the Opioid
 9   Crisis in Cabell County and the City of Huntington"
10   dated August 3rd, 2020, for the record.
11              And can you just identify this, Doctor
12   Alexander, as your expert report in the case?
13      A.   Yes, it is my expert report.
14      Q.   Okay.  And do you need to make any changes,
15   revisions or updates to this expert report?
16      A.   No, but thank you for the question -- or
17   opportunity.  But I do not.
18      Q.   And does this expert report provide a
19   complete list of all of the opinions you intend to
20   offer on behalf of plaintiffs in this case?
21      A.   Yes, it does.  I mean, barring something
22   that there was agreement -- again, I will follow
23   the instructions of the judge and of the Court.  So
24   if I were asked to do something by the judge, I'm
```

Page 50

1    happy to try to be of service any way that I can.

2              But -- but this report is otherwise

3    complete.

4              MR. BURNETT:  And I will note that the

5    report contains a number of appendices and

6    materials considered, which were served on counsel

7    that are not included within this 125 page

8    document.

9              MS. GEIST:  Yep.  No, I'm going to get

10   to that.  Thank you.

11       Q.   But in other words, Doctor Alexander, if

12   counsel for the defendants in this case would like

13   to know, what is Doctor Alexander going to testify

14   about, what opinions are you going to offer in the

15   case, we will be able to find them here in this

16   report and in the attachments to the report.  Is

17   that fair?

18       A.   Yes, it is.  Again, reserving any requests

19   that the judge may make of me or that parties may

20   agree to otherwise, this report and the materials

21   that Mr. Burnett mentioned that accompany it

22   represent the totality of my opinions in the case.

23       Q.   Now, I noticed, Doctor Alexander, if you

24   look at page 3 of your report, the first paragraph,

Page 51

1   sort of in the middle of that paragraph, you write,

2   "I have been asked to discuss ways to abate or

3   reduce the harms caused by the oversupply of

4   opioids into the Community," and "the Community"

5   refers to Cabell County/City of Huntington; is that

6   correct?

7       A.   Yes, ma'am.

8       Q.   Do you intend to offer any opinions in this

9   case regarding causation?  In other words, who or

10  what caused or contributed to the opioid epidemic

11  in Cabell County/Huntington.

12      A.   I was not asked to focus on lines of

13  causation, no.

14           I was asked to focus on evidence-based

15  solutions to abate the opioid epidemic.

16      Q.   So you don't have any opinions in the case,

17  and at trial you don't intend to say to the judge,

18  "Well, in my opinion, I think that there were

19  certain parties who caused or contributed" and list

20  them out.  You will not do that, correct?

21           MR. BURNETT:  Objection.

22      A.   Well, I mean, indirectly, I suppose.  I

23  mean, if you consider a community that had, I

24  believe - what - 40 million prescriptions for

Page 52

1    opioids in a given year that were enough to supply

2    every adult with 400 tablets, I mean, implicitly,

3    when I design an abatement program, there is

4    implicitly some notion about what caused the

5    epidemic.

6              Otherwise, I wouldn't have, as part of

7    my abatement plan, interventions targeting the

8    oversupply of opioids, for example.

9              So I suppose that -- that, again,

10   implicitly there's some discussion about cause, and

11   I would also say that if the judge asks me a

12   question, I'm not going to decline to answer it.

13             But with that being said, my report is

14   not about how we got here; it's about where we go

15   going forward.

16       Q.   And that is how I read your report as well.

17   So I'm going to ask you a follow-up question or

18   two.  You do not have a sentence in your report

19   that identifies who or what contributed or caused

20   what you refer to as an oversupply of opioids into

21   the Cabell County/Huntington community.

22             MR. BURNETT:  Counsel, I'm going to

23   object on two grounds.  First of all, his report

24   does refer to oversupply, not just in Paragraph 1.

Page 53

1         And number 2, it's not fair to ask him

2    in a 125 page line document if he refers to a

3    specific point in a specific sentence.

4         You know, we can review the whole tran

5    -- the whole report if we need to to confirm that,

6    but I object.

7    BY MS. GEIST:

8    Q.   Can you answer my question, Doctor

9    Alexander?

10   A.   Well actually, my reply was going to be not

11   dissimilar from Mr. Burnett's second point, which

12   is that this is a long report and it discusses

13   many, many different matters, and so if you ask

14   your question again, I'll try.

15        But if the question is about whether

16   my report has other -- whether elsewhere in my

17   report I discuss the genesis of the opioid

18   epidemic, the answer is, I believe that I do in

19   many places, and I'd be happy to review those

20   statements with you and we could discuss them and

21   the evidentiary basis for them if that's helpful to

22   do so.

23   Q.   Let me ask it -- ask it this way:  In your

24   deposition in the MDL in Ohio, you were asked

Page 54

1    whether you were going to provide opinions, expert

2    opinions, to a reasonable degree of medical

3    professional certainty as to causation, meaning who

4    caused or contributed to the oversupply of opioids

5    from your perspective.

6              And your answer there was you were not

7    going to do that.  Do you recall that?

8        A.   Well, I don't recall my specific answer,

9    but I wouldn't be surprised if I said "No,"

10   although I may well also have said - and I'm sure

11   that I said somewhere in my deposition - that I

12   will speak to whatever matters I am requested to

13   speak to where there's agreement that I should do

14   so or where the judge requests it.

15             So I certainly kind of caveat out that

16   I'm here to serve and that I'm here to provide my

17   best expertise as a practicing internist and as an

18   epidemiologist.

19             And again, you know, my report isn't

20   focused on looking backwards; it's focused on

21   looking forwards.  But I think you have to have

22   some sense of where we've been if you are designing

23   a plan for where we want to go.

24       Q.   And I understand that, Doctor.  But some

Page 55

1   sense of where we've been is not the same as

2   offering an opinion as an expert to a reasonable

3   degree of medical or professional certainty as to

4   the causes or contributing factors to the opioids

5   epidemic in Cabell County/Huntington.

6             Do you understand that?

7     A.    I mean, I do.  But I think there's a bit of

8   nuance as well.  My report is not focused -- I'm

9   sorry if I was speaking too quickly.

10            I do understand that.  I do think

11  there's a bit of nuance here.  But my report does

12  not focus on causation, and it's not where I spend

13  my time.

14            But again, there are many places in my

15  report where I discuss evidence or discuss

16  solutions that inherently are informed by an

17  understanding of the nature of the problem.

18            So for example, stigma.  You know, I

19  don't discuss - and sort of try to quantify - the

20  role that stigma has played.  But if you're going

21  to design a successful abatement program, you have

22  to consider the role that stigma has played.

23            And so I think of something like

24  opioid oversupply in that instance, or in that

Page 56

1   sense.  Cabell County and the City of Huntington

2   have been off the charts with respect to the volume

3   of opioids that were -- flooded the community.

4           And they still, frankly, are high

5   above the national average.  And I think any

6   sensible abatement plan has to be informed by

7   knowledge about opioid oversupply and the way that

8   that has driven and fed the epidemic.

9       Q.   So let me -- let me ask it again, Doctor

10  Alexander, because this might change how much time

11  we spend here together.

12      A.   Okay.

13      Q.   In the MDL, in Ohio, your testimony was,

14  well, all of this underlies your research -- your

15  expert report is focused on -- is focused on

16  forward-looking interventions and programs.  Do you

17  recall that?

18      A.   Yes, I do.

19      Q.   And you are not going to be offering expert

20  opinions to a reasonable degree of medical

21  professional certainty as to cause or causes with

22  respect to the opioid epidemic.  Do you recall that

23  testimony?

24      A.   Again, I don't recall my precise responses

Page 57

1    in deposition, but it sounds consistent with what I

2    understood at the time my role to be.

3         Q.   Okay.

4              MR. BURNETT:  And Counsel, let me just

5    interject here.  You're talking about a deposition

6    that occurred, you know, 15 months ago.  We have

7    not reviewed the transcript; you're not referring

8    to any specific page of the transcript; and he said

9    that he has not reviewed it in six to twelve

10   months.

11             So I don't think it's fair to ask him

12   his answers to specific questions in the 2019

13   deposition.

14             MS. GEIST:  So can we keep our

15   objections to form, Counsel?  Because you know

16   that's the rule and not the speaking objections

17   that you're doing now.

18        Q.   So Doctor Alexander, in -- you just spoke

19   about your role in that case.  Do you see your role

20   in this case as an expert witness for the

21   plaintiffs in Cabell County/City of Huntington to

22   be any different than your role in the Ohio case?

23             MR. BURNETT:  Objection.

24        A.   I believe my general role is very -- is --

1   is similar.  I believe my general role is similar,

2   which is to advise the courts and the communities

3   regarding evidence-based approaches that can be

4   used to prevent further harm from occurring.

5        Q.   And if we look at the first paragraph here

6   in your report, you outline what you have been

7   asked to do in this case.  Is that right?

8        A.   Yes, ma'am.

9        Q.   Okay.  And just to recap, would you agree

10   with me that what you've been asked to do as an

11   expert witness on behalf of the plaintiffs in this

12   case is to, one, "discuss ways to abate" - using

13   your word - "or reduce the harms caused by the

14   oversupply of opioids into the Community;" two,

15   "estimate the size of specific populations that may

16   require interventions" "over a 15-year time

17   period;" and then three, "provide recommended cost

18   estimates for certain interventions."

19             Does that appropriately outline what

20   you have been asked to do here on behalf of

21   plaintiffs?

22        A.   It does.  And in doing so, I have reviewed

23   an enormous volume of evidence, and -- and

24   undertaking these goals requires consideration of

Page 59

1    many other -- many other factors and facets.  So we

2    can sort of peel back layers of the onion together.

3    But at the highest level, yes, I think that this

4    paragraph summarizes well what I was asked to do by

5    plaintiffs.

6        Q.   Okay.  And you have not been asked by

7    plaintiffs to provide expert testimony to a

8    reasonable degree of medical certainty or

9    probability as to the causes of what you say was an

10   oversupply of opioids into Cabell County/

11   Huntington.

12             That was not part of what you were

13   asked to do; is that correct?

14             MR. BURNETT:  Objection, asked and

15   answered.

16       A.   Yeah, I think we've discussed that before,

17   you know, the focus of my work is looking forwards;

18   but again, I think that in order to design an

19   evidence-based abatement program, one has to

20   understand the nature of the problem.

21             And so that requires some evaluation

22   of the historical context and the foundation that

23   -- that -- that the current situation rests upon.

24       Q.   So again, I feel like we're going around

1   and around and around, Doctor Alexander, so I'm

2   going to try it one more time.  At the trial in

3   this case, do you intend to go beyond opinions that

4   you have stated here:  Opinions relating to ways to

5   abate or reduce the harms, how to estimate the size

6   of the populations that may require interventions

7   and what would be the cost estimates for some of

8   those interventions?

9              Are you telling me you're going to go

10   beyond some of those opinions at the trial?

11              MR. BURNETT:  Objection.

12      A.   I wouldn't go beyond them unless the judge

13   asked, but in addressing or staying within bounds

14   of these opinions, invariably there are -- there

15   are elements of this that require understanding the

16   nature of the problem.

17              So briefly, if you consider an

18   intervention such as physician or prescriber

19   education or education of the general public or

20   interventions to, you know, distribute naloxone,

21   any of these is predicated upon some understanding

22   of the nature of the problem.

23              And as an epidemiologist, that's what

24   I'm trained to do.  So I think it's fair to say

Page 61

1  that at the highest level, that I was asked to

2  focus on these areas and that's where I plan to

3  offer opinions.

4                But if a judge asked me or if counsel

5  agrees and I'm asked a question such as, "Well, why

6  do you think naloxone is important" or "Why do you

7  think that -- you know, why do you plan -- why does

8  your plan include services for children in foster

9  care whose parents have died of overdoses," then I

10  will -- I will discuss that.

11                And that may require, you know, moving

12  to root causes.  Consider something like take-back

13  programs.  You know, if I was asked, "Well, Doctor

14  Alexander, what's the role of a take-back program,"

15  it would require my discussing the fact that there

16  are, you know, tons of opioids sitting on

17  individuals' bedroom nightstands and in their

18  bathroom cabinets and that these should be disposed

19  of.

20                So -- so I -- I hope that that's

21  helpful.  I'm trying to be helpful and to address

22  your question and your needs, but also want to just

23  emphasize my report includes, you know, 650

24  references or something and there's a lot of

Page 62

1   science there that -- and some of it touches upon

2   causation and serves as the foundation for what I

3   propose for abatement.

4       Q.   Sure.  And I understand that some of your

5   references touch on causation, and I understand

6   your statement that your opinions are -- are

7   predicated - to use your words - on a -- on the

8   underlying nature and understanding of the problem.

9              But my issue here, Doctor Alexander,

10  is:  This is the only chance we get to depose you.

11  We get to explore the opinions you intend to offer

12  at trial, and this report is supposed to provide us

13  with notice:  What are you going to say at trial?

14             And so I don't see any section in your

15  report -- and I would note it's a very long report.

16  But I don't see any section in your report where

17  you say, "As an epidemiologist" or "As a health

18  care provider, I have done extensive review into

19  the cause or causes or contributions to the opioid

20  epidemic and I have considered all of the following

21  and I have reached the conclusion that this or

22  these -- for these particular people or individuals

23  or groups are causes of the epidemic."

24             That is not anywhere in your report,

Page 63

```
 1   correct?
 2                MR. BURNETT:  Counsel, I'm going to
 3   object again.  That's a -- that's an unfair
 4   question.  Again, you're asking him the question
 5   about the entirety of his report.  If you want to
 6   go off the record, we can talk about this further,
 7   but you're asking him whether the entirety of his
 8   opinions are contained in the first paragraph of
 9   what is 125-page-long report.
10                MS. GEIST:  So --
11                MR. BURNETT:  I think the report
12   speaks for itself.
13   BY MS. GEIST:
14      Q.   Can you -- can you direct me, Doctor
15   Alexander, to any place in your report - and you
16   can take all the time you want - where you go
17   through the analysis and you discuss and reach
18   conclusions about the causes or the contributing
19   factors to the opioid -- to the oversupply of
20   opioids into the community, to use your words?
21                MR. BURNETT:  Objection.
22      A.   Yeah, there's -- I think I've answered
23   this.  But there are many statements in my report
24   that -- that have some -- that have to do with
```

Page 64

1   understanding the nature of the problem, and

2   inherently, that -- that's partly an effort at

3   understanding what caused the problem.  That's the

4   nature of epidemiology, and pharmacoepidemiology.

5              But you also asked another question,

6   and I would say that although I know Mr. Burnett

7   objected -- but there's no -- there's no specific

8   section of my report that is focused exclusively on

9   arguing lines of causation, if that helps to

10  address your query about whether there's a section

11  of my report that's devoted exclusively to trying

12  to apportion responsibility across different groups

13  or drivers or what have you.

14             There's no section like that in my

15  report.

16      Q.   Okay.  And you said to me you needed to

17  understand the nature of the problem and understand

18  the cause.  But would you agree with me that

19  understanding cause or the nature of the problem -

20  using your words - is different from being asked to

21  offer an expert opinion to a reasonable degree of

22  medical or scientific certainty as to the causes of

23  the oversupply of opioids into Cabell County/

24  Huntington, to use your words?

Page 65

1                    MR. BURNETT:  Objection, asked and

2        answered.

3                    Again, his opinions are contained in

4        the report.

5                    MS. GEIST:  Those are two different

6        things we're talking about.

7           Q.   Is that fair, Doctor Alexander?

8        Understanding the nature of a problem and

9        understanding the causes is different than being

10       asked to provide an expert opinion.  Do you

11       understand that?

12          A.   Well, it -- it sounds to me like the first

13       is sort of a scientific or epidemiologic exercise,

14       and the second is rendering some legal opinion or

15       judgment, and I would prefer to let counsel work

16       this out.

17                   I mean, I've tried to be helpful in

18       identifying where I go.  I was not asked, first and

19       foremost, to argue or delineate lines of causation.

20       It's -- again, my focus is looking forward.

21                   But I think in order to look forward,

22       you have to understand what's behind you, and I

23       gave some examples where I think it's very

24       important to understand the nature of the epidemic,

Page 66

1    and in particular, we could talk about the
2    oversupply of prescription opioids when designing
3    abatement solutions.
4        Q.   Understood.  And again, just following up
5    on what you just said, you were not asked to look
6    at lines of causation.  You were asked to design
7    programs and interventions looking forward.
8    Correct?
9        A.   Yes.  And in order to do so, one has to
10   understand the genesis of the epidemic.
11       Q.   Understood.  Okay.
12            MR. BURNETT:  Counsel, we've been
13   going an hour and a quarter.  Just putting it out
14   there.
15            MS. GEIST:  Yeah, we can -- we can
16   take a break.
17       Q.   Would you like to take a break, Doctor
18   Alexander?
19       A.   Sure.  Shall we reconvene at, say, five
20   minutes to the hour?  That would be about ten
21   minutes.
22            VIDEO OPERATOR:  The time is 10:46.
23   We are now going off the record.
24            (A recess was taken after which the

```
                                           Page 67
 1            proceedings continued as follows:)
 2            VIDEO OPERATOR:  The time is 10:57.
 3   We are now back on the record.
 4   BY MS. GEIST:
 5       Q.  Doctor Alexander, again do you have your
 6   report in front of you?
 7       A.  Yes, ma'am, I do.
 8       Q.  On page 8 of your 125-page report, at
 9   Paragraph 17, if you could go there with me,
10   please.
11       A.  Yes, ma'am.
12       Q.  Here you state that "I conclude an opioid
13   epidemic currently exists within the Community."
14   And again, for the record, every time we refer to
15   "the community" in this deposition or in your
16   report, that refers to Cabell County/City of
17   Huntington, correct?
18       A.  Yes, ma'am.
19       Q.  Okay.  So you have concluded that an opioid
20   epidemic currently exists within Cabell County/
21   Huntington?
22       A.  Yes.
23       Q.  You are aware, though, that a recent study
24   has shown a nearly 40 percent decrease in the
```

Page 68

1    overall opioid prescription rates and a 60 percent

2    decrease in the quantity of opioids prescribed per

3    visit to a physician and a reduction in the

4    strength of opioids prescribed following a public

5    and provider education campaign.

6              You're aware of all that?

7              MR. BURNETT:  Objection.

8       A.   I'm aware that there have been reductions

9    in opioid prescribing, yes, but I'm not -- I can't

10   confirm the precise data points without reviewing

11   the sources of information.

12             But yes, I am aware that there have

13   been reductions in -- fortunately, that there have

14   been some reductions in the volume of opioids into

15   the community over the past few years.

16      Q.   In connection with your research and review

17   of the materials in this case, did you look at the

18   latest data from the Department of Health and Human

19   Services in West Virginia providing preliminary

20   data on 2018 drug overdoses?

21             MR. BURNETT:  Objection.

22      A.   Yeah, I would want to look at any given

23   document again.

24             Again, there were, I believe, more

1    than 650 references in my report, and that doesn't

2    include all of the additional materials that are

3    sourced elsewhere either in the redress models or

4    materials that I reviewed and considered and didn't

5    ultimately cite.

6              So I'm not able to confirm having seen

7    or incorporated a given document without reviewing

8    that with you at this time.

9        Q.   Now, you do cite in your own report,

10   though, that study that I just referred you to.

11   That's at page 16 of your report, if you want to go

12   ahead there and look.

13       A.   And which reference are you referring to?

14       Q.   At Paragraph 38, Doctor.

15       A.   Okay.  And where in the paragraph?

16       Q.   It's -- it's about four or five lines down.

17   Here you note a recent quality improvement study

18   looking at the overall decrease in opioid

19   prescription rate and the decrease in quantity of

20   opioids prescribed per visit?

21       A.   That's at a regional health system in

22   Maryland?

23       Q.   Is that reflective of the national decrease

24   in opioid prescription and the national decrease in

Page 70

1    the quantity of opioids prescribed per visit by
2    physicians?
3        A.   Well, this is a reference to a single
4    quality improvement study.  So I -- I think it
5    would -- it would require some caution in inferring
6    something about national trends in opioid
7    prescribing based on a single study of a regional
8    health system in Maryland.
9        Q.   Well, let's just -- let's focus on Cabell
10   County/Huntington's since that is the case that
11   we're talking about today.
12       A.   Okay.
13       Q.   Are you aware based on the West Virginia
14   Department of Health and Human Services data that
15   specifically in Cabell County, there has been an
16   overall decline of 22 to 26 percent in opioid-
17   related overdeaths {sic} from 2017 to 2018?
18               Are you aware of that?
19               MR. BURNETT:  Objection.
20       A.   Again -- I'm sorry, can you ask the
21   question again, please?
22       Q.   Sure.  Are you aware of the data from the
23   West Virginia Department of Health and Human
24   Resources reporting specifically - based on

1   preliminary data - that there has been a 22 to 26

2   percent overall decline in opioid-related deaths

3   from 2017 to 2018?

4              MR. BURNETT:  Objection.

5       A.   Yeah, so I believe this is a year-over-year

6   analysis of preliminary data, and I believe there

7   have been declines noted.  And that's quite

8   fortunate, because as you know -- you know, the

9   rates of overdose and other opioid-related

10   morbidity and mortality in Cabell County and the

11   City of Huntington have been off the charts.

12              And, I mean, it's not by accident that

13   it's been dubbed the overdose capital of the world.

14              So I'm aware of some modest gains, and

15   I think these are most important, and most

16   important for the community itself and to put some

17   wind in the sails, but I think we have an

18   enormously long way to go, and  I would have grave

19   concern about, you know, overinterpreting some --

20   some -- some glimmers of hope as evidence that

21   somehow there's no longer an opioid epidemic within

22   the community.

23              I think nothing could be further from

24   the truth.

Page 72

1      Q.   Oh, when you say "opioid epidemic," would

2   you agree where me that at least as reported by the

3   West Virginia Department of Health and Human

4   Services, the current opioid epidemic, if there is

5   one, relates to illicit opioids such as fentanyl,

6   heroin, carfentanil?

7              Do you agree with me on that?

8              MR. BURNETT:   Objection.

9      A.   No, I -- I mean, the -- and any -- the

10  situation on the ground at any given point in time

11  is a reflection of exposure that's happened over

12  years, and we know that -- that, you know, using a

13  measure like the volume of opioids prescribed at

14  one point in time to understand whether or not the

15  house is on fire is simply not a -- not a good

16  move.

17              In other words, the -- the

18  manifestations of overprescribing that happened in

19  -- at Time A can manifest for years, and indeed

20  generations.

21              So while I think that the measures of

22  opioid volume that you describe, reductions in

23  opioid volume, are welcome, I believe that West

24  Virginia is still much, much higher than national

Page 73

1    averages.

2            I believe many people are still

3    receiving opioids that would do better with

4    alternative treatments, and you know, it's -- it's,

5    in part -- a lot of the morbidity is driven by

6    addiction and opioid use disorder, and that's a

7    chronic disease.  It's a lifelong disease.

8            You know, people can be treated and

9    many people live happy, successful lives in

10   recovery, so it's highly treatable, but it's a

11   chronic disease, and so I just have a little bit of

12   concern about using, you know, day-to-day or sort

13   of year-to-year fluctuations in opioid prescribing

14   as some global measure of whether or not an

15   epidemic is taking place.

16       Q.   You do disagree with the data from the West

17   Virginia Department of Health and Human Services

18   that indicates that in 2018, 82 percent of overdose

19   deaths were attributed to illicit opioids, not

20   prescription opioids?

21           MR. BURNETT:  Objection.  Is there a

22   specific document you would like to refer the

23   witness to?

24           MS. GEIST:  I'm going to ask him the

Page 74

1    question first.

2         A.    I would like to see --

3         Q.    That is -- that's the data from the

4    Department of Health and Human Services in West

5    Virginia --

6         A.    Right.

7         Q.    -- would you have any reason to disagree

8    with that?

9         A.    Well, I --

10              MR. BURNETT:   Objection.

11        A.    I would like to review any document that's

12   being referred to, but I didn't mean to suggest

13   that I disagree with a data point that's been put

14   out by the West Virginia Department of -- of Public

15   Health, or frankly, you know -- but I would like to

16   see the document.

17              But what I was registering some

18   concern about was a notion that this is an epidemic

19   -- that there's a fentanyl epidemic.

20              I would characterize it as an opioid

21   epidemic.  Just as I have concern about

22   characterizing this as an epidemic of abuse, I

23   would characterize it as an epidemic of addiction.

24              So you know, we can discuss sort of

Page 75

1  the relative contributions of different --

2  different substances or different opioids, but my

3  concern would be I wouldn't want to overlook the

4  important role that prescription opioids have and

5  continue to play in driving opioid-related

6  morbidity and mortality.

7      Q.   And do you know from your research and

8  analysis how -- what percentage of the 2018

9  overdose deaths related to prescription opioids

10  only?

11           MR. BURNETT:  Objection.

12     A.   Yeah, I wasn't asked to -- I wasn't asked

13  to focus on that in my report.

14     Q.   So you're not aware of -- when we're

15  talking about overdose deaths relating to opioids,

16  sitting here today, you're not aware of the latest

17  data and trends in West Virginia and Cabell County

18  specifically about what substances are driving

19  overdose deaths?

20           MR. BURNETT:  Objection.

21     Q.   Is that -- is that correct, Doctor

22  Alexander?

23     A.   No, it's not correct.  I carefully reviewed

24  all of the materials that were provided to me and

Page 76

1    that I had access to, and that included up-to-date

2    recent data from local, State and Federal sources.

3              So I would not -- I would not want to

4    characterize otherwise.

5        Q.   Now, you said -- you brought with you today

6    a copy of your report, correct?

7        A.   Yes, ma'am.

8        Q.   And you have footnotes, of course,

9    citations to authorities and references in that

10   report.  True?

11       A.   Yes, ma'am.

12       Q.   Okay.  The data that I'm referring to,

13   Doctor Alexander, if you look at page 11 of your

14   report, you write - as I -- as I stated earlier -

15   that "there are glimmers of hope, with preliminary

16   data suggesting a 22" to "26% decline in

17   opioid-overdose deaths between 2017 and 2018 in

18   Cabell County."

19              MR. BURNETT:  Counsel, what paragraph

20   is that?  I'm not seeing that.

21              MS. GEIST:  That is page 11, Paragraph

22   29.

23       Q.   And your citation for that, Doctor

24   Alexander, is the data released by the West

Page 77

1    Virginia Department of Health and Human Services on

2    September 5th, 2019.  So you -- you reviewed that

3    data, correct?

4         A.   Yes, ma'am.

5         Q.   You acknowledge that in your report.  True?

6         A.   Yes.

7         Q.   And --

8              MR. BURNETT:  Doctor Alexander, if you

9    need -- if you need time to look at the footnote,

10   don't -- don't be rushed in confirming what she's

11   asking you to confirm.

12             THE DEPONENT:  Thank you.

13        Q.   You cited -- you cited the data from the

14   West Virginia Department of Health and Human

15   Services in your report as we're looking at.

16   Correct, Doctor?

17        A.   Yes, that's right.

18        Q.   Okay.  Do you recall -- I mean, this is

19   significant.  We're talking about trends in opioid

20   and nonopioid drug overdoses in West Virginia.

21   This is a significant report from the Department of

22   Health and Human Services.

23             Would you agree with me on that, this

24   type of report is significant to the case?

Page 78

1              MR. BURNETT:  Objection.

2        A.    There are -- there are dozens of reports

3    and publications that are significant to the case.

4    And I guess I would just highlight that as I note

5    here, just two sentences later, "for every glimmer

6    of hope, there are other signs that the epidemic is

7    as active as ever."  You know --

8        Q.    All right.  So let me -- let me ask you

9    about that.

10             MR. BURNETT:  Counsel -- Counsel, I

11   don't believe Doctor Alexander was finished with

12   his answer.

13       Q.    I didn't mean to cut you off, Doctor

14   Alexander.  Would you like to say something else?

15       A.    Yes.  Thank you.  So my point is that --

16   that as I note just a few sentences later, "For

17   every glimmer of hope, there are other signs that

18   the epidemic is as active as ever, many barriers

19   persist."

20             I cite information that "Cabell County

21   EMS reported that the number of overdoses that they

22   responded to in May of 2020 was two to three times

23   higher than the prior" --

24       Q.    Can I stop you there -- can I stop you

1    there?  I don't want to interrupt -- but whether

2    you just --

3                MR. BURNETT:  Counsel, Counsel,

4    really, you have to let him finish his answer.

5                MS. GEIST:  Well, this is going to be

6    a long deposition if Doctor Alexander is going to

7    read to me paragraphs from his report.

8                MR. BURNETT:  You're asking him to

9    read from his report also.  You can't interrupt him

10   to -- to interrupt him to ask if you can interrupt

11   him.

12      A.   I won't read a lot from my report, and I

13   certainly am all for trying to provide you the

14   information you need in as efficient a means as

15   possible.

16                But my point here is that I relied

17   upon dozens of important references and sources of

18   information for the information that I've provided,

19   and that for every glimmer of hope, there are other

20   signs that the epidemic is as active as ever within

21   the community.

22      Q.   And one of the signs of the epidemic -- and

23   a few times you've referred addiction, correct?

24   The issue here of what we're really talking about

Page 80

1    relates to addiction, correct?

2        A.    Well, I note addiction in contrast to the

3    term "abuse" which I have concerns about because of

4    the ways that I think the epidemic has been

5    misconstrued as an epidemic of abuse, and I don't

6    believe that that's the case.  I think it's an

7    epidemic of addiction.

8               Addiction isn't the only thing that's

9    important here.  There are many people without

10   opioid use disorder that still have a -- that

11   engage in nonmedical use or have otherwise been

12   impacted by the epidemic.

13              I mean, consider -- consider children

14   who have been orphaned.  So I don't want to suggest

15   it's addiction kind of front, center, 24/7, 365.

16   But I also think that addiction is a better frame,

17   a better lens through which to view the epidemic

18   than is the term "abuse."

19              Because abuse is a behavior and

20   addiction is a disease.  And they require very,

21   very different interventions.

22        Q.    And addiction being a disease, you have

23   some familiarity and awareness of addiction even

24   though you're not an addiction medical specialist.

1    Correct?

2                MR. BURNETT:  Objection.

3        A.   I -- as a practicing internist, I treat

4    patients that have addiction to opioids and alcohol

5    and tobacco and other substances, and so yes, I

6    have -- insofar as it's relevant to my report and

7    my opinions that I've offered, I do have an

8    understanding of addiction.

9        Q.   Now -- and so then, you're aware, Doctor

10   Alexander, I assume, from your citation to the

11   Department of Health and Human Services -- I'm

12   sorry, Department of Health and Human Resources

13   data, that right now, people with addiction are

14   looking to move to methamphetamine as part of their

15   addiction.  Is that right?

16       A.   Are you --

17                MR. BURNETT:  Objection.  Again, if

18   there's a cite to a specific document, I would

19   suggest we refer to the document.

20                MS. GEIST:  Well, I will pull it out,

21   but I'm referring to Doctor Alexander's citation

22   that we're looking at right here on the screen in

23   Paragraph 29 of Footnote 105, which is the West

24   Virginia Department of Health and Human Resources

Page 82

1   data from overdose incidents in 2018.

2       Q.   I'm just asking you generally, Doctor

3   Alexander:  You're not disagreeing that there has

4   been a significant increase in overdose deaths

5   relating to methamphetamine in Cabell County/

6   Huntington from 2014 to 2018?  That's what the data

7   tells us, correct?

8               MR. BURNETT:  Objection.  I'm not

9   seeing that in Paragraph 29.

10              MS. GEIST:  I'm not referring to

11  Paragraph 29.

12      Q.   Can you answer my question, Doctor

13  Alexander?  Would you agree with me that from 2014

14  to 2018, that there has been a significant increase

15  in overdose deaths involving methamphetamine?

16              MR. BURNETT:  Same objection.

17      A.   It would be helpful to review any

18  particular reference together, but I believe that

19  it is the case that -- that overdoses of

20  methamphetamine have increased over the time frame

21  that you inquire about.

22      Q.   A significant increase.  Agree with me on

23  that?

24              MR. BURNETT:  Objection.

1    Q.   The percentages in the document that you

2  cite in your report go from 3 percent of overdose

3  deaths involving meth in 2014 to 36 percent of

4  overdose deaths involving meth in 2018.

5              You know that to be the case, don't

6  you, Doctor?

7              MR. BURNETT:  Objection.  Again,

8  Counsel, the numbers that you're referring are not

9  on the face of the report.  If we want to look at

10  the exhibit, I suggest we do that.

11             It's not fair to ask him to confirm

12  specific numbers in a document that he doesn't have

13  in front of him.

14    Q.   You cite that report from the Department of

15  Health and Human Resources in your expert report,

16  do you not, Doctor Alexander?

17    A.   Along with 650 some others, yes, I do.

18    Q.   Okay.  And -- but in general, I assume in

19  your research and work in the case, you are well

20  aware of the significant increase of

21  methamphetamine-related overdose deaths in Cabell

22  County/Huntington.

23             MR. BURNETT:  Objection.

24    Q.   Is that fair?

Page 84

1                MR. BURNETT:  Objection, asked and

2      answered.

3         A.   I believe there have been increases in

4      overdoses from methamphetamine in this community

5      and in other communities around the country, yes.

6         Q.   Now, you mentioned earlier that you had

7      reviewed the Netflix Heroin(e) documentary.

8      Remember that?

9         A.   Yes, ma'am.

10        Q.   Okay.  And one of the -- one of the women

11     highlighted in that documentary is Jan Rader.  Do

12     you recall that?

13        A.   Yes, I do.

14        Q.   Okay.  And do you -- did you read the

15     deposition that she provided in connection with

16     this case?

17        A.   I don't recall having done so, no.

18        Q.   Okay.  If I represented to you that Jan

19     Rader testified that crystal meth is making a

20     comeback in Cabell County/Huntington and that there

21     are -- the current trends that are concerning the

22     community involve the influx of crystal meth and

23     that is eclipsing heroin and fentanyl, any reason

24     to disagree with her perspective?

Page 85

1          MR. BURNETT:  Objection.  We don't

2    have the transcript in front of us.

3       Q.   We can take a look at it, Doctor Alexander.

4    We'll pull it later.  But if that's what Jan Rader

5    said, I assume you would agree with her

6    perspective, given that she's on the ground in

7    Cabell County/Huntington.

8       A.   It would be helpful -- if I'm asked about

9    it and if we're going to look at the transcript, it

10   would be helpful to look while I'm answering --

11   before I answer.  I don't know the context of the

12   questions that were asked.  But I think in general

13   -- I think, you know, my report focuses on opioids

14   and abating opioid related harms.  So --

15          But I'd be happy to look at her -- her

16   deposition and her testimony if that's helpful to

17   do so.

18      Q.   I assume though, I mean, Doctor Alexander,

19   you don't reside and live in the Cabell County/

20   Huntington community; is that true?

21      A.   That is true.  I live in Baltimore,

22   Maryland.

23      Q.   Okay.  So -- and somebody like Jan Rader

24   who lives in the community, if from her perspective

Page 86

1   the current issue relates to an uptick in crystal

2   meth, I assume you would defer to her as somebody

3   living there as to what the current issues are

4   facing the community.

5                 MR. BURNETT:  Objection.

6        Q.   Is that fair?

7                 MR. BURNETT:  Objection.  He said that

8   he can't speak to what she testified to without

9   looking at it.

10                MS. GEIST:  I understood that.

11       Q.   But if that's what she said, I assume that

12  you would not -- you would not think that you have

13  more information than somebody living in the

14  community.  Is that right, Doctor?

15                MR. BURNETT:  Objection.

16       A.   I mean, this feels to me a bit of a false

17  dichotomy.  I don't -- I don't -- I wouldn't be

18  surprised to know that there are individuals that

19  are using methamphetamine and that the community is

20  -- is being impacted by that.

21                But I don't think -- you know, I think

22  if I heard correctly, you said something to the

23  effect of "The issue is X rather than Y" and I --

24  it feels to me like a false dichotomy.

Page 87

1              I don't know that anybody -- it would

2    -- it would -- in my professional experience - and

3    based on my training as an epidemiologist and as a

4    professor of epidemiology, having worked on the

5    opioid epidemic for many years in many different

6    facets of the epidemic, I don't have any hesitation

7    in -- in arguing that there's an opioid epidemic

8    taking place within Cabell County and the City of

9    Huntington.

10             So it's not clear to me that -- that

11   -- there may be individuals that use alcohol; there

12   may be individuals that smoke; there may be

13   individuals that use cocaine.  I wasn't focused on

14   that.  I was focused on -- on opioids.

15             But I think that polysubstance use is

16   a serious issue, and I discuss in my report -- I

17   discuss that in my report, and -- and call that

18   out.

19             So again, if you'd like --

20   Q.   I'm sorry, go ahead.

21   A.   Again, if you would like to review Jan

22   Rader's transcript together or a specific data

23   point on trends in methamphetamine use, I'm happy

24   to do so.  But I don't think it diminishes from the

1   incredible toll that the community has taken and

2   continues to take from opioids.

3       Q.   And you did not read Jan Rader's deposition

4   transcript in connection with forming your opinions

5   in the case or in preparation for your deposition.

6   Is that correct?

7       A.   That's correct.  I didn't read her

8   transcript.  But I certainly have -- I'm familiar

9   with who she is, and I have reviewed other

10  materials in the case that I think are informed by

11  her expertise and her value to the community as a

12  -- as a community member.

13      Q.   And in terms of what drugs the -- or

14  illicit substances that the community is currently

15  dealing with, you would defer - in your own words -

16  to her expertise.  Is that correct?

17                  MR. BURNETT:  Objection.

18      A.   No.  I'm sorry, I -- did I say that I would

19  defer to her?  I don't -- I mean, I don't think

20  that this is a matter of deference.  I think -- I

21  mean, what -- can you ask the question again,

22  please?

23      Q.   No, I'm going to move on to something else.

24                  In terms of -- you've mentioned a few

Page 89

1    times the opioid epidemic.  Would you agree with me

2    that there -- if there is an opioid epidemic

3    currently in Cabell County/Huntington, it is not a

4    prescription opioid epidemic?  Can we agree on --

5              MR. BURNETT:  Objection, asked and

6    answered.

7              MS. GEIST:  No, I didn't answer -- I

8    didn't ask that question before.

9         Q.   Can we agree on that, Doctor Alexander,

10   that to the extent there is a current opioid

11   epidemic today in Cabell County/Huntington, can we

12   agree it is not a prescription opioid epidemic?

13             MR. BURNETT:  Objection, asked and

14   answered.

15        A.   Yeah, I don't -- I wouldn't -- I think

16   we've discussed this, and in considering, for

17   example, whether there is a fentanyl epidemic, I

18   believe earlier in our conversation we discussed

19   whether or not there was a current fentanyl

20   epidemic or something to that effect.

21             And the bottom line is that -- that

22   prescription opioids have played a very important

23   role in the genesis of the epidemic and that many

24   people who use intravenous opioids initiated with

Page 90

1   prescription opioids, and my report doesn't require

2   disaggregating the relative contributions of

3   different types of opioids to overall

4   opioid-related morbidity and mortality.

5              If you look at the molecular structure

6   of OxyContin and compare it with the molecular

7   structure of heroin, they're virtually

8   indistinguishable and their effects on the brain

9   and the body are virtually indistinguishable, and

10  so it should come as no surprise when you have the

11  volume of opioids, prescription opioids, coming

12  into the market as has occurred in Cabell County

13  and the City of Huntington that -- that many

14  adverse outcomes are going to ensue, and that's

15  exactly what has taken place.

16             So certainly there are people that use

17  heroin and certainly there are people that use

18  fentanyl, and there are plenty of people that use

19  prescription opioids nonmedically or have addiction

20  to them.  So I -- I prefer not to frame the opioid

21  epidemic as one of a particular substance.

22             I think fortunately, perhaps, there

23  are evidence-based treatments that work very, very

24  well whether or not one is using heroin or that

1    started with prescription opioids or whether one is

2    using prescription opioids alone.  We have

3    evidence-based treatments, and we have many other

4    abatement interventions that have a terrific body

5    of evidence to support them.

6              So -- so I'm not sure that it is

7    necessary, nor was I asked to disaggregate or

8    design one abatement plan for people that were

9    still using prescription opioids nonmedically or

10   addicted to them and a second abatement plan for

11   people using heroin or illicit fentanyl.

12      Q.   Right.  Just to be clear, your abatement

13   plan, the interventions and the programs that

14   you're proposing here for the individuals living in

15   Cabell County/Huntington, those apply to all

16   individuals who may have opioid use disorder or

17   haven't -- or have not met the diagnostic criteria

18   for opioid use disorder.

19              Your programs apply to all of those

20   people whether or not they are users of illicit

21   opioids or prescription opioids.  Is that correct?

22              MR. BURNETT:  Objection.

23      A.   Well, my abatement plan includes

24   interventions to conduct public education campaigns

Page 92

1    about pain management; it includes workforce

2    preparation; it includes community resiliency; it

3    includes care for families, grief support.  It

4    includes many things.

5              My point is, it includes -- my point

6    is, it includes many things beyond treatment for

7    addiction.  But -- but those parts of my report

8    that are focused on treatment provide treatment for

9    the community of individuals with opioid use

10   disorder, and they do not disaggregate whether or

11   not the opioid use disorder arises from

12   prescription opioids or heroin that began with

13   prescription opioids, etc.

14      Q.   Okay.  So is that a long-winded way of

15   saying, yes, I'm correct, your proposed abatement,

16   intervention and programs do not depend on any

17   individual having used prescription opioids at any

18   point in time?  Is that fair?

19              MR. BURNETT:  I object to the

20   characterization of the witness' testimony as

21   long-winded.

22      A.   And that --

23      Q.   I feel like we're going to have a long day

24   here, Doctor Alexander, so I'm trying to cut

Page 93

1    through some information.  If you could focus on my

2    question without providing any narrative, I would

3    appreciate it.

4              MR. BURNETT:  And I would say, Doctor

5    Alexander, answer as you see fit.  If you feel like

6    her question is not fair or that you need to add

7    context, please do so.

8        Q.   Again, Doctor Alexander, my question is --

9    and we will get to the -- to the plan that you have

10   in place in this case and the interventions and

11   programs that you are proposing.

12             But with respect to the individuals

13   who may benefit from such a plan, from your

14   perspective, those individuals are anyone with

15   opioid use disorder and it doesn't matter whether

16   or not they ever used a prescription opioid.  Is

17   that correct?

18             MR. BURNETT:  Objection.

19             Wait, did we lose the witness --

20             VIDEO OPERATOR:  Yeah, we lost the

21   witness.  Let's go off the record real quick.

22             MR. BURNETT:  Okay.

23             VIDEO OPERATOR:  The time is 11:30.

24   We are now off the record.

Page 94

```
 1              (A discussion was had off the record
 2              after which the proceedings continued
 3              as follows:)
 4              VIDEO OPERATOR:  The time is 11:33, we
 5      are now back on the record.
 6      BY MS. GEIST:
 7         A.   I apologize, Ms. Geist.  I apparently was
 8      booted from the wi-fi network, but I'm back.
 9              And I believe where we left off, I
10      wanted to apologize, you know, for anything that's
11      long-winded and do want to try to provide you with
12      the information that you need.
13              If there's any further question that
14      you'd like to ask me about where we left off, I'm
15      happy to try to answer.
16         Q.   Well, and I -- I appreciate that, Doctor,
17      very much.  So thank you for that.
18              I think I'm asking what I hope is a
19      pretty simple question, but let me try it again.
20              In your proposed abatement plan that
21      you're putting forward on behalf of plaintiffs in
22      this case, in terms of treatment, the treatment
23      aspects of the program, it does not matter whether
24      or not an individual with opioid use disorder ever
```

Page 95

1    used a prescription opioid.  Isn't that true?

2        A.   Yes, that is true.

3        Q.   Okay, thank you.  And I assume you will

4    agree with me that there are likely individuals in

5    Cabell County/Huntington who have opioid use

6    disorder who have never used a prescription opioid.

7    Do you agree with me on that?

8                MR. BURNETT:  Objection.

9        A.   Yes, I believe that's likely.  Although the

10   -- the oversupply of prescription opioids has

11   changed -- it affects local markets for other

12   products, including heroin, so you know, we had a

13   long discussion around causation, and I'm -- I

14   don't want to, you know, have that discussion all

15   over again unless it's helpful for you, but I guess

16   my point is that even somebody who uses heroin de

17   novo could potentially be using it because of local

18   heroin markets that have flourished because of the

19   number of individuals who have developed opioid use

20   disorder from the oversupply of prescription

21   opioids.

22       Q.   Under -- understood.  But you agree with

23   me, I assume, that there's certainly people in

24   Cabell County/Huntington who would be beneficiaries

Page 96

1   of your proposed plan should -- should any aspect

2   of it be ordered by the Court, there are

3   individuals who are heroin users who have never

4   touched a prescription opioid.  Correct?

5                   MR. BURNETT:  Objection.

6      A.   There may be such individuals, but I think

7   it's harder to know, for example, whether they

8   would not have developed heroin use or heroin use

9   disorder but for the oversupply of prescription

10  opioids into the community.

11     Q.   But again, just so I'm sure I have an

12  understanding of your answer, there could be

13  individuals in Cabell County/Huntington who would

14  be beneficiaries of your plan, should that plan go

15  forward, who have never used a prescription opioid

16  ever?

17                  You agree with me on that?

18                  MR. BURNETT:  Objection, asked and

19  answered.

20     Q.   Same -- so those are with respect to heroin

21  users.  I assume that you will agree with me that

22  there could be fentanyl or carfentanil users who

23  would be beneficiaries of your plan should that go

24  forward who had never, in the past, used a

Page 97

1    prescription opioid?

2              MR. BURNETT:  Objection.

3        Q.   You agree with me on that?

4        A.   My abatement plan is to address the opioid

5    epidemic and I don't think it's good science or

6    good public health to -- to try to compartmentalize

7    interventions.

8              Heroin and prescription opioids are

9    much more similar than they are different in many

10   important ways, as we've discussed, and I also --

11   it's also the case that -- that the oversupply of

12   prescription opioids has impacted the heroin market

13   and the local markets for other substances.

14             But yes, it's certainly the case that

15   there may be recipients of, say, improved treatment

16   access or recipients of naloxone after an overdose

17   that receive interventions who have not used

18   prescription opioids themselves before initiating

19   heroin use.

20       Q.   And following along that line, there may be

21   individuals who are users of heroin, fentanyl or

22   carfentanil, all illicit opioids, who used

23   prescription opioids in the past but in a

24   nonmedical way and not under the care and treatment

Page 98

1   of a physician.

2              Do you agree with me that these

3   individuals would also be beneficiaries of your

4   plan?

5              MR. BURNETT:  Objection.

6      A.   I mean, I -- we -- we could discuss -- and

7   there is helpful information on the ways that

8   opioids are used medically and nonmedically and the

9   sources of nonmedical use, and it turns out - as

10  you may be aware - that many individuals that use

11  opioids nonmedically get them from friends or

12  family that, in turn, get them from licensed

13  prescribers.

14             So I think that's an important sort of

15  conversation to have, but yes, there are

16  individuals that could receive services or

17  treatment that I suggest that may use heroin or

18  fentanyl or carfentanil that was preceded by

19  nonmedical prescription opioid use, that didn't

20  arise directly from a licensed prescriber.

21     Q.   And because you've mentioned it a couple

22  times, Doctor Alexander, and you're a medical

23  doctor, I assume you agree with me that the

24  molecular structure of methamphetamine is not a

Page 99

1    close chemical analog to opioids.

2              Is that correct?

3              MR. BURNETT:  Objection.

4         A.   I mean, I've not looked at the molecular

5    structure and compared it.  The information about

6    OxyContin and heroin came from the Nora Volkow and

7    the national directors of health, and there's a

8    very compelling graphic that -- that -- in which

9    she lines these up and shows that you essentially

10   are just like flipping one carbon molecule and

11   moving a hydroxyl group over or something like

12   that.

13             So I've not compared the organic

14   chemical structure of methamphetamine and opioids

15   in order to be able to address your question.

16        Q.   So let me just make sure I understand.  I

17   understand you haven't done a thorough analysis,

18   but it's pretty well known, isn't it, that

19   methamphetamine is not a close chemical analog to

20   opioids?

21             I mean, we can agree --

22             MR. BURNETT:  Objection.

23        Q.   -- on that, can't we?

24             MR. BURNETT:  Objection.  This is

Page 100

1    outside the scope of his report.  He said that he's

2    not testifying as to methamphetamine.

3        Q.   Meth is -- methamphetamine is chemically

4    different from opioids.  Can we agree on that?

5        A.   Yes, it is.

6        Q.   Okay.  Thank you.  Doctor Alexander, going

7    back to my earlier questions about people in the

8    community who have OUD and never used a

9    prescription opioid, do you also agree that there

10   are individuals in Cabell County/Huntington who

11   have HIV and have never used a prescription opioid?

12       A.   Yes.

13       Q.   Are there also individuals in Cabell

14   County/Huntington who have Hepatitis or Hep C and

15   have never used a prescription opioid?

16       A.   I'd like to qualify my last answer.  I

17   would believe so.

18            And that's how I would respond to this

19   query about Hepatitis C also.  Keep in mind that an

20   incredibly large number of individuals receive

21   opioids at some point in time.

22            So many, many individuals receive -- I

23   mean, a remarkably high number of individuals

24   receive a prescription for opioids at some point in

1    time.  So I would have to carefully look at the

2    evidence base in order to -- in order to more

3    definitively answer your question.

4              But yes, that's -- that's my reply.

5        Q.   Doctor, do you agree with me that there are

6    likely individuals in Cabell County/Huntington who

7    have infectious endocarditis and have never used a

8    prescription opioid?

9        A.   Yes, I believe that's probably the case.

10       Q.   In terms of individuals in Cabell

11   County/Huntington who are intravenous drug users

12   who have acquired HIV, Hepatitis C or infectious

13   endocarditis, can you agree with me that those

14   intravenous drug users are using illicit opioids,

15   either heroin, fentanyl or carfentanil?

16       A.   Well, if --

17            MR. BURNETT:  Objection.

18       A.   If they're intravenous drug users and

19   they're using opioids, then they're either crushing

20   and injecting prescription opioids or they're

21   injecting nonprescription opioids.

22       Q.   Okay.  These are not individuals who are

23   users of opioids prescribed and under the care of a

24   physician for treatment.  Correct?

Page 102

1              MR. BURNETT:  Objection.
2    Mischaracterizes the testimony.
3         A.   They may be --
4         Q.   Let me ask -- go ahead.  I'm sorry.  Go
5    ahead.
6         A.   I was going to say, they may be; and they
7    may not be.  I mean, I don't think that one can
8    conclude that just because someone is using
9    intravenous opioids that they're not simultaneously
10   using prescription opioids.
11              And the source of those prescription
12   opioids may be individual prescribers with direct
13   engagement with those prescribers, or it may be
14   through friends or family or through dealers.  You
15   know, there are many different potential sources of
16   those opioids.
17        Q.   But I assume you would agree with me that
18   all intravenous drug users in Cabell
19   County/Huntington, if they are using opioids,
20   they're using it in a legal or illicit way.
21              MR. BURNETT:  Objection.
22        A.   It may not be the only source of opioids
23   that they're using, but if they are injecting -- if
24   you are asking whether injecting opioids is

Page 103

1    illegal, the answer is yes.

2              I mean, unless it's done under the

3    care of a licensed health care provider.  But --

4    but generally and typically here, we're talking

5    about individuals that are -- that are injecting

6    opioids because they're addicted, and because, you

7    know, opioid addiction is, you know, characterized

8    by powerful compulsions to use with incredible

9    dysphoria when one undergoes withdrawal.

10             And this is why -- this is one reason

11   why the epidemic has been so devastating.

12             MS. GEIST:  Let me ask our litigation

13   technology expert if he has the document I had sent

14   that we can publish as an exhibit, Exhibit 2?

15             John, do you have that and are able to

16   publish it to the witness, please?

17             MR. BURNETT:  Exhibit 2 -- Exhibit 2

18   was his deposition transcript.

19             MS. GEIST:  Exhibit 3.  Sorry, my bad.

20   Exhibit 3.

21             MR. BURNETT:  Do you want us to open

22   the tab, the envelope?

23             MS. GEIST:  No, Counsel, just for the

24   record, Doctor Alexander expressed a number of

Page 104

1    times wanting to look at the document that he cited

2    in his report from the West Virginia Department of

3    Human Resources, so I would like to show that to

4    him since it is cited in his report and we talked

5    about it quite a bit if that is agreeable.

6              MR. BURNETT:  Subject to Doctor

7    Alexander confirming, if he can, that it's the same

8    document that he cites.

9              MS. GEIST:  Sure.

10             VIDEO TECH:  I'm currently pulling

11   down that document now.  This is John Matthews,

12   your tech support.  I need a few moments to pull it

13   up on the screen.

14             MS. GEIST:  Thank you.

15             MR. BURNETT:  Counsel, are you getting

16   that document from the materials we provided by

17   Sharefile or from the Internet or --

18             MS. GEIST:  Yes. So --

19   BY MS. GEIST:

20       Q.   Just for the record, Doctor Alexander, I am

21   referring to the document that you refer to on page

22   11 of your report at Footnote 105, and this is the

23   West Virginia Department of Health and Human

24   Resources report on overdose deaths appear to be

Page 105

1   declining" dated September 5th, 2019.

2               MR. BURNETT:  Same question.  Are you

3   getting that here from the Internet link here in

4   the footnote, or are you getting that from the

5   materials we provided?

6               MS. GEIST:  Does it make a difference?

7               MR. BURNETT:  It may in terms of his

8   ability to confirm that that is the same document

9   that he used.

10              MS. GEIST:  Okay.  Well, can we -- can

11  we put it up on the screen and see what Doctor

12  Alexander has to say?

13      A.   Is this related to Tab 3, or unrelated to

14  Tab 3?

15      Q.   Unrelated to Tab 3.

16      A.   Okay.

17          ALEXANDER DEPOSITION EXHIBIT NO. 3

18              (WV DHHR publication, "Gov. Justice -

19              DHHR Data Suggests West Virginia

20              Overdose Deaths Appear to be

21              Declining" dated 9-5-19 was marked for

22              identification purposes as Alexander

23              Deposition Exhibit No. 3.)

24      Q.   Here we go.  So Doctor Alexander, I asked

                                        Page 106

1   you some questions earlier about whether you had

2   reviewed the data from the West Virginia Department

3   of Health and Human Resources that was reporting on

4   preliminary anticipated final data from 2018 fatal

5   drug overdoses.  Do you remember those questions?

6       A.   I'm sorry, can you please ask me that

7   again?

8       Q.   Sure.  Earlier in your deposition, we were

9   looking at page 11 of your expert report, Paragraph

10  29, and you say in your report that there are

11  "glimmers of hope with preliminary data suggesting

12  a 22 to 26 percent decline in opioid overdose

13  deaths between 2017 and 2018 in Cabell County

14  specifically."

15           Do you remember that discussion?

16      A.   Yes, I do.

17      Q.   You have a citation there for this

18  discussion, and I did not show it to you at the

19  time, so I would like to do that now, because I

20  think you asked me if you could see the underlying

21  document, given how many citations there were in

22  your report.

23           And if --

24           MS. GEIST:  Can we just go to the

Page 107

```
1   second page, please, so I can direct Doctor

2   Alexander to where his --

3              MR. BURNETT:  First of all, I would

4   suggest confirming that this is the same document

5   that's cited in his report.

6              MS. GEIST:  Can we go to the third

7   page, John, please?  Maybe pop out the first couple

8   bullets?

9       Q.   Doctor Alexander, this is what I was

10  referring to earlier in your deposition where you

11  wrote in your report citing to this report from

12  West Virginia Department of Health and Human

13  Resources that "Cabell will see between a 22" "and

14  26% decline in overdose deaths."

15             Do you see that?

16      A.   Yes, I do.

17      Q.   Okay.  Do you remember this -- this data

18  that was reported from the Department of Health and

19  Human Resources last year?

20             MR. BURNETT:  Objection.

21      A.    Yes, I believe I do.  Yes.

22      Q.   Okay.  I mean, is this familiar to you?

23  I'm not trying to trick you.  This is cited in your

24  -- in your footnote in your report.  So I -- I just
```

Page 108

1    want to make sure that this document is familiar to

2    you.

3         A.   Yeah, yeah.  I mean, if you could go to the

4    first page, I guess I'd like to just see the -- see

5    the first page again.

6         Q.   Sure.

7         A.   And then --

8         Q.   So --

9         A.   Yeah.

10        Q.   Yeah, so for the -- for the record, the

11   document, you know, describes the release of

12   information from the West Virginia Department of

13   Health and Human Resources on "preliminary data on

14   2018 fatal drug overdoses that suggests a leveling

15   off or decrease in overall deaths."

16             And then if we look further down the

17   document, there is a specific data point reflecting

18   the decrease, and then here, Doctor Alexander, this

19   is where the Department of Health and Human

20   Resources has an analysis, graphically shown, of

21   preliminary data and what they anticipate will be

22   the final data.

23             And it does show a decrease of

24   overdoses in 2018.  Is that right?

Page 109

1          MR. BURNETT:  Objection.

2      A.   Yeah, it appears that while preliminary and

3  while estimate -- while underestimating the total

4  overdose deaths -- I'm reading the footnote here

5  that calls out -- so the data is preliminary and it

6  underestimates the total overdose deaths.

7      Q.   Right.  They are anticipating or estimating

8  that the final overdose -- overdose deaths will be

9  approximately 952, which is still a comparative

10  decrease from the prior year.  Correct?

11          MR. BURNETT:  Objection.

12      Q.   Is that yes?

13      A.   Yes.  Yes, it is.

14      Q.   And then if we look underneath the graphic

15  chart here, there's a discussion about Shifts in

16  Drug Use.  Do you see that?

17      A.   I do.  I do.  I mean, I think an important

18  point to keep in mind about numbers year over year

19  is that they're -- I mean, there are a lot of

20  different data points that one uses as an

21  epidemiologist in order to understand the nature of

22  a problem as complex and multi-faceted as the

23  opioid epidemic.

24          So I don't -- I -- so I don't disagree

Page 110

1    that the preliminary 2018 data on -- on overdose

2    deaths suggests, you know, declines.

3                And I think those are welcome.  But I

4    wouldn't want to, you know, infer from that some

5    broader more general conclusion about sort of the

6    nature of the -- of the problem that's faced within

7    the community.

8        Q.   You're not aware of any data that shows any

9    preliminary or final analysis that indicates that

10   there is not continued decrease in overdose deaths

11   in West Virginia in 2019 and 2020, are you?

12               MR. BURNETT:  Objection.

13       A.   I'm sorry, that was a -- a -- I didn't -- I

14   mean, the question was --

15       Q.   If my question's bad, I'll rephrase.

16       A.   Yeah.

17       Q.   Are you aware of any data that indicates

18   anything other than a continued decrease in

19   overdose deaths in West Virginia in 2019 and 2020?

20               MR. BURNETT:  Objection.

21       A.   Yes, I am.

22       Q.   And what is that?

23       A.   Well, I think we already discussed one

24   source of data, which is EMS calls, which I believe

Page 111

1    have increased.

2              So Cabell County EMS reported that the

3    number of overdoses that they responded in May 2020

4    were two to three times higher than in the prior

5    nine months.

6              But we also know that the -- the COVID

7    pandemic has significantly threatened gains that

8    have been made in reversing opioid-related

9    morbidity and mortality and many, many communities

10   have reported strong upticks in overdose deaths

11   from opioids during the pandemic.

12             So I think there is a number of --

13   well, as I said in my report - which I would stand

14   by - for every glimmer of hope, there are also

15   signs of significant work and a long road that lies

16   ahead.

17        Q.   So a few follow-ups to what you just said.

18   So in terms of the recent reports and calls -- I

19   think you were referring to Cabell County emergency

20   department visits; is that right?

21        A.   EMS calls.

22        Q.   EMS calls.  You're not aware of any annual

23   analysis of data from 2019 indicating an overall

24   increase.  Is that correct?

                                                    Page 112

1              MR. BURNETT:  Objection.

2    Mischaracterizes the testimony.

3         A.   I don't believe that data is available, but

4    should it become so or should it be available, I

5    would be happy to advise the courts regarding my

6    take on it.

7         Q.   And the same with 2020, there's no data

8    available to show an overall -- indicating an

9    overall increase in overdose deaths in West

10   Virginia or Cabell County in the calendar year of

11   2020?  You're not aware that that data exists.

12   Isn't that true, Doctor --

13              MR. BURNETT:  Objection.

14        Q.   -- Doctor Alexander?

15              MR. BURNETT:  Objection, calls for

16   speculation.

17        A.   These -- you know, we don't rely upon a

18   single source of data in the work that I do.  And

19   annual data, while valuable, can lag.  So data

20   points such as the one that I cited can be quite

21   valuable even if it's not annual or finalized.  One

22   --

23        Q.   I under -- I understand what you're saying.

24   My question simply was:  We don't have annual data

Page 113

1    from 2019, or even preliminary data, looking at

2    annual rates of overdoses in 2020?

3              MR. BURNETT:  Counsel, I would remind

4    you to please not interrupt the witness.  I don't

5    believe he was finished with his answer.

6         Q.   That's all I'm asking, Doctor Alexander.

7    Can we agree on that, that data does not exist?

8         A.   I'm not aware of those sources of data, but

9    I think there are plenty of reasons for significant

10   concern about the state of the county and city with

11   respect to the ongoing opioid epidemic.

12        Q.   Now, you had -- I'm looking at the top of

13   page 11 of your report.

14             MS. GEIST:  I do -- I do want to keep

15   this document up yet, John, thank you.

16        Q.   But Doctor Alexander, if you could go to

17   the top of page 11 of your report, is this what you

18   were referring me to when you said that there had

19   been overdose visits specifically in Cabell County

20   between January 2019 and March 2020?

21        A.   Where -- where -- can you show where in my

22   report, what paragraph and line you're referring

23   to?

24        Q.   Yeah, I'm on the top of page 11 of your

Page 114

1    report, and it's the end of Paragraph 25.

2        A.    No, the -- the -- if you're asking about my

3    recent point about EMS calls, it's -- it's at the

4    top of page 12, and it's sort of almost all the way

5    through Paragraph -- I'm sorry, it's the last

6    sentence of Paragraph 29.

7        Q.    I see.  Okay.  Well, let me ask you a

8    couple questions.  First, beginning on your data

9    point at the top of page, end of Paragraph 25, here

10   you write, "Between January 2019 and March 2020,

11   there were 122 overdose-related visits to Cabell

12   County" Emergency Departments "for youth aged 19

13   years and younger."

14               Do you see that?

15       A.    Yes, ma'am.

16       Q.    Do we know what percentage or how many of

17   those overdose-related visits were due to the use

18   of opioids as opposed to other illegal substances,

19   other drugs?

20               MR. BURNETT:  Objection.

21       A.    I would --

22               MR. BURNETT:  And again, Doctor

23   Alexander, if you need to look at the document to

24   answer the question, please do so.

Page 115

1       A.   Yeah, I would want to look -- if you're

2   asking what the source of the overdose was for

3   these 122 visits among youth aged 19 years or

4   younger, it would be helpful to review Reference 94

5   together.

6       Q.   But -- and maybe we'll do that.  But for

7   now, I mean, this is your report.  That is your

8   statement in your report, correct?

9       A.   Yes, ma'am.

10      Q.   And sitting here today, you can't tell me

11  that -- that even a single one of those

12  overdose-related visits to the emergency department

13  related to opioids.  True?

14              MR. BURNETT:  Objection.

15      A.   Well --

16              MR. BURNETT:  Mischaracterizes the

17  testimony.

18      A.   I think it would be highly unlikely that

19  that's the case.  I reviewed all of the materials

20  that are included in my report, and I don't think

21  that I would have -- while I haven't had the

22  opportunity to review Reference 94 with you, I

23  think it's unlikely that I would have included the

24  reference if, having reviewed it -- if in fact it

Page 116

1   wasn't relevant to the point that I'm making in

2   this paragraph.

3               And the point that I'm trying to make

4   is that children and adolescents haven't been

5   immune from the opioid epidemic in Cabell County

6   and the City of Huntington.

7       Q.   Do you know whether any of those

8   overdose-related visits to the Cabell County

9   emergency department related to nonopioid drugs

10  such as methamphetamine or cocaine?

11              MR. BURNETT:  Objection, asked and

12  answered.

13      A.   It would be helpful to review the report

14  together -- the reference together if -- if you

15  have further questions about it.

16      Q.   You -- Doctor, just to be -- you can't

17  answer my questions without looking at the

18  reference?

19      A.   Ask me the question again, please.

20      Q.   Sure.  You can't answer my question without

21  looking at the reference?  Is that what you're

22  telling me?

23      A.   Can you --

24              MR. BURNETT:  Objection.

Page 117

1      A.   -- give me the preceding question again,
2  please?
3      Q.   Sure, sure.  I think the question was,
4  sitting here today, this statement is in your
5  report, and what I would like to know is if you can
6  tell me if any of those overdose-related visits to
7  the Cabell County emergency department related to
8  the use of methamphetamine or cocaine?
9              MR. BURNETT:  Objection, asked and
10  answered.
11      A.   So I think it's likely that some did.  I
12  mean, either I should have clarified that these
13  were opioid overdoses alone, but without the
14  opportunity to review the reference, I can't tell
15  you whether or not that was, you know, an oversight
16  on my part.
17              But unless that's the case -- if you
18  told me that 122 children age 19 years and younger
19  visited the emergency department for overdose in
20  this community, I would expect that some of them
21  visited the -- visited the emergency department for
22  nonopioid-related overdoses, yes.
23      Q.   And do we know if any of them visited the
24  emergency department in Cabell County based on the

Page 118

1    use of prescription opioids as prescribed by a

2    doctor?

3                  MR. BURNETT:  Objection.  Counsel, the

4    witness has told you many times now he would need

5    to see the document to answer these sorts of

6    questions.

7                  THE DEPONENT:  Thank you.

8        A.   Yeah, I feel -- I'm happy to sort of - at

9    the highest level - try to be helpful and provide

10   you with my take, but really, if you're asking

11   detailed questions about how these 122 individuals

12   came to overdose, it would be helpful to review

13   this specific reference, keeping in mind that there

14   are more than 650 references within this report and

15   -- and that I relied upon all of these in order to

16   reach my conclusions.

17       Q.   Now, if you'd turn to the next page of your

18   report, Doctor --

19                  MS. GEIST:  And John, leave this up on

20   the screen, because I'm going to get back to it.

21       Q.   But if you turn to the next page on your

22   expert report, Doctor, the top of page 12, you had

23   referred me to that data point, in terms of the

24   number of calls from EMS and Cabell County?

Page 119

1      A.   Yes, ma'am.

2      Q.   And do you attribute that to the COVID

3   pandemic and the related need for isolation and

4   stay-at-home orders and things of that nature?

5              MR. BURNETT:  Objection.

6      A.   I -- I am not sure without much more review

7   and analysis of precise attribution.  I think

8   what's noteworthy is that this data point suggests

9   that -- that -- it's one of many data points that

10  suggests that there's still significant concern

11  about the potential for opioid-related morbidity

12  and mortality within Cabell County and the City of

13  Huntington.

14     Q.   Is -- are you aware if any of those EMS

15  calls were responding to any increase in overdoses

16  from the use of prescription opioids?

17     A.   Again, as with all --

18              MR. BURNETT:  Objection.

19     A.   I mean, as with all of these questions

20  about statements in my report, it's always helpful

21  in order -- it's always helpful to be able to

22  review the report itself and the references with

23  you.

24              So if this is a reference and a data

1  point that's of particular interest, I'm happy to

2  review it with you.

3      Q.   Okay.  So sitting -- but sitting here today

4  - without looking at the data source - you can't

5  answer my question as to whether any of those calls

6  that EMS had to respond to related in any way to

7  the use of a prescription opioid?

8           MR. BURNETT:  Objection.

9      A.   Correct, I don't -- I don't have

10 information top of mind about how the higher rates

11 of calls recently break down across different types

12 of opioid products, for example.

13     Q.   Okay.  Let's go back to what we're still

14 looking at on the screen, which we have now marked

15 as Exhibit 3.  And then again following on Exhibit

16 3, Doctor Alexander, the Department of Health and

17 Human Resources discusses also in this report what

18 they call "shifts in drug use."  Do you see that?

19     A.   Yes, I do.

20     Q.   And the first line indicates that most

21 individuals who die of an overdose, most of the

22 individuals are using more than one drug in the

23 overdose.  In other words, this is referred to as

24 poly pharmacy or poly drug use; is that right?

Page 121

1           MR. BURNETT:  Objection.

2    Mischaracterizes the document.

3       A.   I do see that -- that -- that the document

4    reports that "For most" "who die, more than one

5    drug is detected," and I see it calls out that

6    "Opioids" "are still the most common type of drug

7    seen," "with over" 80 percent of opioids involved

8    in "overdose deaths in 2018."

9       Q.   So let's -- let's talk about that.  I was

10   going to ask you anyway.  So you read my mind.

11           In terms of the over -- of the "82% of

12   overdose deaths in 2018" relating to opioids,

13   there's some specific data right below that about

14   that sentence, correct?

15      A.   Yes.

16      Q.   In other words, 82 percent of the overdose

17   deaths in 2018, according to this data, that

18   related to opioids involved only illicit or illegal

19   opioids, specifically fentanyl and heroin.

20           Correct?

21      A.   Where -- where are you pointing where it

22   says that they involved only fentanyl or heroin?

23      Q.   So if you look -- what's highlighted here

24   is what you said, is that "Opioids were involved in

Page 122

1   82% of overdose deaths in 2018," and then under --

2   "this is a decline from 2017."  And underneath

3   that, it states, "Fentanyl and heroin remain the

4   most common opiates seen in overdoes deaths (59%

5   and 23% of deaths involved these substances

6   respectively in 2018)."

7              Do you see where I --

8              MR. BURNETT:  So I object to the

9   characterization of the document.  It does not

10  refer to the word "only."

11      Q.   Do you see where I am?

12      A.   I do see where you are, but I was going to

13  make the same point, that I'm not sure I can

14  conclude from this that fentanyl or heroin -- and

15  heroin are the only products.  But I think the

16  larger point is that -- although so I -- so I do

17  see what you're saying here.

18      Q.   Yeah, okay.  So whether or not the data

19  tells us that fentanyl and heroin were the only

20  products, we know that fentanyl and heroin were

21  indeed involved in 82 percent of overdose deaths in

22  2018.  Is that fair?

23      A.   No, I don't think that's --

24              MR. BURNETT:  Yeah.

Page 123

1      A.   -- the case.

2           MR. BURNETT:  Objection.

3  Mischaracterizes the document.

4      Q.   You don't agree with me, Doctor Alexander?

5      A.   Correct, I do not.

6      Q.   Why not?

7      A.   Because I believe you said that the

8  document suggests that fentanyl and heroin were

9  involved in 82 percent of overdose deaths in 2018,

10  and I don't see that the document says that.

11           What I read it as saying is that

12  "Opioids were involved in 82 percent of overdose

13  deaths in 2018."

14      Q.   And then just -- just to clarify for the

15  record, below that, it says that "59% and 23% of

16  deaths involved" either fentanyl or heroin "in

17  2018."  Is that correct?

18      A.   Yes.

19      Q.   All right.  So we know from that that 82

20  percent of the overdose deaths in 2018 involved

21  illegal or illicit opioid substances.  True?

22           MR. BURNETT:  Objection.

23  Mischaracterizes the document.

24      Q.   Well, fentanyl and heroin, as indicated

Page 124

1    here, are not legal substances.  True?

2        A.   Yes, that's true.  But it's not clear to me

3    that this is either/or; in other words, that these

4    categories are mutually exclusive.  So it may well

5    be that someone has discernible in their blood

6    system both heroin and fentanyl, and so if that 59

7    percent and 23 percent aren't mutually exclusive,

8    but overlap, then I don't think one would reach the

9    conclusion that 82 percent of overdose deaths

10   involved -- of opioid overdose deaths, involved

11   fentanyl and heroin.

12       Q.   Now, above these two bullets that we've

13   been looking at, there's a discussion about

14   methamphetamine.  Correct?

15       A.   Yes.

16       Q.   And the West Virginia Department of Health

17   and Human Resources reports that "The percentage"

18   of over -- "of overdose deaths involving

19   methamphetamine" continues "to increase," and now

20   in 2018, "More than one-third," or "36%," "of drug

21   overdose deaths," "involved methamphetamine."

22            Is that correct as I read it?

23       A.   Yes.  In West Virginia, yes, I believe so.

24       Q.   And that this continues to be a significant

Page 125

1    -- or rather --

2              MS. GEIST:  Strike that.

3         Q.   "This continues a significant and rapidly

4    rising trend seen in recent years" and then it

5    shows some statistics from 2014 to 2018, a 33

6    percent increase over those five -- five calendar

7    years.

8              Is that accurate?

9              MR. BURNETT:  Objection,

10   mischaracterizes the document.

11        A.   I mean, it notes that -- it does note an

12   increase in methamphetamine-related overdose

13   deaths, and also notes that more than half of these

14   involved fentanyl.

15             I think it's important to keep in

16   mind, this is at the State level, so it may or may

17   not be that the data applies similarly to Cabell

18   County and the City of Huntington, although I

19   wouldn't be surprised to know that there are

20   similar increases.

21             They may not be identical, but similar

22   increases.  Or important increases like this within

23   the community that -- that we're really focused on.

24             But I -- again, you know, we discussed

Page 126

1   earlier my sense that there was a bit of a

2   potential perception for a false dichotomy.  You

3   know, is this a methamphetamine problem or is this

4   a fentanyl problem or is this a opioid problem or

5   is this a nonopioid problem?

6            And you know, what I was asked to

7   evaluate is the extent of an opioid epidemic within

8   Cabell County and the City of Huntington and to

9   design an evidence-based longitudinal and

10  comprehensive abatement plan to address it.

11           So I don't view -- I think that these

12  trends are important and that any abatement plan

13  that's going to be successful has to be conducted

14  mindful of the -- of the local context in which

15  opioids are being used, but I -- but I don't view

16  these data points as sort of diminishing the

17  importance of the plan that I've proposed.

18     Q.   I understand your point.  My question is:

19  In terms of the increase in methamphetamine in West

20  Virginia, from 2014 to 2018, there's a 33 percent

21  increase in methamphetamine.  Correct?  In overdose

22  deaths, I should say.

23           MR. BURNETT:  Objection,

24  mischaracterizes the document.

1      A.   So I read this as based on preliminary drug

2  overdose data from 888 individuals at a state level

3  at one year, one point in time, there was noted,

4  you know, about a third of overdoses involved

5  methamphetamine.

6      Q.   Is that -- does that indicate that there is

7  a methamphetamine-related epidemic in West

8  Virginia --

9      A.   Well, I --

10     Q.   -- if these --

11     A.   I wasn't asked to opine about a

12  methamphetamine epidemic and so I wasn't -- that's

13  not what I was asked to do.

14     Q.   Do you think it is a significant increase

15  to go from 3 percent overdose deaths involving meth

16  in 2014 all the way to 36 percent in 2018?

17              MR. BURNETT:  Objection.

18     A.   Without a doubt.  Without a doubt.  I think

19  that's significant.  And one of my concerns is that

20  many of these individuals may have opioid use

21  disorder, and that with inadequate funding and

22  support to expand and deploy and scale up

23  evidence-based treatment programs for opioid use

24  disorder, individuals are -- you know, we're paying

Page 128

1    the price, and this may well be -- although not the

2    focus of my report, I certainly have concern

3    insofar as individuals may be engaging in, you

4    know, methamphetamine use or other substance use

5    who have untreated opioid use disorder.

6        Q.   But we don't know, Doctor, do we, that in

7    looking at this data that these individuals have

8    opioid use disorder, do we?

9        A.   Well --

10            MR. BURNETT:  Objection.

11       A.   No, these data are overdose data, so you

12   can't use overdose data to identify whether or not

13   someone has addiction.  No.

14       Q.   And if -- if you look further down, there

15   is a discussion regarding "the presence of

16   prescription medications" in the 2018 overdose

17   death analysis.  Do you see where I am?  It starts

18   "In general"?

19       A.   Yes.  I do.

20       Q.   And it indicates that "the presence of

21   prescription opioids in those dying of overdose

22   continues to decline."  Did I read that correctly?

23            MR. BURNETT:  Objection.

24       A.   Yes.

Page 129

1      Q.   And then "The most common medications seen

2   in overdose deaths" in 2018 relate to Oxycodone, 10

3   percent, which is a significant decrease from 2014.

4   Is that right?

5                MR. BURNETT:   Objection.

6      A.   Yes, I read it as "Oxycodone (10% in 2018,

7   down from 32 percent in 2014").

8      Q.   And there's no indication here that the

9   presence of oxycodone - based on, I would presume,

10  a toxicology report - was there from a

11  prescribed --

12               MS. GEIST:   Strike that.

13     Q.   There's no indication from this data that

14  the presence of oxycodone was medication that was

15  prescribed by a physician as opposed to oxycodone

16  bought off the street or stolen or taken out of a

17  medicine cabinet.   True?

18               MR. BURNETT:   Objection.

19     A.   I don't think one can tell from toxicology

20  data such as this what the source of -- of opioids

21  were, but again, as I think we've discussed

22  previously, the -- there's a lag between when, at a

23  population level -- there are -- there are

24  immediate effects of the oversupply of prescription

1    opioids, but there are also lag effects.

2              Just as if -- as if you take a

3    community and 60 percent of the people in the

4    community start smoking cigarettes, they're not

5    going to drop dead tomorrow.  It takes a while --

6    it takes years to see the manifestations in the

7    case of tobacco, lung cancer, heart disease,

8    stroke, emphysema and the like.

9              And so there are similar lag effects

10   that take place with an oversupply of prescription

11   opioids.  And so I wouldn't necessarily expect to

12   see the effects of an oversupply of opioids.  All

13   of the effects aren't going to manifest in the

14   first 24 hours or the first week or the first

15   month.

16             So my point is that while I think

17   these trends are heartening in some sense insofar

18   as they may suggest declines in the presence of

19   prescription opioids and in these unfortunate

20   individuals who have died, by no means would I use

21   this single data point to draw some conclusion

22   regarding the nature of the opioid epidemic in

23   Cabell County and the City of Huntington.

24        Q.   Doctor Alexander, I'm going to turn now to

Page 131

1   the specific components of your proposed abatement

2   plan, to use your words.

3       A.   Okay.

4       Q.   Okay?  So let me mark -- before we get

5   there, let me make sure I have all of the aspects

6   of your expert report sort of marked for the

7   record.  So -- and let you have all of those

8   materials in front of you when I ask you questions.

9            So if we look at your expert report -

10  which again is Exhibit 4 - I guess it's the second

11  page of that report, you list a number of documents

12  that you included as Appendix A, B, C and D as in

13  dog.

14            Do you see that?

15      A.   I do.

16      Q.   Okay.  So I think Appendix A, we have

17  separately included in the envelope that was marked

18  either Tab 5 or Exhibit 5.  Do you have that in

19  front of you, Doctor?

20      A.   Yes, ma'am.

21      Q.   Okay.  And then your curriculum vitae is

22  included as part of your report.  I just wanted to

23  ask you, Doctor, quickly on your CV, do you need to

24  make any changes or update it in any way?

1      A.   Well, I've had -- I'm sure that I've had

2    some papers accepted for publication or published

3    since the last time that it was submitted, so I

4    don't -- I will follow your lead and that of the

5    plaintiffs' counsel as to whether those are

6    important changes to make.

7              I don't believe that I have -- I mean,

8    I've accepted invitations to speak at one or two

9    national conferences, so there are -- probably

10   week-to-week, there are very modest changes that I

11   could make.  But I think overall this represents

12   fairly well the totality of my professional

13   activities.

14     Q.   Thank you, that's fine.  And we'll just

15   make a request for an updated CV at some point

16   prior to trial.

17     A.   Of course.

18     Q.   Appendix C, that is the list of sources

19   that were consulted in connection with your

20   opinions formed in the case.  And that is Exhibit

21   7, along with -- or Tab 7, along with Appendix D,

22   which is your redress model.

23              And Doctor Alexander, would you mind,

24   if you have those two envelopes in front of you?  I

Page 133

1   just want to make sure that Tab A is -- is Exhibit

2   5, which is your John Hopkins report; and then Tab

3   7 is the list of sources that were consulted in

4   your redress model.

5       A.   Yeah, so I opened -- and by the way, I

6   would appreciate maybe within ten or fifteen

7   minutes a brief break, would be great --

8               MR. BURNETT:  Yeah, Counsel, I was

9   going to suggest not a brief break, but why don't

10  we break for lunch before we get into these other

11  documents?  Since we've been going about an hour

12  and a half, and it's 12:20.

13              MS. GEIST:  Yeah, absolutely, Counsel.

14  What I'm doing right now is I'm just trying to get

15  ready -- because I'm looking at the clock too, and

16  I know we're going to want a lunch break.

17              I want to get into Doctor Alexander 's

18  opinions in the report.  So I'm trying to make sure

19  we're -- we're ready to do that.

20              So I want him to have in front of him

21  his list of sources that he consulted and his Johns

22  Hopkins report that was Appendix A, and his redress

23  model.  Together with his report.  That's what I'm

24  trying to do now.

1     A.   Yeah, so I had -- I think I was asked to

2   open Tabs 4, 5 and 7.  And so those are -- I have

3   opened in front of me.  So Tab 4 is -- is that

4   what's being displayed?

5     Q.   No.  Tab 4, Doctor Alexander, should be

6   what we've marked as Exhibit 4.  That should be

7   your expert report.

8     A.   Okay.  And may I put that away?  Or shall I

9   keep that handy?

10     Q.   I would keep that handy, please.  Thank

11   you.

12     A.   Okay.  So that is Tab 4.  And then Tab 5 --

13     Q.   Tab 5 should be your "Johns Hopkins Report:

14   'From Evidence to Impact'," which is Appendix A to

15   your report.

16     A.   Okay, so I have that available.

17     Q.   And then Tab 7?  And that should be your

18   list of sources that were consulted and your

19   redress model.

20     A.   Right.  And so that's a one-page -- that's

21   a one-page document, and I see it -- on one side,

22   it says, "Expert Witness Report of G. Caleb

23   Alexander, Appendix C, List of Sources That Were

24   Consulted," and on the other side of the page, I

Page 135

1   see "Materials Considered" and it lists three --

2   there's three numbers essentially.

3       Q.   Okay.  We before -- before we take a break

4   for lunch, Doctor Alexander - because I do think

5   it's a good time to break - in terms of your

6   Appendix C to your report, can you just please

7   represent to us that all of the materials that you

8   reviewed and relied upon in forming your opinions

9   that are contained in your expert report are either

10  cited in the report itself or they're in your list

11  of sources that were consulted?

12              MR. BURNETT:  Objection.

13      A.   They could also be included in the redress

14  models.  So if you're -- when you say my report, if

15  you mean both my narrative 125-page report as well

16  as the redress models that I've provided, yes, I

17  can confirm that all of the materials that I used

18  are either referenced or cited in my narrative

19  report, the 125-page report, or the redress models,

20  Appendix D on what's being displayed currently, or

21  the list of sources that were consulted, Appendix

22  C.

23      Q.   Thank you very much for that.  The only --

24  the only other question I have before we take a

1    break is:  There were some notes that were provided

2    to us at our request, and these notes are referred

3    to in your report, notes of meetings or interviews

4    that you or your team members from Monument

5    Analytics had done.

6              You had met with individuals in Cabell

7    County/Huntington.  I think you referred to them as

8    local stakeholders.  Is that correct?

9        A.   Yes, ma'am.

10             MR. BURNETT:  Objection.

11       Q.   And you have -- you and/or your colleagues

12   put together some notes from at least some of those

13   meetings.  Is that right?

14             MR. BURNETT:  Objection.

15       A.   Yes, it is.

16       Q.   Okay.  We have separately marked those as

17   exhibit -- or Tab 52.  We might as well just take

18   that out so we're ready to review that when we come

19   back from lunch.

20       A.   Okay.  So I have Tabs 4 -- excuse me.  4,

21   5, 7 and 52 available and handy.

22       Q.   Great.  It probably would have made better

23   sense to just make it all one document, but we

24   didn't.  So I apologize.  And if we were in person,

Page 137

1   I would just hand it all over to you.  But this is

2   the nature of the -- the Zoom situation that we're

3   in.

4              So why don't we take a break for

5   lunch.  How much time would you like for lunch?

6      A.   Say -- what would you suggest?  I'm open.

7              MR. BURNETT:  How about 1:00 o'clock?

8              MS. GEIST:  I don't know if you're

9   able to get lunch quickly at the hotel where you

10  are, you know, 1:00 o'clock -- we could try for

11  1:00.  You want to say 1:15?  I don't know if

12  you're going down to a restaurant.

13             THE DEPONENT:  No, 1:00 p.m. is fine.

14  Even ten to 1:00 would be fine, but 1:00 would be

15  fine with me.

16             MS. GEIST:  Okay.  1:00 o'clock.

17             MR. BURNETT:  Why don't we say 1:00?

18             MS. GEIST:  1:00 o'clock.

19             THE DEPONENT:  Great.

20             MS. GEIST:  Very good.  Thank you.

21             THE DEPONENT:  Thank you.

22             VIDEO OPERATOR:  The time is

23  12:27 p.m.  We are going off the record.

24             (A recess was taken for lunch after

Page 138

1              which the proceedings continued as

2              follows:)

3              VIDEO OPERATOR:  The time is 1:01, we

4    are now back on the record.

5    BY MS. GEIST:

6         Q.   Okay, welcome back, Doctor Alexander.  I

7    hope you had a nice lunch.

8         A.   Thank you.  Yes, you too.

9         Q.   Thank you.  Quick but fine.  If you could

10   go ahead, Doctor Alexander, and put Exhibit 5 in

11   front of you.  And just for the record, you've

12   included this as an attachment to your expert

13   report in this case, and this is a 2017 report

14   entitled "THE OPIOID EPIDEMIC, From Evidence to

15   Impact," from Johns Hopkins Bloomberg School of

16   Public Health.  Is that correct?

17        A.   Yes, it is.

18        Q.   And could you just explain to me briefly,

19   why did you attach the 2017 Johns Hopkins report to

20   the expert report in this case?

21        A.   Well, this was work that was undertaken in

22   concert with the Clinton Foundation, and the focus

23   of this undertaking was to disseminate evidence-

24   based and evidence-informed approaches to abate the

Page 139

1    opioid epidemic, and I thought it was relevant for

2    this purposes because it -- for a few reasons.

3              I guess the biggest two were that it

4    demonstrates some of my activity in this area, as I

5    was one of three faculty that led this initiative.

6              And also as I highlight in my expert

7    report for this case, there is remarkable alignment

8    between the types of abatement interventions that

9    are -- that are described in Appendix A and the

10   expert recommendations of many other parties,

11   including, you know, Surgeon General's reports and

12   a report from the current administration in

13   Washington, D.C. focused on abating opioid-related

14   harms and the like.

15             And so that's why I included it.

16        Q.   Okay.  Thank you.  And I was asking you

17   that question, because I did see a number of

18   consistencies between the Johns Hopkins report and

19   your abatement plan submitted in this case and your

20   abatement plan submitted in the Ohio MDL case.  So

21   that was part of the reason why I asked you.

22             Did the Johns Hopkins report, Appendix

23   A, at least loosely form the outline or the

24   thinking for what ultimately became your first

Page 140

1    abatement report in this litigation?

2              MR. BURNETT:  Objection.

3       A.   The report is -- the Johns Hopkins report,

4    "From Evidence to Impact," is relevant for the

5    reasons that I mentioned, but each of my -- this

6    was a general report, "From Evidence to Impact,"

7    that wasn't focused on a particular community, and

8    in contrast, the report that I've provided for the

9    county of -- for Cabell County and the City of

10   Huntington is based on and motivated by and

11   informed by many of the what I would call

12   contextual dimensions of the epidemic or the fabric

13   of the epidemic as it's played out in Cabell County

14   and the City of Huntington.

15      Q.   So let's take a look just quickly at page 5

16   of the Johns Hopkins report.  And by the way, while

17   we're doing that, Doctor, this is not the first

18   iteration of the Johns Hopkins report, "From

19   Evidence to Impact;" is that correct?

20      A.   When you say "first iteration," I mean,

21   this represents, I believe, the report that has

22   been produced as the final report that was

23   disseminated in, I believe it was, October of 2017.

24      Q.   Sure.  My question -- maybe my question

                                                        Page 141

1    wasn't clear.  There was at least an earlier

2    version of this Johns Hopkins report, "From

3    Evidence to Impact" back in 2015.  Is that correct?

4         A.   No, I believe --

5                   (Deponent had an interruption at his

6    location.)

7                   THE DEPONENT:  Sorry for the

8    interruption.  That's fine.  Thank you very much.

9    I'm good.  Thank you very much, sir.

10        A.   The 2015 report was a separate report.  I

11   wouldn't characterize it as an earlier version of

12   this report.  It was a separate report.

13        Q.   Okay.  But both of these reports are

14   referenced in the expert report you've provided on

15   behalf of plaintiffs here, correct?

16        A.   That may be.  I mean, there were, again,

17   650 or more references, and so I would want to look

18   carefully with you.

19                   But it may well be the case that I

20   referenced both the 2015 report and this 2017

21   report that we're looking at here.

22        Q.   So you can quickly go to page 4 of your own

23   expert report, Doctor, just so we can clarify this,

24   because in each of your three abatement plans that

1    I have seen - the one here, the one in Washington

2    and the one in Ohio from the MDL case - both of the

3    Johns Hopkins reports or monographs issued in

4    October of 2015 and October of 2017 are -- are

5    referenced specifically in those reports.

6                    There's even a picture, if you look at

7    page 4 of your expert report in this case.

8        A.    I'm quite sure and recall having referenced

9    the 2017 report, and actually in the -- in the page

10   that's being projected, I see that we report that

11   this 2017 report reflects an updated and expanded

12   revision of a prior monograph, which is referencing

13   the 2015 version.

14                   I guess the point that I was

15   requesting an opportunity to confirm with you was

16   whether or not the 2015 report was specifically

17   called out as a reference in my expert report.  But

18   it may well have been.  I think that -- that --

19   that would -- that may well be the case.

20       Q.    Okay.  I mean, it's on page 4 of your

21   report.  I don't want to quibble with you or make

22   you think I'm trying to trick you.  I'm --

23       A.    Well, where -- where on page 4 is there a

24   reference -- I mean, I see that I allude to it.  I

Page 143

1    -- there's a sentence that reads, "These monographs

2    were issued in October 2015 and October 2017," and

3    then I say, "The latter report is provided as

4    Appendix A."  Thank you.

5             But what I'm questioning is:  I guess

6    I thought you were asking whether or not one of the

7    650 odd references is -- I thought you were asking

8    whether one of the 659 references is to the 2015

9    report, and that's where I was raising question as

10   to whether or not that's the case.

11            Because I don't believe it's the case,

12   but it may have been, as I said.

13       Q.   No, it's just referenced -- you know,

14   frankly, I didn't cross-check it.  But it is here

15   referenced as you noted on page --

16       A.   No, I --

17       Q.   -- page 4 of your report.  Right?

18       A.   Yes, it is.

19       Q.   Okay. Thank you.  Now, going back to the

20   Johns Hopkins "From Evidence to Impact" report that

21   you attached specifically at Appendix A, and that

22   was the October of 2017 report, if you look at page

23   5, that sort of outlines, if you will, you know, a

24   "commitment to three principles": Informing Action

Page 144

1    with Evidence; "Intervening Comprehensively;" and

2    "Promoting Appropriate and Safe Use of Prescription

3    Opioids."

4                 Do you see where I am?

5         A.   Yes.  Yes, ma'am.

6         Q.   And then it indicates that "Those

7    principles led to the delineation of 10 topic areas

8    across the spectrum of the problem ranging from

9    how" physicians "treat pain to treatment for opioid

10   use disorders to harm reduction strategies."  And

11   then "The findings of the report are comprised of

12   evidence from these topic areas."

13                Did I read all of that correctly?

14        A.   Yes.

15                MR. BURNETT:  Objection.

16        Q.   And obviously you were part of the research

17   team at Johns Hopkins that did the research and put

18   together this report?

19        A.   Yes, I was one of three faculty that led

20   this initiative.

21        Q.   Okay.  And if you look with me at the --

22   the outline of the report, the ten topic areas, the

23   first half is entitled "Improving the Safe Use of

24   Prescription Opioids" and that addresses five

Page 145

1    topics, and then "The second half" includes

2    additional topics focusing "on addressing,"

3    "Identifying and Treating People with Opioid-Use

4    Disorders."

5              Do you see where I am, Doctor?

6       A.   Yes, I do.

7       Q.   Okay.  And would you agree with me that

8    this loosely follows some of the topics that you

9    have in your expert report?

10      A.   Well, there are some overlap.  I'm --

11             THE DEPONENT:  I'm sorry, David.  Did

12   you wish to say something?

13             MR. BURNETT:  I just said "Objection."

14             You can answer.

15      A.   There was some overlap, and there are --

16   then there are areas where there's not so much

17   overlap.  And you know, keep in mind, this was a

18   report that was generated in 2017 and was focused

19   on a national epidemic.

20             My report for this case was generated

21   earlier this year, and over the course of perhaps a

22   year, and is focused on Cabell County and the City

23   of Huntington.  So there was certainly some

24   dimensions of the epidemic that are highly

Page 146

```
 1   consistent in terms of abatement between this
 2   report and my report in this case.
 3            But -- but there's not perfect
 4   alignment either, nor would I expect there to be.
 5       Q.   And nor did I suggest it.  My question
 6   really was:  Were you -- was this essentially the
 7   starting point for the abatement report you put in
 8   in the Ohio case involving Cuyahoga County and
 9   Summit County?
10            MR. BURNETT:  Objection, asked and
11   answered.
12       A.   I would say it's not.
13       Q.   This didn't form at all any of the bases
14   for your opinions in that initial case that you put
15   the abatement report in in March 2019 in Ohio?
16            MR. BURNETT:  Objection.
17       A.   I disagree with that statement.  It did.
18   It did inform it.  But you asked if it was the
19   starting point, and I would not characterize it as
20   the starting point.
21            I mean, keep in mind that my report
22   and my recommendations are based on a huge volume
23   of literature and an enormous scientific evidence
24   base.
```

Page 147

1          So it's only natural, for example, if

2     I'm talking about treatment for opioid use

3     disorder, some of that literature that I would cite

4     in this 2017 report is bound to be the same as

5     literature that I would cite in my report for

6     Cuyahoga County and Summit County.

7          But I wouldn't -- I would not

8     characterize this as the starting point for my

9     report in Cuyahoga and Summit County.

10          When I'm asked to develop an abatement

11    plan for a community, the starting point is to

12    learn more about the community and understand the

13    scope and the nature of the epidemic within the

14    community that's been affected.

15          So the starting point is not

16    scientific evidence.  The start --

17      Q.   I apologize.  That was my phone.

18      A.   Oh, okay.

19          The starting point is not scientific

20    evidence; the starting point is understanding the

21    community.

22      Q.   Would you agree with me, Doctor Alexander,

23    that some of these topics, these headings that

24    we're looking at here together on the screen, 1

Page 148

1   through 10, some of them are identical or virtually

2   identical to the headings that appear in your

3   report?

4       A.   Absolutely.

5            MR. BURNETT:  Objection.

6       A.   There are -- absolutely.  There are some

7   broad headings and broad domains that run

8   throughout any -- any reasonable and comprehensive

9   abatement plan, things --

10      Q.   I understand.

11      A.   -- reading --

12      Q.   Your answer was, "Absolutely," I'm correct?

13           MR. BURNETT:  No, again, I believe you

14  interrupted the witness while he was answering the

15  question.

16           MS. GEIST:  I just -- I'm going to

17  move to strike after "Absolutely."  Because, you

18  know, I feel like there's a fair bit of

19  narrative --

20           MR. ARNOLD:  Counsel, you can't --

21  this is Edward Arnold for the plaintiffs.  You

22  cannot move to strike.  There is no move to strike

23  here --

24           MS. GEIST:  I'm going to move to

Page 149

1    strike -- I can move to strike after "Absolutely."

2                MR. ARNOLD:  There's no such thing.

3                MS. GEIST:  My seven hours is being

4    impact by all of the long, narrative responses

5    given by Doctor --

6                MR. ARNOLD:  You are giving long

7    narrative questions --

8                MS. GEIST:  I --

9                MR. ARNOLD:  -- so make briefer

10   questions if you want to use your time.

11               MS. GEIST:  The question was:  "Are

12   these identical or near identical to what's in your

13   report?"  That is not a long narrative of question.

14               I've gotten paragraphs of answers in

15   the response.  I'm noting for the record that the

16   seven hours is being taken up in large part by

17   Doctor Alexander expanding well beyond the question

18   posed.

19               So let's move on.

20   BY MS. GEIST:

21        Q.   Doctor Alexander, I want you to go to the

22   first page of the Johns Hopkins "From Evidence to

23   Impact" document that we're looking at here.

24               MR. BURNETT:  Counsel, let me

Page 150

1    interject as well.  I'm going to object to

2    questions that require longer answers because your

3    questions are unfair or misleading, and the witness

4    is entitled to answer as he sees fit, so I would

5    suggest you ask different questions if you're not

6    happy with his answers.

7                You're -- you know, the witness is

8    entitled to answer the question you present in the

9    best way that he thinks possible to best represent

10   his views on the question.

11      Q.   I'll go back one page.

12               MS. GEIST:  John, please -- sorry, I'm

13   looking for the -- it's the first or second page.

14   It has "The Clinton Foundation" at the top.  There

15   we go.  Thank you.

16      Q.   Doctor Alexander, I assume you're familiar

17   with this page in the Johns Hopkins report?

18      A.   Yes, I am.

19      Q.   Okay.  And do you agree with the statement,

20   it appears to be, by the Clinton Foundation and

21   signed off by Former President Bill Clinton in the

22   second paragraph which indicates that "There's no

23   single solution to this grave public health threat,

24   but we know where to start.  First we must

Page 151

1    acknowledge that opioid addiction is a disease that

2    requires comprehensive treatment."

3            I assume you agree with that.

4        A.   Yes, I do.

5        Q.   "Closing the path to addiction means

6    addressing the overprescription of legal opioids."

7    Do you agree with that?

8        A.   I mean -- "Closing the path" --

9        Q.   Well, let's read the whole sentence.

10   "Closing the path to addiction means addressing the

11   overprescription of legal opioids and the

12   proliferation of illicit opioids such as heroin and

13   drugs laced with fentanyl."

14           Do you agree with that sentence?

15       A.   And am I -- I discuss in great detail in my

16   report what I think it's going to take to reverse

17   opioid-related harms in Cabell County and the City

18   of Huntington, and so rather than weighing in on

19   the former president's words, I would rather refer

20   to the four corners of my report, which I think

21   very well characterize what I think it will take to

22   reverse opioid-related harms.

23       Q.   But the question was:  Do you agree or

24   disagree with the sentence that I just read?

Page 152

1    "Closing the path to addiction means addressing the

2    overprescription of legal opioids and the

3    proliferation of illicit opioids such as heroin and

4    drugs laced with fentanyl."

5            MR. BURNETT:  Objection, asked and

6    answered.

7        Q.   Do you agree or disagree?

8        A.   I think that there are many different

9    interventions that have very good evidence to

10   support them that can be used to address the

11   thousands of people within the county that have

12   opioid use disorder, and I'm hesitant to -- to

13   simplify what is a complex phenomenon.  I think

14   that --

15       Q.   Doctor Alexander, I don't want to interrupt

16   you, I really don't.  But it was a question that

17   was really clear and really simple.  There's a

18   sentence in the Johns Hopkins report that -- you

19   were a part of that report.  You chose to include

20   it as a reference material in your expert report

21   here.

22            There is a statement I just read to

23   you, and my only question, sir, is:  Do you agree

24   or disagree?  Can you answer that question?

Page 153

1            MR. BURNETT:  Counsel.  Counsel,
2    number one, you're, again, interrupting him.  I'm
3    -- it's too bad you're not happy with his answer,
4    but he's entitled to answer as he sees fit.  If it
5    doesn't lend itself to a yes or no answer, he's
6    entitled to say that.  It's his testimony.
7       Q.   Not yes or no.  Do you agree or disagree?
8    That's the only question.  If you disagree, you can
9    tell me and you can tell me why.  If you agree, you
10   can tell me that too.
11           MR. BURNETT:  Same objection.  He's
12   answered as he saw fit.  You've now answered the
13   question three times.
14           MS. GEIST:  He hasn't answered.
15      A.   Let me try again.  These are the former
16   president's words.  They're not my own.  I think
17   that addiction is a complex phenomenon and in the
18   case of Cabell County and the City of Huntington, I
19   think it's been driven, in part, by the large
20   oversupply of prescription opioids, so if you're
21   asking whether I think that we need to do a better
22   job of reducing the oversupply of prescription
23   opioids in order to help reduce the number of new
24   individuals developing opioid use disorder, I would

Page 154

1    say absolutely.

2              But addiction is a life-long disease,

3    and people have opioid use disorder their whole

4    lives.  That doesn't mean that they're living in

5    active addiction.  But I just am -- am hesitant to

6    oversimplify and say that -- that closing or that

7    reducing the path to addiction is this single

8    thing.

9              We need to educate prescribers.  We

10   need to educate the general public.  We need to

11   reduce the oversupply of opioids.  We need to do a

12   better job of using alternative treatments to treat

13   and manage pain.  We need to do a better job of

14   linking people to care so that if people show up in

15   an emergency department with an overdose, they're

16   not simply given a dose of naloxone and sent home.

17             We need to screen adolescents and

18   teenagers in order to identify individuals that may

19   be using opioids nonmedically.  So I apologize that

20   I'm not willing to just say, "Yes, I agree with the

21   president" or "No, I disagree with the president,"

22   but it's a complex process and a complex set of

23   solutions, and that's what I've articulated in my

24   report.

1    Q.   Does anywhere in this sentence that I've
2  just read to you now two or three times -- is the
3  word "oversupply" anywhere in this sentence?
4            MR. BURNETT:  Objection.
5    A.   I mean, we've -- we've discussed --
6    Q.   Doctor Alexander, it's a yes or no.  The
7  sentence I just read to you two or three times, is
8  the word "oversupply" in that sentence?
9            MR. BURNETT:  Counsel, he was in the
10  process of answering you.  That's about the seventh
11  time you've interrupted him.  Please do not do
12  that.
13            MS. GEIST:  No, Doctor Alexander was
14  going off on another multi-paragraph answer, and
15  you, Counsel, directed me to be specific.  I cannot
16  be more specific than I am being.
17    Q.   The question is:  Is the word "oversupply"
18  in this sentence that we're looking at?
19            MR. BURNETT:  Counsel, what I'm
20  objecting to is he started to answer your question
21  and then you interrupted.  He's entitled to answer
22  as he sees fit.  If you don't like the answer, you
23  can ask a follow-up question.
24            MS. GEIST:  He's not entitled to

Page 156

1    engage --

2                MR. BURNETT:  You are not entitled to

3    interrupt him.

4                MS. GEIST:  I'm not entitled to have

5    my seven hours taken up by paragraph after

6    paragraph answer --

7                MR. BURNETT:  Counsel, that is his

8    testimony.  Whether or not you like it or not, he

9    is -- all -- everything that he's saying is on

10   topic.  So it's all his testimony.

11               MS. GEIST:  You know what, Counsel,

12   I'm reserving my right to extend, move the Court,

13   for an additional day of deposition from Doctor

14   Alexander if this keeps up.  I'm warning you and

15   I'm providing notice to the witness.

16               I mean, I have seven hours.  So we

17   will move the Court for relief and get additional

18   time in this case if Doctor Alexander will not

19   simply answer my questions.

20               MR. BURNETT:  And Counsel, I think the

21   record will clearly show that he's trying to answer

22   your questions.  Your questions are bad questions

23   and do not lend themselves to easy answers.

24               So you know, you're on notice that you

Page 157

1    could be asking better questions that elicit, you

2    know, more fair responses.

3    BY MS. GEIST:

4        Q.   So Doctor Alexander, let's try it again.

5    We've read this sentence now two or three times.  I

6    assume your answer is the same, but I'll try it

7    again.

8                Can you agree or disagree with this

9    sentence:  "Closing the path to addiction means

10   addressing the overprescription of legal opioids

11   and the proliferation of illicit opioids such as

12   heroin and drugs laced with fentanyl."

13               MR. BURNETT:  Objection.  Asked and

14   answered.

15       Q.   Agree or disagree?

16       A.   Well, I think we did discuss this

17   previously, and what I would say is that I would

18   prefer to look to my report which discusses in

19   detail my recommendations and my beliefs about what

20   needs to be done in Cabell County and the City of

21   Huntington.

22       Q.   So you're not going to answer my question,

23   whether you can agree or disagree, correct?

24               MR. BURNETT:  Objection, Counsel.  He

Page 158

1    has answered your question.  The fact that he

2    doesn't answer it the way you like is irrelevant.

3    He answered your question several times.

4              MS. GEIST:  No, he has not.  But we're

5    going to -- we're going to move on, because I'm not

6    going to waste any more of my time.

7              And again, you're on notice that we

8    will seek relief from this deposition.

9    BY MS. GEIST:

10       Q.   Now, Doctor Alexander, your first report

11   was in the Ohio case, as we discussed before.  So

12   let's take a quick look at that, please.  That is

13   Tab 32 or Exhibit 32, if you want to open up that

14   envelope.

15         ALEXANDER DEPOSITION EXHIBIT NO. 32

16                   (G. Caleb Alexander, MD, MS, Expert

17                   Witness Report, prepared for USDC,

18                   Northern District of Ohio, MDL No.

19                   2803 dated 3-24-19 was marked for

20                   identification purposes as Alexander

21                   Deposition Exhibit No. 32.)

22              VIDEO TECH:  Tab 32 has been marked as

23   Exhibit 32.

24              MS. GEIST:  Thank you, John.

Page 159

1        A.    Just -- I'm concerned I don't want to get

2   other tabs out of place.  So it was Tab 5, this

3   report that we've just been considering, "From

4   Evidence to Impact"?

5        Q.    I think you are correct.  Yes.  Yes, it is.

6        A.    Okay.  And Tab 4 is my overall report for

7   this case, I presume?

8        Q.    Yes, it is.

9        A.    Okay.

10       Q.    And again just for the record, anytime it

11  is a tab, Tab 4 is Exhibit 4, we've marked it as

12  Exhibit 4.  And your Johns Hopkins "Evidence to

13  Impact" report referenced in your expert report is

14  marked as Exhibit 5.

15       A.    Okay.  I've now opened Tab 32.

16       Q.    Great.  Do you have that in front of you,

17  Doctor?

18       A.    Yes, I do.

19       Q.    Okay.  I lost you, so I assume you're

20  coming back.

21       A.    Sorry.  Yes, I do.

22       Q.    That's okay.  Okay.  So can you just

23  identify for the record, please, what Exhibit 32

24  is?

Page 160

1      A.   It looks to be an expert witness report

2   that I produced.

3      Q.   And you produced that in the Ohio

4   litigation?  That was your first expert report

5   provided on behalf of plaintiffs in the opioids

6   litigation; is that correct?

7      A.   Yes, ma'am.

8      Q.   And that was in March 2019?

9      A.   I would want to look at the dates, but I

10  don't have reason to believe otherwise.

11     Q.   Okay.  And in this first expert report, you

12  - as you are doing here - you are putting forward a

13  plan to address - or in your words - abate the

14  opioid -- the opioid epidemic, and you are

15  addressing the opioid epidemic in the two counties

16  in Ohio, Cuyahoga and Summit Counties.  Is that

17  correct?

18     A.   Yes, it is.

19     Q.   Okay.  And I assume that you -- you

20  endeavored to set forth a complete and comprehens

21  -- comprehensive plan that would be implemented as

22  appropriate by the specific community there in

23  Cuyahoga and Summit Counties?

24     A.   Yes, I did.

Page 161

1      Q.   Okay.  Now, if you look at your report here

2   from last year in the two counties in Ohio, it

3   contains sort of an outline of your -- your

4   categories of remedies that, from your perspective,

5   need to be undertaken to address the epidemic.

6            If you look on page 13 to 14, Doctor

7   Alexander --

8      A.   Okay.

9            MR. BURNETT:  Counsel, let me just

10  note here, as you noted before we started - or at

11  the start - the parties are on notice from the

12  Court that the questions in this deposition for

13  this case need to be focused on this case, so

14  you're now asking him his -- his -- you're asking

15  questions about his report in his prior case.

16           So, you know, I don't know how many

17  questions you're planning to ask on this, but you

18  know, just be mindful about that direction about

19  duplicative testimony.

20           MS. GEIST:  I think you know I'm very

21  mindful of it.  I was the one that raised at the

22  beginning, and I'm not asking him any substantive

23  questions about the different aspects of the

24  program he suggested or the programs and

Page 162

1    interventions he suggested last year in the two

2    counties in Ohio.

3         Q.   Doctor Alexander, you're with me on page 13

4    to 14 of this expert report from March 2019?

5         A.   Yes, I am.

6         Q.   Okay.  And if you look on page 13, as you

7    indicated to me today, you note that you were

8    including a comprehensive set of abatement remedies

9    and that you "leave the task of defining the

10   specific application of these programs for Cuyahoga

11   and Summit Counties."  You leave that to the

12   communities themselves.

13            Is that a fair characterization of

14   what you did?

15        A.   Yes, it is.

16        Q.   Okay.  And if you look at page 14, here we

17   see --

18            MS. GEIST:  If we could get to that

19   page, John, please.

20        Q.   -- here we see your categories of remedies

21   or interventions or programs that from your

22   perspective need to be employed to abate or address

23   the opioid crisis.  Is that correct?

24        A.   Well, it seems to me that you're asking

Page 163

1    about the substance of my abatement plan for

2    Cuyahoga and Summit Counties, but with that being

3    said, yes, these were the categories that I felt

4    were -- this was the way that I proposed to

5    structure the abatement plan for those communities.

6        Q.   Okay.  And you, in this case, have a

7    similar list of categories and subcategories in

8    terms of outlining your proposed abatement programs

9    and interventions.  True?

10                 MR. BURNETT:  Objection.

11       A.   I'm -- I have a -- I provide a list -- I

12   mean, I provide a structure for what I think the

13   community should consider, and so the way that I

14   have done so, we could review my report, but I do

15   provide an overarching framework.

16                 I think without that, you know, it

17   would just be kind of mumbo-jumbo, so I do provide

18   a framework, yes.

19       Q.   Yeah.  Well, why don't you put side by

20   side, if you wouldn't mind, the report in this case

21   and then the report in Cuyahoga/Summit so we can

22   take a look at the categories.

23                 And the categories in this case are on

24   page 15 of your expert report.

Page 164

1        A.    Okay.

2        Q.    Do you have those two reports in front of

3    you, Doctor Alexander?

4        A.    Yes, I do.

5        Q.    Okay.  If you look with me here under

6    Category 1 in the report that you've put in in this

7    case, Cabell County/Huntington, there's a section

8    entitled "Community Prevention and Resiliency."  Do

9    you see that?

10       A.    Yes, I do.

11       Q.    That's a new category that you didn't have

12   in the Ohio county report, true?

13       A.    Well, I'm not sure that I didn't speak to

14   it.  Again, I feel that we're talking about that

15   we're talking about the substance of my earlier

16   report, but you know, it's an important matter to

17   -- I mean, the -- ultimately, communities are --

18   are getting the brunt of this.

19              So it's true that there's not a

20   specific call-out for it in my Cuyahoga and Summit

21   report, but I'm not sure that it's not,

22   nevertheless, featured within the report.

23       Q.    Similarly, under Category 2, Treatment, if

24   you look at your report here, "Connecting

Page 165

1    Individuals to Care," that is not an aspect of your

2    abatement or intervention plans for the two

3    counties in Ohio.   True?

4                  MR. BURNETT:   Objection.

5                  And again, as -- as the witness has

6    said himself, these questions go to the substance

7    of his prior report.  I would suggest that you

8    focus on his current report, because you had the

9    opportunity to look at his prior report last year.

10                 MS. GEIST:   Well, we didn't have this

11   report last year when we asked him about his prior

12   report last year, so we're doing a comparison --

13                 MR. BURNETT:   But Counsel, your

14   question was asking him in the content of his last

15   year's prior if a certain topic was covered.   That

16   would require him to look through his prior report

17   and, you know, and disprove a negative.

18                 MR. RUBY:   Counsel, this is Steve

19   Ruby.  I was on the phone with Judge Wilkes when he

20   made the ruling that we've been referring to

21   earlier this week, and he was very clear that prior

22   reports and the like are the proper subject of

23   foundation questions to do things exactly like

24   this, to compare the content of those and ask

Page 166

1   questions that are specific of this litigation.

2            So I'm -- I'm entirely comfortable

3   that that's the ruling that he'd make today.  But

4   if we need to call him, we can.

5            MR. BURNETT:  No, I don't think we

6   need to call him.  I read the transcript.  I wasn't

7   on the call.  I read the transcript.  I don't

8   recall him making that specific point that you're

9   saying.

10           I don't disagree that some questions

11  to compare to the current report could be okay, but

12  you know, the questions that you're asking,

13  Counsel, are -- require substantive discussion of

14  the past report.

15           MS. GEIST:  So --

16           MR. FARRELL:  This is Paul Farrell.

17  As co-lead of the MDL and lead trial counsel in

18  CT-2, I'm recommending, David, that what you do is

19  you contact Judge Wilkes and ask him to referee the

20  next hour or so of this deposition.  That way we

21  can get some rulings.

22           I think it's probably best - both from

23  the defense standpoint and the plaintiffs'

24  standpoint - that we get more substantive questions

Page 167

1   and answers than objections and argument from both

2   sides, and so while I tend to disagree with

3   Mr. Ruby, but I'm not interested in wasting any

4   more time with this.

5                 Doctor Alexander is an important and

6   fundamental witness in this case, and this is an

7   opportunity for you to discover what he has to say,

8   and it seems like we're drifting afield into

9   impeachment and cross examination as if this was at

10  trial.

11                So David, why don't we take a

12  five-minute break.  If Ms. Geist will agree, we'll

13  get special master on the phone, and he can call

14  balls and strikes.

15                MS. GEIST:  I have -- I have

16  absolutely no problem getting the special master on

17  the phone.  I reviewed the transcript myself.  I

18  think exploring what is different here in the

19  abatement plan for Cabell County/Huntington that

20  was not included in an abatement plan put in in a

21  different jurisdiction, but a two-counties

22  jurisdiction last year, is quite an appropriate

23  line of questioning.

24                And so I'm not getting into questions

Page 168

1   that were asked of Doctor Alexander whatsoever in

2   his prior deposition.  I have -- I have absolutely

3   complied with the direction from Judge Wilkes as to

4   that point.

5              So these questions have nothing to do

6   with questions he was asked about before, and it

7   would be impossible, because there was no Cabell

8   County/Huntington report when he was asked

9   questions in the Ohio case.

10             MR. BURNETT:  So Counsel, if you don't

11  object, I suggest we do what Mr. Farrell suggested

12  and get the Court on the phone.

13             I suppose the only alternative would

14  be if we can just focus on his current report,

15  perhaps that would be acceptable to everyone.

16             MS. GEIST:  So I am trying to focus on

17  his current report, Counsel.  That's exactly what

18  I'm doing.  And my questions are, I think, pretty

19  obviously tied to the current report.

20             I am asking Doctor Alexander if he had

21  - as he testified - put in a comprehensive plan for

22  abatement last year, why does he have additional

23  categories for abatement here a year later in the

24  Cabell County/Huntington jurisdiction.

Page 169

1           MR. BURNETT:  Right, I understand your

2   position.  I'm just saying that the only way to

3   possibly resolve this without the Court's

4   intervention would be if you -- if, you know, we

5   set aside the past report entirely and just asked

6   about the current report.

7           If not, I think there's enough of a

8   dispute here that, as Mr. Farrell said, we should

9   get the Court on the phone.

10          MS. GEIST:  Well, first of all, I'm

11  going to ask my questions about why there were

12  categories of programs and interventions here in

13  this report that were not included in Track 1, in

14  Cuyahoga/Summit.

15          So we've -- we can take down the other

16  report.  I've already marked it as an exhibit.  And

17  if Doctor Alexander wants to just answer my

18  questions and the only report we have on the screen

19  in this report in this case, then I'm perfectly

20  fine too.  But I am not going to agree to not ask

21  these questions.

22          MR. BURNETT:  Right.  Okay.  In that

23  case, I think we should try to get the Court on the

24  phone.  So as Mr. Farrell suggests, why don't we go

Page 170

1   off the record and we can set up.

2             VIDEO OPERATOR:  Time is 1:37, we are

3   off the record.

4             (A recess was taken after which the

5             proceedings continued as follows:)

6             VIDEO OPERATOR:  The time is 1:55, we

7   are now back on the record.

8             MR. BURNETT:  So Doctor Alexander,

9   while you were off, we had a discussion among

10  counsel, and the take-away is that in order to

11  hopefully avoid having to get Judge Wilkes on the

12  phone, we will endeavor to keep things moving, and

13  your role in that - to the extent you're able - is

14  to try and answer the question before you

15  succinctly, if possible; and if it requires a

16  longer answer, you know, answer as you see fit, but

17  with that recommendation.

18             THE DEPONENT:  Of course.  Thank you.

19  Thank you.

20             MS. GEIST:  Okay.

21  BY MS. GEIST:

22     Q.   Okay.  So Doctor Alexander, do you have

23  your two reports still in front of you --

24     A.   Yes, I --

1      Q.   -- Exhibit 32, which is the Ohio report,

2   and Exhibit 4, which is your report in this case?

3      A.   Yes, I do.

4      Q.   Okay.  Before we went off the record to

5   have a discussion, I was asking you about Category

6   1, Prevention, in your report in this case, and I

7   asked you --

8              MS. GEIST:  Strike that.

9      Q.   Under Category 1:  Prevention, 1D, it's

10   entitled "Community Prevention and Resiliency."  Do

11   you see that?

12      A.   Yes, I do.

13      Q.   And that is a new category here that you

14   did not have in the Ohio report; is that correct?

15      A.   Well, it may be -- yes, it's correct that

16   it's a new category, but I'm not but it's not a new

17   concept.  In other words, my guess is that in the

18   Ohio case, I consider this concept because it's an

19   important general concept in recovery.

20      Q.   Do you know whether you considered it in

21   Ohio but didn't feel that it rose to the level of

22   having its own subheader?

23      A.   Well, apparently I did not feel --

24   apparently I did not feel that it rose to that

Page 172

1    level or that I needed to call it out to the same

2    degree in the Ohio report.

3              But I'm reporting that solely based on

4    seeing the Ohio report and seeing that I didn't do

5    so.

6        Q.   Under Category 2, Treatment, you have a

7    number of subcategories under that category of

8    intervention or programming that you're suggesting.

9    Correct?

10       A.   Yes.

11       Q.   And your first category, "Connecting

12   Individuals to Care," do you see that?

13       A.   Yes, I do.

14       Q.   Is that new to this report that was not in

15   the Ohio report?

16       A.   No, it is not.  Again, it's a vital concept

17   and it's one that's reflected in the Ohio report as

18   well.  Just not at the level of a category itself.

19       Q.   So it -- it's -- you're telling me now it's

20   a vital concept, but it didn't have its own

21   subheader or separate discussion in the Ohio plan.

22   Is that accurate?

23       A.   Again, without having the Ohio plan in

24   front of me and the opportunity to review it

Page 173

1  carefully, I cannot answer that question.

2      Q.   You do have the Ohio plan in front of you,

3  Doctor; we've marked it.  And you're free to --

4  that's Exhibit 32.

5      A.   Okay.  I guess what I meant was that I

6  haven't asked for you to provide me the time to

7  review it.  But I am confident that if we review it

8  together, there will be many instances where I

9  discuss the importance of connecting individuals to

10  care.

11     Q.   But it didn't rise to its own separate

12  category or subheading.  We can agree on that,

13  correct?

14     A.   Yes, that's --

15          MR. BURNETT:  Objection.

16     Q.   Did you say "Yes"?

17     A.   Yes, that's true.

18     Q.   Now, under the same Category 2, Treatment,

19  there is a section here in your Cabell County/

20  Huntington report entitled "Workforce Expansion and

21  Resiliency."  Do you see that?

22     A.   Yes, I do.

23     Q.   And then that was a new category of

24  intervention or programs here that was not included

Page 174

1    in the Ohio report.  Is that true?

2         A.   Again, in each of these instances, it is

3    the case that these were not called out as separate

4    categories, but I wouldn't want to suggest that  --

5    that they're not potentially important concepts

6    that are also incorporated into the earlier plan.

7         Q.   And do you remember if you also used your

8    redress models document in the Ohio plan?

9         A.   Well, it wasn't -- it's not one document,

10   but I believe that we did provide for -- again, it

11   would be helpful to have the opportunity to review

12   the Ohio plan if we're going to focus on it,

13   because it's been a while.

14              But I believe that I did provide some

15   similar epidemiologic estimates of populations in

16   that plan.

17        Q.   And do you recall sitting here today if you

18   provided a separate estimate of the population that

19   would be able to use workplace -- workforce

20   expansion and resiliency, that program, in Ohio?

21        A.   I do not recall, but my plan generally is

22   structured around these categories.  So I -- my

23   estimates are conservative in many ways, and this

24   may reflect one of them.

Page 175

1          In other words, it may have been in

2    Ohio that my estimates were conservative because I

3    didn't incorporate some of these additional costs

4    that we're considering -- considering now.

5        Q.   Now, under Category 3, Recovery, do you see

6    where I am?

7        A.   Yes, I do.

8        Q.   There under 3C, there's a section entitled

9    "Vocational Training and Job Placement."  Now, that

10   is a new category in Cabell County/Huntington,

11   correct?

12            MR. BURNETT:  Objection.

13       A.   Again, as -- again, as with my previous

14   answers on this matter, it may represent -- it does

15   represent a new category, but I don't think it

16   represents a new concept.

17            And one of the reasons that this --

18   that there's not -- and there are few reasons that

19   the categories don't exactly align between the last

20   report and this report.  One of them is that we're

21   a year or two or three later; and another is that

22   we're in an entirely different part of the country

23   and that there are -- that the epidemic has played

24   out differently in different parts of the country.

Page 176

1          So -- so we can explore this if it's

2     helpful in more detail, but I just want to help you

3     to understand why there's not sort of a one-to-one,

4     you know, well, you have 1, B and C here; why don't

5     you have 1A, B and C there?

6          Q.   Under Category 3, Recovery, 3D, that's

7     "Reengineering the Workplace."  Do you see that?

8          A.   Yes, I do.

9          Q.   And that too is a separate category for

10    Cabell County/Huntington.  That was not in the Ohio

11    report, fair?

12               MR. BURNETT:  Objection.

13         A.   As a category, it wasn't called out in the

14    Ohio report, but the references or the -- the --

15    but I'm not suggesting that the Ohio report

16    entirely neglects or overlooks the importance of

17    the workplace, and I would want to review the

18    report more carefully with you in order to, you

19    know, reach firmer conclusions about that.

20         Q.   Under this same Category 3, Recovery, 3E is

21    "Mental Health Counseling and Grief Support."  Do

22    you see where I am?

23         A.   Yes, I do.

24         Q.   And that, too, is a new category here for

Page 177

1    Cabell County/Huntington?

2              MR. BURNETT:  Objection.

3         A.   As with the previous queries, it may

4    represent a different category, but it's not a

5    concept that's foreign to any abatement plan,

6    because there's -- because this is an important,

7    you know, component of abating the epidemic.

8         Q.   And then finally, your last category, 4,

9    here in Cabell County/Huntington, under 4D, there's

10   a subcategory, "Homeless and Housing Insecure

11   Individuals."  Do you see that?

12        A.   Yes, I do.

13        Q.   Okay.  And that is also a new category that

14   was not in the Ohio report, correct?

15             MR. BURNETT:  Objection.

16        A.   It may be a new category, but again, I do

17   not believe it's an entirely new concept.

18        Q.   Now, you've said that to me a few times,

19   Doctor Alexander.  So let me ask you a couple

20   questions about that.  In this report, what you did

21   - as you explained to us earlier - is you have

22   proposed certain programs or interventions that you

23   believe should be put in place in Cabell County/

24   City of Huntington, correct?

1      A.   Yes, ma'am.

2      Q.   And then you took steps through your

3  redress model to provide population estimates and

4  also cost estimates for some of the programs or

5  interventions that you are suggesting.  Correct?

6      A.   Yes.

7      Q.   Okay.  And do you recall -- for each of

8  your programs and interventions proposed in Ohio,

9  do you recall providing a similar analysis?  You

10  recommended the programs and the interventions, and

11  then through your redress model, you went through

12  each category, identified the population and

13  provided cost estimates for what you were really

14  talking about in terms of your abatement plan.

15           Fair?

16           MR. BURNETT:  Objection.

17      A.   I don't believe that my role was exactly

18  the same in the Ohio litigation and this

19  litigation.

20      Q.   Okay.  Can you -- can you open up the

21  folders or the envelopes for Tabs 33 and 34,

22  please?

23           MR. BURNETT:  Are we setting these

24  aside, these documents?

Page 179

1           ALEXANDER DEPOSITION EXHIBIT NOS. 33 AND 34

2                       (G. Caleb Alexander, MD, MS,

3                       Supplemental Expert Report - Update,

4                       April 17, 2019 (MDL Ohio litigation)

5                       and G. Caleb Alexander, MD, MS,

6                       Supplemental Expert Report Update.

7                       October 8, 2019 (MDL Ohio litigation)

8                       was marked for identification purposes

9                       as Alexander Deposition Exhibit Nos.

10                      33 and 34.)

11                      VIDEO TECH:  My apologies, Melissa.

12      Did you say Tabs 34 and 35?

13                      MS. GEIST:  33 and 34.

14                      VIDEO TECH:  Okay.  Marking Tabs 33

15      and 34 as Exhibits 33 and 34.

16           A.   I have those open.

17           Q.   Do you have those, Doctor Alexander?

18           A.   Yes, ma'am.

19           Q.   Okay.  And do you recognize these?  They

20      appear, for the record, to be supplements to your

21      expert report in Ohio.  Exhibit 33 is dated April

22      17th, 2019; and Exhibit 34 is dated October 8th,

23      2019.  Do you see that?

24           A.   Yes, ma'am.

1    Q.   Okay.  And do you see with respect to each

2    of your 15 categories for abatement plan -- plans

3    or interventions, you have here as part of your

4    redress model the population estimate and the cost

5    estimate for each of these.  Do you see that?

6    A.   Yes.  But I believe that Professor Jeffrey

7    Liebman provided what I call - for lack of a better

8    word - micro estimates.  In other words, that

9    Professor Liebman took the sorts of population

10   numbers that we developed and then -- and then

11   developed economic estimates based on that in a

12   manner not dissimilar to what George Barrett has

13   done.

14              I believe what we did in this instance

15   - and please keep in mind it's been a while since

16   I've looked at these materials - is that we used

17   national numbers and then scaled down projected

18   costs locally based on the relative rates of

19   overdose in Cuyahoga County and Summit County

20   relative to national levels.

21              So the process was a bit different,

22   but in both instances, our effort was to take a

23   population and derive some estimate of the costs of

24   abatement.

Page 181

1       Q.   Sure.  And thank you for that explanation.
2    But you can see here in the redress model, there is
3    the an itemization of the population and there's
4    information relating to costs for each intervention
5    or proposed program, and the categories of
6    abatement or interventions that you're proposing
7    here in Cabell County/Huntington are not reflected
8    in the Ohio redress model, meaning there is no
9    section of the redress model talking about the
10   population or the cost that would be estimated for
11   the following programs and interventions that
12   you're proposing here.
13            So there's nothing indicating that you
14   considered as part of the abatement plan in Ohio
15   Community Prevention and Resiliency, Workforce
16   Expansion and Resiliency, Vocational Training and
17   Job Replacement, Reengineering the Workforce,
18   Mental Health Counseling and Grief Support,
19   Homeless and Housing Insecure Individuals.
20            All those categories here which you --
21   as we went through them, they're not highlighted as
22   subparts of your abatement plan in Ohio in any way.
23   And we agreed to that, correct?
24            MR. BURNETT:  Counsel, I'm going to

Page 182

1    object.  You're not asking a question.  You just

2    spoke your own paragraph or two testifying,

3    effectively, number one.  And number two, the

4    documents you're asking him to look at is not the

5    redress report.  One of them is a supplemental

6    expert report and another is a supplemental expert

7    report, so you need to clarify the terminology.

8         Q.   Let's look at Exhibit 33, because it's

9    important to be precise here, I agree.  So Exhibit

10   33 has a table on it, does it not?

11        A.   Yes, it does.

12        Q.   And it says, "Table 1 represents changes to

13   the redress models used to develop preliminary

14   estimates of the national abatement costs to

15   address the opioid epidemic."

16             And then it refers the reader to your

17   report to address the additional details.  So the

18   redress categories -- while the entire redress

19   model is not here in Exhibit 33, each category is

20   set forth here in Table 1 and then again at Table 2

21   and it gets into costs.

22             Do you see that?

23        A.   Yes, I do.

24        Q.   Okay.  And in Cabell County, Ohio {sic},

Page 183

1    part of your proposed plan for abatement includes

2    Community Prevention and Resiliency, and that is

3    not a subcategory as part of the plan in Ohio and

4    that is also not here in any -- either of the

5    tables listing the redress categories.  Correct?

6              MR. BURNETT:  Objection.

7         A.   We -- it -- we did not -- I did not call it

8    out separately to the best my knowledge, and based

9    on our brief review, as a separate category.  But

10   again, I'm not suggesting that it's not potentially

11   important and that it's not covered elsewhere in my

12   Ohio report.

13             So I really want to underscore that

14   just because something like linking people to care

15   isn't necessarily called out with a banner heading

16   doesn't mean that it's not reflected in the content

17   and the substance of my report.

18        Q.   It's not --

19        A.   You are --

20        Q.   It's not -- I'm sorry.  Were you finished?

21        A.   No, I was not.

22        Q.   Please continue.

23        A.   You are correct that I did not separately

24   itemize the costs for some categories in the Ohio

Page 184

1    report that I do separately itemize the costs for

2    in Cabell County and the City of Huntington.  And

3    if you'd like to discuss that, I'm happy to help

4    you understand why I did not do so in one instance,

5    but I did so in another.

6        Q.   So on that point, you did not separately

7    categorize and put a cost to Community Prevention

8    and Resiliency in Ohio as you did in West Virginia,

9    Cabell County/Huntington, correct?

10               MR. BURNETT:  Objection.

11       A.   That's correct.  But I'd like to also just

12   point out, these are national estimates, okay?  So

13   if you look at page 3 of -- I believe the Exhibit

14   33, Tab 33, if you look at Table -- yeah, Table --

15   I'm sorry, Table 2.  It's being projected.

16               So these are -- these are national

17   estimates, and Professor Liebman, Jeffrey Liebman,

18   performed an entirely different -- produced a

19   separate report and used micro estimates, and he

20   may or may not have included community-based

21   programs.

22               But it is the case that in these

23   preliminary estimates of abatement costs,

24   nationally that I produced for Cuyahoga and Summit

Page 185

1  Counties 18 or 24 months ago that I did not have a

2  separate call-out category for community resilience

3  and community prevention programs.

4     Q.   And similarly, the same answer would be for

5  connecting individuals to care.  That is a separate

6  part of your abatement plan here in Cabell County/

7  Huntington and there's not a separate line item or

8  discussion or cost estimate relating to connecting

9  individuals to care.  Would you agree with me on

10  that?

11     A.   I would --

12          MR. BURNETT:  Objection.

13     A.   -- although it may be subsumed within some

14  of these abatement categories in the Ohio report.

15  So for example, some of the linkages that happened

16  in connecting people to care happened through

17  emergency departments, and this report in Ohio does

18  include interventions to help improve quality of

19  care for people that are seen in emergency

20  departments.

21          And --

22     Q.   Sure.  And so does the report in Cabell

23  County/Huntington, right?

24          MR. BURNETT:  Hold on, Counsel.  He

1   wasn't finished.  You interrupted him again.

2        A.   Well, my point is that I could give other

3   examples of where some of the concepts that are

4   called out and elevated to the level of a subheader

5   in West Virginia may -- are nevertheless present

6   and embedded in different abatement categories in

7   Ohio.

8             And so while it may be that they're

9   not elevated and called out at the -- at the level

10  of a header, they are, nevertheless, may be

11  subsumed within some of these 15 categories that

12  we're looking at in Table 2.

13       Q.   There's also not a separate cost estimate

14  for Community Prevention and Resiliency in Ohio as

15  there is in Cabell County/Huntington, true?

16             MR. BURNETT:  Objection.

17       A.   I believe that's the case.

18       Q.   I'm sorry, Doctor Alexander?

19       A.   I believe that's true.

20       Q.   And same thing for Connecting Individuals

21  to Care?  That's a separate header and a separate

22  cost estimate for Cabell County/Huntington and that

23  is not the case for your Ohio report, correct?

24             MR. BURNETT:  Objection.

1      A.   Yes, it's not a separate header, but these

2   reports are not -- they're not identical reports.

3   I mean, they're two different communities and the

4   reports take place at two different points in time,

5   and whether or not something is a header or not

6   doesn't mean that it's not considered or

7   incorporated into the -- the concepts and the plan

8   as I have put forth.

9              So it's hard to talk about an

10   abstract, but I hope that that point is clear.

11      Q.   Connecting Individuals to Care is on a

12   separate cost item in Ohio, as it is here in Cabell

13   County/Huntington, correct?

14              MR. BURNETT:  Objection.

15      A.   Correct.  It's not a separate line item,

16   but it may be subsumed in some of these other

17   categories.

18      Q.   Workforce Expansion and Resiliency, again,

19   that is not a separate cost estimate in Ohio as it

20   is here in Cabell County/Huntington.  True?

21              MR. BURNETT:  Objection.

22      A.   Again, it hasn't been broken out as a

23   separate category, but it may be subsumed to some

24   degree in some of these categories that are

Page 188

1    depicted.

2        Q.   Same question with respect to Vocational

3    Training and Job Placement.  That is not a separate

4    cost estimate here in Cabell County/Huntington --

5                MS. GEIST:  I'm sorry, strike that.

6        Q.   Same question with respect to Vocational

7    Training and Job Placement.  That is not a separate

8    cost estimate in the Ohio report, but it is a

9    separate cost estimate in Cabell County/Ohio, true?

10               MR. BURNETT:  Objection.

11       A.   Yes, it may be subsumed within some of the

12   other categories and interventions in the Ohio

13   setting, but it was not called out as a separate

14   line item.

15       Q.   Same question with respect to Reengineering

16   the Workplace.  Reengineering the Workplace is a

17   separate cost estimate here in Cabell County/

18   Huntington and was not a separate cost estimate in

19   your Ohio abatement report.  True?

20               MR. BURNETT:  Objection.

21       A.   Again, it may be subsumed to some degree in

22   some of the other categories, but you're correct

23   that it's not a separate called-out category.

24       Q.   Same question with respect to Mental Health

Page 189

1    Counseling and Grief Support.  Again, that is a

2    separate subheader in your abatement plan here in

3    Cabell County/Huntington; it is a separate cost

4    estimate, a separate line item, and that was not

5    included in your Ohio report?

6              There's no separate cost estimate for

7    Mental Health Counseling and Grief Support.

8    Correct?

9              MR. BURNETT:  Objection.

10      A.   I mean, the reports are not identical, and

11   there are concepts that -- there are many, many

12   shared elements and shared concepts, and it's also

13   worth noting that my understanding from looking at

14   the economic estimates - although it's not what I

15   focused on - is that the vast majority of costs are

16   treatment, and that's sort of staring -- staring us

17   right -- you know, front and center.

18             But -- but the reports are not -- so I

19   guess my point is that the underlying concepts,

20   that there's a lot that's shared, but the -- the

21   called-out categories are not identical between the

22   reports.

23      Q.   So the answer to my question is that I am

24   correct, there is not a separate cost estimate or

Page 190

1   line item for Mental Health Counseling and Grief

2   Support in the Ohio report like there is here in

3   Cabell County/Huntington.  Am I correct about that?

4            MR. BURNETT:  Objection.

5       A.   It is -- it is true that there's not a

6   separate line item.  But some of those services and

7   some of those costs may be subsumed in other

8   categories that are represented in Table 2 that's

9   depicted on the left of the screen currently.

10      Q.   Same question with respect to Homeless and

11  Housing Insecure Individuals.  That is a separate

12  component of the abatement plan here for Cabell

13  County/Huntington; it has a separate cost estimate

14  associated with that.

15            And that is not a separate part of the

16  plan and does not have a separate dollar figure or

17  cost estimate associated with it in Ohio.  True?

18            MR. BURNETT:  Objection.

19      A.   I mean, this is an important matter, as

20  many of the others are that we've discussed, when

21  thinking about abatement.  I haven't had the chance

22  to review my Ohio report in detail in preparation

23  for this deposition.  I wasn't anticipating that we

24  would be examining it in -- in this level of

Page 191

1   detail.

2              But I would be surprised if there's

3   not a consideration within the report of

4   homelessness and housing insecurity and the

5   important role that that plays for some individuals

6   with opioid use disorder in preventing their --

7   their treatment and recovery.

8      Q.   Would you agree with me that there is not a

9   separate cost estimate or line item in your

10  abatement plan for Ohio for Homeless and Housing

11  Insecure Individuals as there is here in Cabell

12  County/Huntington?

13             MR. BURNETT:  Objection.

14     A.   I'm just looking at Exhibit -- Tab 4, and

15  I'd just like to see, again, the -- the categories.

16             So yes, Housing and Homeless

17  Insecurity as a concept is an important one, and my

18  guess is that it is included or noted in my Ohio

19  report but may not be called out - or is not called

20  out - as a separate line item.

21     Q.   Now, Doctor Alexander, in the Cabell

22  County/Huntington abatement plan that you have

23  suggested for the county and the city within the

24  county, your abatement plan stretches through 15

Page 192

1    years.  Is that accurate?

2        A.   Yes, it is.

3        Q.   And I believe you state in your report that

4    some abatement approaches may be framed in the

5    context of looking forward 10 or 15 years, and you

6    are opining that your plan should extend out all

7    the way to 15 years, the high end of that estimate.

8    Is that correct?

9        A.   I do propose a 15-year plan, but I -- there

10   are -- the legacy of the opioid epidemic is going

11   to be with Cabell County and the City of Huntington

12   far longer than that.

13       Q.   You proposed that the abatement plan to be

14   put forward in Ohio, if that were to be ordered,

15   would only go out ten years.  So five years less

16   than what you're proposing here in Cabell

17   County/Huntington.  Is that correct?

18       A.   I would have to -- I mean, the -- the

19   materials that I'm seeing in front of me say "10

20   years," but I would want to review the report more

21   carefully to be sure if there was any consideration

22   of 15 versus 10 years.

23       Q.   Well, you have your report from Ohio in

24   front of you, and again, I'm mindful of the ruling.

Page 193

1    I'm not asking you substantive questions about it,
2    but I am asking you to confirm for us today that
3    your proposed abatement plan in Ohio is for
4    interventions and programs that would occur or be
5    implemented over a 10-year-period.  And of course,
6    there's a cost associated with that, correct?
7        A.   Yes.
8        Q.   Okay.  And here, in Cabell County/
9    Huntington, you are suggest that the abatement plan
10   that you are proposing be implemented here stretch
11   out an additional five years.  Not 10 years, but
12   15.  Is that correct?
13              MR. BURNETT:  Hold on, Counsel.  Your
14   prior question was two questions in one and it's
15   not clear which question the witness was answering.
16              MS. GEIST:  Do you have an objection
17   to form?
18              MR. BURNETT:  I do.
19       Q.   Can you answer my question, Doctor
20   Alexander?
21       A.   What specifically was the question?
22       Q.   All right.  Here's the question really
23   simple:  When you did your Ohio report, you put in
24   an abatement report, correct?

Page 194

1      A.   Yes.

2      Q.   You suggested programs and interventions

3   for certain categories and for certain population,

4   true?

5      A.   Yes.

6      Q.   And you put cost estimates or dollar

7   figures associated with the implementation of those

8   programs.  Correct?

9      A.   Yes.

10     Q.   Okay.  And your plan called for those

11  programs to go, be implemented for 10 years.  True?

12     A.   Well, the documents in front of me - which

13  represent two addendum to probably a 100-page

14  report - both suggest economic estimates of 10

15  years, but I guess I would like to see the report

16  if we're dis -- if we are exploring how I reasoned

17  through the length of abatement.

18          And my guess is there is commentary

19  within the report putting some context and meat on

20  the bone around that specific target of 10 years.

21  So I just have a little bit of concern about

22  oversimplifying, you know, my opinions in the last

23  case regarding how long I think abatement will take

24  or how long an abatement plan is necessary for.

Page 195

1       Q.   So looking here at these documents we have

2    on the screen, these are supplements to your Ohio

3    report, Exhibits 33 and 34.   Correct?

4       A.   Yes.

5       Q.   And they talk about a 10-year cost.   You

6    see that on both of these pages that we're looking

7    at together?

8       A.   Yes, I do.

9       Q.   Okay.   But you want to take a look at your

10   report and see whether you talked about a different

11   time frame for your abatement plan in Ohio?

12                MR. BURNETT:   Objection.

13      A.   No, I would like to see -- if it's

14   important -- if this matter is important, I would

15   like to see my Ohio report so that I can review the

16   section of the report where I discussed how long I

17   think abatement will be required for.

18                Because my -- because there's --

19   there's nuance there, and I just would like to see

20   my words if we're -- if we're focusing on what my

21   words were at one point in time, I'd like to see

22   those words.

23      Q.   So sure, and I'm happy to have you do that.

24   We marked your Ohio report as Exhibit 32.   The

Page 196

1   supplements that you provided in that case have

2   been marked as Exhibits 33 and 34.  And in your

3   Ohio report, you reference some abatement

4   approaches may be framed in the context of looking

5   forward five or ten years, and you chose the higher

6   end, the 10-year plan, for Ohio.

7                    And if you want to look at your report

8   and confirm that for me, I'm happy for you to do

9   that.

10       A.   Thank you.

11                    MR. BURNETT:  Counsel, this does go

12   into the issue of duplicative testimony.  This is

13   -- his reasoning for why he may have included ten

14   years in the prior report could have been covered

15   in the prior deposition.

16                    I really think this gets into the

17   issue we were talking about where you really need

18   to focus on this report, and you know, right now,

19   you're asking him to review the substance of his

20   prior report.

21                    MS. GEIST:  All I really want, Counsel

22   - as you know; which should be clear from my

23   questions - is just a confirmation that the

24   abatement plan in Ohio for the two counties there,

1  that the plan proposed by Doctor Alexander in that

2  jurisdiction was a 10-year plan.  That's it.

3          MR. BURNETT:  And Counsel, he answered

4  that with regard to 33 and 34 and the excerpts that

5  we just had highlighted here.  So I think he's

6  answered that, and I think we should just move on.

7          MS. GEIST:  Well, what I heard from

8  the witness was he was not 100 percent comfortable

9  in agreeing that he had a 10-year plan in Ohio and

10  he would like to look at his report.

11          So I'm offering him the opportunity to

12  look at his report and confirm that the plan

13  proposed in Ohio, the abatement plan there for the

14  two counties, was a 10-year plan.

15      A.   Yeah, thank you for that.  And I did read

16  Paragraph 30 from my Ohio report, and it's very

17  helpful, and I think it -- I think it illustrates

18  some of this nuance that I referred to.  So I won't

19  read it or call it out further, but I just want to

20  underscore that I think it provides some of the

21  context.

22          I am comfortable now confirming that

23  this -- that the economic or epidemiologic

24  estimates that I provided in Ohio were for ten

Page 198

1    years.

2        Q.   Thank you.  And here in Cabell County/

3    Huntington, your proposal for your abatement plan

4    -- should the plan or any aspect of the plan be

5    ordered by the Court, is for 15 years, for the

6    county -- Cabell County, excuse me, and the City of

7    Huntington.  I'm correct about that?

8        A.   Sorry.  Can you please repeat the question?

9        Q.   Sure.  Here in Cabell County/Huntington- we

10   have one county and the city within the county -

11   your abatement plan that you're proposing, you are

12   proposing a 15-year abatement plan.  Correct?

13       A.   Yes, I mean, that's -- yes.  Yes.

14            MS. GEIST:  Okay.  Is it a good time

15   now to take a break?

16            MR. BURNETT:  Sure.  Ten minutes.

17            VIDEO OPERATOR:  The time is 2:29, we

18   are now going off the record.

19            (A recess was taken after which the

20            proceedings continued as follows:)

21            VIDEO OPERATOR:  The time is 2:42.  We

22   are now back on the record.

23   BY MS. GEIST:

24       Q.   Doctor Alexander, you engaged in some

1  meetings or interviews or phone calls with

2  individuals who are part of the Cabell

3  County/Huntington community; is that right?

4          I think you're on mute.

5          MR. BURNETT:  You're muted.

6     A.   Thank you, I apologize.  Yes, I did.

7     Q.   And if we look at page 6 of your report,

8  you reference that either you or some of your "team

9  members" "have spoken with many local stakeholders"

10 And when you say "team members," are you referring

11 to individuals at Monument Analytics?

12    A.   Yes, I am.

13    Q.   Okay.  And are those individuals other than

14 the two individuals you mentioned to me earlier in

15 this deposition?

16    A.   They would --

17    Q.   I confess I forget their names.  I

18 apologize.

19    A.   No, no, that's fine.  Mr. Mansour and

20 Ms. Ozenberger, and they would represent -- it's

21 possible that another team member, Elena Fernandez,

22 E-L-E-N-A, Fernandez, may have participated in one

23 or two calls.  But Mr. Mansour and Ms. Ozenberger

24 were the primary Monument Analytics team members

1    that would have participated in these calls.

2        Q.   And looking at the list of individuals that

3    appear on page 6 of your report, is this a complete

4    list of individuals that either you or your team

5    members spoke with in connection with forming your

6    opinions in the case?

7        A.   Yes, I believe so.

8        Q.   And were these all individual telephone

9    calls?

10       A.   As opposed to?  What would be the

11   alternative?

12       Q.   Did you have any in-person meetings?

13       A.   No, I did not.  I had wanted to visit

14   Cabell County and the City of Huntington and

15   unfortunately, because of the pandemic, I did not

16   do so.  I had gone as far as having dates picked

17   out when I was to visit, and that visit was called

18   off.

19       Q.   Okay.  So all of the -- whether it was you

20   or somebody at Monument Analytics, all of the

21   individuals on page 6, you spoke with by phone,

22   correct?

23       A.   I believe Mr. Mansour traveled to Cabell

24   County and the City - in fact, I'm sure that he did

1  - and so he was present for several face-to-face

2  meetings, but I was not.

3      Q.   And do you know who Mr. Mansour met with

4  face to face from this list?

5      A.   I do not know for sure.  I know that he was

6  present for a day or two days of meetings and he

7  related that he met with a comprehensive, you know,

8  set of individuals, so my sense is that he had an

9  opportunity to meet broadly with many, many

10 affected stakeholders.

11     Q.   Did anybody else other than Mr. Mansour

12 meet with individuals in Cabell County in person?

13     A.   No one else from Monument Analytics, no.

14     Q.   And do you know when Mr. Mansour went to

15 Cabell County to have these meetings?

16     A.   I do not, but those -- there were

17 plaintiffs that were present, and I'm sure that

18 that information could be provided were it to be

19 important and helpful.

20     Q.   When you say there were plaintiffs present,

21 are you referring to the plaintiffs' counsel at

22 these meetings?

23     A.   I am sorry, I'm revealing my lack of

24 familiarity with the -- with the field.  So yes,

Page 202

1    there were plaintiffs' counsel present.

2         Q.   I see.  Okay.  Now, did you personally have

3    phone conversations with any of the individuals

4    listed on page 6?

5         A.   Yes, I did.

6         Q.   Okay.  And can you identify for me which

7    individuals you had a phone call or calls with?

8         A.   I cannot do so with full confidence.  I can

9    tell you that I had one call that was with a number

10   of people involved in the educational system.

11              I had a second call with Doctor

12   Kilkenny and colleagues, so individuals

13   representing public health officers, among others.

14              I was on another call and had another

15   call that included, I believe, perhaps some of

16   those same individuals, but also law enforcement

17   representatives.

18              But I cannot -- other than the notes

19   that I've provided - that I understand that you

20   have - I don't have a precise record of the

21   participants in any particular call.

22        Q.   And did you have calls where it was more

23   than just you and one of these individuals from

24   Cabell County?  In other words, was it a conference

Page 203

1    call with a number of people on the phone?

2         A.    In all cases, yes.

3         Q.    Okay.  And was plaintiffs' counsel,

4    plaintiffs' lawyers representing Cabell County/City

5    of Huntington, were they also on these phone calls?

6         A.    I -- it would be hard for me to imagine

7    that they weren't, so I believe that they would

8    always have been present, yes.

9         Q.    Now, if you'd take a look at Exhibit 52 --

10   do you have that in front of you, Doctor?

11        A.    One minute, please.

12        Q.    Uh-huh.

13          ALEXANDER DEPOSITION EXHIBIT NO. 52

14               (Alexander notes taken from telephonic

15               meetings with people within Cabell

16               County/City of Huntington was marked

17               for identification purposes as

18               Alexander Deposition Exhibit No. 52.)

19        A.    Yes, I do.

20        Q.    Okay.  And Exhibit 52 was provided to us by

21   plaintiffs' counsel.  Can you identify them for --

22   for me and for the record, please?

23        A.    Identify them?

24        Q.    Yeah.  So tell me, what is Exhibit 52?  I'm

Page 204

1    looking at it.

2         A.   Oh, I see.  I thought you were -- I --

3    sorry.  I thought you were asking me to identify

4    people.

5              Exhibit 2 {sic} represents notes that

6    I took based on, I believe, two different

7    conversations that I had.

8         Q.   Okay.  So these are -- these are your own

9    personal notes that we've marked as Exhibit 52; is

10   that right?

11        A.   Yes, ma'am.

12        Q.   And do you know why there are blackouts or

13   redactions made in these notes?

14        A.    I believe information was redacted because

15   it was felt to be privileged.  But you would have

16   to ask the counsel to be sure.  It was not

17   something that I blacked out myself.

18        Q.   Okay.

19              MS. GEIST:  And I'll just make a

20   request at this time to counsel to identify whether

21   the redactions were made from counsel representing

22   Cabell County or Huntington and the reason for the

23   redactions.

24              MR. BURNETT:  Yes --

Page 205

1           MS. GEIST:  Obviously we can take care

2    of this after the deposition, but I think we had a

3    request in regarding these redactions, and I'm not

4    aware of a response.  So are these redacted for

5    privilege or can you tell me why they were redacted

6    now?

7           MR. BURNETT:  They were redacted for,

8    you know, for privilege and/or work product and/or

9    any other protection.

10           I do recall that there was a request

11   for information about that and I -- I'm not sure

12   whether there was a response or not.

13           MS. GEIST:  I'm not aware of a

14   response, so I'll just note for the record we're

15   still looking for a response, whether that's a

16   privilege log or some letter or some communication

17   from counsel as to the reason for the redactions,

18   would be great.

19           Thank you.

20   BY MS. GEIST:

21      Q.   Now, Doctor Alexander, did your colleagues

22   from Monument Analytics also take notes when they

23   met with -- met with in person or spoke with the

24   individuals listed on page 6 of your report?

Page 206

1      A.   I don't know.

2      Q.   And that was Mr. Mansour, Ms. Ozenberger

3  and Elana -- I'm sorry, Elana --

4      A.   Fernandez, Fernandez.

5      Q.   Okay.

6           MS. GEIST:  I'll just put a formal

7  request on the record that any notes taken by these

8  three individuals from Monument Analytics during

9  their in-person or telephone meetings with

10  individuals at Cabell County be produced to us,

11  please.

12           MR. BURNETT:  I note the request.

13      Q.   Now, did the -- did the interviews and

14  meetings that you had with individuals from Cabell

15  County/Huntington, Doctor Alexander, inform your

16  opinions in this case in any way?

17      A.   Definitely.

18      Q.   And when did you conduct these phone

19  conferences that you had?  Do you remember how soon

20  before your expert report was served in this case?

21      A.   I apologize, but I do not.  I do not.  I

22  mean, I think that they took place over the course

23  of six to nine months, and I don't know the precise

24  dates.  But they weren't within the last, you know,

Page 207

1    two weeks before I submitted the report; and they
2    weren't two years ago.
3              So I can give you a window, but I'm
4    sorry that I don't have more precise dates.
5         Q.   Okay.  You can set those -- you can set
6    Exhibit 52 aside for now.
7              Doctor Alexander, I'm going to turn in
8    a minute to the actual programs and interventions
9    that you've proposed in your plan.  Hopefully we
10   can get through those quickly since time is running
11   out.  But before we get to that, you reference The
12   City of Solutions document in your expert report.
13   Do you recall that document?
14        A.   Yes, I do.
15        Q.   Okay.  Do you want to go ahead and open up
16   Envelope or Tab 8, please?
17              VIDEO TECH:  Tab 8 has been marked as
18   Exhibit 8.
19           ALEXANDER DEPOSITION EXHIBIT NO. 8
20              ("The City of Solutions Huntington, WV
21              - A Guide to What Works (and what does
22              not) in Reducing the Impact of
23              Substance Use on Local Communities"
24              dated September 2019

1           (HUNT_00365846-6015) was marked for

2           identification purposes as Alexander

3           Deposition Exhibit No. 8.)

4      A.   Okay, I have it open.

5      Q.   Great.  Now, looking at Exhibit 8, would

6  you agree with me that this is a very comprehensive

7  and extensive plan that was put in place by the

8  City of Huntington?  It's entitled "A Guide to What

9  Works (and what does not) in Reducing the Impact of

10 Substance Use on Local Communities" dated September

11 2019.

12     A.   I mean, I would -- I think it's a helpful

13 plan that sets forth many very evidence-based and

14 reasonable abatement measures.

15     Q.   Now, when you go through the plan --

16           MS. GEIST:  Actually, strike that.

17     Q.   When you look at "The City of Solutions:  A

18 Guide to What Works (and what does not)," it sets

19 forth in various categories what the community has

20 done, what they have now, where they are going, and

21 a little bit of the history of substance use

22 disorder and drug problems in the region.  Is that

23 fair?

24     A.   Yes, I believe so.  It's been a while since

Page 209

1  I looked carefully at the plan, but I think that --

2  but I believe that's the case.

3     Q.   Okay.  Do you know when Cabell County/City

4  of Huntington put in place their plan to address

5  substance use disorder and opioid use disorder in

6  the community?

7     A.   Well, I think -- I mean, there is this

8  document, but there is a large number of activities

9  that have taken place over many years, so it's hard

10  to identify one specific point.

11           Are you asking if I know when this

12  plan was issued?

13     Q.   Well, let me ask it a different way.  Did

14  you review the Strategic Plans that were put in

15  place by the Mayor of Huntington Office of Drug

16  Control Policy beginning in 2015?

17     A.   Yes, I did, among -- among dozens or a

18  hundred or more other produced materials about the

19  community.  Yes, I did.

20     Q.   Sure.  But you would agree with me that

21  this area of the country, Cabell County/City of

22  Huntington has been addressing -- implementing and

23  developing programs since at least as early as

24  2015.  Is that fair?

1          MR. BURNETT:  Objection.

2     A.   Yes, I believe that's fair.

3     Q.   Do you think that some of the programs to

4  address opioid use disorder and substance use

5  disorder put in place in this community could be

6  useful models for other communities in the United

7  States dealing with substance use disorder?

8     A.   Sure.  I mean, I think we can all learn

9  from each other.  This is -- we're not alone here.

10  There's no community that hasn't been touched one

11  way or another, so I think there's a lot to learn

12  from other communities.  Yes.

13     Q.   Now, this is a fairly long, comprehensive

14  document that we're looking at together now.

15  Correct?

16     A.   Well, I mean, I would agree that it's long.

17  I think comprehensive is -- are your words, and I

18  guess I would -- I think it's a helpful -- you

19  know, I think it's a helpful -- it's a helpful plan

20  that describes many evidence-based and evidence-

21  informed abatement measures.

22     Q.   You consider yourself to be an expert, I

23  assume, on plans to address substance use disorder,

24  opioid use disorder, across the United States.  Is

Page 211

1    that correct?

2       A.   Well, my expertise is -- is -- as an

3    epidemiologist, has focused extensively on

4    identifying and assessing evidence-based methods to

5    reverse overdoses and other opioid-related harms,

6    yes.

7       Q.   Has Cabell County/City of Huntington done

8    an excellent job in addressing the opioid use

9    disorder or substance use disorder crisis in the

10   community?

11              MR. BURNETT:  Objection, outside the

12   scope.

13      A.   I wasn't asked to -- and I think that from

14   my experience, speaking with local stakeholders and

15   reviewing the materials that I've reviewed, what

16   I've seen is a community that's been ravaged and

17   torn apart, and I think been individuals have shown

18   remarkable leadership and remarkable resilience.

19              You know, am I able to identify areas

20   where - resources notwithstanding - they might have

21   done better?  I suppose so.  But I don't think that

22   -- I mean, I looked carefully in my plan at the --

23   what's been done to date, but I did -- was not

24   asked - nor do I feel that it's my position - to

Page 212

1    sort of give them a grade on how they've done over

2    the past few years.

3        Q.   You don't have -- sitting here today, you

4    don't have any opinions that they have been

5    deficient in any way in terms of the

6    implementations they have done to date.  Is that

7    true?

8                 MR. BURNETT:  Objection.

9        A.   Do you mean in a legal sense do I have

10   opinions, or just in an informal colloquial sense?

11       Q.   No, I mean like, do you have any criticisms

12   of the implementations and the programs that Cabell

13   County/City of Huntington have put in place since

14   2015?

15       A.   Well, I --

16                 MR. BURNETT:  Objection.

17       A.   Yeah, I was asked to look forward, not look

18   backwards, and I did not conduct any comprehensive

19   sort of program evaluation of the performance of

20   the interventions to date.

21                 I think many have been quite laudable,

22   such as Project Engage, which has sought to better

23   link people seen in clinical settings with opioid

24   use disorder with treatment; programs such as

Page 213

1    Lily's Place or the MARC and the MOMS program for

2    women that have addiction and are pregnant, so

3    they're --

4               The syringe services program, which I

5    believe is one of the first in the state and has

6    really stood apart from many others in terms of

7    their ability to conduct outreach.

8               So I think that there are many

9    laudable undertakings that the community has --

10   performed, but certainly I can identify some areas

11   where I think that - with resources notwithstanding

12   - that they might have done more, yes.

13   Q.   Now, you note in your report on page 11

14   that "the Community has" "mobilized in many ways to

15   address the challenges head-on," and you had list

16   some of the programs that you just mentioned to me

17   just now, such as Project Engage, PROACT, etc.

18               And then you also talk in terms of the

19   "remarkable transformation in the Community's

20   system of care to manage OUD among expectant

21   mothers and their offspring."

22               MR. BURNETT:  Counsel, where -- where

23   on page 11 are you quoting from?

24               MS. GEIST:  I'm in the middle of page

1    11.

2              MR. BURNETT:  What paragraph?

3              MS. GEIST:  26 and 27.

4    Q.   And you also agree, don't you, Doctor

5    Alexander, that Cabell County/Huntington engaged in

6    very early initiatives through Mayor Williams'

7    Office of Drug Control Policy to timely and

8    comprehensively recognize the need for data for

9    early intervention?  You agree with that, don't

10   you?

11             MR. BURNETT:  Where is that?

12   A.   Are those my words, or not?

13   Q.   I'm not making them up.  These are your

14   words from your report.

15   A.   But where --

16             MR. BURNETT:  Counsel, if you're

17   asking him about specific language, please point us

18   to it.

19   Q.   I'm asking you if you -- if you agree with

20   what I just said.  Do you agree --

21   A.   But I --

22   Q.   -- that Cabell County -- Cabell County/

23   Huntington, through early initiatives of Mayor

24   Williams' Office of Drug Control Policy timely

Page 215

1    recognized the need for comprehensive data for

2    early intervention?

3                 MR. BURNETT:  Counsel, same request.

4    Where are you quoting this from?

5                 MS. GEIST:  I'm asking him the

6    question.

7       A.   But I don't see in Paragraph 27 or 28 any

8    mention of Mayor Williams.  I may be missing it,

9    but if you could just point out to me where I

10   mention Mayor Williams.

11      Q.   You can't agree with my -- my question

12   without me showing you the exact --

13                MR. BURNETT:  Counsel, you're -- now

14   you're asking him a memory test.  You are quoting

15   from his report, clearly, but you're not telling us

16   where you're quoting from.  That's not fair.

17                MS. GEIST:  I'm asking him if he

18   agrees.

19                MR. BURNETT:  You're asking him if he

20   agrees on specific language that you are reading

21   without telling us what you are reading.

22                MS. GEIST:  I'm reading from my own

23   notes.  I'm not reading from the report.  I'll ask

24   it this way:

1    Q.   Do you agree that this community, through

2   the Mayor's Office of Drug Control Policy, engaged

3   in early initiatives to address the opioid use

4   disorder -- to address opioid use disorder or

5   substance use disorder in the community?  Do you

6   agree with that?

7    A.   Would it be possible to show Tab 4 and to

8   show where you're reading from in my report?

9    Q.   So I'm not reading from your report.

10    A.   Okay.

11    Q.   Do you have your report in front of you?

12    A.   I do.  I'm sorry if I misunderstood.  I

13   thought that you read a sentence and it referred to

14   Mayor Williams and early initiatives and that you

15   had suggested that it was either in Paragraph 27 or

16   28 of my report, and I just am not seeing any

17   mention or callout of Mayor Williams in those

18   paragraphs.

19         And the language sounded a little bit

20   foreign to me.  I'm not suggesting that I disagree

21   with the sentence or the claim.  It's just I want

22   to be clear, is it -- is it your words or is it my

23   words?  And if it is indeed in my report, I just am

24   asking to see where I called out Mayor Williams in

Page 217

1   my report by name.

2        Q.   All I'm asking is if you agree with this

3   sentence -- but if you can't answer me "yes" or

4   "no," let's just move on.

5        A.   No, no, I'm sorry --

6             MR. BURNETT:  Counsel --

7        Q.   No, I'm just going to move on.  This is

8   wasting my time.  I'm just going to move on.

9        A.   Okay.

10       Q.   Now, back to The City of Solutions

11   document --

12       A.   Yeah.

13       Q.   -- do you agree with me, Doctor Alexander,

14   that in terms of the programs that are listed in

15   the document, that this is only a partial list of

16   the programs available to Cabell/Huntington --

17   Cabell County/Huntington now?

18             MR. BURNETT:  Objection.

19       A.   I would guess that that is the case, but I

20   would want to examine further, but if this is a

21   document that was on the ground, you know, two or

22   three years ago, then I would think it's all but

23   certain that newer programs have originated and

24   spawned, if you will, since this report was issued.

Page 218

1     Q.   So let's take a look at page 15 of The City
2  of Solutions guidebook.  Are you there with me,
3  Doctor Alexander?
4     A.   Yes, ma'am.
5     Q.   Okay.  And this section of the guidebook is
6  titled "Prevention and Early Intervention."  Do you
7  see that?
8     A.   Yes, ma'am.
9     Q.   Okay.  And this begins a discussion of the
10  interventions and programs that have been put in
11  place by the community to address the opioid use
12  disorder or opioid epidemic in the area.  Do you
13  see that?
14     A.   Yes, I do.
15     Q.   Okay.  And so your Category 1 of your
16  abatement plan is entitled, as we know, "PREVENTION
17  - REDUCING OPIOID OVERSUPPLY AND IMPROVING SAFE
18  OPIOID USE" and it talks about early intervention.
19  And that's what we have as well here in The City of
20  Solutions guidebook.  Is that fair?
21     A.   I don't know, and I would be very surprised
22  if the content is perfectly aligned.  But I -- if
23  you're asking whether both The City of Solutions,
24  this section of it, and my Category 1 are focused

Page 219

1    on prevention, the answer is yes.

2        Q.   Oh, let me -- let me be real simple about

3    it, Doctor Alexander.  You say the first thing you

4    need to do is focus on prevention, right?  That's

5    your Category 1.  That is the header, correct?

6                MR. BURNETT:  Objection,

7    mischaracterizes.

8        A.   Yeah, it's the first category.  I'm not

9    saying that it's the first thing.  I mean, we need

10   to do a bunch of stuff simultaneously.  It's not --

11   this isn't a linear process.

12       Q.   I understand --

13       A.   But it is Category 1.

14       Q.   I understand.  It is Category 1 of your

15   plan, correct?

16       A.   Yes, ma'am.

17       Q.   Okay.  And has Cabell County/Huntington

18   also engaged in a number of programs under their

19   title "Prevention and Early Intervention?"

20       A.   I believe they have.

21       Q.   Okay.  And if we look through The City of

22   Solutions guide, over the next through pages, does

23   it outline a number of these programs?

24       A.   Yes, it does.

Page 220

1    Q.   Okay.  And some of these programs that have

2    -- have already been in place and are in place in

3    the community are Project Engage, correct?

4    A.   Yes.

5    Q.   And you're familiar with Project Engage?

6    A.   Yes, ma'am.

7    Q.   And what does Project Engage seek to do?

8    A.   It seeks to better link individuals in

9    clinical settings with treatment for substance use

10   disorders.

11   Q.   So when you say "clinical settings," are we

12   talking about individuals who end up in the

13   emergency department, for example, and there's

14   somebody there - a peer recovery coach - to provide

15   them with information and access to treatment

16   should they choose to engage in treatment?  True?

17   A.   Yes.  Yes, for example.

18   Q.   Okay.  And this is something that Cabell

19   County/Huntington has had in place and does have in

20   place now, correct?

21   A.   Yes.  But I -- I mean, programs aren't --

22   yeah, I mean, it may not be adequately resourced;

23   it may not be optimally funded.  It may not be

24   optimally staffed.

Page 221

1              So just because there is a program in

2        place, I'm not disparaging the program, and in

3        fact, I think, you know, it plays a very important

4        role.  But I wouldn't want to misconstrue the

5        presence of a program or equate that with its

6        adequate deployment, support, funding and long-term

7        viability.

8          Q.   And is Project Engage part of a

9        collaboration effort with any of the health care

10       facilities in the area?

11         A.   Well, I think it would have to be.  I don't

12       know details about that, although I do see and --

13       that Christiana Healthcare as a reference, although

14       that's in Delaware -- and Marshall University and

15       the health system that I believe is related to that

16       corporately or structurally, may well be an

17       important part of that.

18              But I don't know the details of the

19       health care systems that may have formally signed

20       on.

21         Q.   Are you -- are you not aware that St. Marys

22       Medical Center and Cabell-Huntington Hospital have

23       worked together to pioneer the Project Engage

24       effort since 2017?

Page 222

1      A.   I am --

2               MR. BURNETT:   Objection.

3      A.   I'm sorry.  I am aware of St. Mary's; I'm

4   not -- you know, I don't know the formal sort of

5   corporate relationship or flow of money or

6   resources between this project and St. Mary's or

7   the corporation that it represents.

8      Q.   And you're not aware or offering any

9   opinion that the City or the County needs to spend

10  any funds, spend any money, relating to Project

11  Engage.  Is that correct?

12     A.   I wasn't asked to identify who pays the

13  bills.  I was -- I was simply asked to identify

14  what I thought would be an evidence-based abatement

15  program for this community.

16     Q.   And in terms of what you just said, Doctor

17  Alexander, so just to confirm, you don't have any

18  opinion in this case that the City of Huntington or

19  Cabell County generally has been responsible for

20  funding any of the programs that they have had in

21  place to date.  Is that correct?

22     A.   And here you --

23               MR. BURNETT:   Objection.

24     A.   Here you mean beliefs or legal opinions?

1     Q.   You're not offering opinions in the case,

2  as an expert, that Cabell County or the City of

3  Huntington has had to fund any of the programs that

4  they have decided to put in place to address the

5  opioid epidemic.

6               MR. BURNETT:   Objection.

7     A.   No.  No, I'm not.

8     Q.   Okay.  And in terms of future payments,

9  you're not offering any opinions that should your

10  plan for abatement be put in place in Cabell

11  County/Huntington that any aspect of the plan would

12  need to be paid for or funded by the City or

13  County.  You're not offering opinions as to that;

14  is that correct?

15     A.   Yeah, that's for the judge to decide,

16  you're correct.

17     Q.   Okay.

18     A.   Or somebody -- it's not for me to decide,

19  let me put it that way.

20     Q.   Not for you to decide who pays, correct?

21     A.   Correct.

22     Q.   You have a plan in place, hopefully a very

23  comprehensive plan - hopefully we'll get through

24  that - but you don't have any opinions as to the

Page 224

1    allocation of funds:  Who will pay, who should pay,

2    how it's divvied up; is that fair?

3         A.   Yes, that's fair.

4         Q.   Okay.  Now, back to what the community has

5    done in terms of prevention and early intervention,

6    I assume you are very familiar with the Quick

7    Response Team?

8         A.   Yes, I am.

9         Q.   And if you look at The City of Solutions

10   guidebook, you can read about the Quick Response

11   Team on page 18 and the pages following after.  And

12   who makes up the Quick Response Team, Doctor

13   Alexander?

14        A.   Well, generally this is a team -- I mean,

15   it varies place to place and community to

16   community, but in general, this includes some sort

17   of health care professional or addiction expert,

18   often a -- at times, it can include a faith-based

19   leader or someone from a faith community.

20             It can have a peer recovery coach, can

21   sometimes participate in these teams.  The teams

22   may or may not include a law enforcement officer.

23   At times, there's concern that that may, you know,

24   scare people off, for lack of a better word.

1           But those are the types of people that

2     participate in these teams.

3       Q.   Okay.  Well, let's just talk about Cabell

4     County/Huntington.  Who makes up the Quick Response

5     Team in Cabell County/Huntington?

6       A.   I think that's depicted here in this

7     exhibit, which indicates "a paramedic" or "EMT,"

8     "law enforcement officer," "peer recovery coach" or

9     "clinician" and a "spiritual or faith leader."

10      Q.   And what types of services does the Quick

11    Response Team provide?

12      A.   Well, this is a good example where I

13    believe that this is covered in my Ohio report --

14    not to open, you know -- not to go back too far

15    there.  But this is a good example where I believe

16    even though linkages as to care may not have been

17    called out as a separate category in my Ohio

18    report, nevertheless, the QRT or Quick Response

19    Team is exactly -- does exactly this.

20           I mean, they can provide a very

21    important role in linking people to care that

22    otherwise would fall through the cracks.

23           I mean, you have a narrow -- you have

24    a narrow window of opportunity when someone

Page 226

1    overdoses, and it's a -- it's an opportunity, in

2    many cases, to help people get into treatment.

3                And part of the benefit of a Quick

4    Response Team is that well-designed and well-

5    deployed, they can serve an important role in

6    helping to bridge people to care.

7        Q.   And this Quick Response Team in Cabell

8    County/Huntington, it has a project director and a

9    coordinator?

10       A.   I -- it -- I mean, it appears at the time

11   that this report was written that it did.  I can't

12   speak to whether or not it's currently staffed at

13   those levels or not.

14       Q.   And you note that the team works "a

15   40-hour-per-week schedule."  Do you see that?

16       A.   Well, this isn't my -- what we're looking

17   at here is if -- I mean, you said "you note."

18       Q.   It's in the document.  I mean, you've read

19   this document --

20       A.   I've reviewed it and I'm familiar with The

21   City of Solutions, yes.  But I'm sorry, I was

22   confused when you said "you note."  But they may

23   well work a 40-hour week.  That may well be the

24   case.

Page 227

1      Q.   And do you know how they came about getting

2   the vehicle that the Quick Response Team uses?

3      A.   I think that's an interesting question.  I

4   think it may have been donated but I don't recall

5   the details of where they came by the vehicle.

6      Q.   It's in the document.  I actually says it

7   was donated.  You are correct.

8      A.   Okay.

9      Q.   Now, in terms of other Harm Reduction, that

10  starts on page 20 of The City of Solutions

11  guidebook, correct?

12     A.   Yes, ma'am.

13     Q.   Okay.  And you said to me earlier, I think,

14  that that was a very important initiative that the

15  community had taken to get ahead of Harm Reduction;

16  is that right?

17     A.   I mean, they're all -- they're all

18  important.  I'm sorry, but I -- I -- I mean,

19  they're all important interventions.  But I do just

20  want to call out and remind you, this was a

21  document that was written at one point in time and

22  so -- but yes, Harm Reduction is important and it's

23  my understanding that the County and the City have

24  done -- have provided some leadership in developing

Page 228

1    a syringe service program.

2              And I do think it's an important

3    component, yes.

4        Q.   And if you look with me at the -- at the

5    document, other than the syringe services program,

6    what other types of programs and interventions has

7    the community been able to implement to further the

8    goal of Harm Reduction?

9        A.   Well, some people consider naloxone a means

10   of harm reduction.  I suppose it's -- it depends

11   who you ask whether you characterize that as harm

12   reduction, but as has been stated by community

13   leaders and in the community itself, you know,

14   naloxone alone isn't gonna get you out of this

15   mess, and you can't just resuscitate someone from

16   an overdose and then expect them to, you know,

17   magically appear in treatment.

18              So naloxone is one.  Fentanyl testing

19   is another approach that is sometimes used to see

20   whether there's evidence of fentanyl in -- in what

21   may be counterfeit prescription opioids that are

22   circulated, or in heroin.

23              And then, you know, I just want to

24   note that harm reduction services don't -- it's not

Page 229

1    just about giving people syringes, it's about --

2    again, we're back to linkages to care.  You know, I

3    have -- there's a saying that "The road to recovery

4    is paved with relationships," and so Harm Reduction

5    outreach allows for one to develop relationships

6    and also provide primary care to these people, not

7    just give them syringes.

8              Screen them for HIV, hepatitis and the

9    like.  So I hope that helps give you a sense.

10   Q.   And are you familiar with the Great Rivers

11   Regional System for Addiction Care?  If we look at

12   page 26?  Are you familiar with that program?

13   A.   Only -- not -- not -- you know, I reviewed

14   this and I reviewed that program, but I'm not as

15   familiar with that as some of the other programs

16   we've considered.

17   Q.   Did you do any independent research?  Did

18   you go on the website and read about Great Rivers

19   Regional System for Addiction Care, read about what

20   they do, read about who they treat?

21   A.   Well, I certainly read about PROACT, and I

22   see here PROACT is called out as a means -- as a

23   means to -- you know, as one component of this

24   system of addiction care.

1          And again, I reviewed an enormous

2    number of materials and spoke with a large number

3    of people on the ground about the state of

4    addiction care in the county and the city.

5      Q.   Well, my question was:  Did you do any

6    reading or research about the expansive programs

7    offered through Great Rivers Regional System for

8    Addiction Care?

9      A.   I did do some -- I did review publicly-

10   available information.  I don't recall having

11   reviewed in depth this particular system.

12     Q.   Can you tell me who runs the program, which

13   health facility, health care facility, runs Great

14   Rivers Regional System for Addiction Care?

15          MR. BURNETT:  Objection.

16     A.   I mean, we've talked about -- I would want

17   to review this -- this document further.  But we've

18   talked about some of the -- you know, the important

19   health systems within the community.  I know that

20   St. Mary's and Marshall University have played

21   important roles, but I --

22          If you're asking about what the source

23   of funding is for this regional system, my guess is

24   it subsists on a variety of funding and that some

1  of it may come from a state or county budgets.

2      Q.   You're not aware that the Great Rivers

3  Regional System for Addiction Care is through

4  Marshall Health?

5              MR. BURNETT:   Objection.

6      A.   I'm familiar with -- I'm familiar with the

7  important role that Marshall Health plays in Cabell

8  County and the City of Huntington in addressing

9  many dimensions of the opioid epidemic, and I'm

10  familiar with the investments that Marshall has

11  made in helping to expand the availability of

12  treatment for people with opioid use disorder.

13              So yes, I'm familiar with the

14  important role that the University and the health

15  system has played.

16      Q.   Did you do any research to inform yourself

17  as to the significant number of West Virginia

18  residents struggling with mental health disorders

19  and poor quality of life generally?

20      A.   Yes, that was part of the materials that --

21  I mean, that -- the issue of mental health and many

22  other -- many other sort of contacts that help

23  create the fabric of this Appalachian community are

24  ones that I reviewed and explored in understanding

Page 232

1    how we got to where we're at in Cabell County and

2    the City of Huntington.

3        Q.   Well, do you agree with what is written

4    here, from your research, that many West Virginia

5    residents contend with complicating risk factors --

6    and this is risk factors for addiction; is that

7    right?

8              MR. BURNETT:  Objection.  Are you

9    reading from a document?

10             MS. GEIST:  I'm reading right from the

11   screen.

12       A.   Can you point out --

13       Q.   Can you agree with what is written here by

14   the community itself, that "Many WV residents

15   contend with complicating risk factors" "such as

16   trauma, intimate partner violence, and other

17   chronic diseases."  And that "These issues are

18   influenced by poor access to health care, low

19   health literacy levels, low levels of educational

20   attainment, and high numbers of unemployment?"

21             Do you -- are you aware of all that,

22   Doctor Alexander, from your own research and

23   review, of the challenges faced by this community?

24       A.   Yes, I am.  And if I could just ask if you

Page 233

1   could please enlarge the screen size a little bit?

2       Q.   I wish I could, but I can't.

3           MS. GEIST:  But perhaps my friend John

4   can do that so we can pop out the bottom paragraph.

5       A.   Yeah, that's fine.  Just going forward, my

6   vision isn't quite what I wish it were.  I do agree

7   with the -- with the question, which was about the

8   -- you know, the fact that many West Virginia

9   residents have, you know, other potential risk

10  factors or - as this puts it - "complicating risk

11  factors," right.

12          So in some cases, these may predispose

13  to developing addiction; and in other cases, they

14  certainly don't make recovery from addiction

15  easier.

16      Q.   Would you agree with me -- and this is all

17  true of the residents of Cabell County/Huntington,

18  correct?

19      A.   Yes, in broad -- in broad form.  I mean,

20  the rates of specific things like posttraumatic

21  stress or intimate partner violence may vary county

22  to county but yes, I think this is true at both a

23  state and county level.

24      Q.   Would you agree with me that both the

1  problems and challenges in this area of the country

2  - rural Appalachia - go way beyond opioid use

3  disorder or even substance use disorder?

4      A.   Without a doubt.

5      Q.   And if we look at The City of Solutions

6  document that we've been working through together

7  now, if you go all the way to page 93 of that

8  document -- have you read before this section,

9  Doctor Alexander?  It's --

10     A.   As with any of the hundreds of documents

11 that I've reviewed and relied upon for my report, I

12 can't ascertain that I've read every word of every

13 document, but I'm certainly familiar with this --

14 this important document, and I did review it

15 carefully in the course of developing my report.

16     Q.   Okay.  And then -- so you read here the

17 community's own description that while there's

18 strategies described in their own plan -- "will

19 help reduce both the supply of and demand for drugs

20 in the Huntington area, they may not be sufficient

21 for addressing the opioid crisis in the long run.

22          The area's epidemic emerged with the

23 statewide decline in the manufacturing, coal mining

24 and construction industries."

Page 235

1              Are you aware of all of that?

2              MR. BURNETT:  Objection.

3      A.   I am -- I am aware.  I mean, there are very

4  important contextual factors that have helped fuel

5  the epidemic in Cabell County and the City of

6  Huntington, but to make an epidemic, it doesn't

7  just take biology and environment; it also takes

8  supply and access.

9              And so I think these factors are very

10  important, and my abatement plan is designed to

11  help address them.  I consider things like mental

12  illness and vocational training and homelessness --

13  in fact, many of the categories that you are asking

14  about and sort of querying and contrasting between

15  my Ohio report and my West Virginia report, are

16  specifically categories intended to address these

17  very problems.

18              So I'm aware of these problems, and I

19  think that they're important, and my abatement plan

20  has to be informed by them, and it is.

21      Q.   Now, do you agree with me then that if your

22  abatement plan were to be implemented - either in

23  whole or in part - by the Court in this case, it

24  would not cure or eliminate opioid use disorder or

Page 236

1   substance use disorder generally in Cabell County/

2   Huntington?

3        A.   Well, I propose that it will decrease -- I

4   believe I make scientific estimates based on my

5   professional experience that I think we can

6   decrease the number of people with opioid use

7   disorder and with overdose by 50 percent over 15

8   years.

9        Q.   Understood.  But my question was a little

10  different, so let me try it again.  Do you agree

11  with me that even -- let's assume your plan is

12  implemented in full, every aspect of your plan is

13  implemented by the Court, do you agree with me that

14  that is not going to cure or eliminate opioid use

15  disorder or substance use disorder in Cabell

16  County/Huntington?

17       A.   Yes, I agree that it won't 100 percent

18  eliminate all opioid use disorder, yes.

19       Q.   And you agree with me that there is always

20  going to be some level of opioid use disorder or

21  substance use disorder in West Virginia and in

22  Cabell County -- at -- in part, at least, due to

23  the issues reflected here in this document relating

24  to mental health, manual employment jobs and

Page 237

1  basically poverty and the loss of industry.

2            All of that will impact the future of

3  this region of the country.  True?

4            MR. BURNETT:  Objection.  Outside the

5  scope.

6     A.   Well, it felt to me a little bit like two

7  different questions, but what I can say is that I

8  think that poverty, unemployment, the loss of

9  manufacturing, the loss of economic opportunity,

10  posttraumatic stress, intimate partner violence,

11  you know, these are all important contextual

12  factors, and my abatement plan was not designed -

13  nor was I asked to design an abatement plan - to

14  eliminate all of these entirely.

15     Q.   Right.  And you agree that no abatement

16  plan could eliminate all of these structural issues

17  in this -- in this area of the country.  Agree?

18     A.   Or -- or anywhere.  I mean, you're not

19  gonna eliminate them.  The idea is -- the idea is

20  not to eliminate them; the idea is to mitigate the

21  impact of these on -- on -- on the population as it

22  manifests through addiction and through overdose.

23            And again, that's why there are so

24  many strategies that are needed, and they need to

Page 238

1    be deployed simultaneously and with a lot of

2    resources behind them.

3        Q.   And due to either the mental health issues

4    in the region or the poverty or their loss of jobs,

5    some individuals in Cabell County/Huntington will

6    always turn to drug use for a variety of reasons.

7    Is that correct?

8        A.   Well, these -- I mean, these are -- there

9    are complex determinants of addiction, as I think

10   other experts have opined, and as I would submit.

11   And so -- people don't develop addiction because of

12   X.   There are complex determinants.

13              But I think most broadly, I find it

14   helpful to think about the biologic or genetic

15   determinants, the social, economic, psychological

16   determinants and then the issue of supply and

17   access.

18              And so that's -- that's, I guess, the

19   framework that I use.

20       Q.   And because of all of these complex

21   determinants that we've been discussing, do you

22   agree with me that there are individuals who,

23   today, do not have opioid use disorder or even

24   substance use disorder, but will develop opioid use

Page 239

1   disorder or substance use disorder at some time in

2   the future?

3       A.   Yes, I hope far fewer than -- I hope with

4   an abatement plan, and I think with an abatement

5   plan, far fewer than would otherwise.

6            But yes, I think there will be some

7   individuals that develop opioid use disorder or

8   other substance use disorders down the road

9   regardless.

10      Q.   Okay.  And certainly this will occur within

11  the next 15 years, which is the time frame that

12  you're proposing for the implementation of your

13  abatement plan.  Correct?

14            In other words, there will be

15  individuals who, today, do not have opioid use

16  disorder, do not have substance use disorder, but

17  they will develop either one or the other within

18  the next 15 years, which is the time frame for your

19  abatement plan.  True?

20      A.   Yeah, I mean, there are -- there are many

21  people that are taking opioids chronically right

22  now in Cabell County and the City of Huntington.  I

23  mean, there are still an enormous volume of opioids

24  that are prescribed by licensed prescribers, and

Page 240

1   some of these individuals may develop addiction in

2   a month or a year.

3            So absolutely, I think that there are

4   some individuals that don't have addiction today

5   that may develop addiction down the road, even if

6   the abatement plan is deployed.

7       Q.   And do you also agree with me that some of

8   the individuals in Cabell County/Huntington who are

9   being prescribed opioids under the care and

10  treatment of a physician and are using them as

11  prescribed will not develop opioid use disorder.

12  True?

13      A.   Yes, I believe that's the case also.  Not

14  everybody develops addiction.  Although I would say

15  that there's still many, many people that are on

16  prescription opioids chronically that shouldn't be

17  on them.

18            So it's not just like, "Well, if you

19  don't develop addiction, then there's no sweat with

20  being on them."  They're actually not only pretty

21  unsafe - or very unsafe in many settings - they're

22  not that effective for the treatment of chronic

23  pain.

24            So -- but yes, I agree with your --

Page 241

1    your point.

2        Q.   Do you also agree with me that there's

3    individuals today who are not using prescription

4    opioids but who may develop opioid use disorder or

5    substance use disorder generally within the next 15

6    years in Cabell County/Huntington?

7        A.   I do, yes.

8        Q.   Okay.  So there is -- we know and expect -

9    just from the nature of addiction and the

10   conditions in Cabell County/Huntington - that

11   within the next 15 years, there will be new addicts

12   who are not yet using any type of opioid today.

13   True?

14       A.   Well, I mean, I -- I try to avoid the term

15   "addicts" because I think it's a bit stigmatizing,

16   but the bottom line is I think there will be new

17   people who develop addiction, yes.

18       Q.   Okay.  Including opioid use disorder who

19   are not using currently, correct?

20       A.   Yes.  Yes.

21       Q.   And those individuals -- looking forward,

22   these individuals, in the next 15 years, would be

23   beneficiaries if your abatement plan is put in

24   place in whole or in part, correct?

Page 242

1       A.    Well, I mean, I think we discussed this a

2    little bit in different contexts.  But I guess I'd

3    like to make two points.  One is that we talked a

4    little bit already about how the prescription

5    opioid market affects heroin markets, so I'm not --

6    while I wasn't asked to focus on this in my report,

7    I think it's worth noting that -- that -- that

8    heroin markets are impacted by demand for opioids,

9    even among individuals that may have an opioid use

10   disorder that originated from prescription drugs.

11            But -- but with respect to whether

12   they'll be beneficiaries that, you know, of my plan

13   that didn't develop opioid addiction because of

14   prescription opioids, I think that too we discussed

15   previously, and I think my -- my response is that

16   my plan is -- was not focused -- I didn't try to

17   disaggregate my plan based on whether or not

18   someone was currently using prescription opioids or

19   heroin or fentanyl.

20            It's just not the way - from a public

21   health perspective - that one tackles this type of

22   problem in a community.  We would never turn

23   someone away from an emergency department and say,

24   "Well, you know, you're a heroin user.  If it was

Page 243

1    prescription opioids, I've got a phone number for

2    you, but since it's heroin, we're not gonna offer

3    it."

4              And frankly, many people that use

5    heroin and fentanyl illicitly, they started with

6    prescription opioids, the majority.  So -- so I

7    didn't disaggregate those components in my plan.

8        Q.   Okay.  I just wanted to make sure I

9    understood your answer, because it was a little

10   long.

11       A.   All right.

12       Q.   My question was:  Going forward, if

13   individuals today in Cabell County/Huntington, they

14   do not have opioid use disorder, they do not have

15   substance use disorder, they are not using

16   prescription opioids, you agree with me that those

17   individuals -- there are individuals with those

18   facts who may at some point in the future develop

19   opioid use disorder who would be beneficiaries of

20   your 15-year plan should it be put in place.

21       A.   Yes, there are, and I believe they should

22   be included in my plan for reasons that I've

23   articulated.

24       Q.   Okay.  And this would also -- just to be

Page 244

1    clear, Doctor Alexander.  I think you answered

2    this, but I want to make sure I understand it.

3    This would include individuals who never touched a

4    prescription opioid, and in the future, they may

5    start using heroin or fentanyl or carfentanil and

6    develop opioid use disorders.

7              Those individuals would also be

8    beneficiaries of your 15-year abatement plan should

9    that be put in place, correct?

10   A.   Yes, they would be beneficiaries, and I

11   believe they should be included in my plan for

12   reasons that I've already explained.

13   Q.   By the way, I forgot to ask you this -- we

14   will get to it later, but in terms of the component

15   parts -- but we've been talking about your plan a

16   lot.  Are you aware and familiar with the estimate,

17   the cost estimate, to implement all of the

18   interventions and programs that you're proposing in

19   your plan over a 15-year time period?

20   A.   Yes, at a high level, I am.

21   Q.   Okay.  How much?

22   A.   I believe it was between 2.6 and 2.7

23   billion, with a B.

24   Q.   And that's just for Cabell County/

Page 245

1    Huntington, correct?

2         A.   Yes, I believe so.

3         Q.   Now, going back briefly to The City of

4    Solutions document that we were discussing

5    together, that document - if you flip a little bit

6    forward to page 31 with me - that talks about a

7    program that the community has had in place called

8    WEAR, W-E-A-R, all caps, and it's within a section

9    talking about the Drug Court in general.

10              And do you know what WEAR stands for,

11   Doctor Alexander?

12        A.   I don't, but I'm quite familiar with the

13   Drug Court itself.  But I don't know what the

14   acronym stands for.

15        Q.   Okay.  Well, there's Drug Court, and then

16   there's a separate program for women titled WEAR,

17   W-E-A-R.  Are you familiar with that program?

18        A.   Yes, I am.

19        Q.   And is -- is there also a separate juvenile

20   Drug Court?

21        A.   I believe so, but I'm not positive.  I can

22   certainly say that having reviewed drug courts and

23   their performance, I -- I think it's an important

24   part of -- of abatement for this community.

1      Q.   And I assume, based on your prior answer,

2   you did not investigate or research who provides

3   the funding for the Drug Court, the juvenile Drug

4   Court, and WEAR; is that correct?

5      A.   Yeah, I was not asked to examine the

6   sources of funding for currently-existing programs.

7      Q.   Okay.  Why don't you go with me, please, to

8   page 33 of The City of Solutions document.  And

9   there it talks about CCSAPP.  What does that stand

10   for, if you know?

11      A.   Well, it's provided here on the document

12   itself.  But it's the Cabell County Substance Abuse

13   Prevention Partnership.

14      Q.   Okay.  And would you agree with me that's

15   an example of an excellent comprehensive

16   collaborative approach to the problem in Cabell

17   County?

18             MR. BURNETT:  Objection.

19      A.   I mean, those are your words.  I wouldn't

20   -- I wouldn't want to characterize.  Again, I

21   wasn't asked to perform a comprehensive review or

22   evaluation or sort of give a grade to any specific

23   program.

24      Q.   Well, you talk a lot about the importance

1  of community coalitions in your own plan, don't

2  you?

3      A.   I do.  I think they are important.  You

4  know, the fabric of this community has been

5  shredded in some ways, so I think that these types

6  of coalitions do play an important role in

7  communities such as this.

8      Q.   Okay.  And this is an example of one of

9  those coalitions that you suggest in your plan,

10 true?

11     A.   Yes, it is.

12     Q.   Okay.  And what does -- what does the

13 Cabell County Substance Abuse Prevention

14 Partnership do?

15     A.   I would want to look at this in more

16 detail.  If that's helpful, I'm happy to do so with

17 you.

18     Q.   I just wanted to know if you could tell me

19 sitting here as we talk about CCSAPP?

20     A.   Well, generally these type of community

21 coalitions are important because they help to

22 support primary prevention within communities, and

23 so if we look, for example, at my report and the

24 reasons that I argue that community coalitions are

Page 248

1   important, it's because they represent an important

2   stakeholder and they can provide opportunities for

3   youth that may otherwise be hanging out and be more

4   likely to use products nonmedically or to get into

5   trouble.

6               They provide, oftentimes, community

7   meeting spaces.  They can serve as a venue for the

8   conduct of media campaigns and social marketing

9   campaigns.  They provide linkages, essentially,

10  between different organizations and so --

11      Q.   And so -- I'm sorry.  Were you finished.

12      A.   Well -- and so -- I was just going to say

13  in closing that they help to -- they help to weave

14  a fabric that can help build resiliency within

15  different communities.

16      Q.   Now, I actually didn't want to talk about

17  these programs or coalitions in general; I wanted

18  to ask you what you could tell me about this

19  particular Cabell County coalition and what they

20  did or what they provide.

21      A.   Yeah, well, I think that they provide --

22  again, it's been a while since I've looked at this

23  document and considered this particular coalition,

24  but my guess is that they provide some of the types

1  of services and opportunities that I've just

2  discussed.

3      Q.   And are you aware that they are funded

4  through Federal funding, SAMHSA and otherwise?

5      A.   Again, I was not asked to examine the

6  funding of different organizations.

7      Q.   And other than providing those top-level

8  generalities, can you give me any specifics about

9  what the Cabell County Substance Abuse Prevention

10 Partnership does for the community?

11          MR. BURNETT:  Objection.  Outside the

12 scope.

13     A.   Yeah, I think I've hopefully given you a

14 sense of the role that I think these organizations

15 play and the -- the importance that they can serve

16 in helping to promote primary prevention and reduce

17 the likelihood that people develop substance use

18 disorders.

19     Q.   Doctor Alexander, what can you tell me

20 about the LEAD program?

21     A.   Very --

22     Q.   In Cabell County.  Not in -- and again, I

23 would like you to be specific about the LEAD

24 program in Cabell County/Huntington if you can do

Page 250

1    that.

2         A.   Sure.  And are you referring to a

3    particular place in this report?  Or no?

4         Q.   I'm just asking you generally if you can

5    tell me what you know about what the LEAD program

6    provides for the community in Cabell County.

7         A.   Sure, sure.  So LEAD stands for Law

8    Enforcement Assisted Diversion, and this is a -- an

9    important means of diverting nonviolent offenders

10   from the criminal justice system.

11             So individuals that have opioid use

12   disorder or other substance use disorders that may

13   engage in nonviolent crimes, property theft, for

14   example, the LEAD program provides an opportunity

15   for these individuals to enter treatment rather

16   than go to jail.

17             And it's a brilliant -- I mean, it's

18   an important program that is, unfortunately,

19   underutilized in some parts of the country, and it

20   gives people a second chance.  And it recognizes

21   that no one chooses to have addiction any more so

22   than they choose to have colon cancer or multiple

23   sclerosis.

24             So it gives people that second chance

Page 251

1   by allowing them to be processed through the

2   treatment system rather than the criminal justice

3   system.

4       Q.   How successful has the LEAD program been in

5   Cabell County?

6                MR. BURNETT:  Objection.

7       A.   Again, I wasn't asked to provide -- you

8   know, I wasn't asked to provide a -- I wasn't asked

9   to provide an estimate or an evaluation of -- of

10  any specific program regarding their -- their

11  success, but I did review, you know, dozens or

12  hundreds of documents, and some of them included

13  information on the performance of these different

14  programs.

15      Q.   But sitting here today, you are unable to

16  tell me any specifics about the success of the LEAD

17  program in Cabell County?

18               MR. BURNETT:  Objection.

19      A.   What -- what would you -- are you looking

20  for a certain number?  Or what would you -- what

21  measure are you asking about and looking for when

22  you ask how successful do I think the program is?

23      Q.   I'm just -- I'm asking you if you can

24  provide to me any -- any specifics about the LEAD

1    program in Cabell County.  Obviously there's LEAD

2    programs throughout the United States, correct?

3         A.   Yes, there are.

4         Q.   And they all generally have the same goals

5    and they generally do the same things, and so while

6    I appreciate the answer you provided me, I wanted

7    to know if you could tell me anything specifically

8    about the achievements of the LEAD program in -- in

9    Cabell County.

10                  MR. BURNETT:  Objection.

11        A.   I think it's been an important program, and

12   my sense is that it's served a very important role

13   in Cabell County in helping to allow for people to

14   avoid getting channeled into the criminal justice

15   system, which is not where people with addiction

16   should be.

17                  So I don't have a top-of-mind number

18   or -- I don't have a top-of-mind number for the

19   number of people, for example, that were processed

20   in 2018 through the LEAD program but for the

21   presence of the program would otherwise have ended

22   up in jail.

23                  You know, I reviewed -- I've already

24   noted the number of -- of data sources and

Page 253

1    information points and data points that I've

2    reviewed in the course of preparing my report.  And

3    I'd be happy to look at information with you that

4    I'm sure that I cite in my report or in my redress

5    models that does provide some of that context that

6    you may be looking for.

7         Q.   Now --

8         A.   May I -- I'm sorry to interrupt, but I'd be

9    happy within the next ten or fifteen minutes for a

10   break.

11             MR. BURNETT:  Yeah, same.

12        Q.   I was going to move on to treatment

13   briefly.  So it's a great time to take a break.

14   Why don't we come back at 4:00.

15             And Justin, would you mind -- can I

16   have the time on the record, please?

17             VIDEO OPERATOR:  Yeah, give me one

18   moment.  The time is 3:48.  We are going off the

19   record.

20             (A recess was taken after which the

21             proceedings continued as follows:)

22             VIDEO OPERATOR:  The time is

23   4:00 o'clock.  We are now back on the record.

24   BY MS. GEIST:

Page 254

1          Q.    Doctor Alexander, let's turn now to

2     treatment, if we could, please, and the discussion

3     of the treatment programs available in Cabell

4     County/Huntington begin on page 38 of The City of

5     Solutions guidebook, if you want to go there.

6          A.    Okay.

7          Q.    Are you there with me?

8          A.    Yeah.

9          Q.    Okay.  The first program that's discussed

10    is Project Hope for Women and Children.  Do you see

11    that?

12         A.    Yes, I do.

13         Q.    Okay.  What does Project Hope for Women and

14    Children do?  Or provide, rather.

15         A.    I believe it provides housing and other

16    services for -- for women that have been impacted

17    by the opioid epidemic and their children.  So it

18    -- it gives people a chance to get back up on their

19    feet and has services that are discussed here in

20    the materials that you're showing as well as the

21    subsequent pages regarding counseling and therapy

22    groups and peer coaches and program assistance and

23    the like.

24         Q.    Does it also address women who have

Page 255

1    co-occurring mental health or mental health

2    disorders?

3         A.   Yes, I believe that it does.

4         Q.   And does it also provide housing for women

5    and children?

6         A.   It does.  As with all of these programs

7    we're considering, you know, the level of support,

8    the sources of support, the ability to scale this

9    to meet continued unmet need is -- is important to

10   consider.

11             So I think those are important, you

12   know, dimensions of this.  But yes, it does provide

13   those services.

14        Q.   And then who's the main partner with Cabell

15   County/Huntington in connection with Project Hope?

16        A.   Well, I think Marshall University or

17   Marshall Health has -- has played a very important

18   role.  I believe that this program previously was

19   City Mission and that the -- the residences or the

20   facilities and the infrastructure and support was

21   subsequently taken over by Marshall -- Marshall

22   Health, I believe.

23        Q.   In your research and review of materials

24   for this case, any indication that there was any

Page 256

1    sort of capacity issue with respect to the

2    apartment housing provided by Project Hope?

3        A.   Well, I carefully considered existing

4    programs and services within the community as I

5    developed my recommendations, but I did not do -- I

6    was not asked to perform a needs assessment per se,

7    so I not attempt in my abatement plan to net out

8    current levels of care and only propose the margin,

9    essentially only propose what I thought -- what

10   additional should be provided.

11       Q.   Well, let me ask you this:  Generally would

12   you agree with me that virtually every aspect of

13   your proposed abatement plan, the programs and

14   interventions you have in the plan, there is some

15   aspect of that already in place in Cabell County/

16   Huntington?  That's true, isn't it?

17       A.   Yes.  To varying -- to markedly varying

18   degrees.  But yes, I believe that's the case.

19       Q.   And for the most part, from my review of

20   your plan, you acknowledge that these

21   implementations or interventions or programs have

22   been put in place, but more times than not, your

23   proposal was to add on or expand.  Is that a fair

24   characterization?

Page 257

1      A.   Again, my program builds on what's been

2  deployed in the community, but I didn't try to

3  identify some level of provision of services which

4  my program would add to.

5      Q.   So sitting here today, you can't tell me

6  whether or not there's been issues with a waiting

7  list at Project Hope, for example or whether that

8  the housing services provided by Project Hope have

9  been insufficient to address the needs of the

10  women and children for whom those programs are

11  intended.

12           Is that correct?

13      A.   No, I believe that's incorrect.

14      Q.   Well, then I'll go back to my question I

15  had asked you:  Is there any issue with the

16  apartment housing provided to women through a

17  partnership with Marshall Health and Project Hope

18  -- is there any issue with capacity or not having

19  enough apartments, essentially?

20      A.   Yeah.  So thank you for that question.  You

21  know, the vast majority of people with opioid use

22  disorder are not in treatment currently.  And that

23  -- that's the case in Cabell County and the City of

24  Huntington just as it is elsewhere in the country.

Page 258

1           And so I would never want to look at a

2   certain level of services or sort of whether or not

3   Lily's Place or Project Hope or, you know, some

4   other organization -- I would never want to look at

5   the current level of -- of services provided and

6   say, "Well, because Project Hope on average has two

7   beds open on a given night, we don't need to invest

8   further in providing housing for women and children

9   that may be impacted by the opioid epidemic in the

10  community."

11          So my point is that there's large,

12  large amounts of unmet need and that we have

13  identified and successfully reached out to only a

14  minority of those individuals.

15          So I think that many of these programs

16  can be substantially scaled, and in fact, my plan

17  proposes to do so over 15 years.

18      Q.   But in other words, Doctor Alexander, you

19  agree with me that with respect to a program like

20  Project Hope, for example - and you also mentioned

21  Lily's Place - you can't tell me today that,

22  through your research and review, you determined

23  that they didn't have enough beds, they didn't have

24  enough apartments, they didn't have enough places,

Page 259

1    they couldn't handle the capacity.

2              You can't tell me any of that.  Is

3    that true?

4              MR. BURNETT:  Objection, asked and

5    answered.

6       A.   I considered the current volume of care in

7    these programs as I -- as I reviewed them.  But my

8    point is that there's large amounts of unmet need

9    within the community, and so even though they may

10   or may not be at capacity now, I don't think that

11   that -- that there's a large amount of unmet need.

12             And again, I wasn't asked to do a

13   needs assessment of specifically how many beds are

14   currently occupied or how many people are currently

15   in treatment that are being paid for by the City or

16   State or County and how many additional people

17   should be treated.

18             My abatement plan just looks at the

19   total populations that I believe are going to need

20   services.

21      Q.   I see.  So for -- for all of the different

22   programs here under the heading of Treatment in The

23   City of Solutions guide, we have -- we have Project

24   Hope; we have Lily's Place; we have Recovery

Page 260

1    Support; Healthy Connections, a variety of

2    different programs.

3              You don't have any information, based

4    on your review, that any of these programs are at

5    capacity now or have had a waiting list.

6              Is that correct?

7              MR. BURNETT:  Objection.

8       A.   I didn't try to quantify -- if you're

9    asking whether I tried to quantify sort of current

10   levels of staffing or provision of care and

11   incorporate these quantitatively into my abatement

12   program, the answer is no, that I did not do so.

13      Q.   Okay.  So the answer to my question is:

14   You can't tell me that any of these programs are at

15   capacity.  True?

16             MR. BURNETT:  Objection.

17      A.   Well, I mean, if you take something like

18   the LEAD program or like Quick Response Teams or

19   the Drug Courts, they may be at capacity, but there

20   may be a -- huge opportunities to expand them

21   further.

22             So again, I think the issue of

23   capacity is relative and the question is capacity

24   at what point in time and with what level of

Page 261

1   outreach and what level of initiative and

2   investment to identify those that could benefit

3   from the program.

4           And so I'm -- but I did not look and

5   try to quantify or evaluate the specific current

6   levels of staffing or provision of care in any

7   given program.  That's correct.

8       Q.   Okay.  So you went back to prevention a

9   little bit, so I do want to ask it again.  I'm

10  talking about treatment now.  We're under the

11  heading of "Treatment," talking about Project Hope,

12  Lily's Place and similar treatment programs

13  available in Cabell County.

14          Just so I'm clear, in forming your

15  abatement plan, you did not look to determine

16  whether or not any of these treatment programs were

17  at capacity, whether there was a wait list or

18  people waiting to get in.  You did not do that in

19  forming your opinions in the case. Is that correct?

20          MR.BURNETT: Objection, asked and

21  answered several times.

22      A.   It is correct, but I would like to just

23  call out that this is part of a broader discussion

24  in a number of other points that I've already made.

Page 262

1      Q.   Okay.  Doctor Alexander, can we go back to

2  your expert report in the case, please, which is

3  Exhibit 4?

4      A.   Okay.

5      Q.   I will like to run through some of the

6  proposals that you have in your plan in our time

7  left.  But first I do want to ask you a couple

8  questions about page 13 of your report where you

9  talk about "PRINCIPLES GOVERNING EFFECTIVE

10  RESPONSE" --

11      A.   Yes, ma'am.

12      Q.   Okay.  Here in this page of your report,

13  Doctor Alexander, you talk about certain

14  misconceptions.  Do you see that?

15      A.   Yes.

16      Q.   Okay.  And your Misconception #2, I think

17  you've said many times today, that "addiction,

18  rather an abuse, is the primary cause of

19  opioid-related morbidity and mortality."  Is that

20  correct?

21      A.   Yes.

22      Q.   And then with respect to Misconception #3,

23  you talk about the misconception that "The epidemic

24  is largely driven by" "rogue physicians" with

Page 263

1   "'doctor shoppers'" and in response, you say, "And

2   for example, "Rogue physicians," "while" "important

3   to identify and manage, account for a small

4   proportion of opioid-related harms."

5                   Is that correct?

6       A.   Yes.

7       Q.   Okay.  So in other words, it would be the

8   wrong focus to be looking at a group of physicians

9   who might be determined to be rogue physicians.

10  They have very little impact, in your opinion, on

11  opioid-related harms.  Is that right?

12                  MR. BURNETT:  Objection, misconstrues

13  his testimony.

14      A.   Yeah, it's not -- not correct.  Because it

15  -- because -- I'm sorry, it's not correct because

16  there's not one singular focus.  I mean, we -- we

17  can't have one focus if we're going to make headway

18  on this problem.

19                  And so I would never want to suggest

20  that these individuals aren't important to

21  identify.  I'm merely making the point here that

22  while they are very important to identify and

23  manage, they account for a small proportion of

24  opioid-related harms.

Page 264

1    Q.   Understood.  And I wasn't suggesting

2  otherwise.

3            But while you might want to focus on a

4  list of particular physicians - and in your

5  opinion, it's important to identify these

6  physicians - that list or that group of physicians,

7  in your opinion, only accounts for a small

8  proportion of opioid-related harms.

9            Is that correct?

10   A.   I -- in -- what I'm trying to do here is to

11 draw attention to the fact that I think we have --

12 historically, many individuals have erroneously

13 overemphasized the importance of devious

14 individuals, as I say, "such as rogue physicians

15 and patients who are 'doctor shoppers'" at the

16 expense of broader efforts to improve the quality

17 and scientific basis for opioid prescribing.

18   Q.   So in other words, you're saying from your

19 perspective and your opinion, we shouldn't be just

20 focusing on a list of devious doctors or rogue

21 physicians; there are larger issues impacting

22 opioid-related harm.  True?

23   A.   Yes.  We should not focus only -- and

24 frankly, it's not just physicians, right?  Because

                                                    Page 265

1    you know, up to a fifth of prescription medicines

2    are prescribed by nonphysicians, including opioids,

3    although I wouldn't want to go on the record

4    regarding a specific number.

5              But the point here is that, yes, I did

6    not believe that we should focus exclusively on

7    rogue prescribers.

8        Q.   And that is because, in your opinion, they

9    would only account for a small proportion of

10   opioid-related harms.  True?

11       A.   I believe that that's the case, yes.

12       Q.   Okay.

13       A.   But -- I mean, "small" is -- you know, we

14   would have to quantify that, and that's part of a

15   longer conversation.

16             But yes, I believe that rogue

17   prescribers are very important and they have

18   contributed enormous harms.  But relative to all

19   opioids prescribed and oversupplied, I believe that

20   rogue physicians are not the primary driver of

21   those behaviors.

22       Q.   Now, on 15 of your report, page 15, this is

23   sort of a nice summary, the categories of your

24   abatement plan.  Correct?

Page 266

1        A.   Yes.

2        Q.   Okay.  And Category 1, generally as we've

3   discussed a few times today, focuses on Prevention,

4   correct.

5        A.   Yes.  And it would helpful, if it's okay

6   with the videographer, if you could just display

7   whatever we're speaking to.

8             But I do have it in front of me, and

9   yes, Category 1 is Prevention.

10       Q.   Sure.  So why don't we go to - for the

11  record - Exhibit 4, let's go to page 16.  And here

12  you write, Doctor Alexander, that the goal of this

13  part of your plan is to reduce what you say is a

14  "widespread oversupply of prescription opioids."

15  Correct?

16       A.   Yes.

17       Q.   Okay.  Is there a current oversupply of

18  prescription opioids in Cabell County/Huntington?

19       A.   Well, I believe the County is about twice

20  the national average, so, you know, I don't want to

21  draw conclusions about any particular patients'

22  care, but I certainly still have concerns that --

23  that many patients may be receiving these medicines

24  that -- where there's an unfavorable risk/benefit

Page 267

1   balance, yes.

2       Q.   Well, so -- again, I'll try my question

3   again.  Do -- is it your opinion that there is a

4   current opioid prescription --

5                 MS. GEIST:  Strike that.

6       Q.   Is it your opinion that there is a current

7   prescription opioid oversupply in Cabell County?

8       A.   Yes, I think we still have a ways to go in

9   reducing the volume of opioids supplied in the

10  community.

11      Q.   Okay.  So can you tell me how much, what

12  percentage?

13      A.   It's -- it's a great question, and it's one

14  I've been asked before.  You know, what I can say

15  is that many patients -- is that we both have

16  underestimated the risks of opioids and we've

17  overestimated their benefits, and that many, many

18  patients receive opioids who would -- who would do

19  better with other products.

20                 There's also a substantial population

21  of individuals - and I'm speaking generally here -

22  that are on chronic opioids that should be tapered

23  off of them.  And I don't know whether other

24  experts have spoken in much more detail about these

Page 268

1    matters.  I did not do a detailed analysis of

2    individual patient record data from Cabell County

3    or the City of Huntington to estimate the quantity

4    of oversupply, and that's why I'm saying that --

5    that's why I'm inclined not to provide an exact

6    number.

7              One way to think of it is that if you

8    think about pre-epidemic levels -- setting aside

9    for a minute exactly when the epidemic began, but

10   let's say for -- for the purposes here, that the

11   epidemic began in the mid to -- mid to late 1990s.

12             If you think about the levels at that

13   time, I think that would provide one -- one

14   potential measure for what -- for what reasonable

15   levels at a population level might look like.

16      Q.   But you can't tell me sitting here today

17   what percentage of the current supply of

18   prescription opioids in Cabell County would be a

19   correct or an appropriate percentage.  Or what

20   percentage is too much.  Is that correct?

21      A.   I would --

22             MR. BURNETT:  Objection.

23      A.   I was not asked to develop that estimate.

24   I believe with time and the appropriate data, I

Page 269

1    could probably do so.  But I was not asked to do so

2    for this case.

3         Q.   Well, to do so, Doctor Alexander, wouldn't

4    you need to look at every single individual

5    patient's records and all of the aspects of that

6    individual patient to determine whether or not the

7    prescribing doctor appropriately prescribed the

8    medication?

9         A.   Well, what I --

10        Q.   You -- you -- how can you -- can you make a

11   decision as to what is an appropriate number or

12   percentage of opioids without knowing everything

13   about the individual patients for whom these are

14   prescribed?

15        A.   Well, I'm trained as a pharmaco-

16   epidemiologist, and my profession is exactly this,

17   which is the study of the use, safety and

18   prescription of medicines in large populations.

19             We never have the entirety of

20   information about an individual.  There is always

21   more information that we would like than we have in

22   the databases that I use.

23             No study is -- is perfect in every

24   single way.  And yet we are able to use

Page 270

1  quantitative data from populations in order to

2  derive estimates such as the one that you're

3  inquiring about.

4       Q.   Now, did you speak with any physicians in

5  Cabell County/Huntington who prescribe prescription

6  opioids and talk to them about why they're

7  prescribing and who their patients are?

8       A.   There may have been -- I believe Doctor

9  Kilkenny's a medically-trained physician, and there

10 may well have been other clinicians that were on

11 one or more of the calls that I participated in.

12            But I did not conduct a study, if you

13 will, or sort of a -- I didn't perform what we

14 would call in -- professionally at Johns Hopkins,

15 key informant interviews.

16            I didn't do that sort of exploratory

17 research with -- with clinicians in Cabell County

18 and the City of Huntington.  No, I did not.

19      Q.   Did you -- well, you mentioned Doctor

20 Kilkenny.  Did you speak with Doctor Kilkenny about

21 his prescriptions -- about his prescribing patterns

22 for prescription opioids?

23      A.   I don't recall the details of the

24 conversation at that level.  But I -- but one --

Page 271

1    one question that invariably I ask people when I'm

2    speaking about local experts is what their sense of

3    the contours of the epidemic are, and -- and what

4    they think should be done and what they think is

5    most effective and what they think is less

6    effective and so on and so forth.

7                 So -- but I don't recall the details

8    of my conversation with Doctor Kilkenny.

9        Q.   Okay.  And you cannot identify for me,

10   sitting here today, any other physicians who

11   spoke with in Cabell County about their prescribing

12   decisions with respect to opioids.  Is that true?

13       A.   I believe that's true, that I did not have

14   those conversations.  I think that some of these

15   matters may have been broached in some of the

16   materials that I reviewed, and if so, those are

17   materials that have been produced for the case.

18       Q.   And sitting here today in terms of the

19   oversupply, you do not have an opinion as to

20   whether it's an oversupply by 5 percent, 10

21   percent, 20 percent, any specific percentage; is

22   that correct?

23                 MR. BURNETT:  Objection, asked and

24   answered.

Page 272

1   Q.   You just think it's just -- it's just too
2   much.  Is that fair?
3   A.   Well, I can do a little better than that, I
4   think, in terms of, again, trying to address the
5   spirit of your question.
6           And I already mentioned considering
7   pre-epidemic levels as one benchmark.
8           I also highlighted that I believe that
9   prescribing rates - while they have declined - in
10  the County and the City of Huntington - they're
11  still off the charts relative to national averages,
12  so I think that's a second perspective.
13          A third is a reminder - and I have
14  noted this previously, but I think it's important
15  to emphasize - that no single measure suffices to
16  understand and project the epidemic, no single
17  measure in and of itself.
18          And you recall the example with lung
19  cancer where if 100 people start smoking today,
20  they're not going to start dying from lung cancer
21  until many years out.  So I have a little bit of
22  concern about using current levels of supply to
23  draw broad assessments regarding the -- the nature
24  of the epidemic.

1           But I think that we can reduce opioid

2    prescribing further within the County and the City

3    and do so safely and in a way that's concordant

4    with evidence-based medicine, and should it be

5    helpful for you or for plaintiffs or for the

6    courts, I'm happy to further opine on these

7    matters.

8           But it probably would take a further

9    investigation of -- of data as well.

10     Q.   Now, but in -- in connection with your

11   opinions, I assume you didn't speak to any patients

12   who are currently being prescribed opioids by their

13   physicians in Cabell County.  Correct?

14     A.   That's correct, although I've spoken with

15   many, many patients, and many, many family members,

16   and many, many people who are bereaved because

17   their moms and dads, brothers and sisters and sons

18   and daughters have died.  So -- and I also treat

19   patients --

20     Q.   Let's --

21     A.   -- so while --

22     Q.   Let's go back to my question.

23           MR. BURNETT:  Counsel, again, I

24   believe Doctor Alexander was not finished with his

Page 274

1    answer.

2                MS. GEIST:  We're in the last hour and

3    a half.  My question -- we went through this

4    before, Counsel.

5                My question was simple.  Did you speak

6    to any patients in Cabell County/Huntington who are

7    prescribed opioids by their physicians?

8                MR. BURNETT:  And Counsel, you're not

9    entitled to interrupt the witness just because he

10   hasn't answered the question the way you want.  I

11   would ask you to allow him to give a full answer,

12   and then you can ask follow-up.

13               MS. GEIST:  He can answer "yes" or

14   "no" and then if he wants to expand on it --

15       Q.   But it's a yes or no.  Did you speak with

16   any patients in Cabell County of City of Huntington

17   who are currently being prescribed opioids by their

18   physician or health care provider?

19               MR. BURNETT:  And Counsel, he was in

20   the process of answering the question, so you're

21   not being fair to the witness.

22       A.   My concern about simply saying "no" is I

23   wouldn't want to misconstrue my knowledge of the

24   clinical dimensions of opioid prescribing, and so I

1   think it's important to highlight that while I did

2   not -- the answer is no, I did not speak with any

3   patients that I can recall from Cabell County or

4   the City of Huntington that are -- are receiving or

5   on long-term opioids, that I've spoken with many,

6   many patients and many, many family members, and

7   I've -- treat patients that have been on long-term

8   opioids.

9                So I just want to put on the record

10  that I have experience in this matter, even though

11  I may not have spoken with patients in Cabell

12  County and the City of Huntington.

13      Q.   Okay.  So just so I'm clear, you didn't

14  speak to any patients in Cabell County/City of

15  Huntington who are currently being prescribed

16  opioids, and you didn't speak to any physicians in

17  Cabell County/Huntington about their prescribing

18  habits with respect to opioids.  That's true,

19  correct?

20               MR. BURNETT:  Objection.  Asked and

21  answered.

22      A.   I mentioned that I have spoken with Doctor

23  Kilkenny, and I would just point to my previous

24  answers to your previous questions for further

1    information regarding this matter.

2         Q.    That was it, Doctor Kilkenny.  But you

3    don't recall sitting here today if you spoke with

4    him about his prescription patterns for opioids,

5    correct?

6              MR. BURNETT:  Objection, asked and

7    answered.

8         A.    This was a conversation that took place

9    perhaps six or nine months ago, and we spoke about

10   many different matters, and I don't recall the

11   details of the conversation at that level.

12        Q.    Now, do you agree with me, Doctor

13   Alexander, as a physician, that the ultimate

14   decision to prescribe is based on risk/benefit

15   analysis and the individual patient factors that a

16   doctor or health care provider is considering?

17   True?

18        A.    Well, I believe -- I mean, this is similar

19   to questions that I believe I've been asked

20   previously in a prior deposition, but -- but -- and

21   I think my answer then is the same as my answer

22   today, which is that ultimately, physicians or

23   other licensed prescribers may make decisions about

24   the use of a medicine, hopefully with patients, but

```
                                            Page 277
 1    they, in turn, are informed by a great number of
 2    other factors.
 3                And so it's not so -- so it's not so
 4    simple.
 5         Q.   Do you have any information in connection
 6    with your opinion that there's an oversupply of
 7    prescription opioids today -- do you have any
 8    information about what percentage of the
 9    prescription opioids being dispensed in Cabell
10    County/Huntington are for patients dealing with
11    cancer-related pain?
12         A.   I wasn't asked to evaluate that.
13         Q.   Do you have any information as to what
14    percentage of prescription opioids being dispensed
15    in Cabell County/Huntington to patients are to
16    treat arthritis or rheumatoid arthritis?
17                MR. BURNETT:  Objection.
18         A.   Which -- which one?  Or both?  Arthritis --
19         Q.   I'll say -- well, do you have any
20    information whatsoever about what percentage of
21    prescription opioids that are being dispensed in
22    Cabell County/Huntington today are to treat
23    patients with rheumatoid arthritis?
24                MR. BURNETT:  Objection.
```

                                            Page 278

1      A.   I wasn't asked to evaluate that, nor did I

2   have data to do so.

3      Q.   Did you have any information as to what

4   percentage of prescription opioids being dispensed

5   in Cabell County/Huntington today are for patients

6   with arthritis?

7                MR. BURNETT:  Objection.

8      A.   And do you mean degenerative joint disease

9   or what we call wear and tear arthritis, which is a

10  different disease than rheumatoid arthritis?

11     Q.   I just said "arthritis" so --

12     A.   Well, which type of arthritis are you

13  referring to?

14     Q.   Let's say degenerative.

15     A.   So opioids -- there are many patients that

16  are receiving opioids for arthritis who would do

17  better with alternative treatments that are safer

18  and more --

19     Q.   That wasn't my -- that wasn't my question.

20  My question is:  Do you know how many or what

21  percentage of patients in Cabell County/Huntington

22  are being dispensed, prescribed opioids for the

23  treatment of arthritis, degenerative arthritis?

24                MR. BURNETT:  And I will note again

Page 279

1    that you interrupted the witness.

2         A.   I wasn't asked to provide such an estimate.

3         Q.   Do you have any idea how many or what

4    percentage of patients in Cabell County/Huntington

5    are being dispensed prescription opioids to treat

6    musculoskeletal conditions?

7              MR. BURNETT:   Objection.

8         A.   Yeah, this wasn't -- this wasn't part of my

9    report.   My report focused on evidence-based

10   methods to abate the epidemic.

11        Q.   Now, in terms of your opinion with respect

12   to reducing what you have determined is an

13   oversupply of prescription opioids in Cabell

14   County/Huntington, you are not offering any opinion

15   that the distributors who are the defendants in

16   this case need to change or modify their business

17   practices.   Is that correct?

18        A.   I wasn't asked to opine on the role of --

19   of a specific party such as distributors.

20        Q.   Do you know who the parties or the

21   defendants are in this case?

22        A.   I believe I know the big three, at least.

23   I don't know if there are more.

24        Q.   And just to confirm, Doctor Alexander, you

Page 280

1   will not at the trial in this case be offering any

2   opinions specific to any of the three distributors

3   who are defendants here, namely AmerisourceBergen

4   Drug Corporation, McKesson and Cardinal Health?

5        A.   Not unless -- not unless I was asked to do

6   so by the judge or, you know, the parties agreed

7   that I should do so.  But that's not my current

8   understanding of the role that I would play.

9        Q.   Okay.  And you don't have any opinions of

10  that nature in your expert report that we've been

11  talking about today, correct?

12       A.   Well, again, there's -- there's sort of the

13  technical term of art "legal opinion" and then

14  there's opinions.  But in my report, I do discuss

15  oversupply, but I think that's as close as I get to

16  discussing the role of -- of potentially arguably

17  the role of distributors.

18       Q.   Now, you also state that harm from

19  oversupply arises from diversion, diversion

20  throughout the supply chain.  Is that correct?

21       A.   Yes, it is, although if we're going to go

22  in detail here, it would be helpful for me if you

23  could project the page at which we are discussing.

24       Q.   Well, I thought I was looking at it, and

Page 281

1    I'm right.  So it's right here, Doctor, on the

2    screen, page 16 --

3         A.   Okay.

4         Q.   -- first paragraph, you say, "Harm from

5    this oversupply arises from many points in the

6    continuum of care, ranging from how clinicians

7    treat pain to the diversion of opioids throughout

8    the supply chain."

9              Do you see that?

10        A.   Yes, I do.

11        Q.   Okay.  That's what I'm referring to.  If

12   there is diversion of prescription opioids

13   throughout the supply chain, who is doing the

14   diverting?

15        A.   Well, many --

16             MR. BURNETT:  Objection.

17        A.   I mean, I wasn't asked to opine on -- on

18   the nature of drug diversion.  What I can tell you

19   - and what we discussed briefly previously - is

20   that if you look at a population level at where

21   people say that they're getting their opioids who

22   are using them nonmedically, the vast majority say

23   either that they got them from a friend or family

24   member who, in turn, got them from a licensed

1   prescriber, or that they got them from a licensed

2   prescriber themselves.

3           But the broader point here is that

4   there is at least some level of diversion all the

5   way through the supply chain, so you can talk all

6   the way from drug warehouses to end users, and

7   there is some degree of diversion throughout the

8   supply chain.

9      Q.   And you're not offering any expert opinions

10  with respect to diversion or the procedures in

11  place to prevent diversion, I assume.  Correct?

12     A.   Well, obliquely I speak to some of those

13  matters, for example, with the implementation of

14  safe storage and take-back programs.  But I don't

15  directly speak to the role of distributors or

16  pharmacies or, you know, methods -- redesigning

17  work flow processes that could be used by those

18  parties so as to improve the safe distribution of

19  opioids.

20     Q.   But certainly as you just acknowledged,

21  you're well aware that there is diversion of

22  prescription opioids by individuals who -- who

23  either steal them or get them from a friend or

24  family member, take them out of the medicine

Page 283

1   cabinet and use them in a nonmedical way.  Correct?

2       A.   Yes.

3       Q.   Now, we talked a little bit about the

4   programs and interventions already in Cabell

5   County/Huntington to address prevention, so I'm not

6   going to rehash a lot of that.  Although just to

7   ask you quickly, are you familiar with the State

8   Prevention First program that's already in

9   existence in West Virginia?

10      A.   The -- it's the State level primary

11  prevention program?

12      Q.   Yeah, it's called Prevention First.  It's a

13  -- literally, it's called Prevention First program

14  and it's in existence in West Virginia.

15      A.   Yeah, I --

16      Q.   Are you familiar with that program?

17      A.   I believe that I considered or reviewed

18  information about it, but -- but I can't provide a

19  lot of additional detail about it.

20      Q.   Can you tell me anything about what

21  Prevention First does and whether or not it's

22  available to Cabell County?

23      A.   Well, there are literally --

24              MR. BURNETT:  Objection.

Page 284

1      A.    There are literally dozens or hundreds of

2  different programs that have been deployed over

3  time in the City of Huntington and Cabell County

4  and in the State, and so you know, again, I -- I --

5  if this report is featured -- I'm sorry, if this

6  program is featured in the materials that I've

7  provided, then I reviewed it at some level of

8  detail.

9            But no, I can't speak to the way that

10 it may be currently deployed in the County.

11     Q.    Do you know -- do you know to whom the

12 prevention or promotional campaign messages are

13 directed to by the Prevention First program?

14     A.    Well, I'm aware that there have been

15 important social marketing campaigns and media

16 outreach that's been deployed in an effort to help

17 educate the general public regarding, you know, the

18 safe use and storage of opioids and principles of

19 sound pain management.

20            So I don't know if this is the program

21 that you're referring to, but --

22     Q.    No, this program is actually directed

23 towards physicians.

24     A.    Okay.

Page 285

1      Q.   Let's move on, though, and talk about pre

2   -- physicians -- you have a header, a specific

3   header, under Prevention where you talk about

4   Health Professional Education.  And so the goal

5   here is "to train health care providers, including"

6   doctors "and other authorized health care"

7   providers who can write prescriptions for opioids.

8   Correct?

9      A.   Yes, ma'am.

10      Q.   And just by way of general purpose, through

11   this part of your plan, you're focusing on raising

12   awareness and disseminating information to the

13   medical community.  Is that a fair

14   characterization?

15      A.   Yes.

16      Q.   Okay.  And this, obviously -- when we're

17   talking about the medical community, we're talking

18   about Cabell County/City of Huntington, true?

19      A.   Yes.

20      Q.   Okay.  Sitting here today, on September

21   18th, 2020, who in the medical community of Cabell

22   County/City of Huntington do you think does not

23   already know about the opioid epidemic?

24      A.   Well --

Page 286

1          MR. BURNETT:  Objection.

2      A.   I mean, everybody has -- my sense is, is

3  that everybody knows somebody that's been impacted.

4  But it's one thing to know that the house is on

5  fire, and it's another thing to know how to put it

6  out.

7          And so I think that there's enormous

8  headway that can be made in training individuals

9  and ensuring that they're up to date with the

10  latest science regarding prevention, treatment and

11  recovery.

12          So I think that virtually all

13  providers can benefit from additional opportunities

14  for training.  There may -- it may be that it

15  shouldn't be one size fits all and that some

16  providers need a different type of training than

17  others, but I think that the vast majority of

18  providers in the community can benefit from an

19  opportunity to -- to learn more and to reflect and

20  to learn about programs and services that are

21  constantly changing and where there's sort of a

22  dynamic nature of that.

23          There's an ever-evolving evidence base

24  around treatments, and so I think there's lots --

1    you know, there's lots of providers, I think, can

2    benefit.

3         Q.   And is it your opinion that today doctors

4    and health care providers in Cabell County/

5    Huntington are not already aware of the opioid

6    epidemic and the risk/benefit calculus that needs

7    to be undertaken in prescribing opioids, just like

8    with any other medication?

9         A.   I was not asked to perform a comprehensive

10   needs assessment.  But again, it's one thing to be

11   aware at a high level; and it's another thing to

12   really know state of the art evidence-based methods

13   of managing pain, to feel empowered, and to be

14   appropriately linked and to know how to utilize the

15   types of services and programs that we've discussed

16   together today.

17             I mean, this -- this abatement plan

18   won't work if there's not some training.  And I'm

19   not naive enough to think that many of these

20   providers don't have a broad understanding of the

21   epidemic, but I think that the vast majority can

22   benefit extensively from opportunities for

23   additional training.

24        Q.   Well, your goal of this aspect of your

Page 288

1  abatement plan is to reduce oversupply through

2  reducing prescriptions.  Isn't that your -- the

3  goal of your plan?

4       A.   I mean, it's more than that.  I mean,

5  that's important.  But I'm sure that I discuss in

6  here - and I know elsewhere in the report, I

7  discuss - that it's not just about reducing

8  oversupply.  I mean, that's very important.  But we

9  need to do it -- but you can't just ratchet down

10 opioids.

11           You have to understand evidence-based

12 pain treatment.  You can't just focus on pain

13 treatment.  You have to identify opioid use

14 disorder.  You can't just identify opioid use

15 disorder; you have to be able to screen in a

16 sensitive matter -- manner for things like intimate

17 partner violence and posttraumatic stress disorder.

18           So it's not -- so it's not -- my point

19 is it's not just about training docs and other

20 prescribers to ratchet down the opioids.

21      Q.   Now, as part of your plan, you suggest that

22 the focus should be on top prescribers, whether

23 those are physicians, dentists, nurse practitioners

24 or P.A.'s, correct?

Page 289

1      A.    Yes.

2      Q.    And that these academic detailers, as I

3  think you refer to them, should meet with these top

4  prescribers four times a year.  Is that right?

5      A.    Yes.

6      Q.    And this assumes, of course, that these top

7  prescribers are not already fully aware of the

8  opioid epidemic and the risk/benefit profile of

9  prescription opioids.  Correct?

10     A.    To -- may I --

11            MR. BURNETT:  Objection.

12     A.    -- ask to pause for one minute, please?

13     Q.    Yes.  Do you need to take a call or

14  something?

15     A.    No, no, thank you.  I just would like to

16  review.  Because in this section, I believe that

17  there is more content regarding the -- the -- sort

18  of the comprehensive nature of the training that I

19  propose, and so I just wondered -- I mean, so for

20  example, in Paragraph 51, I talk about "hospitals,

21  health systems, integrated delivery networks,"

22  "should work diligently to incorporate programming

23  and professional development to raise awareness and

24  knowledge regarding drivers of the epidemic."

1      Q.   Right.  But I'm -- I understand that,

2   Doctor Alexander, and there's a lot of paragraphs

3   here in this section of your plan.

4      A.   I know.

5      Q.   But what I'm asking you about specifically

6   is about the academic detailers that you are

7   suggesting --

8      A.   Yeah.

9      Q.   -- be deployed to speak to top prescribers

10  four times a year.

11     A.   Right, right.  That's fine.  That's fine.

12  That's fine.  I just wanted to call out that in

13  Paragraph 40, I discuss that efforts to reduce

14  oversupply should be coupled with information

15  regarding the principles of sound pain management,

16  comprehensive assessments and so on and so forth.

17          I'm sorry, but I just wanted to be

18  sure that I made clear that it's not just about

19  ratcheting down prescribing.

20          So yes, academic detailing is a

21  program that I propose and I believe should be

22  targeted to the highest volume prescribers with

23  outreach four times a year.

24     Q.   So is it possible that the highest

Page 291

1    prescribers in the region are fully informed and

2    are already aware of the risk/benefit profile of

3    prescription opioids and of alternative treatments

4    to patients with pain?

5                    MR. BURNETT:   Objection.

6        A.   That's something that the academic

7    detailers could -- could -- could evaluate and

8    could discuss with the prescribers.

9        Q.   Now, in terms of your population to which

10   the academic detailing would be focused and the

11   cost, it looks to me from reviewing your - sorry -

12   redress model for health professional education,

13   you don't have a cost estimate.  Is that right?

14       A.   I would like to look at the redress model.

15       Q.   Yeah, you can.  We marked it.  It's Exhibit

16   7.

17                    MR. BURNETT:   Counsel, I don't think

18   we did mark it.  Exhibit 7 is just Appendix C.

19   It's a one -- you know, a front and a back of one

20   document.  It's just --

21                    MS. GEIST:   There is -- I'm sorry,

22   Counsel, or Doctor Alexander.

23                    Is there a tab like 7.1 or something

24   like that?

Page 292

1    A.   Yes, there is.

2    Q.   Okay, that's where it is.  I apologize.

3        ALEXANDER DEPOSITION EXHIBIT NO. 7.1

4            (Alexander Appendix D - Redress Model

5            FINAL was marked for identification

6            purposes as Alexander Deposition

7            Exhibit No. 7.1.)

8            VIDEO TECH:  Exhibit 7.1 has been

9    marked on Exhibit Share.

10            MS. GEIST:  Thank you, John.

11    A.   Okay, I have Tab 1A available from Exhibit

12   7.1.

13    Q.   Great.  Okay.  So just for the record,

14   Doctor Alexander, this is Exhibit 7.1.  It is your

15   redress model, with the population inputs that you

16   had included with your expert report.  Does this

17   look -- is this familiar to you?

18    A.   Yes, although I believe an errata or

19   addendum was provided, but I don't think it's

20   germane to the matter at hand, professional

21   education.

22    Q.   Okay.  And yes, we do have your errata,

23   thank you.  But I didn't mark it for purposes of

24   these questions.

Page 293

1              So in terms of the academic detailing

2      that you're proposing, you have a certain number of

3      prescribers?

4          A.   Yes, ma'am.

5          Q.   Okay.  And it indicates to me - looking at

6      this section of the redress model - that you are

7      assuming an increase in the number of prescribers

8      every year from 2021 through 20 -- well, from 2021

9      through 2035.

10         A.   Yes, ma'am.

11         Q.   And for this population estimate, did you

12     utilize any data specific to Cabell County/

13     Huntington, or is this West Virginia statewide

14     data?

15         A.   Well, the source of the information is from

16     -- is provided on Line 20, and so this was 2017

17     data from HRSA, essentially.

18              And I believe that it's county-

19     specific.

20         Q.   Okay.  You can put this aside.  The

21     academic detailing that you are suggesting to

22     prescribers, you indicate again that that is to

23     educate them and train them on the appropriate use

24     of opioids in their clinical practice.  True?

Page 294

1      A.    Yes.

2      Q.    So it assumes, does it not, that the top

3   prescribers that you indicate should be targeted

4   for this detailing four times a year do not

5   understand the appropriate use of opioids in their

6   practice.  It assumes that, does it not?  It

7   assumes they need to be educated and they don't

8   understand how to appropriately prescribe opioids.

9   True?

10              MR. BURNETT:  Objection, asked and

11   answered.

12      A.    I mean, it provides -- it's a reasonable

13   place -- if you're gonna -- if you're gonna reach

14   out and try to identify the potential oversupply,

15   continuing oversupply, of opioids, it's a

16   reasonable approach, I believe, in my professional

17   experience, to target individuals for that outreach

18   that are at the top of the pyramid.

19              And some of them may be prescribing --

20   I mean, some of them may be prescribing more

21   appropriately than others; and -- and resources

22   notwithstanding, one could use local data to design

23   a different approach.  In other words, it might be

24   that one of these doctors is a hospice doctor.

Page 295

1              Now, it just so happens that opioids

2    are actually overprescribed, many would argue - and

3    some studies suggest - even in hospice, but say if

4    one of the doctors was a hospice doctor, you could

5    decide not to reach out to her, or you could derive

6    another approach.

7              But I think this is a reasonable

8    approach.  But I'm not suggesting that all of these

9    doctors that would be targeted for outreach are

10   doing something wrong or should necessarily change

11   their behavior.

12       Q.   Okay.  Well, then you agree with me that in

13   fact it could be the case that every single one of

14   these top prescribers that you would target for

15   academic detailing may be fully informed as to the

16   risk/benefit calculus involved in any prescription

17   of opioids for their patients, especially sitting

18   here in September of 2020, you would agree with me

19   that that is certainly a possibility.

20              Correct, Doctor?

21       A.   I think it would be highly unlikely in my

22   professional judgment.

23       Q.   But you don't know, sitting here, either

24   way.  True?

Page 296

1          MR. BURNETT:  Objection, asked and

2    answered.

3      A.   Yeah, I wasn't asked to perform a quality

4    evaluation of the current prescribing patterns of

5    -- of prescribers in Cabell County and the City of

6    Huntington.

7      Q.   You know, Doctor, that we are, I think,

8    four years now past the CDC's guidelines with

9    respect to the prescription of opioids.  Correct?

10     A.   Yes, ma'am.

11     Q.   You're very familiar with those guidelines,

12   true?

13     A.   I have working experience with them, yes.

14     Q.   Okay.  And West Virginia, as a state, has

15   put forward different guidelines to the physician

16   community through the State Medical Board.  True?

17     A.   Yes, I believe that's the case.

18     Q.   And you're familiar with all of that,

19   right?

20     A.   Yes.  Again, with varying levels of

21   familiarity.  But I think virtually every state in

22   the country has worked to try to institute

23   guidelines to promote more evidence-based opioid

24   use.

1     Q.   What -- and of course, I'm sure you're

2     familiar because you have it in your report, the

3     PDMP program in West Virginia, I think it's -- the

4     specific acronym is the CSMP, and that's the Board

5     of Pharmacy's Controlled Substance Monitoring

6     Program.  That has been in place and required to be

7     used now by physicians and pharmacists for some

8     time.  True?

9     A.   Yes, I believe so.

10    Q.   What can you tell me about the

11    physician education that has gone on in the state

12    of West Virginia and in Cabell County specifically

13    with respect to the appropriate prescribing of

14    opioids for their patients?

15            MR. BURNETT:  Objection.

16    Q.   Other than what I just listed.

17    A.   Again, I did not perform a comprehensive

18    evaluation of programs to date, but what I would

19    say is that in virtually every part of the country,

20    there is value in further investments being made in

21    educating clinicians regarding not just the

22    appropriate use of opioids - although that's

23    important - but also the principles of sound pain

24    management and also the identification and

Page 298

1    treatment of people with opioid addiction.

2              I mean, keep in mind, you know,

3    anywhere from 8 to 10 percent or 8 to 9 percent of

4    the County is estimated to have opioid use

5    disorder.

6              So this isn't just about -- this isn't

7    just about improving the treatment of people with

8    pain; it's also about better identifying and

9    treating those with opioid use disorder.

10   Q.   Now, you agree with me, I assume, Doctor

11   Alexander, that there is already courses offered

12   regarding the appropriate prescription of opioids

13   from or through the West Virginia Board of

14   Medicine.  Correct?

15   A.   I believe there's educational outreach.  I

16   don't know the details of the curricular offerings.

17   Q.   And Marshall -- so you don't know what type

18   of CMEs or other educational programs the West

19   Virginia Board of Medicine has offered and is

20   offering to its -- to its physician community for

21   the appropriate prescription of opioids?

22             MR. BURNETT:  Objection.

23   A.   Again, I -- I don't know the details of --

24   of sort of the number of hours or the -- the -- you

Page 299

1   know, the -- the core curriculum or the

2   competencies and the like.  But I am aware that

3   there is educational outreach such as online

4   courses that clinicians can take in order to better

5   stay abreast of the principles of sound pain

6   management and opioid use.

7       Q.   Are you aware that Project Engage also has

8   a component of that program that is designed to

9   educate the physician and prescribing community as

10  to the appropriate way to prescribe opioids?

11      A.   Yes, I believe so.

12      Q.   And there's also grand rounds available at

13  Marshall University on these topics, correct?

14      A.   Yeah, that -- that may be the case.  I

15  mean, grand rounds is, you know, not likely to sort

16  of change everyone's behavior, but it's one

17  important piece of the puzzle.

18      Q.   Are you familiar with any information that

19  has come out of the West Virginia Office of

20  Attorney General designed for physicians?

21          MR. BURNETT:  Objection.

22      A.   You're asking whether I'm aware of

23  programming for clinicians that has been produced

24  by the Attorneys General of West Virginia?

Page 300

1     Q.   Yeah, I'm asking you -- I mean, we're

2  talking about your program that you were

3  proposing --

4     A.   Right.

5     Q.   -- to address health care provider

6  education --

7     A.   Yeah.

8     Q.   -- and I'm asking you, are you aware if

9  there is any communication tools or information

10  tools that have come out of the West Virginia

11  office of The Attorney General --

12     A.   Right.

13     Q.   -- to physicians.

14     A.   Right.  I'm not aware of that.  And it may

15  well be that there are such programs.  I think one

16  of the important things that I suggest in my plan

17  is -- is to use evidence-based outreach; in other

18  words, to use opioid prescribing as a means to

19  identify and target specific prescribers.

20          And another thing that I'll note is

21  that a lot of this conversation has been about

22  physicians, but physicians are just one type of

23  health care personnel who is so important to reach

24  in educational outreach.

1          So I think, you know, it's also

2    important to be considering EMTs, nurses,

3    physician's assistants, dentists, allied healthcare

4    professionals and the like.

5        Q.   What about the Mayor's Office of Drug

6    Control Policy?  Have they also been involved in

7    providing education and other materials to

8    prescribers in Cabell County?

9        A.   I think that they have.  Again, I would

10   want to review materials more carefully with you in

11   order to go into detail.  But you know, one of the

12   things that we haven't discussed today and that I

13   think is important to consider is the ways that

14   programs are assessed and quantitatively evaluated

15   over time.

16          And you've asked me about how -- what

17   I thought about City of Solutions and what I think

18   about various programs.  I've spoken to that.  But

19   the idea behind academic detailing - which is one

20   of the core components of this Category 1A - the

21   idea is that we actually use data to have a

22   data-informed outreach to specific prescribers.

23       Q.   Now, one of the things you suggest as part

24   of your plan is -- or you raise the National

Page 302

1    Resource Center for Academic Detailing.  I guess

2    it's NRCAD, and that's at Paragraph 47 --

3         A.   Yes.

4         Q.   -- of your report.

5         A.   Yes.

6         Q.   And that -- that academic detailing group

7    has already partnered in West Virginia and

8    specifically in -- in the region; isn't that true?

9         A.   Yes.

10        Q.   Okay.  Now, with respect to the -- the

11   CSMP, that is the database that is now required to

12   be accessed by both physicians and pharmacists

13   before prescribing medication to ensure that

14   there's not doctor shopping and things of that

15   nature, and you're aware of that, right, Doctor

16   Alexander?

17        A.   Yeah.  I mean, I -- I think there are

18   contexts in which it's to be used.  I'm not sure

19   it's to be used in every single instance, but I am

20   aware of the general role of PDMPs, including West

21   Virginia's PDMP and the efforts to use that to try

22   to promote safer opioid use.

23        Q.   Now, do you agree -- well, do you agree

24   with me or do you know whether the CSMP is

Page 303

1    accessible to distributors?

2        A.   I'm not aware of whether or not

3    distributors use this resource.

4        Q.   Okay.  And do you agree with me if a

5    pharmacist checks this database source, the CSMP,

6    and has a concern on the pharmacist's part about

7    the prescription, prior to dispensing to that

8    patient, the pharmacist should raise the concern

9    with the doctor.  True?

10       A.   Well, I wasn't asked to opine on the use of

11   the PDMP by pharmacists per se, but I think that

12   pharmacists play an important role in addressing

13   the -- the opioid epidemic.

14            I'm sorry, if you can ask the question

15   again, I can try to answer more directly.

16       Q.   Sure.  You have -- you have some

17   information in your report about the PDMP in West

18   Virginia, which is the CSMP, correct?

19       A.   Yes.

20            THE DEPONENT:  Although it would be

21   helpful, Jonathan, if you can show the paragraph

22   that we're discussing.

23            MS. GEIST:  It's Paragraph 43.

24       A.   Okay, thank you.

1    Q.   And here you write, "Since academic
2   detailing should target vie volume prescribers in
3   the Community, it must be based on information
4   regarding specific individuals' prescribing
5   behaviors."  And "One source of such information"
6   is the "(CSMP)."
7    A.   Right, thank you.
8    Q.   Did you review and research and ensure that
9   you understood the CSMP when you included this in
10   your report?
11    A.   Absolutely, of course.  I mean, the
12   reference -- I think Reference 152, in particular,
13   would be the first that I would point to if we were
14   to explore this further.
15    Q.   Okay.  And then so you would agree with me,
16   I assume, from your research and review that the
17   CSMP, the database of information, is not available
18   to distributors.  True?
19    A.   Again, I think you asked me that question,
20   but I wasn't -- I'm not familiar with whether or
21   not distributors use or access the CSMP.
22    Q.   Okay.  Fair enough.  Question, though, with
23   respect to the role of pharmacists here, because
24   you did say pharmacists play an important role.  Is

Page 305

1    that correct?

2         A.   Yes, among many other stakeholders,

3    absolutely.

4         Q.   Okay.  But I assume you would agree with me

5    as a practicing physician, that the decision

6    whether to prescribe prescription opioids in the

7    first instance, that decision is solely within the

8    discretion of the doctor or health care provider

9    who is authorized to prescribe such medication.

10   True?

11                  MR. BURNETT:  Objection, asked and

12   answered.

13        A.   Yeah, I believe we discussed that before.

14                  But it's the provider or the

15   prescriber - as I said before - hopefully, and in

16   many cases, the patient, reaching shared decisions,

17   and they, in turn, are influenced by any number of

18   other factors.

19        Q.   So let me try my question again, because I

20   don't think I asked you and I don't think you

21   answered it.

22        A.   Okay.

23        Q.   In terms of the role of the pharmacist, the

24   pharmacist does not play a role in deciding whether

Page 306

1    or not a prescription opioid should be prescribed

2    in the first instance.  That is solely within the

3    responsibilities of the physician or other health

4    care provider who has authority and license to

5    prescribe.  True?

6         A.   And my response was that it's the

7    prescriber and the patient, so I don't think it's

8    just the prescriber.  I think the patient, in many

9    cases, shares a decision and I just wanted to be

10   sure that I'm clear that they, in turn, can be

11   influenced by a number of other factors.

12              But yes, the pharmacist does not -- is

13   not involved in that initial decision.  I would

14   agree with that.

15        Q.   Now, you reference here, I think on this

16   same page, Doctor Alexander, page 18, the CDC

17   guidelines that we discussed earlier from 2016, the

18   "Guideline for Prescribing Opioids For Chronic

19   Pain."  Do you see that?

20        A.   Yes, ma'am.

21        Q.   Okay.  And you have that as a footnote.

22   Are you -- and you write here - if I can find it.

23   There it is, I apologize.  Paragraph 44, you note

24   that the CDC guidelines from 2016 referring to

Page 307

1    prescribing opioids for chronic pain, that these

2    guidelines have received widespread endorsement.

3              Do you see that in the middle of the

4    paragraph there?

5         A.   Yes.

6         Q.   And then your recommendation is that the

7    "Guideline" should "be cross-referenced with other

8    guidelines and sources used by established provider

9    education programs already underway on opioids."

10             Did I read that correctly?

11        A.   Yes, and then I would just draw your

12   attention to Footnote N where I qualify the use of

13   the guidelines.

14        Q.   Correct.  You say at the bottom, the

15   guideline "is" "comprehensive, authoritative" and

16   "widely cited," and "any" "detailing program as

17   part of an abatement remedy should be based on an

18   assessment of the current and suitable sources of

19   information for such a program."  Correct?

20        A.   Yes.

21        Q.   Okay.  Well, my question is:  You note that

22   the guidelines from the CDC obtained widespread

23   endorsement.  Are you aware that the American

24   Medical Association came out in response to the

1  guidelines, raising issues relating to patient harm

2  -- unintentional patient harm as a result of the

3  guidelines that were put in place by the CDC in

4  2016?

5      A.   I'm not aware that the AMA did; but I know

6  that there has been pushback against the

7  guidelines, and in fact, I've done some empiric

8  work looking at that.

9      Q.   Okay.  So you are aware that there is at

10  least some aspect of the medical community that did

11  not - and has not - widely endorsed the CDC

12  guidelines from 2016, correct?

13      A.   I would characterize it slightly

14  differently.  I think the majority of concern has

15  been around how the guidelines have been

16  interpreted or implemented rather than the science

17  of the guidelines themselves.

18              I'm not aware of authoritative

19  substantive widespread concern about the substance

20  of the guidelines.

21      Q.   But you're not aware of -- and you did not

22  read, I assume, the letter that was put out by the

23  American Medical Association in response to the

24  guidelines.  Is that correct?

Page 309

1    A.   I don't recall if I read that letter or

2    not.  But what I can tell you is that there was

3    enormous pushback to these guidelines, and in fact,

4    we published a paper examining the sources of such

5    pushback, and I believe I referenced that as one of

6    the publications in this report.

7              So I don't want to go back a rabbit

8    hole, but I'll just say that -- that, you know, the

9    guidelines came out at a time when there was a lot

10   of misconceptions around the role that opioids

11   should play in the treatment of chronic noncancer

12   pain, and unfortunately, some of those

13   misconceptions persist.

14             Again, I think the majority of the

15   opposition to the guidelines has been based on how

16   they've been implemented, not -- not sort of

17   concern about the guidelines themselves.

18   Q.   Do you agree that as a results of the

19   guidelines or the implementation of the guidelines

20   that there has been - and perhaps inadvertently so

21   - harm to certain patients?

22   A.   I have yet to see very well done rigorous

23   evaluations quantifying the unintended effects of

24   these guidelines.  And I can tell you that I have

Page 310

1    -- you know, I have seen anecdotes of people, for

2    example, committing suicide - which would be a

3    horrific consequence - but I've not seen

4    substantive scholarship that has carefully

5    enumerated the unintended consequences of these

6    guidelines.

7              I think the very important clinical

8    matter and very important public health matter, but

9    again, I think the majority of the concern around

10   the guidelines has been - just to be more concrete

11   and put a sharper point on this - the issue, for

12   example, of opioid tapering and discontinuation,

13   and I speak to that in my report, and there is an

14   art and a science to that.

15             And there are evidence-based

16   strategies that we can use to reduce the oversupply

17   of opioids and the continued overreliance on

18   opioids and, simultaneously, improve quality of

19   care for those with pain.

20             There's no contest here.

21   Q.   Sorry --

22   A.   There's no --

23   Q.   Sorry, I thought you were done.

24   A.   I could be done.  I'm done.

Page 311

1    Q.   Okay.  I just wanted to ask you a couple

2  quick follow-ups.

3    A.   Okay.

4    Q.   You agree with me that not every patient

5  who is using prescription opioids needs to be

6  tapered off.  True?

7    A.   I agree that there are some patients that

8  can be maintained safely and with clinical benefit

9  on -- on long-term opioids.  But it depends.

10    Q.   But they are not -- you are not suggesting

11  or opining that prescription opioids be removed

12  from the market or that they do not have an

13  appropriate place in terms of options for

14  physicians to use with their patients with pain.

15  You're not suggesting any of that.  True?

16    A.   I'm not suggesting that they should be

17  removed from the market.  And I think I may have

18  used this example previously, but prescription

19  drugs aren't inherently good or bad any more so

20  than a role of duct tape or a hammer or a razor

21  blade is good or bad.

22         The value of a drug depends upon how

23  it's used.  And the concern with opioids is that

24  they've been vastly oversupplied in many contexts,

Page 312

1   and we're paying the price many years later.

2   Q.   I think a few years ago, there was a rally

3   in Washington, D.C. - was it called Fed Up - and

4   you spoke at that rally, didn't you, Doctor

5   Alexander?

6   A.   I did.

7   Q.   And I watched the YouTube video, with

8   interest, but one of the things that struck me is

9   part of your speech really was a criticism of the

10  -- of the health care system generally and the

11  coverage provided for alternative pain medications.

12  Is that correct -- al pain -- alternative pain

13  modalities or treatments.

14          Is that correct?

15  A.   I don't recall the details of the -- of my

16  comments.  It was many years ago.

17  Q.   Well, today, sitting here today, do you

18  agree that there should be changes, revisions to

19  the health care system to allow for insurance

20  coverage for nonmedication-related pain modalities?

21  A.   I believe I addressed this in my report,

22  and I say that this is out of scope.  In other

23  words, I don't consider coverage and reimbursement

24  considerations, but I think it -- it should be part

Page 313

1    of a broader conversation.

2        Q.   Now, you said earlier when we were talking

3    about unintentional harm to patients as a result of

4    the implementation of the CDC guidelines, you --

5    there has not been - from your perspective - a

6    well-designed robust study looking at that in the

7    literature.

8              Is that what you said more or less?

9        A.   More or less.  I'm not aware -- I'm not

10   aware of -- of well done, carefully designed

11   scientific studies quantifying the unintended

12   consequences of the CDC's guidelines.

13       Q.   But you -- so there's not scientific well

14   designed studies quantifying the harm to patients,

15   but based on your reference, you know - and have

16   heard, as a physician - that patients have in fact

17   been harmed.

18              And I think you even mentioned that

19   some patients have committed suicide after their

20   prescription opioids were removed.  Is that right?

21       A.   No.  No.  That was a lot, and I'd like to

22   unpack it.  But you -- first of all, you used the

23   word "reference."  Which reference are you

24   referring to?

Page 314

1      Q.   I'm not sure which reference you're

2   referring to.  So let me start again.  Before you

3   mentioned that you had heard anecdotally that there

4   were cases of suicide by patients suffering

5   enduring pain who had their prescription opioids

6   removed from them as a result of the implementation

7   of the CDC guidelines.  True?

8             MR. BURNETT:  Objection.

9      A.   No.  No.  I have no idea -- I -- this is --

10  so this is anecdote.  I don't know if it's

11  pertaining or related to the CDC guidelines.  And

12  speaking of information about -- speaking of

13  clinical information about individual cases, I have

14  no clinical information about this particular

15  instance.

16            And so you know, in -- I mean, there

17  are so many different levels at which you could

18  raise concern about drawing causal inference from

19  that type of anecdote, and -- and sort of reaching

20  some attribution or conclusion about a guideline

21  based on that.

22            So I just -- it's -- it's -- I would

23  not want to misconstrue what I said.  What I said -

24  or what I intended to say - was that I'm aware that

Page 315

1    there has been pushback against the CDC guidelines;

2    that I believe the majority of the pushback is

3    focused on its implementation rather than the

4    science that it contains; and that I've not seen

5    rigorous scholarship that has evaluated --

6                    I'm not aware of rigorous scholarship

7    that's evaluated unintended consequences of the

8    guidelines, although such scholarship may exist.

9                    And lastly, that -- that I've heard of

10   anecdote of individual -- of an individual or

11   individuals that have committed suicide because

12   they were un -- because of their poor pain control.

13                   But I know nothing about, you know,

14   the -- the clinical context, whether it was an

15   accidental death or not, the degree to which the

16   patient had depression or mental illness, the

17   degree to which opioids were or were not an

18   important feature of the suicide, and so on and so

19   forth.

20                   So I just think that's important to

21   clarify.

22       Q.   So let's move on to Patient and Public

23   Education, talking about --

24                   MR. BURNETT:  Counsel, yeah, before we

Page 316

1    do that, we've been going an hour and 15, and we

2    have less than an hour of testimony left.  Can we

3    take a break?

4              MS. GEIST:  Yeah, absolutely.

5              VIDEO OPERATOR:  The time is 5:16.  We

6    are now going off the record.

7              (A recess was taken after which the

8              proceedings continued as follows:)

9              VIDEO OPERATOR:  The time is 5:32, we

10   are now back on the record.

11   BY MS. GEIST:

12       Q.   Doctor Alexander, we are now going to move

13   to the section of your report that addresses

14   Patient and Public Education, and that starts on

15   page 22 of your report.

16       A.   Yes, ma'am.

17       Q.   And here, it appears --

18              MS. GEIST:  Thank you.

19       Q.   Here, it appears that you are suggesting -

20   among other interventions and programs - that there

21   be a mass media campaign directed towards patient

22   and public education; and in particular, younger

23   individuals.  Is that a fair summary?

24       A.   Yes, I mean, this is focused on all

Page 317

1    individuals, not just younger ones.  But yes.  And

2    if --

3              MS. GEIST:  We need to go to page 22.

4         A.   Yeah, that's right.

5              MS. GEIST:  Sorry, that's my bad.

6    Page 22, John.  I'm sorry.

7         Q.   Okay.  So again, though, Doctor Alexander,

8    we're sitting here in September 2020.  You are

9    proposing this as a future intervention or future

10   programs.  This assumes that individuals in Cabell

11   County/Huntington - because that is what we're

12   talking about - are not aware of the potential

13   risks of using opioids, whether they're

14   prescription or illicit.

15             MR. BURNETT:  Objection.

16        Q.   I mean, is it your opinion that the people

17   of Cabell County/Huntington are not aware that

18   there are risks associated with the use of

19   prescription opioids and illicit opioids?

20        A.   Well, I didn't perform any comprehensive

21   needs assessment or, you know, survey or anything

22   else of -- of the County's residents or the City's

23   residents, but I think you have to include some --

24   some measure of patient and public education if an

Page 318

1    abatement program is going to be successful.

2              And what I've proposed builds upon --

3    and I call out examples of other programs - for

4    example, in Paragraph 55 here - as I -- as I

5    suggest the importance of these interventions.

6         Q.   You would agree with me that as part of the

7    CDC 2016 guidelines, that is a reiteration, if you

8    will, that doctors need to speak with their

9    patients about the risk/benefit profile of

10   prescription opioids.  That's in the guidelines,

11   correct?

12        A.   Yes, I believe it is.

13        Q.   And are you aware that in 2017, the CDC

14   conducted a mass media campaign -- campaign itself,

15   and it was specifically implemented in the state of

16   West Virginia?

17        A.   Yes, I am.

18        Q.   And that was specific as to opioids.

19   Correct?

20        A.   I believe so.  I don't recall for sure, but

21   I believe so.

22        Q.   And are you also aware that there are other

23   programs such as Hope and Hope West Virginia,

24   Stigma Free West Virginia and a media campaign

Page 319

1    through Healthy Connections, all towards the goal

2    of creating information and education about

3    addiction generally and hoping to reduce the stigma

4    of individuals who may want help for their

5    addiction?

6        A.   I am.  And these programs are important,

7    but it's worth noting that over the past 20 years,

8    if you view the epidemic and sort of take a 36,000

9    foot view, there have been many different programs

10   that have been deployed at different stages, and --

11   you know, and yet things have gotten worse rather

12   than better.

13              So I -- what -- and that's the basis

14   for the comprehensive program that I propose.  So

15   it's certainly the case that there are -- in this

16   instance, that there are other public and --

17   patient and public education campaigns that have

18   been conducted thus far.

19              And what I propose to do is to build

20   upon those and to make sure that it's well

21   integrated with other interventions that I

22   describe.

23       Q.   So in other words, you agree with me, all

24   of this public and patient information,

Page 320

1    communication, education, it's all in place; it's

2    all been done.  But you think there essentially

3    needs to be more to do.  Is that fair?

4        A.   Well, I think --

5              MR. BURNETT:  Objection.  Objection,

6    mischaracterizes the testimony.

7        A.   I mean, I think -- as I've -- as I've

8    commented regarding other programs, it's not as

9    simple as just saying, "Well, we've got a program

10   to address that" or "I've got a policy for that."

11             So we can ask questions.  If it's

12   about public and patient education, we can ask

13   questions like -- so it's -- take a tool kit, okay?

14   A tool kit sounds great.  Let's design a tool kit.

15   Who's using the tool kit?  How many people have

16   been reached with it?  How extensive was the

17   outreach?

18             Was it followed up over time?  How

19   well were the messages that were incorporated into

20   the tool kit designed?  Did they use principles of

21   good social market?  And so on and so forth.

22             So it's not just as simple as, you

23   know, "We've got -- we've got a campaign and so

24   we're done" and "We've got a kid -- a place for

Page 321

1    children that are orphaned and we're done with that

2    one too."

3              There's nuance to this, and these

4    programs need resources and they need -- they need

5    scientific foundations, and they need investments

6    over time, and they need leadership, among other

7    things.

8      Q.   Now, in terms of your -- your cost estimate

9    for the mass media campaign that you're proposing,

10   if we look at this section of your redress plan --

11   or your redress model - I apologize - it appear --

12             I'll wait for you to get there, Doctor

13   Alexander.

14     A.   Well, I'm looking at Tab 1B of Tab 7.1 --

15     Q.   Okay.

16     A.   I'm looking at the Excel sheet.  But maybe

17   that's not the right place to look.  But that does

18   include information on -- so it's Tab 1B.  That's

19   where, I believe, we're talking about here.

20     Q.   Okay.  And your cost estimate for the mass

21   media campaign that you are suggesting be

22   implemented in Cabell County and the City of

23   Huntington is based on The Real Cost campaign; is

24   that correct?

Page 322

1       A.    Yes, ma'am.

2       Q.    And that is a national -- or was a national

3   tobacco education plan designed to prevent

4   teenagers, essentially, from beginning cigarette

5   smoking.  Correct?

6       A.    Yeah, it is.

7       Q.    Okay.  Well, what -- it appears that you

8   looked at annual costs of this national program

9   that was put in place some years ago and you've

10  also looked at average costs per month?  Is that

11  correct?

12      A.    Yes.

13      Q.    Okay.  Well, what -- what adjustments did

14  you make to account for the fact that this is --

15  this is not a national program that you would be

16  suggesting; it would be a program targeted at the

17  public and patients in Cabell County, West

18  Virginia.

19      A.    That's a great question.  So one thing I

20  want to note about my cost estimates, is that --

21  well, there's -- there's a reason that we chose --

22  and that I used this campaign as a means to cost

23  out this program.

24              So I'm happy to come to that, if

Page 323

1    that's helpful.  But you asked specifically -- you

2    pointed out that this is a national campaign, and

3    yet we're talking about Cabell County and the City

4    of Huntington, West Virginia.

5                   And what we do here is:  We look at

6    the cost essentially per capita.  And so if you --

7                   THE DEPONENT:  Jonathan, if you can

8    scroll up so that we can review the top of the

9    spreadsheet as well -- maybe at the same time --

10   maybe it's not possible.

11        A.   But in any case, we look at the cost per

12   capita, and so the ultimate cost per capita is 38

13   cents per month per the target population, and I

14   multiply that out by 12 months.  So that's how we

15   derive an estimate that's customized for the target

16   population here, which is the number of individuals

17   in Cabell County age 12 years or older, or about

18   89,600 individuals.

19        Q.   Now, the national campaign, though, of

20   course, appeared on national television, national

21   television channels, correct?

22        A.   I believe it did.

23        Q.   I'm looking at your -- at the bottom there

24   under Suggested Costs?

Page 324

1       A.    Right.

2       Q.    This program would not need to be put on

3    national television programs.   True?

4       A.    Yes, that's true.

5       Q.    And there's no magazines specific to Cabell

6    County/Huntington, I assume, correct?

7       A.    Well, there may well be periodicals or

8    local circulars.   I don't know.

9       Q.    Do you know how many movie theaters are in

10   Cabell County/City of Huntington?

11      A.    I don't.   But these estimates, I'd like to

12   add, are based on a careful and comprehensive

13   review of a number of different sources for any

14   estimate that's included in my redress models, and

15   so I just want to use this point -- or this

16   opportunity to make clear that in all cases, I

17   carefully considered a number of different sources

18   of information.

19            I tried to use local sources whenever

20   they were available, and when they were not

21   available or when I had concerns about the

22   scientific validity of a local source, I would use

23   a regional or national source.

24            There were some instances where there

Page 325

1   were multiple estimates, and in those cases, I

2   either took an average or I conservatively took the

3   lower number of two or more estimates that might be

4   available, so I just want to say that there was a

5   rationale for my approach to costing out different

6   components of the abatement plan.

7       Q.   Understood.  And as we discussed, there

8   have been a number of media campaigns, and

9   specifically in West Virginia, with respect to

10  opioid and drug education.

11             Did you do any research or analysis or

12  speak to anyone in Cabell County/Huntington and ask

13  them if they were, in fact, unaware of the dangers

14  of using illicit opioids and the potential risk of

15  using prescription opioids?

16      A.   I --

17             MR. BURNETT:  Objection, asked and

18  answered.

19      A.   Yeah, I --

20      Q.   I mean, this all -- this assumes, Doctor

21  Alexander, that the people in Cabell

22  County/Huntington are not aware of the risks of use

23  of opioids, whether they're illicit or prescribed

24  by a doctor?

Page 326

1          MR. BURNETT:  Objection, asked and

2     answered.

3      A.   When you have the damage and the harms at

4     the level that has occurred within these

5     communities, I think that some measure of

6     investment should be made in public and patient

7     education.

8               I simply think - based on my

9     professional experience - that it would not be

10    smart to plan an abatement program that doesn't

11    further invest in this.  And you know, it's one

12    thing to say that people know about the epidemic.

13    I mean, I'm not naive enough to think --

14               As I've said, I imagine that every

15    person in the County knows somebody that's been

16    impacted or they themselves have been impacted.  So

17    I'm not suggesting that people have their head in

18    the sand.

19               But the bottom line is that this is a

20    complex epidemic; it has unfolded despite what we

21    might call sort of global awareness for years, and

22    this type of -- and this education just isn't just

23    about -- it's not as if there's one message, like

24    "Opioids can hurt you; be careful that you need

Page 327

1    them if you take them."

2              So I think that it is very important

3    that any intervention, any abatement program,

4    includes further investment in this domain.

5        Q.   And I guess my question in response to

6    that, Doctor Alexander, is:  Isn't it a good idea

7    when you're formulating and proposing an abatement

8    plan to see whether or not there's an unmet need in

9    that particular community?

10             And you haven't done that here.  Isn't

11   that true?

12             MR. BURNETT:  Objection.  Outside the

13   scope.

14       A.   Yeah, I did not perform a comprehensive

15   needs assessment that included collecting primary

16   data from individuals residing within the County.

17   And frankly, if it's helpful for the courts to do

18   so and if the attorneys would like me to, I'm happy

19   to.

20             But I can assure you that there is

21   still stigma.  I can assure you that there is still

22   -- I mean, I recall a conversation with -- that

23   took place with a family of -- a father who had

24   lost his son who blamed the son and said it was all

1    his fault.

2        Q.   Let's --

3        A.   And that --

4             MR. BURNETT:  Counsel, please, don't

5    interrupt the witness, please.

6             MS. GEIST:  I'm running out of time,

7    though, Counsel, so I'm trying to -- let's get to

8    --

9             MR. BURNETT:  That's -- he's answering

10   your question.  You can't cut him off when he's

11   answering your question.

12       A.   And so this father was blaming the son from

13   having died from opioids, and if that's not stigma,

14   I don't know what is, thinking that this is bad

15   choices, that "My son just made a bunch of bad

16   choices, that he should have known better."

17            So I just -- I feel passionately about

18   this, that there have to be investments made in --

19   in correcting misconceptions and in improving

20   general awareness and knowledge among patients in

21   the general public about the contours of the

22   epidemic.

23            And -- but again, I was not asked to

24   do a specific comprehensive evaluation of attitudes

Page 329

1    or beliefs on the ground.

2        Q.   Right.  You weren't -- you didn't do -- you

3    weren't asked to, but you didn't make the

4    assessment of:  What are the actual unmet needs in

5    this community that would need to be addressed

6    through your plan that have not already been

7    addressed by the numerous interventions and

8    programs that Cabell County/Huntington has put in

9    place since at least 2015.  Correct?

10             MR. BURNETT:  Objection, asked and

11   answered.

12       A.   So my plan was not to -- to add on the

13   margin.  I was not asked to -- no one asked me to

14   come in and figure out what exactly is being done

15   and then to add on exactly what I thought was

16   necessary to reach an adequate program.

17             I wasn't asked to figure out where

18   that line lies for each of these categories, and so

19   it may well be that there is widespread investment

20   in -- in education that's already been made.  I

21   would have lots of questions that I would want to

22   answer in order to understand whether I think those

23   are adequate.

24             But even if they are adequate, it's --

Page 330

1    I wasn't asked to figure out if they're adequate

2    and then add on a little bit more.  I was asked

3    what I think constitutes a comprehensive abatement

4    program.

5        Q.   We can move on to Safe Storage and Drug

6    Disposal, please.  And that's page 24 of your

7    expert report, Doctor Alexander.

8        A.   Sure.

9             MS. GEIST:  Okay, thank you very much,

10   John.

11            So here, Doctor Alexander, you state

12   that one of the things that needs to be done as

13   part of this intervention is to address the, quote,

14   "enormous stockpiles of opioids in homes within the

15   Community," meaning Cabell County/Huntington.  Do

16   you see where I'm reading?

17       A.   Yes.

18       Q.   What evidence do you have that today there

19   are enormous stockpiles of opioids in homes in

20   Cabell County/Huntington?

21       A.   Well, when you have millions of

22   prescriptions being provided into a community,

23   these prescriptions don't all end up -- they're not

24   all used.

Page 331

1           I mean, we can all think about our own

2     homes and our own bathroom cabinets or bedroom

3     nightstands and I would bet dollars to doughnuts

4     that all of us have unused prescriptions somewhere

5     in our house, or many of us.

6           And so again, I didn't perform a

7     comprehensive review of the -- I didn't do a

8     household survey or some other assessment door to

9     door of the numbers of families that have unused

10    opioids, but in my professional judgment, there are

11    large numbers of unused opioids that are sitting in

12    kitchen cabinets and bedroom nightstands across

13    this and other communities in West Virginia.

14        Q.   Well, with respect to unused opioids,

15    Doctor, a couple questions.  One, there have been a

16    number of national DEA take-back days to address

17    this problem.  Is that true?

18        A.   Yes, it is.

19        Q.   And there is - as I'm sure you know -

20    another one scheduled for October of this year.

21    Are you aware of that?

22        A.   I wasn't aware of the particular

23    scheduling, but I'm pleased to hear that there will

24    be one.

1      Q.   Yeah, there'll be another DEA national

2   take-back day in October of this year.  And Cabell

3   County has two permanent collection sites for

4   unused prescription medications now, correct?

5      A.   I believe so.

6      Q.   Now -- but my question is, Doctor

7   Alexander, if a patient ends up with leftover

8   pills, more pills than he or she needed for

9   whatever the condition was that they received the

10  prescription in the first instance, why did they

11  get more than they needed?

12           MR. BURNETT:  Objection, calls for

13  speculation.

14     A.   It's a great question, and opioids have

15  been oversupplied, and in some instances, it's

16  prescriptions that shouldn't have been originated

17  in the first place; and in other instances, it's

18  the dose or the -- the duration.

19           And -- and frankly, you know, like

20  many medicines that are used to treat conditions

21  such as pain, pain can resolve, and it's an

22  imperfect science to know the exact number of pills

23  that someone needs.

24     Q.   Who determines how many pills are

Page 333

1    prescribed to that patient?

2         A.   Another great question, and we're back to

3    my -- my earlier reply, that we have prescribers;

4    we have patients; and then we have the factors that

5    drive their behaviors.  And so most immediately,

6    you have prescribers, and in many cases patients,

7    that in more cases than not, I hope, are reaching

8    shared decisions about how to manage pain in this

9    instance.

10             And then you have all the -- all the

11   potential influencers of prescribers and patients.

12        Q.   So the answer to my question was -- I asked

13   you, who is the one who prescribed the medication

14   in the first instance?  Who is the one who decides

15   whether it's 10 pills, 30 pills or 90 pills?  Who

16   decides how many times a day the patient should be

17   using that medication?  Who makes that decision?

18        A.   Yeah, and I'm sorry, I --

19             MR. BURNETT:  Objection.  Objection,

20   asked and answered.

21        A.   I'm sorry I can't give you a kind of

22   one-word answer, but I would say it's the

23   prescriber; it's the patient.  And they exist

24   within a number -- they exist within a sphere --

Page 334

1  there's sort of a sphere of influence, and they're

2  drivers of their behavior.

3      Q.   So it's the doctor and the patient.

4      A.   And the factors that influence their

5  behaviors.

6      Q.   Now, you also state that diversion -- we've

7  talked a little bit about this before.  Diversion

8  of prescription opioids occurred because of the

9  failure to safely store and dispose of the unused

10  opioids.  So if somebody has leftover pills,

11  there's a failure to store it and there's a failure

12  to dispose of it.

13            And whose failure is that?  Who is the

14  one who doesn't dispose of or store unused opioids?

15            MR. BURNETT:  Objection.

16      A.   Well, I mean, ultimately the -- in these

17  instances where we're talking about the potential

18  for diversion or for nonmedical use, we're

19  considering patients or -- that have received

20  prescriptions and so --

21            I suppose in some narrow sense, you

22  could say that patients are on the hook.  But

23  again, patients are -- you know, patients need to

24  be empowered and equipped with appropriate

Page 335

1   knowledge, and if patients believe that opioids are
2   no big deal, that they work great, that they're not
3   addictive, that as long as you have organic pain,
4   you won't -- need not worry about addiction - which
5   is something that I was taught as a resident and as
6   a young physician - if that's what I'm
7   communicating to my patients, then my patients are
8   totally misinformed about how they should be
9   storing and -- and disposing of these products.
10      Q.   Quickly moving on to Harm Reduction, page
11  68 of your report.
12      A.   Sure.
13          MR. BURNETT:  Which -- I'm sorry,
14  which page?
15          MS. GEIST:  68.
16      A.   Okay.
17      Q.   Oh, I'm sorry, I'm sorry.  I'm looking at a
18  different number.  28.
19          MS. GEIST:  I apologize to everyone
20  and to John.  It's the end of a long day.
21      Q.   Page 28. I apologize, Doctor.  Harm
22  Reduction.  So here at page 28, one of the things
23  you are suggest is the addition of a syringe
24  services program or an SSP; is that correct?

1    A.   Yes, although I think we've already

2  discussed that I think Cabell County and the City

3  of Huntington have done a laudable job in

4  developing a syringe program.

5    Q.   They were the first in West Virginia to

6  implement an SSP or a safe needle, clean needle

7  exchange program; is that right?

8    A.   Yes, I believe so.

9    Q.   And just to be clear, this program -- 100

10  percent of the services of this program is provided

11  to people who inject drugs.  True?

12    A.   As opposed to -- who else would they -- as

13  opposed to who else?

14    Q.   I'm just asking you to confirm.  The only

15  individuals who would be serviced by the Syringe

16  Services Program or the needle exchange program are

17  people who inject drugs, meaning people who use

18  drugs illegally.  Correct?

19    A.   Yeah, I --

20        MR. BURNETT:  Object.

21    A.   Yes, yes.  I mean, I suppose theoretically

22  they might, you know, be willing to engage with

23  someone that has addiction if they're not -- if

24  they're doing, for example, Hepatitis C screening

Page 337

1    and they have a mobile van, I don't think they

2    would turn you down if you say, "Hey, can I get

3    screened?  But I'm not currently using needles."

4              But yes, they're designed to focus on

5    people with intravenous drug use.

6       Q.   Now, in terms of your proposal here, in

7    connection with your recommendations, did you

8    research the history of needle exchange programs or

9    SSPs in West Virginia and Cabell County?

10             MR. BURNETT:  Objection.

11      A.   To the degree that it's discussed in my

12   report or referenced in my report, yes, I did.

13      Q.   Okay.  So you are aware that as of the end

14   of last year, there were 18 syringe services

15   programs in West Virginia, but two programs had

16   been closed by local government, including the one

17   in the City of Charleston.  You're aware of that?

18             MR. BURNETT:  Objection.

19      A.   I was not aware of the exact number of

20   programs opening and closing, no.

21      Q.   Okay.  Do you know why the SSP in the City

22   of Charleston was closed down by the local

23   government?

24      A.   No, I do not.

1      Q.   I want to quickly --

2           MS. GEIST:  Actually, let me ask the

3    videographer how many minutes I have left, only

4    because I need to be considerate of counsel for the

5    other defendants who might be on the call or on the

6    video and would like to ask a question.

7           VIDEO OPERATOR:  Hold for one moment

8    so I can add it all up.  The time is 5:58.  We are

9    now going off the record.

10          (A discussion was had off the record

11          after which the proceedings continued

12          as follows:)

13          VIDEO OPERATOR:  The time is 5:59, we

14   are now back on the record.

15   BY MS. GEIST:

16     Q.   Doctor Alexander, in terms of your cost

17   estimate for your Safe Storage and Drug Disposal

18   recommended programs --

19     A.   Yes.

20     Q.   -- I'm looking at your redress model, if

21   you have that in front of you.

22     A.   Yes, I do.  So I think that's Tab 1C.

23     Q.   It is.  Thank you.  And it appears that you

24   have based a cost estimate on this particular

Page 339

1    intervention on -- on a program that was in King

2    County, Washington and a program that was in

3    Alameda County in California.

4              Is that correct?

5        A.   Yes, ma'am.

6        Q.   And were both of these programs SSPs?

7        A.   I believe these are safe storage and drug

8    disposal programs.

9        Q.   Okay.  Any reason why you didn't base your

10   cost estimate on the local jurisdiction in West

11   Virginia, given the fact that there have been 18

12   SSPs in the state to date?

13       A.   Again, here, this is a different abatement

14   category than syringe service programs.  Syringe

15   service programs are focused on providing services

16   for people using drugs intravenously, and this

17   category is focused on trying to improve the safe

18   storage and drug disposal processes and programs in

19   the County and the City of Huntington.

20       Q.   But again, there have been safe storage and

21   drug disposal programs in the City of Huntington

22   and in Cabell County, correct?

23       A.   Pretty modest.  I mean, I think you

24   mentioned that there have been two, and frankly, it

Page 340

1    should be no more difficult to get rid of an unused

2    opioid than it is to get the prescription in the

3    first place.

4                    And so, you know, these -- these boxes

5    and these storage facilities should be -- or

6    storage containers and disposal containers - really

7    is what we're talking about here - these should be

8    available in pharmacies and clinics, doctors'

9    offices.

10                   You know, you can't just put them in

11   one or two sheriffs' departments or, you know, the

12   police department of Milton and expect that you're

13   gonna take care of the oversupply in the County.

14                   So my point is that they should be

15   scaled up.  And in direct response to your question

16   regarding the sources of costs, I would just

17   highlight the point that I made earlier about the

18   step-wise approach that we used.  We used local

19   costs whenever possible and triangulated these

20   costs with experts that we spoke with.

21                   When local costs weren't available, we

22   used regional or national costs.  And this is also

23   a nice example where we took the average of two

24   programs.  It just so happens that they yield

1    fairly similar estimates of the costs of drug

2    storage and disposal programs.  But we did look

3    carefully and thoroughly at different potential

4    sources of this information.

5        Q.   Are you -- thank you for that.  You had

6    mentioned the two DEA-based take-back programs that

7    I had mentioned.  Are you aware that funding from

8    the substance abuse prevention and treatment block

9    also granted take-back activities specifically in

10   the state of West Virginia?

11       A.   I'm not aware of the details of that, but

12   my sense - and again, I'd want to look at the

13   source materials for, you know, more particular

14   information, but my sense is that there are

15   opportunities to scale up take-back programs and

16   safe storage programs within the community.

17       Q.   Are you aware of any information that the

18   national and state-based take-back programs

19   implemented in West Virginia have been inadequate

20   to address the needs of the community?

21       A.   Well --

22            MR. BURNETT:  Objection.

23       A.   -- globally -- again, I wasn't asked to add

24   only the margin, so none of my efforts are based on

1    some assessment and conclusion about sort of the

2    marginal need for additional effort, but I -- I

3    would be amazed -- I mean, I simply would be very

4    surprised in my professional judgment if -- if

5    there are not opportunities to further improve the

6    safe storage and disposal of prescription opioids

7    in Cabell County and the City of Huntington.

8         Q.   Let's talk about your suggestion to put in

9    place an opioid abatement coordinating unit.

10        A.   Sure.

11        Q.   And that appears to be a separately-named

12   unit that would have a director, two data analysts

13   and 0.5 staff assistants.  I'm not sure what that

14   means.

15        A.   Just half of somebody.

16             MR. BURNETT:  Counsel, where are you

17   getting that information from?

18             MS. GEIST:  That's under the 1F

19   section, Surveillance, Evaluation and Leadership.

20        Q.   And that is your suggestion, Doctor

21   Alexander, that there be something called an Opioid

22   Coordinating Abatement Unit?

23        A.   Well, let's see.  So the tab I'm looking at

24   is Surveillance, Evaluation and Leadership.  I see.

1   Yeah, I don't think that it's so important what

2   it's called, but the point is that I think that

3   there is -- that this type of program has to have

4   coordination and leadership and evaluation, and

5   that I have built in some of those costs

6   conservatively into my program.

7        Q.   You have been involved in a -- in the

8   review and research of a number of different

9   interventions and programs, I imagine, throughout

10  the United States to address the substance use

11  crisis in the U.S.  True?

12       A.   Well, they focused on the opioid epidemic,

13  but yes, I have.

14       Q.   All right.  Can you -- can you name for me

15  any area in the country that has not had as much

16  leadership, coordination and surveillance as we

17  have seen in Cabell County/Huntington?

18       A.   I was confused by the construction of the

19  question.  Can you ask again, please?

20       Q.   Sure.  I assume you would agree with me

21  that there has been extensive coordination and

22  leadership in Cabell County with respect to the

23  communication of information, as you -- you discuss

24  here in this section of your report.

Page 344

1      A.   I think there's been a tremendous

2   mobilization, yes.

3      Q.   And you talk about this.  Paragraph 86, you

4   say, "Fortunately, the City of Huntington, through

5   the early initiatives of the Mayor Williams' Office

6   of Drug Control Policy," "recognized the need for

7   timely and comprehensive data from the community to

8   guide early measures and initiatives, including:"

9   "(LEAD);" "Cabell Drug Court; Lily's Place;"

10  "Recovery Point; Huntington Quick Response Team;"

11  "and the Harm Reduction Program at" Cabell

12  Huntington Health Department.

13           Do you see where I am?

14     A.   Yes, I do.

15     Q.   So my question was:  It doesn't get much

16  better than this in terms of coordination.  Would

17  you agree with me on that?

18     A.   Well --

19           MR. BURNETT:  Objection.

20     A.   Again, I wasn't asked to perform a

21  comprehensive evaluation of what's been done to

22  date, and nor is -- nor is my abatement program

23  based on some margin that needs to be added on to

24  that.

Page 345

1          So you know, this type of program

2   could well sit within the mayor's office.  I don't

3   have an -- I wasn't asked, or I didn't provide an

4   opinion about where this should sit.  I'm merely

5   stating that I think that any abatement program -

6   if it's going to be effective - needs to have some

7   resources devoted to the types of functions that I

8   articulate in paragraphs eighty -- 85 to 92.  85 to

9   92.

10          So I talk about data integration; data

11   harmonization; I talk about needs assessments; you

12   know, data linkages.  You know, there's lots of --

13   so I think that there's more good work to be done,

14   but I don't want to diminish the laudable efforts

15   that have been done under enormous constraints thus

16   far in the community.

17      Q.   Well, and they already have - in addition

18   to the programs we already mentioned and discussed

19   - they already have -- as you do acknowledge in

20   your report, there is the ability to monitor fatal

21   and nonfatal overdoses in realtime using the

22   overdose detection mapping system, and there's also

23   Marshall University Data Dashboard, and the West

24   Virginia Office of Drug Control Policy apparently

Page 346

1    recently launched an interactive opioid Data

2    Dashboard and has monthly transfer EMS calls, some

3    of which we discussed earlier.

4              That's all in place already, correct?

5              MR. BURNETT:  Objection.

6       A.   Some of that is in place.  I think in

7    Paragraph 91, I articulate my vision for the role

8    of this group, and I would submit while I was --

9    while I was not asked to perform a comprehensive

10   evaluation of the services to date, I would submit

11   that in Paragraph 91, these areas that I call out,

12   one -- four different points, I think that there

13   are opportunities to further strengthen the

14   performance of the leaders within the mayor's

15   office and elsewhere within the community that are

16   fulfilling these functions.

17      Q.   Well, and you note -- following on your

18   Paragraph 91, you note that "the Community" -

19   meaning Cabell County/Huntington - has in fact "an

20   excellent function for data collection and

21   surveillance."

22              My original question to you was, as

23   somebody with experience in this area, can you

24   identify for us any other jurisdiction in the

Page 347

1    entire United States that has a better -- that has

2    better data collection and surveillance available

3    to it other than Cabell County/Huntington?

4                 MR. BURNETT:  Objection, asked and

5    answered.

6        A.   I mean, it's an interesting -- it's an

7    interesting question.  I've not looked at every

8    community nationwide.  Some of the communities that

9    I've examined, I've not been disclosed, and I don't

10   think I'm sort of, you know, privy to speak about.

11                I think that Cabell County has -- and

12   the City of Huntington have, you know, made very

13   laudable efforts, but I'm not comfortable, you

14   know, opining on the sort of -- the merits or the

15   magnitude of their efforts relative to other

16   communities.

17       Q.   Okay.  But on top of all these laudable

18   efforts - to use your own words - you would like to

19   add a Opioid Abatement Coordinating Unit, and you

20   would leave the costs of that, it looks like, to

21   Mr. Barrett.  Is that correct?

22                MR. BURNETT:  Objection.

23   Mischaracterizes the report.

24       A.   Yeah, I'm not suggesting an addition of --

Page 348

1    of -- again, I wasn't asked to figure out what

2    needs to be added to what is currently taking

3    place.  I was asked to develop a longitudinal and

4    comprehensive program to substantially reduce

5    opioid-related harms over the next 15 years, and

6    that's what I've done.

7         Q.   You are suggesting that there be put in

8    place an Opioid Abatement Coordinating Unit that

9    would be comprised of at least one director, two

10   data analysts, and a staff assistant.  True?

11        A.   Well, I don't think the name is as

12   important as the functions that they serve.  So I

13   -- it doesn't matter to me -- I mean, first of all,

14   ultimately, the decisions will rest with the

15   community itself, right?  So -- but this is merely

16   my professional judgment.

17             Secondly, it doesn't matter to me what

18   it's called.  The point is that there are functions

19   that I think need to be fulfilled if the abatement

20   program is to be successful, and I'd like to just

21   briefly call out again Paragraph 91 where I

22   articulate the types of roles that this type of

23   unit, for lack of a better word, the roles that

24   this unit could serve.

Page 349

1      Q.   Why would -- Doctor Alexander, you've said

2    --

3             MR. BURNETT:  Hold on, he wasn't

4    finished with his answer.

5             MS. GEIST:  This --

6      Q.   I am using your language.  You have termed

7    this new group that you think should be

8    implemented, the quote, "Opioid Abatement

9    Coordinating Unit," end quote.  That's what you

10   call it, correct?

11     A.   That's -- again, it doesn't matter to me

12   what it's called.  But what I was going to say in

13   response to your last query was:  I would wager if

14   we asked Mayor Williams, you know, his beliefs

15   about sort of would it be helpful to have

16   additional resources to fulfill the functions that

17   I've articulated in Paragraph 91, I would be

18   surprised if he said "No."

19             Maybe he would.  But the point is that

20   it doesn't matter to me what it's called; the

21   functions that I'm talking about are improving the

22   timeliness, quality, coordination and integration

23   of existing data streams.

24             I think that's very important.

Page 350

1   Conducting opioid-specific surveillance activities.

2   Enhancing the accessibility, visibility and

3   shareability of data.  And performing comprehensive

4   evaluations of interventions.  And proposing

5   evidence-based recommendations.

6                I'm not aware that all of that is

7   being done currently, no.

8        Q.   Now, did you attempt to calculate what

9   would be the incremental increased benefit if the

10  Opioid Abatement Coordinating Unit was established

11  in Cabell County/Huntington?

12               MR. BURNETT:  Objection, outside the

13  scope.

14       A.   I was not asked to evaluate the incremental

15  impact of the particular components that I

16  proposed, although all of them have scientific and

17  public health evidence base to support them.

18       Q.   Where are the additional syringe services

19  programs or the SSPs -- where do you propose that

20  they be located in -- in the community?

21       A.   Again, I'm not sure if you're referring to

22  syringe programs or take-back-

23       Q.   Syringe services programs --

24       A.   -- programs.  Syringe services programs.

Page 351

1    So --

2         Q.   Yeah.  You would like to have more SSPs in

3    the community, correct?

4         A.   I would like continued investment in Harm

5    Reduction, and one important component of Harm

6    Reduction are syringe service programs.

7         Q.   And so how many more syringe services

8    programs are you proposing be put into the

9    community?

10        A.   Well, it's not the number of programs that

11   matters; it's the number of people that are

12   reached.  And if we look at my redress models, I

13   articulate target populations year over year for

14   this and every other -- every other abatement

15   category.

16             So it's not -- I'm not suggesting we

17   need four more programs.  The point is, we need to

18   scale up and reach more people that are currently

19   walking around using intravenous drugs who may have

20   Hepatitis C or HIV or may be transmitting it to

21   others or may need to get into treatment for opioid

22   addiction.

23             We need to reach those people.

24        Q.   Are you aware that -- that at the present

Page 352

1    time, the SSP or syringe services program, in the

2    City of Huntington or in Cabell County is limited

3    to its own citizens?  That was --

4              MR. BURNETT:  Objection.

5      Q.   -- a decision and modification that the

6    community determined it needed to make, because

7    they had all different IV users coming into their

8    community and they didn't want that.  Are you aware

9    of that?

10             MR. BURNETT:  Objection.

11     A.   That just reflects -- I mean, that reflects

12   the magnitude of unmet need and the resource

13   constraints.  I mean, that's too bad -- I believe I

14   had heard that, and that's too bad to hear, because

15   you know, the last thing I think we want is for

16   people who have opioid addiction to be turned away

17   from treatment or from -- from harm reduction

18   services.

19     Q.   In terms of treatment, I think we had

20   talked about that extensively before.  I had a

21   couple more follow-up questions for you in terms of

22   the help lines.  And I'm at page 42 of your report,

23   Doctor Alexander.

24     A.   Okay.  What -- what paragraph?

Page 353

1      Q.   I'm sorry, wait a minutes.  Yes, page 42 of
2    your report, I was right.
3      A.   What paragraph, please?
4      Q.   Hold on, I'm looking.  I apologize.  I'm
5    back a couple pages.  Sorry about that.
6              Page 34, please.  And this relates to
7    Connecting Individuals to Care, Doctor Alexander.
8      A.   Yes, ma'am.
9      Q.   And you have in here a discussion on help
10   lines?
11     A.   Yes.
12     Q.   And that you think help lines should
13   essentially be expanded?  Is that right?
14     A.   As with the prior queries, I was not asked
15   to decide or to evaluate or make recommendations on
16   the margins, so what I am proposing is that any
17   abatement plan that's going to work needs to link
18   people to care and one of the mechanisms to do so
19   is a help line.
20     Q.   Now, people in Cabell County are able to
21   call in to and get assistance through the help for
22   Virginia -- or HELP4WV, meaning help for West
23   Virginia, help line.  Correct?
24     A.   I believe that's the case, yes.

Page 354

1      Q.   And you note specifically here that there

2   have been a certain percentage of individuals from

3   Cabell County who have in fact utilized that

4   state-based help line.  True?

5      A.   Yes.

6      Q.   Okay.  And you also note that overall, it

7   appears there have been 41,000 individuals who have

8   used that help line to get connected to treatment

9   options.  True?

10     A.   Yes.

11     Q.   And it appears that 40 percent of the users

12  of the hotline or the callers to the hotline had

13  reported using opioids.  Is that right?

14     A.   Yeah, that was the most commonly-used

15  substance among the help line callers.

16     Q.   And of course, 40 percent of opioid users

17  doesn't tell us whether they were using illicit

18  opioids like heroin or fentanyl or carfentanil,

19  true?

20     A.   Correct.

21     Q.   We don't have any indication or any

22  information that anyone calling that hotline was

23  using prescription opioids as -- as provided by a

24  physician.  True?

Page 355

1    A.   I'm not aware of that -- that that

2    information exists, correct.

3    Q.   And I assume you will agree with me - doing

4    this simple math - if 40 percent of the callers are

5    calling because of their use of opioids and 60

6    percent of the callers are calling about some other

7    type of drug for which they are seeking treatment

8    such as methamphetamine or cocaine -- true?

9         MR. BURNETT:  Objection.

10   A.   Or -- or alcohol or marijuana or -- could

11   be, yeah.

12   Q.   In other words, the vast majority of the

13   individuals calling the help line, HELP4WV, were

14   calling about some other substance other than

15   opioids.  That's just mathematically correct.

16   Right?

17        MR. BURNETT:  Objection.

18   A.   Well, those are your words, not mine.  I

19   would characterize it as two out of five were

20   calling pertaining to opioids and three out of five

21   were not.

22   Q.   Now, in terms of -- you have a program

23   designed to address job training?

24   A.   Yes.

Page 356

1      Q.   Is that right, Doctor?

2           MR. BURNETT:  Let me just interrupt.

3    It's been seven hours, so I would say, you know,

4    ask your last question and then we should wrap up

5    here.

6      Q.   Is it your opinion, Doctor Alexander, that

7    job training is going to result in employment for

8    individuals with opioid use disorder or substance

9    use disorder?

10     A.   I think it can help to address one of the

11   -- you know, one important contributor to the

12   epidemic, which has been, you know, a lack of --

13   lack of gainful employment opportunities.

14           But as I noted at the outset, the

15   epidemic isn't just about biology or environment;

16   it's also about access and supply.

17     Q.   And individuals who are in need of job

18   training, I assume you will agree with me, many

19   need that job training because of issues unrelated

20   to opioid use disorder such as mental health

21   problems, lack of education, lack of a high school

22   degree, or issues relating to substance -- mental

23   health disorders.  True?

24     A.   Yeah, there could be complex determinants

Page 357

1    of joblessness, but I think in order to make

2    success in addressing opioid addiction, one needs

3    to work to expand employment opportunities.

4              People need jobs.  People need

5    livelihoods.  And it's only reasonable to expect

6    that a successful program is going to help provide

7    those.

8        Q.   And do you have any idea that if these job

9    training programs are implemented, as you're

10   suggesting, that there are businesses in Cabell

11   County that have job openings for these

12   individuals?

13       A.   Well, it's a great question, and it speaks

14   to the broader economic opportunity -- the

15   important dimension that economic opportunity plays

16   in helping to create a better future for this

17   community.

18              So I don't know specifically -- I was

19   not asked to do a specific estimate of the number

20   of employment opportunities in the County or the

21   City of Huntington.

22       Q.   But you know from The City of Solutions

23   document that we went through together that the

24   community itself acknowledges that because of the

1    economic -- socioeconomic challenges and issues in

2    the region, that there are bigger issues

3    challenging that area in terms of job employment

4    and things of that nature.

5        A.   Well, The City of Solutions document is one

6    of hundreds of documents that I reviewed, and it

7    was performed at one point in time.  But I

8    certainly can agree with you that -- that

9    joblessness and absence of economic opportunity is

10   -- is one of many important facets of the opioid

11   epidemic and the way that it's uniquely affected

12   this rural Appalachian community.

13              MR. BURNETT:  Counsel, we've now gone

14   over seven hours.  We need to stop for the day.

15              MS. GEIST:  That's fine.  I'm done.

16   Thank you for your time, Doctor Alexander.

17              THE DEPONENT:  Thank you.

18              VIDEO OPERATOR:  The time is 6:25.  We

19   are now going off the record.  This concludes the

20   deposition.

21              (Having indicated he would like to

22              read his deposition before filing,

23              further this deponent saith not.)

24                   --oOo--

Page 359

1  STATE OF WEST VIRGINIA,
2  COUNTY OF JACKSON, to wit;

3

4          I, Teresa S. Evans, a Notary Public within
   and for the County and State aforesaid, duly
5  commissioned and qualified, do hereby certify that
   the foregoing deposition of DR. G. CALEB ALEXANDER
6  was duly taken by me and before me at the time and
   place and for the purpose specified in the caption
7  hereof, the said witness having been by me first
   duly sworn.

8

           I do further certify that the said
9  deposition was correctly taken by me in shorthand
   notes, and that the same were accurately written
10 out in full and reduced to typewriting and that the
   witness did request to read his transcript.

11

           I further certify that I am neither
12 attorney or counsel for, nor related to or employed
   by, any of the parties to the action in which this
13 deposition is taken, and further that I am not a
   relative or employee of any attorney or counsel
14 employed by the parties or financially interested
   in the action and that the attached transcript
15 meets the requirements set forth within article
   twenty-seven, chapter forty-seven of the West
16 Virginia Code.
17          My commission expires October 25, 2020.
   Given under my hand this 22nd day of September,
18

19

20 Teresa S. Evans
   RMR, CRR, RPR, WV-CCR

21

22

23

24

Page 360

1

STATE OF WEST VIRGINIA

2

COUNTY OF KANAWHA, to wit;

3

    I, Teresa Evans, owner of Realtime Reporters,

4

LLC, do hereby certify that the attached deposition

5

transcript of DR. G. CALEB ALEXANDER meets the

6

requirements set forth within article twenty-seven,

7

chapter forty-seven of the West Virginia Code to

8

the best of my ability.

9
10

    Given under my hand this 22nd day of September,

11

2020.

12
13
14
15
16

17                    Registered Professional
             Reporter/Certified Realtime Reporter

18
19
20
21
22
23
24

```
                                                              Page 361
  1                          Veritext Legal Solutions
                                 1100 Superior Ave
  2                                 Suite 1820
                              Cleveland, Ohio 44114
  3                            Phone: 216-523-1313
  4
       September 23, 2020
  5
       To: David D. Burnett, Esquire
  6
       Case Name: City of Huntington v. Amerisourcebergen Drug Corporation
  7
       Veritext Reference Number: 4241658
  8
       Witness:  Dr. G. Caleb Alexander      Deposition Date:  9/18/2020
  9
 10    Dear Sir/Madam:
 11
       Enclosed please find a deposition transcript.  Please have the witness
 12
       review the transcript and note any changes or corrections on the
 13
       included errata sheet, indicating the page, line number, change, and
 14
       the reason for the change.  Have the witness' signature notarized and
 15
       forward the completed page(s) back to us at the Production address
 16    shown
 17    above, or email to production-midwest@veritext.com.
 18
       If the errata is not returned within thirty days of your receipt of
 19
       this letter, the reading and signing will be deemed waived.
 20
 21    Sincerely,
 22    Production Department
 23
 24    NO NOTARY REQUIRED IN CA
```

Page 362

```
1                 DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 4241658
3        CASE NAME: City of Huntington v. Amerisourcebergen Drug
    Corporation, et al.
         DATE OF DEPOSITION: 9/18/2020
4        WITNESS' NAME: Dr. G. Caleb Alexander
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8
      10/08/2020                  G. Caleb Alexander
    _____          _____
9   Date                      Dr. G. Caleb Alexander
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
              Statement; and
14       Their execution of this Statement is of
              their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

Page 363

```
 1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2
             ASSIGNMENT REFERENCE NO: 4241658
 3           CASE NAME: City of Huntington v. Amerisourcebergen Drug
        Corporation, et al.
             DATE OF DEPOSITION: 9/18/2020
 4           WITNESS' NAME: Dr. G. Caleb Alexander
 5           In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7           I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
 8      well as the reason(s) for the change(s).
 9           I request that these changes be entered
        as part of the record of my testimony.
10
             I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      _____        _____
        Date                   Dr. G. Caleb Alexander
14
             Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18               in the appended Errata Sheet;
             They signed the foregoing Sworn
19               Statement; and
             Their execution of this Statement is of
20               their free act and deed.
21           I have affixed my name and official seal
22      this _____ day of_____, 20____.
23           _____
             Notary Public
24
             _____
25           Commission Expiration Date
```

Page 364

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4241658

PAGE/LINE(S) /          CHANGE          /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____          _____

Date                      Dr. G. Caleb Alexander

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

            _____

            Notary Public


            _____

            Commission Expiration Date

| & | | | |
|---|---|---|---|

**&** 2:13 3:4 9:7

**0**

**0.5** 342:13
**00365846-6015**
  5:23 208:1
**08540** 2:19

**1**

**1** 5:2 7:13 17:24
  17:24 18:1,5,10,11
  18:12,14 39:14
  52:24 147:24
  164:6 169:13
  171:6,9 176:4
  182:12,20 218:15
  218:24 219:5,13
  219:14 266:2,9
**10** 45:11 47:6
  129:2,6 144:7
  148:1 192:5,19,22
  193:5,11 194:11
  194:14,20 195:5
  196:6 197:2,9,14
  271:20 298:3
  333:15
**10,000** 23:13
**100** 194:13 197:8
  236:17 272:19
  336:9
**10018-1405** 3:6
**105** 5:7 81:23
  104:22
**10538** 359:19
  360:16
**10:46** 66:22
**10:57** 67:2
**11** 76:13,21 104:22
  106:9 113:13,17
  113:24 213:13,23
  214:1

**1100** 361:1
**11:30** 93:23
**11:33** 94:4
**12** 19:22 45:11
  47:6 114:4 118:22
  323:14,17
**122** 114:11 115:3
  117:18 118:11
**125** 50:7 53:2 63:9
  67:8 135:15,19
**12:20** 133:12
**12:27** 137:23
**13** 161:6 162:3,6
  262:8
**14** 161:6 162:4,16
**15** 57:6 58:16
  163:24 180:2
  186:11 191:24
  192:5,7,9,22
  193:12 198:5,12
  218:1 236:7
  239:11,18 241:5
  241:11,22 243:20
  244:8,19 258:17
  265:22,22 316:1
  348:5
**15,000** 23:13
**152** 304:12
**158** 6:2
**16** 69:11 266:11
  281:2
**17** 6:6 67:9 179:4
**179** 6:5,8
**17th** 179:22
**18** 5:2 19:23 185:1
  224:11 306:16
  337:14 339:11
**1820** 361:2
**18th** 1:21 7:3
  285:21

**19** 114:12 115:3
  117:18
**1990s** 268:11
**1:00** 137:7,10,11
  137:13,14,14,16
  137:17,18
**1:01** 138:3
**1:15** 137:11
**1:37** 170:2
**1:55** 170:6
**1a** 176:5 292:11
  301:20
**1b** 321:14,18
**1c** 338:22
**1d** 171:9
**1f** 342:18

**2**

**2** 5:4 20:6 40:14
  40:14,15,16,18,23
  42:18 53:1 103:14
  103:17,17 164:23
  166:18 172:6
  173:18 182:20
  184:15 186:12
  190:8 204:5
  262:16
**2.6** 244:22
**2.7** 244:22
**20** 227:10 271:21
  293:8,16 319:7
  362:16 363:22
  364:22
**2014** 82:6,13 83:3
  125:5 126:20
  127:16 129:3,7
**2015** 141:3,10,20
  142:4,13,16 143:2
  143:8 209:16,24
  212:14 329:9
**2016** 306:17,24
  308:4,12 318:7

**2017** 70:17 71:3
  76:17 106:13
  122:2 138:13,19
  140:23 141:20
  142:4,9,11 143:2
  143:22 145:18
  147:4 221:24
  293:16 318:13
**2018** 68:20 70:17
  71:3 73:18 75:8
  76:17 82:1,6,14
  83:4 106:4,13
  108:14,24 110:1
  121:8,12,17 122:1
  122:6,22 123:9,13
  123:17,20 124:20
  125:5 126:20
  127:16 128:16
  129:2,6 252:20
**2019** 5:23 6:6,9
  19:24 41:6 43:11
  44:21 47:3 57:12
  77:2 105:1 110:11
  110:19 111:23
  113:1,20 114:10
  146:15 160:8
  162:4 179:4,7,22
  179:23 207:24
  208:11
**2020** 1:22 7:4
  10:12 49:10 78:22
  110:11,19 111:3
  112:7,11 113:2,20
  114:10 285:21
  295:18 317:8
  359:17,18 360:11
  361:4
**2021** 293:8,8
**203** 6:10
**2035** 293:9

**208** 5:20
**216-523-1313**
  361:3
**22** 70:16 71:1
  76:16 106:12
  107:13 316:15
  317:3,6
**22nd** 359:17
  360:10
**23** 122:5 123:15
  124:7 361:4
**24** 22:18 43:16,23
  45:11,11,24 46:10
  46:12,16,17 47:2
  130:14 185:1
  330:6
**24/7** 80:15
**25** 114:1,9 359:17
**25323** 2:15
**25714-1180** 2:10
**26** 41:6 43:11
  44:21 47:3 70:16
  71:1 76:16 106:12
  107:14 214:3
  229:12
**27** 214:3 215:7
  216:15
**28** 2:6 215:7
  216:16 335:18,21
  335:22
**2803** 5:5 6:4 40:21
  158:19
**29** 76:22 81:23
  82:9,11 106:10
  114:6
**2900** 2:21
**292** 5:18
**29464** 2:7
**2:29** 198:17
**2:42** 198:21

**3**

**3** 5:7 50:24 83:2
  103:19,20 105:13
  105:14,15,17,23
  120:15,16 127:15
  175:5 176:6,20
  184:13 262:22
**3-24-19** 6:4 158:19
**30** 197:16 333:15
**300** 2:18
**31** 245:6
**32** 6:2 129:7
  158:13,13,15,21
  158:22,23 159:15
  159:23 171:1
  173:4 195:24
**33** 6:5 125:5
  126:20 178:21
  179:1,10,13,14,15
  179:21 182:8,10
  182:19 184:14,14
  195:3 196:2 197:4
  246:8
**34** 6:8 178:21
  179:1,10,12,13,15
  179:15,22 195:3
  196:2 197:4 353:6
**35** 179:12
**355** 2:21
**36** 43:17,23 83:3
  124:20 127:16
**36,000** 319:8
**365** 80:15
**38** 69:14 254:4
  323:12
**3:17-01362** 1:7
  7:20
**3:17-01665** 1:13
  7:21
**3:48** 253:18

**3c** 175:8
**3d** 176:6
**3e** 176:20
**3rd** 2:9 49:10

**4**

**4** 5:10 47:24 48:12
  48:13,15 49:4,7
  131:10 134:2,3,5,6
  134:12 136:20,20
  141:22 142:7,20
  142:23 143:17
  159:6,11,11,12
  171:2 177:8
  191:14 216:7
  262:3 266:11
**4-26-19** 5:6 40:21
**40** 5:4 51:24 67:24
  226:15,23 290:13
  354:11,16 355:4
**400** 52:2
**41,000** 354:7
**42** 352:22 353:1
**422** 2:9
**4241658** 361:7
  362:2 363:2 364:2
**43** 303:23
**44** 306:23
**44114** 361:2
**47** 302:2
**48** 5:10,13
**49** 5:16
**4:00** 253:14,23
**4d** 177:9

**5**

**5** 5:13 48:4,4,4,12
  48:13,15 49:4
  131:18,18 133:2
  134:2,12,13
  136:21 138:10
  140:15 143:23

**159:2,14 271:20
**50** 236:7
**506** 2:18
**51** 289:20
**52** 6:10 136:17,21
  203:9,13,18,20,24
  204:9 207:6
**55** 318:4
**59** 122:4 123:15
  124:6
**5:16** 316:5
**5:32** 316:9
**5:58** 338:8
**5:59** 338:13
**5th** 77:2 105:1

**6**

**6** 199:7 200:3,21
  202:4 205:24
**60** 68:1 130:3
  355:5
**620** 3:5
**650** 61:23 69:1
  83:17 118:14
  141:17 143:7
**659** 143:8
**68** 335:11,15
**6:25** 358:18

**7**

**7** 5:16 48:5,5,13,13
  48:15 49:4 132:21
  132:21 133:3
  134:2,17 136:21
  291:16,18
**7.1** 5:18 291:23
  292:3,8 321:14
**7.1.** 292:7,12,14
**707** 2:14
**75** 23:4 26:6,11,20
  27:10 38:3,8

| 8 |
| --- |

**8**   5:20 6:9 67:8
  179:7 207:16,17
  207:18,19 208:3,5
  298:3,3
**8-3-20**   5:12 48:20
**80**   121:7
**82**   73:18 121:11,16
  122:1,21 123:9,12
  123:19 124:9
**85**   345:8,8
**86**   344:3
**888**   127:2
**89,600**   323:18
**8th**   179:22

| 9 |
| --- |

**9**   4:2 298:3
**9-2-20**   5:3 18:7
**9-5-19**   5:9 105:21
**9/18/2020**   361:8
  362:3 363:3
**90**   333:15
**900**   38:5,8
**90071**   2:21
**901**   2:14
**91**   346:7,11,18
  348:21 349:17
**92**   345:8,9
**93**   234:7
**94**   115:4,22
**952**   109:9
**9:32**   7:3

| a |
| --- |

**a.m.**   7:3
**abate**   24:11 51:2
  51:15 58:12 60:5
  138:24 160:13
  162:22 279:10
**abatement**   5:10
  48:16 49:8 52:3,7

55:21 56:6 59:19
62:3 66:3 91:4,8
91:10,12,23 92:15
94:20 97:4 126:10
126:12 131:1
139:8,19,20 140:1
141:24 146:1,7,15
147:10 148:9
162:8 163:1,5,8
165:2 167:19,20
168:22,23 177:5
178:14 180:2,24
181:6,14,22
182:14 183:1
184:23 185:6,14
186:6 188:19
189:2 190:12,21
191:10,22,24
192:4,13 193:3,9
193:24 194:17,23
194:24 195:11,17
196:3,24 197:13
198:3,11,12
208:14 210:21
218:16 222:14
223:10 235:10,19
235:22 237:12,13
237:15 239:4,4,13
239:19 240:6
241:23 244:8
245:24 256:7,13
259:18 260:11
261:15 265:24
287:17 288:1
307:17 318:1
325:6 326:10
327:3,7 330:3
339:13 342:9,22
344:22 345:5
347:19 348:8,19
349:8 350:10

351:14 353:17
**abating**   85:14
  139:13 177:7
**abide**   27:8
**ability**   42:19 43:6
  45:1 105:8 213:7
  255:8 345:20
  360:8
**able**   50:15 69:6
  99:15 103:15
  119:21 137:9
  170:13 174:19
  211:19 228:7
  269:24 288:15
  353:20
**abreast**   299:5
**absence**   358:9
**absolutely**   13:15
  15:20 45:2 133:13
  148:4,6,12,17
  149:1 154:1
  167:16 168:2
  240:3 304:11
  305:3 316:4
**abstract**   187:10
**abuse**   23:20 24:4,8
  74:22 80:3,5,18,19
  246:12 247:13
  249:9 262:18
  341:8
**academic**   25:6
  289:2 290:6,20
  291:6,10 293:1,21
  295:15 301:19
  302:1,6 304:1
**acceptable**   168:15
**accepted**   132:2,8
**access**   12:15,22
  76:1 97:16 220:15
  232:18 235:8
  238:17 304:21

356:16
**accessed**   302:12
**accessibility**   350:2
**accessible**   303:1
**accident**   71:12
**accidental**   315:15
**accommodate**
  13:11 15:19
**accompany**   50:21
**accompanying**
  47:22
**account**   263:3,23
  265:9 322:14
**accounting**   45:12
**accounts**   264:7
**accrue**   24:12
**accuracy**   22:3
**accurate**   16:12
  42:18 125:8
  172:22 192:1
**accurately**   44:24
  359:9
**achievements**
  252:8
**acknowledge**   77:5
  151:1 256:20
  345:19 362:11
  363:16
**acknowledged**
  282:20
**acknowledges**
  357:24
**acquired**   101:12
**acronym**   245:14
  297:4
**act**   362:14 363:20
**action**   1:6,13,20
  8:5 39:5 143:24
  359:12,14
**active**   23:18 78:7
  78:18 79:20 154:5

activist  24:15,22
activities  132:13
  209:8 341:9 350:1
activity  139:4
actual  207:8 329:4
add  93:6 256:23
  257:4 324:12
  329:12,15 330:2
  338:8 341:23
  347:19
added  344:23
  348:2
addendum  194:13
  292:19
addicted  91:10
  103:6
addiction  24:4
  73:6 74:23 79:23
  80:1,2,7,8,15,16
  80:20,22,23,24
  81:4,8,13,15 90:19
  92:7 103:7 128:13
  151:1,5,10 152:1
  153:17 154:2,5,7
  157:9 213:2
  224:17 229:11,19
  229:24 230:4,8,14
  231:3 232:6
  233:13,14 237:22
  238:9,11 240:1,4,5
  240:14,19 241:9
  241:17 242:13
  250:21 252:15
  262:17 298:1
  319:3,5 335:4
  336:23 351:22
  352:16 357:2
addictive  335:3
addicts  241:11,15
addition  25:21
  335:23 345:17

347:24
additional  23:14
  24:20 38:13,15
  39:4 69:2 145:2
  156:13,17 168:22
  175:3 182:17
  193:11 256:10
  259:16 283:19
  286:13 287:23
  342:2 349:16
  350:18
address  39:5
  61:21 64:10 97:4
  99:15 126:10
  152:10 160:13
  161:5 162:22
  182:15,17 209:4
  210:4,23 213:15
  216:3,4 218:11
  223:4 235:11,16
  254:24 257:9
  272:4 283:5 300:5
  320:10 330:13
  331:16 341:20
  343:10 355:23
  356:10 361:15
addressed  312:21
  329:5,7
addresses  144:24
  316:13
addressing  5:10
  48:16 49:8 60:13
  145:2 151:6,10
  152:1 157:10
  160:15 209:22
  211:8 231:8
  234:21 303:12
  357:2
adequate  221:6
  329:16,23,24
  330:1

adequately  220:22
adjustments
  322:13
administer  8:3
administering
  9:10
administration
  139:12
adolescents  116:4
  154:17
adult  52:2
advance  17:17
  28:17 29:21
adverse  90:14
advise  58:2 112:5
affiliations  8:9
affixed  362:15
  363:21
afield  167:8
aforesaid  359:4
age  117:18 323:17
aged  114:12 115:3
aggregate  37:4
ago  19:23 22:19,20
  43:10 44:1 57:6
  185:1 207:2
  217:22 276:9
  312:2,16 322:9
agree  7:11 12:23
  13:17 14:7,12,17
  14:20 15:6,9,11
  46:19 47:4,10
  50:20 58:9 64:18
  72:2,7 77:23
  82:13,22 85:5
  89:1,4,9,12 95:4,7
  95:22 96:17,21
  97:3 98:2,23
  99:21 100:4,9
  101:5,13 102:17
  113:7 123:4 145:7

147:22 150:19
  151:3,7,14,23
  152:7,23 153:7,9
  154:20 157:8,15
  157:23 167:12
  169:20 173:12
  182:9 185:9 191:8
  208:6 209:20
  210:16 214:4,9,19
  214:20 215:11
  216:1,6 217:2,13
  232:3,13 233:6,16
  233:24 235:21
  236:10,13,17,19
  237:15,17 238:22
  240:7,24 241:2
  243:16 246:14
  256:12 258:19
  276:12 295:12,18
  298:10 302:23,23
  303:4 304:15
  305:4 306:14
  309:18 311:4,7
  312:18 318:6
  319:23 343:20
  344:17 355:3
  356:18 358:8
agreeable  104:5
agreed  181:23
  280:6
agreeing  197:9
agreement  46:1
  49:22 54:13
agrees  61:5 215:18
  215:20
ahead  17:22 22:10
  22:11 24:1 40:13
  48:2 49:6 69:12
  87:20 102:4,5
  111:16 138:10
  207:15 227:15

**al**   1:8,14 7:17,18
  312:12 362:3
  363:3
**alameda**   339:3
**alcohol**   81:4 87:11
  355:10
**alexander**   1:19 5:3
  5:5,12,14,17,18
  6:2,5,8,10 7:14
  9:21 10:2,4 11:9
  12:10 13:8 14:12
  14:18 15:5 16:1
  16:11,15 17:5,22
  18:5,7,9 19:17
  20:8,17 21:19
  27:9,16 31:22
  32:8 33:12 34:1
  35:5,18 36:3,16,22
  38:2 39:7,15
  40:13,18,20,23
  41:2,8 42:5 43:13
  44:14 45:22 47:3
  47:15,20 48:4,15
  48:19,21,24 49:3,7
  49:12 50:11,13,23
  53:9 56:10 57:18
  60:1 61:14 62:9
  63:15 65:7 66:18
  67:5 75:22 76:13
  76:24 77:8 78:11
  78:14 79:6 81:10
  82:3,13 83:16
  85:3,18 89:9
  92:24 93:5,8
  98:22 100:6
  103:24 104:7,20
  105:12,17,22,24
  107:2,9 108:18
  112:14 113:6,16
  114:23 120:16
  123:4 130:24

132:23 133:17
  134:5,23 135:4
  138:6,10 147:22
  149:17,21 150:16
  152:15 155:6,13
  156:14,18 157:4
  158:10,15,16,20
  161:7 162:3 164:3
  167:5 168:1,20
  169:17 170:8,22
  177:19 179:1,2,5,9
  179:17 186:18
  191:21 193:20
  197:1 198:24
  203:13,14,18
  205:21 206:15
  207:7,19 208:2
  214:5 217:13
  218:3 219:3
  222:17 224:13
  232:22 234:9
  244:1 245:11
  249:19 254:1
  258:18 262:1,13
  266:12 269:3
  273:24 276:13
  279:24 290:2
  291:22 292:3,4,6
  292:14 298:11
  302:16 306:16
  312:5 316:12
  317:7 321:13
  325:21 327:6
  330:7,11 332:7
  338:16 342:21
  349:1 352:23
  353:7 356:6
  358:16 359:5
  360:5 361:8 362:4
  362:9 363:4,13
  364:20

**alexander's**   81:21
**align**   175:19
**aligned**   218:22
**alignment**   139:7
  146:4
**allied**   301:3
**allocation**   224:1
**allow**   252:13
  274:11 312:19
**allowing**   251:1
**allows**   229:5
**allude**   142:24
**alternative**   73:4
  154:12 168:13
  200:11 278:17
  291:3 312:11,12
**ama**   308:5
**amazed**   342:3
**amended**   5:2 18:6
  18:14
**american**   307:23
  308:23
**amerisourceberg...**
  1:7,14 2:16 7:16
  7:18 9:3 280:3
  361:6 362:3 363:3
**amount**   23:11
  44:4 259:11
**amounts**   258:12
  259:8
**analog**   99:1,19
**analysis**   63:17
  71:6 75:8 99:17
  108:20 110:9
  111:23 119:7
  128:17 178:9
  268:1 276:15
  325:11
**analysts**   342:12
  348:10

**analytics**   28:10,11
  29:13,19,20,21
  32:12,14 34:9,23
  35:12 36:24 38:11
  136:5 199:11,24
  200:20 201:13
  205:22 206:8
**andrew**   2:5 8:12
  29:16
**anecdotally**   314:3
**anecdote**   314:10
  314:19 315:10
**anecdotes**   310:1
**angeles**   2:21
**anne**   2:4 8:19,23
**annual**   111:22
  112:19,21,24
  113:2 322:8
**answer**   14:9 21:19
  23:24 27:13 33:3
  35:21 37:3 38:20
  39:8,8,12 43:4,5,6
  43:7 52:12 53:8
  53:18 54:6,8
  78:12 79:4 82:12
  85:11 89:7 93:5
  94:15 96:12
  100:16 101:3
  103:1 113:5
  114:24 116:17,20
  118:5 120:5
  145:14 148:12
  150:4,8 152:24
  153:3,4,5 155:14
  155:20,21,22
  156:6,19,21 157:6
  157:22 158:2
  169:17 170:14,16
  170:16 173:1
  185:4 189:23
  193:19 217:3

219:1 243:9 246:1 252:6 260:12,13 274:1,11,13 275:2 276:21,21 303:15 329:22 333:12,22 349:4

**answered** 37:15 43:3 47:6 59:15 63:22 65:2 84:2 89:6,14 96:19 116:12 117:10 146:11 152:6 153:12,12,14 157:14 158:1,3 197:3,6 244:1 259:5 261:21 271:24 274:10 275:21 276:7 294:11 296:2 305:12,21 325:18 326:2 329:11 333:20 347:5

**answering** 85:10 148:14 155:10 193:15 274:20 328:9,11

**answers** 42:16 44:12,24 57:12 149:14 150:2,6 156:23 167:1 175:14 275:24

**anticipate** 10:14 17:12 108:21

**anticipated** 106:4

**anticipating** 109:7 190:23

**anybody** 34:4 87:1 201:11

**anytime** 159:10

**anyway** 121:10

**apart** 37:22 211:17 213:6

**apartment** 256:2 257:16

**apartments** 257:19 258:24

**apologies** 179:11

**apologize** 17:17 94:7,10 136:24 147:17 154:19 199:6,18 206:21 292:2 306:23 321:11 335:19,21 353:4

**appalachia** 234:2

**appalachian** 37:22 231:23 358:12

**apparently** 94:7 171:23,24 345:24

**appear** 5:8 19:12 43:17 104:24 105:20 148:2 179:20 200:3 228:17 321:11 362:11 363:15

**appearance** 8:9

**appearances** 2:1 3:1

**appeared** 323:20

**appearing** 2:2,11 2:16 3:2

**appears** 109:2 150:20 226:10 316:17,19 322:7 338:23 342:11 354:7,11

**appended** 363:11 363:18

**appendices** 50:5

**appendix** 5:14,17 5:18 48:21 49:1

131:12,16 132:18 132:21 133:22 134:14,23 135:6 135:20,21 139:9 139:22 143:4,21 291:18 292:4

**apple** 12:21

**application** 162:10

**applies** 125:17

**apply** 45:18 91:15 91:19

**apportion** 64:12

**appreciate** 13:10 15:20 93:3 94:16 133:6 252:6

**approach** 228:19 246:16 294:16,23 295:6,8 325:5 340:18

**approaches** 24:11 58:3 138:24 192:4 196:4

**appropriate** 144:2 160:22 167:22 268:19,24 269:11 293:23 294:5 297:13,22 298:12 298:21 299:10 311:13 334:24

**appropriately** 58:19 269:7 287:14 294:8,21

**approximately** 26:20 31:7 109:9

**april** 6:6 41:6 43:11 44:21 47:3 179:4,21

**area** 139:4 209:21 218:12 221:10 234:1,20 237:17 343:15 346:23

358:3

**area's** 234:22

**areas** 61:2 144:7 144:12,22 145:16 211:19 213:10 346:11

**arguably** 280:16

**argue** 65:19 247:24 295:2

**arguing** 64:9 87:7

**argument** 32:19 167:1

**arises** 92:11 280:19 281:5

**arnold** 2:5 8:12 29:16 148:20,21 149:2,6,9

**art** 280:13 287:12 310:14

**arthritis** 277:16 277:16,18,23 278:6,9,10,11,12 278:16,23,23

**article** 359:15 360:6

**articulate** 345:8 346:7 348:22 351:13

**articulated** 154:23 243:23 349:17

**ascertain** 234:12

**aside** 45:3 47:14 47:17 169:5 178:24 207:6 268:8 293:20

**asked** 14:5 17:5 25:7 38:17,22 42:14 43:2,3 45:10 47:4 49:24 51:2,12,14 53:24 58:7,10,20 59:4,6

59:13,14 60:13
61:1,4,5,13 64:5
64:20 65:1,10,18
66:5,6 75:12,12
84:1 85:8,12 89:5
89:13 91:7 96:18
105:24 106:20
116:11 117:9
126:6 127:11,13
134:1 139:21
146:10,18 147:10
152:5 157:13
165:11 168:1,6,8
169:5 171:7 173:6
211:13,24 212:17
222:12,13 237:13
242:6 246:5,21
249:5 251:7,8,8
256:6 257:15
259:4,12 261:20
267:14 268:23
269:1 271:23
275:20 276:6,19
277:12 278:1
279:2,18 280:5
281:17 287:9
294:10 296:1,3
301:16 303:10
304:19 305:11,20
323:1 325:17
326:1 328:23
329:3,10,13,13,17
330:1,2 333:12,20
341:23 344:20
345:3 346:9 347:4
348:1,3 349:14
350:14 353:14
357:19
**asking**  14:11
22:12 27:9 32:4
34:6,8 63:4,7

77:11 79:8 82:2
94:18 102:24
113:6 114:2 115:2
118:10 139:16
143:6,7 153:21
157:1 161:14,14
161:22 162:24
165:14 166:12
168:20 171:5
182:1,4 193:1,2
196:19 204:3
209:11 214:17,19
215:5,14,17,19
216:24 217:2
218:23 230:22
235:13 250:4
251:21,23 260:9
290:5 299:22
300:1,8 336:14
**asks**  52:11
**aspect**  96:1 165:1
198:4 223:11
236:12 256:12,15
287:24 308:10
**aspects**  94:23
131:5 161:23
269:5
**assessed**  301:14
**assessing**  211:4
**assessment**  256:6
259:13 287:10
307:18 317:21
327:15 329:4
331:8 342:1
**assessments**
272:23 290:16
345:11
**assignment**  362:2
363:2 364:2
**assistance**  254:22
353:21

**assistant**  348:10
**assistants**  301:3
342:13
**assisted**  250:8
**associated**  190:14
190:17 193:6
194:7 317:18
**association**  307:24
308:23
**assume**  27:16
41:18 81:10 83:18
85:5,18 86:2,11
95:3,23 96:21
98:23 102:17
150:16 151:3
157:6 159:19
160:19 210:23
224:6 236:11
246:1 273:11
282:11 298:10
304:16 305:4
308:22 324:6
343:20 355:3
356:18
**assumes**  289:6
294:2,6,7 317:10
325:20
**assuming**  293:7
**assure**  327:20,21
**attach**  138:19
**attached**  143:21
359:14 360:4
363:7
**attachment**
138:12
**attachments**  47:22
50:16
**attainment**  232:20
**attempt**  256:7
350:8

**attending**  8:8
**attention**  264:11
307:12
**attitudes**  328:24
**attorney**  299:20
300:11 359:12,13
**attorneys**  14:20
299:24 327:18
**attribute**  119:2
**attributed**  73:19
**attribution**  119:7
314:20
**audio**  7:9,10
**august**  49:10
**authoritative**
307:15 308:18
**authorities**  76:9
**authority**  306:4
**authorize**  363:11
**authorized**  8:3
285:6 305:9
**availability**
231:11
**available**  49:5
112:3,4,8 134:16
136:21 217:16
230:10 254:3
261:13 283:22
292:11 299:12
304:17 324:20,21
325:4 340:8,21
347:2
**ave**  361:1
**avenue**  2:21 3:5
**average**  56:5
258:6 266:20
322:10 325:2
340:23
**averages**  73:1
272:11

**avoid** 15:12 170:11 241:14 252:14
**aware** 12:8 14:21 67:23 68:6,8,12 70:13,18,22 71:14 75:14,16 81:9 83:20 98:10 110:8 110:17 111:22 112:11 113:8 119:14 205:4,13 221:21 222:3,8 231:2 232:21 235:1,3,18 244:16 249:3 282:21 284:14 287:5,11 289:7 291:2 299:2 299:7,22 300:8,14 302:15,20 303:2 307:23 308:5,9,18 308:21 313:9,10 314:24 315:6 317:12,17 318:13 318:22 325:22 331:21,22 337:13 337:17,19 341:7 341:11,17 350:6 351:24 352:8 355:1
**awareness** 16:7 80:23 285:12 289:23 326:21 328:20

**b**

**b** 9:16 30:3 131:12 176:4,5 244:23
**back** 13:9 27:14 40:1,3 47:15 59:2 61:12,14 67:3 94:5,8 100:7 118:20 120:13

136:19 138:4,6 141:3 143:19 150:11 159:20 170:7 198:22 217:10 224:4 225:14 229:2 245:3 253:14,23 254:18 257:14 261:8 262:1 273:22 282:14 291:19 309:7 316:10 331:16 332:2 333:2 338:14 341:6,9,15 341:18 350:22 353:5 361:15
**background** 11:16
**backwards** 54:20 212:18
**bad** 103:19 110:15 153:3 156:22 311:19,21 317:5 328:14,15 352:13 352:14
**balance** 38:24 267:1
**balls** 167:14
**baltimore** 11:21 12:7 85:21
**banner** 183:15
**barrett** 11:7 180:12 347:21
**barrett's** 28:22
**barriers** 78:18
**barring** 49:21
**base** 101:2 146:24 286:23 339:9 350:17
**based** 24:11 42:23 51:14 58:3 59:19 70:7,13,24 87:3

90:23 91:3 117:24 126:9 127:1,23 129:9 138:24 140:10 146:22 172:3 180:11,18 183:8 184:20 204:6 208:13 210:20 211:4 222:14 224:18 236:4 242:17 246:1 260:3 273:4 276:14 279:9 287:12 288:11 296:23 300:17 304:3 307:17 309:15 310:15 313:15 314:21 321:23 324:12 326:8 338:24 341:6,18,24 344:23 350:5 354:4
**bases** 146:13
**basically** 237:1
**basis** 13:23 33:1 53:21 264:17 319:13
**bathroom** 61:18 331:2
**bedroom** 61:17 331:2,12
**beds** 258:7,23 259:13
**began** 17:6 92:12 268:9,11
**beginning** 45:24 114:8 161:22 209:16 322:4
**begins** 46:16 218:9
**behalf** 8:11 16:17 17:3 33:9 40:10

49:20 58:11,20 94:21 141:15 160:5
**behavior** 80:19 295:11 299:16 334:2
**behaviors** 265:21 304:5 333:5 334:5
**beliefs** 25:8 157:19 222:24 329:1 349:14
**believe** 11:21 12:9 18:21 22:14 23:2 23:4 25:13 26:15 27:2 30:1 31:4,7 51:24 53:18 57:24 58:1 68:24 71:5,6 72:23 73:2 78:11 80:6 82:18 84:3 89:18 94:9 95:9 100:17 101:9 107:21 110:24 112:3 113:5 123:7 124:23 132:7 140:21,23 141:4 143:11 148:13 160:10 174:10,14 177:17,23 178:17 180:6,14 184:13 186:17,19 192:3 200:7,23 202:15 203:7 204:6,14 208:24 209:2 210:2 213:5 219:20 221:15 225:13,15 236:4 240:13 243:21 244:11,22 245:2 245:21 254:15 255:3,18,22 256:18 257:13

259:19 265:6,11
265:16,19 266:19
268:24 270:8
271:13 272:8
273:24 276:18,19
279:22 283:17
289:16 290:21
292:18 293:18
294:16 296:17
297:9 298:15
299:11 305:13
309:5 312:21
315:2 318:12,20
318:21 321:19
323:22 332:5
335:1 336:8 339:7
352:13 353:24
**benchmark** 272:7
**beneficiaries**
95:24 96:14,23
98:3 241:23
242:12 243:19
244:8,10
**benefit** 93:13
226:3 261:2
266:24 276:14
286:13,18 287:2,6
287:22 289:8
291:2 295:16
311:8 318:9 350:9
**benefits** 267:17
**bereaved** 273:16
**best** 21:14 24:20
42:18 43:6 45:1
54:17 150:9,9
166:22 183:8
360:8
**bet** 331:3
**better** 46:24 73:3
80:16,17 136:22
153:21 154:12,13

157:1 180:7
211:21 212:22
220:8 224:24
267:19 272:3
278:17 298:8
299:4 319:12
328:16 344:16
347:1,2 348:23
357:16
**beyond** 60:3,10,12
92:6 149:17 234:2
**big** 279:22 335:2
**bigger** 358:2
**biggest** 139:3
**bill** 150:21
**billing** 38:4
**billion** 244:23
**bills** 222:13
**biologic** 238:14
**biology** 235:7
356:15
**bit** 17:17 22:20
24:2 25:23 55:7
55:11 73:11 86:16
104:5 126:1
148:18 180:21
194:21 208:21
216:19 233:1
237:6 241:15
242:2,4 245:5
261:9 272:21
283:3 330:2 334:7
**blacked** 204:17
**blackouts** 204:12
**blade** 311:21
**blamed** 327:24
**blaming** 328:12
**block** 341:8
**blood** 124:5
**bloomberg** 138:15

**board** 296:16
297:4 298:13,19
**body** 90:9 91:4
**bone** 194:20
**booted** 94:8
**bottom** 38:20
46:11 89:21 233:4
241:16 307:14
323:23 326:19
**bought** 129:16
**boulevard** 2:6
**bound** 147:4
**bounds** 60:13
**box** 17:7,7,14,19
17:19 48:3
**boxes** 340:4
**boy** 30:3
**brain** 90:8
**break** 15:16,17
26:21 66:16,17
120:11 133:7,9,10
133:16 135:3,5
136:1 137:4
167:12 198:15
253:10,13 316:3
**breaks** 15:14,24
**bridge** 226:6
**bridgeside** 2:6
**brief** 133:7,9
183:9
**briefer** 149:9
**briefly** 19:10 21:9
28:6,21 43:23
60:17 138:18
245:3 253:13
281:19 348:21
**brilliant** 250:17
**bring** 31:14
**broached** 271:15
**broad** 148:7,7
233:19,19 272:23

287:20
**broader** 110:5
261:23 264:16
282:3 313:1
357:14
**broadly** 201:9
238:13
**broken** 187:22
**brothers** 273:17
**brought** 10:19,22
11:10 18:15 21:1
42:7 76:5
**brunt** 164:18
**budgets** 231:1
**build** 248:14
319:19
**building** 3:5
**builds** 257:1 318:2
**built** 343:5
**bullets** 107:8
124:12
**bunch** 219:10
328:15
**burling** 3:4
**burnett** 2:3 8:10
8:11,19 9:11 12:4
13:22 14:3,21
18:1 20:8 21:18
22:8,11 23:22
24:1 26:23 27:12
29:16 31:21 32:7
32:18,24 33:4,18
34:3 35:3,5,6,17
36:14,16,19 39:7
39:21,24 45:9
48:6,11 50:4,21
51:21 52:22 57:4
57:23 59:14 60:11
63:2,11,21 64:6
65:1 66:12 68:7
68:21 70:19 71:4

[burnett - cabell]                                                    Page 10

| | | | |
|---|---|---|---|
| 72:8 73:21 74:10 | 183:6 184:10 | 347:4,22 349:3 | 140:9,13 145:22 |
| 75:11,20 76:19 | 185:12,24 186:16 | 350:12 352:4,10 | 151:17 153:18 |
| 77:8 78:1,10 79:3 | 186:24 187:14,21 | 355:9,17 356:2 | 157:20 164:7 |
| 79:8 81:2,17 82:8 | 188:10,20 189:9 | 358:13 361:5 | 167:19 168:7,24 |
| 82:16,24 83:7,23 | 190:4,18 191:13 | **burnett's** 27:17 | 173:19 175:10 |
| 84:1 85:1 86:5,7 | 193:13,18 195:12 | 53:11 | 176:10 177:1,9,23 |
| 86:15 88:17 89:5 | 196:11 197:3 | **business** 28:12 | 181:7 182:24 |
| 89:13 91:22 92:19 | 198:16 199:5 | 279:16 | 184:2,9 185:6,22 |
| 93:4,18,22 95:8 | 204:24 205:7 | **businesses** 357:10 | 186:15,22 187:12 |
| 96:5,18 97:2 98:5 | 206:12 210:1 | **c** | 187:20 188:4,9,17 |
| 99:3,22,24 101:17 | 211:11 212:8,16 | **c** 5:17 7:1 9:16 | 189:3 190:3,12 |
| 102:1,21 103:17 | 213:22 214:2,11 | 49:1 100:14,19 | 191:11,21 192:11 |
| 103:21 104:6,15 | 214:16 215:3,13 | 101:12 131:12 | 192:16 193:8 |
| 105:2,7 107:3,20 | 215:19 217:6,18 | 132:18 134:23 | 198:2,6,9 199:2 |
| 109:1,11 110:12 | 219:6 222:2,23 | 135:6,22 176:4,5 | 200:14,23 201:12 |
| 110:20 112:1,13 | 223:6 230:15 | 291:18 336:24 | 201:15 202:24 |
| 112:15 113:3 | 231:5 232:8 235:2 | 351:20 | 203:4,15 204:22 |
| 114:20,22 115:14 | 237:4 246:18 | **ca** 2:21 361:24 | 206:10,14 209:3 |
| 115:16 116:11,24 | 249:11 251:6,18 | **cabell** 1:11 5:10 | 209:21 211:7 |
| 117:9 118:3 119:5 | 252:10 253:11 | 6:11 7:17 10:6 | 212:12 214:5,22 |
| 119:18 120:8 | 259:4 260:7,16 | 18:16 20:21 29:4 | 214:22 217:16,17 |
| 121:1 122:8,24 | 263:12 268:22 | 42:8 47:11 48:17 | 219:17 220:18 |
| 123:2,22 125:9 | 271:23 273:23 | 49:9 51:5,11 | 221:22 222:19 |
| 126:23 127:17 | 274:8,19 275:20 | 52:21 55:5 56:1 | 223:2,10 225:3,5 |
| 128:10,23 129:5 | 276:6 277:17,24 | 57:21 59:10 64:23 | 226:7 231:7 232:1 |
| 129:18 133:8 | 278:7,24 279:7 | 67:16,20 70:9,15 | 233:17 235:5 |
| 135:12 136:10,14 | 281:16 283:24 | 71:10 75:17 76:18 | 236:1,15,22 238:5 |
| 137:7,17 140:2 | 286:1 289:11 | 78:20 82:5 83:21 | 239:22 240:8 |
| 144:15 145:13 | 291:5,17 294:10 | 84:20 85:7,19 | 241:6,10 243:13 |
| 146:10,16 148:5 | 296:1 297:15 | 87:8 89:3,11 | 244:24 246:12,16 |
| 148:13 149:24 | 298:22 299:21 | 90:12 91:15 95:5 | 247:13 248:19 |
| 152:5 153:1,11 | 305:11 314:8 | 95:24 96:13 | 249:9,22,24 250:6 |
| 155:4,9,19 156:2,7 | 315:24 317:15 | 100:10,13 101:6 | 251:5,17 252:1,9 |
| 156:20 157:13,24 | 320:5 325:17 | 101:10 102:18 | 252:13 254:3 |
| 161:9 163:10 | 326:1 327:12 | 106:13 107:13 | 255:14 256:15 |
| 165:4,13 166:5 | 328:4,9 329:10 | 111:2,19 112:10 | 257:23 261:13 |
| 168:10 169:1,22 | 332:12 333:19 | 113:19 114:11 | 266:18 267:7 |
| 170:8 173:15 | 334:15 335:13 | 116:5,8 117:7,24 | 268:2,18 270:5,17 |
| 175:12 176:12 | 336:20 337:10,18 | 118:24 119:12 | 271:11 273:13 |
| 177:2,15 178:16 | 341:22 342:16 | 125:17 126:8 | 274:6,16 275:3,11 |
| 178:23 181:24 | 344:19 346:5 | 130:23 136:6 | 275:14,17 277:9 |

277:15,22 278:5
278:21 279:4,13
283:4,22 284:3
285:18,21 287:4
293:12 296:5
297:12 301:8
317:10,17 321:22
322:17 323:3,17
324:5,10 325:12
325:21 329:8
330:15,20 332:2
336:2 337:9
339:22 342:7
343:17,22 344:9
344:11 346:19
347:3,11 350:11
352:2 353:20
354:3 357:10
**cabinet** 129:17
283:1
**cabinets** 61:18
331:2,12
**calculate** 350:8
**calculus** 287:6
295:16
**caleb** 1:19 5:3,5,12
5:14,17 6:2,5,8
7:14 10:4 18:7
40:19 48:19,21,24
134:22 158:16
179:2,5 359:5
360:5 361:8 362:4
362:9 363:4,13
364:20
**calendar** 112:10
125:6
**california** 339:3
**call** 13:5,9 41:21
43:14 46:20 87:17
120:18 140:11
164:20 166:4,6,7

167:13 172:1
180:7 183:7 185:2
197:19 202:7,9,11
202:14,15,21
203:1 227:20
261:23 270:14
278:9 289:13
290:12 318:3
326:21 338:5
346:11 348:21
349:10 353:21
**called** 9:17 142:17
174:3 176:13
183:15 186:4,9
188:13,23 189:21
191:19,19 194:10
200:17 216:24
225:17 229:22
245:7 283:12,13
312:3 342:21
343:2 348:18
349:12,20
**callers** 354:12,15
355:4,6
**calling** 354:22
355:5,6,13,14,20
**callout** 216:17
**calls** 109:5 110:24
111:18,21,22
112:15 114:3
118:24 119:15
120:5,11 121:5
199:1,23 200:1,9
202:7,22 203:5
270:11 332:12
346:2
**campaign** 68:5
284:12 316:21
318:14,14,24
320:23 321:9,21
321:23 322:22

323:2,19
**campaigns** 91:24
248:8,9 284:15
319:17 325:8
**cancer** 130:7
250:22 272:19,20
277:11
**capacity** 256:1
257:18 259:1,10
260:5,15,19,23,23
261:17
**capita** 323:6,12,12
**capital** 71:13
**caps** 245:8
**caption** 359:6
**carbon** 99:10
**cardinal** 2:11 9:5
280:4
**care** 61:9 62:18
92:3 97:24 101:23
103:3,3 154:14
165:1 172:12
173:10 183:14
185:5,9,16,19
186:21 187:11
205:1 213:20
221:9,19 224:17
225:16,21 226:6
229:2,6,11,19,24
230:4,8,13,14
231:3 232:18
240:9 256:8 259:6
260:10 261:6
266:22 274:18
276:16 281:6
285:5,6 287:4
300:5,23 305:8
306:4 310:19
312:10,19 340:13
353:7,18

**careful** 324:12
326:24
**carefully** 44:5
75:23 101:1
141:18 173:1
176:18 192:21
209:1 211:22
234:15 256:3
301:10 310:4
313:10 324:17
341:3
**carey** 2:13 9:6
**carfentanil** 72:6
96:22 97:22 98:18
101:15 244:5
354:18
**carnegie** 2:18
**case** 7:20 10:7,11
11:3 13:3,6,19
16:17 18:15 19:13
19:16,22 20:7,12
20:20,24 21:5,17
22:15,22 23:1,5,16
26:21 27:24 38:4
38:15 40:11 42:5
42:19 43:1,10
44:1 49:12,20
50:12,15,22 51:9
51:16 57:19,20,22
58:7,12 60:3
68:17 70:10 77:24
78:3 80:6 82:19
83:5,19 84:16
88:5,10 93:10
94:22 97:11,14
101:9 115:19
117:17 123:1
130:7 132:20
138:13,20 139:7
139:19,20 141:19
142:2,7,19 143:10

143:11 145:20
146:2,8,14 153:18
156:18 158:11
159:7 161:13,13
161:15 163:6,20
163:23 164:7
167:6 168:9
169:19,23 171:2,6
171:18 174:3
184:22 186:17,23
194:23 196:1
200:6 206:16,20
209:2 217:19
222:18 223:1
226:24 235:23
240:13 255:24
256:18 257:23
261:19 262:2
265:11 269:2
271:17 279:16,21
280:1 295:13
296:17 299:14
319:15 323:11
353:24 361:6
362:3 363:3
**cases** 20:4 21:24
22:13,15 43:5
203:2 226:2
233:12,13 305:16
306:9 314:4,13
324:16 325:1
333:6,7
**categories** 124:4
161:4 162:20
163:3,7,22,23
168:23 169:12
174:4,21 175:19
180:2 181:5,20
182:18 183:5,24
185:14 186:6,11
187:17,24 188:12

188:22 189:21
190:8 191:15
194:3 208:19
235:13,16 265:23
329:18
**categorize** 184:7
**category** 164:6,11
164:23 171:5,9,13
171:16 172:6,7,11
172:18 173:12,18
173:23 175:5,10
175:15 176:6,9,13
176:20,24 177:4,8
177:13,16 178:12
182:19 183:9
185:2 187:23
188:23 218:15,24
219:5,8,13,14
225:17 266:2,9
301:20 339:14,17
351:15
**causal** 314:18
**causation** 51:9,13
54:3 55:12 62:2,5
64:9 65:19 66:6
95:13
**cause** 52:10 56:21
62:19 64:18,19
262:18
**caused** 51:3,10,11
52:4,19 54:4
58:13 64:3
**causes** 55:4 56:21
59:9 61:12 62:19
62:23 63:18 64:22
65:9
**caution** 70:5
**caveat** 54:15
**ccr** 359:20
**ccsapp** 246:9
247:19

**cdc** 306:16,24
307:22 308:3,11
313:4 314:7,11
315:1 318:7,13
**cdc's** 296:8 313:12
**cell** 7:7
**cellular** 7:6
**center** 2:18 80:15
189:17 221:22
302:1
**cents** 323:13
**certain** 51:19
58:18 165:15
177:22 194:3,3
217:23 251:20
258:2 262:13
293:2 309:21
354:2
**certainly** 24:17
25:3,11,18 54:15
79:13 88:8 90:16
90:17 95:23 97:14
128:2 145:23
213:10 229:21
233:14 234:13
239:10 245:22
266:22 282:20
295:19 319:15
358:8
**certainty** 54:3
55:3 56:21 59:8
64:22
**certificate** 363:11
**certification** 362:1
363:1
**certified** 360:17
**certify** 359:5,8,11
360:4
**chain** 280:20
281:8,13 282:5,8

**challenges** 213:15
232:23 234:1
358:1
**challenging** 358:3
**chance** 62:10
190:21 250:20,24
254:18
**change** 56:10
279:16 295:10
299:16 361:13,14
363:8 364:3
**changed** 44:8
95:11
**changes** 49:14
131:24 132:6,10
182:12 312:18
361:12 362:7
363:7,9
**changing** 286:21
**channeled** 252:14
**channels** 323:21
**chapter** 359:15
360:7
**characterization**
92:20 122:9
162:13 256:24
285:14
**characterize** 24:7
74:20,23 76:4
141:11 146:19
147:8 151:21
228:11 246:20
308:13 355:19
**characterized**
103:7
**characterizing**
74:22
**charleston** 2:15
9:5 337:17,22
**chart** 109:15

[charts - colson]                                                                    Page 13

**charts**  56:2 71:11
  272:11
**chase**  2:14
**check**  143:14
**checks**  303:5
**chemical**  99:1,14
  99:19
**chemically**  100:3
**children**  61:8
  80:13 116:4
  117:18 254:10,14
  254:17 255:5
  257:10 258:8
  321:1
**choices**  328:15,16
**choose**  220:16
  250:22
**chooses**  250:21
**chose**  152:19
  196:5 322:21
**christenson**  2:5
**christiana**  221:13
**chronic**  43:19 46:2
  47:4,10 73:7,11
  232:17 240:22
  267:22 306:18
  307:1 309:11
**chronically**
  239:21 240:16
**cigarette**  322:4
**cigarettes**  130:4
**circle**  27:14
**circulars**  324:8
**circulated**  228:22
**citation**  76:23
  81:10,21 106:17
**citations**  76:9
  106:21
**cite**  69:5,9 78:20
  81:18 83:2,14
  147:3,5 253:4

**cited**  77:13,13
  104:1,4 107:5,23
  112:20 135:10,18
  307:16
**cites**  104:8
**citing**  107:11
**citizens**  352:3
**city**  1:4 5:11,20
  6:11 7:15 10:6
  18:16 20:20 29:4
  42:8 47:11 48:18
  49:9 51:5 56:1
  57:21 67:16 71:11
  87:8 90:13 113:10
  116:6 119:12
  125:18 126:8
  130:23 140:9,14
  145:22 151:17
  153:18 157:20
  177:24 184:2
  191:23 192:11
  198:6,10 200:14
  200:24 203:4,16
  207:12,20 208:8
  208:17 209:3,21
  211:7 212:13
  217:10 218:1,19
  218:23 219:21
  222:9,18 223:2,12
  224:9 226:21
  227:10,23 230:4
  231:8 232:2 234:5
  235:5 239:22
  245:3 246:8 254:4
  255:19 257:23
  259:15,23 268:3
  270:18 272:10
  273:2 274:16
  275:4,12,14 284:3
  285:18,22 296:5
  301:17 321:22

  323:3 324:10
  336:2 337:17,21
  339:19,21 342:7
  344:4 347:12
  352:2 357:21,22
  358:5 361:6 362:3
  363:3
**city's**  317:22
**civil**  1:6,13,20
  362:5 363:5
**claim**  216:21
**clarified**  117:12
**clarify**  123:14
  141:23 182:7
  315:21
**clean**  336:6
**clear**  32:8 34:1
  36:12,22 42:22
  46:17 87:10 91:12
  124:2 141:1
  152:17 165:21
  187:10 193:15
  196:22 216:22
  244:1 261:14
  275:13 290:18
  306:10 324:16
  336:9
**clearly**  156:21
  215:15
**cleveland**  361:2
**clinical**  212:23
  220:9,11 274:24
  293:24 310:7
  311:8 314:13,14
  315:14
**clinician**  225:9
**clinicians**  270:10
  270:17 281:6
  297:21 299:4,23
**clinics**  340:8

**clinton**  138:22
  150:14,20,21
**clock**  133:15
**close**  99:1,19
  280:15
**closed**  337:16,22
**closing**  151:5,8,10
  152:1 154:6 157:9
  248:13 337:20
**cmes**  298:18
**coach**  220:14
  224:20 225:8
**coaches**  254:22
**coal**  234:23
**coalition**  248:19
  248:23
**coalitions**  247:1,6
  247:9,21,24
  248:17
**cocaine**  87:13
  116:10 117:8
  355:8
**code**  359:16 360:7
**cognizant**  45:4
**collaboration**
  221:9
**collaborative**
  246:16
**colleagues**  19:4
  28:9 29:13,19
  34:9,23 37:6
  136:11 202:12
  205:21
**collecting**  327:15
**collection**  332:3
  346:20 347:2
**colloquial**  212:10
**colon**  250:22
**colson**  29:1 30:23
  31:20 33:10

**come** 14:14 19:2,3
19:6 38:12 90:10
136:18 231:1
253:14 299:19
300:10 322:24
329:14
**comeback** 84:20
**comes** 13:13
**comfortable** 166:2
197:8,22 347:13
**coming** 90:11
159:20 352:7
**comment** 36:6
**commentary**
194:18
**commented** 320:8
**comments** 312:16
**commission** 1:11
7:17 18:16 359:17
362:19 363:25
364:25
**commissioned**
359:5
**commitment**
143:24
**committed** 23:16
313:19 315:11
**committing** 310:2
**common** 121:6
122:4 129:1
**commonly** 354:14
**communicate**
13:18 14:8 25:8
**communicated**
25:12
**communicating**
335:7
**communication**
13:21 205:16
300:9 320:1
343:23

**communications**
14:10,13 39:10
**communities** 5:22
58:2 84:5 111:9
162:12 163:5
164:17 187:3
207:23 208:10
210:6,12 247:7,22
248:15 326:5
331:13 347:8,16
**community** 37:22
38:22 51:4,4,23
52:21 56:3 58:14
63:20 67:13,15
68:15 71:16,22
79:21 84:4,22
85:20,24 86:4,14
86:19 88:1,11,12
88:14 92:2,9
96:10 100:8 110:7
117:20 125:23
130:3,4 140:7
147:11,12,14,21
160:22 163:13
164:8 171:10
181:15 183:2
184:7,20 185:2,3
186:14 199:3
208:19 209:6,19
210:5,10 211:10
211:16 213:9,14
216:1,5 218:11
220:3 222:15
224:4,15,16,19
227:15 228:7,12
228:13 230:19
231:23 232:14,23
242:22 245:7,24
247:1,4,20,24
248:6 249:10
250:6 256:4 257:2

258:10 259:9
267:10 285:13,17
285:21 286:18
296:16 298:20
299:9 304:3
308:10 327:9
329:5 330:15,22
341:16,20 344:7
345:16 346:15,18
347:8 348:15
350:20 351:3,9
352:6,8 357:17,24
358:12
**community's**
213:19 234:17
**comparative**
109:9
**compare** 90:6
165:24 166:11
**compared** 99:5,13
**comparison**
165:12
**compartmentalize**
97:6
**compelling** 37:20
99:8
**compensated** 38:8
**compensation**
19:15
**competencies**
299:2
**complete** 49:19
50:3 160:20 200:3
**completed** 361:15
**complex** 109:22
152:13 153:17
154:22,22 238:9
238:12,20 326:20
356:24
**complicating**
232:5,15 233:10

**complied** 168:3
**component** 177:7
190:12 228:3
229:23 244:14
299:8 351:5
**components** 131:1
243:7 301:20
325:6 350:15
**comprehens**
160:20
**comprehensive**
126:10 148:8
151:2 160:21
162:8 168:21
201:7 208:6
210:13,17 212:18
215:1 223:23
246:15,21 287:9
289:18 290:16
297:17 307:15
317:20 319:14
324:12 327:14
328:24 330:3
331:7 344:7,21
346:9 348:4 350:3
**comprehensively**
144:1 214:8
**comprised** 144:11
348:9
**compulsions** 103:8
**computer** 12:14
**concept** 171:17,18
171:19 172:16,20
175:16 177:5,17
191:17
**concepts** 174:5
186:3 187:7
189:11,12,19
**concern** 24:3
71:19 73:12 74:18
74:21 75:3 113:10

119:10 128:2
194:21 224:23
272:22 274:22
303:6,8 308:14,19
309:17 310:9
311:23 314:18
**concerned** 32:4
159:1
**concerning** 84:21
**concerns** 25:8
32:3 80:3 127:19
266:22 324:21
**concert** 138:22
**conclude** 67:12
102:8 122:14
**concluded** 41:22
67:19
**concludes** 358:19
**conclusion** 62:21
110:5 124:9
130:21 314:20
342:1
**conclusions** 63:18
118:16 176:19
266:21
**concordant** 273:3
**concrete** 310:10
**condition** 46:2
332:9
**conditions** 241:10
279:6 332:20
**conduct** 91:24
206:18 212:18
213:7 248:8
270:12
**conducted** 15:6
126:13 318:14
319:18
**conducting** 350:1
**conference** 7:23
202:24

**conferences** 25:11
132:9 206:19
**confess** 199:17
**confidence** 202:8
**confident** 173:7
**confirm** 21:11
44:6 53:5 68:10
69:6 77:11 83:11
105:8 135:17
142:15 193:2
196:8 197:12
222:17 279:24
336:14
**confirmation**
196:23
**confirming** 77:10
104:7 107:4
197:22
**confused** 226:22
343:18
**connected** 354:8
**connecting** 164:24
172:11 173:9
185:5,8,16 186:20
187:11 353:7
**connection** 19:15
21:5 22:6,24
68:16 84:15 88:4
132:19 200:5
255:15 273:10
277:5 337:7
**connections** 260:1
319:1
**consensus** 27:20
34:18
**consequence**
310:3
**consequences**
310:5 313:12
315:7

**conservative**
174:23 175:2
**conservatively**
325:2 343:6
**consider** 24:16
51:23 55:22 60:17
61:12 80:13,13
163:13 171:18
210:22 228:9
235:11 255:10
301:13 312:23
**considerate** 338:4
**consideration**
58:24 191:3
192:21
**considerations**
312:24
**considered** 42:9
50:6 62:20 69:4
135:1 171:20
181:14 187:6
229:16 248:23
256:3 259:6
283:17 324:17
**considering** 89:16
159:3 175:4,4
255:7 272:6
276:16 301:2
334:19
**consistencies**
139:18
**consistent** 38:18
45:13 57:1 146:1
**constantly** 286:21
**constitutes** 330:3
**constraints** 345:15
352:13
**construction**
234:24 343:18
**consulted** 49:2
132:19 133:3,21

**conservative**
134:18,24 135:11
135:21
**consulting** 28:12
**contact** 166:19
**contacts** 231:22
**contained** 63:8
65:3 135:9
**containers** 340:6,6
**contains** 50:5
161:3 315:4
**contd** 3:1 6:1
**contend** 232:5,15
**content** 33:21
34:22,24 35:4
45:16 165:14,24
183:16 218:22
289:17
**contest** 310:20
**context** 59:22
85:11 93:7 126:14
192:5 194:19
196:4 197:21
253:5 315:14
**contexts** 242:2
302:18 311:24
**contextual** 140:12
235:4 237:11
**continue** 7:11
24:12 75:5 183:22
**continued** 67:1
94:2 110:10,18
138:1 170:5
198:20 253:21
255:9 310:17
316:8 338:11
351:4
**continues** 88:2
124:19,24 125:3
128:22
**continuing** 294:15

continuum 281:6
contours 24:19
271:3 328:21
contrary 45:6
contrast 80:2
140:8
contrasting
235:14
contributed 51:10
51:19 52:19 54:4
265:18
contributing 55:4
63:18
contributions
62:19 75:1 90:2
contributor
356:11
control 209:16
214:7,24 216:2
301:6 315:12
344:6 345:24
controlled 297:5
conversation 7:6
32:2 33:19 37:24
89:18 98:15
265:15 270:24
271:8 276:8,11
300:21 313:1
327:22
conversations
29:12 30:12,13,19
32:20 34:15,21,22
34:24,24 35:9
36:10 37:5 202:3
204:7 271:14
coordinating
342:9,22 347:19
348:8 349:9
350:10
coordination
343:4,16,21

344:16 349:22
coordinator 226:9
copies 10:23
copy 10:24 11:10
18:21 39:21 76:6
core 299:1 301:20
corners 151:20
corporate 222:5
corporately
221:16
corporation 1:8
1:14 3:2 7:17,18
9:3 222:7 280:4
361:6 362:3 363:3
correct 10:8,12
12:2,3 16:15,16
18:24 20:21 21:2
21:6 24:9 25:15
25:24 33:3,12
36:5 45:1 46:18
46:20 51:6,20
59:13 63:1 66:8
67:17 75:21,23
76:6 77:3,16
79:23 80:1 81:1
82:7 88:6,7,16
91:21 92:15 93:17
96:4 99:2 101:24
109:10 111:24
115:8 120:9
121:14,20 123:5
123:17 124:14,22
126:21 136:8
138:16 140:19
141:3,15 148:12
157:23 159:5
160:6,17 162:23
171:14,15 172:9
173:13 175:11
177:14,24 178:5
181:23 183:5,23

184:9,11 186:23
187:13,15 188:22
189:8,24 190:3
192:8,17 193:6,12
193:24 194:8
195:3 198:7,12
200:22 210:15
211:1 219:5,15
220:3,20 222:11
222:21 223:14,16
223:20,21 227:7
227:11 233:18
238:7 239:13
241:19,24 244:9
245:1 246:4 252:2
257:12 260:6
261:7,19,22
262:20 263:5,14
263:15 264:9
265:24 266:4,15
268:19,20 271:22
273:13,14 275:19
276:5 279:17
280:11,20 282:11
283:1 285:8
288:24 289:9
295:20 296:9
298:14 299:13
303:18 305:1
307:14,19 308:12
308:24 312:12,14
318:11,19 321:24
322:5,11 323:21
324:6 329:9 332:4
335:24 336:18
339:4,22 346:4
347:21 349:10
351:3 353:23
354:20 355:2,15
correcting 328:19

corrections 361:12
363:17
correctly 86:22
128:22 144:13
307:10 359:9
cost 58:17 60:7
178:4,13 180:4
181:10 184:7
185:8 186:13,22
187:12,19 188:4,8
188:9,17,18 189:3
189:6,24 190:13
190:17 191:9
193:6 194:6 195:5
244:17 291:11,13
321:8,20,23
322:20,22 323:6
323:11,12 338:16
338:24 339:10
costing 325:5
costs 175:3 180:18
180:23 181:4
182:14,21 183:24
184:1,23 189:15
190:7 322:8,10
323:24 340:16,19
340:20,21,22
341:1 343:5
347:20
counsel 8:7 9:5
11:24 12:5 13:18
13:23 14:2,8,14
18:24 19:19 22:6
26:23 27:7 28:8,9
29:8,12,14 30:10
30:12,14,21 31:21
32:1,6,10,12,14
33:11,15,20 34:3
34:10 35:16,20,20
36:10,24 37:5
39:10 45:9,21

| | | | |
|---|---|---|---|
| 50:6,12 52:22 | **country** 84:5 | 188:4,9,17 189:3 | 301:8 317:11,17 |
| 57:4,15 61:4 63:2 | 175:22,24 209:21 | 190:3,13 191:12 | 321:22 322:17 |
| 65:15 66:12 76:19 | 234:1 237:3,17 | 191:22,23,24 | 323:3,17 324:6,10 |
| 78:10,10 79:3,3 | 250:19 257:24 | 192:11,17 193:8 | 325:12,22 326:15 |
| 83:8 103:23 | 296:22 297:19 | 198:2,6,6,9,10,10 | 327:16 329:8 |
| 104:15 113:3 | 343:15 | 199:3 200:14,24 | 330:15,20 332:3 |
| 118:3 132:5 133:8 | **county** 1:11 5:11 | 201:12,15 202:24 | 336:2 337:9 339:2 |
| 133:13 148:20 | 6:11 7:17 10:6 | 203:4,16 204:22 | 339:3,19,22 |
| 149:24 153:1,1 | 16:23 18:16 20:21 | 206:10,15 209:3 | 340:13 342:7 |
| 155:9,15,19 156:7 | 29:4 42:8 45:13 | 209:21 211:7 | 343:17,22 346:19 |
| 156:11,20 157:24 | 46:5,6 47:5,5,11 | 212:13 214:5,22 | 347:3,11 350:11 |
| 161:9 165:13,18 | 48:17 49:9 51:5 | 214:22 217:17 | 352:2 353:20 |
| 166:13,17 168:10 | 51:11 52:21 55:5 | 219:17 220:19 | 354:3 357:11,20 |
| 168:17 170:10 | 56:1 57:21 59:10 | 222:9,19 223:2,11 | 359:2,4 360:2 |
| 181:24 185:24 | 64:23 67:16,20 | 223:13 225:4,5 | 362:10 363:15 |
| 193:13 196:11,21 | 70:10,15 71:10 | 226:8 227:23 | **county's** 317:22 |
| 197:3 201:21 | 75:17 76:18 78:20 | 230:4 231:1,8 | **couple** 98:21 |
| 202:1 203:3,21 | 82:5 83:22 84:20 | 232:1 233:17,21 | 107:7 114:8 |
| 204:16,20,21 | 85:7,19 87:8 89:3 | 233:22,23 235:5 | 177:19 262:7 |
| 205:17 213:22 | 89:11 90:12 91:15 | 236:1,16,22 238:5 | 311:1 331:15 |
| 214:16 215:3,13 | 95:5,24 96:13 | 239:22 240:8 | 352:21 353:5 |
| 217:6 273:23 | 100:10,14 101:6 | 241:6,10 243:13 | **coupled** 290:14 |
| 274:4,8,19 291:17 | 101:11 102:19 | 244:24 246:12,17 | **course** 11:20 |
| 291:22 315:24 | 106:13 111:2,19 | 247:13 248:19 | 13:11 16:9 27:7 |
| 328:4,7 338:4 | 112:10 113:10,19 | 249:9,22,24 250:6 | 41:17,19 47:16,16 |
| 342:16 358:13 | 114:12 116:5,8 | 251:5,17 252:1,9 | 76:8 132:17 |
| 359:12,13 | 117:7,24 118:24 | 252:13 254:4 | 145:21 170:18 |
| **counsel's** 20:18 | 119:12 125:18 | 255:15 256:15 | 193:5 206:22 |
| 37:10 | 126:8 130:23 | 257:23 259:16 | 234:15 253:2 |
| **counseling** 176:21 | 136:7 140:9,9,13 | 261:13 266:18,19 | 289:6 297:1 |
| 181:18 189:1,7 | 145:22 146:8,9 | 267:7 268:2,18 | 304:11 323:20 |
| 190:1 254:21 | 147:6,6,9 151:17 | 270:5,17 271:11 | 354:16 |
| **counterfeit** 228:21 | 152:11 153:18 | 272:10 273:2,13 | **courses** 298:11 |
| **counties** 16:19 | 157:20 164:7,12 | 274:6,16 275:3,12 | 299:4 |
| 21:2 22:16 160:15 | 167:19 168:8,24 | 275:14,17 277:10 | **court** 1:1 7:19 8:1 |
| 160:16,23 161:2 | 173:19 175:10 | 277:15,22 278:5 | 9:13 42:6,12 |
| 162:2,11 163:2 | 176:10 177:1,9,23 | 278:21 279:4,14 | 49:23 96:2 156:12 |
| 165:3 167:21 | 180:19,19 181:7 | 283:5,22 284:3,10 | 156:17 161:12 |
| 185:1 196:24 | 182:24 184:2,9 | 285:18,22 287:4 | 168:12 169:9,23 |
| 197:14 | 185:6,23 186:15 | 293:12,18 296:5 | 198:5 235:23 |
| | 186:22 187:13,20 | 297:12 298:4 | 236:13 245:9,13 |

245:15,20 246:3,4
344:9 362:7
**court's** 15:10
169:3
**courts** 28:6 38:21
58:2 112:5 245:22
260:19 273:6
327:17
**coverage** 13:5
312:11,20,23
**covered** 165:15
183:11 196:14
225:13
**covid** 12:11 111:6
119:2
**covington** 3:4
**cracks** 225:22
**create** 231:23
357:16
**creating** 319:2
**crimes** 250:13
**criminal** 250:10
251:2 252:14
**crisis** 5:10 48:17
49:9 162:23 211:9
234:21 343:11
**criteria** 91:17
**criticism** 312:9
**criticisms** 212:11
**cross** 143:14 167:9
307:7
**crr** 359:20
**crushing** 101:19
**crystal** 84:19,22
86:1
**csmp** 297:4 302:11
302:24 303:5,18
304:6,9,17,21
**ct** 166:18
**cure** 235:24
236:14

**current** 59:23 72:4
84:21 86:1,3
89:10,19 139:12
165:8 166:11
168:14,17,19
169:6 256:8 258:5
259:6 260:9 261:5
266:17 267:4,6
268:17 272:22
280:7 296:4
307:18
**currently** 67:13,20
88:14 89:3 104:10
135:20 190:9
226:12 241:19
242:18 246:6
257:22 259:14,14
273:12 274:17
275:15 284:10
337:3 348:2 350:7
351:18
**curricular** 298:16
**curriculum**
131:21 299:1
**customized** 323:15
**cut** 78:13 92:24
328:10
**cuyahoga** 16:19
16:23 21:1 22:15
45:13 46:6 47:5
146:8 147:6,9
160:16,23 162:10
163:2,21 164:20
169:14 180:19
184:24
**cv** 131:23 132:15

**d**

**d** 2:3 5:18 7:1 9:16
131:12 132:21
135:20 292:4
361:5

**d.c.** 139:13 312:3
**dads** 273:17
**damage** 326:3
**dangers** 325:13
**dashboard** 345:23
346:2
**data** 5:7 68:10,18
68:20 70:14,22
71:1,6 73:16 74:3
74:13 75:17 76:2
76:12,16,24 77:3
77:13 81:13 82:1
82:6 87:22 105:19
106:2,4,11 107:17
108:13,17,21,22
109:5,20 110:1,8
110:17,24 111:23
112:3,7,11,18,19
112:19,24 113:1,7
113:8 114:8
118:23 119:8,9,24
120:4 121:13,17
122:18 125:17
126:16 127:2
128:7,11,11,12
129:13,20 130:21
214:8 215:1
252:24 253:1
268:2,24 270:1
273:9 278:2
293:12,14,17
294:22 301:21,22
327:16 342:12
344:7 345:10,10
345:12,23 346:1
346:20 347:2
348:10 349:23
350:3
**database** 302:11
303:5 304:17

**databases** 269:22
**date** 19:20,20 20:4
45:1 76:1 211:23
212:6,20 222:21
286:9 297:18
339:12 344:22
346:10 361:8
362:3,9,19 363:3
363:13,25 364:20
364:25
**dated** 5:3,6,8,12
5:22 6:4 18:7
40:21 48:19 49:10
105:1,21 158:19
179:21,22 207:24
208:10
**dates** 160:9 200:16
206:24 207:4
**daughters** 273:18
**david** 2:3 3:4 8:11
12:3 22:10 29:16
145:11 166:18
167:11 361:5
**day** 1:21 13:6 39:3
73:12,12 92:23
156:13 201:6
332:2 333:16
335:20 358:14
359:17 360:10
362:16 363:22
364:22
**days** 201:6 331:16
361:18
**de** 95:16
**dea** 331:16 332:1
341:6
**dead** 130:5
**deal** 37:12 335:2
**dealers** 102:14
**dealing** 88:15
210:7 277:10

**dear** 361:10
**death** 128:17
  315:15
**deaths** 5:8 71:2
  73:19 75:9,15,19
  76:17 82:4,15
  83:3,4,21 104:24
  105:20 106:13
  107:14 108:15
  109:4,6,8 110:2,10
  110:19 111:10
  112:9 121:8,12,17
  122:1,4,5,21 123:9
  123:13,16,20
  124:9,10,18,21
  125:13 126:22
  127:15 129:2
**decide** 223:15,18
  223:20 295:5
  353:15
**decided** 223:4
**decides** 333:14,16
**deciding** 305:24
**decision** 269:11
  276:14 305:5,7
  306:9,13 333:17
  352:5
**decisions** 271:12
  276:23 305:16
  333:8 348:14
**decline** 52:12
  70:16 71:2 76:16
  106:12 107:14
  122:2 128:22
  234:23
**declined** 272:9
**declines** 71:7
  110:2 130:18
**declining** 5:8
  105:1,21

**decrease** 67:24
  68:2 69:18,19,23
  69:24 108:15,18
  108:23 109:10
  110:10,18 129:3
  236:3,6
**deed** 362:14
  363:20
**deemed** 361:19
**defendant** 2:11,16
  3:2 7:15 9:2
**defendants** 1:9,15
  1:19 9:17 28:23
  33:10 50:12
  279:15,21 280:3
  338:5
**defense** 166:23
**defer** 86:2 88:15
  88:19
**deference** 88:20
**deficient** 212:5
**defining** 162:9
**definitely** 206:17
**definitive** 26:13
**definitively** 101:3
**degenerative**
  278:8,14,23
**degree** 54:2 55:3
  56:20 59:8 64:21
  172:2 187:24
  188:21 282:7
  315:15,17 337:11
  356:22
**degrees** 256:18
**delaware** 221:14
**delineate** 65:19
**delineation** 144:7
**delivery** 289:21
**demand** 234:19
  242:8

**demonstrated**
  24:6
**demonstrates**
  139:4
**dentists** 288:23
  301:3
**department** 68:18
  70:14,23 72:3
  73:17 74:4,14
  77:1,14,21 81:11
  81:12,24 83:14
  104:2,23 106:2
  107:12,18 108:12
  108:19 111:20
  115:12 116:9
  117:7,19,21,24
  120:16 124:16
  154:15 220:13
  242:23 340:12
  344:12 361:22
**departments**
  114:12 185:17,20
  340:11
**depend** 45:14,15
  92:16
**depends** 228:10
  311:9,22
**depicted** 188:1
  190:9 225:6
**deploy** 127:22
**deployed** 226:5
  238:1 240:6 257:2
  284:2,10,16 290:9
  319:10
**deployment** 221:6
**deponent** 9:12
  20:16 21:22 22:10
  33:23 36:18,20
  40:5 77:12 118:7
  137:13,19,21
  141:5,7 145:11

  170:18 303:20
  323:7 358:17,23
**depose** 62:10
**deposition** 1:19
  5:3,4 7:9,14,22
  10:20 11:19 12:24
  13:14,21 14:9
  15:6,13 16:14,17
  16:23 17:1,20
  18:5,6,9,15 19:13
  27:24 28:3,18
  29:6,22 30:16,20
  31:23 32:5 34:11
  35:13 37:9,13
  39:22 40:3,6,8,15
  40:18,19,23 41:3,6
  41:15,21,22 42:17
  42:21 43:9 44:22
  48:15 49:4 53:24
  54:11 57:1,5,13
  67:15 79:6 84:15
  85:16 88:3,5
  103:18 105:17,23
  106:8 107:10
  156:13 158:8,15
  158:21 161:12
  166:20 168:2
  179:1,9 190:23
  196:15 199:15
  203:13,18 205:2
  207:19 208:3
  276:20 292:3,6
  358:20,22 359:5,9
  359:13 360:4
  361:8,11 362:1,3
  363:1,3
**depositions** 14:6
  16:22
**depression** 315:16
**depth** 230:11

**derive**  180:23
270:2 295:5
323:15
**describe**  72:22
319:22
**described**  139:9
234:18
**describes**  108:11
210:20
**description**  234:17
**design**  52:3 55:21
59:18 66:6 91:8
126:9 237:13
294:22 320:14
**designed**  226:4
235:10 237:12
299:8,20 313:6,10
313:14 320:20
322:3 337:4
355:23
**designing**  54:22
66:2
**despite**  326:20
**detail**  32:5 151:15
157:19 176:2
190:22 191:1
247:16 267:24
280:22 283:19
284:8 301:11
**detailed**  118:11
268:1
**detailers**  289:2
290:6 291:7
**detailing**  290:20
291:10 293:1,21
294:4 295:15
301:19 302:1,6
304:2 307:16
**details**  182:17
221:12,18 227:5
270:23 271:7

276:11 298:16,23
312:15 341:11
**detected**  121:5
**detection**  345:22
**determinants**
238:9,12,15,16,21
356:24
**determine**  261:15
269:6
**determined**
258:22 263:9
279:12 352:6
**determines**  332:24
**devastating**
103:11
**develop**  147:10
182:13 229:5
238:11,24 239:7
239:17 240:1,5,11
240:19 241:4,17
242:13 243:18
244:6 249:17
268:23 348:3
**developed**  95:19
96:8 180:10,11
256:5
**developing**  153:24
209:23 227:24
233:13 234:15
336:4
**development**
289:23
**develops**  240:14
**device**  12:15
**devious**  264:13,20
**devoted**  23:4 26:3
64:11 345:7
**dhhr**  5:7,7 105:18
105:19
**diagnostic**  91:17

**dichotomy**  86:17
86:24 126:2
**die**  120:21 121:4
**died**  61:9 130:20
273:18 328:13
**difference**  34:21
105:6
**different**  14:6 20:3
53:13 57:22 64:12
64:20 65:5,9 75:1
75:2,2 80:21 87:5
90:3 97:9 100:4
102:15 109:20
120:11 150:5
152:8 161:23
167:18,21 175:22
175:24 177:4
180:21 184:18
186:6 187:3,4
195:10 204:6
209:13 236:10
237:7 242:2
248:10,15 249:6
251:13 259:21
260:2 276:10
278:10 284:2
286:16 294:23
296:15 314:17
319:9,10 324:13
324:17 325:5
335:18 339:13
341:3 343:8
346:12 352:7
**differentiate**  35:19
**differently**  39:3
175:24 308:14
**difficult**  340:1
**diligently**  289:22
**dimension**  357:15
**dimensions**  140:12
145:24 231:9

255:12 274:24
**diminish**  345:14
**diminishes**  87:24
**diminishing**
126:16
**direct**  38:20 63:14
102:12 107:1
340:15
**directed**  155:15
284:13,22 316:21
**direction**  161:18
168:3
**directly**  9:8 12:4
23:9,10 38:12
98:20 282:15
303:15
**director**  226:8
342:12 348:9
**directors**  99:7
**dis**  194:16
**disaggregate**  91:7
92:10 242:17
243:7
**disaggregating**
90:2
**disagree**  73:16
74:7,13 84:24
109:24 146:17
151:24 152:7,24
153:7,8 154:21
157:8,15,23
166:10 167:2
216:20
**disagreeing**  82:3
**disagreement**
27:21
**discernible**  124:5
**disclose**  20:14
21:19 33:21 39:9
**disclosed**  20:11,19
20:23 21:4,8,15,21

22:1,14 347:9
**discontinuation**
310:12
**discover** 167:7
**discretion** 305:8
**discuss** 20:15 33:8
51:2 53:17,20
55:15,15,19 58:12
61:10 63:17 74:24
87:16,17 98:6
151:15 157:16
173:9 184:3
280:14 288:5,7
290:13 291:8
343:23
**discussed** 30:22,23
34:2 59:16 89:16
89:18 97:10
110:23 125:24
129:21 155:5
158:11 190:20
195:16 242:1,14
249:2 254:9,19
266:3 281:19
287:15 301:12
305:13 306:17
325:7 336:2
337:11 345:18
346:3
**discusses** 53:12
120:17 157:18
**discussing** 61:15
238:21 245:4
280:16,23 303:22
**discussion** 33:22
52:10 94:1 95:13
95:14 106:15,18
109:15 124:13
128:15 166:13
170:9 171:5
172:21 185:8

218:9 254:2
261:23 338:10
353:9
**discussions** 32:9
32:11,13,16 34:8
34:10
**disease** 73:7,7,11
80:20,22 130:7
151:1 154:2 278:8
278:10
**diseases** 232:17
**disorder** 73:6
80:10 91:16,18
92:10,11 93:15
94:24 95:6,20
96:9 127:21,24
128:5,8 147:3
152:12 153:24
154:3 191:6
208:22 209:5,5
210:4,5,7,23,24
211:9,9 212:24
216:4,4,5 218:12
231:12 234:3,3
235:24 236:1,7,15
236:15,18,20,21
238:23,24 239:1,1
239:7,16,16
240:11 241:4,5,18
242:10 243:14,15
243:19 250:12
257:22 288:14,15
288:17 298:5,9
356:8,9,20
**disorders** 144:10
145:4 220:10
231:18 239:8
244:6 249:18
250:12 255:2
356:23

**disparaging** 221:2
**dispensed** 277:9
277:14,21 278:4
278:22 279:5
**dispensing** 303:7
**display** 266:6
**displayed** 46:17
134:4 135:20
**disposal** 330:6
338:17 339:8,18
339:21 340:6
341:2 342:6
**dispose** 334:9,12
334:14
**disposed** 61:18
**disposing** 335:9
**disprove** 165:17
**dispute** 169:8
**disseminate** 25:4
138:23
**disseminated**
140:23
**disseminating**
285:12
**dissimilar** 53:11
180:12
**distribute** 60:20
**distribution**
282:18
**distributors**
279:15,19 280:2
280:17 282:15
303:1,3 304:18,21
**district** 1:1,1 5:5
6:3 7:19,20 40:20
41:5 158:18
**diversion** 250:8
280:19,19 281:7
281:12,18 282:4,7
282:10,11,21
334:6,7,18

**diverting** 250:9
281:14
**divvied** 224:2
**docs** 288:19
**doctor** 7:14 9:21
10:1,15 11:9
12:10 13:8 14:12
14:17 15:5 16:1
16:10,15 17:5,22
18:18 19:17 20:8
20:17 21:18 27:9
27:16 28:12,22
31:22 32:8 33:12
34:1 35:5,18 36:3
36:16,22 38:2
39:7,15 40:13
41:1,7 42:5 43:13
44:14 45:21 47:3
47:15,20 48:3
49:6,11 50:11,13
50:23 53:8 54:24
56:9 57:18 60:1
61:13 62:9 63:14
65:7 66:17 67:5
69:14 75:21 76:13
76:23 77:8,16
78:11,13 79:6
81:9,21 82:2,12
83:6,16 85:3,18
86:14 89:9 92:24
93:4,8 94:16
98:22,23 100:6
101:5 103:24
104:6,20 105:11
105:24 107:1,9
108:18 112:12,14
113:6,16 114:22
116:16 118:2,18
118:22 120:16
123:4 128:6
130:24 131:19,23

[doctor - duct]

132:23 133:17
134:5 135:4 138:6
138:10 140:17
141:23 145:5
147:22 149:5,17
149:21 150:16
152:15 155:6,13
156:13,18 157:4
158:10 159:17
161:6 162:3 164:3
167:5 168:1,20
169:17 170:8,22
173:3 177:19
179:17 186:18
191:21 193:19
197:1 198:24
202:11 203:10
205:21 206:15
207:7 214:4
217:13 218:3
219:3 222:16
224:12 232:22
234:9 244:1
245:11 249:19
254:1 258:18
262:1,13 263:1
264:15 266:12
269:3,7 270:8,19
270:20 271:8
273:24 275:22
276:2,12,16
279:24 281:1
290:2 291:22
292:14 294:24
295:4,20 296:7
298:10 302:14,15
303:9 305:8
306:16 312:4
316:12 317:7
321:12 325:20,24
327:6 330:7,11

331:15 332:6
334:3 335:21
338:16 342:20
349:1 352:23
353:7 356:1,6
358:16
**doctors** 264:20
285:6 287:3
294:24 295:4,9
318:8 340:8
**document** 17:13
17:15 36:8,9 37:4
37:7 41:8 46:11
50:8 53:2 68:23
69:7 73:22 74:11
74:16 81:18,19
83:1,12 103:13
104:1,8,11,16,21
105:8 106:21
107:4 108:1,11,17
113:15 114:23
118:5 121:2,3
122:9 123:3,8,10
123:23 125:10
126:24 134:21
136:23 149:23
174:8,9 207:12,13
209:8 210:14
217:11,15,21
226:18,19 227:6
227:21 228:5
230:17 232:9
234:6,8,13,14
236:23 245:4,5
246:8,11 248:23
291:20 357:23
358:5
**documentary** 29:2
29:3 36:4 37:16
84:7,11

**documents** 17:7
17:19 131:11
133:11 178:24
182:4 194:12
195:1 234:10
251:12 358:6
**dog** 131:13
**doing** 14:24 15:12
16:4 38:14 57:17
58:22 133:14
140:17 160:12
165:12 168:18
281:13 295:10
336:24 355:3
**dollar** 190:16
194:6
**dollars** 331:3
**domain** 327:4
**domains** 148:7
**donated** 227:4,7
**door** 331:8,9
**dose** 154:16
332:18
**doubt** 127:18,18
234:4
**doughnuts** 331:3
**douglas** 2:13 9:6
**downtown** 11:20
**dozens** 78:2 79:17
209:17 251:11
284:1
**dr** 1:19 5:3 18:7
359:5 360:5 361:8
362:4,9 363:4,13
364:20
**drafts** 27:1,7
**draw** 130:21
264:11 266:21
272:23 307:11
**drawing** 314:18

**drifting** 167:8
**drive** 31:16 35:11
333:5
**driven** 56:8 73:5
153:19 262:24
**driver** 265:20
**drivers** 64:13
289:24 334:2
**driving** 75:5,18
**drop** 130:5
**drug** 1:7,14 7:16
7:18 9:3 68:20
77:20 101:11,14
101:18 102:18
106:5 108:14
109:16 120:18,22
120:24 121:5,6
124:20 127:1
208:22 209:15
214:7,24 216:2
238:6 245:9,13,15
245:20,22 246:3,3
260:19 280:4
281:18 282:6
301:5 311:22
325:10 330:5
337:5 338:17
339:7,18,21 341:1
344:6,9 345:24
355:7 361:6 362:3
363:3
**drugs** 88:13
114:19 116:9
151:13 152:4
157:12 234:19
242:10 311:19
336:11,17,18
339:16 351:19
**dubbed** 71:13
**duct** 311:20

**due** 12:11 114:17
236:22 238:3
**duly** 9:18 359:4,6
359:7
**duplicative** 42:9
161:19 196:12
**duration** 332:18
**dying** 128:21
272:20
**dynamic** 286:22
**dysphoria** 103:9

**e**

**e** 7:1,1 9:16,16,16
13:19 14:13 18:21
18:23 29:3 30:2,3
30:4 36:5 37:16
84:7 199:22,22
245:8,17
**earlier** 26:19 38:3
76:14 84:6 89:18
100:7 106:1,8
107:10 126:1
141:1,11 145:21
164:15 165:21
174:6 177:21
199:14 227:13
306:17 313:2
333:3 340:17
346:3
**early** 19:24 209:23
214:6,9,23 215:2
216:3,14 218:6,18
219:19 224:5
344:5,8
**easier** 16:3 233:15
**east** 2:14
**easy** 39:23 156:23
**ebeling** 3:8 7:23
**eclipsing** 84:23
**economic** 180:11
189:14 194:14

197:23 237:9
238:15 357:14,15
358:1,9
**educate** 154:9,10
284:17 293:23
299:9
**educated** 294:7
**educating** 297:21
**education** 60:19
60:19 68:5 91:24
285:4 291:12
292:21 297:11
300:6 301:7 307:9
315:23 316:14,22
317:24 319:2,17
320:1,12 322:3
325:10 326:7,22
329:20 356:21
**educational**
202:10 232:19
298:15,18 299:3
300:24
**edward** 30:3,4
148:21
**effect** 86:23 89:20
**effective** 240:22
262:9 271:5,6
345:6
**effectively** 182:3
**effects** 90:8 129:24
130:1,9,12,13
309:23
**efficient** 79:14
**effort** 64:2 180:22
221:9,24 284:16
342:2
**efforts** 264:16
290:13 302:21
341:24 345:14
347:13,15,18

**eighth** 3:5
**eighty** 345:8
**either** 12:6 17:24
29:8 69:3 101:15
101:19 117:12
123:16 124:3
131:18 135:9,18
146:4 183:4 199:8
200:4 216:15
235:22 238:3
239:17 281:23
282:23 295:23
325:2
**elana** 206:3,3
**elements** 60:15
189:12
**elena** 199:21
**elevated** 186:4,9
**elicit** 157:1
**eliminate** 235:24
236:14,18 237:14
237:16,19,20
**email** 361:17
**embedded** 186:6
**emerged** 234:22
**emergency** 13:10
111:19 114:12
115:12 116:9
117:7,19,21,24
154:15 185:17,19
220:13 242:23
**emphasize** 61:23
272:15
**emphysema** 130:8
**empiric** 308:7
**employed** 162:22
359:12,14
**employee** 359:13
**employment**
236:24 356:7,13
357:3,20 358:3

**empowered**
287:13 334:24
**ems** 78:21 110:24
111:2,21,22 114:3
118:24 119:14
120:6 346:2
**emt** 225:7
**emts** 301:2
**enclose** 20:9
**enclosed** 361:11
**endeavor** 170:12
**endeavored**
160:20
**ended** 252:21
**endocarditis** 101:7
101:13
**endorsed** 308:11
**endorsement**
307:2,23
**ends** 332:7
**enduring** 314:5
**enforcement**
202:16 224:22
225:8 250:8
**engage** 42:9 80:11
156:1 212:22
213:17 220:3,5,7
220:16 221:8,23
222:11 250:13
299:7 336:22
**engaged** 198:24
214:5 216:2
219:18
**engagement**
102:13
**engagements**
20:10
**engaging** 128:3
**enhancing** 350:2
**enlarge** 233:1

**enormous** 23:11
23:11 58:23
146:23 230:1
239:23 265:18
286:7 309:3
330:14,19 345:15
**enormously** 71:18
**ensue** 90:14
**ensure** 33:17
302:13 304:8
**ensuring** 286:9
**enter** 250:15
**entered** 363:9
**entire** 182:18
347:1 362:5 363:5
**entirely** 166:2
169:5 175:22
176:16 177:17
184:18 237:14
**entirety** 63:5,7
269:19
**entitled** 1:20 27:1
32:15 34:6 49:8
138:14 144:23
150:4,8 153:4,6
155:21,24 156:2,4
164:8 171:10
173:20 175:8
208:8 218:16
274:9
**enumerated** 310:5
**envelope** 17:23
47:24 48:3 103:22
131:17 158:14
207:16
**envelopes** 17:8,18
132:24 178:21
**environment**
235:7 356:15
**environmentally**
46:23

**epidemic** 23:8,20
24:3,4,7,8,19
25:13,17,23 26:4
26:12 37:21 51:10
51:15 52:5 53:18
55:5 56:8,22
62:20,23 65:24
66:10 67:13,20
71:21 72:1,4
73:15 74:18,19,21
74:22,23 78:6,18
79:20,22 80:4,5,7
80:12,17 87:5,6,7
89:1,2,4,11,12,17
89:20,23 90:21
97:5 103:11
109:23 113:11
116:5 126:7 127:7
127:12 130:22
138:14 139:1
140:12,13 145:19
145:24 147:13
160:14,15 161:5
175:23 177:7
182:15 192:10
218:12 223:5
231:9 234:22
235:5,6 254:17
258:9 262:23
268:8,9,11 271:3
272:7,16,24
279:10 285:23
287:6,21 289:8,24
303:13 319:8
326:12,20 328:22
343:12 356:12,15
358:11
**epidemiologic**
65:13 174:15
197:23

**epidemiologist**
43:8 54:18 60:23
62:17 87:3 109:21
211:3 269:16
**epidemiology**
24:18 64:4 87:4
**equally** 45:18
**equate** 221:5
**equipped** 334:24
**errata** 292:18,22
361:13,18 363:7
363:10,18 364:1
**erroneously**
264:12
**error** 42:1
**especially** 295:17
**esquire** 2:3,4,4,5,5
2:8,12,13,17,20,20
3:4,9 361:5
**essentially** 34:16
35:8 42:13 99:9
135:2 146:6 248:9
256:9 257:19
293:17 320:2
322:4 323:6
353:13
**established** 307:8
350:10
**estimate** 58:15
60:5 109:3 174:18
180:4,5,23 185:8
186:13,22 187:19
188:4,8,9,17,18
189:4,6,24 190:13
190:17 191:9
192:7 244:16,17
251:9 268:3,23
279:2 291:13
293:11 321:8,20
323:15 324:14
338:17,24 339:10

357:19
**estimated** 181:10
298:4
**estimates** 58:18
60:7 174:15,23
175:2 178:3,4,13
180:8,11 182:14
184:12,17,19,23
189:14 194:6,14
197:24 236:4
270:2 322:20
324:11 325:1,3
341:1
**estimating** 109:7
**et** 1:8,14 7:17,18
362:3 363:3
**evaluate** 126:7
261:5 277:12
278:1 291:7
350:14 353:15
**evaluated** 301:14
315:5,7
**evaluation** 59:21
212:19 246:22
251:9 296:4
297:18 328:24
342:19,24 343:4
344:21 346:10
**evaluations**
309:23 350:4
**evans** 1:21 8:1
359:4,20 360:3
**event** 18:22
**everybody** 240:14
286:2,3
**everyone's** 299:16
**evidence** 5:15
24:11 48:22 51:14
55:15 58:3,23
59:19 71:20 90:23
91:3,5 101:2

126:9 127:23
134:14 138:14,23
138:24 140:4,6,19
141:3 143:20
144:1,12 146:23
147:16,20 149:22
152:19 159:4,12
208:13 210:20,20
211:4 222:14
228:20 273:4
279:9 286:23
287:12 288:11
296:23 300:17
310:15 330:18
350:5,17
**evidentiary** 53:21
**evolving** 286:23
**exact** 19:20 215:12
268:5 332:22
337:19
**exactly** 90:15
165:23 168:17
175:19 178:17
225:19,19 268:9
269:16 329:14,15
**examination** 4:1
9:19 167:9
**examine** 217:20
246:5 249:5
**examined** 347:9
**examining** 24:19
190:24 309:4
**example** 52:8
55:18 89:17 96:7
120:12 147:1
185:15 220:13,17
225:12,15 246:15
247:8,23 250:14
252:19 257:7
258:20 263:2
272:18 282:13

289:20 310:2,12
311:18 318:4
336:24 340:23
**examples** 65:23
186:3 318:3
**excel** 321:16
**excellent** 16:4
211:8 246:15
346:20
**excerpts** 197:4
**exchange** 336:7,16
337:8
**exclusive** 45:12
124:4,7
**exclusively** 64:8
64:11 265:6
**excuse** 136:20
198:6
**executed** 363:10
**execution** 362:14
363:19
**exercise** 65:13
**exhibit** 5:1,2,4,7
5:10,13,16,18,20
6:1,2,5,8,10 17:24
18:5,9,12,12,14
39:14 40:14,15,16
40:17,18,23 42:17
48:4,5,15 49:4,7
83:10 103:14,14
103:17,17,19,20
105:17,23 120:15
120:15 131:10,18
132:20 133:1
134:6 136:17
138:10 158:13,15
158:21,23 159:11
159:12,14,23
169:16 171:1,2
173:4 179:1,9,21
179:22 182:8,9,19

184:13 191:14
195:24 203:9,13
203:18,20,24
204:5,9 207:6,18
207:19 208:3,5
225:7 262:3
266:11 291:15,18
292:3,7,8,9,11,14
**exhibits** 40:1 48:7
48:9,12,13 179:15
195:3 196:2
**exist** 113:7 315:8
333:23,24
**existence** 283:9,14
**existing** 246:6
256:3 349:23
**exists** 67:13,20
112:11 355:2
**expand** 127:22
231:11 256:23
260:20 274:14
357:3
**expanded** 142:11
353:13
**expanding** 149:17
**expansion** 173:20
174:20 181:16
187:18
**expansive** 230:6
**expect** 9:7 15:14
38:7 117:20
130:11 146:4
228:16 241:8
340:12 357:5
**expectant** 213:20
**expectation** 14:19
15:10
**expected** 19:14
**expense** 264:16
**experience** 87:2
211:14 236:5

275:10 294:17
296:13 326:9
346:23
**expert** 5:11,13,16
6:3,6,8 10:10 11:2
11:5,6,7,10,12
16:22 17:1 19:16
20:19,24 21:16
22:6,24 26:20
40:9 43:8 47:21
48:18,20,23 49:12
49:13,15,18 54:1
55:2 56:15,19
57:20 58:11 59:7
64:21 65:10 83:15
103:13 106:9
118:22 131:6,9
134:7,22 135:9
138:12,20 139:6
139:10 141:14,23
142:7,17 145:9
152:20 158:16
159:13 160:1,4,11
162:4 163:24
179:3,6,21 182:6,6
206:20 207:12
210:22 223:2
224:17 262:2
280:10 282:9
292:16 330:7
**expertise** 54:17
88:11,16 211:2
**experts** 238:10
267:24 271:2
340:20
**expiration** 362:19
363:25 364:25
**expires** 359:17
**explain** 28:2
138:18

explained   177:21
244:12
explanation   181:1
explicitly   32:1
exploratory
270:16
explore   32:15
62:11 176:1
304:14
explored   231:24
exploring   167:18
194:16
exposure   72:11
expressed   103:24
extend   25:19
156:12 192:6
extension   27:2
extensive   62:18
208:7 320:16
343:21
extensively   23:6,7
25:12 211:3
287:22 352:20
extent   20:11 39:9
89:10 126:7
170:13

**f**

fabric   140:12
231:23 247:4
248:14
face   83:9 201:1,1,4
201:4
faced   110:6
232:23
faceted   109:22
facets   59:1 87:6
358:10
facilities   221:10
255:20 340:5
facility   230:13,13

facing   86:4
fact   19:8 61:15
115:24 158:1
200:24 221:3
233:8 235:13
258:16 264:11
295:13 308:7
309:3 313:16
322:14 325:13
339:11 346:19
354:3
factors   55:4 59:1
63:19 232:5,6,15
233:10,11 235:4,9
237:12 276:15
277:2 305:18
306:11 333:4
334:4
facts   243:18
faculty   139:5
144:19
fail   15:17
failure   334:9,11
334:11,13
fair   14:7,16 20:1
22:3 23:21 24:24
25:2 36:20 42:2
50:17 53:1 57:11
60:24 65:7 83:11
83:24 86:6 92:18
93:6 122:22
148:18 157:2
162:13 176:11
178:15 208:23
209:24 210:2
215:16 218:20
224:2,3 256:23
272:2 274:21
285:13 304:22
316:23 320:3

fairly   132:12
210:13 341:1
faith   224:18,19
225:9
fall   225:22
false   86:16,24
126:2
familiar   41:7 88:8
107:22 108:1
150:16 220:5
224:6 226:20
229:10,12,15
231:6,6,10,13
234:13 244:16
245:12,17 283:7
283:16 292:17
296:11,18 297:2
299:18 304:20
familiarity   80:23
201:24 296:21
families   92:3
331:9
family   38:23 98:12
102:14 273:15
275:6 281:23
282:24 327:23
far   192:12 200:16
225:14 239:3,5
319:18 345:16
farrell   2:8,8 8:23
8:24 166:16,16
168:11 169:8,24
fashion   39:18
fatal   106:4 108:14
345:20
father   327:23
328:12
fault   328:1
feature   315:18
featured   164:22
284:5,6

fed   56:8 312:3
federal   1:20 76:2
249:4
feel   59:24 92:23
93:5 118:8 148:18
164:14 171:21,23
171:24 211:24
287:13 328:17
feelings   44:11
feels   86:16,24
feet   254:19
felt   37:23 163:3
204:15 237:6
fentanyl   72:5
74:19 84:23 89:17
89:19 90:18 91:11
96:22 97:21 98:18
101:15 121:19,22
122:3,14,19,20
123:8,16,24 124:6
124:11 125:14
126:4 151:13
152:4 157:12
228:18,20 242:19
243:5 244:5
354:18
fernandez   199:21
199:22 206:4,4
fewer   239:3,5
fi   94:8
field   201:24
fifteen   133:6 253:9
fifth   265:1
figure   190:16
329:14,17 330:1
348:1
figures   194:7
filed   7:19
filing   358:22
filled   17:7

final 5:19 106:4
108:22 109:8
110:9 140:22
292:5
finalized 112:21
finally 177:8
financially 8:5
359:14
find 17:23 50:15
238:13 306:22
361:11
findings 144:11
fine 9:24 22:2
36:18 132:14
137:13,14,15
138:9 141:8
169:20 199:19
233:5 290:11,11
290:12 358:15
finish 79:4
finished 78:11
113:5 183:20
186:1 248:11
273:24 349:4
fire 72:15 286:5
firm 7:24 8:1 9:6
12:6
firmer 176:19
firms 34:5
first 9:18 12:13
15:1 16:14 19:18
20:7 22:5,14
37:18 46:3 50:24
52:23 58:5 63:8
65:12,18 74:1
107:3,7 108:4,5
114:8 120:20
130:14,14,14
139:24 140:17,20
144:23 149:22
150:13,24 158:10

160:4,11 169:10
172:11 213:5
219:3,8,9 254:9
262:7 281:4 283:8
283:12,13,21
284:13 304:13
305:7 306:2
313:22 332:10,17
333:14 336:5
340:3 348:13
359:7
fit 93:5 150:4
153:4,12 155:22
170:16
fits 38:23 286:15
five 26:3,9,17
66:19 69:16 125:6
125:6 144:24
167:12 192:15
193:11 196:5
355:19,20
flip 43:22 245:5
flipping 99:10
flooded 56:3
floor 2:9 39:19
flourished 95:18
flow 27:22 222:5
282:17
fluctuations 73:13
focus 26:2 51:12
51:14 55:12 59:17
61:2 65:20 70:9
75:13 93:1 128:2
138:22 165:8
168:14,16 174:12
196:18 219:4
242:6 263:8,16,17
264:3,23 265:6
288:12,22 337:4
focused 24:17
26:16 34:16 54:20

54:20 55:8 56:15
56:15 64:8 87:13
87:14 92:8 125:23
139:13 140:7
145:18,22 161:13
189:15 211:3
218:24 242:16
279:9 291:10
315:3 316:24
339:15,17 343:12
focuses 85:13
266:3
focusing 23:7
145:2 195:20
264:20 285:11
folders 178:21
follow 36:21 49:22
52:17 111:17
132:4 155:23
274:12 311:2
352:21
followed 320:18
following 62:20
66:4 68:4 97:20
120:15 181:11
224:11 346:17
follows 9:18 67:1
94:3 138:2 145:8
170:5 198:20
253:21 316:8
338:12
foot 319:9
footnote 77:9
81:23 104:22
105:4 107:24
109:4 306:21
307:12
footnotes 76:8
foregoing 359:5
362:13 363:18

foreign 177:5
216:20
foremost 65:19
forget 199:17
forgot 244:13
form 13:20 57:15
139:23 146:13
193:17 233:19
formal 206:6
222:4
formally 221:19
formed 132:20
former 150:21
151:19 153:15
forming 88:4
135:8 200:5
261:14,19
formulating 327:7
forth 160:20
182:20 187:8
208:13,19 271:6
290:16 315:19
320:21 359:15
360:6
fortunate 71:8
fortunately 68:13
90:22 344:4
forty 359:15 360:7
forums 25:20
forward 52:15
56:16 65:20,21
66:7 94:21 96:15
96:24 160:12
192:5,14 196:5
212:17 233:5
241:21 243:12
245:6 296:15
361:15
forwards 54:21
59:17

**foster** 61:8
**foundation** 59:22
62:2 138:22
150:14,20 165:23
**foundations** 321:5
**founding** 13:24
**four** 46:8,12,13,15
69:16 151:20
289:4 290:10,23
294:4 296:8
346:12 351:17
**frame** 80:16 82:20
90:20 195:11
239:11,18
**framed** 192:4
196:4
**framework**
163:15,18 238:19
**framing** 24:3
**frankly** 25:15 56:4
74:15 143:14
243:4 264:24
327:17 332:19
339:24
**franks** 2:13 9:4,4
**free** 42:1 173:3
318:24 362:14
363:20
**frequently** 25:22
**friend** 233:3
281:23 282:23
**friends** 98:11
102:14
**front** 18:17 40:24
67:6 80:15 83:13
85:2 131:8,19
132:24 133:20
134:3 138:11
159:16 164:2
170:23 172:24
173:2 189:17

192:19,24 194:12
203:10 216:11
266:8 291:19
338:21
**fuel** 235:4
**fulfill** 349:16
**fulfilled** 348:19
**fulfilling** 346:16
**full** 10:2 16:12
202:8 236:12
274:11 359:10
**fully** 289:7 291:1
295:15
**function** 346:20
**functions** 345:7
346:16 348:12,18
349:16,21
**fund** 223:3
**fundamental**
167:6
**funded** 220:23
223:12 249:3
**funding** 127:21
221:6 222:20
230:23,24 246:3,6
249:4,6 341:7
**funds** 222:10
224:1
**further** 35:21 58:4
63:6 71:23 94:13
108:16 116:15
128:14 197:19
217:20 228:7
230:17 258:8
260:21 273:2,6,8
275:24 297:20
304:14 326:11
327:4 342:5
346:13 358:23
359:8,11,13

**future** 223:8 237:2
239:2 243:18
244:4 317:9,9
357:16

**g**

**g** 1:19 5:3,4,12,13
5:16 6:2,5,8 7:1
7:14 9:16 18:7
30:3 40:19 48:19
48:20,24 134:22
158:16 179:2,5
359:5 360:5 361:8
362:4,9 363:4,13
364:20
**gainful** 356:13
**gains** 71:14 111:7
**gauge** 26:14
**geist** 2:17 4:2 8:14
8:17,22 9:1,2,20
14:2,5 15:3 18:2
27:6,15 31:2 32:7
32:23 33:2,6,24
35:6,23 36:2
39:13 45:20 48:8
48:14 50:9 53:7
57:14 63:10,13
65:5 66:15 67:4
73:24 76:21 79:5
81:20 82:10 86:10
89:7 94:6,7
103:12,19,23
104:9,14,18,19
105:6,10 106:24
107:6 113:14
118:19 125:2
129:12 133:13
137:8,16,18,20
138:5 148:16,24
149:3,8,11,20
150:12 153:14
155:13,24 156:4

156:11 157:3
158:4,9,24 161:20
162:18 165:10
166:15 167:12,15
168:16 169:10
170:20,21 171:8
179:13 188:5
193:16 196:21
197:7 198:14,23
204:19 205:1,13
205:20 206:6
208:16 213:24
214:3 215:5,17,22
232:10 233:3
253:24 267:5
274:2,13 291:21
292:10 303:23
316:4,11,18 317:3
317:5 328:6 330:9
335:15,19 338:2
338:15 342:18
349:5 358:15
**general** 43:14,17
46:1,4 57:24 58:1
60:19 83:18 85:12
110:5 128:18
140:6 154:10
171:19 224:16
245:9 248:17
284:17 285:10
299:20,24 300:11
302:20 328:20,21
**general's** 139:11
**generalities** 249:8
**generally** 23:20
25:7 28:2 82:2
103:4 174:21
222:19 224:14
231:19 236:1
241:5 247:20
250:4 252:4,5

256:11 266:2
267:21 312:10
319:3
**generated**  145:18
145:20
**generations**  72:20
**genesis**  53:17
66:10 89:23
**genetic**  238:14
**george**  10:4 11:6
180:12
**germane**  292:20
**gestalt**  26:15
**getting**  48:3
104:15 105:3,4
164:18 167:16,24
227:1 252:14
281:21 342:17
**give**  10:10 43:15
44:9,10 117:1
186:2 207:3 212:1
229:7,9 246:22
249:8 253:17
274:11 333:21
**given**  16:22 17:2
32:6 35:17 39:22
44:7 46:13 52:1
68:22 69:7 72:10
85:6 106:21 149:5
154:16 249:13
258:7 261:7
339:11 359:17
360:10
**gives**  250:20,24
254:18
**giving**  149:6 229:1
**glimmer**  78:5,17
79:19 111:14
**glimmers**  71:20
76:15 106:11

**global**  44:11 73:14
326:21
**globally**  341:23
**go**  7:11 17:13,15
17:22 22:10,11
24:1 25:9 27:21
35:7 40:1,13 45:5
47:15 48:2 49:6
52:14 54:23 60:3
60:9,12 63:6,16
65:18 67:9 69:11
71:18 83:2 87:20
93:21 96:14,23
102:4,4 105:24
106:24 107:6
108:3 113:16
120:13 127:15
138:10 141:22
149:21 150:11,15
165:6 169:24
192:15 194:11
196:11 207:15
208:15 225:14
229:18 234:2,7
246:7 250:16
254:5 257:14
262:1 265:3
266:10,11 267:8
273:22 280:21
301:11 309:7
317:3
**goal**  228:8 266:12
285:4 287:24
288:3 319:1
**goals**  58:24 252:4
**goes**  38:11
**going**  7:3 14:22
17:13,16 26:23,24
27:7,12,13,17 35:7
35:9,24 36:21
43:16 45:3 48:9

50:9,13,14 52:12
52:15,17,22 53:10
54:1,7 55:20
56:19 59:24 60:2
60:9 62:13 63:2
66:13,23 73:24
79:5,6 85:9 88:23
90:14 92:23 100:6
102:6 118:20
121:10 122:12
126:13 130:5,13
130:24 133:9,11
133:16 137:12,23
143:19 148:16,24
150:1 151:16
155:14 157:22
158:5,5,6 169:11
169:20 174:12
181:24 192:10
198:18 207:7
208:20 217:7,8
233:5 236:14,20
243:12 245:3
248:12 253:12,18
259:19 263:17
272:20 280:21
283:6 316:1,6,12
318:1 338:9 345:6
349:12 353:17
356:7 357:6
358:19
**gonna**  228:14
237:19 243:2
294:13,13 340:13
**good**  7:2 9:1,21,22
18:13 72:15 97:5
97:6 135:5 137:20
141:9 152:9
198:14 225:12,15
311:19,21 320:21
327:6 345:13

**gotcha**  47:1
**gotten**  149:14
319:11
**gov**  5:7 105:18
**governing**  262:9
**government**
337:16,23
**grade**  212:1
246:22
**grand**  2:21 299:12
299:15
**granted**  341:9
**graphic**  99:8
109:14
**graphically**
108:20
**grave**  71:18
150:23
**great**  8:22 18:4
41:1 49:6 133:7
136:22 137:19
151:15 159:16
205:18 208:5
229:10,18 230:7
230:13 231:2
253:13 267:13
277:1 292:13
320:14 322:19
332:14 333:2
335:2 357:13
**green**  46:23
**grey**  11:16
**grief**  92:3 176:21
181:18 189:1,7
190:1
**ground**  72:10 85:6
217:21 230:3
329:1
**grounds**  52:23
**group**  99:11 263:8
264:6 302:6 346:8

349:7
**groups** 62:23
64:12 254:22
**guess** 19:21,22
20:2 22:18 26:5,6
39:2 78:4 95:15
108:4 131:10
139:3 142:14
143:5 171:17
173:5 189:19
191:18 194:15,18
210:18 217:19
230:23 238:18
242:2 248:24
302:1 327:5
**guide** 5:20 207:21
208:8,18 219:22
259:23 344:8
**guidebook** 218:2,5
218:20 224:10
227:11 254:5
**guideline** 306:18
307:7,15 314:20
**guidelines** 296:8
296:11,15,23
306:17,24 307:2,8
307:13,22 308:1,3
308:7,12,15,17,20
308:24 309:3,9,15
309:17,19,19,24
310:6,10 313:4,12
314:7,11 315:1,8
318:7,10

---

**h**

---

**habits** 275:18
**half** 43:10 44:1
125:13 133:12
144:23 145:1
274:3 342:15
**haller** 3:4

**hammer** 311:20
**hand** 137:1 292:20
359:17 360:10
**handle** 259:1
**handy** 134:9,10
136:21
**hanging** 248:3
**happened** 72:11
72:18 185:15,16
**happens** 295:1
340:24
**happy** 14:20 15:9
15:11,18 24:6
27:21 38:24 44:2
44:3 50:1 53:19
73:9 85:15 87:23
94:15 112:5 118:8
120:1 150:6 153:3
184:3 195:23
196:8 247:16
253:3,9 273:6
322:24 327:18
**hard** 31:16 35:11
187:9 203:6 209:9
**harder** 96:7
**harm** 58:4 144:10
227:9,15,22 228:8
228:10,11,24
229:4 264:22
280:18 281:4
308:1,2 309:21
313:3,14 335:10
335:21 344:11
351:4,5 352:17
**harmed** 313:17
**harmonization**
345:11
**harms** 24:12,20
51:3 58:13 60:5
85:14 139:14
151:17,22 211:5

263:4,11,24 264:8
265:10,18 326:3
348:5
**head** 213:15
326:17
**header** 186:10,21
187:1,5 219:5
285:2,3
**heading** 183:15
259:22 261:11
**headings** 147:23
148:2,7
**headway** 263:17
286:8
**health** 2:11 9:6
43:8 62:17 68:18
69:21 70:8,14,23
72:3 73:17 74:4
74:15 77:1,14,22
81:11,12,24 83:15
97:6 99:7 103:3
104:23 106:3
107:12,18 108:13
108:19 120:16
124:16 138:16
150:23 176:21
181:18 188:24
189:7 190:1
202:13 221:9,15
221:19 224:17
230:13,13,19
231:4,7,14,18,21
232:18,19 236:24
238:3 242:21
255:1,1,17,22
257:17 274:18
276:16 280:4
285:4,5,6 287:4
289:21 291:12
300:5,23 305:8
306:3 310:8

312:10,19 344:12
350:17 356:20,23
**healthcare** 221:13
301:3
**healthy** 260:1
319:1
**hear** 15:3 33:4
331:23 352:14
**heard** 14:5 86:22
197:7 313:16
314:3 315:9
352:14
**hearing** 15:1
**heart** 130:7
**heartening** 130:17
**heed** 27:17
**heightened** 16:7
**held** 7:22
**help** 27:18 153:23
176:2 184:3
185:18 226:2
231:22 234:19
235:11 247:21
248:13,13,14
284:16 319:4
352:22 353:9,12
353:19,21,22,23
354:4,8,15 355:13
356:10 357:6
**help4wv** 353:22
355:13
**helped** 235:4
**helpful** 10:17
37:23 53:21 61:21
61:21 65:17 82:17
85:8,10,16 95:15
98:7 115:4 116:13
118:9,12 119:20
119:21 174:11
176:2 197:17
201:19 208:12

210:18,19,19
238:14 247:16
266:5 273:5
280:22 303:21
323:1 327:17
349:15
**helping**   25:14
226:6 231:11
249:16 252:13
357:16
**helps**   64:9 229:9
**hep**   100:14
**hepatitis**   100:14
100:19 101:12
229:8 336:24
351:20
**hereof**   359:7
**heroin**   29:3 36:5
37:16 72:6 84:7
84:23 90:7,17,24
91:11 92:12 95:12
95:16,18 96:3,8,8
96:20 97:8,12,19
97:21 98:17 99:6
101:15 121:19,22
122:3,14,15,19,20
123:8,16,24 124:6
124:11 151:12
152:3 157:12
228:22 242:5,8,19
242:24 243:2,5
244:5 354:18
**hesitant**   152:12
154:5
**hesitation**   87:6
**hey**   337:2
**high**   56:4 100:23
192:7 232:20
244:20 287:11
356:21

**higher**   72:24
78:23 111:4
120:10 196:5
**highest**   59:3 61:1
118:9 290:22,24
**highlight**   11:13
78:4 139:6 275:1
340:17
**highlighted**   84:11
121:23 181:21
197:5 272:8
**highly**   73:10
115:18 145:24
295:21
**historical**   59:22
**historically**
264:12
**history**   208:21
337:8
**hiv**   100:11 101:12
229:8 351:20
**hold**   35:6 185:24
193:13 338:7
349:3 353:4
**hole**   309:8
**home**   119:4
154:16
**homeless**   177:10
181:19 190:10
191:10,16
**homelessness**
191:4 235:12
**homes**   330:14,19
331:2
**hook**   334:22
**hope**   61:20 71:20
76:15 78:6,17
79:19 94:18
106:11 111:14
138:7 187:10
229:9 239:3,3

254:10,13 255:15
256:2 257:7,8,17
258:3,6,20 259:24
261:11 318:23,23
333:7
**hopefully**   18:13,14
170:11 207:9
223:22,23 249:13
276:24 305:15
**hoping**   319:3
**hopkins**   5:14 25:6
48:22 133:2,22
134:13 138:15,19
139:18,22 140:3
140:16,18 141:2
142:3 143:20
144:17 149:22
150:17 152:18
159:12 270:14
**horrific**   310:3
**hospice**   294:24
295:3,4
**hospital**   221:22
**hospitals**   289:20
**hotel**   11:20 12:7
137:9
**hotline**   354:12,12
354:22
**hour**   15:16,24
38:5 66:13,20
133:11 166:20
226:15,23 274:2
316:1,2
**hours**   15:23 19:14
23:4,9,11,13,16
26:20,21 27:10
28:1 31:8,9 38:3
130:14 149:3,16
156:5,16 298:24
356:3 358:14

**house**   72:15 286:4
331:5
**household**   331:8
**housing**   177:10
181:19 190:11
191:4,10,16
254:15 255:4
256:2 257:8,16
258:8
**hrsa**   293:17
**huge**   146:22
260:20
**huh**   26:5 203:12
**human**   68:18
70:14,23 72:3
73:17 74:4 77:1
77:14,22 81:11,12
81:24 83:15 104:3
104:23 106:3
107:12,19 108:13
108:19 120:17
124:17
**hundred**   209:18
**hundreds**   234:10
251:12 284:1
358:6
**hunt**   5:23 208:1
**huntington**   1:4
2:10 5:11,20 6:12
7:16 10:7 18:16
20:21 29:4 42:8
47:12 48:18 49:9
51:5,11 52:21
55:5 56:1 57:21
59:11 64:24 67:17
67:21 71:11 82:6
83:22 84:20 85:7
85:20 87:9 89:3
89:11 90:13 91:15
95:5,24 96:13
100:10,14 101:6

101:11 102:19
116:6 119:13
125:18 126:8
130:23 136:7
140:10,14 145:23
151:18 153:18
157:21 164:7
167:19 168:8,24
173:20 175:10
176:10 177:1,9,24
181:7 184:2,9
185:7,23 186:15
186:22 187:13,20
188:4,18 189:3
190:3,13 191:12
191:22 192:11,17
193:9 198:3,7,9
199:3 200:14
203:5,16 204:22
206:15 207:20
208:8 209:4,15,22
211:7 212:13
214:5,23 217:16
217:17 219:17
220:19 221:22
222:18 223:3,11
225:4,5 226:8
231:8 232:2
233:17 234:20
235:6 236:2,16
238:5 239:22
240:8 241:6,10
243:13 245:1
249:24 254:4
255:15 256:16
257:24 266:18
268:3 270:5,18
272:10 274:6,16
275:4,12,15,17
277:10,15,22
278:5,21 279:4,14

283:5 284:3
285:18,22 287:5
293:13 296:6
317:11,17 321:23
323:4 324:6,10
325:12,22 329:8
330:15,20 336:3
339:19,21 342:7
343:17 344:4,10
344:12 346:19
347:3,12 350:11
352:2 357:21
361:6 362:3 363:3
huntington's
70:10
hurt   326:24
hyatt   11:21
hydroxyl   99:11

i
idea   11:17 237:19
237:19,20 279:3
301:19,21 314:9
327:6 357:8
identical   125:21
148:1,2 149:12,12
187:2 189:10,21
identification   18:8
40:22 49:3 105:22
158:20 179:8
203:17 208:2
292:5 297:24
identified   178:12
258:13
identifies   52:19
identify   49:11
128:12 154:18
159:23 202:6
203:21,23 204:3
204:20 209:10
211:19 213:10
222:12,13 257:3

261:2 263:3,21,22
264:5 271:9
288:13,14 294:14
300:19 346:24
identifying   24:11
65:18 145:3 211:4
298:8
ii   2:13
illegal   103:1
114:18 121:18
123:21
illegally   336:18
illicit   72:5 73:19
88:14 91:11,20
97:22 101:14
102:20 121:18
123:21 151:12
152:3 157:11
317:14,19 325:14
325:23 354:17
illicitly   243:5
illness   235:12
315:16
illustrates   197:17
imagine   203:6
326:14 343:9
immediate   129:24
immediately   333:5
immune   116:5
impact   5:15,21
48:23 134:14
138:15 140:4,6,19
141:3 143:20
149:4,23 159:4,13
207:22 208:9
237:2,21 263:10
350:15
impacted   80:12
86:20 97:12 242:8
254:16 258:9
286:3 326:16,16

impacting   264:21
impeachment
167:9
imperfect   332:22
implement   228:7
244:17 336:6
implementation
194:7 239:12
282:13 309:19
313:4 314:6 315:3
implementations
212:6,12 256:21
implemented
160:21 193:5,10
194:11 235:22
236:12,13 308:16
309:16 318:15
321:22 341:19
349:8 357:9
implementing
209:22
implication   32:21
implicitly   52:2,4
52:10
importance   16:7
126:17 173:9
176:16 246:24
249:15 264:13
318:5
important   23:5
25:4,14 61:6
65:24 71:15,16
75:4 79:17 80:9
89:22 97:10 98:14
109:17 125:15,22
126:12 132:6
164:16 167:5
171:19 174:5
177:6 182:9
183:11 190:19
191:5,17 195:14

195:14 201:19
221:3,17 225:21
226:5 227:14,18
227:19,22 228:2
230:18,21 231:7
231:14 234:14
235:4,10,19
237:11 245:23
247:3,6,21 248:1,1
250:9,18 252:11
252:12 255:9,11
255:17 263:2,20
263:22 264:5
265:17 272:14
275:1 284:15
288:5,8 297:23
299:17 300:16,23
301:2,13 303:12
304:24 310:7,8
315:18,20 319:6
327:2 343:1
348:12 349:24
351:5 356:11
357:15 358:10
**impossible** 168:7
**improve** 185:18
264:16 282:18
310:18 339:17
342:5
**improved** 97:15
**improvement**
69:17 70:4
**improving** 144:23
218:17 298:7
328:19 349:21
**inadequate** 127:21
341:19
**inadvertently**
309:20
**incidents** 82:1

**inclined** 268:5
**include** 61:8 69:2
152:19 185:18
224:18,22 244:3
317:23 321:18
**included** 25:10
29:11 50:7 76:1
115:20,23 131:12
131:17,22 135:13
138:12 139:15
167:20 169:13
173:24 184:20
189:5 191:18
196:13 202:15
243:22 244:11
251:12 292:16
304:9 324:14
327:15 361:13
**includes** 61:23
91:23 92:1,2,3,4,5
92:6 145:1 183:1
224:16 327:4
**including** 27:4
95:12 139:11
162:8 241:18
265:2 285:5
302:20 337:16
344:8
**incorporate** 23:15
175:3 260:11
289:22
**incorporated** 69:7
174:6 187:7
320:19 363:12
**incorrect** 257:13
**increase** 82:4,14
82:22 83:20
111:24 112:9
119:15 124:19
125:6,12 126:19
126:21 127:14

293:7
**increased** 82:20
111:1 350:9
**increases** 84:3
125:20,22,22
**incredible** 88:1
103:8
**incredibly** 100:20
**incremental** 350:9
350:14
**independent**
229:17
**index** 4:1 5:1 6:1
**indicate** 127:6
293:22 294:3
**indicated** 10:16
17:9 32:8 35:11
36:3 38:2 123:24
162:7 358:21
**indicates** 21:24
73:18 110:9,17
120:20 128:20
144:6 150:22
225:7 293:5
**indicating** 111:23
112:8 181:13
361:13
**indication** 129:8
129:13 255:24
354:21
**indirectly** 51:22
**indistinguishable**
90:8,9
**individual** 92:17
94:24 102:12
200:8 268:2 269:4
269:6,13,20
276:15 314:13
315:10,10
**individuals** 32:11
32:13 35:12 36:24

61:17 62:22 86:18
87:11,12,13 91:14
91:16 92:9 93:12
93:14 95:4,19
96:3,6,13 97:21
98:3,10,16 100:10
100:13,20,22,23
101:6,10,22 103:5
118:11 120:21,22
127:2,20,24 128:3
128:7 130:20
136:6 153:24
154:18 165:1
172:12 173:9
177:11 181:19
185:5,9 186:20
187:11 190:11
191:5,11 199:2,11
199:13,14 200:2,4
200:21 201:8,12
202:3,7,12,16,23
205:24 206:8,10
206:14 211:17
220:8,12 238:5,22
239:7,15 240:1,4,8
241:3,21,22 242:9
243:13,17,17
244:3,7 250:11,15
258:14 263:20
264:12,14 267:21
282:22 286:8
294:17 304:4
315:11 316:23
317:1,10 319:4
323:16,18 327:16
336:15 353:7
354:2,7 355:13
356:8,17 357:12
**industries** 234:24
**industry** 237:1

**infectious** 101:7
  101:12
**infer** 110:4
**inference** 314:18
**inferring** 70:5
**influence** 334:1,4
**influenced** 232:18
  305:17 306:11
**influencers** 333:11
**influx** 84:22
**inform** 146:18
  206:15 231:16
**informal** 212:10
**informally** 17:6
**informant** 270:15
**information** 15:7
  21:9 28:5 32:22
  42:24 68:11 78:20
  79:14,18,18 86:13
  93:1 94:12 98:7
  99:5 108:12
  120:10 181:4
  201:18 204:14
  205:11 220:15
  230:10 251:13
  253:1,3 260:3
  269:20,21 276:1
  277:5,8,13,20
  278:3 283:18
  285:12 290:14
  293:15 299:18
  300:9 303:17
  304:3,5,17 307:19
  314:12,13,14
  319:2,24 321:18
  324:18 341:4,14
  341:17 342:17
  343:23 354:22
  355:2
**informed** 55:16
  56:6 88:10 138:24

  140:11 210:21
  235:20 277:1
  291:1 295:15
  301:22
**informing** 143:24
**infrastructure**
  255:20
**infrequently**
  25:10
**inherently** 55:16
  64:2 311:19
**initial** 146:14
  306:13
**initiated** 89:24
**initiating** 97:18
**initiative** 139:5
  144:20 227:14
  261:1
**initiatives** 214:6
  214:23 216:3,14
  344:5,8
**inject** 336:11,17
**injecting** 101:20
  101:21 102:23,24
  103:5
**inputs** 292:15
**inquire** 82:21
**inquiring** 270:3
**insecure** 177:10
  181:19 190:11
  191:11
**insecurity** 191:4
  191:17
**insofar** 81:6 128:3
  130:17
**instance** 55:24
  180:14 184:4
  302:19 305:7
  306:2 314:15
  319:16 332:10
  333:9,14

**instances** 173:8
  174:2 180:22
  324:24 332:15,17
  334:17
**instant** 13:20
**institute** 296:22
**institutions** 25:6
**instruct** 27:13
  34:18 35:20
**instructing** 33:2
**instruction** 20:18
  27:17 42:6,12
  45:21
**instructions** 49:23
**insufficient** 257:9
**insurance** 312:19
**integrated** 289:21
  319:21
**integration** 345:10
  349:22
**intend** 10:10 49:19
  51:8,17 60:3
  62:11
**intended** 235:16
  257:11 314:24
**interactive** 346:1
**interest** 120:1
  312:8
**interested** 8:5
  167:3 359:14
**interesting** 26:6
  227:3 347:6,7
**interfere** 7:8
**interference** 7:6
**interject** 13:22
  20:9 31:22 33:19
  45:10 57:5 150:1
**internet** 12:16,22
  15:8 104:17 105:3
**internist** 13:4 43:7
  54:17 81:3

**interpreted**
  308:16
**interrupt** 44:15
  46:7 79:1,9,10,10
  113:4 152:15
  156:3 253:8 274:9
  328:5 356:2
**interrupted** 34:14
  148:14 155:11,21
  186:1 279:1
**interrupting** 153:2
**interruption** 141:5
  141:8
**intervening** 144:1
**intervention** 60:18
  92:16 165:2 169:4
  172:8 173:24
  181:4 214:9 215:2
  218:6,18 219:19
  224:5 317:9 327:3
  330:13 339:1
**interventions** 52:7
  56:16 58:16,18
  60:6,8,20 66:7
  80:21 91:4,13,24
  93:10 97:7,17
  139:8 152:9 162:1
  162:21 163:9
  169:12 177:22
  178:5,8,10 180:3
  181:6,11 185:18
  188:12 193:4
  194:2 207:8
  212:20 218:10
  227:19 228:6
  244:18 256:14,21
  283:4 316:20
  318:5 319:21
  329:7 343:9 350:4
**interviews** 136:3
  199:1 206:13

270:15
**intimate** 232:16
233:21 237:10
288:16
**intravenous** 89:24
101:11,14,18
102:9,18 337:5
351:19
**intravenously**
339:16
**introduced** 18:11
40:17
**invariably** 60:14
271:1
**invest** 258:7
326:11
**investigate** 246:2
**investigation**
273:9
**investment** 261:2
326:6 327:4
329:19 351:4
**investments**
231:10 297:20
321:5 328:18
**invitations** 132:8
**involve** 32:6 84:22
**involved** 19:5 20:3
20:7 32:9,10
121:7,18,22,24
122:5,21 123:9,12
123:16,20 124:10
124:10,21 125:14
127:4 202:10
295:16 301:6
306:13 343:7
**involving** 82:15
83:3,4 124:18
127:15 146:8
**ipad** 12:14

**iphone** 12:15,19
13:2
**irrelevant** 158:2
**isolation** 119:3
**issue** 14:23 62:9
79:24 86:1,23
87:16 196:12,17
231:21 238:16
256:1 257:15,18
260:22 310:11
**issued** 142:3 143:2
209:12 217:24
**issues** 86:3 232:17
236:23 237:16
238:3 257:6
264:21 308:1
356:19,22 358:1,2
**item** 185:7 187:12
187:15 188:14
189:4 190:1,6
191:9,20
**itemization** 19:14
181:3
**itemize** 183:24
184:1
**items** 39:5
**iteration** 140:18
140:20
**iv** 352:7

**j**

**jackson** 359:2
**jacob** 2:4 8:15
**jail** 250:16 252:22
**jan** 84:11,18 85:4
85:23 87:21 88:3
**january** 113:20
114:10
**jeffrey** 180:6
184:17
**job** 16:4 153:22
154:12,13 175:9

181:17 188:3,7
211:8 336:3
355:23 356:7,17
356:19 357:8,11
358:3
**joblessness** 357:1
358:9
**jobs** 236:24 238:4
357:4
**john** 48:14 103:15
104:11 107:7
113:15 118:19
133:2 150:12
158:24 162:19
233:3 292:10
317:6 330:10
335:20
**johns** 5:14 25:5
48:22 133:21
134:13 138:15,19
139:18,22 140:3
140:16,18 141:2
142:3 143:20
144:17 149:22
150:17 152:18
159:12 270:14
**joined** 8:12
**joint** 278:8
**jonathan** 3:9
303:21 323:7
**jr** 2:8
**judge** 49:23,24
50:19 51:17 52:11
54:14 60:12 61:4
165:19 166:19
168:3 170:11
223:15 280:6
**judge's** 45:4
**judgment** 65:15
295:22 331:10
342:4 348:16

**jumbo** 163:17
**jumping** 17:16
**jurisdiction**
167:21,22 168:24
197:2 339:10
346:24
**justice** 5:7 105:18
250:10 251:2
252:14
**justin** 3:8,9 7:23
253:15
**juvenile** 245:19
246:3

**k**

**kanawha** 360:2
**katherine** 29:23
30:1
**kearse** 2:4 8:19,23
**keep** 57:14 100:19
109:18 113:14
125:15 134:9,10
145:17 146:21
170:12 180:15
298:2
**keeping** 118:13
**keeps** 156:14
**kessler** 2:13 9:6
**key** 270:15
**kid** 320:24
**kilkenny** 202:12
270:20,20 271:8
275:23 276:2
**kilkenny's** 270:9
**kim** 2:20
**kind** 39:23 54:15
80:15 163:17
333:21
**king** 339:1
**kit** 320:13,14,14
320:15,20

kitchen 331:12
know 13:13 15:18
  17:12 19:3,18,20
  20:6 23:12,12,13
  25:1 26:12,24,24
  27:2,4,19 31:5,22
  31:24 32:3 34:2,6
  35:4 36:1 37:3,19
  39:8,9 41:11
  43:23 45:14 50:13
  53:4 54:19 55:18
  57:6,15 59:17
  60:20 61:7,11,13
  61:16,23 64:6
  71:8,8,19 72:12,12
  73:4,8,12 74:15,24
  75:7 78:7 83:5
  85:11,13 86:18,21
  87:1 94:10 95:12
  95:14 96:7 102:15
  103:7,7 108:11
  110:2,4 111:6
  112:17 114:16
  116:7 117:5,15,23
  122:20 123:19
  125:19,24 126:3,6
  127:4,24 128:4,6
  133:16 137:8,10
  137:11 139:11
  143:13,23 145:17
  148:18 150:7,24
  156:11,24 157:2
  161:16,16,18,20
  163:16 164:16
  165:17 166:12
  169:4 170:16
  171:20 176:4,19
  177:7 189:17
  194:22 196:18,22
  201:3,5,5,7,14
  204:12 205:8

206:1,23,24 209:3
209:11 210:19
211:19 217:21
218:16,21 221:3
221:12,18 222:4,4
224:23 225:14
227:1 228:13,16
228:23 229:2,13
229:23 230:18,19
233:8,9 237:11
241:8 242:12,24
245:10,13 246:10
247:4,18 250:5
251:8,11 252:7,23
255:7,12 257:21
258:3 265:1,13
266:20 267:14,23
278:20 279:20,22
279:23 280:6
282:16 284:4,11
284:11,17,20
285:23 286:4,5
287:1,12,14 288:6
290:4 291:19
295:23 296:7
298:2,16,17,23
299:1,15 301:1,11
302:24 308:5
309:8 310:1
313:15 314:10,16
315:13,13 317:21
319:11 320:23
324:8,9 326:11,12
328:14 331:19
332:19,22 334:23
336:22 337:21
340:4,10,11
341:13 345:1,12
345:12 347:10,12
347:14 349:14
352:15 356:3,11

356:12 357:18,22
knowing 269:12
knowledge 21:15
  56:7 183:8 274:23
  289:24 328:20
  335:1
known 99:18
  328:16
knows 286:3
  326:15
kozenberger 30:6

**l**

l 9:16,16 199:22
laced 151:13 152:4
  157:12
lack 180:7 201:23
  224:24 348:23
  356:12,13,21,21
lag 112:19 129:22
  130:1,9
language 214:17
  215:20 216:19
  349:6
laptop 12:14
large 17:14 100:20
  149:16 153:19
  209:8 230:2
  258:11,12 259:8
  259:11 269:18
  331:11
largely 262:24
larger 122:16
  264:21
lasted 31:6
lastly 315:9
late 268:11
latest 68:18 75:16
  286:10
laudable 212:21
  213:9 336:3
  345:14 347:13,17

launched 346:1
law 2:8 9:6 12:6
  34:4 202:16
  224:22 225:8
  250:7
lawyers 203:4
layers 59:2
lead 132:4 166:17
  166:17 249:20,23
  250:5,7,14 251:4
  251:16,24 252:1,8
  252:20 260:18
  344:9
leader 224:19
  225:9
leaders 228:13
  346:14
leadership 211:18
  227:24 321:6
  342:19,24 343:4
  343:16,22
learn 147:12 210:8
  210:11 286:19,20
leave 40:2 118:19
  162:9,11 347:20
led 139:5 144:7,19
left 94:9,14 190:9
  262:7 316:2 338:3
leftover 332:7
  334:10
legacy 192:10
legal 13:24 65:14
  102:20 124:1
  151:6,11 152:2
  157:10 212:9
  222:24 280:13
  361:1 364:1
lend 153:5 156:23
length 194:17
lens 80:17

letter 205:16
308:22 309:1
361:19
letting 17:12
level 59:3 61:1
118:9 125:16
127:2 129:23
171:21 172:1,18
186:4,9 190:24
233:23 236:20
244:20 249:7
255:7 257:3 258:2
258:5 260:24
261:1 268:15
270:24 276:11
281:20 282:4
283:10 284:7
287:11 326:4
leveling 108:14
levels 180:20
226:13 232:19,19
256:8 260:10
261:6 268:8,12,15
272:7,22 296:20
314:17
license 306:4
licensed 98:12,20
103:3 239:24
276:23 281:24
282:1
liebman 180:7,9
184:17,17
lies 111:15 329:18
life 38:24 154:2
231:19
lifelong 73:7
light 24:17
likelihood 249:17
lily's 213:1 258:3
258:21 259:24
261:12 344:9

limited 352:2
limiting 35:14
line 38:20 45:11
47:6 53:2 89:21
97:20 113:22
120:20 167:23
185:7 187:15
188:14 189:4
190:1,6 191:9,20
241:16 293:16
326:19 329:18
353:19,23 354:4,8
354:15 355:13
361:13 363:7
364:3
linear 219:11
lines 51:12 64:9
65:19 66:6 69:16
99:9 352:22
353:10,12
link 105:3 212:23
220:8 353:17
linkages 185:15
225:16 229:2
248:9 345:12
linked 287:14
linking 154:14
183:14 225:21
list 5:17 49:1,19
51:19 131:11
132:18 133:3,21
134:18,23 135:10
135:21 163:7,11
200:2,4 201:4
213:15 217:15
257:7 260:5
261:17 264:4,6,20
listed 202:4
205:24 217:14
297:16 363:7,17

listing 183:5 363:7
lists 135:1
literacy 232:19
literally 283:13,23
284:1
literature 146:23
147:3,5 313:7
litigation 6:7,9
17:2 20:3,10 22:7
40:10 41:4 103:12
140:1 160:4,6
166:1 178:18,19
179:4,7
little 17:17 32:4
73:11 194:21
208:21 216:19
233:1 236:9 237:6
242:2,4 243:9
245:5 261:9
263:10 272:3,21
283:3 330:2 334:7
live 10:15 73:9
85:19,21
livelihoods 357:5
lives 73:9 85:24
154:4
living 86:3,13
91:14 154:4
llc 360:4
local 5:22 9:4 76:2
95:11,17 97:13
126:14 136:8
199:9 207:23
208:10 211:14
271:2 294:22
324:8,19,22
337:16,22 339:10
340:18,21
locally 180:18
located 1:21 11:17
350:20

location 141:6
log 205:16
logged 8:20,21
23:9
long 31:1,5 53:12
62:15 63:9 71:18
79:6 92:14,21,23
94:11 95:13
111:15 149:4,6,13
154:2 194:23,24
195:16 210:13,16
221:6 234:21
243:10 275:5,7
311:9 335:3,20
longer 71:21 150:2
170:16 192:12
265:15
longitudinal 126:9
348:3
look 14:12 17:19
19:9 21:8,23
25:18 34:17 41:10
43:13 44:2,5
45:10,22 47:21
49:7 50:24 58:5
65:21 66:5 68:17
68:22 69:12 76:13
77:9 83:9 85:3,9
85:10,15 90:5
101:1 104:1
108:16 109:14
114:23 115:1
121:23 128:14
131:9 140:15
141:17 142:6
143:22 144:21
157:18 158:12
160:9 161:1,6
162:6,16 163:22
164:5,24 165:9,16
182:4,8 184:13,14

195:9 196:7
197:10,12 199:7
203:9 208:17
212:17,17 218:1
219:21 224:9
228:4 229:11
234:5 247:15,23
253:3 258:1,4
261:4,15 268:15
269:4 281:20
291:14 292:17
321:10,17 323:5
323:11 341:2,12
351:12
**looked** 41:12,24
99:4 180:16 209:1
211:22 248:22
322:8,10 347:7
**looking** 15:7 54:20
54:21 56:16 59:17
65:20 66:7 69:18
77:15 81:14,22
86:9 106:9 113:1
113:12 116:17,21
120:4,14 124:13
128:7 133:15
141:21 147:24
149:23 150:13
155:18 186:12
189:13 191:14
192:5 195:1,6
196:4 200:2 204:1
205:15 208:5
210:14 226:16
241:21 251:19,21
253:6 263:8
280:24 293:5
308:8 313:6
321:14,16 323:23
335:17 338:20
342:23 353:4

**looks** 17:14 160:1
259:18 291:11
347:20
**loosely** 139:23
145:8
**los** 2:21
**lose** 93:19
**loss** 237:1,8,9
238:4
**lost** 93:20 159:19
327:24
**lot** 20:3 23:14 24:5
24:10,17 32:6
44:16 61:24 73:5
79:12 109:19
189:20 210:11
238:1 244:16
246:24 283:6,19
290:2 300:21
309:9 313:21
**lots** 286:24 287:1
329:21 345:12
**low** 232:18,19
**lower** 325:3
**lunch** 133:10,16
135:4 136:19
137:5,5,9,24 138:7
**lung** 130:7 272:18
272:20

### m

**m** 2:20 29:24
**ma'am** 10:9,21
18:19 20:22 21:3
28:13,14 30:17
31:10 43:12 51:7
58:8 67:7,11,18
76:7,11 77:4 84:9
114:15 115:9
119:1 131:20
136:9 144:5 160:7
178:1 179:18,24

204:11 218:4,8
219:16 220:6
227:12 262:11
285:9 293:4,10
296:10 306:20
316:16 322:1
339:5 353:8
**macbook** 12:21
**madam** 361:10
**magazines** 324:5
**magically** 228:17
**magnitude** 347:15
352:12
**mail** 13:19
**mailed** 18:21,23
**mails** 14:13
**main** 255:14
**maintained** 311:8
**majority** 189:15
243:6 257:21
281:22 286:17
287:21 308:14
309:14 310:9
315:2 355:12
**making** 84:19
116:1 166:8
214:13 263:21
**manage** 154:13
213:20 263:3,23
333:8
**management** 92:1
284:19 290:15
297:24 299:6
**managing** 287:13
**manifest** 72:19
130:13
**manifestations**
72:18 130:6
**manifests** 237:22
**manner** 180:12
288:16

**mansour** 29:23,24
30:5,9,20 31:19
33:8 199:19,23
200:23 201:3,11
201:14 206:2
**manual** 236:24
**manufacturing**
234:23 237:9
**mapping** 345:22
**marathon** 15:15
**marc** 213:1
**march** 113:20
114:10 146:15
160:8 162:4
**margin** 256:8
329:13 341:24
344:23
**marginal** 342:2
**margins** 353:16
**marijuana** 355:10
**mark** 11:12 131:4
291:18 292:23
**marked** 17:23
18:8 40:14,22
42:17 48:9,13
49:2 105:21
120:14 131:6,17
134:6 136:16
158:19,22 159:11
159:14 169:16
173:3 179:8
195:24 196:2
203:16 204:9
207:17 208:1
291:15 292:5,9
**markedly** 256:17
**market** 90:12
97:12 242:5
311:12,17 320:21
**marketing** 248:8
284:15

**markets** 95:11,18
97:13 242:5,8
**marking** 179:14
**marshall** 221:14
230:20 231:4,7,10
255:16,17,21,21
257:17 298:17
299:13 345:23
**mary** 29:24
**mary's** 222:3,6
230:20
**maryland** 69:22
70:8 85:22
**marys** 221:21
**mask** 10:1
**mass** 316:21
318:14 321:9,20
**master** 167:13,16
**material** 34:20
152:20
**materials** 10:19
28:7,15,17 29:5
50:6,20 68:17
69:2,4 75:24
88:10 104:16
105:5 115:19
131:8 135:1,7,17
180:16 192:19
209:18 211:15
230:2 231:20
254:20 255:23
271:16,17 284:6
301:7,10 341:13
**math** 355:4
**mathematically**
355:15
**matter** 7:15 19:7
35:19 42:7 88:20
93:15 94:23
164:16 175:14
190:19 195:14

275:10 276:1
288:16 292:20
310:8,8 348:13,17
349:11,20
**matters** 26:18
27:20 53:13 54:12
268:1 271:15
273:7 276:10
282:13 351:11
**matthews** 3:9
104:11
**mayor** 209:15
214:6,23 215:8,10
216:14,17,24
344:5 349:14
**mayor's** 216:2
301:5 345:2
346:14
**mcginness** 2:4
**mckesson** 3:2
280:4
**md** 5:12,14,17 6:2
6:5,8 48:19,21,24
158:16 179:2,5
**mdl** 5:5 6:4,6,9
20:6,24 22:15
40:11,21 44:1
53:24 56:13
139:20 142:2
158:18 166:17
179:4,7
**mean** 13:4,6 14:23
20:2 24:2,24 25:3
26:5,10 27:18
28:13 31:16 38:10
38:17 42:20 44:5
49:21 51:22,23
52:2 55:7 65:17
71:12 72:9 74:12
77:18 78:13 80:13
85:18 86:16 88:19

88:21 98:6 99:4
99:21 100:23
102:7 103:2
107:22 108:3
109:17,19 110:14
115:7 117:12
119:19 125:11
132:7 135:15
140:20 141:16
142:20,24 146:21
151:8 154:4 155:5
156:16 163:12
164:17 183:16
187:3,6 189:10
190:19 192:18
198:13 206:22
208:12 209:7
210:8,16 211:22
212:9,11 219:9
220:21,22 222:24
224:14 225:20,23
226:10,17,18
227:17,18 230:16
231:21 233:19
235:3 237:18
238:8 239:20,23
241:14 242:1
246:19 250:17
260:17 263:16
265:13 276:18
278:8 281:17
286:2 287:17
288:4,4,8 289:19
294:12,20 298:2
299:15 300:1
302:17 304:11
314:16 316:24
317:16 320:7
325:20 326:13
327:22 331:1
334:16 336:21

339:23 342:3
347:6 348:13
352:11,13
**meaning** 54:3
181:8 330:15
336:17 346:19
353:22
**means** 10:15 79:14
130:20 151:5,10
152:1 157:9 228:9
229:22,23 250:9
300:18 322:22
342:14
**meant** 173:5
**measure** 26:13
72:13 73:14
251:21 268:14
272:15,17 317:24
326:5
**measures** 72:21
208:14 210:21
344:8
**meat** 194:19
**mechanisms**
353:18
**media** 7:13 25:2
25:12,14,21 248:8
284:15 316:21
318:14,24 321:9
321:21 325:8
**medical** 46:2 54:2
55:3 56:20 59:8
64:22 80:24 98:22
221:22 285:13,17
285:21 296:16
307:24 308:10,23
**medically** 98:8
270:9
**medication** 129:14
269:8 287:8
302:13 305:9

333:13,17
**medications** 43:21
  128:16 129:1
  312:11 332:4
**medicine** 129:17
  273:4 276:24
  282:24 298:14,19
**medicines** 265:1
  266:23 269:18
  332:20
**meet** 29:8,15
  201:9,12 255:9
  289:3
**meeting** 29:15
  31:3 248:7
**meetings** 6:11
  31:3,4,5,12 32:17
  35:10,11,15,19
  36:23 37:5 136:3
  136:13 199:1
  200:12 201:2,6,15
  201:22 203:15
  206:9,14
**meets** 359:15
  360:5
**mel** 8:14
**melissa** 2:17 9:1
  179:11
**member** 88:12
  199:21 281:24
  282:24
**members** 136:4
  199:9,10,24 200:5
  273:15 275:6
**memory** 215:14
**mental** 176:21
  181:18 188:24
  189:7 190:1
  231:18,21 235:11
  236:24 238:3
  255:1,1 315:16

**mention** 215:8,10
  216:17
**mentioned** 50:21
  84:6 88:24 98:21
  140:5 199:14
  213:16 258:20
  270:19 272:6
  275:22 313:18
  314:3 339:24
  341:6,7 345:18
**merely** 263:21
  345:4 348:15
**merit** 1:21
**merits** 347:14
**mess** 228:15
**message** 13:19
  326:23
**messages** 13:1,2
  14:13 284:12
  320:19
**messenger** 13:20
**met** 29:12,17 33:7
  33:15 91:17 136:6
  201:3,7 205:23,23
**meth** 83:3,4 84:19
  84:22 86:2 100:3
  127:15
**methamphetamine**
  81:14 82:5,15,20
  83:21 84:4 86:19
  87:23 98:24 99:14
  99:19 100:2,3
  116:10 117:8
  124:14,19,21
  125:12 126:3,19
  126:21 127:5,7,12
  128:4 355:8
**methods** 211:4
  279:10 282:16
  287:12

**micro** 180:8
  184:19
**microphones** 7:4,8
**mid** 268:11,11
**middle** 19:24 51:1
  213:24 307:3
**midwest** 361:17
  364:1
**million** 51:24
**millions** 330:21
**milton** 340:12
**mind** 37:6,24
  100:19 109:18
  118:13 120:10
  121:10 125:16
  132:23 145:17
  146:21 163:20
  180:15 252:17,18
  253:15 298:2
**mindful** 126:14
  161:18,21 192:24
**mine** 355:18
**mini** 46:21
**mining** 234:23
**minority** 258:14
**minus** 22:19 26:7
**minute** 34:14 44:9
  44:15 167:12
  203:11 207:8
  268:9 289:12
**minutes** 22:3
  66:20,21 133:7
  198:16 253:9
  338:3 353:1
**mischaracterizes**
  102:2 112:2
  115:16 121:2
  123:3,23 125:10
  126:24 219:7
  320:6 347:23

**misconception**
  262:16,22,23
**misconceptions**
  25:16 262:14
  309:10,13 328:19
**misconstrue** 221:4
  274:23 314:23
**misconstrued** 80:5
**misconstrues**
  263:12
**misinformed**
  335:8
**misleading** 150:3
**missing** 215:8
**mission** 255:19
**misunderstandin...**
  25:15
**misunderstood**
  216:12
**mitigate** 237:20
**mobile** 337:1
**mobilization**
  344:2
**mobilized** 213:14
**modalities** 312:13
  312:20
**model** 5:19 132:22
  133:4,23 134:19
  178:3,11 180:4
  181:2,8,9 182:19
  291:12,14 292:4
  292:15 293:6
  321:11 338:20
**models** 69:3
  135:14,16,19
  174:8 182:13
  210:6 253:5
  324:14 351:12
**modest** 71:14
  132:10 339:23

modification
  352:5
modify 279:16
molecular 90:5,6
  98:24 99:4
molecule 99:10
moment 42:21
  44:23 253:18
  338:7
moments 104:12
moms 213:1
  273:17
money 222:5,10
monique 2:5
monitor 345:20
monitoring 297:5
monograph
  142:12
monographs
  142:3 143:1
month 10:11
  22:17 130:15
  240:2 322:10
  323:13
monthly 346:2
months 19:23
  22:19 41:11,11,11
  57:6,10 111:5
  185:1 206:23
  276:9 323:14
monument 28:9
  28:11 29:13,20,21
  32:11,14 34:9,23
  35:12 36:24 38:11
  136:4 199:11,24
  200:20 201:13
  205:22 206:8
morbidity 71:10
  73:5 75:6 90:4
  111:9 119:11
  262:19

morning 7:2 9:1
  9:21,22
mortality 71:10
  75:6 90:4 111:9
  119:12 262:19
mothers 213:21
motivated 140:10
motley 2:6 8:11,13
  8:15 12:6 34:4
move 35:22 72:16
  81:14 88:23
  148:17,22,22,24
  149:1,19 156:12
  156:17 158:5
  197:6 217:4,7,8
  253:12 285:1
  315:22 316:12
  330:5
movie 324:9
moving 36:19
  61:11 99:11
  170:12 335:10
mr.burnett 261:20
mt 2:7
multi 109:22
  155:14
multiple 31:3
  250:22 325:1
multiply 323:14
mumbo 163:17
musculoskeletal
  279:6
mute 199:4
muted 199:5
mutually 124:4,7

**n**

n 7:1 9:16 29:24
  30:2 199:22
  307:12
naive 287:19
  326:13

naloxone 60:20
  61:6 97:16 154:16
  228:9,14,18
name 7:23 10:3
  30:1 217:1 343:14
  348:11 361:6
  362:3,4,15 363:3,4
  363:21
named 342:11
names 199:17
nancy 11:7 30:3
narrative 93:2
  135:15,18 148:19
  149:4,7,13
narrow 225:23,24
  334:21
national 41:4 56:5
  69:23,24 70:6
  72:24 99:7 132:9
  145:19 180:17,20
  182:14 184:12,16
  266:20 272:11
  301:24 322:2,2,8
  322:15 323:2,19
  323:20,20 324:3
  324:23 331:16
  332:1 340:22
  341:18
nationally 184:24
nationwide 347:8
natural 147:1
nature 55:17
  59:20 60:16,22
  62:8 64:1,4,17,19
  65:8,24 109:21
  110:6 119:4
  130:22 137:2
  147:13 241:9
  272:23 280:10
  281:18 286:22
  289:18 302:15

  358:4
near 149:12
nearly 67:24
neat 39:20
neatly 39:18
necessarily 130:11
  183:15 295:10
necessary 91:7
  194:24 329:16
necessitated 12:11
need 13:9 25:9
  27:2 36:22 39:5
  49:14 53:5 77:9,9
  79:14 93:6 94:12
  104:12 114:23
  118:4 119:3
  131:23 153:21
  154:9,10,10,11,13
  154:17 161:5,13
  162:22 166:4,6
  182:7 196:17
  214:8 215:1 219:4
  219:9 223:12
  237:24 255:9
  258:7,12 259:8,11
  259:19 269:4
  279:16 286:16
  288:9 289:13
  294:7 317:3 318:8
  321:4,4,4,5,6
  324:2 326:24
  327:8 329:5
  334:23 335:4
  338:4 342:2 344:6
  348:19 351:17,17
  351:21,23 352:12
  356:17,19 357:4,4
  358:14
needed 40:4 64:16
  172:1 237:24
  332:8,11 352:6

needle 336:6,6,16
337:8
needles 337:3
needs 38:23 61:22
157:20 222:9
256:6 257:9
259:13 287:6,10
311:5 317:21
320:3 327:15
329:4 330:12
332:23 341:20
344:23 345:6,11
348:2 353:17
357:2
negative 165:17
neglects 176:16
neither 359:11
net 256:7
netflix 29:3 36:4
37:16 84:7
network 94:8
networks 289:21
never 95:6 96:3,15
96:24 100:8,11,15
101:7 242:22
244:3 258:1,4
263:19 269:19
nevertheless
164:22 186:5,10
225:18
new 3:5,6 42:24
153:23 164:11
171:13,16,16
172:14 173:23
175:10,15,16
176:24 177:13,16
177:17 241:11,16
349:7
newer 217:23
nice 138:7 265:23
340:23

night 258:7
nightstands 61:17
331:3,12
nine 41:11 111:5
206:23 276:9
ninth 2:9
nj 2:19
noncancer 309:11
nonfatal 345:21
nonmedical 80:11
97:24 98:9,19
283:1 334:18
nonmedically
90:19 91:9 98:8
98:11 154:19
248:4 281:22
nonmedication
312:20
nonopioid 77:20
116:9 117:22
126:5
nonphysicians
265:2
nonprescription
101:21
nonviolent 250:9
250:13
nora 99:6
northern 5:5 6:3
40:20 41:5 158:18
nos 7:20 48:15
49:4 179:1,9
notarized 361:14
notary 359:4
361:24 362:10,18
363:15,23 364:23
note 7:4 50:4
62:15 69:17 78:4
78:16 80:2 125:11
161:10 162:7
205:14 206:12

213:13 226:14,17
226:22 228:24
278:24 300:20
306:23 307:21
322:20 346:17,18
354:1,6 361:12
noted 71:7 127:3
143:15 161:10
191:18 252:24
272:14 356:14
notes 6:10 31:11
31:14 35:10,15
36:7,8,15,17,23
37:10 125:11,13
136:1,2,3,12
202:18 203:14
204:5,9,13 205:22
206:7 215:23
359:9
noteworthy 119:2
notice 1:20 5:2
18:6,14,20 19:11
62:13 156:15,24
158:7 161:11
noticed 50:23
notifying 18:22
noting 15:20
149:15 189:13
242:7 319:7
notion 52:4 74:18
notwithstanding
211:20 213:11
294:22
novo 95:17
nrcad 302:2
nuance 55:8,11
195:19 197:18
321:3
number 14:6 23:9
23:11 50:5 53:1
78:21 95:19

100:20,23 103:24
111:3,12 118:24
131:11 139:17
153:2,23 172:7
182:3,3 202:9
203:1 209:8
219:18,23 230:2,2
231:17 236:6
243:1 251:20
252:17,18,19,24
261:24 265:4
268:6 269:11
277:1 293:2,7
298:24 305:17
306:11 323:16
324:13,17 325:3,8
331:16 332:22
333:24 335:18
337:19 343:8
351:10,11 357:19
361:7,13
numbers 48:10
83:8,12 109:18
135:2 180:10,17
232:20 331:9,11
363:7
numerous 329:7
nurse 288:23
nurses 301:2
ny 3:6

| o |
| --- |

o 7:1 29:24 30:2
o'clock 137:7,10
137:16,18 253:23
oath 8:4 9:10
41:16 44:23
object 26:24 52:23
53:6 63:3 92:19
122:8 150:1
168:11 182:1
336:20

**objected** 64:7
**objecting** 155:20
**objection** 9:9,11
9:12 14:24 22:8
23:22 33:1 37:11
51:21 57:23 59:14
60:11 63:21 65:1
68:7,21 70:19
71:4 72:8 73:21
74:10 75:11,20
78:1 81:2,17 82:8
82:16,24 83:7,23
84:1 85:1 86:5,7
86:15 88:17 89:5
89:13 91:22 93:18
95:8 96:5,18 97:2
98:5 99:3,22,24
101:17 102:1,21
107:20 109:1,11
110:12,20 112:1
112:13,15 114:20
115:14 116:11,24
117:9 118:3 119:5
119:18 120:8
121:1 123:2,22
125:9 126:23
127:17 128:10,23
129:5,18 135:12
136:10,14 140:2
144:15 145:13
146:10,16 148:5
152:5 153:11
155:4 157:13,24
163:10 165:4
173:15 175:12
176:12 177:2,15
178:16 183:6
184:10 185:12
186:16,24 187:14
187:21 188:10,20
189:9 190:4,18
191:13 193:16
195:12 210:1
211:11 212:8,16
217:18 219:6
222:2,23 223:6
230:15 231:5
232:8 235:2 237:4
246:18 249:11
251:6,18 252:10
259:4 260:7,16
261:20 263:12
268:22 271:23
275:20 276:6
277:17,24 278:7
279:7 281:16
283:24 286:1
289:11 291:5
294:10 296:1
297:15 298:22
299:21 305:11
314:8 317:15
320:5,5 325:17
326:1 327:12
329:10 332:12
333:19,19 334:15
337:10,18 341:22
344:19 346:5
347:4,22 350:12
352:4,10 355:9,17
**objections** 14:10
57:15,16 167:1
**obligations** 43:20
**obliquely** 282:12
**obtained** 307:22
**obviously** 20:19
144:16 168:19
205:1 252:1
285:16
**occupied** 259:14
**occur** 193:4
239:10
**occurred** 32:16
57:6 90:12 326:4
334:8
**occurring** 24:20
58:4 255:1
**october** 6:9 10:11
140:23 142:4,4
143:2,2,22 179:7
179:22 331:20
332:2 359:17
**odd** 12:10 143:7
**offenders** 250:9
**offer** 38:19 49:20
50:14 51:8 61:3
62:11 64:21 243:2
**offered** 81:7 230:7
298:11,19
**offering** 55:2
56:19 197:11
222:8 223:1,9,13
279:14 280:1
282:9 298:20
**offerings** 298:16
**offhand** 19:21
**office** 209:15
214:7,24 216:2
299:19 300:11
301:5 344:5 345:2
345:24 346:15
**officer** 224:22
225:8
**officers** 202:13
**offices** 340:9
**official** 39:21
362:15 363:21
**offspring** 213:21
**oftentimes** 248:6
**oh** 48:11 72:1
147:18 204:2
219:2 335:17
**ohio** 5:5 6:4,7,9
16:18,23 21:2
40:11,21 41:5
43:10 45:18 46:6
47:5,6 53:24
56:13 57:22
139:20 142:2
146:8,15 158:11
158:18 160:3,16
161:2 162:2
164:12 165:3
168:9 171:1,14,18
171:21 172:2,4,15
172:17,21,23
173:2 174:1,8,12
174:20 175:2
176:10,14,15
177:14 178:8,18
179:4,7,21 181:8
181:14,22 182:24
183:3,12,24 184:8
185:14,17 186:7
186:14,23 187:12
187:19 188:8,9,12
188:19 189:5
190:2,17,22
191:10,18 192:14
192:23 193:3,23
195:2,11,15,24
196:3,6,24 197:9
197:13,16,24
225:13,17 235:15
361:2
**okay** 8:22 11:5
12:18 13:12,16
17:11 18:3,13
19:7,11 21:10
24:23 29:7 30:18
33:6,23 36:14,18
40:5,24 41:15,24
42:4 44:18,20

45:3,8,23 46:16,22
47:10 48:1,11
49:5,6,14 56:12
57:3 58:9 59:6
64:16 66:11 67:19
69:15 70:12 76:12
77:18 83:18 84:10
84:14,18 85:23
92:14 93:22 95:3
100:6 101:22
105:10,16 107:17
107:22 114:7
120:3,13 122:18
131:3,4,16,21
134:8,12,16 135:3
136:16,20 137:16
138:6 139:16
141:13 142:20
143:19 144:21
145:7 147:18
150:19 159:6,9,15
159:19,22,22
160:11,19 161:1,8
162:6,16 163:6
164:1,5 166:11
169:22 170:20,22
171:4 173:5
177:13 178:7,20
179:14,19 180:1
182:24 184:12
193:8 194:10
195:9 198:14
199:13 200:19
202:2,6 203:3,20
204:8,18 206:5
207:5,15 208:4
209:3 216:10
217:9 218:5,9,15
219:17,21 220:1
220:18 223:8,17
224:4 225:3 227:8

227:13 234:16
239:10 241:8,18
243:8,24 244:21
245:15 246:7,14
247:8,12 254:6,9
254:13 260:13
261:8 262:1,4,12
262:16 263:7
265:12 266:2,5,17
267:11 271:9
275:13 280:9
281:3,11 284:24
285:16,20 292:2
292:11,13,22
293:5,20 295:12
296:14 302:10
303:4,24 304:15
304:22 305:4,22
306:21 307:21
308:9 311:1,3
317:7 320:13
321:15,20 322:7
322:13 330:9
335:16 337:13,21
339:9 347:17
352:24 354:6
**older** 323:17
**omar** 29:23
**ones** 231:24 317:1
**ongoing** 113:11
**onion** 59:2
**online** 299:3
**ooo** 358:24
**open** 17:18 18:4
40:13 47:24
103:21 134:2
137:6 158:13
178:20 179:16
207:15 208:4
225:14 258:7

**opened** 133:5
134:3 159:15
**opening** 337:20
**openings** 357:11
**operator** 7:2 9:9
9:13 66:22 67:2
93:20,23 94:4
137:22 138:3
170:2,6 198:17,21
253:17,22 316:5,9
338:7,13 358:18
**opiate** 41:4
**opiates** 122:4
**opine** 127:11
273:6 279:18
281:17 303:10
**opined** 238:10
**opining** 192:6
311:11 347:14
**opinion** 51:18 55:2
64:21 65:10,14
222:9,18 263:10
264:5,7,19 265:8
267:3,6 271:19
277:6 279:11,14
280:13 287:3
317:16 345:4
356:6
**opinions** 42:23
49:19 50:14,22
51:8,16 54:1,2
56:20 60:3,4,10,14
61:3 62:6,11 63:8
65:3 81:7 88:4
132:20 133:18
135:8 146:14
194:22 200:6
206:16 212:4,10
222:24 223:1,9,13
223:24 261:19
273:11 280:2,9,14

282:9
**opioid** 5:10 20:3
20:10 21:17 23:7
25:13 26:4,14,18
37:21 48:17 49:8
51:10,15 53:17
55:24 56:7,22
62:19 63:19 67:12
67:19 68:1,9
69:18,24 70:6,16
71:2,9,21 72:1,4
72:22,23 73:6,13
74:20 75:5 76:17
77:19 80:10 85:14
87:5,7 89:1,2,4,10
89:12 90:4,20
91:16,18 92:9,11
93:15,16 94:24
95:1,5,6,19 96:4
96:15 97:1,4
98:19 100:9,11,15
101:8 103:7
106:12 109:23
111:8 113:11
116:5 117:13
119:11 120:7,12
123:21 124:10
126:4,7 127:20,23
128:5,8 130:22
138:14 139:1,13
144:9 145:3 147:2
151:1,17,22
152:12 153:24
154:3 160:14,14
160:15 162:23
182:15 191:6
192:10 209:5
210:4,24 211:5,8
212:23 216:3,4
218:11,12,17,18
223:5 231:9,12

234:2,21 235:24
236:6,14,18,20
238:23,24 239:7
239:15 240:11
241:4,12,18 242:5
242:9,13 243:14
243:19 244:4,6
250:11 254:17
257:21 258:9
262:19 263:4,11
263:24 264:8,17
264:22 265:10
267:4,7 273:1
274:24 285:23
287:5 288:13,14
289:8 296:23
298:1,4,9 299:6
300:18 302:22
303:13 306:1
310:12 325:10
340:2 342:9,21
343:12 346:1
347:19 348:5,8
349:8 350:1,10
351:21 352:16
354:16 356:8,20
357:2 358:10
**opioids** 17:2 22:7
23:20 24:12 25:23
40:10 43:19 51:4
52:1,8,20 54:4
55:4 56:3 58:14
59:10 61:16 63:20
64:23 66:2 68:2,4
68:14 69:20 70:1
72:5,13 73:3,19,20
75:2,4,9,15 81:4
85:13 87:14 88:2
89:22,24 90:1,3,11
90:11,19 91:1,2,9
91:21,21 92:12,13

92:17 95:10,21
96:10 97:8,12,18
97:22,23 98:8,11
99:1,14,20 100:4
100:21,24 101:14
101:19,20,21,23
102:9,10,12,16,19
102:22,24 103:6
111:11 114:18
115:13 118:1
119:16 121:6,7,12
121:18,19,24
123:12 126:15
128:21 129:20
130:1,11,12,19
144:3,24 151:6,11
151:12 152:2,3
153:20,23 154:11
154:19 157:10,11
160:5 228:21
239:21,23 240:9
240:16 241:4
242:8,14,18 243:1
243:6,16 265:2,19
266:14,18 267:9
267:16,18,22
268:18 269:12
270:6,22 271:12
273:12 274:7,17
275:5,8,16,18
276:4 277:7,9,14
277:21 278:4,15
278:16,22 279:5
279:13 281:7,12
281:21 282:19,22
284:18 285:7
287:7 288:10,20
289:9 291:3
293:24 294:5,8,15
295:1,17 296:9
297:14,22 298:12

298:21 299:10
305:6 306:18
307:1,9 309:10
310:17,18 311:5,9
311:11,23 313:20
314:5 315:17
317:13,19,19
318:10,18 325:14
325:15,23 326:24
328:13 330:14,19
331:10,11,14
332:14 334:8,10
334:14 335:1
342:6 354:13,18
354:23 355:5,15
355:20
**opportunities** 25:7
25:19 248:2 249:1
260:20 286:13
287:22 341:15
342:5 346:13
356:13 357:3,20
**opportunity** 41:20
49:17 115:22
117:14 142:15
165:9 167:7
172:24 174:11
197:11 201:9
225:24 226:1
237:9 250:14
286:19 324:16
357:14,15 358:9
**opposed** 114:18
129:15 200:10
336:12,13
**opposition** 309:15
**optimally** 220:23
220:24
**options** 311:13
354:9

**order** 21:11 39:16
45:7 59:18 65:21
66:9 99:15 101:2
101:2 109:21
118:15 119:21
153:23 154:18
170:10 176:18
270:1 299:4
301:11 329:22
357:1
**ordered** 96:2
192:14 198:5
**orders** 119:4
**organic** 99:13
335:3
**organization**
258:4
**organizations**
248:10 249:6,14
**organize** 39:17
**original** 346:22
**originated** 217:23
242:10 332:16
**originates** 25:5
**orphaned** 80:14
321:1
**oscar** 30:2
**oud** 100:8 213:20
**outcome** 8:6
**outcomes** 90:14
**outline** 58:6,19
139:23 144:22
161:3 219:23
**outlines** 143:23
**outlining** 163:8
**output** 26:14
**outreach** 213:7
229:5 261:1
284:16 290:23
294:17 295:9
298:15 299:3

300:17,24 301:22
320:17
**outset** 356:14
**outside** 100:1
211:11 237:4
249:11 327:12
350:12
**outspoken** 23:18
24:14
**overall** 68:1 69:18
70:16 71:2 90:3
108:15 111:23
112:8,9 132:11
159:6 354:6
**overarching**
163:15
**overdeaths** 70:17
**overdoes** 122:4
**overdose** 5:8 71:9
71:13 73:18 75:9
75:15,19 76:17
82:1,4,15 83:2,4
83:21 97:16
104:24 105:20
106:12 107:14
109:4,6,8,8 110:1
110:10,19 111:10
112:9 113:19
114:11,17 115:2
115:12 116:8
117:6,19 118:12
120:21,23 121:8
121:12,16 122:1
122:21 123:9,12
123:20 124:9,10
124:18,21 125:12
126:21 127:2,15
128:11,12,16,21
129:2 154:15
180:19 228:16
236:7 237:22

345:22
**overdoses** 61:9
68:20 77:20 78:21
82:19 84:4 106:5
108:14,24 111:3
113:2 117:13,22
119:15 127:4
211:5 226:1
345:21
**overemphasized**
264:13
**overestimated**
267:17
**overinterpreting**
71:19
**overlap** 124:8
145:10,15,17
**overlook** 75:3
**overlooks** 176:16
**overprescribed**
295:2
**overprescribing**
72:18
**overprescription**
151:6,11 152:2
157:10
**overreliance**
310:17
**oversight** 117:15
**oversimplify**
154:6
**oversimplifying**
194:22
**oversupplied**
265:19 311:24
332:15
**oversupply** 51:3
52:8,20,24 54:4
55:24 56:7 58:14
59:10 63:19 64:23
66:2 95:10,20

96:9 97:11 129:24
130:10,12 153:20
153:22 154:11
155:3,8,17 218:17
266:14,17 267:7
268:4 271:19,20
277:6 279:13
280:15,19 281:5
288:1,8 290:14
294:14,15 310:16
340:13
**owner** 360:3
**oxycodone** 129:2,6
129:9,14,15
**oxycontin** 90:6
99:6
**ozenberger** 29:23
30:1,7,8,9,19
31:19 33:8 199:20
199:23 206:2

**p**

**p** 7:1
**p.a.'s** 288:24
**p.m.** 137:13,23
**page** 36:9 43:16,17
45:11,24 46:9,10
46:11,16 47:2
50:7,24 53:2 57:8
63:9 67:8,8 69:11
76:13,21 104:21
106:9 107:1,7
108:4,5 113:13,17
113:24 114:4,9
118:17,21,22
131:11 134:20,21
134:24 135:15,19
140:15 141:22
142:7,9,20,23
143:15,17,22
149:22 150:11,13
150:17 161:6

162:3,6,16,19
163:24 184:13
194:13 199:7
200:3,21 202:4
205:24 213:13,23
213:24 218:1
224:11 227:10
229:12 234:7
245:6 246:8 254:4
262:8,12 265:22
266:11 280:23
281:2 306:16,16
316:15 317:3,6
330:6 335:10,14
335:21,22 352:22
353:1,6 361:13,15
363:7 364:3
**pages** 43:22 44:3
46:8,13 47:2
195:6 219:22
224:11 254:21
353:5
**paid** 19:15 38:7,10
223:12 259:15
**pain** 43:19 46:2
47:4,10 92:1
144:9 154:13
240:23 277:11
281:7 284:19
287:13 288:12,12
290:15 291:4
297:23 298:8
299:5 306:19
307:1 309:12
310:19 311:14
312:11,12,12,20
314:5 315:12
332:21,21 333:8
335:3
**pandemic** 12:11
111:7,11 119:3

200:15
**paper** 46:8,9,14
  309:4
**papers** 26:12
  132:2
**paragraph** 50:24
  51:1 52:24 58:5
  59:4 63:8 67:9
  69:14,15 76:19,21
  81:23 82:9,11
  106:9 113:22
  114:1,5,6,9 116:2
  150:22 155:14
  156:5,6 182:2
  197:16 214:2
  215:7 216:15
  233:4 281:4
  289:20 290:13
  302:2 303:21,23
  306:23 307:4
  318:4 344:3 346:7
  346:11,18 348:21
  349:17 352:24
  353:3
**paragraphs** 79:7
  149:14 216:18
  290:2 345:8
**parallel** 36:13
**paramedic** 225:7
**parcel** 35:2
**parents** 61:9
**part** 35:2 52:6
  59:12 73:5 81:14
  117:16 131:22
  139:21 144:16
  149:16 152:19
  153:19 175:22
  180:3 181:14
  183:1,3 185:6
  190:15 199:2
  221:8,17 226:3

231:20 235:23
236:22 241:24
245:24 256:19
261:23 265:14
266:13 279:8
285:11 288:21
297:19 301:23
303:6 307:17
312:9,24 318:6
330:13 363:9
**partial** 217:15
**participants**
  202:21
**participate** 224:21
  225:2
**participated**
  199:22 200:1
  270:11
**particular** 19:22
  23:1 28:24 32:1
  38:4 62:22 66:1
  82:18 90:21 120:1
  140:7 202:21
  230:11 248:19,23
  250:3 264:4
  266:21 304:12
  314:14 316:22
  327:9 331:22
  338:24 341:13
  350:15
**parties** 1:21 7:11
  8:4 27:1 42:5
  50:19 51:19
  139:10 161:11
  279:20 280:6
  282:18 359:12,14
**partly** 64:2
**partner** 232:16
  233:21 237:10
  255:14 288:17

**partnered** 302:7
**partnership**
  246:13 247:14
  249:10 257:17
**parts** 92:7 175:24
  244:15 250:19
**party** 279:19
**passionately**
  328:17
**path** 151:5,8,10
  152:1 154:7 157:9
**patient** 13:9 268:2
  269:6 276:15
  303:8 305:16
  306:7,8 308:1,2
  311:4 315:16,22
  316:14,21 317:24
  319:17,24 320:12
  326:6 332:7 333:1
  333:16,23 334:3
**patient's** 269:5
**patients** 81:4
  264:15 266:21,23
  267:15,18 269:13
  270:7 273:11,15
  273:19 274:6,16
  275:3,6,7,11,14
  276:24 277:10,15
  277:23 278:5,15
  278:21 279:4
  291:4 295:17
  297:14 309:21
  311:7,14 313:3,14
  313:16,19 314:4
  318:9 322:17
  328:20 333:4,6,11
  334:19,22,23,23
  335:1,7,7
**patterns** 270:21
  276:4 296:4

**paul** 2:8 8:24
  166:16
**pause** 289:12
**paved** 229:4
**pay** 224:1,1
**paying** 127:24
  312:1
**payment** 38:11,12
**payments** 223:8
**pays** 222:12
  223:20
**pdmp** 297:3
  302:21 303:11,17
**pdmps** 302:20
**peel** 59:2
**peer** 220:14
  224:20 225:8
  254:22
**pending** 10:7 41:5
**people** 6:11 47:5
  47:11 62:22 73:2
  73:8,9 80:9 81:13
  89:24 90:16,17,18
  91:8,11,20 95:23
  100:7 130:3 145:3
  152:11 154:3,14
  154:14 183:14
  185:16,19 202:10
  203:1,15 204:4
  212:23 224:24
  225:1,21 226:2,6
  228:9 229:1,6
  230:3 231:12
  236:6 238:11
  239:21 240:15
  241:17 243:4
  249:17 250:20,24
  252:13,15,19
  254:18 257:21
  259:14,16 261:18
  271:1 272:19

273:16 281:21
298:1,7 310:1
317:16 320:15
325:21 326:12,17
336:11,17,17
337:5 339:16
351:11,18,23
352:16 353:18,20
357:4,4
**percent**  26:6,11
67:24 68:1 70:16
71:2 73:18 83:2,3
106:12 121:7,16
122:21 123:9,12
123:20 124:7,7,9
125:6 126:20
127:15,16 129:3,7
130:3 197:8 236:7
236:17 271:20,21
271:21 298:3,3
336:10 354:11,16
355:4,6
**percentage**  26:8
75:8 114:16
124:17 267:12
268:17,19,20
269:12 271:21
277:8,14,20 278:4
278:21 279:4
354:2
**percentages**  83:1
**perception**  126:2
**perfect**  146:3
269:23
**perfectly**  169:19
218:22
**perform**  246:21
256:6 270:13
287:9 296:3
297:17 317:20
327:14 331:6

344:20 346:9
**performance**
212:19 245:23
251:13 346:14
**performed**  184:18
213:10 358:7
**performing**  350:3
**period**  14:9 58:17
193:5 244:19
**periodicals**  324:7
**permanent**  332:3
**persist**  78:19
309:13
**person**  10:17 29:9
136:24 200:12
201:12 205:23
206:9 326:15
**personal**  204:9
**personally**  202:2
362:11 363:15
**personnel**  300:23
**perspective**  54:5
84:24 85:6,24
93:14 161:4
162:22 242:21
264:19 272:12
313:5
**pertaining**  13:3,6
314:11 355:20
**pharmacies**
282:16 340:8
**pharmacist**  303:5
303:8 305:23,24
306:12
**pharmacist's**
303:6
**pharmacists**  297:7
302:12 303:11,12
304:23,24
**pharmaco**  269:15

**pharmacoepide...**
64:4
**pharmacy**  120:24
**pharmacy's**  297:5
**phenomenon**
152:13 153:17
**phone**  29:9 147:17
165:19 167:13,17
168:12 169:9,24
170:12 199:1
200:21 202:3,7
203:1,5 206:18
243:1 361:3
**phones**  7:7
**physically**  11:17
**physician**  13:9
43:18,20 60:18
68:3 98:1 101:24
129:15 240:10
270:9 274:18
276:13 296:15
297:11 298:20
299:9 305:5 306:3
313:16 335:6
354:24
**physician's**  301:3
**physicians**  70:2
144:9 262:24
263:2,8,9 264:4,6
264:6,14,21,24
265:20 270:4
271:10 273:13
274:7 275:16
276:22 284:23
285:2 288:23
297:7 299:20
300:13,22,22
302:12 311:14
**pick**  7:5
**picked**  200:16

**picture**  142:6
**piece**  46:8,9,13
299:17
**pile**  39:20 40:2
**pills**  332:8,8,22,24
333:15,15,15
334:10
**pioneer**  221:23
**place**  7:7 42:21
63:15 73:15 87:8
90:15 93:10
130:10 159:2
177:23 187:4
206:22 208:7
209:4,9,15 210:5
212:13 213:1
218:11 220:2,2,19
220:20 221:2
222:21 223:4,10
223:22 224:15,15
241:24 243:20
244:9 245:7 250:3
256:15,22 258:3
258:21 259:24
261:12 276:8
282:11 294:13
297:6 308:3
311:13 320:1,24
321:17 322:9
327:23 329:9
332:17 340:3
342:9 344:9 346:4
346:6 348:3,8
359:6
**placement**  175:9
188:3,7
**places**  53:19 55:14
258:24
**plaintiff**  1:5,12
**plaintiffs**  2:2 8:12
8:13,16,18 10:6,16

11:24 12:5 13:18
14:15 16:18,18
17:3 18:24 19:6
19:19 20:20 21:16
22:5,24 28:9
30:10,12,14 34:3,5
38:18 40:10 49:20
57:21 58:11,21
59:5,7 94:21
132:5 141:15
148:21 160:5
166:23 201:17,20
201:21 202:1
203:3,4,21 273:5
**plan** 5:10 38:14
48:16 49:8 52:7
54:23 56:6 61:2,7
61:8 91:8,10,13,23
93:9,13 94:20
96:1,14,14,23 97:4
98:4 126:10,12,17
131:2 139:19,20
147:11 148:9
160:13,21 163:1,5
167:19,20 168:21
172:21,23 173:2
174:6,8,12,16,21
177:5 178:14
180:2 181:14,22
183:1,3 185:6
187:7 189:2
190:12,16 191:10
191:22,24 192:6,9
192:13 193:3,9
194:10,24 195:11
196:6,24 197:1,2,9
197:12,13,14
198:3,4,4,11,12
207:9 208:7,13,15
209:1,4,12 210:19
211:22 218:16

219:15 223:10,11
223:22,23 234:18
235:10,19,22
236:11,12 237:12
237:13,16 239:4,5
239:13,19 240:6
241:23 242:12,16
242:17 243:7,20
243:22 244:8,11
244:15,19 247:1,9
256:7,13,14,20
258:16 259:18
261:15 262:6
265:24 266:13
285:11 287:17
288:1,3,21 290:3
300:16 301:24
321:10 322:3
325:6 326:10
327:8 329:6,12
353:17
**planning** 161:17
**plans** 141:24
165:2 180:2
209:14 210:23
**plate** 39:4
**play** 75:5 247:6
249:15 280:8
303:12 304:24
305:24 309:11
**played** 55:20,22
89:22 140:13
175:23 230:20
231:15 255:17
**plays** 25:14 191:5
221:3 231:7
357:15
**pleasant** 2:7
**please** 7:4,6 9:14
10:2 11:15,18
15:18 16:6 18:4

21:19 28:20 36:7
44:10 67:10 70:21
88:22 93:7 103:16
106:6 107:1,7
113:4 114:24
116:19 117:2
134:10 135:6
150:12 155:11
158:12 159:23
162:19 178:22
180:15 183:22
198:8 203:11,22
206:11 207:16
214:17 233:1
246:7 253:16
254:2 262:2
289:12 328:4,5
330:6 343:19
353:3,6 361:11,11
**pleased** 331:23
**plenty** 90:18 113:9
**plus** 22:19 26:7
**point** 23:14 24:7
39:3,16 45:15
53:3,11 72:10,14
74:13 78:15 79:16
87:23 92:5,5,18
95:16 100:21,24
108:17 109:18
114:3,9 116:1,3
118:23 119:8
120:1 122:13,16
126:18 127:3
130:16,21 132:15
142:14 146:7,19
146:20 147:8,11
147:15,19,20
166:8 168:4 184:6
184:12 186:2
187:10 189:19
195:21 209:10

214:17 215:9
227:21 232:12
241:1 243:18
258:11 259:8
260:24 263:21
265:5 275:23
282:3 288:18
304:13 310:11
324:15 340:14,17
343:2 344:10
348:18 349:19
351:17 358:7
**pointed** 323:2
**pointing** 121:21
**points** 68:10
109:20 112:20
119:9 126:16
187:4 242:3 253:1
253:1 261:24
281:5 346:12
**police** 340:12
**policy** 209:16
214:7,24 216:2
301:6 320:10
344:6 345:24
**poly** 120:24,24
**polysubstance**
87:15
**poor** 231:19
232:18 315:12
**pop** 107:7 233:4
**population** 129:23
174:18 178:3,12
180:4,9,23 181:3
181:10 194:3
237:21 267:20
268:15 281:20
291:9 292:15
293:11 323:13,16
**populations** 58:15
60:6 174:15

259:19 269:18
270:1 351:13
**posed**  149:18
**position**  15:4
169:2 211:24
**positive**  245:21
**possession**  18:3
**possibility**  295:19
**possible**  19:1,3
40:1 79:15 150:9
170:15 199:21
216:7 290:24
323:10 340:19
**possibly**  19:22
22:20 169:3
**posttraumatic**
233:20 237:10
288:17
**potential**  102:15
119:11 126:2
233:9 268:14
294:14 317:12
325:14 333:11
334:17 341:3
**potentially**  95:17
174:5 183:10
280:16
**poverty**  237:1,8
238:4
**powerful**  103:8
**practice**  293:24
294:6
**practices**  279:17
**practicing**  13:4,8
43:7 54:17 81:3
305:5
**practitioners**
288:23
**pre**  268:8 272:7
285:1

**preceded**  98:18
**preceding**  117:1
**precise**  13:16 20:4
22:16 56:24 68:10
119:7 182:9
202:20 206:23
207:4
**predicated**  60:21
62:7
**predispose**  233:12
**preface**  17:11
**prefer**  27:19 65:15
90:20 157:18
**pregnant**  213:2
**preliminary**  68:19
71:1,6 76:15
106:4,11 108:13
108:21 109:2,5
110:1,9 113:1
127:1 182:13
184:23
**preparation**  30:15
30:20 31:23 32:5
32:9,10 38:15
88:5 92:2 190:22
**prepare**  28:3
34:11 35:12 40:7
**prepared**  6:3
158:17
**preparing**  26:22
27:4,10,23 29:6
253:2
**prescribe**  270:5
276:14 294:8
299:10 305:6,9
306:5
**prescribed**  68:2,4
69:20 70:1 72:13
101:23 118:1
129:11,15 239:24
240:9,11 265:2,19

269:7,14 273:12
274:7,17 275:15
278:22 306:1
325:23 333:1,13
**prescriber**  60:18
98:20 282:1,2
305:15 306:7,8
333:23
**prescribers**  98:13
102:12,13 154:9
239:24 265:7,17
276:23 288:20,22
289:4,7 290:9,22
291:1,8 293:3,7,22
294:3 295:14
296:5 300:19
301:8,22 304:2
333:3,6,11
**prescribing**  68:9
70:7 73:13 264:17
269:7 270:7,21
271:11 272:9
273:2 274:24
275:17 287:7
290:19 294:19,20
296:4 297:13
299:9 300:18
302:13 304:4
306:18 307:1
**prescription**  41:4
43:21 66:2 68:1
69:19,24 73:20
75:4,9 89:4,12,22
90:1,11,19 91:1,2
91:9,21 92:12,13
92:17 93:16 95:1
95:6,10,20 96:4,9
96:15 97:1,8,12,18
97:23 98:19 100:9
100:11,15,24
101:8,20 102:10

102:11 118:1
119:16 120:7
128:16,21 129:24
130:10,19 144:2
144:24 153:20,22
228:21 240:16
241:3 242:4,10,14
242:18 243:1,6,16
244:4 265:1
266:14,18 267:4,7
268:18 269:18
270:5,22 276:4
277:7,9,14,21
278:4 279:5,13
281:12 282:22
289:9 291:3
295:16 296:9
298:12,21 303:7
305:6 306:1 311:5
311:11,18 313:20
314:5 317:14,19
318:10 325:15
332:4,10 334:8
340:2 342:6
354:23
**prescriptions**
51:24 270:21
285:7 288:2
330:22,23 331:4
332:16 334:20
**presence**  30:10
128:15,20 129:9
129:14 130:18
221:5 252:21
**present**  3:7 8:7
30:13,14,21 32:12
32:14 33:11 35:16
37:1 150:8 186:5
201:1,6,17,20
202:1 203:8
351:24

**preserving** 32:24
**president** 150:21
  154:21,21
**president's** 151:19
  153:16
**presiding** 42:7
**presume** 13:3
  18:23 19:1 22:12
  129:9 159:7
**pretty** 94:19 99:18
  168:18 240:20
  339:23
**prevent** 16:11
  24:20 58:4 282:11
  322:3
**preventing** 191:6
**prevention** 164:8
  171:6,9,10 181:15
  183:2 184:7 185:3
  186:14 218:6,16
  219:1,4,19 224:5
  246:13 247:13,22
  249:9,16 261:8
  266:3,9 283:5,8,11
  283:12,13,21
  284:12,13 285:3
  286:10 341:8
**previous** 175:13
  177:3 275:23,24
**previously** 129:22
  157:17 242:15
  255:18 272:14
  276:20 281:19
  311:18
**price** 128:1 312:1
**primary** 199:24
  229:6 247:22
  249:16 262:18
  265:20 283:10
  327:15

**princeton** 2:19
**principle** 13:24
  14:23
**principles** 143:24
  144:7 262:9
  284:18 290:15
  297:23 299:5
  320:20
**printouts** 31:17
**prior** 36:6 40:6,8
  78:23 109:10
  111:4 132:16
  142:12 161:15
  165:7,9,11,15,16
  165:21 168:2
  193:14 196:14,15
  196:20 246:1
  276:20 303:7
  353:14
**private** 7:5
**privilege** 32:3
  205:5,8,16
**privileged** 32:21
  204:15
**privy** 347:10
**pro** 12:22
**proact** 213:17
  229:21,22
**probability** 59:9
**probably** 28:1
  40:2 101:9 132:9
  136:22 166:22
  194:13 269:1
  273:8
**problem** 55:17
  59:20 60:16,22
  62:8 64:1,3,17,19
  65:8 109:22 110:6
  126:3,4,4,5 144:8
  167:16 242:22
  246:16 263:18

331:17
**problems** 208:22
  234:1 235:17,18
  356:21
**procedure** 1:20
  362:5 363:5
**procedures** 282:10
**proceed** 34:19
**proceedings** 15:11
  67:1 94:2 138:1
  170:5 198:20
  253:21 316:8
  338:11
**proceeds** 10:11
**process** 27:3 32:2
  34:18 154:22
  155:10 180:21
  219:11 274:20
**processed** 251:1
  252:19
**processes** 282:17
  339:18
**produced** 140:22
  160:2,3 184:18,24
  206:10 209:18
  271:17 299:23
**product** 32:3,21
  205:8
**production** 361:15
  361:17,22
**products** 95:12
  120:12 122:15,20
  248:4 267:19
  335:9
**profession** 269:16
**professional** 38:23
  54:3 55:3 56:21
  87:2 132:12
  224:17 236:5
  285:4 289:23
  291:12 292:20

294:16 295:22
  326:9 331:10
  342:4 348:16
  360:17
**professionally**
  270:14
**professionals**
  301:4
**professor** 24:18
  87:4 180:6,9
  184:17
**profile** 289:8
  291:2 318:9
**program** 52:3
  55:21 59:19 61:14
  94:23 161:24
  174:20 181:5
  212:19 213:1,4
  221:1,2,5 222:15
  228:1,5 229:12,14
  230:12 245:7,16
  245:17 246:23
  249:20,24 250:5
  250:14,18 251:4
  251:10,17,22
  252:1,8,11,20,21
  254:9,22 255:18
  257:1,4 258:19
  260:12,18 261:3,7
  283:8,11,13,16
  284:6,13,20,22
  290:21 297:3,6
  299:8 300:2
  307:16,19 318:1
  319:14 320:9
  322:8,15,16,23
  324:2 326:10
  327:3 329:16
  330:4 335:24
  336:4,7,9,10,16,16
  339:1,2 343:3,6

344:11,22 345:1,5
348:4,20 352:1
355:22 357:6
**programming**
172:8 289:22
299:23
**programs**  25:2,2
56:16 61:13 66:7
91:13,19 92:16
93:11 127:23
161:24 162:10,21
163:8 169:12
173:24 177:22
178:4,8,10 181:11
184:21 185:3
193:4 194:2,8,11
207:8 209:23
210:3 212:12,24
213:16 217:14,16
217:23 218:10
219:18,23 220:1
220:21 222:20
223:3 228:6
229:15 230:6
244:18 246:6
248:17 251:14
252:2 254:3 255:6
256:4,13,21
257:10 258:15
259:7,22 260:2,4
260:14 261:12,16
282:14 283:4
284:2 286:20
287:15 297:18
298:18 300:15
301:14,18 307:9
316:20 317:10
318:3,23 319:6,9
320:8 321:4 324:3
329:8 337:8,15,15
337:20 338:18

339:6,8,14,15,18
339:21 340:24
341:2,6,15,16,18
343:9 345:18
350:19,22,23,24
350:24 351:6,8,10
351:17 357:9
**prohibited**  14:11
27:9
**project**  212:22
213:17 220:3,5,7
221:8,23 222:6,10
226:8 254:10,13
255:15 256:2
257:7,8,17 258:3,6
258:20 259:23
261:11 272:16
280:23 299:7
**projected**  142:10
180:17 184:15
**proliferation**
151:12 152:3
157:11
**promote**  249:16
296:23 302:22
**promoting**  144:2
**promotional**
284:12
**propagated**  25:16
**proper**  165:22
**property**  250:13
**proportion**  263:4
263:23 264:8
265:9
**proposal**  198:3
256:23 337:6
**proposals**  262:6
**propose**  62:3
192:9 236:3 256:8
256:9 289:19
290:21 319:14,19

350:19
**proposed**  92:15
94:20 96:1 126:17
131:1 163:4,8
177:22 178:8
181:5 183:1
192:13 193:3
197:1,13 207:9
256:13 318:2
350:16
**proposes**  258:17
**proposing**  91:14
93:11 181:6,12
192:16 193:10
198:11,12 239:12
244:18 293:2
300:3 317:9 321:9
327:7 350:4 351:8
353:16
**protection**  205:9
**provide**  49:18
54:1,16 58:17
59:7 62:12 65:10
79:13 92:8 94:11
118:9 163:11,12
163:15,17 173:6
174:10,14 178:3
220:14 225:11,20
229:6 248:2,6,9,20
248:21,24 251:7,8
251:9,24 253:5
254:14 255:4,12
268:5,13 279:2
283:18 345:3
357:6
**provided**  28:6
40:9 41:3,6 43:9
43:24 44:21 47:22
75:24 79:18 84:15
104:16 105:5
135:16 136:1

140:8 141:14
143:3 160:5
174:18 178:13
180:7 196:1
197:24 201:18
202:19 203:20
227:24 246:11
252:6 256:2,10
257:8,16 258:5
284:7 292:19
293:16 312:11
330:22 336:10
354:23
**provider**  62:18
68:5 103:3 274:18
276:16 300:5
305:8,14 306:4
307:8
**providers**  285:5,7
286:13,16,18
287:1,4,20
**provides**  197:20
246:2 250:6,14
254:15 294:12
**providing**  10:14
16:11 44:24 68:19
93:2 156:15 178:9
249:7 258:8 301:7
339:15
**provision**  257:3
260:10 261:6
**psychological**
238:15
**public**  43:8 60:19
68:4 74:14 91:24
97:6 138:16
150:23 154:10
202:13 242:20
284:17 310:8
315:22 316:14,22
317:24 319:16,17

319:24 320:12
322:17 326:6
328:21 350:17
359:4 362:10,18
363:15,23 364:23
**publication** 5:7
105:18 132:2
**publications** 78:3
309:6
**publicly** 230:9
**publish** 103:14,16
**published** 25:22
132:2 309:4
**pull** 81:20 85:4
104:12
**pulling** 104:10
**purpose** 31:18
285:10 359:6
**purposes** 12:23
18:8 40:22 49:3
105:22 139:2
158:20 179:8
203:17 208:2
268:10 292:6,23
**pursuant** 1:20
**pushback** 308:6
309:3,5 315:1,2
**put** 39:14,20 47:14
47:17 71:16 74:13
105:11 134:8
136:12 138:10
144:17 146:7,14
163:19 164:6
167:20 168:21
177:23 184:7
187:8 192:14
193:23 194:6
206:6 208:7 209:4
209:14 210:5
212:13 218:10
223:4,10,19

241:23 243:20
244:9 256:22
275:9 286:5
293:20 296:15
308:3,22 310:11
322:9 324:2 329:8
340:10 342:8
348:7 351:8
**puts** 233:10
**putting** 66:13
94:21 160:12
194:19
**puzzle** 299:17
**pyramid** 294:18

**q**

**qrt** 225:18
**quadrants** 46:13
46:15
**qualified** 359:5
**qualify** 100:16
307:12
**quality** 69:17 70:4
185:18 231:19
264:16 296:3
310:18 349:22
**quantify** 55:19
260:8,9 261:5
265:14
**quantifying**
309:23 313:11,14
**quantitative** 26:13
270:1
**quantitatively**
260:11 301:14
**quantity** 68:2
69:19 70:1 268:3
**quarter** 66:13
**quarters** 26:16
**queries** 177:3
353:14

**query** 64:10
100:19 349:13
**querying** 235:14
**question** 13:17,23
14:9 16:5 17:11
26:6 33:5,7 36:21
37:14 39:2,12
42:15 44:6,7 46:3
46:7 49:16 52:12
52:17 53:8,14,15
61:5,22 63:4,4
64:5 70:21 74:1
82:12 88:21 89:8
93:2,6,8 94:13,19
99:15 101:3 105:2
110:14 112:24
114:24 116:19,20
117:1,3 120:5
126:18 135:24
139:17 140:24,24
143:9 146:5
148:15 149:11,13
149:17 150:8,10
151:23 152:16,23
152:24 153:8,13
155:17,20,23
157:22 158:1,3
165:14 170:14
173:1 182:1 188:2
188:6,15,24
189:23 190:10
193:14,15,19,21
193:22 198:8
215:6,11 227:3
230:5 233:7 236:9
243:12 257:14,20
260:13,23 267:2
267:13 271:1
272:5 273:22
274:3,5,10,20
278:19,20 303:14

304:19,22 305:19
307:21 322:19
327:5 328:10,11
332:6,14 333:2,12
338:6 340:15
343:19 344:15
346:22 347:7
356:4 357:13
**question's** 110:15
**questioning** 143:5
167:23
**questions** 12:12
15:8 42:13 43:2
43:14,17 45:5,11
45:17 46:1,4,5
57:12 85:12 100:7
106:1,5 114:8
116:15,17 118:6
118:11 119:19
131:8 149:7,10
150:2,3,5 156:19
156:22,22,22
157:1 161:12,15
161:17,23 165:6
165:23 166:1,10
166:12,24 167:24
168:5,6,9,18
169:11,18,21
177:20 193:1,14
196:23 237:7
262:8 275:24
276:19 292:24
320:11,13 329:21
331:15 352:21
**quibble** 142:21
**quick** 19:9 93:21
138:9 158:12
224:6,10,12 225:4
225:10,18 226:3,7
227:2 260:18
311:2 344:10

quickly 55:9
131:23 137:9
140:15 141:22
207:10 283:7
335:10 338:1
quite 25:23 37:2
71:7 104:5 112:20
142:8 167:22
212:21 233:6
245:12
quote 330:13
349:8,9
quoting 213:23
215:4,14,16

r

r 2:4,12 7:1 9:16
29:24 30:3,4
245:8,17
rabbit 309:7
rader 84:11,19
85:4,23
rader's 87:22 88:3
radio 25:1
raise 289:23
301:24 303:8
314:18
raised 161:21
raising 143:9
285:11 308:1
rallies 25:1,11
rally 312:2,4
ranging 144:8
281:6
rapidly 125:3
ratchet 288:9,20
ratcheting 290:19
rate 38:5 69:19
rates 68:1 71:9
113:2 120:10
180:18 233:20
272:9

rationale 325:5
ravaged 211:16
ray 9:4
raymond 2:13
razor 311:20
reach 27:19 63:17
118:16 124:8
176:19 294:13
295:5 300:23
329:16 351:18,23
reached 62:21
258:13 320:16
351:12
reaching 305:16
314:19 333:7
read 41:21 52:16
79:7,9,12 84:14
88:3,7 121:10
123:11 124:22
127:1 128:22
129:6 144:13
151:9,24 152:22
155:2,7 157:5
166:6,7 197:15,19
216:13 224:10
226:18 229:18,19
229:20,21 234:8
234:12,16 307:10
308:22 309:1
358:22 359:10
362:5,6,12 363:5,6
363:17
reader 182:16
reading 109:4
148:11 215:20,21
215:22,23 216:8,9
230:6 232:9,10
330:16 361:19
reads 143:1
ready 133:15,19
136:18

real 93:21 219:2
321:23
really 19:7 24:4,13
24:16 42:4 43:16
79:4,24 118:10
125:23 146:6
152:16,17,17
178:13 183:13
193:22 196:16,17
196:21 213:6
287:12 312:9
340:6
realtime 345:21
360:3,17
reason 33:15 74:7
84:23 103:10
139:21 160:10
204:22 205:17
322:21 339:9
361:14 363:8
364:3
reasonable 54:2
55:2 56:20 59:8
64:21 148:8
208:14 268:14
294:12,16 295:7
357:5
reasoned 194:16
reasoning 196:13
reasons 113:9
139:2 140:5
175:17,18 238:6
243:22 244:12
247:24
recall 16:19 20:4
24:14 54:7,8
56:17,22,24 77:18
84:12,17 142:8
166:8 174:17,21
178:7,9 205:10
207:13 227:4

230:10 270:23
271:7 272:18
275:3 276:3,10
309:1 312:15
318:20 327:22
recalled 37:18
recap 58:9
receipt 361:18
receive 13:1 97:17
98:16 100:20,22
100:24 267:18
received 42:6,11
307:2 332:9
334:19
receiving 73:3
266:23 275:4
278:16
recess 66:24
137:24 170:4
198:19 253:20
316:7
recipients 97:15
97:16
recognize 179:19
214:8
recognized 215:1
344:6
recognizes 250:20
recollection 22:17
recommendation
170:17 307:6
recommendations
139:10 146:22
157:19 256:5
337:7 350:5
353:15
recommended
58:17 178:10
338:18
recommending
166:18

reconvene  66:19
record  7:3,12 8:9
  10:3 11:15 17:6
  35:10 36:13 41:1
  49:10 63:6 66:23
  67:3,14 93:21,24
  94:1,5 103:24
  104:20 108:10
  123:15 131:7
  137:23 138:4,11
  149:15 156:21
  159:10,23 170:1,3
  170:7 171:4
  179:20 198:18,22
  202:20 203:22
  205:14 206:7
  253:16,19,23
  265:3 266:11
  268:2 275:9
  292:13 316:6,10
  338:9,10,14
  358:19 363:9
recorded  7:14
recording  7:10
  19:5
records  269:5
recovery  73:10
  171:19 175:5
  176:6,20 191:7
  220:14 224:20
  225:8 229:3
  233:14 259:24
  286:11 344:10
redacted  204:14
  205:4,5,7
redactions  204:13
  204:21,23 205:3
  205:17
redesigning
  282:16

redress  5:18 69:3
  132:22 133:4,22
  134:19 135:13,16
  135:19 174:8
  178:3,11 180:4
  181:2,8,9 182:5,13
  182:18,18 183:5
  253:4 291:12,14
  292:4,15 293:6
  321:10,11 324:14
  338:20 351:12
reduce  51:3 58:13
  60:5 153:23
  154:11 234:19
  249:16 266:13
  273:1 288:1
  290:13 310:16
  319:3 348:4
reduced  359:10
reducing  5:21
  153:22 154:7
  207:22 208:9
  218:17 267:9
  279:12 288:2,7
reduction  68:3
  144:10 227:9,15
  227:22 228:8,10
  228:12,24 229:4
  335:10,22 344:11
  351:5,6 352:17
reductions  68:8,13
  68:14 72:22
reed  2:18,20 9:2
reengineering
  176:7 181:17
  188:15,16
refer  40:3 52:20
  52:24 67:14 73:22
  81:19 104:21
  122:10 151:19
  289:3

referee  166:19
reference  45:12
  69:13 70:3 82:18
  115:4,22,24
  116:14,18,21
  117:14 118:13
  119:24 142:17,24
  152:20 196:3
  199:8 207:11
  221:13 304:12,12
  306:15 313:15,23
  313:23 314:1
  361:7 362:2 363:2
referenced  135:18
  141:14,20 142:5,8
  143:13,15 159:13
  307:7 309:5
  337:12 362:11
  363:15
references  61:24
  62:5 69:1 76:9
  79:17 118:14
  119:22 141:17
  143:7,8 176:14
referencing
  142:12
referred  20:24
  69:10 74:12 79:23
  118:23 120:23
  136:2,7 197:18
  216:13
referring  43:15
  46:11,12 57:7
  69:13 76:12 81:21
  82:10 83:8 104:21
  107:10 111:19
  113:18,22 165:20
  199:10 201:21
  250:2 278:13
  281:11 284:21
  306:24 313:24

314:2 350:21
refers  51:5 53:2
  67:16 182:16
reflect  35:15 36:23
  174:24 286:19
reflected  172:17
  181:7 183:16
  236:23
reflecting  108:17
reflection  72:11
reflective  69:23
reflects  36:9 37:4
  142:11 352:11,11
regard  33:19
  197:4
regarding  13:19
  19:21 22:13 31:19
  43:18 51:9 58:3
  112:5 128:15
  130:22 194:23
  205:3 251:10
  254:21 265:4
  272:23 276:1
  284:17 286:10
  289:17,24 290:15
  297:21 298:12
  304:4 320:8
  340:16
regardless  239:9
regency  11:21
region  208:22
  237:3 238:4 291:1
  302:8 358:2
regional  69:21
  70:7 229:11,19
  230:7,14,23 231:3
  324:23 340:22
registered  1:21
  360:17
registering  74:17

regular   15:13
rehash   283:6
reimbursement
   312:23
reiteration   318:7
relate   129:2
related   8:4 21:17
   26:12,14,18 70:17
   71:2,9 75:5,9
   83:21 85:14 90:4
   105:13 111:8
   114:11,17 115:12
   115:13 116:8,9
   117:6,7,22 119:3
   119:11 120:6
   121:18 125:12
   127:7 139:13
   151:17,22 201:7
   211:5 221:15
   262:19 263:4,11
   263:24 264:8,22
   265:10 277:11
   312:20 314:11
   348:5 359:12
relates   72:5 80:1
   86:1 353:6
relating   43:18
   46:1 60:4 75:15
   82:5 121:12 181:4
   185:8 222:10
   236:23 308:1
   356:22
relationship   222:5
relationships
   229:4,5
relative   75:1 90:2
   180:18,20 260:23
   265:18 272:11
   347:15 359:13
release   108:11

released   76:24
relevant   28:7,15
   42:4 81:6 116:1
   139:1 140:4
relied   79:16
   118:15 135:8
   234:11
relief   156:17 158:8
rely   42:15 43:24
   112:17
remain   122:3
remarkable   139:7
   211:18,18 213:19
remarkably
   100:23
remedies   161:4
   162:8,20
remedy   307:17
remember   84:8
   106:5,15 107:17
   174:7 206:19
remind   113:3
   227:20
reminder   272:13
remote   5:2 10:15
   16:8 18:6,15
remotely   1:21
   7:22 8:8 9:10
removed   311:11
   311:17 313:20
   314:6
rendering   65:14
repeat   198:8
rephrase   110:15
replacement
   181:17
reply   29:11 53:10
   101:4 333:3
replying   22:13
report   5:11,13,15
   5:16 6:3,6,8 10:24

11:6,7,10,12 21:7
21:7,9,13,23 23:10
26:22 27:4,11
28:5,16,22,22
30:24 42:22 47:21
47:23 48:18,20,22
48:23 49:12,13,15
49:18 50:2,5,16,16
50:20,24 52:13,16
52:18,23 53:5,12
53:16,17 54:19
55:8,11,15 56:15
58:6 61:23 62:12
62:15,15,16,24
63:5,9,11,15,23
64:8,11,15 65:4
67:6,8,16 69:1,9
69:11 75:13 76:6
76:10,14 77:5,15
77:21,24 79:7,9,12
81:6 83:2,9,14,15
85:13 87:16,17
90:1 92:7 100:1
104:2,4,22,24
106:9,10,22 107:5
107:11,11,24
111:13 113:13,17
113:22 114:1
115:7,8,20 116:13
117:5 118:14,18
118:22 119:20,22
120:17 128:2
129:10 131:6,9,11
131:22 133:2,18
133:22,23 134:7
134:13,15,22
135:6,9,10,14,15
135:19,19 136:3
138:13,13,19,20
139:7,12,18,22
140:1,3,3,6,8,16

140:18,21,22
141:2,10,10,12,12
141:14,20,21,23
142:7,9,10,11,16
142:17,21 143:3,9
143:17,20,22
144:11,18,22
145:9,18,20 146:2
146:2,7,15,21
147:4,5,9 148:3
149:13 150:17
151:16,20 152:18
152:19,20 154:24
157:18 158:10,17
159:3,6,13,13
160:1,4,11 161:1
161:15 162:4
163:14,20,21,24
164:6,12,16,21,22
164:24 165:7,8,9
165:11,12,16
166:11,14 168:8
168:14,17,19
169:5,6,13,16,18
169:19 171:1,2,6
171:14 172:2,4,14
172:15,17 173:20
174:1 175:20,20
176:11,14,15,18
177:14,20 179:3,6
179:21 182:5,6,7
182:17 183:12,17
184:1,19 185:14
185:17,22 186:23
188:8,19 189:5
190:2,22 191:3,19
192:3,20,23
193:23,24 194:14
194:15,19 195:3
195:10,15,16,24
196:3,7,14,18,20

197:10,12,16
199:7 200:3
205:24 206:20
207:1,12 213:13
214:14 215:15,23
216:8,9,11,16,23
217:1,24 225:13
225:18 226:11
234:11,15 235:15
235:15 242:6
247:23 250:3
253:2,4 262:2,8,12
265:22 279:9,9
280:10,14 284:5
288:6 292:16
297:2 302:4
303:17 304:10
309:6 310:13
312:21 316:13,15
330:7 335:11
337:12,12 343:24
345:20 347:23
352:22 353:2
**reported**  72:2
78:21 107:18
111:2,10 354:13
**reporter**  1:21 8:1
9:10,14 360:17,17
362:7
**reporters**  360:3
**reporting**  70:24
106:3 172:3
**reports**  10:23 11:1
11:2,5 27:1 28:23
28:23 30:22,23
31:20 33:9 78:2
111:18 121:4
124:17 139:11
141:13 142:3,5
164:2 165:22
170:23 187:2,2,4

189:10,18,22
**represent**  23:8
50:22 135:7 150:9
175:14,15 177:4
194:13 199:20
248:1
**representatives**
202:17
**represented**  84:18
190:8
**representing**  34:5
202:13 203:4
204:21
**represents**  132:11
140:21 175:16
182:12 204:5
222:7
**request**  14:1,22
15:2 35:10 37:10
132:15 136:2
204:20 205:3,10
206:7,12 215:3
359:10 363:9,11
**requested**  12:20
54:12
**requesting**  142:15
**requests**  50:18
54:14
**require**  58:16 60:6
60:15 61:11,15
70:5 80:20 90:1
150:2 165:16
166:13
**required**  195:17
297:6 302:11
361:24
**requirements**
359:15 360:6
**requires**  58:24
59:21 151:2
170:15

**research**  26:2
56:14 68:16 75:7
83:19 144:16,17
229:17 230:6
231:16 232:4,22
246:2 255:23
258:22 270:17
304:8,16 325:11
337:8 343:8
**researching**  23:19
**reserve**  14:22 35:9
37:9 42:23
**reserving**  50:18
156:12
**reside**  85:19
**residences**  255:19
**resident**  335:5
**residents**  231:18
232:5,14 233:9,17
317:22,23
**residing**  327:16
**resilience**  185:2
211:18
**resiliency**  92:2
164:8 171:10
173:21 174:20
181:15,16 183:2
184:8 186:14
187:18 248:14
**resolve**  169:3
332:21
**resource**  302:1
303:3 352:12
**resourced**  220:22
**resources**  70:24
81:12,24 83:15
104:3,24 106:3
107:13,19 108:13
108:20 120:17
124:17 211:20
213:11 222:6

238:2 294:21
321:4 345:7
349:16
**respect**  23:19
29:14 43:20 56:2
56:22 93:12 96:20
113:11 180:1
188:2,6,15,24
190:10 242:11
256:1 258:19
262:22 271:12
275:18 279:11
282:10 296:9
297:13 302:10
304:23 325:9
331:14 343:22
**respectively**  122:6
**respond**  100:18
120:6
**responded**  78:22
111:3
**responding**  16:6
119:15
**response**  149:15
205:4,12,14,15
224:7,10,12 225:4
225:11,18 226:4,7
227:2 242:15
260:18 262:10
263:1 306:6
307:24 308:23
327:5 340:15
344:10 349:13
**responses**  15:8
42:16 56:24 149:4
157:2
**responsibilities**
306:3
**responsibility**
64:12

responsible
  222:19
rest  348:14
restaurant  137:12
rests  23:10 59:23
result  308:2 313:3
  314:6 356:7
results  309:18
resuscitate  228:15
retained  10:5
  19:18 20:5,19,23
  21:4,8 22:1,5,13
  22:18
return  24:6
returned  361:18
revealing  201:23
reverse  151:16,22
  211:5
reversing  111:8
review  13:1 19:9
  40:6 41:20 53:4
  53:19 62:18 68:16
  74:11 82:17 87:21
  115:4,22 116:13
  117:14 118:12
  119:6,22 120:2
  136:18 163:14
  172:24 173:7,7
  174:11 176:17
  183:9 190:22
  192:20 195:15
  196:19 209:14
  230:9,17 232:23
  234:14 246:21
  251:11 255:23
  256:19 258:22
  260:4 289:16
  301:10 304:8,16
  323:8 324:13
  331:7 343:8
  361:12 362:1

363:1
reviewed  28:5,7
  28:17,21,21 29:6
  30:24 57:7,9
  58:22 69:4 75:23
  77:2 84:7 88:9
  106:2 115:19,24
  135:8 167:17
  211:15 226:20
  229:13,14 230:1
  230:11 231:24
  234:11 245:22
  252:23 253:2
  259:7 271:16
  283:17 284:7
  358:6
reviewing  68:10
  69:7 211:15
  291:11
revision  142:12
revisions  49:15
  312:18
revisit  37:8
rewatched  37:17
rheumatoid
  277:16,23 278:10
rice  2:6 8:11,13,15
  12:6 34:4
rid  340:1
right  16:4 17:10
  30:16 35:9,14,17
  37:9 38:9 42:23
  43:11 45:20 58:7
  74:6 77:17 78:8
  81:13,15,22 86:14
  91:12 108:24
  109:7 111:20
  120:24 121:13
  123:19 129:4
  133:14 134:20
  136:13 143:17

156:12 169:1,22
  185:23 189:17
  193:22 196:18
  199:3 204:10
  219:4 227:16
  232:7,10 233:11
  237:15 239:21
  243:11 263:11
  264:24 281:1,1
  289:4 290:1,11,11
  291:13 296:19
  300:4,12,14
  302:15 304:7
  313:20 317:4
  321:17 324:1
  329:2 336:7
  343:14 348:15
  353:2,13 354:13
  355:16 356:1
rights  14:23
rigorous  309:22
  315:5,6
ripped  37:22
rise  173:11
rising  125:4
risk  232:5,6,15
  233:9,10 266:24
  276:14 287:6
  289:8 291:2
  295:16 318:9
  325:14
risks  267:16
  317:13,18 325:22
rivers  229:10,18
  230:7,14 231:2
rmr  359:20
road  35:7,24
  111:15 229:3
  239:8 240:5
robert  30:3,4

robust  313:6
rogue  262:24
  263:2,9 264:14,20
  265:7,16,20
role  25:14 55:20
  55:22 57:2,19,19
  57:22,24 58:1
  61:14 75:4 89:23
  170:13 178:17
  191:5 221:4
  225:21 226:5
  231:7,14 247:6
  249:14 252:12
  255:18 279:18
  280:8,16,17
  282:15 302:20
  303:12 304:23,24
  305:23,24 309:10
  311:20 346:7
roles  230:21
  348:22,23
room  8:7 11:22
  12:1,4 16:2 17:8
root  61:12
rose  171:21,24
rounds  299:12,15
rpr  359:20
ruby  2:12,13 9:7,7
  165:18,19 167:3
rufus  28:24 30:22
  31:20 33:10
rule  27:6,8 57:16
rules  1:20 14:11
  36:1 362:5 363:5
ruling  45:4 165:20
  166:3 192:24
rulings  166:21
run  148:7 234:21
  262:5
running  207:10
  328:6

**runs** 230:12,13
**rural** 37:22 234:2
  358:12
**rushed** 77:10

**s**

**s** 1:21 2:13 7:1
  29:24 31:23
  133:17 359:4,20
  361:15 363:8,8
  364:3
**safe** 144:2,23
  218:17 282:14,18
  284:18 330:5
  336:6 338:17
  339:7,17,20
  341:16 342:6
**safely** 273:3 311:8
  334:9
**safer** 278:17
  302:22
**safety** 269:17
**sails** 71:17
**saith** 358:23
**sam** 29:24
**samhsa** 249:4
**sand** 326:18
**saw** 153:12
**saying** 32:19 92:15
  112:23 122:17
  123:11 156:9
  166:9 169:2 219:9
  229:3 264:18
  268:4 274:22
  320:9
**says** 121:22
  123:10,15 134:22
  182:12 227:6
**sc** 2:7
**scale** 127:22 255:8
  341:15 351:18

**scaled** 180:17
  258:16 340:15
**scare** 224:24
**schedule** 226:15
**scheduled** 331:20
**scheduling** 331:23
**scholarship** 24:18
  25:5,19 26:16
  310:4 315:5,6,8
**school** 138:15
  356:21
**science** 62:1 97:5
  286:10 308:16
  310:14 315:4
  332:22
**scientific** 64:22
  65:13 146:23
  147:16,19 236:4
  264:17 313:11,13
  321:5 324:22
  350:16
**sclerosis** 250:23
**scope** 100:1
  147:13 211:12
  237:5 249:12
  312:22 327:13
  350:13
**screen** 12:14 81:22
  104:13 105:11
  118:20 120:14
  147:24 154:17
  169:18 190:9
  195:2 229:8
  232:11 233:1
  281:2 288:15
**screened** 337:3
**screening** 336:24
**script** 46:21
**scroll** 323:8
**se** 256:6 303:11

**seal** 362:15 363:21
**sealed** 17:7
**second** 53:11
  65:14 91:10 107:1
  131:10 145:1
  150:13,22 202:11
  250:20,24 272:12
**secondly** 348:17
**section** 62:14,16
  64:8,10,14 164:7
  173:19 175:8
  181:9 195:16
  218:5,24 234:8
  245:8 289:16
  290:3 293:6
  316:13 321:10
  342:19 343:24
**see** 8:19 11:16
  44:10 46:8,18
  47:8 57:19 62:14
  62:16 74:2,16
  93:5 105:11
  106:20 107:13,15
  108:4,4 109:16
  114:7,14 118:5
  120:18 121:3,5
  122:7,11,12,17
  123:10 128:17
  130:6,12 131:14
  134:21 135:1
  139:17 142:10,24
  144:4 145:5
  162:17,20 164:9
  170:16 171:11
  172:12 173:21
  175:5 176:7,22
  177:11 179:23
  180:1,5 181:2
  182:22 191:15
  194:15 195:6,10
  195:13,15,19,21

202:2 204:2 215:7
  216:24 218:7,13
  221:12 226:15
  228:19 229:22
  254:10 259:21
  262:14 281:9
  306:19 307:3
  309:22 327:8
  330:16 342:23,24
  344:13
**seeing** 76:20 82:9
  172:4,4 192:19
  216:16
**seek** 158:8 220:7
**seeking** 355:7
**seeks** 220:8
**seen** 18:20 19:8
  41:9,13 69:6
  121:7 122:4 125:4
  129:1 142:1
  185:19 211:16
  212:23 310:1,3
  315:4 343:17
**sees** 150:4 153:4
  155:22
**send** 12:24 14:12
**sense** 43:15 44:11
  54:22 55:1 56:1
  126:1 130:17
  136:23 201:8
  212:9,10 229:9
  249:14 252:12
  271:2 286:2
  334:21 341:12,14
**sensible** 56:6
**sensitive** 7:5
  288:16
**sent** 103:13 154:16
**sentence** 52:18
  53:3 114:6 121:14
  143:1 151:9,14,24

152:18 155:1,3,7,8
155:18 157:5,9
216:13,21 217:3
**sentences** 78:5,16
**separate** 46:9
141:10,12 172:21
173:11 174:3,18
176:9 183:9
184:19 185:2,5,7
186:13,21,21
187:1,12,15,19,23
188:3,7,9,13,17,18
188:23 189:2,3,4,6
189:24 190:6,11
190:13,15,16
191:9,20 225:17
245:16,19
**separately** 131:17
136:16 183:8,23
184:1,6 342:11
**september** 1:22
5:22 7:3 77:2
105:1 207:24
208:10 285:20
295:18 317:8
359:17 360:10
361:4
**serious** 46:2 87:16
**serve** 38:21,21
54:16 226:5 248:7
249:15 348:12,24
**served** 50:6
206:20 252:12
**serves** 62:2
**service** 50:1 228:1
339:14,15 351:6
**serviced** 336:15
**services** 61:8
68:19 70:14 72:4
73:17 74:4 77:1
77:15,22 81:11

98:16 190:6 213:4
225:10 228:5,24
249:1 254:16,19
255:13 256:4
257:3,8 258:2,5
259:20 286:20
287:15 335:24
336:10,16 337:14
339:15 346:10
350:18,23,24
351:7 352:1,18
**session** 15:16
**set** 45:3 154:22
160:20 162:8
169:5 170:1
182:20 201:8
207:5,5 359:15
360:6
**sets** 36:8,13,15
208:13,18
**setting** 12:11 16:8
178:23 188:13
268:8
**settings** 212:23
220:9,11 240:21
**seven** 149:3,16
156:5,16 356:3
358:14 359:15,15
360:6,7
**seventh** 155:10
**share** 18:12 40:17
292:9
**shareability** 350:3
**shared** 189:12,12
189:20 305:16
333:8
**sharefile** 104:17
**shares** 306:9
**sharper** 310:11
**sheet** 321:16
361:13 363:7,10

363:18 364:1
**sheriffs** 340:11
**shifts** 109:15
120:18
**shoppers** 263:1
264:15
**shopping** 302:14
**shorthand** 359:9
**show** 104:3 106:18
108:23 112:8
113:21 154:14
156:21 216:7,8
303:21
**showing** 215:12
254:20
**shown** 67:24
108:20 211:17
361:16
**shows** 99:9 110:8
125:5
**shredded** 39:17
247:5
**sic** 70:17 182:24
204:5
**side** 39:15 134:21
134:24 163:19,20
**sides** 167:2
**sign** 41:21
**signature** 359:19
360:16 361:14
**signed** 42:1 150:21
221:19 362:13
363:18
**significant** 44:4
77:19,21,24 78:3
82:4,14,22 83:20
111:15 113:9
119:10 124:24
125:3 127:14,19
129:3 231:17

**significantly** 111:7
**signing** 361:19
**signs** 78:6,17
79:20,22 111:15
**similar** 58:1,1 97:9
125:20,21 130:9
163:7 174:15
178:9 261:12
276:18 341:1
**similarly** 15:5
16:1 125:17
164:23 185:4
**simple** 94:19
152:17 193:23
219:2 274:5 277:4
320:9,22 355:4
**simplify** 152:13
**simply** 72:15
112:24 154:16
156:19 222:13
274:22 326:8
342:3
**simultaneously**
102:9 219:10
238:1 310:18
**sincerely** 361:21
**single** 17:13,15
36:7 70:3,7
112:18 115:11
130:21 150:23
154:7 269:4,24
272:15,16 295:13
302:19
**singular** 263:16
**sir** 141:9 152:23
361:10
**sisters** 273:17
**sit** 345:2,4
**sites** 332:3
**sitting** 21:14 28:16
38:14 61:16 75:16

115:10 117:4
120:3,3 174:17
212:3 247:19
251:15 257:5
268:16 271:10,18
276:3 285:20
295:17,23 312:17
317:8 331:11
**situation** 59:23
72:10 137:2
**six** 41:11 57:9
206:23 276:9
**size** 58:15 60:5
233:1 286:15
**slightly** 308:13
**small** 46:8 263:3
263:23 264:7
265:9,13
**smart** 326:10
**smith** 2:18,20 9:2
**smoke** 87:12
**smoking** 130:4
272:19 322:5
**social** 238:15
248:8 284:15
320:21
**socioeconomic**
358:1
**solely** 172:3 305:7
306:2
**solution** 150:23
**solutions** 5:20
51:15 55:16 66:3
154:23 207:12,20
208:17 217:10
218:2,20,23
219:22 224:9
226:21 227:10
234:5 245:4 246:8
254:5 259:23
301:17 357:22

358:5 361:1 364:1
**somebody** 85:23
86:2,13 95:16
200:20 220:14
223:18 286:3
326:15 334:10
342:15 346:23
**son** 327:24,24
328:12,15
**sons** 273:17
**soon** 206:19
**sorry** 8:17 29:10
29:20 30:8 33:16
33:18 34:13 38:19
46:7 48:8 55:9
70:20 81:12 87:20
88:18 102:4
103:19 106:6
110:13 114:5
141:7 145:11
150:12 159:21
183:20 184:15
186:18 188:5
198:8 201:23
204:3 206:3 207:4
216:12 217:5
222:3 226:21
227:18 248:11
253:8 263:15
284:5 290:17
291:11,21 303:14
310:21,23 317:5,6
333:18,21 335:13
335:17,17 353:1,5
**sort** 15:2 31:24
39:18 44:11 51:1
55:19 59:2 65:13
73:12 74:24 98:14
110:5 114:4 118:8
126:16 131:6
143:23 161:3

176:3 189:16
212:1,19 222:4
224:16 231:22
235:14 246:22
256:1 258:2 260:9
265:23 270:13,16
280:12 286:21
289:17 298:24
299:15 309:16
314:19 319:8
326:21 334:1
342:1 347:10,14
349:15
**sorts** 118:5 180:9
**sought** 25:7
212:22
**sound** 284:19
290:15 297:23
299:5
**sounded** 216:19
**sounds** 57:1 65:12
320:14
**source** 102:11,22
110:24 112:18
115:2 120:4
129:20 230:22
293:15 303:5
304:5 324:22,23
341:13
**sourced** 69:3
**sources** 5:17 49:1
68:11 76:2 79:17
98:9 102:15 113:8
132:18 133:3,21
134:18,23 135:11
135:21 246:6
252:24 255:8
307:8,18 309:4
324:13,17,19
340:16 341:4

**south** 2:21
**southern** 1:1 7:19
**spaces** 248:7
**spawned** 217:24
**speak** 16:3 23:10
29:19,20 54:12,13
86:8 132:8 164:13
226:12 270:4,20
273:11 274:5,15
275:2,14,16
282:12,15 284:9
290:9 310:13
318:8 325:12
347:10
**speaking** 12:21
23:19 24:21 25:11
25:21 29:18 31:18
55:9 57:16 211:14
266:7 267:21
271:2 314:12,12
**speaks** 63:12
357:13
**special** 167:13,16
**specialist** 80:24
**specific** 12:12 46:5
53:3,3 54:8 57:8
57:12 58:15 64:7
73:22 81:18 83:12
87:22 108:17
118:13 121:13
131:1 155:15,16
160:22 162:10
164:20 166:1,8
194:20 209:10
214:17 215:20
233:20 246:22
249:23 251:10
261:5 265:4
271:21 279:19
280:2 285:2
293:12,19 297:4

[specific - strong]                                                      Page 62

300:19 301:22
304:4 318:18
324:5 328:24
350:1 357:19
**specifically**  22:22
28:17 70:15,24
75:18 106:14
113:19 121:19
142:5,16 143:21
193:21 235:16
252:7 259:13
290:5 297:12
302:8 318:15
323:1 325:9 341:9
354:1 357:18
**specifics**  249:8
251:16,24
**specified**  359:6
**spectrum**  144:8
**speculation**
112:16 332:13
**speech**  312:9
**spelled**  30:2
**spend**  44:3,4 55:12
56:11 222:9,10
**spent**  19:14,15
22:23 23:4 24:10
26:19,22 27:5,10
27:23 38:3
**sphere**  333:24
334:1
**spirit**  272:5
**spiritual**  225:9
**spoke**  28:8 30:5,8
57:18 182:2 200:5
200:21 205:23
230:2 271:11
276:3,9 312:4
340:20
**spoken**  25:1 199:9
267:24 273:14

275:5,11,22
301:18
**spreadsheet**  323:9
**ssp**  335:24 336:6
337:21 352:1
**ssps**  337:9 339:6
339:12 350:19
351:2
**st**  221:21 222:3,6
230:20
**stacked**  40:2
**staff**  342:13
348:10
**staffed**  220:24
226:12
**staffing**  260:10
261:6
**stages**  319:10
**stakeholder**  248:2
**stakeholders**
136:8 199:9
201:10 211:14
305:2
**stand**  111:13
246:9
**standpoint**  166:23
166:24
**stands**  245:10,14
250:7
**staring**  189:16,16
**start**  8:10 130:4
147:16 150:24
161:11 244:5
272:19,20 314:2
**started**  91:1
155:20 161:10
243:5
**starting**  43:16
45:11 146:7,19,20
147:8,11,15,19,20

**starts**  128:17
227:10 316:14
**state**  8:8 10:2 21:5
67:12 76:2 113:10
125:16 127:2
192:3 213:5 230:3
231:1 233:23
259:16 280:18
283:7,10 284:4
287:12 296:14,16
296:21 297:11
318:15 330:11
334:6 339:12
341:10,18 354:4
359:1,4 360:1
362:10 363:15
**stated**  60:4 76:14
228:12
**statement**  62:6
115:8 117:4
146:17 150:19
152:22 362:13,14
363:19,19
**statements**  53:20
63:23 119:20
**states**  1:1 122:3
210:7,24 252:2
343:10 347:1
**statewide**  234:23
293:13
**stating**  345:5
**statistics**  125:5
**stay**  119:4 299:5
**staying**  60:13
**steal**  282:23
**step**  340:18
**steps**  178:2
**steve**  9:7 165:18
**steven**  2:12
**stigma**  55:18,20
55:22 318:24

319:3 327:21
328:13
**stigmatizing**
241:15
**stockpiles**  330:14
330:19
**stolen**  129:16
**stood**  213:6
**stop**  78:24,24
358:14
**storage**  282:14
284:18 330:5
338:17 339:7,18
339:20 340:5,6
341:2,16 342:6
**store**  334:9,11,14
**storing**  335:9
**stout**  2:4 8:15,15
**strategic**  209:14
**strategies**  144:10
234:18 237:24
310:16
**strategy**  39:10
**streams**  349:23
**street**  2:9,14
129:16
**strength**  68:4
**strengthen**  346:13
**stress**  233:21
237:10 288:21
**stretch**  193:10
**stretches**  191:24
**strike**  31:2 125:2
129:12 148:17,22
148:22 149:1,1
171:8 188:5
208:16 267:5
**strikes**  167:14
**stroke**  130:8
**strong**  34:20
111:10

struck 312:8
structural 237:16
structurally
221:16
structure 90:5,7
98:24 99:5,14
163:5,12
structured 174:22
struggling 231:18
studies 295:3
313:11,14
study 67:23 69:10
69:17 70:4,7
269:17,23 270:12
313:6
stuff 34:17 219:10
subcategories
163:7 172:7
subcategory
177:10 183:3
subheader 171:22
172:21 186:4
189:2
subheading
173:12
subject 20:17
35:19 104:6
165:22
submit 238:10
346:8,10
submitted 11:3
33:9 132:3 139:19
139:20 207:1
subparts 181:22
subscribed 362:10
363:14 364:21
subsequent 254:21
subsequently
255:21
subsists 230:24

substance 5:22
30:18 32:16 90:21
128:4 163:1
164:15 165:6
183:17 196:19
207:23 208:10,21
209:5 210:4,7,23
211:9 216:5 220:9
234:3 236:1,15,21
238:24 239:1,8,16
241:5 243:15
246:12 247:13
249:9,17 250:12
297:5 308:19
341:8 343:10
354:15 355:14
356:8,22
substances 75:2
75:18 81:5 88:14
97:13 114:18
122:5 123:21
124:1
substantial 267:20
substantially
258:16 348:4
substantive
161:22 166:13,24
193:1 308:19
310:4
subsumed 185:13
186:11 187:16,23
188:11,21 190:7
success 251:11,16
357:2
successful 55:21
73:9 126:13 251:4
251:22 318:1
348:20 357:6
successfully
258:13

succinctly 170:15
suffering 314:4
suffices 272:15
sufficient 234:20
suffused 32:2
suggest 74:12
80:14 81:19 83:10
98:17 107:4
130:18 133:9
137:6 146:5 150:5
165:7 168:11
174:4 193:9
194:14 247:9
263:19 288:21
295:3 300:16
301:23 318:5
335:23
suggested 161:24
162:1 168:11
191:23 194:2
216:15 323:24
suggesting 26:11
76:16 106:11
172:8 176:15
178:5 183:10
216:20 264:1
290:7 293:21
295:8 311:10,15
311:16 316:19
321:21 322:16
326:17 347:24
348:7 351:16
357:10
suggestion 342:8
342:20
suggests 5:7
105:19 108:14
110:2 119:8,10
123:8 169:24
suicide 310:2
313:19 314:4

315:11,18
suitable 307:18
suite 2:18,21 361:2
summarizes 59:4
summary 23:17
42:2 265:23
316:23
summit 16:19,23
21:1 22:15 46:5
47:5 146:9 147:6
147:9 160:16,23
162:11 163:2,21
164:20 169:14
180:19 184:24
superior 361:1
supplemental 6:6
6:8 179:3,6 182:5
182:6
supplements
179:20 195:2
196:1
supplied 267:9
supply 52:1
234:19 235:8
238:16 268:17
272:22 280:20
281:8,13 282:5,8
356:16
support 91:5 92:3
104:12 127:22
152:10 176:21
181:18 189:1,7
190:2 221:6
247:22 255:7,8,20
260:1 350:17
suppose 19:1
51:22 52:9 168:13
211:21 228:10
334:21 336:21
supposed 62:12

**sure** 8:20,20 17:14
20:13,14 21:20
22:4 26:10 29:7
37:2 42:1 54:10
62:4 66:19 70:22
91:6 96:11 99:16
104:9 106:8 108:1
108:6 116:20
117:3,3 119:6
122:13 131:5
132:1 133:1,18
140:24 142:8
164:13,21 181:1
185:22 192:21
195:23 198:9,16
200:24 201:5,17
204:16 205:11
209:20 210:8
243:8 244:2 250:2
250:7,7 253:4
266:10 288:5
290:18 297:1
302:18 303:16
306:10 314:1
318:20 319:20
330:8 331:19
335:12 342:10,13
343:20 350:21
**surfing** 15:8
**surgeon** 139:11
**surprise** 90:10
**surprised** 54:9
86:18 125:19
191:2 218:21
342:4 349:18
**surveillance**
342:19,24 343:16
346:21 347:2
350:1
**survey** 317:21
331:8

**swear** 9:14
**sweat** 240:19
**swore** 41:16
**sworn** 9:15,18
359:7 362:10,13
363:14,18 364:21
**syringe** 213:4
228:1,5 335:23
336:4,15 337:14
339:14,14 350:18
350:22,23,24
351:6,7 352:1
**syringes** 229:1,7
**system** 69:21 70:8
124:6 202:10
213:20 221:15
229:11,19,24
230:7,11,14,23
231:3,15 250:10
251:2,3 252:15
312:10,19 345:22
**systems** 221:19
230:19 289:21

**t**

**t** 2:8
**tab** 11:13 17:24
18:1,11 40:14
48:4,5,10 103:22
105:13,14,15
131:18 132:21
133:1,2 134:3,5,12
134:12,13,17
136:17 158:13,22
159:2,6,11,11,15
184:14 191:14
207:16,17 216:7
291:23 292:11
321:14,14,18
338:22 342:23
**table** 182:10,12,20
182:20 184:14,14

184:15 186:12
190:8
**tables** 183:5
**tablets** 52:2
**tabs** 48:6,12 134:2
136:20 159:2
178:21 179:12,14
**tackles** 242:21
**take** 10:1 15:14,16
15:17,24 19:9
31:11 38:24 45:22
47:20 48:4 49:7
61:12,14 63:16
66:16,17 85:3
88:2 112:6 118:10
130:2,10 135:3,24
136:17 137:4
140:15 151:16,21
158:12 163:22
167:11 169:15
170:10 180:22
187:4 194:23
195:9 198:15
203:9 205:1,22
218:1 235:7
253:13 260:17
273:8 282:14,24
289:13 299:4
316:3 319:8
320:13 327:1
331:16 332:2
340:13 341:6,9,15
341:18 350:22
**taken** 1:19 6:10
7:15 66:24 88:1
90:15 129:16
137:24 149:16
156:5 170:4
198:19 203:14
206:7 209:9
227:15 253:20

255:21 316:7
359:6,9,13
**takes** 42:21 130:5
130:6 235:7
**talk** 15:22,22,23
34:11 63:6 66:1
121:9 187:9 195:5
213:18 225:3
246:24 247:19
248:16 262:9,13
262:23 270:6
282:5 285:1,3
289:20 342:8
344:3 345:10,11
**talked** 104:4
195:10 230:16,18
242:3 283:3 334:7
352:20
**talking** 11:2 32:1
40:8 57:5 65:6
70:11 75:15 77:19
79:24 103:4 147:2
164:14,15 178:14
181:9 196:17
220:12 244:15
245:9 261:10,11
280:11 285:17,17
300:2 313:2
315:23 317:12
321:19 323:3
334:17 340:7
349:21
**talks** 218:18 245:6
246:9
**tape** 311:20
**tapered** 267:22
311:6
**tapering** 310:12
**target** 194:20
294:17 295:14
300:19 304:2

323:13,15 351:13
**targeted**  290:22
  294:3 295:9
  322:16
**targeting**  52:7
**task**  162:9
**taught**  335:5
**taylor**  3:9
**team**  136:4 144:17
  199:8,10,21,24
  200:4 224:7,11,12
  224:14 225:5,11
  225:19 226:4,7,14
  227:2 344:10
**teams**  224:21,21
  225:2 260:18
**tear**  278:9
**tech**  3:9 18:11
  40:16 48:12
  104:10,12 158:22
  179:11,14 207:17
  292:8
**technical**  280:13
**technology**  103:13
**teenagers**  154:18
  322:4
**telephone**  200:8
  206:9
**telephonic**  6:11
  203:14
**television**  323:20
  323:21 324:3
**tell**  11:15,18 22:23
  28:16 41:16
  115:10 117:6,14
  129:19 153:9,9,10
  202:9 203:24
  205:5 230:12
  247:18 248:18
  249:19 250:5
  251:16 252:7

257:5 258:21
259:2 260:14
267:11 268:16
281:18 283:20
297:10 309:2,24
354:17
**telling**  35:8 60:9
  116:22 172:19
  215:15,21
**tells**  82:7 122:19
**ten**  28:1 66:20
  133:6 137:14
  144:22 192:15
  196:5,13 197:24
  198:16 253:9
**tend**  15:22 167:2
**teresa**  1:21 8:1
  359:4,20 360:3
**term**  24:22 80:3
  80:18 221:6
  241:14 275:5,7
  280:13 311:9
**termed**  349:6
**terminology**  182:7
**terms**  23:18 24:21
  28:15 29:18 38:13
  88:13,24 94:22
  101:10 105:7
  111:18 118:23
  121:11 126:19
  135:5 146:1 163:8
  178:14 212:5
  213:6,18 217:14
  222:16 223:8
  224:5 227:9
  244:14 271:18
  272:4 279:11
  291:9 293:1
  305:23 311:13
  321:8 337:6
  338:16 344:16

352:19,21 355:22
  358:3
**terrific**  91:4
**test**  215:14
**testified**  9:18
  84:19 86:8 168:21
**testify**  50:13
**testifying**  100:2
  182:2
**testimony**  10:10
  10:15 16:12 28:8
  40:9 42:10 43:24
  56:13,23 59:7
  85:16 92:20 102:2
  112:2 115:17
  153:6 156:8,10
  161:19 196:12
  263:13 316:2
  320:6 362:6,7
  363:6,9,12
**testing**  228:18
**text**  13:1,19 14:13
**thank**  9:24 16:10
  18:2 20:16 21:22
  39:14,15 40:5
  47:17 48:14 49:16
  50:10 77:12 78:15
  94:17 95:3 100:6
  104:14 113:15
  118:7 132:14
  134:10 135:23
  137:20,21 138:8,9
  139:16 141:8,9
  143:4,19 150:15
  158:24 170:18,19
  181:1 196:10
  197:15 198:2
  199:6 205:19
  257:20 289:15
  292:10,23 303:24
  304:7 316:18

330:9 338:23
  341:5 358:16,17
**theaters**  324:9
**theft**  250:13
**theoretically**
  336:21
**therapy**  254:21
**thing**  31:23 80:8
  149:2 154:8
  186:20 219:3,9
  286:4,5 287:10,11
  300:20 322:19
  326:12 352:15
**things**  19:11 39:22
  46:19 65:6 92:4,6
  119:4 148:9
  165:23 170:12
  233:20 235:11
  252:5 288:16
  300:16 301:12,23
  302:14 312:8
  319:11 321:7
  330:12 335:22
  358:4
**think**  14:6,16 16:2
  24:13 25:3 27:8
  32:7 35:21 37:14
  38:2 39:21 45:6
  51:18 54:21 55:7
  55:10,23 56:5
  57:11 59:3,16,18
  60:24 61:6,7
  63:11,22 65:21,23
  70:4 71:15,17,23
  72:21 80:4,6,16
  85:12,13 86:12,21
  86:21 87:15,24
  88:10,19,20 89:15
  90:22 94:18 96:6
  97:5 98:14 102:7
  106:20 109:17

110:3,23 111:12
111:19 113:9
115:18,20,23
117:3,11 119:7
122:15,23 124:8
125:15 126:11
127:14,18 129:19
129:21 130:16
131:16 132:11
134:1 135:4 136:7
142:18,22 151:16
151:20,21 152:8
152:13 153:16,19
153:21 156:20
157:16 159:5
161:20 163:12,16
166:5,22 167:18
168:18 169:7,23
175:15 194:23
195:17 196:16
197:5,6,17,17,20
199:4 205:2
206:22 208:12
209:1,7 210:3,8,11
210:17,18,19
211:13,17,21
212:21 213:8,11
217:22 221:3,11
225:6 227:3,4,13
228:2 233:22
235:9,19 236:5
237:8 238:9,13,14
239:4,6 240:3
241:15,16 242:1,7
242:14,15 244:1
245:23 247:3,5
248:21 249:13,14
251:22 252:11
255:11,16 258:15
259:10 260:22
262:16 264:11

267:8 268:7,8,12
268:13 271:4,4,5
271:14 272:1,4,12
272:14 273:1
275:1 276:21
280:15 285:22
286:7,12,17,24
287:1,19,21 289:3
291:17 292:19
295:7,21 296:7,21
297:3 300:15
301:1,9,13,17
302:17 303:11
304:12,19 305:20
305:20 306:7,8,15
308:14 309:14
310:7,9 311:17
312:2,24 313:18
315:20 317:23
320:2,4,7 326:5,8
326:13 327:2
329:22 330:3
331:1 336:1,2
337:1 338:22
339:23 343:1,2
344:1 345:5,13
346:6,12 347:10
347:11 348:11,19
349:7,24 352:15
352:19 353:12
356:10 357:1
**thinking**  139:24
190:21 328:14
**thinks**  150:9
**third**  107:6 124:20
127:4 272:13
**thirty**  361:18
**thorough**  99:17
**thoroughly**  341:3
**thought**  29:10
139:1 143:6,7

204:2,3 216:13
222:14 256:9
280:24 301:17
310:23 329:15
**thousands**  152:11
**threat**  150:23
**threatened**  111:7
**three**  10:23 11:1
26:16 58:17 78:22
111:4 135:1,2
139:5 141:24
143:24 144:19
153:13 155:2,7
157:5 175:21
206:8 217:22
279:22 280:2
355:20
**tied**  168:19
**time**  15:1,19 22:23
24:10 27:5,23
37:18 38:3 39:3
40:9 42:20,22
44:4,16,23 45:15
55:13 56:10 57:2
58:16 60:2 63:16
66:22 67:2,14
69:8 72:10,14,19
77:9 82:20 92:18
93:23 94:4 100:21
101:1 106:19
127:3 132:3 135:5
137:5,22 138:3
149:10 155:11
156:18 158:6
167:4 170:2,6
173:6 187:4
195:11,21 198:14
198:17,21 204:20
207:10 217:8
226:10 227:21
239:1,11,18

244:19 253:13,16
253:18,22 260:24
262:6 268:13,24
284:3 297:8
301:15 309:9
316:5,9 320:18
321:6 323:9 328:6
338:8,13 352:1
358:7,16,18 359:6
**timeliness**  349:22
**timely**  214:7,24
344:7
**times**  3:5 38:8
78:22 79:23 89:1
98:22 104:1 111:4
118:4 153:13
155:2,7 157:5
158:3 177:18
224:18,23 256:22
261:21 262:17
266:3 289:4
290:10,23 294:4
333:16
**title**  219:19
**titled**  218:6 245:16
**tobacco**  81:5
130:7 322:3
**today**  8:18 9:23
10:20 11:18 12:1
12:7,24 15:15
16:12 18:20 19:8
19:12 21:14 28:4
28:16 31:15 38:14
40:7 44:17 45:6
70:11 75:16 76:5
89:11 115:10
117:4 120:3 162:7
166:3 174:17
193:2 212:3
238:23 239:15
240:4 241:3,12

243:13 251:15
257:5 258:21
262:17 266:3
268:16 271:10,18
272:19 276:3,22
277:7,22 278:5
280:11 285:20
287:3,16 301:12
312:17,17 330:18
**told** 26:19 117:18
118:4
**toll** 88:1
**tomorrow** 130:5
**tons** 61:16
**tool** 320:13,14,14
320:15,20
**tools** 300:9,10
**top** 37:24 113:12
113:17,24 114:4,9
118:22 120:10
150:14 249:7
252:17,18 288:22
289:3,6 290:9
294:2,18 295:14
323:8 347:17
**topic** 25:22 144:7
144:12,22 156:10
165:15
**topics** 145:1,2,8
147:23 299:13
**torn** 211:17
**toss** 39:19
**total** 22:23 38:3
109:3,6 259:19
**totality** 50:22
132:12
**totally** 335:8
**touch** 62:5
**touched** 96:4
210:10 244:3

**touches** 62:1
**tower** 2:14
**toxicology** 129:10
129:19
**track** 20:5,6
169:13
**train** 285:5 293:23
**trained** 60:24
269:15 270:9
**training** 87:3
175:9 181:16
188:3,7 235:12
286:8,14,16
287:18,23 288:19
289:18 355:23
356:7,18,19 357:9
**tran** 53:4
**transcribed** 362:7
**transcribing** 19:5
**transcript** 5:4
40:7,8,19 41:2,8
41:22 42:17 45:22
47:14 57:7,8 85:2
85:9 87:22 88:4,8
103:18 166:6,7
167:17 359:10,14
360:5 361:11,12
362:5,12 363:5,11
363:17
**transfer** 346:2
**transformation**
213:19
**transmitting**
351:20
**trauma** 232:16
**traveled** 200:23
**treat** 81:3 144:9
154:12 229:20
273:18 275:7
277:16,22 279:5
281:7 332:20

**treatable** 73:10
**treated** 73:8
259:17
**treating** 145:3
298:9
**treatment** 43:19
92:6,8,8 94:22,22
97:15,24 98:17
101:24 127:23
144:9 147:2 151:2
164:23 172:6
173:18 189:16
191:7 212:24
220:9,15,16 226:2
228:17 231:12
240:10,22 250:15
251:2 253:12
254:2,3 257:22
259:15,22 261:10
261:11,12,16
278:23 286:10
288:12,13 298:1,7
309:11 341:8
351:21 352:17,19
354:8 355:7
**treatments** 73:4
90:23 91:3 154:12
278:17 286:24
291:3 312:13
**tremendous** 344:1
**trend** 125:4
**trends** 70:6 75:17
77:19 84:21 87:23
126:12 130:17
**trial** 10:11,14
38:16 39:6,10
51:17 60:2,10
62:12,13 132:16
166:17 167:10
280:1

**triangulated**
340:19
**trick** 107:23
142:22
**tried** 65:17 260:9
324:19
**trouble** 248:5
**true** 76:10 77:5
85:20,21 95:1,2
112:12 115:13
123:21 124:1,2
129:17 163:9
164:12,19 165:3
173:17 174:1
186:15,19 187:20
188:9,19 190:5,17
194:4,11 212:7
220:16 233:17,22
237:3 239:19
240:12 241:13
247:10 256:16
259:3 260:15
264:22 265:10
271:12,13 275:18
276:17 285:18
293:24 294:9
295:24 296:12,16
297:8 302:8 303:9
304:18 305:10
306:5 311:6,15
314:7 324:3,4
327:11 331:17
336:11 343:11
348:10 354:4,9,19
354:24 355:8
356:23
**truth** 41:16 71:24
**truthful** 16:12
42:18
**truthfully** 43:6
44:22,24

**try** 15:23 25:8
50:1 53:14 55:19
60:2 94:11,15,19
97:6 118:9 137:10
153:15 157:4,6
169:23 170:14
236:10 241:14
242:16 257:2
260:8 261:5 267:2
294:14 296:22
302:21 303:15
305:19

**trying** 13:7 27:18
44:6 61:21 64:11
79:13 92:24
107:23 116:3
133:14,18,24
142:22 156:21
168:16 264:10
272:4 328:7
339:17

**turn** 7:7 98:12
118:17,21 130:24
207:7 238:6
242:22 254:1
277:1 281:24
305:17 306:10
337:2

**turned** 12:20
352:16

**turns** 98:9

**twelve** 41:11 57:9

**twenty** 45:24
359:15 360:6

**twice** 266:19

**two** 10:23 11:1
15:23 22:20 28:23
31:4,7,9 32:11
36:8,9,13 52:18,23
58:14 65:5 78:5
78:22 111:4

124:12 132:8,24
139:3 155:2,7
157:5 160:15
161:2 162:1 164:2
165:2 167:21
170:23 175:21
182:2,3 187:3,4
193:14 194:13
196:24 197:14
199:14,23 201:6
204:6 207:1,2
217:21 237:6
242:3 258:6 325:3
332:3 337:15
339:24 340:11,23
341:6 342:12
348:9 355:19

**type** 12:14 13:10
77:24 121:6
241:12 242:21
247:20 278:12
286:16 298:17
300:22 314:19
326:22 343:3
345:1 348:22
355:7

**types** 34:21,22
90:3 120:11 139:8
225:1,10 228:6
247:5 248:24
287:15 345:7
348:22

**typewriting**
359:10

**typically** 15:16
103:4

**u**

**u** 29:24

**u.s.** 7:19 23:20
343:11

**uh** 203:12

**ultimate** 276:13
323:12

**ultimately** 69:5
139:24 164:17
276:22 334:16
348:14

**un** 315:12

**unable** 251:15

**unaware** 325:13

**underestimated**
267:16

**underestimates**
109:6

**underestimating**
109:3

**undergoes** 103:9

**underlies** 56:14

**underlying** 62:8
106:20 189:19

**underneath**
109:14 122:2

**underscore** 23:5
183:13 197:20

**understand** 13:8
27:6 32:18 37:10
37:21 54:24 55:6
55:10 59:20 62:4
62:5 64:17,17
65:11,22,24 66:10
72:14 99:16,17
109:21 112:23
126:18 147:12
148:10 169:1
176:3 184:4
202:19 219:12,14
244:2 272:16
288:11 290:1
294:5,8 329:22

**understanding**
20:18 55:17 60:15

60:21 62:8 64:1,3
64:19 65:8,9 81:8
96:12 147:20
189:13 227:23
231:24 280:8
287:20

**understood** 15:3
23:17 37:8 38:13
57:2 66:4,11
86:10 95:22 236:9
243:9 264:1 304:9
325:7

**undertaken**
138:21 161:5
287:7

**undertaking** 58:24
138:23

**undertakings**
213:9

**underutilized**
250:19

**underway** 307:9

**unemployment**
232:20 237:8

**unfair** 63:3 150:3

**unfavorable**
266:24

**unfolded** 326:20

**unfortunate**
130:19

**unfortunately**
200:15 250:18
309:12

**unintended**
309:23 310:5
313:11 315:7

**unintentional**
308:2 313:3

**uniquely** 358:11

**unit** 7:13 342:9,12
342:22 347:19

348:8,23,24 349:9
350:10
**united** 1:1 210:6
210:24 252:2
343:10 347:1
**university** 221:14
230:24 231:14
255:16 299:13
345:23
**unmet** 255:9
258:12 259:8,11
327:8 329:4
352:12
**unpack** 313:22
**unrelated** 105:13
105:15 356:19
**unsafe** 240:21,21
**untreated** 128:5
**unused** 331:4,9,11
331:14 332:4
334:9,14 340:1
**unusual** 14:3
**update** 6:6,9 42:23
131:24 179:3,6
**updated** 132:15
142:11
**updates** 49:15
**ups** 111:17 311:2
**uptick** 86:1
**upticks** 111:10
**usdc** 5:5 6:3 40:20
158:17
**use** 5:22 12:22
23:15 24:21 62:7
63:20 64:24 73:6
80:10,11 87:11,13
87:15,23 89:24
90:16,17,18 91:16
91:18 92:9,11
93:15 94:24 95:5
95:19 96:8,8

97:19 98:9,10,17
98:19 103:8
109:16 114:17
117:8 118:1
119:16 120:7,18
120:24 127:20,23
128:4,4,5,8,12
130:20 131:2
144:2,10,23 145:3
147:2 149:10
152:12 153:24
154:3 174:19
191:6 207:23
208:10,21 209:5,5
210:4,4,7,23,24
211:8,9 212:24
216:3,4,5 218:11
218:18 220:9
231:12 234:2,3
235:24 236:1,6,14
236:15,18,20,21
238:6,19,23,24,24
239:1,7,8,15,16
240:11 241:4,5,18
242:9 243:4,14,15
243:19 244:6
248:4 249:17
250:11,12 257:21
269:17,22,24
276:24 283:1
284:18 288:13,14
293:23 294:5,22
296:24 297:22
298:4,9 299:6
300:17,18 301:21
302:21,22 303:3
303:10 304:21
307:12 310:16
311:14 317:18
320:20 324:15,19
324:22 325:22

334:18 336:17
337:5 343:10
347:18 355:5
356:8,9,20
**useful** 210:6
**user** 242:24
**users** 91:20 96:3
96:21,22 97:21
101:11,14,18,23
102:18 282:6
352:7 354:11,16
**uses** 95:16 109:20
227:2
**utilize** 287:14
293:12
**utilized** 354:3

**v**

**v** 361:6 362:3
363:3
**validity** 324:22
**valuable** 112:19
112:21
**value** 88:11
297:20 311:22
**van** 337:1
**varies** 224:15
**variety** 230:24
238:6 260:1
**various** 208:19
301:18
**vary** 233:21
**varying** 256:17,17
296:20
**vast** 189:15 257:21
281:22 286:17
287:21 355:12
**vastly** 311:24
**vehicle** 227:2,5
**venue** 248:7
**veritext** 3:9 7:24
8:2 19:4 361:1,7

364:1
**veritext.com.**
361:17
**version** 141:2,11
142:13
**versus** 7:16,18
192:22
**viability** 221:7
**video** 7:2,10,13
9:9,13 18:11
40:16 48:12 66:22
67:2 93:20,23
94:4 104:10
137:22 138:3
158:22 170:2,6
179:11,14 198:17
198:21 207:17
253:17,22 292:8
312:7 316:5,9
338:6,7,13 358:18
**videoconference**
1:19
**videographer** 3:8
7:24 266:6 338:3
**videotaped** 1:19
**vie** 304:2
**view** 80:17 126:11
126:15 319:8,9
**views** 43:18 44:7
150:10
**violence** 232:16
233:21 237:10
288:17
**virginia** 1:1 2:14
5:8 7:20 9:5 10:7
42:7 45:19 68:19
70:13,23 72:3,24
73:17 74:5,14
75:17 77:1,14,20
81:24 104:2,23
105:19 106:2

107:12 108:12 110:11,19 112:10 124:16,23 126:20 127:8 184:8 186:5 231:17 232:4 233:8 235:15 236:21 283:9,14 293:13 296:14 297:3,12 298:13 298:19 299:19,24 300:10 302:7 303:18 318:16,23 318:24 322:18 323:4 325:9 331:13 336:5 337:9,15 339:11 341:10,19 345:24 353:22,23 359:1 359:16 360:1,7

**virginia's** 302:21

**virtually** 90:7,9 148:1 256:12 286:12 296:21 297:19

**visibility** 350:2

**vision** 233:6 346:7

**visit** 68:3 69:20 70:1 200:13,17,17

**visited** 117:19,21 117:21,23

**visits** 111:20 113:19 114:11,17 115:3,12 116:8 117:6

**vitae** 131:21

**vital** 172:16,20

**vocational** 175:9 181:16 188:2,6 235:12

**volkow** 99:6

**volume** 56:2 58:23 68:14 72:13,22,23 90:11 146:22 239:23 259:6 267:9 290:22 304:2

**vs** 1:6,13

### w

**w** 3:4 245:8,17

**wager** 349:13

**wait** 93:19 261:17 321:12 353:1

**waiting** 16:5 257:6 260:5 261:18

**waived** 361:19

**walking** 351:19

**wanes** 26:11

**want** 12:12 21:8 21:23 34:2 36:12 40:2 43:15,22 44:5,15 45:5 54:23 61:22 63:5 63:16 68:22 69:11 75:3 76:3 79:1 80:14 83:9 94:11 95:14 103:21 108:1 110:4 113:14 115:1 133:1,16,17,20 137:11 141:17 142:21 149:10,21 152:15 158:13 159:1 160:9 174:4 176:2,17 183:13 192:20 195:9 196:7,21 197:19 207:15 216:21 217:20 221:4 227:20 228:23 230:16 244:2 246:20 247:15

248:16 254:5 258:1,4 261:9 262:7 263:19 264:3 265:3 266:20 274:10,23 275:9 301:10 309:7 314:23 319:4 322:20 324:15 325:4 329:21 338:1 341:12 345:14 352:8,15

**wanted** 94:10 131:22 200:13 243:8 247:18 248:17 252:6 290:12,17 306:9 311:1

**wanting** 104:1

**wants** 169:17 274:14

**warehouses** 282:6

**warning** 156:14

**washington** 21:5 139:13 142:1 312:3 339:2

**waste** 44:16 158:6

**wasting** 167:3 217:8

**watch** 37:15

**watched** 29:2 36:4 37:19 312:7

**watterson** 2:20

**waxes** 26:10

**way** 11:13 23:17 26:17 29:8 37:21 43:3 44:19 50:1 53:23 56:7 71:18 92:14 97:24 102:20 114:4 120:6 127:16

131:24 133:5 140:16 150:9 158:2 163:4,13 166:20 169:2 181:22 192:7 206:16 209:13 210:11 212:5 215:24 223:19 234:2,7 242:20 244:13 268:7 269:24 273:3 274:10 282:5,6 283:1 284:9 285:10 295:24 299:10 358:11

**ways** 51:2 58:12 60:4 80:4 97:10 98:7 174:23 213:14 247:5 267:8 301:13

**we've** 42:17 54:22 55:1 59:16 66:12 89:16 97:10 124:12 129:21 133:11 134:6 155:5,5 157:5 159:3,11 165:20 169:15 173:3 190:20 204:9 229:16 230:16,17 234:6 238:21 244:15 266:2 267:16 280:10 287:15 316:1 320:9,23,23,24 334:6 336:1 358:13

**wear** 245:8,10,16 246:4 278:9

**weave** 248:13

**website**  229:18
**week**  130:14
    132:10,10 165:21
    226:15,23
**weeks**  207:1
**weighing**  151:18
**welcome**  72:23
    110:3 138:6
**went**  171:4 178:11
    181:21 201:14
    261:8 274:3
    357:23
**west**  1:1 5:8 7:20
    9:5 10:7 42:7
    45:18 68:19 70:13
    70:23 72:3,23
    73:16 74:4,14
    75:17 76:24 77:14
    77:20 81:23 104:2
    104:23 105:19
    106:2 107:12
    108:12 110:11,19
    112:9 124:16,23
    126:19 127:7
    184:8 186:5
    231:17 232:4
    233:8 235:15
    236:21 283:9,14
    293:13 296:14
    297:3,12 298:13
    298:18 299:19,24
    300:10 302:7,20
    303:17 318:16,23
    318:24 322:17
    323:4 325:9
    331:13 336:5
    337:9,15 339:10
    341:10,19 345:23
    353:22 359:1,15
    360:1,7

**whatsoever**  168:1
    277:20
**whispering**  7:5
**wi**  94:8
**widely**  307:16
    308:11
**widespread**
    266:14 307:2,22
    308:19 329:19
**wilkes**  165:19
    166:19 168:3
    170:11
**williams**  214:6,24
    215:8,10 216:14
    216:17,24 344:5
    349:14
**willing**  10:18
    154:20 336:22
**wind**  71:17
**winded**  92:14,21
    94:11
**window**  37:20
    207:3 225:24
**wise**  340:18
**wish**  145:12 233:2
    233:6
**wit**  359:2 360:2
**withdrawal**  103:9
**witness**  5:13,16
    6:3 9:14,15,17
    14:7 20:12,20
    21:16 35:7 48:20
    48:23 57:20 58:11
    73:23 92:20 93:19
    93:21 103:16
    113:4 118:4
    134:22 148:14
    150:3,7 156:15
    158:17 160:1
    165:5 167:6
    193:15 197:8

274:9,21 279:1
    328:5 359:7,10
    361:8,11 362:1,4
    362:11 363:1,4,15
**witness'**  361:14
**women**  84:10
    213:2 245:16
    254:10,13,16,24
    255:4 257:10,16
    258:8
**wondered**  289:19
**word**  24:15 58:13
    122:10 155:3,8,17
    180:8 224:24
    234:12 313:23
    333:22 348:23
**words**  30:11 34:16
    42:11 50:11 51:9
    62:7 63:20 64:20
    64:24 72:17 88:15
    120:23 121:16
    124:3 131:2
    151:19 153:16
    160:13 171:17
    175:1 180:8
    195:20,21,22
    202:24 210:17
    214:12,14 216:22
    216:23 239:14
    246:19 258:18
    263:7 264:18
    294:23 300:18
    312:23 319:23
    347:18 355:12,18
**work**  19:16 22:6
    22:24 23:6,14
    24:5,5 26:20 32:3
    32:21 38:13,15,22
    38:24 39:4 59:17
    65:15 83:19 90:23
    111:15 112:18

138:21 205:8
    226:23 282:17
    287:18 289:22
    308:8 335:2
    345:13 353:17
    357:3
**worked**  23:6 87:4
    221:23 296:22
**workforce**  92:1
    173:20 174:19
    181:15,17 187:18
**working**  23:10
    24:10 234:6
    296:13
**workplace**  174:19
    176:7,17 188:16
    188:16
**works**  5:21 207:21
    208:9,18 226:14
**world**  71:13
**worry**  335:4
**worse**  319:11
**worth**  189:13
    242:7 319:7
**wrap**  356:4
**write**  51:1 76:14
    114:10 266:12
    285:7 304:1
    306:22
**writing**  23:19
**written**  226:11
    227:21 232:3,13
    359:9
**wrong**  263:8
    295:10
**wrote**  107:11
**wv**  2:10,15 5:7,20
    105:18 207:20
    232:14 359:20

| x |
|---|
| **x**  9:16 86:23 |
| 238:12 |

| y |
|---|
| **y**  86:23 |

**yeah**  8:23 14:21
  34:13 35:23 47:19
  48:8 59:16 63:22
  66:15 68:22 71:5
  75:12 89:15 93:20
  108:3,3,9,10 109:2
  110:16 113:24
  115:1 118:8
  122:18,24 133:5,8
  133:13 134:1
  163:19 184:14
  197:15 203:24
  212:17 217:12
  219:8 220:22
  223:15 233:5
  239:20 246:5
  248:21 249:13
  253:11,17 254:8
  257:20 263:14
  279:8 283:12,15
  290:8 291:15
  296:3 299:14
  300:1,7 302:17
  305:13 315:24
  316:4 317:4 322:6
  325:19 327:14
  332:1 333:18
  336:19 343:1
  347:24 351:2
  354:14 355:11
  356:24
**year**  22:17 26:8
  43:10 44:1 52:1
  58:16 71:5,5
  73:13,13 107:19

109:10,18,18
112:10 127:3
145:21,22 161:2
162:1 165:9,11,12
167:22 168:22,23
175:21 192:9
193:5 195:5 196:6
197:2,9,14 198:12
240:2 243:20
244:8,19 289:4
290:10,23 293:8
294:4 331:20
332:2 337:14
351:13,13
**year's**  165:15
**years**  22:20 23:7
  26:3,9,17 68:15
  72:12,19 87:5
  114:13 115:3
  117:18 125:4,7
  130:6 192:1,5,7,15
  192:15,20,22
  193:11,11 194:11
  194:15,20 196:5
  196:14 198:1,5
  207:2 209:9 212:2
  217:22 236:8
  239:11,18 241:6
  241:11,22 258:17
  272:21 296:8
  312:1,2,16 319:7
  322:9 323:17
  326:21 348:5
**yep**  50:9
**yesterday**  29:17
  33:16,20 35:1
**yield**  340:24
**york**  3:5,6
**young**  11:8 335:6
**young's**  28:22

**younger**  114:13
  115:4 117:18
  316:22 317:1
**youth**  114:12
  115:3 248:3
**youtube**  312:7

| z |
|---|
| **z**  30:2 |
| **zebra**  30:2 |
| **zoom**  7:23 16:8 |
| 39:22 137:2 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.