**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM G. CALEB ALEXANDER**

## EXHIBIT C

ROBERT J. RUFUS, DBA, CPA, CFF, CVA (EMERITUS)
CT2 EXPERT REPORT (08/27/2020)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br>        Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION. et al.,<br>        Defendants. | CIVIL ACTION NO. 3:17-01362 |
| CABELL COUNTY COMMISSION,<br>        Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION. et al.,<br>        Defendants. | CIVIL ACTION NO. 3:17-01665 |

**EXPERT REPORT OF**
**ROBERT J. RUFUS, DBA, CPA, CFF, CVA (Emeritus)**

August 27, 2020

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Introduction*

I have been engaged by Covington & Burling LLP on behalf of its client, McKesson Corporation, to provide expert witness testimony in the above matter.  I understand that my report and testimony is also on behalf of Cardinal Health and AmerisourceBergen.

My engagement includes four specific tasks:

1) Analyze the trends in key metrics related to the opioid abuse epidemic in the Cabell-Huntington community,

2) Identify and quantify the Plaintiffs' respective historical investments (costs) in intervention programs, which correspond to the programs that Dr. G. Caleb Alexander refers to as abatement[a] programs, such as prevention and harm reduction programs,

3) Analyze the Plaintiffs' financial reports and related data to determine if any additional investments (costs) were made by the Plaintiffs in interventions responsive to the opioid abuse epidemic that were not captured in task 2.

4) My fourth task, relating to my opinions responding to Plaintiffs' experts, has four subparts.

   a) First, I will consider the interventions proposed by Dr. Alexander to respond to the opioid abuse epidemic in Cabell County in the context of the Plaintiffs' respective structure and services provided to their citizens.

   b) Second, I will address interventions and related federal and state funding currently in place to respond to the opioid abuse epidemic in Cabell County.

   c) Third, I will consider the primary economic drivers of Dr. Alexander's report and any methodological failures related thereto.

   d) Finally, I will consider George Barrett's report and any methodological failures related thereto.

*Purpose*

The purpose of my engagement is to assist the Court in its evaluation of the complaint filed by the Plaintiffs against McKesson and certain other defendants (collectively, Defendants), based on the accounting, financial and other evidence I have reviewed.

---

[a] Dr. Alexander uses the term "abatement" to characterize his proposed programs (e.g. prevention, harm reduction, treatment).  I understand the term abatement has legal connotations and is contested by the parties in this matter.  To avoid the appearance of advocacy, I will use the term "interventions" to respond to the same type of programs that Dr. Alexander proposes.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Statement of Opinions

This report contains a complete statement of all opinions to be expressed with respect to the above matter and the reasoning or basis therefor.  I also provide a list of the information considered in forming my opinions and summary exhibits supporting the same.

### Information Considered

A complete list of the information considered in forming my opinions is provided herewith in Appendix A.  Specific limitations related to my specified tasks are provided herewith in Appendix B.

### Statement of Independence

My fee for this engagement is $425 per hour ($550 for trial and deposition testimony) plus reimbursement for direct expenses.  Moreover, payment of fees is not contingent on the results of my findings.

### Limited Purpose

This report is limited to the purpose specified herein and for no other purpose.

### Qualifications

I am a Certified Public Accountant licensed in the State of West Virginia with more than 30 years of professional experience in accounting, tax, valuation, damage calculation, and litigation support.  From 1981 to 1985, I worked as a Revenue Agent with the Internal Revenue Service in Huntington, WV.  From 1985 through 2016, I was the President and Managing Principal of Rufus & Rufus Accounting Corporation.  From 2017 through 2019, I was the President and Managing Principal of Rufus, Miller and Associates.  I am currently self-employed.

From 2008 to May of 2018, I was the Program Coordinator and Lead Instructor of the Master of Forensic Accounting (MFAcc) program offered by the University of Charleston in Charleston, WV.  I was the lead author of *Forensic Accounting*, a forensic accounting textbook published by Pearson Higher Education in 2014.

I received a Doctor of Business Administration (DBA) from Nova Southeastern University in 2007, a Master of Business Administration (MBA) from Marshall University in 1981, and a Bachelor of Science in Business Administration (BS) from Concord College (now University) in 1978.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The balance of my qualifications (including publications) is identified in my CV presented herewith as Appendix C and my recent testimony as Appendix D.

### *Methodologic Approach*

My engagement includes four specific tasks. Each task required the collection of specific information and data for analysis. In Task 1, I collected information related to suspected overdose events, overdose deaths and criminal offenses. This information was compiled (time series) and trended. The data was confirmed or supported via deposition testimony, publicly available information, documents produced in this matter, website data dashboards and publications.

In Task 2, I identified Plaintiffs' investments (costs) in intervention programs that have responded to the opioid abuse epidemic via responses to interrogatories, deposition testimony, publications, documents produced in this matter, and publicly available information. The investments were quantified via the compilation of grant applications and related reporting.

In Task 3, I collected (via discovery and publicly available data sources) and summarized financial statements and budgets. I then conducted horizontal (year-to-year) and vertical (within one year) analysis to determine revenue sources, consumption, and financial conditions, in order to determine whether Plaintiffs incurred any additional costs in responding to the opioid abuse epidemic that were not identified by way of Task 2. Detailed data (budget worksheets) for the Police and Fire Departments were also analyzed to identify expense patterns. Deposition testimony, budget revisions, budgeted HPD /HFD positions, and certified audits were also considered.

In Task 4, I reviewed Dr. Alexander's Expert Report and the related calculations presented by Mr. Barrett. My assignment was to consider the proposed programs in the context of the structure and services offered by the Plaintiffs to their citizens. To this end, I attempted to sort (or group) the proposed interventions into categories comparable to current service offerings. The next component of this task involved gathering data to identify available funding from the federal and state programs responsive to the opioid abuse epidemic. The balance of the task involved consideration of the economic drivers, including a) beginning Opioid Use Disorder (OUD) population, b) changes to the OUD population over time, c) growth rates of projected costs, and d) discounting to present value.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Background

The Plaintiffs—City of Huntington and Cabell County Commission —are governmental units (subdivisions) of the State of West Virginia, located in the southern United States.  Thus, residents of the City of Huntington are serviced and governed by four layers of government: federal, state, county and city.  Similarly, residents of Cabell County residing outside city limits[b] are serviced and governed by three layers of government.

The functions and power of the Plaintiffs are granted by the State of West Virginia.  Although federal, state, and local governments serve different functions, they cooperate (share) in financing and services.  West Virginia has 55 counties and 232 municipal corporations.[1]

## City of Huntington

The City of Huntington is located on the southwestern corner of West Virginia bordering Ohio and Kentucky.
The City of Huntington is the second largest city in the State of West Virginia with a population of roughly 50,000.  The City, with the exception of the neighborhoods of Westmoreland and Spring Valley (Wayne County), is located in Cabell County, where it is the county seat.

Since 1985, the City of Huntington has operated under a strong mayor/city council form of government.  The functions and authority of the City are provided for in its charter.[2] (constitution) as granted by the State of West Virginia.  The Mayor is an elected official with the authority to veto acts of City Council.

## Cabell County Commission

Cabell County is located in southwestern West Virginia along the Ohio River and includes an area of 288 sq. miles and a population of roughly 95,000.[c]

Cabell County's form of government is the commission system, which consists of three elected commissioners collectively charged with the administration of the county government (WV Const. Art 9, Sec. 9; WV Code § 7-1-1).

The jurisdiction, powers and duties (functions) granted to Cabell County and its Commissioners includes (but is not limited to) the superintendence and administration of its fiscal affairs (WV Const. Art 9, Sec. 11; WV Code § 7-1-3 and § 7-7-7).

---

[b] Including the City of Huntington, City of Milton and Village of Barboursville.
[c] Including the population of the City of Huntington within Cabell County.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Fund Accounting, Budgets and Financial Reporting**

The West Virginia State Auditor prescribes the uniform system of accounting and reporting to be used by the Plaintiffs in compliance with the Governmental Accounting Standards Board (GASB).

The primary focus of governmental accounting is accountability rather than profitability. To this end, governmental units use *fund accounting*. Fund accounting segregates resources into categories (or funds) which allows for a tracking of use. In sum, fund accounting creates a distinction between the different types of funds (purpose), identifies the funds, and reports them separately and then collectively. As provided by the West Virginia State Auditor, a separate accounting must be maintained for each fund.

The financial operations of the Plaintiffs are carried out in a fiscal year that begins on July 1 and ends on June 30. A fiscal year is an accounting period of 365(6) days; more specifically, it is an established period of time when an organization's annual financial reporting starts and ends.

As provided by GASB, funds are grouped into three categories:

    a.  *General Fund*. This fund accounts for most of the basic services provided by the government unit. Technically, it accounts for all financial resources not accounted for and reported in another fund.

    b.  *Proprietary Funds*. These funds account for a government's ongoing operations, similar to a commercial activity.

    c.  *Fiduciary Funds*. These funds account for resources for which the government is acting as a collecting/disbursing agent or trustee.

The functions, services, policies and funding of the Plaintiffs are identified in their financial reports, most specifically their budgets. A *budget* is a proposed plan for raising and spending money during the fiscal year for specified policies, programs, functions, activities, and objectives.

On or before March 28 of each year, each Plaintiff is required to construct and submit a budget for the ensuing (next) fiscal year. The budget, following adoption by the respective governing body (Commission or Council) is submitted to the West Virginia State Auditor for approval (WV Code § 11-8-9, WV Code § 11-8-10).

In general, the Plaintiffs are allowed a certain degree of latitude for the revision/s of their budgets to permit expenditures for purposes for which no appropriation or an insufficient

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

appropriation was made.  Revisions must be made prior to the obligation and expenditure of funds and with the prior written approval of the West Virginia State Auditor.

As prescribed by the West Virginia State Auditor, the budgeting process employed should include a gathering and review of the following:

    a.  Revenue projections for the ensuing fiscal year

    b.  Funding requests from each elected official and department head (prosecutor, sheriff, circuit clerk, county clerk and assessor) for the ensuing fiscal year, required on or before March 2 of each year

    c.  Actual revenues and expenditures for the last fiscal year

    d.  Budgeted revenues and expenditures for the current year

    e.  Actual revenues and expenditures through December 31 for current year

Following public notice, each Plaintiff conducts budget meetings (March 7 - March 28) to ascertain their respective fiscal conditions and establish their budgets.  This process must be completed with submission to the West Virginia State Auditor by order prior to March 29.

A budget, when adopted according to procedures specified by state law, is binding upon the administrators of the government unit (i.e., Cabell County Commission and City of Huntington). Revisions to the budget must be adopted and approved by the West Virginia State Auditor. Although budget revisions are common throughout the fiscal year, the final budget (as revised) must be submitted on or before June 15 of the current year (ending June 30).  All annual appropriations lapse at fiscal year-end.

On or before October 15 of each year, the Commission is required to prepare and publish audited financial statements for the *previous* fiscal year revealing:

    a.  All receipts and expenditures during the previous fiscal year

    b.  Names of each firm, corporation and person who received more than $50 during the previous fiscal year; and

    c.  All debts of the county, the purpose for which the debt was contracted, its due date, and to what date the interest thereon has been paid

The City of Huntington is required to prepare an audited financial statement within ninety (90) days after the beginning of each fiscal year.

Audited financial statements summarize financial activities for the previous fiscal year (e.g., July 1 through June 30) and financial condition at the end of the accounting period (e.g., June 30).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Financial statements allow users, among other things, to:

    a.  Assess year-end operating results – funding and appropriations

    b.  Assess the costs incurred in providing services

    c.  Assess the government's financial position (improved or not)

    d.  Assess how the government finances its programs – sources of funding

    e.  Understand how the government has invested in capital assets (or not)

    f.  Compare and contrast reported activities with itself (year-to-year) or competing units

Audited financial statements provide an independent and objective assessment of a county's financial statements. Financial statement audits are conducted by Certified Public Accountants (CPA) and represent their highest level of assurance service. The audit process includes verification and substantiation procedures, compliance testing, and an assessment of internal controls. The objective of a certified audit is to express an opinion that the financial statements are fairly presented and are in accordance with generally accepted accounting principles (GAAP).

### *Task 1: Analyze the trends in key metrics related to the opioid abuse epidemic*

### <u>Task 1 Analytical Facts / Observations</u>

1.1    Mayor Williams testified that he became aware that the opioid crises had evolved into "a full-blown epidemic" during mid 2014 (Williams Depo., pp. 23-25). A first action was the formation of the Mayor's Office of Drug Control Policy (MODCP) shortly after in November 2014. The mission of the MODCP was "promoting strategic approaches and collaboration to reduce drug trafficking and related crime while promoting prevention and treatment options for addicts" (MODCP 2015 Strategic Plan, p. 4). In 2015, the Mayor's Office of Drug Control Policy developed a strategic action plan by collaborating with law enforcement officers, health care professionals, social service administrators, educators, elected officials, clergy, community activists, recovering addicts, and neighborhood groups."[3]

1.2    The collaborative and assertive responses of the Cabell-Huntington community, in conjunction with support and services from the Federal and State government, resulted in "a decline in overdoses, an increase in referrals to treatment, and a reduction in drug-related crime."[4] For context and understanding, I reviewed various presentations by City and County officials, grant applications, budgets and financial documents, testimony, and other materials as supporting evidence that the epidemic was trending downward. To analyze the impact of these collective efforts, I considered three principal metrics related to

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the opioid abuse epidemic in the City of Huntington and Cabell County, West Virginia.

    a. ***Suspected overdose events*** (runs) as reported by Cabell County EMS (CCEMS) and the Huntington Fire Department (HFD);

    b. ***Opioid overdose deaths*** as reported by the West Virginia Department of Health and Human Resources (WV DHHR) and the Center for Disease Control and Prevention (CDC); and

    c. ***Criminal offenses, specifically drug related*** as reported by the Huntington Police Department (HPD) and the Cabell County Prosecutor's Office.

1.3   The first metric considered is suspected overdose events.  CCEMS provides Emergency 911 Service for Cabell County and the City of Huntington.  It operates 17 ambulances in 8 stations throughout Cabell County providing BLS, ALS and Critical Care transport.[5]

1.4   The suspected overdose data for all drugs collected and disseminated by the CCEMS is illustrated in Figures 1.1 and 1.2. [6,7]

**Figure 1.1**
**CCEMS Suspected Overdose Responses for All Drugs by Year**
**2010 to 2019**



*Sources  (1) Cabell County Data Dashboard (https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx)*
*(2) MODCP 2017 Strategic Plan, (3) CCEMS_051857, (4) CCEMS_51427*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1.2**
**CCEMS Suspected Overdose Responses for All Drugs by Month**
**November 2014 to July 2020**



*Source   Cabell County Data Dashboard (https //dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx)*

1.5   The HFD provides fire protection and emergency response services to the City of Huntington, West Virginia.  To this end, the HFD operates eight (8) stations and employs 86 firefighters.  According to Jan Rader,[d] the HFD did not track overdose medical assist calls until January 1, 2017.  Pre-2017 data includes all medical assist responses (runs) as extracted from the HFD's database (Rader Deposition, p. 189).

1.6   Regarding the overdose trend, Chief Rader testified (Rader Deposition, p. 190) that:

> "In 2017 – which was our peak year – 24 point like 6 or 7 percent of our calls in general were 3111 [suspected overdose] calls.  And it was, I think, down to 12 percent in 2018."

1.7   As reported in the HFD's Report to City Council (March 21, 2019)[8], medical assist runs peaked in 2017 at 2,590 then fell to 1,598 in 2018, a reduction of 38.3%.  During this same period, overdose medical assist runs dropped from 1,241 in 2017 to 488 in 2018, a reduction of 60.6%.  The Report attributes a portion of this reduction to the change in response protocol made in May of 2018, wherein the HPD and HFD stopped responding to routine overdose calls.[9]   Pre-May 2018 overdose response protocol included EMS, Fire and Police.

---

[d] Fire Chief, Huntington Fire Department and founding member of Mayor's Office of Drug Policy.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1.8   Medical assist response (run) data, including suspected overdose runs, collected and disseminated by the HFD is illustrated in Figure 1.3.[10]

**Figure 1.3**
**HFD Medical Assists**
**2010 to 2018**



*Source: HUNT_00019591*

1.9   CCEMS and HFD responses are illustrated in Figure 1.4.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1.4**
**Emergency Responses (CCEMS and HFD)**
**2010 to 2018**



*Sources: (1) HUNT_00019591, (2) Cabell County Data Dashboard (https://dhhr.wv.gov/office-of-drug-control-policy*
*/datadashboard/Pages/default.aspx), (3) MODCP 2017 Strategic Plan, (4) CCEMS_051857, (5) CCEMS_51427*

1.10   The second metric considered is overdose deaths.  As published by the National Institute on Drug Abuse,[11] drug overdose deaths in West Virginia dropped from 833 in 2017 to 702 in 2018, a decrease of 15.7%.  Moreover, deaths involving prescription opioids declined from 304 in 2017 to 234 in 2018, a decrease of 23%.  Cabell County's drug overdose deaths dropped from 132 in 2017 to 107 in 2018, a decrease of 18.9%.[12]  Prescription opioid overdose deaths dropped from 24 in 2017 to 17 in 2018, a decrease of 29%.[13]

1.11   Overdose deaths in West Virginia and Cabell County involving opioids, by opioid category, as provided by the CDC, are illustrated in Figures 1.5 and 1.6.[14]  Overdose deaths related to prescription opioids peaked in 2011 in West Virginia and remained flat in Cabell County from 2013 to 2016 before also declining.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1.5**
**West Virginia – Overdose Deaths Involving Opioids**
**1999 to 2018**



*Source: Queries from CDC Wonder Multiple Cause of Death Dataset (http://wonder.cdc.gov/mcd-icd10.ht*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1.6**
**Cabell County - Overdose Deaths Involving Opioids**
**2010 to 2018**



*Source: Queries from CDC Wonder Multiple Cause of Death Dataset (http://wonder.cdc.gov/mcd-icd10.htn*

1.12 Overdose deaths (all opioids) for the State of West Virginia and Cabell County for years 2015 – 2018, extracted from the WV DHHR data dashboard, are illustrated in Figures 1.7[15] and 1.8.  Although there appear to be differences in the way the data sets are recorded, the trends move in the same direction.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1.7**
**Fatal Overdoses (All Opioids) in West Virginia**
**2015 to 2018**



*Source  Cabell County Data Dashboard (https //dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx)*

**Figure 1.8**
**Fatal Overdoses (All Opioids) in Cabell County, WV**
**2015 to 2018**



*Source  Cabell County Data Dashboard (https //dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx)*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1.13  The third metric considered is crime, specifically drug related offenses.[e]  As illustrated in Figures 1.9[16] and 1.10,[17] drug offenses dropped from 743 in 2017 to 532 in 2018, a decline of 28.3%.  During the same period, total offenses dropped from 10,126 to 8,338, a decline of 17.7%

**Figure 1.9**
**HPD Total Drug Offenses**
**2010 to 2018**



*Sources: (1) HUNT_01716770, (2) HUNT_00153162, (3) CC911_0036901*

---

[e] Drug related offenses includes "Drug/Narcotics" offenses from 2010-2015. It is unclear if "Drug Equipment" offenses are also included from 2016-2018 as only a total is provided.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1.10**
**HPD Drug Offenses / Total Offenses**
**2010 to 2018**



| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Drug Offenses | 286 | 213 | 221 | 238 | 231 | 234 | 219 | 242 | 425 | 343 | 646 | 743 | 532 |
| ■ All Offenses | 9,633 | 8,911 | 8,426 | 8,095 | 7,596 | 8,019 | 7,551 | 7,597 | 8,296 | 7,865 | 12,058 | 10,126 | 8,338 |

*Sources: (1) HUNT_01716770, (2) HUNT_00153162, (3) CC911_0036901*

1.14  Additional HPD crime data trends (2017 to 2018), as reported by Mayor Williams in his 2019 State of the City Address, include:[18]

    a.  Murder down – 52.94%

    b.  Robberies down – 30.28%

    c.  Burglary down – 17.58%

    d.  Aggravated assault down – 20.42%

1.15  A final crime metric considered was drug court cases, as identified by the Cabell County Prosecutor's Office.[19]  As illustrated in Figure 1.11, the number of cases declined from 2015 to 2018 and were flat in 2019.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**Figure 1.11**
**Cabell County Drug Court Cases**
**January 2015 to March 2020**



*Source: CCPROS_0000002*

1.16 In May 2018, United States Surgeon General Jerome Adams recognized these trends and noted on a trip to Huntington that, "I came to Huntington because it's one of the best stories in the United States in terms of recovery.  If we can turn around overdose numbers here, we can do it anywhere…Your response (to the opioid epidemic) is surgeon general approved.  You all are kicking butt here, and I'm so proud to be here."[20]

### Task 1 Summary Opinion

1.17 The data described and illustrated above indicate that the opioid abuse epidemic in the City of Huntington and Cabell County, WV, peaked in 2017 and was subsiding through 2019.  The prescription opioid abuse epidemic peaked earlier.  While the limited available data for 2020 year-to-date suggests an uptick in CCEMS suspected overdose responses to all drugs coinciding with the COVID-19 pandemic in May, suspected overdose responses have declined to pre-COVID levels in July.[f]  These data suggest that current interventions responding to the opioid abuse epidemic, at current levels, have been successful so far.

---

[f] CCEMS suspected overdose responses for all drugs was 65 in July 2020, which approximates the average 2019 monthly CCEMS suspected overdose responses of 62, and January 2020 responses of 60 (https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Task 2: Identify and quantify the Plaintiffs' respective investments (costs) in intervention programs responsive to the opioid abuse epidemic*

**Task 2 Analytical Facts / Observations**

2.1 The purpose of this task is to determine the investments (costs) made by the Plaintiffs in support of the intervention programs responsive to the opioid abuse epidemic. To that end, I have reviewed grant applications, budget proposals, program narratives, grant awards, financial reports, and related materials.

2.2 The Plaintiffs have identified[g] multiple intervention programs and actions that they initiated, facilitate, and/or participate in, responsive to the opioid abuse epidemic that accomplished the trends identified above. The principal programs are fully briefed in Marshall University's *The City of SOLUTIONS, Huntington, WV: A Guide to What Works (and what does not) in Reducing the Impact of Substance Use on Local Communities (2019).*

2.3 As illustrated in Task 1, and supported by Mayor Steve Williams[h], the collective impact of the programs identified, in conjunction with support and services from the Federal and State government, have "resulted in a decline in overdoses, an increase in referrals to treatment, and a reduction in drug-related crime" (see forward to City of Solutions). Moreover, these efforts changed the City's reputation from being the "epicenter of the opioid epidemic" to the "epicenter of the solution to the epidemic."

2.4 As discussed above, the City's actions followed Mayor Williams' realization (in mid-2014) that the opioid crises had evolved into "a full-blown epidemic" (Williams Depo., p. 23). A first action was the formation of the Mayor's Office of Drug Control Policy (MODCP) in November of 2014, with the stated mission of "promoting strategic approaches and collaboration to reduce drug trafficking and related crime while promoting prevention and treatment options for addicts" (MODCP 2015 Strategic Plan, p. 4).

2.5 Because the MODCP "consisted of city employees"[21], there were no incremental costs. Members included Jim Johnson, Jan Radar (HFD Chief) and Scott Lemley (HPD crime analyst). According to Chief Rader, the MODCP was organized to "facilitate solutions to the opioid epidemic". The MODCP was "very active until probably 2017-2018" when "our attention shifted to sustainability and trying to get grants and things like that" (Rader Depo., p. 46).

---

[g] Via Responses to Interrogatories, publications, presentations and/or depositions.
[h] Elected mayor in November 2012 and reelected in November 2016; previously elected to Huntington City Council ('08-'12) where he served as Finance Committee Chairman.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.6   Through the leadership of the MODCP, Marshall University, Marshall Health, Cabell-Huntington Hospital, Saint Mary's Medical Center, the Cabell-Huntington Health Department and other stakeholders, the problem was qualified, and solutions were conceptualized and prioritized.[22]  Community stakeholders collaborated to identify and solicit funding opportunities.[23]

2.7   In addition to community collaboration to solicit funding, the City engaged the services of Sustainable Strategies, a lobbying / grant consultant to assist in identifying and pursuing grant opportunities (Williams Depo., p. 101, 105 and 218).  According to Mayor Williams (Depo., p. 105), "they are paid a retainer through the Municipal Development Authority to assist us on grants."  Mayor Williams further testified that the City had recently hired Kim Bailey "to write and to manage grants" (Depo., p. 92).

2.8   Regarding the City's investments (out-of-pocket) to address the opioid abuse epidemic, Mayor Williams testified as follows:

   a.   In the fall of 2014, he requested from City Council additional funding related to opioid abuse, specifically to "hire additional police officers."  That money was "made immediately available to help the Drug Task Force to be able to pay for overtime and other matters as that" (Depo., p. 87-88).  Moreover, this "was the only instance budgetarily that specifically targeted as a result of the opioid epidemic" (p. 88).

   b.   "We're needing assistance in addressing the opioid epidemic.  We are very aggressive in our pursuit of grant funding" (p. 210).

   c.   The City does not allocate funds from its general budget "because we can find grants elsewhere" (p. 210).

   d.   We have found some grant money to provide opioid treatment that is "helpful, but there's always—we're always looking for more" (p. 210).

   e.   The City does not plan to use its unassigned fund balance (about $6m) to address the opioid problem (p. 211).

   f.   A revenue increase to fund anti-opioid efforts has never been considered (p. 214-215).

2.9   Therefore, it is my understanding that neither the city nor the county have appropriated or expended funds from their operating (general) budgets to pay for the programs.

2.10   Based on the above information, I have reviewed grant applications, budget proposals, program narratives, grant awards, financial reports, and related materials for relevant intervention programs to quantify the annual expenditures associated with each.  With the

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

exception of the MODCP, which is no longer active in the City of Huntington, this task assumes all programs administered by the Plaintiffs will continue to operate and address the opioid abuse epidemic into the future through overdose prevention and harm reduction measures.

2.11   Generally, if a relevant program did receive grant funds, the grantee submitted budgets to the grantor to account for expenditures under the proposed program.  Therefore, where available, I reviewed grant budgets to assess whether the grant covered all direct and indirect costs, including whether the Plaintiffs indirectly contributed to the program outside of the scope of grant funding – these "in-kind" contributions[i] were typically outlined and/or quantified in the original grant proposal or sub-agreements with other entities.

### *LEAD*

2.12   Of the many intervention programs identified, the City's Law Enforcement Assisted Diversion program (LEAD) is considered "one of the highest contributions to combatting the substance use epidemic in Huntington" (City of Solutions, p. 10).  "Currently, 50% of individuals contacted through LEAD have gone into some form of treatment" (p. 37).

2.13   The LEAD program is administered by the HPD and serves to reduce recidivism and conserve resources (e.g., cost of incarcerations and officer time).  The pre-booking diversion program provides for a health care professional (Triage Coordinator) to visit individuals identified by law enforcement as in need of being diverted due to mental health or substance use.  According to Krishawna Harless (LEAD's Triage Coordinator), the City had a 72.5% success rate in 2018, i.e., contacted individuals who are "off the streets" in some form of treatment.[24]

2.14   The City's LEAD program was initially funded by a $250,000 grant from the Bureau of Justice Assistance (BJA), which facilitated the partnership between HPD and Prestera.[25] The three-year funding period was 10/01/2015 through 9/30/2018.  According to Ms. Harless, "HPD extended the grant…through September 2019.  The city of Huntington is currently working to write my position into the city budget [HPD civil employee] by October 1, 2019."[26]  It is my understanding that Ms. Harless was not hired by the HPD; I have identified no evidence regarding the current status of the program.

2.15   The grant's proposed budget is presented in Table 2.1

---

[i] Sometimes referred to as "matches."

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Table 2.1 LEAD BJA Grant - 3 Years | | | | |
|---|---|---|---|---|
| | Annual Amount | | Total Amount | |
| Personnel | $ | 54,329 | $ | 162,986 |
| Travel | | 1,667 | | 5,000 |
| Consultants/ Contracts | | 26,380 | | 79,139 |
| Other Costs | | 958 | | 2,875 |
| Total Grant Funding | $ | 83,333 | $ | 250,000 |

*Source: HUNT_00539831*

2.16 Personnel expenses included salaries for HPD officers and the Triage Coordinator.  The consultants/contractual expenses relate to fees charged by the Center for Business and Economic Research to track data for the program (which was a mandated requirement).[27] The budget also included small amounts for travel and miscellaneous costs.

2.17 The LEAD grant called for a 20% matching ($50k total or $16,667 per year) by the City. As proposed, the match was in-kind, "based on a formula of Supervisory salary and percentage of time devoted to Triage and Referral Coordinator activities."[28]

2.18 Given the success of this program and the implementation of LEAD across the state of West Virginia,[29] it is reasonable to assume that it will continue.  That said, no evidence has been identified to confirm a funding source.

### Harm Reduction

2.19 Harm Reduction is recognized as "one of the most important programs combatting substance use and protecting health in the community."[30]

2.20 Harm reduction strategies are intended to reduce the negative consequences of drug use. Harm reduction programs (e.g., syringe exchange, screening tests for HIV and hepatitis, recovery coaches, naloxone training, and health services) provide people with education and tools needed to reduce the risks to themselves, their families and the community.[31]

2.21 Harm reduction was identified as an initiative in the MODCP's 2017 Strategic Plan (p. 6-7).  As presented, in 2015 the City collaborated with the Cabell-Huntington Health Department (CHHD) to open the State's first Harm Reduction Program.  "During its first nine months, the program had almost 4,000 visits with about 150 clients each week."[32] Although the Cabell County Commission provides funding to CHHD, via an excess levy, the Plaintiffs do not govern, and Cabell County Commission has indicated they do not have fiscal responsibility for the CHHD.[33]

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.22   However, the City reports that it received an $85,000 grant for harm reduction in 2015, although no supporting detail has been identified.[34]   The City also reports that it received a donation of 2,200 naloxone auto-injectors (retail value of $1.5m) in 2016.   According to Chief Rader (Rader Depo., p. 130), the naloxone kits were secured in 2016 by the CHHD. According to a February 4, 2016 press release, the CHHD received "a supply of 2,200 doses of EVZIO naloxone auto-injectors from kaléo, a Richmond, Virginia-based pharmaceutical company."[35]

2.23   Due the inability to identify supporting information regarding the grant and donation above, the latter of which appears to be a one-time donation, I examined CHHD Annual Reports to identify investments made in the Harm Reduction Program.   The HRP is funded primarily through grants[36], with supplemental federal, state, and local funds.[37]   According to the 2019 CHHD Annual Report, HRP expenses amount to $222,066.[38]   The source does not allocate the amount between grant funding versus other sources.   However, it does not appear that the Plaintiffs currently contribute to the CHHD HRP and should not expect to incur expenses into the future.

### Drug Court / W.E.A.R

2.24   A drug court is a specially designed court program to reduce recidivism and substance abuse among offenders and to increase the likelihood of successful rehabilitation through early, continuous and intense treatment; mandatory periodic drug testing; community supervision; appropriate sanctions and incentives; and other rehabilitation services, all of which is supervised by a judicial officer.[39]

2.25   Drug court is a one-year program that is completed in phases.   Only non-violent felony offenders are eligible for the program and must be approved by the judge and prosecutor for the program.[40]

2.26   The Cabell County Drug Court opened in the Sixth Judicial Circuit on August 13, 2009. The Circuit Judge of the Cabell County Drug Court is Judge Gregory Howard; Family Court Judge Patricia Keller presides over day-to-day operations.   Matt Meadows serves as the Drug Court Coordinator / probation officer for the drug court.[41]

2.27   The Cabell County Drug Court is the largest in the State. The original drug court was presided over by one judge, and cases were monitored by two parole officers, each with a caseload of twenty individuals.[42]   In 2015, the Cabell County program was expanded (an additional parole officer) to include the Women's Empowerment and Addiction Recovery (WEAR) program, geared to women involved in prostitution as a result of substance abuse.[43]

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.28   The West Virginia Supreme Court has oversight and provides basic funding for drug courts.  Additional funding is provided by participant fees[44] and in-kind contributions (of time) by attending judges.  Basic funding would include two probation officers (approx. $140,000 or $70,000 per officer) along with limited travel and mandatory drug tests (estimated at $750).[45]

2.29   The Western Regional Day Report Center (WRDRC) provides the treatment component of the program, including some drug screens and transportation.  Based on the WRDRC's 2017-2018 budget, $130,335 of its revenues came from the Cabell Adult Drug Court.[46] An inspection of invoices indicates billings were remitted to the WV Supreme Court.[47]

2.30   Table 2.2 summarizes Drug Court funding provided by the WV Supreme Court.

| Table 2.2 | | |
| :--- | :--- | ---: |
| **Drug Court Funding - WV Supreme Court** | | |
| | **Annual Amount** | |
| Probation Officers | $ | 140,000 |
| Travel & Drug Tests | | 750 |
| Day Reporting (WRDRC) | | 130,335 |
| **Annual State Funding** | **$** | **271,085** |

*Sources: HUNT_00365846 and CCCOMM_0030120*

2.31   To support the WEAR program, the City applied for and received $643,716 in grant funding:

   a.   $423,711 from the Substance Abuse and Mental Health Services Administration (SAMHSA), amortized over three years (9/30/2015 to 9/29/2018)[48]; and

   b.   $220,005 from the Bureau of Justice Assistance (BJA), amortized over three years (10/01/2015 to 9/30/2018).[49]  A 25% match was required.[50]

2.32   Table 2.3 presents the proposed budget for the SAMHSA award.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Table 2.3<br>SAMHSA WEAR Grant Funds | Annual Amount | Total Amount |
|---|---|---|
| Probation Officer | $ 42,500 | $ 127,500 |
| Fringe Benefits | 17,850 | 53,550 |
| **Total Personnel** | **60,350** | **181,050** |
| Drug Screens | 7,800 | 23,400 |
| Books/Materials | 1,487 | 4,461 |
| **Total Supplies** | **9,287** | **27,861** |
| Counseling | 71,600 | 214,800 |
| **Total Grant Funding** | **$ 141,237** | **$ 423,711** |

*Note: The budget included a "Part Time Case Manager" position that appears to be funded as part of the BJA Grant.*

*Source: HUNT_00001890*

2.33  As illustrated, roughly 50% of the SAMHSA grant is dedicated to counseling services for drug court participants.  It is my understanding that the Supreme Court will absorb the salary of the additional probation officer if grant funding is discontinued.[51]

2.34  The City applied for and received a "No Cost Extension" of the SAMHSA grant before the end of the funding period (Sept. 2018).[52]  The unused funds totaled $123,262, roughly 30% of the original grant.  The request followed the City's prior-year request (Year 2 to Year 3) to carry over $80,967.[53]  Changes in staff and a "lack of personnel" were cited as the basis for both requests.

2.35  Table 2.4 presents the proposed budget for the BJA award.

| Table 2.4<br>BJA WEAR Grant Funds | Annual Amount | Total Amount |
|---|---|---|
| Coordinator | $ 31,976 | $ 95,927 |
| Fringe Benefits | 2,774 | 8,323 |
| **Total Personnel** | **34,750** | **104,250** |
| Travel | 2,235 | 6,705 |
| Other | 36,350 | 109,050 |
| **Total Supplies** | **38,585** | **115,755** |
| **Total Grant Funding** | **$ 73,335** | **$ 220,005** |

*Source: HUNT_00006980*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.36   Table 2.5 presents the grantee's in-kind match.

| Table 2.5 BJA WEAR In-Kind City and/or County Match | Annual Amount | | Total Amount | |
|---|---|---|---|---|
| Coordinator | $ | 31,975 | $ | 95,926 |
| Part-Time Case Manager | | 20,000 | | 60,000 |
| Fringe Benefits | | 2,775 | | 8,324 |
| **In-Kind Match** | **$** | **54,750** | **$** | **164,250** |

*Note: These matching funds were included in the BJA Budget Summary.*

*Source: HUNT_00006980*

2.37   The BJA proposal indicates that Jim Johnson, Director of the MODCP, will serve as the drug court coordinator as an "in-kind" match.[54]  The proposal also supports the hiring of a part-time case manager.  In-kind City and/or County funds subsidized 50% of the Coordinator's salary and 100% of the Part-Time Case Manager's salary.[55] "Other" federally funded expenses included home confinement and conference registrations.

2.38   In addition to the in-kind match discussed above, an in-kind contribution report (COH In Kind Contributions Report), submitted to the WV Supreme Court in October of 2018, quantifies judicial in-kind contributions to the WEAR program.[56]  The report denotes the value of services provided for three years, as summarized in Table 2.6.[j]

| Table 2.6 WEAR Program - Judicial In-Kind Contribution | Annual Amount | | Total Amount | |
|---|---|---|---|---|
| Judge's Salary | $ | 7,208 | $ | 21,624 |
| Bailiff's Salary | | 1,763 | | 5,288 |
| Probation Officers | | 3,810 | | 11,429 |
| Family Court Coord. | | 753 | | 2,260 |
| Cell Phones | | 220 | | 660 |
| Office Supplies | | 156 | | 468 |
| Telephone Usage | | 221 | | 663 |
| Office Space | | 492 | | 1,476 |
| **In-Kind Contribution** | **$** | **14,623** | **$** | **43,869** |

*Source: HUNT_00001707*

2.39   Table 2.7 summarizes investments in the Drug Court / WEAR program.

---

[j] The summary level information from the source document did not include "Telephone Usage" or "Office Space" even though the amounts were present in the supporting detail and have thus been included.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Table 2.7 | | | | | |
|---|---|---|---|---|---|
| **Drug Court & WEAR Annual Investments** | | | | | |
| | **Plaintiff** | | **External** | | **Table** |
| WV Supreme Court | | $ | 271,085 | | 2.2 |
| SAMHSA | | | 141,237 | | 2.3 |
| BJA | | | 73,335 | | 2.4 |
| BJA In-Kind | $ | 54,750 | | | 2.5 |
| Judicial In-Kind | | 14,623 | | | 2.6 |
| **Annual Total** | **$** | **69,373** | **$** | **485,657** | |

### *Turn Around (Second Chance Act)*

2.40  As presented in the project abstract[57], the Turn Around program represents a collaboration between the City of Huntington, Prestera, Recovery Point, Western Regional Jail and others.

2.41  The program, implemented in October of 2017, targets inmates convicted of misdemeanors and identified as having co-occurring mental health and substance abuse disorders.  Turn Around aims to reduce recidivism through providing clinical services while incarcerated and a post-release service plan that keeps individuals out of jail.[58]

2.42  As can best be determined, the City of Huntington applied for and accepted a grant from the Department of Justice (DOJ) on behalf of the Western Regional Jail (WRJ), which is operated by the WV Division of Corrections and Rehabilitation.  The following was presented to City Council in support of the resolution to accept (March 13, 2017).[59]

    a.  This is a $650k DOJ Grant to be used for co-occurring substance use and mental disorders inmates confined at the WRJ

    b.  The Grant requires no matching of funds

    c.  The Grant has no cost to the City, whatsoever

    d.  The City will receive 10% of the grant

    e.  The City will receive $10k per year to cover administrative costs

2.43  Immediately upon adoption of the resolution to accept the grant, the City adopted a Memorandum of Understanding with the WRJ to disburse the funds for their intended purpose.

2.44  Table 2.8 presents the projected use of the grant proceeds.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Table 2.8 BJA Turn Around Grant Funds | | | | |
|---|---|---|---|---|
| | **Year 1** | **Year 2** | **Year 3** | **Total** |
| Personnel | $ 10,000 | $ 10,000 | $ 10,000 | $ 30,000 |
| Travel | 6,450 | 8,355 | 8,331 | 23,136 |
| Supplies | | 1,080 | 1,080 | 2,160 |
| Contractual | 74,457 | 222,595 | 238,561 | 535,613 |
| Indirect Costs | 9,091 | 24,203 | 25,797 | 59,091 |
| **Total Grant Funding** | **$ 99,998** | **$ 266,233** | **$ 283,769** | **$ 650,000** |

Source: *HUNT_00007765*

2.45   Interestingly, Jan Rader (HFD's Fire Chief and assistant director of the MODCP), is budgeted to receive compensation of $10,000 per year as Project Director, plus travel and supplies.[60]  The budget dedicates more than 80% of proceeds to contracts with third-party providers, including Prestera, Recovery Point, and SV & Associates.  The budget varied each year with increasing amounts under the sub-contract agreements (e.g., therapist and case manager) plus supplies as needed.[61]

2.46   Although representations to Council and the Memorandum of Understanding with the WRJ indicate the City is a pass-through entity, it is not classified as such in the City's Schedule of Expenditures of Federal Awards.

2.47   An additional source of funding for the Turn Around Program is in-kind contributions from Prestera in the amount of $53,539 per year.[62]

### *Quick Response Teams*

2.48   Huntington's Quick Response Team (QRT) represents an innovative approach to dealing with the demand side of the opioid abuse epidemic.  Established in 2017, a QRT attempts to visit individuals who have overdosed within the past 24-72 hours.  The team, comprised of a paramedic, law enforcement officer, peer recovery coach, and a spiritual/faith leader, offers encouragement and attempts to connect the individual with recovery services.  If the individual cannot be reached or does not wish to enter treatment at the time of initial contact, educational materials are left with the individual and the QRT continues to reach out at later dates (Priddy Depo., p. 110, 188-209).

2.49   Huntington's QRT currently has 14 members – four on a team in any given day – Monday through Friday.  Participants are reimbursed by grant funds for their hourly rates (Priddy Depo., p. 188-194).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.50  From its inception in 2017 through July 2018, Huntington's QRT experienced a contact rate of 53% (343 / 650) of suspected overdose calls, with 15% (99) entering treatment.[63] By August of 2019, the QRT reported a steady contact rate of 50%, with 30% transitioning into treatment.[64] The work of Huntington's QRT has been celebrated as a positive force in abating the opioid abuse epidemic.[65]

2.51  Funding for the QRT program is provided (primarily) by two federal grants:[66]

    a.  $1,050,000 from the Department of Health and Human Services (DHHS), 3 years (9/30/17 to 6/30/20)

    b.  $300k from BJA, 3 years (10/01/2017 to 9/30/2020)

2.52  The proposed budgets for each grant are presented in Tables 2.9 and 2.10.

| Table 2.9 DHHS QRT Grant Funds | Annual Amount | | Total Amount | |
|---|---|---|---|---|
| Salaries and Wages | $ | 69,924 | $ | 209,772 |
| Fringe Benefits | | 4,033 | | 12,099 |
| **Total Personnel** | **$** | **73,957** | **$** | **221,871** |
| Supplies | $ | 16,492 | $ | 49,476 |
| Travel | | 7,014 | | 21,042 |
| Contractual | | 230,000 | | 690,000 |
| **Subtotal** | **$** | **253,506** | **$** | **760,518** |
| **Total Direct Costs** | **$** | **327,463** | **$** | **982,389** |
| Indirect Costs | | 22,537 | | 67,611 |
| **Total Grant Funding** | **$** | **350,000** | **$** | **1,050,000** |

*Source: HUNT_00003422*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Table 2.10<br>BJA QRT Grant Fund | Annual Amount | Total Amount |
|---|---|---|
| Law Enforcement (HPD) | $      21,840 | $      65,520 |
| Medical Care Provider (CCEMS) | 21,840 | 65,520 |
| Project Coordinator (CCEMS) | 32,200 | 96,600 |
| Transportation | *In Kind* | *In Kind* |
| 10% Admin Fee to the City | $      10,000 | $      30,000 |
| **Total Budgeted Funds** | **$      85,880** | **$      257,640** |
| **Total Grant Funding** | **$      100,000** | **$      300,000** |
| Grant Funding Available after<br>Revised Budget | $      14,120 | $      42,360 |

*Source: CCEMS_0054121*

2.53  As discussed by Ms. Priddy (Depo., p. 192), "we have one full-time employee, and that is the EMS paramedic." Each agency (e.g., CCEMS, Recovery Point, Prestera, and HPD) listed on the grant subcontract with the City submits invoices to the City (Kim Bailey) for reimbursement (Depo., p. 193).

2.54  As noted, transportation is provided in-kind by CCEMS, including use of the vehicle, fuel, repairs, maintenance, and insurance.[67] Although the type of vehicle was not identified, I have determined the value based on EMS reported fleet costs ($770,408).[68] To determine a per-vehicle cost, I divided this amount by 17, which the CCEMS website lists as the current number of ambulances in operation.[69] This results in an in-kind contribution of $45,318 per year.

2.55  Other in-kind contributions, identified from invoices, include clinician time from Prestera and Recovery Point. The amount of time varies from month to month, with some months having no in-kind contributions. The calculated monthly average of in-kind contributions amounts to $17,491 annually.[70]

## *COMPASS*

2.56  The Compass program is aimed at addressing compassion fatigue in first responders by engaging them to "develop self-care, training, and mental health resources"[71]. The initial plan included hiring additional mental health providers, expanding wellness efforts (such as yoga, meditation, and cooking classes), and expanding education about substance abuse disorders.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.57  The Compass program will be funded in major part by a $1m grant from Bloomberg Philanthropies, covering three years beginning in January 2019.  A current website for the program outlines plans to build a "First Responders' Wellness Center" funded through the Bloomberg Grant, a commitment of $250,000 from the City of Huntington, and a partnership with AT&T.[72]

2.58  It is unclear how the scope of the current Compass goals relate to the initial intent and funding from the Bloomberg Grant, or if the funds will actually be expended to build the Wellness Center.  Therefore, this has not been considered as an expense needed to fund the Compass program.

2.59  Schedule C of the Grant Agreement is summarized in Table 2.11.[73]

| Table 2.11 Compass - Bloomberg Philanthropies Grant Funds | | | | |
|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Total |
| Staff Salaries | $ 79,880 | $ 79,880 | $ 79,880 | $ 239,640 |
| Subcontracts/Consulting | 125,000 | 115,000 | 105,000 | 345,000 |
| Supplies | 41,000 | 24,000 | 24,000 | 89,000 |
| Equipment | 20,000 | 20,000 | 20,000 | 60,000 |
| Advertising/Media/Comm | 6,500 | 1,500 | 1,500 | 9,500 |
| Travel/Meetings | 45,000 | 45,000 | 45,000 | 135,000 |
| Wellness Activities | 20,000 | 20,000 | 20,000 | 60,000 |
| Indirect Costs | 32,238 | 32,070 | 28,038 | 92,346 |
| **Budgeted Grant Funding** | **$ 369,618** | **$ 337,450** | **$ 323,418** | **$ 1,030,486** |

*Source: HUNT_00002187 and HUNT_00025302*

2.60  As illustrated in Table 2.11, the proposed budget exceeds the amount of the Bloomberg Philanthropies Grant.  As illustrated in Table 2.12, the shortfall is resolved via contributions from the City of Huntington General Fund and Donations, Cabell Huntington Hospital, and Marshall Health.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table 2.12**
**Compass - City and/or County and External Donated Funds**

| | Annual Amount | Total Amount |
|---|---|---|
| City of Huntington General Fund and Donations | $ 5,162 | $ 15,486 |
| **Subtotal - City and/or County Funds** | **5,162** | **15,486** |
| | | |
| Cabell Huntington Hospital | 3,333 | 10,000 |
| Marshall University Health | 1,667 | 5,000 |
| **Subtotal - Funding from External Sources** | **5,000** | **15,000** |
| **Total Non-Grant Funding** | **$ 10,162** | **$ 30,486** |

*Source: HUNT_00002187 and HUNT_00025302*

### *Externally Funded and Operated Programs*

2.61  In addition to the programs discussed above, the Plaintiffs have identified a number of community partnerships that reach beyond the boundaries of Cabell County. Of special note is the collaboration of the community's health care organizations – e.g., Cabell-Huntington Health Department, Cabell Huntington Hospital, St. Mary's Medical Center, Marshall University, and Marshall Health – offering supportive programs including, but not limited to:

    a.  Provider Response Organization for Addiction Care and Treatment (PROACT)

    b.  Project Hope

    c.  Maternal Opioid Mediation Support (MOMS) program

    d.  Great Rivers Regional System for Addiction Care

    e.  Healthy Connections

    f.  Cabell County Substance Abuse Partnership (CCSAPP)

2.62  Absent from the above discussion, but worthy of note, is treatment funded by the federal and state governments through Medicaid and Medicare, and through grants including from SAMHSA.

### Task 2 Summary Opinion

2.63  Table 2.13 quantifies the annual investments made by the Plaintiffs and third parties (external sources) to support the noted intervention programs. As evidenced in Task One, these collective efforts, in conjunction with support and services from the Federal and State government, have changed the course of the opioid abuse epidemic. That said, the annual

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

investments made by the Plaintiffs totals $136,520, including in-kind contributions.

**Table 2.13**
**Programs Operated by the City and/or County**

| Program | City and/or County Funds | | | External Funds | Total |
|---|---|---|---|---|---|
| | Direct | In-Kind | Total | | |
| LEAD (a) (Table 2.1) | | $ 16,667 | $ 16,667 | $ 83,333 | $ 100,000 |
| Harm Reduction (b) | | | $ - | $ 222,066 | $ 222,066 |
| Drug Court / WEAR | | | | | |
|    WV Supreme Court (Table 2.2) | | | $ - | $ 271,085 | $ 271,085 |
|    SAMHSA (Table 2.3) | | | $ - | $ 141,237 | $ 141,237 |
|    BJA (Table 2.4) | | | $ - | $ 73,335 | $ 73,335 |
|    BJA In-Kind (Table 2.5) | | $ 54,750 | $ 54,750 | | $ 54,750 |
|    Judicial In-Kind (Table 2.6) | | $ 14,623 | $ 14,623 | | $ 14,623 |
| Turn Around  (Table 2.8) | | | $ - | $ 337,308 | $ 337,308 |
| QRT (Tables 2.9 and 2.10) | | $ 45,318 | $ 45,318 | $ 467,491 | $ 512,809 |
| Compass (c) (Tables 2.11 and 2.12) | $ 5,162 | | $ 5,162 | $ 338,333 | $ 343,495 |
| **Total** | **$ 5,162** | **$ 131,358** | **$ 136,520** | **$ 1,934,188** | **$ 2,070,708** |

*Notes:*
(a) The grant closed on Sept 30, 2019. This value quantifies pre-close investments.
(b) 2019 Harm Reduction Program expenses from the CHHD Annual Report.
(c) The External Funds for the Compass program include the average grant award ($333,333) plus $5,000 from CHH and Marshall.

*Task 3.*  **Analyze the Plaintiffs' financial reports and related data to determine if any additional investments (costs) were made by the Plaintiffs, not captured in task 2.**

**Task 3 Analytical Facts / Observations**

3.1    As stated, the purpose of this task is to analyze the Plaintiffs' financial reports and related data to determine if any additional investments (costs) were made by the Plaintiffs, not captured in task 2.  To that end, I have analyzed the available financial data[k] including annual proposed and approved budgets, annual financial reports for the City and County, and supporting materials.  Special consideration was given to departments identified by the Plaintiffs that may have been involved in opioid related intervention efforts.[74]  For Cabell County, this included the Western Regional Jail, Sherriff, Fire Protection, and EMS. For the City of Huntington, this included the police department and the fire department.

3.2    As prescribed by the West Virginia State Auditor, the City's expenditures are broken down into five broad categories:

    a.   *General Government*.  Includes the elected officials' general operating accounts, city hall, other buildings, community, economic and industrial development, building

---

[k] See Statement of Limiting Conditions.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

inspection, planning, and zoning and grants.

b. *Public Safety*.  Includes police and fire protection.

c. *Streets and Transportation*.  Includes the street department and central garage.

d. *Health and Sanitation*.  Includes the health and garbage departments.

e. *Culture and Recreation*.  Includes parks, swimming pools, fairs, visitor's bureau and libraries.

f. *Social Services*.  Includes senior citizens, public transit, and cemeteries.

3.3   A summary of the City's budgets (its general fund)[l] from fiscal year ending June 30, 2013 through fiscal year ending June 30, 2020 is provided in Exhibit 3.1.  During this period:

a. The City's budget increased from $45.6m to $63.8m, a total increase of 39.8% or approx. 4.9% per year.

b. Growth in the City's budget was driven primarily by:

    i. an increase in its unassigned fund balance – from $685k to $9.45m; and

    ii. an increase in the City Service Fee[m] – from $4.6m to $8.3m.

3.4   As described in the City's June 2019 Audit Report (p. 10), the increase in the unassigned fund balance is driven by "increases in collections and federal and other grant revenues".

3.5   A historical trend of the City's budget growth is illustrated in Figure 3.1.

---

[l] Per WVSAO audit reports.

[m] Effective October 1, 2015, the City Service Fee was increased from $3 per week to $5 per week for all individuals working within the city limits.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3.1**
**City of Huntington General Fund**
**2013 to 2020**



*Source  Exhibit 3.1*

### *Huntington Public Safety*

3.6    Public safety in the City of Huntington includes the Huntington Police Department (HPD)
and the Huntington Fire Department (HFD).

3.7    Exhibit 3.2a shows that from 2013 to 2020 the City's expenditures for HPD grew from
$12m to $14.5m, a total increase of 21.0% or approximately 2.8% per year, which is
consistent with the average inflation rate of state and local government employees'
compensation of 2.4%.[75]  The historical trend is illustrated in Figure 3.2.  However, Exhibit
3.2b shows that HPD's consumption of the total budget <u>decreased</u> during this period from
26.3% to 22.8%, indicating that the remainder of the budget experienced greater growth.

3.8    Exhibit 3.2a also shows that expenditures for the Huntington Fire Department (HFD) grew
from $11.4m to $14.1m during the subject period, a total increase of 23.2% or
approximately 3.0% per year, slightly greater than the average inflation rate over the same
time.[76]  Exhibit 3.2b also shows that, similar to HPD, HFD's consumption of the total
budget decreased during this period from 25.1% to 22.1%.  The historical trend is
illustrated in Figure 3.2.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3.2**
**City of Huntington HPD and HFD Expenses**
**2013 to 2020**



*Source: Exhibit 3.2a*

3.9    Revisions to the City's budgets (original v. final) for years 2013 to 2020 are provided in
       Exhibit 3.3.  This Exhibit shows significant revisions, as well as unexpected correlations.
       For example, in 2013 revenues *increased* by 3.89%, while HPD expenditures *decreased*
       -3.1%, HFD expenditures remained flat.  In other words, in a year when revenues were
       greater than expected, not only was the excess not allocated to HPD and HFD, but these
       divisions lost funding or funding remained stable.

3.10   Actual expenditure data was also produced for the HPD and HFD from 2009 to 2019.
       Exhibit 3.4 presents a detailed summary of HPD's expenditures for years 2009 to 2019.
       HPD's budget grew from $10.9m in 2009 to $14.0 in 2019, an increase of 27.8%, or 2.5%
       per year.  As illustrated in Figure 3.3, personnel costs (salaries and benefits) consume
       nearly 90% of HPD's budget, accounting for the majority of the increased expenditures,
       which are unrelated to intervention efforts (see Exhibit 3.4).  HPD had 94 budgeted
       positions in 2009 and 113 in 2017.[n]

---

[n] Last available data.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3.3**
**HPD Expenditure Activity**
**2009 to 2019**



*Source: Exhibit 3.4*

3.11   Exhibit 3.4 also illustrates HPD's overtime cost in relation to its total expenditures for years 2009 to 2019.  As a percentage of HPD's total expenditures, there was an increase in overtime for years 2014 to 2016 (8.15% to 10.03%), followed by decreases in subsequent years.

3.12   Exhibit 3.5 presents a detailed summary of HFD's budget activity for years 2009 to 2019. HFD's budget grew from $9.9m in 2009 to $14.1m in 2019, a total increase of 42.7%, or approx. 3.6% per year.  As illustrated in Figure 3.4, personnel costs (salaries and benefits) consistently consume roughly 90% of HFD's budget with pension fund contributions accounting for the majority of the increase, which are unrelated to treatment or harm reduction efforts.  HFD had 107 budgeted positions in 2009 and 95 in 2020.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3.4**
**HFD Expenditure Activity**
**2009 to 2019**



*Source  Exhibit 3.5*

3.13  Exhibit 3.5 also illustrates HFD's overtime cost in relation to its total budget for years 2009 to 2019.  Overtime, as a percentage of HFD's total budget, peaked in 2011 at 19.1%, dropping to a low of 13.37% in 2018.

### *City of Huntington Intervention Investments*

3.14  According to Deron Runyon,[o] although "no specific line item was placed with opioids…the whole budget of the City was impacted" (Runyon Depo., p 74).  Runyon testified that "the City spent money in its general fund for police and fire and public safety related to that – to the epidemic" (Depo., p. 132).  Runyon further testified that "[w]hile I was finance director, there was no specific program [related to the opioid epidemic], again, other than related to the public safety budgets that dealt with police and fire" (Depo., p. 133).

3.15  According to Dan Underwood,[p], there have been no budget requests from the HPD for investigations into opioid abuse or funds specifically designated to fight opioid abuse (Underwood Depo, p 117, 160-161). The HPD has consistently come in under budget since 2007 (Depo, p 93-95).[77]  Captain Underwood further testified that the HPD was reimbursed

---

[o] Finance Director for City of Huntington, 2009 to 2015.
[p] Captain, HPD Administrative Bureau Commander

for any officers working overtime for the QRT (Depo, p 190-191).

3.16   According to Mayor Williams, in the fall of 2014, he requested and received additional funding related to opioid abuse, specifically to "hire additional police officers" and that the money was "immediately available to help the Drug Task Force to be able to pay for overtime and other matters as that."  Moreover, this "was the only instance budgetarily that specifically targeted as a result of the opioid epidemic" (Williams Depo., p. 87-88).

3.17   Regarding intervention investments, Mayor Williams testified that:

a.   The City does not allocate funds from its general budget "because we can find grants elsewhere" (Depo., p. 210).

b.   The City does not plan to use its unassigned fund balance (about $6m) to address the opioid problem (Depo., p. 211).

c.   A revenue increase to fund anti-opioid efforts has never been considered (Depo., p. 215).

### Cabell County Commission

3.18   As prescribed by the West Virginia State Auditor, the County Commission's expenditures are broken down into five broad categories:

a.   *General Government*.  Includes the elected officials' general operating accounts, courthouse, other buildings, community, economic and industrial development, building inspection, planning and zoning and grants.  *Note:* Contingencies is not an expenditure account.  This account is used to report an appropriation for unexpected or unknown expenditures and should not exceed 10% of the total budget.

b.   *Public Safety*.  Includes the sheriff's law enforcement and service of process operating accounts, regional jail, fire protection and ambulance expenditures.

c.   *Health and Sanitation*.  Includes the health department, mental health, vital statistics, sewer, water, garbage and recycling.

d.   *Culture and Recreation*.  Includes parks, swimming pools, 4-H Camp, fairs, visitor's bureau and libraries.

e.   *Social Services*.  Includes senior citizens, public transit, homeless shelters and cemeteries.

3.19   A summary of Cabell County's budget (its general fund) from fiscal year ending June 30, 2013 through fiscal year ending June 30, 2020 is provided in Exhibit 3.6.  During this period, the total budget increased from $21.2m to $24.9m, a total increase of 17.8% or approx. 2.4% per year, which is the average inflation rate of state and local government

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

employees' compensation over the same time period.[78]  The historical trend is illustrated in Figure 3.5.  This Figure also illustrates that the County's primary (approximately 65%) funding source is property tax levies (current and prior years).  A detailed breakdown of revenue sources for all subject years is provided in Exhibits 3.7a and 3.7b.

**Figure 3.5**
**Cabell County General Fund**
**2013 to 2020**



*Source: Exhibit 3.6*

### *Cabell County Public Safety*

3.20  As previously described, I reviewed the annual budgets for Cabell County Public Safety, which includes the Western Regional Jail, Sherriff's Department, Fire Protection and EMS.  As shown in Exhibit 3.8a, from 2013 to 2020, Cabell County's expenditures for public safety[q] grew from $7.3m to $9.7m, a total increase of 33.3% or approximately 4.2% per year.  As illustrated in Exhibit 3.8b, because growth during the subject period for public safety expenditures exceeded growth for the entire budget, public safety's consumption of the general fund increased from 34.5% to 39.1%.

3.21  As illustrated in Figure 3.6, growth was variable from year to year, including both decreases and increases.  Figure 3.6 also illustrates growth in the two largest components of public safety expenditures, incarcerations (Regional Jail) and law enforcement (Sheriff).  It

---

[q] As defined by the West Virginia State Auditor to include the sheriff's law enforcement and service of process operating accounts, regional jail, fire protection and ambulance expenditures.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

is apparent that the larger contributor was incarcerations, with growth of more than 50% during the subject period.

**Figure 3.6**
**Cabell County Public Safety Expenditures**
**2013 to 2020**



*Source   WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default#CountyBudgets)*

### *Cabell County Prosecuting Attorney*

3.22   A detailed breakdown of general government expenditures for all subject years is provided in Exhibit 3.6.  Included in this category are expenditures for the Prosecuting Attorney's office.  Between 2013 and 2020, such expenses grew from $1m to $1.4m, a total increase of 35.4% or approx. 4.4% per year.  During this same period, the portion of general government expenditures consumed by the Prosecuting Attorney's office increased from 9.2% to 11.2%.

3.23   Revisions to the Public Safety and Prosecuting Attorney budgets (original v. final) for years 2013 to 2020 are provided in Exhibit 3.9.  For Public Safety, substantial revisions (increases) occurred in years 2017 to 2020, consistent with the overall trend illustrated in Figure 3.6.  For the Prosecuting Attorney's office, substantial revisions occurred only in years 2017 and 2020.

### *Regional Jail Authority*

3.24   In 1982, the State of West Virginia adopted a regional jail system.  In December of 2003, the Western Regional Jail opened with a per diem rate of $45.00 – a rate calculated to fund

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

operations.  The rate was increased in February of 2004 to $48.50.  In 2005, citing budget challenges, the Commission failed to pay the established per diem rate and thus fell in arrears (allegedly in excess of $1.5 million with respect to fiscal year 2005), resulting in litigation.

3.25   In May of 2006, the trial court entered an order through which it ruled that the Commission was liable to the plaintiff (the West Virginia Regional Jail and Correctional Facility Authority) for unpaid per diem charges for fiscal year 2005 based on a rate of $40.42 for every inmate day charged to the Commission from and after July 1, 2004.  The plaintiff filed an appeal resulting in a writ of mandamus.[79]

3.26   In March of 2005, the Cabell County Prosecutor, Circuit Clerk, County Clerk, Assessor and Sheriff filed a lawsuit against the Commission for its approval of a budget on March 2, 2005 wherein the budgets for many of the County offices were significantly reduced in an effort to meet the County's projected obligation to the Regional Jail Authority.

3.27   As reported in The Herald-Dispatch (April 4, 2019),[80] the Cabell County Commission received $1m from Cabell Huntington Hospital in exchange for giving up the ability to appoint three members to the Hospital's governing board.  Commissioner Cartmill said the $1m would be applied to the $1.6m currently owed to the Regional Jail Authority. According to Commissioner Cartmill, the liability peaked at $3m in 2013 and was reduced to $2.8m by the end of the 2016-2017 fiscal year.

3.28   As illustrated above, the largest component of the County's public safety budget is the Regional Jail (incarcerations), which presents erratic behavior (up and down) since 2013, reasonably attributed to the conflicts discussed above.  That said, actual monthly expenditures have remained generally flat since 2004 and declined in 2019, as illustrated in Figure 3.7.[81]

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3.7**
**Cabell County Commission Regional Jail Billing Cost by Month**
**2004 to 2019**



*Source: CCCOMM_0008197*

### *Cabell County Sheriff*

3.29 The second largest component of the County's public safety budget is the Sheriff's Department. This department experienced budget increases of $796,515 from 2013 to 2020, an increase of 27%, or 3.8% per year. No evidence has been identified that indicates the Sheriff's Department is an active participant in intervention strategies.

### *Cabell County EMS*

3.30 Cabell County EMS (CCEMS) operates 17 ambulances in eight stations throughout Cabell County where it provides Basic Life Support, Advanced Life Support, and Critical Care Transport, as well as Emergency 911 Service for Cabell County and the City of Huntington. CCEMS is funded in major part by an excess levy authorized by the voters of Cabell County. The support levy was renewed by Cabell County voters in June of 2020 for another five years (fiscal years 2022-2026). A summary of support provided by the levy is presented in Exhibit 3.10.

3.31 CCEMS, the Cabell-Huntington Health Department and Fire Protection Service are funded in major part by excess levies approved by Cabell County voters. Such expenditures are separately accounted for, i.e., not included in the general fund budget. As illustrated in Exhibit 3.10, from 2013 to 2020, these combined expenditures grew from $4.7m to $5.2m,

a total increase of 10.5% or approximately 1.4% per year, which is less than the average inflation rate of state and local government employees' compensation over the same time period of 2.4%.[82]  As illustrated in Figure 3.7, annual growth was fairly consistent across the three expenditure categories.  Amounts of each category for all subject years are provided in Exhibit 3.8.

**Figure 3.8**
**Cabell County Excess Levies**
**2013 to 2020**



*Source: Exhibit 3.10*

3.32   Fire Protection Services provides funding for fire departments in the county to train personnel and purchase necessary gear.[83]  The budget remained flat from 2013 to 2020 as seen in Figure 3.8 and I did not identify any evidence in other documents of increased, incremental costs related to intervention strategies.

3.33   As illustrated in Exhibit 3.11, CCEMS's budget increased $2.8 million from 2013 to 2020, roughly 3% per year.  This increase is only slightly greater than the average inflation rate of state and local government employees' compensation of 2.4%,[84] and is entirely attributable to two main categories of expenses, "Personnel Services" and "Contributions - Other Funds."  Personnel Services, which includes salaries and benefits, increased $1.4 million while contributions to other funds increased $1.6 million.  Personnel Services increases appear to be standard cost of living increases as budgeted employees only grew

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

by four from 2015 to 2020.[r]  It is unclear what is included in contributions to other funds, but Plaintiffs have not demonstrated that it was intervention related.  Moreover, the department had carryover (excess) funding of $2.5m at the end of FY 2018.[85]

### Cabell-Huntington Health Department

3.34   The Cabell-Huntington Health Department (CHHD) is located at 703 7th Ave., Huntington, WV.  It is directed by an independent Board of Health, although monitored (and partially funded) by the WV Department of Health and Human Resources (DHHR).  The Cabell County Commission provides some funding, via an excess levy, but does not govern.  The support levy was renewed by Cabell County voters in June of 2020 for another five years (fiscal years 2022-2026).

3.35   The West Virginia Legislature appropriates funds for basic public health services each year that are distributed to local boards of health by the Center for Local Health.  As illustrated in Figure 3.9, roughly 37% of local health department funding is provided by the State, while only roughly 11% of funding comes from local revenue. [86]

**Figure 3.9**
**Cabell-Huntington Health Department Funding - FY 2016**



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Task 3 Summary Opinions

3.36   Based upon the study and analysis conducted, it is my opinion that the Plaintiffs made no measurable intervention program investments, not previously discussed or captured in Task 2.

*Task 4*:   Task 4 has four parts.  First, I will consider the interventions proposed by Dr. Alexander to respond to the opioid abuse epidemic in the context of the Plaintiffs' respective structure and services provided to their citizens.  Second, I will identify federal and state funding currently in place for interventions.  Third, I will consider the primary economic drivers of Dr. Alexander's report and address methodological failures (if any) related thereto.  Finally, I will consider George Barrett's report and address methodological failures (if any) related thereto.

## Task 4 Analytical Facts / Observations

*Note:*  I am not a public health expert, and thus I take no position on the reasonableness or efficacy of Dr. Alexander's recommended "abatement" responses and interventions.

## Dr. Alexander's Report

4.1   Dr. Alexander has proposed a variety of measures ("abatement" interventions) he believes should be used to reduce opioid-related harms (para. 17).

4.2   Dr. Alexander acknowledges that many of the interventions he proposes "have already been implemented in the Cabell-Huntington Community" (para. 18).

4.3   Dr. Alexander acknowledges that the Cabell-Huntington community and other stakeholders (e.g., State of West Virginia) have collaborated to address the opioid abuse epidemic head-on, including prevention, harm reduction, and treatment measures (paras. 26 - 28).

4.4   Dr. Alexander acknowledges the success of the response and intervention efforts, noting a "22-26% decline in opioid-overdose deaths between 2017 and 2018 in Cabell County" and "reductions in the rate of new HIV infections linked to injection drug use" (para. 29).

4.5   Dr. Alexander's proposed "abatement" interventions have been grouped into four categories:

1) Prevention – reducing oversupply and improving safe opioid use

2) Treatment – supporting individuals affected by the epidemic

3) Recovery – enhancing public safety and reintegration

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

4) Addressing the needs of special populations

4.6   Dr. Alexander's plan fails to consider the Plaintiffs' respective structures, functions and services provided to its citizens.  Moreover, he fails to consider the different layers of government – local, state, and federal – and functions of external agencies such as SAMHSA, Medicaid, Medicare, private insurance companies, private and non-profit healthcare, and social services providers.

4.7   Based on my analysis of the City's financial reports, I have determined that its functions include general municipal government (e.g., city hall operations, economic development, building inspections and zoning), basic utility services, and public safety (e.g. police and fire).  Similarly, my analysis of the Cabell County Commission's financial reports determined its main functions include general county government (e.g. courthouse, administrative services), support of elected officials, and public safety (e.g. Sheriff's Department).  Importantly, health care services *fall outside the functions of local government*.

4.8   The responsibility for health care is significant because such services constitute the majority of the interventions proposed by Dr. Alexander.  Specifically, interventions for Opioid Use Disorder (OUD) treatment and family welfare services, which are administered by the West Virginia Department of Health & Human Resources, and federal programs such as Medicaid and Medicare, amount to $2.1 billion[s] of the total $2.6 billion quantified by Mr. Barrett.[87]  Moreover, many of the proposed interventions are currently available to the Plaintiffs' citizens via third parties, including the State of West Virginia.

4.9   A void in Dr. Alexander's discussion is funding.  To that end, he fails to consider available funding via federal and state grants for the treatment of substance use disorders, as well as for other programs he describes.  The evidence would suggest that sufficient grant funding has been available to cover the successful response of intervention programs previously described, and neither county general funds or budget surpluses have been utilized or needed to pay for these programs.[88]

4.10   According to Lyn O'Connell (O'Connell Depo, p 63), federal funding for treatment and related services for opioid and substance use disorders has increased over the last four years,[89] and the state has actively allocated funds directly to addressing opioid abuse.

4.11   According to Christina Mullins,[t] as of December 20, 2019, the state of West Virginia "has

---

[s] Sums the categories of 2B. Treating Opioid Use Disorder, 2C. Managing Complications Attributable to the Epidemic, and 4C. Families and Children.
[t] Commissioner of the Bureau of Public Health, WV DHHR.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

received $147,356,427 in federal funds to address the opioid abuse epidemic. An additional $58,908,723 in state funds have also been allocated since July 2016 to support the state's response to this crisis" (Mullins Depo., p. 107, Ex. 5). Importantly, these funds are disbursed through grants to localities within West Virginia (p 107). Federal grants received by West Virginia (2016 – 2020) for the treatment of OUD are illustrated in Table 4.1.

**Table 4.1**
**West Virginia Federal Grants Related to OUD or SUD Prevention and Treatment Through Fiscal Year 2020**

| Grant | Total |
|---|---:|
| State Targeted Response (STR) - Cures Act | $    12,096,567 |
| SAMHSA State Opioid Response (SOR) | 56,055,022 |
| SAMHSA State Opioid Response (SOR) - Continuation/Supplement | 14,630,361 |
| Enhanced State Surveillance of Opioid-Involved Morbidity and Mortality | 1,209,138 |
| Overdose Data to Action | 14,689,676 |
| Prescription Drug Overdose Prevention for West Virginia | 5,767,779 |
| Public Health Emergency Response - Cooperative Agreement to Emergency Response - Public Health Crisis Response | 3,654,254 |
| Expansion of Naloxone Distribution to EMS Agencies and WV State Police and High Risk Selected Communities Pilot Prevention Programs | 1,567,184 |
| Comprehensive Abuse Site-Based Program | 6,500,000 |
| Emergency Department Surveillance of Nonfatal Suicide-Related Outcomes | 293,970 |
| Public Health Emergency Response - Cooperative Agreement to Emergency Response - Public Health Crisis Response (in-kind) | Unable to Locate |
| WV PDO Grant Contribution | 2,434,442 |
| Substance Abuse Prevention & Treatment Block Grant | 34,326,828 |
| WV Strategic Prevention Framework for Prescription Drug | 1,900,897 |
| Strategic Prevention Framework-Partnerships for Success | 5,271,906 |
| **Grand Total** | **$    160,398,024** |

*Sources: (1) https://taggs.hhs.gov/SearchAward, (2) https://bja.ojp.gov/funding/awards/2019-ar-bx-k046*
*(3) https://nasadad.org/wp-content/uploads/2017/08/West-Virginia-Partnerships-for-Success-Program.pdf*
*(4) SAMHSA SOR FAQs.pdf, (5) SOR Grant Summary 12-3.pdf (6) Deposition of Christina Mullins, July 14, 2020, Exhib*

4.12   Relatedly, Dr. Alexander fails to consider the expanded coverage for SUD and OUD treatment under the 1115 Substance Use Disorder Medicaid Waiver.[90]  In 2017 alone, Medicaid paid for $89.9 million in opioid use disorder related treatment.[u]

4.13   The amounts summarized above also do not include an additional $84 million received by the State of West Virginia[91] from opioid litigation settlements.  Roughly $21 million of these funds have been distributed across the state (including Huntington) from the Ryan Brown Addiction Prevention Recovery Fund for treatment programs and additional treatment beds.[v]   The state has used these funds to invest heavily in expanding

---

[u] Medicaid: The Linchpin in State Strategies to Prevent and Address Opioid Use Disorders.  Manatt Health.  March 2018.
[v] https://wvpress.org/breaking-news/20-8m-opioid-settlement-distributed-treatment-beds-wv/

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

infrastructure and treatment options in West Virginia.[92]

4.14   Over the past three years, West Virginia increased residential treatment beds from 197 to 850,[93] distributed over 10,000 doses of naloxone to local health departments, increased women and children specific treatment programs, established neonatal abstinence centers (one in Huntington), and has "really changed the system of care for West Virginia."[94] According to Commissioner Mullins, "significant federal investments have allowed West Virginia the flexibility to focus on the hardest hit regions and localities while also allowing us to address statewide needs that benefit all West Virginians.  For perhaps the first time, West Virginia had the resources to fund what it needed" (Mullins Depo., p. 112, Ex. 5) and that the state "still [has] the momentum and the money to do much of the things we need to do right now."[95]  Therefore, funding constraints do not appear to be barriers to expansion at the state level for many of the Plaintiffs' experts' proposed programs.

4.15   In sum, a majority of the interventions proposed by Dr. Alexander fall outside the Plaintiffs' organizational structure, functions and responsibilities to their citizens. Moreover, many of the programs are in place and are being funded by the state and federal government, and private sources, and it is reasonable to believe those services will continue to be funded and operated as such in the future.

4.16   Additionally, although Dr. Alexander acknowledges that current programs serving individuals within Cabell County and the City of Huntington have succeeded to date in reducing the effects of the opioid abuse epidemic, he does not account for how these programs are factored into his assessment of needs within the Cabell-Huntington community.

**Dr. Alexander's Data**

4.17   The primary economic drivers in Dr. Alexander's proposal are: 1) the implied OUD population in Cabell County, and 2) the duration of "abatement."

<u>OUD Population</u>

4.18   Although Dr. Alexander uses various populations in his plan, the most significant is the number of individuals with Opioid Use Disorder (OUD) in Cabell County (hereinafter "OUD Population").  This factor directly drives costs of treatment, which is by far the largest cost category.  Specifically, of the $2.6 billion total costs determined by Mr. Barrett, more than 78%[96] is attributable to Dr. Alexander's Category 2: Treatment.

4.19   Dr. Alexander relies on Dr. Keyes' 2018 OUD population estimate of 8,252.[97]  Dr.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Alexander assumes a constant OUD population through 2020 and begins adjusting downward in 2021.  Downward adjustments continue through 2035 (15 years) resulting in a 50% reduction.[98]

4.20 Dr. Keyes states in her report (p. 41), "Estimating the number of people with OUD is a challenge given that there is no systematic way to count this population."  This statement ignores the fact that the federal government through its NSDUH survey estimates the OUD population in West Virginia, at a much lower level, and that data is easily accessible to Dr. Keyes.  Dr. Keyes instead approaches this challenge with a "multiplier method" (p. 41) whereby the OUD population in a given location is inferred from the number of overdose deaths for that location.  Specifically, she divides the number of overdose deaths by the overdose death rate (a ratio) to estimate the OUD population.  Dr. Keyes determined Cabell County's 2018 OUD population as follows:

$$115 \text{ overdose deaths} / 1.39\% \text{ overdose death rate} = 8{,}252 \text{ OUD population}$$

4.21 The first input in the equation, number of overdose deaths, is deemed reliable given that the data are tracked by local government agencies.  In contrast, the second input, overdose death rate, lacks reliability for a number of reasons.

4.22 First, the overdose death rate is based on global data that cannot reasonably be expected to represent the experience in Cabell County, West Virginia.

4.23 The overdose death rate is derived from a 2019 meta-analysis (hereinafter "Larney et al.") of 124 studies that assessed mortality rates among "extramedical" opioid users (Keyes report, p. 42).  Importantly, only 56 of the studies assessed drug overdose rates, and only six of these were conducted in the United States.  The estimated overdose death rate, averaged across the 56 studies, is 0.52%.[w]  The rate used by Dr. Keyes (1.39%) is higher because she adjusted to a small degree the average 0.52% to account for the increase in the overdose death rate attributable to the outbreak of synthetic opioids, which occurred after the studies in the meta-analysis were published.[x]

4.24 In the equation stated above, which represents Dr. Keyes' multiplier method, the higher the overdose death rate, the lower the implied OUD population.  Thus, Dr. Keyes' use of an adjusted (higher) rate serves to reduce the OUD Population.  The calculation is highly

---

[w] Multiple times throughout her report, Dr. Keyes incorrectly represents the average overdose death rate from Larney et al. as 0.52 per 100,000, rather than 0.52 per 100.

[x] Specifically, based on the assumption that the overdose rate from synthetic opioid use is approx. three times that of heroin, Dr. Keyes calculates the adjusted rate as three times the 0.52% average rate, or 1.56%.  The rate she actually applies (1.39%) is a weighted average of the unadjusted 0.52% and adjusted 1.56% rates, assuming that 84% of overdose deaths in Cabell County in 2018 were attributable to synthetic opioids.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

sensitive to the overdose rate selected.

4.25  As noted above, Dr. Keyes acknowledges that the overdose death rate is higher for synthetic opioid use.  Thus, the applicability to Cabell County, West Virginia of the global rate drawn from Larney et al. depends on the whether the prevalence of synthetic opioid use in the various populations examined by the 56 studies is indeed representative of synthetic opioid use in Cabell County.

4.26  Data compiled by the CDC does not support this assumption.  Specifically, for year 2018, among the 36 states for which synthetic opioid use is tracked, the percentage of overdose deaths due to synthetic opioid use ranges from a low of 19.0% in Utah to a high of 93.7% in New Hampshire.  Table 4.2, which provides percentages for all 36 states shows that:

  a.  West Virginia is eighth-highest, with a percentage of 78.5%.

  b.  A geographic pattern is apparent, with higher percentages in the eastern U.S.

**Table 4.2**
**Overdose Deaths from Synthetic Opioid Use**
**CDC Data for Year 2018**

| | State | All Opioids | Synthetic Opioids | % Synthetic | | State | All Opioids | Synthetic Opioids | % Synthetic |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Alaska | 68 | 18 | 26.47% | 19 | Nevada | 372 | 85 | 22.85% |
| 2 | Arizona | 1,106 | 522 | 47.20% | 20 | New Hampshire | 412 | 386 | 93.69% |
| 3 | California | 2,410 | 865 | 35.89% | 21 | New Mexico | 338 | 105 | 31.07% |
| 4 | Colorado | 564 | 134 | 23.76% | 22 | New York | 2,991 | 2,195 | 73.39% |
| 5 | Connecticut | 948 | 767 | 80.91% | 23 | North Carolina | 1,783 | 1,272 | 71.34% |
| 6 | Florida | 3,189 | 2,091 | 65.57% | 24 | Ohio | 3,237 | 2,783 | 85.97% |
| 7 | Georgia | 866 | 349 | 40.30% | 25 | Oklahoma | 308 | 79 | 25.65% |
| 8 | Illinois | 2,169 | 1,568 | 72.29% | 26 | Oregon | 339 | 97 | 28.61% |
| 9 | Indiana | 1,104 | 713 | 64.58% | 27 | Rhode Island | 267 | 213 | 79.78% |
| 10 | Iowa | 143 | 80 | 55.94% | 28 | South Carolina | 835 | 510 | 61.08% |
| 11 | Kentucky | 989 | 744 | 75.23% | 29 | Tennessee | 1,307 | 827 | 63.27% |
| 12 | Maine | 282 | 229 | 81.21% | 30 | Texas | 1,402 | 358 | 25.53% |
| 13 | Maryland | 2,087 | 1,825 | 87.45% | 31 | Utah | 437 | 83 | 18.99% |
| 14 | Massachusetts | 1,991 | 1,806 | 90.71% | 32 | Vermont | 127 | 106 | 83.46% |
| 15 | Michigan | 2,011 | 1,531 | 76.13% | 33 | Virginia | 1,193 | 852 | 71.42% |
| 16 | Minnesota | 343 | 202 | 58.89% | 34 | Washington | 737 | 221 | 29.99% |
| 17 | Mississippi | 173 | 72 | 41.62% | 35 | **West Virginia** | **702** | **551** | **78.49%** |
| 18 | Missouri | 1,132 | 868 | 76.68% | 36 | Wisconsin | 846 | 506 | 59.81% |

*Note: District of Columbia does have data but wasn't included in this table since it's not a state.*

*Source: Table 1 and Table 2 (https://www.cdc.gov/mmwr/volumes/69/wr/mm6911a4.htm#T1_down)*

4.27  This data suggests that neither global nor U.S. national average overdose death rates can reasonably be expected to represent Cabell County, WV.

4.28  Based on Cabell County's total population of 93,223, Dr. Keyes' estimate implies that

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

8.9% of all residents have a diagnosis of OUD.  Dr. Keyes states that her estimate is "highly credible with local sources" (p. 43) based on a representation by Todd Davies that "in the Cabell Huntington Community, approximately 7,581 unique individuals considered to have current diagnoses OUD within the care systems for which data is available" (p. 43). Dr. Keyes is referring to Todd Davies' deposition testimony, specifically pages 129 through 132.  According to this testimony, the 7,581 number was reported in a *grant application* as representing individuals *in the Cabell Huntington Hospital and Marshall Health electronic health records systems*.

4.29  Both Cabell Huntington Hospital and Marshall Health serve residents far beyond Cabell County.  Specifically, in its 2016 Community Health Needs Assessment,[99] Cabell Huntington Hospital (CHH) describes its service area as including 12 counties in West Virginia, four counties in Ohio, and ten counties in Kentucky.  Moreover, because CHH's Level III Neonatal Intensive Care Unit (NICU) is one of only three such units in West Virginia,[100] it is reasonable to expect that the patient base would span multiple counties.

4.30  Given these facts, any representation of the number of individuals with OUD in the electronic health records systems of CHH and Marshall Health is not indicative of the *number of Cabell County residents with OUD*.  On the contrary, the fact that Dr. Keyes' OUD Population estimate is comparable to the total number of OUD patients in the CHH and Marshall Health systems suggests that Dr. Keyes' estimate is grossly overstated.

4.31  Additional evidence that questions that validity of Dr. Keyes' OUD Population estimate can be found in the National Survey on Drug Use and Health ("NSDUH"), a widely referenced publication that reports statistics on state-specific drug use each year.[101]  For year 2018, this data source reports an OUD rate of 0.97% for the entire state of West Virginia,[y] compared to the 4.00% rate estimated for the state using the same methodology Dr. Keyes employed for Cabell County.[z]  Dr. Keyes offers no explanation for why her OUD rate for the state is more than four times the rate reported by NSDUH.

4.32  With respect to the OUD population, it is my opinion that:

    a.  The reliability of the multiplier method used by Dr. Keyes to estimate the OUD Population depends on the reliability of her assumed overdose death rate.

    b.  The reliability of Dr. Keyes' assumed overdose death rate depends on the extent to which the populations studied in Larney et al. represent the population of Cabell

---

[y] 97% = 15,000 / 1,542,000 (https://rdas.samhsa.gov/#/survey/NSDUH-2017-2018-RD02YR?column=STNAME&filter=STNAME%3DWEST+VIRGINIA&results_received=true&row=UDPYOPI&run_chisq=false&weight=DASWT_1)

[z] Per Table 2 of Keyes' report, her estimate of the OUD population for West Virginia in year 2018 is 72,200, which represents 4.00% of the state's 1.804 million total population.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

County, WV.

c.  Dr. Keyes offers no evidence to support her unstated assumption that the populations studied in Larney et al. are indeed representative of the population of Cabell County, WV.

d.  Data compiled by the CDC suggest wide variation in synthetic opioid use within the United States, which challenges the applicability of a national average overdose death rate to any given state, let alone a single county within that state.

e.  To the extent that the overdose death rate in Cabell County, WV is higher than the 1.39% assumed by Dr. Keyes, her determination of the OUD population is overstated.

f.  Even a seemingly small increase in the overdose death rate has a significant impact on the calculation; for example, if the rate is actually one percent higher (2.39% v. 1.39%), the implied OUD population is reduced from 8,252 to 4,812, a difference of almost 42%.

Changes to OUD Population Over Time

4.33  As noted above, Dr. Alexander embraces Dr. Keyes' estimate of the OUD Population for year 2018 and then independently determines the rate of change in this estimate over time.

4.34  Dr. Alexander acknowledges that many of the interventions he proposes "have already been implemented in the Cabell-Huntington Community" (para. 18).  Moreover, he acknowledges the success of the Community's efforts in this regard, noting a "22-26% decline in opioid-overdose deaths between 2017 and 2018 in Cabell County" and "reductions in the rate of new HIV infections linked to injection drug use" (para 29). These comments are consistent with the data discussed in Task #1, which indicate that the opioid abuse epidemic in the City of Huntington and Cabell County, WV peaked in 2017 and was subsiding through 2019.  Despite such evidence, Dr. Alexander's projections for the OUD Population assume *no change from 2018 to 2020*.  Specifically, Dr. Alexander's 2020 baseline population equals the 2018 estimate determined by Dr. Keyes.

4.35  Beginning in year 2021, Dr. Alexander applies a declining trend ratio to the OUD Population to reflect a decrease in the size of this population over time as the plan is implemented.  Dr. Alexander explains (in the Abatement Scaling tab of the Redress Model spreadsheet) his determination of the magnitude and rate of the reduction as follows:

> *"Homer et al. modeled the expected impact of a bundle of interventions ([1] reducing prescription dosage by 20%, [2] cutting diversion by 30%, [3] increasing addiction treatment from 45% to 65%, and [4] increasing lay naloxone use from 4% to 20%) to mitigate the opioid epidemic and estimated a reduction of approximately 24% in the*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> *number of individuals with opioid use disorder (OUD), 4% in the number of opioid overdoses, and 18% in opioid overdose deaths over a period of 10 years (2020-2030). Given that I propose more comprehensive and coordinated interventions, I project that they will reduce the number of individuals with OUD by 50% over 15 years and I scale select populations accordingly (Table 2)."*

4.36  In other words, Dr. Alexander embraces the results of a single study,[102] reasons that his plan is more comprehensive and should thus be more effective, and then assumes that the rate of change will occur steadily over the 15-year projection period.

4.37  This is a highly simplistic characterization of a very complex phenomenon.  The complexity of the opioid abuse epidemic is illustrated in a visual depiction of the model tested by Homer et al. (the study cited by Dr. Alexander), which they call the "Opioid Epidemic Dynamic Policy Model."  This model contains multiple variables and feedback loops that are necessary to "systematically anticipate the dynamic consequences of potential interventions" (Homer et al., p. 2).[103]

4.38  Throughout his report, Dr. Alexander highlights the "dynamic" nature of the opioid epidemic (para. 34, 52, 91).  He also states:

   a.  Ongoing education is necessary to keep stakeholders "abreast of the changing contours of the epidemic" (para. 51).

   b.  The opioid epidemic "continues to change and evolve" and "at a local level these changes have often been even more profound" (para. 85).

4.39  Finally, while Dr. Alexander acknowledges that "some of the abatement remedies discussed may interact with one another in synergistic fashion" (para. 34), he fails to explain whether or how he accounted for such interactions in determining the change to the OUD Population over time.

4.40  In sum, it is my opinion that Dr. Alexander's methodology for determining the magnitude and rate of change for the OUD Population over a fifteen-year period, as explained in his Redress Model, is speculative.  More accurate estimates of the magnitude would be in the range of one-quarter of the OUD population he assumes, with a decline that already is in progress.

Duration of "Abatement" Interventions

4.41  Dr. Alexander's plan spans fifteen years, from 2021 to 2035.

4.42  In his report, Dr. Alexander makes the following statements regarding this fifteen-year

projection period:

    a. "I have also been asked to estimate the size of the specific populations that may require abatement interventions within the Community over a fifteen-year period, from 2021 to 2035" (para. 1).

    b. "I believe that coordinated, all-encompassing efforts that respond to the evolving epidemic could reduce the cumulative opioid overdoses and opioid-related harms by 50% over fifteen years" (para. 18).

4.43   "Some abatement approaches may be framed in the context of looking forward ten or fifteen years" (para. 35).

4.44   "This medium-term view strikes a balance – it is long enough to support infrastructure development and several cycles of planning and evaluation while avoiding some of the uncertainty entailed in trying to anticipate the magnitude of sequelae from the epidemic that may last decades or even generations" (footnote h on p. 14).

4.45   From these statements, it is unclear whether the fifteen-year projection period was:

    a. *Independently determined by Dr. Alexander to be appropriate* (e.g., as the necessary time period to reach some threshold of recovery, or the maximum period that can be estimated with reasonable certainty); or

    b. *Provided to him as an operating assumption*.

4.46   Given the significance of this factor (duration of the plan) to the determination of total costs, the source of the input – whether an assumption or an expert opinion – is clearly relevant and should be explicitly disclosed and explained in Dr. Alexander's report.

**George Barrett's Report**

<u>Growth Rate of Projected Costs</u>

4.47   Mr. Barrett's primary contribution in calculating the "Categorical Costs of Dr. Alexander's Abatement Plan"[104] is his determination of future growth (inflation) rates for costs.

4.48   With regard to source data for such growth rates, Mr. Barrett is inconsistent with his use of local versus national data.  In his report, Mr. Barrett states, "Where possible, I looked for data specific to the Cabell Huntington Community, or specific to West Virginia more broadly, so that my cost calculations are relevant to the local community" (para. 20). However, as a metric for general wage growth (which he applies for most projections of labor costs), he uses a national data source – BLS Major Sector Productivity, Hourly

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Compensation, Business Sector), which has a 30-year average of 3.44%.[105]  An exception is wage growth for public safety costs (see para. 17 of Barrett's report).  Instead of the generic 3.44% national average, he uses 2% based on his discovery that HPD officers actually received a 2% raise from 2017 to 2018.

4.49  Mr. Barrett fails to consider available local data for historical wage growth.  An example of such data is the Employment Cost Index (ECI).  For private industry workers, this data is available for the South census region (beginning 2001) and, even more specifically, the South Atlantic census region (beginning 2006).  For comparison, the 15-year average change in the ECI for the South region is 2.28% vs. 2.72% for the data set used by Mr. Barrett.

4.50  Mr. Barrett's estimates for future inflation rates are based on 30-year historical averages. In economic damages calculations, historical average inflation rates are commonly used as proxies for future inflation rates.  However, when this is done, the duration of the look-back period usually matches the future projection period.  As previously discussed, for Dr. Alexander's plan, the projection period is 15 years, which suggests a look-back period of 15 years, not 30 years.

4.51  Some challenge the matching practice, arguing that, given changes in economic policy, data from the distant past are irrelevant even for long future projection periods.  Thus, for a future projection period of 15 years, accepted practice would be to use a 15-year, or shorter, historical average.  For Mr. Barrett's wage growth index, the 15-year average would be 2.72%, compared to the 30-year average of 3.44%

Discounting to Present Value

4.52  Mr. Barrett describes his $2.6 billion figure as "the total cost of implementing the programs in Dr. Alexander's Abatement Plan" (para. 15).   Thus, he simply projects future costs for each year of the 15-year projection period and then adds the amounts.  Under the economic concept of the time value of money, this is called *future value*.

4.53  In contrast, *present value* is the amount of money needed today to fund future costs, understanding that such a lump sum is expected to earn interest over time.  Due to this accumulation of interest, the amount of money needed to fund future costs over time is less than the sum of the future costs.

4.54  It is common practice in economic damages calculations to determine present value.

4.55  Mr. Barrett offers no explanation for his failure to determine present value, and I am not

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

aware of any rationale for such an approach in the instant case.

4.56   Using a discount rate of 2.85%, based on the 15-yr. historical avg. of the 10-year Treasury bond yield, the present value of the projected costs calculated by Mr. Barrett would be approx. $0.5 billion less.

4.57   It is not within the scope of my assignment to attribute damages to specific allegations brought by the Plaintiffs.  Notably, none of the Plaintiffs' experts have done so either.

\*          \*          \*

The opinions described in this report are presented within a reasonable degree of professional certainty and are based on the information available to me as of the date of this report. I reserve the right to supplement my opinions based on any additional information that I might obtain. In addition, Dr. Caleb Alexander and Mr. George Barrett submitted errata to their expert reports late on August 26, 2020, the day before my report was to be served. Due to the exceptionally brief opportunity I had to review these materials, I reserve the right to add new analyses or opinions, and to supplement or modify existing analyses or opinions, that are based on or respond to Dr. Alexander's and Mr. Barrett's reports. If asked to offer testimony at trial, I may use documents or materials referred to in this report, or information from those documents and materials, as exhibits. In addition, I respectfully reserve the right to use demonstratives, enlargements, or tables or graphs using the information stated or referred to in my report in order to illustrate my opinions.

Robert J. Rufus, DBA, CPA, CVA (Emeritus)

Dated: August 27, 2020

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

---

[1] Can be found at:  https://www.wvsao.gov/localgovernment/Default#StateDistributionsToCounties
[2] Can be found at:
https://library.municode.com/wv/huntington/codes/code_of_ordinances?nodeId=COORHUWEVI
[3] HUNT_00010378
[4] The City of Solutions, Huntington, WV (HUNT_00365846), p. 7.
[5] CCEMS website. http://www.ccems.org/about/stations/
[6] Source data from MODCP 2017 Strategic Plan, CCEMS 051857 and 51427, and WV DHHR Data Dashboard
[7] Source WV DHHR Data Dashboard
[8] Report to City Council, Mar 21, 2019 [HUNT_00019591]
[9] Email from HPD to CCEMS dated 3/07/18 [CC911_0006174]
[10] Report to City Council, Mar 21, 2019 [HUNT_00019591]
[11] Can be found at: https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state/west-virginia-opioid-involved-deaths-related-harms
[12] Queries from CDC Wonder Multiple Cause of Death Dataset.  http://wonder.cdc.gov/mcd-icd10.html
[13] Queries from CDC Wonder Multiple Cause of Death Dataset.  http://wonder.cdc.gov/mcd-icd10.html
[14] Queries from CDC Wonder Multiple Cause of Death Dataset.  http://wonder.cdc.gov/mcd-icd10.html
[15] WV DHHR Data Dashboard
[16] 2014 HPD Annual Report [CC911_0036901]; HUNT_01716770; HUNT_00153162
[17] 2014 HPD Annual Report [CC911_0036901]; HUNT_01716770; HUNT_00153162
[18] HUNT_00019409
[19] 04242020 Cabell County Drug Court Listing Report.xlsx (CCPROS_0000002)
[20] https://www.herald-dispatch.com/news/us-surgeon-general-praises-huntington-s-recovery-story/article_ebf9b4e6-e511-51df-8476-8af4ab48c8dc html
[21] City of Solutions, p 10
[22] Id, p 8-9
[23] Id, p 14
[24] HUNT_00581047
[25] HUNT_00579987 and BJA Award
[26] HUNT_00581047
[27] HUNT_00539831
[28] HUNT_00539831
[29] https://dhhr.wv.gov/office-of-drug-control-policy/programs/Pages/LEAD.aspx
[30] City of Solutions, p. 11
[31] City of Solutions, p. 20-25
[32] City of Solutions, p. 7
[33] Cabell's 1st Amended Supplemental Amended Answers to Distributor's First Interrogatories, p. 4
[34] HUNT_00009018
[35] Edited press release. Can be found at: http://www huntingtonnews.net/129091
[36] https://cabellhealth.org/clinical-services/harm-reduction/  The website notes under "Special Points of Interest" that "Funding is provided by grants."
[37] The City of Solutions, Huntington, WV (HUNT_00365846), p. 64
[38] https://cabellhealth.org/wp-content/uploads/2019/12/FY2019-Annual-Report.pdf
[39] West Virginia Judiciary, Adult Drug Courts. Can be found at: http://www.courtswv.gov/lower-courts/adult-drug-courts/adult-drug-courts html
[40] WV Public Broadcasting by Clark Davis (Nov 6, 2015)
[41] West Virginia Judiciary, Cabell County Drug Court. Can be found at: http://www.courtswv.gov/lower-courts/county-drug-courts/drugcourt-cabell html
[42] City of Solutions, p 32
[43] SAMHSA WV Discretionary Grant Awards and City of Solutions Guidebook Huntington, WV (HUNT_00365846), p. 32-33
[44] http://www.courtswv.gov/lower-courts/county-drug-courts/cabell-handbook.pdf, p.4 and The City of Solutions, Huntington, WV (HUNT_00365846), p.156
[45] The City of Solutions, Huntington, WV (HUNT_00365846), p. 65
[46] CCCOMM_0030120
[47] See HUNT_00125228, HUNT_00125271, and HUNT_00611353

[48] HUNT_00001890
[49] https://bja.ojp.gov/funding/awards/2015-dc-bx-0083; HUNT_00614087
[50] HUNT_00023885
[51] City of Solutions, p 65; HUNT_00365846
[52] HUNT_00007199
[53] HUNT_00007304
[54] HUNT_00006982
[55] HUNT_00023885; HUNT_00006980
[56] HUNT_00001707
[57] HUNT_00008051
[58] HUNT_00008050
[59] HUNT_00017273
[60] HUNT_00007767
[61] HUNT_00007765
[62] HUNT_00007765
[63] CCEMS_0050661
[64] https://www.usnews.com/news/best-states/west-virginia/articles/2019-08-17/the-woman-behind-a-west-virginia-addiction-response-team
[65] https://www.emsworld.com/news/1224523/another-w-va-county-using-quick-response-teams-overdoses
[66] HUNT_00003422; HUNT_00614807
[67] CCEMS_0040948
[68] CCEMS_0257726
[69] http://www.ccems.org/about/stations/
[70] HUNT_00000827-836, HUNT_00000844, HUNT_00004444-4454, HUNT_00004448, HUNT_00004757-4793, HUNT_00004866, HUNT_00004928, HUNT_00004945-5002
[71] HUNT_00025302
[72] https://compasshuntington.com/wellnesscenter/
[73] The budget in Schedule C (HUNT_00002187 at 2202) is difficult to read.  It appears to be the same information as the budget captured in HUNT_00025302
[74] Plaintiff Cabell County Commission's Supplemental Reponses to Interrogatory No. 10 and Request for Production No. 15, Pursuant to Discovery Ruling No. 1 dated May 21, 2020; Plaintiff City of Huntington, West Virginia's Supplemental Responses and Objections to Distributor Defendants' First Set of Interrogatories dated April 30, 2020
[75] U.S. Bureau of Labor Statistics, Employment Cost Index (NAICS basis), 2013-2020 – Series I.D. CIU3010000000000Q (Not Seasonally Adjusted)
[76] U.S. Bureau of Labor Statistics, Employment Cost Index (NAICS basis), 2013-2020 – Series I.D. CIU3010000000000Q (Not Seasonally Adjusted)
[77] Deposition of Dan Underwood, July 20, 2020, pp. 93-95, Exhibit 3
[78] U.S. Bureau of Labor Statistics, Employment Cost Index (NAICS basis), 2013-2020 – Series I.D. CIU3010000000000Q (Not Seasonally Adjusted)
[79] Can be found at: http://www.courtswv.gov/supreme-court/docs/fall2007/33347 htm#Footnote4
[80] https://www.herald-dispatch.com/end-of-jail-bill-burden-in-sight-for-cabell-county/article_516380c2-f475-5fab-b2be-fc36726cdb69.html
[81] CCCOMM_0008197
[82] U.S. Bureau of Labor Statistics, Employment Cost Index (NAICS basis), 2013-2020 – Series I.D. CIU3010000000000Q (Not Seasonally Adjusted)
[83] https://www.herald-dispatch.com/elections/cabell-county-renews-all-five-levies/article_9c994f9a-ab84-5184-b9bf-7aff088a9b59.html
[84] U.S. Bureau of Labor Statistics, Employment Cost Index (NAICS basis), 2013-2020 – Series I.D. CIU3010000000000Q (Not Seasonally Adjusted)
[85] Deposition of Gordon Merry, June 29, 2020, p. 179 and Exhibit 24
[86] Can be found  at: https://dhhr.wv.gov/localhealth/localpublichealth/Pages/Funding.aspxd.
[87] Expert Report of George Barrett, August 3, 2020
[88] Deposition of Steve Williams, June 30, 2020, p. 209-212, 275, 277-278
[89] Deposition of Lyn O'Connell, July 31, 2020, p. 68-69

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

[90] Deposition of Lyn O'Connell, July 31, 2020, p. 79-82, 180-182; Deposition of Christina Mullins, July 14, 2020, Exhibit 5

[91] https://www.washingtonpost.com/national/health-science/west-virginia-reaches-37-million-opioid-settlement-with-drug-shipper-mckesson/2019/05/02/c0243878-6d17-11e9-a66d-a82d3f3d96d5_story.html

[92] Deposition of Christina Mullins, July 14, 2020, p. 76-80, Exhibit 5

[93] Treatment beds are consistently at 85% capacity. Deposition of Christina Mullins, July 14, 2020, p. 76-80 and Exhibit 5

[94] Deposition of Christina Mullins, July 14, 2020, p. 76-78

[95] Deposition of Christina Mullins, July 14, 2020, p. 112-114

[96] Expert Report of George Barrett, August 3, 2020

[97] Expert Report of Katherine Keyes, August 3, 2020, p. 42; Expert Report of Caleb Alexander, August 3, 2020, Appendix D, Tab 2B. Treatment

[98] Expert Report of Caleb Alexander, August 3, 2020, Appendix D

[99] https://cabellhuntington.org/assets/Documents/CHNA/Cabell-Huntington-Hospital-CHNA-2016-Optimised.pdf

[100] http://hoopschildrens.org/facilities-programs/neonatal-intensive-care-unit/

[101] https://rdas.samhsa.gov/#/

[102] Homer J, Wakeland W. A Dynamic Model of the Opioid Drug Epidemic With Implications for Policy. The American Journal of Drug and Alcohol Abuse. 2020; 7:1-1.

[103] https://www.tandfonline.com/doi/full/10.1080/00952990.2020.1755677

[104] Expert Report of Caleb Alexander, August 3, 2020, p. 6

[105] Expert Report of George Barrett, August 3, 2020, Appendix A

Appendix A                    **HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## Information Considered:

1. All documents referenced in my Expert Witness Report and dated August 27, 2020 (and corresponding Exhibits)

2. In Re National Prescription Opiate Litigation, Joint and Third Amended Complaint, Demand for Jury Trial, June 13, 2019

3. Defendant McKesson Corporation's Answer and Statement of Defenses

4. Plaintiff City of Huntington, West Virginia Responses and Objections to Distributor Defendants' First Set of Interrogatories dated December 3, 2019

5. Plaintiff Cabell County Commission's Answers to Distributors Defendants' First Set of Interrogatories to Plaintiffs dated December 3, 2019

6. Cabell's 1st Amended Supplemental Amended Answers to Distributor's First Interrogatories dated December 3, 2019

7. Amended Responses of Plaintiff Cabell County Commission to Distributor Defendants' First Set of Requests for Production to Plaintiffs dated December 13, 2019

8. Plaintiff City of Huntington, West Virginia's Supplemental Responses and Objections to Distributor Defendants' First Set of Interrogatories dated April 30, 2020

9. First Amended Supplemental Amended Answers of Plaintiff Cabell County Commission to Distributor Defendants' First Set of Interrogatories to Plaintiffs dated May 11, 2020

10. Plaintiff Cabell County Commission's Supplemental Responses to Interrogatory No. 10 and Request for Production No. 15 Pursuant to Discovery Ruling No. 1, May 21, 2020

11. Deposition of Deron Runyon (City of Huntington Finance Director 2009 – July 2015), dated June 16, 2020 and Exhibits 2, 4-8, 10-11, 13-14, 17, 19, 27, and 29

12. Deposition of Steve Williams (Mayor), dated June 30, 2020 and Exhibits 1-3, 8, 12, 15, 17, 19-20, 22, 22A, 24-27, 30-32, 38-41, and 68

13. Deposition of Connie Priddy (CC EMS), dated July 13, 2020 and Exhibits 2-5, 8, 10-11, 15-16, 20-21, and 24-25

14. Deposition of Christina Mullins (Commissioner, Bureau of Public Health, WV DHHS), dated July 14, 2020 and Exhibits 1-5

15. Deposition of Jan Rader (Chief, HFD), dated July 17, 2020 and Exhibits 2-3, 6-7, 13, 19, 21, 26-27, 35, 37, 42, and 50-51

16. Deposition of Dan Underwood (HPD Chief), dated July 20, 2020 and Exhibits 2, 4-12, 14, 16, 19, 20, and 26

17. Deposition of Todd Davies, Phd (Marshall University), dated July 28, 2020 and Exhibits 1-16

18. Deposition of Gordon Merry, June 29, 2020 and Exhibits 2, 5,-6, 8, 10-11, 17-18, and 25

19. Deposition of Lyn O'Connell dated July 31, 2020

20. Deposition of Charles Zerkle dated June 17, 2020 and Exhibits 1-20

21. Deposition of Crystal Welch dated July 8, 2020 and Exhibits 1-8

22. Deposition of Scott Lemley dated July 3, 2020 and Exhibits 1, 4-7, 9-14, 16-19, 24-25, 29-39, 41, 44-45, 47, and 49

23. Expert Reports
    a. Expert Witness Report of G. Caleb Alexander, MD, MS dated August 3, 2020 including Appendices, all other supplemental materials, and errata filed on August 26, 2020
    b. Expert Report of George Barrett, MBA, MSRC, CRC, CVE dated August 3, 2020 including Appendices and errata filed on August 26, 2020
    c. Expert Report of Dr. Katherine Keyes, PhD, dated August 3, 2020 including Exhibits, all other supplemental materials, and errata filed on August 24, 2020
    d. Expert Report of Dr. Nancy K. Young, PhD dated August 3, 2020 including all other supplemental materials and errata filed on August 26, 2020

24. Homer J, Wakeland W. A Dynamic Model of the Opioid Drug Epidemic With Implications for Policy. The American Journal of Drug and Alcohol Abuse. 2020;7:1-1.

25. Resiliency Plan, Jan 2020, Marshall University

26. Opioid Response Plan for the State of WV, Jan 30,2018
    Department of Health and Human Services

27. FACTSHEET: WV Oversight of Opioid Prescribing and Monitoring of Opioid Use, Mar 2019, Office of Inspector General, US DHHS
    https://oig.hhs.gov/oas/reports/region3/31803302_Factsheet.pdf

28. WV Drug Overdose Deaths, Historical Overview 2001 – 2015, Aug 2017, WV DHHS

29. The City of Solutions, Huntington, WV., Marshall University (2019)

30. A Public Health Emergency: WV's Efforts to Curb the Opioid Crises, Jan 14, 2020 Testimony by Christina Mullins, Commissioner, BPH, WV DHHS

31. West Virginia: Opioid-Involved Deaths and Related Harms, Apr 2020, National Institute of Drug Abuse, US DHHS (https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state/west-virginia-opioid-involved-deaths-related-harms)

32. Centers for Disease Control and Prevention, "About Multiple Cause of Death, 1999-2018" from WONDER (http://wonder.cdc.gov/mcd-icd10.html)

33. Centers for Disease Control and Prevention, "Drug and Opioid-Involved Overdose Deaths-United States, 2017-2018" dated March 20, 2020 (https://www.cdc.gov/mmwr/volumes/69/wr/mm6911a4.htm#TI_down)

34. West Virginia Public Broadcasting by Clark Davis (November 6, 2015)

35. West Virginia Supreme Court of Appeals, "Petition for a Writ of Mandamus" Footnote 4, dated November 21, 2007 (http://www.courtswv.gov/supreme-court/docs/fall2007/33347.htm#Footnote4)

36. U.S. Bureau of Labor Statistics, Employment Cost Index (NAICS basis), 2013-2020 – Series I.D. CIU3010000000000Q (Not Seasonally Adjusted)

37. West Virginia, Center for Local Health, Funding (https://dhhr.wv.gov/localhealth/localpublichealth/Pages/Funding.aspx)

38. The Washington Post, "West Virginia reaches $37 million opioid settlement with drug shipper McKesson" by Lenny Bernstein dated May 2, 2019 (https://www.washingtonpost.com/national/health-science/west-virginia-reaches-37-million-opioid-settlement-with-drug-shipper-mckesson/2019/05/02/c0243878-6d17-11e9-a66d-a82d3f3d96d5_story.html)

39. West Virginia Press, "$20.8M from opioid settlement distributed for treatment beds in WV" by Don Smith dated December 5, 2017 (https://wvpress.org/breaking-news/20-8m-opioid-settlement-distributed-treatment-beds-wv/)

40. Medicaid: The Linchpin in State Strategies to Prevent and Address Opioid Use Disorders. Manatt Health.  March 2018

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

41. Substance Abuse & Mental Health Data Archive (https://rdas.samhsa.gov/#/)

42. Tracking Accountability in Government Grant Systems (TAGGS)
    (https://taggs.hhs.gov/SearchAward)

43. National Association of State Alcohol and Drug Abuse Directors, Inc. "Partnerships for
    Success Program in West Virginia" dated August 2017 (https://nasadad.org/wp-
    content/uploads/2017/08/West-Virginia-Partnerships-for-Success-Program.pdf)

44. SAMHSA, State Opioid Response (SOR) Frequently Asked Questions (FAQs)
    (https://www.samhsa.gov/sites/default/files/grants/pdf/faq/faqs-for-sor.pdf)

45. State Opioid Response (SOR) dated December 3, 2019 pdf
    (https://dhhr.wv.gov/bhhf/Sections/programs/ProgramsPartnerships/AlcoholismandDrug
    Abuse/SOR/Documents/SOR%20Grant%20Summary%2012-3.pdf)

46. West Virginia, Office of Drug Control Policy, LEAD (https://dhhr.wv.gov/office-of-
    drug-control-policy/programs/Pages/LEAD.aspx)

47. EMS World, "Another W. Va. County Using Quick Response Teams for Overdoses" by
    Eddie Trizzino dated June 21, 2020 (https://www.emsworld.com/news/1224523/another-
    w-va-county-using-quick-response-teams-overdoses)

48. SAMHSA Grant Award by State (https://www.samhsa.gov/grants-awards-by-state)

49. Bureau of Justice Assistance Awards (https://bja.ojp.gov/funding/awards/list)


Cabell County Commission

50. County Government Guideline to the Budget Process, WV State Auditor
    (https://www.wvsao.gov/localgovernment/Default#StateDistributionsToCounties)

51. Budgets (as revised) re WV State Auditor
    (https://www.wvsao.gov/localgovernment/Default#StateDistributionsToCounties)
    a.  Fiscal Years ending June 30, 2013, 2014, 2015, 2016, 2017, 2018, 2019 and 2020

52. CHHD Annual Reports (FY Ending June 30, 2015 – 2019)
    (https://cabellhealth.org/about/annual-report/)

53. CCEMS Stations (http://www.ccems.org/about/stations/)

54. Cabell County Excess Levies (FY Ending June 30, 2013 – 2020) re WV State Auditor
    (https://www.wvsao.gov/localgovernment/Default#StateDistributionsToCounties)

      a.   Cabell County Health Department
      b.   Cabell County EMS

55. State of WV v. Cabell County Commission (2007) [Background on Regional Jail]

56. DHHR nixes proposed audit of Cabell-Huntington harm reduction program, Herald Dispatch, Bishop Nash (August 4, 2019) (https://www.wvgazettemail.com/news/health/dhhr-nixes-proposed-audit-of-cabell-huntington-harm-reduction-program/article_4ba2709e-5cc0-5785-b092-243a8aece77d.html)

57. Cabell County renews all five levies. Herald -Dispatch Seth Mitchell (June 9, 2020) (https://www.herald-dispatch.com/elections/cabell-county-renews-all-five-levies/article_9c994f9a-ab84-5184-b9bf-7aff088a9b59.html)

58. End of jail-bill burden in sight for Cabell County. Herald-Dispatch, Lori Wolfe (April 4, 2019) (https://www.herald-dispatch.com/end-of-jail-bill-burden-in-sight-for-cabell-county/article_516380c2-f475-5fab-b2be-fc36726cdb69.html)

59. US surgeon general praises Huntington's recovery story. Herald-Dispatch, Bishop Nash (May 11, 2018) (https://www.herald-dispatch.com/news/us-surgeon-general-praises-huntington-s-recovery-story/article_ebf9b4e6-e511-51df-8476-8af4ab48c8dc.html)

60. Cabell-Huntington Health Department Annual Report (2014-2019) (https://cabellhealth.org/wp-content/uploads/2019/12/FY2019-Annual-Report.pdf)

61. Cabell-Huntington Health Department, Harm Reduction Program (https://cabellhealth.org/clinical-services/harm-reduction/)

62. Cabell Huntington Hospital, 2016 Community Health Needs Assessment (https://cabellhuntington.org/assets/Documents/CHNA/Cabell-Huntington-Hospital-CHNA-2016-Optimised.pdf)

63. Cabell County Data Dashboard (https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx)

<u>City of Huntington</u>

64. Budgets (as revised) WV State Auditor (https://www.wvsao.gov/localgovernment/Default#StateDistributionsToCounties)
      a.   FY Ending June 30, 2013 – 2020

Appendix A                         HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

65. Audited Financial Statements (City of Hgt, Document Center)
    (https://www.cityofhuntington.com/document-center/)
       a.   FY Ending June 30, 2015 – 2019
       b.   FY ending June 30, 2012

66. Municipal Government Guideline to the Budget Process, WV State Auditor
    (https://www.wvsao.gov/localgovernment/)

67. HPD Annual Reports (2011 – 2014) (https://www.cityofhuntington.com/document-
    center/police)

68. Essentials of Accounting: For Governmental and Not-for-Profit Organizations, Copley. P
    (2015), McGraw Hill

69. WV Code (https://www.wvlegislature.gov/wvcode/code.cfm)

70. City of Huntington Municipal Code
    (https://library.municode.com/wv/huntington/codes/code_of_ordinances?nodeId=COOR
    HUWEVI)

71. City of Huntington, City Service Fee (from City of Huntington, Doc Center)
    (https://www.cityofhuntington.com/document-center/)

72. NLC Case Study, Huntington, WV. Building a Comprehensive System to Support
    Individuals with Substance Use Disorder.
    (https://www.nlc.org/sites/default/files/users/user57164/Case%20Study%20-
    %20Huntington%20WV%20Emergency%20Response.pdf)

73. Huntington News, "Pharmaceutical company Donates 2,200 Doses of Life Saving OD
    Drug" dated February 4, 2016 (http://www.huntingtonnews.net/129091)

74. West Virginia Judiciary, "What is an Adult Drug Court?"
    (http://www.courtswv.gov/lower-courts/adult-drug-courts/adult-drug-courts.html)

75. West Virginia Judiciary, "Cabell County Drug Court" (http://www.courtswv.gov/lower-
    courts/county-drug-courts/drugcourt-cabell.html)

76. Cabell County Drug Court, "Program Handbook" (http://www.courtswv.gov/lower-
    courts/county-drug-courts/cabell-handbook.pdf)

77. BJA, Huntington Joint Adult Drug Court Program
    (https://bja.ojp.gov/funding/awards/2015-dc-bx-0083)

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

78. BJA, FY 2019 WV Comprehensive Opioid Abuse Site-Based Program
(https://bja.ojp.gov/funding/awards/2019-ar-bx-k046)

79. U.S. News, "The Woman Behind a West Virginia Addiction Response Team", dated
August 17, 2019 (https://www.usnews.com/news/best-states/west-virginia/articles/2019-
08-17/the-woman-behind-a-west-virginia-addiction-response-team)

80. Compass Huntington Wellness Center (https://compasshuntington.com/wellnesscenter/)

81. Hoops Family Children's Hospital at Cabell Huntington Hospital, "Neonatal Intensive
Care Unit" (http://hoopschildrens.org/facilities-programs/neonatal-intensive-care-unit/)


<u>Bates Labeled Documents</u>

| | | | | |
|---|---|---|---|---|
| HUNT_00010378 | HUNT_00614087 | HUNT_00025302 | HUNT_00611353 | HUNT_00125228 |
| HUNT_00365846 | HUNT_00007199 | HUNT_00002187 | HUNT_00001890 | HUNT_00125271 |
| CC911_0006174 | HUNT_00007304 | CCCOMM_0266356 | HUNT_00003422 | HUNT_00019361 |
| CCPROS_0000002 | HUNT_00023885 | CCCOMM_0008197 | CCEMS_0054121 | HUNT_00539831 |
| HUNT_00019591 | CCEMS_0257723 | CCEMS_0051857 | CCCOMM_0045082 | HUNT_00009018 |
| HUNT_00006980 | HUNT_00001707 | CCEMS_0051427 | CCCOMM_0260731 | CCEMS_0050661 |
| HUNT_00579987 | HUNT_00008050 | CCEMS_0257726 | HUNT_00636496 | CCEMS_0257722 |
| HUNT_00581047 | HUNT_00017271 | HUNT_01716770 | HUNT_00614307 | HUNT_00635499 |
| HUNT_00007765 | HUNT_00570709 | HUNT_00153162 | HUNT_00640914 | HUNT_00640911 |
| HUNT_00614307 | HUNT_00614285 | CC911_0036901 | HUNT_00614291 | CHHD_0097995 |
| CCEMS_0040948 | CCCOMM_0030120 | CCEMS_0257720 | HUNT_00000827 | HUNT_00000832 |
| HUNT_00000844 | HUNT_00004444 | HUNT_00004448 | HUNT_00004757 | HUNT_00004765 |
| HUNT_00004783 | HUNT_00004777 | HUNT_00004792 | HUNT_00004866 | HUNT_00004945 |
| HUNT_00004787 | HUNT_00004928 | HUNT_00004950 | HUNT_00004998 | HUNT_00004960 |
| HUNT_00004966 | HUNT_00004971 | HUNT_00004975 | HUNT_00004978 | HUNT_00004983 |
| HUNT_00004987 | HUNT_00004993 | CC911_0036901 | HUNT_00020128 | HUNT_01515584 |
| HUNT_00023601 | CHHD_0079800 | HUNT_00010059 | CCEMS_0052315 | CCEMS_0051883 |
| HUNT_00639182 | HUNT_00019409 | HUNT_000639215 | CHHD_0113952 | CCCOMM_0259354 |
| CCCOMM_0259712 | CCCOMM_0259812 | CCCOMM_0259882 | CCCOMM_0259956 | CCCOMM_0260024 |
| CCCOMM_0259423 | HUNT_00006119 | | | |

**Appendix B**                    HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Statement of Limiting Conditions*

Specific limitations related to my specified tasks are as follows:

1) Task 1:  Analyze the trends in key metrics related to  the opioid epidemic.  Although the data considered in this task (e.g., CCEMS suspected overdose responses) has limitations as described below, it is believed to be reasonably reliable; collectively, it provides reasonable certainty.

2) Task 2:  Identify and quantify the Plaintiffs' respective historical investments (costs) in abatement programs responsive to the opioid epidemic (e.g., QRT, LEAD, Harm Reduction, and Drug Courts).  During my engagement, it was determined that such investments were funded primarily by grants; to that end, my analysis is limited to incomplete grant application/s and reporting.  Although incomplete, my observations are supported by deposition testimony and publications and are thus believed to be reasonably reliable.

3) Task 3:  Analyze the Plaintiffs' financial reports and related data to: a) determine if any additional investments (costs) were made by the Plaintiffs, not captured in task 2, and b) determine the Plaintiffs' respective structure and services (e.g., public safety) provided to their citizens.  These tasks were limited by incomplete data.  With respect to the Cabell County Commission, data was limited to budgets (as revised) for fiscal years 2013 through 2020[i] and incomplete financial statements for fiscal years ending June 30, 2012 through 2016.  With respect to the City of Huntington, primary data includes municipal budgets for fiscal years 2013 through 2020[ii] and audit reports for fiscal years 2015 through 2019.[iii]  Importantly, this data does not provide for a segregation of costs specifically related to prescription opioid abuse from costs related to *any and all* other cost drivers.  Although incomplete, my observations are supported by deposition testimony and publications and are thus believed to be reasonably reliable.

4) Task 4:  As described, this task has four parts.  Part 2 is limited by incomplete federal and state funding data available for abatement intervention. The balance of the task is limited to the expert reports and supporting references, as received.

---

[i] This information was retrieved from the West Virginia State Auditor's Office and can be found at: https://www.wvsao.gov/localgovernment. No audited financial statements have been provided.
[ii] Ibid.
[iii] This information was retrieved from The City of Huntington's Document Center and can be found at: https://www.cityofhuntington.com/document-center/finance.

**Appendix C**

## Robert J. Rufus, DBA, CPA, CFF, CVA (Emeritus)

1016 6th Ave
Huntington, WV 25701
(304) 634-7210
robert.rufus@rjrufus.com

---

### *Academic Background*

Doctor of Business Administration, 2007
Nova Southeastern University, Fort Lauderdale, FL

Master of Business Administration, 1981
Marshall University, Huntington, WV

Bachelor of Science in Business Administration, 1978
Concord College, Athens, WV

### *Work Experience*

#### *Professional*
2020 to Present: Self-employed.
Dr. Robert J. Rufus, CPA, CFF, CVA (Emeritus)

2017 to 2019: President and Managing Principal
Rufus, Miller & Associates, A.C., Huntington, WV

Oct. 1985 to Dec. 2016:  President and Managing Principal
Rufus & Rufus A.C., Huntington, WV

1994 to Mar. 2017:  President and CEO
The Diamond Links Golf Course, Catlettsburg, KY

2007 to Present:  Programs Director
The Forensic Institute, LLC, Huntington, WV

1981 to 1985:  Revenue Agent
Internal Revenue Service, Huntington, WV

#### *Academic*
2008 to 2018:  Program Coordinator / Lead Instructor, Master of Forensic Accounting (MFAcc)
University of Charleston, Charleston, WV

2008 to 2010:  Programs Director and Instructor
The Forensic Institute at the University of Charleston, Charleston, WV

2007 to 2008: Capstone Instructor, Executive Master of Business Administration (EMBA)
University of Charleston, Charleston, WV

**Appendix C**

1989 to 2005:  Discussion Leader – Practice Management
Joan C. Edwards School of Medicine, Huntington, WV

1982 to 1999:  Adjunct Instructor (Intermittent) – Accounting and Tax
Marshall University, Huntington, WV

1989 to 1996:  Workshop Discussion Leader (Intermittent)
Small Business Administration, Huntington, WV

1985 to 1987:  Instructor – Accounting, Management & Economics
Ohio University, Ironton, OH

1984:  Adjunct Instructor – Finance
West Virginia Graduate College, Institute, WV

## *Certifications*

Certified in Financial Forensics (CFF), 2008
Certified Valuation Analyst, Emeritus (CVA), 1996
Certified Public Accountant (CPA), 1981

## *Licenses*

Licensed Private Investigator, State of West Virginia, (2002-2019)

## *Professional Associations*

American Institute of Certified Public Accountants
West Virginia Society of Certified Public Accountants
National Association of Certified Valuators & Analysts

## *Publications*

"The 3 W's of Engaging a Forensic Accountant:  Why, When and Who"
*American Journal of Family Law*, Fall 2018

"Arson or Accident: A Forensic Accounting Case Requiring Critical Thinking and Expert Communication"
*Issues in Accounting Education,* February 2017
(Co-authored with Cindy Durtschi)

"Voluntary Reduction of Child Support Income: When Does an Economic Self-Improvement Plan Preclude Income Attribution?"
*American Journal of Family Law*, Spring 2016

*Forensic Accounting,  1ˢᵗ Ed.*
Pearson Higher Education, 2014
(Co-authored with Laura S. Miller and William Hahn)

**Appendix C**

"Divorce: A Taxing Experience – 25 Divorce-Related Tax FAQs"
*American Journal of Family Law*, Winter 2014

"Conversion of Separate Property into Marital Property in Divorce"
*The Valuation Examiner,* Jul./Aug. 2012
(Co-authored with Laura S. Miller, Revised and republished from *AJFL* article below)

"What's Mine is Yours, and What's Yours in Mine…Until Divorce: Theory of Transmutation"
*American Journal of Family Law*, Summer 2012
(Co-authored with Laura S. Miller)

"Mountain State Sporting Goods: A Case of Fraud?"
*Issues in Accounting Education*, Feb. 2011
(Co-authored with William Hahn)

*Accredited Fraud Investigator Training Manual, 7ᵗʰ Ed.*
Rufus & Rufus Accounting Corporation, Jan. 2011
(Co-authored with Laura S. Miller)

"The World of Forensic Accounting"
*The West Virginia CPA*, Mar. 2010
(Co-authored with Laura S. Miller)

"Effects of Decision-Aid Use on Evaluations of Tax Preparer Liability"
*Lambert Academic Publishing*, 2010

"Attorney-Client Privilege and the Forensic Accountant"
*The Valuation Examiner,* Jul./Aug. 2007
(Co-authored with Laura S. Miller)

"Whistleblowers:  Truth, Justice and the American Way"
*Journal of Applied Management and Entrepreneurship,* Oct. 2004

"Financial Ratios:  Use, Predictive Power and the Z-Score"
*The Valuation Examiner,* May/Jun. 2003

"The Challenge of Earnings Management:  A Valuator's Perspective"
*The Valuation Examiner,* Jan./Feb. 2003

## ***Presentations***

Oct. 2014: "The Challenge of Business Valuation"
West Virginia Family Court Judicial Education Conference, Charleston, WV

May 2014: "Top Ten Tips for Effective Cross-Examination of Financial Experts"
Kanawha County Family Law Bench Bar, Charleston, WV

**Appendix C**

May 2013: "Divorce-Related Tax Matters"
Kanawha County Family Law Bench Bar, Charleston, WV

Jun. 2012: "The CSI Effect and Forensic Accounting"
West Virginia Association for Justice 54th Annual Convention and Seminar, Charleston, WV

Sept. 2011: "A Case Study Approach"
Fraud, Forensics and Ethics, 2011 Educators Conference
West Virginia Council of Accounting Educators, Morgantown, WV

Mar. 2011:  Panel Discussions
"Ethics and the Expert" & "The Need to Educate Legally Aware Accountants"
American Accounting Association, FIA Section Research Conference, New Orleans, LA

Aug. 2010: "The Perfect Storm for Fraud"
National Association of State Auditors, Comptrollers and Treasurers
2010 Annual Conference, Charleston, WV

May 2010: "Mountain State Sporting Goods:  A Case of Fraud?"
American Accounting Association, FIA Section Research Conference, Baton Rouge, LA

Nov. 2009: "Education in Action:  Bridging the Gap Between Theory and Practice"
West Virginia Council of Accounting Educators, Educators Conference, Charleston, WV

Sept. 2009: "Valuing a Professional Practice as a Marital Asset"
West Virginia Family Law Seminar, West Virginia College of Law, Morgantown, WV

May 2009: "Mountain State Sporting Goods:  A Case of Fraud?"
American Accounting Association, Ohio Region Meeting, Cleveland, OH

Nov. 2008: "IRS Criminal Investigation"
West Virginia Society of CPAs, Huntington Chapter, Huntington, WV

Sept. 2008: "The Evolution of Fraud Theory"
West Virginia Society of CPAs, Charleston, WV

Aug. 2007: "Jurors' Evaluations of Decision-Aid Use in a Tax Malpractice Setting"
American Accounting Association, Annual Meeting, Chicago, IL

## *Service*

### *Professional*
2010 to Aug. 2012: Vice President of Practice
American Accounting Association, Forensic & Investigative Accounting Section

Dec. 2011:  Judge, 2011 AICPA Accounting Competition Finals
American Institute of Certified Public Accountants, Washington, DC

**Appendix C**

Aug. 2010: Moderator for research presentations – Going Concern Disclosures
American Accounting Association, 2010 Annual Conference

2007 to 2008: Member, Course Review Committee
National Association of Certified Valuation Analysts

***Community***
2008 to 2011:  Lawyer Disciplinary Board – Hearing Panel
West Virginia State Bar, Charleston, WV

2004:  Councilman at Large
Huntington City Council, Huntington, WV

***Military***
1971 to 1975:  United States Marine Corps

## ***Additional Activities***

Small Business Administration (SBA) Accountant Advocate of the Year, 1992 & 1995

Updated: July 2, 2020

**Robert J. Rufus, DBA, CPA, CFF, CVA (Emeritus)**
**Expert Witness Testimony - 2015 to Present**

| Case | Jurisdiction | Style | Engaging Attorney | Type | Date |
|---|---|---|---|---|---|
| Douglas Morris v. Kimberley Morris | Gilmer Co. Family | 12-D-8 | James Douglas | Hearing | 01/30/15 |
| Mitzi Rick v. Freddie Rick | Logan Co. Family | 13-D-401 | Brian Abraham | Hearing | 04/13/15 |
| Lesleigh Barber-Thompson v. Victor Sprouse | Kanawha Co. Family | 09-D-1346 | James Douglas | Hearing | 06/01/15 |
| Elizabeth Judy v. William Judy, III | Hardy Co. Family | 13-D-54 | James Douglas | Hearing | 02/09/16 |
| Bordeaux Capital v. U.S. Methanol Corp., et al. | Southern District of WV | 2:18-CV-1262 | John H. Tinney, Jr. | Deposition | 11/05/19 |

Updated:  Aug. 24, 2020

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.1**
**City of Huntington**
**Revenue Summaries**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Unassigned Fund Balance (1) | $ 685,621 | $ 3,929,406 | $ 4,274,039 | $ 1,337,404 | $ 1,914,864 | $ 2,598,781 | $ 6,593,451 | $ 9,451,842 |
| Committed Fund Balance (2) | 270,266 | 714,790 | 1,087,682 | 779,789 | 578,885 | 578,885 | 578,885 | 578,885 |
| Assigned Fund Balance (3) | | 1,156,065 | 1,244,157 | 1,188,756 | 1,394,071 | 1,332,024 | 980,551 | 986,888 |
| Nonspendable Fund Balance (4) | 171,340 | 163,827 | 141,953 | 177,929 | 209,506 | 209,658 | 192,800 | 274,870 |
| B&O | 12,815,566 | 14,784,589 | 13,914,878 | 13,785,000 | 14,135,000 | 13,961,759 | 13,961,759 | 13,500,000 |
| Special Assessment (City Service Fee) | 4,650,000 | 4,706,688 | 4,669,688 | 7,220,000 | 7,869,862 | 8,201,834 | 8,201,834 | 8,300,000 |
| Sales Tax | 6,245,590 | 6,795,099 | 6,081,620 | 6,482,000 | 6,500,000 | 5,951,261 | 6,051,261 | 6,500,000 |
| Property Tax (5) | 5,319,371 | 5,350,000 | 5,575,000 | 5,575,001 | 5,582,933 | 5,802,521 | 5,498,163 | 6,000,000 |
| Municipal Service Fee | 6,000,000 | 6,000,000 | 5,450,000 | 5,400,000 | 5,200,000 | 4,951,909 | 5,000,000 | 5,000,000 |
| Excise Tax on Utilities | 2,050,000 | 2,129,000 | 2,054,000 | 2,200,000 | 2,049,462 | 2,076,165 | 2,076,165 | 2,050,000 |
| Hotel / Motel Occupancy Tax | 500,000 | 550,000 | 504,000 | 729,000 | 651,393 | 739,647 | 750,000 | 800,000 |
| Franchise Tax | 545,000 | 545,000 | 563,000 | 663,000 | 575,000 | 575,000 | 700,000 | 700,000 |
| Capital Lease Revenue (#377) | - | 279,682 | 610,711 | - | - | - | 1,270,684 | - |
| Wine & Liquor Tax | 510,000 | 555,000 | 360,000 | 410,000 | 391,126 | 379,096 | 379,096 | 400,000 |
| All Other (6) | 2,975,400 | 3,133,975 | 3,515,052 | 5,024,627 | 5,988,567 | 5,829,320 | 5,673,274 | 5,753,002 |
| **Total Revenues Before Grants / Contributions** | **$ 42,738,154** | **$ 50,793,121** | **$ 50,045,780** | **$ 50,972,506** | **$ 53,040,669** | **$ 53,187,860** | **$ 57,907,923** | **$ 60,295,487** |
| **Grants** | | | | | | | | |
| Federal | $ 1,000,000 | $ 920,000 | $ 1,000,000 | $ 2,600,564 | $ 2,429,668 | $ 2,681,775 | $ 1,500,000 | $ 2,000,000 |
| State | 1,000,000 | 1,301,510 | 889,289 | 1,000,000 | 1,020,000 | 73,499 | 1,000,000 | 500,000 |
| Contributions from Other Funds / Entities | 732,780 | 603,500 | 397,236 | 228,046 | 175,500 | 167,954 | 193,833 | 558,947 |
| Grant Clearing / Other Grants | 166,736 | 154,731 | 154,736 | 154,736 | 50,000 | 100,000 | 155,231 | 455,231 |
| Total Grants and Contributions | $ 2,899,516 | $ 2,979,741 | $ 2,441,261 | $ 3,983,346 | $ 3,675,168 | $ 3,023,228 | $ 2,849,064 | $ 3,514,178 |
| **Total General Fund Revenue & Grants** | **$ 45,637,670** | **$ 53,772,862** | **$ 52,487,041** | **$ 54,955,852** | **$ 56,715,837** | **$ 56,211,088** | **$ 60,756,987** | **$ 63,809,665** |

**Notes:**

| | |
|---|---|
| (1) Unassigned Fund Balance | Fund balance carried over from the past fiscal year.  If significant, additional information should be submitted. |
| (2) Committed Fund Balance | Fund balance constrained by limitations that have been approved by an ordinance (the highest level of formal action) of the City Council which remains binding unless removed in the same manner. |
| (3) Assigned Fund Balance | Fund balance committed via formal action of the City Council but are neither restricted nor committed. |
| (4) Nonspendable Fund Balance | Represents inventories and/or prepaid amounts that are not in spendable form. |
| (5) Property Tax | Includes current and prior year taxes |
| (6) All other | Includes, among other items, employee health insurance premium charges, retirees' medical , fines and fees, fire protection, parking meters. |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/LocalGovernment/Default#MunicipalFormsDocuments)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.2a**
**City of Huntington**
**Expenditure Summaries**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Total Revenues (Budget) | $ 45,637,670 | $ 53,772,862 | $ 52,487,041 | $ 54,955,852 | $ 56,715,837 | $ 56,211,088 | $ 60,756,987 | $ 63,809,665 |
| General Government Expenditures | 15,657,751 | 19,634,907 | 19,682,485 | 20,315,474 | 22,248,144 | 21,580,055 | 23,138,595 | 23,541,517 |
| Public Safety (HPD) | 12,010,143 | 12,676,922 | 12,790,844 | 13,313,566 | 13,919,469 | 13,464,066 | 13,807,887 | 14,536,758 |
| Public Safety (HFD) | 11,444,439 | 11,888,892 | 11,783,934 | 12,072,746 | 14,012,151 | 13,422,832 | 14,296,819 | 14,102,269 |
| Public Safety (Other) | 1,235,799 | 1,494,371 | 932,973 | 943,667 | 919,389 | 1,098,320 | 938,797 | 950,953 |
| Streets and Transportation | 3,163,191 | 3,821,152 | 3,270,107 | 4,678,348 | 3,506,448 | 4,353,498 | 4,380,564 | 4,722,120 |
| Health and Sanitation | 205,000 | 1,361,904 | 1,521,026 | 382,489 | | | | |
| Culture and Recreation | 1,921,347 | 1,940,057 | 2,161,241 | 2,186,241 | 2,110,236 | 2,292,317 | 2,194,325 | 2,299,422 |
| Social Services | | | | | | | | 106,626 |
| Capital Expenditures | | 954,657 | 344,431 | 1,063,321 | | | 2,000,000 | 3,550,000 |
| **Total** | **$ 45,637,670** | **$ 53,772,862** | **$ 52,487,041** | **$ 54,955,852** | **$ 56,715,837** | **$ 56,211,088** | **$ 60,756,987** | **$ 63,809,665** |
| Excess | - | - | - | - | - | - | - | - |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/LocalGovernment/Default#MunicipalFormsDocuments)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.2b**
**City of Huntington**
**Budget Summary - Component Percentage**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Total Revenues (Budget) | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| General Government Expenditures | 34.31% | 36.51% | 37.50% | 36.97% | 39.23% | 38.39% | 38.08% | 36.89% |
| Public Safety (HPD) | 26.32% | 23.57% | 24.37% | 24.23% | 24.54% | 23.95% | 22.73% | 22.78% |
| Public Safety (HFD) | 25.08% | 22.11% | 22.45% | 21.97% | 24.71% | 23.88% | 23.53% | 22.10% |
| Public Safety (Other) | 2.71% | 2.78% | 1.78% | 1.72% | 1.62% | 1.95% | 1.55% | 1.49% |
| Streets and Transportation | 6.93% | 7.11% | 6.23% | 8.51% | 6.18% | 7.74% | 7.21% | 7.40% |
| Health and Sanitation | 0.45% | 2.53% | 2.90% | 0.70% | 0.00% | 0.00% | 0.00% | 0.00% |
| Culture and Recreation | 4.21% | 3.61% | 4.12% | 3.98% | 3.72% | 4.08% | 3.61% | 3.60% |
| Social Services | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.17% |
| Capital Expenditures | 0.00% | 1.78% | 0.66% | 1.93% | 0.00% | 0.00% | 3.29% | 5.56% |
| **Total** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |
| Excess | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/LocalGovernment/Default#MunicipalFormsDocuments)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.3**
**City of Huntington**
**Budget Summaries**
**Original v. Revised**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Original | 43,930,740 | 47,326,147 | 53,048,650 | 50,300,483 | 48,678,286 | 50,786,466 | 59,211,157 | 60,670,538 |
| Revised | 45,637,670 | 53,772,862 | 52,487,041 | 54,955,852 | 56,715,837 | 56,211,088 | 60,756,987 | 63,809,665 |
| Revisions | 1,706,930 | 6,446,715 | (561,609) | 4,655,369 | 8,037,551 | 5,424,622 | 1,545,830 | 3,139,127 |
| % | 3.89% | 13.62% | -1.06% | 9.26% | 16.51% | 10.68% | 2.61% | 5.17% |

**HPD Budget**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Original | 12,388,000 | 12,255,171 | 13,133,206 | 12,554,076 | 12,663,132 | 13,464,066 | 13,807,887 | 14,536,758 |
| Revised | 12,010,143 | 12,676,922 | 12,790,844 | 13,313,566 | 13,919,469 | 13,464,066 | 13,807,887 | 14,536,758 |
| Revisions | (377,857) | 421,751 | (342,362) | 759,490 | 1,256,337 | - | - | - |
| % | -3.05% | 3.44% | -2.61% | 6.05% | 9.92% | 0.00% | 0.00% | 0.00% |

**HFD Budget**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Original | 11,377,283 | 11,799,115 | 11,851,927 | 11,550,647 | 11,567,272 | 13,422,832 | 13,841,725 | 14,102,269 |
| Revised | 11,444,439 | 11,888,892 | 11,783,934 | 12,072,746 | 14,012,151 | 13,422,832 | 14,296,819 | 14,102,269 |
| Revisions | 67,156 | 89,777 | (67,993) | 522,099 | 2,444,879 | - | 455,094 | - |
| % | 0.59% | 0.76% | -0.57% | 4.52% | 21.14% | 0.00% | 3.29% | 0.00% |

**Source:**

(1) WV State Auditor's Office (https://www.wvsao.gov/LocalGovernment/Default#MunicipalFormsDocuments)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.4**
**City of Huntington**
**HPD Detail Summaries - Actual Expenditures**

| Fiscal Year Ending June 30 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Personal Services | | | | | | | | | | | |
| Salaries & Wages | $ 4,395,013 | $ 4,389,153 | $ 4,538,036 | $ 4,522,183 | $ 5,039,086 | $ 5,305,441 | $ 5,520,885 | $ 5,283,769 | $ 5,142,874 | $ 4,670,185 | $ 4,637,390 |
| Salary & Wages - Longevity | 6,737 | 7,271 | 7,805 | 9,529 | 5,270 | 682 | - | - | - | - | - |
| Salary & Wages - Restricted for Payouts | - | - | - | - | - | - | - | - | - | - | - |
| FICA Tax - Social Security Tax | 91,204 | 94,435 | 95,289 | 96,668 | 103,833 | 126,963 | 136,397 | 134,866 | 117,046 | 96,939 | 97,737 |
| Group Insurance | 15,853 | 14,045 | 13,989 | 12,921 | 19,943 | 27,085 | 19,046 | 19,388 | - | - | - |
| Retirement Expense Civilian | 27,982 | 29,899 | 34,529 | 37,275 | 44,365 | 89,512 | 85,051 | 81,871 | 42,097 | 22,808 | 19,788 |
| Contribution Pension Fund - Police Officers | 4,097,890 | 3,801,260 | 3,823,757 | 4,716,399 | 4,316,854 | 4,398,765 | 4,237,318 | 3,775,581 | 4,590,520 | 4,679,161 | 4,487,498 |
| Contribution Pension Fund (POFFRS) - Police | - | 456 | 9,613 | 17,368 | 35,629 | 82,967 | 98,774 | 124,338 | 126,673 | 129,351 | 159,840 |
| Contribution Pension Fund Insurance Premium | - | - | - | - | - | - | - | 956,286 | 1,070,799 | 1,371,360 | 1,328,189 |
| Overtime / Extra Help | 786,383 | 875,618 | 735,327 | 845,104 | 834,875 | 1,026,100 | 1,167,515 | 1,293,448 | 1,202,460 | 1,095,936 | 1,256,799 |
| Other Fringe Benefits / Uniform Allowance | 139,881 | 126,883 | 131,614 | 69,785 | 19,657 | 20,564 | 16,875 | 21,939 | 26,250 | 18,690 | 28,457 |
| **Total Expenditures - Personnel Services** | **$ 9,560,943** | **$ 9,339,020** | **$ 9,389,959** | **$ 10,327,231** | **$ 10,419,512** | **$ 11,078,078** | **$ 11,281,860** | **$ 11,691,486** | **$ 12,318,719** | **$ 12,084,430** | **$ 12,015,699** |
| | | | | | | | | | | | |
| *Other Costs:* | | | | | | | | | | | |
| Contracted Services (e g , utilities, R&M, training) | $ 826,226 | $ 821,645 | $ 885,098 | $ 778,925 | $ 676,745 | $ 691,262 | $ 534,955 | $ 615,530 | $ 566,305 | $ 608,860 | $ 900,712 |
| Commodities (e g , supplies) | 193,728 | 202,091 | 269,760 | 312,406 | 334,669 | 322,900 | 259,574 | 205,042 | 176,695 | 181,261 | 190,042 |
| Capital Outlay (e g , equipment) | 167,339 | 198,354 | 150,178 | 107,436 | 114,899 | 184,058 | 173,837 | 123,782 | 369,700 | 337,169 | 637,774 |
| Contributions / Transfers to Other Funds | 213,787 | 225,384 | 228,098 | - | 316,545 | 316,637 | 334,253 | 262,170 | 267,295 | 257,106 | 271,963 |
| **Total Other** | **$ 1,401,080** | **$ 1,447,474** | **$ 1,533,134** | **$ 1,198,767** | **$ 1,442,858** | **$ 1,514,857** | **$ 1,302,619** | **$ 1,206,524** | **$ 1,379,995** | **$ 1,384,396** | **$ 2,000,491** |
| | | | | | | | | | | | |
| **Total Expenditures** | **$ 10,962,023** | **$ 10,786,494** | **$ 10,923,093** | **$ 11,525,998** | **$ 11,862,370** | **$ 12,592,935** | **$ 12,584,479** | **$ 12,898,010** | **$ 13,698,714** | **$ 13,468,826** | **$ 14,016,189** |
| | | | | | | | | | | | |
| *Observations:* | | | | | | | | | | | |
| Total Personnel Service / Total Expenditures | **87.22%** | **86.58%** | **85.96%** | **89.60%** | **87.84%** | **87.97%** | **89.65%** | **90.65%** | **89.93%** | **89.72%** | **85.73%** |
| Overtime / Total Expenditures | **7.17%** | **8.12%** | **6.73%** | **7.33%** | **7.04%** | **8.15%** | **9.28%** | **10.03%** | **8.78%** | **8.14%** | **8.97%** |
| Overtime / Total Personnel | **8.22%** | **9.38%** | **7.83%** | **8.18%** | **8.01%** | **9.26%** | **10.35%** | **11.06%** | **9.76%** | **9.07%** | **10.46%** |

**Sources:**
(1) Police Department actual expenses 2012-2014 [HUNT_00636496]
(2) Police Department actual expenses 2013-2015 [HUNT_00640914]
(3) Police Department actual expenses 2016-2018 [HUNT_00614307]
(4) Police Department actual expenses 2017-2019 [HUNT_00614291]
(5) Police and Fire Expenses 2009-2017 [HUNT_00019361]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.5**
**City of Huntington**
**HFD Detail Summaries - Actual Expenditures**

| Fiscal Year Ending June 30 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Personal Services** | | | | | | | | | | | |
| Salaries & Wages | $ 2,971,460 | $ 2,882,866 | $ 2,804,692 | $ 2,691,140 | $ 2,751,660 | $ 2,945,356 | $ 3,180,486 | $ 3,000,166 | $ 2,757,711 | $ 2,631,751 | $ 2,757,459 |
| Salary & Wages - Longevity | 4,838 | 5,198 | 2,490 | 945 | 981 | 164 | - | - | - | - | - |
| Salary & Wages - Restricted for Payouts | - | - | - | - | - | - | - | - | - | - | - |
| Fireman's Readjustment Fund | - | - | - | - | - | - | - | - | - | 3,075 | 28,829 |
| FICA Tax - Social Security Tax | 67,955 | 72,084 | 74,719 | 67,255 | 65,243 | 73,878 | 81,852 | 81,376 | 75,121 | 65,049 | 69,812 |
| Group Insurance | 17,148 | 14,618 | 14,386 | 12,687 | 19,716 | 25,295 | 18,028 | 17,399 | - | - | - |
| Retirement Expense Civilian | 9,124 | 14,025 | 11,557 | 6,548 | 7,225 | 18,803 | 19,385 | 20,415 | 13,847 | 3,659 | 3,506 |
| Contribution Pension Fund - Fire Fighters | 4,137,567 | 4,454,071 | 4,382,367 | 5,387,923 | 5,453,915 | 5,454,915 | 5,326,897 | 5,233,536 | 6,266,667 | 6,282,284 | 5,745,128 |
| Contribution Pension Fund - Fire Fighters | - | - | - | - | 25,449 | 36,885 | 58,659 | 64,055 | 74,314 | 79,581 | 107,683 |
| Contribution Pension Fund Insurance Premium | - | - | - | - | - | - | - | 1,020,829 | 1,128,628 | 1,397,746 | 1,386,836 |
| Overtime / Extra Help | 1,763,207 | 1,918,944 | 1,974,874 | 1,894,328 | 1,392,025 | 1,432,230 | 1,503,009 | 1,541,234 | 1,367,218 | 1,350,595 | 1,328,370 |
| Overtime / Extra - Unscheduled | - | - | - | - | 300,392 | 398,276 | 566,351 | 615,856 | 681,912 | 441,973 | 598,826 |
| Other Fringe Benefits / Uniform Allowance | 107,426 | 101,151 | 96,701 | 48,048 | 20,264 | 20,777 | 16,373 | 4,553 | 12,064 | 15,819 | 20,798 |
| **Total Expenditures - Personnel Services** | $ 9,078,725 | $ 9,462,957 | $ 9,361,786 | $ 10,108,874 | $ 10,036,869 | $ 10,406,080 | $ 10,771,040 | $ 11,599,419 | $ 12,377,482 | $ 12,271,532 | $ 12,047,247 |
| | | | | | | | | | | | |
| ***Other Costs:*** | | | | | | | | | | | |
| Contracted Services (e g , utilities, R&M, training) | $ 416,121 | $ 440,271 | $ 450,736 | $ 326,788 | $ 456,128 | $ 539,880 | $ 407,711 | $ 307,951 | $ 329,987 | $ 504,573 | $ 1,060,377 |
| Commodities (e g  supplies) | 81,939 | 127,178 | 108,392 | 118,256 | 183,241 | 181,320 | 154,780 | 137,562 | 100,766 | 161,800 | 156,104 |
| Capital Outlay (e g , equipment, CC Fire Excess Levy)) | 210,428 | 229,487 | 333,291 | 259,237 | 212,356 | 355,333 | 251,151 | 329,261 | 599,083 | 351,902 | 755,083 |
| Contributions / Transfers to Other Funds | 123,071 | 87,680 | 87,680 | - | 128,464 | 153,501 | 198,570 | 176,785 | 176,785 | 115,131 | 126,955 |
| **Total Other** | $ 831,559 | $ 884,616 | $ 980,099 | $ 704,281 | $ 980,189 | $ 1,230,034 | $ 1,012,212 | $ 951,559 | $ 1,206,621 | $ 1,133,406 | $ 2,098,519 |
| | | | | | | | | | | | |
| **Total Expenditures** | $ 9,910,284 | $ 10,347,573 | $ 10,341,885 | $ 10,813,155 | $ 11,017,058 | $ 11,636,114 | $ 11,783,252 | $ 12,550,978 | $ 13,584,103 | $ 13,404,938 | $ 14,145,766 |
| | | | | | | | | | | | |
| ***Observations:*** | | | | | | | | | | | |
| Total Personnel Service / Total Expenditures | 91.61% | 91.45% | 90.52% | 93.49% | 91.10% | 89.43% | 91.41% | 92.42% | 91.12% | 91.54% | 85.17% |
| Overtime / Total Expenditures | 17.79% | 18.54% | 19.10% | 17.52% | 15.36% | 15.73% | 17.56% | 17.19% | 15.08% | 13.37% | 13.62% |
| Overtime / Total Personnel | 19.42% | 20.28% | 21.10% | 18.74% | 16.86% | 17.59% | 19.21% | 18.60% | 16.56% | 14.61% | 16.00% |

**Sources:**
(1) Fire Department actual expenses 2011-2013 [HUNT_00635499]
(2) Fire Department actual expenses 2013-2015 [HUNT_00640911]
(3) Fire Department actual expenses 2016-2018 [HUNT_00570709]
(4) Fire Department actual expenses 2017-2019 [HUNT_00614285]
(5) Police and Fire Expenses 2009-2017 [HUNT_00019361]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.6**
**Cabell County Commission  - General Fund Budget Summaries**
**Fiscal Years Endings June 30, 2013 through 2020**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Total Revenues - General Fund** | | | | | | | | |
| Property Tax - Current Year | 13,519,853 | 14,085,454 | 14,172,879 | 14,431,080 | 14,723,832 | 14,479,685 | 14,577,647 | 15,200,752 |
| Prior Year Taxes | 866,056 | 885,000 | 925,000 | 945,000 | 965,000 | 975,000 | 975,000 | 991,000 |
| Supplemental Taxes | 423,800 | 350,000 | 400,000 | 450,000 | 480,000 | 420,000 | 430,000 | 420,000 |
| Assigned Fund Balance | 975,000 | 925,000 | 950,000 | 987,461 | 1,838,569 | 2,858,468 | 2,885,600 | 1,967,242 |
| Unassigned Fund Balance | 996,605 | 1,324,665 | 944,450 | 848,996 | 619,888 | | 183,389 | 1,633,344 |
| Tax Penalties & Interest | 580,982 | 580,000 | 600,000 | 625,000 | 630,000 | 640,000 | 600,000 | 640,000 |
| Property Transfer Tax | 400,000 | 400,000 | 420,000 | 410,000 | 450,000 | 531,694 | 300,000 | 531,000 |
| Wine & Liquor Tax | 16,000 | 20,000 | 25,000 | 25,000 | 30,000 | 12,000 | 13,000 | 10,000 |
| Gas & Oil Severance Tax | 50,000 | 30,000 | 120,000 | 125,000 | 75,000 | 70,000 | 65,000 | 70,000 |
| Hotel Occupancy Tax | 525,000 | 525,000 | 525,000 | 525,000 | 500,000 | 510,000 | 550,000 | 530,000 |
| Federal Grants | 304,261 | 150,000 | 160,450 | 100,000 | 100,476 | 90,000 | 867,724 | 254,296 |
| State Grants | 6,188 | 237,000 | 220,000 | 179,253 | 90,000 | 436,088 | 331,887 | 200,000 |
| Sheriff's Service of Process | 80,000 | 80,000 | 80,000 | 80,000 | 44,184 | 60,000 | 60,000 | 60,000 |
| Sheriff's Earnings | 20,000 | 20,000 | 20,000 | 20,000 | 39,000 | 30,000 | 15,000 | 31,000 |
| County Clerk's Earnings | 300,000 | 300,000 | 325,000 | 325,000 | 300,000 | 350,000 | 300,000 | 300,000 |
| Circuit Clerk's Earnings | 160,000 | 160,000 | 160,000 | 150,000 | 150,000 | 12,000 | 15,000 | 123,000 |
| Franchise Agreement | 330,000 | 350,000 | 475,000 | 485,000 | 455,000 | 450,000 | 500,000 | 450,000 |
| Regional Jail Reimbursement | 300,000 | 350,000 | 300,000 | 300,000 | 320,000 | 207,000 | 250,000 | 250,000 |
| Video Lottery | 175,000 | 190,000 | 190,000 | 190,000 | 175,000 | 175,000 | 180,000 | 175,000 |
| General School Reimbursement | 230,000 | 230,000 | 227,000 | 225,000 | 250,000 | 200,000 | 225,000 | 225,000 |
| Magistrate Court reem | 60,000 | 55,000 | 50,000 | 50,000 | 50,000 | 51,000 | 51,546 | 51,546 |
| Refunds/Reimbursement (External Sources) | 376,123 | 483,434 | 423,168 | 275,000 | 563,219 | 851,170 | 1,170,071 | 429,593 |
| Payroll Reimbursement | 90,000 | 90,000 | 90,000 | 75,000 | 80,000 | 100,000 | 175,000 | 10,000 |
| Other | 375,488 | 652,301 | 412,595 | 312,325 | 300,100 | 315,518 | 479,609 | 370,556 |
| ***Total Revenues*** | **21,160,356** | **22,472,854** | **22,215,542** | **22,139,115** | **23,229,268** | **23,824,623** | **25,200,473** | **24,923,329** |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.6**
**Cabell County Commission  - General Fund Budget Summaries**
**Fiscal Years Endings June 30, 2013 through 2020**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **General Government Expenditures** | | | | | | | | |
| County Commission | 1,760,103 | 1,827,862 | 1,990,908 | 2,109,998 | 2,098,211 | 1,878,067 | 2,019,258 | 2,146,064 |
| County Clerk | 884,222 | 923,831 | 987,175 | 978,817 | 903,329 | 928,205 | 890,822 | 993,979 |
| Circuit Clerk | 889,880 | 896,589 | 916,051 | 905,140 | 829,807 | 807,409 | 807,609 | 898,123 |
| Sheriff - Treasurer | 459,154 | 440,861 | 453,798 | 455,362 | 426,086 | 425,924 | 426,086 | 471,622 |
| Prosecuting Attorney | 1,033,881 | 1,052,441 | 1,171,304 | 1,191,750 | 1,288,828 | 1,153,350 | 1,279,393 | 1,399,753 |
| Assessor | 817,999 | 845,529 | 839,543 | 850,065 | 817,810 | 777,958 | 766,259 | 850,065 |
| Elections - County Clerk | 232,064 | 193,910 | 220,101 | 264,097 | 304,560 | 269,999 | 264,142 | 261,398 |
| Insurance Program (self-insured) | 2,799,976 | 2,772,541 | 3,233,626 | 3,572,182 | 4,185,812 | 3,864,469 | 3,639,321 | 2,666,690 |
| Federal Grants | 326,291 | 150,000 | 150,000 | 50,000 | 90,000 | 90,000 | 100,000 | 100,000 |
| State Grants | - | 120,000 | 120,000 | 50,000 | 90,000 | 90,000 | 100,000 | 100,000 |
| Contingencies | 110,293 | 286,159 | 187,033 | 253,290 | 269,810 | 136,840 | 1,151,113 | 1,151,113 |
| Other | 1,896,356 | 2,430,916 | 1,945,040 | 1,522,177 | 1,381,065 | 1,240,054 | 1,265,882 | 1,472,456 |
| ***Total General Government Expenditures*** | **11,210,219** | **11,940,639** | **12,214,579** | **12,202,878** | **12,685,318** | **11,662,275** | **12,709,885** | **12,511,263** |
| | | | | | | | | |
| **Public Safety Expenditures** | | | | | | | | |
| Sheriff - Law Enforcement | 2,943,519 | 3,077,739 | 3,127,813 | 3,099,586 | 2,963,824 | 3,431,189 | 3,554,372 | 3,740,034 |
| Regional Jail | 3,270,647 | 3,652,810 | 3,126,831 | 2,997,428 | 3,766,972 | 4,895,160 | 5,274,400 | 5,023,907 |
| Home Confinement | 451,695 | 455,872 | 465,477 | 464,697 | 418,227 | 418,189 | 493,189 | 464,658 |
| Courthouse Security | 293,747 | 286,699 | 306,090 | 291,985 | 261,706 | 261,706 | 261,706 | 290,904 |
| Fire Department | | 11,000 | | | | | | |
| Rapid Response | - | | | | | | - | - |
| Community Based Corrections | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 126,000 |
| Other | 210,788 | 167,944 | 166,858 | 159,836 | 112,179 | 112,184 | 129,684 | 99,684 |
| ***Total Public Safety*** | **7,310,396** | **7,792,064** | **7,333,069** | **7,153,532** | **7,662,908** | **9,258,428** | **9,853,351** | **9,745,187** |
| | | | | | | - | | |
| **Health & Sanitation Expenditures** | | | | | | | | |
| Local Health Department | | | | | | - | - | |
| Mental Health | 50,000 | 54,000 | 48,000 | 52,000 | 48,000 | 48,000 | 48,000 | 48,000 |
| Other | - | - | - | - | - | | - | |
| ***Total Health & Sanitation Expenditures*** | **50,000** | **54,000** | **48,000** | **52,000** | **48,000** | **48,000** | **48,000** | **48,000** |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.6**
**Cabell County Commission - General Fund Budget Summaries**
**Fiscal Years Endings June 30, 2013 through 2020**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Culture & Recreation Expenditures** | | | | | | | | |
| Parks and Recreation | 455,751 | 495,269 | 450,854 | 492,969 | 530,833 | 562,642 | 453,407 | 460,274 |
| 4-H Camp | 150,784 | 148,033 | 140,737 | 163,087 | 127,215 | 136,778 | 126,778 | 146,778 |
| Fair Associations | 200,000 | 262,500 | 312,500 | 220,000 | 198,000 | 284,217 | 198,000 | 198,000 |
| Visitors Bureau | 288,750 | 262,500 | 262,500 | 262,500 | 262,500 | 269,193 | 295,000 | 275,000 |
| Library | 1,494,456 | 1,517,849 | 1,453,303 | 1,592,149 | 1,714,494 | 1,603,090 | 1,465,590 | 1,488,185 |
| Other | | | | | - | - | - | |
| *Total Culture & Recreation Expenditures* | **2,589,741** | **2,686,151** | **2,619,894** | **2,730,705** | **2,833,042** | **2,855,920** | **2,538,775** | **2,568,237** |
| | | | | | | | | |
| *Total Social Services Expenditures* | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | - | - | - | - | | | | |
| *Total Capital Projects Expenditures* | **-** | **-** | **-** | **-** | **-** | **-** | **50,462** | **50,642** |
| | | | | | | | | |
| **Grand Total All Expenditures** | **21,160,356** | **22,472,854** | **22,215,542** | **22,139,115** | **23,229,268** | **23,824,623** | **25,200,473** | **24,923,329** |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default#CountyBudgets)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.7a**
**Cabell County Commission**
**General Fund Budget Summaries**
**Fiscal Years Endings June 30, 2013 through 2020**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Total Revenues - General Fund** | | | | | | | | |
| Property Tax - Current Year | $ 13,519,853 | $ 14,085,454 | $ 14,172,879 | $ 14,431,080 | $ 14,723,832 | $ 14,479,685 | $ 14,577,647 | $ 15,200,752 |
| Prior Year Taxes | 866,056 | 885,000 | 925,000 | 945,000 | 965,000 | 975,000 | 975,000 | 991,000 |
| Supplemental Taxes | 423,800 | 350,000 | 400,000 | 450,000 | 480,000 | 420,000 | 430,000 | 420,000 |
| Assigned Fund Balance | 975,000 | 925,000 | 950,000 | 987,461 | 1,838,569 | 2,858,468 | 2,885,600 | 1,967,242 |
| Unassigned Fund Balance | 996,605 | 1,324,665 | 944,450 | 848,996 | 619,888 | | 183,389 | 1,633,344 |
| Tax Penalties & Interest | 580,982 | 580,000 | 600,000 | 625,000 | 630,000 | 640,000 | 600,000 | 640,000 |
| Property Transfer Tax | 400,000 | 400,000 | 420,000 | 410,000 | 450,000 | 531,694 | 300,000 | 531,000 |
| Wine & Liquor Tax | 16,000 | 20,000 | 25,000 | 25,000 | 30,000 | 12,000 | 13,000 | 10,000 |
| Gas & Oil Severance Tax | 50,000 | 30,000 | 120,000 | 125,000 | 75,000 | 70,000 | 65,000 | 70,000 |
| Hotel Occupancy Tax | 525,000 | 525,000 | 525,000 | 525,000 | 500,000 | 510,000 | 550,000 | 530,000 |
| Federal Grants | 304,261 | 150,000 | 160,450 | 100,000 | 100,476 | 90,000 | 867,724 | 254,296 |
| State Grants | 6,188 | 237,000 | 220,000 | 179,253 | 90,000 | 436,088 | 331,887 | 200,000 |
| Sheriff's Service of Process | 80,000 | 80,000 | 80,000 | 80,000 | 44,184 | 60,000 | 60,000 | 60,000 |
| Sheriff's Earnings | 20,000 | 20,000 | 20,000 | 20,000 | 39,000 | 30,000 | 15,000 | 31,000 |
| County Clerk's Earnings | 300,000 | 300,000 | 325,000 | 325,000 | 300,000 | 350,000 | 300,000 | 300,000 |
| Circuit Clerk's Earnings | 160,000 | 160,000 | 160,000 | 150,000 | 150,000 | 12,000 | 15,000 | 123,000 |
| Franchise Agreement | 330,000 | 350,000 | 475,000 | 485,000 | 455,000 | 450,000 | 500,000 | 450,000 |
| Regional Jail Reimbursement | 300,000 | 350,000 | 300,000 | 300,000 | 320,000 | 207,000 | 250,000 | 250,000 |
| Video Lottery | 175,000 | 190,000 | 190,000 | 190,000 | 175,000 | 175,000 | 180,000 | 175,000 |
| General School Reimbursement | 230,000 | 230,000 | 227,000 | 225,000 | 250,000 | 200,000 | 225,000 | 225,000 |
| Magistrate Court reem | 60,000 | 55,000 | 50,000 | 50,000 | 50,000 | 51,000 | 51,546 | 51,546 |
| Refunds/Reimbursement (External Sources) | 376,123 | 483,434 | 423,168 | 275,000 | 563,219 | 851,170 | 1,170,071 | 429,593 |
| Payroll Reimbursement | 90,000 | 90,000 | 90,000 | 75,000 | 80,000 | 100,000 | 175,000 | 10,000 |
| Other | 375,488 | 652,301 | 412,595 | 312,325 | 300,100 | 315,518 | 479,609 | 370,556 |
| ***Total Revenues*** | **$ 21,160,356** | **$ 22,472,854** | **$ 22,215,542** | **$ 22,139,115** | **$ 23,229,268** | **$ 23,824,623** | **$ 25,200,473** | **$ 24,923,329** |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default#CountyBudgets)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.7b**
**Cabell County Commission**
**General Fund Revenue Percentage**
**Fiscal Years Endings June 30, 2013 through 2020**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Total Revenues - General Fund** | | | | | | | | |
| Property Tax - Current Year | 63.89% | 62.68% | 63.80% | 65.18% | 63.38% | 60.78% | 57.85% | 60.99% |
| Prior Year Taxes | 4.09% | 3.94% | 4.16% | 4.27% | 4.15% | 4.09% | 3.87% | 3.98% |
| Supplemental Taxes | 2.00% | 1.56% | 1.80% | 2.03% | 2.07% | 1.76% | 1.71% | 1.69% |
| Assigned Fund Balance | 4.61% | 4.12% | 4.28% | 4.46% | 7.91% | 12.00% | 11.45% | 7.89% |
| Unassigned Fund Balance | 4.71% | 5.89% | 4.25% | 3.83% | 2.67% | 0.00% | 0.73% | 6.55% |
| Tax Penalties & Interest | 2.75% | 2.58% | 2.70% | 2.82% | 2.71% | 2.69% | 2.38% | 2.57% |
| Property Transfer Tax | 1.89% | 1.78% | 1.89% | 1.85% | 1.94% | 2.23% | 1.19% | 2.13% |
| Wine & Liquor Tax | 0.08% | 0.09% | 0.11% | 0.11% | 0.13% | 0.05% | 0.05% | 0.04% |
| Gas & Oil Severance Tax | 0.24% | 0.13% | 0.54% | 0.56% | 0.32% | 0.29% | 0.26% | 0.28% |
| Hotel Occupancy Tax | 2.48% | 2.34% | 2.36% | 2.37% | 2.15% | 2.14% | 2.18% | 2.13% |
| Federal Grants | 1.44% | 0.67% | 0.72% | 0.45% | 0.43% | 0.38% | 3.44% | 1.02% |
| State Grants | 0.03% | 1.05% | 0.99% | 0.81% | 0.39% | 1.83% | 1.32% | 0.80% |
| Sheriff's Service of Process | 0.38% | 0.36% | 0.36% | 0.36% | 0.19% | 0.25% | 0.24% | 0.24% |
| Sheriff's Earnings | 0.09% | 0.09% | 0.09% | 0.09% | 0.17% | 0.13% | 0.06% | 0.12% |
| County Clerk's Earnings | 1.42% | 1.33% | 1.46% | 1.47% | 1.29% | 1.47% | 1.19% | 1.20% |
| Circuit Clerk's Earnings | 0.76% | 0.71% | 0.72% | 0.68% | 0.65% | 0.05% | 0.06% | 0.49% |
| Franchise Agreement | 1.56% | 1.56% | 2.14% | 2.19% | 1.96% | 1.89% | 1.98% | 1.81% |
| Regional Jail Reimbursement | 1.42% | 1.56% | 1.35% | 1.36% | 1.38% | 0.87% | 0.99% | 1.00% |
| Video Lottery | 0.83% | 0.85% | 0.86% | 0.86% | 0.75% | 0.73% | 0.71% | 0.70% |
| General School Reimbursement | 1.09% | 1.02% | 1.02% | 1.02% | 1.08% | 0.84% | 0.89% | 0.90% |
| Magistrate Court reem | 0.28% | 0.24% | 0.23% | 0.23% | 0.22% | 0.21% | 0.20% | 0.21% |
| Refunds/Reimbursement (External Sources) | 1.78% | 2.15% | 1.90% | 1.24% | 2.42% | 3.57% | 4.64% | 1.72% |
| Payroll Reimbursement | 0.43% | 0.40% | 0.41% | 0.34% | 0.34% | 0.42% | 0.69% | 0.04% |
| Other | 1.77% | 2.90% | 1.86% | 1.41% | 1.29% | 1.32% | 1.90% | 1.49% |
| *Total Revenues* | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

**Source:**

(1) WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default#CountyBudgets)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.8a**
**Cabell County Commission**
**General Fund**
**Budget Summary - Components**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Total Revenues** | $ 21,160,356 | $ 22,472,854 | $ 22,215,542 | $ 22,139,115 | $ 23,229,268 | $ 23,824,623 | $ 25,200,473 | 24,923,329 |
| | | | | | | | | |
| General Government Expenditures | 11,210,219 | 11,940,639 | 12,214,579 | 12,202,878 | 12,685,318 | 11,662,275 | 12,709,885 | 12,511,263 |
| Public Safety Expenditures | 7,310,396 | 7,792,064 | 7,333,069 | 7,153,532 | 7,662,908 | 9,258,428 | 9,853,351 | 9,745,187 |
| Health & Sanitation Expenditures | 50,000 | 54,000 | 48,000 | 52,000 | 48,000 | 48,000 | 48,000 | 48,000 |
| Culture & Recreation Expenditures | 2,589,741 | 2,686,151 | 2,619,894 | 2,730,705 | 2,833,042 | 2,855,920 | 2,538,775 | 2,568,237 |
| Social Services Expenditures | - | - | - | - | - | - | - | - |
| Capital Projects Expenditures | - | - | - | - | - | - | 50,462 | 50,642 |
| **Grand Total All Expenditures** | $ 21,160,356 | $ 22,472,854 | $ 22,215,542 | $ 22,139,115 | $ 23,229,268 | $ 23,824,623 | $ 25,200,473 | $ 24,923,329 |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default#CountyBudgets)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.8b**
**Cabell County Commission**
**General Fund**
**Budget Summary - Component Percentage**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|---|---|---|
| Total Revenues | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| | | | | | | | | | |
| General Government Expenditures | 52.98% | 53.13% | 54.98% | 55.12% | 54.61% | 48.95% | 50.44% | 50.20% | 52.55% |
| Public Safety Expenditures | 34.55% | 34.67% | 33.01% | 32.31% | 32.99% | 38.86% | 39.10% | 39.10% | 35.57% |
| Health & Sanitation Expenditures | 0.24% | 0.24% | 0.22% | 0.23% | 0.21% | 0.20% | 0.19% | 0.19% | 0.21% |
| Culture & Recreation Expenditures | 12.24% | 11.95% | 11.79% | 12.33% | 12.20% | 11.99% | 10.07% | 10.30% | 11.61% |
| Social Services Expenditures | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Capital Projects Expenditures | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.20% | 0.20% | 0.05% |
| **Grand Total All Expenditures** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default#CountyBudgets)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.9**
**Cabell County Commission**
**Original v. Revised Budget Summary**

| Fiscal Year Ending June 30 | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Prosecuting Attorney | Original | 1,033,881 | 1,039,451 | 1,129,246 | 1,188,793 | 1,072,575 | 1,132,506 | 1,264,393 | 1,264,393 |
| | Revised | 1,033,881 | 1,052,441 | 1,171,304 | 1,191,750 | 1,288,828 | 1,153,350 | 1,279,393 | 1,399,753 |
| | Change | - | 12,990 | 42,058 | 2,957 | 216,253 | 20,844 | 15,000 | 135,360 |
| | Variance | 0.00% | 1.25% | 3.72% | 0.25% | 20.16% | 1.84% | 1.19% | 10.71% |
| Public Safety | Original | 6,744,614 | 7,269,237 | 7,296,186 | 7,208,294 | 6,885,994 | 7,337,192 | 7,827,392 | 8,221,512 |
| | Revised | 7,310,396 | 7,792,064 | 7,333,069 | 7,153,532 | 7,662,908 | 9,258,428 | 9,853,351 | 9,745,187 |
| | Change | 565,782 | 522,827 | 36,883 | (54,762) | 776,914 | 1,921,236 | 2,025,959 | 1,523,675 |
| | Variance | 8.39% | 7.19% | 0.51% | -0.76% | 11.28% | 26.18% | 25.88% | 18.53% |

**Source:**
(1) WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default#CountyBudgets)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.10**
**Cabell County Excess Levies**
**2013 to 2020**

| Fiscal Year Ending June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Emergency | $ 2,959,584 | $ 3,006,565 | $ 3,068,562 | $ 3,128,995 | $ 3,189,863 | $ 3,137,050 | $ 3,163,815 | $ 3,269,907 |
| Health | 1,183,834 | 1,202,627 | 1,227,424 | 1,251,597 | 1,275,945 | 1,254,819 | 1,265,527 | 1,307,962 |
| Fire Protection | 532,726 | 541,180 | 552,342 | 563,220 | 574,176 | 564,668 | 569,487 | 588,582 |
| **Total** | **$ 4,676,144** | **$ 4,750,372** | **$ 4,848,328** | **$ 4,943,812** | **$ 5,039,984** | **$ 4,956,537** | **$ 4,998,829** | **$ 5,166,451** |

**Source:**

(1) WV State Auditor's Office (https://www.wvsao.gov/localgovernment/Default)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3.11**
**Cabell County Emergency Medical Services**
**Budgeted Expenditures**
**2013 to 2020**

| Fiscal Years Ended June 30 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 (a) | Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| Personal Services | $ 6,814,441 | $ 7,091,336 | $ 7,262,708 | $ 8,093,545 | $ 8,097,746 | $ 8,014,454 | $ 8,298,748 | $ 8,255,517 | 2.8% |
| Contractual | 945,191 | 955,358 | 953,640 | 1,139,142 | 1,149,142 | 1,233,142 | 1,253,142 | 1,280,642 | 4.4% |
| Commodities | 743,961 | 751,401 | 740,000 | 855,000 | 770,000 | 830,000 | 880,000 | 880,000 | 2.4% |
| Capital Outlay | 1,939,890 | 2,345,329 | 1,224,999 | 1,762,574 | 243,059 | 2,067,842 | 1,845,531 | 1,784,816 | -1.2% |
| Contributions | 1,500,000 | 1,500,000 | 1,680,000 | 2,000,000 | 3,500,000 | 3,123,000 | 3,123,000 | 3,123,000 | 11.0% |
| Contingencies | 545,515 | 545,515 | - | - | - | - | - | - | n/a |
| **Total Expenditures** | **$ 12,488,998** | **$ 13,188,939** | **$ 11,861,347** | **$ 13,850,261** | **$ 13,759,947** | **$ 15,268,438** | **$ 15,400,421** | **$ 15,323,975** | **3.0%** |

**Note:**
(a) The budgeted expenditures for the fiscal year ended June 30, 2020 are the requested budgeted amounts. The remaining years are the revised/current budgeted amounts.

**Sources:**
(1) CC EMS Budget Supplemental FY 11-12 and 13-14 [CCCOMM_0045082]
(2) CC EMS Budget Supplemental FY 14-15 [CCCOMM_0260731]
(3) CC EMS Budget Supplemental FY 15-16 [CCEMS_0257722]
(4) CC EMS Budget Supplemental FY 16-17 [CCEMS_0257723]
(5) CC EMS Budget Supplemental FY 17-18 [CCCOMM_0266356]
(6) CC EMS Budget Supplemental FY 18-19 [CCEMS_0257720]
(7) CC EMS Budget Supplemental FY 19-20 [CCEMS_0257726]