**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM G. CALEB ALEXANDER**

# EXHIBIT D

GEORGE A. BARRETT DEPOSITION TRANSCRIPT (09-21-2020)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

        Plaintiff,

vs.                                 CIVIL ACTION
                                    NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
        Defendants.
_____
CABELL COUNTY COMMISSION,
        Plaintiff,
vs.                                 CIVIL ACTION
                                    NO. 3:17-01665
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

        Defendants.

* * * * * * * * * * * * * * * * * * * * * *


      Videotaped and videoconference deposition
of GEORGE A. BARRETT taken by the Defendants under
the Federal Rules of Civil Procedure in the above-
entitled action, pursuant to notice, before Teresa
S. Evans, a Registered Merit Reporter, all parties
located remotely, on the 21st day of September,
2020.

Page 115

1  professional practice articles published in the
2  Journal of Forensic Economics, that tells us that a
3  30-year average is the industry standard in
4  forensic economics, and so when we back up and we
5  use the 30-year average, it comes out to be 2.5
6  percent.
7            So you do see that this rate is
8  increased, but across a longer period of time, it's
9  stationary.  It's stable over a longer period of
10 time, it's not fluctuating as radically.
11           For example, as recently as 2019, you
12 see that that rate of increase was actually 2.56
13 percent.  So if we just went back one year and
14 looked at what happened most recently with regard
15 to this category, the rate of increase was actually
16 2.56 percent, whereas the historical average has
17 been 2.5.
18      Q.   Okay.  Why don't we move to the next tab,
19 which is 1E1, Syringe Service Programs.
20      A.   Okay.
21      Q.   Do you know whether there are existing
22 syringe service programs in the Cabell/Huntington
23 community today?
24      A.   No, I'm not.  And again, in this category,

Page 116

1  just like the previous, Doctor Alexander provided
2  the number of opioid injection drug users reached
3  by the syringe service program.  He also provided
4  with -- provided in the redress model the cost per
5  client for the syringe service program.
6      Q.   Did you make any effort to determine the
7  cost of existing syringe service programs in the
8  Cabell/Huntington community in connection with your
9  work?
10     A.   No.  Again, Doctor Alexander provided this
11 information, and I relied upon his opinion for
12 these calculations.
13     Q.   And with respect to existing syringe
14 service programs, do you know who has provided the
15 funding for those, whether it's come from the
16 County or City or alternatively, from some Federal
17 or State source?
18     A.   No.  But again, just like we've talked
19 about with these other costs, even if such a
20 program was being funded by another party, the
21 intention from this particular redress model is to
22 identify and effectively deal with the costs that
23 have been created by the opioid epidemic.
24              So if some other funding mechanism or

Page 117

1   some other agency was perhaps paying for this,
2   typically we would not expect the defense to get a
3   benefit from that just because they were lucky
4   enough to have triggered an opioid epidemic in a
5   geographic area which was providing a syringe
6   program in the first place.
7        Q.   Well, as far as you know, has the City or
8   County ever funded, in whole or in part, a syringe
9   service program using its own funds?
10       A.   I believe that there was - and have been -
11  some programs with regards to a syringe collection
12  effort.  I do recall that -- those types of
13  programs and those types of costs have existed.
14       Q.   So you are aware that -- of a syringe
15  collection program taking place within the
16  geographic boundaries of the City or County, but do
17  you know who funded any such program?
18       A.   No.  Again, I'm not familiar with that, and
19  I think that that would be irrelevant because it
20  would -- it would be in violation of the collateral
21  source rule as it relates to whether or not a
22  defendant gets the benefit of a third party
23  participating in and contributing toward the
24  funding of one of -- any of these types of

Page 118

1 programs.
2 Q. Well, under the collateral source rule, if
3 somebody makes an expenditure that is later
4 reimbursed, you're saying the defendant can't
5 necessarily benefit from that. What I'm asking is:
6 Has the County or City ever even in fact even made
7 the expenditure, or are those programs just funded
8 by others?
9 A. I'm not certain of that.
10 MR. BURNETT: I'll just make a general
11 objection to the extent the question calls for a
12 legal conclusion.
13 Q. In your annual growth cost growth rate in
14 this category, what -- what comparable, you know --
15 how did you come up with this cost growth rate that
16 you use here, and how does that compare with
17 syringe service programs?
18 A. The future value growth rate inflationary
19 category that I utilized is from the medical care
20 commodities category for medical cost price
21 inflation, and that includes medical equipment,
22 essentially. So the types of costs that would be
23 associated with this type of a program would be
24 dealing with medical equipment because we're