**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM G. CALEB ALEXANDER**

# EXHIBIT E

CHRISTINA MULLINS DEPOSITION TRANSCRIPT EXCERPT (07-14-2020) AT 148:6-151:11

```
                                                         Page 1

 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3
 4   * * * * * * * * * * * * * * * * * * * * * * * * *
 5   THE CITY OF HUNTINGTON,
 6            Plaintiff,
 7   vs.                              CIVIL ACTION
                                      NO. 3:17-01362
 8   AMERISOURCEBERGEN DRUG
     CORPORATION, et al.,
 9
             Defendants.
10
     _____
11
     CABELL COUNTY COMMISSION,
12
             Plaintiff,
13                                    CIVIL ACTION
                                      NO. 3:17-01665
14
     AMERISOURCEBERGEN DRUG CORPORATION, et al.,
15
             Defendants.
16
     * * * * * * * * * * * * * * * * * * * * * * * * *
17
18
              Videotaped and videoconference
19       deposition of CHRISTINA MULLINS taken by
         the Defendants under the Federal Rules of
20       Civil Procedure in the above-entitled
         action, pursuant to notice, before
21       Teresa L. Harvey, a Registered Diplomate
         Reporter and West Virginia notary public,
22       the witness appearing via videoconference
         from Charleston, West Virginia, on the
23       14th day of July, 2020.
24
```

Page 139

1  5 minutes.
2              VIDEOGRAPHER:  The time is 2:53.  We are
3  now going off the record.
4              (Brief recess.)
5              VIDEOGRAPHER:  The time is 3:00 p.m.  We
6  are now back on the record.
7                      EXAMINATION
8  BY MS. KEARSE:
9       Q.   Good afternoon, Dr. Mullins.  I'm not sure if
10  you can see me or not?
11       A.   I can see you.
12       Q.   Great.
13       A.   Either Commissioner Mullins or Ms. Mullins.  I
14  don't have a doctorate degree.
15       Q.   Okay.  Commissioner Mullins, thank you very
16  much.  I do want to thank you for appearing today for
17  the opioid crisis as it exists in the state of West
18  Virginia.  And I know you've been involved in this for
19  many years.  My name is Anne Kearse and I represent the
20  City of Huntington and Cabell County in this matter.
21  It's scheduled to proceed to trial in October.
22              And I do want to clarify one thing.  And
23  I'll represent to you that, in the current action,
24  Cabell County and the City of Huntington have what we

Page 140

1   call public nuisance actions and are seeking costs to
2   abate the opioid public health crisis.  And I want to
3   follow up, in light of this action, with some of the
4   testimony that you gave today.
5              You testified today about the opioid
6   crisis as it exists in the state of West Virginia; is
7   that correct?
8        A.   Yes.
9        Q.   And would you agree with me that there
10  currently exists an opioid-related public health crisis
11  in West Virginia?
12       A.   Yes.
13       Q.   And you were shown Exhibit No. 5, which is
14  your testimony -- congressional testimony about the
15  public health emergency and West Virginia's efforts to
16  curb the opioid crisis; is that correct?
17       A.   Yes.
18       Q.   And your testimony today is not to suggest
19  that the opioid crisis is over; is that correct?
20       A.   Could you repeat that question?  I'm sorry.
21       Q.   Your testimony today is not -- strike that.
22              In your testimony you note -- and maybe
23  we can pull it up, if you'd have Exhibit No. 5.
24       A.   I do have Exhibit 5 in front of me.

Page 141

1  Q. Okay. On Page 7 -- I'm sorry, on page --
2  yeah, on Page 7, second full paragraph down, I want to
3  make sure this is just as of this year. You made note
4  that, quote: "Every county and community in West
5  Virginia has been impacted by the opioid crisis, with
6  all able to document some level of need."
7       As we sit here today, is that a fair
8  point that every community within the state of West
9  Virginia has suffered at the hands of an opioid crisis?
10  A. Yes.
11  Q. And Commissioner Mullins, you testified today
12  about some of the programs that have been put in place
13  in response to the crisis. Is that correct?
14  A. Yes, I did.
15  Q. Would you agree with me that, as we sit here
16  today, there's still a lot to do to address the current
17  opioid crisis?
18  A. There is still a lot of work to do. We still
19  have people who need to access treatment. We have
20  children and families who are impacted by the crisis and
21  we have kids that we want to make sure don't follow that
22  same path of addiction.
23  Q. So, as we sit here today, we have not
24  eradicated the opioid crisis in our communities?

Page 142

1  A. No. We still have people needing treatment.
2  We still have people experiencing fatal overdoses and
3  nonfatal overdoses.
4  Q. So it would be fair to say we still have a
5  large population in our communities who are addicted to
6  opioids?
7  A. We still have people who are addicted to
8  opioids. I don't -- without data in front of me, I
9  would be reluctant to add the descriptor.
10  Q. That's fair. That's fair.
11      And Commissioner Mullins, you testified
12  that there was some optimism that overdose deaths were
13  going down in 2018. You're still concerned about a rise
14  of opioid death rates as we sit here today in 2020?
15  A. I'm even concerned about what the data is
16  going to show in 2019, and then again into '20, given
17  the pandemic and what we're seeing across the nation.
18  Q. And is part of that reason, although overdoses
19  were going down, the fact that you may have overdoses in
20  2019 or 2020 is because there are people addicted to
21  opioids?
22  A. Yes. And I am worried about changes in what
23  is available on the market as well, the fentanyl being
24  available in cross -- in different drugs and the

Page 143

1  different things that are happening on the street level
2  concerns me greatly.
3      Q.   Commissioner Mullins, you testified about the
4  distributions of naloxone have increased by 208 percent
5  and, to date, as of that testimony, you had distributed
6  over 10,000 doses of naloxone to local health
7  departments.
8           Do you recall that?
9      A.   Yes.
10     Q.   What is naloxone?
11     A.   Naloxone is an overdose reversal drug that
12 when someone is experiencing an opioid overdose it can
13 be administered to reopen their airways and so they can
14 get treatment.  Or, sometimes, it will completely
15 reverse it but they refuse transport for treatment.
16     Q.   It's a lifesaving treatment for someone that
17 overdoses?
18     A.   Yes.
19     Q.   And is it safe to say that communities are
20 still facing overdoses and that naloxone is preventing
21 them from dying?
22     A.   In some cases, yes.  We've really increased --
23 even over the last three months, tried to increase the
24 amount of naloxone available in communities.

Page 144

1               And we're going to still need continued
2   funds and availability of naloxone to prevent overdose.
3   We will continue to need naloxone for the foreseeable
4   future, yes.
5        Q.   Commissioner Mullins, in your testimony on
6   Page 3 you talk about the impact of the crisis.  And I
7   believe you were -- testified in some sections of that
8   page, but I want to direct your attention to the impact
9   of the crisis.  And you state that in 1999, West
10  Virginia had a lower rate of overdose deaths than the
11  national average of 4.1 per 100,000 population versus
12  the national rate of 0.6.  Is that correct?
13       A.   Versus the national rate of 6.0 yes.
14       Q.   And then you note that, in 2001, West Virginia
15  surpassed the national rate, and in 2010 became the
16  state with the highest rate of overdose deaths in the
17  nation.
18            Do you recall that testimony?
19       A.   Yes.
20       Q.   Okay.  And that's your testimony today?
21       A.   Yes.
22       Q.   And West Virginia continues to lead the nation
23  in overdose deaths with the highest rate of 57.8
24  reported in 2017?

1   A.   Yes, that was the highest rate as of the date
2   of this testimony, yes.
3   Q.   And those rates are still increasing, even
4   though there have been programs in place; is that
5   correct?
6   A.   In 2018, the rate went down to 52, 53, I don't
7   remember, but it dropped a little bit, which is why I
8   felt a little bit more optimistic going into -- in the
9   data, we saw a little more optimism.  It had decreased a
10  little bit for the 2018 death rate.  About 2017 was the
11  highest recorded at that time.  We will see -- we're
12  very interested and watchful for the 2019 data that
13  should be released in the next few months.
14  Q.   And you also note that the loss of life is not
15  the only impact of the crisis?
16  A.   Correct.
17  Q.   And I think you did testify that other things
18  within the communities greatly impact the communities
19  because of the opioid crisis, such as NAS?
20  A.   Yes.  We're very concerned about the impacts
21  to children and families, particularly for women who are
22  pregnant and with a substance use disorder and/or may
23  be, you know, in a relationship with someone with a
24  substance use disorder.  It affects that family's

Page 146

1  ability -- may affect that family's ability to stay
2  together.  And we know that kids do better, families do
3  better, when they're together.  So we really worry about
4  infants being separated from their parents in that first
5  year of life, and then the subsequent downstream
6  consequences of foster care involvement and just that
7  breaking apart of that family unit.
8      Q.  And in your testimony you also note that the
9  NAS -- West Virginia led the nation in NAS.  Is that
10 correct?
11     A.  Yes.
12     Q.  And in regards when you just testified about
13 foster care, you testified that foster care placement in
14 West Virginia has risen 4,129 children from
15 September 2011 to 6,895 in September 2019, an increase
16 of 67 percent; is that correct?
17     A.  Yes.
18     Q.  And then you also mention that, in addition to
19 loss of life and impact of families, the State has also
20 seen an increase in infectious diseases.
21             Do you recall that?
22     A.  I do.
23     Q.  And is that still today you're seeing the
24 opioid crisis include infectious diseases, including

Page 147

1 hepatitis A and other diseases?

2     A.   Yes.

3     Q.   And all these impacts to the crisis still
4 continue today, one way or the other, throughout the
5 state of West Virginia?

6     A.   We are still seeing these impacts, yes.  With
7 the caveat that, you know, as today COVID is changing
8 things somewhat with some of the data.  I do expect some
9 of the data to change a little bit as a result of the
10 pandemic, so, not these -- these things are still
11 happening in communities.  Overdoses are still
12 happening.  There's still infectious diseases in the
13 communities as a result of us sharing needles and other
14 behaviors associated with drug use.

15     Q.   And Commissioner Mullins, even though the
16 death rate may fluctuate, the communities are still
17 faced with the devastation caused by the opioid
18 epidemic?

19     A.   We are going to be facing this for quite a
20 while.  And children that have lost their families of
21 origin because of substance use disorder, the trauma
22 that will happen as a result of that.  We don't know
23 quite fully the consequences of any or some of the other
24 things that we could be facing down the road as a result

Page 148

1  of this.  It's going to impact generations of families.
2  And even if we could cure all of the addiction, we're
3  still going to be dealing with the mental health trauma
4  and some of the other things that are going to be
5  residual effects of the crisis.
6       Q.   And would it be fair to say it's going to mean
7  additional sources of funding and dollars in order to
8  deal with these public health crises in the future?
9       A.   It's likely going to need resources and I -- I
10 am concerned about financial resources long-term,
11 because, as I noted earlier, and I don't know what the
12 grant profiles are going to look like in 3 years,
13 5 years, 10 years down the road.
14            But we're also going to need humans who
15 can participate in these workforces and be able to
16 provide the supporting services, too.  So it's -- it's a
17 little bit of a -- there's a two-prong problem, from my
18 view.
19      Q.   And I thank you, Commissioner Mullins.  I
20 wanted to make sure in the testimony you weren't
21 suggesting that the state of West Virginia has enough
22 money to eradicate the opioid public health crisis as it
23 exists today.  Is that fair?
24      A.   No, my testimony indicated that, for the first

Page 149

1  time ever, we didn't really have to choose between the
2  things that we needed and some of the things that we
3  wanted.  But it -- that is not a guaranteed future
4  statement with the way the grant funds can go up or down
5  or fluctuate.
6       Q.   And you'd agree that the local West
7  Virginia -- the state and local communities are still in
8  great need of resources to address the opioid epidemic?
9       A.   I think that all of the communities are in
10 need of -- of -- of resources, whether it be financial,
11 whether it be human resources, foster families, you name
12 it.  There's great needs out there that need to be met.
13      Q.   And even those type of things will actually --
14 to get the resources and to get the employees and to be
15 able to hire and create that, it's going to take
16 funding.  And one way or another, it may not be from the
17 State of West Virginia, but it will cost money in order
18 to employ these specialities that we need to deal with
19 the opioid crisis?
20      A.   It will take money and investment, and my
21 personal belief, it will take the investment into many
22 of the people who are in active addiction now, investing
23 in them as part of their recovery to become part of the
24 workforce and part of the solution.

1   Q.   And I think what I understand what you're
2   saying is that there is a key concerning that the grants
3   will soon to be limited in time and sustainability in
4   order to deal with future issues as a result of the
5   opioid crisis?
6   A.   Yes.  I see this as a long-term concern.
7   We're going to need to make long-term investments.  As
8   I -- you know, recovery relapse is a part of what we
9   expect, so just because someone is in recovery right now
10  and today is no guarantee that they might not relapse
11  tomorrow or down the road.  And so we have to plan to
12  have those resources available in the future to be able
13  to support people and to continue to support them
14  through -- through recovery.
15  Q.   And Commissioner, in addition to this, the
16  State is doing what they can to help with the opioid
17  crisis.  Cities and communities have their own
18  obligations and assessments of what they need to do for
19  their adjusting to the opioid crisis.  Is that fair?
20  A.   Can you please repeat that?  I'm sorry.
21  Q.   Okay.  I'll change it a different way.
22  Although the State's been assisting various communities
23  in their opioid crises, the communities themselves still
24  are dealing with a crisis that they need to fund and

Page 151

1  expect other sources of funding other than the State?
2      A.   Communities, in general, are working on their
3  own plans particularly.  I mean, I think that Huntington
4  and Cabell County is a good example.  They're working on
5  a strategic plan to try to address their problems that
6  are specific to their community.  Their community plans
7  are not always going to align with whatever the federal
8  grants or the state grants that might be available, and
9  they're going to have to work to identify funding
10 resources to help them implement those plans and
11 strategies that they're trying to develop.
12     Q.   Commissioner Mullins, I just want to show --
13 refer to one of the documents that was touched on today
14 and identify it for the record.
15              MS. KEARSE:  I'll mark it as Plaintiff's
16 Exhibit No. 1 of the deposition, and I'm going to ask my
17 assist -- Monique if you can put that on the screen.
18              DEPOSITION EXHIBIT Plaintiff's 1
19              [A document entitled 2016 West Virginia
20              Overdose Fatality Analysis Report was
21              marked for identification purposes as
22              Deposition Exhibit Plaintiff's 1.]
23     Q.   And I ask you to identify this, Commissioner
24 Mullins.