# EXHIBIT E

1                                                                1

2       SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF SUFFOLK: PART 48
3       ------------------------------------------------x

4       IN RE: OPIOID LITIGATION

5

6                            INDEX NO.:400000/2017

7       ------------------------------------------------x

8                            September 09, 2020
                             Central Islip, New York
9

10                   MINUTES OF FRYE HEARING
                     (Testimony of Dr. Lembke)
11

12      B E F O R E:        HON. JERRY GARGUILO
                            Supreme Court Justice
13
        A P P E A R A N C E S:
14

        SIMMONS HANLY CONROY, LLC
15      **Attorneys for Suffolk County**
        112 Madison Avenue
16      New York, New York 10016
        BY:  PAUL J. HANLY, JR., ESQ.
17           JAYNE CONROY, ESQ,
             THOMAS I SHERIDAN, III, ESQ.
18           (212) 784-6401
             phanly@simmonsfirm.com
19           jconroy@simmonsfirm.com
             tsheridan@simmonsfirm.com
20
        NAPOLI SHKOLNIK, PLLC
21      **Attorneys for Nassau County**
        400 Broadhollow Road, Suite 305
22      Melville, New York 11747
        BY:  HUNTER SKOLNICK, ESQ.
23           SALVATORE C. BADALA, ESQ.
             (212)397-1000
24           pnapoli@napolilaw.com
             sbadala@napolilaw.com
25           jciaccio@napolilaw.com

2

LETITIA JAMES
**Attorney General for the State of New York**
Office of the New York State Attorney General
28 Liberty Street
New York, New York 10005
BY:  LOIS SALDANA, Asst. Attorney General


O'MELVENY & MEYERS, LLP
**Attorneys for Janssen Pharmaceuticals, Inc.**
7 Times Square
New York, New York 10036
BY:  NATE ASHER, ESQ.

*       *       *

STEPHANIE CASAGRANDE, CSR, RPR
OFFICIAL COURT REPORTER

```
 1                    Frye Hearing - Dr. Lembke              3
 2             THE CLERK:  Supreme Court, State of New
 3       York, County of Suffolk, Part 48 is now in
 4       session, the Honorable Jerry Garguilo
 5       presiding.
 6             THE COURT:  Good morning, everybody.
 7             CHORUS:  Good morning.
 8             THE CLERK:  The case on the calendar is
 9       In Re Opioid Litigation, Index Number 400000
10       of 2017.  Your appearances, please, beginning
11       with the Plaintiff.
12             MR. HANLY:  Paul Hanly, for Suffolk
13       County.
14             MS. CONROY:  Jayne Conroy, Suffolk
15       County.
16             THE COURT:  Good morning.
17             MR. SHKOLNIK:  Hunter Shkolnik, Nassau
18       County.  Good morning, your Honor.
19             THE COURT:  Good morning.
20             MS. SALDANA:  Lois Saldana, for the New
21       York Attorney General's office.
22             THE COURT:  Good morning.
23             MS. SALDANA:  Good morning.
24             THE COURT:  Anyone else?
25             MR. BADALA:  Good morning, your Honor.
```

```
 1                  Frye Hearing - Dr. Lembke        4

 2          Salvatore Badala, for the Plaintiff.

 3               THE COURT:  Good morning.

 4               MR. ASHER:  Good morning, Nate Asher,

 5          for Janssen Defendants.

 6               MR. SHERIDAN:  Tom Sheridan, Suffolk

 7          County.

 8               THE COURT:  Good morning.

 9               My picture is on the screen.  I could do

10          without it.  All right.  A couple of

11          announcements before we get started.

12               On Friday we're going to have an

13          abbreviated session.  We have our annual 9/11

14          ceremony, which I will attend.  They commence

15          at 3 p.m. on Friday, September 11th, so we'll

16          work somewhat into the lunch hour and recess

17          thereafter, because traditionally that

18          service takes about a little more than an

19          hour.

20               I received a letter.  Apparently, the

21          Plaintiff is not going to call Dr. Keller as

22          an expert; is that correct?

23               MR. HANLY:  That's correct, your Honor.

24               THE COURT:  Okay.  So our current

25          schedule will be today, of course,
```

```
1                    Frye Hearing - Dr. Lembke              5

2          Dr. Lembke; tomorrow, Dr. Keyes; and on

3          Friday, during the abbreviated session, we'll

4          start with Dr. James Tomarken.

5              Is everybody on board with that?

6              MS. WELCH:  Donna Welch, for the

7          Allergan Defendants.  We are on board with

8          that, but we have sent a proposed Stipulation

9          to the Plaintiffs regarding the withdrawal of

10         Lacey Keller as an expert.

11             We want to make sure that she is being

12         withdrawn for all purposes from their case in

13         chief.  We want to ensure that they are not

14         taking her down from the Frye hearing with

15         any intent to have any other of their experts

16         adopt her opinion in whole or in part or rely

17         on her opinion in whole or in part in their

18         case in chief.

19             We assume that's the intent here, but we

20         want to make sure of that before we're

21         precluded from an opportunity to engage in a

22         Frye hearing on her opinions.

23             THE COURT:  So, in other words, you want

24         to come to an agreement?

25             MS. WELCH:  Correct, your Honor.
```

```
 1              Frye Hearing - Dr. Lembke          6
 2         THE COURT:  The letter I received
 3    indicates that they may call her as a
 4    rebuttal witness, and in the event they
 5    choose to do so, we would have a limited Frye
 6    hearing.
 7         Your issue deals with whether or not any
 8    other expert tends to rely on that testimony?
 9         MS. WELCH:  Correct, your Honor.  Our
10    concern is simply that on the current record,
11    Plaintiffs have relied themselves on
12    Ms. Keller for purposes of summary judgment
13    briefing.  If we are withdrawing her -- if
14    they are withdrawing her as an expert, we
15    don't think that's appropriate.
16         So we believe they shouldn't be able to
17    use her opinions in response to a renewed
18    summary judgment motion, and we want to make
19    clear that their other experts in their case
20    in chief cannot simply rely on her opinions
21    that are being withdrawn, and they can't
22    adopt her opinions as their own.
23         THE COURT:  You said that twice now.
24    Work it out.  If you can't work it out, I
25    will.
```

```
 1                Frye Hearing - Dr. Lembke        7
```

 2          MS. WELCH:  Thank you, your Honor.

 3          MS. CONROY:  Thank you, your Honor.

 4          THE COURT:  Tech people, I'm hearing

 5     myself twice.  It's like a network

 6     five-second delay.  Okay.  Call a witness.

 7          MS. STRONG:  Your Honor, this is Sabrina

 8     Strong, for Johnson & Johnson and Janssen.

 9     Before we begin, I'd like to address one

10     issue, your Honor.

11          THE COURT:  Go ahead.

12          MS. STRONG:  Yesterday you received a

13     letter that was filed by some of the

14     Defendants relating to a late disclosure of

15     materials related to Katherine Keyes.

16          After that, we actually received from

17     Plaintiffs' counsel yesterday, approximately

18     4:40 p.m., a late disclosed list of

19     supplemental materials for Dr. Lembke, who is

20     scheduled to testify, as you know, this

21     morning.

22          There is 239 documents identified on

23     that supplemental materials considered list

24     that we received at 4:40 yesterday.  I have

25     not even had an opportunity to review them,

```
1                    Frye Hearing - Dr. Lembke            8

2        let alone determine whether we have access to

3        all those materials.

4             I understand they include materials from

5        1995, early 2000, materials that could have

6        been included and considered by her before

7        her deposition, before she submitted her

8        report.

9             We would ask, your Honor, that they not

10       be permitted to elicit any testimony or any

11       opinions that rely upon those materials or

12       address those materials in any way at the

13       hearing today, your Honor.  This is classic

14       sandbagging.  The discovery rules do not

15       permit for this, and so we would ask for that

16       relief, your Honor.

17            MR. HANLY:  Your Honor, they've had

18       these materials since August the 3rd when

19       they were disclosed in connection with the

20       West Virginia litigation.  So the notion that

21       they're just seeing them for the first time

22       now is simply not true.

23            The second point is, of course, as your

24       Honor knows, an expert's work, an expert's

25       opinions are not static.  They are dynamic,
```

```
 1                    Frye Hearing - Dr. Lembke          9

 2        and they change over time, and many of these

 3        materials were created subsequent to Dr.

 4        Lembke's deposition in this case.  So we

 5        really don't think that this is a serious

 6        issue.

 7             MS. STRONG:  Again, your Honor, I'm not

 8        familiar with what has been disclosed in West

 9        Virginia and what has not, but to get a list

10        of 239 documents at 4:50 the night before a

11        Frye examination is absolutely improper, your

12        Honor.

13             New York courts have plainly held that

14        the expert discovery rules are promulgated so

15        that no party will be sandbagged or

16        surprised, and that's plainly what this is.

17             And I do understand, your Honor, that

18        there are many documents.  I don't know the

19        totality because, as I said, I haven't looked

20        at the 239 documents, but I understand that

21        there are many that predate her deposition,

22        long predate her deposition.

23             THE COURT:  Okay.  In the event during

24        the course of the examination if, in fact,

25        there is reference to a contested exhibit,
```

```
 1                  Frye Hearing - Dr. Lembke            10
 2      note your objection and I'll rule on it at
 3      the time.
 4           Apparently, through the course of these
 5      hearings, although hundreds of exhibits have
 6      been noted, very few have actually made their
 7      way into the record.  So stay on your toes.
 8           MS. STRONG:  All right.  I will, your
 9      Honor.  I have to tell you it's hard to
10      discern that on the fly with over 700
11      initially identified by her and another 239,
12      so I'd like to have a standing objection at
13      that point, but we'll try to do our best in
14      that regard.
15           I don't know if Mr. Pyser or Mr. Carter
16      have additional points they would like to
17      make before we begin.
18           MR. PYSER:  Briefly, your Honor.  This
19      is Steve Pyser, for Cardinal Health.  Just on
20      the idea that we are aware of these because
21      they were disclosed in the West Virginia
22      litigation, not all Defendants here are in
23      the West Virginia litigation, first of all.
24           Second, there's an entirely different
25      expert report in the West Virginia
```

```
 1                    Frye Hearing - Dr. Lembke        11
 2      litigation.
 3           So if the idea is that we should expect
 4      from this witness what she's testified in
 5      West Virginia, that gets to the heart of the
 6      problem, which is that she entered a report
 7      in this case and should be testifying in line
 8      with the report in this case, and because
 9      there is a report in West Virginia that says
10      different things, that just can't be
11      bootstrapped into this case because there's a
12      materials considered list submitted at 4:39
13      p.m. the night before the Frye hearing.
14           That's just classic sandbagging, and
15      your Honor should strike it.
16           THE COURT:  Okay.  So noted.  Call a
17      witness.  I suggest you stay on your toes
18      also.  In the event an exhibit is mentioned
19      that you have a problem with, raise your
20      objection at that point.
21           And, in any event, you'll have a
22      standing objection as we proceed.
23           MS. STRONG:  Thank you, your Honor.
24           THE COURT:  Call a witness, please.
25           MR. HANLY:  Your Honor, the Plaintiffs
```

1

2          call Dr. Anna Lembke, remotely.

3               THE COURT:  Good morning, Doctor.

4          Doctor, can you hear me?  Are you muted?

5          Your lips are moving, but I don't hear

6          anything.

7               DR. LEMBKE:  Yes, I'm muted.

8               THE COURT:  Swear the witness in,

9          please.

10               THE CLERK:  Yes.  Can you hear me?

11               DR. LEMBKE:  Yes, I can.

12               THE CLERK:  Please raise your right

13          hand.

14               (WHEREUPON, Dr. A-N-N-A  L-E-M-B-K-E,

15          having first been duly sworn by the Clerk of

16          the Court, testified as follows:)

17               THE CLERK:  Please state your name and

18          address for the record.

19               THE WITNESS:  Anna Lembke, 401 Quarry

20          Road, Stanford, California, 94305.

21               THE CLERK:  Thank you.

22               THE COURT:  And, Dr. Lembke, good

23          morning again.  I give all witnesses a few

24          pointers that can expedite these hearings.

25               Of course you're going to be asked some

1

2      questions this morning, and I suggest that

3      you limit your answer to the information

4      sought by the question.

5            For example, if I were on the witness

6      stand and I was asked on what street do I

7      live, I would simply volunteer the name of

8      the street.  I wouldn't give the town, the

9      state or the ZIP code because that

10     information is not sought.

11           Number 2, although in life it is not

12     polite to commence an answer before a

13     question is complete, because we save time

14     that way; however, as you probably know

15     already, in court we require a complete

16     stenographic record of all the questions and

17     the answers.

18           So even though you know exactly where a

19     question is going, wait for the question to

20     be complete before you commence your answer.

21           And, number 3, in the event you hear the

22     word "objection" or anything that sounds like

23     "objection," just stop until you get

24     direction from the Court; fair enough?

25           THE WITNESS:  Yes.

1

2          THE COURT:  Got it.  Good.  You may

3     proceed.

4          MR. HANLY:  Thank you, your Honor.

5  DIRECT EXAMINATION

6  BY MR. HANLY:

7          Q.   Good morning, Dr. Lembke.

8          A    Good morning.

9          Q.   It's early morning where you are; is

10 that correct?

11         A    Yes, it is.

12         Q.   You are in your offices at Stanford

13 University School of Medicine?

14         A    Yes.

15         Q.   Now, you and I have met before, correct?

16         A    Yes.

17         Q.   I presented you in court before Judge

18 Polster some years ago in connection with the opioid

19 litigation; do you recall that?

20         A    Yes, I do.

21         Q.   All right.  Now, just as a road map for

22 where we're gonna go, today we're going to be

23 talking principally about methodology, and in order

24 to start us off on what I hope is the right foot,

25 we're going to put up on the screen the nine

1

2      opinions that you intend to testify to as and when

3      this case goes to trial, okay?

4           A    Yes.

5           Q.   Then thereafter, we'll go through your

6      qualifications, we'll go through the methodologies,

7      and hopefully this will all be over in a reasonable

8      period of time; fair enough?

9           A    Yes.

10               MR. HANLY:  All right.  Could we put up

11          Slide Number 1, please.

12          Q.   Doctor, can you see Slide Number 1?

13          A    Yes.

14          Q.   All right.  And is this a list of the

15     nine opinions that you discuss in your report in

16     this case?

17          A    Yes.

18          Q.   All right.  And is there anything about

19     this list which is substantively different from the

20     list of opinions in your report?

21          A    No.

22          Q.   All right.  Just to go through them very

23     briefly, and I'm just going to paraphrase, your

24     Opinion Number 1 is going to be that addiction is a

25     chronic illness; Opinion Number 2 that opioid

```
1                  Frye Hearing - Dr. Lembke           16

2     prescribing grows fourfold starting in the '90s,

3     which increased the supply of deadly opioids;

4     Opinion Number 3 is that the opioid industry misled

5     doctors into believing that opioids are more

6     effective and safer than they really are.  You then

7     give some examples there.

8                  Opinion Number 4 is that there's no

9     reliable evidence that opioids work for what's

10    called chronic pain.  5 is the increased supply

11    contributed to more individuals becoming addicted to

12    opioids; 6 is increased supply contributed to more

13    individuals, including newborns becoming dependent

14    on opioids.

15                 Number 7, increased supply contributed

16    to more diversion of prescription opioids; Number 8,

17    the increased supply of opioids through legal and

18    illegal sources resulted in the opioid epidemic; and

19    Opinion Number 9 is the opioid epidemic would not

20    have occurred without the pharmaceutical opioid

21    industry's misleading promotion of opioids.

22                 Did I read those correctly, paraphrasing

23    in part?

24         A     Yes, you did.

25         Q.    All right.  And those are the, in sum
```

```
 1                    Frye Hearing - Dr. Lembke              17
 2      and substance, those are identical to the opinions
 3      listed in your report; is that true?
 4             A    Yes, that is true.
 5             Q.   Okay.  You can take that slide down,
 6      please.
 7                  Okay.  Doctor, you are currently
 8      Associate Professor and Chief of the Addiction
 9      Medicine Dual Diagnosis Clinic.  You are Medical
10      Director of Addiction Medicine and Program Director
11      of the Addiction Medicine Fellowship within the
12      Department of Psychiatry and Behavioral Sciences at
13      Stanford University School of Medicine; is that
14      true?
15             A    Yes.
16             Q.   Now, in that --
17                  THE COURT:  Mr. Hanly, I don't mean to
18             interrupt you.  I overlooked placing
19             something on the record.
20                  MR. HANLY:  Yes, your Honor.
21                  THE COURT:  This applies to everybody
22             here and anyone who may be listening through
23             a live stream.  That's the rules of the Chief
24             Judge, Part 29, Section 29(1), the general
25             taking of photographs, films, or videotapes,
```

```
 1                    Frye Hearing - Dr. Lembke              18

 2            or audiotaping, broadcasting or telecasting

 3            in a courthouse, including any courtroom --

 4            and just for the record, the Court considers

 5            the locations where this is being live

 6            streamed to be part of our courtroom --

 7            office or hallway thereof, at any time or at

 8            any occasion, whether or not the Court is in

 9            session, is forbidden, unless permission of

10            the Chief Administrator of the courts or a

11            designee of the Chief Administrator is

12            obtained.

13                 So you may observe the proceedings, but

14            you may not record them, take photographic

15            images, et cetera.  Okay.  Thank you.  I'm

16            sorry, sir.

17                 MR. HANLY:  May I proceed, your Honor?

18     BY MR. HANLY:

19            Q.   Dr. Lembke, among your titles is the

20     Chief of Addiction Medicine within the Dual, dual as

21     in two, Diagnosis Clinic, true?

22            A    Yes.

23            Q.   And in that context, dual diagnosis

24     refers to a psychiatric condition on the one hand,

25     and a substance use disorder on the other, true?
```

2      A     That is true, yes.

3      Q.    All right.  Now, you've been on the

4  faculty at Stanford University School of Medicine

5  since approximately 2003?

6      A     Yes.

7      Q.    All right.  And in terms of your

8  background, you did your undergraduate work at an

9  obscure university called Yale?

10     A     Yes.

11     Q.    And you did your medical degree at

12  Stanford University, correct?

13     A     Yes.

14     Q.    You did a partial residency in pathology

15  at Stanford, true?

16     A     Yes.

17     Q.    And following that, a full residency in

18  psychiatry at Stanford?

19     A     Yes.

20     Q.    And following that, a fellowship in mood

21  disorders within the Department of Psychiatry and

22  Behavioral Sciences, true?

23     A     Yes.

24     Q.    You are licensed to practice medicine in

25  the state of California --

```
 1                    Frye Hearing - Dr. Lembke          20

 2          A    Yes.

 3          Q.   -- since 1995?

 4          A    Yes.

 5          Q.   You actually received a waiver from the

 6     Drug Enforcement Administration to prescribe

 7     buprenorphine products, true?

 8          A    Yes.

 9          Q.   And what, what is the circumstance under

10     which you would prescribe buprenorphine, and you do

11     prescribe buprenorphine products?

12          A    I prescribe buprenorphine for patients

13     who have opioid use disorder, a term for opioid

14     addiction as well as for some patients with severe

15     opioid dependence.

16          Q.   Buprenorphine is itself an opioid

17     product, true?

18          A    Yes, it is.

19          Q.   You're Board Certified, true?

20          A    Yes.

21          Q.   In psychiatry and neurology?

22          A    Yes.

23          Q.   And you are also Board Certified by the

24     American Board of Addiction Medicine; is that true?

25          A    Yes.
```

1

2      Q.   And I'm sure Justice Garguilo knows what

3  Board Certified means, but essentially it means that

4  peers within the same area of work as you come

5  together and vote to give you or not give you a

6  certificate demonstrating your expertise in the

7  particular area; is that a fair description?

8      A    Well, it's not really a vote by peers.

9  It's -- you have to complete additional training to

10  get expertise in a certain area.  And then typically

11  you have to sit for and pass a board exam.

12      Q.   Okay.  But there is a board that

13  actually certifies, true?

14      A    Yes.

15      Q.   All right.  Now, you teach medical

16  students at Stanford; isn't that right?

17      A    Yes.

18      Q.   And you've been doing so for nearly 20

19  years?

20      A    That's correct.

21      Q.   And you've been recognized for your

22  excellence in teaching on two occasions; is that

23  true?

24      A    Yes.

25      Q.   You also maintain an active clinical

1

2    practice, true?

3         A    Yes.

4         Q.   And in your clinical practice, a

5    significant portion of your students are -- sorry --

6    of your patients are patients who have been taking

7    prescription opioids for pain relief and have

8    developed some sort of a use disorder; is that true?

9         A    Yes.

10        Q.   And how many such patients would you say

11   you have treated in the last 20 years or so that

12   you've been treating them?

13        A    Well, I haven't kept count, but it's

14   certainly scores of patients over many years.

15        Q.   Scores did you say?

16        A    Yes.

17        Q.   All right.  Now, we're going to hear a

18   bit about some terms that you are very familiar

19   with, but perhaps the Court and others are not.

20             Can you just briefly explain to the

21   Court what is meant in the context of addiction

22   medicine by the term misuse?

23        A    In the context of addiction medicine,

24   misuse means taking a prescribed medication in a way

25   other than intended by the doctor who prescribed it.

1

2          Q.    Okay.  And how about --

3          A    That's a very broad definition.

4          Q.    That's all --

5          A    Not specific, but...

6          Q.    Thank you, Doctor.  That's all I'm

7    asking is a very broad and brief definition so we

8    can orient the Court in terms of your further

9    examination, okay?

10          A    Yes.

11          Q.    And the term "dependence," what does

12    that mean in the context of addiction medicine?

13          A    That refers to patients specifically

14    with opioid dependence for first the patients who

15    have been taking opioids daily for long periods of

16    time who physiologically adapt to the presence of

17    the molecule such that if they reduce their dose or

18    stop it altogether, they experience opioid

19    withdrawal.

20          Q.    And the term "addiction," how is that

21    term used in your field?

22          A    So addiction is a complex

23    biopsychosocial disease that can broadly be defined

24    as the continued compulsive use of a substance

25    despite harm to self and/or others.

1

2    Q.   And without getting too technical, is

3    there a relationship between that term addiction

4    that you've just defined and something called opioid

5    use disorder, O-U-D?

6    A    Yes.  So opioid use disorder is the

7    terminology used in the Diagnostic and Statistical

8    Manual of Mental Disorders in the latest edition,

9    and it's essentially synonymous with addiction.

10    Q.   Now, in working with the patients in

11    your clinic, you develop treatment plans to deal

12    with opioid use disorder, or addiction, or

13    dependence, or misuse?

14    A    Yes.

15    Q.   And those treatment plans can include

16    nonopioid medications, true?

17    A    Yes.

18    Q.   Also nondrug plans of rehabilitation, if

19    you will?

20    A    Yes, correct.

21    Q.   Now, you also hold a position in the

22    Stanford Department of Anesthesiology and Pain

23    Medicine, true?

24    A    Yes.  I have a courtesy appointment in

25    anesthesiology and pain medicine.

1

2          Q.   And the courtesy appointment does,

3    however, enable you to treat pain patients, correct?

4          A    Yes.

5          Q.   Now, over the years of your career, is

6    there a body of scientific and medical literature

7    that you have studied to understand the relationship

8    among pain, dependence, and addiction?

9          A    Yes.

10          Q.   And have you personally contributed to

11    that body of literature?

12          A    Yes, I have.

13          Q.   Have you written peer -- what are called

14    peer-reviewed papers in that area?

15          A    Yes.

16          Q.   For the record, peer review refers to

17    the process by which an author submits her

18    manuscript to a particular scientific journal or

19    journals, and the journal then sends the paper to

20    other experts in the field to determine whether the

21    paper is worthy of publication in that particular

22    journal.  Is that a fair description of peer review?

23          A    Yes.

24          Q.   Now, in addition to peer-reviewed

25    papers, you've also written a book concerning

1

2       opioids and addiction, true?

3             A    Yes.

4             Q.   And I'm holding up -- can you actually

5       see me, Doctor?

6             A    Yes, yes, I can.

7             Q.   So I'm holding up rather awkwardly a

8       book that you have published called Drug Dealer M.D.

9       That is your book, correct?

10            A    That's correct.

11            Q.   Okay.  And this book was published in

12      2016, true?

13            A    Yes.

14            Q.   And 2016 was prior to the time that you

15      first came to work with lawyers in connection with

16      the opioid litigation, true?

17            A    Yes.

18            Q.   Your book was published, for example,

19      before you and I even met, true?

20            A    Yes.

21            Q.   Now, has this book received some

22      positive press, if you will?

23            A    Yes.

24            Q.   And, in fact, the New York Times

25      selected it as one of the top five books to read if

1

2      you wish to understand the opioid epidemic and how

3      we got to where we are today, true?

4            A    Yes.

5            Q.    Now, you began to treat patients with

6      substance abuse issues in the late 1990s, true?

7            A    That's correct.

8            Q.    And the substances that your patients

9      were abusing included prescription painkillers,

10     true?

11           A    Yes.

12           Q.    Prescription benzodiazepines?

13           A    Yes.

14           Q.    Alcohol, true?

15           A    Yes.

16           Q.    Tobacco?

17           A    Yes.

18           Q.    Marijuana?

19           A    Yes.

20           Q.    A panoply of addictive substances, true?

21           A    That's correct.

22           Q.    Now, had some of those patients that you

23     treated received opioid prescriptions from their own

24     doctors?

25           A    Yes, the majority.

1

2      Q.    And they presented to you with some sort

3  of a substance use disorder; is that true?

4      A     That's right.

5      Q.    Following the lawful prescription to

6  them by their own physicians, true?

7      A     That's correct.

8      Q.    Did the book that you published include

9  any information about prescription opioid deaths

10  among New York Medicaid patients?

11      A     Yes, it did.

12      Q.    And do you recall what your research

13  showed about New York Medicaid patients who had been

14  prescribed opioids?

15      A     It showed that New York Medicaid

16  patients are more likely to be prescribed an opioid

17  than the non-Medicaid patients and more likely to

18  die of an opioid overdose.

19      Q.    Now, is reading the medical literature,

20  a literature written by persons other than yourself,

21  is that a standard part of your practice as a doctor

22  and as a professor at Stanford University?

23      A     Yes, it is.

24      Q.    Why is that?  Why is that a standard

25  methodology in your work?

1

2     A    I need to read the medical literature to

3     stay up to date on the science, and to take good

4     care of my patients, and also to teach medical

5     students, Stanford undergraduates and physicians in

6     training, residents and fellows.

7     Q.   Let me ask you about those students.  Do

8     you develop a curriculum for those students?

9     A    Yes.

10    Q.   Is there any relationship between the

11    curriculum that you develop and the medical

12    literature written by persons other than yourself?

13    A    My curriculum is formed by my review of

14    the best evidence in the medical literature.

15    Q.   All right.  Now, in addition to the work

16    you've described thus far, were you ever appointed

17    to any panels within the state of California dealing

18    with opioid misuse?

19    A    Yes.  I was appointed to the research

20    advisory panel of California by Governor Jerry

21    Brown.

22    Q.   And what was the upshot of that panel?

23    A    Our role was mainly to assist the safety

24    of clinical trials being conducted in the State of

25    California.

```
 1                     Frye Hearing - Dr. Lembke              30
 2          Q.    Now, you used the term safety.  That's a
 3     term that we hear a lot of in the context of
 4     prescription medications, true?
 5          A    Yes.
 6          Q.    Safety and efficacy are two interrelated
 7     concepts in the pharmaceutical world, true?
 8          A    Yes.
 9          Q.    And those are, those are two concepts
10     that the FDA pays particular attention to in respect
11     to prescription medications, true?
12          A    Yes.
13          Q.    Do safety and efficacy relate to
14     something called a risk-benefit profile?
15          A    Yes.
16          Q.    And just very briefly describe for
17     Justice Garguilo what that risk-benefit profile is
18     in the context of opioids.
19          A    So with opioids, it's just essential to
20     assess whether or not the safety of the opioid in a
21     given patient is -- whether or not the benefits in
22     that patient outweigh any risks or unintended
23     adverse medical consequences.
24          Q.    Okay.  Is it fair to say that safety and
25     efficacy are key concepts in the context of
```

1
2    prescription medications?
3        A    Yes.
4        Q.   And in the context of prescription
5    opioid medications?
6        A    Yes.
7        Q.   Now, in reaching the conclusions that
8    are discussed throughout your book published in
9    2016, did you apply the same methodology in reaching
10   those conclusions that you use in your professional
11   work as a scientific researcher and a medical
12   doctor?
13       A    Yes, I did.
14       Q.   And let me ask you this:  Are you
15   familiar with something known as a pharmaceutical
16   sales representative detailing?
17       A    I'm sorry.  I didn't catch the last
18   word.
19       Q.   Are you familiar with something known as
20   pharmaceutical sales representative detailing?
21       A    Yes, I am.
22       Q.   All right.  And is it fair to say that
23   that's the circumstance where a pharmaceutical
24   company sales representative goes into a doctor's
25   offices or other healthcare providers offices and

1

2     discusses, presents to the healthcare provider

3     purported information about particular drugs?

4          A    Yes, that's correct.

5          Q.   Now, in writing your book, did you --

6     did you have regard to any information concerning

7     sales representative representations about opioids

8     made to healthcare providers?

9          A    Yes.

10         Q.   You had access to materials in the

11    public domain concerning the kinds of statements and

12    documents that were being provided by sales

13    representatives, opioid sales representatives to

14    healthcare providers?

15         A    Yes.

16         Q.   These were documents that predated the

17    documents you received from the lawyers in

18    connection with the various opioid litigations,

19    true?

20         A    Yes.

21         Q.   Okay.  Now, since you were -- began to

22    do some work for the lawyers in the opioid

23    litigations, you were provided with internal company

24    documents concerning those promotional messages,

25    true?

1

2          A     That is correct.

3          Q.    And you reviewed all of that material?

4          A     Yes.

5          Q.    And did you reach conclusions concerning

6     the truth or falsity of those messages?

7          A     Yes, we did.

8          Q.    In reaching those conclusions, did you

9     use the same methodology you have used historically

10    as a scientific researcher and a medical doctor in

11    the sphere of addiction medicine?

12         A     Yes.

13         Q.    That methodology, that series of steps

14    didn't change in any way as between pre litigation,

15    for example, and the work you've done in the

16    litigation?

17         A     No, it did not change.

18         Q.    Okay.  Now, have you undertaken any sort

19    of a program designed to correct any

20    misrepresentations that pharmaceutical sales

21    representatives made to healthcare providers in the

22    United States?

23         A     Yes.

24         Q.    And do you call that program academic

25    detailing in contrast to pharmaceutical sales rep

1

2    detailing?

3         A   Yes, I do.

4         Q.   And in the course of -- and the nature

5    of that academic detailing program that you, that

6    you engage in, you actually go around the country

7    from time to time and provide lectures and other

8    support to healthcare providers to deal with the

9    potential misinformation they may have received from

10    the drug companies, true?

11         A   Yes.

12         Q.   And you've actually done this academic

13    detailing, among other places, right here in the

14    State of New York, true?

15         A   Yes.

16         Q.   And you've received thanks from the

17    various healthcare providers for presenting this

18    information correcting misinformation; is that

19    correct?

20         A   Yes.

21         Q.   You've been invited to many different

22    conferences and speaking opportunities throughout

23    the United States to provide this academic

24    detailing, true?

25         A   Yes.

1

2          Q.    And do you continue to do that work

3     today?

4          A    Yes, I do.

5          Q.    And how many such talks, presentations,

6     meetings would you say you've had since the

7     publication of your book in 2016?

8          A    I've had over 100 live speaking

9     engagements since the publication of my book in

10    2016.

11         Q.    Okay.  I want to turn now to -- among

12    your peer-reviewed materials, you published a

13    research letter that looked at the patterns of

14    opioid prescribing under the federal Medicare

15    program, is that true?

16         A    Yes.

17         Q.    And what you want to look at was how

18    many scripts are being written for Medicare

19    beneficiaries over any particular period of time,

20    correct?

21         A    That's correct.

22         Q.    And tell Justice Garguilo what your work

23    discovered concerning prescribing under the Medicare

24    program.

25         A    We found that over one-third of Medicare

1

2   Part D patients is prescribed an opioid in any given

3   year.

4        Q.   In addition to what we've already

5   discussed, have you provided any other public health

6   service, such as consultation with any congressional

7   bodies or with the White House?

8        A    Yes.

9        Q.   Just very briefly, what did you do in

10  that context?

11       A    I testified before lawmakers in

12  Washington regarding opioid safety and efficacy of

13  opioids.  I've been to White House meetings convened

14  to address how to target and abate the opioid

15  epidemic.

16            I've talked with governors and other

17  lawmakers in states across the country regarding the

18  opioid problem.

19       Q.   Okay.  Now I want to turn to discuss a

20  bit with you the methodology that underlies the

21  actual opinions in this case, okay?

22       A    Yes.

23       Q.   All right.  Now, you already testified

24  that in, that in writing your book, you used the

25  same series of steps, methodology that you use in

1

2      your, in your scientific work and in your clinical

3      practice, correct?

4              A    Yes.

5              Q.    And in reaching the opinion which we saw

6      in Slide Number 1 of the nine opinions in this case,

7      you reviewed scientific and medical literature

8      concerning opioids papers that were written by folks

9      other than you, correct?

10             A    Yes.

11             Q.    And how many such papers in connection

12     with this litigation -- and by this litigation I

13     mean not only this case but the other cases in which

14     you've been engaged -- would you say you looked at

15     concerning opioids?

16             A    I've reviewed over 600 papers regarding

17     opioids in the medical literature for this

18     litigation.

19             Q.    Okay.  Now, when you say you reviewed

20     the 600 or so papers, let me ask you, first of all,

21     all of these papers or virtually all of these

22     papers, they have at the front something that's

23     called an abstract, right?

24             A    Yes.

25             Q.    And that's like a little summary of what

1

2      the whole paper is gonna be about, correct?

3            A     Yes.

4            Q.    So in looking at the 600 papers, did you

5      just take a look at the abstract and move on?

6            A     No.  My methodology is founded in

7      in-depth analysis of these papers in order to

8      determine whether or not the information in the

9      abstract summary is reflected in the rest of the

10     paper and supported by the data that the authors put

11     forth.

12                 I'm also very careful to look at things

13     like any conflicts of interest that the authors may

14     have and also who funded the study.

15           Q.    Well, let me see if I understand this.

16                 Are you saying that the abstract which

17     summarizes the paper in some instances might not be

18     accurate as a summary?

19           A     I'm saying that the abstract in my

20     research has shown that an abstract doesn't

21     necessarily reflect the true state of the data that

22     the authors put forth, nor does it necessarily

23     reflect an appropriate summative conclusion derived

24     from the data which is relevant because most

25     healthcare providers, busy clinicians almost always

```
 1                    Frye Hearing - Dr. Lembke              39
 2      -- I won't say almost always, but very often just
 3      read the abstract.
 4             Q.   So do I gather from your answer, Doctor,
 5      that in reviewing the 600 papers in connection with
 6      the opioid litigation, you actually read every page
 7      of every study?
 8             A    Yes.
 9             Q.   So we have an example of what you just
10      testified to.  Could we put up Slide Number 2,
11      please?
12                  Doctor, can you see that slide?
13             A    Yes, I can.
14             Q.   Now, correct me if I'm wrong, this is a
15      part, a pullout, if you will, from a paper by a
16      Dr. Chou, C-H-O-U, that you reviewed as part of your
17      work in connection with this case, correct?
18             A    That's correct.  It's by a large number
19      of authors.  Dr. Chou is the first author.
20             Q.   Correct.  And so what we're seeing here
21      is we've pulled out the abstract, and you've
22      actually highlighted a part of the abstract that
23      reads, "Chronic opioid therapy can be an effective
24      therapy for carefully selected and monitored
25      patients with chronic non-cancer pain."
```

1

2          Do you see that?

3      A    Yes.

4      Q.   And why did you highlight that as part

5  of your testimony here today?

6      A    I highlighted that because that

7  statement is not reflective of the evidence, and I

8  think it would be misleading for many readers if

9  they only read the abstract.

10          Furthermore, the recommendations of the

11  authors are -- and I highlighted the strong

12  recommendation for the use of chronic opioid therapy

13  in the treatment of chronic non-cancer pain, which

14  they then briefly qualify with the words "low

15  quality evidence," which is strange that they would

16  have a strong recommendation for a treatment that

17  has low quality evidence.

18          Furthermore, reading more in depth, it

19  becomes evident that the authors themselves know.

20  That the evidence is insufficient, the evidence for

21  the use of opioids in treatment of chronic

22  non-cancer pain is insufficient to assess the

23  effects on health outcomes which is that third box

24  pulled out below.

25          It's also worth mentioning that that low

```
 1                    Frye Hearing - Dr. Lembke            41

 2      quality information is in an appendix of the

 3      article.  So you really have to go digging for it.

 4                    THE COURT:  Excuse me.  Doctor, who

 5              prepares the abstract, the author or someone

 6              else?

 7                    THE WITNESS:  The abstract is prepared

 8              by the authors.

 9                    THE COURT:  Okay.  Thank you.

10      BY MR. HANLY:

11              Q.  And, Doctor, essentially what you are

12      calling out is the inconsistency between the

13      sentence in the abstract that says, "Chronic opioid

14      therapy can be effective" and the sentence at the

15      very bottom that says, "Evidence is insufficient to

16      assess effects on health outcomes," true?  That

17      stuff --

18              A    Yes.  Yes.  And this is a pattern that

19      repeats itself throughout the medical literature

20      when looking at the data on opioids use for chronic

21      pain.

22              Q.  Now, there's something else about this

23      paper, is there not, that caught your attention?

24      Could we have Slide Number 3, please?

25                    And this is from the appendix.  It's a
```

```
 1                    Frye Hearing - Dr. Lembke              42

 2     little hard to read, but this is the list of panel

 3     members who participated in the promulgation of this

 4     paper, true?

 5          A    Yes.  So it is standards that all

 6     authors who publish in peer-reviewed journals must

 7     declare their financial conflicts of interest.  And

 8     what's notable here is that more than half of the

 9     authors in this 2009 publication who strongly

10     recommended the use of opioids in the treatment of

11     chronic pain, despite weak and insufficient

12     evidence, were, in fact, receiving financial fees,

13     consultative fees from the opioid industry.

14          Q.   Okay.  And, in fact, we see here under

15     Dr. Perry Fine, he discloses that he serves on

16     advisory boards for a number of different companies,

17     including Johnson & Johnson, Purdue Pharma and Endo.

18     Do you see that?

19          A    Yes.

20               THE COURT:  Apparently -- correct me if

21          I'm wrong -- Dr. Fine and Dr. Portnoy appear

22          in the original, in the original Complaint --

23               MR. HANLY:  Precisely, your Honor.

24               THE COURT:  -- as Defendants.

25               MR. HANLY:  As Defendants, that's
```

```
 1                    Frye Hearing - Dr. Lembke        43
 2           correct.
 3      BY MR. HANLY:
 4           Q.   And as the Court already noted, we have
 5      Dr. Portnoy there in the box below, and Dr. Portnoy
 6      discloses consulting agreements with an extensive
 7      list of pharmaceutical companies estimated to work
 8      with four to five within a three-year period, et
 9      cetera, correct?
10           A    Yes.
11           Q.   And is this in-depth analysis of
12      scientific literature published by folks other than
13      yourself, is that a standard method in order to
14      reach conclusions about, for example, the
15      effectiveness of opioids for chronic pain?
16           A    Yes.
17           Q.   And is that the methodology that you
18      followed as part of getting to your opinions in this
19      case and your opinions in your pre litigation book?
20           A    Yes.
21           Q.   Now, in looking at these 600 papers that
22      you looked at -- I'm finished with that slide.
23      Thank you.
24                In selecting the papers to review, the
25      600 or so, did you exclude papers that contained
```

1

2     views that disagreed with yours?

3          A     No.

4          Q.    Why did you include papers which

5     disagreed with yours as part of your methodology?

6          A     Well, those are the papers that would be

7     important for me to look at even more closely to

8     understand how those authors came to conclusions

9     that seem to be going in a direction different from

10    the conclusions that I'm deriving from the evidence.

11         Q.    All right.  Now, did you review

12    something that's become known, become legendary, if

13    you will, in this litigation called the Porter and

14    Jick letter?

15         A     Yes.

16               MR. HANLY:  Could we put up Slide Number

17         4, please?

18    BY MR. HANLY:

19         Q.    Now, Doctor, can you see that screen?

20         A     Yes, I can.

21         Q.    This is the entirety of the Porter and

22    Jick paper, true?

23         A     Yes.  I wouldn't even call it a paper.

24    It's a letter to the editor.

25         Q.    Right.  It's an 11 line, five sentence

```
 1                    Frye Hearing - Dr. Lembke              45

 2     letter to the editor from the New England Journal of

 3     Medicine in 1980 that essentially was a review of

 4     some 12,000 patient hospital charts to see whether

 5     in those charts the healthcare provider had noted

 6     any signs of addiction to the narcotic drugs that

 7     had been administered to those 12,000 patients,

 8     correct?

 9          A    Yes.

10          Q.   This letter has been cited close to a

11     thousand times in the medical literature since 1980,

12     true?

13          A    Yes.

14          Q.   This letter was used by the

15     pharmaceutical opioid manufacturers to support the

16     idea that addiction in patients taking opioids was

17     extremely rare, true?

18               MS. STRONG:  Objection, your Honor.

19               THE COURT:  There's an objection.

20          What's the nature of the objection?

21               MS. STRONG:  Your Honor, it's leading.

22          I know we're being very lenient with leading,

23          but when it comes to feeding the expert

24          substantive components of the opinion, I

25          would ask that they not lead, your Honor.
```

```
 1                  Frye Hearing - Dr. Lembke              46
 2              THE COURT:  I agree.  Rephrase the
 3          question.
 4              MR. HANLY:  Sure thing.
 5     BY MR. HANLY:
 6          Q.   Dr. Lembke, employing your usual
 7     methodology for examining a scientific publication,
 8     did you use that methodology in connection with this
 9     letter to the editor?
10          A    Yes.
11          Q.   And can you tell the Court what history
12     teaches happened after the publication of this
13     letter?
14          A    Well, I think it's important to note,
15     first, that in my review of the medical literature,
16     I saw this article frequently cited.  I also saw it
17     cited in promotional material from the opioid
18     industry.
19                But what's important to note about this
20     data point is that it's a very low quality piece of
21     evidence.  It's not purely a peer-reviewed paper.
22     It's a letter to the editor.  It's not
23     representative of the types of patients who are --
24     have become dependent on and addicted to opioids in
25     the United States today.
```

1

2        These are hospitalized patients, many of

3   who received a single dose of an opioid administered

4   by a healthcare provider.  This is not a reliable

5   piece of evidence to consider the risk of addiction

6   in ambulatory outpatients receiving opioids in large

7   quantities for long duration.

8        Nonetheless, this paper had a huge

9   influence on opioid prescribing and the healthcare

10  perspective on the safety of opioids in the

11  treatment of pain such that it contributed to an

12  increase in opioid prescribing.

13        MR. HANLY:  Thank you, Doctor.  You can

14       take that slide down now, please.

15  BY MR. HANLY:

16        Q.   Now, during the course of your work in

17  this case, Doctor, we've already established that

18  you looked at certain materials provided to you by

19  the Plaintiffs' lawyers from the Defendants internal

20  files concerning statements about the safety and

21  efficacy of opioids, true?

22        A    Yes.

23        Q.   And did you, as part of your work in

24  this case, did you compare those documents, the

25  statements in those documents with the medical

```
 1                    Frye Hearing - Dr. Lembke              48
 2      literature to see whether the statements made by the
 3      manufacturers were consistent with the medical
 4      literature?
 5           A    Yes, I did.
 6           Q.    And what did you, as part of your
 7      methodology, what did you discover?
 8           A    I discovered that there were many
 9      inconsistencies in terms of what the promotional
10      material was saying about the safety and efficacy
11      and what the evidence was saying about safety and
12      efficacy.
13           Q.    Now, in addition to your review of the
14      published medical literature by doctors other than
15      yourself, did you -- in forming your opinions in
16      this case, did you rely on your clinical experience
17      treating patients with pain and substance use
18      issues?
19           A    Yes.
20           Q.    And can you just briefly explain how
21      your personal professional experience figured into
22      the methodology that underlies the opinions you give
23      -- you intend to give, with the Court's permission,
24      in this case?
25           A    So I observed thousands of patients over
```

1

2     the past 20 years becoming addicted to prescription

3     opioids, and I went to the medical literature to see

4     whether or not there was evidence to support my

5     clinical experience, whether my clinical experience

6     was not based in evidence.  And when my clinical

7     experience seemed to be divergent from the evidence,

8     I tried to figure out what I might be missing in

9     terms of my clinical impression.

10              So the medical science was very

11    important, touchstone in terms of evaluating my

12    clinical experience.

13         Q.   Okay.  You used the term evidence a

14    couple of times in your answer and his Honor, I

15    believe, has heard of the concept of evidence-based

16    medicine.  Is that a concept you're familiar with?

17         A    Yes, it is.

18         Q.   And, very briefly, what does that

19    concept connote?

20         A    Evidence-based medicine speaks to the

21    idea that when we ground medical practice in science

22    we will have better medical care.  So it's important

23    to, you know, clinical experience is important, but

24    it's important to reflect on our clinical experience

25    in the context of the scientific evidence.

1

2      Q.    And do you, as part of your methodology

3   in this case, did you -- did you employ

4   evidence-based medicine?

5      A    Yes.

6      Q.    Now, let me ask you, in applying your

7   methodology to reach your opinions in this case, did

8   you determine whether you were able to state those

9   opinions to a reasonable degree of scientific and

10  medical certainty?

11     A    Yes.

12     Q.    And are you?

13     A    Yes.

14     Q.    Now, let's talk about some basic terms.

15  Then we'll go through this section quickly, but just

16  so that we have for the record, let's start with the

17  basics.  Just tell the Court very briefly what

18  opioids are.

19     A    So opioids are molecules that bind to

20  opioid receptors in the brain, and they have very

21  powerful effects.  They can relieve pain in the

22  short-term.

23          They also stimulate a part of the brain

24  called the dopamine reward pathway, which is why

25  they are highly addictive.  And they also work on a

1

2     part of the brain called the brain stem which

3     controls the breathing rate, and they can slow --

4     powerfully slow down the breathing rate and the

5     heart rate, which is why they're very, very lethal

6     and why people overdose and die from them.

7            Q.   All right.  Now, the first opinion of

8     your nine opinions on the list relates to addiction

9     to opioids, correct?

10           A    Yes.

11           Q.   And you state in that opinion that

12    addiction, addiction is a chronic illness.  So

13    staying with the basics, there are accepted

14    definitions of addiction within the area of

15    addiction medicine, true?

16           A    Yes.

17                MR. HANLY:  All right.  Can we put up

18           Slide Number 5, please?

19    BY MR. HANLY:

20           Q.   And while we're doing that, I will ask

21    the Doctor, is there a body called the American

22    Society of Addiction Medicine?

23           A    Yes.

24           Q.   And is that a body that you are in some

25    fashion a member of?

 1

 2          A    Yes.

 3          Q.   And that's a body that is interested in

 4     issues surrounding addiction, true?

 5          A    Yes.  It's a professional medical

 6     society for healthcare providers who treat and

 7     research addiction.

 8          Q.   Okay.  And the American Society of

 9     Addiction Medicine came up with this definition of

10     addiction which reads:  Addiction is a treatable,

11     chronic medical disease involving complex

12     interactions, paraphrasing, and an individual's life

13     experiences.

14               People with addiction use substances --

15     or -- use substances.  People with addiction use

16     substances or engage in behaviors that become

17     compulsive and often continue despite harmful

18     consequences.

19               Prevention efforts and treatment

20     approaches for addiction are generally as successful

21     as those for other chronic diseases.

22               Did I read that correctly?

23          A    Yes.

24          Q.   Okay.  And is this definition by the

25     American Society of Addiction Medicine, is that some

```
 1                    Frye Hearing - Dr. Lembke           53

 2    sort of an outlier?

 3           A    No.  That's a well-accepted definition

 4    of addiction medicine, addiction in the field.

 5           Q.   All right.  It's regarded as a -- strike

 6    that.

 7                Did this definition, promulgated by this

 8    Society of Addiction Medicine, result from some sort

 9    of a consensus of experts in the field?

10           A    Yes.

11                MR. HANLY:  Thank you.  I'm finished

12           with that.

13    BY MR. HANLY:

14           Q.   Now, there's -- just anticipating

15    potential questions from the esteemed lawyers for

16    the drug companies, there's another organization

17    called the American Psychiatric Association, which

18    has a slightly different definition of addiction,

19    true?

20           A    Yes.  You're speaking of the Diagnostic

21    and Statistical Manual of Mental Disorders?

22           Q.   Yes, what's called the DSM.

23                And the DSM, which is a publication of

24    the American Psychiatric Association, it uses the

25    term -- instead of addiction, it uses the term
```

```
1                    Frye Hearing - Dr. Lembke              54
2      opioid use disorder, true?
3            A    Yes.
4            Q.   The Judge has heard that from prior
5      testimony, sometimes called OUD, true?
6            A    Yes.  I don't know what the Judge has
7      heard before, but, yes.
8            Q.   Okay.  If you accept that, I think we'll
9      be okay.
10                Now, is there, based on your review of
11     the medical literature concerning addiction and your
12     20 years or so --
13           A    I'm sorry, I can't hear you when you
14     walk away from the microphone.  I'm sorry.
15           Q.   I'm sorry.  Based upon your experience
16     as a scientist and a doctor engaged in these -- the
17     area of addiction medicine, is there any real
18     difference between the definitions of addiction that
19     the American Society came out with and the
20     definition of opioid use disorder that the American
21     Psychiatric Association has adopted?
22           A    No.  In essence, they're saying the same
23     thing.
24           Q.   Okay.  Now, in your Opinion Number 2 in
25     this case, which is part of Slide Number 1, but we
```

1

2      don't need to put it up, you state:  Opioid

3      prescribing grows fourfold starting in the 1990s,

4      which increased the supply of potent and deadly

5      opioids, et cetera, including in New York, correct?

6              A    Yes.

7              Q.   And elsewhere you've written of what you

8      call a paradigm shift in the prescribing by doctors

9      of opioids beginning in the 1990s, true?

10             A    Yes.

11             Q.   So what happened in the 1990s that was

12     different from what happened over the decades prior

13     to the 1990s in connection with physicians'

14     prescribing habits for opioids?

15             A    Yes, so this was a shift that really

16     began in the 1980s with the advent of the hospice

17     movement and then really gained momentum in the

18     1990s, but the shift was essentially the following:

19                  Prior to 1980 doctors were very

20     reluctant to prescribe opioids for their patients

21     because they were concerned that their patients

22     would get addicted.

23                  This was based on historical prior

24     doctor-caused opioid epidemic back -- dating back at

25     least to the Civil War, early 1900s.  But in the

```
 1                    Frye Hearing - Dr. Lembke            56
 2      1990s there was a huge change in the way that
 3      doctors were trained to regard opioids.
 4                    They were taught that opioids -- that
 5      the risk of addiction to opioids are -- is very,
 6      very small as long as the opioids are being
 7      prescribed by a doctor for a patient with real pain
 8      and real disease, that somehow that prescription pad
 9      could confer some kind of halo effect, and the fact
10      that the patient had serious pain would protect them
11      from addiction.
12                    Doctors were also taught that opioids
13      are effective treatment for chronic pain and that
14      you can continue to go up on the dose without
15      endangering a patient.  So these were huge changes
16      in the way that opioids came to be used, and the
17      treatment really began in medical school.
18                    I went to medical school in the 1990s,
19      and I was the recipient of this training.
20           Q.   And what you just described, Doctor, is
21      there any historical evidence to support what you
22      just said, for example, in the literature?
23           A    Yes.  So there are studies,
24      peer-reviewed literature showing that the risk of
25      addiction is quite common, even among patients who
```

```
                        Frye Hearing - Dr. Lembke              57
 1
 2   are prescribed opioids by a doctor for pain.  And
 3   those data points predate this paradigm shift that
 4   occurred in the 1990s.
 5            So the bottom line is we, as a
 6   healthcare institution, knew that this risk was
 7   there, and then we collectively forgot it for about
 8   two or three decades.
 9            Q.   Your Opinion Number 2 that we've been
10   talking about, this increase of prescribing,
11   fourfold increase, four times what had been
12   prescribed earlier, is there, is there any consensus
13   in the areas of addiction medicine as to whether
14   this increase resulted in any increase in
15   unfavorable outcomes for the patients?
16            THE COURT:  Just yes or no.  Just yes or
17        no, Doctor.
18            THE WITNESS:  Yes.
19            MR. HANLY:  All right.  And could we put
20        up Slide Number 6?
21   BY MR. HANLY:
22            Q.   And let me ask you, Doctor, is there, is
23   there data from the Centers for Disease Control
24   concerning the increase of prescriptions along with
25   potentially adverse events?
```

1

2          A    Yes.

3          Q.    And please describe for Justice Garguilo

4    what is, what is shown here in this, in this graph

5    with the three lines going from left to right.

6          A    This graph shows that as the sales of

7    prescription opioids increased between 1999 and

8    2010, so did opioid-related overdose deaths as well

9    as the number of people presenting to addiction

10   treatment centers with opioid addiction.

11         Q.    Okay.  So, just for the record, the

12   green line, which is at the top, reflects sales; is

13   that correct?

14         A    Yes.

15         Q.    Of prescription opioids, yes?

16         A    Yes.  Yes, it does.

17         Q.    And the middle line is showing overdose

18   deaths; is that right, Doctor?

19         A    Yes, that's correct.

20         Q.    And the bottom line, the orange line is

21   showing treatment admissions for folks suffering

22   from opioid use disorder, true?

23         A    True.

24         Q.    Okay.  Now -- and this, is this CDC data

25   generally accepted by folks in the addiction

1

2    medicine area as being reliable?

3        A    Yes.

4        Q.   Did you -- did you use this as part of

5    your methodology in reaching your Opinion Number 2

6    in this case?

7        A    Yes.

8        Q.   Okay.  Now, did this phenomenon of the

9    fourfold -- you can take that down slide down,

10   please.

11           Did this phenomenon that you've

12   described as a fourfold increase in prescriptions,

13   did this happen also in the State of New York?

14       A    Yes, it did.

15           MR. HANLY:  Could we have Slide Number

16       7, please?

17   BY MR. HANLY:

18       Q.   Now Slide Number 7 is titled, Amount of

19   Opioids Prescribed in State of New York between 1997

20   and 2016, almost a 20-year period, true?

21       A    Yes.

22       Q.   And I'm sure Justice Garguilo -- I hope

23   Justice Garguilo can see this, but just explain,

24   very briefly, what do we see here?

25       A    Well, what we see here is that in 1997,

```
1                    Frye Hearing - Dr. Lembke        60

2      100 morphine milligram equivalent was prescribed per

3      person in the State of New York, and between 1997

4      and 2016 that increased almost fivefold.

5               MR. HANLY:  Okay.  Thank you.  You can

6          take that slide down.

7      BY MR. HANLY:

8          Q.   Now, Doctor, I want to talk a little bit

9      briefly, I hope, about the methodology and the bases

10     for your Opinion Number 3 in this case, which is

11     that the opioid industry misled doctors into

12     believing that opioids are more effective, et

13     cetera, okay?

14         A    Yes.

15         Q.   And I noticed that part of the subtitle

16     of your book, Drug Dealer M.D., is how doctors were

17     duped, correct?

18         A    Yes.

19         Q.   And can you explain to the Court what

20     you meant by that, that the doctors were duped?

21         A    The doctors were duped by the

22     pharmaceutical opioid industry into believing that

23     opioids are safer than they really are and more

24     effective than they really are.

25         Q.   Okay.  And in the book you talk about --
```

```
 1                  Frye Hearing - Dr. Lembke            61
 2          MR. PYSER:  Your Honor, this is Steven
 3      Pyser for Cardinal Health.  I'm just going to
 4      register an objection and apologies for the
 5      late objection.
 6          Vague on the question, the meaning of
 7      what the pharmaceutical opioid industry is
 8      here.  That's not a term that really has a
 9      definition, and as distributors, we don't
10      believe that to be a part of anything.
11          I think the testimony needs to be more
12      specific.
13          THE COURT:  I think the doctor is
14      basically testifying to her findings and
15      impressions, of course, subject to your
16      cross-examination.  Am I missing the point of
17      your objection?  If I am, tell me.
18          MR. PYSER:  Yeah, just, your Honor, that
19      the term is vague.  What this pharmaceutical
20      opioid industry is is not defined, and it's
21      being used in a way that is very unclear
22      through the testimony.
23          THE COURT:  Mr. Hanly, develop that
24      record.
25          MR. HANLY:  I can rephrase, your Honor.
```

```
 1                  Frye Hearing - Dr. Lembke              62
 2              THE COURT:  Rephrase it.
 3    BY MR. HANLY:
 4         Q.   Doctor, in your book you discuss the
 5    alleged fact that certain companies engaged in the
 6    manufacture of opioids created a false narrative.
 7    Is that fair?
 8         A    Yes.
 9         Q.   Okay.  And you -- and you've already
10    explained what you meant by that part of the
11    subtitle that says that the doctors were duped,
12    okay?
13         A    Yes.
14         Q.   Okay.  Now, in your book you talk about
15    certain myths that certain opioid-related companies
16    promulgated, correct?
17         A    Yes.
18              MR. HANLY:  Okay.  And let's take a look
19              at an example of a piece of marketing
20              material that, that we have as Slide Number
21              8.  Could we put up Slide Number 8, please?
22    BY MR. HANLY:
23         Q.   Doctor, Slide Number 8 is actually a
24    page within a marketing brochure that was
25    distributed under the auspices of something called
```

1

2      the American Academy of Pain Medicine.  Do I have

3      that organization correct?

4           A    Yes.  That was not the only organization

5      that was involved, but yes.

6           Q.   Okay.  This also was a piece of

7      marketing material that was used and disseminated by

8      a company called Janssen; is that correct?

9           A    Yes.  This was promoted as an

10     educational booklet.

11          Q.   Okay.  And so this is the authors of

12     this piece saying that, Number 1, it is a myth that

13     opioid medications are always addictive and that the

14     true fact, appearing right there, is that many

15     studies show that opioids are rarely -- and they

16     emphasize the word rarely -- addictive when used

17     properly for the management of chronic pain,

18     correct?

19          A    Yes, that's correct.  That's what it

20     says.

21          Q.   Right.  And as part of your opinions in

22     this case, you came to the conclusion that that

23     so-called fact is, in fact, a falsehood?

24          A    Yes.

25          Q.   And explain why it's false.

1

2      A     Their use of the term rarely addictive

3  is not based on science.  What we see is that

4  between 10 percent and 30 percent of patients

5  prescribed an opioid by a doctor for chronic pain

6  will develop some kind of opioid use disorder.

7      Q.    Okay.

8      A     And, furthermore, this was known prior

9  to the publication of this so-called educational

10  pamphlet.

11      Q.    Okay.  And the second myth that the

12  certain companies engaged in opioid manufacture said

13  was, in fact, a myth is that opioids make it harder

14  to function normally, and what the pamphlet says is,

15  no, that's not correct.  When used correctly for

16  appropriate conditions, opioids may make it easier

17  for people to live normally.  That's what the answer

18  is supposed to be, right?

19      A     Yes.

20      Q.    And is that answer based upon the use of

21  your methodology reviewing 600 articles and your

22  20-odd years of clinical practice, is that a true

23  statement?

24      A     No.

25      Q.    Okay.  And then the last so-called myth

1

2     that the certain of these companies supported is

3     that opioid doses have to get bigger over time

4     because the body gets used to them, and they say,

5     well, that's not true.  The true fact is that unless

6     the underlying cause of your pain gets worse, such

7     as with cancer or arthritis, you will probably

8     remain on the same dose or need only small increases

9     over time.

10            Is that alleged fact true or false based

11    upon your methodology in this case?

12            A    That is false.

13            MR. HANLY:  Now -- your Honor, did you

14            want to take a break at this point?

15            THE COURT:  Talk to my stenographer,

16            when her fingers get tired.

17            MR. HANLY:  I'm flying along.

18            THE COURT:  As a matter of fact, she's

19            getting a note right now from me telling me

20            to give me a heads-up when she needs a break.

21            MR. HANLY:  Okay.  I just want to make

22            sure I'm doing what the Court wants.

23    BY MR. HANLY:

24            Q.   All right.  Now, Doctor, we actually

25    created a slide that contains Dr. Lembke's myths

```
 1                    Frye Hearing - Dr. Lembke            66
 2     about opioids, true?
 3             A    Yes.
 4                  MR. HANLY:   Could we have Slide Number
 5             9, please?
 6     BY MR. HANLY:
 7             Q.   And what you created here is, in part,
 8     contradicts what we just saw from certain
 9     opioid-related companies, correct?
10             A    Yes.
11             Q.   And we've already gone over this, but
12     very quickly, you say that it's a myth that the risk
13     of addiction is rare.  You say it's a myth that
14     opioids are effective in treating chronic pain.  You
15     say it's a myth that no dose is too high.  And you
16     say it's a myth of a concept called pseudoaddiction
17     which, am I correct, is the notion that if you're
18     craving more of the drug, you may not -- that may
19     not be addiction at all but simply your body crying
20     out for pain relief; is that correct?
21             A    Yes.  I think pseudoaddiction means that
22     if you're manifesting many of the signs and symptoms
23     of addiction, you're not really addicted, you're in
24     pain and the solution is to give more opioids.
25             Q.   Okay.  And we've already established
```

1
2     what you did in terms of your methodology with

3     respect to Myth Number 1, that becoming addictive --

4     addicted is rare.

5             With respect to Myth Number 2, that

6     opioids are effective in treating chronic pain, just

7     very briefly, was the methodology any different that

8     you employed?

9         A    No.

10         Q.   And how about with respect to your claim

11    here that it's a myth that no dose is too high, did

12    you employ that same methodology?

13        A    Yes.

14        Q.   Did you look at -- did you look at

15    scientific papers published by people other than

16    you?

17        A    Yes.

18        Q.   Okay.  And the same with respect to Myth

19    Number 4, any difference in the methodology that you

20    used?

21        A    No.

22        Q.   Basically two components of your

23    methodology; is that correct, your review, in-depth

24    review of the substantial body of medical literature

25    taken together with your, what I'll call your

1

2      personal professional experience, meaning your

3      clinical practice and your interaction with other

4      healthcare providers; is that fair?

5           A    Yes.

6           Q.   Now, let's, let's look at Slide Number

7      10, please, and tell Justice Garguilo, this is

8      headed, Prescription Opioids are as Addictive as

9      Heroin.  That's rather a strong statement, isn't it,

10     Doctor?

11          A    Yes, it is.

12          Q.   And tell Justice Garguilo what we've

13     done here.  We've pulled out these two, two

14     quotations, quotations from a medical paper by an

15     author named Harbaugh that appeared in the Journal

16     of Pediatrics in 2018.  So what is the point of this

17     -- these quotes?

18          A    There is consensus in the medical

19     profession that heroin is -- that prescription

20     opioids, Schedule II prescription opioids are as

21     addictive as heroin, that there's really no

22     difference between heroin and prescribed opioids for

23     pain.

24          Q.   By the way, is the Journal of Pediatrics

25     based on your work in researching medical journals,

1
2    is that a peer-reviewed journal?

3         A    Yes, it is.

4         Q.   Does it have -- is it regarded as

5    reputable?

6         A    Yes, it is.

7         Q.   Now, let's next look at Slide Number 11,

8    which relates to your Opinion Number 4, and this,

9    this is Opinion Number 4, the heading, There is no

10   reliable evidence that opioids work for chronic

11   pain.  And in reaching that conclusion, what did you

12   do?

13        A    I reviewed many, many articles, clinical

14   trials, observational studies, epidemiologic studies

15   looking at whether or not long-term opioid therapy

16   is effective in the treatment of chronic pain.

17        Q.   And is this an article that you looked

18   at?

19        A    Yes.

20        Q.   Is -- and the journal is called Pain?

21        A    Yes.

22        Q.   Is that a peer-reviewed paper?

23        A    Yes.

24        Q.   Is it the only paper that you relied

25   upon in reaching your conclusion that there's no

```
 1                    Frye Hearing - Dr. Lembke          70
 2      reliable evidence that opioids work for chronic
 3      pain?
 4              A    No.
 5                   MR. HANLY:  Okay.  Sorry, your Honor.  I
 6              just lost my track.
 7                   Could we put up Slide Number 12, please?
 8                   MS. STRONG:  Your Honor, objection.
 9              This is Sabrina Strong for Johnson & Johnson.
10              This is one of those documents, it appears,
11              your Honor, where they're relying upon
12              something that was submitted to us for the
13              first time yesterday at 4:40 p.m. from their
14              supplemental material considered list, and we
15              would object to any questions relating to
16              this document on this slide on that basis,
17              your Honor.
18                   THE COURT:  Mr. Hanly.
19                   MR. HANLY:  Again, your Honor,
20              Ms. Strong is a leading member of the
21              national defense team, and in that capacity,
22              she would have had access to the supplemental
23              materials provided on August the 3rd in
24              connection with the West Virginia cases.
25                   THE COURT:  Ms. Strong, early on, did
```

1

2      the Court not rule or direct an importation

3      of all of the information -- I'll call it

4      information -- all of the discovery that was

5      handed over and exchanged in the MDL handled

6      by Judge Polster to this Court, and if so,

7      was this thing, this piece of paper, this

8      document, a part of that exchange.

9          MS. STRONG:  My understanding, your

10     Honor, is that he is referencing the West

11     Virginia case, not the MDL.  I don't believe

12     we're in the case to which he is referring,

13     but, again, I want to double-check that, but

14     that's my understanding, your Honor.

15         So, no, I don't believe he's talking

16     about materials that were produced in the

17     MDL.

18         MR. PYSER:  Your Honor, this is Steven

19     Pyser, Cardinal Health.  I am in the West

20     Virginia case.  That's why I raised it

21     earlier as well.  If I'm understanding

22     Mr. Hanly correctly, what he's referring to,

23     that is not the case before Judge Polster.

24     And as well, incorporating discovery into the

25     record does not mean that an expert relied on

```
 1                    Frye Hearing - Dr. Lembke              72

 2         it.

 3              We have a report in this case in New

 4         York in which this document is not mentioned.

 5         If it was mentioned in another case in

 6         another opinion that takes different

 7         positions, I do not believe that the witness

 8         for the state can just incorporate every

 9         report that Dr. Lembke has ever written,

10         including reports against Defendants --

11         excuse me -- including reports in cases in

12         which some Defendants aren't even a part of.

13         So we also object to the inclusion of this

14         document.

15              THE COURT:  I have a couple of points

16         I'd suggest.  You all entered into a

17         Stipulation in connection with these

18         hearings, part and parcel of that Stipulation

19         was that any information, any documents that

20         made their way into evidence in this case to

21         which a party objects, that objection is

22         preserved in the event of a trial.

23              The second point -- Mr. Hanly, this is

24         directed to you.  This Court made it -- and,

25         by the way, it's directed to all counsel.
```

```
 1                    Frye Hearing - Dr. Lembke              73
 2          This Court, in the last go around, referenced
 3          a case, Guerra, G-U-E-R-R-A, versus
 4          D-I-T-T-A, 220 New York Slip Opinion 03771, a
 5          Second Department case that just came down in
 6          July of this year, and I believe -- I don't
 7          believe I know that the Court suggested,
 8          certainly the last session, perhaps the
 9          session before that, that in connection with
10          these hearings, the Court was focusing in on
11          two very specific areas, whether or not the
12          methodology can meet the requirements it of
13          general acceptance, and whether or not if the
14          methodology is appropriately applied, the
15          results can be deemed reliable.
16              Of course, as noted in the Ditta case,
17          that the actual question, the actual issue of
18          whether or not the opinion will ever make
19          it's way to the finder of fact at trial
20          relies upon the foundation that is laid by
21          the person offering the evidence or the lack
22          of foundation by the person or the entities
23          or the lawyers opposing it.
24              We're going a long way, we have been
25          going a long way in both the direct
```

```
 1              Frye Hearing - Dr. Lembke          74
 2      examination and the cross examination, and
 3      away from those two very, very basic
 4      precepts, general acceptance and reliability.
 5           The doctor is, of course, permitted to
 6      -- all witnesses are permitted to, as a
 7      matter of fact, they're required to set forth
 8      their methodology, and the inference that the
 9      person offering the evidence seeks to gain
10      from the Court, it's okay, it's generally
11      accepted methodology, and whether or not the
12      testimony indicates that the appropriate use
13      of the methodology will result in a reliable
14      conclusion, period.
15           That's the step one in what I call the
16      "Fryebert" analysis.  Step 2 will await, if
17      need be, a trial.  So here's my point -- by
18      the way, Mr. Hanly, I ask this to everybody.
19           The Court, of course, has had an
20      opportunity to review the decisions in the
21      MDL concerning this witness, and it broke
22      down to essentially two areas, a marketing
23      causation and a gateway argument or
24      suggestion.
25           Are we beyond that in this case, meaning
```

```
 1                    Frye Hearing - Dr. Lembke          75
 2         is there something beyond those two general
 3         areas that you seek to elicit from this
 4         witness?  I mean, I know I have nine points,
 5         but do the nine points fit within that
 6         framework that Judge Polster --
 7              MR. HANLY:  I think it's slightly
 8         broader at least than what your Honor just
 9         articulated, because Dr. Lembke's opinions
10         include --
11              THE COURT:  Gateway.
12              MR. HANLY:  Gateway, supply, the effect
13         of increased prescribing and so on.  And, of
14         course, the whole issue of marketing
15         representations made by the Defendants.
16              Now, with respect to marketing causation
17         as Judge Polster opined, that's something
18         different from the ability of a witness such
19         as Dr. Lembke to testify based upon her, her
20         extensive work and her methodology, and her
21         interaction with physicians throughout the
22         United States that these marketing messages
23         have an influence.
24              That's a different, that's a different
25         conclusion than the conclusion under some
```

```
 1              Frye Hearing - Dr. Lembke        76
 2      sort of marketing causation analysis.
 3          THE COURT:  He was clearly impressed
 4      with her credentials.  I believe in the short
 5      version of his decision was as to marketing
 6      causation in the absence of some kind of
 7      marketing background, not only this witness,
 8      but another witness would be prohibited,
 9      although he does make it a point in his
10      decision to say, in all other respects, that
11      witness' opinions can be, can be pursued at
12      trial.
13          MS. STRONG:  Your Honor.
14          THE COURT:  Yes.  This is Ms. Strong?
15          MS. STRONG:  Yes.  This is Sabrina
16      Strong on behalf of Johnson & Johnson.
17          I would just note that what Mr. Hanly
18      said does not seem to comport with what Judge
19      Polster decided.  I'm reading from his
20      opinion at page 12, and it says expressly the
21      Court finds Lembke may not testify regarding
22      the effect that Defendants' marketing and
23      promotional efforts had on a doctor's
24      prescribing practices.
25          He goes on to say he's excluding those
```

```
 1                    Frye Hearing - Dr. Lembke          77

 2          opinions that purport to find Defendants'

 3          marketing efforts resulted in or caused

 4          increased sales and/or increased

 5          prescriptions of opioids.

 6               I think that's precisely what Mr. Hanly

 7          was just referencing to you, your Honor, and

 8          that is an issue.  I would agree that the

 9          scope of his direct seems to be going far

10          beyond what we're talking about in terms of

11          marketing causation, which I think is what

12          we're here for, your Honor, but I just wanted

13          to make that point for clarity.

14               THE COURT:  And as I noted at page 12,

15          he also notes the Court's ruling does not in

16          any way affect Lembke's remaining opinions,

17          including the remainder of her 3rd and 5th

18          opinions regarding the inaccuracy of

19          statements and representations of Defendants'

20          marketing materials and other promotional

21          and/or educational efforts.

22               Here's my ruling.  I'll sustain your

23          objection.  And now we'll take a 15-minute

24          break.

25               MS. STRONG:  Thank you, your Honor.
```

```
 1                    Frye Hearing - Dr. Lembke              78
 2              (WHEREUPON, a short recess was taken.)
 3              THE CLERK:  Come to order.  Part 48 is
 4         back in session.
 5              THE COURT:  Remind the witness, please.
 6              THE CLERK:  Oh, I'm sorry.  I remind
 7         you, Doctor, you are still under oath.
 8              MS. STRONG:  Your Honor, it's Sabrina
 9         Strong.  One note before we begin.
10              THE COURT:  Wait a second.  Say it
11         again.
12              MS. STRONG:  Just one note before we
13         begin.  Can we have a sense of how much
14         longer Mr. Hanly intends to go?
15              This is one of those witnesses where we
16         requested two days with her, but we were
17         allotted one, and so we're concerned about
18         the amount of time.  He said he's at Opinion
19         3 of 9, I believe.  Can we have some
20         understanding in that regard?
21              THE COURT:  Perhaps everyone will heed
22         the Court's instruction.  I know Ms. Conroy
23         did during her direct examination.  So
24         perhaps everybody will get on board the same
25         way.
```

```
 1                    Frye Hearing - Dr. Lembke              79
 2              If I need more, I'll let you know.  All
 3         right.  I'd like to finish this witness
 4         today.
 5              MR. HANLY:  Judge, I'm happy to
 6         volunteer.  I think maybe I have another hour
 7         tops.
 8              THE COURT:  Okay.
 9              MS. STRONG:  Okay.  Good to know.
10              THE COURT:  He said about another hour
11         tops.
12              Do you know what tops means in lawyer
13         language?  Okay.  Let's go from there.  Go
14         ahead.
15              MS. STRONG:  Thank you, your Honor.
16    BY MR. HANLY:
17         Q.   Doctor, I want to briefly go back to
18    cover some aspects of the academic detailing that
19    you discussed earlier, because it figures in the
20    methodology and the bases for your opinion.
21              In the course of that academic
22    detailing, did you have available to you examples of
23    marketing statements made by certain of the opioid
24    manufacturers and other opioid-related companies?
25         A    Yes.
```

1

2    Q.   And did you study those statements in

3    comparison to the medical literature that you

4    reviewed?

5    A    Yes.

6    Q.   For example, if a marketing statement

7    was to the effect that addiction is a rare

8    occurrence, what corresponding scientific literature

9    would you go to to see whether that statement was

10   true or not?

11   A    I would go to the literature looking at

12   the risk of addiction in patients treated with

13   prescription opioids.

14   Q.   Does the body of medical literature that

15   you relied upon, is there anything novel about these

16   peer-reviewed papers such that they could not form a

17   basis for -- a proper basis for an opinion that you

18   would have concerning addiction?

19   A    Well, many of the papers that purported

20   to provide evidence on the risk of addiction were

21   not actually founded in a methodology that could

22   reliably report that outcome.

23   Q.   But my question, Doctor, is, is the use

24   of scientific literature written by people other

25   than you, is that a novel basis that an

1

2     investigator, a researcher would have regard to?

3          A    No, that's not novel.

4          Q.   Is it -- is there any degree of

5     reliability that is ascribed to that body of

6     literature, assuming it's all or mostly peer

7     reviewed?

8          A    Yes.  So that's a foundational precept

9     of academic scholarly work is to critically review

10    the literature and that's --

11         Q.   Now -- now, the marketing materials that

12    you have reviewed in this case and that you reviewed

13    prior to being involved in this case in preparing

14    your, your book, did you try to determine when you

15    were doing the academic detailing whether your own

16    experience was similar to the experiences of other

17    doctors who may or may not have received these sorts

18    of marketing materials?

19         A    Yes.

20         Q.   And was there any consistency, or was

21    there inconsistency?

22         A    I heard a lot of inconsistency from my

23    peers.

24         Q.   Did that have any affect on your desire

25    to continue the program of academic detailing?

```
 1                    Frye Hearing - Dr. Lembke        82
 2          A    Yes.  That motivated me to continue
 3     academic detailing.
 4          Q.   Did academic detailing to correct these
 5     misconceptions take up a small amount of time, a
 6     medium amount of time, a considerable amount of
 7     time, or what?
 8          A    A considerable amount of time, yes.  In
 9     the last four to five years, I've spent a
10     considerable amount of my professional time on this
11     project.
12          Q.   When you were academic detailing, did
13     you receive from physicians to whom you were
14     providing this detailing, any anecdotes or
15     recitations of experiences they had had in receiving
16     and reviewing literature about the risks and
17     benefits of opioids?
18          A    Yes.  I heard a large chorus of voices
19     expressing a very similar experience and impression
20     as my own.
21          Q.   When were you taught in medical school,
22     were you taught anything about the addiction
23     propensity of opioid medications?
24          A    None.
25          Q.   And what year, again, did you finish
```

1
2    your medical school?

3         A    1995.

4         Q.    Are you aware that on December the 12th,

5    1995 the FDA approved the manufacture and sale of a

6    drug called OxyContin?

7         A    Yes.

8         Q.    Now, I want to discuss briefly you're --

9    the basis for your opinion and the methodology used

10   to arrive thereat concerning whether a patient would

11   need to have increased doses of an opioid over time

12   and whether such increased doses would put the

13   patient at risk of harm, okay?

14        A    Okay.

15        Q.    And among your opinions is, in sum and

16   substance, that very opinion that increased doses

17   put the patient at risk of harm; is that right?

18        A    Yes.

19        Q.    Did you just pull that opinion out of

20   the air?

21        A    No.

22        Q.    Is that opinion shared by anybody else

23   in the world that you're aware of?

24        A    Yes.

25        Q.    Is that opinion, has the CDC, the Center

1
2     For Disease Control, ever issued any data, or
3     graphs, or anything else concerning whether
4     increased dosages over time of opioids puts the
5     patient at increased risk?
6              A    Yes.
7              MR. HANLY:  Okay.  And could we have
8          Slide Number 13, please?
9     BY MR. HANLY:
10             Q.   Doctor, this slide is entitled Higher
11    Dosage, Higher Risk, and it reads in part, and the
12    footnote indicates that this is a publication made
13    by the Centers for Disease Control and Prevention.
14    Do you see that in Footnote Number 1?
15             A    Yes.
16             Q.   Okay.  And we quoted a little bit from,
17    from it, higher dosages of opioids are associated
18    with higher risk of overdose and death, even
19    relatively low dosages, 20 to 15 morphine milligram
20    equivalence, MME, per day, increased risk, higher
21    doses haven't been shown to reduce pain over the
22    long term.  Did I read that correctly?
23             A    Yes.
24             Q.   And what do we see?  Explain to me and
25    Justice Garguilo what we're seeing in these, in

1

2    these two graphs.

3         A    So the graph on the left with the purple

4    line shows that as you go from low doses of

5    prescription opioids to higher doses of prescription

6    opioids, the risk of overdose death due to those

7    opioids increases.

8              The graph on the right shows that as the

9    yellow line shows, that as you go from lower doses

10   of opioids to higher doses of opioids, the risk of

11   any opioid overdose event increases including

12   nonlethal overdoses that often result in patients

13   showing up in emergency rooms unconscious.

14        Q.   So in both graphs what we're seeing,

15   would it be fair to say, you take more of the stuff,

16   you're increasing your risk of a bad outcome?

17        A    Yes.

18        Q.   And this Center for Disease Control

19   piece of a report actually has two other footnotes

20   referencing two other papers supportive of the

21   statement in this document.  Do you see that, three

22   and four?

23        A    Yes.  The Bonert paper, Number 3, the

24   graph on the left comes from the Bonert paper, and

25   the graph on the right comes from the Dunn paper.

```
 1                    Frye Hearing - Dr. Lembke              86
 2          Q.   So my point is that this CDC publication
 3     is not the only document that you looked at or
 4     relied upon in reaching your opinion that increased
 5     dosage increases the risk of bad outcomes; is that
 6     fair?
 7          A    These are not the only documents I
 8     looked at.  That is correct.
 9          Q.   And, in fact, so we have CDC, we have
10     Bonert, we have Dunn, that's a total of three, but
11     are there other papers peer reviewed that are
12     reliable that reach the same or similar conclusion
13     that more drug that you give, the likelihood is
14     you're going to have a bad event?
15          A    Yes.
16          Q.   And, by the way, Bonert is a
17     publication, it looks like JAMA.  Is that the
18     Journal of the American Medical Association J?
19          A    Yes, it is.
20          Q.   Is that a well-known journal?
21          A    Yes.
22          Q.   And the Dunn paper is from something
23     call the Annals of Internal Medicine, right?
24          A    Yes.
25          Q.   Are those two publications the Journal
```

1
2      of the American Medical Association and the Annals
3      of Internal Medicine, are they both peer reviewed?
4              A    Yes, they are.
5              Q.   Are they regarded in the field of
6      medicine as publications that will reliably publish
7      material that those publications deem to be valid,
8      truthful?
9              A    In general, yes.
10             Q.   Did you -- did any of these three
11     publications, were any of these relied upon by you
12     as a part of your methodology in coming to the
13     higher dosage, higher risk opinion that you set
14     forth?
15             A    Yes.
16             Q.   Now, have you -- we talked earlier about
17     the marketing material that says that addiction is
18     rare.  Do you remember that?
19             A    Yes.
20             Q.   And did you, in the course of your work
21     in connection with this case, did you look at, try
22     to figure out what the real percentage risk of
23     addiction is to patients administered opioid pain
24     medications?
25             A    Yes.

1              Frye Hearing - Dr. Lembke                88

2         Q.   And was your methodology any different

3    in trying to come up with some statistics about the

4    risk of addiction, was it any different from the

5    methodology you described at the very beginning of

6    this examination where you told Justice Garguilo

7    about the importance of a thorough review of all

8    parts of the pieces of medical literature?  Did you

9    do anything different in connection with --

10        A    No.

11        Q.   No?  Is that what you said, Doctor?

12        A    That's right.  Sorry.

13        Q.   Okay.  And did you, in the course of

14   your work, did you come across any papers that

15   themselves tried to pull together the results of a

16   number of other papers and set forth in that paper

17   what the actual risk is of addiction related harms

18   from opioids?

19        A    Yes.

20             MR. HANLY:  Okay.  Can we put up Slide

21        14, please?

22   BY MR. HANLY:

23        Q.   Now, Slide 14 is a chart that appears to

24   have a source as two papers.  Do you see that?

25        A    Yes, I do.

1

2      Q.   So one paper is by someone named, Vowles

3  and the other by someone named Boscarino; is that

4  correct?

5      A    Yes.

6      Q.   So please tell Justice Garguilo and us,

7  what are we seeing in this graph, and what is the

8  significance of this to your opinions, if any?

9      A    So the study population being examined

10  in both of these papers was specifically patients

11  being prescribed opioids for chronic pain in order

12  to determine the risk of addiction to opioids in

13  that population.

14           And what we see here is that the Vowles

15  article in 2015, which is in blue, found that

16  approximately eight to 12 percent of chronic pain

17  patients being prescribed opioids long-term will

18  become severely addicted to opioids, and

19  approximately 21 to 29 percent of those individuals

20  will misuse opioids.

21           Boscarino was another study that

22  specifically looked at the risk of addiction in this

23  population and found similar numbers based on the

24  DSM-IV and the DSM-V criteria.

25      Q.   Would any of these percentages eight to

1
2      12, 13.2, 21 to 29, and 41.3, would any of those
3      percentages, based upon your work over the decades
4      in addiction medicine, be regarded as rare instances
5      of adverse events?
6          A    No.  This would not be considered to be
7      rare.  This would be considered to be common.
8          Q.   Now -- thank you.  You can put that
9      slide down, please.
10             Doctor, is there any amount of --
11     withdrawn.
12             In the course of your work in connection
13     with this case, did you look at the question of
14     whether limited use of opioid painkillers could
15     result in an adverse event for the patient taking
16     the medication?
17         A    Yes.
18         Q.   And did you look at any papers,
19     peer-reviewed papers that relate to the question of
20     limited use of the drug leading to a more persistent
21     use and to an opioid use disorder?
22         A    Yes.
23             MR. HANLY:  Okay.  Can we put up Slide
24             Number 15, please?  Judge there's only 20
25             slides, so we're moving along pretty well.

```
 1                    Frye Hearing - Dr. Lembke          91
 2              THE COURT:  Thank you.
 3   BY MR. HANLY:
 4         Q.   And this slide is titled -- entitled,
 5   Even limited medical exposure can lead to persistent
 6   use and OUD.  That's opioid use disorder.
 7              And tell the Judge what this is
 8   depicting.
 9         A    So these are data showing that patients
10   who are prescribed opioids for surgery, for example
11   in the Brummett paper, is thought to be an acute and
12   self-limiting cause of pain, that 5.9 to 6.5 percent
13   of those individuals will still be taking
14   prescription opioids a year later.
15              So the important thing here is that
16   they're not being diagnosed in this study with
17   opioid use disorder addiction, but they're still
18   taking the opioids a year later when one would have
19   thought that their need for opioids would long be
20   over.
21              That's relevant because we do know that
22   the longer that patients are taking opioids, the
23   higher their risk of adverse health consequences,
24   including but not limited to addiction.
25              The same thing with the Delgado paper
```

1

2      showing that a very limited prescription for opioids

3      for an ankle sprain, for example, to the, you know,

4      relatively benign and self-limiting injury at 4.9

5      percent of individuals receiving an opioid for that

6      type of injury will still be taking opioids a year

7      later.

8                     Schroeder actually looked at whether or

9      not young people exposed to opioids through a dental

10     procedure will develop opioid use disorder within

11     one year and found that 6 percent of those

12     individuals exposed to opioids for a wisdom tooth

13     removal will be diagnosed with an opioid addiction

14     within the year and 10 percent for women.

15               Q.   Thank you, Doctor.  And this chart has

16     three footnotes, and the footnotes are all to

17     published papers, correct?

18               A    That is correct.

19               Q.   Okay.  And the first one is a Journal of

20     the American Medical Association, the surgery

21     journal, correct?

22               A    Yes.

23               Q.   And the second, Delgado is a paper

24     published in the Annals of Emergency Medicine?

25               A    Yes.

```
 1                    Frye Hearing - Dr. Lembke          93
 2          Q.   And the final footnote to Schroeder
 3     published in the Journal of the American Medical
 4     Association, Internal Medicine Journal, correct?
 5          A    Yes.
 6          Q.   All three of these journals of low
 7     regard, high regard, medium regard?
 8          A    These are all high regarded competitive
 9     journals.
10          Q.   Are they all peer reviewed?
11          A    Yes.
12          Q.   Did you rely upon the findings of these
13     journals in connection with your work in this case?
14          A    Yes.
15          Q.   Is there any consensus in the medical
16     literature relating to addiction medicine including
17     any reports of any organizations concerning the
18     question of whether there's a relationship between
19     increased supply of opioids in the country as a
20     whole and adverse outcomes?
21          A    Yes.
22          Q.   And did you look at that issue in
23     connection with your work in this case, the
24     relationship between the supply and adverse outcomes
25     for particular patients?
```

1

2          A    Yes.

3          Q.   And are there publications, peer

4     reviewed or otherwise, that address this issue?

5          A    Yes.

6               MR. HANLY:  Could we put up Slide Number

7          17, please?

8     BY MR. HANLY:

9          Q.   And here what we've done with this slide

10    is we've put two quotations from two separate

11    reports side by side.  On the left is a quotation

12    from a report of the Association of Schools and

13    Programs of Public Health, the ASPPH, correct?

14         A    Yes.

15         Q.   Please explain to Justice Garguilo what

16    that association is.

17         A    So it's an authoritative body on public

18    health issues, including numerous very prominent

19    public health universities like Columbia that came

20    together to look at the opioid crisis to try to

21    figure out what caused it and how to remedy it.

22              And they published a report bringing

23    science to bear on opioids from which this quote was

24    taken.

25         Q.   And this quote, paraphrasing, is that

1

2      the tremendous expansion of the supply led to scaled

3      increases in prescription opioid dependence and to

4      the transition of many to illicit opioids, including

5      fentanyl, which have subsequently driven exponential

6      increases in overdose, correct?

7            A     Yes.

8            Q.    And that quote came from a report of

9      this organization published in 2019?

10           A     Yes.

11           Q.    On the right-hand side we have a quote

12     from something called the National Academies of

13     Sciences, Engineering and Medicine, sometimes called

14     NASEM, correct?

15           A     Yes.

16           Q.    And just very briefly, what is that

17     organization?

18           A     Again, it's an authoritative body of

19     experts who come together to weigh in on looking at

20     the science regarding major issues related to

21     science, engineering and medicine.  In this case,

22     this was a paper they wrote on the opioid crisis.

23           Q.    And that essentially -- paraphrasing it,

24     it says the data presented make a prima facie case

25     that heavy promotion of opioid prescribing by drug

```
1                    Frye Hearing - Dr. Lembke            96
2     manufacturers, including misleading claims by some,
3     and substantially increased prescribing by
4     physicians were key contributors to the increase in
5     misuse, OUD, and accompanying harms.  Did I read
6     that correctly?
7            A     Yes.
8            Q.    And did you, with respect to these two
9     publications, did you read the whole publication, or
10    did you just look at the abstract?
11           A     Yes, I read the whole publication.
12           Q.    And did you, did you rely upon these
13    publications, these specific publications concerning
14    opioids in the course of carrying out your steps,
15    your methods for reaching your opinions?
16           A     Yes, but not exclusively.
17           Q.    Okay.  Well, tell Justice Garguilo again
18    what the other reliance was?
19           A     I relied on the CDC data showing that as
20    opioid prescriptions increased, so did
21    opioid-related overdose deaths and treatment
22    admissions.
23                 I also relied on my clinical experience
24    and my interviews with many of my colleagues in
25    medicine.  And in my clinical experience, I saw
```

1
2     vastly increased opioid prescribing in the 1990s and
3     more and more patients coming in with opioid
4     addiction, more and more patients dying from opioid
5     overdose.
6          Q.   So, again, you analyzed the literature
7     written by folks other than you, and you relied on
8     what I've called your personal professional
9     experience over more than two decades?
10         A    Yes.  That's right.
11         Q.   In connection with your publications, we
12    already discussed your research letter regarding
13    prescribing to Medicare patients, correct?
14         A    Yes.
15         Q.   And there was another paper that you
16    wrote and that was published concerning
17    overprescribing.  Do you recall?
18         A    Yes.
19         Q.   And could you just tell Justice Garguilo
20    what that second paper was about?
21         A    We looked at which doctors in the United
22    States are prescribing opioids to try to detect
23    whether or not there were geographic differences or
24    differences by specialty.
25              And what we found was that by volume,

1

2    primary care doctors prescribe the most opioids.

3    That makes sense because there are more of them than

4    other types of doctors.  And by specialty, it's pain

5    medicine doctors that also -- that prescribe the

6    most opioids.

7              But importantly what we saw was that

8    there was not a small subset of so-called pill

9    doctors driving the increased prescribing, that

10   there was a wholesale paradigm shift and all doctors

11   across all specialties were prescribing large

12   amounts of opioids.

13             We also looked at geographic regions and

14   found that there were no differences geographically.

15   So all across the United States, there was an

16   enormous uptick in opioid prescribing based on the

17   data that we looked at.  That was our findings.

18             THE COURT:  Doctor, what constitutes

19        overprescribing?

20             THE WITNESS:  Well, overprescribing,

21        certainly prescribing more than we were in

22        the 1990s despite the fact that we have not

23        seen an increased need for analgesia in this

24        country.

25             Overprescribing we can also look at

1

2      other countries, other developed nations and

3      see how our prescribing compares to their

4      prescribing and see that we are prescribing

5      in some cases ten times more than other

6      developed nations with aging populations and

7      similar needs for analgesia.

8            So when I talk about overprescribing,

9      I'm really comparing the way we prescribe now

10     to the way that we prescribed before the

11     Defendants launched their campaign in the

12     1990s promoting opioids.

13           THE COURT:  Okay.  Thank you.

14  BY MR. HANLY:

15     Q.   Doctor, you, in the course of your

16  answer that you just gave before Justice Garguilo's

17  question, you talked about consistency of

18  prescribing, prescribing habits across the nation,

19  right?

20     A    Yes.

21     Q.   Now, did you look at any statistics on

22  the changes in the rate of prescribing in either New

23  York State and/or Suffolk County and/or Nassau

24  County?

25     A    Yes.

1

2      Q.   And can you just generally, without

3  holding you to specific percentages, just describe

4  generally for Justice Garguilo what you found and

5  the extent to which, if any, that the trends, if

6  any, that you saw are different from national

7  trends?

8      A    So we saw no difference in New York

9  State compared to national trends.  New York is in

10 no way an outlier in terms of this phenomenon.  And

11 the same is true for Suffolk and Nassau County.

12     Q.   Now, Doctor, Justice Garguilo mentioned,

13 and you wrote in your book, and it's referred to

14 elsewhere concerning a phenomenon or claimed

15 phenomenon called the gateway effect, true?

16     A    Yes.

17     Q.   Just for clarity, would you just explain

18 briefly what the gateway effect is?

19     A    Patients who are prescribed opioids for

20 a medical condition can go on to misuse the opioids

21 that they have been personally prescribed, which

22 then subsequently can lead to a severe opioid

23 addiction, including progression to the use of

24 heroin and other illicit opioids.

25     Q.   Is the gateway effect, does it have any

1

2     acceptance, general acceptance, or otherwise in the

3     medical community to describe the phenomenon you

4     just described?

5          A    Yes.  I would say it's strongly accepted

6     in the medical community to describe what I just

7     described.

8          Q.   It's not a term that you just invented,

9     is it?

10         A    No.

11         Q.   Is there support, is there reference in

12    the medical literature to the gateway effect?

13         A    Yes.

14              MR. HANLY:  Could we put up Slide 18,

15         please?

16    BY MR. HANLY:

17         Q.   Now, slide 18, am I correct, Doctor,

18    this is, we've pulled out some quotes from this

19    National Academies report.  It's called a consensus

20    study report from NASEM, and it's entitled Pain

21    Management and the Opioid Epidemic.

22              And the quote, first quote we have is a

23    preponderance of evidence suggests that the major

24    increase in prescription opioid use beginning in the

25    late 1990s has served as a gateway to increased

```
 1                    Frye Hearing - Dr. Lembke              102
 2      heroin use.
 3                    And then below that, we pulled out the
 4      quote, In any related nature of the prescription in
 5      the illicit opioid epidemic means that one cannot be
 6      addressed separately from the other.  Did I read
 7      that correctly?
 8           A    Yes.
 9           Q.   And the second one, would that -- well,
10      just state to the Court what the second sentence
11      actually means in terms of prescription versus
12      illegal drugs.
13           A    It means that to really understand this
14      opioid epidemic, we have to look at the way that we
15      have been prescribing prescription opioids in the
16      house of medicine.
17                    That the problem of addiction and the
18      problem of chronic pain and even nonchronic pain
19      treated with opioids, those problems are deeply
20      interrelated.
21           Q.   And, Doctor, are there any studies that
22      you're aware of that have looked at the question of
23      gateway effect in the State of New York?
24           A    Yes.
25                    MR. HANLY:  Could we put up Slide Number
```

2          19, please?

3     BY MR. HANLY:

4          Q.    Now, here we have some quotes from a

5     paper by someone named Lankenau in the International

6     Journal of Drug Policy.  Do you see that?

7          A    Yes.

8          Q.    And this study was actually a study of

9     intravenous drug users in the City of New York and

10    the City of Los Angeles.  Is that true?

11         A    Yes.

12         Q.    And we pulled out two quotes.  One at

13    the top, paraphrasing, initiation into opioid misuse

14    was facilitated by easy access via participant's own

15    prescription, family or friends, and occurred

16    earlier than misuse of other drugs, of other illicit

17    drugs.  Prescription opioid misuse was a key feature

18    of trajectories into injection drug use and/or

19    heroin use.  Did I read that correctly?

20         A    Yes.

21         Q.    And then the second is the scientific

22    literature has identified several specific

23    subpopulations involved in prescription opioid

24    misuse and diversion that are so diverse that it is

25    not feasible to study them in a single

1          investigation.

2                    High school students, college students,

3          older persons, and women most of whom initially

4          obtain a prescription drug via legitimate medical

5          practices, correct?

6          A    Yes.

7          Q.   Did you rely on this study for your

8          opinion relating to the so-called gateway effect?

9          A    Yes.

10         Q.   Is this study, is this paper a

11         peer-reviewed paper?

12         A    Yes, it is.

13         Q.   Is this a reliable, or highly regarded,

14         or lowly regarded publication?

15         A    This is a reliable source.

16         Q.   What's happened between 2010 and 2017

17         with respect to New York State deaths from opioids?

18         A    There has been an increase in

19         opioid-related overdose deaths in the State of New

20         York in that timeframe.

21                    MR. HANLY:  Slide Number 20, the last

22              slide, please.

23         BY MR. HANLY:

24         Q.   Doctor, I guess it's pretty clear what

```
1                    Frye Hearing - Dr. Lembke              105
2     this shows, but why don't you explain to Justice
3     Garguilo and us?
4          A    This shows that between 2010 and 2017
5     the number of opioid-related overdose deaths in
6     persons aged 25 to 44 increased more than fourfold
7     in the State of New York.
8          Q.   And in a very -- in a slide very early
9     in the examination, did we see an increase over
10    roughly the same time period in the number of
11    prescriptions written in New York State?
12         A    Yes.
13              MR. HANLY:  Thank you, Doctor.  That's
14         all I have.
15              THE WITNESS:  Thank you.
16              THE COURT:  Ms. Strong, it's almost
17         12:30.  Do you want to get started, or would
18         you prefer starting after the luncheon
19         recess?
20              MS. STRONG:  Let's just start after the
21         luncheon recess, your Honor.
22              THE COURT:  Okay.  We'll resume at 1:45.
23              MS. STRONG:  Thank you, your Honor.
24              (WHEREUPON, after a luncheon recess, the
25         following was had:)
```

```
 1                   Frye Hearing - Dr. Lembke              106
 2            MR. HANLY:  Your Honor, before
 3       Ms. Strong begins, can I put something on the
 4       record?
 5            THE COURT:  Yes.  First, remind the
 6       witness, then you can put something on the
 7       record.
 8            THE CLERK:  Doctor, I remind you you're
 9       still under oath.
10            THE WITNESS:  Thank you.
11            MR. HANLY:  Your Honor, I just wanted to
12       place on the record, we had a dispute earlier
13       in the examination concerning Slide Number
14       12.  Representation was made by defense
15       counsel, in effect, that we were ambushing
16       them, they hadn't seen it.
17            I wish to point out to the Court and
18       counsel that this slide, Exhibit 12, was a
19       joint exhibit, Defendants' and Plaintiffs'
20       Exhibit in the MDL, bearing number 17232, and
21       that exhibit, joint exhibit list was created
22       and filed on September 25th 2019, which is a
23       year ago.
24            THE COURT:  Miss Strong, there was an
25       indication that that piece of paper, that
```

1
2      document, that thing, that exhibit was only
3      used in West Virginia and not part and parcel
4      of the MDL in Ohio, I just heard something
5      otherwise.
6          MS. STRONG:  I think the argument he's
7      trying to make, your Honor, is that we knew
8      of that underlying document period and the
9      abstract.  The question here is was that a
10     document that Dr. Lembke relied upon in
11     support of her opinions.
12         There are millions and millions of
13     documents in this litigation, your Honor, and
14     the question that we are here to address
15     today is the basis for Dr. Lembke's opinions,
16     and my point is that we -- the rules do not
17     allow for us to be sandbagged by documents
18     being presented to us the night before and
19     saying she, too, is relying on these
20     additional documents.  That's the point your
21     Honor.
22         THE COURT:  Okay.  So now we've heard
23     ambushed and sandbag, all right.
24         MS. STRONG:  I know you don't like those
25     types of terms, but I think this is classic

```
1              Frye Hearing - Dr. Lembke            108
2       sandbagging, so I don't use those terms
3       lightly, your Honor.
4            MR. SHKOLNIK:  If I may, your Honor,
5       Napoli Shkolnik, first of all, this is New
6       York, and our rules do allow us to rely upon
7       authoritative articles that come up that
8       become available.  There's no prejudice here.
9       I think that's the rule in New York.
10           It is not sandbagging.  I don't think
11      it's appropriate to use here.  They knew
12      about this study, they knew about everything
13      that we've listed for them, and it's
14      inappropriate to suggest that it can't be
15      utilized in this process before trial, which
16      we could have supplemented even at that
17      point.  I just wanted to state based on New
18      York practice.
19           THE COURT:  If you were sitting here,
20      what should I do?
21           MR. SHKOLNIK:  You've already done it,
22      your Honor.  It's in the record, you'll
23      consider it, use it for what it's worth, and
24      it's really a nonissue.
25           THE COURT:  Here's a fair compromise.
```

1

2         If accepted, it will go to weight, to the

3         weight of the evidence, and not to the --

4         whatever the opposite of the weight is.

5              MR. SHKOLNIK:  And I'm sorry for talking

6         through the mask, I apologize.

7              THE COURT:  Doctor, are you ready?

8              THE WITNESS:  Yes.

9              THE COURT:  Miss Strong, go ahead.

10              MS. STRONG:  And, Mr. Pyser, did you

11         want to say something before I begin?  I just

12         didn't want to interrupt?  Because I see you

13         on my screen.

14              MR. PYSER:  No, that's okay.

15              MS. STRONG:  Okay.  Thank you.

16              THE COURT:  Did I step on your order?

17              MS. STRONG:  No.  No, no, no.  You're

18         doing it correctly.  It's just Mr. Pyser is

19         up on my screen, and I know he's examining

20         today, I didn't know if he wanted to say

21         anything more before we begin, your Honor.

22              THE COURT:  He's very big on my screen,

23         too.

24              MR. PYSER:  And I apologize to all of

25         you.

```
 1                    Frye Hearing - Dr. Lembke              110
 2      EXAMINATION BY
 3      MS. STRONG:
 4            Q.    Good afternoon, Dr. Lembke.
 5            A     Good afternoon.
 6            Q.    My name is Sabrina Strong, and I
 7      represent Johnson & Johnson and Janssen in this
 8      litigation.  I want to turn first to some specifics
 9      about your training and experience.
10                  You're not an economist, correct?
11            A     That is correct.
12            Q.    You do not have a degree or training in
13      marketing, correct?
14            A     That is correct.
15            Q.    You do not have any employment
16      experience working in the field of pharmaceutical
17      marketing; do you?
18            A     No.
19            Q.    You don't belong to any professional
20      associations in the field of pharmaceutical
21      marketing either, correct?
22            A     That's correct.
23            Q.    You also do not have any experience
24      regarding FDA regulations that govern pharmaceutical
25      marketing, correct?
```

1

2        A     That's correct.

3        Q.    You do not have any degrees or training

4    in pharmacoeconomics?

5        A     Since I don't know what that is, the

6    answer is no.

7        Q.    We'll skip that.

8              You're aware that there is a scientific

9    field called econometrics, correct?

10       A     Yes.

11       Q.    Are you aware that that field applies

12   statistical methods to economic data?

13       A     Yes.

14       Q.    But you do not have any degrees or

15   training in econometrics of sales or marketing,

16   correct?

17       A     That is correct.

18       Q.    Okay.  So you're testifying here today

19   as a retained expert for the Plaintiffs, which in

20   this case it's the State of New York, Nassau County,

21   Suffolk County, correct?

22       A     Yes.

23       Q.    But before this case, you were retained

24   by the Plaintiffs in the federal multidistrict

25   litigation pending in Cleveland, Ohio, correct?

```
  1                    Frye Hearing - Dr. Lembke              112

  2           A    Yes.

  3           Q.    You submitted a report in connection

  4    with that MDL proceeding, right?

  5           A    Yes.

  6                 (Video disconnected.)

  7                 THE COURT:  We're back doctor, to a

  8           degree.

  9                 MS. STRONG:  It sounds like everybody

 10           got kicked off, your Honor; is that right?

 11                 THE COURT:  Yes.  We're almost back on.

 12           They're just testing.

 13                 MS. STRONG:  Ready, your Honor.

 14                 THE COURT:  Back on board.  Let's go.

 15                 MS. STRONG:  Okay.

 16           Q.    So I was just asking you, Dr. Lembke,

 17    about the report you submitted in the MDL, and you

 18    confirmed that you did submit a report in the MDL

 19    proceeding, correct?

 20           A    Yes.

 21           Q.    Okay.  And there are some structural

 22    differences between your report in the MDL and your

 23    report here, but the opinions in both are the same,

 24    correct?

 25           A    Yes.
```

```
 1                  Frye Hearing - Dr. Lembke              113
 2           Q.    You understand that Judge Polster, in
 3     the federal MDL proceeding, ruled that he would not
 4     be permitted to opine on marketing causation in his
 5     court, because you do not have the marketing
 6     expertise necessary to offer those causation
 7     opinions, correct?
 8           A     Yes.
 9           Q.    Okay.  And you have distinguished the
10     question of whether opioid marketing material was
11     consistent or inconsistent with scientific evidence
12     from the question of causation, correct?
13           A     Yes.
14                 MS. STRONG:  Okay.  And so we put
15                 together a demonstrative that draws out that
16                 distinction.
17                     And, Pam, if you're able to, can you
18                 pull up Slide 1, and I believe it's being
19                 handed out in the court at this time as well,
20                 or I would ask Mr. Asher to do so.
21           Q.    And so I'd like you to look at these
22     questions, Dr. Lembke.
23                     Question 1 is:  Was each Defendant's
24     promotion, if any, informed by scientific evidence?
25                     Question 2:  If not, did misleading
```

```
 1                    Frye Hearing - Dr. Lembke              114
 2     promotion by any Defendant cause doctors to write
 3     medically inappropriate prescriptions?
 4              And then there's a third question, apart
 5     from that distinction that you made between 1 and 2,
 6     the third question is:  Did those prescriptions, if
 7     any, lead to opioid addiction, misuse or overdose?
 8              Do you see those questions, Dr. Lembke?
 9     A    Yes, I do.
10     Q.   You spent a considerable amount of time
11     with Mr. Hanly talking about question 1, but I want
12     to focus on questions 2 and 3.
13              And so with that, Pam, if you can pull
14     that down, and I'll ask you some questions focusing
15     on that second question.
16              So let's talk about a doctor's decision
17     to prescribe medications to a patient.
18              At a high level you agree that opioid
19     prescribing practices depends largely on the doctor,
20     correct?
21     A    No.
22     Q.   Well, you would agree that there is a
23     huge variation in opioid prescribing across the
24     country and it continues to depend largely on the
25     doctor, right?
```

```
 1                  Frye Hearing - Dr. Lembke              115

 2          A    No.

 3          Q.   Okay.  Do you recall being deposed in

 4     this case, Dr. Lembke, on January 16th 2020?

 5          A    Yes.

 6          Q.   Okay.  And I would like to show you a

 7     portion of your deposition testimony.  For your

 8     benefit and for the Court's benefit, I'd like to

 9     refer you to page 54.

10               If Pam can put this up on the screen,

11     page 54, lines 15 through lines 24.

12               THE COURT:  Okay.

13               MS. STRONG:  And I don't know if you

14          have your transcripts with you, Dr. Lembke or

15          if you prefer to read it off the screen.

16          Q.   Can you read that okay, Dr. Lembke?

17          A    Yes.

18          Q.   Okay.  And at your deposition on January

19     16th 2020 here in the New York case, you were asked

20     the following question:

21               "Has the number of pills in a

22     prescription for three weeks of opioids remained the

23     same over the past decade?

24               ANSWER:  There is huge variation in

25     opioid prescribing across the country.  In some
```

1

2    geographic regions opioid prescribing has decreased

3    rapidly.  In others, it has not.  It really depends

4    on which doctor.

5                QUESTION:  So it depends on the doctors

6    then?

7                ANSWER:  It continues to depend largely

8    on the doctor, yes."

9                Is that the testimony that you gave at

10   your deposition in this case, Dr. Lembke?

11        A    Yes, it is.

12        Q.   Okay.  And doctors are expected to weigh

13   the risks and benefits of any prescription

14   medication for each particular patient before

15   deciding to prescribe it, correct?

16        A    Yes.

17        Q.   For example, there are numerous patient

18   specific risk factors for opioid addiction, right,

19   you believe that?

20        A    I'm sorry, can you repeat the question.

21        Q.   I can.

22             There are numerous patient specific risk

23   factors for opioid addiction, correct?

24        A    Yes.

25        Q.   One of those risk factors is personal

1

2    history of substance abuse?

3          A    Yes.

4          Q.   Another is family history of substance

5    abuse?

6          A    Yes.

7          Q.   Childhood trauma is another factor?

8          A    Yes.

9          Q.   And psychiatric comorbidity, correct?

10         A    Yes.

11         Q.   And by that, just for the benefit of the

12   Court and for clarity, you mean an individual who

13   has a psychiatric disorder, other than the disease

14   of addiction, which could include everything from

15   major depression, obsessive compulsive disorder,

16   bipolar disorder and schizophrenia, correct?

17         A    Yes.

18         Q.   Although you've traveled to New York and

19   you've talked with some doctors in New York, you do

20   not know whether you have talked with any doctor who

21   practices in Nassau County about his or her

22   experiences with prescription opioids, correct?

23         A    That is correct.

24         Q.   And the same is true for Suffolk County,

25   you do not know whether you have ever talked with a

```
 1                  Frye Hearing - Dr. Lembke              118
 2      doctor who practices in Suffolk County about his or
 3      her experience with prescription opioids, correct?
 4           A    Yes.
 5           Q.   In fact, the only doctors in New York
 6      who prescribe opioids that you can identify are
 7      doctors reported in lay-newspapers as operating pill
 8      mills, correct?
 9           A    I'm sorry, could you say that again.
10           Q.   Absolutely.
11                The only doctors in New York who
12      prescribed opioids who you could identify are
13      doctors reported in lay-newspapers as operating pill
14      mills, correct?
15           A    No, that's not correct.
16           Q.   And, again, I'd like to pull up -- I
17      would like you to look at a portion of your
18      deposition testimony in this case, the January 16th
19      2020 deposition.  For everyone's benefit we're
20      turning to page 207, lines 4 through 10.
21                Pam, if you could put that up and
22      everyone can take a moment to get their place, page
23      207.
24                You were asked at your deposition,
25      question, line 4.
```

1

2          "So these are reports in the newspaper

3    about pill mill doctors in New York?

4          ANSWER:  That's right.

5          QUESTION:  Okay.  Other than that, can

6    you give -- identify any doctor who prescribed

7    opioid medications to any individuals in New York?

8          ANSWER:  No."

9          Dr. Lembke, that was the testimony that

10   you gave at your deposition in January, correct?

11      A   Yes.

12      Q.  So that means you didn't try to identify

13   which doctors in New York, if any, saw any of the

14   specific marketing materials you identified as

15   problematic in your report, correct?

16      A   No, that's incorrect.

17      Q.  Well, you didn't identify any doctors

18   who relied upon any specific marketing materials,

19   correct, in describing decisions?

20      A   That is incorrect.

21      Q.  Okay.  Did you identify in your report

22   any doctors or the scope of doctors who you believed

23   saw a particular Defendant marketing materials and

24   actually relied upon it in making a decision; did

25   you identify those folks in your report?

1

2          A     Not in my report, no.

3          Q.    Did you identify them at your

4     deposition?

5          A     No.

6          Q.    In forming your opinions, in forming

7     your opinions you also didn't conduct a survey of

8     New York doctors to try to understand what factors

9     they considered in deciding to prescribe opioid

10    medication to any particular patient; did you?

11         A     What do you mean by "a survey?"

12         Q.    Well, I'm not talking about anecdotes.

13    I'm talking about a scientifically rigorous survey.

14               You didn't conduct a survey to

15    understand what factors any New York doctor

16    considered in deciding to prescribe an opioid

17    medication to any particular patient, correct?

18         A     No.

19         Q.    And you also did not conduct a survey of

20    New York doctors to try to learn what marketing

21    materials, if any, the prescribers in New York may

22    have received from each individual Defendant, that

23    was not part of your methodology in coming up with

24    your opinions in this case, correct?

25         A     No, that's incorrect.

```
 1                    Frye Hearing - Dr. Lembke              121
 2          Q.    You conducted a survey, a scientifically
 3   rigorous survey to try to learn what marketing
 4   materials, if any, a prescriber in New York saw, may
 5   have received from each Defendant?
 6          A    So in the research for my book I
 7   conducted quantitative interviews with doctors
 8   providing what they relied upon in their opioid
 9   prescribing, including some healthcare professionals
10   in New York.
11          Q.    Okay.  So I, I would like you to turn to
12   your January 16th 2020 deposition.  If we can pull
13   that up again.  It's page 175, line 5, and it runs
14   to line 20.  Pam, you've got that on the screen.
15              Dr. Lembke, you were asked at your
16   deposition:
17              "So you conducted no comprehensive
18   survey of doctors and nurses in New York to
19   understand what marketing materials, if any,
20   prescribers in New York received from what
21   individual Defendants; is that correct?"
22          A    It's correct that the survey --
23          Q.    Let me finish the question.
24          A    I'm sorry.
25          Q.    And so the transcript goes on to say:
```

```
 1                    Frye Hearing - Dr. Lembke              122
 2      "I feel like I answered the question to the best of
 3      my ability."
 4                  A follow-up question is asked at line
 5      12:  "So do you have a survey that you can show us
 6      where you surveyed doctors and nurses in New York
 7      regarding asking them, for example, Mallinckrodt,
 8      what specific marketing materials did you, Dr.
 9      Smith, in Nassau, receive from Mallinckrodt; do you
10      have that to produce?
11                  ANSWER:  I don't have a survey at that
12      level of specificity."
13                  That's your testimony from your
14      deposition, correct, Dr. Lembke?
15           A    Yes.
16           Q.   Okay.  And you did not do a regression
17      analysis as part of your methodology; did you?
18           A    No.
19           Q.   So to be clear to the Court, make sure
20      we're on the same page, was there a regression
21      analysis, is a tool that's employed to try to
22      isolate the impact of one factor on another while
23      controlling for potentially confounding factors,
24      correct?
25           A    Yes.
```

```
 1                   Frye Hearing - Dr. Lembke            123
 2          Q.   Okay.  And we've been talking about
 3     doctors -- I want to shift gears for a moment.
 4               Pam, can you actually put up Slide 1 for
 5     us again one more time.
 6               I want to remind you of what question 3
 7     is.  It says:  "Did those prescriptions, if any,
 8     lead to opioid addiction and misuse of use or
 9     overdose?"
10               All right.  So, Pam, you can pull that
11     back down.
12               And so with that in mind, turning to
13     patients, in forming your opinions, you haven't
14     examined patient outcomes for any particular patient
15     in the State of New York who was prescribed one of
16     the Defendants' opioid medications; have you?
17          A    In my book I describe a patient who I
18     interviewed using qualitative methods who was
19     prescribed an opioid in the State of New York.
20          Q.   So in forming your opinions you relied
21     upon that, that's your experience from New York,
22     that one anecdote?
23          A    That is part of my experience for New
24     York, yes.
25          Q.   Okay.  So you've not done anything more
```

1

2      to examine patient outcomes for any particular

3      patient in the State of New York who was prescribed

4      one of the Defendants' opioid medications; have you?

5          A    Not by directly interviewing a patient,

6      no.

7          Q.   And you didn't review individual medical

8      records either, correct?

9          A    Correct.

10         Q.   And you didn't actually speak to any

11     patients in Nassau or Suffolk County for purposes of

12     forming your opinions in this case at all, correct?

13         A    Correct.

14         Q.   And you mentioned that one anecdote in

15     your book.  Which drug did the patient take?

16         A    She was prescribed buprenorphine.

17         Q.   Any other drug?

18         A    No.

19         Q.   So given that you didn't examine

20     patients broadly in forming your opinions, other

21     than the one anecdote you gave us, you didn't talk

22     to folks in Nassau or Suffolk, you didn't talk to

23     patients there, that means that you didn't consider,

24     as part of your methodology, whether any particular

25     patient in New York suffering from chronic pain

1

2    actually benefited from Defendants' opioid

3    medications, correct?

4         A    I'm sorry, could you restate the

5    question?

6         Q.   Sure.

7              Given what you've said, as part of your

8    methodology you didn't consider whether any

9    particular patient in New York who suffers from

10   chronic pain actually benefited from Defendants'

11   opioid medications, correct?

12        A    I did have conversations with patients

13   in New York, others beyond the one that was in my

14   book regarding whether or not they benefited from

15   opioid medications.

16        Q.   So you got some anecdotal conversations,

17   that's what you're referring to?

18        A    I have conversations that I think go

19   beyond anecdote.

20        Q.   Okay.  But you just testified in forming

21   your opinions in this case you didn't review

22   individual medical records or talk with patients in

23   coming up with your opinions in this case; isn't

24   that correct?

25        A    I didn't review medical records, but I

1

2    did talk to patients.

3          Q.   Anecdotally?

4          A    I think they were interviews based on

5    quantitative methodology.

6          Q.   And are they identified in your expert

7    report, Dr. Lembke, in things that you relied upon

8    in forming your opinions in this case?

9          A    No.  We did not identify individual

10   patients in my report.

11         Q.   Because that's not part of your

12   methodology in forming your opinions in this case,

13   correct, Dr. Lembke?

14         A    No, that's not correct.

15         Q.   So you have a methodology that you

16   failed to disclose to us, Dr. Lembke; is that your

17   testimony?

18         A    No.

19         Q.   Okay.  You haven't looked at individual

20   prescribing decisions of doctors in New York, and

21   you haven't surveyed them for purposes of in terms

22   of a scientifically rigorous survey for coming up

23   with your, your opinions here, but your analysis

24   does depend, in part, on your belief that there's no

25   reliable evidence that long-term opioid therapy is

1

2     effective for chronic non-cancer pain, correct?

3          A    Yes.

4          Q.   You recognize that the FDA has approved

5     certain prescription opioid medications for the

6     management of chronic pain, right?

7          A    Yes.

8          Q.   And, for example, the FDA has approved

9     Nucynta Er with the indication for management of

10    chronic pain, correct?

11         A    Yes.

12         Q.   The same is true for Duragesic?

13         A    Yes.

14         Q.   The same is true for Exalgo?

15         A    Yes.

16         Q.   The same is true for Kadian, correct?

17         A    Yes.

18         Q.   There are a number of generic drugs,

19    generic long-acting opioids that are also approved

20    for the management of chronic pain, correct?

21         A    Yes.

22         Q.   Some of those medications are

23    manufactured by some of the Defendants in this case,

24    correct?

25         A    Yes.

1

2      Q.   You understand that before approving any

3   prescription opioid medication the FDA must

4   determine that it's safe and effective?

5      A    Well, I just lost sound.  Can you repeat

6   that?

7      Q.   Yes.

8           Can you hear me okay?

9      A    Yeah.

10      Q.   We have some volume, some noise.  I

11   don't know if you can hear it.

12      A    I hear some static, which makes it

13   harder to hear you.

14      Q.   Yes.  I think it's gone now, Dr. Lembke.

15   Can you hear me better?

16      A    Yes.  Thank you.

17      Q.   So my question was:  You understand that

18   before approving any prescription opioid medication

19   the FDA must determine that it's safe and effective

20   for its indicated use, correct?

21      A    Yes, I understand that.

22      Q.   You also understand that for a drug to

23   be approved for marketing FDA must determine that

24   the drug is effective and that the benefits outweigh

25   its potential risk to patients; is that right?

1

2        A    Yes.

3        Q.    But you don't believe that the totality

4   of the evidence that the FDA reviewed in connection

5   with approving prescription opioid medications for

6   treatment of chronic pain support that indication,

7   correct?

8        A    That is correct.

9        Q.    In your opinion, Dr. Lembke, the FDA was

10  just wrong on this issue, correct?

11       A    They were wrong and also to some extent

12  duped.

13       Q.    Do you believe they were wrong, Dr.

14  Lembke?  That's my question.  I would like you to

15  answer my questions.

16       A    Yes.

17       Q.    So putting aside some of the details

18  that we just covered, at bottom you believe that

19  doctors have prescribed too many opioid medications,

20  correct?

21       A    Yes.

22       Q.    As part of your work in this case,

23  you've not identified any specific prescription for

24  an opioid medication written in the State of New

25  York that you believe is medically unnecessary,

1     correct?

2            And, again, I'm focused on your work in

3     forming your opinions for this case, that which was

4     disclosed to the Defendants.  I'm not talking about

5     anecdotal conversations you may or may not have had.

6     I'm really trying to focus on the basis of your

7     opinions in this case as disclosed to the parties.

8            So do you need me to repeat the

9     question?

10         A    Sure.

11         Q.   So as part of your work in this case, in

12     forming your opinions here you have not identified

13     any specific prescription for an opioid medication

14     written in the State of New York that you believe is

15     medically unnecessary, correct?

16         A    It's hard for me to answer that yes or

17     no.  I did research for my book, which preceded my

18     involvement in this litigation, which just formed my

19     opinion, and in that process I did qualitative

20     interviews, including with individuals in New York

21     State.

22         Q.   Okay.  Just so we have absolute clarity

23     on this, why don't we go ahead and turn to page 207

24     of your January 2020 deposition.  For everyone in

```
 1                    Frye Hearing - Dr. Lembke              131
 2    the courtroom it's page 207, lines 21, and it runs
 3    on to page 208, line 3.  Pam has pulled it up.
 4    Thank you very much, Pam.
 5              So at line 21 you were asked:  "So my
 6    question was a bit different, so let me just ask
 7    this:  Is your opinion in this case based on
 8    identifying concrete examples of specific
 9    prescriptions of any opioids written in New York
10    that you believe in your opinion were medically
11    unnecessary or inappropriate?
12              ANSWER:  My opinion is not based on
13    specific prescriptions, it's based on aggregate
14    prescriptions."
15              That was the testimony that you gave in
16    your deposition in this case, correct?
17         A    Yes.
18         Q.   Did you include those qualitative
19    interviews that you just referenced?  Did you
20    include those interviews in your expert materials in
21    this case?
22         A    Yes.
23         Q.   Okay.  And can you identify where those
24    are located in your expert materials?
25         A    Defense asked for those documents.  They
```

```
  1                    Frye Hearing - Dr. Lembke              132

  2     were copied and given to defense counsel.  They were

  3     used in deposition.  I was asked questions regarding

  4     those documents in deposition.

  5          Q.   And you gave the answer, the aggregate

  6     prescription is what you relied upon.  That's what

  7     you testified to at the deposition, right?  Your

  8     opinion is not based on specific prescriptions, in

  9     terms of forming your opinion in this case, it was

 10     based on aggregate prescriptions, correct?

 11          A    That is what I testified at the

 12     deposition, yes.

 13          Q.   And you can't point to any particular

 14     prescription for any Janssen opioid medications and

 15     tell the jury that those are medically unnecessary,

 16     that's not something that you're going to do in this

 17     case, correct?

 18          A    No.

 19               THE COURT:  "No," or "no," not correct?

 20               THE WITNESS:  Sorry.  Ask the question

 21          again.

 22          Q.   So I'll rephrase it a little bit.

 23               You can't point to any particular

 24     prescription for any Janssen opioid medications and

 25     tell the jury that those are medically unnecessary?
```

```
 1                    Frye Hearing - Dr. Lembke              133

 2          A    No, I cannot point to any specific

 3    Janssen prescriptions.

 4          Q.   The same is true for Allergan, correct?

 5          A    Yes.

 6          Q.   And Teva?

 7          A    Yes.

 8          Q.   Endo?

 9          A    Yes.

10          Q.   Mallinckrodt?

11          A    Yes.

12          Q.   So your opinion in this case instead is

13    that the total number of opioid prescriptions

14    written was too many, right?

15          A    Yes.

16          Q.   Even though you're focused on the total

17    number of opioid prescriptions, you still don't know

18    what the right number of opioid prescriptions is,

19    correct?

20          A    I don't think that's correct.  No, I do

21    have an opinion about that.

22          Q.   Okay.  So let's go and pull up your

23    deposition.  It's page 115 -- let me ask it slightly

24    differently before we do that, Pam, actually, one

25    moment.
```

```
 1              Frye Hearing - Dr. Lembke              134
 2              You don't know the right number of
 3    patients -- I mean, let's set aside total number of
 4    prescriptions.  You don't know the right number of
 5    patients who should be prescribed opioid medications
 6    in this country are in New York or not; do you?
 7         A    Well, I'm not sure what you mean by "the
 8    right number."  I mean, I don't have a specific
 9    number.  I do have an opinion that we should be
10    prescribing a lot less than we're currently
11    prescribing and for a much narrower indication.
12         Q.   Okay.  So you think it should be less,
13    but my question is what is the right number?  You
14    don't know what the right number of prescriptions
15    is, correct?
16         A    I have not calculated a single number,
17    no.
18         Q.   And, in fact, the most you've testified
19    to at your deposition is you said:  It's hard to say
20    what the number should be.  I think it should be
21    lower.  Correct?  That's what you said at your
22    deposition?
23         A    Yes.
24         Q.   Okay.  So that means you can't tell the
25    Court, for example, how many fewer Kadian
```

1

2    prescriptions should have been written, correct?

3        A    As I said to the Judge earlier, a rough

4    estimate is that we're writing four to five times

5    too many opioid prescriptions compared to what we

6    were writing in the 1990s.  So that could also apply

7    to Kadian's products.

8        Q.   Is it your opinion that the correct

9    number of prescriptions is those that were written

10   in 1990?

11       A    I think we were closer to what was

12   appropriate for the actual need for analgesia in the

13   population.

14       Q.   That was -- in the 1990 you do

15   understand that the Defendants' products mostly did

16   not exist, correct?  Do you understand that?

17       A    There are a lot of products.  I don't

18   know the exact dates of every single product and

19   when it came out on the market.

20       Q.   So you don't know that most of the

21   Defendants' products at issue in this case didn't

22   exist in 1990; is that your testimony, Dr. Lembke?

23       A    I'd like to see the material on that.

24   I'm happy to review any additional material.

25       Q.   I'm just asking if you happen to know as

1

2    an expert opining in this case, whether the vast

3    majority of the products at issue in this case did

4    not exist in 1990; do you know that or not?

5         A    Well, I, I would disagree that it's the

6    vast majority.  Morphine was available, OxyContin

7    was available, hydrocodone products were available.

8         Q.   I'm talking about the Defendants'

9    branded products at issue in this litigation as a

10   starting point, most of them did not exist; do you

11   know that or not?  If you don't, that's fine, Dr.

12   Lembke.  I'm just trying to get an understanding of

13   your knowledge of those medications.

14        A    Well, you're wanting me to agree with

15   the statement that I'm reluctant to agree with,

16   because I would want to see more material.

17        Q.   Because you don't know, without seeing

18   more material, you can't tell me; is that fair to

19   say?

20        A    Yes, that is fair to say.

21        Q.   Okay.  And, you know, I just want to ask

22   a couple more on this point, because I think it's

23   important for us all to be clear on this.

24             Right now sitting here today, you can't

25   testify as to how many fewer Nucynta prescriptions

```
 1                    Frye Hearing - Dr. Lembke              137

 2      should have been written at any point in time,

 3      correct?

 4                    And, I mean, you know, how many should

 5      have been written or should not have been written,

 6      you can't do that as you sit here today, correct?

 7            A     I can't provide a specific number, no.

 8            Q.    The same is true for Exalgo?

 9            A     Yes.

10            Q.    Actiq?

11            A     Yes.

12            Q.    That's really true for any individual

13      opioid medications that were sold or distributed or

14      dispensed by any Defendants in this case, correct?

15            A     Yes.

16            Q.    So let's talk more about the factors

17      that led to the number of prescriptions of opioids

18      in New York, generally in Suffolk and Nassau County

19      specifically.

20                    You do agree that some doctors actually

21      prescribed opioids purely for their own personal

22      profit knowing that the individuals to whom they

23      were prescribing didn't really need the medications,

24      correct?

25            A     Yes.
```

1

2       Q.   Doctors who prescribe opioids to people

3   knowing that they don't actually need the

4   medications, those doctors are commonly referred to

5   as pill mill doctors, correct?

6       A    Yes.

7       Q.   They're not prescribing opioids because

8   they believe the prescriptions are appropriate based

9   on anything anyone said, correct?

10      A    Yes.

11      Q.   That would include Defendants, they're

12  not doing it based on anything the Defendants said

13  when they're out there committing those crimes,

14  correct?

15      A    Yes.

16      Q.   You do recognize that pill mills have

17  contributed to the opioid problem, correct?

18      A    Yes.

19      Q.   You're aware from at least lay-newspaper

20  articles, I believe you identified those before,

21  that there have been pill mill doctors in New York,

22  right?

23      A    Yes.

24      Q.   But you can't identify any specific pill

25  mills in New York State, correct?

```
 1                    Frye Hearing - Dr. Lembke            139

 2            A    Correct.

 3            Q.   So it's fair to say that you haven't

 4     taken steps to measure or quantify the impact of

 5     pill mills in causing opioid abuse, misuse or

 6     overdose, that wasn't part of your methodology,

 7     correct?

 8            A    That's incorrect.

 9            Q.   Okay.  So let me go here.

10                 I understand you published an article in

11     JAMA in 2016 with Jonathan Chen, an altered view of

12     2013 Medicaid data on opioid prescribing; are you

13     pausing because of that?

14            A    Yes.

15            Q.   Okay.  So you know that -- and thanks

16     for that Medicare data -- you know that many pill

17     mill doctors actually run all cash businesses and

18     don't accept insurance, correct?

19            A    Yes.

20            Q.   And Medicare is a form of insurance,

21     right?

22            A    Yes, it is.  Yes.

23            Q.   I need an oral answer for the

24     transcript.  Thanks, Dr. Lembke.

25                 If pill mill doctors don't accept an
```

```
1                    Frye Hearing - Dr. Lembke              140
2       insurance, their prescriptions wouldn't show up in
3       Medicare data, correct?
4            A    That's true.
5            Q.   So setting aside that in your 2006 JAMA
6       article addressing Medicare data you conclude -- I'm
7       sorry, setting that aside, in that article you
8       conclude that the overall increase in opioid
9       prescribing was not primarily due to pill mill
10      doctors, correct?
11           A    That's correct.
12           Q.   Okay.  But the article doesn't address
13      the impact of pill mill prescribers on specific
14      patient outcomes, correct?
15           A    That is true.
16           Q.   Okay.  And so nothing in the article
17      directly quantifies the impact of prescriptions from
18      pill mill doctors on opioid abuse, misuse and
19      overdose, fair?
20           A    That is fair.
21           Q.   So let's talk about doctor shopping
22      next.
23                You agree that in some circumstances
24      patients themselves engage in manipulative behaviors
25      to obtain opioid medications from doctors, right?
```

1

2          A     Yes.

3          Q.    And one example is you know of a patient

4    manipulating a prescriber is when a patient goes to

5    multiple doctors to get the same or similar

6    prescriptions, right?

7          A     Yes.

8          Q.    That's called doctor shopping; isn't it?

9          A     Yes, that's correct.

10         Q.    To be clear, doctor shopping patients

11   essentially lie to their doctors to get more opioid

12   prescriptions, correct?

13         A     Yes.

14         Q.    You would agree that doctor shopping

15   often leads to improper prescriptions, right?

16         A     Yes.

17         Q.    You would agree that doctor shopping is

18   certainly part of the opioid abuse problem in New

19   York, correct?

20         A     Yes.

21         Q.    Well, one way to identify patients who

22   may be doctor shopping is to look at the data

23   maintained by a state's prescription drug monitoring

24   program, correct?

25         A     Yes.

1

2      Q.   You haven't looked at New York's

3  prescription drug monitoring program data in forming

4  your opinions in this case, correct?

5      A    That's correct.

6      Q.   So that means you have not tried to

7  identify how many prescription opioid pills were

8  dispensed improperly as a result of doctor shopping,

9  fair?

10      A    Not by looking at the prescription drug

11  monitoring database.

12      Q.   Well, it wasn't part of your methodology

13  in this case to actually measure the impact of

14  doctor shopping on the opioid abuse problem in New

15  York, correct?

16      A    That is correct.

17      Q.   So let's turn to opioid prescriptions

18  that were illegally obtained without any

19  prescription at all.

20           Illegally obtaining opioid medications

21  is often referred to as diversion, correct?

22      A    Yes.

23      Q.   Do you agree that sometimes prescription

24  opioid pills are stolen from production facilities

25  during transit from production facilities or from

1

2       retail pharmacies; is that right?

3               A    Yes.

4               Q.   Opioid pills that were diverted from

5       production facilities, pharmacies or during transit

6       were not prescribed by a doctor, correct?

7               A    That is correct.

8               Q.   You agree that this type of diversion

9       has been part of the opioid abuse problem in New

10      York, right?

11              A    Yes.

12              Q.   But you've not identified the number of

13      these incidents of diversion in forming your

14      causation opinion in this case; have you?

15              A    No.

16              Q.   You don't know what percentage of pills

17      are diverted from pharmacies or distributors; do

18      you?

19              A    No.

20              Q.   In fact, you aren't even offering an

21      opinion on thefts from pharmacies or distributors in

22      this case, correct?

23              A    Pardon me?

24              Q.   I just want to make sure you weren't

25      offering an opinion on thefts from pharmacies or

```
 1                    Frye Hearing - Dr. Lembke              144
 2     distributors in this case, correct?  Right?
 3           A     I can't answer that yes or no.
 4           Q.    Well, let me try, I'm going to rephrase
 5     it one more time and see if we can do this before we
 6     go to the deposition.
 7                 Are you offering any opinion in this
 8     case about any theft from a distributor in this
 9     case?
10           A     I am offering opinion on diversion but
11     not specifically necessarily due to theft.
12           Q.    Okay.  So I just really need you to
13     focus on the question.  That was my question.
14                 You're not offering opinions on thefts
15     from pharmacies or distributors in this case,
16     correct?
17           A     Correct.
18           Q.    And so it's fair to say that you've not
19     tried to quantify the impact of this type of
20     diversion on the opioid abuse crisis in New York;
21     it's not part of your methodology to quantify this
22     diversion, correct?
23           A     That's correct.
24           Q.    One of your opinions in this case is
25     that increased supply of prescription opioids
```

1

2    contributed to more individuals turning to heroin,

3    correct?

4         A    Yes.

5         Q.    You agree that heroin and other

6    illicitly manufactured opioids are supplied by drug

7    dealers and cartels, right?

8         A    Yes.

9         Q.    Despite opining on what you believe was

10   the cause of heroin use, are you aware that there

11   were many -- there were more heroin users in New

12   York City in the mid 1970s than in 2000?

13        A    I haven't seen material to that effect,

14   but I'm happy to review, and if you have something

15   you want me to read.

16        Q.    So you're not aware of that; is that

17   your testimony?

18        A    Yes.

19        Q.    You're not aware of it, correct?

20        A    That's correct.

21        Q.    No part of your methodology involved

22   looking at the illicitly manufactured opioid market

23   in New York, correct?

24        A    That's correct.

25        Q.    So let's talk more about the things that

1

2     may have harmed New York residents.

3              For example, do you believe that other

4     pharmaceutical companies that are not Defendants in

5     this case contributed to opioid related harms in New

6     York, right?

7         A    I'm sorry, could you --

8         Q.   Do you want me to say it again?

9         A    There are a lot of Defendants in this

10    case.  Are you referring to a specific opioid

11    manufacturing --

12        Q.   Right now as you sit here, do you

13    believe that other pharmaceutical companies, other

14    than the Defendants in this case, contributed to

15    opioid related harms in New York?

16        A    Yes.  I mean, I, I look at it as a sort

17    of aggregate influence.

18        Q.   Okay.  And do you believe that doctors

19    contributed to opioid related harms in New York,

20    correct?

21        A    Yes.

22        Q.   The FDA also contributed to the harms in

23    your opinion, correct?

24        A    Yes.

25        Q.   State Medical Boards and the Federation

```
 1                    Frye Hearing - Dr. Lembke          147

 2      of State Medical Boards also contributed?

 3            A    Yes.

 4            Q.   Formulary and reimbursement policies of

 5      insurance companies and other third-party pairs also

 6      contributed in your opinion, correct?

 7            A    Yes.

 8            Q.   So let's talk a little bit about each of

 9      those.

10                 Although you believe that there are

11      pharmaceutical companies, other than the Defendants

12      here, that bear some responsibility, you have not,

13      as part of your opinion in this case, quantified the

14      contribution of those non-Defendant pharmaceutical

15      companies; have you?

16            A    No.

17            Q.   When you say doctors bear some

18      responsibility, that means all doctors, not just the

19      pill mill doctors we discussed before, correct?

20            A    Yes.

21            Q.   Then in the course of writing your book

22      you took notes reflecting that some of your

23      colleagues just want to keep the emergency moving by

24      getting patients out the door, right?

25            A    Yes.
```

Q.    One of your trusted colleagues said,

Just give them what they want, right?

A     Yes, she did.

Q.    But you haven't quantified the extent to

which doctors have contributed to the opioid crisis

in New York, correct?

A     Not to a specific number, no.

Q.    And as we discussed earlier, you think

the FDA got it wrong when they approved opioid

medications for the treatment of chronic pain,

correct?  I just want to make sure we're back on the

same page there.

A     Yes.

Q.    You also believe that the FDA

contributed to the prescription opioid epidemic by

making it easier, because I'm quoting from you,

making it easier for the pharmaceutical companies to

get FDA approval from new opioids coming on the

market; is that fair?

A     Yes.

Q.    But there's no portion of your

methodology where you quantify the degree of

responsibility that should be allocated to FDA,

correct?

1

2          A     That's correct.

3          Q.    So let's talk about some of the other

4    regulatory authorities.

5                The New York Board of Medicine has the

6    power to investigate and discipline doctors,

7    correct?

8          A     Yes.

9          Q.    It also imposes and overseas continuing

10   medical education, or CME requirements; doesn't it?

11         A     Yes.

12         Q.    The New York Board of Medicine has the

13   authority to revoke medical licenses, correct?

14         A     Yes, it does.

15         Q.    If a doctor has his or her license

16   revoked, the doctor can't prescribe opioid

17   medications, correct?

18         A     Not lawfully.

19         Q.    So that's correct?

20         A     That's correct.

21         Q.    And you agree that State Medical Boards,

22   including the New York Board of Medicine,

23   contributed to the opioid related harms, right?

24         A     Yes.

25         Q.    But there's no part of your methodology

```
 1                    Frye Hearing - Dr. Lembke              150

 2      that quantifies the degree of responsibility that

 3      should be allocated to the New York Board of

 4      Medicine, correct?

 5           A    That's correct.

 6           Q.   You also think that model opioid

 7      prescribing guidelines released by the Federation of

 8      State Medical Boards made the opioid epidemic in New

 9      York worse, right?

10           A    Yes.

11           Q.   So we've talked about a few government

12      regulatory agencies now but, again, to be clear, no

13      part of your methodology quantifies the

14      responsibility of any government or regulatory

15      entity, fair?

16           A    Yes.

17           Q.   You also don't, as part of your -- as

18      part of your methodology in this case, you don't

19      quantify the extent to which managed care formulary

20      or other reimbursement policies caused or

21      contributed to the opioid epidemic in New York,

22      correct?

23           A    That's correct.

24           Q.   But you agree that managed care

25      formulary, other reimbursement policies did
```

```
 1                    Frye Hearing - Dr. Lembke              151
 2    influence how medication is prescribed, right?
 3         A    Yes.
 4         Q.   So we've talked about a number of
 5    individuals and entities and other factors that you
 6    believe contributed to the opioid crisis.
 7              I'd ask Pam now to pull up Slide 2 and,
 8    Mr. Asher, if you can, hand that out in court.  This
 9    one will be pretty quick.  And if you can go ahead
10    and pull that up.
11              So, again, we've talked about a number
12    of individuals and entities and other factors that
13    you believed contributed to the opioid crisis, and I
14    think they'll pop up on the screen here in a moment.
15              But to be clear, Dr. Lembke, you've not
16    specifically quantified the responsibility of any of
17    those factors; have you?
18         A    Not with a specific number, no.
19              MS. STRONG:  Okay.  So we just don't
20              know.  No further questions at this time,
21              your Honor.  Thank you, Dr. Lembke.
22              THE WITNESS:  You're welcome.
23              MR. PYSER:  Your Honor, this is Steven
24              Pyser, I'm up next.  Completely up to the
25              Court if you want to take a break now or you
```

1

2          just want me to jump in.

3              THE COURT:  We're only working for an

4          hour, so jump in.

5              THE WITNESS:  Mr. Pyser, can you improve

6          your sound at all?  The sound is not good on

7          my end, neither is my hearing.

8              MR. PYSER:  I will do my best to improve

9          my sound.

10   CROSS-EXAMINATION

11   MR. PYSER:

12         Q.   Dr. Lembke, I just want to start with

13   some questions about your personal experience.

14              Have you ever worked for a

15   pharmaceutical wholesale distributor?

16         A    No.

17         Q.   Do you have any training or expertise in

18   supply chain management?

19         A    No.

20         Q.   Do you have any training or expertise in

21   the distribution of controlled substances?

22         A    No.

23         Q.   Do you have any training or expertise in

24   suspicious order monitoring for controlled

25   substances?

```
 1                    Frye Hearing - Dr. Lembke            153

 2           A    No.

 3           Q.   Do you have any training or expertise in

 4      a distributor's legal or regulatory responsibilities

 5      concerning distribution of controlled substances?

 6           A    I am aware of the Controlled Substances

 7      Act and its statement that every player in the

 8      supply chain has a responsibility to steward those

 9      pills and to monitor suspicious orders.

10           Q.   But you don't have any expertise in

11      distributors' legal or regulatory responsibilities

12      with respect to controlled substances; do you?

13           A    I don't have specific training beyond my

14      medical training and my medical experience, no.

15           Q.   Doctor, if you could, Dr. Lembke, do you

16      recall giving a deposition in the MDL case on April

17      24th 2019?

18           A    Yes, I recall giving that deposition.

19           Q.   Now, if you're able to control the

20      screen and bring up page 276, lines 5 through 9, and

21      in that deposition you were asked:  "Do you have any

22      training or expertise in a distributor's legal or

23      regulatory responsibilities concerning the

24      distribution of controlled substances?"

25                And you answered:  "No."
```

 2            Is that the testimony you gave under

 3     oath?

 4            A    Yes.

 5            Q.   Have you ever designed a suspicious

 6     order monitoring program?

 7            A    Yes.

 8            Q.   Dr. Lembke, you recall being deposed in

 9     this case in New York?

10            A    Yes.

11            MR. PYSER:  Matt, if you can pull up the

12            January 16th 2020 deposition transcript at

13            page 170, line 24, through 171, line one.

14            Q.   You were asked:  "Have you ever designed

15     a suspicious order monitoring program?"

16            And you answered:  "No."

17            Was that the testimony you gave under

18     oath?

19            A    Yes.

20            Q.   Dr. Lembke, I'd like to ask you a little

21     bit about something from your report on page 13 of

22     your report in paragraph 2.  If you have it handy I

23     can read it to you as well.  You wrote the

24     following:  "Opioid prescribing began to increase in

25     the 1980s and became prolific in the 1990s and the

1

2    early part of the 21st century representing a

3    radical part on shift in the treatment of pain and

4    creating more access to opioids across the United

5    States."

6                Did I read that correctly?

7        A    Yes.

8        Q.    And specifically, part of your opinion

9    is that one of the ways that the paradigm shifted is

10   that opioids became a first line treatment for minor

11   pain conditions and chronic pain conditions; is that

12   right?

13       A    Yes.

14       Q.    As a result of that paradigm shifting in

15   the treatment of pain it was generally accepted

16   medical practice to prescribe opioids to patients

17   for chronic non-cancer pain, correct?

18       A    Yes.

19       Q.    Another result of the paradigm shift was

20   that doctors prescribed opioids in higher doses as

21   part of the generally accepted medical practice; is

22   that right?

23       A    Yes.

24       Q.    And doctors, as part of generally

25   accepted medical practice, also prescribed opioids

1

2       on a longer term basis, correct?

3              A    Yes.

4              Q.   When we talk about generally accepted

5       medical practice, that means that's one that most

6       doctors at the time believed was the correct

7       treatment option, correct?

8              A    Yes.

9              Q.   When we talk about generally accepted

10      medical practice, that includes the State of New

11      York, as well as the rest of the country; is that

12      right?

13             A    Yes.

14             Q.   I'm going to ask you a little bit about

15      something you were asked about this morning.  Mr.

16      Hanly brought up something called the gateway

17      effect; do you remember that this morning?

18             A    Yes.

19             Q.   You never used that specific phrase,

20      gateway effect, or published that observation in any

21      peer review journal articles; have you?

22             A    No.

23             Q.   "No," you have not?

24             A    I have not published that in any peer

25      review journal articles.  I have used that in other

1    contexts.

2         Q.    Before you were hired as an expert

3    witness in this case Mr. Hanly brought up a book

4    that you wrote, Drug Dealer, M.D.

5         A    Yes.

6         Q.    And he noted that that book was from

7    2016, right?

8         A    Yes.

9         Q.    You worked hard on the book?

10        A    Yes.

11        Q.    Had to get your facts right?

12        A    Pardon me?

13        Q.    You tried to get your facts right as to

14   what you included in the book?

15        A    Yes, I did.

16        Q.    So in that book, before you were hired

17   by the Plaintiffs' lawyers here, you had concluded

18   that the relationship between doctors' prescribing

19   patterns and the initiation of heroin use remains

20   unclear; is that right?

21        A    Yes.

22        Q.    In making that finding you cited to the

23   New England Journal of Medicine, correct?

24        A    Yes.  But I believe I cited the wrong

```
 1                  Frye Hearing - Dr. Lembke              158

 2     citation.

 3              Q.   Do you know what the right citation is?

 4              A    I can't recall it now, but I had

 5     intended to use something other than what I ended up

 6     using, which was a later publication.

 7              Q.   But the statement itself was included in

 8     your book, right?

 9              A    Yes.

10              Q.   That is the relationship between

11     doctors' prescribing patterns in the initiation of

12     heroin use remains unclear?

13              A    Yes.  I had a very specific idea in mind

14     with that that I didn't clarify, but I could, if

15     you'd like me to.

16              Q.   Dr. Lembke, did you or did you not write

17     that the relationship between doctors' prescribing

18     patterns and the initiation of heroin use remains

19     unclear?

20              A    Yes.

21              Q.   I want to shift gears a little bit

22     towards some of the marketing issues that you were

23     asked about this morning.

24              A    Okay.

25              Q.   Can you identify any false or misleading
```

```
 1                    Frye Hearing - Dr. Lembke              159

 2     claim about opioids made by a pharmaceutical

 3     distributor that's been named as a Defendant in this

 4     case?

 5           A    Yes, I can.

 6           Q.   Well, Dr. Lembke, I'd like to direct you

 7     to your New York deposition at page 70, line 14, and

 8     you were asked at the time the same exact question I

 9     just asked you, and that was can you identify any

10     false or misleading claim about opioids that was

11     made by a pharmaceutical distributor that has been

12     named as a Defendant in this case, and you answered

13     that question no.

14                Is that your testimony under oath?

15           A    Yes.  That was my testimony.

16           Q.   And it was true at the time?

17           A    At the time it was true.

18           Q.   That testimony was given after you

19     submitted your report in New York State, correct?

20           A    Yes.

21           Q.   You've not filed a supplemental report

22     in New York State, the report you filed is the only

23     report we have from you in New York State; is that

24     right?

25           A    That's correct.
```

1

2      Q.   On page 6 of that report, I want to

3    refer you to opinion 3.  At opinion 3 you wrote:

4    "The pharmaceutical opioid industry contributed to

5    the paradigm shift in opioid prescribing through

6    promotional materials and its use and manipulation

7    of key opinion leaders, continuing medical education

8    courses, professional medical societies, Federation

9    of State Medical Boards, and the Joint Commission to

10   convey misleading messages about the safety and

11   effect -- and efficacy of prescription opioids."

12          Is that a correct reading of your

13   opinion 3?

14      A    Yes.

15      Q.   So I would like to break that down and

16   just talk about the role of distributors or lack of

17   role of distributors as to each of those, okay?

18      A    Sure.

19      Q.   When you say the pharmaceutical opioid

20   industry used and manipulated key opinion leaders,

21   you're not talking about distributors, correct?

22      A    That's correct.

23      Q.   When you say the pharmaceutical opioid

24   industry used and manipulated continuing medical

25   educational courses, you're not talking about

1
2    distributors?

3           A    No.

4           Q.   "No," you're not talking about

5    distributors?

6           A    I'm not talking about distributors, no.

7           Q.   When you say the pharmaceutical opioid

8    industry used and manipulated professional medical

9    societies, you're not talking about distributors

10   there either; are you?

11          A    No.

12          Q.   When you say the pharmaceutical opioid

13   industry used and manipulated the Federation of

14   State Medical Boards and the Joint Commission there,

15   you're not talking about distributors either; are

16   you?

17          A    No.

18               THE COURT:  You know, when a question

19               calls for a yes or no, it might be a

20               universal recommendation to have every

21               witness watch the movie My Cousin Vinnie,

22               when he is asked originally by a deputy he's

23               told, You shot the sheriff.  He says, I shot

24               the sheriff.  Then when the deputy gets on

25               the stand, what did he say?  He says, I shot

1

2        the sheriff.

3             So when you say like no to that last

4        question, you really mean something else.

5        You've been doing a good job.  You've been

6        saying, No, I do not, or yes, I do.  So for

7        purposes of the record just --

8             THE WITNESS:  Okay.  Thank you.  I've

9        been worried to say more than yes or no.

10            THE COURT:  All right.  Am I the only

11       person in this building that saw My Cousin

12       Vinnie?  Just curious.  Let's go.

13       Q.   Let's try to clean that up, if we could,

14  because I think we understood what you were saying.

15            For each of those last five questions

16  that I asked you about distributors, your reference

17  there did not include any action by distributors; is

18  that correct?

19       A    My reference there does not include any

20  action by distributors, that is correct.

21            MR. PYSER:  Thank you, Dr. Lembke, and

22       thank you, your Honor, as well for helping

23       clean up.

24            THE COURT:  Is Mr. Carter -- he was

25       referenced in a September 2nd letter as being

1

2          an examiner; is that you, sir?

3                  MR. CARTER:  Yes, it is.

4                  THE COURT:  How are you?

5                  MR. CARTER:  I'm doing well.  I have

6          about ten minutes of questions, so if you

7          would like me to proceed now, I can.

8                  MR. PYSER:  I'm sorry, your Honor, I

9          wasn't quite done.

10                 THE COURT:  I heard you say "thank you,"

11         so that was my queue...

12                 MR. PYSER:  That was to my Cousin Vinnie

13         reference there.

14                 THE COURT:  Mr. Carter, sit down and

15         enjoy the show.

16                 Go ahead.

17         Q.    All right.  As part of your methodology

18    in this case, before serving your report, Dr.

19    Lembke, did you consider any documents produced by

20    Cardinal Health?

21         A     No.

22         Q.    Okay.  And same question for

23    AmerisourceBergen.

24                 Before serving your report did you

25    consider any documents produced by

1

2      AmerisourceBergen?

3            A    No.

4            Q.    As to McKesson Corporation, other than a

5      single document that was brought up at your

6      deposition, the Nucynta savings card, other than

7      that single document, did you consider any other

8      documents produced by McKesson?

9            A    Not before submitting my report, no.

10           Q.    As to that Nucynta document, you

11     describe that document as a coupon or a savings

12     card; is that right?

13           A    That's correct, yes.

14           Q.    So just talking generally about such

15     documents, a savings card that offers co-pay

16     assistance for the cost of prescriptions, you

17     understand that when a patient has a card for co-pay

18     assistance, the patient still needs to obtain a

19     prescription before they can obtain the medication;

20     is that right?

21           A    Yes, of course I understand that the

22     patient still needs a prescription.

23           Q.    And if a doctor has written a

24     prescription, that means the doctor has made a

25     decision that that particular medication is the

1

2     appropriate medication for treatment of pain in that

3     patient; is that right?

4          A     That's harder for me to answer yes or

5     no.

6               MR. PYSER:  Bear with me one second,

7          doctor.

8          Q.   So presumably when a doctor has made a

9     decision that a medication like Nucynta is an

10    appropriate medication for acute treatment of pain

11    in the patient and issues a prescription, that

12    doctor has made a decision based on their own

13    medical judgment, correct?

14         A     Not entirely.  There are other

15    influences that are at play in a doctor's decision.

16    For example, if a drug rep came by and gave them a

17    bunch of, you know, Nucynta saving cards and asked

18    them to give them to patients, that would influence

19    that decision.

20         Q.   But the ultimate decision rather to

21    prescribe or not, that decision rests with the

22    doctor, correct?

23         A     In the most superficial sense, yes.

24         Q.   So you don't believe doctors have

25    independent judgment that they exercise with their

1

2    patients?

3         A    Yes.  But they can only base their

4    judgment on the knowledge that they have, and if

5    that's faulty knowledge, they can't exercise good

6    judgment.

7         Q.   Do doctors have an obligation to educate

8    themselves?

9         A    Yes, they do.

10        Q.   As part of your methodology in this

11   case, did you conduct your own analysis of

12   psychiatric data, such as the ARCOS data, to reach a

13   conclusion about distribution of opioids?

14        A    No.

15        Q.   As part of your report and your work

16   here, you're not able to point to any particular

17   distribution of a particular medication and say that

18   the prescriptions filled by a pharmacy as a result

19   of that distribution were medically unnecessary; you

20   can't get to that level of detail, can you?

21        A    No, not to that level of detail.

22        Q.   As part of your methodology you're not

23   offering an opinion as to the appropriate number of

24   pills that should have been distributed into the

25   State of New York; are you?

1

2        A     Probably I have offered an opinion on

3    that topic, and I have stated before it should be at

4    least four- or fivefold less than current

5    prescribing.

6        Q.    Beyond that four- or fivefold estimate,

7    you're not putting forth a particular number of

8    pills that you believe should have been distributed

9    in the State of New York for particular medications;

10   are you?

11       A     Not a specific number, no.

12       Q.    Same thing for Suffolk County and Nassau

13   County.  You're not offering an opinion as to the

14   specific number of opioid medications that should

15   have been distributed into Nassau or Suffolk County;

16   are you?

17       A     I'm offering the same opinion for those

18   counties as for the State of New York, as I said

19   before.

20       Q.    I'd like to draw your attention to

21   another line in your report at page 18 this time.

22   Do you have that in front of you?

23       A     Yes.  Let me just turn to it.

24       Q.    This is something that was covered a

25   little bit earlier.  It's toward the top of the

```
1              Frye Hearing - Dr. Lembke          168
2     page, the Roman number III.  It says:  "The history
3     of prescription opioid marketing distribution
4     throughout the United States means that it's highly
5     probable that prescribing rates in those counties
6     were far lower in the 1990s before such marketing
7     and distribution campaigns were implemented by the
8     Defendants."
9              Do you see that?
10        A    Yes.
11        Q.   Okay.  I want to just ask you a couple
12    of questions about the basis for that statement.
13             Can you point to any report, article or
14    analysis which concluded that the rate at which
15    healthcare providers prescribed opioids increased
16    because pharmaceutical distributors shift
17    prescription opioids to pharmacies?
18        A    There are, as in my report,
19    authoritative bodies who have weighed in on this,
20    and I agree with them that the distribution of
21    opioid pain pills is what contributed to the
22    increased access to prescription pain pills, and
23    access is a huge risk factor for misuse and
24    addiction.
25        Q.   I think maybe we're talking past each
```

1

2      other.

3              What I'm asking you is whether there's a

4      report, article or analysis which concluded the rate

5      at which the healthcare providers prescribed, the

6      prescribing decisions, are you aware of any analysis

7      which concluded that healthcare providers' decisions

8      to prescribe increased because pharmaceutical

9      distributors shift prescription medicine to

10     pharmacies?

11         A    Well, I take it, as a matter of common

12     sense, that you can't get the pills to the patients

13     unless they're distributed to the pharmacies.

14         Q.   I'm not asking about getting it to the

15     patients, though, doctor.  What I'm asking you is

16     about the healthcare providers' decision to write a

17     prescription and whether you believe that the simple

18     fact that a distributor shifted medication to a

19     pharmacy caused a doctor to alter their medical

20     judgment and write more prescription opioids?

21         A    That's hard for me to answer yes or no

22     because I -- my sense is it's a feed forward cycle.

23     The more that were shift, the more patients became

24     dependent on them, the more that doctors were in a

25     position to have to continue to prescribe them.

1

2          Q.    So sitting here today, can you point me

3     to any academic article or study that found that

4     doctors prescribing was based on the fact that

5     distributors shift pills to pharmacies?

6          A    Yeah, I'm not sure I really understand

7     the point of the question, so it's hard for me to

8     answer it.

9          Q.    You can answer the question whether you

10    understand the point of it or not.

11             So the question is:  Are you aware of

12    any study in which the authors of the study found

13    that doctors prescribing increased because of the

14    shifting by distributors of medicine to a pharmacy?

15         A    The increased distribution meant that

16    these communities had more opioids, which meant that

17    the general population had more access, either

18    through legitimate prescription or otherwise, which

19    then created the need for ongoing prescribing.

20             So I do think that it begins with the

21    access and not with necessarily it's a feed forward

22    cycle.

23         Q.    Doctor, again, you're still not

24    answering the question.

25             The question is pointed at doctors'

```
 1                    Frye Hearing - Dr. Lembke           171

 2    prescribing decisions, healthcare providers'

 3    prescribing decisions, and the question is:  Can you

 4    point me to a study in which the authors found that

 5    doctors prescribing increased because distributors

 6    shift medication to a pharmacy?

 7              THE COURT:  Just a yes or no, doctor.

 8         A    No.

 9              THE COURT:  Next question.

10         Q.   Dr. Lembke, I want to return to

11    something you said this morning actually, this was

12    point 2 of your summary.

13              And, Matt, if you could bring up point 2

14    of the summary.

15              So point 2 was opioid prescribing grows

16    fourfold starting in the 1990s, which increased the

17    supply of potent and deadly opioids in the general

18    population, including New York.

19              That was your point this morning,

20    correct?

21         A    Yes.

22         Q.   And you were trying to be accurate when

23    you testified this morning?

24         A    Yes.

25         Q.   You told the truth in your testimony?
```

```
1                    Frye Hearing - Dr. Lembke              172
2            A    Yes.
3            Q.   And here what you've said is that the
4      prescribing increased the supply of opioids,
5      correct?
6            A    Yes.
7                 MR. PYSER:  You can take that down,
8            Matt.
9            Q.   Is it true that without a prescription,
10     medication that shifts to a pharmacy will stay on
11     the shelves of the pharmacy; is that right, doctor?
12           A    Yes.
13           Q.   Did you interview any pharmacists in the
14     State of New York for purposes of forming your
15     opinions in this case?
16           A    No.
17           Q.   Can you identify for the Court a
18     specific doctor in Nassau or Suffolk County who
19     prescribed more opioids because opioids were
20     available at pharmacies?
21           A    No.
22           Q.   Can you identify a specific doctor in
23     the State of New York who prescribed more opioids
24     because opioids were available at pharmacies?
25           A    No.
```

1

2      Q.   As part of your professional practice as

3   a doctor, before you prescribe a patient a

4   medication do you regularly call the pharmacies in

5   your area from which the patient could fill that

6   prescription to see if the pharmacies have the

7   medication you want to prescribe?

8      A    Not usually.

9      Q.   Dr. Lembke, do you agree with me that

10  the large majority of opioid prescriptions written

11  in New York were written for what the doctor who

12  wrote them thought was a legitimate medical purpose?

13     A    Yes.

14     Q.   The number of pills of a particular

15  medicine that a pharmacy dispenses is dependent on

16  the prescriptions written by healthcare

17  professionals, true?

18     A    Yes.

19     Q.   Doctors have a responsibility to ensure

20  that the medications they prescribe for patients are

21  for a legitimate medical purpose, correct?

22     A    Yes.

23     Q.   Pharmacists can't dispense opioids

24  without a prescription, right?

25     A    Yes.

```
 1                   Frye Hearing - Dr. Lembke              174
 2              MR. PYSER:  No further questions, your
 3       Honor.
 4              THE COURT:  Are you sure?
 5              MR. PYSER:  I'm sure this time.
 6              THE COURT:  Okay.  We'll take 15
 7       minutes.  Thank you.
 8              (WHEREUPON, a short recess was taken.)
 9              THE COURT:  Okay.  I don't see the
10       witness.
11              Welcome back.
12              THE WITNESS:  Thank you.
13              THE COURT:  Of course you're still under
14       oath; you know that, correct?
15              THE WITNESS:  What is that?
16              THE COURT:  I said of course you're
17       still under oath; you know that?
18              THE WITNESS:  Yes, thank you.
19              THE COURT:  Mr. Carter, you're up.
20              MR. CARTER:  Thank you, your Honor.
21       EXAMINATION BY
22       MR. CARTER:
23              Q.   Good afternoon, Dr. Lembke.  We met at
24       your deposition.  My name is Ed Carter, and I
25       represent Walmart, okay?
```

```
 1                    Frye Hearing - Dr. Lembke           175
 2          A    Yes.
 3          Q.   I have just a few questions this
 4     afternoon, so hopefully it will move quickly.
 5               You were asked some questions earlier
 6     today about some of the sources and individuals that
 7     you consulted in preparation for your report as part
 8     of your methodology, I want to start up to that
 9     topic in connection with your work in this case.
10               You did not interview any employees of
11     Nassau County or Suffolk County; did you?
12          A    No.
13          Q.   You did not interview any law
14     enforcement officers in the two counties; did you?
15          A    No.
16          Q.   You testified earlier about addiction
17     and specifically opioid use disorder.
18               You cannot tell us which specific
19     individuals or cases have opioid use disorder
20     diagnosis in Nassau County; can you?
21          A    No.
22          Q.   Same question for Suffolk County?
23          A    Same answer for Suffolk County.
24          Q.   Likewise, you do not know the number of
25     cases where a decedent in that Nassau County or
```

```
 1                  Frye Hearing - Dr. Lembke              176

 2      Suffolk County was diagnosed with an opioid use

 3      disorder; do you?

 4           A     No.

 5                 THE COURT:  You mean, yes, that is

 6            correct?

 7                 THE WITNESS:  That is correct.

 8                 MR. CARTER:  Thank you, your Honor.

 9           Q.    Dr. Lembke, that is not something that

10      you calculated as part of your methodology in this

11      case; is it?

12           A     No, that is not something that I have

13      calculated.

14           Q.    Likewise, you have not studied the

15      overdose death records from either counties to

16      determine whether the individuals had a diagnosis of

17      an opioid use disorder; did you?

18           A     I did not look at whether they had a

19      diagnosis of opioid use disorder.

20           Q.    The methodology that you utilized in

21      this case is not a methodology that is generally

22      accepted by psychiatrists or diagnosee in opioid use

23      disorder in a specific individual; is it?

24           A     Can you rephrase the question.

25           Q.    Sure.
```

1

2          The methodology you employed in this

3     case to reach the nine opinions that were on the

4     first slide that you showed today on direct, that is

5     not an accepted methodology for diagnosing a patient

6     in a clinical setting with an opioid use disorder;

7     is it?

8          A     Well, as part of forming my opinion I

9     did use the methods for diagnosing opioid use

10    disorder in individual patients, and my opinion is

11    informed both by my clinical professional experience

12    and the research that I did.  So I did use that

13    methodology.

14          I couldn't form an opinion about this

15    topic unless I was able to apply the DSM criteria to

16    diagnosing an opioid use disorder.

17          Q.   Maybe we're talking about two separate

18    things.

19          You did not apply the DSM criteria to

20    any patient in Nassau or Suffolk County or New York

21    State; did you?

22          A     No, I did not apply the DSM criteria to

23    any specific patient, as you said.

24          Q.   Thank you.

25          Now, if you were evaluating a patient in

```
 1                     Frye Hearing - Dr. Lembke            178
 2     a clinical setting for a possible opioid use
 3     disorder diagnosis, you would consider the full
 4     context of information available to you in that
 5     clinical setting; wouldn't you?
 6          A    Yes.
 7          Q.    For example, you would consider the
 8     patient's medical history, including their mental
 9     health history, and any information regarding their
10     history of substance abuse, fair?
11          A    Yes.
12          Q.    In a clinical setting you have never
13     made a diagnosis of an opioid use disorder by
14     disregarding that context and that clinical
15     indication and instead relying exclusively on
16     aggregate epidemiological statistics, that's
17     something you've never done in a clinical setting;
18     is it?
19          A    No.
20          Q.    As part of your methodology you did not
21     evaluate specific cases or specific individuals in
22     Nassau County or Suffolk County to determine whether
23     they ever had a prescription for an opioid
24     medication that was made, distributed or dispensed
25     by one of the Defendants; did you?
```

1

2      A     No.

3      Q.    As part of your work in this case, you

4    described error in some of the documents that you

5    considered, I want to follow-up on that topic, all

6    right?

7      A     Okay.

8      Q.    Did you consider any documents produced

9    from the files of a pharmacy Defendant in preparing

10   your report for this case?

11     A     Yes. -- oh, pharmacy Defendant, sorry --

12   well, after submitting this report I have reviewed

13   some files like that, but not before submitting this

14   report.

15     Q.    Not for the Defendants in the New York

16   litigation, correct?

17     A     Correct.

18     Q.    Okay.  And just to be clear, make sure

19   we have it for the record, in preparing your report

20   for this case, did you consider any documents

21   produced from the files of a pharmacy Defendant?

22     A     No, I did not consider documents

23   produced from the files of a pharmacy Defendant for

24   this report.

25     Q.    As part of your work in this case, did

1
2    you review the testimony or depositions of any
3    employees or witnesses from a pharmacy Defendant?
4         A    No.
5         Q.   As part of your methodology in this
6    case, did you study the details of the conduct of
7    any pharmacy Defendant as it pertains to Nassau
8    County or Suffolk County?
9         A    No.
10        Q.   Using Walmart, my client, as an example,
11   did you study the details of Walmart distribution
12   policies for controlled substances in Nassau or
13   Suffolk County?
14        A    No.
15        Q.   Did you study the details of the
16   processes that Walmart put in place to empower its
17   pharmacists to exercise their professional
18   responsibility to evaluate prescriptions?
19        A    No.
20        Q.   Did you review any Walmart policies to
21   identify a specific policy that you believe should
22   have been changed?
23        A    No.
24        Q.   Did you identify any specific orders for
25   opioids that a Walmart pharmacy placed that Walmart

```
 1                    Frye Hearing - Dr. Lembke              181
 2     should have handled differently from a distribution
 3     perspective?
 4           A    No.
 5           Q.   Did you identify any specific
 6     prescriptions that Walmart should not have filled at
 7     its pharmacies?
 8           A    No.
 9           Q.   And if I asked you all of those
10     questions for the other three pharmacy Defendants,
11     would your answers be the same?
12           A    My answers would be the same.
13           Q.   Now I want to switch gears.  You talked
14     about marketing earlier.  I want to ask you about
15     that.
16                It's true that the pharmacy Defendants
17     never marketed opioids; did they?
18                MR. HANLY:  Objection to the form.
19                THE COURT:  Time out.  There's an
20                objection.  Mr. Carter, rephrase the
21                question.  Perhaps you should share your
22                concept of marketing with the witness so
23                we're on the same page.
24                MR. CARTER:  Sure.
25           Q.   In your report, when you offer opinions
```

1
2      regarding marketing, have you offered any marketing

3      opinions that pertain to the pharmacy Defendants?

4           A    Not in my report.

5           Q.   Okay.  And as far as you're aware, did

6      the pharmacy Defendants ever market opioids?

7           A    Yes.

8           Q.   Okay.  I'd like to show you your

9      deposition.  It's the same one from the New York

10     case that you looked at earlier today.  Bear with me

11     a moment while I get the screen.

12              THE COURT:  What's the page and line,

13         please.

14              MR. CARTER:  The page and line is going

15         to be one 27, line 24, and I'm just trying to

16         get control so that I can present.

17              THE COURT:  Okay.

18         Q.   Are you able to see my screen with your

19     transcript up, Dr. Lembke?

20         A    Yes, I do.  I see it.

21         Q.   All right.  So I want to direct your

22     attention to the last page -- or, excuse me, the

23     last line, down here at the bottom of the page.

24              "Are you aware of any marketing of

25     opioids conducted by any of the retail chain

```
 1              Frye Hearing - Dr. Lembke              183
 2     pharmacy Defendants?"
 3                   And it goes to the next page.
 4                   "ANSWER:  No."
 5                   Do you see that?
 6          A    Yes, I do.
 7          Q.   That's the testimony you provided under
 8     oath in your deposition in this case, correct?
 9          A    Yes.  That was true at the time.
10          Q.   That was true for purposes of your
11     report in this case, correct?
12          A    Yes.
13          Q.   Since then you've never supplemented
14     your report or put the pharmacy Defendants or anyone
15     else on notice that there's been any change or
16     errata to your sworn deposition testimony, true?
17          A    I can't speak to what Plaintiffs'
18     counsel has notified Defendants about, but I have
19     reviewed other records since then, which has led to
20     my changing my opinion on this deposition question.
21          Q.   But whatever your opinion is, that's not
22     something you shared with anyone in New York, to
23     your knowledge, true?
24          A    Not in my report.
25          Q.   You don't plan on testifying at trial in
```

1

2      this case with respect to marketing by pharmacy

3      Defendants, true?

4           A     If I'm asked a question about whether or

5      not pharmacies ever marketed specific products, to

6      answer that truthfully I will have to say that I am

7      aware of that having happened.

8           Q.   We can deal with the representations of

9      the various pleadings, I won't belabor the point,

10     but in these subsequent materials that you reviewed,

11     unrelated to New York and not in your New York

12     report, do any of them relate to controlled

13     substance prescription opioids?

14          A     Yes.

15          Q.   Do any of them relate to marketing in

16     Nassau or Suffolk County?

17          A     Possibly, but there is no geographic

18     specific information that I'm recalling.

19          Q.   All right.  And likewise, you cannot

20     identify any claim about opioids made by a pharmacy

21     Defendant that you allege was false or misleading;

22     can you?

23          A     Again, yes, I can, because I've reviewed

24     other materials since the deposition and since my

25     report.

```
 1                  Frye Hearing - Dr. Lembke              185
 2          Q.   Let me pull up -- I'd like to direct you
 3     to page 127 of your deposition.  Lines 20 to 23.
 4               "Can you identify any false or
 5     misleading claim about opioids made by one of the
 6     retail pharmacy Defendants in this case?
 7               ANSWER:  No."
 8               Do you see that?
 9          A    Yes, I do see that.
10          Q.   That was the testimony that you provided
11     under oath in your deposition in January, correct?
12          A    Yes, that was the testimony I provided
13     then.
14          Q.   Between January and today, September
15     9th, have you issued an errata to correct your
16     testimony in the New York case?
17          A    No.
18          Q.   Have you issued a supplemental report to
19     update your opinions in this case on that topic?
20          A    No.
21          Q.   In terms of the nine opinions that were
22     listed on your first slide -- sorry, I'm having
23     trouble with the mouse, your Honor, excuse my
24     technical novice.
25               Back to my question, doctor.
```

```
 1                    Frye Hearing - Dr. Lembke              186

 2             The nine opinions that are listed on

 3    Slide 1 that you showed today, none of them relate

 4    to any marketing statements or allegedly misleading

 5    statements by the pharmacy Defendants, true?

 6        A    In my report I refer to the

 7    pharmaceutical opioid industry and in that I include

 8    the pharmacies.

 9        Q.   So is it your testimony that one of the

10    nine opinions on Slide 1 references pharmacy

11    Defendants making marketing statements?

12        A    Yes.

13        Q.   All right.  I'd like to pull up Slide 1.

14             Which one of these statements references

15    a pharmacy Defendant marketing opioids?

16             THE COURT:  It's not on the screen.

17             MR. CARTER:  That makes it harder, so

18        let me --

19             THE COURT:  Can somebody help out?

20             MR. CARTER:  Your Honor, I relied on the

21        shared Adobe, not the entire screen.  So one

22        second, I think I can fix this I believe.

23             THE COURT:  Halfway there, Mr. Carter.

24        You got the other one down.

25             MR. CARTER:  Okay.
```

1

2          MR. CARTER:  Is this one up now?

3          MR. HANLY:  Yes.

4      Q.    All right.  So, Dr. Lembke, you do not

5  have any references in Slide 1 to a pharmacy

6  Defendant issuing a marketing statement, correct?

7      A     That's true.

8      Q.    Thank you.

9            And, in fact, if we go through your

10  entire report for the New York case, it's also true

11  that you do not mention any pharmacy Defendant by

12  name at any location in your report, true?

13      A     True.

14      Q.    Likewise, your report does not identify

15  any pharmacy Defendant as having, to a reasonable

16  degree of medical and scientific certainty, violated

17  a regulation or duty of care in Nassau County or

18  Suffolk County, correct, that's not anywhere in your

19  report; is it?

20      A     Correct.  That's not in my report.

21      Q.    Bottom line is, because you did not

22  analyze or study the conduct of the pharmacy

23  Defendants in Nassau and Suffolk County in

24  preparation of your report, this case, you'll not be

25  offering any opinion at trial regarding the specific

```
 1                  Frye Hearing - Dr. Lembke              188
 2       conduct of a pharmacy Defendant in Nassau or Suffolk
 3       County; do you agree with that?
 4             A    Again, if I'm asked under oath to
 5       testify about the role of the pharmacies, I will
 6       offer an opinion that's based on additional material
 7       I've seen.
 8             Q.   But sitting here today, in terms of
 9       what's in your report, none of those opinions are
10       articulated with specificity in your report for this
11       case, true?
12             A    That's true.
13             Q.   Last topic.  On direct you expressed an
14       opinion that doctors were duped; do you recall that?
15             A    Yes.
16             Q.   I would like to follow-up on that.
17                  If doctors were duped to the point where
18       well-intentioned doctors genuinely believed that
19       they were exercising appropriate medical judgment in
20       prescribing opioids, you agree that the same
21       phenomenon would also apply to pharmacists, fair?
22             A    Yes.  Possibly.
23             Q.   In terms of your background and
24       training, you are not familiar with the specific
25       licensing requirements for pharmacists in New York;
```

1

2      are you?

3          A    No.

4          Q.   You don't know what kind of training

5      pharmacists in New York go through; do you?

6          A    No, I don't.

7          Q.   The education and training of

8      pharmacists is not a topic that you've studied in

9      connection for this case; is that correct?

10         A    That is correct.

11         Q.   You will not be offering an opinion at

12     trial regarding what pharmacists in Nassau or

13     Suffolk understood or believed about the risks and

14     benefits of opioid medications; will you?

15         A    No.

16         Q.   You will not offer an opinion, starting

17     from the specific pharmacists in those two counties,

18     acted unreasonably in filling any specific

19     prescription; will you?

20         A    Not for any specific prescription, no.

21         Q.   My final question.  As part of your

22     methodology in this case, you have not identified

23     any particular case where specific prescriptions for

24     opioids should not have been filled by a pharmacist

25     acting in good faith; have you?

```
 1              Frye Hearing - Dr. Lembke        190
 2         A    Not any specific case, no.
 3              MR. CARTER:  Those are all the questions
 4         I have for you.  Thank you.
 5              THE WITNESS:  You're welcome.
 6              THE COURT:  Mr. Hanly, redirect.
 7              MR. HANLY:  Thank you, your Honor.
 8    REDIRECT EXAMINATION
 9    MR. HANLY:
10              MR. HANLY:  Could we take down that
11         slide, please.
12         Q.   Dr. Lembke --
13         A    Yes.
14         Q.   -- I'm going to ask you a few questions
15    on redirect examination.
16              First of all, just to clarify, and
17    perhaps I misheard or misunderstood one of the
18    questions asked by Mr. Carter just a few minutes
19    ago, the nine opinions that you hold and would give
20    in this case at trial, if permitted to do so by
21    Justice Garguilo, have nothing to do with the
22    diagnosis or the diagnostic criteria for addiction,
23    true?
24         A    Well, yes and no.  I mean, I, I must be
25    familiar with those diagnostic criteria in order to
```

1

2      have a working background knowledge of this problem

3      more broadly.

4          Q.   But there's nothing referred to in the

5      nine opinions concerning any diagnostic criteria; is

6      that right?

7          A    Well, under opinion one addiction is a

8      chronic illness.  I do describe in brief what the

9      diagnostic criterion are for diagnosing an opioid

10     use disorder.

11         Q.   There was a suggestion -- withdrawn.

12              Is there any peer reviewed publication,

13     guidelines, criteria, mandates, requirements of any

14     sort that provide it is necessary to do widespread

15     surveys of physicians in order to reach opinions,

16     for example, about the relationship between

17     physicians' prescribing habits and, and consequent

18     harms, is there any set of rules that say you have

19     to do a survey of 10 or 100 or a thousand or a

20     million doctors in order to have a sound basis upon

21     which to make conclusions concerning the

22     relationship, for example, between prescribing and

23     ultimate harms?

24         A    No, there are no mandated requirements

25     or recommended requirements to that effect.

1

2      Q.   You were asked a number of questions by

3  Miss Strong concerning whether you are able to

4  quantify the relative roles of different players, if

5  you will, in the opioid saga in respect of the

6  opioid epidemic, correct?

7      A    Yes.

8      Q.   All right.  And -- but you already

9  testified, before she asked you that litany of

10 questions about your ability to give percentages,

11 that you are not an econometrician, right?

12     A    That's correct.

13     Q.   You don't have any training in

14 econometrics?

15     A    That's correct.

16     Q.   And your engagement in this case by the

17 lawyers for the communities had nothing to do with

18 you providing percentages of relative liability,

19 correct?

20     A    That's correct.

21     Q.   Now, you testified, when asked a number

22 of questions by Miss Strong about surveys, you

23 answered on several occasions that you had done

24 qualitative interviews; do you remember that?

25     A    Yes.

1

2          Q.    In fact, you did such interviews; is

3    that correct?

4          A     Yes, I did.

5          Q.    There was a suggestion that, that was

6    not disclosed and didn't appear anywhere in your

7    report, correct?

8          A     That was suggested, yes.

9          Q.    Right.  Do you have your report in the

10   New York litigation handy?

11         A     Yes, I do.

12         Q.    Could you turn to page 5 of that report.

13         A     Yes, I'm at page 5.

14         Q.    Right.  And up at the top is paragraph

15   number 23; do you see that?

16         A     Yes.

17         Q.    And I'm just going to read the beginning

18   part of that paragraph.  You wrote: "In forming the

19   opinions expressed in this report, I have relied on

20   my medical training, more than 20 years of clinical

21   experience, and my own research on opioid

22   prescribing.

23                My research began circa 2001 and has

24   been multimodal.  I have done qualitative interviews

25   with patients, providers and others in the

```
 1                     Frye Hearing - Dr. Lembke              194

 2     healthcare field on questions related to opioid

 3     prescribing?

 4                 Did I read that correctly?

 5        A    Yes.

 6        Q.   That is, in fact, true; is it not?

 7        A    Yes.

 8        Q.   That while you did not do surveys of 10

 9     or 100 or a thousand or a million doctors or

10     patients, you did selective qualitative interviews

11     of that very same population?

12        A    Yes.

13        Q.   Now, Miss Strong also took you through a

14     number of risk factors for the development of opioid

15     use disorder or addiction, right?

16        A    Yes.

17        Q.   But I don't recall her calling to your

18     attention anything about dose and duration of the

19     administration of opioids as constituting a risk

20     factor.

21                 My question to you is:  Are dose and

22     duration of the administration of these kinds of

23     drugs a risk factor for the development of an

24     addiction?

25        A    Yes.  The science showed that those are
```

1

2   important risk factors for the development of

3   addiction.

4        Q.   Do you accept that science?

5        A    Yes, I do.

6        Q.   Okay.  Is that concept generally

7   accepted, that dose and duration -- in other words,

8   how strong the pills are or how many you're taking

9   and for how long are reflective or indicative of

10  what your risk would be?

11       A    Yes.  Increasing dose and duration

12  increase the risk of both addiction and overdose.

13       Q.   You were asked questions about the FDA.

14  I just want to ask you a couple of brief questions

15  about that.

16            The FDA does not have laboratories where

17  they do widespread testing of drugs; isn't that

18  true?

19       A    That's true.

20       Q.   In fact, in determining whether a

21  particular drug is safe and efficacious, the FDA has

22  to rely upon information provided to it by what's

23  called the response of the company that's making the

24  drug, right?

25       A    Yes.

```
 1                    Frye Hearing - Dr. Lembke              196
 2          Q.    So there's a kind of a necessity on the
 3    part of the FDA to take at face value what is told
 4    to it concerning the results of any review of safety
 5    or efficacy?
 6               MS. STRONG:  Objection, your Honor.
 7               This is Sabrina Strong again.  I am
 8          trying to be very lenient with leading.
 9               THE COURT:  I got it.
10               MS. STRONG:  Leading.
11               THE COURT:  I'll sustain it.  Rephrase
12          the question.
13               MR. HANLY:  Okay.
14               THE COURT:  It's too suggestive of the
15          answer.
16               MR. HANLY:  Got it, Judge.
17          Q.    The FDA does not do its own physical
18    research on proposed new drugs, correct?
19          A    That's correct.
20          Q.    Where does the FDA get information then
21    concerning the attributes of that proposed new drug
22    or prospective indication for that new drug; where
23    does that information come from?
24          A    From the drug companies who are making
25    the drug and trying to get approval for the drug.
```

1

2      Q.   Now, there was a question asked by Mr.

3    Pyser as to whether you used the term gateway effect

4    in any peer reviewed publication of yours, right?

5      A   Yes.

6      Q.   You testified that, no, that term did

7    not appear in any such publication, but, of course,

8    it does appear, in fact, it's part of the name of a

9    chapter in your book, correct?

10     A   That's true.

11     Q.   All right.  And isn't it also true that

12   subsequent to the publication of your book in 2016

13   that at least one peer reviewed report used the term

14   gateway effect?

15     A   Yes.

16     Q.   And I'm just looking for that page, that

17   slide that has that on it.

18     A   I would say that gateway effect is a

19   commonly accepted term in addiction medicine.  It's

20   not a new term or a creative term.

21     Q.   But, in fact, in the year 2017, a year

22   after the publication of your book, there was

23   published a peer reviewed article that actually

24   references the gateway effect, right?

25     A   Yes.  Which article was that?  Was that

```
 1                    Frye Hearing - Dr. Lembke              198
 2      the Harbaugh?
 3              Q.   I believe it's Harbaugh, but I can't
 4      seem to find it.
 5                   But in any case, we can agree that
 6      subsequent to your use of the term gateway effect it
 7      was used by other medical researchers and authors,
 8      right?
 9              A    Yes.
10                   MR. PYSER:  Objection.
11                   Leading again.
12                   THE COURT:  I'll allow it.  Go ahead.
13              If we were going to hear an objection for
14              every leading question, we'd be here until
15              Thanksgiving.
16              Q.   Okay.  The report that I was referencing
17      was Slide 18 that we looked at, doctor, and it's the
18      NASEM report on pain management and the opioid
19      epidemic.
20                   We've culled out this particular slide.
21      We see that this paper was published in 2017, the
22      year after your book in which you used the term
23      gateway effect, and there we see a quote from the
24      NASEM report.  "Preponderance of evidence suggests
25      that the major increase in prescription opioid use
```

```
 1                    Frye Hearing - Dr. Lembke              199

 2      beginning in the late 1990s has served as a gateway

 3      to increased heroin use."

 4                  Did I read that correctly?

 5          A    Yes.

 6          Q.   You didn't write that; did you?

 7          A    No.

 8          Q.   You weren't part of the folks who wrote

 9      this consensus study report; were you?

10          A    No.

11          Q.   All right.  Last area.  Promise, your

12      Honor.

13                  Miss Strong's Slide Number 2 is, is the

14      slide that consists of these circles with various

15      things written in; do you remember that, doctor?

16          A    The one with the big question mark in

17      red at the end?

18          Q.   Yes.

19          A    Okay.  Yes.

20          Q.   Okay.  And so let me see if I can use

21      this.  There we are.  Okay.

22                  And so Miss Strong labeled these

23      Lembke's Factors, and let me see if I understand it.

24                  Do you agree that these are some of the

25      factors that in your opinion relate to the opioid
```

1
2     epidemic?
3             A     Yes, they are some of the factors.
4             Q.    But they're not all of the factors; are
5     they?
6             A     No.
7             Q.    Because what's missing from these --
8     this collection of circles of varying --
9                   THE COURT:  Mr. Hanly, ask the witness
10                  what's missing.
11            Q.    What, if anything, are missing from
12    these -- from this chart?
13            A     Well, Miss Strong referred to other
14    pharmaceutical companies by which I believe she
15    meant those not involved in the litigation, so
16    that's a big circle that's missing.
17                  What's also missing is key opinion
18    leaders, drug detailers, drug rep detailers, the
19    whole medical education paradigm shift that led
20    doctors -- that doctors relied on to inform their
21    prescribing.
22            Q.    Should pharmaceutical manufactures be
23    among these circles?
24            A     Yes.  So that's what I meant when I said
25    not just other pharmaceutical companies, but the

```
1                    Frye Hearing - Dr. Lembke              201

2      Defendants in this case should certainly be on this

3      list.

4              Q.   So -- well, I'm not going to lead you.

5                   Who are the others that would be

6      appropriately on the list of Dr. Lembke's Factors?

7              A    So opioid manufacturers, opioid

8      distributors, opioid pharmacies or pharmacies where

9      opioids were dispensed and distributed.

10                  MR. HANLY:  Okay.  Doctor, that is --

11                  oh, one more area.

12             Q.   Mr. Pyser brought to your attention a

13     statement in your book in which, and I'm

14     paraphrasing the statement, that prescription

15     opioids, the relationship between prescription

16     opioids and heroin use is unclear; do you recall him

17     asking you about that sentence?

18             A    Yes, I do.

19             Q.   That is a sentence that you wrote in

20     your book?

21             A    Yes.

22             Q.   Can you explain to Justice Garguilo and

23     all of us what you meant by that sentence.

24             A    Yes.  So at the time there was much

25     debate about whether or not efforts that were being
```

```
 1                    Frye Hearing - Dr. Lembke          202

 2    made at that time to curb opioid prescribing might

 3    be contributing to patients who had become dependent

 4    on and addicted on opioid, turning to elicit

 5    sources.

 6              At the time that I published the book

 7    and finished my reference list there wasn't really

 8    good definitive data.

 9              Furthermore, the natural history and the

10    progression of the disease of addiction would lead

11    patients who become addicted to prescription opioid

12    to seek out more potent, more potent forms and more

13    and cheaper sources, and as the U.S. population

14    broadly became dependent on and addicted to

15    prescription opioid the drug cartels responded to

16    that increased demand by making heroin more cheaply

17    available.

18         Q.   Again, this sentence, called to your

19    attention by Mr. Pyser, was written in or around

20    2016?

21         A    That's right.  Actually, it was written

22    probably a year before that.  It takes about a year

23    between finishing a manuscript and its coming out in

24    publication, so I really finished the book in 2015.

25         Q.   The NASEM article that we looked at that
```

1                    Frye Hearing - Dr. Lembke                    203

2      talked about a prescription opioid use as a gateway

3      to heroin, increased heroin use was two years or so

4      after you wrote this sentence about the relationship

5      being unclear?

6              A    Yes, that's right.

7              Q.   And does science progress over a

8      two-year period?

9              A    Yes.  It became more clear right around

10     that time period that, in fact, prescription opioid

11     are a gateway to heroin.

12             MR. HANLY:  Thank you very much, doctor.

13          That's all I have.  Thank you, your Honor.

14             THE COURT:  Okay.  Dr. Lembke, thank you

15          very much.

16             THE WITNESS:  Thank you.

17             THE COURT:  You're excused.

18             THE WITNESS:  Thank you.

19             THE COURT:  With no other business, the

20          Court will close the record.

21             Thank you all.

22

23

24                      *      *      *

25

1

2

3

4                     C E R T I F I C A T I O N

5

6          I, Stephanie Casagrande Hague, CSR, RPR,

7     an Official Court Reporter of the State of

8     New York, County of Suffolk, do hereby

9     certify that the above is a true and accurate

10    transcription of my stenographic notes taken

11    in the above-entitled action on this day;

12          Furthermore, photocopies made of this

13    transcript by any party cannot be certified

14    by me to be true and accurate.

15          Therefore, only those copies bearing an

16    original signature in blue ink are official

17    certified copies.

18

19

20    _____

      STEPHANIE CASAGRANDE HAGUE, CSR, RPR

21              Official Court Reporter

22

23

24

25

**'**

**'90s** [1] - 16:2

**0**

**03771** [1] - 73:4
**09** [1] - 1:8

**1**

**1** [17] - 15:11, 15:12,
15:24, 37:6, 54:25,
63:12, 67:3, 84:14,
113:18, 113:23,
114:5, 114:11,
123:4, 186:3,
186:10, 186:13,
187:5
**10** [6] - 64:4, 68:7,
92:14, 118:20,
191:19, 194:8
**100** [4] - 35:8, 60:2,
191:19, 194:9
**10005** [1] - 2:4
**10016** [1] - 1:16
**10036** [1] - 2:9
**11** [2] - 44:25, 69:7
**112** [1] - 1:15
**115** [1] - 133:23
**11747** [1] - 1:22
**11th** [1] - 4:15
**12** [8] - 70:7, 76:20,
77:14, 89:16, 90:2,
106:14, 106:18,
122:5
**12,000** [2] - 45:4, 45:7
**127** [1] - 185:3
**12:30** [1] - 105:17
**12th** [1] - 83:4
**13** [2] - 84:8, 154:21
**13.2** [1] - 90:2
**14** [3] - 88:21, 88:23,
159:7
**15** [4] - 84:19, 90:24,
115:11, 174:6
**15-minute** [1] - 77:23
**16th** [5] - 115:4,
115:19, 118:18,
121:12, 154:12
**17** [1] - 94:7
**170** [1] - 154:13
**171** [1] - 154:13
**17232** [1] - 106:20
**175** [1] - 121:13
**18** [4] - 101:14,
101:17, 167:21,
198:17
**19** [1] - 103:2
**1900s** [1] - 55:25

**1970s** [1] - 145:12
**1980** [3] - 45:3, 45:11,
55:19
**1980s** [2] - 55:16,
154:25
**1990** [4] - 135:10,
135:14, 135:22,
136:4
**1990s** [18] - 27:6, 55:3,
55:9, 55:11, 55:13,
55:18, 56:2, 56:18,
57:4, 97:2, 98:22,
99:12, 101:25,
135:6, 154:25,
168:6, 171:16, 199:2
**1995** [4] - 8:5, 20:3,
83:3, 83:5
**1997** [3] - 59:19,
59:25, 60:3
**1999** [1] - 58:7
**1:45** [1] - 105:22

**2**

**2** [17] - 13:11, 15:25,
39:10, 54:24, 57:9,
59:5, 67:5, 74:16,
113:25, 114:5,
114:12, 151:7,
154:22, 171:12,
171:13, 171:15,
199:13
**20** [10] - 21:18, 22:11,
49:2, 54:12, 84:19,
90:24, 104:22,
121:14, 185:3,
193:20
**20-odd** [1] - 64:22
**20-year** [1] - 59:20
**2000** [2] - 8:5, 145:12
**2001** [1] - 193:23
**2003** [1] - 19:5
**2006** [1] - 140:5
**2009** [1] - 42:9
**2010** [3] - 58:8,
104:17, 105:4
**2013** [1] - 139:12
**2015** [2] - 89:15,
202:24
**2016** [11] - 26:12,
26:14, 31:9, 35:7,
35:10, 59:20, 60:4,
139:11, 157:8,
197:12, 202:20
**2017** [5] - 3:10,
104:17, 105:4,
197:21, 198:21
**2018** [1] - 68:16
**2019** [3] - 95:9,
106:22, 153:17

**2020** [7] - 1:8, 115:4,
115:19, 118:19,
121:12, 130:25,
154:12
**207** [4] - 118:20,
118:23, 130:24,
131:2
**208** [1] - 131:3
**21** [4] - 89:19, 90:2,
131:2, 131:5
**212** [1] - 1:18
**212)397-1000** [1] -
1:23
**21st** [1] - 155:2
**220** [1] - 73:4
**23** [2] - 185:3, 193:15
**239** [4] - 7:22, 9:10,
9:20, 10:11
**24** [3] - 115:11,
154:13, 182:15
**24th** [1] - 153:17
**25** [1] - 105:6
**25th** [1] - 106:22
**27** [1] - 182:15
**276** [1] - 153:20
**28** [1] - 2:4
**29** [3] - 17:24, 89:19,
90:2
**29(1** [1] - 17:24
**2nd** [1] - 162:25

**3**

**3** [13] - 4:15, 13:21,
16:4, 41:24, 60:10,
78:19, 85:23,
114:12, 123:6,
131:3, 160:3, 160:13
**30** [1] - 64:4
**305** [1] - 1:21
**3rd** [3] - 8:18, 70:23,
77:17

**4**

**4** [7] - 16:8, 44:17,
67:19, 69:8, 69:9,
118:20, 118:25
**4.9** [1] - 92:4
**400** [1] - 1:21
**400000** [1] - 3:9
**401** [1] - 12:19
**41.3** [1] - 90:2
**44** [1] - 105:6
**48** [3] - 1:2, 3:3, 78:3
**4:39** [1] - 11:12
**4:40** [2] - 7:18, 7:24,
70:13
**4:50** [1] - 9:10

**5**

**5** [6] - 16:10, 51:18,
121:13, 153:20,
193:12, 193:13
**5.9** [1] - 91:12
**54** [2] - 115:9, 115:11
**5th** [1] - 77:17

**6**

**6** [4] - 16:12, 57:20,
92:11, 160:2
**6.5** [1] - 91:12
**600** [7] - 37:16, 37:20,
38:4, 39:5, 43:21,
43:25, 64:21

**7**

**7** [4] - 2:9, 16:15,
59:16, 59:18
**70** [1] - 159:7
**700** [1] - 10:10
**784-6401** [1] - 1:18

**8**

**8** [4] - 16:16, 62:21,
62:23

**9**

**9** [4] - 16:19, 66:5,
78:19, 153:20
**9/11** [1] - 4:13
**94305** [1] - 12:20
**9th** [1] - 185:15

**A**

**abate** [1] - 36:14
**abbreviated** [2] - 4:13,
5:3
**ability** [3] - 75:18,
122:3, 192:10
**able** [8] - 6:16, 50:8,
113:17, 153:19,
166:16, 177:15,
182:18, 192:3
**above-entitled** [1] -
204:11
**absence** [1] - 76:6
**absolute** [1] - 130:23
**absolutely** [2] - 9:11,
118:10
**abstract** [15] - 37:23,
38:5, 38:9, 38:16,
38:19, 38:20, 39:3,
39:21, 39:22, 40:9,
41:5, 41:7, 41:13,

96:10, 107:9
**abuse** [10] - 27:6,
117:2, 117:5, 139:5,
140:18, 141:18,
142:14, 143:9,
144:20, 178:10
**abusing** [1] - 27:9
**academic** [13] - 33:24,
34:5, 34:12, 34:23,
79:18, 79:21, 81:9,
81:15, 81:25, 82:3,
82:4, 82:12, 170:3
**Academies** [2] -
95:12, 101:19
**Academy** [1] - 63:2
**accept** [4] - 54:8,
139:18, 139:25,
195:4
**acceptance** [4] -
73:13, 74:4, 101:2
**accepted** [15] - 51:13,
53:3, 58:25, 74:11,
101:5, 109:2,
155:15, 155:21,
155:25, 156:4,
156:9, 176:22,
177:5, 195:7, 197:19
**access** [9] - 8:2,
32:10, 70:22,
103:14, 155:4,
168:22, 168:23,
170:17, 170:21
**accompanying** [1] -
96:5
**accurate** [4] - 38:18,
171:22, 204:9,
204:14
**Act** [1] - 153:7
**acted** [1] - 189:18
**acting** [2] - 127:19,
189:25
**action** [3] - 162:17,
162:20, 204:11
**Actiq** [1] - 137:10
**active** [1] - 21:25
**actual** [5] - 36:21,
73:17, 88:17, 135:12
**acute** [2] - 91:11,
165:10
**adapt** [1] - 23:16
**addicted** [10] - 16:11,
46:24, 49:2, 55:22,
66:23, 67:4, 89:18,
202:4, 202:11,
202:14
**addiction** [79] - 15:24,
20:14, 22:21, 22:23,
23:12, 23:20, 23:22,
24:3, 24:9, 24:12,
25:8, 26:2, 33:11,

45:6, 45:16, 47:5, 51:8, 51:12, 51:14, 51:15, 52:4, 52:7, 52:10, 52:14, 52:15, 52:20, 53:4, 53:18, 53:25, 54:11, 54:17, 54:18, 56:5, 56:11, 56:25, 57:13, 58:9, 58:10, 58:25, 66:13, 66:19, 66:23, 80:7, 80:12, 80:18, 80:20, 82:22, 87:17, 87:23, 88:4, 88:17, 89:12, 89:22, 90:4, 91:17, 91:24, 92:13, 93:16, 97:4, 100:23, 102:17, 114:7, 116:18, 116:23, 117:14, 123:8, 168:24, 175:16, 190:22, 191:7, 194:15, 194:24, 195:3, 195:12, 197:19, 202:10
**Addiction** [9] - 17:8, 17:10, 17:11, 18:20, 20:24, 51:22, 52:9, 52:25, 53:8
**addictive** [7] - 27:20, 50:25, 63:13, 63:16, 64:2, 67:3, 68:21
**Addictive** [1] - 68:8
**addition** [4] - 25:24, 29:15, 36:4, 48:13
**additional** [5] - 10:16, 21:9, 107:20, 135:24, 188:6
**address** [7] - 7:9, 8:12, 12:18, 36:14, 94:4, 107:14, 140:12
**addressed** [1] - 102:6
**addressing** [1] - 140:6
**administered** [3] - 45:7, 47:3, 87:23
**Administration** [1] - 20:6
**administration** [2] - 194:19, 194:22
**Administrator** [2] - 18:10, 18:11
**admissions** [2] - 58:21, 96:22
**Adobe** [1] - 186:21
**adopt** [2] - 5:16, 6:22
**adopted** [1] - 54:21
**advent** [1] - 55:16
**adverse** [7] - 30:23, 57:25, 90:5, 90:15, 91:23, 93:20, 93:24
**advisory** [2] - 29:20,

42:16
**affect** [2] - 77:16, 81:24
**afternoon** [4] - 110:4, 110:5, 174:23, 175:4
**aged** [1] - 105:6
**agencies** [1] - 150:12
**aggregate** [5] - 131:13, 132:5, 132:10, 146:17, 178:16
**aging** [1] - 99:6
**ago** [3] - 14:18, 106:23, 190:19
**agree** [21] - 46:2, 77:8, 114:18, 114:22, 136:14, 136:15, 137:20, 140:23, 141:14, 141:17, 142:23, 143:8, 145:5, 149:21, 150:24, 168:20, 173:9, 188:3, 188:20, 198:5, 199:24
**agreement** [1] - 5:24
**agreements** [1] - 43:6
**ahead** [7] - 7:11, 79:14, 109:9, 130:24, 151:9, 163:16, 198:12
**air** [1] - 83:20
**alcohol** [1] - 27:14
**allege** [1] - 184:21
**alleged** [2] - 62:5, 65:10
**allegedly** [1] - 186:4
**Allergan** [2] - 5:7, 133:4
**allocated** [2] - 148:24, 150:3
**allotted** [1] - 78:17
**allow** [3] - 107:17, 108:6, 198:12
**almost** [6] - 38:25, 39:2, 59:20, 60:4, 105:16, 112:11
**alone** [1] - 8:2
**alter** [1] - 169:19
**altered** [1] - 139:11
**altogether** [1] - 23:18
**ambulatory** [1] - 47:6
**ambushed** [1] - 107:23
**ambushing** [1] - 106:15
**American** [13] - 20:24, 51:21, 52:8, 52:25, 53:17, 53:24, 54:19, 54:20, 63:2, 86:18,

87:2, 92:20, 93:3
**AmerisourceBergen** [2] - 163:23, 164:2
**amount** [8] - 78:18, 82:5, 82:6, 82:8, 82:10, 90:10, 114:10
**Amount** [1] - 59:18
**amounts** [1] - 98:12
**analgesia** [3] - 98:23, 99:7, 135:12
**analysis** [11] - 38:7, 43:11, 74:16, 76:2, 122:17, 122:21, 126:23, 166:11, 168:14, 169:4, 169:6
**analyze** [1] - 187:22
**analyzed** [1] - 97:6
**anecdotal** [2] - 125:16, 130:6
**anecdotally** [1] - 126:3
**anecdote** [4] - 123:22, 124:14, 124:21, 125:19
**anecdotes** [2] - 82:14, 120:12
**Anesthesiology** [1] - 24:22
**anesthesiology** [1] - 24:25
**Angeles** [1] - 103:10
**ankle** [1] - 92:3
**Anna** [1] - 12:2
**ANNA** [1] - 12:14
**anna** [1] - 12:19
**Annals** [3] - 86:23, 87:2, 92:24
**announcements** [1] - 4:11
**annual** [1] - 4:13
**answer** [21] - 13:3, 13:12, 13:20, 39:4, 49:14, 64:17, 64:20, 99:16, 111:6, 129:15, 130:17, 132:5, 139:23, 144:3, 165:4, 169:21, 170:8, 170:9, 175:23, 184:6, 196:15
**ANSWER** [8] - 115:24, 116:7, 119:4, 119:8, 122:11, 131:12, 183:4, 185:7
**answered** [5] - 122:2, 153:25, 154:16, 159:12, 192:23
**answering** [1] - 170:24
**answers** [3] - 13:17,

181:11, 181:12
**anticipating** [1] - 53:14
**apart** [1] - 114:4
**apologies** [1] - 61:4
**apologize** [2] - 109:6, 109:24
**appear** [4] - 42:21, 193:6, 197:7, 197:8
**appearances** [1] - 3:10
**appeared** [1] - 68:15
**appearing** [1] - 63:14
**appendix** [2] - 41:2, 41:25
**applied** [1] - 73:14
**applies** [2] - 17:21, 111:11
**apply** [6] - 31:9, 135:6, 177:15, 177:19, 177:22, 188:21
**applying** [1] - 50:6
**appointed** [2] - 29:16, 29:19
**appointment** [2] - 24:24, 25:2
**approaches** [1] - 52:20
**appropriate** [11] - 6:15, 38:23, 64:16, 74:12, 108:11, 135:12, 138:8, 165:2, 165:10, 166:23, 188:19
**appropriately** [2] - 73:14, 201:6
**approval** [2] - 148:19, 196:25
**approved** [6] - 83:5, 127:4, 127:8, 127:19, 128:23, 148:10
**approving** [3] - 128:2, 128:18, 129:5
**April** [1] - 153:16
**ARCOS** [1] - 166:12
**area** [10] - 21:4, 21:7, 21:10, 25:14, 51:14, 54:17, 59:2, 173:5, 199:11, 201:11
**areas** [4] - 57:13, 73:11, 74:22, 75:3
**argument** [2] - 74:23, 107:6
**arrive** [1] - 83:10
**arthritis** [1] - 65:7
**article** [15] - 41:3, 46:16, 69:17, 89:15, 139:10, 140:6, 140:7, 140:12,

140:16, 168:13, 169:4, 170:3, 197:23, 197:25, 202:25
**articles** [6] - 64:21, 69:13, 108:7, 138:20, 156:21, 156:25
**articulated** [2] - 75:9, 188:10
**ascribed** [1] - 81:5
**Asher** [3] - 4:4, 113:20, 151:8
**ASHER** [2] - 2:10, 4:4
**aside** [4] - 129:17, 134:3, 140:5, 140:7
**aspects** [1] - 79:18
**ASPPH** [1] - 94:13
**assess** [3] - 30:20, 40:22, 41:16
**assist** [1] - 29:23
**assistance** [2] - 164:16, 164:18
**Associate** [1] - 17:8
**associated** [1] - 84:17
**Association** [8] - 53:17, 53:24, 54:21, 86:18, 87:2, 92:20, 93:4, 94:12
**association** [1] - 94:16
**associations** [1] - 110:20
**Asst** [1] - 2:5
**assume** [1] - 5:19
**assuming** [1] - 81:6
**attend** [1] - 4:14
**attention** [7] - 30:10, 41:23, 167:20, 182:22, 194:18, 201:12, 202:19
**Attorney** [4] - 2:3, 2:3, 2:5, 3:21
**Attorneys** [1] - 1:15, 1:21
**attorneys** [1] - 2:8
**attributes** [1] - 196:21
**audiotaping** [1] - 18:2
**August** [2] - 8:18, 70:23
**auspices** [1] - 62:25
**author** [4] - 25:17, 39:19, 41:5, 68:15
**authoritative** [4] - 94:17, 95:18, 108:7, 168:19
**authorities** [1] - 149:4
**authority** [1] - 149:13
**authors** [14] - 38:10, 38:13, 38:22, 39:19,

40:11, 40:19, 41:8, 42:6, 42:9, 44:8, 63:11, 170:12, 171:4, 198:7
**available** [9] - 79:22, 108:8, 136:6, 136:7, 172:20, 172:24, 178:4, 202:17
**Avenue** [1] - 1:15
**await** [1] - 74:16
**aware** [16] - 10:20, 83:4, 83:23, 102:22, 111:8, 111:11, 138:19, 145:10, 145:16, 145:19, 153:6, 169:6, 170:11, 182:5, 182:24, 184:7
**awkwardly** [1] - 26:7

---

**B**

**background** [4] - 19:8, 76:7, 188:23, 191:2
**bad** [3] - 85:16, 86:5, 86:14
**Badala** [1] - 4:2
**BADALA** [2] - 1:23, 3:25
**base** [1] - 166:3
**based** [27] - 49:6, 49:15, 49:20, 50:4, 54:10, 54:15, 55:23, 64:3, 64:20, 65:10, 68:25, 75:19, 89:23, 90:3, 98:16, 108:17, 126:4, 131:7, 131:12, 131:13, 132:8, 132:10, 138:8, 138:12, 165:12, 170:4, 188:6
**bases** [2] - 60:9, 79:20
**basic** [2] - 50:14, 74:3
**basics** [2] - 50:17, 51:13
**basis** [10] - 70:16, 80:17, 80:25, 83:9, 107:15, 130:7, 156:2, 168:12, 191:20
**bear** [5] - 94:23, 147:12, 147:17, 165:6, 182:10
**bearing** [2] - 106:20, 204:15
**became** [5] - 154:25, 155:10, 169:23, 202:14, 203:9
**become** [8] - 44:12,

46:24, 52:16, 89:18, 108:8, 202:3, 202:11
**becomes** [1] - 40:19
**becoming** [4] - 16:11, 16:13, 49:2, 67:3
**began** [6] - 27:5, 32:21, 55:16, 56:17, 154:24, 193:23
**begin** [6] - 7:9, 10:17, 78:9, 78:13, 109:11, 109:21
**beginning** [6] - 3:10, 55:9, 88:5, 101:24, 193:17, 199:2
**begins** [2] - 106:3, 170:20
**behalf** [1] - 76:16
**Behavioral** [2] - 17:12, 19:22
**behaviors** [2] - 52:16, 140:24
**belabor** [1] - 184:9
**belief** [1] - 126:24
**belong** [1] - 110:19
**below** [3] - 40:24, 43:5, 102:3
**beneficiaries** [1] - 35:19
**benefit** [6] - 30:14, 30:17, 115:8, 117:11, 118:19
**benefited** [3] - 125:2, 125:10, 125:14
**benefits** [5] - 30:21, 82:17, 116:13, 128:24, 189:14
**benign** [1] - 92:4
**benzodiazepines** [1] - 27:12
**best** [4] - 10:13, 29:14, 122:2, 152:8
**better** [2] - 49:22, 128:15
**between** [24] - 24:3, 29:10, 33:14, 41:12, 54:18, 58:7, 59:19, 60:3, 64:4, 68:22, 93:18, 93:24, 104:17, 105:4, 112:22, 114:5, 157:19, 158:10, 158:17, 185:14, 191:16, 191:22, 201:15, 202:23
**beyond** [7] - 74:25, 75:2, 77:10, 125:13, 125:19, 153:13, 167:6
**big** [3] - 109:22, 199:16, 200:16

**bigger** [1] - 65:3
**bind** [1] - 50:19
**biopsychosocial** [1] - 23:23
**bipolar** [1] - 117:16
**bit** [11] - 22:18, 36:20, 60:8, 84:16, 131:6, 132:22, 147:8, 154:21, 156:14, 158:21, 167:25
**blue** [2] - 89:15, 204:16
**board** [6] - 5:5, 5:7, 21:11, 21:12, 78:24, 112:14
**Board** [8] - 20:19, 20:23, 20:24, 21:3, 149:5, 149:12, 149:22, 150:3
**Boards** [6] - 146:25, 147:2, 149:21, 150:8, 160:9, 161:14
**boards** [2] - 42:16, 168:19
**bodies** [2] - 36:7, 168:19
**body** [12] - 25:6, 25:11, 51:21, 51:24, 52:3, 65:4, 66:19, 67:24, 80:14, 81:5, 94:17, 95:18
**Bonert** [4] - 85:23, 85:24, 86:10, 86:16
**book** [39] - 25:25, 26:8, 26:9, 26:11, 26:18, 26:21, 28:8, 31:8, 32:5, 35:7, 35:9, 36:24, 43:19, 60:16, 60:25, 62:4, 62:14, 81:14, 100:13, 121:6, 123:17, 124:15, 125:14, 130:18, 147:21, 157:4, 157:7, 157:10, 157:15, 157:17, 158:8, 197:9, 197:12, 197:22, 198:22, 201:13, 201:20, 202:6, 202:24
**booklet** [1] - 63:10
**books** [1] - 26:25
**bootstrapped** [1] - 11:11
**Boscarino** [1] - 89:3
**boscarino** [1] - 89:21
**bottom** [6] - 41:15, 57:5, 58:20, 129:18, 182:23, 187:21
**box** [2] - 40:23, 43:5

**brain** [4] - 50:20, 50:23, 51:2
**branded** [1] - 136:9
**break** [5] - 65:14, 65:20, 77:24, 151:25, 160:15
**breathing** [2] - 51:3, 51:4
**brief** [3] - 23:7, 191:8, 195:14
**briefing** [1] - 6:13
**briefly** [16] - 10:18, 15:23, 22:20, 30:16, 36:9, 40:14, 48:20, 49:18, 50:17, 59:24, 60:9, 67:7, 79:17, 83:8, 95:16, 100:18
**bring** [2] - 153:20, 171:13
**bringing** [1] - 94:22
**broad** [2] - 23:3, 23:7
**broadcasting** [1] - 18:2
**broader** [1] - 75:8
**Broadhollow** [1] - 1:21
**broadly** [4] - 23:23, 124:20, 191:3, 202:14
**brochure** [1] - 62:24
**broke** [1] - 74:21
**brought** [4] - 156:16, 157:4, 164:5, 201:12
**Brown** [1] - 29:21
**Brummett** [1] - 91:11
**building** [1] - 162:11
**bunch** [1] - 165:17
**buprenorphine** [6] - 20:7, 20:10, 20:11, 20:12, 20:16, 124:16
**business** [1] - 203:19
**businesses** [1] - 139:17
**busy** [1] - 38:25
**but..** [1] - 23:5
**BY** [29] - 2:5, 2:10, 14:6, 18:18, 41:10, 43:3, 44:18, 46:5, 47:15, 51:19, 53:13, 57:21, 59:17, 60:7, 62:3, 62:22, 65:23, 66:6, 79:16, 84:9, 88:22, 91:3, 94:8, 99:14, 101:16, 103:3, 104:24, 110:2, 174:21

134:16, 176:10, 176:13
**calendar** [1] - 3:8
**California** [5] - 12:20, 19:25, 29:17, 29:20, 29:25
**campaign** [1] - 99:11
**campaigns** [1] - 168:7
**cancer** [6] - 39:25, 40:13, 40:22, 65:7, 127:2, 155:17
**cannot** [6] - 6:20, 102:5, 133:2, 175:18, 184:19, 204:13
**capacity** [1] - 70:21
**card** [4] - 164:6, 164:12, 164:15, 164:17
**Cardinal** [4] - 10:19, 61:3, 71:19, 163:20
**cards** [1] - 165:17
**care** [6] - 29:4, 49:22, 98:2, 150:19, 150:24, 187:17
**career** [1] - 25:5
**careful** [1] - 38:12
**carefully** [1] - 39:24
**carrying** [1] - 96:14
**cartels** [2] - 145:7, 202:15
**Carter** [8] - 10:15, 162:24, 163:14, 174:19, 174:24, 181:20, 186:23, 190:18
**CARTER** [12] - 163:3, 163:5, 174:20, 174:22, 176:8, 181:24, 182:14, 186:17, 186:20, 186:25, 187:2, 190:3
**Casagrande** [1] - 204:6
**CASAGRANDE** [2] - 2:20, 204:20
**case** [121] - 3:8, 5:12, 5:18, 6:19, 9:4, 11:7, 11:8, 11:11, 15:3, 15:16, 36:21, 37:6, 37:13, 39:17, 43:19, 47:17, 47:24, 48:16, 48:24, 50:3, 50:7, 54:25, 59:6, 60:10, 63:22, 65:11, 71:11, 71:12, 71:20, 71:23, 72:3, 72:5, 72:20, 73:3, 73:5, 73:16, 74:25, 81:12, 81:13, 87:21, 90:13, 93:13,

---

**C**

**calculated** [3] -

208

93:23, 95:21, 95:24,
111:20, 111:23,
115:4, 115:19,
116:10, 118:18,
120:24, 124:12,
125:21, 125:23,
126:8, 126:12,
127:23, 129:22,
130:4, 130:8,
130:12, 131:7,
131:16, 131:21,
132:9, 132:17,
133:12, 135:21,
136:2, 136:3,
137:14, 142:4,
142:13, 143:14,
143:22, 144:2,
144:8, 144:9,
144:15, 144:24,
146:5, 146:10,
146:14, 147:13,
150:18, 153:16,
154:9, 157:4, 159:4,
159:12, 163:18,
166:11, 172:15,
175:9, 176:11,
176:21, 177:3,
179:3, 179:10,
179:20, 179:25,
180:6, 182:10,
183:8, 183:11,
184:2, 185:6,
185:16, 185:19,
187:10, 187:24,
188:11, 189:9,
189:22, 189:23,
190:2, 190:20,
192:16, 198:5, 201:2
**cases** [7] - 37:13,
70:24, 72:11, 99:5,
175:19, 175:25,
178:21
**cash** [1] - 139:17
**catch** [1] - 31:17
**caught** [1] - 41:23
**causation** [9] - 74:23,
75:16, 76:2, 76:6,
77:11, 113:4, 113:6,
113:12, 143:14
**caused** [5] - 55:24,
77:3, 94:21, 150:20,
169:19
**causing** [1] - 139:5
**CDC** [5] - 58:24,
83:25, 86:2, 86:9,
96:19
**Center** [2] - 83:25,
85:18
**Centers** [2] - 57:23,
84:13

**centers** [1] - 58:10
**Central** [1] - 1:8
**century** [1] - 155:2
**ceremony** [1] - 4:14
**certain** [10] - 21:10,
47:18, 62:5, 62:15,
64:12, 65:2, 66:8,
79:23, 127:5
**certainly** [5] - 22:14,
73:8, 98:21, 141:18,
201:2
**certainty** [2] - 50:10,
187:16
**certificate** [1] - 21:6
**certified** [2] - 204:13,
204:17
**Certified** [3] - 20:19,
20:23, 21:3
**certifies** [1] - 21:13
**certify** [1] - 204:9
**cetera** [4] - 18:15,
43:9, 55:5, 60:13
**chain** [3] - 152:18,
153:8, 182:25
**change** [5] - 9:2,
33:14, 33:17, 56:2,
183:15
**changed** [1] - 180:22
**changes** [2] - 56:15,
99:22
**changing** [1] - 183:20
**chapter** [1] - 197:9
**chart** [3] - 88:23,
92:15, 200:12
**charts** [2] - 45:4, 45:5
**cheaper** [1] - 202:13
**cheaply** [1] - 202:16
**check** [1] - 71:13
**Chen** [1] - 139:11
**chief** [3] - 5:13, 5:18,
6:20
**Chief** [5] - 17:8, 17:23,
18:10, 18:11, 18:20
**childhood** [1] - 117:7
**choose** [1] - 6:5
**chorus** [1] - 82:18
**CHORUS** [1] - 3:7
**Chou** [2] - 39:16,
39:19
**CHOU** [1] - 39:16
**chronic** [34] - 15:25,
16:10, 39:25, 40:12,
40:13, 40:21, 41:20,
42:11, 43:15, 51:12,
52:11, 52:21, 56:13,
63:17, 64:5, 66:14,
67:6, 69:10, 69:16,
70:2, 89:11, 89:16,
102:18, 124:25,
125:10, 127:2,

127:6, 127:10,
127:20, 129:6,
148:11, 155:11,
155:17, 191:8
**Chronic** [2] - 39:23,
41:13
**circa** [1] - 193:23
**circle** [1] - 200:16
**circles** [3] - 199:14,
200:8, 200:23
**circumstance** [2] -
20:9, 31:23
**circumstances** [1] -
140:23
**citation** [2] - 158:2,
158:3
**cited** [5] - 45:10,
46:16, 46:17,
157:23, 157:25
**City** [3] - 103:9,
103:10, 145:12
**Civil** [1] - 55:25
**claim** [5] - 67:10,
159:2, 159:10,
184:20, 185:5
**claimed** [1] - 100:14
**claims** [1] - 96:2
**clarify** [2] - 158:14,
190:16
**clarity** [4] - 77:13,
100:17, 117:12,
130:23
**classic** [3] - 8:13,
11:14, 107:25
**clean** [2] - 162:13,
162:23
**clear** [9] - 6:19,
104:25, 122:19,
136:23, 141:10,
150:12, 151:15,
179:18, 203:9
**clearly** [1] - 76:3
**CLERK** [9] - 3:2, 3:8,
12:10, 12:12, 12:17,
12:21, 78:3, 78:6,
106:8
**Clerk** [1] - 12:15
**Cleveland** [1] - 111:25
**client** [1] - 180:10
**clinic** [1] - 24:11
**Clinic** [2] - 17:9, 18:21
**clinical** [25] - 21:25,
22:4, 29:24, 37:2,
48:16, 49:5, 49:6,
49:9, 49:12, 49:23,
49:24, 64:22, 68:3,
69:13, 96:23, 96:25,
177:6, 177:11,
178:2, 178:5,
178:12, 178:14,

178:17, 193:20
**clinicians** [1] - 38:25
**close** [2] - 45:10,
203:20
**closely** [1] - 44:7
**closer** [1] - 135:11
**CME** [1] - 149:10
**co** [2] - 164:15, 164:17
**co-pay** [2] - 164:15,
164:17
**code** [1] - 13:9
**colleagues** [3] -
96:24, 147:23, 148:2
**collection** [1] - 200:8
**collectively** [1] - 57:7
**college** [1] - 104:3
**Columbia** [1] - 94:19
**coming** [7] - 87:12,
97:3, 120:23,
125:23, 126:22,
148:19, 202:23
**commence** [2] - 4:14,
13:12, 13:20
**Commission** [2] -
160:9, 161:14
**committing** [1] -
138:13
**common** [3] - 56:25,
90:7, 169:11
**commonly** [2] - 138:4,
197:19
**communities** [2] -
170:16, 192:17
**community** [2] -
101:3, 101:6
**comorbidity** [1] -
117:9
**companies** [19] -
34:10, 42:16, 43:7,
53:16, 62:5, 62:15,
64:12, 65:2, 66:9,
79:24, 146:4,
146:13, 147:5,
147:11, 147:15,
148:18, 196:24,
200:14, 200:25
**company** [4] - 31:24,
32:23, 63:8, 195:23
**compare** [1] - 47:24
**compared** [2] - 100:9,
135:5
**compares** [1] - 99:3
**comparing** [1] - 99:9
**comparison** [1] - 80:3
**competitive** [1] - 93:8
**Complaint** [1] - 42:22
**complete** [4] - 13:13,
13:15, 13:20, 21:9
**completely** [1] -
151:24

**complex** [2] - 23:22,
52:11
**components** [2] -
45:24, 67:22
**comport** [1] - 76:18
**comprehensive** [1] -
121:17
**compromise** [1] -
108:25
**compulsive** [3] -
23:24, 52:17, 117:15
**concept** [6] - 49:15,
49:16, 49:19, 66:16,
181:22, 195:6
**concepts** [3] - 30:7,
30:9, 30:25
**concern** [1] - 6:10
**concerned** [2] - 55:21,
78:17
**concerning** [27] -
25:25, 32:6, 32:11,
32:24, 33:5, 35:23,
37:8, 37:15, 47:20,
54:11, 57:24, 74:21,
80:18, 83:10, 84:3,
93:17, 96:13, 97:16,
100:14, 106:13,
153:5, 153:23,
191:5, 191:21,
192:3, 196:4, 196:21
**conclude** [2] - 140:6,
140:8
**concluded** [4] -
157:18, 168:14,
169:4, 169:7
**conclusion** [9] -
38:23, 63:22, 69:11,
69:25, 74:14, 75:25,
86:12, 166:13
**conclusions** [8] -
31:7, 31:10, 33:5,
33:8, 43:14, 44:8,
44:10, 191:21
**concrete** [1] - 131:8
**condition** [2] - 18:24,
100:20
**conditions** [3] - 64:16,
155:11
**conduct** [7] - 120:7,
120:14, 120:19,
166:11, 180:6,
187:22, 188:2
**conducted** [5] - 29:24,
121:2, 121:7,
121:17, 182:25
**confer** [1] - 56:9
**conferences** [1] -
34:22
**confirmed** [1] - 112:18
**conflicts** [2] - 38:13,

42:7

**confounding** [1] - 122:23

**congressional** [1] - 36:6

**connection** [22] - 8:19, 14:18, 26:15, 32:18, 37:11, 39:5, 39:17, 46:8, 55:13, 70:24, 72:17, 73:9, 87:21, 88:9, 90:12, 93:13, 93:23, 97:11, 112:3, 129:4, 175:9, 189:9

**connote** [1] - 49:19

**Conroy** [2] - 3:14, 78:22

**CONROY** [4] - 1:14, 1:17, 3:14, 7:3

**consensus** [6] - 53:9, 57:12, 68:18, 93:15, 101:19, 199:9

**consequences** [3] - 30:23, 52:18, 91:23

**consequent** [1] - 191:17

**consider** [12] - 47:5, 108:23, 124:23, 125:8, 163:19, 163:25, 164:7, 178:3, 178:7, 179:8, 179:20, 179:22

**considerable** [4] - 82:6, 82:8, 82:10, 114:10

**considered** [9] - 7:23, 8:6, 11:12, 70:14, 90:6, 90:7, 120:9, 120:16, 179:5

**considers** [1] - 18:4

**consistency** [2] - 81:20, 99:17

**consistent** [2] - 48:3, 113:11

**consists** [1] - 199:14

**constitutes** [1] - 98:18

**constituting** [1] - 194:19

**consultation** [1] - 36:6

**consultative** [1] - 42:13

**consulted** [1] - 175:7

**consulting** [1] - 43:6

**contained** [1] - 43:25

**contains** [1] - 65:25

**contested** [1] - 9:25

**context** [12] - 18:23, 22:21, 22:23, 23:12, 30:3, 30:18, 30:25, 31:4, 36:10, 49:25,

178:4, 178:14

**contexts** [1] - 157:2

**continue** [6] - 35:2, 52:17, 56:14, 81:25, 82:2, 169:25

**continued** [1] - 23:24

**continues** [2] - 114:24, 116:7

**continuing** [3] - 149:9, 160:7, 160:24

**contradicts** [1] - 66:8

**contrast** [1] - 33:25

**contributed** [21] - 16:11, 16:12, 16:15, 25:10, 47:11, 138:17, 145:2, 146:5, 146:14, 146:19, 146:22, 147:2, 147:6, 148:6, 148:16, 149:23, 150:21, 151:6, 151:13, 160:4, 168:21

**contributing** [1] - 202:3

**contribution** [1] - 147:14

**contributors** [1] - 96:4

**control** [2] - 153:19, 182:16

**Control** [4] - 57:23, 84:2, 84:13, 85:18

**controlled** [7] - 152:21, 152:24, 153:5, 153:12, 153:24, 180:12, 184:12

**Controlled** [1] - 153:6

**controlling** [1] - 122:23

**controls** [1] - 51:3

**convened** [1] - 36:13

**conversations** [4] - 125:12, 125:16, 125:18, 130:6

**convey** [1] - 160:10

**copied** [1] - 132:2

**copies** [2] - 204:15, 204:17

**Corporation** [1] - 164:4

**correct** [227] - 4:22, 4:23, 5:25, 6:9, 14:10, 14:15, 19:12, 21:20, 24:20, 25:3, 26:9, 26:10, 27:7, 27:21, 28:7, 32:4, 33:2, 33:19, 34:19, 35:20, 35:21, 37:3, 37:9, 38:2, 39:14,

39:17, 39:18, 39:20, 42:20, 43:2, 43:9, 45:8, 51:9, 55:5, 58:13, 58:19, 60:17, 62:16, 63:3, 63:8, 63:18, 63:19, 64:15, 66:9, 66:17, 66:20, 67:23, 82:4, 86:8, 89:4, 92:17, 92:18, 92:21, 93:4, 94:13, 95:6, 95:14, 97:13, 101:17, 104:6, 110:10, 110:11, 110:13, 110:14, 110:21, 110:22, 110:25, 111:2, 111:9, 111:16, 111:17, 111:21, 111:25, 112:19, 112:24, 113:7, 113:12, 114:20, 116:15, 116:23, 117:9, 117:16, 117:22, 117:23, 118:3, 118:8, 118:14, 118:15, 119:10, 119:15, 119:19, 120:17, 120:24, 121:21, 121:22, 122:14, 122:24, 124:8, 124:9, 124:12, 124:13, 125:3, 125:11, 125:24, 126:13, 126:14, 127:2, 127:10, 127:16, 127:20, 127:24, 128:20, 129:7, 129:8, 129:10, 129:20, 130:2, 130:16, 131:16, 132:10, 132:17, 132:19, 133:4, 133:19, 133:20, 134:15, 134:21, 135:2, 135:8, 135:16, 137:3, 137:6, 137:14, 137:24, 138:5, 138:9, 138:14, 138:17, 138:25, 139:2, 139:7, 139:18, 140:3, 140:10, 140:11, 140:14, 141:9, 141:12, 141:19, 141:24, 142:4, 142:5, 142:15, 142:16, 142:21, 143:6, 143:7, 143:22,

144:2, 144:16, 144:17, 144:22, 144:23, 145:3, 145:19, 145:20, 145:23, 145:24, 146:20, 146:23, 147:6, 147:19, 148:7, 148:12, 148:25, 149:2, 149:7, 149:13, 149:17, 149:19, 149:20, 150:4, 150:5, 150:22, 150:23, 155:17, 156:2, 156:6, 156:7, 157:24, 159:19, 159:25, 160:12, 160:21, 160:22, 162:18, 162:20, 164:13, 165:13, 165:22, 171:20, 172:5, 173:21, 174:14, 176:6, 176:7, 179:16, 179:17, 183:8, 183:11, 185:11, 185:15, 187:6, 187:18, 187:20, 189:9, 189:10, 192:6, 192:12, 192:15, 192:19, 192:20, 193:3, 193:7, 196:18, 196:19, 197:9

**correcting** [1] - 34:18

**correctly** [12] - 16:22, 52:22, 64:15, 71:22, 84:22, 96:6, 102:7, 103:19, 109:18, 155:6, 194:4, 199:4

**corresponding** [1] - 80:8

**cost** [1] - 164:16

**counsel** [6] - 7:17, 72:25, 106:15, 106:18, 132:2, 183:18

**count** [1] - 22:13

**counties** [5] - 167:18, 168:5, 175:14, 176:15, 189:17

**countries** [1] - 99:2

**country** [8] - 34:6, 36:17, 93:19, 98:24, 114:24, 115:25, 134:6, 156:11

**COUNTY** [1] - 1:2

**County** [40] - 1:15, 1:21, 3:3, 3:13, 3:15, 3:18, 4:7, 99:23,

99:24, 100:11, 111:20, 111:21, 117:21, 117:24, 118:2, 124:11, 137:18, 167:12, 167:13, 167:15, 172:18, 175:11, 175:20, 175:22, 175:23, 175:25, 176:2, 177:20, 178:22, 180:8, 180:13, 184:16, 187:17, 187:18, 187:23, 188:3, 204:8

**couple** [6] - 4:10, 49:14, 72:15, 136:22, 168:11, 195:14

**coupon** [1] - 164:11

**course** [23] - 4:25, 8:23, 9:24, 10:4, 12:25, 34:4, 47:16, 61:15, 73:16, 74:5, 74:19, 75:14, 79:21, 87:20, 88:13, 90:12, 96:14, 99:15, 147:21, 164:21, 174:13, 174:16, 197:7

**courses** [2] - 160:8, 160:25

**court** [5] - 13:15, 14:17, 113:5, 113:19, 151:8

**COURT** [98] - 1:2, 2:20, 3:6, 3:16, 3:19, 3:22, 3:24, 4:3, 4:8, 4:24, 5:23, 6:2, 6:23, 7:4, 7:11, 9:23, 11:16, 11:24, 12:3, 12:8, 12:22, 14:2, 17:17, 17:21, 41:4, 41:9, 42:20, 42:24, 45:19, 46:2, 57:16, 61:13, 61:23, 62:2, 65:15, 65:18, 70:18, 70:25, 72:15, 75:11, 76:3, 76:14, 77:14, 78:5, 78:10, 78:21, 79:8, 79:10, 91:2, 98:18, 99:13, 105:16, 105:22, 106:5, 106:24, 107:22, 108:19, 108:25, 109:7, 109:9, 109:16, 109:22, 112:7, 112:11, 112:14, 115:12, 132:19, 152:3, 161:18,

162:10, 162:24,
163:4, 163:10,
163:14, 171:7,
171:9, 174:4, 174:6,
174:9, 174:13,
174:16, 174:19,
176:5, 181:19,
182:12, 182:17,
186:16, 186:19,
186:23, 190:6,
196:9, 196:11,
196:14, 198:12,
200:9, 203:14,
203:17, 203:19
**Court** [33] - 1:12, 3:2,
12:16, 13:24, 18:4,
18:8, 22:19, 22:21,
23:8, 43:4, 46:11,
50:17, 60:19, 65:22,
71:2, 71:6, 72:24,
73:2, 73:7, 73:10,
74:10, 74:19, 76:21,
102:10, 106:17,
117:12, 122:19,
134:25, 151:25,
172:17, 203:20,
204:7, 204:21
**Court's** [4] - 48:23,
77:15, 78:22, 115:8
**courtesy** [2] - 24:24,
25:2
**courthouse** [1] - 18:3
**courtroom** [3] - 18:3,
18:6, 131:2
**courts** [2] - 9:13,
18:10
**Cousin** [3] - 161:21,
162:11, 163:12
**cover** [1] - 79:18
**covered** [2] - 129:18,
167:24
**craving** [1] - 66:18
**created** [6] - 9:3, 62:6,
65:25, 66:7, 106:21,
170:19
**creating** [1] - 155:4
**creative** [1] - 197:20
**credentials** [1] - 76:4
**crimes** [1] - 138:13
**crisis** [6] - 94:20,
95:22, 144:20,
148:6, 151:6, 151:13
**criteria** [8] - 89:24,
177:15, 177:19,
177:22, 190:22,
190:25, 191:5,
191:13
**criterion** [1] - 191:9
**critically** [1] - 81:9
**cross** [2] - 61:16, 74:2

**CROSS** [1] - 152:10
**cross-examination** [1]
- 61:16
**CROSS-
EXAMINATION** [1] -
152:10
**crying** [1] - 66:19
**CSR** [3] - 2:20, 206:6,
204:20
**culled** [1] - 198:20
**curb** [1] - 202:2
**curious** [1] - 162:12
**current** [3] - 4:24,
6:10, 167:4
**curriculum** [3] - 29:8,
29:11, 29:13
**cycle** [2] - 169:22,
170:22

## D

**daily** [1] - 23:15
**data** [23] - 38:10,
38:21, 38:24, 41:20,
46:20, 57:3, 57:23,
58:24, 84:2, 91:9,
95:24, 96:19, 98:17,
111:12, 139:12,
139:16, 140:3,
140:6, 141:22,
142:3, 166:12, 202:8
**database** [1] - 142:11
**date** [1] - 29:3
**dates** [1] - 135:18
**dating** [1] - 55:24
**days** [1] - 78:16
**deadly** [3] - 16:3, 55:4,
171:17
**deal** [3] - 24:11, 34:8,
184:8
**Dealer** [3] - 26:8,
60:16, 157:5
**dealers** [1] - 145:7
**dealing** [1] - 29:17
**deals** [1] - 6:7
**death** [3] - 84:18,
85:6, 176:15
**deaths** [7] - 28:9,
58:8, 58:18, 96:21,
104:18, 104:20,
105:5
**debate** [1] - 201:25
**decade** [1] - 115:23
**decades** [4] - 55:12,
57:8, 90:3, 97:9
**decedent** [1] - 175:25
**December** [1] - 83:4
**decided** [1] - 76:19
**deciding** [3] - 116:15,
120:9, 120:16

**decision** [12] - 76:5,
76:10, 114:16,
119:24, 164:25,
165:9, 165:12,
165:15, 165:19,
165:20, 165:21,
169:16
**decisions** [7] - 74:20,
119:19, 126:20,
169:6, 169:7, 171:2,
171:3
**declare** [1] - 42:7
**decreased** [1] - 116:2
**deem** [1] - 87:7
**deemed** [1] - 73:15
**deeply** [1] - 102:19
**Defendant** [19] -
114:2, 119:23,
120:22, 121:5,
147:14, 159:3,
159:12, 179:9,
179:11, 179:21,
179:23, 180:3,
180:7, 184:21,
186:15, 187:6,
187:11, 187:15,
188:2
**Defendant's** [1] -
113:23
**Defendants** [37] - 4:5,
5:7, 7:14, 10:22,
42:24, 42:25, 47:19,
72:10, 72:12, 75:15,
99:11, 121:21,
127:23, 130:5,
137:14, 138:11,
138:12, 146:4,
146:9, 146:14,
147:11, 168:8,
178:25, 179:15,
181:10, 181:16,
182:3, 182:6, 183:2,
183:14, 183:18,
184:3, 185:6, 186:5,
186:11, 187:23,
201:2
**Defendants'** [11] -
76:22, 77:2, 77:19,
106:19, 123:16,
124:4, 125:2,
125:10, 135:15,
135:21, 136:8
**defense** [4] - 70:21,
106:14, 131:25,
132:2
**defined** [3] - 23:23,
24:4, 61:20
**definition** [9] - 23:3,
23:7, 52:9, 52:24,
53:3, 53:7, 53:18,

54:20, 61:9
**definitions** [2] - 51:14,
54:18
**definitive** [1] - 202:8
**degree** [8] - 19:11,
50:9, 81:4, 110:12,
112:8, 148:23,
150:2, 187:16
**degrees** [2] - 111:3,
111:14
**delay** [1] - 7:6
**Delgado** [2] - 91:25,
92:23
**demand** [1] - 202:16
**demonstrating** [1] -
21:6
**demonstrative** [1] -
113:15
**dental** [1] - 92:9
**Department** [4] -
17:12, 19:21, 24:22,
73:5
**dependence** [6] -
20:15, 23:11, 23:14,
24:13, 25:8, 95:3
**dependent** [6] - 16:13,
46:24, 169:24,
173:15, 202:3,
202:14
**depicting** [1] - 91:8
**deposed** [2] - 115:3,
154:8
**deposition** [39] - 8:7,
9:4, 9:21, 9:22,
115:7, 115:18,
116:10, 118:18,
118:19, 118:24,
119:10, 120:4,
121:12, 121:16,
122:14, 130:25,
131:16, 132:3,
132:4, 132:7,
132:12, 133:23,
134:19, 134:22,
144:6, 153:16,
153:18, 153:21,
154:12, 159:7,
164:6, 174:24,
182:9, 183:8,
183:16, 183:20,
184:24, 185:3,
185:11
**depositions** [1] -
180:2
**depression** [1] -
117:15
**depth** [4] - 38:7,
40:18, 43:11, 67:23
**deputy** [2] - 161:22,
161:24

**derived** [1] - 38:23
**deriving** [1] - 44:10
**describe** [8] - 30:16,
58:3, 100:3, 101:3,
101:6, 123:17,
164:11, 191:8
**described** [7] - 29:16,
56:20, 59:12, 88:5,
101:4, 101:7, 179:4
**describing** [1] -
119:19
**description** [2] - 21:7,
25:22
**designed** [3] - 33:19,
154:5, 154:14
**designee** [1] - 18:11
**desire** [1] - 81:24
**despite** [5] - 23:25,
42:11, 52:17, 98:22,
145:9
**detail** [2] - 166:20,
166:21
**detailers** [2] - 200:18
**detailing** [15] - 31:16,
31:20, 33:25, 34:2,
34:5, 34:13, 34:24,
79:18, 79:22, 81:15,
81:25, 82:3, 82:4,
82:12, 82:14
**details** [4] - 129:17,
180:6, 180:11,
180:15
**detect** [1] - 97:22
**determine** [11] - 8:2,
25:20, 38:8, 50:8,
81:14, 89:12, 128:4,
128:19, 128:23,
176:16, 178:22
**determining** [1] -
195:20
**develop** [6] - 24:11,
29:8, 29:11, 61:23,
64:6, 92:10
**developed** [3] - 22:8,
99:2, 99:6
**development** [3] -
194:14, 194:23,
195:2
**diagnosed** [3] - 91:16,
92:13, 176:2
**diagnosee** [1] -
176:22
**diagnosing** [4] -
177:5, 177:9,
177:16, 191:9
**Diagnosis** [2] - 17:9,
18:21
**diagnosis** [7] - 18:23,
175:20, 176:16,
176:19, 178:3,

178:13, 190:22
**diagnostic** [4] - 190:22, 190:25, 191:5, 191:9
**Diagnostic** [2] - 24:7, 53:20
**die** [2] - 28:18, 51:6
**difference** [4] - 54:18, 67:19, 68:22, 100:8
**differences** [4] - 97:23, 97:24, 98:14, 112:22
**different** [19] - 10:24, 11:10, 15:19, 34:21, 42:16, 44:9, 53:18, 55:12, 67:7, 72:6, 75:18, 75:24, 88:2, 88:4, 88:9, 100:6, 131:6, 192:4
**differently** [2] - 133:24, 181:2
**digging** [1] - 41:3
**DIRECT** [1] - 14:5
**direct** [9] - 71:2, 73:25, 77:9, 78:23, 159:6, 177:4, 182:21, 185:2, 188:13
**directed** [2] - 72:24, 72:25
**direction** [2] - 13:24, 44:9
**directly** [2] - 124:5, 140:17
**Director** [2] - 17:10
**disagree** [1] - 136:5
**disagreed** [2] - 44:2, 44:5
**discern** [1] - 10:10
**discipline** [1] - 149:6
**disclose** [1] - 126:16
**disclosed** [7] - 7:18, 8:19, 9:8, 10:21, 130:5, 130:8, 193:6
**discloses** [2] - 42:15, 43:6
**disclosure** [1] - 7:14
**disconnected** [1] - 112:6
**discover** [1] - 48:7
**discovered** [2] - 35:23, 48:8
**discovery** [4] - 8:14, 9:14, 71:4, 71:24
**discuss** [4] - 15:15, 36:19, 62:4, 83:8
**discussed** [6] - 31:8, 36:5, 79:19, 97:12, 147:19, 148:9
**discusses** [1] - 32:2

**disease** [5] - 23:23, 52:11, 56:8, 117:13, 202:10
**Disease** [4] - 57:23, 84:2, 84:13, 85:18
**diseases** [1] - 52:21
**disorder** [31] - 18:25, 20:13, 22:8, 24:5, 24:6, 24:12, 28:3, 54:2, 54:20, 58:22, 64:6, 90:21, 91:6, 91:17, 92:10, 117:13, 117:15, 117:16, 175:17, 175:19, 176:3, 176:17, 176:19, 176:23, 177:6, 177:10, 177:16, 178:3, 178:13, 191:10, 194:15
**Disorders** [2] - 24:8, 53:21
**disorders** [1] - 19:21
**dispense** [1] - 173:23
**dispensed** [4] - 137:14, 142:8, 178:24, 201:9
**dispenses** [1] - 173:15
**dispute** [1] - 106:12
**disregarding** [1] - 178:14
**disseminated** [1] - 63:7
**distinction** [2] - 113:16, 114:5
**distinguished** [1] - 113:9
**distributed** [8] - 62:25, 137:13, 166:24, 167:8, 167:15, 169:13, 178:24, 201:9
**distribution** [12] - 152:21, 153:5, 153:24, 166:13, 166:17, 166:19, 168:3, 168:7, 168:20, 170:15, 180:11, 181:2
**distributor** [5] - 144:8, 152:15, 159:3, 159:11, 169:18
**distributor's** [2] - 153:4, 153:22
**distributors** [22] - 61:9, 143:17, 143:21, 144:2, 144:15, 160:16, 160:17, 160:21,

161:2, 161:5, 161:6, 161:9, 161:15, 162:16, 162:17, 162:20, 168:16, 169:9, 170:5, 170:14, 171:5, 201:8
**distributors'** [1] - 153:11
**DITTA** [1] - 73:4
**Ditta** [1] - 73:16
**divergent** [2] - 49:7
**diverse** [1] - 103:24
**diversion** [8] - 16:16, 103:24, 142:21, 143:8, 143:13, 144:10, 144:20, 144:22
**diverted** [2] - 143:4, 143:17
**Doctor** [24] - 12:3, 23:6, 26:5, 39:4, 41:11, 44:19, 47:13, 47:17, 51:11, 56:20, 57:17, 57:22, 58:18, 60:8, 65:24, 68:10, 78:7, 80:23, 88:11, 92:15, 100:12, 101:17, 102:21, 105:13
**doctor** [67] - 12:4, 15:12, 17:7, 22:25, 28:21, 31:12, 33:10, 39:12, 41:4, 54:16, 55:24, 56:7, 57:2, 61:13, 62:4, 62:23, 64:5, 74:5, 79:17, 84:10, 90:10, 98:18, 99:15, 104:25, 106:8, 109:7, 112:7, 114:19, 114:25, 116:4, 116:8, 117:20, 118:2, 119:6, 120:15, 140:21, 141:8, 141:10, 141:14, 141:17, 141:22, 142:8, 142:14, 143:6, 149:15, 149:16, 153:15, 164:23, 164:24, 165:7, 165:8, 165:12, 165:22, 169:15, 169:19, 170:23, 171:7, 172:11, 172:18, 172:22, 173:3, 173:11, 185:25, 198:17, 199:15, 201:10, 203:12
**doctor's** [4] - 31:24,

76:23, 114:16, 165:15
**doctor-caused** [1] - 55:24
**doctors** [75] - 16:5, 27:24, 48:14, 55:8, 55:19, 56:3, 56:12, 60:11, 60:16, 60:20, 60:21, 62:11, 81:17, 97:21, 98:2, 98:4, 98:5, 98:9, 98:10, 114:2, 116:5, 116:12, 117:19, 118:5, 118:7, 118:11, 118:13, 119:3, 119:13, 119:17, 119:22, 120:8, 120:20, 121:7, 121:18, 122:6, 123:3, 126:20, 129:19, 137:20, 138:2, 138:4, 138:5, 138:21, 139:17, 139:25, 140:10, 140:18, 140:25, 141:5, 141:11, 146:18, 147:17, 147:18, 147:19, 148:6, 149:6, 155:20, 155:24, 156:6, 165:24, 166:7, 169:24, 170:4, 170:13, 171:5, 173:19, 188:14, 188:17, 188:18, 191:20, 194:9, 200:20
**doctors'** [4] - 157:19, 158:11, 158:17, 170:25
**document** [13] - 70:16, 71:8, 72:4, 72:14, 85:21, 86:3, 107:2, 107:8, 107:10, 164:5, 164:7, 164:10, 164:11
**documents** [26] - 7:22, 9:10, 9:18, 9:20, 32:12, 32:16, 32:17, 32:24, 47:24, 47:25, 70:10, 72:19, 86:7, 107:13, 107:17, 107:20, 131:25, 132:4, 163:19, 163:25, 164:8, 164:15, 179:4, 179:8, 179:20, 179:22

**domain** [1] - 32:11
**done** [10] - 33:15, 34:12, 68:13, 94:9, 108:21, 123:25, 163:9, 178:17, 192:23, 193:24
**Donna** [1] - 5:6
**door** [1] - 147:24
**dopamine** [1] - 50:24
**Dosage** [1] - 84:11
**dosage** [2] - 86:5, 87:13
**dosages** [3] - 84:4, 84:17, 84:19
**dose** [10] - 23:17, 47:3, 56:14, 65:8, 66:15, 67:11, 194:18, 194:21, 195:7, 195:11
**doses** [10] - 65:3, 83:11, 83:12, 83:16, 84:21, 85:4, 85:5, 85:9, 85:10, 155:20
**double** [1] - 71:13
**double-check** [1] - 71:13
**down** [18] - 5:14, 17:5, 47:14, 51:4, 59:9, 60:6, 73:5, 74:22, 90:9, 114:14, 123:11, 160:15, 163:14, 172:7, 182:23, 186:24, 190:10
**DR** [2] - 12:7, 12:11
**Dr** [66] - 1:10, 4:21, 5:2, 5:4, 7:19, 9:3, 12:2, 12:14, 12:22, 14:7, 18:19, 39:16, 39:19, 42:15, 42:21, 43:5, 46:6, 65:25, 72:9, 75:9, 75:19, 107:10, 107:15, 110:4, 112:16, 113:22, 114:8, 115:4, 115:14, 115:16, 116:10, 119:9, 121:15, 122:8, 122:14, 126:7, 126:13, 126:16, 128:14, 129:9, 129:13, 135:22, 136:11, 139:24, 151:15, 151:21, 152:12, 153:15, 154:8, 154:20, 158:16, 159:6, 162:21, 163:18, 171:10, 173:9, 174:23,

176:9, 182:19, 187:4, 190:12, 201:6, 203:14
**draw** [1] - 167:20
**draws** [1] - 113:15
**driven** [1] - 95:5
**driving** [1] - 98:9
**Drug** [5] - 20:6, 26:8, 60:16, 103:6, 157:5
**drug** [29] - 34:10, 53:16, 66:18, 83:6, 86:13, 90:20, 95:25, 103:9, 103:18, 104:5, 124:15, 124:17, 128:22, 128:24, 141:23, 142:3, 142:10, 145:6, 165:16, 195:21, 195:24, 196:21, 196:22, 196:24, 196:25, 200:18, 202:15
**drugs** [9] - 32:3, 45:6, 102:12, 103:16, 103:17, 127:18, 194:23, 195:17, 196:18
**DSM** [7] - 53:22, 53:23, 89:24, 177:15, 177:19, 177:22
**DSM-IV** [1] - 89:24
**DSM-V** [1] - 89:24
**dual** [2] - 18:20, 18:23
**Dual** [2] - 17:9, 18:20
**due** [3] - 85:6, 140:9, 144:11
**duly** [1] - 125:17
**Dunn** [3] - 85:25, 86:10, 86:22
**duped** [7] - 60:17, 60:20, 60:21, 62:11, 129:12, 188:14, 188:17
**Duragesic** [1] - 127:12
**duration** [5] - 47:7, 194:18, 194:22, 195:7, 195:11
**during** [6] - 5:3, 9:23, 47:16, 78:23, 142:25, 143:5
**duty** [1] - 187:17
**dying** [1] - 97:4
**dynamic** [1] - 8:25

**E**

**early** [6] - 8:5, 14:9, 55:25, 70:25, 105:8, 155:2

**easier** [3] - 64:16, 148:17, 148:18
**easy** [1] - 103:14
**econometrician** [1] - 192:11
**econometrics** [3] - 111:9, 111:15, 192:14
**economic** [1] - 111:12
**economist** [1] - 110:10
**Ed** [1] - 174:24
**edition** [1] - 24:8
**editor** [4] - 44:24, 45:2, 46:9, 46:22
**educate** [1] - 166:7
**education** [4] - 149:10, 160:7, 189:7, 200:19
**educational** [4] - 63:10, 64:9, 77:21, 160:25
**effect** [22] - 56:9, 75:12, 76:22, 80:7, 100:15, 100:18, 100:25, 101:12, 102:23, 104:9, 106:15, 145:13, 156:17, 156:20, 160:11, 191:25, 197:3, 197:14, 197:18, 197:24, 198:6, 198:23
**effective** [13] - 16:6, 39:23, 41:14, 56:13, 60:12, 60:24, 66:14, 67:6, 69:16, 127:2, 128:4, 128:19, 128:24
**effectiveness** [1] - 43:15
**effects** [3] - 40:23, 41:16, 50:21
**efficacious** [1] - 195:21
**efficacy** [9] - 30:6, 30:13, 30:25, 36:12, 47:21, 48:10, 48:12, 160:11, 196:5
**efforts** [5] - 52:19, 76:23, 77:3, 77:21, 201:25
**eight** [2] - 89:16, 89:25
**either** [7] - 99:22, 110:21, 124:8, 161:10, 161:15, 170:17, 176:15
**elicit** [3] - 8:10, 75:3, 202:4

**elsewhere** [2] - 55:7, 100:14
**Emergency** [1] - 92:24
**emergency** [2] - 85:13, 147:23
**emphasize** [1] - 63:16
**employ** [2] - 50:3, 67:12
**employed** [3] - 67:8, 122:21, 177:2
**employees** [2] - 175:10, 180:3
**employing** [1] - 46:6
**employment** [1] - 110:15
**empower** [1] - 180:16
**enable** [1] - 25:3
**end** [2] - 152:7, 199:17
**endangering** [1] - 56:15
**ended** [1] - 158:5
**Endo** [2] - 42:17, 133:8
**Enforcement** [1] - 20:6
**enforcement** [1] - 175:14
**engage** [4] - 5:21, 34:6, 52:16, 140:24
**engaged** [4] - 37:14, 54:16, 62:5, 64:12
**engagement** [1] - 192:16
**engagements** [1] - 35:9
**Engineering** [1] - 95:13
**engineering** [1] - 95:21
**England** [2] - 45:2, 157:24
**enjoy** [1] - 163:15
**enormous** [1] - 98:16
**ensure** [2] - 5:13, 173:19
**entered** [2] - 11:6, 72:16
**entire** [2] - 186:21, 187:10
**entirely** [2] - 10:24, 165:14
**entirety** [1] - 44:21
**entities** [3] - 73:22, 151:5, 151:12
**entitled** [4] - 84:10, 91:4, 101:20, 204:11
**entity** [1] - 150:15
**epidemic** [13] - 16:18, 16:19, 27:2, 36:15, 55:24, 102:5,

102:14, 148:16, 150:8, 150:21, 192:6, 198:19, 200:2
**Epidemic** [1] - 101:21
**epidemiologic** [1] - 69:14
**epidemiological** [1] - 178:16
**equivalence** [1] - 84:20
**equivalent** [1] - 60:2
**Er** [1] - 127:9
**errata** [2] - 183:16, 185:15
**error** [1] - 179:4
**ESQ** [6] - 1:16, 1:17, 1:17, 1:22, 1:23, 2:10
**essence** [1] - 54:22
**essential** [1] - 30:19
**essentially** [8] - 21:3, 24:9, 41:11, 45:3, 55:18, 74:22, 95:23, 141:11
**established** [2] - 47:17, 66:25
**esteemed** [1] - 53:15
**estimate** [2] - 135:4, 167:6
**estimated** [1] - 43:7
**et** [4] - 18:15, 43:8, 55:5, 60:12
**evaluate** [2] - 178:21, 180:18
**evaluating** [2] - 49:11, 177:25
**event** [9] - 6:4, 9:23, 11:18, 11:21, 13:21, 72:22, 85:11, 86:14, 90:15
**events** [2] - 57:25, 90:5
**evidence** [34] - 16:9, 29:14, 40:7, 40:15, 40:17, 40:20, 42:12, 44:10, 46:21, 47:5, 48:11, 49:4, 49:6, 49:7, 49:13, 49:15, 49:20, 49:25, 50:4, 56:21, 69:10, 70:2, 72:20, 73:21, 74:9, 80:20, 101:23, 109:3, 113:11, 113:24, 126:25, 129:4, 198:24
**Evidence** [1] - 41:15
**evidence-based** [3] - 49:15, 49:20, 50:4
**evident** [1] - 40:19
**exact** [2] - 135:18,

159:8
**exactly** [1] - 13:18
**Exalgo** [2] - 127:14, 137:8
**exam** [1] - 21:11
**examination** [11] - 9:11, 9:24, 23:9, 61:16, 74:2, 78:23, 88:6, 105:9, 106:13, 190:15
**EXAMINATION** [5] - 14:5, 110:2, 152:10, 174:21, 190:8
**examine** [2] - 124:2, 124:19
**examined** [2] - 89:9, 123:14
**examiner** [1] - 163:2
**examining** [2] - 46:7, 109:19
**example** [21] - 13:5, 26:18, 33:15, 39:9, 43:14, 56:22, 62:19, 80:6, 91:10, 92:3, 116:17, 122:7, 127:8, 134:25, 141:3, 146:3, 165:16, 178:7, 180:10, 191:16, 191:22
**examples** [3] - 16:7, 79:22, 131:8
**excellence** [1] - 21:22
**exchange** [1] - 71:8
**exchanged** [1] - 71:5
**exclude** [1] - 43:25
**excluding** [1] - 76:25
**exclusively** [2] - 96:16, 178:15
**excuse** [4] - 41:4, 72:11, 182:22, 185:23
**excused** [1] - 203:17
**exercise** [3] - 165:25, 166:5, 180:17
**exercising** [1] - 188:19
**Exhibit** [2] - 106:18, 106:20
**exhibit** [6] - 9:25, 11:18, 106:19, 106:21, 107:2
**exhibits** [1] - 10:5
**exist** [4] - 135:16, 135:22, 136:4, 136:10
**expansion** [1] - 95:2
**expect** [1] - 11:3
**expected** [1] - 116:12
**expedite** [1] - 12:24

213

**experience** [26] - 23:18, 48:16, 48:21, 49:5, 49:7, 49:12, 49:23, 49:24, 54:15, 68:2, 81:16, 82:19, 96:23, 96:25, 97:9, 110:9, 110:16, 110:23, 118:3, 123:21, 123:23, 152:13, 153:14, 177:11, 193:21
**experiences** [4] - 52:13, 81:16, 82:15, 117:22
**expert** [14] - 4:22, 5:10, 6:8, 6:14, 9:14, 10:25, 45:23, 71:25, 111:19, 126:6, 131:20, 131:24, 136:2, 157:3
**expert's** [2] - 8:24
**expertise** [9] - 21:6, 21:10, 113:6, 152:17, 152:20, 152:23, 153:3, 153:10, 153:22
**experts** [5] - 5:15, 6:19, 25:20, 53:9, 95:19
**explain** [10] - 22:20, 48:20, 59:23, 60:19, 63:25, 84:24, 94:15, 100:17, 105:2, 201:22
**explained** [1] - 62:10
**exponential** [1] - 95:5
**exposed** [2] - 92:9, 92:12
**exposure** [1] - 91:5
**expressed** [2] - 188:13, 193:19
**expressing** [1] - 82:19
**expressly** [1] - 76:20
**extensive** [2] - 43:6, 75:20
**extent** [4] - 100:5, 129:11, 148:5, 150:19
**extremely** [1] - 45:11

**F**

**face** [1] - 196:3
**facie** [1] - 95:24
**facilitated** [1] - 103:14
**facilities** [3] - 142:24, 142:25, 143:5
**fact** [29] - 9:24, 26:24, 42:12, 42:14, 56:9, 62:5, 63:14, 63:23,

64:13, 65:5, 65:10, 65:18, 73:19, 74:7, 86:9, 98:22, 118:5, 134:18, 143:20, 169:18, 170:4, 187:9, 193:2, 194:6, 195:20, 197:8, 197:21, 203:10
**factor** [5] - 117:7, 122:22, 168:23, 194:20, 194:23
**Factors** [2] - 199:23, 201:6
**factors** [15] - 116:18, 116:23, 116:25, 120:8, 120:15, 122:23, 137:16, 151:5, 151:12, 151:17, 194:14, 195:2, 199:25, 200:3, 200:4
**facts** [2] - 157:12, 157:14
**faculty** [1] - 19:4
**failed** [1] - 126:16
**fair** [2] - 13:24, 15:8, 21:7, 25:22, 30:24, 31:22, 62:7, 68:4, 85:15, 86:6, 108:25, 136:18, 136:20, 139:3, 140:19, 140:20, 142:9, 144:18, 148:20, 150:15, 178:10, 188:21
**faith** [1] - 189:25
**false** [8] - 62:6, 63:25, 65:10, 65:12, 158:25, 159:10, 184:21, 185:4
**falsehood** [1] - 63:23
**falsity** [1] - 33:6
**familiar** [7] - 9:8, 22:18, 31:15, 31:19, 49:16, 188:24, 190:25
**family** [2] - 103:15, 117:4
**far** [4] - 29:16, 77:9, 168:6, 182:5
**fashion** [1] - 51:25
**faulty** [1] - 166:5
**FDA** [21] - 30:10, 83:5, 110:24, 127:4, 127:8, 128:23, 128:19, 128:23, 129:4, 129:9, 146:22, 148:10, 148:15, 148:19, 148:24, 195:13,

195:16, 195:21, 196:3, 196:17, 196:20
**feasible** [1] - 103:25
**feature** [1] - 103:17
**federal** [3] - 35:14, 111:24, 113:3
**Federation** [4] - 146:25, 150:7, 160:8, 161:13
**feed** [2] - 169:22, 170:21
**feeding** [1] - 45:23
**fees** [2] - 42:12, 42:13
**fellows** [1] - 29:6
**Fellowship** [1] - 17:11
**fellowship** [1] - 19:20
**fentanyl** [1] - 95:5
**few** [6] - 10:6, 12:23, 150:11, 175:3, 190:14, 190:18
**fewer** [2] - 134:25, 136:25
**field** [10] - 23:21, 25:20, 53:4, 53:9, 87:5, 110:16, 110:20, 111:9, 111:11, 194:2
**figure** [3] - 49:8, 87:22, 94:21
**figured** [1] - 48:21
**figures** [1] - 79:19
**filed** [4] - 7:13, 106:22, 159:21, 159:22
**files** [5] - 47:20, 179:9, 179:13, 179:21, 179:23
**fill** [1] - 173:5
**filled** [3] - 166:18, 181:6, 189:24
**filling** [1] - 189:18
**films** [1] - 17:25
**final** [2] - 93:2, 189:21
**financial** [2] - 42:7, 42:12
**finder** [1] - 73:19
**findings** [3] - 61:14, 93:12, 98:17
**fine** [1] - 136:11
**Fine** [2] - 42:15, 42:21
**fingers** [1] - 65:16
**finish** [3] - 79:3, 82:25, 121:23
**finished** [4] - 43:22, 53:11, 202:7, 202:24
**finishing** [1] - 202:23
**first** [19] - 8:21, 10:23, 12:15, 23:14, 26:15, 37:20, 39:19, 46:15, 51:7, 70:13, 92:19,

101:22, 106:5, 108:5, 110:8, 155:10, 177:4, 185:22, 190:16
**fit** [1] - 75:5
**five** [7] - 7:6, 26:25, 43:8, 44:25, 82:9, 135:4, 162:15
**five-second** [1] - 7:6
**fivefold** [3] - 60:4, 167:4, 167:6
**fix** [1] - 186:22
**fly** [1] - 10:10
**flying** [1] - 65:17
**focus** [3] - 114:12, 130:7, 144:13
**focused** [2] - 130:3, 133:16
**focusing** [2] - 73:10, 114:14
**folks** [8] - 37:8, 43:12, 58:21, 58:25, 97:7, 119:25, 124:22, 199:8
**follow** [3] - 122:4, 179:5, 188:16
**follow-up** [3] - 122:4, 179:5, 188:16
**followed** [1] - 43:18
**following** [7] - 19:17, 19:20, 28:5, 55:18, 105:25, 115:20, 154:24
**follows** [1] - 12:16
**foot** [1] - 14:24
**footnote** [2] - 84:12, 93:2
**Footnote** [1] - 84:14
**footnotes** [3] - 85:19, 92:16
**forbidden** [1] - 18:9
**forgot** [1] - 57:7
**form** [4] - 80:16, 139:20, 177:14, 181:18
**formed** [2] - 29:13, 130:19
**forming** [18] - 48:15, 120:6, 123:13, 123:20, 124:12, 124:20, 125:20, 126:8, 126:12, 130:4, 130:13, 132:9, 142:3, 143:13, 172:14, 177:8, 193:18
**forms** [1] - 202:12
**formulary** [3] - 147:4, 150:19, 150:25
**forth** [6] - 38:11,

38:22, 74:7, 87:14, 88:16, 167:7
**forward** [2] - 169:22, 170:21
**foundation** [2] - 73:20, 73:22
**foundational** [1] - 81:8
**founded** [2] - 38:6, 80:21
**four** [7] - 43:8, 57:11, 82:9, 85:22, 135:4, 167:4, 167:6
**fourfold** [7] - 16:2, 55:3, 57:11, 59:9, 59:12, 105:6, 171:16
**framework** [1] - 75:6
**frequently** [1] - 46:16
**Friday** [3] - 4:12, 4:15, 5:3
**friends** [1] - 103:15
**front** [2] - 37:22, 167:22
**Frye** [5] - 5:14, 5:22, 6:5, 9:11, 11:13
**FRYE** [1] - 1:10
**Fryebert** [1] - 74:16
**full** [2] - 19:17, 178:3
**function** [1] - 64:14
**funded** [1] - 38:14
**furthermore** [4] - 40:10, 40:18, 64:8, 202:9
**Furthermore** [1] - 204:12

**G**

**gain** [1] - 74:9
**gained** [1] - 55:17
**Garguilo** [20] - 3:4, 21:2, 30:17, 35:22, 58:3, 59:22, 59:23, 68:7, 68:12, 84:25, 88:6, 89:6, 94:15, 96:17, 97:19, 100:4, 100:12, 105:3, 190:21, 201:22
**GARGUILO** [1] - 1:12
**Garguilo's** [1] - 99:16
**gateway** [21] - 74:23, 75:11, 75:12, 100:15, 100:18, 100:25, 101:12, 101:25, 102:23, 104:9, 156:16, 156:20, 197:3, 197:14, 197:18, 197:24, 198:6, 198:23, 199:2,

203:2, 203:11
**gather** [1] - 39:4
**gears** [3] - 123:3,
158:21, 181:13
**General** [3] - 2:3, 2:3,
2:5
**general** [8] - 17:24,
73:13, 74:4, 75:2,
87:9, 101:2, 170:17,
171:17
**General's** [1] - 3:21
**generally** [14] - 52:20,
58:25, 74:10, 100:2,
100:4, 137:18,
155:15, 155:21,
155:24, 156:4,
156:9, 164:14,
176:21, 195:6
**generic** [2] - 127:18,
127:19
**genuinely** [1] - 188:18
**geographic** [4] -
97:23, 98:13, 116:2,
184:17
**geographically** [1] -
98:14
**given** [6] - 30:21, 36:2,
124:19, 125:7,
132:2, 159:18
**gonna** [2] - 14:22,
38:2
**govern** [1] - 110:24
**government** [2] -
150:11, 150:14
**Governor** [1] - 29:20
**governors** [1] - 36:16
**graph** [7] - 58:4, 58:6,
85:3, 85:8, 85:24,
85:25, 89:7
**graphs** [3] - 84:3,
85:2, 85:14
**green** [1] - 58:12
**ground** [1] - 49:21
**grows** [3] - 16:2, 55:3,
171:15
**Guerra** [1] - 73:3
**GUERRA** [1] - 73:3
**guess** [1] - 104:25
**guidelines** [2] - 150:7,
191:13

**H**

**habits** [3] - 55:14,
99:18, 191:17
**Hague** [1] - 204:6
**HAGUE** [1] - 204:20
**half** [1] - 42:8
**halfway** [1] - 186:23
**hallway** [1] - 18:7

**halo** [1] - 56:9
**hand** [4] - 12:13,
18:24, 95:11, 151:8
**handed** [2] - 71:5,
113:19
**handled** [2] - 71:5,
181:2
**handy** [2] - 154:22,
193:10
**Hanly** [14] - 3:12,
17:17, 61:23, 70:18,
71:22, 72:23, 74:18,
77:6, 78:14, 114:11,
156:16, 157:4,
190:6, 200:9
**hanly** [1] - 76:17
**HANLY** [75] - 1:14,
1:16, 3:12, 4:23,
8:17, 11:25, 14:4,
14:6, 15:10, 17:20,
18:17, 18:18, 41:10,
42:23, 42:25, 43:3,
44:16, 44:18, 46:4,
46:5, 47:13, 47:15,
51:17, 51:19, 53:11,
53:13, 57:19, 57:21,
59:15, 59:17, 60:5,
60:7, 61:25, 62:3,
62:18, 62:22, 65:13,
65:17, 65:21, 65:23,
66:4, 66:6, 70:5,
70:19, 75:7, 75:12,
79:5, 79:16, 84:7,
84:9, 88:20, 88:22,
90:23, 91:3, 94:6,
94:8, 99:14, 101:14,
101:16, 102:25,
103:3, 104:22,
104:24, 105:13,
106:2, 106:11,
181:18, 187:3,
190:7, 190:9,
190:10, 196:13,
196:16, 201:10,
203:12
**happy** [3] - 79:5,
135:24, 145:14
**Harbaugh** [3] - 68:15,
198:2, 198:3
**hard** [7] - 10:9, 42:2,
130:17, 134:19,
157:10, 169:21,
170:7
**harder** [4] - 64:13,
128:13, 165:4,
186:17
**harm** [3] - 23:25,
83:13, 83:17
**harmed** [1] - 146:2
**harmful** [1] - 52:17

**harms** [9] - 88:17,
96:5, 146:5, 146:15,
146:19, 146:22,
149:23, 191:18,
191:23
**headed** [1] - 68:8
**heading** [1] - 69:9
**heads** [1] - 65:20
**heads-up** [1] - 65:20
**health** [7] - 36:5,
40:23, 41:16, 91:23,
94:18, 94:19, 178:9
**Health** [5] - 10:19,
61:3, 71:19, 94:13,
163:20
**healthcare** [22] -
31:25, 32:2, 32:8,
32:14, 33:21, 34:8,
34:17, 38:25, 45:5,
47:4, 47:9, 52:6,
57:6, 68:4, 121:9,
168:15, 169:5,
169:7, 169:16,
171:2, 173:16, 194:2
**hear** [13] - 12:4, 12:5,
12:10, 13:21, 22:17,
30:3, 54:13, 128:8,
128:11, 128:12,
128:13, 128:15,
198:13
**heard** [8] - 49:15,
54:4, 54:7, 81:22,
82:18, 107:4,
107:22, 163:10
**hearing** [7] - 5:14,
5:22, 6:6, 7:4, 8:13,
11:13, 152:7
**HEARING** [1] - 1:10
**hearings** [4] - 10:5,
12:24, 72:18, 73:10
**heart** [2] - 11:5, 51:5
**heavy** [1] - 95:25
**heed** [1] - 78:21
**held** [1] - 9:13
**help** [1] - 186:19
**helping** [1] - 162:22
**hereby** [1] - 204:8
**Heroin** [1] - 68:9
**heroin** [19] - 68:19,
68:21, 68:22,
100:24, 102:2,
103:19, 145:2,
145:5, 145:10,
145:11, 157:20,
158:12, 158:18,
199:3, 201:16,
202:16, 203:3,
203:11
**high** [6] - 66:15,
67:11, 93:7, 93:8,

104:3, 114:18
**Higher** [2] - 84:10,
84:11
**higher** [9] - 84:17,
84:18, 84:20, 85:5,
85:10, 87:13, 91:23,
155:20
**highlight** [1] - 40:4
**highlighted** [3] -
39:22, 40:6, 40:11
**highly** [5] - 50:25,
104:14, 168:4
**hired** [2] - 157:3,
157:17
**historical** [2] - 55:23,
56:21
**historically** [1] - 33:9
**history** [8] - 46:11,
117:2, 117:4, 168:2,
178:8, 178:9,
178:10, 202:9
**hold** [2] - 24:21,
190:19
**holding** [3] - 26:4,
26:7, 100:3
**HON** [1] - 1:12
**Honor** [75] - 3:18,
3:25, 4:23, 5:25, 6:9,
7:2, 7:3, 7:7, 7:10,
8:9, 8:13, 8:16, 8:17,
8:24, 9:7, 9:12, 9:17,
10:9, 10:18, 11:15,
11:23, 11:25, 14:4,
17:20, 18:17, 42:23,
45:18, 45:21, 45:25,
49:14, 61:2, 61:18,
61:25, 65:13, 70:5,
70:8, 70:11, 70:17,
70:19, 71:10, 71:14,
71:18, 75:8, 76:13,
77:7, 77:12, 77:25,
78:8, 79:15, 105:21,
105:23, 106:2,
106:11, 107:7,
107:13, 107:21,
108:3, 108:4,
108:22, 109:21,
112:10, 112:13,
151:21, 151:23,
162:22, 163:8,
174:3, 174:20,
176:8, 185:23,
186:20, 190:7,
196:6, 199:12,
203:13
**Honorable** [1] - 3:4
**hope** [3] - 14:24,
59:22, 60:9
**hopefully** [2] - 15:7,
175:4

**hospice** [1] - 55:16
**hospital** [1] - 45:4
**hospitalized** [1] - 47:2
**hour** [5] - 4:16, 4:19,
79:6, 79:10, 152:4
**House** [2] - 36:7,
36:13
**house** [1] - 102:16
**huge** [6] - 47:8, 56:2,
56:15, 114:23,
115:24, 168:23
**hundreds** [1] - 10:5
**Hunter** [1] - 3:17
**HUNTER** [1] - 1:22
**hydrocodone** [1] -
136:7

**I**

**idea** [5] - 10:20, 11:3,
45:16, 49:21, 158:13
**identical** [1] - 17:2
**identified** [10] - 7:22,
10:11, 103:22,
119:14, 126:6,
129:23, 130:13,
138:20, 143:12,
189:22
**identify** [23] - 118:6,
118:12, 119:6,
119:12, 119:17,
119:21, 119:25,
120:3, 126:9,
131:23, 138:24,
141:21, 142:7,
158:25, 159:9,
172:17, 172:22,
180:21, 180:24,
181:5, 184:20,
185:4, 187:14
**identifying** [1] - 131:8
**II** [1] - 68:20
**III** [2] - 1:17, 168:2
**illegal** [2] - 16:18,
102:12
**illegally** [2] - 142:18,
142:20
**illicit** [4] - 95:4,
100:24, 102:5,
103:16
**illicitly** [2] - 145:6,
145:22
**illness** [3] - 15:25,
51:12, 191:8
**images** [1] - 18:15
**impact** [6] - 122:22,
139:4, 140:13,
140:17, 142:13,
144:19
**implemented** [1] -

168:7
**importance** [1] - 88:7
**important** [10] - 44:7,
46:14, 46:19, 49:11,
49:22, 49:23, 49:24,
91:15, 136:23, 195:2
**importantly** [1] - 98:7
**importation** [1] - 71:2
**imposes** [1] - 149:9
**impressed** [1] - 76:3
**impression** [2] - 49:9,
82:19
**impressions** [1] -
61:15
**improper** [2] - 9:11,
141:15
**improperly** [1] - 142:8
**improve** [2] - 152:5,
152:8
**IN** [1] - 1:4
**in-depth** [3] - 38:7,
43:11, 67:23
**inaccuracy** [1] - 77:18
**inappropriate** [3] -
108:14, 114:3,
131:11
**Inc** [1] - 2:8
**incidents** [1] - 143:13
**include** [12] - 8:4,
24:15, 28:8, 44:4,
75:10, 117:14,
131:18, 131:20,
138:11, 162:17,
162:19, 186:7
**included** [4] - 8:6,
27:9, 157:15, 158:7
**includes** [1] - 156:10
**including** [19] - 16:13,
18:3, 42:17, 55:5,
72:10, 72:11, 77:17,
85:11, 91:24, 93:16,
94:18, 95:4, 96:2,
100:23, 121:9,
130:21, 149:22,
171:18, 178:8
**inclusion** [1] - 72:13
**inconsistencies** [1] -
48:9
**inconsistency** [3] -
41:12, 81:21, 81:22
**inconsistent** [1] -
113:11
**incorporate** [1] - 72:8
**incorporating** [1] -
71:24
**incorrect** [4] - 119:16,
119:20, 120:25,
139:8
**increase** [15] - 47:12,
57:10, 57:11, 57:14,

57:24, 59:12, 96:4,
101:24, 104:19,
105:9, 140:8,
154:24, 195:12,
198:25
**increased** [38] - 16:3,
16:10, 16:12, 16:15,
16:17, 55:4, 58:7,
60:4, 75:13, 77:4,
83:11, 83:12, 83:16,
84:4, 84:5, 84:20,
86:4, 93:19, 96:3,
96:20, 97:2, 98:9,
98:23, 101:25,
105:6, 144:25,
168:15, 168:22,
169:8, 170:13,
170:15, 171:5,
171:16, 172:4,
199:3, 202:16, 203:3
**increases** [6] - 65:8,
85:7, 85:11, 86:5,
95:3, 95:6
**increasing** [2] - 85:16,
195:11
**independent** [1] -
165:25
**INDEX** [1] - 1:6
**Index** [1] - 3:9
**indicated** [1] - 128:20
**indicates** [3] - 6:3,
74:12, 84:12
**indication** [6] -
106:25, 127:9,
129:6, 134:11,
178:15, 196:22
**indicative** [1] - 195:9
**individual** [10] -
117:12, 120:22,
121:21, 124:7,
125:22, 126:9,
126:19, 137:12,
176:23, 177:10
**individual's** [1] -
52:12
**individuals** [16] -
16:11, 16:13, 89:19,
91:13, 92:5, 92:12,
119:7, 130:21,
137:22, 145:2,
151:5, 151:12,
175:6, 175:19,
176:16, 178:21
**industry** [13] - 16:4,
42:13, 46:18, 60:11,
60:22, 61:7, 61:20,
160:4, 160:20,
160:24, 161:8,
161:13, 186:7
**industry's** [1] - 16:21

**inference** [1] - 74:8
**influence** [5] - 47:9,
75:23, 146:17,
151:2, 165:18
**influences** [1] -
165:15
**inform** [1] - 200:20
**information** [17] -
13:3, 13:10, 28:9,
32:3, 32:6, 34:18,
38:8, 41:2, 71:3,
71:4, 72:19, 178:4,
178:9, 184:18,
195:22, 196:20,
196:23
**informed** [2] - 113:24,
177:11
**initiation** [4] - 103:13,
157:20, 158:11,
158:18
**injection** [1] - 103:18
**injury** [2] - 92:4, 92:6
**ink** [1] - 204:16
**instances** [2] - 38:17,
90:4
**instead** [3] - 53:25,
133:12, 178:15
**institution** [1] - 57:6
**instruction** [1] - 78:22
**insufficient** [4] -
40:20, 40:22, 41:15,
42:11
**insurance** [4] -
139:18, 139:20,
140:2, 147:5
**intend** [2] - 15:2,
48:23
**intended** [2] - 22:25,
158:5
**intends** [1] - 78:14
**intent** [2] - 5:15, 5:19
**intentioned** [1] -
188:18
**interaction** [2] - 68:3,
75:21
**interactions** [1] -
52:12
**interest** [2] - 38:13,
42:7
**interested** [1] - 52:3
**internal** [2] - 32:23,
47:19
**Internal** [3] - 86:23,
87:3, 93:4
**International** [1] -
103:5
**interrelated** [2] - 30:6,
102:20
**interrupt** [2] - 17:18,
109:12

**interview** [3] - 172:13,
175:10, 175:13
**interviewed** [1] -
123:18
**interviewing** [1] -
124:5
**interviews** [10] -
96:24, 121:7, 126:4,
130:21, 131:19,
131:20, 192:24,
193:2, 193:24,
194:10
**intravenous** [1] -
103:9
**invented** [1] - 101:8
**investigate** [1] - 149:6
**investigation** [1] -
104:2
**investigator** [1] - 81:2
**invited** [1] - 34:21
**involved** [5] - 63:5,
81:13, 103:23,
145:21, 200:15
**involvement** [1] -
130:19
**involving** [1] - 52:11
**Islip** [1] - 1:8
**isolate** [1] - 122:22
**issue** [12] - 6:7, 7:10,
9:6, 73:17, 75:14,
77:8, 93:22, 94:4,
129:10, 135:21,
136:3, 136:9
**issued** [3] - 84:2,
185:15, 185:18
**issues** [7] - 27:6,
48:18, 52:4, 94:18,
95:20, 158:22,
165:11
**issuing** [1] - 187:6
**itself** [3] - 20:16,
41:19, 158:7
**IV** [1] - 89:24

## J

**JAMA** [3] - 86:17,
139:11, 140:5
**JAMES** [1] - 2:2
**James** [1] - 5:4
**Janssen** [8] - 2:8, 4:5,
7:8, 63:8, 110:7,
132:14, 132:24,
133:3
**January** [9] - 115:4,
115:18, 118:18,
119:10, 121:12,
130:25, 154:12,
185:11, 185:14
**JAYNE** [1] - 1:17

**Jayne** [1] - 3:14
**jciaccio@napolilaw.**
**com** [1] - 1:25
**jconroy@**
**simmonsfirm.com**
[1] - 1:19
**Jerry** [2] - 3:4, 29:20
**JERRY** [1] - 1:12
**Jick** [2] - 44:14, 44:22
**job** [1] - 162:5
**Johnson** [10] - 7:8,
42:17, 70:9, 76:16,
110:7
**Joint** [2] - 160:9,
161:14
**joint** [2] - 106:19,
106:21
**Jonathan** [1] - 139:11
**journal** [9] - 25:18,
25:19, 25:22, 69:2,
69:20, 86:20, 92:21,
156:21, 156:25
**Journal** [10] - 45:2,
68:15, 68:24, 86:18,
86:25, 92:19, 93:3,
93:4, 103:6, 157:24
**journals** [6] - 25:19,
42:6, 68:25, 93:6,
93:9, 93:13
**JR** [1] - 1:16
**Judge** [15] - 14:17,
17:24, 54:4, 54:6,
71:6, 71:23, 75:6,
75:17, 76:18, 79:5,
90:24, 91:7, 113:2,
135:3, 196:16
**judgment** [8] - 6:12,
6:18, 165:13,
165:25, 166:4,
166:6, 169:20,
188:19
**July** [1] - 73:6
**jump** [2] - 152:2,
152:4
**jury** [2] - 132:15,
132:25
**Justice** [21] - 1:12,
21:2, 30:17, 35:22,
58:3, 59:22, 59:23,
68:7, 68:12, 84:25,
88:6, 89:6, 94:15,
96:17, 97:19, 99:16,
100:4, 100:12,
105:2, 190:21,
201:22

## K

**Kadian** [2] - 127:16,
134:25

216

**Kadian's** [1] - 135:7
**Katherine** [1] - 7:15
**keep** [1] - 147:23
**Keller** [3] - 4:21, 5:10, 6:12
**kept** [1] - 22:13
**key** [6] - 30:25, 96:4, 103:17, 160:7, 160:20, 200:17
**Keyes** [2] - 5:2, 7:15
**kicked** [1] - 112:10
**kind** [5] - 56:9, 64:6, 76:6, 189:4, 196:2
**kinds** [2] - 32:11, 194:22
**knowing** [2] - 137:22, 138:3
**knowledge** [5] - 136:13, 166:4, 166:5, 183:23, 191:2
**known** [5] - 31:15, 31:19, 44:12, 64:8, 86:20
**knows** [2] - 8:24, 21:2

**L**

**labeled** [1] - 199:22
**laboratories** [1] - 195:16
**Lacey** [1] - 5:10
**lack** [2] - 73:21, 160:16
**laid** [1] - 73:20
**language** [1] - 79:13
**Lankenau** [1] - 103:5
**large** [5] - 39:18, 47:6, 82:18, 98:11, 173:10
**largely** [3] - 114:19, 114:24, 116:7
**last** [13] - 22:11, 31:17, 64:25, 73:2, 73:8, 82:9, 104:22, 162:3, 162:15, 182:22, 182:23, 188:13, 199:11
**late** [6] - 7:14, 7:18, 27:6, 61:5, 101:25, 199:2
**latest** [1] - 24:8
**launched** [1] - 99:11
**law** [1] - 175:13
**lawful** [1] - 28:5
**lawfully** [1] - 149:18
**lawmakers** [2] - 36:11, 36:17
**lawyer** [1] - 79:12
**lawyers** [8] - 26:15, 32:17, 32:22, 47:19, 53:15, 73:23,

157:18, 192:17
**lay** [3] - 118:7, 118:13, 138:19
**lay-newspaper** [1] - 138:19
**lay-newspapers** [2] - 118:7, 118:13
**lead** [7] - 45:25, 91:5, 100:22, 114:7, 123:8, 201:4, 202:10
**leaders** [3] - 160:7, 160:20, 200:18
**leading** [8] - 45:21, 45:22, 70:20, 90:20, 196:8, 196:10, 198:11, 198:14
**leads** [1] - 141:15
**learn** [2] - 120:20, 121:3
**least** [5] - 55:25, 75:8, 138:19, 167:4, 197:13
**lectures** [1] - 34:7
**led** [4] - 95:2, 137:17, 183:19, 200:19
**left** [4] - 58:5, 85:3, 85:24, 94:11
**legal** [4] - 16:17, 153:4, 153:11, 153:22
**legendary** [1] - 44:12
**legitimate** [4] - 104:5, 170:18, 173:12, 173:21
**LEMBKE** [3] - 12:7, 12:11, 12:14
**Lembke** [51] - 1:10, 5:2, 7:19, 12:2, 12:19, 12:22, 14:7, 18:19, 46:6, 72:9, 75:19, 76:21, 107:10, 110:4, 112:16, 113:22, 114:8, 115:4, 115:14, 115:16, 116:10, 119:9, 121:15, 122:14, 126:7, 126:13, 126:16, 128:14, 129:9, 129:14, 135:22, 136:12, 139:24, 151:15, 151:21, 152:12, 153:15, 154:8, 154:20, 158:16, 159:6, 162:21, 163:19, 171:10, 173:9, 174:23, 176:9, 182:19, 187:4, 190:12,

203:14
**Lembke's** [7] - 9:4, 65:25, 75:9, 77:16, 107:15, 199:23, 201:6
**lenient** [2] - 45:22, 196:8
**less** [3] - 134:10, 134:12, 167:4
**lethal** [1] - 51:5
**LETITIA** [1] - 2:2
**letter** [14] - 4:20, 6:2, 7:13, 35:13, 44:14, 44:24, 45:2, 45:10, 45:14, 46:9, 46:13, 46:22, 97:12, 162:25
**level** [4] - 114:18, 122:12, 166:20, 166:21
**liability** [1] - 192:18
**Liberty** [1] - 2:4
**license** [1] - 149:15
**licensed** [1] - 19:24
**licenses** [1] - 149:13
**licensing** [1] - 188:25
**lie** [1] - 141:11
**life** [2] - 13:11, 52:12
**lightly** [1] - 108:3
**likelihood** [1] - 86:13
**likely** [2] - 28:16, 28:17
**likewise** [4] - 175:24, 176:14, 184:19, 187:14
**limit** [1] - 13:3
**limited** [6] - 6:5, 90:14, 90:20, 91:5, 91:24, 92:2
**limiting** [2] - 91:12, 92:4
**line** [25] - 11:7, 44:25, 57:5, 58:12, 58:17, 58:20, 85:4, 85:9, 118:25, 121:13, 121:14, 122:4, 131:3, 131:5, 154:13, 155:10, 159:7, 167:21, 182:12, 182:14, 182:15, 182:23, 187:21
**lines** [7] - 58:5, 115:11, 118:20, 131:2, 153:20, 185:3
**lips** [1] - 12:5
**list** [15] - 7:18, 7:23, 9:9, 11:12, 15:14, 15:19, 15:20, 42:2, 43:7, 51:8, 70:14, 106:21, 201:3,

201:6, 202:7
**listed** [4] - 17:3, 108:13, 185:22, 186:2
**listening** [1] - 17:22
**litany** [1] - 192:9
**literature** [34] - 25:6, 25:11, 28:19, 28:20, 29:2, 29:12, 29:14, 37:7, 37:17, 41:19, 43:12, 45:11, 46:15, 48:2, 48:4, 48:14, 49:3, 54:11, 56:22, 56:24, 67:24, 80:3, 80:8, 80:11, 80:14, 80:24, 81:6, 81:10, 82:16, 88:8, 93:16, 97:6, 101:12, 103:22
**litigation** [22] - 8:20, 10:22, 10:23, 11:2, 14:19, 26:16, 33:14, 33:16, 37:12, 37:18, 39:6, 43:19, 44:13, 107:13, 110:8, 111:25, 130:19, 136:9, 179:16, 193:10, 200:15
**LITIGATION** [1] - 1:4
**Litigation** [1] - 3:9
**litigations** [2] - 32:18, 32:23
**live** [5] - 13:7, 17:23, 18:5, 35:8, 64:17
**LLC** [1] - 1:14
**LLP** [1] - 2:8
**located** [1] - 131:24
**location** [1] - 187:12
**locations** [1] - 18:5
**LOIS** [1] - 2:5
**Lois** [1] - 3:20
**long-acting** [1] - 127:19
**long-term** [3] - 69:15, 89:17, 126:25
**look** [23] - 35:17, 38:5, 38:12, 44:7, 62:18, 67:14, 68:6, 69:7, 87:21, 90:13, 90:18, 93:22, 94:20, 96:10, 98:25, 99:21, 102:14, 113:21, 118:17, 141:22, 146:16, 176:18
**looked** [19] - 9:19, 35:13, 37:14, 43:22, 47:18, 69:17, 86:3, 86:8, 89:22, 92:8, 97:21, 98:13, 98:17, 102:22, 126:19, 142:2, 182:10,

198:17, 202:25
**looking** [9] - 38:4, 41:20, 43:21, 69:15, 80:11, 95:19, 142:10, 145:22, 197:16
**looks** [1] - 86:17
**Los** [1] - 103:10
**lost** [2] - 70:6, 128:5
**low** [7] - 40:14, 40:17, 40:25, 46:20, 84:19, 85:4, 93:6
**lower** [3] - 85:9, 134:21, 168:6
**lowly** [1] - 104:15
**lunch** [1] - 4:16
**luncheon** [3] - 105:18, 105:21, 105:24

**M**

**M.D** [3] - 26:8, 60:16, 157:5
**Madison** [1] - 1:15
**maintain** [1] - 21:25
**maintained** [1] - 141:23
**major** [4] - 95:20, 101:23, 117:15, 198:25
**majority** [4] - 27:25, 136:3, 136:6, 173:10
**Mallinckrodt** [3] - 122:7, 122:9, 133:10
**managed** [2] - 150:19, 150:24
**management** [6] - 63:17, 127:6, 127:9, 127:20, 152:18, 198:18
**Management** [1] - 101:21
**mandated** [1] - 191:24
**mandates** [1] - 191:13
**manifesting** [1] - 66:22
**manipulated** [4] - 160:20, 160:24, 161:8, 161:13
**manipulating** [1] - 141:4
**manipulation** [1] - 160:6
**manipulative** [1] - 140:24
**Manual** [2] - 24:8, 53:21
**manufacture** [3] - 62:6, 64:12, 83:5
**manufactured** [3] -

127:23, 145:6, 145:22

**manufacturers** [5] - 45:15, 48:3, 79:24, 96:2, 201:7

**manufactures** [1] - 200:22

**manufacturing** [1] - 146:11

**manuscript** [2] - 25:18, 202:23

**map** [1] - 14:21

**marijuana** [1] - 27:18

**mark** [1] - 199:16

**market** [4] - 135:19, 145:22, 148:20, 182:6

**marketed** [2] - 181:17, 184:5

**marketing** [49] - 62:19, 62:24, 63:7, 74:22, 75:14, 75:16, 75:22, 76:2, 76:5, 76:7, 76:22, 77:3, 77:11, 77:20, 79:23, 80:6, 81:11, 81:18, 87:17, 110:13, 110:17, 110:21, 110:25, 111:15, 113:4, 113:5, 113:10, 119:14, 119:18, 119:23, 120:20, 121:3, 121:19, 122:8, 128:23, 158:22, 168:3, 168:6, 181:14, 181:22, 182:2, 182:24, 184:2, 184:15, 186:4, 186:11, 186:15, 187:6

**mask** [1] - 109:6

**material** [15] - 33:3, 46:17, 48:10, 62:20, 63:7, 70:14, 87:7, 87:17, 113:10, 135:23, 135:24, 136:16, 136:18, 145:13, 188:6

**materials** [31] - 7:15, 7:19, 7:23, 8:3, 8:4, 8:5, 8:11, 8:12, 8:18, 9:3, 11:12, 32:10, 35:12, 47:18, 70:23, 71:16, 77:20, 81:11, 81:18, 119:14, 119:18, 119:23, 120:21, 121:4, 121:19, 122:8, 131:20, 131:24,

160:6, 184:10, 184:24

**Matt** [3] - 154:11, 171:13, 172:8

**matter** [3] - 65:18, 74:7, 169:11

**McKesson** [2] - 164:4, 164:8

**MDL** [12] - 71:5, 71:11, 71:17, 74:21, 106:20, 107:4, 112:4, 112:17, 112:18, 112:22, 113:3, 153:16

**mean** [15] - 17:17, 23:12, 37:13, 71:25, 75:4, 117:12, 120:11, 134:3, 134:7, 134:8, 137:4, 146:16, 162:4, 176:5, 190:24

**meaning** [3] - 61:6, 68:2, 74:25

**means** [16] - 21:3, 22:24, 66:21, 79:12, 102:5, 102:11, 102:13, 119:12, 124:23, 134:24, 142:6, 147:18, 156:5, 164:24, 168:4

**meant** [8] - 22:21, 60:20, 62:10, 170:15, 170:16, 200:15, 200:24, 201:23

**measure** [2] - 139:4, 142:13

**Medicaid** [5] - 28:10, 28:13, 28:15, 28:17, 139:12

**Medical** [11] - 17:9, 86:18, 87:2, 92:20, 93:3, 146:25, 147:2, 149:21, 150:8, 160:9, 161:14

**medical** [71] - 19:11, 21:15, 25:6, 28:19, 29:2, 29:4, 29:11, 29:14, 30:23, 31:11, 33:10, 37:7, 37:17, 41:19, 45:11, 46:15, 47:25, 48:3, 48:14, 49:3, 49:10, 49:21, 49:22, 50:10, 52:5, 52:11, 54:11, 56:17, 56:18, 67:24, 68:14, 68:18, 68:25, 80:3, 80:14, 82:21, 83:2, 88:8, 91:5, 93:15, 100:20, 101:3,

101:6, 101:12, 104:5, 124:7, 125:22, 125:25, 149:10, 149:13, 153:14, 155:16, 155:21, 155:25, 156:5, 156:10, 160:7, 160:8, 160:24, 161:8, 165:13, 169:19, 173:12, 173:21, 178:8, 187:16, 188:19, 193:20, 198:7, 200:19

**medically** [7] - 114:3, 129:25, 130:16, 131:10, 132:15, 132:25, 166:19

**medication** [22] - 22:24, 90:16, 116:14, 120:10, 120:17, 128:3, 128:18, 129:24, 130:14, 151:2, 164:19, 164:25, 165:2, 165:9, 165:10, 166:17, 169:18, 171:6, 172:10, 173:4, 173:7, 178:24

**medications** [34] - 24:16, 30:4, 30:11, 31:2, 31:5, 63:13, 82:23, 87:24, 114:17, 119:7, 123:16, 124:4, 125:3, 125:11, 125:15, 127:5, 127:22, 129:5, 129:19, 132:14, 132:24, 134:5, 136:13, 137:13, 137:23, 138:4, 140:25, 142:20, 148:11, 149:17, 167:9, 167:14, 173:20, 189:14

**Medicine** [25] - 14:13, 17:9, 17:10, 17:11, 17:13, 18:20, 19:4, 20:24, 24:23, 45:3, 51:22, 52:9, 52:25, 53:8, 63:2, 86:23, 87:3, 92:24, 93:4, 95:13, 149:5, 149:12, 149:22,

150:4, 157:24

**medicine** [25] - 19:24, 22:22, 22:23, 23:12, 24:25, 33:11, 49:16, 49:20, 50:4, 51:15, 53:4, 54:17, 57:13, 59:2, 87:6, 90:4, 93:16, 95:21, 96:25, 98:5, 102:16, 169:9, 170:14, 173:15, 197:19

**medium** [2] - 82:6, 93:7

**meet** [1] - 73:12

**meetings** [2] - 35:6, 36:13

**Melville** [1] - 1:22

**member** [2] - 51:25, 70:20

**members** [1] - 42:3

**mental** [1] - 178:8

**Mental** [2] - 24:8, 53:21

**mention** [1] - 187:11

**mentioned** [5] - 11:18, 72:4, 72:5, 100:12, 124:14

**mentioning** [1] - 40:25

**messages** [4] - 32:24, 33:6, 75:22, 160:10

**met** [3] - 14:15, 26:19, 174:23

**method** [1] - 43:13

**methodologies** [1] - 15:6

**methodology** [65] - 14:23, 28:25, 31:9, 33:9, 33:13, 36:20, 36:25, 38:6, 43:17, 44:5, 46:7, 46:8, 48:7, 48:22, 50:2, 50:7, 59:5, 60:9, 64:21, 65:11, 67:2, 67:7, 67:12, 67:19, 67:23, 73:12, 73:14, 74:8, 74:11, 74:13, 75:20, 79:20, 80:21, 83:9, 87:12, 88:2, 88:5, 120:23, 122:17, 124:24, 125:8, 126:5, 126:12, 126:15, 139:6, 142:12, 144:21, 145:21, 148:23, 149:25, 150:13, 150:18, 163:17, 166:10, 166:22, 175:8, 176:10, 176:20, 176:21, 177:2,

177:5, 177:13, 178:20, 180:5, 189:22

**methods** [4] - 96:15, 111:12, 123:18, 177:9

**MEYERS** [1] - 2:8

**microphone** [1] - 54:14

**mid** [1] - 145:12

**middle** [1] - 58:17

**might** [4] - 38:17, 49:8, 161:19, 202:2

**mill** [19] - 119:3, 138:5, 138:21, 139:17, 139:25, 140:9, 140:13, 140:18, 147:19

**milligram** [2] - 60:2, 84:19

**million** [2] - 191:20, 194:9

**millions** [2] - 107:12

**mills** [5] - 118:8, 118:14, 138:16, 138:25, 139:5

**mind** [2] - 123:12, 158:13

**minor** [1] - 155:10

**minutes** [3] - 163:6, 174:7, 190:18

**MINUTES** [1] - 1:10

**misconceptions** [1] - 82:5

**misheard** [1] - 190:17

**misinformation** [2] - 34:9, 34:18

**misleading** [10] - 16:21, 40:8, 96:2, 113:25, 158:25, 159:10, 160:10, 184:21, 185:5, 186:4

**misled** [2] - 16:4, 60:11

**misrepresentations** [1] - 33:20

**Miss** [8] - 106:24, 109:9, 192:3, 192:22, 194:13, 199:13, 199:22, 200:13

**missing** [7] - 49:8, 61:16, 200:7, 200:10, 200:11, 200:16, 200:17

**misunderstood** [1] - 190:17

**misuse** [16] - 22:22, 22:24, 24:13, 29:18, 89:20, 96:5, 100:20,

103:13, 103:16, 103:17, 103:24, 114:7, 123:8, 139:5, 140:18, 168:23
**MME** [1] - 84:20
**model** [1] - 150:6
**molecule** [1] - 23:17
**molecules** [1] - 50:19
**moment** [5] - 118:22, 123:3, 133:25, 151:14, 182:11
**momentum** [1] - 55:17
**monitor** [1] - 153:9
**monitored** [1] - 39:24
**monitoring** [6] - 141:23, 142:3, 142:11, 152:24, 154:6, 154:15
**mood** [1] - 19:20
**morning** [24] - 3:6, 3:7, 3:16, 3:18, 3:19, 3:22, 3:23, 3:25, 4:3, 4:4, 4:8, 7:21, 12:3, 12:23, 13:2, 14:7, 14:8, 14:9, 156:15, 156:17, 158:23, 171:11, 171:19, 171:23
**morphine** [3] - 60:2, 84:19, 136:6
**most** [9] - 38:24, 98:2, 98:6, 104:4, 134:18, 135:20, 136:10, 156:5, 165:23
**mostly** [2] - 81:6, 135:15
**motion** [1] - 6:18
**motivated** [1] - 82:2
**mouse** [1] - 185:23
**move** [2] - 38:5, 175:4
**movement** [1] - 55:17
**movie** [1] - 161:21
**moving** [3] - 12:5, 90:25, 147:23
**MR** [107] - 3:12, 3:17, 3:25, 4:4, 4:6, 4:23, 8:17, 10:18, 11:25, 14:4, 14:6, 17:20, 18:17, 18:18, 41:10, 42:23, 42:25, 43:3, 44:16, 44:18, 46:4, 46:5, 47:13, 47:15, 51:17, 51:19, 53:11, 53:13, 57:19, 57:21, 59:15, 59:17, 60:5, 60:7, 61:2, 61:18, 61:25, 62:3, 62:18, 62:22, 65:13, 65:17, 65:21, 65:23, 66:4, 66:6, 70:5, 70:19,

71:18, 75:7, 75:12, 79:5, 79:16, 84:7, 84:9, 88:20, 88:22, 90:23, 91:3, 94:6, 94:8, 99:14, 101:14, 101:16, 102:25, 103:3, 104:22, 104:24, 105:13, 106:2, 106:11, 108:4, 108:21, 109:5, 109:14, 109:24, 151:23, 152:8, 152:11, 154:11, 162:21, 163:3, 163:8, 163:12, 165:6, 172:7, 174:2, 174:5, 174:20, 176:8, 181:18, 181:24, 182:14, 186:17, 186:20, 186:25, 187:2, 187:3, 190:3, 190:7, 190:9, 190:10, 196:13, 196:16, 198:10, 201:10, 203:12
**MS** [40] - 3:14, 3:20, 3:23, 5:6, 5:25, 6:9, 7:2, 7:3, 7:7, 7:12, 9:7, 10:8, 11:23, 45:18, 45:21, 70:8, 71:9, 76:13, 76:15, 77:25, 78:8, 78:12, 79:9, 79:15, 105:20, 105:23, 107:6, 107:24, 109:10, 109:15, 109:17, 110:3, 112:9, 112:13, 112:15, 113:14, 115:13, 151:19, 196:6, 196:10
**multidistrict** [1] - 111:24
**multimodal** [1] - 193:24
**multiple** [1] - 141:5
**must** [5] - 42:6, 128:3, 128:19, 128:23, 190:24
**muted** [2] - 12:4, 12:7
**Myth** [3] - 67:3, 67:5, 67:18
**myth** [9] - 63:12, 64:11, 64:13, 64:25, 66:12, 66:13, 66:15, 66:16, 67:11
**myths** [2] - 62:15, 65:25

## N

**name** [6] - 12:17, 13:7, 110:6, 174:24, 187:12, 197:8
**named** [6] - 68:15, 89:2, 89:3, 103:5, 159:3, 159:12
**Napoli** [1] - 108:5
**NAPOLI** [1] - 1:20
**narcotic** [1] - 45:6
**narrative** [1] - 62:6
**narrower** [1] - 134:11
**NASEM** [5] - 95:14, 101:20, 198:18, 198:24, 202:25
**Nassau** [25] - 1:21, 3:17, 99:23, 100:11, 111:20, 117:21, 122:9, 124:11, 124:22, 137:18, 167:12, 167:15, 172:18, 175:11, 175:20, 175:25, 177:20, 178:22, 180:7, 180:12, 184:16, 187:17, 187:23, 188:2, 189:12
**Nate** [1] - 4:4
**NATE** [1] - 2:10
**nation** [1] - 99:18
**national** [3] - 70:21, 100:6, 100:9
**National** [2] - 95:12, 101:19
**nations** [2] - 99:2, 99:6
**natural** [1] - 202:9
**nature** [3] - 34:4, 45:20, 102:4
**nearly** [1] - 21:18
**necessarily** [4] - 38:21, 38:22, 144:11, 170:21
**necessary** [2] - 113:6, 191:14
**necessity** [1] - 196:2
**need** [15] - 29:2, 55:2, 65:8, 74:17, 79:2, 83:11, 91:19, 98:23, 130:9, 135:12, 137:23, 138:3, 139:23, 144:12, 170:19
**needs** [5] - 61:11, 65:20, 99:7, 164:18, 164:22
**network** [1] - 7:5
**neurology** [1] - 20:21

**never** [5] - 156:19, 178:12, 178:17, 181:17, 183:13
**new** [5] - 148:19, 196:18, 196:21, 196:22, 197:20
**NEW** [1] - 1:2
**New** [116] - 1:8, 1:16, 1:22, 2:3, 2:3, 2:4, 2:9, 3:2, 3:20, 9:13, 26:24, 28:10, 28:13, 28:15, 34:14, 45:2, 55:5, 59:13, 59:19, 60:3, 72:3, 73:4, 99:22, 100:8, 100:9, 102:23, 103:9, 104:18, 104:20, 105:7, 105:11, 108:5, 108:9, 108:17, 111:20, 115:19, 117:18, 117:19, 118:5, 118:11, 119:3, 119:7, 119:13, 120:8, 120:15, 120:20, 120:21, 121:4, 121:10, 121:18, 121:20, 122:6, 123:15, 123:19, 123:21, 123:23, 124:3, 124:25, 125:9, 125:13, 126:20, 129:24, 130:15, 130:21, 131:9, 134:6, 137:18, 138:21, 138:25, 141:18, 142:2, 142:14, 143:9, 144:20, 145:11, 145:23, 146:2, 146:5, 146:15, 146:19, 148:7, 149:5, 149:12, 149:22, 150:3, 150:8, 150:21, 154:9, 156:10, 157:24, 159:7, 159:19, 159:22, 159:23, 166:25, 167:9, 167:18, 171:18, 172:14, 172:23, 173:11, 177:20, 179:15, 182:9, 183:22, 184:11, 185:16, 187:10, 188:25, 189:5, 193:10, 204:8
**newborns** [1] - 16:13
**newspaper** [2] -

119:2, 138:19
**newspapers** [2] - 118:7, 118:13
**next** [5] - 69:7, 140:22, 151:24, 171:9, 183:3
**night** [3] - 9:10, 11:13, 107:18
**nine** [14] - 14:25, 15:15, 37:6, 51:8, 75:4, 75:5, 177:3, 185:21, 186:2, 186:10, 190:19, 191:5
**NO.:400000/2017** [1] - 1:6
**noise** [1] - 128:10
**non** [7] - 28:17, 39:25, 40:13, 40:22, 127:2, 147:14, 155:17
**non-cancer** [5] - 39:25, 40:13, 40:22, 127:2, 155:17
**non-Defendant** [1] - 147:14
**non-Medicaid** [1] - 28:17
**nonchronic** [1] - 102:18
**nondrug** [1] - 24:18
**none** [3] - 82:24, 186:3, 188:9
**nonetheless** [1] - 47:8
**nonissue** [1] - 108:24
**nonlethal** [1] - 85:12
**nonopioid** [1] - 24:16
**normally** [2] - 64:14, 64:17
**notable** [1] - 42:8
**note** [7] - 10:2, 46:14, 46:19, 65:19, 76:17, 78:9, 78:12
**noted** [7] - 10:6, 11:16, 43:4, 45:5, 73:16, 77:14, 157:7
**notes** [3] - 77:15, 147:22, 204:10
**nothing** [4] - 140:16, 190:21, 191:4, 192:17
**notice** [1] - 183:15
**noticed** [1] - 60:15
**notified** [1] - 183:18
**notion** [2] - 8:20, 66:17
**novel** [3] - 80:15, 80:25, 81:3
**novice** [1] - 185:24
**Nucynta** [6] - 127:9, 136:25, 164:6, 164:10, 165:9,

165:17
**number** [42] - 13:21,
16:15, 39:18, 42:16,
58:9, 88:16, 105:5,
105:10, 106:20,
115:21, 127:18,
133:13, 133:17,
133:18, 134:2,
134:3, 134:4, 134:8,
134:9, 134:13,
134:14, 134:16,
134:20, 135:9,
137:7, 137:17,
143:12, 148:8,
151:4, 151:11,
151:18, 166:23,
167:7, 167:11,
167:14, 168:2,
173:14, 175:24,
192:2, 192:21,
193:15, 194:14
**Number** [45] - 3:9,
13:11, 15:11, 15:12,
15:24, 15:25, 16:4,
16:8, 16:16, 16:19,
37:6, 39:10, 41:24,
44:16, 51:18, 54:24,
54:25, 57:9, 57:20,
59:5, 59:15, 59:18,
60:10, 62:20, 62:21,
62:23, 63:12, 66:4,
67:3, 67:5, 67:19,
68:6, 69:7, 69:8,
69:9, 70:7, 84:8,
84:14, 85:23, 90:24,
94:6, 102:25,
104:22, 106:13,
199:13
**numbers** [1] - 89:23
**numerous** [3] - 94:18,
116:17, 116:22
**nurses** [2] - 121:18,
122:6

## O

**O'MELVENY** [1] - 2:8
**oath** [10] - 78:7, 106:9,
154:3, 154:18,
159:14, 174:14,
174:17, 183:8,
185:11, 188:4
**object** [2] - 70:15,
72:13
**objection** [20] - 10:2,
10:12, 11:20, 11:22,
13:22, 13:23, 45:18,
45:19, 45:20, 61:4,
61:5, 61:17, 70:8,
72:21, 77:23,
181:18, 181:20,

196:6, 198:10,
198:13
**objects** [1] - 72:21
**obligation** [1] - 166:7
**obscure** [1] - 19:9
**observation** [1] -
156:20
**observational** [1] -
69:14
**observe** [1] - 18:13
**observed** [1] - 48:25
**obsessive** [1] - 117:15
**obtain** [4] - 104:5,
140:25, 164:18,
164:19
**obtained** [2] - 18:12,
142:18
**obtaining** [1] - 142:20
**occasion** [1] - 18:8
**occasions** [2] - 21:22,
192:23
**occurred** [3] - 16:20,
57:4, 103:15
**occurrence** [1] - 80:8
**OF** [4] - 1:2, 1:2, 1:10
**offer** [4] - 113:6,
181:25, 188:6,
189:16
**offered** [2] - 167:2,
182:2
**offering** [12] - 73:21,
74:9, 143:20,
143:25, 144:7,
144:10, 144:14,
166:23, 167:13,
167:17, 187:25,
189:11
**offers** [1] - 164:15
**Office** [1] - 2:3
**office** [2] - 3:21, 18:7
**officers** [1] - 175:14
**offices** [3] - 14:12,
31:25
**Official** [2] - 204:7,
204:21
**OFFICIAL** [1] - 2:20
**official** [1] - 204:16
**often** [5] - 39:2, 52:17,
85:12, 141:15,
142:21
**Ohio** [2] - 107:4,
111:25
**older** [1] - 104:4
**one** [51] - 7:9, 18:24,
26:25, 35:25, 70:10,
74:15, 78:9, 78:12,
78:15, 78:17, 89:2,
91:18, 92:11, 92:19,
102:5, 102:9,
103:12, 116:25,

122:22, 123:5,
123:15, 123:22,
124:4, 124:14,
124:21, 125:13,
133:24, 141:3,
141:21, 144:5,
144:24, 148:2,
151:9, 154:13,
155:9, 156:5, 165:6,
178:25, 182:9,
182:15, 185:5,
186:9, 186:14,
186:21, 186:24,
187:2, 190:17,
191:7, 197:13,
199:16, 201:11
**one-third** [1] - 35:25
**ongoing** [1] - 170:19
**operating** [2] - 118:7,
118:13
**opine** [1] - 113:4
**opined** [1] - 75:17
**opining** [2] - 136:2,
145:9
**opinion** [62] - 5:16,
5:17, 16:8, 37:5,
45:24, 51:7, 51:11,
72:6, 73:18, 76:20,
79:20, 80:17, 83:9,
83:16, 83:19, 83:22,
83:25, 86:4, 87:13,
104:9, 129:9,
130:20, 131:7,
131:10, 131:12,
132:8, 132:9,
133:12, 133:21,
134:9, 135:8,
143:14, 143:21,
143:25, 144:7,
144:10, 146:23,
147:6, 147:13,
155:8, 160:3, 160:7,
160:13, 160:20,
166:23, 167:2,
167:13, 167:17,
177:8, 177:10,
177:14, 183:20,
183:21, 187:25,
188:6, 188:14,
189:11, 189:16,
191:7, 199:25,
200:17
**Opinion** [12] - 15:24,
15:25, 16:4, 16:19,
54:24, 57:9, 59:5,
60:10, 69:8, 69:9,
73:4, 78:18
**opinions** [63] - 5:22,
6:17, 6:20, 6:22,
8:11, 8:25, 15:2,

15:15, 15:20, 17:2,
36:21, 37:6, 43:18,
43:19, 48:15, 48:22,
50:7, 50:9, 51:8,
63:21, 75:9, 76:11,
77:2, 77:16, 77:18,
83:15, 89:8, 96:15,
107:11, 107:15,
112:23, 113:7,
120:6, 120:7,
120:24, 123:13,
123:20, 124:12,
124:20, 125:21,
125:23, 126:8,
126:12, 126:23,
130:4, 130:8,
130:13, 142:4,
144:14, 144:24,
172:15, 177:3,
181:25, 182:3,
185:19, 185:21,
186:2, 186:10,
188:9, 190:19,
191:5, 191:15,
193:19
**OPIOID** [1] - 1:4
**Opioid** [2] - 3:9,
101:21
**opioid** [204] - 14:18,
15:25, 16:4, 16:18,
16:19, 16:20, 20:13,
20:15, 20:16, 23:14,
23:18, 24:4, 24:6,
24:12, 26:16, 27:2,
27:23, 28:9, 28:16,
28:18, 29:18, 30:20,
31:5, 32:13, 32:18,
32:22, 35:14, 36:2,
36:12, 36:14, 36:18,
39:6, 39:23, 40:12,
41:13, 42:13, 45:15,
46:17, 47:3, 47:9,
47:12, 50:20, 54:2,
54:20, 55:2, 55:24,
58:8, 58:10, 58:22,
60:11, 60:22, 61:7,
61:20, 62:15, 63:13,
64:5, 64:6, 64:12,
65:3, 66:9, 69:15,
79:23, 79:24, 82:23,
83:11, 85:11, 87:23,
90:14, 90:21, 91:6,
91:17, 92:5, 92:10,
92:13, 94:20, 95:3,
95:22, 95:25, 96:20,
96:21, 97:2, 97:3,
97:4, 98:16, 100:22,
101:24, 102:5,
102:14, 103:13,
103:17, 103:23,
104:20, 105:5,

113:10, 114:7,
114:18, 114:23,
115:25, 116:2,
116:18, 116:23,
119:7, 120:9,
120:16, 121:8,
123:8, 123:16,
123:19, 124:4,
125:2, 125:11,
125:15, 126:25,
127:5, 128:3,
128:18, 129:5,
129:19, 129:24,
130:14, 132:14,
132:24, 133:13,
133:17, 133:18,
134:5, 135:5,
137:13, 138:17,
139:5, 139:12,
140:8, 140:18,
140:25, 141:11,
141:18, 142:7,
142:14, 142:17,
142:20, 142:24,
143:4, 143:9,
144:20, 145:22,
146:5, 146:10,
146:15, 146:19,
148:6, 148:10,
148:16, 149:16,
149:23, 150:6,
150:8, 150:21,
151:6, 151:13,
154:24, 160:4,
160:5, 160:19,
160:23, 161:7,
161:12, 167:14,
168:3, 168:21,
171:15, 173:10,
175:17, 175:19,
176:2, 176:17,
176:19, 176:22,
177:6, 177:9,
177:16, 178:2,
178:13, 178:23,
186:7, 189:14,
191:9, 192:5, 192:6,
193:21, 194:2,
194:14, 198:18,
198:25, 199:25,
201:7, 201:8, 202:2,
202:4, 202:11,
202:15, 203:2,
203:10
**opioid-related** [7] -
58:8, 62:15, 66:9,
79:24, 96:21,
104:20, 105:5
**opioids** [148] - 16:3,
16:5, 16:9, 16:12,
16:14, 16:16, 16:17,

16:21, 22:7, 23:15, 26:2, 28:14, 30:18, 30:19, 32:7, 36:13, 37:8, 37:15, 37:17, 40:21, 41:20, 42:10, 43:15, 45:16, 46:24, 47:6, 47:10, 47:21, 49:3, 50:18, 50:19, 51:9, 55:5, 55:9, 55:14, 55:20, 56:3, 56:4, 56:5, 56:6, 56:12, 56:16, 57:2, 58:7, 58:15, 60:12, 60:23, 62:6, 63:15, 64:13, 64:16, 66:2, 66:14, 66:24, 67:6, 68:20, 68:22, 69:10, 70:2, 77:5, 80:13, 82:17, 84:4, 84:17, 85:5, 85:6, 85:7, 85:10, 88:18, 89:11, 89:12, 89:17, 89:18, 89:20, 91:10, 91:14, 91:18, 91:19, 91:22, 92:2, 92:6, 92:9, 92:12, 93:19, 94:23, 95:4, 96:14, 97:22, 98:2, 98:6, 98:12, 99:12, 100:19, 100:20, 100:24, 102:15, 102:19, 104:18, 115:22, 117:22, 118:3, 118:6, 118:12, 127:19, 131:9, 137:17, 137:21, 138:2, 138:7, 144:25, 145:6, 148:19, 155:4, 155:10, 155:16, 155:20, 155:25, 159:2, 159:10, 160:11, 166:13, 168:15, 168:17, 169:20, 170:16, 171:17, 172:4, 172:19, 172:23, 172:24, 173:23, 180:25, 181:17, 182:6, 182:25, 184:13, 184:20, 185:5, 186:15, 188:20, 189:24, 194:19, 201:9, 201:15, 201:16

**Opioids** [2] - 59:19, 68:8

**opportunities** [1] - 34:22

**opportunity** [3] - 5:21, 7:25, 74:20

**opposing** [1] - 73:23
**opposite** [1] - 109:4
**option** [1] - 156:7
**oral** [1] - 139:23
**order** [12] - 14:23, 38:7, 43:13, 78:3, 89:11, 109:16, 152:24, 154:6, 154:15, 190:25, 191:15, 191:20
**orders** [2] - 153:9, 180:24
**organization** [5] - 53:16, 63:3, 63:4, 95:9, 95:17
**organizations** [1] - 93:17
**orient** [1] - 23:8
**original** [3] - 42:22, 204:16
**originally** [1] - 161:22
**otherwise** [4] - 94:4, 101:2, 107:5, 170:18
**OUD** [4] - 24:5, 54:5, 91:6, 96:5
**outcome** [2] - 80:22, 85:16
**outcomes** [9] - 40:23, 41:16, 57:15, 86:5, 93:20, 93:24, 123:14, 124:2, 140:14
**outlier** [2] - 53:2, 100:10
**outpatients** [1] - 47:6
**outweigh** [2] - 30:22, 128:24
**overall** [1] - 140:8
**overdose** [18] - 28:18, 51:6, 58:8, 58:17, 84:18, 85:6, 85:11, 95:6, 96:21, 97:5, 104:20, 105:5, 114:7, 123:9, 139:6, 140:19, 176:15, 195:12
**overdoses** [1] - 85:12
**overlooked** [1] - 17:18
**overprescribing** [5] - 97:17, 98:19, 98:20, 98:25, 99:8
**overseas** [1] - 149:9
**own** [11] - 6:22, 27:23, 28:6, 81:15, 82:20, 103:14, 137:21, 165:12, 166:11, 193:21, 196:17
**OxyContin** [2] - 83:6, 136:6

**P**

**p.m** [4] - 4:15, 7:18, 11:13, 70:13
**pad** [1] - 56:8
**page** [32] - 39:6, 62:24, 76:20, 77:14, 115:9, 115:11, 118:20, 118:22, 121:13, 122:20, 130:24, 131:2, 131:3, 133:23, 148:13, 153:20, 154:13, 154:21, 159:7, 160:2, 167:21, 168:2, 181:23, 182:12, 182:14, 182:22, 182:23, 183:3, 185:3, 193:12, 193:13, 197:16
**pain** [55] - 16:10, 22:7, 24:25, 25:3, 25:8, 39:25, 40:13, 40:22, 41:21, 42:11, 43:15, 47:11, 48:17, 50:21, 56:7, 56:10, 56:13, 57:2, 63:17, 64:5, 65:6, 66:14, 66:20, 66:24, 67:6, 68:23, 69:11, 69:16, 70:3, 84:21, 87:23, 89:11, 89:16, 91:12, 98:4, 102:18, 124:25, 125:10, 127:2, 127:6, 127:10, 127:20, 129:6, 148:11, 155:3, 155:11, 155:15, 155:17, 165:2, 165:10, 168:21, 168:22, 198:18
**Pain** [4] - 24:22, 63:2, 69:20, 101:20
**painkillers** [2] - 27:9, 90:14
**pairs** [1] - 147:5
**Pam** [11] - 113:17, 114:13, 115:10, 118:21, 121:14, 123:4, 123:10, 131:3, 131:4, 133:24, 151:7
**pamphlet** [2] - 64:10, 64:14
**panel** [3] - 29:20, 29:22, 42:22
**panels** [1] - 29:17
**panoply** [1] - 27:20
**paper** [33] - 25:19,

25:21, 38:2, 38:10, 38:17, 39:15, 41:23, 42:4, 44:22, 44:23, 46:21, 47:8, 68:14, 69:22, 69:24, 71:7, 85:23, 85:24, 85:25, 86:22, 88:16, 89:2, 91:11, 91:25, 92:23, 95:22, 97:15, 97:20, 103:5, 104:11, 104:12, 106:25, 198:21
**papers** [28] - 25:14, 25:25, 37:8, 37:11, 37:16, 37:20, 37:21, 37:22, 38:4, 38:7, 39:5, 43:21, 43:24, 43:25, 44:4, 44:6, 67:15, 80:16, 80:19, 85:20, 86:11, 88:14, 88:16, 88:24, 89:10, 90:18, 90:19, 92:17
**paradigm** [2] - 55:8, 57:3, 98:10, 155:9, 155:14, 155:19, 160:5, 200:19
**paragraph** [3] - 154:22, 193:14, 193:18
**paraphrase** [1] - 15:23
**paraphrasing** [6] - 16:22, 52:12, 94:25, 95:23, 103:13, 201:14
**parcel** [2] - 72:18, 107:3
**pardon** [2] - 143:23, 157:13
**part** [71] - 5:16, 5:17, 16:23, 18:6, 28:21, 39:15, 39:16, 39:22, 40:4, 43:18, 44:5, 47:23, 48:6, 50:2, 50:23, 51:2, 54:25, 59:4, 60:15, 61:10, 62:10, 63:21, 66:7, 71:8, 72:12, 72:18, 84:11, 87:12, 107:3, 120:23, 122:17, 123:23, 124:24, 125:7, 126:11, 126:24, 129:22, 130:12, 139:6, 141:18, 142:12, 143:9, 144:21, 145:21, 147:13, 149:25, 150:13, 150:17, 150:18, 155:2, 155:3, 155:8, 155:21, 155:24,

163:17, 166:10, 166:15, 166:22, 173:2, 175:7, 176:10, 177:8, 178:20, 179:3, 179:25, 180:5, 189:21, 193:18, 196:3, 197:8, 199:8
**PART** [1] - 1:2
**Part** [4] - 3:3, 17:24, 36:2, 78:3
**partial** [1] - 19:14
**participant's** [1] - 103:14
**participated** [1] - 42:3
**particular** [26] - 21:7, 25:18, 25:21, 30:10, 32:3, 35:19, 93:25, 116:14, 119:23, 120:10, 120:17, 123:14, 124:2, 124:24, 125:9, 132:13, 132:23, 164:25, 166:16, 166:17, 167:7, 167:9, 173:14, 189:23, 195:21, 198:20
**parties** [1] - 130:8
**parts** [1] - 88:8
**party** [4] - 9:15, 72:21, 147:5, 204:13
**pass** [1] - 21:11
**past** [3] - 49:2, 115:23, 168:25
**pathology** [1] - 19:14
**pathway** [1] - 50:24
**patient** [40] - 30:21, 30:22, 45:4, 56:7, 56:10, 56:15, 83:10, 83:13, 83:17, 84:5, 90:15, 114:17, 116:14, 116:17, 116:22, 120:10, 120:17, 123:14, 123:17, 124:2, 124:3, 124:5, 124:15, 124:25, 125:9, 140:14, 141:3, 141:4, 164:17, 164:18, 164:22, 165:3, 165:11, 173:3, 173:5, 177:5, 177:20, 177:23, 177:25
**patient's** [1] - 178:8
**patients** [70] - 20:12, 20:14, 22:6, 22:10, 22:14, 23:13, 23:14,

24:10, 25:3, 27:5, 27:8, 27:22, 28:10, 28:13, 28:16, 28:17, 29:4, 36:2, 39:25, 45:7, 45:16, 46:23, 47:2, 48:17, 48:25, 55:20, 55:21, 56:25, 57:15, 64:4, 80:12, 85:12, 87:23, 89:10, 89:17, 91:9, 91:22, 93:25, 97:3, 97:4, 97:13, 100:19, 123:13, 124:11, 124:20, 124:23, 125:12, 125:22, 126:2, 126:10, 128:25, 134:3, 134:5, 140:24, 141:10, 141:21, 147:24, 155:16, 165:18, 166:2, 169:12, 169:15, 169:23, 173:20, 177:10, 193:25, 194:10, 202:3, 202:11

**pattern** [1] - 41:18
**patterns** [4] - 35:13, 157:20, 158:11, 158:18
**Paul** [1] - 3:12
**PAUL** [1] - 1:16
**pausing** [1] - 139:13
**pay** [2] - 164:15, 164:17
**pays** [1] - 30:10
**Pediatrics** [2] - 68:16, 68:24
**peer** [25] - 25:13, 25:14, 25:16, 25:22, 25:24, 35:12, 42:6, 46:21, 56:24, 69:2, 69:22, 80:16, 81:6, 86:11, 87:3, 90:19, 93:10, 94:3, 104:12, 156:21, 156:24, 191:12, 197:4, 197:13, 197:23
**peer-reviewed** [11] - 25:14, 25:24, 35:12, 42:6, 46:21, 56:24, 69:2, 69:22, 80:16, 90:19, 104:12
**peers** [3] - 21:4, 21:8, 81:23
**pending** [1] - 111:25
**people** [10] - 7:4, 51:6, 52:14, 52:15, 58:9, 64:17, 67:15, 80:24, 92:9, 138:2

**per** [2] - 60:2, 84:20
**percent** [8] - 64:4, 89:16, 89:19, 91:12, 92:5, 92:11, 92:14
**percentage** [2] - 87:22, 143:16
**percentages** [5] - 89:25, 90:3, 100:3, 192:10, 192:18
**perhaps** [6] - 22:19, 73:8, 78:21, 78:24, 181:21, 190:17
**period** [9] - 15:8, 35:19, 43:8, 59:20, 74:14, 105:10, 107:8, 203:8, 203:10
**periods** [1] - 23:15
**permission** [2] - 18:9, 48:23
**permit** [1] - 8:15
**permitted** [5] - 8:10, 74:5, 74:6, 113:4, 190:20
**Perry** [1] - 42:15
**persistent** [2] - 90:20, 91:5
**person** [5] - 60:3, 73:21, 73:22, 74:9, 162:11
**personal** [6] - 48:21, 68:2, 97:8, 116:25, 137:21, 152:13
**personally** [2] - 25:10, 100:21
**persons** [4] - 28:20, 29:12, 104:4, 105:6
**perspective** [2] - 47:10, 181:3
**pertain** [1] - 182:3
**pertains** [1] - 180:7
**phanly@simmonsfirm.com** [1] - 1:18
**Pharma** [1] - 42:17
**pharmaceutical** [34] - 16:20, 30:7, 31:15, 31:20, 31:23, 33:20, 33:25, 43:7, 45:15, 60:22, 61:7, 61:19, 110:16, 110:20, 116:24, 146:4, 146:13, 147:11, 147:14, 148:18, 152:15, 159:2, 159:11, 160:4, 160:19, 160:23, 161:7, 161:12, 168:16, 169:8, 186:7, 200:14, 200:22, 200:25

**Pharmaceuticals** [1] - 2:8
**pharmacies** [20] - 143:2, 143:5, 143:17, 143:21, 143:25, 144:15, 168:17, 169:10, 169:13, 170:5, 172:20, 172:24, 173:4, 173:6, 181:7, 184:5, 186:8, 188:5, 201:8
**pharmacist** [1] - 189:24
**pharmacists** [9] - 172:13, 173:23, 180:17, 188:21, 188:25, 189:5, 189:8, 189:12, 189:17
**pharmacoeconomics** [1] - 111:4
**pharmacy** [31] - 166:18, 169:19, 170:14, 171:6, 172:10, 172:11, 173:15, 179:9, 179:11, 179:21, 179:23, 180:3, 180:7, 180:25, 181:10, 181:16, 182:3, 182:6, 183:2, 183:14, 184:2, 184:20, 185:6, 186:5, 186:10, 186:15, 187:5, 187:11, 187:15, 187:22, 188:2
**phenomenon** [7] - 59:8, 59:11, 100:10, 100:14, 100:15, 101:3, 188:21
**photocopies** [1] - 204:12
**photographic** [1] - 18:14
**photographs** [1] - 17:25
**phrase** [1] - 156:19
**physical** [1] - 196:17
**physicians** [6] - 28:6, 29:5, 75:21, 82:13, 96:4, 191:15
**physicians'** [2] - 55:13, 191:17
**physiologically** [1] - 23:16
**picture** [1] - 4:9
**piece** [8] - 46:20, 47:5, 62:19, 63:6, 63:12,

71:7, 85:19, 106:25
**pieces** [1] - 88:8
**pill** [15] - 98:8, 118:7, 118:13, 119:3, 138:5, 138:16, 138:21, 138:24, 139:5, 139:16, 139:25, 140:9, 140:13, 140:18, 147:19
**pills** [14] - 115:21, 142:7, 142:24, 143:4, 143:16, 153:9, 166:24, 167:8, 168:21, 168:22, 169:12, 170:5, 173:14, 195:8
**place** [3] - 106:12, 118:22, 180:16
**placed** [1] - 180:25
**places** [1] - 34:13
**placing** [1] - 17:18
**plainly** [2] - 9:13, 9:16
**Plaintiff** [3] - 3:11, 4:2, 4:21
**Plaintiffs** [5] - 5:9, 6:11, 11:25, 111:19, 111:24
**Plaintiffs'** [5] - 7:17, 47:19, 106:19, 157:18, 183:17
**plan** [1] - 183:25
**plans** [3] - 24:11, 24:15, 24:18
**play** [1] - 165:15
**player** [1] - 153:7
**players** [1] - 192:4
**pleadings** [1] - 184:9
**PLLC** [1] - 1:20
**pnapoli@napolilaw.com** [1] - 1:24
**point** [34] - 8:23, 10:13, 11:20, 46:20, 61:16, 65:14, 68:16, 72:23, 74:17, 76:9, 77:13, 86:2, 106:17, 107:16, 107:20, 108:17, 132:13, 132:23, 133:2, 136:10, 136:22, 137:2, 166:16, 168:13, 170:2, 170:7, 170:10, 171:4, 171:12, 171:13, 171:15, 171:19, 184:9, 188:17
**pointed** [1] - 170:25
**pointers** [1] - 12:24
**points** [5] - 10:16,

57:3, 72:15, 75:4, 75:5
**policies** [5] - 147:4, 150:20, 150:25, 180:12, 180:20
**Policy** [1] - 103:6
**policy** [1] - 180:21
**polite** [1] - 13:12
**Polster** [7] - 14:18, 71:6, 71:23, 75:6, 75:17, 76:19, 113:2
**pop** [1] - 151:14
**population** [8] - 89:9, 89:13, 89:23, 135:13, 170:17, 171:18, 194:11, 202:13
**populations** [1] - 99:6
**Porter** [2] - 44:13, 44:21
**portion** [4] - 22:5, 115:7, 118:17, 148:22
**Portnoy** [3] - 42:21, 43:5
**position** [2] - 24:21, 169:25
**positions** [1] - 72:7
**positive** [1] - 26:22
**possible** [1] - 178:2
**possibly** [2] - 184:17, 188:22
**potent** [4] - 55:4, 171:17, 202:12
**potential** [3] - 34:9, 53:15, 128:25
**potentially** [2] - 57:25, 122:23
**power** [1] - 149:6
**powerful** [1] - 50:21
**powerfully** [1] - 51:4
**practice** [15] - 19:24, 22:2, 22:4, 28:21, 37:3, 49:21, 64:22, 68:3, 108:18, 155:16, 155:21, 155:25, 156:5, 156:10, 173:2
**practices** [5] - 76:24, 104:6, 114:19, 117:21, 118:2
**pre** [2] - 33:14, 43:19
**preceded** [1] - 130:18
**precept** [1] - 81:8
**precepts** [1] - 74:4
**precisely** [2] - 42:23, 77:6
**precluded** [1] - 5:21
**predate** [3] - 9:21, 9:22, 57:3

**predated** [1] - 32:16
**prefer** [2] - 105:18, 115:15
**prejudice** [1] - 108:8
**preparation** [2] - 175:7, 187:24
**prepared** [1] - 41:7
**prepares** [1] - 41:5
**preparing** [3] - 81:13, 179:9, 179:19
**preponderance** [2] - 101:23, 198:24
**prescribe** [22] - 20:6, 20:10, 20:11, 20:12, 55:20, 98:2, 98:5, 99:9, 114:17, 116:15, 118:6, 120:9, 120:16, 138:2, 149:16, 155:16, 165:21, 169:8, 169:25, 173:3, 173:7, 173:20
**prescribed** [34] - 22:24, 22:25, 28:14, 28:16, 36:2, 56:7, 57:2, 57:12, 60:2, 64:5, 68:22, 89:11, 89:17, 91:10, 99:10, 100:19, 100:21, 118:12, 119:6, 123:15, 123:19, 124:3, 124:16, 129:19, 134:5, 137:21, 143:6, 151:2, 155:20, 155:25, 168:15, 169:5, 172:19, 172:23
**Prescribed** [1] - 59:19
**prescriber** [2] - 121:4, 141:4
**prescribers** [3] - 120:21, 121:20, 140:13
**prescribing** [63] - 16:2, 35:14, 35:23, 47:9, 47:12, 55:3, 55:8, 55:14, 57:10, 75:13, 76:24, 95:25, 96:3, 97:2, 97:13, 97:22, 98:9, 98:11, 98:16, 98:21, 99:3, 99:4, 99:18, 99:22, 102:15, 114:19, 114:23, 115:25, 116:2, 121:9, 126:20, 134:10, 134:11, 137:23, 138:7, 139:12, 140:9, 150:7,

154:24, 157:19, 158:11, 158:17, 160:5, 167:5, 168:5, 169:6, 170:4, 170:13, 170:19, 171:2, 171:3, 171:5, 171:15, 172:4, 188:20, 191:17, 191:22, 193:22, 194:3, 200:21, 202:2
**Prescription** [1] - 68:8
**prescription** [77] - 16:16, 22:7, 27:9, 27:12, 28:5, 28:9, 30:4, 30:11, 31:2, 31:4, 49:2, 56:8, 58:7, 58:15, 68:19, 68:20, 80:13, 85:5, 91:14, 92:2, 95:3, 101:24, 102:4, 102:11, 102:15, 103:15, 103:17, 103:23, 104:5, 115:22, 116:13, 117:22, 118:3, 127:5, 128:3, 128:18, 129:5, 129:23, 130:14, 132:6, 132:14, 132:24, 141:23, 142:3, 142:7, 142:10, 142:19, 142:23, 144:25, 148:16, 160:11, 164:19, 164:22, 164:24, 165:11, 168:3, 168:17, 168:22, 169:9, 169:17, 169:20, 170:18, 172:9, 173:6, 173:24, 178:23, 184:13, 189:19, 189:20, 198:25, 201:14, 201:15, 202:11, 202:15, 203:2, 203:10
**prescriptions** [39] - 27:23, 57:24, 59:12, 77:5, 96:20, 105:11, 114:3, 114:6, 123:7, 131:9, 131:13, 131:14, 132:8, 132:10, 133:3, 133:13, 133:17, 133:18, 134:4, 134:14, 135:2, 135:5, 135:9, 136:25, 137:17, 138:8, 140:2, 140:17, 141:6,

141:12, 141:15, 142:17, 164:16, 166:18, 173:10, 173:16, 180:18, 181:6, 189:23
**presence** [1] - 23:16
**present** [1] - 182:16
**presentations** [1] - 35:5
**presented** [4] - 14:17, 28:2, 95:24, 107:18
**presenting** [2] - 34:17, 58:9
**presents** [1] - 32:2
**preserved** [1] - 72:22
**presiding** [1] - 3:5
**press** [1] - 26:22
**presumably** [1] - 165:8
**pretty** [3] - 90:25, 104:25, 151:9
**Prevention** [1] - 84:13
**prevention** [1] - 52:19
**prima** [1] - 95:24
**primarily** [1] - 140:9
**primary** [1] - 98:2
**principally** [1] - 14:23
**probable** [1] - 168:5
**problem** [10] - 11:6, 11:19, 36:18, 102:17, 102:18, 138:17, 141:18, 142:14, 143:9, 191:2
**problematic** [1] - 119:15
**problems** [1] - 102:19
**procedure** [1] - 92:10
**proceed** [4] - 11:22, 14:3, 18:17, 163:7
**proceeding** [3] - 112:4, 112:19, 113:3
**proceedings** [1] - 18:13
**process** [3] - 25:17, 108:15, 130:20
**processes** [1] - 180:16
**produce** [1] - 122:10
**produced** [7] - 71:16, 163:19, 163:25, 164:8, 179:8, 179:21, 179:23
**product** [2] - 20:17, 135:18
**production** [3] - 142:24, 142:25, 143:5
**products** [10] - 20:7, 20:11, 135:7, 135:15, 135:17,

135:21, 136:3, 136:7, 136:9, 184:5
**profession** [1] - 68:19
**professional** [12] - 31:10, 48:21, 52:5, 68:2, 82:10, 97:8, 110:19, 160:8, 161:8, 173:2, 177:11, 180:17
**professionals** [2] - 121:9, 173:17
**Professor** [1] - 17:8
**professor** [1] - 28:22
**profile** [2] - 30:14, 30:17
**profit** [1] - 137:22
**program** [10] - 33:19, 33:24, 34:5, 35:15, 35:24, 81:25, 141:24, 142:3, 154:6, 154:15
**Program** [1] - 17:10
**Programs** [1] - 94:13
**progress** [1] - 203:7
**progression** [2] - 100:23, 202:10
**prohibited** [1] - 76:8
**project** [1] - 82:11
**prolific** [1] - 154:25
**prominent** [1] - 94:18
**promise** [1] - 199:11
**promoted** [1] - 63:9
**promoting** [1] - 99:12
**promotion** [4] - 16:21, 95:25, 113:24, 114:2
**promotional** [6] - 32:24, 46:17, 48:9, 76:23, 77:20, 160:6
**promulgated** [3] - 9:14, 53:7, 62:16
**promulgation** [1] - 42:3
**propensity** [1] - 82:23
**proper** [1] - 80:17
**properly** [1] - 63:17
**proposed** [3] - 5:8, 196:18, 196:21
**prospective** [1] - 196:22
**protect** [1] - 56:10
**provide** [5] - 34:7, 34:23, 80:20, 137:7, 191:14
**provided** [9] - 32:12, 32:23, 36:5, 47:18, 70:23, 183:7, 185:10, 185:12, 195:22
**provider** [3] - 32:2, 45:5, 47:4

**providers** [12] - 31:25, 32:8, 32:14, 33:21, 34:8, 34:17, 38:25, 52:6, 68:4, 168:15, 169:5, 193:25
**providers'** [3] - 169:7, 169:16, 171:2
**providing** [3] - 82:14, 121:8, 192:18
**pseudoaddiction** [2] - 66:16, 66:21
**Psychiatric** [3] - 53:17, 53:24, 54:21
**psychiatric** [4] - 18:24, 117:9, 117:13, 166:12
**psychiatrists** [1] - 176:22
**psychiatry** [2] - 19:18, 20:21
**Psychiatry** [2] - 17:12, 19:21
**Public** [1] - 94:13
**public** [4] - 32:11, 36:5, 94:17, 94:19
**publication** [21] - 25:21, 35:7, 35:9, 42:9, 46:7, 46:12, 53:23, 64:9, 84:12, 86:2, 86:17, 96:9, 96:11, 104:15, 158:6, 191:12, 197:4, 197:7, 197:12, 197:22, 202:24
**publications** [9] - 86:25, 87:6, 87:7, 87:11, 94:3, 96:9, 96:13, 97:11
**publish** [2] - 42:6, 87:6
**published** [21] - 26:8, 26:11, 26:18, 28:8, 31:8, 35:12, 43:12, 48:14, 67:15, 92:17, 92:24, 93:3, 94:22, 95:9, 97:16, 139:10, 156:20, 156:24, 197:23, 198:21, 202:6
**pull** [13] - 83:19, 88:15, 113:18, 114:13, 118:16, 121:12, 123:10, 133:22, 151:7, 151:10, 154:11, 185:2, 186:13
**pulled** [7] - 39:21, 40:24, 68:13, 101:18, 102:3,

223

103:12, 131:3
**pullout** [1] - 39:15
**Purdue** [1] - 42:17
**purely** [2] - 46:21, 137:21
**purple** [1] - 85:3
**purport** [1] - 77:2
**purported** [2] - 32:3, 80:19
**purpose** [2] - 173:12, 173:21
**purposes** [7] - 5:12, 6:12, 124:11, 126:21, 162:7, 172:14, 183:10
**pursued** [1] - 76:11
**put** [28] - 14:25, 15:10, 38:10, 38:22, 39:10, 44:16, 51:17, 55:2, 57:19, 62:21, 70:7, 83:12, 83:17, 88:20, 90:8, 90:23, 94:6, 94:10, 101:14, 102:25, 106:3, 106:6, 113:14, 115:10, 118:21, 123:4, 180:16, 183:14
**puts** [1] - 84:4
**putting** [2] - 129:17, 167:7
**Pyser** [11] - 10:15, 10:19, 61:3, 71:19, 109:10, 109:18, 151:24, 152:5, 197:3, 201:12, 202:19
**PYSER** [18] - 10:18, 61:2, 61:18, 71:18, 109:14, 109:24, 151:23, 152:8, 152:11, 154:11, 162:21, 163:8, 163:12, 165:6, 172:7, 174:2, 174:5, 198:10

---

**Q**

**qualifications** [1] - 15:6
**qualify** [1] - 40:14
**qualitative** [6] - 123:18, 130:20, 131:18, 192:24, 193:24, 194:10
**quality** [4] - 40:15, 40:17, 41:2, 46:20
**quantified** [3] - 147:13, 148:5,

151:16
**quantifies** [3] - 140:17, 150:2, 150:13
**quantify** [6] - 139:4, 144:19, 144:21, 148:23, 150:19, 192:4
**quantitative** [2] - 121:7, 126:5
**quantities** [1] - 47:7
**Quarry** [1] - 12:19
**QUESTION** [2] - 116:5, 119:5
**questions** [28] - 13:2, 13:16, 53:15, 70:15, 113:22, 114:8, 114:12, 114:14, 129:15, 132:3, 151:20, 152:13, 162:15, 163:6, 168:12, 174:2, 175:3, 175:5, 181:10, 190:3, 190:14, 190:18, 192:2, 192:10, 192:22, 194:2, 195:13, 195:14
**queue..** [1] - 163:11
**quick** [1] - 151:9
**quickly** [3] - 50:15, 66:12, 175:4
**quite** [2] - 56:25, 163:9
**quotation** [1] - 94:11
**quotations** [3] - 68:14, 94:10
**quote** [8] - 94:23, 94:25, 95:8, 95:11, 101:22, 102:4, 198:23
**quoted** [1] - 84:16
**quotes** [4] - 68:17, 101:18, 103:4, 103:12
**quoting** [1] - 148:17

---

**R**

**radical** [1] - 155:3
**raise** [2] - 11:19, 12:12
**raised** [1] - 71:20
**rapidly** [1] - 116:3
**rare** [7] - 45:17, 66:13, 67:4, 80:7, 87:18, 90:4, 90:7
**rarely** [3] - 63:15, 63:16, 64:2
**rate** [6] - 51:3, 51:4, 51:5, 99:22, 168:14,

169:4
**rates** [1] - 168:5
**rather** [3] - 26:7, 68:9, 165:20
**Re** [1] - 3:9
**RE** [1] - 1:4
**reach** [7] - 33:5, 43:14, 50:7, 86:12, 166:12, 177:3, 191:15
**reaching** [9] - 31:7, 31:9, 33:8, 37:5, 59:5, 69:11, 69:25, 86:4, 96:15
**read** [22] - 16:22, 26:25, 29:2, 39:3, 39:6, 40:9, 42:2, 52:22, 84:22, 96:5, 96:9, 96:11, 102:6, 103:19, 115:15, 115:16, 145:15, 154:23, 155:6, 193:17, 194:4, 199:4
**readers** [1] - 40:8
**reading** [4] - 28:19, 40:18, 76:19, 160:12
**reads** [3] - 39:23, 52:10, 84:11
**ready** [2] - 109:7, 112:13
**real** [4] - 54:17, 56:7, 56:8, 87:22
**really** [24] - 9:5, 16:6, 21:8, 41:3, 55:15, 55:17, 56:17, 60:23, 60:24, 61:8, 66:23, 68:21, 99:9, 102:13, 108:24, 116:3, 130:7, 137:12, 137:23, 144:12, 162:4, 170:6, 202:7, 202:24
**reasonable** [3] - 15:7, 50:9, 187:15
**rebuttal** [1] - 6:4
**recalling** [1] - 184:18
**receive** [2] - 82:13, 122:9
**received** [16] - 4:20, 6:2, 7:12, 7:16, 7:24, 20:5, 26:21, 27:23, 32:17, 34:9, 34:16, 47:3, 81:17, 120:22, 121:5, 121:20
**receiving** [4] - 42:12, 47:6, 82:15, 92:5
**receptors** [1] - 50:20
**recess** [6] - 4:16, 78:2, 105:19, 105:21, 105:24, 174:8

**recipient** [1] - 56:19
**recitations** [1] - 82:15
**recognize** [2] - 127:4, 138:16
**recognized** [1] - 21:21
**recommendation** [3] - 40:12, 40:16, 161:20
**recommendations** [1] - 40:10
**recommended** [2] - 42:10, 191:25
**record** [19] - 6:10, 10:7, 12:18, 13:16, 17:19, 18:4, 18:14, 25:16, 50:16, 58:11, 61:24, 71:25, 106:4, 106:7, 106:12, 108:22, 162:7, 179:19, 203:20
**records** [5] - 124:8, 125:22, 125:25, 176:15, 183:19
**red** [1] - 199:17
**redirect** [2] - 190:6, 190:15
**REDIRECT** [1] - 190:8
**reduce** [2] - 23:17, 84:21
**refer** [3] - 115:9, 160:3, 186:6
**reference** [6] - 9:25, 101:11, 162:16, 162:19, 163:13, 202:7
**referenced** [3] - 73:2, 131:19, 162:25
**references** [4] - 186:10, 186:14, 187:5, 197:24
**referencing** [4] - 71:10, 77:7, 85:20, 198:16
**referred** [5] - 100:13, 138:4, 142:21, 191:4, 200:13
**referring** [4] - 71:12, 71:22, 125:17, 146:10
**refers** [3] - 18:24, 23:13, 25:16
**reflect** [3] - 38:21, 38:23, 49:24
**reflected** [1] - 38:9
**reflecting** [1] - 147:22
**reflective** [2] - 40:7, 195:9
**reflects** [1] - 58:12
**regard** [8] - 10:14, 32:6, 56:3, 78:20, 81:2, 93:7

**regarded** [7] - 53:5, 69:4, 87:5, 90:4, 93:8, 104:14, 104:15
**regarding** [16] - 5:9, 36:12, 36:17, 37:16, 76:21, 77:18, 95:20, 97:12, 110:24, 122:7, 125:14, 132:3, 178:9, 182:2, 187:25, 189:12
**regions** [2] - 98:13, 116:2
**register** [1] - 61:4
**regression** [2] - 122:16, 122:20
**regularly** [1] - 173:4
**regulation** [1] - 187:17
**regulations** [1] - 110:24
**regulatory** [6] - 149:4, 150:12, 150:14, 153:4, 153:11, 153:23
**rehabilitation** [1] - 24:18
**reimbursement** [3] - 147:4, 150:20, 150:25
**relate** [6] - 30:13, 90:19, 184:12, 184:15, 186:3, 199:25
**related** [16] - 7:15, 58:8, 62:15, 66:9, 79:24, 88:17, 95:20, 96:21, 102:4, 104:20, 105:5, 146:5, 146:15, 146:19, 149:23, 194:2
**relates** [2] - 51:8, 69:8
**relating** [4] - 7:14, 70:15, 93:16, 104:9
**relationship** [12] - 24:3, 25:7, 29:10, 93:18, 93:24, 157:19, 158:10, 158:17, 191:16, 191:22, 201:15, 203:4
**relative** [2] - 192:4, 192:18
**relatively** [2] - 84:19, 92:4
**released** [1] - 150:7
**relevant** [2] - 38:24, 91:21
**reliability** [2] - 74:4, 81:5
**reliable** [11] - 16:9,

224

47:4, 59:2, 69:10,
70:2, 73:15, 74:13,
86:12, 104:14,
104:16, 126:25
**reliably** [2] - 80:22,
87:6
**reliance** [1] - 96:18
**relied** [19] - 6:11,
69:24, 71:25, 80:15,
86:4, 87:11, 96:19,
96:23, 97:7, 107:10,
119:18, 119:24,
121:8, 123:20,
126:7, 132:6,
186:20, 193:19,
200:20
**relief** [3] - 8:16, 22:7,
66:20
**relies** [1] - 73:20
**relieve** [1] - 50:21
**reluctant** [2] - 55:20,
136:15
**rely** [10] - 5:16, 6:8,
6:20, 8:11, 48:16,
93:12, 96:12, 104:8,
108:6, 195:22
**relying** [3] - 70:11,
107:19, 178:15
**remain** [1] - 65:8
**remainder** [1] - 77:17
**remained** [1] - 115:22
**remaining** [1] - 77:16
**remains** [3] - 157:20,
158:12, 158:18
**remedy** [1] - 94:21
**remember** [4] - 87:18,
156:17, 192:24,
199:15
**remind** [5] - 78:5,
78:6, 106:5, 106:8,
123:6
**remotely** [1] - 12:2
**removal** [1] - 92:13
**renewed** [1] - 6:17
**rep** [3] - 33:25,
165:16, 200:18
**repeat** [3] - 116:20,
128:5, 130:9
**repeats** [1] - 41:19
**rephrase** [8] - 46:2,
61:25, 62:2, 132:22,
144:4, 176:24,
181:20, 196:11
**report** [75] - 8:8,
10:25, 11:6, 11:8,
11:9, 15:15, 15:20,
17:3, 72:3, 72:9,
80:22, 85:19, 94:12,
94:22, 95:8, 101:19,
101:20, 112:3,

112:17, 112:18,
112:22, 112:23,
119:15, 119:21,
119:25, 120:2,
126:7, 126:10,
154:21, 154:22,
159:19, 159:21,
159:22, 159:23,
160:2, 163:18,
163:24, 164:9,
166:15, 167:21,
168:13, 168:18,
169:4, 175:7,
179:10, 179:12,
179:14, 179:19,
179:24, 181:25,
182:4, 183:11,
183:14, 183:24,
184:12, 184:25,
185:18, 186:6,
187:10, 187:12,
187:14, 187:19,
187:20, 187:24,
188:9, 188:10,
193:7, 193:9,
193:12, 193:19,
197:13, 198:16,
198:18, 198:24,
199:9
**reported** [2] - 118:7,
118:13
**Reporter** [2] - 204:7,
204:21
**REPORTER** [1] - 2:20
**reports** [5] - 72:10,
72:11, 93:17, 94:11,
119:2
**represent** [2] - 110:7,
174:25
**representation** [1] -
106:14
**representations** [4] -
32:7, 75:15, 77:19,
184:8
**representative** [5] -
31:16, 31:20, 31:24,
32:7, 46:23
**representatives** [3] -
32:13, 33:21
**representing** [1] -
155:2
**reputable** [1] - 69:5
**requested** [1] - 78:16
**require** [1] - 13:15
**required** [1] - 74:7
**requirements** [6] -
73:12, 149:10,
188:25, 191:13,
191:24, 191:25
**research** [12] - 28:12,

29:19, 35:13, 38:20,
52:7, 97:12, 121:6,
130:18, 177:12,
193:21, 193:23,
196:18
**researcher** [3] - 31:11,
33:10, 81:2
**researchers** [1] -
198:7
**researching** [1] -
68:25
**residency** [2] - 19:14,
19:17
**residents** [2] - 29:6,
146:2
**respect** [11] - 30:10,
67:3, 67:5, 67:10,
67:18, 75:16, 96:8,
104:18, 153:12,
184:2, 192:5
**respects** [1] - 76:10
**responded** [1] -
202:15
**response** [2] - 6:17,
195:23
**responsibilities** [3] -
153:4, 153:11,
153:23
**responsibility** [9] -
147:12, 147:18,
148:24, 150:2,
150:14, 151:16,
153:8, 173:19,
180:18
**rest** [2] - 38:9, 156:11
**restate** [1] - 125:4
**rests** [1] - 165:21
**result** [8] - 53:8,
74:13, 85:12, 90:15,
142:8, 155:14,
155:19, 166:18
**resulted** [3] - 16:18,
57:14, 77:3
**results** [3] - 73:15,
88:15, 196:4
**resume** [1] - 105:22
**retail** [3] - 143:2,
182:25, 185:6
**retained** [2] - 111:19,
111:23
**return** [1] - 171:10
**review** [25] - 7:25,
25:16, 25:22, 29:13,
43:24, 44:11, 45:3,
46:15, 48:13, 54:10,
67:23, 67:24, 74:20,
81:9, 88:7, 124:7,
125:21, 125:25,
135:24, 145:14,
156:21, 156:25,

180:2, 180:20, 196:4
**reviewed** [34] - 25:14,
25:24, 33:3, 35:12,
37:7, 37:16, 37:19,
39:16, 42:6, 46:21,
56:24, 69:2, 69:13,
69:22, 80:4, 80:16,
81:7, 81:12, 86:11,
87:3, 90:19, 93:10,
94:4, 104:12, 129:4,
179:12, 183:19,
184:10, 184:23,
191:12, 197:4,
197:13, 197:23
**reviewing** [3] - 39:5,
64:21, 82:16
**revoke** [1] - 149:13
**revoked** [1] - 149:16
**reward** [1] - 50:24
**right-hand** [1] - 95:11
**rigorous** [2] - 120:13,
121:3, 126:22
**Risk** [1] - 84:11
**risk** [36] - 30:14,
30:17, 47:5, 56:5,
56:24, 57:6, 66:12,
80:12, 80:20, 83:13,
83:17, 84:5, 84:18,
84:20, 85:6, 85:10,
85:16, 86:5, 87:13,
87:22, 88:4, 88:17,
89:12, 89:22, 91:23,
116:18, 116:22,
116:25, 128:25,
168:23, 194:14,
194:19, 194:23,
195:2, 195:10,
195:12
**risk-benefit** [2] -
30:14, 30:17
**risks** [4] - 30:22,
82:16, 116:13,
189:13
**Road** [2] - 1:21, 12:20
**road** [1] - 14:21
**role** [4] - 29:23,
160:16, 160:17,
188:5
**roles** [1] - 192:4
**Roman** [1] - 168:2
**rooms** [1] - 85:13
**rough** [1] - 135:3
**roughly** [1] - 105:10
**RPR** [3] - 2:20, 204:6,
204:20
**rule** [3] - 10:2, 71:2,
108:9
**ruled** [1] - 113:3
**rules** [6] - 8:14, 9:14,
17:23, 107:16,

180:2, 180:20, 196:4
**ruling** [2] - 77:15,
77:22
**run** [1] - 139:17
**runs** [2] - 121:13,
131:2

**S**

**Sabrina** [6] - 7:7, 70:9,
76:15, 78:8, 110:6,
196:7
**safe** [3] - 128:4,
128:19, 195:21
**safer** [2] - 16:6, 60:23
**safety** [13] - 29:23,
30:2, 30:6, 30:13,
30:20, 30:24, 36:12,
47:10, 47:20, 48:10,
48:11, 160:10, 196:4
**saga** [1] - 192:5
**Saldana** [1] - 3:20
**SALDANA** [3] - 2:5,
3:20, 3:23
**sale** [1] - 83:5
**sales** [12] - 31:16,
31:20, 31:24, 32:7,
32:12, 32:13, 33:20,
33:25, 58:6, 58:12,
77:4, 111:15
**Salvatore** [1] - 4:2
**SALVATORE** [1] -
1:23
**sandbag** [1] - 107:23
**sandbagged** [2] -
9:15, 107:17
**sandbagging** [4] -
8:14, 11:14, 108:2,
108:10
**save** [1] - 13:13
**saving** [1] - 165:17
**savings** [3] - 164:6,
164:11, 164:15
**saw** [12] - 37:5, 46:16,
66:8, 96:25, 98:7,
100:6, 100:8,
119:13, 119:23,
121:4, 162:11
**sbadala@napolilaw.
com** [1] - 1:24
**scaled** [1] - 95:2
**schedule** [1] - 4:25
**Schedule** [1] - 68:20
**scheduled** [1] - 7:20
**schizophrenia** [1] -
117:16
**scholarly** [1] - 81:9
**school** [5] - 56:17,
56:18, 82:21, 83:2,
104:3

225

**School** [3] - 14:13, 17:13, 19:4
**Schools** [1] - 94:12
**Schroeder** [2] - 92:8, 93:2
**science** [10] - 29:3, 49:10, 49:21, 64:3, 94:23, 95:20, 95:21, 194:25, 195:4, 203:7
**Sciences** [3] - 17:12, 19:22, 95:13
**scientific** [18] - 25:6, 25:18, 31:11, 33:10, 37:2, 37:7, 43:12, 46:7, 49:25, 50:9, 67:15, 80:8, 80:24, 103:21, 111:8, 113:11, 113:24, 187:16
**scientifically** [3] - 120:13, 121:2, 126:22
**scientist** [1] - 54:16
**scope** [2] - 77:9, 119:22
**scores** [2] - 22:14, 22:15
**screen** [15] - 4:9, 14:25, 44:19, 109:13, 109:19, 109:22, 115:10, 115:15, 121:14, 151:14, 153:20, 182:11, 182:18, 186:16, 186:21
**scripts** [1] - 35:18
**second** [14] - 7:6, 8:23, 10:24, 64:11, 72:23, 78:10, 92:23, 97:20, 102:9, 102:10, 103:21, 114:15, 165:6, 186:22
**Second** [1] - 73:5
**Section** [1] - 17:24
**section** [1] - 50:15
**see** [43] - 15:12, 26:5, 38:15, 39:12, 40:2, 42:14, 42:18, 44:19, 45:4, 48:2, 49:3, 59:23, 59:24, 59:25, 64:3, 80:9, 84:14, 84:24, 85:21, 88:24, 89:14, 99:3, 99:4, 103:6, 105:9, 109:12, 114:8, 135:23, 136:16, 144:5, 168:9, 173:6, 174:9, 182:18, 182:20, 183:5,

185:8, 185:9, 193:15, 198:21, 198:23, 199:20, 199:23
**seeing** [6] - 8:21, 39:20, 84:25, 85:14, 89:7, 136:17
**seek** [2] - 75:3, 202:12
**seeks** [1] - 74:9
**seem** [3] - 44:9, 76:18, 198:4
**selected** [2] - 26:25, 39:24
**selecting** [1] - 43:24
**selective** [1] - 194:10
**self** [3] - 23:25, 91:12, 92:4
**self-limiting** [2] - 91:12, 92:4
**sends** [1] - 25:19
**sense** [5] - 78:13, 98:3, 165:23, 169:12, 169:22
**sent** [1] - 5:8
**sentence** [9] - 41:13, 41:14, 44:25, 102:10, 201:17, 201:19, 201:23, 202:18, 203:4
**separate** [2] - 94:10, 177:17
**separately** [1] - 102:6
**September** [5] - 1:8, 4:15, 106:22, 162:25, 185:14
**series** [2] - 33:13, 36:25
**serious** [2] - 9:5, 56:10
**served** [2] - 101:25, 199:2
**serves** [1] - 42:15
**service** [2] - 4:18, 36:6
**serving** [2] - 163:18, 163:24
**session** [7] - 3:4, 4:13, 5:3, 18:9, 73:8, 73:9, 78:4
**set** [5] - 74:7, 87:13, 88:16, 134:3, 191:18
**setting** [7] - 140:5, 140:7, 177:6, 178:2, 178:5, 178:12, 178:17
**several** [2] - 103:22, 192:23
**severe** [2] - 20:14, 100:22
**severely** [1] - 89:18
**share** [1] - 181:21

**shared** [3] - 83:22, 183:22, 186:21
**shelves** [1] - 172:11
**SHERIDAN** [2] - 1:17, 4:6
**Sheridan** [1] - 4:6
**sheriff** [3] - 161:23, 161:24, 162:2
**shift** [16] - 55:8, 55:15, 55:18, 57:3, 98:10, 123:3, 155:3, 155:19, 158:21, 160:5, 168:16, 169:9, 169:23, 170:5, 171:6, 200:19
**shifted** [2] - 155:9, 169:18
**shifting** [2] - 155:14, 170:14
**shifts** [1] - 172:10
**Shkolnik** [2] - 3:17, 108:5
**SHKOLNIK** [5] - 1:20, 3:17, 108:4, 108:21, 109:5
**shopping** [8] - 140:21, 141:8, 141:10, 141:14, 141:17, 141:22, 142:8, 142:14
**short** [4] - 50:22, 76:4, 78:2, 174:8
**short-term** [1] - 50:22
**shot** [3] - 161:23, 161:25
**show** [6] - 63:15, 115:6, 122:5, 140:2, 163:15, 182:8
**showed** [5] - 28:13, 28:15, 177:4, 186:3, 194:25
**showing** [7] - 56:24, 58:17, 58:21, 85:13, 91:9, 92:2, 96:19
**shown** [3] - 38:20, 58:4, 84:21
**shows** [6] - 58:6, 85:4, 85:8, 85:9, 105:2, 105:4
**side** [3] - 94:11, 95:11
**signature** [1] - 204:16
**significance** [1] - 89:8
**significant** [1] - 22:5
**signs** [2] - 45:6, 66:22
**similar** [6] - 81:16, 82:19, 86:12, 89:23, 99:7, 141:5
**SIMMONS** [1] - 1:14
**simple** [1] - 169:17
**simply** [5] - 6:10, 6:20,

8:22, 13:7, 66:19
**single** [6] - 47:3, 103:25, 134:16, 135:18, 164:5, 164:7
**sit** [4] - 21:11, 137:6, 146:12, 163:14
**sitting** [4] - 108:19, 136:24, 170:2, 188:8
**skip** [1] - 111:7
**SKOLNICK** [1] - 1:22
**Slide** [36] - 15:11, 15:12, 37:6, 39:10, 41:24, 44:16, 51:18, 54:25, 57:20, 59:15, 59:18, 62:20, 62:21, 62:23, 66:4, 68:6, 69:7, 70:7, 84:8, 88:20, 88:23, 90:23, 94:6, 101:14, 102:25, 104:22, 106:13, 113:18, 123:4, 151:7, 186:3, 186:10, 186:13, 187:5, 198:17, 199:13
**slide** [22] - 17:5, 39:12, 43:22, 47:14, 59:9, 60:6, 65:25, 70:16, 84:10, 90:9, 91:4, 94:9, 101:17, 104:23, 105:8, 106:18, 177:4, 185:22, 190:11, 197:17, 198:20, 199:14
**slides** [1] - 90:25
**slightly** [3] - 53:18, 75:7, 133:23
**Slip** [1] - 73:4
**slow** [2] - 51:3, 51:4
**small** [4] - 56:6, 65:8, 82:5, 98:8
**Smith** [1] - 122:9
**so-called** [5] - 63:23, 64:9, 64:25, 98:8, 104:9
**societies** [2] - 160:8, 161:9
**Society** [5] - 51:22, 52:8, 52:25, 53:8, 54:19
**society** [1] - 52:6
**sold** [1] - 137:13
**solution** [1] - 66:24
**someone** [4] - 41:5, 89:2, 89:3, 103:5
**sometimes** [3] - 54:5, 95:13, 142:23
**somewhat** [4] - 4:16
**sorry** [20] - 18:16,

22:5, 31:17, 54:13, 54:14, 54:15, 70:5, 78:6, 88:12, 109:5, 116:20, 118:9, 121:24, 125:4, 132:20, 140:7, 146:7, 163:8, 179:11, 185:22
**sort** [8] - 22:8, 28:2, 33:18, 53:2, 53:8, 76:2, 146:16, 191:14
**sorts** [1] - 81:17
**sought** [2] - 13:4, 13:10
**sound** [5] - 128:5, 152:6, 152:9, 191:20
**sounds** [3] - 13:22, 112:9
**source** [2] - 88:24, 104:16
**sources** [4] - 16:18, 175:6, 202:5, 202:13
**speaking** [3] - 34:22, 35:8, 53:20
**speaks** [1] - 49:20
**specialties** [1] - 98:11
**specialty** [2] - 97:24, 98:4
**specific** [48] - 23:5, 61:12, 73:11, 96:13, 100:3, 103:22, 116:18, 116:22, 119:14, 119:18, 122:8, 129:23, 130:14, 131:8, 131:13, 132:8, 133:2, 134:8, 137:7, 138:24, 140:13, 146:10, 148:8, 151:18, 153:13, 156:19, 158:13, 167:11, 167:14, 172:18, 172:22, 175:18, 176:23, 177:23, 178:21, 180:21, 180:24, 181:5, 184:5, 184:18, 187:25, 188:24, 189:17, 189:18, 189:20, 189:23, 190:2
**specifically** [8] - 23:13, 89:10, 89:22, 137:19, 144:11, 151:16, 155:8, 175:17
**specificity** [2] - 122:12, 188:10
**specifics** [1] - 110:8
**spent** [2] - 82:9,

114:10
**sphere** [1] - 33:11
**sprain** [1] - 92:3
**Square** [1] - 2:9
**stand** [2] - 13:6,
161:25
**standard** [3] - 28:21,
28:24, 43:13
**standards** [1] - 42:5
**standing** [2] - 10:12,
11:22
**Stanford** [11] - 12:20,
14:12, 17:13, 19:4,
19:12, 19:15, 19:18,
21:16, 24:22, 28:22,
29:5
**start** [6] - 5:4, 14:24,
50:16, 105:20,
152:12, 175:8
**started** [2] - 4:11,
105:17
**starting** [6] - 16:2,
55:3, 105:18,
136:10, 171:16,
189:16
**State** [39] - 2:3, 2:3,
3:2, 29:24, 34:14,
59:13, 59:19, 60:3,
99:23, 100:9,
102:23, 104:18,
104:20, 105:7,
105:11, 111:20,
123:15, 123:19,
124:3, 129:24,
130:15, 130:22,
138:25, 147:2,
149:21, 150:8,
156:10, 159:19,
159:22, 159:23,
160:9, 161:14,
166:25, 167:9,
167:18, 172:14,
172:23, 177:21,
204:7
**state** [12] - 12:17,
13:9, 19:25, 29:17,
38:21, 50:8, 51:11,
55:2, 72:8, 102:10,
108:17, 146:25
**STATE** [1] - 1:2
**state's** [1] - 141:23
**statement** [13] - 40:7,
64:23, 68:9, 80:6,
80:9, 85:21, 136:15,
153:7, 158:7,
168:12, 187:6,
201:13, 201:14
**statements** [11] -
32:11, 47:20, 47:25,
48:2, 77:19, 79:23,

80:2, 186:4, 186:5,
186:11, 186:14
**states** [1] - 36:17
**States** [8] - 33:22,
34:23, 46:25, 75:22,
97:22, 98:15, 155:5,
168:4
**static** [2] - 8:25,
128:12
**statistical** [1] - 111:12
**Statistical** [2] - 24:7,
53:21
**statistics** [3] - 88:3,
99:21, 178:16
**stay** [4] - 10:7, 11:17,
29:3, 172:10
**staying** [1] - 51:13
**stem** [1] - 51:2
**stenographer** [1] -
65:15
**stenographic** [2] -
13:16, 204:10
**step** [3] - 74:15, 74:16,
109:16
**STEPHANIE** [2] - 2:20,
204:20
**Stephanie** [1] - 204:6
**steps** [4] - 33:13,
36:25, 96:14, 139:4
**Steve** [1] - 10:19
**Steven** [3] - 61:2,
71:18, 151:23
**steward** [1] - 153:8
**still** [11] - 78:7, 91:13,
91:17, 92:6, 106:9,
133:17, 164:18,
164:22, 170:23,
174:13, 174:17
**stimulate** [1] - 50:23
**Stipulation** [3] - 5:8,
72:17, 72:18
**stolen** [1] - 142:24
**stop** [2] - 13:23, 23:18
**strange** [1] - 40:15
**stream** [1] - 17:23
**streamed** [1] - 18:6
**Street** [1] - 2:4
**street** [2] - 13:6, 13:8
**strike** [2] - 11:15, 53:5
**STRONG** [32] - 7:7,
7:12, 9:7, 10:8,
11:23, 45:18, 45:21,
70:8, 71:9, 76:13,
76:15, 77:25, 78:8,
78:12, 79:9, 79:15,
105:20, 105:23,
107:6, 107:24,
109:10, 109:15,
109:17, 110:3,
112:9, 112:13,

112:15, 113:14,
115:13, 151:19,
196:6, 196:10
**strong** [4] - 40:11,
40:16, 68:9, 195:8
**Strong** [18] - 7:8, 70:9,
70:20, 70:25, 76:14,
76:16, 78:9, 105:16,
106:3, 106:24,
109:9, 110:6, 192:3,
192:22, 194:13,
196:7, 199:22,
200:13
**Strong's** [1] - 199:13
**strongly** [2] - 42:9,
101:5
**structural** [1] - 112:21
**students** [7] - 21:16,
22:5, 29:5, 29:7,
29:8, 104:3
**studied** [3] - 25:7,
176:14, 189:8
**studies** [5] - 56:23,
63:15, 69:14, 102:21
**study** [22] - 38:14,
39:7, 80:2, 89:9,
89:21, 91:16,
101:20, 103:8,
103:25, 104:8,
104:11, 108:12,
170:3, 170:12,
171:4, 180:6,
180:11, 180:15,
187:22, 199:9
**stuff** [2] - 41:17, 85:15
**subject** [1] - 61:15
**submit** [1] - 112:18
**submits** [1] - 25:17
**submitted** [6] - 8:7,
11:12, 70:12, 112:3,
112:17, 159:19
**submitting** [3] - 164:9,
179:12, 179:13
**subpopulations** [1] -
103:23
**subsequent** [4] - 9:3,
184:10, 197:12,
198:6
**subsequently** [2] -
95:5, 100:22
**subset** [1] - 98:8
**substance** [11] - 17:2,
18:25, 23:24, 27:6,
28:3, 48:17, 83:16,
117:2, 117:4,
178:10, 184:13
**substances** [11] -
27:8, 27:20, 52:14,
52:15, 52:16,
152:21, 152:25,

153:5, 153:12,
153:24, 180:12
**Substances** [1] -
153:6
**substantial** [1] - 67:24
**substantially** [1] -
96:3
**substantive** [1] -
45:24
**substantively** [1] -
15:19
**subtitle** [2] - 60:15,
62:11
**successful** [1] - 52:20
**suffering** [2] - 58:21,
124:25
**suffers** [1] - 125:9
**SUFFOLK** [1] - 1:2
**Suffolk** [30] - 1:15,
3:3, 3:12, 3:14, 4:6,
99:23, 100:11,
111:21, 117:24,
118:2, 124:11,
124:22, 137:18,
167:12, 167:15,
172:18, 175:11,
175:22, 175:23,
176:2, 177:20,
178:22, 180:8,
180:13, 184:16,
187:18, 187:23,
188:2, 189:13, 204:8
**suggest** [4] - 11:17,
13:2, 72:16, 108:14
**suggested** [2] - 73:7,
193:8
**suggestion** [3] -
74:24, 191:11, 193:5
**suggestive** [1] -
196:14
**suggests** [2] - 101:23,
198:24
**Suite** [1] - 1:21
**sum** [2] - 16:25, 83:15
**summarizes** [1] -
38:17
**summary** [7] - 6:12,
6:18, 37:25, 38:9,
38:18, 171:12,
171:14
**summative** [1] - 38:23
**superficial** [1] -
165:23
**supplemental** [6] -
7:19, 7:23, 70:14,
70:22, 159:21,
185:18
**supplemented** [2] -
108:16, 183:13
**supplied** [1] - 145:6

**supply** [15] - 16:3,
16:10, 16:12, 16:15,
16:17, 55:4, 75:12,
93:19, 93:24, 95:2,
144:25, 152:18,
153:8, 171:17, 172:4
**support** [7] - 34:8,
45:15, 49:4, 56:21,
101:11, 107:11,
129:6
**supported** [2] - 38:10,
65:2
**supportive** [1] - 85:20
**supposed** [1] - 64:18
**sUPREME** [1] - 1:2
**Supreme** [2] - 1:12,
3:2
**surgery** [2] - 91:10,
92:20
**surprised** [1] - 9:16
**surrounding** [1] - 52:4
**survey** [13] - 120:7,
120:11, 120:13,
120:14, 120:19,
121:2, 121:3,
121:18, 121:22,
122:5, 122:11,
126:22, 191:19
**surveyed** [2] - 122:6,
126:21
**surveys** [3] - 191:15,
192:22, 194:8
**suspicious** [4] -
152:24, 153:9,
154:5, 154:15
**sustain** [2] - 77:22,
196:11
**swear** [1] - 12:8
**switch** [1] - 181:13
**sworn** [2] - 12:15,
183:16
**symptoms** [1] - 66:22
**synonymous** [1] -
24:9

---

**T**

**talks** [1] - 35:5
**target** [1] - 36:14
**taught** [4] - 56:4,
56:12, 82:21, 82:22
**teach** [2] - 21:15, 29:4
**teaches** [1] - 46:12
**teaching** [1] - 21:22
**team** [1] - 70:21
**tech** [1] - 7:4
**technical** [2] - 24:2,
185:24
**telecasting** [1] - 18:2
**ten** [2] - 99:5, 163:6

227

**tends** [1] - 6:8
**term** [29] - 20:13,
22:22, 23:11, 23:20,
23:21, 24:3, 30:2,
30:3, 49:13, 50:22,
53:25, 61:8, 61:19,
64:2, 69:15, 84:22,
89:17, 101:8,
126:25, 156:2,
197:3, 197:6,
197:13, 197:19,
197:20, 198:6,
198:22
**terminology** [1] - 24:7
**terms** [18] - 19:7,
22:18, 23:8, 48:9,
49:9, 49:11, 50:14,
67:2, 77:10, 100:10,
102:11, 107:25,
108:2, 126:21,
132:9, 185:21,
188:8, 188:23
**testified** [14] - 11:4,
12:16, 36:11, 36:23,
39:10, 125:20,
132:7, 132:11,
134:18, 171:23,
175:16, 192:9,
192:21, 197:6
**testify** [6] - 7:20, 15:2,
75:19, 76:21,
136:25, 188:5
**testifying** [4] - 11:7,
61:14, 111:18,
183:25
**testimony** [29] - 6:8,
8:10, 40:5, 54:5,
61:11, 61:22, 74:12,
115:7, 116:9,
118:18, 119:9,
122:13, 126:17,
131:15, 135:22,
145:17, 154:2,
154:17, 159:14,
159:15, 159:18,
171:25, 180:2,
183:7, 183:16,
185:10, 185:12,
185:16, 186:9
**Testimony** [1] - 1:10
**testing** [2] - 112:12,
195:17
**Teva** [1] - 133:6
**Thanksgiving** [1] -
198:15
**THE** [125] - 1:2, 3:2,
3:6, 3:8, 3:16, 3:19,
3:22, 3:24, 4:3, 4:8,
4:24, 5:23, 6:2, 6:23,
7:4, 7:11, 9:23,

11:16, 11:24, 12:3,
12:8, 12:10, 12:12,
12:17, 12:19, 12:21,
12:22, 13:25, 14:2,
17:17, 17:21, 41:4,
41:7, 41:9, 42:20,
42:24, 45:19, 46:2,
57:16, 57:18, 61:13,
61:23, 62:2, 65:15,
65:18, 70:18, 70:25,
72:15, 75:11, 76:3,
76:14, 77:14, 78:3,
78:5, 78:6, 78:10,
78:21, 79:8, 79:10,
91:2, 98:18, 98:20,
99:13, 105:15,
105:16, 105:22,
106:5, 106:8,
106:10, 106:24,
107:22, 108:19,
108:25, 109:7,
109:8, 109:9,
109:16, 109:22,
112:7, 112:11,
112:14, 115:12,
132:19, 132:20,
151:22, 152:3,
152:5, 161:18,
162:8, 162:10,
162:24, 163:4,
163:10, 163:14,
171:7, 171:9, 174:4,
174:6, 174:9,
174:12, 174:13,
174:15, 174:16,
174:18, 174:19,
176:5, 176:7,
181:19, 182:12,
182:17, 186:16,
186:19, 186:23,
190:5, 190:6, 196:9,
196:11, 196:14,
198:12, 200:9,
203:14, 203:16,
203:17, 203:18,
203:19
**theft** [2] - 144:8,
144:11
**thefts** [3] - 143:21,
143:25, 144:14
**themselves** [5] - 6:11,
40:19, 88:15,
140:24, 166:8
**therapy** [6] - 39:23,
39:24, 40:12, 41:14,
69:15, 126:25
**thereafter** [2] - 4:17,
15:5
**thereat** [1] - 83:10
**Therefore** [1] - 204:15

**thereof** [1] - 18:7
**they've** [1] - 8:17
**third** [5] - 35:25,
40:23, 114:4, 114:6,
147:5
**third-party** [1] - 147:5
**THOMAS** [1] - 1:17
**thorough** [1] - 88:7
**thousand** [3] - 45:11,
191:19, 194:9
**thousands** [1] - 48:25
**three** [10] - 43:8, 57:8,
58:5, 85:21, 86:10,
87:10, 92:16, 93:6,
115:22, 181:10
**three-year** [1] - 43:8
**throughout** [5] - 31:8,
34:22, 41:19, 75:21,
168:4
**timeframe** [1] - 104:21
**tired** [1] - 65:16
**titled** [2] - 59:18, 91:4
**titles** [1] - 18:19
**tobacco** [1] - 27:16
**today** [20] - 4:25, 8:13,
14:22, 27:3, 35:3,
40:5, 46:25, 79:4,
107:15, 109:20,
111:18, 136:24,
137:6, 170:2, 175:6,
177:4, 182:10,
185:14, 186:3, 188:8
**toes** [2] - 10:7, 11:17
**together** [6] - 21:5,
67:25, 88:15, 94:20,
95:19, 113:15
**tom** [1] - 4:6
**Tomarken** [1] - 5:4
**tomorrow** [1] - 5:2
**took** [2] - 147:22,
194:13
**tool** [1] - 122:21
**tooth** [1] - 92:12
**top** [5] - 26:25, 58:12,
103:13, 167:25,
193:14
**topic** [7] - 167:3,
175:9, 177:15,
179:5, 185:19,
188:13, 189:8
**tops** [3] - 79:7, 79:11,
79:12
**total** [4] - 86:10,
133:13, 133:16,
134:3
**totality** [2] - 9:19,
129:3
**touchstone** [1] - 49:11
**toward** [1] - 167:25
**towards** [1] - 158:22

**town** [1] - 13:8
**track** [1] - 70:6
**traditionally** [1] - 4:17
**trained** [1] - 56:3
**training** [19] - 21:9,
29:6, 56:19, 110:9,
110:12, 111:3,
111:15, 152:17,
152:20, 152:23,
153:3, 153:13,
153:14, 153:22,
188:24, 189:4,
189:7, 192:13,
193:20
**trajectories** [1] -
103:18
**transcript** [5] - 121:25,
139:24, 154:12,
182:19, 204:13
**transcription** [1] -
204:10
**transcripts** [1] -
115:14
**transit** [2] - 142:25,
143:5
**transition** [1] - 95:4
**trauma** [1] - 117:7
**traveled** [1] - 117:18
**treat** [3] - 25:3, 27:5,
52:6
**treatable** [1] - 52:10
**treated** [4] - 22:11,
27:23, 80:12, 102:19
**treating** [4] - 22:12,
48:17, 66:14, 67:6
**treatment** [22] - 24:11,
24:15, 40:13, 40:16,
40:21, 42:10, 47:11,
52:19, 56:13, 56:17,
58:10, 58:21, 69:16,
96:21, 129:6,
148:11, 155:3,
155:10, 155:15,
156:7, 165:2, 165:10
**tremendous** [1] - 95:2
**trends** [3] - 100:5,
100:7, 100:9
**trial** [10] - 15:3, 72:22,
73:19, 74:17, 76:12,
108:15, 183:25,
187:25, 189:12,
190:20
**trials** [2] - 29:24,
69:14
**tried** [5] - 49:8, 88:15,
142:6, 144:19,
157:14
**trouble** [1] - 185:23
**true** [99] - 8:22, 17:3,
17:4, 17:14, 18:21,

18:25, 19:2, 19:15,
19:22, 20:7, 20:17,
20:19, 20:24, 21:13,
21:23, 22:2, 22:8,
24:16, 24:23, 26:2,
26:12, 26:16, 26:19,
27:3, 27:6, 27:10,
27:14, 27:20, 28:3,
28:6, 30:4, 30:7,
30:11, 32:19, 32:25,
34:10, 34:14, 34:24,
35:15, 38:21, 41:16,
42:4, 44:22, 45:12,
45:17, 47:21, 51:15,
52:4, 53:19, 54:2,
54:5, 55:9, 58:22,
58:23, 59:20, 63:14,
64:22, 65:5, 65:10,
66:2, 80:10, 100:11,
100:15, 103:10,
117:24, 127:12,
127:14, 127:16,
133:4, 137:8,
137:12, 140:4,
140:15, 159:16,
159:17, 172:9,
173:17, 181:16,
183:9, 183:10,
183:16, 183:23,
184:3, 186:5, 187:7,
187:10, 187:12,
187:13, 188:11,
188:12, 190:23,
194:6, 195:18,
195:19, 197:10,
197:11, 204:9,
204:14
**trusted** [1] - 148:2
**truth** [2] - 33:6, 171:25
**truthful** [1] - 87:8
**truthfully** [1] - 184:6
**try** [12] - 10:13, 81:14,
87:21, 94:20, 97:22,
119:12, 120:8,
120:20, 121:3,
122:21, 144:4,
162:13
**trying** [8] - 88:3,
107:7, 130:7,
136:12, 171:22,
182:15, 196:8,
196:25
**tsheridan@
simmonsfirm.com**
[1] - 1:19
**turn** [8] - 35:11, 36:19,
110:8, 121:11,
130:24, 142:17,
167:23, 193:12
**turning** [4] - 118:20,

123:12, 145:2, 202:4
**twice** [2] - 6:23, 7:5
**two** [28] - 18:21,
21:22, 30:6, 30:9,
57:8, 67:22, 68:13,
73:11, 74:3, 74:22,
75:2, 78:16, 85:2,
85:19, 85:20, 86:25,
88:24, 94:10, 96:8,
97:9, 103:12,
175:14, 177:17,
189:17, 203:3, 203:8
**two-year** [1] - 203:8
**type** [3] - 92:6, 143:8,
144:19
**types** [3] - 46:23, 98:4,
107:25
**typically** [1] - 21:10

## U

**U.S** [1] - 202:13
**ultimate** [2] - 165:20,
191:23
**unclear** [6] - 61:21,
157:21, 158:12,
158:19, 201:16,
203:5
**unconscious** [1] -
85:13
**under** [17] - 20:9,
35:14, 35:23, 42:14,
62:25, 75:25, 78:7,
106:9, 154:2,
154:17, 159:14,
174:13, 174:17,
183:7, 185:11,
188:4, 191:7
**undergraduate** [1] -
19:8
**undergraduates** [1] -
29:5
**underlies** [2] - 36:20,
48:22
**underlying** [2] - 65:6,
107:8
**understood** [2] -
162:14, 189:13
**undertaken** [1] - 33:18
**unfavorable** [1] -
57:15
**unintended** [1] - 30:22
**United** [8] - 33:22,
34:23, 46:25, 75:22,
97:21, 98:15, 155:4,
168:4
**universal** [1] - 161:20
**universities** [1] -
94:19
**university** [1] - 19:9

**University** [5] - 14:13,
17:13, 19:4, 19:12,
28:22
**unless** [4] - 18:9, 65:5,
169:13, 177:15
**unnecessary** [6] -
129:25, 130:16,
131:11, 132:15,
132:25, 166:19
**unreasonably** [1] -
189:18
**unrelated** [1] - 184:11
**up** [61] - 14:25, 15:10,
26:4, 26:7, 29:3,
39:10, 44:16, 51:17,
52:9, 55:2, 56:14,
57:20, 62:21, 65:20,
70:7, 82:5, 85:13,
88:3, 88:20, 90:23,
94:6, 101:14,
102:25, 108:7,
109:19, 113:18,
115:10, 118:16,
118:21, 120:23,
121:13, 122:4,
123:4, 125:23,
126:22, 131:3,
133:22, 140:2,
151:7, 151:10,
151:14, 151:24,
153:20, 154:11,
156:16, 157:4,
158:5, 162:13,
162:23, 164:5,
171:13, 174:19,
175:8, 179:5,
182:19, 185:2,
186:13, 187:2,
188:16, 193:14
**update** [1] - 185:19
**upshot** [1] - 29:22
**uptick** [1] - 98:16
**users** [2] - 103:9,
145:11
**uses** [2] - 53:24, 53:25
**usual** [1] - 46:6
**utilized** [2] - 108:15,
176:20

## V

**vague** [2] - 61:6, 61:19
**valid** [1] - 87:7
**value** [1] - 196:3
**variation** [2] - 114:23,
115:24
**various** [4] - 32:18,
34:17, 184:9, 199:14
**varying** [1] - 200:8
**vast** [2] - 136:2, 136:6

**vastly** [1] - 97:2
**version** [1] - 76:5
**versus** [2] - 73:3,
102:11
**via** [2] - 103:14, 104:5
**Video** [1] - 112:6
**videotapes** [1] - 17:25
**view** [1] - 139:11
**views** [1] - 44:2
**Vinnie** [3] - 161:21,
162:12, 163:12
**violated** [1] - 187:16
**Virginia** [11] - 8:20,
9:9, 10:21, 10:23,
10:25, 11:5, 11:9,
70:24, 71:11, 71:20,
107:3
**virtually** [1] - 37:21
**voices** [1] - 82:18
**volume** [2] - 97:25,
128:10
**volunteer** [2] - 13:7,
79:6
**vote** [2] - 21:5, 21:8
**Vowles** [2] - 89:2,
89:14

## W

**wait** [2] - 13:19, 78:10
**waiver** [1] - 20:5
**walk** [1] - 54:14
**Walmart** [8] - 174:25,
180:10, 180:11,
180:16, 180:20,
180:25, 181:6
**wants** [1] - 65:22
**War** [1] - 55:25
**Washington** [1] -
36:12
**watch** [1] - 161:21
**ways** [1] - 155:9
**weak** [1] - 42:11
**weeks** [1] - 115:22
**weigh** [2] - 95:19,
116:12
**weighed** [1] - 168:19
**weight** [3] - 109:2,
109:3, 109:4
**WELCH** [4] - 5:6, 5:25,
6:9, 7:2
**Welch** [1] - 5:6
**welcome** [3] - 151:22,
174:11, 190:5
**well-accepted** [1] -
53:3
**well-intentioned** [1] -
188:18
**well-known** [1] - 86:20
**West** [11] - 8:20, 9:8,

10:21, 10:23, 10:25,
11:5, 11:9, 70:24,
71:10, 71:19, 107:3
**WHEREUPON** [4] -
12:14, 78:2, 105:24,
174:8
**White** [2] - 36:7, 36:13
**whole** [8] - 5:16, 5:17,
38:2, 75:14, 93:20,
96:9, 96:11, 200:19
**wholesale** [2] - 98:10,
152:15
**widespread** [2] -
191:14, 195:17
**wisdom** [1] - 92:12
**wish** [2] - 27:2, 106:17
**withdrawal** [2] - 5:9,
23:19
**withdrawing** [2] -
6:13, 6:14
**withdrawn** [4] - 5:12,
6:21, 90:11, 191:11
**WITNESS** [21] - 12:19,
13:25, 41:7, 57:18,
98:20, 105:15,
106:10, 109:8,
132:20, 151:22,
152:5, 162:8,
174:12, 174:15,
174:18, 176:7,
190:5, 203:16,
203:18
**witness** [21] - 6:4, 7:6,
11:4, 11:17, 11:24,
12:8, 13:5, 72:7,
74:21, 75:4, 75:18,
76:7, 76:8, 78:5,
79:3, 106:6, 157:4,
161:21, 174:10,
181:22, 200:9
**witness'** [1] - 76:11
**witnesses** [4] - 12:23,
74:6, 78:15, 180:3
**women** [2] - 92:14,
104:4
**word** [3] - 13:22,
31:18, 63:16
**words** [3] - 5:23,
40:14, 195:7
**world** [2] - 30:7, 83:23
**worried** [1] - 162:9
**worse** [2] - 65:6, 150:9
**worth** [2] - 40:25,
108:23
**worthy** [1] - 25:21
**write** [5] - 114:2,
158:16, 169:16,
169:20, 199:6
**writing** [5] - 32:5,
36:24, 135:4, 135:6,

147:21
**written** [27] - 25:13,
25:25, 28:20, 29:12,
35:18, 37:8, 55:7,
72:9, 80:24, 97:7,
105:11, 129:24,
130:15, 131:9,
133:14, 135:2,
135:9, 137:2, 137:5,
164:23, 173:10,
173:11, 173:16,
199:15, 202:19,
202:21
**wrote** [11] - 95:22,
97:16, 100:13,
154:23, 157:5,
160:3, 173:12,
193:18, 199:8,
201:19, 203:4

## Y

**Yale** [1] - 19:9
**year** [16] - 36:3, 43:8,
73:6, 82:25, 91:14,
91:18, 92:6, 92:11,
92:14, 106:23,
197:21, 198:22,
202:22, 203:8
**years** [11] - 14:18,
21:19, 22:11, 22:14,
25:5, 49:2, 54:12,
64:22, 82:9, 193:20,
203:3
**yellow** [1] - 85:9
**yesterday** [4] - 7:12,
7:17, 7:24, 70:13
**YORK** [1] - 1:2
**York** [113] - 1:8, 1:16,
1:22, 2:3, 2:3, 2:4,
2:9, 3:3, 3:21, 9:13,
26:24, 28:10, 28:13,
28:15, 34:14, 55:5,
59:13, 59:19, 60:3,
72:4, 73:4, 99:23,
100:8, 100:9,
102:23, 103:9,
104:18, 104:21,
105:7, 105:11,
108:6, 108:9,
108:18, 111:20,
115:19, 117:18,
117:19, 118:5,
118:11, 119:3,
119:7, 119:13,
120:8, 120:15,
120:20, 120:21,
121:4, 121:10,
121:18, 121:20,
122:6, 123:15,
123:19, 123:21,

123:24, 124:3,
124:25, 125:9,
125:13, 126:20,
129:25, 130:15,
130:21, 131:9,
134:6, 137:18,
138:21, 138:25,
141:19, 142:15,
143:10, 144:20,
145:12, 145:23,
146:2, 146:6,
146:15, 146:19,
148:7, 149:5,
149:12, 149:22,
150:3, 150:9,
150:21, 154:9,
156:11, 159:7,
159:19, 159:22,
159:23, 166:25,
167:9, 167:18,
171:18, 172:14,
172:23, 173:11,
177:20, 179:15,
182:9, 183:22,
184:11, 185:16,
187:10, 188:25,
189:5, 193:10, 204:8
**York's** [1] - 142:2
**young** [1] - 92:9
**yourself** [4] - 28:20,
29:12, 43:13, 48:15

## Z

**ZIP** [1] - 13:9