# EXHIBIT M

1                                                              1

2       SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF SUFFOLK: PART 48
3       ------------------------------------------------x

4       IN RE: OPIOID LITIGATION

5

6                               INDEX NO.:400000/2017

7       ------------------------------------------------x

8                               September 10, 2020
                                Central Islip, New York
9

10                 MINUTES OF FRYE HEARING
                   (Testimony of Dr. Keyes)
11

12      B E F O R E:        HON. JERRY GARGUILO
                            Supreme Court Justice
13
        A P P E A R A N C E S:
14

        SIMMONS HANLY CONROY, LLC
15      **Attorneys for Suffolk County**
        112 Madison Avenue
16      New York, New York 10016
        BY:   JAYNE CONROY, ESQ.
17            THOMAS I. SHERIDAN, III, ESQ.
              (212) 784-6401
18            jconroy@simmonsfirm.com
              tsheridan@simmonsfirm.com
19

20      NAPOLI SHKOLNIK, PLLC
        **Attorneys for Nassau County**
21      400 Broadhollow Road, Suite 305
        Melville, New York 11747
22      BY:   SALVATORE C. BADALA, ESQ.
              (212)397-1000
23            sbadala@napolilaw.com

24

25

1                                                                    2

2     <u>LETITIA JAMES</u>
      **Attorney General for the State of New York**
3     Office of the New York State Attorney General
      28 Liberty Street
4     New York, New York 10005
      BY:  MICHAEL REISMAN, ESQ.
5


6
      <u>LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP</u>
7     **Attorneys for Plaintiffs**
      250 Hudson Street
8     New York, New York 10013
      BY:  PAULINA do AMARAL, ESQ.
9


10
      <u>COVINGTON & BURLING, LLP</u>
11    **Attorneys for McKesson Corp. and**
      **PSS World Medical, Inc.**
12    The New York Times Building
      620 Eighth Avenue
13    New York, New York 10018
      BY:  PAUL W. SCHMIDT, ESQ.
14         GREGORY L. HALPERIN, ESQ.
           (202)662-5272
15         (212)841-1166
            pschmidt@cov.com
16          ghalperin@cov.com

17

18    <u>MORGAN, LEWIS & BOCKIUS, LLP</u>
      **Attorneys for Teva Pharmaceuticals**
19    200 South Biscayne Boulevard
      5300 Southeast Financial Center
20    Miami, Florida 33131
      BY:  BRIAN M. ERCOLE, ESQ.
21

22

23                        *       *       *

24              STEPHANIE CASAGRANDE, CSR, RPR
                   OFFICIAL COURT REPORTER
25

```
 1                    Frye Hearing - Dr. Keyes            3

 2              THE CLERK:  Supreme Court, Suffolk

 3         County, Part 48 is now in session, the

 4         Honorable Jerry Garguilo presiding.

 5              THE COURT:  Good morning.

 6              THE CLERK:  Good morning, your Honor.

 7              THE COURT:  Good morning.

 8              CHORUS.  Good morning, your Honor.

 9              THE COURT:  I understand we're having a

10         little bit of an issue this morning.

11              THE CLERK:  On the Hearing Calendar, In

12         Re Opioid Litigation, Index Number 400000 of

13         '17.  Your appearances, please.

14              MR. REISMAN:  Michael Reisman from the

15         New York Attorney General's Office for

16         Plaintiff, State of New York.

17              THE COURT:  Good morning, Mr. Reisman.

18              MR. REISMAN:  Good morning, sir.

19              MR. BADALA:  Good morning, your Honor.

20         Salvatore Badala for Plaintiff Nassau County.

21              THE COURT:  Good morning.

22              MS. CONROY:  Jayne Conroy for the

23         Plaintiff Suffolk County.

24              THE COURT:  Good morning.

25              MR. SHERIDAN:  Tom Sheridan, Suffolk
```

```
 1                    Frye Hearing - Dr. Keyes            4
 2      County.
 3           THE COURT:  This is someone from Suffolk
 4      County?
 5           MR. SHERIDAN:  Tom Sheridan for Suffolk
 6      County.
 7           THE COURT:  Good morning.
 8           MS. DO AMARAL:  Good morning, your
 9      Honor.  Paulina do Amaral for Plaintiff.
10           MR. SCHMIDT:  Good morning, your Honor.
11      Paul Schmidt for McKesson.
12           THE COURT:  Good morning.
13           MR. HALPERIN:  Good morning, your Honor.
14      Greg Halperin for McKesson.
15           THE COURT:  Good morning.
16           MR. ERCOLE:  Good morning, your Honor.
17      This is Brian Ercole from Morgan Lewis on
18      behalf of the Teva Defendants.  I'll be
19      questioning this remotely.
20           THE COURT:  Okay.  Before we start, like
21      I've been doing every day, I'll just read
22      into the record the rules of the Chief Judge.
23      Keep in mind that whether you're observing
24      these proceedings by live stream, the
25      location you're at and observing and
```

```
                          Frye Hearing - Dr. Keyes                5
```

1
2       listening is deemed the court under Section
3       29.1:  General, taking photographs, films or
4       videotapes, or audio taping, broadcasting or
5       telecasting in a courthouse, including any
6       courtroom, office, or hallway thereof, at any
7       time or on any occasion, whether or not the
8       court is in session, is forbidden, unless
9       permission of the Chief Administrator of the
10      courts or a designee of the Chief
11      Administrator is obtained.
12          Thank you.  You will all be guided
13      accordingly.  I understand we have a witness
14      in person today.
15          MR. REISMAN:  That's correct, your
16      Honor.
17          THE COURT:  Okay.  You may call the
18      witness.
19          MR. REISMAN:  Your Honor, Plaintiffs
20      call Dr. Katherine Keyes.
21          THE COURT:  Dr. Keyes, good morning.
22          THE WITNESS:  Good morning.
23          THE COURT OFFICER:  Stand right here and
24      raise your right hand and face the Clerk.
25          (WHEREUPON, the Dr. Katherine Keyes,

```
1                    Frye Hearing - Dr. Keyes              6
2         having first been duly sworn by the Clerk of
3         the Court, testified as follows:)
4              THE CLERK:  Please state your name and
5         address for the record.
6              THE WITNESS:  My name is Katherine
7         Keyes.  My address is 236 Sackett Street,
8         Brooklyn, New York.
9              THE CLERK:  You may be seated.
10             THE COURT:  Good morning, Dr. Keyes.
11             THE WITNESS:  Good morning.
12             THE COURT:  Doctor, I'm Judge Garguilo.
13        I'm presiding over this case.  I give all
14        witnesses the same three pointers.  Of course
15        you know you're going to be asked a lot of
16        questions today, right?
17             THE WITNESS:  Yes.
18             THE COURT:  Pointer Number 1, listen
19        carefully to the question as put to you and
20        as best you can, limit your answer to the
21        information sought by the question.
22             For instance, if I were in that seat and
23        I was asked on which street do I live, I
24        would simply offer the name of the street.  I
25        would not volunteer the town, the state, the
```

```
 1                    Frye Hearing - Dr. Keyes          7

 2          county, or the ZIP code.

 3                Rule Number 2, although it's not

 4          impolite in life to commence an answer before

 5          a question is complete, we save time that way

 6          in our day-to-day conversations; however, I'm

 7          sure you understand that we require a

 8          complete stenographic record.

 9                So even though you know exactly where a

10          question is going, wait for it to be complete

11          before you commence your answer.  And,

12          lastly, if you hear the word objection or

13          anything that sounds like objection, just

14          stop until I give you direction, okay?

15                THE WITNESS:  Okay.

16                THE COURT:  You may proceed,

17          Mr. Reisman.

18                MR. REISMAN:  Thank you, your Honor.

19     DIRECT EXAMINATION

20     BY MR. REISMAN:

21          Q.   Dr. Keyes, we'll get into your

22     background and methodology in more detail, but I'd

23     like to ask you some preliminary questions.  Where

24     do you live?

25          A    Brooklyn, New York.
```

```
1                   Frye Hearing - Dr. Keyes              8

2                  THE COURT:  Sackett Street.

3                  THE WITNESS:  Sackett Street.

4       BY MR. REISMAN:

5            Q.   For how long have you lived in New York

6       State?

7            A    About 20 years.

8            Q.   What is your profession?

9            A    I'm an epidemiologist.

10           Q.   Can you tell the Court what

11      epidemiologists do?

12           A    Epidemiology is the science of what

13      causes health outcomes so that we can identify

14      populations that are at risk.

15           Q.   Do epidemiologists ever draw causal

16      inferences?

17           A    Yes.

18           Q.   What methodology do epidemiologies use

19      to do that?

20           A    We conduct studies, and do data

21      analysis, and review literature.

22           Q.   Is there anything novel about that

23      methodology?

24           A    No.

25           Q.   Is there a consensus in epidemiology
```

2      that a body of scientific literature can be relied

3      upon to support a causal inference?

4           A    Yes.

5           Q.   Can you give an example in epidemiology

6      where that's the case where a body of literature has

7      been relied on on which there's consensus that the

8      literature supports a causal inference?

9           A    You know, I think the most classic

10     example is smoking and lung cancer.  You know, there

11     were many studies conducted of cigarette smoking,

12     and we've come to a consensus that smoking is a

13     cause of lung cancer.

14          Q.   So epidemiologists have relied on

15     studies.  What kinds of studies have epidemiologists

16     relied onto draw the causal inference about smoking

17     and lung cancer?

18          A    What we call observational studies.

19          Q.   And observational studies are generally

20     accepted as a reliable methodology in your field of

21     epidemiology?

22          A    Yes.

23          Q.   With respect to the link between smoking

24     and lung cancer, would it be ethical to try to prove

25     that smoking causes lung cancer by doing a

```
 1                    Frye Hearing - Dr. Keyes              10
 2      randomized controlled trial to see how many smokers
 3      get lung cancer?
 4              A    No.
 5              Q.   Why not?
 6              A    Because we know that smoking is a health
 7      hazard.
 8              Q.   In this case, do you plan to offer
 9      certain opinions about whether there's a causal
10      relationship between exposure to prescription
11      opioids on the one hand and on the other hand
12      certain harms such as opioid use disorder, opioid
13      overdose death and so on?
14              A    Yes.
15              Q.   In your opinion, is there a causal
16      relationship between exposure to prescription
17      opioids and harms?
18              A    Yes.
19              Q.   In this case do you plan to offer
20      certain opinions about whether there's a causal
21      relationship between the increased supply of opioids
22      in New York and Nassau and Suffolk Counties since
23      the 1990s on the one hand and on the other hand
24      harms?
25              A    Yes.
```

```
 1                  Frye Hearing - Dr. Keyes              11
 2           Q.   In your opinion, is there a causal
 3      relationship between those two things?
 4           A    Yes.
 5                MR. REISMAN:  Now, I'd like to ask you
 6           some questions about your qualifications to
 7           offer opinions in this case.  And with the
 8           Court's permission, we'll show some slides
 9           for demonstrative purposes.
10                THE COURT:  Sure.
11      BY MR. REISMAN:
12           Q.   Dr. Keyes, what is your academic
13      position?
14           A    I'm an associate professor of
15      epidemiology at Columbia University School of Public
16      Health.
17           Q.   What is your specialty as an
18      epidemiologist at Columbia?
19           A    I predominantly study substance abuse
20      disorders and other psychiatric disorders.
21           Q.   Can you tell the Court what degrees you
22      have?
23           A    I have an MPH in epidemiology, which is
24      a Master's degree in public health, and then I have
25      a Ph.D. in epidemiology as well.
```

1

2          Q.   Did you do any academic work after

3    receiving your Ph.D.?

4          A    I did a post doctoral fellowship in the

5    Department of Epidemiology at Columbia University

6    before joining the faculty.

7          Q.   Do you have tenure at Columbia?

8          A    Yes.

9          Q.   Since completing your fellowship, have

10   you been on the Columbia faculty the entire time?

11         A    Yes.

12         Q.   Can you give the Court a few examples of

13   courses that you teach at Columbia?

14         A    I teach graduate level courses at

15   Columbia University.  I teach our graduate course in

16   psychiatric epidemiology as well as other courses in

17   epidemiological methods and statistical methods for

18   public health.

19         Q.   Do you serve on any committees at

20   Columbia?

21         A    Yes.

22         Q.   Can you give the Court an example of

23   one?

24         A    I am on the committee that writes the

25   epidemiological methodology questions that qualify

```
 1                      Frye Hearing - Dr. Keyes          13
 2      students to get a Ph.D. in epidemiology.
 3           Q.   Do you have graduate students in
 4      epidemiology whose work you supervise personally?
 5           A    Yes.
 6           Q.   And do you supervise those graduate
 7      students at Columbia regarding epidemiological
 8      methods?
 9           A    Yes.
10           Q.   Now, in your field of epidemiology, you
11      have published textbooks and articles in scientific
12      journals; is that right?
13           A    Yes.
14           Q.   Can you give the Court a very general
15      idea of how much you have published in your field in
16      terms of textbooks and articles?
17           A    Yes.  I've published around 270
18      peer-reviewed journal articles and about 50
19      additional editorials and book chapters.
20                I've been the author of three books, two
21      that are epidemiological method textbooks, and I
22      coedited a volume on drawing causal inferences for
23      psychiatric disorders.
24           Q.   With respect to the first category, the
25      270 peer-reviewed articles, can you explain to the
```

```
 1                    Frye Hearing - Dr. Keyes              14

 2     Court what that means in your field of epidemiology

 3     where -- the work that you've done to be

 4     peer-reviewed?

 5          A     Yes.  We submit articles to journals,

 6     and those journals will invite other experts in the

 7     field to evaluate the rigor of the work.  And to the

 8     extent that experts, other experts decide that it is

 9     rigorous, sufficiently rigorous and novel, those

10     articles would be published.

11          Q.   So those 270 articles that you've

12     published in peer-reviewed journals, your peers in

13     the field have determined that your methodology in

14     those studies is generally accepted in the field; is

15     that right?

16          A     Yes.

17          Q.   Now, with respect to that group of

18     articles, for how many were you the primary author

19     of?

20          A     About 70.

21          Q.   How many of those articles, again, the

22     larger set of 270, were published -- that you

23     published focused on opioid use and related harms?

24          A     About 20.

25          Q.   Can you tell the Judge about some of the
```

1

2  journals in which your research has appeared?

3      A    Yes.  I published in predominantly

4  epidemiology journals, that is the American Journal

5  of Epidemiology, the International Journal of

6  Epidemiology, as well as the JAMA journals, the

7  pediatrics, and then substance abuse journals like

8  addiction and drug and alcohol dependence.

9      Q.   Do you measure in any way the impact of

10  your work on other researchers in the field of

11  epidemiology?

12      A    Yes.

13      Q.   Can you give an example of how that's

14  measured, your impact?

15      A    Yes.  We evaluate how often our articles

16  are cited by others which is indicative of their

17  impact.

18      Q.   Do you have any examples of numbers of

19  how many times your articles have been cited by

20  other epidemiologists?

21      A    Yes.  About 50 of my articles have been

22  cited more than 100 times which is indicative of

23  impact.

24      Q.   Now, let's talk about your textbooks.

25  On the screen now is -- on the right-hand side of

```
 1                    Frye Hearing - Dr. Keyes              16
 2     the slide, that's the cover of one of your
 3     textbooks; is that right?
 4          A    Yes.
 5          Q.   And the title is Epidemiology Matters a
 6     New Introduction to Methodological Foundations; is
 7     that right?
 8          A    That's right.
 9          Q.   That was published by Oxford University
10     Press in 2014?
11          A    Yes.
12          Q.   Can you briefly tell the Court how you
13     came to be the co-author of a textbook on
14     epidemiological methodology?
15          A    I had been teaching graduate students
16     epidemiological methods and used -- developed my own
17     materials for teaching my course, and those were
18     popular materials.
19               And so the department chair, at the time
20     Sandro Galea, who was the chair of the department of
21     epidemiology, suggested that he and I form it into a
22     textbook.
23          Q.   Where is that textbook used?
24          A    In graduate schools in public health.
25          Q.   Do you know approximately in how many
```

1
2    graduate schools your textbook is used?
3         A    I estimate about 20.
4         Q.   Are you an editor for any scientific
5    journals?
6         A    Yes.
7         Q.   Which ones?
8         A    I'm an Associate Editor For Drug and
9    Alcohol Dependence.  I'm also a Field Editor for
10   alcoholism:  Clinical and Experimental Research.
11        Q.   Are you on the boards of any
12   professional associations?
13        A    Yes.
14        Q.   Which ones?
15        A    I'm on the executive committee of the
16   Society For Epidemiological Research.
17        Q.   What is that society?
18        A    That is one of the oldest organizations,
19   professional organizations for epidemiologists
20   interested in methods.
21        Q.   How did you come to serve on that board?
22        A    I was elected by my peers.
23        Q.   Can you tell the Court about a national
24   award that you received?
25        A    Yes.  Several years ago I received the

1

2    Early Stage Investigator award from the Office of

3    Disease Prevention from the National Institute of

4    Health.

5              Q.    And the National Institutes of Health,

6    that's sometimes abbreviated as NIH; is that right?

7              A    That's right.

8              Q.    And that's a federal government

9    organization?

10             A    Yes.

11             Q.    And with respect to the award that you

12   received in 2017 from the NIH, how many researchers

13   around the United States receive that award each

14   year?

15             A    Two.

16             Q.    So you were one of the two in 2017; is

17   that right?

18             A    Yes.

19             Q.    I just want to go back briefly to your

20   articles, the 270 articles that you published in

21   peer-reviewed journals.  I want to ask you this.

22   When were you first engaged as an expert in opioid

23   litigation?

24             A    I don't -- I think about 2018.

25             Q.    Okay.  So since 2018 have you disclosed

1

2      to journals to which you have submitted your work,

3      have you disclosed your role as an expert witness in

4      opioid litigation?

5           A     Yes.

6           Q.    Have you disclosed your role to each and

7      every journal that you have submitted your work to?

8           A     When it's relevant to the article, yes.

9           Q.    Do the journals always publish the

10     disclosures that you submit?

11          A     No.

12          Q.    So sometimes journals make errors in

13     printing your disclosures; is that right?

14          A     That's right.

15          Q.    What, if anything, have you done to

16     correct omissions or errors in disclosures that

17     journals have made regarding your disclosures?

18          A     I've contacted the journal.

19          Q.    Can you give an example of a situation

20     in which you have contacted a journal asking them to

21     correct your disclosures in a printed article that

22     you've authored?

23          A     Yes.  Last year there was an article

24     that I was a co-author on about stigma as a driver

25     of opioid use disorder, and there was not a

1
2    disclosure printed in the journal.  So I contacted
3    the journal and asked them to change it.
4         Q.   So, just to be clear, was it the case
5    that the journal did not, in fact, print the
6    disclosure information you had submitted to them?
7         A    Yes.
8         Q.   And had you disclosed to that journal
9    that you have been serving as an expert in opioid
10   litigation?
11        A    Yes.
12        Q.   So did you ask them to correct that
13   disclosure so that the article would contain that
14   information about your work on opioid litigation?
15        A    Yes.
16             MR. REISMAN:  Now, I'd like to look at
17        an example of one of your published articles
18        in the opioids area, and with the Court's
19        permission, we're going to, in conjunction
20        with the slide, we'll be doing this
21        throughout this morning, we'll hand out a
22        demonstrative exhibit which is the actual
23        article that is represented by the slide.
24             THE COURT:  Thank you.
25             MR. REISMAN:  And that is Demo 56.

```
 1                      Frye Hearing - Dr. Keyes          21
 2              MR. SCHMIDT:  Can we get the actual
 3          slides?  We can't get a hardcopy.
 4              MR. REISMAN:  They should be sent to
 5          you.
 6              MR. BADALA:  I emailed them.  We're
 7          printing a hardcopy right now.  I sent the
 8          electronic version.
 9              MR. SCHMIDT:  Thank you.
10              THE COURT:  Somebody is going to be
11          presented that.
12              MR. REISMAN:  Yes.  So we'll have a copy
13          for the Court, for the witness, and for
14          Defendants sitting at the table.
15              And these, as we present the documents,
16          they'll also be made available
17          electronically.
18              THE COURT:  Thank you.
19     BY MR. REISMAN:
20          Q.   Dr. Keyes, the slide shows a study that
21     you published back in 2015; is that right?
22          A    Yes.
23          Q.   And the title of this study is,
24     Prescription Opioids in Adolescence and Future
25     Opioid Misuse; is that right?
```

1

2          A      That's right.

3          Q.     And it was published in a peer-reviewed

4     journal, Pediatrics?

5          A      Yes.

6          Q.     And that was three years, approximately,

7     before you became involved as an expert witness in

8     opioids litigation; is that right?

9          A      Correct.

10          Q.     What was your role in this particular

11    study?

12          A      I was involved in forming the data

13    analysis, interpreting the results, and writing the

14    paper.

15          Q.     Can you briefly explain to the Court the

16    methodology that you and your coauthors employed in

17    that study?

18          A      Yes.   These data were drawn from a study

19    called Monitoring the Future, and we used -- the

20    subjects were repeatedly interviewed over time, and

21    we used a longitudinal data analysis to determine

22    whether prior exposure to prescription opioids were

23    associated with future misuse of opioids.

24          Q.     So you said a couple of things that I

25    want to unpack.

```
 1                  Frye Hearing - Dr. Keyes            23
 2                  First, you mentioned the Monitoring the
 3     Future study.  Can you briefly explain what that is?
 4     That's something separate from this study that you
 5     published in 2015; is that right?
 6          A    It's a bigger study than -- this is one
 7     paper from the larger study.
 8          Q.   Would it be fair to say that Monitoring
 9     the Future is a questionnaire?
10          A    It is methodology that includes a
11     questionnaire.
12          Q.   So -- and you said it's given to high
13     school students over time; is that right?
14          A    It's -- yes, one component -- the
15     baseline survey is given to high school students,
16     and then there is a longitudinal follow-up of those
17     high school students over time as well after they
18     leave high school.
19          Q.   And what do you mean by longitudinal?
20          A    I mean that the same respondents are
21     measured multiple times over development.
22               THE COURT:  Doctor, excuse me.  Is there
23          a term of art in this methodology?
24               THE WITNESS:  Longitudinal study or
25          cohort study might be more appropriate.
```

```
1                    Frye Hearing - Dr. Keyes            24

2                 THE COURT:  Thank you.

3    BY MR. REISMAN:

4        Q.   When did the Monitoring the Future study

5    begin?

6        A    1976.

7        Q.   Do you personally have any role in the

8    Monitoring the Future study?

9        A    Yes.

10       Q.   What is your role?

11       A    I'm a coinvestigator of the grant that

12   is funded to conduct the study, and I also have my

13   own independent NIH funding to do analyses of the

14   Monitoring the Future data.

15       Q.   Have you yourself done analysis of the

16   Monitoring the Future survey data?

17       A    Yes.

18       Q.   Is it fair to say that you have

19   extensive knowledge of the Monitoring the Future

20   survey?

21       A    Yes.

22       Q.   In your work on this case, have you

23   relied on that knowledge in analyzing studies that

24   use data from this survey?

25       A    Yes.
```

1

2      Q.   What were the findings of this study?

3      A    We found that opioid use prior to 12th

4  grade that was prescribed by a doctor was associated

5  with an increased risk of future opioid misuse.

6      Q.   So you mentioned opioid use prescribed

7  by a doctor.  Is that sometimes referred to as

8  medical use of opioids?

9      A    Yes.

10     Q.   So, in other words, did the study ask

11  high school students whether a doctor -- whether

12  they had taken opioids because a doctor told them

13  to?

14     A    Yes, that's right.

15     Q.   And then the study followed up the

16  opioid use of those individuals; is that right?

17     A    That's correct.

18     Q.   Is -- so did the study look to see

19  whether those individuals who had taken opioids that

20  a doctor told them to take later on misused opioids?

21     A    That's right.

22     Q.   Now, opioid misuse and opioid use, is

23  there any overlap between those two concepts?

24     A    Yes.  They are correlated.

25     Q.   When you say they're correlated, what do

```
 1                    Frye Hearing - Dr. Keyes          26

 2    you mean?

 3         A    I mean that individuals who use opioids

 4    medically are more likely to use opioids

 5    nonmedically than individuals who don't, and

 6    visa-versa.

 7              Individuals who use opioids nonmedically

 8    are more likely to use opioids medically.

 9         Q.   So sometimes individuals can go back and

10    forth between medical use and nonmedical use of

11    opioids; is that fair?

12         A    That's fair.

13         Q.   Now, this slide that we're showing right

14    now, does that represent the concept that you just

15    described?

16         A    Yes.

17         Q.   Would you say that medical and

18    nonmedical use of prescription opioids are

19    intertwined?

20         A    Yes.

21         Q.   Let's -- we'll back up just a moment and

22    just a few more questions on this 2015 study that

23    you coauthored.

24              You mentioned your findings with respect

25    to the link between medical use of opioids and
```

1

2     nonmedical use.  Can you please explain to the Court

3     why in that study, the finding that you and your

4     colleagues reached was provided?

5         A    Yes.  With addition to the cohort

6     design, we also controlled for many variables that

7     we consider to be what are called confounding

8     factors.

9         Q.   What do you mean by confounding factors?

10        A    These are factors that would be

11    associated with both the exposure, which is in this

12    case prescription opioid use, and the outcome,

13    future opioid misuse.

14        Q.   Can you give an example of a confounding

15    factor that you and your colleagues accounted for in

16    this study?

17        A    Yes.  We accounted for prior substance

18    misuse.  So, you know, the prior -- the misuse of

19    other drugs before opioid misuse.

20        Q.   Is it fair to say that you and your

21    colleagues accounted for that other factor in order

22    to be able to determine whether it was, in fact, a

23    medical use of opioids that was causing or linked to

24    the nonmedical use of opioids?

25        A    That's the intention, yes.

```
 1              Frye Hearing - Dr. Keyes          28
 2          Q.    And that's what you did in that study?
 3          A    Yes.
 4          Q.    And that is a generally accepted
 5    methodology in your field of epidemiology; is that
 6    right?
 7          A    That's right.
 8          Q.    Are you involved today in any research
 9    involving opioids?
10          A    Yes.
11          Q.    Can you tell the Court about some of the
12    research that you are involved in today?
13          A    One project is the Helping End Addiction
14    Long-Term project or HEALing Communities Study.
15          Q.    What is that?
16          A    So that is an NIH-funded organization
17    science project that is taking place across four
18    states including New York with the goal of reducing
19    opioid overdose by 40 percent.
20          Q.    So the HEALing Communities study, that's
21    a federally funded study that involves New York and
22    a few other states; is that right?
23          A    That's right.
24          Q.    And in New York State there are 16
25    counties involved.  That's what we see on the slide
```

1
2    here; is that right?
3           A     That's right.
4           Q.    And is Suffolk County one of those
5    counties?
6           A     Yes.
7           Q.    And there are counties all across the
8    state.  Is that because opioids have impacted
9    communities across New York State?
10          A     Yes.
11          Q.    You mentioned that the study is aiming
12   to reduce opioid overdose by 40 percent.  How is it
13   trying to do that?
14          A     The study is working with communities to
15   identify community-led initiatives that would reduce
16   opioid overdose focusing on increased access to
17   medication for opioid use disorder, increased access
18   to tertiary prevention techniques such as the
19   naloxone access as well as reducing opioid
20   prescribing.
21          Q.    How were you chosen to become an
22   investigator on the HEALing Communities study?
23          A     I have over a decade of expertise in
24   mathematical modeling which is an important
25   component of the HEALing Communities study.

```
 1                    Frye Hearing - Dr. Keyes          30
 2          Q.   So your role in the study involves
 3     mathematical modeling regarding the goals of the
 4     project?
 5          A    That's right.
 6          Q.   How are you developing those
 7     mathematical models?  Are you looking to any sort of
 8     literature?
 9          A    Yes.
10          Q.   What literature are you looking at to
11     develop your mathematical models?
12          A    We synthesize the existing literature on
13     the parameters that are important for modeling
14     opioid use, opioid use disorder, and the transition
15     to overdose.  So synthesizing available literature
16     as well as available data to inform those
17     parameters.
18          Q.   So the methodology that you just
19     described, reviewing and synthesizing scientific
20     literature, is that a generally accepted methodology
21     in your field?
22          A    Yes.
23          Q.   Is there a consensus in your field that
24     that is how research is done and how researchers can
25     form conclusions?
```

1

2       A    Yes.

3       Q.   And that methodology, the review and

4  synthesis of scientific literature, is that the

5  methodology that you employed in this case?

6       A    Yes.

7       Q.   Dr. Keyes, are your opinions in this

8  case based on your education, training, and

9  experience as an epidemiologist?

10       A    Yes.

11       Q.   And have you brought to bear in your

12  work in this case, your knowledge of the conditions

13  surrounding opioid use and misuse in the State of

14  New York and in Nassau and Suffolk Counties?

15       A    Yes.

16       Q.   I'd like to move on now to talking about

17  your assignment and delving deeper into your

18  methodology.

19            Does this slide summarize in general

20  terms your assignment in this case related to

21  causation?

22       A    Yes.

23       Q.   So the first point is that you described

24  the harms associated with opioid use in New York

25  State and in Nassau and Suffolk Counties; is that

1

2      right?

3            A     That's right.

4            Q.    And then you assessed the causes of

5      those harms, correct?

6            A     That's right.

7            Q.    Now, this next slide, does this

8      summarize your methodology that you applied in this

9      case?

10           A     Yes.

11           Q.    We're going to mark as an exhibit, a

12     demonstrative exhibit your expert report in this

13     case.  It's P-23954.

14                 So your methodology in this case, as

15     shown in this slide, is to assess whether there is

16     an association between exposure to prescription

17     opioids and opioid use disorder, opioid overdose and

18     of the harms and whether those associations are

19     causal; is that right?

20           A     Yes.

21           Q.    And to do that, you --

22                 MR. ERCOLE:  Your Honor, I apologize for

23           interrupting the question.  This is Brian

24           Ercole.  It's a little bit hard to hear the

25           witness in certain instances.

```
 1                    Frye Hearing - Dr. Keyes            33
 2              For instance, I couldn't hear the
 3         witness' last answer.  I don't know if
 4         there's a way of asking her to speak closer
 5         into the microphone.  I, again, apologize for
 6         interrupting.
 7              THE COURT:  Thank you.  We made a little
 8         adjustment.
 9              THE WITNESS:  I'll try to keep more --
10              THE COURT:  How is that?  Is that
11         better?
12              MR. ERCOLE:  It is.  I really appreciate
13         that.  Thank you.
14              THE COURT:  You're welcome.
15              Go ahead.
16    BY MR. REISMAN:
17         Q.   So, Dr. Keyes, the factors listed there
18    are factors that you used in implementing your
19    methodology in this case; is that right?
20         A    Yes.
21         Q.   And those factors are:  Dose-response
22    relationship, temporal relationship, strength of the
23    association, replication, biological plausibility,
24    and consideration of alternative explanations; is
25    that right?
```

2      A    Yes.

3      Q.   Where did you get that methodology?

4      A    Those are standard factors in my field

5   that we use when evaluating, synthesizing a body of

6   literature.

7      Q.   Do you use that methodology in your work

8   as an epidemiologist on a daily basis?

9      A    Yes.

10      Q.   Is there anything novel about that

11   methodology?

12      A    No.

13      Q.   Is that methodology generally accepted

14   in your field?

15      A    Yes.

16      Q.   In your work on this case, did you use

17   this methodology in the same way that you do in your

18   work as an epidemiologist?

19      A    Yes.

20      Q.   So I'd like to take a few minutes to go

21   through each of these factors to have you explain

22   what they mean and explain how you applied them.

23           First we have dose-response

24   relationship.  Can you explain to the Court what

25   that means?

1

2     A    Yes.  We look to see whether there is a

3  greater risk of the outcome as the dose of the

4  exposure under investigation increases.

5     Q.   So, for example, you looked to see

6  whether greater exposure to prescription opioids led

7  to certain outcomes such as opioid misuse, opioid

8  use disorder, opioid overdose and other harms; is

9  that right?

10    A    That's right.

11    Q.   And you discussed dose-response

12 relationship in your expert report in this case,

13 right?

14    A    Yes.

15    Q.   Now, to apply this factor of dose

16 response, how did you do that?  What did you do?

17    A    I looked for studies that evaluated

18 different risks of outcomes based on increasing dose

19 and duration of opioid use.

20    Q.   Now, let's break that down.  So when you

21 talk about increasing dose, is there a way that is

22 generally accepted in your field of measuring the

23 dose of a drug, in this case prescription opioids?

24    A    Yes.

25    Q.   Is that sometimes referred to as

```
1                    Frye Hearing - Dr. Keyes              36
2    morphine milligram equivalents?
3         A    Yes.
4         Q.   Or MMEs?
5         A    Yes.
6         Q.   And what is that?
7         A    That is a conversion factor.  So if you
8    have different opioid products that have different
9    strengths and potencies, you can compare across
10   different products on comparing apples to apples,
11   let's say.
12        Q.   And is that based on the relative
13   strength of an opioid as compared to marketing?
14        A    Yes.
15        Q.   So if an opioid has an MME, if it's 50
16   MMEs, that means it's 50 times as strong as
17   morphine; is that right?
18        A    Yes.
19        Q.   Now, you talked about duration.  Does
20   that essentially mean how many days a person is
21   taking opioids?
22        A    Yes.
23             MR. REISMAN:  Let's look at a study that
24             illustrates how you applied dose response.
25             It's Demo 48.
```

```
1                   Frye Hearing - Dr. Keyes              37

2                   THE COURT:  Doctor, while we're looking

3              at this document, I have a question.  You

4              testified about this methodology.

5                   THE WITNESS:  Yes.

6                   THE COURT:  Is there a founding father

7              of this methodology?

8                   THE WITNESS:  Bradford Hill is commonly

9              cited as one of the epidemiologists who wrote

10             on this topic.

11                  THE COURT:  Is he still with us?

12                  THE WITNESS:  I don't think so.

13                  THE COURT:  Okay.  Thank you.

14      BY MR. REISMAN:

15             Q.   So this slide shows a study by Edlund

16      and colleagues published in the Clinic Journal of

17      Pain in 2014; is that right?

18             A    That's right.

19             Q.   And you discussed this study in your

20      report, right?

21             A    Yes.

22             Q.   Now, the conclusion that is shown here

23      from the abstract is that among individuals with a

24      new CNCP episode, prescription opioid exposure was a

25      strong risk factor for incident OUDs.  Did I read
```

```
 1                    Frye Hearing - Dr. Keyes              38

 2      that correctly?

 3            A    Yes.

 4            Q.   And CNCP stands for chronic non-cancer

 5      pain; is that right?

 6            A    That's right.

 7            Q.   And O-U-D stands for opioid use

 8      disorder; is that right?

 9            A    Yes.

10            Q.   What data did Edlund and colleagues use

11      in conducting this study?

12            A    They used health claims data from five

13      health claims databases.

14            Q.   How did Edlund and colleagues analyze

15      that health claims data?

16            A    They constructed variables that

17      represented the dose and duration of opioid use

18      among people who had a claim for a prescription

19      opioid and evaluated the subsequent opioid use

20      disorder diagnosis in the claim.

21            Q.   Did Edlund study patients who had not

22      received prescription opioids or have opioid use

23      disorder in the period before they received an

24      opioid?

25            A    Yes.
```

```
 1                    Frye Hearing - Dr. Keyes              39
 2         Q.    What did Edlund and his colleagues find?
 3         A     They found that there was an increased
 4    -- a dose-response relationship essentially between
 5    dose and duration of prescription opioid use and
 6    incident opioid use disorder.
 7         Q.    Did Edlund quantify that dose-response
 8    relationship?
 9         A     Yes.
10         Q.    This next slide, can you explain to the
11    Court what it shows on -- what it shows in general
12    and maybe start with the right-hand side?
13         A     On the right-hand side are the odds
14    ratios which is a measure of association for the
15    association between prescription opioid use.  In
16    this case a greater -- among those with a greater
17    than 90-day supply and the odds ratio for opioid use
18    disorder compared to those who did not receive a
19    prescription opioid.
20         Q.    So let's just look at one of these bars.
21    On the right-hand side, the red bar, it says "high
22    dose" and under that "122.45."  What does that mean?
23         A     That means that those who received a
24    high dose of prescription opioids for greater than
25    90 days had 122.45 higher odds of opioid use
```

1

2  disorder compared to those who did not receive a

3  prescription opioid.

4        Q.   Is that a strong association?

5        A    Yes.

6        Q.   And then we look at -- if you would look

7  with me at the yellow bar, two bars over from the

8  red bar, it says "low dose" and then "14.92."  Do

9  you see that?

10       A    Yes.

11       Q.   What does that show?

12       A    The low dose here were those who were

13  prescribed 136 milligrams per day, again, among

14  those with a greater than 90-day supply and shows

15  that those who were on a low dose for greater than

16  90 days had almost 15 times higher odds of opioid

17  use disorder compared to those with no prescription

18  opioid.

19       Q.   Is that a strong association?

20       A    Yes.

21       Q.   Now, let me ask you, Dr. Keyes, do

22  epidemiologists ever examine individual patient

23  outcomes?

24       A    Rarely.

25       Q.   Why is that the case?

```
 1                   Frye Hearing - Dr. Keyes              41
 2          A    One of the fundamental principles of
 3     epidemiology is group comparison that we can learn
 4     about causation by studying populations rather than
 5     individual patients.
 6          Q.   Let's look at a second factor that we
 7     had on the slide a moment ago, temporal
 8     relationship.  Can you explain to the Court what
 9     that means?
10          A    Typically for a causal relationship to
11     be present, the exposure has to precede the cause.
12          Q.   So you're looking at whether one
13     thing --
14          A    Occurred before.
15          Q.   -- occurs before another.  Okay.  And
16     let's try not to talk over each other.
17          A    I'm sorry.
18          Q.   Sometimes I pause in my questions.  So
19     did you apply the factor in this case?
20          A    Yes.
21          Q.   Did you apply it in your expert report?
22          A    Yes.
23          Q.   Let's look at a couple of examples of
24     studies that you analyzed in your report.  So this
25     is a slide that is from Demo 46, which we'll hand
```

1

2     out now.  Now, this is a study that you described

3     and analyzed in your report; is that right?

4          A    Yes.

5          Q.   It's a study by Cicero in 2014 titled

6     "The Changing Face of Heroin Use in the United

7     States, A Retrospective Analysis of the Past 50

8     Years."

9               What did the researchers do in this

10    study?

11         A    The researchers in this study analyzed

12    data on individuals who were in substance treatment

13    programs and asked them questions about their prior

14    substance use.

15         Q.   So that methodology that the researchers

16    used asking subjects questions, is that a generally

17    accepted methodology in your field?

18         A    Yes.

19         Q.   Is it -- is there a consensus that that

20    methodology is reliable?

21         A    Yes.

22         Q.   What did Cicero and colleagues find in

23    their research?

24         A    They found that, that among individuals

25    with heroin dependence, that since the 1990s

1

2    prescription opioid use most commonly preceded

3    heroin use in these individuals.

4         Q.   I'm showing you now a figure that is

5    from the Cicero study.  Can you explain to the Court

6    what this figure shows?

7         A    In this figure the authors have

8    separated the decade of first opioid use into

9    decades.  So the '60s, '70s, '80s, et cetera, and

10   examined whether prescription opioid or heroin use

11   was the first substance used in each of those

12   decades.

13        Q.   And if we look all the way at the

14   right-hand side in the 2010s, what does that show

15   with respect to which comes first?

16        A    Since the 2000s and in the 2010s,

17   prescription opioid use was more commonly the first

18   opioid used among the sample.

19        Q.   Now, let's look at another study that

20   you analyzed in your report.  This is Demo 53.  This

21   is a study by Lankenau published in 2011 titled,

22   "Initiation into prescription opioid misuse amongst

23   young injection drug users"?

24        A    Yes.

25        Q.   What information or data did Lankenau

1

2     and colleagues analyze in performing this study?

3          A     Similar to the prior study, there was a

4     questionnaire that was conducted among the sample of

5     injection drug users.

6          Q.    Did this study show that prescription

7     opioid use precedes heroin use?

8          A     Yes.

9          Q.    How did the researchers reach that

10    conclusion?

11         A     Through the questionnaire by asking

12    individuals about their history of drug use.

13         Q.    Now, let's look at this slide which has

14    an excerpt from the study.  This says "Nearly

15    three-quarters have been prescribed an opioid in

16    their lifetime which occurred on average at 14.6

17    years old."  Did I read that correctly?

18         A     Yes.

19         Q.    And then below that towards the bottom,

20    it says "Two-fifths reported their own prescription

21    as the source of first opioid misuse which typically

22    occurred at 15.3 years old."  Did I read that

23    correctly?

24         A     Yes.

25         Q.    So does this study show that for a

1

2    percentage of the subjects, two-fifths, that they

3    had received an opioid prescription from a doctor

4    before becoming -- before initiating heroin?

5           A    Yes.  Before initiating injection drug

6    use.

7           Q.   All right.  And that injection drug use

8    specifically was heroin use; is that right?

9           A    Yes.  I think most were heroin.

10          Q.   Okay.  Let's turn to the third factor.

11   We discussed strong association.  What do

12   epidemiologists look for?

13          A    So the strength of association, you

14   know, you're looking for an association that is

15   unlikely to be explained by alternative factors

16   essentially, and that a strong association indicates

17   that the occurrence of the exposure have a large

18   effect on the outcome.

19          Q.   So would it be fair to say that the

20   Edlund study, which we spoke about a moment ago,

21   shows a strong association between prescription

22   opioid use and OUD?

23          A    Yes.

24          Q.   And there were other studies, just to be

25   clear, there were other studies you examined that

```
 1                  Frye Hearing - Dr. Keyes              46
 2     showed strong associations between those two things;
 3     is that right?
 4          A    Yes.
 5          Q.   Now, let's look at the fourth factor,
 6     replication.  How do epidemiologists apply that
 7     factor?  Well, first what is that factor?
 8          A    With replication you're looking to see
 9     if the same association can be observed in
10     independent samples from independent investigators
11     in diverse settings.
12          Q.   Did you do that in this case?
13          A    Yes.
14          Q.   How did you do that in this case?
15          A    By synthesizing the available
16     literature.  I look to see whether the same
17     association could be observed in different study
18     designs, in different populations, with independent
19     studies.
20          Q.   So I just want to be clear.  We're
21     looking at some examples right now of how you
22     applied each of these factors, but the examples are
23     not the only examples that you analyzed; is that
24     right?
25          A    That's right.
```

```
 1                    Frye Hearing - Dr. Keyes            47
 2            Q.    Would it be fair to say that in applying
 3      these factors, you look at the totality of the
 4      scientific literature?
 5            A    Yes.
 6            Q.    Did you, in your opinion, determine that
 7      the association between prescription opioid use and
 8      OUD and heroin use has been replicated across
 9      numerous studies?
10            A    Yes.
11            Q.    Let's turn to the fifth factor,
12      biological plausibility.  Does plausibility simply
13      mean possible?
14            A    Yes.
15            Q.    How do epidemiologists like yourself
16      apply the factor of biological plausibility?
17            A    We look to see whether an association is
18      consistent with known knowledge about biology and
19      other, you know, pharmacology.
20            Q.    What does that mean in the context of
21      prescription opioids and OUD and heroin
22      specifically?
23            A    Yeah, there have been -- there is
24      literature around the pharmacology of these
25      different products in heroin and prescription
```

1

2      opioids are pharmacologically similar.

3           Q.   So based on the literature and your

4      experience, you determined that it was biologically

5      plausible for prescription opioid use to cause

6      heroin use; is that right?

7           A    Yes.

8           Q.   Now, let's look at the last factor,

9      alternate explanations.  How do epidemiologists

10     apply that factor?

11          A    Through study design and data analysis.

12     For example, controlling for confounding factors

13     would be one way to rule out alternative

14     explanations.

15          Q.   And did you look to see whether that was

16     done in the studies that you analyzed?

17          A    Yes.

18          Q.   And you spoke earlier about the 2015

19     study that you published on the link between opioid

20     use and misuse.  Do you recall that?

21          A    Yes.

22          Q.   And in that study in 2015, how did you

23     and your colleagues account for alternative

24     explanations for confounding factors?

25          A    We controlled for factors that would be

1

2    alternative explanations of the association,

3    specifically controlled for them.

4         Q.   And, for example, I think you mentioned,

5    as an alternative explanation, prior addiction or

6    mental health issues; is that right?

7         A    That's right.

8         Q.   Now, these factors that we've been

9    discussing right now, and Justice Garguilo stole my

10   thunder.  I was going to ask you about where they

11   come from and if there is a person associated with

12   them, and is that Bradford Hill.

13            Are these factors commonly described as

14   the Bradford Hill factors?

15        A    These are among the Bradford Hill

16   factors, yes.

17        Q.   So there are a few more that you didn't

18   talk about today?

19        A    Yes.

20        Q.   Would it be fair to say that the ones we

21   have talked about are the most important factors

22   that you used in your work on this case?

23        A    Yes.

24        Q.   And can you briefly explain what the

25   purpose of the Bradford Hill factors is in

1
2     epidemiology?

3          A     Yes.  It's a framework for, for

4     synthesizing literature and coming to conclusions

5     about whether the evidence is consistent with the

6     causal relationship.

7          Q.   So by applying those factors, can

8     epidemiologists go from reviewing and synthesizing a

9     body of literature to forming a causal inference?

10         A     That's right.

11         Q.   Now, I'd like to briefly go over the

12    nuts and bolts of how you applied your methodology

13    in this case.

14              How did you go about this literature and

15    review synthesis that you performed?  Where did you

16    start?

17         A     I started with PubMed, which is a search

18    engine that is commonly used in my field to elicit a

19    set of articles that were germane to the topic under

20    consideration.

21              From there I also looked at reference

22    lists and kind of drew the body of literature from

23    these initial search criteria.  And I also included

24    gray literature that I know of, what we call the

25    gray literature, which is not necessarily

```
 1                    Frye Hearing - Dr. Keyes              51
 2    peer-reviewed articles, but, you know, CDC reports
 3    and other governmental reports that are available,
 4    publicly available but not might not be
 5    peer-reviewed.
 6          Q.   So did you also use your background
 7    knowledge as someone who specializes in substance
 8    abuse disorders in your data and literature review
 9    and synthesis?
10          A    Yes.
11          Q.   So you mentioned PubMed.  That's a
12    database that is maintained by the federal NIH; is
13    that right?
14          A    Yes.
15          Q.   So from those searches that you did in
16    PubMed, approximately how many articles did you end
17    up reviewing?
18          A    Approximately 400 or so.
19          Q.   What were you looking for in that body
20    of literature?
21          A    I was looking for publications that were
22    specific to the relationship that I was observing.
23    And I was looking for scientific rigor, and I was
24    evaluating them based on the factors that we've
25    outlined.
```

```
 1                    Frye Hearing - Dr. Keyes           52
 2          Q.   When you say that you were looking for
 3     scientific rigor, were you looking at the entirety
 4     of each of these studies that you reviewed?
 5          A    Yes.
 6          Q.   So you didn't just look at the abstract
 7     and then form an opinion about that study; is that
 8     right?
 9          A    That's right.
10          Q.   You looked at the underlying methodology
11     that the researchers in each of the studies that you
12     reviewed applied; is that right?
13          A    Yes.
14          Q.   You mentioned some data sources.  You
15     mentioned the CDC.  That's the Centers for Disease
16     Control; is that right?
17          A    Yes.
18          Q.   Did you, in your work on this case,
19     review and analyze and use mortality data from the
20     CDC?
21          A    Yes.
22          Q.   And did that mortality or death data
23     relate specifically to opioid overdose deaths?
24          A    Yes.
25          Q.   Did you review any data for this case
```

1

2    that came from sources at the State of New York?

3          A    Yes.

4          Q.    Can you briefly explain, describe the

5    New York State data that you reviewed in this case?

6          A    Yes.  I primarily relied on the state's

7    opioid dashboard, which is a public facing site that

8    produces available information on opioid-related

9    harms at the county level and the state level.

10         Q.    And did you also review opioid reports

11   from, from the State of New York?

12         A    Yes.

13         Q.    And those are regular reports that the

14   New York State Department of Health publishes; is

15   that right?

16         A    That's right.

17         Q.    Did you also review data and information

18   that was provided to you by the Plaintiffs in this

19   litigation, the State of New York and Nassau and

20   Suffolk Counties?

21         A    Yes.

22         Q.    And you relied on some of that data in

23   forming your opinions in this case; is that right?

24         A    Yes.

25         Q.    Now, I want to focus on the opioid death

```
 1                      Frye Hearing - Dr. Keyes            54
 2      data.  You got some opioid death data from Suffolk
 3      and Nassau Counties; is that right?
 4           A    That's right.
 5           Q.    What, if anything, did you do to look to
 6      see whether that data was reliable?
 7           A    I examined whether it was consistent
 8      with other sources that were produced, for example,
 9      by the state.
10           Q.    Did you talk to anyone?  Did you do any
11      interviews with anyone in either Nassau or Suffolk
12      County?
13           A    Yes.  I spoke to people in the Medical
14      Examiner's office in both counties.
15           Q.    And why did you do that?
16           A    I wanted to confirm what the methodology
17      was for designating a death as an overdose, for
18      example.
19           Q.    And we'll look at this in a few minutes,
20      but were you looking to see whether the underlying
21      data that you used in forming your opinions about
22      the relationship between opioid supply and harms
23      like opioid overdose deaths, whether the underlying
24      data was reliable?
25           A    That's right.
```

```
 1                    Frye Hearing - Dr. Keyes              55
 2          Q.   In your work on this case, did you also
 3     review rates of prescribing of prescription opioids?
 4          A    Yes.
 5          Q.   And did you do that in -- in reviewing
 6     studies that analyzed that sort of data?
 7          A    Yes.
 8          Q.   Now, in this last section of this
 9     examination, I'd like to discuss how you applied
10     your methodology in reaching your opinions.
11               THE COURT:  Doctor, is this your
12               methodology or the Bradford Hill methodology
13               that you applied?
14               THE WITNESS:  I would say it fits into
15               both.  You know, the Bradford Hill
16               methodology is sort of a larger set of
17               criteria to use when looking at a body of
18               literature, but, you know, the reliability of
19               the underlying data is one of those factors.
20               And so --
21               THE COURT:  Did I hear correctly, you
22               indicated that you applied six of the
23               criteria of the Bradford Hill methodology?
24               THE WITNESS:  Yes.
25               THE COURT:  Is there nine?
```

```
 1                  Frye Hearing - Dr. Keyes            56
 2              THE WITNESS:  There are nine.
 3    BY MR. REISMAN:
 4         Q.   Would it be fair to say that you applied
 5    all of the factors, but the six that we've just
 6    discussed are the most important factors for
 7    purposes of explaining your methodology today?
 8              MR. SCHMIDT:  I'll object to his feeding
 9         testimony to the witness, leading.
10              THE COURT:  Just do me a favor.  Take
11         the mask off for a second.  What's the
12         objection?
13              MR. SCHMIDT:  Sorry.  I will object to
14         that one as leading because he's feeding
15         testimony to the witness.
16              THE COURT:  Rephrase the question.  I'm
17         not going to consider the answer.  Rephrase
18         the question, and then I'll consider the
19         answer.
20    BY MR. REISMAN:
21         Q.   Dr. Keyes, in your methodology in this
22    case, did you apply all of the Bradford Hill
23    factors?
24         A    Generally, if I can give an example, I
25    think it would be helpful.
```

```
 1                    Frye Hearing - Dr. Keyes              57
 2               THE COURT:  Go ahead.  Give me an
 3          example.
 4               THE WITNESS:  So another Bradford Hill
 5          criteria, for example, is analogy.  An
 6          analogy is, you know, not necessarily the,
 7          you know, whether the evidence is consistent
 8          with other associations in the literature
 9          that aren't germane to the one that you're
10          considering.  And I used analogy in my
11          report.
12               I just didn't consider it to be among
13          the most, you know, kind of important and
14          compelling factors that drove my opinions,
15          but certainly there are in my report
16          analogies in other, in other literatures, and
17          that would be a Bradford Hill criteria.  So
18          that's an example.
19               THE COURT:  Next question.
20     BY MR. REISMAN:
21          Q.   Did you use the name Bradford Hill?
22     Does it appear in your report anywhere?
23          A    No.
24          Q.   But you did use the principles, the
25     factors that Bradford Hill described in your report;
```

```
 1                    Frye Hearing - Dr. Keyes              58

 2    is that right?

 3          A    That's right.

 4          Q.   Now, we're going to move on in this last

 5    section to talking about your opinions and how you

 6    got from your methodology to your opinions.  Does

 7    this slide summarize your opinions at a high level

 8    in this case, the opinions relating to causation?

 9          A    Yes.

10               THE COURT:  Do you have a copy of that

11          slide on paper?

12               MR. REISMAN:  We can make one.

13               THE COURT:  I'll move it.  We can see it

14          this way.  Thank you.

15    BY MR. REISMAN:

16          Q.   So the first one, Dr. Keyes, is use of

17    prescription opioids increases the risk of opioid

18    use disorder and abuse of illicit opioids such as

19    heroin and fentanyl; is that right?

20          A    Yes.

21          Q.   The second is the increased supply of

22    prescription opioids since the 1990s led to an

23    increase in rates of opioid use disorder, opioid

24    overdose deaths, and other harms.  Did I read that

25    correctly?
```

```
 1                    Frye Hearing - Dr. Keyes          59

 2          A    Yes.

 3          Q.   And the third here is marketing of

 4     prescription opioids increases prescribers

 5     likelihood of prescribing opioids in the future; is

 6     that right?

 7          A    Yes.

 8          Q.   Now, just so we're all clear, your

 9     expert report in this case contains other opinions;

10     is that right?

11          A    Yes.

12          Q.   But we're focusing for purposes of

13     today's hearing on these three, okay?

14          A    Okay.

15          Q.   Now, the first one, can you explain to

16     the Court what your basis for that opinion is?

17          A    Yes.

18          Q.   What methodology did you use to reach

19     that opinion?

20          A    I reviewed the literature on the

21     association between prescription opioid use and

22     opioid use disorder as well as these other outcomes,

23     and determined that the literature was consistent in

24     showing that prescription opioid use increased the

25     risk or increased the probability of occurrence of
```

```
 1                    Frye Hearing - Dr. Keyes            60

 2      these outcomes.

 3           Q.    In your report you estimated the

 4      prevalence of opioid use disorder that is arising

 5      out of opioid use; is that right?

 6           A     Prescribed opioid use, yes.

 7           Q.    So you estimated that prevalence; is

 8      that right?

 9           A     That's right.

10           Q.    Did you rely, in part, for those

11      prevalence estimates on the Vowles study?

12           A     Yes.

13           Q.    So let's look at this a bit more

14      closely.  This is Demo 58.  Now, before we get into

15      the studies, what is prevalence?

16           A     Prevalence is the total burden of an

17      outcome in a population.

18           Q.    So what would that mean in the opioid

19      context?

20           A     Prevalence would be the number of people

21      who have opioid use disorder in a given sample or

22      population divided by the total number of people in

23      that population.

24           Q.    Do epidemiologists use prevalence

25      estimates to draw causal inferences?
```

```
 1                    Frye Hearing - Dr. Keyes           61

 2          A     Yes.

 3          Q.    Can you explain to the Court why it's

 4    appropriate for epidemiologists to do that?

 5          A     Oftentimes the total burden of a health

 6    outcome has important public health implications.

 7    So we examine prevalence as an indicator of total

 8    harm.

 9          Q.    Is that true in the context of opioids?

10          A     Yes.

11          Q.    So this study by Vowles, it's titled,

12    "Rates of opioid misuse, abuse, and addiction in

13    chronic pain: a systematic review and data

14    synthesis;" is that right?

15          A     Yes.

16          Q.    Now, earlier you mentioned your work on

17    the federally-funded and HEALing Communities study.

18    Do you recall that?

19          A     Yes.

20          Q.    In your work on that study, have you

21    used this Vowles study in any way?

22          A     Yes.  It's one of the studies that we

23    used in terms of our synthesis and literature

24    reviewed to inform mathematical parameters.

25          Q.    Can you briefly explain how you and your
```

1

2      colleagues on the study used this Vowles article in

3      developing your work on HEALing Communities?

4           A    Sure.  We are developing a mathematical

5      model of the transition in New York State from

6      opioid use to disorder to overdose and treatment and

7      in mathematically modeling the transition from

8      opioid use to opioid use disorder, we relied on

9      Vowles and systematic reviews to inform what

10     proportion of our mathematical agents should

11     transition in New York State.

12          Q.   What is a systematic review?

13          A    A systematic review is typically a paper

14     that examines a whole body of literature and comes

15     to a conclusion from it.

16          Q.   How many studies did Vowles and

17     colleagues analyze in their systematic review?

18          A    38.

19          Q.   And they did that to reach conclusions

20     about the prevalence of opioid misuse, abuse, and

21     addiction arising out of the use of prescription

22     opioids for treating chronic pain; is that right?

23          A    That's right.

24          Q.   Now, this systematic review methodology

25     that this particular study employed, is that a

```
 1                    Frye Hearing - Dr. Keyes            63
 2    generally accepted methodology in your field?
 3         A    Yes.
 4         Q.   Is this Vowles study, which analyzed 38
 5    underlined studies, generally accepted in your field
 6    as reliable?
 7         A    Yes.
 8         Q.   Can you explain to the Court why this
 9    study is generally accepted as reliable?
10         A    Sure.  I think the study is generally
11    accepted as reliable because the methods are
12    rigorous and transparent and the underlying studies
13    are well described.
14         Q.   Now, you used this report to generate
15    your own estimates regarding the prevalence of
16    opioid use disorder arising out of prescription
17    opioid use for chronic pain; is that right?
18         A    That's right.
19         Q.   This next slide is Figure 1 from your
20    report which we handed out a few minutes ago.  Can
21    you explain to the Court generally what this slide
22    shows?
23         A    These are circles.  The broader circle
24    denoting that you got a, you know, a total
25    population of people who are treated with opioids.
```

```
 1                    Frye Hearing - Dr. Keyes              64
 2     Within that, there will be a subset who have opioid
 3     use disorder ranging from mild to severe disorder.
 4          Q.   So let's stop right there.  So that
 5     middle circle, which is peach colored, it says
 6     "Opioid use disorder from mild to severe, 21 to 29
 7     percent;" is that right?
 8          A    That's right.
 9          Q.   Now, these are estimates that you
10     derived from Vowles; is that right?
11          A    Um-hm, yes.
12          Q.   Did Vowles use the term "opioid use
13     disorder"?
14          A    No.
15          Q.   Where did you get that term from?
16          A    The Diagnostic and Statistical Manual of
17     Mental Disorders.
18               THE COURT:  The DSM?
19               THE WITNESS:  The DSM.
20     BY MR. REISMAN:
21          Q.   And so that DSM, is it sometimes
22     referred to as the DSM-5, the current version?
23          A    Yes.
24          Q.   Is the DSM-5 used in epidemiology?
25          A    Yes.
```

1

2        Q.   So is it fair to say that you took the

3   analysis about prevalence that Vowles had and you

4   mapped onto the DSM-5?

5        A    That's right.

6        Q.   And so that's how you got to that 21 to

7   29 percent figure for OUD from mild to severe; is

8   that right?

9        A    That's right.

10       Q.   And then the inner circle says "Opioid

11   use disorder from moderate to severe, 8 to 12

12   percent;" is that right?

13       A    Yes.

14       Q.   And with respect to both of those

15   categories, again, you -- did you take the analysis

16   from Vowles and map that onto the DSM-5?

17       A    Yes.

18       Q.   So can you explain to the Court why it

19   was appropriate for you to do that as an

20   epidemiologist?

21       A    That's commonly done in epidemiology

22   when we're synthesizing literature and trying to

23   draw comparisons of cross studies.

24       Q.   So the underlying studies in Vowles,

25   what did they consist of?  What methodology did

1

2       those underlying studies use?

3           A      Predominantly they use questionnaires

4       that were given to patients to assess different

5       symptoms related to opioid use disorder.

6           Q.    So in the systematic review that Vowles

7       performed, Vowles had to map or integrate various

8       questionnaires, various types of questionnaires that

9       the underlying studies used; is that right?

10          A      Yes.

11          Q.    And to map Vowles onto the DSM-5, you

12      did that same sort of analysis; is that right?

13          A      That's right.

14          Q.    Now, you mentioned questionnaires and

15      the DSM-5.  Let's look at an example of what you

16      did.

17              So this chart, it's not in your report.

18      This is for demonstrative purposes.  This is -- this

19      shows an example of your mapping of one of the

20      underlying questionnaires in a study analyzed by

21      Vowles to the DSM-5; is that right?

22          A      That's right.

23          Q.    What does the right-hand side of the

24      table show?

25          A      These are questions from the screener

```
 1                  Frye Hearing - Dr. Keyes          67

 2     and opioid assessment for patients with pain.

 3          Q.   And what is that used for?

 4          A    That is commonly used in clinical

 5     studies to assess whether patients are likely to

 6     have a problem with their opioid prescription.

 7          Q.   And does having a problem with their

 8     opioid prescription sometimes include opioid misuse?

 9          A    Yes.

10          Q.   Does it sometimes include opioid use

11     disorder?

12          A    Questions that are consistent with

13     opioid use disorder, yes.

14          Q.   So on the right-hand side, you have some

15     questions that are contained in the actual

16     questionnaire used in some of the studies analyzed

17     by Vowles; is that correct?

18          A    Yes.

19          Q.   And what does the left-hand side of that

20     table show?

21          A    These are criteria from the DSM-5 for

22     opioid use disorder.

23          Q.   And that's the current version of the

24     DSM; is that right?

25          A    That's right.
```

```
 1                    Frye Hearing - Dr. Keyes              68
 2          Q.    So the first one is opioids are often
 3     taken in larger amounts for over a longer period
 4     than was intended; is that right?
 5          A    Yes.
 6          Q.    And so in your work in mapping Vowles to
 7     the DSM-5, you looked to see whether questions in
 8     the underlying questionnaires in the studies mapped
 9     onto DSM-5 criteria; is that right?
10          A    That's right.
11          Q.    And this is just an example of two DSM-5
12     criteria for which you performed this mapping
13     analysis; is that right?
14          A    That's right.
15          Q.    How many criteria does a person need to
16     meet in order to receive a diagnosis of mild opioid
17     use disorder?
18          A    At least two.
19          Q.    So if a person meets these two criteria
20     that are shown on this slide, is it your
21     understanding that a clinician would diagnose that
22     person with mild opioid use disorder?
23          A    In most cases, yes.
24          Q.    Now, with respect to your prevalence
25     estimates of OUD that you derived from the Vowles
```

1

2    systematic review, did you do anything to assess the

3    reliability of your estimates?

4         A    Yes.

5         Q.   Can you tell the Court what you did?

6         A    I identified a study that was published

7    after the Vowles study that used DSM-5 criteria in

8    assessing the prevalence of OUD in another sample of

9    people being prescribed opioids.

10              And that study came up with very similar

11   prevalence estimates as Vowles.  And so that was an

12   indicator that Vowles was a reliable study to use to

13   estimate the prevalence of OUD.

14        Q.   Now, Dr. Keyes, are you aware that the

15   Defendants in this case criticize you for not

16   addressing in your report a study that was published

17   last year by a researcher named McCabe?

18        A    Yes.

19        Q.   Now, before we get to that McCabe 2019

20   study, I'd like to ask you, again, roughly how many

21   studies did you rely on to form your opinions

22   regarding the causal relationship between

23   prescription opioid use and opioid use disorder?

24        A    Dozens.

25        Q.   And in your report you do cite studies

1

2      that were published by McCabe prior to 2019; is that

3      right?

4              A    Yes.

5              Q.   Let's look at this one.  This is Demo

6      55.  Is the title of this study Trends in Medical

7      and Nonmedical Use of Prescription Opioids Among US

8      Adolescents: 1976 to 2015?

9              A    Yes.

10             Q.   It was published in 2017; is that right?

11             A    Yes.

12             Q.   How did McCabe and his colleagues

13     conduct this 2017 study?

14             A    So these data are drawn from Monitoring

15     the Future, the study that we discussed earlier.

16     And they use questionnaires of adolescents on

17     medical and nonmedical opioid use every year since

18     1976 through 2015.

19             Q.   In this study that we're looking at,

20     what were the primary findings of the researchers?

21             A    The primary findings were that medical

22     and nonmedical use of prescription opioids are

23     highly correlated.

24             Q.   Can you explain in laypersons terms what

25     that means?

1

2       A    It means that there's a lot of overlap

3  between students who use opioids nonmedically and

4  those who report opioid use medically.

5       Q.   Did the study that McCabe published in

6  2017 reach any conclusions about which came first,

7  whether it was prescription opioid medical use first

8  or nonmedical use first?

9       A    Yes.  Among the students who used both

10 medically and nonmedically, medical use is more

11 likely to precede the nonmedical use.

12      Q.   And, again, the medical use is taking a

13 prescription opioid because a doctor told you to?

14      A    That's right.

15      Q.   So this study concluded that that group

16 of medical users used medically before using

17 nonmedically; is that right?

18      A    They were more likely to, yes.

19      Q.   Now, let's look at the 2019 study that

20 McCabe published.  This is Demo 54.  This McCabe

21 2019 study is titled, "A Prospective study of

22 nonmedical use of prescription opioids during

23 adolescence and subsequent substance use disorder

24 symptoms in early midlife;" is that right?

25      A    That's right.

```
 1                    Frye Hearing - Dr. Keyes        72
 2          Q.   Now, before you filed your expert report
 3     in this case, did you review this study?
 4          A    Yes.
 5          Q.   How did you know about it?
 6          A    I'm generally familiar with studies that
 7     are published for Monitoring the Future given my
 8     close affiliation with the study.
 9          Q.   Why did you not discuss this study in
10     your report?
11          A    Opioid use disorder wasn't an outcome of
12     the study, so it didn't seem particularly relevant
13     to the, to the investigation that I was doing.
14          Q.   You mean to the assignment that you had
15     in this case; is that what you mean?
16          A    That's right, yes.
17          Q.   Did this 2019 study repudiate the
18     findings that the 2017 study made?
19          A    No.
20          Q.   Now, why did you come back to this
21     study?  Why -- did you come back to this study and
22     review it after you filed your report?
23          A    Yes.
24          Q.   Does this study -- reviewing this 2019
25     study now, does it change your opinions in any way?
```

```
1                    Frye Hearing - Dr. Keyes          73
2         A    No.
3         Q.   What is the primary finding in your
4    opinion of this study?
5         A    The primary finding is that individuals
6    who use prescription opioids have an increased risk
7    of substance use disorders at age 35.
8              THE COURT:  Okay.  There's an objection.
9         Go ahead.
10             MR. SCHMIDT:  Your Honor, I didn't
11             object before because this is undisclosed,
12             and she's just been saying why it's
13             undisclosed.  Now she's giving substantive
14             undisclosed opinions about it.  We object on
15             that basis.  It's not on her reliance list.
16             It's not discussed in her report.
17             THE COURT:  Mr. Reisman?
18             MR. REISMAN:  This was used by
19             Mr. Schmidt as an exhibit during Dr. Keyes'
20             deposition back in January.  It's completely
21             appropriate for her to be testifying about it
22             now.
23             MR. SCHMIDT:  She's giving a new
24             undisclosed --
25             THE COURT:  Say it again.
```

1

2          MR. SCHMIDT:  That's exactly accurate.

3    I was the first one to show it to her.  She's

4    giving now a new undisclosed opinion about

5    it.

6          THE COURT:  Okay.  During the

7    examination, was the doctor examined in

8    connection with this -- in connection with

9    we'll call it this report?

10          MR. SCHMIDT:  During my examination,

11    yes, but she didn't give the opinions that

12    she's now giving about it.

13          THE COURT:  That's what impeachment is

14    all about.

15          MR. SCHMIDT:  That's what expert witness

16    disclosures are all about.

17          THE COURT:  Overruled.  Go ahead.

18    BY MR. REISMAN:

19          Q.   So I just want to make sure we have on

20    the record, Doctor, your opinion about the primary

21    finding of this study.  Can you say that again?

22          A    Yes.  The primary finding of the study

23    is that adolescents who report prescription opioid

24    use have an increased risk of substance abuse

25    disorder at age 35.

1

2    Q.   And that is adolescents who use

3    medically or nonmedically?

4    A    Primarily those who use nonmedically.

5    Q.   Did the study reach any conclusions

6    about whether medical users of opioids later become

7    nonmedical users of opioids?

8    A    I'm sorry.  Can you repeat the question?

9    Q.   Did the study reach any conclusions

10   about whether medical users of opioids later become

11   nonmedical users of opioids?

12   A    I don't believe that's covered in this

13   paper.

14   Q.   Does it matter which comes first,

15   medical use of opioids or nonmedical use?

16   A    For the purposes of developing a

17   substance use disorder, exposure to opioids is the

18   primary risk factor.

19        THE COURT:  So it doesn't matter?  Okay.

20        THE WITNESS:  No.

21   BY MR. REISMAN:

22   Q.   Is the answer to the question no?

23   A    Correct.

24   Q.   Now --

25        THE COURT:  By the way, I think there

```
 1                    Frye Hearing - Dr. Keyes        76
 2            was a finding in the MDL by Judge Polster.
 3                 MR. REISMAN:  Yes, your Honor.
 4      BY MR. REISMAN:
 5            Q.   And speaking of which, I want to turn
 6      now to talking about your opinions about the causal
 7      relationship between prescription opioid use and
 8      heroin use.  Is that sometimes called the gateway
 9      effect?
10            A    Yes.
11            Q.   Now, in forming your opinions about this
12      aspect of the gateway effect, you reviewed a large
13      number of studies; is that right?
14            A    That's right.
15            Q.   So the studies fell in several
16      categories.  You reviewed 16 studies that found that
17      individuals who use prescription opioids
18      nonmedically have significantly higher rates of
19      heroin use than those who do not; is that right?
20            A    That's right.
21            Q.   And those studies that you reviewed
22      controlled for other factors; is that right?
23            A    Many of them did, yes.
24            Q.   And as we saw earlier with Cicero,
25      studies show that up to 80 percent of individuals
```

1

2      who used heroin in the last 20 years started their

3      opioid use with prescription opioids; is that right?

4              A    That's right.

5              Q.   Another type of evidence that you relied

6      on are studies that were conducted here in New York

7      showing that pathway; is that right?

8              A    Yes.

9              Q.   And then finally we have on this slide

10     the analysis of studies evaluating the effectiveness

11     of prescription drug monitoring programs.

12              Can you just briefly explain to the

13     Court the significance of the role of prescription

14     drug monitoring programs in heroin use?

15              A    Yes.  So prescription drug monitoring

16     programs have been introduced in New York to, to

17     provide a greater check on the opioid supply and

18     opioid prescribing and has resulted in fewer opioid

19     prescriptions to many people who have become

20     dependent on prescription opioids.

21              And numerous studies have now shown that

22     when the opioid supply is restricted, that there is

23     a transition among individuals with high levels of

24     prescription opioid use to heroin.

25              Q.   So is it fair to say that even though

1

2    opioid prescribing has gone down in the last few

3    years, heroin use has gone up?

4         A    Yeah, that's correct.

5         Q.   And do the studies about the impact of

6    prescription drug monitoring programs or PDMPs draw

7    a connection between prescription opioid use and

8    heroin use?

9         A    Yes.

10        Q.   And so your methodology in this case was

11   to look at this body of literature that looked at

12   different factors in the link between prescription

13   opioid use and heroin use; is that right?

14        A    That's right.

15             MR. ERCOLE:  Your Honor, this is

16             Mr. Ercole.  I'm just going to object.  At

17             this point in time, counsel is literally

18             leading opinions to the witness on these

19             issues.

20             THE COURT:  So you're suggesting counsel

21             is permissively leading; is that it?

22             MR. ERCOLE:  Yes, your Honor.

23             THE COURT:  All right.  Sustained.

24        Don't lead.

25             There's times you can lead on

```
 1                    Frye Hearing - Dr. Keyes          79
 2            preliminary matters.  When we get down to
 3            substance, try not to.
 4                 MR. REISMAN:  Understood.
 5                 THE COURT:  Thank you.
 6     BY MR. REISMAN:
 7            Q.   Let's look at several other studies that
 8     you analyzed in forming your opinions on this issue.
 9     This is Demo 57.
10                 This is a study titled, "Associations of
11     Nonmedical Pain Reliever Use and Initiation of
12     Heroin Use in the United States;" is that right?
13            A    That's right.
14            Q.   And it was authored by Muhuri,
15     M-U-H-U-R-I, in 2013?
16            A    Yes.
17            Q.   What did the researchers do in this
18     study?
19            A    They analyzed data from the National
20     Survey of Drug Use and Health, which is conducted
21     annually in the United States.  And they used data
22     from 2002 to 2011 to examine the risk of heroin
23     initiation based on prior nonmedical opioid use.
24            Q.   What did they find?
25            A    They found that prior nonmedical opioid
```

```
 1                          Frye Hearing - Dr. Keyes              80

 2      use increased the risk of heroin initiation.

 3              Q.    Did they make any finding about the

 4      percentage of heroin users that initiated their

 5      opioid use with prescription opioids?

 6              A    Yes.

 7              Q.    What was that finding?

 8              A    The prevalence of heroin initiation was

 9      3.6 percent for the incidents -- excuse me -- the

10      incidents of heroin initiation.

11              Q.    What percentage of heroin users,

12      according to this study, began opioid use with

13      prescription opioids?

14              A    80 percent.

15              Q.    Now, do all prescription opioid users

16      become heroin addicts?

17              A    No.

18              Q.    And you a mentioned a statistic a moment

19      ago, that 3.76 percent?

20              A    Yes.

21              Q.    Can you explain, again, what that means?

22              A    That means that 3.6 percent of people

23      who use prescription opioids nonmedically progressed

24      to initiate heroin within five years.

25              Q.    Is that a significant number?
```

```
  1                    Frye Hearing - Dr. Keyes           81
  2           A     Yes.
  3           Q.    Can you explain why that is significant?
  4           A     Heroin use is relatively rare in the
  5    population.  And so 3.6 percent represents hundreds
  6    of thousands of people.
  7           Q.    Let's look at the next study here.  It's
  8    Demo 45.  This is a study titled, "Non-medical use
  9    of prescription opioids is associated with heroin
 10    initiation among US veterans: a prospective cohort
 11    study;" is that right?
 12           A     Yes.
 13           Q.    What did the researchers do in this
 14    study?
 15           A     In this study they used a cohort of
 16    veterans who had been ascertained at clinics in
 17    major cities in the U.S. and examined whether
 18    nonmedical use of prescription opioids was
 19    associated with heroin initiation.
 20                 THE COURT:  The report indicates they
 21           use a multivariable Cox regression model.
 22                 THE WITNESS:  That's correct.
 23                 THE COURT:  What is that?
 24                 THE WITNESS:  That is a type of
 25           regression model that accounts for time to
```

```
1                    Frye Hearing - Dr. Keyes              82
2              event data.  So if you want to study the time
3              to heroin initiation, you have to have a
4              regression model that allows you to model
5              that out comp with a Cox proportional
6              distribution.
7                   THE COURT:  Thank you.
8    BY MR. REISMAN:
9              Q.   What data did the researchers use in
10   this study?
11             A    They used Veterans Health Administration
12   infectious disease and primary clinic data.
13             Q.   Can you just be a little more specific?
14   Were they using surveys or other types of data?
15             A    Yes.  They did use surveys.
16             Q.   Okay.  So this study used surveys, and
17   you mentioned that in the Lankenau study surveys
18   were also used; is that right?
19             A    That's right.
20             Q.   And then the Muhuri study as well; is
21   that right?
22             A    That's right.
23             Q.   And so is using surveys on a question
24   like this the link between prescription opioid use
25   and heroin use a reliable methodology?
```

1

2          A     Yes.

3          Q.    What was the finding of the researchers

4    in this study?

5          A     The finding was that nonmedical use of

6    prescription opioids was associated with heroin

7    initiation.

8          Q.    And that's in a population of veterans?

9          A     That's right.

10         Q.    You expressed an opinion in this case

11   that prescription opioid use is linked to heroin use

12   and subsequently to fentanyl use; is that right?

13         A     Yes.

14         Q.    What is fentanyl?

15         A     Fentanyl is a highly potent synthetic

16   opioid.

17         Q.    In terms of MMEs, approximately what is

18   the MME equivalent of fentanyl?

19         A     I believe it's 50 to 100 times more

20   potent depending on the fentanyl analog that's being

21   analyzed.

22         Q.    Now, this slide is P-23781.  Is this

23   document that we're looking at a report from the CDC

24   about fentanyl in 2016?

25         A     Yes.

```
 1                    Frye Hearing - Dr. Keyes              84
 2          Q.   Did you discuss this in your report?
 3          A    Yes.
 4          Q.   What does this, what does this report
 5     say about fentanyl?
 6          A    That fentanyl has been adulterated into
 7     the heroin and prescription opioid supply in the
 8     United States.
 9          Q.   So how did you use this report in
10     forming your opinions about the link between
11     prescription opioid use, heroin use, and fentanyl
12     use?
13          A    Because fentanyl has been mixed or
14     contaminated in the heroin supply, my opinion is
15     that the extent to which prescription opioid use is
16     causally associated with heroin use, it's similarly
17     causally associated with heroin use that has been
18     tainted with fentanyl.
19                    MR. HERMAN:   Your Honor, this is Steve
20               Herman for the pharmacies, and I apologize
21               for the late objection, but I believe the
22               question was:   How was this used in your
23               report?
24                    And if I'm not mistaken, I believe this
25               is a material that was considered after the
```

```
 1                    Frye Hearing - Dr. Keyes              85
 2          report.  And so I would just like to object
 3          and to also note that I believe we filed a
 4          letter objecting to the late disclosure of
 5          the supplemental materials considered list.
 6               THE COURT:  First of all, don't ever
 7          apologize for objecting.  Part and parcel of
 8          your job is to protect the record.
 9               Mr. Reisman, did you hear what he said?
10               MR. REISMAN:  Yeah.  With all due
11          respect, Mr. Herman is wrong.  This is in her
12          report.  He's referring to another document
13          we'll get to in a minute, but this one is in
14          her report.
15               MR. HERMAN:  I apologize; obviously,
16          that list came in later.
17               THE COURT:  You don't have to apologize
18          for objecting; you don't have to apologize
19          for not.  It's okay.
20               Go ahead.
21     BY MR. REISMAN:
22          Q.   So, Dr. Keyes, let me ask you this
23     question.  So is fentanyl seen in the world out
24     there as in other substances besides opioids like
25     cocaine and so on?
```

```
                        Frye Hearing - Dr. Keyes              86
 1
 2          A    Yes.
 3          Q.   Is it your opinion in this case that
 4    every single overdose death associated with fentanyl
 5    is attributable to prescription opioids?
 6          A    No.
 7          Q.   What percentage of fentanyl-related
 8    deaths are attributable to prescription opioids in
 9    your opinion?
10          A    My opinion is that in terms of
11    heroin-related deaths that approximately 80 percent.
12               THE COURT:  He asked about fentanyl.
13               THE WITNESS:  Right.  So of those that
14          are not -- I would divide the two between
15          heroin-related deaths and non heroin-related
16          deaths.
17               Among the non heroin-related deaths,
18          certainly there is overlap between, you know,
19          cocaine and methamphetamine and other
20          substances and opioid use.
21               And so certainly some of those would be
22          attributable, but to a less extent than
23          heroin-related deaths.
24               So I don't have a specific number for
25          all fentanyl deaths.
```

```
 1                    Frye Hearing - Dr. Keyes            87
 2     BY MR. REISMAN:
 3          Q.   Let's focus on heroin-related deaths.
 4     What percentage of heroin -- let me strike that.
 5     Let me rephrase.
 6               What percentage of fentanyl-tainted
 7     heroin deaths are attributable to prescription
 8     opioids?
 9          A    I would estimate that about 75 to 80
10     percent.
11          Q.   Why is that?
12          A    Because 75 percent to 80 percent of
13     those individuals are likely to have begun with --
14     begun their opioid use with prescription opioids.
15          Q.   And with respect to fentanyl-related
16     deaths for which there is no heroin or opioid
17     involved, you mentioned that you believed that there
18     is a connection to opioids.  Can you explain what
19     you meant by that?
20          A    Sure.  People who use other substances
21     such as cocaine and methamphetamine, it often
22     co-occurs with opioids.  So there's not no
23     connection.  All of these drugs often co-occur among
24     individuals.
25          Q.   Now we're going to look at -- sorry.
```

```
 1                    Frye Hearing - Dr. Keyes            88
 2     There's a little delay in advancing slides.
 3               THE COURT:  It's okay.
 4     BY MR. REISMAN:
 5          Q.   Let's move to the third opinion that you
 6     expressed in this case or that was summarized
 7     earlier.
 8               The increased supply of prescription
 9     opioids since the 1990s led to an increase in rates
10     of OUD.  Actually, it's the second opinion.  Let me
11     ask you this first.
12               Did the supply of prescription opioids
13     in New York and in Nassau and Suffolk Counties
14     increase beginning in the 1990s?
15          A    Yes.
16          Q.   Can you explain to the Court what your
17     basis for that statement is?
18          A    I reviewed data on the distribution of
19     opioids as well as data on pharmacy dispensing of
20     opioids.
21          Q.   What data did you review?
22          A    The ARCOS data as well as IQVIA.
23          Q.   Can you tell the Court what ARCOS data
24     is?
25          A    ARCOS is a database that measures the
```

```
1                      Frye Hearing - Dr. Keyes              89
2      distribution of medication, pharmaceutical
3      medication in the United States.
4                  THE COURT:  We asked the former chief of
5              the FDA what ARCOS stands for.  He didn't
6              have the answer.  Do you?
7                  THE WITNESS:  Yes.  It's the Automated
8              -- I might get it wrong, but the Consolidated
9              Order System.  And I don't remember -- I got
10             three out of five.
11     BY MR. REISMAN:
12         Q.   Is it the Automation of Reports and
13     Consolidated Orders System?
14         A    That's right.
15         Q.   So ARCOS measures -- is it fair to say
16     that ARCOS measures the distribution of opioids?
17         A    Yes.
18         Q.   How did you go about reviewing ARCOS
19     data for this case?
20         A    I relied on studies, published studies
21     that have examined the association between
22     distribution of opioids and opioid-related harm or
23     studies that examined the distribution more
24     generally as well.
25         Q.   You mentioned IQVIA a moment ago; what
```

```
 1                   Frye Hearing - Dr. Keyes              90
 2    is that?
 3          A     That is a database that measures the
 4    pharmacy dispensing of medication.
 5          Q.    How did you go about reviewing IQVIA
 6    data?
 7          A     Similarly.  I reviewed the peer-reviewed
 8    literature that included IQVIA data on opioids.
 9          Q.    So this slide here that you have on the
10    screen is Demo 59.  This is a study titled, "Trends
11    and Patterns of Geographic Variation in Opioid
12    Prescribing Practices by State, United States, 2006
13    through 2017;" is that right?
14          A     Yes.
15          Q.    Is this a study that you analyzed and
16    relied upon in forming your opinions about the
17    opioid supply?
18          A     Yes.
19          Q.    Can we look at the pull out from the
20    slide?  It says at the end, "In 2017 pharmacies
21    filled enough opioid prescriptions to theoretically
22    provide every US resident with 5 milligrams of
23    hydrocodone bitartrate every four hours around the
24    clock for three weeks;" is that right?
25          A     That's right.
```

1

2      Q.   Now, in your report did you conclude

3   that the empirical literature demonstrates a strong

4   and statistically significant association between

5   the opioid supply and the increase in prescription

6   opioid deaths?

7      A    Yes.

8      Q.   You mentioned that you rely on

9   peer-reviewed literature for your opinions about the

10  increase in supply.

11           Let's look at this study.  This is Demo

12  62.  This is a study titled, "U.S. county prevalence

13  of retail prescription opioid sales and

14  opioid-related hospitalizations from 2011 to 2014"?

15     A    That's right.

16     Q.   Now, you mentioned a moment ago that you

17  have reviewed studies that analyze ARCOS data.  Is

18  this one of those studies?

19     A    Yes.

20     Q.   What was the conclusion of the

21  researchers in this study?

22     A    They concluded that there was a positive

23  and significant relationship between the

24  distribution of opioids and opioid-related

25  hospitalization rates.

```
 1                    Frye Hearing - Dr. Keyes              92

 2          Q.   Did they quantify that relationship?

 3          A    Yes.

 4          Q.   How so?

 5          A    They included the, the percentage

 6   increase in hospitalization rates that occurs with

 7   each increase in opioid sales per 10,000 people.

 8          Q.   And what was that percentage?

 9          A    90 percent.

10          Q.   Did you do any work to extrapolate the

11   results of this study to New York State and Nassau

12   and Suffolk Counties?

13          A    Yes.

14          Q.   What did you do?

15          A    I compared -- I extracted from publicly

16   available records opioid distributions and opioid

17   related hospitalizations just so I could determine

18   whether the direction and magnitudes of the

19   relationships were similar.

20          Q.   Does this next slide show the results of

21   your extrapolation?

22          A    Yes.

23          Q.   Are these figures that are shown in this

24   table contained in your report in this case?

25          A    Yes.
```

```
 1                    Frye Hearing - Dr. Keyes              93
 2          Q.    So based on this Ghertner study
 3   published last year, you extrapolated and determined
 4   the approximate number of prescription opioid pills
 5   per resident in the State of New York and Suffolk
 6   and Nassau Counties per year; is that right?
 7          A    Yes.
 8          Q.   And you were also able to estimate
 9   hospitalization and neonatal abstinence rates; is
10   that right?
11          A    That's right.
12          Q.   What is neonatal abstinence?
13          A    That is a collection of symptoms that
14   occurs among newborns that are consistent with drug
15   withdrawal; for example, from opioids.
16          Q.   This next slide, is this a figure that
17   is contained in your expert report, Figure 5?
18          A    Yes.
19               THE COURT:  Excuse me.  How much more
20          time?
21               MR. REISMAN:  Ten minutes.
22   BY MR. REISMAN:
23          Q.   What does this show?
24          A    This shows overdose death rates in the
25   U.S., in New York State, in Nassau and Suffolk
```

1

2    County as extracted from the CDC WONDER data from

3    1999 through 2017.

4         Q.   Does this show calculations that you

5    made using data from various sources at the federal

6    and state level?

7         A    Yes.

8         Q.   Why do the trends increase a lot

9    beginning in 2013 and 2014?

10        A    That is around the time that the -- that

11   the opioid supply in the United States became

12   contaminated with fentanyl.

13        Q.   So before that, the trends of overdose

14   death rates increased, but then they increased even

15   more after that point when fentanyl showed up in the

16   heroin supply; is that right?

17        A    That's right.

18        Q.   I'd like to talk now about the third

19   opinion that we saw on the slide earlier about

20   marketing causation.

21             And, Dr. Keyes, are you aware that in

22   the federal MDL in Ohio, Judge Polster ruled that

23   you cannot testify about marketing causations,

24   specifically the relationship between marketing of

25   prescription opioids and opioid prescribing?

```
 1                    Frye Hearing - Dr. Keyes              95
 2          A    Yes.
 3          Q.   Can you tell Justice Garguilo what you
 4     did to analyze that relationship for this case?
 5               THE COURT:  Since that determination?
 6               MR. REISMAN:  Yes.
 7               THE COURT:  Go ahead.
 8               THE WITNESS:  Yes.  I've done a number
 9          of things, including, Number 1, I relied on
10          the -- not the marketing materials
11          themselves, but on epidemiological literature
12          and epidemiologists who analyzed the
13          relationship using statistical models that
14          are germane to my field.
15               And I also, as a Bradford Hill criteria
16          of analogy, analyzed other epidemiological
17          studies that look at similar associations
18          with other products in order to determine
19          whether there was a body of evidence with
20          epidemiological methods that I could rely on.
21               THE COURT:  Okay.  Judge Polster -- and
22          correct me if I'm wrong.  By the way, Judge
23          Polster, as you know, is the Judge in the
24          federal MDL out of Ohio.
25               You and a couple of other witnesses on
```

```
 1              Frye Hearing - Dr. Keyes          96
 2         this question of marketing causation spent
 3         some time discussing your lack of background
 4         in the field of let's say pharmaceutical
 5         marketing.
 6              THE WITNESS:  Yes.
 7              THE COURT:  Are you suggesting that the
 8         work you have done since that determination
 9         addresses that finding?  Just yes or no.
10              THE WITNESS:  Yes.  I think the work
11         that I've done in the report has addressed
12         the finding.
13              THE COURT:  The gentlemen will
14         cross-examine on that, of course.
15    BY MR. REISMAN:
16         Q.   So let me ask you this, Dr. Keyes.  So
17    is it fair to say that there are two types of
18    marketing causation studies that you analyzed for
19    purposes of your opinion on marketing causation;
20    Number 1 being general studies about the link
21    between marketing and prescribing and, Number 2,
22    specific studies focused on opioids?
23         A    That's right.
24              MR. ERCOLE:  Your Honor, I'm going to
25         object again.  It's leading, particularly
```

```
1                    Frye Hearing - Dr. Keyes            97
2          with respect to this question when we are
3          getting into the substance of the opinion.
4               THE COURT:  I'm being scolded by my
5          stenographer, and rightfully so.
6               Identify yourself before you note your
7          objection so we get you on the record.
8               So go ahead.  This is Mr. So-and-So on
9          behalf of So-and-So.  My objection is as
10         follows.
11              Go ahead.
12              MR. ERCOLE:  Yes, your Honor.  My name
13         is Brian Ercole, on behalf of the Teva
14         Defendants, and my objection is that this is
15         -- this particular question was leading.
16              THE COURT:  All right.  Rephrase.
17    BY MR. REISMAN:
18         Q.   So, Dr. Keyes, you mentioned the body of
19    epidemiological literature regarding the link
20    between marketing and prescribing.
21              Can you describe what that body of
22    literature includes?
23         A    Yes.  It includes epidemiologists and
24    other people in the epidemiology field who examined
25    statistically associations using data on -- that are
```

1

2    germane to marketing and their associations with

3    prescribing and other outcomes.

4         Q.   Does an epidemiologist need to have a

5    background in marketing in order to study the impact

6    of marketing on prescribing?

7         A    No.

8         Q.   To your knowledge, did the

9    epidemiologist who conducted the studies that you

10   reviewed for this case have a background in

11   marketing?

12        A    Not to my knowledge.

13        Q.   What information did those

14   epidemiologists whose work you reviewed for this

15   case use to form conclusions about the impact of

16   marketing on prescribing?

17        A    They used a database that included

18   information on -- that was quantified dollars of

19   marketing, for example.  They did not review the

20   actual marketing material.

21        Q.   So we're going to move to the end here

22   and talk about several studies.

23             THE COURT:  A while ago you told me ten

24             minutes.  So if you need more time, I'll take

25             a morning break now.

1

2          MR. REISMAN:  Why don't we do that?

3     Yes, please, thank you.

4          THE COURT:  We'll take a 15-minute

5     recess.

6          (WHEREUPON, a short recess was taken.)

7          THE CLERK:  Come to order.  Part 48 is

8     now in session.

9          THE COURT:  Please be seated.  Thank

10    you.

11         THE CLERK:  Doctor, I remind you you're

12    still under oath.

13         THE WITNESS:  Thank you.

14         THE COURT:  You may.

15         MR. REISMAN:  Thank you, your Honor.

16    BY MR. REISMAN:

17    Q.   Dr. Keyes, since Judge Polster issued

18    his marketing causation opinion in the federal

19    opioids MDL, have you become an expert in marketing?

20    A    No.

21    Q.   Let me ask you this.  Do epidemiologists

22    study the effect of marketing on prescribing?

23    A    Yes.

24    Q.   What methodology do epidemiologists use

25    to study that link?

1

2          A     We use the same methodology that we

3    would use for any exposure-outcome relationship.

4          Q.    For example?

5          A     The same methodology that you would use

6    to study prescription opioid dose and duration with

7    OUD.

8          Q.    Are you referring to the Bradford Hill

9    factors, for example?

10         A     Yes.

11         Q.    So would you look to see if there's a

12   dose-response relationship?

13         A     Yes.

14         Q.    Would you look to see if there is

15   replication?

16         A     Yes.

17         Q.    Would you look to see if the studies

18   account for alternative explanations?

19         A     Yes.

20         Q.    Would you apply other Bradford Hill

21   factors?

22         A     Yes.

23         Q.    So this is what epidemiologists do; is

24   that right?

25         A     That's right.

1

2          Q.    Is that what you did in this case?

3          A    Yes.

4          Q.    Since you filed your report in the MDL

5    that Judge Polster addressed, between that time and

6    the time you filed your New York report, did you

7    review and analyze any additional studies regarding

8    the link between marketing of prescription

9    medications generally and prescribing generally?

10         A    Yes.

11         Q.    Now, you looked in particular in your

12   expert report, you analyzed some studies relating to

13   the marketing of opioids and the impact on the

14   prescribing of opioids; is that right?

15         A    That's right.

16         Q.    Let's bring up the next slide, if we

17   can.  So this is Demo 50.

18              Is this the study from Hadland and

19   colleagues in 2017 titled, "Industry Payments to

20   Physicians for Opioid Products, 2013 to 2015"?

21         A    Yes.

22         Q.    Can you briefly tell the Court what data

23   Hadland analyzed in this study?

24         A    Yes.  They used data called Open

25   Payments, and this was a database that included

1

2      information on the dollars that were -- the payments

3      to doctors for opioid products.

4              Q.   Do you know who maintains Open Payments?

5              A    I'm not sure off the top of my head.

6              Q.   Is it a federal agency?

7              A    I believe so.  I believe it was the

8      result of a -- there was a law that was passed

9      saying that these data had to be made public.

10             Q.   Did Hadland in this study interview

11     doctors?

12             A    No.

13             Q.   Did Hadland review marketing materials?

14             A    Not as far as I know, not based on the

15     published paper.

16             Q.   Let's look at the next study from

17     Hadland and colleagues.  This is --

18                  THE COURT:  By the way, go back to the

19             last one for one second.

20                  MR. REISMAN:  Yes.

21                  THE COURT:  It reads:  "These findings

22             should prompt the examination of industry

23             influences on opioid prescribing."

24                  It says it should prompt this kind of an

25             examination/investigation.

1
2          Was there a follow-up on that?
3          THE WITNESS:  There were several other
4      studies published from the same data that
5      examines the industry influences.
6          THE COURT:  But the only conclusion is
7      that the findings should prompt an
8      examination.
9          THE WITNESS:  Yes.
10          THE COURT:  Okay.  Thank you.  By the
11      way, does the article say who was to conduct
12      the examination?
13          THE WITNESS:  That's not specified in
14      the paper.
15          THE COURT:  Okay.  Thank you.
16  BY MR. REISMAN:
17          Q.   So this is Demo 49.  I correct myself.
18  It's Demo 51.
19          Is this study -- was this done,
20  published by Hadland in 2018, a year after --
21  actually, you know, let's hold this for a moment.
22  And I want to ask you about the prior study.
23          MR. REISMAN:  Can we bring the slide
24      back up.  Yeah, if we can skip to the end.
25          Okay.  So, Sal, if you could hand out

1

2          Demo 49.

3     BY MR. REISMAN:

4          Q.    So is this study that was published in

5     2018 in JAMA Internal Medicine, is it titled,

6     "Association of Pharmaceutical Industry Marketing of

7     Opioid Products to Physicians With Subsequent Opioid

8     Prescribing"?

9          A     Yes.

10         Q.    And this is the same Hadland who

11    published the study that we just looked at a year

12    earlier; is that right?

13         A     The same first author, yes.

14         Q.    So what did Hadland do in this study in

15    2018?

16         A     So this study linked two different

17    databases.  One is the same Open Payments database

18    that we were -- that was the topic of the American

19    Journal of Public Health paper.

20              And then they looked at that in

21    association with the Medicare Part D opioid

22    prescriber summary file to correlate the marketing

23    practices with prescription claims for Medicare

24    beneficiaries.

25         Q.    What did Hadland find in this study?

1

2      A     They found an association between the,

3   the amount of money that doctors received from

4   opioid manufacturers with subsequent opioid

5   prescribing.

6      Q.   The slide that we're showing right now

7   is drawn from the article itself.

8           Can you explain to the Court what this

9   slide shows?

10      A     Yes.  This is the association between

11   the number of meals received in 2014 and the number

12   of opioid claims in 2015 from those same physicians

13   based on the number of meals that they received.

14      Q.   Does it show that the more meals that

15   physicians received from opioid industry sales

16   representatives, the more opioids they prescribed?

17      A     Yes.  This would be consistent with

18   dose-response.

19      Q.   Does this study, the 2018 study mention

20   any specific manufacturers of opioids?

21      A     Yes.

22      Q.   Which ones?

23      A     It mentions the three companies with the

24   highest payment totals: Insys Therapeutics, Teva

25   Pharmaceuticals, and Janssen Pharmaceuticals.

1

2    Q.   Let's move to the last slide, and we

3    already marked this for demonstrative purposes.  The

4    study is Demo 51.

5         Is this a study that Hadland published

6    last year in JAMA Open?

7    A    Yes.

8    Q.   And is this one titled, "Association of

9    Pharmaceutical Industry Marketing of Opioid Products

10   With Mortality From Opioid-Related Overdoses"?

11   A    Yes.

12   Q.   What did Hadland and colleagues do in

13   this study?

14   A    So similar to the prior study where

15   different databases were linked, this study used the

16   same Open Payments database and linked it with the

17   CDC WONDER data, the same mortality data that I

18   published in my report.

19   Q.   What did the researchers conclude?

20   A    They concluded that there was an

21   association between the amount of money spent on

22   opioid marketing and opioid-related harms in terms

23   of prescription opioid overdoses in those same areas

24   that were highly saturated with marketing dollars.

25   Q.   So in this Hadland 2019 study, did the

1
2     researchers build on the articles they published in
3     2018 and 2017?
4            A    Yes.
5            Q.   Did you, in your work on this case,
6     evaluate the marketing materials of any manufacturer
7     Defendant?
8            A    No.
9            Q.   Why not?
10           A    Because that's not part of the
11     epidemiological science that I relied on.
12           Q.   Did Hadland and colleagues in these
13     studies that we just looked at evaluate the
14     marketing materials of any manufacturer?
15           A    It's not in the study.
16           Q.   What did they evaluate?
17           A    They evaluated the Open Payments
18     database.
19                THE COURT:  By the way, these authors in
20                Demo 51, are they epidemiologists or
21                something else?
22                THE WITNESS:  I am familiar with several
23                of the authors who are -- who have Ph.D.s in
24                epidemiology.  I don't know the
25                qualifications of all the authors, but many

```
 1                    Frye Hearing - Dr. Keyes              108
 2            of the authors have Ph.D.s in epidemiology.
 3                 THE COURT:  I'm talking about the people
 4            that were listed on 51, Hadland,
 5            Rivera-Aguirre, et cetera.
 6                 THE WITNESS:  Yes.
 7                 THE COURT:  My question is:  Are they
 8            epidemiologists?
 9                 THE WITNESS:  Three out of the four I
10            know are epidemiologists.  One is a question
11            mark.
12                 THE COURT:  Out of curiosity, which one
13            is it?
14                 THE WITNESS:  I don't know the
15            background of Rivera-Aguirre.
16                 THE COURT:  Thank you.
17       BY MR. REISMAN:
18            Q.   Dr. Keyes, in your work on this case and
19       in forming your opinions on marketing causation, did
20       you interview any doctors?
21            A    No.
22            Q.   Why not?
23            A    That's not part of the epidemiological
24       science that I relied on.
25            Q.   To your knowledge did Hadland in these
```

1

2    three opioid studies interview any doctors?

3        A    Not to my knowledge.

4        Q.   Did you review any patient charts in

5    connection with your work on this case?

6        A    No.

7        Q.   Why not?

8        A    Similarly, it's not part of the

9    epidemiological science that I used.

10       Q.   Do epidemiologists draw associations

11   between cause and effect?

12       A    Yes.

13       Q.   Is that what Hadland and colleagues did

14   in these three studies that we just looked at?

15       A    They were looking at associations.  And

16   then I think it's up to the epidemiologist reviewing

17   the material to synthesize those associations and

18   draw their own conclusions.

19       Q.   Is it a generally accepted practice in

20   epidemiology to draw causal inferences from studies

21   that in themselves conclude that there is

22   association between cause and effect?

23       A    That's right.

24       Q.   Is that what you did in this case?

25       A    Yes.

```
 1                    Frye Hearing - Dr. Keyes            110
 2           Q.   Dr. Keyes, just a few concluding
 3      questions.
 4                Was your testimony about the methodology
 5      that you used in formulating your opinions in this
 6      case based on your training in epidemiological
 7      methods?
 8           A    Yes.
 9           Q.   And did you apply those methods to all
10      of the opinions that we discussed today?
11           A    Yes.
12           Q.   Is it a fair summary of your methodology
13      to say that first you assessed whether there is an
14      association between exposure to prescription opioids
15      and harms?
16           A    Yes.
17           Q.   And is it also fair to say that you then
18      determined whether those associations are causal by
19      reviewing and synthesizing scientific literature
20      using the factors that we've discussed today?
21           A    That's right.
22           Q.   And did you apply that same methodology
23      to your opinions about the link between opioid
24      supply and harm?
25           A    Yes.
```

```
 1                    Frye Hearing - Dr. Keyes              111
 2           Q.   Did you apply that same methodology to
 3      the link between marketing of prescription opioids
 4      and prescribing of prescription opioids?
 5           A    Yes.
 6           Q.   Let me ask you one final question,
 7      Dr. Keyes.  Prior to today, on how many occasions
 8      have you testified before a judge as an expert in
 9      any case?
10           A    Zero.
11                MR. REISMAN:  Thank you, Dr. Keyes.
12           Pass the witness.
13                THE COURT:  Thank you.
14                The attorneys I have listed for
15                examiners on this witness are for the
16                distributors, Mr. Schmidt; manufacturers,
17                Mr. Ercole; and pharmacy, Mr. Herman.
18                MR. SCHMIDT:  Correct as to me, your
19                Honor, Paul Schmidt.
20                THE COURT:  You may.
21      CROSS EXAMINATION
22      BY MR. SCHMIDT:
23           Q.   Dr. Keyes, good morning.  I'm going to
24      start asking you questions now and then continue
25      into the afternoon, and I'm going to focus on two
```

1
2    aspects of your opinion; supply and how that relates
3    to harm and what's responsible for supply, and then
4    the gateway view that you've espoused.
5                Before I do that, I want to start with a
6    few basic points.  Is it generally accepted in your
7    field, epidemiology, that something is a cause if
8    the outcome would not have occurred in the absence
9    of that factor, holding everything else constant?
10        A    Yes.
11        Q.   Is it generally accepted in epidemiology
12   that an association does not necessarily equal
13   causation?
14        A    Yes.
15        Q.   In your field, an association means
16   there's some kind of relationship, statistical or
17   otherwise, between two variables, correct?
18        A    That's right.
19        Q.   But that doesn't necessarily tell us
20   that there's a causal relationship in one direction
21   or the other, correct?
22        A    Not necessarily.
23        Q.   It's necessary to rigorously test an
24   association to determine whether the association
25   reflects a causal association, true?

1

2          A    Yes.

3          Q.   And in doing that, it's generally

4    accepted in epidemiology that you have to account

5    for other potential causes, correct?

6          A    Generally.

7          Q.   And you'll recall that was one of the

8    factors you cited on Slide 7 of your methodology

9    slide, and I think you described that as a standard

10   factor considering alternative causes, correct?

11         A    Yes.

12         Q.   That's a critical factor in a causation

13   analysis, right?

14         A    It's one among several.

15         Q.   Is it critical?

16         A    Yes.

17         Q.   And it's generally accepted, but you

18   have to consider alternate causes, correct?

19         A    Yes.

20         Q.   Now, you spent some time talking about

21   Bradford Hill, and that being a methodology.  That's

22   a methodology that was announced in a speech by

23   Austin Bradford Hill in the '60s, correct?

24         A    Yes.

25         Q.   And I think you acknowledge that that's

1
2     a term, Bradford Hill, that you never once mention
3     in your report; is that correct?
4          A    That's correct.
5          Q.    You don't lay out in your report,
6     according to the nine factors of Bradford Hill and
7     how you believe your opinions track against those
8     nine factors, correct?
9          A    Correct.
10         Q.    And you certainly don't do that if you
11    recall Slide 14 of your presentation, that's where
12    you have the three individual opinions.  You
13    certainly don't do that for those three individual
14    opinions.  Say, for this opinion, here's how factor
15    one is met, here's how factor 2 is met, here's how
16    coherence is met.  Here's how analysis of alternate
17    causes is met, correct?  You don't do that?
18         A    That's right.
19         Q.    There's no mention at all in your
20    report, for example, of something like biological
21    plausibility, correct?
22         A    Those words may not be in the report.
23         Q.    Now, you do set forth your methodology
24    in your report, correct?
25         A    Yes.

1

2      Q.    Do you have it handy?

3      A     Yes.

4      Q.    If you look at page 11 of your report, I

5   believe there is a two- or three-page discussion of

6   your methodology for the review of the evidence,

7   correct?

8      A     Yes.

9      Q.    And there's no mention of Bradford Hill

10   in there, correct?

11      A     Not that name.

12      Q.    There's no walk through of Bradford Hill

13   factors one by one in there, is there?  Yes or no.

14      A     Not of the Hill factors.

15      Q.    Okay.  And you talked about published

16   articles you have on prescription opioids.  You've

17   never published an article on prescription opioids

18   that contains one of the three opinions that you

19   stated on Slide 14 that you were shown with

20   Plaintiffs' counsel.  You've never published an

21   article setting forth one of those three opinions

22   and specifically invoking Bradford Hill to analyze

23   those opinions, correct?

24      A     I mean, those are two questions, right?

25   The first is --

1

2       Q.   It's a two-part question.  Have you

3  published the opinions that you've given us in court

4  in an article that specifically discusses the

5  Bradford Hill factors or even references the

6  Bradford Hill criteria?  Yes or no.

7       A    The word Bradford Hill specifically?

8       Q.   Yes.

9       A    Not the word Bradford Hill specifically.

10       Q.   Or that walks through each factor one at

11  a time?

12       A    The discussion sections of the paper is

13  generally in epidemiology cohered to the types of

14  factors that Bradford Hill outlined in.

15       Q.   Can you points me to a paper you

16  published where you give one of the opinions on

17  causation in this case and specifically walk through

18  the various Bradford Hill factors to support that

19  opinion?  Yes or no.

20       A    No, not at the time.

21       Q.   Now, I'd like to turn now to the

22  substance and how that tracks your methodology, and

23  I want to start first with your opinion on supply.

24  I want to talk about the why of supply.

25            Are you aware that the DEA, the Drug

1

2    Enforcement Administration has publicly gone on

3    record and talked about their role in supply, and

4    they have said that we control the amount produced,

5    bought, sold, and otherwise transferred.  Are you

6    aware of that?

7         A    I'm not aware of that material.

8         Q.   Do you take issue with that DEA

9    testimony that our United States Congress, that DEA

10   controls the amount produced, bought, sold, and

11   otherwise transferred when it comes to prescription

12   opioids?

13        A    I would need to look at the testimony.

14        Q.   You don't have a view on whether that's

15   accurate or not?

16        A    No.

17        Q.   Are you aware that the DEA every year

18   sets quotas for how many prescription opioids can be

19   made?

20        A    I'm generally aware.

21        Q.   And are you aware that they set those

22   quotas based on estimated medical scientific

23   research and industrial needs of the United States?

24        A    Generally.

25        Q.   Every opioid pill that's manufactured

1

2    distributed, or dispensed has to be within that

3    quota, correct, under the law?

4         A    I'm not that familiar -- I'm not

5    familiar with those laws, so I wouldn't offer an

6    opinion on that.

7         Q.    Okay.  Let me ask you this then.

8              Do you know if there's ever occasion you

9    can point us to where a manufacturer made opioids

10   that exceeded the permissible quota by the DEA or a

11   distributor shift opioids that exceeded permissible

12   quota of the DEA?

13        A    I'm not aware.

14        Q.    And let me just for terminology, in this

15   case certain chain pharmacies, CVS, Rite Aid,

16   Walgreens, Walmart have been sued as distributors.

17   So I'm going to include them in my definition of

18   distributors, if you're okay with that, because they

19   supply, in some instances, in some time periods,

20   they supply prescription opioids to their chain

21   stores.  Does that make sense?  Are you aware of

22   that fact?

23        A    I know that.

24        Q.    Okay.  Did you know that before I told

25   you?

1

2        A     No.

3        Q.    Do you understand that the prescription

4    opioid supply by law cannot exceed the DEA quota?

5        A     I'm sorry.  Can you just repeat that

6    question?

7        Q.    Of course.

8              Do you understand, yes or no, that the

9    prescription opioids supplied by law cannot exceed

10   the DEA quota?

11       A     Again, I'm not familiar with the DEA

12   regulations.

13       Q.    Do you understand the DEA has the power

14   to reduce prescription opioids supplied by reducing

15   it's quota?

16       A     I haven't reviewed the DEA regulations.

17       Q.    Okay.  And do you know factually that

18   throughout the '90s and the 2000s the DEA

19   continually increased quotas?

20       A     Again, I have not reviewed that.

21       Q.    So you're not offering opinion on

22   whether or not DEA quotas contributed to the opioid

23   supply; is that correct?

24             Let me ask the question differently.

25             Are you offering an opinion, yes or no,

1

2    on whether the DEA quotas contributed to the opioid

3    supply?

4          A    Generally I'm offering the opinion that

5    anything that increased the supply was contributing.

6    So to the extent that the DEA did that, and I have

7    not reviewed the regulations, it would be consistent

8    with the opinion that factors that increase the

9    supply are involved and increase to the supplier.

10         Q.   So you haven't looked at the regulations

11   regarding the quotas, correct?

12         A    That's correct.

13         Q.   You haven't looked at the facts

14   regarding the quotas that the DEA was doing,

15   correct?

16         A    That's right.

17         Q.   But you would agree that if the DEA did,

18   in fact, increase the quota, that would increase

19   supply, correct?

20         A    I would need to review the material,

21   but...

22         Q.   Yes, okay.  You didn't perform any

23   specific evaluation or analysis in your report or

24   your methodology as to whether the specific amount

25   of opioid harm would have occurred in the absence of

```
 1                    Frye Hearing - Dr. Keyes              121

 2      specific DEA increases to the quota, correct?

 3              A    Can you rephrase the question?  It's

 4      about the DEA?

 5              Q.   Yes, it's about the DEA and their

 6      quotas.  Did you perform an analysis -- as part of

 7      your methodology in this case, did you perform an

 8      analysis or evaluation of whether the same amount of

 9      harm would have occurred in terms of prescription

10      opioids in the absence of the DEA changing quotas

11      year to year?

12              A    No.

13              Q.   Let me turn to another factor, doctors.

14      Am I correct that the only legal way to get

15      prescription opioids is to go to a licensed

16      prescriber?

17              A    Yes.

18              Q.   No matter how many opioids a distributor

19      ships to a pharmacy without a prescription from a

20      doctor, those opioids are supposed to sit on the

21      shelf and not go out to the public, correct?

22              A    I'm sorry.  Say that again.

23              Q.   Sure.  No matter how many opioids a

24      distributor ships to a given pharmacy, if there's

25      not a prescription from a doctor, those opioids are
```

1

2      supposed to stay in that pharmacy and not go out to

3      the public, correct?

4           A    That's correct.

5           Q.    And you've not identified prescription

6      opioids that the distributor in this case shipped

7      that were dispensed in New York without a valid

8      prescription being written, correct?

9           A    Correct.

10          Q.    Is there any contribution you can

11     identify that individual distributors made to the

12     supply of prescription opioids available to New York

13     citizens that was not linked to a doctor writing a

14     prescription for those opioids?

15          A    Can you repeat?

16          Q.    Yes.

17               Is there any contribution you can

18     identify that a specific distributor in this case

19     made to the supply of prescription opioids available

20     to New York citizens that came about in some way

21     other than in connection with a doctor writing a

22     prescription for that opioid?

23          A    No.

24          Q.    As a result, doctors play a role in

25     determining the supply of prescription opioids,

1
2      correct?

3           A    Yes.

4           Q.   And in evaluating the causes of the

5      opioid crisis, it's important to evaluate the role

6      of doctors who prescribe opioids, correct?

7           A    Yes.

8           Q.   Are you familiar with DEA statements --

9      I'll ask you about a different set of DEA

10     statements.  Also our Congress saying that the

11     overwhelming majority of doctors, more than 99

12     percent, prescribe opioids to their patients in good

13     faith; are you aware of such statements?

14          A    I'm not familiar with those.

15          Q.   Did you hear -- did you listen to

16     Dr. Lembke yesterday?

17          A    Yes.  I listened to some, part of it.

18          Q.   Did you hear her say that there was a

19     wholesale paradigm shift in how doctors prescribed

20     that led to the opioid crisis?

21          A    I didn't hear that part.

22          Q.   Do you agree with that statement?

23          A    Can you say it again?

24          Q.   That there was a paradigm shift in

25     prescribing practices across the medical community

```
 1                    Frye Hearing - Dr. Keyes            124
 2     that led to the opioid crisis?
 3           A     My methodology doesn't cover that.
 4           Q.    Okay.  You distinguish in your report
 5     between doctors who are prescribing based on their
 6     perception of medical need and something called pill
 7     mill doctors, correct?
 8           A     Yes.
 9           Q.    And have you undertaken any assessment
10     of how much of the prescribing or the supply during
11     the opioid crisis was due to pill mill doctors
12     versus the doctors who are prescribing based on
13     their perception of medical need?  Have you tried to
14     allocate that?
15           A     There is a section in my report where I
16     detail some opinions related to that.
17           Q.    Do you actually allocate it?  Can you
18     tell us how much of supply was due to pill mill
19     doctors versus doctors prescribing in good faith?
20           A     Not a specific number, no.
21           Q.    Do you agree with me that the
22     overwhelming majority was due to doctors in good
23     faith, or do you know?
24           A     Was due to doctors, yes.
25           Q.    Well, I think it was all due to doctors.
```

```
 1                    Frye Hearing - Dr. Keyes            125
 2      My question is:  Was it due to doctors in good
 3      faith?  Do you have a view on that, whether the
 4      overwhelming majority of supply in New York was a
 5      result of doctors acting in good faith versus pill
 6      mill doctors?
 7           A    Yes.  I think that the overwhelming
 8      majority of prescriptions is due to doctors who were
 9      prescribing based on their understanding at the
10      time.
11           Q.   And you're aware that doctors increased
12      prescribing levels for prescription opioids starting
13      in the '90s through the 2000s up until 2010,
14      correct?
15           A    Yes.
16           Q.   You agree that the high volume of opioid
17      prescriptions became the foundation for the overall
18      expansion in the opioid supply and opioid-related
19      harm, correct?
20           A    Say that again.
21           Q.   You agree that the high volume of opioid
22      prescriptions became the foundation for the overall
23      evaluation -- I'm sorry -- the overall expansion in
24      the opioid supply and opioid-related harm?
25           A    Yes.
```

1

2      Q.    You believe that overprescription helped

3   contribute by doctors helping contribute to the

4   increase in opioid disorder, overdose, and related

5   harms, correct?

6      A    Yes.

7      Q.    You believe that the expansion of

8   nonmedical use of prescription opioids would not

9   have occurred without that increase in the opioid

10  supply dispensed for medical use, correct?

11     A    Yes.

12     Q.    In fact, in your publications, you've

13  said that the data are robust in demonstrating that

14  rates of overdoses are proportional to the rates of

15  prescription, correct?

16     A    It depends on what time period that

17  we're talking about.

18     Q.    You published that in an article in

19  2013, correct?

20     A    Yes.

21     Q.    Do you stand behind that statement as to

22  the facts as they existed before 2013?

23     A    Can you say the sentence again?

24     Q.    Yeah.  The sentence is:  The data are

25  robust, however, in demonstrating the rates of

```
 1
 2      overdoses are proportional to the rates of
 3      prescriptions.
 4            A    Yes.
 5            Q.   As part of your methodology in this case
 6      did you perform any specific analysis as to whether
 7      the opioid crisis would have occurred at all or how
 8      much different it would have been in terms of the
 9      harm in the absence of doctors increasing their
10      prescribing and thus increasing the supply of
11      prescription opioids?
12            A    By a specific analysis, can you --
13            Q.   Yeah.  Did you try to quantify how
14      different it would be if doctors had not increased
15      their prescribing?
16            A    No.
17            Q.   You do agree that doctors play a role in
18      bringing about the opioid crisis?
19            A    Yes.
20            Q.   And you agree that opioid harm would not
21      have occurred at the same level in the absence of
22      doctors increasing their prescribing of prescription
23      opioids?
24            A    Yes.
25            Q.   Opioid supply would not have increased
```

```
 1                    Frye Hearing - Dr. Keyes              128

 2    without doctors playing a role in prescribing of

 3    prescription opioids, correct?

 4          A     That's correct.

 5          Q.    Now, you've talked briefly at the end of

 6    your testimony this morning about marketing and how

 7    that influenced doctors.  There are other factors

 8    that have been cited as influencing doctors and

 9    their prescribing practices, correct?

10          A     That's right.

11          Q.    When the State of New York, the entity

12    you represent in this case, makes statements to the

13    medical profession about things like prescription

14    opioids, do you expect them to follow generally

15    accepted practices?

16          A     Sorry.  Can you say that again?

17          Q.    Yes.  When the State of New York gives

18    guidance to doctors in New York about prescription

19    opioids, do you expect them to follow generally

20    accepted medical standards?

21          A     Yes.

22          Q.    Have you undertaken a thorough review of

23    all of the statements that the State of New York

24    made to doctors in New York encouraging them to

25    consider using prescription opioids?
```

```
 1                    Frye Hearing - Dr. Keyes              129
 2          A    No.
 3               MR. SCHMIDT:  Let's just look at one
 4          example and then we'll move on.  May I
 5          approach, your Honor?
 6               THE COURT:  Yeah, sure.
 7               Normally the way we do it is the court
 8          officer is like the liaison between.
 9               MR. SCHMIDT:  Okay.  Do you want me to
10          ask to approach every time I approach the
11          witness?
12               THE COURT:  Ask me.
13               MR. SCHMIDT:  Okay.  I will then.
14     BY MR. SCHMIDT:
15          Q.   Have you seen this document before which
16     is Defense New York 5260 entitled, "New York's
17     Medical Conduct Program.  Pain Management:  A guide
18     For Physicians"?  Have you seen this document
19     before?
20          A    I may have.  I don't recall a specific
21     time.  I have may have seen this before.  I reviewed
22     a lot of these types of materials in the course of
23     my work.
24          Q.   Okay.  It's not on your reliance list.
25     Does that rule out you having seen it?
```

```
 1              Frye Hearing - Dr. Keyes          130
 2         A    It doesn't rule it out.  I may have seen
 3    it before.
 4              MR. SCHMIDT:  Let's put it up on the
 5         screen, Mr. Reynolds, if we can.
 6              MR. REISMAN:  Your Honor, I'm going to
 7         object on the basis that there's no
 8         foundation to use this document right now.
 9         This is a hearing about qualifications and
10         methodology, and he is showing documents
11         that --
12              THE COURT:  Let me see where it goes.
13         You said there's no foundation?
14              MR. REISMAN:  Yes.
15              THE COURT:  Well, the witness is brought
16         here by the Plaintiffs, right?
17              MR. REISMAN:  Yes.
18              THE COURT:  So is foundation really the
19         source of your objection or something else?
20              MR. REISMAN:  Well, it's also just --
21         it's beyond the scope of what this hearing is
22         about.
23              THE COURT:  What was your last question,
24         please?
25              MR. REISMAN:  I think it was:  Have you
```

```
 1                    Frye Hearing - Dr. Keyes            131

 2            seen -- does the fact that it's not on your

 3            reliance list rule it out as something that

 4            you looked at.

 5                 THE COURT:  Overruled.

 6                 Let's see where it goes.

 7     BY MR. SCHMIDT:

 8            Q.   Do you see on the first page right in

 9     the center after the title that we've read, there's

10     the logo for the State of New York and reflecting

11     that this document is from August 2007?  It's got

12     Governor Spitzer on it.  Do you see that?

13            A    Yes.

14            Q.   If we look at the second page of this

15     document, I just want to highlight two sentences in

16     this document.

17                 First of all, on the left hand under

18     introduction, do you see the third paragraph?  It

19     helps to look on the screen.  We're going to

20     highlight it on the screen just to make it easier

21     for you to find.

22                 It says "The board encourages and

23     expects physicians to view effective pain management

24     as part of quality medical practice for all patients

25     with pain, acute or chronic, including pain as a
```

```
 1                Frye Hearing - Dr. Keyes              132
 2    result of terminal illness."  Do you see that
 3    language?
 4           A    I do.
 5           Q.    And then I want to look at the language
 6    under controlled substances.  "The board recognizes
 7    that controlled substances, including opioid
 8    analgesics, are often essential in the treatment of
 9    acute and chronic pain, both malignant and
10    nonmalignant."  Do you see that language?
11           A    Yes.
12           Q.    I'll ask you just two questions about
13    that language.  First of all, yes or no, do you
14    agree with that statement about opioid analgesics
15    being essential or often essential in the treatment
16    of acute and chronic pain, both malignant and
17    non-malignant, or do you have a view on that?
18           A    I don't agree with that statement.
19           Q.    Did you conduct any kind of analysis of
20    whether documents like this, whether the doctors or
21    similar documents to New York residents as patients
22    from the State of New York, whether they had a
23    specific impact on physician prescribing decisions
24    and the levels of supply in the State of New York?
25           A    No.
```

```
 1                  Frye Hearing - Dr. Keyes              133

 2          Q.    Did you conduct any evaluation or

 3    analysis as to whether the same amount of harm would

 4    have occurred in the State of New York if the State

 5    of New York itself were not telling doctors

 6    statements like this that you disagree with about

 7    prescription opioids?  Did you conduct that type of

 8    analysis?

 9          A    No.

10          Q.   That's my foundation, your Honor.  I'll

11    move on.

12               THE COURT:  It's a 2008 document, yes?

13               MR. SCHMIDT:  Yes.  And I'm happy to

14          show more from an earlier time period, but in

15          the interest of time, I'll move on to my next

16          topic, unless your Honor wants to hear more

17          on this topic.

18               THE COURT:  No, I'm fine.

19               MR. SCHMIDT:  I assume the answer will

20          always be no more on any given topic.

21               THE COURT:  I'm fine.

22    BY MR. SCHMIDT:

23          Q.   Do you agree that insurance company

24    decisions about whether to cover prescription

25    opioids were given favorable formulary treatment of
```

```
 1                    Frye Hearing - Dr. Keyes              134
 2    prescription opioids, and correspondingly whether
 3    they cover nonopioid treatments for pain were given
 4    favorable formulary coverage, that those could have
 5    an impact on prescription opioid suppliers?
 6             A    Yes.
 7             Q    And your report doesn't evaluate
 8    insurance formulary decisions, correct?
 9             A    Incorrect.
10             Q    Okay.  Have you conducted an analysis
11    that let's you say this is the amount of harm that
12    would have occurred but for the fact that insurance
13    plans of any sort gave favorable coverage,
14    prescription opioids and less favorable coverage to
15    alternative pain treatments?
16             A    Can you say a specific quantity, a
17    number?
18             Q    Yes.
19             A    No.
20             Q    Okay.  You don't mention New York
21    Medicaid once in your report, correct?
22             A    Not as far as I remember.
23             Q    Do you understand that New York Medicaid
24    has discretion in terms of whether to put an opioid
25    treatment or a nonopioid treatment on its preferred
```

1

2      versus nonpreferred list?

3           A    I'm generally familiar with that.

4           Q.   Do you understand that if it's on the

5      preferred list, it doesn't require prior

6      authorization from a doctor?

7           A    Yes.

8           Q.   And do you understand that as a result,

9      medications on the preferred drug list are used more

10     by New York Medicaid recipients?

11          A    I'm not aware of an epidemiological

12     study of that.

13          Q.   Are you aware of that being a fact?

14     Have you seen testimony from state witnesses in this

15     case acknowledging that fact?

16          A    I haven't seen that testimony.

17          Q.   We heard yesterday, and tell me if you

18     were here for this part of Dr. Lembke yesterday,

19     that New York Medicaid patients are more likely to

20     be prescribed prescription opioids.

21               Do you take issue with that fact, that

22     New York Medicaid residents are more likely than

23     other New York residents to be prescribed

24     prescription opioids?

25          A    I haven't looked at the studies.

```
 1                    Frye Hearing - Dr. Keyes              136
 2          Q.   That's not something that you've
 3     evaluated?
 4          A    That's not something I evaluated.
 5          Q.   We heard yesterday that New York
 6     patients are more likely to experience harm from
 7     prescription opioids than non New York Medicaid
 8     patients.  Do you take issue with that?
 9          A    I'm sorry.  Can you say that again?
10          Q.   Yeah, of course.  We heard yesterday
11     that New York Medicaid patients are more likely to
12     experience harm from prescription opioids than non
13     Medicaid patients.  Do you take issue with that
14     proposition?
15          A    Again, I would need to look at the data.
16          Q.   That's not something you evaluated?
17          A    That's not something I evaluated.
18          Q.   And so let me kind of come back and ask
19     the question more broadly.  Am I correct that as
20     part of your methodology in this case, you did not
21     evaluate New York Medicaid formulary and other
22     coverage decisions regarding prescription opioids?
23          A    I evaluated other coverage decisions,
24     but not New York Medicaid.
25          Q.   Do you know, for example, that in just a
```

1

2    five-year period, between 2012 and 2017, New York

3    Medicaid paid for nearly 600 million opioid pills in

4    the State of New York?

5            A    I have not evaluated that.

6            Q.    You've not conducted any kind of

7    analysis in your methodology where you say if New

8    York Medicaid would have made different decisions in

9    terms of how they cover prescription opioids and

10   reimburse prescription opioids, would we have the

11   same level of harm in New York from prescription

12   opioids, correct?

13           A    Correct.

14           Q.    You've not analyzed whether if New York

15   Medicaid made different decisions about coverage of

16   prescription opioids, we would have a different

17   level of supply of prescription opioids in New York

18   State, correct?

19           A    Correct.

20           Q.    I asked you earlier about pill mill

21   doctors.  I think you defined them in your report

22   has high-volume prescribers who inappropriately

23   prescribe prescription opioids for profit.

24               Does that sound like a reasonable

25   definition?

1

2          A     Yes.

3          Q.    And do you agree that they have

4     contributed to the increase in opioid use disorder,

5     overdose, and related harms?

6          A     Yes.

7          Q.    Do you agree that pill mill doctors

8     helped increase the supply of prescription opioids?

9          A     Yes.

10          Q.    Do you understand that over time New

11     York State has licensed pill mill doctors and has

12     made the decision to reregister pill mill doctors

13     and has failed to investigate specific pill mill

14     doctors?

15          A     I haven't, I haven't looked at that

16     material.

17          Q.    So you've done no analysis of whether

18     the level of harm from prescription opioids would be

19     different but for the licensing and reregistration

20     and failure to investigate decisions made by the

21     State of New York regarding pill mill doctors?

22               MR. REISMAN:  Objection, lack of

23          foundation.

24               THE COURT:  I'll call it a compound

25          question.  Call it objection to form, and

```
 1                    Frye Hearing - Dr. Keyes              139
 2            I'll sustain it.
 3                 MR. REISMAN:  Okay.  Objection to form.
 4                 THE COURT:  Objection to form sustained.
 5            Rephrase it.
 6                 MR. SCHMIDT:  Thanks, your Honor.
 7   BY MR. SCHMIDT:
 8            Q.   Have you done any analysis of whether
 9   New York State would have made different licensing
10   decisions regarding pill mill doctors --
11                 THE COURT:  Yes or no.
12            Q.   -- that would have led to a different
13   level of harm from the opioid crisis?  Yes or no.
14                 MR. REISMAN:  Objection to form.
15                 THE COURT:  Okay.  There are two form
16            objections, right?  Assuming a fact not in
17            evidence and a compound question.  It
18            probably hits -- it probably rings the bell
19            on both of them.
20                 MR. SCHMIDT:  I don't think so, your
21            Honor.  There's ample facts in evidence about
22            New York State's failure, including in
23            prosecutor documents, failure to investigate
24            pill mill doctors.
25                 THE COURT:  You mean evidence in this
```

```
 1                    Frye Hearing - Dr. Keyes              140
 2           courtroom or evidence in the submissions?
 3                MR. SCHMIDT:  That's been generated in
 4           discovery in this case, and I'm happy to put
 5           that on the record right now.
 6                THE COURT:  No.  I'll take your word for
 7           it.
 8                MR. SCHMIDT:  Okay.
 9                THE COURT:  By the way, Doctor, can you
10           handle the question?
11                THE WITNESS:  Can it be repeated?
12                THE COURT:  I'm going to have the
13           stenographer read it back to you.  Then I'm
14           going to ask you, can you handle the
15           question.  You will answer me and then I will
16           direct you.
17                MR. SCHMIDT:  If it's easier, I can try
18           to simplify it.
19                THE COURT:  Simplify it.
20      BY MR. SCHMIDT:
21           Q.   Have you done an analysis of whether
22      we'd have the same level of harm from the opioid
23      crisis had New York State made different licensing
24      decisions regarding pill mill doctors?
25           A    No.
```

```
 1                    Frye Hearing - Dr. Keyes              141
 2              THE COURT:  Find a place to break for
 3         lunch.
 4              MR. SCHMIDT:  This is probably as good a
 5         place as any.
 6              THE COURT:  See everybody at 2:00.
 7         Thank you.
 8              (WHEREUPON, after a luncheon recess, the
 9         following was had:)
10              THE CLERK:  Come to order.  Part 48 is
11         now in session.
12              THE COURT:  Doctor, you can resume the
13         stand.  Please be seated, everybody.
14              THE CLERK:  Doctor, I remind you you're
15         still under oath.
16              THE WITNESS:  Thank you.
17              THE COURT:  You may proceed.  Thank you.
18              MR. SCHMIDT:  Thank you, your Honor.
19    CROSS EXAMINATION CONTINUED
20    BY MR. SCHMIDT:
21         Q.   Doctor, thanks for continuing with us.
22              I want to pick up now on one last set of
23    topics on the supply question.  I want to talk with
24    you about distributors as I opined about earlier,
25    including those chain pharmacies.
```

```
 1                    Frye Hearing - Dr. Keyes              142

 2              Tell me if I'm wrong, we obviously have

 3       the transcript, am I correct that you did not

 4       discuss distributors as a category during your

 5       direct examination?

 6          A     I'm sorry, say the question again.

 7          Q.    Yeah.  You had no discussion,

 8       specifically about distributors as a category of

 9       entities in your direct examination, correct?

10          A     I'm sure -- if you have the transcript,

11       I'm sure that's correct.

12          Q.    You didn't mention any distributors or

13       chain pharmacies by name, correct?

14          A     Correct.

15          Q.    You didn't talk about the specific role

16       of distributors or their obligations with respect to

17       controlled substances in your direct, correct?

18          A     We talked about supplies but not

19       specific distributors.

20          Q.    Right.  You didn't talk about

21       distributors' role in setting supply and meeting

22       their obligations at that point, correct?

23          A     Sure.  Correct.

24          Q.    As part of your methodology, you did not

25       estimate the appropriate level of opioid supply in
```

1

2      New York State; is that right?

3            A      That's right.

4            Q.     You didn't do an analysis, say, looking

5      at medical conditions that opioids are used for and

6      how many people have those conditions in New York;

7      therefore, how many opioids you might want to expect

8      to see, correct?

9            A      I did not do that analysis.

10           Q.     You didn't analyze whether changes in

11     opioid overdose rates track with changes in any

12     individual distributor's distribution levels over

13     time, correct?

14           A      No.

15           Q.     "No," being I'm correct in saying that?

16           A      You are correct.

17           Q.     Okay.  As part of your methodology did

18     you evaluate specific distributors in your report?

19           A      No.

20           Q.     For example, your report doesn't mention

21     McKesson, Cardinal, ABDC, the chain pharmacies at

22     all, correct?

23           A      No, I don't think so.

24           Q.     "No," it doesn't mention them?

25           A      Correct.

```
 1                    Frye Hearing - Dr. Keyes              144
 2          Q.   Okay.  Your article -- your report, and
 3    I think you talked about this in your direct exam,
 4    cites nearly 200 articles that you relied on in
 5    forming your opinions.
 6               Do you recall giving that testimony
 7    earlier today?
 8          A    Yes.
 9          Q.   That epidemiological literature that you
10    cited does not specifically discuss McKesson's
11    conduct or programs, Cardinal's, ABDC's or the chain
12    pharmacies, correct?
13          A    As a whole, yes; but specifically, no.
14          Q.   It doesn't focus on whether anyone of
15    those entities met their obligations or their level
16    of contribution to supply or anything like that,
17    correct?
18          A    Correct.
19          Q.   In the report you originally were served
20    in this case doesn't cite any document from any
21    distributor in this case, correct?
22          A    Correct.
23          Q.   In fact, when we talked at your
24    deposition you weren't sure if you'd ever seen a
25    document created by a McKesson employee, a Cardinal
```

1

2      employee, an ABDC employee or chain pharmacy

3      employee, correct?

4           A    Correct.

5           Q.   As part of your methodology, am I

6      correct that you did not assess any individual

7      distributor's contribution to opioid supply relative

8      to other distributors?

9           A    That's correct.

10          Q.   You didn't consider the specific volume

11     of prescription opioids that any one distributor

12     brought into New York State or Nassau County or

13     Suffolk County; is that correct?

14          A    I'm sorry, can you repeat the question?

15          Q.   Yeah, of course.

16               You didn't consider the specific volume

17     of prescription opioids that any one distributor

18     brought into New York State or Nassau County or

19     Suffolk County, correct?

20          A    Not any one distributor, no.

21          Q.   You didn't know, at least at the time of

22     your deposition, how much they actually brought into

23     New York for Nassau or Suffolk, correct?

24          A    That's right.

25          Q.   And you didn't analyze how much they

```
 1                    Frye Hearing - Dr. Keyes              146
 2      shipped to the specific pharmacies either; is that
 3      correct?
 4           A    That's correct.
 5           Q.   Am I right that there's no pharmacy
 6      you've been able to identify or group of pharmacies
 7      you've been able to identify in New York State where
 8      a distributor in this case in your view shipped too
 9      many prescription opioids?
10           A    That's right.
11           Q.   Am I correct you did not even study
12      individual pharmacies in terms of knowing which
13      distributors supplied which pharmacies?
14           A    That's right.
15           Q.   Am I correct that you can't identify any
16      times when a pharmacy that was a customer of one of
17      the distributors in this case or supplied by one of
18      the distributors in this case filled an improper
19      prescription or had a diverted prescription?
20           A    I'm sorry, can you repeat the question?
21           Q.   Sure.  Am I correct that you cannot
22      identify any pharmacy or any volume of pharmacies in
23      New York State that were supplied by distributor
24      Defendant in this case, that filled an improper
25      prescription or had a diverted prescription?
```

1

2      A    Overall that's documented in the

3      literature, but not a specific pharmacy.  But in

4      terms of groups of pharmacies that I believe is in

5      the report.

6      Q.   Have you attempted to link groups of

7      pharmacies to specific distributors in this case,

8      groups of New York pharmacies?

9      A    No.

10     Q.   Am I correct that you could not identify

11     for us any pharmacy or any group of pharmacies that

12     were acting improperly in New York State that

13     stopped acting improperly or went out of business

14     because one of the distributes in this case cut them

15     off?

16     A    No.

17     Q.   "No," you can't identify that?

18     A    That's correct.

19     Q.   Okay.  Have you been able to identify

20     any doctor who was forced or prescriber who was

21     forced to stop writing improper opioid prescriptions

22     because one of the distributors in this case cut off

23     the pharmacy that those prescriptions were being

24     filled out of?

25     A    A specific doctor?

2    Q.    Yes.

3    A    No.

4    Q.    Have you done any analysis of whether

5  any of the distributor Defendants, take McKesson, if

6  they had decided not to ship prescription opioids

7  and another distributor had stepped in, whether the

8  level of opioid harm would have been any different

9  in the State of New York?

10   A    I'm sorry, can you breakdown --

11   Q.    Sure.

12   A    Okay.  So one distributor stops --

13   Q.    Yes, and another distributor steps in,

14  would the level of opioid harm had been any

15  different?

16   A    No.

17   Q.    You haven't done that analysis?

18   A    No.

19   Q.    And you talked about marketing at the

20  end of your opinions, I just want to ask you a

21  couple of questions on marketing.

22        You don't know of a single time when

23  McKesson, Cardinal, ABDC, one of the chain

24  pharmacies gave marketing materials to a doctor in

25  New York State, correct?

```
1                    Frye Hearing - Dr. Keyes              149

2          A    No.

3          Q.   "No," you don't no that?

4          A    I don't know that.

5          Q.   You don't know of a single time when

6    McKesson, Cardinal, ABDC, a chain pharmacy prepared

7    specific marketing materials for doctors or

8    patients, correct?

9          A    That's correct.

10         Q.   And the literature you've seen in terms

11   of talking about marketing and points to entities

12   other than McKesson, Cardinal, ABDC and chain

13   pharmacies as conducting marketing to physicians

14   regarding prescription opioids; is that correct?

15         A    That's right.

16         Q.   Do you agree that the opioid crisis was

17   caused by multiple different factors?

18         A    Yes.

19         Q.   Would you agree that there are multiple

20   interrelated and deeply rooted social and economic

21   determinants of the U.S. opioid overdose crisis?

22         A    Among others, yes.

23         Q.   And in your work you've not attempted to

24   assign percentages of responsibility for the opioid

25   crisis in New York to Cardinal or McKesson or ABDC
```

```
1                    Frye Hearing - Dr. Keyes          150
2      or the chain pharmacies, correct?
3             A    That's correct.
4             Q.   Or to the manufacturers, correct, as
5      individual entities?
6             A    That's right.
7             Q.   What is correct -- well, is it correct
8      that you would -- strike that.
9                  Would you agree with me that the actions
10     of distributors alone are not sufficient to bring
11     about the opioid crisis?
12            A    I would agree with that.
13            Q.   The actions of manufacturers alone were
14     not sufficient to bring about the opioid crisis?
15            A    Yes.
16            Q.   Am I correct that you cannot even answer
17     the question whether you would fault McKesson?
18            A    I -- that's incorrect.
19            Q.   Okay.  Do you remember giving a
20     deposition in this case?
21            A    Yes.
22                 MR. SCHMIDT:  Could we pull up page 86
23            of the New York deposition.
24            Q.   You were under oath in that deposition,
25     correct?
```

1

2          A    Yes.

3               MR. SCHMIDT:  And can we go to line 11,

4          if we can put that up on the screen, Mr.

5          Reynolds.  It's going to be 86.

6               So you can actually take that down for a

7          second, Mr. Reynolds.

8          Q.   And if you look at page 86, just before

9     on line 5; do you see where I'm referencing?

10         A    Um-hm.

11         Q.   I say:  "Okay."  And you say, "So to the

12    extent that McKesson was involved in increasing

13    supply of opioids, it's likely more than not."

14              Do you see that testimony?

15         A    Yes.

16         Q.   And then this is the part I wanted to

17    ask you about, this is the part we have up on the

18    screen:    "QUESTION:  Do you fault McKesson?

19              "ANSWER:  I can't answer that?"

20              Did I read that correctly as your

21    testimony from our deposition in this case?

22         A    Yes.

23         Q.   Would the same statement apply to

24    Cardinal, ABDC, and the chain pharmacies, that you

25    can't answer whether you fault them for opioid harm;

```
 1                    Frye Hearing - Dr. Keyes              152

 2      yes or no?

 3           A    I think they've more than likely

 4      contributed to harms, but in terms of percentage

 5      fault, I don't have a -- that's what I was

 6      interpreting that question to mean.

 7           Q.   Okay.  You published nearly 275 peer

 8      review articles, I think you talked about that on

 9      direct?

10           A    Yes.

11           Q.   20 of them address opioids specifically?

12           A    Yes.

13           Q.   Some of them address causes of the

14      opioid crisis?

15           A    Yes.

16           Q.   You follow generally accepted

17      methodologies in your publications?

18           A    Yes.

19           Q.   None of them refer to McKesson as a

20      cause of the opioid crisis, correct?

21           A    Correct.

22           Q.   None of them refer to ABDC or Cardinal

23      or the chain pharmacies as a cause of the opioid

24      crisis, correct?

25           A    That's right.
```

1

2     Q.   None of them refer to any of the

3     defendants in this case as a cause of the opioid

4     crisis, correct?

5          A    No specific company, but generally

6     speaking about different, different parts of the

7     distribution and supply of opioids, yes.

8          Q.   Is there a publication you can point us

9     to where you say that publication distributors as a

10    class caused the opioid crisis?

11         A    Not back then, no.

12         Q.   I'd like to now shift from supply to the

13    gateway theory and ask you some questions about the

14    gateway theory and your opinion that prescription

15    opioid use is related to subsequent heroin and

16    illegal fentanyl use, and we talked earlier about

17    the difference between association and causation; do

18    you recall that?

19         A    Yes.

20         Q.   You rely on articles talking about

21    whether there is an association between heroin use

22    and earlier prescription opioid use, not medical,

23    prescription opioid use, correct?

24         A    That's correct.

25         Q.   Have you published any articles where

1

2      you say there's established cause between nonmedical

3      prescription opioid use and later heroin or illegal

4      Fentanyl use?

5            A    Not to my knowledge.

6            Q.   You agree that there is a heroin problem

7      before the opioid crisis?

8            A    I'm sorry, say that again.

9            Q.   Was there a heroin problem before the

10     opioid crisis?

11           A    There was heroin use before the opioid

12     crisis.

13           Q.   Was there a problem?

14           A    All heroin use is a problem so.

15           Q.   Okay.  And are you aware that there was

16     specifically a heroin problem in New York State

17     before the opioid crisis?

18           A    There were -- there was, yes.

19           Q.   Have you studied the degree in which the

20     heroin problem existed in Suffolk County or Nassau

21     County before the opioid crisis?

22           A    I have not.

23           Q.   Do you agree with me that even today

24     there are heroin users who did not start using

25     prescription opioid or did not use prescription

```
 1
 2    opioid before using heroin?
 3         A    Yes.
 4         Q.    Have you attempted to quantify how many,
 5    how many heroin users over the past ten years would
 6    have used heroin even if the supply of prescription
 7    opioids would not have increased in the '90s and
 8    2000s; do you have a number for that?
 9         A    I believe we can point to the literature
10    to give us general guidelines on that.
11         Q.    Do you know what the number is?  How
12    many people would still use heroin today even if
13    there had not been an increase in prescription
14    opioid slide in the '90s to 2000s; can you ballpark
15    what that number is for us in your view?
16         A    So if you could just go a little slower.
17         Q.    Of course, I'm sorry.
18         A    How many people would be using heroin
19    now --
20         Q.    But for the increase in prescription
21    opioid supply in the '90s and 2000s; do you know?
22         A    I think that if we looked at the
23    literature, given the magnitude of the association,
24    it would probably be kind of taking the inverse of
25    the proportion we use prescription opioids before
```

 1

 2      heroin, it would be four to five times lower.

 3              Q.   Okay.  Do you know what the number is?

 4              A    The specific number would be using

 5      heroin now?

 6              Q.   Yes.

 7              A    It would be whatever it was similar to

 8      in the early '90s.

 9              Q.   Is that a calculation you performed?

10              A    I haven't performed that calculation.

11      I'm just expressing the opinion now.

12              Q.   In slide 16 of your analysis you talked

13      and in your report you talk about 16 studies that

14      you rely on evaluating whether there's an

15      association between nonmedical use of prescription

16      opioids and later use of heroin, correct?

17              A    Yes.

18              Q.   And to be clear, those studies are

19      focused on nonmedical use of prescription opioids,

20      correct?

21              A    There are several that, that describe

22      connections between medical use of opioid as well.

23                   MR. SCHMIDT:  Okay.  Can we pull up

24              slide 16, is that possible, Mr. Reynolds,

25              from Plaintiffs' slide?

```
 1                    Frye Hearing - Dr. Keyes          157
 2              Q.   And while we're doing that, are you
 3        aware that there have been changes in the heroin
 4        market since the 1990s in terms of price,
 5        availability, supply.
 6              A    Yes.
 7              Q.   Okay.  I'll come back to that.
 8                   Could we look at slide -- I think I've
 9        got the wrong number.  It's actually slide 20.
10        Yeah, slide 20.
11                   Do you see where you talk about the 16
12        studies here?
13              A    Yes.
14              Q.   And do you see where you use the term
15        individuals who use prescription opioids
16        nonmedically; do you see that?
17              A    Yes.
18              Q.   And you say the same thing in your
19        report, correct, you refer to nonmedical use?
20              A    Yes.
21              Q.   And nonmedical use is opioid misuse,
22        correct?
23              A    Generally speaking.
24              Q.   You're not aware of studies that look at
25        whether people who use prescription opioids
```

```
 1                  Frye Hearing - Dr. Keyes              158
 2     medically have higher than average levels of heroin
 3     use, correct?
 4          A    Incorrect.
 5               MR. SCHMIDT:  Okay.  Let's take a look
 6               at your testimony, please.  Page 323, line
 7               19, to 324, line 5.  Mr. Reynolds, are you
 8               able to put that testimony up on the screen,
 9               please.
10               THE COURT:  It's up.
11          Q.   If we go from page 323, line 19, to 324,
12     line 5, let me ask my question differently.
13               "Have you seen any studies showing that
14     patients who only use prescription opioids medically
15     have higher rates of injecting --" and it says
16     sorting, I think it was snorting -- "snorting
17     heroin; yes or no?"
18               "ANSWER:  I don't know of an
19     epidemiological study to strike and answer that
20     question."
21               Did I read that correctly and do you
22     recall being asked that question and giving that
23     answer?
24          A    Yes.
25          Q.   Your own research results do not support
```

```
 1                   Frye Hearing - Dr. Keyes              159
 2    legitimate opioid prescription use by itself as a
 3    major distributor chronic opioid misuse, correct?
 4         A    Can you state that again.
 5         Q.   Of course, yeah.
 6              Your own research results do not support
 7    legitimate opioid prescription use by itself as a
 8    major contributor to chronic opioid misuse, true?
 9    Do you agree with that statement?
10         A    I would need to go back to -- is there a
11    specific paper that you're referring to?
12         Q.   There is, but can you tell me, just
13    without seeing the paper, whether you agree with
14    that statement?
15         A    It would depend on the study.  I
16    wouldn't say that that's an across the board
17    statement.
18         Q.   Do you still have in front of you the
19    paper that you published in 2015 that the
20    Plaintiffs' counsel showed you?
21         A    Yes.
22         Q.   Demonstrative 56, you're the fourth
23    author or this; do you see this?
24         A    Yes.
25         Q.   I think you described this as a cohort
```

1
2   study where you attempted to follow a generally

3   accepted method, reasonably generally accepted

4   methods in this paper?

5        A    Yes.

6        Q.   I think you said on direct that you were

7   involved in the data analysis, interpreting the data

8   and writing the report?

9        A    Yes.

10       Q.   And did I hear you say that you

11  controlled further risk factors in this study?

12       A    Yes.

13       Q.   Okay.  Let's look at page 7 of the

14  study, please, and if we can put this up on the

15  board, it's demonstrative 56, page 7.

16            Do you see in the bottom right-hand

17  paragraph, the one that continues over, if we could

18  make that bigger, do you see that you talk about

19  limitations of this study?

20       A    Yes.

21       Q.   Now I want to focus on the second

22  limitation.  The second.  (READING:)  The data do

23  not contain information on unmeasured confounding

24  factors, such as family history or mental illness --

25  and then it goes on to say -- although it is likely

1

2      that by 12th grade drug use history and drug

3      attitudes serve as proximate causes for these more

4      distal influences on drug misuse.

5                 Is that an accurate statement that the

6      data do not contain information on unmeasured

7      confounding factors, such as family history or

8      mental illness?

9           A    That's an accurate statement.

10          Q.   Now move, if you would, at the sentence

11     that begins at the bottom of the first column on

12     this page, please and carries over to the second

13     collum, and this is that language I was reading you

14     just a few moments ago.

15                And, Mr. Reynolds, we can actually just

16     call up the last line of that, if that makes it

17     easier.  It's just the word these, because it

18     carries over.

19                Thank you for that.

20                You write (READING:)  These results do

21     not support legitimate opioid prescription use by

22     itself as a major contributor to chronic opioid

23     misuse, at least not by 23.

24                Did I read that correctly?

25          A    Yes.

1

2          Q.    You stand by that statement within the

3     statement?

4          A     Yes.

5          Q.    And is that a generally accepted

6     principle in your field, what you wrote in this

7     paper?

8          A     I don't think it's a principle.

9          Q.    Is it a generally accepted statement?

10         A     I think it's -- no, I think that this is

11    a sentence that describes the results of this paper,

12    and I can expand on the results if you would like me

13    to.

14         Q.    Can you point me to -- actually, let me

15    ask you about one other study that you talked about

16    on direct.

17              Do you remember talking about that

18    McCabe study that you did not cite in your report

19    but that we talked about at your deposition?

20         A     Yes.

21         Q.    That is demonstrative 54.  If you can go

22    ahead and put that up on the screen.  It was showed

23    on slide 19.

24              Did you testify -- I want to be sure I

25    understood what you said about this study -- did you

1

2    say that this study did not speak to whether medical

3    use without nonmedical use is linked to higher rates

4    of heroin use or other drug use?

5          A    I'm sorry, can you say that again?

6          Q.   Sure.  Let me ask it more simply.

7                I thought I heard you say this and tell

8    me if I heard it right.

9                Does this study say, speak to whether if

10   someone uses opioids medically and not nonmedically

11   they have later higher rates of other drug use; does

12   this study speak to that question?

13         A    Later higher rates of -- I'm sorry, what

14   outcome?

15         Q.   Other drug use.

16         A    No.

17         Q.   It does not speak to that?

18         A    No, not other drug use.  They look at

19   substance use disorders, symptoms at age 35.

20         Q.   Including substance use symptoms from

21   other drugs, right?

22         A    Yes.

23         Q.   Let's look specifically at what I'm

24   asking about.  Can we go to page 5, please.  The

25   second to last full paragraph on the page,

```
 1                    Frye Hearing - Dr. Keyes           164
 2   adolescents.
 3              By the way, is this study performed, in
 4   your view, using generally accepted methods?
 5        A    Yes.
 6        Q.   It says:  "Adolescents who indicated
 7   medical use without a history of --" and I'm going
 8   to fill in the acronyms, tell me if I get it wrong.
 9   So let's start again.
10              "Adolescents who indicated medical use
11   without a history of nonmedical use of prescription
12   opioids did not differ from adolescents with no
13   history of medical use of prescription opioids or
14   nonmedical use of prescription opioids in the odds
15   of alcohol use disorder, cannabis use disorder or
16   other drug use disorder."
17              Did I read that correctly?  Fill in any
18   acronyms.
19        A    Generally.
20        Q.   And do you agree with that finding in
21   this study, is that a reasonable interpretation of
22   the data in the study; yes or no?
23        A    Um, I think that I would have written it
24   differently, so no.
25        Q.   Is it wrong in your view?
```

1

2          A     It's not wrong.

3          Q.    Can you point me to a contrary study

4    showing individuals who use prescription opioids

5    only medically have higher rates of heroin use?

6          A     Sorry, say that again.

7          Q.    Can you point me to a contrary cite

8    showing individuals -- actually, no.  I think I just

9    asked you this question, so I'm going to move on.

10               I've asked you now about medical use

11   prescription opioids, so I want to move over to

12   nonmedical use of prescription opioids.  Those 16

13   studies that you cited.

14               Do you consider each of those studies to

15   be reliable when conducted using generally accepted

16   methods?

17         A     Yes.

18         Q.    Going back to that distinction we drew

19   between causation and association, am I accurate

20   that none of those studies make the step of going

21   beyond association to causation?

22         A     No one study alone, no.

23         Q.    None of them collectively, correct?

24         A     Collectively, I think that's up to the

25   epidemiologist.

1

2      Q.   Does anyone of those studies say,

3   looking at our study and all other studies, we're

4   now willing to conclude causation?

5      A    Not those words.

6      Q.   Do any of them go beyond association?

7      A    I think they generally accept the well-

8   accepted principle that prescription opioid use is a

9   risk factor for heroin use.

10      Q.   Do they go beyond association; just yes

11   or no?

12      A    Um, I would say yes.

13      Q.   Okay.  Well, let's look at what they say

14   now.

15           MR. SCHMIDT:  May I approach, your

16           Honor.

17           THE COURT:  Yes.

18      Q.   I'm going to give you two things.  One

19   is a demonstrative that I prepared, and I don't

20   think that you need to look at the study, but if you

21   would like to look at the study, I've given you a

22   set of the studies on this demonstrative --

23      A    Thank you.

24      Q.   -- and they're tabbed.

25           The demonstrative is four of the 16

1

2      studies, you cite language from the studies.  If you

3      can put it up on the screen, Demonstrative Exhibit

4      1, and I think we were using letters, so I'll mark

5      this as Defendant's Exhibit A -- I guess I'll mark

6      it as Defendant's Exhibit B, Exhibit A would be the

7      New York document encouraging opioid use that we

8      looked at earlier.

9              Do you recognize these four studies as

10     four of the 16 studies you looked at?

11         A    Yes.

12         Q.   And just very quickly (READING:)

13              (Khosla) 2011.  Temporality and causal

14     associations could not be determined.

15              (Becker) 2008.  While we were able to

16     describe associations, we are not able to ascribe

17     causality.

18              (Grau) 2007.  A second limitation is the

19     cross-sectional nature of this study, which

20     precludes the possibility of establishing causal

21     relationships.

22              (Havens) 2009.  Causal inferences could

23     not be made.

24              Did I read those excerpts right?

25         A    Yes.

1

2      Q.   Do you agree with those statements as

3   made in the context of those studies; yes or no?

4      A    Yes.

5      Q.   And are you aware of any study that goes

6   farther and says we do find causation, we do find

7   more than an association?

8      A    I think if you look at the language of

9   the discussion section, you know, limitations of the

10   studies aside, I think there is generally accepted

11   language that prescription opioid use is a risk

12   factor for heroin use.

13      Q.   It's important to consider the

14   limitations, right?

15      A    Yes.

16      Q.   Do you know of any study that actually

17   says we believe there is causation between earlier

18   nonmedical prescription opioid use and later heroin

19   use, where it comes to a specific conclusion, it

20   goes beyond association and concludes causation?

21      A    No.

22      Q.   Can you point me to any study that

23   states there's general acceptance that nonmedical

24   prescription opioid use causes heroin use or illegal

25   fentanyl use?

1

2          A    I would need to go back to the studies.

3     I mean, off the top of my head, I don't have

4     specific sentences.

5          Q.   Is there one you can point me to from

6     your work; just yes or no?

7          A    Not off the top of my head.

8               MR. SCHMIDT:  Let me show you one other

9          study you looked at.  I'll mark this -- if I

10         may approach -- Defendant's Exhibit C.

11              THE COURT:  Yes.

12         Q.   Do you recognize this as a 2016 New

13    England Journal of Medicine, that's one of your 16

14    studies that you cite?

15         A    Yes.

16         Q.   This one, the lead author is Compton,

17    and if you look at the heading it's actually a

18    review article, correct?

19         A    Yes.

20         Q.   It's reviewing the literature that

21    existed at the time of this publication.

22         A    Yes.

23         Q.   Are you aware that it reviews 14 of the

24    16 studies that you cite in your report?

25         A    Yes.

1

2     Q.   If we look at page 3 of this document

3     there's a heading that says:  Heroin Use Among

4     People Who Use Prescription Opioids Nonmedically; do

5     you see that?

6     A    Yes.

7     Q.   Then a little further down, or actually

8     right below that, I'm sorry, it says:  "Studies that

9     address the patterns of heroin use in nonmedical

10    users of prescription opioids are mostly

11    observational and descriptive; i.e.,

12    nonexperimental.  Thus, conclusions about cause and

13    effect are uncertain.

14          Yet, certain consistent findings of a

15    positive association between nonmedical use of

16    prescription opioids and heroin use are highly

17    suggestive and plausible, given the common

18    pharmacologic principles described above?"

19          Did I read that correctly?

20    A    Yes, you did.

21    Q.   I want to point you to their later

22    conclusion and ask you about that.  Can you go to

23    the fifth page of this article, please.  And right

24    before the heading on the right, down at the bottom

25    of this page, if we could pull out the -- yeah, it

```
 1                    Frye Hearing - Dr. Keyes              171
 2      says:  "Taken in total, the available data suggests
 3      that nonmedical prescription opioid use is neither
 4      necessary nor sufficient for the initiation of
 5      heroin use and that other factors are contributing
 6      to the increase in the rate of heroin use and
 7      related mortality."
 8                    Did I read that correctly?
 9      A     You did.
10      Q.    Do you agree with that; yes or no?
11      A     Yes.
12      Q.    Is that a generally accepted view, in
13      your opinion?
14      A     Yes, absolutely.
15      Q.    And "necessary" means all cases of the
16      outcome have a risk factor, correct?
17      A     That's right.
18      Q.    "Sufficient" means by itself it can
19      bring it about, correct?
20      A     That's right.
21      Q.    We talked earlier about one of the other
22      factors or some of the other factors:  the price of
23      heroin, the availability of heroin, the purity of
24      heroin; do you recall us touching on that?
25      A     Yes.
```

```
 1                    Frye Hearing - Dr. Keyes            172
 2         Q.   If we just stay with Compton,
 3    Defendant's Exhibit C.  C, as in Compton.
 4              The first full paragraph on this page 5,
 5    just go further on the page.  States (READING):  A
 6    key factor underlying the recent increases in rates
 7    of heroin use and overdose may be the low cost and
 8    high purity of heroin.
 9              Do you recognize -- do you agree with
10    that statement?
11         A    Yes.
12         Q.   And it goes on to detail that the price
13    of heroin has dropped from 2,690 per gram in 1982 to
14    as low as $465 in 2012; do you see that?
15         A    Yes.
16         Q.   And it cites a recent study showed that
17    each hundred-dollar decrease in the price per gram
18    of heroin resulted in a 2.9 percent increase in the
19    number of hospitalizations for heroin use; do you
20    see that?
21         A    Yes.
22         Q.   Do you take any issue with that data
23    showing that as the price comes down by $100, for
24    every $100 there's a 2.9 percent increase in
25    hospitalizations?
```

```
 1                  Frye Hearing - Dr. Keyes              173
 2         A    Availability and price are huge drivers
 3    of drug use, yes.
 4         Q.   Am I correct that you conducted no
 5    specific analysis of the impact of heroin price on
 6    the number of people who have used heroin over the
 7    past several decades?
 8         A    I'm sorry, say that again.
 9         Q.   Sure.
10              Did you conduct any specific analysis
11    looking at changes in heroin price and how that
12    impacted harm from heroin over the past couple
13    decades?
14         A    Aside from just reviewing the
15    literature?
16         Q.   Right.  You didn't do any independent
17    analysis?
18         A    No.
19         Q.   Did you do any analysis to say if there
20    had not been changes in heroin price, here's how the
21    harms from at least illegal heroin and illegal
22    Fentanyl use would have been different?
23         A    No.
24         Q.   The sentence we looked at also talks
25    about purity in the first sentence.
```

```
 1                    Frye Hearing - Dr. Keyes              174
 2                Are you aware of law enforcement
 3      findings that even as the price has gone down for
 4      heroin in New York, the purity of the product has
 5      increased in the New York region?
 6           A    I'm generally familiar with that
 7      literature.
 8           Q.   And are you aware of the idea that as it
 9      becomes more pure it can be snorted -- for lack of a
10      better, more scientific term -- instead of being
11      injected, it allows for a different method of
12      administration?  Maybe that's the more scientific
13      way of saying it.
14           A    Sure.  Yes, I'm generally aware of that.
15           Q.   And when that different method of
16      administration is available are you aware of
17      findings that more people are likely to use it
18      because it doesn't have the stigma of needles?
19           A    Yes.
20           Q.   Am I correct that you've done no
21      analysis specifically looking at changes in heroin
22      purity in the New York market and the impact that's
23      had on the harms in heroin use in the State of New
24      York?
25                A    No -- you are correct.
```

```
 1                    Frye Hearing - Dr. Keyes              175
 2          Q.   You've not evaluated whether if the
 3     changes in heroin purity occurred -- had not
 4     occurred, I'm sorry -- whether there were -- let me
 5     try again.
 6                You've not evaluated whether if there
 7     were no changes in heroin purity in the New York
 8     market the level of harm from heroin would have been
 9     different?
10          A    I think generally that's what that paper
11     is showing that, that we would predict there would
12     be less harm from heroin.
13          Q.   Have you quantified how much less?
14          A    No.
15          Q.   Between 0 and 100; do you know?
16          A    No.
17          Q.   And 0 and 100 percent, you don't know if
18     it's 0 percent or -- I guess you said it would be
19     different, between 1 and 100 percent, do you know
20     where the harm would fall?
21          A    No.
22          Q.   Could be 100 percent different, could be
23     1 percent different, you don't know?
24          A    I don't know.
25          Q.   You talk about, and I think you talked
```

1
2    about it just now, but I want to make sure I have
3    it.  You talk about in your report something called
4    availability theory?
5         A    Yes.
6         Q.   I think that's an idea you alluded to a
7    moment ago that one driver of harm is the
8    availability of a product, correct?
9         A    That's correct.
10        Q.   And you're aware of findings that heroin
11   availability has increased over the last several
12   decades?
13        A    Yes.
14        Q.   Are you aware of law enforcement
15   findings that Mexican cartels have specifically
16   increased both the amount of heroin poppies that
17   they're growing and the amount that they're
18   importing into markets like New York?
19        A    Yes, I'm aware of those.
20        Q.   Am I correct that you did not specific
21   analysis of the impact of heroin availability on the
22   harm from heroin usage?
23        A    I'm sorry, say -- heroin availability?
24        Q.   Sure, let me ask it a little
25   differently.

1
2    I was asking about greater manufacturing

3    of heroin, greater distribution of heroin by illegal

4    drug cartels.

5              Did you conduct any analysis that would

6    let you say this is how much different heroin harm

7    there would be if they had not increased

8    manufacturing and distribution?

9         A    No.

10        Q.   You don't know whether it's between 100

11   percent different, 1 percent different or something

12   in between?

13        A    I'm not aware of an analysis that's

14   quantified that.

15        Q.   And that's not something you've done,

16   right?

17        A    No.

18        Q.   Let's -- let me ask you one more

19   question on this Compton article and then we can

20   leave it.

21              If you turn to page 7 of the article,

22   please.

23              If we look on the right-hand side, down

24   at the bottom, please, in the last paragraph.

25              Do you see where it says:

1

2      "Alternatively, heroin market forces, including

3      increased accessibility, reduced price and high

4      purity of heroin appear to be the major drivers of

5      the recent increases in rates of heroin use."

6                    Do you see that?

7           A      There was -- you didn't read it

8      correctly.

9           Q.     Oh, then let me reread it.  I didn't

10     mean to read it incorrectly.  That's my garble.

11                    Do you see where it states:

12     "Alternatively, heroin market forces, including

13     increased accessibility, reduced price and high

14     purity of heroin appear to be major drivers of the

15     recent increases in rates of heroin use."?

16          A      That's right.

17          Q.     Okay.  Do you agree with that statement;

18     yes or no?

19          A      Yes.

20          Q.     And is that a generally accepted view,

21     as you understand it?

22          A      Yes.

23          Q.     You understand that the predominant

24     source of heroin in the United States is Mexican

25     drug trafficking organizations?

1

2      A    I believe Mexico and China are both

3   sources, from what I understand.

4      Q.   When it comes to New York, you know that

5   the civil lower cartel in Mexico has been identified

6   as having control over the New York market?

7      A    I'm not familiar with the specific

8   cartels.

9      Q.   You're aware when it comes to

10  manufacturing heroin that's illegal manufacturers,

11  correct?

12     A    Yes.

13     Q.   They're the ones who decide how much to

14  manufacture, correct?

15     A    I'm not familiar with cartel decision

16  practices.

17     Q.   DEA licensed manufacturers of

18  prescription opioid don't manufacture or decide how

19  much to manufacture when it comes to illegal heroin,

20  correct?

21     A    I would assume so.

22     Q.   When it comes to the amount that's

23  shipped into the New York market, that's something

24  that illegal criminals do, right?

25     A    I would imagine.

```
 1                    Frye Hearing - Dr. Keyes              180
 2          Q.    That's not something the DEA licensed
 3    distributors of FDA-approved drugs do, correct?
 4          A     That's correct.
 5          Q.    And when it comes to deciding how much
 6    heroin will be sold, what the price it will be sold
 7    at, how pure it will be, that's illegal criminals
 8    making those decisions, correct?
 9          A     I would imagine.  I'm not familiar with
10    the decisions of the drug cartels.
11          Q.    But those aren't decisions made by
12    manufacturers, DEA licensed manufacturers, DEA
13    licensed distributors, correct?
14          A     I would assume not.
15          Q.    Pretty shocking if it were true?
16          A     It would be.
17          Q.    And you've seen no evidence of that?
18          A     No.
19          Q.    Are you aware starting around 2013 drug
20    cartels started mixing heroin with illegal Fentanyl?
21          A     The evidence is consistent with that.
22          Q.    And they did that to boost their
23    profits, because Fentanyl is more potent than
24    heroin?
25          A     That is the assumption.
```

```
 1                    Frye Hearing - Dr. Keyes              181
 2          Q.    Specifically, I think you said this in
 3    your report, an amount of Fentanyl equivalent to 2
 4    grains of salt, can be enough to cause an overdose,
 5    right?
 6          A     That's right.
 7          Q.    And that has led in turn to an increase
 8    in illegal drug overdoses, correct?
 9          A     Yes.
10          Q.    It was illegal criminals that made the
11    decision to pour the Fentanyl into heroin to be
12    sold, correct?
13          A     Yes.
14          Q.    That decision was not made by any
15    Defendant in this case, correct?
16          A     As far as I know, no.
17          Q.    Have illegal criminals caused harm from
18    heroin and illegal fentanyl; just yes or no?
19          A     Yes.
20                MR. REISMAN:  Objection to form.  The
21          question is vague.
22                MR. SCHMIDT:  I think the witness has
23          proved it's not vague by giving a yes answer.
24                THE COURT:  Doctor, you understood the
25          question?
```

```
 1                    Frye Hearing - Dr. Keyes              182

 2              THE WITNESS:  Can you repeat the

 3         question.

 4              THE COURT:  Repeat the question.

 5         Q.   Have illegal criminals caused harm

 6    attributable to heroin and illegal Fentanyl; yes or

 7    no?

 8              THE COURT:  That's like would you have

 9         those notorious factors that a court should

10         accept.

11              MR. SCHMIDT:  I think it's obvious, but

12         I just want to confirm that the witness

13         agrees with it.  I think she agrees with it.

14              THE COURT:  The bad guys created the big

15         problem, right?

16              THE WITNESS:  Bad guys did contribute to

17         the problem, yes.

18              THE COURT:  The bad guys being the

19         cartels and street merchants of heroin,

20         correct?

21              THE WITNESS:  Yes.

22              THE COURT:  Okay.  Go ahead.

23         Q.   Where I'm going with that is your report

24    doesn't contain any analysis of how different the

25    problem with illegal heroin and illegal Fentanyl
```

```
 1                    Frye Hearing - Dr. Keyes            183
 2     would be but for these actions by criminal actors;
 3     does it?
 4          A    The report suggests there would be less
 5     harm now than if those illegal actors had not been
 6     acting.
 7          Q.   Okay.  So if they were to reduce price,
 8     increase production, increase purity, increased
 9     other standards, have you quantified, can you tell
10     us how much less the harm from heroin and Fentanyl
11     would be than it is today?
12          A    I don't have a specific number.
13          Q.   You don't know if it would be 100
14     percent lower, 1 percent lower, somewhere in
15     between, right?
16          A    It's somewhere in between those two.
17          Q.   It would be meaningfully lower though,
18     correct?  Yes or no, if you can answer yes or no.
19          A    It would be lower.
20          Q.   Last thing I'm going to show you, this
21     is an article you talked about on direct
22     examination.
23               Do you remember?  It was demonstrative
24     57.  If we can put it up on the screen, an article
25     by Muhuri.  It was on slide 21.  And if you need
```

```
1                    Frye Hearing - Dr. Keyes              184

2        another copy I can give you another copy so you

3        don't have to sift through a growing pile of

4        documents.

5                   Do you remember talking about this

6        article on direct examination?

7             A    Yes.

8             Q.   There was a slide talking about this

9        article; is that right?

10            A    That's correct.

11            Q.   What I want to do is show you some data

12       from this article that you did not discuss on

13       direct, specifically can you go with me to page 11

14       of this document, which is table 3?

15            A    Yes.

16            Q.   Table 3 is looking at people who started

17       using heroin based on different factors they

18       present, correct?

19            A    Just give me a moment to --

20            Q.   Sure.

21            A    -- familiarize myself with this table.

22            Q.   Why don't we pull up ahead, Mr.

23       Reynolds, if we could...

24                 (READING:)  Percentage distribution of

25       past year heroin initiates aged 12 to 49, by
```

```
 1                    Frye Hearing - Dr. Keyes              185

 2     demographic and geographic characteristics and prior

 3     illicit drug use status.

 4          A    Yes.

 5          Q.   And they do it for three different time

 6     periods and that it combines time periods of 2002

 7     through 2011; do you see that?

 8          A    Yes.

 9          Q.   One of the factors these authors -- this

10     is an article you relied on, correct?

11          A    Yes.

12          Q.   And it's an article that you believe

13     follows generally accepted principles?

14          A    Yes.

15          Q.   One of the factors they look at to see

16     how it is related to later heroin use is prior

17     nonmedical prescription opioid use, correct, or

18     opioid misuse, as you call it?

19          A    Yes.

20          Q.   Just if we can look down at the very

21     bottom, I guess it's actually already up on the

22     screen.

23               Do you see where it says:  "Prior

24     nonmedical prescription use and that the aggregate

25     data of 79.5 percent of those people who used heroin
```

```
 1                   Frye Hearing - Dr. Keyes            186
 2      in this study had previously used nonmedical
 3      prescription opioids;" do you see that?
 4               A    I'm sorry, is this table 3?
 5               Q.   This is table 3, down at the bottom.
 6                    Are you looking at table 3 or figure 3?
 7               A    I'm looking at table 3 but --
 8                    MR. SCHMIDT:  May I approach, your
 9               Honor.
10                    THE COURT:  Yes.
11                    THE WITNESS:  I apologize.  Oh, you know
12               what, there's -- the table 3 continues on two
13               pages, and I was looking at the wrong page.
14               I apologize.
15                    MR. SCHMIDT:  No, no worries at all.
16               Q.   Are you with me now?
17               A    Now I'm with you.
18               Q.   This report in this study, the 79.5
19      percent of people who had heroin use had prior
20      nonmedical prescription opioid use; is that correct?
21               A    That's correct.
22               Q.   That same group, though, 79.5 percent
23      had prior illicit drug use, correct?  And that's the
24      number on the bottom right corner.
25               A    That's correct.
```

1

2          Q.    And prior illicit drug use, if you go to

3     the next page where it says footnote 2, is defined

4     as -- if we pull footnote 2 it includes marijuana,

5     hashish, cocaine, including crack, hallucinogens and

6     inhalents; do you see that?

7          A     Yes.

8          Q.    Just as a more general proposition, do

9     you know what percentage of heroin users who are

10    using heroin today started using marijuana or

11    cocaine or other illegal drugs, other than

12    prescription opioids?

13         A     It's a majority.

14         Q.    Do you know what percentage -- do you

15    know with anymore particularity than that?

16         A     Not off the top of my head.

17         Q.    Do you know what percentage of people

18    who have used heroin abused alcohol before using

19    heroin?

20         A     Abused alcohol?  Do you mean have

21    alcohol use disorder?

22         Q.    Or abused it in some way, used it

23    excessively in some way.

24         A     It's a majority.

25         Q.    Can you quantify more than that?

```
 1                    Frye Hearing - Dr. Keyes          188
 2           A    I can't.
 3           Q.   Okay.  Am I right that your own research
 4      has shown that past-year drug use, other than
 5      nonmedical use of prescription opioids and alcohol
 6      use disorder are the strongest factors associated
 7      with nonmedical use prescription opioids?
 8           A    Yes.
 9           Q.   Is that -- do you stand behind that
10      view?
11           A    Yes.
12           Q.   And is that a generally accepted view in
13      your understanding?
14           A    Yes.
15                MR. SCHMIDT:  That's all I have.  Thank
16           you, doctor, appreciate your time.  Thank
17           you, your Honor.
18                THE COURT:  Mr. Ercole, are you okay?
19                MR. ERCOLE:  Yes, your Honor.
20                THE COURT:  Just give your name once
21           again, who you represent.
22                MR. ERCOLE:  Sure.  Brian Ercole, and I
23           represent the Teva Defendants in this case.
24                THE COURT:  Doctor, you're going to be
25           examined like on the screen.  Mr. Ercole is
```

```
 1                    Frye Hearing - Dr. Keyes              189
 2          someplace else.
 3                  THE WITNESS:  Right.
 4                  THE COURT:  He's feeding in, so to
 5          speak.
 6                  THE WITNESS:  Okay.
 7                  THE COURT:  You may proceed.  Go ahead.
 8                  MR. ERCOLE:  Thank you, your Honor.
 9   EXAMINATION BY
10   MR. ERCOLE:
11          Q.   Good afternoon, Dr. Keyes.  I'm at a
12   slight disadvantage because I can't see you and I'm
13   not sure if you can see me, and I'm sorry.
14                  THE COURT:  Let's address that.  Mr.
15          Ercole indicates he can't see the witness.
16                  MR. REISMAN:  We see her on the screen
17          here.  We see both Mr. Ercole and the
18          witness.
19                  MR. ERCOLE:  Okay.  My screen, for what
20          it's worth, I can see, I have a clear view of
21          your honor, but I don't have a view of the
22          witness, but I mean that's been the case all
23          day, so I'm happy to proceed as planned.
24                  THE COURT:  Okay.
25                  MR. ERCOLE:  Dr. Keyes, I'd like to
```

```
1                      Frye Hearing - Dr. Keyes              190

2             focus on your marketing causation opinion.

3                    THE WITNESS:  Okay.

4                    MR. ERCOLE:  Can we pull up Dr. Keyes'

5             report in this case.

6             Q.   And in particular, Dr. Keyes, if you can

7      turn to section 2 of the report, which I believe you

8      have a copy in front of you.

9             A    Yes.

10            Q.   And section 2 of your report, which is

11     on page 6, is -- identifies in section 2 opinions;

12     is that correct?

13            A    That's correct.

14            Q.   It goes on to say:  "For the detailed

15     reasons stated in this report, I intend to offer the

16     following opinions in this case:"

17                 Correct?

18            A    Yes.

19            Q.   And in that section you identify 10

20     opinions, correct?

21            A    Yes.

22            Q.   The word marketing is not mentioned in

23     any of those opinions, correct?

24            A    Correct.

25            Q.   The word promotion is not mentioned in
```

```
 1                    Frye Hearing - Dr. Keyes              191
 2      any of those opinions, correct?
 3             A    Let me just -- that's correct.
 4             Q.   No individual Defendant is mentioned in
 5      any of those opinions, correct?
 6             A    Correct.
 7             Q.   Okay.  If you can turn to -- is it fair
 8      to say that the first time the word marketing
 9      appears in your report is on page 13?
10             A    I trust that that is correct.
11             Q.   Appreciate that.
12                  So if we can turn to page 14 of your
13      report, Dr. Keyes, if you can turn to page 14 of
14      your report, more particular, the last sentence --
15      excuse me -- the second -- the last two sentences of
16      sort of the initial paragraph on that page that
17      starts with "evidence".
18             A    Yes.
19             Q.   And in those sentences you state:  "The
20      evidence shows that pharmaceutical marketing of
21      prescription drugs increases prescribers likelihood
22      of prescribing the marketing drug in the future.
23      That is also true for prescription opioids.  As a
24      result, increasing marketing of opioid drugs led to
25      increased sales of the marketed drugs."
```

1
2          Is that correct?

3     A    Yes.

4     Q.   Okay.  And those -- those statements

5     there on page 14 of your report are consistent with

6     the opinion that you discussed earlier today with

7     the Plaintiffs' counsel in this case, correct?

8     A    Could you just restate opinion 3, I'm

9     assuming it was the marketing.

10    Q.   Sure.  Yes.  It was the marketing

11    opinion, and I believe in the PowerPoint you read:

12    "Do you recall that opinion being marketing of

13    prescription opioids increases prescribers

14    likelihood of prescribing opioids in the future?"

15    A    Yes.

16    Q.   Okay.  I'd like to get into, discuss

17    with you your qualifications with respect to this

18    particular opinion.

19         Dr. Keyes, you do not have a degree in

20    marketing, correct?

21    A    I have an undergraduate degree in

22    business, but I don't have any graduate degrees in

23    marketing.

24    Q.   Okay.  And you do understand that

25    there's -- there are specific degrees that you can

1

2    obtain in undergraduate for marketing in particular?

3         A    Yes.

4         Q.   Okay.  And you don't have one of those

5    degrees, correct?

6         A    That's correct.

7         Q.   And you do not have a Ph.D. in

8    marketing, correct?

9         A    Correct.

10        Q.   You do not teach in the marketing

11   department of any university, correct?

12        A    That's correct.

13        Q.   You have not personally conducted any

14   study on the impact of pharmaceutical marketing,

15   correct?

16        A    That's correct.

17        Q.   And because you have not personally

18   conducted any study on the impact of pharmaceutical

19   marketing, you have not published any study that you

20   could publish without any study that you conducted

21   on the impact of pharmaceutical marketing, correct?

22        A    I have not published any such studies,

23   no.

24        Q.   Okay.  And you haven't, you haven't

25   worked for a pharmaceutical manufacturer; have you?

```
 1                    Frye Hearing - Dr. Keyes              194
 2          A    No.
 3          Q.   And you're not an expert in the business
 4     practices of pharmaceutical manufactures, correct?
 5          A    That's correct.
 6          Q.   And you're not a medical doctor,
 7     correct?
 8          A    That's correct.
 9          Q.   You do not have a medical degree?
10          A    I do not.
11          Q.   You're not licensed to prescribe
12     pharmaceutical medicine?
13          A    No.
14          Q.   And I assume, since you're not licensed,
15     you have not prescribed a pharmaceutical medicine;
16     is that fair?
17          A    That's fair.
18          Q.   And you don't have any formal medical
19     training, correct?
20          A    My training in epidemiology is the
21     formal training I received.
22          Q.   So let me ask it again.
23               You don't have any formal medical
24     training through a medical school, correct?
25          A    My epidemiology degree is through the
```

```
 1                    Frye Hearing - Dr. Keyes                195
 2      medical school.  I didn't go to medical school to
 3      become a physician, but epidemiology is part of
 4      medicine.
 5            Q.   Fair enough.
 6                 And are you -- you don't have any degree
 7      that allows you to assess whether a prescription
 8      written by a medical doctor is medically appropriate
 9      or inappropriate for a particular patient, correct?
10            A    I'm sorry, can you repeat the question?
11            Q.   Sure.
12                 You don't have any type of medical
13      degree that will allow you to assess whether a
14      particular prescription written by a medical doctor
15      is medically appropriate or inappropriate for a
16      particular patient, correct?
17            A    That's within the purview of
18      epidemiology, to assess medication effectiveness.
19      So my training would allow me to make those types of
20      conclusions based on the literature.
21            Q.   But you have no medical degree, correct?
22            A    I don't have a medical degree, no.
23            Q.   Okay.  And you're aware that last year
24      Judge Polster in the federal MDL ruled that you were
25      not qualified to opine on the effects the
```

1

2     Defendants' marketing had on the increased sales

3     and/or increased prescriptions of opioids, correct?

4          A    Yes.

5          Q.   Okay.  And if we could pull up the MDL

6     order from Judge Polster at page 2, and if you can

7     pull out the following language.

8               Dr. Keyes, are you aware that Judge

9     Polster made the finding that "Also as to Keyes, the

10    Court finds that although she is highly qualified as

11    an expert in epidemiology, Plaintiffs have not shown

12    this expertise extends to her opinions on marketing

13    causation in this case."

14              Are you aware of that finding?

15              MR. REISMAN:  Your Honor, just before

16         the witness answers, I don't have any hard

17         copies of the exhibits that Mr. Ercole is

18         using in court.

19              MR. HALPERIN:  I apologize.  I do have

20         them.

21              MR. REISMAN:  If you can hand them out.

22              THE COURT:  What I can do is I will, of

23         course, I have a copy of the decision he's

24         referring to.  I can, of course, see, as is

25         my job, to make sure whatever he, whatever

1

2      the examiner recites is, in fact, an exact

3      recitation.  However, for purposes of

4      redirect examination, I will see that you

5      have a full copy of the decision.

6          MR. SCHMIDT:  Mr. Ercole, just identify

7      the --

8          THE COURT:  It's Docket 2518, filed

9      August 26th 2019, 14 pages.

10         MR. REISMAN:  Thank you, your Honor.

11     Q.  Dr. Keyes, do you have a copy of that

12  document in front of you now?

13     A    I do.

14     Q.  Okay.  Thank you.  And I just wanted to

15  ask you a couple of questions on this.

16         But you're aware of the finding that is

17  highlighted on the screen right now that we just

18  talked about?

19     A    Yes.

20     Q.  Okay.  And you're aware of the Court's

21  finding in the next sentence that, that states that:

22  "The Court will exclude the limited portions of

23  their opinion and purport to find causation with

24  respect to the effect that Defendants' marketing

25  efforts had on increased sales and/or increased

```
1                    Frye Hearing - Dr. Keyes              198

2       prescriptions of opioids, correct?

3            A    Yes.

4            Q.   Okay.  And one of the opinions that we

5       talked about, that you purport to give in this case

6       is the same opinion that you tried to give in the

7       federal opioid MDL proceeding, correct?

8            A    Can you expand on that?

9            Q.   Sure.  Sure.

10                One of the opinions you purport to give

11      in this case is that marketing caused an increase in

12      prescription opioids, correct?

13           A    I do have the opinion that marketing

14      caused an increase in opioid harms and sales.

15           Q.   And that's the same opinions that you

16      purported to give in the federal MDL case that was

17      the subject of this excluding order, correct?

18           A    Yes.  My report in this case has

19      differences in that section.

20           Q.   The answer is "yes," though, correct?

21           A    Yes.

22           Q.   Okay.  You have not received a medical

23      degree in August of 2019 when Judge Polster issued

24      this opinion; have you?

25           A    No.
```

```
 1                  Frye Hearing - Dr. Keyes              199
 2           Q.   And you haven't received any type of
 3      marketing degree in the last year; have you?
 4           A    No.
 5           Q.   You haven't received any additional
 6      degrees in the last 12 months, correct?
 7           A    No.
 8           Q.   You haven't received any additional
 9      marketing related certifications in the last 12
10      months, correct?
11           A    Correct.
12           Q.   One of the things I believe you
13      testified earlier to that, that you've done since
14      submitting your MDL report, is that you reviewed and
15      analyzed the Hadland studies that are referenced in
16      the slides that you were shown this morning; is that
17      correct?
18           A    Those and other studies.
19           Q.   But it's your testimony that one of the
20      things you've done since submitting your report in
21      the MDL case, federal MDL case, is reviewing the
22      Hadland studies from -- that were discussed earlier
23      today, correct?
24           A    In addition to other studies, that yes
25      to the Hadland studies, and also other studies.
```

```
1                    Frye Hearing - Dr. Keyes            200

2          Q.   Fair enough.

3               And, Dr. Keyes, I'd ask if you can limit

4     your answers to yes or no I would appreciate that.

5          A    I apologize.  I will try.

6          Q.   Thank you very much.

7               Are you aware that those studies were

8     all submitted in connection with your first --

9     strike that.

10              Are you aware that those studies, the

11    Hadland studies that were referenced earlier this

12    morning were all cited in connection with your MDL

13    report?

14         A    Yes.

15         Q.   And so your MDL report referenced all of

16    the studies, all of the Hadland studies that were

17    discussed this morning, correct?

18         A    The Hadland studies, yes.

19         Q.   Okay.  And so Judge Polster reached his

20    decision that you were not qualified to provide an

21    opinion on marketing causation in the federal MDL,

22    despite your analysis of and reliance on the Hadland

23    studies in your first MDL report, correct?

24         A    Yes.

25         Q.   Let's focus a little bit on the -- let's
```

1

2     move into the methodology for -- that you used here

3     with respect to your marketing causation opinion.

4                     I'd like to direct your attention to

5     slide 7 of the slides that you were shown earlier

6     today.

7                     Do you have that in front of you, Dr.

8     Keyes?

9           A     Is that titled methodology?

10          Q.    It is, and it should be up on the screen

11    right now.

12          A     Then, yes, I have it.

13          Q.    I apologize for talking over you if I

14    do.  As I indicated, I can't see you directly, so

15    I'm trying to do my best.

16                     This slide, slide 7 is titled

17    Methodology, correct?

18          A     Yes.

19          Q.    Okay.  And this is the methodology you

20    used in this particular case, correct?

21          A     It is among the methodologies yes.

22          Q.    Well, there's no mention of marketing in

23    this slide; is there?

24          A     No.

25          Q.    There's no mention of promotion here?

```
 1                    Frye Hearing - Dr. Keyes            202

 2          A     There's not.

 3          Q.    No mention of any of the manufacturer

 4    Defendants marketing in this slide type of

 5    methodology?

 6          A     No.

 7          Q.    Your methodology in this case with

 8    respect to your marketing causation opinion did not

 9    involve reviewing any specific marketing materials

10    of any manufacturer Defendant, correct?

11          A     That's correct.

12          Q.    Your methodology did not involve the

13    review of any specific marketing communication

14    attributable to any manufacturer Defendant in New

15    York, correct?

16          A     I'm sorry, can you repeat the question?

17          Q.    Sure.

18                Your methodology did not involve the

19    review of any specific marketing communications

20    attributable to any manufacturer Defendant in New

21    York, correct?

22          A     I believe those are in the open payment

23    database that was used in the Hadland study.

24          Q.    We'll address -- we'll get into that.

25    And then let me, let me sort of emphasize my
```

1
2       question.  Let me rephrase my question.

3              You did not look at any specific

4       marketing communications of any manufacturer,

5       correct?

6           A    Can you just define what you mean by a

7       "marketing communication"?

8           Q.   Fair enough.

9              So you didn't look at any specific

10      marketing statements attributable to any

11      manufacturer Defendant in New York, correct?

12          A    A marketing statement outside the ones

13      that are included in the open payments database

14      or --

15          Q.   Well, let me ask you this:

16             Are any manufacturer statements actually

17      included in the open payment data base?

18          A    I guess I'm -- if you can just describe

19      what you mean by a statement.  I'm not trying to be

20      obstructive.  I'm just -- I included what was in the

21      open payments database.  If something was not in the

22      open payments database, it was not included in my

23      analysis.

24          Q.   The open payment database does not

25      include any content of any specific interactions

1

2      between any manufacturer sales representative in any

3      position, correct?

4           A    I believe you're correct, yes.

5           Q.   Okay.  And it doesn't include the

6      content of any specific interactions whatsoever

7      between manufacturers and physicians, correct?

8           A    I don't believe so.

9           Q.   Meaning, yes, correct, for that

10     statement?

11          A    Yes.

12          Q.   So your methodology did not involve, in

13     this case, did not involve the review of the content

14     of any specific interactions between manufacturer

15     Defendants and physicians in New York, correct?

16          A    Correct.

17          Q.   And it didn't involve the review of any

18     specific statements as opposed to, for instance,

19     payment of attributable to any manufacturer

20     Defendant in New York, correct?

21          A    That's right.

22          Q.   And as far as your methodology in this

23     case, you're not familiar with what opioids, if any,

24     these manufacturer Defendants in this case actually

25     marketed in New York, correct?

1

2       A    I'm sorry, say that again.  The --

3       Q.   Sure.

4            As part of your methodology in this case

5   you're not familiar with what opioids, if any, each

6   manufacturer defendant actually marketed in New

7   York, correct?

8       A    That's correct.

9       Q.   Part of your -- excuse me -- as part of

10  your methodology in this case, you have not

11  evaluated when any manufacturer Defendants, if it

12  did at all, marketed any opioid product in New York,

13  correct?

14      A    I mean, to the extent that that was in

15  the open payments database, that information would

16  be available.  I think in one of the Hadland studies

17  they do break down by state, and so we can look at

18  what the Hadland study has for New York State for

19  that particular question.

20      Q.   So why don't we -- do you recall giving

21  a deposition in this case, doctor?

22      A    Yes.

23      Q.   Can you turn to -- I assume you have a

24  copy of your deposition transcript in front of you?

25      A    I do.

1

2          Q.    Okay.  And can we turn to page 384 of

3     your deposition transcript.

4          A    Yes.

5          Q.    Can you turn to line number -- excuse

6     me -- if you turn to 384, question on line 17.  The

7     question is:

8              "As you sit here today, you don't know

9     what time period Mallinckrodt marketed opioid

10    products in New York?

11             ANSWER:  That's correct.

12             QUESTION:  Is your answer the same for

13    Allergan?"

14             "Yes."

15             "QUESTION:  Janssen?"

16             "I think my answer is going to be the

17    same for all of them."

18             Do you recall giving that testimony?

19         A    Yes.

20         Q.    So sitting here today you can't identify

21    when a manufacturer Defendant ever marketed any

22    opioid products in New York, correct?

23         A    I think we can look at the Hadland

24    study.  It might shed some light on that, I'm not

25    sure.  But we can open that study up to see if there

 1       was relevant time periods.

 2            Q.   Other than the Hadland study, to the

 3       extent it has or does not have any of those time

 4       periods in there, your methodology didn't evaluate

 5       reviewing when particular manufacturers promoted

 6       particular products in New York, correct?

 7            A    That's correct.

 8            Q.   And as part of your methodology in this

 9       case you have not done anything to determine how

10       many manufacturers of opioids there are, correct?

11            A    That's correct.

12            Q.   And you have not determined how many

13       manufacturers of opioids marketed or opioid medicine

14       was marketed in New York between 1996 and the

15       present, correct?

16            A    How many total companies?

17            Q.   Yes.

18            A    I think that would be in the open

19       payments database.

20            Q.   Sitting here today -- I apologize for

21       talking over you.

22            A    I could look in the Hadland study and

23       see if that information is available.  Off the top

24       of my head I don't know.

```
 1                    Frye Hearing - Dr. Keyes              208
 2          Q.    And that's not included in your report,
 3    correct?
 4          A     That's correct.
 5          Q.    Sitting here today you don't know
 6    whether the Hadland study does or does not include
 7    the number of manufacturers of opioids that marketed
 8    the medicine in New York between 1996 and the
 9    present, correct?
10          A     Right.
11          Q.    Given that you have not reviewed any of
12    the Defendants' marketing materials in this case,
13    you have not analyzed the specific impact of those
14    marketing materials, correct?
15          A     Of which marketing materials?
16          Q.    Let me repeat my question.
17                Given that you have not reviewed any of
18    the Defendants' marketing materials in this case,
19    you have not analyzed the impact of any of those
20    specific marketing materials, correct?
21          A     Incorrect.
22          Q.    You haven't reviewed any of the
23    Defendants' marketing materials, right, that's been
24    established?
25          A     That's correct.
```

```
 1
 2        Q.   Okay.  Do you understand there's a
 3   difference between truthful marketing and false or
 4   misleading marketing?
 5        A    I'm generally aware that there would be
 6   truth and falsehood in marketing, yes.
 7        Q.   So meaning some statements may be true
 8   and some statements may not be true, correct?
 9        A    I would imagine so, yes.
10        Q.   And you are not giving in this case any
11   opinion on whether any particular manufacturer
12   Defendants' marketing materials are false or
13   misleading, correct?
14        A    No, I am giving that opinion.  There is
15   other literature that talks about materials
16   underestimating the risk of addiction.
17        Q.   You do not know, Dr. Keyes, whether any
18   of those materials were used by any of the
19   manufacturer Defendants in this case, correct?
20        A    That's correct.
21        Q.   You do not know what, if anything, any
22   manufacturer Defendants may have said about any of
23   those materials, correct?
24        A    Say that again.  I'm sorry, I'm just --
25   it's hard to on Zoom or Team to take it in.
```

```
1                    Frye Hearing - Dr. Keyes              210
2            Q.   Fair enough.
3                 You mentioned that there are -- you
4       mentioned studies that talked about downplaying the
5       risk of opioid use in marketing materials, correct?
6            A    Yes.
7            Q.   Okay.  And we established that -- strike
8       that.
9                 With respect to those studies, you don't
10      know whether any manufacturer Defendant in this case
11      ever cited or used any of those citings in
12      connection with any interactions with New York
13      physicians, correct?
14           A    Correct.
15           Q.   Okay.  And you don't know what, if
16      anything, any manufacturer Defendant might have said
17      about those studies with any New York physician,
18      correct?
19           A    Sorry, give me -- you're asking me if I
20      know what manufacturer said to physicians?
21           Q.   I'm asking you, in connection with the
22      studies we're talking about, you don't know what, if
23      anything, any manufacturer Defendant might have said
24      about those studies in New York, correct?
25           A    I know what the literature says about
```

```
 1                    Frye Hearing - Dr. Keyes              211
 2      the materials, but I am not aware of specific
 3      conversations, for example.
 4            Q.   Let me repeat my question.  And, again,
 5      I ask you to try to keep this to a correct or
 6      incorrect, or a yes or no, if you can.
 7            A    Okay.  I apologize.
 8            Q.   With respect to the studies that are --
 9      that we've been talking about, that you say some
10      marketing materials may have downplayed the risk of
11      those studies, you do not know what any manufacturer
12      Defendant may or may not have said about any of
13      those studies in New York, correct?
14            A    Correct.
15            Q.   And that's because you didn't review any
16      of those marketing materials, right?
17            A    No.
18            Q.   Okay.  You didn't review any of those
19      marketing materials, though, right?
20            A    I did not review specific marketing
21      materials.
22            Q.   Okay.  And you're not giving an opinion
23      on what percentage, if any, of any manufacturer
24      Defendants' marketing materials are supposably false
25      or misleading, correct?
```

```
 1                    Frye Hearing - Dr. Keyes          212
 2          A    A specific percentage?
 3               THE COURT:  You're not testifying as to
 4          truth or voracity of the marketing materials?
 5          A    That's correct.
 6               THE COURT:  Next question -- time out.
 7          Excuse me, I said truth or voracity, it's the
 8          same thing, truth or untruth.
 9          Q.   Dr. Keyes, your methodology did not
10    evaluate whether any New York prescriber received
11    any false or misleading marketing statement from any
12    manufacturer Defendants in this case, correct?
13          A    That's right.
14          Q.   And you agree that there are many
15    factors, other than marketing, that may influence a
16    particular prescriber to write an opioid
17    prescription, correct?
18          A    Yes.
19          Q.   Okay.  And your methodology did not
20    evaluate whether any New York prescriber was
21    influenced by any false or misleading statement from
22    any manufacturer Defendant to write an opioid
23    prescription as opposed to those other factors,
24    correct?
25          A    Can you say the question again?
```

```
 1                    Frye Hearing - Dr. Keyes              213
 2        Q.    Sure.
 3              Your methodology did not evaluate
 4   whether any New York prescriber was influenced by
 5   any false or misleading statement from any
 6   manufacturer Defendant in this case to write an
 7   opioid prescription as opposed to the many other
 8   factors that had influenced prescribing, correct?
 9        A     I would say that's incorrect.
10        Q.    And can you identify for me any New York
11   prescriber who was influenced by any false or
12   misleading statement from any manufacturer Defendant
13   in this case?
14        A     Not a particular prescriber, no.
15        Q.    And your report doesn't identify any
16   such prescribers, correct?
17        A     I don't identify prescribers, no.
18        Q.    And your report conducted no statistical
19   analysis of -- strike that.
20              Your methodology in this particular case
21   did not evaluate whether any New York prescriber --
22   strike that.
23              Is there any section in your report that
24   you can point us to that would indicate which
25   statements, if any, from any of the manufacturer
```

1

2    Defendants in this case actually influenced New York

3    prescribers to write opioid prescriptions?

4         A    You're asking about specific statements

5    from specific Defendants in this case, no, that's

6    not, that's not in the report.

7         Q.   Right.  And so your report does not

8    identify whether any New York prescribers were

9    actually influenced by specific statements from

10   particular manufacturer Defendants in this case,

11   correct?

12        A    No, I would say that part of the --

13   there's a leap from the question before to this

14   question that I think is covered in the literature,

15   and I'm happy to expand on that, if you'd like me

16   to.

17        Q.   Well, let's ask this.

18             None of the literature that you

19   reference in your report addressed the specific

20   marketing materials of these Defendants in this

21   case, correct?

22        A    Correct.

23        Q.   And that's what I'm asking about.  Sort

24   of focus on my question a little bit.

25             I'm asking you about with respect to the

```
 1                  Frye Hearing - Dr. Keyes              215
 2     statements of these manufacturer Defendants in this
 3     case, you cannot identify for me anywhere in your
 4     report where any of those -- where you identify any
 5     situation where those statements influence a New
 6     York prescriber to write an opioid prescription,
 7     correct?
 8            A    I think that's generally correct.
 9            Q.   You talked earlier today about
10     questionnaires that certain authors have used in
11     connection with publishing studies; do you recall
12     sort of talking about that earlier today?
13            A    Yes.
14            Q.   And you talked earlier today about
15     surveys that some epidemiologists have used in
16     connection with studies; do you recall that?
17            A    Yes.
18            Q.   As part of the methodology of your
19     causation opinions here, you have not conducted any
20     independent study or survey of New York prescribers,
21     correct?
22            A    That's correct.
23            Q.   And you haven't done any type of -- you
24     haven't sent out any systematic questionnaires to
25     New York prescribers to understand why they write
```

1

2      prescriptions, correct?

3            A    That's correct.

4            Q.   So as a result, you have not conducted

5      any study or surveys of New York prescribers to

6      determine whether they received any specific

7      marketing statements from the Defendants in this

8      case, correct?

9            A    That's right.  I have not done such a

10     study.

11           Q.   And you haven't done any cite or survey

12     to understand why it is that New York prescribers

13     write opioid prescriptions, correct?

14           A    I believe that's available in the

15     literature, so I would say that's incorrect.

16           Q.   Please, Dr. Keyes, let me rephrase my

17     question, because I think it was more basic than

18     that, which is:  You have not conducted any study or

19     survey of New York prescribers to understand why

20     they write -- I'll rephrase it.

21                You have not conducted any study or

22     survey of New York prescribers to determine whether

23     they wrote an opioid prescription because of any

24     marketing statement from any Defendant, correct?

25           A    That's correct.

1

2      Q.   And you didn't conduct any study or

3   survey or even send out any questionnaires of New

4   York prescribers to determine what it is they

5   actually understood about opioids when they wrote

6   opioid prescriptions, correct?

7      A    Can you say that question again?

8      Q.   Sure.

9           You have not conducted any study or

10  survey or sent out any opioid questionnaires in

11  connection with your opinion in this case to New

12  York prescribers to determine what they understood

13  when they wrote an opioid prescription, right?

14     A    I have not done such a study.

15     Q.   And as part of your methodology in this

16  case, you didn't evaluate the conduct of any

17  particular manufacturer Defendant, correct?

18     A    I believe some particular manufacturers

19  are identified in some of these publications and

20  that is the extent to which these manufacturers have

21  been identified in the report.

22     Q.   You don't identify any of the

23  manufacturer Defendants by name in your report,

24  correct?

25     A    That's correct.

```
 1                    Frye Hearing - Dr. Keyes              218
 2           Q.   And apart from looking at studies, apart
 3      from looking at studies, you didn't evaluate the
 4      conduct of any particular manufacturer Defendant in
 5      this case, correct?
 6           A    I relied on the literature, yes.
 7           Q.   In this particular case you're not
 8      planning to offer an opinion about the marketing
 9      conduct of any particular manufacturer Defendant in
10      New York, correct?
11           A    That's correct.
12           Q.   Let me take an example, if you don't
13      mind, just to try to sort of tease out this
14      methodology.
15                Have you ever heard the name Watson
16      Laboratories, Inc.?
17           A    It sounds familiar, but I don't have
18      expertise in that particular company.
19           Q.   Do you know whether that company is a
20      Defendant in this case?
21           A    I haven't heard that name.
22           Q.   Did you evaluate what medicine that
23      company makes?
24           A    No.
25           Q.   Did you evaluate whether that company
```

```
 1                    Frye Hearing - Dr. Keyes          219
 2    makes and sells any opioid medicine?
 3          A    I have not evaluated that.
 4          Q.   Did you evaluate whether that company
 5    actually promotes any of those opioid medicines in
 6    New York?
 7          A    I have not evaluated that.
 8          Q.   Did you evaluate when they promoted, if
 9    they did at all, any of those medicines?
10          A    No.
11          Q.   Did you evaluate how they were promoted?
12          A    No.
13               THE COURT:  Mr. Ercole, with all due --
14               great deal of respect, if she never heard of
15               the company, what good are the questions?
16               MR. ERCOLE:  I would respectfully
17               submit, your Honor -- but let me ask this,
18               I'll tie this up now...
19          Q.   Dr. Keyes, would it surprise you to
20    learn that that is a Defendant in this particular
21    case?
22          A    Would it surprise me -- I'm sorry, say
23    that again.
24          Q.   Would it surprise you to learn that that
25    company is a Defendant in this particular case?
```

 1

 2          A     It would not surprise me.

 3          Q.    And it wouldn't surprise you because

 4    that was not part of your methodology, correct?

 5          A     That's correct.

 6          Q.    And just so I understand, and that

 7    answer would apply to each of the specific

 8    Defendants, manufacturer Defendants in this case,

 9    correct?

10          A     Some have been more prominent than

11    others in literature, so some I'm familiar with --

12    many I'm familiar with, especially if they've been

13    repeatedly cited in the literature I'm more familiar

14    with the companies.

15          Q.    Well, let's see if we can summarize a

16    little bit here.

17                Your methodology in this particular case

18    did not evaluate whether any of the manufacturers,

19    who are Defendants in this case, actually made

20    marketing statements about opioids in New York,

21    correct?

22          A     The -- correct.

23          Q.    And it did not evaluate what specific

24    opioid medicine they marketed, corrected?

25          A     Some literature does cover that, so I

```
 1                    Frye Hearing - Dr. Keyes         221
 2    would say that's incorrect.
 3          Q.    Sitting here today -- well, you
 4    certainly haven't evaluated all of the opioid
 5    medicine that each of the manufacturer Defendants in
 6    this case market, correct?
 7          A     That's right.
 8          Q.    And you did not evaluate when each of
 9    those opioid products was marketed in New York,
10    correct?
11                MR. REISMAN:  Objection.
12                Asked and answered.
13                THE COURT:  Sustained.
14          Q.    Dr. Keyes, you have not conducted your
15    own statistical analysis to determine how many --
16    excuse me.  Strike that.
17                Doctor Keyes, you have not conducted
18    your own statistical analysis to determine how many
19    opioid restrictions, if any, were influenced by the
20    marketing of any manufacturer Defendant in this case
21    as opposed to other factors, correct?
22          A     Correct.
23          Q.    And you have not conducted your own
24    statistical analysis to determine how many opioid
25    prescriptions, if any, were influenced by any false
```

```
1                      Frye Hearing - Dr. Keyes            222

2      or misleading marketing of any manufacturer

3      Defendant, correct?

4                    MR. REISMAN:  Objection.

5                    Asked and answered.

6                    THE COURT:  Answer it again.

7           A    I believe that that is in the

8      literature, so I believe that that's included in my

9      report.

10          Q.   Dr. Keyes, let me re-ask that question.

11               You have not conducted your own

12     statistical analysis to determine how many opioid

13     prescriptions, if any, were influenced by any false

14     or misleading marketing of any manufacturer as

15     opposed to other factors, correct?

16          A    I relied on the literature, so it is

17     correct that I did not do my own study, I relied on

18     published studies.

19          Q.   None of those studies, Dr. Keyes,

20     evaluated specific statements by specific

21     manufacturer Defendants in this case, correct?

22          A    There's no specific statements, no.

23          Q.   So when you say you relied upon the

24     literature, that literature does not actually

25     identify any false or misleading or other marketing
```

1

2    statements by any of the other manufacturing

3    Defendants in this case?

4         A    I believe there is discussion of

5    misleading statements in some of these articles, and

6    they're attributed to various companies.

7              THE COURT:  The question is:  Are the

8              statements connected to a Defendant in this

9              case?

10             THE WITNESS:  I believe there is some

11             literature on some specific Defendants in

12             this case that we could look at in some of

13             the citations.

14        Q.   Sitting here today -- we'll get into

15   some of those studies -- sitting here right now, can

16   you identify a specific study that evaluated a

17   specific statement by any of the manufacturer

18   Defendants in this case?

19        A    No.

20        Q.   In fact, if we could pull up your

21   deposition transcript at page 381.  If we can go to

22   line 9.  If you pull up line 4 is where it begins.

23             "QUESTION:  Do now who the manufacturing

24   Defendants are in this case currently?"

25             And you state:  "I know it's a bit of a

```
 1                    Frye Hearing - Dr. Keyes              224

 2      moving target, but I try to keep up a little bit,

 3      but I know some of them."

 4                    "Okay.  Which ones can you name right

 5      now?"

 6                    "ANSWER:  And I was going to prepare for

 7      this, so it's Teva, J&J, Janssen, Endo, Allergan,

 8      and those are the ones I can name off the top of my

 9      head.  There may be others.

10                    QUESTION:  As you sit here today, can

11      you point to me any study that evaluated the

12      marketing material of those specific companies?

13                    ANSWER:  No."

14                    Do you see that?

15           A    Yes.

16           Q.   And that was accurate at the time you

17      gave that testimony, correct?

18           A    Correct.

19           Q.   And it remains accurate today?

20           A    Yes.

21           Q.   And if you continue down in your

22      deposition there's a question that's presented and

23      then you give another answer, and if I can point you

24      to page 382, line 6 through 11, you state:

25                    "But the specific marketing materials of
```

1

2  any specific company, except for the Purdue one that

3  I mentioned, I have not seen an extensive

4  epidemiological report on those companies' specific

5  marketing materials."

6              Is that correct?

7      A    That's correct.

8      Q.   That was true at the time you gave that

9  testimony?

10     A    Yes.

11     Q.   That's true today, correct?

12     A    That's correct.

13     Q.   The link back to the questions that I

14  was asking, you have not conducted your own

15  statistical analysis to determine whether any

16  marketing by any manufacturer Defendant in this case

17  actually caused any medically and inappropriate

18  opioid prescription in New York, correct?

19     A    I can infer from the literature on that,

20  but whether there's a specific marketing statement

21  I'm not aware of a study that's listed that.

22     Q.   And you haven't done your own

23  statistical analysis, correct?

24     A    That's correct.

25     Q.   And that's because you relied upon

1

2    literature, correct?

3         A    That's correct.

4         Q.    You talked this morning about harms

5    associated with opioids in New York; do you recall

6    that testimony?

7         A    Yes.

8         Q.    That some of those harms included

9    overdose; do you recall that?

10        A    Yes.

11        Q.    Your methodology in this case does not

12   trace any of those harms to an opioid prescription

13   written because of any particular marketing

14   statement by any particular manufacturer Defendant

15   in this case, correct?

16        A    Again, I think when you look at the

17   literature as a whole one can draw that conclusion,

18   but if there's -- there's no specific prescription

19   that I've evaluated.

20        Q.    There's no particular marketing

21   statement that you evaluated, correct?

22        A    That's right.

23        Q.    Okay.  And so let me just rephrase this

24   question so we can get an actual, you know, sort of

25   correct or incorrect.

```
1                  Frye Hearing - Dr. Keyes          227
2              Your methodology in this case does not
3    trace any of the harms associated with opioids, that
4    you discussed earlier today, to an opioid
5    prescription written because of any particular
6    marketing statement by any particular manufacturer
7    Defendant in this case, correct?
8        A    Incorrect.  I mean, the methodology is
9    actually what does the tracing.  That's exactly what
10   the methodology does, actually.
11       Q.   Your report did not identify any opioid
12   prescription written because of any particular
13   marketing statement by any particular manufacturer
14   Defendant in this case, correct?
15       A    Wait, say that again.
16       Q.   Your report does not identify any
17   specific opioid prescription written because of any
18   particular marketing statement by any particular
19   manufacturer Defendant in this case, correct?
20       A    No specific prescription, that's
21   correct.
22       Q.   And because you haven't identified any
23   specific prescription in your report, your report
24   does not identify any of the harmed, low income
25   subject prescription, correct?
```

```
 1                    Frye Hearing - Dr. Keyes            228
 2          A    So from any one prescription, no, but it
 3     looks at the bulk of prescriptions.
 4          Q.   But it doesn't identify any of the
 5     specific prescriptions that would have been
 6     influenced by any specific marketing statements by
 7     any manufacturer Defendant, correct?
 8          A    No one prescription, no.  It draws
 9     inference from associations.
10          Q.   In fact, it doesn't identify any
11     specific prescriptions in New York, correct?
12          A    That's right.  I'm sorry, I guess I --
13     can I qualify that answer or --
14               THE COURT:  Go ahead.
15               THE WITNESS:  -- or restate it?
16          A    We do look at prescriptions in New York.
17     I mean, my report does include data on prescriptions
18     in New York.
19               THE COURT:  The question suggests a
20          particular prescription.
21               THE WITNESS:  Right.  No one particular
22          prescription.
23               THE COURT:  And carrying it through the
24          chain, and the answer is no?
25               THE WITNESS:  Right.  That's right.
```

1

2      Q.   The opinion that you are giving on

3   marketing causation is based upon studies that other

4   academics have done, correct?

5      A    That's right.

6      Q.   And would you agree that the

7   epidemiological literature shows that whether a

8   pharmaceutical industry interactions and influence

9   prescribers depends on both the product and type of

10   marketing that is done?

11      A    Can you say that again?

12      Q.   Sure.

13           Does the epidemiological literature that

14   you relied upon, does that show that whether

15   pharmaceutical industry interaction can influence

16   prescribers depends on a product and type of

17   marketing that is done?

18      A    I believe that's generally what the

19   literature states.

20      Q.   And you testified to that effect during

21   your deposition, correct?

22      A    Yes.

23      Q.   And would you agree that the academic

24   literature, when it comes to the impact, if any --

25   strike that.

```
 1                    Frye Hearing - Dr. Keyes              230

 2            Would you agree that the academic

 3       literature contains studies for particular products

 4       that do not show an effective influence of marketing

 5       on sales?

 6            A     There have been -- yes.  There are

 7       studies where marketing has not influenced sales.

 8            Q.   And you would describe the academic

 9       literature on the impact of marketing on prescribing

10       as kinergies (phonetic), correct?

11            A     Yes.

12            Q.    In this particular case -- and let me

13       just make clear that I fully understand your

14       testimony -- so you would agree that there are two

15       factors that can influence whether or not -- strike

16       that.

17                 You agree that with respect to the

18       evidence in the epidemiological literature that it

19       hinges upon, A, the product, and B, the type of

20       marketing at issue, right?

21            A     Among other factors.

22            Q.    And in this particular case, you would

23       agree with me that there are many -- strike that.

24                 You would agree with me that there are

25       many different types of opioid medicines, right?
```

1

2          A     Yes.

3          Q.    I think we've discussed this, but you

4     don't know what particular type of opioid medicine

5     that each manufacturer Defendant in this case

6     marketed, correct?

7          A     No.

8               THE COURT:  "No," not correct, or "yes,"

9          that is correct.

10              THE WITNESS:  Yes, that is correct.

11         Q.    And you don't know all of the specific

12    types of marketing conduct or statements, if any,

13    that the manufacturer Defendants in this case

14    engaged in with respect to New York, correct?

15         A     I know some of them but not all of them.

16         Q.    You know some of them because of the

17    open payment database; is that correct?

18         A     That's right.

19         Q.    And again, that open payment database

20    that you're referring to, does not include the

21    content of any specific marketing statement or

22    communication with any physician, right?

23         A     That's right.

24         Q.    I'd like to -- we've been referencing --

25    strike that.

```
 1                    Frye Hearing - Dr. Keyes              232
 2              Earlier today there were slides that
 3       addressed the Hadland articles; do you recall that?
 4            A    Yes.
 5            Q.   Okay.  And there were three Hadland
 6       studies; do you recall that?
 7            A    Yes.
 8            Q.   And with respect to those Hadland
 9       studies, none of those Hadland studies evaluated the
10       impact, if any, that any particular marketing
11       statements by any particular manufacturer Defendant
12       in this case had on opioid prescribing, correct?
13            A    Right.  That's correct.
14            Q.   None of those studies even looked at any
15       particular marketing statements, correct?
16            A    That's correct.  Those three studies,
17       no.
18            Q.   None of those studies evaluated whether
19       statements by pharmaceutical sales representatives
20       about the risks and efficacy of opioid medicine had
21       any impact on opioid prescribing, correct?
22            A    Can you repeat the question?
23            Q.   Sure.
24                 None of the Hadland studies that you
25       referenced earlier today evaluated whether
```

1

2    statements by pharmaceutical sales representatives

3    about the risks and efficacy of opioid medicines had

4    any impact on opioid prescribing, correct?

5         A    Incorrect.

6         Q.   None of those studies, Dr. Keyes,

7    evaluated statements by sales representatives about

8    the risk and efficacy of opioid medicines, correct?

9         A    Specific statements were not included in

10   the article.

11        Q.   Right.  And they weren't studied by

12   those authors in that article, correct?

13        A    To the extent that marketers made

14   statements about the risks and benefits of opioid

15   prescribing, those would be included in the

16   marketing.  No specific statements were included,

17   but if statements were made about the risks and

18   benefits, that would be included in the marketing

19   that was done.  So I would include that in the study

20   material.

21        Q.   And you're using the word "if," correct?

22        A    Yes.

23        Q.   Let me rephrase that question.

24             You don't know whether or not any of

25   the -- any of the -- any of the data collected by

```
 1                  Frye Hearing - Dr. Keyes              234
 2      the authors of those articles actually evaluated
 3      particular statements regarding the safety and
 4      efficacy of opioid medicines, right?
 5          A    They did not evaluate specific
 6      statements.
 7          Q.   Okay.  So with respect to specific
 8      statements, those studies didn't draw any particular
 9      conclusions regarding those statements, right?
10          A    That's correct.
11          Q.   And those studies certainly didn't
12      distinguish between marketing statements that are
13      truthful and marketing statements that are not
14      truthful, correct?
15          A    That's right.
16          Q.   And they didn't isolate the impact, if
17      any, of any false marketing statements as opposed to
18      a truthful marketing statement on opioid
19      prescribing, correct?
20          A    Correct.
21          Q.   None of those Hadland studies reached
22      any conclusion about causation as opposed to
23      association, correct?
24          A    Each study in and of itself did not.
25          Q.   So I'd like to actually turn to --
```

1

2      before I do so, let me ask you this:

3                  In connection with the presentation, the

4      slide presentation that was made earlier today, the

5      Hadland articles were the only articles referenced

6      regarding the impact of marketing on prescribing

7      behavior, correct?

8          A      Incorrect -- oh, I'm sorry, can you

9      repeat the question?

10         Q.     Sure.

11                 In connection with the slide

12     presentation that was given today, the only articles

13     referenced there regarding the impact of marketing

14     on opioid prescribing are the Hadland articles?

15         A      I apologize, I did not understand the

16     question.  That was correct.

17         Q.     Those authors looked at data on payments

18     made to physicians and reported to CMS under the

19     Sunshine Act, correct?

20         A      Yes.

21         Q.     If we can turn to I believe it's Demo

22     Exhibit 50.  Do you have that document in front of

23     you, Dr. Keyes?

24         A      I do.

25         Q.     This is the first Hadland article from

```
 1                    Frye Hearing - Dr. Keyes            236

 2     September of 2017, correct?

 3          A    That's right.

 4          Q.   And if you turn to the conclusion --

 5     excuse me -- if you look at page 1493, and there's a

 6     section that references conclusions; do you see

 7     that?

 8          A    Yes.

 9          Q.   And you were shown that statement

10     earlier today, correct?

11          A    Yes.

12          Q.   And that statement doesn't reach --

13     there is no specific causation conclusion or finding

14     associated with this article, right?

15          A    That's right.

16          Q.   And there's no even association finding

17     associated with this article, correct?

18          A    No -- I mean, you are -- sorry, you are

19     incorrect.

20          Q.   Okay.

21               MR. REISMAN:  Your Honor, I'm sorry to

22               interrupt Mr. Ercole, I just want to note the

23               time and object to the continued examination,

24               if there will not be time left for redirect.

25               THE COURT:  Well, I've been thinking
```

2        about that.  Despite the budgetary issues the

3        court system is facing, I would like to

4        finish the doctor today, and I'll ask my

5        Clerk to contact the administrative offices

6        and ask for overtime.

7              As a matter of fact, I may have even

8        said that in one of our conferences, that in

9        the event we were running short on time on a

10       witness and had other engagements or

11       difficulty coming again, I would ask for

12       overtime.

13             Is everybody okay with that?

14             Doctor, how are you?

15             THE WITNESS:  That's fine.

16             THE COURT:  They're going to ask me how

17       much time, tell them about an hour.

18             MR. REISMAN:  Thank you, your Honor.

19       And just to give a guideline, I will try to

20       keep redirect as brief as possible, ten

21       minutes or so.

22             THE COURT:  That's good to know.  That

23       means they will give me more time than I

24       needed.

25             Mr. Ercole, how much more do you have to

```
                    Frye Hearing - Dr. Keyes              238
 1
 2      go?
 3           As I recall, and I do recall
 4      specifically this particular -- these
 5      sentences were presented to the witness, and
 6      the Court itself asked to go back to it and
 7      know that these findings should prompt an
 8      examination of industry influences on opioid
 9      prescribing.
10           Mr. Ercole, again, I'm not cutting
11      anybody short, don't get that impression.
12      How much time are you going to need to
13      complete your cross-examination?
14           THE WITNESS:  No longer than 15 minutes,
15      your Honor.
16           THE COURT:  Say that again.
17           MR. ERCOLE:  No longer than 15 minutes.
18           THE COURT:  The morning session somebody
19      told me ten minutes, then it went to 45
20      minutes.
21           MR. REISMAN:  I accept the blame for
22      that.  I would also just note that we have,
23      at least on the letter that Defendant
24      submitted, another potential questioner, Mr.
25      Herman, and I don't know if he's going to --
```

```
 1                    Frye Hearing - Dr. Keyes              239
 2             THE COURT:  Oh, yeah.  I forgot.
 3             Mr. Herman, are you with us?  Because I
 4        haven't seen his picture up there.
 5             Does anybody know, does Mr. Herman
 6        intend to --
 7             MR. HERMAN:  Your Honor, I'm here.  I'll
 8        put my picture up.  There's a green screen
 9        they put behind me, I thought that would be a
10        little distractive, but I'm here.
11             THE COURT:  Did anybody catch that?
12             THE WITNESS:  He's here.
13             THE COURT:  Mr. Herman, do you intend to
14        examine?
15             MR. HERMAN:  Your Honor, at this point I
16        do not.
17             THE COURT:  Okay.  Let's take 15
18        minutes, because it's been a lengthy session.
19        We'll come back.
20             (WHEREUPON, a short recess was taken.)
21             THE COURT OFFICER:  Come to order.
22             THE CLERK:  Part 48 is back in session.
23        Doctor, I remind you you're still under oath.
24             THE WITNESS:  Thank you.
25             THE CLERK:  Please be seated.
```

```
 1                    Frye Hearing - Dr. Keyes              240
 2              THE COURT:  Everybody on board?
 3              Please be seated.  Thank you.
 4              You may continue.
 5              Mr. Ercole, can you hear me?
 6              MR. ERCOLE:  Yes, I can, your Honor.
 7         Thank you.
 8              THE COURT:  Okay.
 9    CONTINUED EXAMINATION BY
10    MR. ERCOLE:
11         Q.   Dr. Keyes, we looked at the first
12    Hadland studies from 2017 before we broke, correct?
13         A    Yes.
14         Q.   That study, again, was limited to open
15    payment data regarding nonresearch payments to
16    physicians, correct?
17         A    Correct.
18         Q.   Okay.  If you turn -- if we could pull
19    up Demonstrative 49, which was shown to you earlier
20    today, and if you can turn to that document, Dr.
21    Keyes, it would be -- we'll call it the second
22    Hadland study from 2018.
23         A    Yes.
24         Q.   Do you see that?
25         A    I do.
```

```
 1                     Frye Hearing - Dr. Keyes              241

 2              Q.    And that's titled Association of

 3    Pharmaceutical Industry Marketing of Opioid Products

 4    to Physicians with Subsequent Opioid Prescribing,

 5    correct?

 6              A     That's correct.

 7              Q.    So the title references association not

 8    causation, right?

 9              A     That's right.

10              Q.    And you looking -- (VIDEO CUT OFF)

11              A     I'm sorry, you cut off for a minute.

12                    Can you just repeat the question?

13              Q.    Sure.  Absolutely.

14                    The second -- the first sentence of the

15    second paragraph reads:  "Pharmaceutical industry

16    marketing to physicians is widespread, but it is

17    unclear whether marketing of opioids influences

18    prescribing;" do you see that?

19              A     Yes, I do.

20              Q.    Okay.  And so these, with respect to the

21    authors of this study as of 2018, their opinion was

22    that it's unclear whether marketing of opioids

23    influences prescribing, correct?

24              A     I think it had not been quantified.

25    There had been other material written about that,
```

```
 1
 2     but that's what these authors write in terms of the
 3     quantification had not been available until the open
 4     payment database was released.
 5          Q.   Well, this actually says:  "It's unclear
 6     whether marketing of opioids influenced
 7     prescribing," correct?
 8          A    That's what is written.
 9          Q.   Okay.  And, again, the open payment
10     database that was studied here did not contain any
11     information about statements made by manufacturers
12     about opioids, correct?
13          A    It did not contain statements, that's
14     correct.
15          Q.   So as a result -- and as a result, the
16     study didn't evaluate those particular statements,
17     right?
18          A    It did not evaluate particular
19     statements, no.
20          Q.   Well, we don't know whether it evaluated
21     any statements whatsoever, right?
22          A    I believe that in terms of the types of
23     marketing efforts that were included in the open
24     payments database are listed in the result section,
25     some of which would involve talking.
```

1

2          Q.   Correct.  But we do not know what the

3    content of any of those communications, correct?

4          A    That's correct.

5          Q.   Statements like -- and for all we know,

6    when looking at sort of payments, for instance,

7    associated with, with meals to physicians, that

8    could involve a situation where a sales rep just

9    drops off a lunch with a particular doctor without

10   ever saying anything, correct?

11         A    I, I suppose.  I don't know.  I can't

12   evaluate that statement.

13         Q.   Well, we can't evaluate that statement

14   because we just don't know -- because the open

15   payments data does not contain anything associated

16   with the consents of any interactions between

17   manufacturers and physicians, correct?

18         A    The content of the statements is not

19   included, but the contents of the marketing is.

20         Q.   Well, let me see if I can rephrase this.

21              Would you agree that the type of

22   marketing is contained, but not the content of any

23   of that marketing, correct?

24         A    The statements that are said during the

25   marketing encounter are not included.

```
 1                    Frye Hearing - Dr. Keyes              244
 2          Q.   If you turn to the -- turn to the second
 3     to last paragraph of this particular study on page
 4     863.
 5          A    Yes.
 6          Q.   This paragraph reads:  "Limitations
 7     include the possibility of reverse causality,
 8     because physicians who receive industry payment may
 9     be predisposed to prescribe opioids.  Our findings
10     establish an association, not cause and effect."
11               Correct?
12          A    That's correct.
13          Q.   So at least the authors of this opinion
14     -- of this study were saying our findings do not and
15     cannot establish causation, correct?
16          A    That's not what they said.
17          Q.   Okay.  There's a third, a third Hadland
18     article that was referenced earlier today and that
19     is from 2019.
20               Do you recall the discussion of that
21     particular article?
22          A    Yes.
23          Q.   If you turn to, I believe it's
24     Demonstrative 51.
25          A    Yes.
```

```
1                    Frye Hearing - Dr. Keyes          245
2              Q.    That's titled Association of
3       Pharmaceutical Industry Marketing of Opioid Products
4       With Mortality From Opioid Related Overdoses; is
5       that correct?
6              A     Yes.
7              Q.    And, again, the title refers to
8       association, not causation, right?
9              A     That's right.
10             Q.    And, once again, in this particular
11      study what was being used as a source for marketing
12      information was the overpayments database, correct?
13             A     Yes.
14             Q.    And that -- and the study, by using that
15      open payments database, looked at transfers or
16      payments -- strike that.
17                   As part of that open payments database
18      the study looked at transfers of value from a
19      pharmaceutical company to a physician for
20      nonresearch, right?
21             A     That's right.
22             Q.    And this particular study also does not
23      purport to find causation between any nonresearch
24      payments and physician prescribing, correct?
25             A     That's right.
```

```
 1              Frye Hearing - Dr. Keyes              246
 2         Q.   And the authors of this, this study from
 3    2019 also recognized the number of limitations,
 4    correct?
 5         A    They did.
 6         Q.   And if you turn to the last page of this
 7    particular document labeled "limitations;" do you
 8    see that?
 9         A    Yes.
10         Q.   Page, I believe it's 9 of 12.
11              And the first limitation that they
12    identify is that:  "Our findings demonstrate
13    associations between opioid marketed and subsequent
14    prescribing and mortality from overdoses.  We cannot
15    exclude reverse causation."
16              Correct?
17         A    That's what's written.
18         Q.   And another limitation they identify in
19    this particular study is that they were not able to
20    distinguish between appropriate opioid prescribing
21    from potentially inappropriate prescribing, correct?
22         A    I'm sorry, where is that written?  I
23    just want to make sure I know what they said.
24         Q.   Sure.  Fair enough.
25              If you look down to the fourth -- I
```

1

2     think it's the second to last sentence of that

3     particular document.

4          A     Yes.  That is what is written.

5          Q.    And that's because by looking at the

6     data they had, couldn't determine whether or not

7     payments, nonresearch related payments to physicians

8     actually influenced inappropriate opioid

9     prescribing, correct?

10         A     I'm sorry, say -- the question is

11    whether they could determine whether payments were

12    associated with inappropriate prescribing?

13         Q.    Yes.

14         A     They looked at overall prescribing, not

15    the appropriateness of the prescribing, so that's

16    correct.

17         Q.    And with respect to this study, they

18    also recognized one of the limitations that we've

19    been talking about, which is that the overpayments

20    database does not include further information on the

21    nature of industry physician interactions, correct?

22         A     That's right.

23         Q.    And that limitation is what we've talked

24    -- strike that.

25                And it goes on to say:  "It is possible

```
 1                    Frye Hearing - Dr. Keyes              248
 2    that some industry payments to physicians resulted
 3    in a crude knowledge around safer prescribing
 4    practices; do you see that?
 5         A    Yes.
 6         Q.   And so as a result of this study, is it
 7    fair that the author concluded that they were not
 8    able to determine whether or not payments actually
 9    improved knowledge around safe prescribing practices
10    for opioids as opposed to having a detrimental
11    impact on safety prescribing practices?
12         A    That was not an outcome that was
13    evaluated in the study.  We don't have information
14    on that.
15         Q.   And you have not done any separate
16    evaluation to make such a determination, correct?
17         A    That's correct.
18         Q.   The authors of this particular study ran
19    a regression analysis, correct?
20         A    Let me just -- yes, they did.
21         Q.   Okay.  And you have not done any type of
22    independent regression analysis in this particular
23    case, correct?
24         A    Can you clarify what you mean by that?
25    Have I done a regression --
```

```
 1                    Frye Hearing - Dr. Keyes              249
 2              THE COURT:  Analysis.
 3       Q.   Right.  I'll rephrase the question.
 4              In connection with your marketing
 5    causation opinion in this particular case, you have
 6    not run any regression analysis, correct?
 7       A    In specific to marketing causation, no,
 8    I did not.
 9       Q.   And because you haven't done that, you
10    haven't been able -- you haven't done any type of
11    statistical or other analysis to isolate the impact
12    of any particular statement by manufacturers in this
13    case, correct?
14       A    Well, the authors of the study did
15    control for a number of economic and other related
16    factors, but maybe I'm not understanding the
17    question.
18       Q.   Sure.  I'm asking you -- well, we looked
19    at what the authors did and didn't do in this
20    particular study, right?
21       A    Yes.
22       Q.   Okay.  And one of the things they didn't
23    do in this study was analyze any particular
24    statements, marketing statements, right?
25       A    That's correct.
```

1

2        Q.   Okay.  And you, in this particular case,

3   have not done any, in connection with your marketing

4   causation opinion, have not done any statistical

5   analysis to isolate the impact of any false or

6   misleading marketing statements by any of the

7   manufacturer Defendants here, correct?

8        A    Correct.

9        Q.   And with respect to the Hadland studies

10  that we looked at and that were referenced in your

11  presentation in a PowerPoint earlier today, we've

12  talked about how they didn't reach a causation

13  conclusion, right?

14       A    These -- I'm sorry, can you repeat the

15  question?

16       Q.   Yeah.

17            The studies that we've been referencing,

18  the Hadland studies that we just walked through,

19  none of those studies separately reached a causation

20  opinion, right?

21       A    Separately they did not.

22       Q.   Okay.  And you are the only one, is that

23  correct, in this particular case, using those

24  studies that are reaching a causation conclusion,

25  correct?

1

2       A    I don't believe I'm the only one.  In

3    epidemiology I think it's a well-accepted

4    conclusion.

5       Q.   Well, you are reaching a causation

6    conclusion based upon the Hadland articles that they

7    did not reach, correct?

8       A    I am looking at the totality of the

9    evidence.  So I agree with the authors for each

10   study.  I think they went -- they had the correct

11   conclusion, but when you look at the literature

12   overall I think you can draw a more -- a broader

13   conclusion.

14      Q.   And just to summarize, just a couple of

15   questions before I conclude.

16           The literature that we've been -- that

17   you've been referring to -- strike that.

18           None of the articles in the literature

19   that we've been referring to draw a causation

20   conclusion regarding the impact of marketing on

21   prescribing, correct?

22      A    Are you speaking of the three Hadland

23   articles?

24      Q.   I'm speaking of the three Hadland

25   articles.

```
 1                 Frye Hearing - Dr. Keyes              252

 2             Correct?

 3         A    Correct.  Each study alone does not draw

 4     a causal conclusion.

 5         Q.   Right.  And we talked -- and none of the

 6     studies that you've cited or relied upon in your

 7     report actually address the impact of any marketing

 8     statements or materials by any of the manufacturer

 9     Defendants in this case, correct?

10         A    That's correct.

11             MR. ERCOLE:  Those all the questions I

12         have, your Honor.

13             THE COURT:  Okay.  Thank you.

14             Mr. Herman.

15             MR. HERMAN:  Your Honor, no questions at

16         this time.

17             THE COURT:  Okay.  Redirect.

18             Mr. Herman, you say "at this time..."

19             MR. HERMAN:  Your Honor, I have no

20         questions for the witness.  Thank you.

21     REDIRECT EXAMINATION

22     MR. REISMAN:

23         Q.   Dr. Keyes, I will try to be as brief as

24     possible on redirect here.  I just would like to go

25     over a few topics that were addressed during
```

1

2        cross-examination.

3                First, Mr. Schmidt asked you some

4        questions about the Bradford Hill factors; do you

5        recall that?

6            A    I do.

7            Q.   Would you say as an epidemiologist that

8        it is necessary for each and everyone of the nine

9        Bradford Hill factors to be met in a situation

10       before you can draw a causal inference?

11           A    No.

12           Q.   Are the Bradford Hill factors

13       exhaustive?

14           A    No.

15           Q.   In the epidemiological literature, do

16       researchers use those nine factors as a checklist

17       when they write and publish articles?

18           A    No.

19           Q.   When you have written and published

20       articles in the field, have you used the Bradford

21       Hill factors as a checklist?

22           A    No.

23           Q.   Mr. Schmidt also suggested that you have

24       not, in fact, discussed anything relating to the

25       Bradford Hill factors in your report, and he pointed

1
2     to your methodology section.
3              Let me ask you this question:  In your
4     report did you discuss material and studies in the
5     context of addressing factors that are included in
6     the Bradford Hill factors?
7              A    Yes.
8                   MR. REISMAN:  Dan, if you can please put
9                   up P23954 and turn to page 14.  This is your
10                  expert report, Dr. Keyes.
11                  And if you could scroll to the bottom of
12                  the page, heading B, and enlarge that,
13                  please.
14                  THE WITNESS:  Which page is it?
15                  MR. REISMAN:  It's page 14.
16             Q.   So, you know, we could go through a
17    number of examples of this, but I just want to point
18    this one out to the Court.
19                  So this is from your report, heading
20    subsection B, it says:  "Risks of opioid use
21    disorder following medical use of prescription
22    opioids follow a dose response pattern."
23                  Did I read that correctly?
24             A    Yes.
25             Q.   So is this an example of your use in the

```
 1                    Frye Hearing - Dr. Keyes              255

 2      body of your report of one of the Bradford Hill

 3      factors?

 4              A    Yes, it is.

 5              Q.   I actually want to talk about the next

 6      -- the first sentence under B, it says:  "Early

 7      studies cited in marketing materials to physicians

 8      underestimated the addiction potential of

 9      prescription opioids and concluded claims that risks

10      of opioid use disorders are rare among those

11      prescribed opioids."

12                   Did I read that correctly?

13              A    You did.

14              Q.   Now, Mr. Ercole asked you a number of

15      questions about whether you reviewed marketing

16      materials of the Defendants and whether the studies

17      that you reviewed regarding marketing themselves

18      analyzed the marketing materials of the

19      manufacturers.

20                   Let me ask you this question:  As a

21      hypothetical, if the Defendants had provided

22      information, including marketing materials, to

23      physicians that underestimated the risks of opioid

24      use disorders, do you believe, as an epidemiologist,

25      that that would have had an impact or an influence
```

```
 1                    Frye Hearing - Dr. Keyes            256
 2   on the prescribing of opioids?
 3        A    Yes.
 4        Q.   Now, while we're on this page, I also
 5   want to address a document that Mr. Schmidt showed
 6   you from the New York State Department of Health, it
 7   was a flier from approximately 2007, 2008; do you
 8   recall that?
 9        A    I do.
10        Q.   With respect to the Defendants, and this
11   is another hypothetical, if it were the case that
12   the Defendants have provided information to
13   governmental agencies, including the New York State
14   Department of Health, that underestimated the risks
15   of opioid use disorder, do you believe that that
16   information would have influenced the publication of
17   flyers, such as the one Mr. Schmidt showed you?
18             MR. SCHMIDT:  Objection.
19             MR. ERCOLE:  Your Honor, I'd like to
20        object to this.  I think it's an improper
21        hypothetical and I think it's -- it's
22        certainly beyond the scope of her report.
23             MR. SCHMIDT:  And I'll further object as
24        vague in terms of which Defendants he's
25        talking about.
```

```
 1              Frye Hearing - Dr. Keyes            257
 2              THE COURT:  You tailed off.  You further
 3         say what?
 4              MR. SCHMIDT:  Vague in terms of which
 5         Defendants he's talking about.
 6              THE COURT:  Okay.  Rephrase the
 7         question.
 8         Q.   We'll focus on the manufacturers.
 9              So as a hypothetical, Dr. Keyes, if it
10    were the case that the manufacturer Defendants in
11    this case --
12              THE COURT:  Reframe the hypothetical.
13         You may ask the witness to assume certain
14         facts.
15              MR. REISMAN:  Okay.  Thank you.
16         Q.   Assume that the manufacturer Defendants
17    in this case provided information to the New York
18    State Department of Health that underestimated the
19    risks of addiction from prescription opioids, would
20    that information have had an influence on the
21    publication of flyers, documents like the one Mr.
22    Schmidt showed you?
23         A    I don't --
24              THE COURT:  Time out.  First of all, do
25         you know or you don't know the answer to
```

1

2       that?

3              THE WITNESS:  I know the answer to that.

4              THE COURT:  Now there's an objection.  I

5              assume it's the same objection.

6              MR. ERCOLE:  From --

7              THE COURT:  Excuse me.  The law in New

8              York is quite clear.  If, in fact, the

9              predicate for a hypothetical question is not

10             established in the record, the answer is of

11             no moment, okay.

12             Now given that, what's your objection?

13             MR. ERCOLE:  Your Honor, it's an

14             improper hypothetical and beyond the scope of

15             the opinions that are included in her report,

16             so I just want to preserve that for the

17             record.

18             THE COURT:  Okay.  Answer the question.

19       A    I don't think I need to make an

20      assumption.  I think that there is evidence that the

21      -- that there was -- there were statements that

22      underestimated the risk of addiction, not only to

23      government officials, but to medical schools, to a

24      whole wide variety of industries that then put out

25      material and textbooks and educational materials

1
2   that misstated the risks of addiction, so I do think
3   that under that assumption that there would be an
4   increase in prescribing.
5           Q.   Did any of those materials that you just
6   described perceive -- were they -- withdrawn.
7               To your knowledge, were any of those
8   materials that you've just described issued before
9   2008?
10              THE COURT:  Issued before when?
11              MR. ERCOLE:  Again, your Honor,
12          objection.
13              THE COURT:  Time out.  Time out.
14              MR. REISMAN:  I'm asking about the
15          materials --
16              THE COURT:  You said issued before what?
17          You tailed off.
18              MR. REISMAN:  2008.
19              THE COURT:  Just yes or no.
20              MR. ERCOLE:  Your Honor, if I can just
21          log my -- for the record, again, no
22          foundation and beyond the scope of her
23          report.
24              THE COURT:  Okay.  Beyond the scope and
25          no foundation.  I don't get the foundation

```
 1              Frye Hearing - Dr. Keyes          260
 2         part.
 3              MR. ERCOLE:  Sure, your Honor.  I
 4         believe he's referencing, if I understood the
 5         question, certain materials that have not
 6         been, have not been produced, certainly that
 7         I have not seen, and, you know, it's also
 8         based upon the assumption of manufacturers
 9         somehow influencing all of these sources, so
10         I again --
11              THE COURT:  And, by the way, unless that
12         assumption that the lawyer is asking the
13         witness to assume is not established in the
14         record, that's the Reilly case in New York,
15         Reilly versus one of the hospitals in Port
16         Jefferson, it is of no moment.  All right.
17         Mr. Reisman, be advised.
18              MR. REISMAN:  Thank you, sir.  Thank
19         you, your Honor.
20         Q.   So I'll ask the question again.
21              To your knowledge, did the materials
22    that you've described a minute ago, were they issued
23    before 2008?
24         A    To my knowledge, yes.
25         Q.   Let's turn, if we can, to 17.
```

```
1                    Frye Hearing - Dr. Keyes              261

2              THE COURT:  Bradley versus St. Charles

3         Hospital.

4         Q.   Page 17 of your report.  And I just

5    briefly want to focus on, if we can turn to page 17,

6    which is the exhibit we're looking at, towards the

7    bottom of the page, in the middle there's a sentence

8    that begins with the name Portenoy.

9         A    Yes.

10        Q.   So do you see that?  And let's bring

11   that up on the screen and enlarge it.

12             So in your report, the sentence we're

13   looking at describes a study that was authored by

14   Portenoy and others that was published in 2007; is

15   that correct?

16        A    That's correct.

17        Q.   That was an industry sponsored study; is

18   that right?

19        A    Yes.

20             THE COURT:  Which industry sponsored it?

21        You said it was an industry-sponsored study,

22        what industry?

23             THE WITNESS:  I would have to look at

24        the study.

25             THE COURT:  All right.
```

```
1                  Frye Hearing - Dr. Keyes              262
2              THE WITNESS:  I mean, pharmaceutical,
3          the pharmaceutical industry, the drug
4          leaders, manufacturers.
5              THE COURT:  Do you know that?
6              THE WITNESS:  I know that it was drug
7          manufacturers, but I'm not certain of which
8          one.
9              THE COURT:  Okay.
10     Q.    Now, there were questions from both Mr.
11  Schmidt and Mr. Ercole regarding the limitations
12  sections of some of the studies that you cited in
13  your report; do you recall that?
14     A     Yes.
15     Q.    In peer-reviewed scientific journals is
16  it required that researchers include limitations
17  sections in their studies in order for those studies
18  to be published?
19     A     Typically in journals they require a
20  transparent limitation section.
21     Q.    So there's nothing unusual, is there,
22  about limitations being included in a study; is
23  there?
24     A     No.
25     Q.    I want to turn to the question of the
```

1

2    causal relationship that you have opined on between

3    the use of prescription opioids and subsequent OUD

4    and heroin and fentanyl abuse.

5              During your testimony today have you

6    discussed a study that focused on the link between

7    medical use of opioids and heroin use?

8         A    Have I focused on any particular study

9    that looked at that?

10        Q.   Have we discussed any particular study

11   on that subject?

12        A    I don't think we have.  We've looked at

13   not -- we've looked at studies that have looked at

14   nonmedical and medical use.

15        Q.   Did the Lankenau study that you

16   discussed today address medical use?

17        A    Yes.

18        Q.   What did it say about medical use of

19   opioids?

20        A    That it often precedes nonmedical use.

21        Q.   Did that study specifically have a

22   finding on medical use of opioids?

23        A    Yes.

24              THE COURT:  I hate to interrupt you,

25         going back to an objection I heard five

```
 1                     Frye Hearing - Dr. Keyes            264
 2          minutes ago, you asked a question about 2000
 3          -- going back to 2007, and see if I have this
 4          right, I believe you put a question to the
 5          doctor that based upon the -- we'll call it
 6          the comments or statements of the, I believe
 7          the FDA, right, whether or not that had a
 8          connection to the marketing activities of the
 9          Defendants; was that about it?
10               MR. REISMAN:  I'm not sure that was it.
11          I was referring to marketing statements by
12          the manufacturer Defendants.
13               THE COURT:  Which came from where?
14               MR. REISMAN:  It came from the
15          manufacturers themselves.
16               THE COURT:  What spawned, in your line,
17          what spawned these marketing statements in or
18          about 2007?
19               MR. REISMAN:  Well, they were in
20          materials, and they were in studies that were
21          sponsored by the manufacturers.
22               THE COURT:  And what allowed -- what was
23          the license, let's say, for the Defendant
24          manufacturers to issue those statements?
25               MR. REISMAN:  Well, I don't think they
```

```
 1                    Frye Hearing - Dr. Keyes          265
 2      needed a license to make those statements.
 3           THE COURT:  I'm asking about license in
 4      the legal sense.  There were applications
 5      before the Food and Drug Administration,
 6      correct?
 7           MR. REISMAN:  Yes.
 8           THE COURT:  And based upon those
 9      results, those findings, the approvals of the
10      Food and Drug Administration, the
11      manufacturers, some of the Defendants
12      issued -- well, they didn't issue, they
13      marketed, correct?
14           MR. REISMAN:  Correct.
15           THE COURT:  Right.  Are you asking the
16      witness -- and if I got it wrong you'll tell
17      me -- are you asking the witness to speculate
18      on the, on the link between FDA and marketing
19      as to causation?
20           MR. REISMAN:  Well, I'm not asking about
21      the FDA, I'm asking about the manufacturer
22      Defendants' own activities and the impact on
23      the last DOH and on prescribers.
24           THE COURT:  To the extent any witness
25      speculates, the Court will discount it so --
```

1

2       MR. ERCOLE:  Your Honor -- I'm sorry to

3   interrupt.

4       MR. REISMAN:  Yeah, I just want to

5   finish.  So I was trying to address the point

6   that Mr. Schmidt raised earlier today

7   regarding that flier that he showed Dr. Keyes

8   that she hadn't seen before.

9       THE COURT:  Mr. Ercole, do you have

10  something to say?

11      MR. ERCOLE:  Yeah.  Only that we're

12  talking about hypothetical statements of

13  manufacturers that the witness has already

14  stated under oath that she never reviewed or

15  looked at, so I just want to make that

16  objection clear.

17      MR. SCHMIDT:  Just to further that on

18  his point about speculation, the statement

19  that was just made now that the witness

20  hadn't seen that document, how could she

21  possibly know what influenced it or what the

22  origin of it was?  There's been no discovery,

23  that I'm aware of, that's been produced on

24  that.  Nothing on her list.

25      THE COURT:  In any event, it's not a

1

2          Perry Mason moment.  Let's move on.

3          Q.    Okay.  Just a few more questions, Dr.

4   Keyes.

5               I just want to -- I'm not going to go

6   through each of the studies that Mr. Schmidt,

7   respectfully, cherry picked statements out of, but I

8   just want to focus on one of them, which is the

9   Compton study.  It's DEFNY05561.

10              MR. SCHMIDT:  Object to the lawyer

11         commentary.  I don't think it's appropriate.

12              THE COURT:  Say again.

13              MR. SCHMIDT:  Object to the lawyer

14         commentary, I don't think it's appropriate,

15         your Honor.

16              THE COURT:  All right.  Ask questions.

17         Q.    So --

18              THE COURT:  Time out.  You all can tell

19         the witness what you're going to direct them

20         to, that's not -- just don't editorialize or

21         opine.

22         Q.    So, Dr. Keyes, we'll put up -- you have

23   the exhibit in front of you, and, Dan, if you can

24   bring up that exhibit and please show page 157 on

25   the left side under the graph.  Just a few more

Frye Hearing - Dr. Keyes                    268

2    pages in, and if you can highlight the sentence that

3    begins with the words:  These studies over the

4    current trends heading.

5               So this is the Compton study; is that

6    right?

7        A    That's right.

8        Q.   Did you rely on this study in your

9    report?

10       A    Yes, I did.

11       Q.   I'll read that sentence:  "These studies

12   suggest a clear link between nonmedical use of

13   prescription opioids and heroin use, especially

14   among persons with frequent nonmedical use or those

15   with prescription opioid abuse or dependence."

16              Did I read that correctly?

17       A    You did.

18       Q.   Is that sentence summarizing the

19   authors' review on a number of studies?

20       A    Yes.

21       Q.   For my last topic today I just want to

22   go back to the marketing causation piece, and

23   Justice Garguilo I believe this morning had a

24   question about some of the authors or one of the

25   authors of one of the Hadland studies.

1

2             And, Dan, if you can bring up Demo 51,

3     page 10, and if you can highlight the section

4     towards the top that says:  Author Affiliations.

5             So, Dr. Keyes, in looking at the author

6     affiliations of the authors of this particular

7     Hadland study, which is the 2019 study, can you

8     describe briefly to the Court what the

9     qualifications for those individuals are?

10            A    I can describe their affiliations.

11            Q.   Can you describe, are they

12    epidemiologists?

13            A    I just know that several of them have

14    degrees in epidemiology and some of them have

15    affiliations in Department of Epidemiology, as well

16    as Department of Health.

17            Q.   So in that listing of their affiliations

18    and the departments they work in, are any of those

19    individuals, any of the authors of this study listed

20    as marketing professors?

21            A    No.

22            Q.   So do you have a view as to whether it

23    is necessary to be an expert in marketing to conduct

24    epidemiological research and form opinions about

25    marketing causation?

1

2          A    I believe that epidemiologists can form

3    those opinions without a degree in marketing.

4          Q.   I just want to go to one more section of

5    this document.  If we turn back to page 8, please.

6               Can you please highlight the paragraph

7    that begins with the words:  Pharmaceutical

8    Industry, the third paragraph under discussion.

9    This sentence reads:  "The pharmaceutical industry

10   invests tens of millions of dollars annually in

11   direct to physician marketing of opioids, and it is

12   improbable that companies would provide payments to

13   physicians if such marketing did not either increase

14   prescribing rates or maintain high levels of opioid

15   prescribing; did I read that correctly?

16         A    You did.

17         Q.   Is that statement consistent with your

18   opinions on marketing causation in this case?

19         A    They are.

20         Q.   Now, in forming your opinions on

21   marketing causation in this case, have you taken

22   into account the limitations that Hadland and

23   coauthors mentioned in their studies?

24         A    I did.  I have.

25         Q.   And have they changed your opinions in

```
 1                    Frye Hearing - Dr. Keyes            271

 2      any way?

 3              A     No.   I think that the way these studies

 4      were conducted was rigorous.   In addition to

 5      regressions there were numerous statistical

 6      controls, and when you look at the evidence

 7      altogether, I think it is a very clear picture for

 8      which causal inference can be drawn.

 9              Q.    So taking into account those

10      limitations, you are still able, as an

11      epidemiologist, to draw a causal inference from this

12      body of literature?

13              A     Yes.

14              Q.    I just have one more question for you,

15      Dr. Keyes, and we're not going to show the document.

16      Justice Garguilo has it, I think everyone else does.

17      This is the Judge Polster's decision in the MDL, and

18      page 20, I'd like to just read the sentence to you.

19              At the bottom it says:   "In other words,

20      Keyes has not shown that she applied epidemiological

21      methods to determine that a cause effect

22      relationship may be inferred from the study that she

23      cites."  And it's referring to one particular study.

24              Can you explain to the Court today how

25      you applied epidemiological methods to determine
```

1
2     that there is a cause effect relationship between
3     the marketing of prescription opioids and the
4     prescribing of prescription opioids?
5          A    Yes.  I looked at these epidemiological
6     studies and I evaluated those responses.  I
7     evaluated the strengths of the association.  I
8     looked to see whether they ruled out alternative
9     causes.  I looked at analogy, consistency,
10    plausibility and other factors and determined that
11    they do meet those benchmarks that are common in the
12    epidemiological literature.
13         Q.   And based on that you were able to form
14    your opinion about the cause and effect
15    relationship; is that right?
16         A    That's right.
17              MR. REISMAN:  Thank you, your Honor.
18              THE COURT:  Thank you.
19              Doctor, just one question.
20              THE WITNESS:  Yes.
21              THE COURT:  Actually, it's two.
22              You submitted a report in connection
23         with the Ohio case?
24              THE WITNESS:  I did.
25              THE COURT:  And did you recite Bradford

```
 1                  Frye Hearing - Dr. Keyes              273
 2        Hill criteria in the Ohio case?
 3             THE WITNESS:  I didn't use Bradford Hill
 4        criteria specifically, but I used the same
 5        principles.
 6             THE COURT:  Yeah, but did you actually
 7        recite Bradford Hill criteria?
 8             The only reason why I ask, gentlemen, is
 9        that Judge Polster spent a couple of pages on
10        the application of Bradford Hill criteria.
11             THE WITNESS:  No, I didn't.
12             THE COURT:  That's the only reason I
13        ask.
14             Thank you very much, doctor, you're
15        excused.
16             A couple of things.  Tomorrow we'll
17        commence at 9:45, I intend to continue until
18        about 1:30, and then I think I told everybody
19        yesterday we have a ceremony here tomorrow,
20        which I will attend, a 911 ceremony at 3 p.m.
21        Leaving -- breaking at 1:30 will give the
22        staff an appropriate luncheon recess.
23             There's something else.  I would like
24        you all to take back -- when I say "all," not
25        only the people here, the people that are
```

```
 1                    Frye Hearing - Dr. Keyes          274
 2          participating through the live stream -- when
 3          we're done with the Frye hearings the Court
 4          intends to lift its stay on motion practice.
 5          The stay on motion practice occurred, as I
 6          told you at a prior conference when we were
 7          notified about 51 new applications -- new
 8          motions.  Most of those motions are motions
 9          in limine.  I think 4 of the 51 or 52 were
10          subject to that nature.
11              The Court has reviewed every single
12          motion in limine, has made some notes and has
13          consulted with some of the Special Masters.
14              I am suggesting to all of you that the
15          mass majority of your petitions, your motions
16          in limine, deal with some very basic tenets
17          of evidence.
18              I would like you to meet and confer
19          among yourselves to work out the -- call
20          it -- we'll call it a Stipulation or an
21          Agreement as to those motions.
22              I mean, there is some very basic stuff,
23          stuff in there about hearsay.  I'm drawing a
24          blank, but it's most of them are things, are
25          things, objections that can be raised at
```

1

2       trial, and the Court would rule from the

3       bench.  They're not difficult.  Please do

4       that, because I would like to abbreviate that

5       process and no overinvolve the Court or the

6       Special Masters.

7            Tomorrow we have Mr. -- Dr. Tomarken,

8       correct?

9            MR. REISMAN:  Yes, your Honor.

10           THE COURT:  Just thinking ahead, I do

11      have this courtroom also for Monday.

12           Do you suspect, given the abbreviated

13      day tomorrow, I'm going to have to continue

14      to Monday with Dr. Tomarken?

15           And I realize he's a Suffolk County

16      resident, right?

17           MR. SHERIDAN:  Tom Sheridan from Suffolk

18      County.  Yes, Judge, he is a Suffolk County

19      resident, and my direct examination I think

20      will be completed in about an

21      hour-and-a-half.

22           THE COURT:  Okay.  So safe home

23      everybody.  Thank you for your presentation,

24      I appreciate it.

25           MR. SCHMIDT:  Your Honor, may I raise

```
 1              Frye Hearing - Dr. Keyes                276
 2       one question that I've been asked to raise on
 3       behalf of all the Defendants.
 4            Your Honor had allowed us to file a
 5       brief at the close, a week after the close of
 6       the last witness, and there's two requests we
 7       wanted to make on it.  One is the date is
 8       moving around because of when the witnesses
 9       will finish.  Originally it was September
10       22nd.
11            The first request is can we have until
12       September 25th, a few extra days; and the
13       second is can we have, instead of the 50
14       pages your Honor ordered, 60 pages; so 10
15       pages per witness, or 20 pages for Defendant
16       group?
17            THE COURT:  You want 60?  You can have
18       the extra time.
19            MR. SCHMIDT:  Thank you, your Honor.
20            THE COURT:  Just keep in mind the
21       Court's focus on these hearings.  The Court
22       has set forth its focus in writing in
23       connection with the issues presented at a --
24       I call it a Frye hearing, but I think all of
25       you know that Frye has been evolving rapidly
```

1
2          in New York, that's why we nicknamed it
3          "Fryebert".  So the answer is yes, you can
4          have the extra time.
5                  MR. SHERIDAN:  Your Honor --
6                  THE COURT:  Yes.
7                  MR. SHERIDAN:  Regarding the reschedule
8          for Dr. Tomarken, I very much would like to
9          complete him in one day.  So if there's any
10         question that we can't complete him tomorrow,
11         I don't want to have to come back again on
12         Monday.  If your Honor wishes, we can simply
13         do it on Monday and do a full day on Monday.
14         So I'm offering that for your consideration.
15             In any event, I'd like to be able to
16         start him and complete him in one day so he
17         doesn't have to come back.
18                 MR. SCHMIDT:  Your Honor, I'm not the
19         one examining.  I'm not the one.  Miss
20         Flahive Wu is on the phone, I think it's
21         going to be about two hours for at least the
22         distributor examination.
23                 THE COURT:  Look, I'm good either way.
24         I have this room for Monday, too, correct?
25                 THE CLERK:  Yes.

```
 1              Frye Hearing - Dr. Keyes           278
 2         MR. SCHMIDT:  I don't think we would
 3    object.  Just proactive putting it on Monday,
 4    just doing it in one day.
 5         MR. REISMAN:  I propose Monday.  I would
 6    like to be able to complete it Monday.
 7         THE COURT:  I think we all could use a
 8    breather tomorrow.  9:45 Monday.
 9         Thank you gentleman and ladies.
10         MR. SCHMIDT:  Thank you.
11         MR. SHERIDAN:  Thank you.
12         THE COURT:  Doctor, thank you for coming
13    in.
14
15
16
17                     *      *      *
18
19
20
21
22
23
24
25
```

## $

**$100** [2] - 172:23, 172:24
**$465** [1] - 172:14

## '

**'17** [1] - 3:13
**'60s** [2] - 43:9, 113:23
**'70s** [1] - 43:9
**'80s** [1] - 43:9
**'90s** [6] - 119:18, 125:13, 155:7, 155:14, 155:21, 156:8

## 0

**0** [3] - 175:15, 175:17, 175:18

## 1

**1** [9] - 6:18, 63:19, 95:9, 96:20, 167:4, 175:19, 175:23, 177:11, 183:14
**10** [4] - 1:8, 190:19, 269:3, 276:14
**10,000** [1] - 92:7
**100** [8] - 15:22, 83:19, 175:15, 175:17, 175:19, 175:22, 177:10, 183:13
**10005** [1] - 2:4
**10013** [1] - 2:8
**10016** [1] - 1:16
**10018** [1] - 2:13
**11** [4] - 115:4, 151:3, 184:13, 224:24
**112** [1] - 1:15
**11747** [1] - 1:21
**12** [5] - 65:11, 184:25, 199:6, 199:9, 246:10
**122.45** [2] - 39:22, 39:25
**12th** [2] - 25:3, 161:2
**13** [1] - 191:9
**136** [1] - 40:13
**14** [9] - 114:11, 115:19, 169:23, 191:12, 191:13, 192:5, 197:9, 254:9, 254:15
**14.6** [1] - 44:16
**14.92** [1] - 40:8
**1493** [1] - 236:5
**15** [4] - 40:16, 238:14, 238:17, 239:17
**15-minute** [1] - 99:4

**15.3** [1] - 44:22
**157** [1] - 267:24
**16** [11] - 28:24, 76:16, 156:12, 156:13, 156:24, 157:11, 165:12, 166:25, 167:10, 169:13, 169:24
**17** [4] - 206:6, 260:25, 261:4, 261:5
**19** [3] - 158:7, 158:11, 162:23
**1976** [3] - 24:6, 70:8, 70:18
**1982** [1] - 172:13
**1990s** [6] - 10:23, 42:25, 58:22, 88:9, 88:14, 157:4
**1996** [2] - 207:15, 208:8
**1999** [1] - 94:3
**1:30** [2] - 273:18, 273:21

## 2

**2** [10] - 7:3, 96:21, 114:15, 181:3, 187:3, 187:4, 190:7, 190:10, 190:11, 196:6
**2,690** [1] - 172:13
**2.9** [2] - 172:18, 172:24
**20** [9] - 8:7, 14:24, 17:3, 77:2, 152:11, 157:9, 157:10, 271:18, 276:15
**200** [2] - 2:19, 144:4
**2000** [1] - 264:2
**2000s** [6] - 43:16, 119:18, 125:13, 155:8, 155:14, 155:21
**2002** [2] - 79:22, 185:6
**2006** [1] - 90:12
**2007** [6] - 131:11, 167:18, 256:7, 261:14, 264:3, 264:18
**2008** [6] - 133:12, 167:15, 256:7, 259:9, 259:18, 260:23
**2009** [1] - 167:22
**2010** [1] - 125:13
**2010s** [2] - 43:14, 43:16
**2011** [5] - 43:21, 79:22, 91:14,

167:13, 185:7
**2012** [2] - 137:2, 172:14
**2013** [6] - 79:15, 94:9, 101:20, 126:19, 126:22, 180:19
**2014** [6] - 16:10, 37:17, 42:5, 91:14, 94:9, 105:11
**2015** [10] - 21:21, 23:5, 26:22, 48:18, 48:22, 70:8, 70:18, 101:20, 105:12, 159:19
**2016** [2] - 83:24, 169:12
**2017** [14] - 18:12, 18:16, 70:10, 70:13, 71:6, 72:18, 90:13, 90:20, 94:3, 101:19, 107:3, 137:2, 236:2, 240:12
**2018** [9] - 18:24, 18:25, 103:20, 104:5, 104:15, 105:19, 107:3, 240:22, 241:21
**2019** [12] - 69:19, 70:2, 71:19, 71:21, 72:17, 72:24, 106:25, 197:9, 198:23, 244:19, 246:3, 269:7
**202)662-5272** [1] - 2:14
**2020** [1] - 1:8
**21** [3] - 64:6, 65:6, 183:25
**212** [1] - 1:17
**212)397-1000** [1] - 1:22
**212)841-1166** [1] - 2:15
**22nd** [1] - 276:10
**23** [1] - 161:23
**236** [1] - 6:7
**250** [1] - 2:7
**2518** [1] - 197:8
**25th** [1] - 276:12
**26th** [1] - 197:9
**270** [5] - 13:17, 13:25, 14:11, 14:22, 18:20
**275** [1] - 152:7
**28** [1] - 2:3
**29** [2] - 64:6, 65:7
**29.1** [1] - 5:3
**2:00** [1] - 141:6

## 3

**3** [11] - 170:2, 184:14, 184:16, 186:4,

186:5, 186:6, 186:7, 186:12, 192:8, 273:20
**3.6** [3] - 80:9, 80:22, 81:5
**3.76** [1] - 80:19
**305** [1] - 1:21
**323** [2] - 158:6, 158:11
**324** [2] - 158:7, 158:11
**33131** [1] - 2:20
**35** [3] - 73:7, 74:25, 163:19
**38** [2] - 62:18, 63:4
**381** [1] - 223:21
**382** [1] - 224:24
**384** [2] - 206:2, 206:6

## 4

**4** [2] - 223:22, 274:9
**40** [2] - 28:19, 29:12
**400** [2] - 1:21, 51:18
**400000** [1] - 3:12
**45** [2] - 81:8, 238:19
**46** [1] - 41:25
**48** [6] - 1:2, 3:3, 36:25, 99:7, 141:10, 239:22
**49** [4] - 103:17, 104:2, 184:25, 240:19

## 5

**5** [7] - 90:22, 93:17, 151:9, 158:7, 158:12, 163:24, 172:4
**50** [9] - 13:18, 15:21, 36:15, 36:16, 42:7, 83:19, 101:17, 235:22, 276:13
**51** [8] - 103:18, 106:4, 107:20, 108:4, 244:24, 269:2, 274:7, 274:9
**52** [1] - 274:9
**5260** [1] - 129:16
**53** [1] - 43:20
**5300** [1] - 2:19
**54** [2] - 71:20, 162:21
**55** [1] - 70:6
**56** [3] - 20:25, 159:22, 160:15
**57** [2] - 79:9, 183:24
**58** [1] - 60:14
**59** [1] - 90:10

## 6

**6** [2] - 190:11, 224:24
**60** [2] - 276:14, 276:17

**600** [1] - 137:3
**62** [1] - 91:12
**620** [1] - 2:12

## 7

**7** [6] - 113:8, 160:13, 160:15, 177:21, 201:5, 201:16
**70** [1] - 14:20
**75** [2] - 87:9, 87:12
**784-6401** [1] - 1:17
**79.5** [3] - 185:25, 186:18, 186:22

## 8

**8** [2] - 65:11, 270:5
**80** [5] - 76:25, 80:14, 86:11, 87:9, 87:12
**86** [3] - 150:22, 151:5, 151:8
**863** [1] - 244:4

## 9

**9** [2] - 223:22, 246:10
**90** [3] - 39:25, 40:16, 92:9
**90-day** [2] - 39:17, 40:14
**911** [1] - 273:20
**99** [1] - 123:11
**9:45** [2] - 273:17, 278:8

## A

**abbreviate** [1] - 275:4
**abbreviated** [2] - 18:6, 275:12
**ABDC** [8] - 143:21, 145:2, 148:23, 149:6, 149:12, 149:25, 151:24, 152:22
**ABDC's** [1] - 144:11
**able** [15] - 27:22, 93:8, 146:6, 146:7, 147:19, 158:8, 167:15, 167:16, 246:19, 248:8, 249:10, 271:10, 272:13, 277:15, 278:6
**absence** [5] - 112:8, 120:25, 121:10, 127:9, 127:21
**absolutely** [2] - 171:14, 241:13
**abstinence** [2] - 93:9,

93:12
**abstract** [2] - 37:23, 52:6
**abuse** [9] - 11:19, 15:7, 51:8, 58:18, 61:12, 62:20, 74:24, 263:4, 268:15
**abused** [3] - 187:18, 187:20, 187:22
**academic** [5] - 11:12, 12:2, 229:23, 230:2, 230:8
**academics** [1] - 229:4
**accept** [3] - 166:7, 182:10, 238:21
**acceptance** [1] - 168:23
**accepted** [32] - 9:20, 14:14, 28:4, 30:20, 34:13, 35:22, 42:17, 63:2, 63:5, 63:9, 63:11, 109:19, 112:6, 112:11, 113:4, 113:17, 128:15, 128:20, 152:16, 160:3, 162:5, 162:9, 164:4, 165:15, 166:8, 168:10, 171:12, 178:20, 185:13, 188:12, 251:3
**access** [3] - 29:16, 29:17, 29:19
**accessibility** [2] - 178:3, 178:13
**according** [2] - 80:12, 114:6
**accordingly** [1] - 5:13
**account** [5] - 48:23, 100:18, 113:4, 270:22, 271:9
**accounted** [3] - 27:15, 27:17, 27:21
**accounts** [1] - 81:25
**accurate** [7] - 74:2, 117:15, 161:5, 161:9, 165:19, 224:16, 224:19
**acknowledge** [1] - 113:25
**acknowledging** [1] - 135:15
**acronyms** [2] - 164:8, 164:18
**Act** [1] - 235:19
**acting** [4] - 125:5, 147:12, 147:13, 183:6
**actions** [3] - 150:9, 150:13, 183:2

**activities** [2] - 264:8, 265:22
**actors** [2] - 183:2, 183:5
**actual** [5] - 20:22, 21:2, 67:15, 98:20, 226:24
**acute** [3] - 131:25, 132:9, 132:16
**addiction** [9] - 15:8, 49:5, 61:12, 62:21, 209:16, 255:8, 257:19, 258:22, 259:2
**Addiction** [1] - 28:13
**addicts** [1] - 80:16
**addition** [3] - 27:5, 199:24, 271:4
**additional** [4] - 13:19, 101:7, 199:5, 199:8
**address** [11] - 6:5, 6:7, 152:11, 152:13, 170:9, 189:14, 202:24, 252:7, 256:5, 263:16, 266:5
**addressed** [5] - 96:11, 101:5, 214:19, 232:3, 252:25
**addresses** [1] - 96:9
**addressing** [2] - 69:16, 254:5
**adjustment** [1] - 33:8
**administration** [2] - 174:12, 174:16
**Administration** [4] - 82:11, 117:2, 265:5, 265:10
**administrative** [1] - 237:5
**Administrator** [2] - 5:9, 5:11
**Adolescence** [1] - 21:24
**adolescence** [1] - 71:23
**Adolescents** [1] - 70:8
**adolescents** [7] - 70:16, 74:23, 75:2, 164:2, 164:6, 164:10, 164:12
**adulterated** [1] - 84:6
**advancing** [1] - 88:2
**advised** [1] - 260:17
**affiliation** [1] - 72:8
**Affiliations** [1] - 269:4
**affiliations** [4] - 269:6, 269:10, 269:15, 269:17
**afternoon** [2] - 111:25, 189:11

**age** [3] - 73:7, 74:25, 163:19
**aged** [1] - 184:25
**agencies** [1] - 256:13
**agency** [1] - 102:6
**agents** [1] - 62:10
**aggregate** [1] - 185:24
**ago** [12] - 17:25, 41:7, 45:20, 63:20, 80:19, 89:25, 91:16, 98:23, 161:14, 176:7, 260:22, 264:2
**agree** [35] - 120:17, 123:22, 124:21, 125:16, 125:21, 127:17, 127:20, 132:14, 132:18, 133:23, 138:3, 138:7, 149:16, 149:19, 150:9, 150:12, 154:6, 154:23, 159:9, 159:13, 164:20, 168:2, 171:10, 172:9, 178:17, 212:14, 229:6, 229:23, 230:2, 230:14, 230:17, 230:23, 230:24, 243:21, 251:9
**Agreement** [1] - 274:21
**agrees** [2] - 182:13
**Aguirre** [2] - 108:5, 108:15
**ahead** [14] - 33:15, 57:2, 73:9, 74:17, 85:20, 95:7, 97:8, 97:11, 162:22, 182:22, 184:22, 189:7, 228:14, 275:10
**Aid** [1] - 118:15
**aiming** [1] - 29:11
**alcohol** [6] - 15:8, 164:15, 187:18, 187:20, 187:21, 188:5
**Alcohol** [1] - 17:9
**alcoholism** [1] - 17:10
**Allergan** [2] - 206:13, 224:7
**allocate** [2] - 124:14, 124:17
**allow** [2] - 195:13, 195:19
**allowed** [2] - 264:22, 276:4
**allows** [3] - 82:4, 174:11, 195:7

**alluded** [1] - 176:6
**almost** [1] - 40:16
**alone** [4] - 150:10, 150:13, 165:22, 252:3
**alternate** [3] - 48:9, 113:18, 114:16
**alternative** [10] - 33:24, 45:15, 48:13, 48:23, 49:2, 49:5, 100:18, 113:10, 134:15, 272:8
**alternatively** [2] - 178:2, 178:12
**altogether** [1] - 271:7
**AMARAL** [2] - 2:8, 4:8
**Amaral** [1] - 4:9
**American** [2] - 15:4, 104:18
**amount** [12] - 105:3, 106:21, 117:4, 117:10, 120:24, 121:8, 133:3, 134:11, 176:16, 176:17, 179:22, 181:3
**amounts** [1] - 68:3
**ample** [1] - 139:21
**analgesics** [2] - 132:8, 132:14
**analog** [1] - 83:20
**analogies** [1] - 57:16
**analogy** [5] - 57:5, 57:6, 57:10, 95:16, 272:9
**analyses** [1] - 24:13
**Analysis** [1] - 42:7
**analysis** [55] - 8:21, 22:13, 22:21, 24:15, 48:11, 65:3, 65:15, 66:12, 68:13, 77:10, 113:13, 114:16, 120:23, 121:6, 121:8, 127:6, 127:12, 132:19, 133:3, 133:8, 134:10, 137:7, 138:17, 139:8, 140:21, 143:4, 143:9, 148:4, 148:17, 156:12, 160:7, 173:5, 173:10, 173:17, 173:19, 174:21, 176:21, 177:5, 177:13, 182:24, 200:22, 203:23, 213:19, 221:15, 221:18, 221:24, 222:12, 225:15,

225:23, 248:19, 248:22, 249:2, 249:6, 249:11, 250:5
**analyze** [11] - 38:14, 44:2, 52:19, 62:17, 91:17, 95:4, 101:7, 115:22, 143:10, 145:25, 249:23
**analyzed** [24] - 41:24, 42:3, 42:11, 43:20, 46:23, 48:16, 55:6, 63:4, 66:20, 67:16, 79:8, 79:19, 83:21, 90:15, 95:12, 95:16, 96:18, 101:12, 101:23, 137:14, 199:15, 208:13, 208:19, 255:18
**analyzing** [1] - 24:23
**announced** [1] - 113:22
**annually** [2] - 79:21, 270:10
**Answer** [1] - 222:6
**ANSWER** [5] - 151:19, 158:18, 206:11, 224:6, 224:13
**answer** [29] - 6:20, 7:4, 7:11, 33:3, 56:17, 56:19, 75:22, 89:6, 133:19, 140:15, 150:16, 151:19, 151:25, 158:19, 158:23, 181:23, 183:18, 198:20, 206:12, 206:16, 220:7, 224:23, 228:13, 228:24, 257:25, 258:3, 258:10, 258:18, 277:3
**answered** [2] - 221:12, 222:5
**answers** [2] - 196:16, 200:4
**apart** [2] - 218:2
**apologize** [15] - 32:22, 33:5, 84:20, 85:7, 85:15, 85:17, 85:18, 186:11, 186:14, 196:19, 200:5, 201:13, 207:21, 211:7, 235:15
**appear** [3] - 57:22, 178:4, 178:14
**appearances** [1] - 3:13
**appeared** [1] - 15:2
**apples** [2] - 36:10
**application** [1] -

273:10
**applications** [2] - 265:4, 274:7
**applied** [12] - 32:8, 34:22, 36:24, 46:22, 50:12, 52:12, 55:9, 55:13, 55:22, 56:4, 271:20, 271:25
**apply** [13] - 35:15, 41:19, 41:21, 46:6, 47:16, 48:10, 56:22, 100:20, 110:9, 110:22, 111:2, 151:23, 220:7
**applying** [2] - 47:2, 50:7
**appreciate** [5] - 33:12, 188:16, 191:11, 200:4, 275:24
**approach** [6] - 129:5, 129:10, 166:15, 169:10, 186:8
**appropriate** [11] - 23:25, 61:4, 65:19, 73:21, 142:25, 195:8, 195:15, 246:20, 267:11, 267:14, 273:22
**appropriateness** [1] - 247:15
**approvals** [1] - 265:9
**approved** [1] - 180:3
**approximate** [1] - 93:4
**ARCOS** [8] - 88:22, 88:23, 88:25, 89:5, 89:15, 89:16, 89:18, 91:17
**area** [1] - 20:18
**areas** [1] - 106:23
**arising** [3] - 60:4, 62:21, 63:16
**art** [1] - 23:23
**article** [31] - 19:8, 19:21, 19:23, 20:13, 20:23, 62:2, 103:11, 105:7, 115:17, 115:21, 116:4, 126:18, 144:2, 169:18, 170:23, 177:19, 177:21, 183:21, 183:24, 184:6, 184:9, 184:12, 185:10, 185:12, 233:10, 233:12, 235:25, 236:14, 236:17, 244:18, 244:21
**articles** [37] - 13:11, 13:16, 13:18, 13:25, 14:5, 14:10, 14:11,

14:18, 14:21, 15:15, 15:19, 15:21, 18:20, 20:17, 50:19, 51:2, 51:16, 107:2, 115:16, 144:4, 152:8, 153:20, 153:25, 223:5, 232:3, 234:2, 235:5, 235:12, 235:14, 251:6, 251:18, 251:23, 251:25, 253:17, 253:20
**ascertained** [1] - 81:16
**ascribe** [1] - 167:16
**aside** [2] - 168:10, 173:14
**aspect** [1] - 76:12
**aspects** [1] - 112:2
**assess** [8] - 32:15, 66:4, 67:5, 69:2, 145:6, 195:7, 195:13, 195:18
**assessed** [2] - 32:4, 110:13
**assessing** [1] - 69:8
**assessment** [2] - 67:2, 124:9
**assign** [1] - 149:24
**assignment** [3] - 31:17, 31:20, 72:14
**Associate** [1] - 17:8
**associate** [1] - 11:14
**associated** [19] - 22:23, 25:4, 27:11, 31:24, 49:11, 81:9, 81:19, 83:6, 84:16, 84:17, 86:4, 188:6, 226:5, 227:3, 236:14, 236:17, 243:7, 243:15, 247:12
**association** [47] - 32:16, 33:23, 39:14, 39:15, 40:4, 40:19, 45:11, 45:13, 45:14, 45:16, 45:21, 46:9, 46:17, 47:7, 47:17, 49:2, 59:21, 89:21, 91:4, 104:21, 105:2, 105:10, 106:21, 109:22, 110:14, 112:12, 112:15, 112:24, 112:25, 153:17, 153:21, 155:23, 156:15, 165:19, 165:21, 166:6, 166:10, 168:7, 168:20, 170:15, 234:23,

236:16, 241:7, 244:10, 245:8, 272:7
**Association** [4] - 104:6, 106:8, 241:2, 245:2
**Associations** [1] - 79:10
**associations** [15] - 17:12, 32:18, 46:2, 57:8, 95:17, 97:25, 98:2, 109:10, 109:15, 109:17, 110:18, 167:14, 167:16, 228:9, 246:13
**assume** [9] - 133:19, 179:21, 180:14, 194:14, 205:23, 257:13, 257:16, 258:5, 260:13
**assuming** [2] - 139:16, 192:9
**assumption** [5] - 180:25, 258:20, 259:3, 260:8, 260:12
**attempted** [4] - 147:6, 149:23, 154:4, 160:2
**attend** [1] - 273:20
**attention** [1] - 201:4
**attitudes** [1] - 161:3
**Attorney** [3] - 2:2, 2:3, 3:15
**Attorneys** [5] - 1:15, 1:20, 2:7, 2:11, 2:18
**attorneys** [1] - 111:14
**attributable** [9] - 86:5, 86:8, 86:22, 87:7, 182:6, 202:14, 202:20, 203:10, 204:19
**attributed** [1] - 223:6
**audio** [1] - 5:4
**August** [3] - 131:11, 197:9, 198:23
**Austin** [1] - 113:23
**author** [10] - 13:20, 14:18, 16:13, 19:24, 104:13, 159:23, 169:16, 248:7, 269:4, 269:5
**authored** [3] - 19:22, 79:14, 261:13
**authorization** [1] - 135:6
**authors** [22] - 43:7, 107:19, 107:23, 107:25, 108:2, 185:9, 215:10, 233:12, 234:2, 235:17, 241:21,

242:2, 244:13, 246:2, 248:18, 249:14, 249:19, 251:9, 268:24, 268:25, 269:6, 269:19
**authors'** [1] - 268:19
**Automated** [1] - 89:7
**Automation** [1] - 89:12
**availability** [8] - 157:5, 171:23, 173:2, 176:4, 176:8, 176:11, 176:21, 176:23
**available** [16] - 21:16, 30:15, 30:16, 46:15, 51:3, 51:4, 53:8, 92:16, 122:12, 122:19, 171:2, 174:16, 205:16, 207:24, 216:14, 242:3
**Avenue** [1] - 1:15, 2:12
**average** [2] - 44:16, 158:2
**award** [4] - 17:24, 18:2, 18:11, 18:13
**aware** [40] - 69:14, 94:21, 116:25, 117:6, 117:7, 117:17, 117:20, 117:21, 118:13, 118:21, 123:13, 125:11, 135:11, 135:13, 154:15, 157:3, 157:24, 168:5, 169:23, 174:2, 174:8, 174:14, 174:16, 176:10, 176:14, 176:19, 177:13, 179:9, 180:19, 195:23, 196:8, 196:14, 197:16, 197:20, 200:7, 200:10, 209:5, 211:2, 225:21, 266:23

**background** [6] - 7:22, 51:6, 96:3, 98:5, 98:10, 108:15
**bad** [3] - 182:14, 182:16, 182:18
**Badala** [1] - 3:20
**BADALA** [3] - 1:22, 3:19, 21:6

**ballpark** [1] - 155:14
**bar** [3] - 39:21, 40:7, 40:8
**bars** [2] - 39:20, 40:7
**base** [1] - 203:17
**based** [22] - 31:8, 35:18, 36:12, 48:3, 51:24, 79:23, 93:2, 102:14, 105:13, 110:6, 117:22, 124:5, 124:12, 125:9, 184:17, 195:20, 229:3, 251:6, 260:8, 264:5, 265:8, 272:13
**baseline** [1] - 23:15
**basic** [4] - 112:6, 216:17, 274:16, 274:22
**basis** [5] - 34:8, 59:16, 73:15, 88:17, 130:7
**bear** [1] - 31:11
**became** [4] - 22:7, 94:11, 125:17, 125:22
**Becker** [1] - 167:15
**become** [7] - 29:21, 75:6, 75:10, 77:19, 80:16, 99:19, 195:3
**becomes** [1] - 174:9
**becoming** [1] - 45:4
**began** [1] - 80:12
**begin** [1] - 24:5
**beginning** [2] - 88:14, 94:9
**begins** [5] - 161:11, 223:22, 261:8, 268:3, 270:7
**begun** [2] - 87:13, 87:14
**behalf** [4] - 4:18, 97:9, 97:13, 276:3
**behavior** [1] - 235:7
**behind** [3] - 126:21, 188:9, 239:9
**bell** [1] - 139:18
**below** [2] - 44:19, 170:8
**bench** [1] - 275:3
**benchmarks** [1] - 272:11
**beneficiaries** [1] - 104:24
**benefits** [2] - 233:14, 233:18
**BERNSTEIN** [1] - 2:6
**best** [2] - 6:20, 201:15
**better** [2] - 33:11, 174:10
**between** [76] - 9:23,

10:10, 10:16, 10:21,
11:3, 25:23, 26:10,
26:25, 32:16, 39:4,
39:15, 45:21, 46:2,
47:7, 48:19, 54:22,
59:21, 69:22, 71:3,
76:7, 78:7, 78:12,
82:24, 84:10, 86:14,
86:18, 89:21, 91:4,
91:23, 94:24, 96:21,
97:20, 101:5, 101:8,
105:2, 105:10,
106:21, 109:11,
109:22, 110:14,
110:23, 111:3,
112:17, 124:5,
129:8, 137:2,
153:17, 153:21,
154:2, 156:15,
156:22, 165:19,
168:17, 170:15,
175:15, 175:19,
177:10, 177:12,
183:15, 183:16,
204:2, 204:7,
204:14, 207:15,
208:8, 209:3,
234:12, 243:16,
245:23, 246:13,
246:20, 263:2,
263:6, 265:18,
268:12, 272:2
**beyond** [9] - 130:21,
165:21, 166:6,
166:10, 168:20,
256:22, 258:14,
259:22, 259:24
**big** [1] - 182:14
**bigger** [2] - 23:6,
160:18
**biological** [4] - 33:23,
47:12, 47:16, 114:20
**biologically** [1] - 48:4
**biology** [1] - 47:18
**Biscayne** [1] - 2:19
**bit** [8] - 3:10, 32:24,
60:13, 200:25,
214:24, 220:16,
223:25, 224:2
**bitartrate** [1] - 90:23
**blame** [1] - 238:21
**blank** [1] - 274:24
**board** [6] - 17:21,
131:22, 132:6,
159:16, 160:15,
240:2
**boards** [1] - 17:11
**BOCKIUS** [1] - 2:18
**body** [14] - 9:2, 9:6,
34:5, 50:9, 50:22,

51:19, 55:17, 62:14,
78:11, 95:19, 97:18,
97:21, 255:2, 271:12
**bolts** [1] - 50:12
**book** [1] - 13:19
**books** [1] - 13:20
**boost** [1] - 180:22
**bottom** [11] - 44:19,
160:16, 161:11,
170:24, 177:24,
185:21, 186:5,
186:24, 254:11,
261:7, 271:19
**bought** [2] - 117:5,
117:10
**Boulevard** [1] - 2:19
**Bradford** [40] - 37:8,
49:12, 49:14, 49:15,
49:25, 55:12, 55:15,
55:23, 56:22, 57:4,
57:17, 57:21, 57:25,
95:15, 100:8,
100:20, 113:21,
113:23, 114:2,
114:6, 115:9,
115:12, 115:22,
116:5, 116:6, 116:7,
116:9, 116:14,
116:18, 253:4,
253:9, 253:12,
253:20, 253:25,
254:6, 255:2,
272:25, 273:3,
273:7, 273:10
**Bradley** [1] - 261:2
**break** [4] - 35:20,
98:25, 141:2, 205:17
**breakdown** [1] -
148:10
**breaking** [1] - 273:21
**breather** [1] - 278:8
**BRIAN** [1] - 2:20
**Brian** [4] - 4:17, 32:23,
97:13, 188:22
**brief** [3] - 237:20,
252:23, 276:5
**briefly** [13] - 16:12,
18:19, 22:15, 23:3,
49:24, 50:11, 53:4,
61:25, 77:12,
101:22, 128:5,
261:5, 269:8
**bring** [8] - 101:16,
103:23, 150:10,
150:14, 171:19,
261:10, 267:24,
269:2
**bringing** [1] - 127:18
**broadcasting** [1] - 5:4
**broader** [2] - 63:23,

251:12
**Broadhollow** [1] -
1:21
**broadly** [1] - 136:19
**broke** [1] - 240:12
**Brooklyn** [2] - 6:8,
7:25
**brought** [5] - 31:11,
130:15, 145:12,
145:18, 145:22
**budgetary** [1] - 237:2
**build** [1] - 107:2
**Building** [1] - 2:12
**bulk** [1] - 228:3
**burden** [2] - 60:16,
61:5
**BURLING** [1] - 2:10
**business** [3] - 147:13,
192:22, 194:3
**but..** [1] - 120:21
**BY** [40] - 2:4, 2:13,
2:20, 7:20, 8:4,
11:11, 21:19, 24:3,
33:16, 37:14, 56:3,
56:20, 57:20, 58:15,
64:20, 74:18, 75:21,
76:4, 79:6, 82:8,
85:21, 87:2, 88:4,
89:11, 93:22, 96:15,
97:17, 99:16,
103:16, 104:3,
108:17, 111:22,
129:14, 131:7,
133:22, 139:7,
140:20, 189:9, 240:9

## C

**CABRASER** [1] - 2:6
**calculation** [2] -
156:9, 156:10
**calculations** [1] - 94:4
**Calendar** [1] - 3:11
**cancer** [7] - 9:10,
9:13, 9:17, 9:24,
9:25, 10:3, 38:4
**cannabis** [1] - 164:15
**cannot** [8] - 94:23,
119:4, 119:9,
146:21, 150:16,
215:3, 244:15,
246:14
**Cardinal** [8] - 143:21,
144:25, 148:23,
149:6, 149:12,
149:25, 151:24,
152:22
**Cardinal's** [1] - 144:11
**carefully** [1] - 6:19
**carries** [2] - 161:12,

161:18
**carrying** [1] - 228:23
**cartel** [2] - 179:5,
179:15
**cartels** [6] - 176:15,
177:4, 179:8,
180:10, 180:20,
182:19
**CASAGRANDE** [1] -
2:24
**case** [157] - 6:13, 9:6,
10:8, 10:19, 11:7,
20:4, 24:22, 27:12,
31:5, 31:8, 31:12,
31:20, 32:9, 32:13,
32:14, 33:19, 34:16,
35:12, 35:23, 39:16,
40:25, 41:19, 46:12,
46:14, 49:22, 50:13,
52:18, 52:25, 53:5,
53:23, 55:2, 56:22,
58:8, 59:9, 69:15,
72:3, 72:15, 78:10,
83:10, 86:3, 88:6,
89:19, 92:24, 95:4,
98:10, 98:15, 101:2,
107:5, 108:18,
109:5, 109:24,
110:6, 111:9,
116:17, 118:15,
121:7, 122:6,
122:18, 127:5,
128:12, 135:15,
136:20, 140:4,
144:20, 144:21,
146:8, 146:17,
146:18, 146:24,
147:7, 147:14,
147:22, 150:20,
151:21, 153:3,
181:15, 188:23,
189:22, 190:5,
190:16, 192:7,
196:13, 198:5,
198:11, 198:16,
198:18, 199:21,
201:20, 202:7,
204:13, 204:23,
204:24, 205:4,
205:10, 205:21,
207:10, 208:12,
208:18, 209:10,
209:19, 210:10,
212:12, 213:6,
213:13, 213:20,
214:2, 214:5,
214:10, 214:21,
215:3, 216:8,
217:11, 217:16,
218:5, 218:7,

218:20, 219:21,
219:25, 220:8,
220:17, 220:19,
221:6, 221:20,
222:21, 223:3,
223:9, 223:12,
223:18, 223:24,
226:9, 226:11,
226:15, 227:2,
227:7, 227:14,
227:19, 230:12,
230:22, 231:5,
231:13, 232:12,
248:23, 249:5,
249:13, 250:2,
250:23, 252:9,
256:11, 257:10,
257:11, 257:17,
260:14, 270:18,
270:21, 272:23,
273:2
**cases** [2] - 68:23,
171:15
**catch** [1] - 239:11
**categories** [2] - 65:15,
76:16
**category** [3] - 13:24,
142:4, 142:8
**causal** [27] - 8:15, 9:3,
9:8, 9:16, 10:9,
10:15, 10:20, 11:2,
13:22, 32:19, 41:10,
50:6, 50:9, 60:25,
69:22, 76:6, 109:20,
110:18, 112:20,
112:25, 167:13,
167:20, 252:4,
253:10, 263:2,
271:8, 271:11
**Causal** [1] - 167:22
**causality** [2] - 167:17,
244:7
**causally** [2] - 84:16,
84:17
**causation** [47] - 31:21,
41:4, 58:8, 94:20,
96:2, 96:18, 96:19,
99:18, 108:19,
112:13, 113:12,
116:17, 153:17,
165:19, 165:21,
166:4, 168:6,
168:17, 168:20,
190:2, 196:13,
197:23, 200:21,
201:3, 202:8,
215:19, 229:3,
234:22, 236:13,
241:8, 244:15,
245:8, 245:23,

246:15, 249:5, 249:7, 250:4, 250:12, 250:19, 250:24, 251:5, 251:19, 265:19, 268:22, 269:25, 270:18, 270:21

**causations** [1] - 94:23

**caused** [7] - 149:17, 153:10, 181:17, 182:5, 198:11, 198:14, 225:17

**causes** [12] - 8:13, 9:25, 32:4, 113:5, 113:10, 113:18, 114:17, 123:4, 152:13, 161:3, 168:24, 272:9

**causing** [1] - 27:23

**CDC** [6] - 51:2, 52:15, 52:20, 83:23, 94:2, 106:17

**center** [1] - 131:9

**Center** [1] - 2:19

**Centers** [1] - 52:15

**Central** [1] - 1:8

**ceremony** [2] - 273:19, 273:20

**certain** [11] - 10:9, 10:12, 10:20, 32:25, 35:7, 118:15, 170:14, 215:10, 257:13, 260:5, 262:7

**certainly** [9] - 57:15, 86:13, 86:21, 114:10, 114:13, 221:4, 234:11, 256:22, 260:6

**certifications** [1] - 199:9

**cetera** [2] - 43:9, 108:5

**chain** [14] - 118:15, 118:20, 141:25, 142:13, 143:21, 144:11, 145:2, 148:23, 149:6, 149:12, 150:2, 151:24, 152:23, 228:24

**chair** [2] - 16:19, 16:20

**change** [2] - 20:3, 72:25

**changed** [1] - 270:25

**changes** [8] - 143:10, 143:11, 157:3, 173:11, 173:20, 174:21, 175:3, 175:7

**changing** [1] - 121:10

**Changing** [1] - 42:6

**chapters** [1] - 13:19

**characteristics** [1] - 185:2

**Charles** [1] - 261:2

**chart** [1] - 66:17

**charts** [1] - 109:4

**check** [1] - 77:17

**checklist** [2] - 253:16, 253:21

**cherry** [1] - 267:7

**chief** [1] - 89:4

**Chief** [3] - 4:22, 5:9, 5:10

**China** [1] - 179:2

**CHORUS** [1] - 3:8

**chosen** [1] - 29:21

**chronic** [10] - 38:4, 61:13, 62:22, 63:17, 131:25, 132:9, 132:16, 159:3, 159:8, 161:22

**Cicero** [4] - 42:5, 42:22, 43:5, 76:24

**cigarette** [1] - 9:11

**circle** [3] - 63:23, 64:5, 65:10

**circles** [1] - 63:23

**citations** [1] - 223:13

**cite** [8] - 69:25, 144:20, 162:18, 165:7, 167:2, 169:14, 169:24, 216:11

**cited** [14] - 15:16, 15:19, 15:22, 37:9, 113:8, 128:8, 144:10, 165:13, 200:12, 210:11, 220:13, 252:6, 255:7, 262:12

**cites** [3] - 144:4, 172:16, 271:23

**cities** [1] - 81:17

**citings** [1] - 210:11

**citizens** [2] - 122:13, 122:20

**civil** [1] - 179:5

**claim** [2] - 38:18, 38:20

**claims** [6] - 38:12, 38:13, 38:15, 104:23, 105:12, 255:9

**clarify** [1] - 248:24

**class** [1] - 153:10

**classic** [1] - 9:9

**clear** [11] - 20:4, 45:25, 46:20, 59:8, 156:18, 189:20, 230:13, 258:8,

266:16, 268:12, 271:7

**Clerk** [3] - 5:24, 6:2, 237:5

**CLERK** [12] - 3:2, 3:6, 3:11, 6:4, 6:9, 99:7, 99:11, 141:10, 141:14, 239:22, 239:25, 277:25

**clinic** [1] - 82:12

**Clinic** [1] - 37:16

**clinical** [2] - 17:10, 67:4

**clinician** [1] - 68:21

**clinics** [1] - 81:16

**clock** [1] - 90:24

**close** [3] - 72:8, 276:5

**closely** [1] - 60:14

**closer** [1] - 33:4

**CMS** [1] - 235:18

**CNCP** [2] - 37:24, 38:4

**co** [4] - 16:13, 19:24, 87:22, 87:23

**co-author** [2] - 16:13, 19:24

**co-occur** [1] - 87:23

**co-occurs** [1] - 87:22

**coauthored** [1] - 26:23

**coauthors** [2] - 22:16, 270:23

**cocaine** [5] - 85:25, 86:19, 87:21, 187:5, 187:11

**code** [1] - 7:2

**coedited** [1] - 13:22

**cohered** [1] - 116:13

**coherence** [1] - 114:16

**cohort** [5] - 23:25, 27:5, 81:10, 81:15, 159:25

**coinvestigator** [1] - 24:11

**colleagues** [18] - 27:4, 27:15, 27:21, 37:16, 38:10, 38:14, 39:2, 42:22, 44:2, 48:23, 62:2, 62:17, 70:12, 101:19, 102:17, 106:12, 107:12, 109:13

**collected** [1] - 233:25

**collection** [1] - 93:13

**collectively** [2] - 165:23, 165:24

**collum** [1] - 161:13

**colored** [1] - 64:5

**Columbia** [9] - 11:15, 11:18, 12:5, 12:7,

12:10, 12:13, 12:15, 12:20, 13:7

**column** [1] - 161:11

**combines** [1] - 185:6

**coming** [3] - 50:4, 237:11, 278:12

**commence** [3] - 7:4, 7:11, 273:17

**commentary** [2] - 267:11, 267:14

**comments** [1] - 264:6

**committee** [2] - 12:24, 17:15

**committees** [1] - 12:19

**common** [2] - 170:17, 272:11

**commonly** [7] - 37:8, 43:2, 43:17, 49:13, 50:18, 65:21, 67:4

**communication** [3] - 202:13, 203:7, 231:22

**communications** [3] - 202:19, 203:4, 243:3

**Communities** [6] - 28:14, 28:20, 29:22, 29:25, 61:17, 62:3

**communities** [2] - 29:9, 29:14

**community** [2] - 29:15, 123:25

**community-led** [1] - 29:15

**comp** [1] - 82:5

**companies** [6] - 105:23, 207:17, 220:14, 223:6, 224:12, 270:12

**companies'** [1] - 225:4

**company** [11] - 133:23, 153:5, 218:18, 218:19, 218:23, 218:25, 219:4, 219:15, 219:25, 225:2, 245:19

**compare** [1] - 36:9

**compared** [5] - 36:13, 39:18, 40:2, 40:17, 92:15

**comparing** [1] - 36:10

**comparison** [1] - 41:3

**comparisons** [1] - 65:23

**compelling** [1] - 57:14

**complete** [6] - 7:5, 7:8, 7:10, 238:13, 277:9, 277:10,

277:16, 278:6

**completed** [1] - 275:20

**completely** [1] - 73:20

**completing** [1] - 12:9

**component** [2] - 23:14, 29:25

**compound** [2] - 138:24, 139:17

**Compton** [6] - 169:16, 172:2, 172:3, 177:19, 267:9, 268:5

**concept** [1] - 26:14

**concepts** [1] - 25:23

**conclude** [5] - 91:2, 106:19, 109:21, 166:4, 251:15

**concluded** [5] - 71:15, 91:22, 106:20, 248:7, 255:9

**concludes** [1] - 168:20

**concluding** [1] - 110:2

**conclusion** [19] - 37:22, 44:10, 62:15, 91:20, 103:6, 168:19, 170:22, 226:17, 234:22, 236:4, 236:13, 250:13, 250:24, 251:4, 251:6, 251:11, 251:13, 251:20, 252:4

**conclusions** [12] - 30:25, 50:4, 62:19, 71:6, 75:5, 75:9, 98:15, 109:18, 170:12, 195:20, 234:9, 236:6

**conditions** [3] - 31:12, 143:5, 143:6

**conduct** [16] - 8:20, 24:12, 70:13, 103:11, 132:19, 133:2, 133:7, 144:11, 173:10, 177:5, 217:2, 217:16, 218:4, 218:9, 231:12, 269:23

**Conduct** [1] - 129:17

**conducted** [24] - 9:11, 44:4, 77:6, 79:20, 98:9, 134:10, 137:6, 165:15, 173:4, 193:13, 193:18, 193:20, 213:18, 215:19, 216:4, 216:18, 216:21, 217:9, 221:14,

221:17, 221:23,
222:11, 225:14,
271:4
**conducting** [2] -
38:11, 149:13
**confer** [1] - 274:18
**conference** [1] - 274:6
**conferences** [1] -
237:8
**confirm** [2] - 54:16,
182:12
**confounding** [7] -
27:7, 27:9, 27:14,
48:12, 48:24,
160:23, 161:7
**Congress** [2] - 117:9,
123:10
**conjunction** [1] -
20:19
**connected** [1] - 223:8
**connection** [21] -
74:8, 78:7, 87:18,
87:23, 109:5,
122:21, 200:8,
200:12, 210:12,
210:21, 215:11,
215:16, 217:11,
235:3, 235:11,
249:4, 250:3, 264:8,
272:22, 276:23
**connections** [1] -
156:22
**Conroy** [1] - 3:22
**CONROY** [3] - 1:14,
1:16, 3:22
**consensus** [5] - 8:25,
9:7, 9:12, 30:23,
42:19
**consents** [1] - 243:16
**consider** [10] - 27:7,
56:17, 56:18, 57:12,
113:18, 128:25,
145:10, 145:16,
165:14, 168:13
**consideration** [3] -
33:24, 50:20, 277:14
**considered** [2] -
84:25, 85:5
**considering** [2] -
57:10, 113:10
**consist** [1] - 65:25
**consistency** [1] -
272:9
**consistent** [13] -
47:18, 50:5, 54:7,
57:7, 59:23, 67:12,
93:14, 105:17,
120:7, 170:14,
180:21, 192:5,
270:17

**Consolidated** [2] -
89:8, 89:13
**constant** [1] - 112:9
**constructed** [1] -
38:16
**consulted** [1] - 274:13
**contact** [1] - 237:5
**contacted** [3] - 19:18,
19:20, 20:2
**contain** [7] - 20:13,
160:23, 161:6,
182:24, 242:10,
242:13, 243:15
**contained** [4] - 67:15,
92:24, 93:17, 243:22
**contains** [3] - 59:9,
115:18, 230:3
**contaminated** [2] -
84:14, 94:12
**content** [7] - 203:25,
204:6, 204:13,
231:21, 243:3,
243:18, 243:22
**contents** [1] - 243:19
**context** [5] - 47:20,
60:19, 61:9, 168:3,
254:5
**continually** [1] -
119:19
**continue** [5] - 111:24,
224:21, 240:4,
273:17, 275:13
**CONTINUED** [2] -
141:19, 240:9
**continued** [1] - 236:23
**continues** [2] -
160:17, 186:12
**continuing** [1] -
141:21
**contrary** [2] - 165:3,
165:7
**contribute** [3] - 126:3,
182:16
**contributed** [4] -
119:22, 120:2,
138:4, 152:4
**contributing** [2] -
120:5, 171:5
**contribution** [4] -
122:10, 122:17,
144:16, 145:7
**contributor** [2] -
159:8, 161:22
**Control** [1] - 52:16
**control** [3] - 117:4,
179:6, 249:15
**controlled** [9] - 10:2,
27:6, 48:25, 49:3,
76:22, 132:6, 132:7,
142:17, 160:11

**controlling** [1] - 48:12
**controls** [2] - 117:10,
271:6
**conversations** [2] -
7:6, 211:3
**conversion** [1] - 36:7
**copies** [1] - 196:17
**copy** [9] - 21:12,
58:10, 184:2, 190:8,
196:23, 197:5,
197:11, 205:24
**corner** [1] - 186:24
**Corp** [1] - 2:11
**Correct** [1] - 234:20
**correct** [379] - 5:15,
19:16, 19:21, 20:12,
22:9, 25:17, 32:5,
67:17, 75:23, 78:4,
81:22, 95:22,
103:17, 111:18,
112:17, 112:21,
113:5, 113:10,
113:18, 113:23,
114:3, 114:4, 114:8,
114:9, 114:17,
114:21, 114:24,
115:7, 115:10,
115:23, 118:3,
119:23, 120:11,
120:12, 120:15,
120:19, 121:2,
121:14, 121:21,
122:3, 122:4, 122:8,
122:9, 123:2, 123:6,
124:7, 125:14,
125:19, 126:5,
126:10, 126:15,
126:19, 128:3,
128:4, 128:9, 134:8,
134:21, 136:19,
137:12, 137:13,
137:18, 137:19,
142:3, 142:9,
142:11, 142:13,
142:14, 142:17,
142:22, 142:23,
143:8, 143:13,
143:15, 143:16,
143:22, 143:25,
144:12, 144:17,
144:18, 144:21,
144:22, 145:3,
145:4, 145:6, 145:9,
145:13, 145:19,
145:23, 146:3,
146:4, 146:11,
146:15, 146:21,
147:10, 147:18,
148:25, 149:8,
149:9, 149:14,

150:2, 150:3, 150:4,
150:7, 150:16,
150:25, 152:20,
152:21, 152:24,
153:4, 153:23,
153:24, 156:16,
156:20, 157:19,
157:22, 158:3,
159:3, 165:23,
169:18, 171:16,
171:19, 173:4,
174:20, 174:25,
176:8, 176:9,
176:20, 179:11,
179:14, 179:20,
180:3, 180:4, 180:8,
180:13, 181:8,
181:12, 181:15,
182:20, 183:18,
184:10, 184:18,
185:10, 185:17,
186:20, 186:21,
186:23, 186:25,
190:12, 190:13,
190:17, 190:20,
190:23, 190:24,
191:2, 191:3, 191:5,
191:6, 191:10,
192:2, 192:7,
192:20, 193:5,
193:6, 193:8, 193:9,
193:11, 193:12,
193:15, 193:16,
193:21, 194:4,
194:5, 194:7, 194:8,
194:19, 194:24,
195:9, 195:16,
195:21, 196:3,
198:2, 198:7,
198:12, 198:17,
198:20, 199:6,
199:10, 199:11,
199:17, 199:23,
200:17, 200:23,
201:17, 201:20,
202:10, 202:11,
202:15, 202:21,
203:5, 203:11,
204:3, 204:4, 204:7,
204:9, 204:15,
204:16, 204:20,
204:25, 205:7,
205:8, 205:13,
206:11, 206:22,
207:7, 207:8,
207:11, 207:12,
207:16, 208:3,
208:4, 208:9,
208:14, 208:20,
208:25, 209:8,
209:13, 209:19,

209:20, 209:23,
210:5, 210:13,
210:14, 210:18,
210:24, 211:5,
211:13, 211:14,
211:25, 212:5,
212:12, 212:17,
212:24, 213:8,
213:16, 214:11,
214:21, 214:22,
215:7, 215:8,
215:21, 215:22,
216:2, 216:3, 216:8,
216:13, 216:24,
216:25, 217:6,
217:17, 217:24,
217:25, 218:5,
218:10, 218:11,
220:4, 220:5, 220:9,
220:21, 220:22,
221:6, 221:10,
221:21, 221:22,
222:3, 222:15,
222:17, 222:21,
224:17, 224:18,
225:6, 225:7,
225:11, 225:12,
225:18, 225:23,
225:24, 226:2,
226:3, 226:15,
226:21, 226:25,
227:7, 227:14,
227:19, 227:21,
227:25, 228:7,
228:11, 229:4,
229:21, 230:10,
231:6, 231:8, 231:9,
231:10, 231:14,
231:17, 232:12,
232:13, 232:15,
232:16, 232:21,
233:4, 233:8,
233:12, 233:21,
234:10, 234:14,
234:19, 234:23,
235:7, 235:16,
235:19, 236:2,
236:10, 236:17,
240:12, 240:16,
240:17, 241:5,
241:6, 241:23,
242:7, 242:12,
242:14, 243:2,
243:3, 243:4,
243:10, 243:17,
243:23, 244:11,
244:12, 244:15,
245:5, 245:12,
245:24, 246:4,
246:16, 246:21,
247:9, 247:16,

247:21, 248:16, 248:17, 248:19, 248:23, 249:6, 249:13, 249:25, 250:7, 250:8, 250:23, 250:25, 251:7, 251:10, 251:21, 252:2, 252:3, 252:9, 252:10, 261:15, 261:16, 265:6, 265:13, 265:14, 275:8, 277:24
**corrected** [1] - 220:24
**correctly** [16] - 38:2, 44:17, 44:23, 55:21, 58:25, 151:20, 158:21, 161:24, 164:17, 170:19, 171:8, 178:8, 254:23, 255:12, 268:16, 270:15
**correlate** [1] - 104:22
**correlated** [3] - 25:24, 25:25, 70:23
**correspondingly** [1] - 134:2
**cost** [1] - 172:7
**could..** [1] - 184:23
**counsel** [5] - 78:17, 78:20, 115:20, 159:20, 192:7
**counties** [4] - 28:25, 29:5, 29:7, 54:14
**Counties** [8] - 10:22, 31:14, 31:25, 53:20, 54:3, 88:13, 92:12, 93:6
**COUNTY** [1] - 1:2
**county** [3] - 7:2, 53:9, 91:12
**County** [20] - 1:15, 1:20, 3:3, 3:20, 3:23, 4:2, 4:4, 4:6, 29:4, 54:12, 94:2, 145:12, 145:13, 145:18, 145:19, 154:20, 154:21, 275:15, 275:18
**couple** [9] - 22:24, 41:23, 95:25, 148:21, 173:12, 197:15, 251:14, 273:9, 273:16
**course** [12] - 6:14, 12:15, 16:17, 96:14, 119:7, 129:22, 136:10, 145:15, 155:17, 159:5, 196:23, 196:24

**courses** [3] - 12:13, 12:14, 12:16
**court** [7] - 5:2, 5:8, 116:3, 129:7, 182:9, 196:18, 237:3
**COURT** [198] - 1:2, 2:24, 3:5, 3:7, 3:9, 3:17, 3:21, 3:24, 4:3, 4:7, 4:12, 4:15, 4:20, 5:17, 5:21, 5:23, 6:10, 6:12, 6:18, 7:16, 8:2, 11:10, 20:24, 21:10, 21:18, 23:22, 24:2, 33:7, 33:10, 33:14, 37:2, 37:6, 37:11, 37:13, 55:11, 55:21, 55:25, 56:10, 56:16, 57:2, 57:19, 58:10, 58:13, 64:18, 73:8, 73:17, 73:25, 74:6, 74:13, 74:17, 75:19, 75:25, 78:20, 78:23, 79:5, 81:20, 81:23, 82:7, 85:6, 85:17, 86:12, 88:3, 89:4, 93:19, 95:5, 95:7, 95:21, 96:7, 96:13, 97:4, 97:16, 98:23, 99:4, 99:9, 99:14, 102:18, 102:21, 103:6, 103:10, 103:15, 107:19, 108:3, 108:7, 108:12, 108:16, 111:13, 111:20, 129:6, 129:12, 130:12, 130:15, 130:18, 130:23, 131:5, 133:12, 133:18, 133:21, 138:24, 139:4, 139:11, 139:15, 139:25, 140:6, 140:9, 140:12, 140:19, 141:2, 141:6, 141:12, 141:17, 158:10, 166:17, 169:11, 181:24, 182:4, 182:8, 182:14, 182:18, 182:22, 186:10, 188:18, 188:20, 188:24, 189:4, 189:7, 189:14, 189:24, 196:22, 197:8, 212:3, 212:6, 219:13, 221:13, 222:6, 223:7, 228:14, 228:19, 228:23, 231:8,

236:25, 237:16, 237:22, 238:16, 238:18, 239:2, 239:11, 239:13, 239:17, 239:21, 240:2, 240:8, 249:2, 252:13, 252:17, 257:2, 257:6, 257:12, 257:24, 258:4, 258:7, 258:18, 259:10, 259:13, 259:16, 259:19, 259:24, 260:11, 261:2, 261:20, 261:25, 262:5, 262:9, 263:24, 264:13, 264:16, 264:22, 265:3, 265:8, 265:15, 265:24, 266:9, 266:25, 267:12, 267:16, 267:18, 272:18, 272:21, 272:25, 273:6, 273:12, 275:10, 275:22, 276:17, 276:20, 277:6, 277:23, 278:7, 278:12
**Court** [42] - 1:12, 3:2, 6:3, 8:10, 11:21, 12:12, 12:22, 13:14, 14:2, 16:12, 17:23, 21:13, 22:15, 27:2, 28:11, 34:24, 39:11, 41:8, 43:5, 59:16, 61:3, 63:8, 63:21, 65:18, 69:5, 77:13, 88:16, 88:23, 101:22, 105:8, 196:10, 197:22, 238:6, 254:18, 265:25, 269:8, 271:24, 274:3, 274:11, 275:2, 275:5, 276:21
**Court's** [4] - 11:8, 20:18, 197:20, 276:21
**courthouse** [1] - 5:5
**courtroom** [3] - 5:6, 140:2, 275:11
**courts** [1] - 5:10
**cover** [6] - 16:2, 124:3, 133:24, 134:3, 137:9, 220:25
**coverage** [6] - 134:4, 134:13, 134:14, 136:22, 136:23, 137:15

**covered** [2] - 75:12, 214:14
**COVINGTON** [1] - 2:10
**Cox** [2] - 81:21, 82:5
**crack** [1] - 187:5
**created** [2] - 144:25, 182:14
**criminal** [1] - 183:2
**criminals** [5] - 179:24, 180:7, 181:10, 181:17, 182:5
**crisis** [23] - 123:5, 123:20, 124:2, 124:11, 127:7, 127:18, 139:13, 140:23, 149:16, 149:21, 149:25, 150:11, 150:14, 152:14, 152:20, 152:24, 153:4, 153:10, 154:7, 154:10, 154:12, 154:17, 154:21
**criteria** [17] - 50:23, 55:17, 55:23, 57:5, 57:17, 67:21, 68:9, 68:12, 68:15, 68:19, 69:7, 95:15, 116:6, 273:2, 273:4, 273:7, 273:10
**critical** [2] - 113:12, 113:15
**criticize** [1] - 69:15
**CROSS** [2] - 111:21, 141:19
**cross** [5] - 65:23, 96:14, 167:19, 238:13, 253:2
**cross-examination** - 238:13, 253:2
**cross-examine** [1] - 96:14
**cross-sectional** [1] - 167:19
**crude** [1] - 248:3
**CSR** [1] - 2:24
**curiosity** [1] - 108:12
**current** [3] - 64:22, 67:23, 268:4
**customer** [1] - 146:16
**CUT** [1] - 241:10
**cut** [3] - 147:14, 147:22, 241:11
**cutting** [1] - 238:10
**CVS** [1] - 118:15

**D**

**daily** [1] - 34:8

**Dan** [3] - 254:8, 267:23, 269:2
**dashboard** [1] - 53:7
**data** [74] - 8:20, 22:12, 22:18, 22:21, 24:14, 24:16, 24:24, 30:16, 38:10, 38:12, 38:15, 42:12, 43:25, 48:11, 51:8, 52:14, 52:19, 52:22, 52:25, 53:5, 53:17, 53:22, 54:2, 54:6, 54:21, 54:24, 55:6, 55:19, 61:13, 70:14, 79:19, 79:21, 82:2, 82:9, 82:12, 82:14, 88:18, 88:19, 88:21, 88:22, 88:23, 89:19, 90:6, 90:8, 91:17, 94:2, 94:5, 97:25, 101:22, 101:24, 102:9, 103:4, 106:17, 126:13, 126:24, 136:15, 160:7, 160:22, 161:6, 164:22, 171:2, 172:22, 184:11, 185:25, 203:17, 228:17, 233:25, 235:17, 240:15, 243:15, 247:6
**database** [24] - 51:12, 88:25, 90:3, 98:17, 101:25, 104:17, 106:16, 107:18, 202:23, 203:13, 203:21, 203:22, 203:24, 205:15, 207:20, 231:17, 231:19, 242:4, 242:10, 242:24, 245:12, 245:15, 245:17, 247:20
**databases** [3] - 38:13, 104:17, 106:15
**date** [1] - 276:7
**day-to-day** [1] - 7:6
**days** [4] - 36:20, 39:25, 40:16, 276:12
**DEA** [27] - 116:25, 117:8, 117:9, 117:17, 118:10, 118:12, 119:4, 119:10, 119:11, 119:13, 119:16, 119:18, 119:22, 120:2, 120:6, 120:14, 120:17, 121:2, 121:4, 121:5, 121:10, 123:8,

123:9, 179:17,
180:2, 180:12
**deal** [2] - 219:14,
274:16
**death** [8] - 10:13,
52:22, 53:25, 54:2,
54:17, 86:4, 93:24,
94:14
**deaths** [14] - 52:23,
54:23, 58:24, 86:8,
86:11, 86:15, 86:16,
86:17, 86:23, 86:25,
87:3, 87:7, 87:16,
91:6
**decade** [2] - 29:23,
43:8
**decades** [5] - 43:9,
43:12, 173:7,
173:13, 176:12
**decide** [3] - 14:8,
179:13, 179:18
**decided** [1] - 148:6
**deciding** [1] - 180:5
**decision** [8] - 138:12,
179:15, 181:11,
181:14, 196:23,
197:5, 200:20,
271:17
**decisions** [13] -
132:23, 133:24,
134:8, 136:22,
136:23, 137:8,
137:15, 138:20,
139:10, 140:24,
180:8, 180:10,
180:11
**decrease** [1] - 172:17
**deemed** [1] - 5:2
**deeper** [1] - 31:17
**deeply** [1] - 149:20
**defendant** [1] - 205:6
**Defendant** [38] -
107:7, 146:24,
181:15, 191:4,
202:10, 202:14,
202:20, 203:11,
204:20, 206:21,
210:10, 210:16,
210:23, 211:12,
212:22, 213:6,
213:12, 216:24,
217:17, 218:4,
218:9, 218:20,
219:20, 219:25,
221:20, 222:3,
223:8, 225:16,
226:14, 227:7,
227:14, 227:19,
228:7, 231:5,
232:11, 238:23,

264:23, 276:15
**Defendant's** [4] -
167:5, 167:6,
169:10, 172:3
**defendants** [1] - 153:3
**Defendants** [44] -
4:18, 21:14, 69:15,
97:14, 148:5,
188:23, 202:4,
204:15, 204:24,
205:11, 209:19,
209:22, 212:12,
214:2, 214:5,
214:10, 214:20,
215:2, 216:7,
217:23, 220:8,
220:19, 221:5,
222:21, 223:3,
223:11, 223:18,
223:24, 231:13,
250:7, 252:9,
255:16, 255:21,
256:10, 256:12,
256:24, 257:5,
257:10, 257:16,
264:9, 264:12,
265:11, 276:3
**Defendants'** [8] -
196:2, 197:24,
208:12, 208:18,
208:23, 209:12,
211:24, 265:22
**Defense** [1] - 219:16
**define** [1] - 203:6
**defined** [2] - 137:21,
187:3
**definition** [2] - 118:17,
137:25
**DEFNY05561** [1] -
267:9
**degree** [13] - 11:24,
154:19, 192:19,
192:21, 194:9,
194:25, 195:6,
195:13, 195:21,
195:22, 198:23,
199:3, 270:3
**degrees** [6] - 11:21,
192:22, 192:25,
193:5, 199:6, 269:14
**delay** [1] - 88:2
**delving** [1] - 31:17
**Demo** [19] - 20:25,
36:25, 41:25, 43:20,
60:14, 70:5, 71:20,
79:9, 81:8, 90:10,
91:11, 101:17,
103:17, 103:18,
104:2, 106:4,
107:20, 235:21,

269:2
**demographic** [1] -
185:2
**demonstrate** [1] -
246:12
**demonstrates** [1] -
91:3
**demonstrating** [2] -
126:13, 126:25
**demonstrative** [12] -
11:9, 20:22, 32:12,
66:18, 106:3,
159:22, 160:15,
162:21, 166:19,
166:22, 166:25,
183:23
**Demonstrative** [3] -
167:3, 240:19,
244:24
**denoting** [1] - 63:24
**department** [3] -
16:19, 16:20, 193:11
**Department** [7] - 12:5,
53:14, 256:6,
256:14, 257:18,
269:15, 269:16
**departments** [1] -
269:18
**Dependence** [1] - 17:9
**dependence** [3] -
15:8, 42:25, 268:15
**dependent** [1] - 77:20
**deposition** [14] -
73:20, 144:24,
145:22, 150:20,
150:23, 150:24,
151:21, 162:19,
205:21, 205:24,
206:3, 223:21,
224:22, 229:21
**derived** [2] - 64:10,
68:25
**describe** [9] - 53:4,
97:21, 156:21,
167:16, 203:18,
230:8, 269:8,
269:10, 269:11
**described** [13] - 26:15,
30:19, 31:23, 42:2,
49:13, 57:25, 63:13,
113:9, 159:25,
170:18, 259:6,
259:8, 260:22
**describes** [2] -
162:11, 261:13
**descriptive** [1] -
170:11
**design** [2] - 27:6,
48:11
**designating** [1] -

54:17
**designee** [1] - 5:10
**designs** [1] - 46:18
**despite** [2] - 200:22,
237:2
**detail** [3] - 7:22,
124:16, 172:12
**detailed** [1] - 190:14
**determinants** [1] -
149:21
**determination** [3] -
95:5, 96:8, 248:16
**determine** [2] -
22:21, 27:22, 47:6,
92:17, 95:18,
112:24, 207:10,
216:6, 216:22,
217:4, 217:12,
221:15, 221:18,
221:24, 222:12,
225:15, 247:6,
247:11, 248:8,
271:21, 271:25
**determined** [8] -
14:13, 48:4, 59:23,
93:3, 110:18,
167:14, 207:13,
272:10
**determining** [1] -
122:25
**detrimental** [1] -
248:10
**develop** [1] - 30:11
**developed** [1] - 16:16
**developing** [4] - 30:6,
62:3, 62:4, 75:16
**development** [1] -
23:21
**diagnose** [1] - 68:21
**diagnosis** [2] - 38:20,
68:16
**Diagnostic** [1] - 64:16
**differ** [1] - 164:12
**difference** [2] -
153:17, 209:3
**differences** [1] -
198:19
**different** [40] - 35:18,
36:8, 36:10, 46:17,
46:18, 47:25, 66:4,
78:12, 104:16,
106:15, 123:9,
127:8, 127:14,
137:8, 137:15,
137:16, 138:19,
139:9, 139:12,
140:23, 148:8,
148:15, 149:17,
153:6, 173:22,
174:11, 174:15,

175:9, 175:19,
175:22, 175:23,
177:6, 177:11,
182:24, 184:17,
185:5, 230:25
**differently** [4] -
119:24, 158:12,
164:24, 176:25
**difficult** [1] - 275:3
**difficulty** [1] - 237:11
**direct** [15] - 140:16,
142:5, 142:9,
142:17, 144:3,
152:9, 160:6,
162:16, 183:21,
184:6, 184:13,
201:4, 267:19,
270:11, 275:19
**DIRECT** [1] - 7:19
**direction** [3] - 7:14,
92:18, 112:20
**directly** [1] - 201:14
**disadvantage** [1] -
189:12
**disagree** [1] - 133:6
**disclosed** [4] - 18:25,
19:3, 19:6, 20:8
**disclosure** [4] - 20:2,
20:6, 20:13, 85:4
**disclosures** [6] -
19:10, 19:13, 19:16,
19:17, 19:21, 74:16
**discount** [1] - 265:25
**discovery** [2] - 140:4,
266:22
**discretion** [1] - 134:24
**discuss** [8] - 55:9,
72:9, 84:2, 142:4,
144:10, 184:12,
192:16, 254:4
**discussed** [17] -
35:11, 37:19, 45:11,
56:6, 70:15, 73:16,
110:10, 110:20,
192:6, 199:22,
200:17, 227:4,
231:3, 253:24,
263:6, 263:10,
263:16
**discusses** [1] - 116:4
**discussing** [2] - 49:9,
96:3
**discussion** [7] -
115:5, 116:12,
142:7, 168:9, 223:4,
244:20, 270:8
**disease** [1] - 82:12
**Disease** [2] - 18:3,
52:15
**disorder** [46] - 10:12,

19:25, 29:17, 30:14, 32:17, 35:8, 38:8, 38:20, 38:23, 39:6, 39:18, 40:2, 40:17, 58:18, 58:23, 59:22, 60:4, 60:21, 62:6, 62:8, 63:16, 64:3, 64:6, 64:13, 65:11, 66:5, 67:11, 67:13, 67:22, 68:17, 68:22, 69:23, 71:23, 72:11, 74:25, 75:17, 126:4, 138:4, 164:15, 164:16, 187:21, 188:6, 254:21, 256:15

**Disorders** [1] - 64:17
**disorders** [8] - 11:20, 13:23, 51:8, 73:7, 163:19, 255:10, 255:24
**dispensed** [3] - 118:2, 122:7, 126:10
**dispensing** [2] - 88:19, 90:4
**distal** [1] - 161:4
**distinction** [1] - 165:18
**distinguish** [3] - 124:4, 234:12, 246:20
**distractive** [1] - 239:10
**distributed** [1] - 118:2
**distributes** [1] - 147:14
**distribution** [12] - 82:6, 88:18, 89:2, 89:16, 89:22, 89:23, 91:24, 143:12, 153:7, 177:3, 177:8, 184:24
**distributions** [1] - 92:16
**distributor** [17] - 118:11, 121:18, 121:24, 122:6, 122:18, 144:21, 145:11, 145:17, 145:20, 146:8, 146:23, 148:5, 148:7, 148:12, 148:13, 159:3, 277:22
**distributor's** [2] - 143:12, 145:7
**distributors** [21] - 111:16, 118:16, 118:18, 122:11, 141:24, 142:4,

142:8, 142:12, 142:16, 142:19, 143:18, 145:8, 146:13, 146:17, 146:18, 147:7, 147:22, 150:10, 153:9, 180:3, 180:13
**distributors'** [1] - 142:21
**diverse** [1] - 46:11
**diverted** [2] - 146:19, 146:25
**divide** [1] - 86:14
**divided** [1] - 60:22
**DO** [1] - 4:8
**Docket** [1] - 197:8
**doctor** [40] - 6:12, 23:22, 25:4, 25:7, 25:11, 25:12, 25:20, 37:2, 45:3, 55:11, 71:13, 74:7, 99:11, 121:20, 121:25, 122:13, 122:21, 135:6, 141:12, 141:14, 141:21, 147:20, 147:25, 148:24, 181:24, 188:16, 188:24, 194:6, 195:8, 195:14, 205:21, 221:17, 237:4, 237:14, 239:23, 243:9, 264:5, 272:19, 273:14, 278:12
**Doctor** [2] - 74:20, 140:9
**doctoral** [1] - 12:4
**doctors** [46] - 102:3, 102:11, 105:3, 108:20, 109:2, 121:13, 122:24, 123:6, 123:11, 123:19, 124:5, 124:7, 124:11, 124:12, 124:19, 124:22, 124:24, 124:25, 125:2, 125:5, 125:6, 125:8, 125:11, 126:3, 127:9, 127:14, 127:17, 127:22, 128:2, 128:7, 128:8, 128:18, 128:24, 132:20, 133:5, 137:21, 138:7, 138:11, 138:12, 138:14, 138:21, 139:10, 139:24, 140:24, 149:7

**document** [24] - 37:3, 83:23, 85:12, 129:15, 129:18, 130:8, 131:11, 131:15, 131:16, 133:12, 144:20, 144:25, 167:7, 170:2, 184:14, 197:12, 235:22, 240:20, 246:7, 247:3, 256:5, 266:20, 270:5, 271:15
**documented** [1] - 147:2
**documents** [7] - 21:15, 130:10, 132:20, 132:21, 139:23, 184:4, 257:21
**DOH** [1] - 265:23
**dollar** [1] - 172:17
**dollars** [4] - 98:18, 102:2, 106:24, 270:10
**done** [37] - 14:3, 19:15, 24:15, 30:24, 48:16, 65:21, 95:8, 96:8, 96:11, 103:19, 138:17, 139:8, 140:21, 148:4, 148:17, 174:20, 177:15, 199:13, 199:20, 207:10, 215:23, 216:9, 216:11, 217:14, 225:22, 229:4, 229:10, 229:17, 233:19, 248:15, 248:21, 248:25, 249:9, 249:10, 250:3, 250:4, 274:3
**dose** [22] - 33:21, 34:23, 35:3, 35:11, 35:15, 35:18, 35:21, 35:23, 36:24, 38:17, 39:4, 39:5, 39:7, 39:22, 39:24, 40:8, 40:12, 40:15, 100:6, 100:12, 105:18, 254:22
**dose-response** [7] - 33:21, 34:23, 35:11, 39:4, 39:7, 100:12, 105:18
**down** [14] - 35:20, 78:2, 79:2, 151:6, 170:7, 170:24, 172:23, 174:3, 177:23, 185:20,

186:5, 205:17, 224:21, 246:25
**downplayed** [1] - 211:10
**downplaying** [1] - 210:4
**dozens** [1] - 69:24
**Dr** [59] - 1:10, 5:20, 5:21, 5:25, 6:10, 7:21, 11:12, 21:20, 31:7, 33:17, 40:21, 56:21, 58:16, 69:14, 73:19, 85:22, 94:21, 96:16, 97:18, 99:17, 108:18, 110:2, 111:7, 111:11, 111:23, 123:16, 135:18, 189:11, 189:25, 190:4, 190:6, 191:13, 192:19, 196:8, 197:11, 200:3, 201:7, 209:17, 212:9, 216:16, 219:19, 221:14, 222:10, 222:19, 233:6, 235:23, 240:11, 240:20, 252:23, 254:10, 257:9, 266:7, 267:3, 267:22, 269:5, 271:15, 275:7, 275:14, 277:8
**draw** [15] - 8:15, 9:16, 60:25, 65:23, 78:6, 109:10, 109:18, 109:20, 226:17, 234:8, 251:12, 251:19, 252:3, 253:10, 271:11
**drawing** [2] - 13:22, 274:23
**drawn** [4] - 22:18, 70:14, 105:7, 271:8
**draws** [1] - 228:8
**drew** [5] - 50:22, 165:18
**driver** [2] - 19:24, 176:7
**drivers** [3] - 173:2, 178:4, 178:14
**dropped** [1] - 172:13
**drops** [1] - 243:9
**drove** [1] - 57:14
**Drug** [5] - 17:8, 79:20, 116:25, 265:5, 265:10
**drug** [34] - 15:8, 35:23, 43:23, 44:5, 44:12, 45:5, 45:7, 77:11,

77:14, 77:15, 78:6, 93:14, 135:9, 161:2, 161:4, 163:4, 163:11, 163:15, 163:18, 164:16, 173:3, 177:4, 178:25, 180:10, 180:19, 181:8, 185:3, 186:23, 187:2, 188:4, 191:22, 262:3, 262:6
**drugs** [8] - 27:19, 87:23, 163:21, 180:3, 187:11, 191:21, 191:24, 191:25
**DSM** [4] - 64:18, 64:19, 64:21, 67:24
**DSM-5** [12] - 64:22, 64:24, 65:4, 65:16, 66:11, 66:15, 66:21, 67:21, 68:7, 68:9, 68:11, 69:7
**due** [9] - 85:10, 124:11, 124:18, 124:22, 124:24, 124:25, 125:2, 125:8, 219:13
**duly** [1] - 6:2
**duration** [5] - 35:19, 36:19, 38:17, 39:5, 100:6
**during** [10] - 71:22, 73:19, 74:6, 74:10, 124:10, 142:4, 229:20, 243:24, 252:25, 263:5

**E**

**Early** [1] - 18:2
**early** [3] - 71:24, 156:8, 255:6
**easier** [3] - 131:20, 140:17, 161:17
**economic** [2] - 149:20, 249:15
**editor** [1] - 17:4
**Editor** [2] - 17:8, 17:9
**editorialize** [1] - 267:20
**editorials** [1] - 13:19
**Edlund** [7] - 37:15, 38:10, 38:14, 38:21, 39:2, 39:7, 45:20
**education** [1] - 31:8
**educational** [1] - 258:25
**effect** [13] - 45:18, 76:9, 76:12, 99:22,

288

109:11, 109:22,
170:13, 197:24,
229:20, 244:10,
271:21, 272:2,
272:14
**effective** [2] - 131:23,
230:4
**effectiveness** [2] -
77:10, 195:18
**efficacy** [4] - 232:20,
233:3, 233:8, 234:4
**efforts** [2] - 197:25,
242:23
**Eighth** [1] - 2:12
**either** [4] - 54:11,
146:2, 270:13,
277:23
**elected** [1] - 17:22
**electronic** [1] - 21:8
**electronically** [1] -
21:17
**elicit** [1] - 50:18
**emailed** [1] - 21:6
**emphasize** [1] -
202:25
**empirical** [1] - 91:3
**employed** [3] - 22:16,
31:5, 62:25
**employee** [4] - 144:25,
145:2, 145:3
**encounter** [1] - 243:25
**encourages** [1] -
131:22
**encouraging** [2] -
128:24, 167:7
**end** [6] - 51:16, 90:20,
98:21, 103:24,
128:5, 148:20
**End** [1] - 28:13
**Endo** [1] - 224:7
**enforcement** [2] -
174:2, 176:14
**Enforcement** [1] -
117:2
**engaged** [2] - 18:22,
231:14
**engagements** [1] -
237:10
**engine** [1] - 50:18
**England** [1] - 169:13
**enlarge** [2] - 254:12,
261:11
**entire** [1] - 12:10
**entirety** [1] - 52:3
**entities** [4] - 142:9,
144:15, 149:11,
150:5
**entitled** [1] - 129:16
**entity** [1] - 128:11

**Epidemiological** [1] -
17:16
**epidemiological** [27] -
12:17, 12:25, 13:7,
13:21, 16:14, 16:16,
95:11, 95:16, 95:20,
97:19, 107:11,
108:23, 109:9,
110:6, 135:11,
144:9, 158:19,
225:4, 229:7,
229:13, 230:18,
253:15, 269:24,
271:20, 271:25,
272:5, 272:12
**epidemiologies** [1] -
8:18
**epidemiologist** [13] -
8:9, 11:18, 31:9,
34:8, 34:18, 65:20,
98:4, 98:9, 109:16,
165:25, 253:7,
255:24, 271:11
**epidemiologists** [28] -
8:11, 8:15, 9:14,
9:15, 15:20, 17:19,
37:9, 40:22, 45:12,
46:6, 47:15, 48:9,
50:8, 60:24, 61:4,
95:12, 97:23, 98:14,
99:21, 99:24,
100:23, 107:20,
108:8, 108:10,
109:10, 215:15,
269:12, 270:2
**Epidemiology** [5] -
12:5, 15:5, 15:6,
16:5, 269:15
**epidemiology** [35] -
8:12, 8:25, 9:5, 9:21,
11:15, 11:23, 11:25,
12:16, 13:2, 13:4,
13:10, 14:2, 15:4,
15:11, 16:21, 28:5,
41:3, 50:2, 64:24,
65:21, 97:24,
107:24, 108:2,
109:20, 112:7,
112:11, 113:4,
116:13, 194:20,
194:25, 195:3,
195:18, 196:11,
251:3, 269:14
**episode** [1] - 37:24
**equal** [1] - 112:12
**equivalent** [2] - 83:18,
181:3
**equivalents** [1] - 36:2
**ERCOLE** [28] - 2:20,
4:16, 32:22, 33:12,

78:15, 78:22, 96:24,
97:12, 188:19,
188:22, 189:8,
189:10, 189:19,
189:25, 190:4,
219:16, 238:17,
240:6, 240:10,
252:11, 256:19,
258:6, 258:13,
259:11, 259:20,
260:3, 266:2, 266:11
**ercole** [1] - 78:16
**Ercole** [19] - 4:17,
32:24, 97:13,
111:17, 188:18,
188:22, 188:25,
189:15, 189:17,
196:17, 197:6,
219:13, 236:22,
237:25, 238:10,
240:5, 255:14,
262:11, 266:9
**errors** [2] - 19:12,
19:16
**especially** [2] -
220:12, 268:13
**espoused** [1] - 112:4
**ESQ** [8] - 1:16, 1:17,
1:22, 2:4, 2:8, 2:13,
2:14, 2:20
**essential** [3] - 132:8,
132:15
**essentially** [3] - 36:20,
39:4, 45:16
**establish** [2] - 244:10,
244:15
**established** [5] -
154:2, 208:24,
210:7, 258:10,
260:13
**establishing** [1] -
167:20
**estimate** [5] - 17:3,
69:13, 87:9, 93:8,
142:25
**estimated** [3] - 60:3,
60:7, 117:22
**estimates** [7] - 60:11,
60:25, 63:15, 64:9,
68:25, 69:3, 69:11
**et** [2] - 43:9, 108:5
**ethical** [1] - 9:24
**evaluate** [29] - 14:7,
15:15, 107:6,
107:13, 107:16,
123:5, 134:7,
136:21, 143:18,
207:5, 212:10,
212:20, 213:3,
213:21, 217:16,

218:3, 218:22,
218:25, 219:4,
219:8, 219:11,
220:18, 220:23,
221:8, 234:5,
242:16, 242:18,
243:12, 243:13
**evaluated** [29] - 35:17,
38:19, 107:17,
136:3, 136:4,
136:16, 136:17,
136:23, 137:5,
175:2, 175:6,
205:11, 219:3,
219:7, 221:4,
222:20, 223:16,
224:11, 226:19,
226:21, 232:9,
232:18, 232:25,
233:7, 234:2,
242:20, 248:13,
272:6, 272:7
**evaluating** [5] - 34:5,
51:24, 77:10, 123:4,
156:14
**evaluation** [5] -
120:23, 121:8,
125:23, 133:2,
248:16
**event** [4] - 82:2, 237:9,
266:25, 277:15
**evidence** [17] - 50:5,
57:7, 77:5, 95:19,
115:6, 139:17,
139:21, 139:25,
140:2, 180:17,
180:21, 191:20,
230:18, 251:9,
258:20, 271:6,
274:17
**evidence"** [1] - 191:17
**evolving** [1] - 276:25
**exact** [1] - 197:2
**exactly** [3] - 7:9, 74:2,
227:9
**exam** [1] - 144:3
**examination** [17] -
55:9, 74:7, 74:10,
102:22, 103:8,
103:12, 142:5,
142:9, 183:22,
184:6, 197:4,
236:23, 238:8,
238:13, 253:2,
275:19, 277:22
**EXAMINATION** [6] -
7:19, 111:21,
141:19, 189:9,
240:9, 252:21
**examination/**

**investigation** [1] -
102:25
**examine** [5] - 40:22,
61:7, 79:22, 96:14,
239:14
**examined** [9] - 43:10,
45:25, 54:7, 74:7,
81:17, 89:21, 89:23,
97:24, 188:25
**examiner** [1] - 197:2
**Examiner's** [1] - 54:14
**examiners** [1] -
111:15
**examines** [1] - 62:14,
103:5
**examining** [1] -
277:19
**example** [30] - 9:5,
9:10, 12:22, 15:13,
19:19, 20:17, 27:14,
35:5, 48:12, 49:4,
54:8, 54:18, 56:24,
57:3, 57:5, 57:18,
66:15, 66:19, 68:11,
93:15, 98:19, 100:4,
100:9, 114:20,
129:4, 136:25,
143:20, 211:3,
218:12, 254:25
**examples** [7] - 12:12,
15:18, 41:23, 46:21,
46:22, 46:23, 254:17
**exceed** [2] - 119:4,
119:9
**exceeded** [2] - 118:10,
118:11
**except** [1] - 225:2
**excerpt** [1] - 44:14
**excerpts** [1] - 167:24
**excessively** [1] -
187:23
**exclude** [2] - 197:22,
246:15
**excluding** [1] - 198:17
**excuse** [10] - 23:22,
80:9, 93:19, 191:15,
205:9, 206:5, 212:7,
221:16, 236:5, 258:7
**excused** [1] - 273:15
**executive** [1] - 17:15
**exhaustive** [1] -
253:13
**exhibit** [7] - 20:22,
32:11, 32:12, 73:19,
261:6, 267:23,
267:24
**Exhibit** [7] - 167:3,
167:5, 167:6,
169:10, 172:3,
235:22

289

**exhibits** [1] - 196:17
**existed** [3] - 126:22, 154:20, 169:21
**existing** [1] - 30:12
**expand** [3] - 162:12, 198:8, 214:15
**expansion** [3] - 125:18, 125:23, 126:7
**expect** [3] - 128:14, 128:19, 143:7
**expects** [1] - 131:23
**experience** [4] - 31:9, 48:4, 136:6, 136:12
**Experimental** [1] - 17:10
**expert** [18] - 18:22, 19:3, 20:9, 22:7, 32:12, 35:12, 41:21, 59:9, 72:2, 74:15, 93:17, 99:19, 101:12, 111:8, 194:3, 196:11, 254:10, 269:23
**expertise** [3] - 29:23, 196:12, 218:18
**experts** [3] - 14:6, 14:8
**explain** [26] - 13:25, 22:15, 23:3, 27:2, 34:21, 34:22, 34:24, 39:10, 41:8, 43:5, 49:24, 53:4, 59:15, 61:3, 61:25, 63:8, 63:21, 65:18, 70:24, 77:12, 80:21, 81:3, 87:18, 88:16, 105:8, 271:24
**explained** [1] - 45:15
**explaining** [1] - 56:7
**explanation** [1] - 49:5
**explanations** [6] - 33:24, 48:9, 48:14, 48:24, 49:2, 100:18
**exposure** [13] - 10:10, 10:16, 22:22, 27:11, 32:16, 35:4, 35:6, 37:24, 41:11, 45:17, 75:17, 100:3, 110:14
**exposure-outcome** [1] - 100:3
**expressed** [2] - 83:10, 88:6
**expressing** [1] - 156:11
**extends** [1] - 196:12
**extensive** [2] - 24:19, 225:3
**extent** [10] - 14:8, 84:15, 86:22, 120:6,

151:12, 205:14, 207:4, 217:20, 233:13, 265:24
**extra** [3] - 276:12, 276:18, 277:4
**extracted** [2] - 92:15, 94:2
**extrapolate** [1] - 92:10
**extrapolated** [1] - 93:3
**extrapolation** [1] - 92:21

# F

**face** [1] - 5:24
**Face** [1] - 42:6
**facing** [2] - 53:7, 237:3
**fact** [18] - 20:5, 27:22, 118:22, 120:18, 126:12, 131:2, 134:12, 135:13, 135:15, 135:21, 139:16, 144:23, 197:2, 223:20, 228:10, 237:7, 253:24, 258:8
**factor** [27] - 27:15, 27:21, 35:15, 36:7, 37:25, 41:6, 41:19, 45:10, 46:5, 46:7, 47:11, 47:16, 48:8, 48:10, 75:18, 112:9, 113:10, 113:12, 114:14, 114:15, 116:10, 121:13, 166:9, 168:12, 171:16, 172:6
**factors** [73] - 27:8, 27:9, 27:10, 33:17, 33:18, 33:21, 34:4, 34:21, 45:15, 46:22, 47:3, 48:12, 48:24, 48:25, 49:8, 49:13, 49:14, 49:16, 49:21, 49:25, 50:7, 51:24, 55:19, 56:5, 56:6, 56:23, 57:14, 57:25, 76:22, 78:12, 100:9, 100:21, 110:20, 113:8, 114:6, 114:8, 115:13, 115:14, 116:5, 116:14, 116:18, 120:8, 128:7, 149:17, 160:11, 160:24, 161:7, 171:5, 171:22, 182:9, 184:17, 185:9, 185:15, 188:6, 212:15, 212:23,

213:8, 221:21, 222:15, 230:15, 230:21, 249:16, 253:4, 253:9, 253:12, 253:16, 253:21, 253:25, 254:5, 254:6, 255:3, 272:10
**facts** [4] - 120:13, 126:22, 139:21, 257:14
**factually** [1] - 119:17
**faculty** [2] - 12:6, 12:10
**failed** [1] - 138:13
**failure** [3] - 138:20, 139:22, 139:23
**fair** [24] - 23:8, 24:18, 26:11, 26:12, 27:20, 45:19, 47:2, 49:20, 56:4, 65:2, 77:25, 89:15, 96:17, 110:12, 110:17, 191:7, 194:16, 194:17, 195:5, 200:2, 203:8, 210:2, 246:24, 248:7
**faith** [5] - 123:13, 124:19, 124:23, 125:3, 125:5
**fall** [1] - 175:20
**false** [12] - 209:3, 209:12, 211:24, 212:11, 212:21, 213:5, 213:11, 221:25, 222:13, 222:25, 234:17, 250:5
**falsehood** [1] - 209:6
**familiar** [18] - 72:6, 107:22, 118:4, 118:5, 119:11, 123:8, 123:14, 135:3, 174:6, 179:7, 179:15, 180:9, 204:23, 205:5, 218:17, 220:11, 220:12, 220:13
**familiarize** [1] - 184:21
**family** [2] - 160:24, 161:7
**far** [4] - 102:14, 134:22, 181:16, 204:22
**father** [1] - 37:6
**fault** [4] - 150:17, 151:18, 151:25, 152:5
**favor** [1] - 56:10

**favorable** [4] - 133:25, 134:4, 134:13, 134:14
**FDA** [5] - 89:5, 180:3, 264:7, 265:18, 265:21
**FDA-approved** [1] - 180:3
**federal** [12] - 18:8, 51:12, 94:5, 94:22, 95:24, 99:18, 102:6, 195:24, 198:7, 198:16, 199:21, 200:21
**federally** [2] - 28:21, 61:17
**federally-funded** [1] - 61:17
**feeding** [3] - 56:8, 56:14, 189:4
**fell** [1] - 76:15
**fellowship** [2] - 12:4, 12:9
**Fentanyl** [9] - 154:4, 173:22, 180:20, 180:23, 181:3, 181:11, 182:6, 182:25, 183:10
**fentanyl** [25] - 58:19, 83:12, 83:14, 83:15, 83:18, 83:20, 83:24, 84:5, 84:6, 84:11, 84:13, 84:18, 85:23, 86:4, 86:7, 86:12, 86:25, 87:6, 87:15, 94:12, 94:15, 153:16, 168:25, 181:18, 263:4
**fentanyl-related** [2] - 86:7, 87:15
**fentanyl-tainted** [1] - 87:6
**few** [15] - 12:12, 26:22, 28:22, 34:20, 49:17, 54:19, 63:20, 78:2, 110:2, 112:6, 161:14, 252:25, 267:3, 267:25, 276:12
**fewer** [1] - 77:18
**Field** [1] - 17:9
**field** [25] - 9:20, 13:10, 13:15, 14:2, 14:7, 14:13, 14:14, 15:10, 28:5, 30:21, 30:23, 34:4, 34:14, 35:22, 42:17, 50:18, 63:2, 63:5, 95:14, 96:4, 97:24, 112:7, 112:15, 162:6,

253:20
**fifth** [2] - 47:11, 170:23
**fifths** [2] - 44:20, 45:2
**figure** [6] - 43:4, 43:6, 43:7, 65:7, 93:16, 186:6
**Figure** [2] - 63:19, 93:17
**figures** [1] - 92:23
**file** [2] - 104:22, 276:4
**filed** [6] - 72:2, 72:22, 85:3, 101:4, 101:6, 197:8
**fill** [2] - 164:8, 164:17
**filled** [4] - 90:21, 146:18, 146:24, 147:24
**films** [1] - 5:3
**final** [1] - 111:6
**finally** [1] - 77:9
**Financial** [1] - 2:19
**findings** [17] - 25:2, 26:24, 70:20, 70:21, 72:18, 102:21, 103:7, 170:14, 174:3, 174:17, 176:10, 176:15, 238:7, 244:9, 244:14, 246:12, 265:9
**fine** [3] - 133:18, 133:21, 237:15
**finish** [3] - 237:4, 266:5, 276:9
**first** [43] - 6:2, 13:24, 18:22, 23:2, 31:23, 34:23, 43:8, 43:11, 43:15, 43:17, 44:21, 46:7, 58:16, 59:15, 68:2, 71:6, 71:7, 71:8, 74:3, 75:14, 85:6, 88:11, 104:13, 110:13, 115:25, 116:23, 131:8, 131:17, 132:13, 161:11, 172:4, 173:25, 191:8, 200:8, 200:23, 235:25, 240:11, 241:14, 246:11, 253:3, 255:6, 257:24, 276:11
**fits** [1] - 55:14
**five** [6] - 38:12, 80:24, 89:10, 137:2, 156:2, 263:25
**five-year** [1] - 137:2
**Flahive** [1] - 277:20
**flier** [2] - 256:7, 266:7

**Florida** [1] - 2:20
**flyers** [2] - 256:17, 257:21
**focus** [13] - 53:25, 87:3, 111:25, 144:14, 160:21, 190:2, 200:25, 214:24, 237:8, 261:5, 267:8, 276:21, 276:22
**focused** [5] - 14:23, 96:22, 156:19, 263:6, 263:8
**focusing** [2] - 29:16, 59:12
**follow** [7] - 23:16, 103:2, 128:14, 128:19, 152:16, 160:2, 254:22
**follow-up** [2] - 23:16, 103:2
**followed** [1] - 25:15
**following** [4] - 141:9, 190:16, 196:7, 254:21
**follows** [3] - 6:3, 97:10, 185:13
**Food** [2] - 265:5, 265:10
**footnote** [2] - 187:3, 187:4
**forbidden** [1] - 5:8
**forced** [2] - 147:20, 147:21
**forces** [2] - 178:2, 178:12
**forgot** [1] - 239:2
**form** [14] - 16:21, 30:25, 52:7, 69:21, 98:15, 138:25, 139:3, 139:4, 139:14, 139:15, 181:20, 269:24, 270:2, 272:13
**formal** [3] - 194:18, 194:21, 194:23
**former** [1] - 89:4
**forming** [11] - 22:12, 50:9, 53:23, 54:21, 76:11, 79:8, 84:10, 90:16, 108:19, 144:5, 270:20
**formulary** [4] - 133:25, 134:4, 134:8, 136:21
**formulating** [1] - 110:5
**forth** [4] - 26:10, 114:23, 115:21, 276:22
**foundation** [10] -

125:17, 125:22, 130:8, 130:13, 130:18, 133:10, 138:23, 259:22, 259:25
**Foundations** [1] - 16:6
**founding** [1] - 37:6
**four** [7] - 28:17, 90:23, 108:9, 156:2, 166:25, 167:9, 167:10
**fourth** [3] - 46:5, 159:22, 246:25
**framework** [1] - 50:3
**frequent** [1] - 268:14
**front** [7] - 159:18, 190:8, 197:12, 201:7, 205:24, 235:22, 267:23
**Frye** [3] - 274:3, 276:24, 276:25
**FRYE** [1] - 1:10
**Fryebert"** [1] - 277:3
**full** [4] - 163:25, 172:4, 197:5, 277:13
**fully** [1] - 230:13
**fundamental** [1] - 41:2
**funded** [4] - 24:12, 28:16, 28:21, 61:17
**funding** [1] - 24:13
**Future** [11] - 21:24, 22:19, 23:3, 23:9, 24:4, 24:8, 24:14, 24:16, 24:19, 70:15, 72:7
**future** [6] - 22:23, 25:5, 27:13, 59:5, 191:22, 192:14

## G

**Galea** [1] - 16:20
**garble** [1] - 178:10
**GARGUILO** [1] - 1:12
**Garguilo** [6] - 3:4, 6:12, 49:9, 95:3, 268:23, 271:16
**gateway** [5] - 76:8, 76:12, 112:4, 153:13, 153:14
**General** [3] - 2:2, 2:3, 5:3
**general** [7] - 13:14, 31:19, 39:11, 96:20, 155:10, 168:23, 187:8
**General's** [1] - 3:15
**generally** [52] - 9:19, 14:14, 28:4, 30:20,

34:13, 35:22, 42:16, 56:24, 63:2, 63:5, 63:9, 63:10, 63:21, 72:6, 89:24, 101:9, 109:19, 112:6, 112:11, 113:3, 113:6, 113:17, 116:13, 117:20, 117:24, 120:4, 128:14, 128:19, 135:3, 152:16, 153:5, 157:23, 160:2, 160:3, 162:5, 162:9, 164:4, 164:19, 165:15, 166:7, 168:10, 171:12, 174:6, 174:14, 175:10, 178:20, 185:13, 188:12, 209:5, 215:8, 229:18
**generate** [1] - 63:14
**generated** [1] - 140:3
**gentleman** [1] - 278:9
**gentlemen** [2] - 96:13, 273:8
**Geographic** [1] - 90:11
**geographic** [1] - 185:2
**germane** [4] - 50:19, 57:9, 95:14, 98:2
**ghalperin@cov.com** [1] - 2:16
**Ghertner** [1] - 93:2
**given** [18] - 23:12, 23:15, 60:21, 66:4, 72:7, 116:3, 121:24, 133:20, 133:25, 134:3, 155:23, 166:21, 170:17, 208:11, 208:17, 235:12, 258:12, 275:12
**goal** [1] - 28:18
**goals** [1] - 30:3
**government** [2] - 18:8, 258:23
**governmental** [2] - 51:3, 256:13
**Governor** [1] - 131:12
**grade** [2] - 25:4, 161:2
**graduate** [8] - 12:14, 12:15, 13:3, 13:6, 16:15, 16:24, 17:2, 192:22
**grains** [1] - 181:4
**gram** [2] - 172:13, 172:17
**grant** [1] - 24:11
**graph** [1] - 267:25

**Grau** [1] - 167:18
**gray** [2] - 50:24, 50:25
**great** [1] - 219:14
**greater** [10] - 35:3, 35:6, 39:16, 39:24, 40:14, 40:15, 77:17, 177:2, 177:3
**green** [1] - 239:8
**Greg** [1] - 4:14
**GREGORY** [1] - 2:14
**group** [7] - 14:17, 41:3, 71:15, 146:6, 147:11, 186:22, 276:16
**groups** [3] - 147:4, 147:6, 147:8
**growing** [2] - 176:17, 184:3
**guess** [5] - 167:5, 175:18, 185:21, 203:18, 228:12
**guidance** [1] - 128:18
**guide** [1] - 129:17
**guided** [1] - 5:12
**guideline** [1] - 237:19
**guidelines** [1] - 155:10
**guys** [3] - 182:14, 182:16, 182:18

## H

**Hadland** [50] - 101:18, 101:23, 102:10, 102:13, 102:17, 103:20, 104:10, 104:14, 104:25, 106:5, 106:12, 106:25, 107:12, 108:4, 108:25, 109:13, 199:15, 199:22, 199:25, 200:11, 200:16, 200:18, 200:22, 202:23, 205:16, 205:18, 206:23, 207:3, 207:23, 208:6, 232:3, 232:5, 232:8, 232:9, 232:24, 234:21, 235:5, 235:14, 235:25, 240:12, 240:22, 244:17, 250:9, 250:18, 251:6, 251:22, 251:24, 268:25, 269:7, 270:22
**harmed** [1] - 227:24
**harms** [23] - 10:12, 10:17, 10:24, 14:23, 31:24, 32:5, 32:18, 35:8, 53:9, 54:22, 58:24, 106:22, 110:15, 126:5, 138:5, 152:4, 173:21, 174:23, 198:14, 226:4, 226:8, 226:12, 227:3
**hashish** [1] - 187:5
**hate** [1] - 263:24
**Havens** [1] - 167:22
**hazard** [1] - 10:7
**head** [6] - 102:5, 169:3, 169:7, 187:16, 207:25, 224:9
**heading** [6] - 169:17,

**hallway** [1] - 5:6
**Halperin** [1] - 4:14
**HALPERIN** [3] - 2:14, 4:13, 196:19
**hand** [20] - 5:24, 10:11, 10:23, 15:25, 20:21, 39:12, 39:13, 39:21, 41:25, 43:14, 66:23, 67:14, 67:19, 103:25, 131:17, 160:16, 177:23, 196:21
**handed** [1] - 63:20
**handle** [2] - 140:10, 140:14
**handy** [1] - 115:2
**HANLY** [1] - 1:14
**happy** [4] - 133:13, 140:4, 189:23, 214:15
**hard** [4] - 32:24, 196:16, 209:25
**hardcopy** [2] - 21:3, 21:7
**harm** [32] - 61:8, 89:22, 110:24, 112:3, 120:25, 121:9, 125:19, 125:24, 127:9, 127:20, 133:3, 134:11, 136:6, 136:12, 137:11, 138:18, 139:13, 140:22, 148:8, 148:14, 151:25, 173:12, 175:8, 175:12, 175:20, 176:7, 176:22, 177:6, 181:17, 182:5, 183:5, 183:10

170:3, 170:24,
254:12, 254:19,
268:4
**HEALing** [6] - 28:14,
28:20, 29:22, 29:25,
61:17, 62:3
**Health** [11] - 11:16,
18:4, 18:5, 53:14,
79:20, 82:11,
104:19, 256:6,
256:14, 257:18,
269:16
**health** [11] - 8:13,
10:6, 11:24, 12:18,
16:24, 38:12, 38:13,
38:15, 49:6, 61:5,
61:6
**hear** [11] - 7:12, 32:24,
33:2, 55:21, 85:9,
123:15, 123:18,
123:21, 133:16,
160:10, 240:5
**heard** [9] - 135:17,
136:5, 136:10,
163:7, 163:8,
218:15, 218:21,
219:14, 263:25
**HEARING** [1] - 1:10
**hearing** [4] - 59:13,
130:9, 130:21,
276:24
**Hearing** [1] - 3:11
**hearings** [2] - 274:3,
276:21
**hearsay** [1] - 274:23
**HEIMANN** [1] - 2:6
**helped** [2] - 126:2,
138:8
**helpful** [1] - 56:25
**Helping** [1] - 28:13
**helping** [1] - 126:3
**helps** [1] - 131:19
**HERMAN** [6] - 84:19,
85:15, 239:7,
239:15, 252:15,
252:19
**Herman** [9] - 84:20,
85:11, 111:17,
238:25, 239:3,
239:5, 239:13,
252:14, 252:18
**Heroin** [3] - 42:6,
79:12, 170:3
**heroin** [140] - 42:25,
43:3, 43:10, 44:7,
45:4, 45:8, 45:9,
47:8, 47:21, 47:25,
48:6, 58:19, 76:8,
76:19, 77:2, 77:14,
77:24, 78:3, 78:8,

78:13, 79:22, 80:2,
80:4, 80:8, 80:10,
80:11, 80:16, 80:24,
81:4, 81:9, 81:19,
82:3, 82:25, 83:6,
83:11, 84:7, 84:11,
84:14, 84:16, 84:17,
86:11, 86:15, 86:17,
86:23, 87:3, 87:4,
87:7, 87:16, 94:16,
153:15, 153:21,
154:3, 154:6, 154:9,
154:11, 154:14,
154:16, 154:20,
154:24, 155:2,
155:5, 155:6,
155:12, 155:18,
156:2, 156:5,
156:16, 157:3,
158:2, 158:17,
163:4, 165:5, 166:9,
168:12, 168:18,
168:24, 170:9,
170:16, 171:5,
171:6, 171:23,
171:24, 172:7,
172:8, 172:13,
172:18, 172:19,
173:5, 173:6,
173:11, 173:12,
173:20, 173:21,
174:4, 174:21,
174:23, 175:3,
175:7, 175:8,
175:12, 176:10,
176:16, 176:21,
176:22, 176:23,
177:3, 177:6, 178:2,
178:4, 178:5,
178:12, 178:14,
178:15, 178:24,
179:10, 179:19,
180:6, 180:20,
180:24, 181:11,
181:18, 182:6,
182:19, 182:25,
183:10, 184:17,
184:25, 185:16,
185:25, 186:19,
187:9, 187:10,
187:18, 187:19,
263:4, 263:7, 268:13
**heroin-related** [6] -
86:11, 86:15, 86:17,
86:23, 87:3
**high** [16] - 23:12,
23:15, 23:17, 23:18,
25:11, 39:21, 39:24,
58:7, 77:23, 125:16,
125:21, 137:22,
172:8, 178:3,

178:13, 270:14
**high-volume** [1] -
137:22
**higher** [9] - 39:25,
40:16, 76:18, 158:2,
158:15, 163:3,
163:11, 163:13,
165:5
**highest** [1] - 105:24
**highlight** [5] - 131:15,
131:20, 268:2,
269:3, 270:6
**highlighted** [1] -
197:17
**highly** [5] - 70:23,
83:15, 106:24,
170:16, 196:10
**Hill** [41] - 37:8, 49:12,
49:14, 49:15, 49:25,
55:12, 55:15, 55:23,
56:22, 57:4, 57:17,
57:21, 57:25, 95:15,
100:8, 100:20,
113:21, 113:23,
114:2, 114:6, 115:9,
115:12, 115:14,
115:22, 116:5,
116:6, 116:7, 116:9,
116:14, 116:18,
253:4, 253:9,
253:12, 253:21,
253:25, 254:6,
255:2, 273:2, 273:3,
273:7, 273:10
**hinges** [1] - 230:19
**history** [7] - 44:12,
160:24, 161:2,
161:7, 164:7,
164:11, 164:13
**hits** [1] - 139:18
**hm** [2] - 64:11, 151:10
**hold** [1] - 103:21
**holding** [1] - 112:9
**home** [1] - 275:22
**HON** [1] - 1:12
**Honor** [61] - 3:6, 3:8,
3:19, 4:9, 4:10, 4:13,
4:16, 5:16, 5:19,
7:18, 32:22, 73:10,
76:3, 78:15, 78:22,
84:19, 96:24, 97:12,
99:15, 111:19,
129:5, 130:6,
133:10, 133:16,
139:6, 139:21,
141:18, 166:16,
186:9, 188:17,
188:19, 189:8,
196:15, 197:10,
219:17, 236:21,

237:18, 238:15,
239:7, 239:15,
240:6, 252:12,
252:15, 252:19,
256:19, 258:13,
259:11, 259:20,
260:3, 260:19,
266:2, 267:15,
272:17, 275:9,
275:25, 276:4,
276:14, 276:19,
277:5, 277:12,
277:18
**honor** [1] - 189:21
**Honorable** [1] - 3:4
**Hospital** [1] - 261:3
**hospitalization** [3] -
91:25, 92:6, 93:9
**hospitalizations** [4] -
91:14, 92:17,
172:19, 172:25
**hospitals** [1] - 260:15
**hour** [2] - 237:17,
275:21
**hour-and-a-half** [1] -
275:21
**hours** [2] - 90:23,
277:21
**Hudson** [1] - 2:7
**huge** [1] - 173:2
**hundred** [1] - 172:17
**hundred-dollar** [1] -
172:17
**hundreds** [1] - 81:5
**hydrocodone** [1] -
90:23
**hypothetical** [8] -
255:21, 256:11,
256:21, 257:9,
257:12, 258:9,
258:14, 266:12

**I**

**i.e** [1] - 170:11
**idea** [3] - 13:15, 174:8,
176:6
**identified** [6] - 69:6,
122:5, 179:5,
217:19, 217:21,
227:22
**identifies** [1] - 190:11
**identify** [30] - 8:13,
29:15, 122:11,
122:18, 146:6,
146:7, 146:15,
146:22, 147:10,
147:17, 147:19,
190:19, 197:6,
206:20, 213:10,

213:15, 213:17,
214:8, 215:3, 215:4,
217:22, 222:25,
223:16, 227:11,
227:16, 227:24,
228:4, 228:10,
246:12, 246:18
**Identify** [1] - 97:6
**Ill** [1] - 1:17
**illegal** [21] - 153:16,
154:3, 168:24,
173:21, 177:3,
179:10, 179:19,
179:24, 180:7,
180:20, 181:8,
181:10, 181:17,
181:18, 182:5,
182:6, 182:25,
183:5, 187:11
**illicit** [4] - 58:18,
185:3, 186:23, 187:2
**illness** [3] - 132:2,
160:24, 161:8
**illustrates** [1] - 36:24
**imagine** [3] - 179:25,
180:9, 209:9
**impact** [33] - 15:9,
15:14, 15:17, 15:23,
78:5, 98:5, 98:15,
101:13, 132:23,
134:5, 173:5,
174:22, 176:21,
193:14, 193:18,
193:21, 208:13,
208:19, 229:24,
230:9, 232:10,
232:21, 233:4,
234:16, 235:6,
235:13, 248:11,
249:11, 250:5,
251:20, 252:7,
255:25, 265:22
**impacted** [2] - 29:8,
173:12
**impeachment** [1] -
74:13
**implementing** [1] -
33:18
**implications** [1] - 61:6
**impolite** [1] - 7:4
**important** [8] - 29:24,
30:13, 49:21, 56:6,
57:13, 61:6, 123:5,
168:13
**importing** [1] - 176:18
**impression** [1] -
238:11
**improbable** [1] -
270:12
**improper** [5] - 146:18,

146:24, 147:21,
256:20, 258:14
**improperly** [2] -
147:12, 147:13
**improved** [1] - 248:9
**IN** [1] - 1:4
**inappropriate** [6] -
195:9, 195:15,
225:17, 246:21,
247:8, 247:12
**inappropriately** [1] -
137:22
**Inc** [2] - 2:11, 218:16
**incident** [2] - 37:25,
39:6
**incidents** [2] - 80:9,
80:10
**include** [12] - 67:8,
67:10, 118:17,
203:25, 204:5,
208:6, 228:17,
231:20, 233:19,
244:7, 247:20,
262:16
**included** [22] - 50:23,
90:8, 92:5, 98:17,
101:25, 203:13,
203:17, 203:20,
203:22, 208:2,
222:8, 226:8, 233:9,
233:15, 233:16,
233:18, 242:23,
243:19, 243:25,
254:5, 258:15,
262:22
**includes** [4] - 23:10,
97:22, 97:23, 187:4
**including** [13] - 5:5,
28:18, 95:9, 131:25,
132:7, 139:22,
141:25, 163:20,
178:2, 178:12,
187:5, 255:22,
256:13
**income** [1] - 227:24
**incorrect** [13] - 134:9,
150:18, 158:4,
208:21, 211:6,
213:9, 216:15,
221:2, 226:25,
227:8, 233:5, 235:8,
236:19
**incorrectly** [1] -
178:10
**increase** [28] - 58:23,
88:9, 88:14, 91:5,
91:10, 92:6, 92:7,
94:8, 120:8, 120:9,
120:18, 126:4,
126:9, 138:4, 138:8,

155:13, 155:20,
171:6, 172:18,
172:24, 181:7,
183:8, 198:11,
198:14, 259:4,
270:13
**increased** [32] - 10:21,
25:5, 29:16, 29:17,
39:3, 58:21, 59:24,
59:25, 73:6, 74:24,
80:2, 88:8, 94:14,
119:19, 120:5,
125:11, 127:14,
127:25, 155:7,
174:5, 176:11,
176:16, 177:7,
178:3, 178:13,
183:8, 191:25,
196:2, 196:3, 197:25
**increases** [9] - 35:4,
58:17, 59:4, 121:2,
172:6, 178:5,
178:15, 191:21,
192:13
**increasing** [7] - 35:18,
35:21, 127:9,
127:10, 127:22,
151:12, 191:24
**independent** [7] -
24:13, 46:10, 46:18,
173:16, 215:20,
248:22
**Index** [1] - 3:12
**INDEX** [1] - 1:6
**indicate** [1] - 213:24
**indicated** [4] - 55:22,
164:6, 164:10,
201:14
**indicates** [3] - 45:16,
81:20, 189:15
**indicative** [2] - 15:16,
15:22
**indicator** [2] - 61:7,
69:12
**individual** [10] - 40:22,
41:5, 114:12,
114:13, 122:11,
143:12, 145:6,
146:12, 150:5, 191:4
**individuals** [21] -
25:16, 25:19, 26:3,
26:5, 26:9, 37:23,
42:12, 42:24, 43:3,
44:12, 73:5, 76:17,
76:25, 77:23, 87:13,
87:24, 157:15,
165:4, 165:8, 269:9,
269:19
**Individuals** [1] - 26:7
**industrial** [1] - 117:23

**industries** [1] - 258:24
**Industry** [6] - 101:19,
104:6, 106:9, 241:3,
245:3, 270:8
**industry** [16] - 102:22,
103:5, 105:15,
229:8, 229:15,
238:8, 241:15,
244:8, 247:21,
248:2, 261:17,
261:20, 261:21,
261:22, 262:3, 270:9
**industry-sponsored**
[1] - 261:21
**infectious** [1] - 82:12
**infer** [1] - 225:19
**inference** [8] - 9:3,
9:8, 9:16, 50:9,
228:9, 253:10,
271:8, 271:11
**inferences** [5] - 8:16,
13:22, 60:25,
109:20, 167:22
**inferred** [1] - 271:22
**influence** [8] - 212:15,
215:5, 229:8,
229:15, 230:4,
230:15, 255:25,
257:20
**influenced** [16] -
128:7, 212:21,
213:4, 213:8,
213:11, 214:2,
214:9, 221:19,
221:25, 222:13,
228:6, 230:7, 242:6,
247:8, 256:16,
266:21
**influences** [6] -
102:23, 103:5,
161:4, 238:8,
241:17, 241:23
**influencing** [2] -
128:8, 260:9
**inform** [3] - 30:16,
61:24, 62:9
**information** [22] -
6:21, 20:6, 20:14,
43:25, 53:8, 53:17,
98:13, 98:18, 102:2,
160:23, 161:6,
205:15, 207:24,
242:11, 245:12,
247:20, 248:13,
255:22, 256:12,
256:16, 257:17,
257:20
**inhalents** [1] - 187:6
**initial** [2] - 50:23,
191:16

**initiate** [1] - 80:24
**initiated** [1] - 80:4
**initiates** [1] - 184:25
**initiating** [2] - 45:4,
45:5
**initiation** [9] - 79:23,
80:2, 80:8, 80:10,
81:10, 81:19, 82:3,
83:7, 171:4
**Initiation** [2] - 43:22,
79:11
**initiatives** [1] - 29:15
**injected** [1] - 174:11
**injecting** [1] - 158:15
**injection** [4] - 43:23,
44:5, 45:5, 45:7
**inner** [1] - 65:10
**instance** [4] - 6:22,
33:2, 204:18, 243:6
**instances** [2] - 32:25,
118:19
**instead** [2] - 174:10,
276:13
**Institute** [1] - 18:3
**Institutes** [1] - 18:5
**insurance** [3] -
133:23, 134:8,
134:12
**Insys** [1] - 105:24
**integrate** [1] - 66:7
**intend** [4] - 190:15,
239:6, 239:13,
273:17
**intended** [1] - 68:4
**intends** [1] - 274:4
**intention** [1] - 27:25
**interaction** [1] -
229:15
**interactions** [7] -
203:25, 204:6,
204:14, 210:12,
229:8, 243:16,
247:21
**interest** [1] - 133:15
**interested** [1] - 17:20
**Internal** [1] - 104:5
**International** [1] -
15:5
**interpretation** [1] -
164:21
**interpreting** [3] -
22:13, 152:6, 160:7
**interrelated** [1] -
149:20
**interrupt** [3] - 236:22,
263:24, 266:3
**interrupting** [2] -
32:23, 33:6
**intertwined** [1] - 26:19
**interview** [3] - 102:10,

108:20, 109:2
**interviewed** [1] -
22:20
**interviews** [1] - 54:11
**introduced** [1] - 77:16
**introduction** [1] -
131:18
**Introduction** [1] - 16:6
**inverse** [1] - 155:24
**investigate** [3] -
138:13, 138:20,
139:23
**investigation** [2] -
35:4, 72:13
**Investigator** [1] - 18:2
**investigator** [1] -
29:22
**investigators** [1] -
46:10
**invests** [1] - 270:10
**invite** [1] - 14:6
**invoking** [1] - 115:22
**involve** [8] - 202:9,
202:12, 202:18,
204:12, 204:13,
204:17, 242:25,
243:8
**involved** [9] - 22:7,
22:12, 28:8, 28:12,
28:25, 87:17, 120:9,
151:12, 160:7
**involves** [2] - 28:21,
30:2
**involving** [1] - 28:9
**IQVIA** [4] - 88:22,
89:25, 90:5, 90:8
**Islip** [1] - 1:8
**isolate** [3] - 234:16,
249:11, 250:5
**issue** [10] - 3:10, 79:8,
117:8, 135:21,
136:8, 136:13,
172:22, 230:20,
264:24, 265:12
**issued** [7] - 99:17,
198:23, 259:8,
259:10, 259:16,
260:22, 265:12
**issues** [4] - 49:6,
78:19, 237:2, 276:23
**itself** [8] - 105:7,
133:5, 159:2, 159:7,
161:22, 171:18,
234:24, 238:6

## J

**J&J** [1] - 224:7
**JAMA** [3] - 15:6,
104:5, 106:6

**JAMES** [1] - 2:2
**Janssen** [3] - 105:25, 206:15, 224:7
**January** [1] - 73:20
**JAYNE** [1] - 1:16
**Jayne** [1] - 3:22
jconroy@
   simmonsfirm.com
   [1] - 1:18
**Jefferson** [1] - 260:16
**JERRY** [1] - 1:12
**Jerry** [1] - 3:4
**job** [2] - 85:8, 196:25
**joining** [1] - 12:6
**journal** [9] - 13:18, 19:7, 19:18, 19:20, 20:2, 20:3, 20:5, 20:8, 22:4
**Journal** [5] - 15:4, 15:5, 37:16, 104:19, 169:13
**journals** [16] - 13:12, 14:5, 14:6, 14:12, 15:2, 15:4, 15:6, 15:7, 17:5, 18:21, 19:2, 19:9, 19:12, 19:17, 262:15, 262:19
**judge** [1] - 111:8
**Judge** [18] - 4:22, 6:12, 14:25, 76:2, 94:22, 95:21, 95:22, 95:23, 99:17, 101:5, 195:24, 196:6, 196:8, 198:23, 200:19, 271:17, 273:9, 275:18
**Justice** [5] - 1:12, 49:9, 95:3, 268:23, 271:16

## K

**Katherine** [3] - 5:20, 5:25, 6:6
**keep** [6] - 4:23, 33:9, 211:5, 224:2, 237:20, 276:20
**key** [1] - 172:6
**Keyes** [56] - 1:10, 5:20, 5:21, 5:25, 6:7, 6:10, 7:21, 11:12, 21:20, 31:7, 33:17, 40:21, 56:21, 58:16, 69:14, 85:22, 94:21, 96:16, 97:18, 99:17, 108:18, 110:2, 111:7, 111:11, 111:23, 189:11, 189:25, 190:6,

191:13, 192:19, 196:8, 196:9, 197:11, 200:3, 201:8, 209:17, 212:9, 216:16, 219:19, 221:14, 221:17, 222:10, 222:19, 233:6, 235:23, 240:11, 240:21, 252:23, 254:10, 257:9, 266:7, 267:4, 267:22, 269:5, 271:15, 271:20
**Keyes'** [2] - 73:19, 190:4
**Khosla** [1] - 167:13
**kind** [8] - 50:22, 57:13, 102:24, 112:16, 132:19, 136:18, 137:6, 155:24
**kinds** [1] - 9:15
**kinergies** [1] - 230:10
**knowing** [1] - 146:12
**knowledge** [15] - 24:19, 24:23, 31:12, 47:18, 51:7, 98:8, 98:12, 108:25, 109:3, 154:5, 248:3, 248:9, 259:7, 260:21, 260:24
**known** [1] - 47:18

## L

**labeled** [1] - 246:7
**Laboratories** [1] - 218:16
**lack** [3] - 96:3, 138:22, 174:9
**ladies** [1] - 278:9
**language** [9] - 132:3, 132:5, 132:10, 132:13, 161:13, 167:2, 168:8, 168:11, 196:7
**Lankenau** [4] - 43:21, 43:25, 82:17, 263:15
**large** [2] - 45:17, 76:12
**larger** [4] - 14:22, 23:7, 55:16, 68:3
**last** [31] - 19:23, 33:3, 48:8, 55:8, 58:4, 69:17, 77:2, 78:2, 93:3, 102:19, 106:2, 106:6, 130:23, 141:22, 161:16, 163:25, 176:11, 177:24, 183:20,

191:14, 191:15, 195:23, 199:3, 199:6, 199:9, 244:3, 246:6, 247:2, 265:23, 268:21, 276:6
**lastly** [1] - 7:12
**late** [2] - 84:21, 85:4
**law** [7] - 102:8, 118:3, 119:4, 119:9, 174:2, 176:14, 258:7
**laws** [1] - 118:5
**lawyer** [3] - 260:12, 267:10, 267:13
**lay** [1] - 114:5
**laypersons** [1] - 70:24
**lead** [3] - 78:24, 78:25, 169:16
**leaders** [1] - 262:4
**leading** [6] - 56:9, 56:14, 78:18, 78:21, 96:25, 97:15
**leap** [1] - 214:13
**learn** [3] - 41:3, 219:20, 219:24
**least** [7] - 68:18, 145:21, 161:23, 173:21, 238:23, 244:13, 277:21
**leave** [2] - 23:18, 177:20
**Leaving** [1] - 273:21
**led** [9] - 29:15, 35:6, 58:22, 88:9, 123:20, 124:2, 139:12, 181:7, 191:24
**left** [4] - 67:19, 131:17, 236:24, 267:25
**left-hand** [1] - 67:19
**legal** [2] - 121:14, 265:4
**legitimate** [3] - 159:2, 159:7, 161:21
**Lembke** [2] - 123:16, 135:18
**lengthy** [1] - 239:18
**less** [6] - 86:22, 134:14, 175:12, 175:13, 183:4, 183:10
**LETITIA** [1] - 2:2
**letter** [2] - 85:4, 238:23
**letters** [1] - 167:4
**level** [16] - 12:14, 53:9, 58:7, 94:6, 127:21, 137:11, 137:17, 138:18, 139:13, 140:22, 142:25, 144:15, 148:8,

148:14, 175:8
**levels** [6] - 77:23, 125:12, 132:24, 143:12, 158:2, 270:14
**Lewis** [1] - 4:17
**LEWIS** [1] - 2:18
**liaison** [1] - 129:8
**Liberty** [1] - 2:3
**license** [3] - 264:23, 265:2, 265:3
**licensed** [8] - 121:15, 138:11, 179:17, 180:2, 180:12, 180:13, 194:11, 194:14
**licensing** [3] - 138:19, 139:9, 140:23
**LIEFF** [1] - 2:6
**life** [1] - 7:4
**lifetime** [1] - 44:16
**lift** [1] - 274:4
**light** [1] - 206:24
**likelihood** [3] - 59:5, 191:21, 192:14
**likely** [14] - 26:4, 26:8, 67:5, 71:11, 71:18, 87:13, 135:19, 135:22, 136:6, 136:11, 151:13, 152:3, 160:25, 174:17
**limine** [3] - 274:9, 274:12, 274:16
**limit** [2] - 6:20, 200:3
**limitation** [6] - 160:22, 167:18, 246:11, 246:18, 247:23, 262:20
**limitations** [12] - 160:19, 168:9, 168:14, 244:6, 246:3, 246:7, 247:18, 262:11, 262:16, 262:22, 270:22, 271:10
**limited** [2] - 197:22, 240:14
**line** [13] - 151:3, 151:9, 158:6, 158:7, 158:11, 158:12, 161:16, 206:5, 206:6, 222:22, 224:24, 264:16
**link** [17] - 9:23, 26:25, 48:19, 78:12, 82:24, 84:10, 96:20, 97:19, 99:25, 101:8, 110:23, 111:3, 147:6, 225:13,

263:6, 265:18, 268:12
**linked** [7] - 27:23, 83:11, 104:16, 106:15, 106:16, 122:13, 163:3
**list** [9] - 73:15, 85:5, 85:16, 129:24, 131:3, 135:2, 135:5, 135:9, 266:24
**listed** [6] - 33:17, 108:4, 111:14, 225:21, 242:24, 269:19
**listen** [2] - 6:18, 123:15
**listened** [1] - 123:17
**listening** [1] - 5:2
**listing** [1] - 269:17
**lists** [1] - 50:22
**literally** [1] - 78:17
**literature** [77] - 8:21, 9:2, 9:6, 9:8, 30:8, 30:10, 30:12, 30:15, 30:20, 31:4, 34:6, 46:16, 47:4, 47:24, 48:3, 50:4, 50:9, 50:14, 50:22, 50:24, 50:25, 51:8, 51:20, 55:18, 57:8, 59:20, 59:23, 61:23, 62:14, 65:22, 78:11, 90:8, 91:3, 91:9, 95:11, 97:19, 97:22, 110:19, 144:9, 147:3, 149:10, 155:9, 155:23, 169:20, 173:15, 174:7, 195:20, 209:15, 210:25, 214:14, 214:18, 216:15, 218:6, 220:11, 220:13, 220:25, 222:8, 222:16, 222:24, 223:11, 225:19, 226:2, 226:17, 229:7, 229:13, 229:19, 229:24, 230:3, 230:9, 230:18, 251:11, 251:16, 251:18, 253:15, 271:12, 272:12
**literatures** [1] - 57:16
**LITIGATION** [1] - 1:4
**Litigation** [1] - 3:12
**litigation** [6] - 18:23, 19:4, 20:10, 20:14, 22:8, 53:19

**live** [4] - 4:24, 6:23, 7:24, 274:2
**lived** [1] - 8:5
**LLC** [1] - 1:14
**LLP** [3] - 2:6, 2:10, 2:18
**location** [1] - 4:25
**log** [1] - 259:21
**logo** [1] - 131:10
**Long-Term** [1] - 28:14
**longitudinal** [4] - 22:21, 23:16, 23:19, 23:24
**look** [74] - 20:16, 25:18, 35:2, 36:23, 39:20, 40:6, 41:6, 41:23, 43:13, 43:19, 44:13, 45:12, 46:5, 46:16, 47:3, 47:17, 48:8, 48:15, 52:6, 54:5, 54:19, 60:13, 66:15, 70:5, 71:19, 78:11, 79:7, 81:7, 87:25, 90:19, 91:11, 95:17, 100:11, 100:14, 100:17, 102:16, 115:4, 117:13, 129:3, 131:14, 131:19, 132:5, 136:15, 151:8, 157:8, 157:24, 158:5, 160:13, 163:18, 163:23, 166:13, 166:20, 166:21, 168:8, 169:17, 170:2, 177:23, 185:15, 185:20, 203:3, 203:9, 205:17, 206:23, 207:23, 223:12, 226:16, 228:16, 236:5, 246:25, 251:11, 261:23, 271:6, 277:23
**looked** [37] - 35:5, 35:17, 50:21, 52:10, 68:7, 78:11, 101:11, 104:11, 104:20, 107:13, 109:14, 120:10, 120:13, 131:4, 135:25, 138:15, 155:22, 167:8, 167:10, 169:9, 173:24, 232:14, 235:17, 240:11, 245:15, 245:18, 247:14, 249:18, 250:10, 263:9, 263:12,

263:13, 266:15, 272:5, 272:8, 272:9
**looking** [34] - 30:7, 30:10, 37:2, 41:12, 45:14, 46:8, 46:21, 51:19, 51:21, 51:23, 52:2, 52:3, 54:20, 55:17, 70:19, 83:23, 109:15, 143:4, 166:3, 173:11, 174:21, 184:16, 186:6, 186:7, 186:13, 218:2, 218:3, 241:10, 243:6, 247:5, 251:8, 261:6, 261:13, 269:5
**looks** [1] - 228:3
**low** [6] - 40:8, 40:12, 40:15, 172:7, 172:14, 227:24
**lower** [6] - 156:2, 179:5, 183:14, 183:17, 183:19
**lunch** [2] - 141:3, 243:9
**luncheon** [2] - 141:8, 273:22
**lung** [6] - 9:10, 9:13, 9:17, 9:24, 9:25, 10:3

---
## M

**Madison** [1] - 1:15
**magnitude** [1] - 155:23
**magnitudes** [1] - 92:18
**maintain** [1] - 270:14
**maintained** [1] - 51:12
**maintains** [1] - 102:4
**major** [6] - 81:17, 159:3, 159:8, 161:22, 178:4, 178:14
**majority** [7] - 123:11, 124:22, 125:4, 125:8, 187:13, 187:24, 274:15
**malignant** [3] - 132:9, 132:16, 132:17
**Mallinckrodt** [1] - 206:9
**Management** [1] - 129:17
**management** [1] - 131:23
**Manual** [1] - 64:16
**manufacture** [3] - 179:14, 179:18,

179:19
**manufactured** [1] - 117:25
**manufacturer** [60] - 107:6, 107:14, 118:9, 193:25, 202:3, 202:10, 202:14, 202:20, 203:4, 203:11, 203:16, 204:2, 204:14, 204:19, 204:24, 205:6, 205:11, 206:21, 209:11, 209:19, 209:22, 210:10, 210:16, 210:20, 210:23, 211:11, 211:23, 212:12, 212:22, 213:6, 213:12, 213:25, 214:10, 215:2, 217:17, 217:23, 218:4, 218:9, 220:8, 221:5, 221:20, 222:2, 222:14, 222:21, 223:17, 225:16, 226:14, 227:6, 227:13, 227:19, 228:7, 231:5, 231:13, 232:11, 250:7, 252:8, 257:10, 257:16, 264:12, 265:21
**manufacturers** [30] - 105:4, 105:20, 111:16, 150:4, 150:13, 179:10, 179:17, 180:12, 204:7, 207:6, 207:11, 207:14, 208:7, 217:18, 217:20, 220:18, 242:11, 243:17, 249:12, 255:19, 257:8, 260:8, 262:4, 262:7, 264:15, 264:21, 264:24, 265:11, 266:13
**manufactures** [1] - 194:4
**manufacturing** [5] - 177:2, 177:8, 179:10, 223:2, 223:23
**map** [3] - 65:16, 66:7, 66:11
**mapped** [2] - 65:4, 68:8
**mapping** [3] - 66:19,

68:6, 68:12
**marijuana** [2] - 187:4, 187:10
**mark** [5] - 32:11, 108:11, 167:4, 167:5, 169:9
**marked** [1] - 106:3
**market** [8] - 157:4, 174:22, 175:8, 178:2, 178:12, 179:6, 179:23, 221:6
**marketed** [14] - 191:25, 204:25, 205:6, 205:12, 206:9, 206:21, 207:14, 207:15, 208:7, 220:24, 221:9, 231:6, 246:13, 265:13
**marketers** [1] - 233:13
**marketing** [169] - 36:13, 59:3, 94:20, 94:23, 94:24, 95:10, 96:2, 96:5, 96:18, 96:19, 96:21, 97:20, 98:2, 98:5, 98:6, 98:11, 98:16, 98:19, 98:20, 99:18, 99:19, 99:22, 101:8, 101:13, 102:13, 104:22, 106:22, 106:24, 107:6, 107:14, 108:19, 111:3, 128:6, 148:19, 148:21, 148:24, 149:7, 149:11, 149:13, 190:2, 190:22, 191:8, 191:20, 191:22, 191:24, 192:9, 192:10, 192:12, 192:20, 192:23, 193:2, 193:8, 193:10, 193:14, 193:19, 193:21, 196:2, 196:12, 197:24, 198:11, 198:13, 199:3, 199:9, 200:21, 201:3, 201:22, 202:4, 202:8, 202:9, 202:13, 202:19, 203:4, 203:7, 203:10, 203:12, 208:12, 208:14, 208:15, 208:18, 208:20, 208:23, 209:3, 209:4, 209:6, 209:12, 210:5,

211:10, 211:16, 211:19, 211:20, 211:24, 212:4, 212:11, 212:15, 214:20, 216:7, 216:24, 218:8, 220:20, 221:20, 222:2, 222:14, 222:25, 224:12, 224:25, 225:5, 225:16, 225:20, 226:13, 226:20, 227:6, 227:13, 227:18, 228:6, 229:3, 229:10, 229:17, 230:4, 230:7, 230:9, 230:20, 231:12, 231:21, 232:10, 232:15, 233:16, 233:18, 234:12, 234:13, 234:17, 234:18, 235:6, 235:13, 241:16, 241:17, 241:22, 242:6, 242:23, 243:19, 243:22, 243:23, 243:25, 245:11, 249:4, 249:7, 249:24, 250:3, 250:6, 251:20, 252:7, 255:7, 255:15, 255:17, 255:18, 255:22, 264:8, 264:11, 264:17, 265:18, 268:22, 269:20, 269:23, 269:25, 270:3, 270:11, 270:13, 270:18, 270:21, 272:3
**Marketing** [4] - 104:6, 106:9, 241:3, 245:3
**markets** [1] - 176:18
**mask** [1] - 56:11
**Mason** [1] - 267:2
**mass** [1] - 274:15
**Master's** [1] - 11:24
**Masters** [2] - 274:13, 275:6
**material** [11] - 84:25, 98:20, 109:17, 117:7, 120:20, 138:16, 224:12, 233:20, 241:25, 254:4, 258:25
**materials** [44] - 16:17, 16:18, 85:5, 95:10, 102:13, 107:6,

294

295

107:14, 129:22,
148:24, 149:7,
202:9, 208:12,
208:14, 208:15,
208:18, 208:20,
208:23, 209:12,
209:15, 209:18,
209:23, 210:5,
211:2, 211:10,
211:16, 211:19,
211:21, 211:24,
212:4, 214:20,
224:25, 225:5,
252:8, 255:7,
255:16, 255:18,
255:22, 258:25,
259:5, 259:8,
259:15, 260:5,
260:21, 264:20
**mathematical** [7] -
29:24, 30:3, 30:7,
30:11, 61:24, 62:4,
62:10
**mathematically** [1] -
62:7
**matter** [5] - 75:14,
75:19, 121:18,
121:23, 237:7
**Matters** [1] - 16:5
**matters** [1] - 79:2
**McCabe** [8] - 69:17,
69:19, 70:2, 70:12,
71:5, 71:20, 162:18
**McKesson** [14] - 2:11,
4:11, 4:14, 143:21,
144:25, 148:5,
148:23, 149:6,
149:12, 149:25,
150:17, 151:12,
151:18, 152:19
**McKesson's** [1] -
144:10
**MDL** [17] - 76:2, 94:22,
95:24, 99:19, 101:4,
195:24, 196:5,
198:7, 198:16,
199:14, 199:21,
200:12, 200:15,
200:21, 200:23,
271:17
**meals** [4] - 105:11,
105:13, 105:14,
243:7
**mean** [29] - 23:19,
23:20, 26:2, 26:3,
27:9, 34:22, 36:20,
39:22, 47:13, 47:20,
60:18, 72:14, 72:15,
115:24, 139:25,
152:6, 169:3,

178:10, 187:20,
189:22, 203:6,
203:19, 205:14,
227:8, 228:17,
236:18, 248:24,
262:2, 274:22
**meaning** [2] - 204:9,
209:7
**meaningfully** [1] -
183:17
**means** [13] - 14:2,
34:25, 36:16, 39:23,
41:9, 70:25, 71:2,
80:21, 80:22,
112:15, 171:15,
171:18, 237:23
**meant** [1] - 87:19
**measure** [2] - 15:9,
39:14
**measured** [2] - 15:14,
23:21
**measures** [4] - 88:25,
89:15, 89:16, 90:3
**measuring** [1] - 35:22
**Medicaid** [13] -
134:21, 134:23,
135:10, 135:19,
135:22, 136:7,
136:11, 136:13,
136:21, 136:24,
137:3, 137:8, 137:15
**Medical** [4] - 2:11,
54:13, 70:6, 129:17
**medical** [51] - 25:8,
26:10, 26:17, 26:25,
27:23, 70:17, 70:21,
71:7, 71:10, 71:12,
71:16, 75:6, 75:10,
75:15, 81:8, 117:22,
123:25, 124:6,
124:13, 126:10,
128:13, 128:20,
131:24, 143:5,
153:22, 156:22,
163:2, 164:7,
164:10, 164:13,
165:10, 194:6,
194:9, 194:18,
194:23, 194:24,
195:2, 195:8,
195:12, 195:14,
195:21, 195:22,
198:22, 254:21,
258:23, 263:7,
263:14, 263:16,
263:18, 263:22
**medically** [13] - 26:4,
26:8, 71:4, 71:10,
71:16, 75:3, 158:2,
158:14, 163:10,

165:5, 195:8,
195:15, 225:17
**Medicare** [2] - 104:21,
104:23
**medication** [5] -
29:17, 89:2, 89:3,
90:4, 195:18
**medications** [2] -
101:9, 135:9
**medicine** [11] -
194:12, 194:15,
195:4, 207:14,
208:8, 218:22,
219:2, 220:24,
221:5, 231:4, 232:20
**Medicine** [2] - 104:5,
169:13
**medicines** [6] - 219:5,
219:9, 230:25,
233:3, 233:8, 234:4
**meet** [3] - 68:16,
272:11, 274:18
**meeting** [1] - 142:21
**meets** [1] - 68:19
**Melville** [1] - 1:21
**mental** [3] - 49:6,
160:24, 161:8
**Mental** [1] - 64:17
**mention** [11] - 105:19,
114:2, 114:19,
115:9, 134:20,
142:12, 143:20,
143:24, 201:22,
201:25, 202:3
**mentioned** [24] - 23:2,
25:6, 26:24, 29:11,
49:4, 51:11, 52:14,
52:15, 61:16, 66:14,
80:18, 82:17, 87:17,
89:25, 91:8, 91:16,
97:18, 190:22,
190:25, 191:4,
210:3, 210:4, 225:3,
270:23
**mentions** [1] - 105:23
**merchants** [1] -
182:19
**met** [6] - 114:15,
114:16, 114:17,
144:15, 253:9
**methamphetamine** [1]
- 86:19, 87:21
**method** [4] - 13:21,
160:3, 174:11,
174:15
**Methodological** [1] -
16:6
**methodologies** [2] -
152:17, 201:21
**methodology** [96] -

7:22, 8:18, 8:23,
9:20, 12:25, 14:13,
16:14, 22:16, 23:10,
23:23, 28:5, 30:18,
30:20, 31:3, 31:5,
31:18, 32:8, 32:14,
33:19, 34:3, 34:7,
34:11, 34:13, 34:17,
37:4, 37:7, 42:15,
42:17, 42:20, 50:12,
52:10, 54:16, 55:10,
55:12, 55:16, 55:23,
56:7, 56:21, 58:6,
59:18, 62:24, 63:2,
65:25, 78:10, 82:25,
99:24, 100:2, 100:5,
110:4, 110:12,
110:22, 111:2,
113:8, 113:21,
113:22, 114:23,
115:6, 116:22,
120:24, 121:7,
124:3, 127:5,
130:10, 136:20,
137:7, 142:24,
143:17, 145:5,
201:2, 201:9,
201:19, 202:5,
202:7, 202:12,
202:18, 204:12,
204:22, 205:4,
205:10, 207:5,
207:9, 212:9,
212:19, 213:3,
213:20, 215:18,
217:15, 218:14,
220:4, 220:17,
226:11, 227:2,
227:8, 227:10, 254:2
**Methodology** [1] -
201:17
**methods** [14] - 12:17,
13:8, 16:16, 17:20,
63:11, 95:20, 110:7,
110:9, 160:4, 164:4,
165:16, 271:21,
271:25
**Mexican** [2] - 176:15,
178:24
**Mexico** [2] - 179:2,
179:5
**Miami** [1] - 2:20
**MICHAEL** [1] - 2:4
**Michael** [1] - 3:14
**microphone** [1] - 33:5
**middle** [2] - 64:5,
261:7
**midlife** [1] - 71:24
**might** [7] - 23:25,
51:4, 89:8, 143:7,

206:24, 210:16,
210:23
**mild** [5] - 64:3, 64:6,
65:7, 68:16, 68:22
**mill** [13] - 124:7,
124:11, 124:18,
125:6, 137:20,
138:7, 138:11,
138:12, 138:13,
138:21, 139:10,
139:24, 140:24
**milligram** [1] - 36:2
**milligrams** [2] - 40:13,
90:22
**million** [1] - 137:3
**millions** [1] - 270:10
**mind** [3] - 4:23,
218:13, 276:20
**minute** [3] - 85:13,
241:11, 260:22
**MINUTES** [1] - 1:10
**minutes** [12] - 34:20,
54:19, 63:20, 93:21,
98:24, 237:21,
238:14, 238:17,
238:19, 238:20,
239:18, 264:2
**misleading** [12] -
209:4, 209:13,
211:25, 212:11,
212:21, 213:5,
213:12, 222:2,
222:14, 222:25,
223:5, 250:6
**miss** [1] - 277:19
**misstated** [1] - 259:2
**mistaken** [1] - 84:24
**Misuse** [1] - 21:25
**misuse** [21] - 22:23,
25:5, 25:22, 27:13,
27:18, 27:19, 31:13,
35:7, 43:22, 44:21,
48:20, 61:12, 62:20,
67:8, 157:21, 159:3,
159:8, 161:4,
161:23, 185:18
**misused** [1] - 25:20
**mixed** [1] - 84:13
**mixing** [1] - 180:20
**MME** [2] - 36:15, 83:18
**MMEs** [3] - 36:4,
36:16, 83:17
**model** [5] - 62:5,
81:21, 81:25, 82:4
**modeling** [4] - 29:24,
30:3, 30:13, 62:7
**models** [3] - 30:7,
30:11, 95:13
**moderate** [1] - 65:11
**moment** [12] - 26:21,

41:7, 45:20, 80:18, 89:25, 91:16, 103:21, 176:7, 184:19, 258:11, 260:16, 267:2
**moments** [1] - 161:14
**Monday** [10] - 275:11, 275:14, 277:12, 277:13, 277:24, 278:3, 278:5, 278:6, 278:8
**money** [2] - 105:3, 106:21
**Monitoring** [10] - 22:19, 23:2, 23:8, 24:4, 24:8, 24:14, 24:16, 24:19, 70:14, 72:7
**monitoring** [4] - 77:11, 77:14, 77:15, 78:6
**months** [2] - 199:6, 199:10
**MORGAN** [1] - 2:18
**Morgan** [1] - 4:17
**morning** [31] - 3:5, 3:6, 3:7, 3:8, 3:10, 3:17, 3:18, 3:19, 3:21, 3:24, 4:7, 4:8, 4:10, 4:12, 4:13, 4:15, 4:16, 5:21, 5:22, 6:10, 6:11, 20:21, 98:25, 111:23, 128:6, 199:16, 200:12, 200:17, 226:4, 238:18, 268:23
**morphine** [2] - 36:2, 36:17
**Mortality** [2] - 106:10, 245:4
**mortality** [5] - 52:19, 52:22, 106:17, 171:7, 246:14
**most** [9] - 9:9, 43:2, 45:9, 49:21, 56:6, 57:13, 68:23, 274:8, 274:24
**mostly** [1] - 170:10
**motion** [3] - 274:4, 274:5, 274:12
**motions** [5] - 274:8, 274:15, 274:21
**move** [14] - 31:16, 58:4, 58:13, 88:5, 98:21, 106:2, 129:4, 133:11, 133:15, 161:10, 165:9, 165:11, 201:2, 267:2
**moving** [2] - 224:2,

276:8
**MPH** [1] - 11:23
**MR** [182] - 3:14, 3:18, 3:19, 3:25, 4:5, 4:10, 4:13, 4:16, 5:15, 5:19, 7:18, 7:20, 8:4, 11:5, 11:11, 20:16, 20:25, 21:2, 21:4, 21:6, 21:9, 21:12, 21:19, 24:3, 32:22, 33:12, 33:16, 36:23, 37:14, 56:3, 56:8, 56:13, 56:20, 57:20, 58:12, 58:15, 64:20, 73:10, 73:18, 73:23, 74:2, 74:10, 74:15, 74:18, 75:21, 76:3, 76:4, 78:15, 78:22, 79:4, 79:6, 82:8, 84:19, 85:10, 85:15, 85:21, 87:2, 88:4, 89:11, 93:21, 93:22, 95:6, 96:15, 96:24, 97:12, 97:17, 99:2, 99:15, 99:16, 102:20, 103:16, 103:23, 104:3, 108:17, 111:11, 111:18, 111:22, 129:3, 129:9, 129:13, 129:14, 130:4, 130:6, 130:14, 130:17, 130:20, 130:25, 131:7, 133:13, 133:19, 133:22, 138:22, 139:3, 139:6, 139:7, 139:14, 139:20, 140:3, 140:8, 140:17, 140:20, 141:4, 141:18, 141:20, 150:22, 151:3, 156:23, 158:5, 166:15, 169:8, 181:20, 181:22, 182:11, 186:8, 186:15, 188:15, 188:19, 188:22, 189:8, 189:10, 189:16, 189:19, 189:25, 190:4, 196:15, 196:19, 196:21, 197:6, 197:10, 219:16, 221:11, 222:4, 236:21, 237:18, 238:17, 238:21, 239:7, 239:15, 240:6, 240:10, 252:11,

252:15, 252:19, 254:8, 256:18, 256:19, 256:23, 257:4, 257:15, 258:6, 258:13, 259:11, 259:14, 259:18, 259:20, 260:3, 260:18, 264:10, 264:14, 264:19, 264:25, 265:7, 265:14, 265:20, 266:2, 266:4, 266:11, 266:17, 267:10, 267:13, 272:17, 275:9, 275:17, 275:25, 276:19, 277:5, 277:7, 277:18, 278:2, 278:5, 278:10, 278:11
**MS** [2] - 3:22, 4:8
**Muhuri** [3] - 79:14, 82:20, 183:25
**MUHURI** [1] - 79:15
**multiple** [3] - 23:21, 149:17, 149:19
**multivariable** [1] - 81:21

## N

**naloxone** [1] - 29:19
**name** [14] - 6:4, 6:6, 6:24, 57:21, 97:12, 115:11, 142:13, 188:20, 217:23, 218:15, 218:21, 224:4, 224:8, 261:8
**named** [1] - 69:17
**NAPOLI** [1] - 1:20
**Nassau** [16] - 1:20, 3:20, 10:22, 31:14, 31:25, 53:19, 54:3, 54:11, 88:13, 92:11, 93:6, 93:25, 145:12, 145:18, 145:23, 154:20
**national** [1] - 17:23
**National** [3] - 18:3, 18:5, 79:19
**nature** [3] - 167:19, 247:21, 274:10
**Nearly** [1] - 44:14
**nearly** [3] - 137:3, 144:4, 152:7
**necessarily** [5] - 50:25, 57:6, 112:12, 112:19, 112:22
**necessary** [5] -

112:23, 171:4, 171:15, 253:8, 269:23
**need** [14] - 68:15, 98:4, 98:24, 117:13, 120:20, 124:6, 124:13, 136:15, 159:10, 166:20, 169:2, 183:25, 238:12, 258:19
**needed** [2] - 237:24, 265:2
**needles** [1] - 174:18
**needs** [1] - 117:23
**neonatal** [2] - 93:9, 93:12
**never** [5] - 114:2, 115:17, 115:20, 219:14, 266:14
**NEW** [1] - 1:2
**new** [5] - 37:24, 73:23, 74:4, 274:7
**New** [154] - 1:8, 1:16, 1:21, 2:2, 2:3, 2:4, 2:8, 2:12, 2:13, 3:15, 3:16, 6:8, 7:25, 8:5, 10:22, 16:6, 28:18, 28:21, 28:24, 29:9, 31:14, 31:24, 53:2, 53:5, 53:11, 53:14, 53:19, 62:5, 62:11, 77:6, 77:16, 88:13, 92:11, 93:5, 93:25, 101:6, 122:7, 122:12, 122:20, 125:4, 128:11, 128:17, 128:18, 128:23, 128:24, 129:16, 131:10, 132:21, 132:22, 132:24, 133:4, 133:5, 134:20, 134:23, 135:10, 135:19, 135:22, 135:23, 136:5, 136:7, 136:11, 136:21, 136:24, 137:2, 137:4, 137:7, 137:11, 137:14, 137:17, 138:10, 138:21, 139:9, 139:22, 140:23, 143:2, 143:6, 145:12, 145:18, 145:23, 146:7, 146:23, 147:8, 147:12, 148:9, 148:25, 149:25, 150:23, 154:16, 167:7, 169:12,

174:4, 174:5, 174:22, 174:23, 175:7, 176:18, 179:4, 179:6, 179:23, 202:14, 202:20, 203:11, 204:15, 204:20, 204:25, 205:6, 205:12, 205:18, 206:10, 206:22, 207:7, 207:15, 208:8, 210:12, 210:17, 210:24, 211:13, 212:10, 212:20, 213:4, 213:10, 213:21, 214:2, 214:8, 215:5, 215:20, 215:25, 216:5, 216:12, 216:19, 216:22, 217:3, 217:11, 218:10, 219:6, 220:20, 221:9, 225:18, 226:5, 228:11, 228:16, 228:18, 231:14, 256:6, 256:13, 257:17, 258:7, 260:14, 277:2
**newborns** [1] - 93:14
**next** [14] - 32:7, 39:10, 57:19, 63:19, 81:7, 92:20, 93:16, 101:16, 102:16, 133:15, 187:3, 197:21, 212:6, 255:5
**nicknamed** [1] - 277:2
**NIH** [5] - 18:6, 18:12, 24:13, 28:16, 51:12
**NIH-funded** [1] - 28:16
**nine** [6] - 55:25, 56:2, 114:6, 114:8, 253:8, 253:16
**NO.:400000/2017** [1] - 1:6
**Non** [1] - 81:8
**non** [6] - 38:4, 86:15, 86:17, 132:17, 136:7, 136:12
**non-cancer** [1] - 38:4
**non-malignant** [1] - 132:17
**Non-medical** [1] - 81:8
**none** [16] - 152:19, 152:22, 153:2, 165:20, 165:23, 214:18, 222:19, 232:9, 232:14, 232:18, 232:24,

233:6, 234:21, 250:19, 251:18, 252:5

**nonexperimental** [1] - 170:12

**nonmalignant** [1] - 132:10

**nonmedical** [41] - 26:10, 26:18, 27:2, 27:24, 70:17, 70:22, 71:8, 71:11, 71:22, 75:7, 75:11, 75:15, 79:23, 79:25, 81:18, 83:5, 126:8, 154:2, 156:15, 156:19, 157:19, 157:21, 163:3, 164:11, 164:14, 165:12, 168:18, 168:23, 170:9, 170:15, 171:3, 185:17, 185:24, 186:2, 186:20, 188:5, 188:7, 263:14, 263:20, 268:12, 268:14

**Nonmedical** [2] - 70:7, 79:11

**nonmedically** [11] - 26:5, 26:7, 71:3, 71:10, 71:17, 75:3, 75:4, 76:18, 80:23, 157:16, 163:10

**Nonmedically** [1] - 170:4

**nonopioid** [2] - 134:3, 134:25

**nonpreferred** [1] - 135:2

**nonresearch** [4] - 240:15, 245:20, 245:23, 247:7

**normally** [1] - 129:7

**note** [4] - 85:3, 97:6, 236:22, 238:22

**notes** [1] - 274:12

**nothing** [2] - 262:21, 266:24

**notified** [1] - 274:7

**notorious** [1] - 182:9

**novel** [3] - 8:22, 14:9, 34:10

**now..** [1] - 219:18

**number** [29] - 60:20, 60:22, 76:13, 80:25, 86:24, 93:4, 95:8, 105:11, 105:13, 124:20, 134:17, 155:8, 155:11, 155:15, 156:3,

156:4, 157:9, 172:19, 173:6, 183:12, 186:24, 206:5, 208:7, 246:3, 249:15, 254:17, 255:14, 268:19

**Number** [6] - 3:12, 6:18, 7:3, 95:9, 96:20, 96:21

**numbers** [1] - 15:18

**numerous** [3] - 47:9, 77:21, 271:5

**nuts** [1] - 50:12

---

**O**

**oath** [5] - 99:12, 141:15, 150:24, 239:23, 266:14

**object** [14] - 56:8, 56:13, 73:11, 73:14, 78:16, 85:2, 96:25, 130:7, 236:23, 256:20, 256:23, 267:10, 267:13, 278:3

**objecting** [3] - 85:4, 85:7, 85:18

**objection** [24] - 7:12, 7:13, 56:12, 73:8, 84:21, 97:7, 97:9, 97:14, 130:19, 138:22, 138:25, 139:3, 139:4, 139:14, 181:20, 221:11, 222:4, 256:18, 258:4, 258:5, 258:12, 259:12, 263:25, 266:16

**objections** [2] - 139:16, 274:25

**obligations** [3] - 142:16, 142:22, 144:15

**observational** [3] - 9:18, 9:19, 170:11

**observed** [2] - 46:9, 46:17

**observing** [3] - 4:23, 4:25, 51:22

**obstructive** [1] - 203:20

**obtain** [1] - 193:2

**obtained** [1] - 5:11

**obvious** [1] - 182:11

**obviously** [2] - 85:15, 142:2

**occasion** [2] - 5:7, 118:8

**occasions** [1] - 111:7

**occur** [1] - 87:23

**occurred** [14] - 41:14, 44:16, 44:22, 112:8, 120:25, 121:9, 126:9, 127:7, 127:21, 133:4, 134:12, 175:3, 175:4, 274:5

**occurrence** [2] - 45:17, 59:25

**occurs** [4] - 41:15, 87:22, 92:6, 93:14

**odds** [5] - 39:13, 39:17, 39:25, 40:16, 164:14

**OF** [4] - 1:2, 1:2, 1:10

**OFF** [1] - 241:10

**offer** [7] - 6:24, 10:8, 10:19, 11:7, 118:5, 190:15, 218:8

**offering** [4] - 119:21, 119:25, 120:4, 277:14

**office** [2] - 5:6, 54:14

**Office** [3] - 2:3, 3:15, 18:2

**officer** [1] - 129:8

**OFFICER** [2] - 5:23, 239:21

**offices** [1] - 237:5

**OFFICIAL** [1] - 2:24

**officials** [1] - 258:23

**often** [7] - 15:15, 68:2, 87:21, 87:23, 132:8, 132:15, 263:20

**oftentimes** [1] - 61:5

**Ohio** [4] - 94:22, 95:24, 272:23, 273:2

**old** [2] - 44:17, 44:22

**oldest** [1] - 17:18

**omissions** [1] - 19:16

**once** [4] - 114:2, 134:21, 188:20, 245:10

**one** [106] - 10:11, 10:23, 12:23, 16:2, 17:18, 18:16, 20:17, 23:6, 23:14, 28:13, 29:4, 37:9, 39:20, 41:2, 41:12, 48:13, 55:19, 56:14, 57:9, 58:12, 58:16, 59:15, 61:22, 66:19, 68:2, 70:5, 74:3, 85:13, 91:18, 102:19, 104:17, 106:8, 108:10, 108:12, 111:6, 112:20, 113:7, 113:14,

114:15, 115:13, 115:18, 115:21, 116:10, 116:16, 129:3, 141:22, 145:11, 145:17, 145:20, 146:16, 146:17, 147:14, 147:22, 148:12, 148:23, 160:17, 162:15, 165:22, 166:18, 169:5, 169:8, 169:13, 169:16, 171:21, 176:7, 177:18, 185:9, 185:15, 193:4, 198:4, 198:10, 199:12, 199:19, 205:16, 225:2, 226:17, 228:2, 228:8, 228:21, 237:8, 247:18, 249:22, 250:22, 251:2, 254:18, 255:2, 256:17, 257:21, 260:15, 262:8, 267:8, 268:24, 268:25, 270:4, 271:14, 271:23, 272:19, 276:2, 276:7, 277:9, 277:16, 277:19, 278:4

**ones** [8] - 17:7, 17:14, 49:20, 105:22, 179:13, 203:12, 224:4, 224:8

**open** [18] - 202:22, 203:13, 203:17, 203:21, 203:22, 203:24, 205:15, 206:25, 207:19, 231:17, 231:19, 240:14, 242:3, 242:9, 242:23, 243:14, 245:15, 245:17

**Open** [6] - 101:24, 102:4, 104:17, 106:6, 106:16, 107:17

**opine** [2] - 195:25, 267:21

**opined** [2] - 141:24, 263:2

**opinion** [57] - 10:15, 11:2, 47:6, 52:7, 59:16, 59:19, 73:4, 74:4, 74:20, 83:10, 84:14, 86:3, 86:9,

86:10, 88:5, 88:10, 94:19, 96:19, 97:3, 99:18, 112:2, 114:14, 116:19, 116:23, 118:6, 119:21, 119:25, 120:4, 120:8, 153:14, 156:11, 171:13, 190:2, 192:6, 192:8, 192:11, 192:12, 192:18, 197:23, 198:6, 198:13, 198:24, 200:21, 201:3, 202:8, 209:11, 209:14, 211:22, 217:11, 218:8, 229:2, 241:21, 244:13, 249:5, 250:4, 250:20, 272:14

**opinions** [56] - 10:9, 10:20, 11:7, 31:7, 53:23, 54:21, 55:10, 57:14, 58:5, 58:6, 58:7, 58:8, 59:9, 69:21, 72:25, 73:14, 74:11, 76:6, 76:11, 78:18, 79:8, 84:10, 90:16, 91:9, 108:19, 110:5, 110:10, 110:23, 114:7, 114:12, 114:14, 115:18, 115:21, 115:23, 116:3, 116:16, 124:16, 144:5, 148:20, 190:11, 190:16, 190:20, 190:23, 191:2, 191:5, 196:12, 198:4, 198:10, 198:15, 215:19, 258:15, 269:24, 270:3, 270:18, 270:20, 270:25

**OPIOID** [1] - 1:4

**opioid** [293] - 10:12, 14:23, 18:22, 19:4, 19:25, 20:9, 20:14, 25:3, 25:5, 25:6, 25:16, 25:22, 27:12, 27:13, 27:19, 28:19, 29:12, 29:16, 29:17, 29:19, 30:14, 31:13, 31:24, 32:17, 35:7, 35:8, 35:19, 36:8, 36:13, 36:15, 37:24, 38:7, 38:17, 38:19, 38:22, 38:24, 39:5, 39:6, 39:15, 39:17,

39:19, 39:25, 40:3,
40:16, 40:18, 43:2,
43:8, 43:10, 43:17,
43:18, 43:22, 44:7,
44:15, 44:21, 45:3,
45:22, 47:7, 48:5,
48:19, 52:23, 53:7,
53:8, 53:10, 53:25,
54:2, 54:22, 54:23,
58:17, 58:23, 59:21,
59:22, 59:24, 60:4,
60:5, 60:6, 60:18,
60:21, 61:12, 62:6,
62:8, 62:20, 63:16,
63:17, 64:2, 64:12,
66:5, 67:2, 67:6,
67:8, 67:10, 67:13,
67:22, 68:16, 68:22,
69:23, 70:17, 71:4,
71:7, 71:13, 72:11,
74:23, 76:7, 77:3,
77:17, 77:18, 77:22,
77:24, 78:2, 78:7,
78:13, 79:23, 79:25,
80:5, 80:12, 80:15,
82:24, 83:11, 83:16,
84:7, 84:11, 84:15,
86:20, 87:14, 87:16,
89:22, 90:17, 90:21,
91:5, 91:6, 91:13,
91:14, 91:24, 92:7,
92:16, 93:4, 94:11,
94:25, 100:6, 102:3,
102:23, 104:21,
105:4, 105:12,
105:15, 106:22,
106:23, 109:2,
110:23, 117:25,
119:4, 119:22,
120:2, 120:25,
122:22, 123:5,
123:20, 124:2,
124:11, 125:16,
125:18, 125:21,
125:24, 126:4,
126:9, 127:7,
127:18, 127:20,
127:25, 132:7,
132:14, 134:5,
134:24, 137:3,
138:4, 139:13,
140:22, 142:25,
143:11, 145:7,
147:21, 148:8,
148:14, 149:16,
149:21, 149:24,
150:11, 150:14,
151:25, 152:14,
152:20, 152:23,
153:3, 153:10,
153:15, 153:22,

153:23, 154:3,
154:7, 154:10,
154:11, 154:17,
154:21, 154:25,
155:2, 155:14,
155:21, 156:22,
157:21, 159:2,
159:3, 159:7, 159:8,
161:21, 161:22,
166:8, 167:7,
168:11, 168:18,
168:24, 171:3,
179:18, 185:17,
185:18, 186:20,
191:24, 198:7,
198:14, 205:12,
206:9, 206:22,
207:14, 210:5,
212:16, 212:22,
213:7, 214:3, 215:6,
216:13, 216:23,
217:6, 217:10,
217:13, 219:2,
219:5, 220:24,
221:4, 221:9,
221:19, 221:24,
222:12, 225:18,
226:12, 227:4,
227:11, 227:17,
230:25, 231:4,
232:12, 232:20,
232:21, 233:3,
233:4, 233:8,
233:14, 234:4,
234:18, 235:14,
238:8, 246:13,
246:20, 247:8,
254:20, 255:10,
255:23, 256:15,
268:15, 270:14
**Opioid** [14] - 3:12,
21:25, 64:6, 65:10,
90:11, 101:20,
104:7, 106:9,
106:10, 241:3,
241:4, 245:3, 245:4
**opioid-related** [7] -
53:8, 89:22, 91:14,
91:24, 106:22,
125:18, 125:24
**Opioid-Related** [1] -
106:10
**Opioids** [3] - 21:24,
70:7, 170:4
**opioids** [197] - 10:11,
10:17, 10:21, 20:18,
22:8, 22:22, 22:23,
25:8, 25:12, 25:19,
25:20, 26:3, 26:4,
26:7, 26:8, 26:11,

26:18, 26:25, 27:23,
27:24, 28:9, 29:8,
32:17, 35:6, 35:23,
36:21, 38:22, 39:24,
47:21, 48:2, 55:3,
58:17, 58:18, 58:22,
59:4, 59:5, 61:9,
62:22, 63:25, 68:2,
69:9, 70:22, 71:3,
71:22, 73:6, 75:6,
75:7, 75:10, 75:11,
75:15, 75:17, 76:17,
77:3, 77:20, 80:5,
80:13, 80:23, 81:9,
81:18, 83:6, 85:24,
86:5, 86:8, 87:3,
87:14, 87:18, 87:22,
88:9, 88:12, 88:19,
88:20, 89:16, 89:22,
90:8, 91:24, 93:15,
94:25, 96:22, 99:19,
101:13, 101:14,
105:16, 105:20,
110:14, 111:3,
111:4, 115:16,
115:17, 117:12,
117:18, 118:9,
118:11, 118:20,
119:9, 119:14,
121:10, 121:15,
121:18, 121:20,
121:23, 121:25,
122:6, 122:12,
122:14, 122:19,
122:25, 123:6,
123:12, 125:12,
126:8, 127:11,
127:23, 128:3,
128:14, 128:19,
128:25, 133:7,
133:25, 134:2,
134:14, 135:20,
135:24, 136:7,
136:12, 136:22,
137:9, 137:10,
137:12, 137:16,
137:17, 137:23,
138:8, 138:18,
143:5, 143:7,
145:11, 145:17,
146:9, 148:6,
149:14, 151:13,
152:11, 153:7,
155:7, 155:25,
156:16, 156:19,
157:15, 157:25,
158:14, 163:10,
164:12, 164:13,
164:14, 165:4,
165:11, 165:12,
170:10, 170:16,

186:3, 187:12,
188:5, 188:7,
191:23, 192:13,
192:14, 196:3,
198:2, 198:12,
204:23, 205:5,
207:11, 207:14,
208:7, 217:5,
220:20, 226:5,
227:3, 241:17,
241:22, 242:6,
242:12, 244:9,
248:10, 254:22,
255:9, 255:11,
256:2, 257:19,
263:3, 263:7,
263:19, 263:22,
268:13, 270:11,
272:3, 272:4
**opposed** [8] - 204:18,
212:23, 213:7,
221:21, 222:15,
234:17, 234:22,
248:10
**Order** [1] - 89:9
**order** [10] - 27:21,
68:16, 95:18, 98:5,
99:7, 141:10, 196:6,
198:17, 239:21,
262:17
**ordered** [1] - 276:14
**Orders** [1] - 89:13
**organization** [2] -
18:9, 28:16
**organizations** [3] -
17:18, 17:19, 178:25
**origin** [1] - 266:22
**originally** [2] - 144:19,
276:9
**otherwise** [3] -
112:17, 117:5,
117:11
**OUD** [11] - 38:7, 45:22,
47:8, 47:21, 65:7,
68:25, 69:8, 69:13,
88:10, 100:7, 263:3
**OUDs** [1] - 37:25
**outcome** [11] - 27:12,
35:3, 45:18, 60:17,
61:6, 72:11, 100:3,
112:8, 163:14,
171:16, 248:12
**outcomes** [7] - 8:13,
35:7, 35:18, 40:23,
59:22, 60:2, 98:3
**outlined** [2] - 51:25,
116:14
**outside** [1] - 203:12
**overall** [6] - 125:17,
125:22, 125:23,

147:2, 247:14,
251:12
**overdose** [22] - 10:13,
28:19, 29:12, 29:16,
30:15, 32:17, 35:8,
52:23, 54:17, 54:23,
58:24, 62:6, 86:4,
93:24, 94:13, 126:4,
138:5, 143:11,
149:21, 172:7,
181:4, 226:9
**Overdoses** [2] -
106:10, 245:4
**overdoses** [5] -
106:23, 126:14,
127:2, 181:8, 246:14
**overinvolve** [1] -
275:5
**overlap** [3] - 25:23,
71:2, 86:18
**overpayments** [2] -
245:12, 247:19
**overprescription** [1] -
126:2
**overruled** [2] - 74:17,
131:5
**overtime** [2] - 237:6,
237:12
**overwhelming** [4] -
123:11, 124:22,
125:4, 125:7
**own** [16] - 16:16,
24:13, 44:20, 63:15,
109:18, 158:25,
159:6, 188:3,
221:15, 221:18,
221:23, 222:11,
222:17, 225:14,
225:22, 265:22
**Oxford** [1] - 16:9

---

## P

**P-23781** [1] - 83:22
**P-23954** [1] - 32:13
**p.m** [1] - 273:20
**P23954** [1] - 254:9
**page** [48] - 115:4,
115:5, 131:8,
131:14, 150:22,
151:8, 158:6,
158:11, 160:13,
160:15, 161:12,
163:24, 163:25,
170:2, 170:23,
170:25, 172:4,
172:5, 177:21,
184:13, 186:13,
187:3, 190:11,
191:9, 191:12,

191:13, 191:16, 192:5, 196:6, 206:2, 223:21, 224:24, 236:5, 244:3, 246:6, 246:10, 254:9, 254:12, 254:14, 254:15, 256:4, 261:4, 261:5, 261:7, 267:24, 269:3, 270:5, 271:18

**pages** [8] - 186:13, 197:9, 268:2, 273:9, 276:14, 276:15

**paid** [1] - 137:3

**Pain** [3] - 37:17, 79:11, 129:17

**pain** [12] - 38:5, 61:13, 62:22, 63:17, 67:2, 131:23, 131:25, 132:9, 132:16, 134:3, 134:15

**paper** [17] - 22:14, 23:7, 58:11, 62:13, 75:13, 102:15, 103:14, 104:19, 116:12, 116:15, 159:11, 159:13, 159:19, 160:4, 162:7, 162:11, 175:10

**paradigm** [2] - 123:19, 123:24

**paragraph** [11] - 131:18, 160:17, 163:25, 172:4, 177:24, 191:16, 241:15, 244:3, 244:6, 270:6, 270:8

**parameters** [3] - 30:13, 30:17, 61:24

**parcel** [1] - 85:7

**PART** [1] - 1:2

**part** [29] - 60:10, 85:7, 107:10, 108:23, 109:8, 116:2, 121:6, 123:17, 123:21, 127:5, 131:24, 135:18, 136:20, 142:24, 143:17, 145:5, 151:16, 151:17, 195:3, 205:4, 205:9, 207:9, 214:12, 215:18, 217:15, 220:4, 245:17, 260:2

**Part** [5] - 3:3, 99:7, 104:21, 141:10, 239:22

**participating** [1] - 274:2

**particular** [72] - 22:10, 62:25, 97:15, 101:11, 190:6, 191:14, 192:18, 193:2, 195:9, 195:14, 195:16, 201:20, 205:19, 207:6, 207:7, 209:11, 212:16, 213:14, 213:20, 214:10, 217:17, 217:18, 218:4, 218:7, 218:9, 218:18, 219:20, 219:25, 220:17, 226:13, 226:14, 226:20, 227:5, 227:6, 227:12, 227:13, 227:18, 228:20, 228:21, 230:3, 230:12, 230:22, 231:4, 232:10, 232:11, 232:15, 234:3, 234:8, 238:4, 242:16, 242:18, 243:9, 244:3, 244:21, 245:10, 245:22, 246:7, 246:19, 247:3, 248:18, 248:22, 249:5, 249:12, 249:20, 249:23, 250:2, 250:23, 263:8, 263:10, 269:6, 271:23

**particularity** [1] - 187:15

**particularly** [2] - 72:12, 96:25

**parts** [1] - 153:6

**pass** [1] - 111:12

**passed** [1] - 102:8

**Past** [1] - 42:7

**past** [5] - 155:5, 173:7, 173:12, 184:25, 188:4

**past-year** [1] - 188:4

**pathway** [1] - 77:7

**patient** [4] - 40:22, 109:4, 195:9, 195:16

**patients** [15] - 38:21, 41:5, 66:4, 67:2, 67:5, 123:12, 131:24, 132:21, 135:19, 136:6, 136:8, 136:11, 136:13, 149:8, 158:14

**pattern** [1] - 254:22

**Patterns** [1] - 90:11

**patterns** [1] - 170:9

**Paul** [2] - 4:11, 111:19

**PAUL** [1] - 2:13

**Paulina** [1] - 4:9

**PAULINA** [1] - 2:11

**pause** [1] - 41:18

**payment** [11] - 105:24, 202:22, 203:17, 203:24, 204:19, 231:17, 231:19, 240:15, 242:4, 242:9, 244:8

**Payments** [6] - 101:19, 101:25, 102:4, 104:17, 106:16, 107:17

**payments** [21] - 102:2, 203:13, 203:21, 203:22, 205:15, 207:20, 235:17, 240:15, 242:24, 243:6, 243:15, 245:15, 245:16, 245:17, 245:24, 247:7, 247:11, 248:2, 248:8, 270:12

**PDMPs** [1] - 78:6

**peach** [1] - 64:5

**Pediatrics** [1] - 22:4

**pediatrics** [1] - 15:7

**peer** [12] - 13:18, 13:25, 14:4, 14:12, 18:21, 22:3, 51:2, 51:5, 90:7, 91:9, 152:7, 262:15

**peer-reviewed** [11] - 13:18, 13:25, 14:4, 14:12, 18:21, 22:3, 51:2, 51:5, 90:7, 91:9, 262:15

**peers** [2] - 14:12, 17:22

**People** [1] - 170:4

**people** [25] - 38:18, 54:13, 60:20, 60:22, 63:25, 69:9, 77:19, 80:22, 81:6, 87:20, 92:7, 97:24, 108:3, 143:6, 155:12, 155:18, 157:25, 173:6, 174:17, 184:16, 185:25, 186:19, 187:17, 273:25

**per** [7] - 40:13, 92:7, 93:5, 93:6, 172:13, 172:17, 276:15

**perceive** [1] - 259:6

**percent** [31] - 28:19,

29:12, 64:7, 65:7, 65:12, 76:25, 80:9, 80:14, 80:19, 80:22, 81:5, 86:11, 87:10, 87:12, 92:9, 123:12, 172:18, 172:24, 175:17, 175:18, 175:19, 175:22, 175:23, 177:11, 183:14, 185:25, 186:19, 186:22

**Percentage** [1] - 184:24

**percentage** [14] - 45:2, 80:4, 80:11, 86:7, 87:4, 87:6, 92:5, 92:8, 152:4, 187:9, 187:14, 187:17, 211:23, 212:2

**percentages** [1] - 149:24

**perception** [2] - 124:6, 124:13

**perform** [4] - 120:22, 121:6, 121:7, 127:6

**performed** [6] - 50:15, 66:7, 68:12, 156:9, 156:10, 164:3

**performing** [1] - 44:2

**period** [6] - 38:23, 68:3, 126:16, 133:14, 137:2, 206:9

**periods** [5] - 118:19, 185:6, 207:2, 207:5

**permissible** [2] - 118:10, 118:11

**permission** [3] - 5:9, 11:8, 20:19

**permissively** [1] - 78:21

**Perry** [1] - 267:2

**person** [6] - 5:14, 36:20, 49:11, 68:15, 68:19, 68:22

**personally** [4] - 13:4, 24:7, 193:13, 193:17

**persons** [1] - 268:14

**petitions** [1] - 274:15

**Ph.D** [4] - 11:25, 12:3, 13:2, 193:7

**Ph.D.s** [2] - 107:23, 108:2

**Pharmaceutical** [4] - 104:6, 106:9, 241:3, 245:3

**pharmaceutical** [20] - 89:2, 96:4, 191:20, 193:14, 193:18, 193:21, 193:25,

194:4, 194:12, 194:15, 229:8, 229:15, 232:19, 233:2, 241:15, 245:19, 262:2, 262:3, 270:7, 270:9

**Pharmaceuticals** [3] - 2:18, 105:25

**pharmacies** [21] - 84:20, 90:20, 118:15, 141:25, 142:13, 143:21, 144:12, 146:2, 146:6, 146:12, 146:13, 146:22, 147:4, 147:7, 147:8, 147:11, 148:24, 149:13, 150:2, 151:24, 152:23

**pharmacologic** [1] - 170:18

**pharmacologically** [1] - 48:2

**pharmacology** [2] - 47:19, 47:24

**pharmacy** [14] - 88:19, 90:4, 111:17, 121:19, 121:24, 122:2, 145:2, 146:5, 146:16, 146:22, 147:3, 147:11, 147:23, 149:6

**phone** [1] - 277:20

**phonetic** [1] - 230:10

**photographs** [1] - 5:3

**physician** [8] - 132:23, 195:3, 210:17, 231:22, 245:19, 245:24, 247:21, 270:11

**Physicians** [4] - 101:20, 104:7, 129:18, 241:4

**physicians** [19] - 105:12, 105:15, 131:23, 149:13, 204:7, 204:15, 210:13, 210:20, 235:18, 240:16, 241:16, 243:7, 243:17, 244:8, 247:7, 248:2, 255:7, 255:23, 270:13

**pick** [1] - 141:22

**picked** [1] - 267:7

**picture** [3] - 239:4, 239:8, 271:7

**piece** [1] - 268:22

**pile** [1] - 184:3

**pill** [14] - 117:25,

124:6, 124:11,
124:18, 125:5,
137:20, 138:7,
138:11, 138:12,
138:13, 138:21,
139:10, 139:24,
140:24
**pills** [2] - 93:4, 137:3
**place** [3] - 28:17,
141:2, 141:5
**Plaintiff** [4] - 3:16,
3:20, 3:23, 4:9
**Plaintiffs** [5] - 2:7,
5:19, 53:18, 130:16,
196:11
**Plaintiffs'** [4] - 115:20,
156:25, 159:20,
192:7
**plan** [2] - 10:8, 10:19
**planned** [1] - 189:23
**planning** [1] - 218:8
**plans** [1] - 134:13
**plausibility** [6] -
33:23, 47:12, 47:16,
114:21, 272:10
**plausible** [2] - 48:5,
170:17
**play** [2] - 122:24,
127:17
**playing** [1] - 128:2
**PLLC** [1] - 1:20
**point** [20] - 31:23,
78:17, 94:15, 118:9,
142:22, 153:8,
155:9, 162:14,
165:3, 165:7,
168:22, 169:5,
170:21, 213:24,
224:11, 224:23,
239:15, 254:17,
266:5, 266:18
**pointed** [1] - 253:25
**pointer** [1] - 6:18
**pointers** [1] - 6:14
**points** [3] - 112:6,
116:15, 149:11
**Polster** [12] - 76:2,
94:22, 95:21, 95:23,
99:17, 101:5,
195:24, 196:6,
196:9, 198:23,
200:19, 273:9
**Polster's** [1] - 271:17
**poppies** [1] - 176:16
**popular** [1] - 16:18
**population** [6] - 60:17,
60:22, 60:23, 63:25,
81:5, 83:8
**populations** [3] - 8:14,
41:4, 46:18

**Port** [1] - 260:15
**Portenoy** [2] - 261:8,
261:14
**portions** [1] - 197:22
**position** [2] - 11:13,
204:3
**positive** [2] - 91:22,
170:15
**possibility** [2] -
167:20, 244:7
**possible** [5] - 47:13,
156:24, 237:20,
247:25, 252:24
**possibly** [1] - 266:21
**post** [1] - 12:4
**potencies** [1] - 36:9
**potent** [3] - 83:15,
83:20, 180:23
**potential** [3] - 113:5,
238:24, 255:8
**potentially** [1] -
246:21
**pour** [1] - 181:11
**power** [1] - 119:13
**PowerPoint** [2] -
192:11, 250:11
**practice** [4] - 109:19,
131:24, 274:4, 274:9
**Practices** [1] - 90:12
**practices** [9] - 104:23,
123:25, 128:9,
128:15, 179:16,
194:4, 248:4, 248:9,
248:11
**precede** [2] - 41:11,
71:11
**preceded** [1] - 43:2
**precedes** [2] - 44:7,
263:20
**precludes** [1] - 167:20
**predicate** [1] - 258:9
**predict** [1] - 175:11
**predisposed** [1] -
244:9
**predominant** [1] -
178:23
**predominantly** [3] -
11:19, 15:3, 66:3
**preferred** [3] - 134:25,
135:5, 135:9
**preliminary** [2] - 7:23,
79:2
**prepare** [1] - 224:6
**prepared** [2] - 149:6,
166:19
**prescribe** [5] - 123:6,
123:12, 137:23,
194:11, 244:9
**prescribed** [12] - 25:4,
25:6, 40:13, 44:15,

60:6, 69:9, 105:16,
123:19, 135:20,
135:23, 194:15,
255:11
**prescriber** [11] -
104:22, 121:16,
147:20, 212:10,
212:16, 212:20,
213:4, 213:11,
213:14, 213:21,
215:6
**prescribers** [19] -
59:4, 137:22,
191:21, 192:13,
213:16, 213:17,
214:3, 214:8,
215:20, 215:25,
216:5, 216:12,
216:19, 216:22,
217:4, 217:12,
229:9, 229:16,
265:23
**prescribing** [62] -
29:20, 55:3, 59:5,
77:18, 78:2, 94:25,
96:21, 97:20, 98:3,
98:6, 98:16, 99:22,
101:9, 101:14,
102:23, 105:5,
111:4, 123:25,
124:5, 124:10,
124:12, 124:19,
125:9, 125:12,
127:10, 127:15,
127:22, 128:2,
128:9, 132:23,
191:22, 192:14,
213:8, 230:9,
232:12, 232:21,
233:4, 233:15,
234:19, 235:6,
235:14, 238:9,
241:18, 241:23,
242:7, 245:24,
246:14, 246:20,
246:21, 247:9,
247:12, 247:14,
247:15, 248:3,
248:9, 248:11,
251:21, 256:2,
259:4, 270:14,
270:15, 272:4
**Prescribing** [3] -
90:12, 104:8, 241:4
**prescription** [213] -
10:10, 10:16, 22:22,
26:18, 27:12, 32:16,
35:6, 35:23, 37:24,
38:18, 38:22, 39:5,
39:15, 39:19, 39:24,

40:3, 40:17, 43:2,
43:10, 43:17, 43:22,
44:6, 44:20, 45:3,
45:21, 47:7, 47:21,
47:25, 48:5, 55:3,
58:17, 58:22, 59:4,
59:21, 59:24, 62:21,
63:16, 67:6, 67:8,
69:23, 70:22, 71:7,
71:13, 71:22, 73:6,
74:23, 76:7, 76:17,
77:3, 77:11, 77:13,
77:15, 77:20, 77:24,
78:6, 78:7, 78:12,
80:5, 80:13, 80:15,
80:23, 81:9, 81:18,
82:24, 83:6, 83:11,
84:7, 84:11, 84:15,
86:5, 86:8, 87:7,
87:14, 88:8, 88:12,
91:5, 91:13, 93:4,
94:25, 100:6, 101:8,
104:23, 106:23,
110:14, 111:3,
111:4, 115:16,
115:17, 117:11,
117:18, 118:20,
119:3, 119:9,
119:14, 121:9,
121:15, 121:19,
121:25, 122:5,
122:8, 122:12,
122:14, 122:19,
122:22, 122:25,
125:12, 126:8,
126:15, 127:11,
127:22, 128:3,
128:13, 128:18,
128:25, 133:7,
133:24, 134:2,
134:5, 134:14,
135:20, 135:24,
136:7, 136:12,
136:22, 137:9,
137:10, 137:11,
137:16, 137:17,
137:23, 138:8,
138:18, 145:11,
145:17, 146:9,
146:19, 146:25,
148:6, 149:14,
153:14, 153:22,
153:23, 154:3,
154:25, 155:6,
155:13, 155:20,
155:25, 156:15,
156:19, 157:15,
157:25, 158:14,
159:2, 159:7,
161:21, 164:11,
164:13, 164:14,

165:4, 165:11,
165:12, 166:8,
168:11, 168:18,
168:24, 170:10,
170:16, 171:3,
179:18, 185:17,
185:24, 186:3,
186:20, 187:12,
188:5, 188:7,
191:21, 191:23,
192:13, 195:7,
195:14, 198:12,
212:17, 212:23,
213:7, 215:6,
216:23, 217:13,
225:18, 226:12,
226:18, 227:5,
227:12, 227:17,
227:20, 227:23,
227:25, 228:2,
228:8, 228:20,
228:22, 254:21,
255:9, 257:19,
263:3, 268:13,
268:15, 272:3, 272:4
**Prescription** [3] -
21:24, 70:7, 170:4
**prescriptions** [21] -
77:19, 90:21, 125:8,
125:17, 125:22,
127:3, 147:21,
147:23, 196:3,
198:2, 214:3, 216:2,
216:13, 217:6,
221:25, 222:13,
228:3, 228:5,
228:11, 228:16,
228:17
**present** [5] - 21:15,
41:11, 184:18,
207:16, 208:9
**presentation** [6] -
114:11, 235:3,
235:4, 235:12,
250:11, 275:23
**presented** [4] - 21:11,
224:22, 238:5,
276:23
**preserve** [1] - 258:16
**presiding** [2] - 3:4,
6:13
**Press** [1] - 16:10
**pretty** [1] - 180:15
**prevalence** [17] - 60:4,
60:7, 60:11, 60:15,
60:16, 60:20, 60:24,
61:7, 62:20, 63:15,
65:3, 68:24, 69:8,
69:11, 69:13, 80:8,
91:12

**Prevention** [1] - 18:3
**prevention** [1] - 29:18
**previously** [1] - 186:2
**price** [14] - 157:4,
171:22, 172:12,
172:17, 172:23,
173:2, 173:5,
173:11, 173:20,
174:3, 178:3,
178:13, 180:6, 183:7
**primarily** [2] - 53:6,
75:4
**primary** [9] - 14:18,
70:20, 70:21, 73:3,
73:5, 74:20, 74:22,
75:18, 82:12
**principle** [3] - 162:6,
162:8, 166:8
**principles** [5] - 41:2,
57:24, 170:18,
185:13, 273:5
**print** [1] - 20:5
**printed** [2] - 19:21,
20:2
**printing** [2] - 19:13,
21:7
**proactive** [1] - 278:3
**probability** [1] - 59:25
**problem** [11] - 67:6,
67:7, 154:6, 154:9,
154:13, 154:14,
154:16, 154:20,
182:15, 182:17,
182:25
**proceed** [4] - 7:16,
141:17, 189:7,
189:23
**proceeding** [1] - 198:7
**proceedings** [1] - 4:24
**process** [1] - 275:5
**produced** [5] - 54:8,
117:4, 117:10,
260:6, 266:23
**produces** [1] - 53:8
**product** [6] - 174:4,
176:8, 205:12,
229:9, 229:16,
230:19
**production** [1] - 183:8
**products** [10] - 36:8,
36:10, 47:25, 95:18,
102:3, 206:10,
206:22, 207:7,
221:9, 230:3
**Products** [5] - 101:20,
104:7, 106:9, 241:3,
245:3
**profession** [2] - 8:8,
128:13
**professional** [2] -

17:12, 17:19
**professor** [1] - 11:14
**professors** [1] -
269:20
**profit** [1] - 137:23
**profits** [1] - 180:23
**Program** [1] - 129:17
**programs** [6] - 42:13,
77:11, 77:14, 77:16,
78:6, 144:11
**progressed** [1] - 80:23
**project** [4] - 28:13,
28:14, 28:17, 30:4
**prominent** [1] -
220:10
**promoted** [3] - 207:6,
219:8, 219:11
**promotes** [1] - 219:5
**promotion** [2] -
190:25, 201:25
**prompt** [4] - 102:22,
102:24, 103:7, 238:7
**proportion** [2] - 62:10,
155:25
**proportional** [3] -
82:5, 126:14, 127:2
**propose** [1] - 278:5
**proposition** [2] -
136:14, 187:8
**prosecutor** [1] -
139:23
**Prospective** [1] -
71:21
**prospective** [1] -
81:10
**protect** [1] - 85:8
**prove** [1] - 9:24
**proved** [1] - 181:23
**provide** [4] - 77:17,
90:22, 200:20,
270:12
**provided** [5] - 27:4,
53:18, 255:21,
256:12, 257:17
**proximate** [1] - 161:3
**pschmidt@cov.com**
[1] - 2:15
**PSS** [1] - 2:11
**psychiatric** [3] -
11:20, 12:16, 13:23
**Public** [2] - 11:15,
104:19
**public** [8] - 11:24,
12:18, 16:24, 53:7,
61:6, 102:9, 121:21,
122:3
**publication** [5] -
153:8, 153:9,
169:21, 256:16,
257:21

**publications** [4] -
51:21, 126:12,
152:17, 217:19
**publicly** [3] - 51:4,
92:15, 117:2
**publish** [3] - 19:9,
193:20, 253:17
**published** [49] -
13:11, 13:15, 13:17,
14:10, 14:12, 14:22,
14:23, 15:3, 16:9,
18:20, 20:17, 21:21,
22:3, 23:5, 37:16,
43:21, 48:19, 69:6,
69:16, 70:2, 70:10,
71:5, 71:20, 72:7,
89:20, 93:3, 102:15,
103:4, 103:20,
104:4, 104:11,
106:5, 106:18,
107:2, 115:15,
115:17, 115:20,
116:3, 116:16,
126:18, 152:7,
153:25, 159:19,
193:19, 193:22,
222:18, 253:19,
261:14, 262:18
**publishes** [1] - 53:14
**publishing** [1] -
215:11
**PubMed** [3] - 50:17,
51:11, 51:16
**pull** [12] - 90:19,
150:22, 156:23,
170:25, 184:22,
187:4, 190:4, 196:5,
196:7, 223:20,
223:22, 240:18
**Purdue** [1] - 225:2
**pure** [2] - 174:9, 180:7
**purity** [10] - 171:23,
172:8, 173:25,
174:4, 174:22,
175:3, 175:7, 178:4,
178:14, 183:8
**purport** [4] - 197:23,
198:5, 198:10,
245:23
**purported** [1] - 198:16
**purpose** [1] - 49:25
**purposes** [8] - 11:9,
56:7, 59:12, 66:18,
75:16, 96:19, 106:3,
197:3
**purview** [1] - 195:17
**put** [16] - 6:19, 130:4,
134:24, 140:4,
151:4, 158:8,
160:14, 162:22,

167:3, 183:24,
239:8, 239:9, 254:8,
258:24, 264:4,
267:22
**putting** [1] - 278:3

---

**Q**

**qualifications** [5] -
11:6, 107:25, 130:9,
192:17, 269:9
**qualified** [3] - 195:25,
196:10, 200:20
**qualify** [2] - 12:25,
228:13
**quality** [1] - 131:24
**quantification** [1] -
242:3
**quantified** [5] - 98:18,
175:13, 177:14,
183:9, 241:24
**quantify** [5] - 39:7,
92:2, 127:13, 155:4,
187:25
**quantity** [1] - 134:16
**quarters** [1] - 44:15
**QUESTION** [5] -
151:18, 206:12,
206:15, 223:23,
224:10
**questioner** [1] -
238:24
**questioning** [1] - 4:19
**questionnaire** [5] -
23:9, 23:11, 44:4,
44:11, 67:16
**questionnaires** [11] -
66:3, 66:8, 66:14,
66:20, 68:8, 70:16,
215:10, 215:24,
217:3, 217:10
**questions** [30] - 6:16,
7:23, 11:6, 12:25,
26:22, 41:18, 42:13,
42:16, 66:25, 67:12,
67:15, 68:7, 110:3,
111:24, 115:24,
132:12, 148:21,
153:13, 197:15,
219:15, 225:13,
251:15, 252:11,
252:15, 252:20,
253:4, 255:15,
262:10, 267:3,
267:16
**quickly** [1] - 167:12
**quite** [1] - 258:8
**quota** [8] - 118:3,
118:10, 118:12,
119:4, 119:10,

119:15, 120:18,
121:2
**quotas** [9] - 117:18,
117:22, 119:19,
119:22, 120:2,
120:11, 120:14,
121:6, 121:10

---

**R**

**raise** [3] - 5:24,
275:25, 276:2
**raised** [2] - 266:6,
274:25
**ran** [1] - 248:18
**randomized** [1] - 10:2
**ranging** [1] - 64:3
**rapidly** [1] - 276:25
**rare** [2] - 81:4, 255:10
**rarely** [1] - 40:24
**rate** [1] - 171:6
**Rates** [1] - 61:12
**rates** [23] - 55:3,
58:23, 76:18, 88:9,
91:25, 92:6, 93:9,
93:24, 94:14,
126:14, 126:25,
127:2, 143:11,
158:15, 163:3,
163:11, 163:13,
165:5, 172:6, 178:5,
178:15, 270:14
**rather** [1] - 41:4
**ratio** [1] - 39:17
**ratios** [1] - 39:14
**re** [1] - 222:10
**RE** [1] - 1:4
**Re** [1] - 3:12
**re-ask** [1] - 222:10
**reach** [4] - 44:9,
59:18, 62:19, 71:6,
75:5, 75:9, 236:12,
250:12, 251:7
**reached** [4] - 27:4,
200:19, 234:21,
250:19
**reaching** [3] - 55:10,
250:24, 251:5
**read** [23] - 4:21, 37:25,
44:17, 44:22, 58:24,
131:9, 140:13,
151:20, 158:21,
161:24, 164:17,
167:24, 170:19,
171:8, 178:7,
178:10, 192:11,
254:23, 255:12,
268:11, 268:16,
270:15, 271:18
**READING** [5] - 160:22,

161:20, 167:12,
172:5, 184:24
**reading** [1] - 161:13
**reads** [4] - 102:21,
241:15, 244:6, 270:9
**realize** [1] - 275:15
**really** [2] - 33:12,
130:18
**reason** [2] - 273:8,
273:12
**reasonable** [2] -
137:24, 164:21
**reasonably** [1] - 160:3
**reasons** [1] - 190:15
**receive** [5] - 18:13,
39:18, 40:2, 68:16,
244:8
**received** [18] - 17:24,
17:25, 18:12, 38:22,
38:23, 39:23, 45:3,
105:3, 105:11,
105:13, 105:15,
194:21, 198:22,
199:2, 199:5, 199:8,
212:10, 216:6
**receiving** [1] - 12:3
**recent** [4] - 172:6,
172:16, 178:5,
178:15
**recess** [5] - 99:5, 99:6,
141:8, 239:20,
273:22
**recipients** [1] - 135:10
**recitation** [1] - 197:3
**recite** [2] - 272:25,
273:7
**recites** [1] - 197:2
**recognize** [3] - 167:9,
169:12, 172:9
**recognized** [2] -
246:3, 247:18
**recognizes** [1] - 132:6
**record** [4] - 4:22, 6:5,
7:8, 74:20, 85:8,
97:7, 117:3, 140:5,
258:10, 258:17,
259:21, 260:14
**records** [1] - 92:16
**red** [2] - 39:21, 40:8
**REDIRECT** [1] -
252:21
**redirect** [5] - 197:4,
236:24, 237:20,
252:17, 252:24
**reduce** [4] - 29:12,
29:15, 119:14, 183:7
**reduced** [2] - 178:3,
178:13
**reducing** [3] - 28:18,
29:19, 119:14

**refer** [4] - 152:19,
152:22, 153:2,
157:19
**reference** [2] - 50:21,
214:19
**referenced** [8] -
199:15, 200:11,
200:15, 232:25,
235:5, 235:13,
244:18, 250:10
**references** [3] - 116:5,
236:6, 241:7
**referencing** [4] -
151:9, 231:24,
250:17, 260:4
**referred** [3] - 25:7,
35:25, 64:22
**referring** [9] - 85:12,
100:8, 159:11,
196:24, 231:20,
251:17, 251:19,
264:11, 271:23
**refers** [1] - 245:7
**reflecting** [1] - 131:10
**reflects** [1] - 112:25
**reframe** [1] - 257:12
**regarding** [24] - 13:7,
19:17, 30:3, 63:15,
69:22, 97:19, 101:7,
120:11, 120:14,
136:22, 138:21,
139:10, 140:24,
149:14, 234:3,
234:9, 235:6,
235:13, 240:15,
251:20, 255:17,
262:11, 266:7, 277:7
**region** [1] - 174:5
**regression** [7] - 81:21,
81:25, 82:4, 248:19,
248:22, 248:25,
249:6
**regressions** [1] -
271:5
**regular** [1] - 53:13
**regulations** [4] -
119:12, 119:16,
120:7, 120:10
**Reilly** [2] - 260:14,
260:15
**reimburse** [1] - 137:10
**Reisman** [6] - 3:14,
3:17, 7:17, 73:17,
85:9, 260:17
**REISMAN** [88] - 2:4,
3:14, 3:18, 5:15,
5:19, 7:18, 7:20, 8:4,
11:5, 11:11, 20:16,
20:25, 21:4, 21:12,
21:19, 24:3, 33:16,

36:23, 37:14, 56:3,
56:20, 57:20, 58:12,
58:15, 64:20, 73:18,
74:18, 75:21, 76:3,
76:4, 79:4, 79:6,
82:8, 85:10, 85:21,
87:2, 88:4, 89:11,
93:21, 93:22, 95:6,
96:15, 97:17, 99:2,
99:15, 99:16,
102:20, 103:16,
103:23, 104:3,
108:17, 111:11,
130:6, 130:14,
130:17, 130:20,
130:25, 138:22,
139:3, 139:14,
181:20, 189:16,
196:15, 196:21,
197:10, 221:11,
222:4, 236:21,
237:18, 238:21,
252:22, 254:8,
254:15, 257:15,
259:14, 259:18,
260:18, 264:10,
264:14, 264:19,
264:25, 265:7,
265:14, 265:20,
266:4, 272:17,
275:9, 278:5
**relate** [1] - 52:23
**Related** [2] - 106:10,
245:4
**related** [28] - 14:23,
31:20, 53:8, 66:5,
86:7, 86:11, 86:15,
86:17, 86:23, 87:3,
87:15, 89:22, 91:14,
91:24, 92:17,
106:22, 124:16,
125:18, 125:24,
126:4, 138:5,
153:15, 171:7,
185:16, 199:9,
247:7, 249:15
**relates** [1] - 112:2
**relating** [3] - 58:8,
101:12, 253:24
**relationship** [30] -
10:10, 10:16, 10:21,
11:3, 33:22, 34:24,
35:12, 39:4, 39:8,
41:8, 41:10, 50:6,
51:22, 54:22, 69:22,
76:7, 91:23, 92:2,
94:24, 95:4, 95:13,
100:3, 100:12,
112:16, 112:20,
263:2, 271:22,

272:2, 272:15
**relationships** [2] -
92:19, 167:21
**relative** [2] - 36:12,
145:7
**relatively** [1] - 81:4
**released** [1] - 242:4
**relevant** [3] - 19:8,
72:12, 207:2
**reliability** [2] - 55:18,
69:3
**reliable** [10] - 9:20,
42:20, 54:6, 54:24,
63:6, 63:9, 63:11,
69:12, 82:25, 165:15
**reliance** [4] - 73:15,
129:24, 131:3,
200:22
**relied** [23] - 9:2, 9:7,
9:14, 9:16, 24:23,
53:6, 53:22, 62:8,
77:5, 89:20, 90:16,
95:9, 107:11,
108:24, 144:4,
185:10, 218:6,
222:16, 222:17,
222:23, 225:25,
229:14, 252:6
**Reliever** [1] - 79:11
**rely** [7] - 60:10, 69:21,
91:8, 95:20, 153:20,
156:14, 268:8
**remains** [1] - 224:19
**remember** [6] - 89:9,
134:22, 150:19,
162:17, 183:23,
184:5
**remind** [3] - 99:11,
141:14, 239:23
**remotely** [1] - 4:19
**rep** [1] - 243:8
**repeat** [14] - 75:8,
119:5, 122:15,
145:14, 146:20,
182:2, 195:10,
202:16, 208:16,
211:4, 232:22,
235:9, 241:12,
250:14
**Repeat** [1] - 182:4
**repeated** [1] - 140:11
**repeatedly** [2] - 22:20,
220:13
**rephrase** [14] - 56:16,
56:17, 87:5, 97:16,
121:3, 139:5, 203:2,
216:16, 216:20,
226:23, 233:23,
243:20, 249:3, 257:6
**replicated** [1] - 47:8

**replication** [4] - 33:23,
46:6, 46:8, 100:15
**report** [114] - 32:12,
35:12, 37:20, 41:21,
41:24, 42:3, 43:20,
57:11, 57:15, 57:22,
57:25, 59:9, 60:3,
63:14, 63:20, 66:17,
69:16, 69:25, 71:4,
72:2, 72:10, 72:22,
73:16, 74:9, 74:23,
81:20, 83:23, 84:2,
84:4, 84:9, 84:23,
85:2, 85:12, 85:14,
91:2, 92:24, 93:17,
96:11, 101:4, 101:6,
101:12, 106:18,
114:3, 114:5,
114:20, 114:22,
114:24, 115:4,
120:23, 124:4,
124:15, 134:7,
134:21, 137:21,
143:18, 143:20,
144:2, 144:19,
147:5, 156:13,
157:19, 160:8,
162:18, 169:24,
176:3, 181:3,
182:23, 183:4,
186:18, 190:5,
190:7, 190:10,
190:15, 191:9,
191:13, 191:14,
192:5, 198:18,
199:14, 199:20,
200:13, 200:15,
200:23, 208:2,
213:15, 213:18,
213:23, 214:6,
214:7, 214:19,
215:4, 217:21,
217:23, 222:9,
225:4, 227:11,
227:16, 227:23,
228:17, 252:7,
253:25, 254:4,
254:10, 254:19,
255:2, 256:22,
258:15, 259:23,
261:4, 261:12,
262:13, 268:9,
272:22
**reported** [2] - 44:20,
235:18
**REPORTER** [1] - 2:24
**reports** [4] - 51:2,
51:3, 53:10, 53:13
**Reports** [1] - 89:12
**represent** [4] - 26:14,

128:12, 188:21, 188:23
**representative** [1] - 204:2
**representatives** [4] - 105:16, 232:19, 233:2, 233:7
**represented** [2] - 20:23, 38:17
**represents** [1] - 81:5
**repudiate** [1] - 72:17
**request** [1] - 276:11
**requests** [1] - 276:6
**require** [3] - 7:7, 135:5, 262:19
**required** [1] - 262:16
**reread** [1] - 178:9
**reregister** [1] - 138:12
**reregistration** [1] - 138:19
**reschedule** [1] - 277:7
**Research** [2] - 17:10, 17:16
**research** [10] - 15:2, 28:8, 28:12, 30:24, 42:23, 117:23, 158:25, 159:6, 188:3, 269:24
**researcher** [1] - 69:17
**researchers** [18] - 15:10, 18:12, 30:24, 42:9, 42:11, 42:15, 44:9, 52:11, 70:20, 79:17, 81:13, 82:9, 83:3, 91:21, 106:19, 107:2, 253:16, 262:16
**resident** [4] - 90:22, 93:5, 275:16, 275:19
**residents** [3] - 132:21, 135:22, 135:23
**respect** [28] - 9:23, 13:24, 14:17, 18:11, 26:24, 43:15, 65:14, 68:24, 85:11, 87:15, 97:2, 142:16, 192:17, 197:24, 201:3, 202:8, 210:9, 211:8, 214:25, 219:14, 230:17, 231:14, 232:8, 234:7, 241:20, 247:17, 250:9, 256:10
**respectfully** [2] - 219:16, 267:7
**respondents** [1] - 23:20
**response** [10] - 33:21, 34:23, 35:11, 35:16,

36:24, 39:4, 39:7, 100:12, 105:18, 254:22
**responses** [1] - 272:6
**responsibility** [1] - 149:24
**responsible** [1] - 112:3
**restate** [2] - 192:8, 228:15
**restricted** [1] - 77:22
**restrictions** [1] - 221:19
**result** [11] - 102:8, 122:24, 125:5, 132:2, 135:8, 191:24, 216:4, 242:15, 242:24, 248:6
**resulted** [3] - 77:18, 172:18, 248:2
**results** [9] - 22:13, 92:11, 92:20, 158:25, 159:6, 161:20, 162:11, 162:12, 265:9
**resume** [1] - 141:12
**retail** [1] - 91:13
**Retrospective** [1] - 42:7
**reverse** [2] - 244:7, 246:15
**review** [36] - 8:21, 31:3, 50:15, 51:8, 52:19, 52:25, 53:10, 53:17, 55:3, 61:13, 62:12, 62:13, 62:17, 62:24, 66:6, 69:2, 72:3, 72:22, 88:21, 98:19, 101:7, 102:13, 109:4, 115:6, 120:20, 128:22, 152:8, 169:18, 202:13, 202:19, 204:13, 204:17, 211:15, 211:18, 211:20, 268:19
**reviewed** [36] - 13:18, 13:25, 14:4, 14:12, 18:21, 22:3, 51:2, 51:5, 52:4, 52:12, 53:5, 59:20, 61:24, 76:12, 76:16, 76:21, 88:18, 90:7, 91:9, 91:17, 98:10, 98:14, 119:16, 119:20, 120:7, 129:21, 199:14, 208:11, 208:17, 208:22,

255:15, 255:17, 262:15, 266:14, 274:11
**reviewing** [14] - 30:19, 50:8, 51:17, 55:5, 72:24, 89:18, 90:5, 109:16, 110:19, 169:20, 173:14, 199:21, 202:9, 207:6
**reviews** [2] - 62:9, 169:23
**Reynolds** [7] - 130:5, 151:5, 151:7, 156:24, 158:7, 161:15, 184:23
**right-hand** [9] - 15:25, 39:12, 39:13, 39:21, 43:14, 66:23, 67:14, 160:16, 177:23
**rightfully** [1] - 97:5
**rigor** [3] - 14:7, 51:23, 52:3
**rigorous** [4] - 14:9, 63:12, 271:4
**rigorously** [1] - 112:23
**rings** [1] - 139:18
**risk** [20] - 8:14, 25:5, 35:3, 37:25, 58:17, 59:25, 73:6, 74:24, 75:18, 79:22, 80:2, 160:11, 166:9, 168:11, 171:16, 209:16, 210:5, 211:10, 233:8, 258:22
**risks** [11] - 35:18, 232:20, 233:3, 233:14, 233:17, 254:20, 255:9, 255:23, 256:14, 257:19, 259:2
**Rite** [1] - 118:15
**Rivera** [2] - 108:5, 108:15
**Rivera-Aguirre** [2] - 108:5, 108:15
**Road** [1] - 1:21
**robust** [2] - 126:13, 126:25
**role** [14] - 19:3, 19:6, 22:10, 24:7, 24:10, 30:2, 77:13, 117:3, 122:24, 123:5, 127:17, 128:2, 142:15, 142:21
**room** [1] - 277:24
**rooted** [1] - 149:20
**roughly** [1] - 69:20
**RPR** [1] - 2:24
**rule** [6] - 7:3, 48:13,

129:25, 130:2, 131:3, 275:2
**ruled** [3] - 94:22, 195:24, 272:8
**rules** [1] - 4:22
**run** [1] - 249:6
**running** [1] - 237:9

## S

**sackett** [2] - 8:2, 8:3
**Sackett** [1] - 6:7
**safe** [2] - 248:9, 275:22
**safer** [1] - 248:3
**safety** [2] - 234:3, 248:11
**Sal** [1] - 103:25
**sales** [14] - 91:13, 92:7, 105:15, 191:25, 196:2, 197:25, 198:14, 204:2, 230:5, 230:7, 232:19, 233:2, 233:7, 243:8
**salt** [1] - 181:4
**Salvatore** [1] - 3:20
**SALVATORE** [1] - 1:22
**sample** [4] - 43:18, 44:4, 60:21, 69:8
**samples** [1] - 46:10
**Sandro** [1] - 16:20
**saturated** [1] - 106:24
**save** [1] - 7:5
**saw** [2] - 76:24, 94:19
**sbadala@napolilaw.com** [1] - 1:23
**Schmidt** [12] - 4:11, 73:19, 111:16, 111:19, 253:3, 253:23, 256:5, 256:17, 257:22, 262:11, 266:6, 267:6
**SCHMIDT** [55] - 2:13, 4:10, 21:2, 21:9, 56:8, 56:13, 73:10, 73:23, 74:2, 74:10, 74:15, 111:18, 111:22, 129:3, 129:9, 129:13, 129:14, 130:4, 131:7, 133:13, 133:19, 133:22, 139:6, 139:7, 139:20, 140:3, 140:8, 140:17, 140:20, 141:4, 141:18, 141:20, 150:22, 151:3,

156:23, 158:5, 166:15, 169:8, 181:22, 182:11, 186:8, 186:15, 188:15, 197:6, 256:18, 256:23, 257:4, 266:17, 267:10, 267:13, 275:25, 276:19, 277:18, 278:2, 278:10
**school** [8] - 23:13, 23:15, 23:17, 23:18, 25:11, 194:24, 195:2
**School** [1] - 11:15
**schools** [3] - 16:24, 17:2, 258:23
**science** [5] - 8:12, 28:17, 107:11, 108:24, 109:9
**scientific** [13] - 9:2, 13:11, 17:4, 30:19, 31:4, 47:4, 51:23, 52:3, 110:19, 117:22, 174:10, 174:12, 262:15
**scolded** [1] - 97:4
**scope** [5] - 130:21, 256:22, 258:14, 259:22, 259:24
**screen** [19] - 15:25, 90:10, 130:5, 131:19, 131:20, 151:4, 151:18, 158:8, 162:22, 167:3, 183:24, 185:22, 188:25, 189:16, 189:19, 197:17, 201:10, 239:8, 261:11
**screener** [1] - 66:25
**scroll** [1] - 254:11
**search** [2] - 50:17, 50:23
**searches** [1] - 51:15
**seat** [1] - 6:22
**seated** [5] - 6:9, 99:9, 141:13, 239:25, 240:3
**second** [19] - 41:6, 56:11, 58:21, 88:10, 102:19, 131:14, 151:7, 160:21, 160:22, 161:12, 163:25, 167:18, 191:15, 240:21, 241:14, 241:15, 244:2, 247:2, 276:13
**Section** [1] - 5:2
**section** [16] - 55:8,

58:5, 124:15, 168:9, 190:7, 190:10, 190:11, 190:19, 198:19, 213:23, 236:6, 242:24, 254:2, 262:20, 269:3, 270:4

**sectional** [1] - 167:19

**sections** [3] - 116:12, 262:12, 262:17

**see** [67] - 10:2, 25:18, 28:25, 35:2, 35:5, 40:9, 46:8, 46:16, 47:17, 48:15, 54:6, 54:20, 58:13, 68:7, 100:11, 100:14, 100:17, 130:12, 131:6, 131:8, 131:12, 131:18, 132:2, 132:10, 141:6, 143:8, 151:9, 151:14, 157:11, 157:14, 157:16, 159:23, 160:16, 160:18, 170:5, 172:14, 172:20, 177:25, 178:6, 178:11, 185:7, 185:15, 185:23, 186:3, 187:6, 189:12, 189:13, 189:15, 189:16, 189:17, 189:20, 196:24, 197:4, 201:14, 206:25, 207:24, 220:15, 224:14, 236:6, 240:24, 241:18, 243:20, 246:8, 248:4, 261:10, 264:3, 272:8

**seeing** [1] - 159:13

**seem** [1] - 72:12

**sells** [1] - 219:2

**send** [1] - 217:3

**sense** [2] - 118:21, 265:4

**sent** [4] - 21:4, 21:7, 215:24, 217:10

**sentence** [18] - 126:23, 126:24, 161:10, 162:11, 173:24, 173:25, 191:14, 197:21, 241:14, 247:2, 255:6, 261:7, 261:12, 268:2, 268:11, 268:18, 270:9, 271:18

**sentences** [5] -

131:15, 169:4, 191:15, 191:19, 238:5

**separate** [2] - 23:4, 248:15

**separated** [1] - 43:8

**separately** [2] - 250:19, 250:21

**September** [4] - 1:8, 236:2, 276:9, 276:12

**serve** [3] - 12:19, 17:21, 161:3

**served** [1] - 144:19

**serving** [1] - 20:9

**session** [7] - 3:3, 5:8, 99:8, 141:11, 238:18, 239:18, 239:22

**set** [9] - 14:22, 50:19, 55:16, 114:23, 117:21, 123:9, 141:22, 166:22, 276:22

**sets** [1] - 117:18

**setting** [2] - 115:21, 142:21

**settings** [1] - 46:11

**several** [11] - 17:25, 76:15, 79:7, 98:22, 103:3, 107:22, 113:14, 156:21, 173:7, 176:11, 269:13

**severe** [4] - 64:3, 64:6, 65:7, 65:11

**shed** [1] - 206:24

**shelf** [1] - 121:21

**Sheridan** [3] - 3:25, 4:5, 275:17

**SHERIDAN** [7] - 1:17, 3:25, 4:5, 275:17, 277:5, 277:7, 278:11

**shift** [4] - 118:11, 123:19, 123:24, 153:12

**ship** [1] - 148:6

**shipped** [4] - 122:6, 146:2, 146:8, 179:23

**ships** [2] - 121:19, 121:24

**SHKOLNIK** [1] - 1:20

**shocking** [1] - 180:15

**short** [4] - 99:6, 237:9, 238:11, 239:20

**show** [21] - 11:8, 40:11, 43:14, 44:6, 44:25, 66:24, 67:20, 74:3, 76:25, 92:20, 93:23, 94:4, 105:14, 133:14, 169:8,

183:20, 184:11, 229:14, 230:4, 267:24, 271:15

**showed** [9] - 46:2, 94:15, 159:20, 162:22, 172:16, 256:5, 256:17, 257:22, 266:7

**showing** [11] - 26:13, 43:4, 59:24, 77:7, 105:6, 130:10, 158:13, 165:4, 165:8, 172:23, 175:11

**shown** [13] - 32:15, 37:22, 68:20, 77:21, 92:23, 115:19, 188:4, 196:11, 199:16, 201:5, 236:9, 240:19, 271:20

**shows** [13] - 21:20, 37:15, 39:11, 40:14, 43:6, 45:21, 63:22, 66:19, 93:24, 105:9, 191:20, 229:7

**side** [10] - 15:25, 39:12, 39:13, 39:21, 43:14, 66:23, 67:14, 67:19, 177:23, 267:25

**sift** [1] - 184:3

**significance** [1] - 77:13

**significant** [4] - 80:25, 81:3, 91:4, 91:23

**significantly** [1] - 76:18

**similar** [8] - 44:3, 48:2, 69:10, 92:19, 95:17, 106:14, 132:21, 156:7

**similarly** [3] - 84:16, 90:7, 109:8

**SIMMONS** [1] - 1:14

**simplify** [2] - 140:18, 140:19

**simply** [4] - 6:24, 47:12, 163:6, 277:12

**single** [4] - 86:4, 148:22, 149:5, 274:11

**sit** [3] - 121:20, 206:8, 224:10

**site** [1] - 53:7

**sitting** [7] - 21:14, 206:20, 207:21, 208:5, 221:3, 223:14, 223:15

**situation** [4] - 19:19,

215:5, 243:8, 253:9

**six** [2] - 55:22, 56:5

**skip** [1] - 103:24

**slide** [49] - 16:2, 20:20, 20:23, 21:20, 26:13, 28:25, 31:19, 32:7, 32:15, 37:15, 39:10, 41:7, 41:25, 44:13, 58:7, 58:11, 63:19, 63:21, 68:20, 77:9, 83:22, 90:9, 90:20, 92:20, 93:16, 94:19, 101:16, 103:23, 105:6, 105:9, 106:2, 113:9, 155:14, 156:12, 156:24, 156:25, 157:8, 157:9, 157:10, 162:23, 183:25, 184:8, 201:5, 201:16, 201:23, 202:4, 235:4, 235:11

**Slide** [3] - 113:8, 114:11, 115:19

**slides** [6] - 11:8, 21:3, 88:2, 199:16, 201:5, 232:2

**slight** [1] - 189:12

**slower** [1] - 155:16

**smokers** [1] - 10:2

**smoking** [7] - 9:10, 9:11, 9:12, 9:16, 9:23, 9:25, 10:6

**snorted** [1] - 174:9

**snorting** [2] - 158:16

**So-and-So** [2] - 97:8, 97:9

**social** [1] - 149:20

**Society** [1] - 17:16

**society** [1] - 17:17

**sold** [5] - 117:5, 117:10, 180:6, 181:12

**someone** [3] - 4:3, 51:7, 163:10

**someplace** [1] - 189:2

**sometimes** [10] - 18:6, 19:12, 25:7, 26:9, 35:25, 41:18, 64:21, 67:8, 67:10, 76:8

**somewhere** [2] - 183:14, 183:16

**sorry** [39] - 41:17, 56:13, 75:8, 87:25, 119:5, 121:22, 125:23, 128:16, 136:9, 142:6, 145:14, 146:20, 148:10, 154:8,

155:17, 163:5, 163:13, 165:6, 170:8, 173:8, 175:4, 176:23, 184:4, 189:13, 195:10, 202:16, 205:2, 209:24, 210:19, 219:22, 228:12, 235:8, 236:18, 236:21, 241:11, 246:22, 247:10, 250:14, 266:2

**sort** [12] - 30:7, 55:6, 55:16, 66:12, 134:13, 191:16, 202:25, 214:23, 215:12, 218:13, 226:24, 243:6

**sorting** [1] - 158:16

**sought** [1] - 6:21

**sound** [2] - 137:24

**sounds** [2] - 7:13, 218:17

**source** [4] - 44:21, 130:19, 178:24, 245:11

**sources** [6] - 52:14, 53:2, 54:8, 94:5, 179:3, 260:9

**South** [1] - 2:19

**Southeast** [1] - 2:19

**spawned** [2] - 264:16, 264:17

**speaking** [5] - 76:5, 153:6, 157:23, 251:22, 251:24

**Special** [2] - 274:13, 275:6

**specializes** [1] - 51:7

**specialty** [1] - 11:17

**specific** [84] - 51:22, 82:13, 86:24, 96:22, 105:20, 120:23, 120:24, 121:2, 122:18, 124:20, 127:6, 127:12, 129:20, 132:23, 134:16, 138:13, 142:15, 142:19, 143:18, 145:10, 145:16, 146:2, 147:3, 147:7, 147:25, 149:7, 153:5, 156:4, 159:11, 168:19, 169:4, 173:5, 173:10, 176:20, 179:7, 183:12, 192:25, 202:9, 202:13, 202:19,

304

203:3, 203:9,
203:25, 204:6,
204:14, 204:18,
208:13, 208:20,
211:2, 211:20,
212:2, 214:4, 214:5,
214:9, 214:19,
216:6, 220:7,
220:23, 222:20,
222:22, 223:11,
223:16, 223:17,
224:12, 224:25,
225:2, 225:4,
225:20, 226:18,
227:17, 227:20,
227:23, 228:5,
228:6, 228:11,
231:11, 231:21,
233:9, 233:16,
234:5, 234:7,
236:13, 249:7
**specifically** [23] -
45:8, 47:22, 49:3,
52:23, 94:24,
115:22, 116:4,
116:7, 116:9,
116:17, 142:8,
144:10, 144:13,
152:11, 154:16,
163:23, 174:21,
176:15, 181:2,
184:13, 238:4,
263:21, 273:4
**specified** [1] - 103:13
**speculate** [1] - 265:17
**speculates** [1] -
265:25
**speculation** [1] -
266:18
**speech** [1] - 113:22
**spent** [4] - 96:2,
106:21, 113:20,
273:9
**Spitzer** [1] - 131:12
**sponsored** [4] -
261:17, 261:20,
261:21, 264:21
**St** [1] - 261:2
**staff** [1] - 273:22
**Stage** [1] - 18:2
**stand** [5] - 5:23,
126:21, 141:13,
162:2, 188:9
**standard** [2] - 34:4,
113:9
**standards** [2] -
128:20, 183:9
**stands** [3] - 38:4,
38:7, 89:5
**start** [9] - 4:20, 39:12,

50:16, 111:24,
112:5, 116:23,
154:24, 164:9,
277:16
**started** [5] - 50:17,
77:2, 180:20,
184:16, 187:10
**starting** [2] - 125:12,
180:19
**starts** [1] - 191:17
**State** [47] - 2:2, 2:3,
3:16, 8:6, 28:24,
29:9, 31:13, 31:25,
53:2, 53:5, 53:11,
53:14, 53:19, 62:5,
62:11, 90:12, 92:11,
93:5, 93:25, 128:11,
128:17, 128:23,
131:10, 132:22,
132:24, 133:4,
137:4, 137:18,
138:11, 138:21,
139:9, 140:23,
143:2, 145:12,
145:18, 146:7,
146:23, 147:12,
148:9, 148:25,
154:16, 174:23,
205:18, 256:6,
256:13, 257:18
**state** [12] - 6:4, 6:25,
29:8, 53:9, 54:9,
94:6, 135:14, 159:4,
191:19, 205:17,
223:25, 224:24
**STATE** [1] - 1:2
**State's** [1] - 139:22
**state's** [1] - 53:6
**statement** [40] - 88:17,
123:22, 126:21,
132:14, 132:18,
151:23, 159:9,
159:14, 159:17,
161:5, 161:9, 162:2,
162:3, 162:9,
172:10, 178:17,
203:12, 203:19,
204:10, 212:11,
212:21, 213:5,
213:12, 216:24,
223:17, 225:20,
226:14, 226:21,
227:6, 227:13,
227:18, 231:21,
234:18, 236:9,
236:12, 243:12,
243:13, 249:12,
266:18, 270:17
**statements** [63] -
123:8, 123:10,

123:13, 128:12,
128:23, 133:6,
168:2, 192:4,
203:10, 203:16,
204:18, 209:7,
209:8, 213:25,
214:4, 214:9, 215:2,
215:5, 216:7,
220:20, 222:20,
222:22, 223:2,
223:5, 223:8, 228:6,
231:12, 232:11,
232:15, 232:19,
233:2, 233:7, 233:9,
233:14, 233:16,
233:17, 234:3,
234:6, 234:8, 234:9,
234:12, 234:13,
234:17, 242:11,
242:13, 242:16,
242:19, 242:21,
243:5, 243:18,
243:24, 249:24,
250:6, 252:8,
258:21, 264:6,
264:11, 264:17,
264:24, 265:2,
266:12, 267:7
**States** [11] - 18:13,
42:7, 79:12, 79:21,
84:8, 89:3, 90:12,
94:11, 117:9,
117:23, 178:24
**states** [7] - 28:18,
28:22, 168:23,
172:5, 178:11,
197:21, 229:19
**statistic** [1] - 80:18
**Statistical** [1] - 64:16
**statistical** [13] - 12:17,
95:13, 112:16,
213:18, 221:15,
221:18, 221:24,
222:12, 225:15,
225:23, 249:11,
250:4, 271:5
**statistically** [2] - 91:4,
97:25
**status** [1] - 185:3
**stay** [4] - 122:2, 172:2,
274:4, 274:5
**stenographer** [2] -
97:5, 140:13
**stenographic** [1] - 7:8
**step** [1] - 165:20
**STEPHANIE** [1] - 2:24
**stepped** [1] - 148:7
**steps** [1] - 148:13
**Steve** [1] - 84:19
**stigma** [2] - 19:24,

174:18
**still** [7] - 37:11, 99:12,
141:15, 155:12,
159:18, 239:23,
271:10
**Stipulation** [1] -
274:20
**stole** [1] - 49:9
**stop** [3] - 7:14, 64:4,
147:21
**stopped** [1] - 147:13
**stops** [1] - 148:12
**stores** [1] - 118:21
**stream** [2] - 4:24,
274:2
**Street** [5] - 2:3, 2:7,
6:7, 8:2, 8:3
**street** [3] - 6:23, 6:24,
182:19
**strength** [3] - 33:22,
36:13, 45:13
**strengths** [2] - 36:9,
272:7
**strike** [15] - 87:4,
150:8, 158:19,
200:9, 210:7,
213:19, 213:22,
221:16, 229:25,
230:15, 230:23,
231:25, 245:16,
247:24, 251:17
**strong** [9] - 36:16,
37:25, 40:4, 40:19,
45:11, 45:16, 45:21,
46:2, 91:3
**strongest** [1] - 188:6
**students** [10] - 13:2,
13:3, 13:7, 16:15,
23:13, 23:15, 23:17,
25:11, 71:3, 71:9
**studied** [3] - 154:19,
233:11, 242:10
**studies** [151] - 8:20,
9:11, 9:15, 9:18,
9:19, 14:14, 24:23,
35:17, 41:24, 45:24,
45:25, 46:19, 47:9,
48:16, 52:4, 52:11,
55:6, 60:15, 61:22,
62:16, 63:5, 63:12,
65:23, 65:24, 66:2,
66:9, 67:5, 67:16,
68:8, 69:21, 69:25,
72:6, 76:13, 76:15,
76:16, 76:21, 76:25,
77:6, 77:10, 77:21,
78:5, 79:7, 89:20,
89:23, 91:17, 91:18,
95:17, 96:18, 96:20,
96:22, 98:9, 98:22,

100:17, 101:7,
101:12, 103:4,
107:13, 109:2,
109:14, 109:20,
135:25, 156:13,
156:18, 157:12,
157:24, 158:13,
165:13, 165:14,
165:20, 166:2,
166:3, 166:22,
167:2, 167:9,
167:10, 168:3,
168:10, 169:2,
169:14, 169:24,
170:8, 193:22,
199:15, 199:18,
199:22, 199:24,
199:25, 200:7,
200:10, 200:11,
200:16, 200:18,
200:23, 205:16,
210:4, 210:9,
210:17, 210:22,
210:24, 211:8,
211:11, 211:13,
215:11, 215:16,
218:2, 218:3,
222:18, 222:19,
223:15, 229:3,
230:3, 230:7, 232:6,
232:9, 232:14,
232:16, 232:18,
232:24, 233:6,
234:8, 234:11,
234:21, 240:12,
250:9, 250:17,
250:18, 250:19,
250:24, 252:6,
254:4, 255:7,
255:16, 262:12,
262:17, 263:13,
264:20, 267:6,
268:3, 268:11,
268:19, 268:25,
270:23, 271:3, 272:6
**Study** [1] - 28:14
**study** [233] - 11:19,
11:20, 21:23, 22:11,
22:17, 22:18, 23:3,
23:4, 23:6, 23:7,
23:24, 23:25, 24:4,
24:8, 24:12, 25:2,
25:10, 25:15, 25:18,
26:22, 27:3, 27:16,
28:2, 28:20, 28:21,
29:11, 29:14, 29:22,
29:25, 30:2, 36:23,
37:15, 37:19, 38:11,
38:21, 42:2, 42:5,
42:10, 42:11, 43:5,
43:19, 43:21, 44:2,

44:3, 44:6, 44:14,
44:25, 45:20, 46:17,
48:11, 48:19, 48:22,
52:7, 60:11, 61:11,
61:17, 61:20, 61:21,
62:2, 62:25, 63:4,
63:9, 63:10, 66:20,
69:6, 69:7, 69:10,
69:12, 69:16, 69:20,
70:6, 70:13, 70:15,
70:19, 71:5, 71:15,
71:19, 71:21, 72:3,
72:8, 72:9, 72:12,
72:17, 72:18, 72:21,
72:24, 72:25, 73:4,
74:21, 74:22, 75:5,
75:9, 79:10, 79:18,
80:12, 81:7, 81:8,
81:11, 81:14, 81:15,
82:2, 82:10, 82:16,
82:17, 82:20, 83:4,
90:10, 90:15, 91:11,
91:12, 91:21, 92:11,
93:2, 98:5, 99:22,
99:25, 100:6,
101:18, 101:23,
102:10, 102:16,
103:19, 103:22,
104:4, 104:11,
104:14, 104:16,
104:25, 105:19,
106:4, 106:5,
106:13, 106:14,
106:15, 106:25,
107:15, 135:12,
146:11, 158:19,
159:15, 160:2,
160:11, 160:14,
160:19, 162:15,
162:18, 162:25,
163:2, 163:9,
163:12, 164:3,
164:21, 164:22,
165:3, 165:22,
166:3, 166:20,
166:21, 167:19,
168:5, 168:16,
168:22, 169:9,
172:16, 186:2,
186:18, 193:14,
193:18, 193:19,
193:20, 202:23,
205:18, 206:24,
206:25, 207:3,
207:23, 208:6,
215:20, 216:5,
216:10, 216:18,
216:21, 217:2,
217:9, 217:14,
222:17, 223:16,
224:11, 225:21,

233:19, 234:24,
240:14, 240:22,
241:21, 242:16,
244:3, 244:14,
245:11, 245:14,
245:18, 245:22,
246:2, 246:19,
247:17, 248:6,
248:13, 248:18,
249:14, 249:20,
249:23, 251:10,
252:3, 261:13,
261:17, 261:21,
261:24, 262:22,
263:6, 263:8,
263:10, 263:15,
263:21, 267:9,
268:5, 268:8, 269:7,
269:19, 271:22,
271:23
**studying** [1] - 41:4
**stuff** [2] - 274:22,
274:23
**subject** [4] - 198:17,
227:25, 263:11,
274:10
**subjects** [3] - 22:20,
42:16, 45:2
**submissions** [1] -
140:2
**submit** [3] - 14:5,
19:10, 219:17
**submitted** [6] - 19:2,
19:7, 20:6, 200:8,
238:24, 272:22
**submitting** [2] -
199:14, 199:20
**subsection** [1] -
254:20
**Subsequent** [2] -
104:7, 241:4
**subsequent** [6] -
38:19, 71:23, 105:4,
153:15, 246:13,
263:3
**subsequently** [1] -
83:12
**subset** [1] - 64:2
**substance** [16] -
11:19, 15:7, 27:17,
42:12, 42:14, 43:11,
51:7, 71:23, 73:7,
74:24, 75:17, 79:3,
97:3, 116:22,
163:19, 163:20
**substances** [6] -
85:24, 86:20, 87:20,
132:6, 132:7, 142:17
**substantive** [1] -
73:13

**sued** [1] - 118:16
**sufficient** [4] - 150:10,
150:14, 171:4,
171:18
**sufficiently** [1] - 14:9
**SUFFOLK** [1] - 1:2
**Suffolk** [24] - 1:15,
3:2, 3:23, 3:25, 4:3,
4:5, 10:22, 29:4,
31:14, 31:25, 53:20,
54:2, 54:11, 88:13,
92:12, 93:5, 93:25,
145:13, 145:19,
145:23, 154:20,
275:15, 275:17,
275:18
**suggest** [1] - 268:12
**suggested** [2] - 16:21,
253:23
**suggesting** [3] -
78:20, 96:7, 274:14
**suggestive** [1] -
170:17
**suggests** [3] - 171:2,
183:4, 228:19
**Suite** [1] - 1:21
**summarize** [5] -
31:19, 32:8, 58:7,
220:15, 251:14
**summarized** [1] - 88:6
**summarizing** [1] -
268:18
**summary** [2] - 104:22,
110:12
**Sunshine** [1] - 235:19
**supervise** [2] - 13:4,
13:6
**supplemental** [1] -
85:5
**supplied** [5] - 119:9,
119:14, 146:13,
146:17, 146:23
**supplier** [1] - 120:9
**suppliers** [1] - 134:5
**supplies** [1] - 142:18
**supply** [55] - 10:21,
39:17, 40:14, 54:22,
58:21, 77:17, 77:22,
84:7, 84:14, 88:8,
88:12, 90:17, 91:5,
91:10, 94:11, 94:16,
110:24, 112:2,
112:3, 116:23,
116:24, 117:3,
118:19, 118:20,
119:4, 119:23,
120:3, 120:5, 120:9,
120:19, 122:12,
122:19, 122:25,
124:10, 124:18,

125:4, 125:18,
125:24, 126:10,
127:10, 127:25,
132:24, 137:17,
138:8, 141:23,
142:21, 142:25,
144:16, 145:7,
151:13, 153:7,
153:12, 155:6,
155:21, 157:5
**support** [5] - 9:3,
116:18, 158:25,
159:6, 161:21
**supports** [1] - 9:8
**supposably** [1] -
211:24
**suppose** [1] - 243:11
**supposed** [2] -
121:20, 122:2
**sUPREME** [1] - 1:2
**Supreme** [2] - 1:12,
3:2
**surprise** [5] - 219:19,
219:22, 219:24,
220:2, 220:3
**surrounding** [1] -
31:13
**survey** [10] - 23:15,
24:16, 24:20, 24:24,
215:20, 216:11,
216:19, 216:22,
217:3, 217:10
**Survey** [1] - 79:20
**surveys** [7] - 82:14,
82:15, 82:16, 82:17,
82:23, 215:15, 216:5
**suspect** [1] - 275:12
**sustain** [1] - 139:2
**sustained** [3] - 78:23,
139:4, 221:13
**sworn** [1] - 6:2
**symptoms** [2] - 66:5,
71:24, 93:13,
163:19, 163:20
**synthesis** [5] - 31:4,
50:15, 51:9, 61:14,
61:23
**synthesize** [2] - 30:12,
109:17
**synthesizing** [8] -
30:15, 30:19, 34:5,
46:15, 50:4, 50:8,
65:22, 110:19
**synthetic** [1] - 83:15
**System** [2] - 89:9,
89:13
**system** [1] - 237:3
**systematic** [9] - 61:13,
62:9, 62:12, 62:13,
62:17, 62:24, 66:6,

69:2, 215:24

306

## T

**tabbed** [1] - 166:24
**table** [12] - 21:14,
66:24, 67:20, 92:24,
184:14, 184:16,
184:21, 186:4,
186:5, 186:6, 186:7,
186:12
**tailed** [2] - 257:2,
259:17
**tainted** [2] - 84:18,
87:6
**talks** [2] - 173:24,
209:15
**taping** [1] - 5:4
**target** [1] - 224:2
**teach** [4] - 12:13,
12:14, 12:15, 193:10
**teaching** [2] - 16:15,
16:17
**Team** [1] - 209:25
**tease** [1] - 218:13
**techniques** [1] - 29:18
**telecasting** [1] - 5:5
**temporal** [2] - 33:22,
41:7
**Temporality** [1] -
167:13
**ten** [4] - 98:23, 155:5,
237:20, 238:19
**Ten** [1] - 93:21
**tenets** [1] - 274:16
**tens** [1] - 270:10
**tenure** [1] - 12:7
**term** [6] - 23:23,
64:12, 64:15, 114:2,
157:14, 174:10
**Term** [1] - 28:14
**terminal** [1] - 132:2
**terminology** [1] -
118:14
**terms** [20] - 13:16,
31:20, 61:23, 70:24,
83:17, 86:10,
106:22, 121:9,
127:8, 134:24,
137:9, 146:12,
147:4, 149:10,
152:4, 157:4, 242:2,
242:22, 256:24,
257:4
**tertiary** [1] - 29:18
**test** [1] - 112:23
**testified** [5] - 6:3,
37:4, 111:8, 199:13,
229:20
**testify** [2] - 94:23,

162:24
**testifying** [2] - 73:21, 212:3
**testimony** [20] - 56:9, 56:15, 110:4, 117:9, 117:13, 128:6, 135:14, 135:16, 144:6, 151:14, 151:21, 158:6, 158:8, 199:19, 206:18, 224:17, 225:9, 226:6, 230:14, 263:5
**Testimony** [1] - 1:10
**Teva** [6] - 2:18, 4:18, 97:13, 105:24, 188:23, 224:7
**textbook** [4] - 16:13, 16:22, 16:23, 17:2
**textbooks** [6] - 13:11, 13:16, 13:21, 15:24, 16:3, 258:25
**THE** [268] - 1:2, 3:2, 3:5, 3:6, 3:7, 3:9, 3:11, 3:17, 3:21, 3:24, 4:3, 4:7, 4:12, 4:15, 4:20, 5:17, 5:21, 5:22, 5:23, 6:4, 6:6, 6:9, 6:10, 6:11, 6:12, 6:17, 6:18, 7:15, 7:16, 8:2, 8:3, 11:10, 20:24, 21:10, 21:18, 23:22, 23:24, 24:2, 33:7, 33:9, 33:10, 33:14, 37:2, 37:5, 37:6, 37:8, 37:11, 37:12, 37:13, 55:11, 55:14, 55:21, 55:24, 55:25, 56:2, 56:10, 56:16, 57:2, 57:4, 57:19, 58:10, 58:13, 64:18, 64:19, 73:8, 73:17, 73:25, 74:6, 74:13, 74:17, 75:19, 75:20, 75:25, 78:20, 78:23, 79:5, 81:20, 81:22, 81:23, 81:24, 82:7, 85:6, 85:17, 86:12, 86:13, 88:3, 89:4, 89:7, 93:19, 95:5, 95:7, 95:8, 95:21, 96:6, 96:7, 96:10, 96:13, 97:4, 97:16, 98:23, 99:4, 99:7, 99:9, 99:11, 99:13, 99:14, 102:18, 102:21, 103:3, 103:6, 103:9, 103:10, 103:13, 103:15, 107:19,

107:22, 108:3, 108:6, 108:7, 108:9, 108:12, 108:14, 108:16, 111:13, 111:20, 129:6, 129:12, 130:12, 130:15, 130:18, 130:23, 131:5, 133:12, 133:18, 133:21, 138:24, 139:4, 139:11, 139:15, 139:25, 140:6, 140:9, 140:11, 140:12, 140:19, 141:2, 141:6, 141:10, 141:12, 141:14, 141:16, 141:17, 158:10, 166:17, 169:11, 181:24, 182:2, 182:4, 182:8, 182:14, 182:16, 182:18, 182:21, 182:22, 186:10, 186:11, 188:18, 188:20, 188:24, 189:3, 189:4, 189:6, 189:7, 189:14, 189:24, 190:3, 196:22, 197:8, 212:3, 212:6, 219:13, 221:13, 222:6, 223:7, 223:10, 228:14, 228:15, 228:19, 228:21, 228:23, 228:25, 231:8, 231:10, 236:25, 237:15, 237:16, 237:22, 238:14, 238:16, 238:18, 239:2, 239:11, 239:12, 239:13, 239:17, 239:21, 239:22, 239:24, 239:25, 240:2, 240:8, 249:2, 252:13, 252:17, 254:14, 257:2, 257:6, 257:12, 257:24, 258:3, 258:4, 258:7, 258:18, 259:10, 259:13, 259:16, 259:19, 259:24, 260:11, 261:2, 261:20, 261:23, 261:25, 262:2, 262:5, 262:6, 262:9, 263:24, 264:13, 264:16, 264:22,

265:3, 265:8, 265:15, 265:24, 266:9, 266:25, 267:12, 267:16, 267:18, 272:18, 272:20, 272:21, 272:24, 272:25, 273:3, 273:6, 273:11, 273:12, 275:10, 275:22, 276:17, 276:20, 277:6, 277:23, 277:25, 278:7, 278:12
**themselves** [4] - 95:11, 109:21, 255:17, 264:15
**theoretically** [1] - 90:21
**theory** [3] - 153:13, 153:14, 176:4
**Therapeutics** [1] - 105:24
**therefore** [1] - 143:7
**thereof** [1] - 5:6
**they've** [2] - 152:3, 220:12
**thinking** [2] - 236:25, 275:10
**third** [8] - 45:10, 59:3, 88:5, 94:18, 131:18, 244:17, 270:8
**THOMAS** [1] - 1:17
**thorough** [1] - 128:22
**thousands** [1] - 81:6
**three** [21] - 6:14, 13:20, 22:6, 44:15, 59:13, 89:10, 90:24, 105:23, 108:9, 109:2, 109:14, 114:12, 114:13, 115:5, 115:18, 115:21, 185:5, 232:5, 232:16, 251:22, 251:24
**three-page** [1] - 115:5
**three-quarters** [1] - 44:15
**throughout** [2] - 20:21, 119:18
**thunder** [1] - 49:10
**tie** [1] - 219:18
**time..** [1] - 252:18
**title** [6] - 16:5, 21:23, 70:6, 131:9, 241:7, 245:7
**titled** [15] - 42:5, 43:21, 61:11, 71:21, 79:10, 81:8, 90:10, 91:12, 101:19,

104:5, 106:8, 201:9, 201:16, 241:2, 245:2
**today** [44] - 5:14, 6:16, 28:8, 28:12, 49:18, 56:7, 110:10, 110:20, 111:7, 144:7, 154:23, 155:12, 183:11, 187:10, 192:6, 199:23, 201:6, 206:8, 206:20, 207:21, 208:5, 215:9, 215:12, 215:14, 221:3, 223:14, 224:10, 224:19, 225:11, 227:4, 232:2, 232:25, 235:4, 235:12, 236:10, 237:4, 240:20, 244:18, 250:11, 263:5, 263:16, 266:6, 268:21, 271:24
**today's** [1] - 59:13
**Tom** [2] - 3:25, 275:17
**tom** [1] - 4:5
**Tomarken** [3] - 275:7, 275:14, 277:8
**tomorrow** [6] - 273:16, 273:19, 275:7, 275:13, 277:10, 278:8
**took** [1] - 65:2
**top** [7] - 102:5, 169:3, 169:7, 187:16, 207:24, 224:8, 269:4
**topic** [7] - 37:10, 50:19, 104:18, 133:16, 133:17, 133:20, 268:21
**topics** [2] - 141:23, 252:25
**total** [7] - 60:16, 60:22, 61:5, 61:7, 63:24, 171:2, 207:17
**totality** [2] - 47:3, 251:8
**totals** [1] - 105:24
**touching** [1] - 171:24
**towards** [3] - 44:19, 261:6, 269:4
**town** [1] - 6:25
**trace** [2] - 226:12, 227:3
**tracing** [1] - 227:9
**track** [2] - 114:7, 143:11
**tracks** [1] - 116:22
**trafficking** [1] - 178:25

**training** [7] - 31:8, 110:6, 194:19, 194:20, 194:21, 194:24, 195:19
**transcript** [5] - 142:3, 142:10, 205:24, 206:3, 223:21
**transferred** [2] - 117:5, 117:11
**transfers** [2] - 245:15, 245:18
**transition** [5] - 30:14, 62:5, 62:7, 62:11, 77:23
**transparent** [2] - 63:12, 262:20
**treated** [1] - 63:25
**treating** [1] - 62:22
**treatment** [7] - 42:12, 62:6, 132:8, 132:15, 133:25, 134:25
**treatments** [2] - 134:3, 134:15
**Trends** [2] - 70:6, 90:10
**trends** [3] - 94:8, 94:13, 268:4
**trial** [2] - 10:2, 275:2
**tried** [2] - 124:13, 198:6
**true** [9] - 61:9, 112:25, 159:8, 180:15, 191:23, 209:7, 209:8, 225:8, 225:11
**trust** [1] - 191:10
**truth** [4] - 209:6, 212:4, 212:7, 212:8
**truthful** [4] - 209:3, 234:13, 234:14, 234:18
**try** [13] - 9:24, 33:9, 41:16, 79:3, 127:13, 140:17, 175:5, 200:5, 211:5, 218:13, 224:2, 237:19, 252:23
**trying** [5] - 29:13, 65:22, 201:15, 203:19, 266:5
**tsheridan@ simmonsfirm.com** [1] - 1:18
**turn** [29] - 45:10, 47:11, 76:5, 116:21, 121:13, 177:21, 181:7, 190:7, 191:7, 191:12, 191:13, 205:23, 206:2, 206:5, 206:6, 234:25, 235:21,

308

236:4, 240:18,
240:20, 244:2,
244:23, 246:6,
254:9, 260:25,
261:5, 262:25, 270:5
**two** [30] - 11:3, 13:20,
18:15, 18:16, 25:23,
40:7, 45:2, 46:2,
68:11, 68:18, 68:19,
86:14, 96:17,
104:16, 111:25,
112:17, 115:5,
115:24, 116:2,
131:15, 132:12,
139:15, 166:18,
183:16, 186:12,
191:15, 230:14,
272:21, 276:6,
277:21
**Two** [1] - 44:20
**Two-fifths** [1] - 44:20
**two-fifths** [1] - 45:2
**two-part** [1] - 116:2
**type** [14] - 77:5, 81:24,
133:7, 195:12,
199:2, 202:4,
215:23, 229:9,
229:16, 230:19,
231:4, 243:21,
248:21, 249:10
**types** [9] - 66:8, 82:14,
96:17, 116:13,
129:22, 195:19,
230:25, 231:12,
242:22
**typically** [4] - 41:10,
44:21, 62:13, 262:19

## U

**U.S** [4] - 81:17, 91:12,
93:25, 149:21
**Um-hm** [1] - 151:10
**um-hm** [1] - 64:11
**uncertain** [1] - 170:13
**unclear** [3] - 241:17,
241:22, 242:5
**under** [17] - 5:2, 35:4,
39:22, 50:19, 99:12,
118:3, 131:17,
132:6, 141:15,
150:24, 235:18,
239:23, 255:6,
259:3, 266:14,
267:25, 270:8
**underestimated** [5] -
255:8, 255:23,
256:14, 257:18,
258:22
**underestimating** [1] -

209:16
**undergraduate** [2] -
192:21, 193:2
**underlined** [1] - 63:5
**underlying** [11] -
52:10, 54:20, 54:23,
55:19, 63:12, 65:24,
66:2, 66:9, 66:20,
68:8, 172:6
**understood** [6] - 79:4,
162:25, 181:24,
217:5, 217:12, 260:4
**undertaken** [2] -
124:9, 128:22
**undisclosed** [5] -
73:11, 73:13, 73:14,
73:24, 74:4
**United** [11] - 18:13,
42:6, 79:12, 79:21,
84:8, 89:3, 90:12,
94:11, 117:9,
117:23, 178:24
**university** [1] - 193:11
**University** [4] - 11:15,
12:5, 12:15, 16:9
**unless** [3] - 5:8,
133:16, 260:11
**unlikely** [1] - 183:16
**unmeasured** [2] -
160:23, 161:6
**unpack** [1] - 22:25
**untruth** [1] - 212:8
**unusual** [1] - 262:21
**up** [45] - 23:16, 25:15,
26:21, 51:17, 69:10,
76:25, 78:3, 94:15,
101:16, 103:2,
103:24, 109:16,
125:13, 130:4,
141:22, 150:22,
151:4, 151:17,
156:23, 158:8,
158:10, 160:14,
161:16, 162:22,
165:24, 167:3,
183:24, 184:22,
185:21, 190:4,
196:5, 201:10,
206:25, 219:18,
223:20, 223:22,
224:2, 239:4, 239:8,
240:19, 254:9,
261:11, 267:22,
267:24, 269:2
**US** [3] - 70:7, 81:10,
90:22
**usage** [1] - 176:22
**users** [14] - 43:23,
44:5, 71:16, 75:6,
75:7, 75:10, 75:11,

80:4, 80:11, 80:15,
154:24, 155:5,
170:10, 187:9
**uses** [1] - 163:10

## V

**vague** [4] - 181:21,
181:23, 256:24,
257:4
**valid** [1] - 122:7
**value** [1] - 245:18
**variables** [3] - 27:6,
38:16, 112:17
**Variation** [1] - 90:11
**variety** [1] - 258:24
**various** [5] - 66:7,
66:8, 94:5, 116:18,
223:6
**versa** [1] - 26:6
**version** [3] - 21:8,
64:22, 67:23
**versus** [6] - 124:12,
124:19, 125:5,
135:2, 260:15, 261:2
**veterans** [3] - 81:10,
81:16, 83:8
**Veterans** [1] - 82:11
**VIDEO** [1] - 241:10
**videotapes** [1] - 5:4
**view** [16] - 112:4,
117:14, 125:3,
131:23, 132:17,
146:8, 155:15,
164:4, 164:25,
171:12, 178:20,
188:10, 188:12,
189:20, 189:21,
269:22
**visa** [1] - 26:6
**visa-versa** [1] - 26:6
**volume** [7] - 13:22,
125:16, 125:21,
137:22, 145:10,
145:16, 146:22
**volunteer** [1] - 6:25
**voracity** [2] - 212:4,
212:7
**Vowles** [22] - 60:11,
61:11, 61:21, 62:2,
62:9, 62:16, 63:4,
64:10, 64:12, 65:3,
65:16, 65:24, 66:6,
66:7, 66:11, 66:21,
67:17, 68:6, 68:25,
69:7, 69:11, 69:12

## W

**wait** [2] - 7:10, 227:15

**Walgreens** [1] -
118:16
**walk** [2] - 115:12,
116:17
**walked** [1] - 250:18
**walks** [1] - 116:10
**Walmart** [1] - 118:16
**wants** [1] - 133:16
**Watson** [1] - 218:15
**week** [1] - 276:5
**weeks** [1] - 90:24
**welcome** [1] - 33:14
**well-accepted** [1] -
251:3
**whatsoever** [2] -
204:6, 242:21
**WHEREUPON** [4] -
5:25, 99:6, 141:8,
239:20
**whole** [4] - 62:14,
144:13, 226:17,
258:24
**wholesale** [1] - 123:19
**wide** [1] - 258:24
**widespread** [1] -
241:16
**willing** [1] - 166:4
**wishes** [1] - 277:12
**withdrawal** [1] - 93:15
**withdrawn** [1] - 259:6
**witness** [33] - 5:13,
5:18, 19:3, 21:13,
22:7, 32:25, 56:9,
56:15, 74:15, 78:18,
111:12, 111:15,
129:11, 130:15,
181:22, 182:12,
189:15, 189:18,
189:22, 196:16,
237:10, 238:5,
252:20, 257:13,
260:13, 265:16,
265:17, 265:24,
266:13, 266:19,
267:19, 276:6,
276:15
**WITNESS** [59] - 5:22,
6:6, 6:11, 6:17, 7:15,
8:3, 23:24, 33:9,
37:5, 37:8, 37:12,
55:14, 55:24, 56:2,
57:4, 64:19, 75:20,
81:22, 81:24, 86:13,
89:7, 95:8, 96:6,
96:10, 99:13, 103:3,
103:9, 103:13,
107:22, 108:6,
108:9, 108:14,
140:11, 141:16,
182:2, 182:16,

182:21, 186:11,
189:3, 189:6, 190:3,
223:10, 228:15,
228:21, 228:25,
231:10, 237:15,
238:14, 239:12,
239:24, 254:14,
258:3, 261:23,
262:2, 262:6,
272:20, 272:24,
273:3, 273:11
**witness'** [1] - 33:3
**witnesses** [4] - 6:14,
95:25, 135:14, 276:8
**WONDER** [2] - 94:2,
106:17
**word** [9] - 7:12, 116:7,
116:9, 140:6,
161:17, 190:22,
190:25, 191:8,
233:21
**words** [6] - 25:10,
114:22, 166:5,
268:3, 270:7, 271:19
**World** [1] - 2:11
**world** [1] - 85:23
**worries** [1] - 186:15
**worth** [1] - 189:20
**write** [11] - 161:20,
212:16, 212:22,
213:6, 214:3, 215:6,
215:25, 216:13,
216:20, 242:2,
253:17
**writes** [1] - 12:24
**writing** [6] - 22:13,
122:13, 122:21,
147:21, 160:8,
276:22
**written** [12] - 122:8,
164:23, 195:8,
195:14, 226:13,
227:5, 227:12,
227:17, 241:25,
242:8, 246:17,
246:22, 247:4,
253:19
**wrote** [5] - 37:9,
162:6, 216:23,
217:5, 217:13
**Wu** [1] - 277:20

## Y

**year** [17] - 18:14,
19:23, 69:17, 70:17,
93:3, 93:6, 103:20,
104:11, 106:6,
117:17, 121:11,
137:2, 184:25,

188:4, 195:23, 199:3
**years** [9] - 8:7, 17:25,
22:6, 44:17, 44:22,
77:2, 78:3, 80:24,
155:5
**Years** [1] - 42:8
**yellow** [1] - 40:7
**yesterday** [6] -
123:16, 135:17,
135:18, 136:5,
136:10, 273:19
**YORK** [1] - 1:2
**York** [151] - 1:8, 1:16,
1:21, 2:2, 2:3, 2:4,
2:8, 2:12, 2:13, 3:15,
3:16, 6:8, 7:25, 8:5,
10:22, 28:18, 28:21,
28:24, 29:9, 31:14,
31:24, 53:2, 53:5,
53:11, 53:14, 53:19,
62:5, 62:11, 77:6,
77:16, 88:13, 92:11,
93:5, 93:25, 101:6,
122:7, 122:12,
122:20, 125:4,
128:11, 128:17,
128:18, 128:23,
128:24, 129:16,
131:10, 132:21,
132:22, 132:24,
133:4, 133:5,
134:20, 134:23,
135:10, 135:19,
135:22, 135:23,
136:5, 136:7,
136:11, 136:21,
136:24, 137:2,
137:4, 137:8,
137:11, 137:14,
137:17, 138:11,
138:21, 139:9,
139:22, 140:23,
143:2, 143:6,
145:12, 145:18,
145:23, 146:7,
146:23, 147:8,
147:12, 148:9,
148:25, 149:25,
150:23, 154:16,
167:7, 174:4, 174:5,
174:22, 174:24,
175:7, 176:18,
179:4, 179:6,
179:23, 202:15,
202:21, 203:11,
204:15, 204:20,
204:25, 205:7,
205:12, 205:18,
206:10, 206:22,
207:7, 207:15,

208:8, 210:12,
210:17, 210:24,
211:13, 212:10,
212:20, 213:4,
213:10, 213:21,
214:2, 214:8, 215:6,
215:20, 215:25,
216:5, 216:12,
216:19, 216:22,
217:4, 217:12,
218:10, 219:6,
220:20, 221:9,
225:18, 226:5,
228:11, 228:16,
228:18, 231:14,
256:6, 256:13,
257:17, 258:8,
260:14, 277:2
**York's** [1] - 129:16
**young** [1] - 43:23
**yourself** [3] - 24:15,
47:15, 97:6
**yourselves** [1] -
274:19

**Z**

**zero** [1] - 111:10
**ZIP** [1] - 7:2
**Zoom** [1] - 209:25