# EXHIBIT W

Page 1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

3

    THE CITY OF HUNTINGTON,            )
4                                      )  Civil Action No.:
              Plaintiff,               )  3:17-01362
5                                      )
    -vs-                               )
6                                      )
    AMERISOURCEBERGEN DRUG             )
7   CORPORATION, et al.,               )
                                       )
8             Defendants.              )
9
    CABELL COUNTY COMMISSION,          )
10                                     )  Civil Action No.:
              Plaintiff,               )  3:17-01665
11                                     )
    -vs-                               )
12                                     )
    AMERISOURCEBERGEN DRUG             )
13  CORPORATION, et al.,               )
                                       )
14            Defendants.              )
15
16
17        The videotaped deposition of DAVID COURTWRIGHT,
18   Ph.D. taken by counsel for the Defendant,
19   AmerisourceBergen Drug Corporation, pursuant to notice
20   and by agreement of counsel, reported by Carmen J.
21   Thomas, Registered Professional Reporter and Notary
22   Public, at 701 West Adams Street, Jacksonville, Florida,
23   on Thursday, September 10, 2020, commencing at 9:46 a.m.
24
25

Page 77

1          A       Well, there are many examples of

2     revisionist-themed marketing that come to mind for

3     1990s, early 2000s.

4          Q       Are the examples that are coming to your mind

5     examples of revisionist marketing by manufacturers or

6     some other entity?

7          A       Both.

8          Q       Can you give me an example of revisionist

9     marketing in the mid-1990s or early 2000s that you're

10    aware of from a wholesaler or distributor?

11         A       Yes.

12         Q       Go ahead.

13         A       Well, one example that comes to mind is that

14    AmerisourceBergen had a continuing education program for

15    pharmacists, and the idea was to help train pharmacists

16    to advise customers.

17                 Everyone understood that pharmacists were an

18    important part of the health care system; that the

19    patients would ask them questions about medication; the

20    pharmacist kept an eye on patients and so on.

21                 So there's a continuing education program

22    that the theme of it is, how do you advise patients

23    about opioids?  And this particular continuing education

24    program -- I think the date is 2000, but, again, I don't

25    have the documents in front of me.  But I -- I think

Page 78

1    it's around 2000.  1999, 2000 -- includes, frankly,

2    revisionist literature that was ghostwritten by

3    Purdue-funded operatives which goes out to these

4    pharmacists and adopts a very pro opioid stance, cites

5    the Porter and Jick article, says there's low risk, you

6    should reassure your -- your customers if they're

7    worried about this.  It's -- it's what I would call

8    classic revisionist marketing.

9            And so that's, I guess, an example of a

10   project, the writing of a pro opioid article that's

11   actually created by the manufacturer, and then it's

12   disseminated through the distributor as part of a

13   continuing education program that's aimed at

14   pharmacists.

15           Off the top of my head, I'm not -- I just

16   threw in a couple of examples in the report, and I'm

17   doing this without access to any of these documents, but

18   that comes to mind.

19   Q     And the documents that you just mentioned --

20   that -- that came to your mind, can you recall where you

21   received that or how you received it?

22           MR. ELSNER:  Objection.

23           THE WITNESS:  Sitting here right now, no.

24   I -- I -- I -- I don't know.  Obviously, there are

25       discovery documents in the context of one of these

Page 82

1      trial.  There are other examples I could give, yes.

2    BY MR. WEIMER:

3      Q     And I just -- my -- I want to make sure my

4    question is clear.

5           What I'm asking you is, up to today, have you

6    done any work to identify other examples of distributor

7    involvement in revisionist-themed marketing about which

8    you plan to testify at trial?

9      A     Would you -- would you repeat the question?

10   There -- there were several parts of it I'm -- I'm not

11   quite sure about.  About which I intend to testify.

12   Please ask the question again.

13     Q     So here -- and -- and let me see if I can put

14   a little context around the question.

15          And I'm sure you're familiar from the fact

16   that you've done expert reports in other cases, the --

17   the point of the report is to fairly describe the scope

18   of the opinions that you intend to offer as an expert

19   witness at trial and identify the materials -- the

20   supporting materials upon which those opinions are

21   based.

22          You are talking on page 99 of your report

23   about an example of a particular type of marketing

24   activity.

25          What I'm asking is, as you sit here today, do

Page 83

1    you have -- prepared, organized, assembled -- a set of

2    additional examples that, if you testify at trial, I am

3    going to hear you talk about?

4              MR. ELSNER:  Objection.

5              THE WITNESS:  Organized, prepared, locked and

6         loaded and ready to use in trial, no.  I have read

7         other documents that reinforce the opinion that I

8         state in this report that distributors were engaged

9         in marketing activities, which I find to be

10        continuous with their historical behavior.

11             What I'm trying to do here is -- is show that

12        distributors have never really simply been in a

13        logistics business; that for a century and a half,

14        they've been involved in marketing.  And that

15        marketing continued in this new era of opioid

16        revisionism.  That's the point I'm trying to get

17        across.

18   BY MR. WEIMER:

19        Q    Okay.  And that marketing that you just

20   described that you say distributors have been engaged in

21   for a century and a half, is that marketing to

22   pharmacies?

23             MR. ELSNER:  Objection.

24             THE WITNESS:  Among others, yes.

25   BY MR. WEIMER:

Page 84

1      Q      What others?

2      A      The -- the customers of pharmacies.

3             By the mid-20th century, wholesalers were

4      helping retail pharmacists plan the layout of their drug

5      stores in a way that would be maximally appealing to

6      consumers.

7             So they're thinking about consumer behavior.

8      They're thinking about where you place advertisements.

9      They're helping to design advertisements for drug

10     stores.  They're involved in all of these activities,

11     and they're bragging about it.  They're promoting it.

12            They say, "These are the services we offer

13     you.  Not just the delivery of drugs.  We can help you

14     sell more products, and -- and not just pharmaceuticals.

15     We're in business to help you."

16            And they continue to do that in the late 20th

17     and the early 21st century with respect to opioid

18     analgesics.

19     Q      One of the things you said in your last

20     answer was that wholesalers were helping to design

21     advertisements for drug stores.

22            What do you mean by that?

23     A      Well, they -- they were -- they were coming

24     up with copy and telling druggists where to place the

25     ads so that they would be -- it would catch the eye of

Page 85

1      the consumer and how to arrange the aisles and what

2      products went best with other products.

3                  They were offering marketing -- I would

4      describe those as marketing services, and they were

5      providing them.

6          Q     I want to be very precise in my question,

7      Dr. Courtwright, in making sure I precisely understand

8      your answer.

9          A     Okay.

10         Q     Your -- one of the things you said in your

11     last answer was that you -- you believe wholesalers help

12     pharmacies design advertisements.

13                 So my first question is, is it your belief

14     that wholesalers provided any substantive content about

15     any particular drug to a pharmacy to be used in an -- in

16     an advertisement?

17         A     Yes.  Not only that, they created

18     advertisements in their own catalogs which they sent to

19     the pharmacies.

20         Q     Created advertisements in their own catalogs

21     to -- to be sent to patients?

22                 MR. ELSNER:  Objection.

23                 THE WITNESS:  No.  What I said was sent to

24         their own pharmacies.

25                 So perhaps an example would be helpful.

Page 86

1              If you look at a McKesson catalog from the
2         late 19th century, it's not just a price list.
3         It's not just, if you ordered three dozen bottles
4         of these pills, we'll sell them to you at this
5         price.
6              There -- there are colorful advertisements.
7         There are discounts.  There's -- there's all kinds
8         of marketing material in the catalog.  And --
9              Go ahead.  I -- other -- other examples come
10        to mind, but I don't want to take your time.  Go
11        ahead.
12   BY MR. WEIMER:
13        Q    Okay.  So let's focus on the time period
14   after the mid-1980s.
15             In that time period, is it your belief that
16   wholesalers provided any substantive content about any
17   particular drug to a pharmacy to be used in an
18   advertisement to patients?
19             MR. ELSNER:  Objection.
20             THE WITNESS:  Yes.
21   BY MR. WEIMER:
22        Q    Okay.  And what is that belief based on?
23        A    I'm sorry.  You broke up on that question.
24        Q    What is that belief based on?
25        A    Oh.  Documents indicating that there were --

Page 87

1     that opioid manufacturers contracted with druggists to
2     run infomercials that were sent through the distributors
3     to -- to their linked drug stores, and these
4     infomercials contained information about opioids and --
5     and conditions that might be treated with opioid drugs.
6         Q    Okay.  In that example that you just
7     mentioned, is the information passed on from the
8     manufacturer to the pharmacy via the wholesaler?
9         A    I would have to go back and look at those
10    documents.  My memory is that the content was created by
11    the distributors.  I mean, it was their system.
12              When you walk into a doctor's office, you
13    often see these -- these screens that have information
14    about particular drugs or medical conditions.  Those
15    also exist in drug stores.  And they catch the eye of
16    the customer while he or she is waiting in line.
17              That sort of -- that was one vehicle for
18    providing information about these opioid analgesics.
19    And my recollection is that that content was shaped by
20    the distributor marketing teams and not simply by the
21    manufacturers.
22        Q    Anything else that your -- the belief that
23    you say you have a couple answers ago is based on?
24              MR. ELSNER:  Objection.
25              THE WITNESS:  Could you be more precise,

Page 89

1    types of materials that appear in pharmacies which you

2    believe may have been shaped, to some degree, by a

3    wholesaler or distributor, to the extent that those

4    materials discuss particular benefits or risks or side

5    effects of a drug, do you have any understanding as to a

6    source of that kind of information?

7              MR. ELSNER:  Objection.

8              THE WITNESS:  What time period are we talking

9         about?

10   BY MR. WEIMER:

11        Q    Still in the post mid-1980 time period.

12        A    I -- I really don't understand the question.

13   Could -- could you repeat the last -- just the last part

14   of the question?

15        Q    To -- to the extent that the materials that

16   you have in mind that you believe may have been shaped,

17   to some degree, by a wholesaler discussed benefits or

18   side effects of a drug, do you have any understanding of

19   where that information about the benefits or side

20   effects came from?

21             MR. ELSNER:  Objection.

22             THE WITNESS:  Well, in -- in the continuing

23        education examples, the articles were originally

24        drafted by the manufacturer.  In the -- in the case

25        that's cited on page 99 of the report, it's Kristi

Page 90

```
 1        Dover who -- of Purdue who comes to an
 2        AmerisourceBergen conference and then, as part of
 3        the continuing education program, provides that --
 4        that information.
 5             So, off the top of my head, and -- and -- and
 6        noting that I haven't gone back through these
 7        materials, no other examples occur to me right now
 8        of that kind of marketing.
 9   BY MR. WEIMER:
10        Q    Okay.  You -- you mentioned a while ago that
11   there's a number of documents that were produced in
12   discovery of one or more of the opioid lawsuits.
13             If you had to estimate, up to today, how many
14   documents have you reviewed that were produced in
15   discovery by one or more of the defendants as opposed to
16   historical material you may have uncovered based on your
17   independent research?
18             MR. ELSNER:  Objection.
19             THE WITNESS:  You mean how many -- how many
20        have I reviewed with respect to distributor
21        marketing?
22   BY MR. WEIMER:
23        Q    In general.  Order of magnitude.  Have you
24   had access to the entire universe of the defendants'
25   discovery production, some subset of that?
```

1   activity of service wholesale --

2            MR. ELSNER:  Objection.

3            THE COURT REPORTER:  Could you repeat that?

4       You were garbled a little bit.

5   BY MR. WEIMER:

6       Q    And as a general matter, do you ascribe

7   anything improper about the business of service

8   wholesaling?

9            MR. ELSNER:  Same objection.

10           THE WITNESS:  I don't think it's inherently

11       improper.  I think, under certain circumstances, it

12       can be.

13  BY MR. WEIMER:

14      Q    Dr. Courtwright, sticking with this concept

15  of distributor marketing, as you describe it, do you

16  intend to offer any opinions at trial in this case that

17  any of the Distributor Defendants directly marketed to

18  patients?

19      A    To patients?

20           MR. ELSNER:  Objection.

21           THE WITNESS:  I am prepared to do so.

22  BY MR. WEIMER:

23      Q    Okay.  And what is the basis for that

24  opinion?

25      A    I mentioned it earlier.  The -- the presence

Page 95

1    in drug stores of various screens that contain

2    advertising with respect to opioid products and -- and

3    conditions that might be treated with them.

4            That seems to me to be direct-to-consumer

5    advertising if you put up a screen and it's viewed by

6    customers in a drug store while they're waiting in line

7    to pick up their prescriptions.

8        Q    Okay.  And -- and just -- again, to make sure

9    the record is clear, because we -- we have -- but can

10   you -- when you say "screen," can you describe what you

11   have in your mind?  Is it a computer screen?  Is it one

12   of these big tall, you know, cutout-type displays?

13           What do you understand as a screen as you --

14   as you used the term?

15           MR. ELSNER:  Objection.

16           THE WITNESS:  It's a monitor like the ones

17       you see in the waiting rooms of doctors' offices

18       that have various infomercials.  And sometimes

19       they'll do a break and they'll show you the

20       AccuWeather, and then they'll go on to another

21       infomercial.

22   BY MR. WEIMER:

23       Q    Okay.  Other than the example that you just

24   described, are you -- are you intending to testify at

25   trial about any other direct-to-consumer marketing

Page 96

1    activities by any wholesaler?

2               MR. ELSNER:  Objection.  Asked and answered.

3               THE WITNESS:  Well, I've already given you a

4         couple of examples of -- of where they use

5         continuing education programs to advise pharmacists

6         on how to advise customers about opioids.

7    BY MR. WEIMER:

8         Q    Do you consider that a form of

9    direct-to-consumer advertising?

10              MR. ELSNER:  Objection.

11              THE WITNESS:  Well, the objective of -- of

12        the marketing is to influence consumer behavior and

13        get them not to worry about taking opioid-based

14        medications.  That seems to me it's aimed at the

15        consumer.

16   BY MR. WEIMER:

17        Q    Dr. Courtwright, you're not an expert in

18   marketing, are you?  You don't consider yourself to be

19   an expert in marketing?

20        A    I -- I know a lot about the marketing -- the

21   historical aspects of marketing psychoactive substances

22   about which I've written a couple of books.

23              I don't have a degree -- I don't have a Ph.D.

24   in marketing, if that's what you're asking.

25        Q    I'm asking if you consider yourself to be an

```
 1    aware of any other examples of what you consider to be
 2    direct-to-consumer marketing by wholesalers?
 3                 MR. ELSNER:  Objection.
 4                 THE WITNESS:  As -- as -- as I sit here today
 5           and try to answer your question as honestly as I
 6           can, none comes to mind.  If I -- if I went back
 7           through piles of documents, I might find something
 8           else, but nothing else comes to mind.
 9    BY MR. WEIMER:
10        Q    Okay.  We've talked about pharmacists, and
11    we've talked about patients.  I want to ask, though,
12    about marketing to physicians.
13                 Do you intend to offer any opinion at trial
14    that any of the Distributor Defendants in this case
15    engaged in any marketing activity directly with
16    prescribers or doctors?
17        A    Through -- through the use of coupons and
18    saving cards and in providing information about the use
19    of those cards and sending it back to the manufacturers
20    to improve their targeting, yes.
21        Q    Can you expand on what you mean by your prior
22    answer?
23                 MR. ELSNER:  Objection.
24                 THE WITNESS:  Expand how?  I mean, some of
25           the distributors had programs for opioids in which
```

1          they would distribute or help distribute coupons

2          and saving cards, and they would report who was

3          using them, and -- and they would report that

4          information back to manufacturers.

5     BY MR. WEIMER:

6          Q     Coupon savings cards distributed to

7     physicians?

8          A     Yes.  In other words, the idea was to have

9     a -- a coupon available at the time the physician was

10    seeing a patient, and then physicians, maybe thinking

11    about prescribing the drug, was worried about the

12    initial cost of the medication or whether it's covered

13    by insurance, and so they're -- they and the patient are

14    both more willing to try this if they have a -- a

15    discount available for the -- the first prescription.

16         Q     And so that the coupon that would have been

17    offered by the drug manufacturer through the -- through

18    the --

19         A     Through the distributor, correct.

20         Q     Okay.  Other than the example you just

21    described with respect to the coupons, are you aware of

22    any other examples of -- of what you describe as

23    marketing activity by a wholesaler to prescribers or

24    doctors?

25         A     Only insofar as the Distributor Defendants

Page 100

1    were subsidizing organizations like the American Pain

2    Society, which were very much in the business of

3    providing pro-opioid continuing medical education to

4    physicians.

5              And also, I guess, as -- as I think about it,

6    to the extent that they supported organizations like the

7    American Pain Foundation or the Pain Forum and they were

8    acting as advocacy organizations for a larger public.

9              MR. ELSNER:  We've been going about an hour.

10         If there's a convenient time in your questioning

11         for a break --

12             MR. WEIMER:  I was just thinking the same

13         thing.  Why don't we go off the record.

14             THE VIDEOGRAPHER:  We are off the record at

15         1:35.

16             (A recess was taken.)

17             THE VIDEOGRAPHER:  We're back on the record

18         at 1:51.

19   BY MR. WEIMER:

20        Q    Okay.  Dr. Courtwright, the example that you

21   mentioned of what you consider to be a form of

22   direct-to-consumer marketing by wholesalers of the

23   screens that are placed in pharmacies, that's -- that's

24   not an example that you discussed in your report in this

25   case, is it?

Page 105

1          A      I have not found a document that confirms

2     that.

3          Q      And do you see on Exhibit 19 that the total

4     amount of money reflected at the bottom of the chart is

5     $132,000 -- $132,661, correct?

6          A      Correct.

7          Q      And just in -- in rough numbers, the rebate

8     line item above that constitutes roughly one-third of

9     that total; would you agree?

10         A      No.  Three times 40,000 is 120,000.

11    But it -- it -- you know, it's 30 percent or something.

12    Not quite a third.

13         Q      Okay.  A little further down, there are a

14    couple of entries for telemarketing.

15                Do you see those?

16         A      I do.

17         Q      Okay.  Do you have any understanding, either

18    from the face of this document or any other information

19    you've reviewed, as to what the telemarketing program

20    was that is referred to here?

21         A      I do.

22         Q      Okay.  Can you explain your -- that

23    understanding?

24         A      I recall a Cardinal document representing to

25    manufacturers that it was Cardinal's own trained staff

Page 106

1    that placed the calls to the pharmacists, and they

2    actually had developed personal relationships with the

3    pharmacists over time and that that was a good reason to

4    use the Cardinal telemarketing service.

5         Q    So is your understanding, based on that

6    document, that the telemarketing program that is

7    described here is telemarketing involving pharmacists?

8         A    Yes.  That's my understanding based on other

9    documents.

10        Q    Okay.  Did -- did any of the documents or

11   information that you reviewed indicate that this program

12   contemplated any telemarketing by any wholesaler direct

13   to consumers or patients?

14        A    I have seen no documents to that effect.

15        Q    Okay.

16        A    With respect to telemarketing.

17        Q    Okay.  Do you see on here a couple of entries

18   that relate to screen-saver advertising?

19        A    I do, yes.

20        Q    Okay.  Do you have an understanding, whether

21   from the face of this document or any other information

22   you've reviewed, what that refers to?

23        A    It's what --

24             MR. ELSNER:  Objection.

25             Go ahead.

Page 107

```
 1              THE WITNESS:  It's -- it's what I remember
 2         from the 1990s back in the day when you would see
 3         screen -- when screen savers were a thing, you
 4         would sometimes see advertising.  I mean, I know
 5         what a screen saver is from this era.  I didn't see
 6         a document that described in detail what this
 7         screen saver is.
 8    BY MR. WEIMER:
 9         Q     Okay.  Do you have any understanding from the
10    information that you reviewed whose screen the screen
11    saver would show up on, meaning pharmacists, doctors,
12    patients, somebody else?
13         A     From context -- that is, from the other
14    documents I looked at -- what's being referenced here, I
15    believe, are the pharmacists' screens.
16              One of the things that happened in the
17    industry at this point in time is that there was more
18    and more digital communication between the wholesalers
19    and the pharmacists, that is, between the distributors
20    and the pharmacists.  And so my assumption is that this
21    was going out to alert pharmacists about this new
22    product.
23         Q     Okay.  Dr. Courtwright, is there anything
24    about the OxyContin promotional programs that are listed
25    on Exhibit 19 that you intend to testify at trial were
```

Page 110

1      A      So -- so anyway, so -- so if -- if your
2   question is, am I sure that all of these wholesaler
3   programs that are listed here are exclusively aimed at
4   pharmacists, the answer is, no, I'm not sure.
5      Q      Okay.  Would you agree with me that,
6   regardless of the success or failure of any of the
7   specific wholesaler programs that are described in these
8   first couple of pages of Exhibit 20, that, lawfully,
9   before a patient would receive one of these medications,
10  they would still need a prescription for it from a
11  doctor?
12     A      That is correct.
13     Q      If you turn to page two of Exhibit 20,
14  under -- directing your attention to the portion of the
15  page under the heading "Obstacles to Our Growth," do you
16  see that section?
17     A      I do.
18     Q      And do you see, in the second sentence of
19  that first paragraph of that section, a commentary by
20  the author that says, "While many of the programs are
21  difficult to tie to actual sales growth, they go to
22  tremendous amount of goodwill with the wholesaler" --
23     A      I do.
24     Q      -- do you see that?
25            Based on the other information that you've

Page 111

1    reviewed in connection with your work in this case,

2    do -- do you have any understanding, one way or the

3    other, whether it is difficult to tie any of these

4    programs to actual sales growth?

5              MR. ELSNER:  Objection.

6              THE WITNESS:  Well, it's certainly the case

7         that, historically, the distributors represented

8         such programs -- such marketing programs as

9         providing a boost to manufacture or sales.

10             Now, Mr. Green may be expressing skepticism

11        as to, you know, how easy it is to pin down or

12        quantify that sales growth.  That was certainly a

13        claim that was made by distributors to their

14        customers.

15   BY MR. WEIMER:

16        Q    And just to -- just to make sure I'm clear,

17   while there is some discussion in this document of

18   OxyContin, there is also discussion of other -- other

19   medications as well, correct?

20        A    At the top of the page, I see a reference to

21   MS Contin, which is also an opiate; Kadian, which is

22   also an opiate.

23             Do you want me to read through the entire

24   document and pick out the nonopioid references?

25             I mean, I'll just take your word for it that

1      Q      Okay.  Is -- is that your understanding of

2   the journalistic and government investigations that you

3   describe here, that the focus of those investigations

4   was primarily on the failure of distributors to

5   investigate, suspend, and report suspicious orders and

6   on its lobby -- their lobbying efforts?

7      A      I believe that is an accurate

8   characterization of the major themes in the sources

9   cited in footnote 102.

10     Q      Okay.  If you go over to page 104, you're

11  having some additional discussion about the wholesale

12  drug business in the United States.  And you see at the

13  end of the first paragraph on page 104, you write, "By

14  the late 19th century, they had become vertically

15  integrated operations involved in marketing as well as

16  supply, service wholesalers in industry parlance."

17            Do you see that?

18     A      I do.

19     Q      What's your understanding of -- strike that.

20            When you use the term "vertically integrated"

21  in that sentence on page 104 of your report, what do you

22  mean?

23     A      I mean they were in -- involved in all

24  aspects of the production and distribution and marketing

25  chain.  And, in fact, even -- it's even more extensive

Page 138

1    than that.  McKesson and other large wholesalers were

2    opium importers, and they distributed their own opiates

3    as well as opiates that were manufactured by other

4    companies.  And they advertised both their own opiates

5    as -- as well as the products of other firms that they

6    distributed.

7                 And, as I said earlier, they also gave advice

8    to various retailers about how best to -- to sell

9    merchandise.  They were involved in the marketing.  And

10   so in just about every way you can be involved, they --

11   they were involved in -- in the process from poppy to

12   drug store.

13                That's what I meant by "vertically

14   integrated."

15       Q    Okay.  Do you intend to offer an opinion in

16   this case at trial that the Distributor Defendants in

17   this case are vertically integrated, as you used the

18   term today?

19                MR. ELSNER:  Objection.

20                THE WITNESS:  I'm prepared to offer such a

21       statement if asked.

22   BY MR. WEIMER:

23       Q    Okay.  You have a discussion on page 104

24   about McKesson & Robbins and you -- you -- there's

25   discussion elsewhere in your report about McKesson &

Page 153

```
1     the person is doing something that's perfectly legal,

2     you're taking prescribed medications and they're not

3     diverting them and so on, that doesn't mean that that

4     person is not in a whole lot of trouble or at -- or at

5     risk of their -- of their life.

6             So there are other complications there.  But

7     in terms of the legal distinction, if that's what you're

8     looking for, I agree.

9        Q    Okay.

10            THE WITNESS:  Mr. Weimer, do you mind if we

11       take a short break so I can wet my whistle?

12            MR. WEIMER:  Of course.  Take five or ten

13       minutes.

14            THE VIDEOGRAPHER:  We are off the record at

15       3:43.

16            (A recess was taken.)

17            THE VIDEOGRAPHER:  We are back on the record

18       at 3:59.

19    BY MR. WEIMER:

20       Q    Okay.  Dr. Courtwright, I want to circle back

21    to the discussion we had a little while ago with respect

22    to some of the testimony you gave about marketing

23    activity by wholesalers.  A couple just follow-up

24    questions there.

25            First, you mentioned some document or
```

Page 154

1    documents you think you had reviewed with respect to

2    screens that might have been provided by wholesalers to

3    pharmacies.

4              Do -- do you generally recall that testimony?

5        A    I do.

6        Q    Do -- do you have any further recollection as

7    to what the document or documents were that you saw that

8    described those screens?

9        A    Sure.  I think it was Cardinal, and I think

10   it was tied into some kind of marketing point scheme.

11             In other words, in exchange for volume

12   business, the distributors would assign a certain number

13   of marketing points to the manufacturers, and the

14   manufacturers could then use those to purchase certain

15   marketing services that were offered by the

16   distributors.  And among those services were these --

17   these advertising -- these screen advertising gimmicks

18   or promotions.

19             Now, that's my best recollection.

20       Q    Okay.  The marketing point scheme or program

21   that you described, do you recall seeing any information

22   indicating whether that program was to include only

23   opioid medications or other medications as well?

24             MR. ELSNER:  Objection.

25             THE WITNESS:  Oh, I'm virtually certain that