# EXHIBIT CC

# 10
# THE RISE AND FALL AND RISE OF COCAINE IN THE UNITED STATES
*David T.Courtwright*

## I

Cocaine epidemics have twice figured in American history. The first sustained episode of cocaine use and addiction began in the 1880s and lasted into the 1920s. The second began about 1970 and peaked in the late 1980s. Together the two epidemics illustrate a cardinal principle of drug history: what we think about and how we regulate 'consuming habits' depends very much upon the characteristics of those who consume them.

The widespread use of cocaine in the United States, like the widespread use of narcotics, originated in the nineteenth century as a by-product of medical research and practice. In 1860 a graduate student at the University of Göttingen named Albert Niemann devised a technique for isolating cocaine, the active alkaloid of the coca leaf. Niemann's work made it possible for European and North American medical investigators to carry out human and animal experiments with the new alkaloid. The success of Vin Mariani, a coca tonic introduced in 1863, encouraged research in the field. Vin Mariani was a comparatively mild product, made by steeping blended coca leaves in Bordeaux wine, but its great popularity underscored the likelihood that the coca alkaloid might have therapeutic applications.[1]

American physicians learned of the pharmacological possibilities of coca and cocaine in the late 1870s and early 1880s. Articles in medical journals recommended cocaine as an all-purpose stimulant, a cure for depression, a specific for hay fever and asthma and other conditions. Especially encouraging were reports that the new drug was useful in treating alcoholism and opiate addiction, then widespread problems.[2]

American optimism about coca and cocaine therapies quickly spread to Europe. In 1884 Sigmund Freud, an ambitious young physician at the Vienna General Hospital, published 'Uber Coca', a literature review which he brashly described as a compendium of all existing information on the drug. It was closer, in the tactful words of Freud biographer Peter Gay, to 'a compound of scientific reporting and strenuous advocacy'. Freud recommended the drug as a general stimulant; for treating indigestion; for

cachexia (wasting and malnutrition) associated with such diseases as tuberculosis; for addiction to morphine and alcohol; as an aphrodisiac; and as a local anaesthetic.[3] This last suggestion was quickly confirmed by Carl Koller, Freud's friend and colleague, who demonstrated the drug's anaesthetic potential by touching the head of a pin to his own cocaine-numbed cornea.

Cocaine revolutionized eye, nose and mouth surgery. Operations that had been exceedingly difficult or painful were made routine by the topical application or injection of cocaine solution. The anaesthetizing properties of the drug also proved a boon to the operatic world. As early as 1865 professional singers, at the suggestion of Paris laryngologist Charles Fauvell, began sipping Vin Mariani during rehearsals and recitals to ease the pain of sore throats. Singers sometimes sniffed cocaine to shrink nasal mucous membranes and drain sinuses, better enabling them to resonate their voices through their facial cavities. 'Kindly send to me', the great basso Edouard de Reszke wrote during a 1902 stint at the Metropolitan Opera, 'some of the white pills and powder which do me so good.' A few days later he sent another note to the same obliging physician, asking for 'a good package of your powders which are taken while singing' to be sent to his tenor brother, Jean de Reszke, then performing in Paris.[4]

Had cocaine's uses been restricted to local anaesthesia and the enhancement of opera-singing, it would be remembered as an unqualified triumph of nineteenth-century scientific medicine, rather like William Morton's demonstration of ether anaesthesia. The problem was the excessive enthusiasm of cocaine's medical proponents. As had happened earlier with brandy, tobacco, morphine and other novel psychoactive drugs, some physicians and manufacturers recommended cocaine too indiscriminately and with too few precautions for its toxic and habit-forming properties, which were either unknown or simply dismissed. In 1886 William Hammond, the former US Army Surgeon General, assured an audience of New York physicians that there was no such thing as cocaine addiction. Based on self-experimentation, he concluded that regular use of the drug was comparatively easy to break off, like quitting coffee or tea, and not at all like enslavement to the opiates. In fact, Hammond related, he had given cocaine for some months to a woman addicted to the opium habit, increasing the dose up to five grains (324 mg) injected once a day. It overcame the opium habit', he claimed, 'and the patient failed to acquire the so-called cocaine habit.'

When Hammond finished his remarks a Brooklyn physician and addiction specialist named Jansen Mattison rose to offer rebuttal. Hammond was wrong, he said—dangerously wrong. Seven cases of cocaine addiction had already come under his care, five physicians and two druggists. They had acquired the habit gradually, by making small injections several times a day. Cocaine could damage nerves and tissues, producing hallucinations, delusions and emaciation. Cocaine was

undoubtedly toxic, and death by overdose was a real possibility. Mattison pointedly advised his listeners not to repeat Hammond's self-experiments.[5]

Mattison knew what he was talking about. Over the next seven years medical journals published or cited hundreds of case histories of 'cocainism'. As Mattison had anticipated, many of the cocaine addicts were medical practitioners who had injected themselves. Another common type was the opiate addict treated with cocaine. Some of these addicts switched to cocaine, others continued to use both drugs. In at least one famous case, that of American surgical pioneer William Halsted, a switch was made from cocaine to morphine as the lesser of two evils.[6]

In 1886, the year European and American physicians began to receive warnings of the possibility of addiction, reports began to appear of sudden death from cocaine-related cardiac arrests and strokes. In 1887 one researcher described more than fifty cases of cocaine toxicity, including four with fatal outcomes. Even the routine application of cocaine as an anaesthetic in genito-urinary procedures, or to numb the gums prior to the extraction of teeth, might result in convulsion and death.[7]

Despite these dangers, the authors of the cautionary articles that appeared in the medical literature between 1886 and 1893 did not contemplate the prohibition of cocaine, nor were they particularly interested in blaming the 'cocainists', as compulsive users came to be known. Those who had become addicted to the drug may have been ill-advised by physicians or druggists, or may have unwisely medicated themselves, but they were neither culpable nor vicious. As had happened with the hypodermic injection of morphine in the 1870s and early 1880s (and would happen again with heroin in the early 1900s) the debate over cocaine began as an intramural medical skirmish. Doctors wrangled over the indications, contraindications, dosages and precautions necessary for this new—and, in the right circumstances, undoubtedly useful— alkaloid. When the finger of blame was pointed, it was pointed at other, insufficiently chary doctors, like Freud or Hammond, and not at the cocainists themselves.

Then, beginning in the mid-1890s, the tone of articles in both the medical and popular press abruptly changed, becoming much more critical of the cocaine users and those who supplied them. Although medical addiction was still a threat, it was rapidly overtaken by the spread of cocaine sniffing and injection in the underworld, the traditional locus of vice in Victorian America. Drink, cigarettes and opium smoking were well established among the prostitutes, pimps and gamblers who catered to the lower-order males (and decadent rich ones) in America's cities and towns. Cocaine was portrayed as a new addition to the menu of depravity. Reports began to appear of white and black prostitutes stupefied by cocaine crystals, or of 'drug fiends' who went from smoking opium to injecting morphine, thence to cocaine and morphine in potent combination.[8] In Fort Worth, Texas, where prostitutes sported nicknames like 'Queen Coke Fiend', addiction to

cocaine may actually have surpassed addiction to the more traditional opiates. In 1900 more than half of the prostitutes in the local gaol were cocaine addicts.[9]

Cocaine's popularity among vice figures and their patrons triggered a large increase in importation and manufacture. Consumption levels were fairly flat during 1885–93, when most use was therapeutically initiated. Over the next ten years, however, aggregate national consumption rose 500 per cent and remained on a high plateau until 1910. Medicine may have launched cocaine's career in America, but it was non-medical demand that drove the cocaine epidemic from the mid-1890s on.[10]

American urban culture has long served as a leading indicator of trends in international vice. Cocaine's descent into the American underworld anticipated what was about to happen in the rest of the industrialized world. In Canada cocaine was firmly linked to prostitution and crime by 1910.[11] In England recreational cocaine use flourished, albeit on a smaller scale than in the United States, in underworld and Bohemian circles from the First World War through the early 1920s.[12] In Germany illicit cocaine use became a notorious feature of Weimar nightlife.[13] Some of the German cocaine was shipped to France and Belgium, nations whose proximity made smuggling easy. Cocaine smuggling was also a problem in Austria, where an upsurge in cocaine use, notably in Vienna, occurred around 1923.[14] In 1931 Arthur Woods, a former New York City police commissioner and narcotics adviser to the League of Nations, observed that cocaine was still popular in certain underworld groups 'in practically every country', although the volume of its illicit traffic was less than that of heroin and morphine, the mainstays of the international underground market.[15]

## II

If the American underworld pioneered recreational cocaine use, the American middle class characteristically led the way in its condemnation and repression. From 1896 on newspaper and periodical articles cast cocaine as an exhilarating but deadly new vice. The road to cocainism, like the road to hell, was wide and easy. By 1897 the price of cocaine was approaching $2 an ounce, making it increasingly affordable to the 'tramp and low criminal classes' of the cities. Small packages retailed for anywhere from 5 to 50 cts.[16] American and Canadian writers complained that profiteering druggists would sell pure cocaine to anyone, or that anyone could buy 'catarrh cures' and other patent medicines with a heavy cocaine content.[17] Packages of cocaine powder were also sent discreetly through the mails to customers like nurses or soldiers, who were anxious to conceal their habits.[18]

However come by, cocaine was easy to use. The common commercial form of the drug, cocaine hydrochloride, was a white powder that could be

dissolved and injected, or simply sniffed up the nose. Sniffing avoided the hypodermic needle, which many erstwhile users instinctively feared. It also appealed to city boys whose craving for excitement was, as reformer Jane Addams put it, 'directed into forbidden channels by the social conditions under which they live. [They] are prone to experiment with drugs, as well as the other evils of drink and cigarettes.'[19] Addams was referring to the situation in Chicago, the site of her famous settlement house, but youthful cocaine use was a common occurrence on New York's Lower East Side and in tenement districts throughout the country.[20]

Non-medical cocaine users were considered dangerous to themselves and to society. Their enthusiasm for the exhilarating drug caused them to urge it upon others—pals in a gang, customers in a brothel, tent-mates in the army. They were likened to viruses in the body of the nation, spreading a deadly and compulsive disease. Though not addictive in the same way that opium and morphine were, cocaine could produce a different sort of dependence. The drug imparted a pervasive sense of well-being (one writer chose the word 'beatification' to describe its effect) but its absence could produce the opposite feeling. Habitual users deprived of cocaine felt 'a great emotional longing, a profound depression, a bitter homesickness which only more of the cocaine will relieve'. The cocainist was thus impelled to acquire more of the drug and would stop at nothing to do so. Cocaine was said to destroy the moral senses, turning women into prostitutes, boys into thieves and men into hardened killers. Notorious murders in the slums of New York, Chicago and other American cities were attributed to people under its malign influence.[21]

Particularly to Black people. In 1903 Colonel J.W. Watson of Georgia declared himself convinced 'that many of the horrible crimes committed in the Southern States by the colored people can be traced directly to the cocaine habit'.[22] In 1909 Harris Dickson, a municipal court judge in Vicksburg, Mississippi, complained that anyone who deliberately put cocaine into a Negro was more dangerous than a person who would inoculate a dog with hydrophobia.[23] The following year Dr Hamilton Wright, the chief instigator of federal narcotic laws, informed Congress that 'cocaine is often the direct incentive to the crime of rape by the negroes of the South and other sections of the country'.[24] 'Sexual desires are increased and perverted', Dr Edward Huntington Williams wrote in 1914, 'peaceful negroes become quarrelsome, and timid negroes develop a degree of "Dutch courage" that is sometimes almost incredible'.[25]

Whether and to what extent there was a cocaine-inspired crime wave among American Blacks has been disputed. The historical evidence clearly shows an increase of cocaine use among Blacks, particularly among Black labourers. Before the mechanization of construction and Southern agriculture, Black labour was employed for loading and unloading steamboats, building roads and levees, laying track, picking cotton and other physically demanding jobs, often carried out in primitive

circumstances with no protection from the extremes of climate. Stevedores, construction workers and field-hands toiled for long hours if the schedule or contract or harvest crisis demanded. Some time around 1890 cocaine began to be used by, or was given to, Black labourers to help them cope with these conditions. There was ample precedent for this action. South American natives had for centuries chewed coca leaves to ameliorate fatigue and hunger, and in the eighteenth and nineteenth centuries American agricultural workers often interrupted their labours to imbibe another psychoactive drug, alcohol. 'It is said', reported the *British Medical Journal,* 'that some planters kept the drug in stock among the plantation supplies, and issued regular rations of cocaine just as they used to issue rations of whisky.'[26]

From the docks, construction sites and plantations cocaine spread to the Black underworld, where it flourished in the early twentieth century. A 1902 report from a Georgia correspondent to a special committee of the American Pharmaceutical Association declared that almost every coloured prostitute was addicted to cocaine.[27] Cocaine's use was 'confined to the immoral and lower classes of the community, both white and black', New Orleans Police Inspector W.J.O'Connor wrote in June 1909. 'The habitual use of this drug undoubtedly leads not only to the increase of crime, but weakens both the mental and physical strength of those who use it to that extent.'[28]

O'Connor's judgement epitomized the conventional wisdom. Cocaine had become widely associated with crime, above all with Black crime. But precisely how was it associated and what was the direction of the causality? One possibility is that the vice figures who used cocaine were already involved in criminal activity, rather than the other way around. When prostitutes and petty thieves were observed to snort cocaine, or landed in gaol, the inference was drawn that cocaine had caused the criminal behaviour. Another possibility is that cocaine users were driven to crime, not by the drug itself, but by their addiction to it. That is, they resorted to prostitution or theft to purchase a regular supply of the drug. A third possibility is that cocaine was itself criminogenic. Crazed users robbed merchants, attacked police, raped women.

This last notion is at least plausible, given that scientific studies have shown a statistical link between regular cocaine use and episodes of violence and paranoia. There are two problems, however. One is that anti-social behaviour is most likely to result from the most drastic and toxic modes of administering cocaine (i.e. smoking or injecting the drug rather than sniffing it).[29] Smoking cocaine was uncommon[30] in the early twentieth century and few Blacks, criminal or otherwise, injected the drug. The second problem is that there is little concrete evidence of such crimes. Those who alleged a cocaine-inspired crime wave tended to be long on generalities and short on specifics.

In some instances they were also disingenuous. Dr Williams was an anti-prohibitionist who portrayed cocaine as the greater evil to which Blacks and poor Whites would turn if denied whiskey. Knoxville, he said, was experiencing a cocaine epidemic because the saloons had been closed. In Memphis, where no attempt had been made to stop the sale of liquor, only a 'moderate' increase in drug-taking had been observed.[31] Dr Wright's motives for exaggerating the cocaine crime connection were even more transparent: at the time he made his report to Congress in 1910, he was preparing narcotic control legislation that entailed a sizeable expansion of the federal police power. To emphasize the necessity of the legislation to southern congressmen, many of whom were states' rights conservatives opposed to the extension of federal power, Wright played the Black rape card.[32]

One other possible explanation is racial hypersensitivity. The condition of Blacks in the South after the Civil War was in several respects unchanged from the days of slavery. They remained a servile labour force, deeply distrusted by their White superiors and closely watched for signs of rebelliousness. Black-on-Black crime was expected and to an extent tolerated, but extreme vigilance was exercised against Black assaults on Whites, above all sexual assaults on White women, which became a virtual obsession.[33] Assuming that there were some genuine cocaine-inspired Black felonies, the natural tendency, in such a highly charged racial atmosphere, would be to magnify the threat posed to Whites. Southern newspapers in this period often republished accounts of black crimes and lynchings from other towns and cities. It is possible that isolated episodes, broadcast by newspaper stories and headlines, were conflated into a cocaine crime wave, and that fear of such a crime wave played into the hands of those who further exaggerated the cocaine menace for their own ends.[34]

The fact that a historical phenomenon was consciously or unconsciously exaggerated by contemporaries does not necessarily lessen its impact. Quite the contrary. Appearances, however deceptive, can translate into political pressure, and political pressure is what drives the history of drug laws. Whenever use of a psychoactive substance is perceived to entail significant personal and public health problems, to cause crime, to constitute a sinful indulgence (as opposed to necessary medication), and to be associated with disliked or deviant groups, a public outcry is likely to ensue, to which politicians generally respond by enacting restrictions or outright prohibition.

This is precisely what happened with cocaine: resentment of criminal and minority users combined with the fear that thousands of impressionable young men were ruining their lives with a cheap and accessible drug. Faced with strong expressions of public, professional and editorial concern,[35] legislators passed laws that, at a minimum, required a licensed physician's prescription to purchase cocaine. Illinois enacted one such measure in 1897, prompting the anxious makers of Vin Mariani to proclaim that their coca

wine was not a cocaine preparation, and to offer a reward of $1,000 for information leading to the arrest and conviction of anyone spreading libelous reports to the contrary.[36] By 1915 practically every state in the Union had a statute similar to or stricter than that of Illinois.[37] New York enacted so many restrictions on cocaine that its legal distribution became nearly impossible.[38] The Harrison Narcotic Act, implemented in March 1915, was a federal statute designed in part to help state governments suppress the cocaine traffic within their borders by monitoring and controlling interstate shipments from without.[39]

The immediate consequence of these laws was to enlarge the underground market for cocaine and to increase its price sharply.[40] Initially this market was based on diversion from legitimate medical sources. Profiteering druggists and manufacturers sold the drug to intermediaries who resold it on the street.[41] In Philadelphia old Black men, ostensibly peddlers of roots, barks and herbs, would conceal cocaine beneath their wares and sell it in white envelopes or twisted newspaper packages, earning as much as $20 a day. In Des Moines, Iowa, one peddler was said to acquire his cocaine at a drugstore, and then sell it to teenagers, who sniffed it through rolled cigarette papers.[42] The profits to be made from such sales lured many into the illicit trade. In New Orleans, a police crackdown on violators of the state pharmacy law netted more than fifty cocaine vendors in one twenty-day period.[43] The risk of arrest, in turn, inflated the price of cocaine. In New York City decks, or small paper packages, of cocaine retailed on the street for 25 cts, but contained an average of only 1.3 grains (less than 85 mg) of the drug. The equivalent cost per gram was eleven times that of the legitimate wholesale price of cocaine during the years 1908–14.[44]

Many casual users undoubtedly responded to the price increases by cutting back their consumption of cocaine or stopping altogether. For those who would not, or could not, abstain there was a potent alternative, heroin. Prior to 1915 heroin was much cheaper than cocaine and more readily available.[45] Since the crusade against cocaine had reduced its supply in Boston, complained reformer J.Frank Chase in 1912, 'dope users have turned to [heroin], and as this drug is not so well known we find apothecaries who would not sell cocaine who are selling heroin apparently quite freely'.[46] It could be taken in the same manner, by sniffing, and did not require use of a needle and syringe. Heroin had the added attraction of alleviating the unpleasant effects of cocaine withdrawal, particularly depression. Heroin was a powerful tranquillizer— sometimes too powerful: in Philadelphia several switchers ended up on the coroner's slab, dead by overdose.[47] Those who survived often became compulsive heroin users. In the 1910s reports began to surface of heroin addicts in New York City, Philadelphia and other cities who had a prior history of cocaine use.[48] In 1923 Lawrence Kolb, a pioneer of addiction treatment in the United States, began a systematic study of 230 cases of narcotic addiction. His

manuscript records show that forty of these cases were heroin addicts, and that fully twenty-six of the forty used cocaine prior to or concurrent with their first use of heroin.[49]

## III

The first American cocaine epidemic ended with the 1920s. For the next four decades, from 1930 to 1969, cocaine was a triply marginal drug in the United States. It was of marginal concern to the police, of marginal concern to the public, and of marginal interest to the main addict sub-culture, which was geared towards heroin. I have recorded the life histories of older narcotic addicts who were active during this period and found among them a consistent attitude towards cocaine. 'When you have some cocaine, fine', summarized one man, who was a professional dancer. 'Beautiful. But it's a short-lived euphoria…. Cocaine is a lot more expensive than heroin. So when you mixed some cocaine with heroin, it was done sparingly.'[50] The use of speedballs (combinations of heroin and cocaine) was regarded by addicts as an expensive treat, rather like eating a hot fudge sundae instead of plain vanilla ice cream. Of sixty-five interviewees, only one could be described as primarily a cocaine addict, and eventually he had to switch to sniffing and then injecting heroin.

Some, in all probability the majority, of mid-twentieth-century cocaine users were not addicted, either to heroin or to cocaine itself. The dilettanti included entertainers and musicians, Bohemians, prostitutes and assorted underworld figures. Their numbers were not large. Cocaine seizures were tiny compared to seizures of the opiates and marijuana, which the Bureau of Narcotics regarded as the most common illicit drugs. During 1938, the year after the prohibitive Marijuana Tax Act was enacted, the federal government seized 558 kgs of bulk marijuana, nearly 18,000 marijuana cigarettes, and seized or destroyed 40,000 marijuana plants. In 1938 federal agents also confiscated 674 kgs of opium,[51] 12 kgs of morphine, and over 94 kgs of heroin. Federal cocaine seizures in 1938 totalled only 417 gms—less than a half of 1 per cent of the weight of the confiscated heroin.[52] Reports of annual seizures throughout the 1930s, 1940s, 1950s and 1960s revealed a similar distribution: cocaine seizures were but a fraction of the seizures of opiates.[53] Even in New York City, the national entrepôt of the illicit drug traffic, cocaine became scarce. A significant New York City police problem as late as 1926, cocaine was practically gone by 1940.[54] In 1957 Harry Anslinger, head of the Bureau of Narcotics, declared that cocaine addiction had disappeared in the United States.[55] He was exaggerating, but, if seizures are any indication, the problem was by then minuscule.

Minuscule is not the term that comes to mind to describe cocaine abuse and addiction in the United States during the 1970s, 1980s and 1990s, the decades of the second epidemic. The epidemic can be broken down into

three stages: a sustained increase in cocaine use, mostly sniffing from an initially low level in 1969 through the early 1980s; the explosive growth of crack smoking in the mid-1980s; and a decline after 1988 among younger, casual and affluent users, though not among those already addicted.

The American cocaine revival had several different origins. One, curiously, was the growing availability of methadone programmes for heroin addicts in the late 1960s and early 1970s. At a sufficiently high maintenance dose, methadone blocked the euphoric effects of opiates while satisfying addicts' physical need for them. However, methadone patients soon discovered that non-opiate drugs, including cocaine, could still produce pleasure. To acquire cocaine they sometimes sold or traded part of their supply of methadone. By 1970 one Philadelphia methadone patient in five showed traces of cocaine in his urine.[56]

Restrictions on amphetamines also played a role in the cocaine revival. Introduced in the 1930s, the amphetamines were relatively inexpensive stimulants, widely and legally available. Some 200 million tablets were given to American troops during the Second World War, and by the 1950s amphetamine use had spread to college students, athletes, truck drivers and housewives in the United States. In fact, the growing popularity of the amphetamines may well have contributed to cocaine's mid-century eclipse.[57] By the early 1970s, however, amphetamines were becoming subject to tighter restrictions. 'Speed kills', the most concise and probably the most effective anti-drug slogan in American history, warned of amphetamines' toxic effects. Fear and shorter supplies of amphetamines made cocaine an attractive alternative. The illusion of cocaine's safety was widespread until 1986, when basketball star Len Bias collapsed and died of an overdose. The widespread publicity following Bias' death—analogous in many ways to actor Rock Hudson's death from AIDS—served notice that cocaine could kill at any age.[58]

But the Len Bias tragedy lay in the future. In the late 1960s and 1970s the United States was experiencing a population bulge of 16- to 25-year-olds, the celebrated baby boom. Because experimentation with illicit drugs typically occurs during these years, the number of potential new users was unusually large. Political turmoil increased the likelihood of experimentation, especially with marijuana. Pot was a cheap, double-duty drug, smoked for the high and for symbolic protest against the forces of war and segregation.[59] Students who tried marijuana and who suffered no ill effects grew sceptical (if they were not already) of drug abuse warnings, dismissed as so much propaganda.

Cocaine was a logical next-step drug for baby boomers attuned to the recreational possibilities of illicit substances. It was subtly pleasurable, sexually stimulating, easy to use, considered to be safe and, though expensive, affordable for those with substantial allowances or good jobs. At some universities the percentage of undergraduates who experimented with cocaine increased tenfold between 1970 and 1980.[60] Bob Colacello, the

editor of *Interview* magazine, recalled that 'cocaine suddenly was everywhere' in New York City by the mid-1970s.

> It went from something people tried to hide, except among close friends, to something people took for granted, and shared openly. … None of us thought cocaine was really dangerous, or even addictive, back then. Heroin was off limits in our crowd, but coke was like liquor or pot or poppers, fuel for fun, not self-destruction.[61]

The new fun fuel was openly indulged by some of the most famous celebrities in the world, from Mick Jagger to the glitterati who frequented New York's Studio 54 nightclub. Reports of celebrity use were, in an unintended way, like the written endorsements of eminent persons, such as Thomas Edison, which had helped to sell Vin Mariani a century before.[62]

The American mass media, slavering for trends among the young and famous, played up the cocaine renaissance. Cover stories on the drug and its (revised) history appeared in both conventional and counter-cultural magazines. *Easy Rider,* one of the most popular and profitable films of 1969, opened with a cocaine deal on the Mexican border. It was followed by a string of 1970s hits like *Superfly* or *Annie Hall* in which cocaine played at least a cameo role. Retailers capitalized on the trend by stocking cocaine handbooks and gilded paraphernalia, symbols of sexual prowess and conspicuous consumption. 'Everyone here has the Jordache look', wrote novelist Jay McInerney, describing the clientele of a fashionable Manhattan singles bar of the early 1980s. 'Hundreds of dollars' worth of cosmetics on the women and thousands in gold around the necks of the open-shirted men. Gold crucifixes, Stars of David and coke spoons hang from the chains.'[63]

## IV

As the 1070s ended most Americans knew that cocaine use was spreading, but they were not unduly alarmed by the trend. The past having been forgotten or sanitized, the prevailing view was that cocaine sniffing was neither addictive nor *déclassé,* most users being affluent, White, sexy and successful. This benign view of the drug and the related commodification of its paraphernalia were to prove short-lived, however. By 1986 cocaine was no longer thought of as an accessory of the wealthy, nor was it necessarily associated with sniffing. Indeed, cocaine had by then acquired a reputation as America's most dangerous and addictive drug, linked, as it had been in the early 1900s, with poverty, crime, depravity and death.

What happened was a shift in the pattern of cocaine usage, triggered by an increase in supply, a lowering of wholesale and retail prices, and the introduction of new techniques of administration, freebasing and smoking crack. Colombian drug traffickers, who in the late 1970s realized that they

could earn far more by smuggling cocaine than marijuana, developed an elaborate network for acquiring, processing, and transporting the drug. By 1982 these smugglers had become so sophisticated that they were air-dropping cocaine in watertight containers to waiting speedboats, which raced off to Miami at ninety miles per hour. They secured protection for their operations by means of systematic bribery and violence. In Colombia, where assassinations and car bombings became commonplace, uncooperative government officials were subjected to a reign of terror.[64]

Producers in Peru and Bolivia, whence most of the coca leaves came, expanded their acreage to take advantage of the rising demand. More cocaine entered the smuggling pipeline, driving down prices. Between 1980 and 1988 the wholesale price of the drug in the United States dropped from $60,000 to $10,000–15,000 a kilo.[65] Some of these savings were passed on to lower-level dealers and consumers. The standardized price, defined as the price paid per pure gram of cocaine in a 1-oz transaction, declined from over $120 at the beginning of 1981 to just $50 in late 1988.[66]

As cocaine became cheaper in bulk it also began to be sold in smaller and less expensive units. The key was the development and popularization of crack. Beginning in California in 1974, avant-garde users took to converting illicit powder cocaine, which was adulterated and non-combustible, into cocaine freebase. The method, which involved heating cocaine hydrochloride in a water solution with ammonia and ether, was complicated and time-consuming, but it produced pure crystalline flakes of cocaine that were suitable for vaporization and inhalation from a pipe. The vapour went from lung to arterial blood to heart to brain, jolting the user with a powerful rush. Just as smoking cigarettes was a more intensely pleasurable way of using tobacco than dipping snuff, freebasing was a more intensely pleasurable way of using cocaine than sniffing. By the late 1970s freebasing was in vogue in Hollywood and environs, though expense and complexity limited its appeal. The near-death in 1980 of comedian Richard Pryor, who caught fire while preparing freebase, served to warn that the process could be dangerous. What was needed, from a marketing standpoint, was a form of freebase that was cheap and ready to use.

The ultimate answer was crack. Heating cocaine hydrochloride in a simple baking-soda-and-water solution produced a residue of cocaine which was not as pure as freebase but which was none the less suitable for the pipe, and easy to sell in small chunks. Because these chunks made a crackling sound when smoked, they came to be called 'crack'.

Crack's big advantage was low unit cost. Cocaine powder generally retailed for $75 or more a gram, but crack could be sold in small vials for $5 or less, bringing it within reach of the poor. By 1984 the crack trade, fuelled by ever larger and purer shipments of smuggled cocaine, was flourishing in such impoverished districts as South Central Los Angeles or Miami's Overtown and Liberty City. By 1985 the crack revolution was

transforming the cocaine business in Washington Heights, Harlem and other New York City neighbourhoods populated by Blacks and Latinos. Heroin, the inner-city drug -of-choice a decade before, was partially eclipsed by cocaine—in Miami, almost totally so. Pure heroin addicts became increasingly rare. In San Francisco and Oakland heroin addicts took advantage of the cocaine surfeit to speedball more often, and even began smoking crack after injecting heroin-cocaine solutions into their veins.[67]

The profile of the crack smokers of the mid-1980s was quite different from that of cocaine sniffers five years before. Although suburbanites would drive through the ghetto to purchase crack for home consumption, regular crack users were concentrated in poor Black and Latino neighbourhoods.[68] So were the street-level dealers. In Washington, DC, Black adolescents who sold crack could expect to earn an average of $30 an hour, more than four times the hourly wage of the legitimate jobs open to them.[69] The crack business had other advantages: no White bosses to placate, no strictures on language, dress, or demeanour, no forms to fill out, no taxes to pay. Chances for advancement were better than in the legitimate service sector. For those whose future prospects were otherwise bleak, hustling crack was an appealing job.[70]

If they survived. By 1986 and 1987 the crack trade was attracting heavily armed gangs like the Shower Posse, so named for showering automatic fire on their opponents. As the bodies and drugs stacked up in the metropolises, enterprising gang members began taking their abundant product elsewhere, branching out into second-tier cities like Seattle and Kansas City, and even Mississippi Delta towns like Clarksdale.[71] '[T]oo many dope dealers in Los Angeles', explained one gang member. 'So they take it out of town. The profits are better. Here you can sell an ounce for $600, over there you can sell it for $1,500.'[72]

Because crack was cheap and did not have to be injected, an unusually high percentage, in some places a majority, of its smokers were women.[73] Like their turn-of-the-century counterparts, they frequently resorted to prostitution or its equivalent, trading sex for drugs. The exchange often took place in 'freak houses'—a freak being a woman who would perform any form of intercourse, oral, anal and unprotected vaginal. Thus crack contributed to the other great American epidemic of the 1980s, the spread of HIV infection.[74]

It also gave rise to a new pathology, crack babies. Researchers have disputed the magnitude and source of crack babies' medical problems, but there is no doubt that *in utero* cocaine exposure increased after 1985. In that year 5.3 of every 1,000 New York City birth certificates reported cocaine or crack exposure; in 1990 the rate was 17.6. Of the 2,455 cocaineexposed babies born in New York City in 1990, 66.3 per cent were Black and 20.3 were Puerto Rican. Similar data from other cities

emphasized that the crack baby problem, like crack smoking itself, was concentrated among the non-White and the poor.[75]

The disturbing consequences of crack smoking were made known to the American public beginning in 1986, when the media seized upon the crack story, giving full play to its most sordid elements. Although mass-circulation newspapers and articles had not been alarmist about cocaine in the 1970s or early 1980s, crack was portrayed as extremely—indeed, uniquely—addictive, and a prolific source of urban crime.[76] Similar fears were voiced in Congressional hearings, where crack was compared to the Black Death.[77] Crack catalyzed what came to be known as the drug war, formally declared by President Reagan in August 1986. By 1993 the drug war had produced three nationally televised presidential addresses, two omnibus federal anti-drug laws, the creation of a national 'drug czar', and a fivefold increase in the federal drug control budget. It was easily the most dramatic, sustained and controversial governmental response to illicit drug abuse in American history.[78]

By 1988 it was apparent that cocaine was declining in popularity among middle-class and casual users, made wary by the negative publicity and new emphasis on its addictive potential. Crack was also becoming less popular among potential initiates.[79] The drug war had less impact on those who were already regular consumers, however. An ageing cohort of heavy users, who had begun their careers in the 1970s or 1980s, persisted in abusing cocaine in the early 1990s, developing serious health problems as a consequence. The number of such users has been disputed,[80] but it is widely agreed that since the late 1980s cocaine has been increasingly confined to a 'residual group of dysfunctional drug users' who are concentrated in urban minority groups.[81]

The transformation of cocaine from golden drug to ghetto drug was reinforced by the conduct of the drug war itself. Nationwide, Blacks were four times as likely—in some cities more than twenty times as likely— than Whites to be arrested on drug charges. The disproportionate arrest rate for Blacks has been variously attributed to racism, search tactics based on minority profiles, or to the fact that minority drug dealers and couriers are highly visible, easy targets for police.[82] Whatever the motivation for the large number of Black arrests, their ritualized presentation in newspapers and television news programmes intensified the impression that cocaine use and dealing were becoming the near-monopoly of the Black community.

Racial disparity was also built into the sentencing provisions of the 1986 federal anti-drug law. That statute specified a mandatory minimum sentence of ten years for a violation involving 50 gms of crack cocaine, but required a full 5 kgs (100 times the weight of crack) to warrant a comparable sentence for a powder cocaine violation.[83] The official justification of this disparity, known as the 100-to-1 ratio, was that crack is more dangerous and addictive than powdered cocaine. Those who have challenged the law have pointed out that powdered cocaine can be

dissolved and injected, which is every bit as dangerous as smoking, probably more so, given the risk of needle-transmitted HIV infection. They have also charged that the real motivation and effect of this provision is to single out for harsher punishment Blacks who sell this particular form of cocaine. In 1992 nine out of ten defendants convicted of federal crack violations were Black, as compared to fewer than three of ten convicted of powder cocaine violations.[84] Because less crack was required to trigger a long mandatory sentence, convicted Black crack dealers were more likely to receive harsher punishment, despite the fact that they were usually only retailers in the drug distribution chain.

The sentencing double standard is not surprising. The background of users and sellers has always been an important determinant of the legal response, for cocaine or for any other psychoactive substance. The first anti-cigarette laws appeared in the United States in the 1890s, but there were no equivalent laws against cigars or pipe smoking. This seems irrational—tobacco smoke is tobacco smoke—but it makes social sense when we recall Jane Addams' observation that cigarettes were defiantly puffed by street urchins, while cigar and pipe smoking were habits of respectable men.[85] Anti-cocaine legislation, which also dates to the 1890s, was not enacted until it became clear that non-medical cocaine use was spreading among persons who were either considered anti-social or who might become so. Likewise, the high political drama and prison-mindedness of the drug war commenced only after it was apparent that compulsive cocaine use, especially crack smoking, was widespread in the urban underclass.

The *post hoc ergo propter hoc* fallacy is an old enemy of historians, and should be paid its due when we render causal judgements. I do not wish to argue that whenever the social and class characteristics of a particular drug-using population perceptibly worsen, stricter legislation will automatically follow. The formulation of drug policy is not simply the institutionalization of prejudice. It is a highly complex process shaped by experienced and, for the most part, rational actors who must respond to conflicting demands and forces, often with incomplete knowledge. Nevertheless, the history of the American cocaine epidemics reminds us that something more than reasoned debate shapes drug policy. Fear, anger, disgust and resentment have been the most common reactions to drug abuse by deviant members of society, above all by criminally inclined members of a racial minority. Moral and religious conservatives, more numerous and politically significant in the United States than in Europe, have been the most vociferous in their denunciations, but even the secular high priests of the *New York Times*' editorial page ('Mothers Turned Into Monsters') have been known to strike the shrill note.[86] Such deeply felt reactions have not escaped political strategists, preoccupied with polls and 'moving numbers'. American legislators have long faced an electoral temptation to go beyond what is necessary to deal with the public health aspect of the illicit drug

problem, the very definition of which is shaped by user characteristics. In yielding to that temptation, they have created a regime for suppressing cocaine that is among the strictest in the world.

## NOTES

1  Joseph Kennedy, *Coca Exotica: The Illustrated Story of Cocaine,* Rutherford, NJ, and New York, Farleigh Dickinson University Press and Cornwall Books, 1985, pp. 48–79. Another standard introduction to cocaine and its history is Lester Grinspoon and James B.Bakalar, *Cocaine: A Drug and Its Social Evolution,* New York, Basic Books, 1976.

2  E.g., John Q.Winfield, 'A case of opium habit of six or eight years' standing, treated successfully with the solid extract of coca', *Virginia Medical Monthly,* 1880, vol. 7, pp. 46–7, and H.F.Stimmel, 'Coca in the opium and alcohol habits', *Therapeutic Gazette,* 1881, vol. 5, p. 132.

3  'Über Coca', which first appeared in the *Centralblatt für die gesammte Therapie,* 1884, vol. 2, pp. 289–314, is translated into English in Robert Byck (ed.), *Cocaine Papers,* with notes by Anna Freud, New York, Stonehill, 1974, pp. 48–73. See also Peter Gay, *Freud: A Life for Our Time,* New York, W.W.Norton, pp. 42–5, quotation at 43.

4  Kennedy, op. cit, pp. 63–4; Aida Favia-Artsay, 'White gold in the Golden Age: recalling the sound of the de Reszke brothers and one possible reason for its splendor', *Opera Quarterly,* Spring 1991, vol. 8, pp. 44–61. The letters quoted appear in facsimile on pp. 45 and 49.

5  Hammond's and Mattison's comments are both in 'Remarks on cocaine and the so-called cocaine habit', *Journal of Nervous and Mental Disease,* 1886, vol. 13, pp. 754–9. For more on the panacetic use of cocaine and Hammond's discounting of addiction see Byck, op. cit., pp. 119–50, 178–93.

6  H.G.Brainerd, 'Report of committee on diseases of the mind and nervous system: cocaine addiction', *Transactions of the Medical Society of the State of California,* 1891, n.s. vol. 20, pp. 193–201; J.B.Mattison, 'Cocainism', *Medical Record,* 1892 and 1893, vols. 42 and 43, pp. 474–7 and 34–6; David F.Musto, 'America's first cocaine epidemic', *Wilson Quarterly,* Summer 1989, vol. 13, p. 62; and Sherwin B.Nuland, *Doctors: The Biography of Medicine,* New York, Vintage Books, 1989, pp. 395–9.

7  Teri Randall, 'Cocaine deaths reported for century or more', *Journal of the American Medical Association,* 1992, vol. 267, pp. 1045–6; Robert W.Haynes, 'The dangers of cocain [sic]', *Medical News,* 1894, vol. 65, p. 14.

8  E.R.Waterhouse, 'Cocaine debauchery', *Eclectic Medical Journal of Cincinnati,* 1896, vol. 56, pp. 464–5; E.G.Eberle et al., 'Report of committee on the acquirement of drug habits', *Proceedings of the American Pharmaceutical Association,* 1903, vol. 51, pp. 468, 473. On the Victorian underworld as vice nexus see John C.Burnham, *Bad Habits: Drinking, Smoking, Taking Drugs, Gambling, Sexual Misbehavior, and Swearing in American History,* New York, New York University Press, 1993.

9  Richard F.Selcer, 'Fort Worth and the fraternity of strange women', *Southwestern Historical Quarterly,* 1992, vol. 96, pp. 74, 79.

10  Joseph Spillane, 'Modern drug, modern menace: the legal use and distribution of cocaine in the United States, 1880–1920', unpublished PhD dissertation, Carnegie Mellon University, 1993. Spillane read and commented on an earlier draft of this chapter, as did Jill Jonnes. I am grateful for their assistance.

11  Patricia G.Erickson et al., *The Steel Drug: Cocaine in Perspective,* Lexington, Mass., Lexington Books, 1987, p. 14.

12  Terry M.Parssinen, *Secret Passions, Secret Remedies: Narcotic Drugs in British Society, 1820–1930,* Philadelphia, Institute for the Study of Human Values, 1983, p. 216; Virginia Berridge and Griffith Edwards, *Opium and the People: Opiate Use in Nineteenth-Century England,* New Haven, Yale University Press, 1987, p. 224.

13  Louis Lewin, *Phantastica: Narcotic and Stimulating Drugs: Their Use and Abuse,* tr. P.H.A.Wirth, New York, E.P.Dutton & Company, 1931, p. 80.

14  Joël L.Phillips and Roland D.Wynne, *Cocaine: The Mystique and the Reality,* New York, Avon Books, 1980, pp. 82–5.

15  *Dangerous Drugs: The World Fight Against the Illicit Traffic in Narcotics,* New Haven, Yale University Press, 1931. Although Woods' name appears on the title page, *Dangerous Drugs* was researched and ghost-written by Kenneth Burke, later famous as a literary critic. Kenneth Burke to Lawrence B. Dunham, 4 June 1930, Bureau of Social Hygiene Papers, Series 3, Box 1, Folder 9, Rockefeller Archive Center, North Tarrytown, New York.

16  T.D.Crothers, 'Cocaine-Inebriety', *Quarterly Journal of Inebriety,* 1898, vol. 20, pp. 369–70, quotation at p. 370; '"Cocaine Alley"', *American Druggist and Pharmaceutical Record,* 1900, vol. 37, pp. 337–8; and Waterhouse, op. cit., pp. 464–5. Note that the $2-per-ounce figure given by Crothers may have been artificially low due to depressed economic conditions. In subsequent years the price rose and fluctuated around $4 an ounce—still much cheaper than it had been in the 1880s. Joseph Spillane, personal communication.

17  Eberle, op. cit., p. 476; Erickson, op. cit., pp. 8–13.

18  I.H.Kempner, *Recalled Recollections,* Dallas, Egan Company, 1961, pp. 48–9; W.B.Meister, 'Cocainism in the Army', *Military Surgeon,* 1914, vol. 34, p. 344.

19  Quoted in Charles W.Collins and John Day, 'Dope, the new vice', *Everyday Life,* 1909, vol. 5, no. 2, p. 4.

20  Alan A.Block, 'The snowman cometh: coke in progressive New York', *Criminology,* 1979, vol. 17, pp. 75–99.

21  Collins and Day, op. cit., vol. 4(10), pp. 3–4; (11), pp. 6–7; (12), pp. 4–5; and vol. 5(1), pp. 10–11; (2), pp. 4–5. The quotations are from vol. 4(12), p. 4. This series is a particularly good example of the sensationalized treatment accorded cocaine and other forms of drug use in the popular press in the decade prior to the First World War. For a well-researched but nontechnical account of how cocaine produces its pleasurable effects see John C.Flynn, *Cocaine: An In-Depth Look at the Facts, Science, History and Future of the World's Most Addictive Drug,* New York, Birch Lane Press, 1991.

22  'Cocaine sniffers', *New York Tribune,* 21 June 1903, p. 11.

23  Collins and Day, op. cit., vol. 4(10), p. 5.

24 US Senate, *Report on the International Opium Commission and on the Opium Problem as Seen Within the United States and Its Possessions,* 61st Cong., 2nd sess., Washington, DC, Government Printing Office, 1910, p. 50.

25 'The drug-habit menace in the South', *Medical Record,* 1914, vol. 85, p. 247.

26 'The cocaine habit among negroes', *British Medical Journal,* 1902, part 2, p. 1729.

27 Eberle et al., op. cit., p. 468. Although this article appeared in print in 1903, the local reports were solicited in the previous year, 1902.

28 O'Connor to Hamilton Wright, 22 June 1909, bound letter volume 1, 'Arkansas to Maryland', Records of the United States Delegation to the International Opium Commission and Conference, 1909–13, Record Group 43, National Archives, Washington, DC.

29 A. James Giannini et al., 'Cocaine-associated violence and relationship to route of administration', *Journal of Substance Abuse Treatment,* 1993, vol. 10, pp. 67–9.

30 In 1886 Parkc, Davis & Co., a leading American manufacturer of coca and cocaine products, was producing coca cheroots and cigarettes and advertising their utility in treating throat affections. This means of using the drug seems not to have caught on, however. By the early 1900s the drug was generally obtained through patent medicines like Tucker's Asthma Specific or Crown Catarrh Powder, through medicated 'soft' drinks like Koca-Nola or Kola-Ade, or by outright purchase of cocaine hydrochloride, which could be injected or sniffed up the nose.

31 Williams, op. cit., p. 249. 'I am not an advocate of whiskey', the above-quoted Colonel Watson observed, 'but I am fully convinced that if a man feels he must have a stimulant, the best thing he can do is to get a bottle of liquor.' 'Cocaine sniffers', p. 11. See also David F. Musto, *The American Disease: Origins of Narcotic Control,* revised edn, New York, Oxford University Press, 1987, p. 284, n. 20.

32 In fact, Wright's entire report exaggerated the extent and danger of drug abuse in the United States as a goad to Congressional action. David T. Courtwright, *Dark Paradise: Opiate Addiction in America before 1940,* Cambridge, Mass., Harvard University Press, 1982, Ch. 1, and Musto, *The American Disease,* op. cit., Ch. 2, esp. pp. 43–4.

33 Nicholas Lemann, *The Promised Land: The Great Black Migration and How It Changed America,* New York, Vintage Books, 1992, p. 27.

34 For more on Black cocaine use and its connection to crime see David T. Courtwright, 'The hidden epidemic: opiate addiction and cocaine use in the South, 1860–1920', *Journal of Southern History,* 1983, vol. 49, pp. 57–72.

35 E.g., 'The cocain *[sic]* habit', *Journal of the American Medical Association,* 1900, vol. 34, p. 1637, and '"Cocaine Alley"', op. cit., pp. 337–8.

36 Facsimile advertisement in Byck, op. cit., p. xxxviii.

37 Fifteen states also required that students in public schools receive instruction in the effects of alcohol and narcotic drugs—'narcotic' then understood to include cocaine. Martin I.Wilbert, 'Efforts to curb the misuse of narcotic drugs: a comparative analysis of the federal and state laws designed to restrict or regulate the distribution and use of opium, coca, and other

narcotic or habit-forming drugs', *Public Health Reports,* 1915, vol. 30, pp. 893–923.

38  Musto, *The American Disease,* op. cit., pp. 103–4.

39  US Senate, *Report on International Opium Commission,* op. cit., p. 50; Martin I. Wilbert, 'Sale and use of cocaine and narcotics', *Public Health Reports,* 1914, vol. 29, pp. 3180–1.

40  I say 'enlarge' because a small underground market actually existed before regulation, due to the fact that some retailers refused to sell to customers they deemed to be other than legitimate. Middlemen who had no such scruples would purchase and resell cocaine in the underworld, usually at inflated prices. Formal regulations had the effect of expanding this type of diversionary activity. Spillane, op. cit.

41  Even before the passage of state and federal laws the more professionally minded druggists voluntarily began restricting sales, a trend which also contributed to the rise of the underground market. Joseph Spillane, 'The retail druggists and the transformation of cocaine, 1885–1915', unpublished paper furnished by the author, 1992.

42  Harvey W.Wiley and Anne Lewis Pierce, 'The cocain [sic] crime', *Good Housekeeping,* 1914, vol. 58, pp. 393–4.

43  Undated clipping, 'Grand jury gets behind cocaine sellers', *New Orleans Item,* probably 1909 or 1910, Box 29, Records of the United States Delegation to the International Opium Commission and Conference, 1909–13, Record Group 43, National Archives, Washington, DC.

44  David F.Musto, 'Illicit price of cocaine in two eras: 1908–14 and 1982–89', *Connecticut Medicine,* 1990, vol. 54, 322–3.

45  A good description of the ease with which heroin could be obtained around 1910 is Leroy Street, in collaboration with David Loth, *I Was a Drug Addict,* New York, Random House, 1953, pp. 19, 29–30.

46  J.Frank Chase et al., *The Dope Evil,* Boston, New England Watch & Ward Society, 1912, p. 9.

47  Wilbert, 'Efforts to curb the misuse of narcotic drugs', op. cit., p. 898.

48  E.g., Charles F.Stokes, 'The problem of narcotic addiction of today', *Medical Record,* 1918, vol. 93, pp. 756–7, and Clifford B.Farr, 'The relative frequency of the morphine and heroin habits: based upon some observations at the Philadelphia General Hospital', *New York Medical Journal,* 1915, vol. 101, pp. 892–5.

49  Box 6, Kolb Papers, History of Medicine Division, National Library of Medicine, Bethesda, Maryland. For a fuller description of these records see Courtwright, *Dark Paradise,* op. cit., pp. 161–2, n. 9.

50  David T.Courtwright, Herman Joseph and Don Des Jarlais, *Addicts Who Survived: An Oral History of Narcotic Use in America, 1923–1965,* Knoxville, University of Tennessee Press, 1989, p. 235.

51  All forms, including crude, smoking, medicinal and tinctures and extracts.

52  US Treasury Department, Bureau of Narcotics, *Traffic in Opium and Other Dangerous Drugs,* Washington, DC, Government Printing Office, 1939, pp. 80–5.

53  A partial exception to this generalization would be the years 1948–9, when there was an influx of Peruvian cocaine and a dramatic, but temporary, increase in seizures. 'The white goddess', *Time,* 11 April 1949, vol. 53, p. 44.

54  'Cocaine used by most drug addicts', *New York Times,* 15 April 1926, p. 20; Garland Williams, New York District Supervisor, to Harry Anslinger, Commissioner of Narcotics, 9 February 1940, US Treasury Department File 0120–9, Drug Enforcement Administration, Washington, DC.

55  Harry Anslinger and Kenneth W.Chapman, 'Narcotic addictions', *Modern Medicine,* 1957, vol. 25, p. 179.

56  Gerald T.McLaughlin, 'Cocaine: The history and regulation of a dangerous drug', *Cornell Law Review,* 1973, vol. 58, pp. 555–6. See also James V.Spotts and Franklin C.Schontz, *The Life Styles of Nine American Cocaine Users: Trips to the Land of Cockaigne [sic],* National Institute on Drug Abuse Research Monograph 16, Washington, DC, Government Printing Office, 1976, p. 14, and Barry Spunt et al., 'Methadone diversion: a new look', *Journal of Drug Issues,* 1986, vol. 16, pp. 569–83. It should be emphasized that not all methadone patients continued to use illicit drugs and that there were and are large variations in 'cheating'. Research has shown that patients in programmes which administer higher doses of methadone, in the range of 60 to 100 mg a day, use fewer illicit narcotics and stimulants than do patients in low-dose programmes, who receive 30 to 50 mg a day. Dean R.Gerstein and Henrick J.Harwood (eds), (Committee for the Substance Abuse Coverage Study, Division of Health Care Services, Institute of Medicine), *Treating Drug Problems: A Study of the Evolution, Effectiveness, and Financing of Public and Private Drug Treatment Systems,* Washington, DC, National Academy Press, 1990, vol. 1, pp. 147–51.

57  Joseph L.Zentner, 'Cocaine and the criminal sanction', *Journal of Drug Issues,* 1977, vol. 7, p. 98, and Scott E.Lukas, *Amphetamines: Danger in the Fast Lane,* New York, Chelsea House, 1985, p. 21.

58  The thesis that increased cocaine consumption was partly a substitute for the amphetamines was developed by Edward Brecher et al., *Licit and Illicit Drugs,* Boston, Little, Brown, 1972, pp. 267–305. For further, empirical evidence that amphetamine use was declining as cocaine use was rising see Robert D. Budd, 'Drug use trends among Los Angeles county probationers over the last five years', *American Journal of Drug and Alcohol Abuse,* 1980, vol. 7, p. 59. For information on the amphetamines' legal restriction see Ch. 9 of Lukas, op. cit. The most detailed treatment of the Bias episode is Lewis Cole, *Never Too Young to Die: The Death of Len Bias,* New York, Pantheon Books, 1989.

59  See Todd Gitlin, *The Sixties: Years of Hope, Days of Rage,* New York, Bantam, 1987, esp. Ch. 8, on the political overtones of youthful drug use. The few radicals who shunned illicit drugs were mainly affiliated with the Progressive Labor Movement, a Maoist breakaway from the Communist Party (p. 209).

60  Thomas L.Dezelsky, Jack V.Toohey and Robert Kush, 'A ten-year analysis of non-medical drug use behavior at five American universities', *Journal of School Health,* 1981, vol. 51, pp. 52–3.

61  *Holy Terror: Andy Warhol Close Up,* New York, HarperCollins, 1990, p. 369.
62  Herbert D.Kleber, 'Epidemic cocaine abuse: America's present, Britain's future?', *British Journal of Addiction,* 1988, vol. 83, p. 1362; William H.Helfand, 'Vin Mariani', *Pharmacy in History,* 1980, vol. 22, pp. 11–19.
63  *Bright Lights, Big City,* New York, Vintage, 1984, p. 153. See also Kennedy, op. cit., pp. 117–22.
64  Guy Gugliotta and Jeff Leen, *Kings of Cocaine: Inside the Medellín Cartel—An Astonishing True Story of Murder, Money, and International Corruption,* New York, Simon & Schuster, 1989.
65  Rensselaer W.Lee III, *The White Labyrinth: Cocaine and Political Power,* New Brunswick, NJ, Transaction Publishers, 1989, p. 100. See also Musto, 'Illicit price of cocaine', op. cit., p. 323.
66  US Office of National Drug Control Policy, Executive Office of the President, *Price and Purity of Cocaine: The Relationship to Emergency Room Visits and Deaths, and to Drug Use Among Arrestees,* Washington, DC, Office of National Drug Control Policy, 1992, pp. 5–6.
67  Dan Waldorf, Craig Reinarman and Sheigla Murphy, *Cocaine Changes: The Experience of Using and Quitting,* Philadelphia, Temple University Press, 1991, pp. 103–39; Kleber, op. cit., p. 1363; US House of Representatives, Select Committee on Narcotics Abuse and Control, *Cocaine: A Major Drug Issue of the Seventies: Hearings,* 96th Cong., 1st sess., Washington, DC, Government Printing Office, 1980, pp. 91, 120–1, 125; Gordon Witkin et al., 'The men who invented crack', US *News & World Report,* 19 August 1991, vol. 111, pp. 44–53; Douglas McDonnell, Jeanette Irwin and Marsha Rosenbaum, '"Hop and Hubbas": a tough new mix: a research note on cocaine use among methadone maintenance clients', *Contemporary Drug Problems,* 1990, vol. 17, pp. 147–51; and Beatrice A.Rouse, 'Trends in cocaine use in the general population', in Susan Schober and Charles Schade (eds), *The Epidemiology of Cocaine Use and Abuse,* National Institute on Drug Abuse Research Monograph 110, Washington, DC, Government Printing Office, 1991, p. 14. Two books by ethnographer Terry Williams that provide a vivid account of the transition from cocaine sniffing to smoking in New York City in the 1980s are *The Cocaine Kids: The Inside Story of a Teenage Drug Ring,* Reading, Mass., Addison-Wesley, 1989, and *Crackhouse: Notes from the End of the Line,* Reading, Mass., Addison-Wesley, 1992.
68  Ibid., pp. 3, 8–10; Cole, op. cit., pp. 150–1. Before the crack wave American Blacks were statistically less likely than Whites to initiate cocaine use, but north-eastern urban Black men who tried the drug were more likely than Whites to persist and to become heavily involved with it. North-eastern urban Hispanic men also tended to be more persistent users. Denise B. Kandel and Mark Davies, 'Cocaine use in a national sample of US Youth (NLSY): ethnic patterns, progression, and predictors', in Schober and Schade, op. cit., pp. 154–6.

69  Peter Reuter, Robert MacCoun and Patrick Murphy, *Money from Crime: A Study of the Economics of Drug Dealing in Washington, DC,* Santa Monica, RAND Corporation, 1990, pp. 56, 66.

70  Philippe Bourgois, 'Growing up', *American Enterprise,* May/June 1991, vol. 2, pp. 30–4. Bouigois, an ethnographer who has spent years studying the crack trade in East Harlem, thinks there is considerably less money in it than Reuter et al., op. cit. Bourgois estimates that most street-sellers earn only $6 to $8 an hour. He stresses the non-monetary advantages of selling crack over taking a low-skilled legitimate job with (White) rules, expectations, and requirements.

71  Witkin et al., op. cit., pp. 52–3; Lemann, op. cit., pp. 336–7.

72  Los Angeles County, Office of the District Attorney, *Gangs, Crime and Violence in Los Angeles,* Los Angeles, Office of the District Attorney, 1992, pp. 60–81, quotation at 77.

73  New York City estimates indicated a female majority in early 1989. US General Accounting Office, *Drug Abuse: The Crack Cocaine Epidemic: Health Consequences and Treatment,* Washington, DC, Government Printing Office, 1991, p. 17. 'Many crack users', the report continues, 'are young, unemployed school dropouts who are socially disorganized and lack family support systems.'

74  Terry Williams, *Crackhouse,* op. cit, pp. 112–24; Alan Burdick, 'Looking for the high life', *The Sciences,* June 1991, vol. 31, pp. 14, 15; Paul J.Goldstein et al., 'Frequency of cocaine use and violence: a comparison between men and women', in Schober and Schade, op. cit., pp. 120–2; and Mindy Thompson Fullilove, E.Anne Lown, and Robert E.Fullilove, 'Crack 'Hos and Skeezers: traumatic experiences of women crack users', *Journal of Sex Research,* 1992, vol. 29, pp. 275–87. This last article errs in describing the sex-for-drugs trade as a unique feature of the crack subculture (p. 276). In the early 1980s, before the crack explosion, masseuses bartered powder cocaine for sex. Donald R. Wesson, 'Cocaine use by masseuses', *Journal of Psychoactive Drugs,* 1982, vol. 14, pp. 75–6. Bartering was also practised by female heroin addicts and, according to Goldstein, who is an authority on drugs and prostitution, has historically been commonplace in the illicit drug world: Goldstein, op. cit., p. 121.

75  Herman Joseph and Karla Damus, 'Prenatal cocaine/crack exposure in New York City', and Daniel R.Neuspiel and Sara C.Hamel, 'Cocaine and infant behavior', both in *Cocaine/Crack Research Working Group Newsletter,* October 1991, Issue 2, pp. 4–6 and pp. 14–25, respectively.

76  See, for example, Tom Morganthau et al., 'Crack and crime', *Newsweek,* 16 June 1986, vol. 107, pp. 16–22. It is striking that, fifteen years before, cocaine was described in the pages of the same periodical in a matter-of-fact, non-alarmist way. 'It's the real thing', *Newsweek,* 27 September 1971, vol. 78, p. 124. Drug authorities who had in the 1970s downplayed the dangers posed by cocaine also began changing their minds, sometimes reversing themselves in print. E.g., Waldorf et al., op. cit., pp. 8–9. Even professional ethnographers like Terry Williams, who ordinarily confine themselves to objective and value-neutral language, have deplored the crack revolution. See *The Cocaine Kids,* op. cit., pp. 107–11.

77   US Senate, Committee on Governmental Affairs, Permanent Subcommittee on Investigations, *'Crack' Cocaine: Hearing,* 99th Cong., 2nd sess., Washington, DC, Government Printing Office, 1986, p. 2.

78   For figures on the national drug control budget, 1981–93, see US Office of National Drug Control Policy, Executive Office of the President, *National Drug Control Strategy: Progress in the War on Drugs, 1989–1992,* Washington, DC, The White House, 1993, p. 4.

79   In 1991 Ansley Hamid, a veteran ethnographer of New York City's many drug sub-cultures, reported that it was hard to find crack users or distributors who had become involved after 1987. Burdick, op. cit., p. 15.

80   The National Institute on Drug Abuse's *Household Survey,* which did not cover such groups as prison inmates or the homeless, yielded an estimate of about 860,000 cocaine addicts. A different and more comprehensive study undertaken in 1990 estimated the total of addicts to be 2,200,000, or about one out of every 100 Americans. US Senate, Committee on the Judiciary, *Hard-Core Cocaine Addicts: Measuring—and fighting—the Epidemic: A Staff Report,* 101st Cong., 2nd sess., Washington, DC, Government Printing Office, 1990.

81   Eric D.Wish, 'U.S. drug policy in the 1990s: insights from new data from arrestees', *International Journal of the Addictions,* 1990–1, vol. 25, pp. 377–409, quotation at p. 377. Data on cocaine-related emergencies showed a marked increase in patients who were Black, urban, and older in the early 1990s. 'Cocaine: the first decade', *Rand Drug Policy Research Center Issue Paper,* April 1992. vol. 1(1), p. 3, and US Department of Health and Human Services, Public Health Service, Substance Abuse and Mental Health Services Division, Office of Applied Studies, *Preliminary Estimates from the Drug Abuse Warning Network,* Rockville, Md., xeroxed advance report, April 1993, p. 5. What has happened with heavy cocaine users is reminiscent of the bulge of youthful heroin addicts who began their careers in the late 1960s and 1970s and who, as they aged, continued to show up in gaols, hospitals, and drug treatment programmes in the 1970s and 1980s.

82   Sam Vincent Meddis, 'Is the drug war racist?', series in *USA Today,* 23–25 July 1993. pp. 1A, 3A; 26 July 1993, p. 6A; and 27 July 1993, pp. 6A–7A. The centrepiece of Meddis' investigation is drug arrest data broken down city by city.

83   21 *United States Code* § 841(b).

84   US District Court, Eastern District of Missouri, Eastern Division, defense brief in *US* vs. *Clary,* no. 89–00167–CR(4), pp. 4–5.

85   Burnham, op. cit., pp. 90–2.

86   Sub-heading from an editorial, 'Crack', 28 May 1989, sec. 4, p. 14.