## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE CITY OF HUNTINGTON,
    Plaintiff,

v.    CIVIL ACTION NO 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al,
    Defendants.

CABELL COUNTY COMMISSION,
    Plaintiff,
vs.

AMERISOURCEBERGEN DRUG
CORPORATION, et al,
    Defendants.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    Videotaped and videoconference deposition of BETH THOMPSON, taken by the Defendants pursuant to the West Virginia Federal Rules of Civil Procedure, in the above-entitled action, pursuant to notice, before Twyla Donathan, Registered Professional Reporter and Notary Public, at the Mountain Health Arena, One Civic Center Plaza, Huntington, West Virginia, on the 23rd day of July, 2020.

## Page 2

APPEARANCES
APPEARING FOR THE PLAINTIFFS:
PAUL T. FARRELL, ESQUIRE
FARRELL LAW
422 Ninth Street, 3rd Floor
Huntington, West Virginia 25701
(304)523-7285
paul@farrell.law

APPEARING FOR DEFENDANT AMERISOURCEBERGEN:

ROBBY J. ALIFF, ESQUIRE
JACKSON KELLY, PLLC
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304)340-1000
raliff@jacksonkelly.com

APPEARING FOR DEFENDANT CARDINAL HEALTH:
STEVEN R. RUBY, ESQUIRE
CAREY SCOTT DOUGLAS & KESSLER, PLLC
901 Chase Tower
707 Virginia Street, East
Charleston, West Virginia 25301
(304) 345-1234

ALSO PRESENT:
Chris Leigh, Videographer
Michael J. Fuller, Plaintiff    (by Zoom)
Al Sebok, AmerisourceBergen    (by Zoom)
Suzanne salgado, Cardinal Health    (by Zoom)

## Page 3

C O N T E N T S
EXAMINATION OF BETH THOMPSON    PAGE
By Mr. Ruby    5

E X H I B I T S
(Attached to the transcript)
DESCRIPTION OF EXHIBITS    PAGE
Exhibit No. 1A  Notice of Deposition    7
Exhibit No. 1B  Modified Notice of Videotaped    13
    30(b)(6) Deposition of Cabell
    County Commission
Exhibit No. 17  Website page: County Ordinances    43

## Page 4

1    P R O C E E D I N G S
2    VIDEOGRAPHER: Good afternoon. We are
3  going on the record at 1:16 p.m. on July 23rd, 2020.
4  This is Media Unit 1 of the video recorded deposition
5  of Beth Thompson, as a 30(b)(6) of the Cabell County
6  Commission, taken by counsel for Defendant in the
7  matter of the City of Huntington and the Cabell
8  County Commission vs. AmerisourceBergen Drug
9  Corporation, et al, filed in the U.S. District Court
10  for the Southern District of West Virginia, Case Nos.
11  3:17-01362 and 3:17-0165.
12    This deposition is being held at the
13  Mountain Health Arena, located in Huntington,
14  West Virginia. My name is Chris Leigh from the firm
15  Veritext and I am the videographer. The court
16  reporter is Twyla Donathan. From the firm Veritext.
17    I am not authorized to administer an
18  oath, I am not related to any party in this action,
19  nor am I financially interested in the outcome.
20    Counsel and all present in the room
21  and everyone attending remotely will now state their
22  appearance and affiliations for the record. If there
23  are any objections to proceeding, please state them
24  at the time of your appearance beginning with the

Page 85

1  in the lawsuit.
2     A   The function of County Commission
3  government is to be the fiscal agents of the county,
4  not to be watching how many pills come into our
5  county. And so, you know, our attorneys have asked
6  for the information and -- for two years, I think
7  they said, and we still haven't been given access to
8  it. So, you know, it's not our function to know
9  these things.
10    Q   Setting aside the reason for the county's
11 knowledge or lack of knowledge, can the county
12 identify any prescription that has contributed to the
13 harms it alleges in the Complaint?
14    A   The county is not supposed to. It's not
15 our function. No, the county is not supposed to.
16 It's not our function.
17    Q   So the answer is "no," because --
18    A   It's not our function. It's not our role.
19 That's why we hired the attorneys to file the lawsuit
20 to fix this horrible problem that you have created
21 here.
22    Q   Other than filing this lawsuit and hiring
23 Mr. Farrell and his colleagues, has the county done
24 anything else to try to identify prescriptions that

Page 86

1  have caused the harm alleged in the Complaint?
2     A   The county's functions are set out
3  specifically, and we don't have that function or
4  role. This was the only thing we could do.
5         MR. FARRELL: So the answer is?
6         THE DEPONENT: No.
7     Q   Does the sheriff's office investigate drug
8  cases?
9     A   Yes.
10    Q   Has the sheriff's office ever in the course
11 of investigating a drug case identified a
12 prescription that contributed to the harms alleged in
13 the Complaint?
14    A   You'd need to talk to the sheriff about
15 anything that they've investigated.
16    Q   Is that something that the Commission has
17 ever tried to find out from the sheriff's office?
18    A   The Commission doesn't function that way.
19 It's not our role. It hasn't tried to find out. We
20 have no reason to try to find out. It's not part of
21 what we do on our day-to-day basis, so no.
22    Q   You say that the Commission had no reason
23 to find out. Does the Commission believe that it's
24 important to do everything possible to abate the

Page 87

1  opioid problem in Cabell County?
2     A   Of course. That's why they filed the
3  lawsuit.
4     Q   And since it's important to do everything
5  possible to abate the opioid problem in Cabell
6  County, then why hasn't the Commission ever asked the
7  sheriff's office to identify harmful prescriptions?
8         MR. FARRELL: Objection.
9  Argumentative.
10        MR. RUBY: You can answer.
11    A   Because it's not our function. That's
12 not -- that's not what we do as a county commission.
13    Q   In the view of the Commission -- and you've
14 given a good deal of testimony, Ms. Thompson, about
15 the function of the County Commission. In the view
16 of the Commission, is there anything that the
17 Commission could have done to try to abate the opioid
18 problem in Cabell County besides filing this lawsuit?
19    A   No.
20    Q   You testified near the beginning of the
21 deposition, Ms. Thompson, that the County Commission
22 can obtain information from the sheriff's office; is
23 that correct?
24    A   Yes, it can.

Page 88

1     Q   In preparing to testify about Topic No. 3,
2  did you ask the sheriff's office if it had ever
3  identified a prescription that contributed to the
4  opioid problem here?
5     A   No, we didn't.
6     Q   Why not?
7         MR. FARRELL: Objection.
8  Argumentative.
9         MR. RUBY: It's not argumentative.
10 It's a fair question.
11        MR. FARRELL: It's a fair question,
12 but it's an argumentative fair question.
13        MR. RUBY: You can answer.
14    A   We did not.
15    Q   But why not? That was the question.
16    A   Oh, I'm sorry. We did not because we
17 didn't know to be asking. You all were the ones who
18 knew how much you were sending into the communities.
19 We didn't know. So we didn't know to be asking these
20 questions. We just knew there was a problem, and the
21 only way we could fix it was to file this lawsuit.
22    Q   My question is a different question, which
23 is -- which is why you didn't, in preparation for
24 your deposition, and in particular to testify about

Page 149

1      MR. FARRELL: Objection. Leading.
2      MR. RUBY: This is cross, Counsel.
3    Q   Is the Commission aware of whether the Drug
4  Enforcement Administration sets quotas for the number
5  of doses of prescription opioids that can be
6  manufactured every year in the U.S.?
7      MR. FARRELL: Are we moving off to a
8  different subject matter?
9      MR. RUBY: We're still on actors.
10      As the witness has testified, there
11  are lots of people to blame.
12    A   Yes. And that's why we've hired attorneys
13  and experts to determine all of this for us. The
14  only thing that county commission government can do
15  is file this lawsuit.
16      And you brought up the grants and things
17  while ago. To expect the county to apply for grants
18  and things that we have to match or spend money -- I
19  know my previous deposition, which I know I am not
20  here on that, but the attorney had mentioned imposing
21  a new tax or levy on our taxpayers. You know, to
22  even suggest that we do something in addition to what
23  we've already spent out to cost taxpayers more for
24  this problem that you all have caused, it's just --

Page 150

1  it's horrible.
2      It's horrible that you all would expect us
3  to do anything else except what we've done. We had
4  no other recourse but to file this lawsuit to try to
5  fix this problem that you've created. And, yeah,
6  there are multiple people to blame, but you all
7  should have known and did know the numbers that you
8  were dumping into our community, hundreds of
9  thousands. And you did nothing to stop it or slow it
10  down.
11      And the whole time, we're just sitting here
12  watching this unfold, and watching the crime
13  increase, and watching people die from overdoses, and
14  watching babies be born addicted to substances. And,
15  you know, and to think that we're supposed to sit
16  here and say that we're embarrassed that we didn't do
17  more, how did we know? How did we know what all you
18  all were doing to us? We didn't know. We were just
19  watching it all unfold and not knowing what to do
20  about it and how to combat it.
21      And now this is the only thing we can do.
22  And to suggest that we should do something more, as
23  far as grants or -- that wouldn't even scratch the
24  surface. It's just -- It really makes me mad. And

Page 151

1  it makes the Commission mad too.
2    Q   Has the City of Huntington obtained grants
3  to help abate the opioid problem?
4    A   The County Commission government is
5  completely separate and different from municipal
6  governments. And, yes, I believe it has, but I can't
7  sit here and say specifically if it has or not.
8    Q   If the -- You testified that it's horrible
9  to expect --
10    A   Because our functions --
11    Q   I'm sorry -- I'm sorry, Ms. Thompson.
12  Could I finish my question?
13    A   Yes, I'm sorry.
14      MR. FARRELL: She is the County
15  Commission by the way.
16    Q   Is it inappropriate in some way for the
17  City of Huntington to have obtained grants to abate
18  the opioid problem?
19    A   Absolutely not. No. I'm glad they had the
20  ability to do that. Their rules are much different
21  than county commission government. Municipalities
22  are different. They're different municipalities.
23  They are a municipality. We are a county commission
24  government. Different roles, different functions,

Page 152

1  different funding. It's all completely different.
2  They have home rule. We don't have that.
3      You know, it's just -- it's two completely
4  different animals you're talking about. And I'm glad
5  they have that ability.
6    Q   Does the county not have the ability? Does
7  the County Commission not have the ability to obtain
8  grants?
9    A   It does, but we don't know of any that were
10  out there, and we shouldn't be asked to be spending
11  more money on grants and matching things that I don't
12  even know if they're there, that would even fight to
13  scratch the surface of this problem. That's what I'm
14  saying, and that's what the County Commission is
15  saying.
16    Q   Has the Commission ever asked any
17  representative of the city if the city is aware of
18  grants that the county could obtain?
19    A   Not that I'm aware of.
20    Q   Let me go back to the DEA question. Is the
21  Commission aware of whether the Drug Enforcement
22  Administration sets quotas for the amount of opioids
23  that can be manufactured in the U.S.?
24    A   Yes, I believe it does -- or we believe it

Page 153

1  does, yes.
2    Q  Is the DEA also then a contributor to the
3  harms that the Commission identified in its
4  Complaint?
5    A  If it neglected its responsibilities, yes.
6    Q  Is the Commission familiar with the Joint
7  Commission on Accreditation of Health Care
8  Organizations?
9    A  Yes, somewhat.
10   Q  What does the Commission know about that
11 organization?
12   A  Honestly, we can't sit here right now and
13 say, because I am too tired.  So can I take a break
14 or ...?
15   Q  I tell you what.  We can -- I'll make you a
16 deal.  If we can finish this last question that I
17 still have on the table, then we'll wrap up for the
18 day.  How's that?
19   A  That's fine.
20   Q  So the question was what the Commission
21 knows about the Joint Commission on Accreditation of
22 Health Care Organizations?
23   A  The Commission is unsure what it knows
24 about it.

Page 154

1    Q  Okay.  Well, so the answer was, I think --
2    A  The Commission has heard of it, but we are
3  unsure about what it does.
4    Q  Does the Commission know whether it is
5  involved in the accreditation of hospitals?
6    A  From the name of it, it would seem that
7  that's what it does.
8         MR. FARRELL:  Does the County
9  Commission have any direct knowledge?
10        THE DEPONENT:  No.
11   Q  Does the Commission know and -- I'll just
12 call this organization The Joint Commission for
13 short, which I think is its official name now.  Does
14 the County Commission know whether The Joint
15 Commission had any role in the prescribing of
16 opioids?
17   A  No, it doesn't.
18        MR. RUBY:  Okay.
19        THE DEPONENT:  Okay.
20        MR. RUBY:  We'll be back Tuesday.
21        THE DEPONENT:  Okay.  Thank you.
22        MR. RUBY:  Thank you.
23        VIDEOGRAPHER:  The time is 5:04.  We
24 are going off the record.

Page 155

1        (Signature having not been waived, the
2  deposition of BETH THOMPSON was concluded at 5:04 p.m.

Page 156

1  STATE OF WEST VIRGINIA,
2  COUNTY OF CABELL, to-wit:
3
4        I, Twyla Donathan, RPR, a duly commissioned
   Notary Public for the County and State herein, do hereby
5  certify that the foregoing deposition of BETH THOMPSON was
   duly taken by me and before me at the time and place
6  and for the purpose specified in the caption hereof, the
   said witness having been by me first duly sworn.
7        That the foregoing is a true, correct, and
   full transcript of the testimony adduced, as taken by me
8  in shorthand notes and thereafter accurately transcribed;
        I further certify that I am neither attorney
9  or counsel for, nor related to or employed by, any of the
   parties to the action in which this deposition is taken;
10 and further, that I am not a relative or employee of any
   attorney or counsel employed by the parties or financially
11 interested in the action; and that the attached transcript
   meets the requirements set forth within Article 27,
12 Chapter 47 of the West Virginia Code.
13       IN WITNESS WHEREOF, I have hereunto set
14 my hand this 25th day of July, 2020.
15
            <%10538,Signature%>
16           TWYLA DONATHAN
           Registered Professional Reporter
17    My commission expires September 11, 2022.
18
19
20
21
22
23
24

Page 161

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

*********************************************************

THE CITY OF HUNTINGTON,

    Plaintiff,

v.        CIVIL ACTION NO 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al,
    Defendants.

CABELL COUNTY COMMISSION,
    Plaintiff,
vs.

AMERISOURCEBERGEN DRUG
CORPORATION, et al,
    Defendants.
*********************************************************

Day 2 of the 30(b)(6) videotaped and videoconference deposition of BETH THOMPSON, taken by the Defendants pursuant to the West Virginia Federal Rules of Civil Procedure, in the above-entitled action, pursuant to notice, before Twyla Donathan, Registered Professional Reporter and Notary Public, at the Mountain Health Arena, One Civic Center Plaza, Huntington, West Virginia, on the 28th day of July, 2020.

Page 162

A P P E A R A N C E S
APPEARING FOR THE PLAINTIFFS:
PAUL T. FARRELL, ESQUIRE
FARRELL LAW
422 Ninth Street, 3rd Floor
Huntington, West Virginia 25701
(304)523-7285
paul@farrell.law

MICHAEL A. WOELFEL, ESQUIRE
WOELFEL & WOELFEL, LLP
801 Eighth Street
Huntington, West Virginia 25701
(304)522-6249

APPEARING FOR DEFENDANT AMERISOURCEBERGEN:
ROBBY J. ALIFF, ESQUIRE
JACKSON KELLY, PLLC
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304)340-1000
raliff@jacksonkelly.com

APPEARING FOR DEFENDANT CARDINAL HEALTH:

STEVEN R. RUBY, ESQUIRE
CAREY SCOTT DOUGLAS & KESSLER, PLLC
901 Chase Tower
707 Virginia Street, East
Charleston, West Virginia 25301
(304) 345-1234

ALSO PRESENT:
Adam Hager, Video Specialist
Samuel Bloom       (by Zoom)
Suzanne Salgado      (by Zoom)

Page 163

C O N T E N T S
EXAMINATION OF BETH THOMPSON    PAGE
By Mr. Ruby          166
By Mr. Farrell        412
By Mr. Ruby          415
By Mr. Farrell        415
By Mr. Ruby          416

E X H I B I T S
(Attached to the transcript)
DESCRIPTION OF EXHIBITS      PAGE
Exhibit No. 16  Email from kvance@    168
  cabellcountyclerk.org 4/3/2018,
  Subject: Re: Solution, CCCOMM
  3832-1 through 3832-3
Exhibit No. 43  Corrected Joint and Third Amended   182
  Complaint, National
  Prescription Opiate Litigation
Exhibit No. 2  Email from Stephan M. Petrany,    204
  4/19/2019, Subject: Huntington
  Resiliency Plan, Bates CCCOMM
  0025422-1 through 0025422-6
Exhibit No. 24  Email from Jodi Maiolo,     216
  8/15/2019/, Subject: Huntington
  Resiliency Plan (with attached
  Resiliency Plan draft)
Exhibit No. 25  Email from Beth Thompson to Jim   227
  Morgan, 8/27/2019, Subject:
  Resiliency Plan
Exhibit No. 26  Resiliency Plan, Cabell County,   229
  WV, August 21, CCCOMM 0022443
Exhibit No. 27  Email chain, from Beth Thompson,  237
  2/3/2020, Subject: FW:
  Resiliency Plan Public Release,
  CCCOMM 0036147
Exhibit No. 28  Email from Nancy Cartmill,    243
  2/3/2020, Subject: Re:
  Resiliency Plan Public Release,
  CCCOMM 0037070

Page 164

DESCRIPTION OF EXHIBITS      PAGE
Exhibit No. 29  Email from Paul Farrell to Stephen  249
  Petrany, 2/4/2020, Subject:
  Re: Resiliency Plan Public
  Release, Marshall FEDWV
  00003229
Exhibit No. 57  Press Release, February 7, 2020,  259
  "Cabell County organizations
  release Resiliency Plan"
Exhibit No. 44  JAG GRANT 2019 THRU 2020     262
Exhibit No. 54  Huntington Herald Dispatch, May  289
  21, 2006, "Drug war rages"
Exhibit No. 1B  Modified Notice of Videotaped   310
  30(b)(6) Deposition of Cabell
  County Commission
Exhibit No. 1  City of Solutions, Huntington, WV,  362
  A Guide to What Works and What
  Does Not
Exhibit No. 4  Email from Tim Hazelett,     379
  8/12/2015, Subject:
  Cabell-Huntington Health
  Department Harm Reduction
  Program
Exhibit No. 6  Email from Michael Kilkenny,   380
  11/29/2018, Subject: Statement
  request
Exhibit No. 7  Email chain from Beth Thompson,  382
  6/21/2019, Subject: FW:
  Concerns
Exhibit No. 12  Email from Mike Davis, 8/16/2018,  386
  Subject: Volunteer Fire
  Responses
Exhibit No. 13  Email chain, from Angie Saunders,  389
  10/4/2019, Subject: FW:
  Informational meeting on
  permanent housing
  (post-recovery) Monday, Oct 7th
  3:30 pm
Exhibit No. 14  Email chain, from Jim Morgan,   390
  10/4/2019, Subject: Re:
  Informational meeting on
  permanent housing
  (post-recovery) Monday, Oct 7th
  3:30 pm

Page 413

1  A  I don't recall.
2  Q  What does the Western Regional Day Center
3  do?
4  A  It is similar to home confinement. It's
5  another sentencing type thing for -- that individuals
6  go to, either to report for drug testing -- I think
7  the Day Report Center also has a shelter for women
8  now. I think it gets multiple grants.
9  Q  Does it provide any programs relating to
10 drug abuse other than the drug testing program that
11 you mentioned?
12 A  I'm unsure.
13 Q  Does it provide any sort of rehabilitation
14 services?
15 A  I believe so. I think it has the recovery
16 house.
17 Q  And does the County have any involvement
18 with the recovery house program at the Day Report
19 Center?
20 A  Not directly. No.
21     MR. RUBY: I think that's all I have.
22     Rob, do you have anything?
23     MR. ALIFF: I do not.
24     MR. RUBY: Redirect?

Page 414

1     MR. FARRELL: Yes.
2     EXAMINATION BY COUNSEL FOR PLAINTIFFS:
3  BY MR. FARRELL:
4  Q  Ms. Thompson, how long have you been
5  employed with the Cabell County Commission?
6  A  Five years.
7  Q  And in what capacity?
8  A  Most of the time it's county administrator.
9  Q  Have you been present since the inception
10 of this lawsuit?
11 A  Yes.
12 Q  Have you been present during the executive
13 sessions with the county commissioners?
14 A  Yes.
15 Q  Are you aware of whether the County
16 Commission has formally designated you to serve as
17 its 30(b)(6) witness?
18 A  Yes.
19 Q  And what was their decision?
20 A  To appoint me.
21 Q  Have you also served in the capacity of
22 verifying the pleadings when required, especially
23 discovery responses?
24 A  Yes.

Page 415

1  Q  Have you been intimately involved in every
2  aspect of this lawsuit?
3  A  Yes.
4  Q  Have you reviewed, read, and helped prepare
5  the discovery responses?
6  A  Yes.
7  Q  Are you aware that the Cabell County
8  Commission has disclosed over 400,000 documents in
9  this litigation?
10 A  Very aware of that.
11 Q  Have you been involved with helping
12 coordinate with the constitutional officers in the
13 county to produce those documents?
14 A  Yes.
15 Q  Did you review all 31 topics of the
16 30(b)(6) deposition?
17 A  Yes.
18 Q  Including the italicized subparts of each
19 topic?
20 A  Yes.
21 Q  Did you review each very carefully?
22 A  Yes.
23 Q  Did you make a determination as to which
24 topics the Cabell County Commission had institutional

Page 416

1  knowledge and which topics it did not?
2  A  Yes.
3  Q  And did you just guess, or did you base it
4  upon some reasonable understanding of the function of
5  county government?
6  A  I based it on a reasonable understanding of
7  the function of county government.
8  Q  Have you disclosed every single document
9  that you are aware of responsive to discovery
10 responses?
11 A  Yes.
12 Q  Has the County Commission responded in good
13 faith to every single question that was posed in the
14 30(b)(6) topics?
15 A  Yes.
16 Q  Is there any possible fact or information
17 that exists in the history of the county that you
18 have not disclosed knowingly?
19     MR. ALIFF: Object to form.
20 A  No.
21 Q  Do you believe you have taken a reasonable
22 basis to respond to the institutional knowledge of
23 the Cabell County Commission to the subject matters
24 identified in the 30(b)(6) Notice?

Page 417

1  A  Yes.
2      MR. FARRELL: That's all I have.
3      MR. RUBY: Just a little recross.
4   EXAMINATION BY COUNSEL FOR CARDINAL HEALTH:
5  BY MR. RUBY:
6  Q  Ms. Thompson, am I correct that the only
7  things, based on your testimony today, that you did
8  to prepare for your testimony as a 30(b)(6) witness
9  was to review part of Commissioner Sobonya's
10 deposition transcript and to review the County's
11 written discovery responses?
12 A  Yes. And I've been present throughout all
13 of the executive sessions.
14 Q  Is there anything else that -- besides the
15 two things that I mentioned, that you did to prepare
16 for your deposition testimony in this 30(b)(6)
17 deposition?
18 A  I can't think of anything else.
19     MR. RUBY: Okay.
20   EXAMINATION BY COUNSEL FOR PLAINTIFFS:
21 BY MR. FARRELL:
22 Q  Did you need to review anything else to
23 prepare for this deposition?
24 A  No.

Page 418

1  Q  Is that because you were involved with
2  obtaining the same information in the subject matters
3  that were set forth in the discovery requests?
4  A  Yes.
5      MR. FARRELL: No further questions.
6   EXAMINATION BY COUNSEL FOR CARDINAL HEALTH:
7  BY MR. RUBY:
8  Q  Were there many questions that I asked in
9  the course of this deposition that you lacked the
10 information to respond to, Ms. Thompson?
11 A  Pardon me?
12 Q  Were there many questions that I asked in
13 the course of this deposition that you lacked the
14 information to respond to?
15 A  Yes.
16     MR. RUBY: That's all I have.
17     MR. FARRELL: Thank you.
18     VIDEOGRAPHER: Any questions on the
19 call?
20     (No response.)
21     VIDEOGRAPHER: We're off the record at
22 4:30 p.m. This concludes today's 30(b)(6) deposition
23 of Beth Thompson. The total number of Media Units
24 used was four, and will be retained by Veritext.

Page 419

1      (Signature having not been waived, the
2  deposition of BETH THOMPSON was concluded at 4:30 p.m.)

Page 420

STATE OF WEST VIRGINIA,
COUNTY OF CABELL, to-wit:

      I, Twyla Donathan, RPR, a duly commissioned
Notary Public for the County and State herein, do hereby
certify that the foregoing deposition of BETH THOMPSON was
duly taken by me and before me at the time and place
and for the purpose specified in the caption hereof, the
said witness having been by me first duly sworn.
      That the foregoing is a true, correct, and
full transcript of the testimony adduced, as taken by me
in shorthand notes and thereafter accurately transcribed;
      I further certify that I am neither attorney
or counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken;
and further, that I am not a relative or employee of any
attorney or counsel employed by the parties or financially
interested in the action; and that the attached transcript
meets the requirements set forth within Article 27,
Chapter 47 of the West Virginia Code.
      IN WITNESS WHEREOF, I have hereunto set
my hand this 30th day of July, 2020.
<%10538,Signature%>
_____
          TWYLA DONATHAN
       Registered Professional Reporter
    My commission expires September 11, 2022.