IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>  Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>  Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>  Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>  Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE EVIDENCE, TESTIMONY, STATEMENTS, OR ARGUMENTS PERTAINING TO ANY PAYMENTS THE PLAINTIFFS RECEIVED FROM COLLATERAL SOURCES**

Plaintiffs move to exclude any evidence or argument about payments they received from "collateral sources." Dkt. 1006. Their motion should be denied for three reasons.

***First***, Plaintiffs' motion purportedly seeks to preclude evidence of payments "the Plaintiffs received" from collateral sources. But the vast majority of the evidence Plaintiffs seek to preclude concerns payments from non-party payors to non-party healthcare providers that Plaintiffs never received at all. As Plaintiffs' authorities themselves state, the collateral source rule applies only to payments received by Plaintiffs for their own injuries. The rule does not preclude evidence of resources and monies that ***non-parties***, including the State of West Virginia, received in order to

address the injuries of other non-parties, including addicted individuals in Cabell County and Huntington.

***Second***, the collateral source rule—which ensures that payments from collateral sources do not offset the injured party's ***damages***—has no application here because Plaintiffs have disclaimed recovery of any damages, past or future. No authority cited by Plaintiffs applies the collateral source rule to a purported claim for equitable relief, and this Court should not be the first.[1] Plaintiffs seek money to fund programs that they claim will "abate" the crisis of opioid addiction in Cabell County and Huntington, and to that end, they have compiled an enormous wish list of programs they seek to fund.[2] But it is undisputed that Plaintiffs have no obligation to spend their own money for these types of programs, and in most instances have not; almost all of the programs that the County and City administer or participate in are funded by federal and state grants. Thus, evidence that addiction treatment programs are, and have been, paid for by other government entities is not evidence of "payments made to" Plaintiffs that "mitigate [Plaintiffs'] loss."[3]

***Third***, Plaintiffs contend that their claims are equitable, and a court sitting in equity should not ignore when crafting an equitable remedy the fact that entities other than Plaintiffs bear (and will continue to bear) virtually all of the financial responsibility for responding to the opioid crisis.

---

[1] Because West Virginia has never applied the collateral source rule in the context of equitable relief, a federal court sitting in diversity and applying West Virginia law should be particularly reluctant to do so. *See Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011) ("A federal court acting under its diversity jurisdiction should respond conservatively when asked to discern governing principles of state law.").

[2] As Defendants previously have argued, "abatement" in West Virginia nuisance law refers to an injunction; it does not encompass the payment of money to remedy the purported downstream consequences that resulted from an alleged nuisance. Dkt. 256.

[3] *Kenney v. Liston*, 760 S.E.2d 434, 440 (W. Va. 2014).

2

And because the Court will serve as trier of fact, the concerns regarding juror confusion that underlie the collateral source doctrine are inapplicable here.

## BACKGROUND

Plaintiffs have one claim: public nuisance, for which they seek one remedy—"abatement." Although they seek a monetary award from Defendants to fund their proposed abatement efforts, Plaintiffs have gone to great lengths to characterize this remedy as "abatement," not damages, by arguing repeatedly that the relief they seek is equitable. *See* Dkt. 225 at 5 ("Plaintiffs' public nuisance claims seeking only the equitable remedy of abatement are not tort actions for compensatory damages …."); Dkt. 288 at 11 (arguing Defendants are "simply wrong" to characterize Plaintiffs' proposed remedy as "money damages rather than the equitable remedy of abatement").[4]

The centerpiece of Plaintiffs' purported abatement remedy is the report of their expert Dr. Caleb Alexander, who proposes an "abatement plan" consisting of various programs that he believes Cabell County and the City of Huntington could use to "abate" the opioid crisis— including addiction to illegal drugs—such as prevention and supply reduction measures, treatment and support for addicted individuals, enhanced public safety programs, and programs to address the needs of special populations affected by the opioid crisis. Plaintiffs would have Defendants pay them for the cost of all of these programs for the next 15 years, even though it is not Plaintiffs' function to pay for such programs, they have no obligation to pay for such programs, and they never before have paid for such programs.

---

[4] Defendants maintain that the remedy Plaintiffs seek is money damages, not abatement. Dkt. 256. But Plaintiffs cannot have it both ways. They cannot claim that their requested relief is equitable in order to avoid application of unfavorable legal rules such as non-party fault, several liability, and application of the statute of limitations, but then also invoke a doctrine that applies to money damages to avoid admission of unfavorable evidence.

Dr. Alexander suggests many programs that could be provided or funded by Plaintiffs, but in reality, most, if not all, of the programs that already exist in the Cabell/Huntington community for addiction treatment are funded (and in large part administered) by federal and state governments. More specifically:

- Of the total abatement costs sought by Plaintiffs, more than 81 percent is comprised of costs to treat opioid use disorder, HIV, neonatal abstinence syndrome, hepatitis B and C, infective endocarditis, and other purported co-morbidities—all costs that have been and will continue in the future to be paid by non-party insurers (primarily Medicare and Medicaid) to non-party healthcare providers. None of those costs has been or will be borne by the County and City.

- In addition to treatment costs paid by non-party payors to non-party healthcare providers, the "abatement" costs sought by Plaintiffs also include costs for programs that the County or City might participate in or administer, but that are funded by grants from the federal or state governments, or other sources. None of the grant-funded costs have ever been paid by the County and City, and there is no evidence in the record suggesting that existing grants will not be renewed. Only a minute fraction of the remaining 19 percent consists of funds actually expended by the City and the County.[5]

Dkt. 1069 at 6–8, 14–15. In short, the vast majority of the payments Plaintiffs seek to exclude are not "payments" to Plaintiffs for anything, much less for any "loss" incurred by Plaintiffs.

---

[5] Plaintiffs incurred minor total costs of about $136,000 annually (either through in-kind contributions or cash payments). Dkt. 1006.1 at 32–33.

# ARGUMENT

I. **The Collateral Source Rule Cannot Be Used To Exclude Evidence of Monies (1) Received by Non-Parties, (2) For Injuries to Non-Parties, or (3) Paid by Defendants**

Plaintiffs style their motion as one to preclude evidence of payments the *City* and *County* have received pursuant to the collateral source rule, but their motion makes plain that they also intend to sweep out evidence of monies paid to or received by the State and healthcare providers to treat the addiction and overdose of non-parties. *See* Mot. 1 (citing defense expert report discussing "federal funds to address the opioid abuse epidemic" received by "the state of West Virginia"); *id.* 2 (discussing money paid by Medicaid to treatment providers).

"The collateral source rule excludes payments from other sources *to plaintiffs* from being used to reduce damage awards imposed upon culpable defendants." *Kenney*, 760 S.E.2d at 440.[6] It does not preclude any evidence of payments or money received by non-parties. Thus, to the extent that Plaintiffs' motion seeks to keep out evidence of payments made to or received by the State of West Virginia, or any other non-party, for programs to address the opioid misuse crisis, the Court should deny it. *Ilosky v. Michelin Tire Corp.*, Syl. 11, 207 S.E.2d 603 (W. Va. 1983).

For example, Defendants are entitled to put forth evidence of payments made by Medicare and Medicaid to healthcare providers for addiction treatment because that money is not paid by or to Plaintiffs. Defendants will offer that evidence to establish that Plaintiffs are the wrong government entity to implement addiction treatment programs, to demonstrate that Plaintiffs are not entitled to any "abatement remedy," and to cross-examine Plaintiffs' experts about the breadth, scope, and amount of the "abatement plan" they have proposed. Dkt. 239, 1005.1, 1069. The

---

[6] Unless otherwise noted, all emphasis herein has been added and internal quotations and citations omitted.

5

evidence is thus plainly relevant and—because it does not involve payments to Plaintiffs—not barred by the collateral source rule.

That rule, moreover, applies only in situations where a plaintiff receives money from collateral sources in mitigation or recompense for *its own injuries*. *Kenney*, 760 S.E. 2d at 440 ("The collateral source rule protects payments made to or benefits conferred upon an *injured party* from sources other than the tortfeasor by denying the tortfeasor any corresponding offset or credit against the *injured party's damages*."). Plaintiffs do not seek money for their own injuries, but to provide treatment, prevention, and other services to non-parties who allegedly have been injured as a result of Defendants' conduct. The collateral source rule does not bar evidence of monies paid to treat the injuries of those non-parties.

Finally, the collateral source rule does not bar evidence of payments to a plaintiff *by the defendant*. *Kenney*, 760 S.E.2d at 446 ("The law does not differentiate between the nature of [various] collateral source benefits, *so long as they did not come from the defendant* or a person acting for the defendant."). Thus, Defendants are entitled to put forward evidence of the settlement money they paid to the State of West Virginia for addiction treatment programs—not only to show that the State is the entity that can and does implement treatment programs and to cross-examine Plaintiffs' experts about the scope of their abatement plans, but also to show that Defendants already have paid these Plaintiffs for their claims. To the extent that the State passed on any of that money to Plaintiffs for the "abatement" of the opioid abuse crisis, Defendants should not be required to pay those same costs twice. *See, e.g.*, Dkt. 1006.1 at 48 (describing West Virginia's use of settlement funds to support the Ryan Brown Fund for residential treatment); Dkt. 1006.2 at 32 (same).

**II.     The Collateral Source Rule Only Applies to Awards for Compensatory Damages**

In tort actions for compensatory damages, West Virginia recognizes the collateral source rule, which "'excludes payments from other sources to plaintiffs from being used to reduce ***damage awards*** imposed upon culpable defendants.'" *Kenney*, 760 S.E.2d at 440 (quoting *Ilosky*, Syl. 11, 207 S.E.2d 603). The classic application of the rule is "'to preclude the offsetting of payments made by health and accident insurance companies or other collateral sources as against the damages claimed by the injured party,'" though the rule also applies to other benefits from collateral sources. *Id.* (quoting *Ratlief v. Yokum*, Syl. 7, 280 S.E.2d 584 (1981)). The rule applies in tort actions for compensatory damages because "'it is the tortfeasor's responsibility to compensate for *all* harm that he causes,' not merely the net loss to the injured party." *Id.* at 445 (quoting Restatement (Second) of Torts § 920A, cmt. b) (emphasis in original).

Plaintiffs have disclaimed any compensatory damages. *See* Dkt. 225 ("Plaintiffs have waived all claims for damages."). They say they are seeking only the costs associated with "abating" the opioid abuse crisis in the future. By its own terms, then, the collateral source rule does not apply to the relief Plaintiffs request. Plaintiffs concede, as they must, that "no West Virginia court has yet had occasion to apply the collateral source rule in a nuisance action"— whether for damages or abatement. Mot. 5. But they claim that "other courts in [other] jurisdictions … have … appl[ied] the rule to nuisance abatement actions and government grants."[7] The two cases they cite, however—both of which applied Wisconsin law—involved nuisance actions for ***damages***, not abatement. In *Town of East Troy v. Soo Line Railroad Co.*, 653 F.2d 1123 (7th Cir. 1980), the court held that a town could "recover its full ***damages***" for "loss" it

---

[7] Plaintiffs cite a West Virginia case that they contend is "roughly analogous" to this one, but it is not clear how, given that that case was a "construction defect case" for costs of "repairs made to the airport." Mot. 4 & Ex. 4.

incurred as a result of a carbolic acid spill, even though the town first paid its expenses with funds from a federal grant. *Id.* at 1125–27, 1132.[8] In *City of Milwaukee v. NL Industries*, 762 N.W.2d 757, 778 (Wis. App. 2008), the Wisconsin Court of Appeals held that it was harmless error to admit evidence of collateral funds because the jury was instructed that it could not "reduce [its] award of *damages* because the City may have received funds for some costs from another source." *Id.* at 489 ("The collateral source rule directly pertains to the recovery of damages."). The court did not address whether the collateral source rule could apply to an abatement remedy; indeed, ***the defendant had already won summary judgment on the City's claim for future abatement costs***. *Id.* at 498. In short, none of Plaintiffs' cases applied the collateral source rule to a claim for equitable relief.

Plaintiffs have maintained that their abatement remedy is not to compensate them for past loss but to remedy addiction in the future. Dkt. 225 at 6–7.[9] They therefore do not seek recompense for "loss," and the collateral source rule does not apply, even to monies or payments Plaintiffs themselves may have received for programs to address the prescription opioid abuse crisis.

---

[8] In Wisconsin, a statute permits "[a]ny person, county, city, village or town" to "maintain an action to recover damages or to abate a public nuisance from which injuries peculiar to the complainant are suffered, so far as necessary to protect the complainant's rights and to obtain an injunction to prevent the same." Wisc. Stat. Ann. § 823.01. Plaintiffs' rights to maintain a public nuisance suit under West Virginia law are not nearly so broad. Dkt. 239.

[9] Even those costs are not linked to Defendants' alleged liability for wrongdoing. Plaintiffs seek to treat all opioid-related harms generally and not just to abate harm to *Plaintiffs* (the City and County, and not their addicted citizens) as a result of *Defendants' alleged misconduct* (related only to the distribution of prescription opioids, and not the opioid crisis writ large). *See* Dkt. 1069.

### III. The Collateral Source Rule Does Not Apply Where the Court Sits as the Factfinder in Equity

Plaintiffs' motion also should be denied for another reason: the collateral source rule has no application where the court sits as trier of fact in an equitable proceeding.

"The essence of equity jurisdiction," as the Supreme Court has noted, is the power of the court "to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944). The formation and application of equitable remedies therefore turns on the degree to which the remedy "sought is essential to the ends of justice." *First Am. Title Ins. Co. v. Firriolo*, 695 S.E.2d 918, 920 (W. Va. 2010); *see also* Dobbs on Remedies, § 2.1 ("Discretion as to equitable remedies goes beyond the power to deny relief; it extends as well to the power of shaping relief, determining its extent, scope, and particular incidents.").

It would not be consistent with the ends of justice if Plaintiffs were permitted to block evidence that the majority of the monetary relief they seek for their "abatement remedy" is predicated on past payments they never received and for healthcare services they neither pay for nor perform. Approximately 81 percent of the total costs in Plaintiffs' abatement plan are comprised of costs that have been and will continue to be paid by non-party insurers like Medicaid to non-party healthcare providers (and provided by non-parties, such as Marshall Health University and other hospital based systems in Cabell County). And the vast majority of the remaining 19 percent also is for response programs of a type that already are in place and that are funded by federal, state, and other grants; for instance, in 2021, the first year of the abatement plan, funds actually expended by the City and County account for less than 0.1 percent of Plaintiffs' projected abatement spending. This Court, if it indeed is sitting in equity, *see supra* n.4, should not blind itself to this reality in fashioning an equitable remedy. *See State ex rel. Emery v. Rodgers*, 76

S.E.2d 690, 695 (W. Va. 1953) ("a court of equity having complete jurisdiction of the parties and the subject matter, should make such decree as will settle the rights of the parties, do complete justice between them and close the controversy").

Additionally, West Virginia law is clear that a principal purpose of the collateral source rule is to avoid misleading juries about the proper amount of damages that are recoverable by the plaintiff. *See Ilosky*, 307 S.E.2d at 615 ("we believe that induction of collateral sources into the jury's consciousness for whatever purpose is to be avoided" because "[t]here is always the danger that jury exposure to sources of collateral payments will cause it to award less than actual damages, thereby allowing defendants to reduce their liability"); *see also Reed v. E.I. Du Pont de Nemours & Co.*, 109 F. Supp. 2d 459, 465 (S.D.W. Va. 2000) ("Evidence of collateral source payments could lead to a substantial problem should the jury learn of them."). These concerns simply are not present in a bench trial.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion in Limine To Preclude Evidence, Testimony, Statements, or Arguments Pertaining to Any Payments the Plaintiffs Received from Collateral Sources.

Dated: October 30, 2020                                         Respectfully submitted,

**CARDINAL HEALTH, INC.**

<table>
<tr><td>

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
**CAREY DOUGLAS KESSLER & RUBY PLLC**
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
dpogue@cdkrlaw.com
rfranks@cdkrlaw.com

</td><td>

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
ahardin@wc.com
jwicht@wc.com

</td></tr>
</table>

**AMERISOURCEBERGEN DRUG CORPORATION**

<table>
<tr><td>

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

</td><td>

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
**JACKSON KELLY PLLC**
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

</td></tr>
</table>

**MCKESSON CORPORATION**

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
**FLAHERTY SENSABAUGH BONASSO PLLC**
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*/s/ Timothy C. Hester*
Timothy C. Hester
Paul W. Schmidt
Christian J. Pistilli
Laura Flahive Wu
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
pschmidt@cov.com
cpistilli@cov.com
lflahivewu@cov.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*,<br><br>    Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*,<br><br>    Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**CERTIFICATE OF SERVICE**

I, Steven R. Ruby, counsel for Defendant Cardinal Health, Inc., do hereby certify that on this 30th day of October 2020, **Defendants' Opposition to Plaintiffs' Motion in Limine to Preclude Evidence, Testimony, Statements, or Arguments Pertaining to Any Payments the Plaintiffs Received From Collateral Sources** was served electronically upon all counsel of record.

                                                  /s/ Steven R. Ruby
                                            Steven R. Ruby (WVSB No. 10752)