IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>　　　Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*,<br><br>　　　Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>　　　Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*,<br><br>　　　Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**REPLY IN SUPPORT OF
DEFENDANTS' MOTION TO EXCLUDE
<u>EXPERT TESTIMONY OF THOMAS McGUIRE</u>**

　　Plaintiffs' Opposition dodges the key challenges to McGuire's testimony.

　　Regarding his net-cost (or negative-externalities) analysis, the challenge is not that such an analysis could never be helpful, but that:

- McGuire does not offer just an economic analysis of the net costs of all sales and distribution of opioids to Cabell/Huntington.  He offers a ***legal*** opinion—at Plaintiffs' specific request—as to whether the net costs were such as "to constitute a public

1

nuisance."[1] And he offers that legal opinion without addressing the elements of the claim—whether the conduct "***unlawfully*** operates to hurt or inconvenience an indefinite number of persons" and interferes "with a right ***common to the general public***."[2] McGuire is not competent to render a legal opinion, but even if he were, it is not appropriate for any expert to opine as to the ultimate legal question—especially when he ignores the elements of the claim at issue.

- McGuire's analysis and opinion also fail to "fit" this case, not because he did not "apportion[] costs among them,"[3] but more fundamentally because he did not evaluate the net costs of ***Defendants'*** sales and distribution, much less their ***wrongful*** sales and distribution. The net costs of sales and distribution by others has no relevance to Plaintiffs' claims against these Defendants, nor do sales and distributions by Defendants that were lawful and for a legitimate medical purpose.

The Opposition dodges both issues, just as it does the two issues with McGuire's consideration in his net-costs analysis of the benefits of prescription opioids. The first methodological flaw is not that he relied on other experts,[4] but that he did not rely on what he would customarily rely on in his "real" life as a Harvard professor of health economics. In that

---

[1] Appendix to Defendants' Motion to Exclude Expert Testimony of Thomas McGuire ("App.") 19–20 (Dkt. No. 1050-2) (McGuire Report at 4–5) ("I have been asked the following three questions: … Further, do I have an opinion about whether the net costs imposed by the sales and distribution of prescription opioid products in the Community were of sufficient magnitude to constitute a public nuisance to the Community?").

[2] App. 20 (McGuire Report at 5). All emphases are added unless otherwise indicated.

[3] Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude Expert Testimony of Thomas McGuire ("Opp.") 14 (Dkt. No. 1104) ("Defendants' claim that Prof. McGuire should have apportioned costs among them fails for several reasons."); *id.* ("there is no need to apportion costs among Defendants"); *id.* at 15 ("even assuming Plaintiffs wished to apportion past costs among Defendants").

[4] Opp. 17 ("Judge Polster rejected Defendants' argument that reliance on other experts is a basis for disqualification.").

role, he would (and does) rely on peer-reviewed, published sources; here, however, he relied on two Rule 26 reports by other retained experts that were spoon-fed to him by Plaintiffs' counsel. Second, as for the claim that measuring workplace productivity is "a common and reliable proxy" for all of the benefits of pain medication, we have only the say-so of Plaintiffs' counsel.[5] That purported proxy—and nothing else in McGuire's analysis—attaches any value, much less quantifies, to the hedonic value *of reducing pain*.

In sum, McGuire has no business rendering a legal opinion, and his net-costs analysis is a sham. On one side of the equation, he inflates the costs by considering the costs attributable to *all* sales and distributions, whether or not those sales and distribution have anything to do with Defendants or their allegedly wrongful conduct; on the other side of the equation, he fails to credit, much less quantify, opioid medication's primary benefit—the relief of pain—unless it permits a worker to work more or work harder.

As for Plaintiffs' claim that Judge Polster issued two decisions that "directly address" McGuire's analysis and opinion here,[6] they did not. In the MDL Track 1 cases, McGuire was a "damages" expert, and neither decision addressed McGuire's net-costs analysis here.

## ARGUMENT

I. **The Net-Costs Analysis Does Not "Fit" the Case**

    A. **No "Fit" Legally**

As McGuire recites in his Report, Plaintiffs asked him to answer three questions and, if possible, render three opinions. The third question, which McGuire answered affirmatively,[7] asked whether he has "an opinion about whether the net costs imposed by the sales and

---

[5] Opp. 16.

[6] Opp. 10.

[7] App. 23 (McGuire Report at 8) ("I conclude that the sales and distribution of prescription opioid products imposed and continue to impose net economic costs of sufficient magnitude to constitute a public nuisance.").

3

distribution of prescription opioid products in the Community were of sufficient magnitude *to constitute a public nuisance in the Community*?"[8]  Plaintiffs do not dispute that that question calls for a legal opinion—indeed, the ultimate conclusion that the Court itself must make (or not).  McGuire is not competent to render that, or any other, legal opinion.

Even if he were competent to render a legal opinion and it were proper to do so, the opinion would be "methodologically" deficient.  The Opposition minimizes the role of his net-costs analysis: "[t]hat the economic costs far outweigh the benefits does not *necessarily* mean that Defendants' conduct is unreasonable—nor is the economic cost the only way to assess its reasonableness."[9]  "[Q]uantify[ing] the costs," Plaintiffs argue, "will be useful to the Court" because "it is the reasonableness or unreasonableness of the conduct that may determine liability for nuisance."[10]  But by purportedly measuring the net costs of *all* sales and distribution of prescription opioids, McGuire did not do *any* assessment of Defendants' conduct.  Even if he had, the reasonableness of Defendants' conduct taken as a whole is not the determinant of whether that conduct constitutes a public nuisance; what matters is that conduct which "*unlawfully* operates to hurt or inconvenience an indefinite number of persons" and interferes "with a right *common to the general public*."[11]  Plaintiffs themselves so instructed McGuire, as he duly noted in his Report.[12]  Having failed to consider these elements of a public nuisance claim in his analysis, McGuire cannot render a legal opinion that Defendants' conduct, singly or collectively, constitutes a public nuisance.

---

[8]  App. 20 (McGuire Report at 5).

[9]  Opp. 13 (emphasis in original).

[10]  Opp. 12.

[11]  App. 20 (McGuire Report at 5).

[12]  *Id.* (quoting *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 620 (W. Va. 1985) and Restatement (Second) of Torts, § 821B (1979)).

### B. No "Fit" Factually

If he cannot, is "quantify[ing] the costs arising from the distribution of [all] prescription opioids in the Community" still helpful in some more limited way?[13] The answer is no. McGuire's net-costs analysis does not "fit" factually any more than it addresses the elements of the legal claim because, at the most basic level, the analysis does not limit itself to (i) the allegedly wrongful conduct (ii) of these Defendants. The fundamental flaw in McGuire's approach is not that he fails to apportion costs among the Defendants (although he does fail to do that)[14] or that he fails to "account for various causation-related arguments suggested by Defendants."[15] The fundamental flaw is that he fails to address the only relevant question: did ***Defendants'*** allegedly ***wrongful*** distribution of prescription opioids give rise to a public nuisance? That question cannot be answered by quantifying the costs and benefits of ***all*** sales and distribution of prescription opioids to Cabell/Huntington.

Imagine a different case in which the alleged public nuisance is the environmental damage and consequences to public health of the mining, transportation, and use of coal. If the only defendant is Massey, an analysis that quantifies ***all*** costs—i.e., costs that quite obviously are the result of conduct by Peabody, Patriot, Arch, American Electric Power, Appalachian Power, and others—would have no relevance. That is not because costs should be apportioned among defendants, since Massey is the sole hypothetical defendant. Rather, it is because the factfinder must decide whether ***Massey's*** wrongful conduct constituted an unreasonable interference with a public right. Thus, what might be helpful in making that decision is whether the costs of ***Massey's*** wrongful conduct outweighed the benefits of its conduct.

---

[13]  Opp. 12.

[14]  *See supra* n. 3.

[15]  Opp. 13.

In this proceeding, of course, Plaintiffs complain that the conduct of ABDC, Cardinal Health, and McKesson constituted a public nuisance. But Plaintiffs' Third Amended Complaint also asserted a public nuisance claim against 48 manufacturer defendants and 18 pharmacy-distributor defendants. (And there were additional wholesale distributors, never named as defendants, that also supplied pharmacies in Cabell/Huntington during the relevant period.) Thus, the costs to the Cabell/Huntington community of the sales and distribution of prescription opioids, by Plaintiffs' admission, result from the conduct of many actors, the great majority of which are not parties to this proceeding.

Plaintiffs say that "[i]t is within Prof. McGuire's discretion to choose the scope of his analysis," and he "intentionally focuse[d] on the *total* economic impact of the opioid epidemic on the Community."[16] One indisputable principle, however, is that Defendants can be held liable only for a public nuisance attributable to their conduct, not that of non-parties. So, while McGuire may have discretion to focus on the total costs from all sales and distribution of prescription opioids, *Daubert* operates to exclude opinions, like his, that aim wide of the mark.

McGuire's net-costs analysis is wide of the mark, not only because it is not limited to the costs of Defendants' conduct, but also because it is not limited to Defendants' allegedly wrongful conduct. A second indisputable principle is that a public nuisance claim can be based only on Defendants' wrongful conduct, not their lawful distribution of opioids to fill prescriptions written for medically legitimate reasons.[17] Plaintiffs do not contend, after all, that no prescriptions were written for medically legitimate reasons and that no opioids should ever

---

[16] Opp. 15 (emphasis in original).

[17] Because Defendants' conduct in identifying "suspicious" pharmacy orders must be judged by what was known at the time, not in hindsight, it is also true that a public nuisance claim cannot be based on Defendants' (i) lawful distribution of opioids (ii) to fill prescriptions written for medically legitimate reasons, (iii) as defined by then-prevailing treatment guidelines.

have been shipped.  Thus, it was incumbent on McGuire to focus on the allegedly wrongful shipments and quantify the resulting costs and benefits of those shipments.[18]  The negative externalities that matter, in other words, are those that result from Defendants' wrongful conduct, not conduct that complied with whatever regulatory or other duties exist.

Tucked in a footnote one finds Plaintiffs' observation that "the Court will not end its analysis with 'whether *all* sales and distribution imposed net economic costs'"—recognition that "all sales and distribution" is not the right yardstick—but that Defendants are wrong to suggest that McGuire "alone must prove Plaintiffs' case in his Report" and that "Plaintiffs will prove their case based on the totality of evidence presented."[19]  Defendants suggest no such thing.  The question is:  what is the other evidence that renders McGuire's analysis relevant and helpful to the Court?  It would be different if Plaintiffs offered another expert who took McGuire's analysis the next step by separating out the negative externalities attributable to the wrongful conduct of Defendants.  But Plaintiffs offer no such expert.

Standing alone, then, McGuire's analysis—admittedly, an "economic analysis of the magnitude of opioid epidemic in the Cabell Huntington Community, ***without regard to Defendants' wrongdoing***"[20]—addresses the wrong question and therefore does not "fit" the facts of this case.

---

[18]  The Drug Enforcement Administration witnesses have testified that a pharmacy order that has characteristics making it "suspicious" for purposes of reporting to the agency may, in fact, be atypical for reasons that are easily explained and reflect appropriate prescribing. Supplemental Appendix ("Supp. App.") 2 (Wright MDL Dep. at 208:5–24) (orders that meet regulatory definition of "suspicious" may well be "false positives" that do not pose a risk of diversion); *Id.* at 4 (Prevoznik MDL Dep. at 307:18–308:2) ("Q.  [If] an order that is unusually large, does that order necessarily lead to diversion?  A.  [I]t may or may not."). Even a truly "suspicious" order may be used to dispense both appropriate and inappropriate prescriptions.  Thus, a wrongful shipment may result in both costs and benefits.

[19]  Opp. 15 n.30 (emphasis in original).

[20]  Opp. 14.

## II. The Net-Costs Analysis Does Not Reliably Account for Benefits

### A. No Quantification of Benefits

McGuire explained in his Report that Plaintiffs asked him, first of all, whether it is possible "within the area of applied microeconomics" to "*measure* the extent of … a 'public nuisance..'"[21] He answered that it was possible, and the Opposition argues that his net-costs analysis will be helpful to the Court precisely because it "*quantif[ies]* the costs arising from the distribution of [all] prescription opioids in the Community," "helps through *quantification* to judge whether Defendants' conduct was reasonable," and "*quantifies* the cost of negative externalities arising from the opioid epidemic."[22] True, McGuire quantified the costs of opioid use. But he never bothered to quantify the benefits.

The one thing he did—examining the scientific literature regarding the effect of opioid use on workplace productivity—does not count as quantifying benefits. Plaintiffs want the Court to credit McGuire for assuming that the benefits (helping persons in pain return to work) equal the costs (removing persons from the workforce because of addiction), even though the studies purportedly show a net cost. The obvious methodological problem, however, is that assessing only the effect of opioid use on workplace productivity does not begin to measure the benefits of prescription opioids. The primary use of prescription opioids has always been to provide palliative care to the dying and pain relief for those in cancer or other acute pain—two groups for whom workplace productivity is not really the point. Nor is it the point for all those persons, many of them older, who are retired or not in the workforce as a matter of choice. And then there are those many persons—most of them women—who care for family, but do not get paid and therefore do not get "quantified" in studies of workplace productivity. Pain medication may help them get through the day, but they do not figure in McGuire's analysis.

---

[21]   App. 19 (McGuire Report at 4).

[22]   Opp. 12–13.

Plaintiffs assert that "workplace productivity is frequently used as a common and reliable proxy for benefits in the field of health economics."[23] But that is Plaintiffs' counsel's *ipse dixit*. Nowhere in his report does McGuire make that claim.[24] And for good reason, as workplace productivity plainly does not include whole groups that benefit from pain relief.

Notably, when he is quantifying the costs of opioid use, McGuire employs the economic concept of the value of a "statistical life" to place a value on each death from opioid use. This concept measures what persons in different age cohorts are willing to pay to lower the risk of dying. But McGuire does not consider what persons are willing to pay to avoid or reduce pain. Such studies exist;[25] McGuire fails to rely on any. This kind of one-sided analysis betrays a result-driven approach, not the same rigor that McGuire brings to his academic work.

### B. Inconsistent Intellectual Rigor

This failure to bring the same rigor to his Report that he brings to his academic work also characterizes his reliance on Drs. Lembke and Waller, two of Plaintiffs' other experts. Defendants' position is not that *Daubert* requires the exclusion of McGuire's opinions because he relies on other experts, but because of which experts he relies on and what opinions of theirs he chooses to rely on. Defendants' opening brief said this about his reliance on Lembke and Waller's expert reports: "The Court can be certain [McGuire] has never relied on comparable 'evidence' in his twelve books or 285 published papers." The Court can now be doubly certain, because the Opposition does not claim to the contrary. When McGuire is acting with the intellectual rigor required for publication in peer-reviewed journals, he (i) surveys the relevant literature, (ii) identifies those experts most worthy of reliance, and (iii) cites their published

---

[23] Opp. 16.

[24] The Opposition cites paragraphs 57–59 of the Report, but they do not claim that workplace productivity is a common and reliable proxy for the benefits of prescription opioids.

[25] *See, e.g.*, Anderson Chuck et al., *The Willingness to Pay for Reducing Pain and Paint-Related Disability*, 12 VALUE HEALTH 498 (Nov. 2009), https://pubmed.ncbi.nlm.nih.gov/18798809/.

work.  There is no indication that he did that here.  Plaintiffs' counsel gave McGuire the Lembke and Waller Reports, and he relied on that litigation material, not what Lembke and Waller have said in their published work.

It is fundamental that an expert's methodology must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *Rosen v. Ciba-Geiby Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) (the district court must "make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work").  In *Cooper*, the court upheld the exclusion of a physician's expert testimony in a products liability case because "***for purposes of this litigation***, [he] chose to deviate from his traditional method of evaluation"—i.e., conducting a physical examination of the plaintiff.  *Id.*  Because McGuire took a similar shortcut when considering the benefits of prescription opioids, the Court should exclude his net-costs analysis.

### III.   The MDL Court Did Not Address Defendants' Challenge

In the MDL Track 1 case, McGuire submitted two reports.  In the first, he offered an opinion "as to the amount of those damages [i.e., government costs], both in total and broken out by each Bellwether government and by budgetary components."[26]  That opinion—and the *Daubert* motion challenging it—has no relevance to this case, in which Plaintiffs disclaim damages.

In the second report, he offered a similar net-costs opinion, but the Track 1 defendants elected to challenge it (along with the opinions of five abatement experts) only insofar as the Ohio plaintiffs might offer his opinion in support of abatement.  The plaintiffs responded that

---

[26]   Supp. App. 7 (McGuire Report (March 25, 2019) at 5).

McGuire did not "offer an opinion on the scope or costs of programs needed to abate the nuisance," and, accordingly, the MDL court determined that the *Daubert* challenge to McGuire was moot.[27]

## CONCLUSION

The Court should exclude McGuire's net-costs analysis and public-nuisance opinion.

Dated: October 30, 2020               Respectfully submitted,

**CARDINAL HEALTH, INC.**

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
**CAREY DOUGLAS KESSLER & RUBY PLLC**
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
dpogue@cdkrlaw.com
rfranks@cdkrlaw.com

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard @wc.com
ahardin@wc.com
jwicht@wc.com

---

[27] Order Denying Defendants' Abatement Motion at 2, *In re: Nat'l Prescription Opiate Litig.*, 1:17-md-02804-DAP, Dkt. No. 2519 (N.D. Ohio Aug. 26, 2019).

**AMERISOURCEBERGEN DRUG CORPORATION**

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
**JACKSON KELLY PLLC**
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

**MCKESSON CORPORATION**

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
**FLAHERTY SENSABAUGH BONASSO PLLC**
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*/s/ Timothy C. Hester*
Timothy C. Hester
Paul W. Schmidt
Christian J. Pistilli
Laura Flahive Wu
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
pschmidt@cov.com
cpistilli@cov.com
lflahivewu@cov.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*,<br><br>    Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*,<br><br>    Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**CERTIFICATE OF SERVICE**

    I, Steven R. Ruby, counsel for Defendant Cardinal Health, Inc., do hereby certify that on this 30th day of October 2020, **Reply In Support Of Defendants' Motion To Exclude Expert Testimony Of Thomas McGuire** was served electronically upon all counsel of record.

                                                               /s/ Steven R. Ruby
                                                               Steven R. Ruby (WVSB No. 10752)