Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

---

IN RE: NATIONAL PRESCRIPTION           MDL No. 2804
OPIATE LITIGATION                       Case No. 17-md-2804

This document relates to:               Judge Dan
                                        Aaron Polster

The County of Cuyahoga v. Purdue
Pharma, L.P., et al.
Case No. 17-OP-45005

City of Cleveland, Ohio vs. Purdue
Pharma, L.P., et al.
Case No. 18-OP-45132

The County of Summit, Ohio,
et al. v. Purdue Pharma, L.P.,
et al.
Case No. 18-OP-45090

---

VOLUME I
Videotaped Deposition of Kyle J. Wright
Washington, D.C.
February 28, 2019
9:33 a.m.


Reported by:  Bonnie L. Russo
Job No. 3244302

Page 206

1  MR. TAYMAN: Why don't we have the
2  question read back and let him answer it again.
3  MR. O'CONNOR: Would you mind
4  reading the last question back.
5  (The record was read as requested.)
6  THE WITNESS: I'm having a lot of
7  difficulty answering your question. Because
8  you're transposing "excessive" and
9  "suspicious."
10  MR. O'CONNOR: Uh-huh.
11  THE WITNESS: Excessive did not
12  report suspicious. And it reported excessive.
13  And that was the limit of its foundation.
14  BY MR. O'CONNOR:
15  Q. So excessive orders are different
16  from suspicious orders?
17  MR. MIGLIORI: Objection.
18  THE WITNESS: If they reached
19  arbitrary benchmark that whoever decided to do
20  the report set. Once it reached it, that's all
21  there was to it.
22  BY MR. O'CONNOR:
23  Q. But to be clear, do you believe that
24  excessive orders are different from suspicious?
25  MR. MIGLIORI: Objection.

Page 207

1  THE WITNESS: Earlier today we
2  talked about the distributor briefing. And
3  inside that debriefing is the context or a
4  repeat of the federal regulation. Those are
5  the criteria for suspicious orders.
6  A suspicious order does not mean
7  that -- there's nowhere in that definition of
8  the -- under CFR of a suspicious order of
9  saying it reached a bench -- arbitrary
10  benchmark. That's the difference between
11  excessive and suspicious.
12  BY MR. O'CONNOR:
13  Q. Okay. Is it fair to say that not
14  all orders reported as suspicious are likely to
15  be diverted?
16  MR. BENNETT: Objection.
17  THE WITNESS: I'm going to
18  regurgitate your question to you.
19  That you're saying that a suspicious
20  order does not necessarily mean that there's an
21  illicit act.
22  MR. O'CONNOR: Okay.
23  MR. SHKOLNIK: Object to the form of
24  the reforming of the question.
25  MR. O'CONNOR: Your -- your

Page 208

1  objection was to his question?
2  MR. SHKOLNIK: Yes.
3  MR. O'CONNOR: All right.
4  BY MR. O'CONNOR:
5  Q. With respect to the suspicious
6  orders that were reported to DEA, is it fair to
7  say that there were a large number of false
8  positives?
9  MR. BENNETT: Objection to form.
10  THE WITNESS: Because a suspicious,
11  there could be a false positive. As to the
12  quantity, I cannot stipulate.
13  BY MR. O'CONNOR:
14  Q. Isn't it true that there were a
15  large number of suspicious orders that were
16  reported to DEA that were not, in fact, likely
17  to be diverted?
18  MR. BENNETT: Objection to the form.
19  THE WITNESS: I know --
20  BY MR. O'CONNOR:
21  Q. You can answer the question.
22  A. I know that there was a quantity.
23  As to the extent of that quantity being large
24  or not large, I don't know.
25  MR. O'CONNOR: All right. I'm going

Page 209

1  mark Exhibit No. 29.
2  (Deposition Exhibit 29 was marked
3  for identification.)
4  MR. O'CONNOR: Counsel, could the
5  witness read his copy?
6  MR. BENNETT: Give me one second.
7  MR. MIGLIORI: You said 29, right?
8  MR. O'CONNOR: Yeah. Exhibit 29.
9  And for the record, it's US DEA 00007691.
10  MR. BENNETT: Don't answer anything
11  yet.
12  BY MR. O'CONNOR:
13  Q. This is an e-mail exchange between
14  you and Ruth Carter, correct?
15  MR. BENNETT: Counsel, hang on one
16  second. We're having it reviewed by DEA
17  counsel to see if there's any basis for any
18  objections or any concerns with this document.
19  Can we hold off on the question for
20  a moment, please.
21  MR. O'CONNOR: Sure.
22  MR. BENNETT: Thank you.
23  To the extent that this may refer to
24  a specific investigation, the witness is not
25  authorized to answer any questions about that

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : : : : | HON. DAN A. POLSTER |
| APPLIES TO ALL CASES | : : : | NO. 1:17-MD-2804 |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VOLUME I

- - -

April 17, 2019

- - -

Videotaped deposition of THOMAS PREVOZNIK, taken pursuant to notice, was held at the law offices of Williams & Connolly, 725 12th Street, Washington, D.C., beginning at 9:11 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  Does every order that's
2  unusually large necessarily lead to
3  diversion?
4      A.  I have no idea.
5          MS. SINGER:  Objection.
6      Scope.
7          THE WITNESS:  I have no idea
8      what you mean by unusually large.
9  BY MR. O'CONNOR:
10     Q.  Okay.  As the term
11 "unusually large" is used in the
12 suspicious order monitoring regulation,
13 are orders that are unusually large
14 necessarily diverted?
15     A.  Well, for example, a bottle
16 of 100 Vicodin from a manufacturer to a
17 vet, is that unusually large?
18     Q.  Is it?
19     A.  I don't think it's unusually
20 large, but it would raise my eyebrows of
21 why would -- why would a vet be ordering
22 that bottle when they know that the
23 toxicity to cats and dogs would kill
24 them.  So I don't think you can just look

Page 307

1  at a number and say that's too big.
2          MR. O'CONNOR:  Whoever is on
3      the phone needs to go on mute.
4          MR. FINKELSTEIN:  Whoever is
5      on the phone please mute your
6      phone.
7  BY MR. O'CONNOR:
8      Q.  Before we get back to my
9  question, I just want to be clear.
10 Are -- are vets required to obtain a DEA
11 registration before they order controlled
12 substances?
13     A.  Yes.
14     Q.  And the DEA issues some
15 veterinarians registrations to allow them
16 to purchase controlled substances?
17     A.  Correct.
18     Q.  Okay.  I do -- I do want to
19 get back to my original question though,
20 which was, is an order that is unusually
21 large, does that order necessarily lead
22 to diversion?
23         MR. FINKELSTEIN:  Objection.
24     Vague.

Page 308

1          THE WITNESS:  It may or
2      may -- it may or may not.
3  BY MR. O'CONNOR:
4      Q.  Would the same be true of an
5  unusually frequent order?
6          MR. FINKELSTEIN:  Same
7      objection.  You can answer.
8          THE WITNESS:  Correct.  It
9      may or may not.
10 BY MR. O'CONNOR:
11     Q.  And the same would be true
12 of an order that deviates substantially
13 from the normal pattern?
14         MR. FINKELSTEIN:  Same
15     objection.  You can answer.
16         THE WITNESS:  Correct.  It
17     may or may not.
18 BY MR. O'CONNOR:
19     Q.  Okay.  And putting that
20 together, that means that not every
21 suspicious order leads to diversion,
22 correct?
23         MR. FINKELSTEIN:  Objection.
24     Scope.  You can answer.

Page 309

1          THE WITNESS:  Could you
2      please repeat that?
3  BY MR. O'CONNOR:
4      Q.  Not every suspicious order
5  leads to diversion, correct?
6      A.  Correct.
7      Q.  I want to talk a little bit
8  about how suspicious order reports are --
9  are used within DEA.
10         Is it fair to say that most
11 suspicious order reports are submitted to
12 field offices?
13     A.  I would say based on the
14 fact that the big three are filing
15 electronically, I would say the majority
16 electronically.
17     Q.  When an order or when
18 suspicious order reports are filed
19 electronically, does that mean they are
20 filed with headquarters?
21     A.  Yes.  On the Legacy and the
22 vetted system.
23     Q.  Okay.  And do registrants
24 that are not reporting electronically to

CONFIDENTIAL

# Expert Report of Professor Thomas McGuire

## Damages to Bellwethers

**March 25, 2019**

CONFIDENTIAL

public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin."[7] The Bellwether governments further allege that the opioid epidemic and the need for increased services, "arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use, together with the distributors' equally deliberate efforts to evade restriction on opioid distribution."[8] I refer to these actions collectively as "defendants' misconduct." I refer to the adverse health, public health, public welfare and criminal justice consequences of the opioid epidemic as "harms." Finally, upon instruction from counsel, I refer to the cost consequences of harms to the Bellwether governments due to defendants' misconduct as "damages." In discussing opioids, I follow the CDC's definition, which includes both legal and illicit opioids.[9]

7. My assignment is as follows:

- *Economic framework for damages.* Do you have an opinion, to a reasonable degree of certainty in the area of applied microeconomics, as to whether there is a valid economic methodology for attributing a share of Bellwether government costs to defendants' misconduct; that is, to attribute damages to defendants' misconduct?

---

[7] *In Re National Prescription Opiate Litigation*, The County of Cuyahoga, Ohio, et al., v. Purdue Pharma L.P., et al., Case No. 17-OP-45004, Second Amended Complaint, May 18, 2018, ("Cuyahoga Complaint"), ¶19; *In Re National Prescription Opiate Litigation*, The County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al., Case No. 17-md-2804, Corrected Second Amended Complaint, May 18, 2018, ("Summit Complaint"), ¶20.

[8] Cuyahoga Complaint, ¶3, Summit Complaint ¶3.

[9] CDC define opioids as, "[n]atural or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain and reduce the intensity of pain signals and feelings of pain." This definition includes the illegal drug heroin; synthetic opioids such as fentanyl; and prescription pain medications, such as oxycodone, hydrocodone, codeine and morphine. Centers for Disease Control and Prevention, "Opioid Overdose, Commonly Used Terms," cdc.gov/drugoverdose/opioids/terms.html, accessed, 1/11/2019.

4

- *Bellwether government departments and divisions affected.* Do you have an opinion, to a reasonable degree of certainty in the area of applied microeconomics, as to whether one may identify the departments and divisions[10] of the Bellwether governments which would incur costs as a direct or indirect result of opioid-related public health issues starting in 2006 and continuing through 2018? If departments and divisions may be identified, what are those departments and divisions?

- *Estimation of government costs.* Do you have an opinion, to a reasonable degree of certainty in the area of applied microeconomics, as to whether one may identify the costs at the divisions of the Bellwether governments which may be attributable to defendants' misconduct starting in 2006 and continuing through 2018? If they can be reasonably estimated, what is your opinion as to the amount of those costs, both in total and broken out by each Bellwether government and by budgetary components?

- *Estimation of damages.* If a valid framework for assigning a share of Bellwether government costs to damages does exist, what is your opinion, to a reasonable degree of certainty in the area of applied microeconomics, as to the amount of those damages, both in total and broken out by each Bellwether government and by budgetary components starting in 2006 and continuing through 2018?

### C. Summary of Opinions

8. *The economic framework for damages is reliable and well-supported.* I am of the opinion, to a reasonable degree of certainty in the area of applied microeconomics, that the

---

[10] Hereafter, I will use the term "division" when referring generally to a department or division of a Bellwether government and to the actual name (e.g., Police Department) when referring to a particular division or department.

CONFIDENTIAL

economic framework for determining damages, described in more detail in Section II, is an economically appropriate approach for identifying the costs incurred by the Bellwether governments as a result of defendants' misconduct. The damage framework is based on a straightforward chain of reasoning that links (i) misrepresentations by manufacturer defendants and failure to detect and prevent excessive opioid shipments by all registrants of the Controlled Substances Act ("CSA"), including the distributor defendants, to greater shipments of prescription opioids; (ii) increases in prescription opioid shipments to increases in harms (e.g., crime, overdoses) in the Bellwether jurisdictions; and (iii) increases in harms to costs faced by Bellwether governments which devoted resources to contend with these harms.

9. *The affected divisions can be reliably identified.* Through review of the Bellwether governments' budgets and expenditures and interviews with Bellwether government personnel, I have identified certain divisions that are affected by the opioid epidemic, listed here in Table IV.1.[11] The basis of this determination is discussed in Section III below.

**Table IV.1: Bellwether Divisions Affected by Opioids**

| Bellwether Government | Affected Divisions |
|---|---|
| Cuyahoga County | ADAMHS Board, Division of Children and Family Services, Office of Prosecutor, Office of Public Defender, Court of Common Pleas, Juvenile Court, Sheriff's Office, County Jail, Office of Medical Examiner |
| Summit County | ADM Board, Children Services Board, Prosecutor, Court of Common Pleas, Juvenile Court, Sheriff's Office, County Jail, Alternative Corrections, Adult Probation, Medical Examiner |

Source: Tables IV.3 and IV.4.

10. *The costs faced by Bellwether jurisdictions in responding to harms can be reliably estimated.* Standard methods from microeconomics allow me to reliably estimate past costs

---

[11] As discussed in Section III, my selection focused on the largest divisions and, therefore, may omit other divisions in the Bellwether governments that were also affected.

CONFIDENTIAL

March 25, 2019

_____

Thomas McGuire