## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01362 |
| | Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, et al., | |
| Defendants. | |
| CABELL COUNTY COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01655 |
| | Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, et al., | |
| Defendants. | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* FOR AN ORDER RULING IQVIA DATA ADMISSIBLE

Plaintiffs' Motion *in limine* for an Order Ruling IQVIA Data Admissible, Dkt. 1066, is meritless and should be denied. Contrary to Plaintiffs' representation that "[t]he Defendants are among the purchasers of the IQVIA Data," Mot. at 9, there is no evidence that any Defendant ever purchased or considered purchasing the IQVIA Xponent data series that Plaintiffs seek to have admitted. The Xponent data series are hearsay and not subject to any exception. Moreover, the data series are not relevant evidence, and even if they were, they should be excluded under Rule 403 because of unfair prejudice and wasting of time.

## BACKGROUND

Xponent is a database that IQVIA—a company, formed after the merger of IMS Health and Quintiles, that sells healthcare-related data—markets as providing information useful to

pharmaceutical manufacturers and financial analysts "to measure market and product demand."[1] The data help manufacturers "manage customer operations, sales targeting, and representative incentive compensation."[2]  In other words, the data help **manufacturers** sell more medication. Nothing in IQVIA's marketing material for Xponent holds the data out as providing useful information for wholesale distributors' suspicious order monitoring ("SOM") systems.  Indeed, the Xponent data "reflects the prescribing history of physicians," Mot. at 3, and "filling pharmacy information is not provided with the data"[3]—rendering it unhelpful to wholesale distributors seeking to identify suspicious orders placed by their pharmacy customers.  Plaintiffs' expert Lacey Keller has testified about IQVIA Xponent data in two other opioid litigations.  Both times she characterized the data as information that pharmaceutical **manufacturers** might possess, not wholesale distributors.[4]

Plaintiffs' motion states that "Defendants are among the purchasers of the IQVIA Data," Mot. at 9.  This is nothing more than sleight-of-hand.  While there is evidence that at various points Defendants either purchased or considered purchasing **different** data series sold by IQVIA or its predecessors, Plaintiffs are not seeking to have those **different** files admitted into evidence. Their motion is specific to Xponent data because of what those data series uniquely show, *see*

---

[1]  Appendix ("App.") 16 (IQVIA, Prescription Information (accessed Sept. 15, 2020), https://www.iqvia.com/locations/united-states/solutions/commercial-operations/essential-information/prescription-information, at p. 1).

[2]  App. 17 (*id.* at p. 2).

[3]  App. 25 (Keller Track 2 Rpt. at p. 6).

[4]  *See* App. 21-22 (Keller Track 1 Rpt. at ¶¶ 22, 27) ("I will refer to labelers and manufactures interchangeably as the entities that create the drugs analyzed. …  All defendant labelers purchased IQVIA Xponent data."); App. 28 (Keller N.Y. Rpt. at ¶ 30) ("IQVIA Xponent [data] … could have been purchased or was maintained by Defendant Labelers"); App. 9–10 (Keller Dep. at 92:11–93:13).

Mot. at 1–2, 7, and there is not a shred of evidence that any Defendant ever possessed Xponent data.

Keller herself does not opine that Defendants actually possessed Xponent data.  Instead, she opines that distributors **could have** purchased the data to detect "outlier" prescribers of prescription opioids:

> Q. Is it your opinion in this matter that the case defendants, the wholesale distributors who are the defendants here, had the IQVIA data that you are analyzing[,] in the course of their business?
>
> A. **No**, I'm making the application that IQVIA was widely available for purchase by the pharmaceutical industry. . . .  And what we're trying to demonstrate here is the information that could have been gleaned from distributors, had they accessed the IQVIA Xponent data or some other similar dataset.[5]

Whatever Keller may believe about Defendants' purported ability to purchase this data, the fact remains that there is no evidence that any Defendant ever possessed these data series.

As Plaintiffs note in their motion, the Xponent datasets they seek to have admitted were produced by Allergan Finance, LLC, a non-party affiliate of an opioid manufacturer.  *See* Mot. at 5.  In 2018, Allergan Finance sought IQVIA's permission to use the data in litigation, and IQVIA responded as follows:

> Although there is an inclination to view numerical data as fact, the IQVIA Information represents *an estimate of measured activity and should be treated accordingly*. …  These estimates reflect the independent judgment, expertise and opinion of IQVIA representatives to arrive at a *reasonable approximation of market activity*.  The IQVIA Information is intended to support sales, marketing and research applications and it is highly reliable for those purposes.  The IQVIA Information, although appropriate for its intended purpose of supporting business and marketing analyses in

---

[5]   App. 12 (Keller Dep. 98:1–14); *see also* App. 15 (*id.* at 101:1–10) ("Q. … [A]s you sit here, is it your belief that any of the case defendants had the IQVIA Xponent data that you analyzed? A. … They did not have the Xponent data produced by Allergan.  I mean, you might now have it, because of litigation, and they would produce that, but I don't think that's your question.").  All emphases are added unless otherwise noted.

industries such as the pharmaceutical industry, contains data that ***is susceptible to error or variance, and is not intended to be used as direct evidence or to establish any fact***.  Accordingly, IQVIA offers ***no assurances*** that the IQVIA Information will be suitable for use as evidence in any litigation.[6]

## ARGUMENT

### I.    The Xponent Data Series Are Inadmissible Hearsay.

The Xponent data series are hearsay.  They are out-of-court writings that Plaintiffs intend to offer for the truth of "the opioid prescribing habits of physicians in Cabell County and Huntington."  Mot. at 7.  While experts sometimes may rely upon hearsay in forming their opinions, that does not render the hearsay directly admissible in its own right.[7]  Plaintiffs' request to have these hearsay data series admitted as stand-alone evidence, Mot. at 9, must be denied.  *See* Fed. R. Evid. 802.

Plaintiffs argue that the "IQVIA [Xponent] data is a compilation of pharmacy records" exempted from the rule against hearsay by 803(17)'s exception for "market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."  Fed. R. Evid. 803(17).  Plaintiffs are wrong, for two independent reasons.

First, the Xponent data are not a "market quotation," "list," or "director[y]" within the meaning of the rule, and Plaintiffs do not argue otherwise.  Neither are the data an "other

---

[6]    App. 31 (Ltr. from IQVIA to Allergen Finance, LLC (July 25, 2018) at p. 2, ¶ 7).  IQVIA also conditioned its permission to use the data on Allergan Finance's commitment to prevent the data from being filed on the public docket.  App. 31–32 (*id.* at ¶¶ 10, 13).

[7]    *See* Fed. R. Evid. 703; *Rambus, Inc. v. Infineon Tech., AG*, 222 F.R.D. 101, (E.D. Va. 2004) ("Rule 703 provides a presumption against disclosure to the jury of [inadmissible] information used as the basis for an expert's opinion … when that information is offered by the proponent of the expert.'" (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 703.05 (2d ed. 2003))).

compilation" within the meaning of the exception.  As the Fourth Circuit has squarely held, courts applying this exception must be "guided by *ejusdem generis,* a statutory canon of interpretation holding that where a statute contains an exemplary list of objects to which it applies, a general term that follows specific ones will be limited in its meaning by the more specific terms that preceded it."[8]  Because "[t]he narrower terms listed by the rule—'market quotations, lists, directories'—are items that recite ***established factual information,***" so too must anything else that is characterized as an "other compilation" be comprised of established factual information.[9]

The IQVIA Xponent data series fail this threshold requirement.  As explained by IQVIA itself, the data merely "represents an estimate" and a "reasonable approximation"—not established facts.[10]  The data's existence is the product of "independent judgment, expertise and opinion of IQVIA representatives," none of whom are available to be examined about the judgments they made, why they made them, or what magnitude of "error or variance" may have occurred as a result.[11]  No matter how much confidence Plaintiffs' experts may purport to have in the quality of IQVIA's judgments, that confidence does not transform IQVIA's "***opinion***"[12]

---

[8]   *In re C.R. Bard, Inc., MDL No. 2187, Pelvic Repair Sys. Prods. Liability Litig.*, 810 F.3d 913, 924 (4th Cir. 2016) (holding that district court abused its discretion by applying Rule 803(17) overbroadly).

[9]   *Id.*; *see also White Indus., Inc. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1069 (W.D. Mo. 1985) (the rule contemplates "compilations of relatively straightforward *objective facts not requiring, for their statement, a subjective analysis of other facts*") (emphasis in original).

[10]   App. 31 (Ltr. from IQVIA to Allergen Finance, LLC (July 25, 2018) at p. 2, ¶ 7).

[11]   *Id.*

[12]   *Id.*  Plaintiffs also overstate the testimony of Cardinal's expert, John MacDonald, who testified that he considers Xponent data to be "not a perfect dataset" but a "*reasonably reliable* measure of the legitimate demand for opioids *on an aggregate basis*."  Dkt. 1066-4 (MacDonald Dep.)

into the sort of "established factual information" necessary to satisfy the rule and be admissible evidence in a court of law.[13]

Plaintiffs' citations reinforce this point. In *Lorraine v. Markel American Insurance Co.*, 241 F.R.D. 534 (D. Md. 2007), then-Magistrate Judge Grimm noted that "[a]t least one court has admitted electronically stored compilations and directories under Rule 803(17)"—citing a case involving a compilation of "prime rates of interest obtained from the Federal Reserve Board website."[14] The historical prime interest rate is a classic example of an established fact that can be verified in multiple ways. No one's "judgment" is required to compile that information, and it is not "susceptible to error or variance" in the way IQVIA Xponent data is.[15] Plaintiffs' remaining citations do not address this point and accordingly are inapposite.[16]

Second, Plaintiffs fail to satisfy Rule 803(17)'s requirement that the data are "generally relied on by the public or by persons in particular occupations."[17] As Plaintiffs note, this aspect of the rule speaks to the accuracy of the information based on general reliance by the public and

---

at 114:15–115:23. Plaintiffs are not proposing to use the data in the aggregate manner MacDonald was referencing, but rather to address the prescribing of individual doctors.

[13] *C.R. Bard*, 810 F.3d at 924; *White Indus.*, 611 F. Supp. at 1069.

[14] *Id.* at 575 (citing *Elliott Assoc. L.P. v. Banco de la Nacion,* 194 F.R.D. 116, 121 (S.D.N.Y. 2000)).

[15] App. 31 (Ltr. from IQVIA to Allergen Finance, LLC (July 25, 2018) at p. 2, ¶ 7).

[16] In *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 314 (4th Cir. 2018), the court gave only a brief discussion of the "two studies" admitted under Rule 803(17)'s exception and did not address whether they contained established factual information. Under long-standing Fourth Circuit precedent, that opinion cannot be construed as having overruled *sub-silentio* an express holding of an earlier panel opinion. *See Busby v. Crown Supply, Inc.,* 896 F.2d 833, 840–41 (4th Cir. 1990) (en banc).

[17] Fed. R. Evid. 803(17).

the compiling party's motivation for achieving accuracy.  Mot. at 7 (citing *C.R. Bard*, 810 F.3d at 924).  But as IQVIA itself states, the data are only sufficiently accurate for the purposes for which they are used:  "to support sales, marketing and research applications."[18]  "[A]lthough appropriate for [these] purpose[s]" Xponent data are "not intended to be used as direct evidence or to establish any fact," and IQVIA can offer "no assurances" the data "will be suitable for use as evidence in any litigation."[19]  These disclaimers plainly show that IQVIA lacks the incentive to ensure its data are reliable to the degree they can be used accurately as evidence at trial. Despite the data being "susceptible to error or variance," its customers will purchase it anyway. *Cf.* Mot. at 8.[20]  It is therefore unsurprising that Plaintiffs identify no evidence at all of ***anyone*** using Xponent data for the purposes they seek to use the data here—as evidence of "the opioid prescribing habits of physicians in Cabell County and Huntington."  Mot. at 7.

Finally, Plaintiffs briefly argue that the Xponent data series would not be hearsay if they were offered for a purpose other than proving the truth of the matter asserted, such as to show "notice."  Mot. at 9.  This suggestion is contradictory to Plaintiffs' other arguments, which describe the Xponent data series as evidence of opioid prescribing and "central to Plaintiffs' case."  *Id.* at 7, 9.  But even assuming for the sake of argument Plaintiffs would offer the data for the limited purpose of showing "notice," the first step to securing admission would be to

---

[18]  App. 31 (Ltr. from IQVIA to Allergen Finance, LLC (July 25, 2018) at p. 2, ¶ 7).

[19]  *Id.*

[20]  IQVIA's own disclaimer aside, Plaintiffs fail to show that any quantifiable number of persons use Xponent data, in numbers large enough to provide assurances of its accuracy.  Certainly they are not data that are "generally relied on by the public."  Moreover, notwithstanding Plaintiffs' contention that the Xponent data are "widely purchased by the pharmaceutical industry," Mot. at 3, Plaintiffs' present ***no*** evidence that any Defendant in this case purchased these data.

demonstrate that Defendants possessed the data during a relevant period.[21]  This they cannot do.  There is not a shred of evidence that any Defendant ever possessed Xponent data.  Plaintiffs' own expert, Keller, admits she does not believe Defendants possessed that data.[22]  While she testified to having seen indications that on a "trial basis" some of the Defendants had possessed *different data* sold by IQVIA's predecessor, IMS,[23] she conceded that she had not seen or run analyses on that data, and has only a vague understanding of the fields of information they contain.[24]  Manifestly, Defendants cannot be "charge[d] … with knowledge" of the contents of the Xponent data series, Mot. at 9, just because at some point in time, and "on a trial basis," they had access to *different data* sold by the same company.

In sum, if the Xponent data series are offered into evidence at all, it will be to prove the truth of IQVIA's "estimate" and "approximation" compiled using the "independent judgment" of its representatives.  The data are inadmissible for that reason alone.[25]

## II.   Xponent Data Series Should be Excluded Under Rules 402 and 403.

Plaintiffs argue that the Xponent data are relevant "because it [sic] makes it more likely to show the opioid prescribing habits of physicians in Cabell County and Huntington."  Mot. at 7.  The raw Xponent data, however, merely consist of reams of numbers that do not make any

---

[21]   *See, e.g., Gardner v. Q.H.S., Inc.*, 448 F.2d 238, 244 (4th Cir. 1971) (out of court statements were admitted to show notice "provided only that those [statements] *were brought to the attention of the defendants*"); *C.R. Bard*, 810 F.3d at 926 (same).

[22]   *Supra* n.5.

[23]   App. 2–3 (Keller Dep. 72:24–73:21) (describing certain Defendants' access to a "CS Ratings" database); App. 5–6 (*id.* at 75:20–76:5) (same).

[24]   App. 6–7 (*id.* at 76:9–77:14).

[25]   *See* Fed. R. Evid. 802; *C.R. Bard*, 810 F.3d at 924.

fact of consequence more probable. The Court, as finder of fact, would not be able to simply review the data as one would a document or photograph and form conclusions about the prescribing habits of doctors in Cabell/Huntington. These voluminous data require interpretation by an expert, and it is the expert's opinion that is potentially admissible into evidence, not the underlying data. It is neither necessary nor proper to admit voluminous data into evidence just because an expert plans to offer general opinions based on, but not disclosing, the data.[26] Admitting the Xponent data into evidence therefore serves no relevant evidentiary purpose.

Even if the Court considered the Xponent data to be minimally relevant as stand-alone evidence, the probative value of the data is outweighed by the substantial risks of undue prejudice and wasting time.[27]

Plaintiffs' contend that the Xponent data would "show the opioid prescribing habits of physicians in Cabell County and Huntington." Mot. at 7. But Plaintiffs' claims in this case rest on the argument that Defendants should have reported or identified more "suspicious orders" placed *by pharmacies* in Huntington and Cabell County.[28] Pharmacies place orders in bulk (e.g., by the bottle), not by specific prescription and/or prescriber. As such, a lengthy detour into the voluminous Xponent data series to determine each individual healthcare practitioner's prescribing practices would not help the trier of fact resolve Plaintiffs' claims. Instead, it would devolve into a distracting side-trial, wherein the parties and the Court would be required to sort through a voluminous dataset and try to draw from that cold record post hoc conclusions about practitioners' medical judgments.

---

[26] *Supra* n.7.

[27] *See* Fed. R. Evid. 403.

[28] *See* 21 C.F.R. 1301.74(b).

Direct review and analysis by the Court of large volume data series is an obviously time-consuming exercise, which is one practical reason why general opinions based on such data customarily are submitted through experts instead of admitting the hearsay data directly into evidence.  While Plaintiffs' Motion is vague about their intended uses of the Xponent data, any in-court exercise that calls for direct review of data so voluminous that it has to be submitted separately "on a hard drive"[29] is bound to be wasteful, even before taking into account the disconnect between Plaintiffs' allegations and the information contained in the data.

## Conclusion

For the foregoing reasons, Plaintiffs' Motion *in limine* should be denied.

Dated: October 30, 2020                    Respectfully Submitted:


**CARDINAL HEALTH, INC.**

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
**CAREY DOUGLAS KESSLER & RUBY PLLC**
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
dpogue@cdkrlaw.com
rfranks@cdkrlaw.com

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
Jennifer G. Wicht
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
ahardin@wc.com
jwicht@wc.com

---

[29]  Dkt. 1066-1.

**AMERISOURCEBERGEN DRUG CORPORATION**

/s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

/s/ Gretchen M. Callas
Gretchen M. Callas (WVSB #7136)
**JACKSON KELLY PLLC**
Post Office Box 553
Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com


**MCKESSON CORPORATION**

/s/ Jeffrey M. Wakefield
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
**FLAHERTY SENSABAUGH BONASSO
PLLC**
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

/s/ Timothy C. Hester
Timothy C. Hester
Paul W. Schmidt
Christian J. Pistilli
Laura Flahive Wu
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
pschmidt@cov.com
cpistilli@cov.com
lflahivewu@cov.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | |
| Defendants. | |
| CABELL COUNTY COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I, Steven R. Ruby, counsel for Defendant Cardinal Health, Inc., do hereby certify that on this 30th day of October 2020, **Defendants' Response In Opposition To Plaintiffs' Motion In Limine For An Order Ruling IQVIA Data Admissible** was served electronically upon all counsel of record.

    /s/ Steven R. Ruby

Steven R. Ruby (WVSB No. 10752)