1          IN THE UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

3      **********************************************************

THE CITY OF HUNTINGTON,

4

                    Plaintiff,

5

v.                              CIVIL ACTION NO. 3:17-01362

6

AMERISOURCEBERGEN DRUG

7      CORPORATION, et al,

8                    Defendants.

9

10     CABELL COUNTY COMMISSION,

11                    Plaintiff,

12     vs.

13

AMERISOURCEBERGEN DRUG

14     CORPORATION, et al,

15                    Defendants.

16     **********************************************************

17

18          Videotaped and videoconference deposition of

19     LACEY R. KELLER, MA, taken by the Defendants pursuant to

20     the  West Virginia Federal Rules of Civil Procedure, in

21     the above-entitled action, pursuant to notice, conducted

22     virtually via Zoom, before Twyla Donathan, Registered

23     Professional Reporter and Notary Public, on the 18th day

24     of September, 2020.

Page 72

1   whether or not Allergan witnesses have testified in

2   this case?

3       A    No.

4       Q    Now, in your report in the Track One

5   Summit/Cuyahoga County case, you offered the opinion

6   that, quote:  "All defendant labelers purchased IQVIA

7   Xponent data."  Is that correct?

8       A    Let me pull that report.

9       Q    Sure.  If you would turn to page 9,

10  paragraph 27.

11      A    I see that statement, yes.

12      Q    And that was your opinion in that matter,

13  correct?

14      A    Yes.

15      Q    And you stand by that opinion?

16      A    Yes.

17      Q    In that Track One case, did you determine

18  whether or not any of the Distributor Defendants had

19  also purchased IQVIA component data?

20      A    No.  That was not asked of me.

21      Q    Okay.  And just to be clear, you made no

22  such statements in your report, correct?

23      A    Correct.

24      Q    As you sit here today, are you aware of any

Page 73

1   case defendants that have purchased the IQVIA Xponent

2   data?

3       A    I am aware that defendants have purchased

4   products from IQVIA -- data products from IQVIA.

5       Q    My question was a little bit different.  As

6   you sit here today, are you aware of any case

7   defendant that has purchased the IQVIA Xponent data?

8               MR. METZ:  Object to the form.

9       A    So case defendants purchased, for at least

10  a limited period of time, a dataset called Compliant

11  Solutions, I believe.  Let me make sure I'm saying

12  that correctly.

13              Sorry.  My computer is giving me trouble

14  here.  So I know that for at least a trial basis some

15  of the case defendants purchased something called CS

16  Ratings -- I'm sorry.  I misspoke earlier.

17              As part of that data, and I quote, "IMS CS

18  ratings data -- available from IMS DDD -- PM --

19  (reading) Xponent TM, LifeLink TM, HCRS TM databases,

20  and such data is refreshed on a per month basis"

21  (reading rapidly from unidentified document.)

22      Q    Forgive me.  For purposes of that answer,

23  you appear to be consulting some other material.

24  What is it that you're consulting?

Page 74

1      A    Sure.  Let me give you the Bates number of

2   that document.  CAH_NY Consolidated-0151611.

3      Q    And what system are you reviewing that

4   document on?

5      A    FoxIt.  It's like Adobe.

6      Q    I'm sorry.  Maybe my question was meant to

7   be more basic than that.  Are you reviewing that on a

8   computer?

9      A    Yes.

10      Q    Is it the same computer through which

11   you're streaming your deposition today or is it a

12   different computer?

13      A    Same computer.

14      Q    And forgive me.  I just have to ask.  This

15   is not meant to insinuate anything.  Are you

16   communicating with anyone else via electronic means

17   during the course of your deposition?

18      A    No.

19      Q    Has anyone sent you any information over

20   that -- your computer during the course of the

21   deposition?

22      A    No.

23      Q    Okay.  And if that were to occur, would you

24   tell me?

Page 75

1      A    If asked, yes.

2      Q    Well, I'm asking now.

3      A    Okay.  If you're asking me, then yes, I

4   will.

5      Q    And when you pulled that document you just

6   referenced, when you pulled that up, where did you

7   retrieve it from?

8      A    So I believe there's -- it's the attachment

9   to another document that I think is cited in our

10  report.  And I had asked for one of the paralegals to

11  pull me the attachment that appeared to come with the

12  citation in my report.

13     Q    I see.  I'm sure I could check this, but

14  does the Bates number you just gave me, does that

15  appear as the citation within your report?

16     A    I don't believe so, no.

17     Q    Does it appear on your materials

18  considered?

19     A    I don't believe so.

20     Q    And we said that for a limited time, at

21  least some case defendant had purchased CS Ratings.

22  What was that limited time period?

23     A    I don't know the time period.  I know that

24  AmerisourceBergen had, for example, purchased a few

Page 76

1    months' trial of data from IQVIA -- or IMS probably

2    at the time.  And I've seen documents dated in 2018.

3    And then previous documents were dated a little bit

4    earlier, I can't remember if it was like 2012 or

5    2013, for AmerisourceBergen.

6         Q    And are those documents cited in your

7    report?

8         A    Yes.

9         Q    Now, I had asked you about the IQVIA

10   Xponent data.  You answered with reference to CS

11   Ratings, and then I think read some information to me

12   about that.  Have you ever yourself reviewed the CS

13   Ratings database?

14        A    No.

15        Q    You don't know in what format the data is

16   presented?

17        A    Correct.

18        Q    You have not analyzed the CS Ratings

19   database?

20             MR. METZ:  Object to form.

21        A    Correct.

22        Q    You have not run any data analytics or data

23   mining off the CS Ratings database?

24        A    Correct.

Page 77

1      Q    You don't know what fields of information

2   are presented in the CS Ratings database?

3              MR. LEDLIE:  Object to the form.

4      A    Not beyond what's been cited in my report.

5   I think there was discussion in one of the documents

6   that it talks about pharmacies and physicians, but

7   that's about the extent of my knowledge of what's in

8   that dataset.

9      Q    And that information you just referenced,

10  was that statement made in relation to the CS Ratings

11  database specifically or some other database?

12     A    In talking about the CS ratings data, I've

13  not looked at it personally.  I've only seen what has

14  been described in document side of my report.

15             (Court reporter asked the witness for audio

16  clarification, requesting both counsel and the witness to

17  be mindful and keep their voices up towards the end of

18  their questions and answers.)

19     Q    Now, you offered the opinion in the Track

20  One Summit and Cuyahoga case that as a result of the

21  labelers' possession of IQVIA Xponent data, quote:

22             "It was and is possible using standard data

23  analytic tools to determine from the data that the

24  defendant labelers had in their possession suspicious

Page 78

1    prescribing and purchasing patterns, and to identify

2    particular positions and particular pharmacies the

3    problematic prescribing patterns," closed quote.

4              Do you recall that?

5         A    Yes.

6         Q    And you stand by that opinion?

7         A    Yes.

8         Q    Have you at any point defended any of the

9    opinions that you offered in the Track One MDL case?

10        A    I think we clarified that, where insofar as

11   we say "suspicious," we mean those prescribers or

12   pharmacies who would have triggered compliance

13   metrics.

14        Q    You're saying it would trigger compliance

15   metrics, but you lack the qualification to say that,

16   in fact, makes them suspicious within applicable

17   regulations, correct?

18        A    Correct.

19        Q    And just so the record is clear, your use

20   of the term "labelers" in that statement I just

21   quoted, was -- that meant manufacturers, not any of

22   the distributors who are also defendants in that

23   case, correct?

24        A    Correct.

Page 92

1        Q     Okay.  What is switch data?

2        A     I can't recall the definition right now,

3    but from what I remember -- I actually can't remember

4    right now.  I'm sorry.

5        Q     Okay.  So --

6        A     I would be happy to pull the document,

7    because I have it handy, but I can't remember it.

8        Q     Is that document cited somewhere in your

9    report?

10       A     No.

11       Q     Continuing on page 110, do you see that you

12   were then asked few lines down -- I guess right after

13   the last answer, you were asked:

14             "Okay.  So when you say defendants had

15   sufficient information, you don't mean to say they

16   had the same information that you had?"  Question

17   mark.

18             And you answered:  "Correct."

19             Do you see that?

20       A     Yes.

21       Q     And then can you turn to page 115.

22       A     Okay.

23       Q     Do you see beginning line 10, you were

24   asked the question:

Page 93

1          "Okay.  Now this term, quote, sufficient

2     information, closed quote, you told us earlier a

3     distributor would not have had all of the

4     information, all of the data that you referred to in

5     your report."

6          Do you see that?

7     A    Yes.

8     Q    And you answered:  "Correct, a distributor

9     may or may not have had IQVIA data."

10         Do you see that?

11    A    Yes.

12    Q    And that was truthful testimony?

13    A    Yes.

14         MR. METZ:  I think we've been going a

15    little bit over an hour.  If it makes sense to you

16     (distorted audio)...

17         (Court reporter again cautioned counsel and

18    the witness regarding their poor audio transmission, to

19    keep their voices up towards the end of their questions

20    and answers.)

21         VIDEOGRAPHER:  The time is 11:23.

22    We're going off the record.

23         (A recess was taken.)

24         VIDEOGRAPHER:  The time is 11:38.

Page 97

1    contours of your expert report?

2        A    Yes.

3        Q    In what manner do you consider your

4    opinions to be limited?

5        A    I would say in the other reports we apply

6    compliance metrics.  In this report we do not go

7    through that process, is one example.  In the New

8    York report, we analyzed the distributors' own

9    compliance data, like the actual suspicious order

10   reports made by those entities.  Those are not

11   included in this report.

12       Q    At page 59 of your report you have a

13   summary of your conclusions.

14               MR. LEDLIE:  We're in Exhibit 1, sir?

15               MR. METZ:  Yes, sir.

16       A    Okay.

17       Q    And your first conclusion, which is in

18   paragraph 50, you write:

19           "Based on my analysis of IQVIA data, I

20   conclude that case defendants had sufficient

21   information to understand overall prescribing trends

22   in Cabell County."

23           Do you see that?

24       A    Yes.

Page 98

1      Q    Is it your opinion in this matter that the

2   case defendants, the wholesale distributors who are

3   the defendants here, had the IQVIA data that you are

4   analyzing in the course of their business?

5      A    No, I'm making the application that IQVIA

6   was widely available for purchase by the

7   pharmaceutical industry.  We know for a fact that

8   based on internal documents from -- McKesson,

9   AmerisourceBergen, and Cardinal -- all three had

10  purchased some products from IQVIA.  And what we're

11  trying to demonstrate here is the information that

12  could have been gleaned from distributors, had they

13  accessed the IQVIA Xponent data or some other similar

14  dataset.

15     Q    So when you say the case defendants had

16  sufficient data, you mean it's your opinion that they

17  could have had, had they accessed something that they

18  haven't produced in this case, correct?

19             MR. LEDLIE:  Object to form.

20     A    But that statement starts with "based on my

21  analysis of the IQVIA data."  We're saying based off

22  what we have seen in the IQVIA data, there was -- you

23  could understand the prescribing trends in Cabell

24  County.

1      Q    And you don't use the word "Xponent" in

2    that sentence, but am I correct that the sentence

3    specifically is referring to IQVIA Xponent data, yes?

4                    MR. LEDLIE:  Object to the form of the

5    question.

6      A    Our analysis did rely upon the IQVIA

7    Xponent data, but again, there are other datasets

8    that were available and often purchased -- or and

9    purchased.  I don't know that I should go as far as

10   to say "often," and were purchased by defendants from

11   IMS.

12     Q    We'll talk about those other datasets in a

13   minute.  I just want to make sure I understand this

14   sentence.  Of potentially available datasets sold by

15   IQVIA, the only one you analyzed for purposes of your

16   opinions in this matter is the IQVIA Xponent database

17   produced by Allergan, correct?

18                    MR. LEDLIE:  Object to the form.

19     A    Correct.

20     Q    So when it says "based on my analysis of

21   IQVIA data," that also would accurately be understood

22   to mean based on your analysis of the IQVIA Xponent

23   data produced by Allergan, correct?

24                    MR. LEDLIE:  Object to the form.

1    A    Yes.  Again, you know, other IMS products

2    were available for purchase from IMS by defendants,

3    but we did only analyze the IQVIA Xponent data.

4    Q    And then -- so then when you continue in

5    that sentence to say "case defendants had sufficient

6    information," that more accurately should be read to

7    mean "could have acquired sufficient information," to

8    continue with the rest of your sentence, yes?

9              MR. LEDLIE:  Object to the form.

10   A    So I'm not sure that I would quibble with

11   the word "had," because I know AmerisourceBergen when

12   evaluating the IQVIA data, they, in fact, said that

13   they had data that was even more granular on

14   prescribers and pharmacies, and so they recommended

15   not purchasing it.

16             So I can't speak one way or another whether

17   they had better data than the Xponent data and more

18   granular data.  I just know what I see in the IQVIA

19   Xponent data, and that defendants were able to

20   purchase products from that company.

21   Q    I think that was a little different than

22   the question I asked you.

23             So we will return to what you just

24   referenced in regards to some other data that you

1  reference for AmerisourceBergen.  But did you -- as

2  you sit here, is it your belief that any of the case

3  defendants had the IQVIA Xponent data that you

4  analyzed?

5      A    It is -- They did not have the Xponent data

6  produced by Allergan.  I mean, you might now have it,

7  because of litigation, and they would produce that,

8  but I don't think that's your question.  But I do

9  maintain that they could have purchased other

10  products from IMS.

11      Q    I understand you maintain that.  I am not

12  asking about that.  I want to make sure that there is

13  a qualification to your answer.  I just want to make

14  sure it's not limiting your testimony on this point.

15          As you sit here, is it your belief or

16  understanding that any of the case defendants in the

17  ordinary course of their business had IQVIA Xponent

18  data specifically, whether or not it was the same

19  copy as the one that you analyzed from Allergan?

20              MR. LEDLIE:  Object to the form of the

21  question.

22      A    I don't know one way or another

23  specifically.  I only know what I have seen in the

24  documents cited in my report.  And I know that that



      **MENU**

 🏠  –  Locations  –  United States  –  Our U.S. Solutions  –  Commercial Operations  –  Essential Information  –
Prescription Information

# Prescription Information

*Pharmaceutical and financial companies rely on IQVIA's prescription information to measure market and product demand.*

**CONTACT US**

## Gain the most accurate and reliable view of market demand.

Pharmaceutical and financial companies rely on IQVIA's prescription information to measure market and product demand.

Get a timely, accurate picture of your competitive performance and demand for your products through weekly and monthly prescription information

**EXHIBIT**

**7**

 MENU

Ensure the most informed guide to competitive sales strategies and national performance with national and sub-national information

Gain a deep understanding of your key drug dispensing channels with the most robust capture of activities including retail, mail, and long-term care sectors

Integrate real-world data with prescription activities for a complete 360-degree view

IQVIA's key prescription information offerings:

Xponent® - A suite of sub-national reporting providing granular prescription performance perfectly aligned to help manage customer operations, sales targeting, and representative incentive compensation

National Prescription Audit® (NPA): Relied upon as the most accurate and consistent measure of national prescription performance. NPA provides the fastest insights into weekly prescription dispensing through a BI tool platform designed exclusively for healthcare reporting.

Contact us to find out how you can start leveraging these prescribing pattern insights.



Prescription Information - United States - IQVIA                                    Page 3 of 4

                                                        **MENU**

### OneKey Reference Data Set

Innovative provider reference solutions to
revolutionize your business

### Real World Data

Gain a holistic view of the patient's healthcare
experience

### Sales Information

Gain insights into where products are sold

### Survey Audits

Gain insight into physician share of mind

**OTHER US SOLUTIONS YOU MAY BE INTERESTED IN**



### Managed Markets Data & Analytic Solutions



MENU

Inform your access strategy with critical insights into payer, provider and patient behavior.



  

INVESTOR RELATIONS     CUSTOMER PORTAL     CAREERS     CORPORATE RESPONSIBILITY
EVENTS     CONTACT US

THIRD-PARTY ACCESS     SUPPLIERS     PRIVACY
DO NOT SELL MY PERSONAL INFORMATION     TERMS OF USE

© 2018–2020. All rights reserved. IQVIA® is a registered trademark of IQVIA Inc. in the United States, the European Union, and various other countries.

CONFIDENTIAL

Expert Analysis: Lacey R. Keller

1

  a. Association of Certified Fraud Examiners (ACFE) Global Fraud Conference (forthcoming: 2019)
  b. NASAA Investment Adviser Training (2017, 2019)
  c. Association of Certified Fraud Examiners (ACFE) Law Enforcement and Government Anti-Fraud Summit (2018)
  d. PLI Hedge Fund and Private Equity Enforcement & Regulatory Developments 2018 (2018)

20. My CV is attached as Exhibit 1.

## C. Remuneration

21. Gryphon is being compensated for its time and expenses. My hourly rate is $475 per hour. Other Gryphon personnel working on this matter have billing rates of $275 to $375 per hour.

## D. Scope of Report

22. This report focuses specifically and exclusively on manufacturers' anti-diversion and suspicious order monitoring programs. Throughout the report, I will refer to labelers and manufacturers interchangeably as the entities that create the drugs analyzed.

23. I have been asked to report the results of applying certain compliance metrics applicable to manufacturers to prescribers.

24. I have been asked to report the results of applying certain compliance metrics applicable to a manufacturer to pharmacies and physicians.

25. I have been asked to trace the orders made by distributors that were deemed peculiar by a manufacturer to the end pharmacy buyer through that manufacturer's chargeback data.

26. I have been asked to report the impact on opioid prescribing in Summit and Cuyahoga County if a small labeler had reported the activity of suspicious prescribers.

## E. Summary of Opinions

27. My findings demonstrate that there were millions of prescriptions and purchases of billions of dosage units and MMEs in Cuyahoga and Summit counties that defendant manufacturers of opioids (called labelers) could have identified as being of unusual size or frequency and deviating from the normal pattern yet were unreported. I found that defendant labelers purchased external data sources (IQVIA) and maintained internal data sources (chargebacks, 867 data, sales data) that provided them with granular information regarding the entity distributing, prescribing, and purchasing their opioid products. All defendant labelers purchased IQVIA Xponent data. All of this information was sufficient to support a Suspicious Order Monitoring (SOM) program identifying problematic distributors, prescribers and pharmacies. In particular, it was and is possible using

9

standard data-analytic tools to determine from the data that the defendant labelers had in their possession suspicious prescribing and purchasing patterns, and to identify particular physicians and particular pharmacies with problematic prescribing patterns.

28.  I found that defendant labelers purchased robust external data sources and maintained internal data sources that provided them with granular information regarding the entity distributing, prescribing, and purchasing their opioid products. This information was sufficient to support a Suspicious Order Monitoring (SOM) program identifying problematic prescribers and pharmacies. Nonetheless, defendant labelers did not implement robust monitoring programs and therefore failed to capture a substantial volume of potentially suspicious transactions.

29. Although all defendant labelers purchased IQVIA Xponent® data, each used it to monitor potential inappropriate prescribing in different ways to differing degrees. Teva and Mallinckrodt, for example, committed to regularly monitor IQVIA Xponent as agreed to with the FDA in their Risk Monitoring Plans (RMP), also known as Risk Minimization Action Plans (RiskMAP).[1] However, the details of how that data analysis would take place and what actions it would lead to was unspecified. To my knowledge only one defendant, Purdue Pharma, used IQVIA in a programmatic or algorithmic way[2]. Implementing Purdue's calculations, however, requires additional data that has not been made available to me.

30. Furthermore, instead of using this data to develop monitoring programs, defendants used it to inform their targeted marketing efforts to prescribers and evaluate drug performance. Similarly, despite the scope and detail of the chargeback data they maintained, defendant labelers did not use that data programmatically or effectively to capture suspicious activity among end buyers.

31. To quantify the prescriptions or transactions that labelers could have readily detected were of unusual size or frequency, I applied a series of compliance metrics to each dataset. Defendant labelers and distributors originally developed all but one of these compliance metrics. Among these metrics were whether the volume prescribed or ordered was over a certain static threshold; whether a buyer significantly increased prescriptions or purchases relevant to their own histories; or how prescriptions or purchases compared to national averages for the same labeler opioid product. I then applied these compliance metrics to physicians and pharmacies to determine what suspicious activity could be detected by labelers. The last metric was derived from labeler defendants' due diligence Standard Operating Procedures documents in which companies expressed concern that pharmacies may be purchasing large quantities of controlled substances from more than one distributor as a means of staying below distributor thresholds. Manufacturers were uniquely positioned to identify end-customers' purchasing patterns and, thus, which customers were using multiple distributors.

32. In Part One of this report, I analyzed the prescribing history of physicians from a labeler's perspective. As previously noted, this analysis relied on IQVIA Xponent® data, which was often purchased by defendant labelers for marketing purposes. In fact, this dataset was produced

---

[1] TEVA_CHI_00049296, MNK-T1_0007204156
[2] PDD1503450011

## O. Conclusion

1. Based on my analysis of IQVIA Xponent® data and chargeback data produced by the defendant labelers, I conclude that labelers had sufficient information to assess end buyer prescriptions and purchases.
2. I further conclude that compliance metrics, if properly applied, are capable of capturing patterns of transaction of unusual size or frequency, as illustrated above. Defendant labelers could have leveraged this information to diligently monitor suspicious activity involving defendant labeler opioid products.
3. I further conclude that I have identified significant volume of suspicious activity by both labelers and pharmacies in Summit and Cuyahoga counties that could have been detected by defendant labelers.

LACEY R. KELLER

*Keller Report*

*City of Huntington v. AmerisourceBergen Drug Corp. et al*, No. 3:17-cv-1362 (S.D.W.Va.)
*Cabell County Commission v. AmerisourceBergen Drug Corp. et al*, No. 3:17-cv-1665 (S.D.W.Va.)

Expert Report
Lacey R. Keller

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Keller Report*

nearly 60,000 pharmacies,[12] 72% of mail order pharmacies' distributions obtained from nearly 400 locations, and 78% of long-term care pharmacies' distributions obtained from over 3,000 locations originating at the pharmacy terminal level.[13]

10. Given that IQVIA reflects the prescribing history of physicians, the dataset could allow anyone who purchases it to determine how frequently a physician prescribed particular drugs, as well as what formulations and in what dosages, and how prescribers ranked among other prescribers. The data also allows for the identification of opioid prescribing patterns of individual physicians compared to their cohorts based on specialty, geography (e.g., city, county, zip code, state), and time period. Although IQVIA reflects only the share of prescriptions that were actually filled given that the data is derived from pharmacy sales records, filling pharmacy information is not provided with the data. [14],[15]

11. I first received this data on or around February 1, 2019. I processed this data in my capacity as a plaintiff expert witness in re National Prescription Opiate Litigation, MDL No. 2804. The data was produced as part of Production Volume Number thirteen (ALLERGAN-MDL013) containing the following bates range: ALLERGAN_MDL_02167865 to ALLERGAN_MDL_02485011.[16]

12. Due to rounding differences in such high-volume data, percentages in IQVIA-based tables differ depending on the metrics displayed and the level of granularity used. IQVIA natively represents monthly prescription estimates as decimals. I preserve the raw form of the data in as exact a format as possible while rounding prescriptions to the nearest non-zero whole number. Totals may reflect slightly different values because of differences in underlying aggregation.

---

[12] The IQVIA data includes Chain Pharmacies, Independent Pharmacies, Foodstore Pharmacies, Discount Houses, Mass Merchandisers, Standard & Specialty Mail Pharmacies Combined, and Long-Term Care Pharmacies. It does not include Dispensing Physicians, Hospital Pharmacies, Clinic Pharmacies, Closed-Wall HMOs, Home Healthcare, and the Veterans Administration Long-Term Care or Mail Order Pharmacies.

[13] "National Sales Perspectives & National Prescription Audit Overview." *IQVIA*, 2017.

[14] "National Sales Perspectives & National Prescription Audit Overview." *IQVIA*, 2017.

[15] It is my understanding that other data products from IQVIA do contain this information.

[16] "In re National Prescription Opiate Litigation, MDL No. 2804." *Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.),* August 10, 2018 regarding production Volume Number thirteen (ALLERGAN-MDL013) containing the following bates range: ALLERGAN_MDL_02167865 to ALLERGAN_MDL_02485011

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Keller Report*

Under penalty of perjury, I declare that I have read the foregoing and that the facts alleged therein are true and correct to the best of my knowledge and belief.

Date: August 3, 2020                                        */s/ Lacey R. Keller*

                                                           Lacey R. Keller

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# CORRECTED EXPERT REPORT OF LACEY KELLER

January 15, 2020

*In Re Opioid Litigation*, 400000/2017

Relating to Case Nos. County of Suffolk, 400001/2017; County of Nassau,
400008/2017; and New
York State, 400016/2018

1

28. Compliance metrics for the IQVIA Xponent® data are shown separately as applied to prescriptions of all labeler products and prescriptions of included Defendants' opioid products. Both options could be considered underestimates of Defendants' overall suspicious activity. Defendants could have purchased the entire IQVIA Xponent® dataset, which could provide for a larger denominator on which to flag but which could potentially result in a smaller percentage of flagged prescriptions/transactions. However, it is possible that Defendants purchased only their own data in IQVIA Xponent®, which could provide a smaller denominator on which to flag but which could result in a larger percentage of flagged prescriptions/transactions.

29. My opinions are based on my professional experience and training and rely on publicly available data and information, documents produced in this litigation, documents produced in *In Re: National Prescription Opiate Litigation*, Case No. 18-md-2804 (MDL), and documents produced in the New York Attorney General's pre-litigation investigation. This analysis reflects findings and opinions based on the data that I received and was able to process prior to the filing of this report. I acknowledge that there are additional sources that I was not able to consider for this report and I continue to review documents and gather information. Should substantial new data, compliance metrics, or clarifications become available to me, I reserve the right to update my analysis.

## III. Scope of Report and Summary of Opinions

30. In Section VI: Statewide Overview of this report, I provide an overview of purchasing and prescribing histories in New York for chain pharmacies, retail pharmacies, and practitioners.[15] There are other buyer types (hospitals, VA medical clinics, treatment centers) that exist in New York State and would only increase the numbers included in this analysis. I analyze the prescribing history of physicians and purchases by pharmacies from defendant's perspectives. For labeler and prescriber analysis, I rely upon IQVIA Xponent® and chargeback data, which could have been purchased or was maintained by Defendant Labelers. For distributor and buyer analysis, I rely upon the government-produced ARCOS and MADOCS data, which should be synonymous with the shipment data produced by Defendants. Section VI: Statewide Overview serves as contextual reference for the remainder of this report.

---

[15] IQVIA also provides prescription data at the hospital or medical center (I.E., Brooklyn Hospital Center, LI Jewish Medical Center) which I have also included. Their specialty is listed as "Other/Unspecified Specialty" and the compliance metrics apply them to other entities that share this specialty.

## VII. Conclusion

171. Based on my analysis of IQVIA Xponent® data chargeback data, and ARCOS/MADOCS data produced in this litigation, I conclude Defendants had sufficient information to assess prescriptions and pharmacy purchases.

172. I further conclude that compliance metrics are capable of capturing transactions of unusual size, frequency, or pattern as illustrated above. Defendants could have leveraged this information to diligently monitor suspicious activity involving opioid products.

173. I further conclude that I have identified a significant volume of suspicious activity by both prescribers and pharmacies in New York State that could have been detected.

LACEY R. KELLER

132



IMS Health & Quintiles are now

100 IMS Drive
Parsippany, NJ 07054
iqvia.com

*Via Email*

July 25, 2018

Allergan Finance, LLC
Donald P. Bunnin
Executive Director, Senior Counsel – Litigation & Commercial Eye Care
2525 Dupont Drive
Irvine, CA 92612

RE:        *In re: National Prescription Opiate Litigation*, MDL No. 2804, Case No. 17-md-2804
              filed in the Northern District of Ohio

Data:      IQVIA data concerning opioids from 1997 to the present from the following products
              Allergan has purchased: XPONENT and XPONENT PLANTRAK

Dear Mr. Bunnin:

This letter will serve as a response to your request on behalf of Allergan Finance, LLC (the "CLIENT"), to use the above-referenced Data and documents related thereto (the "IQVIA Information") in connection with the above-referenced litigation (the "Litigation").   IQVIA represents that IQVIA Information is confidential and proprietary to IQVIA and includes trade secrets.  In addition, IQVIA has certain contractual obligations of confidentiality with its clients and its data sources, and the IQVIA Information may include confidential and proprietary trade secrets and information of those third parties.  Accordingly, IQVIA Information retains its value to IQVIA (and to others noted above) so long as it is treated in accordance with the requirements of law affording certain protection for such information (e.g., laws governing trade secrets and copyrights).

You have requested that IQVIA consent to CLIENT's use of IQVIA Information in the Litigation, subject to Case Management Order No. 2: Protective Order entered by the Court on May 15, 2018 (the "Protective Order"), attached hereto as Exhibit A.  To provide consent to this request, it is necessary that, on behalf of CLIENT, you represent and agree that any such usage or disclosure of IQVIA Information will be treated in a manner that does not compromise the above-mentioned protections or obligations and will be consistent with the following:

        1.        The IQVIA Information shall be deemed confidential information and shall be marked and designated as confidential and proprietary to IQVIA in a manner so as to be subject to the Protective Order.  To the extent any terms of the Protective Order are inconsistent with the terms of this letter, the terms of this letter shall control.

        2.        Production of IQVIA Information shall be limited to that portion of IQVIA Information that is relevant to the Litigation.

        3.        The IQVIA Information shall only be used for purposes directly related to the Litigation and shall not in any event be used for any business, competitive, personal, private, public, or any other purpose.

        4.        All documents containing IQVIA Information shall be marked in such a manner as to be identified as documents requiring the highest level of confidential treatment available under the terms of the Protective Order.  CLIENT has agreed to mark the IQVIA Information as "HIGHLY CONFIDENTIAL".

30

5.      To the extent any production of IQVIA Information will be made to any state or federal entity, the cover letter with the production will include the following language or language substantially similar to the following:

>  The information provided in the accompanying material contains trade secrets and proprietary and confidential commercial information of IQVIA.  IQVIA requests that you take all appropriate measures to maintain the confidentiality of the information, including that the information be treated as confidential under the Freedom of Information Act ("FOIA") or any other applicable state open records law.

6.      The IQVIA Information shall not be used to identify any person or entity (including any patient, consumer, outlet, supplier, plan, pharmacy or prescriber) that is not readily identifiable in the IQVIA Information. The IQVIA Information shall not be used to contact, for the purpose of obtaining testimony or otherwise, any person or entity (including any patient, consumer, outlet, supplier, plan, pharmacy or prescriber) identified in or identifiable from the IQVIA Information.  The foregoing limitations shall not apply to independently derived information.

7.      Although there is an inclination to view numerical data as fact, the IQVIA Information represents an estimate of measured activity and should be treated accordingly.  As more fully described in our Published Specifications for Information Services ("Published Specifications"), IQVIA Information reflects projections, estimates, forecasts that are the result of a combination of confidential and proprietary technologies, statistical methodologies and a significant number of sources.  These estimates reflect the independent judgment, expertise and opinion of IQVIA representatives to arrive at a reasonable approximation of market activity.  The IQVIA Information is intended to support sales, marketing and research applications, and it is highly reliable for those purposes.  The IQVIA Information, although appropriate for its intended purpose of supporting business and marketing analyses in industries such as the pharmaceutical industry, contains data that is susceptible to error or variance, and is not intended to be used as direct evidence or to establish any fact.  Accordingly, IQVIA offers no assurances that the IQVIA Information will be suitable for use as evidence in any litigation.  Attached, as Exhibit B, is a copy of these Published Specifications.

8.      Any reports, documents, or exhibits that contain IQVIA Information together with information from other sources shall be identified as such, and shall not be represented as a report, document, or exhibit prepared by IQVIA.

9.      When IQVIA Information is used in or as part of a proceeding in the Litigation, IQVIA will act only as an objective service provider and not as an expert on behalf of any party in the Litigation.  IQVIA will not (1) offer testimony, affidavits, declarations or other evidence regarding the interpretation of the results of the IQVIA Information or the services performed by IQVIA; (2) provide any advice or engage in any advocacy with respect to witness testimony or expert analysis of any party; or (3) provide any opinion as to the relative merits of any party's position in the Litigation.

10.     The IQVIA Information shall not be placed in any information repository accessible to any person or entity not directly involved in the Litigation, and shall not otherwise be made available to any person or entity not directly involved in the Litigation.

11.     The IQVIA Information shall not be reverse engineered or disassembled, nor shall any attempt to ascertain the methodologies by which such information was obtained, sorted, projected, or manipulated be made.

12.     In no event shall any disclosure of IQVIA Information be made to any competitor of IQVIA, or to any person who, upon reasonable good faith inquiry, could be determined to be an employee of any competitor of IQVIA, irrespective of whether that person is retained as an expert in the Litigation.

13.     If IQVIA Information is submitted in a document filed in court, the IQVIA Information shall be filed under seal or through a similar mechanism for the protection of confidential information. If CLIENT desires to use at trial or in any public court proceeding any of the above-referenced IQVIA Information, CLIENT shall

request the court to permit presentation of such material with only counsel and court personnel present or in such other manner as the court deems appropriate to maintain the confidentiality of the IQVIA Information. If the court refuses to maintain the confidentiality of the IQVIA Information or public disclosure of IQVIA Information is otherwise expected to occur, CLIENT agrees to notify IQVIA at least 10 days prior to the expected disclosure if possible or as soon as possible after CLIENT receives notice that public disclosure of IQVIA Information is expected to occur, and to cooperate with IQVIA in maintaining the confidentiality of the IQVIA Information, provided, at no time shall the IQVIA Information be disclosed absent the foregoing confidentiality protections, without IQVIA's written consent.

14.    A copy of this letter and its attachments will be provided with any production of IQVIA Information.

15.    Within 60 days of the conclusion of the Litigation or the term set forth in the Protective Order, IQVIA Information and any copies thereof (except archival copies) shall be destroyed.  Upon request of IQVIA, CLIENT shall provide written certification of any such destruction to the IQVIA Office of General Counsel. Notwithstanding the above, this provision does not require the destruction of IQVIA Data which was purchased for internal use pursuant to CLIENT'S license; any such destruction is governed by the terms of CLIENT'S license.

Subject to your agreement with the foregoing, IQVIA will consent to your request. If the above terms are acceptable, please counter-sign a copy of this letter where indicated and return it to my attention. Thank you.

Very Truly Yours,

/s/

Maureen Nakly
Associate General Counsel
IQVIA

Acknowledged and Agreed by:

SIGNATURE: _____

NAME: Donald Rubin

TITLE: AVP

COMPANY/FIRM: Allergan

DATE: July 21, 2018