# EXHIBIT 2

Page 1

```
IN THE UNITED STATES DISTRICT COURT
  FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA


* * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

          Plaintiff,

vs.                                    CIVIL ACTION
                                       NO. 3:17-01362
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
          Defendants.
_____
CABELL COUNTY COMMISSION,
          Plaintiff,
vs.                                    CIVIL ACTION
                                       NO. 3:17-01665
AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

          Defendants.

* * * * * * * * * * * * * * * * * * * * *
```

         Videotaped and videoconference deposition of
DANIEL CICCARONE taken by the Defendants under the
Federal Rules of Civil Procedure in the above-entitled
action, pursuant to notice, before Teresa S. Evans, a
Registered Merit Reporter, all located remotely, on the
8th day of September, 2020.

Page 217

1  to point you to.  It's in the first full paragraph on
2  that page.
3       A.   Take your time.
4       Q.   Yes.  And it's a -- there's a second sentence
5  of that first full paragraph on 73.  It says, "Wave one
6  is often considered to have been driven by increased
7  supply, i.e., a tripling of opioid prescriptions."
8            Do you see that?
9       A.   I do.
10      Q.   So again here where you're referring to the
11 increased supply, you're talking about a tremendous
12 increase in the volume of prescriptions by the medical
13 community, correct?
14      A.   I'm discussing an increase in volume of
15 prescriptions, yes.
16      Q.   Yeah.  And so those are prescriptions -- or
17 decisions made by doctors to issue prescriptions that
18 led to the increase in supply, right?
19           MR. MORIARTY:  Object to form.
20      A.   It's citing Kolodny and Courtright and others.
21 American View of Public Health, 2015.  I'm taking it
22 from what they've concluded, which is that wave one was
23 driven by increases in opioid prescribing practices.
24      Q.   And to --

Page 218

1  A.   I'm sorry, volume of opioid prescriptions.
2  Q.   Right.  And so those are the volume of
3  prescriptions written by doctors, correct?
4  A.   I would imagine so.  I didn't look exactly
5  what database they're using, but I'm assuming it's
6  legitimate prescribing within the medical business.
7  Q.   And so -- and so that total volume of
8  prescriptions would amalgamate to the supply that
9  you're talking about that caused wave one.
10 A.   Yes.
11 Q.   And do you also -- I take it you agree with
12 this proposition that what the distributors shipped to
13 pharmacies reflected what the doctors were prescribing?
14 A.   Yes.
15 Q.   And that without the prescriptions written by
16 the doctors, the tripling has no effect.  In other
17 words, the supply doesn't expand unless the doctors are
18 writing the prescriptions?
19           MR. MORIARTY:  Object to form.
20 A.   I'm sorry, every time he says "Object to
21 form," I get a little confused.  Can you just restate
22 that?  Sorry.
23 Q.   Yeah, sure.  The supply doesn't expand into
24 the community unless the doctors write the

Page 219

1   prescriptions?
2       A.   For this particular drug, yes.  We're talking
3   about a prescription drug that's driven by doctors
4   writing prescriptions.  Of course, those doctors are
5   influenced by industry, but -- yes, prescriptions by
6   the medical profession.
7       Q.   And the doctors are influenced by a number of
8   factors when they decide what to write as
9   prescriptions, correct?
10              MR. MORIARTY:  Object to form.
11      A.   I'm not a -- I'm not a full expert in this,
12  but I will agree with you, in general, that doctors are
13  influenced by a number of factors in their prescribing
14  practices.
15      Q.   And that would include their own clinical
16  experiences with their patients, correct?
17      A.   That would include clinical experiences with
18  their patients.
19      Q.   And it would include their medical training?
20      A.   It would include their medical training.
21      Q.   And when you refer to "influence by industry,"
22  what are you referring to there?  Are you referring to
23  manufacturers providing information about the
24  attributes of their drugs?

Page 244

1  correct?
2     A.   We have not.  But I can tell you very clearly,
3  though, that from what I've looked at in terms of
4  industrial accidents in West Virginia, that even if
5  there is a relationship to that and opioid pill use,
6  there's nothing that went up four to six to ten-fold in
7  the last 20 years that would explain the rise in
8  opioid-related overdose.
9           There's no force here that -- that trumps
10 supply.
11    Q.   Do you have any evidence that any distributors
12 shipped more pills than what doctors prescribed?
13    A.   Shipped more pills than doctors prescribed?  I
14 don't know how to answer that question.  Is there a
15 more general way to put it?  Or do you really want to
16 know the relationship between --
17    Q.   I'm just asking you -- it's a pretty narrow
18 question, really, which is:  Do you have any evidence
19 -- do you have anything in your head - have you looked
20 at an analysis - that distributors shipped more pills
21 than what the doctors prescribed?
22    A.   I'm not -- I'm not aware of any data there.
23    Q.   And do you have any evidence that any pills
24 left pharmacies without a prescription written by a

1  STATE OF WEST VIRGINIA,
2  COUNTY OF JACKSON, to wit;
3
4          I, Teresa S. Evans, a Notary Public within and
   for the County and State aforesaid, duly commissioned
5  and qualified, do hereby certify that the foregoing
   deposition of DANIEL CICCARONE was duly taken by me and
6  before me at the time and place and for the purpose
   specified in the caption hereof, the said witness
7  having been by me first duly sworn, witness identity
   having been verified by driver's license.
8
           I do further certify that the said deposition
9  was correctly taken by me in shorthand notes, and that
   the same were accurately written out in full and
10 reduced to typewriting and that the witness did request
   to read his transcript.
11
           I further certify that I am neither attorney
12 or counsel for, nor related to or employed by, any of
   the parties to the action in which this deposition is
13 taken, and further that I am not a relative or employee
   of any attorney or counsel employed by the parties or
14 financially interested in the action and that the
   attached transcript meets the requirements set forth
15 within article twenty-seven, chapter forty-seven of the
   West Virginia Code.
16
           My commission expires October 25, 2020.  Given
17  Given under my ha        September, 2020.
18  [signature]
19 Teresa S. Evans
   RMR, CRR, RPR, WV-CCR
20
21
22
23
24

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to wit;

I, Teresa Evans, owner of Realtime Reporters, LLC, do hereby certify that the attached deposition transcript of DANIEL CICCARONE meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code to the best of my ability.

Given under my hand this 11th day of September, 2020.

Given under my har

*Teresa Evans*

Registered Professional
Reporter/Certified Realtime Reporter