# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

      Plaintiff,

vs.                                     CIVIL ACTION
                                        NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

      Defendants.
_____
CABELL COUNTY COMMISSION,

      Plaintiff,

vs.                                     CIVIL ACTION
                                      NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

      Defendants.

* * * * * * * * * * * * * * * * * * * * *

      Videotaped and Zoom videoconference deposition of CRAIG MCCANN, PH.D. taken by the Defendants under the Federal Rules of Civil Procedure in the above-entitled action, pursuant to notice, before Jennifer Vail-Kirkbride, a Registered Merit Reporter, on the 1st day of September, 2020.

Page 14

1  Q. Have you since giving your prior opioid
2  testimony formed any opinion as to whether any of
3  the five flagging methods that you discuss in your
4  report are appropriate for identifying flagged
5  orders?
6  A. Well, they are certainly appropriate for
7  the purpose I put them to in this report.  I'm not
8  opining that any one of them individually should be
9  implemented by any of the distributors that would --
10 that would require more work and more information
11 about the internal systems I have, but for the
12 purposes that I put them to, they were certainly
13 appropriate.
14 Q. Okay.  And that sort of leads to my -- my
15 next question, which is whether since giving your
16 prior opioid testimony, you have formed any opinion
17 as to whether any of the five flagging methodologies
18 that you discuss in your report is appropriate for
19 identifying suspicious orders?
20 A. Not beyond the answer I gave you to the
21 previous question.  They are appropriate for the
22 purpose that I put them to in this report.  They
23 would need to be developed further or enhanced with
24 internal information at the distributors that I

1   don't have and would require more work, but
2   conceptually I think that -- that they would be
3   useful and for the distributors and they are
4   certainly appropriate for the purpose I put them to.
5        Q.   Okay.  Doctor McCann, I don't mean this in
6   any sort of pejorative sense, but you, yourself,
7   have testified multiple times repeatedly, you are
8   just the calculator.  Do you recall testifying to
9   that effect?
10       A.   Yes, at least in some context, including
11  significant aspects of my work here, that's correct.
12       Q.   And -- and so do you -- you stand by that
13  with respect to the opinions and conclusions that
14  you set forth in your report in -- in this case?
15       A.   Well, certainly with respect to the
16  flagging methods you were just asking me about.  I
17  think that that is approximately half of the report,
18  maybe less than half -- maybe substantially less
19  than half of the report.  The rest of the report
20  deals with processing the ARCOS data and producing
21  summaries of that data.  And I -- I think that goes
22  beyond being a simple calculator.
23            But when I have in the past discussed
24  the flagging methods, I explained that I took that

Page 100

1  the code that just switched the order, a couple of
2  steps were taken, a couple of lines of code that had
3  a de minimis impact on the results.  And then there
4  might be some other very minor differences, but
5  effectively, I think it's the same code applied
6  today as we applied in the CT 1 case, 16 months ago.
7      Q.  But your methodology and your computer
8  algorithm have compared a calendar month shipments
9  to the prior six calendar months in each of the
10 jurisdictions; correct?
11     A.  Correct.
12     Q.  Okay.  Now, you are not an expert on the
13 diversion control programs implemented by
14 defendants, are you?
15     A.  I am not.
16     Q.  You have never developed a suspicious order
17 monitoring program for a pharmaceutical distributor?
18     A.  Correct.
19     Q.  Before you became an expert for plaintiffs,
20 you had no experience analyzing ARCOS data using the
21 methodologies of the flagging analysis?
22     A.  Correct.
23     Q.  But the plaintiffs' lawyers here, they
24 asked you to develop a computer algorithm to

Page 101

1  implement the methodologies of the flagging
2  analysis; correct?
3       A.   Yes.
4       Q.   Did you do anything to ensure your computer
5  algorithms complied with the Controlled Substances
6  Act or the West Virginia Controlled Substances Act?
7       A.   No.
8       Q.   You didn't discuss your computer algorithms
9  with Mr. Rafalski?
10      A.   No, that's not correct.
11      Q.   Before your August 29, 2020, discussion
12 with Mr. Rafalski, did you discuss your computer
13 algorithms with him?
14      A.   I did not, no.
15      Q.   Mr. Rafalski did not review your
16 algorithms?
17      A.   You would have to ask him.  I don't know
18 the answer to that.
19      Q.   Mr. Rafalski hasn't checked your computer
20 code?
21      A.   Again, you'd have to ask him.  I don't
22 believe so.  I don't have the understanding that he
23 did, but you'd have to ask him to be sure.
24      Q.   Did you provide a copy of your computer

Page 127

1  8,000 dosage units monthly methodology, would not
2  follow the operating procedures of the LDMP program
3  used by McKesson in 2007 that analyzes only four
4  controlled substances?
5       A.  Correct.
6       Q.  Sir, if we could return to our earlier
7  discussion today about your results from your
8  flagging analysis.  Your flagging analysis does not
9  -- let me strike that.
10              Do you recall, sir, your discussion
11  with Mr. Weimer about the results of your flagging
12  analysis from this morning?
13      A.  Yes.
14      Q.  Now, your flagging analysis, sir, does not
15  identify the number of opioids that were diverted;
16  correct?
17      A.  Correct.
18      Q.  Your flagging analysis does not identify
19  the number of opioids that were unlawfully
20  distributed; correct?
21      A.  Correct.
22      Q.  Your flagging analysis does not identify
23  the number of opioids that were more likely than not
24  to be diverted; correct?

Page 128

1     A.  Correct.
2     Q.  Your flagging analysis does not identify
3  the orders of opioids that should have been reported
4  to DEA; correct?
5     A.  Correct.
6     Q.  As a part of your flagging analysis, you
7  did not review defendants' customer diligence files;
8  correct?
9     A.  Correct.
10    Q.  And as a part of your flagging analysis,
11  you did not review the pharmacy files from the West
12  Virginia Board of Pharmacy; correct?
13    A.  Correct.
14    Q.  And as a part of your flagging analysis,
15  you did not review the pharmacy files from the DEA.
16    A.  Correct.
17    Q.  As a part of your flagging analysis, you
18  did not consider any diligence actually performed by
19  defendants, did you?
20    A.  Correct.
21    Q.  As a part of your flagging analysis, you
22  did not consider any diligence actually performed by
23  the West Virginia Board of Pharmacy; correct?
24    A.  Correct.

Page 167

STATE OF WEST VIRGINIA

COUNTY OF BROOKE, to wit;

I, Jennifer Vail-Kirkbride, a Notary Public and Commissioner within and for the County and State aforesaid, duly commissioned and qualified, do hereby certify that the attached deposition transcript of CRAIG MCCANN meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code to the best of my ability at the time I submitted the same to Realtime Reporters, LLC, 713 Lee Street, Charleston, West Virginia on September 3, 2020, 2015 for distribution.  Said transcript was duly taken by me and before me at the time and place and for the purpose specified in the caption hereof, the said witness having been by me first duly sworn.

I do further certify that the said deposition consisting of 170 pages was correctly taken by me in

Page 168

1   stenotype notes, and that the same were accurately
2   written out in full and reduced to typewriting and
3   that the witness did request to read his transcript.
4
5
6   My Notary Public commission expires:  August 26,
7   2023.
8   My West Virginia Commissioner commission expires:
9   February 15, 2022.
10  Given under my hand this 2nd day of September, 2020.
11
12
13
14                          /s/ Jennifer Vail-Kirkbride
15                          Registered Professional
                            Reporter
16                          RMR, CRR, FCRR, RPR, WV-CCR
17
18
19
20
21
22
23
24

1  STATE OF WEST VIRGINIA
2  COUNTY OF KANAWHA, to wit;
3      I, Teresa Evans, owner of Realtime Reporters,
4  LLC, do hereby certify that the attached deposition
5  transcript of CRAIG MCCANN meets the requirements
6  set forth within article twenty-seven, chapter
7  forty-seven of the West Virginia Code to the best of
8  my ability.
9
10 Given under my hand this 3rd day of September, 2020.
11
12
13
14                     /s/ Teresa Evans
                       _____
15                     Registered Professional
                       Reporter
16
17
18
19
20
21
22
23
24