# EXHIBIT 9

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3
    - - - - - - - - - - - - - - - - - - - - - - - x
 4  THE CITY OF HUNTINGTON,
 5                   Plaintiff,
 6       vs.                    Civil Action No.
                                     3:17-01362
 7  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
 8
                     Defendants.
 9  - - - - - - - - - - - - - - - - - - - - - - - x
    CABELL COUNTY COMMISSION,
10
                     Plaintiff,
11
         vs.                    Civil Action No.
12                                   3:17-01665
13  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
14
                     Defendants.
15  - - - - - - - - - - - - - - - - - - - - - - - x
16                  September 4, 2020
                       9:00 a.m.
17
18      VIDEO RECORDED DEPOSITION of ANDREW KOLODNY, M.D., an
19  Expert Witness for the Plaintiff herein, held remotely via
20  Zoom before Sara K. Killian, a Registered Professional
21  Reporter, Certified Court Reporter and Notary Public of
22  the State of New York.
23
24
25
```

Page 111

1   defendants, billions of MMEs sold by the
2   defendants in the county and so that's clear
3   evidence of prescriptions that were written or
4   pills that left pharmacies for illegitimate
5   reasons.
6              There's no way that Cabell County
7   could have had a legitimate need for billions of
8   MMEs, so that is evidence of a serious problem.
9       Q.    Now, but I wanted to ask a slightly
10  more specific question, which is have you been
11  asked to opine -- I'm asking what you were asked
12  to opine on.
13             Have you been asked to opine on the
14  mix of pills -- prescription opioids -- that were
15  in Cabell/Huntington because of legitimate
16  prescriptions written by doctors as compared to
17  diversion from various sources?  Have you been
18  asked to opine on that?
19             MS. DICKINSON:  Objection to form.
20             Lacks foundation.
21      A.    I was asked to -- I think that the
22  subjects that I was asked to opine on would
23  broadly include that.  I was not asked to try and
24  estimate what percentage of the prescriptions
25  could be legitimate versus illegitimate or

Page 112

1    specific -- what percentage of diversion might
2    have been from a specific route.
3         Q.    And again, just to make it clear, you
4    understand that there's a closed system of
5    distribution when a distributor distributes
6    prescription opioids to a pharmacy?  That's a
7    closed system.  You understand that?
8         A.    Yes, I understand that there is
9    supposed to be a closed system and that the
10   defendants in this case were responsible for
11   ensuring where they could that that system would
12   remain closed, but that there was not a closed
13   system.
14        Q.    Are you aware of any instance where a
15   distributor -- where pills were diverted between a
16   distributor and the time they reached a pharmacy?
17   Do you have any evidence of that?
18              MS. DICKINSON:  Objection to form.
19        A.    I have clear evidence that there was
20   not a closed system.  Where the exact leaks
21   occurred in the system, I was not asked to opine
22   on.
23        Q.    Okay.
24              Again, you don't have any evidence of
25   distributors failing to deliver prescription

Page 116

1  the community comparable to levels that you'd see
2  in other communities in the United States?
3       A.     No.  Higher.  So we know that West
4  Virginia is not just an outlier for opioid-related
5  morbidity and mortality.  We know that West
6  Virginia is also a state where there's been much
7  greater amounts of opioids that have flooded into
8  the state and a pretty consistent finding when you
9  compare geographic areas where the opioid crisis
10 may be more severe than -- it's just exactly what
11 I've said:  Where there are more opioids, you see
12 more opioid-related morbidity and mortality.
13      Q.     Have you done a study of how many
14 pills would be clinically warranted?
15      A.     I haven't performed a study, but I
16 have studied that subject and I've published on
17 appropriate use of opioids and if you're asking
18 me, I would say that the level of consumption in
19 the United States in the 1980s was appropriate and
20 by the early 90s, we start -- it starts to go up
21 and it really takes off in the mid 90s.
22             So if I had to really draw a line
23 somewhere, I would -- the most conservative place
24 to draw that line would be levels of consumption
25 after 1996 when it starts soaring up.  What you're

Page 117

1  adding on to what we were consuming before 1996
2  was clinically unwarranted.
3       Q.    And so your judgment is any levels
4  higher than 1996 are clinically unwarranted?
5       A.    That's a conservative estimate
6  because even in 1996, we had already had some
7  significant growth in opioid consumption and in
8  the early 90s, international comparisons would
9  suggest we were overconsuming opioids in the
10 United States, but 1996 is really an inflection
11 point where the consumption takes off dramatically
12 and so I think it's a conservative place to draw
13 the line.
14      Q.    So you would agree that the levels in
15 1996 would be a clinically warranted basis,
16 clinically warranted levels?
17      A.    I would say that if I'm going to be
18 really conservative and try and define where the
19 consumption is likely to be clinically
20 unwarranted, I would draw that line in 1996 and
21 say what came into the county after 1996 -- if you
22 use 1996 as a benchmark -- would be inappropriate,
23 but that would be a very conservative estimate
24 because consumption was already pretty high in
25 1996.

Page 275

1  Q. There's a medical board in West
2  Virginia, correct?
3  A. Yes.
4  Q. Are you aware of any evidence that
5  any of the distributors' customers were filling
6  prescriptions for doctors who are not licensed by
7  the State of West Virginia Medical Board?
8      MS. DICKINSON: Objection to form.
9  A. I'm sorry. Can you ask that again?
10 Q. Yeah, sure.
11     Are you aware of any evidence showing
12 that distributors' customers were filling
13 prescriptions written by doctors who were not
14 licensed by the State of West Virginia?
15 A. I don't know if that happened. It
16 could have -- I'm not aware of evidence that said
17 prescriptions were filled by doctors that didn't
18 have a license or DEA registration.
19 Q. I'd like to turn to the distributor
20 marketing services for a few minutes.
21     Now, you understand that the
22 marketing services offered by distributors were
23 not just limited to opioids, right?
24 A. Yes.
25 Q. Do you know what percentage of the

1      CERTIFICATION
2           I, SARA K. KILLIAN, RPR, CCR, do
3      hereby certify that ANDREW KOLODNY, M.D.,
4      the witness whose examination under oath
5      is hereinbefore set forth, was duly sworn,
6      and that such deposition is a true record
7      of the testimony given by such witness.
8           I FURTHER CERTIFY that I am not
9      related to any of the parties to this
10     action by blood or marriage, and that
11     I am in no way interested in the
12     outcome of this matter.
13           IN WITNESS WHEREOF, I have hereunto
14     set my hand this 4th day of September, 2020.
15
16
17           *Sara K Kl* (signature)
18     SARA K. KILLIAN, RPR, CCR
19     Notary Public of the State of New York
20
21
22
23
24
25