# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

      Plaintiff,

vs.                        CIVIL ACTION
                           NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

      Defendants.

_____

CABELL COUNTY COMMISSION,

      Plaintiff,

vs.                        CIVIL ACTION
                           NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

      Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * *

      Videotaped and videoconference deposition of JAMES GELDHOF taken by the Defendants under the Federal Rules of Civil Procedure in the above-entitled action, pursuant to notice, before Teresa L. Harvey, a West Virginia notary public and Registered Diplomate Reporter, the witness appearing via videoconference from Detroit, Michigan, West Virginia, on the 22nd day of September, 2020.

Page 24

1  those laws and regulations; correct?
2       A.  No, I'm not.
3       Q.  You weren't involved in writing them, were you?
4       A.  No.
5       Q.  Are you aware that there have been discussions
6  over amending the suspicious order regulation that you
7  cite?
8       A.  Subsequent to my retirement I've heard, but
9  I -- I really don't know what the status of it is.
10      Q.  Have you had any role in potential efforts to
11 amend the suspicious order regulation?
12      A.  No, I've not.
13      Q.  That's Pages 2 to 3.  If you go to Pages 4
14 through 6, you talk about DEA oversight, including the
15 Diversion Investigators Manual, the Distributor
16 Initiative, and some of those Rannazzisi letters; is
17 that correct?
18      A.  Uh-huh, yes.
19      Q.  And then from Pages 6 to 9 you talk about DEA
20 enforcement actions against some defendants and some
21 non-defendants and then, as you mentioned, the
22 Congressional hearings in 2018; correct?
23      A.  Correct.
24      Q.  And there's no specific opinions I saw in here
25

Page 25

| | |
|---|---|
| 1 | talking about the import of the enforcement actions or |
| 2 | the Congressional hearings; correct? |
| 3 | A.  Only that I incorporated them into my, I guess |
| 4 | position, on -- on, you know, the activity of industry |
| 5 | regarding the opioid epidemic. |
| 6 | Q.  Where -- where in your report do you state your |
| 7 | opinion on the activities of industry on the opioid |
| 8 | epidemic? |
| 9 | A.  That's a personal opinion. |
| 10 | Q.  Okay.  And I don't want to ask you about your |
| 11 | personal opinions.  I want to ask you about the opinions |
| 12 | you intend to offer -- |
| 13 | A.  Okay. |
| 14 | Q.  -- in this case.  Is there any opinion |
| 15 | regarding the conduct of the industry that you offer in |
| 16 | Exhibit 1? |
| 17 | A.  No, they're just stated. |
| 18 | Q.  Where are they stated? |
| 19 | A.  Well, they're listed. |
| 20 | Q.  Okay.  Where -- where are they listed?  Where |
| 21 | are any opinions regarding the conduct of the industry |
| 22 | listed? |
| 23 | A.  I'm sorry.  I misunderstood.  I thought you |
| 24 | were talking about the activity -- the actions, the |
| 25 | |

Page 26

```
 1    1   enforcement actions.
 2    2        Q.   Oh, got it.  Got it.  Are there any opinions
 3    3   that you give in your report that you intend to testify
 4    4   about regarding the specific conduct of any defendant in
 5    5   this case?
 6    6        A.   No.
 7    7        Q.   And, for example, you don't talk about any
 8    8   defendants' Suspicious Order Monitoring Systems;
 9    9   correct?
10   10        A.   No.
11   11        Q.   I don't believe you reviewed those in preparing
12   12   your opinion; correct?
13   13        A.   Correct.
14   14        Q.   Do you -- if I were to ask you for Cardinal or
15   15   ABDC or McKesson, what are the names of their programs
16   16   at different points in time, would you be able to answer
17   17   that?
18   18        A.   No.
19   19        Q.   You didn't review, as I understand it, any
20   20   communications between ABDC, Cardinal and McKesson on
21   21   the one hand or, one of them individually, and the DEA
22   22   about their Suspicious Order Monitoring Programs, did
23   23   you?
24   24        A.   I did.
25
```

Page 125

1  1   with the registrant.
2  2       Q.  I'm going to come to that.  I'm asking
3  3   something a little different.  Are you aware of any
4  4   company, before those letters in 2006 and 2007, that
5  5   routinely blocked all orders identified as suspicious?
6  6       A.  I have no idea.  There's -- there's several
7  7   distributors in the country.  I have no idea.
8  8       Q.  Are you aware that DEA knew, before those
9  9   letters, that companies were reporting orders as
10 10  suspicious but then shipping them?
11 11      A.  You'd have to be more specific.  Are you
12 12  talking about Ingredient Limit Reports?
13 13      Q.  Or any kind of report.  Excessive Purchase
14 14  Report, Suspicious Order Reports.  Are you aware that
15 15  DEA knew companies were making reports to DEA regarding
16 16  excessive purchases or suspicious orders, but then
17 17  nevertheless shipping those orders?
18 18      A.  Those Ingredient Limit Reports, based on
19 19  my -- my experience, were not considered suspicious
20 20  orders.
21 21      Q.  I'm not asking you about Ingredient Limit
22 22  Reports; I'm asking about excessive reports and
23 23  suspicious reports.  Do you know if DEA knew, before
24 24  2006, that companies were reporting orders as either
25

Page 147

1  A. Correct.
2  Q. And he then gets asked the question:
3     "Where is that contained in regulations
4     or the statutes that you've cited?"
5        And he says:
6     "It's not contained in these regulations
7     and statutes."
8        Do you see that?
9  A. I do.
10 Q. Do you agree with that, that the do-not-ship
11 requirement is not contained in the regulations or
12 statutes?
13 A. No, I don't agree with that.
14 Q. But he then says:
15    "But they've been informed of that
16    policy by the DEA in these distributor
17    briefings."
18       Do you see that?
19 A. I do.
20 Q. And are you aware that Mr. Rafalski gave that
21 testimony in his case, when you were supervising him,
22 that the distributors were first informed of a
23 do-not-ship requirement as part of a distributor
24 briefing in 2006?
25

Page 148

1    1              MS. QUEZON:  Object to the form.
2    2              THE WITNESS:  I'm aware of the
3    3    testimony -- I was his second line supervisor -- if
4    4    that's the question.
5    5         Q.   Yeah.  So you -- you knew he testified in a
6    6    government case, while you were supervising him, that
7    7    distributors were first told about the do-not-ship
8    8    requirement in 2006?
9    9         A.   I -- that's -- I knew he testified to that,
10   10   yeah.
11   11        Q.   Okay.  And then just to -- just to make sure we
12   12   have it for the record, if -- if you look down on
13   13   Page 91, Line 17.
14   14        A.   Okay.
15   15        Q.   He's asked, "When were they so informed?"
16   16             Do you see that question?
17   17        A.   Yes.
18   18        Q.   And he says:
19   19             "In a briefing conducted by Kyle Wright,
20   20        based on what my conversations were with Kyle
21   21        Wright."
22   22             And he's asked:
23   23             "When was that briefing?
24   24             "The first briefing was in 2006.  I
25

```
                                                         Page 149
 1    1         think January of 2006."
 2    2              Do you see that?
 3    3         A.   Yes.
 4    4         Q.   And that's just that point you mentioned just
 5    5    now, you knew when you were at DEA that Mr. Rafalski
 6    6    testified in a case he had that distributors were first
 7    7    told about the do-not-ship requirement in a meeting in
 8    8    January of 2006; right?
 9    9         A.   I knew about it after he testified, yes.
10   10         Q.   While you were with the DEA; right?
11   11         A.   Yep.  Yes.
12   12         Q.   Did you submit any -- anything to the court or
13   13    any testimony of any sort to correct either Mr. Wright's
14   14    or Mr. Rafalski's testimony?
15   15         A.   No, not that I'm aware of.
16   16         Q.   Did you direct them to correct their testimony?
17   17         A.   Not that I'm aware of.
18   18         Q.   Okay.  I asked you about Agent Mapes --
19   19    actually, before I do, are you aware that there was a
20   20    court decision as a result of this case coming out of
21   21    this case?
22   22         A.   The money case?
23   23         Q.   Yes.
24   24         A.   Yeah, I am.
25
```