# EXHIBIT 11

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA


  * * * * * * * * * * * * * * * * * * * * *

  THE CITY OF HUNTINGTON,

            Plaintiff,

  vs.                                    CIVIL ACTION
                                         NO. 3:17-01362
  AMERISOURCEBERGEN DRUG
  CORPORATION, et al.,
            Defendants.
  _____
  CABELL COUNTY COMMISSION,
            Plaintiff,
  vs.                                    CIVIL ACTION
                                         NO. 3:17-01665
  AMERISOURCEBERGEN DRUG
  CORPORATION, et al.,

            Defendants.

  * * * * * * * * * * * * * * * * * * * * *


         Videotaped and Zoom video conference
  deposition of JAMES RAFALSKI taken by the Defendants
  under the Federal Rules of Civil Procedure in the
  above-entitled action, pursuant to notice, before
  Jennifer Vail-Kirkbride, a Registered Merit
  Reporter, on the 11th day of September, 2020.
```

Page 101

1  all of them.
2      Q.  Okay.  Do you know whether it was between 1
3  and 99 percent of these orders that went to fill
4  legitimate medical needs?
5      A.  I don't know, sir.
6      Q.  Do you know -- am I right in understanding
7  you believe all of these tens of millions of orders
8  should have been reported to the DEA as suspicious?
9      A.  Oh, that's a different question.
10     Q.  Should they -- should all of these tens of
11 millions of orders that you flagged in Method A have
12 been reported to the DEA as suspicious?  Yes or no?
13     A.  No.
14     Q.  Okay.  How many should have been reported
15 to the DEA as suspicious?
16     A.  The nature of my application of the
17 methodology, the algorithm, wasn't for the purpose
18 to identify orders that would be reported to the
19 DEA.  It was just a triggering mechanism to identify
20 orders from the transactional data from the
21 defendants.  It -- it would -- it's a much -- it's
22 broader, it's a broader requirement for the
23 defendants than -- than just to -- for me to apply
24 an algorithm to their transactional data and then

1  say they should have reported them.  That's -- I
2  mean, that's outside of what occurred here.
3       Q.  Okay.  So these tens of millions of orders,
4  can you give me any definition as to whether any of
5  them, and if so how many, should have been reported
6  to the DEA as suspicious?
7       A.  I -- I didn't do that kind of
8  evaluations.  No, I can't give you a number, sir.
9       Q.  So you don't have an opinion that any of
10 these orders individually should have been reported
11 to the DEA as suspicious; correct?
12      A.  I didn't consider that as -- that's not
13 something I considered in doing this
14 evaluation.  Certainly there are orders contained in
15 there that should have been reported to the
16 DEA.  The due diligence assumption based on the
17 defendant failures renders, you know, the ability to
18 look at specific orders to report it to the DEA just
19 doesn't make that feasible.
20      Q.  How many of these tens of millions of
21 orders should have been reported to the DEA as
22 suspicious?
23      A.  I don't have a number, sir.
24      Q.  More than a million?

Page 103

1  A. I don't have a number.
2  Q. More than 1,000?
3  A. I don't have a number, sir.
4  Q. More than one or two?
5  A. I don't have a number.
6  Q. Okay. And you can't answer any of those
7  questions with any specificity whether it should
8  have been more than a million, more than one or two,
9  more than 1,000; correct?
10  A. That wasn't the purpose of applying the
11  algorithm to the data was to identify orders that
12  should have been reported to the DEA; no, sir.
13  Q. So correct?
14  A. That's correct.
15  Q. Okay. How many of these orders should have
16  been blocked?
17  A. The first one.
18  Q. Okay.
19  A. And the other ones -- and the other ones
20  should -- it's an open question or broad
21  question. The first one and none of the other ones
22  should have been shipped until the suspicion was
23  eliminated on the first order.
24  Q. Okay. Well you don't know how many of

Page 104

1  these orders were actually evaluated and the
2  suspicion was eliminated on the first order;
3  correct?
4      A.  Well, I draw my assumption on the due
5  diligence that none of them based on the conduct of
6  the companies in regards to how they evaluated their
7  own suspicious orders and I didn't see -- I saw very
8  limited to know due diligence on their own
9  suspicious orders, so I wouldn't have a high
10 expectation that there would have been due diligence
11 on any of these that were identified by the flag.
12     Q.  Okay.  And I want to get away from
13 assumptions and expectations because I don't think
14 that's proper for expert witnesses.  I want to focus
15 on what you know and what you've done.  Am I correct
16 that in method -- well, do you know -- sticking with
17 Method A, do you know how many of those orders are
18 the first flagged orders and how many are the ones
19 that you just bring along for the ride because of
20 the assumption that there was no diligence to
21 justify later orders for that customer; do you know?
22     A.  The first one is the flagged order.
23     Q.  Do you know how many of the first ones
24 there are, as opposed to the later ones, that are

Page 106

1  A. All right. I didn't want to answer
2  incorrectly or make assumptions. The first one on
3  Masters A, each defendant would be yes to that
4  answer, the first one.
5  Q. Okay. And so am I correct that for Method
6  A, for each defendant there is one, single order
7  that drives the remaining millions of orders that
8  you have flagged?
9  A. Yes, sir.
10  Q. And have you looked -- have you identified
11  those single orders for -- in their entirety for
12  McKesson, Cardinal, and ABDC?
13  A. I don't understand the question, sir.
14  Q. Have you looked at those initial orders for
15  McKesson, Cardinal, and ABDC that are the initial
16  flagged orders of your Method A?
17  A. No, sir.
18  Q. Do you know the diligence that was
19  conducted on those initial flagged orders for
20  McKesson, Cardinal, and ABDC, not having looked at
21  the actual orders themselves?
22  A. Well, I couldn't know the diligence if I
23  answered I didn't know the orders. And as I
24  answered earlier, understanding your question, I

1  Q. They should be accurately reported.
2  A. Yes, sir.
3  Q. Whether purported to be based on what
4  companies were doing in the real world or what DEA
5  approved, they should actually track what the
6  companies were doing in the real world or what DEA
7  approved; correct?
8       MR. FULLER: Object to form.
9  A. I'm sorry, I don't understand that
10 question.
11 Q. Well, as I understand your six
12 methodologies, they purport to be based on systems
13 that different distributors were using; is that
14 correct?
15 A. I think they're generally supposed to
16 mirror those. I don't think they're exact
17 duplications.
18 Q. Okay. Is any one of them an exact
19 duplication of a system that was ever used in the
20 real world?
21 A. No, and I based that statement on -- unless
22 -- unless I'm uninformed -- or don't know the
23 correct answer is, I don't -- do not think we have
24 the code for any of the methodologies. So without

Page 120

1 having the exact code, I'm -- I can't definitively
2 say they are. I think they -- I think the
3 methodologies as I've explained them are what they
4 are. They -- you know, they measure what -- what
5 they measure.
6 And then -- and some of them are a
7 likeness or a mirror, some of the systems that were
8 used by the defendants. But none of them are an
9 exact duplication of the defendant.
10 Q. Okay. Let me -- let me jump ahead. Let's
11 mark tab 6, please.
12 (Deposition Exhibit 6 was marked.)
13 Do you recall saying that you read
14 Doctor McCann's testimony in this case?
15 A. Uhm, I did.
16 Q. I'm going to show you some of his testimony
17 from this case. Let me know when you've got tab 6
18 handy. And let's go to page 124, line 18 through
19 125:6. And tell me when you're with me,
20 Mr. Rafalski.
21 MR. FULLER: Could you give the pages
22 again. My apologies.
23 MR. SCHMIDT: Of course, yes. 124:18
24 to 125:6.

Page 123

1  through E?
2      A.  I don't know if I would call them
3  illustrations.  I wouldn't use that exact
4  language.  I -- I -- like I stated earlier, they
5  weren't -- they weren't -- I don't know that they --
6  well, I know that they were never intended to be
7  exact duplications of the -- of the methodologies
8  that are used by the defendants because we didn't
9  have the code.  I don't know if stylized
10 illustrations would be a good description.  I think
11 they generally mirrored the -- those triggering
12 algorithms, but not exactly.
13     Q.  It was Doctor McCann who attempted to come
14 up with the code; correct?
15     A.  Oh, yes, sir, I couldn't write code.
16     Q.  It was Doctor McCann who implemented the
17 code; correct?
18     A.  Yes, sir.
19     Q.  And so when Doctor McCann said that "each
20 of those methods are stylized illustrations
21 suggested by the underlying documents," was that an
22 accurate or inaccurate statement on his part?  Do
23 you take issue with that as an accurate statement?
24 And let me just ask the question again.

Page 124

1  When Doctor McCann suggested that "each
2  of these methods are stylized illustrations
3  suggested by the underlying documents," do you take
4  issue with the accuracy of that statement by the
5  person who created the code and ran the code?
6      A.  No, I don't take exception to that
7  statement, sir.
8      Q.  Okay.  Method E, if you look back at
9  Exhibit 1, is purportedly based on a method that
10 McKesson used; correct?  The maximum 8,000 dosage
11 units monthly.
12     A.  It is.
13     Q.  Do you know when McKesson used it?
14     A.  They used it for a one-year time period, I
15 think it was 2007 to 2008.
16     Q.  Did the DEA endorse that method in any way?
17     A.  No, I don't believe they endorsed it.
18     Q.  Did they know about it?
19     A.  Uhm, I don't definitively know the answer
20 to that, so I'm not going to guess.
21     Q.  Did McKesson make a point of telling the
22 DEA that it would use that method?
23     A.  I don't recall reviewing that document.  If
24 you have something and you -- I'd like to review it,

Page 150

1  A. Okay.
2  Q. There's a reference to the trailing six
3  month maximum monthly; do you see that?
4  A. Yes, sir.
5  Q. That's Method B; correct?
6  A. Yes.
7  Q. And did --
8  A. Both A and B.
9  Q. Well, no, it's just A; correct?  If you
10 read the full title "Fixed After First Triggered
11 Threshold," that's only B; correct?  Did I lose you,
12 sir?
13 A. No, I'm here.  I'm just rereading it.  No,
14 I believe that -- that's also used in B, it's fixed.
15 Q. It's only used in B; correct?
16 A. Well, yes, because the first -- the first
17 -- it's semantics, but the first order under A stops
18 the application because of the due
19 diligence.  That's what you are getting at, yes.
20 Q. I see what you're saying.  Let me focus on
21 B.  Under B, the first time you have a -- well, the
22 first six months set all preceding six months;
23 correct?
24 A. Yes, sir.

Page 151

1  Q. The threshold is never changed under Method
2  B based on any subsequent developments; correct?
3  A. That's correct.
4  Q. It doesn't change if the population in
5  Cabell County changes; correct?
6  A. That's correct.
7  Q. It doesn't change if the medical need in
8  Cabell County changes; correct?
9  A. It's fixed, sir; right after the first
10 trigger.
11 Q. So correct?
12 A. Yes.
13 Q. It doesn't change if the demographics of
14 the pharmacy or the circumstances of the pharmacy
15 change; correct?
16 A. It does not.
17 Q. If a cancer center opens up next door or a
18 competing pharmacy closes, that doesn't cause a
19 change in Method B; correct?
20 A. It does not.
21 Q. It doesn't change to account for increases
22 in the DEA's own quotas; correct?
23 A. That is correct.
24 Q. Now, Masters did not lock in the first six

Page 155

1  literally, that means that there's been due
2  diligence applied and the -- they -- they
3  definitively identified this order as suspicious and
4  they're reporting it to the DEA.  And if you are
5  just speaking about the trigger, I want to make sure
6  before I answer that I get a clarification on at
7  what point you are discussing.
8      Q.  Okay.  Let me just read you -- let me just
9  ask you a yes/no question then.  If a customer
10 identifies a suspicious order, does that require the
11 suspension of all orders or sales of other
12 controlled substances to that customer?
13     A.  No.
14     Q.  Okay.  In your Methodology A, if -- if a
15 customer identifies a suspicious order, all
16 subsequent suspicious orders are treated -- all --
17 let me try again.
18          Under your Methodology A, you told me
19 all of the orders under Methodology A should be
20 blocked; correct?
21     A.  After the first trigger; yes, sir.
22     Q.  Under your Methodology A, once a customer
23 -- once a distributor identifies an order as
24 suspicious, they should suspend all subsequent

Page 156

1  orders; correct?
2      A.  Yes, based on the assumption that there's
3  no due diligence conducted.  It's -- well.
4      Q.  Do you know if --
5      A.  Hold on a second, maybe I didn't -- I'm
6  thinking about that question.  Maybe I didn't
7  understand it.  It's not a matter of using that
8  trigger to tell a registrant what to do and what not
9  to do.  Just -- and I think your -- your -- I don't
10 know if we're on the same page.
11            What that methodology does is just
12 triggers the first order.  It doesn't make the
13 assumption and tell a registrant what they should
14 and shouldn't do.  I mean, the regulations are clear
15 what they should do.  So I'm not sure I answer -- I
16 understood your question on that last answer.
17     Q.  Okay.  If an order is triggered under
18 Method A and you apply your assumption of no due
19 diligence after that, every order should be blocked
20 after that; correct?
21     A.  Every order should be blocked until there's
22 sufficient due diligence to clear that order and
23 rule out that diversion was going to occur.
24     Q.  Okay.