# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

        Plaintiff,

vs.                               CIVIL ACTION
                                NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
        Defendants.
_____
CABELL COUNTY COMMISSION,
        Plaintiff,
vs.                               CIVIL ACTION
                                NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

        Defendants.

* * * * * * * * * * * * * * * * * * * * * *


      Videotaped and Zoom video conference deposition of JAMES RAFALSKI taken by the Defendants under the Federal Rules of Civil Procedure in the above-entitled action, pursuant to notice, before Jennifer Vail-Kirkbride, a Registered Merit Reporter, on the 11th day of September, 2020.

Page 10

1   Exhibit 1 is your report in the lawsuit of Cabell
2   County and the City of Huntington against three
3   distributors?
4       A.  Yes, sir.
5       Q.  Are you ready to testify fully regarding
6   the opinions in that report?
7       A.  I am.
8       Q.  Is there any further work you know of right
9   now that you need to do before you can testify?
10      A.  Uh, no, sir.
11      Q.  Does the report that we've marked as
12  Exhibit 1 contain all of the opinions you currently
13  know about or intend to offer in the Cabell County,
14  Huntington case?
15      A.  Yes, sir, it does.
16      Q.  There's no additional opinions you know
17  about or that you plan to offer that are not
18  contained in there; correct?
19      A.  Not at this time; no, sir.
20      Q.  Okay.  We've had the benefit now of meeting
21  on a couple of occasions.  You've given testimony in
22  a few different jurisdictions and also prepared two
23  other reports.  Is there anything in your prior
24  testimony or reports you know about that you need to

Page 41

1　about whether there was diversion at any pharmacy
2　level in West Virginia; correct?
3　　　A.　Not as -- not expressed in my report; no,
4　sir.
5　　　Q.　And there's no opinions you have on
6　diversion at the pharmacy level that are unexpressed
7　in your report; correct?  I'm just asking that as a
8　yes or no question.
9　　　A.　Say it one more time.  Could you repeat it.
10　　　Q.　Sure, I am just picking up on your answers.
11　As I understood your answer right now, there are no
12　opinions you are offering of diversion that occurred
13　at a pharmacy level; is that true or false?
14　　　A.　Nothing outside of what's stated in my
15　report.
16　　　Q.　That's not what I asked you, sir.  Are you
17　offering any opinions about whether diversion
18　occurred at a pharmacy level, yes or no?
19　　　A.　No.
20　　　Q.　Thank you.  Do you know -- I was -- I was
21　quoting from West Virginia Board of Pharmacy
22　documents when I said to you that they made findings
23　regarding specific pharmacies that "no improper
24　dispensing," "no illegal sales," quote, quote, "for

Page 49

1    A.   Yes; it's up along the Kentucky border.
2    Q.   Do you know where it is relative to Cabell
3 County?
4    A.   Not specifically, sir.
5    Q.   Do you know what county Huntington is in?
6    A.   I think Cabell County.
7    Q.   Okay.  But you don't know where in Cabell
8 County it is?
9    A.   Geographically, no.  Up -- I think at the
10 northern part of the county, northeastern part.
11   Q.   Do you know what kind of population Cabell
12 County has in terms of medical needs?
13   A.   I recall seeing some population figures,
14 but that would just be general population.  When you
15 qualify it with medical needs, I have not seen any
16 of those documents; no, sir.  And I -- I wouldn't --
17 I really wouldn't have had a need to look at that or
18 have been provided that in trying to make my -- you
19 know, assess my opinion.  But I know it's
20 all-encompassing information.
21   Q.   Do you know if Cabell County is primarily
22 rural or urban?
23   A.   I think it's a mix of both.
24   Q.   Like 50/50?  I don't know what -- what does

Page 85

1    A.    Yes, sir.
2    Q.    West Virginia conduct?
3    A.    Yes, sir.
4    Q.    Okay.  Do you see these six flagging
5  analyses --
6    A.    I do.
7    Q.    -- starting on page 48?
8    A.    Yes, I do, sir.
9    Q.    Each of these six was performed by Doctor
10  McCann; correct?
11   A.    Yes, sir.
12   Q.    And you did not check the math on any of
13  these six; correct?
14   A.    I did not.
15   Q.    You did not speak with Doctor McCann before
16  he ran these calculations that were -- that you
17  adopted into your report; correct?
18   A.    That's correct, I did not.
19   Q.    As I understand it, for the first time you
20  spoke with Doctor McCann on August 29th?
21   A.    Not literally the first time, but the first
22  time in regards to CT2.
23   Q.    Okay.  And when did you literally speak to
24  him for the first time?

Page 87

1 matter and then you had questions to clarify with
2 him?
3     A. I believe that's the sequence; yes, sir.
4     Q. And what were those questions? What were
5 the points you wanted to clarify?
6     A. Uh, the one point I remember is on the
7 Masters Methodology B, or we'll call it maybe
8 Masters B, I was -- wanted to make sure on the
9 triggering order that he was -- his calculation on
10 dosage units was the whole order and not the amount
11 that just was above the triggering amount, if that
12 hopefully makes sense to you.
13     Q. It does, yes. And you weren't sure of that
14 before you reached out to him? [overtalking]
15     A. Well, no, that's why I reached out, if I
16 was sure, then I wouldn't have done it.
17     Q. That's why that was an easy
18 question. Collectively your different methods flag
19 tens of millions of orders; correct?
20     A. They do.
21     Q. You've not reviewed each of those flagged
22 orders; correct?
23     A. No, sir.
24     Q. Do you know how many of the tens of

1 millions you've actually reviewed?
2     A. Yes, I have not reviewed any of them.
3     Q. None of the initial orders, none of the
4 follow-up orders; correct?
5     A. No, sir.
6     Q. So you did not personally determine whether
7 any of the flagged orders when you look at them, you
8 actually consider them to be suspicious; correct?
9     A. Well, I think the fact that they are
10 identified by the trigger, the algorithm, makes --
11 makes them not a suspicious order.
12     Q. Okay. Did you individually review any of
13 them to see if you just looked at the order on its
14 face whether you would consider it to be suspicious?
15     A. No, sir.
16     Q. Did you individually look at any of them to
17 consider just based on the information you had about
18 the actual order whether you would consider it to be
19 likely to be diverted?
20     A. Can you say that one more time, please.
21     Q. Sure. Did you look at the individual
22 orders to consider whether based on the information
23 actually reflected in the individual orders, you
24 would make the judgment that there were likely to be

Page 91

1  did you actually evaluate any single order and make
2  a judgment, "This order is likely to be diverted,"
3  based on the facts of looking at this order,
4  separate and apart from your flagging exercise.  Did
5  you look at any orders to see "Based on the facts of
6  this order I can come to a judgment that it's likely
7  to be diverted"?
8      A.  I think my opinion is that more likely than
9  not all of those orders are diverted.
10     Q.  Well, that's what I'm going to come to.  My
11 question is did you actually look at any of the
12 individual ones to say, "When I look at this
13 individual one, this looks like it's likely to be
14 diverted"?
15     A.  No, sir, not individually.
16     Q.  Okay.  Did you review the diligence files
17 for every one of these tens of millions of flagged
18 orders?
19     A.  There -- that wouldn't be possible.
20     Q.  For example, you can't say you reviewed the
21 complete diligence files for McKesson in Cabell
22 County; correct?
23     A.  Well, that's a different question, is that
24 outside of discussing the trigger orders?

Page 101

1   all of them.
2          Q.  Okay.  Do you know whether it was between 1
3   and 99 percent of these orders that went to fill
4   legitimate medical needs?
5          A.  I don't know, sir.
6          Q.  Do you know -- am I right in understanding
7   you believe all of these tens of millions of orders
8   should have been reported to the DEA as suspicious?
9          A.  Oh, that's a different question.
10         Q.  Should they -- should all of these tens of
11  millions of orders that you flagged in Method A have
12  been reported to the DEA as suspicious?  Yes or no?
13         A.  No.
14         Q.  Okay.  How many should have been reported
15  to the DEA as suspicious?
16         A.  The nature of my application of the
17  methodology, the algorithm, wasn't for the purpose
18  to identify orders that would be reported to the
19  DEA.  It was just a triggering mechanism to identify
20  orders from the transactional data from the
21  defendants.  It -- it would -- it's a much -- it's
22  broader, it's a broader requirement for the
23  defendants than -- than just to -- for me to apply
24  an algorithm to their transactional data and then

Page 102

1  say they should have reported them.  That's -- I
2  mean, that's outside of what occurred here.
3       Q.  Okay.  So these tens of millions of orders,
4  can you give me any definition as to whether any of
5  them, and if so how many, should have been reported
6  to the DEA as suspicious?
7       A.  I -- I didn't do that kind of
8  evaluations.  No, I can't give you a number, sir.
9       Q.  So you don't have an opinion that any of
10 these orders individually should have been reported
11 to the DEA as suspicious; correct?
12      A.  I didn't consider that as -- that's not
13 something I considered in doing this
14 evaluation.  Certainly there are orders contained in
15 there that should have been reported to the
16 DEA.  The due diligence assumption based on the
17 defendant failures renders, you know, the ability to
18 look at specific orders to report it to the DEA just
19 doesn't make that feasible.
20      Q.  How many of these tens of millions of
21 orders should have been reported to the DEA as
22 suspicious?
23      A.  I don't have a number, sir.
24      Q.  More than a million?

Page 105

1  brought along based on your assumption?
2      A.  For each defendant there is one first order
3  and every subsequent one is flagged if we are
4  talking about Masters A?
5      Q.  Yes, how many first orders?
6          MR. FULLER:  Object to form.
7      Q.  Like, let's take an example of the 11.6
8  million oxycodone orders for ABDC, how many of those
9  11.6 million were initial orders and how many of
10 them just came along due to the assumption?
11     A.  One initial order.
12     Q.  And then the remaining 11,610,919 orders
13 were cumulatively flagged?
14     A.  Yes, sir.
15     Q.  Okay.  And is that true for every one of
16 your defendants, that there was only one initial
17 order flagged and then every other order you
18 identify was flagged based on the assumption that
19 because there was not diligence on that initial
20 order, the subsequent orders should have been held?
21     A.  So -- just so I'm clear, the totality of
22 all of -- all of the figures here or are we talking
23 about Masters A?
24     Q.  Masters A.  Just Masters A.

Page 106

1  A. All right. I didn't want to answer
2  incorrectly or make assumptions. The first one on
3  Masters A, each defendant would be yes to that
4  answer, the first one.
5  Q. Okay. And so am I correct that for Method
6  A, for each defendant there is one, single order
7  that drives the remaining millions of orders that
8  you have flagged?
9  A. Yes, sir.
10  Q. And have you looked -- have you identified
11  those single orders for -- in their entirety for
12  McKesson, Cardinal, and ABDC?
13  A. I don't understand the question, sir.
14  Q. Have you looked at those initial orders for
15  McKesson, Cardinal, and ABDC that are the initial
16  flagged orders of your Method A?
17  A. No, sir.
18  Q. Do you know the diligence that was
19  conducted on those initial flagged orders for
20  McKesson, Cardinal, and ABDC, not having looked at
21  the actual orders themselves?
22  A. Well, I couldn't know the diligence if I
23  answered I didn't know the orders. And as I
24  answered earlier, understanding your question, I

Page 306

1  diverted because it was 100 pills higher than the
2  March order, would you reach that conclusion?  Yes
3  or no?
4       A.  Mr. -- Mr. Schmidt, you can't interject
5  Mr. McCann's methodology and then say -- and then
6  eliminate the methodology and ask me to look at a
7  number.  If what you're saying if I just looked at
8  that string of numbers, there's no particular number
9  I would pick out.  But if you interject Doctor
10 McCann running the methodology, that -- that would
11 provide a different answer.
12      Q.  I'll try it one more time and then we'll
13 call the Judge.
14           Looking at those numbers and the fact
15 that August is 100 pills more than March, would that
16 lead you to conclude that August is -- those pills
17 are reasonably -- more likely than not, likely to be
18 diverted; yes or no?
19      A.  If we're looking at a string of data and
20 now you have dropped the Doctor McCann application
21 of the methodology and if I'm just looking at a
22 string of data, the answer would be, no, I could not
23 tell.
24      Q.  Okay.  So I'm going to try one more time

Page 307

1  without the speech.  If you just looked at these
2  numbers, because I'm not sure if you understand what
3  Doctor McCann did.  Do you know all of his
4  assumptions?
5       A.  Uh, yes, sir.
6       Q.  Okay.  Tell me the ten assumptions he made
7  in coming up with his code that he testified about
8  under oath.
9       A.  I do not know all ten; no, sir.
10      Q.  Okay.  Thank you.  Looking at Doctor McCann
11 -- looking at these numbers, does the fact that
12 you've got 100 more pills in August than in March
13 tell you that that August order more likely than not
14 is -- is likely to be diverted?
15      A.  I'm going to answer the same way.  Just
16 purely looking at the string of numbers if that's
17 your question, no.
18      Q.  Does it tell you that the orders from
19 September Year 1 through July Year 2 are more likely
20 than not, likely to be diverted?
21      A.  Purely looking at those numbers; no, sir.
22      Q.  Okay.  Let's look at another example.
23              MR. SCHMIDT:  Megan, what's the tab
24 for demonstrative 4?