## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON,**
    **Plaintiff,**
**v.**                                 **Civil Action No. 3:17-cv-01362**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
    **Defendants.**

_____

**CABELL COUNTY COMMISSION,**
    **Plaintiff,**                            *Consolidated case:*
**v.**                                 **Civil Action No. 3:17-cv-01665**
**AMERISOURCE BERGEN DRUG**
**CORPORATION, et al.,**
    **Defendants.**

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE*

Plaintiffs, the City of Huntington and Cabell County Commission, submit this response in opposition to certain motions *in limine* ("MIL") filed by Defendants.[1] As a preliminary matter, each of the MILs discussed below should be denied on the basis that it seeks to re-litigate matters that are subject to a prior order. On January 3, 2020,[2] Judge Polster issued an evidentiary order memorializing his rulings as to certain pretrial motions *in limine* and other evidentiary motions.[3] In the Order, Judge Polster set forth that "as a general matter, these rulings apply to remanded cases tried by transferor courts" and that the "[d]ecisions that have been made in the case continue to apply unless circumstances change warranting their modification."[4] "In the future," Judge Polster counseled, "the parties should generally not file in any MDL case a motion (including a

---

[1] This Response addresses the arguments raised in Defendants' Motions in Limine, filed at Dkt. # 1067.

[2] The MDL Court initially issued this evidentiary order on December 26, 2019 but issued a subsequent *nunc pro tunc* order "to make the language in the last sentence of the first full paragraph on page 15 of this order regarding Teva MIL No. 3 consistent with the Court's verbal clarification of its ruling during jury selection." *Id.* at 1.

[3] *See* Nunc Pro Tunc Evidentiary Order*, In re: Nat'l Prescr. Opiate Litig.*, Case No. 1:17-MD-2804, Dkt. # 3058 at 1 ("Evidentiary Order"), attached hereto as Exhibit 1.

[4] *Id.*

motion for reconsideration) addressing an evidentiary issue already addressed below."[5] Notwithstanding Judge Polster's clear instructions, the four MILs discussed below attempt to revisit some of the very same evidentiary issues encompassed within the Evidentiary Order. Because Defendants cannot show that the particular circumstances of these cases warrant a revision from Judge Polster's prior ruling, each of the motions *in limine* described below should be denied as contrary to the applicable Evidentiary Order.

Next, even if the Evidentiary Order were not applicable (which it is), Defendants' motions are inappropriate in the context of a bench trial and Defendants cannot prevail on any of their legal or factual arguments. In short, Defendants' motions simply do not (and cannot) demonstrate that the evidence they seek to exclude is inadmissible. For these reasons, explained in greater detail below, Plaintiffs respectfully request that the Court deny Defendants' MILs.

## LEGAL STANDARD

The Fourth Circuit strongly disfavors the exclusion of evidence in nonjury trials, explaining that courts should err on the side of admissibility in a bench trial:

> In a nonjury trial . . . little harm can result from the reception of evidence that could perhaps be excluded. This is so because the judge, trial or administrative, is presumably competent to screen out and disregard what he thinks he should not have heard, or to discount it for practical and sensible reasons. On the other hand, to exclude that which is competent and relevant by mechanistic application of an exclusionary rule is exceedingly dangerous to the administrative or trial process and may well result in vacating the judgment or order on procedural due process grounds.

*Multi-Med. Convalescent & Nursing Ctr. of Towson v. N. L. R. B.*, 550 F.2d 974, 977-78 (4th Cir. 1977); *see also In re Unisys Savings Plan Litigation*, 173 F.3d 145, 172 (3d Cir. 1999) ("In non-jury cases the district court can commit reversible error by excluding evidence but it is almost

---

[5] *Id.* at 2.

impossible for it to do so by admitting evidence."); *Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547, 552 (2d Cir. 1977) (noting "it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records").

Ultimately, the "purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *United States v. Verges*, No. 1:13CR222, 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014). However, unlike in jury cases where Federal Rule of Evidence 103 requires that proceedings be conducted in a way that aims "to prevent inadmissible evidence from being suggested to the jury by any means[,]" in a bench trial, it is presumed that "the Court can and does readily exclude from its consideration inappropriate evidence of whatever ilk. *Cramer v. Sabine Transp, Co.*, 141 F.Supp.2d 727, 733 (S.D. Tex. 2001). As a result, a motion *in limine* "in the case of a bench trial … is generally superfluous." *United States v. Heller*, 551 F.3d 1108, 1111-12 (9th Cir. 2009).

As this Court has previously explained: "there is little need 'for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'" *Greenbrier Hotel Corp. v. Unite Here Health*, No. 5:13-CV-11644, 2016 WL 9781805, at *2 (S.D.W. Va. Mar. 14, 2016) (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)). Thus, rather than exclude evidence, in those cases where the court has assumed the role of fact-finder, "the better course" is to "hear the testimony, and continue to sustain objections when appropriate." *Easley v. Anheuser–Busch, Inc.*, 758 F.2d 251, 258 (8th Cir.1985). *See also United States v. Cohen*, 2012 WL 668478, at *5 (C.D. Ill. Feb. 28, 2012) (denying motion *in limine* as premature because, in a bench trial "there is no concern about a jury hearing evidence that is inadmissible"); *Pinal Creek Grp. v. Newmont Min. Corp.,* No. CV-91-1764-PHX-DAE, 2006 WL 1766494, at *1 (D. Ariz. June 26, 2006)

(noting "the trial judge is better able to assess the admissibility of evidence and witnesses in the context of the bench trial upon appropriate and timely objection at the time of trial").

Even outside the context of a bench trial, evidence should not be excluded on a motion *in limine* unless such evidence is clearly inadmissible on all potential grounds. *See, e.g., Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017) ("A motion in limine to exclude evidence . . . should be granted only when the evidence is clearly inadmissible on all potential grounds."); *Al-Sabah v. Agbodjogbe*, No. CV SAG-17-730, 2019 WL 6498049, at *3 (D. Md. Dec. 3, 2019) ("Generally, courts should grant a motion in limine only when the evidence is clearly inadmissible on all potential grounds."); *Plair v. E.J. Branch & Sons, Inc.*, 864 F.Supp. 67, 69 (N.D. Ill. 1994) (a motion in limine should not be granted unless "the evidence sought to be excluded is clearly inadmissible" and the movant must "establish that the evidence is clearly inadmissible").

Because this matter will be tried to this Court, rather than to a jury, and because Defendants cannot demonstrate that any of the evidence they seek to exclude is clearly inadmissible on all potential grounds, the relief sought in each of Defendants' Motions *in Limine* should be denied.

## ARGUMENT

## I. Defendants' MIL No. 1 Concerning "Individualized Evidence of Opioid Misuse and Diversion."

Personal stories of addiction shared by witnesses, based on their observation, experiences and perceptions are undoubtedly and directly relevant to describing the public nuisance: the opioid crisis in Plaintiffs' communities. However, Defendants' MIL No. 1 asks for a sweeping exclusion of *all* such highly probative testimony or other evidence pertaining to "individual instances" of opioid diversion and misuse.

Defendants attempt to justify their proposed exclusion with three primary assertions: (1) Plaintiffs have disavowed reliance on individualized evidence; (2) Plaintiffs cannot link

individualized evidence to any Defendants' distribution of any particular pill; and (3) any potential testimony relating to personal stories is inadmissible hearsay. Defendants' arguments fail as to each. Moreover, this MIL should be denied as premature given that district courts routinely deny motions that seek a "blanket exclusion" of evidence that may be admissible if the court is given "the benefit of knowing the particular evidence and relevant context." *A.Hak Indus. Servs. et al., v. A.Hak Indus. Servs. B.V.*, No. 3:11-CV-74, 2014 WL 12591696, at *1 (N.D.W. Va. Dec. 18, 2014); *see also Huskey v. Ethicon, Inc.*, No. 2:12-CV-05201, 2014 WL 3861778, at *1 (S.D.W. Va. Aug. 6, 2014) (denying motions *in limine* as premature and vague).

A. Plaintiffs' Discovery Responses Were Not, as Defendants Claim, a Complete Disavowal of All Individualized Evidence.

Defendants' MIL conflates Plaintiffs' arguments concerning the disputed relevancy of individual prescriptions or shipments to causation with the relevancy of the very existence of individual instances of opioid diversion and misuse. For example, to support their argument, Defendants refer to Plaintiffs' Responses to Defendants' Interrogatory No. 8, which asked Plaintiffs to identify "each pharmacy, doctor, healthcare provider, or other drug retailer that diverted or wrongfully dispensed Prescription Opioids that You contend caused you Injury."[6] Plaintiffs' response to this Interrogatory emphasized Judge Polster's Track One rulings on causation – which found that "a factfinder could reasonably infer that" "the massive increases in the supply of prescription opioids" into a jurisdiction, combined with failures to maintain effective controls against diversion, "were a substantial factor in producing the alleged harm" – did not require Plaintiffs to provide Defendants with individual-level information to prove causation. Plaintiffs' response did not mean, as Defendants claim, that any and all references to individual instances of diversion are inadmissible at trial.

---

[6] *See* Exhibit 1 to Defendants' Motion *in Limine*.

B.  Plaintiffs are Entitled to Introduce Documents or Testimony Related to Individualized Instances of Opioid Diversion or Misuse Previously Provided in Discovery at Trial.

Defendants rely on Federal Rule of Civil Procedure 37(c)(1) and certain cherry-picked cases to argue that Plaintiffs' position as to prescription-level data precludes them from introducing any individualized examples. However, the authorities cited by Defendants all acknowledge that, in general, Plaintiffs may use evidence they previously produced through discovery at trial.

Throughout this case, Defendants sought – and Plaintiffs produced – extensive discovery that reflected "individual instances of opioid diversion and misuse." For example, Plaintiffs have produced extensive law enforcement case files, including any non-privileged, responsive materials pertaining to individual criminal cases and files from individuals assigned to the City of Huntington's Drug Unit or to federal drug task forces. Further, it was Defendants themselves who elicited much of the deposition testimony reflecting personal experiences they now refer to in their Motion. For example, during the deposition of the City of Huntington's Fire Chief, Jan Rader, Defendants asked Chief Rader if she knew "what percentage of people using illegal opioids . . . started with a prescription from a physician written to them for a prescription opioid."[7] In response, Chief Rader testified that she "talk[s] to a lot of people on a regular basis that are suffering from substance use disorder or addiction and it's about 80 percent, " and explained that she had discussed "that question" with "hundreds and hundreds" of people.[8] Other questions Defendants asked Chief Rader included whether she had "ever personally used an opioid," whether she "ever had any issues with drug or alcohol abuse," and whether she "had any family members or friends that have had issues with opioid abuse."[9]

---

[7] *See* Deposition of Jan Rader, June 17, 2020 at 70:12-70:18, attached hereto as Exhibit 2.
[8] *Id.* at 71:23-72:8.
[9] *Id.* at 77:15-79:3.

Numerous other witnesses were explicitly asked about specific instances of diversion, as well as their awareness, knowledge or observation of opioid misuse and personal stories of addiction. For example, during his deposition, former Chief of the Huntington Police Department, Skip Holbrook, was asked to give examples of diversion.[10] Defendants went on to suggest and question Chief Holbrook about specific examples of instances of diversion including doctor shopping, prescription forgery, and stealing pills from a relative's medicine cabinet.[11] Chief Holbrook was also questioned using a Huntington Police Department incident report, which pre-dated his tenure with the department, about specific incidences of diversion, such as an instance where the son of a cleaning lady stole prescription pills from the medicine cabinet of a retired police officer.[12]

Similarly, Defendants asked County Commissioner, Kelli Sobonya how serving as a member of the Health Committee or the Judiciary Committee changed her understanding of the opioid issue and whether or not she had personally been prescribed opioids or if she had refused prescriptions for opioids when they were offered to her.[13] Ms. Sobonya was also questioned about family members who have had adverse experiences with opioids, with Defendants eliciting testimony about friends, families and community members who have struggled from opioid addiction.[14]

In the deposition of former budget manager Darla Bentley, Defendants asked a number of questions concerning personal stories of addiction and opioid misuse.[15] Defendants engaged in a lengthy line of questioning concerning when Ms. Bentley first learned about prescription pills,

---

[10] *See* Deposition of Skip Holbrook, July 22, 2020, at 41:5-43:1, attached hereto as Exhibit 3.
[11] *Id.*
[12] *Id.* at 166:14-168:8.
[13] *See* Deposition of Kelli Sobonya, July 10, 2020, at 234:15- 244:15, attached hereto as Exhibit 4.
[14] *Id.*
[15] *See* Deposition of Darla Bentley, July 17, 2020, at 22:21-25:12, attached hereto as Exhibit 5.

what specifically she learned about prescription pills and if she had an understanding of what prescription pills were prescribed for her friends and family with various medical issues.[16] Defendants went on to ask a series of extremely probing, personal questions such as whether the prescription opioids prescribed to her family and close friends helped with their pain and whether any of her family and close friends ever became addicted to prescription opioids.[17]  Defense counsel expressly told Ms. Bentley that he was asking personal questions because "of course, as you know, the case is about prescription opioids, and so it's important to understand how possible witnesses that may be called by either side at trial may have a connection or an understanding of various opioids."[18]

As Judge Polster previously explained in response to Defendants' prior attempts to preclude witnesses from testifying as to anecdotal personal stories in CT1: "At trial, the test for each witness's testimony will include whether Plaintiffs produced the information in discovery." *See* Exhibit 1, Evidentiary Order at 43 n. 85. *See also Greenbrier Hotel*, 2016 WL 9781805, at *3 ("To the extent the Plaintiffs claim that certain evidence was sought but not disclosed during discovery, the Court finds that objections during the bench trial will suffice to give the Court the opportunity to address the exclusion of such evidence.").  Given the substantial amount of evidence pertaining to individual instances of diversion that Plaintiffs have provided in discovery and, considering Defendants' concerted efforts to elicit personal testimony from Plaintiffs' witnesses concerning the opioid epidemic's impact on their community, Defendants' argument that Plaintiffs have somehow waived the introduction of this type of evidence is baseless.

C.  <u>Plaintiffs' Evidence Does Not Need to be Linked to any Defendants' Distribution of any Particular Pill to be Admissible.</u>

---

[16] *Id.*
[17] *Id.*
[18] *Id.*

Defendants argue that individualized evidence should be excluded unless Plaintiffs can tie a particular individual's opioid abuse to a particular Defendant's opioids. However, Plaintiffs may offer testimony or evidence of personal stories of opioid abuse to provide examples of the types of harm caused by opioids generally. Such evidence is relevant to the question of whether a nuisance exists. As noted above, personal anecdotes related to the opioid crisis in the City of Huntington and Cabell County go directly to the existence of a public nuisance in Plaintiffs' communities. Stories of addiction shared by witnesses, based on their observation, experiences and perceptions are undoubtedly and directly relevant to describing the public nuisance: the opioid crisis in plaintiffs' communities, and are therefore highly probative to Plaintiffs' case. Further, as Judge Polster previously noted, "anecdotal stories may be relevant to supplement expert testimony or statistical evidence." Exhibit 1, Evidentiary Order at 43 (citing *Middleton v. City of Flint, Mich.*, 92 F.3d 396, 405 (6th Cir. 1996) ("Anecdotal evidence is most useful as a supplement to strong statistical evidence.")); *see also Brown v. Nucor Corp.,* 785 F.3d 895, 908 (4th Cir. 2015) (finding that "anecdotal evidence" was precisely what "help[ed] animate the statistical findings").

D. Personal Stories Should Not Be Excluded as Impermissible Hearsay Prior to Trial

As discussed above, courts generally deny motions that seek a broad exclusion of information on the grounds that such motions are premature. *See, e.g., Greenbrier Hotel*, 2016 WL 9781805, at *3 ("The Court finds that none of the motions *in limine* seeking to exclude *categories* of evidence should be granted."). In CT1, Judge Polster concluded that he could not make a blanket, pre-trial determination as to whether anecdotal personal stories were admissible given that admissibility would necessarily be informed by "the individual circumstances surrounding each witness's testimony, including whether Plaintiffs produced the evidence in discovery and whether Plaintiffs can establish a foundation for the testimony and show

it is relevant and not otherwise inadmissible." Evidentiary Order at 43. Not only is the same logic applicable here, but it is even more persuasive in the context of a bench trial. Because hearsay objections are highly-context specific, they cannot be considered in a vacuum and must be evaluated in light of the greater context in which they are being offered, particularly in the absence of potential prejudice to the jury. *See e.g., In re: Ethicon Inc.*, No. CV 2327, 2016 WL 4582232, at *5 (S.D.W. Va. Sept. 1, 2016) (finding that the Court would not exclude an expert simply because a statement he or she discussed may constitute hearsay and that hearsay objections are more appropriately raised at trial); *see also In re Sanctuary Belize Litig.*, No. CV PJM 18-3309, 2020 WL 2467280, at *1 (D. Md. May 13, 2020) (finding that in a non-jury trial, there was no need during the proceeding to keep lay jurors from hearing about or relying upon evidence that was potentially questionable due to hearsay, questionable authenticity or other issues).

For all of the reasons set forth above, the Court should deny Defendants' MIL No. 1.

## II.   Defendants' MIL No. 2: "To Preclude Lay Testimony about Prescription Opioids Being a "Gateway" to Illicit Drug Use."

The "Gateway Effect," which refers to the transition from prescription opioids to illicit drugs such as heroin/fentanyl, is a widely acknowledged phenomenon in both scientific literature and common understanding.[19]

However, relying on Federal Rule of Evidence 701 ("Rule 701") and a selective reading of case law from other circuits, Defendants argue that Plaintiffs may not elicit *any* lay opinion testimony that would support a causal connection "between use of prescription opioid medications and later heroin or other illicit drug abuse." Def.'s Mot. at 5. What is especially noteworthy about

---

[19] *See e.g.*, Cicero TJ, Ellis MS, Surratt HL, Kurtz SP. *The changing face of heroin use in the United States: a retrospective analysis of the past 50 years*. JAMA Psychiatry. 2014;71(7):821-826 (finding a majority of individuals entering treatment for heroin addiction initially started with prescription opioids); Muhuri PK, Gfroerer JC, Davies MC; Substance Abuse and Mental Health Services Administration ("SAMSHA"), *Associations of nonmedical pain reliever use and initiation of heroin use in the United States*. CBHSQ Data Review (finding same).

Defendants' Motion is that not only does it seek to exclude testimony about the medical, epidemiological and statistical research on this topic, it precludes a witness from offering any testimony based upon their own experiences that simply supports such a theory. Further, as an overarching issue, this MIL is premature. Rule 701 requires that lay opinion testimony be "rationally based on the witness's perception, helpful to the court," and "not based on scientific, technical, or other specialized knowledge." Yet, many of the witnesses in this case are health professionals or first responders whose testimony concerning "the Gateway Effect" reflects specialized knowledge based on their experiences. Because such testimony can only be addressed on a case-by-case basis, an advance, across-the-board exclusion would be improper.

A. Lay Witness Testimony Supporting the "Gateway Effect" is Consistent with Rule 701.

The Fourth Circuit interprets Rule 701 as permitting lay opinion testimony so long as: (1) the testimony "is based on the witness' own perception," (2) "is helpful to the jury in understanding facts at issue or that witness' testimony," and (3) "is not based on scientific, technical, or other specialized knowledge." *United States v. Hoston*, 728 F. App'x 223, at *223 (4th Cir. 2018). *See also United States v. Lester,* No. CR 1:17-00195, 2018 WL 3732715, at *2 (S.D.W. Va. Aug. 6, 2018) *aff'd*, 808 F. App'x 202 (4th Cir. 2020).

To the extent "a witness's firsthand observations are 'common enough' and require applying only a 'limited amount of expertise,' they may fairly come in under Rule 701 as lay testimony." *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) (internal citation omitted). Whether particular testimony complies with Rule 701 is context-specific. As such, this MIL is premature and the issue should be determined at trial. *A.Hak Indus. Servs. BV v. Techcorr USA, LLC*, No. 3:11-CV-74, 2014 WL 12591895, at *1 (N.D.W. Va. Dec. 18, 2014). Moreover, in the context of a bench trial, the Court need not serve as a "gatekeeper" since the Court "can hear

relevant evidence, weigh its probative value and reject any improper inferences." *Schultz v. Butcher*, 24 F.3d 626, 631-32 (4th Cir. 1994).

Here, the testimony that Defendants seek to exclude satisfies each of Rule 701's core requirements. First, the kind of testimony identified by Defendants is essentially observational and rooted in personal knowledge and firsthand observations. Personal knowledge includes knowledge based on a lay witness's observations during his or her employment. *U.S. v. Agyemang*, 230 F.3d 1354 (4th Cir. 2002) (allowing an INS examiner to testify concerning knowledge from her employment with the INS). Stated otherwise, Plaintiffs' witnesses' testimony reflects their cumulative experiences working in the City of Huntington and Cabell County, and the opioid-related incidents and trends that they observed during that time. *See e.g., United States v. Smith*, 962 F.3d 755, 767 (4th Cir. 2020) (allowing law enforcement officers to testify about drug transactions, stating "we have repeatedly allowed officers to bring to bear their accumulated experience when testifying as lay witnesses").

For example, in the deposition of Connie Priddy, lead coordinator for the Quick Response Team ("QRT"), Defendants asked Ms. Priddy if she knew of "any statistics that would tell us what drug a person starts on."[20] Relying on her experiences and observations as QRT Coordinator, she responded that once the QRT establishes a relationship with an individual, they inquire about the drug the individual started on and that 70 or 80 percent of people say they started with pills before transitioning to heroin.[21]

Similarly, in the deposition of former head of the Huntington Police Department Special Investigations Bureau, Captain Rocky Johnson, Defendants asked Capt. Johnson if it was more

---

[20] *See* Deposition of Connie Priddy, July 13, 2020, at 93:17- 95:3, attached hereto as Exhibit 6.
[21] *Id. See also* Exhibit 2, Rader Dep. at 70:12-70:18 (testifying that about 80 percent of people she talks to who are suffering from substance use disorder initially started with a prescription opioid).

likely for prescription opioids to be abused once they were on the street, and urged him to "talk a little more" about individuals he encountered whose abuse disorder began with a prescription drug due to a workplace injury.[22] In response, Capt. Johnson testified that based on "a lot" of formal and informal interviews with members of the community over the years, it was common for him to hear about people who got injured at their place of work, took prescription pills and switched over to heroin, which was cheaper, when they could no longer get the pills.[23] Likewise, in the deposition of former Huntington Chief of Police, Skip Holbrook, Chief Holbrook was asked "what percentage of those who overdose or use heroin [] started on a prescription pills?"[24] In response, he testified that, based on his personal and professional experiences in the City of Huntington, it was close to 100 percent.[25]

It is well-established that courts routinely allow the admission of "experience-derived" lay witness testimony from first responders. *See, e.g., United States v. Smith*, 962 F.3d 755, 767 (4th Cir. 2020) ("[I]t is well-settled that experience-derived police testimony concerning criminals' typical modi operandi during a drug transaction may qualify as lay opinion under Rule 701."); *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) ("Because their testimony was framed in terms of their eyewitness observations and particularized experience as police officers, we have no trouble finding that their opinions were admissible under Rule 701."); *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995) (allowing an officer to offer lay witness testimony concerning the nexus between drug trafficking and possession of weapons); *United States v. Vega*, 813 F.3d 386, 394 (1st Cir. 2016) ("A police officer noticing patterns of behavior across criminal operations uses straightforward logic to conclude a defendant's behavior fits within that patterns

---

[22] *See* Deposition of Rocky Johnson, June 26, 2020, at 74:16-76:24, attached hereto as Exhibit 7.
[23] *Id.*
[24] *See* Deposition of Skip Holbrook, July 22, 2020, at 79:1-80:13
[25] *Id.*

and thus, does not need to be qualified as an expert.").  In this case, testimony from professional witnesses such as first responders and others would assist the Court in making factual determinations concerning the practices of drug users and/or traffickers, the nature of drug-related investigations or emergency calls, and the manner in which these activities have changed over time in Plaintiffs' communities.

For these reasons, Defendants' MIL No. 2 should be denied.

### III.    Defendants' MIL No. 3: "To Bar Plaintiffs from Introducing Evidence of Defendants' Prescription Opioid Shipments to Places Outside Cabell County and the City of Huntington."

Defendants' Motion seeks to preclude Plaintiffs from introducing all evidence of Defendants' distributions in other jurisdictions, arguing that evidence of this conduct should be excluded on the grounds that it is (i) irrelevant, (ii) constitutes evidence of impermissible "prior bad acts," (iii) is unfairly prejudicial, and (iv) is a waste of resources. As with the prior MILs, Defendants' arguments should be rejected. *See Huskey v. Ethicon, Inc.*, No. 2:12–CV–05201, 2014 WL 3861778, at *1 (S.D.W. Va. Aug. 6, 2014) (denying motions *in limine* as premature and vague given the breadth of the motion).

Defendants' MIL No. 3 makes no effort to explain how its arguments and the facts at bar are in any way distinguishable from those underlying Judge Polster's prior denial of nearly identical[26] motions. In denying those motions, Judge Polster held that:

> [E]vidence of what occurred outside the *Track One* Counties is generally relevant to Defendants' conduct within the *Track One* Counties, and the damages allegedly caused therein. For example, the shipment of suspicious orders to locations outside the *Track One* Counties tends to show (and is thus relevant to) whether Defendants shipped suspicious orders to the *Track One* Counties. This is

---

[26] Specifically, this issue was raised in Distributor Defendants' Omnibus Motions *in Limine*, 1:17-MD-2804, Dkt. #2666; Henry Schein Defendants' Motions *in Limine* 1:17-MD-2804, Dkt. #2645; and Teva Defendants' and Actavis Generic Defendants' Omnibus Motion *in Limine* 1:17-MD-2804, Dkt. #2668.

> particularly true because there is evidence that Defendants acted
> pursuant to practices and policies that were national in scope."

Exhibit 1, Evidentiary Order at 8.

Here, like in CT1, evidence of Defendants' conduct outside of the City of Huntington and Cabell County is plainly relevant to Plaintiffs' nuisance claim in several ways. As a preliminary matter, this evidence is relevant to prove that Defendants' conduct violated the CSA, which is, by itself, an independent route to nuisance liability. Additionally, such evidence demonstrates, among other things: the nature and scope of Defendants' national policies and the effectiveness of Defendants' national diversion controls; Defendants' knowledge and understanding of diversion; and Defendants' awareness of the migration of prescription opioids between cities, counties, and states. Additionally, because Defendants' other arguments (*e.g.*, that extraterritorial conduct constitutes excludable "bad acts" evidence, and that, in addition to being highly prejudicial, this evidence would waste judicial resources) disregard the controlling evidentiary considerations for a bench trial, Defendants cannot show that evidence of Defendants' shipments to other areas should be excluded.

A.  Evidence Concerning Defendants' Prescription Opioid Shipments to Places Outside Cabell County and the City of Huntington is Highly Relevant.

The Fourth Circuit has held that, in the context of a bench trial, relevant evidence should not be excluded on the grounds that it is unfairly prejudicial, noting "[e]xcluding relevant evidence in a bench trial because it is cumulative or a waste of time is clearly a proper exercise of the judge's power, but excluding relevant evidence on the basis of 'unfair' prejudice is a useless procedure." *Schultz v. Butcher*, 24 F.3d 626, 631–32 (4th Cir. 1994) (quoting *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981)).

There is abundant evidence in the record in this case showing that the opioids Defendants shipped migrated beyond the borders of the areas to which the shipments were made, including, from surrounding cities, counties, and even states such as Florida. The record also shows that Defendants were well-aware of this phenomenon.[27] For example, FTI Consulting, a third-party consultant hired by ABDC to evaluate its diversion control program, specifically noted that a current drug diversion trend involved drugs purchased in Florida spreading to Appalachia and acknowledged that "most drug 'customers'" travel to Florida from West Virginia and elsewhere.[28] Indeed, Defendants even referred to individuals coming to Florida from Appalachia, including West Virginia, as "pillbillies."[29] Moreover, at minimum, both Cardinal and ABDC were aware that a flight from Allegiant Air between Huntington, West Virginia and Tampa, Florida had been nicknamed "the OxyExpress."[30]

Defendants were also regularly alerted to the migration phenomenon by the DEA. For example, one DEA Presentation produced by Cardinal noted that, in 2009, the average purchase for all oxycodone products for the top 100 pharmacies in Florida was nearly **20X greater** than the average purchase for all pharmacies in the United States.[31] That same presentation also noted that, in 2010, 43% of all oxycodone 30mg products were distributed to Florida and that the vast majority of "patients" visiting Florida pain clinics came from just a few states, including West Virginia.[32] Although Defendants attempt to argue that Plaintiffs cannot establish that "Defendants shipped

---

[27] *See, e.g.,* CAH_MDL_2804_031944472 at p. 118 (vast majority of Florida pain clinic patients came from out-of-state), Exhibit 8; FTIMDL00039536 (most drug customers travel to Florida from West Virginia and elsewhere), Exhibit 9; ABDCMDL00360134 at Slide 7 (2009 AmerisourceBergen presentation describing distribution from Florida pain clinics to West Virginia and other states), Exhibit 10; MCKMDL00407451 at 465 (McKesson presentation depicting "Drug Diversion Migration Out of Florida" to West Virginia and elsewhere), Exhibit 11
[28] *See* Exhibit 8
[29] ABDCMDL00569571, Exhibit 12; CAH_MDL2804_00854368, Exhibit 13; CAH_MDL2804_00857161, Exhibit 14; *See also* PPLPC019000544475, Exhibit 15.
[30] *See, e.g.,* ABDCMDL00520064, Exhibit 16; CAH_MDL2804_02182440, Exhibit 17
[31] CAH_ALASKA_00036514, Exhibit 18
[32] *Id.* at 36714, Exhibit 18.

too many pills to Florida pharmacies," this argument entirely overlooks that one of the underlying allegations in the DEA's 2012 enforcement action against Cardinal was that, over the course of just one year, Cardinal shipped more than **3 million oxycodone units** to two CVS pharmacies in Sanford, Florida, population 53,570.[33]

Arrest reports produced by Plaintiffs in this case confirm this trend. For example, in March 2009, the Cabell County Sheriff's Department received information that suspects were traveling to Florida in order to obtain various prescription pain medications and then selling them in Cabell County and the Tri-State area. When the department received information that the subjects were at a local motel, the Cabell County Drug Unit performed an undercover purchase for Oxycodone tablets. The subjects were then arrested and their rooms searched. The search found $20,000 worth of Oxycodone (at least 548 pills) and receipts showing subjects had been to pain clinics in Fort Lauderdale, FL.[34] As a 2012 Huntington Police Department Threat Assessment explained:

> In 2011, scores of residents in and around Huntington travelled out of the area, mainly to south Florida, to obtain thousands of dosage units of strong narcotic and other prescription drugs and transported them back to Huntington for use and distribution.[35]

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Defendants' assertion of the lack of a nexus between their irresponsible distribution practices outside of the Cabell/Huntington area and harm to the CT2 Plaintiffs rings hollow. Defendants shipped tens of millions of opioid pills to resellers throughout the U.S. Defendants were also well aware that those resellers could, and often did, sell those opioids to

---

[33] *See* Decl. of M. Leonhart, *Cardinal Health, Inc. v. Holder,* 1:12-cv-185 (RBW), Dkt. # 1-3.

[34] CCDS_0044668 – CCSD Arrest Report, Exhibit 19.   As described throughout the Energy & Commerce Committee's 2018 Report, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia,* Defendants also supplied high volumes of opioids to likely "pill mills" throughout the State of West Virginia.   *See generally,* Energy & Commerce Report, *available at* https://republicans-energycommerce.house.gov/wp-content/uploads/2018/12/Opioid-Distribution-Report-FinalREV.pdf.   Migration of prescription opioids from these nearby pill mills into Plaintiffs' communities is even more self-evident.

[35] HUNT_00286731 – 2012 HPD Threat Assessment, Exhibit 20.

individuals who had come from West Virginia or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every pill that was diverted posed a risk to localities throughout the nation was not only foreseeable to Defendants, it was observed by them. Each shipment Defendants made in disregard of the potential for diversion is evidence of damages caused by Defendants to localities throughout the nation.

In addition, because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a suspicious order monitoring ("SOM") program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. *See generally*, Expert Reports of Jim Geldhof and James Rafalski. Each Defendant's SOM program was implemented nationally; no special procedures were followed with respect to the CT2 jurisdictions or elsewhere.[36] Because the SOM programs were implemented nationally, not regionally, each suspicious order the Defendants filled and/or failed to report shows the flaws in Defendants' SOM programs, wherever it was shipped.

B. <u>The Evidence in Question is Admissible under Rule 404(b).</u>

Defendants also argue, in the alternative, that evidence of their shipments to other areas is inadmissible because it constitutes evidence of "other bad acts" under Federal Rule of Evidence 404(b). Again, it would be impossible for the Court to determine whether evidence from such a general category of information would be subject to Rule 404(b) without being able to evaluate such evidence within the greater context of trial. Certainly not all evidence of extraterritorial conduct constitutes "other bad acts" evidence, and even if a particular piece of evidence did fall within Rule 404's scope, it may still be admissible if offered for another purpose under Rule 404(b). While Rule 404(b) does "contemplate the exclusion of evidence of other crimes, wrongs,

---

[36] *See, e.g.,* Deposition of Stephen Mays (ABDC), February 8, 2019 at 24:18-22, 56:11-17, 57:4 – 58:15, Exhibit 21; Deposition of Mark Hartman (CAH), November 15, 2018 at 229:7 – 230:3, Exhibit 22.

or acts solely to prove a defendant's character" it also "recognizes that this same evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (internal citations and quotations omitted). *See also United States v. Garrett*, No. 2:12-CR-00030, 2012 WL 2368481, at *6 (S.D.W. Va. June 21, 2012) (finding that "even if the evidence constituted 'other crimes' evidence under Rule 404(b)," it would be "relevant and admissible to demonstrate Defendant's intent and motive. . . .").

Additionally, "as with Rule 403," district courts are accorded "greater latitude at bench trials in applying Rule 404(b)" and allowing the admission of evidence that may fall under this Rule at trial. *United States v. Musleh*, 106 F. App'x 850, 857 (4th Cir. 2004) (citing *United States v. Hassanzadeh*, 271 F.3d 574, 578 (4th Cir. 2001) (holding that admission of evidence in a bench trial did not violate Rule 404(b), especially as "at the bench trial, the experienced district judge was able to separate the emotional impact from the probative value of this potentially prejudicial evidence.")); *see also Baker v. Wright Experience, Inc.*, No. 1:14CV1272, 2015 WL 2137278, at *3 (E.D. Va. May 7, 2015) ("Additionally, since this is a bench trial, there is not the same risk that a jury would use Root's testimony as evidence . . . . Therefore, the evidence does not need to be excluded under Rule 403.").

Given the nature of the information Defendants are seeking to exclude, the Fourth Circuit's preference for admitting evidence during a bench trial, and the fact that evidence subject to Rule 404(b) may still be admissible to demonstrate, among other things, Defendants' knowledge and intent – which are key to Plaintiffs' nuisance case – the Court should reject Defendants' argument that evidence of Defendants' shipments in other areas is precluded under Rule 404(b).

C.  Evidence of Defendants' Conduct in Other Jurisdictions is Neither Unfairly Prejudicial Nor a Waste of Judicial Resources.

Defendants' arguments that introduction of the evidence in question would be unduly prejudicial ignore that the Fourth Circuit strongly disfavors excluding relevant evidence in a bench trial on the grounds that it could be prejudicial. *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("[W]e hold that in the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial."). Moreover, as one district court explained, resolving any existing evidentiary issues at trial will not waste judicial resources and is instead likely to "benefit, rather than prejudice, the parties because after the filing of the detailed Final Pretrial Order and hearing opening statements, the trial judge will have more information and understanding regarding the evidentiary issues at trial and will be better able to rule upon the admissibility of evidence and objections at that time." *Pinal Creek Grp. v. Newmont Min. Corp.*, No. CV-91-1764-PHX-DAE, 2006 WL 1766494, at *1 (D. Ariz. June 26, 2006).

In sum, given the highly probative nature of this evidence in question, as well as the arguments set forth above, Plaintiffs respectfully request that this Court deny Defendants' MIL No. 3.

## IV. Defendants' MIL No. 4: To Preclude Plaintiffs From Offering Evidence of, or Arguments about, Defendants' Settlements with the DEA or the Track One MDL Plaintiffs.

Defendants also seek to exclude evidence regarding their resolution of enforcement actions taken by the federal Drug Enforcement Administration or other government agencies, as well as evidence of opioid-related litigation outside of West Virginia, arguing that evidence of these settlements is inadmissible under Federal Rule of Evidence 408, irrelevant, and unduly prejudicial. Just as they did in CT1, Defendants' arguments fail.

A. Evidence Concerning Defendants' Settlements is Not Precluded by Rule 408.

Federal Rule of Evidence 408 "requires exclusion of evidence concerning offers to compromise or settle disputed claims, but only if the evidence is offered to prove either liability for or invalidity of a claim or its amount." *Bituminous Constr., Inc. v. Rucker Enterprises*, 816 F.2d 965, 968-69 (4th Cir. 1987). Moreover, "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, *not some other claim*." *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) (citing Wright, et al., FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5314, 5308 (1st ed. 1980)) (emphasis added); *see also Pili v. Patel,* No. 3:18CV317, 2019 WL 180185, at *17 (E.D. Va. Jan. 11, 2019) (citing *Uforma/Shelby* in its finding that Rule 408 did not proscribe a party from submitting materials obtained during a settlement negotiation because the materials were being submitted to support a new claim).

Defendants rely on *Massachusetts Mutual Life Insurance Co. v. DLJ Mortgage Capital, Inc*., 251 F. Supp. 3d 329 (D. Mass. 2017), in support of their argument that Rule 408 should bar the introduction of evidence of prior settlement agreements involving Defendants. However, in *Massachusetts Mutual*, the Court found that the settlement agreement the plaintiff sought to introduce was barred under Rule 408 on the grounds that it "arose out of the same 'claims' at issue here." *Id.* at 331. Since the evidence Defendants now seek to exclude does not involve specific claims asserted by the City of Huntington or the Cabell County Commission, Rule 408 is inapplicable.

Even if Rule 408 did apply (which it does not), it still would not preclude evidence of prior settlement agreements offered for "another purpose," such as "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." FED. R. EVID. 408(b). Rule 408 is inapplicable when evidence of the compromise is offered to prove notice, *United States v. Austin*, 54 F.3d 394, 400 (7th Cir. 1995), and Rule 408 does not bar consideration of a settlement offered "as evidence of the parties' intent." *Coakley & Williams Constr., Inc. v. Structural Concrete Equip., Inc.,* 973 F.2d 349, 353-54 (4th Cir. 1992). *See generally,* Rule 408, Advisory Committee Notes, 2006 Amendments (discussing that Rule 408

does not bar admission of settlement documents offered to show a fact other than liability or damages, listing cases); *Taylor v. Union Carbide Corp.*, 93 F.R.D. 1 (S.D.W. Va. 1980) (permitting use of exhibits concerning settlement negotiations to determine adequacy of class action representatives and competency of counsel). Indeed, as previously noted by Judge Polster in his rejection of **this very same argument** in CT1: "the Court may admit this evidence for "another purpose," such as to show a particular Defendant's knowledge or notice of potential harm." *See* Evidentiary Order at 13 (quoting FED. R. EVID. 408(b) and Committee Notes on 2006 amendment). Defendants argue that Judge Polster's prior ruling should be disregarded on the grounds that it was "based on the suggestion that the settlement agreements might be relevant to Defendants' 'knowledge' or 'state of mind' because they somehow put Defendants on notice that they were violating the CSA," which would not "establish any element of Plaintiffs' narrower public nuisance claims in this litigation." Def.'s Mot. at 15. This assertion is baseless. "A public nuisance is an unreasonable interference with a right common to the general public." RESTATEMENT § 821B(1) (1979). An unreasonable interference can be based on conduct that is intentional. *See, e.g.,* RESTATEMENT § 821B(2)(iii). Under West Virginia law, "[a]n interference is intentional when the actor knows or should know that the conduct is causing a substantial and unreasonable interference." *Hendricks v. Stalnaker*, 380 S.E.2d 198, 202 (W. Va. 1989). Moreover, even if an actor's conduct is not initially intentional, it becomes intentional when the actor continues the conduct despite becoming aware of its consequences. RESTATEMENT § 825, cmt. d ("[W]hen the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional.").

In this case, the multitude of enforcement actions and settlements establish a pattern of conduct demonstrating Defendants' knowledge that their SOM systems were inadequate and likely to cause harm – not just in the specific locations where the enforcement actions or settlements took place, but throughout the country. Such evidence is particularly probative in this case, given that Defendants have claimed that they lacked understanding of their legal duties. Further, because the

extensive evidence that Defendants SOM systems were nationwide, as well as evidence that Defendants did not remedy the inadequacies in these systems despite repeated regulatory action, these settlements serve as direct evidence that Defendants' conduct in the City of Huntington and Cabell County was also in violation of the CSA. Lastly, these settlements also demonstrate that Defendants' conduct was intentional and persisted over a lengthy period of time, which goes to the heart of Plaintiffs public nuisance claim.

B. Evidence Concerning Defendants' Settlements is also Admissible under Federal Rule of Evidence 406.

Evidence relating to Defendants' settlement agreements is also admissible under Federal Rule of Evidence 406. Evidence of "an organization's routine practice . . . to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice" is admissible. FED. R. EVID. 406.

All three Defendants previously agreed to pay significant fines relating to their failure to comply with their obligations under the Controlled Substances Act. Despite agreeing to comply with those obligations, all three companies continued to ignore them and were the subject of later enforcement actions by the federal government, as well as other opioid-related suits roughly a decade later, reflecting their persistent failure to conform their conduct to the law. In connection with those later enforcement actions, Cardinal and McKesson acknowledged that they had not lived up to their prior agreements. This history of repeated violations of their legal duties shows that Defendants' violations were not the result of mere oversight, but reflected Defendants' intentional and ongoing business practices.

As a result, the agreements are admissible under Rule 406 because they prove Defendants acted in accordance with their routine practice.

C.  Evidence Relating to Defendants' Settlements of Prior Regulatory Actions is Highly
Relevant.

Evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." FED. R. EVID. 401. Generally, "[r]elevant evidence is admissible" while "[i]rrelevant evidence is not admissible." FED. R. EVID. 402. Here, as discussed above, Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiffs' communities, and therefore settlement agreements relating to those failures are relevant to Plaintiffs' claims for public nuisance. Further, Defendants' prior settlements with regulatory agencies and other entities show that Defendants' national diversion control systems failed to maintain effective controls to prevent diversion and filled suspicious orders for opioids. The settlements also describe the multiple suspension orders and other regulatory actions that would have provided notice to Defendants that their SOM systems were failing to properly control diversion. Evidence regarding Defendants' repeated violations of their duties under the CSA also demonstrates that Defendants continued their conduct in the face of confirmed proof that such conduct was creating an opioid epidemic. For these and other reasons, evidence pertaining to settlements relating to opioids are relevant to establish the intentionality of Defendants' conduct.

D.  Particularly in the Context of a Bench Trial, Evidence Relating to Defendants' Prior
Settlement Agreements is Not Unduly Prejudicial.

As discussed above, the Fourth Circuit "generally favor[s] admissibility, and will find undue prejudice **only** if there is a genuine risk that the emotions of a **jury** will be excited to irrational behavior . . . ." *United States v. Wells*, 163 F.3d 889, 896 (4th Cir. 1998) (internal quotations and citations omitted) (emphasis added). Where the evidence in question is probative,

"the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996).

The agreements are also not unfairly prejudicial. Although FED. R. EVID. 403 allows evidence to be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," none of these exceptions are applicable here. Instead, here, any danger of unfair prejudice or confusion is quite limited because the practices described in the settlement agreements pertain directly to Defendants' controls to prevent diversion and the filling of suspicious orders for opioids. Thus, this evidence will not confuse the issue nor will it inject extraneous factual matters into the trial. Further, because this evidence will be considered by the Court rather than by a jury, the risk of misleading a jury is wholly eliminated.

Because Distributor Defendants' arguments that prior settlements are irrelevant, prejudicial, or inadmissible under Rule 408 are without merit, MIL No. 4 should also be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions *in Limine*.

Dated: October 30, 2020                          Respectfully submitted,

**THE CITY OF HUNTINGTON**
/s/ *Anne McGinness Kearse*
Anne McGinness Kearse
WVSB No. 12547
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

**CABELL COUNTY COMMISSION**
/s/ *Paul T. Farrell, Jr.*
Paul T. Farrell, Jr.
WVSB Bar No. 7443
**FARRELL LAW**
422 Ninth Street, 3rd Floor (25701)
PO Box 1180
Huntington, West Virginia 25714-1180
Mobile: 304-654-8281
paul@farrell.law

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel: 202-232-5504
Fax: 202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com
Charles R. "Rusty" Webb
WV No. 4782
**THE WEBB LAW CENTRE**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com


On Brief:
/s/ *Natalie Deyneka*
Natalie Deyneka
Temitope Leyimu
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
ndeyneka@motleyrice.com
tleyimu@motleyrice.com


Andrea Bierstein
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
212-257-8482
abierstein@simmons.com


Paulina do Amaral
**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: 212-355-9500
Fax: 212-355-9592
pdoamaral@LCHB.com

/s/ *Anthony J. Majestro*
Anthony J. Majestro
WVSB No. 5165
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com


Michael A. Woelfel
WVSB No. 4106
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on October 30, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to: Track2OpioidDefendants@ReedSmith.com and mdl2804discovery@motleyrice.com.

/s/ *Moniqúe Christenson*
Monique Christenson (SC Bar No. 104063)
**MOTLEY RICE LLC**