# EXHIBIT 3

```
                                                           Page 1

 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2
 3    THE CITY OF HUNTINGTON,
 4              Plaintiff,
                                     Civil Action
 5         vs.                       No. 3:17-01362
 6    AMERISOURCEBERGEN DRUG CORPORATION, et al.,
 7              Defendants.
      ---------------------------------------------------
 8    CABELL COUNTY COMMISSION,
 9              Plaintiff,
                                     Civil Action
10         vs.                       No. 3:17-01665
11    AMERISOURCEBERGEN DRUG CORPORATION, et al.,
12              Defendants.
13
14    VIDEOTAPED
      DEPOSITION OF:   WILLIAM H. "SKIP" HOLBROOK
15                     (Appearing via Zoom)
16    DATE:            July 22, 2020
17    TIME:            9:11 AM
18    LOCATION OF      One Justice Square
      THE WITNESS:     Columbia, SC
19
      TAKEN BY:        Counsel for the Defendants
20
      REPORTED BY:     Sandra K. Bjerke, RDR, CRR, CBC
21                     (Appearing via Zoom)
22
23
24
25
```

Page 41

1  mechanisms to divert it to -- you know, in some way
2  to potentially sell to somebody else, give to
3  somebody else, use not as directed, you know,
4  obtain it fraudulently.
5      Q.   And do you have examples of diversion?
6           MR. LEDLIE:  Objection; asked and
7  answered.  You may answer.
8  BY MR. ROMAN:
9      Q.   Well, for example, let me suggest some
10 to you.  Do you have an understanding of the phrase
11 doctor shopping?
12     A.   Yes, sir.
13     Q.   And what's your understanding of that?
14     A.   That an individual would visit, you
15 know, many doctors in an effort to obtain a
16 legitimate prescription for an ailment.
17     Q.   And that's a form of diversion?
18     A.   It could be, yes.
19     Q.   And that's a crime.
20     A.   Yes, it could be.
21     Q.   Is there a time when doctor shopping is
22 not a crime?
23     A.   It would be a crime if you could -- if
24 you could prove that.
25     Q.   Right.  But if somebody -- if you could

Page 42

```
 1   prove that somebody went to multiple doctors for
 2   the purpose of getting multiple prescriptions when
 3   only one was needed, that would be a crime.
 4       A.   Yes, that would be a crime.
 5       Q.   Okay.  And I think you mentioned
 6   prescription forgery, did you not, before?
 7       A.   I did.
 8       Q.   And that's a form of diversion?
 9       A.   That would be.
10       Q.   And that, too, is a crime; correct?
11       A.   Yes.  Correct.
12       Q.   Stealing prescription opioids.  That's
13   a form of diversion; correct?
14       A.   I guess you could argue that, yeah.
15   It's a crime.
16       Q.   Crime.  Okay.  And taking someone --
17   you know, taking someone's pills from a medicine
18   cabinet, you know, a relative's pills from a
19   medicine cabinet, that's a form of diversion;
20   right?
21       A.   Yes.
22       Q.   And that's also a crime.
23       A.   Yes.
24       Q.   Is there any form of diversion that is
25   not a crime, as far as you know?
```

1         A.    I can't think of one.
2         Q.    And I know that you -- well, you
3    indicated that you're not a fan of prescription
4    opioids.  But you understand, do you not, that
5    prescription opioids are not an issue for law
6    enforcement until they are diverted; correct?
7               MR. LEDLIE:  Objection.
8               THE WITNESS:  I don't agree with that.
9    BY MR. ROMAN:
10        Q.    Explain, please.
11        A.    So there's people that abuse prescribed
12   drugs all the time that are involved in criminal
13   activity, traffic accidents.  You know, it's
14   absolutely an issue for law enforcement.
15        Q.    When you say they abuse opioids, that's
16   using them not --
17              MR. ROMAN:  Well, strike that.
18   BY MR. ROMAN:
19        Q.    Are you aware of any instance in which
20   you or those working under you in law enforcement
21   have been involved in a crime investigation where
22   the prescription opioids were being used as
23   prescribed, legitimately as prescribed?
24        A.    Yeah.  I mean, I -- absolutely.
25        Q.    Please describe.

Page 79

1  Q. Do you have a sense of what percentage
2  of those who overdose or use heroin who started on
3  prescription pills?
4  A. Do I have an opinion?
5  Q. Yeah. Do you know what percent or do
6  you have an opinion as to what percent?
7  A. I think it would almost be -- I mean, I
8  don't -- I wouldn't say it's a hundred percent, but
9  it's probably very close to that.
10  Q. And that's on the basis of what?
11  A. Just my experience and my conversations
12  with -- you know, with addicts and --
13  Q. I'm sorry. You've had conversation
14  with addicts?
15  A. Sure, I've talked to people who have
16  been placed under arrest. I've been to overdose
17  scenes. I've talked to parents, friends. This --
18  this issue affected everybody in Huntington, sir.
19  Q. I thought that you said that you were
20  basically a supervisor and that you weren't -- you
21  didn't get down to that street level.
22  A. I'm a police chief. I interact with
23  people all the time.
24  Q. Okay. How many people do you think
25  you've talked to who told you that they started on

Page 80

1  prescription pills and turned to heroin?
2       A.   I couldn't put a number on it.  Many.
3       Q.   More than 10?
4       A.   Sure.
5       Q.   More than a hundred?
6       A.   I -- it's a lot.
7       Q.   More than a hundred, or not?
8       A.   I don't know.
9       Q.   And when you had these conversations,
10 did you -- did you make any recorded -- did you
11 write down any notes about them, did you record
12 them anywhere, did you --
13      A.   No.
14      Q.   And when you said that they started on
15 prescription pills, do you know whether they had
16 abused other drugs before using prescription pills?
17      A.   Many would acknowledge starting -- you
18 know, starting with, you know, alcohol and
19 marijuana.
20      Q.   Any start on crack cocaine, then go to
21 prescription pills, then go to heroin?
22      A.   I'm sure that -- I'm sure that's
23 occurred, but that would not be the typical
24 progression that -- that I would say that I
25 normally saw.

Page 166

1            And then under that file number, as
2   things are developed, that -- you know, that may be
3   submitted to that by various officers, or nothing
4   could be done.  I mean, it may not have solvability
5   factors or the person filing the report may not
6   wish to, you know, proceed further.
7   BY MR. ROMAN:
8        Q.   Right.  But that's one of the reasons
9   why it's important to be accurate, because other
10  officers may be involved and will want to rely on
11  the information contained in the report; correct?
12       A.   We all -- we encourage accuracy, yes,
13  sir.
14       Q.   Okay.  So this one is from 2006.  So it
15  predates your time in -- as police chief.  Do you
16  see that?
17       A.   Yes.
18       Q.   And actually, the victim seems to be a
19  retired Huntington Police Department officer.  Do
20  you see that?
21       A.   I do.
22       Q.   Did you know Mr. Davies?
23       A.   I did not.
24       Q.   Okay.  Why don't you take a moment and
25  look at this, please.

1        A.    Okay.
2        Q.    Have you had an opportunity to review
3   Exhibit 12?
4        A.    Yes.
5        Q.    Okay.  So we talked this morning about
6   theft from a medicine cabinet as a form of
7   diversion.  Do you remember that discussion?
8        A.    Yes.
9        Q.    And that happens when someone who isn't
10  prescribed a medication steals it from someone who
11  had it legitimately prescribed; correct?
12       A.    Correct.
13       Q.    And what's happened here, is that the
14  son of a cleaning lady stole prescription
15  opioids -- I think it was Dilaudid -- from the
16  medicine cabinet of a retired police officer
17  suffering from terminal cancer.  Do you see that?
18       A.    I do.
19       Q.    And this is an example of diversion
20  after the pills left the pharmacy; correct?
21       A.    This is an example of theft.
22       Q.    Right.  But this is -- this is a case
23  where the pills appeared to have been prescribed
24  for the legitimate purpose of easing pain of a
25  terminal cancer patient; correct?

Page 168

1  A. Yeah. I'd also say it's an example
2  of -- I don't know when it was dispensed, but 200
3  pills is -- that's a lot to have at any one time.
4  Q. And do we know -- well, we don't know
5  the circumstances why they had -- why he could
6  have -- we don't -- okay. Let me ask this: With
7  respect to this incident, from this report can you
8  tell whether --
9  MR. ROMAN: Well, strike that.
10 BY MR. ROMAN:
11 Q. As you recall in this case, my client,
12 McKesson, is a distributor of pharmaceutical drugs;
13 right?
14 A. Yes, sir.
15 Q. Would you agree that there is nothing
16 that the distributor can do from having pills
17 stolen out of a medicine cabinet once they are --
18 once they've left the pharmacy?
19 A. Yes, I would agree that a distributor
20 would have no control over theft of pills out of
21 somebody's personal residence.
22 Q. And there's no reason in this case why
23 the Huntington Police Department would have ever
24 investigated the identity of the distributor that
25 delivered pills to the pharmacy that filled the