# EXHIBIT 1

Highly Confidential - Subject to Further Confidentiality Review

1            UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION
3

     IN RE: NATIONAL          )
4    PRESCRIPTION             )   MDL No. 2804
     OPIATE LITIGATION        )
5    _____ )   Case No.
                              )   1:17-MD-2804
6                             )
     THIS DOCUMENT RELATES     )   Hon. Dan A.
7    TO ALL CASES             )   Polster
8
              FRIDAY, AUGUST 17, 2018
9
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10            CONFIDENTIALITY REVIEW
11                  - - -
12         Videotaped deposition of Dave
13   Gustin, held at the offices of Taft,
14   Stettinius & Hollister, LLP, 65 East State
15   Street, Suite 1000, Columbus, Ohio,
16   commencing at 9:01 a.m., on the above date,
17   before Carrie A. Campbell, Registered
18   Diplomate Reporter and Certified Realtime
19   Reporter.
20
21
22                  - - -

          GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
25

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    We showed you where you defined

2    it.  Remember that document I showed you

3    earlier where you actually defined what a

4    suspicious order was?  You want me to show it

5    to you again?

6    A.    You might have to.  I don't --

7    Q.    Yeah.

8    A.    I don't remember that I defined

9    it.

10   Q.    Yeah, I'll -- time-wise, I

11   think the jury remembers that document.

12         It says, "McKesson's inability

13   to instill a culture of compliance, even

14   within its compliance operations, may explain

15   why McKesson WCH" -- which is Washington

16   Court House -- "did not report anything

17   suspicious about Community Drug of

18   Manchester, Kentucky, a pharmacy located in a

19   town of less than 1,000 adult residents."

20         Now, were you also in charge of

21   Manchester, Kentucky?

22   A.    Yes.

23   Q.    Okay.  So now we got another

24   one.  We got -- I'm losing track here, but

25   let me see if I can read.  So the Department

Highly Confidential - Subject to Further Confidentiality Review

1    of Justice has written this letter where

2    they're talking about the failures of

3    McKesson to properly control narcotic drugs

4    according to the law.

5              You understand that's what this

6    letter is about, right?  Yes?

7        A.    That's what it says.

8        Q.    And so I happen to have you

9    sitting in front of the camera right now, and

10   as you're sitting in front of the camera, we

11   see that you're the person that was

12   responsible, at least according to this

13   report, for Livonia, right?  Right?

14       A.    For Livonia, yeah.

15       Q.    For Preferred Care Pharmacy,

16   correct?  Right?

17       A.    Preferred Care, yes.

18       Q.    And then for People's Pharmacy,

19   true?

20       A.    Yes.

21       Q.    And then for Washington Court

22   House, right?

23       A.    Yes.

24       Q.    And now Community Drug --

25   Community Drug in Manchester, Kentucky,

1    right?

2         A.    Yes.

3         Q.    And there it says, "A 50,000

4    dosage units of oxycodone products on a

5    monthly basis in 2011."

6              You were giving Community Drugs

7    in Manchester, Kentucky, 50,000 units of

8    oxycodone products on a monthly basis in 2011

9    according to this investigation, correct?

10             MS. BROWNING:  Object to the

11        form.

12             THE WITNESS:  I don't

13        remember -- I don't remember that

14        number at all.

15   QUESTIONS BY MR. PAPANTONIO:

16        Q.    Well, what -- okay.  Well, you

17   think the DEA's lying about that?  This is

18   your opportunity now.  If you believe the

19   government is lying about all this and

20   they're trying to say something wrong, you

21   need to tell the jury about it right now.

22        A.    I'm just saying I have no

23   remembrance of that number, and I have no

24   idea where they came up with that number.  I

25   do remember Community Drug of Manchester.

1      Q.     You knew Manchester -- you knew

2   Manchester was under investigation, correct?

3              Oh, excuse me.  Let me back up

4   just a second.  You knew -- before I get to

5   Manchester, you knew -- you knew Community

6   Drug was under investigation, right, by the

7   Kentucky Board of Pharmacy?  You knew that

8   while you were still selling drugs?

9              MS. BROWNING:  I'm sorry, I am

10          confused by the question.  You said

11          before you get to Manchester.

12   QUESTIONS BY MR. PAPANTONIO:

13      Q.     Yeah, before I get to

14   Manchester, I want to now go back and spend a

15   minute on Community Drug.

16              MS. BROWNING:  But isn't that

17          Manchester?

18              THE WITNESS:  That is

19          Manchester.

20   QUESTIONS BY MR. PAPANTONIO:

21      Q.     Okay, great.  Community Drug is

22   Manchester, that is the same thing.  But I

23   want to talk about Community Drug

24   specifically, that's what I am trying to say.

25              Okay.  You knew, sir, that

1    Community Drug was under investigation by the

2    Kentucky Board of Pharmacy before -- and you

3    continued selling drugs while that was going

4    on, right?

5         A.    I don't know that that's true.

6         Q.    Well, all right.  Let's show

7    him --

8         A.    I do know that I reported them

9    to the DEA, and they ended up taking action

10   against them.  And I know that I got a

11   telephone call from the DEA basically

12   congratulating me and asking me how I knew.

13        Q.    Well, let's see how you knew.

14   I want to show you how you knew and what you

15   did while you knew that they were under

16   investigation and you continued to sell them

17   drugs.  Let's --

18             MS. MOORE:  Gustin 136.

19             (McKesson-Gustin Exhibit 136

20        marked for identification.)

21   QUESTIONS BY MR. PAPANTONIO:

22        Q.    Would you look at page 76,

23   please?  Let's go right to the issue.

24             See the date where it says --

25   halfway down on page 76, there's your name,

1    "Dave Gustin," right?  Right?

2         A.    From Dave -- oh, halfway down,

3    yes.

4         Q.    And so it says, "Dave Gustin."

5    It says, "Please do not mention anything

6    about the Kentucky Board of Pharmacy comments

7    to us when talking to the Community account.

8    The advice we -- the advice we got were

9    confidential, not to be shared with anyone

10   outside the company.  It is a contact that we

11   need to protect and will serve us well in the

12   future."

13              Then you give us a quote by

14   Abraham Lincoln, "You cannot help men

15   permanently by doing for them what they could

16   and should do for themselves."

17              So you see the date there,

18   May 1, 2012?

19        A.    Yes.

20        Q.    You knew that they were under

21   investigation on May 1, 2012, right?  Right?

22        A.    I see that it says Board of

23   Pharmacy's comments.  I don't know what those

24   comments were looking at this document.

25        Q.    You knew something was wrong,

1    and they were being looked at, didn't you,

2    sir?

3              MS. BROWNING:  Objection.

4              THE WITNESS:  I don't know from

5         four years ago or -- more than that,

6         six years ago, what I knew and didn't

7         know.

8    QUESTIONS BY MR. PAPANTONIO:

9         Q.    Well, you certainly -- you

10   think -- to actually sell them narcotics

11   while they're under investigation would be a

12   serious, serious violation of what your job

13   responsibilities would be, wouldn't it?

14   Right?

15        A.    It seems like this was in

16   conjunction with my lowering their

17   thresholds --

18        Q.    You continued to sell them

19   drugs?

20        A.    -- pending an investigation.

21        Q.    Right.

22              You continued selling them

23   drugs knowing they were under investigation.

24   That's a yes or no, sir.

25              Did you or didn't you?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I can't tell looking at this

2   what we did or didn't do.

3       Q.      Didn't you just say you lowered

4   their threshold but you continued selling

5   drugs?  Isn't that what you just told me?

6           MS. BROWNING:  Objection.

7       Misstates his testimony.

8   QUESTIONS BY MR. PAPANTONIO:

9       Q.      Isn't that exactly what you

10  did; you sold them less, but you continued

11  selling them drugs even after the Board of

12  Pharmacy had them under investigation, yes?

13      A.      The Board of Pharmacy -- in

14  another part of this letter it says that they

15  advised us to sell standard amounts.

16      Q.      So you continued selling drugs

17  to them after they were under investigation,

18  yes or no?

19      A.      Per the direction of the Board

20  of Pharmacy, we did whatever -- well, we took

21  whatever action we took.  I can't tell

22  looking at this exactly what that was.

23      Q.      And you didn't tell the DEA

24  about this, did you?

25      A.      Yeah, after we got to the point

Highly Confidential - Subject to Further Confidentiality Review

1    where we were cutting them off, and we

2    weren't doing business with them anymore, I

3    told the DEA, and I told them --

4          Q.    You told them after you knew

5    they were under investigation, sir, didn't

6    you?  That's when you told the DEA about it,

7    after you knew they were under investigation?

8          A.    I told them after I continued

9    my investigation, and then we took the action

10   and closed them down, and that's when I told

11   the DEA.

12         Q.    You had an investigation going,

13   is that what you're telling me?  Is that your

14   testimony here, that Dave Gustin had an

15   investigation going of Community Drug?  Is

16   that what you're telling me, yes?

17         A.    Yes, I was looking into the

18   Manchester Community Drug, the pharmacy.

19         Q.    And let's see -- so let's see

20   what this investigation that the Department

21   of Justice found.

22               It says, "Community Drug,

23   Manchester, Kentucky, a pharmacy located in a

24   town of less than 1,000 adult residents, was

25   ordering 20,000 to almost 50,000 dosage units

Highly Confidential - Subject to Further Confidentiality Review

1    of oxycodone products on a monthly basis in

2    2011."

3              You were the one supplying them

4    those narcotics, correct?

5         A.    I don't know that that's true.

6         Q.    Well, what does it say?

7         A.    Based on the time frames and

8    when we opened the account, and I --

9         Q.    Well, let's read it.

10   "Manchester, Kentucky, a pharmacy located in

11   less than 1,000 adult residents ordering

12   20,000 to almost 15,000 units of oxycodone on

13   a monthly basis in 2011.  Indeed, McKesson,

14   Washington Court House" --

15             Again, that's your facility

16   that you were the DRA, right?

17        A.    Yes.

18        Q.    -- "only took action to reduce

19   this pharmacy's threshold for OxyContin

20   products after receiving a tip from the state

21   pharmacy board that it was under

22   investigation."

23             And then it goes on to say that

24   "even after McKesson WCH was aware of this

25   pharmacy was under investigation, it

Highly Confidential - Subject to Further Confidentiality Review

1  continued to supply it with controlled

2  substances while apologizing for having to

3  reduce the thresholds and promising to bump

4  up those thresholds as soon as they could

5  justify doing so."

6                  You told this pharmacy that,

7  we're going to reduce you, but after the

8  investigation, we're going to bump you back

9  up, didn't you?  You told them that, didn't

10  you?

11                  MS. BROWNING:  Objection.

12                  THE WITNESS:  If we could

13      justify doing so.

14  QUESTIONS BY MR. PAPANTONIO:

15      Q.    Huh?

16      A.    I didn't say we were going to.

17  I said if we could justify doing so, that

18  meant --

19      Q.    You see the word "bump up"?

20  Put bump up -- underline "bump up."

21                  You apologized to these people

22  that were being criminally investigated,

23  right?

24                  MS. BROWNING:  Objection.

25                  THE WITNESS:  I didn't know

Highly Confidential - Subject to Further Confidentiality Review

1          that they were being criminally

2          investigated.

3     QUESTIONS BY MR. PAPANTONIO:

4          Q.     Did you have any idea that the

5     Department of Justice was looking at them,

6     too?

7          A.     I had no idea at that time that

8     anybody was looking at them other than me.

9          Q.     But after you were put on

10    notice that they were being investigated --

11    after that, you continued to sell them drugs,

12    right?

13               MS. BROWNING:  Objection.

14         Asked and answered.

15    QUESTIONS BY MR. PAPANTONIO:

16         Q.     Right?

17               MS. BROWNING:  Same objection.

18    QUESTIONS BY MR. PAPANTONIO:

19         Q.     Well, here it is.  "Even after

20    McKesson WCH" -- underline this, I just don't

21    want to misread this.

22               "Even after McKesson WCH was

23    aware that this pharmacy was under

24    investigation, it continued to supply it with

25    controlled substances while apologizing for

Highly Confidential - Subject to Further Confidentiality Review

1    having to reduce the threshold and promising

2    to bump up those thresholds."

3                   Do you see that?

4         A.     I see that.

5         Q.     Sir, you were selling 50,000

6    narcotic drugs to an area where there are

7    1,000 adults.  That's what this says.

8                   MS. BROWNING:  Objection.

9                   THE WITNESS:  Again, I don't

10        remember that number of 50,000.  I

11        don't know where that comes from.

12   QUESTIONS BY MR. PAPANTONIO:

13        Q.     Well, let me do something.  I

14   want to show you your letter, but hold that

15   right there.  Right there.

16                   Are you the guy that said we're

17   going to bump -- we're going to bump you up

18   as soon as you could justify doing so?

19        A.     Meaning at the end of the

20   investigation.

21        Q.     Right.

22        A.      If the right circumstances

23   existed, that we would, and if not, we would

24   make a different decision.

25        Q.     So you were going to bump

1   up the -- you were going to bump them up

2   where you have 1,000 adult residents

3   receiving 50,000 dosage on a monthly basis --

4   that's what it says.  You understand -- you

5   are shipping 50,000 narcotic drugs into an

6   area where there are 1,000 people who live

7   there.

8           MS. BROWNING:  Objection.

9           THE WITNESS:  It seems like --

10          it seems like what you're missing is

11          that in that time frame, they got

12          taken all the way back down to

13          standard thresholds.

14  QUESTIONS BY MR. PAPANTONIO:

15      Q.    I don't miss that at all, sir.

16  Don't -- let me ask the questions.  I'm not

17  missing a thing.  Trust me, I don't.  I'm not

18  missing a thing.

19          You continued selling them

20  threshold limits even after you knew they

21  were under investigation, true?

22      A.    I don't know that that's true.

23      Q.    Well, we know this:  I got --

24  I've got to go to this.

25          MR. PAPANTONIO:  Go ahead and

```
 1              give him this document.  Do they
 2              already have it?  Do they have this
 3              already?  Do you already have -- yeah,
 4              do you already have 1286?  I think you
 5              do.
 6                      MS. BROWNING:  Oh, this one?
 7                      MR. PAPANTONIO:  Yeah.  Do you
 8              want to pull that out?
 9                      MS. BROWNING:  Gustin 136.
10     QUESTIONS BY MR. PAPANTONIO:
11         Q.    Look at page 89, it's the last
12     page there.
13                      MS. BROWNING:  Last page.
14                      THE WITNESS:  Okay.
15     QUESTIONS BY MR. PAPANTONIO:
16         Q.    It says, "Dave Gustin" at the
17     top, right?
18                See the date there, it's
19     August 23, 2012, right?
20         A.    Okay.
21         Q.    It says, "Kevin, I am ready to
22     recommend that we restore a portion of the
23     oxy and hydro that was their old threshold.
24     Maybe take oxy to 16,000 and hydro to -- and
25     keep oxy 30s at 5,000 so it can stay below
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. PAPANTONIO:

 2        Q.    It says -- again, it says --

 3   okay.  This is from Ryan England.

 4              Who is that?

 5        A.    He was a sales rep.

 6        Q.    It says, "Terry."

 7              Who is Terry?

 8        A.    Who is -- Terry and Melissa

 9   Tenhet, I think they were the owners.

10        Q.    Okay.  They owned this

11   pharmacy, correct?

12        A.    Yes.

13        Q.    They owned this pharmacy that's

14   in a population of 1,000 people that had been

15   receiving 50,000 dosages a month of

16   narcotics; is that a correct statement?  Yes?

17        A.    Could you repeat it, please?

18        Q.    Yes.

19              They were the owners of the

20   pharmacy in Community Drug -- called

21   Community Drug that was receiving 50,000

22   narcotic drugs a month --

23        A.    Again --

24        Q.    -- in a population of 1,000

25   people, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Again, I don't know about the

2    50,000 number, where that came from.  I

3    don't -- I don't remember ever inputting a

4    number like that for this account.

5      Q.      Do you have a reason to believe

6    the Department of Justice is making this up?

7    Now is your time to tell the jury.  If the

8    Department of Justice is doing something, we

9    all want to know about it.  All these folks

10   right here, we want to know.

11     A.      Making it up?

12     Q.      Yeah.

13     A.      I doubt -- I doubt they make

14   things up, but they could be wrong.

15     Q.      Yeah.

16             Okay.  So let's see.  Look at

17   page 81 here.  We're on 81.  This is Terry.

18   It says, "I certainly appreciate your point

19   of view and can't say I'd react any

20   differently if I were in your shoes.  I

21   appreciate the apology and look forward to

22   moving on from this and continuing our

23   business relationship."

24             Right?  And then it says,

25   "Unfortunately the DEA has put all

Highly Confidential - Subject to Further Confidentiality Review

1    wholesalers in a difficult position of being

2    the police.  What happened to Cardinal in

3    Florida a few months ago could have happened

4    to us, ABC, Smith or anyone else.  Because of

5    that, we are all a little on edge and

6    paranoid about these license suspension,

7    fines and bad publicity.  Anytime

8    out-of-state doctors are in the picture it

9    creates immediate and mass panic."

10              Now, you know, sir, that -- you

11   were aware that Cardinal was also hit for

12   {sic} the DEA for doing the same things of

13   not reporting suspicious orders and not

14   having the due diligence program to keep up

15   with suspicious orders; did you know that?

16        A.    I knew that Cardinal was fined.

17        Q.    And you know -- you know, sir,

18   don't you that you actually -- you actually

19   were -- a part of your job was to police the

20   distribution of these drugs from distributor

21   to pharmacy, part of your job to avoid

22   diversion was to be part of the policing of

23   that.  You knew that, right?  Did you not

24   know that?

25              MS. BROWNING:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1           form.

2                   THE WITNESS:  Part of our job

3           was to --

4      QUESTIONS BY MR. PAPANTONIO:

5           Q.    Police and make sure that there

6      weren't too many drugs sold and used for

7      diversion?

8           A.    To vet the accounts for -- yes.

9           Q.    You would agree with that then.

10                It says, "I have an e-mail in

11     our regulatory team" -- let's see.  "I have

12     an e-mail in to our regulatory team to find

13     out exactly what they need to bump up your

14     thresholds again."

15                Right?  Isn't that what that

16     says?

17          A.    Yes.

18          Q.    "Bump up your thresholds."

19                And that's the same words that

20     were used in the -- in this -- in Department

21     of Justice report that -- where they say that

22     it continued to supply controlled

23     substances -- their, Community Drug -- and

24     that they would -- McKesson would bump up the

25     threshold as soon as they could.

1          MS. BROWNING:  As soon as they

2     could justify doing so.

3  QUESTIONS BY MR. PAPANTONIO:

4          Q.    Right?

5          A.    I see that what it says here.

6          Q.    Here's the word right here

7  again, "we're going to bump it up."

8               Do you think it's prudent to

9  bump up thresholds where you have search

10 warrants -- you have search warrants and

11 criminal convictions taking place for a --

12 one of your customers?  You want to bump up

13 their orders?

14         A.    I don't know that -- that

15 that's what happened here --

16         Q.    Well, let's read on.  Okay?

17         A.    -- by the timing of it.

18         Q.    Well, no, no, no.  Let's go

19 ahead and read on.

20              "Even after McKesson was aware

21 that this pharmacy was under

22 investigation" --

23         MS. BROWNING:  I'm sorry, are

24     we back to the letter?

25         MR. PAPANTONIO:  Yeah, we're

Highly Confidential - Subject to Further Confidentiality Review

1        back -- we're back to document 1443.

2                MS. BROWNING:  Thank you.

3                MR. PAPANTONIO:  Page 3.

4    QUESTIONS BY MR. PAPANTONIO:

5        Q.    Same place we were.  "Even

6    after McKesson WCH was aware that this

7    company was under investigation, it continued

8    to supply with controlled substance while

9    apologizing for having to reduce thresholds,

10   and promising to bump up those thresholds as

11   soon as they could justify doing so.  In

12   September 2012, federal and state law

13   enforcement officers executed a search

14   warrant on Community Drug as part of an

15   investigation that ultimately resulted in the

16   criminal conviction of the lead pharmacist

17   and his wife."

18               Isn't that exactly who you were

19   writing to?  That letter was to -- those were

20   the people who were involved in that letter?

21       A.    I was not writing the letter.

22       Q.    You did -- did you know these

23   people?

24       A.    Know them?

25       Q.    Yeah.  Had you met them?

Highly Confidential - Subject to Further Confidentiality Review

1     A.      I don't know that I met them.

2  If I did, it might have been once, but I

3  don't remember them.

4     Q.      "Days after the search warrant

5  was executed and covered by local television

6  news outlets, McKesson WCH contacted

7  Community Drug telling it that it would be

8  seeking a pretty sizeable increase in the

9  oxycodone and hydrocodone thresholds for this

10  store."

11              That's you saying that, isn't

12  it?

13              MS. BROWNING:  Objection.

14              (McKesson-Gustin Exhibit 242

15      marked for identification.)

16  QUESTIONS BY MR. PAPANTONIO:

17     Q.      After -- now, let me get this

18  right.  Give me a piece of paper, please.

19  Could you please turn me over to this Elmo?

20  Let me get this right.  I want to make sure

21  I'm not missing anything here.

22              So, first of all, we're talking

23  about WCH, right?  WCH, that was your

24  responsibility as a DRA, true?

25     A.      Washington Court House, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Washington Court House.

2              Number 2, Community Drugs --

3      yeah, Community Drug -- Community Drug had

4      been receiving -- well, Community Drug is in

5      a population of 1,000 people, according to

6      this report, right?  Correct?

7      A.      According to what it says, yes.

8      Q.      Number 3, Community Drug was

9      your responsibility, right?

10     A.      It fell under my purview, yes.

11     Q.      Number 4, Community Drug,

12     according to this report, was receiving up to

13     50,000 narcotic drugs every month according

14     to this report, correct?  Am I right?

15     A.      According to the report.

16     Q.      All right.  Number 5, Community

17     Drugs had experienced an investigation by

18     the -- what was it -- we called it the

19     pharmacy board, right?

20     A.      Board of Pharmacy.

21     Q.      Board of Pharmacy.

22             They had -- obviously they were

23     investigated by the DEA, according to this,

24     right?

25             You understand this is the DEA

Highly Confidential - Subject to Further Confidentiality Review

1   investigation?  Let's not even put that on

2   there.  Let's leave that off.

3              Let's just say that whatever

4   reason they had received -- they had been

5   subject to search warrants.  They had been

6   subject to subpoenas, right?  Right?  Am I

7   right?

8        A.    I don't know.  I'm just

9   listening to you.

10       Q.    This -- well, no, don't listen

11  to me.  You tell me if I'm wrong, because I'm

12  not -- I want to know what you know.

13             Am I wrong that they were

14  issued subpoenas, or do you know?

15       A.    I don't know that you're right

16  or wrong.  In the first place, it's been

17  quite some time ago.  In the second place,

18  this is not how I remembered this all taking

19  place.

20       Q.    Okay.  Well, you don't remember

21  that they were actually subject to an

22  investigation by the pharmacy board and that

23  they were issued search warrants.  You didn't

24  know that, correct?

25       A.    At the time?

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Yeah.

2      A.      No.  No.  I see it now.  I see

3   it after the fact.

4      Q.      Well, you knew at the time,

5   though, that they were -- the pharmacy board

6   was investigating them?

7      A.      I called them to find out if

8   they knew anything about them and to see if

9   they would tell me anything, because they

10  wouldn't always.

11     Q.      All right.  So now we know that

12  they were -- they were -- well, you don't --

13  there's nothing about subpoenas, I don't

14  think.  So let's take subpoenas out.  I just

15  want to see what you were operating when

16  y'all made your decision to sell them more

17  drugs.

18          So the pharmacy board is

19  investigating.  They have search warrants.

20  They're -- let's see.  What else?  What else?

21          Oh, yeah.  They were convicted

22  criminally, right?  Please look.  I want you

23  to --

24          MS. BROWNING:  Which one are

25      you looking at?

1            MR. PAPANTONIO:  I'm relying on

2        exactly what this report is saying

3        here.

4            MS. BROWNING:  We've got so

5        many things we've been looking at.  I

6        just want make sure I'm on the same

7        thing you are.  Thank you.

8            MR. PAPANTONIO:  I'm on 1443.3.

9        Okay?  I want to make sure anything

10       that I put on this list, that the jury

11       can see, it's right in the report.

12           THE WITNESS:  An investigation

13       that ultimately resulted in a criminal

14       conviction.

15   QUESTIONS BY MR. PAPANTONIO:

16       Q.    Criminal conviction, right?

17       A.    Of the lead pharmacist.

18       Q.    And then after all of that

19   takes place, where they were selling 50,000

20   narcotic drugs every month to 1,000 people --

21   after that takes place, McKesson continues to

22   sell narcotics, right?

23           MS. BROWNING:  Objection.

24       You're misstating what's in this

25       letter.  It says "after the search

Highly Confidential - Subject to Further Confidentiality Review

1       warrant was executed," not "after they

2       were convicted."

3    QUESTIONS BY MR. PAPANTONIO:

4       Q.    Okay.  After the search

5    warrant -- after the search warrant was

6    issued, you continued to sell -- we'll

7    take -- you know they were criminally

8    convicted?

9       A.    Yes.

10      Q.    Okay.  But after the search

11   warrant, McKesson continues to sell narcotic

12   drugs, right?

13      A.    Yes.

14      Q.    And then it says right here --

15   it says that days after -- on your report

16   right there, take a look at 1443.  "Days

17   after that search warrant was executed and

18   covered by local television and news

19   outlets" -- I want to make sure I get this

20   right.  I want to see if you're the one that

21   said this.

22           "McKesson WCH contacted

23   Community Drug telling them it would be

24   seeking a pretty sizeable increase in

25   oxycodone and hydrocodone thresholds for the

Highly Confidential - Subject to Further Confidentiality Review

1    store."

2              After all this, you want to

3    increase thresholds of narcotics, right?

4              MS. BROWNING:  Object to the

5        form.

6    QUESTIONS BY MR. PAPANTONIO:

7        Q.    That's what it says, doesn't

8    it?  Tell me if I'm wrong.

9        A.    I just need you to tell me what

10   you mean by "they."

11       Q.    This is your facility.  You're

12   the DRA.  The buck stops you with you.  You

13   know that, right?

14       A.    Yes, but this is referring to a

15   specific -- it was telling it would seek a

16   pretty sizeable increase.  You said "you."  I

17   didn't --

18       Q.    Did you do that?

19       A.    I didn't communicate with them.

20   I made it a point not to communicate with

21   that pharmacy.

22       Q.    Well, who did?

23             Somebody from McKesson did.

24   Who is that missing person?  Can you guess?

25       A.    It could have been Ryan

Highly Confidential - Subject to Further Confidentiality Review

1    England.  It could have been somebody at the

2    DC, but I don't know -- have any way of

3    really knowing who, but I wouldn't be seeking

4    a sizeable --  a sizeable -- I would be

5    entertaining it after being asked.

6         Q.    Well, sir, you understand that

7    your company didn't even cut them off -- did

8    not cut off this company after all these

9    things we're talking about right here?

10        A.    That's correct.

11        Q.    They didn't cut them off until

12   October 2012.  Did you know that?

13        A.    I didn't remember the exact

14   time, but it seems like we did what we were

15   supposed to do.

16        Q.    Did you know that you continued

17   to sell them narcotic drugs even -- after

18   this that we've been talking about, you

19   continued to sell them narcotic drugs all the

20   way up until October 23, 2012, yes or no?

21        A.    That's very possible, and I

22   think it's because of in those phone calls

23   that I was talking about to the Board of

24   Pharmacy, phone calls to the DEA, it seems

25   like we were asked at one point in time not

Highly Confidential - Subject to Further Confidentiality Review

1    to do anything to alert them that they were

2    being looked at, do standard thresholds, but

3    if we cut them off, then it would impact

4    their investigation.

5              So at the time I was engaged in

6    phone calls back and forth to either the DEA

7    or Board of Pharmacy or both, and that's why

8    when this was all said and done, they made a

9    phone call to me basically wondering how I

10   knew to tip them off that there was a problem

11   there.

12        Q.    Well, you certainly didn't know

13   for years, did you --

14              MS. BROWNING:  Are you finished

15        with your answer?

16              THE WITNESS:  I am.

17   QUESTIONS BY MR. PAPANTONIO:

18        Q.    You didn't know for years that

19   this criminal conduct, that they were

20   criminally convicted of, had been going on

21   under your watch as the DRA for WCH?  The

22   whole time that was going on, you didn't know

23   a thing about it, did you?

24              MS. BROWNING:  Objection.

25

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. PAPANTONIO:

2         Q.    Right?

3         A.    I don't remember everything at

4    that time, but I can't believe I would know

5    something was wrong and not do something

6    about it.

7         Q.    Well, you certainly knew that

8    the total volume of controlled scripts

9    that -- in other words, you got 50,000 --

10   50,000 dosages going into 1,000 adult

11   residents.  You knew that that was

12   inappropriately high, and you granted it

13   anyway, didn't you?

14             MS. BROWNING:  Objection.

15        Asked and answered.

16   QUESTIONS BY MR. PAPANTONIO:

17        Q.    Right?  Yes?

18        A.    I don't remember the specific

19   numbers and who granted what, and so I can't

20   just say a hard yes to that.

21        Q.    Let's go to the next page.

22             Y'all need a break?

23        A.    Which document?

24             MR. PAPANTONIO:  Let's take a

25        ten-minute break.

Highly Confidential - Subject to Further Confidentiality Review

1          asked me if I would go and visit a

2          pharmacy before they invested any time

3          or whatever to see if -- what my

4          feelings on that pharmacy were, and I

5          came back with a negative answer.  And

6          in each of those instances, I let the

7          DEA know that we didn't bring them on

8          board so that they would have a

9          heads-up.

10    QUESTIONS BY MS. BROWNING:

11          Q.    Now, you were asked some

12    questions earlier about Community Drug and

13    your interactions with them.  I think they're

14    in Manchester, Kentucky; is that correct?

15          A.    Yes.

16          Q.    After you cut off -- you

17    terminated sales of controls to Community

18    Drug, correct?

19          A.    Yes.

20          Q.    And after you did that, did you

21    notify the DEA?

22          A.    Yes.

23          Q.    And what -- tell us about that.

24          A.    My recollection of that, and

25    it's been a long time ago, was that I was

Highly Confidential - Subject to Further Confidentiality Review

1   asking questions about them.  After they

2   became on board, I asked more questions about

3   them.  I began hearing things that were

4   unsettling.  I followed up by phone calls to

5   the Board of Pharmacy.  I'm not sure, but it

6   seemed like there was potential action, and

7   then as is the case sometimes, and this

8   happened outside of St. Louis, too, they

9   didn't want to have them just cut off, if

10  they were in the middle of an investigation,

11  and, therefore, be given a heads-up that

12  something might be up.  So we reduced them to

13  standard thresholds, and I refused to talk

14  with the owner any, you know, after that, and

15  I don't know that I talked with him before

16  that.

17           And I remember we ended up --

18  the DEA ended up taking action on them.

19  Naturally, we -- not too much after that, I

20  got a phone call from the DEA, I think it was

21  Jeff Connors and a supervisor or something

22  like that.  They congratulated me on it and

23  asked what might have tipped off that it

24  wasn't a good pharmacy.

25      Q.    All right.  And you had

Highly Confidential - Subject to Further Confidentiality Review

1    similar -- a similar story with -- or actions

2    with regard to Gwinn's pharmacy in Indiana?

3         A.    Yes.

4         Q.    In Anderson, Indiana?

5         A.    Yes.

6         Q.    When you would contact the DEA

7    about customers, how would they respond?

8         A.    Oftentimes they would play it

9    very close to the vest.  They didn't want to

10   say too much over the phone or tell me too

11   much of anything.  About the best I could

12   hope for was there was a DEA agent, I think

13   his name was Dave Tatemple {phonetic}, and he

14   operated in the St. Louis market, and he

15   would give me cryptic -- kind of cryptic

16   replies saying, "Well, as a matter of fact,

17   we are aware of that customer," something to

18   that effect.

19              I think that kept him from

20   saying too much, and at the same time it

21   gave -- it gave me a heads-up that there may

22   be something to really look at on that

23   customer form.  It's just not go near him.

24              MS. BROWNING:  All right.

25         Thank you, Mr. Gustin.  That's all I