# EXHIBIT C

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

3

    * * * * * * * * * * * * * * * * * * * * * *

4

THE CITY OF HUNTINGTON,

5

              Plaintiff,

6

vs.                                    CIVIL ACTION

7                                   NO. 3:17-01362

AMERISOURCEBERGEN DRUG

8   CORPORATION, et al.,

9              Defendants.

10  _____

11  CABELL COUNTY COMMISSION,

12              Plaintiff,

13  vs.                                   CIVIL ACTION
                                    NO. 3:17-01665

14  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,

15

              Defendants.

16

    * * * * * * * * * * * * * * * * * * * * * *

17

18

19          Videotaped and videoconference deposition
    of KATHERINE KEYES taken by the Defendants under

20  the Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa

21  S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 15th day of September,

22  2020.

23

24

Page 184

1  deaths that you directly attribute to prescription

2  opioids, and the other is those you indirectly

3  attribute.  Is that right?

4       A.   That's right.

5       Q.   And you -- you do this based on a review of

6  death certificates?  Is that right?

7       A.   In part.  That's one of the methodologies

8  used.

9       Q.   What else did you look at aside from death

10 certificates?

11      A.   We also looked at the proportion of people

12 who don't have a prescription op -- well, we look

13 -- among those who don't have a prescription opioid

14 listed on their death certificate, we used the

15 literature to estimate the portion that are

16 indirectly attributable based on inference from the

17 literature.

18      Q.   Where did you get the base data for the

19 information listed on the death certificates?

20      A.   The CDC.  The National Vital Statistics

21 system.

22      Q.   And the death certificates list all of the

23 substances found in the body at the time of death.

24 Is that right?

Page 185

1        A.    They list the substances contributing to

2   the death, I believe.

3        Q.    Is it substances contributing to the death

4   or substances found in the body?

5        A.    Based on the T codes that I used, I believe

6   that they are contributing to the death.

7        Q.    And that judgment is made by whom?

8        A.    Usually a medical examiner.

9        Q.    And so there can be circumstances where

10  somebody at the time of death has multiple drugs in

11  their body and -- first of all, let me ask you

12  that.  I take it that's true, right?  At the time

13  of death, you could have people with multiple drugs

14  in their body?

15       A.    That's right.

16       Q.    And there are occasions where the medical

17  examiner lists the factors that contribute to death

18  as more than one drug?

19       A.    That's right.

20       Q.    And your judgment and your methodology was

21  that if -- if prescription opioids were listed as

22  one of the contributing factors, you directly

23  attributed the death to prescription opioids even

24  if there were other drugs also identified as

Page 186

1   contributing causes?

2       A.   That's right.

3       Q.   And so you could have somebody who had a

4   mix of substances that was 99 percent fentanyl and

5   1 percent prescription opioid at the time of death.

6   Right?

7               MR. ARBITBLIT:   Objection. .

8       Q.   I'm saying 99 and 1 percent as a fraction

9   of the drugs in their body.

10              MR. ARBITBLIT:   Objection.

11      A.   That's a hypothetical.   I haven't seen data

12  from the Hunt -- Cabell/Huntington community that

13  would list the percentages of each drug that were

14  --

15      Q.   I'll agree.   Maybe I'll ask it a different

16  way that may be better.

17              So you could have a circumstance where

18  the medical examiner identifies fentanyl and

19  prescription opioid as contributing causes of

20  death, right?

21      A.   That's correct.

22      Q.   And the medical examiner doesn't list which

23  one is primary or which one is secondary, right?

24              MR. ARBITBLIT:   Objection.

Page 187

1     A.   Yeah, in that example, it -- if the

2   fentanyl was in a prescription pill, then both were

3   necessary for the death.

4     Q.   Well, I was just asking about fentanyl --

5   let's talk about illicit fentanyl, illegal

6   fentanyl.  And --

7              MR. ARBITBLIT:  Sorry.

8     Q.   -- after 2015 or so, you're aware that

9   there has been a significant spike in illegal

10  fentanyl use in Cabell/Huntington?

11    A.   Yes.

12    Q.   And so let's -- I just wanted -- it is

13  hypothetical, but to help illustrate what we're

14  talking about, you could have a death certificate

15  that lists fentanyl and heroin as causes of death

16  in the -- without the medical examiner deciding

17  which was primary and which was secondary.

18  Correct?

19              MR. ARBITBLIT:  Objection.

20    A.   Based on the T codes, you know, I think the

21  T codes are all just listed as contributing causes.

22  The idea is that they interact with each other, so

23  that each one was necessary for the death to occur.

24    Q.   And --

Page 190

1   taken together.  So again, I would say that the

2   person would not have taken fentanyl had the

3   prescription opioid not been there.

4           Do you know what I'm saying?  So I

5   would say when the prescription opioid is listed as

6   a cause of death, it's a reliable methodology to

7   consider it a cause of death.

8     Q.   Well, when you -- when you talk about

9   "cause" in this -- in this circumstance, you're not

10  talking about sole cause or the only cause.  You're

11  talking about one among potentially a number of

12  causes.  Correct?

13          MR. ARBITBLIT:  Objection.

14    A.   The definition of "cause" is a factor

15  without which the outcome would not have occurred.

16    Q.   So --

17    A.   So there could be multiple causes.

18    Q.   There could be multiple causes for a

19  certain event, correct?

20    A.   There can be multiple causes, but it's not

21  a cause unless the outcome would not have occurred

22  without it.

23    Q.   But the medical examiner doesn't decide

24  whether an outcome would have occurred without the

Page 318

1      A.   That's right.

2      Q.   And do you believe that's because of any

3  relevant time period in the Dowell paper?

4      A.   -- the paper --

5      Q.   Well, let me ask this -- if the Dowell

6  paper had the same statistics through 2018, would

7  you have stopped at 2015?

8      A.   Yeah.

9           MR. ARBITBLIT:   Objection.

10      Q.   You would have?

11      A.   I would have stopped at 2015.  That was the

12  relevant time period I was interested in.  The 2011

13  to 2015 time period.  Because that covers the

14  direct pre- and post-fentanyl introduction.  And so

15  that small window was the correct window to

16  estimate the factor of three.

17           If you went through 2018, you would get

18  a much bigger factor, but that wouldn't be relevant

19  to the multiplier that I was interested in.

20      Q.   It wouldn't be relevant?

21      A.   Correct.

22      Q.   Did you -- did you consider applying your

23  multiplier based on data through 2018?

24      A.   I considered it and rejected it as

Page 323

1       didn't do that.

2           Q.   And again, that's because you're assuming

3       there were not any changes in what was causing the

4       increased mortality over that period of time.

5       Correct?

6                   MR. ARBITBLIT:   Objection.

7           A.   I am assuming that the contribution of

8       synthetic opioids in terms of the percentage

9       increase in drug overdose death was similar after

10      2015 than pre-- 2013, essentially.

11          Q.   Have there been any changes since 2015 in

12      the ways in which illicit fentanyl is -- is sold on

13      the streets or the forms in which it appears?

14          A.   Can you give an example of that?

15          Q.   Sure.   An example would be -- you

16      testified, I think, earlier fentanyl being

17      available as an adulterant in heroin.   Are you

18      aware that there are also prescription -- sorry,

19      excuse me.

20                   -- that there are counterfeit

21      prescription pills made to resemble a prescription

22      opioid that are often laced with fentanyl and cause

23      death?

24          A.   I am aware that there are counterfeit

Page 324

1    prescription opioids and that some of them have

2    fentanyl in them.

3        Q.   And are you aware that people have

4    overdosed and died from pills like that?

5        A.   Yes, I have -- I'm aware that that occurs.

6        Q.   In forming your conservative estimate of

7    the OUD population in Cabell/Huntington, did you

8    investigate whether or not these types of

9    counterfeit pills were more -- more available after

10   2015 than they were in 2015?

11       A.   Again, that -- that wouldn't change my

12   estimate if they were more available versus less

13   available, as long as the pre/post fentanyl

14   introduction multiplier is -- is the accurate

15   multiplier, which is the one that I've used.

16              So because there are more fentanyl

17   deaths, what matters in terms of the validity of

18   the estimation, is the probability of death

19   per use.

20       Q.   And is carfentanil more potent than what

21   was generally referred to as synthetic fentanyl

22   when fentanyl first appeared?

23       A.   I would need to look at -- there are a

24   number of different synthetic opioids.  I was

Page 325

1  assuming kind of an average of them.

2      Q.   Okay.  Well, I've already asked whether you

3  know if carfentanil is -- is present and available

4  in 2015.  But my question more specifically was:

5  Do you know whether or not carfentanil is more

6  potent and therefore considered more dangerous than

7  other synthetic fentanyls?

8      A.   I would have to look at the range of all

9  synthetic fentanyls.  Carfentanil is very potent.

10  But you know, if you want to show me some data on

11  the potency of various synthetic opioids, I can

12  answer your question.  But just carfentanil

13  compared to a random synthetic opioid, I don't have

14  -- I can't -- that's not sufficiently specific to

15  answer your question.

16      Q.   Okay.  Can you open -- let me just make

17  sure I have the number correct.

18                  -- Exhibit 86?

19            KEYES DEPOSITION EXHIBIT NO. 86

20                ("Underlying Factors in Drug Overdose

21                Deaths" by Dowell, et al. dated

22                12-19-17 was marked for identification

23                purposes as Keyes Deposition Exhibit

24                No. 86.)

1    A.   Can you ask your question again?

2    Q.   Sure.  You had told me that the reason you

3  stuck with 2015 deaths per 100,000 even though you

4  knew that there were higher estimates for later

5  years and even though you fully understand that

6  using those higher estimates would reduce your OUD

7  population, that the reason for that is you wanted

8  to have a multiplier to capture the period of the

9  year before and after the change.

10          So my question was:  If there were

11  further changes in the availability, the potency,

12  the number of ways in which it appeared, the

13  transparency with which it appeared, if any or all

14  of those things changed subsequent to 2015, would

15  your multiplier really be picking up, as you put

16  it, the change?

17          MR. ARBITBLIT:  Objection, vague,

18  ambiguous, argumentative, compound, asked and

19  answered.

20    A.   No.  That's the short answer to your

21  question, is no.  The correct calculation would be

22  2011 to 2015 because the calculation is not

23  capturing -- the purpose of the calculation is not

24  to capture the change from one time to another;

Page 332

1   it's to estimate the change in the probability of

2   drug overdose death, given a change in the

3   underlying death rate.

4            And so the appropriate way to calculate

5   that using the methodology that is reliable in my

6   field would be to use a pre/post comparison in an

7   interrupted time series, which is what I did.

8            If there are further changes after

9   2015, it would be biased to include that as part of

10  my interrupted time series.

11           So the way you are describing the

12  methodology would be incorrect.  The way I'm

13  describing the methodology is correct under the

14  reliable methods of my field.

15       Q.   So let me just make sure I understand that.

16  If there were further changes in how dangerous

17  illicit fentanyl was as measured by the number of

18  deaths it caused per 100,000, that would not be

19  relevant to your estimate of the OUD population

20  based upon the number of deaths attributed to

21  fentanyl?

22           MR. ARBITBLIT:  Objection.

23       A.   I don't know how to describe this

24  methodology again.  Changes in --

Page 340

1      Q.   Doctor Keyes, did you perform your own

2   calculations in this matter?

3      A.   I worked with my research assistant.

4      Q.   Did you review the calculations that were

5   performed in this matter?

6      A.   I did.

7      Q.   Do you have a working understanding of how

8   the calculations were performed?

9      A.   No, to be honest with you, I don't.  If

10  there's a specific subtraction that -- in a

11  specific column of one specific Excel spreadsheet

12  -- I performed a lot of analyses to come up with

13  these estimates, and I would need to see what

14  specifically you're referring to.

15     Q.   Well, I'd be happy to provide it, I'm not

16  trying to do it by ambush.  I knew that there were

17  a lot of exhibits that had been -- had been sent

18  out.  I wasn't aware until today that this Excel

19  spreadsheet was not one of them.

20          If you'd like, I can e-mail the

21  spreadsheet.  But I'm asking you about what was

22  disclosed to us as your -- your backup Excel file,

23  with your calculations, and I just -- I have some

24  questions --

Page 342

1    that to you.  If you're going to complain about me

2    offering to do that, I won't send it to you and

3    I'll continue asking my questions.

4              MR. ARBITBLIT:  You can ask your

5    questions, but the witness is within her rights not

6    to be able to not answer them without seeing what

7    you're talking about.

8              MR. METZ:  Okay, you and I have a

9    different view about what experts can be asked

10   about.

11             MR. ARBITBLIT:  I didn't say you

12   couldn't ask.

13   BY MR. METZ:

14       Q.   Doctor Keyes, do you have a working

15   knowledge of the calculations that you produced for

16   your Figure 8, how they were put together?

17       A.   Yes.

18       Q.   Does that calculation at any point include

19   a -- the creation of a percentage that is the

20   percentage of deaths coded T40.4 as a share of

21   deaths coded T40.2, T40.3 and T40.4 combined.  Yes

22   or no.

23             MR. ARBITBLIT:  Objection.

24       A.   The Figure 8?

Page 343

1      Q.    Yes.

2      A.    So what we did for Figure 8 was T40.2,

3  T40.3 and a portion of T40.4.

4      Q.    Do you know how you arrived at the portion?

5      A.    Yes, I do.

6      Q.    How did you arrive at the portion?

7      A.    We estimated the pre-illicit fentanyl share

8  of prescription opioid overdose deaths that were

9  due to T40.4 and applied that share thereafter.   I

10  attributed those deaths to prescription opioids.

11      Q.    Okay.  In coming up with that share, are

12  deaths that are coded T40.4, are they exclusive of

13  -- that same death can't appear as T40.2 or T40.3,

14  can it?

15             MR. ARBITBLIT:  Objection.

16      A.    That's right.

17      Q.    Okay.  And so getting back to the question

18  I was trying to ask before, you've described the

19  default rule that you would use if T40.2 or T40.3

20  was present, you would code that death as one or

21  the other of those.

22             But my question was:  If they are not

23  present, you only have T40.1 and you only have

24  T40.4.  Did you have a default rule that you

Page 344

1    applied as to which way that death would be coded

2    the one time that it's coded?

3                MR. ARBITBLIT:  Objection.

4        A.   T40.4 is not in Figure 8.  That's what I'm

5    confused about.

6        Q.   Well --

7        A.   I mean, T40.1 is not in Figure 8.

8        Q.   Right.

9        A.   So if it's coded T40.1 and T40.4, it's

10   coded T40.4, so the same rule that's described in

11   the report was applied.

12       Q.   Okay.  And you have a Figure 16, correct?

13       A.   Do you want me to go to Figure 16?

14       Q.   I'm asking, do you know that you have a

15   Figure 16?

16       A.   I do know that I have a Figure 16.

17       Q.   Okay.  Does the calculation that produces

18   your Figure 16 include T40.1?

19       A.   Yes, Figure 16 does include T40.1.

20       Q.   Okay.  So just going back to my prior

21   answer -- my prior question:  For purposes of your

22   Figure 16, when you were deciding whether something

23   belonged in the bucket of T40.1 versus T40.4, if

24   both were present - which again, there is a

Page 345

1    circumstance in which there was heroin and fentanyl

2    both present - did you have a default rule that you

3    used in order to decide whether that death would be

4    coded as fentanyl versus coded as heroin?

5        A.   I would need to look at the spreadsheet to

6    know exactly what mathematical formula that we

7    applied.

8        Q.   Okay.  I don't believe that information is

9    available in the spreadsheet.  So my question is

10   simply:  As you sit here, you do not know whether a

11   death certificate that was coded as both heroin and

12   fentanyl, whether that - for purposes of your

13   analytics - was listed as a heroin death or a

14   fentanyl death?

15       A.   I believe I've been very transparent with

16   my methodology, so if a -- if a death has T40.1 and

17   T40.4, then the share of the T40.4 deaths that were

18   the pre-2013 deaths would be applied to that.  That

19   death could only be -- that death could be

20   considered directly or indirectly attributable to

21   prescription opioids based on a proportionate share

22   from the pre-2013 T40.4 deaths.

23            So it's -- I think the question is a

24   little bit too simplistic of which bucket did T40.1

Page 346

1    and T40.4 deaths go, because it was based on this

2    mathematical calculation.

3        Q.   Is that true, what you just told me, for

4    time periods prior to 2012?

5                MR. ARBITBLIT:   Objection.

6        A.   Prior to 20 -- prior to 2012, T40.4 deaths

7    were considered prescription opioid deaths.

8        Q.   And if it was a T40.1 and a T40.4 both

9    present, you would call that a T40.4 death, a

10   fentanyl death, rather than a heroin death.  Is

11   that fair?

12               MR. ARBITBLIT:   Objection.

13       A.   I didn't call anything a fentanyl death.  I

14   attributed that death to prescription opioids.

15       Q.   Well, but specifically for purposes of your

16   calculation, you attributed it as a T40.4; is that

17   right?

18               MR. ARBITBLIT:   Objection.

19       A.   I --

20               MR. ARBITBLIT:   Vague.

21       A.   I didn't do that.  I didn't attribute

22   anything to T40.4.  I attributed things to

23   prescription opioids or not prescription opioids.

24       Q.   Okay.  I'll move on.

Page 347

1               Now, you've described for purposes of

2    calculating your Figure 8 that that is the before

3    2013 share of overdose deaths that was attributable

4    to -- to -- to what you would understand to be

5    prescription fentanyl.  Is that a fair summation of

6    what Figure 8 represents?

7         A.   I considered T40.4 deaths to be

8    prescription opioid deaths prior to 2013.

9         Q.   Okay.  And sorry I wasn't clear.  So then

10   for 2013 forward, you've not just been able to take

11   the total that is coded T40.4 because you

12   understand some number of those are illicit

13   fentanyl deaths, they're not prescription fentanyl

14   deaths, right?

15        A.   That's right.

16        Q.   Sorry, I couldn't hear you.  Was that a

17   yes?

18        A.   Yes, that's right.  That's right.

19        Q.   And so you were starting to describe this

20   calculation that you perform in order to attribute

21   going forward some number of those -- that T40.4

22   category to -- to prescription opioids, and so my

23   questions are going to relate to that.  I want to

24   understand better the logic of the calculation.

Page 348

1      A.    Sure.

2      Q.    So when you calc -- first of all, is it

3  correct that in order to come up with the share

4  that you're attributing to prescription fentanyl,

5  your first step is to calculate a ratio of T40.4

6  deaths as a function of T40.2, T40.3 and T40.4

7  combined.

8      A.    That's right. .

9      Q.    And --

10     A.    Wait, I'm sorry, actually, I don't think

11  that's quite right.  I would have to look at the

12  spreadsheet.  I'm sorry.  I think that we did some

13  manipulation to the -- to account for deaths that

14  had T40.2 and T40.3 as well as T40.4, so I don't

15  think the way you've described it as exactly what

16  we did.

17     Q.    Okay.  If you'll accept -- well, let me

18  just ask it a different way.  However you would

19  more precisely phrase that, there is a step in your

20  calculation in which you come up with a percentage

21  that T40.4 represented as a function of some other

22  prescription opioids.  You may have made some

23  adjustment to it.

24             But isn't that correct, that that is

Page 349

1  one step in your calculation?

2       A.   Yes.

3       Q.   Is that correct?

4       A.   That's correct.

5       Q.   Okay.  And if it would help -- I think this

6  is described in text on page 33 of your report --

7       A.   Yeah, I was referring to that.

8       Q.   -- where you say -- right, "I estimated the

9  rate of synthetic opioid deaths from 1999 to 2012,

10 and applied that rate to synthetic opioids over

11 those deaths from 2013 and onwards as a estimate of

12 the number of synthetic" "deaths."  Correct?

13      A.   That's correct.

14      Q.   Okay.  So then when you -- and do you

15 recall -- do you recall what that rate was,

16 approximately?

17            MR. ARBITBLIT:  Objection.

18      A.   Not off the top of my head.

19      Q.   Okay.  Off the top of your head, do you

20 know whether in calculating that rate you took a

21 weighted average of the deaths?

22      A.   I considered doing a year-to-year average,

23 but the numbers were unreliable for on a

24 year-to-year basis, and so I summed the total

Page 350

1   period from 1999 to 2012 to get a more

2   statistically reliable estimate.

3       Q.   It's more statistically reliable to sum all

4   the deaths and then take the percentage, correct?

5              MR. ARBITBLIT:   Objection.

6       Q.   Maybe I misunderstood.  I just wanted to

7   make sure I understood correctly what you said you

8   did to get a more reliable estimate.

9       A.   Maybe you could be more clear what you mean

10  by a "weighted average."

11      Q.   Yeah, all I meant was to calculate what you

12  described in your -- the text of your report as a

13  rate, you took -- you formed that rate as a

14  function of all deaths from 1999 through 2012

15  rather than doing it, as you described, year by

16  year.  Is that fair?

17      A.   (Nodded affirmatively).

18      Q.   Okay.  And that approach is taking them all

19  together, as opposed to doing it year by year, I

20  think you just testified that's the more reliable

21  way to do that, correct?

22      A.   I did it both ways, and it didn't make a

23  difference in my final calculation, and I felt that

24  the overall period provided a more reliable

Page 351

1    estimate.

2        Q.   Yeah.   Would it surprise you to know that

3    in fact you did the opposite?

4        A.   I'm sorry, I -- I'm not understanding.

5        Q.   Okay.   Now, you then used this rate that

6    you calculated to estimate going forward the number

7    of deaths coded as T40.4 that are -- that continue

8    to be attributable to prescription opioids, in your

9    opinion.   Is that correct?

10       A.   As an estimate, yes.

11       Q.   Okay.   And you do that for the years 2013

12   through 2018; is that right?

13       A.   That's right.

14       Q.   And explain to me why -- or how is the rate

15   of -- at which prescription opioids -- the rate

16   that that made up of all -- sorry, back this up.

17            Explain to me how the percentage share

18   of prescription opioid deaths that was attributable

19   to prescription fentanyl prior to 2012, how that

20   statistic in any way predictive of the share of

21   T40.4 deaths, so synthetic only, that were the

22   result of prescription fentanyl.

23            Can you explain the logic of that to

24   me?

Page 352

1     A.   Sure.  Well, to back up, I did the

2   calculations several ways, including estimating

3   post-2013, using the same sort of denominator, if

4   you will, of all prescription opioid deaths that

5   were T40.4 and estimated that as a function of the

6   number that would potentially be attributable to

7   prescription opioids, and then estimated the total

8   number of T40.4 deaths - which is the number of

9   deaths that I was interested - how many of those

10   would be attributable to prescription opioids, and

11   the results were similar no matter how you applied

12   that estimate post-2013, but my interest was in the

13   fentanyl deaths, and so I applied the percentage to

14   the -- to the fentanyl deaths specifically, because

15   those are the deaths that I was interested in

16   identifying an estimate of the number that would be

17   due to prescriptions.

18     Q.   But how -- given the manner in which you

19   calculated the percentage, how was it informative

20   of the share of T40.4 deaths that are prescription

21   fentanyl versus illicit fentanyl?  Is it your

22   testimony that the ratio you calculated is somehow

23   informative of that question?  And if so, how?

24     A.   So as an example, if prior to 2013 there

Page 353

1    were 100 prescription opioid deaths and two of them
2    were prescription fentanyl deaths, if there were
3    100 fentanyl deaths after 2013, I would estimate
4    that two of those would be prescription fentanyl
5    deaths.
6        Q.   And if there were 400 fentanyl deaths, you
7    would -- you would estimate that eight were
8    prescription fentanyl, correct?
9        A.   I'm sorry?
10       Q.   Under that same logic you just described,
11   if there were 400 prescription fentanyl deaths, you
12   -- your logic would lead you to conclude to eight
13   were the result of prescription deaths.
14       A.   Using that calculation, that would be the
15   -- that would be the estimate.
16       Q.   Okay.  And if there were -- and if we
17   doubled the number of deaths again, solely within
18   the category of synthetic -- synthetic opioids, you
19   would continue to calculate that that ratio would
20   hold, no matter --
21       A.   Yes.
22       Q.   -- how many additional deaths there were --
23       A.   It stays the same.
24       Q.   -- a certain percentage will always be the

Page 354

1   result of prescription opioids versus illicit --

2   prescription fentanyl versus illicit fentanyl?

3       A.   It's a relatively moot point, because I did

4   it a number of different ways, and the results were

5   robust to the type of correction that you did.

6                But I applied the correction to the

7   T40.4 deaths overall.

8       Q.   What sensitivity tests did you perform on

9   this calculation?

10      A.   As I mentioned, I looked at the T40.4

11  deaths as a function of overall prescription opioid

12  deaths as well.

13      Q.   Are you relying on that calculation for the

14  robustness that you just testified to?

15      A.   I don't -- I guess I don't understand what

16  you mean by that.

17      Q.   Well, that calculation hasn't been

18  disclosed to us, so my question is:  Are you

19  relying on that for purposes of what you just

20  explained was your belief that this is a -- the

21  issue I'm describing -- discussing doesn't matter

22  because you got the same results no matter how you

23  did it so --

24      A.   So --

Page 355

1      Q.   -- are you relying on that other

2    calculation to support that statement?

3      A.   In the course of due diligence in

4    epidemiology, we routinely do a range of different

5    sensitivity analyses on the robustness of our

6    results.  That's just what we do in the course of

7    our calculations.

8            So I rely on the estimate that I

9    provided in the report, and I also - because I'm an

10   epidemiologist - I tested the robustness of it

11   using multiple different approaches.

12     Q.   And did you retain --

13     A.   So I --

14     Q.   And did you retain those robustness and

15   sensitivity analyses?

16     A.   We were -- I'm sure I did.

17     Q.   And have they been produced to the

18   defendants in this litigation?

19     A.   I was asked to produce the calculations

20   that went into the report.  I routinely do

21   sensitivity analyses on my estimates.  So no, I

22   have not produced the sensitivity analyses.

23     Q.   Okay.  Back to my original question:  How

24   is the rate at which T40.4 was present among T40.2,

Page 356

1    T40.3 and T40.4, how does that rate inform at all

2    the question of how much of T40.4 is then made up

3    of prescription fentanyl versus illicit fentanyl?

4                How is the one informative of the

5    other?

6         A.   I would answer it the same way as when you

7    previously asked it:  That that is the population

8    that we're interested in estimating this percentage

9    within, and that's routinely done in epidemiology.

10        Q.   Well, I understand that that's the question

11   you want to answer.  But why does that ratio

12   provide you that answer?

13               MR. ARBITBLIT:  Objection,

14   argumentative, asked and answered.

15        A.   I think I've explained it.  It's the T40 --

16   the T40.4 deaths, we wanted the share of those that

17   were due to prescription opioids.  We knew the

18   share of prescription opioid deaths that were due

19   to fentanyl in a prior period, and so applied that

20   share to the T40.4 deaths, which was the subgroup

21   that we were specifically interested in.

22        Q.   And -- but you understand that after 2013

23   that the subgroup of prescription fentanyl and

24   illicit fentanyl -- you understand that, correct?

Page 357

1      A.    I understand that T40.4 is synthetic opioid

2    death.

3      Q.    And that after 2013, it's inclusive of

4    illicit fentanyl as well as you assumed some

5    prescription fentanyl.  Correct?

6      A.    I would say synthetic opioids.  But yes,

7    it's going to be a mix of illicit and licit.

8      Q.    And it's your testimony, as a reasonable

9    epidemiologist, that you can look at the population

10   at which prescription fentanyl was present, among

11   other prescription opioids, and that will tell you

12   how much prescription fentanyl was present among

13   prescription fentanyl and illicit fentanyl.  That's

14   your testimony?

15     A.    That's one way to estimate that portion.  I

16   did it a number of different ways.  None of them

17   made a difference in terms of my opinion or

18   materially to the calculation, and I think it's

19   routine in epidemiology to, for example, apply an

20   estimate of risk to the subgroup at risk to try to

21   get an estimate of the total number.

22     Q.    Is it routine in epidemiology to have a

23   hypothesis in mind when using statistical analysis,

24   as to how one number might be determinative of some

Page 358

1    other number?  Is that routine?

2                   MR. ARBITBLIT:  Objection.

3        A.   I'm not understanding what the question

4    means.  To have a hypothesis -- what do you mean by

5    "a hypothesis"?

6        Q.   Do you ever use the term "hypothesis" in

7    connection with statistical analysis?

8        A.   I do.

9        Q.   And what do you use it to mean?

10       A.   I would hypothesize that prescription

11   opioid use causes heroin use, for example.  It's

12   usually -- a hypothesis is about a cause or a

13   causal connection.

14       Q.   And is it important to have a hypothesis

15   when interpreting statistical information?  To then

16   base further conclusions on.

17                  MR. ARBITBLIT:  Objection.

18       A.   I wouldn't make a blanket statement like

19   that.

20       Q.   Okay.  Would you agree or disagree with the

21   statement that "One must infer that a causal

22   relationship exists on the basis of an underlying

23   causal theory that explains the relationship

24   between two variables?"

Page 359

1          MR. ARBITBLIT:  Objection.

2     Q.   Would you agree with that as a blanket

3  statement?

4          MR. ARBITBLIT:  Objection.

5     A.   No, I wouldn't agree with that as a blanket

6  statement.

7     Q.   And certainly that's not consistent with

8  the principles you applied in performing this

9  calculation, right?

10         MR. ARBITBLIT:  Objection.

11    A.   I don't --

12         MR. ARBITBLIT:  Vague.

13    A.   It's not consistent or inconsistent.  I

14  don't see the relevance.

15    Q.   Back to your calculation that you used to

16  produce Figure 8 - and also, then, therefore Figure

17  16 - am I correct that you used West Virginia

18  statewide death totals as the basis for the

19  calculation that you performed?

20    A.   For the West Virginia rates, yes.

21    Q.   Well, and am I correct that you then

22  applied that West Virginia rate to -- within Cabell

23  and Huntington, but you didn't estimate a separate

24  Cabell and Huntington rate, correct?

Page 360

1        A.   For the death rates, we had data on Cabell

2    for a number of years.

3        Q.   Right.  I'm just asking you if you used it

4    for purposes of calculating the rate that you

5    attributed to prescription fentanyl.  Is that how

6    you performed the calculation?

7        A.   Can you just be specific about what rate

8    you mean?  Because there's a lot of rates in Figure

9    8.

10       Q.   The rates we've been talking about that are

11   discussed at page 33 of your report.  It's the rate

12   of prescription fentanyl and the share of other

13   prescription opioids.

14       A.   Yes.

15       Q.   Do you recall whether you calculated that

16   rate on the basis of West Virginia-specific data or

17   Cabell and -- Cabell County-specific data?

18       A.   I would need to look at the spreadsheet.

19       Q.   Okay.  Sticking with the West Virginia

20   piece of it, do you recall approximately how many

21   deaths you attributed to prescription -- to

22   prescription fentanyl in the last year for which

23   you were using actual data, not estimated data?  Do

24   you recall approximately how many deaths that was?

Page 361

1      A.    No.

2      Q.    Would you believe me if I told you that in

3   the West Virginia portion of your calculation, you

4   -- for 2012, you had 41 deaths?

5      A.    I really would need to see the -- the

6   spreadsheet.

7      Q.    That's fine.  You can treat this as a

8   hypothetical.  I am asking about your calculation,

9   but if you want to treat it as a hypothetical, be

10  my guest.  I'd like you to assume that for 2012,

11  you had 41 deaths in that category, and then you

12  begin projecting --

13     A.    Could you just slow down a minute?  Which

14  category?  The 20 -- 2012 -- I'm sorry, just go a

15  little bit slowly so I can keep up.

16     Q.    No problem.  2012, the deaths that had only

17  T40.4 as a contributing opioid.  Okay?  You with

18  me?  The death that you --

19     A.    So 2012 -- I'm assuming a hypothetical that

20  in 2012, there were 41 deaths with T40.4 --

21     Q.    Correct.

22     A.    -- only.  No other T codes.

23     Q.    Well, you've told us a little bit how

24  you've categorized things.  But that's the number

Page 362

1    represented in -- we'll call it hypothetically.

2    But that's in Column J, Row 36 of your

3    calculations, as deaths that had only T40.4 as a

4    contributing opioid, is how you describe it there.

5         A.   I find it very difficult to follow this

6    when I'm not allowed to see the spreadsheet.

7         Q.   You're more than allowed.  I offered to

8    provide it.  Your counsel complained about that

9    offer, and so I've not provided it.  If you'd like

10   me to provide it, I'd be willing to provide it

11   right now.  I suspect Mr. Arbitblit will just

12   complain again.

13              So you can have it one way or the

14   other, but you can't have it both ways.

15        A.   This is difficult to --

16        Q.   That's fine.  Why don't I continue my

17   question.  I would like for you to assume for 2012,

18   the deaths that you attributed to prescription

19   fentanyl --

20              MS. DO AMARAL:  I'm sorry, Counsel,

21   can we take a moment?  I don't see that

22   Mr. Arbitblit is still on --

23              MR. ARBITBLIT:  I'm still on.

24              MS. DO AMARAL:  We need to stop the

Page 363

1    deposition for a minute?  Can we take a few

2    minutes?

3              MR. ARBITBLIT:  No, no, no, no I'm

4    still on.

5              MS. DO AMARAL:  I'm sorry, Don, I

6    didn't see you:

7              MR. ARBITBLIT:  I am still on.

8        Q.   Okay, let me ask this again.  For the last

9    year for which you had actual data, you had 41

10   deaths in the category of T40.4 as the contributing

11   opioid, that's the prescription fentanyl.  Okay?

12       A.   I had actual data on all years.

13       Q.   Well, you don't for 2013 and 20-- I'm using

14   data in contrast to the years for which you

15   provided an estimate of the T40.4.  Do you

16   understand my meaning now?

17       A.   Sure.

18       Q.   Okay.  For the last year for which you only

19   used actual data, no estimated or projection, there

20   were 41 deaths in that category.  Do you recall

21   approximately how many deaths your estimate put in

22   that category for the year 2017?

23             MR. ARBITBLIT:  Objection.

24       A.   No.

Page 364

1      Q.   You do not recall?

2      A.   No.

3      Q.   If -- I'll ask you just to assume, as a

4  hypothetical - but for the record, this is in

5  Column J, Row 41 - it's 491 deaths.  So it's 450

6  more than in the last year for which you were using

7  data alone rather than a projection.

8           My question is --

9      A.   I don't know that that's accurate.

10     Q.   Well, I -- you can fight me on whether or

11 not it's accurate.  I'm staring it at in the face.

12 I'd be happy to show it to you.  But if you don't

13 believe me, take it as a hypothetical, and then

14 answer this question:

15           Do you have a theory that would explain

16 why prescription fentanyl went from killing 41

17 people in 2012 to killing 491 people five years

18 later?  Do you have a theory as to why that would

19 be the case?

20     A.   Prescription overdose deaths are --

21 overdose deaths are going up overall, so I would

22 need to look at the specific underlying data in

23 order to answer that question.

24     Q.   Do you know whether the availability of

Page 365

1    prescription fentanyl specifically increased or

2    decreased over that time period?

3         A.   It decreased slightly.

4         Q.   Okay.  Do you know whether the potency of

5    prescription fentanyl increased, decreased or

6    stayed the same over that time period?

7         A.   I don't know.

8         Q.   And at least under your calculation,

9    prescription fentanyl specifically was present in

10   ten times as many overdose deaths as a result of

11   your projection and --

12        A.   Again, I did the projections several

13   different ways.

14        Q.   And my question is:  If it's not because

15   there was more prescription fentanyl available and

16   if it's not because prescription fentanyl was more

17   potent all the sudden, is there a theory that would

18   explain why prescription fentanyl specifically was

19   now causing 12 times as many deaths as before per

20   year?

21        A.   I am not offering any opinions with respect

22   to that.  My only opinion is that the reliability

23   of my estimates was verified as much as I could.

24   And so this is the most reasonable and reliable

Page 366

1   approach that I could -- that I decided to use.

2        Q.   And some of those methods that you've just

3   described, validating the reliability of your

4   analysis, you performed additional statistical

5   calculations that lead you to that conclusion,

6   correct?

7        A.   Yes.  Routinely we perform many different

8   statistical calculations when we're estimating

9   trends like this.

10       Q.   Now, earlier today you made reference to a

11  study that you refer to as the Allen paper?  Do you

12  recall that?

13       A.   I do.

14       Q.   I just want to confirm.  Is the title of

15  that paper "Estimating the number of people who

16  inject drugs in a rural county in Appalachia?"

17       A.   Is it -- is it one of the exhibits?

18       Q.   It is not one of the exhibits.  Do you

19  recall that title?

20       A.   Yeah, I think that that's the title.

21       Q.   Okay.  Do you recall whether one of the

22  co-authors of the paper was a Michael Kilkenny,

23  who's affiliated or employed by the Cabell-

24  Huntington Health Department?