# EXHIBIT E

Page 1

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2
3
    * * * * * * * * * * * * * * * * * * * * * *
4
    THE CITY OF HUNTINGTON,
5
              Plaintiff,
6
    vs.                                    CIVIL ACTION
7                                          NO. 3:17-01362

    AMERISOURCEBERGEN DRUG
8   CORPORATION, et al.,
9             Defendants.
10  _____
11  CABELL COUNTY COMMISSION,
12            Plaintiff,
13  vs.                                    CIVIL ACTION
                                           NO. 3:17-01665
14  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
15
              Defendants.
16
    * * * * * * * * * * * * * * * * * * * * * *
17
18
19        Videotaped and videoconference deposition
    of THOMAS MCGUIRE taken by the Defendants under the
20  Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa
21  S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 9th day of September,
22  2020.
23
24

Page 116

1  the kind of model or idea that prescription opioids
2  can cause disease, and it's people who are ill with
3  opioid use disorder - either directly or indirectly
4  due to prescriptions - who are those that provide
5  -- who that create a risk to a child.
6              And so it's prescriptions, to disease,
7  to risk of maltreatment.  And you know, the various
8  factoring down that we've been discussing -- you
9  factor down because not all drugs are opioids; you
10 factor down because not all opioids are
11 prescription opioids, then --
12             But with that factoring down of the
13 number of children who are maltreated, you come up
14 with these numbers.  That's -- that's the basic
15 idea here.
16     Q.   You submitted an errata sheet on August
17 24th, 2020, correct?
18     A.   Yes, I did.
19     Q.   Do you have a copy of that errata sheet in
20 front of you?
21     A.   I can put one in front of me.
22     Q.   Please do so.
23     A.   Okay.
24     Q.   Do you have it in front of you?

Page 117

1    A.    I do, yes.
2    Q.    Okay.  And the errata sheet appears to have
3    two sections.  One section is titled "Harm
4    Valuation Changes."  Right?
5    A.    Yes.
6    Q.    And the other is titled "Typographical and
7    Citation Changes."  Right?
8    A.    That's correct.
9    Q.    Okay.  Is it accurate to say that all of
10   the harm valuation changes listed in this errata
11   sheet are the result of getting new numbers from
12   Professor Keyes?
13   A.    Well, I listed here the reason.  And in
14   every one of the cases in that Harm Valuation
15   Changes, it's due to an input change from Doctor
16   Keyes, Professor Keyes.
17   Q.    When did you get these input changes from
18   Professor Keyes?
19   A.    I think it was about a week later.  A week
20   after the submission of her original report.
21   Q.    Okay.  So roughly August 10th?
22   A.    Yeah.  I'm not sure exactly, but not long
23   after.
24   Q.    And what did you get on August 10th?  Did

Page 118

1  you get a revised report that had new numbers?
2       A.   No.  I got a revised set of in -- what I
3  would call the input numbers.  In the form -- it
4  comes in an Excel spreadsheet.
5       Q.   Okay.  And who supplied that Excel
6  spreadsheet with the new numbers that were input
7  changes from Professor Keyes?
8       A.   Someone that works with Professor Keyes.
9       Q.   Okay.  And prior to receiving that
10 spreadsheet, had you received a heads-up that
11 Professor Keyes was revising the numbers in her
12 report?
13      A.   I don't think so.  But -- no, I didn't
14 receive a heads-up.
15      Q.   Prior to receiving the spreadsheet, were
16 you aware that the numbers in Professor Keyes'
17 original report were inaccurate?
18      A.   No, I was not.
19      Q.   When you got the spreadsheet, what did you
20 do with it?
21      A.   What my staff did with it was to substitute
22 the previous input numbers that we'd been using
23 from Professor Keyes that, you know, flow through
24 the report.  And I think you can see with all the

Page 119

1  changes that are necessary from the change in
2  Professor Keyes' numbers that, you know, the inputs
3  change, and then there's a series of Excel files
4  that produce tables and figures that themselves
5  changed.
6        So thankfully, to the magic of Excel,
7  you know, one is able to do something like that
8  relatively quickly.
9     Q.  So did -- did someone on your team input
10 the updated corrected figures from Professor Keyes
11 into your -- your report?
12    A.  That -- I mean, that's -- it sounds a
13 little bit more by hand than it actually was.  But
14 yes.  The inputs came from Professor Keyes, and
15 then they were fed into the Excel spreadsheets that
16 produced the tables in my report.
17    Q.  When you got the spreadsheet from Professor
18 Keyes with the updated corrected numbers, did you
19 follow up with Professor Keyes to understand what
20 led to those changes or corrections?
21    A.  I asked my staff about this.  I didn't talk
22 to Professor Keyes directly.
23    Q.  Who on your staff did you ask?
24    A.  Adrian Garcia.

Page 120

1   Q.   And what did Adrian tell you?
2   A.   Well, there was two kind of groups of -- if
3   I can call them corrections, to Professor Keyes'
4   report, one having to do with morbidity, and
5   there -- there was a year - a single year, 2010 -
6   where something was .053 and it should have been
7   .043.  I can't remember exactly what the entry
8   refers to.
9            But that, I understood to have been a
10  typo.  That someone on her end had entered in the
11  wrong number.
12           Then the other source of corrections
13  had to do with mortality, and it had to do with a
14  subset of the years of mortality from 2013 to 2018.
15  And my understanding of what happened there is that
16  on Professor Keyes' end, there was an inadvertent
17  inclusion of a table that wasn't -- or a figure
18  that wasn't the final figure, so it --
19           That -- it's kind of a mistake, but I
20  don't know beyond -- that's my understanding of
21  what -- that's what Adrian explained to me.
22  Q.   Okay.  So what you've offered is what you
23  heard from Adrian, not what you heard from
24  Professor Keyes.

1  A.   That's correct.
2  Q.   And there were two groups of corrections:
3  The first one involved morbidity and the second one
4  involved mortality?
5  A.   That's correct.
6  Q.   And for the second category, mortality, you
7  said there was an inadvertent inclusion of a
8  nonfinal figure in Professor Keyes' calculations
9  for Years 2013 through 20118?
10 A.   Some -- yeah, something like that.
11 Q.   And who -- who identified the error?
12      MR. PENDELL:  Objection to form.
13 A.   I'm not sure.
14 Q.   Who on Professor Keyes' team corrected it?
15      MR. PENDELL:  Objection to form.
16 A.   I'm also not sure about that.
17 Q.   Okay.  And then after Adrian Garcia told
18 you of these errors, did you give Adrian
19 instructions on how to revise and update and
20 correct your report?
21 A.   Yes.
22 Q.   And how long did it take for Adrian to
23 update your report based on the corrected figures
24 from Professor Keyes?