# EXHIBIT D

Ex. D - Plaintiffs' Expert Witness K. Keyes Transcript of Deposition (October 30, 2020) - SEALED

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY OF KATHERINE KEYES

2060370.1

```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2

 3      *******************************************************

        THE CITY OF HUNTINGTON,
 4

                   Plaintiff,
 5

        v.                          CIVIL ACTION NO. 3:17-01362
 6

        AMERISOURCEBERGEN DRUG
 7      CORPORATION, et al,

 8                 Defendants.

 9

10      CABELL COUNTY COMMISSION,

11                 Plaintiff,

12      vs.

13
        AMERISOURCEBERGEN DRUG
14      CORPORATION, et al,

15                 Defendants.

16      *******************************************************

17

18          Videotaped and videoconference deposition of
19      KATHERINE KEYES, taken by the Defendants pursuant to the
20      West Virginia Federal Rules of Civil Procedure, in the
21      above-entitled action, pursuant to notice, conducted
22      virtually via Zoom, before Twyla Donathan, Registered
23      Professional Reporter and Notary Public, on the 30th day
24      of October, 2020.
```

Page 74

1  A  I do.

2  Q  As we talked about, this was the version of
3  your calculation that essentially existed as of your
4  first deposition, the calculation that supports the
5  figures in your first errata. I'm not trying to go
6  back over that. I'm just trying to make sure we're
7  properly oriented.

8     Do you see in Column S there is a notation
9  that states that for 2009, deaths have been set to 5,
10 as this is the mid point in the range of possible
11 suppression values. Do you see that?

12 A  I do.

13 Q  And what does that mean?

14 A  In the CDC WONDER data, numbers below five
15 are suppressed. They're not provided, because it
16 could be identifiable. So sometimes when a number is
17 below five, we don't know what the number is -- I'm
18 sorry, when the number is below ten it's suppressed.

19 Q  When the number is below ten?

20 A  Yes.

21 Q  And so if we -- just to see an example of
22 this, if you were to look at Column D for the year
23 2009, which is what your note references, you have an
24 "NA" listed there. What does the NA represent to

1  you?
2      A   I believe that is values that were
3  suppressed.
4      Q   "NA" means not available or something along
5  those lines?
6      A   Right.
7      Q   And so -- And so even though you don't have
8  a value for 2009 Cabell County, Column D, which is
9  the total deaths involving T40.2, T40.3 or T40.4, and
10 even though you don't have a value for Column G in
11 2009, which is the share that excludes -- that is
12 only T40.2 and T40.3, and even though you don't have
13 a value in Column J, which is the residual that's
14 T40.4 that doesn't involve the other two, despite
15 that, you include under Column A five deaths
16 attributable to prescription opioids, right?
17     A   It's not that we don't have a value, we
18 just know that the value is between zero and nine.
19 So a reasonable approximation is to use the midpoint.
20     Q   Sure.  I'm not quibbling right now with the
21 reasonableness of what you did.  I'm just trying to
22 understand it.  So you say it's not that you don't
23 have a value, it's just that you don't know if the
24 value is between zero and nine.  That means the value

Page 100

1   picked to estimate, by virtue of just sticking the
2   number five into Column E, you come up with two
3   estimates for Column F that are both larger than any
4   single year between 1999 and 2012 where you had
5   actual data, right?
6        A    And there are other years where the
7   estimate is zero.  Sometimes it's higher, then
8   sometimes it's smaller than the average.  That's kind
9   of how math works.
10       Q    And so as you talked about before, if you
11  had stuck to calculating the average based on those
12  years for which you can actually count a number of
13  deaths in the -- from the CDC WONDER database, you
14  would have had 25 deaths that you could count over 14
15  years, correct?
16            MR. ARBITBLIT:  Objection.
17  BY MR. METZ:
18       Q    That's what's reflected in --
19       A    No.
20       Q    That's what's reflected in Column J of
21  Exhibit 10, right?
22            MR. ARBITBLIT:  Objection.
23       A    No.  That's not right.
24       Q    Are you able to count up more than 25

Page 105

1    A    Yes.  In the other year it was three, which
2    is the average of all years.  Some years it's going
3    to be lower, some years it's going to be higher.
4    That's why you use the average.
5    Q    Well, just to be clear, it's the average of
6    all years when you add in the 17 combined that you
7    include for 2001 and 2003, right?
8    A    It's also the average if you use the eight
9    years for which you had data, which there were data
10   available.  It wasn't suppressed.
11   Q    And despite two of the three most recent
12   actual years being zero, you -- under the method
13   you're now using, you add three additional
14   prescription fentanyl deaths for 2013 by assumption,
15   correct?
16   A    I disagree with the premise of the
17   question.  I added three additional prescription
18   fentanyl deaths, not despite there being two years in
19   which it wasn't three, but because the average for
20   all years was three.
21   Q    I might need to go back over what we just
22   went over, to explain how you got to that average.
23        But you're adding three in 2013
24   notwithstanding that in 2012 and in another recent

Page 106

1  year before 2012, the number was zero, right?
2              MR. ARBITBLIT:  Objection.
3      A    I'm adding three because that was the
4  average for all years.
5      Q    And for 2014, you add three more deaths in
6  those categories of prescription opioids overdoses
7  that are attributable to synthetic opioids and not
8  other prescription opioids, right?
9      A    2014, I add three deaths attributable to
10 prescription opioids that did not have a code of
11 T40.2 or T40.3.
12     Q    And you did the same thing for 2015.  You
13 added three more there by assumption, correct?
14     A    That's right.
15     Q    And then you did the same thing for 2016,
16 you added three more deaths in there by assumption as
17 well, correct?
18              MR. ARBITBLIT:  Objection.  Objection.
19     A    Yes.
20     Q    And then for 2017 you added three more
21 deaths by assumption as well, correct?
22     A    I'm sorry, it's not by assumption.  It's
23 because that's the method that I use to estimate
24 the -- it's not an assumption, it's an estimate.

Page 110

1  submissions provided, you wouldn't find those
2  citations there either, would you?
3       A    Citations for?
4       Q    Well, I'll put it this way.  You wouldn't
5  find a discussion of that methodology of attributing
6  the mean point number and the reliability of doing
7  so, you wouldn't find anywhere an explanation that
8  that's a reliable methodology?
9       A    I didn't include a section in the report on
10 replacing suppressed values with a mean value, but
11 it's a commonly used imputation method for like the
12 last hundred years of epidemiology.
13      Q    So, for example, when you set out to
14 prepare your second errata in which you changed the
15 methodology that was disclosed in your report to a
16 different methodology, you didn't take the moment
17 then to write out what you were doing differently or
18 why, you just gave it the final numbers, right?
19           MR. ARBITBLIT:  Objection.
20      A    That's right.
21      Q    Now, in your second errata you also changed
22 some language from your report that referenced the
23 testimony of a Dr. Davies.  Do you recall in that?
24           I didn't hear your answer.

Page 127

1     Q    And what is the fourth quarter?
2     A    119.
3     Q    And if you were to do quick math on that,
4  how many new incident cases would that data support
5  having been diagnosed at either Cabell Huntington
6  Hospital or a Marshall Health clinic?
7     A    About 500.
8     Q    I get 464, but we can call that around 500.
9          Do you consider that to be remarkably close
10 to the 4,000 additional cases that would be needed to
11 validate your estimate of the change in population
12 from 2012 to 2013?
13    A    Well, if you add up 2011 to 2013, it's
14 remarkably close to the 2011 to 2013 change in my
15 report.  There is a dip in 2012 that reflects noise
16 in the data.  So I think if you took a two-year time
17 span, it would be remarkably close.  If you
18 cherry-pick one year where there is noise in the
19 data, it's less close.
20         But, I mean, the trends are completely map
21 on exactly to what I'm showing in the Exhibit 14.
22              MR. ARBITBLIT:  Can we get a time
23 check, please?
24              MR. METZ:  I've got ten minutes.