# Exhibit A

Page 1

1       IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2
3
     * * * * * * * * * * * * * * * * * * * * * *
4
     THE CITY OF HUNTINGTON,
5
              Plaintiff,
6
     vs.                              CIVIL ACTION
7                                     NO. 3:17-01362

     AMERISOURCEBERGEN DRUG
8    CORPORATION, et al.,
9             Defendants.
10   _____
11   CABELL COUNTY COMMISSION,
12            Plaintiff,
13   vs.                              CIVIL ACTION
                                      NO. 3:17-01665
14   AMERISOURCEBERGEN DRUG
     CORPORATION, et al.,
15
              Defendants.
16
     * * * * * * * * * * * * * * * * * * * * * *
17
18
19        Videotaped and Zoom video conference
     deposition of JAMES RAFALSKI taken by the Defendants
20   under the Federal Rules of Civil Procedure in the
     above-entitled action, pursuant to notice, before
21   Jennifer Vail-Kirkbride, a Registered Merit
     Reporter, on the 11th day of September, 2020.
22
23
24

Page 102

1  say they should have reported them.  That's -- I
2  mean, that's outside of what occurred here.
3      Q.  Okay.  So these tens of millions of orders,
4  can you give me any definition as to whether any of
5  them, and if so how many, should have been reported
6  to the DEA as suspicious?
7      A.  I -- I didn't do that kind of
8  evaluations.  No, I can't give you a number, sir.
9      Q.  So you don't have an opinion that any of
10 these orders individually should have been reported
11 to the DEA as suspicious; correct?
12     A.  I didn't consider that as -- that's not
13 something I considered in doing this
14 evaluation.  Certainly there are orders contained in
15 there that should have been reported to the
16 DEA.  The due diligence assumption based on the
17 defendant failures renders, you know, the ability to
18 look at specific orders to report it to the DEA just
19 doesn't make that feasible.
20     Q.  How many of these tens of millions of
21 orders should have been reported to the DEA as
22 suspicious?
23     A.  I don't have a number, sir.
24     Q.  More than a million?

Page 103

1    A.    I don't have a number.
2    Q.    More than 1,000?
3    A.    I don't have a number, sir.
4    Q.    More than one or two?
5    A.    I don't have a number.
6    Q.    Okay.  And you can't answer any of those
7  questions with any specificity whether it should
8  have been more than a million, more than one or two,
9  more than 1,000; correct?
10   A.    That wasn't the purpose of applying the
11 algorithm to the data was to identify orders that
12 should have been reported to the DEA; no, sir.
13   Q.    So correct?
14   A.    That's correct.
15   Q.    Okay.  How many of these orders should have
16 been blocked?
17   A.    The first one.
18   Q.    Okay.
19   A.    And the other ones -- and the other ones
20 should -- it's an open question or broad
21 question.  The first one and none of the other ones
22 should have been shipped until the suspicion was
23 eliminated on the first order.
24   Q.    Okay.  Well you don't know how many of

Page 104

1  these orders were actually evaluated and the
2  suspicion was eliminated on the first order;
3  correct?
4      A.  Well, I draw my assumption on the due
5  diligence that none of them based on the conduct of
6  the companies in regards to how they evaluated their
7  own suspicious orders and I didn't see -- I saw very
8  limited to know due diligence on their own
9  suspicious orders, so I wouldn't have a high
10 expectation that there would have been due diligence
11 on any of these that were identified by the flag.
12     Q.  Okay.  And I want to get away from
13 assumptions and expectations because I don't think
14 that's proper for expert witnesses.  I want to focus
15 on what you know and what you've done.  Am I correct
16 that in method -- well, do you know -- sticking with
17 Method A, do you know how many of those orders are
18 the first flagged orders and how many are the ones
19 that you just bring along for the ride because of
20 the assumption that there was no diligence to
21 justify later orders for that customer; do you know?
22     A.  The first one is the flagged order.
23     Q.  Do you know how many of the first ones
24 there are, as opposed to the later ones, that are

Page 382

1  A.  Uhm, yes, that -- that ruling confirmed the
2  DEA position on that matter; yes, sir.
3  Q.  And aren't you aware that Judge Polster
4  entered a summary judgment order that determined
5  that the shipping requirement has always been part
6  of the Controlled Substances Act?
7  A.  Yes, sir.
8           MR. SCHMIDT:  Objection.
9  Mischaracterization and to leading your own witness.
10 Paul Schmidt, McKesson.
11 A.  Yes, sir.
12 Q.  Now, if you turn to page 8 and 9 of your
13 report, I think it lays out ten of your opinions in
14 this case.  Is that correct?
15 A.  Yes, sir.
16 Q.  And those are still your opinions as we sit
17 here today; is that right?
18 A.  Yes, sir.
19 Q.  And those opinions include that the
20 defendants each failed to maintain adequate controls
21 to prevent diversion?
22 A.  Yes, sir.
23 Q.  Or effective controls, I'm sorry, to
24 prevent diversion?

Page 383

1  A. Yes, maintain -- maintain "of effective
2  controls against diversion of particular controlled
3  substances;" yes, sir.
4  Q. And then they also failed to construct and
5  operate an appropriate suspicious order monitoring
6  system; is that right?
7  A. Yes, sir.
8  Q. And that they each shipped orders that
9  would be determined to be suspicious; is that
10 correct?
11 A. Yes, sir.
12 Q. Now, let's talk about what your opinion is
13 and has been related to obligations under the
14 CSA. If an order is determined to be suspicious,
15 it's your opinion that it should be halted; correct?
16 A. Yes, sir.
17 Q. And that it also should be reported to the
18 DEA; is that right?
19 A. Yes, sir.
20 Q. Now, each registrant has the ability to
21 conduct due diligence on any particular order; is
22 that fair?
23 A. That's a correct statement. I agree with
24 that.

Page 384

1  Q. And then the due diligence can clear up any
2  suspicion; is that true?
3  A. Yes, sir, that's a --
4        MR. SCHMIDT: Can I just have a
5  running objection? This is Paul Schmidt. Could I
6  just have a running objection to all of the leading
7  of your witness so I don't have to keep --
8        MR. FULLER: Absolutely, sure. Sure,
9  no problem.
10       MR. SCHMIDT: Thank you.
11  Q. Additionally, the -- I think it was mainly
12  Mr. Schmidt questioned you about this position that
13  you had Mr. McCann run where once an order is
14  triggered, all future orders are triggered because
15  of the lack of due diligence. I think you
16  referenced it in your report, but can you tell me
17  has the DEA taken a position, to your knowledge, on
18  that same compliance requirement?
19  A. I think they have. I recall the testimony
20  of Mr. Prevoznik in his deposition where he takes
21  that position that once an order is identified as
22  suspicious, that it should be held and shipping
23  should be terminated until the diversion is
24  dispelled, or ruled out.

Page 385

1  Q. The suspicion is dispelled; correct?

2  A. Yeah, I'm sorry. The suspicion is

3  dispelled or ruled out. Sorry.

4  Q. And I believe in your report you also cite

5  the two documents produced by the defendants, one by

6  McKesson and one by Cardinal, that support the same

7  premise; is that true?

8  A. I believe so, yes, sir.

9      MR. SCHMIDT: Object to the

10 mischaracterization.

11 Q. And then some of the counsel asked you

12 about things in your report outside of West

13 Virginia. Each of the defendants here operate a

14 nationally based system, meaning that their system

15 was just as applicable to West Virginia as any other

16 state in the country; correct?

17 A. Uhm, through my review of records, that's

18 what I have determined so far; yes, sir.

19 Q. And, therefore, failures elsewhere may show

20 systemic failures that are applicable to West

21 Virginia; is that right?

22 A. Yes, sir.

23 Q. And the example that you provided, and I

24 think Ms. Salgado provided Ross and I forget the

Page 386

1 last name of it, the pharmacy that's cited, that
2 would be another example of the failure of the
3 system; is that correct?
4     A.  Yes, sir.
5             MS. SALGADO:  Objection to form.  This
6 is Suzanne.
7     Q.  And the reason you cite that is because
8 there was an email that premised the fact that
9 Cardinal was told that they didn't have a suspicious
10 order monitoring system to block suspicious orders
11 to customers such as the Ross pharmacy, and then
12 they indicated they weren't shipping controlled,
13 however the ARCOS data indicated that during the
14 same time frame they were; is that right?
15     A.  Yes, sir.
16             MS. SALGADO:  Suzanne, objection to
17 form.  Leading.
18             MR. FULLER:  And, Suzanne, I'll give
19 you the same standing objection.
20             MS. SALGADO:  Thank you.
21     Q.  Let's talk about the due diligence.  You
22 had the opportunity to review due diligence at
23 multiple levels, and by that I mean you reviewed due
24 diligence files in CT1; is that correct?

Page 387

1    A.   Yes, sir.
2    Q.   You reviewed due diligence files in the New
3 York litigation; is that correct?
4    A.   Yes, sir.
5    Q.   You reviewed due diligence files in CT2; is
6 that correct?
7    A.   Yes, sir.
8    Q.   And what have you noticed about all the due
9 diligence files in different areas of the country
10 that you've had the opportunity to review?
11   A.   Uhm, a pretty -- a consistent, systematic
12 failure.
13   Q.   And is that --
14        MR. SCHMIDT:  Note for the record if I
15 can just to support the leading objection, we're
16 going to assert that there's a stunning difference
17 in the terseness of Mr. Rafalski's answers now
18 versus the speech refinement that was occurring
19 earlier.
20        MR. FULLER:  Fair enough.
21   Q.   Go ahead, Mr. Rafalski.
22   A.   In reviewing those records, I -- throughout
23 all of the three areas of review, I saw the
24 application would be consistent with the policies

Page 388

1  that they had nationwide, corporate policies, and I
2  saw the same systemic failures in the totality of
3  the system, not just the -- the due diligence
4  suspicious orders, the onboarding of customers, the
5  setting of thresholds, all of the things that would
6  be covered under the means of effective controls.
7     Q.  And that opinion relating to due diligence
8  files was supported by the E&C report that you were
9  provided and reviewed; correct?
10    A.  Yes, sir.
11    Q.  There -- there's been a lot of talk on the
12 five methodologies and whether those were exact
13 duplicates of what the defendants ran.  Would you be
14 happy to ask Mr. McCann to run the exact
15 methodologies the defendants ran if they agreed to
16 produce the code which they ran those with?
17    A.  Sure, I have no opposition to that.
18    Q.  And could you have created more
19 methodologies or pulled more methodologies to have
20 ran by Doctor McCann?
21    A.  Yes.
22    Q.  I think you've already explained why you
23 selected the ones did you, and it's your
24 understanding why you didn't mimic them.  You've

Page 391

1  A. Uhm, if you mean the same process of --
2  Q. Yes.
3  A. Yes, sir. Of asking for analysis and
4  getting how the analysis should be conducted or how
5  to run the analysis or the -- sometimes the
6  algorithm; yes, that's correct.
7  Q. Now, the next line of questioning, and I
8  don't know that I have this chronologically right,
9  but it dealt with the quota issue, and the West
10 Virginia report critical of the DEA related to
11 quotas. That -- whether the quotas go up or down or
12 change at all doesn't change the obligation of the
13 three defendants in this case, does it?
14 A. That's a correct -- correct statement, sir.
15 Q. And the main effect of effective controls
16 was no matter if the quotas go up or down, still
17 remains the same?
18 A. Yes, sir.
19 Q. Now your use of the methodology, you have
20 Mr. McCann as we talked about run this approach with
21 the assumption of a lacking of due diligence and
22 that's because that's based on the totality of your
23 review, that's what you found; is that fair?
24 A. That's a correct statement; yes, sir.

Page 392

1  Q. And what that would show is then that would
2  identify orders that should not have been shipped in
3  your opinion; is that correct?
4  A. Yes, sir.
5  Q. Unless the suspicion was dispelled; is that
6  true?
7  A. Yes, sir.
8  Q. Now, we've seen varying degrees of
9  suspicious orders actually provided by the
10 defendant.  Did you have an opportunity to actually
11 look at their suspicious orders?
12 A. I did.
13 Q. And what did you see in the due diligence
14 related to the actual -- actual suspicious orders
15 that they identified and reported?
16 A. Uhm, I saw a lack of due diligence.  In
17 many instances, I failed to see that the orders were
18 even acknowledged by the registrants in the due
19 diligence records I reviewed.
20 Q. And using the methodology that -- excuse
21 me, using the hypothetical that Mr. Schmidt walked
22 you through related to a cancer center or pharmacy
23 shutting down, that would be stuff that you would
24 expect to be documented in the centralized due

Page 393

1  diligence file; is that correct?
2      A.  Yes, sir.  Well, a little more than
3  documented.  I guess when you say, "documented," I
4  would expect to be documented, but -- and especially
5  based on the Masters ruling, it's a little more than
6  just documented to say that it occurs.  There's some
7  expectation that there'd be a confirmation of those
8  things actually occurring versus just taking the
9  registrant's word for it.
10     Q.  The methodologies, the way you've had them
11  utilized, they identify triggering events and,
12  again, I want to make it clear for the record, you
13  didn't dig down and look at every triggering event
14  in the hundreds of thousands of lines of data that
15  were provided by the defendants and via the ARCOS
16  data; correct?
17     A.  That's correct, sir.
18     Q.  So you can't identify or you didn't go
19  through the line-by-line transactions to identify
20  the suspicious orders, but your methodology was to
21  set out triggers and then with the assumption,
22  identify suspicious orders that should have been
23  reported; correct?
24     A.  Uhm, yes, sir.

1    Q.  And that should not have been shipped into
2  Cabell and Huntington; right?
3    A.  If it's identified as suspicion, a
4  suspicious order, it should not have been shipped,
5  that's a correct statement, sir.
6    Q.  And if the suspicion wasn't dispelled by
7  any of the defendants through due diligence, it also
8  shouldn't have been shipped - at least that same
9  drug family - to any future orders to the same base
10  code; is that right?
11    A.  I agree with that statement; yes, sir.
12    Q.  And that it's your opinion that based upon
13  the totality of what you've been able to review and
14  been provided, that those orders identified in those
15  methodologies, the Masters methodology, were all --
16  were likely than not diverted; is that correct?
17    A.  Yeah, I believe I stated that numerous
18  times; yes, sir.
19    Q.  And that's because the complete lacking of
20  due diligence that you've seen across the board; is
21  that fair?
22    A.  Yes, sir.
23    Q.  Had the defendants conducted adequate due
24  diligence, would you be willing to look at that?

Page 395

1      A.  I would.
2      Q.  You re -- reviewed defendants' experts
3   reports; is that right?
4      A.  Yes, I did.
5      Q.  Do you see anywhere where they pointed to
6   specific sufficient due diligence for any of the
7   customers in Cabell or Huntington?
8      A.  I have not.
9      Q.  There's one thing I want to clear up, too,
10  earlier.  When you and Mr. Schmidt were going back
11  and forth about the methodologies and how they
12  worked, I think you indicated for each defendant
13  there may be one triggering order.  It would
14  actually be one triggering order for each of their
15  customers; is that right?
16     A.  Yes, sir.
17            MR. SCHMIDT:  Objection.
18  Leading.  And I'm just going to note for the record
19  that directly changing the witness's testimony
20  through a leading question is improper.
21     Q.  I think there was also some questions about
22  the code that Mr. McCann did.  When you use the term
23  "code" what does that mean, Mr. Rafalski?
24     A.  It's a -- it's an algorithm.  It's a series