# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br>      Plaintiff,<br><br>                v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*<br>      Defendants | Civil Action No. 3:17-01362 |
| CABELL COUNTY COMMISSION,<br>      Plaintiff,<br><br>                v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, *et al.*<br>      Defendants | |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM DR. MICHAEL SIEGEL

November 13, 2020

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................................ II

INTRODUCTION ............................................................................................................................. 1

LEGAL STANDARD ........................................................................................................................ 2

ARGUMENT .................................................................................................................................... 2

    I.    DR. SIEGEL IS QUALIFIED TO OPINE AS TO OVERSUPPLY OF OPIOIDS IN THE CITY OF HUNTINGTON AND CABELL COUNTY AND PUBLIC HEALTH RESPONSIBILITY OF DISTRIBUTORS ........................................................................................................ 2

    II.    DR. SIEGEL'S OPINIONS AS TO OVERSUPPLY ARE RELIABLE ................................... 6

        A.    The Concept of "Oversupply" Is Neither Novel nor Unreliable ................. 6

        B.    The Methodologies Dr. Siegel Used in His Calculations Are Reliable ........................................................................................................ 7

    III.    DR. SIEGEL SHOULD BE PERMITTED TO OPINE THAT DISTRIBUTORS HAVE A PUBLIC HEALTH RESPONSIBILITY TO PREVENT OVERSUPPLY ........................................... 13

CONCLUSION ............................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

Cases

Page(s)

Cases

*AVX Corp. v. United States*,
  518 F. App'x 130 (4th Cir. 2013) .................................................................................. 2, 3, 5, 6
*Belk, Inc. v. Meyer Corp., U.S.*,
  679 F.3d 146 (4th Cir.2012) ..................................................................................................... 3
*Belville v. Ford Motor Co.*,
  919 F.3d 224 (4th Cir. 2019) .................................................................................................... 8
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ............................................................................................................. 7, 9
*Grant Thornton LLP v. Fed. Deposit Ins. Corp.*,
  2007 WL 4591412 .................................................................................................... 10, 12, 15
*Holbrook v. Lykes Bros. S.S. Co.*,
  80 F.3d 777 (3d Cir. 1996) .................................................................................................. 3, 4
*In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,
  345 F. Supp. 3d 897 (S.D. Ohio 2015) ................................................................................... 14
*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*,
  174 F. Supp. 3d 911 (D.S.C. 2016) .......................................................................................... 9
*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir.1994) ........................................................................................................ 3
*In re Processed Egg Prod. Antitrust Litig.*,
  81 F. Supp. 3d 412 (E.D. Pa. 2015) ............................................................................ 10, 13, 14
*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ....................................................... 7
*Oglesby v. General Motors Corp.*,
  190 F.3d 244 (4th Cir. 1999) .................................................................................................... 8
*United States v. Barnette*,
  211 F.3d 803 (4th Cir.2000) ..................................................................................................... 3
*United States v. Crisp*,
  324 F.3d 261 (4th Cir. 2003) .................................................................................................... 7

Rules

FRE 702 ........................................................................................................................................ 2, 3

## INTRODUCTION

Dr. Michael Siegel is a public health expert with more than 25 years of experience in the field of epidemiology. He specializes in chronic disease epidemiology, and beyond that, in substance abuse and addiction. Dr. Siegel has first-hand experience treating several hundred patients for opioid addiction.[1] He teaches about "the opioid epidemic, the public health duties of pharmaceutical companies and distributors, the role of these companies in the opioid epidemic, and approaches to preventing opioid misuse." And he has "collaborated with numerous health agencies and organizations that focus on fighting the opioid epidemic, both through my teaching and as a substance abuse expert consultant."[2] His experience is, therefore, not only extensive, but also tailored to the issues in this case. Other courts have found that Dr. Siegel is qualified to give expert testimony in the areas of addiction, public health, epidemiology, and corporate public health responsibility, and this Court should do the same.

Dr. Siegel's opinions are also reliable. He opines on the issue of oversupply, for example, which is generally accepted as a significant driver behind the opioid epidemic.[3] Defendants claim, without support, that the concept of oversupply is novel, or was created by Dr. Siegel for use in this case. This is plainly false. Dr. Siegel cites numerous studies, published as early as 2006, that address the concept of oversupply.[4] That is, the connection between the supply of prescription opiates and increased opioid addiction, overdose, or death. Oversupply is nothing new, and Dr. Siegel's approach is not novel. He uses the typical methodology for determining oversupply, and applies it with the same intellectual rigor that would be expected of any expert in his field. This is

---

[1] Dkt. # 1097-41, Siegel Report at 6

[2] *Id.* at 7.

[3] *Id.* at 15.

[4] *Id.* at 15-18.

1

exactly what is required under *Daubert* and therefore, the Court should permit him to opine on these issues.

## LEGAL STANDARD

Plaintiffs incorporate by reference the statement of the legal standard made in Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude the Expert Testimony of Andrew Kolodny (Dkt. # 1099).

## ARGUMENT

**I. DR. SIEGEL IS QUALIFIED TO OPINE AS TO OVERSUPPLY OF OPIOIDS IN THE CITY OF HUNTINGTON AND CABELL COUNTY AND PUBLIC HEALTH RESPONSIBILITY OF DISTRIBUTORS**

Dr. Siegel is highly qualified to opine as to oversupply of opioids in the City of Huntington and Cabell County. As described above, he has more than 25 years' experience as an epidemiologist with specific expertise in public health issues relating to substance abuse. An expert may be qualified by knowledge, experience, or skill in a given field. FRE 702. Defendants argue that the Court should exclude Dr. Siegel's testimony because his experience is not sufficiently specialized within the field of epidemiology. (Def. Mem. at 5-7). Contrary to Defendants' assertions, however, it is not necessary that an expert be qualified in the exact sub-specialization about which he intends to testify. *AVX Corp. v. United States*, 518 F. App'x 130, 135 (4th Cir. 2013) (*citing* FRE 702).

In *AVX Corp.*, AVX contested "whether [the United States' expert] was 'qualified' to give expert testimony under Rule 702, claiming he lacked 'specialized knowledge' in the field of hydrogeological groundwater migration." *AVX Corp.*, 518 F. App'x at 134. AVX also argued that the expert was not qualified because he did not have experience with the chemical at issue in the case. *Id*. The Fourth Circuit rejected these arguments:

> This is too narrow a reading of the specialized knowledge requirement. "Certainly, an expert must have specialized knowledge to assist [a trier of fact] in deciding

2

> particular issues in the case," but this Court has taken care not to "read[ ] this requirement ... too narrowly." *Belk, Inc. v. Meyer Corp., U.S.,* 679 F.3d 146, 162 (4th Cir.2012).
>
> …
>
> We will not elaborate further on the specificity required to satisfy Rule 702, for the district court as "gatekeeper" is best situated to determine—on a case-by-case basis—how to assess witness qualifications. ***This is because the specialized knowledge inquiry is one of sufficient reliability, not specificity. "General" expertise may encompass multiple areas of "specialized knowledge that will assist the trier of fact[.]"***
>
> Dr. O'Connell's expertise in hydrogeology was indeed broad, but the issue is whether Dr. O'Connell could reliably apply his general experience with groundwater contamination to the particular chemical contaminant TCE. We commit "great deference" to a district court's decision on that question. *United States v. Barnette,* 211 F.3d 803, 816 (4th Cir.2000). Applying that deference and our liberal construction of Rule 702's "specialized knowledge" requirement, we conclude that the district court did not abuse its discretion in admitting the testimony of Dr. O'Connell.

*Id.* at 135 (quoting FRE 702); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994) (noting that even a "broad range of knowledge, skills, and training qualify an expert as such"); *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996). Defendants attempt to make the same argument here. And, as the Fourth Circuit did in *AVX Corp.*, this Court should reject it.

> Dr. Siegel explained his area of expertise in his expert report, stating:
>
> Public health is the broad study of the conditions necessary to protect the health of the entire population and the actions necessary to create those conditions. It differs from medical sciences in that while the primary focus of medicine is to treat an individual patient, public health aims to promote health and prevent disease among the entire population. Within public health and epidemiology, there are generally two sub-areas. Infectious disease epidemiology is the study of the impact of infections on the public's health…. Often overlooked, but equally important, is the other sub-area of public health: chronic disease epidemiology, or the study of noninfectious harms. This represents an incredibly broad spectrum of non-infectious causes of death, including drug use and addiction to substances like alcohol, tobacco, and opioids, injuries from gun violence, and chronic disease related to obesity or to environmental exposure to certain chemicals. My research, teaching, and experience throughout my career has focused on a range of public

3

>health issues, primarily in the area of chronic diseases. I bring a specialized perspective, one that looks at a wide range of societal problems from the lens of public health.[5]

Thus, not only is Dr. Siegel an expert in epidemiology, but he is also an expert in the sub-area of epidemiology at issue in this case, chronic disease epidemiology. And even further, Dr. Siegel is an expert in the more specialized area of substance abuse and addiction. In his report, he notes that "the main area of my research has been in the area of substance abuse and addiction, particularly smoking, tobacco use, and alcohol. I have published more than 170 articles in the peer-reviewed literature….I have also published in specialty journals in the area of substance use and addiction."[6] He has also published a book about strategies to promote public health to the public.[7] In other cases, he has been recognized as a qualified expert in the areas of addiction, public health, epidemiology, and corporate public health responsibility.[8]

And, if his specialized experience in chronic disease epidemiology, and substance abuse and addiction were not specific enough, Dr. Siegel is also experienced in the even-more-specialized area of opioid addiction. Dr. Siegel has first-hand experience treating several hundred patients for opioid addiction.[9] In addition to this experience, in his teaching at Boston University School of Public Health, he covers "the opioid epidemic, the public health duties of pharmaceutical companies and distributors, the role of these companies in the opioid epidemic, and approaches to preventing opioid misuse"; indeed, he teaches public health students about the opioid epidemic virtually every semester. He has also "collaborated with numerous health agencies and

---

[5] *See* Dkt. # 1097-41, Siegel Report at 4-5.

[6] *Id.* at 5.

[7] *Id.* at 5-6.

[8] *Id.* at 6.

[9] *Id.*

4

organizations that focus on fighting the opioid epidemic, both through my teaching and as a substance abuse expert consultant."[10] Thus, Dr. Siegel has experience and expertise in the broad area of epidemiology, the sub-area of chronic disease epidemiology, in the even more specific area of substance abuse and addiction, and in the specific field of opioid addiction and the opioid epidemic. Defendants here, as in *AVX Corp.*, seek to narrow the specialized knowledge requirement well beyond its intended purpose. *AVX Corp.*, 518 F. App'x at 134-35.

The relevant question is not, as Defendants suggest, whether Dr. Siegel has conducted the exact analysis required for this case before, but rather, whether he can apply his years of expertise in the broad area of epidemiology and the specific areas of chronic illness, substance abuse, and opioid addition, to the particular issues of this case. Defendants fail to identify any reason he cannot.[11] As expanded on below, the methodology Dr. Siegel uses in this case is the same one used more broadly in epidemiology and public health to determine whether a community is facing a particular public health problem.[12] For example, Dr. Siegel described the benchmark he used in this case as "the standard benchmark we use in epidemiology to make judgements about whether a data point at a local level is excessive."[13] Defendants do not explain why making this judgment with respect to opioids is unique, nor do they give any reason why Dr. Siegel could not have accounted for any differences between opioids and other addictive substances in his methodology. And they could not do so, as Dr. Siegel is highly qualified to apply his public health, epidemiology,

---

[10] *Id.* at 7.

[11] Defendants make much of the fact that Dr. Siegel submitted an article he authored about opioids to journals, but it was ultimately not accepted for publication. Defendants seem to imply that this was due to some academic deficiency with the article, but they have no evidence to support such an implication. Instead, Dr. Siegel explained that the likely reason the article was not published was because "this is old knowledge -- this is kind of old news. There's already a lot of articles about it, so generally, you know, to publish something, it has to be novel." *See* Exhibit A, Siegel Dep. at 101:9-12.

[12] *See* Dkt. # 1097-41, Siegel Report at 32.

[13] *See* Exhibit A, Siegel Dep., at 112:24-113:3.

and substance abuse expertise to the issues of opioid oversupply and distributor responsibility. *See AVX Corp.*, 518 F. App'x at 134-35 (noting that AVX "does not explain why TCE's chemical properties are unique, or why [the expert] could not have accounted for these different chemical properties in his methodology" as a reason for denying AVX's arguments). Therefore, this Court should find that Dr. Siegel is qualified to opine as to opioid oversupply in the City of Huntington and Cabell County, and as to distributors' public health responsibility.

**II.     DR. SIEGEL'S OPINIONS AS TO OVERSUPPLY ARE RELIABLE**

    **A.     The Concept of "Oversupply" Is Neither Novel nor Unreliable**

Defendants contend that *any* attempt to determine whether an oversupply exists would be unreliable, because Dr. Siegel's entire conception of "oversupply" is unreliable. Indeed, they suggest that the idea of "oversupply" was invented, by Plaintiffs and/or by Dr. Siegel, for the purpose of this litigation. This is not so. It is generally accepted that that a significant driver behind the opioid epidemic is the dramatic increase in the volume of opioid drugs being supplied to pharmacies in response to an increase in the writing of opioid prescriptions, or oversupply.[14] Dr. Siegel cites multiple published studies and articles that address the concept of oversupply, including "[a] rigorous econometric analysis by Ruhm concluded that increases in opioid supply account for approximately 85% of the observed increase in opioid overdose death rates from 2000-2015".[15] Further, Dr. Siegel explains that the "concept of evaluating the volume of opioids being supplied to a particular pharmacy in light of the population size for the location of the pharmacy is widely accepted as a means of identifying potential oversupply."[16] As noted above, this is exactly what is required by *Daubert*. There is no requirement that an expert show that his

---

[14] Dkt. # 1097-41, Siegel Report at 15.

[15] *Id*. at 15-18.

[16] *See id*. at 33.

6

methodology is without flaws, or even the best methodology, he only needs to show that he "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999). Further, McKesson itself has used the same methodology. As noted by Dr. Siegel in his Report,[17] McKesson's May 2015 CSMP "Red Flags" manual – which was designed to identify "area of possible concern regarding shipments of controlled substances" to ensure "appropriate due diligence" – lists among the "statistical 'red flag[s]'" whether "the population of the surrounding area [is] substantial enough to support th[e] volume" being shipped to that location," and utilizes census data for that analysis.[18] Defendants simply cannot present any evidence that Dr. Siegel did not "employ the same level of intellectual rigor that characterizes the practice of an expert" in epidemiology in his analysis here. *Kumho*, 526 U.S. at 152.

### B. The Methodologies Dr. Siegel Used in His Calculations Are Reliable

Dr. Siegel's methodology plainly meets the *Daubert* threshold for reliability. In *Daubert*, the Supreme Court identified four factors that a court may use in making its gatekeeping determination of reliability: (1) "whether a theory or technique. . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) whether, "in the case of a particular scientific technique," there is a high "known or potential rate of error" and there are "standards controlling the technique's operation," and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). However, the *Daubert* factors are not definitive or exhaustive. *See United States v. Crisp*, 324 F.3d 261, 266 (4th Cir.

---

[17] *See* Dkt. # 1097-41, Siegel Report at 33.

[18] *See* Exh. B, MCKMDL00335740. *See also* Exh. C, Blaine Snider Dep., Nov. 8, 2018, at 163:22-178:15 (full deposition filed publicly at Dkt. # 3027-21).

2003). ("Rather than providing a definitive or exhaustive list, *Daubert* merely illustrates the types of factors that will bear on the inquiry.") "[A]t bottom, the court's evaluation is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019) (*quoting Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

Here, each of these factors weighs in favor of admitting Dr. Siegel's testimony. Defendants challenge two, very specific, parts of Dr. Siegel's calculations. The first relates to the population of the communities served by each pharmacy, and the second relates to the national benchmark of opioid using adults.

***Populations served.*** As to the first, Dr. Siegel determined the population of the communities served by each pharmacy using 2010 United States Census data.[19] When asked why he chose to use the 2010 census, Dr. Siegel stated: "Well, for two reasons. One, because it's kind of towards the middle of that range, so it's going to kind of reflect the situation in the middle. But also because using 2010 is conservative since the population of most of those places went down after 2010."[20] Using census data to determine the size of a population at issue can certainly be tested. It can be compared to censuses from the years before or after, or to records from pharmacies documenting their number of customers, or as the defendants suggest, to records documenting the employees of hospitals or other major employers in the area. (Def. Mot. at 9-11). Defendants, in fact, show how easy it is to test Dr. Siegel's use of this data in their Motion, noting the factors that they believe Dr. Siegel should have considered instead of, or in addition to U.S. census data. (Def. Mot. at 8-12.) The U.S. Census Bureau utilizes both internal and external peer review processes,

---

[19] *See e.g.* Dkt. # 1097-41, Siegel Report at 34, 39, 41, 42, 52 (citing 2010 census data))
[20] *See* Exh. A., Siegel Dep., at 138:12-20.

and it is of course subject to publication.[21] Additionally, use of the U.S. Census to determine population size in a given area is a commonly accepted methodology generally and in the field of epidemiology specifically.[22] In fact, McKesson used this same methodology itself.[23]

Defendants take issue with a number of factors that, they believe, may affect the accuracy of the population sized use by Dr. Siegel. Although of course, Plaintiffs do not believe that these factors negatively affect Dr. Siegel's opinions, Defendants are free to address these issues on cross-examination, as instructed by *Daubert*. 509 U.S. at 596 ("conventional devices" of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (rather than wholesale exclusion by the trial judge) are "the traditional and appropriate means of attacking shaky but admissible evidence").

Defendants also take issue with the fact that Dr. Siegel used the size of the town in which a given pharmacy was located to determine the population served by that pharmacy. As noted above, this is the typical approach. Defendants cannot show that there "is simply too great an analytical gap between the data and the opinion offered" for the conclusion to be reliable. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 920 (D.S.C. 2016). Dr. Siegel was careful to only estimate the population served using the census data for the location of a pharmacy when it was reasonable because only one pharmacy served that town. Defendants cite this as a weakness, but it is in fact shows the strength of Dr. Siegel's

---

[21] *See e.g.*, https://www.census.gov/about/policies/quality/guidelines/transparency.html (stating that "while the Census Bureau utilizes internal peer review to ensure quality in content and subject matter as well as in the application of statistical methodology, and external peer review in content development for many of our programs, and for the review of results in our most highly critical activities, it fully meets OMB section 515 requirements of objectivity in analytic results by ensuring disclosure of the specific quantitative methods and assumptions that have been employed, and the disclosure of error sources affecting data quality" and " [s]tatistical information products disseminated to the public by the Census Bureau must be reproducible following prescribed methodology. Reproducibility means that there is the capability to use the documented methods on the same data set to achieve a consistent result.")

[22] *See* Dkt. # 1097-41, Siegel Report at 32-33.

[23] *See id*. at 33.

conclusions. He did not blindly use census data when it would have resulted in what he believed would be inaccurate or unreliable conclusions, he took care to use this data only where it provided a reliable result.[24]

"Proponents of expert testimony do not 'have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d 412, 416 (E.D. Pa. 2015). Defendants' assertions that Dr. Siegel's conclusions are unreliable merely because the presence of highways near certain towns *may* have led to people utilizing pharmacies in towns where they do not live does nothing to show that Plaintiffs have not met their burden. Defendants do nothing to show that Dr. Siegel's estimations of the population served by a given pharmacy is inaccurate, they merely present possible reasons that they believe could, in theory, affect that estimation. (Def. Mot. at 8-12). Moreover, the proximity of highways in no way undermines Dr. Siegel's estimate of the population legitimately served by a pharmacy. Patients travelling long distances to obtain or fill opioid prescriptions far from home is a well-known indicator of diversion and it is precisely because of the location of convenient highways that a pharmacy may become a source of opioids into illicit markets. Defendants' theories are not sufficient to render Dr. Siegel's testimony unreliable. None of Defendants' qualms with Dr. Siegel's use of census data rise to the level of rendering Dr. Siegel's opinions so completely unreliable as to be excludable at the *Daubert* stage, especially in this bench trial, where prejudice to a jury is not a concern. *See e.g.*, *Grant Thornton*

---

[24] *See* Exh. A, Siegel Dep., 36:7-23 (noting that Dr. Siegel did not render an opinion of oversupply by any one pharmacy in Huntington, because there were multiple pharmacies in the city, and he "didn't feel it would be appropriate to apply it because one would have had to make assumptions about what percentage of the population each pharmacy was legitimately – legitimately supplying")).

*LLP v. Fed. Deposit Ins. Corp.,* No. CIV.A. 1:00-0655, 2007 WL 4591412, at *1 (Faber, J.) (S.D.W. Va. May 6, 2007) (citation and internal quotation omitted). Contrary to Defendants' position, the fact that Defendants would have used a different methodology than the one that Dr. Siegel chose to use does not automatically render his opinions unreliable.

*Nationwide Benchmark*. As to the second issue, Dr. Siegel explained his methodology for determining the nationwide benchmark he used, in part, as follows:

> In public health generally and in epidemiology specifically, a common method of assessing whether a local community is facing a particular public health risk and the severity of that public health risk is to compare data at the local level to national averages. …
>
> Accordingly, to evaluate the volume of opioids distributed into Cabell County I derived a benchmark using the following methodology: generating a national average using ARCOS data compiled by Dr. Craig McCann. The McCann report states that from 2006-2014 there were approximately 114 billion dosage units of oxycodone and hydrocodone distributed in the United States. Using the 2010 Census estimate of 235 million adults in the U.S., this amounts to an average of 0.15 dosage units per day for each adult in the nation. This figure can then be used as a benchmark to assess the volume of opioids distributed into an area of interest – in this instance Cabell County. I use this benchmark to evaluate distributions by individual companies to individual pharmacies by dividing the number of dosage units supplied to the pharmacy per day by the adult population of the municipality in which that pharmacy is located. Using this benchmark to evaluate shipments to a particular pharmacy based on the total number of adults in the municipality in which it is located is extremely conservative because it assumes that each pharmacy supplies the entire city or town.[25]

He goes on to explain, step-by-step, exactly how he validated the benchmark he found using the methodology above, all the while, citing to the sources of his information, and other peer reviewed studies using the same methodology.[26] Here, too, the *Daubert* factors weigh in favor of admitting

---

[25] *See* Dkt. # 1097-41, Siegel Report, at 33-35.

[26] *See, e.g.,* Dkt. # 1097-41, Siegel Report, at 33-37 (citing Nessof ED, Pollack KM, Knowlton AR, Bowie JV, Gielen AC. Local vs. national: Epidemiology of pedestrian injury in a mid-Atlantic city. Traffic Injury Prevention 2018; 19(4):440-445; Wakasugi M, Kazama JJ, Narita I. Use of Japanese Society for Dialysis therapy dialysis tables to compare the local and national incidence of dialysis. *Therapeutic Apheresis and Dialysis* 2012; 16(1):63- 67; Qato DM, Zenk S, Wilder J, Harrington R, Gaskin D, Alexander GC. The availability of pharmacies in the United States: 2007-2015. *PLoS ONE* 2017;12(8):e0183172)).

Dr. Siegel's testimony. First, Dr. Siegel's method for evaluating and validating the nationwide benchmark he used can be easily tested because he lays out each step in the calculations he made to arrive at his ultimate conclusion, a benchmark of 6.9%.[27] Defendants and their own experts may test Dr. Siegel's conclusion by following the steps he describes. Additionally, Dr. Siegel cites multiple peer-reviewed studies following the methodology he used in this case.[28] And finally, this method is widely accepted within the field of epidemiology.[29]

Defendants' quarrel with Dr. Siegel's calculation of this benchmark is that they believe a different number measure of prescription opioid users is a more appropriate base for calculation of the benchmark. Specifically, they disagree with Dr. Siegel's choice to "base[] his benchmark on the number of adults aged 20 and over who used a prescription opioid *in the past 30 days*, rather than the number who used opioids in the past year." (Def. Mot. at 12 (emphasis in original)). However, as before, Defendants' disagreement with this choice is not a sufficient reason for this Court to exclude Dr. Siegel's testimony, especially, when Dr. Siegel clearly explained that he believed using the number for the past year was inappropriate in this case. During his deposition, Dr. Siegel testified:

> Q. Do you know if you changed your numbers from that 6.9 percent we've been talking about for the prior month to 37.8 percent, do you know how much it would change your numbers?
>
> A. I don't know. But again, I wouldn't do that because I don't think this is the correct -- this is going to greatly underestimate the figure, because it includes all kinds of people who are using it maybe just once or twice for a toothache.[30]

---

[27] *Id.*

[28] *See* Dkt. # 1097-41, Siegel Report at 32-37.

[29] *Id.* at 32.

[30] *See* Exh. A., Siegel Dep. at 150:21-151:5.

The question of whether Dr. Siegel's calculation, using the number of opioid users in the past 30 days, is more or less credible than Defendant's calculation, using the number of opioid users in the past year, is a question for the fact-finder to be addressed on cross examination. It does not affect the reliability of Dr. Siegel's opinions under *Daubert*. *In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d at 416 ("Proponents of expert testimony do not 'have to prove their case twice— they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable."). Thus, this Court should find that Dr. Siegel's methodology is reliable and his opinions regarding oversupply in Cabell County and the city of Huntington are admissible.

### III. DR. SIEGEL SHOULD BE PERMITTED TO OPINE THAT DISTRIBUTORS HAVE A PUBLIC HEALTH RESPONSIBILITY TO PREVENT OVERSUPPLY

Defendants argue that Dr. Siegel's opinion that distributors have a public health responsibility to prevent oversupply represents an improper legal conclusion and is unreliable. First, it is important to note, that at no point in his report does Dr. Siegel claim that distributors have a *legal* duty to prevent oversupply, nor does he purport to apply the law to the facts of this case. Rather, his opinion is about the standards for responsibility within the public health field that apply to larger entities, including corporations.[31] Dr. Siegel states that "[p]harmaceutical distributors have a well-recognized public health responsibility to generally and specifically protect the health of the public—to protect the public from the severe health consequences associated with oversupply of drugs. This responsibility derives, in part, from the fact that pharmaceutical distributors are part of the health care industry, whose underlying mission and

---

[31] *See* Dkt. # 1097-41, Siegel Report at 19.

responsibility is the protection and improvement of the public's health."[32] He has been allowed to testify as to similar matters before. The defendants point out that in *In Re E.I. du Pont de Nemours*, the court excluded one of Dr. Siegel's opinions regarding "a general duty of care that any company would be expected to fulfill." However, this is not the kind of opinion that Dr. Siegel puts forth in this case. Here, Dr. Siegel's opinions relate to the prevailing state of medical and scientific knowledge and the standards of care existing within the public health field, and distributor's deviation from those standards. The court in *In Re E.I. du Pont de Nemours*, allowed Dr. Siegel to opine on these matters. *In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 345 F. Supp. 3d 897, 915 (S.D. Ohio 2015) ("Trial Plaintiffs have sufficiently shown that Dr. Siegel is qualified to testify as to the prevailing state of the medical and scientific knowledge and the standards of care existing within these fields, and to compare DuPont's compliance with or deviation from those standards."). Because Dr. Siegel is not seeking to opine as to the legal duty applicable to the distributors in this case, it is not necessary that he cite legal authority such as statutes or regulations to support his opinions. Dr. Siegel supports his opinions about the standard of care in the public health field with sources that are authoritative in that field, including the World Health Organization, the Office of the Inspector General (OIG) of the U.S. Department of Health and Human Services, published literature, and the distributors themselves as well as their trade agencies, the Healthcare Distribution Alliance (HDA) and its predecessor, the Healthcare Distribution Management Association (HDMA).[33] Thus, Dr. Siegel's opinions are reliable and are not improper legal conclusions. Further, as noted above, in this bench trial, the Court is qualified to weigh Dr. Siegel's testimony appropriately and need not exclude his testimony out of fear it

---

[32] *Id.*

[33] *See* Dkt. # 1097-41, Siegel Report at 19-22.

would improperly influence a jury. *See Grant Thornton LLP v. Fed. Deposit Ins. Corp.,* No. CIV.A. 1:00-0655, 2007 WL 4591412, at *1 (Faber, J.) (S.D.W. Va. May 6, 2007).

## CONCLUSION

For the foregoing reasons, this Court should deny in its entirety Defendants' Motion to Exclude Expert Testimony from Dr. Michael Siegel Regarding Purported Opioid Oversupply.

Dated:  November 13, 2020

Respectfully submitted,

| THE CITY OF HUNTINGTON | CABELL COUNTY COMMISSION |
|---|---|
| /s/ *Anne McGinness Kearse* | /s/ *Peter J. Mougey* |
| Anne McGinness Kearse | Peter J. Mougey, Esq. |
| WVSB No. 12547 | LEVIN, PAPANTONIO, THOMAS |
| Joseph F. Rice | MITCHELL, RAFFERTY & PROCTOR, P.A. |
| MOTLEY RICE LLC | 316 South Baylen Street, Suite 600 |
| 28 Bridgeside Blvd. | Pensacola, FL 32502-5996 |
| Mount Pleasant, SC 29464 | Telephone: (850) 435-7068 |
| Tel: 843-216-9000 | Facsimile: (850) 436-6068 |
| Fax: 843-216-9450 | pmougey@levinlaw.com |
| akearse@motleyrice.com | |
| jrice@motleyrice.com | /s/ *Paul T. Farrell, Jr.* |
| | Paul T. Farrell, Jr. |
| /s/ *Anthony J. Majestro* | WVSB No. 7443 |
| Anthony J. Majestro | FARRELL LAW |
| WVSB No. 5165 | 422 Ninth Street, 3rd Floor |
| POWELL & MAJESTRO, PLLC | Huntington, WV 25701 |
| 405 Capitol Street, Suite P-1200 | Tel: (304) 654-8281 |
| Charleston, WV 25301 | paul@farrell.law |
| 304-346-2889 / 304-346-2895 (f) | |
| amajestro@powellmajestro.com | |

Linda Singer
David I. Ackerman
MOTLEY RICE LLC
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb
WVSB No. 4782
THE WEBB LAW CENTRE, PLLC
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

Michael A. Woelfel
WVSB No. 4106
WOELFEL AND WOELFEL, LLP
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

*On the Brief*:

Page A. Poerschke, Esq.
Laura S. Dunning, Esq.
LEVIN, PAPANTONIO, THOMAS
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502-5996
Telephone: (850) 435-7068
Facsimile: (850) 436-6068
ppoerschke@levinlaw.com
ldunning@levinlaw.com

Tyler W. Hudson, Esq.
Bridget K. Brazil, Esq.
WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: (816) 701-1177
Facsimile: (816) 531-2372
thudson@wcllp.com
bbrazil@wcllp.com

## CERTIFICATE OF SERVICE

I certify that on November 13, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties via the Court's electronic filing system. Parties may access this filing through the Court's system. This filing will also be served on all parties by email to: Track2OpioidDefendants@ReedSmith.com and mdl2804discovery@motleyrice.com.

*/s/ Peter J. Mougey*