# Exhibit C

```
 1                UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                       EASTERN DIVISION
 4
 5    ------------------------------x
 6    IN RE: NATIONAL PRESCRIPTION    ) Case No.
 7    OPIATE LITIGATION               ) 1:17-MD-2804
 8    APPLIES TO ALL CASES            ) Hon. Dan A. Polster
 9    ------------------------------x
10         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                    CONFIDENTIALITY REVIEW
12
           VIDEOTAPED DEPOSITION OF BLAINE M. SNIDER
13
                         WASHINGTON, D.C.
14
                   THURSDAY, NOVEMBER 8, 2018
15
                            8:34 A.M.
16
17
18
19
20
21
22
23
24   Reported by: Leslie A. Todd
```

Page 162

1    MR. COLLINS: Objection. Form.
2    THE WITNESS: Not in 2000 to 2006, and
3 the DRAs did that, I'm sure.
4 BY MR. BOGLE:
5    Q   What about from 2007 on?
6    A   The DRAs did that.
7    Q   Okay. So nobody ever told you --
8 because DC management is also referenced here,
9 nobody ever told you you had any role in that
10 process?
11    A   I did the Level Is and I did the
12 threshold increases. It was handled by the DRA
13 whether it was approved or not. I couldn't do it
14 on my own unilater -- unilateral.
15    Q   So is it your testimony that for New
16 Castle at least after 2007, that this assessment
17 that's talked about in this sentence I read to you
18 was actually done for the New Castle customers?
19    A   As part of the SOP, I believe it was
20 done by the DRA, yes.
21    Q   Okay. Your testimony is it was done for
22 New Castle customers.
23    A   For the -- yes, by the DRA.
24    Q   Okay. Have you reviewed the Controlled

Page 163

1 Substances Monitoring Program that was -- that has
2 been in place since 2008, the various versions of
3 it?
4    MR. COLLINS: Objection. Vague.
5    THE WITNESS: Yes.
6 BY MR. BOGLE:
7    Q   Have you read the SOPs itself?
8    A   Yes.
9    Q   Okay. And you know starting in 2015 the
10 Controlled Substances Monitoring Program included
11 a specific section talking about red flags, right?
12    A   I don't recall that. If you could show
13 me, I would be more inclined to remember.
14    Q   All right.
15    MR. BOGLE: What number are we on?
16    MR. COLLINS: 11, I think.
17    (Snider Exhibit No. 11 was marked
18    for identification.)
19    MR. COLLINS: Are you okay?
20    THE WITNESS: Yeah.
21 BY MR. BOGLE:
22    Q   All right. I'm handing you Exhibit 11,
23 which is also Exhibit 1.1146. This is titled
24 "McKesson CSMP Red Flags, May 2015."

Page 164

1    Do you recall ever seeing this portion
2 of the Controlled Substances Monitoring Program?
3    A   I do recall.
4    Q   You do?
5    A   Yes.
6    Q   Okay. And I want to look at a couple of
7 aspects of this here. Under that, it says:
8 "McKesson CSMP has identified certain,"
9 quote/unquote, "red flags that are indicators or
10 areas of possible concern regarding shipments of
11 controlled substances. Additionally, the red
12 flags discussed herein are not intended to be all
13 inclusive as they can change over time depending
14 on a variety of factors, e.g., new regulations,
15 new drugs coming to market or advancements of
16 technology."
17    Do you see that?
18    A   Yes.
19    Q   In the second paragraph, the last
20 sentence, it says: "Nevertheless, it is important
21 that when red flags are identified, they are
22 reviewed to ensure appropriate due diligence."
23    Do you see that?
24    A   Yes.

Page 165

1    Q   Okay. And below that, it says: "This
2 document is designed to separate red flags into
3 two categories. The first section, apparent red
4 flags, list those that are readily identifiable."
5    Do you see that?
6    A   Yes.
7    Q   Okay. I want to look at a couple of
8 those. Section 1 says "Apparent red flags." Do
9 you see that section?
10    A   Yes.
11    Q   It says: "Below is a list of examples
12 of the more readily identifiable red flags. These
13 do not require expertise or extensive analysis in
14 order to identify them."
15    Do you see where I read that?
16    A   Yes.
17    Q   Okay. And if you go to page .3, this is
18 under the section "Responses in the customer
19 questionnaire," do you see letter M says: "The
20 pharmacy's primary business model involves filling
21 prescriptions for or dispensing directly to pain
22 clinics."
23    Do you see that?
24    A   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  Q   Okay.  So that's identified as one of
2  the apparent red flags, right?
3  A   Yes.
4  Q   Okay.  And that's something, quite
5  frankly, that as we saw back in 2007, was already
6  identified as a red flag of something McKesson
7  should be concerned about, right?
8  A   Yes.  I believe it said internet
9  pharmacy on the Level I questionnaire.
10  Q   Okay.  I'm talking -- this talks about
11  pain clinics.  Do you see that, though?
12  A   Oh, yes.
13  Q   Okay.  And business with pain clinics
14  has long been identified as a potential red flag
15  at McKesson, right?
16      MR. COLLINS:  Objection.  Vague.  Form.
17      THE WITNESS:  At least that's down here,
18  yes.
19  BY MR. BOGLE:
20  Q   At least as 2007, the document we saw
21  that was sent by counsel for McKesson to the DEA
22  identified this as something that was going to be
23  investigated back in 2007, right?
24      MR. COLLINS:  Objection.  Assumes facts

Page 167

1  not in evidence.  The witness has no firsthand
2  knowledge of that letter, as we've already
3  established.
4      THE WITNESS:  I don't have any knowledge
5  of that.
6  BY MR. BOGLE:
7  Q   Do you have any reason to think that the
8  primary business model involving filling
9  prescriptions for or dispensing directly to pain
10  clinics is a red flag that could not have been
11  identified prior to 2015?
12      MR. COLLINS:  Objection.  The question
13  is compound, it's vague.
14      THE WITNESS:  I have no reason to
15  believe.
16  BY MR. BOGLE:
17  Q   Okay.  Let's look at Q.  It says:  "The
18  pharmacy's business model centers on controlled
19  substances where the pharmacy is planning to
20  expand its controlled substance business."
21      Do you see that?
22  A   Yes.
23  Q   That's a common sense red flag, right?
24  That makes logical sense.

Page 168

1      MR. COLLINS:  Objection.  Form.
2  Compound.
3      And I'm sorry, is that a question?
4      MR. BOGLE:  Yeah.
5  BY MR. BOGLE:
6  Q   Does that make common sense to you that
7  that would be a red flag?
8  A   That would be --
9      MR. COLLINS:  Objection.  Vague.
10      THE WITNESS:  That would be something I
11  would look at or the DRA would look at.
12  BY MR. BOGLE:
13  Q   Okay.  Because that's a potential red
14  flag, right?
15      MR. COLLINS:  Objection to form.
16  BY MR. BOGLE:
17  Q   Yes or no, sir?
18  A   Okay.  Yes.
19  Q   Section 2 -- I'm on page .4 now -- talks
20  about detailed red flags.  And under
21  "Nonstatistical red flags," the first is
22  geographic location.  Do you see that?
23  A   Yes.
24  Q   And it says under A there:  "The

Page 169

1  pharmacy located in a geographic area known or
2  suspecting -- suspected of having higher than
3  normal prescription drug diversion or level of
4  prescribing.  This would include areas where
5  diversion schemes are known to be centrally
6  located."
7      Do you see that?
8  A   Yes.
9  Q   Do you think that makes sense as a
10  common sense red flag?
11      MR. COLLINS:  Objection.  Vague.  Form.
12      THE WITNESS:  It would make sense to me.
13  BY MR. BOGLE:
14  Q   Okay.  Let's go to under number 2.  Do
15  you see where it says "Pharmacy's business model"
16  on that page?
17  A   Yes.
18  Q   And then on the next page, continuing
19  that section, letter D says:  "There is a pain
20  clinic located inside of or is part of the
21  pharmacy."
22      Do you see that?
23  A   Yes.
24  Q   Do you think that's a common sense red

Page 170

1 flag?
2  A  It would be something to look at, yes.
3  Q  Okay. Number 3 says: "Governmental
4 information/inquiry." Letter A says:
5 "Inquiry/subpoena by government agency regarding
6 customer."
7     Do you see that?
8     MR. COLLINS: Objection. Vague.
9 BY MR. BOGLE:
10  Q  Do you -- do you agree that's a common
11 sense red flag for McKesson?
12     MR. COLLINS: Objection. Vague as to
13 time frame.
14     THE WITNESS: It's something to inquire,
15 I agree with that.
16 BY MR. BOGLE:
17  Q  And that's something if you got a
18 subpoena from a governmental agency regarding your
19 customer and their dispensing of opioids back in
20 2008, that would be a red flag too, right?
21     MR. COLLINS: Objection. Vague. Form.
22     THE WITNESS: If I -- if I got the
23 subpoena?
24 BY MR. BOGLE:

Page 171

1  Q  Yeah.
2  A  Yes, that's something I would know and
3 look at.
4  Q  Okay. Number 4 says: "Integrity
5 concerns," and specifically under E, it says:
6 "Discipline of any pharmacy employee by a state
7 licensing authority or other regulatory agency
8 within the past 10 years."
9     Do you see that?
10  A  Yeah -- yes.
11  Q  And at all times that you've been
12 director of operations at New Castle, that would
13 be a common sense red flag to be investigated,
14 right?
15     MR. COLLINS: Objection. Form.
16     THE WITNESS: I remember I didn't know
17 that until the internet searches, probably 2006 or
18 '7.
19 BY MR. BOGLE:
20  Q  Okay. So starting in 2006, 2007, to you
21 going forward, that would be a common sense red
22 flag if you saw that, that needed investigating,
23 right?
24  A  Yes.

Page 172

1  Q  And then the last couple I want to do
2 here, and then we can take a -- a break if you
3 need to.
4     Number 5 on page .6, talks about other
5 distributors. Do you see that?
6  A  Yes.
7  Q  And A, it says: "Pharmacy purchases
8 controlled substances from other distributors."
9     Do you see that?
10  A  Yes.
11  Q  Okay. Is that something that you would
12 investigate when evaluating a customer's opioid
13 purchases going back even to 2006 to present?
14     MR. COLLINS: Objection. Form. Vague.
15     THE WITNESS: I couldn't always
16 investigate, but it would be something I think
17 they ask on the questionnaire. And then later on,
18 now we have software that's involved that we
19 can -- I think the DEA has provided that, that we
20 can see all of the wholesaler purchases. So the
21 DRA can take a look at that. I'm not privy to
22 that, but the DRAs know that information.
23 BY MR. BOGLE:
24  Q  But that's the sort of information that

Page 173

1 would be useful to know, especially when trying to
2 decide whether to increase the threshold for
3 opioids, right?
4     MR. COLLINS: Objection to the form.
5 The question is vague, incomplete.
6     THE WITNESS: Okay. I'm sorry, can you
7 repeat the --
8 BY MR. BOGLE:
9  Q  Sure.
10    Whether the pharmacy purchases from
11 multiple distributors would at all times be
12 something that would be important for McKesson to
13 know when considering whether to increase a
14 threshold for opioids, for example?
15     MR. COLLINS: Objection to the form, the
16 use of --
17 BY MR. BOGLE:
18  Q  Do they buy opioids from another
19 distributor?
20     MR. COLLINS: Objection to the question
21 to the extent it references "at all times."
22     THE WITNESS: I would like to know that.
23 BY MR. BOGLE:
24  Q  All right. B says: "Other distributors

Page 174

1  have restricted or ceased selling controls to the
2  customer or potential customer in the past five
3  years."
4      Do you see that?
5  A  Yes.
6  Q  And again, from the period of time that
7  you started as director of operations in 2000 to
8  present, that's something you think is reasonable
9  for McKesson to want to know, right?
10     MR. COLLINS: Objection to the form,
11 compound, calls for a legal conclusion.
12     THE WITNESS: I'd like to know why.
13 BY MR. BOGLE:
14 Q  Okay. But you can't know why unless you
15 know if, right?
16     MR. COLLINS: Objection. The question
17 is vague.
18     THE WITNESS: That's vague to me. Can
19 you restate that, please?
20 BY MR. BOGLE:
21 Q  Yeah. You can't ask why if you don't
22 know whether it's happened, right?
23     MR. COLLINS: Same objection.
24     THE WITNESS: Okay. I'm not sure --

Page 175

1  BY MR. BOGLE:
2  Q  Do you agree with that premise?
3      MR. COLLINS: The question doesn't make
4  any sense. Objection to form.
5  BY MR. BOGLE:
6  Q  You can't ask why another distributor
7  cut off or restricted or ceased selling controls
8  to a customer unless you've asked whether that
9  actually has occurred, right?
10 A  Yes.
11 Q  Okay. And then the last one under
12 "Statistical red flags," under A, and this is what
13 we looked at a minute ago, it says: "A customer's
14 control/Rx ratio, when compared to similar
15 customers serviced by the same distribution
16 center seems unusually high. As a benchmark, DEA
17 has previously stated that an average retailer
18 pharmacy's controls/prescription ratio is
19 approximately 20 to 25 percent."
20     Do you see that?
21 A  Yes.
22 Q  I think you said earlier that's not a
23 concept that you were familiar with before today,
24 right?

Page 176

1      MR. COLLINS: Objection. Form.
2      THE WITNESS: I don't remember
3  testifying to that.
4  BY MR. BOGLE:
5  Q  Okay. We looked at the DEA document
6  where they provided these kind of averages.
7      MR. COLLINS: Objection. Lack of
8  foundation.
9      THE WITNESS: I'm not sure that I
10 testified to that.
11 BY MR. BOGLE:
12 Q  Okay. Well, is this something you're
13 familiar with prior to today?
14 A  Yes.
15 Q  Okay. And do you agree that that's a
16 reasonable red flag that requires further due
17 diligence?
18     MR. COLLINS: Objection. The question
19 is vague as to time frame.
20     THE WITNESS: Yes. I agree that when
21 that data became available, that that was a part
22 of the due diligence.
23 BY MR. BOGLE:
24 Q  Well, it's always been available.

Page 177

1  McKesson just never asked for it until the last
2  few years, right?
3      MR. COLLINS: Objection.
4  Mischaracterization.
5      THE WITNESS: I don't agree with that.
6  BY MR. BOGLE:
7  Q  Okay. So are you saying McKesson was
8  unable to, say, for example, in 2009, ask for the
9  complete dispensing data from a -- from a customer
10 and then run the numbers?
11 A  I don't know that.
12 Q  Okay. Have you ever asked a customer
13 for complete dispensing data so an analysis could
14 be done as to how much of those purchases were
15 controlled substances?
16 A  Between what years, please?
17 Q  2008 to 2013.
18 A  Have I?
19 Q  Sure.
20 A  No. That's usually the DRA.
21 Q  Have you ever seen a DRA do it during
22 that five-year time frame for a New Castle
23 customer?
24 A  What five years?

"Highly Confidential" - Subject to Further Confidentiality Review

Page 178

1   Q   2008 to 2013.
2   A   Yes.
3   Q   You've seen them do this specific
4  analysis?
5   A   Yes.
6   Q   Okay.  So you know it can be done.
7   A   Yes.
8   Q   Okay.  And it's a reasonable analysis to
9  conduct, right?
10       MR. COLLINS:  Objection.  Vague, form.
11       THE WITNESS:  If you can, I think it
12 would be a good idea.
13       MR. BOGLE:  Yeah.  Let me look real
14 quick.  I think -- yeah.  We can take a break now
15 is good.
16       MR. COLLINS:  Yep.
17       THE VIDEOGRAPHER:  The time is
18 11:14 a.m.  We're going off the record.
19       (Recess.)
20       THE VIDEOGRAPHER:  The time is 11:29
21 a.m., and we're back on the record.
22 BY MR. BOGLE:
23   Q   All right.  Mr. Snider, the -- your New
24 Castle Distribution Center is in -- located in

Page 179

1  Pennsylvania, right?
2   A   Yes.
3   Q   Okay.  But you guys service customers
4  outside of the state of Pennsylvania, correct?
5   A   Yeah -- oh, yes.
6   Q   For example, you service customers in
7  Ohio, right?
8   A   Yes.
9   Q   You service customers in West Virginia,
10 right?
11  A   Yes.
12  Q   Okay.  And we talked a little bit about
13 the opioid epidemic earlier in your deposition,
14 but you understand that West Virginia is one of
15 the states that's been hit hardest by the opioid
16 epidemic, right?
17  A   Yes.
18  Q   And In fact, there have been
19 congressional investigations into McKesson's
20 conduct specific to pharmacies supplied in West
21 Virginia.
22      Do you understand that?
23      MR. COLLINS:  Objection.  Form.
24      THE WITNESS:  I don't know that.  I'm

Page 180

1  sorry.
2  BY MR. BOGLE:
3   Q   Okay.  You've never been told that?
4   A   No.
5   Q   Okay.
6       (Snider Exhibit No. 12 was marked
7       for identification.)
8  BY MR. BOGLE:
9   Q   I'm going to hand you 1.44, Exhibit 12
10 to your deposition.
11      Okay.  This is noted at the top to be
12 from the House of Representatives, Congress of the
13 United States, February 15, 2008.  Do you see
14 that?
15  A   Yes.
16  Q   Okay.  And it's a letter sent to
17 Mr. John Hammergren.  That's the CEO of McKesson,
18 right?
19      MR. COLLINS:  Objection.  Lack of
20 foundation.
21      THE WITNESS:  Yes.
22 BY MR. BOGLE:
23  Q   Do you see where it's -- he's noted to
24 be the recipient, "Dear Mr. Hammergren"?

Page 181

1   A   I would think he got it.
2       MR. COLLINS:  Objection.
3  BY MR. BOGLE:
4   Q   Do you see that this was designed to be
5  sent to him, right?
6       MR. COLLINS:  Objection.  The witness
7  has no firsthand knowledge.
8       THE WITNESS:  I don't know anything
9  about this document, so I can't answer to that.
10 BY MR. BOGLE:
11  Q   All right.  But you see it says, "Dear
12 Mr. Hammergren," right?  Do you see that on the
13 first page?
14  A   Yeah, I see that.
15  Q   You see that?
16  A   Yeah.
17  Q   Okay.  And so if you look at the first
18 page of this document, it says in the second
19 paragraph, "As part of our investigation."  Do you
20 see that?
21  A   Yes.
22  Q   It says: "As part of our investigation,
23 the Committee wrote to you on May 8, 2017,
24 regarding your distribution practices generally,