# Exhibit A

Page 1

1         IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2
3
     * * * * * * * * * * * * * * * * * * * * * *
4
     THE CITY OF HUNTINGTON,
5
              Plaintiff,
6
     vs.                                    CIVIL ACTION
7                                         NO. 3:17-01362

     AMERISOURCEBERGEN DRUG
8    CORPORATION, et al.,
9             Defendants.
10   _____
11   CABELL COUNTY COMMISSION,
12            Plaintiff,
13   vs.                                    CIVIL ACTION
                                          NO. 3:17-01665
14   AMERISOURCEBERGEN DRUG
     CORPORATION, et al.,
15
              Defendants.
16
     * * * * * * * * * * * * * * * * * * * * * *
17
18
19       Videotaped and videoconference deposition
     of DR. MICHAEL SIEGEL taken by the Defendants under
20   the Federal Rules of Civil Procedure in the above-
     entitled action, pursuant to notice, before Teresa
21   S. Evans, a Registered Merit Reporter, all parties
     located remotely, on the 6th day of October, 2020.
22
23
24

1   pharmacies that were located in Huntington, it's --
2   I believe it's very diff -- there's no real way of
3   knowing what the -- what the service area is for
4   those pharmacies because there's a huge number of
5   pharmacies located in Huntington, and so you can't
6   apply --
7            The way that I did the -- the
8   methodology that I used is I divided the total
9   distribution by the population of the city or town.
10  But if you do that for Huntington, because there's
11  so many pharmacies, each pharmacy is not supplying
12  the entire City, obviously.
13           So I would have had to make some
14  assumptions about the -- you know, the percentage
15  of the town that was being -- or of the city that
16  was being supplied, and I didn't feel that I had
17  data to be able to accurately make those
18  assumptions.
19           So that's why there's an analysis for
20  all of Cabell County and Huntington and then
21  there's an analysis for those pharmacies in the
22  smaller towns where I felt that it was appropriate
23  to be able to make the individual calculations.
24       Q.   So let me be sure I have that.  You looked

Page 101

1  and break down your answer.  You said "We did
2  submit it for publication but the reason it was not
3  -- it was not even sent for review."  What does
4  that mean?
5       A.   It means they just rejected it.  They
6  weren't interested in publishing it.
7       Q.   Okay.
8       A.   And the reason why I think was that, you
9  know, this is old knowledge -- this is kind of old
10 news.  There's already a lot of articles about it,
11 so generally, you know, to publish something, it
12 has to be novel.
13      Q.   Got it.  How many journals rejected it?
14      A.   I believe we sent it to three, and then
15 just decided that it just -- it was clear that this
16 wasn't gonna get published.
17      Q.   Did all three journals reject it?
18      A.   Yes.
19      Q.   And this article you have that has been
20 rejected by three journals, is that the only
21 article you've attempted to get published regarding
22 prescription opioids?
23      A.   Yes.
24      Q.   Have you ever been to Huntington or Cabell

Page 112

1  you said, "We're going to take the national
2  average," just as you've done, "and say, anything
3  that's more than 50 percent above that, we're going
4  to stop distributing to the pharmacy or Cabell
5  County."
6          Do you know how many legitimate
7  prescriptions would not be filled at the pharmacy
8  level if it's that cap, if it's zero, hundreds,
9  thousands?  Do you know?
10     A.   Zero.
11     Q.   Okay.
12     A.   There's no question that at that level,
13 that is enough opioids to supply all the legitimate
14 -- legitimate medical uses.
15     Q.   Okay.  Have you studied the opioid crisis
16 in Huntington or Cabell County in any way before
17 being hired this in this case?
18     A.   No.
19     Q.   Okay.  Let's talk about your methodology in
20 more detail.  I want to make sure I have just the
21 broad strokes of it, and then I'll dive into the
22 details.  You created a benchmark for "oversupply,"
23 correct?
24     A.   Well, I wouldn't say that I created it.  It

Page 113

1  is a standard benchmark that we use in epidemiology
2  to make judgments about whether a data point at a
3  local level is excessive.
4      Q.   You derived a benchmark for "oversupply,"
5  correct?
6      A.   Yes.
7      Q.   All right.  And the benchmark you derived,
8  you took the total number of dosage units of
9  oxycodone and hydrocodone between 2006 and 2014,
10 which for those nine years was 114 billion,
11 correct?
12     A.   Yes.
13     Q.   And if it helps, I'm looking at page 34
14 right now of your report, and I can refer you to
15 the pages I'm looking at if that helps.  I don't
16 mean to make this a memory test on some of these
17 details.
18     MR. SCHMIDT:  Why don't we put it up too on the
19 screen, please.  It's Exhibit 1, page 34.
20     Q.   And so as I understand what you did, Doctor
21 Siegel, is you took that 114 billion dosage units
22 of oxycodone and hydrocodone for the entire United
23 States.  You divided those across a nine-year
24 period, and then divided them by 365 days and 235

Veritext Legal Solutions
www.veritext.com                                888-391-3376

Page 138

1   degree of oversupply, and that was one of my
2   considerations.
3       Q.   You don't -- you don't calculate any kind
4   of averages for urban versus rural versus Suburban
5   areas, correct?
6       A.   No.  No.
7       Q.   What I said is correct?
8       A.   Yes.
9       Q.   Okay.  You base your population on census
10  data, specifically the 2010 census?
11      A.   Correct.
12      Q.   Why did you use 2010 data for years ranging
13  from 2006 to 2014?
14      A.   Well, for two reasons.  One, because it's
15  kind of towards the middle of that range, so it's
16  going to kind of reflect the situation in the
17  middle.
18           But also because using 2010 is
19  conservative since the population of most of those
20  places went down after 2010.
21      Q.   Okay.  Do you know if there were meaningful
22  population changes in years other than 2010 in an
23  upward direction that you didn't consider?
24      A.   Not that I'm aware of offhand.

Page 150

1  disorders?
2      A.  Yes.
3      Q.  All right.  So let's look at what they
4  found when they looked at NSDUH data.  If we could
5  go to page 4, please.  Do you see that they have
6  their results?
7      A.  Yes.
8      Q.  And they say, "On the basis of the 51,200
9  adult respondents to the 2015 NSDUH, we estimated
10  that among civilian, noninstitutionalized U.S.
11  adults aged 18 years or older, 37.8%" "used
12  prescription opioids in the prior year."
13          Do you see that?
14      A.  Yes.
15      Q.  Were you familiar with that number before I
16  showed it to you?
17      A.  No.
18      Q.  Do you know if -- do you have any reason to
19  question this data?
20      A.  No.
21      Q.  Do you know if you changed your numbers
22  from that 6.9 percent we've been talking about for
23  the prior month to 37.8 percent, do you know how
24  much it would change your numbers?

Page 151

1  A.  I don't know.  But again, I wouldn't do
2  that because I don't think this is the correct --
3  this is going to greatly underestimate the figure,
4  because it includes all kinds of people who are
5  using it maybe just once or twice for a toothache.
6  Q.  How many people in the 6.9 percent who have
7  used prescription opioids in the past month used it
8  acutely?
9  A.  Well, certainly a lot smaller number than
10 the number of people who have used it in the last
11 year.
12 Q.  How many?
13 A.  That's why -- I don't know.  I don't know
14 the number.  But that's why it's a better estimate.
15 Q.  Do you know if you backed out acute usage
16 from the 6.9 percent how much that 6.9 percent
17 would drop?
18 A.  I don't know.
19 Q.  Would it go down to 4, 1, something less?
20 A.  I just don't know.
21 Q.  Do you know if you backed out acute usage
22 from those 114 billion dosages that you started
23 with from 2006 to 2014 how much that number would
24 drop, whether it would go down to 50, 25, 1?