## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01362 |
| | Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, et al., | |
| Defendants. | |
| CABELL COUNTY COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-01655 |
| | Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, et al., | |
| Defendants. | |

### SUPPLEMENTAL APPENDIX TO
### REPLY IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
### <u>CERTAIN EXPERT TESTIMONY OF KATHERINE KEYES</u>

## INDEX TO SUPPLEMENTAL APPENDIX

| | Page Range |
|---|---|
| **DEPOSITIONS AND EXHIBITS** | |
| Keyes, Katherine | |
| Second Deposition (excerpts) (October 30, 2020) | 1-62 |
| Exhibit 6 | 63-64 |
| Exhibit 10 | 65-66 |
| Mock, Allen | |
| Deposition (excerpts) (August 14, 2020) | 67-80 |
| **OTHER DOCUMENTS** | |
| CDC, Provisional Drug Overdose Death Counts | 81-88 |
| Allen, et al., *Estimating the Number of People Who Inject Drugs in A Rural County in Appalachia* | 89-94 |

November 19. 2020

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2

       *******************************************************
 3

    THE CITY OF HUNTINGTON,
 4

                Plaintiff,
 5

    v.                        CIVIL ACTION NO. 3:17-01362
 6

    AMERISOURCEBERGEN DRUG
 7   CORPORATION, et al,
 8                Defendants.
 9
10   CABELL COUNTY COMMISSION,
11                Plaintiff,
12   vs.
13
     AMERISOURCEBERGEN DRUG
14   CORPORATION, et al,
15                Defendants.
16   *******************************************************
17
18        Videotaped and videoconference deposition of
19   KATHERINE KEYES, taken by the Defendants pursuant to the
20   West Virginia Federal Rules of Civil Procedure, in the
21   above-entitled action, pursuant to notice, conducted
22   virtually via Zoom, before Twyla Donathan, Registered
23   Professional Reporter and Notary Public, on the 30th day
24   of October, 2020.
```

```
 1                    A P P E A R A N C E S
 2        APPEARING FOR THE PLAINTIFFS:
 3        DON C. ARBITBLIT, ESQUIRE
          PAULINA DO AMARAL, ESQUIRE
 4        KELLY MCNABB, ESQUIRE
          LIEFF, CABRASER, HEIMANN & BERNSTEIN
 5        275 Battery Street, 29th Floor
          San Francisco, CA 94111
 6        Phone: 415-956-1000
 7        APPEARING FOR DEFENDANT CARDINAL HEALTH:
 8        CARL METZ, ESQUIRE
          JOSEPH BUSHUR, ESQUIRE
 9        TRACY FUNG, ESQUIRE
          WILLIAMS & CONNOLLY
10        725 Twelfth Street, N.W.
          Washington, DC 20005
11        (202)434-5000
12        APPEARING FOR THE DEFENDANT McKESSON CORPORATION:
13        TIM HESTER, ESQUIRE
          STEPHEN PETKIS, ESQUIRE
14        COVINGTON & BURLING
          One City Center
15        850 Tenth Street NW
          Washington, DC  20001
16
17        APPEARING FOR THE DEFENDANT AMERISOURCEBERGEN:
18        MELISSA A. GEIST, ESQUIRE
          REED SMITH LLP
19        Reed Smith Centre
          225 Fifth Avenue
20        Pittsburgh, PA  15222
21
22        ALSO PRESENT:
23
24        Adam Hager, Videographer
```

Page 3

1                          C O N T E N T S

2

3        EXAMINATION OF KATHERINE KEYES                    PAGE

4

5        By Mr. Metz                                       6    .

6

7

8

9                          E X H I B I T S

10

11               (Attached to the transcript)

12

13       DESCRIPTION OF EXHIBITS                            PAGE

14

15       Exhibit No. 1    Keyes Report                     10

16       Exhibit No. 6    Fentanyl Sensitivity Analysis    12

17       Exhibit No. 4    First Errata Submitted August 24, 30

18                        2020

19       Exhibit No. 2    Keyes Katherine MDL CT2 input    34

20                        calculations

21       Exhibit No. 10   Keyes Katherine MDL CT2 Input    34

22                        Calculations XLSX

23       Exhibit No. 12   "Second Errata"                  60

24       Exhibit No. 14   "Exhibit 10 to Davies' deposition" 124

1   estimate the deaths directly and indirectly

2   attributable to prescription opioids.

3        Q    Okay.  Exhibit 6 was provided to us after

4   your first deposition, and it bears the title

5   "Fentanyl Sensitivity Analysis.XLSX."

6             Is it fair to say that this file contains

7   the sensitivity analyses that you testified about at

8   your first deposition?

9        A    Yes.

10       Q    When was this file created?

11       A    I created this file after the deposition to

12  kind of organize the sensitivity analyses that were

13  done.  The calculations had been performed

14  previously.

15       Q    Okay.  So previously they existed in some

16  other sets of files, and you created this one file to

17  collect them together; is that fair?

18       A    That's fair.

19       Q    Did you make any changes to your

20  calculations in the course of preparing this file?

21       A    I added the assumed average number of

22  prescription fentanyl deaths per year column, just

23  for completeness.

24       Q    Those are Columns T through V?

Page 14

1        A     Yes.

2        Q     So Column T through V did not exist in any

3    form until after you were deposed?

4        A     Yes.

5        Q     Now, I think you told me just a moment ago

6    you did that for completeness.  What do you mean by

7    that?

8        A     Because I had performed those calculations,

9    and so I thought that they formed a complete set of

10   all the calculations that I had performed.  And so I

11   felt it appropriate to add them to the kind of range

12   of estimates that I performed for this fentanyl

13   sensitivity analysis.

14       Q     You performed those calculations when?

15       A     Which?  The --

16       Q     T through V.

17       A     I don't know the specific date.

18       Q     Was it prior to the service of your report

19   on August 3rd?

20       A     No.

21       Q     Was it prior to the -- sorry.  Bear with

22   me.  Was it prior to the disclosure of your first

23   report errata on August 24th?

24       A     No.

1       Q     Was it prior to your deposition on

2    September 15th?

3       A     No.

4       Q     It was after your deposition?

5       A     Yes.

6       Q     Now, I want to make sure I understand how

7    this information was all put together.  So I just

8    want to walk you through this a little bit.

9             Starting in Column D, you grouped together

10   some statistics for overdose deaths that are coded as

11   involving any of the code -- it's T40.2, T40.3,

12   T40.4.  Do you see that?

13      A     Yes.

14      Q     Now, T40.2 refers to natural or

15   semi-synthetic opioids, such as oxycodone or

16   hydrocodone, correct?

17      A     Yes, those would be examples.

18      Q     So if, for simplicity, I refer to that

19   category throughout the day as prescription opioid

20   pills, will you understand that I am referring by

21   that term to this T40.2 designation?

22      A     I don't think that's an accurate

23   characterization of T40.2.  I wonder if we could just

24   say T40.2?

1        A    Yes.   Just to be clear, a death is in

2   Column D if the death certificate codes T40.2, T40.3

3   or T40.4.

4        Q    Were present?

5        A    That's correct.  Or coded.

6        Q    Or coded.  And that -- in your methodology,

7   that remains true even if the code for heroin is also

8   present, correct?

9        A    That's right.

10        Q    Have you ever investigated how many of the

11   overdose deaths that you have coded in this

12   prescription opioid column also had heroin present at

13   the time of death?

14        A    I've looked at that, yes.

15        Q    You have looked at that number?  Did you

16   make a note of what that number was?

17        A    Not in this spreadsheet.

18        Q    Nor in your report, correct?

19        A    That's correct.  It was not informative to

20   my methodology.

21        Q    As you sit here, do you have a general

22   sense of how many of those deaths that you coded as a

23   prescription-opioid-involved death also involved

24   heroin?

1   deaths that had T40.4 coded that didn't have

2   additionally T40.2 or T40.3.

3        Q    Okay.  Are there any other categories of

4   prescription opioids that have a different code from

5   T40.2, T40.3 or T40.4?

6        A    I just want to be very clear about the

7   methodology.  So that's what that column represents.

8        Q    Okay.  I think I understand your answer.

9             And so in Column F the only exclusion you

10  were making was for T40.2 or T40.3.  And so the

11  deaths that are listed in Column F, those can also

12  include deaths where heroin was a contributing

13  factor, correct?

14       A    That's correct.

15       Q    And have you investigated at any point how

16  many of those deaths also involved heroin?

17       A    I mean, a similar answer is the previous

18  answer.  It was not informative to this methodology,

19  but I have looked at all kinds of combinations of the

20  T codes for various purposes in the past.

21       Q    Okay.  For purposes of determining a number

22  of overdose deaths caused directly by prescription

23  opioids, you weren't interested in knowing how many

24  of them also involved heroin?

1      A     That's correct.

2      Q     And just briefly, if we look at your Column

3  C, which is all opioids T40.0, which again that's

4  opium, T40.4, which is fentanyl or other synthetic

5  opioids, am I right that the difference between

6  Column C and Column D in any given year will be

7  overdose deaths that resulted from either heroin or

8  opium, and no prescription opioid; is that correct?

9      A     That's correct.

10     Q     Okay.  So sticking with this exhibit, I

11  just want to review some of the different versions of

12  the calculation you have here.

13          Am I correct in reading this that you

14  listed here five different versions of calculating

15  the number of deaths that resulted from prescription

16  opioids in your opinion?

17     A     Wait.  I'm sorry, say that again?

18     Q     Am I correct that what's disclosed here in

19  Exhibit 6 are five different methodologies for by

20  which you calculated the number of deaths that

21  resulted from prescription opioids?

22     A     Five different calculations that I did that

23  provide kind of a range of different possible

24  estimates of deaths attributable to prescription

1            Do you recall that?

2       A    Yes.

3       Q    Now, as I am sure you recall, I tried

4  asking you some questions about Exhibit 10 at the

5  last deposition, but it wasn't one of the marked

6  exhibits, and there was some confusion about what I

7  was referring to as columns in that file.  So I

8  just want to touch on that for a moment.

9            If you look at Exhibit 10, is it possible

10 for you to tell how many deaths there were in Cabell

11 County in 2010 that involved prescription fentanyl

12 and no other synthetic opioid -- I'm sorry, and no

13 other prescription opioid?

14      A   .I'm just going to fold this over to make it

15 a little bit easier.

16           So Cabell County, year 2010, deaths not

17 including synthetic -- So your question is about

18 deaths that only had T40.4?

19      Q    Correct.  In the way that you've classified

20 it, I'm asking about Column J, which is the product

21 of when you subtract T40.2 and 3 from the grouping of

22 all of them.

23           MR. ARBITBLIT:  Can we just ask --

24 Carl, would you mind restating the question?  Because

1    there are a couple of different forms of it.  I just

2    want to make sure you have a clear question for the

3    witness to answer.

4    BY MR. METZ:

5        Q    Sure.  So I won't repeat all the

6    orientation we've just done, but can you tell from

7    Exhibit 10 how many deaths there were in Cabell

8    County that were attributable to prescription

9    fentanyl in 2010 but no other prescription opioid?

10       A    Zero.

11       Q    How many were there in 2011?

12       A    Three.

13       Q    And how many were there in 2012?

14       A    Zero.

15       Q    And combined, those are the last three

16   years for which you had actual counts of the deaths

17   that were coded as resulting from prescription

18   fentanyl, correct?

19       A    Can you say what you mean by "actual

20   counts"?

21       Q    So after 2012, meaning starting in 2013,

22   you estimated the amount that was the result of

23   prescription fentanyl, correct?

24       A    Sorry.  Not in Column J.  Column J is not

```
 1              And so now having done the calculation,
 2     would you agree with me that if the only thing
 3     missing between Column G and getting to Column L is
 4     the number you haven't reported, but it's your
 5     estimate of the prescription fentanyl involved
 6     deaths -- those numbers we just calculated --
 7                  MR. ARBITBLIT:  Objection.
 8     BY MR. METZ:
 9         Q    -- 15 in 2018, 18 in 2017, correct?
10                  MR. ARBITBLIT:  Objection.
11         A    Well, I mean, I see what -- I see your
12     reasoning.  However, the difference is the --
13              T40.4 deaths were not excluded from Column
14     G, so that would be the contribution of -- that would
15     be this methodology, which is not the methodology I
16     rely on.  That would be this methodology's assessment
17     of the contribution of prescription T40.4 deaths.
18         Q    Okay.  Now, a moment ago we reviewed the
19     last three years for which you had an actual count,
20     or what you regard as an actual count of the
21     prescription fentanyl involved deaths, and it was
22     zero in 2010, three in 2012, and zero in 2012.  Do
23     you recall that?
24         A    I do.
```

Page 50

1    Q    Okay.  And so just some more very simple

2   math.  Three deaths over three years, that's about an

3   average of one per year over that three-year period?

4              MR. ARBITBLIT:  Objection.

5    A    Yes.

6    Q    And so now we have it that in the way that

7   you set about to estimate prescription fentanyl

8   deaths, by 2017 now there is 18 per year, and in 2018

9   there is 15 per year, in your estimation using this

10  calculation that we've talked about, using --

11   A    Right, using this calculation, that is what

12  you would conclude.

13   Q    And so using this calculation, you would--

14  you would conclude that from 2010 through 2012, then

15  looking ahead to 2017, there would be 18 times more

16  prescription fentanyl deaths than from the years

17  prior, right?

18              MR. ARBITBLIT:  Objection.

19   A    I didn't draw that conclusion from these

20  data.

21   Q    I know you didn't do the analysis, but

22  that's the implication of the data.

23              MR. ARBITBLIT:  Objection.

24   A    I'm not -- I don't want -- I haven't drawn

1    any implications about percentage increases in

2    prescription fentanyl deaths, so I wouldn't want to

3    offer an opinion on that.

4        Q    Not percentage increases.  Do you have a

5    basis to disagree with my observation that in the way

6    you have done the calculation that's reflected in

7    Exhibit 10, you claim an estimate that is 18 times

8    larger for the number of prescription fentanyl deaths

9    occurring in 2017 than occurred on average between

10   2010 and 2012?

11                MR. ARBITBLIT:  Objection.

12       A    I don't quite agree with the premise of the

13   comparison.  It's comparing apples and oranges.

14                You're assuming here that -- you're making

15   some assumptions about the contribution of

16   prescription fentanyl before and after 2012.

17       Q    Wasn't the entire purpose of the

18   calculation here to try and estimate a number of

19   prescription fentanyl deaths occurring after 2012?

20   And I'm simply telling you what that estimate is

21   based on your calculation and comparing it to the

22   ones you were able to count, right?

23                MR. ARBITBLIT:  Objection.

24       A    The T40.4 category does not differentiate

1    between prescription fentanyl and nonprescription

2    fentanyl.  I agree with you that 18 is a bigger

3    number than 1, on that we can agree.  But the

4    allocation to prescription fentanyl pre-2012, I

5    didn't make that comparison.

6              So I agree with you that there is a bigger

7    number attributed to prescription fentanyl after 2012

8    than before 2012.

9         Q    I think you have already agreed with pretty

10   much all of this, so let me just lay out a few pieces

11   and you tell me if you disagree with any of it.

12             Prior to 2012, your interpretation of the

13   T40.4 category is that all of those deaths that

14   you're able to count, those are prescription

15   fentanyl, correct?

16        A    I'm going to -- I'm going to use pre-2012

17   fentanyl deaths as my estimate of prescription

18   fentanyl deaths.

19        Q    Okay.  And then because that was confounded

20   by the presence of illicit fentanyl, you devised a

21   methodology for trying to estimate a number of --

22   from within the T40.4 category that you would

23   estimate as prescription fentanyl deaths after 2013?

24        A    Yeah, I didn't devise the methodology.  I

Page 53

1    applied the methodology that's standard in my field.

2         Q    Okay.  And so, for example, we were talking

3    about 2017.  You recognize that in Column J there

4    were 100 total T40.4 involved deaths that did not

5    also involve T40.2 or T40.3, correct?

6         A    Yes.

7         Q    And you were attempting to identify how

8    many of that -- those 100 deaths you could attribute

9    to prescription fentanyl as opposed to illicit

10   fentanyl, correct?

11        A    That's right.

12        Q    Okay.  And following that methodology, the

13   answer you came up with for 2017 was that 18 of those

14   deaths involved prescription fentanyl and the other

15   82 involved illicit fentanyl, correct?

16        A    Well, the 18 that involved prescription

17   fentanyl could also involve illicit fentanyl.  The

18   remaining, of 100 minus 18, were deaths that did not

19   involve prescription fentanyl.

20             MR. METZ:  I have us going about an

21   hour and 12 so far.  Why don't we take a short break

22   and reconvene in 10 or 15 minutes?

23             THE DEPONENT:  Sure.

24             MR. ARBITBLIT:  The shorter the

1       Q    And so the proper interpretation of the

2    results that are laid out in sort of a matrix, I

3    think, on the first page of your second errata, the

4    proper interpretation of those, that these figures

5    should supplant or replace the figures that were

6    disclosed in Figure 16 of your first errata?

7       A    Yes.

8       Q    Okay.  And I believe you told me this

9    morning that the calculation underlying this second

10   errata is a calculation you first performed after

11   your September 15th deposition, correct?

12      A    That's right.

13      Q    Why did you perform this calculation after

14   your deposition?

15      A    I reconsidered my approach, and although a

16   ratio like I had done is a standard way of simulating

17   something like this, or estimating this parameter, I

18   decided that a constant number might better reflect

19   the pre-2012 prescription fentanyl.

20           MR. METZ:  And I'll just pause and ask

21   if the court reporter heard that okay, because I got

22   a little interference at one point.

23           (The courter reporter responded

24   affirmatively.)

1       Q    Okay.  So you reconsidered.

2            And so was there something about the

3    results that your ratio method produced that seemed a

4    little off after your deposition?

5       A    I thought that after thinking about it

6    more, I thought that the pre-2012 should be a

7    constant rather than a ratio.  When you use the ratio

8    method, you have more prescription fentanyl deaths

9    than pre-2012, and I thought a better reflection of

10   the pre-2012 prescription fentanyl deaths might be a

11   constant.

12      Q    You had -- For example, in the years 2017,

13   you had 18 deaths, whereas in the last year before

14   you ran an estimation, you had zero deaths, right?

15                 MR. ARBITBLIT:  Objection.

16   BY MR. METZ:

17      Q    Attributable by you to prescription

18   fentanyl and no other prescription opioid, right?

19                 MR. ARBITBLIT:  Objection.

20      A    I mean, that's one year.  That's one

21   example.  But yes.

22      Q    Okay --

23      A    -- of the prescription fentanyl

24   contribution would be the pre-2012 constant.

```
 1        Q     Okay.  And to take another year, in 2018,
 2    your prior calculation had estimated that as 15
 3    deaths from prescription fentanyl and no other
 4    prescription opioids, whereas in the year where you
 5    last had actual data, the count was zero, right?
 6                  MR. ARBITBLIT:  Objection.
 7        A     I mean, in 2013 it was -- it was just more
 8    variables across that time.  And I thought that a
 9    constant might be a more stable reflection of the
10    pre-2012 prescription fentanyl contribution.
11        Q     Did you think that a constant would also be
12    a more plausible estimation of the prescription
13    fentanyl overdoses?
14                  MR. ARBITBLIT:  Objection.
15        A     I don't know that I would characterize it
16    that way.  I think that I reconsidered my methodology
17    to include a constant rather than a ratio, because I
18    thought it might be a more accurate reflection of the
19    prescription fentanyl contribution.
20        Q     Okay.  And the constant that you chose to
21    apply, at least as to Cabell County, the constant is
22    plus three, correct?
23        A     Yes.
24        Q     Okay.  And so comparing your earlier ratio
```

1    method to now your constant method for 2017, your

2    ratio method produced a number six times higher than

3    your constant method does, correct?  Sticking within

4    the category of prescription fentanyl deaths?

5         A    The ratio method -- It's not exactly -- As

6    you've subtracted out the T40.4 deaths that are

7    prescription opioid attributable, 18 is 6 times

8    higher than 3. I will grant you that.  But I didn't

9    make that inference in particular.

10        Q    And so in this -- Let's go back to

11   Exhibit 6.

12        A    Now that one I didn't write on the top, so

13   which --

14             MR. ARBITBLIT:  There is no question

15   pending.

16             MR. METZ:  She's just asking for

17   clarification.

18             Exhibit 6 is the Excel printout.  So

19   it's another of the broad sheets.  But it's a

20   sensitivity analysis, the one that includes multiple

21   different versions of your calculation.

22             MR. ARBITBLIT:  Wait for a question.

23   Wait for a question.

24   BY MR. METZ:

1      Q    Have you located and now numbered

2  Exhibit 6?

3      A    Yes.

4      Q    Okay.  So this constant calculation that

5  you just referred to a moment ago, that's reflected

6  in Column T through V of Exhibit 6, correct?

7      A    Yes.

8      Q    All of which were created subsequent to

9  your September 15th deposition, correct?

10     A    This calculation was done subsequent to the

11  September 15th deposition.

12     Q    Without revealing the substance of any

13  communication with counsel, can you answer yes or no

14  whether you undertook this calculation on your own

15  initiative, as opposed to being instructed to do it?

16     A    Yes.

17               MR. ARBITBLIT:  I'll instruct -- Yeah.

18               THE DEPONENT:  Sorry.

19               MR. ARBITBLIT:  Wait for objections.

20               THE DEPONENT:  I apologize.

21               MR. ARBITBLIT:  Did the court reporter

22  get the answer?

23               MR. METZ:  I may have muddied the

24  waters by asking it compound.  So why don't I just

1    ask the first part.

2    BY MR. METZ:

3        Q    Did you undertake this calculation on your

4    own initiative?

5        A    Yes.

6        Q    Okay.  So in this calculation, to get the

7    results that are contained in your second errata, or

8    at least the first row of your second errata, you

9    take those results from Column T, correct?

10       A    The first row of Exhibit 12 corresponds to

11   Column T of Exhibit 6.

12       Q    And the way that you get to Column T is you

13   take whatever number is in Column E of Exhibit 6 and

14   you just add the number 3 to it as a formula, right?

15            And I can clarify that I only mean that in

16   reference to the Cabell County portion of --

17       A    Oh.

18       Q    -- of the spreadsheet.

19       A    That's where I was confused.

20            Hold on one second.  So Column E and

21   Column T.  Yes.

22       Q    Okay.  When you do the same analysis for

23   West Virginia and the nation, you have different

24   constants that you are applying, correct?

Page 67

1      A    That's right.

2      Q    You happen -- Well, we can figure out the

3   math if we need to.  But it's a constant number that

4   you're adding for Cabell County, a different constant

5   number you add for West Virginia, and a different

6   constant number you add for the nation as a whole,

7   correct?

8      A    That's right.

9      Q    And that constant number is based on a

10  calculation you perform of the values contained in

11  Column F, isn't that correct?  From 1999 through

12  2012?

13     A    That's correct.

14     Q    Okay.  And in particular, you add up the

15  values that are in your Column F from '99 through

16  2012, and then when you get that total you divide by

17  14, because there are 14 years in that span, correct?

18     A    That's right.

19     Q    And your number that you come out with is

20  three deaths on average per year that were the result

21  of prescription fentanyl and no other prescription

22  opioid was present?

23     A    That's right -- well, my only clarification

24  would be prescription T40.4.

```
 1        Q    Prescription T40.4 --

 2        A    Synthetic opioid.

 3        Q    Okay.  Fair enough.

 4             Now, I recognize this methodology and these

 5   results did not yet exist when we were at your last

 6   deposition, but I was struck by an answer you gave at

 7   that deposition where you said that no matter how you

 8   estimated the prescription fentanyl, the results were

 9   similar every which way you did it.

10             Do you recall that testimony?

11                  MR. ARBITBLIT:  Objection.

12   Mischaracterizes.  You can show her a question and

13   answer from the transcript rather than

14   mischaracterizing it.

15   BY MR. METZ:

16        Q    I'm asking whether you recall telling me

17   that it didn't matter which way you calculated the

18   prescription fentanyl share of the T40.4 deaths

19   because your results, quote, "were similar," closed

20   quote, every way you did it?

21                  MR. ARBITBLIT:  Objection.

22   Mischaracterizes the record.

23        Q    Do you recall that testimony?

24                  MR. ARBITBLIT:  Objection.
```

1    Mischaracterizes the record.

2         A    What I recall saying is of the sensitivity

3    analyses that I performed to estimate the robustness

4    of that share, the sensitivity analyses that I

5    performed yielded similar results.

6         Q    Okay.  And do you believe that's also true

7    if you now expand that to include this methodology?

8         A    When you use the constant, the number of

9    deaths that is directly attributable to prescription

10   opioids decreases.

11        Q    Decreases significantly, correct?

12        A    I didn't do a statistical test of the

13   change.

14        Q    Well, as between the methodology you were

15   relying upon at your September 15th deposition and

16   the one that you rely on since disclosing your second

17   errata, the deaths in Cabell County that you

18   attribute to prescription opioids fell from 32 to 20.

19   Do you see that?

20        A    I do.

21        Q    That's a decline of nearly 40 percent?

22        A    It's 12 deaths.  It's a 12-death

23   difference.

24        Q    And 12 of 32 is roughly 40 percent?

1       A     Sure.

2       Q     And for 2017 in Cabell County, your

3    estimate falls from 42 deaths to 27?  Do you see

4    that?

5       A     I do.

6       Q     And that's a decline of roughly 36 percent?

7       A     Well, to be fair, the number indirectly

8    attributable to prescription opioid increases.  So

9    the absolute change in the number of deaths that are

10   due to prescription opioids is relatively similar.

11      Q     I realize you have other ways that you

12   attribute deaths to prescription opioids when they

13   involve heroin and illicit fentanyl, but what I'm

14   really just asking you is the deaths that you're

15   calling directly attributable to prescription

16   opioids, that falls by changing from one to the

17   other, that fell from 42 to 27, right?

18      A     Right.

19            MR. ARBITBLIT:  Objection.

20      Q     And would you regard that as a significant

21   change?

22      A     I have not done a statistical test of that

23   change.

24      Q     And if we were to make the same comparison

```
 1   against the results that were in your -- originally
 2   disclosed with your August 3rd report, so that the
 3   results that are in Column K, you agree with me the
 4   change is even more stark, right?
 5               MR. ARBITBLIT:  Objection.
 6       A    Again, the appropriate way to look at it is
 7   the overall change in the number of deaths that's
 8   attributable to prescription opioids.  And so that
 9   would be the comparison that I would make.  It would
10   not be just this directly attributable.
11               And also, at no point did I rely on a
12   number in which all of the T40.4 deaths were directly
13   attributable.  So the change between that and Column
14   T is not relevant, in my opinion.
15       Q    Well, you may not have thought you were
16   relying upon it, but that was the number included
17   within the expert report you signed, correct?
18               MR. ARBITBLIT:  Objection.
19       A    I believe that's why an errata was issued.
20   I didn't rely on -- It was a typo.
21       Q    You didn't rely on it at any point?  Do you
22   know whether other experts relied on that at some
23   point?
24               MR. ARBITBLIT:  Objection,
```

1    Speculative.

2         A    I'm not aware of what other experts are

3    relying on.

4         Q    Now, I think we've sufficiently established

5    that the -- that your -- with this second errata, you

6    now calculate a lower number of deaths that are

7    directly, in your vernacular, attributable to

8    prescription opioids, correct?

9         A    Yes.

10        Q    And that means by implication that if you

11   were today to sit down and reconstruct your Figure 8,

12   the Figure 8 that is disclosed in your report would

13   be wrong, correct?

14        A    I would have updated estimates in Figure 8.

15        Q    And you have not at any point issued an

16   errata updating your Figure 8, correct?

17        A    The numbers in Figure 8, I think, are

18   included in the second errata.  But I have not

19   produced a new Figure 8 that has been supplied.

20        Q    Well, you understand that your Figure 8 is

21   presented as a rate of death per 100,000 people,

22   correct?

23             You are welcome to look at it.  It's in

24   your report.

Page 73

```
 1        A    Yes.   That's what's written in the report.
 2        Q    The purpose of the analysis is to
 3   illustrate differential rates of overdose deaths from
 4   prescription opioids in Cabell County, West Virginia,
 5   and the United States as a whole, correct?
 6        A    Yes.
 7        Q    And as we discussed this morning, to get
 8   there requires some additional calculations beyond
 9   simply calculating a number of prescription opioid
10   deaths.  You then -- you had a further division, and
11   this was all presented in -- I believe, it's Column Q
12   of Exhibit 10, right?
13        A    Right.
14        Q    Okay.  And that's the information that is
15   ultimately plotted in your Figure 8, right?
16        A    Yes.
17        Q    Okay.  Is the information that's -- that
18   would be more accurately plotted in Figure 8 today,
19   are those numbers stated in your second errata?
20        A    No.
21        Q    Now, would you return to Tab 10, please --
22   excuse me, Exhibit 10.  It says "tab"...(fading).
23        A    Okay.
24        Q    Do you have that in front of you?
```

1     A    I do.

2     Q    As we talked about, this was the version of

3    your calculation that essentially existed as of your

4    first deposition, the calculation that supports the

5    figures in your first errata.  I'm not trying to go

6    back over that.  I'm just trying to make sure we're

7    properly oriented.

8          Do you see in Column S there is a notation

9    that states that for 2009, deaths have been set to 5,

10   as this is the mid point in the range of possible

11   suppression values.  Do you see that?

12    A    I do.

13    Q    And what does that mean?

14    A    In the CDC WONDER data, numbers below five

15   are suppressed.  They're not provided, because it

16   could be identifiable.  So sometimes when a number is

17   below five, we don't know what the number is -- I'm

18   sorry, when the number is below ten it's suppressed.

19    Q    When the number is below ten?

20    A    Yes.

21    Q    And so if we -- just to see an example of

22   this, if you were to look at Column D for the year

23   2009, which is what your note references, you have an

24   "NA" listed there.  What does the NA represent to

1    you?

2         A     I believe that is values that were

3    suppressed.

4         Q     "NA" means not available or something along

5    those lines?

6         A     Right.

7         Q     And so -- And so even though you don't have

8    a value for 2009 Cabell County, Column D, which is

9    the total deaths involving T40.2, T40.3 or T40.4, and

10   even though you don't have a value for Column G in

11   2009, which is the share that excludes -- that is

12   only T40.2 and T40.3, and even though you don't have

13   a value in Column J, which is the residual that's

14   T40.4 that doesn't involve the other two, despite

15   that, you include under Column A five deaths

16   attributable to prescription opioids, right?

17        A     It's not that we don't have a value, we

18   just know that the value is between zero and nine.

19   So a reasonable approximation is to use the midpoint.

20        Q     Sure.  I'm not quibbling right now with the

21   reasonableness of what you did.  I'm just trying to

22   understand it.  So you say it's not that you don't

23   have a value, it's just that you don't know if the

24   value is between zero and nine.  That means the value

1   could be zero?

2        A    And it could be nine.

3        Q    Was that a "yes" that it could be zero?

4                  MR. ARBITBLIT:  Objection.

5   BY MR. METZ:

6        Q    In my outline, I'm going to ask you nine as

7   well.  So you don't have to answer that way.

8             Is it correct that the value for that year

9   for the totality of overdose deaths could have been

10  zero?

11       A    We don't know what the value is.

12       Q    I understand that --

13       A    I don't want to speculate on what it could

14  have been.  We know that it is between zero and nine,

15  which I think is inclusive of all numbers between

16  zero and nine.

17       Q    Okay.  For the record, I'm not asking you

18  to speculate.  I'm simply asking you to answer a

19  pretty straightforward question, which is:  Is it

20  possible that that number is zero?

21                 MR. ARBITBLIT:  Objection.

22  BY MR. METZ:

23       Q    Is that a yes?

24       A    It's equally possible that the numbers are

1    between zero and nine.  So I would just be inclusive

2    of all the possibilities.

3         Q    Okay.  Let me ask it this way.  It's

4    possible the number is nine, yes?

5         A    I would have the same answer.  I don't want

6    to speculate on what the possible number is.  All

7    numbers between zero and nine are possible, which

8    would be inclusive of zero and nine.

9         Q    Okay.  I think I have my answer.

10        And so now, just to understand your

11   methodology, so then when you went to calculate the

12   number to the total number of deaths that were

13   directly the result of prescription opioids, you

14   thought it reasonable, so you picked that midpoint of

15   five and you plugged that in as the number for 2009,

16   believing that numbers on either side of it were

17   equally as likely, correct?

18        A    That's right.

19        Q    Now, in your report, and in your -- both

20   your first and second erratas, you disclosed a number

21   of deaths directly as a result of prescription

22   opioids only for the years 2006 forward.  Do you

23   agree with that?

24        A    Can you repeat the question?

```
 1        Q    Sure.  In your report and in each of your
 2   two errata, wherever you are disclosing the number of
 3   deaths that you attribute directly to prescription
 4   opioids, the first year of which you do that is 2006,
 5   correct?
 6        A    In the errata, yes.
 7        Q    And also in your report, correct?
 8             So, for example, your Figure 16 only goes
 9   back to 2006, correct?
10        A    Figure 8 goes back to 1999; 16, goes to
11   2006.
12        Q    Okay.  Thank you for that correction.  You
13   are correct about how far back Figure 8 goes.
14             Is the reason that your Figure 16 does not
15   go back earlier than 2006, that starting with 2005
16   and earlier, you run into this data suppression issue
17   more frequently?
18                  MR. ARBITBLIT:  Objection.
19        A    No.  That's not the reason that I only went
20   back to 2006 for that estimation.
21        Q    Okay.  Do you agree that with the
22   observation that from 2005 and earlier, you run into
23   the data suppression issue that you described more
24   frequently than you do thereafter, at least as it
```

1    relates to Cabell County?

2         A    As it relates to Cabell County, there are

3    two years in which the T40.2, -3, and -4 deaths are

4    suppressed out of -- one, two, three, four, five --

5    wait.  I'm sorry.  You said before 2006?

6         Q    From prior to 2006, yes.  So starting in

7    2005, do you agree with me that the data suppression

8    problem, if you will, or complication, occurs more

9    often in those years?

10        A    So there is data suppression in three of

11   those seven years.  And then after 2006, there is

12   data suppression in one year.  So there is two

13   additional years of data suppression.  I don't think

14   that's -- three is greater than one as a number, but

15   it wouldn't have a meaningful difference.

16        Q    Well, for purposes of your answer, are you

17   only looking at Column G right now?

18        A    Yes.

19        Q    Okay.  I would like you to take a look

20   at -- I would like you to take a look at Column G and

21   tell me if you have the same answer.

22        A    So in Column G, this is prescription

23   opioids T40.2 and T40.3.  There is two years with

24   data prior to 2006, and all the years except one have

1    data after 2006.

2         Q    And so just to be clear, that's -- there

3    are five years for which the data is suppressed in

4    that column, and only one year when it's not

5    suppressed by 2006, correct?

6         A    That's right.

7         Q    Okay.  And we don't have to visually go

8    over it, but in each of those cells that you just

9    looked at, you have a visual representation of "NA,"

10   not available, right?

11        A    That's right.

12        Q    And then I asked you to do the same for

13   Column J, which represents after you subtracted out

14   the T40.2 and T40.3, leaving only deaths that

15   involved a synthetic opioid and no other prescription

16   opioid present, you agree with me again, the data is

17   suppressed in five out of the six years?

18        A    Yes.

19        Q    And so you have an "NA" in those

20   categories, right?

21        A    I do.

22        Q    Okay.  And for purposes of the calculation

23   that is disclosed in your first errata, would you

24   agree with me, the unavailability of that data has no

1    real impact on Figure 16, because Figure 16 only goes

2    back to 2006 anyway?

3                    MR. ARBITBLIT:  Objection.

4        A    I don't quite understand the premise of the

5    question.  Figure 16 starts at 2006.  After 2006 in

6    Column J there is one year of data suppression.  And

7    so prior years of data suppression would not be

8    relevant.

9        Q    That was the answer I thought I would get.

10               Now, looking at this exhibit, this

11   Exhibit 10, if we take in the period 1999 to 2012, if

12   we take only those years for which Column J is not

13   suppressed and we try to add that up, would you agree

14   with me you have only the following entries that are

15   actual numbers and not NA in Column J?  You have the

16   number three in 2002?

17               Do you see that?

18       A    I do.

19       Q    Okay.  You have the number four in 2004?

20   Do you see that?

21       A    I do.

22       Q    You have the number four in 2006, do you

23   see that?

24       A    Uh-huh.

1       Q    You have the number five in 2007?

2       A    Yes.

3       Q    You have the number six in 2008?

4       A    Okay.

5       Q    You have the number zero in 2010, do you

6  see that?

7       A    Yes.

8       Q    And that's not a data suppression issue,

9  that, you actually know it to be zero, yes?

10      A    That's right.

11      Q    You have the number three in 2011?

12      A    Yes.

13      Q    And you have a zero again in 2012, correct?

14      A    Yes.

15      Q    And again, that zero is not a data

16  suppression issue, you have the data, and you know

17  the number to be zero?

18      A    Yes.

19      Q    Okay.  And so the record is clear to anyone

20  who hasn't read this full deposition, those numbers

21  we just counted up, those are the actual counts

22  available to you of deaths that were contributed to

23  in your analysis by prescription fentanyl and no

24  other prescription opioid was present, correct?

1     A     That's right.

2     Q     Okay.  Now --

3     A     Wait.  I'm sorry.  Can you say that again?

4     Q     Yes.  Those --

5     A     This has T40.4 as a contributing opioid

6  without T40.2 or T40.3.

7     Q     Correct.  And as we talked about this

8  morning, there are sort of lay descriptions that may

9  be more relatable, and T40.4 is synthetic opioids

10  that generally consist of fentanyl and fentanyl

11  analogs, correct?

12     A     Yes.

13     Q     Okay.  And during this period prior to and

14  up through 2012, your interpretation is, those

15  numbers, whenever you have a number there, that means

16  prescription fentanyl was prior to the arrival of

17  illicit fentanyl?

18     A     Yes.

19     Q     Now, just a couple quick observations about

20  those numbers.  Would you agree with me that the

21  highest year for which you have an actual count of

22  the prescription fentanyl involved deaths that didn't

23  include other prescription opioids, the highest

24  number in that grouping was six?

1        A     Prior to 2012?

2        Q     Yes.

3        A     The highest number is six.

4        Q     Okay.  And the reason I say prior to 2012,

5    is after 2012, you're not counting that directly for

6    the reasons we discussed at length, yes?

7              I need a verbal yes or no.

8        A     Yes.

9        Q     Okay.  And so there were no years where

10   there were seven or more overdose deaths in this

11   category?

12       A     For Column J in this exhibit, there is not

13   a number that is greater than six between 1999 and

14   2012.

15       Q     Okay.  And if I add up all the years for

16   which there are numbers in Column J during that time

17   period, I get to 25 total overdose deaths involving

18   fentanyl and no other prescription opioid.

19             Do you agree with that count?

20       A     I would just say it's synthetic opioids and

21   not fentanyl.

22       Q     Okay.  If I change it to synthetic opioids,

23   would you agree or disagree with my count of 25?

24       A     Let me just do some quick math.

1              Yes.

2         Q    And as you mentioned, it doesn't mean that

3    there weren't overdose deaths in other years, that

4    data was suppressed, and it's anywhere between zero

5    and nine in those other years, correct?

6         A    Yes.

7         Q    And at least for purposes of the

8    calculations you had performed prior to your

9    deposition, the only year for which you replaced

10   suppressed numbers with the number five was for 2009;

11   isn't that correct?

12        A    I would need to go back and look in more

13   detail in my files to know exactly which cells got

14   replaced.

15        Q    Well, you do see, as you mentioned, the

16   number of entries that are "NA," or not available,

17   yes?

18        A    I do.

19        Q    And you -- We correctly interpret those as

20   data suppression references, right?

21        A    Yes.

22        Q    Okay.  And do you see the notation that

23   appears in Column S, Row 2, that says for 2009, the

24   correct data were replaced with the ...(trailing) --

1           (Court reporter requested clarification.)

2           I'll ask it again.  You do see the notation

3    under Column S that says for 2009, deaths have been

4    set to five, as this is the mid point in the range of

5    possible suppression values?  You see that notation,

6    right?

7        A    Yes.

8        Q    And do you understand that to mean that at

9    least as of that calculation that you were relying on

10   at your last deposition, 2009 is -- was the only year

11   for which you had replaced and suppressed a number

12   with the number five?

13       A    I would need to go back and look for sure

14   to know that that was the only year in which five was

15   used instead of "NA."  I agree that five was used as

16   the mid point for 2009.

17       Q    Okay.  As you sit here, do you have any

18   reason to believe that despite what that note says,

19   that for purposes of this calculation, you replaced

20   any other suppressed data with the number five?

21       A    I would need to go back and look.

22       Q    Okay.  You don't have a belief one way or

23   the other?

24       A    Right.

```
 1      Q    All right.  Now would you turn back to
 2  Exhibit 6.  And I may ask you to make some
 3  comparisons here, so if you keep Exhibit 10 within
 4  reach, that may be helpful.
 5      A    Okay.
 6      Q    Do you see on Exhibit 6 a notation that
 7  says:  "Suppressed values were set to five," it's in
 8  the cell in Row 1, Column A?
 9      A    Yes.
10      Q    And is that a notation that you made
11  subsequent to your first deposition?
12      A    These were collected from various other
13  documents, so I don't know when exactly that cell was
14  written.
15      Q    Do you know whether you wrote that cell?
16      A    It was either me or my data analyst who
17  helped me prepared this.
18      Q    Do you know whether cells that formerly had
19  "NA" due to data suppression were changed to the
20  number five in the preparation of this Exhibit 6?
21      A    For this sensitivity analysis, you can see
22  in Column D that we set the suppression values to
23  five.
24      Q    And do you know whether that was done
```

1  before or after your deposition on September 15th?

2      A    Before.

3      Q    Do you know that for a fact?

4      A    Yes.

5      Q    Okay.  Was it done before or after the

6  preparation of your original expert report on

7  August 3rd?

8      A    That, I'm not sure.  Before, in all

9  likelihood, because we did all of these analyses in

10  preparation for that report.

11      Q    Okay.  Now, it says here that suppressed

12  entries were set to five.  I just want to make sure I

13  understand correctly.  That means on its face it

14  suggests that where you have data suppression,

15  instead of "NA," you now have the number five for

16  purposes of your calculation, right?

17      A    That's right.

18      Q    Okay.  However, despite that, am I right

19  that you did not replace all of the suppressed

20  entries from Exhibit 10 with the number five?

21      A    In Exhibit 10 not all of the entries were

22  suppressed with five.

23      Q    I'm sorry.  That's not what I meant.

24            In Exhibit 6, not all of the entries that

```
 1   previously had been suppressed in Exhibit 10 were set
 2   to the number five; isn't that correct?
 3        A    Exhibit 6.  Can you give me an example?
 4   I'm not sure I understand the question.
 5        Q    Sure.  Let me start by giving you some
 6   examples of ones that were switched from suppressed
 7   to the number five.  So would you agree with me,
 8   Dr. Keyes, that the cells in Column D, Row 43, of
 9   Exhibit 10 corresponds to the cell that is Row 4,
10   Column D, of Exhibit 6?
11        A    I'm sorry.  So it's Exhibit -- okay.  I'm
12   getting confused here.
13        Q    I'm not trying to confuse you.  I do want
14   to make this clear.
15        A    Exhibit 10.  So I'm looking at Exhibit 10,
16   and I'm going to Column D, Row 43.
17        Q    Right.  And you see there is an "NA,"
18   indicating that the data was suppressed for that
19   cell?
20        A    Yes.  I see that.
21        Q    Okay.  And then on Exhibit 6, do you agree
22   with me that Column D, Row 4, corresponds to the same
23   circumstance, if you will, 1999, Cabell County,
24   prescription opioid deaths inclusive of all three of
```

```
 1    those categories, and now the value is set to five?

 2         A    Right.  That's true.

 3         Q    Okay.  So those are equivalent cells in the

 4    workbook, the one that existed as of your deposition

 5    listed as "not available," and in Exhibit 6 it's

 6    listed as "five," right?

 7         A    That's right.

 8         Q    Okay.  And if you just look at the cell

 9    immediately below that, which is the year 2000 for

10    Cabell County, and you make the same comparison, you

11    agree there as well that suppressed data has been

12    replaced with the number five, right?

13         A    Yes.

14         Q    Okay.  And if we move over -- on Exhibit 6,

15    if you move over one cell, so now we're in Column

16    D -- I'm sorry, now we're in Column E, would you

17    agree with me that Row 4, Column D, of Exhibit 6

18    corresponds to Row 43, Column G of Exhibit 10?  That

19    those are meant to capture the same circumstance?

20         A    That's right.

21         Q    Okay.  And that in Column G -- I'm sorry,

22    excuse me, in Exhibit 10, that all shows up as the

23    data suppressed, "not available," and in Exhibit 6 it

24    shows up as the number five?
```

1       A     That's right.

2       Q     Okay.  So those are some examples of cells

3   that in the one analysis were listed as the data

4   suppressed and it just remained at "NA," and then in

5   this analysis, in figure -- in Exhibit 6, they've

6   been replaced with the number five?

7       A     Right.

8       Q     Are you aware of whether or not there are

9   other cells that in Exhibit 10 show up as "NA"

10  because the data was suppressed, and in Exhibit 6

11  have a value different from five?

12      A     Yes.  I can see other cells.

13      Q     And those are the cells in Column F,

14  correct?  Of Exhibit 6?

15      A     Column F is the estimate of the number of

16  synthetic opioid-only deaths, and in Exhibit 6, there

17  are values for every year, and I believe it

18  corresponds to Column J of Exhibit 10, in which some

19  years have "NA" and some years have numbers.

20      Q     Okay.  And isn't that because Column F of

21  your -- of Exhibit 6 is -- is the product of a

22  subtraction.  You take the value that is in Column D,

23  and you subtract from it the value that is in Column

24  E, or whatever is left over as the residual, that is

Page 92

1    what goes into Column F?

2         A    Yes.

3         Q    And so just taking an easy example, in 1999

4    where Column D and Column E were both populated with

5    the number five, they cancel each other out, and the

6    value in Column F is zero, right?

7         A    That's right.

8         Q    Okay.  And so you did not systematically

9    populate the information that was suppressed in

10   Column J, you didn't systematically populate that as

11   the number five in Exhibit 6; instead, you just

12   derived a number based on the other suppressed

13   values, right?

14        A    I don't understand the question.

15             Is the question:  How is Column F

16   calculated?

17        Q    Sure.  That's a better version of the

18   question.

19        A    Column F in Exhibit 6 is calculated as the

20   number of estimated deaths of prescription opioids

21   not including synthetics, minus the number that does

22   include synthetics, and when those are both

23   suppressed, that number is zero.

24        Q    So let's look at the year 2001, Cabell

```
 1   County.  Starting with Row C.

 2        A    Column C?

 3        Q    I'm sorry.  And I don't even mean that.  I

 4   mean Column D.  So starting with Column D, you have

 5   there an actual count of the total overdose deaths

 6   that were coded either T40.2, T40.3 or T40.4,

 7   correct?

 8        A    Yes.

 9        Q    And you're welcome at any time to

10   cross-reference Exhibit 10 if you need it in order to

11   answer this question.  But after having that total

12   death number, because it's larger than the number

13   nine, the next two columns were both suppressed in

14   the CDC WONDER data because their totals were

15   somewhere between zero and nine, right?

16        A    The next, Column E, is the only suppressed

17   value, and that's the prescription opioids not

18   including synthetic.  So that's the number just of

19   T40.2 and T40.3.

20        Q    Okay.  And then if we look at 2003 -- well,

21   wait a minute.  I'm not going to -- I'm not going

22   to -- Let me not move on quite so quick.

23             I think you said the number in Column E for

24   2001 is the only one suppressed.  But if you look
```

1    back at Column J for 2001, does that number not also

2    show up as suppressed?

3        A    Well, that's a bit of a misnomer, because

4    that's a calculated value.  So we don't get that

5    value directly from CDC WONDER.

6        Q    You could have?

7        A    We can't -- we can't get that value.

8    That's why we calculated it.

9        Q    You couldn't query just T40.4 in 2001?

10       A    No, you can't do that in CDC WONDER.  You

11   can't get the values for a single mutually exclusive

12   category.  So if we queried it from CDC WONDER, we

13   would get T40.4 and it might include other things.

14       Q    Okay.  Fair enough.  So I understand.  It's

15   not technically correct to say that number is

16   suppressed.  However, you don't know the actual value

17   of that number, correct?

18       A    That's right.

19       Q    And that's because the number that is in

20   Column E of Exhibit 6, that number was suppressed,

21   and so you're unable to derive what number should go

22   in Column F, right?

23       A    You mean J?  We're unable to derive what

24   number to go in J.

1       Q     Sorry.  Yeah.  Column J of Exhibit 10?

2             MR. ARBITBLIT:  Objection.

3       A     Yes.

4       Q     That's correct.  Okay.

5             But for purposes of your calculation that

6    now is reflected in your second errata, you have

7    derived from Exhibit 6 a number corresponding to the

8    synthetic opioids only without the presence of T40.2

9    or T40.3.  Do you see that?  That result is reflected

10   in Column F, Row 6?

11      A     That's right.

12      Q     And you have listed there that there are

13   seven for 2001 Cabell County -- seven overdose deaths

14   resulting from synthetic opioids without the presence

15   of other prescription opioids, correct?

16      A     That's correct.

17      Q     And as we talked about a few minutes ago,

18   that number seven would be higher than any year for

19   which you had actual numbers that you could

20   calculate, right?

21      A     That number is higher than Column J, 1999

22   to 2006, I think is what we were talking about, for

23   2008.

24      Q     And just so the record is clear.  Column J

1    of Exhibit 10 is meant to reflect the same category

2    of information as Column F of Exhibit 6, yes?

3         A    Yes.

4         Q    And in Exhibit 10, this entry for 2001

5    shows up only as "NA" here in Column J of Exhibit 10,

6    but here in Exhibit 6, you've derived that number to

7    be the number seven, right?

8         A    That's right.

9         Q    And that's because in Column E you plugged

10   in the assumed value of five for that data that was

11   suppressed, right?

12        A    Yes.

13        Q    Now, if we look at -- And so you would

14   agree with me, right, that despite showing up as the

15   number seven in Column F of Exhibit 6 for 2001,

16   that's really just an assumption you're making that

17   there were seven overdose deaths that year involving

18   synthetic fentanyl -- excuse me, synthetic opioids

19   and there were no other opioids present, right?

20             MR. ARBITBLIT:   Objection.

21        A    We don't call that an assumption in

22   epidemiology.  We call it an estimate.  I estimate

23   that there were seven deaths.

24        Q    You estimate that there were seven deaths

1    by just picking a midpoint number for a different

2    column of information and then subtracting that from

3    known information leading to the number seven,

4    correct?

5         A    That's the standard way of estimating that

6    parameter in my field.  So, yes, that's what I did.

7         Q    Well, I'm still a little confused, because

8    that number is higher than any individual year where

9    you were able to count it.  So is it standard in

10   epidemiology to use a method of estimation that leads

11   you to, in the years for which you're missing data,

12   higher estimates than any real-world examples?

13                  MR. ARBITBLIT:  Objection.

14        A    That is -- that happens sometimes when

15   you're estimating parameters.  And the highest value

16   in prior years is six.  This is a seven.  That's

17   pretty well within the ballpark.

18        Q    Okay.  And now if you look at 2003, do you

19   agree with me by looking at Column D, this is another

20   year for which the total number of overdoses is not

21   suppressed.  You have that number.  It's 15.

22   Correct?

23        A    Yes.

24        Q    However, the number that were -- that

Page 98

1   involved either T40.2 or T40.3, other prescription
2   opioids, that number was suppressed, right?
3          A     That's right.
4          Q     And because it was suppressed, you picked
5   the number five to go in that cell?
6          A     Yes.
7          Q     Correct?  And as a result, for 2003 you're
8   estimating there would be ten --
9          A     That's right.
10         Q     -- synthetic prescription fentanyl overdose
11  deaths without other prescription opioids present,
12  correct?
13         A     Yes.
14         Q     And ten -- I don't know if you call it in
15  the same ballpark as six or not, but ten is bigger
16  than six, right?
17         A     I would call that in the same ballpark.
18         Q     Okay.  And there was only one real world
19  year where the count was six, right?
20               MR. ARBITBLIT:  Objection.
21         A     They're all real years.
22         Q     Well, they're all real years, but for some
23  of those years, you don't know the number, so you're
24  estimating?

```
 1                    MR. ARBITBLIT:  Objection.
 2        A     I would say that there were years in which
 3   both numbers were from the CDC WONDER data and some
 4   years where one number was directly from the CDC
 5   WONDER data.  And for the years in which both numbers
 6   were derived directly from CDC WONDER, the largest
 7   number was six and the smallest number was, I
 8   believe, three.
 9        Q     --
10        A     So as -- sorry.
11        Q     Isn't the smallest number actually zero?
12        A     From Exhibit 10?
13        Q     Yes.
14        A     I thought we were talking about 2006 and
15   prior.  No?
16        Q     I'm not at the moment.
17              Isn't the smallest number for which you
18   have actual real world counts zero?  The number that
19   you get to at least twice?
20        A     For which years?
21        Q     For Column J, 2010 and 2012.
22        A     Yes, 2010 and 2012, the estimate is zero.
23        Q     Okay.  And so for these two example years
24   we just looked at, 2001 and 2003, the method you
```

1    picked to estimate, by virtue of just sticking the

2    number five into Column E, you come up with two

3    estimates for Column F that are both larger than any

4    single year between 1999 and 2012 where you had

5    actual data, right?

6         A    And there are other years where the

7    estimate is zero.  Sometimes it's higher, then

8    sometimes it's smaller than the average.  That's kind

9    of how math works.

10        Q    And so as you talked about before, if you

11   had stuck to calculating the average based on those

12   years for which you can actually count a number of

13   deaths in the -- from the CDC WONDER database, you

14   would have had 25 deaths that you could count over 14

15   years, correct?

16             MR. ARBITBLIT:  Objection.

17   BY MR. METZ:

18        Q    That's what's reflected in --

19        A    No.

20        Q    That's what's reflected in Column J of

21   Exhibit 10, right?

22             MR. ARBITBLIT:  Objection.

23        A    No.  That's not right.

24        Q    Are you able to count up more than 25

1        A      No, I'm honestly confused about the

2    question.

3        Q      That's fine.  Are you looking at Exhibit 6

4    or Exhibit 10?

5        A      I'm looking at Exhibit 6.

6        Q      Okay.  In Exhibit 6, do you agree with me

7    that in Cell 17, which is the synthetic-opioid-only

8    overdoses for 2012 for Cabell County, the value is

9    zero?

10       A      Yes.

11       Q      And do you also agree with me that two

12   years prior to that, the value was also zero in 2010?

13       A      Yes.

14       Q      And we talked about this before, but just

15   so I have it all in one place in the record.  Those

16   were not data suppression issues, those were you had

17   the data available, and that's how the count came

18   out, correct?

19       A      That's correct.

20       Q      And so in two of the last three years for

21   which you had actual data available, you -- there

22   were zero deaths in this category of synthetic

23   opioids, not including any other prescription opioid,

24   right?

1        A     Yes.   In the other year it was three, which

2    is the average of all years.   Some years it's going

3    to be lower, some years it's going to be higher.

4    That's why you use the average.

5        Q     Well, just to be clear, it's the average of

6    all years when you add in the 17 combined that you

7    include for 2001 and 2003, right?

8        A     It's also the average if you use the eight

9    years for which you had data, which there were data

10   available.   It wasn't suppressed.

11       Q     And despite two of the three most recent

12   actual years being zero, you -- under the method

13   you're now using, you add three additional

14   prescription fentanyl deaths for 2013 by assumption,

15   correct?

16       A     I disagree with the premise of the

17   question.   I added three additional prescription

18   fentanyl deaths, not despite there being two years in

19   which it wasn't three, but because the average for

20   all years was three.

21       Q     I might need to go back over what we just

22   went over, to explain how you got to that average.

23             But you're adding three in 2013

24   notwithstanding that in 2012 and in another recent

1    year before 2012, the number was zero, right?

2                    MR. ARBITBLIT:   Objection.

3        A    I'm adding three because that was the

4    average for all years.

5        Q    And for 2014, you add three more deaths in

6    those categories of prescription opioids overdoses

7    that are attributable to synthetic opioids and not

8    other prescription opioids, right?

9        A    2014, I add three deaths attributable to

10   prescription opioids that did not have a code of

11   T40.2 or T40.3.

12       Q    And you did the same thing for 2015.  You

13   added three more there by assumption, correct?

14       A    That's right.

15       Q    And then you did the same thing for 2016,

16   you added three more deaths in there by assumption as

17   well, correct?

18                    MR. ARBITBLIT:   Objection.   Objection.

19       A    Yes.

20       Q    And then for 2017 you added three more

21   deaths by assumption as well, correct?

22       A    I'm sorry, it's not by assumption.  It's

23   because that's the method that I use to estimate

24   the -- it's not an assumption, it's an estimate.

1       Q    And you added three more through that

2   method for 2017, correct?   Three more overdose deaths

3   in this category?

4       A    That's right.

5       Q    And you added three more for 2018 in this

6   category as well, correct?

7       A    Yes.

8       Q    Did you allow in your methodology for there

9   to be any years similar to the two out of three

10   immediately preceding years in which there were no

11   deaths in this category?   Did you allow for any years

12   to be like them?

13       A    That would not be a methodology that I

14   would find reliable.   So, no, I did not.

15       Q    Now, can you direct me -- Using Exhibit 1

16   which is your report, can you direct me to where it

17   is in your report that you describe the reasons and

18   basis for this average deaths carried forward

19   methodology that we've just been discussing.   Where

20   in your report can I find that described?

21       A    It was not in the August 3rd report.

22       Q    It's not located in that report anywhere,

23   correct?

24       A    That's right.

1       Q     Where in your first errata can I find a

2    description of the reasons and basis for that

3    methodology?

4       A     It was also not in the first errata.

5       Q     Where in your second errata served after

6    your deposition can I find a discussion of the

7    reasons and basis for that methodology?

8              MR. ARBITBLIT:  Objection.

9       A     The numbers are provided in the second

10   errata, but a narrative description is not provided.

11      Q     And so it's fair to say in terms of any

12   written disclosures to the Defendants, you've not

13   provided anywhere a discussion of this methodology or

14   the reasons and basis for it, correct?

15      A     I have -- Sorry.  I have provided updated

16   numbers and a data file, and that's all I have

17   provided thus far.

18      Q     Just the results, right?

19      A     The results.

20      Q     And how about your methodology for

21   replacing suppressed data in some columns with the

22   number five, where in your report can I find an

23   explanation of your reasons and basis for making that

24   adjustment when the data is suppressed?

1        A      I don't think it's described in the report.

2        Q      Is it described anywhere in your first

3    errata?

4        A      I don't believe so.

5        Q      Is it described anywhere in your second

6    errata?

7        A      No.

8        Q      Are you aware whether epidemiologists in

9    your field have developed advanced statistical

10   techniques for estimating the values of data that

11   have been suppressed from the CDC WONDER database?

12       A      There are various techniques that people

13   use for data imputation, and replacing it with a mean

14   value is a very commonly used method.

15       Q      Can you cite a paper in which that's

16   described as an accepted methodology to plug in the

17   number five?

18       A      Sure.  There's many examples of that used

19   in the epidemiological literature.  Off the top of my

20   head, I don't have a citation available, but it's

21   incredibly commonly used.

22       Q      Okay.  Not just off the top of your head,

23   but if I asked you to, you know, look at your report

24   and look at your errata and the various written

EXHIBIT 6



**EXHIBIT 10**

| Year | County | Population | Rx opioids including synthetic: T40.2, T40.3, T40.4 | | | Rx opioids not including synthetic: T40.2, T40.3 | | | T40.3-T40.4 minus T40.2 and T40.3 Deaths that had only T40.4 as a contributing Rx opioid | % of T40.3-T40.4 deaths that only have T40.4 as contributing Rx opioid | Estimated number of Rx opioid overdose deaths | All opioids: T40.1, T40.2, T40.3, T40.4* | | | | Estimated crude rate of Rx opioid overdose death | | *for 2009, deaths have been set to 5, as this is the midpoint in the range of possible suppression values |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Deaths | Crude Rate | Age Adjusted Rate | Deaths | Crude Rate | Age Adjusted Rate | | | | All deaths due to opioids | Deaths due directly to Rx opioids | Deaths due to non-Rx opioids | Deaths due to non-Rx opioids attributable to Rx opioids | | | |
| 1999 | National | 279040168 | 4030 | 1.444 | 1.446 | 3442 | 1.234 | 1.219 | 588 | 0.145955707 | 4030 | | | | | 1.444 | | |
| 2000 | National | 281421966 | 4400 | 1.563 | 1.542 | 3785 | 1.345 | 1.33 | 615 | 0.139772727 | 4400 | | | | | 1.569 | | |
| 2001 | National | 284968955 | 5328 | 1.94 | 1.922 | 4770 | 1.674 | 1.664 | 558 | 0.137120116 | 5328 | | | | | 1.94 | | |
| 2002 | National | 287625193 | 7456 | 2.592 | 2.59 | 6483 | 2.254 | 2.253 | 973 | 0.130498927 | 7456 | | | | | 2.592 | | |
| 2003 | National | 290107693 | 8517 | 2.936 | 2.926 | 7461 | 2.572 | 2.567 | 1056 | 0.123987519 | 8517 | | | | | 2.936 | | |
| 2004 | National | 292805298 | 9857 | 3.366 | 3.367 | 8577 | 2.929 | 2.931 | 1280 | 0.129856954 | 9857 | | | | | 3.366 | | |
| 2005 | National | 295516599 | 10928 | 3.698 | 3.679 | 9612 | 3.253 | 3.246 | 1316 | 0.120426597 | 10928 | | | | | 3.698 | | |
| 2006 | National | 298379917 | 13723 | 4.599 | 4.58 | 11589 | 3.884 | 3.855 | 2134 | 0.155501356 | 13723 | | | | | 4.599 | | |
| 2007 | National | 301231207 | 14408 | 4.783 | 4.76 | 12796 | 4.248 | 4.239 | 1612 | 0.111882788 | 14408 | | | | | 4.783 | | |
| 2008 | National | 304093966 | 14800 | 4.867 | 4.843 | 13149 | 4.324 | 4.3 | 1651 | 0.111554054 | 14800 | | | | | 4.867 | | |
| 2009 | National | 306771529 | 15597 | 5.084 | 5.036 | 13523 | 4.408 | 4.352 | 2074 | 0.13297429 | 15597 | | | | | 5.084 | | |
| 2010 | National | 308745538 | 16651 | 5.393 | 5.361 | 14583 | 4.723 | 4.702 | 2068 | 0.124196745 | 16651 | | | | | 5.393 | | |
| 2011 | National | 311591917 | 16917 | 5.429 | 5.416 | 15140 | 4.859 | 4.863 | 1777 | 0.105042366 | 16917 | | | | | 5.429 | | |
| 2012 | National | 313914040 | 16007 | 5.099 | 5.064 | 14240 | 4.536 | 4.493 | 1767 | 0.110389205 | 16007 | | | | | 5.099 | | |
| 2013 | National | 316128839 | 16235 | 5.136 | 5.089 | 14145 | 4.474 | 4.418 | 2090 | | 14411 | | | | | 4.559 | | |
| 2014 | National | 318857056 | 18893 | 5.925 | 5.905 | 14838 | 4.653 | 4.59 | 4055 | | 15353 | | | | | 4.815 | | |
| 2015 | National | 321418820 | 22598 | 7.031 | 7.038 | 15281 | 4.754 | 4.77 | 7317 | | 16311 | | | | | 5.044 | | |
| 2016 | National | 323127513 | 32445 | 10.041 | 10.171 | 17087 | 5.288 | 5.246 | 15358 | | 19039 | | | | | 5.892 | | |
| 2017 | National | 325719178 | 40051 | 12.296 | 12.49 | 17029 | 5.228 | 5.179 | 23022 | | 19955 | | | | | 6.126 | | |
| 2018 | National | 327167484 | 40893 | 12.499 | 12.726 | 14975 | 4.577 | 4.507 | 25918 | | 18269 | | | | | 5.584 | | |
| 1999 | West Virginia | 1811799 | 27 | 1.49 | 1.492 | 15 | NA | NA | 12 | 0.444444444 | 27 | | | | | 1.49 | | |
| 2000 | West Virginia | 1808344 | 37 | 2.046 | 2.069 | 30 | 1.659 | 1.695 | 7 | 0.189189189 | 37 | | | | | 2.046 | | |
| 2001 | West Virginia | 1801481 | 131 | 7.272 | 7.441 | 104 | 5.773 | 5.977 | 27 | 0.206105087 | 131 | | | | | 7.272 | | |
| 2002 | West Virginia | 1805414 | 169 | 9.361 | 9.562 | 144 | 7.976 | 8.162 | 25 | 0.147928994 | 169 | | | | | 9.361 | | |
| 2003 | West Virginia | 1812295 | 191 | 10.539 | 11.133 | 165 | 9.104 | 9.655 | 26 | 0.136135654 | 191 | | | | | 10.539 | | |
| 2004 | West Virginia | 1816436 | 240 | 13.213 | 13.622 | 194 | 10.68 | 11.073 | 46 | 0.191666667 | 240 | | | | | 13.213 | | |
| 2005 | West Virginia | 1820692 | 137 | 7.525 | 7.995 | 107 | 5.878 | 6.215 | 30 | 0.218978102 | 137 | | | | | 7.525 | | |
| 2006 | West Virginia | 1827912 | 275 | 15.044 | 15.562 | 242 | 13.239 | 13.669 | 33 | 0.12 | 275 | | | | | 15.044 | | |
| 2007 | West Virginia | 1834052 | 317 | 17.284 | 18.161 | 257 | 14.013 | 14.709 | 60 | 0.189274448 | 317 | | | | | 17.284 | | |
| 2008 | West Virginia | 1840310 | 342 | 18.584 | 19.072 | 288 | 15.65 | 16.795 | 54 | 0.157894737 | 342 | | | | | 18.584 | | |
| 2009 | West Virginia | 1847775 | 158 | 8.551 | 8.855 | 133 | 7.198 | 7.451 | 25 | 0.158227848 | 158 | | | | | 8.551 | | |
| 2010 | West Virginia | 1852994 | 431 | 23.26 | 24.427 | 378 | 20.399 | 21.468 | 53 | 0.122969838 | 431 | | | | | 23.26 | | |
| 2011 | West Virginia | 1855364 | 524 | 28.242 | 29.993 | 476 | 25.655 | 27.9 | 48 | 0.091603053 | 524 | | | | | 28.242 | | |
| 2012 | West Virginia | 1855413 | 431 | 23.229 | 24.815 | 390 | 21.02 | 22.479 | 41 | 0.09951761 | 431 | | | | | 23.229 | | |
| 2013 | West Virginia | 1854004 | 414 | 22.326 | 23.414 | 368 | 19.846 | 20.846 | 46 | | 376 | | | | | 20.277 | | |
| 2014 | West Virginia | 1850336 | 437 | 23.617 | 24.663 | 383 | 20.699 | 21.444 | 54 | | 393 | | | | | 21.24 | | |
| 2015 | West Virginia | 1844128 | 512 | 27.764 | 28.909 | 380 | 20.606 | 21.188 | 132 | | 403 | | | | | 21.853 | | |
| 2016 | West Virginia | 1831102 | 640 | 34.952 | 37.719 | 340 | 18.568 | 19.678 | 300 | | 393 | | | | | 21.462 | | |
| 2017 | West Virginia | 1815857 | 795 | 43.781 | 47.155 | 304 | 16.741 | 17.169 | 491 | | 391 | | | | | 21.533 | | |
| 2018 | West Virginia | 1805832 | 681 | 37.711 | 41.087 | 294 | 12.958 | 13.136 | 447 | | 313 | | | | | 17.333 | | |
| 1999 | Cabell County, WV | 96987 | NA | NA | NA | NA | NA | NA | NA | | NA | | | | | NA | | |
| 2000 | Cabell County, WV | 96784 | NA | NA | NA | NA | NA | NA | NA | | NA | | | | | NA | | |
| 2001 | Cabell County, WV | 96035 | 12 | NA | NA | NA | NA | NA | NA | | 12 | | | | | 12.495 | | |
| 2002 | Cabell County, WV | 95741 | 15 | NA | NA | 12 | NA | NA | 3 | | 15 | | | | | 15.667 | | |
| 2003 | Cabell County, WV | 95554 | 15 | NA | NA | NA | NA | NA | NA | | 15 | | | | | 15.698 | | |

65

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48 | 2004 | Cabel County, WV | 95239 | 17 | NA | NA | 13 | NA | NA | 4 | | 17 | | | | | 17.85 | | |
| 49 | 2005 | Cabel County, WV | 94871 | NA | NA | NA | NA | NA | NA | NA | | NA | | | | | NA | | |
| 50 | 2006 | Cabel County, WV | 94943 | 20 | 21.065 | 21.504 | 16 | NA | NA | 4 | | 20 | 21 | 20 | 1 | 1 | 21.065 | | |
| 51 | 2007 | Cabel County, WV | 95059 | 33 | 34.715 | 36.232 | 78 | 79.455 | 80.739 | 5 | | 33 | 37 | 33 | 4 | 2 | 34.715 | | |
| 52 | 2008 | Cabel County, WV | 95209 | 25 | 26.258 | 28.234 | 19 | NA | NA | 8 | | 25 | 25 | 25 | 0 | 0 | 26.258 | | |
| 53 | 2009 | Cabel County, WV | 96040 | NA | NA | NA | NA | NA | NA | NA | | NA | 5 | 5 | 0 | 0 | NA | | |
| 54 | 2010 | Cabel County, WV | 96339 | 23 | 23.879 | 24.379 | 23 | 23.879 | 24.379 | 0 | | 23 | 25 | 23 | 2 | 1 | 23.879 | | |
| 55 | 2011 | Cabel County, WV | 96653 | 29 | 30.004 | 33.106 | 26 | 26.9 | 29.945 | 3 | | 29 | 36 | 29 | 7 | 4 | 30.004 | | |
| 56 | 2012 | Cabel County, WV | 96974 | 18 | NA | NA | 18 | NA | NA | 0 | | 18 | 22 | 18 | 4 | 2 | 18.562 | | |
| 57 | 2013 | Cabel County, WV | 97133 | 26 | 26.767 | 29.733 | 24 | 24.708 | 27.261 | 2 | | 24 | 42 | 24 | 18 | 10 | 24.708 | | |
| 58 | 2014 | Cabel County, WV | 97109 | 37 | 32.953 | 36.773 | 27 | 27.804 | 31.095 | 5 | | 28 | 45 | 28 | 17 | 9 | 28.834 | | |
| 59 | 2015 | Cabel County, WV | 96844 | 48 | 49.564 | 54.777 | 29 | 29.945 | 33.151 | 19 | | 33 | 69 | 32 | 37 | 20 | 33.043 | | |
| 60 | 2016 | Cabel County, WV | 95987 | 69 | 71.885 | 82.521 | 29 | 30.212 | 34.944 | 40 | | 36 | 87 | 36 | 51 | 27 | 37.505 | | |
| 61 | 2017 | Cabel County, WV | 94958 | 124 | 130.584 | 147.851 | 24 | 25.274 | 27.482 | 100 | | 43 | 132 | 43 | 90 | 48 | 44.23 | | |
| 62 | 2018 | Cabel County, WV | 93224 | 104 | 111.559 | 126.316 | 17 | NA | NA | 87 | | 32 | 105 | 32 | 73 | 39 | 34.326 | | |

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2

 3

     * * * * * * * * * * * * * * * * * * * * * * * *
 4

     THE CITY OF HUNTINGTON,
 5

             Plaintiff,
 6

     vs.                              CIVIL ACTION
 7                                    NO. 3:17-01362

     AMERISOURCEBERGEN DRUG
 8   CORPORATION, et al.,
 9           Defendants.
10   _____
11   CABELL COUNTY COMMISSION,
12            Plaintiff,
13   vs.                              CIVIL ACTION
                                      NO. 3:17-01665
14   AMERISOURCEBERGEN DRUG
     CORPORATION, et al.,
15

             Defendants.
16
     * * * * * * * * * * * * * * * * * * * * * * * *
17

18

19          Videotaped and videoconference personal
     and 30(b)(6) deposition of DR. ALLEN MOCK AS
20   REPRESENTATIVE OF THE WEST VIRGINIA STATE MEDICAL
     OFFICE taken by the Defendants under the Federal
21   Rules of Civil Procedure in the above-entitled
     action, pursuant to notice, before Teresa S. Evans,
22   a Registered Merit Reporter, all parties located
     remotely, on the 14th day of August, 2020.
23

24
```

Page 2

1                          APPEARANCES:
2

    APPEARING FOR THE PLAINTIFFS:
3
            Anne McGinness Kearse, Esquire (via Zoom)
4           Monique Christenson, Esquire (via Zoom)
            MOTLEY RICE
5           28 Bridgeside Boulevard
            Mt. Pleasant, SC   29464
6
7   APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
8            Raymond Franks, Esquire (via Zoom)
             CAREY, DOUGLAS, KESSLER & RUBY
9            901 Chase Tower
             707 Virginia Street, East
10           Charleston, WV   25323
11
    APPEARING FOR THE DEFENDANT AMERISOURCEBERGEN:
12
            Sandra K. Zerrusen, Esquire (via Zoom)
13          JACKSON KELLY
            50 South Main Street
14          Suite 201
            Akron, OH   44308
15
            Sean Thomas, Esquire (via Zoom)
16          JACKSON KELLY
            500 Lee Street, East
17          Suite 1600
            Charleston, WV   25301
18
19
20
21
22
23
24

```
 1                    APPEARANCES (Contd.)
 2

    APPEARING FOR THE DEPONENT OFFICE OF THE CHIEF
 3  MEDICAL EXAMINER AND THE DEPONENT:
 4           M. Claire Winterholler, Esquire (via Zoom)
             Assistant Attorney General
 5           OFFICE OF THE ATTORNEY GENERAL
             350 Capitol Street, Suite 702
 6           Charleston, WV  25301
 7           Vaughn Sizemore, Esquire
             Assistant Attorney General
 8           OFFICE OF THE ATTORNEY GENERAL
             350 Capitol Street, Suite 702
 9           Charleston, WV  25301
10

    ALSO PRESENT:
11
             Adam Hager, Videographer (via Zoom)
12           Daniel LeMasters, Esquire (via Zoom)
             Erik Bolte, Technician (via Zoom)
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

1                    EXAMINATION INDEX

2

3     BY MS. ZERRUSEN - Personal                9

4     BY MS. ZERRUSEN - 30(b)(6)              188

5     BY MS. KEARSE                           234

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    Code §61-12."

2                    Do you agree that this is the mission

3    of OCME?

4        A.   Yes.

5        Q.   And what cases fall within the jurisdiction

6    of OCME?

7        A.   Cases that are unnatural, those that

8    involve nonnatural causes.

9        Q.   And are every -- is every case that is

10   nonnatural referred to the OCME?

11       A.   Yes.

12       Q.   Okay.  Who determines whether a death is

13   natural or unnatural?

14       A.   First, the physician -- it's the treating

15   physician's responsibility to notify the OCME.

16   They do their best job at that.  But occasionally,

17   we're not notified of a death that could escape our

18   -- our jurisdiction.

19                    Typically, the call will come in from

20   either the physician's office or the hospital or

21   hospice or from emergency medical services, or

22   maybe even the county medical examiner directly.

23                    That goes to the FIU, the forensic

24   investigators in-house.  They will confer with the

1    physician on call if necessary and bring the case

2    in based upon the case circumstances, the

3    individual case features.

4        Q.    Okay.  So then would any suspected drug

5    overdose case be within the jurisdiction of OCME?

6        A.    It depends on who has determined it to be

7    suspicious or suspected.  But all -- all suspected

8    toxicology-related deaths will come to the OCME.

9        Q.    Okay.  You talked about treating physicians

10   referring the deaths to OCME, the hospital,

11   hospice, ER, county medical examiners.  Are there

12   any other entities that report deaths to OCME?

13       A.    Those are the primary ones.  There are

14   instances where a funeral home will call the OCME

15   when they see something that they suspect is injury

16   in a case that was not reported to the OCME, but

17   it's -- it's typically from a hospital setting.

18       Q.    Okay.  How about nursing homes?

19       A.    Nursing homes, certainly.

20       Q.    How about law enforcement?

21       A.    Law enforcement, certainly.

22       Q.    Okay.  Any other entities that you could

23   think of that refer cases to the OCME?

24       A.    Anybody that attends a death could

1       A.    I said before that the -- the opinion, the

2    interpretation, is somewhat subjective, whereas the

3    observations are made at autopsy.  I think that you

4    need to go in with the understanding that

5    everything has uncertainty attached to it, which is

6    why I hate that reasonable degree of medical

7    certainty that lawyers love.

8             I think everything has uncertainty and

9    that increases the uncertainty.  With a large

10   postmortem redistribution effect, the uncertainty

11   needs to be increased.

12            Whether that will affect ultimately

13   your cause and manner of death is an interpretive

14   issue that the doctor needs to address.

15      Q.    And so if you didn't feel comfortable

16   putting fentanyl on based on your knowledge based

17   on the redistribution of fentanyl, what would you

18   write on the death certificate?

19      A.    I would either place it in -- in Part II as

20   a other significant contributory factor.  I could

21   add qualifiers to it.  I could say "possible,"

22   "probable," "likely," "fentanyl intoxication."  I

23   could do the same in Part II as a contributor.

24            In "How injury occurred", I could

Page 125

1    mention "cannot exclude the contribution of

2    fentanyl."  There's are a lot of ways that I can

3    de-emphasize my certainty in a fentanyl

4    intoxication.

5       Q.   Could you put "unknown opioid" on there?

6    Is that a possibility?

7       A.   That's frowned upon, but you could.

8    Instances like that, I usually prefer to write --

9    suppose we had a urine drug screen that was -- it

10   just said, "Opioids positive."  They can't

11   differentiate between the two.  If I have nothing

12   else, I might say, "Opioid intoxication" in

13   parentheses, "(clinical)," to indicate that I

14   didn't perform the test.

15      Q.   Okay.

16      A.   The impetus is to record all of the drugs

17   on the -- on Part I in a lethal drug intoxication,

18   and there's a long history behind that, and it

19   takes a lot of getting used to, but that is the

20   kind of generalized accepted position.

21      Q.   And when you -- you say "record all the

22   drugs."  Do you record on the death certificate all

23   the drugs that are in a person's system or all the

24   drugs that were at such a level that in and of

Page 126

1    themselves, they would have been lethal?

2       A.   All of the drugs.

3       Q.   Okay.

4       A.   Currently.  Now, historically -- West

5    Virginia was actually ahead of the curve on this,

6    where they recorded a lot more drugs in Part I than

7    other offices might, and over time, they've all

8    adopted it with very rare exceptions.

9            And I say it takes some getting used to

10   because you might have disparate mechanisms in

11   drugs.  I might have Amphetamine and an opioid as a

12   combined intoxication, and as a physician, knowing

13   that the pharmacology is vastly different, it takes

14   a little getting used to.

15           But I think the data that you're

16   ultimately able to mine when you capture all of the

17   drugs could be important from a public health

18   standpoint.

19      Q.   Okay.  So on a death certificate, if it

20   lists an opioid -- regardless of the opioid -- it

21   doesn't necessarily mean that that opioid in and of

22   itself would have been lethal to that decedent.

23      A.   In the rare case where a clinical opioid

24   intoxication would make it to the DC, I think

1    that's all you could say about it.  In a -- one

2    that's issued by our office where it has a combined

3    intoxication by a disparate range of drugs, you

4    could not say that one drug out of the mixture was

5    responsible for the death.

6            You could insinuate it if other drugs

7    were in low concentrations and one single drug was

8    in variable remarkably high concentrations, but as

9    a rule, no, you can't -- you can't differentiate

10   between which was the cause of death ultimately.

11      Q.   And in drug intoxication cases, it's

12   frequent that there's more than one drug in a

13   decedent's system, correct?

14      A.   Very frequent.

15      Q.   And that's the problem with it, that you

16   can't tell which one was the actual ultimate cause

17   of death for the decedent because there's more than

18   one.

19           MS. KEARSE:   Object to form.

20      A.   You can determine -- so let's say that

21   someone dies from something -- from -- the scene

22   shows that someone died from a sudden collapse.

23   Although fentanyl has been published to cause a

24   sudden death-like reaction, that's not the norm for

1    opioids.  You would expect more somnolence,

2    respiratory depression, death in your sleep.

3    Whereas for methamphetamine, you might suspect an

4    arrhythmia and a sudden death.

5           So if you have someone that's

6    somnolent, they're heard snoring and then they stop

7    snoring and they die and you have a little bit of

8    methamphetamine and a whole lot of fentanyl, you're

9    safe to say that it was the fentanyl that

10   reasonably caused the death.

11          But the Amphetamine would still be

12   listed in Part I.  So when you're reviewing the

13   death certificate, it would be difficult for you to

14   say which one just on the basis of the death

15   certificate.  Which is good for data mining, but

16   bad for a physician reviewer that has to, you know,

17   interpret that.

18       Q.   So in addition to the death certificate,

19   would I need information from the autopsy report,

20   the toxicology report and kind of the whole autopsy

21   file to get a whole picture?

22       A.   Yeah, the Vital Statistics is a -- is a

23   governmental function just like the manner of

24   death.  You know, they -- what you put on the death

1  certificate, there's no guarantee that that will

2  end up in the Vital Statistics database the way

3  it's written, because they code things a certain

4  way.

5           So the most reliable coding strategy to

6  trance -- to transmit the doctor's opinion is by

7  aggressively using Part I to list all the drugs

8  that were present.

9           You may have an opportunity in Part --

10 in "How Injury Occurred" to say, "Abused fentanyl

11 by intravenous route" or you might have to say,

12 "Abused illicit methamphetamine; prescribed

13 Oxycodone," so it's unmanageable and it -- it takes

14 some time to get used to, but I still think it's

15 the most prudent.

16    Q.   So we talked a lot about fentanyl.  How do

17 you test -- or can --

18           MS. ZERRUSEN:  Strike that.

19    Q.   Can OCME test to determine whether fentanyl

20 was prescription fentanyl, illicitly-manufactured

21 fentanyl or fentanyl analogs?

22    A.   There are ways to distinguish all of those.

23 They're not perfect.  There's uncertainty involved.

24 Prescription fentanyl will be fentanyl alone with

1     A.    Correct.

2     Q.    And a different medical examiner can look

3  at the same information for a decedent and come up

4  with a different cause of death?

5     A.    They certainly can.

6     Q.    Okay.  We talked about many different

7  substances being in a decedent's tox screen, but

8  I'm not sure that we -- we used the word "poly

9  pharmacy" earlier.  What is poly pharmacy?

10    A.    Poly pharmacy is a popular cause of death

11 in some areas and some offices, not ours.  It runs

12 counter to the instructions that are listed here.

13 That's used to describe a combined intoxication.

14 It allows the author of the DC to say, "Multiple

15 drugs were in the system" but not be any more

16 specific.

17            So it's coded as an accidental

18 overdose, but very little information about the

19 individual drugs are captured.

20    Q.    Okay.  And OCME wants to capture every

21 single drug that is found in a decedent's tox

22 screen?

23    A.    Every drug that has a -- a relevance.  For

24 example, I won't include nicotine or caffeine, for

1    example, unless there's, you know, a reason to.  So

2    any drugs that have a significant pharmacologic

3    reaction.

4        Q.   Is it possible to overdose on caffeine?

5        A.   Yes.

6        Q.   Wow.  That's bad to know, especially the

7    amount of coffee that I drink.

8        A.   You have to try really hard though.

9        Q.   Okay.  Earlier, we talked about tolerance

10   and tolerance levels.  Is your testimony regarding

11   tolerance and tolerance levels earlier the

12   testimony of OCME as well?

13       A.   Yes.

14       Q.   And earlier, we talked about manner of

15   death and how it is classified and what -- what

16   goes into determining manner of death?

17            Is all of your testimony earlier

18   regarding manner of death also the testimony of

19   OCME?

20       A.   Yes, that's office policy.

21       Q.   Okay.  Similarly, we test -- you testified

22   earlier regarding suicides and several different

23   aspects that go into determining suicides, stigma

24   of suicide.  Is all of your earlier testimony


Centers for Disease
Control and Prevention

## National Center for Health Statistics



## Provisional Drug Overdose Death Counts

Recent improvements in timeliness and data quality have prompted a re-
evaluation of the length of time that data quality requirements have had to be
met for states to be included in "Figure 2. 12 Month-ending Provisional Number
of Drug Overdose Deaths by Drug or Drug Class."  As a result of this re-
evaluation, trends for additional states are presented in Figure 2. Additional
states will be added as they meet data quality and timeliness requirements.
Please see the **Technical Notes** of the dashboard for more information.

This data visualization presents provisional counts for drug overdose deaths based on a current flow of mortality data in the
National Vital Statistics System. Counts for the most recent final annual data are provided for comparison. National
provisional counts include deaths occurring within the 50 states and the District of Columbia as of the date specified and may
not include all deaths that occurred during a given time period. Provisional counts are often incomplete and causes of death
may be pending investigation (see Technical notes) resulting in an underestimate relative to final counts. To address this,
methods were developed to adjust provisional counts for reporting delays by generating a set of predicted provisional counts
(see Technical notes).

The provisional data presented in this visualization include: (a) the reported and predicted provisional counts of deaths due to
drug overdose occurring nationally and in each jurisdiction; (b) a U.S. map of the percentage changes in provisional drug
overdose deaths for the current 12 month-ending period compared with the 12-month period ending in the same month of
the previous year, by jurisdiction; and (c) the reported and predicted provisional counts of drug overdose deaths involving
specific drugs or drug classes occurring nationally and in selected jurisdictions. The reported and predicted provisional counts
represent the numbers of deaths due to drug overdose occurring in the 12-month periods ending in the month indicated.
These counts include all seasons of the year and are insensitive to variations by seasonality. Deaths are reported by the
jurisdiction in which the death occurred.

Several data quality metrics, including the percent completeness in overall death reporting, percentage of deaths with cause
of death pending further investigation, and the percentage of drug overdose deaths with specific drugs or drug classes
reported are included to aid in interpretation of provisional data as these measures are related to the accuracy of provisional
counts (see Technical notes). Reporting of the specific drugs and drug classes involved in drug overdose deaths varies by
jurisdiction, and comparisons of death rates involving specific drugs across selected jurisdictions should not be made
(see Technical notes). Provisional data presented in this visualization will be updated on a monthly basis as additional records
are received.

| Options |
|---|

Select a dashboard:

12 Month-ending Provisional Counts and Percent Change of Drug ⌄

Update Dashboard

Download Datasets:

- CSV Format
- Data.CDC.gov
  (Export to CSV,
  JSON, XLS, XML)[7]

81

# 12 Month-ending Provisional Number of Drug Overdose Deaths

NOTE: Visualization is optimized for a viewing screen of 950 pixels or wider (i.e., PC and tablets in landscape orientation).

**United States**



**Select predicted or reported number of deaths**

◉ Predicted

○ Reported

12 Month-ending Provisional Counts of Drug Overdose Deaths - The following data tables describe the currently displayed dashboard

*click the titlebars to expand / collapse Data tables*

> ❯ Data Table for Figure 1a. 12 Month-ending Provisional Counts of Drug Overdose Deaths

> ❯ Data Table for Figure 1b: Percent Change in 12 Month-ending Count of Drug Overdose Deaths, by Jurisdiction

# Technical notes

## Nature and sources of data

Provisional drug overdose death counts are based on death records received and processed by the National Center for Health Statistics (NCHS) as of a specified cutoff date. The cutoff date is generally the first Sunday of each month. National provisional estimates include deaths occurring within the 50 states and the District of Columbia. NCHS receives the death records from state vital registration offices through the Vital Statistics Cooperative Program (VSCP).

The timeliness of provisional mortality surveillance data in the National Vital Statistics System (NVSS) database varies by cause of death. The lag time (i.e., the time between when the death occurred and when the data are available for analysis) is longer for drug overdose deaths compared with other causes of death (1). Thus, provisional estimates of drug overdose deaths are reported 6 months after the date of death.

Provisional death counts presented in this data visualization are for "12-month ending periods," defined as the number of deaths occurring in the 12-month period ending in the month indicated. For example, the 12-month ending period in June 2017 would include deaths occurring from July 1, 2016, through June 30, 2017. The 12-month ending period counts include all seasons of the year and are insensitive to reporting variations by seasonality. Counts for the 12-month period ending in the same month of the previous year are shown for comparison. These provisional counts of drug overdose deaths and related data quality metrics are provided for public health surveillance and monitoring of emerging trends. Provisional drug overdose death data are often incomplete, and the degree of completeness varies by jurisdiction and 12-month ending period. Consequently, the numbers of drug overdose deaths are underestimated based on provisional data relative to final data and are subject to random variation. Methods to adjust provisional counts have been developed to provide *predicted* provisional counts of drug overdose deaths (2) , accounting for delayed reporting (see Percentage of records pending investigation and Adjustments for delayed reporting).

Provisional data are based on available records that meet certain data quality criteria at the time of analysis and may not include all deaths that occurred during a given time period. Therefore, they should not be considered comparable with final data and are subject to change.

## Cause-of-death classification and definition of drug deaths

Mortality statistics are compiled in accordance with World Health Organization (WHO) regulations specifying that WHO member nations classify and code causes of death with the current revision of the *International Statistical Classification of Diseases and Related Health Problems* (ICD). ICD provides the basic guidance used in virtually all countries to code and classify causes of death. It provides not only disease, injury, and poisoning categories but also the rules used to select the single underlying cause of death for tabulation from the several diagnoses that may be reported on a single death certificate, as well as definitions, tabulation lists, the format of the death certificate, and regulations on use of the classification. Causes of death for data presented in this report were coded according to ICD guidelines described in annual issues of Part 2a of the NCHS Instruction Manual (3).

Drug overdose deaths are identified using underlying cause-of-death codes from the Tenth Revision of ICD (ICD–10): X40–X44 (unintentional), X60–X64 (suicide), X85 (homicide), and Y10–Y14 (undetermined). Drug overdose deaths involving selected drug categories are identified by specific multiple cause-of-death codes. Drug categories presented include: heroin (T40.1); natural opioid analgesics, including morphine and codeine, and semisynthetic opioids, including drugs such as oxycodone, hydrocodone, hydromorphone, and oxymorphone (T40.2); methadone, a synthetic opioid (T40.3); synthetic opioid analgesics other than methadone, including drugs such as fentanyl and tramadol (T40.4); cocaine (T40.5); and psychostimulants with abuse potential, which includes methamphetamine (T43.6). Opioid overdose deaths are identified by the presence of any of the following MCOD codes: opium (T40.0); heroin (T40.1); natural opioid analgesics (T40.2); methadone (T40.3); synthetic opioid analgesics other than methadone (T40.4); or other and unspecified narcotics (T40.6). This latter category includes drug overdose deaths where 'opioid' is reported without more specific information to assign a more specific ICD–10 code (T40.0–T40.4) (4,5). Among deaths with an underlying cause of drug overdose, the percentage with at least one drug or drug class specified is defined as that with at least one ICD–10 multiple cause-of-death code in the range T36–T50.8. Two additional categories were added based on CDC's Opioid Overdose Indicator Support Toolkit (6): drug overdose deaths involving natural, semi-synthetic, or synthetic opioids, including methadone (T40.2–T40.4); drug overdose deaths involving natural and semi-synthetic opioids, and methadone (T40.2–T40.3). These new categories, which are a combination of existing categories, are not displayed on the default figure to facilitate ease of display of the main drug categories, but are accessible through the drop-down box that allows for selection of specific drug categories.

Drug overdose deaths may involve multiple drugs; therefore, a single death might be included in more than one category when describing the number of drug overdose deaths involving specific drugs. For example, a death that involved both heroin and fentanyl would be included in both the number of drug overdose deaths involving heroin and the number of drug overdose deaths involving synthetic opioids other than methadone.

## Selection of specific states and other jurisdictions to report

Provisional counts are presented by the jurisdiction in which the death occurred (i.e., the reporting jurisdiction). Data quality and timeliness for drug overdose deaths vary by reporting jurisdiction. Provisional counts are presented for reporting jurisdictions based on measures of data quality: the percentage of records where the manner of death is listed as "pending investigation," the overall completeness of the data, and the percentage of drug overdose death records with specific drugs or drug classes recorded. These criteria are defined below.

## Percentage of records pending investigation

Drug overdose deaths often require lengthy investigations, and death certificates may be initially filed with a manner of death "pending investigation" and/or with a preliminary or unknown cause of death. When the percentage of records reported as "pending investigation" is high for a given jurisdiction, the number of drug overdose deaths is likely to be underestimated. For jurisdictions reporting fewer than 1% of records as "pending investigation", the provisional number of drug overdose deaths occurring in the fourth quarter of 2015 was approximately 5% lower than the final count of drug overdose deaths occurring in that same time period. For jurisdictions reporting greater than 1% of records as "pending investigation" the provisional counts of drug overdose deaths may underestimate the final count of drug overdose deaths by as much as 30%. Thus, jurisdictions are included in Figure 2 if 1% or fewer of their records in NVSS are reported as "pending investigation," for the six most recent 12-month ending periods. For jurisdictions not meeting quality measures for all periods starting with January 2015, predicted values are shown for all data points that meet percent completeness and drug specificity thresholds with reported values only shown for months where all three data quality measures were met. As a result, estimates are shown for selected reporting periods before the most recent 6 months and there may be gaps in the trends. Values for records pending investigation are updated with each monthly release and reflect the most current data available.

## Percent completeness

NCHS receives monthly counts of the estimated number of deaths from each jurisdictional vital registration offices (referred to as "control counts"). This number represents the best estimate of how many deaths occurred in a given jurisdiction in each month. Death records in the NVSS database must have both demographic and cause-of-death information. The percent completeness is obtained by dividing the number of death records in the NVSS database for each jurisdiction for each 12-month period by the control counts and multiplying by 100. For more information on completeness, see Technical Notes of the Vital Statistics Rapid Release Program. Jurisdictions are included in Figure 2 if the percent completeness was consistently 90% or higher following a 6-month lag for the 12-month ending periods included in the dashboard.

## Drug specificity

The percentage of death records in which a specific drug or drug class is identified as involved in a drug overdose death varies by jurisdiction (7). Selected jurisdictions consistently had 90% or more of drug overdose death certificates mentioning at least one specific drug for all of the 12-month ending periods included in the dashboard. Provisional counts of drug overdose deaths where a specific drug or drug class is reported on the death certificate are presented for the United States and for jurisdictions meeting this threshold. Additionally, as a data quality metric, the percentage of drug overdose death records where at least one drug or drug class is recorded is presented.

## Improvements in Data Quality

In order for information on drug-specific overdose deaths to be reported by jurisdiction in the NCHS Vital Statistics Rapid Release Monthly Provisional Drug Overdose Death dashboard, states have been required to meet a set of timeliness and quality criteria consistently for each time point in the long-term trend line shown (starting with January 2015). Improvements in timeliness and data quality over the last year have prompted a re-evaluation of the length of time that data quality requirements have had to be met for states to be included in "Figure 2. 12 Month-ending Provisional Number of Drug Overdose Deaths by Drug or Drug Class." As a result of this re-evaluation, additional states will be added to "Figure 2. 12 Month-ending Provisional Number of Drug Overdose Deaths by Drug of Drug Class" as they meet the data quality and timeliness requirements. Some states may also drop out of the figure for a given month if they fall below data quality criteria.

As the timeliness and data quality of the drug overdose mortality data improve, the list of included jurisdictions will be re-examined to determine whether additional jurisdictions should be included or excluded based on the criteria described above. Due to reporting variations by jurisdiction, comparisons across selected jurisdictions should not be made. Data quality measures are shown for all jurisdictions in the below table. Values are updated with each monthly release and reflect the most current data available.

The following data quality table is available in a CSV format. Click here ⬇ to download.

> ❯ Data Quality Measures for All Jurisdictions

# Adjustments for delayed reporting

Provisional counts of drug overdose deaths are underestimated relative to final counts. The degree of underestimation is determined primarily by the percentage of records with the manner of death reported as "pending investigation" and tends to vary by reporting jurisdiction, year, and month of death. Specifically, the number of drug overdose deaths will be underestimated to a larger extent in jurisdictions with higher percentages of records reported as "pending investigation," and this percentage tends to be higher in more recent months.

Methods were developed to adjust provisional counts for reporting delays related to temporal factors (i.e., 12 month-ending period) and the percentage of records that are reported with manner of death "pending investigation" (2). Briefly, these methods involve developing 'multiplication factors' based on the degree of underreporting in provisional data compared with final data. For example, if provisional counts of drug overdose deaths were historically 90% complete relative to final data, then the multiplication factor in this instance would be 1.1.  The reported provisional counts can be multiplied by this factor to generate a set of *predicted* provisional counts that adjust for reporting delays.

The 12 month-ending period and the percentage of records with manner of death reported as "pending investigation" were used to predict the degree of underreporting in provisional data relative to final.  Results from these models were used to generate a set of multiplication factors that could be applied to the reported provisional counts of drug overdose deaths to estimate *predicted* provisional counts.  These predicted provisional counts may represent a more accurate picture of recent trends by accounting for reporting delays related to the percentage of records in provisional data with manner of death "pending investigation." It is important to note that flat or declining numbers of drug overdose deaths (either reported or predicted) could be due to incomplete data, true decreases in the number of deaths, or a combination of the two. True declines or plateaus in the numbers of drug overdose deaths across the U.S. cannot be ascertained until final data become available.

Timeliness of drug overdose death reporting has improved in recent years. Adjustments for delayed reporting are based on final data from 2018. Relative to final data, 12-month ending provisional counts of drug overdose deaths for 2018 were 97% to 99% complete after a 6-month lag. The degree of underestimation was largest for 12-month periods ending in August and September, where provisional counts were approximately 98% of final counts, on average. Patterns were similar to those seen for 2017 data, but completeness was slightly higher in 2018. With improvements in reporting and completeness, predicted values will be closer to reported values and the completeness of reported drug overdose death counts may be higher than in prior years.

> ❯ **Table 1. Completeness of 12-month ending provisional counts of drug overdose deaths relative to final counts from 2018 after six month lag, by reporting jurisdiction and ending month**

| Reporting jurisdiction | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| United States | 99.3 | 98.8 | 98.7 | 98.8 | 98.4 | 98.3 | 98.1 | 97.9 | 97.9 | 98.2 | 98.8 | 99.7 |
| Alabama | 100 | 98.5 | 98.6 | 98.2 | 86.8 | 99.3 | 99.2 | 99.1 | 99.1 | 99.7 | 100 | 100 |
| Alaska | 100 | 99.3 | 99.3 | 99.3 | 99.2 | 99.2 | 99.1 | 100 | 100 | 100 | 100 | 100 |
| Arizona | 99.6 | 99.4 | 99.4 | 99.5 | 99.3 | 99.3 | 99.2 | 99.5 | 99.5 | 99.6 | 99.4 | 99.9 |
| Arkansas | 99.5 | 99.5 | 99.5 | 99.5 | 99.5 | 99.1 | 98.7 | 98.7 | 98.7 | 98.7 | 99.1 | 99.8 |
| California | 98.5 | 97.4 | 96.5 | 96.4 | 96.2 | 96.3 | 96 | 94.6 | 92.1 | 96.2 | 98.2 | 98.9 |
| Colorado | 100 | 100 | 99.9 | 99.8 | 99.8 | 99.8 | 99.9 | 99.8 | 99.8 | 99.9 | 99.9 | 100 |
| Connecticut | 99.4 | 98.7 | 98.4 | 98.1 | 97.4 | 96.2 | 95.9 | 98.4 | 98.3 | 99.4 | 98.5 | 100 |
| Delaware | 100 | 100 | 99.7 | 99.7 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| District of Columbia | 99.4 | 99.7 | 99.7 | 99.3 | 97.9 | 98.6 | 98.6 | 98.6 | 98.3 | 98.7 | 99.7 | 100 |
| Florida | 99.5 | 99.1 | 99.2 | 99.2 | 99.5 | 99.6 | 99.6 | 99.4 | 99.6 | 99.7 | 99.9 | 100 |
| Georgia | 99.7 | 99.7 | 99.7 | 99.4 | 99.4 | 99.6 | 99.6 | 99.7 | 99.5 | 99.3 | 99.6 | 100 |
| Hawaii | 100 | 100 | 99.5 | 99.6 | 99.5 | 99.5 | 99.5 | 100 | 99.5 | 99.1 | 97.7 | 100 |

| Reporting Jurisdiction | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Idaho | 99.6 | 99.6 | 100 | 99.6 | 99.6 | 98.7 | 97.6 | 98.4 | 98.3 | 97.8 | 100 | 100 |
| Illinois | 100 | 99.9 | 100 | 100 | 99.9 | 99.9 | 99.8 | 99.8 | 99.9 | 99.9 | 99.9 | 100 |
| Indiana | 99.7 | 99.2 | 98.9 | 98.6 | 98.5 | 98.3 | 98.4 | 98.8 | 98.7 | 98.2 | 97.9 | 99.5 |
| Iowa | 100 | 99.7 | 100 | 100 | 100 | 99.7 | 99.3 | 99.3 | 99 | 99.3 | 99.3 | 99.3 |
| Kansas | 100 | 100 | 100 | 100 | 100 | 99.7 | 99.4 | 99.7 | 99.7 | 99.7 | 99.7 | 100 |
| Kentucky | 99.9 | 99.7 | 99.7 | 99.5 | 99.7 | 99.6 | 99.9 | 99.8 | 99.9 | 99.9 | 99.9 | 99.9 |
| Louisiana | 99.9 | 99.5 | 99.6 | 99.8 | 99.8 | 99.8 | 99.8 | 99.8 | 99.9 | 100 | 100 | 100 |
| Maine | 100 | 100 | 100 | 100 | 100 | 100 | 99.8 | 99.8 | 99.7 | 99.5 | 99.5 | 99.7 |
| Maryland | 99.6 | 99.7 | 99.9 | 100 | 100 | 100 | 100 | 100 | 100 | 99.9 | 99.9 | 100 |
| Massachusetts | 99.9 | 99.9 | 99.5 | 100 | 99.9 | 100 | 100 | 100 | 99.9 | 99.7 | 99.9 | 99.9 |
| Michigan | 96 | 93.6 | 98.3 | 98.2 | 97.9 | 97.7 | 96.8 | 97.3 | 97.2 | 97.3 | 98.2 | 99.8 |
| Minnesota | 100 | 99.7 | 100 | 100 | 99.9 | 99.9 | 99.9 | 99.6 | 99.5 | 99.5 | 99.8 | 99.8 |
| Mississippi | 97.2 | 96.1 | 93 | 92.4 | 91.1 | 96.1 | 93.8 | 92.9 | 94.6 | 99 | 100 | 100.3 |
| Missouri | 99.9 | 99.6 | 99.4 | 99.7 | 99.7 | 99.8 | 99.8 | 100 | 100 | 100 | 100 | 99.9 |
| Montana | 97.4 | 97.1 | 98 | 99 | 100 | 98.1 | 98.1 | 99.1 | 98.2 | 99.1 | 100 | 100 |
| Nebraska | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Nevada | 99.9 | 99.6 | 99.7 | 99.7 | 99.6 | 99.9 | 99.9 | 99.5 | 99.5 | 99.5 | 99.4 | 100 |
| New Hampshire | 99.8 | 99.4 | 96.9 | 95.1 | 95.1 | 94.9 | 94.7 | 94.7 | 93.4 | 88.8 | 100 | 100 |
| New Jersey | 99.2 | 99 | 98.6 | 98.7 | 98.5 | 98.6 | 98.2 | 97.7 | 97.9 | 98.1 | 98.8 | 99.5 |
| New Mexico | 97.8 | 97.9 | 98.1 | 98.1 | 96.9 | 97.2 | 98.4 | 98 | 97.7 | 98.4 | 99.2 | 98.7 |
| New York[1] | 98 | 96.6 | 96.1 | 98.9 | 99.1 | 99.3 | 99.3 | 99.4 | 99.7 | 99.1 | 98.4 | 98.7 |
| New York City | 99.3 | 99.1 | 98.9 | 98.8 | 97.6 | 96.5 | 94.8 | 97.9 | 97.4 | 98.3 | 99.1 | 99.5 |
| North Carolina | 98.3 | 97.5 | 96.5 | 98.3 | 97.3 | 95.5 | 94.7 | 93.8 | 93.7 | 93.6 | 97.5 | 98 |
| North Dakota | 100 | 100 | 100 | 100 | 100 | 97.2 | 97.1 | 95.5 | 87.5 | 85.1 | 78.9 | 100 |
| Ohio | 99.9 | 99.8 | 99.6 | 99.6 | 99.6 | 99.7 | 99.8 | 99.8 | 99.9 | 99.9 | 100 | 99.9 |
| Oklahoma | 99.7 | 99.3 | 100 | 99.7 | 99.5 | 99.3 | 99.1 | 99 | 99.3 | 99.2 | 99.9 | 100 |
| Oregon | 99.8 | 99.4 | 99.6 | 98.9 | 99.6 | 99.8 | 99.5 | 99.8 | 99.8 | 100 | 99.8 | 100 |
| Pennsylvania | 99.2 | 99.4 | 99.3 | 99.1 | 98.9 | 98.2 | 98.7 | 98.5 | 98.6 | 98.8 | 99.5 | 99.9 |
| Rhode Island | 100 | 99.7 | 98.7 | 98.7 | 95.7 | 90.7 | 87.3 | 85.4 | 85.1 | 85.3 | 85.3 | 100 |
| South Carolina | 99.5 | 98.3 | 97.8 | 97.7 | 97.7 | 97.7 | 96.9 | 95.8 | 96.7 | 96.6 | 97.7 | 99.7 |
| South Dakota | 100 | 100 | 100 | 98.4 | 98.4 | 96.8 | 98.4 | 98.3 | 98.2 | 98.3 | 98.2 | 100 |
| Tennessee | 99.4 | 99.1 | 98.6 | 98 | 97.5 | 97.3 | 97.1 | 96.8 | 97.3 | 97.1 | 97.4 | 99.7 |
| Texas | 99.8 | 99.7 | 99.4 | 99.3 | 99.3 | 99.1 | 98.7 | 98.3 | 97.6 | 95.8 | 99 | 99.6 |
| Utah | 99.7 | 99.8 | 99.7 | 100 | 100 | 99.7 | 99.3 | 99.3 | 99.1 | 98.8 | 99.4 | 99.8 |
| Vermont | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Virginia | 100 | 100 | 100 | 100 | 98.9 | 98.8 | 98.8 | 98.8 | 98.6 | 98.7 | 98.6 | 100 |
| Washington | 99.9 | 99.3 | 98.4 | 97.9 | 95.3 | 92.4 | 90.9 | 90.5 | 92.9 | 93.2 | 94.3 | 99.1 |
| West Virginia | 97.3 | 94.6 | 91.3 | 87.8 | 84 | 82.2 | 79 | 77.9 | 86.3 | 89.3 | 89.3 | 99.4 |
| Wisconsin | 99.4 | 98 | 96.8 | 98.5 | 98.4 | 99.6 | 99.4 | 99 | 99.1 | 99.2 | 99.6 | 99.7 |
| Wyoming | 96.8 | 96.9 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

[1]Excludes New York City.

NOTE: Completeness of weekly provisional data is shown with a 6-month lag following the 12-month period ending in the month indicated.

SOURCE: NCHS, National Vital Statistics System, 2018.

Coefficients from these updated models were used to update the multiplication factors applied to the reported provisional counts of drug overdose deaths. Model results for each of the ten drug outcomes of interest are presented below.

⌄ Table 2. Model results of the completeness of provisional data by month-ending and percent pending: Drug overdose deaths and deaths involving any opioid. Values are estimated coefficients (robust standard errors).

| Model Parameters | Drug overdose | Any opioids (T40.0-T40.4,T40.6) | Natural, semi-synthetic, and synthetic opioids, including methadone (T40.2-T40.4) | Natural & semi-synthetic opioids and methadone (T40.2-T40.3) |
|---|---|---|---|---|
| Intercept | 101 (0.1) | 100.9 (0.1) | 100.9 (0.1) | 100.6 (0.1) |
| Feb | -0.3 (0) | -0.4 (0.1) | -0.5 (0.1) | -0.6 (0.1) |
| Mar | -0.7 (0.1) | -0.8 (0.1) | -0.9 (0.1) | -0.9 (0.1) |
| Apr | -0.6 (0.1) | -0.8 (0.1) | -0.9 (0.1) | -0.8 (0.1) |
| May | -0.7 (0.1) | -0.8 (0.1) | -0.9 (0.1) | -0.8 (0.1) |
| Jun | -0.6 (0.1) | -0.7 (0.1) | -0.8 (0.1) | -0.7 (0.1) |
| Jul | -0.7 (0.1) | -0.7 (0.1) | -0.8 (0.1) | -0.7 (0.1) |
| Aug | -0.8 (0.1) | -0.8 (0.1) | -0.8 (0.1) | -0.8 (0.1) |
| Sep | -0.6 (0.1) | -0.7 (0.1) | -0.7 (0.1) | -0.8 (0.1) |
| Oct | -0.7 (0.1) | -0.8 (0.1) | -0.8 (0.1) | -0.8 (0.1) |
| Nov | -0.5 (0.1) | -0.5 (0.1) | -0.5 (0.1) | -0.4 (0.1) |
| Dec | -0.3 (0.1) | -0.3 (0.1) | -0.2 (0.1) | -0.1 (0.1) |
| Percent Pending | -11.9 (0.1) | -11.8 (0.1) | -12.1 (0.1) | -10.3 (0.1) |

SOURCE: NCHS, National Vital Statistics System, 2016-2018.

⌄ Table 3. Model results of the completeness of provisional data by month-ending and percent pending: deaths involving specific drugs and drug classes. Values are estimated coefficients (robust standard errors).

| Model Parameters | Heroin (T40.1) | Natural & semi-synthetic opioids (T40.2) | Methadone (T40.3) | Synthetic opioids, excl. methadone (T40.4) | Cocaine (T40.5) | Psychostim. w/ abuse potential (T43.6) |
|---|---|---|---|---|---|---|
| Intercept | 100.9 (0.1) | 100.6 (0.1) | 100.4 (0.1) | 100.6 (0.1) | 100.7 (0.1) | 100.3 (0.1) |
| Feb | -0.3 (0.1) | -0.5 (0.1) | -0.6 (0.1) | -0.4 (0.1) | -0.4 (0.1) | -0.5 (0.1) |
| Mar | -0.8 (0.1) | -0.9 (0.1) | -1 (0.1) | -0.8 (0.1) | -0.7 (0.1) | -0.8 (0.1) |
| Apr | -0.8 (0.1) | -0.8 (0.1) | -1 (0.1) | -0.7 (0.1) | -1.2 (0.2) | -0.7 (0.1) |
| May | -0.9 (0.1) | -0.8 (0.1) | -1.1 (0.1) | -0.8 (0.1) | -1.5 (0.2) | -0.8 (0.1) |
| Jun | -0.8 (0.1) | -0.7 (0.1) | -0.7 (0.1) | -0.5 (0.1) | -1.2 (0.2) | -0.6 (0.1) |
| Jul | -0.9 (0.1) | -0.7 (0.1) | -0.7 (0.1) | -0.6 (0.1) | -1.2 (0.2) | -0.7 (0.1) |
| Aug | -0.9 (0.1) | -0.8 (0.1) | -0.7 (0.1) | -0.6 (0.1) | -1 (0.2) | -0.6 (0.1) |
| Sep | -0.6 (0.1) | -0.9 (0.1) | -0.8 (0.1) | -0.4 (0.1) | -0.6 (0.2) | -0.4 (0.1) |
| Oct | -0.8 (0.1) | -0.9 (0.1) | -0.7 (0.1) | -0.6 (0.1) | -0.6 (0.2) | -0.6 (0.1) |
| Nov | -0.6 (0.1) | -0.5 (0.1) | -0.3 (0.1) | -0.4 (0.1) | -0.2 (0.2) | -0.1 (0.1) |
| Dec | -0.3 (0.1) | -0.1 (0.1) | 0 (0.1) | -0.1 (0.1) | 0 (0.1) | 0.2 (0.1) |
| Percent Pending | -11.1 (0.1) | -10.3 (0.1) | -9.9 (0.1) | -12.4 (0.1) | -11.5 (0.2) | -11.4 (0.1) |

SOURCE: NCHS, National Vital Statistics System, 2016-2018.

## Differences between final and provisional data

There may be slight differences between provisional and final data for a given data year (e.g., 2019). Final drug overdose death data published annually through NCHS statistical reports (8) and CDC WONDER are typically tabulated by state of residence and limited to residents of the United States. Provisional data, such as the Drug Overdose Death Counts released through the Vital Statistics Rapid Release (VSRR) program, include all deaths that occurred within the 50 states and the District

of Columbia, including foreign residents. As such, provisional counts include approximately 400-500 additional drug overdose death records where the decedents were not US residents. Provisional data are tabulated by state of occurrence to capture the burden on the place where the deaths occur, and to correspond to the various data quality metrics that are provided.

Additionally, in July/August following the end of a given data year, the final file is 'closed' in order to produce the historical and public use files and reports. After it is considered closed, the final file is no longer updated, even if additional updates or records are received from the jurisdictions. The result is that some records that are in the final annual file may still list an unknown cause of death or manner of death indicating 'pending investigation.' The provisional data continues to be updated as additional cause of death information is received, and the counts may increase in response to these changes. As a result, provisional drug overdose death counts published in the VSRR for the 2019 data year (i.e., 12-month ending period in Dec 2019) may differ from the counts published using the 2019 final data. The size of the discrepancy is typically small (approximately 200 additional drug overdose death records in the provisional data that were 'pending investigation' or had an unknown cause of death in the final data).

## Source

NCHS, National Vital Statistics System. Estimates for 2019 and 2020 are based on provisional data. Estimates for 2015-2018 are based on final data (available from: https://www.cdc.gov/nchs/nvss/mortality_public_use_data.htm).

## References

1. Spencer MR, Ahmad F. Timeliness of death certificate data for mortality surveillance and provisional estimates. National Center for Health Statistics. 2016.
2. Rossen LM, Ahmad FB, Spencer MR, Warner M, Sutton P. Methods to adjust provisional counts of drug overdose deaths for underreporting. Vital Statistics Rapid Release; no 6. Hyattsville, MD: National Center for Health Statistics. August 2018. Available from: https://www.cdc.gov/nchs/data/vsrr/report006.pdf
3. National Vital Statistics System. Instructions for classifying the underlying cause of death. In: NCHS instruction manual; Part 2a. Published annually.
4. Slavova S, O'Brien DB, Creppage K, et al. Drug Overdose Deaths: Let's Get Specific. Public Health Reports. 2015;130(4):339-342.
5. Rudd RA, Seth P, David F, Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015. MMWR Morb Mortal Wkly Rep 65(5051):1445–52. 2016.
6. CDC Opioid Overdose Indicator Support Toolkit Version 2.0 The Prescription Drug Overdose: Data-Driven Prevention Initiative (DDPI), National Center for Injury Prevention and Control.
7. Warner M, Paulozzi LJ, Nolte KB, Davis GG, Nelson LS. State variation in certifying manner of death and drugs involved in drug intoxication deaths. Acad Forensic Pathol 3(2)231–7. 2013.
8. Hedegaard H, Miniño AM, Warner M. Drug overdose deaths in the United States, 1999–2018. NCHS Data Brief, no 356. Hyattsville, MD: National Center for Health Statistics. 2020. Available from: https://www.cdc.gov/nchs/products/databriefs/db356.htm

## Suggested citation

Ahmad FB, Rossen LM, Sutton P. Provisional drug overdose death counts. National Center for Health Statistics. 2020.

Designed by LM Rossen, A Lipphardt, FB Ahmad, JM Keralis, and Y Chong: National Center for Health Statistics.

Page last reviewed: November 12, 2020

AJPH METHODS

# Estimating the Number of People Who Inject Drugs in A Rural County in Appalachia

Sean T. Allen, DrPH, MPH, Allison O'Rourke, MPH, Rebecca Hamilton White, MPH, Kristin E. Schneider, BA, Michael Kilkenny, MD, and Susan G. Sherman, PhD, MPH

*Objectives.* To demonstrate how we applied the capture–recapture method for population estimation directly in a rural Appalachian county (Cabell County, WV) to estimate the number of people who inject drugs (PWID).

*Methods.* We conducted 2 separate 2-week periods of data collection in June ("capture") and July ("recapture") 2018. We recruited PWID from a syringe services program and in community locations where PWID were known to congregate. Participants completed a survey that included measures related to sociodemographics, substance use, and HIV and hepatitis C virus prevention.

*Results.* In total, 797 surveys were completed; of these surveys, 49.6% (n = 395) reflected PWID who reported injection drug use in the past 6 months and Cabell County residence. We estimated that there were 1857 (95% confidence interval = 1147, 2567) PWID in Cabell County. Among these individuals, most reported being White (83.4%), younger than 40 years (70.9%), and male (59.5%). The majority reported injecting heroin (82.0%), methamphetamine (71.0%), and fentanyl (56.3%) in the past 6 months.

*Conclusions.* Capture–recapture methods can be applied in rural settings to estimate the size of PWID populations. (*Am J Public Health.* 2019;109:445–450. doi:10.2105/AJPH.2018.304873)

 **See also Pollini, p. 354.**

The opioid epidemic has had far-reaching consequences across the United States. Provisional data suggest that more than 72 000 overdose fatalities occurred in 2017. Among these deaths, an estimated 49 068 involved opioids.[1] This epidemic has had disproportionate impacts in rural communities. For example, in October 2017, the Centers for Disease Control and Prevention (CDC) announced that the rates of overdose fatalities in rural areas surpassed those of urban areas.[2] The opioid epidemic has also fueled outbreaks of HIV and hepatitis C virus (HCV) infections among people who inject drugs (PWID). One such outbreak occurred in Scott County, Indiana, where 181 new cases of HIV were identified between November 2014 and October 2015.[3] Ninety-two percent of these cases were coinfected with HCV. These new infections were linked to the injection of prescription opioids and syringe sharing.[3,4]

In the wake of the Scott County outbreak, 220 counties in 26 states were identified as vulnerable to similar outbreaks. Notably, predominantly rural states bore a disproportionate burden of risk vulnerability. For example, 28 of the 55 counties in West Virginia were identified as vulnerable to opioid injection–related HIV and HCV outbreaks.[5] Considering the breadth of the opioid epidemic, it is imperative that communities implement response strategies that are scaled to meet population-level needs. Unfortunately, few areas have up-to-date information regarding the size and characteristics of local PWID populations; this creates significant challenges for strategic resource allocation (e.g., naloxone distribution programs, sterile injection equipment provision) and tailored program planning.

A variety of population estimation methodologies can be used to estimate the size of vulnerable populations.[6] The capture and recapture (CRC) method has been widely used in public health, including among PWID, sex workers, and refugee populations.[7–13] The CRC method can be applied directly via primary data collection with the target population or indirectly through use of existing data sources that contain members of the target population, such as disease registries and medical records.[6] Direct applications of the CRC method involve 2 periods of data collection (the capture and recapture phases) in which members of the target population are counted. During the recapture phase, individuals who also participated in the capture phase are counted as "recaptures." Count data for each study phase along with the number of recaptures can then be used to calculate a population size estimate.[6] Although there are many examples of CRC methods being used to quantify the size and characteristics of vulnerable populations, most of these studies have used indirect approaches or occurred in urban environments.[7,9–17] Little literature describes how this method can be applied directly in rural areas and among PWID populations.

This is an important gap in the research. Indirectly applying the CRC method in rural communities may be challenging because

### ABOUT THE AUTHORS

*Sean T. Allen, Rebecca Hamilton White, and Susan G. Sherman are with the Department of Health, Behavior and Society, Johns Hopkins University Bloomberg School of Public Health, Baltimore, MD. Allison O'Rourke is with the DC Center for AIDS Research, George Washington University, Washington, DC. Kristin E. Schneider is with the Department of Mental Health, Johns Hopkins University Bloomberg School of Public Health. Michael Kilkenny is with the Cabell-Huntington Health Department, Huntington, WV.*

*Correspondence should be sent to Sean T. Allen, DrPH, MPH, Johns Hopkins University Bloomberg School of Public Health, Department of Health, Behavior and Society, 624 N. Broadway, Baltimore, MD 21205 (e-mail: Sallen63@jhu.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted November 6, 2018.*

*doi: 10.2105/AJPH.2018.304873*

PWID are a hidden population and typically very few data sources (e.g., drug treatment registries) in rural communities can be used to calculate a population estimate. We have demonstrated how we applied direct CRC methods in a rural Appalachian community vulnerable to an opioid injection–related HIV and HCV outbreak (Cabell County, WV) to quantify the size and characteristics of the local PWID population.

## METHODS

We conducted our CRC population estimation study in June and July 2018 in Cabell County, West Virginia. As of July 2017, there were an estimated 76 062 residents in Cabell County who were aged 18 years or older.[18] Although Cabell County contains the city of Huntington, the US Census Bureau classifies 86.2% of its land space as rural.[19] Cabell County also leads the state of West Virginia in heroin-related overdose fatalities and was identified as vulnerable to an HIV AND HCV outbreak.[5,20]

### Strategic Partner

We partnered with the Cabell–Huntington Health Department (CHHD) to implement our CRC population estimation study. The CHHD serves Cabell County and the City of Huntington, West Virginia, as a combined county and municipal local health department. In 2015, the CHHD partnered with more than 30 local community agencies and organizations to decrease the societal and personal harms associated with opioid use. A primary role for the health department was in the creation of a harm-reduction program, including syringe access services. Since opening in September 2015, the Cabell-Huntington Harm Reduction Program (CHHRP) has served an estimated 5000 individuals, dispensed nearly 12 000 doses of naloxone, and referred hundreds of individuals to substance use disorder treatment (M. E. Kilkenny, e-mail communication, August 28, 2018). The CHHRP is housed at the CHHD and operates 6 hours per day (9:00 AM to 3:00 PM), Monday through Friday. The CHHD was an ideal partner for our CRC study because of their existing relationships with the local PWID population, unique position as the only harm-reduction services provider in the county, and their ability to serve as a data collection site during the capture phase (e.g., at the CHHRP).

### Inclusion Criteria

Before implementing our CRC population estimation study, we engaged the CHHD in discussions surrounding local experiences PWID may have with law enforcement, accessing health care services, engaging in research studies, and disclosing personal information (e.g., drug use). We also discussed these topics with local PWID and those in recovery. From these conversations, we determined that PWID would be most receptive to our study if all data were collected anonymously. Furthermore, we determined that people may be reluctant to disclose injection drug use during the screening process because of stigma. As a result, we set our inclusion criteria broadly: (1) to be at least 18 years old, and (2) to have ever used drugs by any route of administration.

### Survey Administration

We collected data anonymously through audio computer-assisted self-interview in which questions and answers were read to participants (in a female voice) via headphones to reduce bias.[21–23] Everyone approached for participation in the study received a verbal description of the study and were given the opportunity to ask questions. Staff then verbally screened those who expressed interest in participating for eligibility. The survey included a diversity of measures, including those related to sociodemographics, substance use, experiences with drug treatment, and HIV and HCV risk behaviors (e.g., syringe sharing).

### Data Collection Procedures

*Capture phase.* The capture phase occurred in June 2018 at the CHHRP and lasted 2 continuous weeks. We asked individuals who went to the CHHRP to participate in our study. Additionally, during the capture phase, the CHHD hosted a 1-day HIV testing event that was publicized at local community-based organizations frequented by PWID. We informed people who took part in the 1-day HIV testing event about our study, and we invited those who expressed interest to be screened for participation. During the capture phase, all participants received a bright green bag filled with snacks as an incentive for their participation.

*Recapture phase.* The recapture phase focused on recruiting PWID from community locations where PWID congregate and commenced 2 weeks after the completion of the capture phase in July 2018. We identified recruitment locations via discussions with local stakeholders, including representatives from the CHHD, PWID who resided in Cabell County, and individuals in recovery who lived or worked in Cabell County. To supplement these data, we conducted a series of geospatial analyses to understand the relative distribution of injection drug use–related activities throughout Cabell County.

Using data provided by the West Virginia Department of Health and Human Resources, we created a heat map of overdose fatalities that occurred in 2016 in Cabell County. We created a heat map that reflected where the CHHD collected discarded syringes. We then reviewed publicly accessible media reports for mentions of drug crimes in Cabell County. We then analyzed location data from these reports, when available, in conjunction with the 2 heat maps to understand potential locations for participant recruitment. Collectively, these data sources afforded an in-depth understanding of where and when we could access the PWID population.

During the recapture phase, participants received a $10 grocery gift card as an incentive for their participation. Notably, participants completed the survey during the recapture phase at a variety of venues, including public parks, transit locations, green spaces, neighborhoods known for drug-related activities, parking lots (apartments and businesses), gas stations, homeless encampments, on the stoops of abandoned properties, and on sidewalks. Staff also provided participants with collapsible stools to sit on (when needed) and umbrellas for shade to improve participant comfort while completing the survey.

*Identifying recounts.* To accurately calculate the population size estimate, the survey included items that ascertained whether the participant had previously completed the

TABLE 1—Summary of People Who Inject Drugs (PWID) Population Estimation Data by Study Phase and Associated PWID Population Estimate: Cabell County, West Virginia, June–July 2018

|  | No. of PWID in Cabell County |
|---|---|
| Capture phase | 194 |
| Recapture phase | 201 |
| Total captures | 395 |
| Recaptures | 21 |
| Excluded[a] | 1 |
| Total unique PWID | 373 |
| Population estimate (95% CI) | 1857 (1147, 2567) |

*Note.* CI = confidence interval.

[a]The tablet overheated, and so the participant was unable to answer items regarding his or her previous participation in the study.

survey. During the capture phase, we asked participants, "Have you ever completed this survey before and received a bright green bag with food in it from the Cabell-Huntington Health Department?" In addition to this item, we asked participants in the recapture phase, "Have you ever completed this survey before and received a $10 gift card to Kroger [a local grocery]?" We identified those who endorsed previously receiving the green snack bag during the capture phase and those who endorsed having previously received a grocery gift card during the recapture phase as repeat phase participants and removed them from the analyses to avoid duplication. We categorized those who endorsed having received the green bag during the recapture phase as "recounts," meaning individuals who completed the survey during the capture and recapture phase.

## Analyses

We analyzed data using SAS version 9.3 (SAS Institute, Cary, NC). We completed calculations for the population estimation using Microsoft Excel (Microsoft Corp., Redmond, WA) and executed them in accordance with the World Health Organization (WHO) and Joint United Nations Programme on HIV and AIDS (UNAIDS) *Guidelines on Estimating the Size of Populations Most at Risk to HIV.*[6] We limited analyses to PWID who indicated Cabell County

residence and injection drug use in the past 6 months.

## RESULTS

In total, 797 surveys were completed; of these surveys, 49.6% (n = 395) reflected PWID who reported injection drug use in the past 6 months and residence in Cabell County. Among these 395 surveys, we identified 21 recaptures and had to exclude 1 survey, as the tablet overheated and the participant was unable to answer items regarding his or her previous participation in the study, leaving 373 unique PWID (Table 1).

Of those 373 unique PWID who resided in Cabell County, most reported being White (83.4%), younger than 40 years (70.9%), male (59.5%), single (52.7%), unemployed (66.0%), and having health insurance (73.2%). Additionally, 28.3% reported having never completed high school and 30.6% reported having been arrested in the past 6 months. Current living situations varied, with 36.7% living in a place they own or rent followed by 21.2% living on the street and 20.6% residing at a family or friends house. Despite their current living situation, most participants considered themselves homeless (57.1%) and reported having gone to bed hungry at least 1 night per week (64.3%). These results are summarized in Table 2.

Among PWID surveyed, mean age of first injection was 24.9 years (Table 3). On average, participants reported injecting 4.5 times per day. Drugs most commonly injected in the past 6 months were heroin (82.0%), methamphetamine (71.0%), and fentanyl (56.3%). For drugs used in other forms (swallowed, smoked, or snorted), prescription pain medications (63.5%), marijuana (63.3%), cocaine (59.2%), and methamphetamine (54.4%) were most reported. When asked where PWID had obtained sterile syringes in the past 6 months, the majority reported from a needle exchange (66.0%). However, large proportions of PWID reported having reused injection equipment they knew had been used by someone else in the past 6 months, specifically syringes (41.0%), cookers (44.0%), cottons (35.9%), and rinse water (41.6%). A majority (57.4%) also reported having ever accessed services at the CHHRP. Seventy-

four percent reported having attempted to quit using drugs in the past 6 months.

During the recapture phase, we identified 21 individuals as recapture PWID who completed the survey during both data collection phases and reported being Cabell County residents. To calculate the population estimate, we used the following formula (as outlined in the WHO and UNAIDS *Guidelines on Estimating the Size of Populations Most at Risk to HIV*[6]) in which C1 = capture phase count, C2 = recapture phase count, and M = recaptures:

$$(1) \quad \text{Population Estimate}(N) = \frac{(C1 \times C2)}{M}.$$

We also calculated a 95% confidence interval (CI) for the population estimate using the following formula[6]: 95% CI = N ± 1.96 $\sqrt{\text{Var}(N)}$, where Var (N) is calculated as follows:

$$(2) \quad \text{Var}(N) = \frac{((C1 \times C2)(C1 - M)(C2 - M))}{(M^3)}.$$

Substituting the number of PWID surveyed in the capture and recapture phases (C1 = 194 and C2 = 201, respectively) and the number of recaptures (M = 21) into the formulas above, we estimated a population of 1857 (95% CI = 1147, 2567) PWID who are also Cabell County residents. These data reflect an estimated 2.4% population prevalence of injection drug use in the past 6 months among Cabell County residents aged 18 years or older.

## DISCUSSION

The results of our study demonstrate that direct CRC methods can be applied in rural Appalachia to estimate the size and characteristics of PWID populations. We estimated that approximately 1900 PWID reside in Cabell County, reflecting 2.4% of individuals aged 18 years or older. This research fills an important gap in the public health literature, as scant population-level data exist for rural PWID, particularly among those who reside in counties the CDC identified as vulnerable to an opioid injection–related HIV and HCV outbreak. These data are critically important

**AJPH** METHODS

**TABLE 2—Sociodemographics of People Who Inject Drugs (PWID) Residing in Cabell County, West Virginia: June–July 2018**

| Characteristic | No. (%) |
|---|---|
| Race/ethnicity | |
| Non-Hispanic White | 302 (83.4) |
| Non-Hispanic Black | 9 (2.5) |
| Hispanic, any race | 24 (6.6) |
| Other | 27 (7.5) |
| Age, y | |
| 18–29 | 95 (25.5) |
| 30–39 | 169 (45.4) |
| 40–49 | 77 (20.7) |
| 50–59 | 28 (7.5) |
| ≥ 60 | 3 (0.8) |
| Gender | |
| Male | 222 (59.5) |
| Female | 151 (40.5) |
| Relationship status | |
| Single | 195 (52.7) |
| In a relationship/married | 175 (47.3) |
| Currently has health insurance | 273 (73.2) |
| Education | |
| Did not finish high school | 105 (28.3) |
| High school graduate or GED | 128 (34.5) |
| Some college | 91 (24.5) |
| Bachelor's or associate's degree | 33 (8.9) |
| Some graduate school | 14 (3.8) |
| Arrested in the past 6 mo | 114 (30.6) |
| Current living situation | |
| Place that you own or rent | 137 (36.7) |
| Family or friend's home | 77 (20.6) |
| Shelter or other temporary housing | 34 (9.1) |
| On the street | 79 (21.2) |
| Other | 46 (12.3) |
| Considers self homeless | 213 (57.1) |
| Goes to bed hungry at least once per week | 240 (64.3) |
| Unemployed | 246 (66.0) |

*Note.* GED = general equivalency diploma. Denominator was n = 373.

for informing and tailoring opioid epidemic response strategies, as they provide insights into the number of PWID and their needs for services and current levels of access. For example, our finding that more than half of PWID reported injecting fentanyl can be used to inform naloxone distribution campaigns and other overdose prevention initiatives.

These data also have significant implications for HIV-prevention initiatives.

Considering the recency with which harm-reduction services were implemented in Cabell County and the amount of time it takes to establish rapport and trust with PWID populations, the fact that most PWID reported having accessed harm-reduction services at the CHHRP is commendable. However, work remains to be done, as large proportions of PWID reported reusing injection equipment they knew had been used by someone else. Additionally, the high prevalence of heroin and methamphetamine injection could increase community-level vulnerability to an HIV outbreak, as research has shown that PWID who report injecting both drugs are more likely to inject with greater frequency and reuse syringes than are their counterparts who inject only heroin or only methamphetamine.[24] Future work should explore how to further reduce risky injection practices among rural PWID, particularly those who inject both heroin and methamphetamine. Research should also be conducted to understand the factors driving the high prevalence of methamphetamine injection.

We learned several lessons throughout our application of CRC methods in this setting. Using heat maps of overdose fatalities and locations of syringe disposal was very useful in identifying specific locations where we may engage PWID in the community. Heat maps were also an unobtrusive strategy for garnering an understanding of the geotemporal distribution of PWID in the county. Stakeholder discussions about where and when to engage the target population were equally useful because of the fluidity of where and when PWID congregate. Relatedly, stakeholder discussions provided valuable insights into safety issues in each venue. We also learned that using multiple data sources is critically important to fully understanding the times and locations where PWID may be encountered and that 1 data source should not be considered superior, as each made unique contributions to our understanding of the geotemporal distribution of PWID.

In terms of systematically covering the identified areas for recruitment, we learned that providing staff with maps of relatively small, defined geographic areas was superior to providing them with specific walking directions based on street intersections, as staff found this method time consuming and often

low yield if few people were in the target area. We also learned that when recruiting PWID in remote rural areas, it is useful to first conduct windshield tours of the target areas to determine whether they are viable areas for recruitment rather than sending out data collection teams. Additionally, we learned that recruiting PWID in very remote areas requires more time than does recruiting their counterparts in areas with public venues and shopping areas.

Branding our study in brightly colored T-shirts and related attire allowed rapid recruitment, as PWID were able to easily identify study staff. It also enhanced our ability to engage with PWID via word of mouth; for instance, individuals knew to look for people in bright green shirts or hats if they wanted to participate. In terms of data collection, participants reported to study staff that audio computer-assisted self-interview made them more comfortable than potentially answering the survey items verbally.

## Limitations and Strengths

Our findings are not without limitations. Although we were able to estimate the number of PWID who reside in Cabell County, we were not able to ascertain the number of nonresident PWID who engage in activities in Cabell County. As a result, our population estimate should be viewed as an underestimate of the overall number of PWID in Cabell County. Because we collected data during periods of high heat and humidity, it is also possible some PWID were not surveyed, as they could have been in locations that were not readily accessible, such as inside air-conditioned homes. However, we feel this is a minor limitation considering the number of days and times we collected data. Additionally, although we generally found that people were highly receptive to participating in our study, a small number declined participation. A further limitation pertains to accessing portions of the PWID population who reside in very remote areas. A few locations were not viable areas for recruitment, as they lacked public venues, sidewalks, and other areas where we could reasonably interact with individuals. An additional limitation is that we were unable to ascertain how individuals knew they were using fentanyl; future work should explore

AJPH METHODS

**TABLE 3—Substance Use Measures Among People Who Inject Drugs (PWID) Residing in Cabell County, West Virginia: June–July 2018**

| Variable | No. (%) |
|---|---|
| Age, y of injection initiation, mean (SD) | 24.9 (8.8) |
| No. of injections per d, mean (SD) | 4.5 (5.4) |
| Drugs injected, past 6 mo | |
| Heroin | 306 (82.0) |
| Methamphetamine | 265 (71.0) |
| Fentanyl | 210 (56.3) |
| Speedball (coinjection of heroin and cocaine) | 141 (37.8) |
| Cocaine | 132 (35.4) |
| Buprenorphine/Suboxone | 111 (29.8) |
| Prescription pain medications | 81 (21.7) |
| Noninjected drugs used, past 6 mo | |
| Prescription pain medications | 237 (63.5) |
| Marijuana | 236 (63.3) |
| Cocaine | 221 (59.2) |
| Methamphetamine | 203 (54.4) |
| Heroin | 121 (32.4) |
| Where obtained sterile syringes, past 6 mo | |
| From a needle exchange | 246 (66.0) |
| From a friend | 139 (37.3) |
| Bought from a person | 132 (35.4) |
| Bought from a store, pharmacy, or online | 51 (13.7) |
| Reused injection equipment used by someone else, past 6 mo | |
| Syringes | 153 (41.0) |
| Cookers | 164 (44.0) |
| Cottons | 134 (35.9) |
| Rinse water | 155 (41.6) |
| Attempted to quit using drugs in past 6 mo | 277 (74.3) |
| Ever accessed harm-reduction services at the CHHRP | 214 (57.4) |

*Note.* CHHRP = Cabell-Huntington Harm Reduction Program. Denominator was n = 373.

whether individuals are intentionally seeking out fentanyl.

Despite these limitations, the study was characterized by numerous strengths. We were able to access a large number of PWID for this research, enhancing the representativeness of our findings. Our use of memorable incentives during each study phase allowed participants to easily remember whether they had previously engaged in our study. Relatedly, our study branding afforded expeditious dissemination of information about our study among the target population, as individuals learned from their peers to look for people in bright green shirts if they wanted to participate in the study. An additional strength of our study was our partnership with the CHHD. The CHHD has a long history of providing services to PWID and is a trusted entity among the population, allowing us to access PWID who may have otherwise been reluctant to participate.

## Conclusions

Direct CRC methods can be applied in rural communities to estimate the size and characteristics of PWID populations. Our research fills an important gap in the public health literature because of the rapid expansion of the opioid epidemic into rural communities and lack of studies that explore how population estimation methods can be implemented in rural areas. Our findings provide important information about the local PWID population that can be used to guide policy discussions, allocate resources strategically, and scale up existing opioid epidemic response initiatives. AJPH

**CONTRIBUTORS**

S. T. Allen conceptualized this research. S. T. Allen, A. O'Rourke, R. H. White, and K. E. Schneider oversaw the study implementation. S. T. Allen, A. O'Rourke, and R. H. White conducted the analyses. M. Kilkenny and S. G. Sherman supported instrumentation and the development of data collection strategies. All authors were involved in the interpretation of the findings and article development.

**ACKNOWLEDGMENTS**

This research was supported by the Bloomberg American Health Initiative at the Johns Hopkins Bloomberg School of Public Health. This research has been facilitated by the infrastructure and resources provided by the Johns Hopkins University Center for AIDS Research, a National Institutes of Health (NIH)–funded program (grant P30AI094189). S. T. Allen is also supported by the NIH (grant K01DA046234). K. E. Schneider is supported by the National Institute on Drug Abuse (grant 5T32DA007292-25).

We are grateful for the collaboration of the Cabell-Huntington Health Department, without which this project would not have been possible. We are especially grateful to Tim Hazelett, Thommy Hill, Tyler Deering, Kathleen Napier, Jeff Keatley, Michelle Perdue, Chad Helig, and Charles "CK" Babcock for all their support throughout the study implementation. We are also grateful for the hard work of the West Virginia COUNTS! research team: Megan Keith, Anne Maynard, Aspen McCorkle, Terrance Purnell, Ronaldo Ramirez, Kayla Rodriguez, Lauren Shappell, Brad Silberzahn, Dominic Thomas, Kevin Williams, and Hayat Yusuf. We gratefully acknowledge the West Virginia Department of Health and Human Resources. We also wish to acknowledge Josh Sharfstein, Michelle Spencer, Dori Henry, and Akola Francis for their support throughout each phase of the study. Most importantly, we are grateful to our study participants.

**Note.** The funders had no role in study design, data collection, or in analysis and interpretation of the results, and this article does not necessarily reflect views or opinions of the funders.

**CONFLICTS OF INTEREST**
None of the authors has any conflicts of interest.

**HUMAN PARTICIPANT PROTECTION**
The study was approved by the Johns Hopkins University institutional review board.

**REFERENCES**
1. National Institute on Drug Abuse. Overdose death rates. 2018. Available at: https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates. Accessed September 20, 2018.

2. Centers for Disease Control and Prevention. Illicit drug use, illicit drug use disorders, and drug overdose deaths in metropolitan and nonmetropolitan areas—United States. *MMWR Surveill Summ.* 2017;66(19):1–12.

3. Peters PJ, Pontones P, Hoover KW, et al. HIV infection linked to injection use of oxymorphone in Indiana, 2014–2015. *N Engl J Med.* 2016;375(3):229–239.

4. Centers for Disease Control and Prevention. Community outbreak of HIV infection linked to injection drug use of oxymorphone—Indiana, 2015. *MMWR Morb Mortal Wkly Rep.* 2015;64(16):443–444.

5. Van Handel MM, Rose CE, Hallisey EJ, et al. County-level vulnerability assessment for rapid dissemination of HIV or HCV infections among persons who inject drugs, United States. *J Acquir Immune Defic Syndr.* 2016;73(3):323–331.

6. UNAIDS/WHO Working Group on Global HIV/AIDS and STI Surveillance. *Guidelines on Estimating the Size of Populations Most at Risk to HIV.* Geneva, Switzerland: World Health Organization; 2010:1–48.

7. Hay G. Capture–recapture estimates of drug misuse in urban and non-urban settings in the north east of Scotland. *Addiction.* 2000;95(12):1795–1803.

8. Holland CE, Kouanda S, Lougué M, et al. Using population-size estimation and cross-sectional survey methods to evaluate HIV service coverage among key populations in Burkina Faso and Togo. *Public Health Rep.* 2016;131(6):773–782.

9. Roberts B, Morgan OW, Sultani MG, et al. A new method to estimate mortality in crisis-affected and resource-poor settings: validation study. *Int J Epidemiol.* 2010;39(6):1584–1596.

10. Mutagoma M, Kayitesi C, Gwiza A, et al. Estimation of the size of the female sex worker population in Rwanda using three different methods. *Int J STD AIDS.* 2015;26(11):810–814.

11. Vuylsteke B, Vandenhoudt H, Langat L, et al. Capture–recapture for estimating the size of the female sex worker population in three cities in Côte d'Ivoire and in Kisumu, western Kenya. *Trop Med Int Health.* 2010;15(12):1537–1543.

12. VanDerNagel JE, Kiewik M, Postel MG, et al. Capture recapture estimation of the prevalence of mild intellectual disability and substance use disorder. *Res Dev Disabil.* 2014;35(4):808–813.

13. Ruiz MS, O'Rourke A, Allen ST. Using capture–recapture methods to estimate the population of people who inject drugs in Washington, DC. *AIDS Behav.* 2016;20(2):363–368.

14. Hickman M, Cox S, Harvey J, et al. Estimating the prevalence of problem drug use in inner London: a

93

**AJPH** METHODS

discussion of three capture–recapture studies. *Addiction.* 1999;94(11):1653–1662.

15. Hickman M, Hope V, Platt L, et al. Estimating prevalence of injecting drug use: a comparison of multiplier and capture–recapture methods in cities in England and Russia. *Drug Alcohol Rev.* 2006;25(2):131–140.

16. Vaissade L, Legleye S. Capture–recapture estimates of the local prevalence of problem drug use in six French cities. *Eur J Public Health.* 2009;19(1):32–37.

17. Barocas JA, White LF, Wang J, et al. Estimated prevalence of opioid use disorder in Massachusetts, 2011–2015: a capture–recapture analysis. *Am J Public Health.* 2018;108(12):1675–1681.

18. US Census Bureau. QuickFacts: Cabell County, West Virginia. 2017. Available at: https://www.census.gov/quickfacts/cabellcountywestvirginia. Accessed September 5, 2018.

19. US Census Bureau. 2010 census urban and rural classification and urban area criteria. 2012. Available at: https://www.census.gov/geo/reference/ua/urban-rural-2010.html. Accessed September 5, 2018.

20. West Virginia Department of Health & Human Resources. *West Virginia Drug Overdose Deaths: Historical Overview 2001–2015.* Charleston, WV: Bureau for Public Health; 2017.

21. Perlis TE, Des Jarlais DC, Friedman SR, Arasteh K, Turner CF. Audio-computerized self-interviewing versus face-to-face interviewing for research data collection at drug abuse treatment programs. *Addiction.* 2004;99(7):885–896.

22. Macalino GE, Celentano DD, Latkin C, Strathdee SA, Vlahov D. Risk behaviors by audio computer-assisted self-interviews among HIV-seropositive and HIV-seronegative injection drug users. *AIDS Educ Prev.* 2002;14(5):367–378.

23. White B, Day C, Maher L. Self reported risk behaviour among injecting drug users: self versus assisted questionnaire completion. *AIDS Care.* 2007;19(3):441–447.

24. Al-Tayyib A, Koester S, Langegger S, Raville L. Heroin and methamphetamine injection: an emerging drug use pattern. *Subst Use Misuse.* 2017;52(8):1051–1058.