IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                            :
THE CITY OF HUNTINGTON,     :        CIVIL ACTION
                            :        NO. 3:17-cv-01362
        Plaintiff,          :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
        Defendants.         :
                            :
----------------------------x
                            :
CABELL COUNTY COMMISSION,   :        CIVIL ACTION
                            :        NO. 3:17-cv-01665
        Plaintiff,          :
                            :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
        Defendants.         :
                            :
----------------------------x
```

VIDEO PRE-TRIAL CONFERENCE

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE

JANUARY 6, 2021

**APPEARANCES:**


**For the Plaintiff,**
**Cabell County Commission:**


**MR. PAUL T. FARRELL, JR. - (Video)**
Greene Ketchum Farrell Bailey & Tweel
P.O. Box 2389
Huntington, WV  25724


**MR. ANTHONY J. MAJESTRO - (Video)**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER MOUGEY - (Video)**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
316 S. Baylen Street
Suite 600
Pensacola, FL  32502


**For the Plaintiff,**
**City of Huntington:**


**MS. ANNE MCGINNESS KEARSE - (Video)**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464


**MS. LINDA J. SINGER - (Video)**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20002

1   **APPEARANCES (Continued):**

2

3   **For the Plaintiff,**
    **City of Huntington:**

4

5   **MR. MICHAEL J. FULLER, JR. - (Telephonically)**
    McHugh Fuller Law Group
6   97 Elias Whiddon Road
    Hattiesburg, MS  39402

7

8   **For the Defendant,**
    **Cardinal Health:**

9

10  **MS. ENU MAINIGI - (Video)**
    **MS. JENNIFER WICHT - (Video)**
11  Williams & Connolly
    725 Twelfth Street, NW
12  Washington, DC  20005

13

14  **MR. STEVEN R. RUBY - (Video)**
    Bailey & Glasser
15  209 Capitol Street
    Charleston, WV  25301-1386

16

17  **MR. FRANK LANE HEARD, III  - (Telephonically)**
    **MS. ASHLEY W. HARDIN - (Video)**
18  Williams & Connolly
    725 Twelfth Street, NW
19  Washington, DC  20005

20

21  **For the Defendant,**
    **McKesson:**

22

23

24  **MR. JEFFREY M. WAKEFIELD - (Video)**
    Flaherty Sensabaugh & Bonasso
25  P.O. Box 3843
    Charleston, WV  25338-3843

1   **APPEARANCES (Continued):**

2   **For the Defendant,**
    **McKesson:**

3

4   **MR. TIMOTHY C. HESTER - (Video)**
    **MR. PAUL W. SCHMIDT - (Video)**

5   **MS. LAURA M. FLAHIVE WU - (Video)**
    **MR. ANDREW STANNER - (Video)**

6   Covington & Burling
    One City Center

7   850 Tenth Street NW
    Washington, DC  20001

8

9   **For the Defendant,**
    **AmerisourceBergen Drug Corporation:**

10

11  **MR. ROBERT A. NICHOLAS - (Video)**
    **MS. SHANNON E. MCCLURE - (Video)**

12  **MR. JOSEPH J. MAHADY - (Video)**
    Reed Smith

13  Three Logan Square
    Suite 3100

14  1717 Arch Street
    Philadelphia, PA  19103

15

16  **MS. GRETCHEN M. CALLAS - (Video)**
    Jackson Kelly

17  P.O. Box 553
    Charleston, WV  25322

18

19  **MS. KIM M. WATTERSON - (Video)**
    Reed Smith

20  Suite 2900
    355 South Grand Avenue

21  Los Angeles, CA  90071

22

23  Court Reporter:             Lisa A. Cook, RPR-RMR-CRR-FCRR

24

    Proceedings recorded by mechanical stenography; transcript
25  produced by computer.

<u>P R O C E E D I N G S</u>

1

2     THE COURT:  Good morning.

3     The case before the Court is the *City of Huntington*

4  against *AmerisourceBergen* and others, Civil Case Number

5  3:17-1362, and *Cabell County Commission* against the

6  defendants in the case.

7     I suppose I should have the counsel note their

8  appearances.

9     MR. FARRELL:  Good morning, Your Honor.  Paul

10  Farrell on behalf of plaintiffs.  And I have with me --

11     THE COURT:  I'm informed that the appearances are

12  already on the record, so you don't need to, you don't need

13  to do that, Mr. Farrell.

14     Before we go any further, I think it might be

15  appropriate for me to publicly thank Judge Wilkes for his

16  work as a Special Master in this case and let him know and

17  the parties know that the Court appreciates the very capable

18  work that he's done without which we wouldn't be where we

19  are at this point in the case.

20     The first thing I have on the agenda is the, the trial

21  schedule.  And I have before me the plaintiffs' proposal to

22  defer opening statements and open the record now for

23  submission of parts of their case.

24     I don't think that would be very helpful to me.  I

25  would prefer doing it the traditional way and do openings

1    and go right into the evidence in the case.

2         And in order to do that, my proposal is to start the

3    case on May the 3rd, spend that day on opening statements

4    with half a day allotted to each side, the morning for the

5    plaintiffs and the afternoon for the defendants.

6         We could then, we could then start the evidence the

7    next day.

8         We're getting a strange noise here.

9         (Pause)

10            THE COURT:  I guess we'll just have to live with

11   it.

12        If we stick to the Court's allocation of six weeks a

13   side, that would mean that we'd finish around mid June with

14   the plaintiffs' case, and recognizing that the dates need to

15   be a little bit flexible.

16        There may be some down time.  The Fourth Circuit

17   Judicial Conference is four days in June.  And if, if I go

18   to that, we'd have to take that time off.  There will be a

19   short break for Memorial Day.

20        We're looking, then, at starting the defendants' case

21   sometime around the end of June, possibly on June 28th,

22   which means we could end the trial around the 9th of August

23   if we stick to the six weeks a side schedule.

24        And I'm mindful of the fact that the time allotted per

25   side might have to be adjusted if there are extensive

1    cross-examinations.  I wouldn't want to permit the

2    defendants to cut into very much of the plaintiffs' time

3    with extensive cross-examination.  So if that happens, I'll

4    take the time for some of it out of the defendants'

5    allotment.

6         On the other hand, if during the defendants' case we

7    have the same situation with the plaintiffs, then I'd be

8    inclined to give the defendants additional time if

9    necessary.

10        Let me ask counsel for their reactions to that proposed

11   schedule.

12             MR. FARRELL:  Plaintiffs are okay, Judge.  Thank

13   you.

14             THE COURT:  And, Mr. Farrell, at this time I'll

15   try not to be Lucy and pull the ball away from you.

16             MR. FARRELL:  Yes, Your Honor.  Thank you.

17             THE COURT:  I read the newspaper, Mr. Farrell.

18             MR. FARRELL:  I see that, Judge.

19             THE COURT:  Defendants?

20             MR. RUBY:  Judge, this is Steve Ruby for Cardinal

21   Health.

22        I will say -- I'm sure, I'm sure the Court's aware of

23   this because it's been in the news -- that the disappointing

24   news from the past month is that the COVID vaccine roll-out

25   is going much slower than the experts expected.

1          The Federal Government's target was to have 20 million

2     people vaccinated by the end of last year.  The actual

3     number turned out to be, I think, less than five million.

4          In early December, the views that were expressed and

5     that the defendants were relying on from Dr. Fauci and from

6     Secretary Azar in the Department of Health and Human

7     Services was that there was going to be widespread

8     vaccination in -- sometime between April and early summer.

9          Based on the disappointingly slow roll-out of the, the

10    vaccine program so far, the latest comments that, that we've

11    heard in the press from Dr. Fauci suggest now that he

12    believes that a return to what I think he characterized as

13    normalcy or something like normalcy would probably not take

14    place until late summer or early fall.

15         Just yesterday the trial in the case that the Ohio

16    Attorney General has brought in State Court in Ohio, which

17    was scheduled to have been the next opioid trial anywhere in

18    the country starting in March, was continued until

19    September.  Judge Polster has already continued his next

20    opioid trial pharmacy Track Three trial until October.

21         I think at some point we're going to see the

22    vaccination effort pick up.  I think that's, that's

23    undoubtedly true.  But --

24              THE COURT:  They got me yesterday, Mr. Ruby.

25              MR. RUBY:  I'm glad, I'm glad they did, Judge.

1    I'm glad to see that they're making sure the courts are

2    taken care of.  Unfortunately, I don't know that they're

3    going to be as, as quick to make sure that counsel are taken

4    care of.  And that's appropriate.  First, first-line,

5    frontline healthcare workers and the continuity of

6    Government type officials obviously ought to be getting the

7    vaccine first, and they are getting the vaccine first.

8        I think, unfortunately, we would have to say that it's

9    unlikely that most, or perhaps even any of counsel will be

10   vaccinated, and many members of the public certainly

11   wouldn't be vaccinated by the beginning of May because it --

12   the vaccination effort just has not gone, if you look at the

13   numbers, the way that, the way that it was expected to go.

14       So if it's -- you know, if it is the view of the Court

15   that we need to get a date on the books -- and everybody

16   here, Your Honor, defense side included, would like to have

17   a date and would like to know when we're going to trial.

18       I think we're just grappling with the reality that even

19   people like Dr. Fauci and Secretary Azar who have their

20   finger on the pulse of this thing still don't seem to be

21   able to predict with any degree of confidence when there's

22   going to be widespread public vaccination.

23       And, so, our concern is that if we, if we put an early

24   date on the books right now and the vaccination roll-out

25   continues in the way that it has so far that we're going to

1   be back here in two or three months facing yet again the

2   reality that, that it's going to be difficult or impossible

3   to have a trial safely, not because we don't want to, but

4   this pandemic is so big and so unpredictable that

5   unfortunately none of us are in a position to make it do

6   what we wish it would.

7           THE COURT:  Anybody else want to put their oar in

8   the water on that?

9           MR. RUBY:  Judge, one thing -- if I could just

10  throw something out, one thing that we had thought might be

11  helpful -- we're scheduled to be back here at the beginning

12  of February, I think on the 3rd, for another status

13  conference.

14      There's some reason to believe, I think, that -- and it

15  may well be, based on some of the things you read in the

16  newspapers, that the, the vaccination program, the pace of

17  it so far has been slow because it's new.

18      The first vaccinations were given out a little more

19  than a month ago, maybe not even that, maybe less than a

20  month ago.  And then there were the holidays intervening

21  that, that I think in some places slowed things down.

22      And some public officials, at least, are optimistic

23  that over the next month or so, things are -- the kinks will

24  get worked out.  Things will begin to move faster and we'll

25  get a more realistic idea of what the pace of vaccination is

1   going to look like over the long haul.

2      And rather than pick a date now, recognizing the, the

3   likelihood the vaccination may just not be far enough along

4   by then, it, it might make more sense and be more productive

5   to see if we have better information about the progress of

6   the vaccine program when we come back in February and think

7   about locking in dates then.

8         THE COURT:  Mr. Farrell, Mr. Majestro, anybody

9   else want to respond?

10         MR. FARRELL:  Judge, we just would like to keep

11   the trial date.

12         THE COURT:  Well, I'm -- I hear what you're

13   saying, Mr. Ruby, but I think this has gone on an awful long

14   time and we need to get some closure.  And that's not going

15   to happen until we, we have a schedule.

16      So I'm going to enter an order implementing the

17   proposed schedule that I just put out, and hopefully we can

18   stick with it.  And I'm inclined to, to err on the side of

19   getting this thing moving.  And we'll, we'll just take it

20   from there.

21      The other things that I have on the plate today -- the

22   first thing on my list is the defendants' motion to exclude

23   Dr. Gupta.

24      And, Mr. Ruby, I believe you're on deck to address

25   that.

1          MR. RUBY:  Yes, Your Honor.  Thank you.

2      The, the background on this motion, Judge, is that on

3  June the 3rd of 2020, Dr. Gupta, who's the former, the

4  former head of the Health Department here in Kanawha County,

5  the Kanawha Charleston Health Department, and then

6  subsequently was the State Commissioner of Public Health,

7  was named as a preliminary -- was named on a preliminary

8  witness list the plaintiffs filed on the docket which

9  included what appear to be a list of fact witnesses as

10  opposed to expert witnesses.

11      In July of last year, Mr. Colantonio, Mark Colantonio

12  of the Fitzsimmons firm in Wheeling, along with Bob

13  Fitzsimmons, entered an appearance on the docket appearing

14  as counsel for plaintiffs, the Cabell County Commission and

15  the City of Huntington, in this case.

16      On August the 3rd, 2020, Dr. Gupta then was identified

17  as a non-retained expert in plaintiffs' expert disclosures,

18  but there was no disclosure of any summary of his opinions,

19  what Rule 26 requires for -- requires for non-retained

20  experts.

21          THE COURT:  Let me interrupt you.  I'm a little

22  bit familiar with this.  I just want to ask you, doesn't the

23  plain language of the rule cut against you here where it

24  says in Rule 26, "Unless otherwise stipulated or ordered by

25  the Court, the disclosure must be accompanied by the written

1   report if the witness is one in the case or one whose

2   duties -- if the witness is one retained or specially

3   employed to provide expert testimony in the case or one

4   whose duties as the party's employee regularly involve

5   giving expert testimony."

6        He hasn't been -- he doesn't -- Dr. Gupta doesn't fit

7   within that description, does he, Mr. Ruby?

8           MR. RUBY:  Well, the, the problem with Dr. Gupta,

9   Your Honor, is that he is being -- he is a retained expert.

10  He's been retained by plaintiffs' counsel.  He's being paid

11  $500 an hour.

12       Plaintiffs' counsel have taken the position that he is

13  being paid to serve as an expert in the West Virginia State

14  Court cases which, of course, are in most respects parallel

15  to this one.  The allegations in those cases are, are

16  extremely similar to the allegations in this case.

17       Plaintiffs' counsel have taken the position that, that

18  he's being paid over there to, to opine on the same things

19  that, that he would be opining on in this case, but that

20  he's, that he's not being paid in this case.

21       Now, to accept that, Your Honor, would set a terrible

22  precedent.  And it would, unfortunately, open the floodgates

23  for parties to play this kind of shell game in any kind of

24  complex litigation.

25       If the Court were to let this go forward, counsel all

1    over the country could do the following.  They could hire an

2    expert.  They could take the position that the expert is

3    being hired in a, a -- somewhere else in the litigation

4    that's not set for trial, use that expert in an early

5    development of the case like this one, and say that the

6    expert is not being retained here but, instead, is being

7    retained for some other case in some other, in some other

8    part of the litigation and, therefore, doesn't have to

9    provide an expert report.

10        And if the Court were to adopt plaintiffs' position,

11   then they could point to a federal judicial opinion that

12   says it's permissible to, to play that kind of a game with

13   Rule 26 expert disclosures.

14        We also think, Judge, that it violates the purpose of

15   the Rule 26 distinction between retained and non-retained

16   experts.  The division is between paid experts on the one

17   hand and, and lay experts, witnesses who may offer lay

18   opinion on the other.

19        The canonical example that I'm sure the Court has seen

20   a thousand times is a police officer or an agent who's not

21   paid to be a witness but, nevertheless, offers opinion

22   testimony about, for example, the details of the drug trade

23   based on his or her experience as an officer or an agent.

24        What the rule recognizes in drawing this distinction

25   between paid and unpaid expert witnesses is that it's not

1    reasonable to require an expert report from somebody who's

2    not getting paid.

3         But for somebody like Dr. Gupta, who is getting paid

4    $500 an hour by plaintiffs' counsel to serve as an expert in

5    the, in the opioid litigation in West Virginia, it's

6    entirely reasonable to require him to provide an expert

7    report.  And that's why the rule requires reports from, from

8    paid experts.

9         The third thing I'd say about it, Your Honor, is that,

10   is that it's fundamentally unfair to defendants.  We could

11   have done the same thing; said that our experts were, were

12   being paid or were being paid for some other case, one of

13   the other hundreds of thousands of cases that we're involved

14   in, not being paid to, to provide their expert opinions

15   here, but here we're providing them for free, but we didn't.

16   We played by the rules.  And it's not fair for defendants to

17   be put at a disadvantage because of that.

18        THE COURT:  Isn't, isn't the problem pretty much

19   resolved by the written disclosure Dr. Gupta would be

20   required to provide or maybe already has provided under

21   26(a)(2)(C)?

22        MR. RUBY:  Well, as a, as a paid expert, Judge, he

23   ought to be, he ought to be required to -- and the rules

24   don't expressly contemplate this situation where you've got

25   parallel cases, Case A and Case B.  A party hires an expert

1    represented by the same counsel, hires an expert in Case A

2    and then in Case B says they're working for free.

3         But Dr. Gupta ought to be required to provide a full

4    expert report because he is a paid expert.  So the

5    disclosure -- the belated disclosures that were provided --

6    and I think what Your Honor is referring to is in October

7    there were a set of disclosures, or supplemental disclosures

8    that were provided to -- with summaries, short summaries of

9    the opinions of the, the experts that plaintiffs had

10   identified as non-retained experts, including Dr. Gupta.

11        Because Dr. Gupta is a paid expert, he ought to have to

12   provide a full expert report, and he didn't.  The, the time

13   has expired.  Discovery has long since closed.  And it would

14   really fly in the face certainly of the purpose of the

15   disclosure required by Rule 26 to allow a paid expert to

16   come and testify at trial or for the Court to allow his

17   deposition testimony when he hasn't provided an expert

18   report.

19        The other point that I'd make, Your Honor, in response

20   to the Court's question, is that there is a problem of

21   timing.  To the extent, to the extent the disclosures that

22   were made in October, the supplemental disclosures the

23   plaintiffs made in October are helpful at all, they came

24   after Dr. Gupta and the other -- the other experts who were

25   listed in those supplemental disclosures in October, they

1    had already all been deposed.  And, so, we, we did not have

2    what Rule 26 clearly contemplates.

3              THE COURT:  Can I order him to make another

4    disclosure and give you the opportunity to redepose him?

5    We've got time to do that.

6              MR. RUBY:  Well, Judge, the, the defendants' view

7    is that it still doesn't cure the unfairness.  Defendants --

8    and as the Court recalls, this case was on a very tight

9    discovery schedule at the request of plaintiffs.

10      The defendants worked very hard to make sure that we

11   followed the rules and on that very tight time frame got out

12   all of our expert disclosures on time so the plaintiffs had

13   the opportunity to take proper, informed depositions of our

14   experts during the appointed discovery period.

15      And in this particular instance with Dr. Gupta,

16   plaintiffs didn't do that.  And it's not, it's not equitable

17   to reward them by letting them have another bite at the

18   apple with no consequences.

19      And what we're asking is not catastrophic to

20   plaintiffs' case.  They can still call Dr. Gupta to trial as

21   a fact witness.  They've taken the position that much of the

22   testimony he would offer would be factual in nature anyway.

23      And plaintiffs have disclosed with, with expert reports

24   20 retained experts who are going to be able to testify

25   copiously about every aspect of their case that requires

1   expert testimony.

2        We're not, we're not asking that they not be able to

3   call Dr. Gupta.  We're not asking that they not be able to,

4   to call the experts that they need to present their case.

5        What we're asking is that the Court apply the mandatory

6   Rule 37 sanction for failure to provide the required expert

7   report for retained experts, and that sanction is exclusion.

8             THE COURT:  Okay.  Let me hear from Mr. Farrell on

9   this.

10            MR. FARRELL:  Thank you, Judge.

11        So the, the same --

12            THE COURT:  Just a minute.  The court reporter

13   can't hear you, Mr. Farrell.  We'll have to get this

14   straightened out.

15            MR. FARRELL:  Let me see if I can go to the

16   lectern.

17        (Pause)

18            MR. FARRELL:  Is that better?

19            THE COURT:  That is better.  Go ahead, please.

20            MR. FARRELL:  Thank you.  So, Judge, Paul Farrell.

21        I'm going to reverse things and start with no foul, no

22   harm.

23        In essence, what this is is -- there's nothing

24   nefarious about this.  If there's, if there's any honor to

25   be offended, it's by myself and by Bob Fitzsimmons.

1    The, the story of how his law firm got involved began

2    with a subpoena on our prosecutor who Bob Fitzsimmons and

3    his firm began to represent.

4    But, nonetheless, to dispel any allegations of any,

5    any, you know, us trying to sneak attack them, there is an

6    MLP proceeding in which the Fitzsimmons firm is one of the

7    lead counsel.  It's in front of Judge Moats in the MLP.  And

8    Dr. Gupta is anticipated to be a disclosed expert in the MLP

9    proceedings.

10   Nonetheless, the CT2 plaintiffs, the City of Huntington

11   and the Cabell County Commission, wanted Dr. Gupta to

12   testify based on his experience, investigation, his

13   knowledge, and his role in this epidemic.

14   He is a nationally recognized expert and is serving on

15   the White House's transition policy for the National Drug

16   Control Policy.

17   So the reason they want Dr. Gupta excluded is because

18   he has a lot of relevant, factual testimony about what

19   happened in West Virginia.

20   Judge, they know this because they deposed him in

21   August of 2016 in the West Virginia Attorney General action

22   against AmerisourceBergen.  And I believe Mr. Al Emch is the

23   one that deposed him.

24   Not only that, but we disclosed his name as a potential

25   witness in April.  He was deposed in this case.  And all of

1    his testimony is well-known.  This is not --

2           THE COURT:  Well, what's the significance -- I

3    find curious the fact that his own counsel showed up at his

4    deposition and questioned him for some 60 pages of

5    deposition testimony.  Is there any significance to that?

6           MR. FARRELL:  You know, we were internally talking

7    about that.  I would think that it would be no different

8    than in your typical car wreck case when you're deposing a

9    physician, and the physician's attorney is there and is

10   either making proffers for the record or completing the

11   record or adding to it so that his client's views and

12   testimony is clear on the record.  I don't see it as a

13   problem.

14       Now, again, to reemphasize, from the CT2 plaintiffs'

15   perspective, my law firm nor anybody else other than the

16   Fitzsimmons firm had any prior contact with Dr. Gupta,

17   prepared him, worked through his, his testimony.

18       What we were attempting to do is we were attempting to

19   create a record of all that he has done in this case.  In

20   fact, Ms. Anne Kearse spent a substantial amount of time

21   putting his reports, based on his prior investigations, into

22   the case.

23       This is really a backdoor *Daubert* challenge.  If

24   there's some particular aspect of what Dr. Gupta intends to

25   testify to, the defendants need to make some type of *Daubert*

1  challenge or at trial challenge the foundation for what

2  Dr. Gupta is going to testify about.

3      As you recall, in CT1 Judge Polster had a similar issue

4  before him when they were deposing the medical examiner and

5  asking the medical examiner about, quote/unquote, gateway

6  drugs.

7      And what Judge Polster said was that if the witness can

8  testify based on his actual knowledge, his investigation in

9  the course of his professional capacity, that's fair game.

10     And, so, that's simply what we're doing here with

11 Dr. Gupta is we're asking Dr. Gupta to show up and say,

12 "Dr. Gupta, what do you think about the opioid epidemic in

13 West Virginia?"  And what he's going to say is, "I have a

14 lot to say about it."

15         THE COURT:  Why was your 26 disclosure not

16 provided before the deposition was taken?

17         MR. FARRELL:  So in April we did disclose that

18 Dr. Gupta was going to be a witness.

19         MR. RUBY:  Paul, we can't hear you.

20         THE COURT:  Yeah.  You've cut out, Mr. -- you've

21 cut out, Mr. Farrell.  We need to get you back on the

22 microphone.  This is one of the many reasons I don't like

23 these modern means of having hearings.

24     (Pause)

25         MR. FARRELL:  Can you hear me now?

```
 1              THE COURT:  We can hear you now, Paul.

 2              MR. FARRELL:  We had a little bit of technical on

 3    our audio.  Are we good to go now, Judge?

 4              THE COURT:  Yes, I think we are.

 5              MR. FARRELL:  So, so circling back to our

 6    disclosures, I will take responsibility for whatever

 7    procedural gaff the defendants are alleging.

 8         To be clear, what we were attempting to do as early as

 9    January, again in February, and formally in April is to tell

10    the defendants there are a number of people in West

11    Virginia, doctors, people in the Governor's staff, in the

12    administration, there are a number of people who have a lot

13    to say about the opioid epidemic.  And to the extent that

14    you want to know what they have to say, you should depose

15    them.

16         Now, I very well could have gone and talked to Dr.

17    Gupta or Dr. Yingling or Dr. Werthammer?  I could have gone

18    behind the scenes and prepped all of these witnesses, but I

19    didn't.  We attempted to be able -- because this is

20    cross-examination fodder.  This goes to weight and

21    prejudice.

22         And, so, they can raise all of these issues they want,

23    but I think ultimately what it comes down to is that there

24    was no foul.  And if there is a harm, the harm can be

25    remedied.  And what this really is is it goes to the weight
```

1   and foundation of the testimony.

2           THE COURT:  How would you remedy -- what's your

3   suggestion for remedying the harm assuming there is a harm?

4           MR. FARRELL:  I would love for Dr. Gupta to have

5   more to say.  The man has a lot to say on the opioid

6   epidemic.

7       Now, remember, he's been deposed by these same lawyers

8   twice.  If that's the, if that's the remedy, then that's the

9   remedy.  You can let them have a third shot at him.  His

10  testimony isn't going to change.  He's been deposed twice by

11  these same defendants.

12          THE COURT:  Okay.  I'll take this under advisement

13  and give you a ruling on it after I have time to digest it a

14  little bit.

15      The next thing on the plate is -- well, something

16  similar I believe.  It's the defendants' motion to exclude

17  undisclosed expert testimony.

18      And at issue here are eight witnesses whom the

19  plaintiffs have designated as non-retained experts.  And I

20  believe these are Christina Mullins, Dr. Kilkenny,

21  Dr. Yingling, Dr. Davies, Dr. Chaffin, Dr. O'Connell, and

22  Dr. Petrany and Dr. Gupta.

23      I believe we're going to change counsel here and I'm

24  going to hear from Ms. Wicht -- did I pronounce your name

25  correctly -- for the defendants?

1          MS. WICHT:  Good morning, Your Honor.  Yes, this

2     is Jennifer Wicht.  I hope that, that you can hear me okay.

3          THE COURT:  All right.  I can hear you.  Go ahead,

4     please.

5          MS. WICHT:  Okay.  Thank you very much, Your

6     Honor.

7          Yes, good morning, Your Honor.  And as the Court noted,

8     we've already touched on this subject a bit with respect to

9     the discussion on Dr. Gupta.

10          But you are correct, Your Honor, that there are now

11     eight witnesses who the plaintiffs are proffering as what I

12     frequently refer to as hybrid fact and opinion witnesses.

13     They are non-retained experts who, who may offer some

14     opinion testimony in addition to their fact testimony.

15          Briefly, on the deadline for expert disclosures, in

16     addition to their 20 retained experts, the plaintiffs

17     initially disclosed 21 of these non-retained experts.  And

18     they did so without the required summaries of the facts and

19     opinions that the witnesses would testify to.  And that's

20     required under Rule 26(a)(2)(C).

21          It was only after the defendants filed this motion --

22     it was on October 30th, almost three months after the expert

23     disclosure deadline -- that plaintiffs trimmed their list of

24     non-disclosed experts down to the eight witnesses the Court

25     mentioned, and for those that remain provided the required

1    disclosure of the opinions that plaintiffs expect those

2    witnesses to offer.

3         What you heard from Mr. Farrell I think already is that

4    the plaintiffs' argument with respect to these witnesses is

5    essentially no harm, no foul.  Now, that's fine.  I

6    understand why that's their argument because the

7    disclosure -- unless the failure to disclose was harmless,

8    the requirement of Rule 37 is a mandatory exclusion of the

9    late disclosed opinion testimony.

10        Then it's not exclusion of the witnesses entirely.

11   They can testify as fact witnesses.  But it is exclusion of

12   the opinion testimony that was not timely disclosed.

13        What the plaintiffs point to in support of their

14   argument that there is no harm, no foul here are the facts

15   that the eight witnesses on the -- who have been now

16   disclosed were deposed in the case.

17        But the reality is, Your Honor, that those witnesses

18   were deposed without the benefit of advance disclosure of

19   the specific nature of any opinions they might offer and,

20   therefore, without any ability by the defendants to prepare

21   for cross-examination for probing on those particular

22   opinions.

23        In fact, six of the eight, Your Honor, were deposed

24   even before the initial facially inadequate disclosure, even

25   before the August disclosure.  So defendants took those

1    depositions with no inkling whatsoever that those witnesses

2    would be offering any opinion testimony at all.

3         Two of the witnesses were deposed after those initial

4    August inadequate disclosures.  And in one of those two

5    depositions, Dr. Petrany's deposition, counsel for

6    Dr. Petrany expressly stated on the record that the witness

7    was not being offered -- was not being -- was not testifying

8    to offer expert opinions.

9         The plaintiffs' counsel who was there didn't contest

10   that.  The witness didn't contest that.  And defendants had

11   no knowledge of the specific, any specific opinions that

12   Dr. Petrany might offer to probe in those depositions.  And,

13   in fact, at the deposition itself it was denied that

14   Dr. Petrany was offering opinion testimony at all.

15        And the other of those witnesses who was deposed after

16   the initial inadequate disclosure was Dr. Gupta who you've

17   already heard about.

18        So these are not depositions, Your Honor, that mitigate

19   the harm to the defendants of the late disclosure of the

20   opinions.

21        I heard the Court's question to Mr. Ruby about

22   potential further depositions of these witnesses.  So I just

23   wanted to briefly address that.  I expect that might be on

24   the Court's mind.

25        It's defendants' position that the current case

1 schedule does not mitigate the harm to the defendants from

2 these late disclosures.  Obviously, at the time that we made

3 the motion seeking exclusion, we were on the eve of trial.

4 Circumstances, of course, have changed between then and now.

5      Defendants' position is now that the Court has

6 indicated its intent to set a trial schedule.  The parties'

7 attentions have correctly turned to trial preparation.  The

8 defendants prepared and submitted their own expert reports,

9 proffered their own witnesses, expert witnesses for

10 depositions.

11      We've prepared exhibit lists and we're reviewing each

12 other's exhibit lists.  We're negotiating document

13 stipulations for trial.  Plaintiffs are suggesting

14 deposition designations.

15      The parties' attentions are now properly turned to

16 trial preparation and moving the case forward.  And we would

17 submit that it does not cure the harm to defendants if the

18 Court were, for example, to offer additional depositions at

19 this point.

20      To require the defendants now to take time to prepare

21 for and conduct eight additional expert depositions would be

22 fundamentally unfair and prejudicial to trial preparation.

23 And we would submit that the remedy of exclusion of the

24 expert opinion is still the proper remedy here for the Court

25 to impose for plaintiffs' late disclosures.

```
 1              THE COURT:  Well, the Fourth Circuit --

 2              MS. WICHT:  The reality is, Your Honor, -- I'm

 3    sorry.

 4              THE COURT:  The Fourth Circuit has laid down a

 5    pretty clear calculus here for the Court to consider on

 6    ruling on this:  Surprise, ability to cure, disruption of

 7    the trial, the importance of the evidence, and the

 8    non-disclosing party's explanation for its failure to

 9    disclose the evidence.

10        It seems to me that most, if not all, of these

11    considerations cut against you, don't they?

12              MS. WICHT:  Well, Your Honor, respectfully we, we

13    disagree.  I think the change in the trial schedule has

14    changed some of those circumstances.  But, but we would

15    submit that some of those factors do still counsel in favor

16    of exclusion.  I'm happy to walk through them briefly if the

17    Court would like.

18        With respect to surprise, as of October 30th, the

19    plaintiffs have now made disclosures of what we can presume

20    are the full opinions that they want to offer.  So there's

21    not unusual trial surprise here any longer.

22        But, of course, there is surprise in the sense that the

23    opinions were disclosed only after the witnesses were

24    deposed, defendants' experts were concluded, *Daubert*

25    briefings fully in, and the case has sort of moved on from
```

1    the expert discovery phase.

2         In terms of ability to cure, again I would simply point

3    to the fact that the plaintiffs' belated cure of that

4    inadequate disclosure has not allowed the defendants to take

5    expert focused or opinion focused depositions of these

6    witnesses on these topics or to make any adjustments to

7    their own experts, to the briefing, anything like that that

8    might be required.

9         We -- the third factor, disruption to trial, we

10   acknowledge that in light of the continuance, there would

11   not appear to be any disruption to trial here.  I think

12   there would be disruption to trial preparation in the event

13   that the Court were to direct eight additional expert

14   depositions to go forward, but there is not disruption to

15   trial itself.

16        With respect to the importance of the witnesses, I

17   would point to I think the factor that Mr. Ruby had also

18   mentioned which is that the plaintiffs here have 20 retained

19   experts who offered some 2,000 pages of opinions.

20        And it seems to me unlikely that these additional

21   opinions that were not disclosed until October 30th are

22   critically important to the plaintiffs' case to the extent

23   they were not offered in those retained expert reports.

24        I think with respect to the explanation for the

25   non-compliance, Your Honor, I think all we understand we've

1    heard from the plaintiffs is simply that a -- the no harm,

2    no foul that we've already talked about, but also that the

3    plaintiffs reasonably believe that their disclosures, their

4    initial disclosures in August were in compliance.

5        The defendants have not suggested bad faith here, but I

6    would say at this time it's difficult to credit that

7    explanation when the plaintiffs certainly knew enough to

8    list the witnesses in their disclosure on August the 3rd and

9    they cited to the very rule, 26(a)(2)(C), that requires

10   disclosure of opinions.  They just, just simply didn't do

11   it.

12       THE COURT:  For the record, the case that I'm

13   relying on for those five considerations is *Southern States*

14   at 318 F.3d 592, a 2003 Fourth Circuit case.

15       Ms.  Kearse, I have down on my score card here that

16   you're going to respond on behalf of the plaintiffs and you

17   may do so.

18       MS. KEARSE:  Thank you, Your Honor.

19       And I'll start with a little bit of background

20   information about what this motion is and what it's not

21   about.

22       Each one of these witnesses, there's no question about

23   their ability to testify.  They all have now been deposed.

24   They have been subject of extensive discovery prior to any

25   depositions.  Prior to our disclosure -- they have given

1    deposition testimony to most of them.

2        The documents have been subpoenaed.  They've been

3    extensively reviewed.  We've provided some subpoenas from

4    the plaintiffs and the defendants.  So to the extent -- and

5    this may go to surprise at trials.  These witnesses have

6    been out there and disclosed from -- earliest disclosures in

7    December of 2019 for the most part.

8        All these witnesses, Your Honor, will testify upon

9    factually based information, including what they observed,

10   what they experienced, what they witnessed and, importantly,

11   in this litigation as to what investigations they were

12   involved in, what the conclusions were of those

13   investigations, and what those investigations revealed, the

14   data that was collected in that investigation.

15       Now, the issue before the Court -- and if you close

16   your eyes to the 701 opinion testimony and --

17           THE COURT:  Just a minute, Ms. Kearse.  You're

18   breaking up a little bit.  I don't know how we can fix this.

19   Why don't you start out again and speak a little more slowly

20   and we'll see if you can come through that way.  If not,

21   we'll have to fix it.

22       (Pause)

23           MR. FARRELL:  Judge, we're trying to unlock her

24   mute button.

25           THE COURT:  Okay.

1    MR. FARRELL:  Judge, her personal mute button is

2    locked administratively, so we're going to send her to the

3    podium.

4         THE COURT:  Okay.

5       (Pause)

6         MS. KEARSE:  Your Honor, is that better?

7         THE COURT:  Yes, much better.

8         MS. KEARSE:  Okay.  Thank you, Your Honor.  We

9    have a podium here as well too.

10      Your Honor, I started with just some background

11   information about what the motion was about and what it

12   wasn't about.

13      And primarily to the extent that these witnesses have

14   been both disclosed to the defendants as early as December,

15   2019, as being significant witnesses in this litigation,

16   they've also had extensive discovery against these

17   witnesses; custodial documents, subpoenas, their personal

18   files, their records.

19      The witnesses at issue that remain, plaintiffs took out

20   a number of our investigative, police, and fire and other

21   folks that are employees of the plaintiffs.  And the

22   remaining eight witnesses are very much involved in the

23   opioid epidemic within Cabell County and City of Huntington.

24      All their testimony will be factually based information

25   including their own observations, their experiences, their

1  personal knowledge, their investigations, what their

2  investigations reveal.  So there's a lot of information

3  that's fact based, and then we get into the 701 and 702

4  opinion testimony.

5     Your Honor, these are all professionals of universities

6  or within the state who have had an incredible amount of

7  experience with the opioid crisis.

8     When we disclosed our initial disclosure, Your Honor,

9  we did include in our disclosure the fact that the

10  information in the depositions for the most part had been

11  taken.  And that was included within the disclosure and the

12  fact that all the information we had about their background

13  and experiences ought to be included.

14     When we supplemented --

15          THE COURT:  Can I interrupt you and ask you a

16  question?  Are all or any of these witnesses necessary in

17  view of the, all the other expert testimony and -- that is

18  going, the Court's going to hear in this case?

19          MS. KEARSE:  Your Honor, there could be some that

20  we select that we say as we get into the record and into

21  your rulings that we would not need as cumulative.  So we'll

22  look at that.

23     I do believe most of these experts, though, do have

24  underlying information as well that they can discuss, opine

25  about regarding the, the actual data that they collected,

1   the data that they oversaw and the investigations they did.

2       Now, there may be some other experts that also rely on

3   that information.  But I think it's important to hear from

4   them on what they observed, what they saw, what they

5   revealed, and what their opinions were in relation to what

6   they were experiencing and seeing in Cabell County and City

7   of Huntington.

8       It all relates back to the very issues from the very

9   beginning, which it should be no surprise, these witnesses

10  and unretained experts in their own field have been very,

11  very much involved in Cabell County and City of Huntington

12  opioid crisis.

13      So, Your Honor, we may not need them all.  And if Your

14  Honor wishes us to, to streamline the eight back, we

15  certainly can.  But I do think they all play a significant

16  role in the public use and what the city and county have

17  gone through and to meet our burden for Your Honor.

18      Your Honor, I will add as to our supplemental

19  disclosure, we went through the depositions and reiterated

20  the opinions.

21          THE COURT:  Did, did you provide summaries for any

22  of these witnesses?

23          MS. KEARSE:  We, we provided -- in our

24  supplemental disclosure we are more specific as to what the

25  depositions stated.  But within our disclosure, we did a

1   more, a broad statement before the witnesses saying their

2   depositions would be included within this disclosure with

3   that.

4        So that's -- and the depositions for the most part had

5   all been taken.  One we scheduled later with that, but they

6   had the depositions.  They had all the documents that they

7   subpoenaed, all the documents that we gave to them in

8   discovery.

9        THE COURT:  Well, do you want to respond to any of

10  that, Ms. Wicht?

11       MS. WICHT:  Thank you, Your Honor.

12       I have -- while Ms. Kearse was speaking, the, the video

13  changed for me dramatically and I just want to make sure

14  that the Court is still able to hear.

15       THE COURT:  I hear you loud and clear right now.

16       MS. WICHT:  Okay, okay.  Thank you very much.

17       Very briefly, Your Honor, I wanted to respond just on

18  the point of Rule 701 testimony which Ms. Kearse referenced

19  potentially the line between Rule 701 testimony and 702

20  testimony being unclear.

21       And certainly that may be true in concept, but I think

22  we certainly don't agree that the testimony that the

23  plaintiffs are purporting to offer from these witnesses is

24  701 testimony.  And I think a few examples make that clear.

25       701 testimony, as the Court is well familiar with, is,

1    is certainly offering a lay opinion just based on personal

2    observation and experience.

3         For example, the example that's given in the Advisory

4    Committee Notes is someone who is familiar with narcotics

5    could identify something as a narcotic based on personal

6    observations, but they couldn't testify as to how it was

7    made or how the products are distributed or things like that

8    because that would be a Rule 702 opinion.

9         So just to give the Court a few examples here, we have

10   Dr. Davies who is a Professor at the Marshall University

11   School of Medicine.  And among the opinions that plaintiffs

12   have disclosed in their October 30th summary is that he will

13   testify on subjects like how the opioid crisis has led to a

14   rise in crime and how it's had a negative economic impact on

15   the community, how the Appalachian setting of Cabell and

16   Huntington affects the opioid epidemic, clearly things that

17   are not conclusions based on his own personal observations.

18        Dr. Kilkenny similarly is disclosed to testify about,

19   for example, the purported failure of oversight and

20   violation of laws and how that contributed to the opioid

21   epidemic in Cabell Huntington.

22        So to the extent plaintiffs are taking the position

23   that actually these are Rule 701 experts and opinions and

24   that's what makes their disclosures adequate, we disagree

25   with that, Your Honor.

1      And, and I would just conclude by noting that, that we

2    agree with Ms. Kearse that it is not the witnesses who are

3    surprises to us.  We agree that the witnesses as fact

4    witnesses were disclosed.  It's the opinions that the

5    plaintiffs are seeking to offer from the witnesses.

6          THE COURT:  Okay.  The next thing is the

7    plaintiffs' motion for summary judgment concerning --

8          MS. MCCLURE:  Your Honor, Your Honor, just briefly

9    with respect to the last motion, this is Shannon McClure on

10    behalf of AmerisourceBergen Drug Corporation.

11      We concur with everything that's been said with the

12    fact that exclusion is the proper remedy.  Nevertheless, to

13    the extent the Court is considering any lesser remedy

14    involving a cure, we note that such a remedy, if there is

15    additional disclosure by the plaintiffs, additional

16    depositions, et cetera, would necessitate and require the

17    defendants to be able to actually respond to those in order

18    for the cure to be effective.

19      So that may involve the supplementation of the

20    defendants' existing expert report, the amendment of such a

21    report, and even possibly an additional newly identified

22    expert given that we at this point would not have examined

23    these plaintiff witnesses on those issues.

24      So we simply wanted the record to reflect that there

25    would be more cure required potentially depending on the

1    scope of any remedy the Court orders that is less than

2    exclusion.

3              THE COURT:  Okay.  Thank you.

4        Back to the motion for summary judgment concerning the

5    ARCOS data.

6        How is this a summary judgment motion, Mr. Farrell?

7    Are you going to address this?

8        I, frankly, don't see this as a motion for summary

9    judgment.  A claim or -- well, you tell me why this is a

10   summary judgment motion.

11             MR. FARRELL:  Judge, Paul Farrell.  Can you hear

12   me okay?

13             THE COURT:  Yes.

14             MR. FARRELL:  Yes.

15       So, Judge, I think that what we're attempting to do is

16   we're attempting to advance the litigation and we have been

17   attempting to do so for quite some time.

18       You'll note that back in March of this year we first

19   proposed the, the proffer of the ARCOS data.  And we've

20   asked the defendants to stipulate to it, and we're

21   attempting to figure out how it is we can take a set of

22   facts that everybody agrees to and put it in your record

23   without having to spend three days going over the deposition

24   testimony from a foundation standpoint and authentication

25   standpoint with our expert witness, Craig McCann.

1    Dr. McCann has been deposed, I don't know, three, four

2    times.  He's been subject to *Daubert* motions in front of

3    Case Track 1 with Judge Polster.  He was subject to a *Frye*

4    hearing in New York.  And at no point in time has anybody

5    stated that the underlying facts, the math is wrong.

6    I want to make that abundantly clear.  We're talking

7    about 500 million lines of data, and that this data was put

8    into a database and then Dr. McCann rendered that data

9    readable, searchable, and indexable.

10   The plaintiffs' experts have relied on the data.  The

11   defendants' experts have relied on the data.  And in order

12   for us to go and stand up in front of you and spend, you

13   know, hours, if not days, going through this pedantic

14   process seems to be an unwise use of resources.

15   So it's an element of our case, of the actual

16   underlying conduct of the sales transactions.  That's number

17   one.

18   And number two is we believe you could take judicial

19   notice if you were to challenge the defendants and ask them

20   whether or not they have any reason to dispute the accuracy

21   of the data or the accuracy of the math, then we can go from

22   there.

23   But I'm here to represent to you in the two years we've

24   been prosecuting the case on a national level, there has

25   been no suggestion that the 500 million lines of data is

1    unreliable or inaccurate.

2        So by placing this data, the McCann ARCOS data into the

3    record, what we'll be able to do then is we'll be able to

4    take 1006 summaries, disclose them to the defendants, and

5    have the defendants then tell us if there's any objections

6    to the introduction of the 1006 summaries of the 500 million

7    lines of data.

8        So to make it abundantly clear, we very well can just

9    show up at trial and present the evidence.  But if we do so,

10   we're going to ask you to do something.  We're going to ask

11   you to allow us early in the trial to present the testimony

12   of Dr. McCann to lay the foundation for the McCann ARCOS

13   data, to enter the McCann ARCOS data and the 1006 summaries,

14   and then recall Dr. McCann five weeks later to offer his

15   expert witness opinion.

16       And, so, whatever the legality of it is is we think

17   that if pressed, we'll be able to take two or three days out

18   of our case in chief and submit it based on facts that

19   nobody disputes.

20           THE COURT:  Is it going to take him two or three

21   days to establish the first part of his testimony you talk

22   about?

23           MR. FARRELL:  It will take at least as long as the

24   *Frye* hearing in New York which was -- was it two days?

25       So, so what we're talking about, just to be clear,

1  you'll recall the Eric Eyre newspaper article that won the

2  Pulitzer, 780 million pills.

3      What we did in this case is we went and we subpoenaed

4  the Federal Government and we got the underlying data not

5  just for West Virginia, but the entire country.  So we have

6  500 million lines of data that we had to process.

7      Now, when we subpoenaed the data from the DEA, they

8  gave us the data in a certain format that was just letters

9  and numbers on pieces of paper, some 50 million pieces of

10 paper.

11     We had to take the underlying data and import it into a

12 database so that the experts could take the data to analyze

13 it and put it into some format that experts could rely on.

14 It was no easy task.  It was not inexpensive.  And it's been

15 subject to voluminous cross-examination.

16     So if, if we get to that point, we will put it on for

17 you.  We just think it's time to begin creating a record for

18 this very thing.  And it seems to me that if there's no

19 objection to it, there should be a stipulation but there's

20 not, that you can direct or take judicial notice or you can

21 enter a partial summary judgment that this is -- this fact

22 is established as a fact of record in the case.

23          THE COURT:  Well, Rule 56(g) gets you to that kind

24 of a judgment, but only in the context of a grant of summary

25 judgment motion, doesn't it?

1          MR. FARRELL:  Yes.

2          THE COURT:  "If the Court does not grant all the

3     relief requested by the motion for summary judgment, it may

4     enter an order stating any material fact that is not

5     genuinely in dispute and treating the fact as established in

6     the case."

7          But there has to be an underlying motion for summary

8     judgment upon a claim or defense, doesn't there, for that to

9     come into effect?

10          MR. FARRELL:  So that's part of our claim, yes,

11     Judge.  Part of our claim will be the entry of these facts

12     to establish that the defendants failed in their obligations

13     to, to design and operate a system to look for anomalies

14     within the data.

15          THE COURT:  All right.  Well, I'm a little

16     troubled by this, but I'll take a closer look at it.  I want

17     to hear from the other side on this point.

18          MR. MAHADY:  Good morning, Your Honor.  This is

19     Joe Mahady for AmerisourceBergen Drug Corporation.  Can you

20     hear me okay?

21          THE COURT:  Yes, I can hear you just fine,

22     Mr. Mahady.

23          MR. MAHADY:  It's nice to see you again.

24          I will begin kind of where you started which is that

25     this is not a motion for summary judgment.  This is very

1   clearly an evidentiary motion and the plaintiffs have not

2   cited to a single case where a court has granted the type of

3   relief that they appear to be seeking here.

4       And I say "appear to be seeking here" because it is not

5   clear from the papers or from what Mr. Farrell just said as

6   to what relief they are actually seeking.

7       In their motions they seek a holding from this Court

8   that the ARCOS data reported by the distributors is

9   accurately reflected in the process data performed by their

10  expert, Dr. Craig McCann.

11          THE COURT:  Is that legitimately in dispute

12  whether this data accurately reflects the shipments reported

13  to the DEA?  Is that, is that -- is that in dispute?  Is

14  there a question about that?

15          MR. MAHADY:  I think it's potentially in dispute.

16  As Mr. Farrell noted, this data set is massive.  It is

17  500 million lines of transactional data that shows all

18  transactions reported by all registered manufacturers and

19  distributors to the DEA ARCOS data set over an eight-year

20  period.

21      No expert on the defense side has undertaken the steps

22  to determine whether or not those 500 million transactions

23  accurately reflect what was reported and shipped by the

24  distributors.

25      And in addition to that, their expert supplemented what

1   was reported by the distributors.  So it is not simply the

2   ARCOS data set.  It is an ARCOS data set --

3            THE COURT:  Well, are you saying before this comes

4   in, there has to be evidence that, that it does accurately

5   reflect the shipments?  Is that an issue?

6            MR. MAHADY:  I think it's a potential issue.  The

7   defendants have reviewed the processes that Mr. McCann

8   applied to the ARCOS data set, not the part he supplemented

9   but the part that he processed, and generally believe that

10  what he did was appropriate.

11       But the ARCOS data set that the plaintiffs are trying

12  to enter is in no way limited to Huntington Cabell or even

13  the State of West Virginia.  It is a nationwide data set

14  that will be of no value to the Court.

15       And notwithstanding the fact that in their reply brief

16  the plaintiffs expressly stated that they are not seeking

17  for the Court to admit the process ARCOS data set, that's

18  exactly what they're trying to do here.  And we think that's

19  very problematic for multiple reasons.

20       First, this process data set by Craig McCann is expert

21  work product.  It should not come into the case at this time

22  or potentially even at trial in the form that the plaintiffs

23  are trying to get it into the case.  There would be no value

24  to the Court in 500 million lines of transactional data.

25       So I think the question is why would the plaintiff want

1    to get this data set in now when it will be of no use to the

2    Court or really the parties?  And I think there's two

3    reasons.

4         First, the plaintiffs want a ruling by this Court that

5    the 500 million data lines are accurate, accurately

6    reflected as reported, and shipped by the distributors.  I

7    don't see how the Court can possibly ever make that

8    determination.

9         But they also want that determination so they can then

10   go tell every other court in the country where this case is

11   being litigated that a Federal Judge in the MDL has already

12   reached a determination that it's accurate and admissible.

13        And the other thing they want to do with this, and I

14   think Mr. Farrell even hinted at it, is they want to begin

15   inundating the Court with 1006 summaries of the data.

16        I'm not saying 1006 summaries of the process ARCOS data

17   would not be appropriate with the proper foundation and a

18   sponsoring witness.  But the plaintiffs want to shortcut

19   that and just start introducing them without Dr. McCann, the

20   same individual who processed the data, supplemented the

21   data, and prepared the very summaries that the plaintiffs

22   want to put into the case.

23        And, so, for those reasons, the fact that this is not a

24   summary judgment motion and it's not being appropriately

25   raised at this time, and the fact that the plaintiffs want

1   to admit a massive database without any foundation or

2   sponsoring witness, we request that the Court deny the

3   motion.

4           THE COURT:  Mr. Farrell, if this is not limited to

5   Huntington and Cabell County, how is it relevant to this

6   case to the extent that it's all admissible?

7           MR. FARRELL:  That's an excellent question, Your

8   Honor, that has not been in dispute in this litigation for

9   two years.  Let me tell you why.

10      The -- what we have done is that in order for the

11  defendants to comply with federal law, they had to look for

12  orders of unusual size.  In order to identify orders of

13  unusual size, you need to define orders of usual size.

14      What we have the benefit of doing is we have the

15  benefit nationwide to look at orders of usual size from

16  these defendants, amongst these defendants, amongst

17  distributors small and large and in between.  It's a

18  numerator and a denominator.

19      So I'll agree Mr. Mahady.  His depiction of our

20  motivation is 100 percent accurate.  We're asking for this

21  MDL court to advance this MDL litigation by deeming the

22  ARCOS data accurate and authentic because it's not in

23  dispute.

24      If it was in dispute, the defendants have not raised

25  it.  To the extent they have raised it in *Frye* hearings and

1    in *Daubert* hearings in front of Polster, they have lost.

2        And, so, all this is is an exercise to delay the

3    development of the record.  And what we're asking for you to

4    do is to allow us to put it in.  And if they have some

5    dispute to it, let them dispute it.

6            MR. MAHADY:  To your -- sorry, Mr. Farrell.

7            MR. FARRELL:  Joe, I'm sure you have something

8    more eloquent to say.

9            MR. MAHADY:  I don't know about that, Mr. Farrell.

10       But, Your Honor, to your first point about it including

11   information beyond Huntington and Cabell, Mr. Farrell said

12   that has not been in dispute for two years.  That is in

13   dispute.  In fact, it was raised in a motion *in limine*

14   that's before the Court.

15       Mr. Farrell has claimed that we have not raised any

16   issues with this to date.  I do not believe the issue as to

17   the admissibility of this entire database has ever been

18   before a court.  And the defendants are certainly entitled

19   to have the ability to cross-examine Mr. McCann when

20   plaintiffs call him in their case in chief at trial.

21       They have six weeks to put on their case.  If it

22   requires the plaintiffs to use two days for this expert that

23   they believe is critical to their case, I don't think that's

24   inappropriate.  I think it's proper and I think that's how

25   we should move forward.

1      If the plaintiffs have 1006 summaries that they want to

2  begin providing and, in fact, have begun providing to the

3  defendants, we will review those and we will work with the

4  plaintiffs as we lead up to trial.  But we cannot be in a

5  position where 500 million lines of data are admitted to

6  trial without a sponsoring witness months before opening

7  statements because we will be at a serious disadvantage in

8  objecting to any future submissions.

9      THE COURT:  Okay.  I'll take a closer look at

10  this.

11      The last thing I have on the batting order here is the

12  plaintiffs' motion *in limine* concerning the IQVIA data.

13      And I've got down here that you're going to argue that,

14  Mr. Majestro.

15      MR. MAJESTRO:  Thank you, Your Honor.  Anthony

16  Majestro on behalf of the plaintiffs.  Can everyone hear me

17  okay?

18      THE COURT:  Yeah.  The first question I have to

19  try to maybe get to the chase here, Dr. Keller's opinion

20  would be admissible just because he relied upon the -- I

21  mean, he could refer to it as something he relied upon and

22  it would come in that way, would it not?

23      MR. MAJESTRO:  That's true, Your Honor.  It

24  could -- yes, it could possibly come in that way.  But it's

25  also independent evidence, and the plaintiffs as part of

1  their case in chief want to put these 1006 summaries of this

2  evidence affirmatively before the Court as independent

3  evidence.

4      And we believe it's, we believe it's admissible and I

5  can go through that, or if the Court has

6  particular questions --

7          THE COURT:  Well, go ahead.  Say anything else you

8  want to say with regard to this.

9          MR. MAJESTRO:  Okay.

10          THE COURT:  It seemed to me that that was a pretty

11  successful end run around your basic motion here, but you go

12  ahead.

13          MR. MAJESTRO:  Well, I mean, I think first I want

14  to explain what this IQVIA data is and why it's important.

15      IQVIA itself describes the data as a suite of

16  sub-national reporting providing granular prescription

17  performance that consists of a representative sample of

18  retail, chain, food store independent pharmacies, and it

19  includes data from 93 percent of retail distributions from

20  nearly 60,000 pharmacies originating at the pharmacy

21  terminal level.

22      So what this is is this is the data that describes the

23  individual prescriptions.  Dr. X wrote a prescription to

24  Patient Y for X and this many refills.

25      Now, the defendants throughout this litigation have

1  emphasized the fact that they have no knowledge of those is

2  their claim, that they have no knowledge of what happens on

3  the retail level.

4      What we want to do is introduce this evidence to show

5  that that is not true because they have access to this data

6  that provides that granular level of knowledge.

7      Second, the data -- there's no question the data is

8  reliable.  Dr. Keller testified extensively that the data is

9  relied upon by the pharmaceutical industry at every level.

10  And the distributors, the manufacturers, even pharmacy

11  defendants, payers like insurance companies rely on it.  The

12  Government relies on -- purchases this data and relies on

13  it.  In fact, the Government even uses this data for

14  regulatory purposes.

15      Third, the defendants' own expert witness testified

16  regarding the reliability.  Dr. MacDonald, their witness,

17  testified that the data is very reliable.  He testified that

18  he embraced the IQVIA data as well peer-reviewed data that

19  is highly relied upon by many players touching the

20  pharmaceutical industry, that the IQVIA data is the largest

21  and best known data aggregate, and that he himself relied on

22  that data in coming up with his opinions.

23      Finally, the key point Dr. McDonald pointed out as to

24  why this data is reliable is, as he explained, it's very

25  expensive data.  IQVIA charges upward of a million dollars

1  to get some of these reports.  So the industry is paying

2  really good money to purchase these reports precisely

3  because they're reliable.

4       In order for the data to be admissible, we have to lay

5  a foundation.  And in this case, this is -- I think if we

6  take anything away from this motion, we want the Court to

7  take this away from that.  And that is the foundation for

8  the admission of this data is not in dispute.

9       The parties -- in our motion we set forth how the data

10  was obtained in the MDL through a discovery request.  One of

11  the other defendants, Allergan, produced the discovery --

12  produced the data in discovery and that is the source of the

13  data that we had provided to the Court.

14       We presented that in our initial motion.  Defendants

15  have no response to that.  They don't contest that the data

16  itself is accurate, that we have an accurate reliable set of

17  the IQVIA data.  Now, defendants have refused to stipulate

18  to this.  We're really not sure why.  They have yet to come

19  up with any reason why.

20       Third, the data is relevant.  Relevancy is a very

21  liberal standard.  And in this case, it's very important to

22  us to be able to use this data to show the nature of the

23  doctors that were prescribing opioids in Cabell County.

24       For example, what this shows is a massive amount of

25  prescriptions written by very few doctors.  The top

1    one percent of the doctors -- I understand doctors have,

2    have written upward of 43 percent of all opioid dosage units

3    and 65 percent of the morphine milligram equivalency of the

4    amount of opioids, the gross amount of opioids each year,

5    the total of 80 million dosage units and 1.6 billion MMEs.

6         So here we have a half a dozen prescribers who wrote

7    enough opioid prescriptions to give every man, woman, and

8    child in Cabell County 60 pills per year for several years

9    between 2007 and 2011.

10        So what we are trying to show here is this emphasis on

11   the small group of bad apple doctors who are flooding Cabell

12   County with prescription opioids.  And that's what this data

13   lets us show.

14        Of these prescribers, five of them lost their, their

15   licenses, two voluntarily and three had them revoked.  And

16   of those, two of these prescribers ended up in prison.

17        So what this data shows is that a lot of opioids were

18   being dispatched by a very few number of bad doctors.  These

19   are facts of consequence in this case and that's what the

20   test is for relevance.

21        The -- this -- we believe this gross amount of pills

22   generally into the county is sufficient to give us an

23   inference of causation and to show diversion.  But the fact

24   that these very few doctors were concentrating the number of

25   pills -- the number of pills that were concentrated in these

1  very few doctors is even stronger evidence that opioids were

2  being diverted by the entry in Cabell County.

3       The data is also evidence of knowledge.  And, you know,

4  it shows what these distributors could have known.  And they

5  actually had purchased other versions of the data in the

6  past.

7       So all they had to do was purchase this same data that

8  we received in discovery and they would have known that the

9  existence of these bad doctors were, were flooding the

10 market with opioids.

11      You know, I think in our causation motion briefing we

12 cited the *Direct Sales* case, *Direct Sales* vs. *United States*,

13 where the U.S. Supreme Court noted the difference between

14 sugar, cans and other -- sugar, cans, and other articles of

15 normal trade on the one hand and narcotic drugs, machine

16 guns, and such other restrictive commodities on the other

17 hand.

18      And what the Court said in that case is that volume

19 of -- just with respect to sugar or a can of beans isn't by

20 itself a problem.  When you're talking about restricted

21 products like machine guns and narcotics, it is.

22      And, so, the importance of the notice and what the

23 defendants could have known is important for our case.

24      Finally, this evidence is relevant with respect to the

25 defendants' claim that all of these doctors are responsible

1   and that this is a problem that they're not responsible for

2   because the doctors are prescribing these pills to

3   everybody.

4       What we want to show is that the problem is these very

5   few doctors that the pills are being diverted, or marking

6   the majority of the diversion.  So for that reason, the

7   evidence is relevant.

8       Now, in order to be admissible, we acknowledge that we

9   have to deal with the hearsay.  The -- we believe it's very

10  clear under the Fourth Circuit's decision that this data

11  is -- constitutes Rule 803(17), commercial publication.  And

12  that is -- Rule 803(17) creates an exception to the hearsay

13  rule for market reports and similar commercial publications.

14      We believe that that is such a similar publication.

15  The rule defines these as market quotations, lists,

16  directories, or other compilations that are generally relied

17  upon by the public or by persons in particular occupations.

18      Now, as the factual recitation I previously set forth

19  to the Court and as we have cited in our brief shows, these

20  are compilations of prescription records that are generally

21  relied upon by persons in the pharmaceutical industry at

22  every level from regulators, insurers, pharmacies,

23  distributors who buy the data.  Academics use it,

24  manufacturers.  The data is generally relied upon.

25      Now, what the Fourth Circuit said in the *C.R. Bard* case

1  is that the basis of applying its admissibility is one of

2  trustworthiness in the case.  And trustworthiness is

3  determined by determining what is the motivation of the

4  compiler to put the data together.

5       And, so, in *Bard* we had a situation where the

6  plaintiffs were trying to admit Material Data Safety Sheets

7  that had certain opinions.

8       There was no evidence in that case, the Court found,

9  that the parties against whom the, the -- well, the party

10  that compiled the Material Data Safety Sheets had an

11  incentive to get it correctly.  They were essentially

12  disclaimers of liability.

13       Here this data compilation is such that the creator,

14  IQVIA, has a strong incentive to get the -- make this data

15  trustworthy and accurate.  They are -- they have a

16  reputation in the industry.  They sell this data to lots of

17  people for lots of money.

18       So the incentive -- and I've cited a few cases on

19  this -- shows that the profit motive is what makes these

20  kinds of commercial publications trustworthy under, under

21  Rule 803(17).

22            THE COURT:  But this is, it seems to me, is

23  different from something like a stock market report in that

24  there is a question about whether the person compiling this

25  has done it accurately that's not present in the kind of

1   data that I'm under the impression 803(17) normally applies

2   to like market reports.

3            MR. MAJESTRO:  Well, the, the answer to that, Your

4   Honor, is it's not just limited to market reports.  The, the

5   case law that we've cited talks about other types of data.

6        For example, in *U.S.* vs. *Anekwu* -- it's the Ninth

7   Circuit case -- the Court admitted summary charts and

8   underlying -- well, that's the wrong case.

9        The, the -- in the cases that were cited -- there were

10  several different cases.  Some of them are statistics.  Some

11  of them are different, different kinds of calculations.

12       In the *Ellis* vs. -- in the *Ellis* vs. *International*

13  *Playtex, Inc.*, case, in the plaintiffs' case there were

14  surveys of -- there were statistical findings based on

15  interviews, and the defendants claimed those constituted

16  multiple hearsay.

17       What the Fourth Circuit said is, "We do not believe

18  this is a proper ground upon which to deny admission.

19  Survey and poll data have repeatedly been admitted under an

20  exception to the rule against hearsay.  See Rule 803(17)."

21       What the Fourth Circuit is telling us is -- and it

22  doesn't have to be first-hand knowledge.  The, the compilers

23  of this information can get it from other sources.  The

24  question is:  Is there an incentive to create an accurate

25  compilation?  That is the keystone of, of the test of

1    reliability pursuant to the *Playtex* case and the *C.R. Bard*

2    case.

3         In this case, we have somebody who has a strong

4    incentive to create accurate data because they sell it.  And

5    if the, if the market for their product can't rely on it

6    because it's determined to be inaccurate, then they will not

7    be able to sell this product.

8         And that's the incentive, and under the case law, the

9    Fourth Circuit case law, that's sufficient to constitute

10   Rule 803(17).

11        And, secondly, Your Honor, we would say that it's not

12   hearsay to the extent we want to use it to show knowledge or

13   lack of knowledge.  And that, and that is clear under the

14   rules that, that the definition of -- that it's not hearsay

15   when you're not offering it to assert it.

16        And knowledge is a classic example of a situation where

17   you can use something that would otherwise be hearsay and

18   you don't offer it for the truth of the matter asserted.

19   And that was what the Court ultimately affirmed the use of

20   the Material Data Safety Sheets in the *C.R. Bard* case.

21             THE COURT:  All right.  Let me hear from the other

22   side on this.

23             MS. HARDIN:  Good afternoon, Your Honor.  This is

24   Ashley Hardin on behalf of Cardinal Health.  Can you see and

25   hear me?

1          THE COURT:  Yes, I can see you and I can hear you.

2          MS. HARDIN:  Great.  I think, Your Honor, I'm

3    going to start off with your very first comment about this

4    motion, Your Honor, which is that it is an end run against

5    the rules.  You are correct.

6          If the plaintiffs have an expert who relies on this

7    data and that expert survives the defendants' *Daubert*

8    challenge and is allowed to testify, then they'll be allowed

9    to testify about, about their opinions regarding the data.

10   But there is no independent evidentiary basis to admit the

11   underlying IQVIA data.

12         Plaintiffs' argument makes clear that what they are

13   trying to do is to take an inadmissible hearsay data set and

14   use it to prove facts that it was not intended to prove for

15   a purpose for which it was not intended and against the

16   group of defendants that did not have the data.

17         It is inadmissible out-of-court statements that the

18   plaintiffs very much want to offer for the truth of the

19   matter.  That's made clear by what Mr. Majestro just said

20   about how they want to use it to prove causation.  And

21   it's -- it should be excluded because it is not -- there is

22   no valid exception.

23         What plaintiffs are telling you is that there are two

24   exceptions to this hearsay admission that would allow them

25   to admit this evidence, and they are wrong on both counts.

1      First, plaintiffs argue that this is admissible for the

2  non-hearsay purpose of notice, but that is incorrect.  The

3  standard -- Mr. Majestro kept saying that it can be for

4  notice because of what the defendants could have known, Your

5  Honor.  That is not the standard for notice.

6      The standard for notice is what you knew or should have

7  known.  There is no dispute that the defendants did not have

8  this IQVIA Xponent data that the plaintiffs want to admit.

9  Their expert, Dr. Keller, admits that we didn't have the

10  data.

11      So when Mr. Majestro says there's evidence that

12  distributors used this data, that is incorrect.  There

13  certainly is not evidence that these --

14         THE COURT:  That's a concern I have.  What's the

15  link between this, this data and the, and the, and the

16  defendants in the case?  I mean, it seems to me --

17         MS. HARDIN:  None, none.  There is no link, Your

18  Honor, because not only did we not purchase the data, Dr.

19  Keller was asked the very specific questions at her

20  deposition:  Should the defendants have gotten the data?

21  Should they have known about it even if they didn't?

22      And I'll refer you, Your Honor, to her deposition on

23  September 18th of 2020.  It's Pages 156 and 157.  And here

24  are the questions she was asked.  And she, she admitted no

25  less than three times she has no basis to link this data to

1    this case.

2        She's asked:  "Is it a requirement of designing and

3    operating a suspicious order monitoring system to purchase

4    third-party data of any kind?"

5        Her answer:  "I don't know."

6        Then she's asked the very particular question:  "Is it

7    a requirement of operating and maintaining a suspicious

8    order monitoring system to purchase IQVIA Xponent data

9    specifically?"

10       Her answer:  "I don't know."

11       Then she goes on to say she doesn't know what the

12   requirements specifically say with regard to suspicious

13   order monitoring systems.  And she says twice on Pages 157

14   that she is not offering an opinion on the requirements.

15       So we don't have the data, no dispute about that.  And

16   there's not a shred of evidence in this case that we should

17   have gotten the data.  All we have is their expert making

18   the offhand remark that we could have gotten it, that we

19   could have purchased it for millions of dollars.

20       But if that was the standard for notice, Your Honor,

21   then anyone would be required to take notice of anything

22   because what you can do and what you should be required to

23   do are two very different things.

24       And it's not surprising that Dr. Keller was not able to

25   make a statement that distributors, wholesale distributors

1  should buy this data because this data isn't intended for

2  them.

3       This is data that is compiled by IQVIA for the purpose

4  of primarily pharmaceutical manufacturers.  And the

5  manufacturers use the data to determine market trends.  They

6  use it to determine compensation, where they need to

7  incentivize, and generally to determine the demand for their

8  product so that they can sell more of it.

9       Distributors don't use this data.  It's not marketed to

10  them by IQVIA and they don't typically buy it, and we didn't

11  typically buy it.

12       And the reason for that is, Your Honor, -- I mean, the

13  plaintiffs say that what we should have done -- what we

14  could have done -- excuse me -- what we could have done was

15  get this data in order to monitor physicians' prescribing.

16       But that is not what wholesale distributors do.  It is

17  not our obligation to police prescribers.  We do not

18  regulate the practice of medicine.  We have no ability to do

19  that.  And we have no authority to do that.

20       What distributors do is monitor wholesale prescription

21  orders placed by their pharmacy customers.  We do that on an

22  order-by-order basis.  We do not do that on a

23  prescription-by-prescription basis.

24       And there is no testimony, no evidence whatsoever that

25  this data, this IQVIA data is ever used by anyone in order

1    to maintain, set up, or operate a suspicious order

2    monitoring system.

3         So the answer to your question, Your Honor, is none.

4    There is no linkage between this data and, and this case and

5    these defendants and what the plaintiffs want to do with it.

6    So notice is not a sufficient basis on which to override a

7    hearsay objection.

8              THE COURT:  If, if Keller testifies that this

9    information was relied upon to support the expert opinions,

10   does that make the data admissible?

11             MS. HARDIN:  No, sir, it does not.  Her

12   opinions -- again, Dr. Keller's opinions are subject to

13   *Daubert* challenges, so I'll just put that out there on the

14   record just for Your Honor's knowledge.

15        But if, if she is permitted to testify, she could

16   testify only to what she's already said, of course, which is

17   that this data exists and could be purchased.

18        She will, of course, be locked into her testimony, her

19   admissions that we didn't buy it, we didn't have it, and she

20   has no opinions about whether or not we should have gotten

21   it.

22        But experts often rely on -- or are permitted to rely

23   on evidence that is otherwise hearsay, as Your Honor well

24   knows.  That does not give the underlying evidence

25   independent evidentiary value.

1      When it is hearsay -- when the underlying evidence is

2  hearsay, it can be admitted only if there is an exception to

3  the hearsay rule or a proper non-hearsay purpose.  We've

4  just discussed the fact that there's not a proper

5  non-hearsay purpose for notice.

6      Plaintiffs' fallback argument is, well, even if it's

7  hearsay, it comes in under the exception under 803(17).

8      That is also incorrect, Your Honor.  And the Fourth

9  Circuit -- I agree with Mr. Majestro that the Fourth Circuit

10  precedent tells us exactly what we need to know here.

11      And what the Fourth Circuit says is that in order to be

12  admissible under this subsection, the evidence has to be

13  established factual information.

14      And Your Honor knows already that you don't -- from

15  what you're seeing, this doesn't seem like the kind of

16  information that satisfies that rule.  And that is exactly

17  correct, Your Honor.

18      Under the Fourth Circuit precedent, evidence has been

19  admitted where it is basically a regurgitation of undisputed

20  facts.  The prime example is an interest rate or directory

21  or the sort of regurgitation of numerical information that

22  no one disputes.

23      When Mr. Majestro says that we don't dispute the

24  foundation and we do not dispute the reliability, he's

25  incorrect.

1          What we have not disputed is authenticity.  That is,

2     that is true.  We don't dispute the authenticity.  But we

3     very much dispute the foundation of this evidence here, and

4     we dispute its reliability.

5          And I would direct the Court to Page 31 of the Appendix

6     that we filed with our opposition, Your Honor.  It's

7     Document Number 1124-2.  And it's the very last page of the

8     Appendix.  It's Page 31 and it's Paragraph 7.

9          And I submit to Your Honor that everything you need to

10    know about why this IQVIA data does not satisfy 803(17) is

11    contained in this paragraph.  And this is what IQVIA itself

12    says about the data.

13         And if anyone is incentivized to say that their data is

14    ironclad, totally factual, absolutely reliable, it would be

15    IQVIA because, as Mr. Majestro says, they sell this data for

16    millions of dollars.

17         But this is what IQVIA itself says about the

18    limitations of its own data.  It says it is not -- it is

19    simply an estimate of measured activity and should be

20    treated accordingly.  It reflects projections, estimates,

21    forecasts that are the result of a combination of

22    confidential and proprietary technologies, statistical

23    methodologies, and a significant number of sources.  It is

24    based on independent judgment, expertise, and opinion.

25         And then, finally, what they say is it should not be

1    used as direct evidence or to establish any fact.

2         So when the experts, including Cardinal's experts --

3    excuse me -- including the defendants' experts testify that

4    the data is reliable, what they mean is that it is reliable

5    for the purpose for which it was intended, which is as an

6    estimation for manufacturers.

7         There is no testimony that anyone has ever used it to

8    police physician prescribing.  It's certainly not been used

9    to establish facts in a court of law, and certainly not used

10   to establish causation as Mr. Majestro now says for the

11   first time they want to do.

12        So there is no basis for which this hearsay testimony

13   should be admitted, Your Honor, and it should be excluded as

14   such.

15             THE COURT:  Okay.  I'm going to take all of this

16   under advisement and we'll decide it as promptly as we can.

17   And I envision entering an order setting the schedule for

18   the trial.  And we'll come back in February and take another

19   crack at it.  All right?

20        Thank you all very much.  It's been very helpful to me.

21        (Proceedings concluded at 12:37 p.m.)

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2     States District Court for the Southern District of West

3     Virginia, do hereby certify that the foregoing is a true and

4     correct transcript, to the best of my ability, from the

5     record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    January 14, 2021

9             Reporter                            Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25