# EXHIBIT A

1

```
 1   STATE OF SOUTH DAKOTA)         IN CIRCUIT COURT
                          SS
 2   COUNTY OF HUGHES     )         SIXTH JUDICIAL CIRCUIT
     _____
 3                        )
     STATE OF SOUTH DAKOTA,)        32CIV18-000065
 4   ex rel JASON RAVNSBORG,)
     South Dakota          )
 5   Attorney General,     )
                           )
 6      Plaintiff,         )        TRANSCRIPT OF
                           )        BENCH DECISION
 7   vs.                   )
                           )
 8   PURDUE PHARMA, L.P.,  )
     et al,                )
 9                         )
        Defendants.        )
10                         )
     _____
11
                 BEFORE:  THE HONORABLE KATHLEEN F. TRANDAHL,
12               Retired Circuit Court Judge of the Sixth
                 Judicial Circuit, in Winner, South Dakota,
13               on the 13th day of January, 2021.

14                        _____

15

16

17

18

19

20

21   ------------------------------------------------------

22                       Mona G. Weiger
                      Official Court Reporter
23                       PO Box 1238
                      Pierre, SD  57501
24                       605-773-3971

25
```

**2**

1    (The following proceedings were held on
2    January 13, 2021, at approximately 3:30 p.m.)
3    THE COURT:  Good afternoon.  We will go back on
4    the record in the matter of the State of South Dakota
5    v. Purdue Pharma, et al, Hughes County civil file
6    18-65.
7    I do want to again at this time thank the
8    attorneys who argued for the last two days, for those
9    that prepared the briefs, and it's just a pleasure to
10   work in a case where quality work is valued and I just
11   want you to know how much I appreciate the work that
12   you've done in this case.
13   I also had hoped to make decisions on all the
14   issues.  I have four that I'm going to take under
15   advisement and, to be honest, it should not take very
16   long.  I have the preliminary work done but I don't
17   have a decision made yet so I'm going to take under
18   advisement the cause of action for unjust enrichment.
19   I'm going to take under advisement the State's Motion
20   to Sever.
21   And Ms. Connolly, I did receive last night the
22   supplemental authority.  I have not had a chance to
23   read it.  Do you want an opportunity to respond?
24   MS. CONNOLLY:  Yes, Your Honor, we would like
25   that opportunity.

**3**

1    THE COURT:  All right.  I'll have you do that
2    and I'll hold that one until I get your response to
3    that supplemental authority.
4    MS. CONNOLLY:  Thank you.
5    THE COURT:  I'm also, Mr. Teitcher, going to
6    take under advisement the Actavis separate Motion to
7    Dismiss.  You've raised some points today that I
8    didn't have prepared so I will write a memorandum
9    decision on that and also the Allergan PLC
10   jurisdictional issue.  So those are the issues that I
11   will get memorandum decisions out to counsel.
12   I also want to state for the record that when
13   the first motion hearing was held on this case back on
14   November 15th of 2018, the only Defendants named in
15   the lawsuit at that time were the first nine
16   Manufacturers listed in the caption.  So the record
17   must be clear that Judge DeVaney's decisions were made
18   prior to some of the Manufacturers, all of the
19   Distributors, including the Pharmacies being added to
20   this litigation.  And I'm going to go through the
21   standard of review, which we're all familiar with, but
22   I want the record to include that as well.
23   The Motion to Dismiss is pursuant to
24   SDCL 15-6-12(b)(5) and tests the legal sufficiency of
25   the pleadings, not the facts supporting it.

**4**

1    In evaluating the pleadings, the Court must
2    treat as true all facts properly pled in the Complaint
3    and resolve all doubts in favor of the pleader, which
4    in this case is the State of South Dakota.  And the
5    Court accepts the pleader's description of what
6    happened along with any conclusions reasonably drawn
7    therefrom.
8    The Complaint does not need detailed factual
9    allegations but must allege facts that, when taken as
10   true, raise more than a speculative right of relief.
11   Motions to Dismiss are viewed with disfavor and
12   seldom prevail.  Pleadings should not be dismissed
13   merely because the Court entertains doubts as to
14   whether the pleader will prevail.  The rules of
15   procedure favor the resolution of cases upon the
16   merits by the trial or summary judgment rather than on
17   failed or inartful accusations.
18   And SDCL 15-6-9(b), which is identical to the
19   federal Rule 9(b), requires that in all cases of fraud
20   the circumstances constituting fraud shall be stated
21   with particularity.  And the Court finds, based upon a
22   review of the Second Amended Complaint, that that is
23   the standard the Court must use.
24   So first the Court will look at some of the
25   threshold issues that were brought to its attention.

**5**

1    The first is the allegation that the State fails to
2    plead damages with requisite particularity.  The
3    Second Amended Complaint differs from the original
4    Complaint upon which Judge DeVaney based her decision
5    that the State failed to plead damages with
6    particularity in that the original Complaint was for
7    specific fraud-based claims such as Medicaid fraud,
8    statutory deceit, common law fraudulent
9    misrepresentation and failure to warn.
10   At the November 15, 2018 hearing, Judge DeVaney
11   discussed the requirements that damages be pled with
12   particularity as an element of the fraud and deceit
13   claims and dismissed the Complaint for failure to
14   plead damages with particularity.  That can be found
15   in the transcript at page 95, line 16 through page 98,
16   line 18, and page 99, lines 7 through 9.
17   While the Second Amended Complaint does not
18   contain those specific fraud-based claims, it does
19   aver to circumstances constituting fraud committed by
20   all the Defendants.  Therefore, as I indicated,
21   Rule 9(b) will be applied by this Court in particular
22   as to this issue raised.
23   Even using the heightened requirements of
24   Rule 9(b), the Court finds that the Second Amended
25   Complaint provides sufficient allegations of damages

```
                                                             6
 1   and comports with these requirements.  The Second
 2   Amended Complaint itemizes various costs the State
 3   alleges were borne due to Defendants' alleged actions:
 4   opioid addiction services and treatment; housing
 5   inmates incarcerated for opioid-related crimes;
 6   training and equipping law enforcement and first
 7   responders for opioid overdoses; increased law
 8   enforcement and criminal justice costs involving
 9   opioid-related crimes; increased costs to the South
10   Dakota Workers' Compensation Program; increased costs
11   related to the South Dakota health insurance plan;
12   increased costs for opioid education and prevention,
13   including the South Dakota Department of Health Avoid
14   Opioid program; and increased costs to the State's
15   Prescription Drug Monitoring Program.
16           On page 18, footnote six of the State's
17   Combined Brief in Opposition to Defendants' Motion to
18   Dismiss, the State lists the specific time periods for
19   which it seeks recovery and the Court will incorporate
20   those paragraphs herein by reference.
21           The Manufacturer Defendants direct the Court to
22   the S.W. Croes Family Trust case and in that case it
23   was held that damages for fraud-based claims must be
24   pled with reasonable certainty.  The Court concludes
25   that the Second Amended Complaint adequately puts
```

```
                                                             7
 1   Defendants on notice of the State's alleged damages.
 2           Next the Court will look at the claims and
 3   whether or not they are preempted under federal law.
 4   The Manufacturer Defendants contend this Court should
 5   follow the North Dakota case, State ex rel Stenehjem
 6   v. Purdue Pharma L.P., on the issue of preemption.  On
 7   this issue, however, this case is distinguishable.
 8           In the North Dakota case, which we all say
 9   instead of trying to pronounce the last name that's in
10   the caption of the case, Purdue filed a Motion to
11   Dismiss.  However, both parties then cited numerous
12   documents and sources outside of the pleadings and
13   each relied heavily on those sources in their
14   briefing.  When the matters are presented outside the
15   pleadings and not excluded by the Court, the motion is
16   then treated as one for summary judgment and disposed
17   of as provided in Rule 56.
18           Motions before this Court are Motions to
19   Dismiss pursuant to Rule 12(b)(6), and this Court is
20   only going to determine the issues based upon the
21   pleadings.
22           The Court's scrutiny of these pleadings should
23   be deferential to the Plaintiff, and because the North
24   Dakota court considered the preemption issue at a
25   summary judgment stage of the proceedings, the Court
```

```
                                                             8
 1   will not consider it as authority on this issue.
 2           The Defendants contend that since the FDA had
 3   approved prescription opioids, the State's challenging
 4   their marketing of prescription opioids for long-term
 5   chronic pain is preempted by federal law, and that's
 6   the Manufacturers' position on this.
 7           The Distributor and Pharmacy Defendants contend
 8   that the State's torts claims should be based -- is
 9   based upon alleged failures to adequately guard
10   against diversion and should be preempted because the
11   State tort liability would stand as an obstacle to the
12   DEA's enforcement of the Controlled Substances Act and
13   its anti-diversion requirements.  This group of
14   Defendants allege that permitting the State to enforce
15   the violations of the Controlled Substances Act
16   creates a conflict with federal law.
17           The Court rejects both of these arguments.
18   There is no impossibility preemption as the
19   Manufacturers contend.  The State does not challenge
20   the sale of opioids for long-term chronic pain or the
21   adequacy of the labels, but the other deceptive
22   practices that contradict or minimize the risk of
23   prescription opioids.
24           The cases sited by the Manufacturers allege
25   that it is impossible for them to be in compliance
```

```
                                                             9
 1   with both the federal and state laws and regulations.
 2   From the Court's review, the state and federal duties
 3   do not overlap.
 4           The Second Amended Complaint sufficiently
 5   alleges in multiple paragraphs that the Manufacturers
 6   fraudulently marketed opioids -- prescription opioids.
 7   And the court in In re: National Prescription Opiate
 8   Litigation rejected the argument that the term
 9   "labeling" is so broad as to encompass the massive
10   marketing campaign alleged by Plaintiff.
11           There is also no conflict between state and
12   federal law.  The allegations in the Second Amended
13   Complaint are consistent with the FDA approved
14   labeling.  At this stage of the proceedings, the Court
15   must accept all of these allegations as true.
16           The Court also rejects the Distributor and
17   Pharmacy Defendants' preemption argument.  The State
18   seeks to hold Defendants liable for conduct that
19   violates state and federal laws.  This does not pose
20   an obstacle to federal law.  This litigation does not
21   seek to enforce the Controlled Substances Act
22   anti-diversion controls, rather, the State seeks to
23   enforce legal duties under state law.
24           In the Medtronic case, the U.S. Supreme Court
25   has approved the imposition of state tort liability
```

10

1 even where the alleged wrong conduct might be
2 violation of federal law. Enforcement of state
3 anti-diversion controls which are complementary to
4 federal anti-diversion controls do not obstruct or
5 interfere with the Controlled Substances Act.
6     In Wyeth v. Levin, the U.S. Supreme Court
7 rejected the argument that enforcement of state law
8 duty to promote stronger warnings about a drug would
9 obstruct the federal drug labeling regulations because
10 the FDA traditionally regarded state law as a
11 complementary form of drug regulation.
12     In 21 U.S.C. 903, the Controlled Substances Act
13 contemplates the states' traditional enforcement of
14 tort law will supplement the federal enforcement
15 scheme.  It provides, "No provision of this subchapter
16 shall be construed as indicating intent on the part of
17 Congress to occupy the field in which that provision
18 operates, including criminal penalties, to the
19 exclusion of any state law on the same subject matter
20 which would otherwise be within the authority of the
21 state, unless there is a positive conflict between the
22 provision of this subchapter and that state law so
23 that the two cannot consistently stand together."
24     Distributor and Pharmacy Defendants further
25 argue that because the Controlled Substances Act

11

1 grants the DEA authority to set quotas for the
2 production of opioids, they were merely distributing
3 amounts that had already been approved by the DEA.
4     However, the State's claims do not challenge
5 the DEA quotas but allege that the Defendants failed
6 to conduct due diligence that would have put them on
7 notice that unreasonable and disproportionate amounts
8 of those authorized opioids were being distributed to
9 certain locations such that they could not have been
10 used for legitimate purposes.  The Second Amended
11 Complaint does not second-guess the DEA quota and,
12 therefore, their claim is not preempted.
13     The Derivative Injury Rule is the next area to
14 review.  The Court finds that the Derivative Injury
15 Rule is not applicable because the State does not seek
16 to recover for personal injuries to its residents.
17 The Court has reviewed the Second Amended Complaint,
18 and the damages they seek to recover are for direct
19 injuries to the State.  Specifically, the Court refers
20 to paragraphs 597, 691 and 692 and there's probably
21 others but those are the ones I picked up.
22     In making this decision, the Court relies on
23 the Summit MDL Decision, the Endo Health Solutions
24 decision, and In re Opioid Litigation cases.
25     The next issue the Court must address is the

12

1 free public services doctrine.  Distributor Defendants
2 contend that the free public services doctrine, which
3 generally bars states and municipalities from
4 recovering in tort for the cost of providing emergency
5 public services, bars the State's claim.
6     The free public service doctrine explained in
7 City of Flagstaff v. Atchison, Topeka and Santa Fe
8 Railway Company says it's premised on the notion that
9 the costs of public services for the protection from
10 fire or safety hazards is to be borne by the public as
11 a whole, not assessed against the tortfeasor whose
12 negligence creates the need for the services.  This is
13 in part because where such services are provided by
14 the government and the costs are spread by taxes, the
15 tortfeasor does not expect a demand for reimbursement.
16     Distributor Defendants cite no case law that
17 the free public services doctrine is a part of South
18 Dakota common law, and they cite no case in which
19 South Dakota has adopted or applied the doctrine.
20     Even if South Dakota does decide to adopt the
21 free public service doctrine, it is not applicable in
22 this case for three reasons:
23     Number one, the Flagstaff case held that this
24 doctrine does not apply where the acts of a private
25 party create a public nuisance which the government

13

1 seeks to abate.
2     Number two, the rule has been rejected when the
3 government has been specifically authorized by statute
4 to recoup its expenses.  SDCL 21-10-9 allows the
5 Attorney General to bring suit to abate a public
6 nuisance.
7     Number three, the courts have rejected the free
8 public service doctrine in cases where, as here, the
9 allegations include a repeated course of conduct on
10 Defendants' part requiring the government to expend
11 substantial government funds on a continuous basis.
12     In James v. Arms Tech, the Ohio court
13 distinguished between a single, discrete incident
14 requiring a single emergency response from misconduct
15 which is ongoing and persistent and which may justify
16 the recoupment of such governmental costs.
17     The Second Amended Complaint alleges in this
18 case that the misconduct has been long-term and
19 continuous and the harm of such a degree that the
20 State could not have reasonably anticipated it.
21     As to the issue of proximate cause, the Second
22 Amended Complaint is no different than the original
23 Complaint.  Judge DeVaney made extensive findings of
24 causation at the November 15, 2018 hearing as they
25 pertain to the Manufacturer Defendants.  Her decision

14

1 at that motion hearing is transcript page 101, line 1
2 to page 108, line 16.
3 The Court agrees that at this stage of the
4 proceedings, South Dakota law does not require
5 Plaintiff to have identified names of specific doctors
6 that allegedly relied upon the representations made by
7 Defendants, nor does it require the Plaintiff to
8 identify specific prescriptions written.
9 The Court does not recognize the North Dakota
10 case as precedent on this issue of causation because
11 again, the court on that issue viewed it in the light
12 of a summary judgment motion rather than a motion on
13 the pleadings.
14 The Court also distinguishes the New Haven v.
15 Purdue Pharma case cited by Defendants. In reviewing
16 the Second Amended Complaint and specifically,
17 Section IV-C, the Court finds that specific
18 description of the causation chain which is alleged
19 permeates all aspects of the distribution chain. At
20 this stage of the proceedings, the Court must accept
21 all facts in the pleadings as true.
22 So having reviewed the Second Amended Complaint
23 and the findings of Judge DeVaney and the case law,
24 the Court finds that the Second Amended Complaint is
25 sufficient as it alleges causation.

15

1 And finally, on the economic loss rule,
2 Manufacturer Defendants contend that the court has
3 already decided that the economic loss rule applies to
4 this case. However, the court's prior ruling applied
5 only to the State's strict liability claim to recover
6 the costs of opioids sold for chronic pain. That is
7 at the transcript page 125, lines 12 through 23.
8 The court found that such claim is based on an
9 underlying transaction involving the sale of goods.
10 That's found in the transcript at page 126, lines 2
11 and 3.
12 Both the Manufacturer and Pharmacy Defendants
13 argue that because the State seeks solely to recover
14 money for public services to combat the opioid crisis,
15 the economic loss rule bars the State's negligence
16 claims.
17 The economic loss doctrine prohibits a party to
18 a commercial transaction governed by the UCC from
19 suing in tort rather than in contract, where that
20 party's sole relief is for economic losses arising out
21 of the transaction. This general rule is found in
22 several South Dakota Supreme Court cases: Kreisers v.
23 First Dakota Title Limited Partnership, City of Lennox
24 v. Mitek Industries, and Jorgensen Farms v. Country
25 Co-op -- or Country Pride.

16

1 The court in Diamond Surface v. State Cement
2 Plant Commission held that the economic loss doctrine
3 applies only to commercial transactions for the sale
4 of goods or merchandise and that if the UCC applies,
5 the economic loss rule precludes non-UCC remedies such
6 as tort claims to recover solely for economic loss.
7 The Diamond Surface case explains that the purpose of
8 the economic loss rule is to encourage negotiated
9 agreements concerning all aspects of a commercial
10 transaction and to prevent parties to a contract from
11 circumventing the allocation of losses set forth in
12 the contract by bringing an action for economic loss
13 in tort.
14 In this case there is no commercial transaction
15 between the State and the Defendants. Instead, the
16 Second Amended Complaint seeks to recover costs
17 associated with combatting, in the State's words, the
18 economic -- or the opioid epidemic which the State
19 alleges incurred because Defendants breaches various
20 duties owed to the State.
21 The Summit MDL Decision also held that the
22 economic loss doctrine was not applicable to
23 Plaintiff's claims.
24 For these reasons, the Court concludes that the
25 economic rule doctrine is not applicable.

17

1 The Court will first look at the public
2 nuisance claims and the first case that the Court will
3 examine is the State of North Dakota ex rel Stenehjem
4 v. Purdue Pharma. It should be noted that this is a
5 trial court decision. As I understand, it was
6 appealed to the North Dakota Supreme Court but is
7 currently subject to the automatic stay of bankruptcy
8 court.
9 This North Dakota case is an opioid-related
10 case where the State has sued Purdue seeking to hold
11 it liable for the impact of the opioid overuse and
12 addiction in North Dakota.
13 There is one procedural difference in this
14 decision that we must look at between the North Dakota
15 case and this case. While the North Dakota case began
16 as a Motion to Dismiss to test the sufficiency of the
17 statement of the claims presented in the Complaint,
18 both parties in their briefs included multiple
19 documents and sources outside the pleadings, turning
20 the Motion to Dismiss into a Motion for Summary
21 Judgment.
22 That said, the Court has reviewed the decision
23 on the issue of public nuisance, and the North Dakota
24 court does not mention any additional documents that
25 were relevant to that issue.

**18**

1    Under our state's public nuisance statutes,
2  State claims injury to "public health and safety" as
3  well as economic injury by virtue of expenditures.
4    On the other hand, Defendants argue that the
5  public nuisance claim must be dismissed because no
6  South Dakota court has extended the public nuisance
7  statutes to cases involving the sale of goods.  This
8  is the same issue decided by the North Dakota court.
9    The court in Stenehjem dismissed the public
10 nuisance claim reasoning that North Dakota courts have
11 not extended the nuisance statute to cases involving
12 the sale of goods, yet the State was clearly seeking
13 to extend the nuisance statute to cases to a situation
14 where one party had sold to another party a product
15 that later is alleged to constitute a nuisance.
16 Because the statute didn't apply to cases involving
17 the sale of goods, the court dismissed the claim.
18    In Stenehjem the District Court recognized that
19 accepting the State's statutory public nuisance claim
20 would extend the application of the nuisance statutes
21 to a situation where one party had sold to another a
22 product that is later alleged to constitute a
23 nuisance, which in his words or the court's
24 words…"would totally rewrite North Dakota tort law
25 because any injury suffered in North Dakota would give

**19**

1  rise to a cause of action under the relevant statute
2  regardless of the Defendant's degree of culpability or
3  of the availability of other traditional tort law
4  theories of recovery.  Nuisance would thus become a
5  monster that would devour in one gulp the entire law
6  of tort, a development we cannot imagine the North
7  Dakota legislature intended when it enacted the
8  nuisance statute."
9    So the issue becomes whether the reasoning is
10 applicable in this case here in South Dakota.  When we
11 look at the North Dakota and South Dakota nuisance
12 statutes, they are identical.
13    And when we look at case law in interpreting
14 and applying South Dakota nuisance law, we see that
15 the South Dakota courts have relied on interpretations
16 of North Dakota's nuisance law by North Dakota courts.
17 Examples include Collins v. Baker and Johnson v.
18 Drysdale.
19    This Court could find no South Dakota case
20 extending the public nuisance statutes to the sale of
21 goods.  In the case of Prairie Hills Water v. Gross,
22 the South Dakota Supreme Court, citing Aberdeen v.
23 Wellman, held that the existence of a nuisance is
24 subject to a rule of reason.  It involves the
25 maintenance of a balance between the right of use

**20**

1  property and the right to enjoy property unaffected by
2  other uses.
3    In Kuper v. Lincoln-Union Electric Company, the
4  South Dakota Supreme Court declined to recognize a
5  public nuisance claim against a rural electric
6  cooperative for stay voltage.  It reasoned that the
7  legislature, in granting an exemption from nuisance
8  actions to statutorily authorized activity, obviously
9  adopted a public policy that private interests must
10 endure some inconvenience for the general populous to
11 receive the benefits of defendant's business conduct.
12    After the Supreme Court handed down this
13 decision, our legislature took no additional action to
14 expand public nuisance law in any way and clearly did
15 not expand it to include the sale of goods generally
16 or specifically.
17    In this case, the Defendants submit that the
18 federal and South Dakota government made a policy
19 decision to permit the manufacture and distribution of
20 opioids because regulators in the medical community
21 have concluded that the medication is beneficial.
22    Other courts have refused to extend public
23 nuisance statutes to the sale of goods.  In Camden
24 City Board v. Beretta, those courts have explained
25 that the sale of non-defective lawful products cannot

**21**

1  be a nuisance without straining the law to absurdity.
2  And Defendant Distributors' Memorandum of Law, pages
3  21 and 22, footnote 16, contain a list of other cases
4  that similarly hold the same.
5    In addition, both the Distributor and
6  Manufacturer Defendants contend that the public
7  nuisance law does not apply to the distribution of
8  opioids because they do not control the
9  instrumentality of the nuisance at the relevant time.
10    In the Second Amended Complaint, paragraph 680,
11 the State alleges that the instrumentality of the
12 nuisance is prescription opioid abuse, addiction,
13 morbidity and mortality.
14    In State v. Lead Industries Association, a
15 Rhode Island court held that, Importantly, the
16 defendant must have had control over the
17 nuisance-causing instrumentality at the time the
18 damage occurred.  Indeed, control at the time the
19 damage occurred is critical to public nuisance cases,
20 especially because the principal remedy is abatement.
21 And this jibes with South Dakota law, SDCL 21-10-5
22 listing abatement as a remedy, and 21-10-6 that
23 authorizes abatement without civil action under
24 certain conditions.
25    The North Dakota court held that a defendant is

22

not liable for public nuisance unless it exercises control over instrumentality that causes the nuisance at the time of the nuisance.

In 2019, in State ex rel Jennings v. Purdue Pharma, the Delaware court dismissed the State of Delaware's identical public nuisance claim against wholesale distributors of opioids for failure to satisfy the control element. It is beyond dispute that commercial sellers, like manufacturers and distributors, relinquish control of the product after their sale. Therefore, commercial sellers cannot be held liable in nuisance for subsequent uses or misuses of those products even if those uses interfere with public rights.

In Cofield v. Lead Industries Association, the court found it indisputable that lead paint distributors lacked control over lead-contaminated products after sale. And in the Tioga Public School District case the court held that nuisance law does not afford a remedy against a manufacturer of an asbestos-containing property because a defendant who has sold an asbestos-containing material to a plaintiff lacked control of the product after the sale.

The Court is also directed to the Restatement

23

(Third) of Torts, Section 8, Liability for Economic Harm. The Third Statement expressly rejects the expansion of public nuisance to economic cases such as this.

Tort suits seeking to recover for public nuisance have occasionally been brought against the makers of products that have caused harm, such as tobacco, firearms and lead paint. These cases vary in the theory of damages on which they seek recovery but often involve claims for economic losses the plaintiffs have suffered on account of the defendant's activities. They may include the cost of removing lead paint, for example, or of providing healthcare to those injured by smoking cigarettes. Liability on such theories has been rejected by most courts and is excluded by this Section because the common law of public nuisance is an inept vehicle for addressing the conduct at issue.

So the Court dismisses the State's claims against all Defendants for public nuisance for the two reasons and each is sufficient on its own to warrant dismissal of the cause of action.

First, the State's claim for public nuisance is dismissed because our public nuisance law does not apply to cases involving the sale of goods. And

24

second, the State's claim for public nuisance is dismissed because the Defendants did not have control of the instrumentality of the nuisance at the time the damage occurred.

The Court will next look at negligence and then negligence per se.

In Counts III and IV the State brings claims of negligence and negligence per se respectfully against all the Defendants. Plaintiff must allege the following elements for negligence:

Number one, a duty owed by the Defendant to Plaintiff; number two, a breach of that duty; number three, causation; and number four, injury.

Defendants contend that the State has failed adequately to allege facts to support the first two elements. The State's claims against the Defendants are premised on alleged violations of the South Dakota Controlled Substances Act along with the relevant federal laws and regulations including the federal Controlled Substances Act.

There is no right -- no private right of action existing under the federal Controlled Substances Act. The DEA is the primary federal agency responsible for the enforcement of the Controlled Substances Act. Courts recognize that, according to its plain terms,

25

the CSA is a statute enforceable only by the Attorney General and, by delegation, the Department of Justice, citing Smith v. Hickenlooper.

Similarly, there is no right of action that permits the South Dakota Attorney General to enforce the South Dakota Act or its implementing regulations through a negligence suit for damages. The statute has its own enforcement provisions and a distinct burden of proof when enforcement is sought in a criminal proceeding.

A recent decision by a New York court is instructive. In Floyd v. Feygin, an opioid addict sued the product manufacturer for negligence alleging that the manufacturer breached New York's Controlled Substances Act by failing to identify and report suspicious orders. The court rejected the Plaintiff's attempt to enforce the manufacturer's duties under the Act through a common law negligence action.

Because the State cannot assert a negligence claim based on alleged violations of the federal Controlled Substances Act or the South Dakota Act, the State must identify a common law duty that the Manufacturers and Distributors owe to the State.

Are there duties of standard of care that exist? Yes. Was the alleged harm to the State

26

1 foreseeable?  Of course.  But the obstacle the Court
2 cannot get over on the negligence claim is the fact
3 that under South Dakota law, the Defendants have no
4 duty to prevent the conduct of third parties in
5 absence of a special relationship.  Walther v. KPKA
6 Meadowlands Limited Partnership, Iverson v. NPC
7 International, Incorporated.
8      And the Second Amended Complaint does not plead
9 the existence of a special relationship between the
10 parties that could plausibly give rise to a duty.
11 Small v. McKennan Hospital and Sorace v. United
12 States.  The South Dakota Substance Control Act does
13 not create a special relationship.
14      In addition, there's no right of action that
15 permits the A.G. to enforce the Act or its
16 implementing regulations through a negligence claim.
17 And I think we've already gone over that.
18      The Defendants contend that South Dakota's
19 alleged injury was caused by third party conduct, for
20 example, illegal drug use.  South Dakota counters with
21 the argument that they are not alleging that the
22 Defendants failed to protect the State from third
23 parties.  Rather, South Dakota alleges that the
24 Defendants directly injured the State by flooding the
25 state with opioids.  The Court rejects that argument.

27

1      The opioid pills are not the problem.  When
2 opioids are manufactured, they're not causing harm.
3 When the opioids enter the distribution chain, they
4 sit on the shelves in the custody of the Distributors
5 and the Pharmacy Defendants and they are not causing
6 harm.  Instead, it is the conduct of the third parties
7 who illegally divert the opioids after they have left
8 the Manufacturers' and Distributors' custody that is
9 the cause of the harm.
10      It is the abuse, misuse and criminal acts of
11 the third parties that cause the harm.  To determine
12 otherwise would leave every manufacturer on the hook
13 when their product is misused by a third party.
14      Even assuming the Distributors have a duty to
15 report or prevent suspicious orders, the negligence
16 claim must be dismissed because that duty does not run
17 to the State.  It is elementary that actionable
18 negligence requires the existence of duty on the part
19 of the Defendant to protect the Plaintiff from injury.
20 Roster v. Inter-State Power Company.  Defendants in
21 this case do not have any relationship with the State
22 conceivable that could give rise to that duty and for
23 these reasons, the Court will grant Defendants' Motion
24 to Dismiss the State's negligence claim.
25      We'll next look at the negligence per se.

28

1 Thompson v. Summers provides the legal standard for
2 this review.  To state a claim for negligence per se,
3 a plaintiff must allege a violation of a statute or
4 ordinance which proximately caused the plaintiff's
5 injury.  For proximate cause the State must allege
6 that the harm suffered is a foreseeable consequence of
7 the act complained of.  The negligent act must be a
8 substantial factor in bringing about the harm.
9      The Second Amended Complaint in paragraph 724
10 alleges that the Defendants have violated the South
11 Dakota Controlled Substances Act and the South Dakota
12 Administrative Code which set standards for preventing
13 diversion.
14      The Second Amended Complaint further alleges
15 these violations were a substantial factor in causing
16 the State's injuries because by violating public
17 safety statutes regarding a controlled system of
18 distribution, it was foreseeable that the public
19 safety would be endangered and that South Dakota would
20 take measures to combat the opioid crisis resulting in
21 injury to the State.
22      In South Dakota under Alley v. Siepman, an
23 alleged violation of statutes and regulations can form
24 the basis of a negligence per se claim only if the
25 plaintiff is in the class of persons the statute was

29

1 designed to protect and the alleged injury is one of
2 the sort that the statute was designed to prevent.
3      The State argues that the South Dakota
4 Controlled Substances Act was intended to protect
5 public safety.  However, there is nothing in the Act
6 or its accompanying regulations that indicates that
7 the State of South Dakota was to be protected.
8      There is no language or legislative history in
9 the South Dakota Act or the regulations to suggest
10 that the alleged injury found in the Second Amended
11 Complaint is the injury designed to be prevented.
12      In addition, the Court finds no language or
13 legislative history in the South Dakota Act or its
14 implementing regulations that suggests that any was
15 enacted to protect governmental bodies from spending
16 money on social services.
17      In the federal MDL case the court dismissed the
18 negligence per se claims, ruling that the claims could
19 not surmount obstacles identical to those the State
20 faces here.  The Court held, The key element of a
21 negligence per se claim that Plaintiffs cannot
22 overcome is showing that they are intended
23 beneficiaries of the statute that the Defendants
24 allegedly violated.  The Controlled Substances Act was
25 intended to protect individual members of the public

30

from falling victim to drug misuse and abuse.  The Controlled Substances Act was not intended to protect sovereigns from spending more on addiction-related public services when rates of addiction increase.

Other courts in Ohio, Oklahoma and New Mexico presiding over similar opioid litigation have also dismissed the negligence per se claims on the grounds that the plaintiff sovereigns in those cases were not the intended beneficiaries of their state Controlled Substances claims.

And in the <u>In re National Prescription Opioid Litigation</u> case, the Ohio court held that where plaintiffs are not "individual members of the public who could fall victim to drug misuse and abuse, they are not intended beneficiaries of these statutes."

This Court concludes that the State of South Dakota is not within the class intended to be protected by the State's Controlled Substances Act and the alleged injury is not the sort the statute was designed to prevent.

For this reason, the Defendants' Motions to Dismiss the negligence per se claim is granted.

The Court will next look at the civil conspiracy count, which is Count V in the Second Amended Complaint.  In paragraph 738, the State cites

31

the <u>Setliff v. Stewart</u> case as its authority that South Dakota law recognizes the cause of action for civil conspiracy.  Fundamentally, civil conspiracy is an agreement to commit a tort.  Civil conspiracy is not an independent cause of action but is sustainable only after underlying tort claims have been established.  And the State has pled tort theories that survive this round of Motions to Dismiss so the Court will move on towards the rest of the legal analysis.

The <u>Huether v. Mimh Transport Company</u> case tells us the purpose of a civil conspiracy claim is to impose civil liability for the ensuing damages simply by virtue of their agreement to engage in the wrongdoing.  The <u>Setliff</u> case sets forth the elements of civil conspiracy.  Number one, two or more persons; number two, an object to be accomplished; number three, a meeting of the minds on the object or course of action to be taken; number four, the commission of one or more unlawful overt acts; and number five, damages as a proximate cause of the conspiracy.

Defendants assert that the Second Amended Complaint fails to plead sufficient facts or circumstances from which the existence of a conspiratorial agreement may reasonably infer that the

32

Complaint is too conclusory and lacks sufficient specificity and factual support to suggest a meeting of the minds.

The Second Amended Complaint paragraphs 613 through 625 allege the conspiracy among the Manufacturer Defendants and the Second Amended Complaint paragraphs 626 to 625 allege the conspiracy among all Defendants.

The Court finds from a review of the Complaint that the State has sufficiently pled an agreement or a meeting of the minds among the Manufacturers and among all the Defendants.  The Complaint alleges that the Defendants "agreed with each other to engage in the unlawful sale of opioids and to deceive the public and federal and state regulators into believing that they were faithfully fulfilling their statutory obligations."

The State alleges that the Defendants' scheme had the common goal of "making billions in unlawful sales of opioids and in turn, increasing and/or maintaining production quotas with the purpose of insuring unlawfully increasing revenues, profits and market shares."  At this stage of the proceedings the Court must accept those allegations as true.

The Second Amended Complaint alleges that for

33

Manufacturer Defendants to fraudulently promote opioids by downplaying or misrepresenting their risks, and an agreement amongst Defendants to evade diversion control so as to increase sales and distribution of opioids and maximize profits.

The Second Amended Complaint describes how Manufacturers together with front groups and key opinion leaders coordinated their efforts to deceptively market opioids for chronic pain in South Dakota and across the country.  The Second Amended Complaint describes conspiracy among all Defendants and also describes fraudulent concealment by all Defendants.

Other courts have found conspiracy allegations like the ones the State makes in this case to be sufficient.  Included in the Court's analysis is the Summit MDL Decision and <u>In re National Prescription Opiate Litigation</u> as cited in the State's Opposition Brief at page 63.

The Court rejects Manufacturer Defendants' contention that the State's conspiracy claim seeks to impose liability based solely on their lawful association in trade groups and their allegation that that violates the First Amendment.

The State's allegations are not based on mere

34

associations, but they allege the Manufacturers used trade associations to conspire with others. The cases cited by the Manufacturer Defendants on page 22 of Manufacturer Defendants' Joint Memorandum of Law are not applicable.

Distributor Defendants contend that the Complaint is vague and conclusory. They argue that the State failed to allege specific agreements or a meeting of the minds to evade diversion controls. Distributor Defendants also allege that the State merely alleges that the Defendants committed parallel conduct.

In reviewing the Second Amended Complaint, the Court finds the State's pleading sufficient. It alleges that the Distributors engaged in the same behavior and tactics to evade diversion controls such as reporting and halting suspicious orders. It alleges the Distributors were in constant communication with each other, including through trade associations and other meetings.

The Second Amended Complaint details Distributors' alleged wrongful and illegal parallel conduct undertaken to advance their common scheme, including refusing to report and halt suspicious orders of controlled substances and publicly

35

misrepresenting their compliance with diversion controls.

Because the Court must make all reasonable inferences in favor of the pleader, the Court must conclude that the allegations of parallel conduct between competitors who normally would have had an incentive to report each other's illegal conduct, a mutual beneficial goal, and evidence of extensive communication between Defendants permits an inference that the Defendants had a meeting of the minds.

Distributor Defendants rely on State ex rel Jennings v. Purdue Pharma as authority for the dismissal of Plaintiff's civil conspiracy claim. The Court finds this case distinguishable. In Jennings the court dismissed without prejudice the conspiracy claim because the State made no claims that participants knowingly and willingly conspired in the scheme and no allegations of a concerted action, an agreement to commit an underlying wrong, awareness of an agreement or action in accordance with that agreement.

In this case, the State has alleged that the Defendants entered into an agreement to commit an underlying wrong to increase the demand for opioids through fraudulent marketing and to evade diversion

36

controls, and had knowledge and intent and took specific actions in accordance with that agreement. The pleading deficiencies the court found in Jennings do not exist here.

Pharmacy Defendants assert that the Complaint contains no allegations of conspiratorial conduct as to them and that they should not be part of the conspiracy because they are not alleged to have belonged to the industry groups. However, Pharmacy Defendants conducted business in South Dakota as licensed wholesale distributors, and pharmacy wholesalers are defined in the Complaint as among the Distributor Defendants. In any event, the Second Amended Complaint does contain specific allegations of wrongful and conspiratorial conduct by the Pharmacy Defendants.

The Court has found the pleadings on this issue sufficient. The Court finds that there are issues of fact and for this reason, the Defendants' Motion to Dismiss the civil conspiracy action is denied.

The Court has also considered the motion by the Defendants to dismiss the Deceptive Trade Practices and Consumer Protection Act which is Count II.

SDCL 37-27-6 defines unlawful deceptive practices to include knowingly act, use or employ any

37

deceptive act or practice, fraud, false pretense, false promises, or misrepresentation to conceal, suppress or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived or damaged thereby.

The Court finds that the Second Amended Complaint paragraphs 697 through 702 sufficiently allege that each Manufacturer Defendant has engaged in unlawful deceptive acts or practices by knowingly misrepresenting material information concerning the characteristics, uses, benefits and risks of prescription opioids.

The Complaint further sufficiently alleges that the Manufacturer, Distributor and Pharmacy Defendants knowingly misrepresented or concealed their compliance with state and federal laws requiring effective anti-diversion controls in order to facilitate their ability to continue selling prescription opioids. That's at paragraph 703.

The State further alleges that the State and its consumers were injured as a result of these deceptive practices. That is in paragraph 704.

While there are no South Dakota Supreme Court cases that have interpreted the Act's exemption, the

## 38

Court rejects the argument of the Defendants that it should broadly interpret the Act's exemptions because, if accepted, the Defendants' argument would effectively nullify the Act's prohibition of deceptive trade practices, as it would exempt virtually all conduct in connection with the sale and advertising of any merchandise that may be lawfully sold.  The Court finds the analysis of the Arkansas and Tennessee courts in Air Evac EMS and the Skinner v. Steele cases persuasive.

In addition, Defendants' interpretation would effectively deprive consumers of a meaningful remedy in many situations.

The Court further rejects Defendants' claims that the State's deceptive practices claim challenges the sale or advertising of prescription opioids.  Since the Court must treat all facts properly plead as true and resolve any doubts in favor of the pleaders, the Court must accept as true the alleged fraud in connection with the marketing and sale of prescription opioids found in the Second Amended Complaint paragraphs 697 through 702, as well as the fraud that concealed compliance with anti-diversion controls in paragraph 703.

The Court concludes that the Second Amended

## 39

Complaint sufficiently alleges that the Defendants misrepresented or concealed their compliance with anti-diversion controls to maintain their registration so they could continue to sell prescription opioids and to do so in increasing amounts to bolster sales.

The Court rejects Pharmacy Defendants' assertion that because they conduct only internal transfers of medication inventories to their own affiliated pharmacies, their conduct cannot be construed to satisfy the commercial element of the statute.

The Court finds persuasive the New York (sic) court's decision in Maese v. Garrett as it relates to how broadly construed the identical "in connection with" element.  The Court rejects the Sisney and Cheval decisions as being distinguishable and not legally on point.

While in Sisney the South Dakota Supreme Court affirmed dismissal, it was not because such fraudulent advertising was not in connection with the sale of the bread to the prison, but because the inmate could not prove that his purported injury was as a result of the act or practice.

In Cheval the court granted summary judgment because Plaintiffs had failed to produce evidence of

## 40

reliance or misrepresentation in connection with the sale or advertisement of merchandise and have not established the requisite causal connection imposed by 37-24-31.

As this is a State action for civil penalties, the State need not allege or prove reliance on the alleged deceptive practices.  SDCL 37-24-6(1) and 37-24-31.

As to the Distributor Defendants' claims that the Second Amended Complaint is fatally defective because it fails to plead any misstatement of fact relating to anti-diversion controls, the Court concludes that the State has sufficiently pled numerous deceptive practices in multiple paragraphs throughout the Complaint that the Defendants put on a front that they were maintaining effective diversion controls, yet behind the scenes they were purposely evading such controls to boost their sales.

Further, the Second Amended Complaint alleges that Defendants had financial incentive to refrain from reporting or declining to fill suspicious orders or using any effective controls to prevent diversion.

On pages 50 and 51 of the State's Combined Brief in Opposition to the motion, they list multiple practices and cite the paragraphs in the Complaint

## 41

that Defendants committed acts that would amount to deception that, if true, would be considered a deceptive act or practice, fraud, false pretense, false promise or misrepresentation to conceal, suppress or omit any material fact, and those are included herein by reference.

The Court rejects the Defendants' assertion that any fraud or misrepresentation concerning their compliance with anti-diversion controls are not material because the State is not alleging that a distributor's compliance would affect a patient's decision whether to take prescription opioids.

The State's claim is that the State was injured as a result of the Defendants flooding South Dakota with more opioids than could have been necessary for legitimate purposes which led to diversion and abuse, directly injuring the State.  The State is not alleging that the harm derived from the individual patients' decision to take prescription opioids.  Whether a patient was affected by Defendants' alleged fraudulent act is not material to the State's claim and need not be alleged.

The plain language of SDCL 37-24-6(1) indicates that materiality requirements only apply to certain types of deceptive acts; to conceal, suppress or omit

42

any material facts. Thus, to the extent that the Second Amended Complaint alleges other types of deceptive acts, there is no requirement under South Dakota law that the State allege materiality.

Pharmacy Defendants contend that the State failed to allege that they acted with the intent to deceive that is necessary for civil penalties. This Court concludes that numerous paragraphs in the Second Amended Complaint allege that the pharmacies knew they were subject to anti-diversion controls such as reporting and stopping suspicious orders, that they concealed their non-compliance with those controls to protect their status as registrants and facilitate their continued sales and distribution, and that they should have known that their conduct was a deceptive practice under the Act as provided in SDCL 37-24-27.

Distributor Defendants contend that the State's claims are premised on misrepresentation to the DEA, and those claims are preempted. A review of the Second Amended Complaint makes it clear that the State's claims are based on misrepresentations to the State and the State entities involved in applying state law governing controlled substances. The State's claims are not based upon alleged misrepresentations to the DEA. Therefore, the State's

43

claim of deceptive trade practices are not preempted from moving forward.

As it pertains to all of the Defendants' arguments that the Court dismiss the cause of action for deceptive trade practices, the Court finds there remains issues of fact that require this Court to reject the Motion to Dismiss at this stage of the proceedings. Therefore, the Defendants' Motions to Dismiss the cause of action is denied.

And then the only decision in addition to those is the Johnson & Johnson and Janssen Pharmaceuticals' Motion to Dismiss and Request for Judicial Notice.

First as to the Request for Judicial Notice of the FDA documents, attached to the Motion to Dismiss is the Affidavit of Jeffrey D. Collins with numerous FDA-related documents that are alleged to be drug labels and Risk Evaluation and Mitigation Strategies. The Court gleans this information from the briefs that were filed with the Court, as the Court has not read the Affidavit or the documents attached thereto.

SDCL 19-19-201 governs notice of an adjudicative fact only and provides for a court to judicially notice the fact that is not subject to reasonable dispute because, one, it is generally known within the trial court's territorial jurisdiction or,

44

two, can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

The Request for Judicial Notice gives the Court no information as to why they are asking the Court to take judicial notice of these documents. Instead, in citing Nooney v. StubHub, Defendants contend the Court should take judicial notice of the exhibits because these documents were expressly referenced in the Second Amended Complaint and are therefore incorporated by reference into the Motion to Dismiss.

In reliance of People v. Purdue Pharma, the Court will deny the request to take judicial notice of those documents. The Court is allowed to take notice of facts not subject to reasonable dispute. Where Defendants request judicial notice of documents instead of facts, there is no way for the Court to determine whether the statements in the documents are undisputed or that the statements go to the truth of the matter asserted.

Because Defendants have failed to identify any adjudicative fact in the documents submitted, they are subject to reasonable dispute and the Court must deny the request to take judicial notice of the documents provided in the Affidavit of Mr. Collins.

45

As to the Motion to Dismiss, most of the issues Johnson & Johnson and Janssen raise were previously decided by the court on November 15, 2018, and there have been no reasons given that would require this Court to again address those issues.

To the extent that the Defendants reiterated the arguments contained in the Manufacturer Defendants' Joint Motion to Dismiss, those have been decided. This includes the allegation that the State has failed to state a claim against Defendants, along with the preemption claim under the Controlled Substances Act.

Janssen contends that it cannot be held liable for sales of active pharmaceutical ingredients by -- and I'm going to butcher these words but -- Noramco, which is part of the Family of Companies, because claims against Noramco are preempted under the federal Controlled Substances Act and are banned by the raw materials doctrine.

First, Noramco is not a named defendant in the action. The State's allegations about Noramco do not implicate any preemption or raw material supplier issues.

The Second Amended Complaint alleges that Noramco and its sister company, Tasmanian Alkaloids,

**46**

1  controlled the market in the U.S. for API and were
2  responsible for supplying API to several opioid
3  manufacturers.  That is at the Second Amended
4  Complaint paragraphs 27 through 112.
5      Tasmanian Alkaloids, a Janssen subsidiary,
6  established a research project in 1994 to develop a
7  newer, more potent poppy to coincide with the initial
8  marketing of a slow-release formation of oxycodone in
9  the U.S.  Paragraph 113.  Janssen reported success in
10 the endeavor and declared the new poppy to be
11 transformational technology that enabled the growth of
12 oxycodone, among other things.  Also paragraph 113.
13     The critical allegation against Janssen based
14 on its connection with Noramco and Tasmanian Alkaloids
15 is this:  Janssen fueled the opioid epidemic by
16 providing a more potent poppy that could provide
17 greater supply and/or profits.  But because Noramco
18 and Tasmanian Alkaloids, Janssen has had incentive to
19 fraudulently market opioids with other Manufacturer
20 Defendants as Janssen profited not only from its own
21 opioid products but from its sale of its API to other
22 manufacturers.
23     Janssen argues that the raw materials doctrine
24 bars the claim against them.  This doctrine, which
25 allegedly bars claims against suppliers of raw

**47**

1  materials used in the manufacture of controlled
2  substances, does not bar claims against the
3  manufacturer, as the State is not seeking to hold
4  Janssen liable for the actions of Noramco.
5      Noramco is not a defendant in this action.  The
6  raw materials doctrine has nothing to do with the
7  State's claim against Janssen as the Second Amended
8  Complaint seeks to hold Janssen liable for its own
9  actions in the alleged fraudulent expansion of the
10 U.S. opioid market.
11     At this stage of the proceedings, the Court is
12 charged with testing the legal sufficiency of the
13 pleadings and not the facts supporting it.  And for
14 that reason, the Motion to Dismiss filed by Johnson &
15 Johnson and Janssen is denied.
16     My proposal, I guess, is that you give the
17 Court the opportunity to get the four memorandums
18 filed and then the Court will sign orders to go along
19 with what we did today.  That way they're all done at
20 one time.
21     And if counsel has questions or if you want to
22 wait for a transcript, that's probably your best
23 course.
24     But anything further?
25     MR. ERCOLE:  Your Honor?  Your Honor, can you

**48**

1  hear me?
2      THE COURT:  Yes.
3      MR. ERCOLE:  Hello?
4      THE COURT:  Yes.
5      MR. ERCOLE:  Sorry.  This is Mr. Ercole.
6  Sorry.  My screen has -- I'm having some technical
7  difficulties so I apologize for that.
8      One question I wanted to raise given Your
9  Honor's rulings today is, at least on behalf of the
10 Manufacturer Defendants, we would request -- once you
11 issue your ruling, it will trigger the time to answer
12 the Amended Complaint on behalf of all of the
13 Defendants.  And so from at least the Manufacturer
14 Defendants' perspective, we would request, given the
15 volume of the Complaint -- given the volume of the
16 allegations and the number of Defendants, 60 days to
17 supply an Answer and otherwise respond to the existing
18 Complaint once Your Honor issues those rulings.
19     THE COURT:  Does the State have any objection
20 to that request?
21     MS. CONNOLLY:  No, Your Honor, we don't.
22     THE COURT:  I will grant that request as to all
23 Defendants.
24     MR. ERCOLE:  Thank you very much, Your Honor.
25 And I apologize for the technical difficulty.  I

**49**

1  cannot see but I can hear everyone at this moment.
2      THE COURT:  Well, you are seen so just so you
3  know.
4      MR. ERCOLE:  Okay.
5      THE COURT:  All right.  Thank you all again and
6  the court will be adjourned.
7      (Proceedings concluded.)

```
                                                          50
 1   STATE OF SOUTH DAKOTA)
                  SS        CERTIFICATE
 2   COUNTY OF HUGHES    )
 3
 4          I, Mona G. Weiger, Official Court Reporter in and
 5   for the State of South Dakota, do hereby certify that
 6   the Transcript of Bench Decision contained on the
 7   foregoing pages was reduced to stenographic writing by
 8   me and thereafter transcribed; that said proceedings
 9   commenced on the 13th day of January, 2021, in the
10   Courtroom of the Tripp County Courthouse, Winner, South
11   Dakota, and that the foregoing is a full, true and
12   complete transcript of my shorthand notes of the
13   proceedings had at the time and place set forth above.
14          Dated this 16th day of January, 2021.
15
16             /s/ Mona G. Weiger
               Mona G. Weiger
17             Official Court Reporter
18
19
20
21
22
23
24
25
```