IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                            :
THE CITY OF HUNTINGTON,     :        CIVIL ACTION
                            :        NO. 3:17-cv-01362
        Plaintiff,          :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
        Defendants.         :
                            :
----------------------------x
                            :
CABELL COUNTY COMMISSION,   :        CIVIL ACTION
                            :        NO. 3:17-cv-01665
        Plaintiff,          :
                            :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
        Defendants.         :
                            :
----------------------------x
```

VIDEO PRE-TRIAL CONFERENCE

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE

FEBRUARY 9, 2021

**APPEARANCES:**


**For the Plaintiff,**
**Cabell County Commission:**


**MR. PAUL T. FARRELL, JR. - (Video)**
Greene Ketchum Farrell Bailey & Tweel
P.O. Box 2389
Huntington, WV  25724


**MR. ANTHONY J. MAJESTRO - (Video)**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. LOUIS M. BOGRAD  (Video)**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC  20004


**For the Plaintiff,**
**City of Huntington:**


**MS. ANNE MCGINNESS KEARSE - (Video)**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

1    **APPEARANCES (Continued):**

2

3    **For the Plaintiff,**
     **City of Huntington:**

4

5    **MS. ANDREA BIERSTEIN (Video)**
     Simmons Hanly Conroy

6    112 Madison Avenue
     New York, NY  10016

7

8

9    **For the Defendant,**
     **Cardinal Health:**

10

11   **MS. ENU MAINIGI - (Video)**
     **MS. JENNIFER WICHT - (Video)**

12   Williams & Connolly
     725 Twelfth Street, NW

13   Washington, DC  20005

14

15   **MR. STEVEN R. RUBY - (Video)**
     Bailey & Glasser

16   209 Capitol Street
     Charleston, WV  25301-1386

17

18   **MR. FRANK LANE HEARD, III  - (Video)**
     **MS. ASHLEY W. HARDIN - (Video)**

19   Williams & Connolly
     725 Twelfth Street, NW

20   Washington, DC  20005

21

22

23

24

25

1    **APPEARANCES (Continued):**

2

3    **For the Defendant,**
     **McKesson:**

4

5    **MR. JEFFREY M. WAKEFIELD - (Video)**
     Flaherty Sensabaugh & Bonasso
6    P.O. Box 3843
     Charleston, WV  25338-3843
7    **APPEARANCES (Continued):**

8

9    **MR. TIMOTHY C. HESTER - (Video)**
     **MR. PAUL W. SCHMIDT - (Video)**
10   **MS. LAURA M. FLAHIVE WU - (Video)**
     Covington & Burling
11   One City Center
     850 Tenth Street NW
12   Washington, DC  20001

13

14   **For the Defendant,**
     **AmerisourceBergen Drug Corporation:**

15

16   **MS. SHANNON E. MCCLURE - (Video)**
     **MR. JOSEPH J. MAHADY - (Video)**
17   Reed Smith
     Three Logan Square
18   Suite 3100
     1717 Arch Street
19   Philadelphia, PA  19103

20

21   **MS. GRETCHEN M. CALLAS - (Video)**
     Jackson Kelly
22   P.O. Box 553
     Charleston, WV  25322

23

24

25

1    **APPEARANCES (Continued):**

2

3    **For the Defendant**
     **AmerisourceBergen Drug Corporation:**

4

5    **MS. KIM M. WATTERSON - (Video)**
     Reed Smith

6    Suite 2900
     355 South Grand Avenue

7    Los Angeles, CA  90071

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

23

     Proceedings recorded by mechanical stenography; transcript
24   produced by computer.

25

P R O C E E D I N G S

1           THE COURT:  I assume we're ready to go.

2       A couple things.  We have a very limited time this

3 morning.  I apologize for that.  I'm going to try to

4 expedite this by minimizing the time that I stick my nose in

5 it and take the attorneys off their argument.  So we'll try

6 to move as fast as we can keeping in mind the limited amount

7 of time.

8       We have a court reporter working from a remote

9 location.  So when you talk, please identify yourself so she

10 can keep the record straight.

11      The first thing on the plate is the defendants' motion

12 for summary judgment based on the statute of limitations.

13      And I have down Ms. Hardin for the defendants and Mr.

14 Majestro for the plaintiffs.  If that's wrong, please let me

15 know.

16      If it's correct, Ms. Hardin, you may go forward.

17        MS. HARDIN:  Good morning, Your Honor.  Can you

18 see and hear me?

19        THE COURT:  Yes, I can.

20        MS. HARDIN:  Great.  Thank you.

21      I'm Ashley Hardin from Williams & Connolly on behalf of

22 the defendants, Your Honor.  And I will be presenting the

23 defendants' motion for partial summary judgment on the

24 statute of limitations.

1    Your Honor, there is a one-year statute of limitations

2    that governs public nuisance claims in West Virginia.  These

3    plaintiffs have admitted that their claims accrued before

4    May of 2015.

5    And, thus, by a straightforward application of the rule

6    that applies to the triggering of the statute of limitations

7    in nuisance cases, a rule that has been on the books in West

8    Virginia since 1895, all the plaintiffs' claims that accrued

9    outside of the one-year statutory period are time-barred.

10    THE COURT:  Ms. Hardin, excuse me.  Isn't there a

11    question here as to whether the statute even applies in a

12    case like this?

13    MS. HARDIN:  The plaintiffs have raised the

14    question about whether the statute applies, but there really

15    is no question about that, Your Honor.  As I said, that's

16    been the, that's been the rule of when and how you apply the

17    statute of limitations in a public nuisance case since at

18    least 1895, then restated by the Supreme Court in West

19    Virginia more than once, and as recently as 2003 in the

20    *Taylor* vs. *Culloden Public Service District* case, Your

21    Honor.  What is typically difficult -- the reason this is

22    actually quite straightforward here, Your Honor.

23    So, as I was saying, plaintiffs filed suit, City of

24    Huntington in January of 2017, Cabell County in March of

25    2017.  And, so, through the straightforward application of

1    that general rule, Your Honor, any claims that they have

2    based on conduct that occurred before January or March of

3    2016 respectively are time-barred.

4         And the reason it's easy here, Your Honor, is because

5    what would normally be difficult at this stage at summary

6    judgment on statute of limitations would be a dispute of

7    facts.

8         We'd be debating whether or not the plaintiffs knew of

9    their claims, when they knew it, what they should have

10   known, and when they should have known it.  And here --

11        THE COURT:  How do you get around the *Kermit*

12   *Lumber* case, Ms. Hardin?  If I understand it, it held that

13   the statute does not begin to run in a nuisance case until

14   the nuisance is abated.  And it hasn't -- it hasn't been

15   abated here, has it?

16        MS. HARDIN:  Well, we do think -- we don't, number

17   one, think there's ever been a nuisance, Your Honor.  But

18   nuisance-causing conduct is what we look to see whether that

19   has been abated.  And I believe that the plaintiffs before

20   this Court in 2017 told you that the defendants are doing

21   their jobs now.  But the *Kermit Lumber* case, Your Honor, is

22   an exception to the general rule.

23        So let me state the general rule first.  And then I'll

24   explain why *Kermit Lumber* isn't the case that we look to.

25        The general rule is set forth as long ago, as I said,

1   as 1895 in the *Henry* vs. *Ohio River* case and again, as I

2   said, set forth again in the *Taylor* case and many cases in

3   between.

4       And those cases set forth the general rule for when we

5   apply and how we apply the statute of limitations in a

6   continuing tort case, a continuing public nuisance case.

7       And I think the nomenclature gets a little bit

8   confusing, Your Honor.  West Virginia calls those temporary

9   nuisances.  But temporary just means on-going.  So those

10  cases where the conduct is alleged to have been on-going for

11  a long time, but also alleged to be continuing within the

12  statutory period.  And that rule, as I said, set forth as

13  long ago as 1895 is this.  I'm quoting from the *Henry* vs.

14  *Ohio River* case.

15      And it says that the general rule as to nuisance is

16  that every continuance from day-to-day is a new nuisance for

17  which a fresh action lies, so that though action for the

18  original nuisance be barred, damages are recoverable for the

19  statutory period for injuries within it.

20      That's the general rule set forth many times by the

21  West Virginia Supreme Court of Appeals.

22      And, so, if the defendants commit tortious conduct

23  today, engages in nuisance-causing conduct today, then a

24  fresh action, a fresh cause of action is triggered today for

25  public nuisance and a fresh statute of limitations is

1   triggered --

2            THE COURT:  I don't mean to interrupt you.  I

3   understand that.  But that is inconsistent with the *Kermit*

4   *Lumber* case.  And you have to tell me why this case does not

5   fall within the rule of *Kermit Lumber*.

6            MS. HARDIN:  Certainly, Your Honor.

7            THE COURT:  Okay.

8            MS. HARDIN:  We do not believe -- sure.  First of

9   all, we don't believe that *Kermit Lumber* is inconsistent

10  with that in any way.

11           *Kermit Lumber* is an exception to the general rule.

12  *Kermit Lumber* notes the general rule, notes that the

13  continuing tort doctrine applies based on continuing conduct

14  and not simply continuing ill effects from previous conduct.

15           But what -- and, and, importantly, because I think

16  plaintiffs are going to tell you that no statute of

17  limitations applies at all to a claim to abate a public

18  nuisance.  *Kermit Lumber* does not hold that.

19           Under the heading "Is there a relevant statute of

20  limitations," the Supreme Court in *Kermit Lumber* says, yes,

21  there is.  And it's one year for public nuisance claims.

22           And then what *Kermit Lumber* -- the Court in *Kermit*

23  *Lumber* went on to do was to hold that there is an

24  exception -- they, they noted a special accrual rule for a

25  very particular and narrow class of cases.  And that case

1    dealt with a hazardous waste contamination and a business

2    site remediation.

3          And the *Kermit Lumber* case says we are -- the general

4    rule, we acknowledge it.  It's been on the books.  That's

5    what we typically apply in a public nuisance case, but here

6    we find that rule unworkable because even though the conduct

7    had occurred long ago, the contaminants were continuing to

8    leach into the soil.

9          And for that very narrow class of cases, the Court said

10   even though the conduct occurred long ago, we're going to

11   hold that the one-year statute of limitations does not

12   accrue while the contaminants remain in the ground.

13         But the reason that's the exception and the reason that

14   is not the rule that applies here, Your Honor, is -- and the

15   Supreme Court tells us -- they were -- they expressly say in

16   *Kermit Lumber* that the special rule is limited and another

17   set of facts might require a different rule.

18         And it's not even a rule that's applicable to all

19   environmental cases, Your Honor.  It is a very particular

20   rule that applies to business site remediation of a

21   hazardous waste.

22         No court in West Virginia has ever applied *Kermit*

23   *Lumber* outside of that very particular set of circumstances.

24   And we submit, Your Honor, that this Federal Court sitting

25   in diversity under *Erie* cannot be the first one to do so.

1    So that's an exception.  It's not the general rule and

2    it doesn't apply here.  And it doesn't hold that no statute

3    of limitations applies to a public nuisance claim.

4        We are under the general rule, the *Henry* vs. *Ohio* rule,

5    the *Taylor* rule that says new conduct triggers a fresh

6    statute of limitations.  And the continuing tort doctrine

7    doesn't save the old claims.

8        So if the plaintiffs here -- the application here is

9    that if the plaintiffs have evidence that the distributors

10   shipped too many pills, is what they accuse us of doing,

11   from January, 2016, to the present, then they may maintain a

12   cause of action at least for purposes of the statute of

13   limitations for those claims.

14       What they may not do is base a liability finding on the

15   defendants' conduct that occurred in 1996 or 2006 or 2010.

16   The plaintiffs admit they have been on notice of their

17   claims they admit since -- as long ago as 2012.

18       So, as I said at the beginning, there are no factual

19   disputes here.  Plaintiffs have taken the position that the

20   facts are irrelevant.  And they hang their hat on one legal

21   argument that there's no statute of limitations.

22       But the difficulty for the plaintiffs is that they have

23   admitted that their claims accrued before May of 2015.  They

24   admitted --

25              THE COURT:  I'm sorry to interrupt you, Ms.

1   Hardin, but in the interest of time, I think I understand

2   where you're coming from.  I read your brief.  And I want to

3   give the other side an opportunity and I want to get to the

4   other issues here.

5        So if you can just -- if there are any specific points

6   you haven't made that you want to get across, get through

7   them and then we'll move on.  I wish I could give you more

8   time, but I can't.

9            MS. HARDIN:  I understand, Your Honor.  I

10  appreciate it.

11       I will make one point before I let you move on to the

12  plaintiffs, Your Honor.  And that is what I think you're

13  going to hear is the centerpiece of the plaintiffs'

14  argument.  They are going to tell you that no statute of

15  limitations applies in this case because they seek equitable

16  relief.

17       And it is true that we have a dispute about the proper

18  label that applies to the big pot of money that they want

19  to, that they want to seek here.  They want money.  There's

20  no dispute about that.  They want a lot of it.

21       But -- and we will, we will debate the proper label

22  for, for that at another time and place, Your Honor.  That's

23  teed up before Your Honor in another set of motions and the

24  Supreme Court's going to take it up later this month.

25       But whatever label we end up putting on that relief

1   does not affect the running of the statute of limitations

2   because the question on statute of limitations is not what

3   label we put on the relief, but for what time period may

4   they seek the relief.

5       If there is a present-day nuisance, they could have

6   sought to enjoin that conduct.  That is abatement.  That is

7   all abatement has ever meant in the State of West Virginia,

8   or they could have sought damages within the statutory

9   period.

10      So the question is:  When can they seek the relief?

11  They could have sought an injunction.  They could have

12  sought abatement.  They could have sought damages, one or

13  the other.  It doesn't matter.

14      The question is:  When did the conduct occur?  How does

15  the statute of limitations apply?  And we look to *Taylor*.

16  We look to *Henry*.  And here is a straightforward, simple,

17  easy application, Your Honor.

18      So for that reason, we submit that Your Honor should

19  grant partial summary judgment to the defendants on the

20  statute of limitations.

21          THE COURT:  Thank you, Ms. Hardin.

22      Mr. Majestro, are you the one to respond here?

23          MR. MAJESTRO:  Yes, Your Honor.  Anthony Majestro

24  for the plaintiffs.

25      Can everyone hear me okay?

1    THE COURT:  Yes, I can hear you.  Go ahead.

2    MR. MAJESTRO:  That's all that matters.

3  Your Honor, defendants confuse the remedies in a public

4 and a private nuisance claim.  In a public nuisance claim,

5 the government is acting to protect health and safety of the

6 public, and the focus is on the conditions that endanger

7 health and human safety; contrast with a private nuisance

8 claim where plaintiffs seek damages where the focus is on

9 the acts of the defendants of the damages incurred by the

10 plaintiff.

11  In essence, what the defendants want you to do is apply

12 those private damage -- private nuisance rules to a public

13 nuisance case.

14  The second point -- general point I want to make, Your

15 Honor, is that defendants, what they're doing, as, as Ms.

16 Hardin admitted, is they're trying to seek the abatement

17 remedy to acts that occurred prior to January and February

18 of 2016.

19  But I want to explain -- show you a little bit about

20 what we're talking about here.

21  Can we pull up Slide Number 1?  I have a couple of

22 slides.  We'll see if they work.

23    THE COURT:  I can't see it, Mr. Majestro.

24    MR. MAJESTRO:  All right.  Well, let's skip that

25 then.  I'll just tell you what they say.

1      So what the slides would show, Your Honor, is that

2   between 1997 and 2019, 2.8 billion milligrams of morphine,

3   or the equivalent of that, were distributed into Cabell

4   County, 2.8 billion.

5      Now, of that, 2.5 billion were distributed prior to

6   2016.  So the vast majority of -- at least in terms of this

7   measure -- there are lots of different measures that

8   we'll -- when we get into the data end in this case.  I'm

9   just picking this one because it's illustrative.  But there

10  is a large chunk of this, of the conduct that occurred prior

11  to 2016.

12     Now, however, the impact of those, of that conduct,

13  like the hazardous waste leaching into the water, stayed

14  past the time that, that the defendants distributed the

15  charts.

16     For example, in the deaths -- if we just take the

17  deaths that happened, in the, in the three-year period from

18  2016 to 2018, there were 324 opioid deaths in Cabell County

19  in Huntington.  But in the ten years prior to that, there

20  were 327, so just three less deaths occurring over a

21  three-year period than over a ten-year period.

22     So what that is evidence of -- and our abatement

23  experts and causation experts will establish that the, that

24  the conduct of the defendants that occurred prior to 2016

25  caused a nuisance, that its effects continued to harm the

1  health and safety of Cabell County.

2      So those are essentially the material facts that are

3  necessary to decide this, this motion.  That -- this

4  nuisance existed and that, that it's continued and not

5  abated.

6      Now, Ms. Hardin is right.  We have two arguments.

7      The first is that there's no statute of limitations on

8  a claim -- on an equitable claim for abatement.

9      The law is clear.  There is no statute of limitations

10 for claims seeking equitable relief.  Now, in CT1 in his

11 August, 26th, 2019 hearing Judge Polster explained in a

12 public nuisance case, the harmed party can, when

13 appropriate, abate the public nuisance or ask the Court for

14 the right to do so and then seek compensation for the cost

15 of abating the nuisance.

16     This compensation is equitable in nature.  The goal is

17 not to compensate the harmed party for the harm already

18 caused by the nuisance.  This would be an award of damages.

19 Instead, an abatement remedy is intended to compensate the

20 plaintiff for the cost of rectifying that nuisance going

21 forward.

22     The West Virginia Mass Litigation Panel accepted this,

23 this statement of the general common law as applied to West

24 Virginia law in, in its September 4th, 2019, decision.

25     Now, Ms. Hardin is right.  The Supreme Court may

1    address this issue later this month.  And they don't

2    seriously -- they don't seriously contend -- they don't

3    seriously quibble with our arguments as to why our claims

4    are equitable versus not, not equitable.

5        And I would refer the Court to our briefing on that

6    issue so we won't -- since she didn't address it, I won't

7    either.

8        But essentially what those cases show is that the

9    payment of money is not determinative and that equity is not

10   limited to injunctive relief.

11       And for the Court's edification, we've cited the case

12   law supporting that on Page 7 to 8 of our reply in support

13   of the motion to strike which was incorporated by reference

14   into this response which is Doc 286.  And then additionally

15   there are additional cases cited on Pages 9 to 10 of that

16   same Document 286.

17       Essentially, though, as the Supreme Court noted in

18   *Cashcall* vs. *Morrisey*, equity is flexible.  Courts have

19   broad powers to fashion equitable relief.  And the Court's

20   equitable powers assume even broader, more flexible

21   character when the public interest is involved in a

22   proceeding in order to secure complete justice.  And for

23   that, they cite the U.S. Supreme Court's opinion in *Porter*

24   vs. *Warner Holding*.

25       Now, essentially -- so that -- so before we even get to

1    whether this is damages or equity, the -- or when the

2    statute of limitations accrues, all of that discussion Ms.

3    Hardin explained, that is all irrelevant because this is an

4    equitable abatement claim to which no statute of limitations

5    applies.

6        The second argument, and that is, that is *Kermit*

7    *Lumber*.  You know, I think that the -- that it's -- that Ms.

8    Hardin completely misstates the, the import of what *Kermit*

9    *Lumber* is talking about.

10       The *Kermit Lumber* rule is not that there's no statute

11   of limitations on unabated public nuisance cases.  It is

12   that the statute of limitations, when there is a danger to

13   health and safety in a public nuisance case, does not begin

14   to run until the nuisance is abated.

15       Now, this is a fairly common sense ruling.  When the

16   public nuisance doctrine, which its entire intent is to

17   protect health, safety, environment exists, that a -- when a

18   government is trying to protect that health and safety by

19   seeking abatement of a, a problem to that health and safety,

20   any other rule would be, would be extremely dangerous to the

21   health and safety.  So that, that -- we'll start there.

22       Second, *Kermit* applies to a temporary nuisance that is

23   abatable and unabated.  There's not any distinction that we

24   have created a sufficient record to establish to go forward

25   on that claim.  The plaintiffs' expert reports alone which

1    were filed in support of all of our *Daubert* motions are

2    sufficient for that.

3        The next point, *Kermit* applies whether or not the

4    damages are compensatory or equitable.  *Kermit Lumber* -- in

5    *Kermit Lumber* the plaintiffs explicitly sought compensatory

6    and punitive damages.  So it's clear that even if Ms. Hardin

7    is right and that our claims are not equitable, the *Kermit*

8    *Lumber* rule still applies.

9        Third, the discovery of the defendants' conduct is not

10   applicable under *Kermit Lumber*.  Notably, in *Kermit Lumber*

11   the Supreme Court wasn't troubled by either the fact that

12   the state first learned of the contamination and Kermit

13   Lumber's actions in 1987 and a criminal conviction in 1988.

14       So '87 - '88 was when the state learned about it, but

15   the lawsuit was not filed until 1995.  The Supreme Court

16   didn't even discuss that, that -- the fact that there was

17   some discovery of this more than a year back.

18       Fourth, *Kermit Lumber* made clear for statute of

19   limitations purposes that the focus of a public nuisance

20   abatement action involving health and safety is the

21   condition, not the defendant's conduct.

22       The, the quote that Ms. Hardin has in their brief, they

23   leave out some passages that are, that are important.

24       The first is the *Kermit Lumber* court expressly noted

25   the object of a public nuisance action is to abate or stop

1    the harm to the public health, safety, and environment which
2    will continue until the hazardous waste is removed.  That's
3    at Footnote 29 of the opinion.
4         The Court also noted in the paragraph that's not quoted
5    in defendants' reply that the -- the part that is
6    ellipsis-ed out, the Court noted that the focus of a
7    governmental public nuisance action is, quote, the
8    continuing harm to the public interest rather than when the
9    acts of the persons in placing the hazardous waste in the
10   soil stopped, clearly distinguishing between conduct and
11   condition.  When it's a public nuisance hurting the health
12   and safety of the public, the focus is on the condition, not
13   the conduct.
14        Now, the Court also noted that a different rule -- in
15   a, in a sentence ellipsis-ed out by the defendants that a
16   different rule applies in private nuisance cases, and that
17   those cases are, quote, less than helpful because they focus
18   on individual harms rather than harms to the public, health,
19   safety, and environment.
20        So we have -- our slides are working.  So this is the,
21   the -- in yellow is the --
22        Can you see it on the screen, Your Honor?
23             THE COURT:  Yeah, I can see it now.
24             MR. MAJESTRO:  Okay.  So the defendants' quote is
25   the highlighted in yellow part.  The bolded part is the rest

1  of the story from the Court.

2      And, you know, that, that -- essentially by extracting

3  out the focus on conditions, they totally distort the

4  meaning of the case.

5      Now, the cases cited by the defendants are cases

6  brought by private parties sounding in private nuisance or

7  other non-nuisance theories, precisely the kind of cases

8  *Kermit Lumber* noted were, quote, less than helpful because

9  they focused on private damages rather than the public

10  interest in abating the harm.

11      So this general rule that the defendants --

12      We can get rid of the slides now.  We're done.

13      This general rule that the defendants speak of is a

14  rule that's applicable in non-public nuisance cases and in

15  cases where there is not an existing harm to health, safety,

16  and environment.

17      Now, they, they rely a lot on *Taylor*.  *Taylor* is

18  distinguishable.

19      First, it's a private nuisance case where a property

20  owner was seeking damages for injury to his property.  We

21  should contrast that with *Taylor* with *Kermit Lumber* where

22  the Court expressly noted that private nuisances are

23  different, and noted that the focus is not on defending

24  parties' interest in continuing the nuisance but on the type

25  of harm suffered.

1   *Taylor* did not overrule *Kermit*.  In fact, *Taylor*

2   recognized that, that *Kermit* provided a special benefit for,

3   you know, a public nuisance case.

4        The Court found it unnecessary to reach that because

5   the plaintiff in *Taylor* was able to recover all of his

6   damages in his private nuisance action which were within the

7   statute of limitations under the rule set forth in *Taylor*.

8        Now, these rulings are consistent with how other courts

9   have, have viewed West Virginia law and the law generally.

10  Judge Polster came to the same conclusion and upheld that no

11  statute of limitations applied to an unabated public

12  nuisance under Ohio law.  The trial court in Alabama in the

13  opioid cases came to a similar holding.

14       But Ms. Hardin says no West Virginia Court has ever

15  held -- has ever accepted the argument that we made.  That

16  is patently untrue.

17       In West -- in interpreting West Virginia law, Judge

18  Hummel in Marshall County and the West Virginia Mass

19  Litigation Panel which upheld Judge Hummel's rulings both

20  found -- applied the *Kermit Lumber* rule and found no statute

21  of limitations begin to run on public nuisance claims in the

22  opioid litigation because the, the nuisance is unabated.

23       Now, in both of those cases, the West Virginia Supreme

24  Court unanimously denied writs of prohibition seeking to

25  challenge the trial court decisions.

1       Unlike the holdings the Court currently considered,

2  it's not like the Court is ignoring this litigation.  With

3  respect to those rulings from Judge Hummel and the Mass

4  Litigation Panel, the Supreme Court unanimously denied the

5  writs.

6       Finally, in this very case, Special Master Wilkes

7  denied a motion to compel by the defendants where the

8  plaintiffs were, were objecting to respond to discovery to

9  identify the date and manner in which (video inaudible)

10 diverted.  They wanted to do discovery into this discovery

11 rule issue.  We objected, said the discovery is burdensome

12 and irrelevant.

13      And what the Court -- what Judge Wilkes said was West

14 Virginia law provides the statute of limitations on nuisance

15 actions does not begin to run until the nuisance is abated

16 in this very case, citing *Kermit Lumber* and the ruling that

17 the defendants did not challenge to this Court.

18      So in total, eight West Virginia jurists sitting on

19 four trial and appellate courts have rejected these

20 arguments that *Kermit Lumber* doesn't govern.

21      Now, defendants argue that this Court should

22 conservatively interpret *Kermit Lumber*.  I would just say

23 that under the *Erie* doctrine, this Court's task is to

24 predict how the Supreme Court of Appeals would rule.  The

25 result ought to be the same in Federal Court as it is in

1    State Court.  That's the whole basis for, for *Erie*.

2        So -- and we've cited some case law on, on how the

3    Court does this in one of our, in one of our nuisance

4    responses, Doc 1077, Page 11, Footnote 2.

5        And, essentially, while not binding, these West

6    Virginia Circuit Court decisions provide persuasive guidance

7    to a Federal Court sitting in diversity, particularly where

8    they're uniform as here.

9        Also, when there's no -- and as the U.S. Supreme Court

10   even said in the *Estate of Bosch* case, there will be no

11   decision by the state's highest court that the federal

12   authorities must apply what they find to be the state law

13   after giving proper regard to relevant rulings of courts of

14   the state.

15       So, essentially, we believe all of these decisions

16   interpreting a very straightforward case, *Kermit Lumber*,

17   should be applied by this Court as a matter of, of

18   diversity.

19       We're not asking for anything more than this Court to

20   apply *Kermit Lumber's* reasoning and the Court's express

21   language.  This is the Court's express language in *Kermit*

22   *Lumber*:

23       "Thus, until such harm to public health and safety is

24   abated, the public nuisance is continuing and the statute of

25   limitations does not begin to accrue."

1      Now, the last point I want to discuss is the similarity

2   between the opioid epidemic and environmental contamination

3   because that's, that's the only hook the defendants really

4   have on *Kermit Lumber*.

5      And that is that environmental contamination requires

6   some special rule.  And they're focusing on that language

7   that, that we had on the screen before.  And other public

8   nuisances -- other nuisances may be different.

9      And -- but I, but I think when you look at what

10   happened in this case that the, the basis for *Kermit*

11   *Lumber's* ruling, a concern over the protection of health and

12   safety, is equally applicable with the opioid epidemic.

13      All of the harms we have, the death, addiction, damage

14   to children, all those things are concerns that touch on

15   health and safety.

16      Opioid addiction is essentially like the hazardous

17   waste in *Kermit Lumber* because once placed in -- once you

18   place those addicts in the community, they continue to cause

19   harm.  And until you remediate the harm that is caused by

20   all these pills that were sent into those communities, the

21   harm is going to continue.

22      Those numbers I started with are evidence that that

23   harm continues well past the stopping of the shipping of

24   particular pills.

25      Now, --

1          THE COURT:  I'm going to cut you off here pretty

2    soon, Mr. Majestro.  So --

3          MR. MAJESTRO:  I've got -- I just have one, one

4    more point.

5          THE COURT:  Okay.

6          MR. MAJESTRO:  And that is -- so, so what does the

7    Court mean when they say other nuisances may be different,

8    other public nuisances?  Let's talk about some other

9    nuisances.

10       Contrast a business that attracts excess traffic in a

11   residential area.  That is a -- may be a public nuisance,

12   but it's not a nuisance that impacts health and safety.  A

13   hog pen which has smells also may not impact health and

14   safety, or a business that's causing excess noise would be

15   another example.  Those are all examples of nuisances that

16   are not implicated by health and safety.  So maybe the

17   *Taylor/Lumber* rule applies in that kind of case.

18       But in a case like this case, a case like contamination

19   where you have arsenic leaching into the water like in

20   *Kermit Lumber* or maybe a case involving infectious diseases,

21   those are cases that trigger health and safety that, that --

22   where the purpose behind a public nuisance abatement action

23   is met by not having the statute of limitations run until

24   the nuisance is abated.

25         THE COURT:  Okay.  Thank you.

1        Ms. Hardin, --

2              MS. HARDIN:  May I respond, Your Honor?

3              THE COURT:  Yes, you may quickly, Ms. Hardin.

4              MS. HARDIN:  Yes.

5        *Taylor*, Your Honor, plaintiffs say it doesn't apply

6    because it's a private nuisance claim.  The Supreme Court of

7    West Virginia says in the *Taylor* opinion that that doesn't

8    matter.  They expressly consider whether the plaintiffs

9    needed to have asserted a public nuisance claim in order to

10   take advantage of the general rule, the general continuing

11   tort rule, and the Supreme Court said, no, you don't.

12       And any suggestion that that case involved somekind of

13   outdated conduct is belied by the opinion where the Supreme

14   Court says the dumping of raw sewage into the Indian Creek

15   Fork continues even unto this day.

16       And the Supreme Court was also very clear to, to make

17   the point that these plaintiffs could have asserted a public

18   nuisance claim because the issue was the pollution of state

19   waters.  So the Supreme Court has told us the distinction

20   between private and public doesn't matter for the general

21   rule.

22       In *Kermit Lumber*, this is not a distinction or a law

23   that the defendants are putting on *Kermit Lumber*, Your

24   Honor.  This is what the Supreme Court itself tells us we

25   are to do and how to apply *Kermit Lumber*.  It's Footnote 29.

1    It says, "We make clear that we are concerned with a

2    public nuisance involving hazardous waste which is in the

3    soil and leaching into a river.  A different public nuisance

4    or a different private nuisance might make a difference."

5    But we -- that is limited to its facts.  And the

6    suggestion that eight other West Virginia courts have held

7    otherwise, there's been one ruling from a trial court that

8    addressed this in one paragraph in a submitted order that

9    was written verbatim and signed word-for-word by the

10   plaintiffs' lawyer.

11   Judge Polster has never taken up the issue of the

12   statute of limitations in West Virginia.  And the fact that

13   the Supreme Court denied the writ is, of course, no

14   indictment of the arguments that are made in the writ.

15   And, lastly, I'll just address this notion, Your Honor,

16   that this case is factually similar to the *Kermit Lumber*

17   case.

18   Nothing could be further from the truth.  The hyperbole

19   and the rhetoric from plaintiffs' side about the

20   contaminants leaching into the soil is, is not -- does not

21   make this case like *Kermit Lumber*.

22   Defendants ship -- wholesale distributors is what

23   defendants are.  We ship prescription drugs that are FDA

24   approved and we're licensed by the DEA and registered by the

25   state to do so.

1     It doesn't matter how many we ship.  We could have

2  shipped too many just as the plaintiffs say.  And every

3  single one of them sits under lock and key at the pharmacy.

4  And they can't get out into society unless a whole host of

5  other DEA registered and state licensed entities write

6  prescriptions and dispense the drugs.

7     So there is no pill spill.  We do not, we do not drop

8  these pills into the town square.  We certainly do not do as

9  Mr. Majestro said, place addicts into the community in the

10  way that people dump chemicals into the ground.  There are

11  no factual similarities.

12     That case is limited, *Kermit Lumber*, not only, as I

13  said, to any environmental case -- and there is nothing in

14  Footnote 29 that says *Kermit Lumber* applies to health and

15  safety cases.  That is not the ruling of *Kermit Lumber*.  It

16  is a narrow exception.

17     The general rule of *Taylor* and *Henry* -- again, this is

18  a rule that's been in effect, Your Honor, in West Virginia

19  for more than 120 years.  And the application here is

20  straightforward.

21     These plaintiffs want to come in and admit for one

22  purpose that their claims accrued before May of 2015.  They

23  want to avoid the application of one unfavorable statute,

24  the non-party fault statute, but they want to have their

25  cake and eat it too because that -- they borrow trouble for

1  themselves on the statute of limitations and they want to

2  try to avoid both by saying that there's no statute of

3  limitations in Virginia -- excuse me -- in West Virginia.

4  And that is not accurate, Your Honor.  There is nothing in

5  the case law that suggests that that is the case.

6       They've admitted that their claims accrued before May

7  of 2015.  That is a stunning admission, Your Honor.  They

8  knew of their claims since before -- as long ago as 2012 and

9  they want this Court to hold that there are no consequences

10  to that admission.  And that is not the law in West

11  Virginia.

12       There is a one-year statute.  They admit their claims

13  accrued in May of 2015.  And, therefore, claims outside the

14  one-year statutory period are time-barred, Your Honor.

15            THE COURT:  Okay.  Thank you.

16            MS. HARDIN:  Thank you.

17            THE COURT:  Let's move on to the next area here.

18  We want to cover the plaintiffs' motion to adopt the MDL

19  Court's ruling on distributors' duties under the Controlled

20  Substances Act -- that's their law of the case argument --

21  and also the plaintiffs' motion for summary judgment on the

22  distributors' duties under the Controlled Substances Act.

23       Mr. Hester, are you going to carry the ball for the

24  defendants on this one?

25            MR. HESTER:  Yes, I am, Your Honor.  Thank you.

1              THE COURT:  You may proceed.

2              MR. HESTER:  Okay.

3              THE COURT:  I'm sorry.  I misspoke.  I get things

4    backwards.  I know which side you're on, Mr. Hester.  Go

5    ahead.

6              MR. HESTER:  Thank you, Your Honor.

7              THE COURT:  Go ahead, please.

8         Oh, I'm sorry.  It's the plaintiffs' motion and I've

9    got Ms. Kearse and Mr. Farrell down for the plaintiffs.

10        Am I straight now?

11        Mr. Farrell, are you going to go forward or Ms. Kearse?

12             MS. KEARSE:  Your Honor, this is Anne Kearse for

13   the plaintiffs.  Andrea Bierstein is also with us as well

14   and will address the Court with Mr. Farrell.

15             THE COURT:  Okay.

16             MS. KEARSE:  Your Honor, you're right.  Plaintiffs

17   did file two motions in regard to the Controlled Substances

18   Act asking the Court to determine as a matter of law the

19   legal obligations defendant distributors have under the CSA.

20        The plaintiffs filed one motion to adopt the

21   Multi-District Litigation Court's order regarding the CSA.

22   And that's Judge Polster's order that was issued on

23   August 19th, 2019.

24        And plaintiffs subsequently filed a motion for partial

25   summary judgment concerning the defendants' statutory and

1  regulatory duties.

2      They're different means to the same end asking this

3  Court to rule as a matter of law that the Controlled

4  Substances Act, Section 1301, and those that follow require

5  the defendants who are DEA registrants to identify

6  suspicious orders of controlled substances, report the

7  DEA -- to the DEA suspicious orders of controlled

8  substances, and to decline to ship suspicious orders until

9  and unless through due diligence the registrar can determine

10  the order is not likely to be diverted into illegal

11  channels.

12      I'm going to touch just briefly, Your Honor, on the MDL

13  coordination proceedings and the law of the case.  And then

14  Mr. Farrell and Ms. Bierstein will touch on the substantive

15  issues that should lead the Court to the same conclusions

16  both under the CSA and under the West Virginia Controlled

17  Substances Act.

18      Your Honor, the -- under the law, the case principles

19  that, that you actually raised in the March 5th hearing

20  about a year ago, the MDL Court presumptively (video

21  inaudible) with respect to the common issues.  And our

22  briefs show that these are common issues that the Court

23  should address.  There were common issues in the MDL

24  proceedings.

25      During our status conference, as you'll recall, you

1    told the, the parties that you intended to follow Judge

2    Polster's ruling unless there was changed circumstances

3    warranting their modification.  And this decision was guided

4    under the Fourth Circuit 1996 decision in *Royster*.

5            Under *Royster* and the guiding multi-state --

6    multi-district litigation principles, the MDL Court's

7    rulings on common issues should be presumptively applied on

8    remand.  And as noted by the Court in *Royster* and also in

9    the hearing, to upset the MDL's ruling would be an

10   undermining of the purposes and usefulness of the transfer

11   under 28, U.S.C., --

12           THE COURT:  Let me interject here a minute.

13        It's my understanding that the law of the case doctrine

14   only applies if it is the same specific case.  Here you

15   don't have that.  You have a -- have rulings that Judge

16   Polster made generally in the multi-district litigation if I

17   understand them correctly.

18        So, technically, the law of the case doesn't apply and

19   you're stuck with the argument that a similar rule should be

20   applied here just to avoid confusion and so forth.

21        So you're on a little less firm ground than if, if he

22   had made that ruling in this specific case, are you not?

23           MS. KEARSE:  Your Honor, that's -- we do call the

24   law of the case principles because the principles apply

25   under multi-district litigation both within the, the complex

1  litigation manuals and writings of the Court's common issues

2  in a multi-district litigation.

3      And, importantly, Your Honor, Judge Polster in his

4  evidentiary order of December 26th, 2019, explained that the

5  ruling did apply to all future MDL cases within his court

6  that he was going to try.

7      But, additionally, as a general matter, as Your Honor

8  just stated, these rulings apply to remanded cases tried by

9  the transferor court --

10      THE COURT:  In what context did, did he make that

11  ruling?  What claims was he, was he addressing and how is

12  that consistent with the, the situation that confronts me

13  right now?

14      MS. KEARSE:  Your Honor, he was addressing all

15  claims, including the public nuisance claim that was set for

16  the first bellwether trial that was set and settled at the

17  eve of trial with that.

18      But, importantly, Your Honor, these are presumptive.

19  These are still discretionary.  It's not necessarily

20  binding.  Judge Breyer in the District Court of the Northern

21  District of California also had the same motions before him.

22      And what Judge Breyer said is that these should be used

23  as springboards, that they should be given great weight in

24  the decisions.  But Judge Breyer also took an independent

25  analysis to see if there was a change in circumstances or

1   whether the California law or Eleventh Circuit law actually

2   had different findings there that would change

3   circumstances.

4        And that's what we've asked the Court in our motion on

5   the MDL proceeding is that if there's changed circumstances,

6   then there would be a further review of that.  And there's

7   no relevant changed circumstances before your Court based on

8   Fourth Circuit law with that either, what Judge Breyer used

9   within the Ninth Circuit law and California law and using it

10  as a springboard to look at his independent review of the

11  case as well.

12       So we've set this motion up basically in a two-phase.

13       One, there is precedent to utilize the findings that

14  Judge Polster made both in his order and subsequent

15  evidentiary order extending it to the transferee and

16  transferor court, but also for Your Honor to take an

17  independent review of that, utilizing the presumptive nature

18  of this ruling and the analysis that went into it that Mr.

19  Farrell and Ms. Bierstein will address for Your Honor with

20  that too.

21       So we've, we've presented it in two different fashions

22  with that, Your Honor, but we do think it at least has great

23  presumptive value to Your Honor on -- under the CSA claims

24  that are just the same as here.  There's no difference in

25  the rule of law of the duties and obligations of the

1  defendants based on the CSA and the findings of Judge

2  Polster in his MDL proceedings for the bellwether one trial.

3  And, of course, as Your Honor knows, this is the bellwether

4  two trial.

5      The Northern District of California case is also a

6  bellwether case that will be proceeding to trial later this

7  year.

8          THE COURT:  Are you through?

9          MS. KEARSE:  Yeah, I think, Your Honor, I think if

10  we want to go ahead and have Mr. Farrell and Ms. Bierstein

11  work through that as well.

12      But, again, our position is that Your Honor could use a

13  law of the case principles and the multi-district guidance

14  on transferee and transferor court rulings as precedent for

15  adopting Judge Polster's ruling.  But I'll turn it over to

16  Mr. Farrell, Your Honor.

17          THE COURT:  Maybe I ought to hear from Mr. Hester

18  on this before I go on to, to the other motion that's

19  related here.

20      So let me hear from you, Mr. Hester.

21          MR. HESTER:  Thank you, Your Honor.  Good morning.

22  Timothy Hester, counsel for McKesson Corporation.

23      Your Honor, you have a --

24          THE COURT:  I accused you of being a plaintiffs'

25  lawyer again, Mr. Hester.

1          MR. HESTER:  Well, I will be sure to inform my

2     partners that I have the ability to switch sides.

3          (Laughter)

4          MR. HESTER:  Your Honor, I, I think you have it

5     just right when you stated the rule of law; that the law of

6     the case doctrine does not apply unless orders are entered

7     in the same case.

8          And as the Court pointed out, the order issued by Judge

9     Polster was not in this case.  It was in other cases that

10    were before him in the MDL --

11          THE COURT:  Well, --

12          MR. HESTER:  -- and there is no exception.

13          THE COURT:  Let me ask a question that's on my

14    mind.  I hope I can frame it properly.

15          How was the context in which Judge Polster made that

16    ruling consistent or inconsistent with the situation that we

17    have before us now?  Was it addressing similar claims or

18    different claims?

19          MR. HESTER:  Well, Your Honor, my understanding is

20    that he was -- he issued that order in the MDL proceeding in

21    relation to cases that were still before him.

22          So the question, as I understand it, was whether his

23    orders would apply to another case that was going to trial

24    before him in Ohio.

25          But here he obviously did not enter these orders in

1   this case.  And, so, the law of the case doctrine just is

2   inapplicable here.  He was, he was entering an order in the

3   MDL proceeding in relation to cases that were still before

4   him which is different from the situation we have here where

5   cases have been transferred back for trial.

6        THE COURT:  What claims were pending in that case,

7   Mr. Hester, if you know, when the, when the ruling was made?

8   Were they the same as the claims we have here or different

9   if you know?

10       MR. HESTER:  I, I don't know at a detailed level,

11  Your Honor.  My understanding is that they, that they

12  included public nuisance claims.  But, but I don't know

13  specifically what the claims were.  But there's two points I

14  wanted to make.

15       First, that the law of the case doctrine doesn't apply

16  because they were not entered in this case.  His order was

17  not entered in this case.

18       But, second, even on its own terms, that was a partial

19  summary judgment ruling subject to reconsideration.  And

20  it's an interlocutory order.  And it's well settled that the

21  law of the case does not apply in that circumstance.

22       So Ms. Kearse made the point that the Court shouldn't

23  apply literally the law of the case doctrine as I heard her.

24  Rather, she was saying it should be presumptive or a

25  springboard.

1        And I'm ready to address that, Your Honor, because

2   there are some differences here.  There are some things that

3   have happened since Judge Polster's rulings.

4        There's evidence that would be presented to this Court

5   that was not considered by Judge Polster in his order.  And

6   there's been a new development with DEA rule-making to add a

7   no-ship requirement.  That was a fact that was not before

8   Judge Polster at the time he entered his order.

9        But there's also an important procedural difference

10  here, Your Honor.  Judge Polster was getting ready for a

11  jury trial.  So was Judge Breyer in his order in San

12  Francisco.

13       Here we have a bench trial.  It's unnecessary for the

14  Court to be making a legal ruling on this issue.  And as I

15  can discuss in more detail, the facts that are going to come

16  out at trial, the evidence bears on this legal question of

17  the nature of this duty, what's the difference between a

18  suspicious order and an order likely to be diverted.  These

19  are factual points on which the Court will hear evidence.

20       The Court will also hear evidence on the shifting

21  positions that DEA took on this issue over time.  And all of

22  that evidentiary record informs the legal issue.  And here

23  we are in a bench trial.  It's not necessary.  It's not

24  appropriate procedurally.  It's not a proper Rule 56 motion.

25  It's not properly framed as the law of the case.

1      But putting all that aside is a matter of the Court's

2  discretion.  It's not necessary at this early stage to be

3  entering an order on this issue because the evidence is

4  going to inform the resolution of this issue.

5      I'm happy to go on, Your Honor, but I, I suspect the

6  plaintiffs are ready to go back on other parts of their

7  argument.

8          THE COURT:  Well, the point you just made, I'd

9  like to hear what they have to say about that.

10         MR. FARRELL:  Judge, this is Paul Farrell.  I hope

11  everybody can hear me.

12         THE COURT:  Yeah, I can hear you.

13         MR. FARRELL:  So I, I guess the, the best way for

14  me to proceed is I want to provide a little bit of context

15  so that we understand why it is that we're having this

16  discussion at this point in time.

17      And I can say with absolute confidence that this legal

18  issue is well-briefed and well-argued and well-known to all

19  of the lawyers on this call.

20      When you look at the public nuisance --

21         THE COURT:  Doesn't Mr. Hester make a good point

22  based on the fact that this is a bench trial?  And I, I want

23  to -- it seems to me I ought to reserve this until I can

24  place it in the specific context of the evidence.  And then

25  I can make a ruling on it and I don't have to be concerned

1  about confusing or misleading the jury.  I can sort it out

2  based on the fuller record that's before me at that time.

3         MR. FARRELL:  I don't have any disagreement if

4  that's the pathway that you wish to choose.

5     There is a ripple effect that will occur based upon

6  what the legal duty is in the case.  So let me be as brief

7  as I can to provide context for you.

8     The, the -- public nuisance is an act or condition that

9  unlawfully operates to hurt or inconvenience an indefinite

10 number of persons.  So there's no question that there's

11 going to be underlying conduct that gives rise to the public

12 nuisance.

13    The plaintiffs and the defendants are going to argue

14 about whether that underlying conduct is governed by

15 negligence, unreasonable interference, unlawful or

16 intentional.

17    But, nonetheless, the, the issue as to what their duty

18 is under the law is what we've been fighting about since the

19 beginning of this litigation.

20    The statute was enacted in 1970.  The C.F.R. provision

21 was enacted in 1971.  And if you'll recall, on June 21st,

22 2017, this same group of wonderful lawyers appeared before

23 you to argue a motion to dismiss.

24    And at that point in time, we were arguing about the

25 nature of that legal duty.  That was the basis for the

1   argument on June 21st, 2017.

2        Nine days later on June 30th, 2017, the D.C. Circuit

3   Court issued its ruling in *Masters*.  Following that, what we

4   have is Judge Polster making a ruling on the legal duty.

5        Then that issue was addressed by Judge Breyer in almost

6   the exact same circumstances that we argued the law of the

7   case.  They argued that there was something different.

8        Judge Breyer's opinion goes through the analysis and

9   says that we'll use it as a springboard, but makes an

10  independent finding on the nature of the legal duty.

11       The only thing that's really changed since Judge

12  Breyer's opinion is the onset of a new proposed rule-making

13  by the DEA and the impact of that.  And the plaintiffs argue

14  that it means one thing and the defendants argue that it

15  means another.

16       And, so, what we believe is that as West Virginia law

17  has long recognized, the existence of a duty is a legal

18  issue for the Court to determine.  And what we're asking is

19  for the Court to make a legal ruling on the nature of that

20  duty along this sequence of procedural history.

21       Otherwise, what's going to happen is that we're going

22  to be presenting to you experts on what the law is or is not

23  which traditionally has not been something that the Court

24  has entertained because as the Court has often held in

25  litigation, this is for the Court to determine, not for the

1    jury.

2         So where we're at today is a motion for partial summary

3    judgment on the nature of the duty, which I think is very

4    fair to be in the breast of the Court.  And if and when you

5    make a ruling on it, then there will be a series of

6    consequences on how this case proceeds.

7              MS. BIERSTEIN:  If I could now, Your Honor, --

8    this is Andrea Bierstein and I wanted to jump in and comment

9    on what Mr. Farrell just said and to second everything he

10   said.

11        But I want to add some facts of context that may

12   address the questions Your Honor was raising, and also

13   address one of the points that Mr. Hester made.

14        So to begin with, when Judge Breyer issued his ruling

15   in California, he had not yet determined whether it was

16   going to be a bench trial or a jury trial.  So that

17   purported distinction is not in fact a distinction because

18   Judge Breyer's ruling did not turn on that.  As I said, he

19   had not yet made that ruling.

20        The context in which Judge Polster issued this ruling

21   was virtually identical to the context here.  That is the

22   argument that the plaintiffs made about why this issue

23   mattered, how it set the framework because in Ohio, as in

24   West Virginia, unlawful conduct is a predicate for nuisance.

25        And, so, the question was:  Have the defendants behaved

1   unlawfully?  And that's the more complicated question that

2   was reserved for trial in Ohio.  But the threshold question:

3   Well, what is the law, what were they required to do, was

4   exactly the same question in the same context for Judge

5   Polster as it is before Your Honor.

6          And the reason is as Mr. Farrell suggested.  It is a

7   pure legal question.  Whether -- once we know what the

8   defendants' duties are under the law, at trial the parties

9   can put in evidence to show they violated it, they didn't

10  violate it, they were confused, they thought it was

11  different, there were mitigating circumstances, the orders

12  didn't look suspicious, whatever evidence they want to put

13  in.  But the basic legal duty sets the framework for what is

14  at issue at trial.

15         And, so, the reason to decide it, it would be like

16  going to trial without knowing, you know, what a public

17  nuisance is.  And, so, it, it sets the legal framework for

18  that.

19         Another thing I wanted to point out to Your Honor

20  was --

21              THE COURT:  Let me ask you a question before you

22  go ahead.

23         I'm having trouble understanding that this can properly

24  be framed as a motion for summary judgment.  How is this a

25  claim or defense or part of a claim within Rule 56?  It

1  seems to me that this is distinct from the, the type of

2  claim or part thereof that is a proper subject of a Rule 56

3  motion.

4  MS. BIERSTEIN:  Well, Your Honor, as you know,

5  Rule 56 applies not only to a claim or defense, but a part

6  of a claim or defense.

7  And here it is an element of our claim.  One of the

8  ways for us to prove nuisance and to prove their liability

9  for the nuisance, one of the avenues for that -- and we've

10  separately briefed this to Your Honor -- is to show that the

11  defendants behaved unlawfully.  So, it -- so what

12  constitutes unlawful conduct in this context is an element

13  of our claim.

14  And, so, the reason we've styled this as summary

15  judgment is because it is an element -- you know, because,

16  for example, this question of their failure to ship.  Is it

17  an element of our claim that they shipped when, when they

18  had suspicious orders or is that not an element of our

19  claim?

20  What Your Honor would be deciding is this piece of our

21  claim and whether that's an element of the claim.  And

22  because it's a pure legal issue -- and this I know we, we --

23  this is addressed in our brief.

24  Because it's a pure legal issue, courts have found that

25  part of a claim, the part of the claim that defines what's

1    the governing law is appropriate for summary judgment

2    because it is a part -- that part of the claim.  It's not,

3    for example, an evidentiary issue, what's going to come in

4    at the trial, what's not.  It's what is the legal framework.

5    And that is an element of our claim.

6        The other point I wanted to make, Your Honor, if that,

7    if that has addressed that issue, is the defendants say that

8    the proposed rule-making in 2020 is a changed circumstance

9    from Judge Polster's ruling.

10        And if we can show Slide 5 -- I think we've got the

11    slides working.  So if we can show Slide 5, I want to talk a

12    little bit about the proposed rule-making because the

13    proposed rule-making did not affect this no-shipping duty.

14        What the proposed rule-making did was to give

15    distributors options about the timing of reporting and due

16    diligence.  And it gave them the option to hold off on their

17    reporting.  And if they could investigate and clear the

18    order fast enough, they would never have to report it.

19        What it did not do is change the no-shipping duty.  And

20    how do we know that?  We know that because the DEA said

21    that.  They said it in the notice of proposed rule-making in

22    the language I've put up on the slide where you see,

23    "Identifying and reporting suspicious orders of controlled

24    substances (and refusing to distribute based on such

25    orders), has always been, and remains, the responsibility of

1    the DEA registrant."

2        So that key language, first of all, "refusing to

3    distribute" and then those keywords "has always been."

4        So this is not new.  This is not a changed rule.  This

5    is the DEA saying we're going to make your reporting life

6    easier, but we are not changing the no-shipping duty which

7    has always been your responsibility.

8        And, in fact, Your Honor, if you look at the proposed

9    rule, both prongs of the rule, the two options that

10   distributors now have, both prongs involve no shipping.  The

11   only thing that's changed is the timing of reporting.

12       And the DEA in order to remove any doubt that this

13   no-shipping was new specifically said it has always been the

14   responsibility.  So the notion that there is anything new

15   here I think is, is simply untenable.

16       And the reason for that, Your Honor, if we go back to

17   the C.F.R., to the regulation -- and this would be Slide 4

18   if we can get that up -- because the C.F.R. puts an

19   affirmative obligation on distributors, on all registrants

20   to provide effective controls against diversion.

21       Now, the defendants like to say, and they said in their

22   brief, that this isn't really an obligation on the

23   registrants.  This is for the DEA to use in deciding how to

24   give out registrations.

25       Well, that's simply not true.  That may be true in the

1    statute.  But this regulation is absolutely clear that it is
2    a, it is a directive to registrants.  The term is
3    "registrants" and the verb is "shall."  This is what they
4    must do.  They must provide effective control to guard
5    against diversion of controlled substances.

6        And our entire point -- and this is why I'm going to be
7    able to wrap it up in about 30 seconds.  Our entire point
8    here -- and this was Judge Polster's point -- is that
9    controls against diversions cannot be effective if a
10   distributor can ship controlled substances when it knows the
11   order is suspicious and has done nothing to investigate and
12   clear up the suspicion or the questions or whatever you want
13   to call them.

14       What would be the point of making them identify them if
15   they're going to send the drugs anyway?  That is not an
16   effective control.  That is what Judge Polster recognized
17   that in order for controls to be effective, distributors
18   must investigate and clear, if possible, the questionable
19   orders before they ship them out.

20       That is a legal question.  How it applies, which orders
21   it applies to, whether they violated it, those are different
22   questions.  But this issue is:  Does this regulation that I
23   showed Your Honor entail an obligation to halt shipments
24   pending due diligence we believe is a legal question
25   suitable for summary judgment on which courts, including

1    Judge Polster and the D.C. Circuit and the DEA, have

2    repeatedly recognized that -- and Congress recognized it in

3    the SUPPORT Act.

4         And that's in our brief, so I'm not going to go through

5    that again.  But they recognized a pre-existing duty to stop

6    suspicious orders.

7         So I think that would be the reason to rule on it and

8    that's why we think it's clear that the duty exists.

9              THE COURT:  Okay.

10        Mr. Farrell, were you done?

11             MR. FARRELL:  Yes, sir, unless you have anything

12   specific for me.

13             THE COURT:  Okay.  Let's hear from the other side

14   on this.

15             MR. HESTER:  Thank you, Your Honor.

16        First, I wanted to go back to the procedural point.

17   We've talked previously about law of the case and why that

18   doesn't apply.

19        It's also clear this is not properly a Rule 56 motion

20   because it does not resolve a claim or defense or part of a

21   claim or defense.  The plaintiffs' argument that this is

22   going to determine the legal framework for their motion, or

23   for their position at trial, that's not a proper Rule 56

24   motion.

25        Of course, Rule 56 can be appropriate to resolve issues

1    that bar statutory construction.  But that only applies if

2    the legal question resolves a claim or a part of a claim.

3    And here they can't make that argument.

4        And the reason is that the existence of a legal duty is

5    not even an element of a claim for public nuisance.  And a

6    violation of a legal duty is neither necessary nor

7    sufficient to establish a public nuisance.  And that's well

8    stated in the Restatement (Second) of Torts at Section 821B

9    which says a violation of law is, quote, not conclusive.

10       So the plaintiffs aren't able to come forward and even

11   argue today that this would resolve a part of their claim.

12   They're asking the Court to set a, quote, legal framework

13   which is something different from a Rule 56 motion.

14       But, in addition, I want to go back again to this point

15   about why it's unnecessary in the setting of a bench trial

16   for the Court to make this ruling now because even assuming

17   a no-ship duty, the plaintiffs would still need to prove

18   when it was in effect, how it applied at different points in

19   time, and whether the defendants violated it.  So the

20   Court's going to need to hear evidence --

21           THE COURT:  Would it make any difference on this

22   point if this were a negligence action instead of a nuisance

23   action?  Would the, would the argument that this was a claim

24   or part of a claim have more merit if this were a negligence

25   case?

1          MR. HESTER:  Well, perhaps, Your Honor.  I haven't

2   gone back recently to look at the law of negligence.  But I

3   suppose if, if the argument were there's negligence because

4   of a violation of a statute that that could be an argument

5   that it establishes a part of the claim.  But here the

6   public nuisance claim is not an element of their claim.

7          So -- but, but -- so I think the Court does not need to

8   reach the merits here of whether there is a no-ship duty.

9   But let me just speak to it quickly because I think it

10  illustrates exactly why it's premature to be issuing a legal

11  ruling at this stage before the Court has heard any

12  evidence.

13         I think the plaintiffs acknowledge that the regulations

14  do not specifically include a no-ship duty.  There's nothing

15  in the regulations that says a registrant shall not ship an

16  order that it has reported as suspicious.

17         So we're in a setting where the plaintiffs are asking

18  us to read into the regulations a requirement that the

19  agency did not provide for.

20         And it's notable, Your Honor, that the regulations

21  specifically define suspicious orders.  They specifically

22  require the registrant to inform DEA of suspicious orders.

23  But the regulations omit and do not include the requirement

24  not to ship.

25         And the DEA itself in the regulations states that these

1   are the regulations that establish the, quote, standards

2   that are, quote, necessary to prevent diversion.  Yet, DEA

3   did not include a no-ship requirement for suspicious orders

4   in those standards.

5       And it's notable here that plaintiffs are saying, well,

6   of course, there must be a no-ship requirement if there's a,

7   if there's an obligation to have effective controls against

8   diversion.  But the DEA did not itself make that judgment.

9   It's not in the rules.

10      And we can see also in the rules the DEA has other

11  no-ship requirements in the regulations.  It prohibits, for

12  instance, any shipment of controlled substances as samples.

13  But it does not prohibit the shipping of suspicious orders.

14      So, in short, we have a detailed extensive regulatory

15  scheme that addresses the handling of controlled substances

16  and the reporting of them, but no regulation stating that a

17  suspicious order cannot be shipped.

18      So under standard principles of construction, a Court

19  cannot and should not read into those regulations a rule

20  that the agency omitted because the Court would in effect be

21  second-guessing the agency's judgment.

22      And the fact that the current rules don't include a

23  no-ship requirement is demonstrated, in our view, by the

24  fact of the DEA's recent rule-making to add a no-ship

25  requirement.  If the, if the plaintiffs were right that this

1   has always been in the rules, there's no reason for the

2   agency to be adding it now.

3        But that gets to the heart of it, Your Honor.  The

4   plaintiffs ultimately are not able to point to something in

5   the rules that establishes a no-ship requirement.

6        What they're doing is arguing (video inaudible) for

7   which it applied.  And I think you've heard this argument

8   today.  When the rules say you need to provide effective

9   controls against diversion, necessarily that means you can't

10  ship a suspicious order.  And they, they logically get to

11  that conclusion through inference.  It's not stated in the

12  rules.

13       But this is the fundamental legal and logical flaw in

14  the plaintiffs' argument and in Judge Polster's order

15  because you have here, first of all, the controlling point

16  of law that a court can't read a new regulatory obligation

17  into a detailed set of regulations that omit any such

18  obligation.  That's for the agency to decide.

19       But even if we put aside that threshold point, a

20  requirement not to ship suspicious orders can't be inferred

21  from the statutory or regulatory requirement to prevent

22  diversion.

23       And the reason why, Your Honor, is because these are

24  two different principles.

25       The regulations define suspicious orders as orders of

1    unusual size deviating substantially from a normal pattern

2    or of unusual frequency.

3         And the evidence that the Court is going to hear will

4    demonstrate that the vast majority of orders that might be

5    suspicious within that definition are not, in fact, likely

6    to be diverted.

7         So the inference that the plaintiffs are asking you to

8    draw as a matter of logic is defeated by the evidence.  And

9    the evidence is going to show that the vast majority of

10   suspicious orders are entirely appropriate and not likely to

11   be diverted.

12        And it's important to highlight the plaintiffs are not

13   alleging a failure to block orders likely to be diverted.

14   They're alleging a duty to block each and every suspicious

15   order.

16        Well, the Court should hear evidence on that

17   difference, on the difference between a suspicious order and

18   one that's likely to be diverted.  And I think the evidence

19   will show very clearly those are different.

20        And it goes to this question of drawing an inference

21   from an absence of something in the regulations inferring a

22   duty that isn't stated by the agency without hearing any

23   evidence.

24        And, in particular, the evidence is going to show why

25   suspicious orders are different from orders likely to be

1   diverted.  And in our view, Your Honor, the Court should

2   hear that testimony before it rules on the scope of these

3   purported duties under the CSA.

4        And I, I also wanted to highlight, Your Honor, whether

5   or not -- I, I think that should resolve it, in our view,

6   that the Court should hear evidence.  It's not properly a

7   Rule 56 motion.  It's not properly law of the case.  And the

8   evidence is going to inform the legal duty that the

9   plaintiffs are asking the Court to find.

10       But, in any event, at a minimum, there's disputed

11  questions, issues of fact around the existence of this duty

12  before 2008.  And the plaintiffs, as the Court heard, are

13  arguing that the, that the duty is inherent in the

14  regulations.  But that is a disputed point because *Masters*,

15  the case that Mr. Farrell referred to, D.C. Circuit decision

16  from 2017, expressly stated the DEA, quote, first

17  articulated, first articulated a no-ship requirement in

18  *Southwood* in 2007.

19       And there's also a decision we cite in our brief,

20  *United States* vs. *$463,000*, quite a case name, where the

21  Court found that DEA announced on September 11th, 2007, a,

22  quote, new interpretation of the suspicious order

23  regulations.

24       There's also going to be testimony of DEA witnesses

25  that the no-ship policy changed around 2008.  And that

1    evidence is set out at Pages 16 to 19 of our opposition

2    brief.

3         The evidence reflects the DEA first asked distributors

4    to start blocking suspicious orders during an industry

5    conference in late 2007.  And the evidence will also reflect

6    that before then, before late 2007, DEA wanted distributors

7    to report suspicious orders and DEA would investigate them,

8    not the distributors.

9         So the evidence reflects the DEA, in fact, approved

10   programs before 2007 where distributors reported and then

11   shipped suspicious orders.

12        And, so, there's no basis to find this duty as a matter

13   of law and undisputed facts before 2008.  In fact, the

14   plaintiffs themselves say that the no-ship requirement is an

15   interpretive rule that, quote, simply states what the

16   administrative agency thinks the statute means.  That's Page

17   10 of their brief.

18        So the rule they're asking the Court to find in their

19   own phraseology is what the administrative agency thinks.

20        Well, the Court should hear evidence on what the

21   administrative agency thinks before it decides on that duty

22   even under the plaintiffs' own phrasing of the issue.

23        And in our brief, Page 17 to 18, we demonstrate this

24   was a very significant change in policy that occurred at the

25   end of 2007, and that before mid 2007, DEA recognized that

1    distributors were shipping orders after they reported them

2    as suspicious.

3         So it all goes back to where we began, I think, on the

4    procedural point.  There's -- it's not law of the case.

5    It's not Rule 56.  And there's good reasons for the Court to

6    hear this evidence on the evolution of this purported policy

7    before it decides on the question of a legal duty.

8         And we would submit, Your Honor, that those factual

9    points on the difference between a suspicious order and an

10   order likely to be diverted will be very important to the

11   Court's ultimate judgment about whether it can or should

12   infer a duty that's not stated in the regulations.

13        So we think procedurally it's not proper what the

14   plaintiffs are asking the Court to do, but we also think as

15   a matter of the Court's discretion, there's very good

16   reasons to wait on this and hear evidence in a bench trial

17   before the Court makes such a ruling.

18             THE COURT:  Okay.  This is the plaintiffs' motion.

19   We've got a few minutes here, so I'll give the plaintiffs

20   the last word if you want to say anything but we need to

21   make it quick because I've got to get out of here.

22             MS. BIERSTEIN:  Judge, I had a couple quick

23   rebuttal points.

24        I wanted to say, first of all, that on this question of

25   putting in evidence on the difference between suspicious

1    orders and orders likely to be diverted, our point is that

2    you need to do due diligence to know the difference.

3         We're not saying you can never ship a suspicious order.

4    We're saying you have to do the due diligence to figure out

5    the difference between the suspicious orders and the ones

6    that are actually likely to be diverted.

7         The evidence they want to put on to show you that

8    there's a difference is not what they did at the time.  They

9    made no investigation.  The evidence isn't relevant because

10   you would have to show that they were considering that kind

11   of evidence when they did what they did.  And they didn't do

12   that.

13        Our, our -- the legal ruling we're asking for isn't

14   that none of these orders can be shipped.  It's that none of

15   these orders can be shipped until you do the due diligence

16   that takes into account exactly the facts that they would,

17   you know, want to convince Your Honor that some of those

18   orders are not likely to be diverted, yes, but you have to

19   do the due diligence to know that.

20        Second of all, the DEA has set this rule.  We're not

21   asking the Court to read into the regulations something that

22   DEA has never said.  They've said it repeatedly.  As I

23   showed you already, they said it most recently in 2020.

24        Finally, I want to say that in terms of evidence about

25   the administrative agencies, I would (video inaudible)

1  rules.  What you would be looking at are the DEA's official

2  pronouncements, not what a particular agent that they're

3  going to put on the stand is going to tell you, well, this

4  is what we thought at the DEA.  That's not how the Court

5  determines what -- how the DEA interpreted its rules.

6      And, so, I think what we've seen is not only how they

7  interpret the rules, but they've told us in 2020 what the

8  rule always was.  And they said it in an official notice of

9  rule-making in the Federal Register.

10     And I think that the Court does not need factual

11  evidence to consider how the DEA has construed its own

12  regulation.  And I will stop and have nothing more to add.

13         THE COURT:  Okay.  Thank you, counsel, very much.

14  And we'll leave it at that.

15     (Proceedings concluded at 10:28 a.m.)

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2    States District Court for the Southern District of West

3    Virginia, do hereby certify that the foregoing is a true and

4    correct transcript, to the best of my ability, from the

5    record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    February 11, 2021

9             Reporter                          Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25