IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                            :
THE CITY OF HUNTINGTON,     :        CIVIL ACTION
                            :        NO. 3:17-cv-01362
        Plaintiff,          :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
        Defendants.         :
                            :
----------------------------x
                            :
CABELL COUNTY COMMISSION,   :        CIVIL ACTION
                            :        NO. 3:17-cv-01665
        Plaintiff,          :
                            :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                            :
        Defendants.         :
                            :
----------------------------x
```

VIDEO PRE-TRIAL CONFERENCE

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE

MARCH 18, 2021

**APPEARANCES:**


**For the Plaintiff,**
**Cabell County Commission:**


**MR. PAUL T. FARRELL, JR. - (Video)**
Greene Ketchum Farrell Bailey & Tweel
P.O. Box 2389
Huntington, WV  25724


**MR. ANTHONY J. MAJESTRO - (Video)**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301



**MR. LOUIS M. BOGRAD  (Video)**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC  20004



**For the Plaintiff,**
**City of Huntington:**


**MS. ANNE MCGINNESS KEARSE - (Video)**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

1    **APPEARANCES (Continued):**

2

3    **For the Plaintiff,**
     **City of Huntington:**

4

5    **MR. MICHAEL J. FULLER, JR. - (Video)**
     McHugh Fuller Law Group

6    97 Elias Whiddon Road
     Hattiesburg, MS  39402

7

8

9    **For the Defendant,**
     **Cardinal Health:**

10

11    **MS. ENU MAINIGI - (Video)**
     **MS. JENNIFER WICHT - (Video)**

12    Williams & Connolly
     725 Twelfth Street, NW

13    Washington, DC  20005

14

15    **MR. STEVEN R. RUBY - (Video)**
     Carey Douglas Kessler & Ruby

16    901 Chase Tower
     707 Virginia Street, East

17    Charleston, WV  25301

18    **MR. FRANK LANE HEARD, III  - (Video)**
     **MS. ASHLEY W. HARDIN - (Video)**

19    Williams & Connolly
     725 Twelfth Street, NW

20    Washington, DC  20005

21

22

23

24

25

1  **APPEARANCES (Continued):**

2

3  **For the Defendant,**
   **McKesson:**

4

5  **MR. JEFFREY M. WAKEFIELD - (Video)**
   Flaherty Sensabaugh & Bonasso

6  P.O. Box 3843
   Charleston, WV  25338-3843

7  **APPEARANCES (Continued):**

8

9  **MR. TIMOTHY C. HESTER - (Video)**
   **MR. PAUL W. SCHMIDT - (Video)**

10 **MS. LAURA M. FLAHIVE WU - (Video)**
   Covington & Burling

11 One City Center
   850 Tenth Street NW

12 Washington, DC  20001

13

14 **For the Defendant,**
   **AmerisourceBergen Drug Corporation:**

15

16 **MS. SHANNON E. MCCLURE - (Video)**
   **MR. JOSEPH J. MAHADY - (Video)**

17 Reed Smith
   Three Logan Square

18 Suite 3100
   1717 Arch Street

19 Philadelphia, PA  19103

20

21 **MS. GRETCHEN M. CALLAS - (Video)**
   Jackson Kelly

22 P.O. Box 553
   Charleston, WV  25322

23

24

25

```
 1   APPEARANCES (Continued):

 2

 3   For the Defendant
     AmerisourceBergen Drug Corporation:
 4

 5   MS. KIM M. WATTERSON - (Video)
     Reed Smith
 6   Suite 2900
     355 South Grand Avenue
 7   Los Angeles, CA  90071

 8

 9   MR. ROBERT A. NICHOLAS - (Video)
     Reed Smith
10   Suite 3100
     Three Logan Square
11   1717 Arch Street
     Philadelphia, PA  19103
12

13

14

15

16

17   Court Reporter:             Lisa A. Cook, RPR-RMR-CRR-FCRR

18

     Proceedings recorded by mechanical stenography; transcript
19   produced by computer.

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2          THE COURT:  I guess we're ready to go here.

3      The case is the *City of Huntington* and *Cabell County*

4  *Commission* against *AmerisourceBergen Corporation and others*.

5  The Civil Actions are 3:17-1362 and 3:17-1665.

6      I set this matter for oral arguments on pending motions

7  to -- a motion for summary judgment on the nuisance question

8  and also the issue of proximate cause.

9      Okay.  Can everybody hear me?

10     (All participants answered in the affirmative.)

11         THE COURT:  Okay.  We'll take up the nuisance

12  issue first.

13     Mr. Heard, are you going to argue that?

14         MR. HEARD:  Yes, Your Honor, I am.  Thank you for

15  the opportunity to address this motion.

16     We have come full circle I think.  It's been almost

17  three years since I first addressed the question of public

18  nuisance with you back in 2017.  I think we've sharpened our

19  thinking since then.

20     What I'd like to do this morning, Your Honor, is put

21  two propositions to you, state them here at the beginning.

22  And then I'd like to step back very quickly to provide two

23  points of context, one that's procedural and one that's

24  factual.  And then I'll go back to these two propositions

25  and dive into them in a little bit more depth.

1          The first proposition is this:  That West Virginia law

2    has never recognized a public nuisance claim where the gist

3    of the complaint is that a product causes personal injuries

4    that in turn causes emotional distress or economic loss.

5          Plaintiffs are asking this Court to go where the West

6    Virginia Supreme Court has never gone, against the general

7    trend of the case law, and where the Third Restatement says

8    public nuisance is not meant to go.

9          Now, the second proposition is this:  That the *sine qua*

10   *non* of a public nuisance claim is interference with a public

11   right which by definition is not the right that everyone

12   has.  I could be assaulted or defamed or defrauded or

13   negligently injured.  But it is that very right not to be

14   negligently injured that is at the heart of this case.  And

15   the Restatement says that is a private right, not a public

16   right.

17         And the importance of this proposition, Your Honor, is

18   the plaintiffs dodge this issue.  And if Your Honor comes to

19   grips with it head-on and makes this distinction, comes

20   head-on and deals with this distinction between public and

21   private right, you will be only the second court in this

22   litigation to do so.  And we think that's a fundamental

23   distinction.

24         So before going into these two propositions, let me

25   make this one -- these two statements about background.

1          The statement about procedural background is obvious,

2     but I think it's important to restate.  That is, that the

3     plaintiffs in this litigation elected to sever and put on

4     the back burner all of their claims against all of the other

5     defendants, which is more than 50, all the manufacturer and

6     pharmacy defendants.

7          And the second choice they made was to dismiss all the

8     claims in this case except nuisance.  That's a choice they

9     made.

10         The second point of background is factual.  And I think

11    it's useful here as we get closer to trial where we are so

12    in the weeds about facts and a lot of the language of legal

13    argument is to step back and take some perspective on this

14    public nuisance claim.

15         And consider -- I'm going to tick off some things, Your

16    Honor.  Consider these facts which are undisputed at this

17    point:

18         First, these defendant distributors are licensed by the

19    state and registered by the DEA to distribute prescription

20    opioids to pharmacies that are themselves licensed and

21    registered.

22         Second, that no distributor ever distributed any

23    prescription opioids to a pharmacy customer that was not

24    licensed and registered.

25         Third, that no distributor ever distributed

1    prescription opioids to anyone other than a licensed

2    registered pharmacy.

3        Fourth, that no pharmacy customer of any of these

4    defendants ever dispensed prescription opioids to anyone

5    without a doctor's prescription.

6        Fifth, that none of the distributors by some negligence

7    in their physical security caused these drugs to get lost

8    or, you know, emerge from the warehouse and get out into the

9    community.

10       And, sixth, defendants reported every single shipment

11   of prescription opioids to the DEA such that the DEA knew

12   quarter by quarter, year by year the total volume of opioids

13   that were going into Cabell Huntington and, indeed, knew the

14   total volume of opioids that were going to every -- each and

15   every pharmacy in Cabell.

16       And with that knowledge, the DEA increased the (video

17   inaudible) from 1995 to 2010 and told Congress in testimony

18   that 99 percent of doctors were prescribing (video

19   inaudible).

20       And, Your Honor, I bring to you that there is nothing

21   remotely like this in the public nuisance of West

22   Virginia -- public nuisance law of West Virginia over the

23   last 150 years.

24       West Virginia public nuisance law is about things like

25   coal dust and soot and smoke from a dye works factory and

1    roads that get blocked, and odor, ammunitions factories,

2    junk yards in the middle of town.  They are cases like the

3    *Smithfield* case that you handled in North Carolina that

4    involved odor, nausea-causing odor from the operation of hog

5    farms.

6        That's what West Virginia public nuisance law has been

7    all along, nothing remotely like this.  And the plaintiffs

8    cannot cite you a single case in West Virginia, in fact

9    elsewhere, that's even like that.

10            THE COURT:  Well, what do you have to say on that

11    point about the opinions by Judge Hummel and Judge Thompson

12    that do create some West Virginia law that's against you

13    here, Mr. Heard?

14            MR. HEARD:  Well, Your Honor, I have to -- I have

15    this to say about those cases.

16        First, there's no West Virginia Supreme Court

17    authority.  So of these seven decisions -- and they're at

18    page -- as Your Honor knows, they're at Page 11 of the

19    opposition.  Of the seven decisions they cite, West Virginia

20    decisions, five of the seven are unpublished.  Six of the

21    seven contain not a word of analysis on this point about

22    whether a product-based or personal-injury-based claim can

23    support a public nuisance claim.

24        Judge Thompson's decision from Boone County, verbatim

25    adoption of the plaintiffs' findings of fact, not a word of

1    analysis as to this issue.

2        Judge Hummel's decision in the *Brooke County Commission*

3    case, verbatim adoption of the plaintiffs' findings of fact,

4    unpublished, one conclusory sentence that simply says public

5    nuisance isn't limited to land.

6            THE COURT:  Do you -- I'm sorry.  Go ahead, Mr.

7    Heard.

8            MR. HEARD:  Judge Moats' order in the, in the Mass

9    Litigation Panel, unpublished, one sentence saying, "We're

10   not going to revisit Judge Hummel."  Three one-paragraph

11   orders from the Supreme Court declining to consider writs of

12   prohibition.

13       In the *Lemongello* case, another Circuit Court opinion,

14   unpublished, one sentence, no analysis, no citation or

15   authority.

16       Your Honor, I would submit to you these Circuit Court

17   opinions can't even buy a ticket of admission for

18   consideration for *Erie* purposes.  These kind of unpublished,

19   unreasoned, copied, verbatim decisions don't buy anything

20   more than a standing room ticket with an unobstructed view

21   of the upper reaches of the balcony.  These are the weakest

22   kind of authorities.

23           THE COURT:  And you don't attach any significance

24   to the fact that the Supreme Court declined to review those

25   cases?

1          MR. HEARD:  No significance to that whatsoever

2    under West Virginia law.  That has no persuasive data.

3          And, Your Honor, I would say here -- return to this

4    first question.  This is first and foremost an impression of

5    *Erie*.  And I would feel presumptuous even saying a word to

6    you about *Erie*.  You've been sitting on the bench for 30

7    years.  You've done this countless times.

8          So the only thing I would ask Your Honor to do is

9    consider three things:

10         One historical fact, one new case which I have to give

11   you, and to ask you to re-read one case that I know is

12   familiar to you.

13         The historical fact, as I've already alluded to, is

14   that there are 17 West Virginia Supreme Court opinions since

15   1878, an average of one every six years.  There's no case

16   where the gist of the complaint was that a product causes

17   personal injury which results in emotional distress.  That's

18   just not in West Virginia Supreme Court case law.  And there

19   is abundant West Virginia Supreme Court case law.  That's

20   the historical fact.

21         Your Honor, the new case that I would like to ask you

22   to consider -- and I regret that we overlooked it in our

23   briefing -- is *Callihan*, C-a-l-l-i-h-a-n, *Callihan* vs.

24   *Surnaik Holdings*.  It's a 2018 decision by Chief Judge

25   Johnston of this court dismissing a public nuisance claim.

1   And this is what he said, and I quote:

2        "A public nuisance claim is an interference with land

3   use or enjoyment that affects the general public."

4        And that is the most recent West Virginia public

5   nuisance law by either the West Virginia Supreme Court or a

6   Federal Court.

7        And then the old case that I know you're familiar

8   with --

9            THE COURT:  Did that case get published, Mr.

10  Heard?

11           MR. HEARD:  It did.  2018 Westlaw 6313012, 6313012

12  in 2018.

13       Now, the older case is *Rhodes* vs. *Dupont*.  That

14  involved contamination of the City of Parkersburg water

15  supply.  But it sort of provides uncanny guidance here

16  because in that case, as here, the plaintiffs were asking

17  the court to predict that the West Virginia court would

18  adopt a rule it had never adopted.

19       But there it had to do with common law battery, not

20  nuisance but common law battery.  Everybody in that case

21  agreed that the West Virginia Supreme Court had always held

22  that battery requires harmful bodily contact.  They didn't

23  have that in that case.  Nobody had personal injuries.  They

24  were saying there were detectable levels of chemicals in

25  their blood.  And they said that the Restatement, Sections

1   15 and 18, would recognize that as a battery.

2       But the Fourth Circuit in *Rhodes* affirming Judge

3   Goodwin said, no, the West Virginia Supreme Court has never

4   adopted that theory.  It's never adopted those sections of

5   the Restatement and, in fact, has held that in every single

6   case that harmful bodily contact is required.

7       We have, we have just that scenario here.  The West

8   Virginia Supreme Court has always applied this to misuses of

9   land or interference with land, never the products that

10  cause personal injury and emotional distress.

11      And on top of that, the Fourth Circuit sometimes says,

12  you know, if there's not Supreme Court authority, you can

13  look to general treatises, you can look to restatements, you

14  can look to general trends of the law.

15      Here we have from the Third Restatement the view that

16  it's inapt to apply public nuisance to claims like this.

17  And we have the Third Restatement saying, and I quote, there

18  is a clear national trend to limit public nuisance to land

19  use.

20      So if we look to the restatements, if we look to the

21  general treatises, if we look to the general trend of the

22  law in conjunction with the actions of the West Virginia

23  Supreme Court, this is a step too far from *Erie*.

24      Now, that takes us, Your Honor, to this first -- to the

25  second proposition which is a true intellectual challenge I

1  think.

2       Public nuisance requires interference with a public

3  right.  And here we have at most interference with a private

4  right.

5       The one point on which the parties agree is that the

6  *sine qua non* of a public nuisance claim is interference with

7  a public right.  Plaintiffs even plead it in their

8  complaint.

9       So the question is:  What, what is a public right?  And

10  the interesting and unavoidable fact is that the Restatement

11  defines public right both by what it is and what it is not.

12  It offers both an affirmative definition and a negative

13  definition.  And it offers them in consecutive sentences.

14       It says that what a public right is is a right held in

15  common by the general public.  And it says what it is not is

16  the right that everyone has not to be assaulted or defamed

17  or defrauded or negligently injured.

18       So the key to defining a public right is defining the

19  difference between a public right and a private right.  And

20  we can be sure that if public right is defined so

21  expansively that nothing is left but the realm of private

22  right, then you've done something wrong.

23       But that's what every opinion in this litigation so far

24  has done.  It has considered what is the public right

25  without even considering the Restatement's negative

1    definition that a public right is not the right that

2    everyone has not to be defrauded or negligently injured.

3        So let me, let me explain why this is a private right

4    and why it is not a public right.

5        It's about a private right, Your Honor, most simply

6    because every aspect of the claim has to do with personal

7    injury.  The cause that's alleged, the harm that's alleged,

8    the remedy that's sought all have to do with personal

9    injury.

10        The cause is quite clear that -- every version of the

11    plaintiffs' complaint tells us that the originating cause of

12    the opioid epidemic in Cabell Huntington is a deceptive

13    marketing campaign by manufacturers that defrauded doctors

14    into overprescribing the drugs, a violation of the right not

15    to be defrauded the Restatement says is a private right

16    that's alleged.

17        From this overprescribing and misprescribing is an

18    epidemic of addiction and overdose deaths, a violation of

19    the right not to be negligently injured, which the

20    Restatement says is a private right.

21        And the remedy behind plaintiffs' expert reports,

22    $2 billion.  Out of $2.6 billion that's asked for,

23    80 percent is for treatment of addiction, treatment of the

24    personal injuries.

25        So every aspect of this claim has to do with personal

1    injuries which in the Restatement definition is a violation

2    of the right that everybody has not to be either defrauded

3    or negligently injured.

4        Now, the question I think that raises, of course, is:

5    Does this understanding of private right that I've given you

6    mean that matters of public health never implicate public

7    rights?  And the answer is, "No."

8        But it's crucial to look at the Restatement because the

9    Restatement, Comment G, explains the difference between

10   public and private right with reference to a public health

11   example.  Now, what could be better for our circumstances

12   than that?  And the example they give is of an

13   epidemic-causing contagious disease.

14       Now, it's noteworthy that the plaintiffs in their

15   opposition quote some general language from the Restatement

16   about public health.  But what they don't do is look at the

17   examples that the Restatement gives us and then look at the

18   case citations that support those examples.  And the

19   examples --

20           THE COURT:  Let me interrupt you here and ask you

21   a question, Mr. Heard.  It's on my mind and I'll forget it

22   if I don't ask it now.

23       There was a suggestion in the, in the brief on your

24   side -- and I don't know whether you wrote it or not, one of

25   your colleagues obviously did -- that if I threw out the

1   negligence claim, there would be other theories that the --

2   that were originally pleaded that the plaintiffs could go

3   back and adopt and, and give renewed viability to their

4   case.

5        I don't see any of those theories that I'm familiar

6   with that would run to the municipal corporations here as a

7   legitimate plan.

8        If it's a negligence case, it would be -- well, I think

9   of the asbestos cases.  The -- this was a hugely harmful

10  commodity that permeated the whole country, the whole world

11  maybe, and the plaintiffs in all those cases were

12  individuals.  None of them went to any governmental entity

13  that would have to clean up any of the mess.

14       I just want you to address the proposition in the brief

15  that if the nuisance claim goes out, the case is still

16  viable.

17            MR. HEARD:  Let me address that in three ways,

18  Your Honor.

19       What we said in the brief and what I said in brief by

20  way of introduction this morning were these things.

21       The first prop -- the first thing is if Your Honor

22  dismisses the public nuisance claim, the case against the

23  distributors is gone.  But the plaintiffs severed and

24  retained the claims against all the other defendants, which

25  number more than 50.  And they maintain all claims against

1   those other defendants.

2        Now, the other thing I said was they elected to dismiss

3   their negligence, RICO, civil conspiracy, unjust enrichment

4   claims against these three distributor defendants.  They

5   made that election.  They made that bed and they have to lie

6   in it.

7        So Your Honor asks if they hadn't dismissed those

8   claims and Your Honor granted summary judgment here, now in

9   theory would they, would they have a viable negligence claim

10  or RICO claim or unjust enrichment claim.  We say not.  We

11  would argue not.  But there's no way to test that because

12  they chose to dismiss those claims.

13       Your Honor mentions the asbestos or tobacco litigation.

14  And maybe this is sliding off your answer a bit, but I think

15  those litigations are telling because those certainly

16  implicated the public health in a colloquial sense.

17       But the courts recognized in those litigations that

18  those involved personal injuries and treated them as product

19  liability personal injury cases.  No court ever seemed to

20  think that those sustained a public nuisance claim.

21       In fact, they were dismissed because when the insurers

22  did what the city and county seek to do here, which is say,

23  "Well, we were economically harmed," they will incur

24  economic costs in the future, the Court said that's a

25  derivative claim and they dismissed it.  They didn't say

1   that's a public nuisance claim and uphold it.

2       If that is an answer to Your Honor's question -- I want

3   to leave no doubt that there are occasions when interference

4   with a true, with a true public right can also implicate the

5   public health.

6       The Restatement gives the example of contagious

7   disease.  It says the threat of communication to smallpox to

8   even one person can constitute a public nuisance claim

9   because of the possibility that it can uncontrollably

10  spread.

11      And the companion example that the Restatement gives

12  has to do with a fire hazard.  If I maintain a fire hazard

13  on my property, the Restatement says that may constitute an

14  interference with public right because of the risk of

15  conflagration.  The fire may uncontrollably spread.

16      And what that shows us is that an interference with the

17  public right and an interference with public health

18  intersect when the public health problem interferes with our

19  ability to be in public, to exercise our public rights, to

20  congregate in public, to travel in public in the very way

21  that our lives in that regard have been hampered over the

22  last year by the COVID-19.  We've all experienced this very

23  example the Restatement gives us in the last 12 months.

24      And you see that even further if we go down a layer in

25  the Restatement to the case citations that support these two

1    examples because the case citations are all about

2    interference with public right and interference with public

3    health as a manner of the spread of disease.

4        So the examples and the case citations are maintenance

5    of a malarial pond, defective sewers, keeping diseased

6    animals on property, maintenance of a hog pen where the

7    Court's discussion indicates that dead carcasses were left

8    lying around threatening the spread of typhoid fever and

9    scarlet fever, and two cases involving the unlicensed

10   practice of medicine where the case discussion explicitly

11   says if you've got an unlicensed doctor, there may be a

12   failure to maintain sanitary methods to prevent the spread

13   of disease.

14       So that's what we're missing here.  We don't have a

15   matter of public health in a colloquial sense, but we don't

16   have interference with a public right in the way that

17   contagious disease interferes with the right of the

18   public -- ability to exercise public rights and be in a

19   public sphere.

20       And that takes us, I think, to the answer, Your Honor,

21   to the question of why is this case not about interference

22   with a public right.

23       Looking again at that first half of the definition in

24   the Restatement, the affirmative definition, a right held in

25   common by the general public.  A right held in common is

1    collective in nature.  It's collective in nature because

2    historically it's involved interference with indivisible

3    resources; the air we breathe, the water we drink, the

4    waterways we navigate, the public spaces in which we

5    congregate, the public roads on which we travel.

6        It is not the right not to be negligently injured

7    because while those are rights everyone has, they're rights

8    that everyone has individually, not collectively.  And, so,

9    the Restatement says those are private rights.

10       And this is not interference with a public right

11   because it's not interference with those collectively held

12   public resources.  We're not talking about a public health

13   problem like contagious disease that keeps us from being in

14   public or traveling in public, you know, being in this

15   courtroom in public.

16       One doesn't catch addiction.  It's not a contagious

17   disease.  And, so, it's a private right because every aspect

18   of the claim is personal injury.  It's not a public right

19   because it's not about these rights held in common

20   collectively regarding indivisible resources.

21       So last of all, Your Honor, my last point is to say,

22   well, what are the plaintiffs arguing here?  What is their

23   argument for why this is interference with a public right?

24       Now, as to Pages 3 to 5, 3 to 6 of their brief, they

25   actually call upon deposition testimony to make the case for

1    why this is interference with a public right.  And I think

2    there are two aspects, but they substantially overlap.

3        One is to say there are a lot of people who have been

4    addicted and overdosed, so there's something going on about

5    the large numbers of people who have been affected by

6    addiction and overdose.

7        And, secondly, there's a statement on their part that

8    the whole community is affected.  And the line in the brief

9    is "no one has been left untouched."

10       I invite Your Honor to go back and look at those

11   examples because when they say no one has been left

12   untouched, they refer to law enforcement, first responders,

13   healthcare providers, and friends and family of the addicted

14   and the dead.

15       And the testimony they cite goes like this.  These are

16   paraphrases.  They refer to law enforcement and first

17   responders who have been exposed to trauma; the first

18   responders, quote, who go into houses where mothers have

19   overdosed.  It's answering the same emergency call for the

20   same person two or three times a day.  It's my partner who's

21   dead because she overdosed.  It's testimony that all

22   children know about -- all children know about growing up is

23   death.

24       And what's clear about those examples -- and this is

25   the argument of interference with a public right.  They are

1    describing the emotional distress of bystanders, bystanders

2    who have witnessed personal injury.

3        And there is no more well established rule in West

4    Virginia common law that the only marital and blood

5    relations can recover for the emotional distress of

6    witnessing of another.

7        What plaintiffs are really trying to do here is

8    circumvent that common law rule and actually upending it and

9    turning it on its head because they would say if there are

10   enough people personally injured and there are enough

11   bystanders who have witnessed that personal injury day in

12   and day out, then what has historically been prohibited

13   recovery under West Virginia law, no bystander recovery,

14   somehow becomes attached to a public nuisance.  And that has

15   to be wrong.  There's no support in West Virginia law to

16   that.

17       So, Your Honor, I would say in summary they chose to

18   drop all the things of public nuisance.  And I submit to

19   Your Honor they did that because the remedy for public

20   nuisance is sometimes abatement.  And for them, they believe

21   abatement -- with abatement, the sky's the limit.  That's

22   why they made that election.

23       They're asking the Court to go where no court has gone

24   before in saying that West Virginia public nuisance law

25   encompasses products that cause personal injury that, in

1   turn, lead to widespread emotional distress and economic

2   loss.

3       And precisely because this is about products that cause

4   personal injury, it's not about interference with a public

5   right.  If Your Honor does what no other court has done and

6   makes this distinction between public and private right that

7   the Restatement definition requires, this is interference

8   with a private right, not with the indivisible, collectively

9   held public resources that give rise to a public right and

10  that implicate the public health when there's something like

11  the spread of disease involved.

12      Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Heard.

14      I'm informed that Mr. Majestro is going to respond to

15  this.  Is that correct?  I don't have him up on the screen

16  here.

17          MR. MAJESTRO:  Yes, Your Honor.  Am I here now?

18  Can you see me?

19          THE COURT:  Yeah.  You're loud and clear,

20  Mr. Majestro.  Go ahead.

21          MR. MAJESTRO:  Thank you, Your Honor.

22      It's interesting to be back here responding to the same

23  argument that Mr. Heard made all those years ago.  A lot has

24  happened since then, as he, as he explained.  But he left

25  some things out and we're going to go over some of those.

1    And I would like to make some, some introductory remarks.

2         Defendants' arguments are essentially factually and

3    legally incorrect.

4         Factually, the defendants are mischaracterizing the

5    harms at issue because they're incorrectly arguing that only

6    individual product rights are implicated by the devastation

7    that the opioid epidemic has caused.  And I'll go through

8    the evidence in more detail than Mr. Heard did.

9         But the evidence in this case shows exactly the

10   opposite effects.  The effects of the opioid epidemic are

11   far-reaching throughout the community.  And the public

12   nuisance law doctrine gives the public the right to be free

13   of this scourge which causes a substantial interference with

14   the public health and safety rights common to the general

15   public.  And this is -- these are decisions that both --

16   that the courts all over the country in the context of this

17   litigation.

18        The defendants' argument misses the point because it

19   mixes up the distinction between a public nuisance case

20   brought by a private party and the broader case available to

21   a public entity seeking to enforce the public's rights.

22        And, so, when you look at the cases, the opioid cases

23   from around the country and, in fact, even at the Third

24   Restatement they cite, these distinctions are evident and

25   govern here.

1        A couple of points I want to make in response to Mr.

2    Heard's --

3            THE COURT:  Do you have a case that specifically

4    is on point with regard to opioids that supports your

5    position?

6            MR. MAJESTRO:  Sure, Your Honor.  There are -- I

7    mean, we have lots of cases.  If you want to go there now, I

8    was going to get to that in a bit, but let's -- let me go --

9    fast forward.

10       First, I would, I would point out, Your Honor, we have

11   the West Virginia cases that I think are -- it's important

12   that the West Virginia trial courts in opioid litigation

13   brought by public entities have unanimously rejected these

14   claims.

15       In addition, these -- by these defendants.  And, in

16   addition, when these defendants sought to get review from

17   the Supreme Court of Appeals on prohibition, they've been

18   denied.

19       Now, those decisions aren't binding in the case, but we

20   would contend that the unanimity of those decisions under

21   West Virginia law should be persuasive to this, to this

22   Court.

23       The -- and I want to mention -- I what to mention

24   *Callihan*, the decision he raised for the first time.

25       Judge Johnston's decision in *Callihan* was a private

1   party pollution case arising out of a fire occurring on

2   land.  So a discussion of whether or not nuisances occurring

3   on land, Judge Johnston did not hold that nuisances are

4   limited to land.  He said nuisances occur -- nuisances on

5   land can constitute a public nuisance.  And, again, that was

6   in the context of the private claim.

7       And I want to talk a little bit more about -- before we

8   get to the court cases, I want to talk a little bit more

9   about precedent in Federal Courts.

10      You know, we cite the applicable law on Page 11,

11  Footnote 2 of our brief.

12      In *Wells* vs. *Liddy*, under the *Erie* doctrine the Fourth

13  Circuit said Your Honor's task was to predict what the

14  Supreme Court will rule.  The Court noted in doing so, you

15  can consider a broad range of sources, including trial court

16  decisions.

17      The Federal Practice and Procedure treatise notes while

18  Circuit Court decisions provide persuasive guidance to a

19  Federal Court sitting in diversity, particularly when

20  they're uniform, as here.

21      And even the U.S. Supreme Court case in the *Estate of*

22  *Bosch* case said that if there's no decision by the state's

23  highest court, then federal authorities must apply what law

24  they find to be state law after giving proper regard to

25  relevant rulings of other courts of the state.

1    So given the unanimity of what the West Virginia courts

2    have said in the context of this very litigation, we think

3    that that, that is persuasive.

4    You know, the --

5    Gina, can you pull up Slide 7?  We'll see if it works

6    this time.

7    So back on June 27th, 2017, when I last argued this

8    motion, there was one decision in the United States dealing

9    with opioid litigation with respect to the question of

10   whether the opioid epidemic could constitute invasion of a

11   private right that, that would satisfy the public nuisance

12   test.  That was Judge Thompson's opinion in the Boone County

13   case.

14   Let's look at -- and you will recall then, Your Honor,

15   that Mr. Heard said that -- we, we argued a lot about what

16   the, the gun cases and the lead paint cases and other cases.

17   And Mr. Heard offered the argument that the trend was

18   against me in that.  But let's look what happened in the

19   context of these cases.

20   So on January 22nd, 2020, when this case got remanded

21   back to you, the decision by 17 states had confirmed that

22   the opioid epidemic results in interference with public

23   nuisance cases against these defendants and other defendants

24   in the distribution chain.

25   So it's California, South Carolina, three orders out of

1    Kentucky, two orders out of Alaska, orders in State and

2    Federal Court in Ohio, New Hampshire, the additional West

3    Virginia decisions, Minnesota, Tennessee, Vermont, Arkansas,

4    Florida, Rhode Island, New Mexico, Massachusetts, Alabama,

5    and Nevada.

6         Go to the next slide, Gina.

7         So then since then, we've had additional decisions from

8    Massachusetts, New York, Missouri, Vermont, Tennessee,

9    another New Mexico opinion, and another California opinion

10   which was decided, and we're going to provide that to you as

11   supplemental authority.

12        Just last week, the Circuit Court in the Santa Clara

13   opioid litigation brought by Santa Clara and Orange County,

14   California, rejected these same arguments regarding the

15   scope of public nuisance claim.

16        So that's a total of 20 states that have rejected these

17   arguments in the context of this very litigation.

18        Now, there's some -- to be fair, there are -- and

19   defendants have cited.  There are some cases that have

20   dismissed public nuisance claims in opioid cases brought by

21   Attorney Generals in Delaware, Connecticut.  Defendants

22   provided a resent decision in Illinois and, and South

23   Dakota.

24        But those decisions largely rely on prior decisions

25   from the Supreme Court in those cases which we would contend

1    have adopted a minority position rejecting nuisance claims

2    arising out of product cases like the lead paint and the gun

3    sales.

4         For example, the Illinois opinion felt -- the trial

5    court in Illinois felt it was bound by the Illinois Supreme

6    Court's *Beretta* decision which we don't think was the right

7    result anyway, but that Illinois court was bound by that

8    decision.  So the majority two to one recognizes these

9    claims in the context of opioid litigation.

10        Now, interestingly enough, Mr. Heard is asking you to

11   rule that no other court -- to conduct an analysis that no

12   other court has done in these litigations.  He's asking you

13   to -- he's saying all of these arguments that they've made

14   all across the country, every other court, including the

15   courts in West Virginia, got it wrong when they rejected it.

16   And he's asking you to apply this distinction that doesn't

17   exist in the context, context of nuisance law, a distinction

18   that it's important that he admit no other court has really

19   done this.

20            THE COURT:  Well, the, the Illinois court in the

21   gun case and the Rhode Island court in the lead paint case,

22   those cases seem to me to hold just the opposite of what

23   you're asking me to do.  How do you get around those cases?

24            MR. MAJESTRO:  Well, those cases are, are -- you

25   know, there is -- in the context of the gun and the lead

1    paint cases, Illinois and Rhode Island went one way.  Ohio

2    and California went another way on those cases.

3        The, the cases like -- and we have the -- the map I

4    have in Ohio, the opioid courts have, have gone our way, as

5    have cases in California.

6        In addition, the cases in all of these other

7    jurisdictions that don't have binding authority with respect

8    to lead or guns or something similar have, have also applied

9    the broad test in the Second Restatement and found opioid

10   cases are recognizable public nuisance cases.

11       And I want to deal with the, the Third Restatement

12   argument and -- because that's Mr. Heard's big point as to

13   why the trend exists on those.

14       And first I'd point out that the limitation to

15   property, the exclusion of products, no West Virginia case

16   holds that.  There are cases involving -- unquestionably,

17   there are cases involving property damage or nuisances

18   arising out of property.  And -- but there is not a case

19   that says you're limited to that or that, that products

20   claims are excluded.

21       In fact, in addition to the opioid litigation, the

22   *Lemongello* case that we cited dealt with guns.  A West

23   Virginia Circuit Court has accepted a public nuisance case

24   arising out of guns.

25       Now, you know, I would be remiss if I didn't defend my

1    State Court judges that I appear regularly before.  Their

2    decisions are maybe not to detail that maybe Your Honor

3    does.  And it is -- as is common in West Virginia, the

4    courts, after ruling, allow submission of Proposed Findings

5    of Facts and Conclusions of Law which are often adopted by,

6    by those courts.

7         West Virginia law is clear that does not make those

8    decisions any less the law or any less the ruling of the

9    Court.  The fact that, that, that the winning counsel

10   drafted the argument that was accepted by the Court is

11   indicative of the strength of the argument, not a reason to

12   disregard it.

13        So let's talk about the Third Restatement.  The Third

14   Restatement has generally been viewed as a viable departure

15   from the settled standards of tort law.  Itself indicates

16   that it's an almost total overhaul of the Restatement

17   (Second) in the introduction.

18        Unlike its predecessor which has been adopted all

19   throughout the country, and particularly with respect to the

20   Second Restatement's test for public nuisance, the Third

21   Restatement has not widely been adopted by the states.

22   Generally, in Kansas, Pennsylvania and Connecticut Supreme

23   Courts have rejected it.

24        More importantly, no state's highest court has adopted

25   Section 8 of the, of the Second Restatement unlike here

1   where in the -- in other contexts we have Supreme Court

2   opinions like California, like Ohio, like other places that

3   have adopted our view of the Second Restatement with respect

4   to public nuisance claims.

5        But, finally, and most importantly -- and this is where

6   I think Mr. Heard gets it wrong.  He's talking -- his --

7   most of his argument deals with cases addressing the

8   question of when a private party can bring a public nuisance

9   claim.

10       And there's a distinction in the law, and the Second

11  Restatement makes this clear, that a private party must show

12  a special injury different from members of the public and

13  community in order to bring a public nuisance claim.

14       So there are a lot of public nuisance claims brought by

15  private parties; for example, the *Callihan* decision that,

16  that Mr. Heard said.

17       Now, what's really significant is the Third Restatement

18  confirms this distinction.  Section 8 provides -- the notes

19  to Section 8 provide the provision applies only to claims

20  for economic loss by a private party who has suffered an

21  injury, quote, distinct in kind from those suffered by

22  members affected, of the affected community in general.

23  That's, that's what Section 8 says.

24       The comment to Section 8 makes it clear, however, that

25  the provision is not intended to apply to public nuisance

1    actions brought by public officials.

2        Comment 8 says in addition to the common law claims

3    recognized here, public officials may bring civil or

4    criminal actions against a defendant who creates a public

5    nuisance.  The definition of a public nuisance for those

6    purposes tends to be considerably broader than the common

7    law definition recognized by this section as a basis for a

8    private suit.

9        So that -- it's very clear that the Third Restatement

10   keeps and recognizes this distinction between private -- or

11   public nuisance claims brought by private parties and public

12   nuisance claims brought by public entities.

13       You know, he, he points out that we have lots of

14   different -- he tries to characterize this case as an

15   amalgamation of a bunch of different product claims.

16       But if you take his argument, every governmental public

17   nuisance claim can be broken down for amalgamation of

18   injuries to members of the public.

19       Take contamination for example, individuals who

20   directly suffer property damage from hazardous waste spills

21   on their property.  But the fact that those spills are

22   creating a hazard to the public doesn't take those cases

23   outside the realm of a public nuisance action.

24       The abatement remedy to clean up that action to stop

25   the continued harm to the public doesn't take those claims

1   outside the realm of a public nuisance action.  That's what

2   governments do.  They look at the injury to the public and

3   take the action to abate that injury by getting rid of the

4   harmful conditions that, that the, that the public nuisance

5   has caused.  In this case, a large part of that is treatment

6   of the opioid epidemic to stop the harm to the public.

7        The difference between asbestos and other personal

8   injuries or those sorts of claims, it's different because if

9   I get an asbestos disease, my disease -- the effects of my

10  disease are generally limited to my immediate household.

11       What this epidemic has caused is a, a destruction of a

12  community which implicates the public's right to health,

13  safety, et cetera.  And I want to go and talk about some of

14  the factual testimony that Mr. Lane [sic] blew through.

15       Gina, bring up -- let's start with slide -- let's just

16  go through the slides.  Let's start with Slide 1.

17       Okay.  Jan Rader, the Chief of the Huntington Fire

18  Department, says, "There's not one person in this area that

19  I know of that has not been touched or had collateral

20  damage.  It is horrendous."  She described it as a war zone

21  for first responders.  It is a war zone for children, that

22  they all know growing up -- all they know growing up is

23  death and destruction.

24       Go to Slide 2.

25       Mr. Lemley, a former member of the City's Office of

1    Drug Control Policy:  "The opioid epidemic has affected

2    every aspect of what we do in Huntington.  It's

3    socioeconomic.  It affects the university.  It affects our

4    medical community.  It affects our quality of life and our

5    parks.  It affects our first responders.  It affects our

6    property values."

7         Go to Slide 3.

8         Mr. Merry, the Director of the EMS -- and Mr. Lane

9    [sic] read from some of this.  But I -- and, and he's,

10   he's -- Mr. Lane [sic] is right.  There is trauma that is --

11   that the EMS and the police and fire have gone through

12   because of dealing with the consequences of this opioid

13   epidemic.

14        But when you have the, the, the very public officials

15   that, whose job it is to protect the public who are facing

16   trials, who are quitting jobs early, and that's what the

17   testimony says, that, that, that the opioid epidemic is

18   running off the people whose job it is to protect the

19   public.

20        The public has a right to have their public officials

21   that are protecting them, their health and their safety,

22   free from the, these kind of stresses that distract them

23   from otherwise doing their job.

24        Let's go to Slide -- let's skip Slide 4 and go to Slide

25   5.

1    Dr. McGuire is one of our experts and let's talk about

2    that.  I think he gives a good description of one of the

3    other ways that this epidemic affects the public.

4    He says, "One pernicious and impossible-to-miss harm

5    from the opioid epidemic is neighborhood blight, the

6    degradation of neighborhoods contaminated by drug sellers,

7    drug users, and crime.  The association between crime, empty

8    homes, and neighborhood decline is widely documented.  Homes

9    and neighborhoods in the Cabell Huntington community have

10   been severely adversely affected by the opioid epidemic with

11   hundreds of homes demolished due to abandonment, crime, and

12   uninhabitability."

13   "The opioid epidemic degrades neighborhoods along many

14   dimensions.  Risk of crime, loss of safe public space, loss

15   of connection with neighbors and other harms interfere with

16   residents' ability to appreciate where they live.

17   Degradation lowers home property values and lowers

18   residents' valuation of parks, public transportation,

19   schools, and other local public services."

20   Now, Mr. Lane [sic] was explaining that what

21   differentiates these other public nuisances from the opioid

22   epidemic is that it affects, affects people's ability to go

23   out in public spaces.

24   As Dr. McGuire testified, and anyone who has had any

25   kind -- I know Your Honor has lived in the middle of the

1  opioid epidemic down in southern West Virginia.  The

2  degradation to these public spaces, that is exactly the kind

3  of problem that Mr. Heard is saying causes burdens on the

4  public.

5       Go to Slide 6, Gina.

6       Lastly, we can't omit the public interest in our

7  children and the education of our children.

8       Dr. Keyes, one of our other experts, is going to

9  testify that children in the Cabell Huntington community are

10  expected to experience a large burden of psychiatric

11  disorders and learning disorders throughout pre-school and

12  school-age developmental periods due to in-utero exposure to

13  opioids, as well as parental opioid use during development.

14  The burden of parental and caregiver opioid use to children

15  in the Cabell Huntington community is on-going and

16  significant, disrupting the home as well as the learning

17  environment.

18       So the opioid effect, like pollution, like air

19  pollution, like noise, is not just limited to those directly

20  impacted.  It's -- it expands to their children.  And

21  because those children have problems in our school system

22  and our public services system, it impacts the children of

23  those who aren't even, who aren't even directly impacted by

24  the opioid crisis because it burdens the educational system.

25       That is the kind of public right, the right to

1   education and, in fact, the right to education is a

2   fundamental right under our state constitution that is

3   burdened by this opioid epidemic.

4       These are public rights.  These are not individual

5   claims for property damage.  They're not individual claims

6   for personal injuries, those claims that we have gotten rid

7   of in this case.  Our claim is seeking to, to correct the

8   public impacts the scourge of the opioid epidemic has on our

9   community.

10      So, finally, I want to just deal with generally West

11  Virginia public nuisance law.  And let's look at what the

12  cases actually say.

13      First of all, none of the cases say that, that we have

14  to have a, have to have some link to land.  None of the

15  cases say products are excluded.

16      The cases define public nuisance in a broad sense.  In

17  *Duff*, for example, the Supreme Court said a public nuisance

18  is an act or condition that unlawfully operates to hurt or

19  inconvenience an indefinite number of parties.

20      The Restatement which is adopted by a number of

21  decisions applying West Virginia law says that interference

22  with public rights that involve a significant interference

23  with the public health, the public safety, public peace, the

24  public comfort, the public convenience, that is what an

25  interference with a public right is under the Second

1  Restatement test.

2      Numerous cases we've cited, *Kermit Lumber*, *Rhodes* vs.

3  *DuPont*, they all stand for the proposition that interfering

4  with public health constitutes a public nuisance.

5      Now, again, Mr. Lane [sic] is back to his distinction

6  between these -- the, the things like epidemic, like

7  epidemics or hog farms, those sorts of, those sorts of

8  things.

9      I would submit to you those distinctions matter more in

10  the context of a private person bringing a public nuisance

11  claim.  Where the, where we are dealing with the public

12  governmental entity that has an interest in, in the peace

13  and security and safety of a community, those distinctions

14  are as important as, as the Third Restatement and the Second

15  Restatement recognizes.

16      You know, so, let's take infectious disease.  An

17  infectious disease is, is no different than the epidemic

18  that's caused here.

19      As I, as I demonstrated with the factual testimony, the

20  opioid epidemic infects the community not directly in terms

21  of disease, but infects the community in a manner that, that

22  creates interference with public rights.

23      It's -- an infectious disease is still a collection of,

24  of individuals who are sick.  But because of the, the

25  presence of a condition that impacts the public level as a

1  whole, that is what differentiates a public right that is

2  recognizable in public nuisance cases.

3      The final point I would make, and that is the

4  Controlled Substances Act has been totally ignored by

5  Mr. Lane [sic].  Now, Mr. Lane [sic] started off his

6  discussion, as the distributors do in all this case, talking

7  about the fact that the pharmacies are licensed, they are

8  licensed, the prescriptions were issued by doctors.

9      But what differentiates this case from some of the gun

10 cases and some of the lead paint cases and some of the

11 (video inaudible) keep talking about conduct that -- and we

12 had this argument last time, that violates the Federal

13 Controlled Substances Act.

14     The Controlled Substances Act places duties on these

15 very defendants to stop the, the harms that were caused by

16 the use of opioids for other than medical purposes.

17     Diversion under the Controlled Substances Act is

18 foreseeable.  And I'm not going to restate the argument we

19 had last time, but that is the distinction.

20     And the fact that the defendants sold massive

21 quantities of drugs to licensed pharmacies who then filled

22 prescriptions issued by pill mill doctors doesn't immunize

23 them from their responsibility under the Controlled

24 Substances Act to stop suspicious orders and prevent

25 diversion.  And the reason for that is because it's

1    foreseeable that these harms to the public would occur.

2         So for those reasons, unless Your Honor has any

3    questions, that's all we have today.

4              THE COURT:  Thank you, Mr. Majestro.

5         Mr. Heard, do you want to respond to any of this?

6              MR. HEARD:  Yes, Your Honor, three points.

7         First, on the question of authority and what is good

8    authority, I heard Mr. Majestro say several times that the

9    authority he is citing is persuasive.  Persuasive authority

10   has reasoning that provides reasons for the conclusion.

11        The second point, the Circuit Court authority that they

12   cited contains no reasoning.  The 25 non-West Virginia cases

13   that are cited in their table of authorities, not one of

14   them contains any reasoning distinguishing between a public

15   and private right.

16        The plaintiffs cannot have it both ways.  They can't

17   say, as Mr. Majestro did, that these cases apply the

18   Restatement test in 821B and, at the same time, ignore the

19   fact that none of these decisions address the very

20   definition that the Restatement gives in back-to-back

21   sentences.

22        A public right is a right held in common.  It is not

23   the private right that everyone has not to be negligently

24   injured.  If they don't make that distinction, they are not

25   persuasive.

1       And I'm perfectly happy for Your Honor to read all of

2    those non-West Virginia cases they cited.  If Your Honor

3    meets the intellectual challenge of coming to terms with

4    that difference, you will be only the second case.

5       And the first case is the *Brooke County* case which

6    applied the Illinois Supreme Court decision Your Honor

7    referred to which got this distinction right.

8       The second thing I would say, Your Honor, is we're not

9    citing the Restatement (Third) because we say the West

10    Virginia Supreme Court would adopt it.  We're citing the

11    Restatement (Third) for the statement of fact that the

12    Restatement makes.  And it says liability on such theories,

13    that is, product-based theories, has been rejected by most

14    courts.

15       Even if Your Honor disregards that statement in the

16    Restatement (Third), the Delaware Court in the opioid

17    litigation said the same thing.  Quote:  "There is a clear

18    national trend to limit public nuisance to land use."

19       I ask Your Honor to look at that Fourth Circuit

20    decision in *Rhodes* vs. *DuPont* for a second reason.  That

21    case involved contamination of the water supply of

22    Parkersburg and contained both a private and public nuisance

23    claim.

24       If Your Honor wants to come to grips with whether

25    something interferes with a public or private right, and

1    whether the so-called destruction of the community makes

2    this a public nuisance case, *Rhodes* indicates the proper

3    line of analysis.

4        In that case the plaintiffs, in support of their

5    private nuisance claim said, yes, DuPont put chemicals into

6    the public water supply, but that public water got pumped

7    into our private homes and, therefore, that supports a

8    private nuisance claim.

9        And the Fourth Circuit said, no, that analysis is

10   entirely mistaken.  The point of first impact where the

11   contamination first affected, first interfered is with the

12   public water supply.  And, so, that point of first impact

13   defines this nuisance as a public nuisance because it's

14   interfering with a public right.

15       In that same way, distribution of opioids clearly

16   affects in the first instance and has its immediate first

17   impact on the persons who are addicted and suffer personal

18   injury.  It's only secondarily that the first responders and

19   healthcare providers and children suffer emotional trauma.

20   And it's only third-hand that property values are supposedly

21   affected.

22       And (video inaudible) in the first instance, this is

23   all about personal injury, about addiction, is that

24   80 percent of the remedy that plaintiffs seek is for a

25   remedy for personal injury.  They're seeking two billion

1  dollars out of 2.6 to provide addiction treatment for the

2  people personally injured.

3      The last point, Your Honor, is this.  Mr. Majestro

4  mentions the Controlled Substances Act.  The Restatement

5  says in Comment E that a violation of statute or regulation

6  or ordinance may provide the basis for a public nuisance

7  claim where the statute or ordinance brands the conduct as a

8  public nuisance.

9      No West Virginia statute or regulation, no ordinance of

10  Cabell or Huntington, nor the CSA, brands the distribution

11  of opioids as a public nuisance.  And, in fact, this is an

12  argument the plaintiffs don't even make in their opposition,

13  just resurrecting it today.

14      So at the end, I would simply say there is the old

15  adage with which you're all familiar:  Hard cases make bad

16  law.  Before today I looked back to see what the original

17  meaning of that term was.  You know, there's a tendency to

18  bend the law when there are sympathetic plaintiffs.  But

19  when that happens, hard cases make bad law.

20      And, in fact, the authority that the plaintiffs cite in

21  their brief, not one of them addressed the fundamental

22  distinction in the Restatement definition.  It's a

23  give-away.

24      But so far, the sympathetic case that makes for bad

25  law, there's a fundamental distinction between public and

1    private right.  It's not implicated here.  And the

2    defendants are entitled to summary judgment.

3         Thank you.

4         THE COURT:  Let's take a break before we go to the

5    proximate cause issue.  We'll be in recess for five or ten

6    minutes and then we'll come back and look at the other

7    issues before the Court today.

8         (Recess taken from 12:09 p.m. until 12:20 p.m.)

9         THE COURT:  All right, we're ready to go back on

10   the record in the Cabell County cases, and the next issue is

11   the proximate cause issue.

12        And, Mr. Hester, I believe it's your turn to bat.

13        MR. HESTER:  Yes.  Thank you, Your Honor.  I guess

14   early good afternoon to you.

15        This motion turns on the requirements of West Virginia

16   law that proximate causation cannot be established if the

17   chain of causation leading to the alleged harm is remote.

18        The plaintiffs don't dispute the facts that bear on

19   this remoteness issue.  They do not contest that their

20   alleged harm from defendants' distribution of opioids occurs

21   only after a doctor prescribes opioids, a pharmacist

22   dispenses opioids, a third party illegally diverts opioids,

23   and a third party uses opioids illegally.

24        Now, the plaintiffs' brief discusses three different

25   categories of evidence relating to their alleged harm.  But

1   the important point is that none of that evidence disputes

2   this four-step chain of causation.

3       The plaintiffs point to a flood or an excessive supply

4   of opioids.  They point to correlations between opioid

5   volumes and opioid harms.  And they point to a failure to

6   control for suspicious orders which they allege led to an

7   excessive volume of opioids.

8       Those are all contested factual issues, Your Honor.

9   But the essential point for purposes of this motion is that

10  none of this evidence creates an issue of fact on the

11  four-step chain of causation that I've described.

12      No matter how many pills defendants shipped, and even

13  accepting the plaintiffs' allegation that the volume is

14  excessive, the pills would have sat on a shelf harming no

15  one unless a doctor prescribes, a pharmacist dispenses, a

16  third party diverts, and a third party uses opioids

17  illegally.

18      So this four-step causal chain for plaintiffs' theory

19  of harm from the distribution of opioids is undisputed.  The

20  only remaining question is over the legal standard that

21  applies to this undisputed chain of causation.

22      And the West Virginia Supreme Court has made clear that

23  remoteness is an essential element of proximate causation

24  under West Virginia law.  It's set forth clearly in the

25  *Aikens* decision.  Quote:  "Remoteness is a component of

1    proximate cause."

2         And in *Metro* vs. *Smith* where the West Virginia Supreme

3    Court said conduct must be, quote, a proximate, not a

4    remote, cause of injury.

5         So this remoteness standard under West Virginia law is

6    clearly reflected in decisions of this Court holding that

7    proximate causation could not be established where the

8    alleged harm was unduly remote from the challenged conduct.

9         In the *Employer Teamsters* case that we discuss in our

10   brief, Judge Chambers found no proximate causation because

11   of, quote, a vast array of intervening events, including the

12   independent medical judgments of doctors.

13        And in the *City of Charleston* case, Judge Copenhaver

14   found no proximate causation because, quote, no injury would

15   occur, closed quote, unless a doctor prescribed opioids and

16   because the claims relied on, quote, various criminal

17   actions of third parties.

18        We submit the plaintiffs have no answer to these cases

19   or to this legal standard of remoteness.  Instead, the

20   plaintiffs are relying only on foreseeability as the sole

21   test for proximate causation.

22        This is reflected quite clearly in their brief.  At

23   Page 18 of their brief they say, quote, "Foreseeability is

24   the touchstone of proximate causation."  And they rely on

25   Judge Polster's ruling under Ohio law which was based solely

1    on foreseeability and did not address remoteness.

2        But that is not West Virginia law.  Remoteness is a

3    distinct and separate issue from foreseeability under West

4    Virginia law.  And under that West Virginia standard of

5    remoteness, plaintiffs cannot establish proximate cause here

6    because under their own allegations and under the undisputed

7    evidence I've discussed, plaintiffs don't suffer harm

8    without at least four separate, independent steps after

9    distributors shipped to pharmacies.  These are highly

10   contingent steps, including criminal acts.

11       Now, let me go back now to the decisions by Judge

12   Copenhaver in *Employer Teamsters* and Judge Chambers in *City*

13   *of Charleston*.

14       Those two cases set up the goal posts here.  They

15   demonstrate why these claims cannot satisfy the remoteness

16   test of West Virginia law.

17       First, the plaintiffs' theory of harm depends on

18   prescribing decisions by doctors.  And both *Employer*

19   *Teamsters* and *City of Charleston* found that, quote, the

20   independent medical judgments of doctors, closed quote, made

21   the claims too remote.  Both of those cases use that same

22   principle.

23       We have the same issue here.  There is no injury, there

24   is no injury unless doctors prescribe opioids in their

25   independent medical judgment.

1          The second point on remoteness, the plaintiffs' theory

2     of harm depends on criminal acts of diversion and illegal

3     use of opioids.  And, again, Judge Copenhaver in *City of*

4     *Charleston* found claims unduly remote because, quote, the

5     claims rely on various criminal actions of third parties.

6          We have the same issue here.  There is no injury

7     without criminal acts of diversion and illegal use of

8     opioids.

9          So in short, Your Honor, Judge Chambers and Judge

10    Copenhaver have already established the framework for

11    decision here.  Both *Employer Teamsters* and *City of*

12    *Charleston* demonstrate why the claims here are too remote

13    because plaintiffs' theory of harm relies on, first, the

14    medical judgments of doctors followed by, second, criminal

15    actions of third parties.

16         So that's the core point I wanted to make for the

17    Court.  But I wanted to transition to a separate but related

18    point.

19         So far, I've been focusing on the plaintiffs' four-step

20    theory of harm from prescription opioids after distributors

21    deliver those opioids to pharmacies.  But there's also

22    another theory of harm in this case.

23         The plaintiffs are also claiming an injury from illegal

24    heroin and fentanyl use.  And their theory is that the

25    distribution of prescription opioids led subsequently to

1    increases in illegal drug use.

2        That presents an even bigger issue of remoteness under

3    West Virginia law.  These alleged harms from illegal drug

4    use are even further removed from the distribution of

5    prescription opioids.

6        Unlike claims relating to prescription opioids it's, of

7    course, undisputed that none of the defendants plays any

8    role whatsoever in distributing illegal opioids such as

9    heroin.

10       So the plaintiffs' theory that links prescription

11   opioids to harms from illegal heroin and fentanyl is even

12   more remote.  It involves the four-step causation chain

13   we've already discussed; a doctor prescribing, a pharmacist

14   dispensing, a third party diverting, and a third party

15   illegally using.

16       But in addition to those four steps, there are

17   additional illegal acts when we start talking about heroin

18   or illegal fentanyl.  There's the distribution of illegal

19   drugs by drug cartels and traffickers, and there's the sale

20   and use of illegal drugs.

21       So those additional illegal acts further defeats a

22   showing of proximate cause as to heroin use or illicit

23   fentanyl.  We're at least, at this point, six or seven steps

24   removed from the distribution of prescription opioids.  And

25   there's not a single West Virginia case that finds proximate

1   cause that involves so many intervening acts, including

2   intervening criminal conduct of drug cartels and illegal

3   purchase and sale of street drugs.

4        So my first point was the entire claim suffers from

5   remoteness.  But even if the Court does not accept that

6   remoteness defeats plaintiffs' claims entirely, it would

7   significantly --

8        (Video connection lost with Mr. Hester)

9             THE COURT:  I think I've lost you, Mr. Hester.

10            MR. FARRELL:  Judge, this is Paul Farrell.  If you

11   would like, I'll continue the argument for Mr. Hester.

12       (Laughter)

13            THE COURT:  Well, thanks for your kind offer, Mr.

14   Farrell.

15            MR. MAJESTRO:  I think Mr. Ruby wants to do it.

16            MR. RUBY:  I don't think I could do Mr. Hester's

17   argument justice, Tony.

18            THE COURT:  Well, we need some help here to get

19   back on line.

20       (Pause in proceedings)

21            MR. SCHMIDT:  Your Honor, this is Paul Schmidt,

22   Mr. Hester's partner.  Can Your Honor hear me?

23            THE COURT:  Yes.

24            MR. SCHMIDT:  Maybe if the Court would indulge, I

25   think Mr. Hester was at the end of his argument if we could

1  give him maybe a few more seconds to try to get back on and

2  I'll, I'll try to work with him separately.

3           THE COURT:  Let's do that.  I don't want to cut

4  him off.  Yeah, that's fine, Mr. Schmidt.

5           MR. FARRELL:  Judge, this is Paul Farrell.  Might

6  I recommend we take a short five-minute break and see if we

7  can untangle it?

8           THE COURT:  All right, that's what we'll do.

9  We'll be in recess for five minutes.

10       (Recess taken from 12:29 p.m. until 12:32 p.m.)

11           THE COURT:  Mr. Kearse [sic], are you back on?

12           MR. HESTER:  Your Honor, I'm sorry.  Can you hear

13  me okay?

14           THE COURT:  Yeah, I can hear you just fine now.

15  You go ahead, sir.

16           MR. HESTER:  Okay.  My apologies.  I didn't mean

17  to be making a dramatic pause there.

18           THE COURT:  Well, I don't know how much you said

19  after I couldn't hear you.  So you might want to go back and

20  do an overlap.  I don't know.

21           MR. HESTER:  Well, Your Honor, I had been, I had

22  been speaking about, about the remoteness issues as to the

23  illegal heroin and fentanyl use.

24           THE COURT:  Correct, yeah.

25           MR. HESTER:  Okay.  And I'd been making the point

1   that there is not a single West Virginia case that finds

2   proximate cause involving so many intervening acts,

3   including intervening criminal conduct of drug cartels and

4   the illegal purchase and sale of street drugs.

5        And, so, I made the point, Your Honor, and I think this

6   is where I cut off, that we believe the entire claim, the

7   entire claim advanced by the plaintiffs is too remote.

8        But even if the Court does not accept that remoteness

9   defeats the plaintiffs' claims entirely, it would

10  significantly streamline the trial to enter summary judgment

11  to claims based on illegal heroin and fentanyl use as unduly

12  remote because otherwise this gateway theory, this alleged

13  link between illegal street drugs and prescription opioids

14  will consume significant trial time with experts on both

15  sides to address these issues and with extensive discussion

16  of epidemiological studies.

17       And our view is there's no need to take evidence on

18  claims that are so clearly remote involving illegal heroin

19  and fentanyl use.  It cannot meet the proximate cause

20  standards of West Virginia law.

21       So those are the remoteness points I wanted to make,

22  Your Honor.  And then I did want to shift gears and touch on

23  a separate point.

24       Aside from the issue of remoteness, there's another

25  reason, a separate reason that the plaintiffs cannot

 1    establish proximate causation here.

 2         In addition to the problem of remoteness that I've been

 3    discussing, the plaintiffs also have a fundamental failure

 4    of proof as to causation.

 5         The plaintiffs have evidence which they present in

 6    their papers of a correlation between increased supply of

 7    opioids and subsequent harm.  But they don't have any

 8    evidence that any distributor wrongdoing caused the increase

 9    in supply.

10         Rather, the evidence is that the volume of opioids, the

11    so-called flood, as the plaintiffs discuss, is driven by

12    prescriber decisions.  And there is no evidence that

13    distributors had the obligation or the ability to

14    second-guess those prescriber decisions.

15         And, so, even assuming a flood of opioids that caused

16    the plaintiffs harm, plaintiffs have no evidence defendants

17    caused that flood.  The supply was caused by prescribers.

18         So, further, while the plaintiffs rely on expert

19    opinions that certain orders were suspicious and should have

20    been flagged for further review, plaintiffs have no evidence

21    that any of, any of the flagged orders should not have been

22    shipped or were improper under the prevailing standard of

23    care.

24         So plaintiffs are claiming a flood caused by the

25    defendants.  They need evidence that fewer medicines would

1   have shipped, and they have no such evidence.

2       In addition, plaintiffs have no evidence they were

3   harmed by any order or group of orders shipped by any

4   defendant.  Plaintiffs have no evidence that any order that

5   they claim should have been blocked as suspicious was, in

6   fact, diverted or caused any harm.

7       And I wanted to point the Court to plaintiffs' brief at

8   Page 17.  They say, quote, "There is no doubt that some of

9   the suspicious orders defendants shipped were, in fact,

10  diverted."

11      But they have no evidence.  And on summary judgment,

12  it's not good enough to say there is no doubt.  They need to

13  come forward with evidence.  And they have none on that

14  critical point.  They also have no evidence that any orders

15  shipped by the defendants caused harm from illegal street

16  drugs.

17      So we have here a failure of first principles of tort

18  law.  The plaintiffs need to show that some conduct of the

19  defendants caused injury, and they have no such evidence.

20      And on summary judgment under the *Celotex* standard, the

21  defendants are permitted to seek judgment because the

22  plaintiffs have no evidence to support an element of their

23  claim.  And that's what we've done here, Your Honor.

24      We've submitted a showing that there's a complete lack

25  of evidence on causation.  Plaintiffs have no (recording

1    inaudible) any individual cause to harm they've said they've

2    suffered.  And this is a required element of their tort

3    claim and it's lacking.  It's a fundamental gap in their

4    proof.

5         So I can close up here, Your Honor.  I just wanted to

6    recap three critical points.

7         First, the remoteness test of West Virginia law defeats

8    plaintiffs' claims of harm from the distribution of

9    prescription opioids.  It's too remote.

10        But, second, the claims of harm based on illegal heroin

11   and fentanyl use are even further remote, further removed,

12   and even more remote.  They suffer from an even more obvious

13   problem of remoteness.

14        And, third, the plaintiffs lack fundamental evidence of

15   causation.  They cannot show, they cannot show that the

16   defendants caused the alleged flood of opioids.  And they

17   have no evidence that any of defendants' shipments caused

18   harm.

19        So that's where I wanted to end up, Your Honor.  And I

20   do apologize that I, I was interrupted midway.  I'm not sure

21   quite what happened.

22             THE COURT:  Ms. Kearse, I believe, is going to

23   take the other side here.

24             MS. KEARSE:  Good morning, Your Honor.  I guess

25   good afternoon, Your Honor.  And Mr. Farrell as well will

1    jump in on some of the fact issues there should I not

2    disclose them all for you today.

3        But, Your Honor, basically from the causation argument

4    that the defendants just presented to you, and contrary to

5    what they've argued to Your Honor, plaintiffs submit that

6    they presented within their briefings and with the record to

7    date more than sufficient evidence of causation to create a

8    (video inaudible) disputed material fact.

9        And as Judge Thompson stated in *Morrisey* vs. *ABDC*,

10    which defense counsel referred to, foreseeability is the

11    touchstone of proximate cause analysis.  Under West Virginia

12    law, the chain of causation has not been broken that would

13    absolve these defendants as a matter of law for liability

14    contributing to the opioid epidemic within the City of

15    Huntington and Cabell County.

16        Your Honor, the defendants have not shown that these

17    intervening causes that they've raised constituted any new,

18    effective cause and operated independently of any other act

19    making it the only proximate cause injury, nor is there any

20    policy consideration that the remoteness argument of those

21    sorts that this chain of causation that would warrant a

22    finding of remoteness in the chain of custody is a chain of

23    causation within this case.

24        And, Your Honor, in addition to the cases we've talked

25    about today, I'll go into more detail about those, but West

1   Virginia courts and other courts specifically to the opioid

2   issue have found that it is reasonably foreseeable

3   consequences of the defendants' conduct to have the harm

4   that the plaintiffs have described in their papers and today

5   through the public nuisance arguments with that.

6        So I want to touch with a -- the touchstone of, of

7   really this case in addition to the foreseeability issue

8   under West Virginia law is the very heart of this case goes

9   to the Controlled Substances Act, and the fact that these

10  defendants have duties and obligations under this act in

11  order to not ship and divert opioids on that.

12       The very heart of this Controlled Substances Act goes

13  to public health and safety as reflected in many of the

14  exhibits that were presented to Your Honor in these papers.

15       But, importantly, within the actual regulations, the

16  language promulgated by the DEA in response to Congress'

17  regulations regarding controlled substances is that it

18  requires under Section 1301.71(a) that the registrant, which

19  would be the distributors in this case, provide effective

20  controls and procedures to guard against theft and diversion

21  of controlled substances.

22       Your Honor, in a couple of the cases that have looked

23  at this very issue, I'll submit to you the California case

24  that's also Judge Breyer's case in the MDL looked at this

25  very issue of just the CSA and that particular language and

1    noted within his opinion, "The very existence of the duties

2    to maintain effective control supports the notion that

3    opioid misuse is foreseeable.  And a lack of reasonable care

4    in the handling of distribution and administrative

5    controlled substances can foreseeably harm the individuals

6    who take them."

7         And that's why there's control in the first place.  The

8    overuse and the misuse that leads to addiction and these

9    other causal links within this chain and the long-term

10   health problems is the very heart of our case and is very

11   foreseeable for the very nature of the Controlled Substances

12   Act.

13        Your Honor, in addition to the Controlled Substances

14   Act, the DEA sent more communications or had more

15   communications educating these distributors on what the CSA

16   was for; to protect the public health and safety, to protect

17   from diversion of opioid pills that would be out in the

18   community and create great harm from that.

19        And how do we know that, Your Honor?  Because one

20   exhibit --

21        And I'll put this up there, Gina.

22        Exhibit 26 to our submissions, Your Honor, is a

23   September 27th, 2006, letter from Joe Rannazzisi with the

24   Office of Diversion Control.  And this goes to the very

25   heart of why defendants have an obligation to follow the law

1    and to report suspicious orders, to stop suspicious orders.

2         What Mr. Rannazzisi says is that, "Nonetheless, DEA

3    recognizes that the overwhelming majority of registered

4    distributors act lawfully and take appropriate measures to

5    prevent diversion.  Moreover, all registrants,

6    manufacturers, distributors, pharmacies, and practitioners

7    share responsibility for maintaining appropriate safeguards

8    against diversion.  Nonetheless, given the extent of

9    prescription drug abuse in the United States, along with the

10   dangerous and potentially lethal consequences of such abuse,

11   even just one distributor that uses its DEA registration to

12   facilitate diversion can cause enormous harm."

13        And, Your Honor, we submit in this case with the

14   evidence there that the -- and the allegations that these

15   three defendants likely disregarded their obligations under

16   the CSA and created more diversion for that as well.

17        Your Honor, the, the cases specific to the opioid

18   litigation, specific to causation, I'd like to draw your

19   attention to our briefing.

20        Judge Polster looked at this very issue.  Judge Polster

21   looked at the *Holmes* doctrine and things that were raised in

22   regard to (video inaudible).  But Judge Polster cited on

23   September 3rd, 2019 -- and this is in regards to summary

24   judgment on that -- that given the massive increases in the

25   supply of prescription opioids into the Track One counties,

1   combined with evidence that suggests a complete failure by

2   the distributors and pharmacies to maintain effective

3   controls against diversion, a fact finder could reasonably

4   infer these failures were a substantial factor in producing

5   the alleged harm suffered by the plaintiffs.  Because

6   plaintiffs have presented evidence that shows they have

7   suffered the sort of injury that would be an expected

8   consequence of the alleged wrongful conduct, plaintiffs have

9   done enough to withstand summary judgment on this issue.

10      Your Honor, Tony mentioned the new case that just came

11  out last week that we'll provide to you in the California

12  State Court that has also found causation with -- in which

13  there was summary judgment on that issue.

14      But going back to the San Francisco case, the Court

15  also noted that based on the city's allegations and the

16  widespread failure, it is reasonable to infer that the

17  defendants' conduct also occurred in San Francisco.

18      This was (video inaudible) to the nationwide failure

19  and whether you have to have a specific diversion from a

20  specific location in order to infer that there was a

21  wholesale failure of the defendants to protect against

22  diversion in the communities.

23      And, again, Judge Breyer -- the city alleges that the

24  distributors flooded San Francisco with massive amounts of

25  opioids and failed to prevent a diversion of opioid orders

1    bound for San Francisco.

2          While the city does not cite to a specific example of

3    diversion that occurred in San Francisco, it does cite to

4    enforcement actions of the various agencies, distributors

5    nationwide for their failure to report suspicious orders of

6    controlled substances which frequently resulted in

7    diversion.

8          And again, Your Honor, as I read that before, the

9    distributors have alleged failure to maintain effective

10   controls against diversion can result in forseeable harm.

11         And, Your Honor, in the *Brooke County* case that we

12   talked about with Judge Hummel, again, the West Virginia law

13   looking at this case and looking at the same defendants in

14   these cases with more of a motion to dismiss, but in citing

15   to *Morrisey*, "The Court further finds and concludes that

16   defendants' conduct was not too remote from the opioid

17   epidemic."

18         "Even considering that third-party conduct may have

19   also contributed to the opioid epidemic and that the acts of

20   third parties, even criminals, were foreseeable and did not

21   create a new effective cause or operate independently."

22         And, again, citing to the law in West Virginia that the

23   West Virginia intervening criminal acts breaking a cause

24   of -- chain of causation only when they're unforeseeable.

25         Additionally, an intervening cause in order to relieve

1    a person charged with negligence in connection with an

2    injury must be a negligent act or omission.

3        Again, turning to Judge Hummel and then again Judge

4    Thompson in *State ex rel. Morrisey*, West Virginia case law

5    holds the element of causation may be satisfied even where

6    the immediate cause of injury was a criminal act by a third

7    party on that.

8        Furthermore, in California (video inaudible)

9    specifically to the very defendants which included

10   distributors also reached the same thing, that the

11   intervening acts, including decisions by prescribers,

12   patients, distributors, pharmacies, and criminals, were all

13   reasonably foreseeable and not superseding acts.

14       Again, that's based on the very existence of a duty of

15   maintaining effective controls was a foreseeable act under

16   Judge Breyer's opinion with that.

17       The flood of pills into the community.  Your Honor,

18   the, the fact that the, these companies failed to stop

19   shipments, the fact that these companies did not report

20   suspicious orders, the fact that these companies violated

21   the law and such creates an issue of fact on the amount of

22   pills that have come into West Virginia.

23       Our brief goes into great detail about the number of

24   pills that have come into West Virginia from these three

25   defendants.  And when we talk about a remoteness issue --

1    and I'll talk about the *Joint Commission* case in a moment.

2    But these three companies delivered opioid pills into the

3    communities of Cabell County and City of Huntington.

4        So the causal chain with that is more direct when we're

5    looking at their conduct directly to our community within

6    Cabell County and City of Huntington with that.

7        The final argument (video inaudible) part of a

8    diversion and the evidence will show -- our experts will

9    show these sophisticated companies which have marketing

10   departments, which have promotion departments, actually

11   promoted the use of opioids in their distribution chain with

12   that and promoted more opioids to come into these

13   communities there so that they could sell the opioids to the

14   pharmacies and to the very doctors who use them.

15       So when counsel says there's actually no evidence, it's

16   actually to the contrary.  I would like to direct you to

17   Exhibit 29 within our brief which is the 30(b)(6) testimony

18   of Mr. Hartle with the McKesson Corporation.

19       And, again, outside of what our experts say, what our

20   documents will say, some questions are asked that -- I'll

21   refer you to Page 53 of the transcript that is part of

22   Exhibit 29.  I don't have it on the slide, Your Honor.

23       Question:  "And they surround McKesson's failure to

24   prevent diversion in America, diversion of narcotics in

25   America; true?"

1    And the question:  "Is there a relationship between the

2    number of pills that get sold and the number of pills that

3    get diverted?"

4    Answer:  "Yeah.  Using common sense and basic logic,

5    you could assume the more pills that are out there, the more

6    potential for diversion there could be."

7    Again, this is from the 30(b) witness on McKesson.

8    Question:  "What is the correlation between opioid

9    sales and opioid deaths?  Are they related or unrelated?"

10   Witness, Mr. Hartle:  "They're both increasing at a

11   similar rate."

12   Question:  "As the McKesson corporate representative,

13   do you acknowledge that abuse of prescription opioid pills

14   is a gateway to the initiation of heroin?"

15   Answer:  "Based on everything that I've read and in the

16   media and statistics and discussion, I would agree, agree to

17   that."

18   So this is not just, Your Honor --

19   "Does McKesson acknowledge that, that prescription

20   opioid pill abuse is a driving factor in the heroin epidemic

21   we're also experiencing?"

22   Witness, Mr. Hartle:  "Yeah, it's a factor."

23   I bring this to your attention, Your Honor, because in

24   addition to what our experts said and we submitted to Your

25   Honor, defendants' own documents and own witnesses were also

1    shown the foreseeability and the fact that if someone was

2    addicted to opioid pills, that the high probability that

3    they would seek other opiate-related drugs is foreseeable

4    and, again, at the heart of the law.

5        At trial, Your Honor, we'll have Dr. Waller and Dr.

6    Lembke who will also talk about the opioid chemical

7    structures and how hydrocodone, oxycodone, heroin are one

8    molecule apart with that.

9        So there will be ample evidence at trial to show that

10   the scourge of opioid pills has led to the heroin epidemic

11   and use, continued opioid use.  And oftentimes we link them

12   together with that.  There's no way to unlink that

13   connection with that.  And it's a very big part of the whole

14   epidemic in the State of West Virginia of tying together.

15   But for the fact that these opioid pills flooded these

16   communities, they would not be seeking other opioid drugs

17   such as heroin.

18       But, Your Honor, going to the very fact that the, the

19   SOMs and the case with the unlawful conduct of the

20   defendants, their failures of the signs led to the flood of

21   opioids into Huntington and Cabell County with that.

22       Mr. Rafalski, a DEA agent, will actually go to great

23   length in his testimony, and some of these things are cited

24   in our brief, that the majority of oxycodone and hydrocodone

25   shipments in Huntington were -- should have been flagged as

1  suspicious orders.

2     Had they been flagged as suspicious orders, they would

3  have stopped shipping.  And they -- we argued that earlier,

4  Your Honor, with the CSA requirements that they would have

5  to stop and do due diligence to see what was going on.

6     There are specific examples within our, our papers of

7  the high volume pharmacies and doctors that the defendants

8  and distributors were well aware of within the community and

9  could have stopped and, and done due diligence to look at

10 those and look at we are continually selling more and more

11 and more pills in this community to see what was going on

12 with them.

13    Congressional hearings were held on this very issue of

14 looking at these massive increases in opioids that, that we

15 allege caused the public nuisance with that.

16    Your Honor, going to a couple of the issues when we

17 talk about the other actors within the chain of causation,

18 under West Virginia law, when multiple wrongdoers contribute

19 to a harm, plaintiff establishes causation by showing that

20 each defendant contributed in any degree of injury with

21 that.  So multiple -- we cite the case of *Wehner* vs.

22 *Weinstein* on that that multiple wrongdoers are part of the

23 causal chain.

24    Again, when we talk about the, in the *Brooke County*

25 case, in public nuisance claims where the welfare and safety

1    of an entire community is at stake, the cause need not be so

2    proximate as in individual cases.  And, so, as to proximate

3    cause, we believe we can still fulfill our obligations under

4    proximate cause when the health and safety there is an issue

5    there.  The Court can also look at that differently in an

6    individual negligence case there as well.

7         Again, under the West Virginia law, the intervening

8    causes, third parties do not break the causation if such

9    acts were reasonably foreseeable and the burden is on the

10   defendants to prove the intervening causes.

11        The *Joint Commission* case, Your Honor, the *Joint*

12   *Commission* case that they reference about the remoteness

13   with Judge Copenhaver is very different from this case.

14   And, and the Judge went to great lengths I think to

15   distinguish this particular case from the distributors'

16   cases that are pending in the MDL.

17        There's various -- I'll give you a little background on

18   that case, Your Honor.  The case was a class action.  A

19   nationwide class action was filed.  It had three counts, did

20   not have a public nuisance claim in it, did not have

21   Controlled Substances Act issues to look at.

22        The defendant in that case is a non-profit, independent

23   standards organization that the Court found didn't have

24   duties to the intended recipients but on the third parties.

25        The Court specifically states that, "Still this Court

1  finds this case is distinguishable and does not involve the

2  manufacturers, the distributors, the prescribers as sellers

3  themselves, but an independent, accreditation organization

4  without any direct connections to plaintiffs."

5      So the Court distinguished that both within looking at

6  the duty questions and then as to proximate cause as well.

7  The Court states, "While West Virginia generally treats

8  proximate cause as a factual question for the jury, the

9  Court may rule on it as a matter of law when there is no

10  conflicting evidence and reasonable minds could not differ

11  on the facts."

12      Again, we submit to Your Honor in this case there is an

13  abundance of factual disputes in a trial of this matter that

14  is different from what the Court ruled on particular

15  defendants in a non-manufacturer, distributor, or pharmacy

16  with that as well.

17      Again, distinguishing *Summit County*, the Court stated,

18  "Unlike Summit County and the City of Everett," which was

19  another opioid case with that, the defendants had a role in

20  manufacturing, distributing, or marketing opioids," and goes

21  on with some other notes on that.

22      But it very much distinguishes that case.  So, Your

23  Honor, this is a completely different case.  This is not a

24  remoteness case as Judge Copenhaver found and cited

25  specifically to the differences within this litigation of

1  these defendants who are, have more of a direct causal

2  connection with the plaintiffs at issue with that.

3       Your Honor, I would point to one other exhibit.  When

4  we're talking about -- I would draw your attention to

5  Exhibit 28 which was a, an actual PowerPoint by Mr. Boggs of

6  McKesson Corporation.  And, again, it goes into great detail

7  of what the obligations are of the distributors and what

8  impact happens when you have (audio inaudible) understanding

9  problem.

10      And I'll quote a couple of just quick statements from

11 this PowerPoint that talks about the checks and balances

12 under the CSA.  It talks about what can happen when the

13 checks and balances collapse.

14      And, Your Honor, it goes into great detail about what

15 the responsibility that a distributor has because of their

16 power.  And specifically they state -- this is at Bates

17 stamped MCKMDL00557232 of this exhibit:

18      "Distributors have great power individually and

19 collectively.  Your DEA registration ensures how many

20 distributions prevent uninterrupted supply, and you control

21 the supply to downstream customers."

22      They're very well aware of their market and who they

23 were supplying to.

24      This exhibit also talks about protecting the public

25 health and safety of what is involved within their

1   obligations to follow the law under the CSA on that.

2       Your Honor, the defendants have not provided you with

3   any evidence that would suggest that there is a break in the

4   causal chain, especially proximate cause, or that the

5   remoteness in this particular case or these particular facts

6   before you is even suggestive that the distributors would

7   not be part of the causal chain reflecting that harm of what

8   the Controlled Substances Act is meant to protect against,

9   the harms that can get diverted pills into the public,

10  addiction, overdose, morbidity, and the exact same things

11  that we have seen today within our communities that was

12  described by Mr. Tony Majestro in the public nuisance claim.

13      Cabell County, as Your Honor as heard throughout this

14  litigation, has been devastated by the opioid crisis.  The

15  opioid crisis stems from opioid use disorder.  Opioid use

16  disorder starts with the prescription pills.

17      And then actually if you have an opioid use disorder,

18  it is highly foreseeable that you will seek other

19  opioid-related drugs.  That will be gone into in much more

20  detail within the trial of this matter.

21      Dr. Courtwright, who is an historian, will testify and

22  show to the Court that in addition to the history of opioid

23  use disorder, opioid use abuse, there's another issue of

24  just putting opioids and putting heroin in a pill is why we

25  now have the two colliding.

1        So it is a very foreseeable issue when you've got

2   heroin and opioid pills and you're going to continually

3   fight against addiction and need to do something with -- for

4   the community in order to address these matters regardless

5   if there's a secondary market that's been involved that was

6   for the very reason to protect the health and safety of the

7   community with that as well.

8        I'll ask Mr. Farrell if he has anything he wants to

9   add.

10           MR. FARRELL:  Well, I always have something that I

11  want to add.  It's a question of whether I should add.  And

12  I think you've covered it pretty well, Anne.

13           THE COURT:  All right.

14       Mr. Hester, you get the last word here.

15           MR. HESTER:  Thank you, Your Honor.

16       I think that the argument from the plaintiffs tees it

17  up nicely.  They really focused on foreseeability, and they

18  have not addressed the separate question of remoteness in

19  any meaningful way.

20       They don't dispute this four-step chain of causation

21  and they focus, instead, solely on foreseeability.  And that

22  is not West Virginia law.

23       And I think it's reflected quite clearly in the

24  decision by Judge Copenhaver in *City of Charleston*, Judge

25  Chambers in the *Employer Teamsters* case.  Both of them apply

1    remoteness which is separate, and it's a separate analytical

2    question from foreseeability.

3         And, so, the discussion of whether or not defendants

4    should have adhered or improved their SOMs programs, all of

5    that goes to foreseeability.  It does not dispute the point,

6    the core point that no harm occurs until after a doctor

7    prescribes, a pharmacist dispenses, someone, a third party

8    diverts, and a third party uses illegally.

9         And I want to highlight in particular the *City of*

10   *Charleston* and *Employer Teamsters* cases.  Both of them

11   highlight the fact that remoteness was present in those

12   cases, as here, because the claim of harm relied on the

13   independent medical judgments of doctors.  And that's the

14   same issue here.  It's not solely a question of

15   foreseeability under West Virginia law.  It's a question of

16   remoteness.

17        I think -- I wanted to point in particular to Judge

18   Breyer's decision in the San Francisco case which Ms. Kearse

19   discussed.

20        Judge Breyer had two holdings there in the same order.

21   He found under the RICO standard that there was not

22   sufficient proximate cause for the RICO claim to go forward.

23   And the RICO claim was subject to a remoteness test.

24        He then found that the common law claims under

25   California law could proceed because he applied solely a

1    foreseeability test under California tort law.

2        Well, that actually illustrates precisely the point.

3    If one applies a remoteness standard, these claims are too

4    remote.  Foreseeability doesn't answer that.

5        And when we look at Judge Breyer's opinion in those two

6    parts of the same order when he applied the foreseeability

7    standard, he found that it was a triable issue, or at least

8    it got past a motion to dismiss on proximate cause.  But on

9    applying the remoteness standard, he found the claims were

10   too remote under RICO.

11       Well, here we have under West Virginia law very clearly

12   the requirement that remoteness has to be addressed.  And

13   it's not -- and it's separate from proximate cause as

14   reflected in the West Virginia Supreme Court case I

15   mentioned in my opening argument.

16       And for the same reasons, Judge Polster's opinion that

17   Ms. Kearse cited, that was a foreseeability test he applied.

18   He referred to foreseeability in evaluating proximate cause.

19       And the *Brooke County* and *Morrisey* cases, Judge Hummel

20   and Judge Thompson's opinions, both of them discuss

21   foreseeability.  They don't address remoteness.

22       And here we have a significant problem of remoteness.

23   And I submit, Your Honor, that the *City of Charleston* and

24   *Employer Teamsters* cases pave the way.  They establish the

25   framework because of, first, the medical decisions of

1   doctors to prescribe opioids without which the pills would

2   have sat on a shelf and, second, the criminal acts that

3   followed from third parties that made those claims too

4   remote.  And the same reasoning applies here.

5        One other point I wanted to make.  Ms. Kearse made the

6   argument that there's no evidence -- that we have not come

7   forward with, with evidence controverting their argument

8   that we were responsible for the flood.

9        Well, it's very clear there is no evidence in the

10  record that defendants distributed anymore pills than

11  doctors prescribed.  Without prescriptions, none of these

12  pills would have left the pharmacies.  And the plaintiffs

13  have no evidence of pills leaving the pharmacies or coming

14  out into the community without doctors' decisions in these

15  prescriptions.

16       And, so, the doctors controlled the flood.  If there is

17  a flood here, that was not caused by the defendants.  The

18  defendants were reacting to the prescriptions that the

19  doctors issued.

20       But that's really my second point, Your Honor, on

21  causation; that the plaintiffs are lacking evidence,

22  fundamental evidence that defendants caused a flood because

23  that flood was caused by prescribers.

24       But the first point, which is really I think the

25  dispositive issue, is remoteness because they can't satisfy

1   the standards of West Virginia law.

2       I heard Ms. Kearse start off today by saying

3   foreseeability is the touchstone.  We, we submit that's not

4   a correct statement of West Virginia law.  And both *City of*

5   *Charleston* and the *Employer Teamsters* case out of this court

6   reflect that remoteness is separate from foreseeability.

7       And I would particularly highlight that the remoteness

8   problem is really even more clear, even more self-evident

9   with respect to the use of illegal heroin and illegal

10  fentanyl because Ms. Kearse cannot dispute that that

11  requires even additional criminal acts.

12      After the distributors shipped to, to pharmacies,

13  there's a whole cascade of illegal conduct before somebody's

14  using heroin or fentanyl.  And that's a fundamental problem

15  of remoteness.

16      And I stand on the point I made in the opening, Your

17  Honor, that there is no West Virginia case that recognizes

18  proximate cause involving such a remote sequence of events.

19      So I, I would stop there, Your Honor.  I'm happy to

20  answer any questions you may have.

21          THE COURT:  Well, my attention span has been

22  pretty much exhausted, Mr. Hester, so we'll leave it at that

23  and I'll take all this under advisement.  And I appreciate

24  the hard work of counsel and we'll leave it at that and I'll

25  see you next time.

1        (Proceedings concluded at 1:13 p.m.)

2                        *  *  *  *  *

3

4

5

6

7

8        I, Lisa A. Cook, Official Reporter of the United

9    States District Court for the Southern District of West

10   Virginia, do hereby certify that the foregoing is a true and

11   correct transcript, to the best of my ability, from the

12   record of proceedings in the above-entitled matter.

13

14

15      s\Lisa A. Cook                    March 22, 2021

16          Reporter                          Date

17

18

19

20

21

22

23

24

25