IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS

----------------------------x
                                 :
THE CITY OF HUNTINGTON,          :        CIVIL ACTION
                                 :        NO. 3:17-cv-01362
        Plaintiff,               :
                                 :
vs.                              :
                                 :
AMERISOURCEBERGEN DRUG           :
CORPORATION, et al.,             :
                                 :
        Defendants.              :
                                 :
----------------------------x
                                 :
CABELL COUNTY COMMISSION,        :        CIVIL ACTION
                                 :        NO. 3:17-cv-01665
        Plaintiff,               :
                                 :
vs.                              :
                                 :
AMERISOURCEBERGEN DRUG           :
CORPORATION, et al.,             :
                                 :
        Defendants.              :
                                 :
----------------------------x

VIDEO PRE-TRIAL CONFERENCE

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE

April 14, 2021

1

2  **APPEARANCES:**

3

4  **For the Plaintiff,**
   **Cabell County Commission:**

5

6  **MR. PAUL T. FARRELL, JR. - (Video)**
   Greene Ketchum Farrell Bailey & Tweel
7  P.O. Box 2389
   Huntington, WV  25724

8

9  **MR. ANTHONY J. MAJESTRO - (Video)**
   Powell & Majestro
10 Suite P-1200
   405 Capitol Street
11 Charleston, WV  25301

12

13 **MR. LOUIS M. BOGRAD (Video)**
   Motley Rice
14 Suite 1001
   401 9th Street NW
15 Washington, DC  20004

16

17 **For the Plaintiff,**
   **City of Huntington:**

18

19 **MS. ANNE MCGINNESS KEARSE - (Video)**
   Motley Rice
20 28 Bridgeside Blvd.
   Mt. Pleasant, SC  29464

21

22

23

24

25

```
 1   APPEARANCES (Continued):

 2

 3   For the Plaintiff,
     City of Huntington:

 4

 5   MR. MICHAEL J. FULLER, JR. - (Video)
     McHugh Fuller Law Group
 6   97 Elias Whiddon Road
     Hattiesburg, MS  39402

 7

 8   MS. ANDREA BIERSTEIN - (Video)
     Simmons Hanly Conroy
 9   112 Madison Avenue
     New York, NY  10016

10

11   For the Defendant,
     Cardinal Health:

12

13   MS. ENU MAINIGI - (Video)
     MS. JENNIFER WICHT - (Video)
14   Williams & Connolly
     725 Twelfth Street, NW
15   Washington, DC  20005

16

17   MR. STEVEN R. RUBY - (Video)
     Carey Douglas Kessler & Ruby
18   901 Chase Tower
     707 Virginia Street, East
19   Charleston, WV  25301

20   MS. ASHLEY W. HARDIN - (Video)
     Williams & Connolly
21   725 Twelfth Street, NW
     Washington, DC  20005

22

23

24

25
```

1    **APPEARANCES (Continued):**

2

3    **For the Defendant,**
     **McKesson:**

4

5    **MR. JEFFREY M. WAKEFIELD - (Video)**
     Flaherty Sensabaugh & Bonasso

6    P.O. Box 3843
     Charleston, WV  25338-3843

7    **APPEARANCES (Continued):**

8

9    **MR. TIMOTHY C. HESTER - (Video)**
     **MR. PAUL W. SCHMIDT - (Video)**

10   **MS. LAURA M. FLAHIVE WU - (Video)**
     **MR. ANDREW STANNER - (Video)**

11   Covington & Burling
     One City Center

12   850 Tenth Street NW
     Washington, DC  20001

13

14   **For the Defendant,**
     **AmerisourceBergen Drug Corporation:**

15

16   **MS. SHANNON E. MCCLURE - (Video)**
     **MR. JOSEPH J. MAHADY - (Video)**

17   Reed Smith
     Three Logan Square

18   Suite 3100
     1717 Arch Street

19   Philadelphia, PA  19103

20

21   **MS. GRETCHEN M. CALLAS - (Video)**
     Jackson Kelly

22   P.O. Box 553
     Charleston, WV  25322

23

24

25

1    **APPEARANCES (Continued):**

2

3    **For the Defendant**
     **AmerisourceBergen Drug Corporation:**

4

5    **MS. KIM M. WATTERSON - (Video)**
     Reed Smith
6    Suite 2900
     355 South Grand Avenue
7    Los Angeles, CA  90071

8

9    **MR. ROBERT A. NICHOLAS - (Video)**
     Reed Smith
10   Suite 3100
     Three Logan Square
11   1717 Arch Street
     Philadelphia, PA  19103

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

23

     Proceedings recorded by mechanical stenography; transcript
24   produced by computer.

25

```
1                    P R O C E E D I N G S

2           THE COURT:  All right.  This is another pre-trial

3    conference and motions hearing in the City of Huntington

4    against AmerisourceBergen and others case.

5        I assume all the attorneys have given your appearances

6    to the court reporter.  And she's nodding "yes" and I hear

7    no objection to that.

8        So the first thing I have on the list, I thought

9    we'd -- I should say something about the logistics.  I know

10   there have been a lot of discussions and things about that.

11       Can you all hear me?

12       (All counsel indicated an affirmative response.)

13           THE COURT:  All right.  The Centers for Disease

14   Control limit suggests a cap of 30 people in the courtroom.

15   If we have five attorneys per party, which I believe there

16   have been discussions to allow, that's 25 people.  The court

17   family will have at least five members.  That's 30.  Then,

18   of course, we'll have a witness and, in some cases, a

19   witness counsel.  So that fills up the courtroom where the

20   trial is actually taking place.

21       As I've indicated before, I'm not going to allow a

22   public feed on the -- I'm not going to allow any public

23   feed.  I will allow public feed for the final pre-trial.

24   I'm concerned about the obligation to grant the public and

25   the press access to the trial.  And since there's not going
```

1   to be a public feed and there's so many persons involved,

2   that's difficult.  But I think we can handle it.

3       We're going to provide an overflow courtroom which will

4   seat about 25 people I believe.  And we can arrange a

5   separate overflow courtroom with a capacity of about 35 more

6   if, if we need it.  Hopefully that will do it.

7       I read this morning the memo from Mr. Ruby suggesting

8   procedures, and I'm in agreement with everything in that.

9   And hopefully that will give everybody guidance on, on the

10  logistics.

11      The first motion I have for hearing is the plaintiffs'

12  motion to compel.  This is ECF Number 1211 from the court

13  file.  I understand Mr. Fuller for the plaintiffs and Ms.

14  Wicht for the defendants will argue this.

15      I'm informed that Ms. Wicht's monitor is not -- she's

16  not getting any video now.  The Court won't be able to see

17  her.

18      But I think we can hear you, Ms. Wicht, and we'll make

19  the best of that situation.

20      Mr. Fuller, do you want to go ahead?

21          MR. FULLER:  Yes, Your Honor, if it may please the

22  Court.

23          THE COURT:  Yes.

24          MR. FULLER:  Judge, this motion focuses around the

25  sales and data of Cardinal Health not just to CT2 or West

1    Virginia but across the country.  And the, the information

2    has been provided via the ARCOS database which Your Honor

3    has heard some argument about that and Mr. McCann's working

4    with that.  Mr. McCann will provide some opinions and, and

5    additional information related to that ARCOS database.

6         But all that information is is the defendants' sales

7    data.  And what I've tried to do with the 1006 that I

8    provided to the defendants is simplify it because you're

9    dealing with millions upon millions of lines of data or

10   pills.

11        The 1006 basically sums up the Oxycontin and the

12   hydrocodone -- excuse me -- oxycodone and hydrocodone that

13   was delivered into each state.  And there's significant

14   reasons why that's important in this litigation because one

15   of the things the defendants are looking for is what's

16   unusual; unusual size, pattern, and frequency.

17        And what this data demonstrates is it demonstrates that

18   while West Virginia is getting a significant number of

19   pills, it outweighs what is going into other states and

20   which would demonstrate what is unusual.

21        So, for example, just one for the Court, if we take a

22   look at Texas, Texas is about 15 times larger in population.

23   Yet, West Virginia got more oxycodone pills over the same

24   time frame than Texas did which would certainly speak to

25   something that is going on that is unusual.

1     Now, what the motion asks for, Judge, is not for you to

2   admit the 1006.  The defendants make some reference to

3   that's what we're seeking.  We're not.  They've -- and,

4   quite frankly, I've worked very well with Ms. Wicht and the

5   other Cardinal counsel and we've been able to work a lot of

6   issues out.  But the 1006, they tell me they object to it.

7   They won't specify why they object to it.

8     And then based on the stipulation that's part of the

9   record in this case with Cardinal, I said, all right, well,

10   give me a 30(b) witness that can tell me how the volume of

11   pills going to each state from the time frame of '06 to '14,

12   or just tell me how many pills you believe you've shipped

13   into each state.

14          THE COURT:  Let me interrupt you.

15          MR. FULLER:  Yes, Your Honor.

16          THE COURT:  The problem I have with this is what

17   authority do I have to order the parties to do something

18   that's within their discretionary management of their case?

19   Do you have any authority that says I can do this?

20          MR. FULLER:  Well, Judge, I'm relying on the

21   stipulation.  The defendants are going to say, well, this

22   isn't their data.  Well, it is their sales data.  And the

23   stipulation requires if they're objecting to the

24   admissibility of something that we have the opportunity to

25   cure that before trial.  And that's all I'm trying to do,

1    Judge.

2         THE COURT:  I understand all that.  But do you

3    have any authority for what you want me to do?  You're

4    asking me to compel the defendants to stipulate here and I

5    don't -- I question whether I have any authority to do that.

6         That's sticking my nose into, into their trial tactics

7    and trial preparation.  And there may well be a reason why

8    they're taking this action.  And, and I need some authority

9    to persuade me that I can do this if I'm going to do it.

10        MR. FULLER:  Sure, Judge, if that was what we were

11   asking for.  And that's not what we're seeking, Your Honor.

12        What I'm simply seeking is to require them to provide

13   me a 30(b) who can give me the evidence that I need in a

14   form that's admissible, or they can just disclose to us what

15   they believe their sales data is.

16        The motion does not seek to have you require them to

17   stipulate.  It does seek to have you order them to allow me

18   to correct any deficiencies that they are objecting to.

19        So I -- and I want to make that abundantly clear.

20   We're not asking you to force them to stipulate because I

21   believe Your Honor is correct.  You don't have the authority

22   to do that.  That's their prerogative.

23        But the Court does have the authority to require them

24   to give me a 30(b) so I can correct the deficiencies that

25   they perceive with the 1006.

1          THE COURT:  Well, you ask in your motion for an

2     order compelling Cardinal Health, quote, to provide the

3     complete basis for refusing to stipulate to the accuracy of

4     plaintiffs' request.  So --

5          MR. FULLER:  Yes, Judge.  I think -- I'm sorry.

6          THE COURT:  So if, if I make them provide the

7     basis for refusing to stipulate, that's, in effect, ordering

8     them to stipulate, isn't it?  I mean, it's just one step

9     away from that.

10          MR. FULLER:  Well, Judge, I think it's requiring

11     them to tell us what is the -- what they believe is

12     deficient with it.  And I think also in our "wherefore"

13     clause we ask that in the alternative they be ordered to

14     provide us what they believe their sales numbers are into

15     each state or to give us a 30(b) that can testify based on

16     the company's knowledge of what their sales numbers are into

17     each state.

18          THE COURT:  Well, why can't you just get a 30(b)

19     without the Court's intervention?  Is that, is that

20     inconsistent with the scheduling orders and so forth?

21          MR. FULLER:  That, that is, Your Honor.  That is.

22     And the reason I'm seeking it -- and we attached the

23     stipulation that we entered into with Cardinal on certain

24     issues -- is that that stipulation, when they object to

25     something being admissible, they stipulated that they would

1    provide us even a deponent if that's what we needed to cure

2    the defects.  And that's simply what we're trying to do.

3        We're not asking this Court to force them to stipulate

4    because I think that would be absolutely improper.  But the

5    Court could require them to provide a 30(b); or I think the

6    easiest way, Judge, is just say, hey, tell them what you

7    believe the distribution numbers are into each state.  And

8    then I think we could work it out.

9            THE COURT:  So, so basically -- I mean, I'm a

10   little bit -- basically, what you're asking for is for me

11   to, in a very limited method, reopen discovery so you can

12   take this 30(b).  Is that right?

13           MR. FULLER:  Or if they want to just produce to us

14   what they believe the sales numbers are into each state, I

15   think that would actually be the easiest, Judge.  But, yes,

16   Your Honor, that's, that's what we're requesting.

17           THE COURT:  And if, if you take the 30(b), you

18   would be after the information that you've just said you

19   thought they should voluntarily provide.  Is that right?

20           MR. FULLER:  Yes, Your Honor.

21           THE COURT:  Okay.  Let me hear from Ms. Wicht.  I

22   hope you can hear all this and I'll hear from you now.  And

23   if there's any problem with anybody hearing you, let me

24   know.  Apparently we've got a partial breakdown in

25   technology here.

1    MS. WICHT:  Good morning, Your Honor.  Thank you

2 very much.  I am able to see and I'm actually able to see

3 and hear everybody.  I hope that everyone can hear me.

4    THE COURT:  Well, I can certainly hear you and I

5 don't see anybody objecting on the screen here.  So I

6 assume --

7    MS. WICHT:  Okay.

8    THE COURT:  And you're coming through loud and

9 clear in the courtroom.

10    MR. FULLER:  We can hear fine, Judge.

11    MS. WICHT:  Thank you, Your Honor.

12    Thank you, Mr. Fuller.  I apologize for the technical

13 difficulties.

14    THE COURT:  Can you hear her, Mr. Fuller?  You're

15 the key man here.

16    MS. WICHT:  I can.

17    MR. FULLER:  Yes, Your Honor.  I can hear her

18 clearly.

19    THE COURT:  All right.  Go ahead, please.

20    MS. WICHT:  Thank you, Your Honor.

21    What plaintiffs are actually seeking in this motion,

22 Your Honor, is an order of the Court to force Cardinal

23 Health to stipulate to the accuracy of the work of

24 plaintiffs' expert.

25    There's nothing in the Federal Rules or the prior

1    stipulations of the parties that requires Cardinal Health to

2    agree with plaintiffs' expert, nor to provide testimony

3    after the expert's work was presented in an untimely

4    fashion, I might add, to identify their agreements or

5    disagreements with the expert.

6         Mr. Fuller and the plaintiffs in their papers and in

7    their argument today framed this as being an issue about

8    Cardinal Health's data, but that's not correct.  That's not

9    what's been presented in these charts.

10        What's presented in the charts is that Cardinal Health

11   submitted distribution data to DEA through the ARCOS system.

12   DEA, presumably in the normal course of its operations, made

13   changes to that data, including adding 22 fields of

14   information that were generated and calculated by DEA,

15   including the principal one that's featured on plaintiffs'

16   summary which is dosage units.

17        DEA then produced that data to plaintiffs in this

18   litigation.  And plaintiffs' expert, Dr. McCann, conducted

19   an analysis that resulted in other changes to the data that

20   he deemed to be necessary to make it accurate in his

21   opinion.

22        So that's the information that plaintiffs have

23   summarized in the charts that they've presented.  So it's

24   not correct to say that they reflect Cardinal Health data.

25   They do not.  They reflect plaintiffs' expert's analysis of

1    DEA data.

2         So a factual deposition of a Cardinal Health witness on

3    these charts, in addition to the fact that it's entirely out

4    of time under the scheduling order in the case, would be

5    entirely unproductive.  There is no Cardinal Health fact

6    witness who could testify from personal knowledge about what

7    DEA did with the data or what plaintiffs' expert did with

8    the data to generate the numbers that appears on the charts.

9         I would also note, Your Honor, that the summaries that

10   have been presented with plaintiffs' motion actually were

11   not presented in Dr. McCann's expert report.  What

12   plaintiffs have presented here is an analysis or a

13   calculation by Dr. McCann that is nationwide.  It's not

14   limited to Cabell Huntington or to any other geographic

15   region.

16        Cardinal Health was not requested to produce nationwide

17   distribution data in this case.  And Cardinal Health did not

18   produce nationwide distribution data in this case.

19        So to the extent that Mr. Fuller is talking about a

20   30(b)(6) deposition of Cardinal Health where the witness

21   would testify about Cardinal Health's internal distribution

22   numbers, that would be new discovery that we would be taking

23   in this case two and a half weeks before trial.  That hasn't

24   been requested from Cardinal Health.  It hasn't been

25   produced by Cardinal Health.

1    As to Dr. McCann's nationwide analysis, neither

2  Cardinal Health nor its litigation experts have undertaken

3  to evaluate all of the billions of data points that were

4  added by DEA before it produced the data in the litigation,

5  nor the tens of millions of changes that Dr. McCann made as

6  part of his litigation analysis.

7    The fact that the defendants didn't file a *Daubert*

8  motion as to Dr. McCann's ARCOS analysis and the fact that

9  Cardinal Health's experts didn't do a competing calculation

10 doesn't mean that we can be forced to agree that Dr.

11 McCann's analysis is correct.

12    As the Court noted at the outset, respectfully we

13 submit that there is nothing in the Federal Rules of Civil

14 Procedure or Federal Rules of Evidence or the stipulation

15 that would allow the Court to, to require that from Cardinal

16 Health.

17    The stipulation that Cardinal Health entered into with

18 plaintiffs pre-trial is to allow it to work with plaintiffs'

19 counsel to cure defects with respect to foundation of

20 Cardinal Health produced documents.

21    And I appreciate Mr. Fuller saying that we've been

22 working together cooperatively on that, and I, I share that

23 assessment.  I think we have and we've resolved many, many

24 issues and we continue to work through those issues, but

25 this, respectfully, is not one of them.  This is not

1  Cardinal Health data.  This is plaintiffs' expert opinion

2  testimony, and Cardinal Health can't be compelled to

3  stipulate to it.

4      What will happen if the Court denies this motion is

5  what happens with expert analysis in every case in every

6  Federal Court across the country.  The plaintiffs will

7  present their expert, Dr. McCann, for testimony.  They will

8  qualify him as an expert in the subject matter.  And

9  assuming they're able to do so, he will testify to his

10 analysis.

11     The defendants will cross-examine him about that

12 analysis to whatever degree they wish to do so.  And the

13 fact finder -- here Your Honor - ultimately will make a

14 determination about what parts of the analysis are relevant

15 and whether it accepts or rejects the analysis.

16     And the last point I would make, Your Honor, is that to

17 the extent -- the Court has probably seen that the parties

18 have now stipulated that if plaintiffs prefer to do so, they

19 can bifurcate Dr. McCann's testimony.

20     The defendants have agreed that plaintiffs could call

21 Dr. McCann once just for the purpose of introducing whatever

22 ARCOS analysis the Court ultimately permits.

23     So to the extent that plaintiffs are using this motion

24 as a method of case structure and where, for example, they

25 want certain members in the case early instead of waiting,

1    first of all, they always have the opportunity to do that

2    through deciding what order they wanted to call their own

3    witnesses in.  But now they have the opportunity to do it by

4    agreement with the defendants exactly the way they want even

5    if that requires Dr. McCann to testify at trial.

6        So the request that plaintiffs have made has no basis

7    in the rules, has no basis in the stipulations, and should

8    be denied by the Court.

9        I'm happy to address any additional questions that the

10   Court may have, but that's all I have this morning.

11            THE COURT:  Thank you, Ms. Wicht.

12       Mr. Fuller, do you want to respond to any of that?

13            MR. FULLER:  Sure, just briefly, Judge.

14       As I stated earlier, we're not asking for the Court to

15   require them to stipulate.  We're simply asking for them to

16   tell us, "Hey, you're saying we have the numbers wrong."

17       And this isn't -- Judge, this isn't some complicated

18   math.  This is counting the number of pills that you shipped

19   into each state.  It's very simplistic.

20       A 30(b) designee wouldn't be asked, "Hey, look at these

21   numbers."  The 30(b) would be asked, "What are your

22   numbers?"

23       And they would espouse whatever distributions Cardinal

24   did of hydrocodone and oxycodone into each state, or the

25   defendants could simply write it on a piece of paper and

1   send it over to us.  "Hey, these are what we think the

2   numbers are.  These are what we believe our distribution

3   numbers are."

4        They have the data.  It's their information.  They say

5   using ARCOS isn't theirs, but that's where ARCOS comes from,

6   Judge.  It comes from each of these defendants.

7        Unless the Court has any other questions, --

8            THE COURT:  I don't.  I realize that this needs to

9   be decided expeditiously.  I'm not going to rule on it from

10  the bench, but I'll get an order out right away deciding it.

11       Let's move on to the next motion.  It is one of the

12  four parts of the motion *in limine*.  It's ECF Number 1067 in

13  the file.  And the matter before the Court is part three, I

14  believe, of that motion which goes to the issue of the

15  geographic scope.

16       Mr. Farrell, you're going to take the lead here I

17  believe.

18           MR. FARRELL:  Judge, I would be honored to do so,

19  but it's the defendants' motion *in limine*.  I'll respond to

20  it.

21           THE COURT:  I'm reading -- your name is at the top

22  of the script, Mr. Farrell, and I just read it off.  I'm

23  sorry.  I think I've accused you before of being a defense

24  counsel in this case.

25       Ms. Hardin is the --

1          MS. HARDIN:  Yes, sir.  Can you see me and hear

2    me, Your Honor?

3          THE COURT:  Yes, I can.  I can see you well and

4    hear you loud and clear.

5          MS. HARDIN:  Thank you.

6          THE COURT:  You may proceed.

7          MS. HARDIN:  Ashley Hardin from Williams &

8    Connolly on behalf of the distributor defendants, Your

9    Honor.

10        We selected this motion out of all the other motions *in*

11   *limine* because we believe that this motion in particular

12   will have significant impact on the scope of the evidence

13   that is presented at the trial.  I think the previous

14   argument that you just heard demonstrates that.

15        And we expect this issue to come up as early as the

16   opening statements.  So we appreciate the opportunity to

17   address this this morning, Your Honor, and hope that we can

18   receive a pre-trial ruling on this one so that your guidance

19   can inform the parties' final preparations for trial in the

20   next few weeks and set the parameters for what will and will

21   not be permissible during the opening statements.

22        THE COURT:  All right.  Well, my big question to

23   you is why shouldn't I just follow Judge Polster on this?

24        MS. HARDIN:  Two reasons, Your Honor.

25        Number one, Judge Polster's reasonings are not law of

1  the case.  The plaintiffs have already tried to get you to

2  adopt that reasoning.  They did so at the February argument

3  on their motion for summary judgment on the Controlled

4  Substances Act.  Your Honor rejected that premise when he

5  denied that, the plaintiffs' motion.

6      This motion has to do with what is the evidentiary

7  nexus to Cabell and Huntington.  That was never before Judge

8  Polster.  Judge Polster was not able to issue a ruling on

9  what evidence is connected to Cabell Huntington.  So that's

10  the first reason.

11      And the second reason is that Judge Polster himself has

12  revisited that ruling in the Track 3 cases which involve

13  only the pharmacy defendants.  This motion was renewed, and

14  he clarified that what he meant by his initial ruling was

15  that perhaps some aggregate data on the whole could be

16  admissible without relating specifically to the Track 1

17  jurisdiction in Ohio.  But where specific evidence is

18  concerned, there must be a geographic and causal -- or at

19  least evidentiary nexus between the evidence and the

20  jurisdiction.

21      And here that is completely lacking, Your Honor.  There

22  is not going to be a single witness, fact or expert, who

23  will testify, nor will a single piece of documentary

24  evidence in the case establish that a single pill

25  distributed by these three distributors to pharmacies

1    located outside Cabell and Huntington ever found their way

2    into Cabell Huntington and caused harm there.

3         Plaintiffs have a few theories as to why this evidence

4    is relevant, but none of them have any merit.

5         The first is their migration theory.  And that is the

6    contention that pills distributed elsewhere to places like

7    Florida or Ohio or Kentucky or even into other places in

8    West Virginia were trafficked into Cabell and Huntington and

9    contributed to the public nuisance that plaintiffs allege is

10   happening here.  But that migration theory is not connected

11   to the defendants in any way.

12        First of all, as I said, there's no evidence, witness

13   or documentary, that establishes that any pills that may

14   have been trafficked into Cabell Huntington were ever

15   distributed by these three distributors.

16        McKesson, Cardinal, and ABDC are not the only

17   distributors in West Virginia, are not the only distributors

18   in Florida, or in any other of the states that plaintiffs

19   have argued were the source of pills coming into Cabell and

20   Huntington, nor is there any evidence that these defendants

21   themselves participated in any, quote/unquote, migration.

22        So what migration means is criminal trafficking.  It

23   means criminal diverters went to places outside of this

24   jurisdiction and brought pills back into the jurisdiction

25   for the purposes of illicit drug trafficking.

1    There is no allegation, much less evidence, in this

2    case that these three distributors ever distributed their

3    products to anyone other than DEA registered and state

4    licensed pharmacies.

5    And the plaintiffs' expert, their DEA expert, James

6    Rafalski, in his report is very clear about what he thinks

7    the source of this, quote/unquote, migration along what he

8    terms the Blue Highway or the Oxy Express from Florida to

9    West Virginia and that is criminal diversion.  There's no

10   allegation that the defendants themselves participated in

11   that.

12   And even if there were some linkage between our pills

13   distributed somewhere else and those that found their way

14   into Cabell Huntington, which there isn't, but even if there

15   were, that is not evidence that the shipments themselves by

16   distributors into these other locales were themselves

17   wrongful or excessive because, of course, the mere fact that

18   a criminal traffics in drugs does not indicate that there is

19   any wrongdoing on the part of the defendants.

20   What the plaintiffs have, and all that they have, is

21   evidence that the defendants were aware of migration.  But,

22   of course, being aware that criminal activity takes place is

23   not a sufficient evidentiary hook to admit evidence of our

24   distributions to other pharmacies.

25   The very documents that the plaintiffs cite make very

1   clear that we're not the only entities that had that

2   awareness; that the DEA itself was aware of migration and,

3   in fact, Cabell and Huntington local law enforcement were

4   aware of that migration.

5       So the mere fact of that criminal activity, of course,

6   does not indicate any wrongdoing on the part of

7   distributors.  So their migration theory doesn't get them

8   there, Your Honor.

9       And then I think we just heard from Mr. Fuller that

10  they want to use certain national trends and national

11  distribution data to serve as perhaps a benchmark for what

12  the distributors should have known was reasonable or

13  appropriate shipments into Cabell Huntington itself.

14      But that is a nonstarter and it's a reason why the

15  argument about whether or not we have stipulated, produced

16  our national distribution data is really beside the point

17  because that national trend data cannot tell us anything

18  about what was reasonable and appropriate in Cabell

19  Huntington.

20      The mere -- the entire concept of an average, of

21  course, is that there were distributions to some pharmacies

22  that were higher and distributions to some pharmacies that

23  were lower.

24      So the mere fact that someone at these three

25  distributors might have known that the distributions to

1   either a single pharmacy in Cabell Huntington or to the

2   region as a whole were higher or lower than some other place

3   in the country or some other place, frankly, located within

4   West Virginia is irrelevant.  That's not notice that

5   something was amiss in Cabell Huntington because there's a

6   reason why we evaluate suspicious orders on an

7   order-by-order pharmacy-by-pharmacy basis.

8        And that is because what makes an order reasonable or

9   of typical or usual size, frequency, or duration depends on

10  the location in which the pharmacy is located.  What is it

11  near?  What population does it serve?

12       And, so, making those evaluations with respect to

13  Cabell and Huntington are independent of and unrelated to

14  making those determinations for Texas or Florida.

15            THE COURT:  Why doesn't this come in under 404(b)?

16            MS. HARDIN:  It is actually prohibited under

17  404(b), Your Honor, because there is no causal nexus.  There

18  is no evidentiary basis.

19       The only possible purpose that the plaintiffs can have

20  for utilizing this information, other than the national

21  trends that Mr. Fuller said, is as propensity evidence.  And

22  they really make no bones about this.  At Pages 14 and 15 of

23  their opposition, Your Honor, they indicate that they very

24  much want to make an "if it happened there, it must be

25  happening here" argument.

1        They want to argue that if we shipped too many pills to

2    Florida, for example, under our national policies and

3    procedures, then we must have also shipped too many pills to

4    Cabell and Huntington.  That is a -- that's classic

5    propensity evidence, prior bad acts evidence that is

6    prohibited by 404(b).

7        There are exceptions, of course.  Plaintiffs have not

8    argued for the applicability of any of the exceptions of

9    404(b).  At most, what they muster in their opposition is to

10   say that some exception could become apparent, might become

11   available to them at the trial depending on how the evidence

12   comes in.  But that's insufficient at this point, Your

13   Honor.

14       We made the motion.  We, we brought forward the point

15   that there was no evidence linking these shipments outside

16   of the jurisdiction to Cabell Huntington and that it's

17   prohibited under 404(b).  And plaintiffs have not come

18   forward to tell Your Honor what exception would apply or why

19   it would apply.

20       So 404(b) is prohibitive of this evidence.  So it's

21   irrelevant.  It's prohibited under 404(b).  It's actually

22   going to prejudice the defendants.  If, if the plaintiffs

23   are allowed in this case to base a liability finding for

24   nuisance in Cabell Huntington based on conduct that we took

25   in other places, then we're going to be subject to repeated

1    verdicts for the same conduct because those other

2    jurisdictions have also sued us, Your Honor.

3        The State of Florida has sued these three distributors.

4    And, so, we're going to fall to account for our conduct, our

5    shipments into Florida.  And if there is evidence that they

6    were wrongful or in excess of what was allowable, the State

7    of Florida is going to litigate those claims.

8        As you know, 54 out of 55 West Virginia counties have

9    sued these three distributors.  And, so, if we've made

10   inappropriate shipments to other places, that's going to be

11   litigated before the Mass Litigation Panel.

12       And, so, without a connection between conduct in those

13   jurisdictions and this jurisdiction, these plaintiffs cannot

14   hold us liable for that same conduct without subjecting us

15   to repeated judgments, and that's inappropriate.

16       And, of course, Your Honor it's going to be an enormous

17   waste of trial time.  We're already slated to be together

18   for 12 weeks just talking about the issues that are relevant

19   to Cabell and Huntington.  And if we have to devolve into a

20   bunch of mini trials talking about the various shipments

21   that were made to Florida or Ohio or Kentucky, we're going

22   to be here for a long time because defendants do not agree

23   that any of our conduct was wrongful in any of those places

24   anymore than we agree that it was wrongful in Cabell

25   Huntington.

1    And, so, if plaintiffs put forward evidence of

2  shipments to other places, defendants are going to want to

3  defend themselves.  And we will be required to defend

4  ourselves and admit evidence about those shipments and it's

5  going to take trial time that we don't have and it's

6  irrelevant.  And for that reason, we ask that Your Honor

7  exclude evidence of our out-of-jurisdiction shipments.

8         THE COURT:  Thank you, Ms. Hardin.

9    Mr. Farrell, I now have you appropriately aligned in

10 this case with the defendants no longer and you may respond.

11        MR. FARRELL:  Thank you, Your Honor.  I will note

12 that there are other Farrells that practice law in this

13 state that would probably not mind being aligned on the

14 defense side.

15   Thank you, Judge.  This is an important issue.  And at

16 the outset, I wanted just to affirm that, yes, the

17 geographic scope has been the subject of not only discovery,

18 but evidentiary rulings in other courts.

19   But before we kind of get there, I want to -- I don't

20 want to engage in closing arguments right now.  And, so,

21 some of what defense is raising is the weight of evidence

22 and the, the probative value of some of this evidence.

23   And I'm going to try to stay away from that as best as

24 I can and point out the irony initially that the defendants

25 are filing a motion in front of you to prevent you from

1   hearing evidence as a fact finder.  And it seems like the

2   cat's out of the bag because you're the jury and the Judge.

3       That being said, the Fourth Circuit has already put

4   together some of these rules in saying that, you know,

5   prejudice for a bench trial, you get to weigh the evidence.

6       And, so, I'll say this at the outset.  I am acutely

7   aware that the plaintiffs are going to need to follow the

8   rules of evidence.  We're going to have to lay proper

9   foundations.  We're going to have to be methodical.  We're

10  going to have to stay within the facts and present to you a

11  case in order for us to prevail.

12      And, so, in general, what I can tell you is this.  The

13  reason this information is important is because all three

14  defendants have acknowledged that they have a duty to

15  identify and monitor suspicious orders.  All three

16  defendants have distribution centers across the country.

17  And all three defendants have acknowledged on the record

18  that their Suspicious Order Monitoring System, SOMS for

19  short, is systemic.

20      So for whatever successes these companies have in

21  complying with their duty, it's as a result of a systemic

22  process.  And whatever failures it has is the result of a

23  systemic process.

24      So we intend to present evidence that what happened

25  with the volume of pills in Huntington, Cabell County was

1   not a mistake.  It was not an isolated event.  It was the

2   result of a systemic failure by each of the three defendants

3   to comply with their regulatory duties to identify, block,

4   and report suspicious orders.

5        Suspicious orders are defined in the Code of Federal

6   Regulations as orders that are of unusual size.  In order

7   for us to determine what is unusual, we're going to have to

8   define what is usual.  And to do so, what we have done is we

9   have hired experts to come in and review this data and

10  present it in a logical, methodical way to you so that we

11  can identify the facts of national, regional, state, and

12  local patterns.

13       And I will point this one thing out.  The defense is

14  arguing that the national trends, the benchmark, cannot tell

15  us anything about what is suspicious.  And I will point out

16  that that very argument is the basis of the DEA

17  investigating them, sanctioning them, and fining them for

18  the past decade.

19       I'll also point out that the defendants concede that

20  they were aware of migration.  And I will point out that

21  there is a case that we will be discussing at great length

22  called *Direct Sales*, which is a case that was actually

23  provided to the defendants by the DEA.  It's dated 1947 I

24  believe.  And it talked very much about this awareness and

25  the culpable liability that comes with such awareness.

1       So, yes, we intend to discuss migration.  We understand

2   we have an evidentiary burden.  We will put on evidence

3   through our own internal documents.  We will put on evidence

4   of the Oxy Express and Blue Highway through the DEA

5   documents.  And we're going to put on evidence of the Oxy

6   Express and Blue Highway through the defendants' own

7   internal documents.

8       We're going to put on evidence that the problems that

9   were -- that, that resulted, the consequences and carnage

10  that happened in Cabell Huntington is the result of a

11  systemic failure.

12      We'll be able to establish that the volume of pills in

13  Huntington Cabell weren't being diffused by going in other

14  places because our surrounding counties were immersed in

15  pills themselves.

16      So, in general, an argument under 404(b), we understand

17  that, yes, we have obligations under the rules of evidence

18  regarding relevance and prejudice.  You as the finder of

19  fact will be the gatekeeper and I'm sure will be very clear

20  as to when you've heard enough.  And you'll be able to give

21  appropriate weight to the evidence.

22          THE COURT:  And you're relying solely on 404(b) to

23  get this in, Mr. Farrell?

24          MR. FARRELL:  Well, no, we think this is direct

25  evidence of their systemic failures.  In addition to 404(b),

1    we'll be able to show that this was not a mistake, that this

2    was part of their plan.

3          THE COURT:  When Judge Polster ruled it was

4    admissible, did he rely on 404(b) if you know?

5          MR. FARRELL:  I do know.  His direct quote I

6    believe -- I'm looking at Page 15 of our response, the end

7    of Page 14 bleeding onto Page 15.  And what he basically

8    says is that evidence outside of Track 1, CT1, comes in.  He

9    says this is particularly true because there is evidence

10   that defendants acted pursuant to practices and policies

11   that were national in scope.

12      So I don't have the order in front of me but, in

13   general, there not only is direct evidence, but we're also

14   going to be able to show the other counties and cities and

15   states for purposes of benchmarks.  So I don't think this is

16   a back door attempt, Judge.  This is blunt, direct evidence

17   of our case in chief.

18         THE COURT:  Did Judge Polster revisit this issue

19   in the Track 3 cases?

20         MR. FARRELL:  Now, my focus -- as you know, I am

21   the co-lead of the national litigation, so I'm going to

22   feign a little bit of, of a lack of knowledge on this.

23      I believe what is happening in CT3 is that we're still

24   in the discovery phase, and I fully anticipate that this

25   issue will be re-litigated.  But the Judge entered a 75-page

1    evidentiary order that makes it pretty clear that he's going

2    to allow this into a jury.

3        And all I'm suggesting is that if we get to trial and I

4    have failed to put on proper evidence, I'm sure the defense

5    will be keen to object and you'll be, you'll be prompt in

6    sustaining the objection.

7            THE COURT:  Well, I've got Judge Polster's order

8    in my hand and he very emphatically on the last page

9    indicated that in his view, the rulings he made should apply

10   to all the remanded cases.

11       I realize that's not binding upon me, but I have a lot

12   of respect for the work that he's put into it and I just --

13   I'll be asking your opponent this.  But shouldn't I just

14   follow Judge Polster?

15           MR. FARRELL:  Well, Judge, I --

16           MS. HARDIN:  Your Honor -- I'm sorry.  Did you

17   want Mr. Farrell to address that or me?

18           THE COURT:  Yeah.  I'll give you an opportunity in

19   a minute, Ms. Hardin.

20       Go ahead, Mr. Farrell.

21           MR. FARRELL:  Yes.

22           THE COURT:  Your answer was probably "yes."

23   Right?

24           MR. FARRELL:  Yes, I would like for you to follow

25   Judge Polster's orders to the extent they help my case.  And

1    I would ask you not to follow his orders to the extent that

2    it hurts my case.

3             THE COURT:  Fair enough.

4        Ms. Hardin, do you want to respond to that?

5        And if you're not through, I'll get back to you, Mr.

6    Farrell.

7        Go ahead, Ms. Hardin.  The issue is whether I should

8    follow Judge Polster or not.

9             MS. HARDIN:  You're certainly not required to

10   follow Judge Polster.  I think Your Honor just recognized

11   that.  His rulings are not law of the case.  As a general

12   matter, we've dealt with that already.  We've put that issue

13   to the side.  I take it from your rulings already you don't

14   adhere to the notion that they are law of the case.

15       But particularly when we are talking about motions and

16   what evidence has been adduced in this case, there's no

17   reason to follow Judge Polster.  He didn't have this record

18   before him.  He had a different record before him with

19   different evidence and different facts.

20       And, so, we ask Your Honor to make your own rulings

21   based on what the evidence is here.

22       But to Your Honor's question has he reconsidered or

23   re-evaluated, the answer is, yes.  The Track 1 ruling is not

24   his final word on this issue.

25       On November the 3rd of 2020 -- and we cite this at Page

1   12 of our reply which is in this case Docket 1154 -- he says

2   this.  He said while he would permit broad-scope aggregate

3   evidence related to things like nationwide trends and

4   shipments, which we certainly disagree with but that's his

5   ruling, he said extraterritorial evidence must have some

6   demonstrable nexus to the plaintiffs such as the fact that a

7   distribution center located outside of the plaintiff

8   counties distributes prescription opioids into them.

9       So even Judge Polster -- again, we disagree with the

10  broad scope of his ruling.  But even he recognizes that when

11  you're talking about specific evidence, it needs to have a

12  demonstrable nexus.

13      I have other points to respond to Mr. Farrell, but I'm

14  not sure if he was finished or if he's got more to say or I

15  should continue.

16              THE COURT:  Okay.

17      Do you have more to say, Mr. Farrell?

18              MR. FARRELL:  I think I made clear I have more to

19  say.  But right now, Judge, I think I've said what we need

20  to.

21              THE COURT:  All right.

22              MS. HARDIN:  Just a couple of points then if I

23  might, --

24              THE COURT:  Yes, sure.

25              MS. HARDIN:  -- Your Honor.

1      On the systemic failures point, if, if we have national

2    policies and procedures and they impacted what happened in

3    Cabell and Huntington, this motion is not trying to prevent

4    the plaintiffs from talking about that evidence.

5      If our Suspicious Order Monitoring System on the whole,

6    as they were implemented in Cabell Huntington, had certain

7    failures or inadequacies, I feel certain that Mr. Farrell

8    and his team are going to try and point that out and this

9    motion isn't going to try to keep them from doing so.

10      But what pills we shipped to other places pursuant to

11    those policies just is not relevant.  It doesn't matter if

12    we shipped too many, too few, or just the right amount of

13    pills to a pharmacy in Florida or Ohio or Kentucky.  That

14    does not mean that we shipped too many or too few or just

15    the right amount to Cabell and Huntington.

16      And, so, if they want to talk about why our policies

17    and Suspicious Order Monitoring Systems were insufficient

18    with regard to the decisions we made with respect to Cabell

19    Huntington pharmacies, they may do so.  But they don't need

20    to tell you how we operated under those policies in some

21    other place.  That's not going to inform what we did here.

22      And we've not put mistake at issue, Your Honor.  We've

23    not argued that our distributions into Cabell Huntington

24    were a mistake.  So they don't need to introduce evidence to

25    show that we didn't make a mistake.  We're going to defend

1   our Suspicious Order Monitoring Programs on their merits.

2   But we have not said that somehow mistake or identity or

3   opportunity is at issue.  So it just doesn't pull in 404(b).

4       And, again, the notion that unusual size, frequency, or

5   duration is (video inaudible) for a Cabell Huntington

6   pharmacy based on what might be happening in Florida or

7   Texas or New York City is incorrect.  That's not how

8   suspicious orders are evaluated for the reasons that I

9   already said.  They are locale and pharmacy specific.

10      And to the issue that this is an issue of weight of the

11  evidence, there is no evidence.  We haven't talked about any

12  evidence that connects the distributors to the migration

13  theory.  They have evidence of the migration theory to be

14  sure, but they don't have anything that connects us to that

15  theory.  So that is not a sufficient basis on which to admit

16  our distributions from outside of the jurisdiction.

17      Thank you, Your Honor.

18          THE COURT:  All right.  I'm going to take this one

19  under advisement.  And let's go on to the last thing on the,

20  on the agenda here.  That's the defendants' motion to

21  exclude the marketing opinions of four experts.  And Kim

22  Watterson is going to present this, I believe, for the

23  defendants.

24          MS. WATTERSON:  That's correct, Your Honor.  I

25  will check.  Am I transmitting both audio and video to you?

1          THE COURT:  You are, Ms. Watterson.

2          MS. WATTERSON:  All right.  Well, thank you.  Kim

3     Watterson, Reed Smith.  I'm here arguing today, though, on

4     behalf of all of the distributor defendants in this case.

5          And I think like the geographic scope issue that was

6     just argued, we really appreciate you hearing from us on

7     marketing because it too will help shape the scope of the

8     evidence in the case, or your rulings will, and it will have

9     an impact perhaps on the length of the trial.

10          Your Honor, it always helps me especially with a motion

11     like this where there's several experts implicated, several

12     moving parts in terms of the number of different *Daubert*

13     criteria at play to set forth a little bit of an inventory

14     before I start.

15          So there's going to be three basic parts to my argument

16     today.

17          First, I'm going to explain why three of plaintiffs'

18     marketing experts -- and I'm going to shorthand for now and

19     call them marketing experts - Keyes, Lembke, and Kolodny -

20     are not qualified to give an opinion on what again I'm

21     short-handing as marketing for now.

22          Second, I'm going to explain why those three experts,

23     Keyes, Lembke, and Kolodny, as well as plaintiffs' other

24     marketing expert, Jakki Mohr, on these experts plaintiffs

25     have not satisfied their burden.  And, again, it's

1   plaintiffs' burden under *Daubert* to demonstrate reliability

2   and relevance when it comes to all four experts.

3        And, third, I'm going to talk about Professor Mohr in

4   and of herself and explain why, given her own descriptions

5   of the limitations in her opinion and what remains after we

6   look at those limitations, the testimony that she's going to

7   provide is simply not helpful to the Court.  It doesn't meet

8   the criteria that expert testimony must be helpful to the

9   finder of fact.  And, of course, Professor Mohr's testimony

10   doesn't fit the circumstances of this case.

11        And when we talk about Professor Mohr, I want to

12   foreshadow this.  This Court's recent April 8th order is

13   going to come into play in that analysis.

14        A little bit of context before we begin to talk about

15   these experts.

16        Throughout this opioid litigation, plaintiffs'

17   marketing liability theory has focused on manufacturers.

18   That's reflected in the complaint that they filed in this

19   case.

20        If you look at Paragraphs 372 through 669, there's a

21   discussion of manufacturers' alleged marketing activities.

22   Their experts in this case until recently, that is, their

23   marketing experts have focused on manufacturers' conduct.

24        But now that we find ourselves in this case, and a few

25   others, where the distributors are the only defendants,

1   plaintiffs are trying to read the distributors --

2           THE COURT:  Is it stronger against the

3   manufacturers than it is against the distributors or is it

4   comparable?

5           MS. WATTERSON:  It is -- pardon me, Your Honor?

6   Did you say is it weaker or is it comparable?

7           THE COURT:  All of the above.  Is it -- I'm under

8   the impression that the plaintiffs' evidence is better

9   against the manufacturers, who aren't in this case anymore,

10  than it is against the distributors.  And I'm just asking

11  you if you agree with that or not.

12          MS. WATTERSON:  I think it's certainly better.  I

13  think manufacturers have been the focus of their marketing

14  liability theory.  I will argue today they do not have

15  expert testimony on the critical link in that theory.

16      You know, the marketing liability theory is that

17  defendants engaged in marketing activities that caused

18  physicians to prescribe more opioids.  You know, stated in

19  its simplest fashion, that marketing drove the supply of

20  opioids by misleading physicians into prescribing more

21  opioids, not paying attention to the risks of opioids,

22  marketing that overstated the benefits.

23      So that's the marketing liability theory which, again,

24  I don't want to get caught up on this distinction between

25  manufacturers and distributors by way of setting forth the

1   context, but I do think it is an important context.  And I

2   also think it lays the groundwork for why their marketing

3   experts, and particularly their marketing causation experts,

4   really don't have anything to say that passes *Daubert* muster

5   when it comes to distributors.

6       So let me start with qualifications.  You know, we

7   talked a little bit about Judge Polster's order.  Your

8   Honor, you asked us in our papers to indicate whether Judge

9   Polster has ruled on a particular issue that's before you.

10  So we did that.

11      Judge Polster ruled as to two of these experts, Lembke

12  and Keyes, and the reasoning applies equally to Kolodny,

13  that they do not have the requisite experience, education,

14  and training to render an opinion on marketing and its

15  effects on prescription prescribing.

16      Now, we're not just talking about Judge Polster's

17  opinions because we think it's the law of the case because

18  we don't think Judge Polster's opinions are law of the case.

19  But Judge Polster was perfectly correct, and we

20  independently demonstrate to you in our papers that Lembke,

21  Keyes, and Kolodny do not have the requisite experience.

22      Lembke is a medical doctor.  She deals with addiction

23  and pain.  She offers some opinions in this case that do not

24  deal with marketing and are not the subject of this motion.

25  But she has no background whatsoever in marketing.

1      Plaintiffs point to a book that she authored.  But
2  authoring a book that mentions marketing does not qualify
3  her as an expert under the *Daubert* criteria.  Plaintiffs say
4  repeatedly that Lembke, as well as Keyes, and as well as
5  Kolodny, are reading up on things in order to prepare to
6  testify in this case.

7      Well, this Court's opinion in *Salazar* has made very
8  clear you don't gain expertise just by getting ready to
9  testify in litigation as an expert.  You don't become an
10 expert outside of your regular field just by reading up on
11 things.

12     Plaintiffs point to a class that Professor Lembke
13 teaches on the opioid epidemic, as she calls it.  One day
14 she teaches a class throughout the entire course, just one
15 day, where she touches on marketing.  That doesn't make her
16 an expert under *Daubert*.

17     The same goes for Keyes.  Again, she's an
18 epidemiologist.  She has no credentials that qualify her to
19 talk about marketing, and specifically whether marketing
20 here drove prescriptions of opioids or physicians'
21 prescriptions.

22     Again, what plaintiffs have to say is she's working
23 hard to get ready to go to testify.  That doesn't pass
24 *Daubert* muster.

25     Interestingly, with respect to Keyes, this crash course

1   that she might be engaging in on marketing, by her own

2   admission she isn't even evaluating -- and we'll talk more

3   about this when we get to the reliability criteria.  But she

4   doesn't even -- she disclaims having any knowledge of

5   distributor marketing.  And she hasn't evaluated the

6   specific marketing materials that, that are at issue in this

7   case.

8        And, again, the same goes with Dr. Kolodny.  Again, he

9   is a physician.  He treats OUD.  He is not positioned to

10  testify on marketing and marketing causation.

11       Plaintiffs may raise, because we're talking about other

12  judges' opinions, that the judge in Oklahoma issued a

13  one-liner allowing Dr. Kolodny to testify.  But there's no

14  reasoning in that opinion, and nothing that suggests that

15  he's qualified under *Daubert*.

16       And, certainly, that pales in comparison to what I will

17  say is Judge Polster's well-reasoned analysis here and what

18  we argue in our papers looking specifically at what these

19  folks have by way of background, what they're lacking when

20  it comes to expertise in this area, and why under the

21  controlling case law they simply don't meet the

22  qualification criteria.

23       Your Honor, I'm going to move now on to the reliability

24  prong.  Maybe fit and reliability are the two most important

25  touchstones under *Daubert*.

1        None of these experts offer a reliable opinion on

2   marketing causation, again defined as, in accordance with

3   plaintiffs' liability theory, the theory that distributors

4   engaged in marketing that drove an increase in the supply of

5   prescription opioids because they convinced doctors through

6   misleading statements to prescribe more opioids to more

7   patients in higher doses and for a greater multitude of

8   conditions.

9        So, again, that's the focus.  That's the frame.  That's

10  what these experts need to offer a reliable opinion on based

11  on a methodology, based on data, not simply speculation and

12  surmise.

13       So for starters, let me point out that Jakki Mohr, the

14  only expert of the four who has any background in training,

15  in marketing, she has essentially disclaimed having any

16  opinion on causation.  She said her opinion is limited to

17  whether distributors engaged in marketing activity; were

18  these activities marketing; can they be considered

19  marketing.

20       She has no opinion that any of these activities were

21  false or misleading.  And she has no opinion on whether any

22  of this marketing had an impact on the overall levels of

23  opioids prescribed, and certainly not on the overall level

24  of opioids prescribed in Cabell and Huntington.

25       Those experts that do purport to have an opinion on

1   marketing causation - Keyes, Lembke, and Kolodny - they

2   didn't employ any methodology at all.  They didn't talk to

3   any physicians anywhere, and certainly not in Cabell and

4   Huntington, -- and we'll talk about that later specifically

5   with respect to the fit criteria -- to determine whether and

6   to what extent any of these marketing activities, whatever

7   they may be, whether and to what extent they influenced

8   prescribing.  They just didn't do it.

9       You know, there isn't any pile of data that they looked

10  at to say, "Hey, physicians, did you get this information?

11  Did this move the needle?"  There is no underlying data set,

12  and there was no methodology.

13      It's just, well, you know, if folks engage in marketing

14  and tout the benefits of opioids and underplay the risks

15  which, of course, is plaintiffs' theory, of course that

16  impacted physicians.

17      But I want to draw this Court's attention to the case

18  of *In Re: Actos* and *In Re: Diet Drugs*, as well as this

19  Court's opinion in *Salazar* as well.  It says it's really

20  just speculation, you know.  This is *In Re: Actos*.  They

21  excluded marketing causation -- and I'm going to read what

22  it says -- because there was no foundation laid to show that

23  the experts knew what a physician actually knew, what

24  marketing materials the physician actually received, and

25  whether and to what extent the physician was impacted by

1    those marketing materials.

2        So there, there is no methodology at all.  It really

3    amounts to an *ipse dixit*.  They admit, and we cite in our

4    brief, all of the pages of the depositions where each of

5    these experts admitted they don't know whether any

6    distributors distributed marketing material.  They don't

7    know whether any doctors saw such marketing material.  They

8    don't know whether doctors relied on or the extent to which

9    they relied on these marketing materials in making

10   prescribing decisions.

11       Now, plaintiffs come back and say, well, you know, we

12   don't have to tell you which doctors.  We don't have to

13   identify specific doctors that relied on these materials.

14       Your Honor, that's not our point.  We're not faulting

15   the experts because they don't give us an inventory or list

16   or count up the numbers of doctors who say they relied on

17   these marketing materials.

18       It's simply that they don't have any methodology at

19   all.  There wasn't any examination of underlying facts from

20   which they could draw their opinions.  So it's *ipse dixit*.

21   It's guess.  It's surmise.  It's, it's speculation that

22   somehow these materials must have moved the needle.

23       That's not what *Daubert* requires.  There has to be a

24   methodology.  And there really is none here when it comes to

25   the question of whether they can opine that distributor

1  marketing moved the needle and influenced physician

2  prescribing.

3        Another thing, Your Honor, that's missing from the

4  Keyes, Kolodny, and Lembke opinions -- and it's nothing, by

5  the way, that Professor Mohr admits that she didn't do.  You

6  know, all of these experts admit and agree that there are

7  other factors that influence prescription -- physician

8  prescribing; manufacturer conduct, DEA, FDA, physicians' own

9  judgments, et cetera, et cetera.  So all of them agree that

10  there are other drivers of prescription prescribing.

11        When asked whether they did any assessment at all,

12  well, what role does this distributor marketing, if any,

13  play in the equation, none of them evaluated that.  Mohr

14  said she didn't do it because she said that wasn't her task.

15  And she said in order to reach a conclusion on that

16  question, you would have to do, and her quote was an

17  economic, an econometric study that would take some time to

18  sort out.  "That wasn't the scope of my task."

19        Well, Keyes, Kolodny, and Lembke didn't do that either.

20  So, again, it's *ipse dixit*.  I hate to keep using that word

21  out of the Supreme Court precedent, but that's what it is.

22  They say we understand they did some marketing.  It must

23  have moved the needle.  But we can't tell you how much and

24  we can't tell you based upon a methodology and the

25  examination of data, a close examination of the marketing

1  material, and talking to physicians that it moved the

2  needle.  We just suspect and surmise, well, it must have.

3      Now, also missing from the marketing experts' opinions

4  is fit.  All of them admitted that they didn't do any look

5  into Cabell County.  They don't know whether any of the

6  so-called marketing materials and marketing activities --

7  and, Your Honor, you'll notice I'm calling them so-called

8  because for the purposes of this motion now, we're not

9  probing into those materials and deciding, you know, whether

10 or not, or arguing that they weren't disseminated, whether

11 they were disseminated, and whether they really amount to

12 marketing.

13     But whatever the so-called marketing might be, none of

14 the experts know whether any of these marketing materials

15 made their way into Cabell and Huntington, whether

16 physicians in Cabell and Huntington looked at them, whether

17 they resulted in a prescription being written for someone in

18 Cabell and Huntington.  They were all very honest about it.

19 They said that they didn't look into this jurisdiction.

20     So what they have to say simply doesn't fit this case

21 brought by Cabell and Huntington looking at impact in this

22 jurisdiction.  So they all flunk the *Daubert* test when it

23 comes to both reliability and fit.

24     Now, I want to talk a little bit about Jakki Mohr

25 because interestingly, Your Honor, I mentioned to you that

1    she disclaims having any opinion at all on this marketing

2    causation question.  She says, "All I'm really doing is

3    answering the question of whether distributors engaged in

4    marketing."

5        She's not opining on whether any of the so-called

6    marketing was false.  And she says she didn't do any

7    analysis to determine whether or not that marketing, in

8    fact, moved the needle and led to physicians

9    overprescribing.

10       So all we are left with when it comes to what Jakki

11   Mohr has to say is an inventory of activities,

12   communications, programs that she looks at and she says,

13   "Yes, that amounts to marketing," not that this marketing

14   did anything to cause prescribing, not that it's false.

15   That meets the definition.  "I'm a professor of marketing.

16   This meets the definition of marketing and this is how

17   marketing works."

18       Helpfulness to the trier of fact, as this Court has

19   said in its own opinions, is the, is the touchstone of the

20   Rule 702 analysis.  How is that helpful to the Court?  What

21   remains is she's going to get on the stand and she's going

22   to be the vehicle through which plaintiffs put on an

23   inventory of activities and communications.  And then she's

24   going to say, "In my expert opinion, I think that's

25   marketing."

1    Well, first of all, whether an expert says it's
2  marketing or not doesn't inform the central question here.
3  The central question here is whether these communications or
4  programs, whatever you call them, marketing or something
5  else, influenced prescribing habits such that there was a
6  greater supply of opioids in Cabell and Huntington.  She
7  can't say that.

8    And as this Court noted in its April 8th opinion,
9  experts -- expert testimony isn't the vehicle for a party,
10 here in this case the plaintiff, to get into evidence facts
11 about corporate documents or corporate activity.

12    So at the end of the day, that's really all that we're
13 left with when it comes to Jakki Mohr.  And she should,
14 therefore, be excluded in her entirety.  She has nothing to
15 say about causation.  She has nothing to say about falsity.
16 She doesn't fit.  She has nothing to say about Cabell.

17    And what's left of her testimony, again, this inventory
18 of activities and then affixing the marketing label on them,
19 that's not helpful to the trier of fact.  That's not going
20 to help Your Honor determine whether plaintiffs' marketing
21 liability theory carries the day.  And it's also not the
22 proper vehicle to put in the evidence about these so-called
23 marketing programs.

24    I think, Your Honor, I will stop there -- there's a lot
25 more to say, there's a lot going on with marketing -- and

1    I'll answer any questions that you might have.

2              THE COURT:  I'm going to hear from Ms. Bierstein.

3         Thank you, Ms. Watterson.

4              MS. BIERSTEIN:  Sorry, Your Honor.  I had to

5    unmute.  I had to remember to unmute.  But can you hear me

6    now?

7              THE COURT:  I can hear you loud and clear, Ms.

8    Bierstein.

9              MS. BIERSTEIN:  Okay, great.  Thank you.  Good

10   morning, Your Honor.  Andrea Bierstein, Simmons, Hanly,

11   Conroy, arguing for the plaintiffs.

12        This motion to exclude the marketing evidence of

13   plaintiffs' expert, as I'm going to try to demonstrate to

14   Your Honor, should be denied because each of the experts at

15   issue --

16             THE COURT:  Let me interrupt you.  Judge Polster

17   ruled at least two of these experts out.  How -- why

18   shouldn't I do the same thing?

19             MS. BIERSTEIN:  Well, I was going to get to Judge

20   Polster, but I'll get to him first since that's the focus of

21   Your Honor's question.

22        I noticed that all counsel, Ms. Watterson, Mr. Farrell,

23   we all seem to agree that you should follow Judge Polster

24   when we like what he does and that you shouldn't follow him

25   when we don't like what he does.

1      But, you know, looking more specifically here, I want

2  to say a few things about Judge Polster's ruling.

3      First of all, Judge Polster's ruling was extremely

4  narrow.  The relief the defendants are asking for here is

5  quite a bit broader.

6      What Judge Polster did was to exclude very limited

7  amounts of testimony.  And you see in his opinion it's like,

8  "Well, I'm not letting you say this paragraph and this

9  paragraph."  It's very surgical.

10      And a lot of what's at issue here is simply either not

11  the subject of his ruling -- certainly was not -- the

12  breadth of what they're seeking to exclude is, is much

13  broader than what Judge Polster addressed.

14      But even as to what Judge Polster did address, the

15  record before him was quite different I think in, in certain

16  important ways from the record before Your Honor.  And I

17  know this is kind of going a little bit backwards in terms

18  of, you know, the way I was going to present this.

19      But I want to start with what Judge Polster said about

20  Dr. Keyes in particular because one of -- because Judge

21  Polster's main criticism of Dr. Keyes -- and this is quoting

22  from his opinion -- was that her report, he said, does not

23  indicate that in formulating this opinion, Keyes performed

24  the methodology that is standard in the scientific process

25  of her field of expertise.

1      In other words, Keyes has not shown that she applied

2  epidemiological methods to determine that a cause/effect

3  relationship may be inferred from the study she cites.

4      So he didn't say -- I want to say he didn't even say

5  she hadn't used the methods, but he said her report didn't

6  show that she had.

7      And the report here is different because if you look on

8  Pages 29 to 31 of Dr. Keyes' report in this case, different

9  from her report in CT1, you will see that Dr. Keyes isn't

10  just reporting on articles, and I'm going to talk some more

11  later about this business of reading up, that she's not

12  only -- she's analyzing the literature specifically using

13  the epidemiological tools to do that.  She's assessing the

14  extent to which the studies at issue are epidemiologically

15  sound.

16      And, so, what -- so what she's doing here is what she

17  didn't do in front of Judge Polster.  She's demonstrating

18  that she's using her epidemiological expertise and her

19  epidemiological methods in looking at epidemiological

20  literature in order to reach her conclusions.

21      So I think she's cured of what Judge Polster was

22  concerned about which is, yes, what she's doing here is

23  epidemiology.  And she obviously had not made that clear

24  enough in her CT1 report.  We think that in the CT2 report

25  she has demonstrated to the Court that that is what she's

1    doing.

2         And I am going to come back and talk some more about

3    what she's doing and why it is epidemiology in just a

4    minute.  But I did want to answer Your Honor's question.

5         I think with Dr. Lembke the situation is a little bit

6    different, but not that different.  It's true that the

7    record in front of Judge Polster included original research

8    that Dr. Lembke had performed before writing her book.

9         By the way, you know, Ms. Watterson, the defendants

10   keep saying nobody ever talked to any doctors.  Well, Dr.

11   Lembke did.  When she researched her book, she did extensive

12   patient and physician interviews, as well as analyses of

13   published literature about prescribing.

14        And although a lot of that was in the record, Judge

15   Polster didn't mention any of that research when he found

16   her book to be an insufficient basis.  And I don't know

17   whether he had focused on it or whether it sort of, you

18   know, didn't come to his attention.  He doesn't say, "Well,

19   yes, she did all this research, but it's not enough."

20        And I want to say -- and this is where I want to talk

21   about reading up on something which we hear a lot about, how

22   you can't just read up to become an expert.

23        Well, that's not exactly true.  And the reason it's not

24   exactly true, Your Honor, is that a literature search is a

25   respected and well recognized methodology that has passed

1  *Daubert* on numerous occasions and it's been recognized by

2  numerous courts.

3      There is a limitation on a literature search which is

4  that you need to have the right expertise.  A medical doctor

5  can read medical literature and analyze it and figure out:

6  Is it sound?  Was this study done correctly?  Does this make

7  sense?  If I read the same medical study, I could not bring

8  my expertise to bear to understand it.

9      So what you need when you're reading up on something,

10 you need to be reading up in your own field.  And as long as

11 you're reading up in your own field so that you are -- you

12 have the same or similar expertise to the literature that

13 you're reading, you don't have to have had an opinion or

14 know the specific issue beforehand.  You can read the

15 literature and, and form an opinion based on it if you bring

16 to bear the correct expertise.

17     And I want to circle back to talk about why Drs.

18 Lembke, Kolodny, and Keyes do bring the right expertise such

19 that the component of their work that involves literature

20 search is, is not a problem because they have the

21 qualifications to do it.

22     Before I get there, I'm going to circle back to a

23 couple of kind of preliminary points.

24     I did want to talk just for a second about Rule 702 and

25 *Daubert* generally.  I'm sure Your Honor knows the purpose of

1    *Daubert* is for the Court to act as a gatekeeper with respect

2    to expert testimony.  And as Mr. Farrell has already alluded

3    to, in this circumstance with a bench trial, the Court is

4    essentially a gatekeeper for itself.

5        So it's not to say we don't have to meet the

6    requirements of, of Rule 702.  But as Your Honor recognized

7    in the *Grant Thornton* case, this applies differently in a

8    bench trial where the relevance and the helpfulness of the

9    evidence in particular can be more easily assessed at trial

10   in the context of the rest of the evidence that comes in.

11       And issues that may arguably go to weight rather than

12   admissibility or sufficiency, some defects in the

13   methodology or smaller gaps in qualification are also best

14   dealt with in the context of, of the trial because it's in

15   that context that the Court can see how helpful is it, how

16   relevant is it, how, you know, big a problem is this, you

17   know, methodological flaw that cross-examination has brought

18   out.

19       And because the Court is the gatekeeper for itself here

20   and not for, you know, a jury that may be swayed by the mere

21   fact that somebody with a Ph.D. is on the stand, I think the

22   Court needs to keep that in mind in applying this.

23       I also want to note that although the defendants'

24   motion is a little bit vague about exactly what parts of

25   these experts' opinions they're trying to include -- trying

1    to exclude.  But the scope is pretty broad.  They're asking

2    the Court to exclude large swaths of evidence, as I already

3    mentioned, way broader than what Judge Polster did, which

4    was very narrow.

5        But I also want to mention to Your Honor that the total

6    amount of testimony at issue here is small.  This is not

7    going to shorten the trial by substantial amounts.  And

8    that's because this motion contains no challenge to the

9    opinions of Dr. Lembke about addiction, about pain

10   medication, about the falsity of defendants'

11   misrepresentations, the host of other topics in her expert

12   report.

13       It includes no challenge to the rest of the opinions of

14   Dr. Keyes about opioid use disorder, diversion, the

15   connection between oversupply and harms.  And it doesn't --

16   well, I'll get to the issues with Dr. Mohr because they now

17   say what I think was not clear in their motion, that they

18   think she should be excluded in her entirety.  But it

19   doesn't address the rest of Dr. Kolodny's opinions about

20   oversupply and the opioid epidemic.

21       So we're talking about a smaller amount of testimony.

22   And it's in that circumstance again that it's especially

23   appropriate for the Court to hear all of the evidence and

24   determine in the context of the trial whether to consider

25   this evidence and, if so, what weight to give it.

1        It would not make sense for the -- for even in a bench

2   trial for a Court to do that for weeks and weeks of

3   testimony that takes up everyone's time only for the Court

4   to say at the end, "Well, I'm sorry, but really that, you

5   know, I don't see it."

6        But where it's a small amount of testimony and where I

7   think I'm, I'm hoping to demonstrate we do meet the

8   requirements, the threshold requirements, the Court will be

9   better positioned in the context of the trial to assess the

10  relevance, the fit, the methodology, and all the, all the

11  rest of that.

12       Before I, I talk more specifically about the

13  qualifications of our experts, though, I do want to hit two

14  other points.

15       And the first has to do with the term "marketing" which

16  is in some ways a little bit misleading.  But I think it

17  also helps understand why Dr. Mohr's testimony is so helpful

18  here.

19       When we think of marketing, I think most of us think of

20  advertising and maybe a little bit of PR.  But what we're

21  talking about here is really much broader, just how do you

22  change perceptions of a product so as to increase (video

23  inaudible) it fails.  How do you get the relevant

24  decision-makers to think differently about your product.

25       Now, that includes advertising and branding and

1   promotion, but it includes a lot more.  It includes issue

2   management.  It includes education.  It includes all the

3   ways that you change people's minds in order to make them

4   receptive.  It may include lobbying.  It may include working

5   with medical societies.  It may include getting your message

6   into continuing medical education.

7        It is a very broad -- the activities at issue here are

8   very broad.  And the word "marketing" does encompass that,

9   but it's not necessarily what most of us think of as

10  marketing.

11       And Dr. Mohr, who is an expert in exactly this issue,

12  explains that in her report.  She explains how broad

13  marketing is and she explains the role of issue management

14  and other aspects of marketing.

15       So that when she says, "I've looked at what the

16  defendants did and, yep, that's marketing," you know, and

17  they say, "Well, that's not helpful to the fact finder,"

18  well, it's helpful to the fact finder when the marketing

19  strategies go way beyond what we usually think of as

20  marketing.

21       It's also helpful to the fact finder because the other

22  thing that Dr. Mohr is an expert in is something called

23  channel management.  And this has to do with the way

24  manufacturers, distributors, and retailers work together in

25  order to get -- to market a product, to increase sales.

1       They have an aligned interest.  The manufacturer wants

2  to increase sales.  The distributor makes a profit off how

3  much is sold and so does the retailer.  And the ways in

4  which the different actors in a supply chain work together

5  in order to do that is critical and important information

6  that is not simply obvious, that is not known to everyone

7  who doesn't have a marketing background.  And this --

8       THE COURT:  Did Dr. Mohr's, Professor Mohr's

9  opinion reach the issue of causation?  Did she have an

10  opinion on whether the marketing -- the distributor

11  marketing tactics were actually a cause of the damage,

12  damages alleged by the plaintiffs in the case?

13       MS. BIERSTEIN:  I don't believe that she does.  I

14  think it is the other experts who can identify the causal

15  connection.  She's in a position to identify the scope of

16  those activities and how those activities work in the

17  marketplace.

18       THE COURT:  So if the other experts on this point

19  are excluded, there would be no evidence of causation.

20  Right?

21       MS. BIERSTEIN:  I don't think that's true, Your

22  Honor.  I think there would be no expert evidence of

23  causation.  There's plenty of other evidence of causation.

24       For example, a lot of -- certainly, the manufacturers,

25  and I think perhaps the distributors, and I'm going to get

1   in a minute to that connection, did their own internal

2   analyses of causation.

3           THE COURT:  That was a bad question.  I should

4   have limited it to experts.  So you don't need to go further

5   on this point --

6           MS. BIERSTEIN:  Okay, all right.

7           THE COURT:  -- because I asked a bad question.

8           MS. BIERSTEIN:  Yeah, okay.

9      So -- but, yes, it is the other experts that we're

10  relying on to make this, this causal connection.

11      And before I turn again to why these experts are

12  qualified to do that, I do want to say that -- and I think

13  this is a really important point to understand what's going

14  on with these experts.

15      One of the defendants' points is that they say we

16  haven't distinguished and our experts haven't distinguished

17  the effect of distributor marketing from that of

18  manufacturer marketing.

19      And I want to say, Your Honor, I think that gets to the

20  heart of the issue because that criticism is really a

21  non-sequitur.  It misses the point.

22      What we're saying here is that the defendants and the

23  manufacturers were acting in concert on a single marketing

24  scheme to alter the perceptions of doctors and patients

25  about the risks and benefits of opioids.

1    The distributors offered marketing services to the

2  manufacturers to help the manufacturers with their

3  marketing.  It's not two separate streams of marketing where

4  the experts need to say what was the effect of this stream,

5  what was the effect of that stream.

6    THE COURT:  So if you succeed on this point, you

7  bootstrap any weakness you have in the evidence against the

8  distributors by tying them to the marketing -- to the, to

9  the manufacturers against whom your evidence may be

10 stronger.  Right?

11   MS. BIERSTEIN:  I think that's right, Your Honor.

12 And I -- we understand -- we do still need to prove that to

13 you.  We have to prove that they acted in concert.  And we

14 have to prove to you that it was one scheme.

15   And we think the documentary evidence at trial will

16 show that.  But once that's established, that's correct.

17 Now we're in the world of looking at what was the effect of

18 that scheme.

19   And here's the interesting thing.  Your Honor refers to

20 that evidence about the manufacturer scheme.  You know,

21 you've said it's better or stronger.  But what I think is

22 interesting about it is that there really isn't a dispute

23 about the causal connection between that marketing activity

24 and the huge increase in prescribing and sales of opioids

25 that occurred in West Virginia and around the country.

1      Defendants have been saying all along that marketing

2   changed the standard of care and caused an increase in

3   prescribing.  They've just been saying it was the

4   manufacturers' marketing, not ours.  But they have -- you

5   know, when they thought we were only talking about the

6   manufacturers, they were happy to say our SOMS failures

7   didn't cause the oversupplies they argue.  The oversupply

8   was caused by those manufacturers and their marketing

9   scheme.

10      So they've been saying for a long time that it's the

11   marketing scheme that brought all the pills to West

12   Virginia, not our SOMS failures.  Now, we, of course, are

13   saying it's both.  It's the SOMS failures and the marketing

14   scheme.

15      But, more important, we're saying you defendants, you

16   were working with them on the marketing scheme.  You were in

17   concert.  And you are just as responsible for it when you

18   signed up and said, "Hi.  How can we help you with your

19   marketing?  We'd like to be part of that."  And, so, that I

20   think is an important crux of, of this case.

21      Now I want to turn to what I think is the heart of

22   defendants' motion, their attack on Drs. Lembke, Keyes, and

23   Kolodny, which I think is the misconception that marketing

24   professionals are the only ones who can assess the

25   effectiveness of marketing here, that they are the only ones

1   who are qualified to talk about causation.

2        And, you know, so we have a situation.  A company or a

3   group of companies spends millions of dollars on marketing.

4   The sales go through the roof.  But the theory is that only

5   a marketing professional can tell us if the two things are

6   connected, if the increase -- if the marketing plan and all

7   the money they spent actually caused the sales to go through

8   the roof.

9        Now, I will say there's a superficial appeal to that

10  argument.  After all, we all know that correlation isn't

11  necessarily causation.  So, you know, you put in the money,

12  the sales go up.  How do we know?  Someone has to assess

13  whether there was a connection, whether the sales would have

14  gone up anyway even without the investment and the

15  marketing.

16       But I want to try to (video inaudible) marketing

17  professional can do that while appealing is simply wrong, at

18  least in this context.  When we're dealing with

19  pharmaceuticals and disease like OUD, I think there's at

20  least two categories of professionals who are at least as

21  well situated, if not better, than marketing people to

22  assess causation.  And that's doctors and epidemiologists.

23  And I want to try to explain why that is.

24       So I want to start with epidemiology.  The *Reference*

25  *Manual on Scientific Evidence* tells us that epidemiology is

1    the field of public health and medicine that studies the

2    incidence, distribution, and etiology of disease in human

3    populations.

4         And etiology is that fancy word they always use for

5    cause.  We all want to say, "Why don't you just say cause?"

6         But, anyway, the point is epidemiologists, the, their,

7    their field, their expertise of three things, incidence,

8    distribution, cause of disease in populations.  So studying

9    causes of disease is the expertise of an epidemiologist.

10         Is the epidemiologist an expert in every disease?  No.

11   Is the epidemiologist an expert in every cause

12   independently?  Again, no.  But the epidemiologist's

13   expertise is in assessing the relationship between cause and

14   effect, of looking at the data of, you know, of an input and

15   exposure and an effect and drilling into is that causal.

16   That is exactly what epidemiologists do.

17         And I want to make a little bit of a digression.  I

18   hope I won't take up too much of your time with this.  But I

19   think it's a helpful illustration.

20         There was a book out a couple of years ago.  I don't

21   know if, you know, if Your Honor would have noticed it,

22   about a guy named John Snow.  And John Snow was a doctor in

23   England and he's considered one of the founders of

24   epidemiology.

25         And that's because there was a cholera pandemic in the

1 middle of the 19th Century.  It was worldwide.  It was a

2 pandemic kind of like what we're dealing with now except it

3 was cholera which I think is way worse.

4      And there was a particular outbreak in London that

5 caught his attention.  And nobody knew then what caused

6 cholera, but Dr. Show figured out that the cholera was

7 transmitted through contaminated water and, in particular,

8 through a particular pump in London where a lot of people

9 got their water.

10      Now, he wasn't an expert in pumps but what he was an

11 expert in, besides medicine generally, was analyzing data in

12 a systematic way to figure out what the cause of an outbreak

13 was.

14      So he looked at who got the disease and who didn't,

15 where it happened and where it didn't.  And he made the

16 connections to figure out, you know, based on those, those

17 factors was this causal or not.

18      And since then, epidemiology has developed.  It's

19 advanced.  They've come up with more advanced systems to

20 assess whether an association is causal or not.

21      This is Dr. Keyes' field.  She's an epidemiologist.

22 And not only is she an epidemiologist, her field of

23 expertise is substance abuse.  She studies the incidence,

24 distribution, and causes of substance abuse.  That's what

25 she does when she's not working for us.  That's her day job.

1   It has nothing to do with us having hired her.

2        Now, if you want to figure out how to prevent people

3   from getting OUD, you need to understand the causes.  If you

4   don't know why we're having this outbreak, you can't figure

5   out how to stop it.  You can't prevent something if you

6   don't know what's causing it.

7        And as part of her work as an epidemiologist, again not

8   part of this case, just part of her regular job, she is part

9   of a large NIH grant funded initiative aiming to reduce

10  opioid overdose; specifically, you know, to develop

11  strategies to figure out what's going to make it go away.

12       So here's Dr. Keyes out in the field assessing what's

13  caused the opioid epidemic and how to prevent folks from

14  getting it and, therefore, from overdosing.

15       Now, according to the defendants, Dr. Keyes may be

16  qualified to tell us about all the other potential causes of

17  substance abuse; familial history or mental illness or

18  anything else that might be correlated.

19       But somehow, according to the defendants, when it comes

20  to the -- this particular cause, the potential causal effect

21  of marketing, suddenly only a marketing professional can do

22  that.  I mean, it would -- you know, it would be as if to

23  say only a genetic counselor could assess the role of

24  familial history in, in causing OUD.

25       This is what Dr. Keyes does for a living.  So it's --

1    to say that she suddenly can address all the other potential

2    causes using the statistical tools and sophistication, but

3    suddenly can't talk about this one because it's marketing I

4    don't think makes sense.

5        And this is particularly true because -- you know, this

6    bleeds into the issue of methodology.  The methodology here

7    involves looking at studies.  And one of the things that an

8    epidemiologist is an expert in is reading studies of those

9    kinds of studies, population studies, studies between cause

10   and effect.  This is what she does.

11       So when Dr. Keyes tells you, "Well, what I did is to

12   read some studies," yes, that's what she does.  You know,

13   the epidemiologist looks at the studies that found

14   correlation and figures out if it's causal.

15       So there is literature on the role of marketing and

16   prescribing.  And, so, there's nothing surprising about an

17   epidemiologist looking at that.

18       The situation for the medical doctors, Dr. Lembke and

19   Dr. Kolodny, is a little different, although it's similar.

20   And, again, it comes down to the specifics of what the

21   marketing case here is about.

22       So what we've said and we're going to prove are that

23   before the defendants and the manufacturers got busy with

24   all that marketing, doctors prescribed opioids in a certain

25   way, in a very limited way according to certain guidelines

1    and precepts that kept the prescribing low.

2         Second, that after all the marketing, doctors

3    prescribed differently.  Suddenly they were prescribing very

4    loosely as if every ailment needed an opioid.

5         And, third, and this is very important, that much of

6    the marketing was false and fraudulent.

7         So, you know, if we look at what expertise a medical

8    doctor has with respect to those elements, and then we'll

9    talk about why that helps us with causation, a medical

10   doctor has the expertise to tell us how doctors used to

11   prescribe opioids and to understand what it would take for

12   doctors to change their minds about that; if, if you are an

13   addiction or pain or an addiction and pain doctor, to

14   understand why did we used to do it that way and why are we

15   now doing it differently.

16        In addition to that, doctors like Dr. Lembke and Dr.

17   Kolodny have the expertise to know what about the marketing

18   was false.  And this is absolutely critical and here's why.

19        If everything the defendants and the manufacturers had

20   said about opioids was true, there were a lot of ways

21   doctors could have come to believe that mass prescribing was

22   a good idea.  They could have figured it out themselves.

23   They could have observed their own patients and come to that

24   conclusion.  They could have read studies that the

25   defendants and manufacturers had nothing to do with because

1    there are a lot of independent sources for things that are

2    true.

3        The problem is that when something is not true, it

4    becomes easy to trace.  When somebody says something false,

5    a particular thing and someone else down the road is

6    repeating that exact thing, it's easier to see the influence

7    of the liar.  And why is it easier to see?  Because there

8    are no independent sources for things that are false.  There

9    are many independent sources for things that are true.

10       So if the defendants and the manufacturers began

11   promoting a particular set of misrepresentations and after a

12   while lots of doctors started behaving as if those

13   misrepresentations were true, well, where did they get that?

14   What were the other sources available to doctors to make

15   them believe those things?  And how did they come to believe

16   them?  What was the role of continuing medical education in

17   getting doctors to believe those things?

18       An addiction specialist like Dr. Lembke and Dr.

19   Kolodny, these doctors have the expertise to know what the

20   doctors were doing before, what it would take for them to

21   change their mind.  They have the historical knowledge of

22   what it did take, what actually made their colleagues change

23   their mind.  And they have the expertise to trace which of

24   the messages were false and to see how those particular

25   false messages came to pervade the medical community.

1        They also have the expertise to read the literature

2   about the effect of marketing on prescribing.  And that

3   literature, Your Honor, includes an understanding that

4   doctors themselves are not the best reporters of the sources

5   of their own, you know, of their own ideas about

6   prescribing.

7        And I want to say a couple of things specifically about

8   Dr. Kolodny who was not the subject of Judge Polster's

9   order.  He wasn't an expert in the CT1.

10       Dr. Kolodny has spent approximately 17 years

11  researching specifically the industry-funded campaign to

12  increase prescribing of opioids and the relationship between

13  the opioid industry and pain organizations.  He co-founded

14  Physicians For Responsible Prescribing long before his

15  involvement in this case which focused specifically on the

16  role of marketing and the need for counter education to

17  combat misinformation.

18       So he has spent 17 years or so devoting his life and

19  his professional career to understanding how we got here,

20  how did we get to this opioid crisis, and what role did the

21  marketing of opioids play in that.

22       Not only that, he's been consulted by the U.S. Senate,

23  Finance Committee specifically, on the question of the role

24  of manufacturers and marketing in causing the opioid crisis.

25       He's been asked to provide his expertise about the

1    causes of the opioid epidemic to numerous groups, including

2    The World Health Organization, The National Governors

3    Association, The National Association of State Attorneys

4    General, The National Judicial Opioid Task Force, The

5    National Academy of Sciences, and bipartisan members of

6    Congress.  He's been invited to testify before Congress

7    before a host of committees.  And the expertise for which

8    he's been consulted has specifically included the causes of

9    the opioid epidemic.

10       So to say that he's not qualified to talk about this

11   one particular cause, the role of marketing in causing it, I

12   think is really to turn on its head the notion of (video

13   inaudible) for everyone else on the role of marketing in the

14   opioid epidemic to say that he's not qualified to be an

15   expert in a bench trial before Your Honor when The World

16   Health Organization wants to hear from him on how marketing

17   related to, to causes I think is really to stretch *Daubert*

18   beyond what, what it can do.

19       I've taken up a lot of time with that and I want to try

20   to be brief on my last couple of points.

21       The defendants say that the experts used no methodology

22   at all.  And I think that's, that's simply not correct.  As

23   we've talked about, Dr. Lembke did her own independent

24   research.  She read a lot of -- she read literature.

25       Dr. Kolodny has done a lot of his own independent

1   research on literature in delving into where did this

2   problem come from.

3        Dr. Keyes used her epidemiological methods to look at

4   the limited amount of studies that there are on this.

5        So I think we do have a methodology.  It's just not the

6   methodology that the defendants want, although, as I say,

7   with Dr. Lembke, she actually did talk to doctors.  But the

8   notion that the best way to do this is to ask doctors what

9   affected them I think is fundamentally wrong.

10       The case is about public health.  It's about large

11  overall risks.  Not every doctor had to be convinced in

12  order for this to become a problem.  It was enough to get a

13  core of people.

14       And, so, I think -- and if we did have particular

15  interviews, then the defendants could just say, "Well,

16  that's anecdotal.  This doctor says, 'Yeah, I listened.

17  This doctor says, 'I didn't.'"

18       Instead what we've looked at are the broad trends.

19  What were the marketing materials?  Where did they do?  What

20  happened to the sales?  What happened to continuing medical

21  education?  What happened to the guidelines?  And was any of

22  this true?

23       I want to say two things about the *Actos* decision in

24  particular which was mentioned.  I think *Actos* is quite

25  distinguishable.  I think any case where we're dealing with

1    individual personal injury cases requires a plaintiff to

2    show that his or her particular doctor relied.  But because

3    we are talking about public health, we just need to show

4    that the trend of the increase in sales that devastated the

5    communities, that was caused by the marketing.  And, so, it

6    doesn't matter to identify particular people in order to do

7    that.

8         I think for the same reason the opinions don't need to

9    be specific to West Virginia.  The marketing campaign of the

10   defendants and the manufacturers was nationwide in scope.

11   It aimed to change the understanding of the risks and

12   benefits of opioids throughout the United States.  And that

13   understanding was changed, and the number of prescriptions

14   increased substantially in West Virginia as in other parts

15   of the country.

16        And these experts have studied that nationwide change

17   and they've concluded that the marketing behavior caused the

18   increase.  And surely the fact finder could conclude that

19   when you have the same behavior and the same outcome all

20   over the country, and the experts have seen a causal

21   connection overall, that it's causal here too.

22        The risks and benefits of opioids are the same here as

23   everywhere, and the marketing campaign was no less

24   fraudulent here than anywhere else.

25        So if somebody wants to come up with a theory that

1   while doctors all over the country came to believe things

2   that weren't true because of the defendants and the

3   manufacturers, but somehow in West Virginia doctors came to

4   believe the same untrue things by a completely different

5   route, I don't think it's plaintiffs' burden to eliminate

6   that remaining speculative possibility.  It may be the

7   subject of cross-examination.  It may be something for Your

8   Honor to take into account as to weight.  But I don't think

9   it's our burden to chase down every last, you know,

10  possibility that somehow West Virginia was on a different

11  planet than everybody else.

12      I think the last thing I wanted to say -- I think I've

13  already talked about Dr. Mohr and why the rest of her

14  opinion is helpful to the fact finder.  We understand that

15  Dr. Mohr's testimony will need to comply with the Court's

16  April 8th order which defendants mentioned.

17      But she has a lot of helpful information in

18  understanding what the defendants were doing, how it

19  dovetailed with the manufacturers, how manufacturers and

20  distributors worked together, how issue management plays a

21  role in marketing, how channel management plays a role in

22  marketing.  And I think that all of those things mean that

23  she has many helpful opinions to provide.

24      To the extent that she -- that plaintiffs try to go

25  beyond that and have her, use her to tell things that she's

1    not helpful for, I think the Court can curtail that at

2    trial.

3         The fact that she doesn't have an opinion that any of

4    the marketing was false is not a weakness.  We're proving

5    that through other experts.  Again, it points to the limits

6    of what a marketing expert is good at and what a marketing

7    expert is not.  We have other evidence for that.

8         I think, Your Honor, that unless you have further

9    questions, I think that takes me to the end.

10        THE COURT:  I don't.  We've got a little bit of

11   time left and I want to give Ms. Watterson the chance to

12   respond.

13        Can you do it in ten minutes?

14        MS. WATTERSON:  I can, Your Honor.  Can you hear

15   me?  Did I turn on my mic?  I am going to bring to bear the

16   skills that I use in the appellate court when I only have

17   five minutes for rebuttal.  So I have a few points.  It's

18   not going to be perfect prose, but I'm going to check the

19   box, boxes of what's on my list.

20        And I'm going to try to bring us back to *Daubert*, not

21   an overall argument on the marketing case and the strength

22   and weaknesses of the evidence.  I just want to look at

23   these experts.

24        Your Honor, I'm not going to say anymore during this

25   argument about the lack of qualifications when it comes

1    to -- and I don't mean to be disrespectful just using their

2    last names -- Keyes, Lembke and Kolodny when it comes

3    specifically to the issue of whether they can say marketing

4    drove prescribing of opioids in a way that led to

5    oversupply.

6         I know they have opinions in other areas.  That's what

7    Judge Polster correctly said that they cannot testify on

8    because they do not have the expertise.  So that's in our

9    brief.  And again, Your Honor, we don't just rely on Judge

10   Polster.  We describe why he was correct on that.

11        On methodology, these experts, the three that purport

12   to offer an opinion in this case -- again, this is

13   plaintiffs' marketing liability here, distributors

14   marketing, distributors marketing, whether on their own or

15   in collaboration -- but, by the way, there is no evidence of

16   collaboration with respect to the assertions in the

17   complaint, the seven supposed falsehoods that drove

18   overprescribing.

19        But setting that aside, there was no method brought to

20   bear by Keyes, Kolodny, or Lembke that answers that question

21   based upon the review of what needs to be reviewed, not just

22   academic literature that says, well, it's possible that this

23   could impact this.

24        They admitted that they did not look -- and we have

25   citations in our brief to support, and I'm sorry I don't

1    have the page for you, Your Honor.  They did not -- they do

2    not know whether any distributors disseminated any marketing

3    material.  They don't know whether any doctors at all, much

4    less those in Cabell County, saw any such marketing

5    materials or whether any doctors relied on those materials

6    in writing an opioid prescription.

7         So in order to proffer an opinion that distributors

8    engaged in marketing that drove overprescribing, one would

9    think you would need to know those things.  Did we, in fact,

10   disseminate material?  Did anybody see such material, and

11   whether doctors relied on those materials?  That's the type

12   of study and analysis that needs to be done, not the

13   literature review that was discussed.  And by these experts'

14   own admissions, they didn't do that.

15        And I think Ms. Bierstein basically admitted because

16   she didn't defend the notion that they looked into Cabell

17   and Huntington.  They didn't look in Cabell or Huntington.

18   So that -- and, again, we laid this forth in our brief.

19   They didn't engage in the right methodology.

20        Let me say something again about Mohr.  You know, there

21   was a suggestion that our argument on Mohr was a

22   late-breaking argument with respect to Mohr.  It was really

23   how all of the pieces fit together, you know, given what she

24   had disclaimed in terms of, "I don't have anything to say

25   about falsehoods.  I don't have anything to say about this

1    causation question."  My question was limited to whether

2    distributors engaged in marketing.

3        And I think that this Court's April 8th opinion, you

4    know, speaks to that notion of, you know, Mohr getting up on

5    the stand and just going through the litany of inventory of

6    activities that she says are marketing.  That's not helpful

7    to the Court.

8        They've got to put into putting evidence saying what we

9    did, and then the fact finder, Your Honor, needs to

10   determine whether that, that moved the needle.  And we don't

11   need her to give a narrative on that evidence.

12       So, you know, just about everything that I said in this

13   rebuttal, Your Honor, is in the brief.  It is supported by

14   citations to the record, citations to the record of these

15   experts who were very candid in their deposition in terms of

16   telling us what they did and didn't do, what they reviewed,

17   and what they didn't review.

18       You know, Dr. Keyes, for instance -- I know I keep

19   focusing on this because there is this assumption, not yet

20   proven, that there was this collaboration with

21   manufacturers.  There's no evidence of that.

22       And Keyes herself said she didn't -- she's not really

23   talking about distributors.  She says the materials that I

24   looked at, and these are my words, not hers, that she thinks

25   moved the needle were manufacturer materials.  And, you

1    know, that's in her deposition.  We've cited to those pages

2    in our brief.

3         So, again, taking it back to *Daubert*, I'm not going to

4    respond on all of the arguments with respect to the

5    marketing theory, but we have three experts who may be

6    highly qualified to testify in other areas and may very well

7    be on the stand in this case.  They simply are not qualified

8    to testify with respect to the marketing theory.

9         Jakki Mohr has nothing to say on causation or falsity.

10   And all she's really going to provide to the Court is a

11   laundry list and inventory.

12        And I'm arguing on qualifications, not asking you to

13   rule the same way Judge Polster ruled just because he ruled

14   that way but, instead, because that is the correct outcome

15   here.

16        One last comment on that.  There was an assertion --

17   and, again, I'm doing a checklist here, not in a beautiful

18   narrative.  There was a suggestion that something had

19   changed between the time that Judge Polster issued his

20   opinion and today, a suggestion that some of the arguments

21   and reasons why plaintiffs believe Lembke and Keyes are

22   qualified were either not before Judge Polster or not

23   understood by Judge Polster.

24        We explained in our brief, again with support, why that

25   is incorrect.  Judge Polster did have in front of him

1   everything that Your Honor has in front of you today.

2       And thank you for taking so much time on this marketing

3   issue, or giving the parties so much time.  Appreciate it.

4           THE COURT:  Well, I realize that it's important

5   for counsel to know what the result here is and I will --

6   all I can promise you is that I'll rule on these things as

7   promptly as I can.  And I thank you all very much.  These

8   are very helpful arguments.

9       (Proceedings concluded at 11:58 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2    States District Court for the Southern District of West

3    Virginia, do hereby certify that the foregoing is a true and

4    correct transcript, to the best of my ability, from the

5    record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    April 15, 2021

9              Reporter                            Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25