# Opioid Litigation and The Law of Public Nuisance: A Preliminary Assessment

70 DEPAUL L. REV. ___ (forthcoming 2021) (26th annual Clifford Symposium)

John C. P. Goldberg[†]
Benjamin C. Zipursky[††]

In recent years, several states and cities have filed civil actions against manufacturers and distributors of prescription opioid medications. These suits seek, among other things, reimbursement for the cost of treating individuals who suffer from addiction, overdoses, and related illnesses. In many respects, these lawsuits have followed the pattern set by suits against tobacco companies, as well as gun and paint manufacturers. This Article focuses on one of the most striking similarities: the plaintiffs' aggressive invocation of the law of public nuisance as a basis for liability.

The question we explore is whether the plaintiff-entities can rely on public nuisance as a ground for prevailing and recovering damages. As is typically the case when dealing with state law, it is difficult to provide a generic answer because of variations among jurisdictions. Moreover, the law of public nuisance, despite its pedigree, raises many difficult questions that have just begun in recent years to receive the attention they warrant. This is why we are careful to label our analysis "preliminary." Nonetheless, our inclination is to conclude that these suits should fail because they do not fall within the concept of public nuisance as courts have deployed it, and because the admittedly grave problems they aim to address are of a very different kind than those which the law of public nuisance is well suited to address.

In arguing for these conclusions, we do not deny—as some scholars have—that public nuisance is a tort. Rather, we maintain, primarily, that the entities have not alleged the kind of interference with a right common to the public that is required for the commission of this tort. Instead, in substance, their claims more closely resemble a type of "derivative" tort claim that courts in a related context have properly rejected.

---

[†] Deputy Dean and Carter Professor of General Jurisprudence, Harvard Law School. Professor Goldberg has received compensation for advising attorneys representing the City of Baltimore in a public nuisance suit brought against opioid manufacturers and distributors.

[††] James H. Quinn '49, Chair in Legal Ethics and Professor of Law, Fordham University School of Law. Thanks for very helpful comments to the participants in the Clifford Symposium and the Notre Dame Law School Private Law Workshop.

Electronic copy available at: https://ssrn.com/abstract=3804948

Of course, even if we are correct to conclude that the plaintiffs' public nuisance claims fail, the opioid defendants might well face liability on other claims, such as those alleging civil RICO violations or consumer fraud.  Moreover, none of our comments relate to the much larger question of whether individuals who have suffered physical injury as a result of becoming addicted to opiate-based medications have tort claims against the manufacturers, prescribers, or retailers of those drugs. Criminal actions against opioid manufacturers, distributors, and sellers are also outside of the ambit of this article.

While our analysis of public nuisance tort liability might strike some as "formalistic" in a pejorative sense, we maintain that in-depth doctrinal analysis should not be mistaken for out-of-touch conceptualism. Part of what makes the common law valuable and adaptive is that it has *some* content and structure. If it did not, it would not qualify as law at all. Our contention is that, notwithstanding the breadth of the public nuisance tort, it is not capacious enough to absorb claims seeking compensation for the concededly urgent harms associated with the current opioid crisis. To burst the seams of the legal framework while pretending one has remained within it is to lose the institutional stability that renders tort law a form of law and that helps to sustain the authority of judge-fashioned bodies of law. Perhaps some courts will decide this is worth doing. Our point is that, in so far as they do, they probably are exceeding the bounds of ordinary common law reasoning, even on a capacious understanding of it.

## I.     What is a Public Nuisance?

### A.  Nuisances as Interferences with Use and Enjoyment

The law of public nuisance is elusive. At its core is conduct that unreasonably interferes with a right common to the public. Blackstone identified six categories of conduct falling within the definition of this wrong, either as a matter of common law or specific statutory prohibition:

(1) obstructing a public way,

(2) engaging in conduct that constitutes the tort of private nuisance as to multiple victims,

(3) operating a disorderly establishment, such as a brothel or gambling house,

(4) running a lottery,

(5) storing large quantities of explosives, as well as making, selling, or setting-off fireworks, and

2

Electronic copy available at: https://ssrn.com/abstract=3804948

(6) eavesdropping and publicly quarrelsome behavior.[1]

Scholars have long been fond of emphasizing the degree to which the nominally singular offense of public nuisance consists of a grab-bag. How could it be otherwise, they have asked, for a crime defined in English law (again, per Blackstone) as "the doing of a thing to the annoyance of all the king's subjects, or the neglecting to do a thing which the common good requires"?[2] State public nuisance statutes do no better: indeed, many involve variations on Blackstone's list and his general definition of the wrong (albeit without reference in the latter to a monarch).[3] Yet, while it can hardly be denied that the category of public nuisance has extended to activities that would be hard to fit within a non-vacuous definition, the core examples of the offense—including most or all of those listed by Blackstone—form a relatively coherent assemblage.[4]

The thread that runs through public nuisance is best grasped by viewing it through the lens of the more familiar tort action for private nuisance.[5] A private nuisance is an activity or condition that substantially and unreasonably interferes with another's use and enjoyment of her land.[6] Whether an interference is "substantial and unreasonable" is judged relative to context or locality.

---

[1] WILLIAM BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND *166–69 (1769).

[2] *Id.* at *166.

[3] *See*, e.g., CAL. CIV. CODE §§ 3479–3480 (West 1872) (defining as a nuisance "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway …," and defining a public nuisance as a nuisance that "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."). Other states have statutes identifying particular activities as public nuisances, including offenses related to the use, manufacturer, or distribution of a controlled substance, as well as the use of buildings for prostitution and illicit gambling. CONN. GEN. STAT. ANN. § 19a-343 (West 2017).

[4] Among the activities on Blackstone's list, lotteries would seem to be the outlier. As he notes, these were declared public nuisances by specific legislation, but then legalized and regulated by subsequent legislation. BLACKSTONE, *supra* note 3, at 168. In an important and illuminating recent article, Jason Neyers argues (as do we here) that public nuisance has a coherent conceptual core. *See generally* J.W. Neyers, *Reconceptualising the Tort of Public Nuisance*, 76 CAMBRIDGE L.J. 87 (2017). While his account harnesses Kantian political theory to provide a powerful explanation of public nuisance law as applied specifically to the blockage of public ways and denial of access to public waters, ours proceeds in a more doctrinally driven manner, which enables it to explain a wider set of public nuisance cases.

[5] F.H. Newark, *The Boundaries of Nuisance*, 65 L.Q. REV. 480, 482 (1949) (suggesting that the resemblance between the blocking of a private way and the blocking of a public way led common lawyers to use the term "nuisance" to cover the latter cases).

[6] *Id.* (noting that, at common law, the "essence of nuisance" was an interference with the plaintiff's enjoyment of rights over land).

3

Electronic copy available at: https://ssrn.com/abstract=3804948

The same noises, vibrations, or odors might constitute a private nuisance in a suburban residential community but not in a densely populated urban area. Moreover, an interference ordinarily will not be deemed substantial and unreasonable unless it involves a repeated, ongoing, or permanent burdening of the victim's interest in using and enjoying her land.  A noisy but one-off party that causes a neighbor to lose a night's sleep will not generate liability for private nuisance. A kennel full of constantly howling dogs might.

Public nuisances do not concern interference with *private* property rights. They nonetheless tend to involve activities or conditions that interfere in certain ways with rights of each member of the public to use and enjoy certain spaces and resources. The spaces and resources in question—roads, navigable waters, ambient air—are public. Also like the law of private nuisance, public nuisance law is heavily contextual in application, and typically concerns repeated, ongoing, or permanent interferences with use and enjoyment. Storing large amounts of explosives in a crowded urban area may amount to a public nuisance, even if doing so in a sparsely populated rural area might not. To build a structure that encroaches on a public way, thereby making the way impassible, is to commit a public nuisance. To cause an accident that blocks a highway for two hours, or that precludes use of one of several comparably convenient routes to the same destinations, is not.

On the question of whether public nuisance law has any conceptual integrity, some scholars seem to suppose that "moral" nuisances are the straw that breaks the camel's back. Perhaps if the tort applied only to blocked public ways and polluted waterways, they reason, it would make some sense as a wrong focused on interference with public rights of physical access to certain spaces. But what could possibly connect blocked highways to brothels and gambling houses? A modern Oregon case—*Mark v. State Department of Fish and Wildlife*—helps answer this question.[7]

The plaintiffs owned a residence located within a designated state wildlife area that was under the management of the defendant agency.[8] According to their complaint, the agency had adopted a management plan that affirmatively designated certain beaches within the area as "clothing optional."[9] The plaintiffs further alleged that, as a result, and to the knowledge of the

---

[7]  *See* Mark v. State Dep't of Fish & Wildlife, 974 P.2d 716, 718 (Or. App. 1999), *rev. denied*, 329 Or. 479 (1999). On remand, the trial court found for the plaintiffs on their private nuisance claim only and ordered injunctive relief. The court of appeals affirmed this decision. Mark v. State Dep't of Fish & Wildlife, 84 P.3d 155, 157 (Or. App. 2004).

[8] *Mark*, 974 P.2d at 721.

[9] *Id.* at 721.

4

Electronic copy available at: https://ssrn.com/abstract=3804948

agency, they were, while on their own property, regularly confronted with naked beachgoers, as well as open displays of sexual activity. [10]

After the trial court dismissed the complaint, an Oregon appellate court partially reversed. It reasoned that the agency could be deemed responsible if the plaintiffs could show that it had invited and endorsed the nudity and sex (rather than merely having ignored or tolerated the behavior).[11] More saliently for present purposes, it held that the plaintiffs had stated a claim for private nuisance, given the allegations of "uncontrolled and intrusive nudity occurring on the area immediately around their property."[12] Finally, it held that "the routine use of defendants' land for public sexual activity," if proven, would constitute a public nuisance causing particular harm to the plaintiffs by virtue of their proximity to the activity.[13]

Professor John Copeland Nagel properly casts *Mark* as a cousin of the brothel cases.[14] Yet, though apt in certain respects, as Nagel himself appreciated, the label sometimes used for this category—"moral nuisance"—is misleading. What renders moral nuisances "nuisances" is not their immorality per se. The law of nuisance does not provide government officials or private citizens with broad authority to enforce prevailing conceptions of morality. After all, the vast bulk of immoral conduct—from infidelity to homicide—falls beyond the reach of nuisance law. Moreover, it is not a nuisance merely to engage in a type of conduct that could, if other conditions are present, give rise to a nuisance. A sex worker who pays discreet visits to clients risks prosecution for prostitution, not for public nuisance. The same result might obtain even if the activity is "scaled up." For example, an escort service that, with equal discretion, arranges for sex workers to meet with clients at area hotels may not be a public nuisance.

Instead, for "immoral" conduct to constitute a nuisance, it must have an *invasive or assaultive quality*, though of course the type of invasion or assault is not physical.[15] Nagel's evocative description of some of the allegations in *Mark* helps convey the idea:

---

[10] *Id.* at 718.

[11] *Id.*

[12] *Id.* at 720.

[13] *Id.*

[14] John Copeland Nagle, *Moral Nuisances*, 50 EMORY L.J. 265, 266, 322 (2001).

[15] Henry Smith, *Exclusion and Property Rules in the Law of Nuisance*, 90 VA. L. REV. 965, 998–99 (2004) (arguing that an extended conception of invasiveness is at the core of private nuisance and helps explain why, for example, courts rarely impose liability for "aesthetic" nuisances).

Electronic copy available at: https://ssrn.com/abstract=3804948

> [The wildlife area] … attracted thousands of nude sunbathers who enjoyed the beach immediately adjacent to the property owned by [the plaintiffs]. The couple was displeased. They were embarrassed to entertain friends or family in the presence of those using the adjacent nude beach. They were repulsed by the sight of public sexual activity. They were harassed by nudists who chided them for remaining clothed. They worried that the value of their property had declined.[16]

If the use of the beaches in *Mark* was a nuisance, it was not merely because of the putative immorality of public nudity or sex. It was because these ongoing activities, in the context in which they were taking place, were—in the exact language of the appellate court—"intrusive."[17] Likewise, when the law has deemed the maintenance of brothels and gambling houses to be public nuisances, it has done so on the ground that their operation burdens either private citizens in the use and enjoyment of their properties, or the right of the public to make use of public spaces without being confronted with (or 'molested' or 'assaulted' by) certain activities deemed beyond the pale.[18] Just as a person has a right to sit in her backyard without regularly being confronted by neighbors having sex in their adjacent yard, so too—the argument goes—each member of the public has a right to sit in his or her backyard without regularly being confronted by persons having sex in the adjacent public park, and a right to walk on public streets or in public parks without regularly being confronted by such conduct.

Appreciating the precise grounds on which an activity like the maintenance of a brothel counts as a public nuisance is important to understanding the scope of this offense when it comes to the distribution of drugs. Presumably one of the reasons that plaintiffs' lawyers and some courts have latched onto public nuisance as a basis for liability in the opioid litigation is that public nuisance statutes sometimes include as an item in their illustrative lists of the offense "the illegal sale of controlled substances."[19] Of course, the opioid-based pain medications at issue were approved by federal regulators. Thus, the attribution of illegality in this instance would have to be based on the notion that the manufacturers and distributers acted immorally by knowingly making misrepresentations as to the safety of these drugs in order to boost sales. In other words, the opioid

---

[16] Nagle, *supra* note 14, at 266.
[17] Mark v. State Dep't of Fish & Wildlife, 974 P.2d 716, 720 (Or. App. 1999).
[18] Nagle, *supra* note 14, at 278–79.
[19] *See, e.g.*, CAL. CIV. CODE §§ 3479–80 (West 1872).

Electronic copy available at: https://ssrn.com/abstract=3804948

defendants are being compared to operators of brothels and drug dens on the ground that are involved in immoral conduct with implications for public welfare.

To see why this reasoning is problematic, it is crucial to recall that when it appears in nuisance statutes, "illegal sales of controlled substances," is offered as a species of the genus "nuisance." And at its core, the idea of a legal nuisance is a person *unreasonably interfering with another's use and enjoyment of certain spaces or resources*. In private nuisance, an actor imposes unduly on a possessor's use and enjoyment of her property. In public nuisance, an actor imposes unduly on the public's use and enjoyment of public spaces and resources. The latter form of imposition can involve the creation of physical barriers to movement in, or use of, public spaces or resources. Or it might involve burdening members of the public as they go about public spaces by subjecting them to excessive noise, indecent behavior, unreasonable dangers to health, and certain kinds of blights. This is why—as is true of illegal activities that take place in brothels—the fact of the sales of controlled substances, whether legal or illegal, does not of itself generate a nuisance. Until an activity generates, in the right way, an excrescence on what might be termed *experienced public space*, there is no basis for a public nuisance claim.

A different way to make the same point is to identify the content of the "public right" protected and vindicated by the law of public nuisance. The right in question is not a right that others refrain from engaging in unlawful or immoral actions. Nor even is it a right that others refrain from generating negative social consequences by means of such actions. Suppose, for example, many members of a locality consume illegal substances in the privacy of their residences, and that their doing so leads to higher rates of absenteeism and a loss of profitability in an important local industry. This in turn causes the local government modestly to increase fares for bus routes while also cancelling popular youth sports leagues and cultural and arts programming. These developments would not provide the basis for a public nuisance claim against the manufacturer or distributor of the substances. Instead, for the sale of illegal drugs to count as a public nuisance it must take a form such that it interferes with the ability of members of the public to occupy, move in, and otherwise use public spaces and resources free from unreasonable safety or health risks, and free from being confronted with certain noxious conditions or behaviors.

Electronic copy available at: https://ssrn.com/abstract=3804948

To be clear, our present aim is *not* to defend all the standard historic applications of public nuisance law,[20] or even the particular result in *Mark*.[21] It is instead to locate the thread running through the various fact-patterns that have long been taken to exemplify the category. The historic inclusion of certain moral nuisance cases in the category might be objectionable on various grounds. That it renders the category incoherent or jumbled is not among them. A public nuisance involves conduct that is seriously disruptive or intrusive with respect to the right of members of a community to go about the world unhindered and unmolested by conditions that an ordinarily constituted person should not be expected to encounter and endure.[22]

Pragmatic lawyers, judges, and law professors understandably may have trouble seeing why government would have less power to impose liability for truly harmful activities that do not themselves constitute interferences with enjoyment of public space, and more power to shut down publicly experienced activity even if it does not create nearly as much harm to the community and its members. We have not suggested (and would not suggest) that this is the case. The question at hand is not how much power government at some level (federal, state, or local) has to control the sales and marketing of potentially dangerous pharmaceutical products. Rather, it is how much power can be wielded by a state or municipal entity by invoking the law of public nuisance, as opposed to other kinds of legislation or regulation. Thus, for example, a firm that engages in widespread fraudulent marketing will appropriately face civil or criminal liability under consumer protection statutes that prohibit such actions. We recognize that our insistence that litigants and governments proceed against wrongdoers on the proper legal basis will strike some readers as a

---

[20] Like any concepts, the relevant notions of invasion, intrusion, and imposition can be stretched past their breaking point. Such would be the case, for example, if a court were to treat the mere fact of ongoing immoral activity in a given location as "intrusive" just by virtue of residents being appalled by it. Insofar as the classification of lotteries as public nuisances rests on this sort of extension of notions of intrusiveness, the classification would seem to be erroneous.

[21] We argue in Part II that one of the main difficulties posed by governmental entities' public nuisance suits against opioid manufacturers and distributors is establishing that the latter engaged in the kind of intrusive or invasive conduct that is necessary for public nuisance liability. *See infra* Part II. Whether the agency in *Mark* engaged in such conduct is a close question. As noted in the text, the Oregon courts emphasized that the agency had promoted or supported the use of a portion of land under its control for public nudity and sex.

[22] The storage-of-explosive cases are perhaps best understood as responding to dangerous conditions that, in the manner akin to the Sword of Damocles, create an oppressive threat of injury to persons as they go about their daily lives. *See* Eagle-Picher Indus., Inc. v. Cox, 481 So.2d 517, 527 (Fla. App. 1985) (insofar as fear-of-disease claims are actionable in negligence they involve situations in which plaintiffs' exposure to a toxin leaves them facing a Sword-of-Damocles-like threat).

Electronic copy available at: https://ssrn.com/abstract=3804948

persnickety demand for the observance of formalities that will get in the way of lawyers and courts ameliorating grave social problems. We discuss below why we think this charge is off the mark.

### B.        Public Nuisance: Crime, Quasi-Tort, and Tort

Blackstone's treatment of public nuisance appears in Book Four, which addresses "public wrongs" (crimes) rather than "private wrongs." He deemed public nuisances to be "indictable only, and not actionable."[23] American jurisdictions later codified this crime in statutes that either identify specific activities to be public nuisances, or issue a general prohibition on such conduct.[24] Criminal proceedings typically results in judicial orders requiring offenders to remedy the interfering condition, in addition to fines.[25] For all these reasons and others, it is quite right to say that public nuisance is a crime.

Yet, this offense has long had strong regulatory and tort overtones. From the get-go, it was cast as a low-level, regulatory offense—an offense "against the public order and the oeconomical regimen of the state."[26] In part for this reason, it was originally dealt with by local English courts ("leets"): bodies that, in modern terms, were half-courts and half-administrative agencies charged with maintaining public health and convenience.[27] In substance, the crime of public nuisance is not typically defined to include a robust *mens rea* requirement.[28] Its definition is likewise vague enough to raise questions as to whether it satisfies modern due process and rule-of-law standards for crimes.[29] Today, relatively modest fines are the most common penalty for public nuisance crimes, though these can become significant under statutes that treat each day on which a nuisance remains unabated as a separate offense.[30]

---

[23] BLACKSTONE, *supra* note 1, at *167.

[24] William L. Prosser, *Private Action for Public Nuisance*, 52 VA. L. REV. 997, 999–1000 (1966).

[25] BLACKSTONE, *supra* note 1, at *167.

[26] *Id.*; J.R. Spencer, *Public Nuisance–A Critical Examination*, 48 CAMBRIDGE L.J. 55, 59 (1989) (noting that, in 16th century England, public nuisances were adjudicated as 'public welfare' offenses in local courts known as "leets," which tended to issue fines).

[27] Spencer, *supra* note 26, at 60.

[28] N.Y. PENAL LAW § 240.45 (McKinney 2020) (Practice Commentaries) (noting that a knowledge or recklessness element was added to the definition nuisance in 1965 to give the offense "a greater criminal dimension").

[29] Spencer, *supra* note 26, at 55 ("Everything in public nuisance law runs contrary to modern notions of certainty and precision in criminal law—and indeed, in civil law as well.").

[30] TEX. HEALTH & SAFETY CODE ANN. § 343.012 (West 1999). Repeat offenders may also sometimes face imprisonment. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3804948

Adding to the confusion surrounding the crime of public nuisance is the fact that, by around 1800, "the usual method of repressing [public nuisances] ceased to be a public prosecution in the criminal courts and became an injunction issued in the civil courts."[31] Although these suits were brought in the name of the Attorney General, by the late 1800s, at least in England, they were more often filed and pursued by private citizens, roughly on the model of *qui tam* actions.[32] Modern statutes in the United States likewise authorize abatement actions that stand apart from criminal prosecutions.[33]  And whether pursued by officials or individuals, actions to enjoin public nuisances appear to have long operated under civil burdens of proof—either a clear-and-convincing standard or the preponderance standard.[34]

Finally, public nuisance law contains a somewhat unusual crime-tort overlap.  As indicated by Blackstone's second iteration of the crime listed above, conduct can be deemed a public nuisance just by virtue of its constituting the tort of private nuisance as to numerous individuals.[35] In this respect, the crime of public nuisance has few, if any, counterparts. An individual whose negligent conduct ends up causing bodily harm to numerous victims is not by that fact alone guilty of a crime called "public negligence."

So, in addition to being a crime, is public nuisance a tort?  Our answer is, alas, somewhat complicated.  Clearly, actors responsible for public nuisances are subject to forms of civil liability.  However, we would suggest that they are subject to two distinct forms of civil liability, and that the primary form—liability to an abatement action by a governmental entity—is best described as

---

[31] Spencer, *supra* note 26, at 66.

[32] *Id*. at 69–70 (discussing individual "relator" actions seeking to enjoin public nuisances).

[33] *See, e.g.*, CONN. GEN. STAT. ANN. § 19a-343(b) (West 2017) (conferring on certain state officials the exclusive right to bring actions to abate certain specified public nuisances); WIS. STAT. ANN. § 823.01 (West 2019) ("Any person, county, city, village or town may maintain an action to recover damages or to abate a public nuisance from which injuries peculiar to the complainant are suffered, so far as necessary to protect the complainant's rights and to obtain an injunction to prevent the same."); TEX. HEALTH & SAFETY CODE ANN. § 343.012(a), (e) (West 1999) (authorizing county officials, agents, or employees to seek abatement after thirty days' notice to the defendant).

[34] N.A.A.C.P. v. AcuSport, Inc., 271 F.Supp.2d 435, 465 (E.D.N.Y. 2003) (reviewing conflicting New York case law and concluding that it supports the use of a clear-and-convincing evidence standard in actions to enjoin a public nuisance).

[35] *See, e.g.*, People v. Rubenfeld, 172 N.E. 485, 486 (N.Y. 1930) ("Public is the nuisance whereby 'a public right or privilege common to every person in the community is interrupted or interfered with,' as by the obstruction of a public way. Public also is the nuisance committed 'in such place and in such manner that the aggregation of private injuries becomes so great and extensive as to constitute a public annoyance and inconvenience, and a wrong against the community, which may be properly the subject of a public prosecution.'") (quote authorities omitted). Apparently modern English law is to the contrary. J.W. Neyers, *supra* note 4, at 103.

Electronic copy available at: https://ssrn.com/abstract=3804948

"tort-like" or "quasi-tort." Under special circumstances, this quasi-tort of public nuisance will support genuine tort claims on behalf of particular individuals. But the latter are, in an important sense, derivative.

A hallmark of torts such as battery, defamation, invasion of privacy, and negligence is that each is an injury-inclusive wrong: there are no victimless torts.[36]  Moreover, in tort law, "injury" refers to a setback to some aspect of individual well-being, such as bodily harm, interference with possessory rights, reputational damage, loss of privacy, and the like.[37]  In order for conduct to ripen into a tort, the potential for injury within it must be realized: careless driving does not amount to the tort of negligence until it proximately causes bodily harm, property damage, emotional distress, or some other setback to an individual recognized as an injury.  Relatedly, torts are wrongs that ordinarily generate for the injured victim a private right of action—that is, an entitlement to pursue a court action that allows the victim recourse against the wrongdoer.[38]  In sum, by virtue of having been victimized in a way that the law recognizes as a tort, a person gains the ability to press a claim in court that, if proven, entitles her to remedies such as damages payments and injunctions, which are understood to constitute redress for the wrong done.

It is these features of tort law that we have in mind when we describe public nuisance claims as quasi-tort actions.  Like torts such as battery and negligence, public nuisances are *injury-inclusive* wrongs. It is only if the requisite rights-invasion occurs that the wrong is committed. Moreover, once committed, this wrong, like traditional torts, generates in the victim *a right of action*: a legal power to seek and obtain a court-ordered remedy for the wrong (the above-referenced abatement actions).  And yet public nuisance is not a full-blown tort because the injury that must occur to complete the legal wrong is an interference with a shared or common right, such as the right to use certain public spaces or resources unbothered by certain kinds of noxious conditions. In other words, the immediate "victim" of a public nuisance is the public as a whole. This is why a governmental entity appropriately sues in response. It does so in its capacity as an entity responsible for securing a remedy for interferences with public right.

---

[36] *See generally* JOHN C. P. GOLDBERG & BENJAMIN C. ZIPURSKY, RECOGNIZING WRONGS (2020).

[37] A version of this point is true, as well, for torts committed against artificial persons, such as business entities. A business that sues for tortious interference with contract is claiming to have been deprived of the performance to which *it* was legally entitled.

[38] GOLDBERG & ZIPURSKY, *supra* note 36, at 25–30.

Electronic copy available at: https://ssrn.com/abstract=3804948

So, public nuisance shares with torts the quality of being a (non-contractual) injury-inclusive wrong that gives rise to a power to obtain through a civil proceeding a court-ordered remedy.  Yet the injury at issue is different from the sort of setback that counts as an injury in tort because it does not involve a setback to an aspect of individual well-being.  Instead, it is a setback to a right common to each member of the public, such as the right of each to use a public way.  The legal wrong of public nuisance is committed just as soon as a road is blocked or navigable waters are polluted—even if, at that moment, no member of the public has suffered any actual interference with her ability to use the road or the body of water.  In the absence of an additional harm suffered by particular members of the public, a public nuisance does not generate a right of action for any individual citizen (though individuals can sometimes sue as relators, in the name of the public interest).  It does, however, generate a right of action for the appropriate governmental entity, which—either of its own accord or through an action by a relator—can commence a civil action that seeks a court order requiring the offender to abate the nuisance.

The primarily quasi-tortious nature of public nuisance has been obscured by the fact that, in many instances, there are particular individuals who do suffer harm as a result of the nuisance—harm that sets them apart from other members of the general public.  In this subset of public nuisance cases, the primary civil wrong—the quasi-tort—gives rise to a subsidiary action that is a full-blown tort claim.[39]  In contrast to proceedings brought by governmental entities seeking abatement in vindication of the public's right to use certain kinds of public spaces and resources, these actions, like suits for torts such as negligence, typically seek compensatory damages.  For example, if while acting in the course of their employment, employees of an energy company cause an oil spill that shuts down a bay, the relevant governmental entity can sue the company in *quasi-tort* to abate the public nuisance, while commercial fishermen who are prevented by the spill from harvesting the bay's fisheries have a *tort* claim against the company for compensatory damages.[40]  Likewise, a defendant responsible for an obstacle to transit on a public way is subject to liability to the person injured in a car crash caused by that obstacle.[41]

---

[39] RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 (AM. L. INST. 2020) (specifying the terms under which an actor incurs public nuisance liability to others who suffer  economic losses as a result of the nuisance).

[40]  *Id*. cmt. *d*.

[41] Brown v. Eastern and Midlands Rwy., 22 Q.B.D. 391 (1889) (holding that, if a mound of earth placed adjacent to a public way by defendant's employees was likely to scare horses as they passed by, the mound would constitute a public nuisance and that, if it were shown that plaintiff's wife was thrown from her cart

Electronic copy available at: https://ssrn.com/abstract=3804948

The line between quasi-tort actions for abatement and full-blown tort actions for compensation has been blurred because there are times at which a government entity can sue either in quasi-tort or in tort, or both. Suppose, for example, a company regularly dumps malodorous solvents in a public park, rendering the park unsafe and unsuitable for use by members of the public while also damaging government-owned buildings located in the park. In its capacity as protector and vindicator of public rights, the relevant government entity can sue the company for the quasi-tort of public nuisance and can seek abatement and reimbursement for expenses incurred in abating the nuisance. In addition, in its capacity as property owner, the relevant government entity can bring a tort claim for the damage to its property on the ground that it has suffered a distinct harm from that of other members of the public, just as a private individual could if her home were damaged by the company's actions. The fact that government can wear two different hats when suing for public nuisance should not cause us to lose sight of the differences between public nuisance as a quasi-tort and as a tort.[42]

In cases involving distinctive harms to individuals (or to government entities in their capacity as property owners), the law of public nuisance gives rise to genuine tort liability. To say the same thing, the quasi-tort of public nuisance, under certain circumstances, generates a private right of action for persons or entities who suffer a certain kind of setback as a result of its commission. Much as the United States Supreme Court long ago ruled that the Safety Appliance Acts—federal statutes setting regulatory standards for safe railroad cars—gave rise to implied rights of action for railroad workers injured by cars not in compliance with the Acts' requirements,[43] and like state statutory standards of care—such as statutes requiring the use by vehicles of headlights after dusk—that support negligence per se claims by persons injured by statutory violations,[44] the crime and quasi-tort of public nuisance generates tort actions for persons and entities who suffer a certain kind of harm.

---

and injured because her horse was scared by the mound, she would be entitled to damages on a claim for public nuisance). Thanks to Barbara Lauriate for pointing us to *Brown*.

[42] *See* Chicago v. Beretta U.S.A. Corp., 831 N.E. 1099, 1143 (Ill. 2004) (contrasting an abatement action by a city on behalf of the public (for which compensatory damages are not available) with a public nuisance action by a city alleging physical harm to its property or other direct injury (for which compensatory damages are available)).

[43] Texas & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 42 (1916).

[44] Martin v. Herzog, 126 N.E. 814, 815 (N.Y. 1920). Negligence per se is usually understood as a matter of courts incorporating certain statutory safety standards into the common law of negligence instead of their inferring that a statute confers private rights of action on persons injured as a result of statutory violations.

Electronic copy available at: https://ssrn.com/abstract=3804948

Another way to clarify our account of the civil side of public nuisance law is by contrasting it to that of Professor Thomas Merrill.  In an important article, he argues that it is a mistake to think of public nuisance as a tort at all.[45]  A public nuisance, he says, is always *only* a criminal offense, actionable, like other crimes, by means of an official proceeding that seeks punishment.[46] Those instances in which courts permit the recovery of damages by private plaintiffs based on an allegation of particular harm—as in the case of the fishermen posited just above—have been miscast as imposing tort liability.  In such cases, he argues, the existence of the public offense is a mere coincidence: the fact that the defendant's conduct meets the definition of the crime of public nuisance does not explain why the plaintiff has a claim. Instead, the plaintiff enjoys a right of action because it just so happens that the defendant, in committing the offense of public nuisance, also committed an independently defined tort, such as negligence.[47] For example, if an actor negligently causes a building to collapse and block a public road, and a driver is then forced to veer off the road and suffers physical injury, the driver stands to recover in tort from the actor.  But the recovery, in Merrill's view, is not for the tort of public nuisance, it is for the tort of negligence. On the issue of liability to the driver, the fact that the blockage is a public nuisance is neither here nor there.

While Merrill is correct to describe public nuisance as a crime, the particular implications he draws from that description are overstated.  As we have noted, the public nuisance offense has always had regulatory and civil dimensions in a way that other crimes have not. This is why we have labeled its primary civil form as "quasi-tort."  But even if we treat it simply as a crime, that

---

But the line between these two characterizations is blurry at best. It is thus no accident that *Rigsby* has been characterized both as a negligence per se case and implied-right-of-action case. *Compare* Franklin v. Gwinnett Cnty. Pub. Schs., 503 U.S. 60, 67 (1992) (treating *Rigsby* as an implied-right-of-action case) *with* Cannon v. Univ. of Chicago, 441 U.S. 677, 732 (Powell, J., dissenting) (characterizing the claim in *Rigsby* as "a common law negligence claim"); and N.Y. Cent. R.R. Co. v. White, 243 U.S. 188, 198 (1917) (suggesting that the Safety Appliance Acts altered the standard of care for negligence cases governed by them). The proximity of the two characterizations is demonstrated by recalling the conditions that must be met before a statutory standard will serve as the standard of care in a negligence per se case: the plaintiff must be deemed to be a beneficiary of the protections afforded by the statute, and the scenario in which the plaintiff was injured must be the type of scenario the statute was meant to prevent. RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL AND EMOTIONAL HARM § 14 (AM. L. INST. 2020). These conditions closely resemble the circumstances in which a statute is ripe for being construed as conferring private rights of action.

[45] Thomas W. Merrill, *Is Public Nuisance a Tort?*, 4 J. TORT L., No. 2, 2011, at 5.

[46] *Id.*

[47] *Id.* at 14.

Electronic copy available at: https://ssrn.com/abstract=3804948

fact is not of itself sufficient to render the law of public nuisance irrelevant to the question of whether a state entity or individual enjoys a right of action. As an injury-inclusive, public welfare offense, the wrong of public nuisance supports private rights of action for persons who suffer certain kinds of injuries as a result of its commission. In making his argument for the strict separation of crime and tort, Merrill seems to rely implicitly on a presumption against the recognition of implied rights of action for violation of a public law or statutory provision. While this of course has long been the position adopted by the Supreme Court in its interpretation of federal statutes,[48] no comparable presumption applies to state statutes. We see no reason why public nuisances—in their criminal form or quasi-tort forms—should not similarly give rise to claims for redress when they cause the right kinds of harms to certain individuals.

Relatedly, we are not persuaded by Merrill's effort to explain away these recoveries as grounded in other independently recognized torts. While it is true that in some instances—such as the car crash described above—a defendant's conduct will meet both the definition of public nuisance and negligence (or some other tort), there are also cases in which this will not be true. Indeed, given the well-established rule of negligence law holding that actors generally are under no duty to take care against causing "pure" economic loss, even to those who might foreseeably suffer such loss, the recovery by the fishermen in the pollution example provided above is probably explicable only by virtue of the private actionability of public nuisances that cause particular harm to certain individuals.[49] In these cases, there is no common-law tort that explains the plaintiff's

---

[48] *See, e.g.*, Touche Ross & Co. v. Redington, 442 U.S. 560, 575–76 (1979).

[49] Some courts have allowed recovery in these cases by reasoning that the fishermen have suffered damage to things in which they have a property interest, thus taking these cases outside the general rule of no duty to take care against causing economic loss. But the attribution to fisherman of a property interest in as-yet-uncaught fish is a stretch. Our analysis of these cases is consistent with that provided in the current Torts Restatement. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 (AM. L. INST. 2020) (recognizing liability for public nuisances resulting in distinctive losses to particular members of the public).

We thus find less mysterious than does Merrill the inclusion by Prosser of a public nuisance provision in the Second Torts Restatement. Merrill, *supra* note 45, at 21. Its inclusion is no less odd than the inclusion in that Restatement of provisions on negligence per se. Likewise, we would reject Merrill's contention that suits for individual injuries grounded in the defendant's commission of a public nuisance "proceed on the basis of a very un-tortlike analysis" by virtue of imposing forms of strict liability. *Id.* at 22. Liability for private nuisance equally "strict": there is no requirement that the interference of which the plaintiff is complaining have been the product of a failure of care on the part of the defendant. Rather, the issue is whether the defendant's conduct is (a) inappropriate given the character of the locus of the activity, and (b) causes a severe enough interference with the plaintiff's use and enjoyment as to be the sort of interference with which a possessor need not put up.

Electronic copy available at: https://ssrn.com/abstract=3804948

recovery.  Likewise, even if an actor responsible for creating a blockage of a public way can show that the blockage occurred despite the defendant's exercise of reasonable care, a person injured because of the blockage would presumably have a claim sounding in public nuisance, even though she would not have a claim for negligence.[50]

We thus reject as overly broad Professor Merrill's claim that public nuisances never give rise to tort liability. Yet his analysis does emphasize, as we have also emphasized, a critical and distinctive feature of such liability. In *Rigsby* (the implied-right-of-action decision mentioned above), the injured plaintiff could prevail in his suit against the railroad without making the showing of fault required by the common law of negligence only because the federal Safety Appliance Acts imposed on railroads a duty not to violate their (strict) requirements.[51] Likewise, in so far as an individual is entitled to prevail on a public nuisance claim for damages as a result of experiencing a harm distinctive from that experienced by other members of the community, it is only because the defendant actually has committed the offense of creating a public nuisance. This is the sense in which 'tort' claims for public nuisance are derivative. Whereas a negligence plaintiff sues for a legal wrong that, in most jurisdictions, is purely a creation of the common law, a public nuisance plaintiff sues for a legal wrong that, in the first instance, is defined through criminal or regulatory law.

The comparison and contrast with negligence per se doctrine helps to see why the derivative nature of public nuisance claims is especially important. While judges applying 'freestanding' common law torts such as negligence can incorporate statutory standards (via the doctrine of negligence per se), they are also free to impose liability even in situations in which the defendant has *complied* with relevant statutory standards of conduct. To take a familiar example, a driver who causes a collision that injures another can be held liable for negligence even if the driver was at the time driving under the posted speed limit and otherwise complying with applicable statutes and regulations. For purposes of negligence analysis, statutes set a floor, not a ceiling: compliance is relevant to the question of whether the actor has acted carelessly but not dispositive.  The criminal conception of public nuisance at the foundation of public nuisance, operates differently.  If there is a quasi-tort or a tort of public nuisance in a particular case, it is

---

[50] *See* Brown v. Eastern and Midlands Rwy., 22 Q.B.D. 391, 393 (1889) (suggesting that, if the mound created by the defendant's employees interfered with the passage of horses on an adjacent public way, liability would attach for injuries caused by it).

[51] Texas & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 42 (1916).

Electronic copy available at: https://ssrn.com/abstract=3804948

*only* because the defendant is interfering with public right in a manner that would warrant a state-commenced action for a court order commanding the defendant to cease engaging in the unlawful conduct. The power to commence a civil action, in other words, is tied to what counts as an interference with public right, and the availability of a private action for damages based on a public nuisance is limited by those constraints.[52]

## II.    Public Nuisance Applied to the Opioid Complaints

We now turn to the question of whether the allegations in the complaints in the opioid cases make out a case of public nuisance.  The lower courts who have considered this question have generally concluded that they do.[53]

A recent Tennessee trial court decision rejecting the defendant Purdue Pharma's motion to dismiss provides a typical analysis.  Judge Kristi M. Davis quoted a Tennessee Court of Appeals decision stating that the legal term nuisance "'extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property.'" [54]  Drawing on a state Supreme Court decision, she added that a nuisance is "'a condition of things which is prejudicial to the health, comfort, safety, property, sense of decency, or morals of the citizens at large, resulting either from an act not warranted by law, or from neglect of a duty imposed by law.'"[55]  After reviewing the allegations against Purdue and considering the defendant's arguments against liability, Judge Davis concluded that the State's

---

[52] Although our principal claim is that the offense of public nuisance does not provide a sound analytical basis under state common law principles to warrant its application to the opioid crisis, a more complete analysis requires examination of whether state legislative actions or aggressive judicial applications of common law would properly be regarded as preempted by federal law. *See, e.g.*, Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 344 (2001) (state tort law premising liability on fraudulent statements to FDA is preempted); *but see* City and Cnty. of S.F. v. Purdue Pharma, L.P., 2020 WL 5816488, *28–*33 (N.D. Cal. Sept. 30, 2020) (rejecting preemption argument in an opioid public nuisance case, and distinguishing *Buckman*).

[53] *See, e.g.*, State v. Purdue Pharma L.P., No. CJ-2017-816, 2019 WL 4019929 at 29–30 (Okla. Dist. Ct. Aug. 26, 2019) (denying motion to dismiss public nuisance claim); In re Nat'l Prescription Opiate Litig., 406 F. Supp. 3d 672, 673 (N.D. Ohio 2019) (same); Commonwealth v. Purdue Pharma, L.P., 36 Mass. L. Rptr. 56 (Sup. Ct.  2019) (same). *But see* State ex rel. Jennings v. Purdue Pharma L.P., C.A. No. N18C-01-223 MMJ CCLD, 2019 WL 446382 at 8, 13 (Del. Sup. Ct. Feb. 4, 2019) (dismissing public nuisance claim while denying motions to dismiss negligence and consumer fraud claims).

[54] State v. Purdue Pharma L.P., No. 1-173-18, 2019 WL 2331282, at *5 (Tenn. Cir. Ct. Feb. 22, 2019) (citing Sherrod v. Dutton, 635 S.W.2d 117, 119 (Tenn. Ct. App. 1982)) (internal citation omitted).

[55] State v. Purdue Pharma L.P., No. 1-173-18, 2019 WL 2331282, at *5 (Tenn. Cir. Ct. Feb. 22, 2019) (citing State ex rel. Swann v. Pack, 527 S.W.2d 99, 113 (Tenn. 1975)) (internal citation omitted).

Electronic copy available at: https://ssrn.com/abstract=3804948

Complaint alleged a viable public nuisance claim by asserting that Purdue "engaged in misleading and deceptive marketing practices for the purpose of increasing opioid prescriptions and that, as a result, Purdue created an opioid epidemic that has endangered the health and safety of the citizens of Tennessee and has resulted in financial loss to the State."[56]

Numerous trial courts across the country have adopted versions of the same argument in rejecting opioid defendants' motions to dismiss.[57]  Whereas public nuisance theories offered by plaintiffs in the tobacco cases went largely untested, and whereas suits over the sale of handguns and lead paint largely resulted in victories for defendants,[58] in the opioid context, the defendants' pre-trial dispositive motions on public nuisance have thus far tended to be decided  in favor of the plaintiffs and in line with the Tennessee decision.

While lawyers inclined against liability in these cases might argue that they must fail because they involve pure economic loss, that argument seems vulnerable to a powerful reply. According to this reply, the pure economic loss objection would be compelling if the plaintiffs were arguing for liability on claims of negligence or products liability. As explained above, however, appropriate entities are entitled to bring proceedings to abate public nuisances.  Thus, *if* what the opioid defendants have done is genuinely comparable to polluting a navigable waterway, they are vulnerable to being sued by a city or locality and ordered by a court to clean it up (or to foot the bill for cleaning it up).[59]  And, indeed, even if the public rights invasion differs in some ways in the opioid case, the common law evolves, and the government's responsibilities have expanded over the past century.  Proponents of public nuisance claims – and the courts that have

---

[56] *Id.* at *6.

[57] *See supra* note 43.

[58] Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. CIN. L. REV. 741, 754, 764, 774 (2003) (reviewing decisions).

[59] To say that a public nuisance action, if available, would entitle the entities to some relief, is not necessarily to say that they are entitled to all the forms of relief they seek. In its standard form, a quasi-tort claim for public nuisance is a claim that entitles the plaintiff to a court order directing the defendant to abate the nuisance, or to reimburse the plaintiff for the cost of abating the nuisance, as opposed to compensation for losses suffered by virtue of the nuisance.  *See, e.g.*, CONN. GEN. STAT. ANN. § 19a-343b (1998) (in a proceeding to abate a public nuisance, "the court may enter any orders necessary and proper to abate the nuisance"); People v. ConAgra Grocery Prods. Co. 227 Cal. Rptr.3d 499, 560 (Cal. Ct. App. 2017) (noting that, under California law, damages are unavailable in actions brought on behalf of the People to abate a public nuisance); *In re* Lead Paint Litig., 924 A.2d 484, 502 (N.J. 2007) (damages unavailable in an abatement action); Rapid City v. Big Sky, LLC, 914 N.W.2d 541, 549 (S.D. 2018) (city's abatement action permits only an injunction and reimbursement for cost of abating the nuisance); Gifford, *supra* note 59, at 782.

Electronic copy available at: https://ssrn.com/abstract=3804948

accepted their arguments – conclude that the law must be flexible enough to respond to new types of threats to public welfare, and the opioid crisis is one of these.[60]

This is the best argument for regarding the opioid epidemic as supporting a public nuisance action by an appropriate governmental entity.  Our inclination ultimately is to reject it because we think it stretches the concept of public nuisance beyond recognition.  However, that line of criticism is still to come.  For the moment, let's take seriously the idea that modern governments today bear additional responsibilities of various kinds with respect to public health, and that these demand openness to changes in the law and expansions of legal form in order to discharge them.

That new laws should address new responsibilities gets us only so far, because it does not tell us what sorts of laws they should be.  In fact, our legal system has developed various legal tools that are well-suited, in principle, to deal with the sorts of risks and harms associated with the opioid epidemic.  There is regulation of pharmaceuticals at the federal level, and plenty of regulation of marketing at both the state and federal levels.  There are state tort claims for products-liability, negligence, warranty, etc.  And, there are various forms of public and private insurance, and various ways of regulating and taxing industries that generate the relevant risks.  Almost all of these tools are at least partly prospective and seem better suited to preventing drug-related epidemics from occurring in the first place. Some could still be useful in turning back the epidemic or slowing it down significantly.  By contrast, "after-the-fact" massive liability imposition seems ill-suited to the task at hand, if that task is dealing with the epidemic. The idea that new forms of law are necessary to deal with new kinds of social problems thus does not lend much support to the expansion of public nuisance law, unless one believes pragmatic post-hoc need is a reasonable basis for designing new forms of law.

Turning to our ultimate question: have the majority of lower courts thus far been right to conclude that the category of public nuisance applies to the facts alleged by cities and states in the opioid litigation?  We think not.  The problem with this conclusion derives from the failure to address satisfactorily two issues that must be resolved to get from a standard instance of public nuisance to the opioid crisis as a public nuisance.  The first we will call the *community-excrescence* issue.  The second is the *defendant-intrusion* issue.

---

[60] *See* Catherine M. Sharkey, *Public Nuisance as Modern Business Tort: A New Unified Framework for Liability for Economic Harm*, 70 DEPAUL L. REV. (forthcoming 2021) (arguing that public nuisance can play an important gap-filling role by incentivizing precaution-taking by actors whose conduct risks causing financial losses that are not linked to physical harms).

Electronic copy available at: https://ssrn.com/abstract=3804948

What we call the "community-excrescence" issue concerns whether the state of affairs that is serving as the basis for liability is of the right kind to count as "*a condition of things* which is prejudicial to the health, comfort, safety, property, sense of decency, or morals *of the citizens at large* ….."[61] It is understandable that courts around the country have ruled that the overuse of opioids has been prejudicial to the health, comfort, and safety of many citizens.  Is it, in addition, a condition of things prejudicial to the citizens at large—or to public right?  This is a different question, to which we think the answer often will be "no." A public nuisance suit by a city that seeks reimbursement for expenses incurred in responding to and treating individual cases of addiction, while undoubtedly alleging harm that is "public" in the sense of widespread, is not alleging an interference with the right protected by nuisance law.[62]  As we noted above in our exposition of nuisance law, to qualify as a public nuisance, an activity must interfere unduly with the ability of members of the public to use and enjoy public spaces and resources. A suit by a city for costs incurred in providing care for persons addicted to opioids and their dependents is not, of itself, a claim predicated on any such injury. Moreover, it is not a claim that seeks on its face the abatement of an interference with public right, or reimbursement for abatement measures already taken to eliminate such interference.  At a minimum, in order for a suit proceeding on this theory to prevail, it would need to allege and  eventually to establish that the opioid sales in question actually did result in members being regularly hindered in their ability to occupy, use, and enjoy public spaces, and that the relief sought either aims to eliminate such hinderances or to reimburse the claimant for having incurred expenses in eliminating them. By contrast, a suit that seeks to base liability simply on the fact the claimant incurred expenses to treat addiction should fail.

Even granted a community excrescence of the right sort – that is, a genuine interference with experienced public space – and even when a suit is brought that seeks relief for dealing with the excrescence, there still remains the question of who can be deemed responsible for it—that is, who can be deemed to have *created* the nuisance. This leads us to the defendant-intrusion issue, which provides an independent limit on liability. A fanciful hypothetical will make the point.

---

[61] *See supra* note 55 & accompanying text (quoting State v. Purdue Pharma L.P., No. 1-173-18, 2019 WL 2331282, at *5 (Tenn. Cir. Ct. Feb. 22, 2019)).

[62] Gifford, *supra* note 58, at 819 (discussing the requirement of interference with public right and explaining why it differs from the idea of a widespread harm).

Electronic copy available at: https://ssrn.com/abstract=3804948

Suppose several bars in a college town each Thursday night hold an event called "Devil 'n Dune Night,"[63] at which they sell a wildly popular drink that mixes locally crafted whiskey and beer.  Suppose further that a tradition develops among local fraternity members that calls for them to descend *en masse* on the bars, consume the drink in copious amounts, then unceremoniously relieve themselves in a tributary of a local river.  Of course, a local ordinance could be passed to stop the bars from holding "Devil 'n Dune Night." Moreover, if there were evidence that something peculiar in the beer or whiskey (or the combination thereof) led to this form of conduct, the brewer and distiller probably could be prohibited from making or selling their products and punished for violating such prohibitions if they did so.  But any such proceedings against the bars, the brewer, and the distiller would not be based on *their having acted in a manner properly described as an intrusion on, or interference with, public right*.  It is the drinkers who interfere with the public right against the tributary being fouled, not the bars, brewers, or distillers.  While it is plausible to suppose that the conduct of members of the latter group (particularly the bars) should be regulated or perhaps even criminalized, none have themselves committed the legal wrong of creating a public nuisance.

Another example illustrates the same point. Suppose *B* is a component manufacturer that sells 'bladders' that are used to line the inside of tanker ships to make it less likely that a tanker's liquid contents will leak if the tanker is damaged or wrecked. *B*'s bladders are manufactured in compliance with federal safety standards and are efficacious to the extent required by those standards. However, *B*'s sales force knowingly and materially overstates the efficacy of its bladders to the tanker manufacturers to whom it markets its products. A particular tanker manufacturer, *T*, purchases and installs *B*'s bladders in several of its tankers, then in turn sells one of its tankers, equipped with one of *B*'s bladder, to oil company *O*. (It is unclear to what extent *T* relies on *B*'s misrepresentations in choosing to purchase the bladders.) Two years later, *O*'s tanker is wrecked on a reef due to piloting error, causing an oil spill that shuts down a public waterway. If *B*'s misrepresentations had been true, the spill would not have happened or would have been much less severe.

On our account, local fisherman put of out of business by the spill would have a valid public nuisance claim against *O*, because it was *O* that interfered with the right of the public to use

---

[63] Here we draw on a real-world event known as "Imp 'n' Ahn." *Imp 'n' Ahn*, URBAN DICTIONARY (Nov. 25, 2009), https://www.urbandictionary.com/define.php?term=Imp%20%27n%27%20Ahn.

Electronic copy available at: https://ssrn.com/abstract=3804948

the waterway. Yet, even though $B$ acted wrongfully in a manner that contributed to the creation of the spill, $B$'s actions—like those of the alcohol manufacturers in the Devil 'n Dune example—are not themselves "interferences" with public right.  It does not necessarily follow that $B$ would face no legal consequences for its role in these events. In particular, it might be that $O$ would have an equitable claim against $B$ for indemnification or contribution. But this would not make $B$ liable in the first instance for having created a public nuisance.

Amorphous though it is, public nuisance is a distinctive, injury-inclusive legal wrong and is in that respect tort-like: its injury inclusiveness is why it goes along with the empowerment of a government entity to obtain certain kinds of remedies. It also involves a defendant *doing something intrusive or invasive*. The alleged wrongdoer must be an interferer, intruder, or invader of public right, not merely an actor whose wrongful conduct precipitates the development of, or sets the stage for, such invasion.  There are kinds of acts—like urinating in public waters—that might be such interferences, intrusions, or invasions.  By contrast, the sale of a component part or alcoholic drinks in an otherwise lawful manner, even if irresponsible, is not interfering, intruding, or invading in the requisite sense.  The same goes doubly for the brewer's and distiller's otherwise lawful sale of their products.[64]

Versions of the problem we are identifying arise in other torts. A plaintiff might be suing to recover compensation for a particular kind of harm, and that kind of harm might be prototypically displayed by a certain tort. However, torts also contemplate a particular kind of act or doing, and not simply a particular kind of harm, and if the plaintiff cannot demonstrate the relevant act or doing, her claim will fail. Defamation law provides a helpful example of this point. In *Jorgensen v. Massachusetts Port Authority*, a pilot sued the Massachusetts Port Authority, demanding compensation for injury to his reputation.[65] The defendant was alleged to have been negligent in clearing a runway, as a consequence of which the pilot's commercial plane skidded

---

[64] It is in large part because bars are licensed to sell alcohol that they cannot be treated in this example as counterparts to certain recognized examples of public nuisances, such as brothels, or buildings used for illegal drug sales. What renders the latter eligible to be treated as public nuisances is that they are loci of illegal activities that tend to operate in a manner that is invasive or intrusive in the requisite sense.

Professor Gifford has argued in a similar vein that public nuisance law serves as an awkward basis for claims based on the contributions of products to societal harms. Gifford, *supra* note 58, at 819. His focus, however, is on the lack of *de facto* control that manufacturers and retailers have with respect to whether or not such harms result from their conduct, whereas ours concerns whether their conduct is correctly characterized as consisting of a certain kind of intrusion or imposition.

[65] Jorgensen v. Massachusetts Port Auth., 905 F.2d 515, 517 (1st Cir. 1990).

Electronic copy available at: https://ssrn.com/abstract=3804948

off the runway.  This event in turn was alleged to have caused the pilot to suffer reputational harm.[66] Yet the defendant did not sue for libel or slander. Instead, he sued for negligence. His lawyers probably concluded, correctly, that defamation requires some sort of communicative act by the defendant.  Whatever the defendant had done was not a communicative act of the sort that fits even a capacious description of libel or slander. Appropriately closer cases arise when an employee sues an employer for defaming him by searching his desk or having her escorted out of the office by security guards. The question is whether these acts are properly interpreted as communicating a defamatory message to third parties.

A similar problem arises in battery cases. Does turning up the heat in a prison cell count as battery if it causes the prisoner in the cell to faint? What about college friends leading one of their own to suffer alcohol poisoning by goading him to drink to excess on his 21st birthday? All of these are difficult cases analytically, even granted that we are looking at wrongful conduct that the legal system may well want to prohibit.  Battery concerns a particular kind of conduct, and the conduct in these cases does not quite fit the description. Some (or all) of these perhaps fit the description of some other wrong, such as negligence, assuming that the requisite kind of harm comes about.  However, battery is a particular tort with particular features and advantages for plaintiffs, and the question of whether it can be invoked is often consequential.  The same is true in the defamation example.

Again, our point is not that the opioid defendants face no tort liability, only that they should not be vulnerable to claims for public nuisance.  It is likely that many people who unwittingly became addicted to prescription painkillers, and who suffered adverse health and economic consequences as a result of the defendant's misconduct have plausible claims for fraud, negligence, and strict products-liability.  To the extent courts have identified doctrinal obstacles to such claims, it seems vastly less problematic for them to make adjustments to negligence or products-liability law that clear a path for recovery by individual personal injury plaintiffs—whether in individual suits or suits aggregated through an MDL-type process—than by invoking a novel, blank-check version of public nuisance law.

Indeed, if one attends to historical progression of opioid litigation, a somewhat dispiriting pattern emerges.  In their careful study, Professors Nora Freeman Engstrom and Robert Rabin observe that, in the period from 2001 to 2013, opioid plaintiffs often asserted traditional personal

---

[66] *Id*. at 517–18.

Electronic copy available at: https://ssrn.com/abstract=3804948

injury claims.[67]  However, this litigation foundered at the summary judgment stage.  In part, this was because of the operation of familiar doctrines such as the learned intermediary rule.  But it was also the product of judicial innovations, including something dubbed the "wrongful conduct rule," according to which a plaintiff is deemed per se ineligible to recover in tort if her injuries resulted in part from her knowingly engaging in illegal activity (such as the use of illegal narcotics).[68]  This pattern of decisions helps explain why today the action in opioid litigation is in the domain of public nuisance.

One can only wonder if courts had been a bit more thoughtful and receptive in their handling of the personal injury claims—by, e.g., modifying the learned intermediary doctrine (at least in certain applications) or refraining from constructing novel hurdles for personal injury claimants (such as the obscure "wrongful conduct rule")—they might have been able to offer victims with meaningful redress in a far less adventurous manner than by embracing an open-ended conception of the tort of public nuisance.  In this respect, courts themselves carry some responsibility for practically inviting the creative use of public nuisance as a rearguard effort to hold the opioid defendants legally accountable for their injurious misconduct.

Reflecting on the relation of the cities' public nuisance claims to the personal injury claims that were or could have been brought invites consideration of one last reason to be skeptical about the former.  The fact that the city suits have come on the heels of individual actions, and that the cities are not seeking abatement in any standard sense but instead compensation for expenses incurred in dealing with the opioid crisis, inevitably suggests that these suits are fundamentally derivative of individuals' personal injury claims. At its core, their complaint is that the opioid defendants' *mistreatment of the individuals who were misled or misinformed about the risks of using opioids* has cost the cities a lot of money. This is undoubtedly true; yet, it quite clearly fails as a theory of tort liability. Absent special circumstances, a tort plaintiff sues in her own right, as

---

[67] Nora Freeman Engstrom & Robert L. Rabin, *Pursuing Health Through Litigation*, 73 STAN. L. REV. at 26-27 (forthcoming 2021).

[68] *Id*. at 28. The learned intermediary doctrine holds, in essence, that a prescription drug manufacturer's duty to warn is discharged if the manufacturer adequately warns prescribing physicians, irrespective of whether patients receive any warning. A handful of decisions have questioned whether the rule's retention is warranted given, for example, the rise of direct-to-consumer advertising for prescription drugs. *See, e.g.*, State ex rel. Johnson & Johnson Corp. v. Karl, 647 S.E.2d 899, 901 n.1, 907, 909–10, 913 (W. Va. 2007). On the "wrongful conduct rule," see Samuel Fresher, *Opioid Addiction Litigation and the Wrongful Conduct Rule*, 89 U. COLO. L. REV. 1311, 1319–20 (2011).

Electronic copy available at: https://ssrn.com/abstract=3804948

herself the victim of mistreatment, rather than vicariously for the mistreatment of another.[69] Indeed, this general principle of tort law is enshrined in a specific rule tailored precisely to the question of whether a municipality can recover for expenses incurred in responding to a tort committed against an individual. Under the "free public services" doctrine, a governmental entity is barred from recovering for the cost of providing emergency services or medical care in the aftermath of a car or plane crash, or any other conduct that was tortious as to someone other than the entity itself.[70]

Of course, as the cities have argued in the opioid cases, *if* they have valid public nuisance claims that entitle them to reimbursement for treatment expenses, they are *not* suing derivatively. Instead, they are suing in their own right, as victims of the tort of public nuisance. Thus, the existence of the free public services doctrine does not of itself demonstrate that the cities lack valid public nuisance claims—the latter requires an independent judgment as to the validity of those claims. And yet, both the genealogy of the opioid litigation and the nature of the relief sought by the cities, along with the conceptual and doctrinal problems we have discussed in this part, strongly suggest that the cities cannot establish liability grounded in public nuisance and are instead attempting to recover as the vicarious beneficiary of legal duties owed to individual victims.. It is tempting to believe that tort law or some hybrid of tort and equity supports such a result, but close analysis suggests they do not.[71]

From our point of view, the conduct of opioid manufacturers is lacking in the attributes that would qualify it as an interference with, or an invasion or intrusion of, a public right. This is so even if the state of affairs that their conduct has created constitutes the sort of public excrescence that can qualify as a public nuisance. Moreover, as suggested in the prior paragraph, there may be other torts or legal wrongs or crimes for which their conduct in principle qualifies. But the plaintiffs in these cases have special reasons for wanting to be able to fit them into the box of public nuisance.

---

[69] Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 100 (N.Y. 1928) ("The plaintiff sues in her own right for a wrong personal to her, and not as the vicarious beneficiary of a breach of a duty to another.").

[70] *See, e.g.*, Cnty. of Erie v. Colgan Air, Inc., 711 F.3d 147, 150, 152 (2nd Cir. 2013) (applying New York law's free public services doctrine to bar plaintiff county from recovering for extraordinary expenses incurred in responding to plane crash allegedly caused by defendant's negligence).

[71] *Cf.* Anthony J. Sebok, *Pretext, Transparency and Motive in Mass Restitution Litigation*, 57 VAND. L. REV 2177 (2004) (criticizing tort, subrogation, and restitution theory in tobacco litigation); Doug Rendleman, *Common Law Restitution in the Mississippi Tobacco Settlement: Did the Smoke Get in Their Eyes?*, 33 GA. L. REV. 847 (1999) (same).

Electronic copy available at: https://ssrn.com/abstract=3804948

Our question has been whether courts should be willing to say it fits. Doctrinally and analytically, we think not.

### III.    A Functionalist Challenge, and a Response

Even one who accepts the admittedly tentative analysis of Part II can raise an important question as to the conclusion it supports. Suppose we are right that the government opioid lawsuits do not fit the public nuisance mold, and we are right in analogizing the shortcoming of plaintiffs' opioid claims to those in a variety of other tort areas. Why accept these limitations?  What is their normative point, other than simply limiting claims? Isn't their acceptance simply blind formalism, or yet another example of kowtowing to the interests of corporate America?

There are at least two ways to interpret this challenge, and we shall examine both. The first is a demand for an explanation of what functional role is played by limitations of the kind illustrated in libel and battery and allegedly instantiated in public nuisance law itself. Here we shall only gesture at our answer, but we have offered detailed versions of answers to similar questions in our recent book and several other writings.[72] The common law of torts aims in substantial part to provide guidance to legal actors, and it aims to do so well and fairly by articulating norms of conduct that are typically latent in our ordinary interactions with others.

Unlike some influential voices of the mid-twentieth century, we do not think that all of tort law boils down to notions of unreasonable conduct or negligence. Rather, tort law is comprised of a "gallery" of different wrongs—violations of one or more various norms against mistreatment that the state and individuals expect us to comply with. An advantage of negligence is that it operates broadly by requiring, at a general level, taking care not to harm others.  But many of our rights are protected by more categorical rules, including: "Don't defame," "Don't defraud," "Don't confine," and "Don't enter another's land without permission." These rules have sharper edges and, because of this, the protection they provide is in some ways more robust than that of negligence law. And, indeed, they provide protection to a broader range of individual interests: reputation, decision-making capacity, dignity, exclusivity of land possession, and the like, not just security as against physical harm.

The sharper edges and deeper reach of many of the nominate torts may provide the average citizen with valuable protection, albeit at a substantial cost.  That is because each of us might be

---

[72] GOLDBERG & ZIPURSKY, *supra* note 36.

Electronic copy available at: https://ssrn.com/abstract=3804948

on either end of the tort or on either end of the litigation, and because plaintiffs need only satisfy a preponderance of evidence standard and their remedies are not as fixed or definite as those of the criminal law. And—to repeat—the kinds of injury for which redress may be sought are both broad and, in some ways, indefinite. The dictionary still defines "nuisances" as "annoyances."

Our view is that nominate torts like those mentioned above involve *kinds of conduct*—communications, touchings, misrepresentations—and although there is a range of actions covered by each kind, the categories have a certain character or integrity. More to the point, it is important to our legal system that different torts are limited to different kinds of doings. They provide categories such that acts that are members of the category will in some ways be *recognizable* by those who are expected to live under them and comply with them. The importance of clearing airport runways is never going to be perceived in terms of the importance of not tarnishing a pilot's reputation. There must be a nexus between the *kinds* of actions certain torts prohibit and the workability of the tort as a guidance rule enjoining conduct in a recognizable way.[73]

The point here is not to declare the *impossibility* of a far broader kind of legal claim for public nuisance, one that is broad enough to allow for liability in the opioid litigation. It is to say that the kind-of-interference and kind-of-intrusion problems we have identified in opioid public nuisance claims are not trivial or formalistic or without functional significance. It is core to the normative structure of tort law and its capacity to be a guidance-supplying form of law that the criteria of interference-type and intrusion-type it deploys are observed.

None of this is to say that the defendants in these cases are innocent, nor is it to deny that significant legal duties were breached, assuming the allegations of the complaints are true. Deceiving people is wrong in morality and wrong in law. But tort law does not work by tracing a causal pathway from some form of misconduct to some form of harm. It works by announcing

---

[73] *Id*. at 232-59 (explaining the importance of nexus and integration requirements in the structure of torts). Professor Landsman, among others, argue that, even if concerns such as those we identify in this Part have some weight when it comes to judicial application of relatively well-defined torts such as battery or libel, they have no weight with respect to the wrong of public nuisance, because it has from the get-go been conceived as broad delegation of authority to governmental entities to address widespread harms as they arise. We are unmoved by this argument for several reasons. First, there are other torts—most notably negligence—that have a similar breadth. Second, as we argued in Part I, the public nuisance tort has structure and substance that courts are bound to respect even as they apply it to new scenarios. Third, the notion of public nuisance as 'delegating' authority to governmental entities needs to be handled with care. As we note above, the conditions under which cities and other entities can properly invoke public nuisance law to obtain orders of abatement (or reimbursement for abatement) are different from those in which they can obtain compensation for losses they have incurred as the result of the nuisance.

Electronic copy available at: https://ssrn.com/abstract=3804948

and critically revising kinds of wrongs and kinds of rights, and by empowering right holders to hold accountable those who have wronged them. Public nuisance law has emerged as an interesting hybrid; one which empowers government actors themselves to seek remedies for certain kinds of wrongs that involve the invasion of public right. The opioid complaints plead many kinds of wrongdoings to many categories of persons, but public nuisance does not appear to be among them.

### Conclusion

The infliction on state and local governments of even enormous expenses incurred in dealing with an epidemic through misrepresentations concerning the sale and distribution of a lawful product does not appear to qualify as a public nuisance. If our legal analysis is correct, then judges should be granting the opioid defendants' motions to dismiss the public nuisance claims against them. We come now to a final challenge, not so much doctrinal or theoretical, but pragmatic and political.

*"Surely,"* our friends and colleagues will argue, *"you know that the argument does not end here. You have said nothing that surprises us or would surprise those courts who have ruled otherwise. Of course, the allegations by the states and cities do not fit perfectly into the box of public nuisance. So what? It can be made to fit, even if it is a stretch. To convince us that public nuisance doctrine should not be interpreted capaciously enough to include the opioid defendants, you need to establish that it is better to dismiss these cases than it is to allow the cases to move forward. But the truth seems clearly to be otherwise. If the plaintiffs really are able to prove the conduct that they have very plausibly alleged, shouldn't the defendants be accountable for their misconduct? No other political branch seems willing to do this. Conversely, there is great need for resources to address the continuing effects of the opioid crisis that these defendants seem to have helped generate. Where are the resources going to come from? Why shouldn't those whose misconduct is responsible for creating the problem help to solve it? In 2021, aren't we beyond the kind of naïvely legalistic arguments that your critique relies upon?"*

It is hard to know what to say to this objection. It is premised on the idea that one must not be naïve about what judges can and should do to solve grave social problems. It insists on looking at the big picture and complains that we really have not done so. It points to deep pathologies in

Electronic copy available at: https://ssrn.com/abstract=3804948

our political and legal system and the suffering caused by such pathologies.  We expect to hear next, *"If you are not part of the solution, you are part of the problem."*

While we would assent to many of the foregoing propositions, they generally draw us away from the supposed public nuisance solution to the opioid problem, not towards it.  It all depends on what one sees as naïveté, as the big picture, and as the pathologies of our political and legal system.  To us, what is naïve is the belief that states and cities can solve public health crises by aggressive and inventive affirmative tort litigation that aims to drain money from corporate malefactors in front of Solomonic judges.  The big picture is that corporate America and its lawyers might still prefer decades-long courtroom contests to muscular regulation in the first instance, and if the legal profession and state and local governments are going to settle for that, all the better.  In our view, no pathologies in today's legal and political system run deeper than a pervasive distrust of our political institutions.  Thinking that one can use clever manipulation of open-ended terms like "public right" and historical oddities like the public nuisance doctrine to solve social problems related to the sale of guns, tobacco, and now opioid-based pharmaceuticals is not part of the solution. It might even be part of the problem.  Or so we worry.

Electronic copy available at: https://ssrn.com/abstract=3804948