ELECTRONICALLY FILED
11/13/2019 3:02 PM
03-CV-2019-901174.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
GINA J. ISHMAN, CLERK

MONTGOMERY COUNTY, ALABAMA
GINA J. ISHMAN, CLERK

## IN THE CIRCUIT COURT FOR
## MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| **THE STATE OF ALABAMA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **03-CV-2019-901174.00** |
| | § | |
| **PURDUE PHARMA L.P., et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>ORDER</u>

This matter is before the Court on three separate motions: Endo, Purdue, and Rhodes' Joint Motion to Dismiss the State of Alabama's Complaint ("Endo's Motion"), McKesson's Motion to Dismiss ("McKesson's Motion"), and Rhode's Supplemental Motion to Endo's Motion. This case is currently stayed as to the Purdue Defendants (Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; and Rhodes Pharmaceuticals, L.P.) due to the entry of a temporary stay in Purdue's Bankruptcy petition in the Southern District of New York. For the reasons that follow, and after review of the record, with the benefit of oral arguments of counsel, and considering the applicable law, the Court hereby **DENIES** all of the Motions as to the Endo Defendants (Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc.) and Defendant McKesson (McKesson Corporation).

Ex A - Tab 1 - Alabama

## I.    FACTUAL ALLEGATIONS OF THE STATE'S COMPLAINT

The Complaint filed by the State of Alabama alleges that Endo, a pharmaceutical manufacturer, and McKesson, a pharmaceutical distributor, combined and concurred to create an opioid crisis in the State of Alabama. Endo, primarily through its aggressive and misleading marketing of opioids, and McKesson, through its reckless or intentional disregard for its State and Federal Controlled Substances Act responsibilities, wrought havoc on the public health and drained public coffers by unleashing a tidal wave of addictive and deadly painkillers.

Prescription opioids are a potent painkiller that is chemically similar to heroin, and equally as addictive. Compl. ¶¶ 3, 101. In fact, both heroin and prescription opioids, such as oxycodone and hydrocodone, are derived from the opium poppy. Opium has been known to be a dangerous and addictive substance for centuries, and until the mid-1990's, prescribers were reluctant to prescribe opium derived drugs for anything other than palliative care (where death was or appeared to be imminent) or post-surgery pain (and there, only for short durations). *See* Compl. ¶ 6

By binding to opioid receptors, opioids can block pain signals, but they also highjack the brain's pleasure systems (through the release of large amounts of dopamine), causing euphoria. Compl. ¶ 50. Repeated exposure to opioids alters the brain, causing opioid tolerance (the need to take higher and higher dosages of drugs to achieve the same opioid effect, such as analgesia) and drug dependence (susceptibility to withdrawal symptoms). Compl. ¶¶ 49, 51. This combination of dopamine release, opioid tolerance, and withdrawal works in concert to make opioids highly addictive. ¶¶ 45-46. Opioids are also very deadly. Opioids cause respiratory depression, which leads to overdoes death from respiratory failure. Compl. ¶ 52. The opioid crisis has in part been exacerbated because tolerance to opioid respiratory depressive effects develops at a slower rate than tolerance to opioid analgesic effects. *Id.* As a chronic pain patient's dosage is increased in

response to the diminishing return on pain-relief, there is not a concomitant increase in the body's resistance to respiratory depression, thus leading to death from overdose even where the opioid is taken as recommended. *Id.*

The State's complaint alleges that Endo sought to counteract the prevailing belief that opioids were too dangerous to prescribe long term for anything less than the most dire of circumstances in order to create a profitable market for opioids. Compl. ¶ 104.

These allegedly false and deceptive statements targeted regulators, doctors, and patients throughout the State of Alabama by using independent third parties including "front groups," "key opinion leaders" and other actors allegedly controlled to gain the appearance of impartiality. Compl. ¶ 10, 66. The Complaint alleges that Endo funded and controlled these advocacy groups and influential experts in order to overstate the benefits of opioids for chronic pain treatment while understating the risks of addiction.

The Complaint further alleges that Endo and co-defendant McKesson failed in their legal duties to serve as the critical choke point safeguarding the public and the State from the foreseeable harms if prescription opioids were diverted for illegitimate purposes. *See, e.g.*, Compl. ¶ 266, 322. The federal and state Controlled Substances Acts ("CSAs") require Endo and McKesson to register to manufacture or distribute opioids; to maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and to design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the government authorities.

The State alleges the Endo and McKesson took no meaningful action to curtail the diversion of opioids in the state or to design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the government authorities.

The State further alleges that McKesson instead sent facially suspicious quantities of opioids into the State. *See, e.g.*, Compl. ¶ 157.

The State contends that but for the deceptive marketing by Endo and failure to monitor, report, and stop suspicious orders by McKesson and Endo, there would be no opioid crisis in Alabama.

The State alleges it has suffered a variety of significant injuries as a result of Defendants' conduct. In particular, the State alleges it has suffered damages in the form of "health care costs from opioid abuse," "costs related to overdose responses, naloxone spending for first responders, increased law enforcement spending, increased pretrial and post-trial incarceration costs, increased criminal defense costs, increased social services spending such as representing parents and children in neglect proceedings, loss of productivity, loss of tax revenues for the State of Alabama, and other costs and response measures needed to address the epidemic." Compl. ¶¶ 366-367.

## II.   PLEADING STANDARDS ON A MOTION TO DISMISS AND PARTICULARITY.

Alabama's pleading rules are liberal and emphasize simplicity. Alabama has not adopted the stringent federal pleading standard. *See McKelvin v. Smith*, 85 So. 3d 386, 389-391 (Ala. Civ. App. 2010). Under Rules 8 and 12(b)(6) of the Alabama Rules of Civil Procedure,[1] "the dismissal

---

[1] The Defendants raise the question whether Rule 9(b) of the Alabama Rules of Civil Procedure applies to some or all of the State's claims. This Court finds that the only portion of the complaint that is subject to Rule 9(b)'s pleading standard is the State's allegation of fraudulent concealment of a cause of action. However, the Court notes that the State has pleaded sufficient facts to satisfy Rule 9(b) in the State's allegations of misrepresentations or false statements made by the defendants. The State has pleaded the "time, place and the content" of Defendants' alleged misleading or false messages, what was misrepresented, and what was gained — all that is required under Rule 9(b). "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Ala R. Civ. P 9(b). The pleading standard under Rule 9(b) does not require an allegation of every single statement the plaintiff intends to rely on at trial to make its case. In cases of "prolonged multi-act schemes," a plaintiff may "plead the overall nature of the fraud and then ... allege with particularity one or more illustrative instances of the fraud." *Burgess v. Religious Technology Center, Inc.*, 600 Fed. Appx 657, 662 (11th Cir. 2015). The State has pled much more than a few illustrative instances of the Defendants false and misleading statements.

The Court also notes that there are legally sufficient claims made against McKesson and Endo that do not rely on allegations of false and misleading statements at all. Counts I, III, IV, V, and VI could proceed on allegations that the

of a complaint is not proper if the pleading contains 'even a generalized statement of facts which will support a claim for relief under [Rule] 8, [Ala. R. Civ. P.]'" *McKelvin v. Smith*, 85 So. 3d 386, 389 (Ala. Civ. App. 2010). "Under this rule the prime purpose of pleadings is to give notice. Such common law concepts as stating the facts each party believes to exist and narrowing the issues that must be litigated are completely abandoned. The distinctions between 'ultimate facts' and 'evidence' or conclusions of law are no longer important since the proposed new rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties." Ala. R. Civ. P. 8(a) (Committee Comments on 1973 Adoption). Thus, a complaint is sufficient if it contains nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for judgment for the relief the pleader seeks." ALA. R. CIV. P. 8(a).

"In considering whether a complaint is sufficient to withstand a motion to dismiss under Rule 12(b)(6), ALA. R. CIV. P., a court 'must accept the allegations of the complaint as true.' *Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C.*, 828 So. 2d 285, 288 (Ala. 2002) (emphasis omitted). The court does "not consider whether the pleader will ultimately prevail but whether the pleader may possibly prevail." *Wilson v. University of Alabama Health Services Foundation, P.C.*, 266 So. 3d 674, 676 (2017) (internal quotes and citations omitted); A court must "construe all doubts regarding the sufficiency of the complaint in favor of the plaintiff." *Id.* "[A] dismissal for failure to state a claim is properly granted only when it appears beyond a doubt that the plaintiff can prove no set of facts entitling him to relief." *Winn-Dixie Montgomery, Inc. v. Henderson*, 371 So. 2d 899 (Ala. 1979). Stated another way, if under a provable set of facts, upon any cognizable theory of law, a complaint states a claim upon which relief could be granted, the complaint should

---

Defendants did not adequately police the distribution of their opioids. The Court will assume Rule 8 applies throughout, excepting the fraudulent concealment allegation.

not be dismissed. *Childs v. Mississippi Valley Title Insurance Co.*, 359 So. 2d 1146 (Ala. 1978)."
*Ex parte City of Birmingham*, 624 So. 2d 1018, 1020 (Ala. 1993) (quoting *Seals v. City of Columbia*, 575 So. 2d 1061, 1063 (Ala. 1991)).

Finally, with regard to the pleading standard, the Court disagrees with the Defendants' contention that the Complaint's claims must be dismissed for failure to specifically identify prescribing physicians who relied on Defendants' alleged misrepresentations or particular suspicious prescriptions for opioids. This Court finds no practical benefit in requiring the State to name a particular physician or list of prescriptions that were "suspect" in order to illustrate the alleged schemes that are otherwise well-pled in the Complaint. The Court finds that the Complaint is adequate to place all Defendants upon fair notice of the allegations they must meet in order to prepare a defense.

## III.   THE COMPLAINT ADEQUATELY ALLEGES ACTUAL AND PROXIMATE CAUSE.

One of Defendants' primary arguments is that the State has failed to properly allege proximate cause. *See, e.g.*, Endo's Br. at 24, McKesson's Br. at 6. However, the Court must resolve all doubts regarding the pleadings in the plaintiff's favor. *Wilson* at 676. Causation is a very fact-intensive analysis, and proximate cause is thus generally "a question of fact to be determined by a jury." *Green v. Alabama Power Co.*, 597 So. 2d 1325 (Ala. 1992). Indeed, "[p]roximate cause becomes a question of law only when there is a total lack of **evidence** from which the factfinder can reasonably infer" a causal relationship exists between the defendant's conduct and the resulting injury to the plaintiff. *Id.* at 1328 (emphasis supplied). That is not the case here.

Under Alabama law, "foreseeability is the cornerstone of proximate cause," *Alabama Power Co. v. Taylor*, 306 So. 2d 236, 249 (Ala. 1975), and is generally a question of fact for the jury. *See Thetford v. City of Clanton*, 605 So. 2d 835, 839 (1992). At this stage of the litigation,

the State has adequately alleged that the harms caused by Endo's marketing of opioids and McKesson's distribution of opioids were foreseeable by the defendants. Moreover, this case is currently at the pleading stage and thus it would be inappropriate to dismiss due to a lack of evidence, particularly in light of the facts alleged in the State's Complaint.

Defendants argue that the causal chain between their conduct and the State's alleged injuries is "too attenuated." Endo's Br. at 24; McKesson's Br. at 9. In support of this argument, they claim there is a several-steps-long chain, involving addicts and prescribers, separating their conduct from the harms suffered by the State. Endo's Br. at 23; McKesson's Br. at 9.

First, the Court notes that what constitutes the "causal chain" is an issue of fact that will be determined by the evidence, and is therefore inappropriate for adjudication at the pleading stage.

Second, the mere presence of other parties in the arguable "causal chain" does not foreclose that a legally sufficient causal connection may ultimately be established. Alabama law explicitly recognizes that the intervention of prescribers into the causal chain does not "break" the chain of causation in an action against a drug manufacturer if the prescriber is intentionally misinformed by the manufacturer. *Wyeth v. Weeks*, 159 So. 3d 649 (Ala. 2014). Even a criminal act might not "intervene" so as to sever the causal chain, if the result is foreseeable. *See Thetford*, 605 So. 2d at 839 (1992). Here, the injuries claimed by the State were especially foreseeable because they were allegedly caused by *intentional* conduct on the part of Defendants. And drug-seeking behavior of patients is certainly foreseeable where the drug is addictive, and patients were led to believe that the risk of addiction was low. Compl. ¶ 10.

The Defendants also portray the State's injuries as "derivative" of injuries of other parties less removed from Defendants' actions, such as losses sustained by Alabamians who became addicted (e.g. personal injury or wrongful death). The cases cited by defendants are inapposite.

The State is not attempting to stand in the shoes of the people of Alabama; it is instead standing in its own shoes, trying to protect the people of Alabama from the Defendants' misconduct.

The State also seeks to recover its own costs for its own injuries. Defendants are also essentially asking the Court to undermine (if not vitiate) the well-accepted, inherent authority of States to protect their citizens under the *parens patriae* doctrine. The State has unique, or "quasi-sovereign," interests in protecting the health and welfare of its citizens and markets. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). These interests have without a doubt been harmed by the Opioid Crisis. Under the *parens patriae* doctrine, the "indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population" to have standing to sue. *Id.* The plaintiffs in the cases cited by Defendants were not domestic states, and they therefore lacked an American state's right to protect or mitigate an "injury to an identifiable group of individual residents." *Id.* Thus, the Defendants' cases addressing indirect injuries to third-parties are not applicable.

McKesson makes an additional causation argument: that they were not the cause-in-fact of the State's harms. As McKesson puts it, (1) if doctors acted with full information when they prescribed opioids, then those doctors were the cause-in-fact of a given patient's injury; (2) if doctors acted pursuant to a standard of care that developed as the result of marketing fraud, then the Manufacturers' alleged marketing campaign (or some combination of the marketing and the doctor's decision making) is the cause-in-fact, and (3) if the user "obtained or used the drugs illicitly, then his own wrongful conduct is the but-for cause of any resulting addiction." McKesson's Br. at 6. But this argument fails. An injury may have more than one cause-in-fact. *See, e.g. Thetford*, 605 So. 2d 835 (Ala. 1992). The State has alleged that the McKesson's conduct was the cause-in-fact of the State's injuries, and it has sufficiently pleaded those allegations.

## IV.    THE STATE'S CLAIMS ARE NOT TIME-BARRED.

Endo has also moved to dismiss the State's claims, arguing the claims "are entirely or predominately barred by the applicable statutes of limitations. *See* Endo's Br. at 39. McKesson moves to dismiss only the State's Alabama Deceptive Trade Practices Act Claims. McKesson's Br. 35. The State's claims are not subject to a statute of limitations for a number of reasons.

In Alabama, consistent with the United States, the doctrine of *nullum tempus occurrit reipublicae* immunizes the State from the application of statutes of limitation, unless the State "is expressly or by necessary implication included within the operation of the statute." *Bd. of School Com'rs v. Architects Group*, 752 So. 2d 489, 491 (Ala. 1999). This State's highest Court has held that "it is a cardinal rule that the statute of limitations, unless so expressed, does not run against the state; but it is equally a cardinal rule that [statutes of limitations] do run against the state, if so expressed." *Cox v. Board of Trustees of the University of Alabama*, 49 So. 814, 820 (Ala. 1909). This immunization from statutory limitations, on the State and Federal level, is "based upon the important public policy of preserving public rights and revenues from the negligence of public officers." *United States v. Weintraub*, 613 F.2d 612, 618 (6th Cir. 1979) (citing *Guaranty Trust Co. v. United States*, 304 U.S. 126, 132-33 (1938)). The case at hand falls within the parameters of applicability.

The Legislature did not include a time bar against the state within the State's nuisance statutes, Section 6-5-120, et seq. of the Code of Alabama. Furthermore, it is a firmly rooted common law principle that an action to abate an existing nuisance has no expiration date. The Legislature did not include a statute of limitations governing the State's filing of ACSA claims; thus the *nullum tempus* doctrine mandates that no time limitation applies to this action. The State is not mentioned in the two-year catch-all provision of Section 6-2-38(1) of the Code of Alabama.

The State of Alabama clearly has not voluntarily subjected itself to a statute of limitation for any of its pleaded counts

Defendants argue that "broad and general" language is enough "to bar the State of Alabama from presenting a claim after the time allowed by statute," without expressly implicating the State. *State v. Estate of Crocker*, 83 So. 2d 261, 262 (Ala. Ct. App. 1955). This argument fails because the Court of Appeals was interpreting a statute of non-claims. 83 So. 2d at 264. The argument also ignores subsequent decisions of the Supreme Court of Alabama expressly recognizing the continued validity of the doctrine that "no time runs against the state[.]" *Board of School Com'rs of Mobile County v. Architects Group, Inc.*, 752 So. 2d 489 (1999) .

The Defendants also argue that the State is subject to the Deceptive Trade Practices Act's statute of limitations, which applies a one-year statute of limitations to "persons." Ala. Code § 8-9-14. Defendants argue that the plain language of the statute defines "person" to include the Office of Attorney General. However, here, the Attorney General is not a "person" bringing the actions, but merely an extension of the State of Alabama. Separate definitions within the Act for "Attorney General" and "Persons" supports this dichotomy. Ala. Code § 8-19-3(1), (5). Also, the Legislature has treated the Attorney General differently than private "persons" throughout the DTPA, placing restrictions on private plaintiffs that it does not impose on the Attorney General. Lastly, if there is any question whether the Attorney General is a "person" to whom the limitation applies, the *nullumn tempus* doctrine dictates that the limitation does not apply, because the State is not expressly, or by necessary implication,[2] included within the operation of the DTPA's statute of limitations. *Bd. of School Com'rs*, 752 So. 2d at 491.

---

[2] The Endo Defendants wrongly argued during the hearing on their motion to dismiss that the statute of limitation under the DTPA that the limitations period can be applied to the State either expressly *or implicitly*. The *nullum tempus* doctrine does not hold this. Rather, it holds that a limitations period can be applied to the State either expressly or by *necessary implication. Bd. of School Com'rs*, 752 So. 2d at 491. The term "necessary implication" means "[a]n

Finally, Defendants argue that because claims are derivative of injuries to others, *nullum tempus* does not apply, citing *Miller v. State*, 38 Ala. 600, 604 (1863). In *Miller*, the litigation was "substantially between the township and the defendant," with the State playing a nominal role, resulting in the court finding the State was not entitled to *nullum tempus*. *Miller*, 38 Ala. at 604. Defendants also cite to *Miller* for the proposition that *nullum tempus* does not extend to claims that are derivative of harms to its residents. As discussed above, the State of Alabama has a substantial interest in this action and is the true plaintiff and seeks compensation for its own injuries distinct from those of individual citizens.

Because of the aforementioned reasons, the issue of whether the State's claims are time-barred is not appropriate for consideration in a motion to dismiss.

## V. The Complaint Adequately States a Claim for Public Nuisance.

The Complaint alleges a valid claim under the theory of public nuisance. "The determination of the existence of a nuisance necessarily depends upon the circumstances of each case and is a question of fact for the jury or the judge sitting without a jury." *Morgan County Concrete Co. v. Tanner*, 374 So. 2d 1344, 1347. (Ala. 1979). Alabama law defines nuisance as "[a]nything that works hurt, inconvenience, or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance." Ala. Code § 6-5-120. "A public nuisance does not necessarily involve interference with use and enjoyment of land." Restatement (Second) of Torts § 821B cmt h; *see also State v. Ellis*, 78 So. 71 (Ala. 1918) (injunction to protect

---

implication so strong in its probability that anything to the contrary would be unreasonable. *Implication*, Black's Law Dictionary (11th ed. 2019). Thus, for the State to be included under a statute of limitations by "necessary implication," the failure to apply the statute of limitations to the State must be so unreasonable that it frustrates the purpose of the statute. But the DTPA is a straightforward enforcement act that presents no reason on its face why its limitations period should apply to the State, particularly where the DTPA treats State actions differently from private actions in multiple ways. Moreover, this case presents a perfect illustration of why the Legislature would decline to extend the DTPA's statute of limitations to the State. At best, the Defendants can only argue – as they have done – that the State is implicitly included in the DTPA's statute of limitations. But that is simply not the standard.

the moral health of the community). "The conducting of a business, trade, industry or occupation or the doing of a thing, not inherently insanitary or a menace to public health, in such a manner as to make it a menace, or likely to become a menace, to public health," is a nuisance per se. Ala. Code § 22-10-1.

The Complaint charges the Defendants with causing injury to the public health and public safety through the sale and distribution of dangerous and addictive Opioid products. Alabama has the highest number of prescriptions per person in the nation, and the number of Alabamians on long-term opioid therapy well exceeds the national average. Comp. ¶16. This has caused public injuries such as statewide "addiction and abuse," "an elevated level of crime," and "loss of tax revenues for the State[.]" Compl. ¶380. The court finds that, at the pleading stage, this is sufficient to establish the existence of a nuisance.

The State also pleads sufficient facts to establish that the Opioid Crisis "damages all persons who come within the sphere of its operation." Ala. Code § 6-5-121. The sheer number of persons affected by the opioid crisis in Alabama is itself sufficient to constitute a public nuisance. *See West Morgan-East Lawrence Water and Sewer Authority v. 3M Company*, 208 F.Supp.3d 1227, 1234 (N.D.Ala.2016).

Defendants' argue that they cannot be liable for abating the public nuisance because other parties controlled the opioid distribution at some point. Endo's Br. at 33; McKesson Br. at 25. Both cite the same Alabama case, *Tipler v. McKenzie Tank Lines*, 547 So. 2d 438 (Ala. 1989), to support their argument. The Court finds *Tipler* inapposite.

James Tipler was injured by a truck that was driving to pick up liquid sulfur from an Exxon facility. Tipler added Exxon as a Defendant under the theory that the trucks driving to and from its facility created a public nuisance. Importantly, the Alabama Supreme Court applied Alabama's

proximate cause standard to determine whether Exxon had "control" over a public nuisance:

> we must look to the particular facts of each case to determine whether the party charged with creating and maintaining a nuisance has engaged in a course of conduct, or has permitted to exist a set of circumstances, that, in its natural and foreseeable consequences, proximately caused the hurt, inconvenience, or damage complained about.

547 So. 2d at 440-41. The Court said Exxon did not exert sufficient control because:

> [i]t is undisputed that Exxon had no agency relationship with either of the other defendants; that Exxon had no right of control, and exercised no control, over the hauling activities from its facility; and that Exxon did not engage in any activity relating to the construction or maintenance of the public roads here involved or relating to traffic control upon those roads.

*Id.* at 440. In other words, Exxon had nothing to do with the accident.

Unlike Exxon, the State pleaded that Endo exercised control over their production and marketing of opioids, and that the opioid epidemic was a foreseeable result of their deceptive marketing campaign. Unlike Exxon, McKesson was in control of the distribution of nearly 800 million opioids throughout Alabama; 16 million of which it delivered to one street. The opioid epidemic was certainly a foreseeable result of these controlled acts.

In short, "control" equals "proximate cause" under Alabama law. *See id.* at 440-41. Because the State adequately pleaded that each Defendant was a proximate cause of the opioid epidemic, the State adequately pleaded that each Defendant had control of the public nuisance.

McKesson also argue that the State's public nuisance claim (and other common law claims) are barred by the Municipal Cost Recovery Rule set out in *Flagstaff v. Atchison, Topeka, and Santa Fe Ry. Co.*, 719 F.2d 322 (9th Cir. 1983). McKesson's Br. at 12. But this claims fails for multiple reasons. First, as the name implies, the Municipal Cost Recovery Rule generally applies to local, not state, governments. McKesson acknowledges this but points out that one state appellate court (Wyoming) and one state trial court (Delaware) have applied the rule to their states. Second,

Alabama has not adopted the Municipal Cost Recovery Rule, and this Court does not see any reason to adopt it now. Plus, even if Alabama did follow the Municipal Cost Recovery Rule, the State's case falls within the many exceptions to the Rule, to wit: (1) the action is authorized by statute, *Flagstaff v. Atchison, Topeka, and Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983); (2) the acts of private parties create a public nuisance which the government seeks to abate, *id.*; (3) the conduct is ongoing and persistent, s*ee, e.g., State ex rel. Jennings v. Purdue Pharma L.P.*, No. CVN18C01223MMJCCLD, 2019 WL 446382, at *6 (Del. Super. Ct. Feb. 4, 2019); and (4) the conduct of the defendants is "intentional" or "deceptive." *In re Opioid Litigation*, No. 4000002017, 2018 WL 4827862, at *5 (N.Y. Sup. Ct. July 17, 2018).

## VI.    The Complaint Adequately Pleads Claims Under the Law of Wantonness.

The State pleaded a common-law claim of wantonness, which in Alabama, is distinct from negligence. "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains." *Lemley v. Wilson*, 178 So. 3d 834, 841-42 (Ala. 2015). The State has sufficiently pleaded wantonness claims against all Defendants.

The State pleaded sufficient facts to establish that the Manufacturers "consciously and intentionally" committed acts with "reckless indifference to the consequences." *Id.* For example, the State has alleged that Endo knew about the addictive character of their opioids. They knew opioids were a dangerous health risk for people taking high doses. They knew that their products would not be suitable for long term, chronic non-cancer pain. And they knew extended-release opioids were susceptible to abuse and addiction. Despite knowing those opioid traits, Endo made public statements to the contrary, including hiring KOLs and front groups to misrepresent the facts

- 14 -

about opioids. Scientific studies, detailed prescription data, and reports of adverse effects and warnings from the FDA establish that the Manufacturers knew what they were saying was wrong—and they knew what the consequences of their actions could be. They simply did not care. That is the very definition of wantonness. *See Lemley*, 178 So. 3d at 841-42 ("To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty").

As to McKesson, the State pleaded that the DEA sent two letters in 2006 and 2007 warning Purdue, Endo, *and* McKesson to exercise diligence and avoid filling suspicious orders that might be diverted into illegitimate medical, scientific, and industrial channels. Yet, McKesson sold prescription opioids to retailers in the State of Alabama knowing they would likely be diverted. McKesson knew that its orders were excessive for the medical needs of the communities in Alabama and were facially suspicious, but it failed to take meaningful action to stop the diversion that was obviously, to McKesson, occurring in Alabama. McKesson knew that it was failing in its duty to report suspicious orders, and it knew what the consequences of those actions would be and made the decision to continue distributing in such a manner anyway. If the State's allegations are true, that makes McKesson's actions wanton. *See Lemley*, 178 So. 3d at 841-42

## VII. The Complaint Adequately Pleads Claims Under the Law of Negligence.

Under Alabama law, an actionable negligence claim requires a plaintiff to show that the Defendants owed a duty, a breach of that duty, causation, and damages. *Glass v. Birmingham Southern Ry. Co.*, 905 So. 2d 789, 794 (Ala. 2004). The Defendants argue that the State failed to plead sufficient facts to establish the first three elements. The Court has addressed causation above. The court now turns to the duty elements.

Endo and McKesson assert they owe no duty to avoid damaging the State of Alabama and its citizens. The reasoning of Judge Polster in the Multi-District Litigation in Ohio is instructive as to why they owe a duty: "Defendants' assert that 'the [Report and Recommendation of the Magistrate Judge] identified no Ohio case recognizing a common-law *duty to report or halt suspicious orders of controlled substances*,' and 'even if there were a common-law duty to *report or halt suspicious orders,* no authority suggests that such a duty runs to the cities or counties' …. The duty that Plaintiffs allege is not so narrow. Plaintiffs allege that Defendants, like all reasonably prudent persons, have a duty "to not expose Plaintiffs to an unreasonable risk of harm." *County of Summit Ohio, et al. v. Purdue Pharma L.P.,* Opinion and Order, Case No. 18-op-4509 (N.D. Ohio, Dec. 19, 2018).

In their respective briefs, the Defendants attempt to narrow the duties the State's Complaint alleges they owe to the State. McKesson states the "sole source of this purported duty is a federal regulation." McKesson's Br. at 19. The Manufacturer Defendants limits the State's allegations of duty to only "three breaches of a duty." Endo's Br. at 36. What the Defendants fail to acknowledge, however, is that under Alabama law, duty is a much broader concept. In Alabama, "every person owes every other person a duty imposed by law to be careful" not to harm one another. *Southeastern Greyhound Lines v. Callahan,* 13 So. 2d 660, 663 (Ala. 1943). *Compare County of Summit Ohio,* Opinion and Order, Case No. 18-op-4509.

The "key factor" for determining whether this common-law duty of care exists is the "foreseeability" of the harm that might result if care is not exercised. *Taylor v. Smith,* 892 So. 2d 887, 892 (Ala. 2004) (emphasis original) (quoting *Key v. Compass Bank, Inc.,* 826 So. 2d 159, 170 (Ala. Civ. App. 2001)). "In determining foreseeability, it is not necessary to anticipate the *specific* event that occurred, but only that some general harm or consequence would follow." *Smith v.*

*AmSouth Bank, Inc.*, 892 So. 2d 905, 910 (Ala. 2004) (emphasis in original). At the pleading stage, the State need only allege facts that, if taken as true, establish that Defendants could foresee that their lack of care would harm the State and/or its citizens. The Court finds that Alabama's opioid epidemic was a reasonably foreseeable result of Defendants' conduct as pled.

Finally, the Court rejects Defendants' argument that the State is improperly seeking to assert a private right of action under the federal Controlled Substance Act. In Alabama, statutes can and do create a duty of care, *see King v. National Spa and Pool Institute, Inc.*, 570 So. 2d 612, 614 (Ala. 1990) ("a legal duty to exercise care, therefore, arises… where the obligations are expressly or impliedly imposed by statute, municipal ordinance, or by administrative rules or regulations, or by judicial decisions"), and proof that a person violated that statute is proof of a breach of duty/negligence. *See Parker Bldg. Service Co., Inc. v. Lightsey ex rel. Lightsey*, 925 So. 2d 927, 930 (Ala. 2005).

The State is plainly not seeking to enforce the CSA. It simply asserts that the federal CSA (and the state CSA, which Alabama can enforce) provide the standard of care of care for common law negligence, a very different proposition.

## VIII. The Complaint States a Claim for Unjust Enrichment.

In order to plead an unjust enrichment claim, the plaintiff must show that "the defendant holds money which, in *equity and good conscience*, belongs to the plaintiff or holds money which was improperly paid to defendant because of *mistake or fraud*." *Mantiply v. Mantiply,* 951 So. 2d 638, 654 (Ala. 2006)(emphasis in original). It is an equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Id.* "One is unjustly enriched if his retention of a benefit would be unjust." *Id.* The retention of a benefit is unjust if "(1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a

right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship." *Id.* at 654-55. The State alleges that the cost of Defendants' wrongful acts includes increased health care services and treatments, which the State has paid for with public funds. Compl. ¶ 434. The State further alleges that Defendants' businesses created these costs, but Defendants are not paying for them. "[S]ociety's reasonable expectations of person and property would be defeated by nonpayment" of these monies back to the Government. *United States v. Halifax Hosp. Med. Ctr.*, 2013 WL 6017329, at *7 (M.D. Fla. Nov. 13, 2013) (citations omitted).

The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case. *Mantiply*, 951 So. 2d at 654. The Court finds that the State's Unjust Enrichment claim is adequately pleaded at this stage of the litigation.[3]

## IX. The Complaint Adequately Pleads a Claim for Deceptive Trade Practices.

The State alleged that Defendants violated (at least) the following provisions:

- Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services. Ala. Code § 8-19-5(2);

- Representing that goods have characteristics, uses, benefits, or qualities that they do not have. Ala. Code § 8-19-5(5);

- Representing that goods or services are of a particular standard, quality, or grade, if they are of another. Ala. Code § 8-19-5(7);

- Advertising goods or services with the intent not to sell them as advertised. Ala. Code § 8-19-5(9); and

- Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce. Ala. Code § 8-19-5(27).

---

[3] McKesson also argues that unjust enrichment is unavailable because the State has pleaded other claims that provide a legal remedy. McKesson's Br. at 30-31. At this stage of the litigation, that argument is unavailing. "A party may state as many separate claims or defenses it has, regardless of consistency." Ala. R. Civ. P. 8(e)(2).

Compl. ¶ 389.

The State alleges that Endo, *inter alia*:

- Trained its sales representatives to tell Alabama prescribers that "Endo's opioids had a lower potential for abuse because they were 'designed to be crush resistant,' even though the 'clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER;' and that drug seeking behavior was a sign of undertreated pain rather than addiction[.]" Compl. ¶ 163;

- Operated a website, www.opana.com, that deceptively stated that "most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted." Compl. ¶ 169;

- Endo operated another website, www.painaction.com, that similarly stated that "most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Compl. ¶ 172; and

- Wrongly promoted Opana ER as "crush-resistant," (and thus abuse resistant), even though "the FDA advised Endo that it could not market the new Opana ER as abuse-deterrent." Compl. ¶ 177.

A jury could find that these facts, if proven, establish that Endo violated subsections (2), (5), (7), and (9) of Section 8-19-5, which deal with various forms of false advertising.

As for McKesson, the State alleges that it has, *inter alia*, claimed that it had "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country," Compl. ¶ 298, even though it failed to report 'suspicious orders' originating from the State. A jury could find that these facts establish that McKesson violated Section 8-19-5(7)'s prohibition against "representing that goods or services are of a particular standard, quality, or grade, if they are of another," or Section 8-19-5(27)'s prohibition against "engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

In the end, the State pleaded "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged" for each. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Defendants further argue that argue that the pleaded deceptive statements are nothing more than "broad promotional statements" that are not actionable because the State did not allege "that such statements were likely to be relied upon by or posed any harm to members of the public." The Court does not find this argument persuasive.

First "broad promotional statements" can be deceptive, and thus actionable, under the DTPA. Whether the State can prove this divide is a question for a factfinder, and dismissal is not appropriate here.

Second, unlike federal law, there is no requirement under the DTPA that the State prove that Defendants "mislead customers." To add such a requirement to the DTPA, when the Legislature did not, would violate the omitted case canon of construction. *See Pace v. Armstrong World Indus. Inc.,* 578 So. 2d 281, 284-85 (Ala. 1991); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012).

The Defendants also contend that the State's claims fail because their claims do not meet Rule 9(b)'s heightened pleading requirement for fraud claims. *See, e.g.,* Endo's Br. at 31. This argument fails for two reasons. First, Rule 9(b) does not apply because a DTPA claim is not a fraud claim. Although there is no case on point in Alabama, Rule 9(b) should not apply because, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *See State, Office of Atty. Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.,* 869 So. 2d 592, 598 (Fla. Dist. Ct. App. 2004). Because the DTPA does not require proof of the same essential elements as fraud, such as reliance, it makes sense not to impose Rule 9(b)'s heightened pleading standard for fraud claims on claims brought under the DTPA. *See*

*Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Second, as noted above, the Court believes the State has met 9(b)'s heightened pleading requirement.

Finally, the defendants contend the State's DTPA claim should be dismissed because the State has not pled compliance with the DTPA's pre-suit notice requirement. This argument fails. There is nothing in the DTPA or the Rules of Civil Procedure that requires the State to plead compliance with the statute to satisfy Rule 8(a)(2). Moreover, the DTPA expressly provides that the Attorney General is not required to meet with a Defendant prior to filing an action under the DTPA if the Attorney General determines that the Defendant "designs . . . to continue practices unlawful under this chapter." *Id.* The State has invoked this exception by requesting an injunction preventing the Defendants from continuing their "unfair and deceptive acts and practices[.]" Compl. ¶ 444. Thus, this part of the Defendants' argument fails.

## X. The State has Adequately Pleaded a State Controlled Substance Act Claim

Alabama alleges that each of the Defendants violated Alabama's Controlled Substances Act ("ACSA") by failing to report suspicious orders as they are statutorily required to do. Compl. ¶¶ 401-16. None of Defendants' arguments to the contrary warrants Rule 12(b) dismissal.

The ACSA requires McKesson and Endo to keep records in conformance with "federal law and with any additional rules issued by the State Board of Medical Examiners, the State Board of Health, or the State Board of Pharmacy." Ala. Code § 20-2-56. Rule 680-X-3-.05(2) of the State Pharmacy Board rules requires as follows:

> Such manufacturers, wholesalers, or distributors doing business in the State of Alabama who sell, furnish, give away, or otherwise dispose of controlled substances drugs enumerated in Schedule I, II, III, IV, or V or precursor agents used to manufacturer such controlled substances to a registrant other than another manufacturer or wholesaler, shall submit to the Alabama State Board of Pharmacy legible copies of records and reports required by the Drug Enforcement Administration concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days.

By its plain text, this rule imposes a duty on McKesson and Endo to submit to the Pharmacy Board a copy of every suspicious order "report required by the [DEA]." The State alleges McKesson and Endo violated this rule when it should have, but did not, submit suspicious order reports to the DEA and state Pharmacy Board.

McKesson's argument that the rule "merely requires McKesson to forward to BOP *legible copies* of the records and reports that it submits to the DEA and that it does not create an independent obligation under Alabama law to generate reports concerning 'suspicious orders' of opioids." McKesson's Br. at 13. But McKesson's emphasis on "legible copies" is misplaced. The Rule's truly operative term is "required by." As the plain text shows, any time DEA/ federal rules require McKesson or Endo to submit a suspicious order report, they must also submit a report to the state Pharmacy Board.  It does not matter whether McKesson *actually* submitted a report to the DEA; all that matters is that McKesson was "*required by*" federal rules to submit a report.

The State alleged that Endo and McKesson had specific knowledge about suspicious orders, and they had detailed information to monitor those orders, Compl. ¶¶ 310, 320, 321, and did not report any suspicious orders to the state Pharmacy Board. Compl. ¶¶ 77, 274, 277.  Taken as true, these facts (individually or collectively) would establish a violation of the ACSA.

Finally, Endo argues that its only duty is "to monitor pharmacy orders *only* on the distributors who sell to pharmacies." Endo's Br. at 28 (emphasis in original). Such a limitation is not contained in the rule's plain text, and Endo's argument fails. The State has sufficiently pleaded a claim.

XI.  **FDA Preemption Doctrines Are Not Available to the Manufacturer Defendants, Including the Makers of Generic Opioids.**

Endo argues the State's claims against them are entirely preempted by federal law because the FDA regulates of the contents of drug labels, i.e., the information that "accompanies" an FDA regulated pharmaceutical. Endo's Br. at 3-9. This argument has been routinely rejected by other courts that have heard this argument in opioid litigation. *See, e.g. In re Opioid Litig.*, Index No. 40000/2017, slip op. at 5-11 (Sup. Ct .Suffolk County, NY, June 18, 2018); *State of Washington v. Purdue Pharma. L.P*, No. 17-2-25505-8, slip op. at 2 (Sup. Ct. King County, WA, May 14, 2018).

As the United States Supreme Court has made clear, FDA approval of a drug or a drug's label is not a complete defense to traditional state tort law claims. *Wyeth v. Levine*, 555 U.S. 555 (2009). In fact, state tort law is intended to supplement the FDA's regulation of the industry. *Id.* Congress "determined that widely available state rights of action provided appropriate relief for injured consumers," *id.* at 574, because "the FDA traditionally regarded state law as a complimentary form of drug regulation." *Id.* at 578. Indeed, the "FDA long maintained that the state law offers an additional, and important, layer of consumer protection" because "[s]tate tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly." Id. at 579.

Furthermore, States "have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 47, 475 (1996) (citation omitted). This is particularly true where a State protects its consumers from deceptive business practices, *see California v. ARC Am. Corp.*, 490 U.S. 93 (1989), including drug promotion. *See Wyeth*, 555 U.S. 555.

Endo next claims that the State's claims are preempted because "it is impossible to comply

with both state and federal law." Endo's Br. at 5, 13. Endo claims the FDA has approved the statements it has made in promoting its drugs. Endo oversimplifies what the State alleges in arguing that it was simply repeating what the FDA required them to say and omitting what the FDA did not require them to say. Endo is not accused of simply repeating the contents of its drug label to prescribers. Rather, the State alleges that, *inter alia*, Endo contradicted or downplayed the contents of its drug labels through aggressive detailing by sales representatives to deliver untruthful messaging portraying opioids as low risk and beneficent. Compl. ¶ 170. Passing along information (or misinformation) that contradicts FDA labeling is certainly not entitled to a preemption defense.

Endo is also accused of using independent third parties to deliver similar messaging, often delivered at continuing medical education programs. Compl.¶ 213. Essentially, Endo is accused of training doctors with non-FDA approved information. The FDA generally does not review "unbranded" promotional materials. *See, City of Chicago v. Purdue Pharma, L.P.*, 2015 WL 2208423,*2 (N.D. Ill 2015 This marketing was also used to promote opioids generally, including Endo's generics. Compl. 224-227. As such, the State's claims against Endo regarding Endo's generic pharmaceuticals are not preempted. *See, e.g., In re: Prescription Opiate Litigation*, Case No. 1:17-md-02804, Report and Recommendation on Motions to Dismiss Complaint of Muscogee (Creek) Nation, Doc. 1499 at 42 (April 1, 2019); *see also, e.g., Arters v. Sandoz, Inc.*, 921 F.Supp.2d 813, 819-20 (S.D. Ohio 2013) (state law fraud claims based on defendants' allegedly fraudulent or unreasonably dangerous promotion of generic drug were not preempted). Thus, Endo cannot use the FDA as a shield against non-branded false promotions.

Endo also argues that its messaging was consistent with its labelling. That is contradicted by the allegations in the State's complaint.

Finally, the determination of whether the FDA would approve a change to an opioid warning label (assuming that determination is even necessary, as this is not a failure to warn case) is not a determination that can be made at this stage of the litigation. Determinations such as whether a statement is conceivably FDA approved requires the gathering and presentation of evidence and the hearing of testimony from experts in order to guide that determination. *Merck Sharp & Dohme Corp., v. Albrecht*, 587 US ___, 139 S. Ct. 1668 (2019). For this reason, too, the Defendants' arguments fail.

For the foregoing reasons, Defendants' Motions to Dismiss are **DENIED**.

SO ORDERED, this __13__ day of __Nov.__ 2019.

Hon. J.R. Gaines
Circuit Judge